1  PETER S. DICKINSON (SBN 139495)
   pdickinson@BushGottlieb.com
2  BUSH GOTTLIEB SINGER LÓPEZ
   KOHANSKI ADELSTEIN & DICKINSON
3  A Law Corporation
   500 North Central Avenue, Suite 800
4  Glendale, California  91203-3345
   Telephone:  (818) 973-3200
5  Facsimile:  (818) 973-3201

6  Attorneys for Creditors Trustees of the Screen
   Actors Guild-Producers Pension and Health
7  Plans

8

9                  UNITED STATES BANKRUPTCY COURT

10              STATE OF NEW YORK, SOUTHERN DISTRICT

11

12  In re                              | CASE NO. 09-50026 (REG)

13  MOTORS LIQUIDATION COMPANY, *et*   | **Chapter 11**
    *al.*,  f/k/a General Motors Corp., *et al.*,

14                                     | **DECLARATION OF PETER S.
                                       | DICKINSON IN SUPPORT OF THE**
15             Debtor.                 | **RESPONSE OF THE TRUSTEES OF
                                       | THE SCREEN ACTORS GUILD-**
16                                     | **PRODUCERS PENSION AND
                                       | HEALTH PLANS TO DEBTORS'**
17                                     | **EIGHTY-FIFTH OMNIBUS
                                       | OBJECTION TO CLAIMS (CLAIM**
18                                     | **#1039)**

19                                     | **Judge:** Hon. Robert E. Gerber
                                       | **Date:**  October 26, 2010
20                                     | **Time:**  9:45 a.m.
                                       | **Ctrm.:** 621
21                                     |           **One Bowling Green
                                       |           New York. New York 10004**
22

23      I, Peter S. Dickinson declare:

24      1.     I am an attorney at law licensed to practice in all courts of the States of

25  California and Nevada, and the federal courts of the United States.  I am a partner in the

26  law firm of Bush, Gottlieb, Singer, Lopez, Kohanski, Adelstein & Dickinson, which is

27  counsel to the TRUSTEES OF THE SCREEN ACTORS GUILD-PRODUCERS

28  PENSION PLAN; and TRUSTEES OF THE SCREEN ACTORS GUILD-PRODUCERS

231578.1  11630-19027

HEALTH PLAN ("Plans") in this matter.  I have personal knowledge of the facts set forth herein, and if called as a witness, I could and would competently testify to the matters stated herein.

2.    Attached hereto as Exhibit A are true and correct copies of communications between the auditors of the Plans and General Motors Corporation or its advertising agency Campbell Ewald concerning the audit of the records of General Motors Corporation relative to the hiring of various performers and the production of commercials.  These documents indicate that the audit commenced on June 22, 2006 with respect to General Motors Corporation and on March 7, 2008 with respect to its advertising agency Campbell-Ewald.

3.    Attached hereto as Exhibit B are true and correct copies of relevant pages from the 2003 Commercials Contract between the Screen Actors Guild (SAG), a California non-profit corporation (the Union) and the ANA-AAAA Joint Policy Committee on Broadcast Talent Union Relations acting on behalf of advertisers and advertising agencies.  Also attached, is the schedule of contributions.

4.    Attached hereto as Exhibit C is a true and correct copy of the Trust Agreement of the Screen Actors Guild-Producers Pension Plan for Motion Picture Actors entered into as of February 1, 1960, as amended.

5.    Attached hereto as Exhibit D is a true and correct copy of the Trust Agreement of the Screen Actors Guild-Producers Health Plan for Motion Picture Actors entered into as of February 1, 1960, as amended.

6.    Pursuant to the Trust Agreements creating the Plans, and the SAG Commercials Contract, the Debtors are obligated to report and pay contributions measured by a percentage of the total compensation paid to the performer from whatever source.  The audit revealed pension and health contribution delinquencies in the amount of $175,542.20, plus liquidated damages of 20% of the delinquency in the amount of $35,108.44.  Additionally, the Plans are entitled to interest, legal and audit fees in amounts to be determined.  A summary of the delinquency which was

1   prepared at my direction is attached hereto as Exhibit E. This is a pre-petition

2   unsecured claim.

3         7.    Attached hereto as Exhibit F is a true and correct copy of the Proof of

4   Claim for Unliquidated Claims filed by the SAG-Producer Pension and Health Plans

5   on August 13, 2009.

6         8.    Attached hereto as Exhibit G is a true and correct copy of the Debtors'

7   demand for a liquidated amount with respect to Proof of Claim 1039 received by the

8   Plans on or about February 16, 2010.

9         9.    Attached hereto as Exhibit H is a true and correct copy of the Plans

10  submission of a liquidated amount, with supporting spreadsheet, mailed to the

11  Debtors by overnight mail on March 4, 2010.

12

13

14

15  DATED: October 18, 2010          By: _____

16                                        PETER S. DICKINSON

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit A

/54 9400      SAG-PP&HP Cont. Co

# SCREEN ACTORS GUILD-PRODUCERS PENSION & HEALTH PLANS

Certified Receipt Request
7002 2030 0006 9282 7451

June 22, 2006                                    File No.:27037

Mr. Paul Haggerty
Manager
General Motors Corporation
100 Renaissance Center
Mail Code – MC
482-A30-C36
Detroit, MI 48265

Re:  Audit Inspection of Signatory Records for **GENERAL MOTORS CORPORATION**

Dear Mr. Haggerty:

In accordance with Amendment No. One, of the Screen Actors Guild-Producers Restated Health Plan, and Amendment No. Nine, of the Screen Actors Guild-Producers Pension Plan, please be advised, that the Trustees have requested an audit inspection of the above captioned signatory company's records.

The Trustees have engaged the firm Nigro, Karlin & Segal, CPA, to audit records of contributions to the Pension and Health Plans. This letter will service as authorization for our auditors to proceed on behalf of the Plans.

At such time as representatives of the auditing firm commence the audit of your contributions to the Pension and Health Plans, it is requested that you cooperate in order to achieve an expeditious and correct determination concerning the status of your contributions to the Plans.

A representative from Nigro, Karlin & Segal will be contacting you in the near future for the purpose of establishing an appointment date.

Sincerely,

Screen Actors Guild
Producers Pension & Health Plans

Nora W. Sham
Director
Contribution Compliance

NWS:jm

cc:    Brian Meath, Nigro, Karlin & Segal

3801 WEST OLIVE AVENUE, BURBANK, CA 91505
MAILING ADDRESS: P.O. BOX 7830, BURBANK, CA 91510-7830
(818) 954-9400 • FAX (818) 953-9880 • (800) 777-4013 (EXCLUDES LOS ANGELES AREA)

# SCREEN ACTORS GUILD-PRODUCERS PENSION & HEALTH PLANS

Certified Receipt Request
7005 0390 0000 0121 2925

March 7, 2008                                                    File No.: 31269

Ms. Mitzi Palms-Burt
Lintas Campbell-Ewald
30400 Van Dyke Ave.
Warren, MI 48093-2316

Re:  Audit Inspection of Signatory Records for Lintas Campbell-Ewald

Dear Ms. Palms-Burt:

In accordance with Amendment No. One, of the Screen Actors Guild-Producers Restated Health Plan, and Amendment No. Nine, of the Screen Actors Guild-Producers Pension Plan, please be advised, that the Trustees have requested an audit inspection of the above captioned signatory company's records.

The Trustees have engaged the firm Nigro Karlin Segal & Feldstein to audit records of contributions to the Pension and Health Plans.  This letter will service as authorization for our auditors to proceed on behalf of the Plans.

At such time as representatives of the auditing firm commence the audit of your contributions to the Pension and Health Plans, it is requested that you cooperate in order to achieve an expeditious and correct determination concerning the status of your contributions to the Plans.

A representative from Nigro Karlin Segal & Feldstein will be contacting you in the near future for the purpose of establishing an appointment date.

Sincerely,

Screen Actors Guild
Producers Pension & Health Plans

Nora W. Sham
Director
Contribution Compliance

NWS:st

cc:    Brian Meath, Nigro Karlin Segal & Feldstein

3801 WEST OLIVE AVENUE, BURBANK, CA 91505
MAILING ADDRESS: P.O. BOX 7830, BURBANK, CA 91510-7830
(818) 954-9400 • FAX (818) 953-9880 • (800) 777-4013 (EXCLUDES LOS ANGELES AREA)

 **Nigro Karlin Segal & Feldstein, LLP**
Certified Public Accountants

10100 Santa Monica Blvd • Suite 1300
Los Angeles, CA 90067-4104
(310) 277-4657
Fax: (310) 277-9232

156 West 56th Street • Suite 1702
New York, NY 10019
(212) 765-3200
Fax: (212) 765-3299

July 1, 2008

Ms. Mitzi Palms-Burt
Campbell-Ewald
30400 Van Dyke Ave.
Warren, MI 48093-2316

Re:    Screen Actors Guild – Producers Pension and Health Plans Payroll Compliance
Review of Campbell-Ewald for the period January 1, 2005 through
December 31, 2007

Dear Ms. Palms-Burt:

Thank you for providing the information to date. The following are our open items:

1.    For each of the clients listed below, please provide a list of all commercials that ran and/or
were produced during our review period. From this list of commercials for selected clients,
we will make a selection of specific commercials to test. If possible, please indicate the year
each commercial was produced and/or aired.

| Client | Client ID |
| --- | --- |
| American Heart Association | AHS |
| Campbell-Ewald | CAM |
| General Motors | GM |
| Ghirardelli | GHIR |
| Michelin | MICH |
| Playtex | PLA |
| Ppg Olympic | OY |
| United States Postal Service | USPS |

Exhibit A to PSD Declaration in Support of Response to Debtor's Objection, page 6

Ms. Mitzi Palms-Burt
Campbell-Ewald
July 1, 2008
Page Two

2.  Please provide all contracts, extensions, amendments, tracking reports, and documentation of payment for the following guarantee performers:

| Client | Guarantee |
|---|---|
| Alltel | Angelou, Maya |
| | Brokaw, Chad |
| | Corso, Lee |
| | Simmons, Matthew |
| Chevrolet | Ali, Muhammed |
| | Barnhardt Jr., Dale |
| | Gordon, Jeff |
| | Grandberry, Omarion |
| | Harvick, Kevin |
| | Hill, Tamia |
| | IPM/The King Estate |
| | Kodjoe, Boris |
| | Labunski, Estate of Edward |
| | Mellencamp, John |
| | Ripken, Calvin |
| | Stewart, Anthony |
| Farmers Insurance | CMG Worldwide |
| | Sherr, Lloyd |
| Kaiser Permanete | Janney, Allison |
| Navy | David, Keith |
| National City Bank | Sandberg, Ryne |

3.  According to our records, the following performers appear to have guarantees with Campbell-Ewald. Please advise why the following guarantee performers were not on the list of performers provided to us as well as provide all contracts, extensions, amendments, and invoices:

| Client | Performer |
|---|---|
| Chevrolet | Burton, Jeffrey |
| Chevrolet | Wilderson, Wayne |

Ms. Mitzi Palms-Burt
Campbell-Ewald
July 1, 2008
Page Three

4.    Based on the records noted in the Plans' system, scale reportings were noted for the following
      celebrities.  Please provide all contracts, amendments, and extensions as well as any invoice
      details for each performer:

| Client | Performer |
|--------|-----------|
| Alltel | Bowyer, Clint |
| Alltel | Newman, Ryan |
| Chevrolet | Lange, Eilleen a.k.a. Shania Twain |
| Chevrolet | Zito, Chuck |

5.    Johnson, Jimmie/Chevrolet – Please provide invoice and tracking reports for the agreement
      between Chevrolet, General Motors Corporation, and Jimmie Johnson dated January 1, 2004.

Please provide this information by July 15, 2008.  If you have any questions, please call me at (310)
229-5178. Thank you for providing this information to us.

Sincerely,

Brian Meath

BM/bdp

cc:    Nora Sham
       Mickey Segal
       Christie Yiasemis



Direct Dial: 212.468.4829
Personal Fax: 212.974.7036
Email: hweingrad@dglaw.com

November 20, 2008

Mr. Brian Meath
Nigro Karlin Segal & Feldstein, LLP
10100 Santa Monica Blvd.
Suite 1300
Los Angeles, California 90067

     Re:  General Motors Contracts

Dear Brian:

As you know, our firm represents General Motors Corporation ("GM").  In connection with your firm's audit of GM, on behalf of the Screen Actors Guild Producers Pension and Health Plans (the "Plans"), I am enclosing for your review the following endorsement agreements (the "GM Agreements") as between GM and certain individual talent and/or their loan-out companies:

Jerome Bettis
Phil Simms
Mike Krzyzewski
Milka Duno
Howie Long
Olivier Beretta
Clint Bowyer
Jeff Burton
Ron Fellows
Oliver Gavin
Ron Hornaday, Jr.
Kevin Harvick
Jan Magnussen
Casey Mears
Johnny O'Connell
Max Papis
Jack Sprague
JJ Yeley

I trust you are aware of the recent arbitration decision nullifying the Plans' internal pension and health allocation guidelines, and also determining that the Plans do not have the authority to unilaterally determine pension and health allocations.  Accordingly, I am expressly reserving all of GM's rights, remedies and defenses, including, without limitation, GM's right to object to any claim for an improper allocation raised by the Plans, on the grounds that the Plans lack the jurisdiction and authority to determine such allocations.

Very truly yours,

Howard Weingrad

HW/wls
Enclosures

CC: .Catherine Karol

Mr. Brian Meath
Page 2

November 20, 2008

 **Nigro Karlin Segal & Feldstein, LLP**
Certified Public Accountants

10100 Santa Monica Blvd • Suite 1300
Los Angeles, CA 90067-4104
(310) 277-4657
Fax: (310) 277-9232

November 26, 2008

156 West 56th Street • Suite 1702
New York, NY 10019
(212) 765-3200
Fax: (212) 765-3299

Ms. Mitzi Palms-Burt
Campbell-Ewald
30400 Van Dyke Avenue
Warren, MI 48093-2316

Re:    Screen Actors Guild – Producers Pension and Health Plans (Plans) Payroll
Compliance Review of Campbell-Ewald for the period January 1, 2005 through
December 31, 2007

Dear Ms. Palms-Burt:

Thank you for providing the information to date. The following are our open items:

1.    <u>Muhammad Ali / General Motors Corporation</u> – Please indicate if the Option Term was
exercised in Mr. Ali's September 26, 2006 agreement.

2.    <u>Clint Bowyer / AC Delco</u> – Enclosed is a contribution report indicating contributions made
on behalf of this performer by Campbell-Ewald. Please provide all contracts, amendments,
extensions, as well as tracking reports for Mr. Bowyer.

3.    <u>Chad Brokaw / Alltel Communications, LLC</u> – Per paragraph 5 in Attachment A of
Mr. Brokaw's November 21, 2007 agreement, please advise if compensation for repurposing
existing footage in the amount of $20,000.00 and $12,500.00 was paid. We also noted
additional guarantee reportings of $57,000.00 and $72,000.00 made on behalf of this
performer in 2006 and 2007 (respectively) that were not covered by the November 21, 2007
Agreement. Please provide all contracts, amendments, extensions, as well as tracking reports
for Mr. Brokaw, as it relates to all the above amounts (see enclosure).

4.    <u>CMG Worldwide f/s/o Errol Flynn / Farmers Insurance</u> – Please indicate the guarantee
amount paid to this performer and provide supporting documentation.

5.    <u>Kevin Harvick / General Motors Corporation</u> – We noted a $50,000.00 reporting made on
behalf of Mr. Harvick in 2005. Please provide all contracts, amendments, extensions, as well
as tracking reports for Mr. Harvick from 2005 through 2006 (see enclosure).

6.    <u>Jimmie Johnson / General Motors Corporation</u> – Per Mr. Johnson's agreement, please
indicate the value of the vehicle(s) loaned, if any.

Exhibit A to PSD Declaration in Support of Response to Debtor's Objection, page 11

Ms. Mitzi Palms-Burt
Campbell-Ewald
November 26, 2008
Page Two

7.  Jeff Gordon / General Motors Corporation – Paragraph 1C in Exhibit A of Mr. Gordon's January 1, 2005 agreement states that the DIVISION will give to the SUPPLIER one current model year, factory equipped C-6 Corvette or other vehicle to be mutually agreed upon for each year of the agreement. Please provide documentation of the value of the three vehicles as it pertains to each term of the agreement. In addition, please also provide documentation of the value of the vehicle(s) leased to this NASCAR driver, if any.

8.  The following performers' contracts with General Motors Corporation indicate the return of vehicle(s) of the SUPPLIER to the DIVISION. Please provide documentation of the value of the vehicle(s) loaned to the NASCAR drivers listed below, if any.

     Performer
     Jeffrey Burton
     Kevin Harvick

9.  Anthony Stewart / General Motors Corporation – Paragraph 1C in Exhibit A of Mr. Stewart's January 1, 2005 agreement states that one 2005 model year, factory equipped Chevrolet will be given to Mr. Stewart. Please provide documentation of the value of the vehicle. In addition, please also provide documentation of the value of the vehicle(s) leased to this NASCAR driver, if any.

10. John Mellencamp / General Motors Corporation – We noted scale reportings for this performer in 2005. Please provide all contracts, extensions, amendments, as well as tracking reports for Mr. Mellencamp as it relates to his reportings in 2005.

11. Ryan Newman / Alltel – We received standard endorsement contracts for this performer. Please provide a full endorsement contract along with any extensions, amendments, as well as tracking reports for Mr. Newman.

12. Lloyd Sherr / Farmers Insurance – We received a standard endorsement contract for this performer. Please provide a full service contract along with any extensions, amendments, as well as tracking reports for Mr. Sherr.

13. Matthew Simmons / Alltel Communications, Inc. – We noted scale reportings for this performer in 2006. Please provide all contracts, extensions, amendments, as well as tracking reports for Mr. Simmons as it relates to his reportings in 2006.

Exhibit A to PSD Declaration in Support of Response to Debtor's Objection, page 12

Ms. Mitzi Palms-Burt
Campbell-Ewald
November 26, 2008
Page Three

14.   <u>Chuck Zito / General Motors Corporation</u> – We received a standard endorsement contract
      for this performer.  Please provide a full endorsement contract along with any extensions,
      amendments, as well as tracking reports for Mr. Zito.

15.   We acknowledge Campbell-Ewald's statement that the following performers did not provide
      SAG covered services.  However, in order to complete our audit we will need to review their
      contracts.   They are listed in the Talent Partners' report provided by Campbell-Ewald as
      having broadcast guarantees.  Please provide all contracts, extensions, amendments, as well as
      tracking reports for the following performers:

| <u>Performer</u> | <u>Client</u> |
|---|---|
| Maya Angelou | Alltel |
| Omarion Grandberry | General Motors Corporation |
| Tamia Hill | General Motors Corporation |
| Boris Kodjoe | General Motors Corporation |

16.   <u>Cal Ripkin / General Motors Corporation</u> – Please note that Mr. Ripkin's contract is still
      outstanding.

17.   Please note that we are waiting for a list of vocalists as it pertains to the fifth bullet of our
      March 11, 2008 letter.

Please provide this information by December 10, 2008.  If you have any questions regarding this
matter, please call me at (310) 229-5178.  Thank you for providing this information to us.

Sincerely,

Brian Meath

BM/rk

Enclosures

cc:   Nora Sham
      Mickey Segal
      Christie Ylasemis
      Jake Liu

Exhibit A to PSD Declaration in Support of Response to Debtor's Objection, page 13



**Nigro Karlin Segal & Feldstein, LLP**
Certified Public Accountants

10100 Santa Monica Blvd • Suite 1300
Los Angeles, CA 90067-4104
(310) 277-4657
Fax: (310) 277-9232

January 27, 2009

156 West 56th Street • Suite 1702
New York, NY 10019
(212) 765-3200
Fax: (212) 765-3299

Howard Weingrad, Esq.
Davis & Gilbert
1740 Broadway
New York, NY 10019

Re:    Screen Actors Guild – Producers Pension and Health Plans Payroll Compliance
Review of General Motors Corporation

Dear Howard:

The following items represent our open points:

1.    <u>Summary of Contracts Provided</u> – For your review, please find enclosed as Exhibit A, a
summary of the pertinent details of the eighteen (18) contracts you provided to us. Please
note that two (2) of the contracts are currently being audited by NKSF through our audit of
the agency Campbell-Ewald. In addition, the Howie Long agreements either have been, or
are currently being audited by the Plans' Internal Staff.

2.    <u>Financial Records</u> – Please provide financial records from GM's Accounting System
documenting payments to performers. Specifically, we would like to view the underlying
accounts from which disbursements were made. By reviewing these records, we can
confirm that all payments were made to each performer pursuant to the terms of the
contract, as well as ensuring we have a complete list of performers with endorsement deals
in our review period.

3.    <u>Clint Bowyer / Chevrolet Cars & Trucks</u> – The contract we reviewed indicates that
Chevrolet Motor Division has the option to renew the term of this agreement to cover the
year 2007. Please indicate if this option was exercised.

4.    <u>Casey Mears / Chevrolet Cars & Trucks</u> – The contract we reviewed indicates that
Chevrolet Motor Division has the option to renew the term of the agreement to cover the
year 2008. Please indicate if this option was exercised.

Howard Weingrad, Esq.
Davis & Gilbert
January 27, 2009
Page Two

5. <u>Jack Sprague / Chevrolet Cars & Trucks</u> – The contract we reviewed indicated the term of the agreement was for the calendar year 2005. There is a clause in the contract that gives Chevrolet Motor Division the option to terminate the agreement if this driver no longer drives for the Express Motorsports race team. Our research indicated that Mr. Sprague left the Express Motorsports race team in 2005. Please advise if this agreement was terminated.

6. The following drivers had an exhibit in their contract which gave GM the option of loaning them a vehicle during the term of their agreement:

   - Olivier Baretta
   - Clint Bowyer
   - Ron Fellows
   - Oliver Gavin
   - Jan Magnussen
   - Casey Mears
   - Johnny O'Connell
   - Max Papis

   Please indicate whether GM loaned a vehicle to each driver. If yes, please indicate the model and year of the vehicle.

7. The contracts of the following celebrity performers indicate that they were loaned a vehicle during the term of their agreement:

   - <u>Jerome Bettis</u> – One (1) current model GM vehicle (07-08 contract term)
   - <u>Mike Krzyzewski</u> – Two (2) Pontiac vehicles during each contract year (October 2005 to present)

   Please indicate the brands of the vehicle(s) loaned to these performers and/or the fair market value of the loans.

Howard Weingrad, Esq.
Davis & Gilbert
January 27, 2009
Page Three

8.    The following drivers and/or celebrities had clauses in their contracts indicating they would
      be paid additional compensation if additional commercials were produced.   They are as
      follows:

| Performer | Amount | Contract Term |
|---|---|---|
| Olivier Barretta | $ 20,000 | 01/01/07-12/31/07 |
| Clint Bowyer | 10,000 | 01/01/06-12/31/06 |
| Ron Fellows | 20,000 | 02/28/07-12/31/07 |
| Oliver Gavin | 20,000 | 01/01/07-12/31/07 |
| Mike Krzyzewski | 100,000 | 10/10/05-Present |
| Jan Magnussen | 20,000 | 01/01/07-12/31/07 |
| Casey Mears | 10,000 | 01/01/07-12/31/07 |
| John O' Connell | 20,000 | 01/01/07-12/31/07 |
| Max Papis | 20,000 | 02/01/07-12/31/07 |
| J.J. Yeley | 10,000 | 01/01/07-12/31/07 |

      Please indicate if any additional commercials were produced.

9.    Phil Simms / GM Automotive Products & Parts – Please advise if Mr. Simms produced
      any SAG-covered series to GM.

10.   The following items are still outstanding from our December 11, 2008 email:

      • Tony Stewart – This driver did a commercial spot for GM entitled
        *Reputational* in 2006. We have reviewed a Chevrolet contract through our
        audit of the agency Campbell-Ewald. Please provide the GM deal related to
        this commercial.

      • Tiger Woods – GM has been sending wire transfers of contributions to the
        Plans for Mr. Woods. However, they have not provided a Report of
        Contributions or a contract. In order for the Plans to assess the accuracy of
        the contributions made, they will need to review his contract. Please provide
        this document.

      • Cal Ripken – The Plans advised us that Mr. Ripken contract would be part of
        the package of the contracts that you provided recently. However, it was not
        included in that package. Please research and indicate whether there is a
        General Motors deal for Mr. Ripken.

Howard Weingrad, Esq.
Davis & Gilbert
January 27, 2009
Page Four


Please call me if you have any questions regarding this matter.

Sincerely,

Brian Meath

BM/rk

Enclosures

cc:    Nora Sham
       Mickey Segal
       Scott K. Residor

# SCREEN ACTORS GUILD TRUST FUNDS COMPLIANCE REVIEW OF GENERAL MOTORS
## SUMMARY OF CONTRACTS PROVIDED BY GENERAL MOTORS

| Performer | Product | Contract Term | Contract Amount | Amount Reported |
|---|---|---|---|---|
| Olivier Beretta | Chevrolet Cars & Trucks | 01/01/07-12/31/07 | $ 30,000 | $ 0 |
| Jerome Bettis | GM's Products and Services | 09/01/07-09/30/08 | 150,000 | 0 |
| Clint Bowyer | GM Cars and Trucks | 01/01/06-12/31/06 | 50,000 | 0 |
| Milka Duno | Pontiac Products and Services | 06/23/04-12/31/05 | 150,000 | 0 |
| | Pontiac Products and Services | 01/01/06-12/31/06 | 125,000 | 0 |
| Ron Fellows | Chevrolet Cars & Trucks | 02/28/07-12/31/07 | 30,000 | 0 |
| Oliver Gavin | Chevrolet Cars & Trucks | 01/01/07-12/31/07 | 30,000 | 0 |
| Ron Hornaday | Chevrolet Cars & Trucks | 01/01/07-12/31/07 | (A) | 0 |
| Mike Krzyewski | GM's Products and Services | 10/10/05-04/15/10 | 2,350,000 | 100,000 |
| Jan Magnussen | Chevrolet Cars & Trucks | 01/01/07-12/31/07 | 10,000 | 0 |
| Casey Mears | Chevrolet Cars & Trucks | 01/01/07-12/31/07 | 100,000 | 0 |
| John O'Connell | Chevrolet Cars & Trucks | 01/01/07-12/31/07 | 30,000 | 6,750 |
| Max Papis | Chevrolet Cars & Trucks | 02/01/07-12/31/07 | 10,000 | 0 |
| Jack Sprague | Chevrolet Cars & Trucks | 01/01/05-12/31/05 | 75,000 | 0 |
| J.J. Yeley | Chevrolet Cars & Trucks | 01/01/07-12/31/07 | 75,000 | 0 |
| Jeff Burton | Chevrolet Cars & Trucks | 01/01/05-12/31/07 | (B) | (B) |
| Kevin Harvick | Chevrolet Cars & Trucks | 05/01/07-12/31/09 | (B) | (B) |
| Howie Long | Chevrolet | 04/26/04-04/26/08 | (C) | (C) |
| Phil Simms | GM's Automotive Products & Parts | 09/01/07-08/31/09 | 775,000 | 0 |
| | | TOTAL | $ 3,990,000 | $ 106,750 |

(A) All compensation paid to this performer is conditional. $15,000.00 for each personal appearance day in excess of eight (8). $1,000.00 for each hospitality day in excess of ten (10). If television commercials are produced, fees will be computed at SAG minimum scale rates.

(B) This contract term is currently being audited by NKSF through an audit of the agency Campbell-Ewald.

(C) The first three (3) years of this contract term have been audited internally by the Plans. The fourth (4th) year is currently being audited internally by the Plans.

Exhibit A

Exhibit B

# 2003
# COMMERCIALS CONTRACT

# SCREEN ACTORS GUILD



### AND
# ANA-AAAA JOINT POLICY COMMITTEE
# ON BROADCAST TALENT RELATIONS





# SCREEN ACTORS GUILD
# 2003 COMMERCIALS CONTRACT

AGREEMENT made by and between SCREEN ACTORS GUILD, INC., a California non-profit corporation, herein called the "UNION" and the ANA-AAAA JOINT POLICY COMMITTEE ON BROADCAST TALENT UNION RELATIONS, herein called the "JOINT POLICY COMMITTEE", acting on behalf of advertisers and advertising agencies who have authorized said Committee to act on their behalf, a list of which has been filed with the Union and is by this reference included as a part of this Contract, and others who sign this Contract or Letters of Adherence hereto, hereinafter individually referred to as "Producer."

## I.  PRE-PRODUCTION

## 1.  RECOGNITION AND COVERAGE

### A.  Principal Performers

The Union is recognized by Producer as the exclusive bargaining agent for all principal performers (including actors, narrators, announcers, singers, specialty dancers, specialty acts, puppeteers, stunt performers, and pilots) as described in Section 6, Persons Covered, employed by Producer for commercials, as the term "commercials" is defined in Section 4, within the scope of this Contract as provided in subsection A of Section 5, Scope of Contract.

Compensation to principal performers in commercials is based both on the services which the principal performer renders in the production of such commercials and on the use which is made of the finished commercial in which the principal performer has rendered services. This dual basis of compensation springs from the unique nature of the services rendered by principal performers in commercials. The Union contended that a principal performer rendering services in a commercial performs, to a great extent, the duties of a demonstrator or salesperson of a particular product or service and as such, tends to be identified with that particular product or service.

The Union also contended that this identification increases proportionately with the continued telecasting of a commercial. The Union further contended that advertisers and their agencies seldom approve the employment of a principal performer who has become identified with another product or service, especially if the product or service is competitive. These conditions and practices tend to reduce opportunities for further employment in this field.

The Producer, realizing the singular nature of this kind of service and that the reuse of a commercial may limit or curtail further employment opportunities for the principal performers appearing in the commercial, has agreed to this unique method of compensation.

### B.  Extra Performers

The Union is also recognized by the Producers, and each of them, as the exclusive bargaining agent for all extra performers employed in the production of commercials, as the term "commercials" is defined in Section 4, in the zones as defined in Section 1 of Schedule D hereof.

1

damages shall be in addition to any and all other remedies which the Union may have against Producer under this Contract.

The liquidated damages herein provided shall not be invoked if the principal performer is at fault for failure to execute his/her W-4 Form or other required tax forms or if the principal performer, having been furnished an engagement contract on or before the date of employment, fails to return the signed contract promptly, or when there is a bona fide dispute as to compensation.

B. In the event of a claim, any undisputed sums due and payable to principal performer shall nevertheless be paid within the time periods specified in Section 43, Payment. Failure to make timely payment shall activate the liquidated damages provisions hereof.

C. Liquidated damages for late payment shall accrue commencing 12 business days after the settlement of a disputed claim.

D. In the event Producer fails to make timely payments as required hereunder, the Union may, by written notice, require the payment of session fees, use fees and other fees to be sent to principal performers in care of a designated Screen Actors Guild office.

## 46. CONTRIBUTIONS TO PENSION AND HEALTH PLANS

A. Producer and advertising agencies signatory to Letters of Adherence, shall become parties to the "Screen Actors Guild-Producers Pension Plan for Motion Picture Actors" and "Screen Actors Guild-Producers Health Plan for Motion Picture Actors" and to the "Industry Advancement and Cooperative Fund" ("IACF"). Producers shall contribute an amount equal to 14.30% of all gross compensation paid to principal performers as herein defined with respect to television commercials produced on and after October 30, 2003. Such contribution shall be allocated as follows: 0.3% to the IACF and 14% to the Pension and Health Plans. Of such 14%, 4.75% will be allocated to the Pension Plan and 9.25% to the Health Plan. The allocation of the 14% between the Health Plan and the Pension Plan may be changed at any time during the term hereof by the Boards of Trustees of said Plans based on actuarial studies.

B. This Section 46 applies with respect to extra performers employed in accordance with Schedule D.

C. The term "gross compensation" as used in this subsection A means all salaries, session fees and other compensation or remuneration including holding fees and use fees, foreign use payments and theatrical or industrial use payments; excluding however, allowances; payments for meal period violations; rest period violations; traveling, lodging, or living expenses; liquidated damages for late payments; flight insurance allowance; reimbursements for special hairdress or for wardrobe maintenance or damage to wardrobe or personal property; but without any other deductions whatsoever. Such term also includes amounts paid to an employee with respect to services as a principal performer or as an extra performer ("performer") (including compensation paid as salary settlements) whether or not any services were performed.

D. If, during the term of this Contract, the Union negotiates a higher rate of employer contributions than 14.30% with the AMPTP or any successor organization, for its theatrical and TV film contracts, this Contract may be reopened for negotiations with respect to pension and health contributions only.

E. Where Producer borrows acting services from a signatory loan-out company, or enters into a contract with a principal performer under which covered services and noncovered services are to be provided, the following shall apply:

1. There will be a separate provision in principal performer's agreement or loan-out agreement covering only acting services. Where other services are involved and there is a dispute over the portion of the compensation allocated to acting services, the principal performer's "customary salary" shall be given substantial consideration in resolving such dispute.

2. Contributions shall be payable on the amount allocated to covered services.

61

3. The Producer shall have the obligation to make the contributions directly to the Plans whether the agreement is with the principal performer or with the principal performer's loan-out company.

4. If, prior to the date on which Producer assumed the obligation to make the contributions directly to the Plans, a loan-out company has failed to make the applicable pension and health contributions on behalf of the loaned-out principal performer pursuant to the provisions of any applicable SAG Commercials Contract, Producer shall not be liable for such contributions if the loan-out company failed to pay such contributions more than 4 years prior to the date of commencement of the audit that gives rise to the claim (whether or not it is of the loan-out company's records or the borrowing Producer's records). The date of commencement of the audit shall be deemed to be the date of actual audit entry, but in no event later than 90 days after the date of the Plans' notice of intent to audit. In the event that the Plans conclude, based on an audit of a loan-out company's records, that there exists a claim for unpaid contributions, the Plans or the Union must give the borrowing Producer written notification of any such claim for unpaid contributions at the time that the loan-out company is notified of such claim.

5. Claims against Producer for pension and health contributions on behalf of principal performers borrowed from a loan-out company, or claims against Producer on behalf of principal performers employed directly by the Producer, must be brought within 4 years from the date of filing of the compensation remittance report covering such principal performers.

6. Any claim for contributions not brought within the 4-year period referred to in subsections F 4 and 5 above shall be barred.

F. It is understood that the Pension and Health Plans are industry-wide and open to all Producers and advertising agencies signatory to any of the Union's collective bargaining contracts or Letters of Adherence thereto which provide for payments to the Plans as above set forth. By signing a Letter of Adherence to the Trust Agreement hereinafter referred to and upon acceptance by the Trustees, Producers and advertising agencies shall be deemed bound by the terms and conditions of the Plans and to have appointed the Producers' Trustees and Alternate Trustees previously appointed.

G. The funds contributed to the Pension Plan and the Health Plan shall be trust funds and shall be administered under the Screen Actors Guild-Producers Pension Plan Agreement, and the Screen Actors Guild-Producers Health Plan Trust Agreement both dated February 1, 1960, which Agreements and Declarations of Trust shall become part of the collective bargaining contract. The Trust Fund for the Pension Plan shall be used solely for the purpose of providing pension benefits for employees covered by the Union's collective bargaining contracts in the motion picture industry who are eligible for benefits under the Pension Plan and for expenses in connection with the establishment and administration of such Pension Plan. The Trust Fund for the Health Plan shall be used solely for the purpose of providing welfare benefits for employees covered by the Union's collective bargaining contracts in the motion picture industry who are eligible for benefits under the Health Plan, and in the discretion of the Trustees for their families, and for expenses in connection with the establishment and administration of such Health Plan.

The Trustees shall determine the form, nature and amount of Pension and Health benefits, respectively, the rules of eligibility for such benefits and the effective dates of such benefits.

H. The Plan of pension benefits shall be subject to the approval of the Internal Revenue Service as a qualified Plan. If any part of the Plan is not approved, the Plan shall be modified by the Trustees to such form as is approved by the Internal Revenue Service.

I. The Declarations of Trust shall provide that no portion of the contributions thereof may be paid or revert to any Producer.

J. Producers and advertising agencies shall furnish the Trustees of each Plan, upon request, with the required information pertaining to the names, job classification, Social Security numbers and wage information for all persons covered by this Contract, together with such information as may be reasonably required for the

62

proper and efficient administration of the Pension Plan and the Health Plan, respectively. Upon the written request of the Union to the Producer, such information shall also be made available to the Union.

K. No part of the Producer's contributions to such Plans may be credited against the performer's overscale compensation or against any other remuneration that the performer may be entitled to, no matter what form such other remuneration may take nor shall such contributions constitute or be deemed to be wages due to the individual employees subject to this Contract, nor in any manner be liable for or subject to the debts, contracts, liabilities or torts of such employees.

## 47. SOCIAL SECURITY, WITHHOLDING, UNEMPLOYMENT AND DISABILITY INSURANCE TAXES

Session fees, holding fees, use fees and all other compensation paid to principal performers and all compensation paid to extra performers covered by this Contract for or in connection with the making and use of commercials constitute wages and as such are subject to Social Security, withholding, unemployment insurance taxes and disability insurance taxes. Advertising agencies or others, such as production companies, payroll agencies or loan-out companies, who assume the contractual obligation to make such payments shall also make the required payments, reports and withholding with respect to such taxes. Nothing herein shall relieve the Producer or Union of their respective obligations under this Contract.

The period of service for which compensation is ordinarily paid to principal performers covered by this Contract is a 13-week period. The "part-year employment method" of withholding as currently set forth in Section 31 — 3402(h)(4)-1(C) of the Internal Revenue Code and Regulations or any applicable successor Regulations, shall be utilized for any principal performer upon his or her request provided that the principal performer qualifies for such method of withholding under the Internal Revenue Code and Regulations and the form of declaration for each such use shall be attached to the principal performer's employment contract.

If Producer withholds taxes or makes any other payroll deductions which are not required or are in excess of the amount required by U.S. State or Federal law, Producer shall promptly reimburse the principal performer and the extra performer ("performer") the entire amount erroneously withheld upon performer's request and appropriate documentation, provided that the request is made during the then current calendar year.

## 48. PRINCIPAL PERFORMER'S RIGHTS VESTED

The right of a principal performer to compensation for the use of a commercial shall be a vested right and shall not be affected by the expiration of this Contract or by any act on the part of the Producer.

## 49. CONTRACT INCORPORATED IN PERFORMER'S INDIVIDUAL CONTRACT; WAIVERS

A. The applicable provisions of this Contract shall be deemed incorporated in the individual contract of employment between Producer and each principal performer or extra performer ("performer") and Producer and the performers shall each be bound thereby as to all services performed after the effective date hereof. Nothing contained in this Contract shall be construed to prevent any performer from negotiating with and obtaining from any Producer better terms than are provided herein.

B. No waiver by any performer of any of the applicable terms of this Contract shall be requested of the performer or become effective unless the consent of the Union is first had and obtained. Such consent may be oral, but the Union agrees that all oral waivers will be confirmed in writing by it. Whenever the Producer is entitled to a waiver, the Union agrees to issue the same without cost.

63

**SCREEN ACTORS GUILD- PRODUCERS PENSION AND HEALTH PLANS**
**TV COMMERCIALS EXHIBIT B**

1.  Use this form to report Production, Editing, or Use of programs

2.  Report programs with different casts, or for different advertisers, on separate forms.

3.  Mail copy of P & H Report to SAG office nearest the city in which commercial was made, refer to SAG branch addresses on
    www.sag.org\branches.

4.  Additional information and forms may be obtained by refering to the Plans website at www.sagph.org/StudioWeb

**Schedule of Contributions to Screen Actors Guild-Producers Pension and Health Plans**
**ACTORS**

15.50% Rate: For commercials produced on or after 04-01-09 (and Re-Run Fees thereon)

14.80% Rate: For commercials produced on or after 10-30-06 (and Re-Run Fees thereon)
14.30% Rate: For commercials produced on or after 10-30-03 (and Re-Run Fees thereon)

13.30% Rate: For commercials produced on or after 10-30-00  (and Re-Run Fees thereon)

13.30% Rate: For commercials produced on or after 05-01-00  for RIA Group (and Re-Run Fees thereon)

14.15% Rate: For commercials produced on or after 05-01-00 for CIA Group (and Re-Run Fees thereon)

12.65% Rate: For commercials produced on or after 02-07-94 (and Re-Run Fees thereon)

12.50% Rate: For commercials produced on or after 02-07-92 (and Re-Run Fees thereon)

11.50% Rate: For commercials produced on or after 04-15-88 (and Re-Run Fees thereon)

11.00% Rate: For commercials produced on or after 02-07-85 (and Re-Run Fees thereon)

10.00% Rate: For commercials produced on or after 02-07-82 (and Re-Run Fees thereon)

9.00% Rate: For commercials produced on or after 02-07-79 (and Re-Run Fees thereon)

8.50% Rate: For commercials produced on or after 11-16-74 (and Re-Run Fees thereon)

7.75% Rate: For commercials produced on or after 07-01-72 (and Re-Run Fees thereon)

5.00% Rate: For commercials produced on or after 01-01-61 (and Re-Run Fees thereon)

**Schedule of Contributions to Screen Actors Guild-Producers Pension and Health Plans**
**BACKGROUND PERFORMERS**

15.50% Rate: For commercials produced on or after 04-01-09 (and Re-Run Fees thereon)

14.80% Rate: For commercials produced on or after 10-30-06 (and Re-Run Fees thereon)

14.30% Rate: For commercials produced on or after 10-30-03 (and Re-Run Fees thereon)

13.30% Rate: For commercials produced on or after 10-30-00 (and Re-Run Fees thereon)

13.30% Rate: For commercials produced on or after 05-01-00 for RIA group (and Re-Run Fees thereon)

14.15% Rate: For commercials produced on or after 05-01-00 for CIA Group (and Re-Run Fees thereon)

12.65% Rate: For commercials produced on or after 02-07-94 (and Re-Run Fees thereon)

12.50% Rate: For commercials produced on or after 02-07-92 (and Re-Run Fees thereon)

11.50% Rate: For commercials produced on or after 04-15-88 (and Re-Run Fees thereon)

11.00% Rate: For commercials produced on or after 02-07-85 (and Re-Run Fees thereon)

10.00% Rate: For commercials produced on or after 02-07-82 (and Re-Run Fees thereon)

9.00% Rate: For commercials produced on or after 02-07-79 (and Re-Run Fees thereon)

8.50% Rate: For commercials produced on or after 11-16-74 (and Re-Run Fees thereon)

7.75% Rate: For commercials produced on or after 07-01-72 (and Re-Run Fees thereon)

5.00% Rate: For commercials produced on or after 01-01-61 (and Re-Run Fees thereon)

**MULTIPLE SERVICE CONTRACT REPORTING PROCEDURES**

According to the 2009 Screen Actors Guild Commericals Agreement, "Producer shall designate multi-service contract status on the contribution
remittance reports filed with the Plans when contributions are tendered in connection with services related to multiple-service agreement.
Producer agrees to provide unredacted copies of all contracts relating to services provided under such multiple-service agreements to SAG and
to the Plans at the time of submission of initial contribution reports to the Plans." A multiple-service agreement should be noted with a check
mark in column (10) on page 1 of the TV Commercials Exhibit B Contribution Report.

**PERFORMER CATEGORY**

| | | | |
|---|---|---|---|
| P - Principal Performer | Pil - Pilot | S9 - Group Singer (9 or more) | DS - Dancer Solo/Duo |
| E - Background Performer | SS - Singer Solo/Duo | CHR - Choreographers | D9 - Group Dancer (9 or more) |
| HM - Hand Model | SC - Singer Contractor | D3 - Group Dancer (3 to 5) | MSC - Multiple-Service Contract |
| ST - Stunt Performer | S3 - Group Singer (3 to 5) | D6 - Group Dancer (6 to 8) | |
| Pup - Puppeteer | S6 - Group Singer (6 to 8) | D9 - Group Dancer (9 or more) | |

**Special Rate Codes**

| | | |
|---|---|---|
| S= Supplemental | H - Home Video | N = New Media |
| L = Side Letter | I = Internet | O = Other |

Exhibit C

SCREEN ACTORS GUILD-PRODUCERS PENSION PLAN
FOR MOTION PICTURE ACTORS

TRUST AGREEMENT

Including Amendments 1 through 23

This is an agreement entered into as of the 1st day of February, 1960, in the County of Los Angeles, State of California. The parties hereto are, first, certain motion picture producers as more fully described herein and who will be hereinafter referred to as "Producers"; second, Screen Actors Guild, Inc., being the representative for collective bargaining purposes of members of the motion picture acting profession; and third, the Plan Trustees and the successor Plan Trustees.

The parties hereto contracting do so with reference to the following facts:

Screen Actors Guild, Inc., hereinafter referred to as "SAG", has entered into collective bargaining agreements with the Producers who are members of the Association of Motion Picture Producers, Inc., and may hereafter enter into collective bargaining agreements with certain other Producers, which agreements provide and may provide among other things for contributions by each such Producer to the Pension Fund hereunder with respect to services subject to such collective bargaining agreement with such Producer, for the purpose of providing pension benefits for eligible actors.

In order to effectuate the aforesaid purpose SAG and the Producers signatory hereto are members of Association of Motion Picture Producers, Inc., desire to create a pension plan and to establish a pension fund to be used in the manner hereinafter set forth.

NOW THEREFORE in consideration of the mutual promises of the parties, a trust is hereby created and declared and it is mutually understood and agreed as follows:

# ARTICLE I

## DEFINITIONS
### (Amended 2/1/84)

Section 1.  SAG.  The term "SAG" as used herein shall mean Screen Actors Guild, Inc., a non-profit corporation.

Section 2.  Producers.  (Amended 01/01/02).  The term "Producers" as used herein shall mean:

a)  Those member companies of Association of Motion Picture Producers, Inc. (now succeeded by the Alliance of Motion Picture and Television Producers, Inc.) who are original signatories to this agreement; and

b)  Companies that have authorized the A.N.A. – A.A.A.A. Joint Policy Committee on Broadcast Talent Union Relations to represent them in collective bargaining with the Screen Actors Guild; and

c)  Any other motion picture producer who becomes signatory to the Producer-SAG Codified Basic Agreement or to the Producer-SAG Television Agreement or to the SAG Commericials Contract; and

d)  Any motion picture producer or other employer of actors engaged in the production of motion pictures in the United States, its territories or possessions, (hereinafter referred to as a "U.S. Producer") who is or hereafter becomes a party to a SAG collective bargaining agreement that provides for payments to be made by such U.S. Producer into the Fund created hereby and any producer or other employer of actors engaged in the production of motion pictures outside the U.S. (hereinafter referred to as a "Foreign Producer") whose agent is or hereafter becomes a party to a SAG collective bargaining agreement that provides for payments to be made by such Foreign Producer into the Fund created hereby; and

e)  Any employer who is permitted by the Plan Trustees to be regarded as an employer hereunder pursuant to Article IV, Section 1, subsection u."

Section 3.  Employer Associations  (Amended  11/9/84).  The term "Employer Associations" shall mean and include the Alliance of Motion Picture and Television Producers, Inc., A.N.A.-A.A.A.A. Joint Policy Committee on Broadcast Talent Union Relations, and any other association organized and existing for the representation of Producers in matters pertaining to a Collective Bargaining Agreement (as defined in Section 11 of this article).

2

Exhibit C to PSD Declaration in Response to Debtor's Opposition, Page 26

Section 4.  Plan Trustees.  The term "Plan Trustees" as used herein shall mean those persons who as of any time are properly acting as such.

Section 5.  Actors.  (Amended 4/13/61, 2/1/84 and 11/9/84).  The term "Actors" as used herein shall mean the persons employed by Producers to render services as actors in Motion Pictures (as defined in Section 10 of this article) who are covered by and whose services are subject to a collective bargaining agreement with SAG. and with respect to whose services contributions are required thereunder to be made into the Pension Fund. Because no substantial separate group of extras and actors exists in New York and certain other areas of the United States, and in those areas the same persons generally work interchangeably in both capacities, the term "actors" shall also include, for the limited purposes of the Pension Plan, the persons employed by Producers to render services as extras in the motion picture industry in the New York area and other areas who are covered by and whose services are subject to a collective bargaining agreement with SAG and with respect to whose services contributions are required thereunder to be made into the Pension Fund. The term "Actors" shall also include persons employed by Producers to render services as extras and whose services are subject to a collective bargaining agreement with the Screen Extras Guild and with respect to whose services contributions are made into the Pension Fund pursuant to a supplemental agreement between Producers and the Screen Extras Guild.

Section 6.  Pension Fund.  The term "Pension Fund" as used herein shall mean the Screen Actors Guild-Producers Pension Fund for Motion Picture Actors, a trust fund created hereunder, including the monies and other things of value which comprise the corpus, and all income therefrom and increments thereto.

Section 7.  Pension Plan.  The term "Pension Plan" as used herein shall mean and include this trust agreement, the Pension Fund, and the plan of pension eligibilities and benefits to be adopted by the Plan Trustees pursuant to this agreement. The Pension Plan as herein defined may be referred to as "Screen Actors Guild-Producers Pension Plan for Motion Picture Actors.

Section 8.  Fund Trustee.  The term "Fund Trustee" as used herein shall mean the bank or trust company designated by the Plan Trustees pursuant to the provisions hereof as the trustee for the purpose of receiving, holding, investing and paying out the monies and other assets of the Pension Fund.

Section 9.  Trustees.  The term "Trustees" as used herein shall mean either the Plan Trustees or the Fund Trustee, or both, as the case may require.

Section 10.  Motion Pictures.  The term "Motion Pictures" as used herein shall be deemed to include but is not limited to theatrical motion pictures, television motion pictures, television motion picture commercials and commercial and industrial motion pictures.

3

Section 11. <u>Collective Bargaining Agreement.</u>    The term "Collective Bargaining Agreement" as used herein shall mean the collective bargaining agreement or agreements in force and effective from time to time between SAG and Producers with respect to the employment and services of actors in the production of motion pictures and which provide for contributions by such Producers into the Pension Fund hereunder.

Section 12. <u>Full Complement of Plan Trustees.</u>    Whenever in this trust agreement reference is made to a full complement of qualified Plan Trustees, such reference shall be deemed to mean the total number of Plan Trustees then authorized to act as the Board of Plan Trustees.

4

ARTICLE II

PLAN TRUSTEES
(Amended 2/1/84)

Section 1.   Administration by Plan Trustees.  (Amended 8/13/64, 11/11/65 and 1/12/67)
The operation and administration of the Pension Plan shall be the joint responsibility of
thirty-six (36) Plan Trustees who shall constitute the Board of Plan Trustees.  Eighteen
(18) of these Plan Trustees shall be appointed by the Producers and eighteen (18) shall be
appointed by Screen Actors Guild, Inc.  The number of Plan Trustees to be appointed by
the Producers shall be allocated among the Alliance of Motion Picture and Television
Producers, Inc., and other Employer Associations in the manner provided in Section 6 of
this Article.

Section 2.   Acceptance of Trusteeship.  The original Plan Trustees, by affixing their
signatures at the end of this agreement, have agreed to accept the Plan Trusteeship and to
act in such capacity strictly in accordance with the provisions herein contained.  Any
substitute or new or additional Plan Trustee thereafter appointed, shall, by his attendance
at and participation in any meeting of the Plan Trustees hereunder, be deemed to have
agreed to have accepted the Plan Trusteeship and to have agreed to act in such capacity
strictly in accordance with the provisions herein contained.

Section 3.   Term of Plan Trustees.   Each Plan Trustee originally appointed and each
successor Plan Trustee shall continue to serve as such until his death, disability,
resignation, absence or substitution.

Section 4.   Substitution of Plan Trustees. (SAG)  SAG may at any time in its discretion
by written notice given to the Chairman (who upon receipt of such notice shall notify all
Plan Trustees then in office thereof) appoint a successor or successors for any one or
more of the Plan Trustees theretofore appointed by it.  Such written notices shall contain
the names of the Plan Trustee or Trustees to be replaced and the name or names of the
new Plan Trustees so appointed, and the effective date of such appointment or
appointments.

Section 5.   Substitution of Plan Trustees.  (Producers)    Any Employer Association
responsible in the first instance for the appointment of any Plan Trustee may at any time
in its discretion by written notice given to the Chairman ( who upon receipt of such notice
shall notify all Plan Trustees then in office thereof) appoint a successor or successors for
any one or more of the  Plan Trustees theretofore appointed by it.  Such written notices
shall contain the name or names of the Plan Trustee or Trustees to be replaced and the
name or names of the new Plan Trustees so appointed, and the effective date of such
appointment or appointments.

5

Section 6.    Change in the Allocation of Plan Trustees.    The number of Plan Trustees to be allocated to the respective Employer Associations which may be entitled to appointment of the same shall be subject to redetermination and review by the Plan Trustees at the end of each three-year interval following February 1, 1960.    Such allocation for the ensuing three-year period shall be determined as nearly as practicable in accordance with the proportion which the total contributions to the Pension Fund for the preceding three-year period made by the member of each such Employer Association bears to the total contribution to the Pension Fund made by members of all such Employer Associations during such preceding three-year period.    In computing the amount of such contributions there shall be included therein all sums contributed to the Pension Fund by each member, whether for past services or for current services, regardless of how the amount thereof was originally determined or allocated to such member.

Section 7.    Resignations.    A Plan Trustee may resign by giving notice in writing to the Chairman who upon receipt of such notice shall notify the remaining Plan Trustees thereof.  Such resignation shall become effective when a successor to the resigning Plan Trustee has been appointed in the manner provided in Section 4 or Section 5 of this article, as the case may be, and has accepted the trusteeship in the manner provided in Section 2 of this article.  The successor Plan Trustee shall thereupon become vested with all of the rights, powers and duties of a Plan Trustee hereunder.

6

# ARTICLE III

## CONTRIBUTIONS TO THE PENSION FUND

**Section 1. Rate of Contributions.** In order to carry out the purposes hereof each Producer shall contribute to the Pension Fund in the amount and as required by the collective bargaining agreement with such Producer. The rate and amount of contribution shall at all times be governed by said collective bargaining agreement. Nothing in this trust agreement or in any Plan or trust agreement pursuant hereto shall be deemed to change, alter or amend any of said collective bargaining agreements.

**Section 2. Effective Date of Contributions.** All contributions shall be made effective as of the date specified in the respective collective bargaining agreements between SAG and Producers and said contributions shall continue to be paid as long as a Producer is so obliged pursuant to said collective bargaining agreements. Promptly upon the execution of any new collective bargaining agreement or the amendment of any then existing collective bargaining agreement in a way that affects contributions to be made thereunder, SAG shall file an executed or a true copy of such agreement with the Plan Trustees, and the Plan Trustees shall be entitled to treat the copy so filed as determining the obligations of the parties thereto, thereunder and hereunder.

**Section 3. Mode and Time of Payment. (Amended 9/1/84)** All contributions to the Pension Fund shall be payable to the Fund Trustee and, except as otherwise provided by resolution of the Plan Trustees, shall be paid by transmitting to the Plan Trustees a check therefor payable to the Fund Trustee. Any such check or checks received by the Plan Trustees shall be processed administratively by them and forwarded to the Fund Trustee. The Plan Trustees shall, by resolution duly adopted, establish the due dates for contributions in conformity with the respective collective bargaining agreements between SAG and Producers. The Plan Trustees may, by resolution duly adopted, provide for payment with respect to any Producer or Producers upon a different periodic basis if it is shown that such different basis will be administratively convenient and will not cause any material financial disadvantage to the Pension Fund.

**Section 4. Default of Payment and Liquidated Damages. (Amended 9/1/84)** The failure of a Producer to pay the contributions required hereunder at the times and in the manner herein provided shall constitute a violation of such Producer's obligations hereunder. Nonpayment by a Producer of any contribution as herein provided shall not relieve any other Producer of his obligation to make payment of his required contributions. A Producer who fails to pay required Producer contributions when due shall be liable for liquidated damages as follows:

| Period of Delinquency | Liquidated Damages |
|---|---|
| Up to 30 days | None |
| 31 days to 60 days | 10 percent of contributions due |
| Over 60 days | 20 percent of contributions due |

7

Exhibit C to PSD Declaration in Response to Debtor's Opposition, Page 31

A Producer in default shall also be liable for reasonable attorney's fees and costs incurred in the collection of the delinquent contributions. The Plan Trustees may take or cause to be taken any action deemed by them advisable or necessary to enforce payment of the contributions due hereunder, including actions in law or equity. In addition to all rights to enforce payment of such accrued obligation of a Producer anywhere in this trust agreement provided or given by law, in the event a Producer has been repeatedly delinquent or has otherwise willfully violated the provisions of this agreement and declaration of trust, the status of such Producer as a party hereto may be terminated by the Plan Trustees in their discretion by a resolution duly adopted, and upon such termination such Producer shall forthwith cease to be a Producer under the provisions of this agreement or a party hereto in any way thereafter. No Producer who has at any time defaulted hereunder and whose status as a party hereto has been so terminated shall be eligible again to become a party hereto except upon such terms as to payment of all past obligations to the Pension Fund as the Plan Trustees may require. The provisions of this Section 4 shall be without prejudice to the rights of SAG, if any, under its collective bargaining agreements or otherwise, against the defaulting Producer by reason of such default.

Section 5.  Report on Contributions.  (Amended 9/1/84, 1/1/89 and 1/1/96) Each Producer shall make such reports and statements to the Trustees with respect to the amount and calculation of any and all contributions as the Trustees may deem necessary or desirable. All contribution reports submitted by each Producer shall specifically designate the project title, name and Social Security number of each Actor for whom the contribution is made. If the Producer fails to supply the data requested, the Producer shall be liable for liquidated damages in the amount of ten percent (10%) of the contribution amount for each Actor with respect to whom an omission occurs. If the Producer's failure to supply the data requested continues for 60 or more days from the due date of the report, the Producer shall be liable for liquidated damages in the amount of twenty percent (20%) of the contribution amount for each actor with respect to whom an omission occurs. Such producer shall also be liable for the reasonable attorney's fees and costs, if any, incurred in collection of the liquidated damages. The Plan Trustees may take or cause to be taken any action deemed by them to be advisable or necessary to enforce payment of the liquidated damages described in this section.

The Trustees may at reasonable times and during normal business hours of any Producer audit or cause the audit or an inspection of the records of any Producer which may be pertinent in connection with the said contributions and/or reports insofar as the same may be necessary to accomplish the purpose of the Pension Plan. Should any audit or inspection disclose a delinquency or underpayment, the cost of the audit or inspection shall be borne by the Producer who is found to be delinquent. The Trustees shall have the power to waive such audit or inspection costs in a particular case upon good cause shown, such as, but not limited to, a case in which the delinquency found is small in amount. If litigation is required to compel such an audit or inspection, the Producer

8

involved shall pay all attorney's fees, the cost of the audit or inspection subsequently conducted, interest, and court costs incurred by the Trust in connection with such litigation and the subsequent audit or inspection.

If a Producer fails or refuses to make a substantial portion of such reports and statements as are required by the Trustees, or fails or refuses to permit an audit or inspection of its records sufficient to verify the accuracy of reports or statements, the Trustees may refuse contributions from the Producer beginning with that period of time for which the Trustees determine that adequate or reliable records or statements were unavailable and may deny eligibility for benefits for all employees of the Producer for which contributions were made. This paragraph shall not be in derogation of the remedies provided in this Article III.

Section 6. Repayment of Benefits For Ineligible Employees.   (Amended 1/1/96)  If a Producer reports contribution for an employee who did not render bona fide covered services as a result of which contributions the employee receives benefits under the Plan, the Trustees may require the Producer and said employee to repay to the Plans the amount by which the benefits paid on behalf of that ineligible employee exceed the contributions paid by the Producer.

Section 7. Limitation for 25% Ownership Interest.   (Amended 1/1/96)  A person who owns a 25% or greater interest in a Producer of an Industrial/Educational motion picture shall not be entitled to credit for earnings attributable to employment by such Producer. For purposes hereof, an ownership interest held directly or indirectly by the person, the person's spouse, parent or child or by a trust for the benefit of the person or the person's spouse, parent or child shall be deemed to be owned by the person.

The foregoing paragraph shall not apply if the Trustees determine, upon application by any person described in the preceding paragraph, that the person performed or is performing bona fide services covered by the S.A.G. Industrial/Educational Agreement.

9

## ARTICLE IV

## POWERS AND DUTIES OF TRUSTEES

Section 1.  General.  In the administration of the Pension Fund created the Plan Trustees
are authorized and empowered as follows:

a) To invest and reinvest such part of the assets of the Pension Fund as in their sole
judgment is advisable in such securities as they may select in their sole discretion
whether or not the same be authorized by law for the investment of trust funds
generally.

b) To sell, exchange, lease, convey or dispose of any property whether real or personal at
any time forming a part of the Pension Fund upon such terms as they may deem
proper, and to execute and deliver any and all authorizations, instruments of
conveyance and transfer in connection therewith.

c) To vote in person or by proxy securities held by the Pension Fund, and to exercise or
cause to be exercised any other rights of whatsoever nature pertaining to securities or
any other property held hereunder.

d) To exercise options, conversion privileges, or rights to subscribe for additional
securities and to make payments therefor.

e) To consent to or participate in dissolutions, reorganizations, consolidations, mergers,
sales, leases, mortgages, transfers or other changes affecting securities held by the
Pension Fund and in connection therewith, and to pay assessments, subscriptions or
other charges.

f) The Plan Trustees shall appoint a bank or trust company to be designated and to act as
Fund Trustee for the Pension Plan.  Such Fund Trustee shall receive and hold, subject
to the provisions hereof and to the provisions of the trust agreement under and
pursuant to which it is acting, all contributions to the Pension Fund and all assets
thereof.  The Plan Trustees shall enter into a trust agreement with such Fund Trustee
setting forth the terms and conditions of such trust and providing for the investment
and re-investment of the Pension Fund in accordance with the directions and
instructions of the Plan Trustees, and incorporating such other provisions therein as
may be deemed desirable in the Plan Trustee's sole discretion for the management of
the Pension Fund, including such delegation of the Fund Trustees of such of the
rights, powers and duties of the Plan Trustees with respect to the assets of the Pension
Fund and the control and management thereof as the Plan Trustees deem proper.
Such trust agreement may provide, in the discretion of the Plan Trustees, for the
periodic withdrawal by the Plan Trustees of the amounts necessary for the payment of
pension benefits as the same accrue, and for the withdrawal by the Plan Trustees from
time to time of such amounts as may be required in their discretion for the payment of

10

Exhibit C to PSD Declaration in Response to Debtor's Opposition, Page 34

the costs and expenses incurred in establishing and maintaining the Pension Plan and for the payment of administrative costs, including, but not limited to rentals, supplies, materials and equipment, taxes, the compensation of legal counsel, investment counsel, administrative, accounting, actuarial, clerical and other experts, assistants or employees. Such trust agreement may also provide that all securities held by the Fund Trustee may be registered in the name of a nominee or nominees of the Fund Trustee or held in unregistered or bearer form. The Plan Trustees shall have the right at any time and from time to time to remove any Fund Trustee and to substitute another bank or trust company as such Fund Trustee.

g) To enter into any and all contracts and agreements to carry out the term of this trust agreement and for the administration of the Pension Plan, and to do all acts which they in their discretion may deem necessary or advisable, and such contracts and agreements and acts shall be binding and conclusive on the parties hereto and on the actors and all beneficiaries. Without limiting the foregoing the Plan Trustees shall have the power to make appropriate allocations of common administration expenses and disbursements shared with any other Plan or Fund.

h) To compromise, settle, arbitrate and release claims or demands in favor of or against the Pension Plan and on such terms and conditions as the Plan Trustees may deem advisable.

i) To establish and accumulate as part of the fund reserves up to such amounts as are adequate in the opinion of the Plan Trustees to carry out the purpose of the Pension Plan.

j) To borrow money in such amounts and upon such terms and conditions as shall be deemed advisable or proper by the Plan Trustees to carry out the purposes of the Pension Plan and to pledge any securities or other property of the Pension Fund for the repayment of any such loans.

k) To require the Fund Trustee to hold part of all of the assets of the Pension Fund uninvested.

l) To pay or to require to the Fund Trustee to pay out of the assets of the Pension Fund all real and personal property taxes, income taxes and other taxes of any and all kinds levied and assessed under existing or future laws upon or with respect to the Pension Fund or any money, property or securities forming a part thereof.

m) To do all acts, whether or not expressly authorized herein, which the Plan Trustees may deem necessary or proper for the protection of the Pension Fund.

11

n) To lease or purchase such premises, supplies, materials and equipment and to hire, employ and retain such legal counsel, investment counsel, administrative, accounting, actuarial, clerical, and other experts, assistants or employees as in their discretion the Plan Trustees may find necessary or appropriate in the performance of their duties, and to pay therefor such amounts as the Plan Trustees deem proper.

o) To maintain a bank account or accounts in a selected bank or banks in the name of the Pension Plan for depositing all or any part of the cash monies withdrawn from the Pension Fund and to withdraw monies from such account or accounts as required or convenient. All withdrawals of money from any such account shall be made only upon checks signed by such person or persons as may have been duly designated by proper resolution of the Plan Trustees to sign such checks. The person or persons so authorized to sign checks or to handle such monies shall each be bonded by a duly authorized surety company in such amounts as may be determined from time to time by the Plan Trustees, and the cost of premiums on such bonds shall be paid by the Pension-Plan.

p) To construe the meaning of any doubtful or ambiguous provisions of the Pension Plan and the terms used herein, and any construction thereof adopted by the Plan Trustees in good faith shall be binding upon SAG, the Producers, the actors and all beneficiaries.

q) To do any and all other matters and things pertaining to or required of the trustees by the sections and articles of this agreement other than this Section 1 of Article IV.

r) Generally to do all things, execute all such instruments, adopt and promulgate all such reasonable rules and regulations, take all such proceedings and exercise all such rights and privileges as are necessary in the establishment, maintenance and administration of the Pension Plan, and specifically, but not limited to the plan of pension eligibilities and benefits required thereunder.

s) If and to the extent permitted by law and governmental regulation, the Pension Plan itself may be permitted by the Plan Trustees to be regarded as a Producer hereunder to the end that the employees directly employed the Pension Plan in the administration thereof shall be entitled to benefits under the Pension Plan. In such event the Plan Trustees shall determine the eligibility requirements and shall determine and pay the contributions required on account of such employees.

t) (Amended 1/20/72) To enter into a contract or contracts with an insurance company as a means of providing all or any part of the benefits to which employees are entitled in accordance with the Plan. The Plan Trustees shall have the right at any time or times to change the means through which the benefits are provided.

12

u) (Amended 3/12/04)  To the extent permitted by law and governmental regulations, and in order that their employees may be permitted to become eligible for and to receive benefits under the Pension Plan established hereunder, the Plan Trustees may permit SAG to be, for such purposes, regarded as an employer hereunder.  In such event, the Plan Trustees shall determine the eligibility requirements applicable to such group of employees and the contributions required on account of such group of employees shall be paid by SAG.

v) (Amended 3/21/86)   To invest in units of the Pacific Investment Management Company Mortgage Plus Fund, a group trust created under an Agreement of Trust dated as of July 22, 1985, the provisions of which are incorporated herein by this reference.

w) (Amended 7/18/86)  To purchase and sell interest rate futures contracts, stock index futures contracts, and options on futures, and to open and maintain futures accounts with brokers to effect such purchases and sales.

x) (Amended /24/88)  The assets of the Pension Fund may be invested in TCW Realty Fund VA created by Trust Company of the West under a Trust Agreement made as of July 31, 1987, which instrument, as amended from time to time, is incorporated and made a part hereof as if fully set forth at length herein, and assets of this trust so invested in TCW Realty Fund VA shall be held and administered by Trust Company of the West in accordance with the terms of said instrument, as so amended; the combining of assets of the Pension Fund with assets of other qualified trusts in said TCW Realty Fund VA is hereby specifically authorized.

y) (Amended 10/21/88)  The assets of the Pension Fund may be invested in Heitman Real Estate Fund IV created by Norman Perlmutter, et al., under an Agreement and Declaration of Trust dated as of October 1, 1987, which instrument, as amended from time to time, is incorporated and made a part hereof as if fully set forth at length herein, and assets of this trust so invested in Heitman Real Estate Fund IV shall be held and administered by Heitman Advisory Corporation in accordance with the terms of said instrument, as so amended; the combining of assets of the Pension Fund with assets of other qualified trusts in said Heitman Real Estate Fund IV is hereby specifically authorized.

z) (Amended 10/21/88)  The assets of the Pension Fund may be invested in AEW-State Street Real Estate Fund VI created by State Street Bank and Trust Company under a Declaration of Trust dated as of May 27, 1982, which instrument, as amended from time to time, is incorporated and  made a part hereof as if fully set forth at length herein, and assets of this trust so invested in AEW-State Street Real Estate Fund VI shall be held and administered by State Street Bank and Trust Company in accordance with the terms of said instrument, as so amended; the combining of assets of the

13

Exhibit C to PSD Declaration in Response to Debtor's Opposition, Page 37

Pension Fund with assets of other qualified trusts in said AEW-State Street Real Estate Fund VI is hereby specifically authorized.

aa) (Amended 12/1/93) To invest in any collective investment trust fund qualified for tax exemption under Section 501(a) of the Internal Revenue Code of 1986, as amended, which is maintained by any bank or trust company whether or not acting as a trustee, co-trustee, or agent for the Trustee hereunder. The provisions of the document governing such collective investment trust, as amended from time to time, shall govern any investment therein, and are hereby made a part of this Trust Agreement.

Section 2.  Compensation.  The Plan Trustees shall not receive compensation from the Pension Plan for the performance of their duties hereunder, but shall be entitled to reimbursement for reasonable actual expenses incurred in the performance of their duties hereunder, including, in the discretion of the Plan Trustees, traveling expenses to attend Plan Trustees' meetings. The Fund Trustee shall be entitled to such compensation as may be mutually agreed upon by the Plan Trustees and the Fund Trustee.

Section 3.  Fiduciary Responsibility.  (Amended 9/19/75) Subject to the provisions of Section 5 of Article VIII, the Plan Trustees and any other fiduciary shall discharge their respective duties as set forth in the Pension Plan solely in the interest of the Participants and their beneficiaries and:

a) For the exclusive purpose of providing benefits to Participants and their beneficiaries and defraying reasonable expenses of administering the Pension Plan.

b) With the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

c) By diversifying the investments of the Pension Fund so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so.

Section 4.  Books of Account.  Both the Fund Trustee and the Plan Trustees shall keep true and accurate books of account and records of all their transactions, which shall be open to the inspection of each of the Plan Trustees at all times and which shall be audited annually or more often, as the Plan Trustees may determine, by a certified public accountant selected by the Plan Trustees. A statement of the results of such audit shall be available at all times for the inspection by SAG, the Producers, and the Actors at the principal office of the Pension Plan.

Section 5.  Execution of Documents.  The Plan Trustees may authorize the Chairman or the Vice Chairman and the Secretary or the Assistant Secretary, or any group of two or more Plan Trustees composed equally of Producer and SAG Plan Trustees to jointly execute on behalf of the Plan Trustees any certificate, notice or other instrument in

14

writing, and all persons, partnerships, corporations or associations may accept such notice or instrument as having been duly authorized by and being binding upon the Plan Trustees.

Section 6.  Deposits and Withdrawals.    All monies received by the Plan Trustees hereunder shall be deposited by them in such bank or banks as the Plan Trustees may designate for that purpose.  All withdrawals from such account or accounts shall be made only by checks signed by those Plan Trustees authorized by resolution duly adopted by the Plan Trustees to sign such checks, and withdrawals of funds from the Fund Trustee shall likewise be made only upon written authorization duly signed by those Plan Trustees authorized by resolution duly adopted by the Plan Trustees to sign such authorization.  Except as hereinafter provided no such resolution shall be valid unless requiring signature by an equal number of one or more SAG Plan Trustees and one or more Producer Plan Trustees.  The Plan Trustees may in their discretion designate and authorize an employee or employees of the Pension Plan to sign checks upon such separate and specific bank account or bank accounts as the Plan Trustees may designate and establish for the purpose of meeting day to day operating requirements.

Section 7.  Committees.  (Amended 7/24/87) The Plan Trustees may establish such committees as they in their discretion deem proper and desirable for the proper administration of the Pension Plan and of the Trust established hereby.  The appointment, operation and authority of such committees shall be governed, by the following rules:

a)  Standing Committees.  The standing committees of the Board of Trustees shall be as follows:

        Administrative Committee

        Benefits Committee

        Collections Committee

        Finance Committee

b)  Ad Hoc Committees.  Other committees for special purposes may be created  from time to time by resolution duly adopted by the Board of Trustees.

c)  Committee Membership.  Each committee shall have an equal number of members who are Producer Trustees and members who are Guild Trustees.  Committee members shall be appointed by the Chairman of the Board and shall serve until their successors are appointed.

d)  Committee Chairman and Vice Chairman. (Amended 7/1/90) A chairman and a vice chairman of each committee shall be appointed by the Chairman of the Board.  Of the four standing committees the chairmen and vice chairmen of two of them shall be

15

Producer Plan Trustees and the chairmen and vice chairmen of the other two (2) shall be Guild Plan Trustees. The term of office of a committee chairman shall not exceed three (3) years. For committee chairmen in office on the date of adoption of these Rules, said terms shall be measured from July 1, 1987. Effective with respect to the chairman and vice chairman of a committee appointed for a term commencing on or after July 1, 1990, the term of office of such individuals shall not exceed two years.

e) <u>Subcommittees.</u>  The chairman of a committee may from time to time create one or more subcommittees and appoint the members and chairman thereof from among the members of the committee.

f) <u>Committee Authority.</u>  The general purpose of a committee is to study and debate issues that arise in the administration of the Pension Plan and to make recommendations thereon to the Board for action by the Board. Notwithstanding this general limitation, the Board may, by resolution duly, adopted, delegate to a committee the authority to take final action in specified areas: and in such instances the action of the committee shall have the same binding effect as an action by the full Board.

The following delegations of authority to committees are now in effect:

(i) To the Benefits Committee the authority to render decisions on claims appeals under the Pension Plan.

(ii) To any Collections Committee the authority to refer to arbitration any disputed issue of liability for contributions or liquidated damages.

(iii) To the Administrative Committee the authority to make decisions regarding utilization of the space occupied by the Pension and Health Plans in the Business Arts Plaza.

g) <u>Voting.</u>  In all matters where the Board has delegated to a committee the authority to take final action, the unit voting rules of Article V, Section 5 and 6 of the Trust Agreement shall be applicable. In the event of a deadlock as defined in Section 6 of Article V, no action shall be taken and the matter shall be reported to the Board for further consideration. In matters where only a recommendation to the Board is involved, a majority vote in favor of the recommendation shall be sufficient.

h) <u>Quorum for Meetings.</u>  To have a quorum for the conduct of committee business in a meeting, there must be present at the meeting at least two (2) members who are Producer Trustees and two (2) members who are Guild Trustees.

i) <u>Participation of Non-members in Committee Proceedings.</u>  All Trustees shall be given notice of committee meetings. Trustees who are not members of a committee may attend meetings of the committee and shall be entitled to participate in the

16

discussions of issues; but only members of the committee shall be entitled to make or second motions and to vote on motions.

j) <u>Minutes.</u>    Each committee shall keep written minutes of its proceedings, which minutes shall be distributed to all Trustees.

<u>Section 8.</u>  <u>Bonding.</u>  (Amended 2/1/84)  The Plan Trustees shall be bonded by a duly authorized surety company in such amounts as may be determined from time to time by the Plan Trustees and in any case in at least as large an amount as that required by any applicable federal or state law. Each employee employed by the Plan Trustees who is empowered to sign checks or who may be engaged in handling the monies or securities of the Pension Plan shall also be similarly bonded by a duly authorized surety company. The premiums for all bonds shall be paid by the Pension Plan.

<u>Section 9.</u>  <u>Appointment of Investment Manager.</u>  (Amended 9/19/75)  Notwithstanding any other provisions of this Article IV, the Plan Trustees may appoint an Investment Manager or Managers to manage (including the power to acquire and dispose of) any assets of the Pension Fund. As used in this Section 9, the term "Investment Manager" shall have the meaning given to it in Section 3 (38) of the Employee Retirement Income Security Act of 1974 (hereinafter referred to as the "Act"), and shall refer to any Investment Manager or Managers who may be appointed in the manner hereinafter described. If the Plan Trustees appoint an Investment Manager, the following provisions shall apply:

a) The appointment shall be effective upon written notice thereof being given by the Plan Trustees to the Fund Trustee.

b) The Fund Trustee is authorized and entitled to rely upon the fact that said Investment Manager is at all times a qualified Investment Manager, as defined in Section 3 (38) of the Act, until such times as the Fund Trustee has received a written notice from the Plan Trustees to the contrary, as well as to rely upon the fact that said Investment Manager is authorized to direct the investment and management of the assets of the Pension Fund until such time as the Plan Trustees shall notify the Fund Trustee in writing that another Investment Manager has been appointed in the place and stead of the Investment Manager named, or, in the alternative, that the Investment Manager named has been removed and the responsibility for the investment and management of the Trust assets has been assumed by the Plan Trustees.

c) The Fund Trustee shall not be liable or responsible in any way for any losses or other unfavorable results arising from the Fund Trustee's compliance with investment or management directions received by the Fund Trustee from the Investment Manager. All directions concerning investments made by the Investment Manager shall be given in such manner and by such person or persons, acting on behalf of the Investment Manager as may be duly authorized by the Investment Manager in writing. The Fund Trustee shall be entitled to rely upon directions which it receives

17

that are so given and shall in no way be responsible for the consequences of any unauthorized use of such method which use was not, in fact, known by the Fund Trustee at the time to be unauthorized. The Fund Trustee shall be under no duty to question any directions of the Investment Manager nor to review any securities or other property of the Pension Fund constituting assets thereof with respect to which an Investment Manager has investment responsibility nor to make any suggestions to such Investment Manager in connection therewith. The Fund Trustee shall, as promptly as possible, comply with any written directions given by the Investment Manager. The Fund Trustee shall not be liable, in any manner nor for any reason, for the making or retention of any investment pursuant to such directions of the Investment Manager, nor shall the Fund Trustee be liable for its failure to invest any or all of the Pension Fund in the absence of such written directions.

18

<u>ARTICLE V</u>

<u>Section 1</u>.    <u>Officers</u>.  (Amended 2/1/84 and 1/1/91)  As soon as possible after the execution of this agreement the Plan Trustees shall meet and shall elect a Chairman and a Vice Chairman, each of whom shall be a Producer Plan Trustee and a Secretary and an Assistant Secretary, each of whom shall be a SAG Plan Trustee.  The terms of such officers shall commence on the date of their election and shall continue to December 31, 1961.  Prior to December 31, 1961, and prior to December 31 of each year thereafter the Plan Trustees shall select from among them a Chairman and a Vice Chairman and a Secretary and an Assistant Secretary to serve for a term of one year, commencing January 1 then next following.  To serve during each odd numbered year (and for the original remaining fraction of the year 1960) the Chairman and Vice Chairman shall be selected by and from among the Producer Plan Trustees and the Secretary and Assistant Secretary shall be selected by and from among the SAG Plan Trustees. To serve during each even numbered year commencing with the year 1962 the Chairman and the Vice Chairman shall be selected by and from among the SAG Plan Trustees and the Secretary and Assistant Secretary shall be selected by and from among the Producer Plan Trustees. Effective for officers elected to serve commencing on or after January 1, 1990, the term of office shall be increased from one year to two years.  Prior to December 31, 1991, and prior to December 31 of each odd numbered year thereafter, the Plan Trustees shall select from among them a Chairman and Vice Chairman and a Secretary and an Assistant Secretary to serve for a term of two years, commencing January 1 next following.  The selection of the Chairman and Vice Chairman for the two-year period commencing January 1, 1992 shall be made by and from among the Producer Plan Trustees and  the selection of the Secretary and Assistant Secretary for the two-year period commencing January 1, 1992 shall be made by and from among the SAG Plan Trustees.  Thereafter, the SAG Plan Trustees shall alternate with the Producer Plan Trustees with respect to which group selects the Chairman and Vice Chairman and which group selects the Secretary and Assistant Secretary.  For example, the SAG Plan Trustees will select the Chairman and Vice Chairman for the two-year periods commencing January 1, 1994 and January 1, 1998 whereas the Producer Plan Trustees will select the Chairman and Vice Chairman for the two-year periods commencing January 1996 and January 1, 2000.  The Producer Plan Trustee will select the Secretary and Assistant Secretary for the two-year periods commencing January 1, 1994 and January 1, 1998, whereas the SAG Plan Trustees will select the Secretary and Assistant Secretary for the two-year periods commencing January 1, 1996 and January 1, 2000. ·

<u>Section 2</u>.  <u>Meetings of Plan Trustees</u>.  (Amended 4/8/65 and 2/1/84).  Meetings of the Plan Trustees shall be held a the principal office of the Pension Plan or at such place or places as may at any time or from time to time be agreed upon by the then Chairman and Secretary and may be called by either of said officers or by any two Plan Trustees upon seven days written notice to the other Plan Trustees; provided that where matters of an urgent nature arise which make it impractical to give such seven (7) days advance notice of meeting, the Chairman and Secretary may call a meeting on twenty-four (24) hours telegraphic notice to the other Plan Trustees.  Meetings of the Plan Trustees may be held

19

at any time without notice if all of the Plan Trustees consent thereto in writing or by telegram or cable. Neither notice nor consent shall be required if a full complement of qualified Plan Trustees are present at any meeting. Notices of meeting shall in each instance specify the hour and place of such meeting and shall state the nature of any business which is to be considered at such meeting. Except with the unanimous consent of all Plan Trustees present at a meeting at which at least a full quorum of Plan Trustees are present, no business other than that stated in the notice shall be acted upon by the Plan Trustees.

Section 3. Action by the Plan Trustees Without Meeting. (Amended 2/1/84) Action by the Plan Trustees may also be taken by them without a meeting provided that such action is evidenced by an instrument in writing to which all of the Plan Trustees shall consent by unanimous written concurrence.

Section 4. Quorum. (Amended 2/1/84) Fourteen (14) Plan Trustees shall constitute a quorum for the transaction of business provided that not less than seven (7) of those present and acting shall be SAG Plan Trustees and not less than seven (7) shall be Producer Plan Trustees. During the absence of a quorum at any time during a meeting the Plan Trustees shall have no power to transact any business other than to adjourn. If the quorum is lacking because of the failure to attend of the minimum required number of either Producer Plan Trustees or SAG Plan Trustees, but the minimum required number of one such group is present, then the group so present may require any proposal or proposals properly on the agenda of such meeting in accordance with the provisions of Section 2 of this Article V to be specifically placed upon the agenda for the next meeting of the Plan Trustees and to be specifically included in the notice calling such next meeting. If at such next meeting a quorum again shall not be present because of the absence of the minimum required number of Plan Trustees from the same group which caused the failure of a quorum at the first meeting, then upon adjournment of the second meeting as in this section provided and required, the vote of the absent group of Plan Trustees shall be deemed cast automatically in opposition to the vote of the group which has been present at such meetings, so as to cause thereby a deadlock vote between the groups which deadlock vote may then be determined in accordance with the provisions of Section 6 of this Article V.

Section 5. Majority Vote of Trustees. Except where specifically provided differently elsewhere herein all action by the Plan Trustees at a meeting at which a quorum of the Plan Trustees are present shall be by a majority of those present and voting.

Section 6. Action in the Event of Deadlock. (Amended 2/1/84) In the event of a deadlock between all of the Producer Plan Trustees who cast a vote on the one hand and all of the SAG Plan Trustees who cast a vote on the other hand, and provided that the question or resolution so deadlocked is presented for a second time at the next succeeding meeting of the Plan Trustees and again the Plan Trustees are deadlocked because of a continued existence of the same sort of deadlock, then an impartial umpire to cast the deciding vote shall be chosen if possible forthwith by the Plan Trustees. If the Plan

20

Trustees are unable to agree among themselves upon a person so to be designated to act as such impartial umpire, then within 72 hours after the adjournment of the meeting at which such subsequent deadlock and failure to designate an impartial umpire occurred, the Chairman and the Secretary shall attempt to agree upon the selection of such impartial umpire. If upon the expiration of such 72-hour period the Chairman and the Secretary have failed to select such impartial umpire then either group of Plan Trustees or any producer party hereto or SAG or any employer association that has appointed one or more of the then Plan Trustees may petition the District Court of the United States, Southern District of California, Central Division, for the appointment of such impartial umpire. When an impartial umpire has been selected in any of the manners aforesaid a meeting of the Plan Trustees shall be held as soon as practicable, which meeting shall be attended by such impartial umpire, and at that time the entire matter of the question or resolution in dispute shall be presented and re-argued and the umpire shall hear any evidence or arguments presented by either group of Plan Trustees upon the question or resolution upon which such deadlock has occurred. Such umpire may if he so desires make direct inquiries to the Plan Trustees with respect to any information which he deems to be relevant or material to a proper determination of the question, and any such information as is not then immediately available shall be furnished to such umpire by the Chairman and the Secretary jointly as soon as practicable. As soon as practicable, and in any event within 14 days after the date of such meeting or the date upon which the last of such requested information is furnished to him, whichever is the later date, the impartial umpire shall by written instrument cast his vote for or against the question or resolution upon which the deadlock has occurred. The vote so cast by such umpire shall be determinative of the question or resolution, and in casting such vote the umpire may but need not specify his reasons for so voting. The vote so cast by the umpire shall be in writing and shall be delivered by him to the Chairman and a copy thereof shall be delivered by him to the Secretary. All costs and expenses incidental to any such proceeding, including costs incurred in the appointment of the umpire, the holding of proceedings before him, the fee, if any, charged by him for his services, shall be a proper charge against the Pension Plan and the Plan Trustees are authorized to pay or direct the payment of such charges.

In the event of a deadlock within the unit of Producer Plan Trustees or within the unit of SAG Plan Trustees, the deciding vote shall be cast by the Plan Trustee in the deadlocked unit who is the current Chairman or the current Secretary of the Board of Trustees, as the case may be.

Section 7. Minutes of Meetings. (Amended 2/1/84) The Plan Trustees shall keep minutes of all meetings but such minutes need not be verbatim. Copies of the minutes of each meeting shall be sent to each Plan Trustee, whether or not such Plan Trustee was actually present at the meeting. The keep of such minutes shall be the responsibility of the Secretary and it shall be the duty of the Secretary to cause such minutes to be distributed as aforesaid as soon as practicable after the adjournment of each meeting. In the absence of the Secretary the Assistant Secretary shall have such duties. Such minutes shall be subject to approval by the Plan Trustees.

21

Exhibit C to PSD Declaration in Response to Debtor's Opposition, Page 45

ARTICLE VI

PLAN OF PENSION ELIGIBILITIES AND BENEFITS

Section 1.  Preparation of Plan.    As soon as possible after the execution of this agreement the Plan Trustees shall formulate and adopt a written plan which shall contain and provide all of the provisions, regulations, terms and conditions for the establishment of a complete program of pension eligibilities and benefits. Such plan shall conform to the applicable provisions and requirements of the respective collective bargaining agreements herein elsewhere referred to and of this agreement. The adoption of such plan shall require at a meeting the affirmative vote of not less than a majority of the full complement of then qualified Plan Trustees. Subject to the provisions hereof the Plan Trustees shall have the sole and entire power and authority to decide upon, agree to, and set forth and determine such provisions, regulations, terms and conditions, and likewise the Plan Trustees shall have the full power and authority and right to amend such plan at any time from time to time provided that the amendments comply with the purpose stated above.

Section 2.  Compliance with Applicable Laws.  It is the intention of the parties that the Pension Plan and any and all amendments thereto shall at all times:

a)  Be and remain such as to constitute it a qualified plan under the provisions of Section 401 of the Internal Revenue Code of 1954, and such that all contributions of Producers thereto will be fully deductible by the Producers for federal income and franchise tax purposes, and

b)  Be and remain in compliance and conformity with all applicable laws and regulations, including but not limited to all applicable provisions of the Labor Management Relations Act and any other applicable valid federal or state laws or rules or regulations, and

c)  Be and remain such that contributions to the Pension Fund satisfy the requirements of the Fair Labor Standards Act to the extent, if any, that such Act is applicable to the employments covered thereby, in order that contributions by Producers are excluded from employees' regular rate for overtime computation purposes, and

d)  Be and remain such that contributions to the Pension Fund shall not be subject to deductions under and for the purposes of the California Unemployment Insurance Act, the Federal Unemployment Tax Act, the Social Security Act, or the Federal Insurance Contributions Act or any similar legislation.

To these ends the Plan Trustees shall from time to time promptly amend this trust agreement and the plan of pension eligibilities and benefits and any other parts of the Pension Plan in any respect necessary or appropriate to make the provisions conform and comply with these laws, rules and regulations. Any such amendment shall be made

22

effective retroactive if necessary to such date as the circumstances require in order to obtain and maintain the continuity of such compliance and conformities. The Pension Plan and all amendments thereto shall be submitted to the United States Treasury Department or other authorized agency for approval under the applicable provisions of the Internal Revenue Code so that all contributions of Producers thereto will be fully deductible by the Producers for tax purposes, and in the event of failure to obtain approval of the Pension Plan as qualified under said Internal Revenue Code, or allowance of deductibility as aforesaid, the Plan Trustees shall immediately, and retroactively, if necessary, make such revisions as are necessary to obtain such approval and allowance.

Section 2a. Contributions Prior to Adoption of Plan.    Until the Plan Trustees have adopted a plan of pension eligibilities and benefits pursuant to Article VI hereof, the Fund Trustee shall act as escrowee in respect to contributions received by it. Forthwith upon the adoption by the Plan Trustee of such plan of pension eligibilities and benefits, the Plan Trustees shall notify the Fund Trustee of the adoption of such plan and the escrowee shall thereupon terminate and thenceforth, but in no event prior thereto, the Fund Trustee shall hold such contributors and any income earned thereon as part of the Pension Fund. Pending the adoption of such plan, such contributions and the income earned thereon shall be held as a separate escrow fund by the Fund Trustee for the account of the respective contributors thereto, to be repayable by them if no such plan has been adopted by February 1, 1963. Funds held by the Fund Trustee as escrowee in such escrow account may, by direction of the Plan Trustees, be held in an interest bearing account and/or invested in United States Government obligations.

Section 3.    Twentieth Century-Fox Film Corporation Private Retirement Plan.    There is presently in effect an employee's Retirement Plan of Twentieth Century-Fox Film Corporation (hereinafter called "Fox") and certain of its subsidiaries. Such plan is hereinafter called the "Fox Retirement Plan" and the Pension Plan referred to in this agreement is herein referred to as the "Pension Plan". Any employee of Fox who because of the nature of his employment might be subject to both of such plans, is hereinafter referred to as a "Fox Employee", whether he be a present employee or a future employee.

As long as a Fox Employee is a member of the Fox Retirement Plan, he shall not be a member of the Pension Plan and shall not be obligated to establish a reserve for, or to make payments into, the Pension Fund with respect to him or measured by his compensation.

Inasmuch as the Fox Retirement Plan prescribes a waiting period of one year before a new employee may become a member of the Fox Retirement Plan, if Fox for such period makes the required payments into the Fox Retirement Plan for an employee, Fox shall be entitled, whenever any such new Fox Employee becomes a member of the Fox Retirement Plan, to take credit in reduction of its next payment into the Pension Fund for any amounts paid into the Pension Fund, or set aside in a reserve therefor during such waiting period.

23

Any such Fox Employee who now is or hereafter becomes a member of the Fox Retirement Plan shall have the right, prior to his normal retirement date under the Fox Retirement Plan, to withdraw from membership in the Fox Retirement Plan as of any December 31 and to become a member of the Pension Plan as of the immediately following January 1 by serving on Fox, on or before the immediately preceding December 1, a written notice of his election to do so. Any new Fox Employee who, because of the waiting period, has not yet become a member of the Fox Retirement Plan, may elect not to become a member of the Fox Retirement Plan by serving on Fox, at least thirty days before the date on which he would become a member of such plan, a written notice of his election to remain a member of the Pension Plan.

Any such election to become or remain a member of the Pension Plan shall be irrevocable and such Fox Employees shall not thereafter be eligible for membership in the Fox Retirement Plan. Upon the exercise of such election, such Employee, and any person claiming under, through or by him or under, through or by any settlement option which he may have exercised under the Fox Retirement Plan, shall automatically relinquish all rights in and to the Fox Retirement Plan and the benefits or prospective benefits thereunder, except such rights and benefits that have already accrued and in which such Employee has a vested right under such Fox Retirement Plan, at the time of such election.

An election to withdraw from the Fox Retirement Plan and to become a member of the Pension Plan shall be dated and signed by the employee and his signature shall be witnessed by an executive of Fox. Such notice shall be addressed to Fox and shall read as follows:

> "I hereby elect to withdraw from the Employees' Retirement Plan of Twentieth Century-Fox Film Corporation and certain subsidiaries and to become, as of next January 1, a member of the Pension Plan established under your existing contract with SCREEN ACTORS GUILD, INC. I realize that this election is irrevocable and that in so electing I, and my beneficiary or beneficiaries whom I may have designated, relinquish all rights to benefits under the Employees' Retirement Plan of Twentieth Century-Fox Film Corporation and certain subsidiaries, except such benefits that have already accrued and in which I have a vested right under such Fox Retirement Plan, at the date of this election."

An election by a new Fox Employee to remain a member of the Pension Plan shall be dated and signed by the Employee and his signature shall be witnessed by an executive of Fox. Such notice shall be addressed to Fox and shall read as follows:

> "I hereby elect to remain a member of the Pension Plan established under your existing contract with SCREEN ACTORS GUILD, INC. I realize that this election is irrevocable and that in so electing I relinquish any right to become a member of the Employees' Retirement Plan of Twentieth Century-Fox Film Corporation and certain subsidiaries."

24

The Pension Plan shall not be effective as to any Fox Employees who are or become members of the Fox Retirement Plan until Fox shall have received a written ruling from the Internal Revenue Service to the effect that the provisions of the Pension Plan will not deprive Fox of the deductibility, for United States income tax purposes, of contributions heretofore or hereafter made by it to the trust established under the Fox Retirement Plan.

25

## ARTICLE VII

## PARTIES TO PENSION PLAN

Section 1.  Original Parties.  (Amended 2/1/84)    This agreement and trust shall be executed by SAG, those Producers who are members of Association of Motion Picture Producers, Inc., the  Plan Trustees originally designated by SAG, and the Plan Trustees originally designated by Association of Motion Picture Producers, Inc., and thereby each such party becomes a party to the Pension Plan.

Section 2.   Additional Parties.  Any Producer (as defined herein) who is not an original party to the Pension Plan may adopt and become a party to the Pension Plan by executing and delivering to the Plan Trustees in duplicate, a sufficient written instrument approved by the Plan Trustees, wherein it agrees to become a party thereto.  Such instrument may by reference include the terms of any then existing collective bargaining agreement.

26

## ARTICLE VIII

## MISCELLANEOUS PROVISIONS

**Section 1. Amendment.** This trust agreement may be amended at any time and from time to time at a meeting by the affirmative vote of not less than 75% of the full complement of then qualified Plan Trustees. The amendment of the plan of pension eligibilities and benefits adopted pursuant hereto at any time or from time to time shall require at a meeting the affirmative vote of not less than a majority of the full complement of then qualified Plan Trustees.

**Section 2. Limitation on Right of Amendment.** No amendment of or change in the Pension Plan may be adopted which will alter the basic principles hereof or be in conflict with the then existing collective bargaining agreements or contrary to any applicable law or governmental rule or regulation. No amendment may be adopted which will cause any of he assets of the Pension Fund to be used for or diverted to purposes other than those herein authorized or which will retroactively deprive any person of any vested benefit; except any amendment may be made which is required as a condition to obtaining or retaining the approval of this Pension Plan by the Internal Revenue Service under the Internal Revenue Code or the Franchise Tax Board under the California Revenue and Taxation Code as either are now in effect or hereafter amended to the end that any contributions made to the Pension Fund by the Producer are deductible for federal income tax and California state franchise tax purposes.

No amendment shall change the obligations of Twentieth Century-Fox Film Corporation as set forth in Section 3 of Article VI hereof unless such corporation agrees thereto.

**Section 3. Notification of Amendment.. (Amended 2/1/84)** Whenever an amendment is adopted in accordance with this Article, a copy thereof shall be distributed to each Plan Trustee and the Plan Trustees shall notify any other necessary persons or parties thereof and shall execute any necessary instrument or instruments in connection therewith.

**Section 4. Termination.** This trust agreement may be terminated by an instrument in writing executed by all of the Principal and Alternate Plan Trustees when there is no longer in force and effect a collective bargaining agreement between SAG and any Producer requiring contributions to the Pension Fund, or it may be terminated at any time by an instrument in writing executed by SAG and by all Producers having collective bargaining agreements with SAG who are Producers under this trust agreement. In the event of any such termination hereof the Plan Trustees shall apply the Pension Fund solely for the purpose of paying or providing for the payment of obligations created pursuant to the Pension Plan and in no case shall any part of the corpus or income of the fund be used for or diverted to purposes other than for the exclusive benefit of persons entitled thereto under the terms of the plan of pension eligibilities and benefits or the administrative expenses of the Pension Plan or of this trust or for other payments in

27

accordance with the provisions of this trust agreement. Under no circumstances shall any portion of the corpus or income of the Pension Fund directly or indirectly revert or accrue to the benefit of any contributing Producer or to SAG. Upon any such termination the Plan Trustees and the Fund Trustee shall continue as trustees for the purpose of winding up the affairs of the trust and of the Pension Plan.

Section 5.    Reversion.    No portion of any contribution may be paid or reverted to any Producer.

Section 6.    Use of Funds.    The Plan Trustees shall use and apply the assets of the Pension Fund for the following purposes only:

a)    To pay all reasonable and necessary expenses incurred in the establishment and administration of the Pension Plan, and

b)    To pay for the retirement benefits provided for in the plan of pension eligibilities and benefits to be adopted pursuant hereto.

Section 7.    Situs.    This agreement and the entire Pension Plan shall be deemed to have been executed in the City of Los Angeles, State of California, and such place shall be deemed the situs thereof. All questions pertaining to validity and construction shall be determined in accordance with the laws of such state.

Section 8.    Notification to Plan Trustees.    The address of each of the original Plan Trustees shall be that stated following his signature hereto. Any changes of address shall be effected by written notice to the Plan Trustees.

Section 9.    Severability.    Should any provision of the Pension Plan or rules and regulations adopted hereunder or of any Collective Bargaining Agreement be deemed or held to be unlawful or invalid for any reason, such fact shall not adversely affect the other provisions thereof unless such illegality shall make impossible or impractical the functioning of the Pension Plan. In the event the functioning of the Pension Plan becomes impossible or impractical for such reason, all the then parties, including the Plan Trustees shall endeavor to devise and adopt an amendment which will permit, if possible, the functioning of the Pension Plan as nearly as possible in accordance with the true spirit and intent thereof.

Section 10.    Nonassignability.    To make it impossible for any person to imperil, directly or indirectly, the Pension benefits provided by the Pension Plan, none of the Pension benefits, payments, proceeds or claims of any person thereunder shall be subject to any claim of any creditor and, in particular, the same shall not be subject to attachment or garnishment or other legal process by any creditors, or to the jurisdiction of any bankruptcy court or any insolvency proceedings by operation of law, or otherwise, nor shall any person have any right to alienate, anticipate, commute, pledge, encumber or assign any of the benefits or payments or proceeds which he may expect to receive,

28

contingently or otherwise, under the Pension Plan. If by operation of law, or otherwise, any pension benefit, payment, proceed or claim of any person would devolve to anyone else, then the Plan Trustees in their discretion may terminate such interest and apply it to or for the benefit of such person, his spouse, children or other dependent, or any of them in such manner as the Plan Trustees may elect.

Section 11. Validity of Action. No action determined by the vote of the Plan Trustees, directly or through the vote of an umpire as herein contemplated, shall be valid or effective which shall interpret or apply any provisions of the Pension Plan in any manner or to any extent so as to be contrary to any applicable law or governmental rule or regulation or which would exceed the powers given to the Plan Trustees as set forth hereunder or change or enlarge the express purposes thereof.

Section 12. Titles. This instrument may be referred to as the "Screen Actors Guild-Producers Pension Plan Trust Agreement." The Trust provided for in Section 1 subsection f, or Article IV, may be referred to as the "Screen Actors Guild - Producers Pension Fund Trust." The plan of pension eligibilities and benefits provided-for-in-Section 1 of Article VI hereof may be referred to as the "Screen Actors Guild-Producers Pension Benefits Plan."

Section 13. Headings no Part of Agreements. Headings and subheadings in this agreement are inserted for convenience of reference only and are not to be considered in the construction of the provisions hereof.

Section 14. Counterparts. This Trust Agreement may be executed in one or more counterparts. The signature of a party on any counterpart shall be sufficient evidence of his execution hereof.

29

# Exhibit D

## SCREEN ACTORS GUILD-PRODUCERS HEALTH PLAN
## TRUST AGREEMENT

(Including Amendments 1 through 13)

(Amended 11/6/92)  This is an agreement entered into as of the 1st day of February, 1960, but amended in its entirety as of the 14th day of February 1, 1961 and as of the 1st day of February, 1984, all in the County of Los Angeles, State of California.  The parties to this agreement, as amended are:  first, certain employers of motion picture actors and extras, as more fully described herein, and who will be hereinafter referred  to as "Producers"; second, Screen Actors Guild,  Inc., being the representative for collective bargaining purposes of members of the motion picture acting and motion picture extra professions; and third, the Health Plan Trustees and the Successor Health Plan Trustees.

The parties hereto contracting do so with reference to the following facts:

Screen Actors Guild, Inc., hereinafter referred to as "SAG" has entered into collective bargaining agreements with various Producers, including the Producers who are members of the Association of Motion Picture Producers, Inc., and including the Producers who had previously entered into collective bargaining agreements with the Screen Extras Guild, Inc., which was formerly a party to this Agreement, and may hereafter enter into collective bargaining agreements with certain other producers, which agreements provide and may provide, among other things, for contributions by each such Producer to the Health Fund hereunder (formerly known as the Welfare Fund) with respect to services subject to such collective bargaining agreements.

In order to effectuate the aforesaid purpose, SAG and the Producers signatory hereto desire to create a Health Fund to be used in the manner hereinafter set forth.

NOW, THEREFORE, in consideration of the mutual promises of the parties, a trust is hereby created and declared and it is mutually understood and agreed as follows:

## ARTICLE I

### DEFINITIONS

Section 1.    (Amended 11/6/92)

a) SAG. The term "SAG", as used herein, shall mean Screen Actors Guild, Inc., a non-profit corporation.

b) Guild. The term "Guild", as used herein, shall mean SAG.

Section 2.    Producers.  (Amended 01/01/02) The term "Producers" as used herein shall mean:

a) Those member companies of Association of Motion Picture Producers, Inc. (now succeeded by the Alliance of Motion Picture and Television Producers, Inc.) who are original signatories to this agreement; and

b) Companies that have authorized the A.N.A. - A.A.A.A. Joint Policy Committee on Broadcast Talent Union Relations to represent them in collective bargaining with the Screen Actors Guild; and

c) Any other motion picture producer who becomes a signatory to the Producer-SAG Codified Basis Agreement or to the Producer-SAG Television Agreement or to the SAG Commercials Contract; and

d) Any motion picture producer or other employer of actors engaged in the production of motion pictures in the United States, its territories or possessions, (hereinafter referred to as a "U.S. Producer") who is or hereafter becomes a party to a SAG collective bargaining agreement that provides for payments to be made by such U.S. Producer into the Fund created hereby and any producer or other employer of actors engaged in the production of motion pictures outside the U.S. (hereinafter referred to as a "Foreign Producer") whose agent is or hereafter become a party to a SAG collective bargaining agreement that provides for payments to be made by such Foreign Producer into the Fund created hereby; and

e) Any employer who is permitted by the Plan Trustees to be regarded as an employer hereunder pursuant to Article IV Section 1, subsection u.

Section 3.    Employer Associations.    (Amended 11/9/84)    The term "Employer Associations" shall mean and include the Alliance of Motion Picture and Television Producers, Inc., A.N.A.-A.A.A.A. Joint Policy Committee on Broadcast Talent Union Relations, and any other association organized and existing for the representation of Producers in matters pertaining to a Collective Bargaining Agreement (as defined in Section 11 of this article).

2

Section 4.   Plan Trustees.   The term "Plan Trustees" as used herein shall mean those persons who as of any time are properly acting as such.

Section 5.   Actors.   (Amended 11/9/84 and 11/6/92) The term "Actors" as used herein shall mean the persons employed by Producers to render services as actors in Motion Pictures (as defined in Section 10 of this article) who are covered by and whose services are subject to a collective bargaining agreement with SAG, and with respect to whose services contributions are required thereunder to be made into the Health Fund. Because no substantial separate group of extras and actors exists in the United States and the same persons generally work interchangeably in both capacities, the term "actors" shall also include, for the limited purposes of the Health Plan, the persons employed by Producers to render services as extras in the motion picture industry who are covered by and whose services are subject to a collective bargaining agreement with SAG (including those individuals employed by Producers to render services as extras in the motion picture industry who are covered by and whose services were formerly subject to a collective bargaining agreement with SEG) and with respect to whose services contributions are required thereunder to be made into the Health Plan.

Section 6.   Health Fund.   The term "Health Fund" (formerly "Welfare Fund") as used herein shall mean the Screen Actors Guild-Producers Health Fund for Motion Picture Actors, a trust fund created hereunder, including the monies and other things of value which comprise the corpus, and all income therefrom and increments thereto.

Section 7.   Health Plan.   The term "Health Plan" (formerly "Welfare Plan") as used herein shall mean and include this trust agreement, the Health Fund, and any plan or plans of welfare eligibilities and benefits adopted by the Plan Trustees pursuant to this agreement. The Trustees may in their discretion distinguish between actors and extras hereunder or, where reason justifies such distinction, may distinguish between various groups of actors hereunder or between various groups of extras hereunder, and to whatever extent the Trustees deem advisable may adopt separate rules and/or benefits for each group so separately distinguished and provided for. The Welfare Plan as herein defined includes collectively any and all such plans adopted hereunder the Health Plan in its entirety may be referred to as the "SAG—Producers Health Plan for Motion Picture Actors."

Section 8.   Fund Trustee.   The term "Fund Trustee" as used herein shall mean the bank or trust company, if any, designated by the Plan Trustees pursuant to the provisions hereof as the trustee for the purpose of receiving, holding, investing and paying out all or any part of the monies and other assets of the Health Fund.

Section 9.   Trustees.   The term "Trustees" as used herein shall mean either the Plan Trustees or the Fund Trustees, or both, as the case may require.

3

Section 10. Motion Pictures. The term "motion pictures" as used herein shall be deemed to include but is not limited to theatrical motion pictures, television motion pictures, television motion picture commercials and commercial and industrial motion pictures.

Section 11. Collective Bargaining Agreement. (Amended 11/6/92) The term "Collective Bargaining Agreement" as used herein shall mean the collective bargaining agreement or agreements in force and effective from time to time between SAG and Producers with respect to the employment and services of actors or extras in the production of motion pictures and which provide for contributions by such Producers into the Health Fund hereunder.

Section 12. Full Complement of Plan Trustees. When ever in this trust agreement reference is made to a full complement of qualified Plan Trustees, such reference shall be deemed to mean the total number of Plan Trustees then authorized to act as the Board of Plan Trustees.

Section 13. Protected Health Information. (Amended 04/14/03) Individually identifiable information that is created or received by the Health Plan, or a business associate of the Health Plan, whether in oral, written, or electronic form, that relates to (i) the past, present or future physical or mental health or condition of a Health Plan participant or dependent; (ii) the provision of health care to a Health Plan participant or dependent; or (iii) the past, present, or future payment for the provision of healthcare to a Health Plan participant or dependent.   Health information becomes individually identifiable when it either identifies the Health Plan participant or dependent or provides a reasonable basis to believe the information can be used to identify the Health Plan participant or dependent. The following items may cause health information to become individually identifiable: i) name; ii) street, city, county, precinct, zip code; iii) dates directly related to a Health Plan participant's or dependent's receipt of healthcare treatment, including birth date, health facility admission and discharge date, and date of death; iv) telephone numbers, fax numbers, and electronic mail addresses; v) social security numbers; vi) medical record numbers; vii) Health Plan participant or dependent numbers; viii) account numbers; ix) certificate/license numbers; x) vehicle identifiers and serial numbers, including license plate numbers; xi) device identifiers and serial numbers; xii) Web Universal Resource Locators (URLs); xiii) internet protocol (IP) address numbers; xiv) biometric identifiers, including finger and voice prints; xv) full face photographic images and any comparable images; and xvi) any other unique identifying number, characteristic, or code.

Section 14. Summary Health Information. (Amended 4/14/03) Health information, that may identify a Health Plan participant or dependent, and (i) summarizes the claims history, claims expenses, or type of claims experienced by individuals for whom a plan sponsor has provided health benefits under a health plan; and (ii) from which the information described at 42 CFR § 164.514(b)(2)(i) has been deleted, except that the geographic information need only be aggregated to the level of a five-digit zip code.

4

ARTICLE II

PLAN TRUSTEES

Section 1.    Administration by Plan Trustees.    (Amended 11/6/92)  The operation and administration of the Health Plan shall be the joint responsibility of thirty-six (36) Plan Trustees, who shall constitute the Board of Plan Trustees.  Of these, eighteen (18) shall be Producer Plan Trustees, to be appointed, nine (9) by the Alliance of Motion Picture and Television Producers, Inc., and nine (9) by an Employer Association from the New York area representing the New York signatories to Guild collective bargaining agreements; and eighteen (18) shall be Guild Plan Trustees, to be appointed by SAG.

Section 2.    Acceptance of Trusteeship.  Any original, substitute, new or additional Plan Trustee shall, either by signing this trust agreement, or by signing a written acceptance of such trusteeship, or by having attended at or participated in a meeting of the Board of Plan Trustees, be deemed to have accepted such trusteeship and to have agreed to act in such capacity strictly in accordance with the provisions hereof.

Section 3.    Term of Plan Trustees.  Each Plan Trustee at any time or from time to time appointed hereunder shall continue to serve as such until his death, disability, resignation, absence or substitution.

Section 4.    Substitution of Plan Trustees.  (Amended 11/6/92)  The Guild or any Employer Association responsible in the first instance for the appointment of any Plan Trustees may at any time in its discretion by written notice given to the Chairman (who, upon receipt of such notice, shall immediately notify all Plan Trustees then in office thereof) appoint a successor or successors for any one or more of the Plan Trustees theretofore appointed by it (including, with respect to the Guild, the right to appoint a successor or successors for either or both of the Plan Trustees formerly appointed by SEG when it was a party to this Agreement).

Such written notice shall contain the name or names of the Plan Trustee or Trustees to be replaced and the name or names of the new Plan Trustees so appointed, and the effective date or such appointment or appointments.

Section 5.    Change in the Allocation of Plan Trustees.  The number of Plan Trustees to be allocated to the respective Employer Associations which may be entitled to appointment of the same shall be subject to redetermination and review by the Plan Trustees at the end of each three-year interval following February 1, 1960.  Such allocation for the ensuing three-year period shall be determined as nearly as practicable in accordance with the proportion which the total contributions to the Health Fund for the preceding three-year period made by the members of each such Employer Association bears to the total contribution to the Health Fund made by members of all such Employer

5

Associations during such preceding three-year period. In computing the amount of such contributions there shall be included therein all sums contributed to the Pension Fund by each member, whether for past services or for current services, regardless of how the amount thereof was originally determined or allocated to such member.

When a reallocation of Plan Trustees is made, an Employer Association whose allocation is reduced shall remove, and an Employer Association whose allocation is increased shall appoint, a sufficient number to Trustees to maintain the total number of Producer Plan Trustees at eighteen (18).

Section 6.    Resignations.  A Plan Trustee may resign by giving notice in writing to the Chairman who upon receipt of such notice shall notify the remaining Plan Trustees thereof. Such resignation shall become effective when a successor to the resigning Plan Trustee has been appointed in the manner provided in Section 4 of this article, as the case may be, and has accepted the trusteeship in the manner provided in Section 2 of this article. The successor Plan Trustee shall thereupon become vested with all of the rights, powers and duties of a Plan Trustee hereunder.

6

ARTICLE IIi

CONTRIBUTIONS TO THE HEALTH FUND

Section 1.    Rate of Contributions.    In order to carry out the purposes hereof, each Producer shall contribute to the Health Fund in the amount and as required by the collective bargaining agreement or agreements with such Producer. Contributions shall also be made by Producers of any amounts deducted from the compensation of employees under collective bargaining contracts which provide for such deductions and payments into the Health Fund. The rate and amount of contribution shall at all times be governed by said collective bargaining agreements. Nothing in this Trust Agreement or in any Plan or trust agreement pursuant hereto shall be deemed to change, alter or amend any of said collective bargaining agreements.

Section 2.    Effective Date of Contributions.    (Amended 11/6/92)   All contributions shall be made effective as of the date specified in the respective collective bargaining agreements and said contributions shall continue to be paid so long as a Producer is so obligated pursuant to said collective bargaining agreements.    Promptly upon the execution of any new collective bargaining agreement or amendment of any then existing collective bargaining agreement in a way that affects contributions to be made thereunder, SAG shall file an executed or a true copy of such agreement with the Plan Trustees, and the Plan Trustees shall be entitled to treat the copy so filed as determining the obligations of the parties thereto, thereunder and hereunder.

Section 3.    Mode and Time of Payment.   (Amended 9/1/84)   All contributions to the Health Fund shall be payable to the Fund Trustee and, except as otherwise provided by resolution of the Plan Trustees, shall be paid by transmitting to the Plan Trustees a check therefor payable to the Fund Trustee. Any such check or checks received by the Plan Trustees shall be processed administratively by them and forwarded to the Fund Trustee. The Plan Trustees shall, by resolution duly adopted, establish the due dates for contributions in conformity with the respective collective bargaining agreements between the Guild and Producers. The Plan Trustees may, by resolution duly adopted, provide for payment with respect to any Producer or Producers upon a different periodic basis if it is shown that such different basis will be administratively convenient and will not cause any material financial disadvantage to the Health Fund.

7

<u>Section 4.    Default of Payment and Liquidated Damages.</u>  (Amended 9/1/84)   The failure of a Producer to pay the contributions required hereunder at the times and in the manner herein provided shall constitute a violation of such Producer's obligations hereunder. Non-payment by a Producer of any contribution as herein provided shall not relieve any other Producer of his obligation to make payment of his required contributions.  A Producer who fails to pay required Producer contributions when due shall be liable for liquidated damages as follows:

| Period of Delinquency | Liquidated Damages |
|---|---|
| Up to 30 days | None |
| 31 days to 60 days | 10 percent of contributions due |
| Over 60 days | 20 percent of contributions due |

A Producer in default shall also be liable for reasonable attorney's fees and costs incurred in the collection of the delinquent contributions. The Plan Trustees may take or cause to be taken any action deemed by them advisable or necessary to enforce payment of the contributions due hereunder, including actions in law or equity. In addition to all rights to enforce  payment of such accrued obligation of a Producer anywhere in this trust agreement provided or given by the law, in the event a Producer has been repeatedly delinquent or has otherwise willfully violated the provisions of this agreement and declaration of trust, the status of such Producer as a party hereto may be terminated by the Plan Trustees in their discretion by a resolution duly adopted, and upon such termination such Producer shall forthwith cease to be a Producer under the provisions of this agreement or a party hereto in any way thereafter. No Producer who has at any time defaulted hereunder and whose status as a part hereto  has been so terminated shall be eligible again to become a part hereto except upon such terms as to payment of all past obligations to the Health Fund as the Plan Trustees may require. The provisions of this Section 4 shall be without prejudice to the rights of the Guild, if any, under its collective bargaining agreements, or otherwise, against the defaulting Producer by reason of such default.

<u>Section 5.    Report on Contributions.</u>  (Amended 9/1/84, 1/1/89 and 1/1/96) Each Producer shall make such reports and statements to the Trustees with respect to the amount and calculation of any and all contributions as the Trustees may deem necessary or desirable.  All contribution reports submitted by each Producer shall specifically designate the project title, name and Social Security number of each Actor for whom the contribution is made. If the Producer fails to supply the data requested, the Producer shall be liable for liquidated damages in the amount of ten percent (10%) of the contribution amount for each Actor with respect to whom an omission occurs.  If the Producer's failure to supply the data requested continues for 60 or more days from the due date of the report, the Producer shall be liable for liquidated damages in the amount of twenty percent (20%) of the contribution amount for each actor with respect to whom an omission occurs. Such producer shall also be liable for the reasonable attorney's fees and

8

costs, if any, incurred in collection of the liquidated damages. The Plan Trustees may take or cause to be taken any action deemed by them to be advisable or necessary to enforce payment of the liquidated damages described in this section.

The Trustees may at reasonable times and during normal business hours of any Producer audit or cause the audit or an inspection of the records of any Producer which may be pertinent in connection with the said contributions and/or reports insofar as the same may be necessary to accomplish the purpose of the Health Plan. Should any audit or inspection disclose a delinquency or underpayment, the cost of the audit or inspection shall be borne by the Producer who is found to be delinquent. The Trustees shall have the power to waive such audit or inspection costs in a particular case upon good cause shown. such as, but not limited to, a case in which the delinquency found is small in amount. If litigation is required to compel such an audit or inspection, the Producer involved shall pay all attorney's fees, the cost of the audit or inspection subsequently conducted, interest, and court costs incurred by the Trust in connection with such litigation and the subsequent audit or inspection.

If a Producer fails or refuses to make a substantial portion of such reports and statements as are required by the Trustees, or fails or refuses to permit an audit or inspection of its records sufficient to verify the accuracy of reports or statements, the Trustees may refuse contributions from the Producer beginning with that period of time for which the Trustees determine that adequate or reliable records or statements were unavailable and may deny eligibility for benefits for all employees of the Producer for which contributions were made. This paragraph shall not be in derogation of the other remedies provided in this Article III.

Section 6.    Advancement of Premium.  Upon the failure of any Producer to make all the required contributions when due hereunder, the Plan Trustees shall have the right and power to pay or provide for payments from the Health Fund of any premiums necessary to provide the benefits under the plan of health eligibilities and benefits to be adopted pursuant hereto for the eligible employees of such delinquent Producer, but the Plan Trustees shall not be obligated, either to said employees or said Producer, to make or provide such payments, and the Plan Trustees shall incur no liability whatsoever, either individually or collectively, for their failure or refusal to do so. In the event such payments are made by the Plan Trustees from the Health Fund on behalf of a delinquent Producer, the Health Fund shall be reimbursed by said Producer for such payments, and the fact that the Plan Trustees may have made such payments shall not alter nor diminish the obligations of such Producer or the rights of the Plan Trustees under this Article.

Section 7.    Repayment of Benefits For Ineligible Employees. (Amended 1/1/96)    If a Producer reports contributions for an employee who did not render bona fide covered services as a result of which contributions the employee receives benefits under the Plan, the Trustees may require the Producer and said employee to repay to the Plans the amount by which the benefits paid on behalf of that ineligible employee exceed the contributions paid by the Producer.

9

Section 8.    Limitation for 25% Ownership Interest.   (Amended 1/1/96)   A person who owns a 25% or greater interest in a Producer of an Industrial/Educational motion picture shall not be entitled to credit for earnings attributable to employment by such Producer. For purposes hereof, an ownership interest held directly or indirectly by the person, the person's spouse, parent or child or by a trust for the benefit of the person or the person's spouse, parent or child shall be deemed to be owned by the person.

The foregoing paragraph shall not apply if the Trustees determine, upon application by any person describe in the preceding paragraph, that the person performed or is performing bona fide services covered by the S.A.G. Industrial/Educational Agreement.

Section 9.    Participant Premiums.   (Amended 1/1/2003)   In their discretion the Plan Trustees may, from time to time, determine that it is advisable to impose the payment of premiums on Plan Participants.   If such Participant premiums are imposed the Plan Trustees, in their discretion, may authorize the payment of such premiums through any means they deem advisable, including, but not limited to, payment via the Plan's website, payroll deduction, automatic bank account debit, credit card charge, or authorized by telephone.   A decision by the Plan Trustees to authorize any such system of premium payment shall be evidenced in the minutes of the meetings of the Plan Trustees and any Plan Trustee minutes memorializing such decision shall automatically be incorporated by reference into this Trust Agreement.

10

## ARTICLE IV

### POWERS AND DUTIES OF TRUSTEES

Section 1.    General.  In the administration of the Health Fund, the Plan Trustees are authorized and empowered as follows:

a) To invest and reinvest such part of the assets and the income of the Health Fund as in their sole judgment is advisable, in such securities and other investments, including bonds, common and preferred stocks, notes, mortgages, trust deeds or other property (real, personal or mixed), tangible and intangible, as they may select in their sole discretion, whether or not the same be authorized by law for the investment of trust funds generally.

b) To sell, exchange, lease, convey or dispose of any property whether real or personal at any time forming a part of the Health Fund upon such terms as they may deem proper, and to execute and deliver any and all authorizations, instruments of conveyance and transfer in connection therewith.

c) To vote in person or by proxy securities held by the Health Fund, and to exercise or cause to be exercised any other rights of whatsoever nature pertaining to securities or any other property held hereunder.

d) To exercise options, conversion privileges, or rights to subscribe for additional securities and to make payments therefor.

e) To consent to or participate in dissolutions, reorganizations, consolidations, mergers, sales, leases, mortgages, transfers or other changes affecting securities held by the Health Fund and in connection therewith, and to pay assessments, subscriptions or other charges.

f) The Plan Trustees may, if they deem it advisable, appoint a bank or trust company to be designated and to act as Fund Trustee for all or any part of the assets of the Health Fund. Such Fund Trustee shall receive and hold, subject to the provisions hereof and to the provisions of the trust agreement under and pursuant to which it is acting, such portion of the Health Fund as the Plan Trustees see fit to turn over to it.  The Plan Trustees shall enter into a trust agreement with such Fund Trustee setting forth the terms and conditions of such trust and providing for the investment and reinvestment of the funds so held by the Fund Trustee in accordance with the directions and instructions of the Plan Trustees, and incorporating such other provisions therein as may be deemed desirable in the Plan Trustees' sole discretion for the management thereof, including such delegation to the Fund Trustee of such of the rights, powers and duties of the Plan Trustees with respect to these assets of the Health Fund and the control and management thereof as the Plan Trustees deem proper.  Such trust agreement may provide, in the discretion of the Plan Trustees, for the periodic

11

Exhibit D to PSD Declaration in Support of Response to Debtor's Objection, Page 64

withdrawal by the Plan Trustees of the amounts necessary for the payment of health benefits or insurance premiums in connection therewith as the same accrue. and for the withdrawal by the Plan Trustees from time to time of such amounts as may be required in their discretion for the payment of the costs and expenses incurred in establishing and maintaining the Health Plan and for the payment of administrative costs, including, but not limited to rentals, supplies materials and equipment, taxes, the compensation of legal counsel, investment counsel, administrative, accounting, actuarial, clerical and other experts, assistants or employees. Such trust agreement may also provide that all securities held by the Fund Trustee may be registered in the name of a nominee or nominees of the Fund Trustee or held in unregistered or bearer form. The Plan Trustees shall have the right at any time and from time to time to remove any Fund Trustee and to substitute another bank or trust company as such Fund Trustee.

g) To enter into any and all contracts and agreements to carry out the terms of this Trust Agreement and for the administration of the Health Plan, and to do all acts which they in their discretion may deem necessary or advisable, and such contracts and agreements and acts shall be binding and conclusive on the parties hereto and on the actors and all beneficiaries. Without limiting the foregoing the Plan Trustees shall have the power to make appropriate allocations of common administration expenses and disbursements shared with any other Plan or Fund.

h) To compromise, settle, arbitrate and release claims or demands in favor of or against the Health Plan on such terms and conditions as the Plan Trustees may deem advisable.

i) To establish and accumulate reserves up to such amounts as are adequate in the opinion of the Plan Trustees to carry out the purposes of the Health Plan.

j) To borrow money in such amounts and upon such terms and conditions as shall be deemed advisable or proper by the Plan Trustees to carry out the purposes of the Health Plan and to pledge any securities or other property of the Health Fund for the repayment of any such loans.

k) To hold or require the Fund Trustee to hold part or all of the assets of the Health Fund uninvested.

l) To pay or to require the Fund Trustee to pay out of the assets of the Health Fund all real and personal property taxes, income taxes and other taxes of any and all kinds levied and assessed under existing or future laws upon or with respect to the Health Fund or any money, property or securities forming a part thereof.

m) To do all acts, whether or not expressly authorized herein, which the Plan Trustees may deem necessary or proper for the protection of the Health Fund.

Exhibit D to PSD Declaration in Support of Response to Debtor's Objection, Page 65

n) To lease or purchase such premises, supplies, materials and equipment and to hire, employ and retain such legal counsel, investment counsel, administrative, accounting, actuarial, clerical, and other experts, assistants or employees as in their discretion the Plan Trustees may find necessary or appropriate in the performance of their duties, and to pay therefor such amounts as the Plan Trustees deem proper.

o) (Amended 1/1/2003) To maintain a bank account or accounts in a selected bank or banks in the name of the Health Plan for depositing all or any part of the cash monies of the Health Fund and to withdraw monies from such account or accounts as required or convenient. All withdrawals of money from any such account shall be made by any method necessary and convenient, including, but not limited to, wire transfers, electronic debits or upon checks. The Plan Trustees may designate the Plan Administrator, or other individual, as the person or persons having the authority to make withdrawals from such account or accounts.

p) only upon checks signed by such person or persons as may have been duly designated by proper resolution of the Plan Trustees to sign such checks. The person or persons so authorized to sign checks or to handle such monies shall each be bonded by a duly authorized surety company in such amounts as may be determined from time to time by the Plan Trustees, and the cost of premiums on such bonds shall be paid by the Health Fund.

q) (Amended 11/6/92)   To construe the meaning of any doubtful or ambiguous provisions of the Health Plan, and any construction thereof adopted by the Plan Trustees in good faith shall be binding upon SAG, the Producers, the Actors, Extras and all beneficiaries.

r) To do any and all other matters and things pertaining to or required of the Trustees by the sections and articles of this agreement other than this Section 1 of Article IV.

s) Generally to do all things, execute all such instruments, adopt and promulgate all such reasonable rules and regulations, take all such proceedings and exercise all such rights and privileges as are necessary in the establishment, maintenance and administration of the Health Plan, and specifically but not limited to the plan or plans or welfare eligibilities and benefits required thereunder.

t) To keep property or securities in the custody of one or more banks or trust companies.

u) To pay or provide for the payment of premiums on such policies of insurance as the Plan Trustees may see fit to purchase to provide for the benefits to be provided hereunder; to exercise all rights or privileges granted to the policy holder by the provisions of each such policy or allowed by the insurance carrier of such policy, and to agree with such insurance carrier to any alteration, modification or amendment of such policy, and to take any action with respect to such policy or the insurance

13

provided thereunder which the Plan Trustees in their discretion may deem necessary or advisable, and such insurance carrier shall not be required to inquire into the authority of the Plan Trustees with respect to any such action.

v)  (Amended 1/6/92)  To the extent permitted by law and governmental regulation, and in order that their employees may be permitted to become eligible for and to receive benefits under the Health Plan established hereunder, the Plan Trustees may permit the Health Plan itself and/or SAG, to be, for such purpose, regarded as an employer hereunder.  In each such event, the Plan Trustees shall determine the eligibility requirements applicable to each such group of employees and the contributions required respectively on account of each such group of employees, and as to each group the contributions so required shall be paid by the respective employer of such group.

v)  (Amended 1/1/89)  Effective July 1, 1966, the Health Plan shall reimburse any person then eligible for benefits for amounts paid by them as premiums to the Social Security Administrator for voluntary supplemental medical insurance for them or their eligible dependents under the provisions of Part B of Title XVIII of the Social Security Act commonly known as "Medicare".  Such reimbursement shall not include, however, that portion of such premiums which is imposed under the Medicare Catastrophic Coverage Act of 1988.  An application for such reimbursement shall be made in writing on a form and in the manner prescribed by the Plan Trustees.  Reimbursement of the medicare fee shall be made from the beginning of the month for which the person has paid premiums for the supplementary medical insurance, but not earlier than a date eleven (11) months prior to the month in which the Medicare Reimbursement Application is received and shall continue on a calendar year quarterly reimbursement basis for so long as the participant shall continue eligible for participation in the Health Plan.

w)  To invest in units of any present or future common or collective trust fund with respect to which this Trust is eligible to participate and which trust fund has been or is established and maintained by the Fund Trustee.

Section 2.    Compensation.  The Plan Trustees shall not receive compensation from the Health Plan for the performance of their duties hereunder, but shall be entitled to reimbursement for reasonable actual expenses incurred in the performance of their duties hereunder, including, in the discretion of the Plan Trustees, traveling expenses to attend Plan Trustees' meetings.  The Fund Trustee shall be entitled to such compensation as may be mutually agreed upon by the Plan Trustees and the Fund Trustees.

Section 3.    Fiduciary Responsibility.  Subject to the provisions of Section 5 of Article VIII, the Plan Trustees and any other fiduciary shall discharge their respective duties set forth in the Health Plan solely in the interest of the Participants and their beneficiaries, and:

14

a) For the exclusive purpose of providing benefits to Participants and their beneficiaries and defraying reasonable expenses of administering the Health Plan.

b) With the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

c) By diversifying the investments of the Health Fund so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so.

d) The Plan Trustees shall not be liable for the proper application of any part of the funds of the Health Plan or for any other liabilities arising in connection with the administration thereof.

e) The Plan Trustees may from time to time consult with the Health Plans's Legal Counsel and shall be fully protected in acting upon the advice of said counsel with respect to legal questions.

f) Nothing herein contained shall exempt any Plan Trustee from liability arising out of his own willful misconduct, fraud or bad faith.

Section 4.    Books of Account. (Amended 11/6/92) Both the Fund Trustee, if any, and the Plan Trustees, shall keep true and accurate books of account and records of all their transactions, which shall be open to the inspection of each of the Plan Trustees at all times and which shall be audited annually or more often, as the Plan Trustees may determine, by a certified public accountant selected by the Plan Trustees. A statement of the results of such audits shall be available at all times for inspection by SAG, the Producers, the Actors and Extras at the principal office of the Health Plan.

Section 5.    Execution of Documents. The Plan Trustees may authorize the Chairman or the Vice Chairman and the Secretary or the Assistant Secretary, or any group of two or more Plan Trustees composed equally of Producer and SAG Plan Trustees to jointly execute on behalf of the Plan Trustees any certificate, notice or other instrument in writing, and all persons, partnerships, corporations or associations may accept such notice or instrument as having been duly authorized by and being binding upon the Plan Trustees.

Section 6.    Deposits and Withdrawals. (Amended 1/1/2003) All monies received by the Plan Trustees hereunder shall be deposited by them in such bank or banks as the Plan Trustees may designate for that purpose. All deposits to, and withdrawals from, such account or accounts shall be made by any method necessary and convenient, including, but not limited to, wire transfers, electronic debits or upon checks. The Plan Trustees may designate the Plan Administrator, or other individual, as the person or persons having the authority to make withdrawals from such account or accounts.

Exhibit D to PSD Declaration in Support of Response to Debtor's Objection, Page 68

Section 7.    Committees.    (Amended 7/24/87)  The Plan Trustees may establish such committees as they in their discretion deem proper and desirable for the proper administration of the Health Plan.  The appointment, operation, and authority of such committees shall be governed by the following rules:

a) Standing Committees.  The standing committees of the Board of Trustees shall be as follows:

> Administrative Committee
> Benefits Committee
> Collections Committee
> Finance Committee

b) Ad Hoc Committees.  Other committees for special purposes may be created from time to time by resolution duly adopted by the Board of Trustees.

c) Committee Membership.  Each committee shall have an equal number of members who are Producer Trustees and members who are Guild Trustees.  Committee members shall be appointed by the Chairman of the Board and shall serve until their successors are appointed.

d) Committee Chairman and Vice Chairman (Amended 7/24/87 and 7/1/90)    A chairman and vice chairman of each committee shall be appointed by the Chairman of the Board.  Of the four (4) standing committees the chairmen and vice chairmen of the two of them shall be Producer Plan Trustees and the chairmen and vice chairmen of the other two (2) shall be Guild Plan Trustees.  The term of office of a committee chairman shall not exceed three (3) years.  For committee chairmen in office on the date of adoption of these Rules, said terms shall be measured from the date of adoption of these Rules, said terms shall be measured from July 1, 1987.  Effective with respect to the chairman and vice chairman of a committee appointed for a term commencing on or after July 1, 1990, the term of office of such individuals shall not exceed two years.

e) Subcommittees.  The chairman of a committee may from time to time create one or more subcommittees and appoint the members and chairmen thereof from among the members of the committee.

f) Committee Authority.  The general purpose of a committee is to study and debate issues that arise in the administration of the Health Plan and to make recommendations thereon to the Board for action by the Board.  Notwithstanding this general limitation, the Board may, by resolution duly, adopted, delegate to a committee the authority to take final action in specified areas; and in such instances the action of the committee shall have the same binding effect as an action by the full Board.

16

The following delegations of authority to committees are now in effect:

(i)  To the Benefits Committee the authority to render decisions on claims appeals under the Health Plan.

(ii) To the Collections Committee the authority to refer to arbitration any disputed issue of liability for contributions or liquidated damages.

g)  Voting. In all matters where the Board has delegated to a committee the authority to take final action, the unit voting rules of Article V, Sections 5 and 6 of the Trust Agreement shall be applicable. In the event of a deadlock as defined in Section 6 of Article V, no action shall be taken and in the matter shall be reported to the Board for further consideration. In matters where only a recommendation to the Board is involved, a majority vote in favor of the recommendation shall be sufficient.

h)  Quorum for Meetings. To have a quorum for the conduct of committee business in a meeting, there must be present at the meeting at least two (2) members who are Producer Trustees and two (2) members who are Guild Trustees.

i)  Participation of Non-members in Committee Proceedings. All Trustees shall be given notice of committee meetings. Trustees who are not members of a committee may attend meetings of the committee and shall be entitled to participate in the discussions of issues; but only members of the committee shall be entitled to make or second motions and to vote on motions.

j)  Minutes. Each committee shall keep written minutes of its proceedings, which minutes shall be distributed to all Trustees.

Section 8.  Bonding. The Plan Trustees shall be bonded by a duly authorized surety company in such amounts as may be determined from time to time by the Plan Trustees and in any case in at least as large an amount as that required by any applicable federal or state law. Each employee employed by the Plan Trustees who is empowered to sign checks or who may be engaged in handling the monies or securities of the Health Plan shall also be similarly bonded by a duly authorized surety company. The premiums for all bonds shall be paid by the Health Plan.

Section 9.  Appointment of Investment Manager. Notwithstanding any other provisions of this Article IV, the Plan Trustees may appoint an Investment Manager or Managers to manage (including the power to acquire and dispose of) any assets of the Health Fund. As used in this Section 9, the term "Investment Manager" shall have the meaning given to it in Section 3 (38) of the Employment Retirement Income Security Act of 1974 (hereinafter referred to as the "Act"), and shall refer to any Investment Manager or Managers who may be appointed in the manner hereinafter described. If the Plan Trustees appoint an Investment Manager, the following provisions shall apply:

17

a) The appointment shall be effective upon written notice thereof being given by the Plan Trustees to the Fund Trustee.

b) The Fund Trustee is authorized and entitled to rely upon the fact that said Investment Manager is at all times a qualified Investment Manager, as defined in Section (3) of the Act, until such time as the Fund Trustee has received a written notice from the Plan Trustees to the contrary, as well as to rely upon the fact that said Investment Manager is authorized to direct the investment and management of the assets of the Health Fund until such time as the Plan Trustees shall notify the Fund Trustee in writing that another Investment Manager has been appointed in the place and stead of the Investment Manager named, or, in the alternative, that the Investment Manager named had been removed and the responsibility for the investment and management of the Trust assets has been assumed by the Plan Trustees.

c) The Fund Trustee shall not be liable or responsible in any way for any losses or other unfavorable results arising from the Fund Trustee's compliance with investment or management directions received by the Fund Trustee from the Investment Manager. All directions concerning investments made by the Investment Manager shall be given in such manner and by such person or persons, acting on behalf of the Investment Manager as may be duly authorized by the Investment Manager in writing. The Fund Trustee shall be entitled to rely upon directions which it receives that are so given and shall in no way be responsible for the consequences of any unauthorized use of such method which use was not, in fact, known by the Fund Trustee at the time to be unauthorized. The Fund Trustee shall be under no duty to question any directions of the Investment Manager nor to review any securities or other property of the Health Fund constituting assets thereof with respect to which an Investment Manager has investment responsibility, nor to make any suggestions to such Investment Manager in connection therewith. The Fund Trustee shall, as promptly as possible, comply with any written directions given by the Investment Manager. The Fund Trustee shall not be liable, in any manner not for any reason, for the making or retention of any investment pursuant to such directions of the Investment Manager, nor shall the Fund Trustee be liable for its failure to invest any or all of the Health Fund in the absence of such written directions.

Section 10. Uses and Disclosure of Protected Health Information. (Amended 04/14/03) The Health Plan may disclose Protected Health Information to the Plan Trustees in order for the Plan Trustees to carry out any of the powers or duties enumerated under this Article IV. Notwithstanding anything to the contrary, in on event shall the Plan Trustees be permitted to use or disclose Protected Health Information in a manner that is inconsistent with the HIPAA Privacy Regulation. Specific duties for which the Plan Trustees are permitted access to Protected Health Information include the following:

a) To perform Health Plan activities on behalf of the Health Plan, including activities that would meet the definition of treatment, payment or healthcare operations. Health Plan activities for which Protected Health Information may be

18

disclosed to Plan Trustees would also include, but are not limited to, quality assurance, claims processing and appeals, eligibility processing and appeals, auditing, monitoring, and management of the Health Plan.

b)   To obtain bids from insurance companies or health plan vendors for providing health insurance coverage or health benefits under or on behalf of the Health Plan.

c)   To modify, amend, or terminate the Health Plan.

Section 11.   Conditions of Disclosure. (Amended 04/14/03) The Plan Trustees agree that with respect to any Protected Health Information disclosed to them by the Health Plan Trustees shall:

a)   Not use or further disclose the Protected Health Information other than as permitted or required by the Health Plan, or as required by law.

b)   Ensure that any agents, including independent contractors and subcontractors to whom they provide Protected Health Information, agree to the same restrictions and conditions that apply pursuant to this Trust Agreement to the Plan Trustees with respect to Protected Health Information.

c)   Not use or disclose the Protected Health Information for employment-related actions and decisions, or in connection with any other benefit or employee benefit plan of the Plan Trustee.

d)   Report to the Health Plan any use or disclosure of Protected Health Information that is inconsistent with the uses or disclosures permitted by the Health Plan, of which they become aware.

e)   Make available, to an individual Health Plan participant or dependent who request access to the participant's or dependent's Protected Health Information, such information as may be requested, to the extent provided by 45 CFR §164.524.

f)   Make available, to an individual Health Plan participant or dependent who request an amendment, to the participant's or dependent's Protected Health Information, and incorporated any amendments to the participant's or dependent's Protected Health Information, to the extent required and/or permitted by 45 CFR § 164.526.

g)   Make available to an individual Health Plan participant or dependent who request an accounting of disclosures of the participant's or dependent's Protected Health Information, the information required to provide an accounting of disclosures in accordance with 45 CFR § 164.528.

19

h)  Make the internal practices, books and records of Plan Trustee meetings relating to the use and disclosure of Protected Health Information received from the Health Plan, available to the Secretary of Health and Human Services for purposes of determining compliance by the Health Plan with 45 CFR §164.504(f).

i)  If feasible, return or destroy all Protected Health Information received from the Health Plan that the Plan Trustee maintains in any form, and retain no copies of such information, when no longer needed for the purposes for which the disclosure was made, except that, if such return or destruction is not feasible, limit further uses and disclosures to those purposes that make the return or destruction of the information feasible.

Section 12.  Permitted Uses and Disclosure of Summary Health Information. (Amended 04/14/03) The Health Plan may disclose Summary Health Information to a Plan Trustee, provided such Summary Health Information is only used by the Plan Trustee for one of the following purposes:

a)  Obtaining bids from insurance companies or health plan vendors for providing health insurance coverage or health benefits under the Health Plan; or

b)  Modifying, amending, or terminating the Health Plan.

20

## ARTICLE V.

Section 1.    Officers.  (Amended 1/1/91)  As soon as possible after the execution of this agreement, the Plan Trustees shall meet and shall elect a Chairman and a Vice Chairman, each of whom shall be a Producer Plan Trustee. and a Secretary and an Assistant Secretary, each of whom shall be a SAG Plan Trustee.  The terms of such officers shall commence on the date of their election and shall continue to December 31, 1961.  Prior to December 31, 1961, and prior to December 31 of each year thereafter, the Plan Trustees shall select from among them a Chairman and a Vice Chairman and a Secretary and an Assistant Secretary to serve for a term of one year, commencing January 1 then next following.  To serve during each odd numbered year (and for the original remaining fraction of the year 1960) the Chairman and Vice Chairman shall be selected by and from among the Producer Plan Trustees and the Secretary and Assistant Secretary shall be selected by and from the SAG Plan Trustees.  To serve during each even numbered year commencing with the year 1962 the Chairman and Vice Chairman shall be selected by and from among the SAG Plan Trustees and the Secretary and Assistant Secretary shall be selected by and from among the Producer Plan Trustees.  Effective for officers elected to serve commencing on or after January 1, 1990, the term of office shall be increased from one year to two years.  Prior to December 31, 1991, and prior to December 31 of each odd numbered year thereafter, the Plan Trustees shall select from among them a Chairman and a Vice Chairman and a Secretary and an Assistant Secretary to serve for a term of two years, commencing January 1 next following.  The selection of the Chairman and Vice Chairman for the two-year period commencing January 1, 1992 shall be made by and from among the Producer Plan Trustees and the selection of the Secretary and Assistant Secretary for the two-year period commencing January 1, 1992 shall be made by and from among the SAG Plan Trustees.  Thereafter, the SAG Plan Trustees shall alternate with the Producer Plan Trustees with respect to which group selects the Chairman and Vice Chairman and which group selects the Secretary and Assistant Secretary.  For example, the SAG Plan Trustees will select the Chairman and Vice Chairman for the two-year periods commencing January 1, 1994 and January 1, 1998, whereas the Producer Plan Trustees will select the Chairman and Vice Chairman for the two-year periods commencing January 1, 1996 and January 1, 2000.  The Producer Plan Trustees will select the Secretary and Assistant Secretary for the two-year periods commencing January 1, 1994 and January 1, 1998, whereas the SAG Plan Trustees will select the Secretary and Assistant Secretary for the two-year periods commencing January 1, 1996 and January 1, 2000.

Section 2.    Meetings of Plan Trustees.  Meetings of the Plan Trustees shall be held at the principal office of the Health Plan or at such other place or places as may at any time or from time to time be agreed upon by the then Chairman and Secretary and may be called by either of said officers or by any two Plan Trustees upon seven days' written notice to the other Plan Trustees; provided that where matters of an urgent nature arise which make it impractical to give such seven (7) days' advance notice of meeting, the

21

Chairman and Secretary may call a meeting on twenty-four (24) hours' telegraphic notice to the other Plan Trustees.

Section 3.    Action by the Plan Trustees Without Meeting.    Action by the Plan Trustees may also be taken by them without a meeting provided that action is evidenced by an instrument in writing to which all of the Plan Trustees shall consent by unanimous written concurrence.

Section 4.    Quorum.    Fourteen (14) Plan Trustees shall constitute a quorum for the transaction of business, provided that not less than seven (7) of those present and acting shall be Guild Plan Trustees and not less than seven (7) shall be Producer Plan Trustees. During the absence of a quorum at any time during a meeting, the Plan Trustees shall have no power to transact any business other than to adjourn. If the quorum is lacking because of the failure to attend of the minimum required number of either Producer Plan Trustees or Guild Plan Trustees, but the minimum required number of one such group is present, then the group so present may require any proposal or proposals properly on the agenda of such meeting in accordance with the provisions of Section 2 of this Article V to be specifically placed upon the agenda for the next meeting of the Plan Trustees and to be specifically included in the notice calling such next meeting. If at such next meeting a quorum again shall not be present because of the absence of the minimum required number of Plan Trustees from the same group which caused the failure of a quorum at the first meeting, then upon adjournment of the second meeting as in this section provided and required, the vote of the absent group of Plan Trustees shall be deemed cast automatically in opposition to the vote of the group which has been present at such meetings, so as to cause thereby a deadlock vote between the groups, which deadlock vote may be determined in accordance with the provisions of Section 6 of this Article V.

Section 5.    Majority Vote of Trustees.    Except where specifically provided differently elsewhere herein, all action by the Plan Trustees at a meeting at which a quorum of the Plan Trustees are present shall be by a majority of those present and voting.

Section 6.    Action in the Event of Deadlock.    (Amended 11/6/92) In the event of a deadlock between all of the Producer Plan Trustees who cast a vote on the one hand and all of the Guild Plan Trustees who cast a vote on the other hand, and provided that the question or resolution so deadlocked is presented for a second time at the next succeeding meeting of the Plan Trustees and again the Plan Trustees are deadlocked because of a continued existence of the same sort of deadlock, then an impartial umpire to cast the deciding vote shall be chosen, if possible, forthwith by the Plan Trustees. If the Plan Trustees are unable to agree among themselves upon a person to act as such impartial umpire, then within 72 hours after the adjournment of the meeting at which subsequent deadlock and failure to designate an impartial umpire occurred, the Chairman and the Secretary shall attempt to agree upon the selection of such impartial umpire. If upon the expiration of such 72-hour period the Chairman and the Secretary have failed to select such impartial umpire, then either group of Plan Trustees or any Producer party hereto or SAG or any employer association that has appointed one or more of the then Plan Trustees may petition the District Court of the United States, Southern District of

22

California, Central Division, for the appointment of such impartial umpire. When an impartial umpire has been selected in any of the manners aforesaid a meeting of the Plan Trustees shall be held as soon as practicable, which meeting shall be attended by such impartial umpire, and at that time the entire matter of the question or resolution in dispute shall be presented and reargued and the umpire shall hear any evidence or arguments presented by either group of Plan Trustees upon the question or resolution upon which such deadlock has occurred. Such umpire may, if he so desires, make direct inquiries to the Plan Trustees with respect to any information which he deems to be relevant or material to a proper determination of the question, and any such information as is not then immediately available shall be furnished to such umpire by the Chairman and the Secretary jointly as soon as practicable. As soon as practicable, and in any event within 14 days after the date of such meeting or the date upon which the last of such requested information is furnished to him, whichever is the later date, the impartial umpire shall by written instrument cast his vote for or against the question or resolution upon which the deadlock has occurred. The vote so cast by such umpire shall be determinative of the question or resolution, and in casting such vote the umpire may but need not specify his reasons for so voting. The vote so cast by the umpire shall be in writing and shall be delivered by him to the Chairman and a copy thereof shall be delivered by him to the Secretary. All costs and expenses incident to any such proceeding, including costs incurred in the appointment of the umpire, the holding of proceedings before him, the fee, if any, charged by him for his services, shall be a proper charge against the Health Plan and the Plan Trustees are authorized to pay or direct the payment of such charge.

In the event of a deadlock within the unit of Producer Plan Trustees or within the unit of Guild Plan Trustees, the deciding vote shall be cast by the Plan Trustee in the deadlocked unit who is the current Chairman or the current Secretary of the Board of Trustees, as the case may be.

Section 7.    Minutes of Meetings. The Plan Trustees shall keep minutes of all meetings but such minutes need not be verbatim. Copies of the minutes of each meeting shall be sent to Plan Trustees, whether or not such Plan Trustee was actually present at the meeting. The keeping of such minutes shall be the responsibility of the Secretary and it shall be the duty of the Secretary to cause such minutes to be distributed as aforesaid as soon as practicable after the adjournment of each meeting. In the absence of the Secretary, the Assistant Secretary shall have such duties. Such minutes shall be subject to approval by the Plan Trustees.

23

## ARTICLE VI

## PLANS OF HEALTH ELIGIBILITIES AND BENEFITS

Section 1.  Preparation of Plans.  As soon as possible after the execution of this agreement the Plan Trustees shall formulate and adopt a written plan or plans which shall provide all of the provisions, regulations, terms and conditions for the establishment of a program or programs of Health eligibilities and benefits.  Such plans shall conform to the applicable provisions and requirements of the respective collective bargaining agreements herein elsewhere referred to and of this agreement.  In voting upon the adoption of any such plan or of any amendment thereto, the Producer Plan Trustees collectively shall have one vote and the Guild Plan Trustees collectively shall have one vote, and the adoption of the plan or amendment shall require the affirmative concurrence of both such votes.  The vote of the Producer Plan Trustees shall be determined by a majority of the Producer Plan Trustees present, and the vote of the Guild Plan Trustees shall be determined by the vote of a majority of the Guild Plan Trustees present.  For the purposes of determining whether or not a proper type of deadlock exists to invoke the provisions of Section 6 of Article V, the vote of the majority of Plan Trustees on each side shall be deemed to be the vote of all of the Plan Trustees who cast a vote on that side.  Subject to the provisions hereof the Plan Trustees shall have the sole and entire power and authority to decide upon, agree to, and set forth and determine such provisions, regulations, terms and conditions, and likewise the Plan Trustees shall have the full power and authority and right to amend such plan at any time and from time to time provided that the amendments comply with the purpose stated above.  The Plan Trustees shall have full authority to determine the form, nature and amount of Health benefits to be provided and the rules of eligibility therefor and the effective dates thereof except that said benefits must be limited to one or more of the following:  Death, accidental death, injury, disability, hospitalization, surgical expenses and medical expenses, and any other similar types of benefits permitted by law to be paid with the same tax and over-time consequences, and shall in no event include any pension benefits.

Section 2.  Compliance with Applicable Laws.  It is the intention of the parties that the Health Plan and any and all amendments thereto shall at all times:

a)  Be and remain in compliance and conformity with all applicable laws and regulations, including but not limited to all applicable provisions of the Labor Management Relations Act and any other applicable valid federal or state laws or rules or regulations, and

b)  Be and remain such that all contributions of Producers thereto will be fully deductible by the Producers for federal income and franchise tax purposes, and

24

c) Be and remain such that contributions to the Health Fund satisfy the requirements of the Fair Labor Standards Act to the extent, if any, that such Act is applicable to the employments covered hereby, in order that contributions by Producers are excluded from employees' regular rate for overtime computation purposes, and

d) Be and remain such that contributions of Producers to the Health Fund shall not be subject to deductions under and for the purposes of the California Unemployment Insurance Act, the Federal Unemployment Tax Act, the Social Security Act, or the Federal Insurance Contributions Act, or any similar legislation.

To these ends the Plan Trustees shall from time to time promptly amend this Trust Agreement and the plan of health eligibilities and benefits and any other part of the Health Plan in any respect necessary or appropriate to make the provisions conform and comply with these laws, rules and regulations. Any such amendment shall be made effective retroactive, if necessary, to such date as the circumstances require in order to obtain and maintain the continuity of such compliances and conformities. The Health Plan and all amendments thereto shall be submitted to the United States Treasury Department or other authorized agency for approval under the applicable provisions of the Internal Revenue Code so that all contributions of Producers thereto will qualify for deduction by the Producers for tax purposes, and in the event of failure to obtain approval of the Health Plan as so qualified under said Internal Revenue Code the Plan Trustees shall immediately, and retroactively if necessary, make revisions as are necessary to obtain such approval.

Section 3.    Appellate Procedure.

a) No employee, pensioner, dependent, or other person shall have any right or claim to benefits under the Health Plan other than as specified in the rules of the Plan. If any such claimant shall have a dispute as to eligibility, type, amount, or duration of such benefits, the dispute shall be resolved by the Board of Trustees under and pursuant to the Health Plan and Trust Agreement, and its decision regarding the dispute shall be final and binding upon all parties thereto.

b) Any person whose application for benefits under the Health Plan has been denied in whole or in part shall be notified of such decision, in writing and may petition the Board of Trustees to reconsider the decision. A petition for reconsideration shall be in writing, shall state in clear and concise terms the reason or reasons for disagreement with the decision, and shall be filed with or received by the Administrative Office within sixty (60) days after the date shown on the notice to the petitioner of the decision denying the claim, or within sixty (60) days after August 31, 1975, whichever is later.

25

Upon good cause shown, the Board of Trustees may permit the petition to be amended or supplemented. The failure to file a petition for reconsideration within such 60-day period shall constitute a waiver of the claimant's right to reconsideration of the decision. Such failure shall not, however, preclude the applicant or claimant from establishing his entitlement at a later date based on additional information evidence which was not available to him at the time of the decision on his application for benefits.

c)  Upon receipt of a petition for reconsideration the Board of Trustees shall proceed to review the administrative file, including the petition for reconsideration and its contents. A decision by the Board of Trustees shall be made promptly and not later than sixty (60) days after the receipt of the petition by the Administrative Office unless special circumstances require an extension of time for processing, in which case a decision shall be rendered as soon as possible, but not later than 120 days after receipt of the request for review. The petitioner shall be advised of the decision of the Board of Trustees in writing.

d)  The Board of Trustees shall adopt procedural rules under which a full and fair review of the application and its denial may be obtained. Such procedure (i) shall afford the petitioner or his duly authorized representative an opportunity to review pertinent documents and submit issues and comments; (ii) may, but shall not be required to, provide for referral of the petition for reconsideration to a committee of the Board of Trustees for review and investigation. If a petition is referred to such a committee, the Board of Trustees may either direct the committee to make a recommendation to the Board of Trustees for disposition of the petition or may delegate to such committee the authority to decide the petition. If such authority is delegated to the committee, then the decisions of the committee shall be deemed to be the decision of the Board of Trustees for all purposes.

e)  The decision of the Board of Trustees with respect to petition for reconsideration shall be final and binding upon all parties, including the petitioner and any person claiming under the petitioner. The provisions of this Section shall apply to and include any and every claim to benefits from the Trust Fund, and any claim or right asserted against the Trust Fund, regardless of the basis asserted for the claim and regardless of when the act or omission upon which the claim is based occurred.

26

## ARTICLE VII

## PARTIES TO THE HEALTH PLAN

Section 1.    Original Parties.    This agreement and trust shall be executed by SAG, those Producers who are members of Association of Motion Picture Producers, Inc., the Plan Trustees originally designated by SAG, and the Plan Trustees originally designated by Association of Motion Picture Producers, Inc., and thereby each such party becomes a party to the Health Plan.

Section 2.    Additional Parties.    (Amended 11/6/92)  Any Producer (as defined herein) who is not an original party to the Health Plan may adopt and become a party to the Health Plan by executing and delivering to the Plan Trustees, in duplicate, a sufficient written instrument in form approved by the Plan Trustees, wherein it agrees to become a party thereto, and upon acceptance thereby by the Plan Trustees.  Such instrument may, by reference, include the terms of any then existing collective bargaining agreement. SEG, which was formerly deemed to have become a party of the Health Plan by virtue of having executed the February 14, 1961 amendment to this agreement and trust, shall no longer be deemed a party of the Health Plan effective as of the date that SAG assumed jurisdiction over the collective bargaining rights of those extras whose collective bargaining rights formerly were under the jurisdiction of SEG.

27

## ARTICLE VIII

## MISCELLANEOUS PROVISIONS

**Section 1.    Amendment.**  This trust agreement may be amended at any time and from time to time at a meeting by the affirmative vote of not less than 75% of the full complement of then qualified Plan Trustees.

**Section 2.    Limitation on Right of Amendment.**  No amendment of or change in the Health Plan may be adopted which will alter the basic principles hereof or be in conflict with the then existing collective bargaining agreements or contrary to any applicable law or governmental rule or regulation.  No amendment may be adopted which will cause any of the assets of the Health Fund to be used for or diverted to purposes other than those herein authorized or which will retroactively deprive any person of any vested benefit; except any amendment may be made which is required as a condition to obtaining or retaining the approval of the Health Plan by the Internal Revenue Service under the Internal Revenue Code or the Franchise Tax Board under the California Revenue and Taxation Code as either are now in effect or hereafter amended to the end that any contributions made to the Health Fund by the Producers are deductible for federal income tax and California state franchise tax purposes.

**Section 3.    Notification of Amendment.**  Whenever an amendment is adopted in accordance with this Article, a copy thereof shall be distributed to each Plan Trustee and the Plan Trustees shall notify any other necessary persons or parties thereof and shall execute any necessary instrument or instruments in connection therewith.

**Section 4.    Termination.  (Amended 11/6/92)**  This trust agreement may be terminated by an instrument in writing executed by all of the Plan Trustees when there is no longer in force and effect a collective bargaining agreement between SAG and any Producer requiring contributions on the Health Fund, or it may be terminated at any time by an instrument in writing executed by SAG, and by all Producers having collective bargaining agreements with SAG who are Producers under this trust agreement.  In the event of any such termination hereof, the Plan Trustees shall apply the Health Fund solely for the purpose of paying or providing for the payment of obligations created pursuant to the Health Plan, and in no case shall any part of the corpus or income of the Health Fund be used for diverted to purposes other than for the exclusive benefit of persons entitled thereto under the terms of the plan of welfare eligibilities and benefits or the administrative expenses of the Health Plan or for other payments in accordance with the provisions of this trust agreement.  Under no circumstances shall any portion of the corpus or income of the Health Fund directly or indirectly revert or accrue to the benefit of any contributing Producer or to SAG.  Upon any such termination, the Plan Trustees

28

and the Fund Trustees, if any, shall continue as trustees for the purpose of winding up the affairs of the trust and of the Health Plan.

Section 5.   Reversion.   No portion of any contribution may be paid or reverted to any Producer.

Section 6.   Use of Funds.   The Plan Trustees shall use and apply the assets of the Health Fund for the following purposes only:

a)   To pay all reasonable and necessary expenses incurred in the establishment and administration of the Health Plan; and

b)   To pay for the benefits or for the cost of insurance to provide the benefits provided for in any plan of welfare eligibilities and benefits to be adopted pursuant hereto.

Section 7.   Situs.   This agreement and the entire Health Plan shall be deemed to have been executed in the City of Los Angeles, State of California; and such place shall be deemed the situs thereof.   All questions pertaining to validity and construction shall be determined in accordance with the laws of such state.

Section 8.   Notification to Plan Trustees.   The address of each of the original Plan Trustees shall be that stated following his signature hereto. Any change of address shall be effected by written notice to the Plan Trustees.

Section 9.   Severability.   Should any provision the Health Plan or rules and regulation adopted thereunder or any collective bargaining agreement be deemed or held to be unlawful or invalid for any reason, such fact shall not adversely affect the other provisions thereof, unless such illegality shall make impossible or impractical the functioning of the Health Plan. In the event the functioning of the Health Plan becomes impossible or impractical for such reason, all the then parties, including the Plan Trustees, shall endeavor to devise and adopt an amendment which will permit, if possible, the functioning of the Health Plan as nearly as possible in accordance with the true spirit and intent thereof.

Section 10.   Encumbrance of Benefits.   No monies, property, or equity of any nature whatsoever, in the Health Plan or in the Health Fund, or policies or benefits or monies payable therefrom, shall be subject in any manner by any actor or extra or other person claiming through such actor or extra to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance, garnishment, mortgage, lien or charge, and any attempt to cause the same to be subject thereto shall be null and void.

Notwithstanding the foregoing provisions, benefits provided by the Health Plan may, if permitted by the appropriate insurance carrier, be assigned to the physician or other purveyor of services for which benefits are payable, if specifically authorized, in writing,

29

by the Actor or Extra Player or other person entitled to receive such benefits, upon a form approved by and delivered to the Plan Administrator.

Section 11.    Validity of Action.    No action determined by the vote of the Plan Trustees, directly or through the vote of an umpire as herein contemplated, shall be valid or effective which shall interpret or apply any provisions of the Health Plans in any manner or to any extent so as to be contrary to any applicable law or governmental rule or regulation or which would exceed the powers given to the Plan Trustees as set forth hereunder or change or enlarge the express purpose hereof.

Section 12.    Headings No Part of Agreement.    Headings and subheadings in this agreement are inserted for convenience of reference only and are not to be considered in the construction of the provisions hereof.

Section 13.    Counterparts.    This trust agreement may be executed in one or more counterparts. The signature of a party on any counterpart shall be sufficient evidence of his execution hereof.

Section 14.    Persons Dealing with Trustees.    All persons dealing with the Plan Trustees or the Fund Trustee, except any person who is also fiduciary, shall have no obligation to inquire into the decisions and authorities of the Trustees or to see to the application of any funds paid to the Trustees.

30

# Exhibit E

*Screen Actors Guild Producers Pension and Health Plans*
*General Motors - Outstanding Matters*

| Performer | Product | Contract Amount | Reportable Compensation Based on Allocation Guidelines | Amount Reported to SAG Plans | Unreported Compensation Based on Allocation Guidelines | P&H Rate | Additional Contributions Due Based on Allocation Guidelines | Notes |
|---|---|---|---|---|---|---|---|---|
| **I.** | ***Claim Based on Application of Allocation Guidelines (A)*** | | | | | | | |
| Baretta, Olivier | Chevrolet | $ 30,000.00 | $ 6,000.00 | $ - | $ 6,000.00 | 14.8% | $ 888.00 | |
| Bettis, Jerome | General Motors | 150,000.00 | 67,500.00 | - | 67,500.00 | 14.8% | 9,990.00 | |
| Bowyer, Clint | Chevrolet | 50,000.00 | 10,000.00 | - | 10,000.00 | 14.30% | 1,430.00 | |
| Duno, Milka | Pontiac | 150,000.00 | 30,000.00 | - | 30,000.00 | 14.30% | 4,290.00 | |
| Duno, Milka | Pontiac | 125,000.00 | 25,000.00 | - | 25,000.00 | 14.30% | 3,575.00 | |
| Fellows, Ron | Chevrolet | 30,000.00 | 6,000.00 | - | 6,000.00 | 14.80% | 888.00 | |
| Gavin, Oliver | Chevrolet | 30,000.00 | 6,000.00 | - | 6,000.00 | 14.80% | 888.00 | |
| Krzyzewski, Mike | Pontiac | 1,600,000.00 | 720,000.00 | - | 720,000.00 | 14.3%/14.8% | 105,480.00 | |
| Magnussen, Jan | Chevrolet | 10,000.00 | 2,000.00 | - | 2,000.00 | 14.80% | 296.00 | |
| Mears, Casey | Chevrolet | 100,000.00 | 20,000.00 | - | 20,000.00 | 14.80% | 2,960.00 | |
| Mellencamp, John | Chevrolet | 1,000,000.00 | 800,000.00 | 600,000.00 | 200,000.00 | 14.3%/14.8% | 29,100.00 | |
| Papis, Max | Chevrolet | 10,000.00 | 2,000.00 | - | 2,000.00 | 14.80% | 296.00 | |
| Yeley, JJ | Chevrolet | 75,000.00 | 15,000.00 | - | 15,000.00 | 14.80% | 2,220.00 | |
| **II.** | ***Claim Based on Estimated Value of Vehicle Provided to Performer (B)*** | | | | | | | |
| Bettis, Jerome | General Motors | 20,000.00 | 9,000.00 | - | 9,000.00 | 14.80% | 1,332.00 | Estimated Value of One Vehicle |
| Duno, Milka | Pontiac | 60,000.00 | 12,000.00 | - | 12,000.00 | 14.30% | 1,716.00 | Estimated Value of Three Vehicles |
| Gordon, Jeff | Chevrolet | 132,000.00 | 26,400.00 | - | 26,400.00 | 14.3%/14.8% | 3,841.20 | Estimated Value of Three Vehicles |
| Harvick, Kevin | Chevrolet | 40,000.00 | 8,000.00 | - | 8,000.00 | 14.30% | 1,144.00 | Estimated Value of One Vehicle |
| Hornaday, Ron | Chevrolet | 20,000.00 | 4,000.00 | - | 4,000.00 | 14.80% | 592.00 | Estimated Value of One Vehicle |
| Krzyzewski, Mike | Pontiac | 100,000.00 | 20,000.00 | - | 20,000.00 | 14.30% | 2,860.00 | Estimated Value of Two Vehicles |
| Stewart, Tony | Chevrolet | 20,000.00 | 4,000.00 | - | 4,000.00 | 14.30% | 572.00 | Estimated Value of One Vehicle |
| Yeley, JJ | Chevrolet | 40,000.00 | 8,000.00 | - | 8,000.00 | 14.80% | 1,184.00 | Estimated Value of One Vehicle |
| **III.** | ***Additional Information Needed to Determine Claim*** | | | | | | | |
| Baretta, Olivier | Chevrolet | Not Provided | Not Known | | Not Known | | Not Known | Car may have been provided; value unknown |
| Bowyer, Clint | Chevrolet | Not Provided | Not Known | | Not Known | | Not Known | Car may have been provided; value unknown |
| Burton, Jeffrey | Chevrolet | Not Provided | Not Known | | Not Known | | Not Known | Car may have been provided; value unknown |
| Cartagena, Joseph | Cadillac | Not Provided | Not Known | | Not Known | | Not Known | Contract Not Provided for Inspection |
| Earnhardt, Dale | Chevrolet | Not Provided | Not Known | | Not Known | | Not Known | Car may have been provided; value unknown |
| Fellows, Ron | Chevrolet | Not Provided | Not Known | | Not Known | | Not Known | Car may have been provided; value unknown |
| Gavin, Oliver | Chevrolet | Not Provided | Not Known | | Not Known | | Not Known | Car may have been provided; value unknown |
| Gordon, Jeff | OnStar | Not Provided | Not Known | | Not Known | | Not Known | Contract Not Provided for Inspection |
| Gordon, Jeff | Chevrolet | Not Provided | Not Known | | Not Known | | Not Known | Car may have been provided; value unknown |
| Harvick, Kevin | Chevrolet | Not Provided | Not Known | | Not Known | | Not Known | Car may have been provided; value unknown |
| Hornaday, Ron | Chevrolet | Scale | Not Known | | Not Known | | Not Known | Scale contract provided only |
| Johnson, Jimmie | Cadillac | Not Provided | Not Known | | Not Known | | Not Known | Contract Not Provided for Inspection |
| Johnson, Jimmie | Chevrolet | Not Provided | Not Known | | Not Known | | Not Known | Car may have been provided; value unknown |
| Ludacris aka Bridges, Chris | Pontiac | Not Provided | Not Known | | Not Known | | Not Known | Contract Not Provided for Inspection |
| Magnussen, Jan | Chevrolet | Not Provided | Not Known | | Not Known | | Not Known | Car may have been provided; value unknown |
| McPeak, Holly | Cadillac | Not Provided | Not Known | | Not Known | | Not Known | Contract Not Provided for Inspection |
| Mears, Casey | Chevrolet | Not Provided | Not Known | | Not Known | | Not Known | Car may have been provided; value unknown |
| Papis, Max | Chevrolet | Not Provided | Not Known | | Not Known | | Not Known | Car may have been provided; value unknown |
| Parker, Travis | Cadillac | Not Provided | Not Known | | Not Known | | Not Known | Contract Not Provided for Inspection |
| Ripken, Calvin | Chevrolet | Not Provided | Not Known | | Not Known | | Not Known | Cars may have been provided; value unknown |
| Sprague, Jack | Chevrolet | 75,000.00 | Not Known | | Not Known | | Not Known | Contract may have been canceled |
| Sprague, Jack | Chevrolet | 20,000.00 | Not Known | | Not Known | | Not Known | Estimated Value of One Vehicle; contract may have been canceled |
| Wilderson, Wayne | Chevy Equinox | Not Provided | Not Known | | Not Known | | Not Known | Contract Not Provided for Inspection |
| Woods, Tiger | Buick | Not Provided | Not Known | | Not Known | | Not Known | Contract Not Provided for Inspection |

| | |
|---|---|
| Total Contributions Due to Plans | $  175,542.20 |
| Liquidated Damages (20%) | 35,108.44 |
| Total Contributions and Liquidated Damages Due to Plans | $  210,650.64 |

(A)  Contractual services include performing in television commercials, personal appearances and print advertisements, amongst other services.
(B)  Contract amount represents the estimated vehicle value provided to the performers. Vehicles were provided to certain performers in addition to cash compensation.

**Exhibit E to PSD Declaration in Support of Response to Debtor's Opposition, Page 84**

# Exhibit F



PETER S. DICKINSON (Bar No. 139495)
BUSH GOTTLIEB SINGER LÓPEZ
KOHANSKI ADELSTEIN & DICKINSON
A Law Corporation
500 North Central Avenue, Suite 800
Glendale, California 91203
Telephone: (818) 973-3200
Facsimile: (818) 973-3201

Attorneys for Creditors TRUSTEES OF THE
SCREEN ACTORS GUILD-PRODUCERS
PENSION & HEALTH PLANS

# UNITED STATES BANKRUPTCY COURT

## STATE OF NEW YORK, SOUTHERN DISTRICT

| | |
|---|---|
| In re | Case Nos.   **09-50026**-reg |
| Motors Liquidation Company | Chapter 11 |
| Debtor. | **PROOF OF CLAIM FOR UNLIQUIDATED CLAIMS FILED BY THE SAG-PRODUCER PENSION AND HEALTH PLANS** |
| | [No hearing set or required pursuant to Local Bankruptcy Rules 9013-1 (7) (iv)] |

1.      This Proof of Claim is filed by the Trustees of the Screen Actors Guild-Producer

Pension & Health Plans ("the Plans"). The Plans' address and telephone number are:

Screen Actors Guild-Producers Pension & Health Plans, 3601 West Olive Avenue, Burbank,

California 91510-7830; (818) 954-9400.

Copies of all correspondence and pleadings should be sent to:

Peter S. Dickinson

Bush Gottlieb Singer López

Kohanski Adelstein & Dickinson

500 North Central Avenue, Suite 800

Glendale, California 91203

BUSH GOTTLIEB SINGER LÓPEZ KOHANSKI ADELSTEIN & DICKINSON
500 North Central Avenue, Suite 800
Glendale, California 91203-3345

125332.1  11630-19027

Proof of Claim

2.      The consideration for this debt is as follows: the Screen Actors Guild, Inc. ("SAG" or "the Guild") is the exclusive collective bargaining representative of all Guild-represented performers who provide acting and other services in connection with the production of commercials for the benefit of the Debtors.  Minimum initial compensation for each Guild-represented members are governed by the applicable Commercials Contract.

3.      The Debtors were indebted and at the time of the filing of the petition initiating this case remain indebted (or liable) to the Plans for pre-petition and post-petition claims that are currently unliquidated, due primarily to Debtors' failure to pay pension and health contributions on the initial compensation amounts, plus unliquidated damages and interest, in a sum to be determined.  The Debtors were and still are further indebted (or liable) to the Plans in an additional, unliquidated sum, due to such violations of the Commercials Contract as the Debtors failed to pay pension and health contributions on the initial compensation.

4.      This Proof of Claim may be secured to the extent that certain SAG pre-petition and post-petition claims may be secured.

5.      To the extent that any of the secured claims referenced herein do not encompass any other Plans pre-and post-petition claims with respect to any and all commercials produced and/or distributed by the Debtors, all such claims are general unsecured obligations of the Debtors, with all such post-petition obligations entitled to administrative priority pursuant to Bankruptcy Code §§ 503 and 507 as well.

6.      Claims for unpaid pension and health contributions on initial compensation or unpaid residual payments may also be entitled to priority status pursuant to 11 U.S.C. § 507.

7.      In addition to the claims referenced above, further claims for contributions pertaining to initial compensation, along with relevant interest and liquidated damages, are accumulating on a post-petition basis.

8.      This claim is not based on an open account.

9.      All payments made on this claim have been credited and deducted from the amount claimed.

BUSH GOTTLIEB SINGER LÓPEZ KOHANSKI ADELSTEIN & DICKINSON
500 North Central Avenue, Suite 800
Glendale, California 91203-3345

125332.1  11630-19027                                    2                                    Proof of Claim

10.     This claim is entitled to administrative and/or priority status to the extent provided by all applicable law, including 11 U.S.C. §§ 503, 507, 1113 and 1114.

11.     The Plans reserve the right to file with this Court an amended proof of claim in the event that claims liquidation, the scope of Debtor obligations and the Debtor's library, or the identity of appropriate related entities, is further clarified.

12.     This proof of claim shall not waive the Plans' right to have final orders in noncore matters entered only after de novo review by the District Court Judge; or the right to trial by jury in any proceeding so triable in this case or any case, controversy, or proceeding related to this case; or the right to have the District Court withdraw the reference in any matter subject to mandatory or discretionary withdrawal; or to adjudicate rights in other applicable forums, or any other rights, claims, actions, defenses, set-offs, or recoupments to which these entities are or may be entitled under any agreements, in law or in equity, all of which rights are expressly reserved.

DATED:   July 28, 2009

BUSH GOTTLIEB SINGER LÓPEZ
KOHANSKI ADELSTEIN & DICKINSON
A Law Corporation

By: _____
PETER S. DICKINSON
Attorneys for Creditor Trustees of the
Screen Actors Guild-Producer
Pension and Health Plans

BUSH GOTTLIEB SINGER LÓPEZ KOHANSKI ADELSTEIN & DICKINSON
500 North Central Avenue, Suite 800
Glendale, California 91203-3345

125332.1  11630-19027                    3                    Proof of Claim

# Exhibit G

<u>VIA FIRST CLASS MAIL</u>

TRUSTEES OF THE SCREEN ACTORS GUILD-
PRODUCER PENSION & HEALTH PLANS
3601 WEST OLIVE AVENUE
BURBANK, CA 91510

      Re:    In re Motors Liquidation Company, et al. (f/k/a/ General Motors Corporation, et al.) Case
              No.: 09-50026 (REG)

Dear Claimant,

    Motors Liquidation Company (f/k/a General Motors Corporation) and its affiliated debtors
(collectively, "MLC") are in receipt of the following proof(s) of claim that you filed against MLC in an
unspecified and unsecured amount:

1039 TRUSTEES OF THE SCREEN ACTORS GUILD-

    The purpose of this letter is to request that you provide MLC with a liquidated amount for your
proof(s) of claim against MLC. If you do not provide us with a liquidated amount for your proof(s) of claim,
MLC may be compelled to pursue liquidation of your proof(s) of claim in the Bankruptcy Court through an
objection or other available procedures. If you wish to provide MLC with a liquidated amount for your
proof(s) of claim, please fill out the enclosed Claim Liquidation Letter and return it to MLC at the address
indicated in the top left hand corner of the letter no later than March 5, 2010. Please attach any relevant
documentation to your Claim Liquidation Letter.

    Upon receipt of your Claim Liquidation Letter, MLC will direct its claims agent to update the official
claims register with the liquidated amount for the above-listed proof(s) of claim provided in the Claim
Liquidation Letter. Please be informed that submission of a Claim Liquidation Letter will not result in
allowance of your proof(s) of claim. MLC reserves all rights with regard to the above-listed proof(s) of
claim, including the right to object to the liquidated amount included in the Claim Liquidation Letter.

    Should you have any questions about this matter, please contact MLC at 1-800-414-9607 or by e-
mail at claims@motorsliquidation.com.

Sincerely,
Motors Liquidation Company

Enclosure

FEB 1 6 2010

FEB 1 6 2010



VIA EMAIL AND FIRST CLASS MAIL

Motors Liquidation Company
Attn: ADR Claims Team
2101 Cedar Springs Road
Suite 1100
Dallas, TX 75201
claims@motorsliquidation.com

       Re:     In re Motors Liquidation Company, et al. ("Debtors"), Case No. 09-50026 (REG) –
               Claim Liquidation Letter

Dear Motors Liquidation Company,

By this letter, I hereby submit a liquidated amount for the following proof(s) of claim:

| Proof(s) of Claim Number | Liquidated Amount (Unsecured) |
|---|---|
| 1039 | $_____ |

I understand and acknowledge that submission of this letter does not constitute allowance of the above-described proof(s) of claim, and that the Debtors reserve all rights with respect to these claims. I further acknowledge that upon receipt of this letter, the Debtors will direct their claims agent to update the official claims register with the liquidated amount provided in this letter for the corresponding proof(s) of claim listed above.

Very truly yours,

X_____
Print Name   _____
Address      _____
City and State _____

2

# Exhibit H

March 4, 2010

BY OVERNIGHT MAIL

Motors Liquidation Company
2101 Cedar Springs Road, Suite 1100
Dallas, Texas 75201

Attention:  ADR Claims Team

Re:    In Re Motors Liquidation Company, et al.  ("Debtors"), Case No.  09-50026
         (REG)  Claim Liquidation Letter

Dear Motors Liquidation Company:

The Trustees of the Screen Actors Guild-Producer Pension & Health Plans ("Plans") filed a
Proof of Claim in the above-listed Chapter 11 bankruptcy on August 13, 2009.  On February 16,
2010, Motors Liquidation Company requested the amount of the claim (a copy of the letter is
attached).  By this letter, the Plans hereby submit a liquidated amount for the following proof of
claim:

| Proof of Claim Number | Liquidated Amount (Unsecured) |
|---|---|
| 1039 | $193,361.41 |

A copy of the supporting spreadsheet documenting the claim is also enclosed. As indicated in the
Proof of Claim, some of these claims may be entitled to administrative and/or priority status.
While some of the Plans' claims are known, a complete liquidation of the Plans' claims is a
function of being granted access to the endorsement agreements and related documents involving
services of the type covered by the Screen Actors Guild collective bargaining agreements.
Accordingly, the Plans reserve the right to amend, adjust, revise and supplement these claims
once additional information and documents are provided.

The Plans acknowledge that upon receipt of this letter, the Debtors will direct their claims agent
to update the official claims register with the liquidated amount provided in this letter for the
corresponding proof of claim listed above.

Very truly yours,

Exhibit H to PSD Declaration in Support of Response to Debtor's Objection, Page 91

## OUTSTANDING GM MATTERS

| # | Performer | Auditors | File # | Letter Sent | Product | Advertiser/Ad Agency | Age | Notes | Contract Amount | Known Reportable Amount | Reported | P&H Rate | Known Claim |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Burton, Jeffrey | NKSF | 31269 | 03/07/08 | Chevrolet | Campbell Ewald | 453 | Pending additional informatik (A) | | | | | $ - |
| 2 | Earnhardt, Dale | NKSF | 31269 | 03/07/08 | Chevrolet | Campbell Ewald | 453 | Pending additional informatik (A) | | | | | - |
| 3 | Gordon, Jeff | NKSF | 31269 | 03/07/08 | Chevrolet | Campbell Ewald | 453 | Pending additional information | 132,295.00 | 26,459.00 | - | 14.3/14.8% | 19,139.43 |
| | | | | | | | | (A) for | | | | | |
| 4 | Harvick, Kevin | NKSF | 31269 | 03/07/08 | Chevrolet | Campbell Ewald | 453 | Pending additional informatik 2007 | 40,000.00 | 8,000.00 | - | 14.30% | 1,144.00 |
| 5 | Johnson, Jimmie | NKSF | 31269 | 03/07/08 | Chevrolet | Campbell Ewald | 453 | Pending additional informatik (A) | | | | | - |
| 6 | Mellencamp, John | NKSF | 31269 | 03/07/08 | Chevrolet | Campbell Ewald | 453 | Allocation dispute | 1,000,000.00 | 800,000.00 | 600,000.00 | 14.3%/14.8' | 29,150.00 |
| 7 | Ripken, Calvin | NKSF | 31269 | 03/07/08 | Chevrolet | Campbell Ewald | 453 | Mailed request for contract | - | 17,629.25 | - | 14.30% | 2,520.96 |
| 8 | Stewart, Tony | NKSF | 31269 | 03/07/08 | Chevrolet | Campbell Ewald | 453 | Pending additional information | | | | | |
| | | | | | | | | Est Value of 1 Vehicle | 20,000.00 | 4,000.00 | - | 14.30% | 572.00 |
| 9 | Wilderson, Wayne | Plans | 28996 | 10/12/07 | Chevy Equinox | Leo Burnett Company | 600 | No Contract for | | | | | - |
| 10 | Gordon, Jeff | Plans | 29336 | 06/25/07 | OnStar | Deutsch Direct, Inc. | 645 | Mailed request for contract | | | | | - |
| 11 | Woods, Tiger | Plans | 29340 | 06/25/07 | OnStar | Deutsch Direct, Inc. | 645 | Mailed request for contract | | | | | - |
| 12 | Woods, Tiger | Plans | 29303 | 06/18/07 | Buick | General Motors Corporation | 716 | Mailed request for contract | | | | | - |
| 13 | McPeak, Holly | Plans | 29171 | 05/29/07 | Cadillac | Spunky Dog Productions | 736 | Mailed request for contract | | | | | - |
| 14 | Johnson, Jimmie | Plans | 29172 | 05/29/07 | Cadillac | Spunky Dog Productions | 736 | Mailed request for contract | | | | | - |
| 15 | Cartegena, Joseph | Plans | 29173 | 05/29/07 | Cadillac | Spunky Dog Productions | 736 | Mailed request for contract | | | | | - |
| 16 | Parker, Travis | Plans | 29174 | 05/29/07 | Cadillac | Spunky Dog Productions | 736 | Mailed request for contract | | | | | - |
| 17 | Baretta, Olivier | NKSF | 27037 | 06/16/06 | Chevrolet | General Motors Corporation | 1,083 | Pending additional informatik (A) | 30,000.00 | 6,000.00 | - | 14.80% | 888.00 |
| 18 | Bettis, Jerome | NKSF | 27037 | 06/16/06 | Chevrolet | General Motors Corporation | 1,083 | Pending additional information | 150,000.00 | 67,500.00 | - | 14.80% | 9,990.00 |
| | | | | | | | | Est. Value of 1 Vehicle | 20,000.00 | 9,000.00 | - | 14.80% | 1,332.00 |
| 19 | Bowyer, Clint | NKSF | 27037 | 06/16/06 | Chevrolet | General Motors Corporation | 1,083 | Pending additional informatik (A) | 50,000.00 | 10,000.00 | - | 14.30% | 1,430.00 |
| 20 | Duno, Milka | NKSF | 27037 | 06/16/06 | Pontiac | General Motors Corporation | 1,083 | Pending additional information | 150,000.00 | 30,000.00 | - | 14.30% | 4,290.00 |
| | | | | | | | | | 125,000.00 | 25,000.00 | - | 14.30% | 3,575.00 |
| | | | | | | | | Est. Value of 3 Vehicles | 60,000.00 | 12,000.00 | - | 14.30% | 1,716.00 |
| 21 | Fellows, Ron | NKSF | 27037 | 06/16/06 | Chevrolet | General Motors Corporation | 1,083 | Pending additional information | 30,000.00 | 6,000.00 | - | 14.80% | 888.00 |
| 22 | Gavin, Oliver | NKSF | 27037 | 06/16/06 | Chevrolet | General Motors Corporation | 1,083 | Pending additional information | 30,000.00 | 6,000.00 | - | 14.80% | 888.00 |
| 23 | Hornaday, Ron | NKSF | 27037 | 06/16/06 | Chevrolet | General Motors Corporation | 1,083 | Pending additional information | Scale | Unknown | - | 14.80% | N/A |
| | | | | | | | | Est. Value of 1 Vehicle | 20,000.00 | 4,000.00 | - | 14.80% | 592.00 |
| 24 | Krzyzewski, Mike | NKSF | 27037 | 06/16/06 | Pontiac | General Motors Corporation | 1,083 | Pending additional informatik (A) | 1,600,000.00 | 720,000.00 | - | 14.3%/14.8 | 105,480.00 |
| | | | | | | | | Est. Value of 2 Vehicles | 100,000.00 | 20,000.00 | - | 14.30% | 2,860.00 |
| 25 | Magnussen, Jan | NKSF | 27037 | 06/16/06 | Chevrolet | General Motors Corporation | 1,083 | Pending additional informatik (A) | 10,000.00 | 2,000.00 | - | 14.80% | 296.00 |
| 26 | Mears, Casey | NKSF | 27037 | 06/16/06 | Chevrolet | General Motors Corporation | 1,083 | Pending additional informatik (A) | 100,000.00 | 20,000.00 | - | 14.80% | 2,960.00 |
| 27 | O'Connell, Johnny | NKSF | 27037 | 06/16/06 | Chevrolet | General Motors Corporation | 1,083 | Pending additional information | 30,000.00 | 6,000.00 | 6,950.00 | 14.80% | - |
| 28 | Papis, Max | NKSF | 27037 | 06/16/06 | Chevrolet | General Motors Corporation | 1,083 | Pending additional information | 10,000.00 | 2,000.00 | - | 14.80% | 296.00 |
| 29 | Simms, Phil | NKSF | 27037 | 06/16/06 | Chevrolet | General Motors Corporation | 1,083 | No TV commercial services | 775,000.00 | - | - | 14.80% | - |
| 30 | Sprague, Jack | NKSF | 27037 | 06/16/06 | Chevrolet | General Motors Corporation | 1,083 | Contract may have been cancelled | 75,000.00 | Unknown | - | 14.30% | N/A |
| | | | | | | | | Est. Value of 1 Vehicle | 20,000.00 | Unknown | - | 14.30% | N/A |
| 31 | Woods, Tiger | Plans/NKSF | 27037 | 06/16/06 | Buick | General Motors Corporation | 1,083 | Mailed request for contract | Plans conducted internal audit | | | | |
| 32 | Yeley, JJ | NKSF | 27037 | 06/16/06 | Chevrolet | General Motors Corporation | 1,083 | Pending additional information | 75,000.00 | 15,000.00 | - | 14.80% | 2,220.00 |
| | | | | | | | | Est. Value of 1 Vehicle | 40,000.00 | 8,000.00 | - | 14.80% | 1,184.00 |
| 33 | Ludacris aka Bridges, Chris | Plans | 25929 | 01/25/06 | Chevrolet | Bromley Aguilar & Assoc | 1,161 | Pending additional information | | | | | |
| 34 | Armstrong, Louis | NKSF | 20650 | 08/30/03 | General Motors | Lowe Partners | 2,040 | Deceased performer issue | Issued on 11/14/05 as part of Lowe & Partners Final Report | | | | - |
| 35 | Prima, Louis | NKSF | 20650 | 08/30/03 | General Motors | Lowe Partners | 2,040 | Deceased performer issue | Issued on 11/14/05 as part of Lowe & Partners Final Report | | | | - |

$ 193,361.41

(A) Unknown if vehicle was loaned, requesting information.

Incorrect

| In re: | CHAPTER: 11 |
|---|---|
| MOTORS LIQUIDATION COMPANY, et al., f/k/a General Motors Corp., et al. | |
| Debtor(s). | CASE NUMBER: 09-50026 REG |

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:
500 North Central Avenue, Suite 800, Glendale, California  91203-3345

A true and correct copy of the foregoing document described as  TRUSTEES OF THE SCREEN ACTORS GUILD-PRODUCERS PENSION AND HEALTH PLANS RESPONSE TO DEBTORS' EIGHTY FIFTH OMNIBUS OBJECTION TO CLAIMS (CLAIM #1039); DECLARATION OF PETER S. DICKINSON IN SUPPORT THEREOF will be served or was served **(a)** on the judge in chambers in the form and served in accordance with General Order M-399 and in the manner indicated below:

**SERVED BY U.S. MAIL OR OVERNIGHT MAIL** (indicate method for each person or entity served):
On  October  18, 2010  I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follow. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

SEE ATTACHED SERVICE LIST

☒ Service Information continued on attached page.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| October 18, 2010 | Joan Silver | |
|---|---|---|
| *Date* | *Type Name* | *Signature* |

231571.1  12350-0000

| In re:<br><br>MOTORS LIQUIDATION COMPANY, et al., f/k/a General Motors Corp., et al.<br><br>Debtor(s). | CHAPTER: 11<br><br>CASE NUMBER: 09-50026 REG |
|---|---|

ADDITIONAL SERVICE INFORMATION (if needed):

### Service List

Re Eighty-Fifth Omnibus Objection to Claims

Honorable Robert E. Gerber                    Via Federal Express Mail
United States Bankruptcy Court
Southern District of New York
One Bowling Green, Room 621
New York, NY 10004                            Judge

Harvey R. Miller, Esq.                        Via Federal Express Mail
Stephen Karotkin, Esq.
Joseph H. Smolinsky, Esq.
Weil Gotshal & Manger LLP
767 Fifth Avenue
New York, NY 10153                            Attorneys for the Debtors

Lawrence S. Buonomo, Esq.                     Via Federal Express Mail
Motors Liquidation Company
500 Renaissance Center, Suite 1400
Detroit, Michigan 48265                       Debtor

Lawrence S. Buonomo, Esq.                     Via Federal Express Mail
General Motors, LLC
500 Renaissance Center, Suite 1400
Detroit, Michigan 48265                       Debtor

John J. Rapisardi, Esq.                       Via Federal Express Mail
Cadwalader, Wickersham & Taft, LLP
One World Financial Center
New York, NY 10281                            Attorneys for U.S. Department of the Treasury

Joseph Samarias, Esq.                         Via Federal Express Mail
The United States Department of the Treasury
1500 Pennsylvania Avenue NW, Room 2312
Washington, DC 20220                          Attorney for U.S. Department of the Treasury

Michael J. Edelman, Esq.                      Via Federal Express Mail
Michael L. Schein, Esq.
Vedder Price P.C.
1633 Broadway, 47th Floor
New York, NY 10019                            Attorneys for Export Development Canada

231571.1 11630-19027

| In re: | CHAPTER: 11 |
|---|---|
| MOTORS LIQUIDATION COMPANY, et al., f/k/a General Motors Corp., et al. | |
| Debtor(s). | CASE NUMBER: 09-50026 REG |

Thomas Moers Mayer, Esq.                          Via Federal Express Mail
Robert Schmidt, Esq.
Lauren Maksoud, Esq.
Jennifer Sharret, Esq.
Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas                       Attorneys for the Statutory Committee of
New York, NY 10036                                Unsecured Creditors

Tracy Hope Davis, Esq.                            Via Federal Express Mail
United States Trustee for the Southern District
of New York
33 Whitefall Street, 21st Floor                   United States Trustee for the Southern District
New York, NY 10004                                of New York

David S. Jones, Esq.                              Via Federal Express Mail
Natalie Kuehler, Esq.
U.S. Attorney's Office, S.D.N.Y.
86 Chambers Street, Third Floor
New York, NY 10007                                U.S. Attorney's Office, S.D.N.Y.

Elihu Inselbuch, Esq.                             Via Federal Express Mail
Rita C. Tobin, Esq.
Caplin & Drysdale, Chartered
375 Park Avenue, 35th Floor
New York, NY 10152-3500

Trevor W. Swett III, Esq.
Kevin C. Maclay, Esq.                             Attorneys for the Official Committee of
One Thomas Circle, N.W., Suite 1100               Unsecured Creditors Holding Asbestos-related
Washington, DC 20005                              claims

Sander L. Esserman, Esq.                          Via Federal Express Mail
Robert T. Brousseau, Esq.
Stutzman Bromberg Esserman & Plifka PC            Attorneys for Dean M. Trafelet as Legal
2323 Bryan Street, Suite 2200                     representative for Future Asbestos-related
Dallas, TX 75201                                  Personal Injury claimants

231571.1  11630-19027