Page 1

1

2    UNITED STATES BANKRUPTCY COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    Case No. 09-50026-reg

5    - - - - - - - - - - - - - - - - - - - - -x

6    In the Matter of:

7

8    MOTORS LIQUIDATION COMPANY, ET AL.,

9        f/k/a General Motors Corp., et al.,

10

11           Debtors.

12

13   - - - - - - - - - - - - - - - - - - - - -x

14

15                U.S. Bankruptcy Court

16                One Bowling Green

17                New York, New York

18

19                October 21, 2010

20                10:11 AM

21

22   B E F O R E:

23   HON. ROBERT E. GERBER

24   U.S. BANKRUPTCY JUDGE

25

Page 2

1

2      Motion of the Official Committee of Unsecured Creditors of

3      Motors Liquidation Company to Enforce (A) the Final DIP Order,

4      (B) the Wind-Down Order, and (C) the Amended DIP Facility

5

6      Debtors' Motion for an Order (I) Approving Notice of Disclosure

7      Statement Hearing; (II) Approving Disclosure Statement; (III)

8      Establishing a Record Date; (IV) Establishing Notice and

9      Objection Procedures for Confirmation of the Plan; (V)

10     Approving Solicitation Packages; and Procedures for

11     Distribution Thereof; (VI) Approving the Forms of Ballots and

12     Establishing Procedures for Voting on the Plan; and (VII)

13     Approving the Form of Notices to Non-Voting Classes Under the

14     Plan

15

16     Statement of the Official Committee of Unsecured Creditors

17     Holding Asbestos-Related Claims Regarding the Anonymity

18     Protocol

19

20

21

22

23

24

25     Transcribed by:  Dena Page

Page 3

```
 1
 2    A P P E A R A N C E S :
 3    WEIL,  GOTSHAL  &  MANGES LLP
 4            Attorneys  for  Debtors
 5            767  Fifth  Avenue
 6            New  York,  NY  10153
 7
 8    BY:    STEPHEN  KAROTKIN,  ESQ.
 9            JOSEPH  H.  SMOLINSKY,  ESQ.
10
11
12    WEIL,  GOTSHAL  &  MANGES LLP
13            Attorneys  for  Debtors
14            1300  Eye  Street  NW
15            Suite  900
16            Washington,  DC  20005
17
18    BY:    DAVID  R.  BERZ,  ESQ.
19
20
21
22
23
24
25
```

Page 4

1

2   AKIN GUMP STRAUSS HAUER & FELD LLP

3        Attorneys for Green Hunt Wedlake as trustee for the

4            Nova Scotia Finance Company

5        One Bryant Park

6        New York, NY 10036

7

8   BY:   DANIEL H. GOLDEN, ESQ.

9        NATALIE E. LEVINE, ESQ.

10

11

12   BINGHAM MCCUTCHEN LLP

13        Attorneys for BKK Group and ILCO Group

14        2020 K Street NW

15        Washington, DC 20006

16

17   BY:   MILISSA A. MURRAY, ESQ. (TELEPHONICALLY)

18

19

20   CALIFORNIA DEPARTMENT OF JUSTICE

21        Attorneys for State of California

22        P.O. Box 944255

23        Sacramento, CA 94244

24

25   BY:   JAMES POTTER, ESQ. (TELEPHONICALLY)

Page 5

1

2    CAPLIN & DRYSDALE

3          Attorneys for the Official Committee of Unsecured

4             Creditors Holding Asbestos-Related Claims

5          One Thomas Circle, N.W.

6          Suite 1100

7          Washington, D.C. 20005

8

9    BY:   TREVOR W. SWETT, ESQ.

10

11

12   CROWELL MORING

13          Attorneys for Winkelmann Sp. z.o.o.

14          590 Madison Avenue

15          20th Floor

16          New York, NY 10022

17

18   BY:   STEVEN B. EICHEL, ESQ.

19

20

21

22

23

24

25

Page 6

```
 1
 2    FRIEDMAN KAPLAN SEILER & ADELMAN LLP
 3          Attorneys for Manville Personal Injury Settlement Trust
 4              and Claims Resolution Management Corporation
 5          1633 Broadway
 6          46th Floor
 7          New York, NY 10019
 8
 9    BY:   EMILY A. STUBBS, ESQ.
10
11
12    GIBSON, DUNN & CRUTCHER LLP
13          Attorneys for Wilmington Trust as Indenture Trustee
14          200 Park Avenue
15          New York, NY 10166
16
17    BY:   MATT J. WILLIAMS, ESQ.
18
19
20    GREENBERG TRAURIG, LLP
21          Attorneys for Nova Scotia Bondholders
22          200 Park Avenue
23          New York, NY 10166
24
25    BY:   NANCY A. MITCHELL, ESQ.
```

Page 7

1

2    HARRIS BEACH PLLC

3         Attorneys for Town of Salina

4         100 Wall Street

5         New York, NY 10005

6

7    BY:   ERIC H. LINDENMAN, ESQ.

8

9

10   KELLEY DRYE & WARREN LLP

11        Attorneys for Loan Debenture Trust Company of New York

12             as Indenture Trustee

13        101 Park Avenue

14        New York, NY 10178

15

16   BY:   DAVID E. RETTER, ESQ.

17        STACIA A. NEELEY, ESQ. (TELEPHONICALLY)

18

19

20   MORVILLO, ABRAMOWITZ, GRAND, IASON, ANELLO & BOHRER, P.C.

21        565 Fifth Avenue

22        New York, NY 10017

23

24   BY:   STEPHEN M. JURIS, ESQ.

25

Page 8

1

2    KRAMER LEVIN NAFTALIS & FRANKEL LLP

3         Attorneys for Creditors' Committee

4         1177 Avenue of the Americas

5         New York, NY 10036

6

7    BY:   THOMAS MOERS MAYER, ESQ.

8         PHILIP BENTLEY, ESQ.

9         LAUREN M. MACKSOUD, ESQ.

10        ROBERT T. SCHMIDT, ESQ. (TELEPHONICALLY)

11

12

13   NEW YORK STATE OFFICE OF THE ATTORNEY

14        Attorneys for State of New York

15        The Capitol

16        Albany, NY 12224

17

18   BY:   MAUREEN F. LEARY, ESQ. (TELEPHONICALLY)

19

20

21

22

23

24

25

Page 9

1

2    STUTZMAN, BROMBERG, ESSERMAN & PLIFKA, P.C.

3         Attorneys for the Future Asbestos Claimants

4         2323 Bryan Street

5         Suite 2200

6         Dallas, TX 75201

7

8    BY:   SANDER L. ESSERMAN, ESQ.

9         ROBERT RUSSO, ESQ.

10

11

12   UNITED STATES DEPARTMENT OF JUSTICE, U.S. ATTORNEY'S OFFICE

13        Attorneys for United States of America

14        86 Chambers Street

15        New York, NY 10007

16

17   BY:   DAVID S. JONES, ESQ.

18        NATALIE N. KUEHLER, AUSA

19        JOSEPH N. CORDARO, AUSA

20

21

22

23

24

25

Page 10

1

2    UNITED STATES DEPARTMENT OF JUSTICE

3            Office of the United States Trustee

4            33 Whitehall Street

5            21st Floor

6            New York, NY 10004

7

8    BY:  BRIAN S. MASUMOTO, ESQ.

9

10

11    VEDDER PRICE, P.C.

12            Attorneys for Export Development Canada

13            1633 Broadway

14            47th Floor

15            New York, NY 10019

16

17    BY:  MICHAEL L. SCHEIN, ESQ.

18

19

20    ALSO PRESENT:

21            JENNIFER H. SCHILLING, Farallon Capital Management

22            LUIS ANTONIO MENDEZ, ESQ., County of Onondaga, New York

23            MARIANNE LISENKO

24

25

1              P R O C E E D I N G S

2          THE COURT:  All right, GM Motors Liquidation Company.

3     Can you hear me, or do I have a problem with my microphone?

4          MR. KAROTKIN:  We can hear you.

5          THE COURT:  All right.  I gather that there's still

6     many, many people on line downstairs, but we have so much to do

7     today that I think we need to get started.  I assume that most

8     people are here by reason of the disclosure statement, and

9     subject to your rights to be heard, I'm inclined to take that

10    first.

11         Before we do, I have some preliminary remarks on that.

12    Mr. Karotkin, can you think of any reason why I shouldn't deal

13    with disclosure statement first?

14         MR. KAROTKIN:  Stephen Karotkin, Weil, Gotshal &

15    Manges for the debtors.  Your Honor, we certainly have no

16    objection to proceeding in that fashion.  I will note that in

17    the agenda that we furnished to you, we did provide for Mr.

18    Mayer's issues to go first.

19         THE COURT:  I never got that agenda, Mr. Karotkin.  I

20    don't know what happened to it.

21         MR. KAROTKIN:  Okay, we can --

22         THE COURT:  Wait, I've got it now.  I don't want to

23    deal with the creditors' committee first.

24         MR. KAROTKIN:  I think that settles it, then.

25         THE COURT:  Okay.  All right.  On disclosure

09-50026-mg    Doc 7596    Filed 10/25/10    Entered 10/28/10 14:25:31    Main Document
MOTORS LIQUIDATION COMPANY, ET AL.
Pg 12 of 142

Page 12

```
 1   statement.  Folks, one of the problems we have whenever judges

 2   like me are asked to deal with disclosure statements is that

 3   because we need to deal with them in real time, we don't write

 4   on disclosure statement issues.  But I have a continuing

 5   problem in all of my 11s, and sometime I'm going to dust off

 6   one or more of the transcripts because I go through the same

 7   thing each time, and I'm just going to have them posted on the

 8   Internet.  But people don't get it when we're dealing with

 9   disclosure statements.  This is not the time to deal with

10   confirmation issues, and despite that seemingly obvious fact

11   and the fact that the purpose of a disclosure statement is to

12   give the reasonable creditor or stakeholder the information

13   that he, she, or it needs to vote on the plan, I get the same

14   stuff over and over again, and I got it on this motion, this

15   motion to approve a disclosure statement, which is

16   fundamentally a disclosure document, kind of like a prospectus

17   to a person to permit the vote.  If, notwithstanding my saying

18   this as clearly as I can, people are going to still try to

19   argue confirmation objections, they're going to get me even

20   crankier than I am now.

21           Additionally, although there is some case law out

22   there that says if a plan is patently unconfirmable, we'll deal

23   with it at the disclosure statement stage, in ten years on the

24   bench, now, and the thirty years I was a lawyer before that,

25   I've never seen on in any manner in which I was involved.  Not
```

09-50026-mg   Doc 7596   Filed 10/25/10   Entered 10/28/10 14:25:31   Main Document
MOTORS LIQUIDATION COMPANY, ET AL.
Pg 13 of 142

Page 13

 1    even in the small cases, much less the large 11s in which the

 2    problem incident to confirmation may be very real, but where

 3    they're dealt with by the traditional means:  confirmation

 4    objections in a hearing under 1129.  So don't waste my time

 5    with the patently unconfirmable stuff.  I think this goes to

 6    either asbestos or future claims rep or both.  I've read the

 7    papers, and those contentions are rejected.  We'll deal with

 8    the extent to which any disclosure issues have to be addressed.

 9         Then, another thing that I see over and over again,

10    and folks, it drives me ballistic, is when people try to deal

11    with their private needs and concerns, their private disputes

12    with the debtors or with the creditors' committee or whoever's

13    suing them or whoever has a dispute with them on an executory

14    contract, and they try to elevate those into disclosure

15    statement objections.  The purpose of a disclosure statement

16    hearing is not to deal with people's private needs and

17    concerns.  If and when those disputes are teed up for judicial

18    determination, people get the usual due process.  But do not

19    waste my time with objections of the character that the

20    disclosure statement doesn't disclose sufficiently how you plan

21    to treat me.  I don't want to hear about that.  The extent to

22    which a disclosure statement issue has validity is the extent

23    to which it deals with the disclosure to people across the

24    board who are voting on the plan.  I'll hear objections of that

25    character.

Page 14

1       So for the avoidance of doubt, I'm not going to allow

2   the distributions to the thousands of Old GM creditors to be

3   delayed by people pushing their private agendas.

4       Now, I'm going to tell you the order in which I want

5   disclosure statement objections addressed because I have issues

6   here similar to those that I addressed at the 363 hearing where

7   if we had a parade of people coming up -- even though I assume

8   that parade will be materially shortened since I told people

9   the standards under which this hearing is going to be held --

10  we'd never get done.  In each case, I'm going to want to hear

11  from the objector I identify.  Then I will hear the debtors' or

12  any other plan supporter's response, and then we'll deal with

13  what the disclosure statement needs to be done to deal with

14  that objection.  And so Mr. Karotkin, you're going to be

15  bouncing up and down as we deal with particular objections, but

16  you're not going to speak first in each case except to the

17  extent that you think it's necessary to put on the record

18  resolutions of objections before people speak.

19      I want to hear first from the creditors' committee.

20  Then from the present asbestos creditors, that is, their

21  official committee.  Then from the asbestos future rep --

22  future claims rep.  And then, to the extent they haven't been

23  resolved, by the United States Trustee's Office.  Then I'll

24  hear any nonrepetitive comments by others.  And again, I'm

25  going to be looking for people to be nonrepetitive and to

09-50026-mg    Doc 7596    Filed 10/25/10    Entered 10/28/10 14:25:31    Main Document
MOTORS LIQUIDATION COMPANY, ET AL.
Pg 15 of 142

Page 15

1    understand the principles under which a disclosure statement

2    hearing is addressed.

3             So Mr. Karotkin, you want to yield to Mr. Mayer or one

4    of Mr. Mayer's partners?

5             MR. KAROTKIN:  Can I just make a couple of opening

6    remarks?

7             THE COURT:  Sure, yes.

8             MR. KAROTKIN:  Thank you, sir.  I would first like to

9    note, Your Honor, for the record -- and you may have seen

10   this -- that yesterday, the Department of Justice filed a copy

11   of a comprehensive settlement agreement relating to the

12   debtors' environmental obligations with respect to its owned

13   sites.  That reflects a comprehensive resolution of the

14   liability with respect to those sites.  Those sites will be

15   transferred, under the plan, to what is known as the

16   environmental trust, and that settlement is among the U.S.

17   Treasury, the Department of Justice, the EPA, a number of state

18   governments, as well as the Indian tribe adjacent to the

19   Messina facility in upstate New York.  That settlement is a

20   critical prerequisite to moving forward with the plan, and

21   obviously, we are quite pleased that that has been brought to

22   resolution.  It covers eighty-nine sites in fourteen states.

23   And again, this is as to the debtors' owned property.  It does

24   not address superfund sites.  And it provides for the

25   establishment of the environmental trust under the plan that

Page 16

1   will administer the remediation of those sites and provides for

2   cash funding from the debtors to the trust on the effective

3   date of the plan of approximately 640 million dollars.  And

4   those are proceeds from the wind-down facility provided by the

5   U.S. Treasury.

6           We are obviously very pleased.  That is a major, major

7   hurdle that's been accomplished to move forward with

8   confirmation.

9           THE COURT:  Well, pause, please, Mr. Karotkin because

10  I'd be inclined to agree that it's a huge development, but I

11  also assume that you're going to have to put in some paragraphs

12  to describe it in the disclosure statement.

13          MR. KAROTKIN:  I think it -- there is some description

14  in there already, but we can certainly buttress that.

15          THE COURT:  Well, at the time the disclosure statement

16  was drafted, had the deal been made?

17          MR. KAROTKIN:  The economics -- a lot of the economics

18  had been agreed to already, and it was really finalizing the

19  documentation, but we will take a look and make sure that

20  there's appropriate disclosure.  And to the extent it needs to

21  be beefed up, we will do so.  Again, as I was about to

22  indicate, it is obviously our intention to submit a revised

23  disclosure statement and plan to address the objections, and we

24  will certainly work with the creditors' committee, the other

25  committees, and as well as with U.S. Treasury to make sure that

Page 17

1    everyone is happy with whatever additional disclosure as to the

2    environmental settlement as appropriate.

3              THE COURT:  Um-hum, now, I don't know if you can

4    answer this or I need the U.S. Attorney's Office to do it, but

5    in some of the other similar settlements of environmental

6    issues that I've dealt with, I've had to approve reasonableness

7    not just from the perspective of the estate but to make sure

8    that the government wasn't giving away the store.  Do I have a

9    similar issue here?

10             MR. KAROTKIN:  I may defer to Mr. Jones on that, but I

11   know that this has to go through the appropriate government

12   procedures, I think in the federal register, if I'm not

13   mistaken.  And there is a common period, but why don't I defer

14   to Mr. Jones.

15             MR. JONES:  Your Honor, David Jones from the U.S.

16   Attorney's Office, Southern District of New York for the United

17   States.  And I believe the answer is yes, Your Honor.  Mr.

18   Karotkin is correct.  The settlement agreement, as we indicate

19   in our notice of lodging, is subject to a public notice and

20   comment period which is independent of this Court's review, and

21   then it is also subject to both types of settlement review, as

22   I think Your Honor has seen in other cases.

23             THE COURT:  Um-hum.  All right --

24             MR. JONES:  Oh, Your Honor, very quickly, I may add,

25   also, just to confirm my understanding with debtors on the

09-50026-mg    Doc 7596    Filed 10/25/10    Entered 10/28/10 14:25:31    Main Document
MOTORS LIQUIDATION COMPANY, ET AL.
Pg 18 of 142

Page 18

1    disclosure statement front, the current version does describe

2    the settlement in principle because the main terms were blocked

3    in.  The deal has now been finalized, and as Mr. Karotkin says,

4    perhaps they'll be updating and firming up their description,

5    but I think it is already reflected.

6            THE COURT:  Okay, Mr. Karotkin.

7            MR. KAROTKIN:  Yes, again, just for the record, the

8    motion before Your Honor today to approve the disclosure

9    statement as well as solicitation procedures with respect to

10   the plan and setting a confirmation hearing and objection

11   procedures was filed on September 3rd, and as set forth in that

12   motion, notice was given by mail to all known creditors.  It's

13   my understanding, Your Honor that notice of this hearing was

14   mailed to approximately two million creditors and other

15   parties-in-interest, as well as stockholders.  And certificates

16   of service are on file; in addition, Your Honor, notice by

17   publication of this hearing was given in several newspapers,

18   and certificates of publication are on file, as well, with the

19   Court.

20           Approximately sixty responses and objections have been

21   filed.  We furnished Your Honor with a chart of those, and we

22   believe really on thirteen of those relate to the adequacy of

23   disclosure, and as I think you have already noted, the balance

24   relate to objections to confirmation which are appropriately

25   deferred.

1      Some of -- we have been in discussions with various

2  parties to address the disclosure statement objections and are

3  working on language, and in fact, have agreed to language with

4  some parties to address their concerns.  I think that with

5  respect to the Office of the United States Trustee, all of the

6  issues raised by the United States trustee in its objection,

7  we've agreed to resolve with them, and I think that the chart

8  annexed to our response reflects that.  And of course, I think

9  Mr. Masumoto is here, and he can hopefully confirm that.

10      A number of people, Your Honor -- and we can address

11  this if it comes up while the objectors speak -- have obviously

12  noted that there were blanks in the plan with respect to

13  certain numbers.  Obviously, we intend to fill those numbers

14  in.  A lot of those numbers have been refined since September

15  3rd when the disclosure statement was filed, and we, of course,

16  will provide the best information we have available with

17  respect to those numbers, as of the time that we will submit

18  the revised disclosure statement.

19      We have also agreed, and I'm sure you noted, that

20  certain of the objecting parties had requested that we attach

21  as an exhibit with the solicitation materials what is called

22  the Guk (ph.) trust agreement.  We will certainly do that.  I

23  believe that that is substantially final at that point, and in

24  addition, some parties have asked that we attached the

25  environmental settlement agreement to which I just referred,

09-50026-mg    Doc 7596    Filed 10/25/10    Entered 10/28/10 14:25:31    Main Document
MOTORS LIQUIDATION COMPANY, ET AL.
Pg 20 of 142

Page 20

1    and we will be more than happy to do that, as well.

2        Other parties have requested that a going-forward

3    budget with respect to the various trusts be included as an

4    exhibit to the disclosure statement.  That always was

5    contemplated, and again, with the amended disclosure statement,

6    that will be filed, as well.

7        I think with respect to the objection filed by the

8    future claimants representative and the asbestos claimants'

9    committee, there was some reference to attaching copies of the

10    asbestos trust document, as well as the asbestos claims

11    resolutions procedures.  Typically, in my experience, and I

12    think they probably would confirm that, that document is

13    drafted by those committees.

14        THE COURT:  Well, you said that in your reply, so

15    what's the game plan, then?  You're just going to say that if

16    they want it, they can have it?

17        MR. KAROTKIN:  If they want it, they can have it.  If

18    they don't want to draft it, then we will do so.  I, frankly,

19    don't believe it's material in this case to have it annexed as

20    an exhibit.  But if they believe it is, we're not going to

21    fight them on that.

22        And I think with that, Your Honor, I will defer to Mr.

23    Mayer.

24        THE COURT:  Okay.  Mr. Mayer, you want to come up,

25    please?

MOTORS LIQUIDATION COMPANY, ET AL.

Page 21

1          MR. MAYER:  Thank you, Your Honor.  Thomas Moers Mayer

2     for Kramer Levin Naftalis & Frankel, counsel to the official

3     committee of unsecured creditors.  We appreciate the debtors'

4     work towards solving a number of our issues.  The Guk trust

5     agreement is pretty close to final.  We do have some final

6     negotiations, mostly with Treasury, over the consent rights

7     they want.  But I'm hoping that that will be resolved.  We had

8     a conversation with them yesterday.

9          With respect to pure disclosure issues, and I don't

10    think we've raised anything that we thought of as a

11    confirmation issue, but -- I hope not.   First, we do think

12    it's appropriate that creditors know who's going to run this

13    thing when it comes out, so we have asked for the

14    identification of who's actually going to do what needs to be

15    done.  And my understanding is with one or two exceptions,

16    that's doable.

17         I might add that with respect to professionals

18    retained by the creditors' committee, Kramer Levin does not

19    expect to have ay role going forward post-effective date.  It's

20    possible if we're still litigating asbestos that my firm will

21    continue to work on that, and if we're still litigating who

22    owns the term loan litigation, the issue of ownership is one

23    that my firm feels quite strongly about, so we will seek to

24    maintain a role in that.  But otherwise, with the exception of

25    those two particular issues, I stand today as someone who does

Page 22

1      not expect to be here after the plan is confirmed.

2           THE COURT:  Um-hum, well, pause please, Mr. Mayer,

3      because you've been around the block a few times.  The issue of

4      future leadership has come up most commonly in those cases.

5      Unfortunately, we don't have them as often as we used to, where

6      we're reorganizing a company, and you're going to have a

7      reorganized debtor that has a board.  And my memory, and I'm

8      perfectly willing to be corrected, is that very, very often,

9      the incumbency of the new board hasn't been selected by the

10     time the disclosure statement goes out, and the debtor

11     supplements it before confirmation.  I think I need to make a

12     finding at a confirmation hearing as to that, but I have a

13     memory which may be numb or incorrect that we haven't done it

14     that often at the disclosure statement stage.  Do you think I'm

15     mistaken in that regard?

16          MR. MAYER:  No, Your Honor, I think you're absolutely

17     right.  And Your Honor is correct.  It is that the requirement

18     that the management be identified is in the conditions to

19     confirmation.  In this context, my view was -- and if I'm

20     wrong, I'm wrong -- that this is something the creditors should

21     know.  You refer to this as a prospectus; it's kind of a

22     combination prospectus and proxy statement.  Sometimes it's not

23     possible to identify who's going to do the work.  We believe,

24     based on our discussions with the parties, that it is indeed

25     possible, and we think it would be useful for creditors to

Page 23

 1  know, but I leave that to Your Honor's discretion.  As far as I

 2  know, ther's nothing that requires that this information would

 3  be disclosed, but I am of the view the creditors should know

 4  who's going to run the show.

 5          THE COURT:  Okay, and to put it in context you're

 6  talking about who's going to be captain of the ship or the

 7  principal decision makers as we liquidate Motors Liquidation

 8  Company --

 9          MR. MAYER:  Correct.

10          THE COURT:  -- because this has nothing to do with,

11  like, a real living company --

12          MR. MAYER:  Correct.

13          THE COURT:  -- like New GM would be.

14          MR. MAYER:  Correct.  And again, I think it's

15  inappropriate to talk names, but I think -- to -- without

16  disclosing any discussions, that one of the issues is does the

17  current team continue to manage the wind-down or is there a new

18  team.

19          THE COURT:  Okay.

20          MR. MAYER:  And there's going to be -- it's going to

21  take some time, and it's a -- every now and then, somebody says

22  to me, well, GM's over.  And I say to them, well, according to

23  the bond prices that are out there, there's something in the

24  neighborhood of twelve to fourteen billion dollars of value to

25  be distributed under a plan, and in other cases, somebody would

Page 24

1    say gee, if you have twelve to fourteen billion dollars of

2    value to distribute, that's a real case.  Well, that's what we

3    have here, and it's going to take some time to distribute it.

4    So there's work to be done post-effective date.  I don't plan

5    on doing very much of it, but I think creditors would like to

6    know who's going to do the work.  And if Your Honor decides

7    differently, then I understand that.

8            With respect to the budget, we made a lot of progress.

9    We do think creditors need to know what the risk is, that their

10   securities will be invaded if the cash is not sufficient.

11   That's a topic of some heated discussion right now, and it, of

12   course, is not unrelated to the discussion of who's going to do

13   the work.  Treasury has the right to a reasonable budget.  In

14   my view -- and I hope we don't have to actually litigate

15   this -- that does not mean the Treasury gets to pick who

16   actually does the work.  Those two issues sometimes meld

17   together.  We're working on it.  I won't pretend -- and as I

18   said at the beginning, it has nothing to do with me -- I won't

19   present those discussions have been completely without heat,

20   but hopefully, they will produce some light, and there has been

21   progress on a budget, as far as we're concerned.

22           The -- before I get to the really big one, one other

23   area where the debtors and we continue to have an issue --

24           THE COURT:  Can you pause on that, please, --

25           MR. MAYER:  Sure.

Page 25

1          THE COURT:  -- Mr. Mayer, so I make sure I'm keeping

2     up with you.  The point that you made, which I take is the

3     premise for the discussion, that there's a risk that the

4     securities will be invaded and that the creditor community

5     needs to get some comfort as to whether it knows whether or not

6     that's happening or going to happen.  I understand that.  But

7     does that require knowledge of the specifics of the budget and

8     who's going to be doing stuff to implement the budget, or does

9     it instead require some kind of macroeconomic discussion as to

10    whether there's going to be a -- what I'll call crudely a

11    blowing of the budget?

12          MR. MAYER:  I think it's the latter, Your Honor.  I

13    don't know that we need to have actual -- actual subsets

14    disclosed.  Why don't we just say that there are certain

15    numbers that have been discussed where the committee would be

16    comfortable that there's enough money, and there are certain

17    numbers that have been discussed where the committee is not

18    comfortable, and we're rewinding the discussion that we had a

19    year ago, and hopefully we'll get to yes on a number that

20    everybody can agree provides a reasonable shot that the costs

21    will be covered.

22          THE COURT:  Okay, continue, please.

23          MR. MAYER:  The next point is one that I personally

24    feel strongly about.  I know that the debtors don't.  We're

25    going to get flooded with calls -- we always do -- trying to

09-50026-mg    Doc 7596    Filed 10/25/10    Entered 10/28/10 14:25:31    Main Document
MOTORS LIQUIDATION COMPANY, ET AL.
Pg 26 of 142

Page 26

1    figure out what the claim universe is.  The debtors have agreed

2    to put in a range of projected claims.  The monthly operating

3    reports have a breakdown by category, and frankly, we have a

4    breakdown by category of ranges of where contract claims are

5    estimated to go from X to Y, and asbestos claims are expected

6    to go from A to B.  And we are going to get calls about that.

7    And I believe those ranges on a category by category basis are

8    material to creditors who will be deciding what to do and

9    should be in the debtors' disclosure statement.  If they're not

10   in the debtors' disclosure statement, a potential sort of

11   halfway house is that the debtors' disclosure statement can

12   contain a link to my web site, and we'll post those ranges on

13   our web site.  But we are going to get calls on that.  And a

14   range of outcomes for an executory contract litigation is

15   different from a range of outcomes for asbestos litigation, and

16   this is going to be material.

17          Your Honor made a very interesting point which is that

18   this is like a prospectus.  In fact, if you take a look at

19   Section 1145 in another case, you can't have trading post-

20   effective date, unless a copy of the disclosure statement is

21   resident with the broker-dealers who were actually doing the

22   trading.  There's a uni -- this is an enormous universe of

23   people who are going to get distributions from this estate.

24   And they're going to get distributions in two flavors.  They're

25   going to get GM stock and warrants that they can trade as they

09-50026-mg    Doc 7596    Filed 10/25/10    Entered 10/28/10 14:25:31    Main Document
MOTORS LIQUIDATION COMPANY, ET AL.
Pg 27 of 142

Page 27

```
 1    see fit.  And then they're going to get interest in a trust

 2    which is going to release additional stock and warrants and, if

 3    we own the term-loan litigation, and if we win, there'll be

 4    another trust distributing cash.  And that'll happen over time.

 5    And people need to know, over time, what's going on.  And I

 6    think this is the kind of information that people need to know

 7    to understand whether they should buy, sell, or hold, and if it

 8    isn't in the disclosure statement or available on the web site,

 9    it's going -- it always does -- it leaks out and different

10    people benefit in different ways.  I'm a believer in more

11    information rather than less.  Put up whatever language you

12    want about how all these numbers may be wrong, but this is

13    information that the committee has and that is affecting our

14    judgments on whether to settle or prosecute, for example,

15    asbestos claims, how important the term loan litigation is

16    anyway.  We make real-time judgments based on this information.

17    And we believe that creditors should have it generally.  And

18    again, I leave that to Your Honor's judgment.  There's nothing

19    in 1125 that says this has to be available, but I think it is

20    material, and it should be available.

21            THE COURT:  Help me with the thing that's causing me

22    to scratch my head, Mr. Mayer, which is that in some cases, the

23    amount of funded debt or trade claims that are capable of

24    getting one's arms around with a fair degree of comfort

25    represents a very high percentage of the debt in the whole
```

1   case, and therefore, you got a pretty good arm -- your arms

2   around, pretty well, around the claims universe.  But when you

3   have a lot of question mark types of debt, all of which is

4   still debt, if you have the range, it doesn't tell you a whole

5   lot.  Where are we in this case, in your view?

6          MR. MAYER:  We're in the middle.  There are some odd

7   points to this case.  First, you have about -- I think the big

8   bond issue that Wilmington Trust is the indenture trustee for

9   is twenty-three billion principal amount.  Did I get that

10  right?

11         UNIDENTIFIED SPEAKER:  Yes.

12         MR. MAYER:  And you've got some sort of odds and ends,

13  other bond issues out there.  You have a very large claim filed

14  by what we call the Nova Scotia bonds that we have a very large

15  range for, and that's an issue before Your Honor that I'm not

16  going to be handling.

17         THE COURT:  You also have a very large objection to

18  that, don't you?

19         MR. MAYER:  There's a very large objection to that.

20  So you can call that funded debt, but that's sort of funded

21  debt that could go from here to here, depending on where Your

22  Honor comes out.

23         Then you've got asbestos; there's the range there.

24  There's product liability claims.  Those are being handled by

25  an ADR process, and I might add, as far as we can gather from

Page 29

1    the reports that we've gotten, they've been fairly -- that's

2    not a complaint.  It's been handled extremely well.  Those

3    claims are coming down, it's very efficient, and it's all

4    working.  But when you come right down to it, the initial range

5    that was negotiated for partial dilution protection was between

6    thirty-five and forty-two billion dollars.  So you had, just

7    taking that -- and I want to be careful not to put into the

8    record anything that's not public -- but if you take that,

9    which was a public measure, what that estimated was that there

10   was a twenty percent dilution risk that was partially mitigated

11   by the deal with New GM.  That -- I don't want to provide a new

12   disclosure as to whether that's an accurate range or an

13   inaccurate range, but that gives you an order of magnitude.

14        THE COURT:  And you say partly because it provides for

15   more stock but not new -- more -- new warrants?

16        MR. MAYER:  That is correct.  That is correct.  And

17   the back of the envelope calculation when the deal was cut was

18   that the warrants were worth as much as the stock.  I don't

19   intend to put on evidence of this today; the current trading

20   price of the bonds indicates the warrants are worth even more

21   than the stock right now.  So the dilution protection for the

22   stock is less of a protection than it used to be just because

23   the warrants are worth more.  And I'll -- the automobile world

24   is better today than it was when these warrants were negotiated

25   in the spring of 2009.

09-50026-mg    Doc 7596    Filed 10/25/10    Entered 10/28/10 14:25:31    Main Document
MOTORS LIQUIDATION COMPANY, ET AL.
Pg 30 of 142

Page 30

1           So I hope that's an answer to Your Honor's question.

2    It's not an enormous swing, but I believe it's a material

3    swing.  Thirty-five to forty-two billion dollars, that's twenty

4    percent.  New GM has put out into the public domain its

5    estimate of thirty-seven billion.  I don't know what the basis

6    for that is, by the way, and I don't know that anybody at Old

7    GM knows what the basis for that is, but that's in New GM's 10-

8    Q.

9           THE COURT:  All right, continue, please.

10          MR. MAYER:  The last thing that I want to raise

11   unfortunately brings us back to the term-loan litigation.  Your

12   Honor, that is potentially a billion-five asset, and I think

13   that has to be resolved before the disclosure statement is

14   approved because of the following unfortunate dynamic.  Your

15   Honor, the committee will probably be among the last parties

16   ever to recommend a liquidation as opposed to a reorganization.

17   Reorganization -- I shouldn't say reorganization.  A Chapter 11

18   liquidating plan, as Your Honor has noted, you have 1145 in

19   Chapter 11; you don't have it in Chapter 7.  It would be

20   complicated but not impossible to distribute New GM shares by a

21   Chapter 7 trustee.  You might have to go under 3(a)(10) of the

22   Securities Act; you might have to use Rule 144.

23          THE COURT:  Wait; I thought -- of the '33 Act?  How

24   can you distribute so much stock in compliance with the '33 Act

25   other than under an 1145 exemption?

Page 31

1          MR. MAYER:  Section 3(a)(10), Your Honor, provides

2     that a Court may approve a settlement, and that provides an

3     exemption to the requirement of registration statement under

4     the '33 Act.  It hasn't happened often, but it is out there,

5     and there are also provisions for distributions over time,

6     especially where the stock that is being distributed is

7     publicly traded.  Nobody knows if the IPO is going to go

8     effective, but I think it's a pretty good bet.  And by the time

9     we come out, certainly, those shares will be registered in

10    trading, and this will be in the nature of a release of

11    relatively small amount of total GM stock into a market where

12    the IPO has already become effective.

13          THE COURT:  In other words, because New GM is in '33

14    Act compliance.

15          MR. MAYER:  Oh, New GM is going to do a '33 Act

16    registration statement.  It's filed a red -- I don't know if

17    it's a red herring but it's filed a draft.

18          THE COURT:  But it hasn't become effective, has it?

19          MR. MAYER:  No, Your Honor.  I'm trying to think of

20    what's public and what isn't.

21          THE COURT:  Well, don't try to guess.

22          MR. MAYER:  Let's put it this way.

23          THE COURT:  I don't need to get an answer to that

24    question that much.

25          MR. MAYER:  They -- what's -- I mean --

Page 32

1      THE COURT:  I hadn't been aware of that '33 Act

2    exception.  3(a)(10) you said?

3      MR. MAYER:  It's 3(a)(10).  And again, under Rule 144

4    which has been liberalized substantially since I started

5    practicing, there's a holding period, and you can dribble

6    during the holding period, and the holding period isn't that

7    long anymore.  Look, none of this is great.  This is all a

8    subpar outcome for distributing the stock.  But it can be done,

9    and it's not like this is going to be brand new stock that

10   nothing is trading.  This stock is going to be trading, and

11   they're going to be -- New GM is already filing Ks and Qs.  And

12   unless they pull the  IPO, they expect that it will go

13   effective relatively soon -- there actually has been a

14   tremendous amount put in the public domain.  One of these days,

15   somebody should probably write a satirical article about how

16   gun-jumping doesn't seem to apply in this particular

17   circumstance because there's been a lot of chatter by the CEO

18   and others about where they're going to price it, when it's

19   going to go effective.

20       But in any event, the betting is it is going to go

21   effective, and there will be tradable stock.  It is a matter of

22   public record that this estate cannot distribute stock through

23   a plan or otherwise until sixty days after the stock is

24   distributed through the IPO, if the IPO is going forward.  That

25   was negotiated as part of the sale transaction.  So by the time

09-50026-mg    Doc 7596    Filed 10/25/10    Entered 10/28/10 14:25:31    Main Document
MOTORS LIQUIDATION COMPANY, ET AL.
Pg 33 of 142

Page 33

1    stock is going to creditors, here, there's going to be a public

2    market for New GM stock assuming the IPO goes effective.

3         So that brings me to my problem.  This is a

4    liquidating plan, and we have an asset that could be zero, and

5    it could be a billion-five plus whatever derives through the

6    amount of post-judgment interest there is if the judgment is

7    obtained.  A billion-five is a lot of money.  I said that you

8    look at the bond prices, it looks like we're getting somewhere

9    north of twelve and a half billion (sic) dollars of value.  A

10   billion-five is a noticeable improvement on 12.5 billion

11   dollars.  If this disclosure statement is approved and it goes

12   out for a vote, everybody who votes yes is giving up rights,

13   under 1129(a)(7) with respect to that billion-five if Your

14   Honor were to rule in Treasury's favor and say that Treasury

15   still has a right under 1129(a)(9) to the proceeds of the term

16   loan litigation because the only argument that Treasury has

17   raised is 1129(a)(9) which doesn't apply in Chapter 7, which

18   means you need a new liquidation analysis.  Again, I don't want

19   liquidation here.  But I don't want creditors being told vote

20   yes on a plan and your yes estops you from coming in later and

21   saying, wait a minute, if we do it in a Chapter 11 we lose the

22   billion-five; if we do it in a Chapter 7, I get my share of it.

23   I don't want people to have to make that choice.  That's one of

24   the reasons why we moved, and one of the reasons why the

25   additional fact that there was a November 1 hearing on summary

09-50026-mg    Doc 7596    Filed 10/25/10    Entered 10/28/10 14:25:31    Main Document
MOTORS LIQUIDATION COMPANY, ET AL.
Pg 34 of 142

Page 34

1    judgment, why we hope Your Honor will decide that issue today

2    or at least before the disclosure statement comes out, because

3    people won't -- you're exposing them to a risk if they vote

4    yes.  And I guess we can change the disclosure statement around

5    such that it is prominently noted if you vote yes, and if the

6    Court decides the Treasury owns this lawsuit under 1129(a)(9),

7    you could be giving up your right of a pro rata share of a

8    billion-five.  See liquidation analysis attached as an exhibit;

9    it shows what the outcome is.  You could do that.

10            THE COURT:  It's the obvious answer, isn't it?

11            MR. MAYER:  I think that is definitely not optimal.

12            THE COURT:  I'm sorry?

13            MR. MAYER:  I think that's definitely not optimal.

14            So that's really it for our colleagues.  Did I leave

15    anything -- Jen, did I leave anything out?

16            THE COURT:  I assume the disclosure statement is also

17    going to tell the creditor community that the ability to

18    collect a billion and a half or any subset of that is not

19    assured.

20            MR. MAYER:  Oh, absolutely, and would also say

21    liability's not assured, collection's not assured.  As we said

22    in our papers -- I think we said in our papers, there are -- we

23    are told there are forty recipients of this money.  One of the

24    problems with this lawsuit, Judge --

25            THE COURT:  And if I'm not mistaken, there are some

09-50026-mg    Doc 7596    Filed 10/25/10    Entered 10/28/10 14:25:31    Main Document
MOTORS LIQUIDATION COMPANY, ET AL.
Pg 35 of 142

Page 35

 1    remaining UCC-1s that are still on file, like, twenty-six of

 2    them, apart from the most important one.

 3            MR. MAYER:  Yes, you're now getting into areas where,

 4    because I'm not the counsel handling that suit --

 5            THE COURT:  All right.

 6            MR. MAYER:  -- would probably have to have Butzel Long

 7    respond to that.

 8            THE COURT:  No, but one thing that I have assumed is

 9    that just like a prospectus has risk factors, the disclosure

10    statement will disclose risk factors associated with the Butzel

11    Long litigation succeeding on the one hand or failing on the

12    other.

13            MR. MAYER:  Absolutely.  And as we said in our papers,

14    I believe, in my view, this is going to go to the circuit.

15    This is a pure UCC question, up or down, and not really capable

16    of settlement because you have too many people on the other

17    side already have their money.

18            THE COURT:  Um-hum.

19            MR. MAYER:  Unless Your Honor has further questions.

20            THE COURT:  No, I'd like to hear from Mr. Karotkin on

21    the issues you articulated.

22            MR. MAYER:  Thank you.

23            MR. KAROTKIN:  Stephen Karotkin, Weil, Gotshal &

24    Manges.

25            I think I have them in order, Your Honor.  I think Mr.

09-50026-mg    Doc 7596    Filed 10/25/10    Entered 10/28/10 14:25:31    Main Document
MOTORS LIQUIDATION COMPANY, ET AL.
Pg 36 of 142

Page 36

1    Mayer wanted the Guk trust administer named in the disclosure

2    statement.  Is that correct?

3          MR. MAYER:  The folks working for the Guk trust and

4    the administrator, yeah.

5          MR. KAROTKIN:  Well, as far as we know, and I think

6    Mr. Mayer knows better than we do, the Guk trust administrator

7    is going to be Wilmington Trust Company, and we're happy to

8    disclose it.  And we also -- it's our understanding that the

9    intention is that the AlixPartners firm be retained to continue

10   to do work post-effective date on behalf of the Guk trust --

11         THE COURT:  Any problem in telling the creditor

12   community that?

13         MR. KAROTKIN:  Not in the least, as long as Mr. Mayer

14   tells us that that is the decision --

15         MR. MAYER:  No, that's -- we don't have a problem with

16   that.  And I didn't -- that's for -- is Alix okay with that?

17         UNIDENTIFIED SPEAKER:  Yeah, no worries.

18         MR. KAROTKIN:  So we're happy to do that.  I think he

19   addressed the budget already.  As I said, it is our intention

20   to file a budget with the amended disclosure statement, which I

21   expect will address that issue, as well.

22         With respect to the claim universe in more detail,

23   with respect to the categories of claims, I have a couple of

24   views on that.  I guess first and foremost, I don't think it's

25   necessary, and I think that what Mr. Mayer is saying that he

Page 37

1    needs that to protect people currently, in his view -- or, he

2    needs, in his view, to protect people who currently are trading

3    in claims.  And the bondholders who, perhaps, want to sell.  I

4    don't believe it's the purpose of a disclosure statement to

5    facilitate trading in the marketplace.

6           THE COURT:  Well, of course, it isn't, but I didn't

7    hear Mr. Mayer say that.  If he did, it would have gotten my

8    attention because -- I'll give him another opportunity to be

9    heard, but I think my purpose in life is not to exist to serve

10   claims traders.  But I thought that his -- the thrust of his

11   point was to give creditors some ballpark or universe

12   opportunity to decide whether they're going to get diluted.

13   Now, was that his delicate way of telling me that this is

14   really a claims trader issue, in your view?

15          MR. KAROTKIN:  I don't know; he can respond to that.

16   But as I indicated earlier, we intend to put in a range of what

17   we believe will be the allowed claims in class 3, which is the

18   unsecured creditor claims.  And I think what he wanted was a

19   further breakdown by category within class 3 of those claims,

20   based on some information that AlixPartners and MLC has done

21   and based on some refinement, I guess, that FTI has done on

22   behalf of the creditors' committee.  I don't think that's

23   necessary.  As I said, we will provide a range on an aggregate

24   basis as to that.  My concern, Your Honor, is that once you

25   go --

1         THE COURT:  Pause, please, Mr. Karotkin.  Are you -- I

2    may be articulating the question in the wrong way because I

3    think, for instance, that asbestos claimants get the same thing

4    as -- present claimants, at least, get the same thing as

5    general unsecured claims.  But would there be a difference in

6    what claims classes get other than the oddball priority claims,

7    or something like that?

8         MR. KAROTKIN:  No.  Everyone gets -- although the

9    asbestos claims are classified separately from the general

10   unsecured claims --

11        THE COURT:  They get the same cents on the dollar the

12   general unsecureds get.

13        MR. KAROTKIN:  The theory is they get the same ratable

14   distribution on the dollar that other creditors get.  So again,

15   that's why I think that the aggregate amount is the relevant

16   amount.  To break it down further, I think there would have to

17   be so many disclaimers.  I suppose if the creditors' committee

18   wants to have an exhibit to the disclosure statement that says

19   this is their view, or this is their belief based on their

20   analysis, I'm not sure we would object, but again, I don't

21   think it's necessary.  And I do -- we're talking about voting

22   on the plan.  We believe the aggregate amount for the class is

23   what's relevant, and that no further breakdown is necessary.

24   If Your Honor disagrees, as I said, Mr. Mayer has prepared a

25   breakdown, and if his clients want to take responsibility for

MOTORS LIQUIDATION COMPANY, ET AL.

Page 39

1     that, I leave that up to you, Your Honor.

2          With respect -- his last point, I think, is with

3     respect to the avoidance action, and I think that --

4          THE COURT:  What about blowing the budget?

5          MR. KAROTKIN:  I'm sorry?

6          THE COURT:  Or is that fully resolved now?

7          MR. KAROTKIN:  I'm sorry, I didn't hear you.

8          THE COURT:  The budget.  Is that fully resolved?

9          MR. KAROTKIN:  I think, as Mr. Mayer indicated, and I

10    would agree with him, there are still discussions going on with

11    Treasury as to the budget, and the amount of the budget and how

12    it will operate.  And I am hopeful that -- I'm hopeful that

13    before we file the amended disclosure statement, that will be

14    resolved.  It may not be resolved, and we may be back here with

15    you seeking some appropriate relief.

16         And I think the last item he raised was with respect

17    to the avoidance action, and I think that what he was saying is

18    before -- I think what he was saying is that before the

19    disclosure can go out, Your Honor has to rule who's entitled to

20    it, so that information can be set forth in the disclosure

21    statement.  And I think Your Honor had the appropriate answer,

22    that why can't there be disclosure of what happens under

23    various scenarios.  And we already do have that disclosure, and

24    that can be supplemented, as well, based on some estimates.

25    But the plan and disclosure statement are very clear that

Page 40

```
 1    either the avoidance action proceeds go to Treasury or they go

 2    for the benefit of unsecured creditors, depending on either a

 3    settlement or a litigated outcome.  And we can add language

 4    that will describe the differences in the expected

 5    distributions, based on those two scenarios.  And I think what

 6    Mr. Mayer is saying, well, that's still not enough.  And he is

 7    of the belief, and I frankly don't understand it, Your Honor,

 8    that in Chapter 7 there is a different result with respect to

 9    the avoidance action.  As I understand it, and the argument

10    being made by Treasury is that they have a superpriority claim

11    with respect to the --

12              THE COURT:  And your point is you're going to have

13    that same superpri in either 7 or 11?

14              MR. KAROTKIN:  Yeah, that's my understanding, and --

15              THE COURT:  If they have one at all.

16              MR. KAROTKIN:  Correct.  If they have it, they will

17    have it in Chapter 7.  If they don't have it, it makes no

18    difference.

19              Now, if Mr. Mayer would like to add a paragraph to the

20    disclosure statement -- I think this is what maybe you were

21    suggesting -- that says the creditors' committee believes that

22    in Chapter 7 something else will happen, we certainly have no

23    objection to that, and the government or the debtors or whoever

24    else is interested can say they either disagree with that or

25    they agree with that.  And that may be one way to go.
```

Page 41

1          THE COURT:  Okay.  Mr. Mayer?  Any further reply?

2          MR. MAYER:  Just to be clear, Your Honor, because

3     it's -- to be clear, our position is the Treasury does have a

4     superpriority claim, but that it has waived both lien and

5     recourse to the term-loan litigation, and the only thing they

6     have is the requirement under 1129(a)(9) that in Chapter 11,

7     they have to be paid whether or not they have recourse.

8     Section 1129(a)(9) doesn't apply in a Chapter 7 liquidation.

9     They would be in a position of saying they have a superpriority

10    claim, but they have waived recourse to this asset, and there

11    is nothing left in the Code that gives them any hook.  We don't

12    think 1129(a)(9) gives them a hook, either, for reasons that

13    are set forth in our papers, but that's for argument at a later

14    time.  That's why there's a difference between Chapter 7 and

15    Chapter 11.  1129(a)(9) doesn't apply in Chapter 7, and that's

16    all they have.  That's our view.

17         THE COURT:  Okay.  All right, here's what we're going

18    to do on this, folks.  I think that on the first issue, who's

19    going to be quarterback in the litigation, we've now resolved

20    that consensually.  And I think we have on the budget, as well.

21    In any event the best available information in broad terms will

22    be provided on the budget because I do think that it's

23    important to the creditor community to get whatever sense they

24    can, recognizing uncertainties as to what we're talking about

25    on the budget.

09-50026-mg   Doc 7596   Filed 10/25/10   Entered 10/28/10 14:25:31   Main Document
MOTORS LIQUIDATION COMPANY, ET AL.
Pg 42 of 142

Page 42

1           On the range of recoveries, the debtors' proposal that

2      the presently known overall range be disclosed will be

3      satisfactory from the perspective of duties on the debtors.

4      However, if the creditors' committee wants to put in

5      supplemental information, it will have the right but not the

6      duty to do so, as long as it just decides what it wants to do

7      in a reasonable period of time.

8           On the control of the term-loan litigation -- or,

9      that's not the control, because it's -- the control is the

10     creditors' committee, but the entitlement to proceeds in this

11     ongoing dispute as to whether the alleged superpri rights --

12     there are superpri rights, but the effect of the superpri

13     rights on the recourse and nonrecourse, it will disclose the

14     outcome of the litigation that I will hear after we deal with

15     the argument on that, which has obviously not been put first on

16     the calendar.  And to the extent which I am not now deciding,

17     that I have not fully decided those issues, the consequences of

18     anything undecided will be added to the discussion of the

19     uncertainties as to the underlying litigation itself.  If the

20     creditors' committee wants to be the principal drafter of that,

21     since it knows so much about the issues, I'm going to give the

22     creditors' committee drafting control over that document and

23     the debtors are going to put in whatever the creditors'

24     committee reasonably wants to say.  If I thought there were any

25     risk that the creditors' committee would be saying something

Page 43

1     unreasonable, I'd give the debtors a chance to be heard on

2     that, but I don't see that as a material risk.  If you need an

3     escape valve, you can call me up on the phone.  But basically,

4     this is something that creditors' committee has a lot of

5     knowledge about and has a lot of interest in.  So what the

6     creditors' committee wants to put in there, in the absence of

7     something extraordinary, is going to be fine with me.

8              And am I right that I've dealt with all of the

9     existing creditors' committee issues?

10             MR. KAROTKIN:  Yes, Your Honor.

11             THE COURT:  Okay, then let's go on --

12             UNIDENTIFIED SPEAKER:  I have a question.

13             THE COURT:  I'm sorry?

14             UNIDENTIFIED SPEAKER:  I'm a creditor and I have an

15    objection.

16             THE COURT:  No, I'm looking for the creditors'

17    committee's position.

18             UNIDENTIFIED SPEAKER:  Well, I could present it.

19             THE COURT:  Okay.  Asbestos committee.  They're up.

20             Is it Mr. Swett?

21             MR. SWETT:  Yes, Your Honor.

22             THE COURT:  Okay.

23             MR. SWETT:  Good morning, Your Honor.  Trevor Swett,

24    Caplin & Drysdale, for the official committee of unsecured

25    creditors holding asbestos-related claims.  Your Honor, within

09-50026-mg   Doc 7596   Filed 10/25/10   Entered 10/28/10 14:25:31   Main Document
MOTORS LIQUIDATION COMPANY, ET AL.
Pg 44 of 142

Page 44

1    the constraints that you laid out so clearly this morning, I

2    have two points.

3              THE COURT:  Go ahead.

4              MR. SWETT:  The first is that the disclosure statement

5    cannot be approved without setting forth the amount of funding

6    that the asbestos trust to be created under the plan is to

7    receive.  The second is that the disclosure statement cannot be

8    approved without the debtors identifying New General Motors as

9    a protected party, if, indeed, that is the intention of the

10   plan.  Those are my essential contentions.  Both should be

11   resolved under this --

12             THE COURT:  Pause, please, Mr. Swett.  You're not the

13   future claims rep.  You've got the existing asbestos creditors.

14   I thought I ruled back at the time of the 363 sale that

15   existing asbestos creditors don't have any rights against New

16   GM because there isn't successor liability.  Am I

17   misunderstanding my earlier ruling?

18             MR. SWETT:  I would not presume to contradict you on

19   what you ruled.  However, I would point out --

20             THE COURT:  So what -- how -- I mean, I can -- I'm

21   sure I'm going to hear from Mr. Esserman or somebody for the

22   future claims rep next, and I understand what the constitution

23   provides and what I said about future claims.  But I am having

24   trouble understanding how an existing holder of a known

25   asbestos claim has any interest or rights against New GM.

09-50026-mg   Doc 7596   Filed 10/25/10   Entered 10/28/10 14:25:31   Main Document
MOTORS LIQUIDATION COMPANY, ET AL.
Pg 45 of 142

Page 45

1      MR. SWETT:  I would put it this way.  The allocation

2   of the trust funding as between present and future claimants

3   cannot be negotiated without knowing whether or not it is the

4   intention of the plan to protect New GM.  The trust

5   distribution procedures contain -- in the usual asbestos trust

6   contain important architectural provisions that are intended to

7   strike the balance between the extent to which the trust can

8   pay currently and the extent to which it must reserve assets in

9   favor of the future -- so as to not dilute the recoveries of

10   the future claimants.  If this plan does not intend to protect

11   New GM, then the negotiation of the proceeds coming out of this

12   liquidation into the asbestos trust is one thing.  If, on the

13   other hand, it is the intention of the plan to cut off the

14   future claimants' rights against New GM, the present claimants

15   stand in a different position when it comes to negotiating the

16   allocation of the proceeds out of this liquidation.

17      THE COURT:  Um-hum.

18      MR. SWETT:  It is an extremely material point.  It

19   was, of course, key in the Section 363 debates.  And it sort of

20   a game of blind man's bluff to put out a bunch of legalese that

21   describes in arcane terms who is going to be protected despite

22   not contributing to the plan.

23      THE COURT:  Now, is this a concern of yours, or is

24   this a concern of a reasonable holder of an asbestos claim?

25   Because I thought I heard Mr. Karotkin and/or Mr. Mayer tell me

09-50026-mg    Doc 7596    Filed 10/25/10    Entered 10/28/10 14:25:31    Main Document
MOTORS LIQUIDATION COMPANY, ET AL.
Pg 46 of 142

Page 46

1    that asbestos, present claimants, at least, your guys, would be

2    getting the same amounts as general unsecured creditors,

3    generally.

4         MR. SWETT:  Well, in the broadest terms, that's true.

5    But the amount of funding that must be allocated out of that

6    common fund to the asbestos trust is, unlike some features of

7    the plan, capable of reasonable estimation in a reasonable

8    period of time.  So on the balancing of costs and benefits of

9    an incremental disclosure, disclosing the funding to the

10   asbestos trust, which is quite material to members of that

11   constituency, more material to them, granted, than it is to the

12   general unsecured creditors outside of that class because they

13   will have recourse to a bigger pool, but it's highly germane to

14   the vote of a present claimant what the amount to be divided

15   among the presents and futures is.  It's the only way they have

16   of even approximating what, at the end of the day, is going to

17   come to them to satisfy their claims.

18        THE COURT:  Um-hum.  All right.  Anything further?

19        MR. SWETT:  No, Your Honor, I don't think so, other

20   than to say that because the asbestos liability, and thus the

21   funding that must go to an asbestos trust, is amenable to

22   estimation fairly quickly, the disclosure statement shouldn't

23   go out until that estimate is known.

24        THE COURT:  Well, how could the amount be determined

25   fairly quickly, especially in light of the bickering between

Page 47

1    you and the creditors' committee on things as fundamental as

2    the protocol?

3           MR. SWETT:  Your Honor, the path towards estimating

4    aggregate asbestos liabilities is a well-trod path.  It happens

5    in many cases all the time.  That process can be managed by the

6    Court to keep the parties within reasonable bounds and on a

7    timetable consistent with the broader needs of the case to get

8    the plan confirmed and the distributions out there.

9           THE COURT:  Which is why I wondered why I got four

10   letters from the feuding parties, not counting the supplemental

11   letters from the debtor and from the trust over an issue

12   involving a confidentiality step and/or protocol.

13          MR. SWETT:  Well, Your Honor, from our point of view,

14   those disputes stem from the failure of the UCC to confine its

15   information-gathering within limits that are compatible with a

16   reasonably quick, reasonable approximation of the liability.

17   They're being overly ambitious, in our view, of the precision

18   with which they hope to achieve an estimate and to take their

19   leisurely time in arriving at it.  We think that properly

20   managed, and with the fair scope of discovery be delineated by

21   the Court after hearing the issues, that process can happen in

22   sixty to ninety days.  Ninety days is probably more realistic.

23   But it's not something that requires a long drawn-out post-

24   effective date litigation.

25          THE COURT:  Okay.

Page 48

1          MR. SWETT:  Thank you.

2          THE COURT:  Well, I see both Mr. Karotkin and Mr.

3     Mayer rising.  I'm going to give each of you a chance to be

4     heard.  Who wants to be heard first?  Be warned; I'm going to

5     give Mr. Swett an opportunity to reply to you both, so I assume

6     that didn't even need to be said.

7          MR. KAROTKIN:  I can be very brief.  I think Mr. Swett

8     was referring to a blank in the disclosure statement as to

9     initial cash funding in to the asbestos trust, and that will be

10    filled in with the sum of two million dollars.

11         THE COURT:  Um-hum.

12         MR. KAROTKIN:  So I think that disposes of that.  With

13    respect --

14         THE COURT:  Pause, please.  To what extent would that

15    be adjusted upward or downward or supplemented by whatever I

16    determined at such time as the asbestos estimation process is

17    completed?

18         MR. KAROTKIN:  It's irrelevant to that, Your Honor.

19    That's basically money to provide for the administrative costs

20    of the trust.

21         THE COURT:  Okay, continue, please.

22         MR. KAROTKIN:  The way the asbestos present and future

23    claim works is at such time as it is allowed, it gets -- that

24    aggregate claim gets a distribution as a class 3 creditor.  So

25    an aggregate amount of consideration based on what is

Page 49

1    distributed to unsecured creditors in class 3, basically, the

2    securities, would then be distributed to the trust.

3            THE COURT:  In other words, I fix an amount based on

4    the estimation for those unsecured creditors who are asbestos

5    claimants, and then MLC will take stock of a value sufficient

6    to be equivalent to the amount that they would -- that would be

7    allocated to claims in that class?

8            MR. KAROTKIN:  Can I try and state it differently?

9            THE COURT:  Of course you can.

10           MR. KAROTKIN:  When the aggregate amount of present

11   and future asbestos personal claims is either agreed upon or

12   determined by Your Honor --

13           THE COURT:  And you also said future, as well as

14   present?

15           MR. KAROTKIN:  Correct.

16           THE COURT:  Okay.

17           MR. KAROTKIN:  It is an aggregate number for present

18   and future.  When that is agreed upon, that is treated as an

19   allowed claim in class 3, which is the unsecured -- general

20   unsecured creditors' class, and that allowed claim in class 3

21   gets a ratable distribution which goes to the trust on the same

22   basis that any other allowed claim in class 3 gets a

23   distribution.  Once it goes into the trust, it's administered

24   by the trust under the trust distribution procedures and claims

25   resolution procedures.

Page 50

1          THE COURT:  I'm with you, now.  Continue.

2          MR. KAROTKIN:  Okay.  The other point he raised is to

3    identify New GM as a protected party.  And we can do that.  As

4    currently drafted, and we will -- as currently drafted, New GM

5    is a protected party.  And we -- and to the extent nothing

6    changes between now and when the disclosure statement is

7    approved, we are happy to make that clear.  So I think that

8    disposes of that.

9          And the last question I have for Mr. Swett is I had

10   indicated that we're happy to attach as an exhibit the trust

11   documents, and I would like to know whether he will draft them

12   or we will draft them.  And if he intends to draft them, when

13   will we get them?

14         THE COURT:  All right, fair enough.  Mr. Mayer?

15         MR. MAYER:  The anonymity protocol is for a later

16   time.  My partner, Phil Bentley, is not in the courtroom.

17         THE COURT:  I don't think that's on our calendar until

18   2 o'clock.

19         MR. MAYER:  Correct.

20         THE COURT:  Although I'm becoming decreasingly

21   optimistic that we're going to be done with this by 2 o'clock.

22         MR. MAYER:  Anyway, we reserve our rights to respond

23   to Mr. Swett's characterizations until that time.

24         THE COURT:  Sure.  Mr. Swett?

25         MR. SWETT:  Yes, Your Honor.  I thank Mr. Karotkin for

09-50026-mg    Doc 7596    Filed 10/25/10    Entered 10/28/10 14:25:31    Main Document
MOTORS LIQUIDATION COMPANY, ET AL.
Pg 51 of 142

Page 51

1    clarification with respect to the intention of the plan, as to

2    New GM.  That does, indeed, resolve that question.  The trust

3    doc --

4            THE COURT:  I couldn't hear that.  After you thanked

5    him, what did you say next?

6            MR. SWETT:  That does seem to resolve the disclosure

7    statement issue as to New GM.  We have submitted other points,

8    that I'll just rest on the papers on that sort of surround that

9    issue, but you set the ground rules for what's open for today

10   and I'm abiding by them.

11           With regard to the trust documents, it would be my

12   expectation that the trust documents would be drafted by the

13   legal representative and the committee.  We would undertake

14   that task.  It does not take long to set up the basic structure

15   of the documents.  However, the trust distribution procedures

16   cannot be completed without knowing what the funding available

17   to the trust is.  That's for the following reasons, and this is

18   just an elaboration of, in more detail, of the point I made in

19   my opening remarks.  The trust distribution procedures set

20   forth certain mechanisms that are intended to prevent the trust

21   from running out of money and not being able to pay the future

22   claimants as they come on stream equally in relation to

23   creditors at the front end of the queue.  That includes what

24   are known as scheduled values for asbestos claims of various

25   categories and average values.  The averages are a target that

09-50026-mg   Doc 7596   Filed 10/25/10   Entered 10/28/10 14:25:31   Main Document
MOTORS LIQUIDATION COMPANY, ET AL.
Pg 52 of 142

Page 52

1   the trust must meet across all of the claim resolution options

2   available to claimants under the procedures if it is going to

3   maintain the appropriate balance between presents and futures.

4   Those can't be set; that target cannot be set without knowing

5   what the resources available to the trust are expected to be.

6          Then, of course, there is the payment percentage.  The

7   payment percentage is, perhaps, even more important as the

8   mechanism for controlling the balance between presents and

9   futures.  And it depends vitally on how much money is available

10  to the trust, what the assets are and what their value is.  So

11  we can write the documents in some general sense quite quickly.

12  But we cannot provide the substance of the TDPs without knowing

13  what the funding is going to be.

14          THE COURT:  So you're saying that I've Gordian knot

15  that I can't untie here?

16          MR. SWETT:  I'm urging Your Honor that the prudent

17  thing to do is to bear down on the estimate and get it done

18  before the disclosure statement goes out.  And that's --

19          THE COURT:  Well, that ain't gonna happen, Mr. Swett,

20  so why don't you tell me what the disclosure statement needs to

21  do.

22          MR. SWETT:  My contention, Your Honor, is that no

23  reasonable person can -- in the asbestos constituency can cast

24  an intelligent vote on that basis.

25          THE COURT:  Then I guess you're going to have an issue

09-50026-mg    Doc 7596    Filed 10/25/10    Entered 10/28/10 14:25:31    Main Document
MOTORS LIQUIDATION COMPANY, ET AL.
Pg 53 of 142

Page 53

1    on appeal.  But let's talk about whether you want to put in a

2    paragraph or page or whatever dealing with a disclosure to the

3    affected creditors or future claimants of the risks associated

4    with them not getting everything they're looking for in the

5    claims estimation process.

6           MR. SWETT:  Yes, without waiving my objection, I would

7    undertake to do that.

8           THE COURT:  I never ask people to waive their

9    objections, Mr. Swett.

10          MR. SWETT:  Very well, very well.

11          THE COURT:  I mean, if the debtors wish to hold up the

12   distributions to the other thousands of GM creditors to deal

13   with your needs and concerns, I'll respect their decision.  But

14   this cannot be run for the needs and concerns of any subset of

15   the debtors' thousands of creditors.  That is not a message

16   solely to you, of course.  It's a message to everybody in the

17   room and in the overflow room and on the telephone.  But I'm

18   telling you folks the way it's going to be.

19          MR. SWETT:  I fully understand that.

20          THE COURT:  Okay.  Okay.

21          MR. JONES:  Your Honor?

22          THE COURT:  Mr. Jones.

23          MR. JONES:  I'm sorry.  May I be heard quickly on one

24   quick clarification based on the discussion that just occurred?

25          THE COURT:  Of course you can.

Page 54

1          MR. JONES:  Thank you.  Again, Your Honor.  David

2    Jones from the U.S. Attorney's Office, and a number of

3    objectors have expressed concern about uncertain funding levels

4    in various post-effective date or other budgets.  Treasury is

5    engaged in discussions, as has been represented, as to where --

6    what an appropriate level for those budgets will be.  Debtors

7    just stated that the asbestos trust would be funded to the tune

8    of two million dollars.  I simply want to note that discussions

9    are ongoing with Treasury to try to achieve a sensible and

10   rational and agreeable funding level.  And I'm not going to

11   jump up and down or interrupt the flow, but any representations

12   concerning funding that will be provided is subject to

13   successful resolution of those discussions and possible change

14   in light of it.

15          THE COURT:  Yeah, okay.

16          MR. JONES:  Thank you.

17          THE COURT:  All right.  I think that the narrow issues

18   insofar as the adequacy of the disclosure statement have been

19   mooted out with the exception of the following.  The asbestos

20   committee, the official asbestos committee, present claims,

21   will have the right but not the duty to provide a trust

22   document, if it chooses to, or if it prefers, because there

23   would be so many uncertainties associated with that, it will

24   have the right, if it chooses to do it, assuming it can be done

25   in a timely way, to put in one or more paragraphs -- I'm not

09-50026-mg    Doc 7596    Filed 10/25/10    Entered 10/28/10 14:25:31    Main Document
MOTORS LIQUIDATION COMPANY, ET AL.
Pg 55 of 142

Page 55

1    talking about pages and pages, but a few paragraphs that

2    describe, if it wishes, the risk factors associated with people

3    voting on the plan before the estimation proceeding is

4    completed, and or before any rulings on the estimation process

5    are forthcoming.  If the asbestos committee elects to avail

6    itself of that right, any of the debtors or the regular

7    creditors' committee will have the right, if either is a mind

8    to, to put in one or more paragraphs of comparable length in

9    response to describe its view of the world concerning the

10   asbestos committee's positions in that regard.  This is without

11   prejudice to anybody's rights on the estimation proceeding, on

12   the discovery dispute/protocol dispute that is on the calendar

13   for 2 o'clock -- I don't know when it will be heard now -- or

14   to appeal either the confirmation order or, to the extent that

15   it's appealable, my ruling approving or conditionally approving

16   the disclosure statement.  Nobody's expected to waive any

17   rights.  But you are to do that which is appropriate to give

18   our creditors the best disclosure we can.

19           Future claims rep.  Is that Mr. Esserman?

20           MR. ESSERMAN:  Yes, Your Honor.

21           THE COURT:  Come on up, please.

22           MR. ESSERMAN:  Your Honor, Sandy Esserman for the

23   future claims representative.  I think Your Honor has addressed

24   most of the issues either in your preliminary remarks or just

25   now, and I do not intend to go over them again.  I think it is

09-50026-mg    Doc 7596    Filed 10/25/10    Entered 10/28/10 14:25:31    Main Document
MOTORS LIQUIDATION COMPANY, ET AL.
Pg 56 of 142

Page 56

1    important to say clearly in the disclosure statement that GM is

2    intended to be -- Old GM, if you will, and New GM are both

3    intended to be protected parties under the asbestos trust, and

4    as long as there's a clear statement to that effect, I think

5    that that goes a long way, and I think Mr. Karotkin intends to

6    do that.

7            With regard to what Your Honor just said about the

8    trust documents, historically and in other matters, those are

9    usually negotiated between the FCR, the future claims

10   representative, and the asbestos committee, and we would intend

11   to engage in that discussion and negotiation with the asbestos

12   committee, and I assume that Your Honor's ruling did not mean

13   to exclude the future claims representative from conducting

14   those negotiations.

15           THE COURT:  Well, of course, I'm not getting in the

16   way of any negotiations, and my tentative, subject to people's

17   rights to be heard, is that all of the rights and terms of

18   sticking stuff in the disclosure statement that I gave to Mr.

19   Swett would be equally available to you.

20           MR. ESSERMAN:  That's fine, Your Honor.  And with

21   that, we're concluded.

22           THE COURT:  All right, Mr. Karotkin, you or Mr. Mayer

23   want to be heard with respect to anything unique to the future

24   claims rep or my tentative on giving him the same rights I gave

25   to Mr. Swett?

Page 57

1          MR. MAYER:  No, sir.

2          MR. KAROTKIN:  No, Your Honor.

3          THE COURT:  Okay, then the tentative becomes the

4     ruling on that.  So you have the same rights that the official

5     asbestos committee has in terms of putting anything in the

6     disclosure statement if you choose to do that, Mr. Esserman.

7          MR. ESSERMAN:  Thank you, Your Honor.

8          THE COURT:  Okay.  United States trustee?

9          MR. MASUMOTO:  Good morning, Your Honor.  Brian

10    Masumoto for the Office of the United States Trustee.  As

11    indicated by Mr. Karotkin, all of our issues have been

12    resolved, but I just would like to make two comments.  One is

13    that we did have an issue regarding the identity of post-

14    confirmation management.  I believe that's been addressed by

15    the Court earlier, so we will abide by that ruling.

16          In addition, as indicated in their response and chart,

17    issues regarding releases, exculpation, and so forth, the

18    substantive issues are reserved for confirmation.

19          Thank you, Your Honor.

20          THE COURT:  Very well.  All right, the Appaloosa and

21    the other hedge funds that have Nova Scotia Bonds.

22          MS. MITCHELL:  Nancy Mitchell from Greenberg Traurig

23    on behalf of the Nova Scotia bondholders.

24          THE COURT:  Right.  Pause.  Was that Mitchell?

25          MS. MITCHELL:  Mitchell, yes.

09-50026-mg    Doc 7596    Filed 10/25/10    Entered 10/28/10 14:25:31    Main Document
MOTORS LIQUIDATION COMPANY, ET AL.
Pg 58 of 142

Page 58

1          THE COURT:  Go ahead, Ms. Mitchell.

2          MS. MITCHELL:  I was in line downstairs, so I didn't

3     hand in my business card.  I apologize.

4          THE COURT:  No, that's all right.  Somehow, I thought

5     we'd take enough time so that we could get something useful

6     while everybody waited on line.

7          MS. MITCHELL:  I appreciate that.

8          THE COURT:  Go ahead.  Unfortunately, you may not have

9     heard your preliminary remarks.

10         MS. MITCHELL:  I did.

11         THE COURT:  Okay.

12         MS. MITCHELL:  And I'm going to be short.  I believe,

13    Your Honor, we had a number of issues, some of which might have

14    fallen into the issues that you described, others of which were

15    clarifications to the plan and disclosure statement that,

16    frankly, were just confusing.  I believe, subject to Mr.

17    Karotkin circulating revised language, that we have, in fact,

18    dealt with all of our issues with the debtor.  So we're just

19    waiting to see the revised language from Mr. Karotkin, and I

20    think we're going to be fine.

21         THE COURT:  Okay.  Any need for you to respond, Mr.

22    Karotkin, or anybody else in the case?

23         MR. KAROTKIN:  Ms. Mitchell is correct.  We've had

24    various discussions.  And just so Your Honor knows what we've

25    agreed to do with respect to both the unsecured creditors'

Page 59

1   committee and the, what I'll call globally, the Nova Scotia, is

2   they've asked for certain clarification under the plan and

3   disclosure statement as to defined terms to make sure it's

4   clear, and obviously, we have no objection to that.  And both

5   sides have essentially asked us to state their positions with

6   respect to the litigation, and we've agreed to do that.  And

7   it's just working out that language.

8           THE COURT:  You're going to state it for them?

9           MR. KAROTKIN:  No, no.  We will -- no, they have

10   drafted the language.

11           THE COURT:  And you're going to stick it in.

12           MR. KAROTKIN:  And we will put it in.

13           THE COURT:  Okay.  All right, did I see Mr. Golden

14   back there?  You have the Nova Scotia Canadian representative?

15           MR. GOLDEN:  Yes.  Thank you, Your Honor.  Daniel

16   Golden, Akin Gump Strauss Hauer & Feld, counsel for Green Hunt

17   Wedlake as trustee for the Nova Scotia Finance Company.

18           Your Honor, we did hear your opening remarks, and

19   we've heard them in many other cases.  I think we tried very

20   hard to confine our objection to the bounds that Your Honor

21   usually finds acceptable with respect to disclosure statements.

22   We did, in fact, give the debtors detailed proposed language

23   that would resolve our claims, and we have, over the last ten

24   days, been discussing that language with Mr. Karotkin and his

25   colleagues.  I can confirm what Mr. Karotkin just said.  We

Page 60

1    believe that we will be fully resolved based upon the proposed

2    language we gave to the debtors and the proposed language that

3    I assume that the creditors' committee will give to the debtors

4    for inclusion in the disclosure statement.  We await to see

5    that final language, but I believe, as I stand here today, our

6    objections will be substantially, if not fully resolved.

7           THE COURT:  Fair enough.  Good.

8           All right, does the U.S. government need to be heard

9    on any of this stuff on the disclosure statement issues?

10          MR. JONES:  Your Honor, I don't think I have anything

11   else to say, except other than with respect to the avoidance

12   action, which simply to say that disclosure of all applicable

13   contingencies is the way to go.  Other than that, I think we

14   have nothing to add.

15          THE COURT:  All right.  I will now hear any

16   nonduplicative issues that don't deal with people's private

17   needs and concerns and that are consistent with my opening

18   rulings.  Anybody want to be heard on that?

19          I have two people.  Yes, sir.  Come on up, please.

20          Unfortunately, I only know the main players in the

21   case, so I don't know everybody.

22          MR. LINDENMAN:  Certainly, Your Honor.

23          MR. KAROTKIN:  Your Honor, may I interrupt?  I'm

24   sorry.

25          THE COURT:  Yeah, go ahead, Mr. Karotkin.

Page 61

```
 1          MR. KAROTKIN:  Just to resolve -- there was an

 2    objection -- I'm sorry.  Let me just -- there was an objection

 3    filed by Winkelmann Sp., which is the first one on the chart,

 4    and we've agreed with counsel to state on the record that

 5    neither the plan nor the disclosure statement limits Winkelmann

 6    Sp. z.o.o.'s right to set off post-confirmation to the extent

 7    that such right has been asserted in Winkelmann Sp.'s proof of

 8    claim and has been properly preserved.

 9          THE COURT:  Okay.

10          All right, yes, sir.

11          MR. LINDENMAN:  Thank you, Your Honor.  Eric Lindenman

12    from Harris Beach for the Town of Salina.  We'll be very

13    limited, Your Honor, in light of the debtors' response filed

14    yesterday.

15          THE COURT:  Yeah, I read your objection and it sure

16    looked like you had private needs and concerns, Mr. Lindenman.

17          MR. LINDENMAN:  Not at all, Your Honor.  This is very

18    simple.  For the most part, the references made in the response

19    will address many of our concerns with regard to amending the

20    disclosure statement to better reflect and include documents

21    that will hopefully allow us to determine our claim class.  I

22    believe -- I'm assuming that the documents they propose to add

23    as part of the amended disclosure will permit us to -- and not

24    just us, but other similarly-situated municipalities,

25    governments, and whatnot, to continue whether it's a class 3 or
```

09-50026-mg    Doc 7596    Filed 10/25/10    Entered 10/28/10 14:25:31    Main Document
MOTORS LIQUIDATION COMPANY, ET AL.
Pg 62 of 142

Page 62

1    a class 4.

2        The only other issue, Your Honor, and while I

3    understand it is somewhat of a parochial issue, I believe it

4    does relate to disclosure, rather than confirmation, because I

5    can't evaluate my status and determine whether ultimately this

6    is something that is even -- I hate to say even -- confirmable,

7    but the inability of the Town of Salina or any county or other

8    association from accepting stock in a public company is

9    generally prohibited by the New York State constitution.  And I

10   think if this is part of the process by which my claim, if I am

11   a class 3, to receive as part of a distribution the shares of

12   stock or the trust unit, I think there should be disclosure as

13   to how exactly I can accept that, given my clients and other

14   similarly-situated municipal entities accepting stock.

15       Those are my issue, Your Honor.  I think that there

16   can be and should be disclosure as to how it is that a New York

17   State municipality or government entity can accept stock as

18   part of its claim.

19       THE COURT:  Well, before I express any views I might

20   have on that, I'll give the debtors and/or the creditors'

21   committee the opportunity to comment, if they wish.

22       MR. KAROTKIN:  Your Honor, Stephen Karotkin.  I think

23   we've addressed the disclosure issues with the supplements

24   we've agreed to make as reflected on the chart and as I

25   indicated earlier.

09-50026-mg    Doc 7596    Filed 10/25/10    Entered 10/28/10 14:25:31    Main Document
MOTORS LIQUIDATION COMPANY, ET AL.
Pg 63 of 142

Page 63

1          With respect to the issue of the inability of the

2    municipality to accept securities, I suppose an easy solution

3    to that would be for, at such time as their claim is allowed,

4    arrangements could be made with the Guk trustee to liquidate

5    the securities prior to distribution and give them the

6    proceeds.  That, to me, would be a pretty easy solution to that

7    issue.

8          Just to be clear, I believe that the claims that

9    Salina has, the counsel is referring to, are class 3 general

10   unsecured claims, so there's no misunderstanding.

11         THE COURT:  I also assume they would be able to get a

12   clue when they got their ballot?

13         MR. KAROTKIN:  Sure, yes, absolutely.

14         THE COURT:  All right.

15         Mr. Mayer, do you want to supplement what Mr. Karotkin

16   said?

17         MR. MAYER:  No, Your Honor.

18         THE COURT:  Mr. Lindenman, any reply?

19         MR. LINDENMAN:  While the concept of a pre -- I guess

20   the liquidation of the shares is potentially viable -- I would

21   still have to look at the particulars -- to my mind, there

22   should be at least some disclosure in the disclosure statement

23   as to such an option, such a process, rather than at the time

24   of distribution, partly because it's just not clear at this

25   point if that's viable because it certainly would affect my

09-50026-mg   Doc 7596   Filed 10/25/10   Entered 10/28/10 14:25:31   Main Document
MOTORS LIQUIDATION COMPANY, ET AL.
Pg 64 of 142

Page 64

1    ability to vote one way or the other.

2            THE COURT:  All right, here's what we're going to do,

3    folks.  The debtors are going to add a paragraph to the

4    disclosure statement that says, in substance, the debtors have

5    been informed that some municipalities have reservations as to

6    their ability, under applicable state law, to accept securities

7    or stock or whatever the words Mr. Lindenman gives you are.

8    The debtors can provide no assurance that -- if it's true,

9    although the debtors are willing to work with municipalities to

10   deal with their concerns to the extent practical, the debtors

11   can give no assurance to those municipalities that the

12   municipalities' concerns can be satisfactorily addressed.  And

13   if you guys can make a deal, God bless you.  But that is the

14   disclosure statement for today.

15           MR. LINDENMAN:  Thank you, Your Honor.

16           THE COURT:  If you want to work with Mr. Karotkin to

17   fine tune that language, anything true to that concept is okay

18   with me.

19           MR. LINDENMAN:  All right, thank you, Your Honor.

20           THE COURT:  All righty.

21           Yes, sir.

22           MR. MENDEZ:  Your Honor, I'm Luis Antonio Mendez.

23           THE COURT:  I'm sorry, could you speak closer to the

24   microphone, please, sir?

25           MR. MENDEZ:  Sorry, sure.  My name is Luis Antonio

Page 65

1    Mendez (ph.), and I represent the County of Onondaga.

2    Actually --

3              THE COURT:  Onondaga County, upstate New York?

4              MR. MENDEZ:  Onondaga County, upstate New York.  We

5    have a few issues that we believe go to the heart of the

6    disclosure that really have not been fully addressed by even

7    the disclosure today that sometime yesterday an environmental

8    response trust was, in fact -- or, response document was, in

9    fact, finalized, which document, as the United States has

10   stated, now must go through the process of public review and

11   comment before it can actually be presented to a Court and

12   attached to a revised disclosure statement.  We are gratified

13   that the -- that there is, at least, such a document out there

14   in the wild and hope to be able to view it.  But nevertheless,

15   the County's claims really cannot be addressed in terms of

16   whether to withdraw its objections to the disclosure statement

17   as it now stands.

18             THE COURT:  Mr. Mendez, what are your complaints about

19   the disclosure?

20             MR. MENDEZ:  First that it -- when the disclosure was

21   filed and as of the -- when the disclosure was filed, at the

22   time that we filed our objections, and at the time that the

23   reply was filed to those objections, the underpinnings of the

24   environmental response and the Guk trust that addressed other

25   environmental issues were nowhere to be seen.  And as a result,

Page 66

1    applying the rule that was so cogently laid out by the Court

2    this morning, no reasonable investor looking at a prospectus

3    that offered a plan without its central underpinnings would

4    bite.  That, we hope, will be resolved, but I would urge the

5    Court that rather than conditionally approving the disclosure

6    statement, at least with respect to the environmental claims,

7    that that portion of the disclosure be reserved until the plan

8    is actually reviewed, commented on, and it's an approvable

9    form, and then can be appropriately appended to the amended

10   disclosure.

11        THE COURT:  Mr. Mendez, with respect, I'm going to

12   tell you the same thing I told Mr. Swett.  That's not going to

13   happen.  I am going to tell the debtors that which is necessary

14   to implement my rulings, and they're going to do it.

15        MR. MENDEZ:  Okay.

16        THE COURT:  If they fail to do it, I'll leave for

17   another day what would happen if the debtors were so dumb as to

18   disregard my instructions.  But I am going to be ruling today

19   on that which is necessary to make this a disclosure statement

20   in compliance with 1125 of the Code.

21        MR. MENDEZ:  Then let me --

22        THE COURT:  Now, that's why I asked you, is there

23   anything that is necessary for the creditor community,

24   generally, as contrasted to Onondaga's private needs and

25   concerns, where you can tell me that there is anything in the

Page 67

1   disclosure statement that affects everybody and not just you

2   that they haven't done?

3           MR. MENDEZ:  I respectfully believe that Onondaga's

4   claims are not private concerns.  They are concerns that affect

5   half a million people in the State of New York.  They are

6   concerns that arise out of the debtors' contamination of large

7   stretches of a creek that has been rendered useless for

8   recreation purposes and otherwise, and this will lead into

9   my -- our additional problem.

10          Assuming that the debtor is trying and will ultimately

11  prevail in its attempt to convert a statutory obligation to

12  remediate that contamination which it has left behind, the

13  third issue, and we appreciate that there may be elements of

14  confirmation here, as well, but the third issue that we have is

15  the valuation of what debtor is going to propose, since we

16  don't have the trust documents in front of us, in terms of

17  converting that obligation to remediate into a cash or some

18  other substitute that would allow that remediation to go

19  forward.  Those are our two principal objections.  We are

20  cognizant of the limitations that have been placed on the

21  proceedings and are willing, of course, to abide by them.

22          THE COURT:  Okay.  Is there a desire to respond before

23  I rule on this?

24          MR. KAROTKIN:  No, sir.

25          THE COURT:  All right.  No.  We're not up to that yet.

09-50026-mg    Doc 7596    Filed 10/25/10    Entered 10/28/10 14:25:31    Main Document
MOTORS LIQUIDATION COMPANY, ET AL.
Pg 68 of 142

Page 68

1    To the extent, which is one hundred percent, that I'm asked to

2    deal with the adequacy of a disclosure statement, the Onondaga

3    objection is overruled.  Nothing in a ruling on a disclosure

4    statement affects, in any way, the underlying obligations that

5    any company in a Chapter 11 case on my watch has to comply with

6    the environmental laws or to pay damages for its failure to do

7    so.  To the extent that Onondaga can't settle its environmental

8    issues, though I sense that many upstate municipalities, or

9    tribes, as well as the U.S. government have done so, it will be

10   free to do what it sees fit.  But that's nothing to do with

11   this disclosure statement issue, and this is not an issue of

12   enough materiality to the remainder of the GM -- Old GM

13   creditor community to require anything to be added to the

14   disclosure statement.  Hence, as I said at the beginning, the

15   objection's overruled.

16        Next objection.  Ma'am, you want to come up, please?

17        I have a message that was passed to me by my law clerk

18   that some people in the overflow room are having a hard time

19   hearing the attorneys and that they should speak into the

20   microphone.

21        MS. LISENKO:  Good morning, Your Honor.  My name is

22   Marianne Lisenko, and I'm a creditor.  I've read quite

23   extensively all the documents that have been filed.  My docket

24   number, by the way, is 7071 where I wrote my first objection in

25   regard to the duplicative claims and 7344, for those who

09-50026-mg    Doc 7596    Filed 10/25/10    Entered 10/28/10 14:25:31    Main Document
MOTORS LIQUIDATION COMPANY, ET AL.
Pg 69 of 142

Page 69

1    haven't read it, you could read my objections in more detail.

2    Right now, I'll try to be as succinct as possible, and that is

3    my first objection to the disclosure statement that it's

4    written in a most redundant, evasive, and unclear blurted way

5    possible.  I believe, as a creditor, as part of the public, we

6    do want to be able to read the documents that the courts

7    produce.  All over the world, everybody looks towards America

8    as the land of the rule of law, and if we can't read a document

9    that's so evasive and contradictory in some instances, so

10   that's my first objection.

11          When I read the indenture, the 1990 indenture,

12   regarding the debt securities that were issued, there were

13   clauses regarding immunity of all directors.  That would be my

14   second objection that there seems to be kind of a jackpot

15   justice.  I think some people might have read about the

16   criticism in the media right now about the types of expenses

17   that are being wasted in the courts, and that obviously people

18   are not receiving due remedy for their suffering, whereas

19   lawyers and the legal administrative community is really raking

20   in a jackpot.  Thirty-three billion was mentioned in the

21   disclosure statement, yet nowhere, we had 500 million going to

22   the remedial -- environmental remedial trust, yet nothing was

23   said -- today, I heard about the -- well, the asbestos trust,

24   two million; 28,000 people have filed claims.  I don't know how

25   serious these claims are and, you know, how much really they've

Page 70

```
1   been claiming in the courts.  So as much objection as I have to

2   this whole proceeding to begin with, because it seems to be an

3   abuse, really of the bankruptcy proceedings, as I mentioned in

4   my first objections, General Motors is a very, very successful,

5   admired world-wide company.  The disclosure statement does say

6   that 150 billion in revenues have been -- well, these are the

7   revenues that come in through the sales of close to eight to

8   nine million vehicles a year, and even this year -- I made a

9   little mistake in my objection, there, regarding the last

10  report that says it was 2.2 million, but that was only for the

11  quarter.  So it seems even for this last year, it would still

12  be operating capacity of ninety-three, full capacity, really.

13  So revenues are very good.  Where, my question is, did all that

14  money go?  Expenses were also shown in the last report as

15  fairly reasonable.  So again, the question is, why -- if

16  there's thirty-three billion, the disclosure statement says

17  there is pre- and post-petition expenses.  My question is,

18  where do these thirty-three billion go, and why can't we

19  somehow equitably divide this money, because there is enough

20  money, from what I see.  Sixty billion, the government gave,

21  the shares -- that was probably one of the problems, that the

22  shares were diluting the value of the company.  Went from, I

23  understand it, from 1.5 billion shares that were being sold,

24  they eventually, when you dilute that much, and the shares,

25  obviously, become worthless, and all these fees, obviously,
```

09-50026-mg    Doc 7596    Filed 10/25/10    Entered 10/28/10 14:25:31    Main Document
MOTORS LIQUIDATION COMPANY, ET AL.
Pg 71 of 142

Page 71

1    being collected by all these finance companies that are selling

2    these shares --

3             THE COURT:  All right, pardon me, ma'am.  I was very,

4    very patient, and I let you speak for a long, long time.  But I

5    have hundreds of people who are participating in this hearing

6    whose presence is costing their clients a lot of money.  And

7    I'm going to need you to finish in the next two minutes --

8             MS. LISENKO:  Okay, so --

9             THE COURT:  -- and to limit --

10            MS. LISENKO:  -- again, fees --

11            THE COURT:  -- no --

12            MS. LISENKO:  -- bloated fees --

13            THE COURT:  -- ma'am -- ma'am, you cannot speak over

14    me.

15            MS. LISENKO:  I'm sorry.

16            THE COURT:  Concerns as to how GM got into its

17    difficulties, bloated fees, matters as to management are not

18    matters that I can deal with on a disclosure statement.  Take

19    your next two minutes to tell me anything that you want to

20    identify beyond what you already said concerning the adequacy

21    of the disclosure statement.

22            MS. LISENKO:  Well, the main point, of course, is that

23    there's no -- no sums, no totals given to all these different

24    trusts that are being set up.  The avoidance action, the term

25    loan, the avoidance action is not explained.  What is it about?

09-50026-mg   Doc 7596   Filed 10/25/10   Entered 10/28/10 14:25:31   Main Document
MOTORS LIQUIDATION COMPANY, ET AL.
Pg 72 of 142

Page 72

```
 1   I'm also objecting to the action against BMW that's restricted.

 2   You can't read what is this action about.  Is this regarding

 3   the term loan action or not.  And of course, I object to these

 4   future loans.  In your sales, when there was objection to the

 5   master sale and purchase agreement, you, yourself, said that

 6   this is a class 6 standing in this case.  So there's also fees,

 7   they're adding up.  And it doesn't look like, from what I

 8   understood, that these thirty-three billion are going to go to

 9   anybody except the lawyers.  So I would like that to be clear

10   in the disclosure statement, and I wish somebody could write

11   something that everybody understands that's succinct, clear,

12   and substandard, especially the numbers.  That's sort of all I

13   have to say.  Thank you very much.

14            THE COURT:  Thank you.

15            Is there a desire by anybody to respond?

16            MR. KAROTKIN:  No, sir.

17            THE COURT:  Okay.  Of the various things that were

18   said, one raises an issue as to disclosure statement adequacy,

19   which is that it is redundant and that it is difficult to read.

20   Both of those objections happen to be so, but with that said,

21   they're not legally cognizable objections.  Frankly, folks, if

22   I were the United States Congress, I would put in a rule that

23   says that disclosure statements have to be drafted in plain

24   English.  But I'm, to state the obvious, I don't write the

25   laws.  I enforce them.  And particularly in business cases
```

MOTORS LIQUIDATION COMPANY, ET AL.

Page 73

1    where you have billions of dollars of debt, it's understandable

2    that people are going to write things like corporate lawyers

3    always do.  If -- I could encourage people to write in plainer

4    English, but I'm sure it would be a futile exercise.

5           Although there are undoubtedly things that appear more

6    than once, the fact is it would be more expensive to fix it

7    than it would be to make them go through the document to take

8    it out.

9           The remaining objections deal with disappointment with

10   how GM got into its mess and compensation of officers and

11   directors and of professionals for which we have other

12   mechanisms to deal with them, in the case of professionals, and

13   a limited ability to deal with them, at least on a disclosure

14   statement hearing.  For those reasons, that objection's

15   overruled.

16          Now, within the confines of my initial rulings at the

17   outset of this hearing, do I have anything else?

18          No.  Yes, sir.

19          UNIDENTIFIED SPEAKER:  I wasn't here at the original

20   hearing, but I'd like to make a statement.

21          THE COURT:  You can come up to a microphone, please,

22   but I will require that your remarks be nonduplicative, and

23   that they be consistent with the rulings that I announced at

24   the outset of the hearing.

25          UNIDENTIFIED SPEAKER:  I'm sorry, Your Honor.  I

09-50026-mg   Doc 7596   Filed 10/25/10   Entered 10/28/10 14:25:31   Main Document
MOTORS LIQUIDATION COMPANY, ET AL.
Pg 74 of 142

Page 74

1    apologize for being late.  But I believe that the U.S.

2    government corrupted the bankruptcy process by stepping in and

3    changing the process.  The system is supported -- supposed to

4    work when the company goes bankruptcy that the business is sold

5    off and as many parties as satisfied as possible.  The common

6    stockholder loses out and the second, the preferred stockholder

7    may get some value, and the bondholders, which I am, are

8    usually considered to be pretty solid because that's an

9    investment that shouldn't be fooled with.  The U.S. government

10   stepped in and bypassed this system.  If private industry and

11   money would have them allowed to do this without this process,

12   the General Motors would have been bought as a bankrupt

13   company, unions would have lost what was not theirs and would

14   make -- there would be more people working today because

15   private enterprise would have bought and rehired at a different

16   process.  The union -- I believe the government stepped in and

17   gave unions more representation, money-wise, because of a 2008

18   elections thing, backing.

19          THE COURT:  Forgive me, sir.  This is a court of law,

20   and we don't get involved in politics, here.  And the issues,

21   to the extent they were legally cognizable, were addressed last

22   June and addressed in the decision that came out already and

23   are no longer appropriate for discussion.  I did not, at the

24   outset of this hearing, foreclose pro se objectors from being

25   heard, but I must, in fairness to the thousands of other GM

Page 75

1    creditors, limit the discussion today, with all due respect --

2    if you have problems, I'm not going to take away your votes as

3    a citizen to vote next month -- to something that I, as a

4    judge, can deal with, and in particular, that I can deal with

5    in a hearing on a disclosure statement.

6           Do you have anything that you think that the

7    disclosure statement fails to give the reasonable creditor that

8    it doesn't already have?

9           UNIDENTIFIED SPEAKER:  No, Your Honor.  I just believe

10   that the process was not followed in an order that it should

11   have been in a regular bankruptcy.

12          THE COURT:  Well, that issue has already been ruled

13   upon, sir.  Thank you very much.

14          UNIDENTIFIED SPEAKER:  All right, thank you --

15          THE COURT:  Have a good day.

16          UNIDENTIFIED SPEAKER:  -- for letting me be heard.

17          THE COURT:  All right.  The disclosure statement is

18   conditionally approved.  Mr. Karotkin, you and you designees

19   are going to implement all of my rulings and give the other

20   stakeholders in the case who had an opportunity to put in their

21   own submissions a reasonable time to do it.

22          What's your recommendation as to how we should proceed

23   next?

24          MR. POTTER:  Your Honor, this is Jim Potter

25   representing the State of California, Department of --

09-50026-mg   Doc 7596   Filed 10/25/10   Entered 10/28/10 14:25:31   Main Document
MOTORS LIQUIDATION COMPANY, ET AL.
Pg 76 of 142

Page 76

1          THE COURT:  Wait a second.  Who is this speaking, and

2     what do you want to be heard with respect to?

3          MR. POTTER:  My name is James Potter.  I'm with the

4     California Department of Justice, and if I may, I'd like to be

5     heard on the disclosure statement.  I understand the Court's

6     limitations on what can be brought up.

7          THE COURT:  Go ahead, Mr. Potter.

8          MR. POTTER:  Before I do, I'm covering for my

9     colleague who had another hearing.  My application pro hac vice

10    is pending.

11         THE COURT:  It's granted.  Go ahead.

12         MR. POTTER:  Thank you.  Three quick points.  First,

13    the State of California, like the New York municipalities,

14    cannot accept stock.  My understanding from your earlier

15    direction is that the disclosure statement will say that,

16    basically, neither the Court nor the debtors can guarantee,

17    therefore, that we'll get any distribution because under our

18    law, as well, we're not allowed to accept stock.  And that --

19    if that's all that says, it will put us in a very difficult

20    position when it comes to votes.  And I guess I'd ask for, at

21    minimum, the opportunity to join in the negotiations about how

22    they draft that statement regarding the accepting of stock.

23         THE COURT:  Well, that isn't a disclosure statement

24    objection, but if you, along with the other -- I think it was

25    represented by Mr. Lindenman and Harris Beach -- want to see if

09-50026-mg    Doc 7596    Filed 10/25/10    Entered 10/28/10 14:25:31    Main Document
MOTORS LIQUIDATION COMPANY, ET AL.
Pg 77 of 142

Page 77

1    you can work out a mechanism to meet your needs and concerns,

2    of course, I welcome that.

3           MR. POTTER:  Okay.  And if the disclosure statement

4    makes that clear, then it puts us in a much better position

5    when we have to vote yea or nay.  If the disclosure statement

6    is unclear, then we may be hampered in ability.  Thank you.

7           THE COURT:  Very well.  All right.

8           MR. POTTER:  The second issue is, and I'm not too sure

9    if this is more of a statement or a question, there seems to be

10   a conflict between the disclosure statement as it stands and

11   the environmental trust.  The disclosure statement puts class 4

12   at 536 million.  The environmental trust indicates that the on-

13   sites will have costs of 641 million.  And that doesn't include

14   the priority auto of the sites.  Is -- and will, in going

15   forward, will the disclosure statement be made to conform to

16   the environmental trust?  That's really a discrepancy of over a

17   million dollars (sic) not even including the priority auto

18   sites.  And while, according to disclosure statement, the

19   environmental trust governs, that would make it very hard for

20   us to evaluate the disclosure statement.  So again, I would ask

21   that the Court instruct the debtors to make, as part of this

22   ruling, to ensure that the disclosure statement conforms to the

23   trust agreement -- the environmental trust and any other trust

24   agreements that are already outstanding.

25           THE COURT:  And is this supposed to be something that

09-50026-mg   Doc 7596   Filed 10/25/10   Entered 10/28/10 14:25:31   Main Document
MOTORS LIQUIDATION COMPANY, ET AL.
Pg 78 of 142

Page 78

1    affects the entirety of the Old GM creditor community, or is

2    this for your own private needs and concerns?

3         MR. POTTER:  I think it affects the entire of the

4    unsecured creditors because there seems to be a discrepancy in

5    where well over a hundred million dollars is going to come

6    from, and it's our concern that it may end up coming from class

7    3 of the unsecured creditors.  We are not a party to the --

8    California is not a party to the environmental trust since we

9    don't have any of the auto sites.

10        THE COURT:  All right.  And did you say you had a

11   third issue, Mr. Potter?

12        MR. POTTER:  Yes, just what was included in our

13   objection, I don't think it's been addressed today that the

14   disclosure statement discussions of substantive consolidation

15   has a number of conclusions, including that no creditor will

16   get paid less based on the substantive consolidations than that

17   creditor would get if there were not consolidations.  And if

18   that's true, we have no problem, but the disclosure statement

19   does not include anything that allows us to evaluate whether

20   that is, in fact, accurate, and we believe the disclosure

21   statement is inadequate for that reason.

22        THE COURT:  All right, is there a desire to respond?

23        MR. POTTER:  Thank you, Your Honor.

24        THE COURT:  Very well, Mr. Potter.

25        MR. KAROTKIN:  Stephen Karotkin for the debtors.  I

09-50026-mg    Doc 7596    Filed 10/25/10    Entered 10/28/10 14:25:31    Main Document
MOTORS LIQUIDATION COMPANY, ET AL.
Pg 79 of 142

Page 79

1   think with respect to the first point that was made, we will,

2   as I said, we will appropriately amend the disclosure statement

3   to reflect any additional material terms of the environmental

4   settlement that needs to be disclosed, as well as make sure

5   it's accurate.  And I think that addresses his first comment.

6          As to substantive consolidation, we believe there's

7   sufficient information for disclosure statement purposes, and

8   to the extent that counsel for California is unhappy, he can

9   object at confirmation.

10         THE COURT:  All right.  I'm going to overrule these

11  objections, Mr. Potter.  I didn't hear you have any facts to

12  say that you think that substantive consolidation is

13  inappropriate, but if you do, you can raise them at

14  confirmation.

15         MR. POTTER:  Thank you, Your Honor.

16         THE COURT:  The -- to the extent that there's an

17  objection to the accuracy of the disclosure statement in terms

18  of its discussion of the environmental trust, I haven't heard

19  any specifics, other than the seeming difference in numbers,

20  which may or may not be an apples and apples comparison.  But

21  Mr. Karotkin, you're to look at that, and if the numbers don't

22  fit properly, you're to fix them.

23         MR. KAROTKIN:  Yes, sir.

24         THE COURT:  All right.  Now, I think we're done on

25  this issue.  And the disclosure statement will be conditionally

Page 80

1   approved, and you're to make the changes required to implement

2   my rulings or to accept the language provided by others to do

3   so.

4        And now I'll ask you the question that I thought I was

5   about to ask before or that I did ask before, Mr. Karotkin.

6   How do you recommend that we mechanically provide for your

7   taking the various inserts, your doing the things necessary to

8   implement my rulings, and take it from here?

9        MR. KAROTKIN:  There are, obviously, a number of

10  things we have to do.  We are in the process of doing that.  My

11  suggestion, Your Honor, is that we will commence that process;

12  to the extent we need information from other parties, we will

13  press them to get that information so we can proceed as

14  expeditiously as possible.  We still do need to resolve the

15  budget issues.  We will have to do appropriate amendments to

16  the ballots, appropriate amendments to the order.  So there are

17  a number of things to do over the next several days, and I

18  think what -- when we get all the information and we have

19  resolution of issues, we will circulate the revised disclosure

20  statement among the objecting parties.

21       THE COURT:  Yes, not everybody.

22       MR. KAROTKIN:  Not everybody; that's way too

23  expensive.  And I assume that you would like us to include all

24  sixty objecting parties?  Or I take your guidance on that.  Or

25  should we limit it to the substantive objections that were

09-50026-mg   Doc 7596   Filed 10/25/10   Entered 10/28/10 14:25:31   Main Document
MOTORS LIQUIDATION COMPANY, ET AL.
Pg 81 of 142

Page 81

1    heard -- the parties heard today?

2        THE COURT:  Let's do it to all objectors.

3        MR. KAROTKIN:  Okay.

4        THE COURT:  And although I may not have gotten formal

5    objections from the -- a few of the other key parties, like

6    Export Development Canada or anybody else, give them a copy of

7    the new disclosure statement, also.

8        MR. KAROTKIN:  Yes, we would do that anyway.  We will

9    endeavor to circulate that as soon as we can.  It's a little

10   hard for me to predict exactly when that will happen, and I

11   would ask the Court if we could get a holding date in case we

12   need to come back to have anything resolved.

13       THE COURT:  I wonder if it would be better to do it by

14   an on-the-record conference call.

15       MR. KAROTKIN:  We could do that, Your Honor.  The

16   only -- I guess the only thing I'm concerned of is -- I'm

17   concerned about is to the extent that we adjourn this hearing,

18   we need to make a formal announcement of that at this hearing

19   so people are on notice.  That's all.

20       THE COURT:  Well, you want to -- actually, we've been

21   going for two and a half hours without a recess anyway, or

22   three and a half.  I've lost track of the math.  If you want to

23   take a recess, and then we'll see what we can do thereafter.  I

24   guess the question is what kind of zone do you want from me to

25   try to find you a holding date.

09-50026-mg    Doc 7596    Filed 10/25/10    Entered 10/28/10 14:25:31    Main Document
MOTORS LIQUIDATION COMPANY, ET AL.
Pg 82 of 142

Page 82

1         MR. KAROTKIN:  Well, we can dis -- I can discuss this

2    with my colleagues.  I have my own personal preferences since

3    I'm going to be away next week, but I don't want to let that

4    interfere with the process.

5         THE COURT:  I assume you're going to be making the

6    folks back in your office work while you're away, so --

7         MR. KAROTKIN:  I'm going to try to.

8         THE COURT:  -- you'll then, hopefully -- I'm sorry?

9         MR. KAROTKIN:  I'm going to try to.  I only have

10   limited power, you know.

11        THE COURT:  Actually, I never thought at your firm you

12   had any difficulty making your associates work.  But why don't

13   you talk to the players in this and to whoever's going to have

14   to implement what we're going to need to implement, and I was

15   prepared to take only a ten-minute recess, but I don't think we

16   can go all day without a lunch break, anyway.  So would it be

17   helpful for you to do caucusing during the lunch hour and also

18   for me to talk to my deputy over my lunch hour as to what we

19   can give you in, say, the period from about a week from now to

20   whatever you think you would need on the other side?

21        MR. KAROTKIN:  Sure.

22        THE COURT:  And make an announcement after our lunch

23   break?

24        MR. KAROTKIN:  That'd be fine.  Thank you.

25        THE COURT:  So shall we reconvene at a quarter after

Page 83

1   1?  Or is that too tight?

2           MR. KAROTKIN:  I think that's fine.

3           THE COURT:  All right, then we're in recess until

4   1:15.  The next matter, for your planning your lives, will be

5   the implementation of what I just discussed with Mr. Karotkin,

6   then the creditors' committee/U.S. government dispute on the

7   superpri, and then any remaining GM matters -- I don't know if

8   we have them -- and then at 2 o'clock, we'll have the -- or as

9   soon thereafter as counsel can be heard -- the dispute on the

10  asbestos protocol.

11          We're in recess.

12          MR. KAROTKIN:  Thank you, sir.

13      (Recess from 12:07 p.m. until 1:15 p.m.)

14          THE COURT:  Have seats, please.  Okay, Motors

15  Liquidation Company.  Let's button up any open issues vis-a-vis

16  disclosure statement, and then we'll go on to the creditors'

17  committee's motion on the DIP order.

18          Mr. Karotkin.

19          MR. KAROTKIN:  We're still -- Treasury is still

20  waiting to hear back on a date that makes sense to them.  We

21  were targeting November 9th, but if we could wait a few minutes

22  to hear back from Treasury on that date?

23          THE COURT:  Okay.  I don't have an objection to that,

24  but I'd like to be able to usefully use the time we have on

25  other stuff.

Page 84

```
 1              MR. KAROTKIN:  I think we can move forward with the

 2     other stuff.

 3              THE COURT:  All right.

 4              MR. KAROTKIN:  I just have a question.  I don't know

 5     whether Your Honor has thought about how long a solicitation

 6     period you believed was appropriate in view of the number of

 7     people involved.

 8              THE COURT:  I want to get a recommendation from the

 9     major constituencies on that.  And I need to get my arms around

10     the extent to which I have logistic issues, either because of

11     the size of the body to be notified or where they might be

12     located or anything else.

13              MR. KAROTKIN:  There certainly are logistical issues.

14     There are about two million people that have to get notice.

15     Not that many people, of course, vote, because shareholders are

16     not voting.  And there are Eurobond issues as well.  We were

17     contemplating, Your Honor, something like about sixty days from

18     the date that we mailed, I think.

19              THE COURT:  Mr. Mayer, a lot of the folks are going to

20     be in your constituency.  Can I get your perspective?

21              MR. MAYER:  Certainly, Your Honor.  Just one second.

22     If I may confer with the indenture trustee's counsel, probably

23     most directly in touch with large numbers of small holders.

24              THE COURT:  Sure.

25              MR. MAYER:  Sixty is fine with us, Your Honor.
```

09-50026-mg    Doc 7596    Filed 10/25/10    Entered 10/28/10 14:25:31    Main Document
MOTORS LIQUIDATION COMPANY, ET AL.
Pg 85 of 142

Page 85

 1          THE COURT:  Okay.

 2          MR. KAROTKIN:  But again, I don't think you have to

 3     decide that today.

 4          THE COURT:  All right.  Sixty doesn't offend me.  I

 5     take it what you're talking about, though, is the time that

 6     they're going to have to vote.  Am I correct on that?

 7          MR. KAROTKIN:  No, I was talking about the time from

 8     mailing to the voting deadline.

 9          THE COURT:  How would those differ?

10          MR. KAROTKIN:  Um --

11          THE COURT:  Oh, you mean it might be shortened by the

12     time that it would take the envelope to get to them?

13          MR. KAROTKIN:  Yes.

14          THE COURT:  But I guess what I was driving at was in

15     contradistinction to the date upon which we'd be setting the

16     confirmation hearing, and when objections to confirmation would

17     be due --

18          MR. KAROTKIN:  Right.

19          THE COURT:  -- since I suspect you and maybe other

20     folks would want the opportunity to reply --

21          MR. KAROTKIN:  Yes, sir.

22          THE COURT:  -- to any objections.  And I'm going to

23     need time to read the stuff.  And if it turns out to be

24     requiring an evidentiary hearing, we've got to allow for time

25     for me to get direct testimony declarations, and to the extent

Page 86

1    applicable, expert reports.

2           MR. KAROTKIN:  Well, I think that, obviously subject

3    to Your Honor's -- once we finalize the disclosure statement

4    and we're prepared to have an order entered approving it, the

5    proposed order sets forth all of those dates.  And we can fill

6    them in at that time, with the -- obviously, the input of the

7    parties.

8           THE COURT:  Um-hum.  Anybody else want to be heard on

9    that?  Because I assume that you're going to have a little bit

10   of a dialogue on that between now and the time the disclosure

11   statement's finalized.

12          MR. KAROTKIN:  Yes, sir.

13          MR. MAYER:  Just one thing, Your Honor.  I'm sorry,

14   Mr. Karotkin, did you mention record date, because that's going

15   to be important?  What date would you anticipate being the

16   record date?

17          MR. KAROTKIN:  I think we had a proposed record date

18   in our motion, I just don't recall, Mr. Mayer, off the top of

19   my head.  And we're certainly -- we certainly understand we

20   ought to be working with the trustee to make sure all of that

21   works properly.

22          MR. MAYER:  We can do this offline.  Thank you, Your

23   Honor.

24          THE COURT:  Do we have one indenture trustee or two?

25          MR. MAYER:  Two, Your Honor, I believe.

09-50026-mg    Doc 7596    Filed 10/25/10    Entered 10/28/10 14:25:31    Main Document
MOTORS LIQUIDATION COMPANY, ET AL.
Pg 87 of 142

Page 87

 1          THE COURT:  Yeah, I seem to remember that from last

 2     June.

 3          MR. MAYER:  Oh, actually, I misspoke.  There are two

 4     on the committee, and then there's the Nova Scotia indenture

 5     trustee.  So I guess that would make three all together.

 6          MR. KAROTKIN:  It's a fiscal paying agent, it's not an

 7     indenture trustee, for the -- for a couple of issues.

 8          THE COURT:  Okay.  All right.  What I'd like you to do

 9     is to focus on this while you're doing the final implementation

10     of my ruling and to see if you can come up with a joint

11     recommendation on all of the dates.

12          MR. KAROTKIN:  Very well, sir.

13          THE COURT:  Obviously it'll have to be subject, a

14     little, to both my calendar and to my ability to read stuff.

15     And obviously, if you can make this case be wholly consensual,

16     or wholly consensual as amongst the major constituencies, then

17     it places less pressure on me in terms of reading stuff than it

18     would if I have still another contested confirmation hearing.

19          MR. KAROTKIN:  Yes, sir.  And that certainly is our

20     goal.

21          THE COURT:  Okay.  All right.  Fair enough.  Are we

22     now ready to deal with the creditors' committee's motion?

23          Okay, I guess everybody's already up there.  I have a

24     couple of preliminary comments.  Just pause for a second.

25          (Pause)

09-50026-mg    Doc 7596    Filed 10/25/10    Entered 10/28/10 14:25:31    Main Document
MOTORS LIQUIDATION COMPANY, ET AL.
Pg 88 of 142

Page 88

1          THE COURT:  All right, folks.  I assume, I'll hear

2     from you, Mr. Mayer, and you, Mr. Jones.  But while you'll make

3     your presentations as you see fit, I have the question to both

4     of you, but on this one, mainly to Mr. Mayer.  Help me

5     understand what the creditors' committee contends Treasury has

6     done to date that is violative of the DIP financing order, or

7     whether the contention is not so much that it's violated the

8     order, as I know, obviously, you didn't ask for contempt, but

9     that puts you in fear that they will in the future.  Or is it

10    that you think that they're going to act in a way by which

11    either the order, when implemented or its legislative history,

12    if found to bind or estop the government would then cause you

13    to win any dispute with the U.S. government?

14          And what I would like each side to address, in

15    addition to what's already on your outlines, is whether in

16    substance I'm being asked to issue a declaratory judgment.

17    Because it's arguable that this case has similarities to a

18    matter that I -- actually, two matters that I dealt with in

19    Adelphia, one on the construction of an X clause, and one in

20    connection with an insurance policy's coverage issue.

21          I well understand why the creditors' committee cares

22    about this issue.  But like a lot of the Article III courts

23    sometimes do, and spend unbelievable amounts of time

24    addressing, I wonder whether there are jurisprudential

25    constraints that I have on me in dealing with the creditors'

09-50026-mg    Doc 7596    Filed 10/25/10    Entered 10/28/10 14:25:31    Main Document
MOTORS LIQUIDATION COMPANY, ET AL.
Pg 89 of 142

Page 89

1    committee's motion today.  And that's what I would like both

2    sides to address.

3            I think I understand the merits, but frankly, my more

4    fundamental concern is whether I should today be getting to the

5    merits or not.  So Mr. Mayer, do you want to take the lead,

6    please?

7            MR. MAYER:  Yes, Your Honor.  The history of how this

8    dispute came to our attention is set forth in the papers, so I

9    won't go over the phone calls, the e-mails, the development of

10   why we're here.

11           Your Honor, we believe that the orders that this Court

12   has entered and the agreements the Treasury has signed state

13   unequivocally that Treasury has no interest in this lawsuit.

14   Treasury has done several things which we believe violate those

15   orders or show that it will violate those orders.  First, in

16   addition to calling us up and saying that they have an interest

17   in it, which I don't know would rise to that level, they filed

18   a reservation of rights with respect to an ownership of that

19   lawsuit, which believe has no foundation.

20           Second, they went to the debtors and they asked the

21   debtors to change the plan from the way it had been for some

22   time, where interests in this lawsuit would be distributed to

23   unsecured creditors.  And that was put up for adjudication by

24   this Court.

25           Your Honor, we didn't pick this fight.  The plan

09-50026-mg   Doc 7596   Filed 10/25/10   Entered 10/28/10 14:25:31   Main Document
MOTORS LIQUIDATION COMPANY, ET AL.
Pg 90 of 142

Page 90

1   itself contemplates that this Court will make a determination

2   of this matter.  We brought on this motion as the most

3   expeditious way of doing so.  Treasury has invited this Court

4   to rule.  And that is why we're here asking you to do so.

5          We believe that is either a violation of the

6   agreements that they signed saying they had no interest in the

7   lawsuit, and the orders that have been entered saying that they

8   have no interest in the lawsuit.  They basically said the

9   lawsuit doesn't go -- could go to Treasury unless they cut a

10  deal or Your Honor decides otherwise.  I had some difficulty

11  wrapping my head around that, and I still do.

12         Now, in terms of what else is here from a

13  jurisprudential basis.  Your Honor, Treasury's argument to the

14  extent I understand it, is that they may not have a lien, and

15  they may have given up recourse to the asset, but hang it all,

16  they still have that superpriority claim, and that claim's got

17  to be paid by the effective date.  Well, we don't think there's

18  a basis for that either.  We think Treasury is asserting a

19  right they simply do not have.  We think they agreed that their

20  superpriority claim wouldn't be paid on the effective date.

21  They certainly agreed to that without any escape hatch in the

22  DIP agreement that Your Honor approved by order July 5th.

23         As Your Honor knows from our papers, in between the

24  time that you approved the DIP agreement and the time this deal

25  closed, precisely about six hours before closing, Treasury

09-50026-mg   Doc 7596   Filed 10/25/10   Entered 10/28/10 14:25:31   Main Document
MOTORS LIQUIDATION COMPANY, ET AL.
Pg 91 of 142

Page 91

1    insisted on the reinsertion of a clause which gives them the

2    right under a DIP loan agreement that has never been filed and

3    has never been approved by this Court, to insist on payment if

4    the plan is not reasonably acceptable to them.  And I stand

5    here reluctantly to confess, as we did in our papers, we agreed

6    to it.  It was two in the morning, the closing was at six.

7    But it required them to be reasonable in what consent they

8    exercised with respect to a plan.

9            Your Honor, we're about to go out with a disclosure

10   statement on a plan of reorganization, which, if Treasury finds

11   unacceptable, cannot be confirmed, because there's a billion-

12   175 due in cash on the effective date, assuming that that

13   clause of the DIP loan agreement, which, as I said, has not

14   been approved by this Court -- is given effect.

15           This needs to be determined, otherwise there is no

16   plan in this case.  I don't know whether that constitutes a

17   confirmation objection.  I hope not.  I want this plan

18   confirmed.  I think Treasury is asserting a veto right they do

19   not have.  But I think, from jurisprudential considerations,

20   yes, I think Your Honor -- Treasury has invited Your Honor to

21   rule.  This is a ruling that must be made before we get out of

22   this case.  It's as ruling that, in my view, must be made

23   before the hearing on summary judgment on November 1.  If we

24   don't own this lawsuit, Your Honor, we're not pursuing it.  It

25   costs us money if we win.

09-50026-mg    Doc 7596    Filed 10/25/10    Entered 10/28/10 14:25:31    Main Document
MOTORS LIQUIDATION COMPANY, ET AL.
Pg 92 of 142

Page 92

1          There's a billion-five additional claims that get

2     created.  This is assuming we win.  For all I know, Your Honor

3     will rule against us when my co-counsel argues the case.  For

4     all I know, the Second Circuit -- because I suspect it goes

5     there -- it's a billion-five at issue, it's an interpretation

6     of the UCC -- could go one way or the other.  But there's a lot

7     of money at stake.

8          I misspoke, by the way in the morning session.  My

9     conflicts counsel has informed me that the number of holders

10    who are defendants in this isn't 40, it's 400.  So there's no

11    real way to settle this thing.  This thing -- this lawsuit is

12    going to get adjudicated and somebody is going to be out a

13    billion-five or not, as the case may be.  But we need to know.

14    Because if we don't own this lawsuit, Your Honor, we're not

15    pursuing it, and no one is.

16         And so November 1, I don't know what the committee

17    tells, but so long to say on November 1, if we don't know

18    whether we own this lawsuit.  It puts us in an unacceptable

19    position.

20         Now, of course, Your Honor, your calendar is yours to

21    control.  You can kick November 1.  I understand that.  But

22    we're trying to get out of this case, and this issue is ripe.

23    There's nothing else coming down the pike that's going to make

24    it less ripe or more ripe.  Even if Your Honor rules completely

25    in our favor on November 1, there's going to be an appeal.  If

Page 93

1    Your Honor rules completely against us, with all due respect,

2    we'll probably take an appeal.  It's a billion-five.  It's a

3    lot of money.

4         One way or the other, this lawsuit is going to blast.

5    We need to know whether we own it.  Because if we don't own it,

6    we're not bringing it.  And we need to know that, certainly

7    before we have an argument on summary judgment.

8         The merits are set forth in great detail.  You said

9    you understand them.  Unless you have questions, I think that's

10   where I'd rest.

11        THE COURT:  No.  I'll give you a chance to reply.  But

12   I want to hear from Mr. Jones or whoever's going to be speaking

13   for the government.

14        MR. JONES:  Thank you, Your Honor.  And again, may it

15   please the Court, I'm David Jones, Assistant U.S. Attorney for

16   the Southern District of New York, for the United States of

17   America, and specifically the U.S. Treasury Department as co-

18   DIP lender along with EDC.

19        Your Honor, I will focus on Your Honor's questions,

20   which was my primary intention anyway to focus on

21   jurisdictional and procedural aspects and deficiencies of the

22   motion.  At the outset, because Treasury takes with the utmost

23   seriousness the accusation that it is acting contrary to a deal

24   it made, I have to state just categorically and emphatically

25   that Treasury believes itself not to be doing so.  It is acting

09-50026-mg    Doc 7596    Filed 10/25/10    Entered 10/28/10 14:25:31    Main Document
MOTORS LIQUIDATION COMPANY, ET AL.
Pg 94 of 142

Page 94

1    consistent with its understanding of both the substance of the

2    agreements it made without regard to what the papers say and

3    also consistent with what the controlling papers, orders and

4    agreements say.

5          I won't detail that, and I note -- am very sure the

6    Court has absorbed the merits quite thoroughly from the

7    parties' papers.  But I need very forcefully to say that in

8    open court as well and make that clear.

9          To focus on Your Honor's questions.  First, the motion

10   is indeed, Your Honor, jurisdictionally deficient for reasons

11   of standing and ripeness.  The motion is styled as one -- and

12   of course we're focusing very directly on what the motion is.

13   It's presented as one to enforce prior orders of this Court and

14   a prior agreement approved pursuant to those orders from

15   roughly a year ago.  In both their papers and again in court

16   today, the committee characterizes and identifies only two

17   things as potential injuries, neither of which in fact

18   constitutes an injury or a violation of an order or a

19   threatened violation of an order, anything that could give rise

20   to injury, in fact, for standing purposes, or a ripe dispute

21   for case in controversy purposes.

22          Those two things are the fact that the government

23   filed a very short pleading in the nature of a reservation of

24   rights in the avoidance action, and all that said is that we

25   don't read the committee to be seeking anything more than it

09-50026-mg    Doc 7596    Filed 10/25/10    Entered 10/28/10 14:25:31    Main Document
MOTORS LIQUIDATION COMPANY, ET AL.
Pg 95 of 142

Page 95

1    said in its underlying complaint, which is that it is pursuing

2    an avoidance action to recover assets for the benefit of the

3    estate under Section 551 by avoiding certain liens and certain

4    transfers, which occurred when Treasury funding -- other

5    Treasury funding was used to retire preexisting, seemingly

6    secured debt.

7         Your Honor, that filing merely states accurately what

8    the undisputed requirements of Section 551 of the Code are, and

9    merely states what the complaint in the avoidance action in

10   fact seeks, explicitly, in its claim to relief, namely

11   avoidance of assets and recovery of -- avoidance of transfers

12   of liens and recovery of assets, specifically for the benefit

13   of the estate.  And we quote in our papers that that is

14   explicitly acknowledged by the committee, and they haven't said

15   otherwise today, nor can they.

16        Your Honor, the only other alleged -- or potential

17   violation of an order or agreement that's been identified is

18   Treasury's alleged -- and it's true -- request that the debtors

19   modify their initial draft plan of liquidation that was being

20   circulated to avoid building in the conclusion that those

21   proceeds are definitely reserved for unsecured creditors; and

22   rather to acknowledge the existence of some question on that

23   for potential future disposition.  Could be through plan

24   proceedings; could be through other order of the Court; could

25   be by agreement of the parties.  That is simply an accurate

09-50026-mg   Doc 7596   Filed 10/25/10   Entered 10/28/10 14:25:31   Main Document
MOTORS LIQUIDATION COMPANY, ET AL.
Pg 96 of 142

Page 96

1    statement of the state of affairs, and does to constitute an

2    actual or threatened act by the government in violation of any

3    preexisting order.

4          So again, focusing specifically on the motion before

5    the Court, there simply is no violation of any order in play or

6    threatened, and therefore nothing that gives rise to a ripe

7    case or controversy for the relief expressly sought through

8    that motion, which is --

9          THE COURT:  Mr. Jones, their stronger position isn't

10   so much that you're in existing violation of an order.  I don't

11   know if they would have chosen to go against the United States

12   government for contempt, but obviously the failure to allege

13   contempt or specific words of the order that have been

14   violated, seems to me to suggest that that isn't their main

15   thrust.  Their main thrust is that you're about to act contrary

16   to the letter or spirit of the order.  Can you focus on that

17   part, please?

18         MR. JONES:  Yes, Your Honor.  I think that's -- first

19   off, the government's being entirely transparent about what

20   it's doing.  It's identifying this as an unresolved issue and

21   stating that we have a clear understanding which is different

22   from the committee's understanding, as they've expressed, of

23   what the deal was that we entered.  That -- to have different

24   understandings of the meaning of an order or a deal does not

25   constitute an act in violation of an order, and cannot.

09-50026-mg    Doc 7596    Filed 10/25/10    Entered 10/28/10 14:25:31    Main Document
MOTORS LIQUIDATION COMPANY, ET AL.
Pg 97 of 142

Page 97

1          We are fully committed to resolving that, either

2     consensually, through private discussions, necessarily with the

3     committee, or through open, fair, litigation in the courts.

4     Which again, I simply don't see how open litigation with full

5     notice and opportunity to be heard, could constitute a

6     violation of a prior order, when we're seeking guidance of the

7     Court if we can't resolve it, as to what an order means.

8          I'm unaware of any authority cited by the committee to

9     suggest otherwise.  What we're simply doing is saying hey, we

10    seem not to be on the same wavelength about what these orders

11    and these agreements mean.  We had a different understanding.

12    This has to be resolved sooner or later, if the avoidance

13    action proves to be something, because it's important not to

14    lose sight of the fact, this could be a fight over nothing, if

15    the avoidance action proves to have no value.

16         But at any rate, to focus on Your Honor's question,

17    there is nothing we have done or threatened to do or

18    contemplate doing that could in any stretch be seen as a

19    violation of an order.  If the Court concludes that by making

20    application to the Court or discussing in settlement

21    discussions could constitute a violation of an order, I suppose

22    they might have a leg to stand on, jurisdictionally.  But I

23    simply don't see how that could possibly be the case.

24         Your Honor, another thing Your Honor touched on in

25    your initial questions is whether this isn't really something

Page 98

1    in the nature of a request for a declaratory judgment, which

2    should be teed up as an adversary proceeding under Rule 7001.

3            THE COURT:  Well, pause, please, Mr. Jones.  Because

4    while Rule 7001 does say that declaratory judgments require

5    adversary proceedings, the more fundamental thing is that

6    declaratory judgment actions, like the Adelphia X clause action

7    that I decided four years ago, six years ago, I don't remember

8    when it was, tend, by their nature, to raise greater ripeness

9    issues, and to a lesser extent, standing issues, than some

10   other kinds of disputes.

11           MR. JONES:  I think that's absolutely correct, Your

12   Honor, and we might well be making a similar ripeness argument.

13   I think if the committee -- my first observation is --

14           THE COURT:  I thought you did.

15           MR. JONES:  I'm sorry, Your Honor.  If they came

16   forward with a properly formulated adversary proceeding which

17   would be procedurally within the requirements of Rule 7001, we

18   might -- I would anticipate we would raise the same ripeness

19   objection and say you can't get a declaration out of thin air

20   just because you'd like to know something.  There has to be

21   some actual or threatened, again, violation of right or an

22   order.

23           Now, they might be closer because I assume they would

24   then -- then, their articulation of a desire to know, to have

25   certainty, as they proceed with the plan process, might be

09-50026-mg   Doc 7596   Filed 10/25/10   Entered 10/28/10 14:25:31   Main Document
MOTORS LIQUIDATION COMPANY, ET AL.
Pg 99 of 142

Page 99

1    something that's cognizable.  In the context, again, before the

2    Court right now, which is a motion to enforce a prior order,

3    whether or not committee members or unsecured creditors might

4    want to have certainty on this issue now doesn't go to whether

5    the motion, as they presented it, is properly before the Court

6    or is justiciable.

7            Your Honor, a very important thing for me to say is

8    that setting aside the jurisdictional and ripeness issues, and

9    other procedural issues, this application is also premature.

10   The government is keenly aware and Treasury is keenly aware

11   that it is using taxpayer dollars to finance every major

12   constituent in this case, certainly every recognized trustee,

13   the committee's pursuit of litigation, including the avoidance

14   action, and now the committee's pursuit of potentially an

15   intensive action to allocate the potential recovery of that

16   avoidance action, if such a recovery ever comes to pass.

17           Your Honor, the dispute is simply premature when we

18   don't know if we're actually fighting about anything.  It

19   imposes on the Court's very scarce and overburdened resources,

20   it imposes on -- tremendous cost on the government to fund all

21   sides of this litigation, and it imposes effort and burden on

22   important governmental actors whose time will be imposed on by

23   attempting to resolve this issue.  And so even if these

24   jurisdictional and ripeness constraints didn't bar the motion's

25   consideration outright, the Court should, in its discretion,

09-50026-mg    Doc 7596    Filed 10/25/10    Entered 10/28/10 14:25:31    Main Document
MOTORS LIQUIDATION COMPANY, ET AL.
Pg 100 of 142

Page 100

1    not entertain it now because it's is simply premature.  The

2    argued reason why it's necessary really doesn't hold water,

3    Your Honor.  There's an argument that unsecured creditors and

4    the reasonable unsecured creditor should know whether or not

5    they're going to have an actual interest in this action as they

6    assess the plan, but Your Honor, what they already are being

7    told is that the avoidance action is --

8         THE COURT:  Well, is that their contention?  Are they

9    contending that it's something that's important to creditors in

10   voting, or are they contending that they don't want to waste

11   their money for your benefit?

12        MR. JONES:  I think they're con -- well, I think

13   they're contending both.  If they're not contending the first

14   at all, then I'm swatting at a nonexistent fly, Your Honor.

15   But what I would say is if they have a concern about the

16   disclosure statement, they can raise it and have raised it and

17   it can be addressed through recognizing the existence of

18   another contingency.  There already was a contingency as to

19   whether or not there will be a recovery at all.  There would

20   simply be an added recognition of a contingency as to how the

21   benefits of the action would proceed.

22        This brings to mind for me, Your Honor, a very

23   important correction I need to make.  The committee

24   characterizes this as a dispute between the government and them

25   as to ownership of the action or a grab by the government for

1    ownership of the action.  And that's a hundred percent not

2    correct.

3            THE COURT:  You stipulate that they keep owning the

4    action, and it's only where the proceeds, if it is successful,

5    ultimately, wind up?

6            MR. JONES:  Correct, Your Honor.  The action was

7    brought explicitly for the benefit of the estate with proceeds

8    to flow into the estate, and our position is disposition of

9    estate assets is a matter for the plan, hasn't been decided by

10   a prior order.  We've been given an allowed superpriority

11   administrative claim, and that by ordinary operation of the

12   Bankruptcy Code, we are entitled to be paid subject to the

13   timing limitations and other limitations that have been

14   negotiated.

15           Now, of course, the dispute, the merits dispute will

16   be whether we've actually waived more than that and waived any

17   potential repayment from any proceeds that may flow in, and

18   again, I'll not get into the merits because the Court didn't

19   ask us to focus on that, but we obviously say emphatically that

20   the answer to that is no, we didn't waive such a recovery.

21           Your Honor, I think I've largely covered the

22   procedural points I wanted to make, but again, I do emphasize

23   that the government believes it has correctly -- that it has --

24   it's proceeding based on its understanding of the deals, that

25   that understanding is correct.  I would note that even the e-

Page 102

1    mail traffic provided by the committee is, in fact, consistent

2    with the government's position.  If you look at the June 30th

3    e-mail characterizing what they understand to be the business

4    deal, that simply says the government won't be paid until the

5    estate wind-down is complete and successfully done -- and I

6    didn't include this in my papers, Your Honor, really is why I'm

7    getting into it.

8         THE COURT:  I lost you there, Mr. Jones.

9         MR. JONES:  I'm sorry, Your Honor.  They rely on a

10   June 30th e-mail from Amy Caten (ph.) stating what they believe

11   to be the business deal.  This is shortly before the July 5th -

12   -

13        THE COURT:  Um-hum.

14        MR. JONES:  -- order that we're fighting about.  And

15   what I am observing is that in addition to the things that we

16   observed on the merits in our argument, that e-mail, on re-

17   reading, I realize is consistent with our position.  And what

18   that e-mail says, first off, it's not competent to say what was

19   in Treasury's mind, but it recites the committee's

20   understanding as follows.  "The wind-down loan is to be repaid

21   only to the extent that the wind-down is complete and there is

22   cash left over."  That, to my reading, is the critical sentence

23   in this e-mail, and we agree with it.  Treasury did agree, as

24   was obviously critical to all players in this case and to the

25   Court, that this bankruptcy not descend into administrative

Page 103

1    insolvency.  As part of financing the sale and sponsoring the

2    creation of New GM, which provided tremendous economic benefit

3    to the unsecured creditor community through the equity stake,

4    Treasury agreed and committed to provide adequate wind-down

5    financing to see this case through, and it has done so.  It

6    agreed not to be paid until the wind-down is complete.  And it

7    has done so.  It is living by that commitment.  What we're

8    saying is -- so what we're saying is consistent with this e-

9    mail.  We are not to be repaid until and unless the wind-down

10   is done and there is cash left over.  What we did not say is,

11   and if that cash happened, directly or indirectly to derive

12   from a particular source, the avoidance action, we'll take a

13   pass on that.  There's nothing explicit anywhere that says we

14   entered such an agreement.

15          And so for those reasons, and the reasons stated in

16   our papers, if the Court were to reach the merits, which we

17   think is inappropriate, the motion should be denied.  If the

18   Court has no further questions?

19          THE COURT:  No, I don't.  Mr. Mayer, I'll hear reply,

20   and then Mr. Jones, I'll hear surreply.

21          MR. MAYER:  With respect to Your Honor's precise

22   question and the invitation to cite a particular order that has

23   been violated, I think I have found one.  The order entered on

24   July 5th provides on page 4 that "except as modified by the

25   amended DIP facility," which was attached to the July 5th

Page 104

1    order, "or this order, the final DIP order shall remain in full

2    force and effect."  Now, the final DIP order is a defined term,

3    and it refers to the order that Your Honor entered on June

4    25th.  The order that Your Honor entered on June 25th provides

5    in paragraph 23 -- oh, and the July 5th order says that "the

6    amended DIP facility is interpreted to mean the DIP facility

7    under the June 25th order."  So the June 25th order carries

8    over to the amended DIP facility.  Paragraph 23 of the

9    amended -- of the original final DIP order says, "Parties for

10   the DIP credit agreement may, from time to time, enter into

11   waivers or consents with respect thereto without further order

12   of this Court.  In addition, parties to the DIP credit facility

13   may, from time to time, enter into amendments with respect

14   thereto without further order of this Court provided that, A,

15   the DIP credit facility as amended is not materially different

16   from the form approved by this final order, B, notice of all

17   amendments is filed with this Court, C, notice of all

18   amendments other than those that are ministerial or technical

19   and do not adversely affect the debtors are provided in advance

20   to counsel for the committee and any other statutory committee,

21   all parties requesting notice in these cases, and the United

22   States trustee.  For purposes hereof, a material difference

23   from the form approved by this final order shall mean any

24   difference resulting from a modification that operates to

25   shorten the maturity of the extensions of credit under the DIP

09-50026-mg   Doc 7596   Filed 10/25/10   Entered 10/28/10 14:25:31   Main Document
MOTORS LIQUIDATION COMPANY, ET AL.
Pg 105 of 142

Page 105

1    credit facility or otherwise require more rapid principal

2    amortization and is currently required under the DIP credit

3    facility."  And there are a bunch of other clauses that are not

4    relevant.

5            Your Honor, by etnering into, and I would, frankly,

6    say compelling others to enter into six hours before closing,

7    an amendment which, by its terms, purports to shorten the

8    maturity of the DIP credit agreement withotu notice to this

9    Court, I read that as a violation of this paragraph 23.  I am

10   embarrassed to say it is possible Your Honor could rule that

11   the committee is estopped.  We agreed to it; we had no choice.

12   But there are other parties in this courtroom who are not

13   estopped and who are prepared to take up the cudgels.  So if

14   Your Honor is looking for an order that Treasury violated, I

15   suggest you look at paragraph 23 of June 25th.  I'm not asking

16   Treasury to be held in contempt; that does me no good.  But I

17   thiknk you heard Treasury say that even if we brought this on

18   as an adversary proceeding, they'd make all the same arguments.

19   This is never going to be more right than it is now, and

20   frankly, I -- it boggles my mind to hear them say that this

21   asset -- they had a secret intent to say that at the end of the

22   wind-down, when we'd gotten all the money from the banks, that

23   we couldn't distribute it before then.  If we got the money in

24   earlier, it had to sit there until the last claim was allowed?

25   Nobody ever discussed that.

09-50026-mg   Doc 7596   Filed 10/25/10   Entered 10/28/10 14:25:31   Main Document
MOTORS LIQUIDATION COMPANY, ET AL.
Pg 106 of 142

Page 106

1          THE COURT:  Before you continue, Mr. Mayer, do you

2     have an extra copy of that paragraph 23 or do one of your

3     partners or associates have one that you can hand up so we

4     don't have to dig it off the Internet?

5          MR. MAYER:  I'm happy to give you -- well, let me show

6     this to Mr. Jones --

7          THE COURT:  Is it in your spiral?  I don't remember --

8          MR. MAYER:  No, unfortunately, it's a different

9     spiral, Your Honor.  We didn't include it in the original -- we

10    cited to it, and there's a docket number.  I don't think I have

11    it in my list of exhibits.

12         THE COURT:  Well, if you can give me the ECF, I'm sure

13    we can dig it out.

14         MR. MAYER:  Absolutley, Your Honor.  Hold on one sec.

15         MR. JONES:  I'm sorry; Your Honor, I think it's

16    Exhibit 4 to the Mayer declaration.  It's from the June 25th

17    '09 order.

18         THE COURT:  Hang on a sec.

19         MR. MAYER:  Oh, maybe you're right.  "The guilty flee

20    where no man pursueth."  Yes, Your Honor, it's Exhibit 4; it's

21    on page 27 to 28.

22         THE COURT:  I've got it.  Continue, please.

23         MR. MAYER:  I think I'd finished, Your Honor.

24         THE COURT:  Fair enough.

25         MR. MAYER:  Or I've lost the thread.

09-50026-mg    Doc 7596    Filed 10/25/10    Entered 10/28/10 14:25:31    Main Document
MOTORS LIQUIDATION COMPANY, ET AL.
Pg 107 of 142

Page 107

1          THE COURT:  All right, Mr. Jones, do you have any

2     surreply, limtied, of course, to what Mr. Mayer said in his

3     reply?

4          MR. JONES:  Yes, Your Honor.  As to the purported

5     violation of an order, identified by mr. Mayer, first, Your

6     Honor, that simply has nothing to do with the subject of this

7     motion, as I understand it.  The subject of the motion is

8     whether the government is seeking to collect as an

9     adminstrative claimant from the estate in the event, at the end

10    of the wind-down period, the estate includes cash from any

11    source that will be available, then, at that time to pay the

12    claim.  That simply has nothing to do with negotiated changes

13    in -- of the nature that Mr. Mayer was describing.  And I don't

14    have my head around it well enough to characterize it

15    correctly.

16          To the extent anyone believed there was an obligation

17    to notify the Court or to seek pre-approval under the documents

18    Mr. Mayer has identified, no one did.  There were discussions

19    between the debtors, Treasury, and the committee, and the

20    requirement pertains to material changes.  There must have been

21    a collective judgment that this change was not material within

22    the meaning of that requirement.

23          But most importantly, for purposes of the motion, Your

24    Honor, that's simply a red herring because what's sought now is

25    enforcement of the order with respect to whether or not the

09-50026-mg   Doc 7596   Filed 10/25/10   Entered 10/28/10 14:25:31   Main Document
MOTORS LIQUIDATION COMPANY, ET AL.
Pg 108 of 142

Page 108

1    United States has any right, at the end of this day, to be paid

2    from a particular potential source of proceeds on account of

3    its administrative claim.  And as to that issue, the government

4    has committed no violation of any order and is not threatening

5    to do so.  So for those reasons, our jurisdictional objections

6    should be granted, and in addition, we stand by our observation

7    that it's an inapproprpiate use of Court and party and

8    governmental resources to fund and pursue this litigation at

9    this time.

10           THE COURT:  All right, thank you.

11           Here's what we're going to do, folks.  I can give you

12   a decision on this today, but I'm going to have to take a

13   recess of probably at least half an hour to do it.  We also

14   have the dispute over the asbestos protocol, and on that one, I

15   think I'd be in a position where I could rule without a recess.

16   So rather than making you guys wait for a half an hour or more

17   twiddling your thumbs, while I'm back in my chambers getting

18   myself in a position to rule and dictate a ruling, I wonder if

19   we should go straight to the protocol, get that behind us, and

20   then anybody who wants to leave can leave, and then I can take

21   the time I need to decide the matter and then come back out on

22   the bench.

23           Mr. Mayer, you got your partner, Mr. Bentley, here,

24   yet?

25           MR. MAYER:  I told him we were going forward at 2, and

Page 109

1    I tried to warn him about the security lines.  I don't believe

2    he's in the courtroom, yet.

3             THE COURT:  Well, then, would you prefer that I take

4    the recess after all?  I mean, I guess you've got to, don't

5    you?

6             MR. MAYER:  I think I don't have a choice, Your Honor.

7    I'm sorry.

8             UNIDENTIFIED SPEAKER:  Your Honor, there's another

9    reason to do that.  Mr. Bentley delivered a proposal this

10   morning that I would like to discuss with them before we argue.

11            THE COURT:  Fair enough.  Then I'll get off the bench

12   now, and I'll be back to you when I can be back to you.

13            Okay, we're in recess.

14            MR. MAYER:  Thank you, Your Honor.

15        (Recess from 1:57 p.m. until 3:31 p.m.)

16            THE COURT:  Seats, everybody.

17            I apologize for keeping you all waiting.

18            In this contested matter in the jointly administered

19   Chapter 11 cases of Motors Liquidation Company and its

20   affiliates, the creditors' committee moves, under Sections

21   105(a), 361, 362, 363, 364, and 507 of the Code for an order

22   enforcing first my June 25th, 2009 order giving final approval

23   of the DIP financing in my case, two, my July 5th, 2009 order

24   aprpoving an amendment to the DIP to provide for wind-down

25   financing, and three, an agreement dated July 10th, 2009

09-50026-mg    Doc 7596    Filed 10/25/10    Entered 10/28/10 14:25:31    Main Document
MOTORS LIQUIDATION COMPANY, ET AL.
Pg 110 of 142

Page 110

1   between the debtors, the U.S. government, and Export

2   Development Canada, that dealt with the DIP financing.  As

3   supplemented or clarified in the briefs and oral argument, the

4   creditors' committee also asked me to take action to prevent

5   what the creditors' committee alleges are threatened violations

6   of one or more of those orders or agreements.

7        The underlying controversy involves the extent to

8   which the government, after agreeing that its collateral would

9   not include the proceeds of an avoidance action that the

10  creditors' committee now has pending on behalf of the estate,

11  might still recover from any proceeds that the estate might

12  secure if the estate could prevail and collect in that

13  avoidance action by means of a separate superpriority claim

14  that the government obtained to bolster its right to repayment

15  under the DIP loan.

16       The creditors' committee motion is denied without

17  prejudice.  I understand why the creditors' committee cares

18  about the underlying issues and why it would like to know how

19  the underlying controversy would be decided.  But for reasons

20  that I'll explain, I think it's quite clear that there's been

21  an insufficient showing that any of my orders have been

22  violated yet, if they ever will be, or that there's an imminent

23  threat that they're about to be violated.  Thus,

24  jurisprudential concerns articulated under the rubrics of

25  standing and ripeness deprive me, as a federal judge, of the

09-50026-mg    Doc 7596    Filed 10/25/10    Entered 10/28/10 14:25:31    Main Document
MOTORS LIQUIDATION COMPANY, ET AL.
Pg 111 of 142

Page 111

1    ability to decide them now.  My findings of facts and

2    conclusions of law in connection with this determination

3    follow.

4              Turning, first, to my findings of fact, given the many

5    things on our plate for today, familiarity with the background

6    is assumed.  While dealing with the merits of this dispute

7    would require much more factual discussion and perhaps even an

8    evidentiary hearing, the key facts here can be addressed much

9    more briefly.  It appears to be undisputed that the government

10   did two things that occasioned the creditors' committee's

11   request for relief today.  First, the government filed, in

12   court, or on our ECF system, a document in the avoidance action

13   that the creditors' committee brought against JPMorgan Chase in

14   which the creditors' committee is trying to avoid a security

15   interest under which JPMorgan Chase was secured as a secured

16   lender and paid off back in 2009.  In that document that the

17   government filed, which was denominated as a reservation of

18   rights or which has at least been colloquially referred to as

19   such, the government noted that any recovery was for the

20   benefit of the estate, in contrast to any subset of the

21   stakeholders in the estate, such as its unsecured creditor

22   community, and at least impliedly, not necessarily for the

23   benefit just of unsecured creditors.

24              Secondly, the governmnnt asked the debtors to revise

25   their proposed reorgnization plan to provide, in susbstnace,

Page 112

1    that if the creditors' committee's litigation against JPMorgan

2    Chase and/or its syndicate was successful, and if it brought in

3    value, the rights to the recover would thereafter be determined

4    before me, as contrasted to going straight to the unsecured

5    creditor community.

6         I think it's a fair inference that the government was

7    taking steps to protect its ability in the future to share in

8    the proceeds that might ultimately result from the avoidance

9    action by means of its right or, perhaps, only arguable

10   right -- a matter that I don't, today, decide -- to a

11   superpriority administrative claim under certain circumstnaces.

12   But even after reading the briefs, I didn't see more than that.

13   And even after reading the briefs, I didn't see how such

14   measures, at least without more, would violate either of the

15   DIP financing orders.  In fact, the DIP financing orders at

16   least seemingly gave the U.S. government -- or, maybe I should

17   be more precise and say the DIP lenders, perhaps also including

18   Export Canada -- that superpriority admin claim.  See the wind-

19   down order at 4.  Although it's at least arguable, if not

20   plain, that such rights could be subjecgt to limits that the

21   parties could disagree about down the road, and undoubtedly,

22   they might also argue about the meaning of nonrecourse language

23   elsewehere in the wind-down order if they ever got to a dispute

24   concerning the government's request for any administrative

25   expense claim that the government might hereafter file.

1          So early in the oral argument, after having some

2      uncertainty in my mind after reading the briefs, I asked

3      counsel for the creditors' committee, in substance, whether the

4      creditors' committee was alleging an actual violation of an

5      order or merely a threatened one, hoping that I'd be able to

6      get my arms around whether I actually had an allegation of

7      violation of the order itself.  I didn't hear anything that

8      satisfied me that there really was any actual violation of the

9      order.  The single provision that the creditors' committee

10     pointed to was paragraph 23 of the June 25th order.  It

11     provides, as relevant here, "The parties to the DIP credit

12     facility may, from time to time, enter into waivers or consents

13     with respect thereto without further order of this Court.  In

14     addition, the parties to the DIP credit facility may, from time

15     to time, enter into amendments with respect thereto without

16     further order of this Court provided that, A, the DIP credit

17     facility as amended is not materially different from the form

18     approved by this final order, B, notice of all amendments is

19     filed with this Court, C, notice of all amendments ... are

20     provided in advance to counsel for the committee and ... other

21     statutory committee[s], all parties requesting notice in these

22     cases, and the United States trustee."  I've left out

23     immaterial language from that lengthier quote.  The paragraph

24     in question, paragraph 23, went on to set forth standards for

25     determinign what a "matieral" difference would be.  But as is

09-50026-mg   Doc 7596   Filed 10/25/10   Entered 10/28/10 14:25:31   Main Document
MOTORS LIQUIDATION COMPANY, ET AL.
Pg 114 of 142

Page 114

1    apparent from the language that I just read, that paragraph is

2    permissive.  It doesn't command anyone to do anything.  In the

3    two places where it's operative, it begins "may" not "shall".

4         And the proviso sets forth conditions that must be

5    satisfied if that permissive power is exercised.  The proviso

6    doesn't set forth any commands, either.  It merely provides for

7    things that must be done if the power to amend is exercised.

8         So I find as a fact, or a mixed question of fact and

9    law that none of the orders has yet been violated, if any ever

10   will be.  The creditors' committee hasn't established that

11   either of the two acts that the government took violated any

12   order.  Nor do I see any threat of an imminent violation.

13        Turning now to my conclusions of law.  The Second

14   Circuits explain that the constitutional requirements for

15   standing are grounded in Article III of the Constitution which

16   limits the jurisdiction of federal courts to cases or

17   controversies.  See Port Washington Teachers' Association v.

18   Board of Education, 478 F.3d at 501.  The Supreme Court has

19   laid down further requirements for standing in the federal

20   courts that are binding on us Article I judges, just as they

21   are binding under judges who get their tickets from Article

22   III.  One of the requirements in injury and fact places the

23   burden on a plaintiff to demonstrate an invasion of a legally

24   protected interest which is, A, concrete and particularized,

25   and B, actual or imminent, not conjectural or hypothetical.

09-50026-mg   Doc 7596   Filed 10/25/10   Entered 10/28/10 14:25:31   Main Document
MOTORS LIQUIDATION COMPANY, ET AL.
Pg 115 of 142

Page 115

1    See Lujan v. Defenders of Wildlife, 504 U.S. at 560-561.

2         Of course, the creditors' committee asked me to

3    enforce prior orders, but we have to, as I just did, look at

4    those prior orders to see whether that's the substance of its

5    request or whether it is doing something short of that.  And I

6    find as a fact or as a mixed question of fact and law that it's

7    doing something short of that.  The motion alleges no past or

8    certain of violation of order, and this isn't the type of

9    situation where, well, it hasn't done it already; it's about to

10   do it tomorrow or even next week.  There's been an insufficient

11   showing a violation is imminent.

12        A second aspect of the Constitution's case or

13   controversy requirement, the rightness doctrine, serves to

14   ensure that a dispute has generated injury sufficient to

15   satisfy the case or controversy requirement of Article III.

16   See Clearinghouse Association v. Cuomo, 510 F.3d at 123.  This

17   requirement requires that the injury be imminent rather than

18   conjectural or hypothetical, see Brooklyn Legal Services Corp.

19   v. Legal Services Corp. 462 F.3d at 225, and for the reasons

20   that I articulated a moment ago, I can't make such a finding.

21   At this point, all that we have is what amounts to a

22   reservation of rights to avoid forfeiting rights that may or

23   may not be invoked in the future if the litigation against

24   Chase and its syndicate is successful, if it brings in money,

25   if the government needs to file an admin claim or superpri

Page 116

1    admin claim for repayment, and if the government decides to

2    file, such a claim.  That's an awful lot of ifs.  Of course, I

3    understand that planning one's life would be much easier for

4    the creditors' committee if it got this information, but this

5    is a problem we bankruptcy judges have all the time, where

6    decisions, if made early, could facilitate plan negotations,

7    give people financial underpinnings to have -- to shape their

8    plan in certain ways or to negotiate with other parties-in-

9    interest, and for very good reasons grounded partly in the

10   rules that are applicable on bankruptcy judges like other

11   federal judges, and partly because we would never get our work

12   done if we were deciding issues every time somebody wanted us

13   to, we bankruptcy judges have to invoke ripeness doctrine to

14   triage our caseload and deal with those kinds of matters that

15   need to be decided.

16          Now, especially when you consider this in the context

17   of two other published decisions that I have in this area,

18   those two decisions tell us how we need to go here.  In the

19   first of them, In re:  Adelphia Communications Corporation, 307

20   B.R. at 436-441, what those who were present in the Adelphia

21   case remember as the X clause case or the X clause controversy,

22   the subdebt in that case wanted very badly to get a ruling from

23   me as to the extent to which an X clause in the applicable bond

24   indenture would give them the right to securities if -- and at

25   a senior level, if Adelphia confirmed a plan which would give

09-50026-mg    Doc 7596    Filed 10/25/10    Entered 10/28/10 14:25:31    Main Document
MOTORS LIQUIDATION COMPANY, ET AL.
Pg 117 of 142

Page 117

1    securities to its stakeholders.  And we had a major discussion

2    about whether that need, which was very real, and which would,

3    without a doubt, materially have advanced the plan

4    negotiations, passed muster under ripeness doctrine.  And I

5    ruled, as those of you who were involved in Adelphia, as I know

6    some of you are -- or were, may well remember, I ruled that it

7    didn't pass muster under ripeness and muster doctrine.  As I

8    said there, "Thus, upon consideration of the case law of this

9    area, this Court concludes that the requirements for

10   establishing the required case or controversy and the related

11   requirement of ripeness have not been satisfied.  While the

12   Court fully understands the monetary consequences to the

13   creditor groups concerned of a decision on the merits, and the

14   subdebt's preference that the issue be decided now as an aid to

15   the parties' further negotiations and decisions as to

16   litigation positions, the Court cannot decide the merits at

17   this time.  The feared consequences remain a mere possibility

18   that may or may not occur as expected or may not happen at

19   all."

20           Similarly, in another of my Adelphia decisions, see

21   364 B.R. at 530, I likewise was constrained from dealing with

22   some of the issues because of ripeness concerns.  Quoting from

23   that second decision:  "Other contentions by the objectors must

24   be rejected or are not yet ripe.  One such contention is that

25   the proposed settlement represents a violation of provisions of

Page 118

1    the settlement agreement between the debtors and the Regises

2    (ph.) entered into in April 2005 under which the debtors agreed

3    not to oppose payment of defense costs by the insurers to the

4    Regises under the policies.  I agree this agreement must be

5    honored by the estate but do not see a violation of that

6    undertaking based on anything the estate has done yet.  And

7    while measures by the estate to secure payments under the

8    policies to which the estate itself is entitled would at least

9    seemingly not be violative of that undertaking either, it's

10   sufficient to await any future action proposed by the estate

11   and then see whether or not it should be violative of that

12   obligation."

13            Finally, as I noted, the request that I have here is,

14   in substance if not in name, a request for a declaratory

15   judgment.  It's a request for a declaratory judgment as to the

16   government's rights to a superpriority claim if there are

17   proceeds for the superpri to attach to and if the government

18   decides to file it.  As I indicated in oral argument, I wasn't

19   that troubled by the fact that the creditors' committee didn't

20   commence an adversary proceeding as Federal Rule of Bankruptcy

21   Procedures 7001 requires.  I think there have been times, in

22   this district and other districts -- I think Judge Drain, in

23   this court, has the leading decision on it, but there are

24   probably others including a dictated decision by me on this

25   point -- that when we can provide adequate due process, we

MOTORS LIQUIDATION COMPANY, ET AL.

1  don't always make people go through the formalities of an

2  adversary proceeding if we can make sure that fairness can be

3  accomplished by the measures that accompany contested ones.

4  But the same reasons that we don't decide declaratory judgment

5  actions in the absence of a sufficiently concrete and actual

6  controversy apply in declaratory judgment actions, and they

7  equally apply, at least by analogy here.

8          And for this reason, too, I can't decide this issue

9  now, notwithstanding what I am confident is a very good reason

10  for which the creditors' committee asked for it.

11          Mr. Jones, you or your colleagues are to settle an

12  order in accordance with the foregoing.

13          MR. JONES:  Very well, Your Honor.

14          THE COURT:  I'd like to go straight, now, into the

15  asbestos protocol issues, but I'll allow anybody who is here on

16  other matters to be excused.

17          MR. MAYER:  Thank you, Your Honor.  Your Honor, thank

18  you.  My partner, Mr. Bentley, will handle the asbestos matter.

19          THE COURT:  Of course.

20          MR. KAROTKIN:  Your Honor --

21          MR. BENTLEY:  Your Honor -- oh, I'm sorry.

22          MR. KAROTKIN:  Just give me one second.  Sorry.  Just

23  a housekeeping.  On the holding date for the disclosure

24  statement hearing --

25          THE COURT:  Yes?

Page 120

1          MR. KAROTKIN:  -- I think we're okay with the 9th.

2          THE COURT:  Okay.  The 9th it will be.  I think you

3    also have other GM matters on at that time, right?

4          MR. KAROTKIN:  Yes, sir.

5          THE COURT:  So why don't you put this on your calendar

6    for that day and have either you or one of your staff give me a

7    recommendation as to how in the context of the other matters

8    you want to deal with it, and perhaps I can cross my fingers

9    whether -- while you have the holding date, you don't need to

10   use it.

11         MR. KAROTKIN:  Okay.  I think that's at 9:45.

12         THE COURT:  Right.

13         MR. KAROTKIN:  Thank you, sir.

14         THE COURT:  Sure.

15         MR. BENTLEY:  Just one second, Your Honor.

16         THE COURT:  Yes.

17         MR. BENTLEY:  I think we have an agreement.

18         THE COURT:  Then I'd be happy to wait.

19      (Pause)

20         MR. BENTLEY:  I apologize, Your Honor.

21         THE COURT:  Mr. Bentley?

22         MR. BENTLEY:  Yes, thank you, Your Honor, for giving

23   us a moment.  I'm very happy to inform the Court that after

24   several months of a great deal of back and forth without

25   success in trying to reach an agreement among the various

09-50026-mg   Doc 7596   Filed 10/25/10   Entered 10/28/10 14:25:31   Main Document
MOTORS LIQUIDATION COMPANY, ET AL.
Pg 121 of 142

Page 121

1   parties, we -- I believe, we have finally reached an agreement.

2   There's a few tiny language issues that, after we discuss this

3   on the record, I would suggest we have a very brief break to

4   allow us to work out the final language issues, but what I

5   would suggest is the following.

6        First, a very brief description of what has happened

7   over the past two hours.  The parties -- most of the parties

8   spent a good chunk of the last two hours meeting in the hallway

9   and trying to reach an agreement.

10       THE COURT:  If I had known you were doing that, I

11  would have given you a conference room.

12       MR. BENTLEY:  The hallway was actually fine, Your

13  Honor.

14       THE COURT:  All right.

15       MR. BENTLEY:  We appreciate -- the next time, we'll

16  ask for a conference room.  The parties who have reached

17  agreement are ourselves, the creditors' committee, the ACC, the

18  FCR, and the trusts and claims processing facilities.  I

19  understand the debtor may have its own views, and what I would

20  suggest is that I first describe the basic outlines of the

21  agreement we've reached, that I then let the other parties to

22  the agreement add whatever they may want to add, and let Mr.

23  Karotkin speak for the debtors.  Then if Your Honor is inclined

24  to proceed with this as an agreed order, I would ask that we

25  then have a five or ten-minute break to allow myself and Mr.

MOTORS LIQUIDATION COMPANY, ET AL.

Page 122

1   Swett and the other parties work out the final, very -- what I

2   believe are very minor language issues.  We would then propose

3   to read it into the record and then overnight create a written

4   order that should be verbatim identical to what we read into

5   the record and submit that to Your Honor tomorrow.

6        THE COURT:  Keep going.

7        MR. BENTLEY:  And we would ask as part of this deal

8   that if Your Honor approves this agreed resolution, that Your

9   Honor will today, if possible, that we are authorized to serve

10  our subpoenas because we are quite anxious that that process

11  proceed without further delay.

12       The -- here are the basic terms of the agreed

13  resolution.  As Your Honor will recall, the creditors'

14  committee is concerned with the ACC's approach to

15  confidentiality.  It was essentially two-fold.

16       We were concerned that a third party neutral would be

17  brought in and would perform a lot of the work that we think

18  it's appropriate for the parties' experts themselves to

19  perform.  And second, we were concerned that the result, the

20  end result of this process, would be that the parties' experts

21  would not receive all of the data that they need for their

22  analysis, but would receive a redacted database which, in our

23  view, would be missing some important data fields.

24       The resolution that's been now agreed to by the

25  parties does not -- has removed those two features which we

1    objected to.  This proposal will not require the retention of a

2    third party neutral and it will not result in any data fields

3    that we believe are needed for the estimation analysis to be

4    redacted.  We'll be getting everything that we need.

5           What the agreed resolution provides is that the trusts

6    will produce the data directly to the experts for the four

7    parties to the estimation proceeding; namely, the debtors, the

8    creditors' committee, the ACC and the FCR.  Each party's expert

9    will then perform its own matching exercise, its own exercise

10   of matching the trust data and merging it with other data

11   sources.  The experts will then meet and they'll make a good

12   faith effort to resolve any disagreements they might have about

13   the results of the matching exercise.  They'll have a specified

14   period of two weeks to meet and try to reach agreement.

15          And after they reach ag -- and the anticipation is

16   that they'll reach agreement on many issues.  Perhaps not reach

17   agreement on some, but at the end of this exercise, they

18   will -- everyone will know which matching issues are agreed and

19   which remain in dispute.  There would then be a defined period

20   of time thereafter for the experts to submit their expert

21   reports.

22          Now, to satisfy the confidentiality concerns that have

23   been raised by the ACC and the trusts, the agreement involves a

24   set of data security restrictions which are designed to keep as

25   tightly under wraps as we think is possible the claimant-

Page 124

1   specific sensitive data, claimant names and Social Security

2   numbers in particular.  And the basic approach that's employed,

3   Your Honor, is that that data, Social Security numbers and

4   other similarly sensitive data, shall be used only for matching

5   purposes.

6           Once the matching process is completed, then that data

7   twill be taken off the networks -- of the computer networks of

8   each expert, will be put on a device and stored in a secure

9   location, out of the way, with the proviso that to the extent

10  matching issues come up down the road as the process proceeds,

11  as we expect they probably will, each expert can retrieve the

12  data for -- to deal with the new matching issues as they arise.

13  And then when done, put it back in its secure location.

14          That is the basic process, Your Honor, and what I

15  would suggest is that I now yield to Mr. Swett to inform Your

16  Honor if I got that wrong in any respect.  And then let the

17  other parties be heard to the extent they see fit.

18          THE COURT:  All right.  Mr. Swett?

19          MR. SWETT:  Thank you, Your Honor.  As I listened to

20  Mr. Bentley, I did not hear anything that's in significant

21  tension with my understanding of the agreement.  But there are

22  a couple of points I would like to emphasize.

23          The data security provisions consist of stage by stage

24  production of trust data, expert linking that data to other

25  sources the experts believe will be useful in confirming that a

Page 125

```
 1    claim that shows up under one unique identifier in GM's data is

 2    the same as a claim that shows up as another unique -- under

 3    another unique identifier in one or more of the trust data.

 4            THE COURT:  In other words, that it's the same guy?

 5            MR. SWETT:  It's the same person behind the claim.

 6    That's seemed to be the driving concern of the UCC and we have

 7    tried to accommodate that.  And the key to it is that after the

 8    matching is done, a new discrete data set is created which

 9    strips out names, Social Security numbers and certain other

10    agreed fields that would tend to reveal the identity of the

11    claimant if erred outside of the sealed record, in this case,

12    or in the world at large.

13            So that's the first thing, the stripping out of

14    identifying detail from the data set that will ultimately be

15    used in court.  The experts will have, as an interim step in

16    expert discovery, they will come forth with their matched data

17    sets and any disagreements concerning the matches will be

18    identified and there will be a defined period of time to

19    attempt to resolve or at least to narrow those disagreements.

20            This has two virtues.  It allows us to set aside

21    permanently, at that point, the original data concerning those

22    matches that are not in dispute.  And to narrow the issues at

23    the data level so that, to the greatest extent possible, when

24    the experts come before you to give their opinions and be

25    cross-examined, each one is working with a common set of data.
```

09-50026-mg    Doc 7596    Filed 10/25/10    Entered 10/28/10 14:25:31    Main Document
MOTORS LIQUIDATION COMPANY, ET AL.
Pg 126 of 142

Page 126

1    That -- it won't be perfect.  We're not entirely there, but

2    it'll be a whole lot better than if each came to court with

3    multiple data sets that hadn't been reconciled.  We will at

4    least know what the hopefully narrow areas of disagreement are.

5            The -- there is an aspect of this understanding that I

6    don't think I heard Mr. Bentley mention that is material to the

7    ACC.  Because of events going on in the world, as I adverted to

8    in my last -- the last of my letters to Your Honor on this

9    subject, and because of the great interest in -- among certain

10   sectors of tort defendants and insurers in getting into trust

11   data that is not available to them in the tort system, and

12   because of the risk that you identified when ruling on the 2004

13   application to the legitimate concerns and interests of absent

14   individual asbestos claimants when it comes to actually

15   litigating their claims against GM or anybody else --

16           THE COURT:  What I referred to as the one-on-ones?

17           MR. SWETT:  Yes.  Because of those concerns, the raw

18   data and certain data sets derived from the raw data that will

19   be defined in this order, need to be subject to a provision

20   which must be satisfactory of course to Your Honor that the

21   information in those sets and in those forms will not be

22   subject to production or to subpoena.

23           What is going on here is the Court is supervising the

24   creation of a set of data for the limited purposes of claims

25   estimation in this case.  The Court, therefore, should make

Page 127

1    adequate provision to ensure that the data in the forms that

2    proceed from stage to stage until we get to that nearly single

3    data source for use at trial is protected.

4         I would remind you that the TDP, the trust

5    distribution procedures of all of the trusts who are

6    respondents to these subpoenas, all provide for the

7    confidentiality of the information.  For reasons that you've

8    ruled upon and that we need not revisit, you have nevertheless

9    decreed that for the limited purposes of this proceeding, this

10   information must come forth here.

11        Well, we wish to provide failsafe assurance that that

12   raw data will not find its way into other case or proceeding.

13   We think the way to do that is based on Section 105 of the

14   Code, a decretal provision of the order we're now proposing

15   that basically says that the information in those forms shall

16   not be subject to subpoena.  That's an important provision.

17        The duties and obligations created by this order will

18   be in addition to and not in derogation of the duties created

19   by the confidentiality agreement previously so ordered by Your

20   Honor.  But that agreement doesn't address in the pointed

21   fashion that this order would the risk of the inappropriate use

22   of this information which is being called forth for a specific

23   purpose in other settings and for other purposes not intended

24   by the Court.

25        It also -- the confidentiality also -- agreement also

Page 128

1    does not address something that this order does which is the

2    massaging into as agreed upon master set of data as these

3    parties can achieve for your -- for the benefit of the

4    substantive disputes and airing of the real issues of substance

5    at the eventual hearing so that we don't get mired in a whole

6    bunch of nitty-gritty details concerning whether or not we

7    agree to the data.

8          So those are two interests that are addressed in

9    important ways by the agreement that we're now putting forth

10   that were not addressed and were not intended to be addressed

11   by the confidentiality agreement which had other, more limited

12   purposes.

13         Thank you, Your Honor.

14         THE COURT:  Okay.  Before I give Mr. Esserman a chance

15   to speak, Mr. Bentley, do you have any problems with what Mr.

16   Swett said?

17         MR. BENTLEY:  I do not, Your Honor.

18         THE COURT:  Okay.  Mr. Esserman?

19         MR. ESSERMAN:  Sandy Esserman for the record.  I

20   concur with what Mr. Swett said.  Thank you.

21         THE COURT:  Okay.  Mr. Karotkin, you want to be heard?

22         MR. KAROTKIN:  Thank you, Your Honor.  The debtor has

23   the same concern it had from day one in connection with this

24   process, is that it be done efficiently, economically and

25   expeditiously.

Page 129

1         We don't want to stand in the way of what they've

2    agreed to here.  However, I will point out that in connection

3    with the agreed-to, "agreed-to" 2004 order in the

4    confidentiality agreement, it took, I would say, ten days of

5    nonstop lawyer time to finalize that agreement at an

6    extraordinary cost to the estate.  I don't think in my career I

7    have seen more drafts of confidentiality agreements in my --

8    there must have been fifty drafts of the agreement before it

9    was finalized and sent to Your Honor.

10         And as I said, the debtor is concerned with the time

11   and expense and how this whole process is going to hold up

12   confirmation and making distributions to creditors.  And I am

13   also concerned about them going back tonight to try to agree

14   upon a form of order because my big fear is we go through the

15   same process we did six or eight weeks ago.  And this is --

16   just serves to delay the hearing before Your Honor when you

17   have to decide the issue.

18         And, again, I'm not going to -- I'm not asking you to

19   not approve this, but I want people to be mindful of what we're

20   trying to accomplish here.  And this, in my view, has gotten

21   way out of hand.  There was a confidentiality agreement

22   drafted, agreed to and I just don't understand why that's not

23   sufficient here.

24         THE COURT:  All right.  Mr. Bentley?

25         MR. BENTLEY:  Just very briefly, Your Honor.  I second

MOTORS LIQUIDATION COMPANY, ET AL.

Page 130

1    one of the points that Mr. Karotkin made and that is, it is

2    very important to us that this order not be further negotiated.

3    And so, in fact, what we've worked out is once we come back to

4    Your Honor after our five or ten minute break, we hope what we

5    will have, precisely for that reason, is an order that we can

6    read into the record.  And I have to apologize in advance.

7    It's going to be a little bit tedious; it'll be about four

8    pages typed.  But the reason we think it's valuable to read it

9    into the record now is so that we're done.  And there will be

10   no further negotiations.

11          THE COURT:  All right.  Yes, sir.  Come on up here.

12   Identify yourself, please.  I can't rule out the possibility

13   that I've seen you before, but I'm tired.

14          MR. CORDARO:  You have, Your Honor.  Joseph Cordaro

15   from the United States Attorney's office on behalf of the

16   United States and specifically Treasury.  And without being

17   repetitive, I know it's been a long day, I just want to echo

18   some of the concerns that Mr. Karotkin just mentioned to you.

19          Obviously, this is money coming out of the DIP and

20   it's tax payer money and I think the word Mr. Karotkin used was

21   "efficiency".  And that is the concern of the government, too,

22   that this process be as efficient as possible.

23          THE COURT:  All right.  Thank you, Mr. Cordaro.

24          MR. CORDARO:  Thank you, sir.

25          THE COURT:  Everybody had a chance to speak in as much

1    as anybody would want to up to this point?

2        (No response)

3        THE COURT:  All right.  Mr. Karotkin, Mr. Cordaro, I

4    share some of your concerns and if this matter had been argued

5    as until thirty seconds ago or whatever I thought it was going

6    to be, my preliminary remarks after I read all of that stuff

7    would have echoed some of the comments that you and Mr. Cordaro

8    stated.

9        But with that said, I'm a pragmatist.  I don't look

10   gift horses in the mouth and anything that decreases the degree

11   of litigiousness in this case or in my other cases is, with

12   rare exception, to be welcomed.

13       I am going to take this to the next step which is

14   invite you to put your deal on the record.  While everything we

15   say, even in a dictated decision, tends to acquire a life of

16   its own, I don't know whether the relatively unusual provision

17   about me entering an order saying that what gets created is

18   going to be exempt from further disclosure should be a

19   precedent in the future.  But I think that under the unusual

20   circumstances here, especially since we are in substance

21   shepherding the preparation of new data for the use of a

22   particular case makes a deal of the type that was done

23   acceptable to me.  And I'm not going to stand in the way of

24   issuing an order that protects it from disclosure and subpoena

25   in another case.

MOTORS LIQUIDATION COMPANY, ET AL.

Page 132

1    So if you can make the deal, I will enter such an

2   order which, presumably, will be binding on other courts as

3   well as on other litigants.

4    So unless you have any more, then -- I guess your

5   thought, Mr. Bentley, Mr. Swett, is that we would take a

6   recess.  You would pull out your pads and agree on the

7   remainder of your language and then you would come back after a

8   defined period of time?

9    MR. SWETT:  Yes, sir.  My friend Mr. Bentley is an

10   optimist, he said five minutes.  I would say, realistically,

11   it's going to take us fifteen.

12    THE COURT:  If you can do it in as little as fifteen

13   minutes, I'll be very pleased.

14    All right.  We'll take a recess then.  I think, under

15   the circumstances, since I've been around the block a few

16   times, too, somebody better knock on the door of my chambers

17   when you're ready.

18    MR. BENTLEY:  Judge, if there is a conference room we

19   could use that would be helpful.

20    THE COURT:  You can use the one that I share with

21   Judge Liflin behind me.

22    MR. BENTLEY:  Thank you, Your Honor.

23    THE COURT:  Right.  We're in recess.

24    (Recess from 4:15 p.m. until 5:26 p.m.)

25    THE CLERK:  Take your seats, please.

09-50026-mg    Doc 7596    Filed 10/25/10    Entered 10/28/10 14:25:31    Main Document
MOTORS LIQUIDATION COMPANY, ET AL.
Pg 133 of 142

Page 133

1          THE COURT:  Mr. Bentley?

2          MR. BENTLEY:  Your Honor, I'm glad to report -- for

3     the record, Philip Bentley for the creditors' committee.

4          I'm glad to report we have resolved the few remaining

5     issues.  I'd like to mention just one substantive issue.  Mr.

6     Karotkin may want to add a comment on that issue.  And then

7     what we would suggest is Mr. Esserman made a wonderful

8     suggestion which is rather than burdening the Court with a

9     fifteen minute reading of this order, we have made a few copies

10    of it and I would, with the Court's permission, I would like to

11    lodge the original of the -- the original marked-up agreement

12    with the Court.

13         We will then, overnight, turn the document, produce a

14    clean typed up version of the stipulated order, circulate it

15    among all counsel, make sure we have no disagreements that this

16    accurately reflects what has been agreed and what has been

17    lodged with the Court.  And we'll then file that with Your

18    Honor tomorrow.

19         THE COURT:  Okay.

20         MR. BENTLEY:  The one substantive point that I'd like

21    to mention is one of -- perhaps the most substantive sticking

22    points that we have just been discussing and have just resolved

23    involves timing.  And what we have agreed and what's reflected

24    in the order that we'll be handing up is as follows.

25         It relates to the timing of the matching process and

09-50026-mg    Doc 7596    Filed 10/25/10    Entered 10/28/10 14:25:31    Main Document
MOTORS LIQUIDATION COMPANY, ET AL.
Pg 134 of 142

Page 134

1    the filing of expert reports.  Specifically, the parties have

2    agreed that within two weeks after the production of the trust

3    data, the experts will exchange their own lists of claimants,

4    their own, in effect, submissions on the matching issue.  The

5    experts will then take a period of two weeks to try to reach

6    agreement as much as they can on those issues.  And then two

7    weeks thereafter, in other words, a total of six weeks after

8    the production of trust data, the experts will exchange initial

9    expert reports.

10           THE COURT:  Okay.

11           MR. BENTLEY:  Thank you, Your Honor.

12           THE COURT:  Mr. Swett?

13           MR. SWETT:  Your Honor, I would just like to point out

14    that subject to the provision that Mr. Bentley just recited,

15    this isn't a scheduling order.  There are other aspects of this

16    schedule leading to the contested hearing on estimation that

17    would have to be worked out.  In particular, the period for

18    expert reply reports will be important in this case because of

19    some information extrinsic to what we've been talking about

20    involving the trust production that the UCC is working with,

21    that we will not know what they're doing with it until they

22    produce their expert report.

23           And we don't want to try to anticipate and replicate

24    that work; that would be wasteful.  So we're going to have an

25    issue as to the timing of reply reports.  And that will be

Page 135

1   important.  In addition, we may seek some fact depositions.

2   Right now there's no --

3           THE COURT:  You may seek some what?

4           MR. SWETT:  Some fact depositions.

5           THE COURT:  Um-hum.

6           MR. SWETT:  There is, as of yet, no overall scheduling

7   order and I just wanted to point that out.

8           THE COURT:  All right.  Mr. Karotkin?

9           MR. KAROTKIN:  The concern I have is simply with

10  timing, the way this looks like it's playing out to me before

11  we ever get to an evidentiary hearing, it looks like we're well

12  into the first quarter.

13          And my concern, Your Honor, is that this doesn't hold

14  up distributions under the plan because with a -- as you know,

15  with a pot plan, you have to know what the denomina -- you have

16  to know the denominator before you can make distributions.  And

17  I would assume that Mr. Bentley and the unsecured creditors'

18  committee ought to be more concerned about that than I am

19  because it's his clients that the distributions -- who are

20  getting the distributions, because it's all Class 3.

21          And I think that although I'm not objecting to this,

22  at some point in the near future, we have to figure out a

23  methodology to address that issue so we can move ahead with

24  confirmation and then not continue to wait forever until we

25  make distributions.

09-50026-mg   Doc 7596   Filed 10/25/10   Entered 10/28/10 14:25:31   Main Document
MOTORS LIQUIDATION COMPANY, ET AL.
Pg 136 of 142

Page 136

1          THE COURT:  I assume that making multiple

2     distributions to this many creditors in a case of this

3     character is a very expensive process.

4          MR. KAROTKIN:  It is, Your Honor, but I'm not really

5     even talking about that.  I'm talking about an initial

6     distribution.  We can't make an initial distribution unless the

7     asbestos liability is either quantified or capped.

8          THE COURT:  Um-hum.

9          MR. KAROTKIN:  And we may have a way to cap it for

10    distribution purposes that -- and we may be able to agree on

11    that.  But I'm just alerting the Court to an issue that we, as

12    the debtor, are particularly sensitive to.

13         THE COURT:  Mr. Bentley, do you want to comment on

14    that?

15         MR. BENTLEY:  I would agree with Mr. Karotkin's

16    comments.  That issue is a matter of great importance to us and

17    we do plan to come back to Your Honor with a proposal with

18    respect to the setting of reserves, with respect to the

19    asbestos claim.

20         And we think that will be a very important issue.

21         THE COURT:  Um-hum.  All right.

22         To what extent do I need to rule on anything other

23    than to say that this doesn't offend me?  Your giving me the

24    document and then you're superseding it with one or confirming

25    that it's the final tomorrow?

1          MR. BENTLEY:  Your Honor, the Rule 2004 order that the

2     Court entered back on August 24 addresses what happens in the

3     event an anonymity dispute is raised by the ACC.

4          THE COURT:  And then they serve the notice confirming

5     the existence of that dispute which put the subpoenas on hold.

6          MR. BENTLEY:  Correct.  And what is says specifically

7     with respect to service of the subpoenas, is the subpoenas may

8     not issue pending further direction from the Court.

9          THE COURT:  Yeah.  I understand that, Mr. Bentley.

10    Remember I read the papers thinking I was going to have an

11    argument today.

12         MR. BENTLEY:  So we -- and Your Honor, I would have

13    loved to have come before you a couple of days before with a

14    resolution.  This happened today.

15         What we would ask Your Honor is that, from the bench,

16    if Your Honor feels comfortable doing this, you'd direct.  You

17    provide the further direction that's contemplated by the order.

18    Namely, that we are now authorized to go ahead -- to proceed

19    and issue our subpoenas.

20         THE COURT:  Does your having formulated the document

21    give me the predicate upon which I can do that?

22         MR. BENTLEY:  The fact that all of the parties

23    involved in this issue were before the Court today and agreed

24    on this resolution, I believe does give you the authority to do

25    that.

Page 138

1          THE COURT:  All right.  Mr. Swett, any objection?

2          MR. SWETT:  Your Honor, I think the more prudent

3     course would be to receive the conformed order tomorrow and

4     sign it and that will be the direction to proceed.  It's

5     already twenty of 6 this evening, so the subpoenas wouldn't

6     presumably be going out today.  They can go out tomorrow with

7     the signed order buttoned down and all issues will be avoided.

8          THE COURT:  Um-hum.

9          MR. BENTLEY:  We are okay with that, Your Honor.

10          THE COURT:  All right.  Fine.  Have we lost Mr.

11    Esserman?  Do I have any of his colleagues here?

12          MR. RUSSO:  Your Honor, we agree with that procedure.

13    Thank you.

14          THE COURT:  Okay.  Just identify yourself, please.

15          MR. RUSSO:  I'm sorry, Your Honor.  Bob Russo for the

16    Futures Claims Representative.

17          THE COURT:  Okay.  All right.  Then let's do it

18    tomorrow.

19          MR. BENTLEY:  And if I may, Your Honor, per the

20    procedure I described, I'd like to lodge with the Court the

21    mark up that the parties have agreed to.

22          THE COURT:  Okay.  Okay, fair enough.  Do we have any

23    further business today?

24          MR. BENTLEY:  Not as far as we're concerned, Your

25    Honor.

Page 139

1            MR. KAROTKIN:  No, sir.

2            THE COURT:  All right.  We're adjourned.

3            IN UNISON:  Thank you, Your Honor.

4       (Whereupon these proceedings were concluded at 5:35 PM)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 140

1

2                          I N D E X

3

4                             RULINGS

5                                    Page      Line

6    Creditors' Committee May   42        5

7    Insert Supplemental

8    Clarifying Language into

9    the Disclosure Statement

10   Asbestos Committee          55        3

11   Representative May

12   Insert Language into the

13   Disclosure Statement to

14   Clarify Asbestos Claims

15   Information

16   Future Claims              57        4

17   Representative May

18   Insert Language into the

19   Disclosure Statement to

20   Clarify Asbestos Claims

21   Information

22   Debtors will Add           64        3

23   Supplemental Language to

24   the Disclosure

25   Statement to Acknowledge

Page 141

```
 1   Potential Challenges to

 2   Municipalities Based on

 3   Applicable State Law

 4   Disclosure Statement is    75      17

 5   Conditionally Approved

 6   Pro Hac Vice Application  76      11

 7   of James Potter, Esq.

 8   Granted

 9   Motion of the Official    110     17

10   Committee of Unsecured

11   Creditors of Motors

12   Liquidation Company to

13   Enforce (A) the Final

14   DIP Order, (B) the

15   Wind-Down Order, and

16   (C) the Amended DIP

17   Facility Denied

18

19

20

21

22

23

24

25
```

1

2                C E R T I F I C A T I O N

3

4    I, Dena Page, certify that the foregoing transcript is a true

5    and accurate record of the proceedings.

6

7

8    _____

9    DENA PAGE

10

11   Veritext

12   200 Old Country Road

13   Suite 580

14   Mineola, NY 11501

15

16   Date: October 25, 2010

17

18

19

20

21

22

23

24

25