Page 1

1

2   UNITED STATES BANKRUPTCY COURT

3   SOUTHERN DISTRICT OF NEW YORK

4   Case No. 09-50026(REG)

5   - - - - - - - - - - - - - - - - - - - -x

6   In the Matter of:

7

8   MOTORS LIQUIDATION COMPANY, et al.

9           f/k/a General Motors Corporation, et al.,

10

11           Debtors.

12

13   - - - - - - - - - - - - - - - - - - - -x

14

15              United States Bankruptcy Court

16              One Bowling Green

17              New York, New York

18

19              October 26, 2010

20              9:53 AM

21

22

23   B E F O R E:

24   HON. ROBERT E. GERBER

25   U.S. BANKRUPTCY JUDGE

```
 1

 2   HEARING re Motion of General Motors LLC to Enforce 363 Sale

 3   Order and Approved Deferred Termination Agreements against Rose

 4   Chevrolet, Inc., Halleen Chevrolet, Inc., Andy Chevrolet

 5   Company, and Leson Chevrolet Company, Inc.

 6

 7   HEARING re Motion of Movant in the Action Entitled Walter J.

 8   Lawrence V. General Motors Hourly Rate Employee Pension, and

 9   General Motors Corporation, 5:07-CV-408 OC, United States

10   District Court, Middle District of Florida for Entry of an

11   Order Thereby Ordering United States District court Judge

12   for the Middle District of Florida to Appear before This Court

13   to Answer These Criminal Charges

14

15   Omnibus Objections to Beneficial Bondholder Claims:

16   HEARING re Debtors' Forty-Seventh Omnibus Objection to Claims

17   (Duplicate Debt Claims)

18

19   HEARING re Debtors' Forty-Ninth Omnibus Objection to Claims

20   (Duplicate Debt Claims)

21

22   HEARING re Debtors' Sixty-First Omnibus Objection to Claims

23   (Duplicate Debt Claims)

24

25
```

Page 3

1

2    HEARING re Debtors' Sixty-Third Omnibus Objection to Claims

3    (Duplicate Debt Claims)

4

5    HEARING re Debtors' Sixty-Fifth Omnibus Objection to Claims

6    (Duplicate Debt Claims)

7

8    HEARING re Debtors' Seventy-First Omnibus Objection to Claims

9    (Duplicate Debt Claims)

10

11   HEARING re Debtors' Motion for Preliminary Approval of

12   Settlement, Including Claims Estimation, for Conditional

13   Certification of Settlement Class, to Approve Cash Disbursement

14   and Forms of Notice, and to Set Fairness Hearing, Boyd Bryant

15   vs. Motors Liquidation Company, Adv. Proc. 09-00508-REG

16

17   HEARING re Motion of Weber Automotive Pursuant to Rule 60(b) of

18   the Federal Rules of Civil Procedure and Bankruptcy Rule 9024

19   for Relief from Order Granting Debtors' Twenty-Third Omnibus

20   Objection to Claims

21

22   Omnibus Objections to Tax Claims:

23   HEARING re Debtors' Eighty-Seventh Omnibus Objection to Claims

24   (No Liability Tax Claims)

25

Page 4

1

2      Omnibus Objections to Claims Assumed by General Motors, LLC:

3      HEARING re Debtors' Twenty-Third Omnibus Objection to Claims

4      (Claims Assumed by General Motors, LLC)

5

6      Omnibus Objections to Incorrectly Classified Claims:

7      HEARING re Debtors' Twenty-Seventh Omnibus Objection to Claims

8      (Incorrectly Classified Claims)

9

10     HEARING re Debtors' Twenty-Eighth Omnibus Objection to Claims

11     (Incorrectly Classified Claims)

12

13     HEARING re Debtors' Twenty-Ninth Omnibus Objection to Claims

14     (Incorrectly Classified Claims)

15

16     HEARING re Debtors' Thirtieth Omnibus Objection to Claims

17     (Incorrectly Classified Claims)

18

19     HEARING re Debtors' Thirty-Second Omnibus Objection to Claims

20     (Incorrectly Classified Claims)

21

22     HEARING re Debtors' Ninety-Eighth Omnibus Objection to Claims

23     (Incorrectly Classified Claims)

24

25

Page 5

1

2    HEARING re Debtors' Ninety-Ninth Omnibus Objection to Claims

3    (Incorrectly Classified Claims)

4

5    Omnibus Objections to Claims with Insufficient Documentation:

6    HEARING re Debtors' Thirty-Seventh Omnibus Objection to Claims

7    (Claims with Insufficient Documentation)

8

9    HEARING re Debtors' Eighty-Fifth Omnibus Objection to Claims

10   (Claims with Insufficient Documentation)

11

12   HEARING re Debtors' Eighty-Sixth Omnibus Objection to Claims

13   (Claims with Insufficient Documentation)

14

15   HEARING re Debtors' 104th Omnibus Objection to Claims (Claims

16   with Insufficient Documentation)

17

18   HEARING re Debtors' 105th Omnibus Objection to Claims (Claims

19   with Insufficient Documentation)

20

21   HEARING re Debtors' 106th Omnibus Objection to Claims (Claims

22   with Insufficient Documentation)

23

24   HEARING re Debtors' 107th Omnibus Objection to Claims (Claims

25   with Insufficient Documentation)

Page 6

```
 1

 2   HEARING re Debtors' 108th Omnibus Objection to Claims (Claims

 3   with Insufficient Documentation)

 4

 5   Omnibus Objections to Employee-Related Claims:

 6   HEARING re Debtors' Eightieth Omnibus Objection to Claims

 7   (Supplemental Executive Retirement Benefits Claims of Former

 8   Executive Employees)

 9

10   HEARING re Debtors' Eighty-Second Omnibus Objection to Claims

11   (Claims Relating to Former Employees Represented by United Auto

12   Workers)

13

14   HEARING re Debtors' Eighty-Third Omnibus Objection to Claims

15   (Welfare Benefits Claims of Retired and Former Salaried and

16   Executive Employees)

17

18   HEARING re Debtors' One Hundredth Omnibus Objection to Claims

19   (Claims Relating to Former Employees Represented by United Auto

20   Workers)

21

22   HEARING re Debtors' 101st Omnibus Objection to Claims (Claims

23   Relating to Former Employees Represented by United Auto

24   Workers)

25
```

Page 7

1

2    HEARING re Debtors' 102nd Omnibus Objection to Claims (Claims

3    Relating to former Employees Represented by United Auto

4    Workers)

5

6    HEARING re Debtors' 103rd Omnibus Objection to Claims (Welfare

7    Benefits Claims of Retired and Former Salaried and Executive

8    Employees)

9

10   Omnibus Objections to Late-Filed Claims:

11   HEARING re Debtors' Eighty-Ninth Omnibus Objection to Claims

12   and Motion Requesting Enforcement of Bar Date Orders (Late-

13   Filed Claims)

14

15   HEARING re Debtors' Ninetieth Omnibus Objection to Claims and

16   Motion Requesting Enforcement of Bar Date Orders (Late-Filed

17   Claims)

18

19   HEARING re Debtors' Ninety-First Omnibus Objection to Claims

20   and Motion Requesting Enforcement of Bar Date Orders (Late-

21   Filed Claims)

22

23   HEARING re Debtors' Ninety-Second Omnibus Objection to Claims

24   and Motion Requesting Enforcement of Bar Date Orders (Late-

25   Filed Claims)

Page 8

1

2   Omnibus Objections to No Liability GMAC Debt Claims:

3   HEARING re Debtors' Ninety-Third Omnibus Objection to Claims

4    (No Liability GMAC Debt Claims)

5

6   HEARING re Debtors' Ninety-Fourth Omnibus Objection to Claims

7    (No Liability GMAC Debt Claims)

8

9   HEARING re Debtors' Ninety-Fifth Omnibus Objection to Claims

10   (No Liability GMAC Debt Claims)

11

12   HEARING re Debtors' Ninety-Sixth Omnibus Objection to Claims

13   (No Liability GMAC Debt Claims)

14

15   HEARING re Debtors' Ninety-Seventh Omnibus Objection to Claims

16   (No Liability GMAC Debt Claims)

17

18   Omnibus Objection to Duplicate and Amended and Superseded

19   Claims:

20   HEARING re Debtors' Eighty-Eighth Omnibus Objection to Claims

21   (Duplicate and Amended and Superseded Claims)

22

23

24

25

Page 9

1

2    Interim Fee Applications:

3    HEARING re Third Application of Weil, Gotshal & Manges LLP, as

4    Attorneys for the Debtors, for Interim Allowance of

5    Compensation for Professional Services Rendered and

6    Reimbursement of Actual and Necessary Expenses Incurred from

7    February 1, 2010 through May 31, 2010

8

9    HEARING re First Interim Quarterly Application of Caplin &

10   Drysdale, Chartered for Interim Compensation and Reimbursement

11   of Expenses with Respect to Services Rendered as Counsel to the

12   Official Committee of Unsecured Creditors Holdings Asbestos-

13   Related Claims for the Period October 6, 2009 through May 31,

14   2010

15

16   HEARING re Third Interim Application of the Claro Group, LLC,

17   for Allowance of Compensation and Reimbursement of Expenses for

18   the Period February 1, 2010 - May 31, 2010

19

20   HEARING re First Interim Application of Dean M. Trafelet, in

21   His Capacity as Legal Representative for Future Asbestos

22   Personal Injury Claimants, for Allowance of Interim

23   Compensation and Reimbursement of Expenses Incurred for the

24   Period from November 13, 2009 through May 31, 2010

25

Page 10

```
 1

 2      HEARING re Third Interim Application of Kramer, Levin, Naftalis

 3      & Frankel LLP, as Counsel for the Official Committee of

 4      Unsecured Creditors, for Allowance of Compensation for

 5      Professional Services Rendered and for Reimbursement of Actual

 6      and Necessary Expenses Incurred for the Period February 2, 2010

 7      through May 31, 2010

 8

 9      HEARING re Second Application of Plante & Moran, PLLC, as

10      Accountants for the Debtors, for Interim Allowance of

11      Compensation for Professional Services Rendered and

12      Reimbursement of Actual and Necessary Expenses Incurred from

13      February 1, 2010 through May 31, 2010

14

15      HEARING re First Interim Application of Stutzman, Bromberg,

16      Esserman & Plifka, a Professional Corporation, for Allowance of

17      Interim Compensation and Reimbursement of Expenses Incurred as

18      Counsel for Dean M. Trafelet in his Capacity as Legal

19      Representative for Future Asbestos Personal Injury Claimants

20      for the Period from February 24, 2010 through May 31, 2010

21

22

23

24

25
```

Page 11

1

2    HEARING re First Application for Interim Professional

3    Compensation\First Interim Application of Bates White, LLC, as

4    Asbestos Liability Consultant to the Official Committee of

5    Unsecured Creditors, for Allowance of Compensation for

6    Professional Services Rendered and for Reimbursement of Actual

7    and Necessary Expenses Incurred for the Period from March 16,

8    2010 through May 31, 2010

9

10   HEARING re First Application for Interim Professional

11   Compensation/First Interim Quarterly Application of Legal

12   Analysis Systems, Inc., for Interim Compensation and

13   Reimbursement of Expenses with Respect to Services Rendered as

14   Consultant on the Valuation of Asbestos Liabilities to the

15   Official Committee of Unsecured Creditors Holdings Asbestos-

16   Related Claims for The Period April 28, 2010 through May 31,

17   2010

18

19   HEARING re Third Interim Fee Application of Jenner & Block LLP

20   for Allowance of Compensation for Services Rendered and

21   Reimbursement of Expenses

22

23

24

25

Page 12

1

2    HEARING re First Application of Togut, Segal & Segal, LLP as

3    Conflicts Counsel for the Debtors for Allowance of Interim

4    Compensation for Services Rendered for the Period December 21,

5    2009 through May 31, 2010, and for Reimbursement of Expenses

6

7    HEARING re First Interim Application of Analysis Research

8    Planning Corporation as Asbestos Claims Valuation Consultant to

9    Dean M. Trafelet in His Capacity as Legal Representative for

10   Future Asbestos Personal Injury Claimants for Allowance of

11   Interim Compensation and Reimbursement of Expenses Incurred for

12   the Period from March 1, 2010 through May 31, 2010

13

14   HEARING re Third Application of Butzel Long, a Professional

15   Corporation, as Special Counsel to the Official Committee of

16   Unsecured Creditors of Motors Liquidation Company, f/k/a

17   General Motors Corporation, for Interim Allowance of

18   Compensation for Professional Services Rendered and

19   Reimbursement of Actual and Necessary Expenses Incurred from

20   February 1, 2010 through May 31, 2010

21

22   HEARING re Amended First Interim Fee Application of Deloitte

23   Tax LLP as Tax Services Providers for the Period from January

24   1, 2010 through May 31, 2010

25

1

2    HEARING re Third Interim Application of FTI Consulting, Inc.

3    for Allowance of Compensation and for Reimbursement for

4    Expenses for Services Rendered in the Case for the Period

5    February 1, 2010 through May 31, 2010

6

7    HEARING re First Application of Hamilton, Rabinovitz &

8    Associates, Inc. as Consultants for the Debtors with Respect to

9    Present and Future Asbestos Claims, for Interim Allowance of

10   Compensation for Professional Services Rendered and

11   Reimbursement of Actual and Necessary Expenses Incurred from

12   February 1, 2010 through May 31, 2010

13

14   HEARING re First Consolidated Application of Brady C.

15   Williamson, Fee Examiner, and Godfrey & Kahn, S.C., Counsel to

16   the Fee Examiner, for Interim Allowance of Compensation for

17   Professional Services Rendered from December 28, 2009 through

18   May 31, 2010 and Reimbursement of Actual and Necessary Expenses

19   Incurred from December 28, 2009 through August 31, 2010

20

21

22

23

24

25

Page 14

1

2    HEARING re Second Interim Application of LFR Inc. for Allowance

3    of Compensation and for Reimbursement of Expenses for Services

4    Rendered in the Case for the Period October 1, 2009 through

5    January 31, 2010 and Third Interim Application of LFR Inc. for

6    Allowance of Compensation and for Reimbursement of Expenses for

7    Services Rendered in the Case for the Period February 1, 2010

8    through May 30, 2010

9

10   HEARING re Stipulation and Order for Adjournment of October 26,

11   2010 Hearing on Third Interim Fee Application of LFR Inc.

12

13   HEARING re Debtors' Third Omnibus Motion Pursuant to 11 U.S.C.

14   §365 to Reject Certain Unexpired Leases of Nonresidential Real

15   Property (Tricon Verizon Leasing Only)

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Lisa Bar-Leib

Page 15

```
 1
 2    A P P E A R A N C E S :
 3    WEIL, GOTSHAL & MANGES LLP
 4         Attorneys for the Debtors and Debtors-in-Possession
 5         767 Fifth Avenue
 6         New York, NY 10153
 7
 8    BY:  JOSEPH H. SMOLINSKY, ESQ.
 9
10    WEIL, GOTSHAL & MANGES LLP
11         Attorneys for the Debtors and Debtors-in-Possession
12         200 Crescent Court
13         Suite 300
14         Dallas, TX 75201
15
16    BY:  MICHELLE HARTMANN, ESQ.
17         (TELEPHONICALLY)
18
19    KRAMER LEVIN NAFTALIS & FRANKEL LLP
20         Attorneys for the Official Committee of Unsecured
21          Creditors
22         1177 Avenue of the Americas
23         New York, NY 10036
24
25    BY:  ROBERT T. SCHMIDT, ESQ.
```

Page 16

1

2    KING & SPALDING LLP

3        Attorneys for General Motors LLC a/k/a New GM

4        1185 Avenue of the Americas

5        New York, NY 10036

6

7    BY:   ARTHUR J. STEINBERG, ESQ.

8        SCOTT DAVIDSON, ESQ.

9

10   JONES DAY

11       Attorneys for General Motors LLC a/k/a New GM

12       325 John H. McConnell Boulevard

13       Suite 600

14       Columbus, OH 43215

15

16   BY:   JEFFREY J. JONES, ESQ.

17       (TELEPHONICALLY)

18

19

20

21

22

23

24

25

Page 17

1

2    JONES, WALKER, WAECHTER, POITEVENT, CARRERE & DENEGRE, LLP

3         Attorneys for General Motors LLC a/k/a New GM

4         201 St. Charles Avenue

5         Suite 5100

6         New Orleans, LA 70170

7

8    BY:  THOMAS A. CASEY, JR., ESQ.

9         (TELEPHONICALLY)

10

11   TOGUT, SEGAL & SEGAL LLP

12        Conflicts Counsel for the Debtors

13        One Penn Plaza

14        New York, NY 10119

15

16   BY:  FRANK A. OSWALD, ESQ.

17

18   JENNER & BLOCK LLP

19        Special Counsel for the Debtors

20        919 Third Avenue

21        37th Floor

22        New York, NY 10022

23

24   BY:  HEATHER D. MCARN, ESQ.

25

Page 18

1

2   U.S. DEPARTMENT OF JUSTICE

3        Office of the United States Trustee

4        33 Whitehall Street

5        Suite 2100

6        New York, NY 10004

7

8   BY:  LINDA A. RIFFKIN, AUST

9        BRIAN S. MASUMOTO, TRIAL ATTORNEY

10

11  ADAMS & REESE LLP

12       Attorneys for Leson Chevrolet Company, Inc.

13       One Shell Square

14       701 Peydras Street

15       Suite 4500

16       New Orleans, LA 70139

17

18  BY:  MARK R. BEEBE, ESQ.

19       DAVID C. COOND, ESQ. (TELEPHONICALLY)

20       JOHNNY DOMIANO, ESQ. (TELEPHONICALLY)

21

22

23

24

25

Page 19

```
 1

 2    BAILEY CROWE & KUGLER, LLP

 3         Attorneys for Boyd Bryant on Behalf of Himself and All

 4          Others Similarly Situated

 5         6550 Bank of America Plaza

 6         901 Main Street

 7         Dallas, TX 75202

 8

 9    BY:  JOHN W. ARNOLD, ESQ.

10

11    BELLAVIA GENTILE & ASSOCIATES, LLP

12         Attorneys for Rose Chevrolet, Inc.; Halleen Chevrolet,

13          Inc.; and Andy Chevrolet Company

14         200 Old Country Road

15         Suite 400

16         Mineola, NY 11501

17

18    BY:  STEVEN H. BLATT, ESQ.

19

20

21

22

23

24

25
```

Page 20

1

2    BUTZEL LONG, P.C.

3         Special Counsel to the Official Committee of Unsecured

4          Creditors

5         380 Madison Avenue

6         22nd Floor

7         New York, NY 10017

8

9    BY:  BARRY N. SEIDEL, ESQ.

10

11   CAPLIN & DRYSDALE, CHARTERED

12        Attorneys for Asbestos Claimants Committee

13        One Thomas Circle, NW

14        Suite 1100

15        Washington, DC 20005

16

17   BY:  RONALD E. REINSEL, ESQ.

18

19   CARELLA, BYRNE, CECCHI, OLSTEIN, BRODY & AGNELLO, P.C.

20        Attorneys for Leson Chevrolet Company, Inc.

21        5 Becker Farm Road

22        Roseland, NJ 07068

23

24   BY:  JEFFREY A. COOPER, ESQ.

25

Page 21

1

2    PRONSKE & PATEL, P.C.

3          Attorneys for Boyd Bryant on Behalf of Himself and All

4           Others Similarly Situated

5          2200 Ross Avenue

6          Suite 5350

7          Dallas, TX 75201

8

9    BY:  RAKHEE V. PATEL, ESQ.

10

11   WYLY-ROMMEL, PLLC

12          Attorneys for Boyd Bryant on Behalf of Himself and All

13           Others Similarly Situated

14          2311 Moores Lane

15          Texarkana, TX 75503

16

17   BY:  SEAN F. ROMMEL, ESQ.

18

19

20

21

22

23

24

25

Page 22

1

2  BROOKS WILKINS SHARKEY & TURCO, PLLC

3       Attorneys for Weber Automotive Corporation

4       401 South Old Woodward

5       Suite 460

6       Birmingham, MI 48009

7

8  BY:  MATTHEW E. WILKINS, ESQ.

9       (TELEPHONICALLY)

10

11  GODFREY & KAHN, S.C.

12       Attorneys for Examiner, Brady Williamson

13       333 Main Street

14       Suite 600

15       Green Bay, WI 54307

16

17  BY:  CARLA O. ANDRES, ESQ.

18       (TELEPHONICALLY)

19

20

21

22

23

24

25

Page 23

```
 1

 2    GODFREY & KAHN, S.C.

 3         Attorneys for Examiner, Brady Williamson

 4         One East Main Street

 5         Suite 500

 6         Madison, WI 53701

 7

 8    BY:  KATHERINE STADLER, ESQ.

 9         ERIC J. WILSON, ESQ.

10         (TELEPHONICALLY)

11

12    LAKIN CHAPMAN, LLC

13         Attorneys for Plaintiff, Kelly Castillo

14         300 Evans Avenue

15         Wood River, IL 62095

16

17    BY:  MARK L. BROWN, ESQ.

18         (TELEPHONICALLY)

19

20

21

22

23

24

25
```

Page 24

1

2     STUTZMAN, BROMBERG, ESSERMAN & PLIFKA P.C.

3          Attorneys for Dean Trafelet, Future Claimants'

4           Representative

5          2323 Bryan Street

6          Suite 2200

7          Dallas, TX 75201

8

9     BY:  JACOB L. NEWTON, ESQ.

10         (TELEPHONICALLY)

11

12    ALSO APPEARING:

13    FTI CONSULTING, INC.

14         Financial Advisor to the Official Committee of Unsecured

15          Creditors

16         3 Times Square

17         9th Floor

18         New York, NY 10036

19

20    BY:  MICHAEL C. EISENBAND

21

22

23

24

25

Page 25

1

2    WALTER J. LAWRENCE, PRO SE

3         Box #103

4         2609 North Forest Ridge Boulevard

5         Hernando, FL 34442

6

7    BY:  WALTER J. LAWRENCE

8         (TELEPHONICALLY)

9

10   JOSEPH R. CATERINA, PRO SE

11        Appearing on Behalf of Francis H. Caterina

12        202 Kenyon Drive

13        Peckville, PA 18452

14

15   BY:  JOSEPH R. CATERINA

16

17   PATRICIA MEYER, PRO SE

18        Box #112

19        West Olive, MI 49460

20

21   BY:  PATRICIA MEYER

22        (TELEPHONICALLY)

23

24

25

Page 26

1                    P R O C E E D I N G S

2            THE COURT:  Have seats, please.  All right.  GM.

3    Motors Liquidation Company.  It seems like we have a zillion

4    matters on today's calendar.  My agenda runs about twenty-five

5    pages.  Let me get a recommendation from you, Mr. Smolinsky as

6    to the means by which I can get the most people out of the

7    courtroom as quickly as possible.  My tentative, subject to

8    rights to be heard is to deal with the dealer matters at the

9    end because I'm likely to have to dictate one or more rulings

10   possibly after a recess.  And I don't want to make people wait

11   while I'm doing something like that.  Go ahead, Mr. Smolinsky.

12           MR. SMOLINSKY:  Good morning, Your Honor.  Joseph

13   Smolinsky of Weil Gotshal & Manges for the debtors.  As usual,

14   we have a long calendar but we have tried to make it as user

15   friendly as possible.  I do think that we can run through most

16   of the calendar fairly quickly.  I have no objection and that

17   actually makes sense to move the dealer motion to the end.  I

18   think that may be the only matter other than the fee requests

19   that will take a substantial amount of time.

20           With respect to --

21           THE COURT:  Pause, please, Mr. Smolinsky.  Based on

22   your dialogues and other professionals' dialogues, are we going

23   to have as long a session of argument on the fee apps that we

24   had the last two times?

25           MR. SMOLINSKY:  I don't think so, Your Honor.  We

Page 27

1    have twenty fee applications on today.  All matters, as I

2    understand it, are resolved except with respect to four.  With

3    respect to those four, there are only two issues that remain at

4    issue in this hearing.  The first is the fee rate issue.  And

5    the second is the ability of law firms to be compensated for

6    defending their fee application.  So I don't expect oral

7    argument on those two issues to be that lengthy unless Your

8    Honor has specific extensive questions.

9           THE COURT:  Go ahead then in accordance with your

10   recommendation.

11          MR. SMOLINSKY:  Okay.  Maybe what would make sense

12   because we have a number of people here from the Bryant class

13   action to tackle that matter first so that those people can

14   leave.  That matter was initially scheduled for 8:45 this

15   morning.  And then --

16          THE COURT:  Did you say 8:45?

17          MR. SMOLINSKY:  It was, Your Honor.  And then

18   chambers notified us that they wanted the hearing at 9:45 and

19   we filed an amended agenda in that regard.

20       (Pause)

21          MR. SMOLINSKY:  Your Honor, this motion which appears

22   as the first uncontested matter seeks final approval of a

23   settlement with the Bryant class action claimants.  This matter

24   concerns a nationwide class action based on allegedly defective

25   parking brakes which were found in the 1999 to 2002 GMC and

09-50026-mg   Doc 7598   Filed 10/27/10   Entered 10/28/10 15:28:30   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 28 of 182

Page 28

1    Chevrolet pickups and SUVs.

2            The action was originally pending in the state court

3    of Arkansas and was transferred to this court and follows

4    lengthy litigation on class litigation on class action

5    certification.  We were before Your Honor on August 6th, 2010

6    to request preliminary approval of the settlement agreement and

7    to schedule a fairness hearing.  As Your Honor may recall, on

8    August 9th, 2010, the Court entered an order approving the

9    settlement preliminarily and setting today as the fairness

10   hearing.

11           Since that time and in accordance with the

12   preliminary order, Bryant and the provisionally designated

13   class counsel published a notice three times on August 31st,

14   September 1st and September 2nd in the USA Today on one-

15   sixteenth of a page a summary form of notice which was attached

16   to the preliminary order.  We have attached copies with the

17   declaration of Jeffrey Dahl (ph.) which is attached to the

18   debtors' brief in support of the settlement as Exhibit B.  The

19   full settlement agreement, mailed notice and the reimbursement

20   claim forms were also posted on a website,

21   www.parkingbrakeclasssettlement.com and a 1-800 number was

22   established for parties interested in the settlement agreement

23   to order a copy of the full settlement agreement, the mailed

24   notice and copies of claim forms.

25           In addition to notice of publication, Garden City

Page 29

1  Group, together with MLC, also sent direct mail notices of the

2  settlement to each potential Bryant class action members.  You

3  may recall, Your Honor, that we had a list of approximately

4  6,000 potential claimants that were received from the records

5  of New GM and that is the list that we used to mail notice of

6  the settlement and the claims form.

7        Both forms of notice advised the absent class members

8  of their ability to opt out of the settlement and their ability

9  to file objections to the hearing today.  To date, no

10  objections have been received and we have had a steady flow of

11  claim forms coming in under the procedures that were

12  established.  So now today, we request entry of a judgment

13  finally approving the settlement, finally certifying the class

14  counsel as a class and upholding the Court's approval of the

15  notice that were established in the preliminary order.

16        The underlying settlement contemplates a one billion

17  dollar claim being reduced and allowed in the amount twelve

18  million dollars.

19        THE COURT:  Mr. Smolinsky, did we lose our microphone

20  or did you just drift a little.

21        MR. SMOLINSKY:  I may have stepped away.

22        THE COURT:  Okay.  Keep going, please.

23        MR. SMOLINSKY:  Again, Your Honor, the initial claim

24  was filed in the amount of one billion dollars.  The settlement

25  was for an allowed claim in the amount of twelve million

Page 30

1    dollars.  The creditors' committee played an active role in the

2    negotiation of the settlement and fully supports approval.

3            The Court should also approve the settlement pursuant

4    to Rule 23(e) of the Federal Rules of Civil Procedure because

5    the settlement agreement is procedurally fair, reasonable,

6    adequate and not the product of collusion.  Rather, the

7    settlement agreement is the product of extensive arm's length

8    negotiations conducted by experienced counsel with input from

9    the parties.  Just for the record, Your Honor, the settlement

10   is substantially fair.  In that regard, all the factors set

11   forth in City of Detroit v. Grinnell, 495 F.2d 448, which

12   provides the analytical framework for evaluating substantial

13   fairness of a class action settlement weigh in favor of final

14   approval.  Litigation through trial would be complex, expensive

15   and long.

16           Second, the settlement classes' reaction to the

17   settlement agreement was positive.  No settlement class member

18   objected to the settlement agreement or requested exclusion.

19           Third, the parties have completed enough discovery to

20   recommend settlement.  The pertinent question is whether

21   counsel had an adequate appreciation of the merits of the case

22   before negotiating.  The parties engaged in aggressive

23   discovery efforts obtaining voluminous amounts of documents and

24   taking over ten depositions.  The resulting discovery allowed

25   them to evaluate their strengths and weaknesses of their case.

09-50026-mg    Doc 7598    Filed 10/27/10    Entered 10/28/10 15:28:30    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 31 of 182

Page 31

1          Next, the risk of establishing liability and damages

2     further weighs in favor of final approval.  There's also a risk

3     of maintaining class status throughout the trial.  If this

4     settlement was not approved, the debtors would likely be before

5     Your Honor trying to decertify the class.  And, of course,

6     there are risks attendant to that litigation.

7          Finally, Your Honor, the value of litigating is

8     called into question simply given the debtors' bankruptcy.  As

9     with a lot of litigation claims here, the risk of bankruptcy

10    and the cents on the dollar aspect creates a positive impetus

11    towards settlement.

12         So based on the foregoing and for the reasons set

13    forth in the Court's preliminary order, including the Court's

14    specific finding at the time that the settlement agreement is

15    in the best interest of the debtors, their estates, creditors

16    and all parties in interest, including as to all members of the

17    class, we ask that the Court approve the settlement not only

18    under Rule 9019 of the bankruptcy rules but also Rule 23 of the

19    federal rules.

20         Your Honor, in the preliminary order, we set out --

21    and in the motion, of course, we set out the fees that are

22    going to be paid to class action counsel.  That also is part of

23    the settlement here today.  Class counsel is here to answer any

24    questions on the fees.  But the way it works is that they get

25    the greater of a claim for four million dollars or thirty-three

09-50026-mg   Doc 7598   Filed 10/27/10   Entered 10/28/10 15:28:30   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 32 of 182

Page 32

```
 1    percent of the total amount of the claim or four million

 2    dollars in cash, whichever is higher, but they're not entitled

 3    to get more than thirty-three percent of the claim unless the

 4    claims come in such that there's excess value  So all claims

 5    would have to be satisfied in full before they can get more

 6    than the thirty-three percent of the claim amount.  That's

 7    consistent with the contingency fee agreement that was entered

 8    into and approved by the Arkansas court.

 9            I think that's it, Your Honor, unless you have any

10    questions.  There was one change to the final judgment.  We had

11    estimated an expense reimbursement number for noticing out of,

12    I think, 295,000.  That number's been reduced to 279,000 and

13    that's been reflected in a revised judgment that would be

14    submitted to your Court for consideration.

15            THE COURT:  Okay.  I have no objections.  However, I

16    will permit counsel for either of the two official committees

17    or class counsel to be heard if any wants to be.  I see no

18    interest in that.

19            All right.  Because this matter is unopposed, I'm not

20    going to make extensive findings.  A settlement of this type,

21    like a few others that I've been called to deal with in my

22    other bag of cases over the last six months, requires me to

23    make findings of two different types.  One of them is the

24    classic 9019 inquiry which has as its underlying premise me

25    satisfying myself that the estate isn't giving away the store.
```

1          Additionally, as I've had to do in certain

2     environmental settlements and other class action settlements,

3     I'm called upon to make a different kind of inquiry analogous

4     to that which district judges frequently make to satisfy myself

5     that the settlement is fair to the class from the plaintiff's

6     perspective.

7          In this case, I can and do find that it's within the

8     range of reasonableness and is substantively fair to both sides

9     for the reasons that Mr. Smolinsky articulated.  Accordingly,

10    Mr. Smolinsky, you or your designee -- you can enlist class

11    counsel if you wish -- are to provide me with the paperwork to

12    reflect my approval from both points of view.

13          MR. SMOLINSKY:  Thank you, Your Honor.  We will.

14    Next, Your Honor, maybe we can go back to the uncontested -- I

15    mean, to the contested matters and handle the Walter Lawrence

16    motion seeking to hold the district court judge from the Middle

17    District of Florida in contempt -- criminal contempt, I

18    believe, for violating the stay.

19          Your Honor, we filed responsive pleadings not because

20    we were the target of the motion but because justice screamed

21    out for us to do so.  I don't know if Mr. Lawrence is here in

22    person or on the phone to present his motion.

23          THE COURT:  Is Mr. Lawrence in the courtroom?  Mr.

24    Lawrence, you on the phone?

25          MR. LAWRENCE (TELEPHONICALLY):  This is Mr. Lawrence.

09-50026-mg    Doc 7598    Filed 10/27/10    Entered 10/28/10 15:28:30    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 34 of 182

Page 34

1          THE COURT:  Okay.  Mr. Lawrence, I read your brief.

2     Do you want to supplement it in any way?

3          MR. LAWRENCE:  Excuse me, Your Honor?

4          THE COURT:  Do you want to supplement your brief?

5          MR. LAWRENCE:  In regards to the contempt of court?

6          THE COURT:  Yes.

7          MR. LAWRENCE:  Yes.  I'd like to supplement it with

8     just one quick thing, if I may, Your Honor.  In regards to

9     Judge Hodges' order of September 21st, counsel for the other

10    side has stated -- he's bifurcated his ruling -- Judge Hodges'

11    rulings into two parts.

12         THE COURT:  Would you pause, please?

13         MR. LAWRENCE:  As --

14         THE COURT:  Please, Mr. Lawrence.  Just a minute.

15         (Pause)

16         MR. LAWRENCE:  Excuse me?

17         THE COURT:  Just a minute, please, Mr. Lawrence.

18         MR. LAWRENCE:  Oh, okay.  Thank you.

19         THE COURT:  Do you have the copy that I had

20    underlined and highlighted?  Hmm?  Yeah.  Go ahead.

21         All right.  Go ahead, Mr. Lawrence.

22         MR. LAWRENCE:  Okay.  I'm directing the Court's

23    attention to page 31 of Judge Hodges' order where he states "I

24    want them to" -- he bifurcates the defendants into two groups.

25    And -- but then he makes rulings on items (3), (4), (6), (7),

Page 35

1    (8), (9), (10), (11), (12), (13), (14), (15) and (16) where he

2    does not bifurcate the groups into -- the pension plan and

3    General Motors.  For example, number (5) -- excuse me -- number

4    (7), for example -- item (7):  "Defendants' Motion to Strike

5    Plaintiff's Motion for the Court to Take Judicial Notice is

6    DENIED AS MOOT".  And now, he applies that to the defendants

7    which means, if you look at the caption on the case, the

8    defendants are General Motors and the Pension Plan.  So in

9    regards to items (3), (4), (6), (7), (8), (9), (10), (11),

10   (12), (13), (14), (15) and (16), are all violations of the

11   automatic stay and that because he does not bifurcate.  He just

12   deals with the parties generically as plaintiffs and

13   defendants.  And so, he knew that there had to be a bifurcation

14   between the two because he did that in items (1) and (2) and

15   items (4) (sic) where he said, for example, on item (1):

16   "Plaintiff's Motion for Summary Judgment is DENIED as to

17   Defendant General Motors Hourly-Rate Employees Pension Plan".

18   And he does the same thing on item (2) and (4) (sic).  But all

19   the other items, he doesn't bifurcate them.

20            It's my position that because he has made a ruling as

21   to Defendant General Motors and Defendant Pension Plan that the

22   ruling in regards to Defendant General Motors is in violation

23   of the automatic stay.  And what I'm asking the Court

24   specifically to do is to either certify this matter to the

25   district court as to the civil side of it; and then on the

Page 36

1    criminal side, refer this matter to the appropriate U.S.

2    attorney's office for his or her consideration as to criminal

3    contempt of court under 18 U.S.C. 401.

4           In regards to my objections on omnibus number 82, and

5    in the interest of brevity and the Court's time, I'll stand on

6    my documents as filed.

7           THE COURT:  Okay.  Mr. Smolinsky, you may respond if

8    you wish.

9           MR. SMOLINSKY:  Your Honor, I think what the Court in

10   Florida did was made factual findings that were necessary in

11   order to reach the decision that there was no liability by the

12   GM Pension Plan which is a separate entity.  And I don't think

13   that the findings of fact necessarily spill over to General

14   Motors Corporation as --

15          MR. LAWRENCE:  Excuse me, Your Honor.  I can hardly

16   hear counsel.

17          MR. SMOLINSKY:  I'm sorry and I apologize.  I'm a

18   little under the weather today so it's a little bit more

19   difficult for me.

20          But I was saying that we read the decision carefully.

21   We believe that the findings of fact made by the Court in

22   Florida support the ruling as against the GM Pension Plan,

23   which is a separate legal entity from MLC.  We obviously are

24   very cognizant of the automatic stay and the importance to the

25   debtors but we think that the decision doesn't even -- doesn't

09-50026-mg   Doc 7598   Filed 10/27/10   Entered 10/28/10 15:28:30   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 37 of 182

Page 37

1    touch upon a violation of the stay and, certainly, is not

2    subject to this Court's contempt -- criminal contempt which the

3    Courts have found relate to actions that occur in front of the

4    judge's view.  I think that Mr. Lawrence's source of remedy

5    here is to go back to Florida and to appeal the decision of the

6    district court, not to come in to this court.

7         THE COURT:  All right.  Thank you.  Mr. Lawrence, any

8    reply limited to what Mr. Smolinsky said?

9         MR. LAWRENCE:  Yes.  Thanks but no thanks, counsel,

10   to the invitation because if I were to file a notice of appeal,

11   and I think that's what you're hoping would happen but I'm not

12   going to do it, I'd be in the same boat right now as Judge

13   Hodges.  I'd be looking at a criminal charge, possible criminal

14   prosecution under 18 U.S.C. 401.  And that I'm not going to do.

15   Thanks anyways.

16        THE COURT:  All right.  Folks, because this matter is

17   so straightforward -- can you hear okay, Mr. Lawrence, because

18   I'm having problems with the microphones in my courtroom.

19        MR. LAWRENCE:  I can hear you now.  Thank you, Your

20   Honor.

21        THE COURT:  All right.  Because this matter is so

22   straightforward, I'm not going to make lengthy findings.  By

23   entering the order that the Florida Court, the Florida Court

24   did it exactly by the book, did it exactly right.  The case law

25   is clear that the automatic stay does not stay proceedings

Page 38

1   against co-defendants.  See, for example, decisions by Judge

2   Weinfeld and by the Second Circuit in Teachers' Insurance v.

3   Butler.

4          Moreover, the Florida Court didn't violate the

5   automatic stay as to our debtor, Motors Liquidation Company,

6   because the Florida Court stated that the dismissal was subject

7   to the right of any party to move to reopen the case upon a

8   showing that the bankruptcy stay had been lifted or for other

9   cause shown.

10          In other words, the Florida district court did it

11   exactly the way the Court is supposed to.  Therefore, although

12   I also agree with the debtors' point that parties other than

13   the debtor or a bankruptcy trustee don't have standing to

14   complain of violations of the automatic stay, even if I were to

15   assume arguendo that there were standing, I would issue the

16   same two rulings on the merits that I just issued.

17          Accordingly, I determine that there was no violation

18   of the stay and that the Florida Court's rulings vis-à-vis the

19   nondebtor with respect to whom the Florida Court ruled were

20   entirely appropriate and proper.  Debtors are to settle an

21   order in accordance with the foregoing.  Since Mr. Lawrence

22   isn't present in the courtroom, you're to do it on -- give him

23   a full two weeks notice of settlement.  Mr. Lawrence, your time

24   to appeal from my ruling will run from the time of the entry of

25   the resulting order and not from the time of this dictated

Page 39

1    decision.  And whether or not you choose to take any action in

2    the Eleventh Circuit is for you to decide and I express no view

3    on that subject.

4            Mr. Smolinsky, next matter, please.  Mr. Lawrence,

5    you may either stay on the phone or drop off as you prefer.

6            MR. LAWRENCE:  Can I ask just one other thing, Your

7    Honor --

8            THE COURT:  I can't give you legal advice but it --

9            MR. LAWRENCE:  -- because --

10           THE COURT:  No.  Time out, Mr. Lawrence.  You can't

11   speak over me.  As I was saying, I can't give you legal advice

12   but if you wish to ask a question of a procedural character,

13   you may.

14           MR. LAWRENCE:  I'm just concerned about my pending

15   appeal.  Are you going to rule on this omnibus now or are you

16   going to let that stay until appeal is final?

17           THE COURT:  Which appeal is that, sir?

18           MR. LAWRENCE:  Excuse me?

19           THE COURT:  Which appeal?

20           MR. LAWRENCE:  I only have one appeal.

21           THE COURT:  I can't --

22           MR. LAWRENCE:  And that was your order.

23           THE COURT:  Well, I can't -- I can't take an appeal

24   of my own order, sir.

25           MR. LAWRENCE:  I'm not asking you to take an appeal.

MOTORS LIQUIDATION COMPANY, et al.

Page 40

1    I'm asking you are you going to stay your hand because --

2    become divested of jurisdiction because it's on appeal, the

3    matter.

4            THE COURT:  I just ruled as I said I'm ruling.  If

5    you have a separate matter in the district court, I'm not going

6    to tell the district courts in this district what to do.  And

7    if you have a pending -- if you have a pending appeal, as I

8    sense you do -- one of the problems is that when things go up

9    on appeal, we're not always currently briefed on their status.

10   But if you have an appeal before the district court, whatever

11   happens there is not anything I would be interfering with.  And

12   if the district courts issue a ruling that tells me what to do,

13   of course I'm going to comply.

14           MR. LAWRENCE:  Thank you for your time, sir.

15           THE COURT:  Very well.  Have a good day.

16           MR. LAWRENCE:  You, too, sir.

17           THE COURT:  Okay.  Mr. Smolinsky, back to you.

18           MR. SMOLINSKY:  Thank you, Your Honor.  I think other

19   than the fee applications, we only have one other contested

20   matter.  And I consider this a group.

21           We had filed, as Your Honor knows, omnibus objections

22   to over 18,000 bondholder claims on the basis that they were

23   already allowed by virtue of the claims that we allowed in the

24   name of Wilmington Trust Company.  When we filed the many

25   motions seeking to expunge those 18,000 plus claims, we

Page 41

1    received various phone calls and letters and informal

2    objections.  We were very successful in reaching out to those

3    parties and to explain to them what it was that we were trying

4    to achieve.  And all of those objections went away but for six.

5    And those six remain.  We adjourned the motion with respect to

6    those six objections and we want Your Honor to hear them today.

7             We believe that all six of these objections are

8    really objections dealing with their lack of happiness about

9    the fact that they've lost money in connection with the bonds

10   rather than a substantive objection to the relief requested.

11   These six parties either didn't respond to our phone calls and

12   letters or refused to discuss it outside of the court context.

13            Your Honor, the six objections are from Dr. Helga

14   Harm, Francis Caterina, Marianne Lisenko, Miguel Villalobos,

15   Nick Zonas -- Nick and Diane Zonas and Sharyn Weinstein.  I

16   think our papers are very clear as to what we were trying to

17   achieve and the basis for the relief requested.  And, Your

18   Honor, you've seen the objections and to the extent that these

19   bondholders are here, they can speak as to their specific

20   issues.

21            THE COURT:  Okay.  Are there such bondholders who

22   would like to be heard?  Would -- sir, would you please stand

23   where Mr. Smolinsky is standing and take control of the

24   microphone, please, and I'll hear you.

25            MR. CATERINA:  Thank you, Your Honor.  Our argument

09-50026-mg   Doc 7598   Filed 10/27/10   Entered 10/28/10 15:28:30   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 42 of 182

Page 42

```
 1    is --

 2              THE COURT:  Well, before you begin, tell us your name

 3    so that --

 4              MR. CATERINA:  I understand.

 5              THE COURT:  -- when we make a transcript --

 6              MR. CATERINA:  I understand.

 7              THE COURT:  -- we know who spoke.  And you may

 8    proceed.

 9              MR. CATERINA:  I am Joseph R. Caterina and I'm here

10    on behalf of my wife, Francis H. Caterina.  And I think she's

11    omnibus number 49?  Is that correct?

12              Ours is a simple argument, Your Honor.  We filed a

13    claim like all the other people and we litigated the claim as

14    best we could.  And then they made an omnibus motion to expunge

15    all the claims.

16              THE COURT:  Pause, please, Mr. Caterina.  Am I right

17    that your wife is a bondholder?

18              MR. CATERINA:  That's correct.

19              THE COURT:  Continue, please.

20              MR. CATERINA:  I'm sorry.  So we opposed this motion

21    because we feel as if it's denying us our due process.  We had

22    two phone calls from the law offices and the last phone call

23    they ended with "What do you want to settle?"  So I came to

24    court last month not knowing that the case was canceled and I

25    filed my wife's authorization for settlement.  And then General
```

MOTORS LIQUIDATION COMPANY, et al.

Page 43

1    Motors opposed everything that we did.

2         There's a uniqueness in our claim inasmuch as that we

3    don't think that anybody can expunge everybody's due process by

4    motion and it seems as if they want the Court to do this for

5    them.  The best I could find out was under 18 U.S.C. 241 and 18

6    U.S.C. 242 not being addressed to the various people of

7    different colors and ethnic background but being addressed

8    solely to the fact that under those laws citizens are protected

9    from being denied due process.  And General Motors is very

10   adamant on stopping everybody's due process and proceeding with

11   their motion.  And we object to that.

12        THE COURT:  Okay.  Fair enough.  Mr. Smolinsky, you

13   may respond if you wish.  It's up to you.

14        MR. CATERINA:  Your Honor, I filed a rebuttal this

15   morning down in the clerk's office.

16        THE COURT:  Well, forgive me, Mr. Caterina, but --

17        MR. CATERINA:  I'm sorry --

18        THE COURT:  -- I have case management orders.  I

19   can't take papers --

20        MR. CATERINA:  I understand.

21        THE COURT:  -- filed on the morning of arguments.  I

22   think I understand the issues.

23        MR. CATERINA:  All right.  Thank you.

24        THE COURT:  And --

25        MR. CATERINA:  Am I finished or --

MOTORS LIQUIDATION COMPANY, et al.

Page 44

 1          THE COURT:  If you have any additional points that

 2     you didn't make in your objection --

 3          MR. CATERINA:  Yes.

 4          THE COURT:  -- yes.

 5          MR. CATERINA:  Under Miranda, Miranda states that "No

 6     rule or legislation can abrogate said rights" referring to

 7     constitutional rights.  We noticed in the 363 transaction under

 8     which this whole bankruptcy operated that we were denied the

 9     right to trial by a jury as per the rules of that procedure.

10     And we -- when we filed our original claim -- they're only one-

11     pagers -- we reserved all our rights under Uniform Commercial

12     Code because under the Uniform Commercial Code, you will find

13     preserved your right to trial by a jury.  So we questioned

14     whether or not the 363 transaction is in violation of Miranda's

15     noted decision that no rule or legislation can abrogate said

16     rights and that legislation did just that.  Then, by virtue of

17     their motion to expunge everybody's due process, we believe

18     that they're violating 18 U.S.C. 241 and 242.

19          So therefore, we feel as if as a bondholder we

20     preserved our rights under the Uniform Commercial Code.  And in

21     the Uniform Commercial Code, we don't have these problematic

22     issues on constitutionality of what's being done and what's not

23     being done.  In addition of that, under the Uniform Commercial

24     Code, bondholders are secured investors.  However, they

25     rebutted by saying that the bondholders are not secured

Page 45

1    investors.

2            Other than that, I don't want to belabor you in my

3    enthusiasm for this argument.

4            THE COURT:  All right, folks.  Mr. Smolinsky, if

5    you're willing to waive rebuttal, I'm in a position to rule.

6            MR. SMOLINSKY:  That's fine, Your Honor.

7            THE COURT:  All right.

8            MR. CATERINA:  Should I go --

9            THE COURT:  You can have a seat because I'm about to

10    issue a ruling.  And my ruling is more by way of explanation to

11    you, Mr. Caterina, and to your wife because while I am

12    compelled to and do sustain the debtors' objection, I want to

13    explain it.

14            You, like thousands of other folks, you and your

15    wife, Mr. Caterina, are bondholders.  You have indenture

16    trustees who filed claims on your behalf.  To the extent that

17    Motors Liquidation Company has the resources to do it, it's

18    going to recognize the validity of its bondholders' claims.  We

19    all know that it doesn't have enough value in the estate to

20    make anything more than a modest distribution on the claims.

21    But because there are thousands of bondholders like you, Mr.

22    Caterina -- or you and your wife, we have a system under which

23    indenture trustees go to bat for you when they file a proof of

24    claim on your behalf.  So you don't have a separate right to

25    recover on your bonds but your right to recover on your bonds

MOTORS LIQUIDATION COMPANY, et al.

Page 46

1    has already been respected because your indenture trustee went

2    to bat for you.

3           Now we all recognize that there isn't enough money in

4    the Motors Liquidation estate, as I said, to make more than a

5    modest distribution to bondholders.  But you're already going

6    to get what you're entitled to.  Therefore, since all we're

7    talking about is what is, in substance, a duplicative claim, I

8    don't need to speak to the fact that in bankruptcy you don't

9    have a right to a jury trial, that on unsecured bond issues, I

10   don't need to deal with what Article 9 or other aspects of the

11   Uniform Commercial Code would provide.

12          So therefore, Mr. Smolinsky, you or one of your guys

13   is to submit an order that says in substance that the objection

14   to the claim is sustained but nothing in this order will result

15   in the disallowance of the entitlement of Mr. Caterina or his

16   wife or any of the other people to their entitlements on their

17   bonds as filed by the indenture trustees in this case or words

18   to that effect.

19          MR. SMOLINSKY:  We will, Your Honor.

20          THE COURT:  Very well.  Thank you.

21          MR. CATERINA:  Thank you.

22          THE COURT:  Mr. Caterina, your time to appeal from

23   this ruling, even though hopefully I gave you the peace of mind

24   so that you understand that you don't need to, will run from

25   the time of the resulting order and not from the time of this

09-50026-mg   Doc 7598   Filed 10/27/10   Entered 10/28/10 15:28:30   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 47 of 182

Page 47

1    dictated decision.

2           MR. CATERINA:  I will not appeal, Your Honor.  But

3    I --

4           THE COURT:  If you want to say something, you got to

5    say it into a microphone, please.  But understand that, in

6    substance, you won.  So you may not want to mess with what you

7    got.

8           MR. CATERINA:  These funds are in my wife's IRA

9    account.  In her IRA account, not even Morgan Stanley can

10   settle anything without her written consent.  The trustee has

11   nothing to do with her IRA account.  So how can somebody

12   outside of her IRA account have the authority to make decisions

13   on her financial future?

14          THE COURT:  I'm not sure if that's the legal issue

15   that's before me, Mr. Caterina.

16          MR. CATERINA:  All right.  Thank you for your

17   concern.

18          THE COURT:  Very well.  Have a good day.  Mr.

19   Smolinsky?

20          MR. SMOLINSKY:  Your Honor, one thing to note just

21   for Your Honor's information, we have reviewed the Wilmington

22   Trust stipulation.  And it appears out of the twenty-one and a

23   half billion dollars that there may be approximately fifty

24   million dollars of original issue discount that was included in

25   the calculations.  FTI and the debtors and Wilmington Trust are

09-50026-mg   Doc 7598   Filed 10/27/10   Entered 10/28/10 15:28:30   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 48 of 182

Page 48

1   working on this issue.  And we may before Your Honor with an

2   amended stipulation which would adjust the twenty-one and a

3   half billion dollar claim by no more than fifty million

4   dollars.  We just wanted Your Honor to be aware of that.

5          THE COURT:  You do what you and the others consider

6   appropriate.  And if anybody has a problem with that, I'll give

7   anyone an opportunity to be heard at that time.

8          MR. SMOLINSKY:  Thank you, Your Honor.  With respect

9   to the other five, I don't know -- we should give them an

10  opportunity if they're on the phone to speak.

11         THE COURT:  Is any other bondholder on the phone who

12  wants to be heard?  I guess not.  All right.  My ruling, Mr.

13  Smolinsky, should be deemed to apply to everybody.  Say in baby

14  talk for the peace of mind of the bondholders that it's without

15  prejudice to the entitlements to recover under the proof or

16  proofs of claim that have been filed by the indenture trustees.

17         MR. SMOLINSKY:  We will, Your Honor.  And I believe

18  the orders that we had entered with respect to the others had

19  similar language.  But we'll -

20         THE COURT:  Good enough.  Thank you.

21         MR. SMOLINSKY:  Your Honor, moving to the uncontested

22  matters, item number B on the agenda, this is a motion by Weber

23  Automotive pursuant to Rule 60(b) to reconsider our order with

24  respect to debtors' omnibus objection to claims number 23.

25  This was a motion seeking to expunge claims that were related

1    to contract damages based on the fact that the contracts were

2    assumed and assigned to New GM.  Even though Weber did not

3    respond to that motion and a default was taken, in their motion

4    for reconsideration, they raised the fact that there were

5    certain contracts that were not assumed and assigned to New GM.

6    We went back and researched those issues and, in fact, they're

7    correct.  So we have agreed to a stipulation which allows their

8    claim to be resurrected notwithstanding the order that was

9    entered by the Court subject, of course, to all of our

10   continuing rights to object to that claim during the

11   reconciliation process.  And we'll submit that order to Your

12   Honor.

13             THE COURT:  That's fine.

14             MR. WILKINS (TELEPHONICALLY):  Your Honor, Matthew

15   Wilkins on behalf of Weber Automotive Corporation and Albert

16   Weber GmbH.  We have agreed to the terms of the stipulated

17   order that Mr. Smolinsky wanted entered.

18             THE COURT:  Fair enough, Mr. Wilkins.  Are you about

19   to move on to the next matter, Mr. Smolinsky?

20             MR. SMOLINSKY:  Yes, Your Honor.  Mr. Wilkins, you

21   can choose.  You can either stay on the call or you can drop

22   off, whichever you prefer.

23             MR. WILKINS:  I'll drop off and I appreciate being

24   able to appear by telephone.

25             THE COURT:  No problem.

09-50026-mg   Doc 7598   Filed 10/27/10   Entered 10/28/10 15:28:30   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 50 of 182

Page 50

 1          MR. WILKINS:  Thank you.

 2          MR. SMOLINSKY:  Your Honor, the rest of the agenda

 3    other than the fee applications relate to claim objections,

 4    omnibus claim objections filed by the debtors.  It's a

 5    combination of claim objections that were on the calendar

 6    before that we've continued to try to resolve as well as

 7    omnibus claims motions 85 to 108 which are new motions.

 8          As we have been trying to make it easier on Your

 9    Honor, we have attached to the agenda a schedule of those

10    claims that were not seeking relief with respect to today

11    either because we've decided to withdraw the motion after

12    receiving additional information or we've agreed to adjourn to

13    continue our discussions.  And unless anyone wants to be heard

14    with respect to that, we would suggest that we simply submit

15    orders for those parties who did not respond to the motion and

16    to address the other claims as identified on the schedule to

17    the agenda.

18          THE COURT:  Fair enough.  Anybody in the courtroom

19    who wants to be heard given what Mr. Smolinsky just said?  No

20    response.  Anybody on the phone who wants to be heard given

21    what Mr. Smolinsky said?

22          MS. MEYER (TELEPHONICALLY):  My name is Patricia

23    Meyer.  And I'm not sure that I applied to work this motion in

24    at the present time.  My name is Patricia Meyer and my i.d. is

25    317595.  And the case number is, of course, 09-50026.  I filed

09-50026-mg   Doc 7598   Filed 10/27/10   Entered 10/28/10 15:28:30   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 51 of 182

Page 51

1    an omnibus claim against the Liquidation Motors (sic) and that

2    GM was never held accountable for -- in the amount paid.

3    Number  one --

4              THE COURT:  Pause, please, Mr. Meyer (sic).  What was

5    your claim for again?

6              MS. MEYER:  For an omnibus objection against

7    reservation orders.  And my name is Patricia Meyer --

8              THE COURT:  Well, I heard your name.  But even though

9    you repeated it, either because of the phone or my lack of

10   understanding, I didn't get the substance of what your claim is

11   for.

12             MS. MEYER:  It's against the debtor, Motors

13   Liquidation Corporation.

14             THE COURT:  Well, I understand that.  But what --

15             MS. MEYER:  It's for recovery --

16             THE COURT:  What is the nature of the debt?

17             MS. MEYER:  Recovery.  Fines for the indemnification

18   in what we have done to prove what we have above General Motors

19   Corporation and the bankruptcy.

20             THE COURT:  What kind of investigation?  What kind of

21   recovery?  I lost you.

22             MS. MEYER:  It would be a personal recovery for the

23   cost of our indemnification and what we have done with the

24   government agencies and trying to work with General Motors

25   through the path --

Page 52

 1          THE COURT:  You mean, you want to be paid for having

 2    the government investigating General Motors?

 3          MS. MEYER:  No, sir.  We took our claims to the

 4    government and to federal agencies and we have been in the

 5    courtroom before with General Motors.  And so I filed an

 6    omnibus claim and wanted to bring it before you.  And when he

 7    said that some of these issues are not cleared up, they may not

 8    be.  I am coming before you as Patricia Meyer, a person who was

 9    -- who activated all the investigations.

10          THE COURT:  Mr. Smolinsky, is that a claim that you

11    want me to deal with today?

12          MR. SMOLINSKY:  No, Your Honor.  If I recall, this

13    claim arises out of a whistleblower claim that Ms. Meyer has

14    been trying to assert before the government with no success for

15    several years.  I don't believe that it's the subject of the

16    motions that are on today.  We will double check.  And if Ms.

17    Meyers (sic) wants her day in court with respect to her claim,

18    we'll provide her with that opportunity.

19          THE COURT:  Fair enough.  All right.  Ms. Meyer, do

20    you understand what Mr. Smolinsky just said?

21          MS. MEYER:  Yes.  Do I deal with the Court for my --

22    just asking -- or do I have to deal with Mr. Smolinsky to put

23    me on a time for a court hearing?

24          THE COURT:  Well, for scheduling, I would appreciate

25    it if you coordinated with Mr. Smolinsky or one of his guys.

Page 53

1    If you agree to disagree on whether you have a claim,

2    ultimately, the decision as to whether it's a good claim or not

3    will be mine.  And --

4              MS. MEYER:  All right.  And --

5              THE COURT:  -- you'll have your day in court as Mr.

6    Smolinsky said.

7              MS. MEYER:  That is fair, Your Honor.  And that's

8    what we need.  Thank you.

9              THE COURT:  Very well.  Okay.

10             MS. MEYER:  I'll be looking for -- do I contact them?

11   Is that my -- that's what I have to do now?

12             THE COURT:  What I would suggest is that since I

13   suspect it's going to be a busy day today, over the next few

14   days arrange with somebody at Mr. Smolinsky's firm or if they

15   haven't -- maybe it would be easier if they detail somebody who

16   they would like to deal with you and talk about what to do --

17             MS. MEYER:  That would be --

18             THE COURT:  -- what to do next.  I'm not making any

19   substantive rulings today.

20             MS. MEYER:  Thank you very much, Your Honor.

21             THE COURT:  Okay.

22             MS. MEYER:  I'll be looking forward to working with

23   their firm.

24             THE COURT:  Very well.  Ms. Meyer, you may be excused

25   from the call if you wish.

Page 54

```
 1              MS. MEYER:  Thank you, Your Honor.

 2              THE COURT:  Okay.  Next, Mr. Smolinsky?  Or if -- was

 3    that the only person who spoke up when we invited people on the

 4    phone to speak up?  Anybody else on the phone who wants to be

 5    heard?  The record will reflect no response.  Okay.

 6              Your motion is, to the extent you wanted to push it

 7    against non-responders, is granted or, I guess more

 8    technically, your objections are sustained for the

 9    nonobjectors.  They're continued for those who you said would

10    be continued including Ms. Meyer.

11              MR. SMOLINSKY:  Thank you, Your Honor.

12              THE COURT:  Okay.

13              MR. SMOLINSKY:  I think, as promised, that leaves the

14    fee applications as the last matter to address today.

15              THE COURT:  Okay.  What's your recommendation --

16              MR. SMOLINSKY:  How would Your Honor like to proceed?

17              THE COURT:  -- as to how you want to proceed on that?

18              MR. SMOLINSKY:  Perhaps we should start with the fee

19    examiner who can give an update on where --

20              THE COURT:  All right.  I see Mr. Wilkinson (sic)

21    coming up -- good morning, Mr. Wilkinson.  I said Wilkinson.  I

22    meant Williamson.  I apologize.  I'm tired, Mr. Williamson.

23              MR. WILLIAMSON:  Good morning, Your Honor.  Thank

24    you.  Brady Williamson, the fee examiner in this proceeding.

25    My colleagues from Godfrey & Kahn are on the telephone if their
```

09-50026-mg   Doc 7598   Filed 10/27/10   Entered 10/28/10 15:28:30   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 55 of 182

Page 55

1    involvement is needed.

2         Your Honor, the Court has before it twenty

3    applications totaling approximately fifteen million dollars.

4    We believe that we have resolved all but five.  And with one

5    exception, we further believe that those five turn on the two

6    issues that we've highlighted for the Court in the summary that

7    we filed.  Those two issues, of course, being the question of

8    hourly rate increases during the term of the case.  And the

9    second issue being the question of to what extent should

10   professionals be compensated for dealing with the U.S. trustee

11   and with the fee examiner on issues involving fees.  And I

12   think we've come to an agreement that using the shorthand "fees

13   on fees" is a good way to describe that second issue.

14        Our memorandum to the Court outlined the case law on

15   both of these issues.  I think particularly with respect to the

16   question of fees on fees, Your Honor, Professor Resnick and

17   Henry Sommer tell us in their volume that there was a split of

18   authority.  There is indeed a split of authority.  I think it

19   reflects a tension between avoiding dilution of the

20   professionals' work and their hourly compensation, on the one

21   hand, and incentive or disincentive for preparing fee

22   applications that comply with the letter and the spirit of the

23   law.  And that tension, I think, whether you agree with Judge

24   Bernstein in Brous, B-R-O-U-S, or whether you agree with Judge

25   Cudahy in In re Smith, that tension permeates the issue.

09-50026-mg   Doc 7598   Filed 10/27/10   Entered 10/28/10 15:28:30   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 56 of 182

Page 56

1        With respect to hourly rate increases during the term

2    of this proceeding, or, for that matter, any other, in our

3    report, Your Honor, we do not recommend a deduction of those.

4    But what we do ask is, both retrospectively and prospectively,

5    that the Court ask that professionals when they impose an

6    hourly rate increase for associates, partners,

7    paraprofessionals, that they provide, at a minimum, notice and

8    an affidavit so that if an objection were warranted it could be

9    lodged.  We note that this Court in other cases has imposed

10   that requirement at the outset of the case.  It was not imposed

11   at the outset of the case here.  But we think given the

12   magnitude of the amounts involved, in simply in the hourly rate

13   increases for lawyer X, an increase from 450 dollars an hour to

14   525 dollars an hour, that kind of hourly rate increase can

15   amount to real money.  In this fee period, we think it's about

16   650,000 dollars attributable solely to the delta, the

17   differential between an hourly rate in the preceding fee period

18   and in this fee period.

19        So, in the first two cycles, Your Honor, we talked a

20   lot about trees and forests.  I think it's good news that we're

21   here primarily this morning to talk about the forest, that

22   being those two issues.  Let me also note that there are tree

23   issues involving both the debtors' counsel and the committee

24   counsel.  But I really do think that we can those to the extent

25   they haven't already been resolved.

09-50026-mg   Doc 7598   Filed 10/27/10   Entered 10/28/10 15:28:30   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 57 of 182

Page 57

```
 1              THE COURT:  Pause, please, Mr. Williamson.  And if

 2      I'm going to embarrass myself, I'll do it in front of a full

 3      courtroom.  I spent all my time today preparing on the New GM

 4      issues with its dealers and on the rulings that I had issued

 5      yesterday in Chemtura and on the stuff I did last week on

 6      Chemtura and several of my other big cases.  I'm underprepared

 7      on the legal issue as to the split in the authorities on the

 8      fees on fees issue although I'm generally aware of it.

 9              What I'm not aware of, and I need your help and any

10      opponent's help, is on the extent to which there is authority

11      in this district -- because, as I've said a zillion times, I

12      follow the opinions of other judges in my district except in

13      cases of manifest error because I think that predictability in

14      this district is of such great importance.  I think you said

15      there was a ruling on this by Judge Bernstein.  And I think you

16      also said there's a split in authority as Collier recognizes --

17      either Collier or -- you said Professor Resnick and I don't

18      know if that's separate or it's just in Collier.

19              But what --

20              MR. WILLIAMSON:  He's the new --

21              THE COURT:  I'm sorry?

22              MR. WILLIAMSON:  Excuse me.  He's the new editor of

23      Colliers.  I was --

24              THE COURT:  Right.  I know him.  What is the

25      authority in the Southern District of New York on this issue?
```

09-50026-mg    Doc 7598    Filed 10/27/10    Entered 10/28/10 15:28:30    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 58 of 182

Page 58

1          MR. WILLIAMSON:  The two most recent and two most

2     significant cases, we believe, were both written and issued by

3     Judge Bernstein.  The most --

4          THE COURT:  By Judge Stu Bernstein upstairs?

5          MR. WILLIAMSON:  Yes, sir.

6          THE COURT:  Keep going.

7          MR. WILLIAMSON:  The most recent on August 24th of

8     this year, In re CCT Communications.  And it's cited in our

9     papers and also in the papers filed by debtors' counsel and

10    committee counsel.  And then three years ago, another decision

11    by Judge Bernstein, In re Brous, B-R-O-U-S, and again cited in

12    the papers that the Court has before it.  And I think it's fair

13    in the interest of candor to say that the two cases are not

14    automatically reconcilable because in one, CCT, the most

15    recent, Judge Brous -- excuse me -- Judge Bernstein allowed --

16    permitted an award of fees for contesting, defending, whatever

17    the right word is, a fee application against an objection.  In

18    re Brous, four years earlier, 2007 case, it was a Chapter 7 --

19    that may have some significance.  Judge Bernstein denied the

20    same request for fees on fees.

21          THE COURT:  Pause.  Did any one of these -- because

22    it tends to boost admin expenses, tends to gore the ox of the

23    remaining creditors like the unsecured community.  Were there

24    any particular facts in either Brous or CCT, which I assume was

25    an 11, that would cause that to be unusually a matter of

1    concern?

2           MR. WILLIAMSON:  CCT was a Chapter 11.  It was a

3    final fee application.  And I think the Court felt that since

4    the counsel had substantially prevailed -- I believe that's a

5    magic phrase, "substantially prevailed" -- that the fees should

6    be permitted.  And that's -- in that same case, by the way,

7    Judge Bernstein was quite, I think, forceful in saying that the

8    review and editing of time records is not compensable which --

9           THE COURT:  Well, I already ruled on that --

10          MR. WILLIAMSON:  You did.

11          THE COURT:  -- in one of the earlier cycles, if I

12   recall.  Okay.  And I'm going to ask the question first of you,

13   Mr. Williamson and I'm going to ask it of whoever has a

14   different view of the world than you.  Would you prefer that I

15   rule on it based upon my general knowledge of the area or would

16   you prefer that I defer ruling until I've been able to read CCT

17   and Brous and any other authorities that people think are

18   particularly relevant?

19          MR. WILLIAMSON:  I would prefer that on the question

20   of fees on fees, Your Honor, that you defer ruling because I

21   think the issue is quite significant.  And over the course of

22   this case and others, has a significant financial impact.  So

23   that would be my preference.  And I think between debtors'

24   counsel, committee counsel and our work, the case law is there

25   and about ten significant decisions, two from this district,

Page 60

1    one from the Western District of New York.  And I think it

2    raises some significant philosophical issues, if that's the

3    right term, in terms of this tension that I discussed.

4              THE COURT:  Fair enough.  I appreciate that.

5              MR. WILLIAMSON:  And, Your Honor, in our memorandum,

6    we basically suggest the Court has three choices:  approve them

7    all, approve none or accept our admittedly pragmatic suggestion

8    of fifty percent which is, as the Court recalls, what it did

9    with respect to the issue of preparing not fee application but

10   preparing time records.

11             THE COURT:  Well, if I heard you right, though, based

12   on something you said before, I'm wondering if there's a fourth

13   alternative which is to look at it, as you described Judge

14   Bernstein's ruling in CCT, to make perhaps not an

15   excruciatingly detailed analysis of the merits of the

16   underlying dispute that caused counsel -- or presumably it

17   applies to professionals generally -- to defend their request

18   or to see whether they were defending themselves because ways

19   in which, for lack of a more delicate word, they screwed up or

20   whether they substantially prevailed or whether this was on

21   cutting edge issues or perhaps some alternative approach.

22             MR. WILLIAMSON:  There are two difficulties with

23   that, it seems to me, Your Honor.  The first is that would not

24   place an appropriate value on either the prophylactic effect of

25   the fee review process nor would it take into account the

Page 61

1    process itself in that, as the Court knows, we start with a

2    letter raising questions, the professionals respond, we winnow,

3    hopefully, the number of issues down.  And the use of the term

4    "substantially prevailed" I don't think does justice to those

5    other two categories.

6              I would also point out that --

7              THE COURT:  Pause, please, though, Mr. Williamson,

8    because while I can see that you and perhaps other folks might

9    contend that that's not the best approach, if one goes with the

10   judicial philosophy that I've papered in close to a dozen

11   written decisions, do you think that kind of approach would be

12   manifest here if Judge Bernstein did that?  And I'm wondering

13   if certainly due diligence would require me to read his

14   decision.  But unless I conclude that he blew it, I got to tell

15   you, my tentative would be to follow a colleague in this

16   district.

17             MR. WILLIAMSON:  The difficulty with that, Your

18   Honor, is, I think, Judge Bernstein has been of two minds

19   because if you look at the bottom line result in each of the

20   case -- each of the two cases, they are --

21             THE COURT:  You're respectfully suggesting they can't

22   be reconciled.

23             MR. WILLIAMSON:  Yes, sir.

24             THE COURT:  Okay.

25             MR. WILLIAMSON:  They can be distinguished.  One is a

MOTORS LIQUIDATION COMPANY, et al.

Page 62

1    7, one is an 11.  And it's interesting, Your Honor --

2              THE COURT:  But they're both under 330, I assume.

3              MR. WILLIAMSON:  Yes.  It's interesting, Your Honor,

4    that, if you look at the basket of cases, ten or twelve of

5    them, each of the Courts that have addressed this have said

6    here's my rule, no fees for fees except in exceptional cases.

7    And then the other Courts that have come out the opposite way

8    have said fees on fees are approved, parens, except in

9    exceptional cases because the Courts in the latter basket are

10   concerned, I think rightfully, about a lax or relaxed approach

11   to the fee process which then results in professionals who

12   don't devote appropriate diligence being compensated while they

13   do what, one would argue, they should have done in the first

14   place.

15             THE COURT:  I understand.  Okay.  Is it time to give

16   your opponents a chance to be heard or did you have further

17   points?

18             MR. WILLIAMSON:  Only to note, Your Honor, that the

19   question about hourly rate increases can be addressed not at

20   least at this hearing in a quantitative yes or no approach but

21   rather simply to direct that professionals who raise rates

22   during the course of a proceeding provide a notice of that and,

23   if anyone chooses to be heard, not just the fee examiner or the

24   UST, that they have an opportunity to do that.

25             THE COURT:  Okay.  Thank you.  Who would like to be

Page 63

1    heard?  Mr. Smolinsky?

2              MR. SMOLINSKY:  Thank you, Your Honor.  Joe Smolinsky

3    of Weil Gotshal for the debtors.

4              Let me start with the two cases that the fee examiner

5    has mentioned and let me just raise a very significant

6    distinction.  I believe in the CCT Communications case, that

7    was an analogous situation where there was a fee examiner in

8    the case and the Court found that the law firm substantially

9    prevailed and denial of the defense costs would simply dilute

10   the award.

11             In the Brous case, you had a creditor, a third party

12   creditor, I believe Bear Sterns, that took issue with the

13   reasonableness of the fees in a single, stand out dispute and

14   was successful in that dispute and the Court found that the

15   professionals should not be reimbursed for defending that fee

16   application.

17             I think it's very different because we are, as Your

18   Honor knows, subject to quarterly forensic audits, effectively,

19   of our fee applications.  There is not a standing dispute as to

20   the reasonableness of the fees in this case.  This is simply a

21   quarterly analysis, under very different standards than third

22   parties outside of bankruptcy or clients outside of bankruptcy

23   would typically be engaged in.

24             Your Honor, we take no issue with the way that the

25   fee examiner has approached these issues.  I think that he's

Page 64

1    been fair in how sets out the issue.  He acknowledges the fact

2    that there are cases for, cases against.  Ultimately these are

3    policy issues and I think that's hugely significant here.

4          The question is whether my firm and other firms

5    should be penalized for establishing policy in this case, which

6    ultimately starts the process of a national movement to modify

7    the way that fee applications are dealt with.  And

8    respectfully, I believe that that discussion should happen in

9    Washington, not necessarily in this case.  I don't think the

10   fee examiner specifically points to any rules or judicial

11   precedent for what he's looking for here.

12         THE COURT:  The underlying problem, isn't it, Mr.

13   Smolinsky, that every time one of us even issues a dictated

14   decision it acquires a life of its own?

15         MR. SMOLINSKY:  That's right, Your Honor.  And

16   ultimately, these issues may be appealed not for purposes of

17   this case but for purposes generically.

18         I think the American rule, which is what this is

19   about, especially in the context of cases like Brous where you

20   have a creditor challenging the debtor and saying the debtors'

21   estate should not pay for this, I think has no place here.

22   These are policies.  Again, they are not challenges to the

23   reasonableness of fees.

24         The American rule is very much about each party

25   paying its own way and evaluating whether the costs of bringing

09-50026-mg   Doc 7598   Filed 10/27/10   Entered 10/28/10 15:28:30   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 65 of 182

Page 65

1    up the issues are outweighed by the risks associated with doing

2    so and the benefits that could be incurred by proceeding.

3         They don't deal with single issues.  They deal with

4    whether or not we should publicly announce our fees rates to

5    the world whenever we increase rates and things of that nature.

6         I would note that the examiner, the fee examiner, has

7    no client here other than the United States trustee and the

8    U.S. government.  That makes it very easy to take on issues

9    outside of the typical American rule.  I don't think that the

10   American rule would see a situation where an eight-page

11   response would be filed with respect to a fourteen dollar

12   expense dispute, which was the case of Legal Analysis Systems'

13   fee applications.

14        So this is very much about the estate, in this case,

15   paying for a determination of policy issues.  And if the estate

16   is going to be paid for those claims to be pursued, those

17   challenges to be pursued, then it should pay for the costs of

18   the determination of whether that policy should be invoked.

19        With respect to the fee rates and the increases, I

20   would only add that law firms such as Weil Gotshal are very

21   sensitive to announcing when rates are increased publicly.  We,

22   in our fee applications, provide enough information to

23   understand what rates of lawyers that are working on the

24   matters when they increase.

25        THE COURT:  Pause, please, Mr. Smolinsky.

Page 66

1     "Sensitive" is subject to a double entendre.  It can mean that

2     you're already ahead of us in making that information known or

3     it could mean that it's sensitive in the sense that it's

4     something that you would prefer not to disclose.  Which of the

5     two meanings am I supposed to draw from this one?

6             MR. SMOLINSKY:  We would prefer not to disclose, in

7     the public forum, the way that the fee examiner requests.

8     Understand that the -- when we increase rates, as we did here

9     in January and we do put into place annual increases, that this

10    is not a GM issue.  This is not a restructuring department

11    issue.  This is a firm-wide decision to raise rates and that's

12    consistent with our obligation to charge the same rates that we

13    charge our other clients.

14            What the fee examiner is asking for is to file a

15    public affidavit every time the firm increases rates, setting

16    out each --

17            THE COURT:  Well, is he saying that or is he saying

18    every time the firm raises rates in a case in which the

19    creditors of the case are going to have to pay?

20            MR. SMOLINSKY:  Well that's certainly not the case

21    here, Your Honor, because the creditors, the unsecured

22    creditors of this estate are not paying the fees.

23    Interestingly enough the U.S. government is on both sides of

24    this issue.

25            THE COURT:  So you're saying I should issue a Bush

09-50026-mg   Doc 7598   Filed 10/27/10   Entered 10/28/10 15:28:30   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 67 of 182

Page 67

1    vs. Gore ruling which is not a precedent for anything except

2    the exact matter that I have before me?  I tend to believe that

3    I should go by, kind of, like a rule of law.

4           MR. SMOLINSKY:  We have no problem providing the

5    Court, providing the fee examiner with a schedule of rates when

6    they're increased.  But the media is the media and what Your

7    Honor would be starting is a precedence where every major law

8    firm would, once a year, publicly file in the bankruptcy court

9    their new rate schedule.  And that would be -- that would just

10   become a circus which I don't think this Court intends.

11          The purpose of the notice is to provide information

12   about the reasonableness of fees and the rates.  That

13   information is already provided.  Every time we file we provide

14   a monthly fee statement or a quarterly fee application.  In our

15   summary in the beginning it sets out the rates of each

16   professional.  And to the extent that the fee examiner has some

17   need to tick and tie old rates to new rates, we're happy to

18   provide that information to help him do that.

19          I think the notion that every large law firm now has

20   to, once a year, file in every Chapter 11 case in which they

21   perform services an affidavit that they had a firm-wide rate

22   increase, I think is a little overboard and creates a precedent

23   that I think is not healthy.  So I think when you look at the

24   American rule I don't think that it's really appropriate here.

25   The fee examiner -- the U.S. trustee has delegated a portion of

09-50026-mg    Doc 7598    Filed 10/27/10    Entered 10/28/10 15:28:30    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 68 of 182

Page 68

 1    its duties to the fee examiner paid out of the estate to pursue

 2    policy issues and general issues, which we have to respond to.

 3    And these quarterly audits are significant, they're

 4    substantial, they're expensive to comply with and ultimately it

 5    would just create an automatic discount to our fees if the

 6    examiner was allowed unlimited access to the debtors' coffers

 7    and we were forced to pay, on our own dime, for responding.

 8              THE COURT:  Okay.  Fair enough.  Others want to be

 9    heard on this?  Mr. Schmidt?

10              MR. SCHMIDT:  Thank you, Your Honor.  Robert Schmidt

11    from Kramer, Levin, Naftalis & Frankel on behalf of the

12    creditors committee.

13              Your Honor, we're pleased to report that we were able

14    to work out, as Mr. Williamson reported, virtually all our

15    issues with the fee examiner.  It took a lot of effort but we

16    got there.

17              The issue that remains is the fee on fee issue for

18    us, which I won't retrace the arguments made by Mr. Smolinsky.

19    We certainly agree with his arguments and we believe that we

20    should be compensated for the amounts charged in that regard.

21              I would add, Your Honor, with respect to the

22    committee's issue here, it took on particular importance

23    because as the Court may recall the fee examiner took a very

24    aggressive approach with respect to the duties that the

25    committee performed on a variety of important estate issues,

09-50026-mg   Doc 7598   Filed 10/27/10   Entered 10/28/10 15:28:30   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 69 of 182

Page 69

1    including environmental claims, the DIP and wind down claims,

2    collateral review.  And he really, aggressively, went after the

3    fees that we incurred in connection with those very important

4    projects and we felt we had to vigorously oppose his objection

5    to our fees on that front and so we did expend significant time

6    and effort on that front.

7           The Court heard the arguments during the April 29 fee

8    hearing so I won't rehash them.  And I believe we did

9    substantially, ultimately substantially prevail wherein we

10   ended up taking 114,000 dollar reduction on a 4.5 million

11   dollar fee application.  So I think, if you do the math, that

12   is certainly a very modest reduction for a fee application and

13   we believe that it does evidence that we did prevail and that

14   would comport with the rulings in, certainly, Judge Bernstein's

15   CTT case.

16          THE COURT:  Got a different question for you, Mr.

17   Schmidt, because one of the things that I've wrestled with over

18   the last week was your constituencies differences in

19   perspective with the U.S. government in which I understood, I

20   think correctly based on what was presented to me at least,

21   that the unsecured creditor community in this case is subject

22   to a dilution risk if the admin expenses in this case get too

23   high.  And while I had assumed, and you just confirmed, that

24   you would agree with Mr. Smolinsky on the fees on fees issue,

25   I'm wondering if you want to weigh in on the issue of increases

Page 70

1    going forward?

2           MR. SCHMIDT:  Your Honor, if I may, before I get into

3    the increases, the increase in the potential administrative

4    claim base is not necessarily diluted; it's really the

5    unsecured claims base that's diluted.  The only time that you

6    get into an issue on the administrative claims base is if we

7    blow through the wind down budget.

8           THE COURT:  Right.  But I thought that was enough of

9    an issue that I should be paying attention to it.

10          MR. SCHMIDT:  Fair enough, Your Honor.

11          THE COURT:  So if you're not taking a position on the

12   second issue all you've got to do is tell me that, but I don't

13   know what your position is on that.

14          MR. SCHMIDT:  Your Honor, on the rate increase issue

15   I would just simply note that yes we do periodically assess and

16   increase our rates.  We acknowledge that and make it clear in

17   our initial retention papers that we implement step-up

18   increases for associates on a yearly basis and come the end of

19   the calendar year, assess the marketplace and determine whether

20   to make additional market driven increases, which we do from

21   time to time.

22          If it's a matter of providing a list to Mr.

23   Williamson in advance, that's certainly not a problem for us.

24   But we do note that we take that position up front in our

25   retention application.

09-50026-mg    Doc 7598    Filed 10/27/10    Entered 10/28/10 15:28:30    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 71 of 182

Page 71

1          THE COURT:  Now as far as I know every firm does,

2     doesn't it?

3          MR. SCHMIDT:  I believe that's fairly standard.

4          THE COURT:  Okay.  Mr. Reinsel, any of the other

5     official committees or your firm want to be heard on this?  I

6     guess I only have one other official committee, which is you.

7          MR. REINSEL:  Your Honor, Ron Reinsel, Caplin &

8     Drysdale, for the asbestos committee.  I think we would just

9     join with the debtor and the committee.

10          THE COURT:  Fair enough.  All right.  Anybody else

11     want to be -- Mr. Seidel?

12          MR. SEIDEL:  Yes, Your Honor.

13          THE COURT:  And then I'll give you a chance, after

14     that, Mr. Masumoto.

15          MR. SEIDEL:  Good morning, Your Honor.  Barry Seidel

16     of Butzel Long, we're special counsel to the creditors

17     committee, as you know.

18          I just stood up to answer the question that Your

19     Honor addressed before anyone made remarks, which is whether

20     any of us were interested in having you deliberate further on

21     the issue or have you rule on general knowledge.

22          Your Honor, I know that before you sat on the bench

23     you were a long-time practicing lawyer.  I personally believe

24     you are familiar enough with the law and certainly the facts in

25     this case to make a ruling without further deliberation.  So I

Page 72

```
 1    join with Mr. Smolinsky and Mr. Schmidt on the issue of fees on

 2    fees.

 3            THE COURT:  On the merits of that issue.

 4            MR. SEIDEL:  Yes.  And as to the other issue, we're

 5    not affected by that.

 6            THE COURT:  Fair enough.

 7            MR. SEIDEL:  Thank you, Your Honor.

 8            THE COURT:  Okay.  Anybody else want to be heard for

 9    a first time?  Mr. Williamson, I'll hear from you in reply if

10    you have any limited to what your opponents said in their

11    remarks after you.  Oh, I'm sorry Mr. Masumoto.  Go ahead.

12            MR. MASUMOTO:  Your Honor, if you don't mind?

13            THE COURT:  No disrespect.  Come on up, please.

14            MR. MASUMOTO:  Good morning, Your Honor.  Brian

15    Masumoto for the Office of the United States trustee.  Your

16    Honor, as indicated in our papers, we do support the fee

17    examiner's recommendations with respect to the various fee

18    applications.  However, we did also want to stress that, as

19    highlighted by all of the parties who have spoken previously,

20    there were two major matters of concern that we would like to

21    articulate our position on, which are the rate increases and

22    the issue referred to as fees on fees.

23            With respect to the rate increases -- I'm sorry;

24    before I get into that I would like to respond to a comment

25    made by debtors' counsel.  The U.S. trustee did not delegate
```

09-50026-mg    Doc 7598    Filed 10/27/10    Entered 10/28/10 15:28:30    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 73 of 182

Page 73

1    any of its responsibilities to the fee examiner.  In fact, as

2    Your Honor may recall, the appointment of a fee examiner was

3    based on a consensual arrangement among the parties, including

4    the debtors' professionals and the committee.  And as Your

5    Honor knows, fee examiners have been appointed in a number of

6    cases.

7         This attempt at utilizing a fee examiner is not to

8    absolve the U.S. trustee from its responsibility to examine the

9    fee applications because we do, regardless of whether fee

10   examiners are appointed or not, we do examine the fee

11   applications.  However, I think it's quite apparent that given

12   the nature of the very large mega cases that exist, that the

13   amount of resources available by the U.S. trustee cannot be

14   measured or cannot be compared to the resources of a dedicated

15   fee examiner.

16        So I would like to indicate that the fee examiner is

17   not just merely a tool for the U.S. trustee but for the Court,

18   as well as the various estates, to insure that the expenses,

19   fees and expenses, meet the criteria set forth in the statute.

20        With respect to the two major issues, we certainly

21   have no quarrel with respect to rate increases.  We have no

22   quarrel with the approach of providing notice and an

23   opportunity to be heard.  However, we did want to articulate a

24   major concern that there be no ambiguity or misunderstanding

25   that whatever notice is provided, whether it's provided prior

09-50026-mg    Doc 7598    Filed 10/27/10    Entered 10/28/10 15:28:30    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 74 of 182

Page 74

1    to fee application or at the time of the fee application, the

2    true test of determining whether or not the fee increases are

3    reasonable can only be fully and accurately examined or

4    evaluated in the context of a fee application.  So for example,

5    if in fact the Court imposes a requirement that notices be

6    provided at the time the increases occur, which may not

7    coincide with the fee application.  That whatever issues are

8    raised or highlighted or if none at all, it does not estop or

9    preclude further examination in valuation at the time of the

10   fee application.  I believe that all of the cases that referred

11   to rate increases and so forth were, in fact, examined in the

12   context of a fee application.

13           So, I guess, in some respects, it might be similar to

14   the monthly compensation procedure in which monthly invoices

15   are issued, payments are made and objections can be raised.

16   However, no objections are waived at the time of the fee

17   application.  So similarly, if in fact advanced notice and an

18   opportunity to be heard is required and/or allowed in any of

19   these cases, we would certainly maintain or reserve our right,

20   one, to be able to evaluate it in the context of a fee

21   application as well as reserve our rights based upon, perhaps,

22   that advanced notice, to engage in any appropriate discovery

23   regarding those rate increases.

24           Second, moving on to the issue of fees on fees, I

25   think the parties have outlined the various split in the case

Page 75

1    law in the southern district.  I would like to indicate that I

2    believe that Judge Bernstein, essentially, is applying a

3    similar approach, I think, even across the board, on both sides

4    of the divide.  I believe there's an element, at the polar

5    extremes.  One is that on one hand you want to discourage

6    improper fee applications, you want to encourage compliance;

7    you want to make sure that it gets done at the same time.  At

8    the opposite extreme is not to penalize professionals for

9    frivolous or vexatious type objections to fee applications that

10   are raised as part of a strategic matter.

11           And I think the Courts, in struggling to address

12   those, will come out one way in one case and the other in --

13           THE COURT:  I think you may have nailed it, Mr.

14   Masumoto but if that is the kind of thought process that I or

15   another judge would go through would Judge Bernstein's approach

16   represent the sweet spot in achieving that balancing?

17           MR. MASUMOTO:  Well, I think Judge Bernstein -- yes.

18   In response to your question I think it does because if you

19   look at Brous I think the conclusion was that the objections

20   were valid, the objections to the fee applications and the

21   defense of the fee applications were valid and the creditor who

22   raised the objections prevailed.  In the CCT Communications,

23   the Court determined that the objections were not valid and

24   that the fee applicant had properly defended the contents of

25   its fee applications.  I suppose in some respects it was a form

MOTORS LIQUIDATION COMPANY, et al.

Page 76

1    of -- as Judge Bernstein mentioned this is, sort of, the

2    application of the American rule.  However, the distinction

3    that we want to make with respect to the current fee

4    application and the trustee's recommendation is that the

5    trustee's recommending a fifty percent.

6            THE COURT:  Five-zero.

7            MR. MASUMOTO:  Right.  A five-zero percent and that

8    is an approach which is a compromise, sort of a realistic

9    compromise, and I think consistent with Your Honor's ruling

10   with respect to the second interim fee application.

11           The concern that we have in the application of that

12   fifty percent, that the prophylactic portion for, what I

13   believe all the courts have indicating, including Your Honor in

14   the second, is the concern that the estate not be saddled with

15   the correction of mistakes and failures or omissions.

16           Hypothetically, part of the issue and the difficulty

17   Your Honor encountered in the second interim is that some of

18   the issues raised had not been really fully developed or

19   articulated by the courts in other cases.  In fact, Your Honor

20   was concerned that applying a rule retroactively would penalize

21   the applicants and I believe, in part, that that's justified or

22   at least a warrant of the fifty percent application.

23           The concern, I think, as Your Honor articulated even

24   in that ruling is that once the courts start to rule and

25   establish the parameters going forward with respect to these

09-50026-mg   Doc 7598   Filed 10/27/10   Entered 10/28/10 15:28:30   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 77 of 182

Page 77

 1   fee applications, that ignorance should no longer exist and

 2   that latitude should not longer exist.

 3          So, theoretically, as we move forward and the

 4   experienced increases amongst the professionals, presumably the

 5   reviewing and having to deal with some of the issues raised,

 6   Your Honor's concern about checking, I believe you raised a

 7   concern about privilege reviews and the amount of details that

 8   are necessary to address the privilege issues in the bankruptcy

 9   cases which don't exist in non-bankruptcy cases, that as that

10   experience develops in fact what you may see is that perhaps a

11   smaller amount of time necessary to review and correct and edit

12   the time records which, I believe, Judge Bernstein and even

13   Your Honor has ruled should not be compensated because that's

14   not available to non-bankruptcy practitioners.

15          So what's left is, in fact, correcting mistakes.  A

16   large portion that will be left is the debtors' -- not

17   debtors' -- I'm sorry -- the professional's response to

18   criticisms or objections and corrections.  So if a fifty

19   percent rule is applied in that context, a larger and larger

20   proportion would presumably be for correcting errors and those,

21   I think, the Court has been quite adamant, I mean, in an

22   attempt to try to eliminate the compensation for correcting

23   errors you applied in the context, given the nature of the

24   unknown factors, uncertain case law, the fifty percent rule

25   didn't make sense because arguably fees that would have been

09-50026-mg   Doc 7598   Filed 10/27/10   Entered 10/28/10 15:28:30   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 78 of 182

Page 78

1    compensated you reduce by fifty percent.  And although there

2    were fees that should not be included at all, which are the

3    correcting and dealing with omissions, that portion of the fees

4    which would not be permitted at all would still also suffer a

5    reduction.

6          But I think, on balance, I think the Court's

7    determination was the results achieved effectively eliminated

8    any possibility that a firm would benefit by correcting its

9    mistakes.

10         Our concern is that unless there is that absolute

11   deterrence, there's always an incentive not to comply or at

12   least not intentionally not to comply but not be as careful

13   because it doesn't matter.  Even if you get only fifty percent

14   of the correction, you're still, in fact, increasing your

15   recoveries and still don't have to spend the time complying

16   completely with the case law.

17         Now I believe that there has been, in fact, some

18   difficulty in applying all of the different considerations from

19   Your Honor's second interim fee application ruling, in the

20   sense that if the fifty percent rule apply not only to the fees

21   on fees but the actual deficient fees, that, again, increases

22   the deterrence for not having compliant time records.

23         If in fact it only applies to the time records that

24   are under question, the actual fees on fees, then the level of

25   deterrence is certainly not as high.

09-50026-mg    Doc 7598    Filed 10/27/10    Entered 10/28/10 15:28:30    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 79 of 182

Page 79

1          Our main concern is that however the rule is applied,

2     whether or not the Court applies a fifty percent rule in terms

3     of taking the overall picture, including the fee applications,

4     that there be a complete deterrence from not complying with the

5     rules.  Anything less would encourage a -- it would reduce the

6     prophylactic effect of any rule.  And that is, I guess, from

7     our perspective our departure from the, sort of, I guess,

8     pragmatic approach of the fee examiner.

9          We do want a rule that maintains a hundred percent

10    deterrence against non-compliance.

11         THE COURT:  Mr. Masumoto, that analysis in a lot of

12    ways advances the ball.  So let me ask a couple of follow-up

13    questions on that.  The first is that, as Mr. Smolinsky

14    observed and I think he was right, there is a certain cost

15    associated with responding to inquiries, and in some cases

16    objections, irrespective of whether your fees were justified or

17    not, kind of like a mandatory cost imposed upon the

18    professional for playing -- not playing, for complying with the

19    informational requirements that are imposed upon it and, in

20    some cases, for justifying the propriety of its fees even if it

21    did nothing wrong.

22         And then there is a second layer above that, the cost

23    of responding to its screw ups or its failures to comply.  The

24    points you made, for the most part, apply to the second half of

25    what I said rather than the first, I would think or do you

MOTORS LIQUIDATION COMPANY, et al.

Page 80

1    think I'm off base in that regard?

2            MR. MASUMOTO:  I think that's right, Your Honor.  And

3    to address the first point, one, as, sort of, a primary and

4    basic matter, I believe that the courts have held, and I think

5    it should be an important principle to, sort of, hold to which

6    is that the burden of proof is on the fee applicant.  They have

7    the burden to justify the reasonableness and necessity of their

8    fees and expenses.  If they fail to do so, triggering or

9    requiring further inquiries, they should bear the cost.

10           Now once again, we have the opposite extreme.  If

11   someone is undertaking a frivolous or vexatious type of

12   inquiry, clearly, I think, most courts and certainly the U.S.

13   trustee would feel that in order to defend against that type of

14   tactic that the professionals should not be penalized.

15           THE COURT:  And presumably, if you use a

16   substantially prevailed type of approach, then the professional

17   wouldn't have to eat the costs of defending against that

18   frivolous attack.

19           MR. MASUMOTO:  That's correct, Your Honor.  I would

20   also -- I'm sorry.

21           THE COURT:  No, finish your thought but I have

22   another one after that, Mr. Masumoto.

23           MR. MASUMOTO:  The other concern that I had, in terms

24   of the inquiry and so forth, is to note, Your Honor -- as Your

25   Honor knows, having practiced for so long, prior to the advent

MOTORS LIQUIDATION COMPANY, et al.

Page 81

1    of the electronic filing all fee applications were, in its

2    entirety, available to the public.  They were filed with the

3    court in hard copy and were available to individuals to

4    examine.

5              After the advent of electronic filing, given the size

6    of the files that were necessary in some cases for fee

7    applications, as Your Honor probably is aware, not all the time

8    records are actually on file.  They're not universally

9    available to anyone who wants them.  They're available upon

10   request from the professionals but in the very large cases many

11   of the professionals with very voluminous time records do not

12   file them online.  They will file the narrative and the

13   schedules but the actual time records are actually not online.

14   And so if Your Honor is perhaps concerned about inquiries from

15   people who might want an opportunity to review time records,

16   that's in fact a function of the system and the parties.

17             I believe some of your colleagues have required, even

18   in the mega cases, that the fee applications, the actual time

19   records, are filed online.  I believe sometimes the mechanism

20   is used that the monthly compensation invoices have to be filed

21   online and therefore would be available for review at the time

22   of the fee application.  But in many cases, I believe, in many

23   of the large cases actual time records are not universally

24   available.

25             So any inquiries regarding time records and detail

Page 82

1    and so forth that may be raised by interested parties isn't at

2    a cost upon the professionals but certainly, it seems to me, a

3    choice and a function of how they approach the filing

4    requirements.

5               THE COURT:  Mr. Masumoto, when you study physics you

6    learn about the Heisenberg Uncertainty Principle, which it's

7    been a long time since I studied physics but I, kind of,

8    capture it by saying that by measuring a phenomenon you alter

9    it.  And while subject to review of the cases my inclination

10   might well be to have some kind of merits-based evaluation, at

11   least beyond the requirements of dealing with the objection at

12   all, what I mentioned a moment ago, that has merits to it but

13   there's also an expense associated with getting into that

14   merits-based inquiry.  And I would be a little nervous about

15   establishing a regime under which the creditors of the cases on

16   my watch are paying more for the precision than they're getting

17   in the way of benefits of the merits-based fine-tuned analysis.

18   Do you want to comment on that trade off?

19              MR. MASUMOTO:  Yes, Your Honor.  It is unfortunate,

20   as Your Honor indicated, that perhaps individual estates might

21   have to bear that additional cost.  However, in those cases

22   where the cost is borne by a particular estate, they become and

23   serve, I think as Your Honor noted in your decision regarding

24   the second interim fees, as standards to be applied going

25   forward, eliminating the excuses on the professionals.

Page 83

1            Just as a really practical example Your Honor, as

2     Your Honor knows if you look at -- one of the review functions

3     that you have, a simple one, you can't bill more than twenty-

4     four hours a day.  I mean, it should be -- no one should be

5     billing more than twenty-four hours a day.  I believe that the

6     fee examiner, in some of the earlier fee applications, based

7     upon the mechanical software available to Stewart Maue, was

8     able to identify applications in which there were timekeepers

9     who billed more than twenty-four hours a day.  Now should that

10    ever occur?  Shouldn't the law firms, in preparing their fee

11    applications, have checking functions that would screen that

12    out?

13            Another example is the compromise that was reached

14    with respect to overtime meals and expenses.  I believe at the

15    last interim application, I don't recall the exact amount, I

16    think it was either five or six hours, but the idea is that if

17    someone billed, for the debtor, less than five hours of work

18    for that day they shouldn't be entitled to an overtime meal

19    and/or a cab ride home.

20            Now I can tell you that as far as I know Your Honor,

21    I don't know of any law firm that has any software in effect

22    that can do that checking.  Now the fee examiner was able to

23    utilize the services of Stewart Maue and in fact could make

24    that cross reference very easily and could screen that out.

25            Now if Your Honor ruled in the cases that it's

MOTORS LIQUIDATION COMPANY, et al.

Page 84

```
1    impermissible to have a time keeper bill an hour or two a day,

2    open up the file at the end of the day and then ask for a meal

3    and/or a cab ride home and the firms know that that is the

4    standard, then how difficult would it be for those firms to

5    implement a checking procedure to require it.  I'm aware, at

6    least with respect to one applicant when the issue was raised,

7    said that their software prevents anyone from requesting or

8    putting in for a fee reimbursement without any time records.

9    However, it didn't specify the amount.  It didn't say if you

10   only have less than five hours you can't bill something.  But

11   that was an effort.

12          Now if in fact Your Honor ruled and other judges

13   ruled and enforced a rule that you can't bill for time -- for

14   overtime expenses without a certain minimum amount of time

15   billed to the estate, then presumably the firms would implement

16   that procedure.

17          So I understand that in individual cases one might

18   see, perhaps as Your Honor indicated, an absorbing of

19   additional costs in order to justify it but I think, in the

20   long run, it would serve as, sort of, an emerging standard to

21   impose upon the firms so that in fact the concern -- if we had

22   to do it in every case I agree with Your Honor, it may be

23   unfair to impose that burden on every individual case.  But

24   once the Court establishes procedures, and the Court has done

25   it, in fact that's the reason for the southern district
```

09-50026-mg   Doc 7598   Filed 10/27/10   Entered 10/28/10 15:28:30   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 85 of 182

Page 85

1    guidelines and the various local guidelines, where the Court

2    attempts to impose standards on the law firms to prevent

3    perceived abuses.

4          So I cannot -- I cannot say or evaluate the benefit

5    in an individual case that has to bear that particular cost,

6    but for purposes of insuring, in general and certainly for

7    future cases, a standard avoiding abuses, I think it is part of

8    the cost that the system, in general, has to bear.

9          THE COURT:  Okay.  Thank you very much, Mr. Masumoto.

10         MR. MASUMOTO:  Thank you, Your Honor.

11         THE COURT:  Mr. Eisenband?

12         MR. EISENBAND:  Thank you, Your Honor.  Michael

13   Eisenband with FTI Consulting.  I guess my situation is a

14   little unique.  I'm not -- obviously I'm a financial advisor,

15   not an attorney, so I'm going to leave it to the attorneys to

16   talk about case law.  But I do want to talk about the fees on

17   fees because even though FTI is billing on a fixed fee basis

18   and does not charge any extra for the time spent on responding

19   to fees, that has not stopped the fee examiner from proposing a

20   57,000 dollar reduction to FTI for fees on fees.

21         And it comes to the issue of what I believe is a

22   frivolous objection and I think the objections in this case

23   clearly are frivolous for two specific reasons.  First, as I

24   stated, FTI is not billing any additional time for any hours

25   spent on defending any of the objections.  If FTI didn't spend

MOTORS LIQUIDATION COMPANY, et al.

Page 86

1    the time, the fees would still be the same amount, so we're not

2    billing.

3              And the second one, I would just like to read from,

4    actually, an excerpt from the first hearing, Your Honor,

5    something that you said talking about, and this I quote from

6    you, Your Honor, "FTI argues that its fee was based on a fixed

7    fee arrangement and that when FTI did more work, as it might,

8    FTI wouldn't get any more compensation for doing so."

9              You said, referring to the fee examiner's position,

10   you stated, "I've never seen this position taken in the thirty-

11   seven years since I started the bankruptcy business.  I agree

12   with FTI as to this issue."

13             That was on the first fee application.  We had to

14   deal with their objections on the second fee applications on

15   the same issues and now we've had to deal on the third

16   application.

17             Now I understand the fee examiner has an important

18   role and certainly FTI is aware that the fee examiner is and

19   should be looking at FTI's fees.  But to propose objections to

20   hours spent on FTI's fee application, when we're not getting

21   paid for these additional hours, to me is certainly frivolous

22   and I think it puts into question -- the judge has actually

23   ruled on this issue, as it pertains to FTI.  Yet the fee

24   examiner is spending more time, the estate's money, on

25   objecting to FTI's issue.  The fee issue is just one, there is

Page 87

1    also objection, and you might have seen it in their objection

2    and our response, that we're sending too many people to

3    meetings, even though we're obviously not billing by the hour

4    and those are different issues that maybe we can talk about

5    after.  But that's all I wanted to say on fees on fees.

6           THE COURT:  All right.  Anybody else before I give

7    Mr. Williamson a chance to reply?

8           THE COURT:  All right.  Mr. Williamson?

9           MR. WILLIAMSON:  Thank you, Your Honor.  Let me

10   address, very briefly, FTI's expression of concern.  In each of

11   those first two bench decisions the Court also noted that there

12   would come a day, at the end of this case, when even fixed fee

13   arrangements are subject to review and the case law is quite

14   clear that the hourly rate, as computed within a fixed fee, is

15   a relevant factor.  So yes, we pay attention.  Yes, we called

16   things to FTI's attention, including some of the expense issues

17   that this Court has dealt with.

18          Now let me turn to the two principle issues.  The

19   debtors' counsel used the phrase public policy issue.  And

20   that's not a phrase that should frighten anyone because both of

21   these issues are inherent, embodied in the term reasonableness.

22   If a professional submits a deficient application should that

23   professional be paid from the estate to remedy deficiencies,

24   errors, mistakes, misstatements that shouldn't have been on an

25   application to begin with?

1           If a professional, during the course of two fee

2    periods, raises an associate's rate by almost a hundred dollars

3    an hour, that goes to the question of reasonableness.  And in

4    the interest of the professional, it's either a reasonable

5    increase now or it isn't.  And it is possible, by comparing the

6    hourly rates listed in the first application and the third

7    application, to determine when there's been an increase.  So

8    given the Code's commitment to a public transparent process,

9    I'm not quite sure of the validity of that concern.

10          In the two cases Judge Bernstein decided it was a

11   very finite question, very finite objections, one application.

12   Here we have twenty and by the end of the case we may have

13   twenty-five or more.

14          My concern, Your Honor, with the phrase substantially

15   prevailed is that while it appears talismanic, it isn't.  And

16   the reason it isn't is because I, for one, don't want to be at

17   this podium arguing with my colleagues about whether the fee

18   examiner or the UST prevailed on a particular point of

19   disagreement.  I don't think the Court would look kindly on

20   that kind of discussion, and with good reason.  And of course

21   we're left with the inherent problem that my computation of the

22   fee examiner's batting average might be somewhat different than

23   my friends at counsel table's computation of the batting

24   average of the fee examiner, especially when you take into

25   account the prophylactic issues that the U.S. trustee's office

09-50026-mg   Doc 7598   Filed 10/27/10   Entered 10/28/10 15:28:30   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 89 of 182

Page 89

1    very ably discussed.

2            It's not my responsibility, I don't think, to give a

3    report card but there is no doubt that incrementally, taken as

4    a whole, the fee applications submitted to this Court have

5    improved significantly and the best example of that is the fact

6    that we are here, by and large, talking about the forest and

7    not individual trees.

8            You know, I don't know if this case is a perfect

9    vehicle for having some of these issues decided but the fact

10   remains that this case, unlike Lehman Brothers just to pick

11   one, involves taxpayer dollars directly.  The Code doesn't say

12   anything about cases funded by tax dollars, but I think that

13   that is a very real issue here.  Because we're not simply

14   dealing with a company, its shareholders, its creditors, we're

15   dealing with taxpayers, we're dealing with organized labor,

16   we're dealing with huge pension funds, we're dealing with

17   incredibly environmental and asbestos problems.  And so I think

18   the integrity of the process is important here, whether or not

19   we set the dinner ceiling at twenty dollars or whether we set

20   the dinner ceiling at thirty-five dollars.

21           The Court asked about precedent.  Judge Peck, in

22   Lehman Brothers, has these issues pending before him right now.

23   To my knowledge, as of this morning, he had not issued any

24   decisions and, in fact, he may not even be writing a decision.

25           THE COURT:  When you said these issues, did you mean

MOTORS LIQUIDATION COMPANY, et al.

Page 90

1   both of the issues on today's calendar or the fees on fees

2   issue?

3              MR. WILLIAMSON:  Both.  And they've arisen in Lehman

4   Brothers in this context.  Lehman Brothers, of course, has a

5   fee committee and the fee committee has recommended a one

6   percent of gross fees absolute ceiling on all fee-related time.

7   Call it what you will, anything to do with fees is compensable

8   only to one percent.

9              THE COURT:  I think I ruled on that before, didn't I?

10  And -- or at least in oral argument thought that arbitrary

11  percentages were a matter of concern to me?

12             MR. WILLIAMSON:  Yes, and we have not proposed it.

13  I'm simply addressing the Court's request for what's happening

14  in this district; to the extent we know it.  And the hourly

15  rate increase has been addressed by the fee committee with a

16  recommendation that fees be frozen at the 2009 rates.  In other

17  words, that there be no increase in 2010.

18             Now Judge Peck has not ruled on those but the

19  recommendations of the fee committee in that case, I think, are

20  quite clear.  And whether either of those approaches, one

21  percent or no rate increases, is the right one, these clearly

22  are issues that transcend this particular case.

23             Getting back to the point, and I'll conclude quickly

24  Your Honor, about substantially prevailed.  The Court used the

25  phrase well what if it turns out that the fee examiner or the

09-50026-mg   Doc 7598   Filed 10/27/10   Entered 10/28/10 15:28:30   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 91 of 182

Page 91

1    UST raised an inquiry, made an objection and there was, in the

2    Court's words, "Nothing wrong".  The problem with that

3    approach, of course, is putting aside the Court's determination

4    not, hopefully, ninety-eight percent of what we have in our

5    dialogue with the professionals is not about whether something

6    is wrong or nothing wrong, it's whether in a rational,

7    deliberative process we can come to a conclusion and in most

8    cases we've been able to do that.

9            This Court has often said, in a different context,

10   still this case, it's not a question of whether professionals

11   should be able to travel first class.  It's not a question of

12   whether professionals should be able to dine beyond twenty

13   dollars a meal.  It's a question of who pays that price, who

14   bears that burden.  And that's, I think, a concern with this

15   talismanic approach that may have had appeal in a narrow case

16   where there was no fee committee and no fee examiner but

17   probably won't work here.

18           THE COURT:  Very well.  Thank you.

19           MR. WILLIAMSON:  Your Honor, before the Court -- let

20   me just note one other thing.  I have a scheduling matter that

21   I'd like to raise at an appropriate time; it should only take

22   thirty seconds.

23           THE COURT:  All right.  Mr. Eisenband, is it really

24   important?

25           MR. EISENBAND:  I --

09-50026-mg    Doc 7598    Filed 10/27/10    Entered 10/28/10 15:28:30    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 92 of 182

Page 92

1          THE COURT:  Because frankly I'm not into a mind to

2     make a he said/she said type of determination on the FTI issue

3     today.

4          MR. EISENBAND:  I would just like, Your Honor, that

5     you can help on just one issue and that is while the fee

6     examiner talks about that he understands that FTI will be

7     really -- the issue will be dealt at the end, he still objects

8     and requests a disallowance on a monthly basis that makes us

9     spend time responding to it, even though he basically said

10    he -- and he says in the objection that he understands that it

11    probably will be overruled.

12          I would ask that he stops with these types of

13    objections until the final fee hearing.  Thank you.

14          THE COURT:  All right.  Here's what we're going to

15    do, folks.  I've historically prided myself on being properly

16    prepared for arguments and the decisions by Judge Bernstein are

17    of enough materiality that I think it would be contrary to my

18    historic practice and unfair for you for me to rule on the fees

19    on fees issues without deciding that.

20          And while I have a pretty strong tentative in my mind

21    as to how I should deal with the notice of the changes in fees,

22    if this is a matter that is already before Judge Peck, I think,

23    given my historic desire to be consistent with my colleagues I

24    should resist the temptation to rule based on my tentative, in

25    the absence of having issued a more premeditated decision in

1     that regard.

2             Some of these matters also raise issues as to

3     whether, if they are to be implemented, I'm thinking

4     particularly of the notice issue, as well or better handled by

5     way of an amendment to court rules and/or guidelines rather

6     than in a one-off ruling in a particular case.

7             For these reasons, the fees are approved to the

8     extent that they either were not objected to by the fee

9     examiner or the U.S. trustee's office or were resolved in a

10    manner or manners satisfactory to those parties.  And if and to

11    the extent they weren't paid, they're now authorized to be

12    paid.  However, to the extent, albeit only the extent, to which

13    they involve either of these two issues, they're to be carved

14    out of the remainder of the application and I will arrange for

15    an on-the-record conference call in which I will dictate a

16    ruling on that.

17            I've got to caution you, folks, that I'm juggling a

18    lot of balls in this case and the other cases on my watch.  And

19    on this issue it could be several weeks or, potentially, worse

20    before I can issue that part.  But, folks, I'm like the Dutch

21    kid with his finger in the dyke; I just have to deal with the

22    most pressing issues on my watch and the fees on fees issue and

23    the notice issue, in the world of the triaging that I have to

24    do, just can't be put at the top of the pile.

25            Also, to tell you the truth, I have less interest in

MOTORS LIQUIDATION COMPANY, et al.

Page 94

1    deciding policy matters and issuing precedent for other cases

2    than I do with meeting the responsibilities that are on me in

3    any given case.  So that's the way we're going to do it.

4           Mr. Masumoto?

5           MR. MASUMOTO:  Your Honor, just for the record, we

6    did ask for a ten percent holdback.  I think there is no

7    objection to that, I just wanted to allow the parties to

8    confirm that.

9           THE COURT:  Is there anybody who has a problem with

10   what Mr. Masumoto just said?  Hearing no response, that'll be

11   the way it is.

12          We'll now take a ten minute recess.  Everybody who's

13   here on anything other than the New GM dealers matters is free

14   to leave.  And after the break I'll take that.  Mr. Williamson,

15   oh, you had that scheduling matter you wanted to address.

16          MR. WILLIAMSON:  Yes, just two and very quickly, Your

17   Honor.  With respect to the Court's ruling from the bench,

18   debtors' counsel and the fee examiner do have a few trees to

19   work through but I'm hopeful we will do that without any

20   difficulty.  And if we have difficulty we'll consider it under

21   the umbrella of what the Court said.

22          THE COURT:  Would it work for you and the counsel to

23   say that if you can work out a deal you can implement it

24   without further order from me and if you have to agree to

25   disagree you should tee it up for some kind of determination?

Page 95

1          MR. WILLIAMSON:  Correct.

2          THE COURT:  Okay.

3          MR. WILLIAMSON:  No difficulty.  Your Honor, today is

4   October 26th.  We are now current on all pending fee

5   applications.  The next round of fee applications covers the

6   period from June to the end of September.  They are due on

7   November 15th in terms of filing under the local rules.

8          The end of the year sometimes matters to law firms

9   and consulting firms; we're not unaware of that.  And we're

10  prepared to at least make a significant effort to process the

11  next round of fee applications, Your Honor, if it is within the

12  Court's ability to schedule a hearing in the second half of

13  December so that the end of the year would at least provide an

14  opportunity for the professionals to become current for their

15  own purposes.

16          THE COURT:  Well, having been a lawyer, as some

17  people noted, I'm sensitive to that but I am less clear on how

18  much of an issue that is nowadays when we have interim fee

19  orders.  To what extent does the ratification on a quarterly

20  basis affect that?  And maybe you're the wrong guy to be asking

21  that, Mr. Williamson.  Maybe I need some help from Mr.

22  Smolinsky and Mr. Schmidt and Mr. Reinsel on it, and for that

23  matter your special counsel colleagues.

24          But I would have thought that the lawyers are going

25  to get pretty much what they're entitled to whether or not I

Page 96

1    hold an interim fee app hearing in the last few weeks of

2    December.  Would you be willing to yield to give them a chance

3    to be heard on that exact issue, Mr. Williamson?

4              MR. WILLIAMSON:  I've concluded, Your Honor, and I

5    thank the Court for noting that some of us aren't on the

6    eighty/twenty program.

7              THE COURT:  Wait.  I lost you on that.

8              MR. WILLIAMSON:  Well, some of the professionals,

9    Your Honor, aren't --

10             THE COURT:  Oh.  Like you, yourself?

11             MR. WILLIAMSON:  Yes.

12             THE COURT:  Fair enough.  I certainly understand that

13   concern.  So let me understand, first, if this is mainly an

14   issue for those who aren't on the eighty/twenty program.  Mr.

15   Smolinsky?

16             MR. SMOLINSKY:  Your Honor, Joe Smolinsky for the

17   debtors.  We are on the eighty/twenty program.  I think the

18   difference for us is maybe the ten percent on fees.

19             THE COURT:  So you have the issue, too?

20             MR. SMOLINSKY:  We have the issue.  I don't know if

21   it's enough to upset your whole schedule but I guess we are

22   sensitive to the fee examiner's issue not being on that

23   program.

24             THE COURT:  Can you guys get your ducks in a row a

25   week or two before Christmas day?

Page 97

1          MR. SMOLINSKY:  Why don't we work together on

2     scheduling and see if we can come up with --

3          THE COURT:  I have enough memory of what it used to

4     be like to be a lawyer to be sensitive to your concerns, folks,

5     especially if it's consensual getting you something a little

6     before Christmas would be something I would try very hard to do

7     if I can.  And I assume that it's of enough importance to you

8     that you'd be willing to do it, like, at 8:30 in the morning or

9     at 6 o'clock at night, if need be.  So Mr. Smolinsky, you put

10    your noodle together with Mr. Williamson and anybody else who

11    has to do deal with this and to tell you the truth, if I can

12    get some rest between Christmas and New Year's I'm going to

13    try.  But if I can do something for you in the way of giving

14    you court time in the week or so before Christmas, I'll try

15    very hard to do that.

16         MR. SMOLINSKY:  Maybe for Christmas we can give you

17    an uncontested fee hearing.

18         THE COURT:  I need more than that from you guys for

19    Christmas but it's a step in the right direction.  Okay.  Fair

20    enough.  All right, we'll take a ten minute recess then we'll

21    start, without any more than that, in the way of New GM and the

22    dealers.  Anybody who is here just on what we've had so far is

23    free to leave.  We're in recess.

24         (Recess from 11:50 a.m. until 1:12 p.m.)

25         THE CLERK:  All rise.

09-50026-mg    Doc 7598    Filed 10/27/10    Entered 10/28/10 15:28:30    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 98 of 182

Page 98

1         THE COURT:  Have seats, please.  All right.  Motors

2    Liquidation, New GM and the dealers.  I want to get appearances

3    from everybody and then I have observations.  So let me get the

4    appearances, then sit down and I'll tell you what you need to

5    address.

6         MR. STEINBERG:  Arthur Steinberg and Scott Davidson

7    from King & Spalding on behalf of New General Motors.

8         THE COURT:  All right.

9         MR. COOPER:  Good afternoon, Judge.  Jeffrey Cooper

10   from Carella Byrne and Mark R. Beebe -- I'm sorry.  I

11   apologize, Judge -- Adams and Reese from New Orleans,

12   Louisiana.  Mr. Beebe has been admitted pro hac vice by Your

13   Honor's order for Leson Chevrolet.

14        THE COURT:  Okay, Mr. Beebe.

15        MR. BEEBE:  Thank you, Your Honor.

16        MR. BLATT:  Good afternoon, Your Honor.  Steven Blatt

17   from Bellavia Gentile on behalf of Rose Chevrolet, Halleen

18   Chevrolet and Andy Chevrolet.

19        THE COURT:  All right, gentlemen.  Here's what we're

20   going to do.  First, on the Ohio car dealers, it appears to be

21   acknowledged that the Ohio car dealers' situation is, I think

22   the words that were used, virtually identical to those in the

23   matter upon which I ruled for Rally.  So I want both sides to

24   address the extent and/or manner to which I should deal with

25   the matter that at least seemingly must be decided before the

Page 99

1    31st of October, while simultaneously providing appropriate

2    opportunity to take into account any views that Judge Patterson

3    might express on the Rally appeal, which at least seemingly

4    would not be binding on this issue but at the same time be

5    beneficial.  But on the Ohio dealers' issue, Mr. Blatt, I got

6    to tell you that I see no basis for distinguishing the Ohio

7    dealers' circumstances from those I addressed.  Please have a

8    seat.

9              MR. BLATT:  Oh, I'm sorry.

10             THE COURT:  The more difficult challenge for me,

11   gentlemen and what I need both sides to address, is the Leson

12   Chevrolet matter.

13             Now I gather that it's considered perfectly okay, in

14   some places, perhaps a lot of places, to be going into your

15   local tribunal to get an ex parte order, although I think it's

16   much less okay when you're trying to do that in the face of

17   both contractual provisions and court orders that say that this

18   court has exclusive jurisdiction of it.

19             But to the extent that the Leson Chevrolet involve

20   going to one's hometown tribunal to get out of my jurisdiction

21   and order, and I will speak softly and I will control the

22   outrage by which I view such measures, they're legally

23   indistinguishable from those in the Ohio dealers situation,

24   unless you, Mr. Beebe or your co-counsel, can explain to me

25   something to which I'm unaware, given the extensive analysis

MOTORS LIQUIDATION COMPANY, et al.

Page 100

1    and thought that I gave to these issues before.

2           The more difficult issue, gentlemen, is what I should

3    do about the fact that Leson Chevrolet won an arbitration and

4    this is not a down-home court and this court looks at matters

5    objectively.  And on the merits, I have trouble with both of

6    your positions but especially New GM's.

7           Now here, we do not have a situation where the dealer

8    has lost an arbitration and wants a second bite at the apple

9    and is looking for some kind of a do over somewhere else and

10   instead it is trying to enforce the arbitrator's ruling.  Now

11   in my earlier decision, I distinguished situations to enforce

12   the ruling from those to get out of it.

13          Now what I need both sides to address is a number of

14   issues in that vein, because just as I believe that parties

15   should live with the results of the arbitration when they lose,

16   I'm of the view that the converse is also true.  And just --

17   or, putting it differently, just as I believe that the dealers

18   have to live with the consequences of the arbitration when they

19   lose, I think New GM has to do likewise.

20          Now, in that connection, under the law of New York,

21   in which I was trained, and I suspect but don't know that it's

22   true under the law of Michigan which was the law whose -- the

23   law the parties said would apply in connection with the

24   termination agreements, one can't rely on the failure of a

25   condition that ones own conduct has occasioned.  GM has a

Page 101

1    problem in this regard because by having started a termination

2    process and deprived Leson of vehicles which, if they had been

3    provided might have given it more liquidity and/or more ability

4    to get financing, that put Leson in a catch 22 situation where

5    it was reinstated but may have lacked either the working

6    capital or the ability to get financing that were elements of

7    its ability to continue as an operating concern.  Frankly, I

8    don't know how far that analysis takes on and, for that reason,

9    I want both sides to address it.  But it's a matter that

10    troubles me, gentlemen.

11            I also notice the seeming disconnect between what 747

12    says that the winning dealer gets and what GM offered it.  Now

13    Leson cites in its brief the language of 747 and I assume

14    nobody is quarreling with the accuracy of its quotation which

15    says that the New GM has to provide the dealer, if it wins, if

16    the dealer wins, a customary and usual letter of intent to

17    enter into a sales and service agreement.  And I have questions

18    in my mind as to whether GM did that.

19            I also have heard, but am not impressed by the

20    argument, that by giving the dealer X days, and although there

21    was a reference to two days, I think, it may be that the more

22    accurate number is ten, but even ten, on a take-it-or-leave-it

23    basis, I have issues in my mind as to whether, (a)any assent to

24    that should be regarded as being under duress; and (b)whether

25    GM had the right to make such a demand.

09-50026-mg   Doc 7598   Filed 10/27/10   Entered 10/28/10 15:28:30   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 102 of 182

Page 102

1        I also have questions in my mind as to the extent to

2    which there should be res judicata or collateral estoppel with

3    respect to the arbitrator's findings on Leson's ability to

4    perform.  And I also am sensitive to Leson's desire to get

5    discovery on the issue of whether it did in fact get what is

6    customary and usual.

7        So, as you can tell from these preliminary remarks,

8    gentlemen, I'm pretty annoyed at both sides.  And until I can

9    get my arms around these issues I have a strong disinclination

10   to allow GM to pull the plug on Leson, notwithstanding how

11   offended I am about the way Leson behaved, and it appears to

12   me, subject to people's rights to be heard, that if Leson could

13   bring itself into compliance within a reasonable period of time

14   or satisfy me that it's capable of meeting what the statute

15   requires it to meet, as compared and contrasted to what GM

16   demands that it should meet, that I, as a neutral court, should

17   be a little slow to deny it the benefits of the arbitration

18   award that it won.

19       I'll hear first from the New GM side.  Actually, I

20   want to rephrase that.  I'll hear first from the Ohio dealers

21   because I don't, frankly, think there's much to talk about for

22   the Ohio dealers other than how, if at all, I should leave

23   things to be adjusted by reason of any change in precedent but

24   nothing binding on me.  I think I want to talk about the Ohio

25   dealers, get that behind us and then talk about the more

Page 103

1    difficult issues involving Leson.

2         So, Mr. Blatt?

3         MR. BLATT:  Thank you, Your Honor.  Steven Blatt,

4    Bellavia Gentile for the Ohio dealers.  Your Honor, I believe

5    in accord with both the letter that I sent and Mr. Jeff Jones

6    sent yesterday to the Court, trying to resolve the motion, I

7    believe we've done that in the hall prior to taking the bench.

8         With your permission, we propose that -- you know,

9    both sides acknowledge that the issues, the legal issues with

10   respect to this Court's jurisdiction litigated in Rally are, I

11   believe, virtually identical, as I acknowledged in my letter

12   yesterday.  As a result, we propose to submit a proposed order,

13   a joint order, granting the motion on the same terms as the

14   Rally motion.  However, both sides would be subject to the stay

15   that Judge Patterson has enacted in the Rally Rule 8005 motion

16   that we filed with him and that, to put it as simply as I can,

17   the Ohio dealers will agree to rise and fall with Rally on its

18   Rule 8005 motion and its appeal.  We'll agree not to go to any

19   other court with respect to the order that you'll enter, that

20   we'll submit with respect to this GM motion returnable today.

21   And whatever Judge Patterson decides with respect to that

22   motion and whether or not we go forward with the appeal, we'll

23   abide by that.

24        THE COURT:  On the GM side, Mr. Steinberg, did he

25   accurately describe the deal?

Page 104

1          MR. STEINBERG:  Yes.  But I probably have a few more

2     words.  So if Your Honor would indulge me I'd like to be able

3     to add what I think we had agreed to but would be a little more

4     expansive.

5          THE COURT:  Pull the mic closer to you, please.

6          MR. STEINBERG:  If I could --

7          THE COURT:  That's probably best, so, yes, do that.

8          MR. STEINBERG:  It was agreed that if any appeal of

9     the Ohio dealer's order would be treated as a related matter so

10    that it would go before Judge Patterson as well, so we wouldn't

11    have two district courts hearing, essentially, the same kind of

12    case.  We would be presenting to Your Honor the language that

13    Judge Patterson included in his order to show cause, which

14    basically froze the situation until he actually ruled on the

15    Rule 8005 motion.  So there as, in effect, a TRO and we would

16    copy that language there and it was agreed that, as Rally goes

17    on the stay issue, so will the Ohio dealers consensual stay.

18    And that they will not, if Judge Patterson denies the stay,

19    they will not run to another district court in the southern

20    district trying to get stay relief from another judge.  And

21    that, as he said, that there would be -- the exclusive

22    jurisdiction of this Court will be recognized, they won't go to

23    any other courts but it'll be without prejudice for them

24    pursuing their appellant rights, either in the district court

25    or for an appeal of the district -- the southern district of

09-50026-mg   Doc 7598   Filed 10/27/10   Entered 10/28/10 15:28:30   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 105 of 182

Page 105

1    New York.

2         And that the stay, and to the extent that the Rally

3    order had the requirement to dismiss the Ohio litigation, it'll

4    not run off the date of Your Honor's order but will run off the

5    date of termination of the stay by Judge Patterson and it'll be

6    something like three business days to terminate, with

7    prejudice, the litigation and two days thereafter to file

8    evidence of the termination with the Court.

9         So we're going to try to stay as close as we can to

10   the agreed upon Rally order, which Mr. Blatt was also involved

11   with, but would encompass those terms.  And I think that

12   that -- that satisfies the Ohio dealers and as a practical

13   matter, it satisfies New GM because we believe that this is

14   related to Judge Patterson.  Judge Patterson already entered

15   this kind of TRO stay.  So, as a practical matter, if they

16   appeal and then went in front of Judge Patterson he would do

17   the same thing until he ruled.

18        We also think this is relatively -- a very short term

19   measure because at the oral argument Judge Patterson indicated

20   that he would try very hard to make his decision before October

21   31st, which is Sunday.  So we assume that the status quo will

22   remain in place.

23        We felt strongly, though, about having this hearing

24   and this order because, as Your Honor will note, that after we

25   filed our motion before Your Honor, they went into the Ohio

Page 106

1    court and in effect they asked to change the equation and the

2    Ohio judge there refused to grant a temporary restraining

3    order.  We didn't want any kind of repeat of that again.

4           THE COURT:  Mr. Blatt, except for the last sentence

5    or two that Mr. Steinberg said, which I assume was his view of

6    the world as contrasted to describing the deal you made with

7    him, did he accurately describe the deal?

8           MR. BLATT:  Yes, Your Honor.

9           THE COURT:  Okay.  Gentlemen, I regard that approach

10   as very sensible and actually superior to the tentative that I

11   had articulated in my endorsed order.  So I'm going to approve

12   it.  Can I get your respective recommendations as to whether

13   you're merely having stated it on the record and me having just

14   stated that I approve it is sufficient or does it need to be

15   papered in any further way, either for the record here or to

16   help Judge Patterson?

17          MR. STEINBERG:  I think --

18          THE COURT:  You can use that mic if you just pull it

19   close to your mouth.

20          MR. STEINBERG:  I think Mr. Blatt would prefer to

21   submit an order.  So we will endeavor to do the first draft,

22   get something to Mr. Blatt this afternoon and hopefully be able

23   to present something to Your Honor.

24          THE COURT:  Which order, I take it, will be

25   consistent with what I just heard on the record.

Page 107

```
 1              MR. STEINBERG:  That's correct, Your Honor.

 2              MR. BLATT:  Yes, Your Honor.

 3              THE COURT:  Sure.  Okay.  That takes care of that.

 4              MR. BLATT:  Your Honor, if I may take my leave?

 5              THE COURT:  Yes, sure.  I'm sorry?

 6              MR. BLATT:  If I may take my leave?

 7              THE COURT:  Yeah.  What I was about to say is if you

 8    don't feel like you need to hear Leson, you're free to leave,

 9    if you choose to.

10              MR. BLATT:  Thank you for your consideration, Your

11    Honor.

12              THE COURT:  Okay.  All right.  Now, on Leson, I think

13    I still should be hearing from you first, Mr. Steinberg.

14              MR. STEINBERG:  That's fine.

15              THE COURT:  Then we'll have the usual back and forth.

16              MR. STEINBERG:  Your Honor, I plan on addressing your

17    remarks.  There was the threshold question, which I think Your

18    Honor alluded to but I wasn't sure of the phrase in the

19    question as to your exclusive jurisdiction and whether you

20    needed to hear argument on the jurisdictional point or whether

21    you wanted me to go directly to the questions that you had

22    where you expressed some displeasure with New GM.

23              THE COURT:  Do you know, from your dialogue with

24    Leson, whether Leson is really challenging my exclusive

25    jurisdiction?  If it is, I think you better address it but I've
```

09-50026-mg   Doc 7598   Filed 10/27/10   Entered 10/28/10 15:28:30   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 108 of 182

Page 108

1    got to tell you, Mr. Beebe, I don't regard this as any closer

2    for you then it is for the Ohio dealers.

3            MR. BEEBE:  Your Honor, I would like to present a

4    short brief argument on that issue but I do hear what you're

5    saying and I do appreciate the Court's position on that.  I

6    think it's just slightly different based on two factors,

7    primarily --

8            THE COURT:  Well, fair enough.  And I'll give you

9    that opportunity but with that preview, Mr. Steinberg, make --

10   you know what, since you're presumably going to be responding

11   to somewhat different points than Mr. Beebe's going to make on

12   behalf of Leson, as contrasted to what the other dealers did,

13   why don't we flip flop the order and let Mr. Beebe be heard

14   first on everything and then you can respond.  I'll let him

15   reply and I'll let you surreply.

16           MR. STEINBERG:  Your Honor, I think that it makes

17   perfect sense to hear his remarks on exclusive jurisdiction and

18   then Your Honor can see whether you needed any further argument

19   from the arguments that I had made in Rally.  But I did have

20   specific answers to a lot of the questions that were troubling

21   with -- troubling you about what you perceived to be the heavy-

22   handedness of New GM and I think I probably could advance the

23   ball in the dialogue.

24           Having said that, I'm prepared to do it any which way

25   you want.

09-50026-mg    Doc 7598    Filed 10/27/10    Entered 10/28/10 15:28:30    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 109 of 182

Page 109

```
 1              THE COURT:  Well, if you think you can advance the

 2     dialogue then let's bifurcate it.  Mr. Beebe, I'll hear your

 3     points on exclusive jurisdiction, give Mr. Steinberg a chance

 4     to respond, you to reply and him to surreply on jurisdiction.

 5     And then we'll flip flop the order in the event, as I've got to

 6     tell you is likely, that I still see myself as having the

 7     jurisdiction.

 8              MR. BEEBE:  Thank you, Your Honor, and it is a

 9     privilege and honor to appear before you and I thank you for

10     signing the order for me to appear pro hac.

11              Judge, I want to address one issue, before I get into

12     the jurisdictional issue, just so the record is clear.  I heard

13     the Court's admonishment regarding what was perceived to be

14     Leson's ex parte attempts to secure jurisdiction outside of

15     this court.  But I think factually --

16              THE COURT:  It wasn't just securing jurisdiction,

17     didn't you get a cease and desist order out of the Louisiana

18     agency?

19              MR. BEEBE:  The LMVC, that's correct Your Honor.

20     Actually co-counsel with another firm but I'm not disregarding

21     that obviously here on behalf of Leson, our client.

22              The reason, though, Your Honor was that we were

23     coming upon an impeding deadline and GM was going to terminate

24     or potentially terminate the LOI or the wind down or the

25     amended wind down and we had no idea, because this was in
```

Page 110

1   September.  Realize, we filed that on September 13th, long

2   before the October 4th Rally hearing before Your Honor.  We had

3   no idea that this Court felt so strongly about exercising

4   exclusive jurisdiction.

5          Even in the Rally hearing Your Honor entertained

6   quite a considerable amount of argument about the AAA rules

7   applying, about Rule 48(c) and the enforcement of some

8   arbitration judgment or order being conducted in some other

9   tribunal, besides this court.  And you even acknowledged in

10   that Rally hearing, Your Honor, that that may be a

11   consideration, that you could go someplace else and maybe go to

12   state court or federal court but we don't have that situation

13   here, is what you said.

14          We're in that situation where Leson has won.  We

15   filed in September just to say wait, let's maintain the status

16   quo, let's not lose our dealership.  And I think it was wise,

17   on our part, to get some relief.  Had we known that the Court

18   wanted to exercise jurisdiction, we certainly would have come

19   here.  Although in our minds it would have been a leap for

20   Leson because it would have been inconsistent with 747, at

21   least from where we're coming from, from the standpoint

22   Congress carves out jurisdiction from this Court and says,

23   look, you dealers who have been terminated, we're going to give

24   you an opportunity to go ahead and prove your case to an

25   arbitrator but you're going to do it in your home state.  So it

Page 111

1    makes little sense, at least in our minds, that we would come

2    here if Congress, in its infinite wisdom decides you, Leson,

3    terminated dealer, go and prove your case and we win, then you

4    would go and enforce your judgment in a state or federal court

5    under 48(c) of the AAA rules.

6          But in Louisiana, the LMVC regulates all the

7    relationships between a manufacturer and a dealer.  So it's

8    logical that's where we would go to seek relief and say we want

9    to be reinstated, can't we just be reinstated and proceed

10   because we won back in July and we still don't have new

11   inventory, we still can't sell cars.  And as you pointed out,

12   Your Honor, in one of the questions that you posed to New GM

13   and their "heavy-handedness", it's killing us.

14         And so I just want the record to be clear and the

15   judge to understand that we didn't feel like we were doing

16   anything wrong or attempting to circumvent the jurisdiction of

17   this Court.  And the timing and the facts certainly indicate

18   that we weren't doing that.  And in fact we didn't hear about -

19   - they removed, meaning GM removed to the Eastern District of

20   Louisiana.  That court sua sponte dismissed the remand --

21   dismissed the removal.  And so it went back to the LMVC, they

22   ex parted, asked for a stay of that remand order and so we had

23   a teleconference with the Judge, with both GM counsel and

24   myself participating.  And the Judge rescinded his stay order

25   and that's why the LMVC said, well, we'll proceed as we

Page 112

1    normally would proceed because it's more than a month old at

2    this point in time.

3            So again, my apologies to Your Honor.  Had we thought

4    this was -- the Court wanted to exercise exclusive jurisdiction

5    over this matter we would have certainly come here.  But there

6    was no reason why we would think that, based on the facts, as

7    we knew them on September 13th when we filed before the LMVC.

8            Now let me go into the jurisdiction issue.  Your

9    Honor, you've been more than patient with me.  We think there's

10   two factors that the Court needs to look at and one, in fact,

11   is your 363 order.  Under that particular sale where you

12   created a regime where you had two types of dealers, you had

13   participating dealers and those are the ones that had the

14   relationship with New GM going forward and then third

15   termination dealers which we happen to fall into.  And if you

16   read Your Honor's order, at paragraph 32, this talks about

17   participation agreements.  And at the end it says, "Any

18   disputes that may arise under the participation agreements

19   shall be adjudicated on a case by case basis in an appropriate

20   forum other than this court."

21           In paragraph 32, you chose to say new dealers, you're

22   not coming back here.  And in preparation for this argument I

23   called the Louisiana AG; because I understood they participated

24   in these early on discussions and they said yes there were

25   discussions regarding what would happen to these new dealers.

09-50026-mg    Doc 7598    Filed 10/27/10    Entered 10/28/10 15:28:30    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 113 of 182

Page 113

1    Would they have to continue to come back before Judge Gerber to

2    resolve all disputes regarding their new participation

3    agreements and their relationship going forward?  And they said

4    no, that was something that was very important to the AGs and

5    in fact I spoke to National -- Counsel for the National

6    Association of Attorneys General who also confirmed that was a

7    negotiated term and discussed regarding those participating

8    dealers.

9           And, secondly, if you look at paragraph 71 of the 363

10   order, it says, "This Court does not retain jurisdiction to

11   hear disputes arising in connection with the application of the

12   participation agreements."  You, Your Honor, specifically

13   carved out jurisdiction for participating dealers.  So under

14   your regime, there were two, as I said.  There's participating

15   agreements and deferred termination dealers.

16          Originally, we fell into deferred termination dealer.

17   But 747 comes along almost five/six months after this order's

18   issued.  It's a carve-out.  It says "Please proceed to

19   arbitration, prove that you were wrongfully terminated."  We

20   did it with flying colors, Your Honor.  As you can see from the

21   arbitrator's decision, it was clear that we were a very

22   successful dealership.  We had put in twenty-five million

23   dollars of profit in GM's pocket for three years before we

24   were -- before we received the wind-down in 2008.

25          And there's several other factors.  We were one of

09-50026-mg   Doc 7598   Filed 10/27/10   Entered 10/28/10 15:28:30   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 114 of 182

Page 114

1   the dealers in Louisiana.  We have 2.5 times the capital

2   because of our property than the average dealer in our region,

3   which includes a thousand dealers.  All of these facts were

4   heard by the arbitrator and decided in our favor.

5           But, more importantly, once we win arbitration under

6   747 we presume that we're not a deferred termination dealer,

7   but we're more akin to a participating dealer.  The ones that

8   you said, that, Your Honor, under 363 we don't want to exercise

9   jurisdiction over.  You have a dispute with New GM go through

10  the state route.  Go through whatever remedies you have, either

11  under state or federal court.

12          So the one -- the one exception, at least under your

13  own order, 363, would say that the Leson is more like a

14  participating dealer than it would be a -- a dealer that lost

15  arbitration.  So that's the first limitation to this Honorable

16  Court's jurisdiction.  And in spite -- ironically, it seems

17  that GM is violating the 363 order by bringing Leson here.

18          The second issue, 747, Your Honor.  It's a carve-out.

19  Congress said we're going to limit the bankruptcy court's

20  jurisdiction for the purposes of those deferred termination

21  dealers.  And there's no question that we fell into that --

22          THE COURT:  Where does 747 say anything about the

23  bankruptcy court's jurisdiction?

24          MR. BEEBE:  Your Honor, I don't think it specifically

25  addresses it.  And I know that in the Rally hearing you wanted

09-50026-mg   Doc 7598   Filed 10/27/10   Entered 10/28/10 15:28:30   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 115 of 182

Page 115

1    to harmonize those.  And what I'm trying to understand is how

2    to do that jurisdictionally.  But here's how what the

3    conclusions we come down to, Your Honor.

4             If you look at 747 -- just give me a moment.

5         (Pause)

6             You'll see in paragraph E it talks about what happens

7    in the arbitration.  The first thing in that paragraph E of 747

8    it says that you'll go to the Triple A.  It says that "The

9    arbitrator shall be selected from a list of qualified

10   arbitrators and it will proceed under the Triple A."  It

11   follows and continues.  It says "The arbitration shall be

12   conducted in the state where the covered dealership is

13   located."  Why did it do that?  Why did Congress choose to give

14   that up.  It could have said, you know, Judge Gerber, we know

15   you're busy but we're going to ask that you administer --

16            THE COURT:  Forgive me, Mr. Beebe.  In my court we

17   start any statutory analysis with textual analysis.  And we

18   talk about what the statute says, not what people read into the

19   statute.

20            So tell me in response to the question that I asked,

21   but you did not answer --

22            MR. BEEBE:  Your Honor --

23            THE COURT:  -- what 747 says that addresses the

24   matter of the jurisdiction of the bankruptcy Court?

25            MR. BEEBE:  And that's a fair question, Your Honor.

Page 116

1    It does not specifically address the bankruptcy court's

2    jurisdiction.  And, so, it is subject to Your Honor's

3    interpretation in saying that look, I've got to harmonize

4    these.

5            The one thing I would point to is paragraph G that

6    says "Notwithstanding the requirements of this provision

7    nothing in here shall prevent a covered manufacturer from

8    lawfully terminating a covered dealership in accordance with

9    the applicable state law."

10           I would argue that the Court also -- Congress also

11   carved out a particular situation where you could -- GM could

12   go and exercise its rights under state law.  If that was

13   intended why -- how could that happen if, in fact, this Court

14   had exclusive jurisdiction.

15           There is -- you have to give meaning to paragraph G,

16   in pari materia, if you give that statutory interpretation and

17   give G meaning, you couldn't have that carve-out, GM couldn't

18   go to state court if that were the case, at least the way I

19   would read it in statutory interpretation.

20           And as a consequence, it seems to be a reasonable

21   interpretation to take the other paragraphs of 747 and

22   interpret that there was some limitation.  Because otherwise

23   paragraph G is meaningless.  It has absolutely no meaning

24   because GM can't go and terminate them under state law, they've

25   got to come here.  And that's not what paragraph G of 747 says,

Page 117

1    Your Honor.

2            So it's a consequence the combination of the 363

3    limitations, your court's own limitation, Your Honor, about

4    dealing with participating dealers, and then 747 which has a

5    carve-out.  And it's under paragraph G, it's clear Congress

6    gave at least GM some other alternative.  If that wasn't

7    intended, then why is it in that particular statutory scheme.

8            So those two particular provisions at least are on

9    line with 363 order, on its face, as well as 747 would allow us

10   to go to our home state, where the arbitration took place, and

11   seek enforcement of our reinforcement rights -- reinstatement

12   rights, I'm sorry.

13           That's really what we're asking.  And it seems to be

14   consistent with Congressional intent when they say let's do it

15   expeditiously and lets do it cost-effectively versus having to

16   come to New York to seek reinstatement.  That seems to be

17   consistent with the spirit of that statute.

18           And I can't -- again, it may have been oversight, it

19   was a long -- a long law, frankly, and this was tagged at the

20   end of that particular law that was passed.  But it's clear

21   under paragraph G there was a -- some limitation to this

22   Court's jurisdiction because otherwise it becomes meaningless

23   without giving G some effect.

24           Your Honor, I'm happy to answer any questions you may

25   have regarding the jurisdictional issue, but that's the sum and

Page 118

1    substance of my argument.

2            THE COURT:  Fair enough.  Mr. Steinberg.

3            MR. STEINBERG:  The Rally motion was filed on

4    September 10th.  Their request for a hearing in the cease and

5    desist came after that on September 14th in Louisiana.

6            This past week there's been a hearing scheduled for

7    the end of this week in connection and before the Louisiana

8    Motor Vehicle Commission.

9            I think, but counsel can confirm this, because I

10   don't know this for a fact, I think they did something to try

11   to provoke that kind of hearing after Your Honor ruled on Rally

12   and after the motion was filed.

13           I do think that there's a simple answer to the

14   jurisdiction question, though, because I think counsel said if

15   he knew that the Court wanted to exercise jurisdiction he would

16   have come here.  So I think it -- notwithstanding all of the

17   argument, he basically said if I thought there was exclusive

18   jurisdiction here and I knew the Court felt this strongly I

19   apologize, but I would have come here.  So now we're here.  So

20   I think he's consented to the Court's exclusive jurisdiction.

21           On his surreply he could say whatever he wants to say

22   in response to try to clarify it, but I think that's what he

23   said.

24           The definition of participation agreement is in

25   Section 6.7 of the master sale and purchase agreement.  They

Page 119

1    are not someone who signed a participation agreement.  That

2    provision in the sale order which talked about the different

3    type of relief that someone who has a participation agreement

4    would have, is not them.

5           So you can listen to them closely, Mr. Beebe said

6    it's akin, which is his concession that it wasn't --  it wasn't

7    an actual participation agreement.

8           And in 6.7(b) it says "Participation agreements and

9    the related continuing brand dealer agreements will be auto --

10   will automatically be assumable executory contracts hereunder."

11   So the notion is is that Old GM had assumed these agreements,

12   had assigned them to New GM and now they were an assumed

13   contract by the purchaser.  And people in the context of

14   dealing with the AG in the order, carved out something special

15   for participation agreements.

16          But on the flip side it clearly didn't have the same

17   type of thing for people covered by the wind-down agreements,

18   which is what Leson had, which is what Leson signed.

19          So they are not a participation, they didn't have the

20   right.  They started their request before the Louisiana Motor

21   Vehicle Commission.  But after the Rally motion was started,

22   they -- I think that they precipitated action before the

23   Louisiana Motor Vehicle Commission within the last days -- last

24   ten days to have a hearing.  And the provision in Section 747,

25   which they referred to, didn't say you pursue under -- in the

09-50026-mg   Doc 7598   Filed 10/27/10   Entered 10/28/10 15:28:30   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 120 of 182

Page 120

```
 1    state courts, it just says pursue under state law if you wanted

 2    to terminate somebody.  And I think that's a different --

 3    that's not the same thing as saying that statute is saying you

 4    should pursue your remedies in state court.

 5              But the bottom line is that if he said I made a

 6    mistake, I didn't realize it, we're prepared to accept him at

 7    his word, and then he's consented to the jurisdiction of this

 8    Court.  And Your Honor has said that you have particular

 9    concerns of New General Motor's conduct, and I'm prepared to

10    try to address those concerns.

11              THE COURT:  Well, before you do, I think I need to

12    rule on the jurisdictional issue.

13              MR. BEEBE:  Your Honor, if I may just have --

14              THE COURT:  Yes, I'll permit you to do that.

15              MR. BEEBE:  One reply regarding --

16              THE COURT:  Okay.

17              MR. BEEBE:  -- co-counsel's -- other counsel's

18    comments.

19              Your Honor, clearly we didn't know about the Rally

20    here, and we're not monitoring the GM bankruptcy.  GM can't

21    come here before you and say they served Leson with the Rally

22    pleadings, that's absurd.  And that's --

23              THE COURT:  Have a seat, please, Mr. Steinberg.

24              MR. BEEBE:  That's the misimplication that Mr.

25    Steinberg has just led this Court to believe.
```

Page 121

```
 1           We had no idea about Rally.  But so it's clear, Your

 2    Honor, we do believe that this Court can share jurisdiction,

 3    it's not -- it shouldn't be exclusive just because of the two

 4    factors we cited.  And I've been over that and I won't

 5    reiterate that argument.

 6           Just from the fact -- the standpoint of -- again,

 7    there's been two limitations and it would not offend the

 8    notions of this Court's jurisdiction to have that particular

 9    non-exclusive jurisdiction over the Leson matter.

10           Thank you, Your Honor.

11           THE COURT:  All right.  Gentlemen, stay in place for

12    a second.

13        (Pause)

14           THE COURT:  All right.  Gentlemen, I'm ruling that

15    just as I had exclusive jurisdiction in the Rally in the Ohio

16    dealership matters, where the dealers lost in the arbitration

17    process, I have that same exclusive jurisdiction where the

18    dealer won in the arbitration process.

19           I don't need to rehash.  I think everybody agrees on

20    what the sale agreement and the 363 order provided.  And,

21    therefore, the only remaining issue appears to be whether if

22    somebody wins in the arbitration process, and, therefore, is

23    entitled to avail itself over or of what 747 provides that

24    rewrites history.  And without a doubt it gives the winning

25    dealership rights, which I discussed in my preliminary
```

09-50026-mg   Doc 7598   Filed 10/27/10   Entered 10/28/10 15:28:30   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 122 of 182

Page 122

 1   observations, and which we'll discuss further.  But it doesn't

 2   unwind history.

 3           Leson, like the Ohio dealers, like Rally, like

 4   countless other dealers that lost in the arbitration process,

 5   was subject to a deferred termination agreement with respect to

 6   which Congress gave dealers the arbitration mechanism to change

 7   that conclusion.

 8           As I ruled on page 47 of the Rally transcript in the

 9   slightly different context, and, of course, talking about a

10   different dealer, "Here and to the extent Rally was successful

11   in the arbitration, of course, that would be a defense to" --

12   and there's a transcription error, "to any effort to make it

13   terminate its agreement."

14           But the fact is that what Leson won in the

15   arbitration was what 747 gives it.  It didn't make the

16   termination agreement disappear.  And until and unless the new

17   agreement comes into place Leson lives under the provisions of

18   the termination agreement, subject, of course, to its rights to

19   come in here, to cause me to conclude, as I may ultimately

20   conclude, that I need to implement the arbitrator's ruling.

21           Now, it is not a satisfactory explanation to say that

22   now we're no longer under the termination agreement that we

23   signed, but that we entered into or should be deemed to enter

24   into it, because it's undisputed that they didn't, a new

25   agreement that one could, in any way, shape or form regard as a

Page 123

1    participation agreement.

2            Mr. Steinberg, on behalf of New GM, said that Leson's

3    contention was that the new agreement, or that the rights it

4    had, were akin to a participation agreement.  I don't think he

5    quoted it exactly correct because I took it in my notes.  What

6    Mr. Beebe actually said was two things, which I wrote in my

7    notes.  We presume.  And he said it's more like a participating

8    dealer.

9            We can and will talk about whether it is appropriate

10   to implement the arbitrator's ruling.  But whatever the

11   arbitrator did rule it cannot in any way, shape or form be read

12   as saying that Leson didn't really enter into a deferred

13   termination agreement back in 2009.  And it was and continues

14   to be acting under a different statutory regime.

15           So observers may no doubt notice the parallelism or

16   congruity in what I'm ruling.  I have exclusive jurisdiction

17   whether you win or lose.  So that's what we're going to talk

18   about next.

19           This ruling will be implemented in connection with

20   any final order, or interlocutory order that gets entered in

21   connection with this controversy.  But, gentlemen, that matter

22   is now decided for the purpose of going forward.  Although,

23   your rights to appeal or seek leave to appeal that

24   interlocutory order will run from the time of its entry and not

25   from the timing that I'm saying it now.

Page 124

1          All right, Mr. Steinberg, now let's address the

2    merits, which I regard as much more significant and debatable.

3          MR. STEINBERG:  Thank you, Your Honor.  I think Your

4    Honor put your finger on a number of issues that were troubling

5    you.  And I think they were -- that you were right to be

6    troubled by them.  Because when I reviewed the file, as well, I

7    wanted to be able to have answers for Your Honor with respect

8    to these types of questions.

9          They are, other than the fees, dealer, which is the

10   Iowa court decision, which you have, they are the only one we

11   are in litigation with, where they actually won in arbitration,

12   but they haven't been formally reinstated.

13         I'm sure Mr. Beebe will argue that will be a sign of

14   New General Motors recalcitrant's, and I would say the

15   opposite, which is that if we can get along with everybody else

16   and figure out how to institute an ordinary and customary

17   letter of intent with everyone else other than Leson, that

18   perhaps the problem is with Leson not with New General Motors.

19   I don't think that advances really the argument very far, I

20   just wanted to be able to point out that this is a unique

21   circumstance.  And New General Motors has been struggling with

22   how to try to get a satisfactory resolution of this matter.

23         Now, I think that there were two competing concerns

24   here, and they're legitimate concerns from Leson and legitimate

25   concerns from New General Motors.

09-50026-mg   Doc 7598   Filed 10/27/10   Entered 10/28/10 15:28:30   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 125 of 182

Page 125

1          In an ordinary and customary letter of intent there

2    needs to be something that addresses the net working capital

3    requirement, and there needs to be something that addresses a

4    floor dealer financing -- floor planning financing.  That's the

5    requirements that they put in all of their dealerships, and it

6    was in the dealership that Leson had signed before the

7    bankruptcy and was included in the LOI.

8          The issue is is what should those numbers be?  When

9    New GM sent the proposed LOI it used the same working capital

10   requirement that was in the original Leson dealership

11   agreement, and had been the same between 2003 and 2008.

12         The purpose of the net working capital agreement, and

13   if Your Honor has an evidentiary hearing on this, we will

14   actually have to present testimony on this, but my

15   understanding talking to my colleagues, some of whom are on the

16   phone here, is that you need to be able to demonstrate to New

17   General Motors that you have the capability of performing your

18   projected business plan, not your past performance over the

19   last twelve months, but your projected business plan.

20         The number that was included in the letter of intent,

21   which was the same number that was in the prior dealership

22   agreement, essentially gave Leson four months to get up to that

23   net working capital agreement.  That proposal was given to

24   Leson -- the LOI was given in June and was signed by Leson on

25   July 1, and required that by October 31 it would have to get

09-50026-mg    Doc 7598    Filed 10/27/10    Entered 10/28/10 15:28:30    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 126 of 182

Page 126

1    back to the same threshold, it would have had three/four months

2    to try to be able to do that.

3          The issue about financing was that they had to get

4    financing within a sixty-day period of time.  If you read the

5    arbitrator's decision you'll see there's a reference that they

6    told the arbitrator that they either had or could get it.  And

7    so that was -- and they had a commitment letter from local

8    banks.  So it was assumed that they would be able to try to

9    accomplish something within the sixty days.

10         Sixty days goes by, New GM still has not been sued,

11   but they say they're having problems with the dates.  So New GM

12   pushes --

13         THE COURT:  Problems with the what?

14         MR. STEINBERG:  Meeting the dates, meeting the

15   deadlines.

16         New GM pushes the deadlines to give them more

17   opportunity to try to comply with the deadlines.  To try to get

18   the floor -- the dealer floor financing and to try to get the

19   ability to get 2.85 million dollars of net working capital,

20   which is a formula that has -- is based on your current assets

21   and has some additions and some subtractions.  I think one of

22   the exhibits to the Leson objection does have some of the

23   materials on that.  Not the complete materials but some of the

24   materials.

25         So we had given Leson the opportunity and they still

09-50026-mg    Doc 7598    Filed 10/27/10    Entered 10/28/10 15:28:30    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 127 of 182

Page 127

1    had the opportunity as of October 31.

2         When we gave the extension in September we hadn't

3    been sued.  And then after giving the further extension we did

4    get sued.  And I think the real dynamic here is as follows,

5    Your Honor.  And I did try to approach this sort of in a

6    practical basis, because we could litigate, you know, as to

7    whether there was duress here or not.  Because if there was no

8    duress then they voluntarily signed a letter of intent with

9    certain requirements which they haven't been able to meet,

10   which should lead to the termination.

11        THE COURT:  Why don't you assume for the purpose of

12   this discussion there's at least an issue of fact as to whether

13   there was duress in 2010.

14        MR. STEINBERG:  Right.  We would have to -- we would

15   have to have that as a special trial.  But if we were

16   successful at that trial that would be the end of the issue.

17        But we tried to approach this on practical basis.

18   And I don't think it violates privileged communication for me

19   to tell you what our last settlement proposal was.  I won't say

20   anything about what they did other than that this proposal was

21   out there, and was made last Friday.  And I think it does

22   illustrate to Your Honor what we're trying to do to try to

23   address this on a practical basis.

24        But if we can't address it on a practical basis we

25   will have an evidentiary hearing and address it on the merits.

09-50026-mg   Doc 7598   Filed 10/27/10   Entered 10/28/10 15:28:30   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 128 of 182

Page 128

1          We had made this proposal to a principal of Leson.

2     "That the parties will agree that the wind-down agreements and

3     the letter of intent would be extended, along with the present

4     dealer sale and servicing agreement, to the dates contemplated

5     in the settlement outlined below.  We'll be sending you a

6     letter as soon as the parties have executed the settlement

7     agreement advising that the dealer agreement had been extended

8     pursuant to this resolution.

9          Item one, by January 31, 2011, Leson Chevrolet will

10    have 2.137 million level of net working capital.  That's

11    seventy-five percent of the 2.85 million," which is in the

12    letter of intent.

13         "As soon as possible, but in no event later than" --

14    I'm sorry.  "As soon as possible, but in no event later than

15    January 31, 2011, Leson will have acceptable floor planning in

16    place as contemplated by the LOI."  So we were giving them

17    another four months to get their floor planning in place and

18    lowering the net working capital requirement.

19         "Leson will be required to reach the 2.85 million

20    dollar level by January 31, 2012.  Leson will provide GM with

21    building plans acceptable to GM for it's showroom and

22    facilities by June 30, 2011.  They'll have all their permits

23    and needed actions completed to start construction by January

24    31, 2012, and will commence the facility construction on that

25    date, with a completion date by December 31, 2012.

Page 129

1          If Leson fails to meet these requirements or dates,

2     then the dealer servicing agreement will terminate at that

3     point in time, together with the wind-down agreement, and

4     provides it complies with its terms Leson will resume the wind-

5     down payment that's in paragraph 6.

6          And then the parties will sign a stipulation to

7     reflect that."

8          The purpose of that proposal was to try to meet, to

9     some extent, Leson's argument that the reason why it has a

10    problem ramping up to the working capital that it had in 2008

11    was because they were suffering under the wind-down agreement.

12         So if you go back to when the arbitration award was

13    ended in June we would have, essentially, given them seven

14    months to try and ramp up to seventy -- a level of seventy-five

15    percent of that, which we think was more than generous and

16    certainly within the ordinary and customary language of what

17    we'd done, with both the people that got reinstated through

18    arbitration and through the people who we settled.  And we're

19    prepared to try that matter.

20         The only thing that we want is that whatever the

21    numbers shift out, whatever they turn out to be, if they can't

22    meet then it has to be an end.  We don't get continually

23    litigated over the issue.  We want an agreement that, in

24    effect, has a remedy that is effectuating.  That's the approach

25    that we have here.

Page 130

1          I think the real robust of why this thing can't get

2    resolved, is because they don't want to have a firm remedy for

3    whatever the numbers turn out to be.

4          And my suggestion to Your Honor is understanding

5    these issues, and I'll try to address each of the specific

6    issues, is that you set an evidentiary hearing that we will not

7    terminate them.  We set an evidentiary hearing for whatever's

8    convenient for your schedule.  I think my brethren on the phone

9    will be prepared to try this thing as soon as they can.

10         But the parties can either -- to do two things.  They

11   can either litigate and try to settle on a practical basis to

12   try to reach some kind of economic number, whether it's

13   seventy-five percent of the working capital agreement, whether

14   it's February versus January versus December.  It doesn't seem

15   to me that its overly complicated to ultimately strike a deal

16   on these numbers.

17         The real issue is Leson's concern that it won't be

18   able to meet it.  And the real concern -- I mean, clearly,

19   every letter of intent should have the ability of their dealer

20   to provide financing.  They say it's a chicken and egg

21   situation.  Right.  Until I lock in onto a working capital

22   requirement and have a servicing agreement I can't get the

23   final commitment.

24         But as of today they still don't have, I believe, a

25   final commitment.  Counsel will stand up if I'm wrong on that

Page 131

1    issue, it would be able to say I'm wrong, and be able to

2    pronounce that he's got firm financing.

3         But without firm financing, forget about the working

4    capital requirement, whether created this or not, if they don't

5    have dealer floor financing they're not a qualified dealer,

6    under every circumstance.

7         Now the issue is how much do I give them -- how much

8    time do we give them to ramp up to their old levels, and what

9    should be their interim benchmarks?  Things like that get

10   negotiated in various types of deals all the time.  And they

11   should be able to be able to come to some kind of an

12   arrangement to be able to do that.

13        And it's not -- their proposal was all I should be

14   able to give you is 1.8 million dollars because that's what I

15   did during the wind-down agreement.  Well, we could quibble

16   with this, but if we have to argue this it's my understanding

17   that the dealer service agreement in Section 10.1 provides that

18   if there are changes in the operating conditions that indicate

19   the capital needs have changed that's when you change it.  But

20   you don't have to change it all the time.

21        And it's certainly unreasonable for us to set their

22   working capital needs based on a wind-down period when they're

23   supposed to set it for purposes of their projected business

24   going forward.  They'll be able to buy new cars, they need to

25   have more working capital.  It shouldn't be based on the

Page 132

1    numbers when it was set when they couldn't buy more cars.  And

2    so the bid and the ask I think they presented an affidavit was

3    something like a million-eight.  Was it?  A mil -- was it a

4    million-eight?

5        MR. BEEBE:  It's a million-eight, but that's what GM

6    really requires under it's accounting guidelines.

7        MR. STEINBERG:  It was a million-eight based on -- I

8    disagree with that we could -- when we get into the battle of

9    the experts we'll be able to show that's not true.

10       But for purposes of just pure numbers, yours was a

11   million-eight based on wind-down performance over the last

12   eighteen months.  And New GM has made a proposal that said they

13   want you to get up to a 2.1 -- 2.137 million net working

14   capital performance in the next four months, presuming you're

15   buying cars and you're ramping up, and trying to make money and

16   be in business, make money for yourself and make money for New

17   GM.

18       So my practical solution is, Judge, set this out far

19   enough so that the parties can either negotiate a deal and use

20   their dollars for that purposes.  And if they can't we will

21   present to you evidence on the duress issue, on the letter of

22   intent, to demonstrate that they had the opportunity to do

23   exactly what they're doing now, and they chose not to do it.

24   They were clearly lawyered up, they just came from an

25   arbitration, and they chose to sign a letter of intent.

Page 133

1          Once they signed a letter of intent, and the letter

2     of intent has language about this is knowing representation, et

3     cetera, then they should be stuck with it, and they will have

4     violated the letter of intent.

5          GM is not trying to be heavy-handed about this.

6     We've tried to meet them halfway, but we're not going to agree

7     to do a deal with a dealer who can't get financing, who won't

8     commit in the future to have financing locked in by a specific

9     time.  And won't commit to a working capital requirement that

10    is -- they want to have it predicated on a wind-down number.

11    And that clearly can't be the case, because they don't want to

12    do business as they've been doing it on the wind-down basis.

13    They need to do it based on buying new inventory, which means

14    it's a higher number.

15         We'll have a trial then for Your Honor to say well,

16    what should have been customary and usual.  And we'll see how

17    much money we'll spend to see whether we can get something that

18    fits between his 1.8 million dollar number and the offer that

19    we made which is at the 2.137 million dollar number as of

20    January 31.  And giving them another full year to ramp up fully

21    to their operations that they had in 2008.

22         Your Honor had said that you were concerned about the

23    res judicata of the arbitrator's findings.  Our belief is that

24    under the Dealer Arbitration Act the arbitrator could put in

25    whatever his reasoning was, but his final determination was

Page 134

1    reinstate or not reinstate subject to a letter of intent.  And

2    that's the only significance of the arbitration finding.

3         The sentence that Leson's pulled out which says that

4    we think they met the capital needs because it goes back to

5    2003 I don't think is relevant for what Your Honor's

6    determination will have to be.  I don't think it's entitled to

7    res judicata effect.  And it wasn't part of what they were

8    supposed to do.

9         And, Your Honor --

10        THE COURT:  Pause, please, Mr. Steinberg.  What did

11   you mean you don't think it was part of what they were supposed

12   to do?  You mean the arbitrator wasn't required to make that

13   finding, or you're saying he acted ultra vires by making it?

14   Or are you saying that you understand he made it but it's

15   irrelevant?  Or some fourth possibility?

16        MR. STEINBERG:  That the arbitrator's -- the

17   relevancy of the arbitrator's finding is to reinstate or to not

18   reinstate.  And how we got to the decision and how we weigh the

19   seven factors that the statute talked about should not have res

20   judicata effect for purposes of any subsequent hearing.

21        THE COURT:  Uh-huh.

22        MR. STEINBERG:  The issue on discovery on customary

23   and usual, we actually do have a trial, is that we would say

24   that Your Honor should bifurcate and first try the issues of

25   duress.  Because if we win on duress that there was no duress,

Page 135

1   then the letter of intent governs and it's not relevant

2   anymore.  They just will have not been able to perform.

3          THE COURT:  Well, why don't you give me a preview,

4   Mr. Steinberg.  What was the legal authority under which GM

5   gave them the deadline to sign it or not sign it?  I don't

6   remember whether it was two days or ten days, or whatever?

7          MR. STEINBERG:  It was ten days.

8          THE COURT:  All right.  And what was the statutory

9   authority or alternative authority which entitled New GM to

10  make that demand?

11         MR. STEINBERG:  I don't think it's in the statute

12  that is says it's ten days, two days or twenty days.  It just

13  says you're supposed to give a letter of customary and ordinary

14  -- a  customary and usual letter of intent, and that's what

15  they did.

16         They didn't want the offer to be outstanding.  I

17  think you can actually see Leson's objection, you'll see that -

18  - ironic that Leson signs the letter of intent on July 1.  And

19  on July 2 New GM is writing a letter to Leson saying you have

20  to July 16th to determine whether you want to sign the letter

21  of intent.  So there wasn't -- I don't think there's anything

22  statutory.  I think it's just simply a matter when someone

23  makes an offer they'd like to have a deadline as to when the

24  offer will then be rescinded.  So that's what it is.

25         THE COURT:  You're not troubled by the notion of

Page 136

```
 1   giving a dealer a deadline, especially one that short, without

 2   any statutory authority for a take it or leave it proposal?

 3            MR. STEINBERG:  I think we -- I think, and -- I think

 4   this is the case, but we -- I would need to confirm it, I think

 5   that's what we did for the dealers.  I mean, I think that's

 6   what we did.  Because at some point in time you need to

 7   start -- you need to come back on the bandwagon and you need to

 8   start performing.  And so there was a desire as to now that

 9   you've won, now we want to get you on the bandwagon, here's the

10   terms, and you have ten days to accept the terms.

11            I mean -- and think about it, what happens if they

12   had said no, does that mean that the world stopped at that

13   point in time?  They could have done exactly what they're doing

14   now, which is that they would come to court and say I didn't

15   get something that was ordinary and customary, I'm not signing

16   this agreement.  I want to have something that's ordinary and

17   customary, or simply I want to have another two weeks to

18   evaluate what it is.  But they didn't do either.  They signed a

19   letter of intent.

20            So I --

21            THE COURT:  Better make your next point, Mr.

22   Steinberg.

23        (Pause)

24            MR. STEINBERG:  I think, Your Honor, the only thing

25   that I have left to say was that the wind-down provision
```

09-50026-mg   Doc 7598   Filed 10/27/10   Entered 10/28/10 15:28:30   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 137 of 182

Page 137

1   affected Leson's performance.  And I think what New GM tried to

2   do was to give a lead time for them to ramp back up to their

3   2008 performance.  They weren't saying you needed to have net

4   working capital by a specific date.  They gave them four months

5   to get to that point in time.

6         THE COURT:  Isn't that the real thing to get one's

7   arm's around, either by negotiating or by litigation?  When the

8   dealer has atrophied, if you will, because of the consequences

9   of the wind-down environment, to what extent is it appropriate

10  to meet otherwise legitimate needs to get the proper

11  capitalization and floor financing, to simultaneously address

12  GM's legitimate needs and concerns, and the dealers think God,

13  I'd love to comply, but given what you did to me for the last

14  eleven months how am I supposed to do it.

15        So I would concede to you, or at least for purposes

16  of argument I would concede to you, that the devil is in the

17  details, and that one should try to find a sweet spot to have

18  the dealer get into compliance, recognizing the dealer can't

19  get into instantaneous compliance, and how to reconcile those

20  needs.  That is far better, it would seem to me, than arguing

21  about what is customary and usual when the environment in which

22  that's measured has been distorted by the consequences of the

23  deferred termination agreement.

24        MR. STEINBERG:  Yeah, I think, Your Honor, you're

25  absolutely correct.  And that's why I stood up to say that I

MOTORS LIQUIDATION COMPANY, et al.

1    thought I can address some of your concerns and try to give it

2    it's color and try to push where I think this thing needed to

3    go.  I mean, at some point in time hearing stopped, business

4    people get to absorb Your Honor's comments, and then they

5    either will react and change their negotiation position, or we

6    will set up a litigation backdrop for people to get more

7    realistic in their expectations.

8          And I think -- I tried to be very candid to you --

9    with Your Honor, which is that they raised, I believe, an issue

10   about how long should I have to ramp up.  And am I going to

11   have a draconian remedy when I'm concerned about whether I

12   won't be able to perform because I won't be able to get what I

13   need from New GM.  So I'm concerned about the draconian remedy.

14   I think there's an underlying tension there.

15         So how much time do we give them to try to build in

16   that concern and to be able to make sure that they have every

17   opportunity to perform, with the concern that New GM has, which

18   is that this is the dealer who may not be able to perform.  And

19   at some point in time you need to cut bait with them.  And

20   that's the tension here in this case.

21         Clearly, it can't be that the numbers should be set

22   based on the wind-down agreement.  And their argument is I

23   can't do 2008 numbers now and I need to have time to be able to

24   do the 2008 numbers.  And with regard to financing I have a

25   chicken and egg situation.  I need to show that I'm real and

Page 139

1   that I can get my lenders finally to commit to me.

2           So how much time do you need, and what do I need to

3   do to be able to do that?  Most of those things are much better

4   accomplished at a negotiating table with business people by the

5   side who did thing for a living every day, to try to reach a

6   deal.

7           And I'm suggesting to you that the -- my interim

8   solution that I would recommend to Your Honor for your

9   consideration and for my counsel -- my co -- my opposing

10  counsel's consideration.  Is that I don't think anything should

11  go forward in the Louisiana Motor Vehicle Commission this week.

12  I think Your Honor's ruling on exclusive jurisdiction means

13  that that has to stop.

14          I think that we would commit to have parties continue

15  the dialogue.  The settlement offer that I read is -- we will

16  leave on the table for a period of time for them to further

17  consider in view of Your Honor's ruling.  And that we ask that

18  Your Honor if -- set a date for an evidentiary trial, as to

19  whether we acted appropriately and whether the LOI was in the

20  context of a duress.  That we know Your Honor's schedule's very

21  busy and that if we don't see a dynamic moving on the business

22  side, that within a ten-day period of time we would call,

23  collectively, Your Honor's chambers and try to put this on for

24  a hearing.  And during that in between time, before we have the

25  actual hearing on the evidentiary side, we will agree that they

Page 140

```
 1    won't be terminated.

 2            THE COURT:  Uh-huh.  Okay, Mr. Beebe, your turn.

 3            MR. BEEBE:  Thank you, You Honor.

 4            There's a lot there, Your Honor.  And I want to begin

 5    with the net working capital issue and dealing with what GM

 6    really requires under its dealer and service and sales

 7    agreement.

 8            Your Honor, if I may I'll provide you with a copy.

 9            THE COURT:  Okay.  I assume you have one for Mr.

10    Steinberg.

11            MR. BEEBE:  I do, Your Honor.

12        (Pause)

13            MR. BEEBE:  GM's counsel paraphrased, and I think not

14    necessarily correctly, but the point shouldn't be lost on the

15    Court regarding 10.1 and what it provides.

16            Now, Your Honor, I also want to point out this is the

17    agreement which is governing the relationship between the

18    parties, along with, I presume the wind-down.  But this is the

19    dealer sales and service agreement in which Leson is operating.

20    And it was the one that was introduced in the arbitration and

21    is considered to be -- GM at least admitted in the arbitration

22    it has effect currently.

23            And you can see 10.1 net working capital.  "The

24    capital standard addendum reflects the minimum net working

25    capital necessary for a dealer to effectively conduct
```

Page 141

1   dealership operations.  Dealer agrees to maintain at least this

2   level of net working capital.  GM Motors will issue a new

3   addendum if changes in operating conditions or General Motors

4   guidelines indicate capital needs have changed materially."

5           Well, Your Honor, they have changed materially.

6   They've changed materially because of GM's wrongful termination

7   of Leson.

8           Rebo's calculation is consistent with what GM

9   requires.

10          If I may, Your Honor, if you'll look at Exhibit P,

11  I'm going to give you what's actually their -- from their

12  accounting guidelines.  Or, actually, their requirements.  This

13  is what GM says is required.  And I'll give you the addendum

14  here in a second, Your Honor.

15          If I may --

16          THE COURT:  Mr. Beebe, is this one unique to the

17  GM/Leson relationship, or is this a prototype for a use and

18  other matter?

19          MR. BEEBE:  This is what they have, this is for all

20  dealers, Your Honor.  I believe this comes up as a computer

21  generated document.  In other words, their manual is on their

22  server.  And if you were to go and say I want to pull net

23  working capital standard, this is what would -- you would find.

24          And as you can -- and I also gave you Exhibit O which

25  is the addendum which supplements the dealer service and sales

Page 142

1    agreement.

2           But, Your Honor, if you look at this net working

3    capital standard, it says on page 1 of the operating report,

4    "Represents the minimum amount of net working capital needed to

5    sustain satisfactory operation of the business.  This net

6    working capital standard is part of the contractual agreement

7    between the dealership and the manufacturer established

8    annually based on the dealer's method of operation and data

9    shown on the operating reports for a twelve-month period."

10          And it says "The determinants are," and it gives you

11   six determinants.  And Ms. Rebo has calculated those for you.

12   And it comes out to be 1.8 million dollars based on the twelve

13   months running through, I believe, maybe September or August.

14   But, essentially, it's 1.8 million dollars during the wind-down

15   period.

16          And what Leson expects is GM to honor its promises.

17   Honor its obligations; its contractual obligations.  Whether

18   it's under the dealer sales and service agreement or what

19   they're saying is how they calculate it.

20          There has been a material change and Your Honor

21   pointed out, when you said it seems a little unfair if GM

22   creates a situation and then tries to benefit from it.  They're

23   the ones who wrongfully terminated Leson, and now saying well,

24   you have to disregard that.  We want 2008 performance because

25   we're certain you're going to get there.

09-50026-mg    Doc 7598    Filed 10/27/10    Entered 10/28/10 15:28:30    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 143 of 182

Page 143

1           How are they certain we're going to get there?  Okay.

2     What if they decide they can't -- they don't manufacture cars

3     quick enough or get us to the inventory that we need to sell?

4     There are so many other factors.

5           So all Leson is saying is honor your commitment,

6     honor what the written document says.  Let's calculate it.

7     And then in thirteen months if you want to recalculate it,

8     let's recalculate it based on our performance.  Okay.  Because

9     that's really what should happen here.  And what they -- what

10    GM has offered here, is saying no, we really want a hook here,

11    we want seventy-five percent of that net working capital.

12          But the fact is it's based on operational

13    performance.  And so if we get the inventory, but we still

14    can't get inventory from them, so we -- four months from now

15    it's not going to really matter to have it at 2.1 million

16    dollars if you don't get any cars to sell.  I mean, it truly is

17    a chicken and egg situation, Your Honor, that we find ourselves

18    in where GM keeps saying we want 2.8 million dollars.  So we go

19    to GMAC and say well, we're working on that.  We think they're

20    going to allow us to have a lesser number, we think it should

21    be 1.8.  GMAC says well, we really want to get that number

22    because that's going to be amount of capital you have really

23    sitting on the side.

24          The key, Your Honor, and you're going to have to

25    understand this, is a commitment.  And financial resources

Page 144

1    committed to the dealership.

2          And, in fact, I'm going to provide to you a copy of

3    what was Exhibit -- I want to say 18, to the Thys' brief.  It

4    is what is considered according to Mr. Aronson, counsel for

5    Thys, which is being transferred to you out of Iowa, a

6    customary and usual LOI.  And you'll see there are no

7    operational directives in it.

8          And, in fact, it says you have thirty days to decide

9    what -- whether you're going to accept this or not.  And,

10   again, this is based on -- this is something that was attached

11   to the brief in Thys.  And, obviously, GM has a copy of it.

12         Your Honor, you see that there is no specific number

13   of net working capital in this standard LOI.  What it does

14   require is that commitment.  We have an eight million dollar

15   facility, fourteen acres in Metropolitan New Orleans in the

16   West Bank.  We're the only GM Chevrolet dealer on the West

17   Bank.  This family has been there for eighty years.

18         THE COURT:  By West Bank you mean the West Bank of

19   the Mississippi?

20         MR. BEEBE:  Yes, sir.  I apologize, the West Bank of

21   Mississippi.

22         THE COURT:  No, I just -- I've been to New Orleans

23   but I don't know it as well as I think you do.

24         MR. BEEBE:  Well, it's right over the river probably

25   about two miles from the bridge.  So not too far from downtown.

Page 145

1    It's a wonderful location, but they have eighteen acres.  The

2    second busiest intersection in the State of Louisiana,

3    according to traffic surveys and part of the evidence that had

4    been introduced.

5            So this family is committed, they've been there for

6    eighty years.  And you'll hear a long and distinguished history

7    if we ever have that opportunity to present that to you, Your

8    Honor.  But we'll get to that on the res judicata question.

9            But what you can see, and this is why GM isn't being

10   as forthcoming as it appears in usual and customary LOI.  No

11   mention of net working capital number, no mention of a floor

12   plan financing.  They do what evidence of commitment of

13   financing.  Okay.  But they don't put specific operational

14   parameters in this particular LOI.  And they give you thirty

15   days.

16           There is -- it's not consistent with 747 when it says

17   you're supposed to get a dealer in service -- a dealer sales

18   and service agreement, and in that particular statute it says

19   you get the LOI and it specifically references that you will

20   get -- it contains the operational parameters in that deal, the

21   sales and service agreement under 747.

22           It says after executing the sales and service

23   agreement and successfully completing the operational

24   prerequisite set forth therein.

25           So, by reference, the operational prerequisites are

09-50026-mg   Doc 7598   Filed 10/27/10   Entered 10/28/10 15:28:30   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 146 of 182

Page 146

1    to be set forth in the DSSA and not in the LOI.  That's one

2    thing that we have an issue with substantively about why they

3    haven't complied.

4              But getting back to the net working capital, Your

5    Honor, it should be at 1.8 million dollars.  There's no debate

6    about what GM requires other dealers.  And the fact is there's

7    been a material change, a material change caused by GM in that

8    regard.  And then when GM comes to you and says oh, let's

9    litigate the duress issue, and if they lose then there's no

10   further issue, no, there is a further issue.  Whether we

11   entered into the LOI under duress or not, the question is, is

12   it appropriate to have those terms?  Is it appropriate to have

13   it there in ten days?  Is it appropriate to have 2.85 million

14   dollars worth of net working capital when their own accounting

15   manual will tell you otherwise?  When our own operational

16   parameters, just from a practical standpoint, how is that we go

17   to a bank and we say GM says they only want to look at 2008.

18   Mr. Banker, we want you to only look at our 2008 financial

19   performance.  Do you know what the bank says?  You got to be

20   kidding me, I want to see what you did in 2009 and 2010.  2008

21   is irrelevant.  But GM doesn't seem to understand that, Your

22   Honor.

23             You want to give us a four-month ramp-up period, why?

24   Are you going to give us cars after that four-month ramp-up

25   period?  Find out how many cars we sold and let's go calculate

Page 147

1    it according and in accordance with GM's net working capital

2    requirement under its own manual.  That's really what's

3    required.  That's what the obligations of the party happens to

4    be under, whether it's the wind-down, whether it's the DSSA,

5    that's what's required.  So recalculate it annually, but it

6    certainly should be based on our performance.  And it's poor,

7    as you saw from Ms. Rebo's declaration submitted to this court.

8    When you have 700 cars to sell and you're down to thirty cars

9    to sell it's very tough.  And we're not getting any new

10   inventory, and we don't seem like we're going to get any new

11   inventory.

12          So in that regard, Your Honor, I think that GM is

13   dead wrong when they say the duress issues satisfies the whole

14   LOI problem.

15          Now, there's a question about whether it's usual and

16   customary, and it's clear it's not.  And I think that they're

17   going -- you'll find through discovery that, in fact, they've

18   given other dealers different deals.  You'll find those

19   participating dealers don't meet net working capital.  That's

20   what we think we'll find if you go through discovery.  You'll

21   find that they've allowed some dealers to slide in one point --

22   slide a little bit on net working capital.

23          Our fear is we agreed to this -- because GM hasn't

24   honored their promises with Leson.  And so there's a real fear

25   that wow, we're our net working capital's at 2.1, you've agreed

Page 148

1    to walk away, we're going to make you walk away from this

2    dealership.  And that's hard for the Leson family to accept.

3    Again, eighty years they've been in business, and it troubles

4    them to say why is it we can't get to some agreement that's

5    reasonable.

6           And that was the whole purpose, frankly, before the

7    LMDC, that's really what they do.  During the manufacturing the

8    dealer in and they say here, let's talk about what we think the

9    various issues are between you and get the lines of

10   communication.

11          GM has sent their in-house counsel --

12          THE COURT:  Pause, please, Mr. Beebe.  Do they

13   provide a mediation function, or an adjudicative function, or

14   both?

15          MR. BEEBE:  Both, Your Honor.  The preliminary

16   hearing, as I understand it, is where they sit down and talk

17   about -- about here's your issue GM, here's your issue Leson.

18   Let's figure out what the resolution is going to ultimately be.

19   Because I think they really are attempting to balance the

20   playing field between a manufacturer and dealer, but make

21   certain that both are satisfied.  GM gets the security that

22   they need with respect to determining okay, is this dealership

23   going to function.

24          Because that's really what net working capital's

25   about, right?  Is it are they going to survive?  Are they going

MOTORS LIQUIDATION COMPANY, et al.

Page 149

1    to have enough capital to weather the storm?  And that's why

2    it's based on a couple of months average of sales, of parts,

3    used cars, et cetera.

4           But G -- Leson is in it for the long haul, and they

5    have secured some financing.  But it's not going to get to 2.8

6    million dollars.  And they're working on that to take out GMAC,

7    which has the first lien on its property.  It's probably more

8    facts than Your Honor needs, but --

9           THE COURT:  On the fee or on the vehicles, or both?

10          MR. BEEBE:  Well, floor plan would be on the

11   vehicles.  And then they have the real estate, which, again,

12   the dealership is worth between five and eight million dollars,

13   depending on the appraisal.

14          THE COURT:  You mean, the land.

15          MR. BEEBE:  Land, yes, sir.  And they're looking to

16   take the floor plan financing out of GMAC's hands and going to

17   a local bank.  And based on SPA's latest legislation that

18   they've put forth and availability of funds, it appears that --

19   we're hopeful that we'll get that and be able to take GMAC out

20   of the equation and have the floor plan financing as well as

21   the facilities, or the real estate loan covered by this local

22   bank.  So we're working on that.

23          But we also have secured a million dollars from

24   another local bank, which would put our working capital at

25   2.1/2.3.  But, again, that's not what's required.  That's the

09-50026-mg   Doc 7598   Filed 10/27/10   Entered 10/28/10 15:28:30   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 150 of 182

Page 150

```
 1   problem.  They're saying, you know, you got to take that
 2   million dollars, we need to use some of that million dollars,
 3   obviously, to reinvest in the business, reinvest in our
 4   employees and grow our business.
 5            But, Your Honor, as far as net working capital and
 6   usual and customary I think I covered the ground on that unless
 7   you have some questions regarding that.  But we feel pretty
 8   strongly that GM isn't honoring their promises, and, frankly,
 9   the net working capital should be calculated at the number that
10   Ms. Rebo has submitted to Your Honor.
11            And the fact is this letter, while submitted in
12   another matter, is fairly determinative that GM hasn't
13   submitted a usual and customary LOI to Leson, at least in these
14   circumstances.  And I think Thys is going to take that very
15   same position before Your Honor when they arrive here, because
16   they're being transferred from Iowa.
17            Now, Your Honor, you talked about the res judicata
18   effect of the arbitrator.  And I think the arbitrator's
19   decision that we have net our capital requirement absolutely
20   stands.  And I'll tell you why.
21            Congress in 747 said "The factors considered by the
22   arbitrator shall (1) include the covered dealerships
23   profitability in 2006, 2007, 2008, and 2009, (2) the covered
24   manufacturers overall business plan, (3) the covered
25   dealerships current economic viability, (4) the covered
```

Page 151

1   dealerships satisfaction of performance objective established

2   pursuant to the applicable franchise agreement, (5) the

3   demographic and geographic characteristics of the covered

4   dealerships market territory, (6) the covered dealership's

5   performance in relation to the criteria used by the covered

6   manufacturer to terminate, not renew, not assume, or not assign

7   the covered dealership's franchise agreement, and (7) the

8   length of experience of the covered dealership.

9           THE COURT:  Pause, please, Mr. Beebe.

10          MR. BEEBE:  Sure.

11          THE COURT:  The words that preceded that list of

12  seven things, what did you read to me?  Did it say in substance

13  the arbitrator shall consider or take into account?  What were

14  the exact --

15          MR. BEEBE:  Yes.  "The factors considered" --

16          THE COURT:  -- words?

17          MR. BEEBE:  -- "by the arbitrator shall include those

18  seven factors."

19          THE COURT:  Okay.

20          MR. BEEBE:  And so -- and you can see from the

21  opinion he drew a conclusion that all of those weighed in favor

22  of Leson.  And so we can't revisit that here.

23          THE COURT:  So pause, please.  Your position is that

24  he made factual findings in connection with that determination

25  on those seven sub-issues prior to issuing, what we might call

Page 152

1    in slang, a bottom line decision.

2            MR. BEEBE:  That's right.  And you'll see that in his

3    opinion, Your Honor, or his decision.  Which I think is

4    submitted to Your Honor as -- let's see, it is Exhibit C to our

5    reply.  And it's approximately six or seven pages, but there

6    are several facts that he has presented to Your Honor in that

7    decision.  And it's pretty clear that, again, all of them

8    weighed in favor of Leson.

9            So Leson is a little fearful that we're going to come

10   back and relitigate those issues.  And we certainly shouldn't

11   have to.  It seems completely unfair when you have a

12   determination after somebody having heard evidence for two days

13   comes to the conclusion regarding Leson's viability, it's

14   economic contribution to GM and says you should be reinstated

15   per 747.

16           THE COURT:  Brief me on the arbitration procedure.

17   Was there opportunity to cross-examine?

18           MR. BEEBE:  Yes, Your Honor.  It was just like a --

19   essentially, a trial.  We had our opening arguments, our

20   opening statements, and had witnesses presented by Leson first,

21   cross-examined by GM's counsel.  The arbitrator asked questions

22   when he thought it was appropriate.  Then GM was allowed to put

23   on their defense case.  And then we were allowed to put on a

24   rebuttal case.  There were no closings.

25           THE COURT:  Continue, please.

09-50026-mg   Doc 7598   Filed 10/27/10   Entered 10/28/10 15:28:30   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 153 of 182

Page 153

 1            MR. BEEBE:  I'm sorry?

 2            THE COURT:  Continue, please.

 3            MR. BEEBE:  Okay.  Now, so with respect to that, we

 4    ask that the Court look very carefully at 747 and look at the

 5    factors that were considered and look at the arbitrator's

 6    decision.  It's clear that it should res judicata regarding

 7    those particular factors and Leson's satisfaction of its

 8    performance obligations to GM under the dealer's sales and

 9    service agreement which was really what we're talking about

10    here.  And as a consequence, there shouldn't be a lot of issues

11    regarding Leson's inability to perform going forward.

12            Part of it is what would have happened if GM had said

13    you should have ten million dollars in net working capital?

14    Why is that not unreasonable?  I mean, so the point is, they

15    have a formula which they're completely disregarding.

16            Your Honor, there was also -- you had raised -- let

17    me take a look at my notes.  I want to talk a little bit about

18    the duress issue, Your Honor.  GM takes the position that on

19    July 1st we just signed the agreement without any thought.  As

20    you'll note in our submission to you, Your Honor, we gave you a

21    copy as Exhibit E of the June 28th, 2010 correspondence and as

22    Exhibit F our July 1st, 2010 correspondence.  I have copies for

23    Your Honor if you'd like.

24            THE COURT:  Yeah, you can hand it up, please.  I

25    couldn't find it in my pile.

09-50026-mg   Doc 7598   Filed 10/27/10   Entered 10/28/10 15:28:30   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 154 of 182

Page 154

1          MR. BEEBE:  I have E -- here's the letter we sent

2     basically two days after we receive the LOI, raising the very

3     issues that we're here raising before Your Honor regarding

4     propriety of the LOI and the inconsistency with 747.  And,

5     again, when we signed -- because they said you have ten days,

6     we were really concerned; we had no choice but to sign it.

7              With -- July 1st, when we sent it to them and we made

8     phone calls, Your Honor.  That'll be -- that's clear from the

9     record and the submission of Lisa Rebo calling GM to talk about

10    this.  And we sent a second letter that raises considerable

11    issue with GM's approach and heavy-handed approach on demanding

12    that we sign the LOI that wasn't consistent with our reading of

13    747.  And so you can see we have a long laundry list of issues

14    or complaints here in Exhibit E and the same is repeated again

15    in Exhibit F which accompanied the signed LOI.

16              And, so, Your Honor with respect to duress, we think

17    we'd be able to prove the case of duress but it seems to us

18    that what the Court should be focusing on is getting the

19    parties together and saying GM, what is really your obligations

20    under the dealer's sales and service agreements and Leson, what

21    are your obligations in that regard, going forward now that

22    you've been reinstated?

23              We think our net working capital, if it's 1.8 million

24    dollars, we're going to get the financing and get the floor

25    plan financing and get new cars in and be able to meet --

MOTORS LIQUIDATION COMPANY, et al.

Page 155

```
 1   recalculate it, net working capital, recalculate performance

 2   parameters that are equivalent or consistent with those

 3   particular requirements based on our financial performance.

 4          It can't be usual and customary, Your Honor, where

 5   you wrongfully terminate somebody, you create this financial

 6   hardship and then we can't go to a bank and say, we only want

 7   you to look at 2008 numbers.  And the bank says, no, we want to

 8   look at 2009 and 2000 (sic) numbers -- 10 numbers.  That can't

 9   be usual and customary.  It's commercially unreasonable to

10   demand that Leson automatically reach its 2008 performance.

11   Four months isn't enough time.  It's simply not enough time.

12   It took eighteen months or sixteen months to get here.  Why is

13   it you wouldn't have that same ramp up time to see how many

14   cars you have, then set the net working capital, based on that

15   performance after you've had a chance to at least sell a full

16   inventory and sell it for twelve months?  That seems to be the

17   reasonable business approach, get a full inventory, sell these

18   cars then recalculate net working capital.  That's really how

19   it should work and that's how it worked, frankly, I think,

20   before the arbitration and before the GM bankruptcy.

21          Your Honor, with respect to discovery, I've kind of

22   covered that briefly with regards to the -- what we consider to

23   be at least a question about usual and customary.  We're sort

24   of in that catch-22 that you mentioned earlier.  It's the

25   expense that it takes to engage in this battle and Leson,
```

Page 156

```
 1    again, is not getting any new cars any time soon and so it puts

 2    us at a sever disadvantage and it's very problematic.

 3            We don't want to spend a lot of money engaged in

 4    extensive discovery, but I'm pretty certain that we're going to

 5    be able to prove what we say that GM hasn't given us a usual

 6    and customary LOI.  And you'll see that they've negotiated with

 7    several dealers.  And they say that's a tribute to their good

 8    faith.  Well, maybe they can take it with respect to their good

 9    faith with those other dealers, but certainly not in Leson's

10    case.

11            Also, the other thing, Your Honor, is we'd -- we

12    believe that the choice of law is important here.  We think

13    that the choice of law analysis and obviously with this Court

14    sitting here in New York that New York's choice of law analysis

15    would govern.  But ultimately, the Court would conclude that

16    Louisiana law would govern this arrangement in this

17    relationship.

18            THE COURT:  You better help me with that, Mr. Beebe,

19    because the choice of law ruled in New York as in most states

20    will respect choice of law provisions in other documents.

21            MR. BEEBE:  That's certainly true, Your Honor, but in

22    your opinion, I believe it's in Lois/USA Incorporated 264 B.R.

23    69, it's -- you basically acknowledge that under Cargill, that

24    the Second Circuit has noted that New York law allows a court

25    to disregard the party's choice when the most significant
```

Page 157

1    contact with the matter in dispute are in another state.

2           THE COURT:  Are you a Saints fan?

3           MR. BEEBE:  I am, Your Honor.

4           THE COURT:  You know what a Hail Mary is?

5           MR. BEEBE:  Yes, Your Honor, I do.

6           THE COURT:  Well, when you're trying to get out of a

7    contractual choice of law provision.  That's kind of like a

8    Hail Mary.

9           MR. BEEBE:  I understand, Your Honor, but --

10          THE COURT:  Now --

11          MR. BEEBE:  -- I do want to raise --

12          THE COURT:  Now --

13          MR. BEEBE:  -- that issue --

14          THE COURT:  -- there is more room under choice of law

15   doctrine, conflicts of law doctrine, for resort to other forums

16   when there is no express choice of law provision.  But didn't

17   the termination agreement provide for Michigan choice of law?

18          MR. BEEBE:  It does, Your Honor.  There is a specific

19   provision in the wind-down agreement that applies Michigan law.

20          THE COURT:  Under normal choice of law rules, unless

21   you can tell me that I've missed something over the last ten

22   years, a New York Court would honor a choice of law provision

23   providing for the selection of Michigan law.

24          MR. BEEBE:  No, and I appreciate that, Your Honor.  I

25   will tell you, for example, I believe the dealers' sales and

09-50026-mg   Doc 7598   Filed 10/27/10   Entered 10/28/10 15:28:30   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 158 of 182

Page 158

1   service agreement also provide Michigan law, but I believe that

2   in Louisiana, the Louisiana Court or the LMVC would apply

3   Louisiana law because of the strong public policy that's

4   involved with regards to the manufacturer of vehicles in

5   Louisiana and its police powers that are being exercised under

6   its regulatory scheme that enabled and created the LMVC in

7   Louisiana.

8           As a consequence, Louisiana court would in fact apply

9   Louisiana law to that relationship.  And, again, you decision

10  in Lois cites Cargill which would allow the Court to disregard

11  it if the most significant factors weigh to another state.  And

12  here we'd argue that, look, Leson's dealership is there, GM

13  goes all over the country and they deal with other states'

14  laws.  The contract was signed in Louisiana, at least on

15  Leson's part.  That's where the real dispute is with regards to

16  the administering of Leson's Chevrolet.

17          THE COURT:  Are you aware of any case in the country

18  that has ever based choice of law on a physical locality of

19  where a contract was signed?

20          MR. BEEBE:  No, not exclusively.  But I believe

21  that's one of the factors that was listed, at least, in the

22  Cargill decision, Your Honor, from the Second Circuit here.  So

23  it's not persuasive -- it's not determinative certainly, but

24  it's a factor to be taken into consideration apparently.

25          THE COURT:  Well, your other points have been a

09-50026-mg   Doc 7598   Filed 10/27/10   Entered 10/28/10 15:28:30   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 159 of 182

Page 159

1    little stronger, Mr. Beebe, so why don't you get back on track?

2            MR. BEEBE:  Okay.  Your Honor, I want to make certain

3    that I've answered each and every one of your questions here.

4            Your Honor, I think that I've covered each of your

5    questions, at least as listed in my notes regarding first the

6    failure to meet the performance criteria, was created obviously

7    by GM's wrongful termination.  I think we've covered that and

8    feel pretty comfortable that we find ourselves in this

9    situation because of GM's wrongful termination.

10           Now, with respect to what GM has offered in its LOI,

11   we clearly believe there's a disconnect and inconsistency

12   what -- which is absolutely required under 747 where it says

13   you are to give them an LOI, usual and customary, and then a

14   dealers' sales and service agreement not an amended wind-down

15   agreement which they were offering.  And so, we're still

16   waiting for that dealer's sales and service agreement and

17   that's where the operational parameters should be contained.

18   That's where they should be listing what you're required to

19   have as far as net working capital, as far as floor plan

20   financing.

21           And then as far as the issue dealing with duress,

22   Your Honor, I think it's well documented regarding our position

23   and signing it under protest, beginning on the 28th of June and

24   then subsequently on July 1st.

25           And then finally, Your Honor, res judicata.  We ask

Page 160

```
 1   that you carefully review the arbitrator's decision and the

 2   factors that he considered in 747 and that we not be forced to

 3   revisit those here.  Because I think absolutely, it is

 4   persuasive and determinative of the fact that Leson had reached

 5   and had maintained a proper dealership and maintained

 6   consistent with it dealer's sales and service obligations.  And

 7   as a consequence, it should be reinstated.

 8            THE COURT:  All right.

 9            MR. BEEBE:  And finally, Your Honor, just with

10   respect to discovery, obviously we think that we should be

11   entitled to it and that ultimately, it really would relate to

12   what is usual and customary.  You may also have some discovery

13   on duress, but usual and customary, I think it will be

14   demonstrated, that GM doesn't have something that's completely

15   usual and customary but what they sent out to Leson certainly

16   is not usual and customary and consistent with what they had

17   sent out previously and perhaps with even another arbitration

18   winners.  Thank you, Your Honor.

19            THE COURT:  very well.  Mr. Steinberg.

20            MR. STEINBERG:  Your Honor, attached to the reply

21   memorandum is the Ohio -- Iowa decision in Thys.  And on page 8

22   of the decision, it describes what New GM did to Family Auto

23   which was the dealer in Thys and what the LOI was that it sent.

24            And it says that it wanted to establish and maintain

25   a 296,000 net working capital, obtain all appropriate silence
```

09-50026-mg    Doc 7598    Filed 10/27/10    Entered 10/28/10 15:28:30    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 161 of 182

Page 161

1    to conduct the franchise and return its wind-down payments.

2    And then New GM asked Family Auto to sign and return the letter

3    of intent within ten days of receipt.

4            So counsel got totally confused in its presentation

5    of what is ordinary and cust -- ordinary, customary and we will

6    have that opportunity to present it to Your Honor.  But the

7    first thing he did was totally misstate the letter of intent

8    that was given to the person who won the arbitration award.

9            What he did give you was something different.  Your

10   Honor doesn't have the Thys case yet in front of it, but the

11   decision in Thys related to the fact that this dealer, while it

12   had just -- while it was in arbitration, essentially sold his

13   business.  And what counsel gave to you was the letter that

14   New GM gave to the buyer of the business, the buyer who bought

15    from the entity that won in the arbitration award.  So it

16   wasn't a letter of intent in connection with having won an

17   arbitration award.  It was essentially the type of letter that

18   you give to someone who's going to become a new dealer in your

19    network.

20           Even if you wanted to look at that document that he

21   said doesn't have provisions, it does have provisions.  So

22   paragraph 1, the second bullet point says, "Evidence that the

23   investment had been made in accordance with the proposal of the

24   capitalization of the dealer company to include originating

25   account disbursements as represented on the Source of Fund

Page 162

1    statement together with like deposits in the dealer company."

2    So they were asking the new dealer to give me the evidence of

3    your capitalization proposal.

4         The fifth bullet point, "Evidence that the dealership

5    had obtained a separate line of credit from a credit-worthy

6    financial institution acceptable to GM to enable the dealership

7    company to sufficiently finance the purchase of a sufficient

8    number of new GM vehicles to meet the obligations under the

9    dealer agreements."  Which is essentially the same kind of

10   general language which was in the letter of intent about the

11   ability to get capitalization.

12        So we're not here -- and I don't mean to try to turn

13   what was not supposed to be an evidentiary hearing into an

14   evidentiary hearing.  And I think Your Honor should have the

15   opportunity for that if we end up getting to that stage.  But

16   what he gave you was totally wrong.  He tried to give you

17   evidence of what was in the letter of intent.  The decision in

18   the Iowa court describes what was in the letter of intent.

19   He's giving you the response that we gave to the person who was

20   going to buy -- bought the business from the dealer.

21        The second thing.  The exhibit that counsel gave to

22   you about the capital standard addendum, the second paragraph

23   which is his -- which was denominated as Exhibit O says,

24   "General Motors has determined that the minimum net working

25   capital standard necessary for the dealer to adequately conduct

Page 163

1    the dealership operations consistence (sic) with the dealer's

2    responsibility is 2.85 million dollars." So this is where that

3    number came from; it didn't dream ten million dollars. It was

4    in the dealership agreement. And it's not predicated upon what

5    you did in the past and it's predicated on what you expect to

6    do in the future. The whole concept is to make sure you're

7    capitalized to do your anticipated work, not that you're

8    capitalized to the extent that you may have poorly performed in

9    the prior year.

10          It's perspective. And we will have that opportunity

11   if we have a trial on this thing to be able to present that

12   type of evidence and we'll be able to show that the Exhibit P,

13   which has been presented, is sort of taken out of context and

14   is not supposed to be reset on a twelve month period, but is to

15   be set in accordance with Section 10.1 of the dealership

16   agreement.

17          I let counsel say over and over again that New Gm

18   didn't honor their promises and I will just say once that there

19   was a letter of intent signed by his client and we believe they

20   have not honored their promises. Part of the problems in

21   negotiating the deal is -- if we have a deal, is that level of

22   distrust because both sides said that the other haven't honored

23   their promises. But, no one should think it's a one-sided

24   situation where only New GM has been at fault for their conduct

25   in this case. And I won't even say they're at fault.

Page 164

1          They were a bankruptcy debtor who chose to enter into

2     wind-down agreements, consistent with their opportunity to

3     reject executory contracts.  Congress passed a statute after

4     the fact and then they revisited the decisions to reject in an

5     arbitrator's rule.  And sometimes the arbitrator sided with GM

6     and sometimes it didn't and that's just the way it was.

7          But you don't translate that kind of activity into

8     saying that we breached the agreement.  Having said that, I

9     still recognize what Your Honor was troubled with, which is

10    that by virtue of them being in wind-down mode not being able

11    to purchase new inventory, their business has suffered.  And

12    that they need to have the opportunity to ramp up.

13         The arbitrator's decision and -- is with regard to

14    the working capital standard, was that Leson has also met GM's

15    capital requirements as it hasn't changed since 2003.  They - -

16    the decision didn't say what the capital requirement should be

17    as -- for purposes of a letter of intent.  And there is nothing

18    there in the decision which says what it should be.  And this

19    arbitrator didn't have the ability to set that amount.  And

20    what New Gm did was set it at the existing amount and gave what

21    it thought what the appropriate time to ramp up.  And if we

22    have a trial, it'll be to show that we gave other dealers the

23    same type of time to ramp up to their past performance deals.

24         The arbitrator's decision also did include on

25    paragraph 9 a statement that the dealership has secured

09-50026-mg    Doc 7598    Filed 10/27/10    Entered 10/28/10 15:28:30    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 165 of 182

Page 165

1   drawings for a new car showroom and a commitment letter from a

2   local bank for perspective financing, once it's reinstated by

3   General Motors.  Whatever that commitment letter is from a

4   local bank doesn't seem to still be a lot.  They don't seem to

5   have the financing as part of the issue and the concerns that

6   New GM has.  And I guess that was the basis upon -- one of the

7   things why this arbitrator believed that it was appropriate to

8   reinstate the dealer.

9           But, Your Honor, I want to stop myself here because I

10  feel that if I go back and forth on a tit for tat basis, he

11  didn't give you the full evidence but we'll present it later

12  on, I won't be serving judicial resources' time appropriately.

13  At this point in time, it seemed to me that we have differences

14  that either we negotiate or that we need Your Honor to make

15  rulings on.  And I go back to what I had proposed before which

16  is give the clients the opportunity to absorb the ruling.

17  We've done our sparring for today.  If he wants to continue to

18  spar, I don't think I have much more to say.

19          I'm sure if I let my co-counsel on the phone who's

20  been listening to this, they're probably jumping up and down

21  with a lot -- what they want to say, but I don't think it

22  matters because we have to present it to you in an organized

23  form with proper briefing and proper evidence and this is not

24  an evidentiary hearing.  And Your Honor has wanted to hear the

25  issues for purposes of the evidentiary hearing, but at some

09-50026-mg    Doc 7598    Filed 10/27/10    Entered 10/28/10 15:28:30    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 166 of 182

Page 166

1    point in time we stop because we don't turn this into an

2    evidentiary hearing.

3            If we can't resolve it, I go back to what I s said

4    before which is that whether the letter of intent was entered

5    into duress is the show stopping gating issue.  Because if

6    we're correct that it was not under duress, then they will not

7    have performed and then under the contractual commitment that

8    they made, they would have lost their dealership.  And that

9    should be, if they want to save expense, that should be the

10   gating issue that it happens.

11           If they can establish that there's a factual issue

12   that -- or that they win on that issue, we're not bound by the

13   letter of intent, then we can get into the litigation as to

14   whether what is ordinary and customary.  And we have a large

15   track record of what we've done in this case, what we've given

16   to people who have settled and not gone to arbitration, what

17   we've done in connection with people who won arbitrations.  I

18   mean -- and what they got is consistent with what we gave.  And

19   it addresses the two most critical issues here which is

20   financing and working capital requirements.  And if we end up

21   asking Your Honor to be the Solomon decision maker here as to

22   setting what the working capital requirements are for this

23   dealership and what -- and when they should get their financing

24   in place, so be it.

25           Most li -- most parties like to put that situation

Page 167

1    into their own hand as compared to giving it to a judge to

2    decide, but we're prepared to do it either way.  If you think

3    it should be negotiated, if it can't be negotiated then we

4    should have a hearing.  I know Your Honor is very busy.  I know

5    we will try hard so that we don't need to do it.  I do think

6    that the cost of a hearing will be expensive in light of where

7    we are right now.  Remember?  He wants to use the wind-down

8    provisions -- the wind-down performance as the basis for

9    setting net working capital requirements for when they have to

10   start ordering inventory to show that they can be capitalized

11   as a running business.  We think that that notion is ludicrous

12   and we'll be able to show that right of way so that the number

13   will naturally rise.

14          And the issue is -- we're at 2.137 million dollars

15   over four months and then giving him another year to get up to

16   where he was in 2008.  I'm not sure if we're off, how far we

17   are off at all.  But I'm pretty sure that whatever we end up

18   litigating will eat into some of these differences.

19          But that's what I think, Your Honor, is the best way

20   to go forward.  I did have some more notes as to what the res

21   judicata effect, choice of law. I think Your Honor would be

22   better off, if they do want to raise it, if it does become

23   issues, to get the benefit of briefs to be ale to have the

24   benefit of documentary evidence and not the way that this has

25   gone on for the last little while.  Because it's clear that

Page 168

1    when he referred to the Thys situation and referred to a

2    dealership, he was not referring to the letter of intent that

3    was given to that dealer.  Thank you.

4              THE COURT:  All right.  Thank you.

5              MR. BEEBE:  Your Honor, if I may.  Just one last

6    point if I may.

7              THE COURT:  If brief, go ahead.

8              MR. BEEBE:  Well, Your Honor, one thing.  I think the

9    record is clear now --

10             THE COURT:  Come to the microphone first, please.

11             MR. BEEBE:  Mark Beebe on behalf of Leson Chevrolet.

12   Your Honor, I think the record is clear regarding what this is

13   in Exhibit 18.  I wasn't suggesting that, obviously, this is

14   what was given to Family Car Dealership are -- is -- this is

15   something Mr. Anderson who represents those particular dealers

16   submitted to the Court in Iowa suggesting this is usual and

17   customary and that's the representation that I made on the

18   record.

19             Your Honor, the one thing that I'd ask that you

20   carefully consider is perhaps given -- I heard you say this

21   morning that you felt like the Dutch boy with his finger in the

22   dyke.  Perhaps I would ask that you abstain under, you know,

23   1334(c)(1) --

24             THE COURT:  That's not going to happen, Mr. Beebe.

25   So let's talk about the issues that --

Page 169

1              MR. BEEBE:  Okay.

2              THE COURT:  -- are before me.

3              MR. BEEBE:  Well, and then finally, Your Honor, I'm

4     going to need -- I respectfully request a stay.  I think, which

5     has been -- also been granted to the other dealers regarding

6     the termination or potential termination to October 31.  I

7     think Your Honor had entered this language and it said order

8     that sufficient reason having been shown therefore pending the

9     hearing and the termination, I would say of Leson's

10    application, pursuant to Federal Rules of Bankruptcy Procedure

11    Rule 8005, New GM is hereby enjoined, restrained and prohibited

12    from A) seeking to enforce this Court's order today and B0

13    terminate suspending, canceling, limiting or otherwise

14    restricting under the wind-down agreement Leson's Chevrolet

15    dealership agreement and right to own and operate a Chevrolet

16    dealership.

17             THE COURT:  Whose language was that because I

18    wouldn't have thought that I --

19             MR. BEEBE:  That's Judge Patterson's language.

20             THE COURT:  -- was bound by 8005.

21             MR. BEEBE:  I'm sorry.  This is Judge Patterson's

22    language.  I apologize.

23             THE COURT:  Nobody's given me a copy of Judge

24    Patterson's order.  Would you be good enough to do that?

25             MR. BEEBE:  I would, Your Honor.  I apologize because

09-50026-mg   Doc 7598   Filed 10/27/10   Entered 10/28/10 15:28:30   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 170 of 182

Page 170

1    I've highlighted -- but if counsel's okay with it, then

2    certainly.  This is the order to show cause that you signed

3    leading up to the hearing, Judge.

4            MR. COOPER:  To be clear, Your Honor, this is the TRO

5    that he entered for to stay -- to keep the status quo until he

6    heard the actual argument on the stay pending appeal and he has

7    not rendered a decision on that.  But that's the order to show

8    cause that he signed.

9            THE COURT:  So this is not a stay pending on appeal,

10   strictly speaking.

11           MR. COOPER:  That's correct.

12           THE COURT:  It is something that he ordered to

13   preserve the status quo while he considered the stay

14   application?

15           MR. STEINBERG:  That's correct, Your Honor.

16           THE COURT:  Okay.  All right.  Fair enough.  All

17   right, gentlemen.  We're going to take a recess and I want

18   everybody back here by 3:25.  I don't know if I'll be fully

19   ready by that time, but that's when I'm going to want you guys

20   available.  We're in recess.

21           MR. STEINBERG:  Thank you, Your Honor.

22       (Recess from 3:06 p.m. until 3:41 p.m.)

23           THE COURT:  Have a seat, please.

24           Okay.  Some of the issues we have here are easy, some

25   are much harder.  The easy ones are those with respect to

MOTORS LIQUIDATION COMPANY, et al.

1    jurisdiction and to abstention.  The more difficult ones

2    involve the merits which I will deal with because I will be

3    exercising jurisdiction if you people can't consensually

4    resolve it.

5            With respect to the easy issues, I rule in accordance

6    with my earlier decisions involving the losing car dealerships,

7    that I have subject matter jurisdiction, that this is a core

8    matter, that the jurisdiction of this Court is exclusive and

9    that I need not nor should I abstain and I won't abstain.  I

10   will exercise the exclusive jurisdiction that was provided for

11   back in 2009.

12           For the avoidance of doubt, the Louisiana Motor

13   Vehicle Commission will not decide the issues with respect to

14   the enforcement of the arbitrator's rulings.  I will.  And also

15   for the avoidance of doubt, I'm going to enjoining Leson from

16   any proceedings before the Louisiana Motor Vehicle Commission

17   with respect to this controversy, including most obviously the

18   proceedings that are scheduled for Thursday of this week.

19           On the merits, however, Leson has established the

20   existence of issues of fact vis-a-vis the enforcement of the

21   arbitrator's award in its favor on at least the following

22   issues:  (1)whether it's signed the 2010 letter of intent under

23   duress; (2)whether New GM imposed the ten-day deadline for

24   acceptance of that letter of intent in good faith; and

25   (3)whether New GM did in fact provide Leson with a customary

MOTORS LIQUIDATION COMPANY, et al.

Page 172

1    and usual letter of intent to enter into a sales and service

2    agreement which is at least seemingly what Section 747

3    requires.

4              By articulating those issues, I do not intend to

5    foreclose any other issues that might reasonably be raised by

6    either party.  But it's my view as my articulation of those

7    issues implies that having prevailed before the arbitrator,

8    Leson is entitled to a reasonable opportunity to secure the

9    benefits of that ruling.  It's that simple.  In that

10   connection, the two sides should be free to argue for or in

11   opposition to res judicata, collateral estoppel or law of the

12   case with respect to the arbitrator's findings that it made

13   before the arbitrator issued the bottom line decision.

14             As my colloquy with each of you hopefully indicated,

15   the underlying concern I have, which may or may not be part of

16   the issues that I articulated above or a separate issue, is

17   whether, under the applicable law, New GM may avail itself of

18   the failure of a condition that its own conduct, at least in

19   material part, occasioned.

20             And though I think I know the answer to the question

21   that follows or questions that follow, the two sides can have a

22   reservation of rights as to the state whose law will apply and

23   whether the conduct that occasions the failure of condition

24   needs to be malicious or otherwise wrongful or otherwise

25   intentional or simply to have happened.

Page 173

1              As I indicated, I'll give you further opportunity to

2    discuss the choice of law, discuss and/or address and also the

3    standard for the application of the principal that I

4    articulated or, for that matter, whether I'm imagining a

5    principal of law that doesn't exist which I'm not deciding

6    today.  But I believe each side is entitled to its day in court

7    on those issues.  Leson will also be entitled to reasonable

8    discovery as to these issues, though subject to appropriate

9    confidentiality protection.

10             Until my further order, or any decision adjudicating

11   the merits, both sides will be enjoined.  Leson, as I

12   indicated, is enjoined from proceeding before the Motor Vehicle

13   Commission.  Leson will get its day in court but it will get it

14   from me.  By the same token, New GM is to be enjoined and is

15   hereby enjoined from terminating Leson's dealership until I

16   decide the issues on the merits or any further order from me.

17             You are to paper those two injunctions by a separate

18   written order whose form you are to agree upon without

19   prejudice to your respective rights to appeal my determinations

20   today or to seek leave to appeal this interlocutory

21   determination.  If after trying you can't come up with a

22   satisfactory order to paper that, each side will have the right

23   to settle it upon the other, but I would hope that on a matter

24   of this simplicity that that's not necessary.

25             For the avoidance of doubt, however, I am so ordering

09-50026-mg    Doc 7598    Filed 10/27/10    Entered 10/28/10 15:28:30    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 174 of 182

Page 174

1    the record and telling you guys right now that you're enjoined.

2    And that if as it's foreseeable, it takes you a few days to

3    come up with the written order, that written order will

4    supersede my oral injunction today and starting this minute,

5    3:50 p.m. Eastern time on Tuesday, October 26, Leson is not

6    going to proceed before the Louisiana Motor Vehicle Commission

7    and GM is not going to proceed to terminate Leson's dealership.

8    In each case, the enjoined action is stayed.

9            Now, with that said, folks, it's obvious to me from

10   hearing the argument and from considering that which is

11   appropriate to implement the arbitrator's ruling, that each

12   side has legitimate needs and concerns.  GM needs its dealers

13   to be viable and to satisfy appropriate requirements.  Leson

14   needs a fair time to satisfy those requests and to meet

15   requirements that are reasonably appropriate to comply with the

16   requirements of Section 747, the arbitrator's ruling, and to

17   bring itself into compliance with the requirements that I

18   believe that GM reasonably can impose.

19           I don't see Leson as having the right to get an

20   indefinite get out of jail free card from the requirements that

21   I think GM can legitimately impose.  I think it is ultimately

22   likely as a matter of negotiation to be one of setting

23   appropriate requirements and providing for a reasonable time to

24   comply with them.  This matter cries out for a consensual deal

25   that balances those competing needs and concerns.  But I don't

09-50026-mg    Doc 7598    Filed 10/27/10    Entered 10/28/10 15:28:30    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 175 of 182

Page 175

 1    think that I can or should try to micromanage it and I should

 2    not get -- be involved in dictating the terms of any such deal.

 3    Instead, it should be negotiated between the parties.  Failing

 4    which, if you guys want to roll the dice and litigate before

 5    me, you'll ultimately have that opportunity.  Frankly, I think

 6    that would be suicidal for both sides, but you obviously have

 7    that underlying legal entitlement.

 8            However, I have both the right under Section 105(d)

 9    of the Code and my inherent ability to manage the cases on my

10    watch and the responsibility for managing this litigation in a

11    sensible way.  So while I'll authorize the discovery and will

12    decide the underlying controversy if I need to, I first want

13    you to take the effort to try to settle it either one-on-one or

14    with the assistance of a mediator.  The choice between direct

15    settlement and use of a mediator, one as to which I express no

16    present view, but what I am telling you is that I am

17    authorizing discovery but the discovery in my view isn't

18    necessary to settle in the matter and to come up with a

19    satisfactory letter of intent.  And therefore the discovery

20    will be held in abeyance while -- for a reasonable period of

21    time during which you try to resolve it consensually.  If you

22    try and fail then the discovery will proceed before I decide

23    the matter on the merits.

24            As my questioning to each of you indicated, I haven't

25    been happy with either side's past conduct to date.  But now

09-50026-mg   Doc 7598   Filed 10/27/10   Entered 10/28/10 15:28:30   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 176 of 182

Page 176

1    that both sides understand that I'm invoking my exclusive

2    jurisdiction and that I'll be doing whatever it takes to

3    maintain control of this litigation and to ensure that both

4    sides act appropriately, I assume that the actions by each side

5    that bothered me are now a thing of the past.

6         So we're either going to resolve this consensually or

7    litigate it; taking as the obvious backdrop for that what

8    Section 747 provides and what the arbitrator's ruling said.

9         All right.  Not by way of reargument, are there any

10   open issues?  Mr. Steinberg?

11        MR. STEINBERG:  Your Honor, do you think it would be

12   appropriate to set some kind of calendar date to have a 105(d)

13   conference for us to come back to be able to report as to

14   whether we are in a settlement mode or whether we need to have

15   something more formal?

16        THE COURT:  I think that's fine.  I can't give you a

17   date this minute.  I have no problem with the two of you

18   walking across the hall to do it.

19        Mr. Beebe, I assume that if you're in New Orleans

20   it's a burden for you to come up here and if we're talking

21   about a conference only as contrasted to an evidentiary

22   hearing, I'd be willing to do that by conference call.

23        MR. BEEBE:  Thank you.

24        THE COURT:  Although I would want to hear your

25   respective views as to whether any such conference call should

Page 177

1   be on the record or off.  Normally, if either side wants

2   something on the record, I give it to him.  But I prefer to get

3   the recommendation from the parties as to what they think best

4   skins the cat in that regard.  And I wouldn't ask you to decide

5   that now.  It's easier, to tell you the truth, to hold a

6   conference call than to hold a full hearing, especially with

7   what I'm juggling.

8          I'm agreeable in concept to what you proposed, Mr.

9   Steinberg, but what we need to do is find the sweet spot that

10  doesn't let it drift too much on the one hand but gives you a

11  fair opportunity to have the dialog that I think is essential,

12  on the other.

13         MR. STEINBERG:  Your Honor, I think that I would

14  appreciate having the opportunity to talk to my client to try

15  to figure out logistically how they want to approach the

16  resolution and how they think it best to do.  And so, having

17  made the suggestion for setting a conference date, if we can

18  just defer for a few days and maybe by Friday of this week,

19  counsel and I can call your chambers and try to lock in a

20  convenient date.  But this will give us more of an opportunity

21  to confer with our clients and digest a little of what

22  transpired today.

23         THE COURT:  I assume you're okay with that, Mr.

24  Beebe?

25         MR. BEEBE:  I am, Your Honor.

Page 178

1            THE COURT:  Okay.  All right, then let's do that.  Am

2     I correct that we have no further business?

3            MR. STEINBERG:  I don't have anything, Your Honor.

4            THE COURT:  All right.  Thank you very much, folks.

5     Have a good day.  We're adjourned.

6            ALL:  Thank you.

7         (Whereupon these proceedings were concluded at 3:58 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 179

1

2                          I N D E X

3

4                        R U L I N G S

5    DESCRIPTION                                    PAGE      LINE

6    Debtors' motion seeking final approval of a     32        12

7    settlement with the Bryant class action

8    claimants granted

9    Motion of Walter Lawrence seeking to hold the

10   district court judge from the Middle District

11   of Florida in criminal contempt, I believe,

12   for violating the stay

13   Debtors' omnibus objection seeking to expunge    44        11

14   bondholders' claims for reason that they are

15   duplicative sustained as to claim of Francis

16   H. Caterina

17   Motion by Weber Automotive pursuant to

18   Rule 60(b) to reconsider order with

19   respect to debtors' omnibus objection

20   to claim #23

21   Fee apps approved with a 10% holdback to the     92         7

22   extent they're not objected to by the fee

23   examiner or UST

24

25

Page 180

1

2                    I N D E X, cont'd

3

4                     R U L I N G S

5   DESCRIPTION                              PAGE     LINE

6   Motion of GML to enforce 363 sale order and     106      11

7   approved termination agreements with respect

8   to Leson Chevrolet granted subject to stay

9   that Judge Patterson enacted in Rally Rule

10  8005 motion and subject to further

11  representations made on the record to be

12  submitted in an order;

13  This Court has subject matter jurisdiction;     171       5

14  this is a core matter; that jurisdiction of

15  this Court is exclusive; and that Court need

16  not abstain nor will it abstain

17  Both Leson and New GM to be enjoined;           173      11

18  Leson enjoined from any proceedings before

19  Louisiana Motor Vehicle Commission with respect

20  to this controversy, including proceedings

21  scheduled on 10/28/2010;

22  New GM enjoined from terminating the Leson      173      15

23  dealership until Court issues further order;

24

25

Page 181

I N D E X, cont'd

R U L I N G S

| DESCRIPTION | PAGE | LINE |
|---|---|---|
| Injunctions to be submitted in written order | 173 | 17 |
| without prejudice to parties' rights to appeal | | |
| or seek leave to appeal; | | |
| If parties cannot agree upon order, | 173 | 23 |
| each side to settle upon the other; | | |
| Record so ordered; | 173 | 25 |
| Written order to supersede oral injunction; | 174 | 4 |
| Enjoined action is stayed with regard to both | 174 | 8 |
| Leson and New GM; | | |
| Discovery authorized but held in abeyance | 175 | 17 |
| to give parties time to try to work out | | |
| matters consensually | | |

Page 182

1

2                    C E R T I F I C A T I O N

3

4    I, Lisa Bar-Leib, certify that the foregoing transcript is a

5    true and accurate record of the proceedings.

6

7    _____

8    LISA BAR-LEIB

9    AAERT Certified Electronic Transcriber (CET**D-486)

10

11   Veritext

12   200 Old Country Road

13   Suite 580

14   Mineola, NY 11501

15

16   Date:  October 27, 2010

17

18

19

20

21

22

23

24

25