# **EXHIBIT B**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                           :
      In re                          :     Chapter 11
                                           :
DELPHI CORPORATION, et al.,                :     Case No. 05-44481 (RDD)
                                           :
             Debtors.          :     (Jointly Administered)
                                           :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

## FIRST AMENDED JOINT PLAN OF REORGANIZATION OF DELPHI CORPORATION AND CERTAIN AFFILIATES, DEBTORS AND DEBTORS-IN-POSSESSION (AS MODIFIED)

SKADDEN, ARPS, SLATE, MEAGHER &
    FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
Toll Free: (800) 718-5305
International: (248) 813-2698
John Wm. Butler, Jr.
Ron E. Meisler
Nathan L. Stuart
Allison K. Verderber Herriott

SKADDEN, ARPS, SLATE, MEAGHER &
    FLOM LLP
Four Times Square
New York, New York 10036
Kayalyn A. Marafioti
Thomas J. Matz

                    Of Counsel
          DELPHI CORPORATION
          5725 Delphi Drive
          Troy, Michigan 48098
          (248) 813-2000
          David M. Sherbin
          Sean P. Corcoran
          Karen J. Craft

Attorneys for Debtors and Debtors-in-Possession

Dated:        December 10, 2007

As Modified:  January 25, 2008
             June 16, 2009
             July 30, 2009
             New York, New York

# TABLE OF CONTENTS

**Page**

ARTICLE I DEFINITIONS, RULES OF  INTERPRETATION, AND COMPUTATION
OF TIME ................................................................................................................4
    A.    Scope Of Definitions..............................................................................4
    B.    Definitions..............................................................................................4
        1.1    "503 Deadline".............................................................................4
        ^ 1.2   "Acquired Assets"........................................................................4
        ^ 1.3   "Acquired Contracts"..................................................................4
        ^ 1.4   "Administrative Claim".............................................................4
        ^ 1.5   "Administrative Claims Bar Date".............................................4
        1.6    "^ ADR Procedures"....................................................................4
        ^ 1.7   "Affiliate Debtors".....................................................................5
        1.8    "Affiliates"................................................................................5
        1.^ 9   "Allowed ^ Claim"^ ..................................................................5
        1.^ 10  "Allowed Class . . . Claim" or "Allowed Class . . . Interest" .................5^ 6
        ^ 1.11  "Allowed Interest"......................................................................5
        ^ 1.12  "Assumed Liabilities".................................................................6
        1.13   "^ Avoidance Claims"................................................................6
        1.14   "Ballot".....................................................................................6
        1.^ 15  "Bankruptcy Code"....................................................................6
        1.^ 16  "Bankruptcy Court"...................................................................6
        1.^ 17  "Bankruptcy Rules"...................................................................6^ 6
        1.18   "Bar Date^ "..............................................................................6
        1.19   "^ Bar Date Order"....................................................................6
        1.20   "^ Beneficiaries"........................................................................6
        1.21   "^ Business Day"........................................................................6
        1.22   "^ Buyers".................................................................................7
        1.23   "Cash^ " ...................................................................................7^ 7
        ^ 1.24  "Cash Reserve"..........................................................................7
        1.25   "Causes of Action".....................................................................7
        1.26   "Certificate^ " ...........................................................................7
        ^ 1.27  "Certificate of Incorporation and Bylaws" ...............................7
        1.28   "^ Chapter 11 Cases" .................................................................7^ 7
        ^ 1.29  "Claim"......................................................................................7
        1.30   "Claims Agent"..........................................................................7
        1.31   "^ Claims/Interests Objection Deadline"....................................7
        1.32   "^ Class"....................................................................................7
        ^ 1.33  "Company Acquired Assets" ......................................................7^ 8
        ^ 1.34  "Company Assumed Contracts" .................................................8
        ^ 1.35  "Company Assumed Liabilities"................................................8
        ^ 1.36  "Company Buyer".....................................................................8
        1.37   "Company Sales Securities"........................................................8
        ^ 1.38  "Confirmation Date"...................................................................8^ 9
        1.^ 39  "Confirmation Hearing"............................................................8
        ^ 1.40  "Confirmation Order".................................................................8
        ^ 1.41  "Connection Systems Debtors"...................................................8

1.42     "Contingent PBGC Secured Claim" ...................................................8
1.43     "^ Continuing Indemnification Rights" .............................................8
1.44     "^ Controlled Affiliate" .....................................................................8
1.45     "^ Credit Bid" ....................................................................................9
1.46     "^ Creditors' Committee" ..................................................................9
1.47     "^ Cure" ..............................................................................................9
^ 1.48  "Cure Amount Notice" ......................................................................9
^ 1.49  "Cure Amount Proposal" ..................................................................9
1.50     "^ DASHI Debtors" ............................................................................9
1.51     "^ Debtor" ..........................................................................................9
1.52     "^ Debtors" .........................................................................................9
1.53     "Delphi^ " ...........................................................................................9
^ 1.54  "Delphi-DAS Debtors" ......................................................................9
1.55     "Delphi-GM Arrangement" .............................................................10
^ 1.56  "Delphi-GM Definitive Documents" ..............................................10
^ 1.57  "Delphi-GM Global Settlement Agreement" .................................10
^ 1.58  "Delphi-GM Master Restructuring Agreement" ...........................10
^ 1.59  "Delphi HRP" ..................................................................................10
^ 1.60  "Delphi-PBGC Settlement Agreement" .................................10^ 11
1.61     "DIP ^ Accommodation Agreement" ..............................................10
1.62     "DIP Accommodation Agreement Order" ......................................10
1.^ 63  "DIP ^ Agent" ..................................................................................10
1.^ 64  "DIP ^ Claims" .................................................................................10
1.65     "DIP Credit Agreement" ..................................................................11
1.^ 66  "DIP ^ Facility" .................................................................................11
^ 1.67  "DIP Facility First Priority Term Claim" ......................................11
1.^ 68  "DIP ^ Facility Order" ......................................................................11
^ 1.69  "DIP Facility Revolver Claim" ........................................................11
1.^ 70  "DIP ^ Facility Second Priority Term Claim" ...............................11
1.^ 71  "DIP Lenders" ..................................................................................11
^ 1.72  "DIP Lenders Steering Committee" ................................................11
^ 1.73  "DIP Loan Documents" ...................................................................11
1.74     "DIP Priority Payment Amount" ....................................................11
1.75     "DIP Transfer" .................................................................................12
^ 1.76  "Disallowed Claim" .........................................................................12
^ 1.77  "Disallowed Interest" ......................................................................12
^ 1.78  "Disbursing Agent" ..........................................................................12
^ 1.79  "Disclosure Statement" ...................................................................12
^ 1.80  "Disposition Transactions" .............................................................12
^ 1.81  "Disputed Claim" or "Disputed Interest" ......................................12
^ 1.82  "Distribution Date" ...........................................13^ 13^ 13^ 13^ 13
^ 1.83  "Distribution Reserve" ....................................................................13
1.84     "^ Effective Date" ............................................................................13
1.85     "^ Emergence Capital" ....................................................................13
1.86     "^ Employee-Related Obligation" ..................................................13
^ 1.87  "Equity Committee" .........................................................................13
1.88     "^ ERISA" ..........................................................................................13
^ 1.89  "ERISA Plaintiffs" ............................................................................13

1.90    "^ ERISA Settlement" ..................................................................................13
1.91    "^ Estates" ...............................................................................................13
1.92    "^ Exchange Act" .....................................................................................13
1.93    "^ Exhibit" ...............................................................................................14
^ 1.94  "Exhibit Filing Date" ...............................................................................14
^ 1.95  "Existing Common Stock" ........................................................................14
1.96    "^ Existing Securities" .............................................................................14
1.97    "^ Face Amount" ......................................................................................14
^ 1.98  "Final Modification Hearing" ...................................................................14
1.99    "Final Order" ..........................................................................................14
1.^ 100 "Flow-Through Claim" ............................................................................14
^ 1.101 "General Unsecured Claim" .....................................................................14
^ 1.102 "General Unsecured MDA Distribution" .....................................................14
1.^ 103 "GM^ " ..................................................................................................15
1.^ 104 "GM ^ Acquired Assets" ..........................................................................15
1.^ 105 "GM ^ 414(l) Administrative Claim" .................................15^ 15^ 16^ 16
^ 1.106 "GM Administrative Claim" .....................................................................15
^ 1.107 "GM Arrangement Administrative Claim" ..................................................15
^ 1.108 "GM Assumed Contracts" .......................................................................15
^ 1.109 "GM Assumed Liabilities" .......................................................................15
^ 1.110 "GM Buyer(s)" .......................................................................................15
^ 1.111 "GMCo." ................................................................................................15
1.112   "GM-PBGC Agreement" ..........................................................................15
1.113   "GM Sales Securities" .............................................................................15
1.114   "^ GM Unsecured Claim" .........................................................................15
1.115   "^ Holdback Amount" ..............................................................................15
1.116   "Holdback Escrow Account" ....................................................................16
1.^ 117 "IAM" ...................................................................................................16
^ 1.118 "IAM Memorandum of Understanding" .....................................................16
^ 1.119 "IBEW" ..................................................................................................16
^ 1.120 "IBEW E&S Memorandum of Understanding" ............................................16
^ 1.121 "IBEW Powertrain Memorandum of Understanding" ...................................16
^ 1.122 "Impaired" .............................................................................................16
^ 1.123 "Indemnification Rights" .........................................................................16
^ 1.124 "Indemnitee" ..........................................................................................16
1.^ 125 "Indenture Trustees" ..............................................................................16
^ 1.126 "Indentures" ...........................................................................................17
^ 1.127 "Insurance Coverage" .............................................................................17
1.^ 128 "Insurance Settlement^ " ........................................................................17
^ 1.129 "Intercompany Claim" .............................................................................17
^ 1.130 "Intercompany Executory Contract" .........................................................17
^ 1.131 "Intercompany Unexpired Lease" .............................................................17
^ 1.132 "Interest" ...............................................................................................17
^ 1.133 "Investment Agreement" .........................................................................17
1.^ 134 "IRC" .....................................................................................................17
^ 1.135 "IRC Section 414(l) Transfer" ..........................................................17^ 18
1.136   "^ IUE-CWA" ..........................................................................................17
1.137   "IUE-CWA 1113/114 Settlement Approval Order" ......................................17

iii

1.138 "IUE-CWA Benefit Guarantee"....................................................................17
1.139 "IUE-CWA Benefit Guarantee Term Sheet"...................................................18
^ 1.140 "IUE-CWA-Delphi-GM Memorandum of Understanding" .........................18
^ 1.141 "IUOE"..........................................................................................................18
^ 1.142 "IUOE Local 18S Memorandum of Understanding".....................................18
^ 1.143 "IUOE Local 101S Memorandum of Understanding"...................................18
^ 1.144 "IUOE Local 832S Memorandum of Understanding"...................................18
^ 1.145 "IUOE-IBEW-IAM OPEB Term Sheet".......................................................18
^ 1.146 "IUOE, IBEW, And IAM 1113/1114 Settlement Approval Order"19^ 19^ 19^ 20
1.147 "^ Lead Plaintiffs".........................................................................................19
^ 1.148 "Management Compensation Plan" ..............................................................19
^ 1.149 "Master Disposition Agreement"..................................................................19
1.150 "^ Material Supply Agreement^ "..................................................................19
1.151 "^ MDA Assumption And Assignment Notice" .............................................19
1.152 "^ MDL Actions"...........................................................................................19
1.153 "^ MDL Court"..............................................................................................19
1.154 "^ MDL Settlements".....................................................................................19
^ 1.155 "Modification Approval Date"......................................................................19
^ 1.156 "Modification Approval Order"....................................................................20
^ 1.157 "Modification Procedures Order".................................................................20
1.158 "^ New Common Stock".................................................................................20
^ 1.159 "Non-Represented Term Sheet".....................................................................20
^ 1.160 "Omitted Material Supply Agreement Objection Deadline" .......................20
1.161 "^ OPEB".......................................................................................................20
^ 1.162 "Ordinary Course Professionals Order".......................................................20
1.163 "^ Other Executory Contract"........................................................................20
1.164 "^ Other Interests".........................................................................................20
^ 1.165 "Other MDA Assumed Contracts".................................................................20
1.166 "^ Other Priority Claim"................................................................................20
^ 1.167 "Other Unexpired Lease" ..............................................................................20
1.168 "^ PBGC" .......................................................................................................20
1.169 "^ PBGC Claims"..........................................................................................20
1.170 "^ PBGC General Unsecured Claim" .............................................................20
1.171 "Pension Plans" .............................................................................................21
^ 1.172 "Periodic Distribution Date".......................................................................21
^ 1.173 "Person".......................................................................................................21
^ 1.174 "Petition Date".............................................................................................21
^ 1.175 "Plan"...........................................................................................................21
^ 1.176 "Plan Investors" ..........................................................................................21
^ 1.177 "Plan Objection Deadline".........................................................................21
^ 1.178 "Post-Confirmation Reorganized DPH Holdings Share Trust" .................21
^ 1.179 "Post-Confirmation Trust Agreement"........................................................21
^ 1.180 "Post-Confirmation Trust Plan Administrator" .........................................22^ 22
1.181 "^ Prepetition Employee-Related Obligation"...............................................22
^ 1.182 "Prepetition Employee-Related Obligations Bar Date".............................22
^ 1.183 "Priority Tax Claim"....................................................................................22
1.184 "^ Pro Rata"...................................................................................................22
1.185 "^ Professional"..............................................................................................22

1.186 "Professional Claim" ........................................................................22
1.187 "Professional Fee Order" ..................................................................22
1.188 "Reinstated" or "Reinstatement" ......................................................22
1.189 "Released Parties" ............................................................................23
1.190 "Reorganized . . ." ...........................................................................23
1.191 "Reorganized Debtor" or "Reorganized Debtors" .............................23
1.192 "Reorganized DPH Holdings" ..........................................................23
1.193 "Required Lenders" ..........................................................................23
1.194 "Restructuring Debtors" ..................................................................23
1.195 "Restructuring Transaction(s)" .........................................................24
1.196 "Restructuring Transaction Notice" ...................................24  24  24  24
1.197 "Retained Actions" ...........................................................................24
1.198 "Retained Assets" ............................................................................24
1.199 "Scheduled" ....................................................................................24
1.200 "Schedules" ....................................................................................24
1.201 "Section 510(b) Equity Claim" .......................................................24
1.202 "Section 510(b) ERISA Claim" ......................................................24
1.203 "Section 510(b) Note Claim" ..........................................................24
1.204 "Section 510(b) Opt Out Claim" .....................................................25
1.205 "Section 510(b) Opt Out Equity Claim" ..........................................25
1.206 "Section 510(b) Opt Out Note Claim" .............................................25
1.207 "Secured Claim" ..............................................................................25
1.208 "Securities Act" ...............................................................................25
1.209 "Securities Settlement" ....................................................................25
1.210 "Security" ........................................................................................25
1.211 "Security And Pledge Agreement" ...................................................25
1.212 "Senior Notes" .................................................................................25
1.213 "Senior Notes Claim" ......................................................................25
1.214 "Senior Notes Indenture" .................................................................25
1.215 "Senior Notes Indenture Trustee" ....................................................25
1.216 "SERP" ...........................................................................................26
1.217 "SERP Claim" .................................................................................26
1.218 "Servicer" ........................................................................................26
1.219 "Solicitation Procedures Order" .......................................................26
1.220 "Specialty Electronics Debtors" .......................................................26
1.221 "Statutory Committees" ......................................................26  26  26
1.222 "Subordinated Notes" ......................................................................26
1.223 "Subordinated Notes Holder" ..........................................................26
1.224 "Subordinated Notes Indenture" ......................................................26
1.225 "Subordinated Notes Indenture Trustee" ..........................................26
1.226 "Supplemental Distribution Account" ..............................................26
1.227 "TOPrS" ..........................................................................................26
1.228 "TOPrS Claim" ...............................................................................26
1.229 "UAW" ............................................................................................26
1.230 "UAW 1113/1114 Settlement Approval Order" ...............................27
1.231 "UAW Benefit Guarantee" ...............................................................27
1.232 "UAW Benefit Guarantee Term Sheet" ............................................27
1.233 "UAW-Delphi-GM Memorandum of Understanding" ......................27

^ 1.234 "Unimpaired" .................................................................................27
1.^ 235 "Union Settlement Agreements" ...............................................27
^ 1.236 "Unions" ........................................................................................27
1.^ 237 "USW ^ " ......................................................................................27
^ 1.238 "USW 1113/1114 Settlement Approval Order" ...........................27
^ 1.239 "USW Benefit Guarantee" ...........................................................27
^ 1.240 "USW Benefit Guarantee Term Sheet" .......................................28
1.^ 241 "USW-^ Delphi-GM Memoranda of Understanding" ..................28
^ 1.242 "USW-Home Avenue Memorandum of Understanding" ..............28
^ 1.243 "USW-Vandalia Memorandum of Understanding" .......................28
^ 1.244 "Voting Deadline" ........................................................................28
^ C.     Rules Of Interpretation ..................................................................28
^ D.     Computation Of Time .....................................................................29
^ E.     References To Monetary Figures .....................................................29
F.       Exhibits ............................................................................................29
^ 29 ARTICLE II ADMINISTRATIVE EXPENSES AND PRIORITY TAX CLAIMS ............29
2.^ 1     Administrative Claims ...........................................................29^ 30^ 30
^ 2.2     Priority Tax Claims ................................................................30
^ 2.3     GM Administrative Claim. .....................................................30
ARTICLE ^ III CLASSIFICATION OF CLAIMS AND INTERESTS^  ..................30
^ 3.1     The Debtors. ...........................................................................30
^ 3.2     ^ Classification Of Claims And Interests. ...............................31
ARTICLE IV IDENTIFICATION OF CLASSES OF CLAIMS AND INTERESTS IMPAIRED AND UNIMPAIRED BY THE PLAN ...........................................32
^ 4.1     Classes Of Claims That Are Unimpaired. ..............................32
^ 4.2     Impaired Classes Of Claims And Interests. ............................32
^ ARTICLE V PROVISIONS FOR TREATMENT OF CLAIMS AND INTERESTS ...........33
5.1      Class 1A-1, Class 3A-1, and Class 4A-1 (Secured Claims) .....................33
5.2      Class 1B through Class 12B (Flow-Through Claims) ..............33
5.3      Class 1C-1 through Class 12C-1 (General Unsecured Claims) ...............33
5.4      Class 1C-2 through Class 12C-2 (PBGC Claims) ...................34
5.5      Class 1D through Class 12D (GM Unsecured Claim) ...............34^ 34^ 34
^ 5.6     Class 1E (Section 510(b) Note Claims) .................................34
5.^ 7     Class ^ 1F through Class 13F (Intercompany Claims) ............34
^ 5.8     Class 1G-1 (Existing Common Stock) ...................................34
^ 5.9     Class 1G-2 (Section 510(b) Equity Claims) ...........................34
^ 5.10    Class 1H and Class 8H (Section 510(b) ERISA Claims) .......34
5.^ 11    Class ^ 1I (Other ^ Interests) ...............................................35
^ 5.12    Class 1J through Class 12J (Interests In Affiliate Debtors) .....................35
^ 5.13    Class 1K through Class 12K (Other Priority Claims) .............35
^ ARTICLE VI ACCEPTANCE OR REJECTION OF THE PLAN; EFFECT OF REJECTION BY ONE OR MORE IMPAIRED CLASSES OF CLAIMS OR INTERESTS _____35
6.^ 1     Impaired Classes Of Claims Entitled To Vote ........................35
6.^ 2     Classes Deemed To ^ Accept The Plan ...................................35
^ 6.3     Acceptance By Impaired Classes ...........................................35
^ 6.4     Classes Deemed To Reject The Plan .....................................35
^ ^ 6.5                Prior Acceptances Or Rejections Of The Plan ...............36

6.6    Approval of Modifications Subject To Sections 1127 And 1129(b)
Of The Bankruptcy Code ..................................................36^ 36
ARTICLE VII MEANS FOR IMPLEMENTATION OF THE PLAN ...................36
7.1    Continued Corporate Existence ...........................................36
7.2    Substantive Consolidation ................................................36
7.^ 3    Restructuring Transactions. ............................................38
7.4    Certificate Of Incorporation And Bylaws. ...............................38
7.5    Directors And Officers Of Reorganized DPH Holdings And
Affiliate Debtors. ........................................................38
7.6    Consummation Of Disposition Transactions To Occur On Effective
Date. ....................................................................38
7.7    Master Disposition Agreement. ..........................................39
7.8    DIP Lender Credit Bid. ..................................................39
7.9    Post-Confirmation Reorganized DPH Holdings Share Trust .............40
7.10  Emergence Capital. ......................................................40
7.11  Management Compensation Plan. .........................................40
7.12  Procedures For Asserting Certain Claims .................................41
7.13  Cancellation Of Existing Securities And Agreements......................41
7.14  Sources of Cash For Plan Distributions. .................................42
7.15  Establishment Of A General Unsecured Distribution Account. ..............42
7.16  Collective Bargaining Agreements. ......................................42
7.17  Pension Matters And PBGC Settlement. ..................................44
7.18  Salaried OPEB Settlement. ..............................................44
7.19  Preservation Of Causes Of Action .......................................45
7.20  Reservation Of Rights. ..................................................45
7.21  Exclusivity Period. ......................................................45
7.22  Dismissal Of Complaints. ................................................45
7.23  Corporate Action. ......................................................45
7.24  Effectuating Documents; Further Transactions ...........................45
7.25  Consummation Of Divestiture Transactions...............................46
7.26  Exemption From Certain Transfer Taxes And Recording Fees..............46
ARTICLE VIII UNEXPIRED LEASES AND EXECUTORY CONTRACTS ...........46
8.1    Assumed And Rejected Contracts And Leases. .............................46
8.^ 2    Cure Procedures and ^ Payments Related To Assumption Of
Executory Contracts ^ And Unexpired Leases^  .....................47
8.3    Assignment Pursuant To Restructuring Transaction. ......................52
8.4    Rejection Damages Bar Date ...........................................52
8.5    Assumption and Assignment of Divestiture-Related Executory
Contracts and Unexpired Leases.........................................52
ARTICLE IX PROVISIONS GOVERNING DISTRIBUTIONS ....................53
9.1    Time Of Distributions. ..................................................53
9.2    No Interest On Disputed Claims ...........................53^ 53^ 53^ 54
9.3    Disbursing Agent. ......................................................53
9.4    Surrender Of Securities Or Instruments. .................................53
9.5    Services Of Indenture Trustees, Agents, And Servicers...................54
9.6    Claims Administration Responsibility. ...................................54
9.^ 7    Delivery Of ^ Distributions^  .........................................55

^ 9.8    Procedures For Treating And Resolving Disputed And Contingent
Claims..........................................................................................................56
^ 9.9    Section 510(b) Opt Out Claims.................................................................57
^ 9.10  Allocation Of Plan Distributions Between Principal And Interest. ...........58
^ ARTICLE X ALLOWANCE AND PAYMENT OF CERTAIN ADMINISTRATIVE
CLAIMS       58
^ 10.1  DIP Facility Claims..................................................................................58
10.^ 2  Pre-Confirmation Administrative ^ Claim Procedures...............................58
^ 10.3  Professional Claims .................................................................................58
^ 10.4  Substantial Contribution Compensation And Expenses Bar Date............59
^ 10.5  Other Administrative Claims ...................................................................60
^ ARTICLE XI EFFECT OF THE PLAN ON CLAIMS AND INTERESTS ...................60
^ 11.1  Revesting Of Assets.................................................................................60
^ 11.2  Discharge Of The Debtors .......................................................................60
^ 11.3  Compromises And Settlements.................................................................61
11.4    Release By Debtors Of Certain Parties.....................................................61
11.5    Release By Holders Of Claims And Interests............................................61
11.6    Release By Unions....................................................................................62
11.7    Release Of GM By Debtors And Third Parties. .......................................62
11.8    ^ Release of GMCo. By Debtors And Third Parties............62^ 63^ 63^ 63
^ 11.9  Setoffs ....................................................................................................63
^ 11.10 Subordination Rights ..............................................................................63
11.11   Exculpation And Limitation Of Liability ................................................63
11.12   Indemnification Obligations ....................................................................64
11.13   Exclusions And Limitations On Exculpation, Indemnification, And
Releases...................................................................................................65
11.14   Injunction................................................................................................65
ARTICLE XII CONDITIONS PRECEDENT.......................................................65^ 66^ 66^ 66
^ 12.1  Confirmation...........................................................................................66
^ 12.2  Conditions To The Effective Date Of The Plan.......................................66
12.3    Waiver Of Conditions Precedent .............................................................66
ARTICLE XIII RETENTION OF JURISDICTION..................................................................67
ARTICLE XIV MISCELLANEOUS PROVISIONS.................................................................69
14.1    Binding Effect..........................................................................................69
14.2    Payment Of Statutory Fees ......................................................................69
14.3    Modification And Amendments ...............................................................69
14.4    Reserved...........................................................................................69^ 69^ 70^ 70
^ 14.5  Withholding And Reporting Requirements ..............................................69
^ 14.6  Committees ..............................................................................................70
14.7    Revocation, Withdrawal, Or Non-Consummation....................................70
14.8    Notices .....................................................................................................70
14.9    Term Of Injunctions Or Stays..................................................................72
14.10  Governing Law ........................................................................................72
14.11  No Waiver Or Estoppel............................................................................73
14.12  Conflicts...................................................................................................73

## EXHIBITS

| Exhibit 7.3 | **Restructuring Transactions Notice** |
|---|---|
| Exhibit 7.4(a) | **Certificate Of Incorporation For Reorganized DPH Holdings** |
| Exhibit 7.4(b) | **Bylaws Of Reorganized DPH Holdings** |
| Exhibit 7.7 | **Master Disposition Agreement** |
| Exhibit 7.9 | **Post-Confirmation Reorganized DPH Holdings Share Trust Agreement** |
| Exhibit 7.11 | **Management Compensation Plan** |
| Exhibit 7.17 | **Delphi-PBGC Settlement Agreement** |
| Exhibit 7.19 | **Retained Causes Of Action** |
| Exhibit 8.1(a) | **Executory Contracts And Unexpired Leases To Be Rejected** |
| Exhibit 10.5 | **Administrative Claim Request Form** |

# INTRODUCTION

Delphi Corporation and certain of its direct and indirect subsidiaries, debtors and debtors-in-possession in the above-captioned jointly administered Chapter 11 Cases, hereby propose this joint plan of reorganization for the resolution of the outstanding Claims against and Interests in the Debtors. Capitalized terms used herein shall have the meanings ascribed to them in Article I.B. of this Plan.

The subsidiaries of Delphi incorporated outside of the United States are not the subject of the Chapter 11 Cases.

These Chapter 11 Cases have been consolidated for procedural purposes only and are being jointly administered pursuant to an order of the Bankruptcy Court. The Debtors are the proponents of this Plan within the meaning of section 1129 of the Bankruptcy Code. The distributions to be made to holders of Claims and Interests are set forth herein.

The Debtors' reorganization plan was confirmed, with certain modifications, by the Bankruptcy Court on January 25, 2008, and the confirmation order became final on February 4, 2008. The Debtors met the conditions required to consummate the plan, including obtaining $6.1 billion of exit financing, but on April 4, 2008, the Plan Investors delivered to Delphi a letter stating that such letter "constitutes a notice of immediate termination" of the Investment Agreement. The financing the Debtors were to receive under the Investment Agreement was an integral element to the consummation of the Plan. Appaloosa Management L.P.'s ("Appaloosa") April 4 letter alleged that Delphi had breached certain provisions of the Investment Agreement and that Appaloosa was entitled to terminate the Investment Agreement. On May 16, 2008, Delphi filed complaints for damages and specific performance against the Plan Investors and related parties who refused to honor their contractual obligations. Nevertheless, the termination of the Investment Agreement resulted in the Debtors' inability to consummate the Plan without additional modifications. The Debtors are now seeking approval of modifications to the Plan pursuant to section 1127 of the Bankruptcy Code.

This Plan provides for the substantive consolidation of certain of the Estates, but only for the purposes of voting and making distributions to holders of Claims under this Plan. Under section 1127 of the Bankruptcy Code, as it incorporates section 1125(b) of the Bankruptcy Code, a vote to accept or reject this Plan cannot be solicited from a holder of a Claim or Interest until a disclosure statement has been approved by the Bankruptcy Court and distributed to holders of Claims and Interests. The Disclosure Statement Supplement (the "Supplement") relating to this Plan was approved by the Bankruptcy Court on June 16, 2009, and has been distributed simultaneously with this Plan to all parties whose votes are being solicited. The Supplement contains, among other things, a discussion of the Debtors' history, business, properties and operations, risk factors associated with the business and Plan, a summary and analysis of this Plan, and certain related matters.

1

ALL HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE ARE ENCOURAGED TO READ THIS PLAN AND THE SUPPLEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THIS PLAN.

**PLEASE TAKE NOTICE THAT YOUR PREVIOUS ACCEPTANCE OR REJECTION OF THE PLAN WILL NOT BE COUNTED. CONSEQUENTLY, YOUR VOTE ON THE MODIFICATIONS TO THE PLAN IS IMPORTANT.**

Subject to the restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in Article XIV of this Plan, each of the Debtors expressly reserves its respective rights to alter, amend, modify, revoke, or withdraw this Plan with respect to such Debtor, one or more times, prior to this Plan's substantial consummation.

A complete list of the Debtors is set forth below.  The list identifies each Debtor by its case number in these Chapter 11 Cases.

2

## **THE DEBTORS**

- ASEC Manufacturing General Partnership, 05-44482

- ASEC Sales General Partnership, 05-44484

- Aspire, Inc, 05-44618

- Delco Electronics Overseas Corporation, 05-44610

- Delphi Automotive Systems (Holding), Inc., 05-44596

- Delphi Automotive Systems Global (Holding), Inc., 05-44636

- Delphi Automotive Systems Human Resources LLC, 05-44639

- Delphi Automotive Systems International, Inc., 05-44589

- Delphi Automotive Systems Korea, Inc., 05-44580

- Delphi Automotive Systems LLC, 05-44640

- Delphi Automotive Systems Overseas Corporation, 05-44593

- Delphi Automotive Systems Risk Management Corp., 05-44570

- Delphi Automotive Systems Services LLC, 05-44632

- Delphi Automotive Systems Tennessee, Inc., 05-44558

- Delphi Automotive Systems Thailand, Inc., 05-44586

- Delphi China LLC, 05-44577

- Delphi Connection Systems, 05-44624

- Delphi Corporation, 05-44481

- Delphi Diesel Systems Corp., 05-44612

- Delphi Electronics (Holding) LLC, 05-44547

- Delphi Foreign Sales Corporation, 05-44638

- Delphi Furukawa Wiring Systems LLC, 05-47452

- Delphi Integrated Service Solutions, Inc., 05-44623

- Delphi International Holdings Corp., 05-44591

- Delphi International Services, Inc., 05-44583

- Delphi Liquidation Holding Company, 05-44542

- Delphi LLC, 05-44615

- Delphi Mechatronic Systems, Inc., 05-44567

- Delphi Medical Systems Colorado Corporation, 05-44507

- Delphi Medical Systems Corporation, 05-44529

- Delphi Medical Systems Texas Corporation, 05-44511

- Delphi NY Holding Corporation, 05-44480

- Delphi Receivables LLC, 05-47459

- Delphi Services Holding Corporation, 05-44633

- Delphi Technologies, Inc., 05-44554

- DREAL, Inc., 05-44627

- Environmental Catalysts, LLC, 05-44503

- Exhaust Systems Corporation, 05-44573

- MobileAria, Inc., 05-47474

- Packard Hughes Interconnect Company, 05-44626

- Specialty Electronics International Ltd., 05-44536

- Specialty Electronics, Inc., 05-44539

# ARTICLE I

## DEFINITIONS, RULES OF
## INTERPRETATION, AND COMPUTATION OF TIME

### A.    Scope Of Definitions

For purposes of this Plan, except as expressly provided otherwise or unless the context requires otherwise, all capitalized terms not otherwise defined shall have the meanings ascribed to them in Article I.B. of this Plan.  Any term used in this Plan that is not defined herein, but is defined in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules.

### B.    Definitions

1.1    **"503 Deadline"** has the meaning ascribed to it in Article 10.4 hereof.

1.2    **"Acquired Assets"** means the GM Acquired Assets and the Company Acquired Assets.

1.3    **"Acquired Contracts"** has the meaning ascribed to it in the Master Disposition Agreement.

^ 1.4   **"Administrative Claim"** means a Claim (other than the GM Administrative Claim) for payment of an administrative expense of a kind specified in section 503(b) of the Bankruptcy Code and entitled to priority pursuant to section 507(a)(1) of the Bankruptcy Code, including, but not limited to, the DIP Facility Revolver Claim, the DIP Facility First Priority Term Claim, the DIP Facility Second Priority Term Claim, the actual, necessary costs and expenses, incurred on or after the Petition Date, of preserving the Estates and operating the business of the Debtors, including wages, salaries, or commissions for services rendered after the Petition Date, Professional Claims, all fees and charges assessed against the Estates under chapter 123 of title 28, United States Code, and all Allowed Claims that are to be treated as Administrative Claims pursuant to a Final Order of the Bankruptcy Court under section 546(c)(2)(A) of the Bankruptcy Code.

^ 1.5   **"Administrative Claims Bar Date"^** means the deadline for filing proofs of or requests for payment of Administrative Claims arising after June 1, 2009, which shall be 30 days after the Effective Date, unless otherwise ordered by the Bankruptcy Court, and except with respect to Professional Claims, which shall be subject to the provisions of Article 10.3 hereof.

^ 1.6   **"ADR Procedures"** means any alternative dispute resolution procedures approved by the Bankruptcy Court prior to the Effective Date, including, but not limited to, those approved in the Amended And Restated Order Under 11 U.S.C. §§ 363, 502, And 503 And Fed. R.

4

Bankr. P. 9019(b) Authorizing Debtors To Compromise Or Settle Certain Classes Of Controversy And Allow Claims Without Further Court Approval, entered June 26, 2007.

**^ 1.7    "Affiliate Debtors"** means all the Debtors, other than Delphi.

**^ 1.8    "Affiliates"** has the meaning given such term by section 101(2) of the Bankruptcy Code.

**^ 1.9    "Allowed Claim"** means a Claim, or any portion thereof,

**(a)**    that has been allowed by a Final Order of the Bankruptcy Court (or such other court or forum as the Reorganized Debtors and the holder of such Claim agree may adjudicate such Claim and objections thereto);

**(b)**    as to which a proof of claim has been timely filed with the Bankruptcy Court pursuant to the Bankruptcy Code, or is allowed by any Final Order of the Bankruptcy Court or by other applicable non-bankruptcy law, but only to the extent that such claim is identified in such proof of claim in a liquidated and noncontingent amount, and either (i) no objection to its allowance has been filed, or is intended to be filed, within the periods of limitation fixed by this Plan, the Bankruptcy Code, or by any order of the Bankruptcy Court, or (ii) any objection as to its allowance has been settled or withdrawn or has been denied by a Final Order;

**(c)**    as to which no proof of claim has been filed with the Bankruptcy Court and (i) which is Scheduled as liquidated in an amount other than zero and not contingent or disputed, but solely to the extent of such liquidated amount and (ii) no objection to its allowance has been filed, or is intended to be filed, by the Debtors or the Reorganized Debtors, within the periods of limitation fixed by this Plan, the Bankruptcy Code, or by any order of the Bankruptcy Court;

**(d)**    that is expressly allowed in a liquidated amount in this Plan; or

**(e)**    that is a Section 510(b) Note Claim, Section 510(b) Equity Claim, or Section 510(b) ERISA Claim; provided that both the Bankruptcy Court and MDL Court shall have approved the MDL Settlements, except to the extent that any such Claim is or becomes a Section 510(b) Opt Out Claim.

**^ 1.10  "Allowed Class . . . Claim" or "Allowed Class . . . Interest"** means an Allowed Claim or an Allowed Interest in the specified Class.

**^ 1.11  "Allowed Interest"** means an Interest in any Debtor, which has been or hereafter is listed by such Debtor in its books and records as liquidated in an amount and not disputed or contingent; provided, however, that to the extent an Interest is a Disputed Interest, the determination of whether such Interest shall be allowed and/or the amount of any such Interest shall be determined, resolved, or adjudicated, as the case may be, in the manner in which such Interest would have been determined, resolved, or adjudicated if the Chapter 11 Cases had not been commenced; and provided further, however, that proofs of Interest need not and should not be filed in the Bankruptcy Court with respect to any Interests; and provided further, however, that

the Reorganized Debtors, in their discretion, may bring an objection or motion with respect to a Disputed Interest before the Bankruptcy Court for resolution.

      1.12    ^ **"Assumed Liabilities"** means GM Assumed Liabilities or Company Assumed Liabilities, as applicable.

      ^ **1.13 "Avoidance Claims"** means Causes of Action or defenses arising under any of sections 502, 510, 541, 542, 543, 544, 545, 547, 548, 549, 550, 551, or 553 of the Bankruptcy Code, or under similar or related state or federal statutes and common law, including fraudulent transfer laws, whether or not litigation has been commenced as of the Confirmation Date to prosecute such Causes of Action.

      ^ **1.14 "Ballot"** means each of the ballot forms that is distributed with the Disclosure Statement to holders of Claims and Interests included in Classes that are Impaired under this Plan and entitled to vote under Article VI of this Plan.

      ^ **1.15 "Bankruptcy Code"** means the Bankruptcy Reform Act of 1978, as amended and codified in title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as in effect on the Petition Date.

      ^ **1.16 "Bankruptcy Court"** means the United States Bankruptcy Court for the Southern District of New York or such other court as may have jurisdiction over the Chapter 11 Cases.

      ^ **1.17 "Bankruptcy Rules"** means the Federal Rules of Bankruptcy Procedure and the Official Bankruptcy Forms, as amended, the Federal Rules of Civil Procedure, as amended, as applicable to the Chapter 11 Cases or proceedings therein, and the Local Rules of the Bankruptcy Court, as applicable to the Chapter 11 Cases or proceedings therein, as the case may be.

      ^ **1.18 "Bar Date"** means the deadlines set by the Bankruptcy Court pursuant to the Bar Date Order or other Final Order for filing proofs of claim in the Chapter 11 Cases, as the context may require.  Except as explicitly provided in the Bar Date Order, the Bar Date was July 31, 2006.

      ^ **1.19 "Bar Date Order"** means the order entered by the Bankruptcy Court on April 12, 2006, which established the Bar Date, and any subsequent order supplementing such initial order or relating thereto.

      ^ **1.20 "Beneficiaries"** means those Holders of Claims that are to be satisfied under the Plan by post-Effective Date distributions to be made by Reorganized DPH Holdings at the direction of the Post-Confirmation Trust Plan Administrator.

      ^ **1.21 "Business Day"** means any day, excluding Saturdays, Sundays, and "legal holidays" (as defined in Bankruptcy Rule 9006(a)), on which commercial banks are open for business in New York City.

**^ 1.22 "Buyers"** means, collectively, GM Buyer and ^ Company Buyer.

**^ 1.23 "Cash"** means legal tender of the United States of America and equivalents thereof.

**^ 1.24 "Cash Reserve"** means the cash reserved, as determined by the Debtors or the Reorganized Debtors in their sole and absolute discretion, sufficient to pay Administrative Claims, Other Secured Claims, Priority Tax Claims, and as otherwise required by this Plan.

**^ 1.25 "Causes of Action"** means any and all actions, proceedings, causes of action, suits, accounts, demands, controversies, agreements, promises, rights to legal remedies, rights to equitable remedies, rights to payment, and claims, whether known, unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, non-contingent, matured, unmatured, disputed, undisputed, secured, or unsecured, and whether asserted or assertable directly or derivatively in law, equity, or otherwise, including Avoidance Claims, unless otherwise waived or released by the Debtors or the Reorganized Debtors to the extent such Cause of Action is a Cause of Action held by the Debtors or the Reorganized Debtors.

**^ 1.26 "Certificate"** has the meaning ascribed to it in Article 9.4 hereof.

**^ 1.27 "Certificate of Incorporation and Bylaws"** means the Certificate of Incorporation and Bylaws (or other similar documents) of Reorganized DPH Holdings, in substantially the forms attached hereto as Exhibit 7.4(a) and Exhibit 7.4(b) respectively.

**^ 1.28 "Chapter 11 Cases"** means the chapter 11 cases of the Debtors pending in the Bankruptcy Court and being jointly administered with one another under Case No. 05-44481, and the phrase "Chapter 11 Case" when used with reference to a particular Debtor means the particular case under chapter 11 of the Bankruptcy Code that such Debtor commenced in the Bankruptcy Court.

**^ 1.29 "Claim"** means a claim against one of the Debtors (or all or some of them), whether or not asserted, as defined in section 101(5) of the Bankruptcy Code.

**^ 1.30 "Claims Agent"** means Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, California 90245, Attention: Delphi Corporation.

**^ 1.31 "Claims/Interests Objection Deadline"** means, as applicable (except for Administrative Claims), (a) the day that is the later of (i) the first Business Day that is at least 120 days after the Effective Date and (ii) as to proofs of claim filed after the Bar Date, the first Business Day that is at least 120 days after a Final Order is entered deeming the late filed claim to be treated as timely filed or (b) such later date as may be established by the Bankruptcy Court upon request of the Reorganized Debtors without further notice to parties-in-interest.

**^ 1.32 "Class"** means a category of holders of Claims or Interests as described in Article III of this Plan.

**1.33    "Company Acquired Assets"** has the meaning ascribed to "Company Acquired Assets" as set forth in the Master Disposition Agreement.

7

**1.34** **"Company Assumed Contracts"** means those prepetition executory contracts and/or unexpired leases acquired by Company Buyer under the terms of the Master Disposition Agreement.

**1.35** **"Company Assumed Liabilities"** means those liabilities assumed by Company Buyer under the terms of the Master Disposition Agreement.

**1.36** **"Company Buyer"** means DIP Holdco 3, LLC, on behalf of itself and other buyers as set forth in the Master Disposition Agreement, as assignees of the rights of the DIP Agent to the Company Acquired Assets in connection with the Credit Bid.

**1.37** **"Company Sales Securities"** means those outstanding shares and other equity interests acquired by the Company Buyer under the terms of the Master Disposition Agreement.

**^ 1.38** **"Confirmation Date"** means the date of entry of the Confirmation Order.

**^ 1.39** **"Confirmation Hearing"** means the hearing before the Bankruptcy Court commencing on January 17, 2008 held under section 1128 of the Bankruptcy Code to consider confirmation of the Plan and related matters.

**^ 1.40** **"Confirmation Order"** means the order entered on January 25, 2008 by the Bankruptcy Court confirming this Plan under section 1129 of the Bankruptcy Code.

**^ 1.41** **"Connection Systems Debtors"** means, collectively, Packard Hughes Interconnect Company and Delphi Connection Systems, as substantively consolidated for Plan purposes.

**^ 1.42** **"Contingent PBGC Secured Claim"** means any Claim of the PBGC asserted against the applicable Debtors or group of Debtors, which Claims were granted conditional adequate protection liens pursuant to, and in the priority and with the validity set forth in, the Order Under 11 U.S.C. §§ 361 and 363, Fed. R. Bankr. P. 9019, And Cash Management Order Authorizing DASHI To Grant Adequate Protection To Pension Benefit Guaranty Corporation In Connection With Certain Intercompany Transfer Of Repatriated Funds, dated May 29, 2008 (Docket No. 13694) and the Second Supplemental Order Under 11 U.S.C. §§ 361 and 363, Fed. R. Bankr. P. 9019 And Cash Management Order Authorizing DASHI To Grant Adequate Protection To Pension Benefit Guaranty Corporation In Connection With Certain Intercompany Transfers Of Repatriated Funds, dated July 30, 2008 (Docket No. 14005).

**^ 1.43** **"Continuing Indemnification Rights"** means those Indemnification Rights held by any Indemnitee who is a Released Party, together with any Indemnification Rights held by any Indemnitee on account of events occurring on or after the Petition Date.

**^ 1.44** **"Controlled Affiliate"** means any Affiliate in which a Debtor (whether directly or indirectly and whether by ownership or share capital, the possession of voting power, contract or otherwise) has the power to appoint and/or remove the majority of the members of the board of directors or other governing body of such Affiliate or otherwise to direct or cause the direction of the affairs and policies of such Affiliate.

8

**1.45** **"Credit Bid"** means the payment in an amount equal to 100% of the principal and interest due under the DIP Credit Agreement, as set forth in the Master Disposition Agreement.

**^ 1.46** **"Creditors' Committee"** means the official committee of unsecured creditors appointed pursuant to section 1102(a) of the Bankruptcy Code in the Chapter 11 Cases on October 17, 2005, as reconstituted from time to time.

**^ 1.47** **"Cure"** means the payment or other honoring of all obligations required to be paid or honored in connection with assumption of an executory contract or unexpired lease pursuant to section 365 of the Bankruptcy Code, including (a) the cure of any non-monetary defaults to the extent required, if at all, pursuant to section 365 of the Bankruptcy Code, and (b) with respect to monetary defaults, the distribution within a reasonable period of time following the Effective Date of Cash, or such other property as may be agreed upon by the parties or ordered by the Bankruptcy Court, with respect to the assumption (or assumption and assignment) of an executory contract or unexpired lease, pursuant to section 365(b) of the Bankruptcy Code, in an amount equal to all undisputed, unpaid, and past due monetary obligations or such lesser amount as may be agreed upon by the parties, under such executory contract or unexpired lease, to the extent such obligations are enforceable under the Bankruptcy Code and applicable non-bankruptcy law.

**^ 1.48** **"Cure Amount Notice"** means the notice of proposed Cure amount provided to counterparties to Material Supply Agreements pursuant to the Solicitation Procedures Order and the Confirmation Order, and such notices provided under the Modification Procedures Order.

**^ 1.49** **"Cure Amount Proposal"** has the meaning ascribed to it in Article 8.2 of this Plan.

**^ 1.50** **"DASHI Debtors"** means, collectively, Delphi Automotive Systems (Holding), Inc., Delphi Automotive Systems International, Inc., Delphi Automotive Systems Korea, Inc., Delphi Automotive Systems Overseas Corporation, Delphi Automotive Systems Thailand, Inc., Delphi China LLC, Delphi International Holdings Corp., and Delphi International Services, Inc., as substantively consolidated for Plan purposes.

**^ 1.51** **"Debtor"** means, individually, any of Delphi or the Affiliate Debtors.

**^ 1.52** **"Debtors"** means, collectively, Delphi and the Affiliate Debtors.

**^ 1.53** **"Delphi"** means Delphi Corporation, a Delaware corporation, debtor-in-possession in the above-captioned Case No. 05-44481 (RDD) pending in the Bankruptcy Court.

**^ 1.54** **"Delphi-DAS Debtors"** means, collectively, Delphi Corporation, ASEC Manufacturing General Partnership, ASEC Sales General Partnership, Aspire, Inc., Delphi Automotive Systems LLC, Delphi Automotive Systems Global (Holdings), Inc., Delphi Automotive Systems Human Resources LLC, Delphi Automotive Systems Services LLC, Delphi Foreign Sales Corporation, Delphi Integrated Service Solutions, Inc., Delphi LLC, Delphi NY Holding Corporation, Delphi Receivables LLC, Delphi Services Holding Corporation, Delphi

Automotive Systems Risk Management Corp., Delphi Automotive Systems Tennessee, Inc., Delphi Technologies, Inc., Delphi Electronics (Holding) LLC, Delphi Liquidation Holding Company, DREAL, Inc., Environmental Catalysts, LLC, and Exhaust Systems Corporation, as substantively consolidated for Plan purposes.

^ 1.55 **"Delphi-GM Arrangement"** means that certain agreement between the Debtors and GM, dated May 9, 2008, as subsequently amended, supplemented, or otherwise modified from time to time, pursuant to which GM agreed to make specified accommodations to enhance the Debtors' liquidity.

^ 1.56 **"Delphi-GM Definitive Documents"** means the Delphi-GM Global Settlement Agreement, the Delphi-GM Master Restructuring Agreement, each as amended and supplemented, and all attachments and exhibits thereto.

^ 1.57 **"Delphi-GM Global Settlement Agreement"** means that certain Amended and Restated Global Settlement Agreement between Delphi Corporation, on behalf of itself and certain subsidiaries and Affiliates, and General Motors Corporation, dated September 12, 2008 and September 25, 2008.

^ 1.58 **"Delphi-GM Master Restructuring Agreement"** means that certain Amended and Restated Master Restructuring Agreement between Delphi Corporation and General Motors Corporation, dated September 12, 2008.

^ 1.59 **"Delphi HRP"** means the Delphi Hourly-Rate Employees Pension Plan.

^ 1.60 **"Delphi-PBGC Settlement Agreement"**^ means ^ the agreement ^ dated July 21, 2009 between Delphi and the PBGC that provides for, among other things, resolution of the Debtors' Pension Plans and related Claims, ^ as attached hereto ^ as Exhibit 7.17.

^ 1.61 **"DIP Accommodation Agreement"** means that certain Accommodation Agreement, dated December 12, 2008, by and among the Debtors, the DIP Agent, and the requisite percentage of DIP Lenders, as amended and supplemented.

^ 1.62 **"DIP Accommodation Agreement Order"** means, collectively, the Order (I) Supplementing January 5, 2007 DIP Refinancing Order (Docket No. 6461) And Authorizing Debtors To Enter Into And Implement Accommodation Agreement With Agent And Participating Lenders And (II) Authorizing Debtors To (A) Enter Into Related Documents And (B) Pay Fees In Connection Therewith, entered by the Bankruptcy Court on December 3, 2008 (Docket No. 14515), the Order Authorizing Debtors To (I) Enter Into Amendment To Accommodation Agreement With Certain Participating Lenders And (II)(A) Enter Into Related Documents And (B) Pay Fees And Expenses In Connection Therewith, entered by the Bankruptcy Court on February 25, 2009 (Docket No. 16377), and any and all other orders entered by the Bankruptcy Court authorizing and approving the amendments to the DIP Accommodation Agreement.

^ 1.63 **"DIP Agent"** means the administrative agent for the DIP Lenders as defined in the DIP Credit Agreement.

^ 1.64 **"DIP Claims"** means, collectively, the DIP Facility First Priority Term Claim, DIP Facility Revolver Claim, and DIP Facility Second Priority Term Claim.

10

**^ 1.65 "DIP Credit Agreement"** means that certain Amended and Restated Revolving Credit, Term Loan and Guaranty Agreement, dated as of May 9, 2008, by and among the Debtors, the DIP Agent, and the DIP Lenders, which was executed by the Debtors in connection with the DIP Facility, as amended, supplemented, or otherwise modified from time to time, and all documents executed in connection therewith.

**^ 1.66 "DIP Facility"** means the debtor-in-possession secured financing facility provided to the Debtors by the DIP Lenders pursuant to the DIP Credit Agreement as authorized by the Bankruptcy Court pursuant to the DIP Facility Order.

**^ 1.67 "DIP Facility First Priority Term Claim"** means any Claim of the DIP Agent and/or the DIP Lenders, as the case may be, arising under or pursuant to that portion of the DIP Facility that affords to the Debtors a $500 million term loan facility, including, without limitation, principal and interest thereon, plus all reasonable fees and expenses (including professional fees and expenses) payable by the Debtors thereunder.

**^ 1.68 "DIP Facility Order"** means, collectively, (a) the interim order that was entered by the Bankruptcy Court on October 12, 2005, (b) the final order that was entered by the Bankruptcy Court on October 28, 2005, authorizing and approving the DIP Facility and the agreements related thereto, (c) the order that was entered by the Bankruptcy Court on January 5, 2007, authorizing the Debtors to refinance the DIP Facility, and (d) any and all orders entered by the Bankruptcy Court authorizing and approving the amendments to the DIP Credit Agreement.

**^ 1.69 "DIP Facility Revolver Claim"** means any Claim of the DIP Agent and/or the DIP Lenders, as the case may be, arising under or pursuant to that portion of the DIP Facility that affords to the Debtors a $1.1 billion revolving lending facility, including, without limitation, principal and interest thereon, plus all reasonable fees and expenses (including professional fees and expenses) payable by the Debtors thereunder.

**^ 1.70 "DIP Facility Second Priority Term Claim"** means any Claim of the DIP Agent and/or the DIP Lenders, as the case may be, arising under or pursuant to that portion of the DIP Facility that affords to the Debtors a $2.^ 750 billion term loan facility, including, without limitation, principal and interest thereon, plus all reasonable fees and expenses (including professional fees and expenses) payable by the Debtors thereunder.

**^ 1.71 "DIP Lenders"** means the lenders and issuers from time to time party to the DIP Credit Agreement.

**^ 1.72 "DIP Lenders Steering Committee"** means the committee with members consisting of certain DIP Lenders with DIP Facility First Priority Term Claims, DIP Facility Revolver Claims, and DIP Facility Second Priority Term Claims.

**^ 1.73 "DIP Loan Documents"** means the DIP Facility together with the DIP Accommodation Agreement as authorized by the Bankruptcy Court pursuant to the DIP Accommodation Agreement Order, and all documents relating thereto.

**^ 1.74 "DIP Priority Payment Amount"** means the aggregate amount (after giving effect to the application of any applicable cash collateral) necessary to pay on the closing date of the Master Disposition Agreement, in dollars:  (i) all outstanding and unpaid fees and

expenses then due under Section 10.05 of the DIP Credit Agreement (including any counsel and advisor fees payable under Section 10.05 of the DIP Credit Agreement); (ii) accrued and unpaid interest and fees then due on account of DIP Facility Revolver Claims and DIP Facility First Priority Term Claims; (iii) the DIP Facility Revolver Claims and DIP Facility First Priority Term Claims for then outstanding principal amounts; and (iv) up to $350,000,000 of Swap Exposure (as defined in the DIP Credit Agreement) that are not assumed liabilities under the Master Disposition Agreement for those Hedging Agreements (as defined in the DIP Credit Agreement) that are not assumed liabilities under the Master Disposition Agreement.

^ **1.75** **"DIP Transfer"**^ means the transfer to the DIP Agent of the consideration specified in that certain Assignment Agreement dated July __, 2009 among the DIP Agent, DIP Holdco 3, LLC and GM Components Holdings, LLC to be distributed in accordance with the DIP Loan Documents, in exchange for the DIP Agent's right under the Credit Bid to receive the Company Acquired Assets, Company Sale Securities, GM Acquired Assets, and GM Sales Securities.

^ **1.76** **"Disallowed Claim"** means (a) a Claim, or any portion thereof, that has been disallowed by a Final Order or a settlement, (b) a Claim or any portion thereof that is Scheduled at zero or as contingent, disputed, or unliquidated and as to which a proof of claim bar date has been established but no proof of claim has been timely filed or deemed timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely filed under applicable law, or (c) a Claim or any portion thereof that is not Scheduled and as to which a proof of claim bar date has been established but no proof of claim has been timely filed or deemed timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely filed under applicable law.

^ **1.77** **"Disallowed Interest"** means an Interest or any portion thereof that has been disallowed by a Final Order or a settlement.

^ **1.78** **"Disbursing Agent"** means Reorganized DPH Holdings, or any Person designated by it, in its sole discretion, to serve as a disbursing agent under this Plan. For purposes of distributions to holders of Allowed General Unsecured Claims, Reorganized DIP Holdings shall, as of the Effective Date, appoint DIP Holdco 3, LLC as the Disbursing Agent, or such other party as may be determined by mutual agreement between Reorganized DIP Holdings and DIP Holdco 3, LLC.

^ **1.79** **"Disclosure Statement"** means the written disclosure statement or any supplements thereto (including the Supplement and all schedules thereto or referenced therein) that relates to this Plan, as such disclosure statement may be amended, modified, or supplemented from time to time, all as approved by the Bankruptcy Court pursuant to sections 1125 and 1127 of the Bankruptcy Code and Bankruptcy Rule 3017.

^ **1.80** **"Disposition Transactions"** means those transactions described in the Master Disposition Agreement^ .

^ **1.81** **"Disputed Claim"** or **"Disputed Interest"** means a Claim or any portion thereof, or an Interest or an portion thereof, that is neither an Allowed Claim nor a Disallowed Claim, nor an Allowed Interest nor a Disallowed Interest, as the case may be.

**^ 1.82  "Distribution Date"** means the date, selected by the Reorganized Debtors, upon which distributions to holders of Allowed Claims entitled to receive distributions under this Plan shall commence; provided, however, that the Distribution Date shall occur as soon as reasonably practicable after the Effective Date, but in any event no later than 30 days after the Effective Date.

**^ 1.83  "Distribution Reserve"** means, as applicable, one or more reserves of property for distribution to holders of Allowed Claims in the Chapter 11 Cases to be reserved pending allowance of Disputed Claims in accordance with Article 9.8 of this Plan.

**^ 1.84  "Effective Date"** means the Business Day determined by the Debtors on which all conditions to the consummation of this Plan set forth in Article 12.2 of this Plan have been either satisfied or waived as provided in Article 12.3 of this Plan and the day upon which this Plan is substantially consummated.

**^ 1.85  "Emergence Capital"** means that certain amount to be provided to the Reorganized Debtors by ^ GMCo. and DIP Holdco 3, LLC pursuant to Sections 3.1.1, 3.^ 2.1, and 3.2.3 of the Master Disposition Agreement (as each are applicable) related to the post-Effective Date operations of Reorganized DPH Holdings and the Reorganized Debtors.

**^ 1.86  "Employee-Related Obligation"** means a Claim of a salaried employee of one or more of the Debtors, in his or her capacity as an employee of such Debtor or Debtors, for (i) severance, provided, however, that such employee was in his or her capacity as an employee of a Debtor on or after June 1, 2009, and (ii) indemnification, provided, however, that such employee was in his or her capacity as an employee of a Debtor as of the date of the commencement of the hearing on the Disclosure Statement.

**^ 1.87  "Equity Committee"** means the official committee of equity security holders that was appointed pursuant to section 1102(a) of the Bankruptcy Code in the Chapter 11 Cases on April 28, 2006 and disbanded on April 24, 2009.

**^ 1.88  "ERISA"** means Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001-1461 and 26 U.S.C. §§ 401-420, as amended.

**^ 1.89  "ERISA Plaintiffs"** means, collectively, Gregory Bartell, Thomas Kessler, Neal Folck, Donald McEvoy, Irene Polito, and Kimberly Chase-Orr on behalf of participants in the Debtors and their subsidiaries' defined contribution employee benefit pension plans that invested in Delphi common stock, as styled in the MDL Actions.

**^ 1.90  "ERISA Settlement"** means that certain settlement of the ERISA-related MDL Actions, as it may be amended or modified.

**^ 1.91  "Estates"** means the bankruptcy estates of the Debtors created pursuant to section 541 of the Bankruptcy Code.

**^ 1.92  "Exchange Act"** means the Securities Exchange Act of 1934, as now in effect or hereafter amended.

^ **1.93** **"Exhibit"** means an exhibit annexed either to this Plan or as an appendix to the Disclosure Statement.

^ **1.94** **"Exhibit Filing Date"** means the date on which Exhibits to this Plan or the Disclosure Statement shall be filed with the Bankruptcy Court, which date shall be at least ten days prior to the Voting Deadline or such later date as may be approved by the Bankruptcy Court without further notice.

^ **1.95** **"Existing Common Stock"** means shares of common stock of Delphi that are authorized, issued, and outstanding prior to the Effective Date.

^ **1.96** **"Existing Securities"** means, collectively, the Senior Notes, the Subordinated Notes, and the Existing Common Stock.

^ **1.97** **"Face Amount"** means, (a) when used in reference to a Disputed or Disallowed Claim, the full stated liquidated amount claimed by the holder of a Claim in any proof of claim timely filed with the Bankruptcy Court or otherwise deemed timely filed by any Final Order of the Bankruptcy Court or other applicable bankruptcy law, (b) when used in reference to an Allowed Claim, the allowed amount of such Claim, and (c) when used in reference to a TOPrS Claim, $0.

^ **1.98** **"Final Modification Hearing"** means the final hearing before the Bankruptcy Court held under section 1127 of the Bankruptcy Code to consider modification of this Plan and related matters.

^ **1.99** **"Final Order"** means an order or judgment, the operation or effect of which has not been reversed, stayed, modified, or amended, and as to which order or judgment (or any reversal, stay, modification, or amendment thereof) (a) the time to appeal, seek certiorari, or request reargument or further review or rehearing has expired and no appeal, petition for certiorari, or request for reargument or further review or rehearing has been timely filed, or (b) any appeal that has been or may be taken or any petition for certiorari or request for reargument or further review or rehearing that has been or may be filed has been resolved by the highest court to which the order or judgment was appealed, from which certiorari was sought, or to which the request was made, and no further appeal or petition for certiorari or request for reargument or further review or rehearing has been or can be taken or granted.

^ **1.100** **"Flow-Through Claim"** means a claim arising from an Employee-Related Obligation; provided, however, that all Estate Causes of Action and defenses to any Flow-Through Claim shall be fully preserved.

^ **1.101** **"General Unsecured Claim"** means any Claim, including a Senior Note Claim, TOPrS Claim or a SERP Claim, that is not otherwise an Administrative Claim, Priority Tax Claim, GM Administrative Claim, Secured Claim, Contingent PBGC Secured Claim, Flow-Through Claim, GM Unsecured Claim, Section 510(b) Note Claim, Section 510(b) Equity Claim, Section 510(b) ERISA Claim, Section 510(b) Opt Out Claim, or Intercompany Claim.

^ **1.102** **"General Unsecured MDA Distribution"** means, if and to the extent ^ Company Buyer makes distributions to its members ^ in accordance with the ^ Company Buyer Operating Agreement, as described in section 3.2.3 of ^ the ^ Master Disposition

14

Agreement, in excess of $7.2 billion, an amount equal to $^ 32.50 for every $^ 67.50 so distributed
in excess of $7.2 billion; provided, however, that in no event shall the General Unsecured MDA
Distribution exceed $^ 300,000,000 in the aggregate.

**^ 1.103**    **"GM"** means Motors Liquidation Company, formerly known as
General Motors Corporation.

**^ 1.104**    **"GM Acquired Assets"** has the meaning set forth in the Master
Disposition Agreement.

**^ 1.105**    **"GM 414(l) Administrative Claim"** means the claim of GM under
the Delphi-GM Definitive Documents in connection with the IRC Section 414(l) Transfer
described in section 2.03(c) of the Delphi-GM Global Settlement Agreement of no more in the
aggregate than $2.055 billion.

**^ 1.106**    **"GM Administrative Claim"** means the GM 414(l)
Administrative Claim and the GM Arrangement Administrative Claim.

**^ 1.107**    **"GM Arrangement Administrative Claim"** means the claim of
GM under the Delphi-GM Arrangement.

**^ 1.108**    **"GM Assumed Contracts"** means those prepetition executory
contracts and/or unexpired leases acquired by GM (and then assigned to GMCo.) under the terms
of the Master Disposition Agreement.

**^ 1.109**    **"GM Assumed Liabilities"** means liabilities assumed by ^ GMCo.
under the terms of the Master Disposition Agreement.

**^ 1.110**    **"GM Buyer(s)"** has the meaning set forth in the Master Disposition
Agreement.

**1.111**    **"GMCo."** means General Motors Company.

**1.112**    **"GM-PBGC Agreement"** means the Waiver and Release Agreement
among PBGC, General Motors Company, and Motors Liquidation Company, dated July 24, 2009,
which is appended as Exhibit B to the Delphi-PBGC Settlement Agreement.

**1.113**    **"GM Sales Securities"** means those outstanding shares and other equity
interests acquired by the GM Buyer under the terms of the Master Disposition Agreement.

**^ 1.114**    **"GM Unsecured Claim"** means any Claim of GM, excluding the
GM Administrative Claim and all other Claims and amounts to be treated pursuant to the Master
Disposition Agreement (or any agreements ancillary to the Master Disposition Agreement) or the
Delphi-GM Global Settlement Agreement, but shall otherwise include all claims asserted in GM's
proof of claim, which was allowed in the amount of $2.5 billion upon the effectiveness of the
Delphi-GM Global Settlement Agreement.

**^ 1.115**    **"Holdback Amount"** means the amounts withheld by the Debtors
as of the Confirmation Date as a holdback on payment of Professional Claims pursuant to the
Professional Fee Order.

**^ 1.116** **"Holdback Escrow Account"** means the escrow account into which Cash equal to the Holdback Amount shall be deposited on the Effective Date for the payment of Allowed Professional Claims to the extent not previously paid or disallowed.

**^ 1.117** **"IAM"** means the International Association of Machinists and Aerospace Workers and its District 10 and Tool and Die Makers Lodge 78.

**^ 1.118** **"IAM Memorandum of Understanding"** means, collectively, (i) that certain memorandum of understanding, dated July 31, 2007, as approved by the Bankruptcy Court on August 16, 2007, among the IAM, Delphi, and GM, and all attachments and exhibits thereto; and (ii) IUOE-IBEW-IAM-Delphi-GM Implementation Agreement Regarding 414(l) Transfers, Implementation of Term Sheet, Delphi Pension Freeze and Cessation of OPEB, and Application of Releases, dated September 25, 2008.

**^ 1.119** **"IBEW"** means the International Brotherhood of Electrical Workers and its Local 663.

**^ 1.120** **"IBEW E&S Memorandum of Understanding"** means, collectively, (i) that certain memorandum of understanding, dated July 31, 2007, as approved by the Bankruptcy Court on August 16, 2007, among the IBEW and its Local 663 relating to Delphi Electronics and Safety, Delphi, and GM, and all attachments and exhibits thereto; and (ii) IUOE-IBEW-IAM-Delphi-GM Implementation Agreement Regarding 414(l) Transfers, Implementation of Term Sheet, Delphi Pension Freeze and Cessation of OPEB, and Application of Releases, dated September 25, 2008.

**^ 1.121** **"IBEW Powertrain Memorandum of Understanding"** means, collectively, (i) that certain memorandum of understanding, dated July 31, 2007, as approved by the Bankruptcy Court on August 16, 2007, among the IBEW and its Local 663 relating to Delphi Powertrain, Delphi, and GM, and all attachment and exhibits thereto; and (ii) IUOE-IBEW-IAM-Delphi-GM Implementation Agreement Regarding 414(l) Transfers, Implementation of Term Sheet, Delphi Pension Freeze and Cessation of OPEB, and Application of Releases, dated September 25, 2008.

**^ 1.122** **"Impaired"** refers to any Claim or Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

**^ 1.123** **"Indemnification Rights"** means obligations of the Debtors, if any, to indemnify, reimburse, advance, or contribute to the losses, liabilities, or expenses of an Indemnitee pursuant to the Debtor's certificate of incorporation, bylaws, policy of providing employee indemnification, applicable law, or specific agreement in respect of any claims, demands, suits, causes of action, or proceedings against an Indemnitee based upon any act or omission related to an Indemnitee's service with, for, or on behalf of the Debtors.

**^ 1.124** **"Indemnitee"** means all current and former directors, officers, employees, agents, or representatives of the Debtors who are entitled to assert Indemnification Rights.

**^ 1.125** **"Indenture Trustees"** means the Senior Notes Indenture Trustee and the Subordinated Notes Indenture Trustee.

**^ 1.126**            **"Indentures"** means the Senior Notes Indenture and the
Subordinated Notes Indenture.

**^ 1.127**            **"Insurance Coverage"** has the meaning ascribed to it in <u>Article
11.12</u> of this Plan.

**^ 1.128**            **"Insurance Settlement"** means that certain agreement among
Delphi, certain insured officers and directors, and certain insurance carriers resolving certain
insurance claims related to the MDL Actions, as it may be amended or modified.

**^ 1.129**            **"Intercompany Claim"** means a Claim by a Debtor, a Controlled
Affiliate of a Debtor, or a non-Debtor Controlled Affiliate against another Debtor, Controlled
Affiliate of a Debtor, or non-Debtor Controlled Affiliate.

**^ 1.130**            **"Intercompany Executory Contract"** means an executory
contract solely between two or more Debtors or an executory contract solely between one or more
Debtors and one or more non-Debtor Controlled Affiliates.

**^ 1.131**            **"Intercompany Unexpired Lease"** means an unexpired lease
solely between two or more Debtors or an unexpired lease solely between one or more Debtors and
one or more non-Debtor Controlled Affiliates.

**^ 1.132**            **"Interest"** means the legal, equitable, contractual, and other rights
of any Person with respect to Existing Common Stock, Other Interests, or any other equity
securities of, or ownership interests in, Delphi or the Affiliate Debtors.

**^ 1.133**            **"Investment Agreement"** means that Equity Purchase and
Commitment Agreement, dated December 10, 2007, between the Plan Investors and Delphi, as the
same may have been amended, modified, or supplemented from time to time, and all documents
executed in connection therewith.

**^ 1.134**            **"IRC"** means the Internal Revenue Code of 1986, as amended.

**^ 1.135**            **"IRC Section 414(l) Transfer"** means the transaction or
transactions through which the GM Hourly-Rate Employees Pension Plan assumed or shall
assume from Delphi Hourly-Rate Employee Pension Plan pension obligations and applicable
pensions assets pursuant the terms of the Delphi-GM Definitive Documents, IRC section 414(l),
and Section 208 of ERISA.

**^ 1.136**            **"IUE-CWA"** means the International Union of Electronic,
Electrical, Salaried, Machine and Furniture Workers-Communication Workers of America and its
applicable local unions.

**^ 1.137**            **"IUE-CWA 1113/114 Settlement Approval Order"** means the
order entered by the Bankruptcy Court on August 16, 2007 approving the IUE-CWA-Delphi-GM
Memorandum of Understanding.

**^ 1.138**            **"IUE-CWA Benefit Guarantee"** means the benefit guarantee
agreement between GM and the IUE-CWA, dated November 13, 1999.

**^ 1.139**　　　　**"IUE-CWA Benefit Guarantee Term Sheet"** means that term sheet, attached as Attachment B to the IUE-CWA-Delphi-GM Memorandum of Understanding, which sets forth the agreement of GM, Delphi, and the IUE-CWA regarding the freeze of the Delphi HRP, Delphi's cessation of post-retirement health care benefits and employer-paid post-retirement life insurance benefits, and the terms of a consensual triggering and application of the IUE-CWA Benefit Guarantee.

**^ 1.140**　　　　**"IUE-CWA-Delphi-GM Memorandum of Understanding"** means, collectively, (i) that certain memorandum of understanding, dated August 5, 2007, as approved by the Bankruptcy Court on August 16, 2007, among the IUE-CWA, Delphi, and GM, and all attachments and exhibits thereto and all IUE-CWA-Delphi collective bargaining agreements referenced therein as modified; and (ii) the IUE-CWA-Delphi-GM Implementation Agreement Regarding 414(l) Transfers, Implementation of Term Sheet, Delphi Pension Freeze and Cessation of OPEB, and Application of Releases, dated September 25, 2008.

**^ 1.141**　　　　**"IUOE"** means the International Union of Operating Engineers Locals 832S, 18S, and 101S, and their affiliated entities.

**^ 1.142**　　　　**"IUOE Local 18S Memorandum of Understanding"** means, collectively, (i) that certain memorandum of understanding, dated August 1, 2007, as approved by the Bankruptcy Court on August 16, 2007, among the IUOE 18S, Delphi, and GM, and all attachments and exhibits thereto; and (ii) IUOE-IBEW-IAM-Delphi-GM Implementation Agreement Regarding 414(l) Transfers, Implementation of Term Sheet, Delphi Pension Freeze and Cessation of OPEB, and Application of Releases, dated September 25, 2008.

**^ 1.143**　　　　**"IUOE Local 101S Memorandum of Understanding"** means, collectively, (i) that certain memorandum of understanding, dated August 1, 2007, as approved by the Bankruptcy Court on August 16, 2007, among the IUOE Local 101S, Delphi, and GM, and all attachments and exhibits thereto; and (ii) IUOE-IBEW-IAM-Delphi-GM Implementation Agreement Regarding 414(l) Transfers, Implementation of Term Sheet, Delphi Pension Freeze and Cessation of OPEB, and Application of Releases, dated September 25, 2008.

**^ 1.144**　　　　**"IUOE Local 832S Memorandum of Understanding"** means, collectively, (i) that certain memorandum of understanding dated August 1, 2007, as approved by the Bankruptcy Court on August 16, 2007, among the IUOE Local 832S, Delphi, and GM, and all attachments and exhibits thereto; and (ii) IUOE-IBEW-IAM-Delphi-GM Implementation Agreement Regarding 414(l) Transfers, Implementation of Term Sheet, Delphi Pension Freeze and Cessation of OPEB, and Application of Releases, dated September 25, 2008.

**^ 1.145**　　　　**"IUOE-IBEW-IAM OPEB Term Sheet"** means that term sheet, attached as Attachment B to the IBEW E&S Memorandum of Understanding, IBEW Powertrain Memorandum of Understanding, IAM Memorandum of Understanding, IUOE Local 18S Memorandum of Understanding, IUOE Local 101S Memorandum of Understanding, and IUOE Local 832S Memorandum of Understanding, regarding Delphi's cessation of post-retirement health care benefits and employer-paid post retirement life insurance benefits and GM's agreement to provide certain post retirement benefits to certain retired employees currently receiving such benefits from Delphi and other active employees who may become eligible for OPEB in accordance therewith.

18

**^ 1.146**          **"IUOE, IBEW, And IAM 1113/1114 Settlement Approval Order"** means the order entered by the Bankruptcy Court on August 16, 2007 approving the IAM Memorandum of Understanding, IBEW E&S Memorandum of Understanding, IBEW Powertrain Memorandum of Understanding, IUOE Local 18S Memorandum of Understanding, IUOE Local 101S Memorandum of Understanding, and IUOE Local 832S Memorandum of Understanding.

**^ 1.147**          **"Lead Plaintiffs"** means, collectively, Teachers' Retirement System of Oklahoma, Public Employees' Retirement System Of Mississippi, Raiffeisen Kapitalanlage-Gesellschaft m.b.H, and Stichting Pensioenfonds ABP, as styled in the MDL Actions.

**^ 1.148**          **"Management Compensation Plan"** means those certain plans and/or agreements by which the Reorganized Debtors, as substantially in the forms set forth on Exhibit 7.11 hereto, and ^ Company Buyer shall implement a compensation program for certain members of management and other employees on and after the Effective Date.

**^ 1.149**          **"Master Disposition Agreement"** means that certain master disposition agreement among Delphi, ^ General Motors Company (Solely With Respect To Article 6 And Sections 3.1.1.C, 9.11, 9.19, 9.37.1, 9.37.2, 9.43, 11.5.1.A , And 12.2.6), Motors Liquidation Company (FKA General Motors Corporation) (Solely With Respect To Sections 3.1.1.C, 9.19 And 11.5.1.A), DIP Holdco 3, LLC^ ,And The Other Sellers ^ And Other Buyers Party ^ Thereto, Dated As Of July 26, 2009.

**^ 1.150**          **"Material Supply Agreement"** means any agreement to which any of the Debtors is a party and pursuant to which the Debtors purchase materials which are directly incorporated into one or more of the Debtors' products.

**^ 1.151**          **"MDA Assumption And Assignment Notice"** has the meaning ascribed in Article 8.2(c).

**^ 1.152**          **"MDL Actions"** means those certain actions consolidated in that certain multi-district litigation proceeding captioned In re Delphi Corporation Securities, Derivative & ERISA Litigation, MDL No. 1725 (GER), pending in the United States District Court for the Eastern District of Michigan, related to certain actions for damages arising from the purchase or sale of the Senior Notes, the TOPrS, the Subordinated Notes, or Existing Common Stock, for violations of the securities laws, for violations of ERISA, misrepresentations, or any similar Claims.

**^ 1.153**          **"MDL Court"** means the United States District Court for the Eastern District of Michigan.

**^ 1.154**          **"MDL Settlements"** means, collectively, the ERISA Settlement, the Securities Settlement, and the Insurance Settlement.

**^ 1.155**          **"Modification Approval Date"** means the date of entry of the Modification Approval Order.

**^ 1.156** **"Modification Approval Order"** means the order entered by the Bankruptcy Court approving the modifications to this Plan under section 1127 of the Bankruptcy Code.

**^ 1.157** **"Modification Procedures Order"** means the order entered by the Bankruptcy Court on June 16, 2009 authorizing the procedures by which votes on the modifications to this Plan are to take place, among other matters.

**^ 1.158** **"New Common Stock"** means the share(s) of new common stock of Reorganized DPH Holdings.

**^ 1.159** **"Non-Represented Term Sheet"** means the Term Sheet – Delphi Cessation and GM Provision of OPEB For Certain Non-Represented Delphi Employees and Retirees entered into between Delphi and GM, dated August 3, 2007.

**^ 1.160** **"Omitted Material Supply Agreement Objection Deadline"** means February 8, 2008, the date that was ten days after service of notice upon counterparties to Material Supply Agreements as required by paragraph 24 of the Confirmation Order.

**^ 1.161** **"OPEB"** means other post-employment benefits obligations.

**^ 1.162** **"Ordinary Course Professionals Order"** means the order entered by the Bankruptcy Court on November 4, 2005 authorizing the retention of professionals utilized by the Debtors in the ordinary course of business.

**^ 1.163** **"Other Executory Contract"** means any executory contract, other than a Material Supply Agreement and Other Unexpired Lease, to which any of the Debtors is a party.

**^ 1.164** **"Other Interests"** means all options, warrants, call rights, puts, awards, or other agreements to acquire Existing Common Stock.

**^ 1.165** **"Other MDA Assumed Contracts"** means, collectively, Other Executory Contracts and Other Unexpired Leases to be assigned to Buyers pursuant to the MDA.

**^ 1.166** **"Other Priority Claim"** means any Claim, other than an Administrative Claim or Priority Tax Claim, entitled to priority payment as specified in section 507(a)(3), (4), (6), or (7) of the Bankruptcy Code.

**^ 1.167** **"Other Unexpired Lease"** means any unexpired lease, other than a Material Supply Agreement and Other Executory Contract, to which any of the Debtors is a party.

**^ 1.168** ^ **"PBGC"** means the Pension Benefit Guaranty Corporation.

**^ 1.169** **"PBGC Claims"** means the Contingent PBGC Secured Claim and PBGC General Unsecured Claim.

**^ 1.170** **"PBGC General Unsecured Claim"** means any Claim of the PBGC against the applicable Debtors or group of Debtors arising from or relating to the Pension

Plans that are not secured by valid, perfected, and enforceable liens against the assets or property of the Debtors.

**^ 1.171** **"Pension Plans"** means Delphi Corporation: the Delphi Hourly Rate Employees Pension Plan and the Delphi Retirement Program for Salaried Employees; Delphi Mechatronic Systems, Inc.: the Delphi Mechatronic Systems Retirement Program; ASEC Manufacturing: the ASEC Manufacturing Retirement Program; and Packard-Hughes Interconnect Company: the Packard-Hughes Interconnect Bargaining Retirement Plan and the Packard-Hughes Interconnect Non-Bargaining Retirement Plan.

**^ 1.172** **"Periodic Distribution Date"** means, as applicable, (a) the Distribution Date, as to the first distribution made by the Reorganized Debtors, and (b) thereafter, (i) the first Business Day occurring ninety (90) days after the Distribution Date and (ii) subsequently, the first Business Day occurring ninety (90) days after the immediately preceding Periodic Distribution Date, or such other Business Day selected by Reorganized DPH Holdings in its sole and absolute discretion; provided, however, distribution dates shall be no more than quarterly.

**^ 1.173** **"Person"** means an individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited liability partnership, trust, estate, unincorporated organization, governmental unit (as defined in section 101(27) of the Bankruptcy Code), or other entity.

**^ 1.174** **"Petition Date"** means, as applicable, (a) October 8, 2005 with respect to those Debtors which filed their petitions for reorganization relief in the Bankruptcy Court on such date or (b) October 14, 2005 with respect to those Debtors which filed their petitions for reorganization relief in the Bankruptcy Court on such date.

**^ 1.175** **"Plan"** means this joint plan of reorganization for the resolution of outstanding Claims and Interests in the Chapter 11 Cases, as confirmed by the Bankruptcy Court on January 25, 2008 and as may be modified in accordance with the Bankruptcy Code and Bankruptcy Rules, including as modified by the Modification Approval Order, and all exhibits, supplements, appendices, and schedules hereto, either in its or their present form or as the same may be further altered, amended, or modified from time to time in accordance with the Bankruptcy Code and Bankruptcy Rules.

**^ 1.176** **"Plan Investors"** means A-D Acquisition Holdings, LLC, Harbinger Del-Auto Investment Company, Ltd., Merrill Lynch, Pierce, Fenner & Smith Incorporated, UBS Securities LLC, Goldman Sachs & Co., and Pardus DPH Holding LLC.

**^ 1.177** **"Plan Objection Deadline"** means July 15, 2009 at 4:00 p.m. prevailing Eastern time.

**^ 1.178** **^ "Post-Confirmation Reorganized DPH Holdings Share Trust"** means that certain trust to be created on the Effective Date in accordance with the provisions of Article 7.9 and the Post-Confirmation Trust Agreement.

**^ 1.179** **"Post-Confirmation Trust Agreement"** means that certain trust agreement that, among other things, (a) establishes and governs the Post-Confirmation

Reorganized DPH Holdings Share Trust, and (b) describes the powers, duties, and responsibilities of the Post-Confirmation Trust Plan Administrator.

**^ 1.180** **"Post-Confirmation Trust Plan Administrator"** means that Person designated by the Debtors, identified at or prior to the Final Modification Hearing, and retained as of the Effective Date as the employee or fiduciary responsible for implementing the applicable provisions of the Plan and administering the Post-Confirmation Reorganized DPH Holdings Share Trust in accordance with the Plan and the Post-Confirmation Trust Agreement, and any successor appointed in accordance with the Post-Confirmation Trust Agreement.

**^ 1.181** **"Prepetition Employee-Related Obligation"** means a Claim arising prior to the Petition Date of an hourly employee of one or more of the Debtors, in his or her capacity as an employee of such Debtor or Debtors, for post-employment benefits, including, without limitation, retiree health care and life insurance.

**^ 1.182** **"Prepetition Employee-Related Obligations Bar Date"** means the deadline for filing proofs of claim in accordance with Article 7.12 of this Plan with respect to Prepetition Employee-Related Obligations, which shall be 45 days after the Effective Date, unless otherwise ordered by the Bankruptcy Court.

**^ 1.183** **"Priority Tax Claim"** means a Claim entitled to priority pursuant to section 507(a)(8) of the Bankruptcy Code.

**^ 1.184** **"Pro Rata"** means, (a) with respect to Claims, at any time, the proportion that the Face Amount of a Claim in a particular Class or Classes bears to the aggregate Face Amount of all Claims (including Disputed Claims, but excluding Disallowed Claims) in such Class or Classes, unless this Plan provides otherwise.

**^ 1.185** **"Professional"** means any Person retained in the Chapter 11 Cases by separate Bankruptcy Court order pursuant to sections 327 and 1103 of the Bankruptcy Code or otherwise; provided, however, that Professional does not include any Person retained pursuant to the Ordinary Course Professionals Order.

**^ 1.186** **"Professional Claim"** means an Administrative Claim of a Professional for compensation for services rendered or reimbursement of costs, expenses, or other charges and disbursements incurred relating to services rendered or expenses incurred after the Petition Date and prior to and including the Effective Date.

**^ 1.187** **"Professional Fee Order"** means the order entered by the Bankruptcy Court on November 4, 2005, authorizing the interim payment of Professional Claims subject to the Holdback Amount.

**^ 1.188** **"Reinstated" or "Reinstatement"** means (a) leaving unaltered the legal, equitable, and contractual rights to which a Claim entitles the holder of a Claim so as to leave such Claim unimpaired in accordance with section 1124 of the Bankruptcy Code or (b) notwithstanding any contractual provision or applicable law that entitles the holder of a Claim to demand or receive accelerated payment of such Claim after the occurrence of a default (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code; (ii) reinstating the maturity of such Claim

22

as such maturity existed before such default; (iii) compensating the holder of a Claim for any damages incurred as a result of any reasonable reliance by such holder of a Claim on such contractual provision or such applicable law; and (iv) not otherwise altering the legal, equitable or contractual rights to which such Claim entitles the holder of a Claim; provided, however, that any contractual right that does not pertain to the payment when due of principal and interest on the obligation on which such Claim is based, including, but not limited to, financial covenant ratios, negative pledge covenants, covenants or restrictions on merger or consolidation, and affirmative covenants regarding corporate existence prohibiting certain transactions or actions contemplated by this Plan, or conditioning such transactions or actions on certain factors, shall not be required to be cured or reinstated to achieve Reinstatement.

**^ 1.189** **"Released Parties"** means, collectively, (a) all officers of each of the Debtors and Reorganized Debtors, all members of the boards of directors of each of the Debtors and Reorganized Debtors, and all employees of each of the Debtors and Reorganized Debtors, in each case in their respective capacities as of the date of the commencement of the hearing on the Disclosure Statement, (b) the Creditors' Committee and all current and former members of the Creditors' Committee in their respective capacities as such, (c) the Equity Committee and all current and former members of the Equity Committee in their respective capacities as such, (d) the DIP Agent in its capacity as such, (e) the DIP Lenders solely in their capacities as such, (f) the DIP Steering Committee and all current and former members of the DIP Steering Committee in their respective capacities as such, (g) Parnassus Holdings II, LLC, (h) Platinum Equity Capital Partners II, L.P., (i) DIP Holdco 3, LLC and other buyers party to the Master Disposition Agreement, (j) all Professionals, (^ k) the Unions and current or former members, officers, and committee members of the Unions, (^ l) the Indenture Trustees, in their capacities as such, and (^ m) with respect to each of the above-named Persons, such Person's affiliates, advisors, principals, employees, officers, directors, representatives, financial advisors, attorneys, accountants, investment bankers, consultants, agents, and other representatives and professionals.

**^ 1.190** **"Reorganized . . . "** means the applicable Debtor from and after the Effective Date.

**^ 1.191** **"Reorganized Debtor" or "Reorganized Debtors"** means, individually, any Debtor and, collectively, all Debtors, in each case from and after the Effective Date.

**^ 1.192** **"Reorganized DPH Holdings"** means Reorganized Delphi from and after the Effective Date, a corporation organized under the laws of Delaware or under such other law as determined by the Debtors, which will be the parent holding company of the Reorganized Debtors, the stock of which will be issued to the Post-Confirmation Reorganized DPH Holdings Share Trust.

**1.193** **"Required Lenders"** has the meaning ascribed in the DIP Credit Agreement.

**^ 1.194** **"Restructuring Debtors"** means those Debtors that shall be the subject of a Restructuring Transaction under this Plan.

**^ 1.195**          **"Restructuring Transaction(s)"** means a dissolution or winding up of the corporate existence of a Debtor or the consolidation, merger, contribution of assets, or other transaction in which a Reorganized Debtor or non-Debtor Affiliate directly owned by a Debtor merges with or transfers some or substantially all of its assets and liabilities to a Reorganized Debtor or its Affiliates, on or following the Confirmation Date, as set forth in the Restructuring Transaction Notice.

**^ 1.196**          **"Restructuring Transaction Notice"** means the notice filed with the Bankruptcy Court on or before the Exhibit Filing Date, a copy of which is attached as Exhibit 7.3 to this Plan, describing the anticipated post-Effective Date structure of the Reorganized Debtors.

**^ 1.197**          **"Retained Actions"** means all Claims, Causes of Action, rights of action, suits, and proceedings, whether in law or in equity, whether known or unknown, which any Debtor or any Debtor's Estate may hold against any Person, including, without limitation, Claims and Causes of Action brought prior to the Effective Date or identified in the Schedules, other than Claims explicitly released under this Plan or by Final Order of the Bankruptcy Court prior to the date hereof and Claims transferred to the Buyers pursuant to the Master Disposition Agreement. A non-exclusive list of Retained Actions is attached hereto as Exhibit 7.19.

**^ 1.198**          **"Retained Assets"** means all assets of the Debtors that are not the GM Acquired Assets or the ^ Company Buyer Acquired Assets.

**^ 1.199**          **"Scheduled"** means, with respect to any Claim, the status, priority, and amount, if any, of such Claim as set forth in the Schedules.

**^ 1.200**          **"Schedules"** means the schedules of assets and liabilities and the statements of financial affairs filed in the Chapter 11 Cases by the Debtors, which incorporate by reference the global notes and statement of limitations, methodology, and disclaimer regarding the Debtors' schedules and statements, as such schedules or statements have been or may be further modified, amended, or supplemented from time to time in accordance with Bankruptcy Rule 1009 or orders of the Bankruptcy Court.

**^ 1.201**          **"Section 510(b) Equity Claim"** means any Cause of Action consolidated in the MDL Actions related to any claim against the Debtors (a) arising from the rescission of a purchase or sale of any Existing Common Stock, (b) for damages arising from the purchase or sale of Existing Common Stock, and (c) for alleged violations of the securities laws, misrepresentations, or any similar Claims related to the Existing Common Stock.

**^ 1.202**          **"Section 510(b) ERISA Claim"** means any Cause of Action consolidated in the MDL Actions arising from the alleged violation of ERISA.

**^ 1.203**          **"Section 510(b) Note Claim"** means any Cause of Action consolidated in the MDL Actions related to any claim against the Debtors (a) arising from the rescission of a purchase or sale of any Senior Notes, Subordinated Notes, or TOPrS, (b) for damages arising from the purchase of Senior Notes, Subordinated Notes, or TOPrS, and (c) for alleged violations of the securities laws, misrepresentations, or any similar Claims related to the Senior Notes, Subordinated Notes, or TOPrS.

**^ 1.204** **"Section 510(b) Opt Out Claim"** means any Section 510(b) Opt Out Note Claim or Section 510(b) Opt Out Equity Claim.

**^ 1.205** **"Section 510(b) Opt Out Equity Claim"** means any Section 510(b) Equity Claim, the holder of which has opted not to participate in the Securities Settlement pursuant to the procedures set forth in the "Notice of Settlement" approved by the MDL Court.

**^ 1.206** **"Section 510(b) Opt Out Note Claim"** means any Section 510(b) Note Claim, the holder of which has opted not to participate in the Securities Settlement pursuant to the procedures set forth in the "Notice of Settlement" approved by the MDL Court.

**^ 1.207** **"Secured Claim"** means a Claim, other than the DIP Facility Revolver Claim, DIP Facility First Priority Term Claim, or DIP Facility Second Priority Term Claim, secured by a security interest in or a lien on property in which a Debtor's Estate has an interest or that is subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value, as of the Effective Date or such other date as is established by the Bankruptcy Court, of such Claim holder's interest in the applicable Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined by a Final Order of the Bankruptcy Court pursuant to section 506(a) of the Bankruptcy Code or, in the case of setoff, pursuant to section 553 of the Bankruptcy Code, or as otherwise agreed upon in writing by the Debtors and the holder of such Claim.

**^ 1.208** **"Securities Act"** means the Securities Act of 1933, as now in effect or hereafter amended.

**^ 1.209** **"Securities Settlement"** means that certain stipulation and agreement of settlement of the securities-related MDL Actions, as it may be amended or modified.

**^ 1.210** **"Security"** has the meaning ascribed to it in section 101(49) of the Bankruptcy Code.

**^ 1.211** **"Security And Pledge Agreement"** has the meaning specified in the DIP Credit Agreement.

**^ 1.212** **"Senior Notes"** means, collectively, the (a) 6.55% Notes due 2006, (b) 6.5% Notes due 2009, (c) 6.5% Notes due 2013, and (d) 7.125% Notes due 2029, all issued by Delphi under the Senior Notes Indenture.

**^ 1.213** **"Senior Notes Claim"** means a Claim arising under or as a result of the Senior Notes.

**^ 1.214** **"Senior Notes Indenture"** means that certain indenture for the debt securities between Delphi Corporation and the First National Bank of Chicago, as indenture trustee, dated as of April 28, 1999.

**^ 1.215** **"Senior Notes Indenture Trustee"** means the indenture trustee under the Senior Notes Indenture.

**^ 1.216** **"SERP"** means the prepetition supplemental executive retirement program between Delphi and certain employees.

**^ 1.217** **"SERP Claim"** means a Claim of a SERP participant arising out of the SERP.

**^ 1.218** **"Servicer"** has the meaning ascribed to it in Article 7.13 of this Plan.

**^ 1.219** **"Solicitation Procedures Order"** means the order entered by the Bankruptcy Court on December 10, 2007 authorizing the procedures by which solicitation of votes on this Plan is to take place, among other matters.

**^ 1.220** **"Specialty Electronics Debtors"** means, collectively, Specialty Electronics, Inc. and Specialty Electronics International Ltd., as substantively consolidated for Plan purposes.

**^ 1.221** **"Statutory Committees"** means the Creditors' Committee and the Equity Committee.

**^ 1.222** **"Subordinated Notes"** means those notes issued pursuant to the Subordinated Notes Indenture.

**^ 1.223** **"Subordinated Notes Holder"** means a holder of Subordinated Notes.

**^ 1.224** **"Subordinated Notes Indenture"** means that certain indenture for the subordinated debt securities between Delphi Corporation and Bank One Trust Company, N.A., as trustee indenture, dated as of October 28, 2003.

**^ 1.225** **"Subordinated Notes Indenture Trustee"** means the trustee under the Subordinated Notes Indenture.

**^ 1.226** **"Supplemental Distribution Account"** means the property remaining in the applicable Distribution Reserve, if any, to the extent that a Disputed Class C Claim is not allowed or is allowed in an amount less than the amount reserved for such Disputed Claim.

**^ 1.227** **^ "TOPrS"** means (a) those 8.25% Cumulative Trust Preferred Securities issued by Delphi Trust I and (b) those Adjustable Rate Trust Preferred Securities issued by Delphi Trust II.

**^ 1.228** **"TOPrS Claim"** means a Claim of a Subordinated Notes Holder arising under or as a result of the Subordinated Notes.

**^ 1.229** **"UAW"** means the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America and its applicable local unions, and other affiliated entities.

**^ 1.230** **"UAW 1113/1114 Settlement Approval Order"** means the order entered by the Bankruptcy Court on July 19, 2007 approving the UAW-Delphi-GM Memorandum of Understanding.

**^ 1.231** **"UAW Benefit Guarantee"** means the benefit guarantee agreement between GM and the UAW, dated September 30, 1999.

**^ 1.232** **"UAW Benefit Guarantee Term Sheet"** means that term sheet, attached as Attachment B to the UAW-Delphi-GM Memorandum of Understanding, which sets forth the agreement of GM, Delphi, and the UAW regarding the freeze of the Delphi HRP, Delphi's cessation of post-retirement health care benefits and employer-paid post-retirement life insurance benefits, and the terms of a consensual triggering and application of the UAW Benefit Guarantee.

**^ 1.233** **"UAW-Delphi-GM Memorandum of Understanding"** means, collectively, (i) that certain memorandum of understanding, dated June 22, 2007, as approved by the Bankruptcy Court on July 19, 2007 among the UAW, Delphi and GM, and all attachments and exhibits thereto and all UAW-Delphi collective bargaining agreements referenced therein as modified; and (ii) the UAW-Delphi-GM Implementation Agreement Regarding 414(l) Transfers, Implementation of Term Sheet, Delphi Pension Freeze and Cessation of OPEB, and Application of Releases, dated September 26, 2008.

**^ 1.234** **^ "Unimpaired"** means, with respect to a Claim, any Claim that is not Impaired.

**^ 1.235** **"Union Settlement Agreements"** means, collectively, the IAM Memorandum of Understanding, IBEW E&S Memorandum of Understanding, IBEW Powertrain Memorandum of Understanding, IUE-CWA Benefit Guarantee Term Sheet, IUE-CWA-Delphi-GM Memorandum of Understanding, IUOE-IBEW-IAM OPEB Term Sheet, IUOE Local 18S Memorandum of Understanding, IUOE Local 101S Memorandum of Understanding, IUOE Local 832S Memorandum of Understanding, UAW Benefit Guarantee Term Sheet, UAW-Delphi-GM Memorandum of Understanding, USW Benefit Guarantee Term Sheet, and USW-Delphi-GM Memoranda of Understanding.

**^ 1.236** **"Unions"** means the IAM, the IBEW, the IUOE, the IUE-CWA, the UAW, and the USW.

**^ 1.237** **"USW"** means the United Steel Workers and its applicable local unions.

**^ 1.238** **"USW 1113/1114 Settlement Approval Order"** means the order entered by the Bankruptcy Court on August 29, 2007 approving the USW-Delphi-GM Memoranda of Understanding.

**^ 1.239** **"USW Benefit Guarantee"** means the benefit guarantee agreement between GM and the USW, dated December 13, 1999, and signed December 16 and 17, 1999.

27

**^ 1.240**        **"USW Benefit Guarantee Term Sheet"** means that certain term sheet attached as Attachment B to each of the USW-Delphi-GM Memoranda of Understanding.

**^ 1.241**        **"USW-Delphi-GM Memoranda of Understanding"** means, collectively, the (i) USW-Home Avenue Memorandum of Understanding; (ii) the USW-Vandalia Memorandum of Understanding; and (iii) USW-Delphi-GM Implementation Agreement Regarding 414(l) Transfers, Implementation of Term Sheet, Delphi Pension Freeze and Cessation of OPEB, and Application of Releases, dated September 25-26, 2008.

**^ 1.242**        **"USW-Home Avenue Memorandum of Understanding"** means that certain memorandum of understanding, dated August 16, 2007, as approved by the Bankruptcy Court on August 29, 2007, among the USW, Delphi, and GM, and all attachments and exhibits thereto.

**^ 1.243**        **"USW-Vandalia Memorandum of Understanding"** means that certain memorandum of understanding, dated August 16, 2007, as approved by the Bankruptcy Court on August 29, 2007, among the USW, Delphi, and GM, and all attachments and exhibits thereto.

**^ 1.244**        **"Voting Deadline"** means July 15, 2009 at 7:00 p.m. prevailing Eastern time.


## C.    <u>Rules Of Interpretation</u>

For purposes of this Plan, unless otherwise provided herein, (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural; (b) each pronoun stated in the masculine, feminine, or neuter includes the masculine, feminine, and neuter; (c) any reference in this Plan to an existing document or schedule filed or to be filed means such document or schedule, as it may have been or may be amended, modified, or supplemented; (d) any reference to an entity as a holder of a Claim or Interest includes that entity's successors and assigns; (e) all references in this Plan to Sections, Articles, and Exhibits are references to Sections, Articles, and Exhibits of or to this Plan; (f) the words "herein," "hereunder," and "hereto" refer to this Plan in its entirety rather than to a particular portion of this Plan; (g) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Plan; (h) subject to the provisions of any contract, certificates of incorporation, by-laws, instrument, release, or other agreement or document entered into in connection with this Plan, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, federal law, including the Bankruptcy Code and Bankruptcy Rules; and (i) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply.

This Plan is the product of extensive discussions and negotiations between and among the Debtors, GM, ^ GMCo., the DIP Agent, the DIP Lenders, the Creditors' Committee, and certain other creditors and constituencies. Each of the foregoing was represented by counsel, who either (a) participated in the formulation and documentation of, or (b) was afforded the opportunity to review and provide comments on, this Plan, the Disclosure Statement, and the

documents ancillary thereto. Accordingly, the general rule of contract construction known as
"contra preferentem" shall not apply to the construction or interpretation of any provision of this
Plan, the Disclosure Statement, or any contract, instrument, release, indenture, exhibit, or other
agreement or document generated in connection herewith.

**D.    Computation Of Time**

      In computing any period of time prescribed or allowed by this Plan, unless
otherwise expressly provided, the provisions of Bankruptcy Rule 9006(a) shall apply.

**E.    References To Monetary Figures**

      All references in this Plan to monetary figures shall refer to currency of the United
States of America, unless otherwise expressly provided.

**F.    Exhibits**

      All Exhibits are incorporated into and are a part of this Plan as if set forth in full
herein and, to the extent not annexed hereto, such Exhibits shall be filed with the Bankruptcy Court
on or before the Exhibit Filing Date. After the Exhibit Filing Date, copies of Exhibits may be
obtained upon written request to Skadden, Arps, Slate, Meagher & Flom LLP, 333 West Wacker
Drive, Chicago, Illinois 60606 (Att'n: John Wm. Butler, Jr.), or Skadden, Arps, Slate, Meagher &
Flom LLP, Four Times Square, New York, New York 10036 (Att'n: Kayalyn A. Marafioti),
counsel to the Debtors, or by downloading such exhibits from the Debtors' informational website
at www.delphidocket.com. To the extent any Exhibit is inconsistent with the terms of this Plan
and unless otherwise provided for in the Confirmation Order or Modification Approval Order, the
terms of the Exhibit shall control as to the transactions contemplated thereby and the terms of this
Plan shall control as to any Plan provision that may be required under the Exhibit.

## ARTICLE II

### ADMINISTRATIVE EXPENSES AND
### PRIORITY TAX CLAIMS

      **2.1    Administrative Claims.** Subject to the Master Disposition Agreement and
the provisions of Article X of this Plan, on the first Periodic Distribution Date occurring after the
later of (a) the date when an Administrative Claim becomes an Allowed Administrative Claim or
(b) the date when an Administrative Claim becomes payable pursuant to any agreement between a
Debtor (or a Reorganized Debtor) and the holder of such Administrative Claim, a holder of an
Allowed Administrative Claim shall receive, in full satisfaction, settlement, release, and discharge
of, and in exchange for, such Administrative Claim, (i) Cash equal to the unpaid portion of such
Allowed Administrative Claim or (ii) such other less favorable treatment which the Debtors (or the
Reorganized Debtors) and the holder of such Allowed Administrative Claim shall have agreed

upon in writing; provided, however, that (x) ^ the ^ Claims arising under the DIP Credit Agreement shall be deemed ^ Allowed Administrative Claims as of the Effective Date in such amount as the Debtors^ , the DIP Agent, and the DIP Lenders shall have agreed upon ^ pursuant to the Master Disposition Agreement, which Claims shall be satisfied in accordance with Article 7.8 and Article X of this Plan and the Master Disposition Agreement, (y) holders of hedging claims arising under the DIP Facility shall receive the treatment described in the Master Disposition Agreement, and (z) the holder of ^ any other Administrative Claim shall have filed a proof of claim form no later than the July 15, 2009, pursuant to the procedures described in Article 10.2 and the Modification Procedures Order, and such Claim shall have become an Allowed Claim. For the avoidance of doubt, the GM Administrative Claim shall receive the treatment set forth in Article 2.3 of this Plan.

**2.2    Priority Tax Claims.**  Commencing on the first Periodic Distribution Date occurring after the later of (a) the date a Priority Tax Claim becomes an Allowed Priority Tax Claim or (b) the date a Priority Tax Claim first becomes payable pursuant to any agreement between a Debtor (or a Reorganized Debtor) and the holder of such Priority Tax Claim, at the sole option of the Debtors (or the Reorganized Debtors), such holder of an Allowed Priority Tax Claim shall be entitled to receive, on account of such Priority Tax Claim, in full satisfaction, settlement, release, and discharge of, and in exchange for, such Priority Tax Claim, (i) equal Cash payments during a period not to exceed six years after the assessment of the tax on which such Claim is based, totaling the aggregate amount of such Claim, plus simple interest at the rate required by applicable law on any outstanding balance from the Effective Date, or such lesser rate as is agreed to by a particular taxing authority, (ii) such other treatment as is agreed to by the holder of an Allowed Priority Tax Claim and the Debtors (or the Reorganized Debtors), provided that such treatment is on more favorable terms to the Debtors (or the Reorganized Debtors) than the treatment set forth in clause (i) hereof, or (iii) payment in full in Cash; provided, however, that holders of Priority Tax Claims whose Claims have been assumed by the Buyers pursuant to the Master Disposition Agreement shall be treated in the manner set forth therein.

**2.3    GM Administrative Claim.**  For good and valuable consideration provided by GM under the Delphi-GM Definitive Documents in connection with the IRC Section 414(l) Transfer described in Section 2.03(c) of the Delphi-GM Global Settlement Agreement, GM has received and shall receive allowed administrative expense claims of no more in the aggregate than $2.055 billion (the "GM 414(l) Administrative Claim").  Upon the Effective Date and the consummation of the Master Disposition Agreement, GM shall waive and release the GM 414(l) Administrative Claim and the GM Arrangement Administrative Claim, and GM shall accordingly receive no distribution on account of such claims.

## ARTICLE III

## CLASSIFICATION OF CLAIMS AND INTERESTS

**3.1    The Debtors.**  There are a total of 42 Debtors.  Certain of the Debtors shall be substantively consolidated for Plan voting and distribution purposes as described in Article 7.2. Each Debtor or group of consolidated Debtors has been assigned a number below for the purposes of classifying and treating Claims against and Interests in each Debtor or consolidated group of Debtors for balloting purposes.  The Claims against and Interests in each Debtor or consolidated group of Debtors, in turn, have been assigned to separate lettered Classes with respect to each

Debtor or consolidated group of Debtors, based on the type of Claim involved. Accordingly, the classification of any particular Claim or Interest in any of the Debtors or consolidated group of Debtors depends on the particular Debtor against which such Claim is asserted (or in which such Interest is held) and the type of Claim or Interest in question. The numbers applicable to the various Debtors or consolidated Debtor groups are as follows:

| Number | Consolidated Debtor Group Or Debtor Name |
|--------|-------------------------------------------|
| 1 | Delphi-DAS Debtors |
| 2 | DASHI Debtors |
| 3 | Connection System Debtors |
| 4 | Specialty Electronics Debtors |
| 5 | Delco Electronics Overseas Corporation |
| 6 | Delphi Diesel Systems Corp. |
| 7 | Delphi Furukawa Wiring Systems LLC |
| 8 | Delphi Mechatronic Systems, Inc. |
| 9 | Delphi Medical Systems Corporation |
| 10 | Delphi Medical Systems Colorado Corporation |
| 11 | Delphi Medical Systems Texas Corporation |
| 12 | MobileAria, Inc. |

### 3.2    Classification Of Claims And Interests.

(a)    Pursuant to section 1122 of the Bankruptcy Code, set forth below is a designation of classes of Claims against and Interests in the Debtors. A Claim or Interest is placed in a particular Class for the purposes of voting on this Plan and of receiving distributions pursuant to this Plan only to the extent that such Claim or Interest is an Allowed Claim or an Allowed Interest in that Class and such Claim or Interest has not been paid, released, or otherwise settled prior to the Effective Date. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims of the kinds specified in sections 507(a)(1) and 507(a)(8) of the Bankruptcy Code have not been classified and their treatment is set forth in Article II above.

(b)    Claims against and Interests in each of the Debtors are divided into lettered Classes. Not all of the Classes apply to every Debtor, and consequently not all of the lettered Classes appear in the case of each Debtor. For purposes of voting, claims within the Class shall be counted for each applicable Debtor or group of consolidated Debtors. Whenever such a Class of Claims or Equity Interests is relevant to a particular Debtor, that class of Claims or Interests shall be grouped under the appropriate lettered Class from the following list:

Class A-1    Class A-1 consists of separate subclasses for all Secured Claims, other than the Contingent PBGC Secured Claims, against the applicable Debtor or consolidated group of Debtors.

Class B    Class B consists of all Flow-Through Claims against the applicable Debtor or consolidated group of Debtors.

Class C-1    Class C-1 consists of all General Unsecured Claims, other than the PBGC General Unsecured Claims, against the applicable Debtor or consolidated group of Debtors.

31

| | |
|---|---|
| Class C-2 | Class C-2 consists of all PBGC Claims against the applicable Debtor or consolidated group of Debtors. |
| Class D | Class D consists of the GM Unsecured Claim against the applicable Debtor or consolidated group of Debtors. |
| Class E | Class E consists of all Section 510(b) Note Claims against Delphi Corporation. |
| Class F | Class F consists of all Intercompany Claims against the applicable Debtor or consolidated group of Debtors. |
| Class G-1 | Class G-1 consists of all Existing Common Stock of Delphi Corporation. |
| Class G-2 | Class G-2 consists of all Section 510(b) Equity Claims against Delphi Corporation. |
| Class H | Class H consists of all Section 510(b) ERISA Claims against the applicable Debtors. |
| Class I | Class I consists of all Other Interests in Delphi Corporation. |
| Class J | Class J consists of all Interests in the Affiliate Debtors. |
| Class K | Class K consists of all Other Priority Claims against the applicable Debtor or consolidated group of Debtors. |

## ARTICLE IV

## IDENTIFICATION OF CLASSES OF CLAIMS
## AND INTERESTS IMPAIRED AND UNIMPAIRED BY THE PLAN

**4.1    Classes Of Claims That Are Unimpaired.**  The following Classes of Claims and Interests are Unimpaired by the Plan:

| | |
|---|---|
| **Class 1B through Class 12B** | (Flow-Through Claims) |
| **Class 1J through Class 12J** | (Interests in the Affiliate Debtors) |
| **Class 1K through Class 12K** | (Other Priority Claims) |

**4.2    Impaired Classes Of Claims And Interests.**  The following Classes of Claims and Interests are Impaired by the Plan:

| | |
|---|---|
| **Class 1A-1, 3A-1, and ^ 4A-1** | (Secured Claims) |
| **Class 1C-1 through Class 12C-1** | (General Unsecured Claims) |
| **Class 1C-2 through Class 12C-2** | (PBGC Claims) |
| **Class 1D through Class 12D** | (GM Unsecured Claim) |
| **Class 1E** | (Section 510(b) Note Claims) |
| **Class 1F through Class 12F** | (Intercompany Claims) |
| **Class 1G-1** | (Existing Common Stock) |
| **Class 1G-2** | (Section 510(b) Equity Claims) |
| **Class 1H, 8H** | (Section 510(b) ERISA Claims) |
| **Class 1I** | (Other Interests) |

## ARTICLE V

## PROVISIONS FOR TREATMENT
## OF CLAIMS AND INTERESTS

      5.1      **Class 1A-1, Class 3A-1, and Class ^ 4A-1 (Secured Claims).**  Except as otherwise provided in and subject to Article 9.8 of this Plan, at the sole option of the Debtors or Reorganized Debtors, each Allowed Secured Claim shall receive (i) distributions of Cash payments in equal installments over a period not to exceed seven years from the Effective Date plus interest accruing at the rate that is equal to the closing seven-year treasury yield rate on the Effective Date plus 200 basis points (the "Secured Claim Interest Rate"), and to the extent, if any, that a Secured Claim is entitled to postpetition interest pursuant to section 506 of the Bankruptcy Code for the period between the Petition Date and the Effective Date, such interest shall have accrued at the applicable non-default contractual rate or statutory rate, as the case may be, and be included in the Allowed amount of such Secured Claim; (ii) their collateral free and clear of liens, Claims, and encumbrances, provided that such collateral, as of the day prior to the Effective Date, was property of the Estate; or (iii) such other treatment as to which the Debtors or Reorganized Debtors, as the case may be, and the holder of such Allowed Secured Claim have agreed upon in writing, provided that such treatment is more favorable to the Debtors or the Reorganized Debtors, as the case may be, than the treatment in clause (i) or clause (ii) above.  Notwithstanding section 1141(c) or any other provision of the Bankruptcy Code, with respect to the treatment in clause (i) and clause (iii) above, all valid, enforceable, and perfected prepetition liens on property of the Debtors held by or on behalf of holders of Secured Claims with respect to such Claims shall survive the Effective Date and continue in accordance with the contractual terms of the underlying agreements with such holders of such Secured Claims and/or applicable law until, as to each such holder of an Allowed Secured Claim, such Secured Claim is satisfied pursuant to this Plan; provided, however, that such holder of an Allowed Secured Claim shall be prohibited from exercising rights or remedies pursuant to such underlying agreements so long as the Reorganized Debtors are in compliance with this Article 5.1. To the extent the Debtors or the Reorganized Debtors elect the treatment set forth in clause (ii) above, all valid liens shall be discharged and otherwise satisfied upon the receipt of the claimant's collateral by the holder of such Allowed Secured Claim.

      5.2      **Class 1B through Class 12B (Flow-Through Claims).**  The legal, equitable, and contractual rights of each holder of a Flow-Through Claim, if any, shall be unaltered by the Plan and shall be satisfied in the ordinary course of business at such time and in such manner as the applicable Reorganized Debtor is obligated to satisfy each Flow-Through Claim (subject to the preservation and flow-through of all Estate Causes of Action and defenses with respect thereto, which shall be fully preserved); provided, however, that any Flow Through Claim assumed pursuant to the Master Disposition Agreement will receive the treatment specified therein. The Debtors' failure to object to a Flow-Through Claim in their Chapter 11 Cases shall be without prejudice to a Reorganized Debtors' right to contest or otherwise object to the classification of such Claim in the Bankruptcy Court or such other court of competent jurisdiction.

      5.3      **Class 1C-1 through Class 12C-1 (General Unsecured Claims).**  On the Effective Date, the Disbursing Agent shall establish a distribution account to hold the proceeds, if any, of the General Unsecured MDA Distribution.  Except as otherwise provided in and subject to Articles 9.8 and 11.10 of this Plan, commencing on the first Periodic Distribution Date occurring after the later of (i) the date when the proceeds of the General Unsecured MDA Distribution may be distributed to holders of General Unsecured Claims, (ii) the date when a General Unsecured

Claim becomes an Allowed General Unsecured Claim or (iii) the date when a General Unsecured Claim becomes payable pursuant to any agreement between the Debtors (or the Reorganized Debtors) and the holder of such General Unsecured Claim, each holder of an Allowed General Unsecured Claim shall receive, in full satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed General Unsecured Claim, its Pro Rata share of the proceeds of the General Unsecured MDA Distribution.  In addition, if applicable, on each Periodic Distribution Date, each holder of an Allowed General Unsecured Claim shall receive its Pro Rata Share of the proceeds of the General Unsecured MDA Distribution held in the Supplemental Distribution Account; provided, however, that no distribution from the Supplemental Distribution Account shall be made if, in the Reorganized Debtors' or the Disbursing Agent's sole discretion, the value of the property in the Supplemental Distribution Account is insufficient.  Distributions made pursuant to this Article 5.3 and Articles 5.4, 5.5, and 11.10 shall be in complete satisfaction of all obligations of GM under Section 4.04 of the Delphi-GM Global Settlement Agreement.

**5.4    Class 1C-2 through Class 12C-2 (PBGC Claims).**  Pursuant to Article 7.17, and except as otherwise provided in and subject to Articles 9.8 and 11.10 of this Plan, the PBGC shall receive, on the Distribution Date on account of its PBGC Claims in full satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed PBGC Claims, the treatment set forth in Article 7.17 of this Plan.

**5.5    Class 1D through Class 12D (GM Unsecured Claim).**  In full settlement, satisfaction, and release of the GM Unsecured Claim, GM shall receive the remaining releases provided for in section 4.01 of the Delphi-GM Global Settlement Agreement.

**5.6    Class 1E (Section 510(b) Note Claims)**.  Holders of Section 510(b) Note Claims shall not be entitled to, and shall not receive or retain any property or interest in property pursuant to this Plan on account of the Section 510(b) Note Claims.

**5.7    Class 1F through Class 13F (Intercompany Claims).**  On the Effective Date, and subject to the Master Disposition Agreement, at the option of the Debtors or the Reorganized Debtors, the Intercompany Claims against any Debtor, including, but not limited to, any Intercompany Claims arising as a result of rejection of an Intercompany Executory Contract or Intercompany Unexpired Lease, shall not receive a distribution on the Effective Date and instead shall either be (a) Reinstated, in full or in part, and treated in the ordinary course of business, or (b) cancelled and discharged, in full or in part, in which case such discharged and satisfied portion shall be eliminated and the holders thereof shall not be entitled to, and shall not receive or retain, any property or interest in property on account of such portion under the Plan.

**5.8    Class 1G-1 (Existing Common Stock).**  On the Effective Date, the Existing Common Stock shall be cancelled and extinguished.  The holders of Existing Common Stock shall not be entitled to, and shall not, receive or retain any property or interest on account of such Existing Common Stock.

**5.9    Class 1G-2 (Section 510(b) Equity Claims)**.  Holders of Section 510(b) Equity Claims shall not be entitled to, and shall not receive or retain any property or interest in property pursuant to this Plan on account of the Section 510(b) Equity Claims.

**5.10    Class 1H and Class 8H (Section 510(b) ERISA Claims)**.  The ERISA Settlement disbursing agent, on behalf of all holders of Section 510(b) ERISA Claims, shall not be

34

entitled to and shall not receive or retain any property or interest in property pursuant to this Plan on account of the Section 510(b) ERISA Claims.

**5.11    Class 1I (Other Interests)**.  On the Effective Date, all Other Interests shall be deemed cancelled and the holders of Other Interests shall not receive or retain any property on account of such Other Interests under this Plan.

**5.12    Class 1J through Class 12J (Interests In Affiliate Debtors)**.  On the Effective Date, except as otherwise contemplated by the Restructuring Transactions or the Master Disposition Agreement, the holders of Interests in the Affiliate Debtors shall retain such Interests in the Affiliate Debtors under the Plan.

**5.13    Class 1K through Class 12K (Other Priority Claims)**.  Except to the extent that a holder of an Allowed Other Priority Claim against any of the Debtors agrees to a different treatment of such Claim, on the Effective Date, or as soon thereafter as is reasonably practicable, each such holder shall receive, in full satisfaction of such Claim, an amount in Cash equal to the Allowed amount of such Claim.

# ARTICLE VI

## ACCEPTANCE OR REJECTION OF THE PLAN;
## EFFECT OF REJECTION BY ONE OR MORE
## <u>IMPAIRED CLASSES OF CLAIMS OR INTERESTS</u>

**6.1    Impaired Classes Of Claims Entitled To Vote.**  Except as otherwise provided in order(s) of the Bankruptcy Court pertaining to solicitation of votes on this Plan and <u>Article 6.2</u>, <u>Article 6.4</u>, and <u>Article 6.5</u> of this Plan, holders of Claims and Interests in each Impaired Class are entitled to vote in their respective classes as a class to accept or reject this Plan.

**6.2    Classes Deemed To Accept The Plan.**  Classes 1B through 12B, 1J through 12J, and 1K through 12K are Unimpaired under this Plan.  Pursuant to section 1126(f) of the Bankruptcy Code, such Classes are conclusively presumed to have accepted this Plan, and the votes of holders of Claims and Interests in such Classes therefore shall not be solicited.  Because all Debtors are proponents of this Plan, the votes of holders of such Claims in Class 1F through 12F (Intercompany Claims) shall not be solicited.

**6.3    Acceptance By Impaired Classes.**  Classes 1A-1<u>, 3A-1,</u> and ^ <u>4A</u>-1, Classes 1C-1 through 12C-1, and 1D through 12D are Impaired under this Plan.  In addition, Classes 1C-2 through 12C-2 shall be Impaired to the extent the Claims in such Classes are Allowed.  Pursuant to section 1126(c) of the Bankruptcy Code, and except as provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims has accepted the Plan if the Plan is accepted by the holders of at least two-thirds in dollar amount and more than one-half in number of the Allowed Claims of such Class that have timely and properly voted to accept or reject the Plan.

**6.4    Classes Deemed To Reject The Plan**.  Holders of Claims and Interests in Class 1E, 1G-1, 1G-2, 1H, 8H and 1I are not entitled to receive any distribution under the Plan on account of their Claims or Interests.  Since none of the holders of Claims or  Interests in Class 1E, 1G-1, 1G-2, 1H, 8H, and 1I are entitled to receive a distribution under the Plan, pursuant to section

1126(g) of the Bankruptcy Code, each holder of a Claim or Interest in such Class is conclusively presumed to have rejected the Plan, and the votes of such holders of Claims or Interests therefore shall not be solicited.

**6.5    Prior Acceptances Or Rejections Of The Plan.**  The previous votes by any holder of a Claim that has accepted or rejected the Plan shall not be counted.

**6.6    Approval of Modifications Subject To Sections 1127 And 1129(b) Of The Bankruptcy Code.**  Because Classes 1E, 1G-1, 1G-2, 1H, 8H and 1I are deemed to reject the Plan, the Debtors shall request approval of the modifications to the Plan, as it may be modified from time to time, pursuant to section 1127 and 1129(b) of the Bankruptcy Code.

## ARTICLE VII

## <u>MEANS FOR IMPLEMENTATION OF THE PLAN</u>

### 7.1    Continued Corporate Existence

**(a)**    Subject to the Restructuring Transactions and Disposition Transactions contemplated by this Plan, each of the Debtors shall continue to exist after the Effective Date as a separate entity, with all the powers of a corporation, limited liability company, or partnership, as the case may be, under applicable law in the jurisdiction in which each applicable Debtor is incorporated or otherwise formed and pursuant to its certificate of incorporation and bylaws or other organizational documents in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws or other organization documents are amended and restated by this Plan and the Certificate of Incorporation and Bylaws without prejudice to any right to terminate such existence (whether by merger or otherwise) under applicable law after the Effective Date.

**(b)**    There are certain Affiliates of the Debtors that are not Debtors in these Chapter 11 Cases.  The continued existence, operation, and ownership of such non-Debtor Affiliates is a material component of the business of the Debtors and Reorganized Debtors, as applicable, and, as set forth in <u>Article 11.1</u> of this Plan but subject to the Restructuring Transactions and Disposition Transactions, all of the Debtors' equity interests and other property interests in such non-Debtor Affiliates shall revest in the applicable Reorganized Debtor or its successor on the Effective Date.

### 7.2    Substantive Consolidation

**(a)**    This Plan provides for the substantive consolidation of certain of the Debtors' Estates, but only for purposes of voting on this Plan and making distributions to holders of Claims and Interests under this Plan.  For purposes of this Plan, the DAS Debtors shall be substantively consolidated; the DASHI Debtors shall be substantively consolidated; the Connection System Debtors shall be substantively consolidated; the Specialty Electronics Debtors

36

shall be substantively consolidated; and the remaining Debtors shall not be substantively consolidated. None of the substantively consolidated Debtor entities shall be consolidated with each other. Notwithstanding the foregoing, but subject to the Disposition Transactions, the Debtors reserve all rights with respect to the substantive consolidation of any and all of the Debtors.

**(b)** With respect to the consolidated Debtor entities, on the Effective Date, and only as to the consolidated Debtor entities, (i) all assets and third-party liabilities of the Delphi-DAS Debtors, the DASHI Debtors, the Connection Systems Debtors, and the Specialty Electronics Debtors, respectively, will, for voting and distribution purposes only, be treated as if they were merged, (ii) each Claim against the Delphi-DAS Debtors, the DASHI Debtors, the Connection Systems Debtors, and the Specialty Electronics Debtors, respectively, will be deemed a single Claim against and a single obligation of the Delphi-DAS Debtors, the DASHI Debtors, the Connection Systems Debtors, and the Specialty Electronics Debtors, respectively, (iii) all Intercompany Claims by, between, and among the Delphi-DAS Debtors, the DASHI Debtors, the Connection Systems Debtors, and the Specialty Electronics Debtors, respectively, will, for voting and distribution purposes only, be eliminated, and (iv) any obligation of the Delphi-DAS Debtors, the DASHI Debtors, the Connection Systems Debtors, and the Specialty Electronics Debtors, respectively, and all guaranties thereof by one or more of the other Delphi-DAS Debtors, DASHI Debtors, Connection Systems Debtors, and Specialty Electronics Debtors, respectively, will be deemed to be one obligation of all of the Delphi-DAS Debtors, the DASHI Debtors, the Connection Systems Debtors, and the Specialty Electronics Debtors, respectively. Except as set forth in this Article, and subject to the Disposition Transactions, such substantive consolidation shall not (other than for purposes related to this Plan) (w) affect the legal and corporate structures of the Debtors or Reorganized Debtors, subject to the right of the Debtors or Reorganized Debtors to effect the Restructuring Transactions contemplated by this Plan, (x) cause any Debtor to be liable for any Claim or Interest under this Plan for which it otherwise is not liable, and the liability of any Debtor for any such Claim or Interest shall not be affected by such substantive consolidation, (y) except as otherwise stated in this Article 7.2, affect Intercompany Claims of Debtors against Debtors, and (z) affect Interests in the Affiliate Debtors except as otherwise may be required in connection with the Restructuring Transactions contemplated by this Plan.

Notwithstanding that the Bankruptcy Court has already approved the substantive consolidation of certain of the Debtors' Estates in the Confirmation Order, this Plan shall serve as, and shall be deemed to be, a request for entry of an order confirming the substantive consolidation of certain of the Debtors' Estates, but only for purposes of voting on this Plan and making distributions to holders of Claims and Interests under this Plan. If no objection to substantive consolidation of certain of the Debtors' Estates is timely filed and served by any holder of an impaired Claim affected by the Plan as provided in the Modification Procedures Order, or such other date as may be established by the Bankruptcy Court, the Modification Approval Order shall serve as the order approving the substantive consolidation of certain of the Debtors' Estates, but only for purposes of voting on this Plan and making distributions to holders of Claims and Interests under this Plan. If any such objections are timely filed and served, a hearing with respect to the substantive consolidation of certain of the Debtors' Estates, but only for purposes of voting on this Plan and making distributions to holders of Claims and Interests under this Plan, and any objections thereto shall be part of the Final Modification Hearing.

### 7.3    Restructuring Transactions.

**(a)**    On or following the Modification Approval Date, the Debtors or Reorganized Debtors, as the case may be, shall take such actions as may be necessary or appropriate to effect the relevant Restructuring Transactions as set forth in the Restructuring Transaction Notice including, but not limited to, actions necessary to execute the Disposition Transactions and any other transactions described in this Plan, and may take any other actions on or after the Effective Date.    The anticipated post-Effective Date structure of the Reorganized Debtors is attached as <u>Exhibit 7.3</u>.

**(b)**    The Restructuring Transactions may include without limitation:  (a) the execution and delivery of appropriate agreements or other documents of merger, consolidation, or reorganization containing terms that are consistent with the terms of this Plan and that satisfy the requirements of applicable law; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, guaranty, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of this Plan; (c) the filing of appropriate certificates of incorporation, merger, consolidation, or dissolution with the appropriate governmental authorities under applicable law; and (d) all other actions that such Debtors and Reorganized Debtors determine are necessary or appropriate, including the making of filings or recordings in connection with the relevant Restructuring Transactions.    The form of each Restructuring Transaction shall be determined by the boards of directors of a Debtor or Reorganized Debtor party to any Restructuring Transaction.    In the event a Restructuring Transaction is a merger transaction, upon the consummation of such Restructuring Transaction, each party to such merger shall cease to exist as a separate corporate entity and thereafter the surviving Reorganized Debtor shall assume and perform the obligations of each merged Debtor under this Plan.    In the event that a Reorganized Debtor is liquidated, the Reorganized Debtors (or the Reorganized Debtor which owned the stock of such liquidating Debtor prior to such liquidation) shall assume and perform the obligations of such liquidating Debtor.    Implementation of the Restructuring Transactions shall not affect the distributions under the Plan.

### 7.4    Certificate Of Incorporation And Bylaws.    The Certificate of Incorporation of Reorganized DPH Holdings, substantially in the form attached hereto as <u>Exhibit 7.4(a)</u>, and Bylaws of Reorganized DPH Holdings, substantially in the form attached hereto as <u>Exhibit 7.4(b)</u>, shall be adopted and amended as may be required so that they are consistent with the provisions of this Plan and otherwise comply with section 1123(a)(6) of the Bankruptcy Code. Each Affiliate Debtor shall amend its certificate of incorporation, charter, bylaws, or applicable organizational document to otherwise comply with section 1123(a)(6).

### 7.5    Directors And Officers Of Reorganized DPH Holdings And Affiliate Debtors.    The Debtors shall file a notice listing the officers and directors of Reorganized DPH Holdings no later than the Exhibit Filing Date.  Unless the Debtors otherwise file a notice on or prior to the Final Modification Hearing, the existing directors and officers of the Affiliate Debtors shall continue to serve in their current capacities after the Effective Date.

### ^ ^ Consummation Of Disposition Transactions^ To Occur On Effective Date.  The DIP Agent, at the direction of the Required Lenders and on behalf of the DIP Lenders,

has effectuated the Credit Bid in accordance with the direction letter from the Required Lenders, the DIP Transfer, and the Master Disposition Agreement. On the Effective Date, the Debtors shall consummate the Disposition Transactions, pursuant to which, among other things, (i) the Company Acquired Assets, including the Company Assumed Contracts, shall be transferred to the Company Buyer free and clear of all Claims, liens, and encumbrances pursuant to the terms of the Master Disposition Agreement and the Modification Approval Order, and (ii) the GM Acquired Assets, including the GM Assumed Contracts, shall be transferred to GM Buyer free and clear of all Claims, liens, and encumbrances pursuant to the terms of the Master Disposition Agreement and the Modification Approval Order^ .

### 7.7    Master Disposition Agreement.

(a)    **Approval Of Master Disposition Agreement**. This Plan constitutes a request to authorize and approve the Master Disposition Agreement, attached hereto as Exhibit 7.7.

^ ^ Sale/Transfer Of Assets To Company Buyer And GM Buyer. Pursuant to the terms of the Master Disposition Agreement, ^ sections 363(k) and 1123(a)(5) of the Bankruptcy Code, the DIP Transfer, and the Modification Approval Order, on the Effective Date, the Debtors shall consummate the transfer, free and clear of any Claims, liens and encumbrances pursuant to the terms of the Master Disposition Agreement and the Modification Approval Order to (i) the Company Buyer of the Company Acquired Assets (subject to the Company Assumed Liabilities), the Company Assumed Contracts, and the Company Sales Securities, and (ii) the GM Buyer of the GM Acquired Assets^ (subject to the GM Assumed ^ Liabilities), the GM Assumed ^ Contracts, and the ^ GM Sales Securities. To facilitate the transfers set forth in this subsection, the DIP Agent has assigned, or shall assign, pursuant to the terms of the DIP Transfer (i) to the GM Buyer, the right to receive the GM Acquired Assets (subject to the GM Assumed Liabilities), the GM Assumed Contracts and the GM Sales Securities and (ii) to the Company Buyer, the right to receive the Company Acquired Assets (subject to the Company Assumed Liabilities), the Company Assumed Contracts and the Company Sales Securities.

### ^ 7.8  ^ DIP Lender Credit ^ Bid.^

(a)    **Required Lender Direction.** The Required Lenders shall have directed the DIP Agent, on behalf of the DIP Lenders, to take certain actions required to consummate the Master Disposition Agreement, including but not limited to (i) making the Credit Bid, (ii) assigning the right receive the Company Acquired Assets (subject to the Company Assumed Liabilities), the Company Assumed Contracts, and the Company Sales Securities to the Company Buyer, and (iii) assigning the right to receive the GM Acquired Assets (subject to the GM Assumed Liabilities), the GM Assumed Contracts, and the GM Sales Securities to the GM Buyer.

(b)    **Termination Of DIP Facility Claims And Cancellation Of Liens.**^  Pursuant to the Credit Bid, upon the consummation of the Master Disposition Agreement

on the Effective Date and upon the making of the DIP Transfer^ , except as contemplated by the ^ Master Disposition Agreement, (i) the obligations in respect of loans under the DIP ^ Credit Agreement shall be fully discharged, released, terminated, and if necessary, deemed waived, (ii) all Claims, liens, security interests, and obligations related thereto ^ against Collateral (as defined in the DIP Credit Agreement) wherever located shall be fully discharged, released, terminated, and if necessary, deemed waived without need for any further action, (iii) the Debtors and the Reorganized Debtors shall be fully discharged and released of all obligations of any kind relating to ^ such loans and the Debtors and Reorganized Debtors shall have no further obligation to the DIP Lenders under and relating to ^ such loans, and (iv) the DIP Lenders shall be deemed to be bound to the provisions of Article XI of this Plan and the Modification Approval Order; provided, however, that notwithstanding the above, (w) the letters of credit under the DIP Facility shall receive the treatment set forth in the Master Disposition Agreement, (x) the Reorganized Debtors shall be obligated on an unsecured basis (i) in respect of the indemnity to the DIP Agent to the extent contemplated under the DIP Credit Agreement and section 13(d) of the DIP Facility Order and (ii) for post Effective Date reasonable fees of the DIP Agent and out-of-pocket expenses related to the DIP Documents, including, without limitation, all reasonable fees and out-of-pocket expenses incurred in connection with the cancellation and/or extinguishment of all publicly-filed liens and/or security interests as described below, (y) DIP Lender professional fees that have accrued prior to the Effective Date shall be treated as set forth in the Master Disposition Agreement, and (z) the Assumed Hedging Agreements (as defined in the Master Disposition Agreement) shall be paid or assumed by the GM Buyer as set forth in the Master Disposition Agreement.. To the extent that the DIP Lenders or the DIP Agent have filed or recorded publicly any liens and/or security interests to secure the Debtors' obligations under the DIP Facility, the DIP Lenders or the DIP Agent, as the case may be, shall take any and all commercially reasonable steps requested by the Company Buyer, GM Buyer, or Reorganized Debtors, at the Reorganized Debtors' reasonable expense, that are necessary to cancel and/or extinguish such publicly filed liens and/or security interests.^

### 7.9    Post-Confirmation Reorganized DPH Holdings Share Trust

(a)    **Post-Confirmation Reorganized DPH Holdings Share Trust.**  On the Effective Date, the Debtors, on their own behalf and on behalf of the Beneficiaries, shall execute the Post-Confirmation Trust Agreement and take all other steps necessary to establish the Post-Confirmation Reorganized DPH Holdings Share Trust pursuant the Post-Confirmation Trust Agreement, substantially in the form attached as Exhibit 7.9.  On the Effective Date, and in accordance with and pursuant to the terms of the Plan, the Post-Confirmation Reorganized DPH Holdings Share Trust shall become the sole shareholder of Reorganized DPH Holdings.

(b)    **Appointment Of Post-Confirmation Trust Plan Administrator.**  On the Effective Date,  the Post-Confirmation Trust Plan Administrator shall be appointed in accordance with the Post-Confirmation Trust Agreement and the Post-Confirmation Reorganized DPH Holdings Share Trust shall be administered by the Post-Confirmation Trust Plan Administrator in accordance with the Post-Confirmation Trust Agreement.

### 7.10    Emergence Capital.  On the Effective Date, pursuant to the Master Disposition Agreement, the Reorganized Debtors shall receive the Emergence Capital^ .

### 7.11    Management Compensation Plan.  The Debtors or ^ Company Buyer shall enter into employment^ agreements with ^ and^ /or shall provide new and/or assumed

compensation and benefit arrangements to the Debtors' officers who continue ^ to be employed after the Effective Date, as more fully stated ^ on Exhibit 7.11 attached hereto; provided, however, that to enter into or to obtain the benefits of any such employment^ agreement^, such ^ executive officer must contractually waive and release ^ all pre-existing claims, including those arising from pre-existing employment, ^ change in control or other employment-related agreements ^ and/or benefits under certain pre-existing compensation and benefit arrangements. The Management Compensation Plan, as more fully described ^ on Exhibit 7.11, may include equity and other incentive plans as components of compensation to be paid to executives after the Effective Date.

### 7.12   Procedures For Asserting Certain Claims.

(a)   **SERP Claims.**  All persons holding or wishing to assert Claims solely on the basis of pension or other post-employment benefits arising out of the SERP, and whose SERP Claims vest or vested prior to the Effective Date, must file with the Bankruptcy Court and serve upon the Debtors a separate, completed, and executed proof of claim (substantially conforming to Form. No. 10 of the Official Bankruptcy Forms) no later than 30 days after the Effective Date; provided, however, that to the extent that (a) a SERP claimant's SERP Claim has already been Scheduled as non-disputed, non-contingent, and in a liquidated amount or (b) a SERP claimant timely and properly filed a proof of claim asserting his or her SERP Claim, then such SERP claimant need not file and serve an additional executed proof of claim.  All such SERP Claims not Scheduled or filed prior to the time set forth above in this Article 7.12 shall be forever barred from asserting such claims against the Debtors and their estates, or the Reorganized Debtors and their property.  Any Claims arising out of the SERP after the Effective Date shall be disallowed in their entirety regardless of whether a proof of claim has been filed for such contingent claim.  On the Effective Date, the Debtors shall reject or otherwise terminate the SERP. In accordance with that certain Order Authorizing Modification Of Benefits Under Hourly And Salaried Pension Programs And Modification Of Applicable Union Agreements In Connection Therewith, entered on September 23, 2008 (Docket No. 14258), on the Effective Date, the Amended SERP (as defined in the related order) and Amended SRESP (as defined in the related order) shall be vested and payable in accordance with the terms of such order and the related non-qualified pension plans.

(b)   **Prepetition Employee-Related Obligations.**  Except as set forth in Article 7.12(a) above, all Persons holding or wishing to assert Prepetition Employee-Related Obligations must file with the Bankruptcy Court and serve upon the Debtors a separate, completed, and executed proof of claim (substantially conforming to Form. No. 10 of the Official Bankruptcy Forms) no later than 45 days after the Effective Date; provided, however, that such claimant need not file and serve an executed proof of claim to the extent that (a) such claimant's Prepetition Employee-Related Obligation has already been Scheduled as non-disputed, non-contingent, and in a liquidated amount or (b) such a claimant already timely and properly filed a proof of claim asserting such Prepetition Employee-Related Obligation.  All Prepetition Employee-Related Obligations not Scheduled or filed prior to the time set forth above in this Article 7.12(b) shall be forever barred from asserting such claims against the Debtors and their estates, or the Reorganized Debtors and their property.

### 7.13   Cancellation Of Existing Securities And Agreements.  On the Effective Date, except as otherwise specifically provided for herein (a) the Existing Securities and any other

note, bond, indenture, or other instrument or document evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors, except such notes or other instruments evidencing indebtedness or obligations of the Debtors as are Reinstated under this Plan, shall be cancelled; provided, however, that Interests in the Affiliate Debtors shall not be cancelled, and (b) the obligations of, Claims against, and/or Interests in the Debtors under, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the Existing Securities, and any other note, bond, indenture, or other instrument or document evidencing or creating any indebtedness or obligation of the Debtors, except such notes or other instruments evidencing indebtedness or obligations of the Debtors as are Reinstated under this Plan, as the case may be, shall be released and discharged; provided, however, that any agreement (including the Indentures) that governs the rights of a holder of a Claim and that is administered by an indenture trustee, agent, or servicer (each hereinafter referred to as a "Servicer") shall continue in effect solely for purposes of (x) allowing such Servicer to make the distributions on account of such Claims under this Plan as provided in Article IX of this Plan and (y) permitting such Servicer to maintain any rights or liens it may have for fees, costs, and expenses under such indenture or other agreement; provided further, however, that the preceding proviso shall not affect the discharge of Claims against or Interests in the Debtors under the Bankruptcy Code, the Confirmation Order, Modification Approval Order, or this Plan, or result in any expense or liability to the Reorganized Debtors. The Reorganized Debtors shall not have any obligations to any Servicer (or to any Disbursing Agent replacing such Servicer) for any fees, costs, or expenses incurred on and after the Effective Date of the Plan except as expressly provided in Article 9.5 hereof; provided further, however, that nothing herein shall preclude any Servicer (or any Disbursing Agent replacing such Servicer) from being paid or reimbursed for prepetition or postpetition fees, costs, and expenses from the distributions being made by such Servicer (or any Disbursing Agent replacing such Servicer) pursuant to such agreement in accordance with the provisions set forth therein, all without application to or approval by the Bankruptcy Court.

**7.14    Sources of Cash For Plan Distributions**.  Except as otherwise provided in the Plan, Confirmation Order, the Master Disposition Agreement, or the Modification Approval Order, all Cash necessary for the Reorganized Debtors to make payments pursuant to the Plan shall be obtained from the Emergence Capital, ^ and as further described in the ^ Master Disposition Agreement.

**7.15    Establishment Of A General Unsecured Distribution Account.**  On the Effective Date, the Disbursing Agent shall establish a distribution account on behalf of holders of General Unsecured Claims for the purpose of holding the proceeds of the General Unsecured MDA Distribution, if any, to be distributed to holders of General Unsecured Claims in accordance with Article 5.3 of this Plan and the Master Disposition Agreement.

**7.16    Collective Bargaining Agreements.**

**(a)    UAW.**  Pursuant to this Plan and in accordance with the UAW 1113/1114 Settlement Approval Order, on the Effective Date, the UAW-Delphi-GM Memorandum of Understanding, ^ and all documents described in Attachment E to the UAW-Delphi-GM Memorandum of Understanding and Exhibit 2 to the UAW 1113/1114

Settlement Approval Order, shall be automatically assumed by the applicable Reorganized Debtor under sections 365 and 1123 of the Bankruptcy Code and assigned, as ^ applicable, in accordance with the Master Disposition Agreement and the Modification Approval Order.

(b)    **IUE-CWA.**    Pursuant to this Plan and in accordance with the IUE-CWA 1113/1114 Settlement Approval Order, on the Effective Date, the IUE-CWA-Delphi-GM Memorandum of Understanding, ^ and all documents described in Attachment E to the IUE-CWA-Delphi-GM Memorandum of Understanding, shall be automatically assumed by the applicable Reorganized Debtor under sections 365 and 1123 of the Bankruptcy Code and assigned, as ^ applicable, in accordance with the Master Disposition Agreement and the Modification Approval Order.

(c)    **USW.**    Pursuant to this Plan and in accordance with the USW 1113/1114 Settlement Approval Order, on the Effective Date, (i) the USW-Home Avenue Memorandum of Understanding ^ and all documents described in Attachment E to the USW-Home Avenue Memorandum of Understanding and (ii) the USW-Vandalia Memorandum of Understanding ^ and all documents described in Attachment E to the USW-Vandalia Memorandum of Understanding, shall be automatically assumed by the applicable Reorganized Debtor under sections 365 and 1123 of the Bankruptcy Code and assigned, as ^ applicable, in accordance with the Master Disposition Agreement and the Modification Approval Order.

(d)    **IUOE.**    Pursuant to this Plan and in accordance with the IUOE, IBEW, and IAM 1113/1114 Settlement Approval Order, on the Effective Date, (i) the IUOE Local 832S Memorandum of Understanding^ and all documents described in Attachment A to the IUOE Local 832S Memorandum of Understanding, (ii) the IUOE Local 18S Memorandum of Understanding ^ and all documents described in Attachment A to the IUOE Local 18S Memorandum of Understanding, and (iii) the IUOE Local 101S Memorandum of Understanding^ and all documents described in Attachment A to the IUOE Local 101S Memorandum of Understanding, shall be automatically assumed by the applicable Reorganized Debtor under sections 365 and 1123 of the Bankruptcy Code and assigned^ , as applicable, in accordance with the Master Disposition Agreement^ and the Modification Approval Order.

(e)    **IBEW.**    Pursuant to this Plan and in accordance with the IUOE, IBEW, and IAM 1113/1114 Settlement Approval Order, on the Effective Date, (i) the IBEW E&S Memorandum of Understanding^ and all documents described in Attachment A to the IBEW E&S Memorandum of Understanding and (ii) the IBEW Powertrain Memorandum of Understanding ^ and all documents described in Attachment A to the IBEW Powertrain Memorandum of Understanding, shall be automatically assumed by the applicable Reorganized Debtor under sections 365 and 1123 of the Bankruptcy Code and assigned^ , as applicable, in accordance with the Master Disposition Agreement^ and the Modification Approval Order.

(f)    **IAM.**    Pursuant to this Plan and in accordance with the IUOE, IBEW, and IAM 1113/1114 Settlement Approval Order, the IAM-Delphi Memorandum of Understanding, ^ and all documents described in Attachment A to the IAM-Delphi Memorandum of

Understanding, shall be automatically assumed by the applicable Reorganized Debtor under sections 365 and 1123 of the Bankruptcy Code and assigned^ , as applicable, in accordance with the Master Disposition Agreement and the Modification Approval Order.

### 7.17    Pension Matters And PBGC Settlement.

(a)    **Delphi HRP.**  Upon the entry of the Modification Approval Order, PBGC will determine whether to initiate and/or proceed with an involuntary termination under 29 U.S.C. § 1342 of the Delphi HRP; provided, however, that upon the Effective Date, the Delphi HRP shall no longer be the responsibility of the Debtors ^ or the Reorganized Debtors.

(b)    **Salaried and Subsidiary Pension Plans.**  ^ Upon the entry of the Modification Approval Order, PBGC will determine whether to initiate and/or proceed with an involuntary termination under 29 U.S.C. § 1342 of the Delphi Retirement Program for Salaried Employees, the Delphi Mechatronic Systems Retirement Program, the ASEC Manufacturing Retirement Program, the Packard-Hughes Interconnect Bargaining Retirement Plan, and the Packard-Hughes Interconnect Non-Bargaining Retirement Plan shall be terminated (collectively, the "Salaried and Other Pension Plans").

(c)    **PBGC Settlement.**  Pursuant to section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019, this Plan constitutes the Debtors' request to authorize and approve the ^ Delphi-PBGC Settlement Agreement^ , attached hereto ^ as Exhibit 7.17.  Pursuant to the Delphi-PBGC Settlement Agreement and this Plan, the Debtors shall grant the PBGC an allowed general unsecured nonpriority claim in the amount of $3 billion (the "PBGC General Unsecured Claim^ ") against each of the Debtors, which shall receive the treatment, as a single claim in the amount of $3 billion, given to holders of General Unsecured Claims pursuant to Article 5.3 of this Plan^ .  The distributions on account of the PBGC General Unsecured Claim, together with the consideration ^ set forth in the GM-PBGC Agreement, shall result in (i) no distribution being made on account of the Contingent PBGC Secured Claims other than ^ those distributions to be made as set forth above, (ii) the PBGC's settlement of its claims arising under Title IV of ERISA with respect to the Salaried and Other Pension Plans, (iii) the PBGC's agreement not to perfect, pursue, or enforce any and all asserted liens and claims not otherwise discharged by this Plan on the Effective Date and asserted or assertable against Delphi and/or any other member of its "controlled group" as defined under the IRC and/or ERISA including, without limitation, any of Delphi's non-U.S. affiliates, ^ (iv) the withdrawal of all notices of liens filed by the PBGC against non-Debtor affiliates under IRC §§ 412(n) or 430(k), ERISA § 4068, or otherwise, and (v) the releases set forth in the Delphi-PBGC Settlement Agreement and the GM-PBGC Agreement.  Except as specifically provided in the PBGC Settlement Agreement and as set forth in Article V above, on the Effective Date, all liens arising from or relating to the Delphi HRP and/or the Salaried and Other Pension Plans shall be terminated and discharged.

7.18    **Salaried OPEB Settlement**.  The Debtors will continue the payments on the schedule authorized under the Order Pursuant to 11 U.S.C § 363 and Fed. R. Bankr. P. 9019 For Order Approving Debtors' Compromise and Settlement with Committee of Eligible Salaried Retirees and Delphi Salaried Retirees' Association (Docket No. 16545).

**7.19     Preservation Of Causes Of Action.**  In accordance with section 1123(b)(3) of the Bankruptcy Code and except as otherwise provided in this Plan or the Master Disposition Agreement, the Reorganized Debtors shall retain and may (but are not required to) enforce all Retained Actions and all other similar claims arising under applicable state laws, including, without limitation, fraudulent transfer claims, if any, and all other Causes of Action of a trustee and debtor-in-possession under the Bankruptcy Code.  The Debtors or the Reorganized Debtors, in their sole and absolute discretion, shall determine whether to bring, settle, release, compromise, or enforce such Retained Actions (or decline to do any of the foregoing), and shall not be required to seek further approval of the Bankruptcy Court for such action.  The Reorganized Debtors or any successors may pursue such litigation claims in accordance with the best interests of the Reorganized Debtors or any successors holding such rights of action.  Notwithstanding the foregoing, Causes of Action against Persons arising under section 544, 545, 547, 548, or 553 of the Bankruptcy Code or similar state laws shall not be retained by the Reorganized Debtors unless specifically listed on <u>Exhibit 7.19</u> hereto.  For the avoidance of doubt, the Appaloosa Claim (as defined in the Master Disposition Agreement) shall be assigned to the applicable Purchasing Entity pursuant to the terms of the Master Disposition Agreement.

**7.20     Reservation Of Rights.**  With respect to any avoidance causes of action under section 544, 545, 547, 548, or 553 of the Bankruptcy Code that the Debtors abandon in accordance with <u>Article 7.19</u> of this Plan, the Debtors and the Reorganized Debtors, as applicable, reserve all rights, including the right under section 502(d) of the Bankruptcy Code to use defensively the abandoned avoidance cause of action as a basis to object to all or any part of a claim against any Estate asserted by a creditor which remains in possession of, or otherwise obtains the benefit of, the avoidable transfer.

**7.21     Exclusivity Period.**  The Debtors shall retain the exclusive right to amend or modify this Plan, and to solicit acceptances of any amendments to or modifications of this Plan, through and until the Effective Date.

**7.22     Dismissal Of Complaints.**  Upon the Effective Date of this Plan, the proceedings initiated by the Creditors' Committee and the Senior Notes Indenture Trustee for the revocation of the Confirmation Order shall be closed and the complaints seeking relief therefor shall be dismissed as moot.

**7.23     Corporate Action.**  Each of the matters provided for under this Plan involving the corporate structure of any Debtor or Reorganized Debtor or corporate action to be taken by or required of any Debtor or Reorganized Debtor shall, as of the Effective Date, be deemed to have occurred and be effective as provided herein, and shall be authorized, approved, and to the extent taken prior to the Effective Date, ratified in all respects without any requirement of further action by stockholders, creditors, or directors of any of the Debtors or the Reorganized Debtors.

**7.24     Effectuating Documents; Further Transactions.**  Each of the Chief Executive Officer, Chief Financial Officer, and General Counsel of the Debtors, or their respective designees, shall be authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan or to otherwise comply with applicable law.  The secretary or assistant secretary of the Debtors shall be authorized to certify or attest to any of the foregoing actions.

**7.25    Consummation Of Divestiture Transactions**.  In the event that the Bankruptcy Court enters an order on or prior to the Effective Date authorizing a Debtor(s) to sell assets free and clear of liens, Claims, and encumbrances, such Debtor(s) and or Reorganized Debtor(s), as the case may be, shall be permitted to close on the sale of such assets subsequent to the Effective Date free and clear of liens, Claims, and encumbrances pursuant to sections 363 and 1123 of the Bankruptcy Code.

**7.26    Exemption From Certain Transfer Taxes And Recording Fees.** Pursuant to section 1146(c) of the Bankruptcy Code, any transfers from a Debtor to a Reorganized Debtor or from a Reorganized Debtor to any other Person or entity pursuant to this Plan, Master Disposition Agreement, or any agreement regarding the transfer of title to or ownership of any of the Debtors' or the Reorganized Debtors' real or personal property, shall not be subject to any stamp taxes and any other similar tax or governmental assessment to the fullest extent contemplated by section 1146(c) of the Bankruptcy Code, and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

# ARTICLE VIII

## UNEXPIRED LEASES AND EXECUTORY CONTRACTS

**8.1    Assumed And Rejected Contracts And Leases.**

**(a)    Executory Contracts And Unexpired Leases.**    All executory contracts and unexpired leases as to which any of the Debtors is a party shall be deemed automatically assumed by the applicable Reorganized Debtor in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code as of the Effective Date, unless such executory contracts or unexpired leases (i) shall have been previously rejected by the Debtors by Final Order of the Bankruptcy Court, (ii) shall be the subject of a motion to reject, or that otherwise authorizes rejection, filed on or before the Modification Approval Date, (iii) shall be rejected or assumed pursuant to a motion to sell or transfer property or assets filed by the Debtors prior to the Effective Date, (iv) shall have expired or terminated on or prior to the Effective Date (and not otherwise extended) pursuant to their own terms, (v) are listed on the schedule of rejected contracts attached hereto as Exhibit 8.1(a)—Rejected Contracts, or (vi) are otherwise rejected pursuant to the terms of this Plan and/or upon the direction of either Buyer pursuant to the Master Disposition Agreement.  Subject to the foregoing sentence and consummation of this Plan, entry of the Plan Modification Approval Order by the Bankruptcy Court shall constitute approval of the rejections and assumptions contemplated hereby pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.  Upon the occurrence of the Effective Date, each executory contract or unexpired lease assumed, or assumed and assigned, as applicable, pursuant to this Article 8.l(a) shall vest in and be fully enforceable by the applicable Reorganized Debtor or its assignee in accordance with its terms, except as modified by the provisions of this Plan or any order of the Bankruptcy Court authorizing or providing for its assumption or applicable federal law.  Subject to the Master Disposition Agreement, the Debtors reserve the right to file a motion on or before the Modification Approval Date to reject any executory contract or unexpired lease.

(b)   **Real Property Agreements**.  Each executory contract and unexpired lease that is assumed by the applicable Reorganized Debtor and relates to the use, ability to acquire, or occupancy of real property shall include (i) all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affect such executory contract or unexpired lease and (ii) all executory contracts or unexpired leases appurtenant to the premises, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, powers, uses, reciprocal easement agreements, and any other interests in real estate or rights in rem related to such premises, unless any of the foregoing agreements has been rejected pursuant to a Final Order of the Bankruptcy Court or is otherwise rejected as a part of this Plan.  In the event that the Effective Date does not occur, the Court shall retain jurisdiction with respect to any request to extend the deadline for assuming any unexpired leases pursuant to section 365(d)(4) of the Bankruptcy Code.

(c)   **Exhibits Not Admissions.**  Neither the exclusion nor the inclusion by the Debtors of a contract or lease on Exhibit 8.1(a) nor anything contained in this Plan shall constitute an admission by the Debtors that such lease or contract is an unexpired lease or executory contract or that any Debtor, or its respective Affiliates, has any liability thereunder.  The Debtors reserve the right, subject to notice, to amend, modify, supplement, or otherwise change Exhibit 8.1(a) on or before the Modification Approval Date.

**8.2   Cure Procedures and Payments Related To Assumption Of Executory Contracts And Unexpired Leases**.

(a)   **Material Supply Agreements**.  The provisions (if any) of each Material Supply Agreement to be assumed under this Plan which are or may be in default shall be satisfied solely by Cure.  For the avoidance of any doubt, any monetary amounts by which each Material Supply Agreement to be assumed pursuant to this Plan is in default shall be satisfied by Cure as required by section 365(b)(1) of the Bankruptcy Code and shall be paid to the non-Debtor counterparty to the Material Supply Agreement.  To the extent an Allowed Claim includes a claim for default of a Material Supply Agreement assumed under this Plan, then any Cure distributed pursuant to this section on account of such Material Supply Agreement shall offset or reduce the amount to be distributed to the holder of such related Allowed Claim (x) by the amount of the default under such Material Supply Agreement so recorded in the claim holder's proof of claim or documentation allowing such claim or (y) if such default amount is not definitively recorded or is agreed to in writing in an amount that is less than the undisputed default amount, then by the amount of any Cure payments made on account of the assumption, pursuant to sections 365 and 1123 of the Bankruptcy Code.

(i)   **Cure Amount Notices.**  Pursuant to the Solicitation Procedures Order and the Confirmation Order, the Debtors issued a Cure Amount Notice to counterparties to Material Supply Agreements.  The proposed Cure amount set forth in such Cure Amount Notice was equal to the amount that the applicable Debtor believed it or the applicable Reorganized Debtor would be obligated to pay in connection with an assumption of such contract under section 365(b)(1) of the Bankruptcy Code (such amount, the "Cure Amount Proposal").  With respect to reconciling the amount of Cure, the

47

procedures set forth in the Solicitation Procedures Order, as modified by the Confirmation Order and subsequently modified by the Modification Procedures Order, and implemented in accordance therewith shall control and accordingly, Cure shall be equal to (i) subject to modification by written agreement between the Debtors and the applicable counterparty to reduce the Allowed Cure amount, the amount set forth on the Cure Amount Notice, to the extent that no proper and timely objection was filed in accordance with the Solicitation Procedures Order or was filed on or before the Omitted Material Supply Agreement Objection Deadline, as applicable, unless the Debtors send an Amended Cure Amount Notice (as defined below) to an applicable counterparty in which case Cure shall be determined pursuant to the procedures set forth in the Modification Procedures Order, or (ii) to the extent a proper and timely objection to the Cure Amount Notice and Cure Amount Proposal was filed in accordance with the Solicitation Procedures Order or was filed on or before the Omitted Material Supply Agreement Objection Deadline, as applicable, (a) the amount agreed to between the Debtors or Reorganized Debtors and the applicable counterparty or, (b) to the extent no such agreement was or is reached, such other amount as ordered by the Bankruptcy Court.  The Debtors shall send an amended notice with respect to such Cure Amount Notices for which the Debtors have since determined that the Cure Amount Proposal was overstated.  To reduce the overstated Cure amount to its proper amount, the Debtors may, at least 20 days prior to the Effective Date, file with the Court and serve a separate notice (the "Amended Cure Amount Notice") stating the amended Cure amount that the Debtors believe is necessary and proper to cure such contract. Pursuant to the Modification Procedures Order, if an affected contract counterparty disagrees with the Cure amount listed on the Amended Cure Amount Notice, then the counterparty shall file an objection within ten days of receipt of the Amended Cure Amount Notice to object to the amended Cure amount.  If no objection is timely received, each counterparty shall be deemed to have consented to the Cure amount set forth on the Amended Cure Amount Notice.  Any unresolved objection to an Amended Cure Amount Notice shall be scheduled to be heard at a claims hearing following 20 days' notice thereof provided by the Debtors or the Reorganized Debtors, as applicable, to the applicable counterparty, or such other date as may be agreed upon by the parties.

(ii)      **Objections To Cure Amount Notices And Payment Of Cure.** The Cure Amount Notice provided procedures for contracts that were to be assumed by the Reorganized Debtors (and with respect to contracts to be assumed and assigned to GM or ^ Company Buyer pursuant to the Modification Procedures Order, such notice of assumption and ^ assignment shall provide procedures) for each counterparty to object to, among other things, the assumption or assumption and assignment of the applicable contract.  The Cure Amount Notice also provided procedures for each counterparty to object to the Cure Amount Proposal.  If the counterparty responded to the Cure Amount Notice in accordance with the procedures set forth in the Solicitation Procedures Order, as modified by the Confirmation Order, or if the counterparty responded to the Amended Cure Amount Notice in accordance with the procedures herein and in the Modification Procedures Order, and the counterparty asserted a dispute regarding (x) the nature or amount of any Cure, (y) the ability of the Reorganized Debtor or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract to be assumed, or (z) any other matter pertaining to assumptions, then the Cure shall be paid, honored, or otherwise occur following the later of

48

a reasonable period of time following the Effective Date if the dispute is resolved consensually between the applicable counterparty and the Debtors or Reorganized Debtors, or a reasonable period of time following the entry of a Final Order adjudicating the dispute and approving the assumption and assignment of such Material Supply Agreement; provided that if there is a dispute as to the amount of Cure or adequate assurance that cannot be resolved consensually among the applicable counterparty and the Debtors, Reorganized Debtors, or the Buyers then notwithstanding anything to the contrary herein, in the Confirmation Order, in the Modification Procedures Order, or in the Modification Approval Order, the Debtors or Reorganized Debtors, shall have the right (and shall do so if directed by a Buyer pursuant to the terms of the Master Disposition Agreement) to reject the contract or lease for a period of ^ six days after entry of a Final Order establishing (a) a Cure amount in excess of that provided by the Debtors or (b) adequate assurance on terms not reasonably acceptable to the Debtors or Reorganized Debtors and the assignee, if applicable, of such Material Supply Agreement.  To the extent disputed Cure amounts have not been resolved prior to the Effective Date, each Buyer shall establish an escrow account funded with Cash sufficient to pay the face amount of the disputed Cure asserted with respect to any Material Supply Agreement to be assigned to such Buyer pursuant to the Master Disposition Agreement.  Any delay in approval of the assignability of the contracts to be assumed or the amount of Cure shall not affect the closing of the Disposition Transactions or the Effective Date of the Plan.  If the non-Debtor counterparty to the Material Supply Agreement did not respond to the Cure Amount Notice in accordance with the Solicitation Procedures Order, or even if responded, did not dispute the Cure amount set forth in the Cure Amount Notice or did not dispute the Cure amount set forth in the Amended Cure Amount Notice, then Cure shall be paid in the amount set forth in the Cure Amount Notice or Amended Cure Amount Notice, as applicable, within a reasonable period of time following the Effective Date.

        **(iii)**      **Form Of Cure Payments.**    Notwithstanding anything to the contrary in the Solicitation Procedures Order, as modified by the Confirmation Order, and supplemented by the Modification Procedures Order, a Cure Amount Notice, the First Order Pursuant To Solicitation Procedures Order, Confirmation Order, Plan Of Reorganization, 11 U.S.C. § 105(a), And Fed. R. Bankr. P. 9010 Striking Certain Non-Conforming Cure Amount Notices And Objections Identified In Non-Conforming Cure Notice Motion (Docket No. 12899), the Second Order Pursuant To Solicitation Procedures Order, Confirmation Order, Plan Of Reorganization, 11 U.S.C. § 105(a), And Fed. R. Bankr. P. 9010 Striking Certain Non-Conforming Cure Amount Notices And Objections Identified In Non-Conforming Cure Notice Motion (Docket No. 12900), and the Third Order Pursuant To Solicitation Procedures Order, Confirmation Order, Plan Of Reorganization, 11 U.S.C. § 105(a), And Fed. R. Bankr. P. 9010 Striking Certain Non-Conforming Cure Amount Notices And Objections Identified In Non-Conforming Cure Notice Motion (Docket No. 12901), absent a consensual agreement between the Debtors and the applicable counterparty, each counterparty to a Material Supply Agreement shall be paid in cash for the Cure of monetary defaults under a Material Supply Agreement assumed pursuant to this Plan and the Master Disposition Agreement.

**(b)    Other Executory Contracts And Other Unexpired Leases**.  The provisions (if any) of each Other Executory Contract or Other Unexpired Lease to be assumed, or assumed and assigned, under this Plan which are or may be in default shall be satisfied solely by Cure.  For the avoidance of doubt, any monetary amounts by which each Other Executory Contract or Other Unexpired Lease to be assumed pursuant to this Plan is in default shall be satisfied by Cure as required by section 365(b)(1) of the Bankruptcy Code and shall be paid to the non-Debtor counterparty to the Other Executory Contract or Other Unexpired Lease.  Any Cure distributed pursuant to this section shall offset or reduce the amount to be distributed to the holder of such related Allowed Claim (x) by the amount of the default under such Other Executory Contract or Other Unexpired Lease so recorded in the claim holder's proof of claim or documentation allowing such claim or (y) if such default amount is not definitively recorded or is agreed to in writing in an amount that is less than the undisputed default amount, then by the amount of any Cure payments made on account of the assumption, pursuant to sections 365 and 1123 of the Bankruptcy Code.

**(i)    Cure Proposals.**    Pursuant to Article 8.2(b), as confirmed on January 25, 2008, any counterparty to an Other Executory Contract or Other Unexpired Lease who wished to assert that Cure is required as a condition to assumption must have filed and served a proposed cure proposal (a "Cure Proposal") so as to be received by the Debtors and their counsel at the address set forth in Article 14.8 hereof by March 10, 2008 (the "Cure Proposal Submission Deadline"), after which the Debtors had until April 24, 2008, to file any objections thereto (the "Cure Proposal Objections").

**(ii)    Cure Proposal Objections.**    The Debtors or Reorganized Debtors shall have the right to amend, modify, or supplement the Cure Proposal Objections. Counterparties to an Other Executory Contract or Other Unexpired Lease which failed to file and serve a Cure Proposal by the Cure Proposal Submission Deadline in accordance with the procedures set forth in the Plan confirmed on January 25, 2008, shall each be deemed to have waived its right to assert a default requiring Cure and any default existing as of January 25, 2008 shall have been deemed cured as of the day following the Cure Proposal Submission Deadline and such party shall forever be barred from asserting against the Debtors or the Reorganized Debtors, as applicable, a claim that arose on or prior to the Cure Proposal Submission Deadline.  Counterparties shall assert any claims for defaults of Other Executory Contracts or Other Unexpired Leases accruing after the Cure Proposal Submission Deadline as Administrative Claims and shall file and serve such claims before the Administrative Claims Bar Date in accordance with the Modification Approval Order and as otherwise set forth in Articles 10.2 and 10.5.  If a counterparty included an assertion in its timely filed and served Cure Proposal disputing (i) the nature or amount of any Cure, (ii) the ability of any Reorganized Debtor, or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed, or (iii) any other matter pertaining to assumption, or if there is a Cure Proposal Objection then the disputed matter shall be set for hearing in the Bankruptcy Court, which hearing shall be scheduled for an available claims hearing date following 20 days' notice provided by the Debtors or the Reorganized Debtors, as applicable, to the applicable counterparty, or such other date as may be agreed upon, and Cure, if any, shall be paid, honored, or otherwise occur following the earlier of a consensual resolution or the entry of a Final Order of the Bankruptcy Court

resolving the dispute and approving the assumption or assumption and assignment, as the case may be; provided, however, that if there is a dispute as to the amount of Cure or regarding adequate assurance that cannot be resolved consensually among the parties, notwithstanding anything to the contrary herein or in the Confirmation Order, the Debtors shall have the right (and shall do so if directed by a Buyer pursuant to the terms of the Master Disposition Agreement) to reject the contract or lease for a period of ^ six days after entry of a Final Order establishing (a) a Cure amount in excess of that asserted by the Debtors or (b) adequate assurance on terms not reasonably acceptable to the Debtors or the Reorganized Debtors, as the case may be, and the assignee of such contract or lease.  To the extent the disputed Cure amounts have not been resolved prior to the Effective Date, each Buyer shall establish an escrow account funded with Cash sufficient to pay the face amount of the disputed Cure asserted with respect to any Other Executory Contract or Other Unexpired Lease to be assigned to such Buyer pursuant to the Master Disposition Agreement.  Any delay in approval of the assignability of the contracts to be assumed or the amount of Cure shall not affect the closing of the Disposition Transactions or the Effective Date of the Plan.

   **(iii)**  **Payment Of Cure.** Except as otherwise provided in this <u>Article VIII</u>, to the extent a Cure Proposal was timely filed and served and is not disputed, the Debtors or Reorganized Debtors, as the case may be, shall pay the Cure Proposal, if any, to the counterparty within a reasonable period of time following the Effective Date.  Disputed Cure Proposals or any other disputes regarding Cure or the assumption or assumption and assignment of an Other Executory Contract or Other Unexpired Lease that are resolved consensually or by agreement or Final Order shall be paid or otherwise honored by the Debtors or the Reorganized Debtors, as applicable, by the later of a reasonable period of time following the Effective Date and a reasonable period of time following such agreement or Final Order.

   **(c)** **Other Executory Contracts And Other Unexpired Leases Assigned to Buyers**.  Pursuant to the Master Disposition Agreement, the Debtors or Reorganized Debtors, as the case may be, shall assign certain Other Executory Contracts and Other Unexpired Leases to GM Buyer or ^ Company Buyer.  In connection therewith and in accordance with the procedures set forth in the Modification Procedures Order, Delphi shall serve each counterparty to a GM Assumed Contract or ^ Company Buyer Assumed Contract the respective notice (together, the "MDA Assumption and Assignment Notices"), which shall identify the respective Buyer as the party to whom all of the Debtors' rights, title, and interests in the Other MDA Assumed Contracts shall be assigned.  Counterparties to Other MDA Assumed Contracts which failed to file and serve an objection to the MDA Assumption and Assignment Notice by the deadline set forth in the Modification Procedures Order, shall each be deemed to have waived its right to challenge the Debtors' or the Reorganized Debtors' assignment of such contract or lease and shall be barred from challenging the ability of any Debtor or Reorganized Debtor, as the case may be, or the respective Buyer or its assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed, and shall be barred from making any other challenge pertaining to assumption.  If there is an objection to the MDA Assumption and Assignment Notice and the parties cannot consensually resolve their dispute, then the disputed matter shall be set for hearing in the Bankruptcy Court, which hearing

51

shall be scheduled for an available claims hearing date following 20 days' notice provided by the Debtors or the Reorganized Debtors, as applicable, to the applicable counterparty, or such other date as may be agreed upon, and Cure, if any, shall be paid, honored, and otherwise occur following the entry of a Final Order of the Bankruptcy Court resolving the dispute and approving the assumption or assumption and assignment, as the case may be; provided, however, notwithstanding anything to the contrary herein or in the Confirmation Order, the Debtors or Reorganized Debtors, as the case may be, shall have the right to reject the contract or lease for a period of ^ six days after entry of a Final Order establishing Cure (and shall if directed by a Buyer pursuant to the terms of the Master Disposition Agreement) or adequate assurance on terms not reasonably acceptable to the Debtors or Reorganized Debtors, as applicable, and the assignee. To the extent the disputed Cure amounts have not been resolved prior to the Effective Date, each Buyer shall establish an escrow account funded with Cash sufficient to pay the face amount of the disputed Cure asserted with respect to any Other MDA Assumed Contracts to be assigned to such Buyer pursuant to the Master Disposition Agreement. Any delay in approval of the assignability of the contracts to be assumed or the amount of Cure shall not affect the closing of the Disposition Transactions or the Effective Date of the Plan. Notwithstanding anything to the contrary in this Article 8.2(c), Article 8.2(b)(ii) shall control with respect to Cure amounts related to Other MDA Assumed Contracts.

**(d)  Intercompany Executory Contracts And Intercompany Unexpired Leases.**  Subject to the Master Disposition Agreement, any Claim outstanding at the time of assumption of an Intercompany Executory Contract or an Intercompany Unexpired Lease shall be Reinstated and shall be satisfied in a manner to be agreed upon by the relevant Debtors and/or non-Debtor Affiliates.

**8.3  Assignment Pursuant To Restructuring Transaction.**  To the extent the Debtor which is party to an executory contract or unexpired lease is to be merged or liquidated as part of a Restructuring Transaction, the non-Debtor parties to such executory contract or unexpired lease shall, upon assumption as contemplated herein, be deemed to have consented to the assignment of such executory contract or unexpired lease to the Reorganized Debtor that is the surviving entity after such Restructuring Transaction.

**8.4  Rejection Damages Bar Date.**  If the rejection by the Debtors (pursuant to this Plan or otherwise) of an executory contract or unexpired lease results in a Claim, then such Claim shall be forever barred and shall not be enforceable against the Debtors, the Reorganized Debtors, or such entities' properties unless a proof of claim is filed with the Claims Agent and served upon counsel to the Debtors and the Creditors' Committee within 30 days after the later of (a) entry of the Modification Approval Order or (b) notice that the executory contract or unexpired lease has been rejected, unless otherwise ordered by the Bankruptcy Court.

**8.5  Assumption and Assignment of Divestiture-Related Executory Contracts and Unexpired Leases.**  In the event that the Bankruptcy Court enters an order on or prior to the Effective Date authorizing a Debtor(s) to assume and assign or reject certain executory contracts or unexpired leases in connection with a divestiture transaction, but a Debtor(s) does not assume and assign or reject such contracts and leases prior to the Effective Date: (a) notwithstanding anything to the contrary in the applicable sale order, such assumption or rejection shall be consummated pursuant to Article VIII of this Plan and service of notice and any Cure

payments owed to a non-Debtor counterparty under such contracts and leases shall be made pursuant to Article 8.2 of the Plan and (b) a Debtor(s) or Reorganized Debtor(s), as the case may be, shall be permitted to either reject or assign such assumed executory contracts and unexpired leases subsequent to the Effective Date pursuant to sections 365 and 1123 of the Bankruptcy Code and the applicable sale order.

## ARTICLE IX

## PROVISIONS GOVERNING DISTRIBUTIONS

9.1     **Time Of Distributions.**  Except as otherwise provided for herein or ordered by the Bankruptcy Court, distributions under this Plan shall be made on a Periodic Distribution Date.

9.2     **No Interest On Disputed Claims.**  Unless otherwise specifically provided for in this Plan or as otherwise required by Section 506(b) of the Bankruptcy Code, postpetition interest shall not accrue or be paid on Claims or Interests, and no holder of a Claim or Interest shall be entitled to interest accruing on or after the Petition Date on any Claim or Interest.  Additionally, and without limiting the foregoing, unless otherwise specifically provided for in this Plan or as otherwise required by section 506(b) of the Bankruptcy Code, interest shall not accrue or be paid on any Disputed Claim in respect of the period from the Effective Date to the date a final distribution is made when and if such Disputed Claim becomes an Allowed Claim.

9.3     **Disbursing Agent.**  The Disbursing Agent shall make all distributions required under this Plan except with respect to any holder of a Claim whose Claim is governed by an agreement and is administered by a Servicer, which distributions shall be deposited with the appropriate Servicer, as applicable, who shall deliver such distributions to the holders of Claims in accordance with the provisions of this Plan and the terms of any governing agreement; provided, however, that if any such Servicer is unable to make such distributions, the Disbursing Agent, with the cooperation of such Servicer, shall make such distributions.

9.4     **Surrender Of Securities Or Instruments.**  On or before the Distribution Date, or as soon as practicable thereafter, each holder of an instrument evidencing a Claim (a "Certificate") shall surrender such Certificate to the Disbursing Agent, or, with respect to indebtedness that is governed by an agreement and administered by a Servicer, the respective Servicer, and such Certificate shall be cancelled solely with respect to the Debtors and such cancellation shall not alter the obligations or rights of any non-Debtor third parties vis-a-vis one another to such instruments; provided, however, that this Article 9.4 shall not apply to any Claims Reinstated pursuant to the terms of this Plan.  No distribution of property hereunder shall be made to or on behalf of any such holder unless and until such Certificate is received by the Disbursing Agent or the respective Servicer or the unavailability of such Certificate is reasonably established to the satisfaction of the Disbursing Agent or the respective Servicer.  Any holder who fails to surrender or cause to be surrendered such Certificate, or fails to execute and deliver an affidavit of loss and indemnity reasonably satisfactory to the Disbursing Agent or the respective Servicer prior to the second anniversary of the Effective Date, shall be deemed to have forfeited all rights and Claims in respect of such Certificate and shall not participate in any distribution hereunder, and all property in respect of such forfeited distribution, including any dividends or interest attributable

thereto, shall revert to the Reorganized Debtors notwithstanding any federal or state escheat laws to the contrary.

   **9.5 Services Of Indenture Trustees, Agents, And Servicers.** The services, with respect to implementation of the distributions contemplated by this Plan, of Servicers under the relevant agreements that govern the rights of holders of Claims and Interests shall be as set forth elsewhere in this Plan.  The Reorganized Debtors shall reimburse any Servicer (including the Indenture Trustees) for reasonable and necessary services performed by it (including reasonable attorneys' fees and documented out-of-pocket expenses) in connection with the making of distributions under this Plan to holders of Allowed Claims, without the need for the filing of an application with the Bankruptcy Court or approval by the Bankruptcy Court.  To the extent that there are any disputes that the reviewing parties are unable to resolve with the Servicers, the reviewing parties shall report to the Bankruptcy Court as to whether there are any unresolved disputes regarding the reasonableness of the Servicers' (and their attorneys') fees and expenses. Any such unresolved disputes may be submitted to the Bankruptcy Court for resolution.

   **9.6 Claims Administration Responsibility.**

    **(a) Reorganized Debtors.** The Reorganized Debtors shall retain responsibility for administering, disputing, objecting to, compromising, or otherwise resolving all Claims against, and Interests in, the Debtors and making distributions (if any) with respect to all Claims and Interests, except as otherwise described in this Article IX.

    **(b) Filing Of Objections.** Unless otherwise extended by the Bankruptcy Court, any objections to Claims and/or Interests shall be served and filed on or before the Claims/Interests Objection Deadline (or such later date as may be established by the Bankruptcy Court upon request of the Reorganized Debtors without further notice to parties-in-interest). Notwithstanding any authority to the contrary, an objection to a Claim or Interest shall be deemed properly served on the holder of the Claim or Interest if the Debtors or Reorganized Debtors effect service in any of the following manners:  (i) in accordance with Federal Rule of Civil Procedure 4, as modified and made applicable by Bankruptcy Rule 7004, (ii) to the extent counsel for a holder of a Claim or Interest is unknown, by first class mail, postage prepaid, on the signatory on the proof of claim or other representative identified on the proof of claim or any attachment thereto (or at the last known addresses of such holders of Claims if no proof of claim is filed or if the Debtors have been notified in writing of a change of address), or (iii) by first class mail, postage prepaid, on any counsel that has appeared on behalf of the holder of the Claim or Interest in the Chapter 11 Cases and has not withdrawn such appearance.

    **(c) Determination Of Claims.** Any Claim determined and liquidated pursuant to (i) the ADR Procedures, (ii) an order of the Bankruptcy Court, or (iii) applicable non-bankruptcy law (which determination has not been stayed, reversed, or amended and as to which determination (or any revision, modification, or amendment thereof) the time to appeal or seek review or rehearing has expired and as to which no appeal or petition for review or rehearing was filed or, if filed, remains pending) shall be deemed an Allowed Claim in such liquidated amount and satisfied in accordance with this Plan.  Nothing contained in this Article 9.6 shall constitute or be deemed a waiver of any claim, right, or Cause of Action that the Debtors or

Reorganized Debtors may have against any Person in connection with or arising out of any Claim or Claims, including, without limitation, any rights under section 157(b) of title 28 of the United States Code.

      **(d)    Claims Bar Date.**    Any Claim (whether a newly filed Claim or an amendment to a previously filed Claim) filed after the later of (i) the Effective Date, (ii) with respect to Claims for rejection damages, the bar date established pursuant to <u>Article 8.3</u> of this Plan for the filing of such claims, (iii) with respect to Claims that are Administrative Claims, the bar date established pursuant to <u>Articles 10.2 and 10.5</u> of this Plan, or (iv) with respect to Claims that are Prepetition Employee Related Obligations, the bar date established pursuant to <u>Article 7.12(b)</u> of this Plan, shall not be recognized, or recorded on the claims register, by the Claims Agent and shall be disallowed automatically without the need for any objection from the Debtors or the Reorganized Debtors unless such untimely filing is expressly authorized by an order of the Bankruptcy Court.  Nothing herein shall in any way alter, impair, or abridge the legal effect of the Bar Date Order, or the rights of the Debtors, the Reorganized Debtors, or other parties-in-interest to object to such Claims on the grounds that they are time barred or otherwise subject to disallowance or modification.

      **9.7    Delivery Of Distributions.**

      **(a)    Allowed Claims.**    Distributions to holders of Allowed Claims shall be made by the Disbursing Agent or the appropriate Servicer (a) at the addresses set forth on the proofs of claim filed by such holders of Claims (or at the last known addresses of such holders of Claims if no proof of claim is filed or if the Debtors have been notified in writing of a change of address), (b) at the addresses set forth in any written notices of address changes delivered to the Disbursing Agent after the date of any related proof of claim, (c) at the addresses reflected in the Schedules if no proof of claim has been filed and the Disbursing Agent has not received a written notice of a change of address, or (d) in the case of a holder of a Claim whose Claim is governed by an agreement and administered by a Servicer, at the addresses contained in the official records of such Servicer.

      **(b)    Undeliverable Distributions.**    If any distribution to a holder of a Claim is returned as undeliverable, no further distributions to such holder of such Claim shall be made unless and until the Disbursing Agent or the appropriate Servicer is notified of the then-current address of such holder of the Claim, at which time all missed distributions shall be made to such holder of the Claim without interest. Amounts in respect of undeliverable distributions shall be returned to the Reorganized Debtors until such distributions are claimed. The Reorganized Debtors shall make reasonable efforts to locate holders of undeliverable distributions.  All claims for undeliverable distributions must be made on or before the later to occur of (i) the first anniversary of the Effective Date or (ii) six months after such holder's Claim becomes an Allowed Claim, after which date all unclaimed property shall revert to the Reorganized Debtors free of any restrictions thereon and the claim of any holder or successor to such holder with respect to such property shall be discharged and forever barred, notwithstanding federal or state escheat laws to the contrary.

55

**9.8      Procedures For Treating And Resolving Disputed And Contingent
Claims.**

(a)      **No Distributions Pending Allowance.**  No payments or distributions
shall be made with respect to all or any portion of a Disputed Claim unless and until all objections
to such Disputed Claim have been settled or withdrawn or have been determined by a Final Order
of the Bankruptcy Court, and the Disputed Claim has become an Allowed Claim.  All objections to
Claims must be filed on or before the Claims/Interests Objection Deadline.

(b)      **Distribution Reserves.**  The Reorganized Debtors or Disbursing
Agent shall withhold the Distribution Reserves, if any, from the property to be distributed to
particular classes under this Plan based upon the Face Amount of Disputed Claims.  The
Reorganized Debtors or Disbursing Agent shall withhold such amounts or property as may be
necessary from property to be distributed to such Classes of Claims under the Plan on a Pro Rata
basis based upon the Face Amount of such Claims.  The Reorganized Debtors or Disbursing Agent
shall also place in the applicable Distribution Reserve any dividends, payments, or other
distributions made on account of, as well as any obligations arising from, the property withheld as
the applicable Distribution Reserve, to the extent that such property continues to be withheld as the
applicable Distribution Reserve at the time such distributions are made or such obligations arise.
Nothing in this Plan or the Disclosure Statement shall be deemed to entitle the holder of a Disputed
Claim to postpetition interest on such Claim.

(i)      **Estimation Of Claims For Distribution Reserves.**
To the extent that any General Unsecured Claims remain Disputed Claims as of the ^ first
Periodic Distribution Date for such Claims, the Debtors or Reorganized Debtors shall seek
an order from the Bankruptcy Court establishing the amounts to be withheld as part of the
Distribution Reserves.  Without limiting the foregoing, the Debtors or the Reorganized
Debtors may at any time request that the Bankruptcy Court estimate any Disputed Claim,
including any such Claim arising from the Debtors' or the Reorganized Debtors' rejection
of an executory contract, pursuant to section 502(c) of the Bankruptcy Code regardless of
whether the Debtors have previously objected to such Claim, and the Bankruptcy Court
shall retain jurisdiction to estimate any Disputed Claim at any time during litigation
concerning any objection to any Disputed Claim, including during the pendency of any
appeal relating to any such objection. In the event that the Bankruptcy Court estimates any
Disputed Claim, that estimated amount may, as determined by the Bankruptcy Court,
constitute either (a) the Allowed amount of such Disputed Claim, (b) a maximum
limitation on such Disputed Claim, or (c) in the event such Disputed Claim is estimated in
connection with the estimation of other Claims within the same Class, a maximum
limitation on the aggregate amount of Allowed Claims on account of such Disputed Claims
so estimated; provided, however, that if the estimate constitutes the maximum limitation
on a Disputed Claim, or on more than one such Claim within a Class of Claims, as
applicable, the Debtors or the Reorganized Debtors may elect to pursue supplemental
proceedings to object to any ultimate allowance of any such Disputed Claim.  All of the
objection, estimation, settlement, and resolution procedures set forth in the Plan are
cumulative and not necessarily exclusive of one another.  Disputed Claims may be

56

estimated and subsequently compromised, settled, withdrawn, or resolved by any
mechanism approved by the Bankruptcy Court.

      **(c)**    **No Recourse To Debtors Or Reorganized Debtors.** Any Disputed
Claim that ultimately becomes an Allowed Claim shall be entitled to receive its applicable
distribution under the Plan solely from the Distribution Reserve established on account of such
Disputed Claim.  In no event shall any holder of a Disputed Claim have any recourse with respect
to distributions made, or to be made, under the Plan to holders of such Claims to any Debtor or
Reorganized Debtor on account of such Disputed Claim, regardless of whether such Disputed
Claim shall ultimately become an Allowed Claim or regardless of whether sufficient Cash, or other
property remains available for distribution in the Distribution Reserve established on account of
such Disputed Claim at the time such Claim becomes entitled to receive a distribution under the
Plan.

      **(d)**    **Distributions After Allowance.**  Payments and distributions from
the Distribution Reserve to each respective holder of a Claim on account of a Disputed Claim, to
the extent that it ultimately becomes an Allowed Claim, shall be made in accordance with
provisions of this Plan that govern distributions to such holder of a Claim.  On the first Periodic
Distribution Date following the date when a Disputed Claim becomes undisputed, noncontingent,
and liquidated, the Disbursing Agent shall distribute to the holder of such Allowed Claim any
proceeds from the General Unsecured MDA Distribution, or other property, from the Distribution
Reserve that would have been distributed on the dates when distributions were previously made
had such Allowed Claim been an Allowed Claim on such dates and shall not be limited by the
Disputed Claim Amounts previously reserved with respect to such Disputed Claim to the extent
that additional amounts are available therefor, but only to the extent that such additional amounts
have not yet been distributed to holders of Allowed Claims.  Upon such distribution, the
Distribution Reserve shall be reduced by an amount equal to the amount reserved with respect to
such Disputed Claim.

      **(e)**    **De Minimis Distributions.**  Neither the Disbursing Agent nor any
Servicer shall have any obligation to make a distribution on account of an Allowed Claim from any
Distribution Reserve or otherwise if (i) the aggregate amount of all distributions authorized to be
made from such Distribution Reserve or otherwise on the Periodic Distribution Date in question is
or has a value less than $25,000; provided that the Reorganized Debtors shall make, or cause to be
made, a distribution on a Periodic Distribution Date of less than $25,000 if the Debtors expect that
such Periodic Distribution Date shall be the final Periodic Distribution Date or (ii) the amount to
be distributed to the specific holder of the Allowed Claim on the particular Periodic Distribution
Date does not both (x) constitute a final distribution to such holder and (y) have a value less than
$50.00.

      **9.9**    **Section 510(b) Opt Out Claims.**  No Section 510(b) Opt Out Claim shall
be an Allowed Claim unless and until such Claim has been allowed by Final Order of the
Bankruptcy Court.  Any Section 510(b) Opt Out Claim that ultimately becomes an Allowed Claim
shall be entitled to receive its applicable distribution that would have otherwise been distributed
under the Plan solely from the applicable portion of the Securities Settlement.  In no event shall
any holder of a Section 510(b) Opt Out Claim have any recourse with respect to distributions made,

or to be made, under the Securities Settlement to holders of such Claims or Interests to or against any Debtor or Reorganized Debtor on account of such Section 510(b) Opt Out Claim, regardless of whether such Claim shall ultimately become an Allowed Claim.

   **9.10 Allocation Of Plan Distributions Between Principal And Interest.** To the extent that any Allowed Claim entitled to a distribution under this Plan is composed of indebtedness and accrued but unpaid interest thereon, such distribution shall, to the extent permitted by applicable law, be allocated for federal income tax purposes to the principal amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to the portion of such Claim representing accrued but unpaid interest.

# ARTICLE X

## ALLOWANCE AND PAYMENT OF CERTAIN ADMINISTRATIVE CLAIMS

   **10.1 DIP Facility Claims.**^ Upon consummation of the ^ Master Disposition Agreement, all liens and security interests granted to secure the DIP Facility Revolver Claim, the DIP Facility First Priority Term Claim, and the DIP Facility Second Priority Term Claim shall be deemed discharged, cancelled, and released and shall be of no further force and effect.  To the extent that the DIP Lenders or the DIP Agent have filed or recorded publicly any liens and/or security interests to secure the Debtors' obligations under the DIP Facility, the DIP Lenders ^ or the DIP Agent, as the case may be, shall take any commercially reasonable steps requested by the Debtors, at the expense of the Reorganized Debtors, that are necessary to cancel and/or extinguish such publicly-filed liens and/or security interests.

   **10.2 Pre-Confirmation Administrative Claim Procedures**.  Pursuant to the Modification Procedures Order, all requests for payment of an Administrative Claim through June 1, 2009 (other than claims under the DIP Facility or as set forth in the Modification Procedures Order, Article 10.1, or Article 10.3 of this Plan) must be filed with the Claims Agent and served on counsel for the Debtors and the Statutory Committees no later than the July 15, 2009.  Any request for payment of an Administrative Claim pursuant to this Article 10.2 that is not timely filed and served shall be disallowed automatically without the need for any objection from the Debtors or the Reorganized Debtors.  The Debtors or the Reorganized Debtors may settle an Administrative Claim request made pursuant to this Article 10.2 without further Bankruptcy Court approval. Unless the Debtors or the Reorganized Debtors object to an Administrative Claim within 180 days after the Administrative Claims Bar Date (unless such objection period is extended by the Bankruptcy Court), such Administrative Claim shall be deemed allowed in the amount requested. In the event that the Debtors or the Reorganized Debtors object to an Administrative Claim, the Bankruptcy Court shall determine the allowed amount of such Administrative Claim.

   **10.3 Professional Claims.**

    **(a) Final Fee Applications.** All final requests for payment of Professional Claims and requests for reimbursement of expenses of members of the Statutory Committees must be filed no later than the last day of the second full month after the Effective Date.  After notice and a hearing in accordance with the procedures established by the Bankruptcy

Code and prior orders of the Bankruptcy Court, the allowed amounts of such Professional Claims and expenses shall be determined by the Bankruptcy Court.

**(b)    Payment Of Interim Amounts.**  Subject to the Holdback Amount, on the Effective Date, the Debtors or the Reorganized Debtors shall pay all amounts owing to Professionals and members of the Statutory Committees for all outstanding amounts payable relating to prior periods through the Modification Approval Order Date.  To receive payment on the Effective Date for unbilled fees and expenses incurred through the Modification Approval Date, the Professionals shall estimate fees and expenses due for periods that have not been billed as of the Modification Approval Date and shall deliver such estimate to the Debtors, counsel for the Creditors' Committee, and the United States Trustee for the Southern District of New York. Within 45 days after the Effective Date, a Professional receiving payment for the estimated period shall submit a detailed invoice covering such period in the manner and providing the detail as set forth in the Professional Fee Order or the Ordinary Course Professional Order, as applicable. Should the estimated payment received by any Professional exceed the actual fees and expenses for such period, this excess amount shall be credited against the Holdback Amount for such Professional or, if the award of the Holdback Amount for such matter is insufficient, disgorged by such Professional.

**(c)    Holdback Amount.**  On the Effective Date, the Debtors or the Reorganized Debtors shall fund the Holdback Escrow Account with Cash equal to the aggregate Holdback Amount for all Professionals.  The Disbursing Agent shall maintain the Holdback Escrow Account in trust for the Professionals with respect to whom fees have been held back pursuant to the Professional Fee Order.  Such funds shall not be considered property of the Debtors the Reorganized Debtors, or the Estates.  The remaining amount of Professional Claims owing to the Professionals shall be paid to such Professionals by the Disbursing Agent from the Holdback Escrow Account when such claims are finally allowed by the Bankruptcy Court.  When all Professional Claims have been paid in full, amounts remaining in the Holdback Escrow Account, if any, shall be paid to the Reorganized Debtors.

**(d)    Post-Confirmation Date Retention.**  Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors shall employ and pay Professionals in the ordinary course of business.

**10.4    Substantial Contribution Compensation And Expenses Bar Date.**  Any Person (including the Indenture Trustees) who requests compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4), and (5) of the Bankruptcy Code shall file an application with the clerk of the Bankruptcy Court on or before the 45th day after the Effective Date (the "503 Deadline"), and serve such application on counsel for the Debtors, the Creditors' Committee, the United States Trustee for the Southern District of New York, and such other parties as may be decided by the Bankruptcy Court and the Bankruptcy Code on or before the 503 Deadline, or be forever barred from seeking such compensation or expense reimbursement.

**10.5    Other Administrative Claims.**  All other requests for payment of an Administrative Claim (other than claims under the DIP Facility or as set forth in Article 10.1, Article 10.2, Article 10.3, or Article 10.4 of this Plan) must be filed, in substantially the form of the Administrative Claim Request Form attached hereto as Exhibit 10.5, with the Claims Agent and served on counsel for the Debtors and the Creditors' Committee no later than 30 days after the Effective Date.  Any request for payment of an Administrative Claim pursuant to this Article 10.5 that is not timely filed and served shall be disallowed automatically without the need for any objection from the Debtors or the Reorganized Debtors.  The Debtors or the Reorganized Debtors may settle an Administrative Claim without further Bankruptcy Court approval.  Unless the Debtors or the Reorganized Debtors object to an Administrative Claim within 180 days after the Administrative Claims Bar Date (unless such objection period is extended by the Bankruptcy Court), such Administrative Claim shall be deemed allowed in the amount requested.  In the event that the Debtors or the Reorganized Debtors object to an Administrative Claim, the Bankruptcy Court shall determine the allowed amount of such Administrative Claim.

# ARTICLE XI

## EFFECT OF THE PLAN ON CLAIMS AND INTERESTS

**11.1    Revesting Of Assets.**  Except as otherwise explicitly provided in this Plan, on the Effective Date, all property comprising the Estates (including Retained Actions and Retained Assets, but excluding property that has been abandoned pursuant to an order of the Bankruptcy Court or are the subject of any of the Disposition Transactions) shall revest in each of the Reorganized Debtors which, as Debtors, owned such property or interest in property as of the Effective Date, free and clear of all Claims, liens, charges, encumbrances, rights, and Interests of creditors and equity security holders.  As of and following the Effective Date, the Reorganized Debtors may operate their businesses and use, acquire, and dispose of property and settle and compromise Claims or Interests without supervision of the Bankruptcy Court, free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by this Plan, the Confirmation Order, and the Modification Approval Order.

**11.2    Discharge Of The Debtors.**  Pursuant to section 1141(d) of the Bankruptcy Code, except as otherwise specifically provided in this Plan ^ , Confirmation Order, or Modification Approval Order, the distributions and rights that are provided in this Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims and Causes of Action, whether known or unknown, against, liabilities of, liens on, obligations of, rights against, and Interests in the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to this Plan on account of such Claims, rights, and Interests, including, but not limited to, Claims and Interests that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims relate to services performed by employees of the Debtors prior to the Petition Date and that arise from a termination of employment or a termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not (a) a proof of claim or interest based upon such Claim, debt, right, or Interest is filed or deemed filed under section 501 of the Bankruptcy Code, (b) a Claim or Interest based upon such Claim, debt, right, or Interest is allowed under section 502 of the Bankruptcy Code, or (c) the

holder of such a Claim, right, or Interest accepted this Plan.  The Confirmation Order shall be a judicial determination of the discharge of all Claims against and Interests in the Debtors, subject to the occurrence of the Effective Date.

      **11.3**    **Compromises And Settlements.**  In accordance with <u>Article 9.6</u> of this Plan, pursuant to Bankruptcy Rule 9019(a), the Debtors may compromise and settle various (a) Claims against, or Interests in, the Debtors and (b) Causes of Action that the Debtors have against other Persons up to and including the Effective Date.  After the Effective Date, any such right shall pass to the Reorganized Debtors as contemplated in <u>Article 11.1</u> of this Plan, without the need for further approval of the Bankruptcy Court.

      **11.4**    **Release By Debtors Of Certain Parties.  Pursuant to section 1123(b)(3) of the Bankruptcy Code, but subject to <u>Article 11.13</u> of this Plan, effective as of the Effective Date (and with respect to the DIP Lenders, the DIP Agent, and the members of the DIP Steering Committee, upon the consummation of the DIP ^ <u>Transfer</u>, which shall be deemed to occur on the Effective Date), each Debtor, in its individual capacity and as a debtor-in-possession for and on behalf of its Estate, shall release and discharge and be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged all Released Parties for and from any and all claims or Causes of Action existing as of the Effective Date in any manner arising from, based on, or relating to, in whole or in part, the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in this Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, or any act, omission, occurrence, or event in any manner related to any such Claims, Interests, restructuring, or the Chapter 11 Cases. The Reorganized Debtors, including Reorganized DPH Holdings, and any newly-formed entities that will be continuing the Debtors' businesses after the Effective Date shall be bound, to the same extent the Debtors are bound, by the releases and discharges set forth above.  Notwithstanding the foregoing, nothing in this Plan shall be deemed to release (i) any of the Debtors or GM from their obligations under the Delphi-GM Definitive Documents or the transactions contemplated thereby, except to the extent set forth in the Master Disposition Agreement, (ii) any of the Debtors, the Unions, or GM from their obligations under the Union Settlement Agreements or the transactions contemplated thereby, (iii) any of the Buyers from their obligations under the Master Disposition Agreement, or (iii) any of the Debtors or the Plan Investors or their affiliates from their obligations under the Investment Agreement or the transactions contemplated thereby.**

      **11.5**    **Release By Holders Of Claims And Interests .  On the Effective Date, (a) each Person who votes to accept this Plan and (b) to the fullest extent permissible under applicable law, as such law may be extended or interpreted subsequent to the Effective Date, each entity (other than a Debtor) which has held, holds, or may hold a Claim against or Interest in the Debtors, in consideration for the obligations of the Debtors and the Reorganized Debtors under this Plan and Cash, General Unsecured MDA Distribution, and other contracts, instruments, releases, agreements, or documents to be delivered in connection with this Plan (each, a "Release Obligor"), shall have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged all Released Parties for and from any claim or Cause of Action existing as of the Effective Date in any manner arising from, based on, or relating to, in whole or in part, the Debtors, the subject matter of,**

or the transaction or event giving rise to, the claim of such Release Obligor, the business or contractual arrangements between any Debtor and Release Obligor or any Released Party, the restructuring of the claim prior to the Chapter 11 Cases, or any act, omission, occurrence, or event in any manner related to such subject matter, transaction, obligation, restructuring, or the Chapter 11 Cases, including, but not limited to, any claim relating to, or arising out of the Debtors' Chapter 11 Cases, the negotiation and filing of this Plan, the filing of the Chapter 11 Cases, the formulation, preparation, negotiation, dissemination, filing, implementation, administration, confirmation, or consummation of this Plan, the Disclosure Statement, the Plan Exhibits, the Delphi-PBGC Settlement Agreement, the **Credit Bid, the** Master Disposition Agreement, the ^ Union Settlement Agreements, any employee benefit plan, instrument, release, or other agreement or document created, modified, amended or entered into in connection with either this Plan or any other agreement with the Unions, including but not limited to the Union Settlement Agreements, or any other act taken or not taken consistent with the Union Settlement Agreements in connection with the Chapter 11 cases; <u>provided</u>, <u>however</u>, that (A) this <u>Article 11.5</u> is subject to and limited by <u>Article 11.13</u> of this Plan and (B) this <u>Article 11.5</u> shall not release any Released Party from any Cause of Action held by a governmental entity existing as of the Effective Date based on (i) the Internal Revenue Code or other domestic state, city, or municipal tax code, (ii) the environmental laws of the United States or any domestic state, city, or municipality, (iii) any criminal laws of the United States or any domestic state, city, or municipality, (iv) the Exchange Act, the Securities Act, or other securities laws of the United States or any domestic state, city, or municipality, (v) the Employee Retirement Income Security Act of 1974, as amended, or (vi) the laws and regulations of the Bureau of Customs and Border Protection of the United States Department of Homeland Security. Notwithstanding the foregoing, all releases given by GM to (i) the Debtors and the Debtors' Affiliates shall be as set forth in the Delphi-GM Global Settlement Agreement and (ii) the Unions shall be as set forth in the Union Settlement Agreements.

**11.6    Release By Unions.**  The releases provided for in (i) Section K.3 of the UAW-Delphi-GM Memorandum of Understanding, (ii) Section H.3 of the IUE-CWA-Delphi-GM Memorandum of Understanding, (iii) Section G.3 of the USW Memoranda of Understanding, (iv) Section F.3 of the IUOE Local 18S Memorandum of Understanding and IUOE Local 832S Memorandum of Understanding and Section E.3 of the IUOE Local 101S Memorandum of Understanding, (v) Section F.3 of the IBEW E&S Memorandum of Understanding and the IBEW Powertrain Memorandum of Understanding, and (vi) Section F.3 of the IAM Memorandum of Understanding are incorporated by reference herein in their entirety.

**11.7    Release Of GM By Debtors And Third Parties.**  On the Effective Date, GM **and the other GM-Related Parties (as defined in the Delphi-GM Global Settlement Agreement)** shall receive all releases provided for in Section 4.01 of the Delphi-GM Global Settlement Agreement, which provisions are incorporated by reference herein in their entirety.

**11.8    ^ Release of GMCo. By Debtors And Third Parties.  On the Effective Date, GMCo. shall receive the same releases provided for GM-Related Parties (as defined in the Delphi-GM Global Settlement Agreement) in Section 4.01 of the Delphi-GM Global Settlement Agreement as though it were a party thereto, which provisions are incorporated**

**by reference herein in their entirety; provided, however, that for purposes of Section 4.02 of
the Delphi-GM Global Settlement Agreement, GMCo. shall grant to the Debtors the same
releases provided by GM and the GM-Related Parties (as defined in the Delphi-GM Global
Settlement Agreement).**

**11.9    Setoffs.**  Subject to <u>Article 11.13</u> of this Plan, the Debtors or the
Reorganized Debtors, as applicable, may, but shall not be required to, set off against any Claim,
and the payments or other distributions to be made pursuant to this Plan in respect of such Claim,
claims of any nature whatsoever that the Debtors or the Reorganized Debtors, as applicable, may
have against such holder of such Claim, but neither the failure to do so nor the allowance of any
Claim hereunder shall constitute a waiver or release by the Debtors or the Reorganized Debtors of
any such claim that the Debtors or the Reorganized Debtors may have against such holder of such
Claim.

**11.10   Subordination Rights.^**

**(a)**    All Claims against the Debtors and all rights and claims between or
among holders of Claims relating in any manner whatsoever to distributions on account of Claims
against or Interests in the Debtors, based upon any claimed subordination rights, whether asserted
or unasserted, legal or equitable, shall be deemed satisfied by the distributions under the Plan to
holders of Claims having such subordination rights, and such subordination rights shall be deemed
waived, released, discharged, and terminated as of the Effective Date; <u>provided</u>, <u>further</u>, that the
subordination rights of Senior Debt (as such term is defined in the Subordinated Notes Indenture)
shall be deemed satisfied through the distributions described in <u>Article 5.4</u>, and that as a result of
the satisfaction of the subordination provisions of the Subordinated Notes Indenture, the holders of
TOPrS Claims shall not receive a distribution under this Plan.  Except as otherwise specifically
provided for in the Plan, distributions to the various Classes of Claims hereunder shall not be
subject to levy, garnishment, attachment, or like legal process by any holder of a Claim by reason
of any subordination rights or otherwise, so that each holder of a Claim shall have and receive the
benefit of the distributions in the manner set forth in the Plan.

**(b)**    Except as otherwise provided in the Plan (including any Plan
Exhibits), the Confirmation Order, or the Modification Approval Order the right of any of the
Debtors or Reorganized Debtors to seek subordination of any Claim or Interest pursuant to section
510 of the Bankruptcy Code is fully reserved, and the treatment afforded any Claim or Interest that
becomes a subordinated Claim or Interest at any time shall be modified to reflect such
subordination.  Unless the Plan (including Plan Exhibits), the Confirmation Order, or the
Modification Approval Order, otherwise provide, no distributions shall be made on account of a
Claim subordinated pursuant to this <u>Article 11.10(b)</u> unless ordered by the Bankruptcy Court.

**11.11   Exculpation And Limitation Of Liability. Subject to <u>Article 11.13</u> of
this Plan, the Debtors, the Reorganized Debtors, the Statutory Committees, the members of
the Statutory Committees in their capacities as such, the UAW, the IUE-CWA, the USW, the
IAM, the IBEW, the IUOE, the DIP Agent, the DIP Lenders in their capacities as such, GM,
GMCo., Parnassus Holdings II, LLC, Platinum Equity Capital Partners II, L.P., the
Indenture Trustees in their capacities as such, and any of such parties' respective current or
former members, officers, directors, committee members, affiliates, employees, advisors,**

**attorneys, representatives, accountants, financial advisors, consultants, investment bankers, or agents, and any of such parties' successors and assigns, shall not have or incur, and are hereby released from, any claim, obligation, Cause of Action, or liability to any party, or any of its agents, employees, representatives, current or former members, financial advisors, attorneys or affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of the Debtors' Chapter 11 Cases, the negotiation and filing of this Plan, the filing of the Chapter 11 Cases, the formulation, preparation, negotiation, dissemination, filing, implementation, administration, confirmation or consummation of this Plan, the Disclosure Statement, the Credit Bid, the Plan Exhibits, the Delphi-GM Definitive Documents, the Delphi-PBGC Settlement Agreement, the Master Disposition Agreement, the ^ Union Settlement Agreements, any employee benefit plan, instrument, release or other agreement or document created, modified, amended or entered into in connection with either this Plan or any agreement with the Unions, including but not limited to the Union Settlement Agreements, or any other act taken or not taken consistent with the Union Settlement Agreements in connection with the Chapter 11 Cases, except for their willful misconduct and gross negligence and except with respect to obligations arising under confidentiality agreements, joint interest agreements, and protective orders entered during the Chapter 11 Cases, and in all respects shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under this Plan. Other than as provided for in this Article and in Article 11.13, no party or its agents, employees, representatives, current or former members, financial advisors, attorneys, or affiliates, and no successors or assigns of the foregoing, shall have any right of action against the parties listed in this Article for any act or omission in connection with, relating to, or arising out of the Chapter 11 Cases, the formulation, preparation, negotiation, dissemination, filing, implementation, administration, confirmation or consummation of this Plan, the Disclosure Statement, the Delphi-GM Definitive Documents, the Delphi-PBGC Settlement Agreement, the Credit Bid, the Master Disposition Agreement, the ^ Union Settlement Agreements, any employee benefit plan, instrument, release or other agreement or document created, modified, amended or entered into in connection with either this Plan or any agreement with the Unions, including but not limited to the Union Settlement Agreements, or any other act taken or not taken consistent with the Union Settlement Agreements in connection with the Chapter 11 Cases. For the avoidance of doubt, the exculpatory provisions of this Article, which apply to postpetition conduct, are not intended, nor shall they be construed, to bar any governmental unit from pursuing any police or regulatory action. Moreover, nothing in this Plan shall be deemed to release (i) any of the Debtors or GM from their obligations under the Delphi-GM Definitive Documents or the transactions contemplated thereby, (ii) any of the Debtors, the Unions, or GM from their obligations under the Union Settlement Agreements or the transactions contemplated thereby, (iii) any of the Debtors or the Buyers from their obligations under the Disposition Agreements, (iv) any of the Debtors or the Plan Investors or their affiliates from their obligations under the Investment Agreement or the transactions contemplated thereby, or (v) any of the Debtors from their obligations under this Plan or the transactions contemplated thereby.**

      **11.12  Indemnification Obligations.**  Subject to Article 11.13 of this Plan, in satisfaction and compromise of the Indemnitees' Indemnification Rights: (a) all Indemnification Rights shall be released and discharged on and as of the Effective Date except for Continuing Indemnification Rights (which shall remain in full force and effect to the fullest extent allowed by law or contract on and after the Effective Date and shall not be modified, reduced, discharged, or

otherwise affected in any way by the Chapter 11 Cases); (b) the Debtors or the Reorganized Debtors, as the case may be, shall maintain directors' and officers' insurance providing coverage for those Indemnitees currently covered by such policies for the remaining term of such policy and shall maintain tail coverage under policies in existence as of the Effective Date for a period of six years after the Effective Date, to the fullest extent permitted by such provisions, in each case insuring such parties in respect of any claims, demands, suits, Causes of Action, or proceedings against such Persons based upon any act or omission related to such Person's service with, for, or on behalf of the Debtors in at least the scope and amount as currently maintained by the Debtors (the "Insurance Coverage") and hereby further indemnify such Indemnitees without Continuing Indemnification Rights solely to pay for any deductible or retention amount that may be payable in connection with any claim covered under either the foregoing Insurance Coverage or any prior similar policy in an aggregate amount not to exceed $10 million; (c) the insurers who issue the Insurance Coverage shall be authorized to pay any professional fees and expenses incurred in connection with any action relating to any Indemnification Rights and Continuing Indemnification Rights; and (d) the Debtors or the Reorganized Debtors, as the case may be, shall indemnify Indemnitees with Continuing Indemnification Rights and agree to pay for any deductible or retention amount that may be payable in connection with any claim covered under either the foregoing Insurance Coverage or any prior similar policy.  Notwithstanding subclause (a) above, pursuant to the Stipulation and Agreement of Insurance Settlement (the "Insurance Stipulation") the Delphi Officers' and Directors' (as defined in the Insurance Stipulation) indemnification claims related to the MDL Actions and related government investigations and proceedings have been estimated at $0 for all purposes in these cases, and the Delphi Officers and Directors have released all such indemnification claims against Delphi, subject to the Delphi Officers' and Directors' right to assert an indemnification claim against Delphi for legal fees and expenses incurred in the defense of unsuccessful claims asserted as a defense or set-off by Delphi against the Delphi Officers and Directors related to the MDL Actions or related government investigations and proceedings, all as more particularly set forth in the Insurance Stipulation.

**11.13   Exclusions And Limitations On Exculpation, Indemnification, And Releases.**  Notwithstanding anything in this Plan to the contrary, no provision of this Plan, the Confirmation Order, or the Modification Approval Order, including, without limitation, any exculpation, indemnification, or release provision, shall modify, release, or otherwise limit the liability of any Person not specifically released hereunder, including, without limitation, any Person who is a co-obligor or joint tortfeasor of a Released Party or who is otherwise liable under theories of vicarious or other derivative liability.

**11.14   Injunction.  Subject to <u>Article 11.13</u> of this Plan, ^ the satisfaction, release, and discharge pursuant to this <u>Article XI</u> shall act as an injunction against any Person commencing or continuing any action, employment of process, or act to collect, offset, or recover any Claim, Interest, or Cause of Action satisfied, released, or discharged under this Plan to the fullest extent authorized or provided by the Bankruptcy Code, including, without limitation, to the extent provided for or authorized by sections 524 and 1141 thereof.**

## ARTICLE XII

## <u>CONDITIONS PRECEDENT</u>

65

**12.1    Confirmation.**  The Confirmation Order was entered on January 25, 2008, and became a final order on February 4, 2008.

**12.2    Conditions To The Effective Date Of The Plan.**  The following are conditions precedent to the occurrence of the Effective Date, each of which may be satisfied or waived in accordance with Article 12.3 of this Plan:

(a)    The Bankruptcy Court shall have entered one or more orders, in form and substance acceptable to the Debtors, granting relief under section 1127 of the Bankruptcy Code with respect to modifications of the Plan.

(b)    The Debtors or the Reorganized Debtors, as the case may be, shall have entered into the Master Disposition Agreement, and all conditions precedent to the consummation of the Master Disposition Agreement shall have been waived or satisfied in accordance with the terms thereof.

^ (c) ^ The Debtors or the Reorganized Debtors, as the case may be, shall have entered into the Delphi-PBGC Settlement Agreement and all conditions precedent to the consummation thereof shall have been waived or satisfied in accordance with the terms thereof.

^ (d) The Bankruptcy Court shall have entered one or more orders, which may include the Modification Approval Order, authorizing the assumption and rejection of unexpired leases and executory contracts by the Debtors as contemplated by Article 8.1 of this Plan.

^ (e) Each Exhibit, document, or agreement to be executed in connection with this Plan shall be in form and substance reasonably acceptable to the Debtors.

**12.3    Waiver Of Conditions Precedent.** The conditions set forth in 12.2(^ d) and 12.2(^ e) of this Plan may be waived, in whole or in part, by the Debtors without any notice to any other parties-in-interest or the Bankruptcy Court and without a hearing. The failure to satisfy or waive any condition to the Confirmation Date or the Effective Date may be asserted by the Debtors in their sole discretion regardless of the circumstances giving rise to the failure of such condition to be satisfied (including any action or inaction by the Debtors in their sole discretion). The failure of the Debtors to exercise any of the foregoing rights shall not be deemed a waiver of any other rights, and each such right shall be deemed an ongoing right, which may be asserted at any time.

# ARTICLE XIII

## RETENTION OF JURISDICTION

Pursuant to sections 105(a) and 1142 of the Bankruptcy Code, the Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of, and related to, the Chapter 11 Cases and this Plan, including, among others, the following matters:

**(a)** to hear and determine motions for (i) the assumption or rejection or (ii) the assumption and assignment of executory contracts or unexpired leases to which any of the Debtors are a party or with respect to which any of the Debtors may be liable, and to hear and determine the allowance of Claims resulting therefrom including the amount of Cure, if any, required to be paid;

**(b)** to adjudicate any and all adversary proceedings, applications, and contested matters that may be commenced or maintained pursuant to the Chapter 11 Cases, this Plan, or that were the subject of proceedings before the Bankruptcy Court prior to the Effective Date, proceedings to adjudicate the allowance of Disputed Claims and Disputed Interests, and all controversies and issues arising from or relating to any of the foregoing;

**(c)** to adjudicate any and all disputes arising from or relating to the distribution or retention of the General Unsecured MDA Distributions, or other consideration under this Plan;

**(d)** to ensure that distributions to holders of Allowed Claims are accomplished as provided herein;

**(e)** to hear and determine any and all objections to the allowance or estimation of Claims or Interests filed, both before and after the Confirmation Date, including any objections to the classification of any Claim or Interest, and to allow or disallow any Claim or Interest, in whole or in part;

**(f)** to enter and implement such orders as may be appropriate if the Confirmation Order is for any reason stayed, revoked, modified, and/or vacated;

**(g)** to issue orders in aid of execution, implementation, or consummation of this Plan;

**(h)** to consider any modifications of this Plan, to cure any defect or omission, or to reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order or Modification Approval Order;

67

**(i)**    to hear and determine all applications for allowance of compensation and reimbursement of Professional Claims under this Plan or under sections 330, 331, 503(b), 1103, and 1129(a)(4) of the Bankruptcy Code;

**(j)**    to determine requests for the payment of Claims entitled to priority under section 507(a)(1) of the Bankruptcy Code, including compensation and reimbursement of expenses of parties entitled thereto;

**(k)**    to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of this Plan the Confirmation Order, or the Modification Approval Order, including disputes arising under agreements, documents, or instruments executed in connection with this Plan; provided that retention of jurisdiction as to disputes involving GM or GMCo. shall be as set forth in Article XIII (u);

**(l)**    to hear and determine all suits or adversary proceedings to recover assets of any of the Debtors and property of their Estates, wherever located;

**(m)**    to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

**(n)**    to resolve any matters relating to the pre- and post-confirmation sales of the Debtors' assets;

**(o)**    to hear any other matter not inconsistent with the Bankruptcy Code;

**(p)**    to hear and determine all disputes involving the existence, nature or scope of the Debtors' discharge, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

**(q)**    to enter a final decree closing the Chapter 11 Cases;

**(r)**    to enforce all orders previously entered by the Bankruptcy Court;

**(s)**    to hear and determine all matters relating to any Section 510(b) Note Claim, Section 510(b) Equity Claim, or Section 510(b) ERISA Claim;

**(t)**    to hear and determine all matters arising in connection with the interpretation, implementation, or enforcement of the Investment Agreement;

68

**(u)**    to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Delphi-GM Definitive Documents^ _and_ the Master Disposition Agreement, except as provided in such documents; and

**(v)**    to hear and determine all matters relating to the Contingent PBGC Secured Claims or the Delphi-PBGC Settlement Agreement.

Notwithstanding anything contained herein to the contrary, the Bankruptcy Court shall retain exclusive jurisdiction to adjudicate and to hear and determine disputes concerning Retained Actions and any motions to compromise or settle such disputes or Retained Actions. Despite the foregoing, if the Bankruptcy Court is determined not to have jurisdiction with respect to the foregoing, or if the Reorganized Debtors choose to pursue any Retained Actions in another court of competent jurisdiction, the Reorganized Debtors shall have authority to bring such action in any other court of competent jurisdiction.

## ARTICLE XIV

## MISCELLANEOUS PROVISIONS

**14.1    Binding Effect**. Upon the Effective Date, this Plan shall be binding upon and inure to the benefit of the Debtors, the Reorganized Debtors, all current and former holders of Claims, all current and former holders of Interests, and all other parties-in-interest and their respective heirs, successors, and assigns.

**14.2    Payment Of Statutory Fees**. All fees payable pursuant to section 1930 of title 28 of the United States Code, as of the entry of the Confirmation Order as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid on the Effective Date. The Reorganized Debtors shall continue to pay fees pursuant to section 1930 of title 28 of the United States Code until the Chapter 11 Cases are closed.

**14.3    Modification And Amendments**. The Debtors may alter, amend, or modify this Plan under section 1127(a) of the Bankruptcy Code at any time prior to the Confirmation Hearing. The Debtors may alter, amend, or modify any Exhibits to this Plan under section 1127(a) of the Bankruptcy Code at any time prior to the Confirmation Date. After the Confirmation Date and prior to substantial consummation of this Plan with respect to any Debtor as defined in section 1101(2) of the Bankruptcy Code, any Debtor may, under section 1127(b) of the Bankruptcy Code, institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in this Plan, the Disclosure Statement, or the Confirmation Order, and such matters as may be necessary to carry out the purposes and effects of this Plan.

**14.4    Reserved.**

**14.5    Withholding And Reporting Requirements**. In connection with this Plan and all instruments issued in connection therewith and distributions thereunder, the Debtors shall comply with all withholding and reporting requirements imposed by any federal, state, local, or

foreign taxing authority, and all distributions hereunder shall be subject to any such withholding and reporting requirements.

**14.6    Committees**.  Effective on the Effective Date, the Creditors' Committee shall dissolve automatically, whereupon their members, professionals, and agents shall be released from any further duties and responsibilities in the Chapter 11 Cases and under the Bankruptcy Code, provided that obligations arising under confidentiality agreements, joint interest agreements, and protective orders entered during the Chapter 11 Cases shall remain in full force and effect according to their terms. The Statutory Committees may make applications for Professional Claims and members of the Statutory Committees may make requests for compensation and reimbursement of expenses pursuant to section 503(b) of the Bankruptcy Code for making a substantial contribution in any of the Chapter 11 Cases.  The Professionals retained by the Creditors' Committee and the respective members thereof shall not be entitled to compensation and reimbursement of expenses for services rendered after the Effective Date, except for services rendered in connection with challenges to any order confirming the Plan or any applications for allowance of compensation and reimbursement of expenses pending on the Effective Date or filed after the Effective Date and for the other duties and responsibilities of the Statutory Committees set forth in this Section and other services as may be requested by, the Debtors and the Reorganized Debtors shall pay the fees and expenses in respect of such services in the ordinary course of business without further order of the Bankruptcy Court.  This Section shall apply for all purposes and to all Debtors and their respective Estates under the Plan.

**14.7    Revocation, Withdrawal, Or Non-Consummation**.

(a)    **Right to revoke or withdraw.**  Each of the Debtors reserves the right to revoke or withdraw this Plan with respect to such Debtor at any time prior to the Effective Date.

(b)    **Effect of withdrawal, revocation, or non-consummation.**  If any of the Debtors revokes or withdraws this Plan as to such Debtor prior to the Effective Date, or if the Confirmation Date or the Effective Date does not occur, then this Plan, any settlement or compromise embodied in this Plan with respect to such Debtor or Debtors (including the fixing or limiting to an amount certain any Claim or Class of Claims with respect to such Debtor or Debtors, the effect of substantive consolidation for purposes under this Plan, or the allocation of the distributions to be made hereunder), the assumption or rejection of executory contracts or leases effected by this Plan with respect to such Debtor or Debtors, and any document or agreement executed pursuant to this Plan with respect to such Debtor or Debtors shall be null and void as to such Debtor or Debtors.  In such event, nothing contained herein or in the Disclosure Statement, and no acts taken in preparation for consummation of this Plan, shall be deemed to constitute a waiver or release of any Claims by or against such Debtor or Debtors or any other Person, to prejudice in any manner the rights of any such Debtor or Debtors, the holder of a Claim or Interest, or any Person in any further proceedings involving such Debtor or Debtors or to constitute an admission of any sort by the Debtors or any other Person.

**14.8    Notices**.  Any notice required or permitted to be provided to the Debtors, Creditors' Committee, GM, GMCo., and ^ Company Buyer shall be in writing and served by (a) certified mail, return receipt requested, (b) hand delivery, or (c) overnight delivery service, to be addressed as follows:

**If to the Debtors:**

Delphi Corporation
5725 Delphi Drive
Troy, Michigan 48098
Att'n:   David M. Sherbin
          General Counsel

with a copy to:

Skadden, Arps, Slate, Meagher &
   Flom LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois  60606
Att'n:   John Wm. Butler, Jr.
          Ron E. Meisler

– and –

Skadden, Arps, Slate, Meagher &
   Flom LLP
Four Times Square
New York, New York 10036
Att'n:   Kayalyn A. Marafioti

**If to the Creditors' Committee:**

Latham & Watkins LLP
885 Third Avenue, Suite 1000
New York, New York 10022-4834
Att'n:   Robert J. Rosenberg
          Mitchell A. Seider
          Mark A. Broude

**If to ^ GM or GMCo.:**

General Motors Corporation
300 GM Renaissance Center
Detroit, Michigan 48265
Attn:  General Counsel

with a copy to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York  10153
Att'n:  Jeffrey L. Tanenbaum
        Robert J. Lemons

**If to ^ Company Buyer:**


^ DIP Holdco 3, LLC
^ c/o Elliott Management Corporation
712 Fifth Avenue
New York, New York ^ 10019


With a copy to:


Silver Point Capital, L.P.
Two Greenwich Plaza
Greenwich, Connecticut 06830
Attn:^  Michael Gatto
^
 With a copy to:


Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, New York 10019
Attn:  Marc A. Abrams
        Maurice M. Lefkort


and

Dechert LLP
1095 Avenue of the Americas
New York, New York 10036
Attn:   Glenn E. Siegel
         Charles I. Weissman
         Scott M. Zimmerman


**14.9    Term Of Injunctions Or Stays**.  Unless otherwise provided herein or in the Confirmation Order or the Modification Approval Order, all injunctions or stays provided for in the Chapter 11 Cases under sections 105 or 362 of the Bankruptcy Code or otherwise, and extant on the Confirmation Date or the Modification Approval Date, shall remain in full force and effect until the Effective Date.


**14.10    Governing Law**.  Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York shall govern the construction and implementation of this Plan, any agreements, documents, and instruments executed in connection with this Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreements shall

72

control).  Corporate governance matters shall be governed by the laws of the state of incorporation
of the applicable Debtor.

       **14.11  No Waiver Or Estoppel**.  Upon the Effective Date, each holder of a Claim
or Interest shall be deemed to have waived any right to assert that its Claim or Interest should be
Allowed in a certain amount, in a certain priority, be secured, or not be subordinated by virtue of
an agreement made with the Debtors and/or their counsel, the Creditors' Committee and/or its
counsel, the Equity Committee and/or its counsel, or any other party, if such agreement was not
disclosed in this Plan, the Disclosure Statement, or papers filed with the Bankruptcy Court.

       **14.12  Conflicts**.  In the event that the provisions of the Disclosure Statement and
the provisions of the Plan conflict, the terms of this Plan shall govern.

Dated:     December 10, 2007

As Modified:  January 25, 2008
           June 16, 2009
           July 30, 2009
           Troy, Michigan

                    DELPHI CORPORATION AND THE AFFILIATE
                    DEBTORS


               By:__/s/ John D. Sheehan_____
                  John D. Sheehan
                  Vice President, Chief Financial Officer