FOLEY & LARDNER LLP
Victor A. Vilaplana (*admitted pro hac vice*)
Matthew J. Riopelle (*admitted pro hac vice*)
402 West Broadway, Suite 2100
San Diego, CA 92101
Telephone: (619) 234-6655
Facsimile: (619) 234-3510

FOLEY & LARDNER LLP
Jeffrey A. Soble (*admitted pro hac vice*)
321 North Clark Street, Suite 2800
Chicago, IL 60654-5313
Telephone: (312) 832-4500
Facsimile: (312) 832-4700

*Attorneys for Toyota Motor Corporation*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

```
-------------------------------------------------------------X
In re:                                        :        Chapter 11
                                              :
MOTORS LIQUIDATION COMPANY, et al.,           :        Case No. 09-50026 (REG)
     f/k/a General Motors Corp., et al.       :
                                              :        (Jointly Administered)
                              Debtors         :
                                              :
-------------------------------------------------------------X
```

## TOYOTA MOTOR CORPORATION'S MEMORANDUM OF LAW IN SUPPORT OF NEW UNITED MOTOR MANUFACTURING, INC'S RESPONSE TO DEBTORS' OBJECTION TO PROOF OF CLAIM 67357

# TABLE OF CONTENTS

**Page**

PROCEDURAL BACKGROUND............................................................................... 1

FACTUAL BACKGROUND..................................................................................... 4

I.      The NUMMI Joint Venture. ........................................................................ 4

II.     TMC's Claims Against MLC........................................................................ 6

        A.      TMC's VSA Claim ......................................................................... 6

                1.      TMC Honored Its Unique Contractual Obligation to Design
                        Vehicles for MLC. ............................................................... 6

                2.      MLC's Obligation to Purchase Pontiac Vibes Under the VSA and
                        2006 MOU. ........................................................................ 8

                3.      TMC's Research and Design Costs in Developing the Pontiac Vibe
                        for MLC. ........................................................................... 9

        B.      TMC's NUMMI Claim....................................................................... 10

III.    MLC's Abandonment of NUMMI................................................................. 10

ARGUMENT..................................................................................................... 11

I.      Standard of Review................................................................................ 11

II.     The NUMMI Joint Venture Creates a Special Relationship Between MLC and
        TMC.................................................................................................. 12

III.    TMC And NUMMI Are Entitled To Damages As A Result Of MLC's Breach Of
        The Requirements Contracts...................................................................... 13

        A.      The VSA and 2006 MOU Are Enforceable Contracts.......................... 13

        B.      MLC Breached the VSA and 2006 MOU........................................... 14

                1.      MLC Breached the VSA and 2006 MOU by Rejecting Them. ............... 14

                2.      MLC Breached the VSA and 2006 MOU by Cancelling the
                        Purchase of Pontiac Vibes. ................................................... 14

                3.      MLC Breached the Best Efforts Clause of the 2006 MOU. ............... 19

        C.      TMC Performed Its Contractual Obligations.................................... 20

        D.      TMC and NUMMI Are Entitled to Recover Damages From MLC As A
                Result of its Breach............................................................... 20

IV.     MLC Breached The Covenant Of Good Faith And Fair Dealing...................... 22

        A.      The Contracts Contain An Implied Duty of Good Faith and Fair Dealing.......... 22

        B.      MLC Breached its Duty of Good Faith and Fair Dealing...................... 22

i

C.      TMC and NUMMI Are Entitled to Damages As A Result of MLC's Breach of its Duty of Good Faith and Fair Dealing.............................................. 23

V.      Promissory Estoppel Entitles TMC And NUMMI To Damages From MLC.................. 24

VI.     The Force Majeure Clause Does Not Excuse MLC's Breach. ........................................ 25

VII.    NUMMI Has Asserted that NUMMI Is Entitled To Recover Damages From MLC For Its Failure To Pay Its Share Of NUMMI's Wind Down Costs. ................................ 26

A.      MLC, As The Prior Owner of the NUMMI Plant, Is Liable for NUMMI's Environmental Clean Up Costs.................................................................... 26

B.      MLC, As A Substantial Shareholder of NUMMI, Is Liable for NUMMI's Workers' Compensation Liabilities. .................................................................... 27

CONCLUSION......................................................................................................................... 27

SDCA_1697183.7

# TABLE OF AUTHORITIES

**FEDERAL CASES**

*Amber Chem. Inc. v. Reilly Indus., Inc.*,
   No. 06-cv-6090, at *6 (E.D. Cal. Feb. 14, 2007) ..................................................24

*Ashcroft v. Iqbal*,
   - U.S. --, 129 S. Ct. 1937, 1949 (2009) ...........................................................11, 24

*Celador Int'l Ltd. v. Walt Disney Co.*,
   347 F.Supp 2d 846 (C.D. Cal. 2004) ..................................................................12

*Consortium Info. Svcs., Inc. v. Credit Data Svcs., Inc.*,
   149 F. App'x 575 (9th Cir. 2005) ........................................................................24

*In re Alper Holdings USA, Inc.*,
   398 B.R. 736 (S.D.N.Y. 2008) ............................................................................11

*In re Big V Holding Corp.*,
   267 B.R. 71, 11 0 (Bankr. D. Del. 2001) .............................................................23

*Nashville Lodging Co. v. Resolution Trust Corp.*,
   59 F.3d 236 (D.C. Cir. 1995) ..............................................................................21

*Rescuecom Corp. v. Google Inc.*,
   562 F.3d 123 (2d Cir. 2009) ................................................................................11

*Speakman v. Allmerica Fin. Life Ins.*,
   367 F. Supp. 2d 122 (D. Mass. 2005) ................................................................22

*Tri-State Generation and Transmission Ass'n, Inc. v. Shoshone River Power, Inc.*,
   874 F.2d 1346 (10th Cir. 1989) ................................................................. 14-16, 23

*U.S. Cellular Investment Co. v. GTE Mobilnet, Inc.*,
   281 F.3d 929 (9th Cir. 2002) ..............................................................................16

*Watson Labs, Inc. v. Rhone-Poulenc Rorer, Inc.*,
   178 F. Supp. 2d 1099 (C.D. Cal. 2001) ..............................................................25

*Weddington v. United Nat'l Ins., Co.*,
   No. 07-1733, 2008 U.S. Dist. LEXIS 15610 (N.D. Cal. February 29, 2008) .........................24

**STATE CASES**

*407 East 61st Garage, Inc. v. Savoy Fifth Ave. Corp.*,
   244 N.E. 2d 37 (N.Y. Ct. App. 1968) .......................................................... 22-23

i

*Benson v. Rhino Indus., Inc.*,
    No. A116543, 2008 Cal. App. .................................................................. 19-20

*Brandon & Tibbs v. George Kevorkian Accountancy Corp.*,
    277 Cal. Rptr. 40 (Cal. App. 1990) ...............................................................21

*Burgermeister Brewing Corp. v. Bowman*,
    38 Cal. Rptr. 597 (Cal. App. 1964) ...............................................................13

*Butler v. Nepple*,
    354 P.2d 239 (Cal. 1960) ...............................................................................25

*City of El Cajon v. El Cajon Police Officers' Assoc.*,
    56 Cal. Rptr. 2d 723 (Cal. Ct. App. 1996) ....................................................17

*Communale v. Traders & Gen. Ins. Co.*,
    328 P.2d 198 (Cal. 1958) ...............................................................................22

*Cooper v. State Farm Mut. Auto Ins. Co.*,
    99 Cal. Rptr. 3d 870 (Cal. App. 2009) ..........................................................24

*Copeland v. Baskin Robbins, U.S.A.*,
    96 Cal. App. 4th 1251 (Cal. App. 2002) ........................................................21

*Durell v. Sharp Healthcare*,
    108 Cal. Rptr. 3d 682 (Cal. Ct. App. 2010) ..................................................13

*Ellison v. City of San Buena Ventura*,
    122 Cal. Rptr. 167 (Cal. App. 1975) .......................................................... 25-26

*Garcia v. World Sav., FSB*,
    107 Cal. Rptr. 3d 683 (Cal. App. 2010) ........................................................24

*Gilmore v. Hoffman*,
    266 P.2d 833 (Cal. App. 1954) ......................................................................20

*Harm v. Frasher*,
    5 Cal. Rptr. 367 (Cal. App. 1960) .................................................................22

*Henry v. Weinman*,
    321 P.2d 117 (Cal. App. 1958) ......................................................................25

*Kashmiri v. Regents of Univ. of Cal.*,
    67 Cal. Rptr. 3d 635 (Cal. Ct. App. 2008) ....................................................18

*Ladd v. Warner Bros. Entm't, Inc.*,
    --- Cal. Rptr. 3d ---, 2010 WL 2044878 (Cal. App. May 25, 2010) ...............22

ii

*McNeely v. Claremont Mgmt. Co.*,
    27 Cal. Rptr. 87 (Cal. Ct. App. 1962) ..................................................................................18

*Midland Pacific Bldg. Corp. v. King*,
    68 Cal. Rptr. 3d 499 (Cal. App. 2007) ...............................................................................13

*Miranda v. Williams*,
    No. F054365, 2008 WL 4636445 (Cal. App. Oct. 21, 2008) ..............................................26

*Montoya v. Shah*,
    2010 WL 709131 (Cal. App. March 02, 2010) ....................................................................21

*Oakland Raiders v. Nat'l Football League*,
    32 Cal. Rptr. 3d 266 (Cal. Ct. App. 2005) .........................................................................12

*Shea-Kaiser-Lockheard-Healy v. Dep't of Water and Power of City of Los Angeles*,
    140 Cal. Rptr. 884 (Cal. App. 1977) ............................................................................ 13-14

*Simcala, Inc.* v. *Am. Coal Trade, Inc.*,
    821 So. 2d 197, 203 (Ala. 2001) .........................................................................................18

*Spinks v. Equity Residential Briarwood Apartments*,
    90 Cal. Rptr. 3d 453 (Cal. Ct. App. 2009) .................................................................... 16-17

*Storek & Storek, Inc. v. Citicorp Real Estate, Inc.*,
    122 Cal. Rptr. 2d 267 (Cal. App. 2002) ..............................................................................22

*Thompson v. Friendly Hills Reg'l Med. Ctr.*,
    84 Cal. Rptr. 2d 51 (Cal. App. 1999) ..................................................................................23

*Toscano v. Greene Music*,
    124 Cal. App. 4th 685 (Cal. App. 2004) ..............................................................................25

*US Ecology, Inc. v. State of California*,
    111 Cal. Rptr. 2d 689 (Cal. App. 2001) ..................................................................... 13-14, 20

*Van Hook v. S. Cal. Waiters Alliance, Local 17*,
    323 P.2d 212 (Cal. App. 1958) ............................................................................................24

*Wolf v. Superior Court of Los Angeles County*,
    130 Cal. Rptr. 2d 860 (Cal. Ct. App. 2003) ........................................................................13

## REGULATORY CASES

*In re General Motors Corp.*,
    103 F.T.C. 374 (1984) ................................................................................................... 5, 12

SDCA_1697183.7

## FEDERAL STATUTES

11 U.S.C. § 365(g ......................................................................................................11

11 U.S.C. § 502(g) .....................................................................................................14

11 U.S.C. § 1109 ...................................................................................................... 1-3

42 U.S.C. 9607(a)(2) .................................................................................................26

## STATE STATUTES

Cal. Civ. Code § 1550 ...............................................................................................13

Cal. Civ. Code § 1636 ...............................................................................................16

Cal. Civ. Code § 1638 ...............................................................................................17

Cal. Civ. Code § 1641 ...............................................................................................17

Cal. Com. Code § 2306(1) .............................................................................13-14, 18-19

Cal. Labor Code § 3300 .............................................................................................21

Cal. Labor Code § 3717(b) ........................................................................................27

## RULES

Fed. R. Bankr. P. 3001(f) ..........................................................................................11

Fed. R. Civ. P. 12(b)(6)...........................................................................3, 11, 21, 24, 25,27

Fed. R. Civ. R. 8(a)(2) ..............................................................................................11

SDCA_1697183.7

Toyota Motor Corporation ("TMC"), by its attorneys, hereby submits, pursuant to Section 1109(b) of Title 11 of the United States Code (the "Bankruptcy Code"), this Memorandum of Law ("Memorandum") In Support of New United Motor Manufacturing, Inc.'s Response to Debtors' Objection to Proof of Claim 67357 ("NUMMI's Response").  In support of its Memorandum, TMC states as follows:

## PROCEDURAL BACKGROUND

1.    On June 1, 2009, Motors Liquidation Company (f/k/a General Motors Corporation) ("MLC") filed bankruptcy under Chapter 11 of the Bankruptcy Code.  On July 10, 2009, after obtaining Court approval, MLC sold substantially all of its assets to General Motors, LLC ("New GM").  MLC's fifty percent (50%) interest in New United Motor Manufacturing, Inc. ("NUMMI") was not included in the sale to New GM.  Instead, MLC retained its interest in NUMMI to evade its obligations to NUMMI and avoid transferring those liabilities to New GM.

2.    Among its claims against MLC, TMC timely filed Proofs of Claim against MLC for: (i) certain costs incurred by TMC related to the wind down of NUMMI as required under the Shareholders' Agreement between TMC, MLC and NUMMI ("TMC's NUMMI Claim") and (ii) certain research and development costs rendered unrecoverable as a result of MLC's decision to walk away from its contractual obligations to TMC and NUMMI and reject the Vehicle Supply Agreement ("VSA"), attached hereto as Exhibit "A", and the 2006 Memorandum of Understanding ("2006 MOU"), attached hereto as Exhibit "B", ("TMC's VSA Claim", together with TMC's NUMMI Claims, the "TMC Claims")[1].

---

[1] TMC timely filed Proofs of Claim for damages under the VSA and the 2006 MOU.  On or about July 30, 2010, TMC filed an amended and consolidated proof of claim for the VSA and 2006 MOU.  The amended and consolidated proof of claim is referred to herein as the VSA Proof of Claim and is attached hereto as Exhibit "C".

1

3.      On November 24, 2009, NUMMI filed a proof of claim against MLC for Five Hundred Million Dollars ($500,000,000) to recover certain wind down costs and capital expenditures that NUMMI incurred in reliance on MLC's commitments under the various agreements executed by and between NUMMI, MLC and TMC ("NUMMI's Claim").  On April 1, 2010, MLC filed the Debtors' Objection to Proof of Claim 67357 Filed by NUMMI (the "MLC Objection") requesting that the Court enter an order disallowing and expunging NUMMI's Claim.  The hearing on the MLC Objection is scheduled for November 9, 2010 at 9:45 a.m. before this Court.

4.      The issues raised in the MLC Objection and in NUMMI's Response could drastically affect TMC's Claims against MLC.  NUMMI's Claim involves an interpretation of many of the same contracts as TMC's Claims.  Therefore, pursuant to § 1109(b) of the Bankruptcy Code, TMC files this Memorandum in support of NUMMI's Response to address the legal arguments that directly affect TMC's Claims against MLC.[2]  *See* 11 U.S.C. § 1109(b) ("A party in interest, including … a creditor … may raise and may appear and be heard on any issue in a case under this chapter.").  TMC urges the Court to overrule the MLC Objection and either allow NUMMI's (and TMC's) Claims in full or set the matter for a full and fair trial as a contested matter under the Part 9 Rules of the Federal Rules of Bankruptcy Procedure to hear and determine the critical legal and factual issues in dispute.

---

[2] On October 18, 2010, counsel for TMC and MLC spoke regarding MLC's Objection.  MLC's counsel informed TMC's counsel that MLC did not object to TMC filing a brief in support of NUMMI in advance of the hearing on the MLC Objection pursuant to Section 1109 of the Bankruptcy Code, nor did MLC object to TMC's counsel appearing and arguing in support of NUMMI (and TMC) at the hearing on the MLC Objection.  As a courtesy, on November 2, 2010, TMC's counsel provided language to MLC's counsel memorializing MLC's non-objection to TMC's filing and appearance at the hearing.  On November 4, 2010, MLC's counsel changed its position and informed TMC's counsel that MLC does not take any position regarding TMC's filing and/or appearance at the hearing.

SDCA_1697183.7

5.    MLC understands that the issues in NUMMI's Claim and TMC's Claims are intertwined.    In fact, MLC specifically requested that TMC's counsel attend settlement negotiations with MLC and NUMMI.    It was MLC's position that TMC was essential to those settlement negotiations because of how the issues related to TMC's Claims and NUMMI's Claim overlapped.    Thus, at MLC's specific request, TMC's counsel flew to New York City and attended a negotiating session with counsel for MLC and NUMMI.    The triparte negotiations were unsuccessful.    TMC asked MLC if MLC would separately negotiate TMC's Claims.    MLC refused and all parties agreed that it would be necessary to proceed to a hearing on the MLC Objection.    After the conclusion of the settlement negotiations in August, TMC expected that MLC would object to TMC's Claims and schedule a joint hearing on MLC's objections to the claims of TMC and NUMMI.    However, an objection was never filed.

6.    Approximately five weeks prior to the hearing on the MLC Objection, counsel for TMC asked MLC's counsel if MLC would include TMC's Claims in the upcoming hearing on the MLC Objection.    After two weeks of "internal discussions" MLC's counsel informed TMC's counsel that MLC would not file an objection to TMC's Claims.    To date, MLC has not objected to TMC's Claims; therefore, TMC's Claims constitute allowed claims against the estate.    However, TMC anticipates an objection from MLC and given the similarities between TMC's Claims and NUMMI's Claim, as recognized by TMC, NUMMI *and MLC*, TMC's appearance in support of NUMMI's Claim is necessary.

7.    As set forth below, the MLC Objection, which is equivalent to a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure ("FRCP"), should be denied and the claims of NUMMI – and TMC – should be allowed in full or, at a minimum, entitled to full hearings and adjudication of their claims.

3

## FACTUAL BACKGROUND[3]

I.     **The NUMMI Joint Venture.**

8.     NUMMI is a unique joint venture between two major automotive companies: MLC and TMC.  MLC and TMC agreed to establish NUMMI as an equally owned joint venture to manufacture MLC (and later TMC) vehicles in an old MLC plant in Fremont, California.  The parties memorialized their joint venture agreement in a Memorandum of Understanding executed on February 17, 1983 (the "1983 MOU").  *See* Ex. "D".  The 1983 MOU provided the foundation for NUMMI, which ultimately manufactured millions vehicles for MLC and provided MLC (and New GM) with billions of dollars of institutional knowledge prior to MLC's decision to abandon its obligations as a joint venture partner to TMC and NUMMI.

9.     In February 1984, TMC and MLC implemented the 1983 MOU by entering into a Shareholders' Agreement, as amended, originally dated February 21, 1984 (the "SHA") and various other organizational documents for the NUMMI joint venture.  *See* Ex. "E".  Both companies made significant initial contributions to NUMMI: MLC contributed its Fremont plant and TMC contributed $100 million in cash.  NUMMI Resp. ¶¶ 10-11.  On December 18, 1984, a yellow Chevrolet Nova became the first MLC vehicle manufactured by NUMMI.

10.     TMC's contributions to NUMMI went beyond simple cash.  As detailed in the 1983 MOU and the VSA, TMC agreed to design vehicles for NUMMI to manufacture.  Between 1984 and 1986, NUMMI exclusively manufactured TMC designed cars that NUMMI sold to MLC, and that MLC in turn sold to customers as MLC badged Chevrolet Novas.  Beginning in 1986, NUMMI also began manufacturing the Toyota Corolla FX for TMC.  More recently,

---

[3] In NUMMI's Response, NUMMI provides a detailed history of NUMMI and the relationship between the parties. *See* NUMMI Resp. ¶¶ 7-34.

4

NUMMI manufactured the Pontiac Vibe and Toyota Corolla.  Over the past 25 years, MLC has sold almost two million cars badged under its various brands that that TMC designed and NUMMI manufactured.  NUMMI Resp. ¶ 9.

11.    NUMMI's purpose was "not just to produce cars."  NUMMI Resp. ¶ 9.  The NUMMI venture "was designed as a way for MLC to learn [Toyota's] manufacturing methods from TMC."  *Id*.  In fact, the Federal Trade Commission ("<u>FTC</u>"), in its final approval of the NUMMI joint venture, noted that TMC and MLC's joint venture "promises substantial benefits for American consumers, for American labor, and for the American manufacturing sector in general."  *In re General Motors Corp.*, 103 F.T.C. 374 (1984) (Douglas, G., concurring). Ultimately, MLC's involvement was "'positive[,]' 'beneficial' and lucrative'" and resulted in MLC gaining "'billions of dollars worth of learnings [sic]' from NUMMI."  NUMMI Resp. ¶¶ 9, 20.  NUMMI became an award winning plant, producing high quality vehicles for MLC.  In addition, NUMMI became a training ground for MLC's managers and executives who studied the Toyota manufacturing system in place at NUMMI.  The knowledge, experience and business acumen that MLC gained from TMC through this joint venture is priceless and was spread to all of MLC's (and now New GM's) manufacturing facilities.  NUMMI ¶ 9, 20.  Thus, for over 25 years, TMC and MLC operated NUMMI as a joint venture.

12.    In 2006, MLC committed to purchasing at least 65,000 Pontiac Vibes per year from NUMMI pursuant to the 2006 MOU.  NUMMI Resp. ¶ 21.  In reliance on MLC's promise in the 2006 MOU, TMC and NUMMI spent hundreds of millions of dollars in research, design, equipment, machinery and tooling to design and manufacture the Pontiac Vibe.  NUMMI Resp. ¶ 16.  As detailed below, MLC's decision to cease ordering the Vibe left NUMMI with over $120 million of unrecoverable capital expenditures and TMC with over $73 million of unrecoverable

5

research and development expenditures that never would have been spent if MLC had not executed the 2006 MOU. NUMMI Resp. ¶ 22. Moreover, MLC's failure to work with NUMMI and TMC to seek alternatives to the Pontiac Vibe and its ultimate decision to "withdraw from NUMMI" necessitated the wind down of NUMMI. NUMMI Resp. ¶¶ 31, 32 ("With MLC's withdrawal, one of NUMMI's 50 percent owners had abandoned it and it was no longer a viable joint venture ... its collaborative production and allocation procedures needed to be replaced.").

## II.    TMC's Claims Against MLC.

### A.    TMC's VSA Claim

#### 1.    TMC Honored Its Unique Contractual Obligation to Design Vehicles for MLC.

13.    Between 1983 and 2009, TMC, MLC and NUMMI entered into numerous contracts regarding the parties' obligations. The contracts memorialized TMC's agreement to design, in consultation with MLC, MLC badged vehicles to be manufactured by NUMMI. From the first Chevrolet Nova to the last Pontiac Vibe, TMC designed and collaborated with MLC on each vehicle that MLC purchased from NUMMI.

14.    The various agreements reflect the unique relationship between the parties. Moreover, the contracts demonstrate that the relationship between TMC, MLC and NUMMI was not a typical customer-supplier relationship in the automotive industry. As specified below, TMC invested hundreds of millions of dollars to design vehicles for MLC, MLC collaborated with TMC and knew that TMC was investing hundreds of millions of dollars for MLC's benefit, and MLC approved of TMC's continued expenditures through 2012 in the 2006 MOU.

15.    The 1983 MOU contains the first recitation of the unique relationship between TMC and MLC:

> The vehicle to be manufactured by the JV will be derived from Toyota's new front-wheel drive Sprinter. Body styles will include

6

a 4-Door Sedan and (6-12 months later) a 5-Door Liftback. **Toyota will retain design authority over the vehicle, in consultation as to vehicle appearance with GM, the purchaser.** As modifications will probably be made to the Sprinter or Corolla over time in accordance with market demand.  Toyota will effect similar changes to the JV vehicles **if such changes are deemed desirable by the parties**.  (1983 MOU at pgs. 1-2.) (emphasis added)

16.    After incorporating NUMMI, TMC and MLC memorialized their collaborative joint venture relationship in the founding contracts, including the VSA:

As Modifications will probably be made to the "Sprinter" or "Corolla" over time in accordance with market demand, Toyota will effect similar changes in the design of the Vehicles **if such changes are deemed desirable by the parties**.  (VSA at § 3.3(a).) (emphasis added)

Toyota will present to the **JV Company** the plan for any Modifications, Specification Changes or model changes concerned. **The JV Company will thereafter submit to and negotiate with GM the planned Modifications, Specification Changes or model changes** together the planned price changes.  (VSA at § 3.3(c).) (emphasis added)

Toyota has previously **furnished to GM preliminary technical information and specifications for the initial Vehicle** … to be manufactured by the **JV Company** to GM.  (VSA at § 3.1.) (emphasis added)

17.    The February 21, 1984 Vehicle License Agreement, as amended, by and between TMC, MLC, and NUMMI ("<u>VLA</u>") demonstrates that the relationship between TMC and MLC vis-à-vis each other and vis-à-vis NUMMI goes well beyond the typical customer-supplier agreements common in the automotive industry.  *See* Ex. "F".

During the Agreement Term **Toyota shall**, to the extent reasonably necessary for the manufacture of the Licensed Vehicles … **furnish the JV Company such technical information**, data and other like information which Toyota possesses at the time of this Agreement or may **hereafter develop or acquire** and which are within the categories identified in Annex A.  (VLA at § 2.1) (emphasis added)

7

18.     As recently as the 2006 MOU 2006, MLC reiterated the parties' distinctive relationship and the unique obligations to each other.  Moreover, MLC extended the parties' mutual obligations through the 2012 model year.

> It is understood that over the product lifecycle, product enhancements will be made.  **All changes of Vibe's specifications which are visible to the customer**, and/or which affect vehicle performance in such a manner that would be apparent to the customer, **must be discussed with estimated transfer price changes and agreed upon among the Parties prior to determination of implementation**.  (2006 MOU at § 4) (emphasis added)

> As for additional minor model changes to the Products, if any, the timing of them may be made as separately agreed upon among the Parties.  (2006 MOU at § 6)

19.     The common theme running throughout all of the agreements executed over the 25 years of NUMMI's existence is that TMC, MLC and NUMMI have a special relationship not common in the industry.  From inception, NUMMI was an exceptional collaboration among competitors.  The contracts demonstrate that the obligations between the parties run deeper than the customer-supplier obligations typical in the industry.  TMC, with MLC's collaboration and consent, fulfilled its obligations under the joint venture agreements resulting in the production of almost two million vehicles sold under MLC's brands and billions of dollars worth of institutional knowledge for MLC.  There is no doubt that MLC knew of, and explicitly approved, TMC's extensive research and development efforts undertaken for MLC's benefit.

### 2.     MLC's Obligation to Purchase Pontiac Vibes Under the VSA and 2006 MOU.

20.     The VSA and 2006 MOU detail MLC's commitment to purchase vehicles from NUMMI on a "continuous and stable basis."   VSA at § 4.1(b).   In the VSA, MLC "acknowledged that the JV Company is making substantial amounts of capital expenditures … relying on GM's present projection that market demand for the Vehicles will exceed 200,000 per

8

annum." VSA at § 4.1(b). Over the course of the joint venture, NUMMI began making cars for TMC, but retained its annual production goal of at least 200,000 vehicles. Pursuant to the 2006 MOU, MLC agreed to purchase "at least 65,000" Pontiac Vibes per year from NUMMI. 2006 MOU, § 1(3). As detailed in the NUMMI Response, MLC understood its obligations to NUMMI and upheld its commitments until mid-2009 when MLC abruptly elected to withdraw from NUMMI in June 2009. NUMMI Resp. ¶ 23. Despite its commitment to "ensure that NUMMI will remain viable," MLC stopped ordering Pontiac Vibes from NUMMI in August 2009. NUMMI Resp. ¶ 31; 2006 MOU at § 7.

### 3.    TMC's Research and Design Costs in Developing the Pontiac Vibe for MLC.

21.    In reliance on MLC's promise to purchase vehicles from NUMMI contained in the VSA and 2006 MOU, TMC actually incurred over $100 million in research and development costs for the Pontiac Vibe. Of those costs actually spent by TMC, $73.8 million were rendered uncollectable as a result of MLC's breach of the VSA and 2006 MOU. These costs included labor, subcontracting, and prototype production for the initial Vibe model and the 2011 minor-model changes. In addition, TMC incurred costs in the advanced prototype production of the chassis, body and engine design for multiple TMC designed vehicles, including the Pontiac Vibe. TMC paid for all of these hard costs prior to MLC's breach.

22.    TMC incurred these costs in reliance on MLC's contractual commitment to continue purchasing Pontiac Vibes from NUMMI. In fact, TMC's research and development costs would have been recovered from various agreements between NUMMI and TMC, including the royalty paid by NUMMI pursuant to the VLA, had MLC not breached the contract to TMC and NUMMI. Instead, MLC breached the VSA and 2006 MOU leaving TMC with only the TMC Claims for the uncollectable research and development costs.

### B.    TMC's NUMMI Claim.

23.    In addition to leaving TMC with over $73 million of unrecoverable research and development costs, MLC also refused to support NUMMI's wind down despite contractual obligations to do so.  In particular, MLC shirked its legal responsibilities to pay its share of NUMMI's workers' compensation and environmental liabilities attributable to NUMMI's shareholders.  In fact, MLC has tried to impede NUMMI's wind down by taking adverse positions regarding NUMMI's asset sales.

24.    As a result of MLC's abandonment of NUMMI and the transfer of billions of dollars of institutional knowledge to New GM without any consideration to TMC or NUMMI, TMC's and NUMMI's sole recourse against MLC for the breach of its contractual and statutory obligations to TMC and NUMMI is the filing of a proofs of claim in MLC's bankruptcy case. Yet, MLC was not satisfied to simply leave TMC and NUMMI with hundreds of millions of dollars of unrecoverable costs.  MLC filed the MLC Objection to NUMMI's Claim and is attempting to walk away from the NUMMI joint venture without any liability.  MLC could not escape liability for these obligations outside of bankruptcy and, thus, it cannot escape paying a pro rata distribution with all other the general unsecured creditors of MLC.

## III.    MLC's Abandonment of NUMMI.

25.    In the months leading up to MLC's bankruptcy, MLC misled NUMMI and TMC by explaining that it "remain[ed] committed to our partnership and NUMMI joint venture." NUMMI Resp. ¶ 25.  Moreover, MLC informed NUMMI that it was considering terminating the Pontiac brand and it wanted to "'pull together contingency plans in the event the Pontiac brand is discontinued.'"  *Id.*  Notwithstanding its prior commitments, on June 26, 2009, MLC reversed course and announced that it intended to withdraw from NUMMI and cease purchasing vehicles from NUMMI in August, 2009.  NUMMI Resp. ¶ 31.  On August 17, 2009, the final Pontiac

10

Vibe was produced, becoming the last MLC vehicle to be manufactured at NUMMI. In electing to abandon NUMMI, MLC also abandoned NUMMI's 4,500 workers and a countless number of suppliers and regional businesses that depended on NUMMI. NUMMI Resp. ¶ 33. This was a *purely* economic decision by MLC. MLC Obj. ¶¶ 28 – 30.

## ARGUMENT

### I.      Standard of Review.

26.      A proof of claim filed in accordance with the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules") constitutes *prima facie* evidence of the validity and amount of the claim. Fed. R. Bankr. P. 3001(f). An objection to a proof of claim under Section 502 of the Bankruptcy Code is "equivalent to dismissing a claim under Fed. R. Civ. P. 12(b)(6)." *In re Alper Holdings USA, Inc.*, 398 B.R. 736, 748 (S.D.N.Y. 2008). Under FRCP 8(a)(2), a compliant must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). As explained in *Ashcroft v. Iqbal*, "to survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." -- U.S. --, 129 S. Ct. 1937, 1949 (2009). The Court must accept the factual allegations in the complaint as true and "draw inference from those allegations in the light most favorable to plaintiff, and construe the complaint liberally." *Rescuecom Corp. v. Google Inc.*, 562 F.3d 123, 127 (2d Cir. 2009) (internal quotations and citations omitted). Both TMC's Claims and NUMMI's Claim contain ample factual allegations to state a claim for relief against MLC. Accordingly, MLC's Objection should be denied.

11

## II.    The NUMMI Joint Venture Creates a Special Relationship Between MLC and TMC.

27.    Under California law[4], the existence of a joint venture gives rise to a special or fiduciary relationship between the joint venturers.  *See Oakland Raiders v. Nat'l Football League*, 32 Cal. Rptr. 3d 266, 273-74 (Cal. Ct. App. 2005); *Celador Int'l Ltd. v. Walt Disney Co.*, 347 F.Supp 2d 846, 853 (C.D. Cal. 2004).  NUMMI is a joint venture between TMC and MLC from which MLC has reaped immense benefits.  As noted by the FTC, the three principal benefits of the NUMMI joint venture are:  (1) an "increase the total number of small cars available in America, thus allowing consumers a greater choice at lower prices, despite present restrictions on Japanese imports;" (2) "the joint venture car will cost less to produce than if GM were forced to rely immediately on some other production source;" and (3) "the joint venture offers a valuable opportunity for GM to complete its learning of more efficient Japanese manufacturing and management techniques."  103 F.T.C. 374 (Miller III, J., concurring).  The FTC added "to the extent the [joint] venture demonstrates the Japanese system can be successfully adapted to the United States, the venture should lead to the development of a more efficient and competitive U.S. industry.  Evidence obtained during the Commission's investigation persuasively establishes that a successful experiment at [NUMMI] could serve as a predicate for other domestic auto makers and their unionized employees to work out similar flexibility in work rules and practices."  *Id*.

28.    As TMC's joint venture partner, MLC has a "special relationship" with TMC that is unlike routine customer-supplier relationships in the automotive industry.  32 Cal. Rptr. 3d at 273-74.  This fiduciary relationship between "joint adventurers" holds the parties "to something

---

[4] Pursuant to Section 7.6 of the VSA, the VSA is governed under California law.

SDCA_1697183.7

*stricter than the morals of the market place*. Not honesty alone, but the *punctilio of an honor* the most sensitive is then the standard of behavior." *Wolf v. Superior Court of Los Angeles County*, 130 Cal. Rptr. 2d 860, 863-64 (Cal. Ct. App. 2003) (emphasis added). As a result of the NUMMI joint venture, TMC and MLC forged a special relationship, stricter than the morals of the market, that must be upheld and enforced.

## III.    TMC And NUMMI Are Entitled To Damages As A Result Of MLC's Breach Of The Requirements Contracts.

29.    The claims for breach of contract have been adequately pled. Under California law, a cause of action for breach of contract requires the following elements: (1) a contract; (2) plaintiff's performance or excuse for nonperformance; (3) defendant's breach; and (4) damages to plaintiff. *Durell v. Sharp Healthcare*, 108 Cal. Rptr. 3d 682, 697 (Cal. Ct. App. 2010). TMC's Claims and NUMMI's Claim provide sufficient factual allegations to support all four elements of a breach of contract action under California law.

### A.    The VSA and 2006 MOU Are Enforceable Contracts.

30.    The VSA and 2006 MOU are enforceable contracts. An enforceable contract requires the following elements: (1) parties capable of contracting; (2) their consent; (3) a lawful object; and (4) sufficient cause or consideration. Cal. Civ. Code § 1550; *see also* NUMMI Resp., ¶¶ 41, 46; Cal. Com. Code § 2306(1); *Shea-Kaiser-Lockheard-Healy v. Dep't of Water and Power of City of Los Angeles*, 140 Cal. Rptr. 884, 888-90 (Cal. App. 1977) (quantity estimate enforceable). Here, all four elements are satisfied.

31.    Further, the best efforts clause in the 2006 MOU is enforceable. NUMMI Resp., ¶ 41; *Midland Pacific Bldg. Corp. v. King*, 68 Cal. Rptr. 3d 499, 507 (Cal. App. 2007); *Burgermeister Brewing Corp. v. Bowman*, 38 Cal. Rptr. 597, 601 (Cal. App. 1964) (contractual requirement to use best efforts was enforceable); *see also US Ecology, Inc. v. State of California*,

13

111 Cal. Rptr. 2d 689, 707-08 (Cal. App. 2001) ("question whether a defendant used its best efforts under the circumstances is generally a factual issue").

**B.      MLC Breached the VSA and 2006 MOU.**

**1.      MLC Breached the VSA and 2006 MOU by Rejecting Them.**

32.      MLC rejected the VSA and 2006 MOU pursuant to the Eleventh Omnibus Motion to Reject Executory Contracts and Unexpired Leases and the Ninth Omnibus Motion to Reject Executory Contracts and Unexpired Leases, respectively. *See* Ex. "G" and "H". Pursuant to Section 365(g) of the Bankruptcy Code, the rejection of an executor contract "constitutes a breach of such contract." 11 U.S.C. § 365(g). Therefore, there can be no dispute that MLC breached the VSA and 2006 MOU.

33.      Upon rejection, the non-debtor parties are entitled to file a claim for rejection damages. 11 U.S.C. § 502(g). Here, TMC timely filed its Proofs of Claim for rejection damages under the VSA and 2006 MOU. *See* Ex. "C". While MLC may dispute the amount of damages TMC and NUMMI suffered, there can be no dispute that TMC and NUMMI suffered damages.

**2.      MLC Breached the VSA and 2006 MOU by Cancelling the Purchase of Pontiac Vibes.**

34.      Not only did MLC breach the VSA and 2006 MOU by virtue of the rejection, but MLC breached its obligation to purchase Pontiac Vibes under the VSA and the 2006 MOU by cancelling the purchase of Pontiac Vibes. NUMMI Resp. ¶ 46 ("MLC was obligated to purchase NUMMI's vehicles in quantities not 'unreasonably disproportionate to [that] estimate' for that time period."); *see also* Cal. Com. Code § 2306(1); *Shea-Kaiser-Lockheard-Healy*, 140 Cal. Rptr. at 888-90. The Tenth Circuit's opinion in *Tri-State Generation and Transmission Ass'n, Inc. v. Shoshone River Power, Inc.*, 874 F.2d 1346 (10th Cir. 1989) ("*Tri-State*"), is particularly instructive. In *Tri-State*, the defendant entered into a requirements contract with the plaintiff

14

whereby the defendant promised to purchase all of its power-electricity needs from the plaintiff co-operative. *Id.* at 1349. After the plaintiff built generation and transmission facilities and obtained loans to service its members' electricity needs, economic conditions dipped dramatically, leading to an oversupply of electric power and stagnant demand. *Id.* at 1350. The defendant thereafter attempted to sell its assets to a third-party, which would have effectively eliminated the defendant's purchase of electric power from the plaintiff. *Id.*

35.    In holding that the sale of the defendant's business constituted a breach of the requirements contract, the *Tri-State* court noted the inter-relatedness of the parties and that the plaintiff's investments were made in reliance on the defendant's commitment to purchase its electric power needs from the plaintiff. Although the contract did not forbid the defendant from terminating its business, the court stated that such an obligation was implied in the contract: "We believe that the promise to purchase requirements for a definite term . . . implies that Shoshone will remain in business and maintain requirements throughout the term of the contract, as long as there are sufficient members in Shoshone's system requiring electric power." *Id.* at 1356. The court explained further that the purpose of the contract would be frustrated if the defendant could simply walk away from its requirements promises:

> The parties obviously expected that Shoshone would continue purchasing electric power from Tri-State throughout the term of the contract so long as Shoshone had sufficient members requiring electric power. If Shoshone is able to eliminate its requirements by simply transferring its member subscriptions to Pacific, the contract cannot be carried out in the way it was expected. If Shoshone puts itself in a position in which it cannot carry out the all-requirements contract, it breaches the contract. *Id.* at 1357-58.

Finally, the court noted that because of the inter-relatedness of the parties, the defendant realized unique benefits that went beyond the purchase of electric power from the plaintiff, and that by selling its business, the defendant was not "sharing the burden that has come with the benefits it

15

has received under" the contract and the loan program that the parties were able to participate in as a result of their requirements contract. *Id*. at 1360.

36.    Likewise, as detailed herein (¶¶ 8-12, *supra*) and by NUMMI (NUMMI Resp. ¶ 20),  NUMMI was a unique joint venture between MLC and TMC which conferred upon MLC significant direct and indirect benefits.  Just as in *Tri-State*, TMC and NUMMI made significant investments in reliance on MLC's commitment to purchase Pontiac Vibes for a definite term. The purpose of NUMMI was frustrated (if not eviscerated) when MLC abandoned NUMMI. MLC cannot simply walk away from its obligations to NUMMI and TMC by terminating the Pontiac Vibe.  Instead, MLC must share the burden that has come with the benefits it has received under the VSA and the 2006 MOU.

37.    Moreover, MLC cannot rely on the language of Section 3 of the 2006 MOU[5] or Section 4.2 of the VSA[6] to escape its obligations to purchase Pontiac Vibes from TMC and NUMMI.  The primary goal of contract interpretation under California law is to "give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful."  Cal. Civ. Code § 1636; s*ee also U.S. Cellular Investment Co. v. GTE Mobilnet, Inc.*, 281 F.3d 929, 934 (9th Cir. 2002) (applying California law); *Spinks v. Equity*

---

[5] Section 3 of the 2006 MOU provides:  "The Parties understand that, assuming that 225,000 units of the Products are scheduled to be produced in a year, the Products will be allocated between TMC and GMC under the following formula, where each of TMC and GMC will have a right to, but not an obligation to, purchase the Products from NUMMI.

| | |
|---|---|
| TMC Corolla | at least 160,000 (71.11%) |
| GMC Vibe | at least 65,000 (28.89%)" |

[6] Section 4.2 of the VSA provides: "…each purchase and sale transaction between the JV Company and GM relating to the Products shall be governed by individual sales contracts, it being agreed within that context that the JV Company has no obligation to supply and GM has no obligation to purchase any Products until the parties enter such a contract."

16

*Residential Briarwood Apartments*, 90 Cal. Rptr. 3d 453, 469 (Cal. Ct. App. 2009).  If possible, the parties' intent is to be ascertained "solely from the language of the written contract." *Id.*; *see also* Cal. Civ. Code § 1638.  Here, the parties' intent was to establish a continuous and stable joint venturer to supply vehicles and permit flexibility to account for changing market demand. The parties' intent is clear from the language of the VSA and 2006 MOU: MLC is obligated to purchase Pontiac Vibes from NUMMI through 2012.  The VSA recites MLC's commitment to purchase vehicles from NUMMI on a "continuous and stable basis."  VSA at § 4.1(b).  Under the 2006 MOU, MLC agreed to purchase "at least 65,000" Pontiac Vibes per year from NUMMI and to "ensure that NUMMI will remain viable."  2006 MOU at §§ 1(3) & 7.  Also, under the VSA, MLC "acknowledged that the JV Company is making substantial amounts of capital expenditures … relying on GM's present projection that market demand for the Vehicles will exceed 200,000 per annum."  VSA at § 4.1(b).  Although the express terms of the VSA and 2006 MOU provide MLC with some flexibility in its purchasing, they do not give MLC sole discretion to purchase any chosen number of Pontiac Vibes.  Any other interpretation would lead to an absurd result, and, thus, would be contrary to California law.

38.    An interpretation of Section 3 of the 2006 MOU and Section 4.2 of the VSA that permits MLC to escape its commitments under these contracts would also render the above quoted language meaningless.  Under California law, the "whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other."  Cal. Civ. Code § 1641.  "An interpretation which renders part of the instrument to be surplusage should be avoided."  *City of El Cajon v. El Cajon Police Officers' Assoc.*, 56 Cal. Rptr. 2d 723, 727 (Cal. Ct. App. 1996).  Here, an interpretation that permits MLC to terminate the Vibe would render many provisions of the VSA and 2006 MOU (not to mention

17

the entire NUMMI joint venture) surplusage. Thus, such an interpretation should be avoided. Instead, the Court should find that the language of the VSA and 2006 MOU provided MLC with the necessary flexibility to deal with the typically elastic demand of the automobile industry.

39.     California law also adopts the "well recognized rule . . . that where a general and a particular provision of a written instrument are inconsistent, the particular controls the general." *McNeely v. Claremont Mgmt. Co.*, 27 Cal. Rptr. 87, 89 (Cal. Ct. App. 1962); *see also Kashmiri v. Regents of Univ. of Cal.*, 67 Cal. Rptr. 3d 635, 654 (Cal. Ct. App. 2008). Here, 2006 MOU provides that MLC will purchase "at least 65,000 Pontiac Vibes." This language is definite and specific. In contrast, Section 3 of the 2006 MOU and Section 4.2 of the VSA are far more general. Because, under California law, the specific term controls, MLC breached its obligation to purchase Pontiac Vibes from NUMMI.

40.     Lastly, Section 3 of the 2006 MOU and Section 4.2 of the VSA do not provide MLC with a defense for its breach for the following reasons. First, MLC and TMC, as joint venture partners have a special relationship that is stricter than the morals of the market. *See ¶ 28, supra*. Therefore, MLC cannot simply ignore its obligations to purchase Pontiac Vibes by and cancelling all orders. Second, MLC, as a party to the contracts, cannot order a "quantity unreasonably disproportionate to any stated estimate." Cal. Comm. Code §2306(1). It is undisputable that ordering **zero** Pontiac Vibes is "unreasonably disproportionate" to the stated requirement that MLC would order "at least 65,000" Pontiac Vibes that MLC agreed to purchase under the 2006 MOU. In *Simcala, Inc.* v. *Am. Coal Trade, Inc.*, the Alabama Supreme Court, interpreting the same provision of the Alabama Commercial Code, held that unreasonably disproportionate decreases of orders under a requirements contract constituted a breach, regardless of whether the breaching party acted in good faith. 821 So. 2d 197, 203 (Ala. 2001).

18

Third, MLC's decision to terminate the Pontiac Vibe and MLC's failure to work with TMC and NUMMI to find a suitable replacement was not in good faith. As detailed in the Comment 2 to Section 2306 of the California Commercial Code, "A shut-down by a requirements buyer for lack of orders might be permissible when a *shut-down merely to curtail losses would not*." It is indisputable that MLC's termination of the Pontiac Vibe was merely to curtail its losses.

### 3.    MLC Breached the Best Efforts Clause of the 2006 MOU.

41.    MLC also breached its obligations under the best efforts clause of the 2006 MOU by failing to work with NUMMI and TMC to rebrand the Vibe or order an alternative vehicle which would keep NUMMI's annual manufacturing volume above the target of 225,000 cars. NUMMI Resp. ¶¶ 17, 21, 40-41. Despite MLC's statements to NUMMI that it "'remain[ed] committed to our partnership and NUMMI joint venture'" MLC elected to cease purchasing Pontiac Vibes and abandon NUMMI and TMC. NUMMI Resp. ¶ 25. MLC's decision to allocate its resources and efforts to focus on other lines of vehicles cannot comport with its obligations to use its "best efforts" to ensure NUMMI's continued viability. *Benson v. Rhino Indus., Inc.*, No. A116543, 2008 Cal. App. Unpub. LEXIS 3358 (Cal App. April 23, 2008).

42.    In *Benson*, the Court of Appeals sustained a bench trial finding of breach of a contractual promise to use its "best efforts to ensure reasonable growth in sales of the PRO-TRAK line of products" where the defendant did not use its advertising networks to promote the PRO-TRAK line, pulled employees off of the PRO-TRAK line, assigning them to more successful products, and closed the facility that had primary responsibility for manufacturing the PRO-TRAK line. *Id.* at *10-11. Rejecting the defendant's arguments that it had abandoned the PRO-TRAK line because it was unprofitable, the court instead found that "the real reason for its abandonment appears to be a decision by Rhino to **focus its energy and resources on other more profitable products**." *Id.* at *12 (emphasis added). This allocation of resources was

19

incompatible with a contractual promise to exercise its best efforts towards the promotion of the

PRO-TRAK product.  *Id.* at n.1 ("California courts have repeatedly enforced contracts with 'best

efforts' clauses"); s*ee also Gilmore v. Hoffman*, 266 P.2d 833, 837 (Cal. App. 1954).

43.    Just as in *Benson*, MLC abandoned the Pontiac Vibe and NUMMI to focus its

energy and resources on more profitable products.  Moreover, MLC's half-hearted attempts to

"work" with TMC and NUMMI on a contingency plan for NUMMI failed to comply with the

best efforts clause of the 2006 MOU.  MLC failed to use its best efforts to achieve the annual

manufacturing volume necessary for NUMMI's survival and thus breached the best efforts

clause of the 2006 MOU.

44.    Of particular relevance to this action, the court in *US Ecology, Inc.* observed that

"whether a defendant used its best efforts under the circumstances is generally a factual issue."

111 Cal. Rptr. 2d at 707.  Thus, disallowance of NUMMI's claim is not appropriate at this stage

because factual issues cannot be determined at this stage of the objection process.  *See ¶* 26.

## C.    TMC Performed Its Contractual Obligations.

45.    As detailed in ¶¶ 13 – 19 *supra*, TMC performed is obligations under the 2006

MOU and the VSA.  TMC spent hundreds of millions of dollars in research and development for

the Pontiac Vibe manufactured by NUMMI and sold by MLC.  Only upon MLC's termination of

orders for future Pontiac Vibes did TMC stop its research and development for 2011 mid model

year change for the Pontiac Vibe.  Therefore, TMC performed its obligations under the contracts

and was excused from future performance as a result of MLC's breach.

## D.    TMC and NUMMI Are Entitled to Recover Damages From MLC As A Result of its Breach.

46.    In reliance on MLC's commitment in the 2006 MOU to purchase at least 65,000

Pontiac Vibes from NUMMI, TMC and NUMMI expended hundreds of millions of dollars to

research, design and manufacture the Pontiac Vibe for MLC. Had MLC fulfilled its contractual obligations, these costs would have been recovered by NUMMI and TMC. NUMMI Resp. ¶ 44; *see generally Nashville Lodging Co. v. Resolution Trust Corp.*, 59 F.3d 236, 250 (D.C. Cir. 1995) (plaintiff could recover expense incurred during the contractual relationship on account of defendant's promises); *Brandon & Tibbs v. George Kevorkian Accountancy Corp.*, 277 Cal. Rptr. 40 (Cal. App. 1990) (contract damages include those that are foreseeable).

47.    Additionally, Section 3300 of the California Civil Code, provides that the measure of damages for a breach of contract is "the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom." Cal. Civ. Code § 3300; *see also Copeland v. Baskin Robbins, U.S.A.*, 96 Cal. App. 4th 1251, 1262-63 (Cal. App. 2002). Reliance damages, such as those asserted by TMC and NUMMI are encompassed in the damages contemplated in Section 3300 of the California Civil Code. *Montoya v. Shah*, 2010 WL 709131, at *7 (Cal. App. March 02, 2010); *see also Nashville Lodging Co.*, 59 F.3d at 250 ("actual direct compensatory damages" include restitution damages). TMC actually spent hundreds of millions of dollars on the research and development of the Pontiac Vibe and future modifications to the Pontiac Vibe. MLC knew that TMC had (and continued to) incurred these costs as MLC approved and collaborated with TMC on the design of the Pontiac Vibes. Thus, TMC's research and development costs related to future Vibe models are clearly foreseeable, compensatory, reliance damages and MLC's breach entitles TMC and NUMMI to seek damages from MLC.

48.    As detailed above, the breach of contract claims against MLC contain sufficient factual allegations to overcome a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). Therefore, the MLC Objection must be denied.

## IV.    MLC Breached The Covenant Of Good Faith And Fair Dealing.

### A.    The Contracts Contain An Implied Duty of Good Faith and Fair Dealing.

49.    It is black letter law in California that MLC had an implied duty of good faith and fair dealing under the VSA and 2006 MOU.  NUMMI Resp. ¶ 55; *Communale v. Traders & Gen. Ins. Co.*, 328 P.2d 198, 200 (Cal. 1958); *Ladd v. Warner Bros. Entm't, Inc.*, --- Cal. Rptr. 3d ---, 2010 WL 2044878, at *5 (Cal. App. May 25, 2010) (implied covenant "finds particular application in situations where one party is invested with a discretionary power affecting the rights of another.  Such power must be exercised in good faith.") (quoting *Carma Developers (Cal.), Inc. v. Marathon Dev. Cal.*, 2 Cal. 4th 342 (Cal. 1992)); *Harm v. Frasher*, 5 Cal. Rptr. 367, 417 (Cal. App. 1960) (there "is implied in every contract a covenant by each party not to do anything which will deprive the other parties thereto of the benefits of the contract".)  Here, MLC was invested with discretionary power to affect the rights of TMC and NUMMI and yet MLC intentionally deprived TMC and NUMMI of the benefits under the contracts.  Thus, MLC had an implied duty of good faith and fair dealing.

### B.    MLC Breached its Duty of Good Faith and Fair Dealing.

50.    By misleading TMC and NUMMI about Vibe production commitments before unilaterally changing course, MLC breached its duty of good faith and fair dealing, creating a separate cause of action against MLC.  NUMMI Resp. ¶¶ 55-57; *see also Storek & Storek, Inc. v. Citicorp Real Estate, Inc.*, 122 Cal. Rptr. 2d 267, 283 n.15 (Cal. App. 2002) (rejecting the proposition that a breach of duty of good faith and fair dealing occurs only when a specific provision of the contract is breached).  In fact, courts routinely uphold claims for violations of the implied covenant of good faith and fair dealing, where a party to a requirements contract discontinues a line of business.  *See, e.g., Speakman v. Allmerica Fin. Life Ins.*, 367 F. Supp. 2d 122, 138 (D. Mass. 2005); *407 East 61st Garage, Inc. v. Savoy Fifth Ave. Corp.*, 244 N.E. 2d 37,

22

40 (N.Y. Ct. App. 1968) ("a promise to remain in business will be implied particularly where the promise has undertaken certain burdens or obligations in expectation of an[d] reliance upon the promisor's continued activity"). Here, TMC and NUMMI incurred significant research and development and capital expenditures in expectation and reliance on MLC's agreement to order 65,000 Pontiac Vibes per year from 2008 through 2012. Thus, MLC breached its duty of good faith and fair dealing by abandoning TMC and NUMMI.

51.     Moreover, as detailed in NUMMI's Response, MLC's refusal to perform under the requirements contract constitutes a breach of its duty of good faith and fair dealing and entitles TMC and NUMMI to recover research and development and capital expenditures, respectively, from MLC. NUMMI Resp. ¶¶ 55-57; *see also Tri-State*, 874 F.2d at 1360 (buyer could not discontinue a requirements contract where the seller incurred debt obligations to build facilities to meet the buyer's needs). Notably, in *In re Big V Holding Corp.*, the court required a withdrawing member of cooperative based on a requirements contract to "live up to its … obligations and if not, to compensate remaining members who bear the economic burden associated with a withdrawing member." 267 B.R. 71, 11 0 (Bankr. D. Del. 2001). The court explained that a requirement contract executed in connection with a joint venture required the defendant to fulfill its contractual duties because the "very purpose behind forming the [joint venture]" was to facilitate the requirements contract. *Id.* at 110. This is precisely the situation between TMC, NUMMI and MLC that MLC seeks to avoid.

## C.     TMC and NUMMI Are Entitled to Damages As A Result of MLC's Breach of its Duty of Good Faith and Fair Dealing.

52.     There can be no dispute that MLC's willful breach of the duty of good faith and fair dealing gives rise to damages. *See Thompson v. Friendly Hills Reg'l Med. Ctr.*, 84 Cal. Rptr. 2d 51, 53 (Cal. App. 1999). The factual allegations support the claims against MLC for breach

23

of the duty of good faith and fair dealing and "state a claim to relief that is plausible on its face." 129 S. Ct. at 1949.  Moreover, a breach of the duty of good faith and fair dealing is a question of fact and cannot be determined in the context of a motion to dismiss under FRCP Rule 12(b)(6). *See Weddington v. United Nat'l Ins., Co.*, No. 07-1733, 2008 U.S. Dist. LEXIS 15610 (N.D. Cal. February 29, 2008).

**V.    Promissory Estoppel Entitles TMC And NUMMI To Damages From MLC.**

53.    TMC and NUMMI are entitled to recover the uncollectable research and development costs and capital expenditures, respectively, under the doctrine of promissory estoppel.  NUMMI Resp. ¶¶ 58-61; *see also Van Hook v. S. Cal. Waiters Alliance, Local 17*, 323 P.2d 212, 221 (Cal. App. 1958), *Garcia v. World Sav., FSB*, 107 Cal. Rptr. 3d 683, 1040-41 (Cal. App. 2010); *Cooper v. State Farm Mut. Auto Ins. Co.*, 99 Cal. Rptr. 3d 870, 892 (Cal. App. 2009).  TMC, in consultation with MLC, designed almost two million vehicles that were sold under the badge of the various MLC brands.  For each of these vehicles, TMC had "design authority ... in consultation ... with GM."  1983 MOU at Pgs 1-2.  Further, the 2006 MOU provided that "all changes of Vibe's specifications which are visible to the customer ... must be discussed ... and agreed upon among the Parties prior to determination of implementation." 2006 MOU § 4.  Thus, there is no doubt that MLC was aware of and approved the extensive research and development costs incurred by TMC in the design of the Pontiac Vibe.

54.    Recovery under the doctrine of promissory estoppel is expressly permitted upon the breach of a requirements contract.  *Amber Chem. Inc. v. Reilly Indus., Inc.*, No. 06-cv-6090, at *6 (E.D. Cal. Feb. 14, 2007).  Furthermore, TMC's and NUMMI's reliance damages are the appropriate remedy for a promissory estoppel claim.  *Consortium Info. Svcs., Inc. v. Credit Data Svcs., Inc.*, 149 F. App'x 575, 577 (9th Cir. 2005) (applying California law) (the "usual remedy in promissory estoppel cases is enforcement of the promise, and the damages are measured by

24

the extent of the obligation assumed and not performed."); *see also Toscano v. Greene Music*, 124 Cal. App. 4th 685, 692-93 (Cal. App. 2004). Reliance damages are precisely what TMC seeks in its claim. TMC relied on the promises of MLC to continue to purchase Vibes from 2008 through 2012. Based on that reliance, TMC expended hundreds of millions of dollars in research and development to design a Vibe for MLC to sell. MLC's breach left TMC with $73 million of unrecoverable research and development costs.

55. Similar to the determination of whether MLC breached of the VSA and 2006 MOU or its duties of good faith and fair dealing, the determination of whether promissory estoppel exists is a question of fact. *See Henry v. Weinman*, 321 P.2d 117, 121 (Cal. App. 1958). Thus, a determination on a Rule 12(b)(6) motion to dismiss is inappropriate for this issue.

## VI.    The Force Majeure Clause Does Not Excuse MLC's Breach.

56. There was no force majeure. NUMMI Resp. at ¶ 49. Force majeure applies to unforeseen circumstances, such as "typhoons, citizens run[ning] amok, [or] Hannibal and his elephants at the gates." *Watson Labs, Inc. v. Rhone-Poulenc Rorer, Inc.*, 178 F. Supp. 2d 1099, 1111 (C.D. Cal. 2001) (citing *URI Cogeneration Partners, L.P. v. Bd. of Governors for Higher Educ.*, 915 F. Supp. 1267, 1287 (D.R.I. 1996)) ("*Watson Labs*"). Notably, *Watson Labs* explains that "California law requires (not 'permits') that each event claimed to be a 'force majeure' be beyond the control of the breaching party." 178 F. Supp. 2d at 1111 (citing *Nissho-Iwai Co., Ltd. v. Occidental Crude Sales, Inc.*, 729 F.2d 1530 (5th Cir. 1984)) (applying California Law).

57. Here, MLC made an economic decision to discontinue purchasing Vibes from NUMMI. MLC's economic decision was not beyond its own control. Moreover, economic impracticality is not sufficient to trigger a force majeure clause under California law. *See Butler v. Nepple*, 354 P.2d 239, 244-45 (Cal. 1960) (the "fact that compliance with his contract would involve greater expense than he anticipated would not excuse defendant."); *Ellison v. City of San*

25

*Buena Ventura*, 122 Cal. Rptr. 167, 173 (Cal. App. 1975) ( "[i]t is elemental that a person may not escape a voluntarily assumed contractual obligation merely because performance would be more expensive than contemplated unless it arises to the point of impossibility") (internal citation omitted); *Miranda v. Williams*, No. F054365, 2008 WL 4636445, at *3 (Cal. App. Oct. 21, 2008) ( "[t]he impossibility that excuses performance under a contract must be in the nature of the thing to be done and not in the inability of the promisor to do it. Mere unforeseen difficulty or expense does not constitute impossibility and ordinarily will not excuse performance").

58.      In short, MLC's force majeure defense is completely without merit. MLC's economic decision to terminate the Pontiac Vibe is not akin to "Hannibal and his elephants at the gates" and is not an excuse for MLC's breach.

## VII.    NUMMI Has Asserted that NUMMI Is Entitled To Recover Damages From MLC For Its Failure To Pay Its Share Of NUMMI's Wind Down Costs.

59.      In the NUMMI Response, NUMMI contends that MLC is liable for fifty percent of NUMMI's wind down deficit. Except as provided below, TMC takes no position on this issue and reserves all rights to assert its own arguments with respect to this contention.

### A.    MLC, As The Prior Owner of the NUMMI Plant, Is Liable for NUMMI's Environmental Clean Up Costs.

60.      MLC, as the prior owner of NUMMI's land and plant, is liable for environmental clean up costs required at the NUMMI plant as a result of MLC's dumping or disposal of hazardous substances at the plant while it was owned and operated by MLC. *See* 42 U.S.C. 9607(a)(2) ("any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of, … shall be liable for - all costs of removal or remedial action"). The environmental remediation costs constitute a potentially significant component of NUMMI's wind down costs and MLC, as a prior owner, is

26

obligated to pay those remediation costs. The facts regarding the potential environmental liability at NUMMI will require the parties to engage in factual investigations to determine the cause and timing of the pollution. Therefore, because determining the appropriate amount of NUMMI's Proof of Claim, which seeks wind down costs such as environmental remediation, will require a factual investigation and determination, NUMMI's Proof of Claim cannot be disallowed in a proceeding similar to a FRCP Rule 12(b)(6) motion to dismiss.

**B.** **MLC, As A Substantial Shareholder of NUMMI, Is Liable for NUMMI's Workers' Compensation Liabilities.**

61. MLC is liable for NUMMI's workers' compensation liabilities if NUMMI is unable to cover its workers' compensation costs. Pursuant to Section 3717 of the California Labor Code, if an employer fails to make the required workers' compensation and the California Department of Industrial Relations is required to make that employers' workers' compensation payments, the employer shall be jointly and severally liable for the payments with all substantial shareholders. A substantial shareholder is a shareholder who owns more than fifteen percent (15%) of the corporation. Cal. Labor Code § 3717(b). Thus, MLC, as a fifty percent (50%) shareholder of NUMMI, is jointly and severally liable with NUMMI and TMC for any unpaid workers' compensation payments.

## <u>CONCLUSION</u>

62. TMC's Claims and NUMMI's Claim constitute *prima facie* evidence of the validity of the claims. An objection to a proof of claim is analogous to dismissing a claim under FRCP Rule 12(b)(6). Thus, the MLC Objection to NUMMI's Claim must be overruled if NUMMI has stated a claim that is plausible on its face. NUMMI (and TMC) has so pled. Thus, the MLC Objection must be denied. Moreover, the following questions of fact cannot be determined in a motion to dismiss:

27

- The enforceability of the VSA and 2006 MOU (¶31, *supra*);

- MLC's breach of the best efforts clause of the 2006 MOU (¶44, *supra*);

- NUMMI's (and TMC's) damages as a result of MLC's breach (¶ 47, *supra*);

- MLC's breach of duty of good faith and fair dealing (¶ 52, *supra*);

- Existence of promissory estoppel (¶ 55, *supra*);

- The cause of (and liability for) any environmental damages at NUMMI caused while MLC owned the plant (¶ 60, *supra*).

At the very least, NUMMI should be given an opportunity to amend its claim, and TMC its claims, prior to any dismissal with prejudice.

63.     Over 25 years ago, MLC and TMC agreed to establish NUMMI, a ground breaking and unique joint venture for the benefit of both parties.   MLC reaped significant benefits from its joint venture with TMC, including billions of dollars of institutional knowledge that MLC transferred to New GM.   Despite accepting the benefits of the joint venture for over 25 years, MLC decided to shirk its responsibilities to TMC and NUMMI and is now objecting to NUMMI's Claim.   Collectively, TMC and NUMMI invested over $200 million in reliance of MLC's promise in 2006 to purchase 65,000 Pontiac Vibes per year from 2008 through 2012. MLC, without regard for the significant investments by TMC and NUMMI and its contractual obligations, abruptly ceased ordering Pontiac Vibes and left NUMMI and TMC holding the bag. Since MLC's bankruptcy TMC has provided NUMMI with hundreds of millions of dollars of support in cash and guaranties.   ***MLC has done nothing.***   It has rejected many of the contracts between TMC, NUMMI and MLC and sought to avoid any and all obligations it has to both TMC and NUMMI.   MLC's actions cannot be tolerated – TMC and NUMMI must be permitted to file and collect upon (with all other unsecured creditors) their claims.

28

64.    Accordingly, TMC respectfully requests that the Court overrule the MLC Objection and either allow NUMMI's (and TMC's) Claim in full or, at a minimum, allow NUMMI and TMC to full hearings to adjudicate their claims.

Dated:  November 4, 2010                FOLEY & LARDNER LLP


                                        */s/* Matthew J. Riopelle
                                        Victor A. Vilaplana (*admitted pro hac vice*)
                                        Matthew J. Riopelle (*admitted pro hac vice*)
                                        402 West Broadway, Suite 2100
                                        San Diego, CA 92101
                                        Telephone: (619) 234-6655
                                        Facsimile: (619) 234-3510

                                        Jeffery A. Soble (*admitted pro hac vice*)
                                        321 North Clark Street, Suite 2800
                                        Chicago, IL 60654-5313
                                        Telephone: (312) 832-4500
                                        Facsimile: (312) 832-4700

                                        *Attorneys for Toyota Motor Corporation*

SDCA_1697183.7