# EXHIBIT "D"

TOYOTA MOTOR CORPORATION-
GENERAL MOTORS CORPORATION


MEMORANDUM OF UNDERSTANDING


FEBRUARY 17, 1983

TOYOTA MOTOR CORPORATION (Toyota) and GENERAL MOTORS
CORPORATION (GM) agree to establish a joint venture (JV) for
the limited purpose of manufacturing in the United States a
specific automotive vehicle not heretofore produced, and
related components described below.  In so doing, it is the
intent of both parties to provide such assistance to the JV as
is considered appropriate to the enhancement of the JV's
success.  The JV will be limited in scope to this vehicle and
this agreement is not intended to establish a cooperative
relationship between the parties in any other business.

    The purpose of this Memorandum is to summarize the
current understanding of Toyota and GM regarding the basic
parameters of this limited manufacturing arrangement.

Product

    The vehicle to be manufactured by the JV will be
derived from Toyota's new front-wheel drive Sprinter.  Body
styles will include a 4-Door Sedan and (6-12 months later) a
5-Door Liftback.  Toyota will retain design authority over the
vehicle, in consultation as to vehicle appearance with GM, the
purchaser.  As modifications will probably be made to the

Sprinter or Corolla over time in accordance with market demand,
Toyota will effect similar changes to the JV vehicle if such
changes are deemed desirable by the parties.  Vehicle
certification will be handled by Toyota, with assistance
provided by the JV and GM as agreed upon by the parties.                    5

## Manufacturing

The JV will begin production of the GM-specific
vehicle as early as possible in the 1985 Model Year with
nominal capacity of approximately 200,000 units per annum at
GM's former assembly facility in Fremont, California.                    10

As part of the technical assistance stated
hereinafter, Toyota will take the initiative, in consultation
with GM, in designing the Fremont manufacturing layout and
coordinating the related acquisition and installation of its
machinery, equipment and tooling.  In this regard, if GM deems              15
it necessary for orders to be placed for construction of
buildings, JV machinery, equipment and tooling prior to the
establishment of the JV (to facilitate a timely introduction of
the initial JV vehicle in the 1985 Model Year) GM may do so in
its own name directly or through Toyota, and the parties agree             20
to share equally any capital expenditures or cancellation
charges arising from such orders.  The only exceptions to the
above are as follows:  In the event the JV is not established

3   (93/6/20412)

July 31, 198

as a result of unfavorable U.S. governmental review of the
matters set forth in this Memorandum or, following
consultations between the senior management of Toyota and GM,
as a result of either party notifying the other on or prior to
one hundred twenty (120) days following the signing of this
Memorandum of Understanding by the parties that such party is
not satisfied with the prospects for developing an acceptable
employe relations structure, GM shall bear 100% of the cost of
such expenditures and charges.

GM's annual requirements are presently expected to
exceed 200,000 units per annum.  Both parties will, therefore,
assist the JV in increasing its production to the maximum
extent possible within the available capacity.  Requirements
for capacity beyond the first module will be the subject of a
separate study.

The JV may later produce a variation of the JV vehicle
for Toyota.  Toyota and GM may also agree for GM to source the
GM-specific vehicle from Toyota assembly plants in Japan,
freeing JV capacity for Toyota's full or partial production of
Toyota-specific vehicles.

Purchase of Production Materials

The JV will purchase its production materials from
those sources providing the least possible cost, consistent

with its standards for product quality and vendor reliability of supply. Based on this principle, Toyota and GM have agreed upon a tentative sourcing approach, under which specific components to be purchased from Toyota, GM and other outside vendors have been separately identified. Components to be manufactured by the JV, mainly major stampings, have also been identified.

Marketing

All GM-specific vehicles produced by the JV will be sold directly to GM or its designated marketing units for resale through GM's dealer network. If any variation of the JV vehicles should be produced by the JV for Toyota, such vehicles would be sold directly to Toyota or its designated marketing unit for resale through Toyota's dealer network. Neither Toyota nor GM will consult the other with respect to the marketing of JV products, or any other products, through their respective marketing organizations.

Vehicles sold by the JV should be priced by the JV to provide a reasonable profit for the JV, Toyota, and GM. To accomplish this, production costs must be kept as low as possible through the combined best efforts of the JV, Toyota, GM and other major suppliers. In this regard, the parties have been conducting extensive studies detailing how each can work to minimize JV expenses.

The initial JV selling price of the JV vehicle to be
sold to GM during the 1985 Model Year will be determined at
least 60 days prior to the start of production by negotiation
between the JV and GM.  This negotiation will be based on the
production cost estimated 90 days prior to the expected start
of production by the JV, with estimates of said cost to be
guided by the feasibility study.  In no event, however, will
the said initial JV selling price be higher than the upper
limit nor lower than the lower limit, each as defined below.
The upper limit shall be determined by adjusting for feature
differences the Dealer Net Price less 8% of Toyota's then
current U.S. model front-wheel drive Corolla equipped
comparably with the JV vehicle concerned, and the lower limit
shall be determined by adjusting for feature differences the
Dealer Net Price less 11% of said Corolla.  The adjustment for
feature differences will be made by agreement between the JV
and GM.

Thereafter, although there may be exceptions, the JV
vehicle selling price will be revised and determined for each
model year.  The new selling price for the new model year will
be determined by applying to the selling price for the previous
model year the Index as defined in Exhibit A.  Since the
calculations embodied in the Index may occasionally yield a
selling price which is at significant variance with then

5

current market conditions, the JV and GM will in such cases negotiate a more appropriate selling price.

If model changes or specification changes of the vehicle manufactured by the JV are necessary, Toyota, GM and the JV will agree upon these model changes or specification changes. Toyota will present to the JV the plan for the model changes or specification changes concerned. Then, the JV will submit to and negotiate with GM the planned model changes and specification changes together with the planned price changes. These model changes and specification changes will be made as agreed upon by the JV and GM.

The methodology to be employed in pricing optional equipment available on the JV vehicle (both initial and subsequent) will be comparable to that described in the three preceding paragraphs.

The initial prices of Toyota and GM components purchased by the JV will be determined 90 days or more prior to the start of production by negotiation between the JV and component suppliers after the determination of the specifications of the JV vehicle. Identification of the respective sources of supply and determination of the initial component prices will be guided by the feasibility study, with adjustments made for changes in specifications and appropriate economics.

7

Thereafter, the prices of components will be reviewed semi-annually.  The new prices will be determined by negotiation between the JV and component suppliers.

If it is anticipated that continuation of the above-mentioned methods for determination of the prices of the JV vehicles to be sold by the JV and of components to be purchased by the JV would cause those prices to be at such levels as the JV would incur the losses which could endanger the normal operation of the JV, Toyota, GM and the JV shall negotiate and take necessary measures.

As a fundamental principle, Toyota and GM shall each be free to price and free to market the respective vehicles purchased from the JV without restrictions or influence from the other.

Operating Responsibility

The JV will be jointly controlled by an equal number of Toyota and GM directors, in line with Toyota and GM ownership.  Toyota will designate the JV president as the chief executive officer and chief operating officer.  Toyota and GM will assign to the JV other operating officers as the JV president and JV directors may request, but the parties recognize that the question of which party shall designate the JV officers in charge of financial affairs, labor relations and certain other operations has not yet been agreed upon.

8

## Quality Assurance

New vehicle warranty expense and administration will
be the responsibility of the purchaser of the JV vehicle.  The
JV shall maintain product liability insurance for the benefit
of the JV, the parties and other persons in such amounts as the
parties may deem prudent, and the premium costs for such
product liability insurance will be borne by the JV.  In each
product liability lawsuit involving a JV vehicle, the JV and
each of the parties will communicate and cooperate with each
other in all respects in investigating the facts surrounding
the case and in litigating the matter.  Each of the parties
will refrain from taking adversarial positions against each
other.  To the extent possible under the JV's product liability
insurance arrangements, the JV shall be the entity having the
right to control such product liability lawsuits.  However, the
relative financial share of settlement or adverse judgment
costs relating to such product liability claims or losses which
are not covered by such product liability insurance shall be
apportioned 60% to Toyota and 40% to GM.  Matters relating to
JV vehicle recall campaigns (including fines and costs of
corrective actions) shall be the subject of further study and
negotiation between the parties.

## Technical Assistance

Toyota will grant to the JV the license to manufacture the vehicle developed by Toyota, and in exchange for this license, the JV will pay a reasonable royalty to Toyota as may be agreed upon by the parties.  Toyota and GM will license the necessary industrial property rights to the JV, and in exchange for these rights, the JV will pay reasonable license fees to Toyota and/or GM as may be agreed upon by the parties.  Toyota and GM will also provide technical assistance to the JV on a cost basis plus reasonable markup.

As part of the technical assistance, GM agrees to assist Toyota and the JV in completing compliance tests for safety, emissions and other areas, as agreed upon by the parties.

## Purchase/Sale of Equity Interest

Toyota and GM (including, subject to the approval of the other party, their wholly or majority-owned subsidiaries) will each hold a 50% equity interest in the JV.  Neither party may transfer its equity interest in the JV to a third party without the written consent of the other.  The above notwithstanding, the JV will terminate not later than 12 years after start of production.  The methodology for disposition of Toyota and GM equity interests prior to or upon JV termination

09-50026-mg    Doc 7640-4    Filed 11/04/10    Entered 11/04/10 11:59:35    Exhibit D -
1983 Memorandum of Understanding    Pg 12 of 18

10

will be incorporated in the JV documentation.  Any surplus or
deficit of the JV as at termination of the JV will be shared
equally by Toyota and GM, in line with Toyota and GM
ownership.  Other issues relating to JV termination will be
separately discussed.


## Financing

Both Toyota and GM will contribute cash and/or fixed
assets to the JV in exchange for equity interests.  The amount
to be contributed as equity will depend upon the JV's total
projected capital requirements.  In the event that either
lenders or lessors insist that payments made by the JV be
subject to appropriate guarantees, Toyota and GM agree either
to provide such guarantees based on their pro rata share of the
JV or to temporarily advance funds to the JV on their own
account (also on a pro rata basis).  To the extent permitted by
creditors, Toyota and GM further agree that any security
interests held by the parties in the JV assets will be shared
equally.


## Future Difficulties

If it is anticipated that the establishment or
continuation of the JV would become difficult or infeasible due
to any legal, political or labor-related reason which may arise

09-50026-mg    Doc 7640-4    Filed 11/04/10    Entered 11/04/10 11:59:35    Exhibit D -
1983 Memorandum of Understanding    Pg 13 of 18

11

in the United States, the parties will in good faith discuss
the measures to be taken concerning the JV and endeavor to find
appropriate solutions.

## Agreements to be Concluded

Depending upon the specific organizational form,
various agreements will be concluded among Toyota and GM
(including subsidiaries thereof) and the JV.  These will
include the following: Partnership Agreement or Shareholders
Agreement and Articles of Incorporation; Vehicle Supply
Agreement (JV to GM); Toyota Component Supply Agreement (Toyota
to JV); GM Component Supply Agreement (GM to JV); Toyota
Service Parts Agreement (Toyota to JV and/or GM); Technical
Assistance and License Agreement; Realty and Other Asset Sale
and/or Lease Agreements; Product Responsibility Agreement; and
other documents related to the foregoing.

Since it is extremely important that the JV begin
production as early as possible in the 1985 Model Year, Toyota
and GM commit their best efforts to completing such
documentation by May 15, 1983.  In any event, both parties
agree to immediately begin the detailed production process
planning necessary for conversion of the Fremont plant.  Except
as set forth in the separate provisions for JV buildings,
machinery, equipment and tooling referred to in the

١٣/

12

"Manufacturing" section above, expenses incurred by either
party which directly benefit the JV will be properly recorded
and, if mutually agreed, will be subsequently rebilled to the
JV.


Transaction Review                                                                       5

        The agreements reached between the parties relate only
to the manufacturing JV described above and do not establish
any special relationship between Toyota and GM who continue to
be competitors in the United States and throughout the world.
Toyota and GM further acknowledge that there are no implied          10
obligations or restrictions other than those expressly set
forth.

        This Memorandum of Understanding is subject to review
by the governments of Japan and the United States.  Both
parties commit to use their best efforts to obtain favorable          15
reviews.  Until execution of all formal documentation,
satisfaction by the parties with the results of any government
reviews which are undertaken, and satisfaction by the parties
with the prospects for developing an acceptable employe
relations structure, each party reserves the right to terminate   20

13          15/

negotiations without liability to the other and the JV shall
not be established.  However, except as separately set forth in
the "Manufacturing" section, the parties shall share equally
the expenses and costs incurred by the parties which would, but
for such termination, be rebilled to the JV.                    5

Governing Language

        This Memorandum of Understanding shall be executed in
both an English and a Japanese version, but the parties agree
that in the event of a conflict between the meaning of the
English text and the Japanese text, the English text shall          10
control.


                        TOYOTA MOTOR CORPORATION

                        By _____
                           Eiji Toyoda, Chairman of the Board

Dated:  February 17, 1983


                        GENERAL MOTORS CORPORATION

                        By _____
                         · Roger B. Smith, Chairman of the Board

14                16/

## MARKET BASKET INDEX

The ten best selling models among the sub-compacts will be the models which constitute the basket.  The models shall be revised at every model year on the basis of model volume in the U.S., using the latest R. L. Polk registration data for the previous 12 months.

For reference, the ten best selling models at present are as follows:

| | |
|---|---|
| Chevrolet Cavalier | Mercury Lynx |
| Chevrolet Chevette | Nissan Sentra |
| Ford Escort | Subaru DL |
| Honda Accord | Toyota Corolla |
| Honda Civic | Volkswagen Rabbit |

The "Index" shall be the weighted average rate of wholesale price fluctuations of these models from the prior model year to the current, weighting Corolla at 30% versus 70% for all other comparable models combined without regard of model volumes in the U.S.

For this purpose, the wholesale price shall be adjusted by eliminating the value of equipment changes and product improvements in comparison with the previous year models.  To this end, the JV will evaluate and determine the value of equipment changes and product improvements, taking into account the opinions of Toyota and GM.

When competitive models are replaced by new models, or additional competitive models are brought in, neither the old model nor the new or additional model will be included in the calculation of the Index for the model year when such model changes take place.  It will, however, be included in the calculation of the Index for subsequent model years.

TOYOTA MOTOR CORPORATION/
GENERAL MOTORS CORPORATION

FIRST AMENDMENT
TO
MEMORANDUM OF UNDERSTANDING
OF
FEBRUARY 17, 1983

This Amendment is entered into this 20th day of June,
1983 between Toyota Motor Corporation ("Toyota") and General
Motors Corporation ("GM").

1.    Reference is made to the Memorandum of Under-
standing ("Memorandum"), dated February 17, 1983, between
Toyota and GM and pertaining to the establishment of a joint
venture for the limited purpose of manufacturing in the
United States a specific automotive vehicle and related
components.

2.    The Memorandum is amended in the following two
respects:

(a)  Under the caption "Manufacturing", page 3,
lines 5 and 6, delete the phrase "one hundred twenty (120)
days following the signing of this Memorandum of Understand-
ing by the parties" and substitute "July 31, 1983".

(b)  Under the caption "Agreements to be
Concluded", page 11, second paragraph, line 4, delete
"May 15," and substitute "July 31,".

SEP 09 '92  07:04PM  NUMMI 510 770 4010

P O:

P.3

3.   Toyota and GM confirm the Memorandum as modified by this Amendment.

The parties have executed this Amendment on the date first above written.

TOYOTA MOTOR CORPORATION

By: _____
Eiji Toyoda,
Chairman of the Board

GENERAL MOTORS CORPORATION

By: _____
Roger B. Smith,
Chairman of the Board

- 2 -