**Hearing Date and Time: November 9, 2010 at 9:45 a.m. (Eastern)**

Harvey R. Miller
Stephen Karotkin
Joseph H. Smolinsky
Anthony J. Albanese
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors and
Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------------------ x
                                                             :
In re                                                        :    Chapter 11 Case No.
                                                             :
MOTORS LIQUIDATION COMPANY, et al                            :    09-50026 (REG)
        f/k/a General Motors Corp., et al.                   :
                                                             :
                Debtors.                                     :    (Jointly Administered)
                                                             :
------------------------------------------------------------ x
```

**DEBTORS' REPLY TO INITIAL RESPONSE OF NEW UNITED**
**MOTOR MANUFACTURING, INC. TO DEBTORS' OBJECTION TO PROOF**
**OF CLAIM NO. 67357 FILED BY NEW UNITED MOTOR MANUFACTURING, INC.**

**TABLE OF CONTENTS**

**Page**

Relief Requested .................................................................................................................. 1

Jurisdiction........................................................................................................................... 2

Preliminary Statement.......................................................................................................... 2

Argument .............................................................................................................................. 3

I.      NUMMI Has Failed to State a Claim for Breach of Contract ........................................... 4

        A.      NUMMI Has Failed to State a Claim for "Wind-Down" Costs ........................... 5

        B.      NUMMI Has Failed to State a Claim for Breach of the VSA and the
                Production MOU.................................................................................................. 7

II.     NUMMI Has Failed to State a Claim for Promissory Estoppel...................................... 12

Conclusion ........................................................................................................................ 15

# TABLE OF AUTHORITIES

**Cases:**                                                                                                    **Page(s)**

*B.F. Goodrich Co. v. Vinyltech Corp.*,
  711 F. Supp. 1513 (D. Ariz. 1989) .......................................................................................9

*In re Big V Holding Corp.*,
  267 B.R. 71 (Bankr. D. Del. 2001) .....................................................................................11

*Burgermeister Brewing Corp. v. Bowman*,
  38 Cal. Rptr. 597 (Cal. Ct. App. 1964) ...............................................................................11

*E. Aviation Group, Inc. v. Airborne Express, Inc.*,
  8 Cal. Rptr. 2d 355 (Cal. Ct. App. 1992) ..............................................................................7

*Fireman's Fund Ins. Co. v. Workers' Comp. Appeals Bd.*,
  No. B215486, 2010 WL 3961272 (Cal. Ct. App. Oct. 12, 2010) ..........................................4

*Iglesia Evangelica Latina, Inc. v. S. Pac. Latin Am. Dist. of the Assemblies of God*,
  93 Cal. Rptr. 3d 75 (Cal. Ct. App.2009) ...............................................................................4

*Midland Pac. Bldg. Corp. v. King*,
  68 Cal. Rptr. 3d 499 (Cal. Ct. App. 2007) ..........................................................................11

*NCC Sunday Inserts, Inc. v. World Color Press, Inc.*,
  759 F. Supp. 1004 (S.D.N.Y. 1991)....................................................................................13

*In re Netia Holdings S.A.*,
  278 B.R. 344 (Bankr. S.D.N.Y. 2002) ..................................................................................4

*Salaway v. Ocean Towers Hous. Corp.*,
  No. B183174, 2006 WL 2391067 (Cal. Ct. App. Aug. 21, 2006) .......................................13

*Shea-Kaiser-Lockheed-Healy v. Dep't of Water & Power*,
  140 Cal. Rptr. 884 (Cal. Ct. App. 1977) ..........................................................................8, 10

*Storek & Storek Inc. v. Citicorp Real Estate, Inc.*,
  122 Cal. Rptr. 2d 267 (Cal. Ct. App. 2002) ........................................................................11

*Tex. Indus., Inc. v. Brown*,
  218 F.2d 510 (5th Cir. 1955) .........................................................................................10, 11

*Toyomenka Pac. Petroleum v. Hess Oil Virgin Islands Corp.*,
  771 F. Supp. 63 (S.D.N.Y. 1991)..........................................................................................9

*Tri-State Generation & Transmission Ass'n v. Shoshone River Power, Inc.*,
  874 F.2d 1346 (10th Cir. 1989) ..........................................................................................10

**TABLE OF AUTHORITIES**
**(continued)**

**Cases:**                                                                       **Page(s)**

*United States v. Panhandle E. Corp.*,
    693 F. Supp. 88 (D. Del. 1988),
    *aff'd*, 868 F.2d 1363 (3d Cir. 1889) ..................................................................................9

*United States v. Wallace & Wallace Fuel Oil. Co.*,
    540 F. Supp. 419 (S.D.N.Y. 1982).......................................................................11

*US Ecology, Inc. v. California,*
    28 Cal. Rptr. 3d 894 (Cal. Ct. App. 2005) .........................................................12

**STATUTES**

11 U.S.C. § 502..................................................................................................................1

11 U.S.C. § 503..................................................................................................................1

28 U.S.C. § 157..................................................................................................................2

28 U.S.C. § 1334................................................................................................................2

Cal. Civ. Code § 1559........................................................................................................6

Fed. R. Bankr. P. 3003.......................................................................................................1

Fed. R. Bankr. P. 3007.......................................................................................................1

TO THE HONORABLE ROBERT E. GERBER,
UNITED STATES BANKRUPTCY JUDGE:

Motors Liquidation Company (f/k/a General Motors Corporation) ("**MLC**") and

its affiliated debtors, as debtors in possession (collectively, the "**Debtors**") respectfully

represent:

### Relief Requested

1.      On April 1, 2010, the Debtors filed their Objection pursuant to section 502 of title

11, United States Code (the "**Bankruptcy Code**"), Rule 3007(d) of the Federal Rules of

Bankruptcy Procedure (the "**Bankruptcy Rules**"), and this Court's Order Pursuant to Section

502(b)(9) of the Bankruptcy Code and Bankruptcy Rule 3003(c)(3) Establishing the Deadline for

Filing Proofs of Claim (Including Claims Under Bankruptcy Code Section 503(b)(9)) and

Procedures Relating Thereto and Approving the Form and Manner of Notice Thereof (the "**Bar

Date Order**") [Docket No. 4079] seeking entry of an order disallowing and expunging Proof of

Claim No. 67357 (the "**Claim**") filed by New United Motor Manufacturing, Inc. ("**NUMMI**," or

the "**JV Company**") (the "**Objection**").[1]

2.      On May 24, 2010, NUMMI filed its Initial Response to Debtors' Objection to

Proof of Claim 67357 Filed by New United Motor Manufacturing, Inc. (the "**Response**").  As set

forth below, notwithstanding NUMMI's Response, the Debtors have concluded that, based on

the plain language of the relevant agreements governing the relationship between MLC and

NUMMI, the Claim contains no supportable legal or factual basis.  Thus, the Debtors request

---

[1] Capitalized terms used herein and not otherwise defined herein shall have the meaning ascribed to them in the Objection.

US_ACTIVE:\43548660\08\72240.0639                                    1

entry of an order disallowing and expunging the Claim from the Debtors' claims register in its

entirety.

## Jurisdiction

3.       This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157

and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

## Preliminary Statement

4.       At issue is a purely contract-based Claim involving sophisticated commercial

entities.  NUMMI's attempt to recast its Claim by asserting that it is "unlike MLC's other tier-

one suppliers" and that its Claim is "unique" has no bearing on the parties' rights and obligations

under the plain language of the governing agreements.  Those facts simply are not relevant here.

What is relevant are the unambiguous terms of the contracts that governed the parties'

relationship.  Because MLC has not breached any of those agreements, the Claim should be

disallowed in its entirety.

5.       Notably, in the Response, NUMMI has abandoned the fatally flawed breach of

fiduciary duty claim and the piercing claim originally set forth in the Claim, and now asserts its

right to relief based solely on breach of contract and promissory estoppel.  Thus, most, if not all,

of NUMMI's Response in support of its Claim is based on legal theories and new documents not

previously asserted or substantively detailed in the Claim.  None of these allegations have merit.

In particular, NUMMI now alleges, for the first time, that MLC breached a non-binding 1983

"memorandum of understanding"  -- an agreement to which NUMMI is not even a party -- and

an agreement that was not attached, included, referenced or even identified in its Claim (the

"**1983 MOU**").[2]  Nevertheless, as detailed below, this memorandum was expressly superseded

and replaced by later binding agreements entered into by the parties.  Thus, this newly-minted

theory on which NUMMI primarily relies in the Response is nothing more than a red herring dug

up at the 11th hour to try to support its unfounded Claim.  NUMMI's other claims for breach of

contract and promissory estoppel also fail to provide any basis for relief as set forth in the

Objection and herein.  The unambiguous terms of the parties' relevant agreements establish that

MLC has not breached the terms of any binding agreement with NUMMI.  Therefore, the Claim

should be disallowed and expunged in its entirety.

### Argument

6.    According to NUMMI, the Claim is based on five causes of action, substantively

identified for the first time in the Response, including four claims for breach of contract and a

claim for promissory estoppel.  Essentially, NUMMI contends that MLC breached its

commitment to pay "its share" of NUMMI's wind down costs, breached its obligation to

purchase Pontiac Vibes through 2012 and by so doing breached an obligation to use best efforts

to ensure NUMMI's viability.  (Response at 2-3.)  In addition, according to NUMMI, MLC's

withdrawal from the joint venture constitutes a breach of the covenant of good faith and fair

dealing.  Finally, in the alternative, NUMMI contends that, even if it lacks a viable claim for

breach of contract, it has established facts sufficient to state a claim for promissory estoppel.

(*Id.*)  As set forth below, NUMMI's Claim is without merit because the unambiguous language

of the governing agreements between the parties unequivocally establishes that MLC has no

outstanding obligations or liability to NUMMI.

---

[2] May 24, 2010 Declaration of Mitsunori Tsuzuki (attached to the Response), Ex. A (hereinafter "**1983 MOU**").

**I.      NUMMI Has Failed to State a Claim for Breach of Contract**

7.      This Court should disallow NUMMI's Claim based on breach of contract because

the Debtors have not breached any contract with NUMMI that entitles NUMMI to any recovery

relating to costs or expenses associated with: (1) "wind down obligations" and costs incurred in

connection with NUMMI's dissolution and end of production and (2) the discontinuation of the

Pontiac Vibe. (Response at 3.)[3]

8.      It is a fundamental precept of contract law that where the terms of a contract are

clear, the court is bound to enforce its terms as they are written. *See In re Netia Holdings S.A.*,

278 B.R. 344, 355 (Bankr. S.D.N.Y. 2002) (Gerber, J.) (". . . this Court does not believe that it

has a license to disregard the language of a contract when it is clear and unambiguous");

*Fireman's Fund Ins. Co. v. Workers' Comp. Appeals Bd.*, No. B215486, 2010 WL 3961272, at

*8 (Cal. Ct. App. Oct. 12, 2010) (unambiguous contract will be enforced as written as "there is

no need to go outside its provisions").  Further, where contractual terms are unambiguous, a

court should not, and need not, consider extrinsic evidence regarding the underlying meaning of

the contract. *See Netia Holdings*, 278 B.R. at 353 n.25 (". . . because the Court finds no

ambiguity whatever in the words of . . . the relevant contract itself, . . . the Court believes that

resort to parol evidence is inappropriate"); *Iglesia Evangelica Latina, Inc. v. S. Pac. Latin Am.

Dist. of the Assemblies of God*, 93 Cal. Rptr. 3d 75, 84 (Cal. Ct. App. 2009) ("extrinsic evidence

may not be used to contradict or vary the terms of an unambiguous writing").  Here, the

unambiguous terms of the contracts make clear that MLC has not breached any provision

contained therein, and despite NUMMI's best efforts to distract this Court with irrelevant

---

[3] Although NUMMI characterizes these claims as two distinct breach of contract claims, each contends that MLC
has breached the VSA and the Production MOU in connection with the discontinuation of the Pontiac Vibe.

background information and innuendo, the Court need only look within the four corners of the

relevant agreements discussed in the Objection and herein to make its ruling.

### A.    NUMMI Has Failed to State a Claim for "Wind-Down" Costs

9.      In the Response, NUMMI alleges (for the first time) that MLC is obligated under

the non-binding 1983 MOU to share any "deficit" at termination of the NUMMI joint venture.

(Response at 25.)  According to NUMMI, and despite clear language to the contrary in the

subsequent Shareholders' Agreement, the obligations in the 1983 MOU survived the joint

venture's incorporation and "MLC remain[s] obligated under the 1983 MOU and is therefore

required to share in whatever excess liabilities remain during NUMMI's wind down."  (Response

¶ 51.)   Among other things, the 1983 MOU provided that in the event of "[a]ny surplus or

deficit of the JV as at termination of the JV will be shared equally by [TMC] and [MLC], in line

with [TMC] and [MLC] ownership."  (1983 MOU at 10.)

10.     However, as detailed below, the 1983 MOU was entered into *prior* to NUMMI's

incorporation and was *expressly* superseded and replaced by the subsequent NUMMI

Shareholders' Agreement. Therefore, NUMMI's reliance on this document is totally unfounded

and fails to establish any obligation or liability for MLC.[4]

11.     The Shareholders' Agreement provides that NUMMI has a "separate and distinct

existence from each of its Shareholders" and confirms that NUMMI "is responsible for the

payment of all of its own expenses." (Objection Ex. B at 1; ¶ 4.3.)  At all times prior to the filing

of the Claim, NUMMI has observed corporate formalities and held itself out to creditors and

business partners as a distinct legal entity from MLC and TMC.

---

[4] Indeed, the 1983 MOU also sets forth that "the JV will terminate not later than 12 years after the start of
production" (i.e. in *1995*), which only serves to underscore that the agreement has not governed MLC and TMC's
obligations with respect to NUMMI for many years.  (1983 MOU at 9.)

12.     Section 4.3 of the Shareholders' Agreement, to which NUMMI, MLC and TMC

were signatories, provides:

> 4.3    JV Company Expenses.  Except as otherwise provided in
> any agreement or instrument to which the parties signatory hereto
> are parties, t*he JV Company shall be responsible for the payment
> of all of its own expenses*.

(Objection Ex. B) (emphasis added).  Further, Section 10.7 of the Shareholders' Agreement
provides:

> 10.7    Entire Agreement, Etc.    This Agreement constitutes the
> entire agreement of the parties hereto with respect to the subject
> matter hereof.  ***To the extent that provisions in any of the Prior
> Agreements (as that term is hereafter defined) are inconsistent
> with any provision of this Agreement, this Agreement supersedes
> all prior agreements and understandings***, oral and written, among
> the parties hereto with respect to the subject matter hereof,
> ***including without limitation the Memorandum of Understanding
> (the "Memorandum"), dated February 17, 1983***, as amended,
> between [TMC] and [MLC] and all letter agreements, minutes of
> meetings and similar documents dated prior to the date hereof to
> which [MLC], [TMC] and any of their respective representatives
> are parties (the Memorandum and such letter agreements, minutes
> and similar documents being referred to herein as the "Prior
> Agreements."

(Objection Ex. B) (emphasis added).  Thus, to the extent that the 1983 MOU was inconsistent

with the Shareholders' Agreement and imposed any liability on MLC, Section 10.7 makes clear

that the provisions of the Shareholders' Agreement superseded the 1983 MOU.  To require MLC

to cover NUMMI's outstanding expenses at its termination under the terms of the 1983 MOU is

completely inconsistent with NUMMI being responsible for its own expenses as provided in the

controlling Shareholders' Agreement.[5]  Because the unambiguous language of the Shareholders'

---

[5] In addition, NUMMI is not even a signatory to the 1983 MOU because the entity had not yet been created.
NUMMI contends that it is entitled to rely on this document is as a third-party beneficiary.  Under California law,
"[a] contract, made expressly for the benefit of a third person, may be enforced by him at any time before the parties
thereto rescind it."  Cal. Civ. Code § 1559.  However, " 'The fact that he is incidentally named in the contract, or
that the contract, if carried out according to its terms, would inure to his benefit, is not sufficient to entitle him to

Agreement precludes the result urged by NUMMI, this Court should find that NUMMI, a distinct

legal entity, is responsible for all of its own expenses, including at termination.

**B.      NUMMI Has Failed to State a Claim for Breach of the VSA and the
          Production MOU**

13.      As set forth in the Objection and reiterated below, because the Debtors were not

required to purchase any vehicles from NUMMI, much less pay NUMMI for costs incurred as a

result of the discontinuation of the Pontiac Vibe, NUMMI's breach of contract claims lack merit.

According to NUMMI, MLC's failure to purchase Vibes through 2012 gives rise to two distinct

breach of contract claims: (i) breach of contract based on an alleged agreement to keep NUMMI

viable (Response at 17-21), and (ii) breach of contract for failing to purchase products on a

continuous and stable basis (Response at 21-24).  Notably, however, there is not a single

contractual provision in the VSA or in the Production MOU -- or in any other agreement

between and/or among TMC, NUMMI and MLC -- that requires the Debtors to purchase Vibes

through 2012.  This Court should not accept NUMMI's invitation to rewrite the parties'

contractual obligations in connection with these supply contracts.

i.      <u>The VSA</u>

14.      The express terms of the VSA, the governing agreement with respect to the

parties' purchase and sale obligations, make clear that the Debtors have no remaining purchase

obligations or requirements with respect to NUMMI.  Section 4.1 of the VSA, entitled "General

Understanding", sets forth the principles that applied to purchase and sale agreements between

NUMMI and MLC:

---

demand its fulfillment. It must appear to have been the intention of *the parties* to secure to him personally the
benefit of its provisions.' " *E. Aviation Group, Inc. v. Airborne Express, Inc.*, 8 Cal. Rptr. 2d 355, 357 (Cal. Ct.
App. 1992) (citation omitted).  Because NUMMI has not -- and cannot -- alleged facts sufficient to establish that it
was the intent of MLC and TMC to benefit NUMMI under the 1983 MOU, this Court should not permit NUMMI to
rely on its provisions as a third-party beneficiary.

> 4.1   General Understanding: (a) The general principles contained in this Section 4.1 will apply to supply and purchase arrangements under this Agreement.
>
> (b)   The parties hereto are establishing supply and purchase arrangements under which [NUMMI] shall supply and [MLC] shall purchase the Product on a continuous and stable basis. It is acknowledged that [NUMMI] is making substantial amounts of capital expenditures in its facilities relying on [MLC's] present projection that market demand for the vehicles will exceed 200,000 units per annum.   ***However, it is further acknowledged that market demand for the Products that can be generated in the area in which [MLC] expects to sell them will govern the purchase commitments of the parties as to all products***.

(Objection Ex. I) (emphasis added).  Accordingly, the parties expressly agreed that market demand for the products would govern MLC's purchasing obligations with respect to all products.

15.   The VSA further provided that absent an individual sales contract, MLC *had no obligation to purchase any* vehicles from NUMMI:

> 4.2   Individual Sales Contracts: (a) Within the general principles set forth in Section 4.1 hereof, each purchase and sale transaction between [NUMMI] and [MLC] relating to the Products shall be governed by an individual sales contract, it being agreed within that context that ***[NUMMI] has no obligation to supply and [MLC] has no obligation to purchase*** any Products until the parties enter such a contract.  The terms of this agreement (insofar as applicable) shall apply to each such sales contract.

(Objection Ex. I) (emphasis added).  Here, NUMMI has failed to allege the existence of any remaining or unfulfilled individual sales contract governing the purchase and sale of the Pontiac Vibe through 2012.[6]  Thus, NUMMI has failed to establish that MLC has any remaining purchase obligations relating to the Pontiac Vibe whatsoever.

---

[6] For this reason, NUMMI's reliance on *Shea-Kaiser-Lockheed-Healy v. Department of Water & Power*, 140 Cal. Rptr. 884 (Cal. Ct. App. 1977) is misplaced.  In *Shea-Kaiser-Lockheed-Healy*, the court found that a quantity estimate in an individual requirements contract was enforceable.  As set forth in the Objection and below, no such individual requirements contract is at issue here.

16.     Finally, even if the Court were to find that MLC was obliged to perform under the VSA and the Production MOU, which it was not as set forth above, the VSA provides that in the event of the discontinuation of the manufacture of the Products ordered, any failure of performance is excused:

> 6.1    Force Majeure.    *Any delay in or failure of the performance of any party hereunder shall be excused if and to the extent caused by occurrences beyond such parties control, including, but not limited* to, acts of God; fire or flood; war; governmental regulations, policies or actions; closure of foreign exchange markets; any labor, material, transportation or utility shortage or curtailment; *discontinuation or curtailment of the manufacture of the Products ordered*; or any labor trouble in the manufacturing plants of [NUMMI] in Fremont, California or any of its suppliers.

(Objection Ex. I) (emphasis added).  Accordingly, to the extent that the Court finds that MLC was required to purchase the Vibe from NUMMI through 2012 -- which it should not based on the plain language of the relevant agreements -- any performance by MLC would still be excused in its entirety because of the discontinuation of the manufacture of all Pontiac vehicles.[7]  *See Toyomenka Pac. Petroleum v. Hess Oil Virgin Islands Corp.*, 771 F. Supp. 63, 67 (S.D.N.Y. 1991) (failure of performance excused by force majeure clause).

---

[7] In the Response, NUMMI contends that MLC's performance is not excused because the decision to discontinue the manufacture of Vibes was not caused by "occurrences beyond [MLC's] control." (Response ¶ 49).  To the contrary, and as set forth in the Objection, the decision to discontinue the manufacture of **ALL** Pontiac vehicles (and not just the Vibe) was made in a time of unprecedented financial crisis after the **Government Lenders** -- the Debtors' lenders of last resort -- determined that MLC needed to phase out Pontiac and its other non-core brands as a key component of the reorganization process.  The discontinuation of the Pontiac brand thus falls squarely within the express language of the force majeure provision and excused MLC's performance (if any was required).  For this reason, NUMMI's reliance on *B.F. Goodrich Co. v. Vinyltech Corp.*, 711 F. Supp. 1513 (D. Ariz. 1989) (rejecting reliance on force majeure provision when market prices fluctuated and alternate goods would have been cheaper) and *United States v. Panhandle E. Corp.*, 693 F. Supp. 88 (D. Del. 1988), *aff'd*, 868 F.2d 1363 (3d Cir. 1989) (rejecting reliance on force majeure provision when performance would have been more expensive) have no bearing on the force majeure provision here, as these cases involve a party attempting to excuse its breach based on market fluctuation.  The fact that market forces may have played a part in the discontinuation of the Pontiac brand does not mean that MLC is not entitled to rely on the force majeure provision, which includes product discontinuation, to excuse performance if any such performance was required.  MLC does not believe performance was required.

ii.    The Production MOU

17.    The Production MOU further contradicts any notion that the Debtors were

obligated to purchase vehicles from NUMMI through 2012.  Although NUMMI argues that

under the Production MOU, MLC committed to purchase a certain number of Vibes through

2012, as set forth below, under the express terms of the Production MOU, although MLC *had a*

*right* to purchase at least 65,000 Vibe vehicles from NUMMI, *it was not obligated to do so.*  In

fact, the Production MOU, like the VSA, does not require MLC to purchase any vehicles from

NUMMI:

> (3)    The parties understand that, assuming that 225,000 units of
> the Products are scheduled to be produced in a year, the Products
> will be allocated between TMC and [MLC] under the following
> formula, where each of TMC and *[MLC] will have a right to, but*
> *not an obligation to, purchase the products* from NUMMI.
>
> | | | |
> |---|---|---|
> | TMC Corolla | at least 160,000 | (71.11%) |
> | GMC Vibe | at least 65,000 | (28.89%) |

(Objection Ex. K at § 1(3)) (emphasis added).

18.    While NUMMI asserts in a conclusory fashion that the VSA, coupled with the

Production MOU, amounted to a "requirements contract" entitling NUMMI to damages based on

capital expenditures relating to the Vibe, as set forth above, neither the VSA nor the Production

MOU required MLC to purchase any Vibes through 2012.[8]  The Production MOU was ***not*** a

---

[8] For this reason, the cases relied on in the Response involving "all requirements" contracts have no bearing on the
issues before this Court.  Unlike the cases dealing with "all requirements" contracts relied on by NUMMI, the
agreements here do not include language indicating any promise or requirement that MLC will purchase **all** required
vehicles, much less a set number of vehicles from NUMMI, indeed, they unambiguously provide that there is no
such obligation.  *See Shea-Kaiser-Lockheed-Healy*, 140 Cal. Rptr. at 887 (contract specified minimum quantity of
product to be provided as well as purchaser's option to request additional product "up to the [purchaser's] maximum
requirements"); *Tri-State Generation & Transmission Ass'n v. Shoshone River Power, Inc.*, 874 F.2d 1346, 1349
(10th Cir. 1989) (seller would deliver, and purchaser would purchase and receive "all electric power and energy
which purchaser would require for the operation of its system"); *Tex. Indus., Inc. v. Brown*, 218 F.2d 510, 511 (5th
Cir. 1955); (buyers agreed to purchase "all of the lightweight aggregate" buyers "should thereafter require for a

requirements contract, it was a supply contract, under which MLC had a right, but not an

obligation, to purchase Vehicles through 2012.[9]

19.     Nor has NUMMI alleged the requisite facts to establish that MLC breached the

implied covenant of good faith and fair dealing.  As set forth above, MLC was not required to

purchase Vibes from NUMMI through 2012 under the express terms of the VSA and the

Production MOU.  The fact that "NUMMI believes the parties could have reached a beneficial

agreement on a substitute for the Vibe" is not sufficient to establish that MLC's conduct was so

objectively unreasonable that it would give rise to a claim for breach of the implied covenant of

good faith and fair dealing, nor has NUMMI alleged any facts suggesting that MLC subjectively

lacked belief in the validity of its actions.  *See Storek & Storek Inc. v. Citicorp Real Estate, Inc.*,

122 Cal. Rptr. 2d 267, 282 n.13 (Cal. Ct. App. 2002) (cited in the Response n.14).  NUMMI

should not be permitted to rewrite the parties' agreements in the face of express contractual

provisions to the contrary.

---

period of five years"); *In re Big V Holding Corp.*, 267 B.R. 71, 79 (Bankr. D. Del. 2001) ("[e]ach Stockholder, for a period of ten years . . . shall purchase from [seller], at least 85% of such Stockholders requirements, during each fiscal year.").

[9] NUMMI also seeks to rely on certain language of the Production MOU, which provides that "both TMC and [MLC] will make best effort to maximize the production volume during the model life in consideration of maintaining the stability of operations at NUMMI." (Response ¶ 41.)  Although the Production MOU included such aspirational language, as set forth above and in the Objection, both the VSA and Production MOU make clear that MLC had no requirement to purchase any vehicles.  *See United States v. Wallace & Wallace Fuel Oil Co.*, 540 F. Supp. 419, 427 (S.D.N.Y. 1982) (breach of contract claim based on "best efforts" clause fails where contract expressly permits nonperformance).  Thus, *Midland Pacific Building Corp. v. King*, 68 Cal. Rptr. 3d 499 (Cal. Ct. App. 2007) (cited in the Response), in which a party, instead of using "best efforts" to obtain government approval of a specific real estate plan, sought government approval of an entirely different plan, and *Burgermeister Brewing Corp. v. Bowman*, 38 Cal. Rptr. 597 (Cal. Ct. App. 1964) (cited in the Response), in which the court enforced an oral contract requiring a distributor to use best efforts to promote and distribute the brewery's products and "take care of the territory," have no bearing on this dispute.  In both *Midland* and *Burgermeister*, the "best efforts" clause was the essence of the contract.  Neither involved a supply contract relating to the manufacture and sale of goods.

## II.    NUMMI Has Failed to State a Claim for Promissory Estoppel

20.    In the alternative,[10] NUMMI now argues for the first time in the Response, that MLC's failure to purchase the Pontiac Vibe through 2012 or a replacement vehicle, despite allegedly promising to do so, amounts to a claim for promissory estoppel.  In particular, NUMMI contends that MLC "acknowledged" in 2009 an "obligation" to continue purchasing Vibes, or to provide a replacement vehicle to be manufactured by NUMMI.  (Response at 29.)  To support this allegation, NUMMI points to general and non-definitive statements purportedly made by MLC employees regarding future production levels and anticipated Vibe purchases prior and subsequent to entering into the Production MOU.  (Id.)

21.    To state a claim for promissory estoppel under California law, a plaintiff must allege "(1) a promise clear and unambiguous in its terms; (2) reliance by the party to whom the promise is made; (3) [the] reliance must be both reasonable and foreseeable; and (4) the party asserting the estoppel must be injured by his reliance." *US Ecology, Inc. v. California*, 28 Cal. Rptr. 3d 894, 905 (Cal. Ct. App. 2005).  In addition, a plaintiff must allege causation.  *See id*. at 907 ("[I]t is logical and proper to require that any claimed damages be caused by a defendant's breach of the agreement . . . . causation must be required as an element that a plaintiff must prove, just as in ordinary contract actions.").

22.    Here, MLC never made a "clear and unambiguous" promise to NUMMI to continue purchasing vehicles through 2012.  Rather, the statements relied on by NUMMI are general, non-binding business discussions regarding certain market projections, which clearly do not constitute a "clear and unambiguous" promise to purchase any vehicles through 2012.

---

[10] NUMMI acknowledges that its promissory estoppel claim would be redundant should it prevail on a breach of contract claim.  (Response n.15.)

Further, in the face of express contractual provisions that do not require MLC to make any purchases (unless agreed to in a definitive sales contract), it is manifestly unreasonable and contrary to law to construe those general business discussions as a promise to purchase Vibes through 2012. *See NCC Sunday Inserts, Inc. v. World Color Press, Inc.*, 759 F. Supp. 1004, 1011-12 (S.D.N.Y. 1991) ("When an enforceable contract does exist, the parties cannot assert a claim for promissory estoppel based on alleged promises that contradict the written contract. An untenable situation would result if notwithstanding the existence of a written, enforceable contract, a party could sue for promissory estoppel based on contradictory promises that it allegedly relied on. . . . Holding otherwise would allow a party to seek damages based on promissory estoppel any time it did not like a contract's terms, or the legal interpretations of such terms.").

23.      As set forth above in detail, the Production MOU and VSA expressly provided that ***MLC had a right, but not an obligation***, to purchase products from NUMMI, and that any purchase requirements must be reduced to individual sales contracts.  To permit a promissory estoppel claim to prevail would read that language out of the contracts entirely.  Therefore, any reliance by NUMMI on MLC purchasing vehicles through 2012 in light of express contractual language to the contrary is without merit.  *Id.*; *See also Salawy v. Ocean Towers Hous. Corp.*, No. B183174, 2006 WL 2391067, at *5 (Cal. Ct. App. Aug. 21, 2006) ("Plaintiffs could not maintain a successful action for promissory estoppel where their rights and duties were fixed by a contract. . . .").

24.      Finally, although NUMMI acknowledges that it must allege causation, *see* Response ¶ 58, NUMMI fails to allege that MLC caused the cessation of NUMMI's business because MLC exercised its express contract right not to order Vibes through 2012.   Nor could

such an allegation be made.  As set forth in the Objection, TMC manufactured 80% of the

vehicles at NUMMI.  In light of the fact that TMC has served as NUMMI's largest customer for

more than a decade, it is implausible that MLC's withdrawal was the proximate cause of

NUMMI's damages.  Instead, it was TMC's decision to no longer manufacture its vehicles at

NUMMI that necessitated NUMMI's wind down.

**Conclusion**

25.     At bottom, despite NUMMI's best efforts to distract this Court with irrelevant

background history and non-binding, superseded agreements, the plain language of all of the

relevant agreements makes it clear that MLC has not breached any of those agreements and has

no remaining obligations or liabilities to NUMMI.  Accordingly, the Debtors respectfully request

entry of an order granting the relief requested in the Objection and herein and such other and

further relief as is just.

Dated:   New York, New York
         November 4, 2010

                                            /s/ Joseph H. Smolinsky
                                            Harvey R. Miller
                                            Stephen Karotkin
                                            Joseph H. Smolinsky
                                            Anthony J. Albanese

                                            WEIL, GOTSHAL & MANGES LLP
                                            767 Fifth Avenue
                                            New York, New York 10153
                                            Telephone: (212) 310-8000
                                            Facsimile: (212) 310-8007

                                            Attorneys for Debtors
                                            and Debtors in Possession