# EXHIBIT E

Page 1

1

2   UNITED STATES BANKRUPTCY COURT

3   SOUTHERN DISTRICT OF NEW YORK

4   Case No. 09-50026

5   - - - - - - - - - - - - - - - - - - - -x

6   In the Matter of:

7

8   MOTORS LIQUIDATION COMPANY, et al.

9          f/k/a General Motors Corporation, et al.,

10

11             Debtors.

12

13  - - - - - - - - - - - - - - - - - - - -x

14

15             United States Bankruptcy Court

16             One Bowling Green

17             New York, New York

18

19             August 9, 2010

20             10:05 AM

21

22

23  B E F O R E:

24  HON. ROBERT E. GERBER

25  U.S. BANKRUPTCY JUDGE

Page 2

 1

 2    HEARING re Motion of the Official Committee of Unsecured

 3    Creditors of Motors Liquidation Company for an Order Pursuant

 4    to Bankruptcy Rule 2004 Directing Production of Documents by

 5    (I) the Claims Processing Facilities for Certain Trusts Created

 6    Pursuant to Bankruptcy Code Section 524(g) And (II) General

 7    Motors LLC and the Debtors

 8

 9    HEARING re Application of the Official Committee of Unsecured

10    Creditors Holding Asbestos- Related Claims for an Order

11    Pursuant to Bankruptcy Rule 2004 Authorizing the Taking of

12    Document Discovery and Deposition Testimony from the Debtors

13    and from General Motors, LLC, its Subsidiaries and Affiliated

14    Companies

15

16    HEARING re The Future Asbestos Claimants' Application for an

17    Order Pursuant to Bankruptcy Rule 2004 Authorizing and

18    Directing (A)the Production of Documents and (B)the Oral

19    Examination of Individuals Designated by the Debtors and New GM

20    Believed to Have Knowledge of Relevant Matters

21

22

23

24

25    Transcribed by:  Lisa Bar-Leib

Page 3

1

2    A P P E A R A N C E S :

3    WEIL, GOTSHAL & MANGES LLP

4         Attorneys for the Debtors

5         767 Fifth Avenue

6         New York, NY 10153

7

8    BY:  STEPHEN KAROTKIN, ESQ.

9

10   KRAMER LEVIN NAFTALIS & FRANKEL LLP

11        Attorneys for the Official Committee of Unsecured

12         Creditors

13        1177 Avenue of the Americas

14        New York, NY 10036

15

16   BY:  PHILIP BENTLEY, ESQ.

17

18   UNITED STATES DEPARTMENT OF JUSTICE

19        U.S. Attorney's Office

20        86 Chambers Street

21        3rd Floor

22        New York, NY 10007

23

24   BY:  JOSEPH N. CORDARO, DEPUTY CHIEF, AUSA

25

Page 4

1

2    MORVILLO, ABRAMOWITZ, GRAND, IASON, ANELLO & BOHRER, P.C.

3         Attorneys for Babcock & Wilcox Company Asbestos Personal

4          Injury Settlement Trust, Owens Corning/Fibreboard

5          Asbestos Personal Injury Trust, DII Industries, LLC

6          Asbestos Pi Trust, United States Gypsum Asbestos Personal

7          Injury Settlement Trust; and Delaware Claims Processing

8          Facility

9          565 Fifth Avenue

10         New York, NY 10017

11

12   BY:  STEPHEN M. JURIS, ESQ.

13

14   FRIEDMAN KAPLAN SEILER & ADELMAN LLP

15         Attorneys for the Manville Personal Injury Settlement

16          Trust and Claims Resolution Management Corporation

17         1633 Broadway

18         New York, NY 10019

19

20   BY:  EMILY A. STUBBS, ESQ.

21

22

23

24

25

                                                            Page 5

1

2    CAPLIN & DRYSDALE

3         Attorneys for the Official Committee of Unsecured

4          Creditors Holding Asbestos Related Claims

5         One Thomas Circle N.W.

6         Suite 1100

7         Washington, DC 20005

8

9    BY:  TREVOR W. SWETT, ESQ.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 6

1                  P R O C E E D I N G S

2          THE COURT:  All right.  GM.  Motors Liquidation

3     Corporation -- Company.

4          (Pause)

5          THE COURT:  I want to get appearances by everybody.

6     I want word as to the extent to which objections remain and

7     those which have been consensually resolved.  And then I want

8     everybody to sit down.

9          Mr. Karotkin, you've got the debtor.

10         MR. KAROTKIN:  Yes, sir.  Stephen Karotkin, Weil

11    Gotshal & Manges LLP, for the debtors.

12         THE COURT:  Right.  Is somebody other than Mr. Mayer

13    appearing for the creditors' committee?

14         MR. BENTLEY:  Yes, Your Honor.  Philip Bentley of

15    Kramer Levin.

16         THE COURT:  Right, Mr. Bentley.

17         THE COURT:  Okay.  For the D -- the Delaware

18    Management Company and the objecting trusts --

19         MR. JURIS:  Yes, Your Honor.

20         THE COURT:  -- DCPF.

21         MR. JURIS:  Yes, Your Honor.  Stephen Juris from

22    Morvillo Abramowitz.  In addition to the Delaware Claims

23    Processing Facility, we represent the Armstrong World

24    Industries, Inc. Asbestos Personal Injury Settlement Trust, the

25    Celotex Trust -- I'll use the short form to make it easier for

1    the Court.  And I've given my full appearance to your staff.

2    Babcock & Wilcox Company Asbestos Personal Injury Trust, the

3    Owens Corning Trust, the DII Industries Trust, the USG Trust.

4    And I think that covers it.

5             THE COURT:  All right.  Is that Ms. Stubbs?

6             MS. STUBBS:  Yes.  Emily Stubbs of Friedman Kaplan

7    Seiler & Adelman for the Manville Personal Injury Settlement

8    Trust and Claims Resolution Management Corporation.

9             THE COURT:  All right.  Thank you.

10            MR. SWETT:  Good morning, Your Honor.  Caplin &

11   Drysdale for the official committee of unsecured creditors

12   holding asbestos related claims.

13            THE COURT:  Right.  Okay.  Okay.  I'd like to get a

14   briefing from somebody -- I don't know if that's better you,

15   Mr. Bentley, than Mr. Karotkin, but either way -- on what has

16   been consensually resolved since I originally got all these

17   papers especially vis-à-vis the asbestos committee.

18            MR. BENTLEY:  Your Honor, we have reached a

19   resolution with the debtors and new GM.  The terms of the

20   resolution are set forth in the responses that were filed by

21   those two parties a week ago.  We have not reached a resolution

22   with the other parties.  We have scaled back the request we've

23   made to those other parties as set forth in our reply but we

24   have not -- and we have had discussions with those parties

25   since last Thursday.  But we have not been able to reach any

Page 8

1    resolution.

2            THE COURT:  All right.  Have a seat, please, Mr.

3    Bentley.  Okay, folks, I've read the papers.  I don't need

4    argument on whether or not the creditors' committee's request

5    is sufficiently relevant.  It plainly is.  And I don't need

6    argument on whether 2004 is appropriately invoked in this

7    procedural posture.  With the contested matter likely but not

8    yet initiated, I think it plainly is.  I've authorized it, in

9    fact, in this very case when I granted the same result for the

10   asbestos committee.  I've done it a zillion times, even most

11   obviously in cases where creditors' committees are doing their

12   investigation and their lawsuit against the bank group is all

13   but certain.  I don't need debate on that.

14           What I do want you people to address is the remaining

15   burden, if any, associated with the responses now that the

16   creditors' committee has scaled back its request.  And akin to

17   an issue that I dealt with in Chemtura, whether we've now put

18   in place sufficient screening to protect individual litigants

19   on their individual claims in any future battle with GM -- with

20   Motors Liquidation Company, or whether, incident to granting

21   any request by the creditors' committee or, to be more precise,

22   in connection with any grant of the creditors' committee

23   request, we'll need to create a wall between the creditors'

24   committee and those who would ultimately be defending any

25   claims or a stronger wall.

1        I saw a lot -- I think it was in your brief, Ms.

2   Stubbs -- about rightness and the fact that the Bates White

3   request had been made and you have some kind of licensing

4   mechanism.  I assume that's all now Emily Litella style, never

5   mind, in light of the fact that the factual predicate for that

6   argument or in lieu of that argument is now evaporated.

7        MS. STUBBS:  Yes, Your Honor.

8        THE COURT:  And I assume I should disregard it.  I'm

9   just laying out things that you'll each address in your oral

10   argument.

11        On behalf of DCPF, in particular, and perhaps the

12   individual trusts that DCPF serves, reading your brief, Mr.

13   Juris, it sure walked and talked and quacked like after I was

14   going to rule on these issues, that you then had some thought

15   that you were going to then go down to Delaware and

16   collaterally attack my order in enforcement in a Rule 45

17   context.  I want to know if that's really your intention.  If

18   it is your intention and you intend to get a second bite at the

19   apple, that would be a matter of material concern to me.  But

20   hopefully, you can give me a comfort that I read your papers

21   incorrectly.

22        I also want those on the trust side who argued it to

23   address the matter of notice which the briefs seemed to be

24   dancing around in terms of talking about your practice, what

25   you like to do.  And it wasn't clear to me whether your

Page 10

1    practice could or should trump a court order that requires

2    things to be done.  You give notice to a bunch of tort

3    litigants, of course they're going to say no.  If I were a

4    lawyer for a tort litigant, I'd say no.  Why make things easy

5    for your opponent?  So what is the purpose of that?  And is

6    this notice procedure supposed to trump what a Court thinks is

7    necessary or appropriate to run a case on its watch?  I need

8    help from you in that regard.

9         And I especially want to know if the trusts -- not

10   especially because the matters that I articulated are matters

11   of considerable concern to me -- whether the trusts are still

12   looking for the creditors' committee to contact 7,000 claimants

13   to get what the trusts, except for Celotex, already have in the

14   computerized database.

15        It seems to me, folks, that this is all about the

16   extent, if any, to which we have residual burden and what we

17   need to do to put in place appropriate confidentiality

18   arrangements and, in particular, what we need to do to protect

19   individual claimants.  Now, I'm not an appellate court.  You

20   don't need to address my concerns first.  But I need each side

21   to address those matters by the time we're all done.

22        And I'm assuming that what I have now before me is

23   the revised narrowed and refined request as articulated by Mr.

24   Bentley in his reply brief in contrast to the original broader

25   request which, if it hadn't been narrowed, would have been a

1  matter of concern to me which I no longer understand to be on

2  the table.

3          Mr. Bentley, I'll hear from you first.  And I ask you

4  to come to the main lectern, if you would, please.

5          MR. BENTLEY:  Good morning, Your Honor.  To begin, by

6  answering the question you just posed, you're absolutely right.

7  What's before the Court is the narrower set of requests that

8  are set forth in our Thursday -- our pleading of last Thursday.

9          I would suggest that it might make sense for me to be

10 quite brief now, because I think Your Honor knows our position,

11 and to then cede the floor to the other side but reserve some

12 time for rebuttal.

13         THE COURT:  Sure.

14         MR. BENTLEY:  Just very briefly, I think the guts of

15 the concerns that were raised in the other side's papers have

16 been addressed entirely or in large part by the narrowing that

17 we conducted.  We're not seeking any underlying medical

18 documentation or financial documentation.  We're merely seeking

19 the information contained in the claims forms themselves, which

20 is quite limited, as I think -- we attached a sample claim form

21 to our reply.  And as Your Honor can see, it does require each

22 claimant to identify the disease or diseases that he or she is

23 suffering.  But that's not confidential, Your Honor.  Every one

24 of these claimants is somebody who filed a complaint against GM

25 prior to the petition date.  That's the universe we're looking

Page 12

1    at.  Those complaints were not filed under seal.  So they're

2    publicly on record as having alleging diseases, presumably the

3    same diseases --

4            THE COURT:  Let me make sure I'm keeping up with you,

5    Mr. Bentley, because I assume that GM has a complaint from each

6    of those litigants that were described, the ailment that the

7    plaintiff had.  Your desire would be to see whether that

8    plaintiff asserted a different ailment to the relevant asbestos

9    trust or --

10           MR. BENTLEY:  The truth is, Your Honor, the medical

11   data on the forms, if they want to propose that that be

12   redacted or not provided, that's okay with us.  We didn't

13   propose that because we, frankly, thought it might be more

14   burdensome for them to start redacting things piecemeal.  But

15   we actually don't need that data.  There's a lot of other

16   information in the claims forms that is very important, most

17   important, their exposure allegations, the allegation my

18   disease was caused by exposure to the product of the company

19   that's now represented by this trust.  Those, we believe, are

20   critical.  Also of significant importance, although not quite

21   as central as that, are a variety of other sorts of data that

22   will enable us essentially to fill in the gaps in the debtors'

23   claims data base.

24           The approach we're proposing here is the traditional

25   estimation approach.  Sometimes debtors have claims databases

09-50026-mg   Doc 7696-5   Filed 11/08/10   Entered 11/08/10 23:24:36   Exhibit
MOTORS LIQUIDATION COMPANY, et al.
Pg 14 of 119

Page 13

1  that are very full in the information they provide.  This

2  debtor's database is somewhat thin and it doesn't have a number

3  of important fields filled in.  For example, the age of each

4  claimant.  That's an important data point because in our tort

5  system, an older claimant -- the claim of an older claimant is

6  less valuable than of a younger claimant because there are

7  fewer years left to live.  The date on which the claimant's

8  disease was diagnosed is also a very important variable.  If it

9  was diagnosed a long time ago, the claim was considered stale.

10  And the all estimation experts will tell Your Honor it's worth

11  a lot less.

12        So those are two examples of the sorts of data that

13  should be contained in the claim forms that we're seeking and

14  that is relevant.  The medical data that you mentioned -- that

15  Your Honor mentioned really is the one example of something

16  that we don't really care about.  And if they want to exclude

17  that, they're welcome to.

18        THE COURT:  So your point is you don't care whether

19  or not it's provided.  You're just happy to get it the cheapest

20  way possible?

21        MR. BENTLEY:  That's correct.

22        THE COURT:  What mechanisms have you proposed or do

23  you have in mind to protect the individual litigants from

24  anything being produced to you or your experts that could later

25  prejudice them in any litigation against the company if it ever

09-50026-mg    Doc 7696-5    Filed 11/08/10    Entered 11/08/10 23:24:36    Exhibit
MOTORS LIQUIDATION COMPANY, et al.
Pg 15 of 119

Page 14

```
 1    got to that point?

 2         MR. BENTLEY:  We've proposed a standard

 3    confidentiality agreement.  If Your Honor -- which we annexed

 4    as an exhibit to our reply papers.  If Your Honor believes that

 5    should be tightened up, we have no objection whatsoever.  We

 6    didn't think there was any need for tightening.  The agreement

 7    contains standard provisions which require us to treat this on

 8    a professional's eyes only basis.  We cannot share it with

 9    committee members except in summary form.  It requires to use

10    this only in connection with this litigation.  And when this

11    estimation litigation is over to destroy it or to return it.

12    It will not appear in any article that our experts are ever

13    going to publish.  It'll be used only for this purpose only.

14    So we do intend to -- we think those provisions should be

15    sufficient to satisfy the concerns Your Honor has raised.

16         THE COURT:  Pause, please, Mr. Bentley.  I'm not so

17    concerned about you sharing it with committee members as I am

18    with you sharing it with whoever at the debtors, especially

19    Motors Liquidation Company, would be actually defending these

20    lawsuits on an individual basis.

21         Just a minute.

22    (Pause)

23         THE COURT:  Before you answer, Mr. Bentley, CourtCall

24    is complaining that people are having trouble hearing from my

25    mic.  I now have it in maximum volume.  I assume you can hear
```

Page 15

1    me fine.

2            MR. BENTLEY:  Absolutely, Your Honor.

3            THE COURT:  Folks in the back of the room, can you

4    hear me okay?  People are nodding.  CourtCall, you're just

5    going to have to do the best you can.  That's the risk people

6    take when they appear by phone.

7            All right.  Do you remember the question, Mr.

8    Bentley?

9            MR. BENTLEY:  I do, Your Honor.  We think Your

10   Honor's concern is an important one.  Frankly, we have not

11   focused on that.  And if there is tightening up that needs to

12   be done, we'd be happy to do it.  The way the contract

13   currently reads, the one we have proposed, is it permits the

14   debtors' professionals to use this information solely for

15   purposes of the estimation.  But, as Your Honor is suggesting,

16   it may be that that needs to be made a little bit more specific

17   and a little bit more concrete.  The debtor, as I believe Your

18   Honor knows, has an estimation expert, Francine Rabinovitz, who

19   will be crunching the data and presenting Your Honor with an

20   expert report.  And she does not play any role in the ongoing

21   tort litigation against GM.  So I think the objection here --

22           THE COURT:  Well, maybe I need to ask Mr. Karotkin

23   the question.  But what I would have in mind then akin to what

24   I did in Chemtura, is to tell Ms. Rabinovitz -- is that her

25   name?

09-50026-mg   Doc 7696-5   Filed 11/08/10   Entered 11/08/10 23:24:36   Exhibit
MOTORS LIQUIDATION COMPANY, et al.
Pg 17 of 119

Page 16

1          MR. BENTLEY:  Correct.

2          THE COURT:  -- that she's under a wall so that she

3   couldn't share the information with whatever individual lawyers

4   on behalf of GM might ultimately be defending the claims if

5   later brought on a one on one basis.

6          MR. BENTLEY:  And I think we might want to make

7   certain that it's specifically drafted to restrict the debtor's

8   access to certain people who are involved in the estimation

9   process.  And a question I don't know the answer to is whether

10  some of those people are also involved in the defense of tort

11  claims in the tort system.

12         THE COURT:  Well, I would assume that the last thing

13  in the world that Mr. Karotkin would be doing was defending an

14  individual asbestos claim.  So we just got to make sure that

15  that goes across the board as far as I'm concerned.

16         MR. BENTLEY:  The issue I had in mind, Your Honor,

17  was not Mr. Karotkin or anyone at his firm.  It was whether

18  there might be people at new GM who might be participating in

19  the -- you know what?  On reflection, it's probably not a

20  concern because people at the debtors would be involved in the

21  estimation.  People at new GM would not be involved in the

22  estimation.  And only new GM will be defending claims in the

23  tort system.

24         THE COURT:  Well, okay.  I've articulated the

25  concern.  I want to give everybody a chance to be heard.  I

1    want to deal with this on a conceptual level.  And on a

2    conceptual level, what I care about is getting the

3    macroeconomic information we need as part of this estimation

4    without prejudicing individual litigants in their one-on-one

5    lawsuits in the future.  We successfully did that in Chemtura

6    and I hope to be equally successful here.

7              MR. BENTLEY:  And I think that should be eminently

8    manageable.  We'll focus on that, Your Honor.

9              THE COURT:  Okay.  Continue, please, Mr. Bentley.

10             MR. BENTLEY:  Just a few remaining points, Your

11   Honor.  What we're seeking here is very limited as I've said.

12   And what emerged in the papers that were filed by the claims

13   facilities last week was that all of this information with one

14   exception, the Celotex trust data, all of the information other

15   than Celotex is available electronically and on databases that

16   they describe as being sophisticated and they no doubt are.

17   That's their job.

18             We have withdrawn our request for any data from

19   Celotex.  We're limiting it just to electronic information.  So

20   what we're requesting is merely that they extract the

21   particular fields, the particular bits of data that we're

22   requesting, and provide them to us.  And I understand that may

23   require some work, data processing, software kind of work, to

24   make sure a code is written to extract the right information.

25   Frankly, that's what they're in the business of doing so I

Page 18

1    would think that wouldn't be a great burden.  But if it helps

2    the process, Your Honor, we're prepared to have our experts

3    step in and help write the code.  And if it's a matter of

4    expense, I would think that Your Honor might authorize this

5    estate to pay a modest reimbursement of expense that might be

6    entailed in doing this electronic project.

7          But we don't think it's a massive project.  We think

8    it's eminently manageable.  We think it's the sort of project

9    they're set up to do.  And I would note, Your Honor recalls the

10   back and forth about the Manville Trust having a voluntary

11   process which, at the end of the road, they decided not to

12   extend to us.  That's very pertinent, Your Honor.  The Manville

13   Trust is in the business, among other things, of providing this

14   data to people who ask or at least most people who ask for it.

15   They charge a modest fee.  But that's their job.  And that's

16   all we're asking them to do here.

17          And so, I would suggest, Your Honor, with all respect

18   to my fellow counsel in this courtroom that some of the

19   concerns you may hear expressed about burden really are masking

20   the fact that there is an alliance between the trusts and the

21   plaintiff's bar.  They are controlled by the same plaintiff's

22   law firms that set them up and that negotiated the terms of the

23   524(g) trusts at the end of these bankruptcies.  And they have

24   an allied interest with the plaintiff's bar in keeping this

25   information confidential for the very reason that we want the

09-50026-mg    Doc 7696-5    Filed 11/08/10    Entered 11/08/10 23:24:36    Exhibit
MOTORS LIQUIDATION COMPANY, et al.
Pg 20 of 119

Page 19

```
 1   information to use in our estimation.  That is to show that

 2   this double-dipping, triple, quadruple-dipping process is

 3   occurring.  This is an issue that's being fought out in

 4   courtrooms, state courtrooms, across the country.  And it's

 5   very heated.  It's one of the cutting edged issues in this tort

 6   litigation across the country, the asbestos litigation.  And if

 7   it were to get out, if Your Honor were to rule in your

 8   estimation ruling that the spike and values that occurred over

 9   the last decade was a short term thing and that the trusts are

10   now paying as much, we believe in the aggregate, as those

11   companies were paying in the tort system before they went

12   bankrupt and that those values should be and probably will be

13   reflected in the tort system going forward.  That is a damaging

14   ruling to the plaintiffs in state courts across the country

15   going forward.  That's what they don't want, Your Honor.  And I

16   would suggest that that may color -- that may stand behind the

17   position they're taking why they're making such a big deal

18   about the burden.  After all, the papers that were filed were

19   not cheap to prepare.  And we think it would cost them much,

20   much less to actually respond to our discovery than to litigate

21   the way they've been litigating.

22               THE COURT:  All right.  Do you want to save the rest

23   for reply?

24               MR. BENTLEY:  I would, Your Honor.  Thank you.

25               THE COURT:  Okay.  Mr. Juris?
```

09-50026-mg   Doc 7696-5   Filed 11/08/10   Entered 11/08/10 23:24:36   Exhibit
MOTORS LIQUIDATION COMPANY, et al.
Pg 21 of 119

Page 20

1            MR. JURIS:  Thank you, Your Honor.  Thank you, Your

2    Honor.  Stephen Juris.  I guess I should start by saying my

3    papers probably wouldn't have been as extensive -- and I'm

4    sorry to put Your Honor through reading them if the request we

5    had received in the first instance had been a little different.

6    But --

7            THE COURT:  I understand.

8            MR. JURIS:  But we'll leave that --

9            THE COURT:  Okay.  So roll with the punch now,

10    however.

11            MR. JURIS:  Absolutely.

12            THE COURT:  And focus on the request as narrowed.

13            MR. JURIS:  Certainly, Your Honor.  I think, to be

14    sure, the request is less burdensome than it was.  And I think,

15    as Your Honor's prefatory comments signaled, Your Honor is

16    trying to assess the respective need and burden and how that

17    shakes out in the balancing test how much is --

18            THE COURT:  But, frankly, I'm beyond need, Mr. Juris,

19    because I consider this matter that they're asking about much,

20    much more than sufficient to satisfy relevance requirements.

21    The issue is burden and bang for the buck.  And if it's still

22    an issue when you've got a computerized database, delay.  So

23    I'm not going to put a sock in your mouth and foreclose you

24    from discussing other things.  But I think that coupling my

25    review of the briefs with my knowledge of the law, I don't need

1    argument on relevance and I don't need argument on the extent

2    to which 2004 can be utilized.

3             MR. JURIS:  Understood, Your Honor.  If it would help

4    the Court, let me take a step back and explain what I think

5    would be entailed for us to comply with the creditors'

6    committee's request as presently framed.  You're absolutely

7    right that the endeavor does not involve nearly the same degree

8    of review of hard copy documents and redaction that would have

9    been involved had we been forced to supply paper files and

10   medical records.  We do have a database.  That database is

11   populated with data that is supplied by asbestos claimants.  By

12   and large, other than Celotex, that data is supplied to us

13   electronically.  Each of the larger plaintiffs' law firms

14   maintains those records.  In fact, they're required to maintain

15   those records.  And they retain them in electronic form in

16   exactly the same format that we receive them.

17            But what we don't have control over is exactly what

18   they put in their submissions.  We receive what they send us.

19   And what that means, in practical terms, is for us to respond

20   to a subpoena which we presume would issue from Delaware.  But

21   I think, just to address Your Honor's earlier comment, we all

22   recognize that Your Honor is responsible for overseeing this

23   case and is making decisions about what is relevant and how

24   Rule 45 or Rule 2004 should be applied in this case.  We all

25   recognize that.

Page 22

1          If we are to respond --

2          THE COURT:  Well, pause, please, Mr. Juris.  That's

3     helpful but doesn't answer my question.  When I am asked to

4     enforce a subpoena on behalf of another court, say, the

5     Northern District of Georgia -- I remember one instance where I

6     did that, one of many.  I call up the home court, call up Judge

7     Drake or whoever, and say I got a relevance objection here.

8     Looks to me like it's relevant but do you have concerns about

9     it.  And I would never in a thousand years think of stepping on

10    the toes of the home court on something where the home court

11    has a thousand percent more information about the underlying

12    issues than I, as an outpost court enforcing the subpoena,

13    would.

14         Are you or are you not reserving the right to

15    collaterally attack my order somewhere else?

16         MR. JURIS:  No, Your Honor.  And, in fact, all we

17    would insist upon --

18         THE COURT:  Well, I had two choices and you answered

19    no.  Which of those two is the no?

20         MR. JURIS:  We do not anticipate collaterally

21    attacking your order today although it is our position that a

22    subpoena should issue, as a matter of law, from Delaware to our

23    clients if Your Honor orders discovery to proceed.  That said,

24    Your Honor's description of what you anticipated happening is

25    exactly what I would anticipate happening.  And for that

Page 23

1    reason, we're here and we're arguing before you today.  We

2    think that you're the judge who we should be making this

3    argument to.  And that's why the papers we put in were

4    extensive and that's why we argued what we did.  So our

5    expectation, while the subpoena nonetheless has to issue in

6    Delaware or in Texas, is that today is our day to make our case

7    to Your Honor.  And we fully expect that that Delaware judge or

8    a Texas judge would be picking up the phone and talking to you

9    and asking what you would think about the outcome.  So I don't

10   have any expectation that we'll be collaterally attacking Your

11   Honor's rulings here today.

12          THE COURT:  I've heard much less equivocal answers to

13   my questions before, Mr. Juris.  Is that what you're prepared

14   to give me.

15          MR. JURIS:  We do not -- we will not collaterally

16   attack Your Honor's order.  I don't know if I could be more

17   clear.  We don't --

18          THE COURT:  Now you're clear but it took you a while

19   to get to that point.  Continue, please.

20          MR. JURIS:  Certainly, Your Honor.  I think the

21   question for Your Honor here today is how our burden of

22   producing materials compares with what the alternatives would

23   be.  In other words, we are not the only source of this

24   information.  And as I mentioned before, we get information

25   from claimants, we process them, we don't control what's in

Page 24

1    there and, consistent with the request that has been framed by

2    the committee, if we were to do the kind of production that

3    they've asked for, we would nonetheless have to run a script,

4    figure out what the overlap is which, I think, presents some

5    real logistical problems, which I'll address in a minute.  And

6    then we're going to have to review it and make sure that

7    material that's not called for by their request and it wouldn't

8    be confidential or otherwise not called for by an order from

9    Your Honor is extracted.  And there's only one way to do that.

10        THE COURT:  Well, you know, you said that in your

11   brief.  Forgive me, but I could not for the life of me

12   understand that.  To the extent that I agree with the

13   creditors' committee, I'm going to issue an order.  So what are

14   we talking about on requiring an order or what you would do if

15   you didn't have an order?  But you're going to have an order.

16        MR. JURIS:  Understood.  I'm just trying to -- I'm

17   trying to address Your Honor's question which I think is what

18   would discovery along the lines proposed by the committee

19   require of the trusts.  And what I'm suggesting, Your Honor, is

20   that in order for us to respond, there are a number of steps,

21   the steps that we, in good faith, took to reply and to give

22   them the information they've sought.  And what that would

23   entail would be, at first blush, a computer review.  Mr.

24   Bentley's absolutely right.  We have a sophisticated computer

25   system.  We could pull up what the plaintiffs' lawyers sent to

Page 25

1    us.  But that wouldn't be the last step.  What we would then

2    need to do would be to check that information, make sure

3    they're the right people.  That requires someone from the staff

4    of the Delaware Claims Processing Facility to make sure that

5    they're the right person.  That would require them to then

6    review the information and make sure that there isn't

7    information in that form that isn't nonresponsive or otherwise

8    confidential or wouldn't be parsed out as a result of Your

9    Honor's orders.  And then that information would have to be

10   prepared to be sent over to the committee.  Now, most of that

11   information, aside from Celotex, is supplied to the trust by

12   the claimants' lawyers electronically.  And in addition to

13   that, the TDPs for all of the trusts, including TDPs that were

14   approved --

15            THE COURT:  A TDP, for the record, is what?

16            MR. JURIS:  A TDP is a trust distribution procedure.

17   These are procedures that govern the trust that effectively tie

18   the trust's hands, tell the trust what it's supposed to be

19   doing, what it's not supposed to be doing.  They're approved by

20   the bankruptcy courts.  And one in particular, the Owens

21   Corning TDP, which I attached to our papers, provides for a

22   mechanism, for what we're supposed to do, what the trust is

23   supposed to do when it receives a subpoena.  And one of the

24   things that the trust is required to do, and I don't have any -

25   - I can't say we're not going to do it.  Your Honor can

Page 26

1    obviously order it and we have to adhere to Your Honor's

2    orders.  But what the trust procedures say is that we have to

3    then go ahead and notify the claimants that we've received the

4    subpoena.

5            Now, as an aside, I would just note that while Mr.

6    Bentley makes light of the efforts that would be impaled to do

7    that, he has not suggested anywhere, in his papers or here

8    today, that they're prepared to take on that obligation.  The

9    obligation would be ours.  And that's not withstanding the fact

10   that the confidentiality order that they've offered up as a

11   model for the Court to use provides that, in a corresponding

12   circumstance, where a subpoena is issued to the committee that

13   GM wouldn't get that same kind of notice.  So from my

14   perspective, we have pretty clear rules about what we have to

15   do vis-à-vis the actual claimants and it imposes a burden.  Is

16   it impossible to comply with?  No.  We get subpoenas.

17   Typically, they're one-off subpoenas.  And when we get a

18   subpoena, using the TDP procedures that have been imposed on us

19   that we're required to follow, we notify the claimants and give

20   them an opportunity to object because, after all, it's their

21   medical information.

22           What I'd like to suggest to Your Honor is that while

23   this information is in the possession of the trust and we could

24   produce it, isn't the better question why is it more difficult

25   and more burdensome, all things being equal, for the parties to

Page 27

1   this action to get the same information through a source that

2   would have the same exact information.  All they are asking

3   from us is what were the claimants paid and what did the

4   claimants submit.  And since the claimants submit their

5   information electronically and since many of the claimants are

6   represented by the very same counsel, from my perspective and

7   from my clients' perspective, this is an exercise where we are

8   an interloper here and they can get the information, the same

9   exact information from another source.

10          THE COURT:  Is that a euphemism for telling me that

11  the creditors' committee has to go to the individual 7,000

12  claimants or the lesser subset of them that are lawyers

13  representing 7,000 claimants?

14          MR. JURIS:  It is, but I think that it's not as

15  difficult as it sounds, Your Honor, for this reason.  I think

16  that if the outcome of today's hearing were that we were to be

17  able to supply Mr. Bentley with simply a cross-reference list

18  of the people who are claimants against GM and who have also

19  claims against the trust, that he would readily be able to

20  identify who he needs to be reaching out to.  And I don't think

21  it would be the same kind of burdensome exercise --

22          THE COURT:  You're seriously suggesting to me that

23  instead of going to one person to which all of the filings have

24  been directed, I have to go to 7,000 individual ones or the

25  lesser number of lawyers who represent 7,000 individual

Page 28

1    claimants?

2         MR. JURIS:  Well, Your Honor, the alternative is that

3    in any bankruptcy case, in any case in which estimation becomes

4    an issue, these 524(g) trusts end up -- will end up spending

5    their time responding to subpoena requests for information that

6    the claimants and the creditors, the asbestos creditors or

7    other creditors, of the bankrupt estate already have.  And I

8    think from a systemic standpoint, the concern that I hear from

9    my clients is that they have limited resources.  While they

10   have significant resources, the amounts of money that they have

11   available to pay the claims is less than the amount of claims

12   that they have against them.  And so what this presents is a

13   very real administrative problem.  It's very easy to say we can

14   just press a button on our computer and it'll spit out the

15   names.  But it doesn't work that way.  And there's both the

16   specific concern in this case but a systemic concern.

17        There's also a concern that we have of how to

18   reconcile the TDPs and the court orders that require us to

19   notify recipients of these subpoenas.  One way or another,

20   someone has to notify them.  So apropos of Your Honor's

21   comment, I don't think it's the case that we can simply ignore

22   the claimants.  Someone is going to have to notify them.  And

23   that burden will fall on my clients.  And my only question is

24   who does that burden fall on.  Does is fall on the trusts who

25   have limited resources who, in the case of Owens Corning, are

Page 29

1    paying ten cents of every dollar for every claim which may have

2    its own macroeconomic lesson there as well.  But set that

3    aside, they have limited resources and they have to get this

4    right.  And so what that means is it's not so easy to say well,

5    we'll just produce all this information and send it along.  And

6    if it turns out that we were wrong about something or we sent

7    the wrong information that we shouldn't have that we can just

8    say well, it's not our problem.  The problem is we have a

9    limited mission.  And that limited mission is bounded by the

10   rules that the bankruptcy judges created to govern what we do.

11            So, I don't mean to make light of the notion that --

12            THE COURT:  The bankruptcy judges created or the

13   bankruptcy judges approved when the parties in those cases

14   submitted them orders for signature.  You think the bankruptcy

15   judges devised these programs themselves?

16            MR. JURIS:  Your Honor, I confess, I was -- I have

17   the luxury here of simply being brought in at the last minute

18   to deal with an emergency discovery dispute.

19            THE COURT:  Well, I've been a judge for ten years.

20   And I bring a little bit -- and I've been a lawyer now for

21   forty, believe it or not.  And I have a little experience as to

22   how the judicial process works.  And maybe seven or eight times

23   in ten years, I've drafted an order from scratch and I've

24   crafted it thinking up all of the things that might go into it

25   and might not.  But I'll not be giving away the store when I

Page 30

```
 1   tell you that lawyers submit orders for us to review and

 2   ultimately sign, and I read them, even when they give me forty-

 3   page debtor-in-possession financing orders or sixty-page

 4   confirmation orders but I don't sit thinking up all of the

 5   things and all of the procedures that would go into those

 6   confirmation orders.  Do you think Judges Fitzgerald and the

 7   other judges who approved -- or Judge Lifland and others who

 8   approved procedures for the implementation of asbestos trust

 9   did it any differently than I would?

10            MR. JURIS:  Your Honor, all I can say in response to

11   your question is regardless of the process that resulted in

12   those orders, I have to follow those orders.  I don't have the

13   luxury of looking behind what the order says.  And if the order

14   says I'm going to approve this plan and I'm going to approve

15   this TDP, then my clients don't have a choice.  They have to

16   follow it.  And -- unless a judge tells them you've got it

17   wrong and you should do it a different way.  And so that's the

18   bind we're in.

19            One thought about the case that you mentioned earlier

20   today, the Chemtura case, my recollection of that case, Your

21   Honor, is that in that case the request at issue was made to

22   the lawyer for the claimants.

23            THE COURT:  I had the luxury there, Mr. Juris, that

24   ninety percent of the claims in Chemtura were brought by the

25   Humphreys firm co-represented by Caplin & Drysdale, if I'm not
```

1   mistaken, which had needs and concerns that where, as a

2   practical matter, so easily implemented by dealing directly

3   with those two firms that I had a materially different lay of

4   the land in terms of the number of people who would need to be

5   pulled and would need to have input.  And I'll stand corrected,

6   if need be, by you or anyone else, but it's my recollection

7   that by providing access and getting the cooperation of the

8   Humphreys firm and its co-counsel and four or five others that

9   I essentially captured the universe of diacetyl claimants.

10  That's pretty different.  Isn't it?

11          MR. JURIS:  Well, I'm not sure that I'm in a position

12  to know until we were to do a cross-reference.  But, Your

13  Honor, my suspicion would be that when you actually ran the

14  numbers -- we could stand corrected, but I would imagine that

15  if we were to run a cross-referencing, we might end up in a

16  very similar position.  Maybe it wouldn't be four.  Maybe it'd

17  be five or six.  But my understanding is that, from my clients'

18  perspective, a lot of the claims that they get are claims from

19  similar law firms and that there's a handful of major law firms

20  that submit an awful lot of their claims.  It doesn't mean that

21  all of them are submitted by those firms.  But if the end

22  result of this analysis we're to suggest that the exact same

23  information maintained by the law firms in electronic form

24  could be obtained from four, five, six or seven law firms with

25  appropriate notice, it would solve my clients' notice issue.

Page 32

1    We would be out of this mix.  You know, the reality here is we

2    don't want to be in this mix.  We're here, we're responsive.

3    We don't want to be part of the asbestos wars notwithstanding

4    what Mr. Bentley said.  In fact, my clients were created as an

5    outgrowth of the asbestos war to put an end to it with respect

6    to specific companies.  They're done with the tort system.  And

7    we have a limited mandate.  And that mandate is to pay and

8    process claims.

9           If it turns out that the exact same information is

10   available through someone who has a direct and abiding interest

11   in the outcome of this, since we're talking about GM

12   mesothelioma claimants and their counsel.  And they can get

13   that same information from them and avoid all of the

14   difficulties that that presents for us as we grapple with these

15   TDPs that we're required to adhere to.  Then that strikes me as

16   a third way.  Mr. Bentley gets the information he wants.  We

17   don't have to be kicking the tires to make sure that we haven't

18   produced confidential information about claimants that wasn't

19   asked for or not ordered by Your Honor.

20          THE COURT:  Well, pause, please.  Because what a

21   claimant provides your processing outfit or, for that matter,

22   your trusts, that, by definition, isn't privileged, right?  We

23   agree on that?

24          MR. JURIS:  Correct, Your Honor, although I will

25   direct Your Honor's attention to the TDPs that we submitted,

Page 33

1    some of which were approved by the bankruptcy courts which tell

2    the claimants that that information is settlement material

3    protected by applicable privileges.  I think we --

4         THE COURT:  Well, there are no privileges associated

5    with communications that proceed between two opponents.  Am I

6    correct on that?

7         MR. JURIS:  Ordinarily correct, Your Honor,

8    although --

9         THE COURT:  Can you think of a single exception in

10   your ten, twenty or thirty years of practice?

11        MR. JURIS:  Well, the only thing I would say, Your

12   Honor, not a privilege in a classic sense.  Certainly from a

13   rule of evidence perspective, the trusts are set up as

14   settlement trusts and submissions are made by litigants in

15   order to get an offer of settlement.

16        But your point is well taken, Your Honor.  We are not

17   claiming there's an absolute privilege here.  At best, this is

18   a factor that factors into Your Honor's balancing of burdens

19   and the need which Your Honor has already addressed.  So we're

20   not claiming here that it's privileged in that sense.

21        What I will say is when this issue has come up in

22   litigation before, and I would flag the Western Asbestos case

23   in which there's a request for information that's held by a

24   trust, Courts have found that the claimants, the people who

25   submitted their information to the trust, don't lose the

Page 34

1   ability to claim, hey, that's my confidential information,

2   that's my medical information, merely because they submitted to

3   a trust.

4           THE COURT:  Okay.

5           MR. JURIS:  So I think recognizing the balancing that

6   Your Honor is undertaking here, the question that we would pose

7   is why can't Mr. Bentley get that information elsewhere.  It is

8   easy to say this is 7400 claimants.  It may be much less than

9   that but, candidly, once a cross-referencing is done and if we

10  were given enough real information, including full social

11  security numbers, to do that cross-referencing -- but let's

12  assume that the end result of that is that they can get that

13  information through someone else, meaning, the claimants'

14  counsel.  Now they may claim, as they do in their brief, that

15  that's an imposition on claimants which I took as a positive

16  given that we were alleged to be in a stooge for the

17  plaintiffs' bar.  From my client's perspective, if the burden

18  falls on the asbestos claimants and their counsel, that's where

19  the burden belongs, not on 524(g) settlement trusts.  Their job

20  is to be a bystander.  Their job is to be out of this.  And

21  certainly not to be bound up in the GM bankruptcy.

22          I think if Your Honor's ultimate -- Your Honor, my

23  understanding is that, in rough -- and I don't think this

24  applies just to mesothelioma claims.  This is more broadly --

25  that in the Congoleum case, approximately 122,000 claims were

Page 35

1    filed.  Sixty-eight percent of those claims were represented by

2    six law firms.  And let me go back to where I started which is

3    how is this information supplied to us, why are we able to have

4    it in this format, why is it so easy for us to pull it up,

5    supposedly, electronically.  It's because the law firms give it

6    to us.  And they give it to us electronically and they download

7    it directly in to our systems.  We don't play a role in that.

8    But if discovery is to proceed in a manner that is suggested

9    here, producing that information is going to require us to

10   review those records and actually go into those records and see

11   is someone's social security number there that ought not be

12   there.  Did one law firm put in social security numbers next to

13   next of kin that we would all agree would need to be redacted.

14   And who's going to redact that?  Ultimately, it's going to be

15   the trust and its counsel that bears that burden.  And some of

16   that burden can certainly be recouped by paying cost and

17   defraying expense, but not all of it, because we have staff and

18   they're going to have to spend their time working on this.  And

19   it's not going to work simply to have the expert for the

20   committee waltz in there and say, well, give me everything and

21   we promise to give everything back.  And it's going to present

22   a lot of problems for us because when claimants get the notice,

23   if we're the ones who have to send it, that there's a subpoena

24   that's been issued for your records, who are they going to

25   call?  They're going to call us.  What are they going to tell

Page 36

1    us?  We object.  We don't want you to produce it.  And we're

2    going to have to produce it if the Court orders it.  But

3    ultimately, that creates an administrative burden that

4    shouldn't be ours to bear.  And if it were the case that this

5    was the only place to get this information, I could understand

6    a much different argument.  But since the information is

7    available and it's available from people with a direct and a

8    binding stake in this bankruptcy, it shouldn't fall on the

9    524(g) trusts.

10           THE COURT:  Anything else?

11           MR. JURIS:  Your Honor, one last point that did occur

12   to me is that in the Chemtura -- Your Honor mentioned

13   initially, in the colloquy with creditors' counsel that you

14   were guided by your experience in the Chemtura case.  In

15   addition to being a case in which it was really counsel for

16   claimants that was responding to the request, I also know that

17   in that case, the information was disaggregated and didn't

18   present the same kinds of confidentiality concerns.  Surely it

19   presented concerns.

20           THE COURT:  Well, pause, please, Mr. Juris.  If I had

21   a volunteer from the asbestos claimants' community who, as in

22   Chemtura, had ninety percent of the claims and who volunteered

23   to give me a statistical abstract of the type that was mutually

24   found satisfactorily there, I'd give that very serious

25   consideration.  But nobody's given me that offer yet.

Page 37

1          MR. JURIS:  I appreciate that, Your Honor.  I guess

2     what -

3          THE COURT:  The Humphreys firm, while not being the

4     only claimant there, was by any objective measurement the

5     dominant counsel for the plaintiff community in that case.

6          MR. JURIS:  I appreciate that, Your Honor.  I guess

7     my point is a little different which is that in that case, you

8     still had issues about the rights of underlying claimants

9     and -- who had submitted their information.  But in that

10    circumstance, I think that presented less of an issue than here

11    because here, in order for Mr. Bentley to do what he says he

12    wants to do with this information, he has to be able to link up

13    individual claimants to GM files.  That's the point of his

14    exercise.  And in the Chemtura case, those individual

15    claimants, they didn't have any identifying information

16    provided.  What they had provided was their medical situation

17    and some data.  But it didn't provide names and it didn't

18    provide social security numbers.  And my suggestion to Your

19    Honor is that presents a host of different confidentiality

20    issues.  It still presents them.  And I don't mean to make

21    light of it.  And I saw Your Honor's order and the protections

22    that Your Honor applied in that case.  I guess what I'm

23    suggesting is in our circumstance, if discovery were to proceed

24    against the trust, they would have to provide detailed claim by

25    claim information electronically, to be sure, about individuals

Page 38

```
 1   in such a way that the creditors' committee could link up that
 2   information to GM's information.  Otherwise, it doesn't do them
 3   any good.  And in that circumstance, the privacy concerns and
 4   the concerns for what happens to the claimants, what role do
 5   they play, what do we have to do to do right by them and why
 6   should the burden fall on us to be doing whatever that is.
 7   That presents distinct issues in this case and they're an issue
 8   that, I think, should factor into the Court's assessment of the
 9   burden.
10          THE COURT:  Very well.  Thank you.
11          MR. JURIS:  Thank you, Your Honor.
12          THE COURT:  All right.  I'll hear from Ms. -- oh, Mr.
13   Swett --
14          MR. SWETT:  I'm sorry.  I'm out --
15          MS. STUBBS:  That's okay.
16          MR. SWETT:  -- of order, Your Honor.
17          MS. STUBBS:  That's all right.
18          THE COURT:  All right.  But just a minute, Ms.
19   Stubbs, before you begin, I have Chemtura stuff that I
20   scheduled for 11 unduly optimistically believing that we
21   wouldn't take this much time here.  I see at least at least one
22   or two people in Chemtura but I don't see the principal
23   players.  Could I look for a volunteer to go out into the hall
24   and find out how much Chemtura thinks they're going to need,
25   because if, as I imagine, that Chemtura Canada's filings can be
```

Page 39

1    done in ten minutes, fifteen tops, and if there is a consensual

2    resolution on the exit financing, then I might be able to

3    interrupt GM long enough to deal with Chemtura and then

4    continue again with GM.

5            Ms. Labovitz, can I ask you to come up for a second,

6    please?  Knowing the lay of the land as to how much of your

7    stuff is going to be contested or not, do you have a sense as

8    to how long you're going to be?

9            MS. LABOVITZ:  I don't think it will be long, Your

10   Honor.  We have a fully consensual presentation on the exit

11   financing with just one brief item to put not he record as

12   requested by the equity committee.  And then, Your Honor, we

13   have the first day motions for Chemtura Canada as to which I

14   believe, again, there are no objections but the U.S. trustee

15   has asked us to make some clarifications on the record.

16           THE COURT:  And as to which on one relatively minor

17   issue I have a potential concern but we can resolve that pretty

18   quickly.

19           MS. LABOVITZ:  Okay.

20           THE COURT:  Ms. Stubbs, before I get you going,

21   because I don't want you to be interrupted, I wonder if the

22   people who are here on GM can just sit in place.  If the ones

23   who are here on Chemtura can have seats and you can get right

24   into your stuff, Ms. Labovitz.

25           MS. LABOVITZ:  Absolutely.

Page 40

1          THE COURT:  Do you have everybody here?  It's five

2     minutes before your kick-off time.

3          MS. LABOVITZ:  Yes.  Your Honor, I believe we have

4     everyone who needs to be here.

5          THE COURT:  Then would you continue, please?

6          (Motors Liquidation hearing interrupted to hear Chemtura)

7          (Resume Motors Liquidation hearing)

8          THE COURT:  All right.  I want to apologize to you

9     guys once again for what you had to go through.  I think we're

10    up to Ms. Stubbs.  I'll hear from you next.  Oh, wait a second.

11    I don't have Mr. Bentley.  Thank you.  Let's pause for a

12    minute.  Ms. Stubbs, you can come up but before you start

13    talking, let's wait for him, please.

14         (Pause)

15         MS. STUBBS:  Thank you, Your Honor.  As you know, I

16    represent the Manville Personal Injury Settlement Trust and

17    Claims Resolution Management Corporation.  As you mentioned in

18    your preliminary statement, we had objected to the discovery

19    request, the motion, on the basis that a license application

20    was pending and had not yet been acted upon.  After we filed

21    the objection, we received notice that one of the parties that

22    is obligated to consent to the license did not consent and we

23    advised Your Honor of that and the applicants of that.

24         THE COURT:  That nonconsent didn't come as a surprise

25    to you, did it?

Page 41

1          MS. STUBBS:  The trustees actually did not know

2     whether or not the parties would consent or not so they

3     submitted the application to those parties and received a

4     response after we submitted our objection.  So --

5          THE COURT:  Okay.

6          MS. STUBBS:  -- that issue has been resolved.  With

7     respect to the other objections, we will adopt the arguments

8     asserted by the other trusts.

9          THE COURT:  Oh, okay.  Mr. Swett?

10         MR. SWETT:  Yes, Your Honor.

11         THE COURT:  Did you want to be heard?

12         MR. SWETT:  Yes, sir.  Your Honor, Trevor Swett,

13    Caplin & Drysdale for the official committee of unsecured

14    creditors holding asbestos related claims.  I'm going to

15    address my remarks, Your Honor, subject to whatever questions

16    you may have, to the need to measure the burden that would be

17    appropriate for the discovery that has been framed here in the

18    context of an aggregate estimate of the -- of what GM would pay

19    in the tort system to resolve all its pending and future claims

20    which, I take it, the parties have kind of a violent agreement.

21    That's what this process is supposed to end up with.  That's

22    what we're shooting at.  And I ask the question, why in that

23    context individual payment amounts warrant any burden at all to

24    elicit from a third person, from a debtor that has its own very

25    expensive settlement history.  This is not like Chemtura, Your

Page 42

1    Honor, where the debtor there was faced with the need to

2    estimate some 375 diacetyl claims in the absence of any

3    significant settlement history at all on its part.  And so,

4    they look to third party settlement information conveniently

5    collected by the law firm that represented most of the

6    claimants.  And they accepted it in an aggregated form stripped

7    of any identifying detail with regard to individual claimants.

8    Why isn't the UCC here framing its request in that way and

9    pitching it at that level which is the aggregate estimate which

10   is the only thing that we're now engaged with?

11          THE COURT:  Your firm represented the Humphreys firm,

12   didn't it?

13          MR. SWETT:  Yes.  My partner, Jeffrey Liesemer did.

14          THE COURT:  Yeah.  I've seen a lot of Mr. Liesemer.

15          MR. SWETT:  Yes, sir.

16          THE COURT:  And me and his co-counsel from -- was it

17   from Missouri?  I'm not sure of the exact state?

18          MR. SWETT:  I think so, but, Your Honor, I'm not

19   personally involved in the case.

20          THE COURT:  Yeah.  Had the ability to prepare up a

21   nice workup for us covering ninety percent of the claims which

22   was not a hundred percent but a whopping number and which also

23   gave us a statistical comfort that was of very great value.  I

24   don't have a law firm that I can look to that can give me that

25   kind of a workup here that's going to cover ninety percent of

Page 43

1    the claims against old GM or anything close, do I?

2         MR. SWETT:  No, but my point, Your Honor, is that

3    that aggregate information already exists and is in the public

4    realm.  It exists and is in the public realm in the form of the

5    trust distribution procedures of all the trusts, most of which

6    are on the internet, all of which are available which set forth

7    what are known as the scheduled claim values that each trust

8    will pay, which claim values are derived from the particular

9    tort predecessor of that trust and its history in the tort

10   system.

11        So that, for example, if you turn to Exhibit J of the

12   trusts -- the Delaware trusts' exhibits, that would be the

13   Owens Corning and Fiberboard Trust, trust distribution

14   procedure.  And on page 28 of that document, it sets forth the

15   scheduled claim values that that trust will pay on expedited

16   review for any mesothelioma claim that satisfies the exposure

17   requirements.  It says right there in black and white that

18   that -- that the Owens Corning Trust fund will pay 215,000

19   dollars to those claimants.  It says right there in black and

20   white that the Fiberboard subfund of that trust will pay

21   135,000 dollars for a mesothelioma claimant that qualifies

22   under the terms of the TDP.

23        Now, those are the numbers that drive the averages

24   because the trusts have the statutory mandate to preserve their

25   assets such that the last claimant forty years from now will be

Page 44

1   treated fairly in relation to the first claimant on the queue

2   when the company emerged from bankruptcy.  And that means that

3   the trustees have to manage the affairs of that trust to bring

4   the claims in within those averages.  And even where a claimant

5   applies for what is known as individual review, the scheduled

6   claim values drive the range in which that claimant can

7   recover.  So that TDP scheduled values are the averages.  And

8   it's the averages that matter for aggregate claim estimation

9   which is what we're about here.

10          Similarly, Exhibit K of the trust documents, at page

11   26, this is another example.  It is the USG TDP.  It says that

12   that trust will pay 150 -- the scheduled mesothelioma value of

13   that trust is 155,000 dollars.

14          Now, let me make one point of clarification.  These

15   trusts pay pennies on the dollar.  These defendants were

16   insolvent.  When the trusts come on stream and begin paying,

17   they will not be paying the full share of the tort predecessors

18   that the trusts stand in the shoes of.  They will be paying

19   some fraction of it which causes one to question intuitively

20   whether the overall theory of relevancy sponsored by the UCC

21   makes any sense.  But, Your Honor, has directed me to direct my

22   comments at the issues of burden and I'm putting that in the

23   context of the aggregate estimation.

24          THE COURT:  Burden, and an additional one, Mr. Swett,

25   which if you believe that the safeguard's to protect individual

Page 45

1   litigants down the road are inadequate, I care about your views

2   in that regard as well.

3           MR. SWETT:  Yes, sir, I understand.  Let me just

4   complete my thought on the payment percentage.

5           THE COURT:  Go ahead.

6           MR. SWETT:  To figure out what the OC trust will pay

7   on average to OC mesothelioma of victims, the UCC would have to

8   apply the trust payment percentage to the scheduled value.  The

9   scheduled value is by analogy the allowable amount, the payment

10  percentage tells you how much that's going to be discounted

11  before that claimant receives a cash payment.

12          In the Owens Corning case it's forty percent as of

13  now.  In the Fiberboard Trust it's twenty-five percent.  In the

14  USG Trust it's forty-five percent.  In the Manville Trust it's

15  seven and a half cents.  In the GAF Trust it's seven and a half

16  cents.  These are, indeed, underfunded trusts.  They are

17  limited funds that stand in the shoes of insolvent defendants.

18          With regard to the aggregative significance of the

19  TDB scheduled values when conjoined with the payment

20  percentages, that information satisfies any legitimate need

21  that the UCC has for payment of information at all.  There is

22  no burden, not even an incremental step beyond that, that could

23  be justified in relation to what is already known.

24          With regard to protecting the rights of individual

25  claimants, let me first observe that that is vital for the

Page 46

1    estimation proceeding to remain focused as it ought to be on

2    the aggregate.

3           If we get into a discovery arm's race, focused on

4    individual claims, what the particular exposures of this Mr. X

5    who claimed against GM and also OC and USG were, what his

6    health situation was, what his payment amount from each of

7    those trusts was, what the comparative force of his exposure

8    evidenced, as it gets USC product v. GM products was, we will

9    lose the proper focus of this proceeding.  And it will become

10   impossible in fairness to hold this case to the desired

11   expedited track that all parties hope for for confirmation of a

12   plan of liquidation.

13          We will be forced to go their too.  And to take

14   exception to the inferences that Mr. Bates, on behalf of the

15   UCC, would draw from the granular of particulars of individual

16   claims.  From the standpoint of maintaining the focus of the

17   aggregate estimation proceeding where it ought to be or the

18   aggregate, the discovery is not only unduly burdensome it is

19   quite counterproductive and holds the seeds, for lack of a

20   better term, discovery arm's race that the Court would need to

21   keep close tabs on while also being evenhanded and fair to all

22   parties, so that people are not forced to deal with information

23   that they haven't had a chance to respond on.

24          Let me turn now to the issue of protecting the

25   individual claimants.  There is only one real way to do that

Page 47

1   with regard to the payment information, which is the most

2   sensitive information that they've requested.  And that is to

3   strip away all identifying detail that would tie any particular

4   payment to any particular claim.  I submit, again, they don't

5   need that given that they know what the average payments are

6   from each trust according to -- by reference to the TDPs and

7   the payment percentages.  But these things in the tort world,

8   and the hard fought litigation between tort claimants who

9   believe strongly in their claims and corporate defendants --

10           THE COURT:  Pause, please, Mr. Swett.  You said strip

11   away the identifying detail, presumably that meant the dollars

12   to a particular litigant?

13           MR. SWETT:  Yes.

14           THE COURT:  Were you talking about any other kind of

15   identifying detail besides dollars to that litigant?

16           MR. SWETT:  What I meant was it would be possible for

17   the respondents to construct an anonymous matrix rather like

18   the one in Chemtura.

19           THE COURT:  You think they could do that?

20           MR. SWETT:  I think they could.  With regard to the

21   information that they have, which is all they could respond

22   with.

23           The Manville Trust is colloquially thought to have

24   about ninety percent of the claims that existed against all

25   manner of defendants, including GM.  We don't know that but

Page 48

1    it's a fair assumption based upon thirty years of history.

2             So one can imagine a reporting divide that identifies

3    by anonymous reference which GM meso claimants also claim

4    against a given trust.  And to report for that set as a whole

5    an average payment amount.  That would be possible, and it

6    wouldn't implicate the individual's rights.

7             THE COURT:  That's intriguing Mr. Swett, but there's

8    an inconsistency between the position that you just articulated

9    and what they're telling me, which is that all of this stuff is

10   work and basically what you're proposing is laying more work on

11   them, whereas otherwise, all they would have to do is do a data

12   dump on the claims that were filed against them and the dollars

13   that were paid.

14            I assume this isn't your idea which hasn't been

15   blessed by the people who are the ones who would be asked to

16   provide the information?

17            MR. SWETT:  I haven't yet vetted it with the trust

18   administrators.  I believe it would be feasible.  There is no

19   cost-free way to provide this information while protecting the

20   individuals.  My present comments are aimed at underscoring the

21   importance of protecting the individuals.  I don't represent

22   them; I represent the constituency as a whole.  I am not able

23   to articulate fully the prejudice that an individual claimant

24   would have by having his prior settlements with third-party

25   defendants leaked out into the tort system.

Page 49

1        I will say this, the discovery that these folks are

2    seeking here has a lot to do, not so much with the particulars

3    of this case, as with what is going on as Mr. Bentley referred

4    to in the tort system among the remaining solvent defendants

5    and the claimants, who also have trust claims.

6        The defendants don't like the fact that under the

7    applicable state laws they don't get settlement information

8    from co-defendants unless and until they suffer a judgment.  By

9    and large, that is true.  It's certainly true in New York.

10   There is an illustrative case called ABF Capital Management,

11   decided by Judge Sweet back in 2000, it's Westlaw 191698, where

12   the demand from co-defendant securities fraud defendants was to

13   get at a settlement agreement made by one of their joint co-

14   defendants who was getting out of the case.

15       Judge Sweet considered the arguments, came to rest on

16   the idea that if there was ever going to be any right to elicit

17   the settlement terms of that selling codefendant by the

18   remaining litigating defendants, it would only be after a

19   judgment and only for purposes of molding -- after verdict and

20   only for purposes of molding a judgment so as to give credit

21   against the verdict for the settlement amount or the settling

22   defendant's equitable share.

23       Now, in GM's history there are very few trials.

24   Everyone would acknowledge that by and large the claims history

25   of GM is a settlement history.  No one would contend that

Page 50

1    that's going to change drastically in the future.

2            So, ironically, what the UCC is asking you to inflict

3    burden for is discovery that they would not get in the tort

4    system, and we're supposed to be measuring their resolution

5    costs in the tort system, which carries with it the conceptual

6    framework that you are supposed to view the claims through the

7    prism that the rules would apply in that system.  And you're

8    supposed to do a mega extrapolation of the values in the

9    aggregate of resolving all those claims in that study.

10           And, here, by going at individual payment information

11   for claimants who are not before you they are making a big end

12   run around the rules of the tort system.  And while I

13   appreciate that you have certain notions of the relevancy in

14   the discovery context that you've embraced, I predict to Your

15   Honor, that we will face in the further evolution of this

16   proceeding similar issues in the slightly different context of

17   probativeness and admissibility.  Because what they are doing

18   is to subvert the tort system rules that must control the

19   valuation of the claims in the aggregate estimate.  And no

20   burden is justified by that exercise.

21           Now, to test my hypothesis of the misfit between the

22   discovery requested and the purposes of this estimation look to

23   Exhibit A of the reply that the UCC has filed.  You will see

24   there the work of an insurance counsel.

25           THE COURT:  I understood that.  But I got to tell

09-50026-mg   Doc 7696-5   Filed 11/08/10   Entered 11/08/10 23:24:36   Exhibit
MOTORS LIQUIDATION COMPANY, et al.
Pg 52 of 119

Page 51

1   you, and the next thing you're going to tell me is that this

2   insurance counsel; this guy who writes this article is in the

3   business of fighting the plaintiff's bar and asbestos cases.

4   But I got to tell you that the perspective of the plaintiff

5   bar, which it is at least alleged, had a meaningful role in

6   creating these trusts, is one with which I have equal --

7   distrust isn't exactly the right word.  I take both of the

8   extremes positions with a grain of salt.

9           MR. SWETT:  Entirely appropriate that you should do

10  so, as long as you're willing to listen with empathy to the

11  perspective of that constituency.

12          THE COURT:  Well, it -- but -- you mean by listening

13  with empathy is not screwing the individual litigants in their

14  individual tort suits.  I thought I said from the get-go that

15  that's what I cared about in Chemtura and what I care about

16  here.  But what we got to talk about is the appropriate way to

17  skin the cat so that I, not having an ax to grind in either

18  direction, can get the right result.

19          MR. SWETT:  I understand, and before I pass more

20  specifically to that point, I would like to complete my thought

21  on what really drives this discovery.  You heard Mr. Bentley

22  accuse the plaintiff of manipulations and having an undisclosed

23  agendas behind their discovery objections.  But he, himself,

24  told you that a ruling here, allowing them to get at this

25  information through these trusts would be a hurtful ruling for

Page 52

1    the plaintiffs in the tort system.  And there is no occasion

2    for the Court to stray into that here.  All care should be

3    taken not to get into those weeds.

4         Now, if we go back to the idea on the payment

5    information of stripping out -- of giving them aggregated data,

6    not specific to any claim, constructed on the basis of the set

7    of GM mesothelioma claimants that each trust would identify,

8    assuming that were cost-effective and not horribly costly in

9    relation to what the UCC is asking, well, that would be a

10   reasonable accommodation.  And it would be effective because

11   there is no way that any individual would ever have to fear

12   that when it took -- came to squaring off against GM or at

13   another case against Garlock or Charlie Bates is also the

14   expert, or Bondex where he's pursuing the same things, that

15   they would never be prejudiced in liquidating their claim

16   against any of those defendants.

17        The only absolute security is -- can be achieved here

18   at that incremental expense, and it would also have the

19   salutary virtue of framing the information at the appropriate

20   aggregative level for the purposes of this Court, and prevent

21   its abuse in other courts with other purposes.

22        Now, I'm aware that there's been an offer to confine

23   the uses of this information to the purposes of this case and

24   that's fine, but something more is needed.  The expert appears

25   all over the place; he and his firm are holding themselves out

Page 53

1    as expert in the tort system and what the trust will pay.

2    Which causes one to wonder why he thinks he needs individual

3    payment information here, that's another point.  My point now

4    is there tends to be leakage and we can prevent it.  And we

5    ought to prevent it, and it fits better if we prevent it with

6    the purposes of this exercise aggregate estimation anyway.

7            With regard to the proofs of claim I have one point

8    similar in content to what I just said about the payment

9    information.  And that is that when measuring the burdens on

10   these pennies on the dollar trusts, and the inconvenience to

11   them of being held out as sort of open season discovery targets

12   for any defendant or bankruptcy tort defendant who wants to go

13   there and inflict those costs on them, you ought to consider

14   what information is already available.

15           In the tort system it was GM's theory that it was

16   merely a peripheral defendant, that the really culpable guys

17   were those other guys; Owens Corning, USG, GAF, Manville, all

18   those other guys.  And they all went into bankruptcy.

19           Now, did GM forget about them when they went into

20   bankruptcy?  Of course not.  His whole theory was we're not --

21   we have little, if any, culpability here, little, if any,

22   product exposure.  It's the friable stuff that those guys made

23   that caused these injuries.

24           Well, just because those defendants were in

25   bankruptcy did not prevent them from exercising their rights

Page 54

1    against the claimants in the tort system to take discovery.

2    And it did not want their economic incentives to do so because

3    they were interested in developing arguments that they could

4    make to the plaintiff's lawyer, or, if need be, the court or

5    the jury in the end, diminishing their own relative fault and

6    elevating that of the absent parties.  Trying the empty chair

7    is by no means a novel tactic in the tort system.  And GM had

8    the economic incentives and the discovery tools available to

9    develop from each claimant his work history, the products he

10   came in contact with to explore the testimony of coworkers on

11   those jobs.

12          This is a mature tort, these facts and circumstances

13   are largely out there to be explored by the defendants in well

14   trod discovery paths.  That was our point in the brief, Your

15   Honor, that the exposures, the relative culpability of other

16   defendants and so forth is baked into the GM settlement date.

17   Because when they decided in a given case that it was in their

18   enlightened self-interest to compromise a claim at a certain

19   amount of money.  It was with the benefit of whatever

20   information they had developed or could had they thought it

21   economically worthwhile developed in the tort system.

22          So the idea that they need to go explore the proofs

23   of claims in the third party trust in order to find out who had

24   other exposures is not correct.  And one way to approach that

25   issue, while respecting the rights of the individuals, is to

09-50026-mg    Doc 7696-5    Filed 11/08/10    Entered 11/08/10 23:24:36    Exhibit
MOTORS LIQUIDATION COMPANY, et al.
Pg 56 of 119

Page 55

1    require them to plum the resources of GM, including its claim

2    data and have a more concrete showing that it is inadequate for

3    that purpose, then they have yet made, before burdens are

4    inflicted on these trusts.

5             Now, if you pass that question it would be worth

6    giving thought to a way in which an anonymous not identified by

7    individual claimant basis.  The trust could respond with

8    aggregated information.  Now, that's a little trickier, it

9    would require a little more thought in consultation with the

10   parties, but I believe that certainly the identities of the

11   individuals attached to these proofs of claim forms could be

12   stripped out as long as the trust were representing and there

13   were some means of corroborating that the population of the

14   claim forms that they were representing corresponded to

15   individuals who had also claimed against GM, their purposes

16   would be served, but the individual rights of the claimants

17   would be protected.

18            THE COURT:  Pause, please, Mr. Swett, because you

19   anticipated, or at least you tickled the issue that was a

20   matter of concern to me.

21            There's a cliché out there about trust but verify.

22   And I don't remember, though your partners, Mr. Liesemer

23   probably does.  What we established in Chemtura as a means for

24   verifying the aggregation that the Humphrey and Caplin &

25   Drysdale firms did in Chemtura to give not so much to me, but

Page 56

1    the people who were on the receiving end of that information,

2    comfort that the aggregation they were getting was reliable.

3    Do you have any knowledge that's not speculation as to how that

4    was done in Chemtura for any similar response on what would be

5    a fair method here?

6            MR. SWETT:  I have no specific information other than

7    what I saw in the order.  And if I understood it correctly,

8    there was another committee that was permitted to audit but not

9    shape the contents of the anonymous matrix, or the backup to

10   the anonymous matrix.

11           THE COURT:  I'm not remembering that from my

12   management of the Chemtura case, and having trouble thinking

13   who that committee might have been, or who that party might

14   have been.

15           MR. SWETT:  Your Honor, after I sit down I can pull

16   out the exhibits which I think have your order, or the

17   transcript.

18           THE COURT:  I'm not sure that the order would do it,

19   maybe the transcript would, or maybe stuff that goes on in

20   conference rooms of the world would reveal that.  But --

21           MR. SWETT:  We have it --

22           THE COURT:  -- your idea, while it's certainly -- or

23   at least arguably worth of consideration, would need an

24   effective verification mechanism to make it affective, I think.

25           MR. SWETT:  I understand, and I think we could put in

Page 57

1    place, if we put our heads together, some means that would

2    corroborate the integrity of the date while protecting the

3    individual rights.  And that in the context that would be a

4    justified measure if you think this discovery should go

5    forward.

6            THE COURT:  Continue please.

7            MR. SWETT:  Your Honor, I think I said pretty much

8    all I need to, other than this.  Discovery is often an

9    intensely practical process, where rights are balanced.  And I

10   take it that that's Your Honor's frame of mind.  We stand ready

11   to work with the trusts and the UCC.  Our perspective will be

12   that of protecting the rights of individual constituents and

13   holding the scope to the stated purposes.  But we will not

14   obstruct it, we will cooperate in an effort to make it -- to

15   make that information come forth in an appropriate forum for

16   this proceeding, if as you seem to have it in mind, you think

17   it should come forth.  But we do suggest to Your Honor that

18   pausing and giving intensely practical consideration to

19   protecting the rights of the individual claimants is

20   worthwhile.

21           THE COURT:  I understand, Mr. Swett, but before you

22   sit down, as a matter again of reality, I put my time and

23   effort into matters that I need to decide.  And when matters

24   resolve themselves consensually I don't put as much attention

25   to.

Page 58

```
 1              Refresh my recollection as to what you asked for in

 2    your Rule 2004 request and what was done there vis-a-vis, both

 3    burden and protection of confidentiality.  My memory, albeit

 4    dim and possibly mistaken, is that you wanted discovery from

 5    Old GM and New GM, am I correct in that?

 6              MR. SWETT:  Exclusively of those sources.

 7              THE COURT:  And what measures did you put in place,

 8    if any, to address confidentiality insofar as that information

 9    might be used in a one-on-one litigation?

10              MR. SWETT:  There is a confidentiality agreement that

11    restricts the uses to the estimation.  Provides that the UCC

12    can have the agreement upon the execution of a confidentiality

13    undertaking.

14              In terms of -- that negotiation, Judge, was really

15    about expedition and scope.  We reserved our rights to take

16    federal rule discovery if it becomes a contested proceeding.

17    But we were rather forcefully reminded by the debtor that the

18    idea here, and this goes to the present stage of the case, was

19    that the parties would get the database and have the chance to

20    supplement it if they had additional inquiries of the debtor

21    and New GM.  It turns out that New GM is the party that really

22    has the information.  And then go off with their experts and do

23    their preliminary work and then come to the table.  And then we

24    would see --

25              THE COURT:  And try to have a negotiation that would
```

Page 59

1    obviate the need for a contested matter for me to estimate?

2            MR. SWETT:  Yes.  To have a negotiation, see how wide

3    the gap is, is it one that could be bridged by a negotiation or

4    must we go to battle.  So having been forcefully reminded of

5    that agenda, having in the first instance confined our

6    inquiries to the sources that seem most germane, GM and New GM,

7    we also negotiated scope limitations that would allow certain

8    data to come forth expeditiously, certain searches of data that

9    isn't electronic to be made and go on with the preliminary

10   estimate to accelerate the date at which we come to the table

11   prepared to discuss the problem with the other parties in

12   interest.

13           THE COURT:  All right.  And to what extent did you

14   put in mechanisms so that whatever you got from Old GM and New

15   GM would not find its way into the hands of the plaintiffs tort

16   orders of the world?

17           MR. SWETT:  We have -- I'm speaking from memory, now,

18   Judge, and we would be prepared to offer most favorite nations

19   treatment in terms of protection to the same level that emerges

20   from whatever happens here with regard to the UCC's case.

21           THE COURT:  I take it you agree that what's sauce for

22   the goose should at least theoretically be sauce for the

23   gander?

24           MR. SWETT:  I have no problem with that proposition,

25   Judge.  Our information by and large is in the form of data or

Page 60

1    documentation that's not specific to any case.  The data is

2    because of one of the things that we were interested in

3    exploring was the extent to which claims were handled under a

4    joint defense process with Ford or Chrysler.  Another thing we

5    wanted to know about was the extent to which cases were settled

6    across large groups of claimants.  And GM told us that, you

7    know, they could respond to that.  The particulars I'm not at

8    liberty to discuss in open court.  But it doesn't seem to be

9    burdensome, and it doesn't seem to have a whole to do with the

10   facts of a particular claimants demand or claim upon GM.  It

11   has to do with  GM's claims handling processes which we believe

12   are the key to shaping the outcomes that are reflected in the

13   historical claims data.

14           THE COURT:  More questions, forgive me.

15           MR. SWETT:  Yes, sir.

16           THE COURT:  Am I right in assuming that a good chunk

17   of GM's alleged liability arises from brakes?

18           MR. SWETT:  There are I think three well documented

19   sources, brakes is one.  More categorically, friction products;

20   which would include brakes and clutch facings and parts, are a

21   major source.

22           Another source is locomotive.  GM made locomotives

23   and they had insulation in the breaks.  One of the comments you

24   may have noticed in the UCC's brief was that we're not like

25   railroad makers, in fact, they made railroad cars or

Page 61

1    locomotive --

2            THE COURT:  I remember when I was a kid I had a red

3    and silver F3 locomotive that had GM on it.

4            MR. SWETT:  Right.  There's another source which is

5    called premises liability, which is exposure by workers on --

6    in properties owned by GM to asbestos dust.

7            THE COURT:  Now, one thing I learned in the 363 sale

8    was that a good percentage, I don't remember how much, I think

9    it was the majority, actually, of the GM vehicle might actually

10   be subassemblies made by the supplier community.  Was there one

11   or more brake suppliers or clutch facing suppliers that

12   provided brakes or clutches to GM?

13           MR. SWETT:  GM was an original equipment manufacturer

14   of those things.  I don't know yet the extent to which it

15   acquired those products from third parties.  It supplied those

16   products to a lot of third parties, including other automobile

17   dealers.  And, of course, shops that kept parts on the shelf.

18           THE COURT:  Like repair shops.

19           MR. SWETT:  Right.  I don't know the extent to which

20   GM friction products were manufactured by independent persons.

21           THE COURT:  Okay, thank you.  Mr. Bentley, reply?

22   Oh, before I do, Mr. Karotkin, I assume -- I don't know if you

23   want to be heard or not?

24           MR. KAROTKIN:  Can I go last?

25           THE COURT:  If you want.  Go ahead, Mr. Bentley.

Page 62

1          MR. BENTLEY:  Your Honor, I would propose to address

2     first the relevance issues raised by Mr. Swett, and then turn

3     to the issues of burden and the like raised by the trust and

4     the claim facilities.

5          And if I may, Your Honor, in order to address the

6     relevance issues, with the Court's permission I'd like to hand

7     up a one-page demonstrative exhibit.  I shared this with

8     counsel for the other parties on Friday afternoon and have

9     received no objections to my using this as a demonstrative aid.

10          THE COURT:  All right.  Hand it up.

11          MR. BENTLEY:  Your Honor, this is compiled using the

12     information in GM's asbestos claims database, which all the

13     parties have.  And it shows one thing principally, that is the

14     asbestos expenditures each year, the indemnities expenditures,

15     not defense costs, incurred by your -- by GM during the period

16     from 1990 through 2008, that being the last full year before

17     its bankruptcy filing.  And we offer it to the Court to

18     illustrate one fact that we think is perhaps the central fact

19     in this estimation -- that will inform this estimation

20     proceeding.  And that is if Your Honor compares the expenditure

21     levels in the 1990s they're relatively tiny; one or two million

22     dollars in almost every year.  And then in around the year 2000

23     there's an uptick followed by a very, very big spike upwards

24     peaking at about fifty million dollars in 2003, followed by a

25     gradual decline.

Page 63

1          And as we get into estimation Your Honor will learn,

2      if you've not been exposed to this already, one of the central

3      issues in any estimation is you look at the historical claim

4      values and you then apply them with adjustments to projected

5      future claims.  And in most cases, including this, the bulk of

6      the debtors' liability tends to be on account of future

7      asbestos claims.  Most of the claims have not yet been filed.

8      They're ten/twenty years out.

9          In many cases there's not a huge dispute over what

10     will the value of the future claims be.  The assumption is that

11     because in many cases in the past -- the past claim values have

12     followed a relatively stable trend line.  There's, therefore,

13     not a huge dispute over what will they be in the future.  All

14     the parties agree they'll continue to follow the relatively

15     stable trend lines.  Any dispute are cabined within the

16     relatively narrow area.

17         If you look at this case, and this chart, what jumps

18     out on you is how on earth is the Court going to solve the

19     conundrum, the puzzle that will be at the core of the

20     estimation hearing?  What will the future value be of asbestos

21     claims?  Will future values mirror the experience in the 1990s,

22     when GM was, in fact, a peripheral defendant, it was spending

23     tiny amounts to resolve asbestos claims?  Or will it, instead,

24     mirror the experience over the past ten years?  And you'll find

25     that the experts will, in effect, lay a pencil on this graph.

Page 64

1   And we will argue we will lay a pencil across the 1990s.  And

2   we'll say Your Honor there's very strong grounds to believe

3   that the past decade was an aberration, future values will

4   mirror the 1990s.  Alternatively, we may say, Your Honor, look

5   at the scope declining from 2002 down to 2008, future values

6   will continue to follow that trend.  And you'll hear from Mr.

7   Swett and his experts, oh, no, you should lay your pencil this

8   way from 2002 -- sorry, 2000, up to 2008 what we have is an

9   ascending trend.

10          The amount of the swing in Your Honor's eventual

11  estimation ruling based on your answer to this question, which

12  of these options you pick, will be absolutely enormous.  And

13  this is why we argue the debtors' estimation is very small, and

14  the hundreds of millions, if that.  And Mr. Swett, you'll hear

15  will argue it's in the billions of dollars.  Very big swing.

16  Principally explained by this issue.

17          So the question is how will Your Honor pick?  And we

18  submit that in order to select the time period that's

19  representative, that as a predictor of future claim values,

20  step number one is to understand the reasons for the swings and

21  claim values in the past.  Why did they spike in and around

22  2000?  Why did they then begin to come down pretty steadily

23  after 2003?  And we have a theory as to why that is and the

24  discovery we're seeking goes to the heart of that theory.  And

25  the information we're seeking we think is necessary in order

Page 65

1    for Your Honor to evaluate the merits of our theory and neither

2    accept it or reject it.

3              And here's our theory.  We think it's quite obvious

4    what the reason for the spike was.  Namely, in the year 2000 a

5    very large number of the principal asbestos defendants; Owens

6    Corning, Armstrong, others, filed for bankruptcy.  A large

7    parade of other principal defendants filed the next year.  And

8    more in 2002 and more in 2003.  All of a sudden the plaintiffs,

9    who had been suing those defendants, they're no longer in the

10   tort system, they're forced to look to new defendants; GM,

11   which had been a peripheral player, had been sued on average

12   forty suits a year during the '90s, on average.  All of a

13   sudden 850 suits per year.  And not only that, but it's a

14   target defendant.  So it can't resolve these claims for

15   nuisance values, it has to really litigate them.  And it faces

16   a risk of going to a jury in a very bad environment.  And this

17   relates directly to what you heard from Mr. Swett.  The

18   environment is -- those other defendants are not in the

19   courtroom.  Those other --

20             Now, Mr. Swett says, oh, well, they could litigate

21   the empty chair, they could point to those defendants.  But

22   there was -- there were two key things they could not do over

23   the past decade that going forward, were they still in the tort

24   system, they could do.  Number one, they couldn't say look,

25   Owens Corning, Armstrong, they've paid hundreds of thousands of

Page 66

1    dollars to this claimant.  This payment has already collected a

2    million dollars from the other claimants.  You should consider

3    that in deciding whether GM is liable for any additional

4    amount.  They couldn't say that because those claimants were in

5    the middle of a bankruptcy case, they weren't paying anything,

6    the automatic stay precluded them being joined in a suit.

7         There was another thing GM couldn't say.  GM couldn't

8    say look, look at their complaint, it alleges that they were

9    exposed to Owens Corning K low product, or they were exposed to

10   WR Grace's monocoat product.  And those products give off much

11   greater exposure levels, vastly greater, perhaps 1,000 times

12   great than GM's product.  They allege they were exposed to that

13   product.  GM's contribution to that, the argument would be, is

14   de minimis.  That's an argument they can't make because those

15   defendants were in bankruptcy, because they're in bankruptcy

16   the plaintiffs weren't filing suits against them, and they

17   weren't making -- they weren't forced to make exposure

18   allegations against those other defendants.  So they were able

19   to say GM is my only source, or GM and Ford were my only source

20   of exposure.

21        Now, the second central question for Your Honor is

22   has this environment changed now?  Or even though this was the

23   reason will it continue indefinitely out into the future?  And

24   here's where the discovery comes into play.  We say yes, it has

25   changed because the Owens Corning, the Armstrongs of this world

09-50026-mg    Doc 7696-5    Filed 11/08/10    Entered 11/08/10 23:24:36    Exhibit
MOTORS LIQUIDATION COMPANY, et al.
Pg 68 of 119

Page 67

1    they were absent from the tort system over the past decade,

2    they're now back.  They've confirmed Section 524(g) trusts.

3    Those trusts are paying very large sums.  And while Mr. Swett

4    tried to minimize it by saying pennies on the dollar, if you

5    aggregate all the funding of all the trusts, put it altogether,

6    it totals somewhere between thirty billion dollars and sixty

7    billion dollars, which, on average, if you assume 30,000 meso

8    claimants from now to when asbestos stops causing meso, that's

9    the round estimate, that translates into a million dollars,

10   perhaps more per meso claimant from the trusts.  That's a

11   situation comparable to the situation that existed back into

12   the '90s.  That is going forward it's reasonable to expect

13   claimants against GM will be filing claims against those other

14   trusts.  They'll be collecting in the aggregate something like

15   a million dollars from the trusts.  And in order to recover

16   those monies they'll be making allegations exactly like the

17   allegations they were making in their complaints back in the

18   1990s.  And that is what GM will be able to point to, it's

19   much, much better than litigating the empty chair when the

20   empty chair isn't making claimants and the claimant to the

21   plaintiff isn't making exposure allegations as to the absent

22   defendant.

23           Now, what discovery -- why do we need discovery in

24   order to prove this point?  Mr. Swett said oh, they seem to

25   know about the aggregate numbers already, so do they really

Page 68

1    need discovery?  He mentioned perhaps the single most

2    significant example of why you need discovery.  He said these

3    are trusts that are paying pennies on the dollar.  Your Honor,

4    we believe that's absolutely not true.  But we can't ask Your

5    Honor to take it on our say so.  So the principal reason we

6    need this discovery is we want to find out the facts, not what

7    amounts are the trusts funded with overall, but what have they

8    been paying to the claimants who've filed claims against GM.

9    As to each GM claimant what's the aggregate that he or she has

10   received from all the trusts.  And in addition, what are the

11   exposure allegations that those claimants are making against

12   the trusts.  How do they compare to what was being done back

13   into the '90s?  Are we right when we say the environment, the

14   conditions of the 1990s will essentially be the conditions

15   going forward, and, therefore, when Your Honor extrapolates

16   from this chart you will conclude, we hope, that it's

17   appropriate to lay our pencil across the 1990's values and

18   extrapolate them into the future.

19            That, Your Honor, is why we submit that this is

20   relevant.  And if Your Honor likes, I'm happy to turn to Mr.

21   Swett's suggestion about why not strip away all the detail,

22   which is something that we'd be amenable to providing there's a

23   way to make it work, which I'm, frankly, a little skeptical

24   about.

25            Here's the problem.  We need to match -- every

Page 69

1    claimant on the GM database, we need to match that person,

2    let's call him Mr. X, we need to find Mr. X's claims and data

3    as to each trust.  And so for every trust we have to make sure

4    it's the same Mr. X.  And then we have to make sure it's the

5    same Mr. X as to not just the GM claims database, but also the

6    other discovery that GM and New GM are going to be providing to

7    us pursuant to our recently resolved Rule 2004.  Namely,

8    they're providing to us as to a subset of claimants

9    interrogatory responses, deposition transcripts.  We need those

10   in order to compare --

11             THE COURT:  They being Old and New GM?

12             MR. BENTLEY:  Correct.  We need those in order to

13   compare the exposure allegations that each claimant was making

14   to the trusts to the exposure allegations -- this is among

15   other things, to the exposure allegations that each claimant

16   was making to GM, had made to GM at the time it reached a

17   settlement with GM.  Because they're going to say aha, this

18   claimant settled with GM, GM -- this claimant received X

19   dollars from the trusts, GM must have known of the dollars and

20   of the exposure allegations that this claimant make, so we ask

21   give us the interrogatory responses from which we can see did

22   this claimant, in fact, disclose to GM, in fact, the payments

23   that it received and the exposure allegations it had made

24   because there's a lot of evidence out there, as was mentioned

25   in the article by the insurance defense lawyer, that there's

Page 70

1    often very incomplete disclosure.  And there's been a number of

2    court decisions to that effect.

3           So providing that we can make all these matches then

4    we're okay with stripping away the names, but I -- what I'm

5    struggling with is I don't see how you can make the matches

6    without using the name and the other identifying data that you

7    have.

8           And in terms of the risk that's involved, Mr. Swett's

9    concern that Charlie Bates, our expert, is going to somehow

10   disclose this data.  Mr. Bates' interest, our interest in this

11   is in this data as an aggregate matter.  We have no interest,

12   he has no interest in what was the resolution of Mr. Smith's,

13   Mrs. Smith's claim against GM, it's the aggregate data.  It's

14   being able to tell the story that I just told to Your Honor.

15   In the aggregate here's what was happening.  So we have no

16   interest in the names and there's absolutely no reason to

17   suspect anybody would violate a confidentiality order.  We just

18   may need the names in order to make the matches that are going

19   to be uses.

20          THE COURT:  The allegation that I heard, Mr. Bentley,

21   was that somebody in -- I don't know if it's the same guy or

22   not, is going to be testifying as an expert, not just in this

23   case, but in other cases, presumably with the purpose or effect

24   of prejudicing the individual litigants in the plaintiff

25   community.  And that expressly or impliedly it wouldn't be

Page 71

1    enough for me to say that he couldn't give the information to

2    the individual defendant's tort lawyers, who are defending the

3    one-on-one's in asbestos litigation on behalf of GM if it ever

4    got to that point.

5            I don't know if you think I heard him rightly or

6    wrongly, but please answer whether you -- I did, and whether

7    that's something I need to pay attention to.

8            MR. BENTLEY:  Mr. Swett will correct me if I'm wrong,

9    but I think Your Honor misheard him or he misspoke.  That is,

10   there's absolutely no circumstance that I'm aware of in which

11   Mr. Bates, our expert, would ever be testifying with respect to

12   an individual claimant.  Mr. Bates, he's a statistician, his

13   job is to look at aggregate claims of populations.

14           THE COURT:  Okay.  So it may be that what Mr. Swett

15   was talking about, and I guess Mr. Swett's the best evidence of

16   what he was talking about, would be in other estimation

17   proceedings and other asbestos bankruptcies, or did I

18   misunderstand in total?

19           Mr. Swett, did you -- Mr. Bentley, do you mind

20   yielding to Mr. Swett to clarify?

21           MR. BENTLEY:  Not at all, Your Honor.

22           MR. SWETT:  Your Honor, I was making a more intensely

23   practical point.  This kind of information in the seeing of

24   these hard fought tort suits and resulting bankruptcies is very

25   difficult to protect reliably if the individual data is

Page 72

1   produced to a hostile party.  And a hostile expert who is --

2        THE COURT:  Disclosed from whom to whom?

3        MR. SWETT:  Disclosed from those who receive it to

4   those who have an interest in using it in another context.

5        THE COURT:  That's a pretty broad answer.

6        MR. SWETT:  It is and I'm not --

7        THE COURT:  I'm looking for more in the way of

8   specifics.

9        MR. SWETT:  I'm not accusing anyone in advance, I am

10  simply saying that there is a way to protect it and to make

11  sure that doesn't happen, and that would be a salutary thing.

12  But it is entirely possible to imagine a scenario in which Mr.

13  Bates' -- Dr. Bates' office inadvertently provides -- it

14  creates these funds of data.  It's computerized, it's easy to

15  transfer, it's hard to trace.  That there is no effective

16  protection against that kind of leakage once the payment

17  information is linked to the individual identity.  And here

18  we're going to have partial Social Security numbers that are

19  going to be used if they're permitted to make this matching

20  exercise.  And when it comes time for -- when Mr. Bentley has

21  concluded I do have a couple of responses to make.

22        THE COURT:  This isn't like the formula for Coke or

23  the nuclear launch codes, I mean I can see why you don't want

24  it to get into the wrong hands, but I still see a difference in

25  degree.

Page 73

1          MR. SWETT:  Well, in Chemtura, Judge, you had 375

2     claimants.  You've got 7,400 claimants that the UCC is

3     enquiring about here.  In Chemtura you had one or two other

4     sources.  Here you've got six trusts, two claims processing

5     facilities, and I think a seventh trust, Manville, with its own

6     claims processing facility.  There are lots of players, there

7     are lots of disputes out there involving other debtors who

8     would like to propound similar ideas, who will be eager to get

9     their hands on that data.  I have the pleasure of being the

10    committee counsel for the asbestos constituency in the Garlock

11    case, just now, we're they're proposing a whole course of

12    dealing in the bankruptcy program that's key to Mr. Bates'

13    views.  It's very sensitive information from the standpoint of

14    maintaining the balance between the plaintiffs and the

15    defendants in the tort system, which is the key to properly

16    valuing their claims for bankruptcy purposes and which is the

17    key to fairness in the tort outcomes too.

18          THE COURT:  All right, time out.  You've answered my

19    question, this wasn't intended as a surreply opportunity.  I

20    want you to yield back to Mr. Bentley, please.

21          MR. BENTLEY:  Two quick responses, Your Honor.

22          First, Your Honor mentioned the Coke formula.  And as

23    I think Your Honor's probably well aware, even the Coke formula

24    was required to be produced in the litigation when it was

25    relevant.  The court dealt with that very high degrees of

Page 74

1   sensitivity through a confidentiality order.  And that can

2   certainly be done here.

3           And, in fact, the confi that we have already proposed

4   provides that all this information will be destroyed or

5   returned at the end of this litigation.  Dr. Bates is not going

6   to use it in any other litigation.  And the way our courts work

7   is they take people at their word when they commit.  And he's a

8   serious professional, with an outstanding reputation.  And I

9   would submit that that is sufficient protection.

10          THE COURT:  Okay.

11          MR. BENTLEY:  Moving on, Your Honor, let me turn to

12  the arguments that Mr. Juris made.  And my interpretation of

13  his arguments, Your Honor, was that his principal argument is

14  we should look to the plaintiffs.  That rather than going to

15  the centralized database as maintained by the two claim

16  facilities, we should go to the claimants.  Well, we took

17  advantage of the breaks, the breaks during this proceeding to

18  check with the Bates White firm, our experts, as to how

19  feasible would that be.  And here's the information we got

20  back.

21          That in order to reach ninety percent of the GM

22  claimant population we would have to go to almost sixty, 6-0,

23  law firms.  In order to reach ninety-five percent of the

24  population we'd have to go to more than a hundred firms.  And

25  we don't even know how many firms it would be to get all the

Page 75

1    way to 100 percent but it would clearly be a lot larger number

2    than that.  So that simply is a recipe, in our view, for

3    multiplying the burden it's not a solution.  Here we have claim

4    facilities that are in the business of crunching this data in

5    the most efficient way possible.

6           And on that score, Your Honor, with respect to burden

7    we learned one other very pertinent fact from our expert firm

8    during the breaks.  And that is as Your Honor knows the

9    Manville Trust is in the business of supplying this data to be

10   people who've requested.  Although, the Manville Trust reserves

11   the right to supply it to those who it chooses, and decline to

12   supply it to others.

13          It used to be that they regularly supplied data to

14   the Bates White firm.  And, in fact, the Bates White firm tells

15   us that it was routine, it was regular, that they would provide

16   very substantial amounts of data, more than 100 data fields,

17   culled from thousands of documents, thousands of records.  They

18   would compile all this in a matter of a few days and turn it

19   over for a fee of merely 10,000 dollars.

20          Now, they're choosing not to do that now.  But while

21   they may prefer not to give it to the Bates White firm for

22   reasons we can all guess at, they are continuing to provide

23   these sorts of services to other parties who may be more to

24   their liking.

25          For example, the firm ARPC, they're the firm that's

Page 76

1    been retained in this proceeding by the FCR, the future

2    claimants' representative, to be their estimation estimate.  So

3    they're in this proceeding, a plaintiff's side estimation

4    expert.  They regularly make these sorts of requests to the

5    Manville Trust and are giving this sort of data.  No sweat.  So

6    we think that Your Honor can con --

7                THE COURT:  Do you know what data was provided to the

8    other side?

9                MR. BENTLEY:  I'm sorry, to the ARPC firm?

10               THE COURT:  The specifics of the data that was

11   provided to the other side?  I assume that at some point you're

12   going to be litigating against the creditors' committee, or the

13   asbestos creditors' committee for the prepetition claims and

14   the future claims rep for the future demands.  Do I have a

15   situation here where you're informed that there was one-sided

16   licensing here or one-sided disclosure?

17               MR. BENTLEY:  No, Your Honor has taken it one step

18   beyond what I was meaning to say.  That is we don't have any

19   basis to believe that in this case the Manville Trust has

20   turned over data to ARPC, or to Dr. Peterson, who is Mr.

21   Swett's expert.  A big note that --

22               THE COURT:  Then what was -- what were you referring

23   to when you said that they gave it -- gave some kind of data to

24   somebody associated with the claims rep, the future claims rep?

25               MR. BENTLEY:  The ARPC firm, like the Bates White

1    firm in the past has had occasion to request this data in

2    connection with a variety of matters; estimations in other

3    cases or other projects they may be working off.  I can't

4    identify the projects, but I can represent --

5         THE COURT:  So you're saying in non-GM litigation

6    their expert was provided this info, but not in this case.

7         MR. BENTLEY:  That's correct, Your Honor.  And in the

8    past Bates White on a regular basis was provided this sort of

9    information within days for a 10,000 dollar fee.  And my point

10   is not so much to argue -- well, it's certainly not to suggest

11   that it's happening here in the GM case, it's simply to make

12   the point that when they want to make it easy they make it

13   easy.  And I think Your Honor can give that a certain amount of

14   weight in considering the burden that you're hearing about

15   here.  We didn't hear a huge amount, we heard a lot of

16   protestations about burden, but we didn't hear a lot of

17   specifics.  We just heard make somebody else bear the burden.

18        So, Your Honor, that's all I have on the substance.

19   But if I may, I have a practical suggestion as to where we

20   might go from here.

21        THE COURT:  Go on.

22        MR. BENTLEY:  We recognize there's some work to be

23   done here among the lawyers.  Your Honor raised a very

24   important point about the confidentiality agreement to make

25   sure there's an absolutely secure screen in place with respect

1   to New GM, not to mention the issues that have been raised as

2   to making certain that the screen as to Dr. Bates is 100

3   percent secure.  We're happy to work on that, and we're happy

4   to work on that with counsel for all the other parties.

5            We're also happy to work with those other parties on

6   the issues of burden.  For example, we're prepared to explore

7   with them whether this masking approach, this strip away the

8   individual names approach could work.  If that works we're

9   happy to do it.

10           THE COURT:  Do you mean, as we did in Chemtura or

11  something different?  And as Mr. Swett proposed or something

12  different.

13           MR. BENTLEY:  I'm referring to what Mr. Swett

14  provided.  And I do have hesitations, I do have concerns about

15  whether that would work here as I described.  The issue is if

16  you stripped away the name could you really make all the

17  matches with the various different sources of data here,

18  including GM interrogatory responses and so forth that you

19  would need to.  If that problem is solvable then we have no

20  problem with stripping away the names.  We don't -- this is not

21  about individual claimant names, so we're happy to explore

22  that.

23           From a timing perspective, here's what I would

24  suggest, subject, of course, to Your Honor's preferences.  We

25  are concerned about moving this process forward.  You've heard

Page 79

1    from several parties and we share the view that we want the

2    estimation process to move forward promptly.  And we also want

3    the settlement process to move forward promptly.  For those

4    reasons, it's important that Your Honor enter an order that

5    enables us to issue subpoenas, and hopefully to do it now

6    particularly given that it's August and we understand Your

7    Honor may be away a fair amount of the rest of the month.  What

8    we would propose in order to mesh this need to move forward

9    with the concern about -- with the need of the lawyers to work

10   amongst themselves and hash out some of these issues, is what

11   we would suggest is we prepare and submit an order to the Court

12   this afternoon, which we would circulate first to the other

13   parties, that the order would authorize the issuance of

14   subpoenas to the claims facilities now.  It would provide that

15   the producing parties would reserve their rights to come back

16   to this Court, this Court, not another court per your colloquy

17   with Mr. Juris, in the event specific issues are not able to be

18   resolved through the discussions that we'll be having with them

19   over the next few weeks.

20            And entering an order of that sort would permit the

21   process to begin.  It would permit the clock to start ticking

22   as far as -- forcing them to resolve any issues and to produce

23   documents.  And so that's what we would propose.  I would

24   propose one other wrinkle in the order, and that is we intend

25   to attach to the subpoenas a list of claimants with Social

Page 80

```
 1   Security data provided by the debtors or New GM attached to it.

 2   We're doing that because that will be helpful to them in making

 3   sure they have the right claimants, in making the match that

 4   they need to make.

 5          That's obviously confidential, the list of claimant

 6   names and their Social Security data.  But the way, it's just

 7   the last four digits, not the whole Social.  And so we would

 8   suggest that if Your Honor's inclined to enter an order now

 9   that the order provide, among other things, that the

10   confidentiality of this list and the annexed data will be

11   protected until the parties are able to work out a fully

12   negotiated confidentiality agreement in the meantime that will

13   be entitled to attach this list and the parties will keep it

14   confidential.

15          THE COURT:  Suppose, Mr. Bentley, that I'm inclined

16   to give you a -- most or even more of what you're asking for,

17   but I think Mr. Swett's idea is preferable.  And that is it

18   were practical I might prefer it.  In other words, to give the

19   various trusts and the like the key to the jail if they could

20   provide an implementation of the Swett idea, if I can call it

21   that, in sufficiently fulsome way that it would meet your

22   needs.  How would I best implement a ruling that says that what

23   you're asking for is basically okay, but Swett's idea is

24   better?

25          MR. BENTLEY:  I think Your Honor has essentially just
```

Page 81

1   done it.  That is, if Your Honor were to enter an order along

2   the lines I was suggesting we are now very clearly on notice

3   that Your Honor would like us to do our darndest to make the

4   Swett idea work.  And that would be motivating, Your Honor.

5         THE COURT:  One thing you didn't address was a point

6   that Mr. Juris made about a requirement in many of the trust

7   agreements that provides in substance for notice to individual

8   litigants.  Do you believe that I have to -- I have to or

9   should, those being two different issues, give notice to

10  individual tort litigants, what would I do if, as I think is

11  nearly a certainty, some number of them raise objections,

12  either because their ox is genuinely gored or because they want

13  to be difficult.  And what do I do with the risk that the

14  notice period provide -- has the potential of bringing

15  everything to a halt, on the one hand.  But on the other would

16  raise, at least arguable due process issues to the individual

17  litigants?

18        MR. BENTLEY:  I think that issue is manageable, Your

19  Honor.  Let me address it in a few bites.

20        First, they -- Your Honor doesn't have to order

21  notice, they believe they're required, at least to their

22  practices if not anything more, to give notice.  We believe

23  it's very easy for them to give notice.  Their claims database

24  can undoubtedly match the various claimants to the various

25  claimants' counsel, presumably with a touch of a button.  And

Page 82

1    they almost certainly have the e-mail addresses for the various

2    counsel and can send out a mass e-mail tomorrow if Your Honor

3    were to enter an order.  They could forward the order --

4              THE COURT:  So we don't have to do it the old-

5    fashioned way, like we used to of mailed notices, kind of like

6    notice of a class action or anything like that, or of a

7    proposed class action settlement?

8              MR. BENTLEY:  I think, Your Honor, I think this is a

9    matter of them complying with their own procedures, nothing

10   more.  It's not a matter of compliance with other court's

11   order -- another court's order.  I would also say --

12             THE COURT:  You're saying, you don't have to use the

13   old-fashioned U.S. Mail anymore?

14             MR. BENTLEY:  I think Your Honor is entitled to be

15   practical.  And I think these claimants all are represented by

16   counsel.  Counsel have e-mail, and we all prefer, as counsel,

17   as Your Honor knows, to get e-mails than hard copy mail.  I

18   think we can be practical about this.

19             THE COURT:  Continue.

20             MR. BENTLEY:  And I think Your Honor can also take

21   advantage of the two-step process that's always involved when

22   the Court signs a 2004 order; that is, if Your Honor were to

23   sign the order today or tomorrow, the next step, as you heard

24   from counsel, is for us to serve subpoenas.  And they do have

25   the power, under the rules, to then raise issues as to -- not

Page 83

1    as to the global issues Your Honor has already ruled on, like

2    relevance, but as to discrete issues of privilege or burden.

3    And Your Honor's order can provide --

4            THE COURT:  Well, from the perspective of a tort

5    litigant, one of those who would be getting notice, you're

6    right that the issue of relevance and most of these issues

7    would have gone by the wayside.  But the one area where a tort

8    litigant might have a legitimate desire to be heard is saying,

9    hey listen, there's a leak in the protective screen, and my ox

10   is going to get gored because they're going to use the

11   information against me in X, Y and Z ways.

12           Now, that would -- if established, that would be both

13   the area where I would think that a complaint by a tort

14   litigant might be judicially cognizable, and might, if there

15   were something wrong with it, be the kind of thing I'd be

16   interested in.

17           MR. BENTLEY:  And I believe the procedure that I'm

18   suggesting would give those tort claimants the ability to be

19   back in court, as Your Honor's order would leave open the

20   possibility of us all being back in court with respect to

21   discrete issues.  Now, the broad issues, the global issues --

22           THE COURT:  Of course, you realize that you're

23   hostage in terms of delay, to frivolous objections of tort

24   litigants?

25           MR. BENTLEY:  I think Your -- I don't know Your

Page 84

1    Honor's schedule, but if we could --

2              THE COURT:  It's bad.

3              MR. BENTLEY:  -- I understood that.

4              THE COURT:  It's bad in August, and it's bad because

5    I have a contested confirmation hearing in Chemtura and a

6    dactyl estimation hearing in Chemtura for the nonsettling

7    defendants, which is roughly ten percent of the Chemtura

8    universe.  And there are limits to which I can give litigants

9    court time, especially if, for certain litigants, Saturdays are

10   not available or people don't like working on Sundays.

11             MR. BENTLEY:  I think a saving grace, Your Honor, is

12   that the issues that are likely to arise, I think, would be

13   global issues.  We've addressed, today, all the global issues

14   that all of the very good lawyers in this courtroom can think

15   of.  Your Honor, a moment ago, envisioned a possible claimant-

16   specific issue.  But frankly, I have trouble believing there's

17   going to be many of those.

18             THE COURT:  The only claimant-specific issue that I

19   can think of, is we don't have enough protection of that

20   information being used against me.  But I'm not one of the very

21   good lawyers in this courtroom.  And you guys have thought

22   about it more than I have.

23             MR. BENTLEY:  But, Your Honor, is that a global issue

24   as opposed to a claimant-specific issue?

25             THE COURT:  Well, it depends on the nature of the

Page 85

1    alleged violation; if it's common to a particular litigant --

2    unique to a particular litigant or if it's one that everybody

3    suffers from.  I'm not sure if one litigant has standing to

4    complain about it insofar as others are concerned.  But I'm not

5    going to decide issues that aren't before me now.

6            MR. BENTLEY:  Yes, I understand.  I think the

7    practicality, Your Honor, is that if we go this route, we would

8    need to expect that there might be a follow-up hearing in this

9    Court that would need to be set, perhaps sometime in September.

10           THE COURT:  Um-hum.  All right.  I've interrupted you

11   a zillion times, Mr. Bentley.  You can finish up.

12           MR. BENTLEY:  I think I've made the points I'd like

13   to make, unless Your Honor has questions.

14           THE COURT:  All right.  Thank you.

15           Mr. Juris, I'll allow any brief comment if it's

16   limited to anything that was said by your opponent, not by Mr.

17   Swett, who I think has to be regarded as your ally.  If there's

18   anything limited to what Mr. Bentley said, I'll take brief

19   surreply.

20           MR. JURIS:  Thank you, Your Honor.  Should I --

21           THE COURT:  Yes.

22           MR. JURIS:  -- take the podium?

23           THE COURT:  Yes.

24           MR. JURIS:  I'll keep it brief, Your Honor.  I know

25   we've got a while.  A couple of points, just more on mechanics

Page 86

1    more than anything else, because I think the issues have been

2    fleshed out.

3            There is a mechanical issue that just relates to

4    timing I just want to be clear with the Court about, which is,

5    depending on whatever regime ultimately is decided upon here,

6    whether it's disaggregated data without names or with names,

7    there's an open question in my mind about whether or not, as

8    I'm told from our technical folks, with just the last four

9    digits of the Social Security numbers, whether we would be able

10   to quickly and without a lot of manual review, match up GM

11   litigants against the trusts, as quickly -- in the way that I

12   think is contemplated.  I think that gets much, much better,

13   the more detailed information we --

14           THE COURT:  If they gave you all nine numbers in the

15   Social Security number and you agreed not to give it in Macy's

16   window, would that issue go away?

17           MR. JURIS:  I think that issue, but only that issue.

18   And then there's the other issue which I'm frankly more

19   concerned about.  It's what Your Honor just touched on a moment

20   ago, which is this.  As we read the TDPs which courts have

21   approved and we're required to follow, when a subpoena is

22   issued, we're required to tell the claimants that their

23   information has been subpoenaed.  We don't have a choice in

24   that matter.  And if we get a subpoena that asks for this

25   stuff, someone is going to have to reach out to these people.

Page 87

1           And it's not as easy -- for some it may be as easy as

2    sending out a mass e-mail.  But life is not that easy.  It

3    strikes me that the debtor here knows exactly who has made

4    claims against GM.  This is a bankruptcy case.  We're not

5    equipped in the way that Your Honor and the lawyers who deal

6    with the bankruptcy on a day-in day-out basis -- we're just not

7    equipped to deal with the claims process in quite the same way

8    that, as I understand, in Chemtura or other cases, there's

9    constant discussion about claims being sent out.

10          It strikes me that at the very least, whatever remedy

11   is imposed here to try to do justice and try to deal with the

12   equities and the balance of burdens here, that it shouldn't

13   fall, if we can make it so it doesn't fall, on the trusts to

14   have to deal with the notices and the inevitable responses that

15   are going to come.  Because I can assure Your Honor that what

16   will happen is, we will send out notices.  We're going to have

17   to -- for some it will be easy, for some it won't be so easy.

18   There may be folks who were once represented, who are no longer

19   represented.  And what are we going to do with those folks?

20          We know that in the bankruptcy case, these are all

21   claimants, these are all creditors.  And the parties to this

22   case deal with them as creditors of record.  GM knows who they

23   are.  They're chomping at the bit to send us a list.  So that

24   if whatever the ultimate resolution is here, and I think this

25   would have to apply whether it's disaggregated or whether it's

Page 88

```
1    claimant-specific, under the terms of the TDPs, the parties-in-
2    interest who are claimants whose information was supplied to
3    the trust under the TDPs and under the electronic file
4    agreements and under the court orders that required notice to
5    be given and the material to be treated as confidential, I
6    think would give the claimant who is not here today, every
7    right to come in and say, you know what, these lawyers are
8    great, but when I submitted my information --
9               THE COURT:  How are you contending that you can give
10   notice to somebody -- you have information as to somebody
11   having filed a claim.  They must have given you some, either
12   e-mail address or snail mail address or both.  So whatever you
13   got, you just send it back to them with whatever information
14   they gave you.  Are you telling me that doesn't comply with
15   your notice obligation?
16              MR. JURIS:  Well, it says that we're supposed to give
17   notice to the counsel for the holder of the subpoena.  And I
18   guess my point is this --
19              THE COURT:  Well, do you think there are that many
20   lawyers in the country who don't have e-mail addresses?
21              MR. JURIS:  I think if past practice is any guide,
22   when inquiry has been made here about just how to respond to
23   these kinds of requests, it's not as easy.  And what I'm
24   suggesting is that there's a solution here that is made
25   available because the individuals who would be the GM claimants
```

Page 89

1    are claimants in this case.  They're notice parties in this

2    case.  They've presumably filed proofs of claim.  And the

3    debtor knows who they are and Mr. Bentley knows who they are.

4    They want -- they know who they are, because they want to give

5    us a list of them.  So I guess what I'm suggesting is, that

6    doesn't solve our burden issue.

7                 THE COURT:  You think that any judge who heard -- me

8    or Judy Fitzgerald or Burt Lifland or whoever else has -- do

9    you think if any of us heard that the debtors -- that somebody

10   had tried to send notice to the e-mail address or snail mail

11   address that had been provided by a claimant, would then find

12   that responding to the notice requirement hadn't been

13   satisfied?

14                 MR. JURIS:  Your Honor, I guess what I'm suggesting

15   is, we can -- you're correct in that we can only do what we can

16   do.  And I think, in fairness, our argument would be that we,

17   in fact, had only done what we could do.  What I'm suggesting

18   is, the parties to this case may be able to do us one better,

19   and it may be easier.  And then our staff doesn't have to be

20   sending these things out.  And it's just that simple.

21                 Is that perfect?  No.  Are there costs on both sides

22   of the equation?  Yes.  Could we do it and satisfy ourselves

23   that we were doing a good a job as anyone in our situation

24   could do?  Sure.  And we would so say to Judge Fitzgerald or

25   whatever judge.  I guess what I'm saying is, given the balance

Page 90

1   here, there's a ready way in which anyone who would have GM

2   claims, Mesothelioma claims, would be able to get notice from

3   the committee or from the debtor, in a way that would eliminate

4   the middle-man, and eliminate all these issues altogether.  It

5   wouldn't eliminate the burden, but it would make it easier for

6   the trusts and their staff.

7               THE COURT:  Okay.

8               MR. JURIS:  Thank you, Your Honor.

9               THE COURT:  Thank you.  Mr. Karotkin, before we shut

10  it down, do you want to be heard?

11              Oh, wait, Mr. Swett, you're twitching.  Do you want

12  to get up?  Same limits on what I imposed on Mr. Juris.

13              MR. SWETT:  Yes, sir.  I think what you should do is

14  send the parties off, having heard your remarks today, to see

15  what they can work out.  And my focus will be on the

16  protections and the scope and trying to find practical means to

17  square that circle.  And past experience suggests that there

18  are means preferable to just allowing the information to come

19  forth in the fashion that the UCC has requested.

20              I do note, Judge, by way of rebuttal, that Mr.

21  Bentley did not have an answer to the fact that the TDPs tell

22  you what the average values the trust will pay in the future

23  are.  And again, that suggests to me that by pushing more on

24  the theory of how they're trying to justify it, you will come,

25  in the dialogue among the parties, to better scope for what

Page 91

 1   information needs to come forth to satisfy their means -- their

 2   needs.

 3           THE COURT:  Well, is this a discovery objection or is

 4   this an objection that you're going to raise at the estimation

 5   hearing if you can't settle, where you're going to say that

 6   their predictions of the future are subject to greater question

 7   on my part, because the underlying data does not necessarily

 8   support the inference they're going to be asking me to draw?

 9           MR. SWETT:  Well, of course, if they go to the level

10   of individual claims, we'll have it out at that level.  And

11   that will be a relevancy issue and a debate about probativeness

12   and does it all amount up to anything at the time of the

13   contested evidentiary hearing.  But right now, it's a discovery

14   matter.

15           I notice, for instance, that they've only asked for

16   650 claim files from the most obvious source, General Motors.

17   They want data on 7,400 claimants from the trusts.  There's an

18   imbalance there.  If they thought harder about what their real

19   needs are, that imbalance could be redressed and something more

20   sensible could happen.

21           So I think that all counsel have had their ears wide

22   open during this hearing.  I think we all have a pretty good

23   sense of where you believe this ought to come out.  You think

24   they should get information of the kind they are requesting,

25   within limits and with subject to protections, that recognize

Page 92

1    the nature of the proceeding and the individual rights that are

2    implicated, but that really shouldn't be at stake in the way we

3    structure the estimation hearing.  And that -- with that

4    direction from the Court, it would probably be useful to have a

5    meet-and-confer, to see what we could accomplish.

6            And it shouldn't be under the gun of a presumptive

7    order that, in effect, gives the UCC a veto over the proposals.

8    They should be required to work with us in earnest to try and

9    solve this problem.  And if it can't be solved, then we come

10   back to you and you tell us what we should do.

11           THE COURT:  Mr. Karotkin?

12           MR. KAROTKIN:  Thank you, Your Honor.  Stephen

13   Karotkin, Weil, Gotshal & Manges, for the debtors.  I will be

14   brief.

15           First of all, there was some discussion about all

16   nine Social Security numbers as opposed to the last four.  That

17   was something that was agreed upon between the UCC and New GM.

18   There was a fair amount of sensitivity to that issue on the

19   part of New GM.  And I am not able to speak for them on whether

20   or not that's an issue for them.  But it sounded like a rather

21   important issue to them.  I think that to the extent that Your

22   Honor is inclined to grant the relief, I think certainly we

23   could start with the last four digits, and that ought to pretty

24   much eliminate or pick up most of the population of the claims

25   that are being looked for.

Page 93

1          THE COURT:  Well, the comment goes to New GM, I

2     guess, rather than to you, Mr. Karotkin.  But the fact is that

3     we bankruptcy judges, more than anybody, are sensitive to the

4     desirability of not revealing the first five numbers.  But we

5     also expect our confidentiality orders to be complied with.

6     And if New GM has a problem and it saves everybody a fortune to

7     do it with nine, and if it is nutty not to, I guess I can --

8     who's their counsel, Honigman?

9          MR. KAROTKIN:  Yes, sir.  I can certainly arrange

10    with them --

11         THE COURT:  They can explain to me why they don't

12    want to comply with an order that I am inclined, tentatively,

13    to grant.

14         MR. KAROTKIN:  -- I would imagine they would comply,

15    Your Honor.

16         THE COURT:  Okay.

17         MR. KAROTKIN:  I am just saying, I cannot speak to

18    that issue on their behalf.

19         THE COURT:  I understand matters of principle, but I

20    also believe in the effectiveness of confidentiality orders.

21    And my main goal in life is to put money into the pockets of

22    creditors and save jobs.  And I'm not going to quantify the

23    importance of those two.  But I would think that the latter,

24    which New GM benefitted from at one point, is one where they

25    would understand that judges need some concerns as well.

Page 94

1    Again, I may be talking to the wrong guy.

2            MR. KAROTKIN:  I am sure they would recognize that,

3    sir.

4            THE COURT:  Okay.

5            MR. KAROTKIN:  With respect to the notice issue that

6    Mr. Juris indicated that perhaps the debtors ought to do that.

7    I really don't think that's appropriate.  That's a burden that

8    his claims resolution procedure or trust took on for

9    themselves.  I don't think it's appropriate to put the debtor

10   in the middle of that exercise.  I'm not even sure what the

11   notice ought to say.  Again --

12           THE COURT:  Well, the notice would probably have to

13   say whatever the individual trust agreements require it to say

14   and to be sent to the people who have told the trust that they

15   want to participate in their trust.

16           MR. KAROTKIN:  And I'm sure they're perfectly capable

17   of doing that rather easily.

18           THE COURT:  Um-hum.

19           MR. KAROTKIN:  As we mentioned in our response, we

20   really have, as the debtors, one keen interest in this, and

21   that is time and expense, as Your Honor recognized and as Mr.

22   Swett alluded to on a number of occasions.  And he did say that

23   at one point he was forcefully reminded of the fact that from

24   the debtors' perspective we hoped that we wouldn't be engaged

25   in this discovery free-for-all, and that since three or four

1    months have elapsed since these experts were retained, and this

2    is first coming up now, that we were hopeful, Your Honor, that

3    the experts had sufficient data with the information provided

4    by New GM -- that information was supplemented -- that we could

5    get people in a room together and sit down and have a

6    meaningful negotiation before, again, this devolved into --

7    everyone's talking about an estimation proceeding already.

8    Everyone is gearing up for an estimation proceeding already.

9              THE COURT:  And if you could have your Christmas wish

10   list satisfied, you would love for these guys to get the

11   information they need to make a deal and then make a deal, and

12   stop this water torture before it goes on into January or

13   February or later.

14             MR. KAROTKIN:  And I think you would like it better

15   than I would like it.

16             THE COURT:  Yes, but I get paid a lot of money to do

17   what I do.  Probably almost as much as you pay some of your

18   paras.  Or at least --

19             MR. KAROTKIN:  I'm not going to take that one on --

20             THE COURT:  -- your first-year associates.

21             MR. KAROTKIN:  -- Your Honor, all I'm suggesting is,

22   I think -- unfortunately, I think we're heading to an

23   estimation proceeding.  I would just hope that the parties

24   could get their experts going, come up with the numbers -- I

25   think I could probably predict the number at this point that

Page 96

1    they're going to come into a room with -- and that we sit down

2    like mature adults and try to resolve this.

3              In the context, Your Honor, of thirty-five or forty-

4    five billion dollars of overall unsecured claims here, a

5    relative swing in the asbestos liability, based on the

6    distribution or the percentage distribution in these cases, may

7    not be that material where mature adults couldn't sit in a room

8    with their experts and come up with a solution --

9              THE COURT:  I understand.  And --

10             MR. KAROTKIN:  -- that would save a lot of time and

11   expense.

12             THE COURT:  -- are you also about to tell me that you

13   would assume, as I do, that both the general unsecured creditor

14   community and the asbestos unsecured creditor community would

15   prefer to get their money sooner rather than later?

16             MR. KAROTKIN:  I was just --

17             THE COURT:  Or their stock or whatever they're going

18   to get?

19             MR. KAROTKIN:  -- I was -- you took the words out of

20   my mouth, sir.

21             THE COURT:  Yes, I understand.

22             MR. KAROTKIN:  So, again, we're concerned about cost

23   and time.  We are poised to, as you heard on Friday, I believe,

24   to file a plan.  And again, we share the interests that Your

25   Honor just alluded to, and we hope that the creditors share

1  that interest in getting distributions out as quickly as

2  possible rather than engaging in months of an estimation

3  hearing.  Thank you.

4          THE COURT:  All right.  Here's what we're going to

5  do, folks.  It's now a quarter to two.  I want you all to take

6  a lunch hour and be back here in an hour.  Hopefully, I'll be

7  able to give you a ruling then.  So be back here at 2:45.

8  We're in recess.

9      (Recess from 1:49 p.m. to 3:25 p.m.)

10         THE CLERK:  All rise.

11         THE COURT:  Have seats, everybody.  I apologize for

12  keeping you all waiting.

13         Before I issue my ruling, Ms. Stubbs, in your letter

14  of August 6, you wrote at the end, "We write to advise the

15  Court that the Manville Trust and CRMC have learned that one of

16  the constituencies does not consent to the licensing and

17  distribution of Manville Trust data to Bates White."  Who is

18  that?

19         MS. STUBBS:  The selected counsel for --

20         THE COURT:  Move a microphone closer to you.

21         MS. STUBBS:  -- selected counsel for certain

22  beneficiaries.

23         THE COURT:  Be more specific.

24         MS. STUBBS:  Are you asking which of the three firms

25  represent -- I don't know which of the three firms did not

1    consent.

2            THE COURT:  Selected counsel for certain

3    beneficiaries?

4            MS. STUBBS:  Correct.  There are three law firms that

5    represent the beneficiary group to the Manville Trust.

6            THE COURT:  The law firms that represent the asbestos

7    plaintiffs?

8            MS. STUBBS:  The claimants to the Manville Trust,

9    correct.  They're --

10            THE COURT:  Who, if they didn't make a claim to the

11    trust would be plaintiffs against somebody?

12            MS. STUBBS:  Correct.  I believe that's correct.

13            THE COURT:  And you don't know who they are?

14            MS. STUBBS:  I know who the three law firms are.  I

15    don't know which of those --

16            THE COURT:  Tell me who the three law firms are.

17            MS. STUBBS:  I'll have to get that from my notes.

18            THE COURT:  Okay.

19        (Pause)

20            MS. STUBBS:  Motley Rice in Mount Pleasant, South

21    Carolina; Baron and Budd, located in Dallas; and Rose, Klein &

22    Marias in Los Angeles.

23            THE COURT:  All right.

24            All right.  Ladies and gentlemen, I'm granting the

25    creditors' committee's motion as modified by the creditors'

MOTORS LIQUIDATION COMPANY, et al.

1    committee in its reply, and as I'm going to impose conditions

2    and qualifications as to the grant of the authority here, the

3    most significant of which will be:  (1) notice and opportunity

4    for individual tort litigants to be heard; and (2) a possible

5    means for the trusts to be relieved of the duty to comply if

6    they can offer information consistent with the Swett proposal

7    and what I approved in Chemtura; and the trust accepts the

8    offer to provide the necessary information in that fashion, or,

9    as after a negotiation, the parties might otherwise agree; but

10   which acceptance can't unreasonably be withheld, and where I'll

11   rule on any refusal if need be.  My bases for the exercise of

12   my discretion and, where applicable, conclusions of law,

13   follow.

14          First, I'm fully satisfied that the information that

15   the creditors' committee seeks is relevant, or at least much

16   more than sufficiently relevant to permit discovery with

17   respect to it; though I'll give anyone who might wish to object

18   to ultimate admissibility at trial, a reservation of rights, to

19   the extent that would even be necessary, if and when any of the

20   produced material might be offered at trial.

21          I'm also satisfied that the request here is an

22   appropriate use of Bankruptcy Rule 2004.  We judges approve use

23   of 2004 in advance of a likely contested matter or adversary

24   proceeding all the time.  I did it in this case, in fact, when

25   I authorized it for the asbestos committee.  And I've done it

Page 100

1    repeatedly when creditors' committees investigate potential

2    claims against secured lenders, that anyone with an ounce of

3    knowledge as to Chapter 11 knows, will be followed by further

4    avoidance actions, lender liability actions, aiding and

5    abetting litigation or some combination of those or some

6    alternative theory upon which they might later sue.

7           The real issues on this motion as culled from the

8    much longer laundry list of objections filed by the trust, most

9    of which, as my questions revealed, I regard as silly, are the

10   extent to which the request imposes an unreasonable burden and

11   the extent to which disclosure of the information might

12   prejudice individual tort litigants in the future, one-on-one

13   litigation down the road, or otherwise, though I regard any

14   otherwise contingencies as unlikely.

15          As to those two important issues, first I'm not

16   persuaded that there's a material burden.  Except for the

17   Celotex data, all of the relevant data is on computer and can

18   be extracted in a variety of ways that are relatively simple

19   and inexpensive to provide.  Certainly the fact that the

20   Manville Trust can provide similar information by license, for

21   a fee of 10,000 dollars, and could have done so here, were it

22   not for the objections to which I was just informed, is

23   instructive.

24          I've also considered and rejected the contention that

25   disclosure is barred by Rule 408.  First, that's not a rule of

Page 101

1    privilege, it's a rule governing admissibility at trial.

2    Second, we're talking about the results of settlement

3    negotiations, not what the parties admit to each other or

4    otherwise say in settlement negotiations.  Third, Rule 408, by

5    its express terms, excludes statements offered for purposes

6    other than to prove liability for, inability of, or the amount

7    of a claim, or for impeachment.  Whatever their applicability

8    might be in one-on-one litigation, they have no relevance here.

9         Then, neither the filings with the trusts by tort

10   claimants nor the amounts of the settlements are privileged.

11   By definition, they're not.  And we all agree on that.  So

12   there's no need for expensive attorney review.  And the

13   suggestion that I should require payment for attorneys' fees

14   associated with the trust production -- I'm going to use a

15   softer word than I have in my notes -- is extraordinarily

16   lacking in merit, especially when we consider the important

17   information that could have been provided under the Manville

18   Trust longstanding license procedures, if only those three law

19   firms for tort litigants, whose tactical interests would be

20   contrary to the creditors' committee, hadn't objected.

21         With that said, I wonder whether providing the

22   information in the manner Mr. Swett proposed, akin to the way

23   we did it in Chemtura, might not be materially more burdensome,

24   and might better protect individual tort litigants'

25   confidentiality.  I'm intrigued by that idea, and might even

09-50026-mg    Doc 7696-5    Filed 11/08/10    Entered 11/08/10 23:24:36    Exhibit
MOTORS LIQUIDATION COMPANY, et al.
Pg 103 of 119

Page 102

1    prefer it, but not to the degree that I deny the creditors'

2    committee's motion or deny the creditors' committee the option

3    to get this information as requested, if the trust's proposal

4    were to turn out, in the eyes of a reasonable observer -- first

5    the creditors' committee, and then if there were disagreement,

6    me -- turned out to be an unacceptable substitute for

7    disclosure of the matter that I've authorized to be disclosed

8    now.

9            Putting it another way, I think the Swett idea is

10   preferable.  But if we can't make it work, and if the

11   creditors' committee rejects it and I later conclude that the

12   creditors' committee's refusal to accept it was reasonable

13   under the circumstances, then the creditors' committee is going

14   to have that discovery the way I've now authorized it to

15   proceed.

16           The second issue, and ultimately the most important,

17   in my view, is protection of the legitimate needs and concerns

18   of individual tort litigants in one-on-one litigation with New

19   GM or anyone else with whom they might be involved in one-on-

20   one litigation, all as contrasted to the macroeconomic

21   estimation that we have before us here.

22           Here I believe that confidentiality agreements and

23   orders implementing them will do just fine, assuming that

24   they're appropriately drafted.  The idea is to make the

25   information available to the experts and anyone such as the

Page 103

1   creditors' committee and the asbestos committee, who are

2   negotiating the underlying issues, or acting as trial counsel,

3   in the event of an inability to settle, while keeping that

4   information out of the hands of those defending litigation

5   brought by individual asbestos litigants in one-on-one lawsuits

6   or claims processes, or, of course, those on the other side of

7   those litigations as well.

8          While providing information, as Mr. Swett proposes,

9   would perhaps be the best way to protect sensitive information,

10   it's not the only acceptable way.  And as I said,

11   confidentiality orders will be satisfactory.  I'm not going to

12   presume or assume noncompliance with a confidentiality order.

13   In ten years on the bench, I've never had any such

14   noncompliance.

15          Ladies and gentlemen, I think the cost of compliance

16   with the requested discovery will be relatively modest, since

17   the data is already on computer, and need only be extracted.

18   However, I'll require that the creditors' committee pay for the

19   reasonable out-of-pocket costs of providing the data, not

20   including absorption of overhead or other fixed costs, and not

21   including attorney's fees.

22          I will also say, for the avoidance of doubt, that

23   I've considered and rejected the contentions that the requested

24   discovery in any way requires inappropriate dissemination of

25   proprietary information belonging to DCPF or any of the trusts.

Page 104

1   We're not talking about disclosure of source code or

2   confidential algorithms, or if I understood the request

3   differently and such was requested, I'll consider further

4   relief with respect to that request.  Here, we're talking about

5   data in the databases that the computers will spit out.

6          It's been pointed out to me that several of the

7   trusts' agreements require notice to claimants before

8   information in those claimants' claim files is provided.  While

9   I think that the procedures we've put in place and will put

10  into place, would provide claimants with adequate protection of

11  any confidential information, especially as the creditors'

12  committee has narrowed its request, I don't want to step on the

13  toes on my brother and sister bankruptcy judges and either

14  disregard procedures they approved or deny claimants'

15  protections that my colleagues thought were appropriate.

16         Thus, I'm going to direct that notice and opportunity

17  to be heard be provided to individual claimants whose

18  information is to be provided, with a reasonable period -- I'm

19  thinking of two weeks -- after notice to file an objection to

20  me as to disclosure.  I won't hear any further objection with

21  respect to any matters I've now ruled upon, nor, of course,

22  with respect to any litigant's normal desire to avoid

23  assistance to his or her adversary.  But I will hear any and

24  all objection with respect to whether the confidentiality

25  agreements, orders and other protective mechanisms are

Page 105

1    adequate, or any other legitimate confidentiality concerns that

2    I may have overlooked, have been satisfactorily protected, or

3    those which I've focused on or otherwise, don't go sufficiently

4    far to provide necessary protection.

5            That notice is to go by e-mail to anyone who provided

6    or whose counsel provided an e-mail address with his or her

7    claim, and by regular First Class Mail to anyone who provided

8    only a mail address and not an e-mail address.  Where a lawyer

9    or law firm filed claims on behalf of more than one claimant,

10   and I sense that there may be many of those, a single e-mail to

11   that law firm on behalf of all of that firm's clients will be

12   sufficient.  I rule that notice in that fashion will be

13   satisfactory.

14           As I indicated, the Swett proposal is better in a

15   number of respects, if it can be implemented without material

16   prejudice to the creditors' committee.  It is better in that

17   compliance is likely to be more focused on the real issues,

18   almost as fast in delivery of data, and likely faster with

19   respect to data analysis, and more protective of individual

20   asbestos litigant confidentiality.  But the Swett proposal has

21   not been made by the trusts or endorsed by them, and it might

22   be easier for them to simply provide the requested data under a

23   confidentiality agreement.  And I won't make the creditors'

24   committee accept the Swett proposal or any variant of it

25   without appropriate verification.

Page 106

1          You all are to caucus amongst yourselves to see if

2     you can make the Swett approach work.  Initially unacceptable

3     proposals should be responded to by counterproposals rather

4     than by a cessation of negotiations.  If a reasonable proposal

5     is made, and the creditors' committee rejects it without good

6     reason, anyone who's made such a proposal can contact me to see

7     if I think the proposal should have been accepted, and should

8     thus be the alternate way by which the creditors' committee

9     will get the necessary information.  But for the avoidance of

10    doubt, if you can't agree upon this alternative, the creditors'

11    committee will still have its rights under this ruling.

12         Mechanically, the creditors' committee is to settle

13    an order authorizing the discovery as soon as possible.  It

14    will also provide for comment by any and all whose ox would be

15    gored by it, a proposed form of confidentiality agreement,

16    which will be negotiated out until a satisfactory form of it

17    has been finalized.  Again, if the initial proposal is

18    unsatisfactory, I don't expect to hear about a unilateral

19    rejection.  I expect to have negotiations and counterproposals

20    until a satisfactory form of confidentiality agreement and

21    order have been developed.

22         The order authorizing the 2004s is to provide that

23    subpoenas may be issued two weeks from the date of entry of the

24    order and finalization of the confidentiality order --

25    agreement and/or order -- but the order must go with the

Page 107

1    confidentiality agreement -- whichever comes later, provided

2    that if a deal to implement a Swett proposal or variant of that

3    is made within those two weeks, it will supersede that

4    authorization that I'm now granting; and that if a deal isn't

5    made but a proposal along the Swett proposal lines has been

6    made with a contention that the creditors' committee

7    unreasonably withheld its assent, service of the subpoenas will

8    be held up until I've ruled on what is and what isn't

9    reasonable, by hearing or conference call.

10            Let me tell you what I also expect.  I couldn't have

11   agreed with Mr. Karotkin more when he emphasized the importance

12   of getting these issues resolved promptly.  I also believe that

13   to the extent practical, they need to be resolved as

14   inexpensively as the circumstances permit.  And as I believe

15   everyone in the room understands and agrees, this controversy

16   over the asbestos claims is a gating issue, impairing all

17   creditors, general unsecured and asbestos creditor alike, from

18   getting their stock and any other distributions under the plan.

19   I expect all parties to be continually sensitive to the need to

20   avoid prejudicing the creditor community by delay in connection

21   with this dispute.

22            All right.  Not by way of reargument, are there any

23   issues that I failed to address?  Mr. Karotkin?

24            MR. KAROTKIN:  Just one point of clarifica -- well,

25   two points.  Number one, you mentioned the committees in terms

Page 108

1    of being able to get the information but not the debtor.  I

2    assume the debtor --

3            THE COURT:  I didn't mean to exclude the debtor.

4            MR. KAROTKIN:  -- okay.

5            THE COURT:  I had assumed, fairly or unfairly, that

6    the creditors' committee needing it was going to be carrying

7    more of a laboring oar, but I did not mean to exclude the

8    debtor.  And anything the creditors' committee gets will be

9    available to the debtor.  Except I'm going to need you to be

10   particularly diligent, Mr. Karotkin, in making sure that any

11   data that's provided to you and your colleagues at Weil,

12   doesn't fall into the wrong hands.

13           MR. KAROTKIN:  Yes, we will do that, sir.  And just

14   one other question.  You mentioned the notice that would go to

15   the claimants, the trusts' requirement to give notice, but you

16   didn't mention who would give that notice.

17           THE COURT:  I thought I did.  And I thought -- but if

18   I didn't, let me correct that right now.  The trusts know what

19   they have to say in their notice.  And they're to provide what

20   their notices require.  In addition, any such notices are to

21   say that if any recipient has concerns about what's going to

22   happen, those concerns, as I indicated, being that its

23   information's going to fall into the wrong hands or is at risk

24   of falling into the wrong hands, those objections should be

25   brought before me, and I'm going to deal with them quickly.

Page 109

1          MR. KAROTKIN:  Perhaps the form of notice should be

2     an exhibit to the proposed order?

3          THE COURT:  Good idea.  Can you make that happen?

4          MR. KAROTKIN:  I'm sure Mr. Bentley can make it

5     happen.

6          THE COURT:  Well, it's obviously the kind of thing

7     that you guys have to have a back-and-forth on.  But make it

8     so.

9          MR. KAROTKIN:  Yes, sir.

10         THE COURT:  Mr. Bentley, are you on deck for

11    questions or clarifications?

12         MR. BENTLEY:  A few questions, Your Honor.

13         THE COURT:  Yes, go ahead.

14         MR. BENTLEY:  Treasury indicated to me during a break

15    that they may wish to be included -- they may wish to be among

16    the recipients of this information.  So I want -- I don't know

17    if any representative of Treasury is still in the courtroom.  I

18    think not.  But I wanted to mention that.

19         UNIDENTIFIED ATTORNEY:  There is, there is, there is.

20         MR. BENTLEY:  Oh, sorry.

21         MR. CORDARO:  That's okay.

22         THE COURT:  Come on up to a microphone, please.

23         MR. CORDARO:  Good afternoon, Your Honor.  Joseph

24    Cordaro from the U.S. Attorney's Office.

25         THE COURT:  Southern District?

Page 110

1          MR. CORDARO:  Yes, sir.  That is accurate, Your

2    Honor.  The Treasury would like to be included in on this

3    information, and at the very least, have access to the

4    confidentiality order that's being proposed with it.

5          THE COURT:  Well, the order is a no-brainer.  And

6    subject to people's rights to be heard, I'm inclined to say

7    that you should get the same rights as the debtor.  But to the

8    extent that you're wired in with New GM, I need you to give me

9    the same comfort Mr. Karotkin did that it's not going to fall

10   into the right hands -- wrong hands, that being principally

11   those who are defending lawsuits by the individual tort

12   litigants.

13         MR. CORDARO:  Yes, Your Honor.  I understand.

14         THE COURT:  Anybody object to Treasury getting it?

15         MR. SWETT:  Your Honor, I'd like to talk to counsel.

16   I don't understand their interest in the question.  I would

17   have thought that the people entitled to see whatever flows

18   here by way of discovery are those who would be direct

19   participants if it comes to a contested proceeding on

20   estimation.  And I was not aware that the United States

21   Treasury or New GM itself, proposed to take on such a role.

22         THE COURT:  Well, Mr. Swett, Treasury is a very major

23   creditor in this case and has a number of interests in this

24   case's success as well.  And I have never known the U.S.

25   Attorney's Office in this district to violate a confidentiality

Page 111

1    agreement either.

2            You can talk to whoever you want.  It's going to be a

3    few days or longer -- presumably a few weeks -- before there's

4    anything that's going to come into Treasury's hands.  If you

5    really think you have a good objection, I'll review it ab

6    initio.  But I've got to tell you, my strong tentative, unless

7    there's something that I'm unaware of, and I think I've got a

8    pretty good handle on what's going on in this case, is that

9    it's absolutely no harm no foul to let Treasury have the stuff.

10   I'm confident that I'm going to get the same protection of

11   confidential information from the U.S. Attorney's Office, and

12   that the U.S. Attorney's Office can control its client that

13   I've always had.

14           But if you really want to make an issue of this, Mr.

15   Swett, I'll give you another opportunity to be heard, and I'll

16   give Treasury an opportunity to respond.

17           MR. SWETT:  Thank you.

18           MR. CORDARO:  Thank you, Your Honor.

19           THE COURT:  Okay.  Mr. --

20           MR. BENTLEY:  One final point of clarification, Your

21   Honor.  And this is probably my fault in not hearing the Court

22   correctly.  But Your Honor said that the order should provide

23   for subpoenas to be issued two weeks within entry of the order.

24   And --

25           THE COURT:  The order or confidentiality agreement

Page 112

1   and order, whichever comes later.  Because I don't expect

2   people to be complying with subpoenas until there's a good,

3   solid confidentiality order in place.

4         MR. BENTLEY:  So did Your Honor mean to say that the

5   subpoenas -- you're referring not to the response to the

6   subpoenas, but to the actual issuance of the subpoenas.

7         THE COURT:  Yes, I want you to try to work out the

8   Swett deal first.  If that doesn't work, then we'll take it to

9   the next step.  But I'm intentionally allowing a two-week

10  window for you not to go down the longer road, if you can make

11  the Swett deal happen.  I am not so Pollyanna-ish, if that's a

12  word, to be -- that I'm confident that you can make the deal,

13  but I want you to try.

14        MR. BENTLEY:  No, understood, Your Honor.

15        THE COURT:  Okay.

16        MR. BENTLEY:  What I wasn't clear on is are you

17  saying that the subpoenas may not be issued less than two weeks

18  after entry of the order, or not --

19        THE COURT:  Yes.  What was the alternative?

20        MR. BENTLEY:  -- um --

21        THE COURT:  To issue them now and make them with

22  compliance required at some time later down the road?

23        MR. BENTLEY:  I think I get it, Your Honor.  Thank

24  you.

25        THE COURT:  Yes.  Okay.

MOTORS LIQUIDATION COMPANY, et al.

Page 113

```
 1              Yes, Mr. Juris?

 2              MR. JURIS:  Your Honor --

 3              MR. ESSERMAN:  Your Honor, Sandy Esserman, may I ask

 4    one question?

 5              THE COURT:  You may, Mr. Esserman, but I've got Mr.

 6    Juris rising in front of me.  I'll put you in the on-deck

 7    circle.

 8              MR. ESSERMAN:  Thank you, sir.

 9              MR. JURIS:  Your Honor, this may be more

10    appropriately an issue to be taken up --

11              THE COURT:  Pull the mike close to your mouth,

12    please.

13              MR. JURIS:  -- among counsel.  But earlier we had an

14    exchange about the number of digits to which the Social

15    Security numbers could be taken to.  I take it that's something

16    that Your Honor wants us to see whether we can work out with

17    counsel?

18              THE COURT:  Well, I always like you to work it out.

19    But I've got to tell my friend from the U.S. Attorney's

20    Office -- oh, no, he's U.S. Attorney's Office, he's no longer

21    GM -- New GM.  That would be somebody who's not in the

22    courtroom, the Honigman firm.  If it's going to save us money

23    and time to provide nine digits, I'm confident that the trusts

24    can keep things just as confidential as the creditors'

25    committee can.  And I prefer to keep this thing moving and to
```

Page 114

1    go with nine digits, rather than make life complicated for

2    everybody by only using four.

3              So I want you to share the transcript or at least an

4    anecdote of what I've said with Honigman, and tell Honigman

5    that if they have some good reason that's wholly unfathomable

6    to me why there should only be four and not nine, I'll deal

7    with it by conference call.

8              MR. JURIS:  Thank you, Your Honor.

9              THE COURT:  Mr. Bentley, did we cover your needs and

10   concerns?

11             MR. BENTLEY:  We did, Your Honor.  Thank you.

12             THE COURT:  Okay, sir, behind -- in between Mr. Juris

13   and Mr. Karotkin, did you want to be heard on anything?

14             UNIDENTIFIED ATTORNEY:  No, Your Honor, thank you.

15   Mr. Juris is here as counsel.

16             THE COURT:  Okay.  Anything, else, anybody?

17             MR. KAROTKIN:  Mr. Esserman.

18             MR. ESSERMAN:  Your Honor, this is Sandy --

19             THE COURT:  Oh, yes, Mr. Esserman.  Go ahead.  I'm

20   sorry.

21             MR. ESSERMAN:  I apologize.  I -- Sandy Esserman on

22   behalf of the Futures group.  I have one question.

23             THE COURT:  Yes.

24             MR. ESSERMAN:  It's a little bit out of paper, as far

25   as anything else.  As regards to the confidentiality order, my

Page 115

1    only question -- and I'd literally phrase it rhetorically, is:

2    Can the Treasury Department agree to a confidentiality order as

3    against a Freedom of Information request that might come into

4    the Treasury or the U.S. Attorney's Office?  And would that --

5    would a confidentiality order be sufficient to protect the data

6    or the information that is being transmitted to the government?

7              THE COURT:  I need help from my friend in the U.S.

8    Attorney's Office on that.  You can answer it if you can today,

9    but if you can't I've got to tell you that when Mr. Esserman

10   said that, that lit up a light in my head, because I've got

11   confidence in you guys, but if you can't defend it on a Freedom

12   of Information Act request, that might be a matter of concern

13   to me.

14             MR. CORDARO:  Yes, Your Honor.  Joseph Cordaro,

15   again, from the U.S. Attorney's Office.  And I don't think it

16   is something I can answer today and would like to consider it.

17             THE COURT:  All right.  Tell your guys that if I knew

18   it was only in Treasury and the U.S. Attorney's Office and it

19   could stay there, I'd be fine with it.  But if there's any

20   material risk that you couldn't protect it, I'd, at the least,

21   need to hear from Mr. Esserman or anyone who shares his

22   concerns.  Because I think I sense where Mr. Esserman might be

23   going on this.

24             MR. CORDARO:  Thank you, Your Honor.

25             THE COURT:  Mr. Esserman, further thoughts on your

Page 116

1    part?

2            MR. ESSERMAN:  Not right this minute.  That addresses

3    it sufficiently.  Thank you, Your Honor.

4            THE COURT:  Well, I had assumed that you and your

5    client, the Future claims rep, would be getting the same access

6    that Mr. Swett and his guys would be getting.  Has that always

7    been understood or is there a different approach on that?

8            MR. ESSERMAN:  I think that to the extent that Mr.

9    Swett's clients and experts get it, it was always our intention

10   that our expert would also get it.  But we're letting Mr. Swett

11   take the lead on all these issues.

12           THE COURT:  Okay.

13           MR. ESSERMAN:  Thank you.

14           THE COURT:  All right.  Fair enough.  Anything else,

15   anyone?  All right, thank you, folks.  We're adjourned.

16       (Whereupon these proceedings were concluded at 3:57 p.m.)

17

18

19

20

21

22

23

24

25

Page 117

```
 1

 2                          I N D E X

 3

 4                        R U L I N G S

 5      DESCRIPTION                             PAGE     LINE

 6      Creditors' Committee's motion granted as    98       25

 7      modified by the committee and as

 8      delineated in the Court's ruling

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 118

1

2                    C E R T I F I C A T I O N

3

4    I, Lisa Bar-Leib, certify that the foregoing transcript is a

5    true and accurate record of the proceedings.

6

7    _____

8    LISA BAR-LEIB

9    AAERT Certified Electronic Transcriber (CET**D-486)

10

11   Veritext

12   200 Old Country Road

13   Suite 580

14   Mineola, NY 11501

15

16   Date:  August 10, 2010

17

18

19

20

21

22

23

24

25