# EXHIBIT F

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 1

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

------------------------------------------------------

CHAPTER 11

IN RE:

LESLIE CONTROLS, INC.,

      Debtor.

------------------------------------------------------

DEPOSITION OF

Charles Mullin, Ph.D.

October 4, 2010

Washington, D.C.

Lead:  John Dorsey, Esquire

Firm:  Young Conaway

FINAL COPY

JANE ROSE REPORTING   1-800-825-3341

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 2

A P P E A R A N C E S

YOUNG CONAWAY STARGATT & TAYLOR, LLP

Attorneys for Debtor

P.O. Box 391

The Brandywine Building

1000 West Street, 17th Floor

Wilmington, DE  19801

Phone:  302-571-6712

John T. Dorsey, Esquire


DICKSTEIN SHAPIRO, LLP

Attorneys for Leslie Controls

1825 Eye Street, N.W.

Washington, D.C.  20006-5403

Phone:  202-420-3369

Scott N. Godes, Esquire


FRANK/GECKER, LLP

Attorneys for Asbestos Claimants Committee

325 N. LaSalle Street, Suite 625

Chicago, IL  60610

Phone:  312-276-1400

Joseph D. Frank, Esquire

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 3

APPEARANCES CONTINUED:

GOODWIN PROCTER, LLP

    Attorneys for CIRCOR International, Inc.

    901 New York Avenue, N.W.

    Washington, D.C.  20001

    Phone:  202-346-4244

    Richard M. Wyner, Esquire

MONTGOMERY McCRACKEN WALKER & RHOADES, LLP

    Attorneys for Official Committee of Unsecured

    Creditors

    123 South Broad Street

    Avenue of the Arts

    Philadelphia, PA  19109

    Phone:  215-772-7410

    Laurie A. Krepto, Esquire

HARDIN KUNDLA McKEON & POLETTA, P.A.

    Attorneys for Winterthur Swiss Insurance Co. &

    Yasuda Fire & Marine Insurance Co. (UK), Ltd.

    673 Morris Avenue

    Springfield, NJ  07081

    Phone:  973-912-5222

    John S. Favate, Esquire

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 4

APPEARANCES CONTINUED:

CROWELL & MORING, LLP

Attorneys for Century Indemnity Company

1001 Pennsylvania Avenue, N.W.

Washington, D.C.  20004

Phone:  202-624-2727

Leslie A. Davis, Esquire

Stacie B. Lieberman, Esquire

ALSO PRESENT:

Andrew R. Evans, Bates White

JANE ROSE REPORTING

80 Fifth Avenue

New York, New York  10011

1-800-825-3341

Susan L. Ciminelli, CRR, RPR

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 5

TABLE OF CONTENTS

DEPOSITION OF CHARLES MULLIN, PH.D.

Examination by Mr. Dorsey....................Page 6

Examination by Mr. Wyner.....................Page 186

Index to Exhibits.........................Page 197

Notice to Read & Sign.....................Page 201

JANE ROSE REPORTING
1-800-825-3341  janerosereporting.com

US Bankruptcy Court - Delaware                    FINAL - October 4, 2010
In Re Leslie Controls                             Charles Mullin, Ph.D.

Page 6

1          Monday, October 4, 2008

2          Washington, D.C.

3                ---

4          Whereupon,

5          CHARLES MULLIN, PH.D.

6     1300 Eye Street, N.W. Washington, D.C.,

7     having been duly sworn, was examined and testifies

8          as follows:

9          - - - - -

10         EXAMINATION

11         - - - - -

12     EXAMINATION BY COUNSEL FOR LESLIE CONTROLS

13    BY MR. DORSEY:

14      **Q.   Good morning, Dr. Mullin.  We met a moment**

15    **ago.  My name is John Dorsey.  I represent the future**

16    **claims representative in the Leslie Controls**

17    **bankruptcy proceeding in the bankruptcy court in**

18    **Delaware, and we are here today to take your**

19    **deposition.  I assume you've been deposed before; is**

20    **that correct?**

21      A.   I have.

22      **Q.   How many times?**

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 7

1    A.    Maybe somewhere around 15.

2    **Q.    So you're familiar with how this works.**

3    **I'll be asking questions; you answer the questions.**

4    **If you don't understand a question that I ask, please**

5    **let me know, and I will rephrase it for you to try to**

6    **make it understandable.  And if you need a break at**

7    **any time, let me know, and I'm happy to take a break.**

8    **I usually try to take one about every hour myself**

9    **anyway, just because everybody gets a little**

10   **blurry-eyed after a while.**

11        **When were first contacted, Dr. Mullin,**

12   **about providing an expert opinion in this case?**

13   A.    Around a month ago.  Maybe a little --

14   **Q.    I'm sorry.  Who contacted you?**

15   A.    Leslie Davis.

16   **Q.    And Ms. Davis is an attorney?**

17   A.    Correct.

18   **Q.    And do you know who Ms. Davis represents?**

19   A.    The Century Insurance.

20   **Q.    And what did she ask you when she**

21   **contacted you about giving an opinion in this case?**

22   A.    The initial discussion was more just a

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 8

1  description of some background on the case, and I was

2  asked to look at the claims data and see if I had an

3  opinion about what it's future liability may be.

4      **Q.    Were you asked to provide any specific**

5  **types of opinions?**

6      A.   Not at that juncture.  It was more

7  open-ended.  I normally don't offer opinions at the

8  beginning.  I look at what's there first.

9      **Q.    Did Ms. Davis tell you, though, what**

10  **opinion they were asking to you give, other than what**

11  **the potential future value of the -- or the value of**

12  **the future claims might be?**

13      A.   Initially, it was to look at the data and

14  see what my thoughts were.

15      **Q.    In that initial conversation, did you**

16  **speak with anyone other than Ms. Davis?**

17      A.   No.

18      **Q.    What information did you review then,**

19  **after you had that first conversation?**

20      A.   I received a set of materials concerning

21  Leslie Controls.  One of the -- probably the most

22  important was historical claims data.  I think there

US Bankruptcy Court - Delaware                FINAL - October 4, 2010
In Re Leslie Controls                              Charles Mullin, Ph.D.

Page 9

1    were some other reviewed -- some of the filings.  I

2    can't recall what all of them were titled, but some

3    of the filings related to the bankruptcy.  Also

4    reviewed a number of the cases that had gone to trial

5    and looked at those outcomes specifically.

6        Q.    When you say cases to trial, are you

7    referring to cases against Leslie?

8        A.    Correct.

9        Q.    Who provided you with the information that

10   you reviewed?

11       A.    It was either provided to me from counsel,

12   or it would have been information that was publicly

13   available that I or someone on my staff collected.

14       Q.    What did Ms. Davis tell you about the

15   background in the case in that first conversation

16   that you had?

17       A.    I don't have a specific recollection.  I

18   knew -- I knew about the case before I spoke with her

19   in very broad general terms, and I don't recall

20   exactly what she told me that I may not already have

21   been aware of.

22       Q.    After you reviewed the material that

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 10

1    **you've identified, what happened next?  In terms of**

2    **your conversations with either Ms. Davis or anyone**

3    **else with regard to your opinion?**

4        A.    I provided her with my initial impressions

5    and had a discussion about what, if any, future work

6    her client desired.

7        **Q.    What did you tell her about your initial**

8    **impressions?**

9        A.    My initial impressions were that Leslie

10   Controls was a relatively new defendant in the

11   asbestos litigation.  It hadn't seen much liability

12   prior to 2000, or seen -- it had seen some

13   third-party actions and some other things, but hadn't

14   paid much indemnity at all in the underlying tort

15   cases prior to that.  As a set of other companies

16   went bankrupt in the early 2000s, they appeared to

17   start to get named.

18        They seemed to be a company that followed

19   kind of a relatively classic pattern of a new

20   defendant in that as those new claims come in,

21   initially they start paying a fair amount of

22   indemnity, and then they build up their defenses, and

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 11

1    as they build up those defenses, those play out in

2    the tort system.  In the case of Leslie, it appeared

3    that those defenses were effective and that they were

4    winning the cases that were going to trial in

5    general.  They were getting defense verdicts.  Their

6    claim values had been declining in the recent years,

7    and their dismissal rate had been climbing.  So I had

8    the impression of a defendant that had ramped up its

9    defenses, was defending successfully, and its

10   liabilities, if anything, appeared to be coming down

11   on a go-forward basis as opposed to trending up.

12       **Q.   And after you provided your initial**

13   **impressions, were you asked to do anything further?**

14       A.   I was eventually asked to prepare the

15   declaration that I subsequently filed.

16       **Q.   Were you asked to provide any specific**

17   **types of opinions with regard to your initial**

18   **impressions?**

19       A.   In the scope, as I think fairly laid out

20   in terms of the declaration itself, I wasn't asked to

21   give a particular opinion or conclusion.  I was asked

22   to provide my opinions regarding the proposed trust

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 12

1    distribution procedures, the average values in those,

2    the projected liabilities, future -- potential future

3    liabilities of Leslie Controls, and that's what I

4    did.

5        **Q.    You mentioned the declaration that you**

6    **prepared.  Did you prepare this yourself?**

7        A.    I mean, I either directly prepared or

8    oversaw the preparation of everything that's in here,

9    so, I mean, I have a staff that assists me in my

10   first drafts of things if they have done analyses,

11   but I will always edit those to ensure that they

12   properly reflect my opinions.

13       **Q.    And do you know whether in this particular**

14   **case you drafted the declaration yourself, or did**

15   **your staff draft all or portions of it initially and**

16   **then you reviewed it?**

17       A.    It's a mixture throughout.  So I drafted

18   -- I spent -- I can't tell you exactly how many

19   hours, but I spent a fair number of hours going

20   through either writing paragraphs from scratch myself

21   or editing the proposed text that others had provided

22   to me.

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 13

1    **Q.    Were there drafts of the report -- or**

2    **excuse me -- the declaration before this final**

3    **version that's been produced?**

4        A.    I didn't type it as you see it here the

5    first time.  I just had a Word file that I was

6    working in, so that file evolved through time.

7        **Q.    You mentioned that there were edits to the**

8    **declaration as you were going through it over time.**

9    **Do those edits still exist, or were they overwritten?**

10        A.    As best as I know, it's how computers

11    work.  I mean, I had one Word file, and I'd keep

12    revising that one Word file and saving over it.

13        **Q.    The portions of it that were written by**

14    **your staff, did they provide them to you**

15    **electronically or in hard copy?**

16        A.    Those were -- typically, it's done just

17    within the same Word document.  Somebody else would

18    be handed over control of the Word file, and they

19    would propose edits in that.

20        **Q.    Is that Word file then emailed between the**

21    **people who were working on a particular declaration?**

22        A.    No.  We typically -- it's stored on our

US Bankruptcy Court - Delaware                    FINAL - October 4, 2010
In Re Leslie Controls                                   Charles Mullin, Ph.D.

Page 14

1    network drive, and people just go to that network

2    drive, and that way it's backed up in some sense if

3    you were to lose everything.  That way it exists in a

4    secure framework for us, as opposed to sending it

5    over email.

6         **Q.   Would someone who was working on the**

7    **draft, the portions that you didn't draft yourself**

8    **directly, would they email you to tell you they had**

9    **updated the declaration and you should go look at it?**

10        A.   They may, and they may just drop by my

11   office and tell me.

12        **Q.   Do you know whether there are any emails**

13   **between you and your staff regarding the work that**

14   **was done on the declaration?**

15        A.   I'm sure there's a number of emails back

16   and forth.  The gist of those would be scheduling, or

17   there may be a note that says I completed reviewing

18   the section you wanted me to review.  There may be an

19   email of that nature.  And, generally, emails

20   wouldn't contain any edits themselves.

21        **Q.   Have you brought any copies of the emails**

22   **or any other documents with you today?**

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 15

1    A.    Sitting in front of me is a copy of the

2  declaration itself, but I haven't brought any emails.

3        MR. DORSEY:  I would like to see the

4  emails that were sent between him and his staff

5  regarding the preparation of the declaration.

6  BY MR. DORSEY:

7    **Q.    You mentioned that you have a Word file on**

8  **your system at work that would contain the document**

9  **that everybody just would go into and make edits to**

10 **as they were working on the declaration; is that**

11 **correct?**

12   A.    Correct.

13   **Q.    Is there a backup of your system every**

14 **night to back up the documents that are contained on**

15 **the -- on the system?**

16   A.    I know that my IT department does backups.

17 I don't know the exact frequency or how long they are

18 preserved.

19   **Q.    Is it possible then that there could be,**

20 **in the backups that are conducted, different versions**

21 **of the declaration as it was going through the**

22 **process of being edited?**

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 16

1     A.   It's possible.

2         **Q.   I'd also like to see copies of any edits**

3     **for previous versions of the declaration that might**

4     **be on the system.  As you were working on the**

5     **declaration, did you send copies of it to counsel?**

6     A.   I think at some point there was a -- a

7     version sent to counsel.

8         **Q.   Do you recall when that was?**

9     A.   I don't recall the exact date.  Probably a

10    day or two or so before it was filed.

11        **Q.   And that would have been a Word version of**

12    **the document that you had been working on?**

13    A.   It would either be a Word version or a PDF

14    version.

15        **Q.   Were there edits made to the declaration**

16    **after you sent it to counsel?**

17    A.   Yes.

18        **Q.   I'd also ask to see then a copy of**

19    **whatever was sent to counsel prior to the filed**

20    **version.  Did counsel provide any comments to you**

21    **about the report that you sent to them initially?**

22    A.   Yes.

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 17

1    Q.    What comments did they provide?

2    A.    Largely, grammatical in nature, so

3    rephrasing of a sentence, punctuation, proper

4    referencing on items was the gist of the feedback.

5    Q.    You say "largely."  Were there other edits

6    that were more substantive?

7    A.    Not edits per se.  I mean, there was a

8    discussion of the declaration, but there wasn't, you

9    know, an edit of a line item.

10    Q.    How were those edits transmitted to you?

11    Was it verbally or by email?

12    A.    I don't recall exactly how they arrived.

13    I mean, I don't -- it wasn't verbally to me, but it

14    may have been to somebody on my staff or it may have

15    been a -- you know, effectively a marked-up version.

16    I don't recall.

17    Q.    So it's possible there is either a

18    marked-up version or emails discussing edits counsel

19    was requesting that you make to the declaration?

20    A.    It's possible.

21    Q.    To the extent they exist, I would ask for

22    production of those emails.  Other than the

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 18

1    **information that you reviewed that you've already**

2    **testified about in the initial documents that you**

3    **took a look at in the preparation of your**

4    **declaration, did you look at other documents in**

5    **preparing your opinions in this case?  Other than the**

6    **ones you've already identified?**

7        A.    I'm probably not going to recall all of

8    them as I sit here, but in general categories, I

9    reviewed some financial information related to Leslie

10   Controls.  I reviewed some financial information of

11   companies that, in a loose sense, could be viewed as

12   comparables to them from an evaluation perspective.

13   There's not so much reviewed per se for this but

14   things that are in my general knowledge of things

15   that I am constantly aware of are, you know, the

16   evolving tort environment both with regard to, you

17   know, substantive developments potentially in the law

18   but also substantive developments in terms of

19   economic factors in that environment.

20       Q.    **We'll go ahead and mark your declaration**

21   **as an exhibit.**

22             - - - - -

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 19

1          **(Exhibit 1 marked.)**

2                 **- - - - -**

3     **BY MR. DORSEY:**

4          **Q.   Attached to your declaration that has been**

5     **marked as Mullin Exhibit Number 1, there is a list of**

6     **materials that you considered in the preparation of**

7     **your opinion; is that -- is that correct?**

8          A.   There is.

9          **Q.   And that's Exhibit -- or attachment B to**

10    **your declaration?  Correct?**

11         A.   Correct.

12         **Q.   And in addition to the list, there is some**

13    **additional copies of materials that are attached to**

14    **the back of that list; is that accurate?**

15         A.   Yes.

16         **Q.   Is this a comprehensive list of all of the**

17    **materials that you considered in the preparation of**

18    **your opinion?**

19         A.   It would be -- there's always a chance I

20    missed something, but the intent was for this to be a

21    comprehensive list of the things that I specifically

22    considered here.  As I said, there's a broad array of

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 20

1    knowledge that I would also put in there in terms of

2    knowledge about the bankruptcy trust system,

3    knowledge about the amount of funding in those trusts

4    and how that may affect the tort environment, and

5    knowledge of the legal environment in the different

6    states.  I didn't try to, you know, give a complete

7    list of all of that knowledge that I possess that

8    does frame my opinions.

9         **Q.    If you look to the documents that are**

10   **behind the list of materials that were considered,**

11   **the first is a spreadsheet that's captioned Leslie**

12   **valuation analysis.  Is that correct?**

13        A.    Correct.

14        **Q.    And this is the valuation of Leslie**

15   **itself, as opposed to the claims against Leslie,**

16   **correct?**

17        A.    Yes.  That's the purpose of the -- these

18   working papers.  Yes.

19        **Q.    And what was the purpose of reviewing this**

20   **particular information with regard to your opinion in**

21   **the case?**

22        A.    There's a section in my declaration, which

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 21

1    I'll just turn to so I can make direct reference.

2    Really the section that's probably -- runs from about

3    paragraph 27 through paragraph 30 expresses opinions

4    concerning the Leslie and CIRCOR contributions

5    relative to the value of Leslie.  So to quantify the

6    value of the contribution above the enterprise value

7    of an asbestos-free Leslie Controls was the purpose

8    of looking at that.

9        **Q.    And then behind those two pages, there's**

10   **some additional spreadsheet-type information.  Can**

11   **you tell me what this is?**

12       A.   Yes.  So after the first two pages?

13       **Q.   Yes.**

14       A.   Right.  This is more the raw data as has

15   been publicly available concerning companies that one

16   may consider comparables to Leslie Controls.  And so

17   that -- that's the raw data that feeds in on the

18   front page where it says Multiples Analysis on the

19   first Excel sheet and has various company names.

20       **Q.   Okay.**

21       A.   So it's characterizing those companies.

22       **Q.    And why did you review this information in**

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 22

1  **connection with your opinion?**

2      A.    Again, it goes to the valuation of Leslie

3  Controls and -- which is a component of determining

4  what, if any, contribution CIRCOR was making above

5  and beyond the value of an asbestos-free Leslie

6  Controls.

7      **Q.    Did you make that determination about the**

8  **value of Leslie and the comparable companies**

9  **yourself, or did somebody else on staff do that?**

10     A.    I made the determination of my opinion,

11  which is that the value was probably not above its

12  liquidation value of 35 million, and I did that

13  through looking at both the financials of Leslie

14  directly and by looking at the comparable companies.

15     **Q.    Do you have experience in valuing**

16  **companies?**

17     A.    I have limited experience in that regard.

18     **Q.    What experience do you have?**

19     A.    I have my training in economics going back

20  and looking at valuing companies.  I understand the

21  basic concepts of discounted cash flows and

22  enterprise value.  And all I was really attempting to

US Bankruptcy Court - Delaware                    FINAL - October 4, 2010
In Re Leslie Controls                                   Charles Mullin, Ph.D.

Page 23

1    look at here is a company that averages less than two

2    million a year of profit, and asking the question of

3    if it averages less than two million a year in

4    profit, could it have an enterprise value in excess

5    of $35 million, its stated liquidation value?  I took

6    its liquidation value from the disclosure statements

7    as given.  I didn't do my own analysis of that.  And

8    the discount rate that would be necessary for it to

9    exceed 35 million would be incredibly low.  So it's

10   really easy to come to the conclusion where the

11   numbers are very obvious that its enterprise value

12   doesn't exceed its liquidation value.  So knowing

13   that, it gave me comfort that that's where all the

14   economic factors pointed.

15       **Q.    Have you ever given an expert opinion**

16   **about the value of the company?**

17       A.    What?  No.  And here I'm really saying

18   that it doesn't exceed its liquidation value.  I'm

19   not stating what its value would be outside of

20   liquidation, outside of the fact that it appears to

21   be well below its liquidation value.

22       **Q.    Going back to Exhibit B, if you go past**

US Bankruptcy Court - Delaware

FINAL - October 4, 2010

In Re Leslie Controls

Charles Mullin, Ph.D.

Page 24

1    **the information regarding comparable companies,**

2    **there's another document, and at the top it says**

3    **Wilson Elser Moskowitz Edelman & Dicker.  Do you see**

4    **that?**

5        A.   Yes.

6        **Q.   What is this document?**

7        A.   This is a document that the most relevant

8    section from my perspective is really looking at the

9    subsection on California, but it's a document that

10   provides an overview of the legal environment and an

11   opinion on what the appellate court rulings mean and,

12   in that sense, leads into how that environment may

13   impact Leslie Controls, had it stayed in the tort

14   system.

15       **Q.   Why was that important for you in**

16   **preparing your opinion in this case?**

17       A.   Well, a core component of my opinion is

18   explicitly about what is the -- what would have been

19   the likely liability faced by Leslie Controls if it

20   had stayed in the tort system.  In order to answer

21   that question, one has to look at the tort

22   environment as it -- both as it exists today, as it

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 25

1    existed over the recent past, if you're going to use

2    their claims history in the recent past, and how that

3    is evolving or likely to move in the future.  And if

4    you don't do that, you don't get a reliability

5    estimate.  So you need to understand what that tort

6    environment is to come up with reliable forecasts.

7         **Q.   Are you familiar with the Wilson Elser**

8    **firm?**

9         A.   I'm not deeply familiar with them.

10        **Q.   Have you ever worked with them before?**

11        A.   Not to the best of my knowledge.

12        **Q.   Has anyone at Bates White ever provided an**

13   **opinion on behalf of Wilson Elser?**

14        A.   Not that I'm aware of.

15        **Q.   Do you know what kind of work Wilson Elser**

16   **does?**

17        A.   I may know -- in this section, it's

18   talking about their toxic tort and environmental

19   practice, but I don't know globally what the law firm

20   does.

21        **Q.   Do you know whether they represent**

22   **plaintiffs in toxic tort cases or defendants?**

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 26

1      A.    I mean, its description is more consistent

2   with the defense posture in the national defense

3   platforms it's describing and looking at things, but

4   I don't know all of its history.

5      **Q.    Other than this information provided by**

6   **Wilson Elser, did you look at any other source of**

7   **information about what the meaning of the opinions**

8   **that are referred to in these materials meant?**

9      A.    I've read them -- I mean, I'm familiar

10   with the appellate rulings.  I've reviewed them.

11   I've had discussions at any number of conferences

12   with both defense and plaintiff counsel at those

13   conferences, you know, about how these things may

14   impact the environment.

15      **Q.    Do you have any legal training?**

16      A.    I did not go to law school, if you mean by

17   formal legal training, in that sense, no.

18      **Q.    Do you feel you have some expertise in the**

19   **law?**

20      A.    A key component of what economists do

21   generally is incorporate different disciplines.  I do

22   that pretty much every day when I look at asbestos

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 27

1   liabilities.  As I said earlier, you can't forecast

2   asbestos expenditures or even understand a company's

3   historical expenditures unless you understand that

4   legal environment in which those expenditures are

5   occurring.  And so, across many disciplines, you

6   know, law being one of those, economists routinely

7   read the literature, get an understanding of it, and

8   incorporate that into the analysis.  And I do that

9   every time I do -- look at potential future

10  expenditure for a company, and that's explicitly what

11  my expertise is in.

12      **Q.    In reviewing the material about what's**

13  **going on in the tort system, did you -- other than**

14  **this Wilson Elser material that you've attached, did**

15  **you review any other materials?**

16      A.    For California specifically, I've looked

17  at a number of the appellate rulings themselves and

18  with regard to equipment manufacturers.

19      **Q.    And your basis for knowledge of the law**

20  **then is as your work in an economist in reviewing the**

21  **work done by other people with regard to what is**

22  **happening in the legal community; is that a fair**

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 28

1   **statement?**

2       MS. DAVIS:  Objection to form.

3       THE WITNESS:  When you look at appellate

4   rulings, I mean there's -- I'm not going to -- I'm

5   not an attorney.  I don't know what inferences

6   attorneys draw from them, but I know most of them

7   aren't that hard for a layperson to just read and

8   understand what the general meaning of the ruling is.

9   When you get a ruling that says an equipment

10  manufacturer isn't liable for something that was

11  specced or not specced, that was put on the outside

12  by somebody else, and prior to that ruling they were

13  potentially liable for it, it's very easy to know

14  that that means the scope of potential liabilities

15  for those equipment manufacturers has declined.  And

16  that will create downward pressure on their future

17  expenditure.  Then it becomes an empirical question

18  as to how much downward pressure.  Does that cause

19  their expenditure to fall 1 percent, 5 percent, 20

20  percent, 50 percent?  Those are empirical questions.

21  Attorneys don't know the answer to that when they

22  read an opinion.  You know, that -- you go to the

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 29

1    data, and you have to estimate that from data that

2    you go to quantification.

3         And that's really what I do.  I go in, and

4    I look at the environment.  I look at what's

5    changing, and then it becomes an empirical question

6    to quantify the likely impact of those changes or

7    potential changes on future expenditure.

8         **Q.    But you know that two lawyers could look**

9    **at the same opinion and draw different conclusions**

10   **about what that opinion means, right?**

11   A.   Correct.

12        **Q.    Otherwise we don't have work.**

13   A.   I have confidence you'd find something.

14        **Q.    Going back to your opinion itself -- or**

15   **your declaration.  The declaration basically is your**

16   **opinion in this case, correct?**

17   A.   Correct.

18        **Q.    And in the first paragraph, you say that**

19   **you were retained to, quote, "evaluate the potential**

20   **impact of the Leslie Controls, Inc., in parens**

21   **("Leslie") bankruptcy filing on Leslie's pending and**

22   **future asbestos bodily injury claims.  Correct?**

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 30

1   A.   Correct.

2       **Q.   And in doing that, you reviewed the**

3   **materials that we've already talked about, and -- and**

4   **then the rest of your report is the opinion itself**

5   **about how that interrelates, correct?  Pending future**

6   **asbestos claims?**

7   A.   The report speaks for itself, but that's a

8   characterization.

9       **Q.   If you look at paragraph five of your**

10  **report, as I read this paragraph -- and correct me if**

11  **I'm wrong -- there are really three different**

12  **opinions that you're giving; is that a fair**

13  **statement?**

14  A.   Like I said, there's -- there's numerous

15  things throughout here to -- I haven't gone through

16  the exercise of trying to put a count as to how many

17  opinions I have.

18      **Q.   Well, if we go through this paragraph, as**

19  **I look at the three, one is the TDP values and**

20  **Leslie's liability estimate that form a basis of a**

21  **proposed prepackage plan of reorganization are**

22  **inconsistent with Leslie's recent tort experience.**

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 31

1    In particular, the trust envisions paying numerous

2    claims that would have been uncompensable in the tort

3    environment.  Do you see that?

4        A.   I do.

5        Q.   I count that as opinion number one.  You

6    then go on to say, further, the TDP proposes paying

7    compensable claims substantially more than they

8    likely would have received in the tort environment.

9    I'd say that's opinion number two.  Is that fair?

10       A.   Like I said, I wrote it the way that I

11   would like to express my opinions.  You can

12   characterize them as you like.

13       Q.   Okay.  And then, three, although Leslie,

14   its parent CIRCOR, and other plan proponents have an

15   economic incentive to overstate the potential

16   asbestos liabilities, the resultant TDP figures do

17   not reflect Leslie's likely tort liability.  Correct?

18       A.   That's what it says.

19       Q.   And then you say in paragraph six, each of

20   these opinions is described in more detail below.  So

21   paragraph five contains the opinions, and then below

22   that is the support for your opinions, correct?

US Bankruptcy Court - Delaware                FINAL - October 4, 2010
In Re Leslie Controls                              Charles Mullin, Ph.D.

Page 32

1      A.   I mean, I would describe paragraph five as

2   stating at a -- in very broad brush strokes what the

3   opinions are, and underneath that it provides more

4   detail and subtlety to what those mean, which you

5   could call multiple opinions or you could just call

6   fleshing out what are these broad brush stroke

7   opinions up above.

8      **Q.   If we then turn to paragraph number eight,**

9   **we are talking about Leslie's claims data and trial**

10  **history.  And you state in the second sentence of**

11  **that paragraph, in each of the three years preceding**

12  **its bankruptcy filing, 70 to 80 percent of resolved**

13  **mesothelioma claims were dismissed without payment.**

14  **Do you see that?**

15     A.   I do.

16     **Q.   Do you know what the total value of the**

17  **claims that were paid for the remaining 20 to 30**

18  **percent over the -- over that three-year period?**

19     A.   I don't recall the exact number.  I don't

20  think that's contained explicitly in my declaration,

21  but probably somewhere -- 10 to $20 million.  I

22  forget the exact.  Something in that -- more than 10,

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 33

1    I believe, but probably less than 15.

2        **Q.    And when you speak in terms of 10 to $20**

3    **million, is that for settlements and verdicts?**

4        A.    That's the amounts that were paid.  I

5    believe so, as reflected in their claims data.

6        **Q.    That doesn't include then the defense**

7    **costs for defending claims?**

8        A.    No.  It does not.

9        **Q.    You go on in the next sentence to describe**

10   **the eight cases that were tried to completion, and**

11   **you note that there was one verdict against Leslie**

12   **that was reduced on appeal to $355,000; is that**

13   **correct?**

14       A.    Actually of the eight that were tried to

15   completion, seven were defense verdicts, and the one

16   was a plaintiff verdict reduced to 355,000.

17       **Q.    And you note, though, in footnote number**

18   **three that there was another action that resulted in**

19   **a plaintiff verdict, correct?**

20       A.    I don't know the technical -- I mean, I

21   know the initial verdict was a plaintiff verdict, and

22   then that was I believe sent back to be retried.  So

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 34

1    I don't know if that's technically still a plaintiff

2    verdict, or if that is now -- you know, they're just

3    starting over from scratch and as yet to be

4    determined.  I would view that as yet to be

5    determined as to whether -- if the proper rules and

6    everything was followed as the appellate courts

7    thought it should be, we don't know what the outcome

8    is yet.

9        **Q.    So when you said eight cases with one that**

10   **resulted in a plaintiff's verdict, does that include**

11   **or exclude the one that's referred to in footnote**

12   **number three?**

13       A.   I view that one as not having been -- it

14   isn't complete.  The ultimate resolution remains

15   unknown.  We still don't know whether it will

16   ultimately be a defense or a plaintiff verdict.

17       **Q.    Do you know the amount of the verdict that**

18   **was entered by the jury in that case?**

19       A.   I've seen it, but I don't recall.

20       **Q.    You state in footnote three that on appeal**

21   **this matter was remanded for a new trial which will**

22   **no longer occur due to the bankruptcy filing.  Do you**

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 35

1    see that?

2        A.   I do.

3        Q.   Do you know whether there was a subsequent

4    appeal from the first appeal that was entered in that

5    case?

6        A.   I don't recall.

7        Q.   The opinions that you reviewed in

8    connection with preparation of your report were

9    from -- they were all from California, correct?

10       A.   I focused on California.  That's correct.

11       Q.   And what level of appeal court did those

12   opinions all come from; do you know?

13       A.   I believe they are the -- I believe they

14   are all the appellate court.

15       Q.   Is there more than one level of appellate

16   court in California?

17       A.   There is a Supreme Court.  So there's a

18   higher court above that.

19       Q.   And none of the opinions that you reviewed

20   were from the California Supreme Court, correct?

21       A.   That's correct.

22       Q.   Going up to paragraph number eight, you

US Bankruptcy Court - Delaware                    FINAL - October 4, 2010
In Re Leslie Controls                                      Charles Mullin, Ph.D.

Page 36

1    **talk about the one verdict that was entered, and you**

2    **state in the last sentence of that paragraph, thus,**

3    **Leslie has paid on average less than $50,000 per**

4    **verdict.  Do you see that?**

5        A.   Yes, I do.

6        **Q.   So why do you include the -- when you're**

7    **talking about average verdicts, why do you include**

8    **those that resulted in a defense verdict?**

9        A.   It's still a verdict.  I view what I think

10   of the litigation environment that both the

11   plaintiffs' attorneys and defendant companies face

12   when they make decisions about whether or not they

13   are going to try a case.  A plaintiff's attorney is

14   going to look at their economic returns doing so, as

15   is a defense, the defense side.  As they look at

16   that, both the probability that they get a plaintiff

17   verdict and the award that they may attain once they

18   get a plaintiff verdict are both relevant factors.

19   So what we've seen is, over the course of eight

20   cases, an average return on trying the case from the

21   plaintiff's side of under $50,000 for the effort of

22   trying the case, which is a low rate of return in

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 37

1  asbestos litigation for trying cases.

2      **Q.   But that doesn't include the defense**

3  **costs, correct?**

4      A.   It's the indemnity side.

5      **Q.   And do you know how much Leslie paid in**

6  **defense costs to take those eight cases to trial?**

7      A.   I don't recall the exact number.  It was a

8  fair amount of money.

9      **Q.   Is that also something that attorneys**

10  **would take into account in determining the risk**

11  **factors on going forward with a trial, what the**

12  **defense costs are going to be?**

13      A.   In my experience of working with different

14  companies, companies take very different viewpoints

15  on that.  Some are much more willing to incur defense

16  costs to avoid indemnity and set precedents and

17  others aren't.

18      **Q.   But in determining the risk of going**

19  **forward -- you were talking about the risks of going**

20  **to trial and trying the case and that the average**

21  **payout is less than $50,000 per year.  Wouldn't the**

22  **attorneys who are advising the companies say a**

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 38

1    **potential risk of a verdict is $50,000, but in**

2    **addition to that, you have to consider what was spent**

3    **in defense costs to defend those cases?**

4        A.    What I think of the analysis -- I don't

5    think of defense cost so much as a risk.  They are

6    costs.  I don't think verdicts are volatile.  You

7    might get a defense verdict and pay zero, or you

8    might get a plaintiff verdict and pay $355,000.

9    There's a lot of uncertainty and hence risk as to

10   what a jury may do.  I don't think there's nearly as

11   much uncertainty of risk as to what your defense bill

12   for trial is going to be.  It's a cost.  And like all

13   costs -- does a company take its costs into account?

14   They should.  I don't know what Leslie Controls did.

15   I haven't had an opportunity to talk to them, but

16   they should take that cost into account in making

17   their decisions.

18       Q.    And that makes sense because if you were

19   **going to take a case to trial and it was going to**

20   **cost you a million dollars in attorney's fees and you**

21   **have a risk of a $50,000 verdict, but you could**

22   **settle the case for $100,000, that might be a good**

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 39

1    **deal, right?**

2        A.    Again, this depends on where you are in

3    your litigation.  If -- and I think what asbestos

4    litigation has taught many defendants is that if you

5    simply settle to avoid defense costs, you'll just get

6    more and more claims.  And if you have a low exposure

7    profile like Leslie with what appear to be very few

8    compensable claims against you, establishing that

9    precedent in the tort system might have a lot of

10   long-run value, which their actions seems to be more

11   the route that they took.  They did try nine cases.

12   They did make the decision to set precedents and not

13   just settle for $100,000 less than it would have cost

14   them to try the case.  And that contains the number

15   of future claims you're going to get because the

16   plaintiffs' bar has set costs too of trying the case,

17   and if they know that you'll fight back and resist,

18   they're less likely to try a case against you.

19        So it's -- there is an interaction between

20   the two sides, and you can't look at it only from one

21   side.  If you viewed it simply as a one-sided

22   equation, no case should ever go to trial because the

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 40

1    defendant has costs of litigating, the plaintiff has

2    costs of litigating, and both should be willing -- I

3    mean, your logic -- if I flip it around, if I have a

4    plaintiff who says I expect to get $100,000 if I try

5    this case, but I have $150,000 in trial costs,

6    therefore they should be willing to accept zero

7    payment and walk away.  And at the same time, you may

8    say, oh, it has a value of $100,000 and there's

9    $150,000 in trial costs for the defendant, your logic

10   says the defendant should be able to settle for

11   250,000 or less, and so now I have one side willing

12   to take zero and the other side willing to pay 250.

13   That's not how people negotiate, and that's not how

14   precedents are set.  So both of those logics are

15   flawed.

16        **Q.   So, in your view, it would be illogical to**

17   **take into account the defense costs in determining**

18   **the long-term risks of litigating cases, as opposed**

19   **to filing for bankruptcy and getting an 524(g)**

20   **injunction?**

21        A.  No.  That's not what I said.

22        **Q.   Okay.  How would you approach that when**

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 41

1    **you're considering whether or not you should take**

2    **into account defense costs in determining long-term**

3    **risks and making a decision then about whether you**

4    **should file for bankruptcy and seek a 524(g)**

5    **injunction?**

6         A.    So -- I'm a little unclear on exactly what

7    question you're asking me.

8         **Q.    Let me try and rephrase it for you.  In**

9    **your experience, when companies are deciding whether**

10   **or not to file for bankruptcy and seek a 524(g)**

11   **injunction when they have asbestos liabilities, do**

12   **those companies take into account in addition to what**

13   **the potential verdicts might about, if they had to**

14   **try a case, the cost of defending those cases in the**

15   **tort system?**

16        A.    I think it is a business decision.  They

17   would take into account all costs associated with it.

18   So I think they would take into account their defense

19   costs.  I think they'd take into account their

20   capital financing costs.  I think they'd take into

21   account overhang on their stock price.  I think

22   there's a whole slew of costs that go into the

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 42

1   business decision as to what you should -- whether or

2   not that's a good business choice for CIRCOR or

3   Leslie or any other defendant.

4        **Q.   Now, you talked about how Leslie took -- I**

5   **think we have a little bit of an inconsistency.  I**

6   **think in your last answer.  Not this past one but**

7   **going back a little farther, you said they took nine**

8   **cases to trial, but it's really eight cases, correct?**

9        A.   My understanding is that there were eight

10  cases that have gone to trial through completion, so

11  the final outcome is eight.  There's a ninth case

12  that went to trial, that initially had a plaintiff

13  verdict which was overturned on appeal, and therefore

14  we don't know the final outcome.  So I think there's

15  nine cases that I'm aware of that have gone to trial,

16  and eight of those we know the outcome of, one we

17  don't know the outcome of.

18       **Q.   I was confused about what you meant in**

19  **paragraph eight about the eight cases, whether it**

20  **included that case that was included in footnote**

21  **three.  But you've clarified that.**

22       A.   I've excluded that one --

US Bankruptcy Court - Delaware

FINAL - October 4, 2010

In Re Leslie Controls

Charles Mullin, Ph.D.

Page 43

1    Q.   Okay.

2    A.   -- because it's not completed.

3    Q.   Okay.  In addition to those eight cases

4    that they took to trial, they also settled a number

5    of cases, didn't they?

6    A.   Yes.  They did.  Numerous settled cases.

7    Q.   In the eight cases that they tried, do you

8    know when those cases were initially filed against

9    Leslie?

10    A.   It's in the claims data, but I don't

11    recall the dates.

12    Q.   Turning to page 4 of your declaration,

13    there's a chart that lists by year filed the number

14    of mesothelioma claims, lung cancer claims, other

15    cancer claims, and nonmalignant or unknown claims,

16    correct?

17    A.   Correct.

18    Q.   And then the total column for all claims

19    filed in any particular year, correct?

20    A.   Correct.

21    Q.   And you go -- in paragraph 11, you state,

22    starting in 2008, law firms that ultimately comprised

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 44

1   **the members of the ad hoc committee and then**

2   **subsequently other plaintiff law firms appear to have**

3   **begun dumping their claims inventory on Leslie.  Do**

4   **you see that?**

5       A.   I do.

6       **Q.   What's your basis for stating that it**

7   **appears that these firms began dumping their**

8   **inventory of cases on Leslie?**

9       A.   Well, I go on to define more specifically

10   what I mean by that, I think, in the next sentence,

11   which states that, in other words, once those firms

12   establish that Leslie was a potential source of

13   compensation, they filed a large portion of their

14   claims inventory against Leslie.  What you see in the

15   data is you see more claims being filed that were

16   diagnosed multiple years in the past.  Initially, the

17   filings are almost always -- like the filing in 2004

18   was almost always a claimant who was diagnosed with

19   mesothelioma in 2004 or maybe 2003, but they are very

20   close in time.  As you move forward in time, you see

21   a larger and larger fraction of the claimants with

22   diagnosis dates reaching back three, four, five, six

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 45

1    years into the past, which is indicative of a claim

2    that's not in its initial pass through the tort

3    system.

4        You also see it in the resolutions.

5    Empirically, you can tell that as the claim filings

6    increased and went from the small numbers in the

7    early part of the decade up closer to 300, 400 claims

8    in the latter part of the decade, that the dismissal

9    rates rise, the average settlement value falls, even

10   among those that -- so fewer of them are paid, and

11   the ones that are paid are paid less per claim.

12   These are all things that are very consistent with a

13   weaker inventory of claims with regard to the

14   strength of the case against Leslie.

15       So all the factors point to -- that the

16   initial batch of claims that came in were the cases

17   that have the strongest connection to Leslie and face

18   the greatest litigation risk, and as time moved

19   forward, that population of claimants expanded to

20   those that had a much weaker a nexus, if any, to

21   Leslie Controls.

22       **Q.    Well, if we look at the chart, how many of**

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 46

1    the 392 cases filed in 2009 were cases that had a

2    diagnosis farther back than three or four years?

3        A.   I don't know the exact number.  In other

4    words, I was looking at -- it I forget if I was

5    looking at '08 or '09, but initially, as I said, they

6    were almost within the same year or one year before,

7    and through that time that grew to about 25 percent

8    of the claims being older than the year before.  So

9    they'd be two calendar years plus back when initially

10   you saw almost no cases of that nature.

11       Q.   Now, you go on in paragraph 12 to talk

12   about how in recent years the percentage of resolved

13   claims the company has paid has fallen from about 40

14   percent to 25 percent.  Do you see that?

15       A.   Correct.

16       Q.   If you look at -- and you're going based

17   upon claims that resolved beginning in 2008.  So if

18   we look at your chart on page 4, there were a hundred

19   -- 751 cases total filed against Leslie during that

20   year of 2008, correct?

21       A.   Yes.

22       Q.   And if you turn to the next page, this is

US Bankruptcy Court - Delaware          FINAL - October 4, 2010
In Re Leslie Controls                            Charles Mullin, Ph.D.

Page 47

1    a chart that lays out your -- your view on the number

2    of cases resolved versus number of cases paid, and

3    then the payment rate and dismissal rate.  Is that

4    accurate?

5        A.   This is only looking at mesothelioma

6    claims.

7        Q.   Right.  And if we look at 2008, there were

8    186 mesothelioma claims resolved in 2008, correct?

9        A.   Correct.

10       Q.   How many of those 186 claims were filed in

11   2008?

12       A.   I don't have that number, as I sit here.

13   I could cross-tab that in the data, but I don't know

14   the number right now.

15       Q.   Did you look at that to see how many were

16   filed sometime prior to 2008?

17       A.   I looked generally, and I looked at

18   clearly as you -- the big change, when you look at

19   this table, is that the payment rates in 2005, 2006

20   and 2007 are sitting at about 40 percent.  It's 39,

21   38, 40 percent over three years.  2008, 2009, 2010

22   it's averaging about 25 percent.  The majority of the

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 48

1    claims that were resolved in -- really all the claims

2    resolved in 2007 and earlier were clearly filed in

3    2007 and earlier.  And the majority of the claims

4    that were resolved in 2008 to 2010 were claims that

5    were filed much more recently.  So the trend is there

6    in the data.  You know, would that eventually bottom

7    out even lower?  And 2010 is indicative that, you

8    know, that affect may not have fully fleshed out yet,

9    and you may see that, you know, when you get more

10   like 400 claims filed, like in 2009, that the payment

11   rate may be 20 percent.  It may be 15 percent.  We

12   haven't seen that completely play out yet.

13       **Q.   But as you sit here today, you can't tell**

14   **me how many of the claims that were resolved in 2008**

15   **were actually filed in 2008 as opposed to 2007 or**

16   **2006 or 2005?**

17       A.   I can't -- I don't recall the exact

18   numbers.

19       **Q.   And when those claims are resolved, when**

20   **you say they are resolved, what does that mean?**

21       A.   They are -- I didn't do an independent

22   audit of the data provided by Leslie concerning their

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 49

1    claims history.  I took that as given.  So resolved

2    means that, in the data that Leslie provided, it is

3    indicated that it's either dismissed with no payment

4    or that it's been settled for a payment, and there is

5    an amount of payment specified.  Those are resolved.

6    It's no longer pending or open.

7        **Q.    So in 2008 in your chart on page 5, when**

8    **you say 75 percent dismissal rate, that would mean 75**

9    **percent of the cases resolved in 2008 resulted in the**

10   **case being dismissed without payment?**

11       A.    Correct.

12       **Q.    And how long does it normally take in your**

13   **experience in the tort system to get a case dismissed**

14   **once it's filed?**

15       A.    It varies.  There's no one answer to that.

16   It varies by jurisdiction.  It varies by defendant.

17   It varies by defense strategy.  And it can even vary

18   by the date of the plaintiff filing.

19       **Q.    Do you have a range of how long it takes,**

20   **based on those variables?**

21       A.    California, particularly for -- is a

22   relatively fast jurisdiction typically.  Plaintiffs

US Bankruptcy Court - Delaware                FINAL - October 4, 2010
In Re Leslie Controls                          Charles Mullin, Ph.D.

Page 50

1    can get trial dates relatively quickly.  So the

2    majority of cases tend to resolve within, you know, a

3    year, two years of filing.

4        **Q.    And then if it takes a year or two years,**

5    **it's safe to say that the cases that were resolved in**

6    **2008 wouldn't have been filed in 2008.  It takes a**

7    **year or two years?**

8        A.    It's within that.  There's cases that are

9    filed and I've seen defendants -- I mean, a case that

10   was filed in, you know, April of 2008 may very well

11   have resolved against a number of defendants within

12   2008 in California.  It's going to depend on what its

13   trial date is and the positions the various parties

14   take.

15       **Q.    But you don't know that information?**

16       A.    I know it's not uncommon in California.  I

17   can't give you an exact date.  If you filed in, you

18   know, December of 2008, you probably didn't resolve

19   with anybody in 2008, but if you filed in January,

20   you probably resolved with a number of defendants in

21   2008.

22       **Q.    Do you know what Leslie spent in defense**

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 51

1    **costs in each of the years 2008 and 2009?**

2        A.    I don't recall the exact numbers.  They're

3    spending a little bit more on defense than they're

4    spending on indemnity on average.

5        **Q.    Did you include 2010 in your analysis of**

6    **the potential future claims value in this -- in this**

7    **case?**

8        A.    I considered the data.  I mean, as I --

9    when I look at it, I provide a range that I think

10   it's less than, and I explain why I think it's less

11   than that range.  So part of what explains the

12   variation in that range is how much weight you give

13   to different periods of time.  So there's a question

14   we just talked about, a bit about the calibration

15   period.  So do you want to say that 2010 is

16   representative of the future or not in some capacity?

17   Do you want to say that, because it was close to the

18   bankruptcy filing, in some way it's not

19   representative and exclude it?  I've looked at

20   different calibration windows, so in some scenarios

21   or some of the extrapolations I've looked at, it's

22   included.  In other ones, it's not.

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 52

1      **Q.    How do you do those various extrapolations**

2    **based on the variables?**

3      A.    It's really what part of the settlement

4    history you want to look at.  So when you're doing an

5    extrapolation, you're fundamentally saying the

6    ultimate question is how many future compensable

7    claims are there going to be by year, and how much

8    will they get paid?  But there's components that go

9    into that in terms of you usually start with, how

10   many claims are going to be filed against them?

11   Among those, how many of those will get dismissed

12   without payment versus will be settled for payment?

13   So when you look at that, you can choose a set of

14   years as what you think is representative for how

15   many claims they are going to receive and match that

16   up with what you think is the appropriate payment

17   rate for those years and match that up with what you

18   think is the appropriate average settlement value.

19        And there's an element of keeping your

20   analysis consistent as you go across those pieces.

21   You wouldn't want to take one set of years for your

22   filing rate and a totally different set of years for

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 53

1    your payment rate, but you're looking at different

2    combinations and seeing how sensitive is the answer

3    to the assumptions you're invoking.

4         **Q.   When you do that analysis and you put in**

5    **and take out certain variables, do you prepare a**

6    **document that shows what the results of that analysis**

7    **is?**

8         A.   I mean, I do it interactively, so I look

9    at it and I see the outcome, and then I look at

10   another scenario and I see what that outcome would

11   be.

12        **Q.   You don't print out a copy of it once you**

13   **see what the results are going to be?**

14        A.   No.  I could replicate it very easily, but

15   I don't print out a copy.  It's a matter of how I set

16   scenarios.

17        **Q.   And so someone who wanted to repeat what**

18   **you had done wouldn't be able to do that by the**

19   **information we had in front of us, could they?**

20        A.   Well, they have all the underlying data to

21   do it, and we talk about using different calibration

22   periods and how sensitive it is to that, but I didn't

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 54

1    specify or say a particular scenario is the one.  I

2    have more looked at it across all of them to come to

3    a conclusion that -- you know, kind of a range if you

4    were to keep a static tort environment.  So if you

5    ignore the fact that they have been winning their

6    trial verdicts and that there's tens of billions of

7    dollars coming on line in trusts and other factors

8    that should create downward pressure, if you ignore

9    all of those factors and you just did an

10   extrapolation assuming that the tort environment of,

11   you know, the last two to four years looking at

12   different calibration windows within that, you really

13   can't get a number above 90 million, that falls

14   between 60 and 90, is that range, and that range

15   overstates the likely outcome because it's ignoring a

16   bunch of factors that are creating downward pressure.

17        **Q.   My question was if someone wanted to**

18   **re-create the calibrations that you've performed in**

19   **order to come to your conclusions about what the**

20   **value of the future claims are based on the**

21   **information contained in your declaration and the**

22   **attachments to your declarations, they wouldn't be**

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 55

1  **able to do that, would they?**

2      A.   They could.  They can test my opinions

3  based on the information that's in here.  The

4  information that's in here -- the fact that I combine

5  them in different ways -- whether I'm doing that in

6  my head, whether I'm doing that on a computer doesn't

7  really matter.  The relevant information is all in

8  here.  It talks about what the dismissal rates are.

9  It talks about how many claims they are going to get

10  and how many of those are going to get paid.  It

11  talks about the justification for why I feel like the

12  claim values are going to be in a certain range for

13  the ones that are going to get paid.  All the

14  components are there, and they can test the veracity

15  of any one of those components at will with the

16  claims data.

17      I'm not relying on any one scenario.

18  That's just how I get an understanding of the data.

19  That's my process of developing my understanding and

20  my opinion.  That's not the opinion itself.

21      **Q.   But someone outside wouldn't know which**

22  **variables you plugged in for which calibrations in**

US Bankruptcy Court - Delaware                    FINAL - October 4, 2010
In Re Leslie Controls                                      Charles Mullin, Ph.D.

Page 56

1    **order to re-create and determine whether your**

2    **calibrations were accurate, could they?**

3         A.   I -- I'm not presented a calibration here.

4    I'm presenting a range based on my understanding of

5    their data based on the component pieces that are

6    explained here.  So I think -- I think we're talking

7    past each other a little bit, but I don't have an

8    opinion on a scenario.  I have an opinion about what

9    their ultimate liability would have been, had they

10   stayed in the sort system, and the foundation of that

11   is all laid out in the declaration.  The fact that

12   I've run lots of queries on the data, I've gotten to

13   know their claims data and I understand it, that's

14   just part of the foundational work I do as an expert

15   to get towards forming that opinion, and any other

16   expert, I presume, would spend their own time getting

17   to understand the data and understanding what drives

18   their liability and come to an opinion of whether

19   they agreed or disagreed with me.

20        Q.   **Well, let's look at paragraph 20 of your**

21   **declaration.  In here, you say, in preparing the**

22   **extrapolation scenarios which were based on Leslie's**

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 57

1    **recent tort history, I evaluated several different**

2    **calibration windows, that is to say, I evaluated the**

3    **impact of using only certain portions of Leslie's**

4    **recent tort history as a basis for the**

5    **extrapolations.  Do you see that?**

6        A.    Correct.

7        **Q.    But it doesn't say what those**

8    **extrapolation scenarios are, correct?**

9        A.    No.  They're not particularly relevant to

10   what I'm saying in the paragraph.  That's correct.

11       **Q.    And why are they not relevant?**

12       A.    The purpose of this paragraph is the

13   statement that what goes on next, which is the

14   calibration window, doesn't really affect the answer.

15   It's not real sensitive.  I didn't pick one.  I don't

16   -- I didn't go out and create an opinion about which

17   calibration window is right.  What I did is I looked

18   at it, and I said the choice of calibration window

19   really doesn't matter.  Whether you use the last four

20   years, you use only years three and four in the past,

21   only the most recent two, I take a three-year window

22   in there.  I get basically the same answer.  The data

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 58

1    is stable.  That's what's important.  What's

2    important is that, as you look over the last four

3    years, there's some relative stability.  What's

4    happening is there's more claims coming in.  The

5    dismissal rate is going up.  The average payment

6    amount is going down.  And the number of core kind of

7    claims that are driving the liability really isn't

8    changing.  And so that portion of it's relatively

9    stable of what's going on.  And that's why it doesn't

10   really matter as you move back and forth.  So what

11   this is really telling you is the calibration window

12   isn't particularly relevant to the analysis.

13          Sometimes it is.  There's other defendants

14   where their data, depending on what you pick, makes a

15   really big difference.  This one doesn't.  That's

16   something any other expert could go assess and

17   come -- whether they agree or disagree that it's not

18   sensitive to that.

19          Q.   Well, let me ask you this:  What did you

20   determine the potential future claims were against

21   Leslie in terms of dollar amount?

22          A.   What I did -- I really had a more limited

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 59

1    opinion than that.  What I did is I came to the

2    conclusion that it's likely less than the 60 to 90

3    million.  So I said if you assume -- which is really

4    what's in paragraph 15 and 16.  If you assume a

5    static tort environment, so you ignore the receipt

6    changes and the foreseeable future changes that are

7    going to create downward pressure and should lower

8    Leslie's liabilities, if you set all that so the side

9    and pretend none of that exists, and so you take the

10   last four years and you say I'm going to assume the

11   last four years is perfectly representative of what `

12   the future is going to look like for Leslie Controls,

13   depending exactly how you want to play with that

14   data, you can get a number as low as 60 million or as

15   high as 90 million in nominal terms as to the money

16   that's going to be paid.  That's what's -- that's

17   what you can do.  And, you know, that's going to be

18   too high because you're ignoring all these factors

19   that are creating downward pressure.

20         That's the extent of what my opinion was

21   there.  I explained in some subsequent paragraphs

22   what assumptions you need to make to get at the high

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 60

1    end of that range versus what assumptions you need to

2    make to get at the low end of that range.  And so

3    those are explained really in -- I think paragraphs

4    18 and 19 explain kind of what drives some of that

5    variability, but that's the extent of the opinion.

6          I didn't go through the exercise of

7    quantifying how much of an impact the downward

8    pressure may have on Leslie of the fact that they

9    have been winning at trial and the other changes that

10   are coming in the tort environment.

11         Q.    Why didn't you do that?

12         A.    It wasn't necessary.  I mean, 60 to 90

13   million, what's being shown in the TDP -- I don't

14   need to do that to show that the TDP values are

15   unreasonable in my opinion.  When I look at the TDP

16   values, they average a little bit more than $100,000

17   per mesothelioma claim, and I compare that to a

18   history that, for the last three years, has been

19   trending down.  Its high-water mark was about 80,000.

20   It was closer to 50,000 in 2010, but if I look at any

21   two-year average, it's hard to make it break 70,000,

22   and it's been coming down.  And I look at that along

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 61

1    with the fact that what's going on in the tort

2    environment should be creating more downward

3    pressure, and I don't see any justification for an

4    average value in a trust that exceeds the historical

5    experience.  If anything, it should be lower, but

6    definitely it shouldn't exceed.  So I didn't need to

7    do more work than that to determine that the 100,000

8    dollar average value in the trust, which is really

9    the weighted average of the two values that the trust

10   provides, but when you -- I don't need to do more

11   work to determine that that's an unreasonable value.

12       Q.    Did you take into account the payment

13   percentage on the TDPs?

14       A.    The payment percentage -- I mean, that's

15   an internal number in the trust.  When you say take

16   into account, for what purpose?

17       Q.    To determine whether what's going to be

18   paid to claimants under the trust is a reasonable

19   amount.

20       A.    I guess this depends what purpose you're

21   liking at.  I'm looking at the liquidated values, and

22   I'm saying the liquidated values do not represent the

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 62

1    tort liability that Leslie would have faced.  Now, if

2    you're going to ask once you take 40 percent of the

3    liquidated values, would those represent the tort

4    liability that might have been faced for compensable

5    claims, it might very well.  It might even be too low

6    for some claims.  But the TDP -- that's not the

7    question I was asked to look at.  I was asked to look

8    at the liquidated numbers, and on the liquidated

9    values, those are unreasonably high.

10        **Q.    Who asked you to look at the liquidated**

11   **values?**

12        A.    That's what I understood is my scope of

13   work as I was looking at the reasonableness of the

14   TDP.  As the payment percentage moves through time,

15   the liquidated values are presumably supposed to

16   represent what the indemnity payments of Leslie would

17   have been in the tort system.

18        **Q.    But did somebody tell you specifically**

19   **only look at the liquidation values; don't look at**

20   **the payment percentage values?**

21        A.    No.  No one said that to me specifically.

22        **Q.    And when you say liquidation value, what**

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 63

1    do you mean by that?

2        A.    The face value of the claim as processed

3    by the -- under the trust distribution procedures.

4        Q.    Did you discuss with counsel why it was --

5    why you were only looking at liquidation value, as

6    opposed to TDP value?  Or payment percentage values,

7    I should say?

8        A.    No.

9        Q.    When you indicated earlier that in your --

10   in many coming up with the 60 to $90 million range,

11   you looked at the last four years of claims history;

12   is that correct?

13       A.    I mean, I looked at in totality.  I think

14   reaching further back wouldn't have been appropriate.

15       Q.    And when you say you looked at the last

16   four years, does that include 2010?

17       A.    That's in the last four years.  Yes.

18       Q.    Did you take into account the fact that

19   the debtor filed for bankruptcy in July of 2010,

20   which would have stopped any claims being filed

21   against it?

22       A.    Yes.

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 64

1     **Q.   How did you do that?**

2     A.   So, to me, you need to understand some

3 things.  There's nothing magical about calendar

4 years.  So time -- every day is a day.  So they have

5 claims data through a given day, and the fact that

6 it's a partial day makes no difference in the

7 analysis.  It's -- if it's a shorter year, I actually

8 do things typically in 12-month windows because there

9 is some seasonality actually in asbestos litigation.

10 So it's good to look in 12-month windows.  So I

11 typically look in 12-month windows for the most

12 current data to the data reaching back.  So I'll look

13 four years that date back from the filing date.  I've

14 also looked at it in calendar years here because

15 that's just what most people naturally -- that's kind

16 of how they are used to seeing it.  So I'll look at

17 it that way as well.

18     **Q.   Well, to come up with the 60 to $90**

19 **million range, did you look at calendar year, or did**

20 **you look at 12 months beginning right before the**

21 **bankruptcy filing?**

22     A.   I looked at the 48 months preceding.  I

US Bankruptcy Court - Delaware                    FINAL - October 4, 2010
In Re Leslie Controls                                      Charles Mullin, Ph.D.

Page 65

1    also looked at the three and a half, in essence,

2    calendar years preceding.

3         Q.    Did you also take -- let me strike that.

4              Do you know when the members of the ad hoc

5    committee first began negotiating with Leslie about a

6    possible 524(g) trust?

7         A.    No.  The only data I recall seeing is when

8    they actually formed the committee.  Presumably there

9    were conversations that predated the forming of the

10   committee, and I don't know when those occurred or

11   how extensive they were.

12        Q.    And are you aware that the members of the

13   ad hoc committee indicated that they would not file

14   any further claims against Leslie while they were

15   negotiating in the prepetition period?

16        A.    I am aware.

17        Q.    Did you take that into account in your

18   calibrations for determining what the potential

19   claims would have been in 2010?

20        A.    Yes.

21        Q.    How did you do that?

22        A.    As I said, I've done this where I've

US Bankruptcy Court - Delaware                FINAL - October 4, 2010
In Re Leslie Controls                              Charles Mullin, Ph.D.

Page 66

1    altered -- so I've taken the calibration period where

2    I've excluded the last 12 months.  I've looked at the

3    calibration period.  If I exclude the last 18 or 36,

4    or 18 or 24 months, the most recent.  And I used a

5    little bit older data before those agreements were in

6    place.  So that's really the point of where you

7    referenced paragraph 20.  It's just not that

8    sensitive.  The answer which -- how you treat these

9    different periods of time isn't what drives the

10   answer.

11        Q.   I'm going to take a break in a minute, but

12   I just want to ask a couple more questions.

13            So is it your opinion that the 60 to $90

14   million range is a reasonable range for the value of

15   future claims against Leslie Controls?

16        A.   No.  It overstates.

17        Q.   Okay.  And we'll come back and talk about

18   that.  Let's take a break.

19            (Recess.)

20   BY MR. DORSEY:

21        Q.   Dr. Mullin, you indicated that it's your

22   belief that the 60 to $90 million simple

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 67

1    **extrapolation of historical tort information from**

2    **Leslie on the value of future claims is not --**

3    **overstates, is that correct?**

4        A.    I believe it's substantially more likely

5    to overstate than to understate.  That's correct.

6        **Q.    And I believe you testified earlier,**

7    **correct me if I'm wrong, that you did not try to**

8    **quantify to what extent it may overstate the claim**

9    **system or the potential future claims?**

10       A.    No.  I didn't try to put forward an

11   explicit quantification.

12       **Q.    And if we look at paragraph 15 of your**

13   **report, you indicate the reasons why you believe that**

14   **the 60 to $90 million figure might be overstated, is**

15   **that correct?**

16       A.    Correct.  Those are four factors I've

17   listed.

18       **Q.    Are there others other than those four?**

19       A.    The others I think more are -- there is

20   other factors that affect it.  There is a reason the

21   range was 60 to 90 million.  For example, if you

22   control for the fact that through time, the typical

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 68

1    mesothelioma claimant gets older, older claimants

2    typically recover less than younger claimants.  And

3    if you control for that factor, you're more likely to

4    be at the 60 end of the 60 to 90.  And if you don't

5    control to that and think values are independent of

6    age, you get closer to the higher end.

7         So there are other factors that matter

8    that were in those scenarios that were discussed.

9    These are the four factors that I assumed would have

10   no impact for the sake of producing the 60 to $90

11   million range, but in reality, those four factors all

12   create downward pressure which should lead to a

13   realized number below that range.

14        **Q.   Well, let's walk through those four that**

15   **you have listed here.  The first is Leslie's average**

16   **settlement value has been trending down over the past**

17   **three years, correct?**

18        A.   Correct.

19        **Q.   And we've talked about that already.  Over**

20   **that same three-year period, what has happened to**

21   **Leslie's defense costs?**

22        A.   I don't recall the exact numbers.  They

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 69

1    are in the data that was provided to me.

2       **Q.    Are they trending up or trending down?**

3       A.    I recall that they are slightly more than

4    indemnities, so my guess is given the number of

5    resolved claims has gone up, that they -- I believe

6    they trended up a bit in that period.

7       **Q.    You say the defense costs are slightly**

8    **more than the indemnity costs?**

9       A.    Overall.  If you look at total indemnity

10   versus total defense, I think there is in rough

11   numbers, my recollection is there is about 20 million

12   of historical indemnity payments and about 25 million

13   of historical defense payments.

14      **Q.    Let's take a look at a document.**

15             **- - - - -**

16          **(Exhibit 2 marked.)**

17             **- - - - -**

18   **BY MR. DORSEY:**

19      **Q.    Dr. Mullin, you've been handed what's been**

20   **marked as Mullin Exhibit 2 and this is the first**

21   **amended disclosure statement filed by Leslie Controls**

22   **in the bankruptcy claim filed in Delaware?**

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 70

1    A.   Yes.

2    **Q.   You looked at this in connection with your**

3    **opinions in this case?**

4    A.   Yes.

5    **Q.   And if we turn to page 6 of the disclosure**

6    **statement.  In the middle of the page, right before**

7    **subsection C, there is a paragraph that begins**

8    **Leslie's gross expenditures.  Do you see that?**

9    A.   Yes.

10   **Q.   And that lists what the payments were, the**

11   **gross expenditures includes what?  Are you aware?**

12   A.   It says gross expenditures from the costs

13   of defending, that appears to read defense, it makes

14   reference to defending.  I'm not sure if that is

15   defense and indemnity combined or just defense.

16   **Q.   Let's assume it's just the defense costs**

17   **and if we look at the numbers, it goes from 2005 to**

18   **2009 with the costs going from 2.2 million in 2005 to**

19   **12.3 million in 2009, correct?**

20   A.   I see that.

21   **Q.   And I've done the math.  If you add those**

22   **numbers up between 2005 and 2009, defense costs would**

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 71

1    be 39.4 million dollars, does that look about right?

2        A.    I'll take your representation with the

3    math.

4        Q.    And then the next sentence in that

5    paragraph talks about Leslie's growth in indemnity or

6    settlement payments.  Do you see that?

7        A.    Yes.

8        Q.    And they range from 1.1 million in 2005,

9    2.1 million in 2010.  I'm sorry.

10       A.    There is a series of numbers in between so

11   --

12       Q.    Right.  I'm just giving a range.

13       A.    The range exceeds, the high end is above

14   2.1, that's why I was clarifying.

15       Q.    The high was in 2009 when the settlement

16   costs were $6.3 million?

17       A.    Correct.

18       Q.    And if we add up those years excluding

19   2010 because we don't have the numbers for 2009 on

20   defense costs, the total settlement costs were $18.1

21   million.  Does that look about right?

22       A.    Again, I'll take your representation for

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 72

1    the math.

2        Q.    So it would be fair to say if the gross

3    costs of defending the asbestos claims is the 39.4

4    million and using those figures that are in the

5    disclosure statement, those numbers have been

6    trending upward over the past five years, correct?

7        A.    The -- and clearly the numbers in the

8    first sentence are increasing with each subsequent

9    year for defense costs.  To clarify, those differ

10   from what's provided in the underlying claims data,

11   so in the underlying claims data which allegedly

12   reports the defense costs associated with each claim,

13   you don't get this much money, so I assume -- I don't

14   know for sure what the discrepancy is, but it could

15   be these are national coordinating costs were rather

16   nonclaim specific, but there is a discrepancy between

17   those two data sources and I don't see the foundation

18   for these numbers.

19       Q.    Assuming that those numbers are correct,

20   though, it looks like the defense costs were going up

21   over the last five years?  Is that accurate?

22       A.    I mean, if those numbers are correct, they

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 73

1    do.  Each successive year gets larger.

2        **Q.    And it looks like if those numbers are**

3    **correct that Leslie spent about twice as much on**

4    **defense costs as they did on settling claims?**

5        A.    As a rough ratio.

6        **Q.    Going back to paragraph 15 of your**

7    **declaration, the second item that you list as**

8    **potential changes in the tort environment are**

9    **Leslie's co-defendants who departed the tort system**

10    **during the bankruptcy wave that occurred in the first**

11    **part of the last decade are now being replaced with**

12    **well funded 524(g) trusts.  Do you see that?**

13        A.    Yes, I do.

14        **Q.    How would that result in a downward**

15    **pressure on the amount that Leslie would be paying in**

16    **the tort system?**

17        A.    So for an extended period of time, a lot

18    of the kind of what used to be the front line

19    defendants in asbestos litigation filed for

20    bankruptcy.  While they were in bankruptcy, there

21    were stays against those entities so they weren't

22    really part of the active tort system.

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 74

1        During that period, a number of different

2    co-defendants that still were in the tort system

3    faced increased litigation exposure because those

4    co-defendants were no longer there.  And as these

5    trusts have come on line, the -- there is clarity as

6    to what kind of contribution towards the ultimate

7    payment amount would come from these, from the trusts

8    that replaced the predecessor entities.

9        So people have a better sense of what

10    their offset might be down the road and that lowers

11    the risk of exposure because there is less

12    uncertainty.  Those trusts are very well funded in

13    California.  They could easily be producing north of

14    a million dollars per mesothelioma claim on average

15    for compensation which didn't exist in 2005.

16        So there is a shift in terms of what kind

17    of offset you may see down the road.  There is a

18    shift also in terms of this may affect how exposure

19    evidence enters the courtroom.  It may not.  There is

20    some outstanding questions, but there is really no

21    scenario where the presence of these well funded

22    trusts would increase their liability while there are

US Bankruptcy Court - Delaware

FINAL - October 4, 2010

In Re Leslie Controls

Charles Mullin, Ph.D.

Page 75

1  many scenarios where the presence of these well

2  funded trusts would decrease the liability.

3      **Q.    Or it could be that the presence of the**

4  **trust would be neutral?**

5      A.    It's very difficult to view them being

6  neutral in any state that has joint and several

7  liability.  Just the mere sum of money and the fact

8  that the offset is going to be large while before it

9  was viewed as very uncertain, that should decrease

10  the litigation risk.  So in any place where there is

11  joint and several liability, it should have a

12  downward effect.

13          In jurisdictions -- some of the

14  liabilities of Leslie are joint and several

15  jurisdictions.  The bulk has been in California which

16  has joint and several liability with regard to

17  economic damages, so it should lower the risk

18  exposure with regard to that, and it is several

19  liability with regard to noneconomic which does mean

20  it really hinges on the type of exposure evidence

21  that enters the courtroom.

22      **Q.    In your experience, when claimants begin**

US Bankruptcy Court - Delaware                    FINAL - October 4, 2010
In Re Leslie Controls                                 Charles Mullin, Ph.D.

Page 76

1    **the process of looking for compensation for their**

2    **asbestos exposure, do they usually go to the tort**

3    **system first before they turn to the trusts?**

4            MS. DAVIS:  I'm going to object.  He is

5    not being presented as an expert on that basis, for

6    that reason.  You can answer.

7            THE WITNESS:  Historically, they almost

8    exclusively turned to the tort system first.  The

9    trusts weren't operational.  These companies were in

10   bankruptcy.  So if you look in 2007, very few trusts

11   were up operating and processing claims so if I'm

12   going to look at 2007, 2008, there weren't that many

13   trusts they could seek compensation from.  There were

14   some.  Recently a number of those trusts have been

15   confirmed and they are starting to process claims.

16   So there is a framework now where they are able to do

17   that, but historically they weren't.

18           So definitively, historically, they turn

19   to the tort system first, the trust second.  You can

20   see that in the historical Johns Manville data that

21   even where the trusts were available with Manville

22   going way back, plaintiffs typically pursued their

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 77

1    tort claim and they would show up one, two, three

2    years later in the Manville Trust, so they would go

3    after the Manville compensation after the tort

4    compensation.

5         For the more recent trusts that are coming

6    online, clearly we don't have the data.  They are

7    just coming on line but now at least is the potential

8    they could come first and whether or not it comes

9    first they have site lists.  They have other ways of

10   establishing exposure to those products and

11   mechanisms for defendants to show that there is

12   liability in those other companies and that a share

13   of the liability is attributable to them.

14        **Q.    Well, how is a company that's still in the**

15   **tort system going to be able to take advantage of**

16   **existence of those trusts to reduce the amount that**

17   **it's going to pay to a company?**

18        A.    So it's going to depend on the specific

19   jurisdictions.  The case management orders that are

20   in place.  It's going to vary by jurisdiction.  But

21   in very general terms, they are going to be able to

22   take advantage of some of the information in the

US Bankruptcy Court - Delaware

FINAL - October 4, 2010

In Re Leslie Controls

Charles Mullin, Ph.D.

Page 78

1    trusts, so if the trust has a site list, for example,

2    and it has preapproved sites where there is

3    presumptively exposure, they can take those site

4    lists, they can cede it to a plaintiff who may or may

5    not recall exposure to Owens Corning, but worked at

6    four sites that Owens Corning says its product is all

7    over the site, and there is presumptive exposure,

8    they could do what the plaintiff's bar used to do,

9    and help refresh the plaintiff's memory, they could

10    say you worked here and Owens Corning is very

11    commonly present here.                                    `

12          And if you go to the conferences and you

13    listen to the debate between plaintiff's bar and

14    defense bar, that's exactly what they are talking

15    about.  The plaintiff's bar will tell you we used to

16    refresh everybody's recollection prior to a

17    deposition of all of these front line defendants.

18    They didn't remember.  It was 40, 50 years ago.  We

19    don't need to do that any longer is what the

20    plaintiff's bar will tell you in these conferences,

21    because it's not in their interest, and it's the

22    defense bar's job now to do that.

US Bankruptcy Court - Delaware

FINAL - October 4, 2010

In Re Leslie Controls

Charles Mullin, Ph.D.

Page 79

1      Well, this is what's giving the defense

2   bar lots of data to do that.  The trusts are laying

3   out where their products were.  They are laying out

4   where there is presumptively exposure, and the way

5   defendants are pursuing this really varies by

6   jurisdiction.  Some are asking for it in the form of

7   admissions.  Some are asking for it in case

8   management orders where you have to file your trust

9   claims before you get a trial date.  It varies by

10   jurisdiction as to how that will play out.

11      **Q.   And given that there is no data at this**

12   **point to be able to look to, you're speculating that**

13   **that's what will happen?  Is that a fair statement?**

14      A.   No.

15      **Q.   Why not?**

16      A.   There is lots of data as to what the tort

17   system looked like when these companies were paying

18   claims, these now defunct, bankrupt companies when

19   these were in the tort system, there is lots of data.

20   These companies were in the tort system for more than

21   a decade.  So if you want to know what all the

22   members -- for example, members of the CCR

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 80

1    collectively used to pay less than a quarter million

2    apiece for mesothelioma claims back in '96, '97, '98,

3    '99, 2000 before a large number of those companies

4    went for bankruptcy.

5           If you look at resultant trusts from

6    former CCR members, those trusts now pay about a

7    quarter million of cash, not liquidated values, not

8    TDP values.  When you adjust for payment percentages,

9    they pay about a quarter million and those don't

10   include the solvent entities that remain from the

11   CCR.                                                    `

12          So if you believe that the courts were

13   going to get to transparency between the tort system

14   and the trust system and it used to be that a group

15   of companies paid a quarter million and now their

16   trusts are paying a quarter million, a very logical

17   conclusion for that is there shouldn't be any

18   transfer of liability.  The liability should revert

19   back to how it looked when those companies were in

20   the tort system.  It won't look like that when all

21   the stays are in place and no one can get

22   compensation from them.

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 81

1       But post the existence of the trusts, we

2    actually know what that world used to look like.  The

3    real outstanding question was whether or not the tort

4    system and the trust system will have transparency.

5    If they do, we actually have a pretty good idea of

6    what it will revert to.

7       Q.   So but we still don't know what that

8    transparency level is going to be, if at all?

9       A.   We know some aspects of it.  We know that

10    there are site lists.  We know that defendants have

11    more information available to them than they did five

12    years ago.  So we know that they are in a better

13    position to highlight the exposure to the products of

14    these bankrupt entities than they used to be.  So as

15    that information in each of these trusts comes on

16    line and they establish site lists and procedures,

17    and you see what they are doing through time, you

18    know those defenses will get -- they can only get

19    stronger.  They don't get weaker.

20       Q.   Well, I guess my question ultimately is,

21    how are we going to know, how do we know now as we

22    are sitting here today that the plaintiffs are going

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 82

1    **to go to the trusts first as opposed to the tort**

2    **system first?**

3         A.   I don't even think that's the relevant

4    question when I look at most of these.  So I mean, I

5    -- do I know what order they are going to do it in?

6    I don't.  That's going to be a function of the

7    underlying economics.  Whichever way makes the best

8    economic sense for a given plaintiff presumably is

9    the way they will go and that's an individual

10   plaintiff specific question in terms of the trusts

11   probably aren't capable of paying money faster.  Many

12   of them.

13         But if there is a cost associated with

14   that, they may choose to defer.  But that's not the

15   right question for what will happen for solvent

16   defendants in the tort system.

17         **Q.   Why do you say it's not the right**

18   **question?**

19         A.   The right question is, how does this

20   affect settlement.  And how it affects settlement is

21   when parties address settlement, it's a classic

22   economic negotiation.  There is an end game, which is

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 83

1    if you go to trial and people backward induce from

2    that end game to what they are willing to pay in

3    settlement.  That's how it works.

4         So when something changes the end game at

5    trial, that affects settlement.  So if, for example,

6    companies knew they could establish that a claimant

7    had a million dollars of compensation coming from

8    trusts, whether the claimant actually has already

9    received that money or they simply have the evidence

10   that they can get it later, it's a million dollar

11   offset to them on a verdict either way potentially    `

12   because that money is there.

13        If you take the verdict, you have the

14   release for everybody potentially and then you can go

15   file the claims on behalf of the person under the

16   contribution rules of the trust.  If they have

17   already filed the claim and they already have the

18   money, then it's just already there, so the timing is

19   not necessarily the relevant question.  The relevant

20   question is how much money will it be and what type

21   of exposure evidence does this push into the

22   courtroom.  Those are the two things that will affect

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 84

1    the settlement discussion.

2    **Q.    Item three in paragraph 15 is Leslie has**

3    **been prevailing at trial.  How does that put downward**

4    **pressure?**

5    A.    Each trial has the potential to get an

6    adverse outcome which typically for defendants if

7    they get a strong adverse outcome from a defendants'

8    perspective of a large verdict that's upheld

9    frequently that causes them to pay more money in

10    future settlements.  They reassessed their risk

11    profile.

12    Similarly, every time they get a defense

13    verdict, they get verification from a jury that the

14    defenses they have are believable defenses to a jury.

15    The juries are ruling in their favor.  So with each

16    passing verdict where a defendant prevails, the

17    strength of their defenses is being confirmed and

18    typically defendants can take a more aggressive

19    position after that in their settlement negotiations

20    because they have more faith in their defenses.  And

21    that tends in contrast if they are losing and they

22    get hit with a 5 or 10 million dollar verdict, you

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 85

1    often get pressure in the other direction.  And

2    that's a pattern you can look across defendants

3    generally and so you're getting confirmation that

4    their defenses are valid.

5         **Q.   And you've talked about the eight cases**

6    **that went through trial.  What years did those trials**

7    **occur?**

8         A.   I don't remember.

9         **Q.   What year was the case that resulted in a**

10   **verdict against Leslie?**

11        A.   Again, I don't remember.

12        **Q.   I'm going back to paragraph 15, the fourth**

13   **item that you list is California appellant rules have**

14   **been favorable for equipment manufacturers.  How does**

15   **that -- I think we talked about this a little bit.**

16   **But how does it put downward pressure on the likely**

17   **future claims in the cases?**

18        A.   Well, my understanding is that plaintiffs

19   could bring at least three different theories of how

20   an equipment manufacturer could face liability.  One

21   was that the asbestos containing products put on the

22   outside of their equipment, even though they didn't

JANE ROSE REPORTING
1-800-825-3341  janerosereporting.com

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 86

1   supply that, they would be liable for that being

2   there.  Maybe because they spec'ed it.  Maybe they

3   didn't spec it, but it was put there, but that's a

4   potential avenue towards liability.

5           There is a second one which is replacement

6   parts that contained asbestos that were put in, they

7   could face liability for.  And the third is that just

8   the parts that were originally supplied by them when

9   they first sold the piece of equipment, they could be

10  liable and initially they faced litigation risk with

11  regard to all three of those.  Through time, the        `

12  appellate court seemed to be moving in a direction

13  where they may very well not face liability for the

14  asbestos products put on the outside of the equipment

15  and they may well may not face liability for

16  replacement parts put in.

17          And so two of the three avenues through

18  which one potentially could have established

19  liability for them and that were theories of cases

20  three, four years ago are running into trouble in the

21  appellate courts, and may not be viable theories

22  going forward.

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 87

1    So if you go from three sources of

2    liability to only one, your litigation risk has gone

3    down, your several share has declined because you're

4    not liable now for the high temp product on the

5    outside.  You're only liable for maybe a gasket on

6    the inside.  And at that, only the original one

7    supplied with the product.  So the amount of a

8    person's lifetime exposure that's attributable to you

9    has shrunk rapidly for the typical claimant.  So for

10    the typical claimant, the possible share that could

11    be assigned to Leslie has diminished.

12    **Q.    And we already talked about the fact that**

13    **the opinions that you reviewed with regard to item**

14    **number four were intermediate appellate court**

15    **opinions, correct?  They are not California Supreme**

16    **Court opinion?**

17    A.    I'm not aware of a California Supreme

18    Court opinions.

19    **Q.    And all of those opinions that are**

20    **favorable could in fact be overturned by the**

21    **California Supreme Court on appeal, right?**

22    A.    We can speculate about what the Supreme

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 88

1    Court may do.

2       Q.   But we can't quantify it, can we?

3       A.   We know what the appellate courts have

4    done and we know that in general those are binding in

5    the near term on the lower courts.  So we know -- we

6    do have a sense of what's going on and in the absence

7    of the California Supreme Court weighing in, we know

8    where we stand.  If it weighs in, and it alters it,

9    it may do that.

10      Q.   And in fact, it would reopen all of those

11   cases where the intermediate appellate courts had

12   ruled against the plaintiff?

13      A.   It could.

14      Q.   It could result in further verdicts

15   against the defendants?

16      A.   We can speculate about all sorts of

17   scenarios.  My only point is very simple.  Leslie is

18   clearly in better shape with the appellate court

19   rulings going in their favor than the appellate court

20   rulings having gone against them.

21      Q.   Did you discuss the meaning of those

22   appellate court rulings with counsel to the insurance

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 89

1    **company?**

2    A.    No.

3    **Q.    Did you discuss it with any attorney?**

4    A.    As I said, I've discussed these really

5    starting with Taylor a number of years ago, I've

6    discussed this with a number of underlying defense

7    attorneys and plaintiff attorneys about what they

8    think the likely impacts would be.

9    **Q.    Anyone that you discussed it with recently**

10   **in terms of in connection with your preparation of**

11   **your opinion in this case?**

12   A.    No.

13   **Q.    So you didn't discuss it with anyone at**

14   **Wilson Elser?**

15   A.    No.

16   **Q.    Why did you pick Wilson Elser, by the way,**

17   **of all the law firms out there that might have stuff**

18   **posted about asbestos tort liability?  Why did you**

19   **pick them?**

20   A.    It's just a representative article that

21   summarizes more from an attorney's perspective what

22   these may do.  It's -- you know, there is nothing

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 90

1    special about that particular one.

2    **Q.    Did you look at others?**

3    A.    I didn't do an exhaustive search.  I

4    talked to numerous attorneys and all of them that

5    I've ever talked to agree that this creates downward

6    pressure on equipment manufacturers that I have

7    spoken with.  Some do hope that it will be overturned

8    on appeal and hope that that would get reversed, but

9    they all agreed that under the current status, this

10   creates downward pressure.

11   **Q.    And which attorneys have you talked to**

12   **about these opinions?**

13   A.    I'm not going to be able to itemize all of

14   them.  I'm saying I have gone to, at this point --

15   many of them are on my CV -- but I attend many of the

16   conferences on asbestos litigation.  There is panels

17   on this topic at those conferences where people talk

18   about the impact of this.  I've talked to a number of

19   the attorneys in those panels in follow-up

20   discussions.  I've talked in group settings.  I

21   couldn't attach any one opinion with any one

22   attorney.

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 91

1        Q.   Do you recall anybody as you're sitting

2    here today?

3        A.   In terms of general discussions?

4        Q.   Yes.

5        A.   As I said, I've talked -- I'm not going to

6    be able to tie a particular name to a particular

7    topic.  I more have recollections of having had

8    discussions on the environment with a large group of

9    attorneys.  I'm not tying any one of them to any one

10   opinion.  As I said, I can't do it.

11       Q.   What about the general discussions?  Can

12   you recall anybody you've spoken to about generally

13   the environment?

14       A.   Generally?

15       Q.   Yes.

16       A.   I have a hard time going through.  And

17   I've -- on the plaintiff's side, I've spoken with Bob

18   Phillips, Perry White, Joe Rice, generally about tort

19   environment issues.  Probably, let's see -- Perry

20   Router.  Do I have that right?

21           I've talked with attorneys on the defense

22   side about the litigation environment.  Going through

US Bankruptcy Court - Delaware                FINAL - October 4, 2010
In Re Leslie Controls                              Charles Mullin, Ph.D.

Page 92

1    names and numbers of attorneys at Cambridge I've

2    spoken with.  I've spoken with different coverage

3    counsel about what they think the impacts of these

4    things might be.  I've spoken with different in-house

5    counsel about what the potential impacts of these

6    things might be.

7        **Q.    If we go to paragraph 16 of your**

8    **declaration.  You say extrapolations of Leslie's tort**

9    **history that ignore recent and likely positive**

10   **changes in the tort environment result in the nominal**

11   **value of Leslie's unresolved asbestos claims,**

12   **including those expected to be filed in the future**

13   **ranging from 60 million to 90 million.  Do you see**

14   **that?**

15       A.    I do.

16       **Q.    The likely positive changes that you refer**

17   **to in that sentence, do those relate back to the ones**

18   **we've talked about in paragraph 15?**

19       A.    Correct.

20       **Q.    Anything other than those four?**

21       A.    Those are the four I was referring to.

22       **Q.    You say the middle of this range is 75 --**

US Bankruptcy Court - Delaware                    FINAL - October 4, 2010
In Re Leslie Controls                               Charles Mullin, Ph.D.

Page 93

1    excuse me, the middle of this range, 75 million, is

2    most consistent with the claims history, correct?

3        A.   Correct.

4        Q.   So if you look just at the claims history

5    and don't include the potential or likely positive

6    changes in the tort environment, one would conclude

7    the potential future claims against the debtor are

8    somewhere in the neighborhood of $75 million?

9        A.   Yes.  It would be in that neighborhood.

10       Q.   You then go on to say including

11   extrapolations that invoke less probable assumptions

12   expands that range to 50 to 100 million.  Do you see

13   that?

14       A.   I do.

15       Q.   I was a little confused by this because

16   you say less probable assumptions, but then you

17   include a number that's lower than the 60 million

18   dollar range.  Are there some assumptions that

19   would -- that are not probable that would make that

20   number even lower?

21       A.   Well, there is -- you could take more

22   extreme assumptions in either direction both for the

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 94

1    good and the bad.  You can be too pessimistic or too

2    optimistic in that sense.  I talk a little bit about

3    those things.  But for example, their liability is

4    driven by -- and the TDP reflects this -- below deck

5    Naval claims and Naval and shipyard-based disease

6    incidents peaked about 10 years earlier than

7    construction based disease incidents in terms of

8    mesothelioma.

9        So if you take a national curve and you

10   trend out the liability over a national curve, you're

11   probably overstating liability because that's going`

12   to overstate the number of future Naval claims

13   because those claims peaked earlier due to World War

14   II.  So you're likely to see a sharper rate of

15   decline.

16       You could assume that all of it will

17   follow the Naval curve.  If you do that, you can get

18   a number closer to $50 million, but they do have some

19   nonNaval claims.  So putting 100 percent weight on

20   the Naval curve is an assumption you could make.  You

21   could say that's what's driving their liability, so

22   that's how I'm going to do an extrapolation.  That

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 95

1   probably would understate, because they have a

2   mixture of largely Naval in terms of dollars and some

3   other claims which probably that curve would be too

4   steep for.

5           Similarly, at the high end, if you're

6   going to do the whole thing on the national curve,

7   that's going to overstate.  And if you do the whole

8   thing on the national curve, you don't account for

9   the impact of an aging population.  You kind of

10  ignore some of those things.  But if those are your

11  assumptions, you can start getting numbers around 100

12  million.  I don't think those are likely.  I don't

13  think you should view those as in the reasonable

14  range.  I think those are assumptions that the data

15  tell us shouldn't happen, we have good reason to

16  believe.  But there are people that may argue for

17  them.

18      **Q.   On page 7 of your report, paragraph 17,**

19  **you have included a table to show the nominal value**

20  **and then the net present value of that 50 to $100**

21  **million range, correct?**

22      A.   Correct.

US Bankruptcy Court - Delaware          FINAL - October 4, 2010
In Re Leslie Controls                          Charles Mullin, Ph.D.

Page 96

1      Q.    And I think you just explained paragraph
2  18, which is the using the national, U.S. national
3  incident curve versus the Naval incident curve.  That
4  was reflected in paragraph 18?
5      A.    Yes.  That's an issue discussed there.
6      Q.    And then paragraph 19 is looking at it if
7  they were able to resolve all older pending
8  mesothelioma.  What did you mean by that?
9      A.    Most defendants end up with a portion of
10  the claims filing against them never resolving, so
11  the claims will eventually be 10, 15, 20 years old
12  and they are never technically resolved in the tort
13  system.  They are still open.  It's very rare to see
14  those claimants ever get paid.  Some people will call
15  them abandoned claims.  Some people will call them
16  stale claims.
17         But there is typically not activity on
18  them for an extended period and companies don't
19  expect to have to pay anything, but they are
20  technically in the data as open claims.  So there is
21  a concept of a resolution rate.  What fraction of
22  your claims actually ever get resolved as opposed to

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 97

1    just kind of abandoned, orphaned in the tort system.

2        The data for Leslie appears to be

3    consistent with many, that their resolving it seems

4    around 85 percent of their claims, and 15 percent are

5    getting old.  So if we look at the earlier year claim

6    filings, there is kind of a stable percentage of

7    those claims that are just sitting open.  You kind of

8    get up to somewhere, 80, 85, 88 percent, and then it

9    stops, and you don't see additional resolutions.

10        So there is a question of what do you do

11    with those older claims?  One approach that some

12    people will do is they will ignore the fact that they

13    are older and they will say I'm going to assume that

14    they are all going to get paid or not all going to

15    get resolved, or they are going to get resolved with

16    the same rate and dismissal rates that have been

17    resolved.  And for the same values, and generally

18    that overvalues them grossly.

19        So in reality, few of them actually get

20    resolved and few of them get resolved for

21    substantially less money than the typical paid claim

22    that's resolved quickly.  So there are still young

US Bankruptcy Court - Delaware                FINAL - October 4, 2010
In Re Leslie Controls                                   Charles Mullin, Ph.D.

Page 98

1    defendants so there is more uncertainty than if

2    you're looking at a defendant that's had 20 years

3    history where you can look at their first 10 years

4    filings and look at a resolution rate.

5          So there is more uncertainty about many

6    defendants about what to do with that 15 percent and

7    that's really what it's getting at, the high end of

8    the range says we are going to assume that those

9    claims that are four years old, five years old, that

10   15 percent is going to get paid at the same rate as

11   all the other claims and paid the same amount, and

12   history has told us that overvalues.  At the low end,

13   I'm going to assume none of them get paid and if you

14   assume there won't be another dollar, that can only

15   understate, not overstate.  That's how you go to the

16   low end.

17       **Q.    And just so I'm clear, you may have**

18   **answered this question already, but I just want to**

19   **make sure I understand it.  You have the midpoint**

20   **baseline of 75 million based on just looking at the**

21   **claims history, not taking into account what might**

22   **happen in the tort system in terms of reforms that**

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 99

1    would reduce that potentially down the road.

2        A.    Or the impact of recent -- relatively

3    recent rulings which may not be reflected in the data

4    from three or four years ago.

5        Q.    But you don't put a -- you don't quantify

6    what those tort environment impacts might be in terms

7    of how much it would reduce the potential future

8    claims against Leslie?

9        A.    I have not done that at this point in

10   time.

11       Q.    And the reason you didn't do that is you

12   didn't think you had to because at 75 million looking

13   at the TDP values, they are overpaying any claim, is

14   that accurate?

15       A.    Correct.

16       Q.    Going to paragraph 21 of your report and

17   you have a caption over the top of this that says

18   Leslie's TDP and payment projects are inconsistent

19   with its claims history.  And you state both the

20   number of compensable mesothelioma claims in the

21   Leslie liability estimate the value of those claims

22   established in the TDP collectively, the TDP forecast

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 100

1    **are inconsistent with Leslie's claims history.  Now,**

2    **what is the Leslie liability estimate that you refer**

3    **to here?**

4        A.    It's really defined in paragraph four.

5    And it is the estimate of Leslie's liability for

6    asbestos -- well, ARPC is estimate of assigned values

7    under the proposed TDP.

8        **Q.    And what does that ARPC estimate conclude**

9    **in terms of assigned values under the proposed TDP?**

10        A.    It adopts the TDP values, and my

11    understanding is that ARPC when I look at the math,

12    how it's put together is providing a projection of

13    accounts of compensable claims.  And it's assigning

14    the values that the TDP prescribes to those claims

15    and then it adds it up to get to the $230 million.

16        **Q.    So just so I understand, you take the TDP**

17    **values and assuming the number of claims ARPC are**

18    **soon to be filing against the trust would result**

19    **ultimately in $230 million of claims against the**

20    **trust?**

21        A.    The estimate I was provided gives the cash

22    flows, so I had actually divided the cash flow for

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 101

1  the given year by the amount, by the scheduled value

2  to recover the estimated number of claims, but it

3  appears to adopt those claim values that are

4  explicitly in the spreadsheets.

5      **Q.    And comparing then the Leslie liability**

6  **estimate and the value of the claims under the --**

7  **established in the TDP, you see the TDP forecast then**

8  **projects future asbestos related indemnity under the**

9  **trust to be 230 million and not -- can you just walk**

10  **me through how you came to the 230 million?**

11      A.   It's the number taken from the spreadsheet

12  provided by ARPC.  That's what their total number is.

13      **Q.    And that would be future claims against**

14  **the trust, correct?**

15      A.   Future and pending.

16      **Q.    It's not an estimate of what the potential**

17  **future claims against Leslie would be in the tort**

18  **system?**

19      A.   That's the point.  It's very much not

20  that.  It's about three times that number.

21      **Q.    And then you go on to talk about two**

22  **assumptions that you think account for the**

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 102

1  **discrepancy.**

2      A.   Correct.

3      **Q.   And the first is that the TDP forecast**

4  **assumes that the trust will pay twice as many**

5  **mesothelioma claims as Leslie did, while in the tort**

6  **system.  How did you come up with that number?**

7      A.   Leslie's, the most claims it ever sees per

8  year in the tort system at any point in time is about

9  400.  When it's seeing those kinds of claims, it's

10 seeing that 75 percent arguably pushing 80 percent

11 are getting dismissed, so that means there is no more

12 than 100 claims left after you've taken care of the

13 dismissals.

14      On top of that, there is a resolution rate

15 and there is a set of them that haven't been getting

16 resolved, so you're probably in a range at a low end

17 of something like 60 compensable claims a year and at

18 a high end something like closer to 90.  There is a

19 little uncertainty because it's in that neighborhood.

20 It's not in the neighborhood of 150.  That's

21 inconsistent with the 75, 80 percent dismissal rate

22 and flows of 400 claim files per year for

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 103

1    mesothelioma.

2          So you can't get to 150 compensable

3    claims.  They weren't seeing that.  It's not what

4    they were paying in one year.  It's assuming once

5    they were resolving the whole stock of what's getting

6    paid, the ones that would resolve would resolve

7    similarly to the ones that have already resolved for

8    a given filing year.

9          **Q.   If you take that out, take out that**

10   **assumption, it reduces the estimate of future claims,**

11   **future and pending claims against the trust to 115**

12   **million?**

13         A.   If you eliminate half the claims, you're

14   going to eliminate half the payments.

15         **Q.   You're not saying that the trust is going**

16   **to pay claims that would not have been compensable in**

17   **the tort system, right?**

18         A.   I'm saying the forecast, the ARPC forecast

19   appears to be saying exactly that.  It's paying a

20   larger body of claims than Leslie has demonstrated

21   are compensable in the tort system.  That's

22   explicitly what that forecast is saying.

US Bankruptcy Court - Delaware

In Re Leslie Controls

FINAL - October 4, 2010

Charles Mullin, Ph.D.

Page 104

1    **Q.    And the purpose of that is to negotiate**

2    **with Leslie over what the payment percentage is going**

3    **to be in the TDP, correct?**

4        A.    I presume that's a purpose for it.

5        **Q.    Because they want to make sure there is**

6    **enough money to pay all the future claims, is that a**

7    **fair statement?**

8        A.    You're speaking on behalf of yourself as

9    the future's rep, or speaking generally about the

10   process?

11       **Q.    Generally about the process.**

12       A.    I think it's an adversarial process.  The

13   future represents that, and the people who represent

14   the pending claims presumably want as much money as

15   possible for their pending claims.  And you have to

16   reach a compromise with them or get to resolution.  I

17   assume that the plaintiff's attorneys are maximizing

18   the economic outcome of their clients, as I

19   understand their ethical obligation to be.

20       **Q.    So ARPC would have been looking at the**

21   **worst possible case scenario for the number of claims**

22   **that would be filed against the trust in order to**

US Bankruptcy Court - Delaware          FINAL - October 4, 2010
In Re Leslie Controls                          Charles Mullin, Ph.D.

Page 105

1    **ensure that there was enough money left over to pay**

2    **all those future claims that come in, is that a fair**

3    **statement?**

4        A.   No.

5        **Q.   Why not?**

6        A.   The forecast they put down is very

7    inconsistent with that statement.  They have a

8    forecast that has about 1 percent of the money being

9    paid, for example, to nonmalignant claims.  There is

10   a provision in the trust that says up to 20 percent

11   can go to that group.  Presumably that provision

12   could have been written as 2 percent or 1 percent if

13   the worst possible scenario was seen as 1 percent.

14   The cap in the trust was 20, so presumably there is

15   scenarios under which the trust will end up

16   compensating to the tune of 20 percent of the money

17   in nonmalignant claims.  I don't see that in the ARPC

18   scenario.

19       **Q.   Isn't it true that it says in the trust**

20   **agreement that claims are to be compensated,**

21   **nonmalignant claims -- let me strike that.**

22       **20 percent of the amount of money in the**

US Bankruptcy Court - Delaware                FINAL - October 4, 2010
In Re Leslie Controls                             Charles Mullin, Ph.D.

Page 106

1    trust is set aside on a year-by-year basis to pay

2    potential nonmalignant claims, correct?

3        A.   Category 1, level I and level II, I

4    believe.

5        Q.   Those are the nonmalignant claims.

6        A.   There is higher level nonmalignant claims

7    as well.

8        Q.   And it doesn't necessarily mean that they

9    are going to pay out 20 percent on a year-by-year

10   basis for nonmalignant claims, does it?

11       A.   No.  There is a possibility.

12       Q.   The only way they are going to pay those

13   claims out is if nonmalignant claims would be paid

14   out for what is provided for them in the trust?

15       A.   Presumably the trustees are going to

16   enforce the terms of the trust.

17       Q.   So you're not -- you're not opining that

18   the trustees are going to somehow pay fraudulent

19   claims when they get filed with the trust?

20       A.   I think I'm more going back to if you look

21   at, for example, the Rand report that came out

22   recently which shows for a series of trusts what

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 107

1  fraction of the payments have gone to the

2  nonmalignant claims and the fraction is 40 percent

3  and that's happening while in the tort system, 90

4  percent is going to mesothelioma and 5 percent is

5  going to nonmalignant claims.

6         So in practice, the trusts are

7  compensating or paying a much larger fraction of

8  claims to nonmalignant claims than tort defendants.

9  That doesn't mean the Leslie Controls trust will do

10  that, but it means when I look at other trusts, that

11  seems to be what they are doing.

12         If you can point to very stark differences

13  in the language between the TDP language of the two,

14  that would tell me why I wouldn't expect that to be

15  the outcome, Leslie may be different.  But the

16  history of these other trusts is that over a third,

17  40, 45 percent of the money to date has been going to

18  nonmalignant claims, while only 5, at most 10 percent

19  goes to that group in the tort system.  And that's a

20  stark contrast in terms of how the two systems appear

21  to be compensating claimants.

22      **Q.   And the trusts that are in place have**

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 108

1    certain criteria that have to be met for someone who

2    files a claim, whether it's a malignant or

3    nonmalignant claim, correct?

4        A.    They specify criteria.

5        Q.    And the Leslie Controls trust specifies

6    criteria that have to be met before someone can have

7    a compensable -- will be compensated by the trust?

8        A.    It specifies criteria.

9        Q.    And you have no basis to believe that as

10   we are setting here today, that the trustees are

11   going to disregard those criteria and say we are not

12   going to compensate or we are going to compensate

13   people who don't meet those criteria?

14       A.    I'm more based on the history of other

15   trusts, I have a question about whether the manner in

16   which those criteria will be interpreted and enforced

17   will be consistent with less than 1 percent of the

18   money going to nonmalignant claims, or if the

19   criteria themselves are actually looser than the

20   criteria in the tort system.

21           I'm not saying I expect the trustees to

22   violate their fiduciary responsibility, but there is

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 109

1    a question as to whether the criteria present in the

2    trust actually mimics the outcome in the tort or it

3    allows in a large group of malignant claims that

4    wouldn't have been compensable in the tort.  Does it

5    say, for example, that if you're on an inactive

6    docket, you're not eligible for compensation?  Does

7    it say that in the Leslie Controls trust?  I don't

8    recall as I read through, but I would think if you

9    wanted to mimic the tort system, it would explicitly

10   say that.  And if it doesn't, I ask why is that

11   omitted?  That's one of the first defenses that a

12   tort defendant has is if you're on an inactive

13   docket, you're not compensable.

14        Q.    What does it mean to be on an inactive

15   docket?

16        A.    Varies a little bit by state, but in

17   general, similar to medical criteria bills, that your

18   litigation is effectively stayed.  They are tolling

19   the statute of limitations.  If you subsequently

20   develop an impairment, however this may be defined in

21   a particular jurisdiction, you can come off the

22   inactive docket and pursue your tort claim and you

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 110

1   won't run into any statute of limitations, but until

2   you've done that, it's inactive.  Nothing's happened.

3       **Q.   That doesn't mean if you're on inactive**

4   **docket that people on that docket are never going to**

5   **be compensated, right?**

6       A.   They are very akin to a person not on an

7   inactive docket who may subsequently develop a

8   disease.  Whether you're on an inactive docket or

9   not, if you develop mesothelioma down the road, it's

10  a compensable disease, you get paid for the

11  mesothelioma under the trust.  And the future's rep

12  is there to protect the right of future claimants.  A

13  person on the inactive docket strikes me as very akin

14  to that.  They don't have impairment that qualifies

15  for compensation in the tort system currently but

16  they may develop it in the future.  And if they do,

17  they can pursue their claim at that time.

18      **Q.   You go on in paragraph 21 to say the**

19  **second reason that the TDP forecasts are overstated**

20  **is that they compensate 150 percent of Leslie's**

21  **historical average of payment, correct?**

22      A.   It's roughly 150 percent.  That's correct.

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 111

1        **Q.    And that's because the liquidated amount**

2    **under the TDP procedures is an average of about**

3    **$100,000, correct?**

4        A.    Just north of $100,000.

5        **Q.    And we've already talked about how that**

6    **doesn't take into account the payment percentage**

7    **which is 40 percent of that 100,000?**

8        A.    That's correct.

9        **Q.    So if you take that into account as to**

10    **what the claimants against the trust will actually**

11    **receive in terms of dollars, that's below the average**

12    **that was being paid by Leslie in the tort system,**

13    **correct?**

14        MS. DAVIS:  Objection to form.

15        THE WITNESS:  That depends how you want to

16    compute it.  Within the group of compensable claims

17    in the tort system, the historical average over the

18    last three or four years has been 60 to $65,000.  As

19    I said, that's trending down.  You could go back to

20    some of the earlier tables in that report and you see

21    that's gone from 80,000 in 2008 to 50,000 in 2010,

22    but it's averaged around 60, 65,000 so something a

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 112

1    little north of 100,000 is about 50 percent larger.

2          Assuming that it only compensated the same

3    group of claimants, if you include the other

4    claimants that the number of compensable claims seems

5    to anticipate, then you have to average in a whole

6    bunch of zeros.  Those are claims that would have

7    received zero.  They would have been dismissed claims

8    in the tort system.

9          When you bring those in -- those are

10   claims that would have been dismissed, if you bring

11   those in the tort system, paying a total of $65,000;

12   it means you're paying about $15,000 per resolved

13   claim.  Three quarters get zero, one quarter averages

14   60,000.  So saying whether -- if you applied a 40

15   percent payment percentage, so we are getting just

16   north of 45,000 of cash is less than they would have

17   gotten in the tort system, that depends which

18   claimant.

19         It's much more than a claimant dismissed

20   in the tort system would have gotten.  It's more than

21   what many claimants would have gotten who were in the

22   tort system and less than what the highly compensated

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 113

1    claimants would have gotten in the tort system.

2       **Q.   Are you assuming in that statement that**

3    **every claim that gets filed against the trust is**

4    **going to have been paid?**

5       A.   No.  I'm saying I have -- I'm just making

6    clear that there is two pieces here.  There is an

7    overstatement in the number of compensable claims.

8    And for the compensable claims, there is -- the value

9    is too high.  It's about 50 percent too high.  The

10   liquidated value.

11      **Q.   But I think you testified that if you look**

12   **at the -- if you take the number of claims dismissed**

13   **and the number of claims that are settled in the tort**

14   **system and you took an average across all of those**

15   **claims, then the amount paid is more like -- it could**

16   **be as low as $15,000 per claimant?**

17      A.   Correct.

18      **Q.   But that then assumes that every claim**

19   **that gets filed against the trust is going to get**

20   **paid as opposed to claims that might get filed**

21   **against the trust where the trust says you haven't**

22   **met the criteria to have been exposed to a Leslie**

US Bankruptcy Court - Delaware

FINAL - October 4, 2010

In Re Leslie Controls

Charles Mullin, Ph.D.

Page 114

1    **property, for example?**

2        A.   No.  I'm trying to address your earlier

3    question, which if you say I applied a 40,000 payment

4    to this, is that more or less than claimants would

5    have gotten in the tort system.  That depends how you

6    define the population of claimants in the tort

7    system.  I can define that it's less than the average

8    amount that the average compensable claimant in the

9    old tort environment was receiving.  It's more than

10   the amount that the typical resolved claim got.  It's

11   more -- it's even greater than the typical amount of

12   the claim filed against Leslie and it's substantially

13   higher than the typical mesothelioma claim in the

14   tort system because the vast majority don't name

15   Leslie.

16       So it depends what universe of claimants

17   are going to get paid that number for whether 40

18   percent is too high or too small.

19       **Q.   What is the universe that;s going to get**

20   **paid the 40 percent against the Leslie trust?**

21       A.   That depends how the trust criteria are

22   enforced.

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 115

1      Q.   If we assume that the same number of

2   claims get filed against the trust as were filed

3   against Leslie in the tort system, and the same

4   number of claims are rejected by the trust as were

5   dismissed in the tort system, then $40,000 is lower

6   than what the payment percentage was or the payment

7   payouts were to claimants in the tort system, right?

8      A.   On average.  As I said, there is a group,

9   the average value in the tort system is driven

10  heavily by a small group of highly compensated

11  claims.  There is a larger group of claimants that

12  don't get nearly that much money and the average is

13  60 to 65,000, but 40,000 per claimant would result in

14  a large number of overcompensated claims and a small

15  number of highly undercompensated claims.

16     Q.   Paragraph 24, you go on to say, in

17  addition, the TDP allows for substantial sums to be

18  paid to category B nonmalignant claims that have de

19  minimis tort value.  Do you see that?

20     A.   I do.

21     Q.   What does de minimis mean to you?

22     A.   Well, in this context, they have received

US Bankruptcy Court - Delaware                FINAL - October 4, 2010
In Re Leslie Controls                              Charles Mullin, Ph.D.

Page 116

1    around 1 percent or less of the money in the tort

2    environment to date.

3        **Q.    What is it on a dollar amount?**

4        A.    Per claimant?

5        **Q.    Yes.**

6        A.    Okay.  The average payment is on the order

7    of $5,000 to a very small number of claimants.

8        **Q.    And how much will those claimants receive**

9    **under the tort or under the trust if it's approved?**

10        A.    If it's approved?

11        **Q.    Yes.**

12        A.    That's an open question.  If you believe

13    the ARPC kind of TDP forecast, they say it's a very

14    small number.  It's less than 1 percent.  If you

15    believe that the collar of 20 percent may be binding,

16    that 20 percent of payments may be made to this group

17    that would be about 20 times what they were getting

18    in the tort as a fraction of the total money.

19            So it again it depends on how it's

20    enforced.  This is just saying it allows for

21    substantial sums.  It doesn't say it's going to do

22    it, but it's definitely written explicitly to allow

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 117

1    for 20 percent of the money to go to a group that in

2    the history of the tort got a -- about 1 percent of

3    the money.

4        **Q.    My question was a bad question.  But my**

5    **question was more how much is a person who files a**

6    **claim under category B nonmalignant claim against the**

7    **trust, what are they going to receive in terms of a**

8    **dollar amount?**

9        A.    Do you recall which page actually has the

10    trust procedures in it to look up the values?  I

11    don't remember it, but it's provided.

12        **Q.    There is a table in the trust procedures.**

13    **It's page IV of the disclosure statement.**

14        A.    So it's providing an average value for

15    level II of 4500, 1500 for level I, and those are the

16    two that are technically in category B, the severe

17    asbestotics can receive an average or expect to

18    receive an average of 20,000.

19        **Q.    And again, if you apply the 40 percent**

20    **payment percentage under the TDP, the 4500 figure and**

21    **1500 figure is very small?**

22        A.    40 percent is going to be $600 for the one

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 118

1    and for the other it's in the neighborhood of just

2    under 2,000, $1800.

3        **Q.    Which is lower than the $5,000 average**

4    **that claimants who actually received a payment in the**

5    **tort system received?**

6        A.    That's not the right comparison because

7    the $5,000 average includes the claimants that are

8    scheduled to get 20,000 under the trust.  It's all

9    nonmalignant claims are in that 5,000 average so

10    that's not a fair comparison.

11        **Q.    Just to follow on that, were you saying**

12    **category one and two claims are ordinarily not**

13    **compensable in the tort system?  Is that what you're**

14    **saying?**

15        A.    I said their tort history has shown that

16    these do not have substantial value against Leslie,

17    and that in many jurisdictions unimpaired

18    nonmalignant claims don't get trial dates.  They may

19    have an inactive docket.  They may fail medical

20    criteria.  There is different provisions in different

21    jurisdictions.

22        **Q.    And those cases that you're talking about**

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 119

1    **would fall within level I and II of the TDP?**

2        A.    I mean, severe asbestotics may have severe

3    impairment so it's not typically going to fall to

4    inactive docket.  Whether or not some of the level II

5    claims would or wouldn't is probably a jurisdiction

6    by jurisdiction question.

7        **Q.    So level III, it is likely they would**

8    **receive compensation in the tort system?**

9        A.    Correct.  If they can, if they have

10    physical impairment, severe asbestotics, I need to

11    look at the definition, but typically show sufficient

12    impairment criteria such that they would satisfy

13    medical criteria requirements or the requirements to

14    be removed from an inactive docket.

15        **Q.    And on level II, they might be entitled to**

16    **compensation depending on the jurisdiction?**

17        A.    And the exact -- I'd have to go back and

18    review the definition again.  I mean to me, the most

19    important thing in all of this is not what the TDP

20    says.  It's what the tort history has been.  Leslie

21    has not compensated these types of claimants.  They

22    haven't in aggregate amounted to a substantial

US Bankruptcy Court - Delaware                 FINAL - October 4, 2010
In Re Leslie Controls                          Charles Mullin, Ph.D.

Page 120

1    portion of the litigation against them and the trust

2    sits in stark contrast to that by saying instead of

3    this being a very small fraction of total

4    expenditure, we are going to allow for that potential

5    to increase to 1 and $5.

6        **Q.    Let's go to the next section of your**

7    **report, which has a title, Leslie has an economic**

8    **incentive to inflate the value of its future asbestos**

9    **expenditures.  And you state in paragraph 26 that**

10   **Leslie's insurance is an asset for Leslie and its**

11   **parent, CIRCOR.  The value of this insurance asset**

12   **increases with Leslie's liability.  What did you mean**

13   **by increasing with Leslie's liability?**

14       A.    The insurance is potentially subject to

15   reimbursing Leslie for its tort losses with regard to

16   asbestos litigation.  The greater those losses are,

17   the more losses there are to cede to the insurance.

18   The faster that money comes in, the faster it fills

19   up the insurance chart and the greater the net

20   present value of the payments and quite potentially

21   the greater the magnitude of the payments.

22       **Q.    You go on to say, thus the greater the**

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 121

1    value of the insurance asset that Leslie and CIRCOR

2    contribute to the trust, the more credit the ACC

3    should give them for that contribution resulting in

4    lower cash contributions by Leslie and CIRCOR.  Do

5    you see that?

6        A.   Yes.

7        Q.   Wouldn't the opposite actually be true?

8    The lower the claims, the more valuable the

9    insurance?

10       A.   No.  I'm stating it -- I'm making

11   explicitly a statement that I wrote.  If Leslie and

12   the ACC have agreed that the tort liability is worth

13   $70 million, and they look at the insurance and they

14   say, hey, the insurance is worth 50, it covers 50 out

15   of the 70.  If they look at the insurance and say

16   it's only worth 10, it's only going to cover 10 of

17   the 70, the more valuable that insurance asset is,

18   the greater credit Leslie gets for contributing it

19   towards payment of whatever price it's negotiated

20   with the ACC.

21       Q.   I'm not sure I followed your answer on

22   that one.  The insurance is what the insurance is.  I

US Bankruptcy Court - Delaware                    FINAL - October 4, 2010
In Re Leslie Controls                                      Charles Mullin, Ph.D.

Page 122

1    **mean, there is a certain amount of insurance that's**

2    **available to Leslie at the current time, correct?**

3        A.   You can't buy more insurance for the years

4    that have passed, if that's what you mean by that

5    statement.

6        **Q.   And do you know how much insurance Leslie**

7    **has available to it now?**

8        A.   I understand it's a bit of an open

9    question.  And I've seen a representation of the

10   coverage that I think starts at some point in the 60s

11   and runs into the 80s, and is unspecific about what,

12   if anything, existed earlier in time.

13       **Q.   Did you look at what it says in the**

14   **disclosure statement about the amount of insurance**

15   **available?**

16       A.   I have.

17       **Q.   I think it says something about $48**

18   **million?**

19       A.   And I think of it more in terms of that

20   initially there is about 110 or something in the

21   neighborhood of 135 million in aggregate limits, some

22   of which -- some of which certain insurers have

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 123

1    asserted are exhausted, some of which may be

2    insolvent, and so only pay certain cents on the

3    dollar.  I'm not sure what the 48 million number

4    you're referring to represents.

5        **Q.    Do you know how much primary insurance**

6    **Leslie has available to it?**

7        A.    I recall that certain policies, the

8    disclosure statement asserts, are exhausted.  Others

9    aren't.  I don't know exactly how many limits are

10   remaining.

11       **Q.    And are you aware that primary insurance**

12   **coverage pays for defense costs and doesn't reduce**

13   **the amount of the coverage available under the**

14   **policy?**

15       A.    That's not always true.  I haven't seen

16   the language policy for a lot of the policies.  The

17   most common outcome for a primary policy is that it

18   pays defense in addition to the limits.  So the

19   defense payments don't erode.  I've seen primary

20   policies where the defense payments do erode the

21   limit and I've also seen ones with deductibles or

22   self insured retentions.  Whether some of those are

US Bankruptcy Court - Delaware                    FINAL - October 4, 2010
In Re Leslie Controls                                      Charles Mullin, Ph.D.

Page 124

1    even in the Leslie program in the latter years -- but

2    I haven't seen the language of the policy, so I don't

3    know exactly how they treat defense costs.

4         **Q.   How about with the excess policy?  Do they**

5    **cover defense costs without reducing the amount of**

6    **coverage available?**

7         A.   Again, I haven't seen the policy language

8    so I don't know.  Umbrella policies, it's probably

9    more common to pay the inside limit.  I've definitely

10   seen examples where they pay defense in addition to

11   limits or they may pay no defense, so the defense

12   costs aren't covered by the insurers, and they don't

13   erode the limit.  So I don't know what state of the

14   world Leslie's policies are because I haven't seen

15   the language.

16        **Q.   Well, going back to your comment in**

17   **paragraph 26 of your declaration, if the future**

18   **claims against Leslie are potentially -- the 75**

19   **million that's -- taking claims history, 75 million**

20   **is the midpoint range, correct?**

21        A.   Okay.

22        **Q.   And we assume that there is, for a round**

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 125

1    **number, insurance of $50 million available to cover**

2    **those claims in the future.  Wouldn't Leslie then say**

3    **to the ACC, well, I can pay you $25 million because**

4    **you've got 50 million of insurance I'm giving you,**

5    **and so the cash that I need to contribute should be**

6    **lower than what I did pay you?**

7        A.    Well, I think CIRCOR is buying more than

8    finality for Leslie, so when they say the liability

9    is 75 million, I don't think that's the only thing

10   that's involved.  I mean, there is explicitly

11   channelling injunctions for CIRCOR and for Watts, so

12   there is other forms of consideration being exchanged

13   in this business transaction.

14       So the liability, I think it's

15   inappropriate to look at that as the only motivation

16   for payment because it's not the only form of

17   consideration being given.  I think in general the

18   statement that if the insurance is worth 50 million

19   they will get a larger credit than if it's worth 20,

20   it's true.  They should get a larger credit.  It's a

21   more valuable commodity to assign 50 million worth of

22   proceeds to the trust than 30 million to the trust.

JANE ROSE REPORTING
1-800-825-3341  janerosereporting.com

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 126

1   That's why I said the more valuable they can make

2   that asset, the better off they are going to be.

3      **Q.    But you say in your report that they**

4   **inflated what the future claims were going to be in**

5   **order -- so that they could pay less?**

6      A.    Correct.  I don't say they do.  Let me be

7   careful.  I say they have an economic incentive to do

8   that.  I say here I believe the TDP forecast that's

9   put forward has inflated values.  Whether the

10  economic incentive is why they have the inflated

11  values, I don't know their motivation.  I know they

12  have an economic incentive.  That's a pure economics

13  question, and I know that the forecast they have is

14  at least three times too big so the resultant

15  forecast is consistent with that economic incentive.

16     **Q.    That's where you lose me on that one**

17  **because I gave you the one example.  Let me give you**

18  **another example.  Say the future claims against**

19  **Leslie are $200 million and there is still $50**

20  **million of insurance coverage.  Now, the ACC says to**

21  **Leslie, you got to put up $175 million or -- $150**

22  **million.**

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 127

1      A.    No.  Let me -- maybe we need to take this

2   a little bit more slowly.  There is a reason it says

3   Leslie, its parent CIRCOR, and the official committee

4   of unsecured creditors or the ACC all have an

5   economic incentive to do this.  Suppose all three of

6   those parties get together and they decided the

7   future liability is $75 million.  That negotiation is

8   done and over with.

9        Now they are sitting around the table.

10   They got to fund this with at least 75 million.

11   That's what they have agreed to do and they said we

12   have this insurance asset.  Well, how much is that

13   worth?  It's now common asset to the three of them.

14   This is an asset and the more it's worth now that we

15   have decided on a price, now we want to make that

16   asset as valuable as possible.

17        Well, if we actually cede 75 million of

18   losses, maybe the insurance is worth $15 million.

19   But if we cede 230 million of losses, the TDP

20   forecast, then the insurance is worth $50 million.  I

21   have made those two numbers up just as an example,

22   but in terms of the 50 million of what it would be

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 128

1    under those scenarios.

2         But they have an incentive to jointly

3    maximize and divide that pie up.  Whether or not they

4    respond to that economic incentive is another

5    question, but they have that incentive.  Once they

6    have agreed on a price, they want to maximize the

7    value of the asset that is not present at the table.

8    That's what they want to do.  From a pure economic

9    standpoint.

10        **Q.   Well, both 75 million and 230 million are**

11   **more than the value of the insurance that's available**

12   **so how would it -- if it's $75 million in future**

13   **claims, why would insurance be worth only 50 million?**

14        A.   They are not.  The comparison you're

15   making just doesn't work at all.  So when you think

16   of insurance, you take losses each year.  You

17   allocate those to the insurance coverage under the

18   allocation rules and policies pending as those losses

19   get allocated to them.  That creates a flow of money

20   through time.

21        Suppose they had exactly 75 million of

22   nominal limits relating and the losses fit perfectly

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 129

1    in that.  That never happens.  Suppose it is.  They

2    get 75 million paid out over the next 40 years which

3    may have a net present value of $35 million.  Instead

4    they now say it's 230 million, so we fill that up in

5    the next five years.  So instead of getting 75

6    million paid out over 40 years, they now get 75

7    million paid out in the five years.  Over five years

8    it might have a net present value of $60 million.  So

9    they have turned the net present value of this asset

10    from a $35 million asset to a $60 million asset by

11    accelerating the payments.                              `

12            Similarly, at 75 million, there probably

13    doesn't run through all the insurance.  There is

14    an -- in comparing the numbers, there is 135 million

15    of limits.  My understanding is that the only limits

16    that they really tapped into are the primary when I

17    read through things.  There may be some excess

18    policies that have paid, but I didn't see that.

19    There is much more than $50 million of limits in

20    their excess program.

21            Admittedly lots of it may be insolvent but

22    Leslie has to stand in the shoes of those insolvents

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 130

1    before it can get to the insolvent policies on top.

2    They don't just get skipped.  So it actually does

3    take a little more than $75 million to access all of

4    that insurance.  So the only way they get to the

5    value they are talking about is by having a number

6    substantially larger than 75 million.

7    **Q.    What does it mean when the -- when you say**

8    **that Leslie is -- Leslie and CIRCOR are contributing**

9    **the insurance to the trust?  How are they doing it?**

10    A.    My recollection is that the insurance

11    proceeds, they will contribute to the trust.  I don't

12    think they are technically assigning policies.

13    That's my recollection.

14    **Q.    What does that mean to you, that they are**

15    **assigning proceeds?**

16    A.    My understanding is Leslie and CIRCOR will

17    go presumably in either voluntarily or through a

18    coverage action with its insurers, will come to a

19    determination of what the insurers owe for the

20    asbestos losses and whatever moneys flow in will get

21    turned over to the trust.

22    **Q.    So in this case, assuming the trust gets**

US Bankruptcy Court - Delaware                    FINAL - October 4, 2010
In Re Leslie Controls                                      Charles Mullin, Ph.D.

Page 131

1    **approved, the insurers will be in the same position**

2    **in terms of paying claims as they would be in the**

3    **tort system?  They would only pay as they come?  They**

4    **are not contributing the entire value of their**

5    **policies to the trust, are they?**

6         A.    Well they very much won't be in the same

7    position.  They aren't litigating in the tort system.

8    They don't have available the tort defenses.  They

9    are not having claims resolved through trust

10   distribution procedures.  There is a very different

11   resolution mechanism than the tort system.  Prior

12   trusts pay substantial sums to nonmalignant claims.

13   That's in their financials.  Current tort defendants

14   don't.  It's a very different resolution mechanism.

15        So saying they are in the same position is

16   a gross mischaracterization.  They are in a very,

17   very different position.  It presumes values.  The

18   tort system doesn't presume values.  It doesn't say

19   check these three boxes, get $140,000 or get $100,000

20   scheduled value.  It says, no, each claim has got to

21   be judged on its own merits based on their own

22   characteristics, so they are not in the same position

US Bankruptcy Court - Delaware                FINAL - October 4, 2010
In Re Leslie Controls                            Charles Mullin, Ph.D.

Page 132

1    at all.  There has been a big change in how the cases

2    will be resolved.

3        **Q.    And the amount of defense costs is going**

4    **to be substantially lower as well, right?**

5        A.    Presumably.

6        **Q.    And if the numbers in the disclosure**

7    **statement are correct, that's double the amount that**

8    **the insurance companies were paying in the context of**

9    **the tort system?  If you look at claims paid versus**

10   **defense costs?**

11       MS. DAVIS:  Objection.

12       THE WITNESS:  The numbers that we went

13   through in the disclosure statement showed

14   substantially less defense dollars than indemnity

15   payments.

16   BY MR. DORSEY:

17       **Q.    Have you done an analysis to determine**

18   **whether taking into account what the insurance**

19   **companies have paid in defense costs and paid in**

20   **indemnity claims over the past five years, and then**

21   **compare that to what the insurance companies might**

22   **have to pay in the trust scenario if the trust gets**

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 133

1    **approved, have you looked at what the difference**

2    **would be in terms of whether they are better off or**

3    **not in the tort system versus the trust?**

4        A.   It's an interesting question.  I haven't

5    specifically gone to do that.  They have fewer

6    options available to them.  They don't have control

7    over the defense any longer.  How the defense costs

8    would have proceeded in the tort is a very

9    interesting question to me because I find it unlikely

10   that they would continue trying cases on a regular

11   basis in California against the plaintiff's bar if

12   they kept winning.

13        So if their tort history kept persisting

14   where they were getting defense verdicts on seven out

15   of eight and paid half a million if they did get hit

16   with a verdict, I don't think they would continue

17   trying cases.  I haven't analyzed that.  You can

18   imagine defense costs will come down substantially

19   once they establish what their defense costs are.

20   They ramp up defense costs, establish defenses, which

21   is expensive.  Once they are established, they are

22   easier to maintain, and then they can bring them down

US Bankruptcy Court - Delaware                    FINAL - October 4, 2010
In Re Leslie Controls                             Charles Mullin, Ph.D.

Page 134

1    a bit.  That's a likely pattern for how they would

2    have played out.

3         So would they have continued to have such

4    a large ratio of defense to indemnity?  Probably not.

5    If we are going to assume that they did, assume it

6    was two to one, then you can run out the numbers and

7    do an assessment and it's going to depend a lot on

8    the policy language in the chart for what's the

9    treatment of defense costs on a policy by policy

10   basis.

11        **Q.    And what's the basis for your knowledge**

12   **about how defense costs compared to indemnity costs**

13   **in the tort system over a long period of time?**

14        A.    I have seen at least 50 and probably

15   closer to 100 different companies claims data, both

16   defense and indemnity, and I've had the ability to

17   observe that and see the patterns that appear across

18   them.

19        **Q.    And how long does it usually take to**

20   **develop a pattern where defense costs begin to come**

21   **down?**

22        A.    There is usually a -- it varies.  It

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 135

1  depends on how successful they are.  The more

2  successful they are, they will probably come down

3  faster.  It's usually three to five years.

4  **Q.    How long has Leslie been in the tort**

5  **system defending claims?**

6  A.    Well, my three to five-year statement, if

7  we go back, is in reference to from when they ramped

8  those defenses up, so they really started ramping

9  their defenses up materially in 2006.  They went from

10  2.2 million in '05 to almost 6 million in '06 and

11  they have been in the neighborhood of 10 million in

12  '07, '08, and '09, so they have been at that level

13  running around 10 million with some growth for four

14  years now.  And they have been fairly successful.

15  They have been winning verdicts.

16       I said the big driver is probably going to

17  be how many more cases do they need to keep trying

18  but I didn't specifically go off and estimate that.

19  I viewed my task as, are the liquidated values which

20  my understanding in the TDP are supposed to represent

21  Leslie's several share of the indemnity due to those

22  claimants, are those values reasonable.  And no, they

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 136

1    are not.  If you're asking a different question of if

2    you transfer all the defense costs to the plaintiff,

3    that's a different question.  If what the liquidated

4    values are supposed to represent are Leslie's several

5    share of the indemnity payment to the plaintiff, it

6    is an unreasonably high value if that's what it's

7    intended to capture.

8       **Q.    When you say you viewed your task as "are**

9    **the liquidated values, which my understanding in the**

10   **TDP are supposed to represent Leslie's several share**

11   **of the indemnity due to those claimants" where did**

12   **you get the understanding that that was your task?**

13      A.    Well, my -- I was looking -- one of the

14   things I was asked to look at is, are these

15   reasonable settlement values.  Were the values being

16   assigned to these claims reasonable based on Leslie's

17   tort history.  I view that as when I go to what's the

18   potential impact of the trust on the insurers if the

19   values that are being assigned claims under the trust

20   are at least three times -- or in terms of the money

21   flows, probably three times in terms of the values,

22   at least 50 percent higher than they would have had

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 137

1    to pay compensable claims in the tort system, that

2    would have an adverse effect on them if those values

3    are viewed as reasonable and binding.

4         Those values overstate what the tort

5    liability would be and I was asked to say what could

6    be the impact of this trust on the insurers.  And one

7    impact would be the claim values have been inflated.

8         **Q.   Is there anything in the TDP or the trust**

9    **or the plan that says insurance companies have to pay**

10   **TDP values for indemnity on this claim?**

11        A.   I don't know if there is anything one way

12   or the other.  I haven't gone through every line in

13   detail.  I assume there to be some form of neutrality

14   language worked into it and this will be put forward

15   as a reason for why it potentially doesn't need to be

16   addressed here.

17        **Q.   What did you mean it doesn't need to be**

18   **addressed here?  What doesn't need to be addressed**

19   **here?**

20        A.   The TDP values, in my opinion, are

21   unreasonably high relative to its tort history.

22   Depending on what the purpose of the TDP is, you

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 138

1    know, historically parties have dealt with that in

2    different ways.  As I said, without going back

3    specifically, my -- most of these prepacks that I've

4    seen in the past have put in insurance neutrality

5    language.  And the proponents of the plan have argued

6    that whether these are reasonable or not is a fight

7    for another day.  It doesn't need to be a fight

8    within the bankruptcy and now we'll talk about

9    insurance neutrality language.  But it won't say they

10   don't bind.  It will typically leave open the

11   possibility that they could, but that's subject to

12   adjudication another day, but it doesn't say they

13   don't bind.

14        **Q.   So you're familiar with insurance**

15   **neutrality language in the trust agreement?**

16        A.   I have seen numerous of the trusts.  I'm

17   generally familiar.

18        **Q.   And in your experience, have those trusts**

19   **been approved by the court, the bankruptcy court?**

20        A.   They have been, the trusts have varied.

21   Most eventually get approved.

22        **Q.   What's your understanding of the insurance**

US Bankruptcy Court - Delaware                    FINAL - October 4, 2010
In Re Leslie Controls                                Charles Mullin, Ph.D.

Page 139

1    **neutrality language?**

2        A.    I have a broad understanding.  I don't

3    know the specifics or nuances of it, but the -- and

4    it takes various forms, but my broad understanding is

5    that the TDP or those values may not be viewed as

6    binding.  The adjudication by the trust may not be

7    viewed as binding.  It also may be viewed as binding.

8    And those are defenses the insurer could raise

9    subsequently.  There is kind of a long windy history

10   of all of this, and the arguments the various parties

11   have made, but it doesn't preclude typically the

12   policy, although they are arguing that the values are

13   reasonable.

14       **Q.    And you did not look at the plan in the**

15   **trust agreement to see whether there was in fact**

16   **insurance neutrality language?**

17       A.    I read through it quickly.  It's not what

18   I was focused on.  I probably did see the language,

19   but to the degree it's there, it doesn't stick out

20   specifically in my mind.

21       **Q.    If it was there, would it surprise you**

22   **that the insurance companies are fighting over TDP**

US Bankruptcy Court - Delaware                FINAL - October 4, 2010
In Re Leslie Controls                                Charles Mullin, Ph.D.

Page 140

1    **values?**

2          MS. DAVIS:  Objection.  He is not here as

3    an insurance expert or to opine about insurance

4    neutrality.

5    BY MR. DORSEY:

6          **Q.    You can answer.**

7          A.    In my experience, it doesn't surprise me

8    at all.  I've seen in different contexts the other

9    side after these are confirmed and I've seen the

10   proponents of those plans subsequently argue that

11   those values should be binding, and that courts have

12   ruled on them and put forward various different

13   arguments and try to use the bankruptcy ruling as

14   what I would describe as leverage in pushing the

15   settlement discussions.  So it doesn't surprise me

16   that the insurers would fight against that.

17         **Q.    Have you seen any coverage litigation**

18   **where that issue has been decided by a court?**

19         MS. DAVIS:  Objection.  Beyond the scope.

20         THE WITNESS:  I'm aware of, for example,

21   Fuller Austin, those rulings.  My other context of

22   this is typically in cases that have eventually

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 141

1    settled without any court ruling on the matter one

2    way or the other.

3    BY MR. DORSEY:

4        **Q.    And what's your understanding of the**

5    **Fuller Austin rulings?**

6        A.    That doesn't relate so much to the TDP.

7    That's the estimate of total liability and that the

8    estimate of total liability is not a court decision

9    that's binding on the insurers and payable at the

10   time of the ruling.

11       MS. DAVIS:  Can we take a break?

12       MR. DORSEY:  Sure.

13       (Recess.)

14   BY MR. DORSEY:

15       **Q.    Dr. Mullin, did you discuss your testimony**

16   **with anyone during the break?**

17       A.    No specific piece of testimony.

18       **Q.    Did you talk about your testimony at all?**

19       A.    There was a discussion just to -- I would

20   describe it as a reminder that I don't give legal

21   opinions.

22       **Q.    Okay.  And was it in the context of**

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 142

1    **anything in particular?**

2        A.    Not in particular.

3        **Q.    Have to do with insurance neutrality?**

4        A.    Not in particular.

5        **Q.    Going back to your report, or your**

6    **declaration, page 11.  This -- you have a caption at**

7    **the very top of the page, CIRCOR receives substantial**

8    **benefits under the plan.  And in paragraph 27, you**

9    **describe how by paying $75 million, the debtor and**

10   **CIRCOR are actually overpaying for the potential**

11   **future liabilities, is that a fair statement?**

12       A.    I think they are overpaying relative to

13   the indemnity due to the plaintiffs.

14       **Q.    And again, by indemnity, you're referring**

15   **only to the potential costs of paying claims as**

16   **opposed to defense costs, correct?**

17       A.    Much broader than that.  By indemnity, I'm

18   constraining myself to the likely -- the value of the

19   likely future indemnity payments excluding defense

20   costs, but I'm also excluding stock takeover

21   premiums.  I'm excluding any costs they may face in

22   terms of their financing on their debt.  Excluding

US Bankruptcy Court - Delaware                    FINAL - October 4, 2010
In Re Leslie Controls                                    Charles Mullin, Ph.D.

Page 143

1    any distraction of senior management.  All the types

2    of reasons that companies make business decisions to

3    do things, all of those are being excluded so it's

4    just indemnity relative to the payment.

5        **Q.    Got you.  And then in paragraph 28, you**

6    **say a reason CIRCOR may be willing to pay this**

7    **premium is that it accrues additional benefits beyond**

8    **the enterprise value under the Leslie plan.  In**

9    **particular, CIRCOR itself and Watts Water**

10   **Technologies, Inc., ("Watts") whom CIRCOR has**

11   **indemnified against certain future asbestos related**

12   **liabilities.  Both obtained 524(g) relief under the**

13   **proposed plan.  This relief is a major consideration**

14   **for CIRCOR.  Did I read that correctly?**

15       A.    I believe so.

16       **Q.    You say a reason.  Are there other reasons**

17   **that CIRCOR might be willing to pay a premium?**

18       A.    I don't know all the reasons that CIRCOR

19   may.  As I said, getting finality provides them many

20   potential benefits.  I haven't gone and tried to

21   quantify all of these potential benefits, but as I

22   said, there are -- it eliminates having to deal with

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 144

1    the asbestos litigation for management.  It

2    eliminates any influence this may have on their

3    credit rating and their ability to get financing.  So

4    there is that sense of finality is typically valued

5    by the stock market and that has value to them.  And

6    that's just the primary one that I'm focusing on here

7    because that's something that's explicit under the

8    plan.

9        **Q.    Is it correct that companies that are**

10   **facing potential asbestos liabilities have difficulty**

11   **or have an increase in the cost of their capital?**

12       A.    That's a company specific question.  It's

13   frequently the case.  You can read the analyst

14   reports.  You can go look and see whether that's

15   there or not.  If there is a company that does 10

16   billion a year in revenue and it pays 10 million a

17   year in asbestos litigation, it probably doesn't have

18   an influence on their financials.  So if you say,

19   does this influence Exxon, probably not.  If you look

20   at ones where it's a substantial portion of the cash

21   flow, it more typically does.

22       **Q.    And could it also affect the ability of a**

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 145

1   corporation to do restructuring of its corporate

2   entities?

3      A.   Yes.

4      Q.   And you go on to say that you looked at a

5   press release that was issued by CIRCOR in which --

6   or excuse me, the 2009 annual report of CIRCOR that

7   says, "upon exhaustion of its primary layer of

8   insurance, Leslie may be required to bear an ever

9   greater share of indemnity and defense costs which

10  would have a material adverse effect on CIRCOR's

11  financial condition consolidated results of

12  operations and consolidated cash flows."  Do you see

13  that?

14     A.   I see where you're referring to.

15     Q.   Is that a reasonable assumption on the

16  part of CIRCOR in the context of potential asbestos

17  tort liability?

18     A.   I think for them in particular, because

19  when you look at their insurance coverage program, my

20  recollection is that much of their umbrella insurance

21  is insolvent.  So when they transition from their

22  primary insurers to their umbrella insurers due to

US Bankruptcy Court - Delaware

FINAL - October 4, 2010

In Re Leslie Controls

Charles Mullin, Ph.D.

Page 146

1  the insolvencies, in that umbrella layer, a much

2  larger fraction of the expenditure will drop to their

3  bottom line instead of being reimbursed by insurers.

4     **Q.   You go on in paragraph 29 to say, had**

5  **Leslie remained in the tort system and benefited from**

6  **a downward movement in its asbestos expenditures, the**

7  **benefit of that movement would have been shared with**

8  **its insurers and capped at their current reserve.  In**

9  **contrast, had Leslie remained in the tort system and**

10 **suffered an adverse movement in its asbestos**

11 **expenditures, almost all of that increase would have**

12 **been borne by Leslie and CIRCOR.  What do you mean by**

13 **that?**

14    A.   Well, there is kind of an asymmetry in the

15 risk function, so when you look at a company in its

16 insurance profile and I'll just use round numbers.

17 These won't map perfectly, but if you had a company

18 with exactly 100 million of insurance and suppose you

19 had no insolvencies at all, just to take the simplest

20 examples to start with the 100 million and you had a

21 forecast that said you were going to have exactly 100

22 million of losses, and insurers were going to pay all

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 147

1    of them, suppose that was the world in which you

2    lived.  Clearly anything above the 100 million

3    adversely affects the company because they are out of

4    insurance and they pay it.

5            Now, a favorable development to the tort

6    is all the funds come down because they were paying

7    the first hundred million, the company pays

8    everything afterward.  This case isn't that simple

9    but the same concept is there.  There is 135 million

10   of insurance limits.  The insurers collectively are

11   paying a portion of that 135 million, but they are

12   not paying anything outside of it.

13           So if you're within that 135, which I

14   believe they are, then downward shocks accrue

15   disproportionately to the insurers as opposed to the

16   company.  As you start to go above 135 million, then

17   you are going into worlds where there is no more

18   insurance, so it's being borne by the company.  When

19   you have insolvencies and allocation, the lines get

20   blurred but the concept is the same as kind of the

21   more simple example I started with.

22       **Q.   What's the basis for your saying that if**

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 148

1  there is $135 million of insurance, but a portion of

2  that is insolvent insurance coverages, that Leslie

3  has to incur liabilities up to the amount of the

4  insolvent portion of the insurance before it can go

5  into the solvent excess carriers?

6      A.   I've done an awful lot of allocation work

7  in coverage litigation, and I'm unaware of any

8  allocation in which if a whole band of umbrella

9  insurance is insolvent and there is a solvent policy

10  above it, that you can just skip all of it, and in

11  some way, even if it's all sums, you have to go up

12  through the one tower.  You may not have to incur all

13  of it.  So under New Jersey, under pro rata, time on

14  risk, it just flows straight through them.  If you

15  have an all sums type ruling, you can avoid some of

16  the insolvencies but you still can't avoid all of

17  them.

18      Q.   What if the insolvencies are at the same

19  level of excess coverage as those that are solvent?

20      A.   This is going to depend on the

21  jurisdiction now, or the choice of law that would

22  affect the coverage.  So if you had all sums, the

US Bankruptcy Court - Delaware          FINAL - October 4, 2010
In Re Leslie Controls                            Charles Mullin, Ph.D.

Page 149

1    policyholder could pick and choose and at least for a

2    while defer getting into the insolvencies.  Usually

3    they can't defer forever.  If it's anything that's

4    based on a pro rata scheme, then it's going to be

5    spread across, and if they are at the same level, a

6    lot of it's going to go into the insolvent policies

7    and some will go into the solvent policies.

8        Q.    And which jurisdictions are which?  Are

9    you aware?

10       A.    Complicated question.  Some jurisdictions

11   probably have a consensus opinion within, what I

12   talked about, policyholder and insurer counsel.

13   Others are very open and debated.  So New Jersey law

14   has the Carter Wallace ruling, as other rulings that

15   have clarified, that are time and risk weighted by

16   limits.  New York is generally viewed as pro rata

17   time on risk.  Some would contest that.  California

18   may be viewed as all sums by many, but even the

19   interpretation is very fuzzy.  Not all states, there

20   is clarity as to what's going on.

21       Q.    And am I correct, you haven't looked at

22   the policies or what level the excess carriers are in

US Bankruptcy Court - Delaware                    FINAL - October 4, 2010
In Re Leslie Controls                              Charles Mullin, Ph.D.

Page 150

1  **terms relevant to each other in order to determine**

2  **how the allocation is, correct?**

3      A.   I have seen a policy chart, so I have a

4  feel for that, but I haven't seen the exact policy

5  language.

6      **Q.   What was the chart that you saw?  Where**

7  **was that?**

8      A.   I believe it was the chart prepared by

9  Dickstein.

10         MS. DAVIS:  Can we go off the record for a

11  second?

12         (Discussion off the record.)

13  BY MR. DORSEY:

14      **Q.   Did you do an analysis of the coverage to**

15  **determine whether -- how the allocation would work**

16  **with regard to the insolvent excess carriers?**

17      A.   That would be a function of the choice of

18  law.  Once you have a choice of law, the math

19  follows.

20      **Q.   I was asking, did you do that?  Have you**

21  **done that analysis?**

22      A.   Have I done -- have I looked at how

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 151

1    different allocations would flow through?

2    **Q.   Yes.**

3    A.   I have looked at a few.

4    **Q.   In connection with this case?**

5    A.   I've looked at -- in terms of specifically

6    looking at Leslie?

7    **Q.   Yes.**

8    A.   I have looked at how dollars would flow

9    under different choices of law.

10   **Q.   And what were the conclusions that you**

11   **reached?**

12   A.   They are exactly what the math dictated,

13   so if you get a pro rata time on risk, it's going to

14   stay in the insolvent umbrella carriers for a long

15   time, because there is no collapsing in, and a very

16   large fraction of the liability after you get out of

17   the primary would go to the policyholder and it would

18   depend on what people believe were the solvency

19   percentages or the payment rates coming out of the

20   various insolvent carriers would have a lot to drive

21   it.

22        If you pick something like New Jersey law,

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 152

1   it stays more in the chart because it's proportional

2   to the limits.  So it -- a little bit less would be

3   borne, but still the majority would be borne by the

4   policyholder, in this case Leslie.  I don't think I

5   looked at all sums.  You can visually look at it, but

6   I don't think I ran anything to see what it looked

7   like.

8       Q.    Did you prepare a written analysis?

9       A.    No.

10      Q.    Did you take notes or prepare anything

11  that shows how you came to these conclusions?

12      A.    No.

13      Q.    Did you discuss them with counsel?

14      A.    In broad brush strokes, how the different

15  choices of law would cause the dollars to flow

16  through, similar to the discussion I just had with

17  you.

18      Q.    When you did that presentation, did you

19  have anything in front of you?

20      A.    No.

21      Q.    You did it off the top of your head?

22      A.    When you've done enough of them, you can

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 153

1    talk through a policy chart and talk through it.

2        **Q.    Can you tell me what you told counsel**

3    **about the allocation issue?**

4        A.    I more just walked through what the impact

5    would be in different places.  And so under pro rata

6    time on risk claims, it's going to take a longer time

7    to move up through the chart.  So the policies would

8    be less valuable under that choice of law than if you

9    had a choice of law like Carter Wallace that weighted

10    limits that would move up more quickly because

11    everything stays inside the chart.  That would

12    increase the value of the insurance.  And if you went

13    to something like all sums among those three, that

14    would maximize the value of the insurance relative to

15    the other two.

16        **Q.    And did do you an analysis of which one of**

17    **those was the most likely allocation that would occur**

18    **in this case?**

19        A.    That's outside of my expertise, choosing

20    which choice of coverage law the court will deem most

21    appropriate.

22        **Q.    Is there a reason why you didn't do the**

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 154

1  **all sums amount?**

2      A.   I can look at a chart and I can tell what

3  happens under all sums.  All sums pick and choose,

4  you're trying to prognosticate what the policyholder

5  will pick and choose, so there is no one given

6  answer.  So usually I more speak to that than try to

7  do anything explicit.

8      **Q.   When you made that presentation to**

9  **counsel, did counsel take notes about what you were**

10 **talking about?**

11     A.   I don't know.

12     **Q.   Was it in person or over the phone?**

13     A.   I think presentation kind of overstates.

14 There was a dialogue at one point where we discussed

15 potential choices of law, but that was -- that was

16 it.

17     **Q.   What did you talk about with regard to the**

18 **potential choices of law?**

19     A.   Potential choices of law?

20     **Q.   Yes.**

21     A.   New Jersey was a likely choice is the

22 piece that I recall from it.

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 155

1      **Q.   Why was New Jersey the likely choice?**

2      A.   I don't remember the specifics.  It wasn't

3   that relevant to me as to what the exact motivating

4   reason was.

5      **Q.   And what was New Jersey's position again**

6   **on allocation?**

7      A.   Pro rata proportional to policy limits

8   follows Carter Wallace Owens Illinois rules.

9      **Q.   And how would that affect the allocation**

10  **of the excess coverage in this case?**

11     A.   It would be done pro rata time on risk

12  weighted by limits, so that means the policyholder

13  does stand in the shoes of all the insolvent

14  policies.  And so in that case, the policyholder

15  would be bearing a substantial portion of the

16  expenses as it got out of its primary and went into

17  those insolvent policies.

18         Eventually, it may have enough losses to

19  get through those umbrella policies.  It may not.  If

20  it does, then it would start going into the excess

21  policies that are above them where they exist.  And

22  where they don't, they would fall 100 percent to the

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 156

1    policy if there was no excess above the umbrella.

2        **Q.    So when you did your analysis in**

3    **paragraphs 29 and 30 as it relates to the benefits to**

4    **CIRCOR and the potential down side for the insurers,**

5    **which analysis were you looking at in terms of the**

6    **allocation of the policies?**

7        A.    It doesn't really matter.  It's always

8    true.  The insurance, there is a level of expenditure

9    for which insurance will be a partial offset to the

10   losses incurred by the policyholder.  There is an

11   expenditure level above that regardless of the choice

12   of law in terms of how the coverage is done.  There

13   is a level of expenditure for every given choice of

14   law that once you get above that, it's going to be

15   100 percent borne by the policyholder because there

16   is no insurance remaining.

17        There is always this asymmetry in the

18   risk.  Insurers disproportionately benefit from

19   downward movements in liability and the policyholder

20   disproportionately incurs the cost of upward

21   movements, so their options on this are very

22   different if you think of it on option pricing.

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 157

1    Insurers have a valuable option that someone would

2    pay to take from them, while the policyholder has an

3    option they would be willing to pay somebody to get

4    rid of.

5        **Q.    So in all of the cases that you're aware**

6    **of where a trust has been established, that same**

7    **scenario would apply, the upside risk is on the**

8    **insurance companies in the context of the trust?**

9        A.    The upside risk is -- I mean, it depends

10    where you are.  So if you're not, if you're in a

11    world where you have 100 percent solvent insurance

12    and you have a billion of insurance, and the

13    liabilities are projected to be $50 million, if they

14    triple, and it's 150 million, it's still all of the

15    insurance, so it would have to go up by so much that

16    from an economic perspective, although the asymmetry

17    exists, it would be immaterial, because unless you

18    thought you were going to break a billion dollars,

19    the policyholder would not face that down side risk

20    in reality.

21        There is other places if you take somebody

22    like Owens Corning, my understanding was they had

US Bankruptcy Court - Delaware                    FINAL - October 4, 2010
In Re Leslie Controls                                    Charles Mullin, Ph.D.

Page 158

1    gone through all their aggregate insurance limits

2    before they filed for bankruptcy.  Their insurance is

3    gone.  So Owens Corning bears both the upside and

4    downside.  So when insurance exists and when you're

5    in a scenario where you're likely to not go through

6    all the insurance, but in downside scenarios you

7    could go through all the insurance and more, if

8    that's a world in which you're in, then this

9    asymmetry exists.

10        **Q.    Did you look at the question of whether or**

11   **not on the downside scenarios in this case, that it's**

12   **more likely that the insurance would not be**

13   **exhausted?**

14        A.   I think there is when I look at 135

15   million of limits, they are basically in their

16   primary right now, and future costs of about 75

17   million, you wouldn't go through all of it.  And

18   there is less indemnity there than there are

19   insurance limits.

20        **Q.    But you don't know what the primary is?**

21   **You don't know how much the primary covers?**

22        A.   Even if I only look at the umbrella and

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 159

1    excess and look at the limits, I believe it's in

2    excess of $75 million.

3    **Q.    And have you done analysis to determine**

4    **whether --  assuming the trust pays only claims that**

5    **are valid as having been presented to them, pursuant**

6    **to what's required for getting paid under the TDP,**

7    **whether the insurance would be exhausted?**

8        A.    I mean, I have not tried to come up with

9    my own prediction of how the specifics in the TDP are

10   going to be enforced or who constitutes a valid claim

11   under those criteria.  There is no history for that.

12   The history is what's a valid claim in the tort

13   system.  The trust you're asking somebody to take a

14   set of rules and the best indicator of that is what

15   other trusts have done in the past, but this is the

16   Leslie Controls trust.  It is distinct from the other

17   ones, but there is no history outside the tort

18   history that's Leslie specific.

19       So I can answer for you if they only paid

20   the claims that would have been compensable under the

21   tort system.  Whether the rules in this trust pay

22   half of those claims so the tort system would have

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 160

1  paid 75 and this will only pay 35 a year, or whether

2  this is going to pay 300 a year, that's an open

3  question.

4      I looked at the forecast that was put

5  forward that said it's going to pay out 230 million

6  and it's going to pay more claims and that was what

7  was done by ARPC.  And I assumed that that was their

8  task is what's this trust actually going to do.  If I

9  look at that, yes, then it's paying too many claims

10  and it's going to go through, if you looked at 230

11  million under a Carter Wallace allocation to 135

12  million of insurance, it will go through the whole

13  insurance.  In contrast, if you look at 75 million,

14  it won't, which puts us in exactly the situation

15  described in paragraph 29 and 30.

16      **Q.   Is it true that once companies go out of**

17  **the tort system and they establish trusts that the**

18  **claims against the trusts tend to be -- there tend to**

19  **be more claims against the trust than there were**

20  **against the company when it was in full existence?**

21      A.   Interesting question.  Most of the trusts

22  aren't very public with that data, so the question to

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 161

1    the general population is unknown.  The only context

2    in which I have seen trust data are subject to

3    confidentiality, so I don't think it's appropriate

4    for me to tell you what I've seen in those contexts.

5    I have seen some trust data.

6         So you can -- it's more looking at them

7    from the context of what is in their annual reports.

8    Can you draw some inferences between what's in their

9    annual reports.  The amount of money they are paying

10   and how that relates to what solvent tort defendants

11   are doing.  There is discrepancies between what

12   trusts consider compensable and what the tort

13   considers compensable in the trusts that are

14   currently running.

15        **Q.   Using publicly available data, have you**

16   **drawn any conclusions about whether claims against**

17   **trusts go up as compared to what they were?**

18        A.   There is -- they do.  You can see it most

19   clearly in nonmalignant claims.  Nonmalignant claims

20   is the clearest example when you look at the amount

21   of moneys being paid to them from the trust and from

22   that, you can back up the number of claims because

US Bankruptcy Court - Delaware                    FINAL - October 4, 2010
In Re Leslie Controls                                      Charles Mullin, Ph.D.

Page 162

1    you know what the average value is for nonmalignant

2    values.  40 to 45 percent of the money over the last

3    couple of years have been going to those nonmalignant

4    under those trusts, according to the Rand report.

5           That shows you the trusts are not

6    mimicking the tort system.  At a much more general

7    level, the trusts allocate very little money to due

8    diligence on claims, so it's a very different

9    process.  You wouldn't expect the same outcome.  The

10   one is much more adversarial with large resources

11   spent to defense.  The other one is not.  So you

12   wouldn't expect those to produce the same outcome.

13   You'd expect them to produce different outcomes.

14         **Q.   Looking to the last page of your report,**

15   **or your declaration, the last sentence of paragraph**

16   **31, you say, although paying a premium in order to**

17   **limit CIRCOR's downside may be a sound business**

18   **decision for CIRCOR, the TDP figures do not reflect**

19   **Leslie's tort liability.  Do you believe it was a**

20   **sound decision to pay a premium in order to limit?**

21         A.   I believe companies in general buy

22   insurance for lots of reasons.  This can be thought

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 163

1    of as like an insurance product.  They are getting a

2    524(g) channeling injunction that says you'll never

3    face liability for this.  It can be similar to buying

4    a very large insurance policy and paying a very large

5    premium for it.  Doesn't mean the liabilities are

6    coming, but if they did, it will give you peace that

7    you don't have to pay anything for them.

8         Companies make risk decisions all the time

9    about when they might want to pay a premium to get

10   rid of a risk and how likely they think that risk is.

11   It's reasonable for companies to do those              `

12   assessments.  So as a general concept, people buying

13   insurance paying above their expected liabilities to

14   get insurance, that's a reasonable business decision

15   that manifests in all sorts of contexts in business.

16        People hedge exchange rate risk.  People

17   buy insurance products explicitly.  They do all sorts

18   of things, so that is reasonable.  Whether the

19   premium they paid was a reasonable amount or not a

20   reasonable amount, I don't know enough about the

21   internal workings of their business to say whether

22   paying 35, 40 million premium to get that finality

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 164

1    was a good or bad thing.  They are going to have done

2    their own internal assessment and clearly they

3    thought it was.  They decided to do it.

4        **Q.    Take a look at Exhibit A to your**

5    **declaration.  This is your curriculum vitae, is that**

6    **correct?**

7        A.   Yes.

8        **Q.    At the bottom of the first page, you have**

9    **a section that's listed as selected experience.**

10        A.   Correct.

11        **Q.    Why did you include only selected**

12    **experience as opposed to all of your experience?**

13        A.   Some of my experience, I'm not allowed to

14    talk about.  Some of -- some of this, I'm sure I've

15    omitted over the years just because I can't remember

16    it at this point.  But the specific thing is there is

17    certain things I've done under confidentiality where

18    even the fact that I've retained is confidential.

19        **Q.    Would it be fair to say that this is --**

20    **let me strike that.**

21        **Would there be a way to describe the**

22    **things you've been retained for on a confidential**

US Bankruptcy Court - Delaware                    FINAL - October 4, 2010
In Re Leslie Controls                                      Charles Mullin, Ph.D.

Page 165

1    **basis without actually disclosing confidential**

2    **information?**

3        A.   In broad brush strokes.

4        **Q.   What are the things that aren't on here**

5    **that would be confidential that you can describe in**

6    **broad brush strokes?**

7        A.   I've done work on behalf of potential

8    purchasers of companies, could be hedge fund, could

9    be private equity funds.  Could be one corporation.

10   Somebody is interested in buying another party and

11   I've been retained to do due diligence with regard to

12   the potential liabilities that the target entity may

13   have.

14       **Q.   Anything else?**

15       A.   I've been retained in settlement,

16   exclusively for settlement on some matters.

17       **Q.   What kind of claims?**

18       A.   Different claims.  Sometimes asbestos.

19   Sometimes it's insurance.  Sometimes it's something

20   outside of asbestos, something like environmental

21   liability.  Something else.

22       **Q.   When you've been retained in those types**

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 166

1    **of cases, who are you typically retained by?  Is it**

2    **insurance companies or companies?**

3        A.    It varies.  I'm retained both by

4    policyholders and insurers in a coverage litigation

5    context.  In a bankruptcy context, I'm retained by

6    debtors, unsecured creditors, equity committees,

7    different constituencies.  In that framework, they've

8    retained myself or my firm.  Both in expert roles and

9    in consulting roles.

10        **Q.    I was just curious.  You have under**

11    **professional associations, you're a member of the**

12    **American Bar Association?**

13        A.    I always get asked that question.  Yes, I

14    am.

15        **Q.    How did you become a member of the**

16    **American Bar Association without becoming a lawyer?**

17        A.    You write them a check.  Anybody willing

18    to write the check can join.

19        **Q.    What is the American Law and Economics**

20    **Association?**

21        A.    American Law and Economics Association is

22    largely law professors and economics professors in

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 167

1    academic association, principally.  It runs

2    conferences.  It reviews -- it publishes papers.  It

3    runs a journal, academic journal.

4        **Q.    Are you familiar with Professor Priest**

5    **from Yale University?**

6        A.    I recognize his name.

7        **Q.    Have you ever had conversations with him?**

8        A.    I don't believe so.

9        **Q.    Are you familiar with a company called**

10   **Litigation Resources Group?**

11       A.    No.  But I think I know what you're trying

12   to refer to.

13       **Q.    What do you think I'm trying to refer to?**

14       A.    Litigation Resolution Group.

15       **Q.    Resolution Group.  Okay.  You're familiar**

16   **with that company?**

17       A.    That company I'm familiar with.

18       **Q.    You're a principal in that company?**

19       A.    Correct.

20       **Q.    Is there a reason it's not listed on your**

21   **curriculum vitae?**

22       A.    Probably largely because it's a startup

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 168

1    company that's trying to be successful.

2        **Q.    When did you start that company?**

3        A.    I think about three years ago at this

4    point.  I'm not sure on the exact date.

5        **Q.    And what does Litigation -- I'm just going**

6    **to call it LRG, if that's all right?**

7        A.    That's fine.

8        **Q.    What does LRG do?**

9        A.    It tries to facilitate business

10    transactions for entities facing liabilities.

11        **Q.    When you say business transactions, what**

12    **kind of transactions are you talking about?**

13        A.    It varies, depending on the entity's need.

14    So probably I could give you a couple of concrete

15    examples.  Suppose a company wants to do an IPO and

16    it wants to create comfort that some set of

17    liabilities aren't that dangerous and give comfort to

18    the banks and the potential purchasers.  Litigation

19    Resolution Group may try to place for them some type

20    of indemnification, capped indemnification, some type

21    of signal to the market about what those liabilities

22    are likely to be, so there is a third party credible

JANE ROSE REPORTING
1-800-825-3341  janerosereporting.com

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 169

1    signal to potential investors as to the likely range

2    of those liabilities that facilitates the exchange of

3    information in a credible manner, in essence.

4        **Q.   Do you do work with companies that are**

5    **facing potential asbestos liabilities?**

6        A.   I would.

7        **Q.   Do you advertise the company as someone,**

8    **as a company that can deal with potential asbestos**

9    **liabilities on behalf of a company?**

10       A.   Yes.  It's capable of doing that.

11       **Q.   Is it something you advertise?**

12       A.   I think so.  I don't remember exactly what

13   all is on the website.

14       **Q.   Okay.  What's your position with LRG, by**

15   **the way?**

16       A.   I'm a principal within it, one of the

17   founders.

18       **Q.   Is it a partnership or LLC?**

19       A.   It's an LLC.

20           - - - - -

21           (Exhibit 3 marked.)

22           - - - - -

JANE ROSE REPORTING
1-800-825-3341  janerosereporting.com

US Bankruptcy Court - Delaware                    FINAL - October 4, 2010
In Re Leslie Controls                                Charles Mullin, Ph.D.

Page 170

1    BY MR. DORSEY:

2        Q.    I've handed you what's been marked as

3    Mullin Exhibit Number 3.  Do you recognize the screen

4    shot from the LRG web page?

5        A.    That looks familiar.

6        Q.    How much time do you spend working with

7    LRG as opposed to Bates White?

8        A.    Over the last year, I've probably spent

9    less than 5 percent of my time at LRG.

10       Q.    And if you look at the screen shot, it

11   says, our market.  Asbestos, LRG versus 524(g).  Do

12   you see that?

13       A.    I do.

14       Q.    And can you walk me through -- well, let

15   me ask you this, are you trying to present here that

16   your services would be superior to a 524(g) trust in

17   bankruptcy?

18       A.    It's different, but it's superior

19   depending on the perspective of the company.  It's an

20   alternative so it's a financial instrument as opposed

21   to channelling injunction.  So it has pros and cons.

22   If a company is looking for solutions -- for some

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 171

1    companies, 524(g) would dominate what LRG can offer.

2    For other companies, LRG may dominate what 524(g)

3    could offer.  But it's just pros and cons.

4        Q.    When you say it's a financial instrument,

5    what do you mean?

6        A.    It's a financial transaction.  It's --

7    unlike 524(g), where it's a ruling from a bankruptcy

8    court with a congressionally backed channeling

9    injunction, and that's how you're getting your sense

10   of finality or your reaching, what LRG will do for a

11   client is it will quantify a litigation risk that

12   they assess.  It will underwrite that litigation risk

13   and offer to take it on for a price.

14       Q.    How does it work?  Can you tell me?  How

15   would that work?

16       A.    There is no -- it's a business

17   transaction, so it's not constrained to work in any

18   one particular manner.  So you can work with the

19   business needs of your client to construct a

20   financial instrument that really hedges the risk that

21   they are facing.  And you can tailor it to their

22   needs.

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 172

1    **Q.   Are you buying the liabilities from them?**

2    **Is that what you're doing?  Or are they selling you**

3    **the liabilities, I should say?**

4        A.   Neither of those is exactly right.  I

5    mean, it could go -- it can take different forms so

6    there is no one characterization.  It -- as I said,

7    it depends on what a company's needs are as to what

8    form that would take.

9        **Q.   Are you currently working with any**

10   **companies on their asbestos liabilities?**

11       A.   No.

12       **Q.   Have you in the past worked with any**

13   **companies on their asbestos liabilities?**

14       A.   Yes.

15       **Q.   And how many companies have you worked**

16   **with on their asbestos liabilities?**

17       A.   I don't know the exact count of how many

18   we've had a meaningful interaction with.  But less

19   than 10.

20       **Q.   And are those less than 10 where you've**

21   **actually entered into this financial instrument that**

22   **released them of their asbestos liabilities?**

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 173

1      A.   We haven't entered into a financial

2   instrument with anybody.  That's why I said it's a

3   struggling startup hoping to succeed one day.

4      **Q.   And if you look at Exhibit Number 3 at the**

5   **bottom, there is a chart, and beneath the chart there**

6   **is some language that says, as evidenced by past**

7   **corporate reorganizations that involve 524(g) of the**

8   **U.S. bankruptcy code, many companies facing the**

9   **specter of legacy asbestos related claims benefit by**

10  **paying sums above the direct cost of their asbestos**

11  **litigation to obtain finality and eliminate those**

12  **direct litigation costs.**

13     A.   Yes.

14     **Q.   And that's pretty much what we talked**

15  **about in this case.  That you believe Leslie paid a**

16  **premium above what the value of the claims are in**

17  **order to be released of those liabilities?**

18     A.   I believe CIRCOR did.

19     **Q.   CIRCOR?**

20     A.   Yes.  CIRCOR made a business decision to

21  pay above its expected costs of the liability to get

22  finality.

JANE ROSE REPORTING
1-800-825-3341  janerosereporting.com

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 174

1      **Q.    And it goes on to say, LRG's product**
2  **offers companies an attractive and more cost**
3  **effective alternative to 524(g) that provides for a**
4  **quicker timeline to resolution and enables the**
5  **company to retain procedural control of the**
6  **litigation throughout the process.  What is the more**
7  **cost effective alternative that you refer to there?**
8      A.   I think we can look at that more in the
9  context of various bankruptcies that have occurred in
10  the past.  I think we -- if I were to use a concrete
11  example, I think LRG in its -- would have gladly
12  taken on the liabilities of the company like USG for
13  $2 billion instead of the 4 billion that they paid to
14  get 524(g).  I think the shareholders of USG, we
15  didn't exist at that point in time, but I think the
16  shareholders of USG would have been prepared to pay
17  $2 billion less.
18      **Q.   If you took on the liabilities of USG for**
19  **$2 billion, how would it relieve USG of its asbestos**
20  **liabilities going forward?**
21      A.   In one form or another, there would have
22  been some form of, as it says in here, large capped

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 175

1   indemnification.

2       **Q.    What does that mean?  What do you mean by**

3   **that?**

4       A.    That means LRG would have agreed to pay

5   the next 5 billion of losses, the next 7 billion of

6   losses.  Some fraction of future losses incurred on

7   USG's behalf would have been paid by LRG.  And if

8   that capped indemnification is large enough, the

9   investors of USG may or may not have comfort that

10  it's not going to come back to them or they may

11  decide they want to pay 4 billion instead of 2

12  billion and have a congressional injunction.  That's

13  a choice that they have.  One is less expensive, has

14  some risk that it might revert.  The other one is

15  more expensive and that is a congressional channeling

16  injunction.

17      **Q.    Do you believe in this case, you would**

18  **have structured a financial instrument that would**

19  **have released Leslie of its liabilities at a lower**

20  **cost than the 524(g) injunction it's seeking here?**

21      A.    I don't know.

22      **Q.    Why don't you know?**

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 176

1    A.   I haven't done sufficient work to

2    underwrite such a transaction, so I don't know what

3    the price would be.

4    **Q.   When you're underwriting those**

5    **liabilities, do you obtain insurance coverage for**

6    **them?**

7    A.   I don't have to.  It depends on the nature

8    of the business contract.

9    **Q.   But you might seek to obtain insurance**

10   **coverage?**

11   A.   I mean, in general, insurers aren't

12   issuing insurance for asbestos liabilities so it

13   would probably take a slightly different form than a

14   traditional insurance policy, but clearly we need to

15   bring forward the financial backing to cover the

16   indemnification that we are offering and so one form

17   or another the financial resources would be there to

18   cover that indemnification.

19   **Q.   Now, you say in your chart above the**

20   **language that we've been looking at that LRG is**

21   **confidential, whereas 524(g) is not.  How is it that**

22   **LRG can remain confidential?**

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 177

1    A.   It's confidential during the negotiation

2    phase, so I mean, where I describe the distinction is

3    if you talk to LRG and you don't want to do it, there

4    is no change in your litigation position.  There has

5    been no impact.  If you talk to your adversaries in

6    the litigation, so the company goes and talks to the

7    plaintiff attorneys, they are having a dialogue

8    directly with their adversaries expressing a desire

9    to go down this road.  That may affect, if they

10   choose not to go forward with the litigation, what

11   their tort environment looks like.  It may not.  But

12   they are negotiating directly with their adversary on

13   litigation as opposed to a third party.

14       **Q.   When you say it's confidential, it's**

15   **through the negotiation process, but once the deal is**

16   **consummated, it would be public knowledge?**

17       A.   You mean as a publicly traded company, it

18   would virtually have to be public because they would

19   have to disclose.  If it was a private company, it

20   may or may not.

21       **Q.   Companies like USG, they would have to**

22   **disclose?**

US Bankruptcy Court - Delaware                      FINAL - October 4, 2010
In Re Leslie Controls                                      Charles Mullin, Ph.D.

Page 178

1       A.    That would be a public company.

2       **Q.    There is another block that says, are**

3    **insurance assets affected?  LRG, no.  524(g), yes, at**

4    **risk.  What did you mean there?**

5       A.    As a business transaction, things can be

6    easily structured so there is no issues with

7    anti-assignments clauses.  There is no issues with

8    some of the things that may cause problems from the

9    policyholders' perspective in terms of their ability

10   to access their insurance that 524(g) may cost.

11       It also doesn't create issues like what

12   are things worth under trust distribution procedures.

13   You're still in the tort system so you're still

14   valuing claims in the sort system so you have your

15   defense costs, your indemnity payments all in the

16   tort system.  The world hasn't changed from the

17   insurer's perspective.

18       **Q.    How would you structure in the context of**

19   **an LRG transaction, so that the issues of**

20   **anti-assignment insurance is not affected?**

21       A.    There is lots of potential business

22   structures for that.

US Bankruptcy Court - Delaware                FINAL - October 4, 2010
In Re Leslie Controls                          Charles Mullin, Ph.D.

Page 179

1    **Q.   What would those be?**

2    A.   To get into the details, I'd end up

3    referring you to a corporate transactional lawyer in

4    that I have more of an understanding in very broad

5    brush strokes, but it can be an indemnification that

6    we issue that's above and beyond any of their

7    existing insurance.

8        So it's not -- it's a net effect that we

9    are paying.  And we are just paying them.  There is

10   no transfer of liability.  There is no transfer of

11   insurance.  We could buy the whole entity potentially

12   and so you're taking on the whole entity.  You're not

13   transferring.  The liabilities still reside with the

14   entity.  There is lots of different structures you

15   could go down that never separate the liabilities

16   from the insurance and never assign the insurance.

17   You'd have flexibility.

18   **Q.   Then you say in the next block who can use**

19   **it.  You say, open to all companies, 524(g) is**

20   **restricted.  What did you mean by that?**

21   A.   Any company can do a business transaction.

22   There is nothing that prevents them.  When I talk to

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 180

1   corporations, there is a set of companies that view

2   524(g) as not a viable option to them.  Their

3   corporate structures, their liabilities aren't in a

4   sub, so you may have somebody like GE.  GE is very

5   unlikely to put itself in bankruptcy in order to

6   resolve its asbestos liabilities.  It doesn't have a

7   convenient sub to place it in instead.

8        So if its only choice is putting all of GE

9   in, if we are dealing with the tort system it's going

10  to stay in the tort system while a financial

11  transaction, it could do.  Other companies have a

12  very nice financial structure to facilitate 524(g),

13  so it really depends on the structure of the entity.

14       **Q.   And if you look, I think, at -- the page**

15  **might be double sided.  If you flip it over on the**

16  **back, there is a continuation of that page that says,**

17  **further, unlike 524(g), the LRG product can be**

18  **tailored to work with any corporate structure and its**

19  **availability is not limited by the complexities of**

20  **the bankruptcy code.  Did I read that correctly?**

21       A.   Yes.

22       **Q.   And that's what you're just talking about**

US Bankruptcy Court - Delaware                    FINAL - October 4, 2010
In Re Leslie Controls                                  Charles Mullin, Ph.D.

Page 181

1    that GE could relieve itself without having to put

2    itself through bankruptcy?

3        A.   Correct.  Or a company that currently can

4    get rid of most of its liability by putting a sub in,

5    but also has some nonderivative liability.  Might

6    have a hard time of getting rid of it under 524(g),

7    but under a financial contract, there is no such

8    limitations.

9        Q.   If you could turn to the third page of

10   this exhibit.  This is asbestos case study summary.

11   LRG's clients receive certainly in regard to the

12   direct costs of their litigation liabilities and

13   relief from the indirect costs of litigation?

14       A.   Where are you?

15       Q.   Third page of the exhibit.  Where it says

16   asbestos case study summary?

17       A.   Yes.  I'm with you.

18       Q.   LRG's clients receive, certainty in regard

19   to the direct costs of their litigation liabilities

20   and relief from the indirect costs of the litigation.

21   Specifically, LRG assumes the financial risk and

22   responsibilities for managing the client company's

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 182

1   **liability and related litigation.  This includes**

2   **handling underlying tort cases, resolving coverage**

3   **disputes with insurers, satisfying auditors for**

4   **financial reporting purposes.  Do you see that?**

5      A.   I do.

6      **Q.   How would LRG resolve coverage disputes**

7   **with insurers?**

8      A.   Really the same way the policyholder would

9   have before.  They had at this point, it doesn't have

10  to be done that way, but if the company wants an

11  insurance asset to count towards its purchase price

12  of the product, then those insurance proceeds would

13  need to get collected and contributed in.  Any

14  settlement compromises or things along those natures,

15  since it's being paid to LRG would be LRG's decisions

16  at that point and LRG's cost.  They could pay

17  coverage counsel.

18     **Q.   Have you in your work with LRG worked with**

19  **insurance companies in any capacity?**

20     A.   Have I worked with insurance companies?

21     **Q.   Yes.**

22     A.   Yes.

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 183

1      **Q.   Which companies have you worked with?**

2      A.   That's confidential.

3      **Q.   Have you worked with any of the insurance**

4      **companies that you're representing in this case --**

5      **not representing, excuse me, that you're giving an**

6      **opinion for in this case?**

7      A.   No.

8      **Q.   Have you ever been retained as an expert**

9      **by Century Indemnity Company in the past?**

10     A.   Yes.

11     **Q.   How many times?**

12     A.   I don't know.  I'm frequently retained in

13     the context of a large joint defense group so there

14     may be technically 30 to 50 insurers that have

15     retained me, and I'm not sure how many times Century

16     appears in that context.

17     **Q.   Do you have a general idea how many times**

18     **it might have been?**

19     A.   It's probably I guess somewhere in the

20     range of 5 to 10 across the various joint defense

21     groups, but you know, I don't know exactly.

22     **Q.   How about Winterthur Swiss Company.  Have**

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 184

1  **you worked as an expert for them before?**

2      A.   I have no recollection of working

3  explicitly on their behalf.  There is a very good

4  chance that they too would appear on one of these

5  lists of joint defense groups, but they have never

6  been a lead carrier that I've dealt with directly.

7      **Q.   How about Yasuda Fire?**

8      A.   I know they have been in some joint

9  defense groups, but again, they have never been the

10 lead carrier and I haven't worked with them directly.

11     **Q.   Just to be clear, has Century been a lead**

12 **client that you've worked with in the past?**

13     A.   Yes.

14     **Q.   Do you have an engagement letter in**

15 **connection with your work in this case?**

16     A.   I believe we do.

17     **Q.   Is it a standard engagement letter you use**

18 **in other cases?**

19     A.   It's very similar.

20     **Q.   Is your engagement letter directly with**

21 **Century Indemnity and the other insurance carriers or**

22 **is it with --**

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 185

1    A.   I'd have to go look.

2        MS. DAVIS:  I can tell you that we have

3    received one.  It's not signed.

4    BY MR. DORSEY:

5    **Q.   How much are you being compensated for**

6    **your work in this case?**

7    A.   Bates White charges for my time and all

8    the staff's time on the case.

9    **Q.   What is your hourly rate?**

10   A.   My hourly rate is 625 an hour.

11   **Q.   What about the staff?**

12   A.   Ranges from about 160, and I'd be the

13   highest I think, highest on the staff, so probably 4

14   or 500, depending on exactly who.

15   **Q.   Do you know how much time has been spent**

16   **by all of the employees at Bates White on this case**

17   **since you've started working on it?**

18   A.   Probably on the order of 250 hours, 350

19   hours, something in that range.

20   **Q.   Have you issued an invoice yet?**

21   A.   I don't think so.

22   **Q.   Do you have an idea what the overall**

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 186

1    **expenditure would be to date?**

2    A.   I think it's north of 75,000 but under

3    100,000.

4    **Q.   Can we take another short break?**

5    **(Recess.)**

6    MR. DORSEY:  I have no further questions.

7    Thank you very much.

8    MR. WYNER:  I have a few.

9    EXAMINATION BY COUNSEL FOR CIRCOR INTERNATIONAL, INC.

10   BY MR. WYNER:

11   **Q.  I'm Richard Wyner on behalf of CIRCOR.  I**

12   **have a couple of questions.  On page 16 of your**

13   **deposition, you talk about extrapolations that you**

14   **did that produced a range of 60 to $90 million, is**

15   **that right?**

16   A.   Correct.

17   **Q.   Where are the calculations?  Are they in a**

18   **file?  Are they on a piece of paper?  Where are the**

19   **actual underlying calculations?**

20   A.   Neither.  They are -- I have a piece of

21   software that I use where I can set different

22   parameters and it tells me what the cash flows look

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 187

1    like, and what the value of those cash flows are.

2    And I can change those and it creates -- I look at

3    scenarios and I can show whatever scenarios I want.

4        Q.    And to do that, did you plug Leslie data

5    into that software?

6        A.    Correct.

7        Q.    And at no time have you ever printed out

8    any of the numbers that the software produced?

9        A.    I mean, I have, in essence, the 60 to 90

10    is really summarizing that range.  So in that sense,

11    I transposed some of them as kind of book ends of

12    what you can get at 50 and 100 are when you make some

13    less probable assumptions, but I haven't printed out

14    any of the cash flows that come out of that.

15        Q.    And so you don't have any charts that show

16    a year by year cash flow amount, is that right?

17        A.    The software displays that for me when I

18    run a scenario, so I see that and it will show me

19    both the nominal totals and the net present value of

20    those, but unless I go through the exercise of trying

21    to save that somewhere, it goes away.  It's like an

22    interactive session.

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 188

1      Q.    And so you've never printed that out, is

2    that right?

3      A.    No.

4      Q.    And you have no screen shots or anything

5    like that?

6      A.    No.  I don't have screen shots.

7      Q.    So then does the software work in coming

8    up with an amount by year?

9      A.    Yes.  It will.  It will produce a nominal

10   cash flow through time.

11     Q.    As it does each year, what does it take

12   into account?

13     A.    What you tell it to take into account, so

14   there is calibration parameters, many calibration

15   parameters in the software.  So you can specify what

16   historical time window you want to look at that you

17   believe is representative for how many future claim

18   filings they are going to get, for resolution rates,

19   for settlement rates among the result claims, for

20   dismissal rates, what average claim values would be.

21        You can specify a calibration window.  You

22   can specify what interest rate and inflation rates

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 189

1  and these types of things you want to put in, so it's

2  got many, many parameters when you specify those

3  parameters and it produces the cash flows.

4      **Q.   How many disease categories does it take**

5  **into account?**

6      A.   It explicitly -- I'd describe it as five.

7  Many might describe it as four, so it has

8  mesothelioma claims, lung cancer claims, other cancer

9  claims which just means everything except lung cancer

10  and mesothelioma and nonmalignant claims.  And the

11  software is capable of distinguishing between massive

12  nonmalignant claims and other nonmalignant claims.

13  That's not a particularly relevant distinction in the

14  terms of Leslie Controls, but for many others,

15  particularly those who went insolvent five plus years

16  ago, that was a relevant modeling parameter.

17      **Q.   And does it come up with a number of**

18  **mesothelioma claims that it predicts would be paid in**

19  **a particular year?**

20      A.   Yes.  It will.

21      **Q.   And then it multiplies it by predicted**

22  **settlement amount for a mesothelioma claim in that**

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 190

1    year?

2        A.    Correct.

3        Q.    And it does that for each of the other

4    disease categories?

5        A.    Correct.

6        Q.    And then it produces an annual expected

7    payout amount?

8        A.    Per year.

9        Q.    For that particular year.  And then it

10    goes on to the next year?

11        A.    Correct.  To be clear, that software works

12    in 12-month periods.  And we use it in all different

13    contexts, so a year is the last 12 months.  So it

14    might be -- in this case, I forget the actual

15    bankruptcy filing date, but it's not going to

16    correspond to a calendar year.  It's going to look at

17    things in 12-month increments.

18        Q.    And is this a piece of software that your

19    company has done itself?

20        A.    Yes.

21        Q.    Have you ever testified based on numbers

22    generated by that software in any prior lawsuit?

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 191

1    A.   I have not.  Dr. Bates has.

2    **Q.   When you come up with the 60 to 90 million**

3    **number, how many years into the future was that**

4    **estimate covering?**

5    A.   I forget at this point whether it's

6    running through 2050 or 2060.  But the distinction

7    really isn't very material because the amount of

8    nominal expenditure between 2050 and 2060 would be

9    extremely small.

10    **Q.   But it was through 2050 or 2060?**

11    A.   It goes out at least 40 years.  That's a

12    parameter can you put in the model is how far out you

13    want it to run.

14    **Q.   And what interest or inflation rate were**

15    **you using on the settlement numbers?**

16    A.   That's something that could vary because

17    it's an input.  I was generally looking at things on

18    the order of 2.5 percent per year.

19    **Q.   Starting in year one or year two?**

20    A.   Starting in year one.

21    **Q.   And so the 60 to 90 million numbers**

22    **included a 2.5 percent inflation rate?  Is that what**

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 192

1   **you're saying?**

2       A.   Correct.  So, and there is one thing you

3   need just because if you look at the data, you

4   wouldn't see it exactly that way.  There is eight

5   specific settlement values are inflated at 2.5

6   percent a year.  The software will also control for

7   the age distribution of claimants through time.  And

8   since the typical claimant gets older through time

9   the realized average settlement value grows more

10  slowly than that.  The average claimant is older and

11  that partially offsets some of that.  So if you just

12  look at the averaged realized settlement values, you

13  won't see 2.5 percent growth.  You'll see something

14  slower because it's inclusive of the aging population

15  effect.

16      **Q.   Paragraph 17, you take nominal values and**

17  **you take net present values.**

18      A.   Yes.

19      **Q.   What discount rate did you apply to get**

20  **there?**

21      A.   I believe that was at 4.5 percent.  Might

22  have been four and a quarter.  Might have to go back

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 193

1   and check.

2       **Q.    In paragraph 18, there is a sentence in**

3   **the middle that reads, ship related occupational**

4   **exposure in the U.S. is concentrated most earlier in**

5   **time to occupational asbestos from other major**

6   **sources such as construction.  What's the basis for**

7   **your statement?**

8       A.    Both -- this is actually fairly well

9   documented in the epidemiological literature.

10  Shipyards and ship has a very large spike in exposure

11  associated with World War II and that generated a

12  high incidence of mesothelioma coming out of that

13  relative to shipbuilding and ships subsequent to

14  World War II.  So they are loaded in the earlier

15  years.

16      The most salient fact in terms of general

17  construction is it was very depressed in World War II

18  principally because of the war, but as you come out,

19  you enter a construction boom.  So just the number of

20  people doing construction greatly expands while the

21  number of people in ship related work declines.

22  That's just in all the labor statistics data, but the

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 194

1    exposure in construction went up with the advent of

2    spray on high temp insulation products.  And that's

3    if you go back to Dr. Nicholson even in 1982 in his

4    paper, he points out the increased rate of exposure

5    and his original models gives a big kick to the

6    intensity of exposure of construction workers in the

7    '60s due to the advent of spray on products.

8        **Q.    Can you cite me, as we are here today, to**

9    **any specific piece of literature that relates to ship**

10   **exposure?**

11       A.    The easiest thing I can cite you is the

12   U.S. census data, the Bureau of Labor Statistics data

13   which can provide you censuses every 10 years.  The

14   Bureau of Labor Statistics allows you to go on for

15   the nine years in between each census that shows the

16   employment levels in the different centers.  So that

17   will show you the decline in ship related work and

18   the rise in construction related work.

19           So purely just the timetable, the number

20   of people and when they were working leads to this

21   outcome.  The other thing to cite you to the EPA

22   reports on the risk equations which is what goes into

US Bankruptcy Court - Delaware          FINAL - October 4, 2010
In Re Leslie Controls                             Charles Mullin, Ph.D.

Page 195

1    the incidence model.  So this would be when you get

2    this outcome in Nicholson's modeling, you get this

3    under the KPMG modeling, under the Bates White

4    modeling.  There is nothing particularly involved

5    about this statement.

6          There is also largely an amount of

7    literature on job exposure matrices that I didn't

8    cite here on industrial hygiene which goes through

9    and documents the relative exposure levels to

10   asbestos fibers in different industry and

11   occupational settings, and that provides the basis

12   for how much exposure was occurring during different

13   points in time at different industries.  That's a

14   large body of literature.  It's not one large

15   article.

16        **Q.    In paragraph nine, I'm sorry, 29, you**

17   **address opinions concerning the situation if, you**

18   **know, if "had Leslie remained in the tort system", is**

19   **that right?**

20        A.   You're starting with the second sentence.

21        **Q.    First and second sentence.  Third**

22   **sentence.  They all talk about Leslie remaining in**

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 196

1    **the tort system, right?**

2    A.   Yes.

3         **Q.    As part of your work, did you do any**

4    **analysis of Leslie's financial ability to remain in**

5    **the tort system at the time of its bankruptcy filing?**

6    A.   I did not.

7         MR. WYNER:  I have no further questions.

8         (The proceedings concluded at 3:30 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 197

1          INDEX OF EXHIBITS

2     DEPOSITION OF CHARLES MULLIN, PH.D.

3     Mullin Exhibit 1..........................Page 19

4     Declaration of Charles H. Mullin, PH.D.

5     NO BATES

6

7

8

9

10    Mullin Exhibit 2..........................Page 69

11    First Amended Disclosure Statement              `

12    NO BATES

13

14

15

16

17    Mullin Exhibit 3..........................Page 169

18    LRG Screenshots from website

19    NO BATES

20

21

22

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 198

1          C E R T I F I C A T I O N

2

3       I, SUSAN L. CIMINELLI, a Certified Shorthand

4    Reporter and Notary Public of the District of

5    Columbia, do hereby certify that prior to the

6    commencement of the examination the witness was sworn

7    by me to testify as to the truth, the whole truth,

8    and nothing but the truth.

9       I do further certify that the foregoing is a

10   true and accurate transcript of the testimony as

11   taken stenographically by and before me at the time,

12   place, and on the date hereinbefore set forth.

13       I do further certify that I am neither of

14   counsel nor attorney for any party in this action and

15   that I am not interested in the event nor outcome of

16   this litigation.

17                    *Jane Rose Reporting*

18   Susan L. Ciminelli
        Notary Public in and for the District of

19      Columbia

20
        Dated:

21

22   My commission expires:  11/30/2011

US Bankruptcy Court - Delaware       FINAL - October 4, 2010
In Re Leslie Controls                Charles Mullin, Ph.D.

Page 199

```
 1        ACKNOWLEDGMENT OF DEPONENT
 2         I, CHARLES MULLIN, PH.D.,
 3     do hereby certify that I have read
 4     the foregoing pages and that the same is a
       correct transcription of the answers given
 5     by me to the questions therein propounded,
       except for the corrections or changes in form or
 6     substance, if any, noted in the attached Errata
 7     Sheet.
 8     _____
 9          CHARLES MULLIN
10     Signed this     day of        , 2010.
11             ---
12          ERRATA
13     PAGE  LINE   CHANGE        REASON THEREFOR
14     _____
15     _____
16     _____
17     _____
18     _____
19     _____
20     _____
21     _____
22     _____
```

JANE ROSE REPORTING
1-800-825-3341  janerosereporting.com

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 200

1            ---

2            ERRATA

3            ---

4    PAGE  LINE   CHANGE         REASON THEREFOR

5    _____

6    _____

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 201

1           NOTICE TO READ AND SIGN

2

3       A copy of this deposition transcript is being

4    provided to counsel for the witness by JANE ROSE

5    REPORTING for signature.

6           JANE ROSE REPORTING

7           80 Fifth Avenue

8           New York, New York  10011

9               1-800-825-3341

10

11                                        `

12

13

14

15

16

17

18

19

20

21

22

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

## Page 202

**A**

**abandoned** 96:15 97:1
**ability** 134:16 144:3
  144:22 178:9 196:4
**able** 40:10 53:18 55:1
  76:16 77:15,21
  79:12 90:13 91:6
  96:7
**absence** 88:6
**academic** 167:1,3
**ACC** 121:2,12,20
  125:3 126:20 127:4
**accelerating** 129:11
**accept** 40:6
**access** 130:3 178:10
**account** 37:10 38:13
  38:16 40:17 41:2,12
  41:17,18,19,21
  61:12,16 63:18
  65:17 95:8 98:21
  101:22 111:6,9
  132:18 188:12,13
  189:5
**accounts** 100:13
**accrue** 147:14
**accrues** 143:7
**accurate** 19:14 47:4
  56:2 72:21 99:14
  198:10
**ACKNOWLEDGMENT**
  199:1
**action** 33:18 130:18
  198:14
**actions** 10:13 39:10
**active** 73:22
**activity** 96:17
**actual** 186:19 190:14
**ad** 44:1 65:4,13
**add** 70:21 71:18
**addition** 19:12 38:2
  41:12 43:3 115:17
  123:18 124:10
**additional** 19:13 21:10
  97:9 143:7
**address** 82:21 114:2
  195:17
**addressed** 137:16,18
  137:18
**adds** 100:15
**adjudication** 138:12

139:6
**adjust** 80:8
**admissions** 79:7
**Admittedly** 129:21
**adopt** 101:3
**adopts** 100:10
**advantage** 77:15,22
**advent** 194:1,7
**adversarial** 104:12
  162:10
**adversaries** 177:5,8
**adversary** 177:12
**adverse** 84:6,7 137:2
  145:10 146:10
**adversely** 147:3
**advertise** 169:7,11
**advising** 37:22
**affect** 20:4 48:8 57:14
  67:20 74:18 82:20
  83:22 144:22
  148:22 155:9 177:9
**afterward** 147:8
**age** 68:6 192:7
**aggregate** 119:22
  122:21 158:1
**aggressive** 84:18
**aging** 95:9 192:14
**ago** 6:15 7:13 78:18
  81:12 86:20 89:5
  99:4 168:3 189:16
**agree** 58:17 90:5
**agreed** 56:19 90:9
  121:12 127:11
  128:6 175:4
**agreement** 105:20
  138:15 139:15
**agreements** 66:5
**ahead** 18:20
**akin** 110:6,13
**allegedly** 72:11
**allocate** 128:17 162:7
**allocated** 128:19
**allocation** 128:18
  147:19 148:6,8
  150:2,15 153:3,17
  155:6,9 156:6
  160:11
**allocations** 151:1
**allow** 116:22 120:4
**allowed** 164:13

**allows** 109:3 115:17
  116:20 194:14
**altered** 66:1
**alternative** 170:20
  174:3,7
**alters** 88:8
**amended** 69:21
  197:11
**American** 166:12,16
  166:19,21
**amount** 10:21 20:3
  34:17 37:8 49:5 58:6
  58:21 61:19 73:15
  74:7 77:16 87:7
  98:11 101:1 105:22
  111:1 113:15 114:8
  114:10,11 116:3
  117:8 122:1,14
  123:13 124:5 132:3
  132:7 148:3 154:1
  161:9,20 163:19,20
  187:16 188:8
  189:22 190:7 191:7
  195:6
**amounted** 119:22
**amounts** 33:4
**analyses** 12:10
**analysis** 20:12 21:18
  23:7 27:8 38:4 51:5
  52:20 53:4,6 58:12
  64:7 132:17 150:14
  150:21 152:8
  153:16 156:2,5
  159:3 196:4
**analyst** 144:13
**analyzed** 133:17
**Andrew** 4:12
**annual** 145:6 161:7,9
  190:6
**answer** 7:3 24:20
  28:21 42:6 49:15
  53:2 57:14,22 66:8
  66:10 76:6 121:21
  140:6 154:6 159:19
**answered** 98:18
**answers** 199:4
**anticipate** 112:5
**anti-assignment**
  178:20
**anti-assignments**

178:7
**anybody** 50:19 91:1
  91:12 166:17 173:2
**anyway** 7:9
**apiece** 80:2
**appeal** 33:12 34:20
  35:4,4,11 42:13
  87:21 90:8
**appear** 39:7 44:2
  107:20 134:17
  184:4
**APPEARANCES** 3:1
  4:1
**appeared** 10:16 11:2
  11:10
**appears** 23:20 44:7
  70:13 97:2 101:3
  103:19 183:16
**appellant** 85:13
**appellate** 24:11 26:10
  27:17 28:3 34:6
  35:14,15 86:12,21
  87:14 88:3,11,18,19
  88:22
**applied** 112:14 114:3
**apply** 117:19 157:7
  192:19
**approach** 40:22 97:11
**appropriate** 52:16,18
  63:14 153:21 161:3
**approved** 116:9,10
  131:1 133:1 138:19
  138:21
**April** 50:10
**arguably** 102:10
**argue** 95:16 140:10
**argued** 138:5
**arguing** 139:12
**arguments** 139:10
  140:13
**ARPC** 100:6,8,11,17
  101:12 103:18
  104:20 105:17
  116:13 160:7
**array** 19:22
**arrived** 17:12
**article** 89:20 195:15
**Arts** 3:12
**asbestos** 2:18 10:11
  26:22 27:2 29:22

30:6 31:16 37:1 39:3
  41:11 64:9 72:3
  73:19 76:2 85:21
  86:6,14 89:18 90:16
  92:11 100:6 101:8
  120:8,16 130:20
  143:11 144:1,10,17
  145:16 146:6,10
  165:18,20 169:5,8
  170:11 172:10,13
  172:16,22 173:9,10
  174:19 176:12
  180:6 181:10,16
  193:5 195:10
**asbestos-free** 21:7
  22:5
**asbestotics** 117:17
  119:2,10
**aside** 106:1
**asked** 8:2,4 11:13,14
  11:16,20,21 62:7,7
  62:10 136:14 137:5
  166:13
**asking** 7:3 8:10 23:2
  41:7 79:6,7 136:1
  150:20 159:13
**aspects** 81:9
**asserted** 123:1
**asserts** 123:8
**assess** 58:16 171:12
**assessment** 134:7
  164:2
**assessments** 163:12
**asset** 120:10,11 121:1
  121:17 126:2
  127:12,13,14,16
  128:7 129:9,10,10
  182:11
**assets** 178:3
**assign** 125:21 179:16
**assigned** 87:11 100:6
  100:9 136:16,19
**assigning** 100:13
  130:12,15
**assists** 12:9
**associated** 41:17
  72:12 82:13 193:11
**association** 166:12,16
  166:20,21 167:1
**associations** 166:11

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 203

**assume** 6:19 59:3,4
59:10 70:16 72:13
94:16 97:13 98:8,13
98:14 104:17 115:1
124:22 134:5,5
137:13
**assumed** 68:9 160:7
**assumes** 102:4
113:18 181:21
**assuming** 54:10 72:19
100:17 103:4 112:2
113:2 130:22 159:4
**assumption** 94:20
103:10 145:15
**assumptions** 53:3
59:22 60:1 93:11,16
93:18,22 95:11,14
101:22 187:13
**asymmetry** 146:14
156:17 157:16
158:9
**attach** 90:21
**attached** 19:4,13
27:14 199:6
**attachment** 19:9
**attachments** 54:22
**attain** 36:17
**attempting** 22:22
**attend** 90:15
**attorney** 7:16 28:5
36:13 89:3 90:22
198:14
**attorneys** 2:3,11,18
3:3,9,17 4:3 28:6,21
36:11 37:9,22 89:7,7
90:4,11,19 91:9,21
92:1 104:17 177:7
**attorney's** 38:20
89:21
**attractive** 174:2
**attributable** 77:13
87:8
**audit** 48:22
**auditors** 182:3
**Austin** 140:21 141:5
**availability** 180:19
**available** 9:13 21:15
76:21 81:11 122:2,7
122:15 123:6,13
124:6 125:1 128:11

131:8 133:6 161:15
**avenue** 3:4,12,19 4:4
4:18 86:4 201:7
**avenues** 86:17
**average** 12:1 36:3,7
36:20 37:20 45:9
51:4 52:18 58:5
60:16,21 61:4,8,9
68:15 74:14 110:21
111:2,11,17 112:5
113:14 114:7,8
115:8,9,12 116:6
117:14,17,18 118:3
118:7,9 162:1
188:20 192:9,10
**averaged** 111:22
192:12
**averages** 23:1,3
112:13
**averaging** 47:22
**avoid** 37:16 39:5
148:15,16
**award** 36:17
**aware** 9:21 18:15
25:14 42:15 65:12
65:16 70:11 87:17
123:11 140:20
149:9 157:5
**awful** 148:6

**B**

**B** 4:8 19:9 23:22
115:18 117:6,16
**back** 14:15 15:14
19:14 22:19 23:22
29:14 33:22 39:17
42:7 44:22 46:2,9
58:10 63:14 64:12
64:13 66:17 73:6
76:22 80:2,19 85:12
92:17 106:20
111:19 119:17
124:16 135:7 138:2
142:5 161:22
175:10 180:16
192:22 194:3
**backed** 14:2 171:8
**background** 8:1 9:15
**backing** 176:15
**backup** 15:13

**backups** 15:16,20
**backward** 83:1
**bad** 94:1 117:4 164:1
**band** 148:8
**bankrupt** 10:16 79:18
81:14
**bankruptcies** 174:9
**bankruptcy** 1:1 6:17
6:17 9:3 20:2 29:21
32:12 34:22 40:19
41:4,10 51:18 63:19
64:21 69:22 73:10
73:20,20 76:10 80:4
138:8,19 140:13
158:2 166:5 170:17
171:7 173:8 180:5
180:20 181:2
190:15 196:5
**banks** 168:18
**bar** 39:16 78:8,13,14
78:15,20 79:2
133:11 166:12,16
**bar's** 78:22
**based** 46:16 49:20
52:2 54:20 55:3 56:4
56:5,22 94:7 98:20
108:14 131:21
136:16 149:4
190:21
**baseline** 98:20
**basic** 22:21
**basically** 29:15 57:22
158:15
**basis** 11:11 27:19
30:20 44:6 57:4 76:5
106:1,10 108:9
133:11 134:10,11
147:22 165:1 193:6
195:11
**batch** 45:16
**Bates** 4:12 25:12
170:7 185:7,16
191:1 195:3 197:5
197:12,19
**bear** 145:8
**bearing** 155:15
**bears** 158:3
**becoming** 166:16
**began** 44:7 65:5
**beginning** 8:8 46:17

64:20
**begins** 70:7
**begun** 44:3
**behalf** 25:13 83:15
104:8 165:7 169:9
175:7 184:3 186:11
**belief** 66:22
**believable** 84:14
**believe** 33:1,5,22
35:13,13 67:4,6,13
69:5 80:12 95:16
106:4 108:9 116:12
116:15 126:8
143:15 147:14
150:8 151:18 159:1
162:19,21 167:8
173:15,18 175:17
184:16 188:17
192:21
**beneath** 173:5
**benefit** 146:7 156:18
173:9
**benefited** 146:5
**benefits** 142:8 143:7
143:20,21 156:3
**best** 13:10 25:11 82:7
159:14
**better** 74:9 81:12
88:18 126:2 133:2
**beyond** 22:5 140:19
143:7 179:6
**big** 47:18 58:15
126:14 132:1
135:16 194:5
**bill** 38:11
**billion** 144:16 157:12
157:18 174:13,13
174:17,19 175:5,5
175:11,12
**billions** 54:6
**bills** 109:17
**bind** 138:10,13
**binding** 88:4 116:15
137:3 139:6,7,7
140:11 141:9
**bit** 42:5 51:3,14 56:7
60:16 66:5 69:6
85:15 94:2 109:16
122:8 127:2 134:1
152:2

**block** 178:2 179:18
**blurred** 147:20
**blurry-eyed** 7:10
**Bob** 91:17
**bodily** 29:22
**body** 103:20 195:14
**book** 187:11
**boom** 193:19
**borne** 146:12 147:18
152:3,3 156:15
**bottom** 48:6 146:3
164:8 173:5
**Box** 2:4
**boxes** 131:19
**Brandywine** 2:4
**break** 7:6,7 60:21
66:11,18 141:11,16
157:18 186:4
**bring** 85:19 112:9,10
133:22 176:15
**broad** 3:11 9:19 19:22
32:2,6 139:2,4
152:14 165:3,6
179:4
**broader** 142:17
**brought** 14:21 15:2
**brush** 32:2,6 152:14
165:3,6 179:5
**build** 10:22 11:1
**Building** 2:4
**bulk** 75:15
**bunch** 54:16 112:6
**Bureau** 194:12,14
**business** 41:16 42:1,2
125:13 143:2
162:17 163:14,15
163:21 168:9,11
171:16,19 173:20
176:8 178:5,21
179:21
**buy** 122:3 162:21
163:17 179:11
**buying** 125:7 163:3,12
165:10 172:1

**C**

**C** 2:1 70:7 198:1,1
**calculations** 186:17
186:19
**calendar** 46:9 64:3,14

09-50026-mg    Doc 7696-6    Filed 11/08/10    Entered 11/08/10 23:24:36    Exhibit
Pg 205 of 225

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 204

64:19 65:2 190:16
**calibration** 51:14,20
53:21 54:12 56:3
57:2,14,17,18 58:11
66:1,3 188:14,14,21
**calibrations** 54:18
55:22 56:2 65:18
**California** 24:9 27:16
35:9,10,16,20 49:21
50:12,16 74:13
75:15 85:13 87:15
87:17,21 88:7
133:11 149:17
**call** 32:5,5 96:14,15
168:6
**called** 167:9
**Cambridge** 92:1
**cancer** 43:14,15
189:8,8,9
**cap** 105:14
**capable** 82:11 169:10
189:11
**capacity** 51:16 182:19
**capital** 41:20 144:11
**capped** 146:8 168:20
174:22 175:8
**caption** 99:17 142:6
**captioned** 20:11
**capture** 136:7
**care** 102:12
**careful** 126:7
**carrier** 184:6,10
**carriers** 148:5 149:22
150:16 151:14,20
184:21
**Carter** 149:14 153:9
155:8 160:11
**case** 7:12,21 8:1 9:15
9:18 11:2 12:14 18:5
20:21 24:16 29:16
34:18 35:5 36:13,20
36:22 37:20 38:19
38:22 39:14,16,18
39:22 40:5 41:14
42:11,20 45:14
49:10,13 50:9 51:7
70:3 77:19 79:7 85:9
89:11 104:21
130:22 144:13
147:8 151:4 152:4

153:18 155:10,14
158:11 173:15
175:17 181:10,16
183:4,6 184:15
185:6,8,16 190:14
**cases** 9:4,6,7 10:15
11:4 25:22 33:10
34:9 36:20 37:1,6
38:3 39:11 40:18
41:14 42:8,8,10,15
42:19 43:3,5,6,7,8
44:8 45:16 46:1,1,10
46:19 47:2,2 49:9
50:2,5,8 85:5,17
86:19 88:11 118:22
132:1 133:10,17
135:17 140:22
157:5 166:1 182:2
184:18
**cash** 22:21 80:7
100:21,22 112:16
121:4 125:5 144:20
145:12 186:22
187:1,14,16 188:10
189:3
**categories** 18:8 189:4
190:4
**category** 106:3
115:18 117:6,16
118:12
**cause** 28:18 152:15
178:8
**causes** 84:9
**CCR** 79:22 80:6,11
**cede** 78:4 120:17
127:17,19
**census** 194:12,15
**censuses** 194:13
**centers** 194:16
**cents** 123:2
**Century** 4:3 7:19
183:9,15 184:11,21
**certain** 53:5 55:12
57:3 108:1 122:1,22
123:2,7 143:11
164:17
**certainly** 181:11
**certainty** 181:18
**Certified** 198:3
**certify** 198:5,9,13

199:3
**chance** 19:19 184:4
**change** 47:18 132:1
177:4 187:2 199:13
200:4
**changed** 178:16
**changes** 29:6,7 59:6,6
60:9 73:8 83:4 92:10
92:16 93:6 199:5
**changing** 29:5 58:8
**channeling** 163:2
171:8 175:15
**channelling** 125:11
170:21
**CHAPTER** 1:4
**characteristics**
131:22
**characterization** 30:8
172:6
**characterize** 31:12
**characterizing** 21:21
**charges** 185:7
**Charles** 1:12 5:2 6:5
197:2,4 199:2,9
**chart** 43:13 45:22
46:18 47:1 49:7
120:19 134:8 150:3
150:6,8 152:1 153:1
153:7,11 154:2
173:5,5 176:19
**charts** 187:15
**check** 131:19 166:17
166:18 193:1
**Chicago** 2:20
**choice** 42:2 57:18
148:21 150:17,18
153:8,9,20 154:21
155:1 156:11,13
175:13 180:8
**choices** 151:9 152:15
154:15,18,19
**choose** 52:13 82:14
149:1 154:3,5
177:10
**choosing** 153:19
**Ciminelli** 4:21 198:3
198:18
**CIRCOR** 3:3 21:4 22:4
31:14 42:2 120:11
121:1,4 125:7,11

127:3 130:8,16
142:7,10 143:6,9,10
143:14,17,18 145:5
145:6,16 146:12
156:4 162:18
173:18,19,20 186:9
186:11
**CIRCOR's** 145:10
162:17
**cite** 194:8,11,21 195:8
**claim** 11:6 45:1,5,11
55:12 60:17 63:2
67:8 69:22 72:12
74:14 77:1 83:17
97:5,21 99:13 101:3
102:22 108:2,3
109:22 110:17
112:13 113:3,18
114:10,12,13 117:6
117:6 131:20 137:7
137:10 159:10,12
188:17,20 189:22
**claimant** 44:18 68:1
83:6,8 87:9,10
112:18,19 113:16
114:8 115:13 116:4
192:8,10
**claimants** 2:18 44:21
45:19 61:18 68:1,2
75:22 96:14 107:21
110:12 111:10
112:3,4,21 113:1
114:4,6,16 115:7,11
116:7,8 118:4,7
119:21 135:22
136:11 192:7
**claims** 6:16 8:2,12,22
10:20 20:15 25:2
29:22 30:6 31:2,7
32:9,13,17 33:5,7
39:6,8,15 43:10,14
43:14,15,15,18 44:3
44:14,15 45:7,13,16
46:8,13,17 47:6,8,10
48:1,1,3,4,10,14,19
49:1 51:6 52:7,10,15
54:20 55:9,16 56:13
58:4,7,20 62:5,6
63:11,20 64:5 65:14
65:19 66:15 67:2,9

69:5 72:3,10,11 73:4
76:11,15 79:9,18
80:2 83:15 85:17
92:11 93:2,4,7 94:5
94:12,13,19 95:3
96:10,11,15,16,20
96:22 97:4,7,11 98:9
98:11,21 99:8,19,20
99:21 100:1,13,14
100:17,19 101:2,6
101:13,17 102:5,7,9
102:12,17 103:3,10
103:11,13,16,20
104:6,14,15,21
105:2,9,17,20,21
106:2,5,6,10,13,13
106:19 107:2,5,8,8
107:18 108:18
109:3 111:16 112:4
112:6,7,10 113:7,8
113:12,13,15,20
115:2,4,11,14,15,18
118:9,12,18 119:5
121:8 124:18,19
125:2 126:4,18
128:13 131:2,9,12
132:9,20 134:14,15
135:5 136:16,19
137:1 142:15 153:6
159:4,20,22 160:6,9
160:18,19 161:16
161:19,19,22 162:8
165:17,18 173:9,16
178:14 188:19
189:8,8,9,10,12,12
189:18
**clarified** 42:21 149:15
**clarify** 72:9
**clarifying** 71:14
**clarity** 74:5 149:20
**classic** 10:19 82:21
**clauses** 178:7
**clear** 98:17 113:6
184:11 190:11
**clearest** 161:20
**clearly** 47:18 48:2
72:7 77:6 88:18
147:2 161:19 164:2
176:14
**client** 10:6 171:11,19

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

## Page 205

**181**:22 **184**:12

**clients** 104:18 181:11
181:18

**climbing** 11:7

**close** 44:20 51:17

**closer** 45:7 60:20 68:6
94:18 102:18
134:15

**code** 173:8 180:20

**collapsing** 151:15

**collar** 116:15

**collected** 9:13 182:13

**collectively** 80:1 99:22
147:10

**Columbia** 198:5,19

**column** 43:18

**combinations** 53:2

**combine** 55:4

**combined** 70:15

**come** 10:20 23:10
25:6 35:12 54:2,19
56:18 58:17 64:18
66:17 74:5,7 77:8
102:6 105:2 109:21
130:18 131:3
133:18 134:20
135:2 147:6 159:8
175:10 187:14
189:17 191:2
193:18

**comes** 77:8 81:15
120:18

**comfort** 23:13 168:16
168:17 175:9

**coming** 11:10 54:7
58:4 60:10,22 63:10
77:5,7 83:7 151:19
163:6 188:7 193:12

**commencement**
198:6

**comment** 124:16

**comments** 16:20 17:1

**commission** 198:22

**committee** 2:18 3:9
44:1 65:5,8,10,13
127:3

**committees** 166:6

**commodity** 125:21

**common** 123:17
124:9 127:13

**commonly** 78:11

**community** 27:22

**companies** 10:15
18:11 21:15,21 22:8
22:14,16,20 24:1
36:11 37:14,14,22
41:9,12 76:9 77:12
79:17,18,20 80:3,15
80:19 83:6 96:18
132:8,19,21 134:15
137:9 139:22 143:2
144:9 157:8 160:16
162:21 163:8,11
165:8 166:2,2 169:4
171:1,2 172:10,13
172:15 173:8 174:2
177:21 179:19
180:1,11 182:19,20
183:1,4

**company** 4:3 10:18
21:19 23:1,16 27:10
38:13 46:13 77:14
77:17 89:1 144:12
144:15 146:15,17
147:3,7,16,18
160:20 167:9,16,17
167:18 168:1,2,15
169:7,8,9 170:19,22
174:5,12 177:6,17
177:19 178:1
179:21 181:3
182:10 183:9,22
190:19

**company's** 27:2 172:7
181:22

**comparable** 22:8,14
24:1

**comparables** 18:12
21:16

**compare** 60:17
132:21

**compared** 134:12
161:17

**comparing** 101:5
129:14

**comparison** 118:6,10
128:14

**compensable** 31:7
39:8 52:6 62:4 99:20
100:13 102:17

**103**:2,16,21 108:7
109:4,13 110:10
111:16 112:4 113:7
113:8 114:8 118:13
137:1 159:20
161:12,13

**compensate** 108:12
108:12 110:20

**compensated** 105:20
108:7 110:5 112:2
112:22 115:10
119:21 185:5

**compensating** 105:16
107:7,21

**compensation** 44:13
74:15 76:1,13 77:3,4
80:22 83:7 109:6
110:15 119:8,16

**complete** 20:6 34:14

**completed** 14:17 43:2

**completely** 48:12

**completion** 33:10,15
42:10

**complexities** 180:19

**Complicated** 149:10

**component** 22:3
24:17 26:20 56:5

**components** 52:8
55:14,15

**comprehensive** 19:16
19:21

**comprised** 43:22

**compromise** 104:16

**compromises** 182:14

**compute** 111:16

**computer** 55:6

**computers** 13:10

**Conaway** 1:16 2:2

**concentrated** 193:4

**concept** 96:21 147:9
147:20 163:12

**concepts** 22:21

**concerning** 8:20 21:4
21:15 48:22 195:17

**conclude** 93:6 100:8

**concluded** 196:8

**conclusion** 11:21
23:10 54:3 59:2
80:17

**conclusions** 29:9

**54**:19 151:10
152:11 161:16

**concrete** 168:14
174:10

**condition** 145:11

**conducted** 15:20

**conferences** 26:11,13
78:12,20 90:16,17
167:2

**confidence** 29:13

**confidential** 164:18,22
165:1,5 176:21,22
177:1,14 183:2

**confidentiality** 161:3
164:17

**confirmation** 85:3

**confirmed** 76:15
84:17 140:9

**confused** 42:18 93:15

**congressional** 175:12
175:15

**congressionally** 171:8

**connection** 22:1 35:8
45:17 70:2 89:10
151:4 184:15

**cons** 170:21 171:3

**consensus** 149:11

**consider** 21:16 38:2
161:12

**consideration** 125:12
125:17 143:13

**considered** 19:6,17
19:22 20:10 51:8

**considering** 41:1

**considers** 161:13

**consistent** 26:1 45:12
52:20 93:2 97:3

**consolidated** 145:11
145:12

**constantly** 18:15

**constituencies** 166:7

**constitutes** 159:10

**constrained** 171:17

**constraining** 142:18

**construct** 171:19

**construction** 94:7
193:6,17,19,20
194:1,6,18

**consulting** 166:9

**consummated** 177:16

**contacted** 7:11,14,21

**contain** 14:20 15:8

**contained** 15:14 32:20
54:21 86:6

**containing** 85:21

**contains** 31:21 39:14

**CONTENTS** 5:1

**contest** 149:17

**context** 115:22 132:8
140:21 141:22
145:16 157:8 161:1
161:7 166:5,5 174:9
178:18 183:13,16

**contexts** 140:8 161:4
163:15 190:13

**continuation** 180:16

**continue** 133:10,16

**continued** 3:1 4:1
134:3

**contract** 176:8 181:7

**contrast** 84:21 107:20
120:2 146:9 160:13

**contribute** 121:2
125:5 130:11

**contributed** 182:13

**contributing** 121:18
130:8 131:3

**contribution** 21:6 22:4
74:6 83:16 121:3

**contributions** 21:4
121:4

**control** 13:18 67:22
68:3,5 133:6 174:5
192:6

**Controls** 1:6 2:11 6:12
6:16 8:21 10:10 12:3
18:10 21:7,16 22:3,6
24:13,19 29:20
38:14 45:21 59:12
66:15 69:21 107:9
108:5 109:7 159:16
189:14

**convenient** 180:7

**conversation** 8:15,19
9:15

**conversations** 10:2
65:9 167:7

**coordinating** 72:15

**copies** 14:21 16:2,5

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 206

19:13
**copy** 1:21 13:15 15:1
16:18 53:12,15
201:3
**core** 24:17 58:6
**Corning** 78:5,6,10
157:22 158:3
**corporate** 145:1 173:7
179:3 180:3,18
**corporation** 145:1
165:9
**corporations** 180:1
**correct** 6:20 7:17 9:8
15:11,12 19:7,10,11
20:12,13,16 29:11
29:16,17,22 30:1,5
30:10 31:17,22
33:13,19 35:9,10,20
35:21 37:3 42:8
43:16,17,19,20
46:15,20 47:8,9
49:11 57:6,8,10
63:12 67:3,5,7,15,16
68:17,18 70:19
71:17 72:6,19,22
73:3 87:15 92:19
93:2,3 95:21,22
99:15 101:14 102:2
104:3 106:2 108:3
110:21,22 111:3,8
111:13 113:17
119:9 122:2 124:20
126:6 132:7 142:16
144:9 149:21 150:2
164:6,10 167:19
181:3 186:16 187:6
190:2,5,11 192:2
199:4
**corrections** 199:5
**correctly** 143:14
180:20
**correspond** 190:16
**cost** 38:5,12,16,20
39:13 41:14 82:13
144:11 156:20
173:10 174:2,7
175:20 178:10
182:16
**costs** 33:7 37:3,6,12
37:16 38:3,6,13,13

39:5,16 40:1,2,5,9
40:17 41:2,17,19,20
41:22 51:1 68:21
69:7,8 70:12,16,18
70:22 71:16,20,20
72:3,9,12,15,20 73:4
123:12 124:3,5,12
132:3,10,19 133:7
133:18,19,20 134:9
134:12,12,20 136:2
142:15,16,20,21
145:9 158:16
173:12,21 178:15
181:12,13,19,20
**counsel** 6:12 9:11
16:5,7,16,19,20
17:18 26:12 63:4
88:22 92:3,5 149:12
152:13 153:2 154:9
154:9 182:17 186:9
198:14 201:4
**count** 30:16 31:5
172:17 182:11
**couple** 66:12 162:3
168:14 186:12
**course** 36:19
**court** 1:1 6:17 24:11
35:11,14,16,17,18
35:20 86:12 87:14
87:16,18,21 88:1,7
88:18,19,22 138:19
138:19 140:18
141:1,8 153:20
171:8
**courtroom** 74:19
75:21 83:22
**courts** 34:6 80:12
86:21 88:3,5,11
140:11
**cover** 121:16 124:5
125:1 176:15,18
**coverage** 92:2 122:10
123:12,13 124:6
126:20 128:17
130:18 140:17
145:19 148:7,19,22
150:14 153:20
155:10 156:12
166:4 176:5,10
182:2,6,17

**coverages** 148:2
**covered** 124:12
**covering** 191:4
**covers** 121:14 158:21
**co-defendants** 73:9
74:2,4
**create** 28:16 54:8
57:16 59:7 68:12
168:16 178:11
**creates** 90:5,10
128:19 187:2
**creating** 54:16 59:19
61:2
**credible** 168:22 169:3
**credit** 121:2,18
125:19,20 144:3
**creditors** 3:10 127:4
166:6
**criteria** 108:1,4,6,8,11
108:13,16,19,20
109:1,17 113:22
114:21 118:20
119:12,13 159:11
**cross-tab** 47:13
**CROWELL** 4:2
**CRR** 4:21
**curious** 166:10
**current** 64:12 90:9
122:2 131:13 146:8
**currently** 110:15
161:14 172:9 181:3
**curriculum** 164:5
167:21
**curve** 94:9,10,17,20
95:3,6,8 96:3,3
**CV** 90:15

___

**D**

**D** 2:22
**damages** 75:17
**dangerous** 168:17
**data** 8:2,13,22 21:14
21:17 29:1,1 32:9
33:5 43:10 44:15
47:13 48:6,22 49:2
51:8 53:20 55:16,18
56:5,12,13,17 57:22
58:14 59:14 64:5,12
64:12 65:7 66:5 69:1
72:10,11,17 76:20

77:6 79:2,11,16,19
95:14 96:20 97:2
99:3 134:15 160:22
161:2,5,15 187:4
192:3 193:22
194:12,12
**date** 16:9 49:18 50:13
50:17 64:13,13 79:9
107:17 116:2 168:4
186:1 190:15
198:12
**Dated** 198:20
**dates** 43:11 44:22
50:1 118:18
**Davis** 4:7 7:15,16,18
8:9,16 9:14 10:2
28:2 76:4 111:14
132:11 140:2,19
141:11 150:10
185:2
**day** 16:10 26:22 64:4
64:4,5,6 138:7,12
173:3 199:10
**de** 2:6 115:18,21
**deal** 39:1 143:22
169:8 177:15
**dealing** 180:9
**dealt** 138:1 184:6
**debate** 78:13
**debated** 149:13
**debt** 142:22
**debtor** 1:7 2:3 63:19
93:7 142:9
**debtors** 166:6
**decade** 45:7,8 73:11
79:21
**December** 50:18
**decide** 175:11
**decided** 127:6,15
140:18 164:3
**deciding** 41:9
**decision** 39:12 41:3
41:16 42:1 141:8
162:18,20 163:14
173:20
**decisions** 36:12 38:17
143:2 163:8 182:15
**deck** 94:4
**declaration** 11:15,20
12:5,14 13:2,8,21

14:9,14 15:2,5,10,21
16:3,5,15 17:8,19
18:4,20 19:4,10
20:22 29:15,15
32:20 43:12 54:21
56:11,21 73:7 92:8
124:17 142:6
162:15 164:5 197:4
**declarations** 54:22
**decline** 94:15 194:17
**declined** 25:15 87:3
**declines** 193:21
**declining** 11:6
**decrease** 75:2,9
**deductibles** 123:21
**deem** 153:20
**deeply** 25:9
**defend** 38:3
**defendant** 10:10,20
11:8 36:11 40:1,9,10
42:3 49:16 84:16
98:2 109:12
**defendants** 25:22
39:4 50:9,11,20
58:13 73:19 77:11
78:17 79:5 81:10
82:16 84:6,7,18 85:2
88:15 96:9 98:1,6
107:8 131:13
161:10
**defending** 11:9 33:7
41:14 70:13,14 72:3
135:5
**defense** 11:5 26:2,2
26:12 33:6,15 34:16
36:8,15,15 37:2,6,12
37:15 38:3,5,7,11
39:5 40:17 41:2,18
49:17 50:22 51:3
68:21 69:7,10,13
70:13,15,15,16,22
71:20 72:9,12,20
73:4 78:14,22 79:1
84:12 89:6 91:21
123:12,18,19,20
124:3,5,10,11,11
132:3,10,14,19
133:7,7,14,18,19,20
134:4,9,12,16,20
136:2 142:16,19

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 207

145:9 162:11
178:15 183:13,20
184:5,9
**defenses** 10:22 11:1,3
11:9 81:18 84:14,14
84:17,20 85:4
109:11 131:8
133:20 135:8,9
139:8
**defer** 82:14 149:2,3
**define** 44:9 114:6,7
**defined** 100:4 109:20
**definitely** 61:6 116:22
124:9
**definition** 119:11,18
**definitively** 76:18
**defunct** 79:18
**degree** 139:19
**Delaware** 1:2 6:18
69:22
**demonstrated** 103:20
**departed** 73:9
**department** 15:16
**depend** 50:12 77:18
134:7 148:20
151:18
**depending** 58:14
59:13 119:16
137:22 168:13
170:19 185:14
**depends** 39:2 61:20
111:15 112:17
114:5,16,21 116:19
135:1 157:9 172:7
176:7 180:13
**DEPONENT** 199:1
**deposed** 6:19
**deposition** 1:11 5:2
6:19 78:17 186:13
197:2 201:3
**depressed** 193:17
**describe** 32:1 33:9
140:14 141:20
142:9 164:21 165:5
177:2 189:6,7
**described** 31:20
160:15
**describing** 26:3
**description** 8:1 26:1
**desire** 177:8

**desired** 10:6
**detail** 31:20 32:4
137:13
**details** 179:2
**determination** 22:7,10
130:19
**determine** 56:1 58:20
61:7,11,17 132:17
150:1,15 159:3
**determined** 34:4,5
**determining** 22:3
37:10,18 40:17 41:2
65:18
**develop** 109:20 110:7
110:9,16 134:20
**developing** 55:19
**development** 147:5
**developments** 18:17
18:18
**diagnosed** 44:16,18
**diagnosis** 44:22 46:2
**dialogue** 154:14 177:7
**Dicker** 24:3
**Dickstein** 2:10 150:9
**dictated** 151:12
**differ** 72:9
**difference** 58:15 64:6
133:1
**differences** 107:12
**different** 15:20 20:5
26:21 29:9 30:11
37:13,14 51:13,20
52:22 53:1,21 54:12
55:5 57:1 66:9 74:1
85:19 92:2,4 107:15
118:20,20 131:10
131:14,17 134:15
136:1,3 138:2 140:8
140:12 151:1,9
152:14 153:5
156:22 162:8,13
165:18 166:7
170:18 172:5
176:13 179:14
186:21 190:12
194:16 195:10,12
195:13
**difficult** 75:5
**difficulty** 144:10
**diligence** 162:8

165:11
**diminished** 87:11
**direct** 21:1 173:10,12
181:12,19
**direction** 85:1 86:12
93:22
**directly** 12:7 14:8
22:14 177:8,12
184:6,10,20
**disagree** 58:17
**disagreed** 56:19
**disciplines** 26:21 27:5
**disclose** 177:19,22
**disclosing** 165:1
**disclosure** 23:6 69:21
70:5 72:5 117:13
122:14 123:8 132:6
132:13 197:11
**discount** 23:8 192:19
**discounted** 22:21
**discrepancies** 161:11
**discrepancy** 72:14,16
102:1
**discuss** 63:4 88:21
89:3,13 141:15
152:13
**discussed** 68:8 89:4,6
89:9 96:5 154:14
**discussing** 17:18
**discussion** 7:22 10:5
17:8 84:1 141:19
150:12 152:16
**discussions** 26:11
90:20 91:3,8,11
140:15
**disease** 94:5,7 110:8
110:10 189:4 190:4
**dismissal** 11:7 45:8
47:3 49:8 55:8 58:5
97:16 102:21
188:20
**dismissals** 102:13
**dismissed** 32:13 49:3
49:10,13 52:11
102:11 112:7,10,19
113:12 115:5
**displays** 187:17
**disproportionately**
147:15 156:18,20
**disputes** 182:3,6

**disregard** 108:11
**distinct** 159:16
**distinction** 177:2
189:13 191:6
**distinguishing** 189:11
**distraction** 143:1
**distribution** 12:1 63:3
131:10 178:12
192:7
**District** 1:2 198:4,18
**divide** 128:3
**divided** 100:22
**docket** 109:6,13,15,22
110:4,4,7,8,13
118:19 119:4,14
**document** 13:17 15:8
16:12 24:2,6,7,9
53:6 69:14
**documented** 193:9
**documents** 14:22
15:14 18:2,4 20:9
195:9
**doing** 30:2 36:14 52:4
55:5,6 81:17 107:11
130:9 161:11
169:10 172:2
193:20
**dollar** 58:21 61:8
83:10 84:22 93:18
98:14 116:3 117:8
123:3
**dollars** 38:20 54:7
71:1 74:14 83:7 95:2
111:11 132:14
151:8 152:15
157:18
**dominate** 171:1,2
**Dorsey** 1:15 2:8 5:4
6:13,15 15:3,6 19:3
66:20 69:18 132:16
140:5 141:3,12,14
150:13 170:1 185:4
186:6
**double** 132:7 180:15
**downside** 158:4,6,11
162:17
**downward** 28:16,18
54:8,16 59:7,19 60:7
61:2 68:12 73:14
75:12 84:3 85:16

90:5,10 146:6
147:14 156:19
**Dr** 6:14 7:11 66:21
69:19 141:15 191:1
194:3
**draft** 12:15 14:7,7
**drafted** 12:14,17
**drafts** 12:10 13:1
**draw** 28:6 29:9 161:8
**drawn** 161:16
**drive** 14:1,2 151:20
**driven** 94:4 115:9
**driver** 135:16
**drives** 56:17 60:4 66:9
**driving** 58:7 94:21
**drop** 14:10 146:2
**due** 34:22 94:13
135:21 136:11
142:13 145:22
162:7 165:11 194:7
**duly** 6:7
**dumping** 44:3,7
**D.C** 1:14 2:13 3:5 4:5
6:2,6

**E**

**E** 2:1,1 198:1
**earlier** 27:1 48:2,3
63:9 67:6 94:6,13
97:5 111:20 114:2
122:12 193:4,14
**early** 10:16 45:7
**easier** 133:22
**easiest** 194:11
**easily** 53:14 74:13
178:6
**easy** 23:10 28:13
**economic** 18:19 23:14
31:15 36:14 75:17
82:8,22 104:18
120:7 126:7,10,12
126:15 127:5 128:4
128:8 157:16
**economics** 22:19 82:7
126:12 166:19,21
166:22
**economist** 27:20
**economists** 26:20
27:6
**Edelman** 24:3

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 208

**edit** 12:11 17:9
**edited** 15:22
**editing** 12:21
**edits** 13:7,9,19 14:20
  15:9 16:2,15 17:5,7
  17:10,18
**effect** 75:12 137:2
  145:10 179:8
  192:15
**effective** 11:3 174:3,7
**effectively** 17:15
  109:18
**effort** 36:21
**eight** 32:8 33:10,14
  34:9 35:22 36:19
  37:6 42:8,9,11,16,19
  42:19 43:3,7 85:5
  133:15 192:4
**either** 9:11 10:2 12:7
  12:20 16:13 17:17
  49:3 83:11 93:22
  130:17
**electronically** 13:15
**element** 52:19
**eligible** 109:6
**eliminate** 103:13,14
  173:11
**eliminates** 143:22
  144:2
**Elser** 24:3 25:7,13,15
  26:6 27:14 89:14,16
**email** 14:5,8,19 17:11
**emailed** 13:20
**emails** 14:12,15,19,21
  15:2,4 17:18,22
**empirical** 28:17,20
  29:5
**Empirically** 45:5
**employees** 185:16
**employment** 194:16
**enables** 174:4
**ends** 187:11
**enforce** 106:16
**enforced** 108:16
  114:22 116:20
  159:10
**engagement** 184:14
  184:17,20
**ensure** 12:11 105:1
**enter** 193:19

**entered** 34:18 35:4
  36:1 172:21 173:1
**enterprise** 21:6 22:22
  23:4,11 143:8
**enters** 74:19 75:21
**entire** 131:4
**entities** 73:21 74:8
  80:10 81:14 145:2
  168:10
**entitled** 119:15
**entity** 165:12 179:11
  179:12,14 180:13
**entity's** 168:13
**environment** 18:16,19
  20:4,5 24:10,12,22
  25:6 26:14 27:4 29:4
  31:3,8 36:10 54:4,10
  59:5 60:10 61:2 73:8
  91:8,13,19,22 92:10
  93:6 99:6 114:9
  116:2 177:11
**environmental** 25:18
  165:20
**envisions** 31:1
**EPA** 194:21
**epidemiological** 193:9
**equation** 39:22
**equations** 194:22
**equipment** 27:18 28:9
  28:15 85:14,20,22
  86:9,14 90:6
**equity** 165:9 166:6
**erode** 123:19,20
  124:13
**Errata** 199:6,12 200:2
**Esquire** 1:15 2:8,15,22
  3:7,15,22 4:7,8
**essence** 65:1 169:3
  187:9
**establish** 44:12 81:16
  83:6 133:19,20
  160:17
**established** 86:18
  99:22 101:7 133:21
  157:6
**establishing** 39:8
  77:10
**estimate** 25:5 29:1
  30:20 99:21 100:2,5
  100:6,8,21 101:6,16

**103:10** 135:18
  141:7,8 191:4
**estimated** 101:2
**ethical** 104:19
**evaluate** 29:19
**evaluated** 57:1,2
**evaluation** 18:12
**Evans** 4:12
**event** 198:15
**eventually** 11:14 48:6
  96:11 138:21
  140:22 155:18
**everybody** 7:9 15:9
  83:14
**everybody's** 78:16
**evidence** 74:19 75:20
  83:9,21
**evidenced** 173:6
**evolved** 13:6
**evolving** 18:16 25:3
**exact** 15:17 16:9
  32:19,22 37:7 46:3
  48:17 50:17 51:2
  68:22 119:17 150:4
  155:3 168:4 172:17
**exactly** 9:20 12:18
  17:12 41:6 59:13
  78:14 103:19 123:9
  124:3 128:21
  146:18,21 151:12
  160:14 169:12
  172:4 183:21
  185:14 192:4
**examination** 5:4,5
  6:10,12 186:9 198:6
**examined** 6:7
**example** 67:21 78:1
  79:22 83:5 94:3
  105:9 106:21 109:5
  114:1 126:17,18
  127:21 140:20
  147:21 161:20
  174:11
**examples** 124:10
  146:20 168:15
**exceed** 23:9,12,18
  61:6
**exceeds** 61:4 71:13
**Excel** 21:19
**excess** 23:4 124:4

**129:17,20** 148:5,19
  149:22 150:16
  155:10,20 156:1
  159:1,2
**exchange** 163:16
  169:2
**exchanged** 125:12
**exclude** 34:11 51:19
  66:3
**excluded** 42:22 66:2
  143:3
**excluding** 71:18
  142:19,20,21,22
**exclusively** 76:8
  165:16
**excuse** 13:2 93:1
  145:6 183:5
**exercise** 30:16 60:6
  187:20
**exhausted** 123:1,8
  158:13 159:7
**exhaustion** 145:7
**exhaustive** 90:3
**exhibit** 18:21 19:1,5,9
  23:22 69:16,20
  164:4 169:21 170:3
  173:4 181:10,15
  197:3,10,17
**Exhibits** 5:15 197:1
**exist** 13:9 17:21 74:15
  155:21 174:15
**existed** 25:1 122:12
**existence** 77:16 81:1
  160:20
**existing** 179:7
**exists** 14:3 24:22 59:9
  157:17 158:4,9
**expanded** 45:19
**expands** 93:12 193:20
**expect** 40:4 96:19
  107:14 108:21
  117:17 162:9,12,13
**expected** 92:12
  163:13 173:21
  190:6
**expenditure** 27:10
  28:17,19 29:7 120:4
  146:2 156:8,11,13
  186:1 191:8
**expenditures** 27:2,3,4

**70:8,11,12** 120:9
  146:6,11
**expenses** 155:16
**expensive** 133:21
  175:13,15
**experience** 22:15,17
  22:18 30:22 37:13
  41:9 49:13 61:5
  75:22 138:18 140:7
  164:9,12,12,13
**expert** 7:12 23:15
  56:14,16 58:16 76:5
  140:3 166:8 183:8
  184:1
**expertise** 26:18 27:11
  153:19
**expires** 198:22
**explain** 51:10 60:4
**explained** 56:6 59:21
  60:3 96:1
**explains** 51:11
**explicit** 67:11 144:7
  154:7
**explicitly** 24:18 27:10
  32:20 101:4 103:22
  109:9 116:22
  121:11 125:10
  163:17 184:3 189:6
**exposed** 113:22
**exposure** 39:6 74:3
  74:11,18 75:18,20
  76:2 77:10 78:3,5,7
  79:4 81:13 83:21
  87:8 193:4,10 194:1
  194:4,6,10 195:7,9
  195:12
**express** 31:11
**expresses** 21:3
**expressing** 177:8
**extended** 73:17 96:18
**extensive** 65:11
**extent** 17:21 59:20
  60:5 67:8
**extrapolation** 52:5
  54:10 56:22 57:8
  67:1 94:22
**extrapolations** 51:21
  52:1 57:5 92:8 93:11
  186:13
**extreme** 93:22

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

**extremely** 191:9
**Exxon** 144:19
**Eye** 2:12 6:6

**F**

**F** 198:1
**face** 36:11 45:17 63:2
85:20 86:7,13,15
142:21 157:19
163:3
**faced** 24:19 62:1,4
74:3 86:10
**facilitate** 168:9 180:12
**facilitates** 169:2
**facing** 144:10 168:10
169:5 171:21 173:8
**fact** 23:20 54:5 55:4
56:11 60:8 61:1
63:18 64:5 67:22
75:7 87:12,20 88:10
97:12 139:15
164:18 193:16
**factor** 68:3
**factors** 18:19 23:14
36:18 37:11 45:15
54:7,9,16 59:18
67:16,20 68:7,9,11
**fail** 118:19
**fair** 10:21 12:19 27:22
30:12 31:9 37:8 72:2
79:13 104:7 105:2
118:10 142:11
164:19
**fairly** 11:19 135:14
193:8
**faith** 84:20
**fall** 28:19 119:1,3
155:22
**fallen** 46:13
**falls** 45:9 54:13
**familiar** 7:2 25:7,9
26:9 138:14,17
167:4,9,15,17 170:5
**far** 191:12
**farther** 42:7 46:2
**fast** 49:22
**faster** 82:11 120:18
120:18 135:3
**Favate** 3:22
**favor** 84:15 88:19

**favorable** 85:14 87:20
147:5
**feedback** 17:4
**feeds** 21:17
**feel** 26:18 55:11 150:4
**fees** 38:20
**fewer** 45:10 133:5
**fibers** 195:10
**fiduciary** 108:22
**Fifth** 4:18 201:7
**fight** 39:17 138:6,7
140:16
**fighting** 139:22
**figure** 67:14 117:20
117:21
**figures** 31:16 72:4
162:18
**file** 13:5,6,11,12,18,20
15:7 41:4,10 65:13
79:8 83:15 186:18
**filed** 11:15 16:10,19
43:8,13,19 44:13,15
46:1,19 47:10,16
48:2,5,10,15 49:14
50:6,9,10,17,19
52:10 63:19,20
69:21,22 73:19
83:17 92:12 104:22
106:19 113:3,19,20
114:12 115:2,2
158:2
**files** 102:22 108:2
117:5
**filing** 29:21 32:12
34:22 40:19 44:17
49:18 50:3 51:18
52:22 64:13,21
96:10 100:18 103:8
190:15 196:5
**filings** 9:1,3 44:17
45:5 97:6 98:4
188:18
**fill** 129:4
**fills** 120:18
**final** 1:21 13:2 42:11
42:14
**finality** 125:8 143:19
144:4 163:22
171:10 173:11,22
**financial** 18:9,10

145:11 170:20
171:4,6,20 172:21
173:1 175:18
176:15,17 180:10
180:12 181:7,21
182:4 196:4
**financials** 22:13
131:13 144:18
**financing** 41:20
142:22 144:3
**find** 29:13 133:9
**fine** 168:7
**Fire** 3:18 184:7
**firm** 1:16 25:8,19
166:8
**firms** 43:22 44:2,7,11
89:17
**first** 7:11 8:8,19 9:15
12:10 13:5 20:11
21:12,19 29:18 35:4
65:5 68:15 69:20
72:8 73:10 76:3,8,19
77:8,9 82:1,2 86:9
98:3 102:3 109:11
147:7 164:8 195:21
197:11
**fit** 128:22
**five** 30:9 31:21 32:1
44:22 72:6,21 81:11
98:9 129:5,7,7
132:20 135:3 189:6
189:15
**five-year** 135:6
**flawed** 40:15
**fleshed** 48:8
**fleshing** 32:6
**flexibility** 179:17
**flip** 40:3 180:15
**Floor** 2:5
**flow** 100:22 128:19
130:20 144:21
151:1,8 152:15
187:16 188:10
**flows** 22:21 100:22
102:22 136:21
145:12 148:14
186:22 187:1,14
189:3
**focused** 35:10 139:18
**focusing** 144:6

**follow** 94:17 118:11
**followed** 10:18 34:6
121:21
**follows** 6:8 150:19
155:8
**follow-up** 90:19
**footnote** 33:17 34:11
34:20 42:20
**forecast** 27:1 99:22
101:7 102:3 103:18
103:18,22 105:6,8
116:13 126:8,13,15
127:20 146:21
160:4
**forecasts** 25:6 110:19
**foregoing** 198:9 199:4
**foreseeable** 59:6
**forever** 149:3
**forget** 32:22 46:4
190:14 191:5
**form** 28:2 30:20 79:6
111:14 125:16
137:13 172:8
174:21,22 176:13
176:16 199:5
**formal** 26:17
**formed** 65:8
**former** 80:6
**forming** 56:15 65:9
**forms** 125:12 139:4
172:5
**forth** 14:16 58:10
198:12
**forward** 37:11,19
44:20 45:19 67:10
86:22 126:9 137:14
140:12 160:5
174:20 176:15
177:10
**foundation** 56:10
72:17
**foundational** 56:14
**founders** 169:17
**four** 44:22 46:2 54:11
57:19,20 58:2 59:10
59:11 63:11,16,17
64:13 67:16,18 68:9
68:11,14 78:6 86:20
87:14 92:20,21 98:9
99:4 100:4 111:18

135:13 189:7
192:22
**fourth** 85:12
**fraction** 44:21 96:21
107:1,2,7 116:18
120:3 146:2 151:16
175:6
**frame** 20:8
**framework** 14:4 76:16
166:7
**Frank** 2:22
**FRANK/GECKER** 2:17
**fraudulent** 106:18
**frequency** 15:17
**frequently** 84:9
144:13 183:12
**front** 15:1 21:18 53:19
73:18 78:17 152:19
**full** 160:20
**Fuller** 140:21 141:5
**fully** 48:8
**function** 82:6 146:15
150:17
**fund** 127:10 165:8
**fundamentally** 52:5
**funded** 73:12 74:12,21
75:2
**funding** 20:3
**funds** 147:6 165:9
**further** 11:13 31:6
63:14 65:14 88:14
180:17 186:6 196:7
198:9,13
**future** 6:15 8:3,11,12
10:5 12:2,2 25:3
27:9 28:16 29:7,22
30:5 39:15 51:6,16
52:6 54:20 58:20
59:6,12 66:15 67:2,9
84:10 85:17 92:12
93:7 94:12 99:7
101:8,13,15,17
103:10,11 104:6,13
105:2 110:12,16
120:8 124:17 125:2
126:4,18 127:7
128:12 142:11,19
143:11 158:16
175:6 188:17 191:3
**future's** 104:9 110:11

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

## Page 210

**fuzzy** 149:19

---

### G

**game** 82:22 83:2,4
**gasket** 87:5
**GE** 180:4,4,8 181:1
**general** 9:19 11:5 18:8
  18:14 28:8 77:21
  88:4 91:3,11 109:17
  125:17 161:1 162:6
  162:21 163:12
  176:11 183:17
  193:16
**generally** 14:19 26:21
  47:17 85:3 91:12,14
  91:18 97:17 104:9
  104:11 138:17
  149:16 191:17
**generated** 190:22
  193:11
**getting** 11:5 40:19
  56:16 85:3 95:11
  97:5 98:7 102:11,15
  103:5 112:15
  116:17 129:5
  133:14 143:19
  149:2 159:6 163:1
  171:9 181:6
**gist** 14:16 17:4
**give** 8:10 11:21 20:6
  50:17 51:12 121:3
  126:17 141:20
  163:6 168:14,17
**given** 23:7,15 49:1
  64:5 69:4 79:11 82:8
  101:1 103:8 125:17
  154:5 156:13 199:4
**gives** 100:21 194:5
**giving** 7:21 30:12
  71:12 79:1 125:4
  183:5
**gladly** 174:11
**globally** 25:19
**go** 14:1,9 15:9 18:20
  23:22 26:16 28:22
  29:2,3 30:18 31:6
  33:9 39:22 41:22
  43:21 44:9 46:11
  52:8,20 57:16 58:16
  60:6 76:2 77:2 78:12

82:1,9 83:1,14 87:1
  92:7 93:10 98:15
  101:21 105:11
  110:18 111:19
  115:16 117:1
  119:17 120:6,22
  130:17 135:7,18
  136:17 144:14
  145:4 146:4 147:16
  148:4,11 149:6,7
  150:10 151:17
  157:15 158:5,7,17
  160:10,12,16
  161:17 172:5 177:9
  177:10 179:15
  185:1 187:20
  192:22 194:3,14
**Godes** 2:15
**goes** 22:2 57:13 70:17
  107:19 174:1 177:6
  187:21 190:10
  191:11 194:22
  195:8
**going** 11:4 12:19 13:8
  15:21 18:7 22:19
  23:22 25:1 27:13
  28:4 29:14 35:22
  36:13,14 37:11,12
  37:18,19 38:12,19
  38:19 39:15 42:7
  46:16 50:12 52:7,10
  52:15 53:13 55:9,10
  55:12,13 58:5,6,9
  59:7,10,12,16,17
  61:1,17 62:2 66:11
  70:18 72:20 73:6
  75:8 76:4,12,22
  77:15,17,18,20,21
  80:13 81:8,21,22
  82:5,6 85:12 86:22
  88:6,19 90:13 91:5
  91:16,22 94:11,22
  95:6,7 97:13,14,14
  97:15 98:8,10,13
  99:16 103:14,15
  104:2 106:9,12,15
  106:18,20 107:4,5
  107:17 108:11,12
  108:12,18 110:4
  113:4,19 114:17,19

116:21 117:7,22
  119:3 120:4 121:16
  124:16 126:2,4
  132:3 134:5,7
  135:16 138:2 142:5
  146:21,22 147:17
  148:20 149:4,6,20
  151:13 153:6
  155:20 156:14
  157:18 159:10
  160:2,5,6,8,10 162:3
  164:1 168:5 174:20
  175:10 180:9
  188:18 190:15,16
**good** 6:14 38:22 42:2
  64:10 81:5 94:1
  95:15 164:1 184:3
**GOODWIN** 3:2
**gotten** 56:12 112:17
  112:20,21 113:1
  114:5
**go-forward** 11:11
**grammatical** 17:2
**greater** 114:11 120:16
  120:19,21,22
  121:18 145:9
**greatest** 45:18
**greatly** 193:20
**grew** 46:7
**gross** 70:8,11,12 72:2
  131:16
**grossly** 97:18
**group** 80:14 90:20
  91:8 105:11 107:19
  109:3 111:16 112:3
  115:8,10,11 116:16
  117:1 167:10,14,15
  168:19 183:13
**groups** 183:21 184:5
  184:9
**grows** 192:9
**growth** 71:5 135:13
  192:13
**guess** 61:20 69:4
  81:20 183:19

---

### H

**H** 197:4
**half** 65:1 103:13,14
  133:15 159:22

**handed** 13:18 69:19
  170:2
**handling** 182:2
**happen** 79:13 82:15
  95:15 98:22
**happened** 10:1 68:20
  110:2
**happening** 27:22 58:4
  107:3
**happens** 129:1 154:3
**happy** 7:7
**hard** 13:15 28:7 60:21
  91:16 181:6
**HARDIN** 3:16
**head** 55:6 152:21
**heavily** 115:10
**hedge** 163:16 165:8
**hedges** 171:20
**help** 78:9
**hereinbefore** 198:12
**hey** 121:14
**high** 59:15,18,22 62:9
  71:13,15 87:4 95:5
  98:7 102:18 113:9,9
  114:18 136:6
  137:21 193:12
  194:2
**higher** 35:18 68:6
  106:6 114:13
  136:22
**highest** 185:13,13
**highlight** 81:13
**highly** 112:22 115:10
  115:15
**high-water** 60:19
**hinges** 75:20
**historical** 8:22 27:3
  61:4 67:1 69:12,13
  76:20 110:21
  111:17 188:16
**historically** 76:7,17,18
  138:1
**history** 25:2 26:4
  32:10 49:1 52:4 57:1
  57:4 60:18 63:11
  92:9 93:2,4 98:3,12
  98:21 99:19 100:1
  107:16 108:14
  117:2 118:15
  119:20 124:19

133:13 136:17
  137:21 139:9
  159:11,12,17,18
**hit** 84:22 133:15
**hoc** 44:1 65:4,13
**hope** 90:7,8
**hoping** 173:3
**hour** 7:8 185:10
**hourly** 185:9,10
**hours** 12:19,19
  185:18,19
**hundred** 46:18 147:7
**hygiene** 195:8

---

### I

**idea** 81:5 183:17
  185:22
**identified** 10:1 18:6
**ignore** 54:5,8 59:5
  92:9 95:10 97:12
**ignoring** 54:15 59:18
**II** 94:14 106:3 117:15
  119:1,4,15 193:11
  193:14,17
**III** 119:7
**IL** 2:20
**Illinois** 155:8
**illogical** 40:16
**imagine** 133:18
**immaterial** 157:17
**impact** 24:13 26:14
  29:6,20 57:3 60:7
  68:10 90:18 95:9
  99:2 136:18 137:6,7
  153:4 177:5
**impacts** 89:8 92:3,5
  99:6
**impairment** 109:20
  110:14 119:3,10,12
**important** 8:22 24:15
  58:1,2 119:19
**impression** 11:8
**impressions** 10:4,8,9
  11:13,18
**inactive** 109:5,12,14
  109:22 110:2,3,7,8
  110:13 118:19
  119:4,14
**inappropriate** 125:15
**incentive** 31:15 120:8

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

126:7,10,12,15
127:5 128:2,4,5
**incidence** 193:12
195:1
**incident** 96:3,3
**incidents** 94:6,7
**include** 33:6 34:10
36:6,7 37:2 51:5
63:16 80:10 93:5,17
112:3 164:11
**included** 42:20,20
51:22 95:19 191:22
**includes** 70:11 118:7
182:1
**including** 92:12 93:10
**inclusive** 192:14
**inconsistency** 42:5
**inconsistent** 30:22
99:18 100:1 102:21
105:7
**incorporate** 26:21
27:8
**increase** 74:22 120:5
144:11 146:11
153:12
**increased** 45:6 74:3
194:4
**increases** 120:12
**increasing** 72:8
120:13
**incredibly** 23:9
**increments** 190:17
**incur** 37:15 148:3,12
**incurred** 156:10 175:6
**incurs** 156:20
**indemnification**
168:20,20 175:1,8
176:16,18 179:5
**indemnified** 143:11
**indemnities** 69:4
**indemnity** 4:3 10:14
10:22 37:4,16 51:4
62:16 69:8,9,12
70:15 71:5 101:8
132:14,20 134:4,12
134:16 135:21
136:5,11 137:10
142:13,14,17,19
143:4 145:9 158:18
178:15 183:9

184:21
**independent** 48:21
68:5
**Index** 5:15 197:1
**indicate** 67:13
**indicated** 49:3 63:9
65:13 66:21
**indicative** 45:1 48:7
**indicator** 159:14
**indirect** 181:13,20
**individual** 82:9
**induce** 83:1
**industrial** 195:8
**industries** 195:13
**industry** 195:10
**inferences** 28:5 161:8
**inflate** 120:8
**inflated** 126:4,9,10
137:7 192:5
**inflation** 188:22
191:14,22
**influence** 144:2,18,19
**information** 8:18 9:9
9:12 18:1,9,10 20:20
21:10,22 24:1 26:5,7
50:15 53:19 54:21
55:3,4,7 67:1 77:22
81:11,15 165:2
169:3
**initial** 7:22 8:15 10:4,7
10:9 11:12,17 18:2
33:21 45:2,16
**initially** 8:13 10:21
12:15 16:21 42:12
43:8 44:16 46:5,9
86:10 122:20
**injunction** 40:20 41:5
41:11 163:2 170:21
171:9 175:12,16,20
**injunctions** 125:11
**injury** 29:22
**input** 191:17
**inside** 87:6 124:9
153:11
**insolvencies** 146:1,19
147:19 148:16,18
149:2
**insolvent** 123:2
129:21 130:1
145:21 148:2,4,9

149:6 150:16
151:14,20 155:13
155:17 189:15
**insolvents** 129:22
**instrument** 170:20
171:4,20 172:21
173:2 175:18
**insulation** 194:2
**insurance** 3:17,18
7:19 88:22 120:10
120:11,14,17,19
121:1,9,13,14,15,17
121:22,22 122:1,3,6
122:14 123:5,11
125:1,4,18 126:20
127:12,18,20
128:11,13,16,17
129:13 130:4,9,10
132:8,18,21 137:9
138:4,9,14,22
139:16,22 140:3,3
142:3 145:8,19,20
146:16,18 147:4,10
147:18 148:1,2,4,9
153:12,14 156:8,9
156:16 157:8,11,12
157:15 158:1,2,4,6,7
158:12,19 159:7
160:12,13 162:22
163:1,4,13,14,17
165:19 166:2 176:5
176:9,12,14 178:3
178:10,20 179:7,11
179:16,16 182:11
182:12,19,20 183:3
184:21
**insured** 123:22
**insurer** 139:8 149:12
**insurers** 122:22
124:12 130:18,19
131:1 136:18 137:6
140:16 141:9
145:22,22 146:3,8
146:22 147:10,15
156:4,18 157:1
166:4 176:11 182:3
182:7 183:14
**insurer's** 178:17
**intended** 136:7
**intensity** 194:6

**intent** 19:20
**interaction** 39:19
172:18
**interactive** 187:22
**interactively** 53:8
**interest** 78:21 188:22
191:14
**interested** 165:10
198:15
**interesting** 133:4,9
160:21
**intermediate** 87:14
88:11
**internal** 61:15 163:21
164:2
**International** 3:3
186:9
**interpretation** 149:19
**interpreted** 108:16
**interrelates** 30:5
**inventory** 44:3,8,14
45:13
**investors** 169:1 175:9
**invoice** 185:20
**invoke** 93:11
**invoking** 53:3
**involve** 173:7
**involved** 125:10 195:4
**in-house** 92:4
**IPO** 168:15
**issue** 96:5 140:18
153:3 179:6
**issued** 145:5 185:20
**issues** 91:19 178:6,7
178:11,19
**issuing** 176:12
**item** 17:9 73:7 84:2
85:13 87:13
**itemize** 90:13
**items** 17:4
**IV** 117:13

---

**J**

**JANE** 1:22 4:17 201:4
201:6
**January** 50:19
**Jersey** 148:13 149:13
151:22 154:21
155:1
**Jersey's** 155:5

**job** 78:22 195:7
**Joe** 91:18
**John** 1:15 2:8 3:22
6:15
**Johns** 76:20
**join** 166:18
**joint** 75:6,11,14,16
183:13,20 184:5,8
**jointly** 128:2
**Joseph** 2:22
**journal** 167:3,3
**judged** 131:21
**July** 63:19
**juncture** 8:6
**juries** 84:15
**jurisdiction** 49:16,22
77:20 79:6,10
109:21 119:5,6,16
148:21
**jurisdictions** 75:13,15
77:19 118:17,21
149:8,10
**jury** 34:18 38:10 84:13
84:14
**justification** 55:11
61:3

---

**K**

**keep** 13:11 54:4
135:17
**keeping** 52:19
**kept** 133:12,13
**key** 26:20
**kick** 194:5
**kind** 10:19 25:15 54:3
58:6 60:4 64:15
73:18 74:6,16 95:9
97:1,6,7 116:13
139:9 146:14
147:20 154:13
165:17 168:12
187:11
**kinds** 102:9
**knew** 9:18,18 83:6
**know** 7:5,7,18 12:13
13:10 14:12 15:16
15:17 17:9,15 18:15
18:17 20:6 25:15,17
25:19,21 26:4,13
27:6 28:5,6,13,21,22

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 212

29:8 32:16 33:20,21
34:1,2,7,15,17 35:3
35:12 37:5 38:14
39:17 42:14,16,17
43:8 46:3 47:13 48:6
48:8,9 50:2,10,15,16
50:18,22 54:3,11
55:21 56:13 59:17
65:4,10 72:14 79:21
81:2,7,9,9,10,12,18
81:21,21 82:5 88:3,4
88:5,7 89:22 122:6
123:5,9 124:3,8,13
126:11,11,13
137:11 138:1 139:3
143:18 154:11
158:20,21 162:1
163:20 167:11
172:17 175:21,22
176:2 183:12,21,21
184:8 185:15
195:18
**knowing** 23:12
**knowledge** 18:14 20:1
20:2,3,5,7 25:11
27:19 134:11
177:16
**KPMG** 195:3
**Krepto** 3:15
**KUNDLA** 3:16

**L**
**L** 4:21 198:3,18
**labor** 193:22 194:12
194:14
**laid** 11:19 56:11
**language** 107:13,13
123:16 124:2,7,15
134:8 137:14 138:5
138:9,15 139:1,16
139:18 150:5 173:6
176:20
**large** 44:13 75:8 80:3
84:8 91:8 109:3
115:14 134:4
151:16 162:10
163:4,4 174:22
175:8 183:13
193:10 195:14,14
**largely** 17:2,5 95:2

166:22 167:22
195:6
**larger** 44:21,21 73:1
103:20 107:7 112:1
115:11 125:19,20
130:6 146:2
**LaSalle** 2:19
**Laurie** 3:15
**law** 18:17 25:19 26:16
26:19 27:6,19 43:22
44:2 89:17 148:21
149:13 150:18,18
151:9,22 152:15
153:8,9,20 154:15
154:18,19 156:12
156:14 166:19,21
166:22
**lawsuit** 190:22
**lawyer** 166:16 179:3
**lawyers** 29:8
**layer** 145:7 146:1
**laying** 79:2,3
**layperson** 28:7
**lays** 47:1
**lead** 1:15 68:12 184:6
184:10,11
**leads** 24:12 194:20
**leave** 138:10
**left** 102:12 105:1
**legacy** 173:9
**legal** 20:5 24:10 26:15
26:17 27:4,22
141:20
**Leslie** 1:6 2:11 4:7
6:12,16 7:15 8:21
9:7 10:9 11:2 12:3
18:9 20:11,14,15
21:4,5,7,16 22:2,5,8
22:13 24:13,19
29:20,21 31:13
33:11 36:3 37:5
38:14 39:7 42:3,4
43:9 44:3,8,12,14
45:14,17,21 46:19
48:22 49:2 50:22
58:21 59:12 60:8
62:1,16 65:5,14
66:15 67:2 69:21
73:3,15 75:14 84:2
85:10 87:11 88:17

97:2 99:8,21 100:2
101:5,17 102:5
103:20 104:2 107:9
107:15 108:5 109:7
111:12 113:22
114:12,15,20 115:3
118:16 119:20
120:7,10,15 121:1,4
121:11,18 122:2,6
123:6 124:1,18
125:2,8 126:19,21
127:3 129:22 130:8
130:8,16 135:4
143:8 145:8 146:5,9
146:12 148:2 151:6
152:4 159:16,18
173:15 175:19
187:4 189:14
195:18,22
**Leslie's** 29:21 30:20
30:22 31:17 32:9
56:22 57:3 59:8
68:15,21 70:8 71:5
73:9 92:8,11 99:18
100:1,5 102:7
110:20 120:10,12
120:13 124:14
135:21 136:4,10,16
162:19 196:4
**letter** 184:14,17,20
**let's** 56:20 66:18
68:14 69:14 70:16
91:19 120:6
**level** 35:11,15 81:8
106:3,3,6 117:15,15
119:1,4,7,15 135:12
148:19 149:5,22
156:8,11,13 162:7
**levels** 194:16 195:9
**leverage** 140:14
**liabilities** 11:10 12:2,3
27:1 28:14 31:16
41:11 59:8 75:14
142:11 143:12
144:10 148:3
157:13 163:5,13
165:12 168:10,17
168:21 169:2,5,9
172:1,3,10,13,16,22
173:17 174:12,18

174:20 175:19
176:5,12 179:13,15
180:3,6 181:12,19
**liability** 8:3 10:11
24:19 30:20 31:17
56:9,18 58:7 62:1,4
74:22 75:2,7,11,16
75:19 77:12,13
80:18,18 85:20 86:4
86:7,13,15,19 87:2
89:18 94:3,10,11,21
99:21 100:2,5 101:5
120:12,13 121:12
125:8,14 127:7
137:5 141:7,8
145:17 151:16
156:19 162:19
163:3 165:21
173:21 179:10
181:4,5 182:1
**liable** 28:10,13 86:1
86:10 87:4,5
**Lieberman** 4:8
**lifetime** 87:8
**liking** 61:21
**limit** 123:21 124:9,13
162:17,20
**limitations** 109:19
110:1 181:8
**limited** 22:17 58:22
180:19
**limits** 122:21 123:9,18
124:11 128:22
129:15,15,19
147:10 149:16
152:2 153:10 155:7
155:12 158:1,15,19
159:1
**line** 17:9 54:7 73:18
74:5 77:7 78:17
81:16 137:12 146:3
199:13 200:4
**lines** 147:19
**liquidated** 61:21,22
62:3,8,8,10,15 80:7
111:1 113:10
135:19 136:3,9
**liquidation** 22:12 23:5
23:6,12,18,20,21
62:19,22 63:5

**list** 19:5,12,14,16,21
20:7,10 73:7 78:1
85:13
**listed** 67:17 68:15
164:9 167:20
**listen** 78:13
**lists** 43:13 70:10 77:9
78:4 81:10,16 184:5
**literature** 27:7 193:9
194:9 195:7,14
**litigating** 40:1,2,18
131:7
**litigation** 10:11 36:10
37:1 39:3,4 45:18
64:9 73:19 74:3
75:10 86:10 87:2
90:16 91:22 109:18
120:1,16 140:17
144:1,17 148:7
166:4 167:10,14
168:5,18 171:11,12
173:11,12 174:6
177:4,6,10,13
181:12,13,19,20
182:1 198:16
**little** 7:9,13 41:6 42:5
42:7 51:3 56:7 60:16
66:5 85:15 93:15
94:2 102:19 109:16
112:1 127:12 130:3
152:2 162:7
**lived** 147:2
**LLC** 169:18,19
**LLP** 2:2,10,17 3:2,8
4:2
**loaded** 193:14
**logic** 40:3,9
**logical** 80:16
**logics** 40:14
**long** 15:17 49:12,19
134:13,19 135:4
139:9 151:14
**longer** 34:22 49:6 74:4
78:19 133:7 153:6
**long-run** 39:10
**long-term** 40:18 41:2
**look** 8:2,8,13 14:9
18:3,4 20:9 23:1
24:21 26:6,22 27:9
28:3 29:4,4,8 30:9

09-50026-mg Doc 7696-6 Filed 11/08/10 Entered 11/08/10 23:24:36 Exhibit
Pg 214 of 225

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 213

30:19 36:14,15
39:20 45:22 46:16
46:18 47:7,15,18
51:9 52:4,13 53:8,9
56:20 58:2 59:12
60:15,20,22 62:7,7
62:10,19,19 64:10
64:11,12,16,19,20
67:12 69:9,14 70:17
71:1,21 76:10,12
79:12 80:5,20 81:2
82:4 85:2 90:2 93:4
97:5 98:3,4 100:11
106:20 107:10
113:11 117:10
119:11 121:13,15
122:13 125:15
132:9 136:14
139:14 144:14,19
145:19 146:15
152:5 154:2 158:10
158:14,22 159:1
160:9,13 161:20
164:4 170:10 173:4
174:8 180:14 185:1
186:22 187:2
188:16 190:16
192:3,12
**looked** 9:5 27:16
47:17,17 51:19,21
54:2 57:17 63:11,13
63:15 64:14,22 65:1
66:2 70:2 79:17
80:19 133:1 145:4
149:21 150:22
151:3,5,8 152:5,6
160:4,10
**looking** 21:8 22:13,14
22:20 24:8 26:3 46:4
46:5 47:5 53:1 54:11
61:21 62:13 63:5
76:1 96:6 98:2,20
99:12 104:20
136:13 151:6 156:5
161:6 162:14
170:22 176:20
191:17
**looks** 72:20 73:2
170:5 177:11
**loose** 18:11

**looser** 108:19
**lose** 14:3 126:16
**losing** 84:21
**losses** 120:15,16,17
127:18,19 128:16
128:18,22 130:20
146:22 155:18
156:10 175:5,6,6
**lot** 38:9 39:9 73:17
123:16 134:7 148:6
149:6 151:20
**lots** 56:12 79:2,16,19
129:21 162:22
178:21 179:14
**low** 23:9 36:22 39:6
59:14 60:2 62:5
98:12,16 102:16
113:16
**lower** 48:7 59:7 61:5
75:17 88:5 93:17,20
115:5 118:3 121:4,8
125:6 132:4 175:19
**lowers** 74:10
**LRG** 168:6,8 169:14
170:4,7,9,11 171:1,2
171:10 174:11
175:4,7 176:20,22
177:3 178:3,19
180:17 181:21
182:6,15,18 197:18
**LRG's** 174:1 181:11
181:18 182:15,16
**lung** 43:14 189:8,9

_____

**M**

**M** 3:7
**magical** 64:3
**magnitude** 120:21
**maintain** 133:22
**major** 143:13 193:5
**majority** 47:22 48:3
50:2 114:14 152:3
**making** 22:4 38:16
41:3 113:5 121:10
128:15
**malignant** 108:2 109:3
**management** 77:19
79:8 143:1 144:1
**managing** 181:22
**manifests** 163:15

**manner** 108:15 169:3
171:18
**manufacturer** 28:10
85:20
**manufacturers** 27:18
28:15 85:14 90:6
**Manville** 76:20,21 77:2
77:3
**map** 146:17
**Marine** 3:18
**mark** 18:20 60:19
**marked** 19:1,5 69:16
69:20 169:21 170:2
**marked-up** 17:15,18
**market** 144:5 168:21
170:11
**massive** 189:11
**match** 52:15,17
**material** 9:22 27:12
27:14 145:10 191:7
**materially** 135:9
**materials** 8:20 19:6
19:13,17 20:10 26:8
27:15 30:3
**math** 70:21 71:3 72:1
100:11 150:18
151:12
**matrices** 195:7
**matter** 34:21 53:15
55:7 57:19 58:10
68:7 141:1 156:7
**matters** 165:16
**maximize** 128:3,6
153:14
**maximizing** 104:17
**McCRACKEN** 3:8
**McKEON** 3:16
**mean** 12:7,9 13:11
17:7,13 24:11 26:1,9
26:16 28:4 32:1,4
33:20 40:3 44:10
48:20 49:8 50:9 51:8
53:8 60:12 61:14
63:1,13 72:22 75:19
82:4 96:8 106:8
107:9 109:14 110:3
115:21 119:2,18
120:12 122:1,4
125:10 130:7,14
137:17 146:12

157:9 159:8 163:5
171:5 172:5 175:2,2
176:11 177:2,17
178:4 179:20 187:9
**meaning** 26:7 28:8
88:21
**meaningful** 172:18
**means** 28:14 29:10
49:2 102:11 107:10
112:12 155:12
175:4 189:9
**meant** 26:8 42:18
**mechanism** 131:11
131:14
**mechanisms** 77:11
**medical** 109:17
118:19 119:13
**meet** 108:13
**member** 166:11,15
**members** 44:1 65:4
65:12 79:22,22 80:6
**memory** 78:9
**mentioned** 12:5 13:7
15:7
**mere** 75:7
**merits** 131:21
**mesothelioma** 32:13
43:14 44:19 47:5,8
60:17 68:1 74:14
80:2 94:8 96:8 99:20
102:5 103:1 107:4
110:9,11 114:13
189:8,10,18,22
193:12
**met** 6:14 108:1,6
113:22
**middle** 70:6 92:22
93:1 193:3
**midpoint** 98:19 124:20
**million** 22:12 23:2,3,5
23:9 32:21 33:3
38:20 54:13 59:3,14
59:15 60:13 63:10
64:19 66:14,22
67:14,21 68:11
69:11,12 70:18,19
71:1,8,9,16,21 72:4
74:14 80:1,7,9,15,16
83:7,10 84:22 92:13
92:13 93:1,8,12,17

94:18 95:12,21
98:20 99:12 100:15
100:19 101:9,10
103:12 121:13
122:18,21 123:3
124:19,19 125:1,3,4
125:9,18,21,22
126:19,20,21,22
127:7,10,17,18,19
127:20,22 128:10
128:10,12,13,21
129:2,3,4,6,7,8,10
129:10,12,14,19
130:3,6 133:15
135:10,10,11,13
142:9 144:16
146:18,20,22 147:2
147:7,9,11,16 148:1
157:13,14 158:15
158:17 159:2 160:5
160:11,12,13
163:22 186:14
191:2,21
**mimic** 109:9
**mimicking** 162:6
**mimics** 109:2
**mind** 139:20
**minimis** 115:19,21
**minute** 66:11
**mischaracterization**
131:16
**missed** 19:20
**mixture** 12:17 95:2
**model** 191:12 195:1
**modeling** 189:16
195:2,3,4
**models** 194:5
**moment** 6:14
**Monday** 6:1
**money** 37:8 59:15
72:13 75:7 82:11
83:9,12,18,20 84:9
97:21 104:6,14
105:1,8,16,22
107:17 108:18
115:12 116:1,18
117:1,3 120:18
128:19 136:20
161:9 162:2,7
**moneys** 130:20

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 214

161:21
**MONTGOMERY** 3:8
**month** 7:13
**months** 64:20,22 66:2
  66:4 190:13
**MORING** 4:2
**morning** 6:14
**Morris** 3:19
**Moskowitz** 24:3
**motivating** 155:3
**motivation** 125:15
  126:11
**move** 25:3 44:20
  58:10 153:7,10
**moved** 45:18
**movement** 146:6,7,10
**movements** 156:19
  156:21
**moves** 62:14
**moving** 86:12
**Mullin** 1:12 5:2 6:5,14
  7:11 19:5 66:21
  69:19,20 141:15
  170:3 197:2,3,4,10
  197:17 199:2,9
**multiple** 32:5 44:16
**Multiples** 21:18
**multiplies** 189:21

**N**

**N** 2:1,15,19 198:1
**name** 6:15 91:6
  114:14 167:6
**named** 10:17
**names** 21:19 92:1
**national** 26:2 72:15
  94:9,10 95:6,8 96:2
  96:2
**naturally** 64:15
**nature** 14:19 17:2
  46:10 176:7
**natures** 182:14
**Naval** 94:5,5,12,17,20
  95:2 96:3
**near** 88:5
**nearly** 38:10 115:12
**necessarily** 83:19
  106:8
**necessary** 23:8 60:12
**need** 7:6 25:5 59:22

60:1,14 61:6,10 64:2
78:19 119:10 125:5
127:1 135:17
137:15,17,18 138:7
168:13 176:14
182:13 192:3
**needs** 171:19,22
  172:7
**negotiate** 40:13 104:1
**negotiated** 121:19
**negotiating** 65:5,15
  177:12
**negotiation** 82:22
  127:7 177:1,15
**negotiations** 84:19
**neighborhood** 93:8,9
  102:19,20 118:1
  122:21 135:11
**neither** 172:4 186:20
  198:13
**net** 95:20 120:19
  129:3,8,9 179:8
  187:19 192:17
**network** 14:1,1
**neutral** 75:4,6
**neutrality** 137:13
  138:4,9,15 139:1,16
  140:4 142:3
**never** 96:10,12 110:4
  129:1 163:2 179:15
  179:16 184:5,9
  188:1
**new** 3:4 4:19,19 10:10
  10:19,20 34:21
  148:13 149:13,16
  151:22 154:21
  155:1,5 201:8,8
**nexus** 45:20
**nice** 180:12
**Nicholson** 194:3
**Nicholson's** 195:2
**night** 15:14
**nine** 39:11 42:7,15
  194:15 195:16
**ninth** 42:11
**NJ** 3:20
**nominal** 59:15 92:10
  95:19 128:22
  187:19 188:9 191:8
  192:16

**nonclaim** 72:16
**nonderivative** 181:5
**noneconomic** 75:19
**nonmalignant** 43:15
  105:9,17,21 106:2,5
  106:6,10,13 107:2,5
  107:8,18 108:3,18
  115:18 117:6 118:9
  118:18 131:12
  161:19,19 162:1,3
  189:10,12,12
**nonNaval** 94:19
**normally** 8:7 49:12
**north** 74:13 111:4
  112:1,16 186:2
**Notary** 198:4,18
**note** 14:17 33:11,17
**noted** 199:6
**notes** 152:10 154:9
**Nothing's** 110:2
**Notice** 5:17 201:1
**nuances** 139:3
**number** 9:4 12:19
  14:15 19:5 26:11
  27:17 31:5,9 32:8,19
  33:17 34:12 35:22
  37:7 39:14 43:4,13
  46:3 47:1,2,12,14
  50:11,20 54:13 58:6
  59:14 61:15 68:13
  69:4 74:1 76:14 80:3
  87:14 89:5,6 90:18
  93:17,20 94:12,18
  99:20 100:17 101:2
  101:11,12,20 102:6
  104:21 112:4 113:7
  113:12,13 114:17
  115:1,4,14,15 116:7
  116:14 123:3 125:1
  130:5 161:22 170:3
  173:4 189:17 191:3
  193:19,21 194:19
**numbers** 23:11 45:6
  48:18 51:2 62:8
  68:22 69:11 70:17
  70:22 71:10,19 72:5
  72:7,18,19,22 73:2
  92:1 95:11 127:21
  129:14 132:6,12
  134:6 146:16 187:8

190:21 191:15,21
**numerous** 30:14 31:1
  43:6 90:4 138:16
**N.W** 2:12 3:4 4:4 6:6

**O**

**O** 198:1
**object** 76:4
**Objection** 28:2 111:14
  132:11 140:2,19
**obligation** 104:19
**observe** 134:17
**obtain** 173:11 176:5,9
**obtained** 143:12
**obvious** 23:11
**occupational** 193:3,5
  195:11
**occur** 34:22 85:7
  153:17
**occurred** 65:10 73:10
  174:9
**occurring** 27:5 195:12
**October** 1:13 6:1
**offer** 8:7 171:1,3,13
**offering** 176:16
**offers** 174:2
**office** 14:11
**official** 3:9 127:3
**offset** 74:10,17 75:8
  83:11 156:9
**offsets** 192:11
**oh** 40:8
**Okay** 21:20 31:13
  40:22 43:1,3 66:17
  116:6 124:21
  141:22 167:15
  169:14
**old** 96:11 97:5 98:9,9
  114:9
**older** 46:8 66:5 68:1,1
  96:7 97:11,13 192:8
  192:10
**omitted** 109:11
  164:15
**once** 36:17 44:11
  49:14 53:12 62:2
  103:4 128:5 133:19
  133:21 150:18
  156:14 160:16
  177:15

**ones** 18:6 45:11 51:22
  55:13 92:17 103:6,7
  123:21 144:20
  159:17
**one-sided** 39:21
**online** 77:6
**open** 49:6 96:13,20
  97:7 116:12 122:8
  138:10 149:13
  160:2 179:19
**open-ended** 8:7
**operating** 76:11
**operational** 76:9
**operations** 145:12
**opine** 140:3
**opining** 106:17
**opinion** 7:12,21 8:3,10
  10:3 11:21 19:7,18
  20:20 22:1,10 23:15
  24:11,16,17 25:13
  28:22 29:9,10,14,16
  30:4 31:5,9 55:20,20
  56:8,8,15,18 57:16
  59:1,20 60:5,15
  66:13 87:16 89:11
  90:21 91:10 137:20
  149:11 183:6
**opinions** 8:5,7 11:17
  11:22 12:12 18:5
  20:8 21:3 26:7 30:12
  30:17 31:11,20,21
  31:22 32:3,5,7 35:7
  35:12,19 55:2 70:3
  87:13,15,18,19
  90:12 141:21
  195:17
**opportunity** 38:15
**opposed** 11:11 14:4
  20:15 40:18 48:15
  63:6 82:1 96:22
  113:20 142:16
  147:15 164:12
  170:7,20 177:13
**opposite** 121:7
**optimistic** 94:2
**option** 156:22 157:1,3
  180:2
**options** 133:6 156:21
**order** 24:20 54:19
  56:1 82:5 104:22

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

## Page 215

116:6 126:5 150:1
162:16,20 173:17
180:5 185:18
191:18
**orders** 77:19 79:8
**ordinarily** 118:12
**original** 87:6 194:5
**originally** 86:8
**orphaned** 97:1
**outcome** 34:7 42:11
42:14,16,17 53:9,10
54:15 84:6,7 104:18
107:15 109:2
123:17 162:9,12
194:21 195:2
198:15
**outcomes** 9:5 162:13
**outside** 23:19,20
28:11 55:21 85:22
86:14 87:5 147:12
153:19 159:17
165:20
**outstanding** 74:20
81:3
**overall** 69:9 185:22
**overcompensated**
115:14
**overhang** 41:21
**overpaying** 99:13
142:10,12
**oversaw** 12:8
**overstate** 31:15 67:5
67:8 94:12 95:7
98:15 137:4
**overstated** 67:14
110:19
**overstatement** 113:7
**overstates** 54:15
66:16 67:3 154:13
**overstating** 94:11
**overturned** 42:13
87:20 90:7
**overvalues** 97:18
98:12
**overview** 24:10
**overwritten** 13:9
**owe** 130:19
**Owens** 78:5,6,10
155:8 157:22 158:3

**P**

**P** 2:1,1
**PA** 3:13
**page** 5:4,5,15,17
21:18 43:12 46:18
46:22 49:7 70:5,6
95:18 117:9,13
142:6,7 162:14
164:8 170:4 180:14
180:16 181:9,15
186:12 197:3,10,17
199:13 200:4
**pages** 21:9,12 199:4
**paid** 10:14 32:17 33:4
36:3 37:5 45:10,11
45:11 46:13 47:2
52:8 55:10,13 59:16
61:18 80:15 96:14
97:14,21 98:10,11
98:13 103:6 105:9
106:13 110:10
111:12 113:4,15,20
114:17,20 115:18
129:2,6,7,18 132:9
132:19,19 133:15
159:6,19 160:1
161:21 163:19
173:15 174:13
175:7 182:15
189:18
**panels** 90:16,19
**paper** 186:18 194:4
**papers** 20:18 167:2
**paragraph** 21:3,3
29:18 30:9,10,18
31:19,21 32:1,8,11
35:22 36:2 42:19
43:21 46:11 56:20
57:10,12 59:4 66:7
67:12 70:7 71:5 73:6
84:2 85:12 92:7,18
95:18 96:1,4,6 99:16
100:4 110:18
115:16 120:9
124:17 142:8 143:5
146:4 160:15
162:15 192:16
193:2 195:16
**paragraphs** 12:20
59:21 60:3 156:3

**parameter** 189:16
191:12
**parameters** 186:22
188:14,15 189:2,3
**parens** 29:20
**parent** 31:14 120:11
127:3
**part** 45:7,8 51:11 52:3
56:14 73:11,22
145:16 196:3
**partial** 64:6 156:9
**partially** 192:11
**particular** 11:21 12:13
13:21 20:20 31:1
43:19 54:1 90:1 91:6
91:6 109:21 142:1,2
142:4 143:9 145:18
171:18 189:19
190:9
**particularly** 49:21
57:9 58:12 189:13
189:15 195:4
**parties** 50:13 82:21
127:6 138:1 139:10
**partnership** 169:18
**parts** 86:6,8,16
**party** 165:10 168:22
177:13 198:14
**pass** 45:2
**passed** 122:4
**passing** 84:16
**pattern** 10:19 85:2
134:1,20
**patterns** 134:17
**pay** 38:7,8 40:12
77:17 80:1,6,9 83:2
84:9 96:19 102:4
103:16 104:6 105:1
106:1,9,12,18 123:2
124:9,10,11 125:3,6
126:5 131:3,12
132:22 137:1,9
143:6,17 146:22
147:4 157:2,3
159:21 160:1,2,5,6
162:20 163:7,9
173:21 174:16
175:4,11 182:16
**payable** 141:9
**paying** 10:21 31:1,6

73:15 79:17 80:16
82:11 103:4,19
107:7 112:11,12
131:2 132:8 142:9
142:15 147:6,11,12
160:9 161:9 162:16
163:4,13,22 173:10
179:9,9
**payment** 32:13 40:7
47:3,19 48:10 49:3,4
49:5,10 52:12,12,16
53:1 58:5 61:12,14
62:14,20 63:6 74:7
80:8 99:18 104:2
110:21 111:6
112:15 114:3 115:6
115:6 116:6 117:20
118:4 121:19
125:16 136:5 143:4
151:19
**payments** 62:16 69:12
69:13 70:10 71:6
103:14 107:1
116:16 120:20,21
123:19,20 129:11
132:15 142:19
178:15
**payout** 37:21 190:7
**payouts** 115:7
**pays** 123:12,18
144:16 147:7 159:4
**PDF** 16:13
**peace** 163:6
**peaked** 94:6,13
**pending** 29:21 30:5
49:6 96:7 101:15
103:11 104:14,15
128:18
**Pennsylvania** 4:4
**people** 12:21 14:1
27:21 40:13 64:15
74:9 83:1 90:17
95:16 96:14,15
97:12 104:13
108:13 110:4
151:18 163:12,16
163:16 193:20,21
194:20
**percent** 28:19,19,20
28:20 32:12,18 46:7

46:14,14 47:20,21
47:22 48:11,11 49:8
49:9 62:2 94:19 97:4
97:4,8 98:6,10
102:10,10,21 105:8
105:10,12,12,13,16
105:22 106:9 107:2
107:4,4,17,18
108:17 110:20,22
111:7 112:1,15
113:9 114:18,20
116:1,14,15,16
117:1,2,19,22
136:22 155:22
156:15 157:11
162:2 170:9 191:18
191:22 192:6,13,21
**percentage** 46:12
61:13,14 62:14,20
63:6 97:6 104:2
111:6 112:15 115:6
117:20
**percentages** 80:8
151:19
**perfectly** 59:11
128:22 146:17
**performed** 54:18
**period** 32:18 51:15
65:15 66:1,3 68:20
69:6 73:17 74:1
96:18 134:13
**periods** 51:13 53:22
66:9 190:12
**Perry** 91:18,19
**persisting** 133:13
**person** 83:15 110:6
110:13 117:5
154:12
**person's** 87:8
**perspective** 18:12
24:8 84:8 89:21
157:16 170:19
178:9,17
**pessimistic** 94:1
**phase** 177:2
**Philadelphia** 3:13
**Phillips** 91:18
**phone** 2:7,14,21 3:6
3:14,21 4:6 154:12
**physical** 119:10

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 216

**Ph.D** 1:12 5:2 6:5
  197:2,4 199:2
**pick** 57:15 58:14
  89:16,19 149:1
  151:22 154:3,5
**pie** 128:3
**piece** 86:9 141:17
  154:22 186:18,20
  190:18 194:9
**pieces** 52:20 56:5
  113:6
**place** 66:6 75:10
  77:20 80:21 107:22
  168:19 180:7
  198:12
**places** 153:5 157:21
**plaintiff** 26:12 33:16
  33:19,21 34:1,16
  36:16,18 38:8 40:1,4
  42:12 44:2 49:18
  78:4 82:8,10 88:12
  89:7 136:2,5 177:7
**plaintiffs** 25:22 36:11
  39:16 49:22 76:22
  81:22 85:18 142:13
**plaintiff's** 34:10 36:13
  36:21 78:8,9,13,15
  78:20 91:17 104:17
  133:11
**plan** 30:21 31:14
  137:9 138:5 139:14
  142:8 143:8,13
  144:8
**plans** 140:10
**platforms** 26:3
**play** 11:1 48:12 59:13
  79:10
**played** 134:2
**please** 7:4
**plug** 187:4
**plugged** 55:22
**plus** 46:9 189:15
**point** 16:6 45:15 66:6
  79:12 88:17 90:14
  99:9 101:19 102:8
  107:12 122:10
  154:14 164:16
  168:4 174:15 182:9
  182:16 191:5
**pointed** 23:14

**points** 194:4 195:13
**POLETTA** 3:16
**policies** 123:7,16,20
  124:8,14 128:18
  129:18 130:1,12
  131:5 149:6,7,22
  153:7 155:14,17,19
  155:21 156:6
**policy** 123:14,16,17
  124:2,4,7 134:8,9,9
  139:12 148:9 150:3
  150:4 153:1 155:7
  156:1 163:4 176:14
**policyholder** 149:1,12
  151:17 152:4 154:4
  155:12,14 156:10
  156:15,19 157:2,19
  182:8
**policyholders** 166:4
  178:9
**population** 45:19 95:9
  114:6 161:1 192:14
**portion** 44:13 58:8
  96:9 120:1 144:20
  147:11 148:1,4
  155:15
**portions** 12:15 13:13
  14:7 57:3
**position** 81:13 84:19
  131:1,7,15,17,22
  155:5 169:14 177:4
**positions** 50:13
**positive** 92:9,16 93:5
**possess** 20:7
**possibility** 106:11
  138:11
**possible** 15:19 16:1
  17:17,20 65:6 87:10
  104:15,21 105:13
  127:16
**post** 81:1
**posted** 89:18
**posture** 26:2
**potential** 8:11 12:2
  27:9 28:14 29:7,19
  31:15 38:1 41:13
  44:12 51:6 58:20
  65:18 67:9 73:8 77:7
  84:5 86:4 92:5 93:5
  93:7 99:7 101:16

106:2 120:4 136:18
  142:10,15 143:20
  143:21 144:10
  145:16 154:15,18
  154:19 156:4 165:7
  165:12 168:18
  169:1,5,8 178:21
**potentially** 18:17
  28:13 83:11,14
  86:18 99:1 120:14
  120:20 124:18
  137:15 179:11
**practice** 25:19 107:6
**preapproved** 78:2
**precedent** 39:9
**precedents** 37:16
  39:12 40:14
**preceding** 32:11
  64:22 65:2
**preclude** 139:11
**predated** 65:9
**predecessor** 74:8
**predicted** 189:21
**prediction** 159:9
**predicts** 189:18
**premium** 143:7,17
  162:16,20 163:5,9
  163:19,22 173:16
**premiums** 142:21
**prepackage** 30:21
**prepacks** 138:3
**preparation** 12:8 15:5
  18:3 19:6,17 35:8
  89:10
**prepare** 11:14 12:6
  53:5 152:8,10
**prepared** 12:6,7 150:8
  174:16
**preparing** 18:5 24:16
  56:21
**prepetition** 65:15
**prescribes** 100:14
**presence** 74:21 75:1
  75:3
**present** 4:11 78:11
  95:20 109:1 120:20
  128:7 129:3,8,9
  170:15 187:19
  192:17
**presentation** 152:18

154:8,13
**presented** 56:3 76:5
  159:5
**presenting** 56:4
**preserved** 15:18
**press** 145:5
**pressure** 28:16,18
  54:8,16 59:7,19 60:8
  61:3 68:12 73:15
  84:4 85:1,16 90:6,10
**presumably** 62:15
  65:8 82:8 104:14
  105:11,14 106:15
  130:17 132:5
**presume** 56:16 104:4
  131:18
**presumes** 131:17
**presumptive** 78:7
**presumptively** 78:3
  79:4
**pretend** 59:9
**pretty** 26:22 81:5
  173:14
**prevailing** 84:3
**prevails** 84:16
**prevents** 179:22
**previous** 16:3
**price** 41:21 121:19
  127:15 128:6
  171:13 176:3
  182:11
**pricing** 156:22
**Priest** 167:4
**primary** 123:5,11,17
  123:19 129:16
  144:6 145:7,22
  151:17 155:16
  158:16,20,21
**principal** 167:18
  169:16
**principally** 167:1
  193:18
**print** 53:12,15
**printed** 187:7,13
  188:1
**prior** 10:12,15 16:19
  28:12 47:16 78:16
  131:11 190:22
  198:5
**private** 165:9 177:19

**pro** 148:13 149:4,16
  151:13 153:5 155:7
  155:11
**probability** 36:16
**probable** 93:11,16,19
  187:13
**probably** 8:21 16:9
  18:7 21:2 22:11
  32:21 33:1 50:18,20
  82:11 91:19 94:11
  95:1,3 102:16 119:5
  124:8 129:12 134:4
  134:14 135:2,16
  136:21 139:18
  144:17,19 149:11
  167:22 168:14
  170:8 176:13
  183:19 185:13,18
**problems** 178:8
**procedural** 174:5
**procedures** 12:1 63:3
  81:16 111:2 117:10
  117:12 131:10
  178:12
**proceeded** 133:8
**proceeding** 6:17
**proceedings** 196:8
**proceeds** 125:22
  130:11,15 182:12
**process** 15:22 55:19
  76:1,15 104:10,11
  104:12 162:9 174:6
  177:15
**processed** 63:2
**processing** 76:11
**PROCTER** 3:2
**produce** 162:12,13
  188:9
**produced** 13:3 186:14
  187:8
**produces** 189:3 190:6
**producing** 68:10
  74:13
**product** 78:6 87:4,7
  163:1 174:1 180:17
  182:12
**production** 17:22
**products** 77:10 79:3
  81:13 85:21 86:14
  163:17 194:2,7

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

# Page 217

professional 166:11
Professor 167:4
professors 166:22,22
profile 39:7 84:11
    146:16
profit 23:2,4
prognosticate 154:4
program 124:1 129:20
    145:19
projected 12:2 157:13
projection 100:12
projects 99:18 101:8
proper 17:3 34:5
properly 12:12
property 114:1
proponents 31:14
    138:5 140:10
proportional 152:1
    155:7
propose 13:19
proposed 11:22 12:21
    30:21 100:7,9
    143:13
proposes 31:6
propounded 199:5
pros 170:21 171:3
protect 110:12
provide 8:4 11:16,22
    13:14 16:20 17:1
    51:9 194:13
provided 9:9,11 10:4
    11:12 12:21 25:12
    26:5 48:22 49:2 69:1
    72:10 100:21
    101:12 106:14
    117:11 201:4
provides 24:10 32:3
    61:10 143:19 174:3
    195:11
providing 7:12 100:12
    117:14
provision 105:10,11
provisions 118:20
public 160:22 177:16
    177:18 178:1 198:4
    198:18
publicly 9:12 21:15
    161:15 177:17
publishes 167:2
punctuation 17:3

purchase 182:11
purchasers 165:8
    168:18
pure 126:12 128:8
purely 194:19
purpose 20:17,19
    21:7 57:12 61:16,20
    104:1,4 137:22
purposes 182:4
pursuant 159:5
pursue 109:22 110:17
pursued 76:22
pursuing 79:5
push 83:21
pushing 102:10
    140:14
put 20:1 28:11 30:16
    53:4 67:10 84:3
    85:16,21 86:3,6,14
    86:16 99:5 100:12
    105:6 126:9,21
    137:14 138:4
    140:12 160:4 180:5
    181:1 189:1 191:12
puts 160:14
putting 94:19 180:8
    181:4
P.A 3:16
p.m 196:8
P.O 2:4

**Q**

qualifies 110:14
quantification 29:2
    67:11
quantify 21:5 29:6
    67:8 88:2 99:5
    143:21 171:11
quantifying 60:7
quarter 80:1,7,9,15,16
    112:13 192:22
quarters 112:13
queries 56:12
question 7:4 23:2
    24:21 28:17 29:5
    41:7 51:13 52:6
    54:17 62:7 81:3,20
    82:4,10,15,18,19
    83:19,20 97:10
    98:18 108:15 109:1

114:3 116:12 117:4
    117:4,5 119:6 122:9
    126:13 128:5 133:4
    133:9 136:1,3
    144:12 149:10
    158:10 160:3,21,22
    166:13
questions 7:3,3 28:20
    66:12 74:20 186:6
    186:12 196:7 199:5
quicker 174:4
quickly 50:1 97:22
    139:17 153:10
quite 120:20
quote 29:19

**R**

R 2:1 4:12 198:1
raise 139:8
ramp 133:20
ramped 11:8 135:7
ramping 135:8
ran 152:6
Rand 106:21 162:4
range 49:19 51:9,11
    51:12 54:3,14,14
    55:12 56:4 60:1,2
    63:10 64:19 66:14
    66:14 67:21 68:11
    68:13 71:8,12,13
    92:22 93:1,12,18
    95:14,21 98:8
    102:16 124:20
    169:1 183:20
    185:19 186:14
    187:10
Ranges 185:12
ranging 92:13
rapidly 87:9
rare 96:13
rata 148:13 149:4,16
    151:13 153:5 155:7
    155:11
rate 11:7 23:8 36:22
    47:3,3 48:11 49:8
    52:17,22 53:1 58:5
    94:14 96:21 97:16
    98:4,10 102:14,21
    163:16 185:9,10
    188:22 191:14,22

192:19 194:4
rates 45:9 47:19 55:8
    97:16 151:19
    188:18,19,20,22
rating 144:3
ratio 73:5 134:4
raw 21:14,17
reach 104:16
reached 151:11
reaching 44:22 63:14
    64:12 171:10
read 5:17 26:9 27:7
    28:7,22 30:10 70:13
    109:8 129:17
    139:17 143:14
    144:13 180:20
    199:3 201:1
reads 193:3
real 57:15 81:3
reality 68:11 97:19
    157:20
realized 68:13 192:9
    192:12
really 21:2 22:22
    23:10,17 24:8 29:3
    30:11 42:8 48:1 52:3
    54:12 55:7 57:14,19
    58:7,10,11,15,22
    59:3 60:3 61:8 66:6
    73:22 74:20 75:20
    79:5 89:4 98:7 100:4
    129:16 135:8 156:7
    171:20 180:13
    182:8 187:10 191:7
reason 67:20 76:6
    95:15 99:11 110:19
    127:2 137:15 143:6
    143:16 153:22
    155:4 167:20
    199:13 200:4
reasonable 61:18
    66:14 95:13 135:22
    136:15,16 137:3
    138:6 139:13
    145:15 163:11,14
    163:18,19,20
reasonableness
    62:13
reasons 67:13 143:2
    143:16,18 162:22

reassessed 84:10
recall 9:2,19 16:8,9
    17:12,16 18:7 32:19
    34:19 35:6 37:7
    43:11 48:17 51:2
    65:7 68:22 69:3 78:5
    91:1,12 109:8 117:9
    123:7 154:22
receipt 59:5
receive 52:15 111:11
    116:8 117:7,17,18
    119:8 181:11,18
received 8:20 31:8
    83:9 112:7 115:22
    118:4,5 185:3
receives 142:7
receiving 114:9
Recess 66:19 141:13
    186:5
recognize 167:6 170:3
recollection 9:17
    69:11 78:16 130:10
    130:13 145:20
    184:2
recollections 91:7
record 150:10,12
recover 68:2 101:2
reduce 77:16 99:1,7
    123:12
reduced 33:12,16
reduces 103:10
reducing 124:5
refer 92:16 100:2
    167:12,13 174:7
reference 21:1 70:14
    135:7
referenced 66:7
referencing 17:4
referred 26:8 34:11
referring 9:7 92:21
    123:4 142:14
    145:14 179:3
reflect 12:12 31:17
    162:18
reflected 33:5 96:4
    99:3
reflects 94:4
reforms 98:22
refresh 78:9,16
regard 10:3 11:17

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

## Page 218

18:16 20:20 22:17
27:18,21 45:13
75:16,18,19 86:11
87:13 120:15
150:16 154:17
165:11 181:11,18
**regarding** 11:22 14:13
15:5 24:1
**regardless** 156:11
**regular** 133:10
**reimbursed** 146:3
**reimbursing** 120:15
**rejected** 115:4
**relate** 92:17 141:6
**related** 9:3 18:9 101:8
143:11 173:9 182:1
193:3,21 194:17,18
**relates** 156:3 161:10
194:9
**relating** 128:22
**relative** 21:5 58:3
137:21 142:12
143:4 153:14
193:13 195:9
**relatively** 10:10,19
49:22 50:1 58:8 99:2
**release** 83:14 145:5
**released** 172:22
173:17 175:19
**relevant** 24:7 36:18
55:7 57:9,11 58:12
82:3 83:19,19 150:1
155:3 189:13,16
**reliability** 25:4
**reliable** 25:6
**relief** 143:12,13
181:13,20
**relieve** 174:19 181:1
**relying** 55:17
**remain** 80:10 176:22
196:4
**remained** 146:5,9
195:18
**remaining** 32:17
123:10 156:16
195:22
**remains** 34:14
**remanded** 34:21
**remember** 78:18 85:8
85:11 117:11 155:2

164:15 169:12
**reminder** 141:20
**removed** 119:14
**reopen** 88:10
**reorganization** 30:21
**reorganizations** 173:7
**rep** 104:9 110:11
**repeat** 53:17
**rephrase** 7:5 41:8
**rephrasing** 17:3
**replaced** 73:11 74:8
**replacement** 86:5,16
**replicate** 53:14
**report** 13:1 16:21 30:4
30:7,10 35:8 67:13
95:18 99:16 106:21
111:20 120:7 126:3
142:5 145:6 162:4
162:14
**Reporter** 198:4
**reporting** 1:22 4:17
182:4 201:5,6
**reports** 72:12 144:14
161:7,9 194:22
**represent** 6:15 25:21
61:22 62:3,16
104:13 135:20
136:4,10
**representation** 71:2
71:22 122:9
**representative** 6:16
51:16,19 52:14
59:11 89:20 188:17
**representing** 183:4,5
**represents** 7:18
104:13 123:4
**requesting** 17:19
**required** 145:8 159:6
**requirements** 119:13
119:13
**reserve** 146:8
**reside** 179:13
**resist** 39:17
**resolution** 34:14
96:21 98:4 102:14
104:16 131:11,14
167:14,15 168:19
174:4 188:18
**resolutions** 45:4 97:9
**resolve** 50:2,18 96:7

103:6,6 180:6 182:6
**resolved** 32:12 46:12
46:17 47:2,8 48:1,2
48:4,14,19,20 49:1,5
49:9 50:5,11,20 69:5
96:12,22 97:15,15
97:17,20,20,22
102:16 103:7
112:12 114:10
131:9 132:2
**resolving** 96:10 97:3
103:5 182:2
**resources** 162:10
167:10 176:17
**respond** 128:4
**responsibilities**
181:22
**responsibility** 108:22
**rest** 30:4
**restricted** 179:20
**restructuring** 145:1
**result** 73:14 88:14
92:10 100:18
115:13 188:19
**resultant** 31:16 80:5
126:14
**resulted** 33:18 34:10
36:8 49:9 85:9
**resulting** 121:3
**results** 53:6,13
145:11
**retain** 174:5
**retained** 29:19 164:18
164:22 165:11,15
165:22 166:1,3,5,8
183:8,12,15
**retentions** 123:22
**retried** 33:22
**return** 36:20,22
**returns** 36:14
**revenue** 144:16
**reversed** 90:8
**revert** 80:18 81:6
175:14
**review** 8:18 14:18
21:22 27:15 119:18
**reviewed** 9:1,4,10,22
12:16 18:1,9,10,13
26:10 30:2 35:7,19
87:13

**reviewing** 14:17 20:19
27:12,20
**reviews** 167:2
**revising** 13:12
**re-create** 54:18 56:1
**RHOADES** 3:8
**Rice** 91:18
**Richard** 3:7 186:11
**rid** 157:4 163:10 181:4
181:6
**right** 21:14 29:10 39:1
47:7,14 57:17 64:20
70:6 71:1,12,21
82:15,17,19 87:21
91:20 103:17 110:5
110:12 115:7 118:6
132:4 158:16 168:6
172:4 186:15
187:16 188:2
195:19 196:1
**rise** 45:9 194:18
**risk** 37:10,18 38:1,5,9
38:11,21 45:18
74:11 75:10,17
84:10 86:10 87:2
146:15 148:14
149:15,17 151:13
153:6 155:11
156:18 157:7,9,19
163:8,10,10,16
171:11,12,20
175:14 178:4
181:21 194:22
**risks** 37:19 40:18 41:3
**road** 74:10,17 99:1
110:9 177:9
**roles** 166:8,9
**ROSE** 1:22 4:17 201:4
201:6
**rough** 69:10 73:5
**roughly** 110:22
**round** 124:22 146:16
**route** 39:11
**Router** 91:20
**routinely** 27:6
**RPR** 4:21
**ruled** 88:12 140:12
**rules** 34:5 83:16 85:13
128:18 155:8
159:14,21

**ruling** 28:8,9,12 84:15
140:13 141:1,10
148:15 149:14
171:7
**rulings** 24:11 26:10
27:17 28:4 88:19,20
88:22 99:3 140:21
141:5 149:14
**run** 56:12 110:1
129:13 134:6
187:18 191:13
**running** 86:20 135:13
161:14 191:6
**runs** 21:2 122:11
167:1,3

---

**S**

**S** 2:1 3:22
**safe** 50:5
**sake** 68:10
**salient** 193:16
**satisfy** 119:12
**satisfying** 182:3
**save** 187:21
**saving** 13:12
**saw** 46:10 150:6
**saying** 23:17 52:5
57:10 61:22 90:14
103:15,18,19,22
108:21 112:14
113:5 116:20
118:11,14 120:2
131:15 147:22
192:1
**says** 14:17 21:18 24:2
28:9 31:18 40:4,10
70:12 78:6 98:8
99:17 105:10,19
113:21 119:20
122:13,17 126:20
127:2 131:20 137:9
145:7 163:2 170:11
173:6 174:22 178:2
180:16 181:15
**scenario** 53:10 54:1
55:17 56:8 74:21
104:21 105:13,18
132:22 157:7 158:5
187:18
**scenarios** 51:20

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

53:16 56:22 57:8
68:8 75:1 88:17
105:15 128:1 158:6
158:11 187:3,3
**scheduled** 101:1
118:8 131:20
**scheduling** 14:16
**scheme** 149:4
**school** 26:16
**scope** 11:19 28:14
62:12 140:19
**Scott** 2:15
**scratch** 12:20 34:3
**screen** 170:3,10
188:4,6
**Screenshots** 197:18
**se** 17:7 18:13
**search** 90:3
**seasonality** 64:9
**second** 32:10 73:7
76:19 86:5 110:19
150:11 195:20,21
**section** 14:18 20:22
21:2 24:8 25:17
120:6 164:9
**secure** 14:4
**see** 8:2,14 13:4 15:3
16:2,18 24:3 31:3
32:14 35:1 36:4 44:4
44:14,15,20 45:4
46:14 47:15 48:9
53:9,10,13 57:5 61:3
70:8,20 71:6 72:17
73:12 74:17 76:20
81:17 91:19 92:13
93:12 94:14 96:13
97:9 101:7 105:17
111:20 115:19
121:5 129:18
134:17 139:15,18
144:14 145:12,14
152:6 161:18
170:12 182:4
187:18 192:4,13,13
**seeing** 53:2 64:16
65:7 102:9,10 103:3
**seek** 41:4,10 76:13
176:9
**seeking** 175:20
**seen** 10:11,12,12

34:19 36:19 48:12
50:9 105:13 122:9
123:15,19,21 124:2
124:7,10,14 134:14
138:4,16 140:8,9,17
150:3,4 161:2,4,5
**sees** 102:7
**selected** 164:9,11
**self** 123:22
**selling** 172:2
**send** 16:5
**sending** 14:4
**senior** 143:1
**sense** 14:2 18:11
24:12 26:17 38:18
74:9 82:8 88:6 94:2
144:4 171:9 187:10
**sensitive** 53:2,22
57:15 58:18 66:8
**sent** 15:4 16:7,16,19
16:21 33:22
**sentence** 17:3 32:10
33:9 36:2 44:10 71:4
72:8 92:17 162:15
193:2 195:20,21,22
**separate** 179:15
**series** 71:10 106:22
**services** 170:16
**session** 187:22
**set** 8:20 10:15 37:16
39:12,16 40:14
52:13,21,22 53:15
59:8 102:15 106:1
159:14 168:16
180:1 186:21
198:12
**setting** 108:10
**settings** 90:20 195:11
**settle** 38:22 39:5,13
40:10
**settled** 43:4,6 49:4
52:12 113:13 141:1
**settlement** 45:9 52:3
52:18 68:16 71:6,15
71:20 82:20,20,21
83:3,5 84:1,19
136:15 140:15
165:15,16 182:14
188:19 189:22
191:15 192:5,9,12

**settlements** 33:3
84:10
**settling** 73:4
**seven** 33:15 133:14
**severe** 117:16 119:2,2
119:10
**shape** 88:18
**SHAPIRO** 2:10
**share** 77:12 87:3,10
135:21 136:5,10
145:9
**shared** 146:7
**shareholders** 174:14
174:16
**sharper** 94:14
**sheet** 21:19 199:7
**shift** 74:16,18
**ship** 193:3,10,21
194:9,17
**shipbuilding** 193:13
**ships** 193:13
**Shipyards** 193:10
**shipyard-based** 94:5
**shocks** 147:14
**shoes** 129:22 155:13
**short** 186:4
**shorter** 64:7
**Shorthand** 198:3
**shot** 170:4,10
**shots** 188:4,6
**show** 60:14 77:1,11
95:19 119:11 187:3
187:15,18 194:17
**showed** 132:13
**shown** 60:13 118:15
**shows** 53:6 106:22
152:11 162:5
194:15
**shrunk** 87:9
**side** 36:15,21 37:4
39:21 40:11,12 59:8
91:17,22 140:9
156:4 157:19
**sided** 180:15
**sides** 39:20
**Sign** 5:17 201:1
**signal** 168:21 169:1
**signature** 201:5
**signed** 185:3 199:10
**similar** 109:17 152:16

163:3 184:19
**similarly** 84:12 95:5
103:7 129:12
**simple** 66:22 88:17
147:8,21
**simplest** 146:19
**simply** 39:5,21 83:9
**sit** 18:8 47:12 48:13
**site** 77:9 78:1,3,7
81:10,16
**sites** 78:2,6
**sits** 120:2
**sitting** 15:1 47:20
81:22 91:1 97:7
127:9
**situation** 160:14
195:17
**six** 31:19 44:22
**skip** 148:10
**skipped** 130:2
**slew** 41:22
**slightly** 69:3,7 176:13
**slower** 192:14
**slowly** 127:2 192:10
**small** 45:6 114:18
115:10,14 116:7,14
117:21 120:3 191:9
**sold** 86:9
**solutions** 170:22
**solvency** 151:18
**solvent** 80:10 82:15
148:5,9,19 149:7
157:11 161:10
**somebody** 13:17
17:14 22:9 28:12
62:18 157:3,21
159:13 165:10
180:4
**soon** 100:18
**sorry** 7:14 71:9
195:16
**sort** 56:10 178:14
**sorts** 88:16 163:15,17
**sound** 162:17,20
**source** 26:6 44:12
**sources** 72:17 87:1

193:6
**South** 3:11
**speak** 8:16 33:2 154:6
**speaking** 104:8,9
**speaks** 30:7
**spec** 86:3
**specced** 28:11,11
**special** 90:1
**specific** 8:4 9:17
11:16 72:16 77:18
82:10 141:17
144:12 159:18
164:16 192:5 194:9
**specifically** 9:5 19:21
27:16 44:9 62:18,21
133:5 135:18 138:3
139:20 151:5
181:21
**specifics** 139:3 155:2
159:9
**specified** 49:5
**specifies** 108:5,8
**specify** 54:1 108:4
188:15,21,22 189:2
**specter** 173:9
**speculate** 87:22 88:16
**speculating** 79:12
**spec'ed** 86:2
**spend** 56:16 170:6
**spending** 51:3,4
**spent** 12:18,19 38:2
50:22 73:3 162:11
170:8 185:15
**spike** 193:10
**spoke** 9:18
**spoken** 90:7 91:12,17
92:2,2,4
**spray** 194:2,7
**spread** 149:5
**spreadsheet** 20:11
101:11
**spreadsheets** 101:4
**spreadsheet-type**
21:10
**Springfield** 3:20
**stability** 58:3
**stable** 58:1,9 97:6
**Stacie** 4:8
**staff** 9:13 12:9,15
13:14 14:13 15:4

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 220

17:14 22:9 185:11
185:13
**staff's** 185:8
**stale** 96:16
**stand** 88:8 129:22
155:13
**standard** 184:17
**standpoint** 128:9
**STARGATT** 2:2
**stark** 107:12,20 120:2
**start** 10:17,21 52:9
95:11 146:20
147:16 155:20
168:2
**started** 135:8 147:21
185:17
**starting** 34:3 43:22
76:15 89:5 191:19
191:20 195:20
**starts** 122:10
**startup** 167:22 173:3
**state** 32:10 34:20 36:2
43:21 75:6 99:19
109:16 120:9
124:13
**stated** 23:5
**statement** 28:1 30:13
57:13 69:21 70:6
72:5 79:13 104:7
105:3,7 113:2
117:13 121:11
122:5,14 123:8
125:18 132:7,13
135:6 142:11 193:7
195:5 197:11
**statements** 23:6
**states** 1:1 20:6 44:11
149:19
**static** 54:4 59:5
**stating** 23:19 32:2
44:6 121:10
**statistics** 193:22
194:12,14
**status** 90:9
**statute** 109:19 110:1
**stay** 151:14 180:10
**stayed** 24:13,20 56:10
109:18
**stays** 73:21 80:21
152:1 153:11

**steep** 95:4
**stenographically**
198:11
**stick** 139:19
**stock** 41:21 103:5
142:20 144:5
**stopped** 63:20
**stops** 97:9
**stored** 13:22
**straight** 148:14
**strategy** 49:17
**Street** 2:5,12,19 3:11
6:6
**strength** 45:14 84:17
**strike** 65:3 105:21
164:20
**strikes** 110:13
**stroke** 32:6
**strokes** 32:2 152:14
165:3,6 179:5
**strong** 84:7
**stronger** 81:19
**strongest** 45:17
**structure** 178:18
180:12,13,18
**structured** 175:18
178:6
**structures** 178:22
179:14 180:3
**struggling** 173:3
**study** 181:10,16
**stuff** 89:17
**sub** 180:4,7 181:4
**subject** 120:14 138:11
161:2
**subsection** 24:9 70:7
**subsequent** 35:3
59:21 72:8 193:13
**subsequently** 11:15
44:2 109:19 110:7
139:9 140:10
**substance** 199:6
**substantial** 115:17
116:21 118:16
119:22 131:12
142:7 144:20
155:15
**substantially** 31:7
67:4 97:21 114:12
130:6 132:4,14

133:18
**substantive** 17:6
18:17,18
**subtlety** 32:4
**succeed** 173:3
**successful** 135:1,2,14
168:1
**successfully** 11:9
**successive** 73:1
**suffered** 146:10
**sufficient** 119:11
176:1
**Suite** 2:19
**sum** 75:7
**summarizes** 89:21
**summarizing** 187:10
**summary** 181:10,16
**sums** 115:17 116:21
131:12 148:11,15
148:22 149:18
152:5 153:13 154:1
154:3,3 173:10
**superior** 170:16,18
**supplied** 86:8 87:7
**supply** 86:1
**support** 31:22
**suppose** 127:5 128:21
129:1 146:18 147:1
168:15
**supposed** 62:15
135:20 136:4,10
**Supreme** 36:17,20
87:15,17,21,22 88:7
**sure** 14:15 70:14
72:14 98:19 104:5
121:21 123:3
141:12 164:14
168:4 183:15
**surprise** 139:21 140:7
140:15
**Susan** 4:21 198:3,18
**Swiss** 3:17 183:22
**sworn** 6:7 198:6
**system** 11:2 15:8,13
15:15 16:4 20:2
24:14,20 27:13 39:9
41:15 45:3 49:13
56:10 62:17 67:9
73:9,16,22 74:2 76:3
76:8,19 77:15 79:17

79:19,20 80:13,14
80:20 81:4,4 82:2,16
96:13 97:1 98:22
101:18 102:6,8
103:17,21 107:3,19
108:20 109:9
110:15 111:12,17
112:8,11,17,20,22
113:1,14 114:5,7,14
115:3,5,7,9 118:5,13
119:8 131:3,7,11,18
132:9 133:3 134:13
135:5 137:1 146:5,9
159:13,21,22
160:17 162:6
178:13,14,16 180:9
180:10 195:18
196:1,5
**systems** 107:20

**T**

**T** 2:8 198:1,1
**table** 5:1 47:19 95:19
117:12 127:9 128:7
**tables** 111:20
**tailor** 171:21
**tailored** 180:18
**take** 6:18 7:7,8 37:6
37:10,14 38:13,16
38:19 40:12,17 41:1
41:12,17,18,19,20
49:12 50:14 52:21
53:5 57:21 59:9
61:12,15 62:2 63:18
65:3,17 66:11,18
69:14 71:2,22 77:15
77:22 78:3 83:13
84:18 93:21 94:9
100:16 103:9,9
111:6,9 113:12
127:1 128:16 130:3
134:19 141:11
146:19 152:10
153:6 154:9 157:2
157:21 159:13
164:4 171:13 172:5
172:8 176:13 186:4
188:11,13 189:4
192:16,17
**taken** 66:1 101:11

102:12 174:12
198:11
**takeover** 142:20
**takes** 49:19 50:4,6
139:4
**talk** 36:1 38:15 46:11
53:21 66:17 90:17
94:2 101:21 138:8
141:18 153:1,1
154:17 164:14
177:3,5 179:22
186:13 195:22
**talked** 30:3 42:4 51:14
68:19 85:5,15 87:12
90:4,5,11,18,20 91:5
91:21 92:18 111:5
149:12 173:14
**talking** 25:18 32:9
36:7 37:19 56:6
78:14 118:22 130:5
154:10 168:12
180:22
**talks** 55:8,9,11 71:5
177:6
**tapped** 129:16
**target** 165:12
**task** 135:19 136:8,12
160:8
**taught** 39:4
**Taylor** 2:2 89:5
**TDP** 30:19 31:6,16
60:13,14,15 62:6,14
63:6 80:8 94:4 99:13
99:18,22,22 100:7,9
100:10,14,16 101:7
101:7 102:3 104:3
107:13 110:19
111:2 115:17
116:13 117:20
119:1,19 126:8
127:19 135:20
136:10 137:8,10,20
137:22 139:5,22
141:6 159:6,9
162:18
**TDPs** 61:13
**technical** 33:20
**technically** 34:1 96:12
96:20 117:16
130:12 183:14

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 221

**Technologies** 143:10
**tell** 8:9 9:14 10:7
  12:18 14:8,11 21:11
  45:5 48:13 62:18
  78:15,20 95:15
  107:14 153:2 154:2
  161:4 171:14 185:2
  188:13
**telling** 58:11
**tells** 186:22
**temp** 87:4 194:2
**tend** 50:2 160:18,18
**tends** 84:21
**tens** 54:6
**term** 88:5
**terms** 9:19 10:1 11:20
  18:18 20:1 33:2 52:9
  58:21 59:15 74:16
  74:18 77:21 82:10
  89:10 91:3 94:7 95:2
  98:22 99:6 100:9
  106:16 107:20
  111:11 117:7
  122:19 127:22
  131:2 133:2 136:20
  136:21 142:22
  150:1 151:5 156:5
  156:12 178:9
  189:14 193:16
**test** 55:2,14
**testified** 18:2 67:6
  113:11 190:21
**testifies** 6:7
**testify** 198:7
**testimony** 141:15,17
  141:18 198:10
**text** 12:21
**Thank** 186:7
**that;s** 114:19
**theories** 85:19 86:19
  86:21
**THEREFOR** 199:13
  200:4
**they'd** 41:19,20 46:9
**thing** 95:6,8 119:19
  125:9 164:1,16
  192:2 194:11,21
**things** 10:13 12:10
  18:14,14 19:21 26:3
  26:13 30:15 45:12

64:3,8 83:22 92:4,6
  94:3 95:10 129:17
  136:14 143:3
  163:18 164:17,22
  165:4 178:5,8,12
  182:14 189:1
  190:17 191:17
**think** 8:22 11:19 16:6
  32:20 36:9 38:4,5,6
  38:10 39:3 41:16,18
  41:19,20,21 42:5,6
  42:14 44:10 51:9,10
  52:14,16,18 56:6,6
  60:3 63:13 67:19
  68:5 69:10 82:3
  85:15 89:8 92:3
  95:12,13,14 96:1
  99:12 101:22
  104:12 106:20
  109:8 113:11
  122:10,17,19 125:7
  125:9,14,17 128:15
  130:12 133:16
  142:12 145:18
  152:4,6 154:13
  156:22 158:14
  161:3 163:10
  167:11,13 168:3
  169:12 174:8,10,11
  174:14,15 180:14
  185:13,21 186:2
**third** 86:7 107:16
  168:22 177:13
  181:9,15 195:21
**third-party** 10:13
**thought** 34:7 157:18
  162:22 164:3
**thoughts** 8:14
**three** 30:11,19 31:13
  32:11 33:18 34:12
  34:20 42:21 44:22
  46:2 47:21 57:20
  60:18 65:1 68:17
  77:1 84:2 85:19
  86:11,17,20 87:1
  99:4 101:20 111:18
  112:13 126:14
  127:5,13 131:19
  135:3,6 136:20,21
  153:13 168:3

**three-year** 32:18
  57:21 68:20
**tie** 91:6
**time** 7:7 13:5,6,8 27:9
  40:7 44:20,20 45:18
  46:7 51:13 56:16
  62:14 64:4 66:9
  67:22 73:17 81:17
  84:12 86:11 91:16
  99:10 102:8 110:17
  122:2,12 128:20
  134:13 141:10
  148:13 149:15,17
  151:13,15 153:6,6
  155:11 163:8 170:6
  170:9 174:15 181:6
  185:7,8,15 187:7
  188:10,16 192:7,8
  193:5 195:13 196:5
  198:11
**timeline** 174:4
**times** 6:22 101:20
  116:17 126:14
  136:20,21 183:11
  183:15,17
**timetable** 194:19
**timing** 83:18
**title** 120:7
**titled** 9:2
**today** 6:18 14:22
  24:22 48:13 81:22
  91:2 108:10 194:8
**told** 9:20 98:12 153:2
**tolling** 109:18
**top** 24:2 99:17 102:14
  130:1 142:7 152:21
**topic** 90:17 91:7
**tort** 10:14 11:2 18:16
  20:4 24:13,20,21
  25:5,18,22 27:13
  30:22 31:2,8,17 39:9
  41:15 45:2 49:13
  54:4,10 57:1,4 59:5
  60:10 61:1 62:1,3,17
  67:1 73:8,9,16,22
  74:2 76:2,8,19 77:1
  77:3,15 79:16,19,20
  80:13,20 81:3 82:1
  82:16 89:18 91:18
  92:8,10 93:6 96:12

97:1 98:22 99:6
  101:17 102:5,8
  103:17,21 107:3,8
  107:19 108:20
  109:2,4,9,12,22
  110:15 111:12,17
  112:8,11,17,20,22
  113:1,13 114:5,6,9
  114:14 115:3,5,7,9
  115:19 116:1,9,18
  117:2 118:5,13,15
  119:8,20 120:15
  121:12 131:3,7,8,11
  131:13,18 132:9
  133:3,8,13 134:13
  135:4 136:17 137:1
  137:4,21 145:17
  146:5,9 147:5
  159:12,17,21,22
  160:17 161:10,12
  162:6,19 177:11
  178:13,16 180:9,10
  182:2 195:18 196:1
  196:5
**total** 32:16 43:18
  46:19 69:9,10 71:20
  101:12 112:11
  116:18 120:3 141:7
  141:8
**totality** 63:13
**totally** 52:22
**totals** 187:19
**tower** 148:12
**toxic** 25:18,22
**traded** 177:17
**traditional** 176:14
**training** 22:19 26:15
  26:17
**transaction** 125:13
  171:6,17 176:2
  178:5,19 179:21
  180:11
**transactional** 179:3
**transactions** 168:10
  168:11,12
**transcript** 198:10
  201:3
**transcription** 199:4
**transfer** 80:18 136:2
  179:10,10

**transferring** 179:13
**transition** 145:21
**transmitted** 17:10
**transparency** 80:13
  81:4,8
**transposed** 187:11
**treat** 66:8 124:3
**treatment** 134:9
**trend** 48:5 94:10
**trended** 69:6
**trending** 11:11 60:19
  68:16 69:2,2 72:6
  111:19
**trial** 9:4,6 11:4 32:9
  34:21 37:6,11,20
  38:12,19 39:22 40:5
  40:9 42:8,10,12,15
  43:4 50:1,13 54:6
  60:9 79:9 83:1,5
  84:3,5 85:6 118:18
**trials** 85:6
**tried** 33:10,14 43:7
  143:20 159:8
**tries** 168:9
**triple** 157:14
**trouble** 86:20
**true** 105:19 121:7
  123:15 125:20
  156:8 160:16
  198:10
**trust** 11:22 20:2 31:1
  61:4,8,9,15,18 63:3
  65:6 75:4 76:19 77:2
  78:1 79:8 80:14 81:4
  83:16 100:18,20
  101:9,14 102:4
  103:11,15 104:22
  105:10,14,15,19
  106:1,14,16,19
  107:9 108:5,7 109:2
  109:7 110:11
  111:10 113:3,19,21
  113:21 114:20,21
  115:2,4 116:9 117:7
  117:10,12 118:8
  120:1 121:2 125:22
  125:22 130:9,11,21
  130:22 131:5,9
  132:22,22 133:3
  136:18,19 137:6,8

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

138:15 139:6,15
157:6,8 159:4,13,16
159:21 160:8,19
161:2,5,21 170:16
178:12
**trustees** 106:15,18
108:10,21
**trusts** 20:3 54:7 73:12
74:5,7,12,22 75:2
76:3,9,10,13,14,21
77:5,16 78:1 79:2
80:5,6,16 81:1,15
82:1,10 83:8 106:22
107:6,10,16,22
108:15 131:12
138:16,18,20
159:15 160:17,18
160:21 161:12,13
161:17 162:4,5,7
**truth** 198:7,7,8
**try** 7:5,8 20:6 36:13
39:11,14,18 40:4
41:8,14 67:7,10
140:13 154:6
168:19
**trying** 30:16 36:20,22
37:1,20 39:16 114:2
133:10,17 135:17
154:4 167:11,13
168:1 170:15
187:20
**tune** 105:16
**turn** 21:1 32:8 46:22
70:5 76:3,18 181:9
**turned** 76:8 129:9
130:21
**Turning** 43:12
**twice** 73:3 102:4
**two** 16:10 21:9,12
23:1,3 29:8 31:9
39:20 46:9 50:3,4,7
54:11 57:21 61:9
72:17 77:1 83:22
86:17 101:21
107:13,20 113:6
117:16 118:12
127:21 134:6
153:15 191:19
**two-year** 60:21
**tying** 91:9

**U**

**type** 13:4 75:20 83:20
148:15 168:19,20
**types** 8:5 11:17
119:21 143:1
165:22 189:1
**typical** 67:22 87:9,10
97:21 114:10,11,13
192:8
**typically** 13:16,22
49:22 64:8,11 68:2
76:22 84:6,18 96:17
119:3,11 138:10
139:11 140:22
144:4,21 166:1

**U**

**UK** 3:18
**ultimate** 34:14 52:6
56:9 74:6
**ultimately** 34:16 43:22
81:20 100:19
**umbrella** 124:8
145:20,22 146:1
148:8 151:14
155:19 156:1
158:22
**unaware** 148:7
**uncertain** 75:9
**uncertainty** 38:9,11
74:12 98:1,5 102:19
**unclear** 41:6
**uncommon** 50:16
**uncompensable** 31:2
**undercompensated**
115:15
**underlying** 10:14
53:20 72:10,11 82:7
89:6 182:2 186:19
**underneath** 32:3
**understand** 7:4 22:20
25:5 27:2,3 28:8
56:13,17 64:2 98:19
100:16 104:19
122:8
**understandable** 7:6
**understanding** 27:7
42:9 55:18,19 56:4
56:17 85:18 100:11
129:15 130:16
135:20 136:9,12

138:22 139:2,4
141:4 157:22 179:4
**understate** 67:5 95:1
98:15
**understood** 62:12
**underwrite** 171:12
176:2
**underwriting** 176:4
**unimpaired** 118:17
**UNITED** 1:1
**universe** 114:16,19
**University** 167:5
**unknown** 34:15 43:15
161:1
**unreasonable** 60:15
61:11
**unreasonably** 62:9
136:6 137:21
**unresolved** 92:11
**unsecured** 3:9 127:4
166:6
**unspecific** 122:11
**updated** 14:9
**upheld** 84:8
**upside** 157:7,9 158:3
**upward** 72:6 156:20
**use** 25:1 57:19,20
140:13 146:16
174:10 179:18
184:17 186:21
190:12
**USG** 174:12,14,16,18
174:19 175:9
177:21
**USG's** 175:7
**usually** 7:8 52:9 76:2
134:19,22 135:3
149:2 154:6
**U.S** 96:2 173:8 193:4
194:12

**V**

**valid** 85:4 159:5,10,12
**valuable** 121:8,17
125:21 126:1
127:16 153:8 157:1
**valuation** 20:12,14
22:2
**value** 8:11,11 21:5,6,6
22:5,8,11,12,22 23:4

23:5,6,11,12,16,18
23:19,21 32:16
39:10 40:8 45:9 51:6
52:18 54:20 61:4,8
61:11 62:22 63:2,5,6
66:14 67:2 68:16
92:11 95:19,20
99:21 101:1,6 113:8
113:10 115:9,19
117:14 118:16
120:8,11,20 121:1
128:7,11 129:3,8,9
130:5 131:4,20
136:6 142:18 143:8
144:5 153:12,14
162:1 173:16 187:1
187:19 192:9
**valued** 144:4
**values** 11:6 12:1
30:19 55:12 60:14
60:16 61:9,21,22
62:3,9,11,15,19,20
63:6 68:5 80:7,8
97:17 99:13 100:6,9
100:10,14,17 101:3
117:10 126:9,11
131:17,18 135:19
135:22 136:4,9,15
136:15,19,21 137:2
137:4,7,10,20 139:5
139:12 140:1,11
162:2 188:20 192:5
192:12,16,17
**valuing** 22:15,20
178:14
**variability** 60:5
**variables** 49:20 52:2
53:5 55:22
**variation** 51:12
**varied** 138:20
**varies** 49:15,16,16,17
79:5,9 109:16
134:22 166:3
168:13
**various** 21:19 50:13
52:1 139:4,10
140:12 151:20
174:9 183:20
**vary** 49:17 77:20
191:16

**vast** 114:14
**veracity** 55:14
**verbally** 17:11,13
**verdict** 33:11,16,19,21
33:21 34:2,10,16,17
36:1,4,8,9,17,18
38:1,7,8,21 42:13
83:11,13 84:8,13,16
84:22 85:10 133:16
**verdicts** 11:5 33:3,15
36:7 38:6 41:13 54:6
88:14 133:14
135:15
**verification** 84:13
**version** 13:3 16:7,11
16:13,14,20 17:15
17:18
**versions** 15:20 16:3
**versus** 47:2 52:12
60:1 69:10 96:3
132:9 133:3 170:11
**viable** 86:21 180:2
**view** 34:4,13 36:9
40:16 47:1 75:5
95:13 136:17 180:1
**viewed** 18:11 39:21
75:9 135:19 136:8
137:3 139:5,7,7
149:16,18
**viewpoints** 37:14
**violate** 108:22
**virtually** 39:17
**visually** 152:5
**vitae** 164:5 167:21
**volatile** 38:6
**voluntarily** 130:17

**W**

**walk** 40:7 68:14 101:9
170:14
**walked** 153:4
**WALKER** 3:8
**Wallace** 149:14 153:9
155:8 160:11
**want** 51:15,17 52:4,21
59:13 66:12 79:21
98:18 104:5,14
111:15 127:15
128:6,8 163:9
175:11 177:3 187:3

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 223

188:16 189:1
191:13
**wanted** 14:18 53:17
54:17 109:9
**wants** 168:15,16
182:10
**war** 94:13 193:11,14
193:17,18
**Washington** 1:14 2:13
3:5 4:5 6:2,6
**wasn't** 11:20 17:8,13
60:12 155:2
**Water** 143:9
**Watts** 125:11 143:9
143:10
**wave** 73:10
**way** 14:2,3 31:10
51:18 64:17 76:22
79:4 82:7,9 83:11
89:16 106:12 130:4
137:11 141:2
148:11 164:21
169:15 182:8,10
192:4
**ways** 55:5 77:9 138:2
81:19
**web** 170:4
**website** 169:13
197:18
**weighing** 88:7
**weighs** 88:8
**weight** 51:12 94:19
**weighted** 61:9 149:15
153:9 155:12
**went** 10:16 42:12 45:6
80:4 85:6 132:12
135:9 153:12
155:16 189:15
194:1
**weren't** 73:21 76:9,12
76:17 103:3
**West** 2:5
**we'll** 18:20 66:17
138:8
**we're** 56:6
**we've** 30:3 36:19
68:19 92:18 111:5
172:18 176:20
**Whichever** 82:7

**White** 4:12 25:12
91:18 170:7 185:7
185:16 195:3
**willing** 37:15 40:2,6,11
40:12 83:2 143:6,17
157:3 166:17
**Wilmington** 2:6
**Wilson** 24:3 25:7,13
25:15 26:6 27:14
89:14,16
**window** 57:14,17,18
57:21 58:11 188:16
188:21
**windows** 51:20 54:12
57:2 64:8,10,11
**windy** 139:9
**winning** 11:4 54:5
60:9 133:12 135:15
**Winterthur** 3:17
183:22
**witness** 28:3 76:7
111:15 132:12
140:20 198:6 201:4
**Word** 13:5,11,12,17
13:18,20 15:7 16:11
16:13
**words** 44:11 46:4
**work** 10:5 13:11 14:13
15:8 25:15 27:20,21
29:12 56:14 61:7,11
62:13 128:15 148:6
150:15 165:7 169:4
171:14,15,17,18
176:1 180:18
182:18 184:15
185:6 188:7 193:21
194:17,18 196:3
**worked** 25:10 78:5,10
137:14 172:12,15
182:18,20 183:1,3
184:1,10,12
**workers** 194:6
**working** 13:6,21 14:6
15:10 16:4,12 20:18
37:13 170:6 172:9
184:2 185:17
194:20
**workings** 163:21
**works** 7:2 83:3 190:11
**world** 81:2 94:13

124:14 147:1
157:11 158:8
178:16 193:11,14
193:17
**worlds** 147:17
**worst** 104:21 105:13
**worth** 121:12,14,16
125:18,19,21
127:13,14,18,20
128:13 178:12
**wouldn't** 14:20 37:21
50:6 52:21 53:18
54:22 55:21 63:14
107:14 109:4 119:5
121:7 125:2 158:17
162:9,12 192:4
**write** 166:17,18
**writing** 12:20
**written** 13:13 105:12
116:22 152:8
**wrong** 30:11 67:7
**wrote** 31:10 121:11
**Wyner** 3:7 5:5 186:8
186:10,11 196:7

**Y**

**Yale** 167:5
**Yasuda** 3:18 184:7
**year** 23:2,3 37:21
43:13,19 46:6,6,8,20
50:3,4,7 52:7 64:7
64:19 72:9 73:1 85:9
97:5 101:1 102:8,17
102:22 103:4,8
128:16 144:16,17
160:1,2 170:8
187:16,16 188:8,11
189:19 190:1,8,9,10
190:13,16 191:18
191:19,19,20 192:6
**years** 11:6 32:11
44:16 45:1 46:2,9,12
47:21 50:3,4,7 51:1
52:14,17,21,22
54:11 57:20,20 58:3
59:10,11 60:18
63:11,16,17 64:4,13
64:14 65:2 68:17
71:18 72:6,21 77:2
78:18 81:12 85:6

86:20 89:5 94:6
96:11 98:2,3,9,9
99:4 111:18 122:3
124:1 129:2,5,6,7,7
132:20 135:3,14
162:3 164:15 168:3
189:15 191:3,11
193:15 194:13,15
**year-by-year** 106:1,9
**York** 3:4 4:19,19
149:16 201:8,8
**young** 1:16 2:2 97:22
**younger** 68:2

**Z**

**zero** 38:7 40:6,12
112:7,13
**zeros** 112:6

**$**

**$100** 95:20
**$100,000** 38:22 39:13
40:4,8 60:16 111:3,4
131:19
**$135** 148:1
**$140,000** 131:19
**$15** 127:18
**$15,000** 112:12
113:16
**$150** 126:21
**$150,000** 40:5,9
**$175** 126:21
**$18.1** 71:20
**$1800** 118:2
**$2** 174:13,17,19
**$20** 32:21 33:2
**$200** 126:19
**$230** 100:15,19
**$25** 125:3
**$35** 23:5 129:3,10
**$355,000** 33:12 38:8
**$40,000** 115:5
**$48** 122:17
**$5** 120:5
**$5,000** 116:7 118:3,7
**$50** 94:18 125:1
126:19 127:20
129:19 157:13
**$50,000** 36:3,21 37:21
38:1,21

**$6.3** 71:16
**$60** 129:8,10
**$600** 117:22
**$65,000** 111:18
112:11
**$70** 121:13
**$75** 93:8 127:7 128:12
130:3 142:9 159:2
**$90** 63:10 64:18 66:13
66:22 67:14 68:10
186:14

**0**

**05** 135:10
**06** 135:10
**07** 135:12
**07081** 3:20
**08** 46:5 135:12
**09** 46:5 135:12

**1**

**1** 19:1,5 28:19 105:8
105:12,13 106:3
108:17 116:1,14
117:2 120:5 197:3
**1-800-825-3341** 1:22
4:20 201:9
**1.1** 71:8
**10** 32:21,22 33:2
84:22 94:6 96:11
98:3 107:18 121:16
121:16 135:11,13
144:15,16 172:19
172:20 183:20
194:13
**100** 93:12 94:19 95:11
102:12 134:15
146:18,20,21 147:2
155:22 156:15
157:11 187:12
**100,000** 61:7 111:7
112:1 186:3
**1000** 2:5
**1001** 4:4
**10011** 4:19 201:8
**11** 1:4 43:21 142:6
**11/30/2011** 198:22
**110** 122:20
**115** 103:11
**12** 46:11 64:20 66:2

US Bankruptcy Court - Delaware
In Re Leslie Controls

FINAL - October 4, 2010
Charles Mullin, Ph.D.

Page 224

190:13
**12-month** 64:8,10,11
  190:12,17
**12.3** 70:19
**123** 3:11
**1300** 6:6
**135** 122:21 129:14
  147:9,11,13,16
  158:14 160:11
**15** 7:1 33:1 48:11 59:4
  67:12 73:6 84:2
  85:12 92:18 96:11
  97:4 98:6,10
**150** 102:20 103:2
  110:20,22 157:14
**1500** 117:15,21
**16** 59:4 92:7 186:12
**160** 185:12
**169** 197:17
**17** 95:18 192:16
**17th** 2:5
**18** 60:4 66:3,4 96:2,4
  193:2
**1825** 2:12
**186** 5:5 47:8,10
**19** 60:4 96:6 197:3
**19109** 3:13
**197** 5:15
**19801** 2:6
**1982** 194:3

_____
**2**
**2** 69:16,20 105:12
  175:11 197:10
**2,000** 118:2
**2.1** 71:9,14
**2.2** 70:18 135:10
**2.5** 191:18,22 192:5
  192:13
**20** 28:19 32:17 48:11
  56:20 66:7 69:11
  96:11 98:2 105:10
  105:14,16,22 106:9
  116:15,16,17 117:1
  125:19
**20,000** 117:18 118:8
**2000** 10:12 80:3
**2000s** 10:16
**20001** 3:5
**20004** 4:5

**20006-5403** 2:13
**2003** 44:19
**2004** 44:17,19
**2005** 47:19 48:16
  70:17,18,22 71:8
  74:15
**2006** 47:19 48:16
  135:9
**2007** 47:20 48:2,3,15
  76:10,12
**2008** 6:1 43:22 46:17
  46:20 47:7,8,11,16
  47:21 48:4,14,15
  49:7,9 50:6,6,10,12
  50:18,19,21 51:1
  76:12 111:21
**2009** 46:1 47:21 48:10
  51:1 70:18,19,22
  71:15,19 145:6
**201** 5:17
**2010** 1:13 47:21 48:4
  48:7 51:5,15 60:20
  63:16,19 65:19 71:9
  71:19 111:21
  199:10
**202-346-4244** 3:6
**202-420-3369** 2:14
**202-624-2727** 4:6
**2050** 191:6,8,10
**2060** 191:6,8,10
**21** 99:16 110:18
**215-772-7410** 3:14
**230** 101:9,10 127:19
  128:10 129:4 160:5
  160:10
**24** 66:4 115:16
**25** 46:7,14 47:22
  69:12
**250** 40:12 185:18
**250,000** 40:11
**26** 120:9 124:17
**27** 21:3 142:8
**28** 143:5
**29** 146:4 156:3 160:15
  195:16

_____
**3**
**3** 169:21 170:3 173:4
  197:17
**3:30** 196:8

**30** 21:3 32:17 125:22
  156:3 160:15
  183:14
**300** 45:7 160:2
**302-571-6712** 2:7
**31** 162:16
**312-276-1400** 2:21
**325** 2:19
**35** 22:12 23:9 160:1
  163:22
**350** 185:18
**355,000** 33:16
**36** 66:3
**38** 47:21
**39** 47:20
**39.4** 71:1 72:3
**391** 2:4
**392** 46:1

_____
**4**
**4** 1:13 6:1 43:12 46:18
  174:13 175:11
  185:13
**4.5** 192:21
**40** 46:13 47:20,21
  62:2 78:18 107:2,17
  111:7 112:14
  114:17,20 117:19
  117:22 129:2,6
  162:2 163:22
  191:11
**40,000** 114:3 115:13
**400** 45:7 48:10 102:9
  102:22
**45** 107:17 162:2
**45,000** 112:16
**4500** 117:15,20
**48** 64:22 123:3

_____
**5**
**5** 28:19 49:7 84:22
  107:4,18 170:9
  175:5 183:20
**5,000** 118:9
**50** 28:20 78:18 93:12
  95:20 112:1 113:9
  121:14,14 125:4,18
  125:21 127:22
  128:13 134:14
  136:22 183:14

187:12
**50,000** 60:20 111:21
**500** 185:14
**524(g)** 40:19 41:4,10
  65:6 73:12 143:12
  163:2 170:11,16
  171:1,2,7 173:7
  174:3,14 175:20
  176:21 178:3,10
  179:19 180:2,12,17
  181:6

_____
**6**
**6** 5:4 70:5 135:10
**60** 54:14 59:2,14
  60:12 63:10 64:18
  66:13,22 67:14,21
  68:4,4,10 92:13
  93:17 102:17
  111:18,22 115:13
  186:14 187:9 191:2
  191:21
**60s** 122:10 194:7
**60,000** 112:14
**60610** 2:20
**625** 2:19 185:10
**65,000** 111:22 115:13
**673** 3:19
**69** 197:10

_____
**7**
**7** 95:18 175:5
**70** 32:12 121:15,17
**70,000** 60:21
**75** 49:8,8 92:22 93:1
  98:20 99:12 102:10
  102:21 124:18,19
  125:9 127:10,17
  128:10,21 129:2,5,6
  129:12 130:6
  158:16 160:1,13
**75,000** 186:2
**751** 46:19

_____
**8**
**80** 4:18 32:12 97:8
  102:10,21 201:7
**80s** 122:11
**80,000** 60:19 111:21
**85** 97:4,8

**88** 97:8

_____
**9**
**90** 54:13,14 59:2,15
  60:12 67:21 68:4
  92:13 102:18 107:3
  187:9 191:2,21
**901** 3:4
**96** 80:2
**97** 80:2
**973-912-5222** 3:21
**98** 80:2
**99** 80:3