# EXHIBIT A

B10 (Official Form 10) (12/08)

| UNITED STATES BANKRUPTCY COURT - EASTERN DISTRICT OF NEW YORK | PROOF OF CLAIM |
|---|---|

| Name of Debtor:  Ramp Chevrolet, LLC | Case Number:  09-77513 (reg) |
|---|---|

NOTE: *This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.*

Name of Creditor (the person or other entity to whom the debtor owes money or property):
General Motors LLC

☐ Check this box to indicate that this claim amends a previously filed claim.

Name and address where notices should be sent:
John R. Skelton, Esq.
Bingham McCutchen LLP
One Federal Street
Boston, Ma. 02110
Telephone number:   617.951.8789

Court Claim Number: _____
*(If known)*

Filed on: _____

Name and address where payment should be sent (if different from above):

Telephone number:

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check this box if you are the debtor or trustee in this case.

**1. Amount of Claim as of Date Case Filed:**    *See Addendum* _____

If all or part of your claim is secured, complete item 4 below; however, if all of your claim is unsecured, do not complete item 4.

If all or part of your claim is entitled to priority, complete item 5.

☐ Check this box if claim includes interest or other charges in addition to the principal amount of claim. Attach itemized statement of interest or charges. See Addendum (to the extent permitted by law).

**2. Basis for Claim:** *See Addendum* _____
(See instruction #2 on reverse side.)

**3. Last four digits of any number by which creditor identifies debtor:**   2107

**4. Secured Claim** (See instruction #4 on reverse side.)
Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.

Nature of property or right of setoff:  ☐ Real Estate    ☐ Motor Vehicle    ☒ Other
**Describe:** See Addendum

Value of Property:$ *See Addendum*    Annual Interest Rate _____%

Amount of arrearage and other charges as of time case filed included in secured claim,

if any: $ _____    **Basis for perfection:** *See Addendum* _____

Amount of Secured Claim: $ *See Addendum*    Amount Unsecured: $ -0-

**6. Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim.

**7. Documents:** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements or running accounts, contracts, judgments, mortgages, and security agreements. You may also attach a summary. Attach redacted copies of documents providing evidence of perfection of a security interest. You may also attach a summary. *(See definition of "redacted" on reverse side.)*

DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

If the documents are not available, please explain:

**5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a). If** any portion of your claim falls in one of the following categories, check the box and state the amount.

Specify the priority of the claim.

☐ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries, or commissions (up to $10,950*) earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier – 11 U.S.C. §507 (a)(4).

☐ Contributions to an employee benefit plan – 11 U.S.C. §507 (a)(5).

☐ Up to $2,425* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. §507 (a)(7).

☐ Taxes or penalties owed to governmental units – 11 U.S.C. §507 (a)(8).

☐ Other – Specify applicable paragraph of 11 U.S.C. §507 (a)(_____).

**Amount entitled to priority:**

$ _____

**Amounts are subject to adjustment on 4/1/10 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.*

| Date: | Signature: The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any.  *Maynard L Timm (by aes)*    Maynard L. Timm, Esq., Legal Staff General Motors LLC | FOR COURT USE ONLY |
|---|---|---|

IN RE RAMP CHEVROLET, LLC
CHAPTER 11 CASE NO. 09-77513 (REG)

## ADDENDUM TO PROOF OF CLAIM OF
## GENERAL MOTORS LLC

**Background**

1.      On October 5, 2009 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), which Chapter 11 proceeding is now pending in the United States Bankruptcy Court for the Eastern District of New York, as Case No. 09-77513 (reg) (the "Ramp Bankruptcy Proceeding").

2.      By order dated June 23, 2010, the Bankruptcy Court established July 26, 2010 as the bar date for creditors to file proofs of claim.

**GM Asserts a Secured Claim of $699,096.01 Based on its Set Off and Recoupment Rights**

3.      General Motors LLC ("GM") asserts a secured claim of at least $699,096.01. GM's Claim is secured, in full, by its set off and recoupment rights as set forth in (i) the Dealer Sales and Service Agreements between Ramp Chevrolet, LLC (the "Debtor") and GM, pursuant to which the Debtor was authorized to operate a Chevrolet, a Chevrolet Medium Duty Truck and a Hummer dealership (collectively, the "Dealership") at 1395 Route 119, Port Jefferson, New York (the "Dealership Premises"); and as described more fully below, (ii) the "Wind-Down Agreements" executed by the Debtor and approved by the Bankruptcy as part of the "Old GM" bankruptcy proceeding.

4.      As set forth below, pursuant to the Wind-Down Agreements the Debtor's Wind-Down Agreement payment totals $1,304,613 (the "Wind-Down Payment"). GM's claim is secured by its right of set off against the Wind-Down Payment.

**GM's Bankruptcy and The Execution and Approval of the Wind-Down Agreements**

5.      On June 1, 2009, General Motors Corporation ("Old GM") filed a petition pursuant to Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the

IN RE RAMP CHEVROLET, LLC
CHAPTER 11 CASE NO. 09-77513 (REG)

Southern District of New York, Chapter 11 Case No. 09-50026 (REG) (the "GM Bankruptcy").
That case is still pending.

6.      As part of the GM Bankruptcy, the GM Bankruptcy Court approved the sale of
substantially all of Old GM's assets to "New GM". *See generally In re General Motors Corp.,*
407 B.R. 463, (Bankr. S.D.N.Y. 2009).

7.      As part of the sale process, Old GM identified the poorly performing dealers that
would no longer be retained. Although the bankruptcy proceedings would have allowed Old GM
to reject these dealers immediately, Old GM instead issued the so-called "Wind-Down
Agreements" to the discontinued dealers, giving them more than a year to wind down operations.
If executed and agreed to by the dealers, those Wind-Down Agreements were then assumed by
New GM. The Debtor was among those dealers who executed Wind-Down Agreements and
whose agreements were assumed by New GM.

8.      More specifically, the Wind-Down Agreements allowed the Dealers to continue
selling and servicing GM vehicles under certain modified conditions until October 31, 2010 and,
relevant here, provided monetary payments to the Dealers to wind down their operations.  The
entire sale process, including the Wind-Down Agreements, were approved by the Bankruptcy
Court.

9.      Because the Debtor operated three dealerships (Chevrolet, Chevrolet Medium
Duty Truck and Hummer), the Debtor executed and the GM Bankruptcy Court approved three
Wind-Down Agreements.  The Wind-Down Agreements are attached hereto as Exhibits A-C.
Each provided a Wind-Down payment to be made to the Debtor.  Pursuant to the Wind-Down
Agreements, for the Debtor's Chevrolet operations, GM agreed to make a wind down payment to
the Debtor totaling $1,261,613. *See* Exhibit A, §3(a).  The payment for Chevrolet Medium Duty
Truck was $19,000, Exhibit B, §3(a), and the payment for Hummer was $24,000. *See* Exhibit C,
§3(a).  The total Wind-Down Payment was $1,304,613.

2

IN RE RAMP CHEVROLET, LLC
CHAPTER 11 CASE NO. 09-77513 (REG)

10.    Pursuant to the terms of the Wind-Down Agreements, the Wind-Down Payments are to be made in two (2) installments, 25% or $326,153.25 upon, among other things, execution of the Wind-Down Agreements and the approval by the GM Bankruptcy Court of the 363 Sale; and the remaining 75% or $978,459.80, upon the satisfaction by the Debtor of certain conditions. *See* Wind-Down Agreements, Exs. A-C, ¶3(a).

11.    As set forth in the Wind-Down Agreements, GM's obligation to pay and the Debtor's right to receive the Wind-Down Payment is subject to certain specific terms. Indeed, by order dated February 3, 2010, this Court approved the Debtor's assumption of the Wind-Down Agreements, and in doing so recognized that any payment by GM to the Debtor was to be "pursuant to" the specific terms set forth in the Wind-Down Agreements.

**The Wind-Down Agreements Provide That The Debtor's Wind-Down Payment is Subject to GM's Recoupment and Set off Rights and the Reconciliation of the Open Account.**

12.    Pursuant to the Dealer Agreement and other applicable GM policies and procedures, the financial dealings between GM and its dealers, including the Debtor, related to the operations of the Dealership (other than for the purchase of new vehicle inventory but including the payment of warranty reimbursements, sales and other incentives and rebates, etc.) is handled through a series of debits and credits posted to what is commonly referred to as the dealer's Open Account (the "Open Account"). The Open Account is normally reconciled or settled on a weekly basis, and if there is a credit balance, such credit balance is paid by GM to the Dealer and, if there is a debit balance, such debit balance is to be paid by the Dealer to GM. Further, pursuant to the Dealer Agreement, "all monies or accounts due Dealer are net of Dealer's indebtedness to General Motors and its subsidiaries."

13.    The terms and conditions set forth in the Wind Down Agreements that must be satisfied before GM is obligated to make the Final Payment include:

(i)    Payment is to be made by crediting the Dealer's Open Account in accordance with GM's standard practices;

3

IN RE RAMP CHEVROLET, LLC
CHAPTER 11 CASE NO. 09-77513 (REG)

(ii)     Dealer must have sold all of its new motor vehicle inventory;

(iii)    Dealer must be in compliance with all "applicable bulk transfer, sales tax transfer or similar laws . . ."

(iv)    Dealer must deliver to GM a certificate from any applicable taxing authority that the Dealer has paid all sales, use and other taxes or provide other evidence reasonably satisfactory to GM that it will have no liability or obligation to pay any such taxes that remain unpaid;

(v)     Dealer's removal of all dealer-owned signs (freestanding or not) from the Dealership Premises, and

(vi)    Dealer's execution and submission of a fully executed Supplemental Wind-Down Agreement.

14.     Paragraph 3(c) of the Wind-Down Agreements also specifically provides that in addition to any other rights of set off under the Dealer Agreements, payment of all or any part of the Wind-Down Payment (i) may be reduced by any amount owed by the Dealer to GM or its affiliates; or (ii) it may be delayed if GM has a reasonable basis to believe that there is a competing claim.

**Balance Due Based on Open Account Reconciliation is $699,096.01**

15.     Attached hereto as Exhibit D is a summary of the weekly Open Account statements provided to the Debtor which show the amounts due and owing to GM. The actual weekly statements are available upon request. The Open Account statements show that as of the statement dated July 16, 2010, the Debtor owes to GM a total of $699,096.01. Pursuant to the terms of the Wind-Down Agreements, GM has the right to set off this amount, plus any additional charges that may be posted to the Open Account pursuant to GM's standard process, from any Wind-Down Payment due from GM to the Debtor. The Wind-Down Payment to be made by GM shall be net of any monies owed by the Debtor to GM (or its affiliates).

**Reservation of Rights**

16.     Pursuant to the order entered in the GM Bankruptcy, the GM Bankruptcy Court retained exclusive jurisdiction to determine any disputes regarding. among other things, the terms, conditions or enforceability of the Wind-Down Agreements. GM specifically reserves all

A/73444965.2

IN RE RAMP CHEVROLET, LLC
CHAPTER 11 CASE NO. 09-77513 (REG)

rights to have any dispute between GM and the Debtor concerning the parties' respective rights under the Wind-Down Agreements to be determined as part of the GM Bankruptcy.

17.    This Claim is hereby filed to preserve GM's rights with regard to any amounts which are or may be due under the Dealer Agreements or the Wind-Down Agreements.

18.    GM reserves the right to amend this Claim from time to time to restate amounts contained in this Claim as it becomes further liquidated or for other lawful purposes, including, without limitation, to file additional proofs of claim for additional claims which may arise based on the respective rights and obligations arising under the Agreements referred to herein, as well as under any other or applicable agreements or events and circumstances described herein. GM reserves its right to claim all amounts due in respect of any post-petition interest, default interest, all rights of and to indemnification, premiums, collection costs, pre- and post-petition fees, costs and expenses, including, without limitation, attorneys' fees, costs and expenses, in amounts as yet undetermined, pursuant to the Agreement and to the extent allowed by applicable law.

19.    This Claim is filed under the compulsion of the bar date and is filed to protect GM from a potential forfeiture of claims or rights by reason of said bar date. Filing of this Claim is not and shall not be deemed or construed as: (a) a waiver or release of GM's rights against any person, entity or property (including, without limitation, any person or entity that is or may become a debtor in a case pending in this Court); (b) a consent by GM to the jurisdiction of this Court or any other court with respect to proceedings, if any, commenced in any case against or otherwise involving GM; (c) a waiver or release of GM's right to trial by jury in this Court or any other court in any proceeding as to any and all matters so triable herein, whether or not the same be designated legal or private rights or in any case, controversy or proceeding related hereto, notwithstanding the designation or not of such matters as "core proceedings" pursuant to 28 U.S.C. §157(b)(2), and whether such jury trial right is pursuant to statute or the United States Constitution; (d) a consent by GM to a jury trial in this Court or any other court in any proceeding as to any and all matters so triable herein or in any case, controversy or proceeding

5

IN RE RAMP CHEVROLET, LLC
CHAPTER 11 CASE NO. 09-77513 (REG)

related hereto, pursuant to 28 U.S.C. §157(e) or otherwise; (e) a waiver or release of GM's right to have any and all final orders in any and all non-core matters or proceedings entered only after de novo review by a United States District Court Judge; (f) a waiver of the right to move to withdraw the reference with respect to the subject matter of this Claim, any objection thereto or other proceeding which may be commenced in this case against or otherwise involving GM; (g) an election of remedies; or (h) a waiver or release of any right of setoff or recoupment that GM may hold. Furthermore, GM reserves the right to attach or bring forth additional documents supporting its claims and additional documents that may become available after further investigation or discovery. The filing of this Claim shall not be deemed a waiver of the GM's right to assert that any or all of the amounts owed to it, if any, are entitled to administrative priority status.

20.     This Claim is filed in addition to and not in lieu of any other claim filed by any division of the subject creditor or by any of its affiliates.

6

**EXHIBIT B**

HEARING DATE: OCTOBER 27, 2010
HEARING TIME: 1:30 P.M.

WILK AUSLANDER LLP
675 Third Avenue
New York, New York 10017
Ph: (212) 421-2233
Eric J. Snyder (ES-8032)
Counsel for the Debtor

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| RAMP CHEVROLET, INC., | Case No.: 09-77513 (reg) |
| Debtor. | |

**REPLY OF DEBTOR TO RESPONSE OF GENERAL MOTORS LLC TO MOTION OF DEBTOR FOR ORDER: (1) FINDING GENERAL MOTORS IN VIOLATION OF THE AUTOMATIC STAY FOR: (A) APPLYING DEBTOR'S POST-PETITION PAYABLES TO ITS PRE-PETITION CLAIM; AND (B) FOR FAILING TO RECEIVE BANKRUPTCY COURT APPROVAL BEFORE EFFECTUATING A SET-OFF; (2) HOLDING GENERAL MOTORS IN CONTEMPT FOR DELIBERATELY VIOLATING THE STAY; (3) COMPELLING GENERAL MOTORS TO REMIT TO THE DEBTOR THE OUTSTANDING WIND-DOWN MONEY, PURSUANT TO WIND-DOWN ORDER ASSUMING THE WIND-DOWN AGREEMENT; AND (4) GRANTING ITS OBJECTION AND RECLASSIFYING AND REDUCING CLAIM #21, THE PROOF OF CLAIM OF GENERAL MOTORS**

TO:   THE HONORABLE ROBERT E. GROSSMAN,
       UNITED STATES BANKRUPTCY JUDGE:

Ramp Chevrolet, Inc., the debtor and debtor-in-possession herein ("Debtor"), by

its counsel, submits this reply (the "Reply") to the response (the "Response") of General

Motors LLC ("GM") to the objection and motion (collectively, the "Objection"), filed by

the Debtor, pursuant to Sections 105(a), 362(a)(7) and 502 of Title 11 (the "Bankruptcy

Code"), and Bankruptcy Rules 3007, 9014 and 9020, for an order: (i) finding GM in

violation of the automatic stay for asserting set-offs without Bankruptcy Court approval;

442980v1

(ii) holding GM in contempt for deliberately violating the automatic stay; (iii) compelling

GM to remit to the Debtor the sum of $975,459.80, representing the sum outstanding

under the Wind-Down Agreement; and (iv) reclassifying and reducing Claim #21, the

secured proof of claim of GM from $699,096.01 to $406,571.50. In support of the Reply,

the Debtor states as follows:

I.

**THE MOTION SHOULD BE HEARD BY THIS COURT**

A.    **THE OBJECTION SHOULD BE HEARD IN THIS BANKRUPTCY
COURT BECAUSE THE TWO ELEMENTS OF THE RELIEF SOUGHT,
AN OBJECTION TO A CLAIM AND CONTEMPT ARE BOTH CORE
PROCEEDINGS WHICH THIS COURT HAS EXCLUSIVE
JURISDICTION TO CONSIDER.**

1.    New GM devotes more than half of the Response to its argument that this

Court should not hear the Objection and "defer" to the jurisdiction of the Bankruptcy

Court for the Southern District of New York. This attempt to circumvent the exclusive

jurisdiction of this Court has no merit and should be seen for what it is: forum shopping

in its purest form.

2.    The Objection seeks two forms of relief: (i) the reclassification and

reduction of the GM POC[1]; and (ii) to hold GM in contempt (twice) for violating the

automatic stay. Both these forms of relief constitute core proceedings. See 28 U.S.C.

Section 157(b)(2)(allowance or disallowance of claims is core proceeding); *Maritime*

*Asbestosis Legal Clinic v. LTV Steel Co., Inc. (In re Chateaugay Corp.)*, 920 F.2d 183,

187 (2d Cir.1990) ("For other debtors [who are not natural persons], contempt

proceedings are the proper means of compensation and punishment for willful violations

of the automatic stay.").

---

[1] Capitalized terms shall retain the meaning ascribed to them in the Objection, unless otherwise indicated.

2

3.    Since the Objection constitutes a core proceeding, GM's attempt to compel Ramp (and, by extension, this Court) from adjudicating the Objection to the GM POC is an unprecedented attempt to infringe upon the exclusive jurisdiction of this Court.

4.    GM complains that the SDNY Bankruptcy Court has exclusive jurisdiction over the Objection because the Debtor is seeking an interpretation of the WDA. Response, p.3: (""[the Objection] ultimately challenges the enforceability of the various provisions of the WDAs and as such, implicates the enforceability of the very agreement approved by the Old GM Bankruptcy Court as part of the GM sale and comes with the retention of exclusive jurisdiction by the Old GM Bankruptcy Court....").

5.    The Debtor is not seeking an interpretation by this Court of the WDA or any agreement. What the Debtor is seeking is the determination that Section 553 applies (and, as set forth below, circumscribes) GM's set-off rights under the WDAs. The ability of this Court to make this determination as part of the claim adjudication process, directly implicates a core function and can be applied harmoniously with the jurisdiction of the SDNY Bankruptcy Court in the General Motors bankruptcy proceeding.

6.    Therefore, this Court should not defer its core jurisdiction to the SDNY Bankruptcy Court and should decide the Objection.

B.    **THE OBJECTION SHOULD NE HEARD IN THIS BANKRUPTCY COURT BECAUSE GM HAS CONSENTED TO THIS COURT'S EXCLUSIVE JURISDICTION TO ADJUDICATE THE OBJECTION.**

7.    In the Response, GM goes to great lengths to avoid addressing the fact that it filed the GM POC (Objection, Ex. F) and that the Objection seeks it adjudication pursuant to the claims allowance process. By filing the GM POC, GM specifically

3

consented to the jurisdiction of this Court to adjudicate the GM claim. *Granfinanciera,*

*S.A. v. Nordberg,* 492 U.S. 33, 109 S.Ct. 2782, 106 L.Ed.2d 26 (1989).

8.    In *Granfinanceria,* the Supreme Court specifically recognized that by

filing a claim against a bankruptcy estate, the creditor triggers the process of "allowance

and disallowance of claims," thereby subjecting himself to the bankruptcy court's

equitable power. 492 U.S., at 58-59, and n. 14, 109 S.Ct., at 2799-2800, and n. 14.[2]

9.    Therefore, not only does this court maintain exclusive core jurisdiction

over the Objection, GM consented to the adjudication of the claim's process in this Court.

It is clear that GM is attempting to circumvent this Court's jurisdiction because, as we

show below, it cannot meet its burden of demonstrating the right to set-off or

recoupment.

10.    In fact, GM, by its (in) action, has made it clear that this Court should

decide the issues set forth in the Objection.

11.    The Objection was filed on September 24, 2010. If GM genuinely

believed the SDNY Bankruptcy Court retained sole and exclusive jurisdiction to

determine the Objection, it would have sought such relief immediately in that Court. In

fact, more than three weeks after the filing of the Objection, on October 12, 2010,

counsel for GM transmitted a letter to counsel for the Debtor stating, among other things,

that "If [the Objection] is put over, GM will not file an emergency motion with Judge

Gerber." *See* Ex. E to Response, p.3 and "[GM] will have no choice but to seek such a

hearing before October 27." *Id.*

---

[2] In the GM POC, GM "reserves" its right to object to the jurisdiction of the Bankruptcy Court, Objection, Ex. F at p.5. Such a reservation has no legal effect. As one court has noted, in analyzing the effect of so "called "protective" proofs of claims: "[the] proof of claim purports to reserve his right to jury trial, but he can no more stave off a waiver in that manner than he could accede to this court's jurisdiction only on the condition that he win." *In re Smith,* 389 B.R. 902, 916, n.10 (Bankr. D. Nev. 2008).

442980v1

12.     Counsel for the Debtor immediately responded to counsel for GM that it would not adjourn the hearing.  Response, Ex. E. What steps did GM take to obtain the relief it the SDNY Bankruptcy Court "on an emergency basis" and before October 27, 2010, the hearing date on the Objection? GM waited an additional 8 days until October 20, 2010 to file a motion to compel in the SDNY Bankruptcy Court and scheduled a hearing on the motion to compel by regular notice, returnable November 18, 2010, twenty-two days after the hearing on the Objection.

13.     Put simply, GM sat on its rights. Asking the SDNY Bankruptcy Court to consider an issue more than three weeks after this Court, on twenty-nine days notice and more than 3 weeks after this Court is scheduled to hear the Objection, demonstrates that GM has no pressing interest in obtaining a determination in any Court other than this one. In light of GM's previous consent to this Court's jurisdiction, codified by Congress in 28 U.S.C. §157(b)(2), this Court should determine the Objection.

## II.

## GM MAINTAINS NO RIGHT OF SETOFF

14.     In the Objection, GM argues that its right of Set-Off is exclusively governed under the Wind-Down Agreement and this Court should ignore Section 553 of the Bankruptcy Code. In the alternative, GM maintains that the Debtor's obligation to GM and the obligation from GM to the Debtor both arose pre-petition, and therefore, GM has satisfied the right of set-off.  Response, pp 14-22.

15.     GM has the burden of demonstrating it has satisfied the requirements of Section 553 to effectuate a set-off. *In re Bill Heard Enterprises, Inc.*, 400 B.R. 813, 823 (Bankr. N.D. Ala. 2009). A party seeking to establish a right of setoff must prove that the

debt owed to the debtor and the debt owing from the debtor both arose before the

commencement of the case and that the claims and debts are mutual between the parties.

*Id.* GM must also demonstrate that it is not effectuating a set-off within 90 days of the

Petition Date under Section 553(a)(2) of the Bankruptcy Code. In the present case, GM

has satisfied *none* of these requirements.

A.    **GM HAS NO RIGHT OF SETOFF BECAUSE THE DEBT OWED TO GM
      AND THE DEBT OWED BY GM TO THE DEBTOR DID NOT BOTH
      ARISE PRIOR TO THE PETITION DATE.**

16.    As set forth in the Objection, and not disputed by GM, GM is required to

demonstrate that the debt incurred by the Debtor and by GM both occurred prior to the

Petition Date. See 11 U.S.C § 553(a) (....this title does not affect the right of a creditor to

offset a mutual debt  owing such creditor to the debtor that arose before the

commencement of the case...against a claim of such creditor against the debtor that

arose before the commencement of the case....").

17.    There is no dispute that the claims of GM, consisting of the claims of

Argonaut and the claims of General Motors Corporation, the assignor of the claims to

GM, occurred prior to the Petition Date.  Response, p.10.

18.    However, the Debtor's claims against GM clearly did not also arise pre-

petition.  This is admitted by GM in the Response as well: "Ramp is simply not entitled

to a payment unless and until it (i) has satisfied all of the pre-conditions to payment....As

long as Ramp owes GM and its affiliates monies, regardless as to whether those

obligations arose pre- or post-petition, it does not have an unforceable right under the

express terms of the WDAs to force New GM to make a Wind-Down Payment."

Response, ¶ 51.

442980v1

19.     Therefore, it is undisputed that, as of the Petition Date, the right of the
Debtor to obtain the Wind-Down Money was contingent upon the Debtor satisfying
certain of the aforementioned "pre-conditions". Therefore, the Bankruptcy court should
look to applicable state law to determine if contingent claims may be set-off. *See. e.g.,
Town of Hempstead Employees Federal Credit Union v. Wicks,* 215 B.R. 316
(Bankr.E.D.N.Y. 1997)(Bankruptcy Courts should look first to state law first to
determine rights of set-off).

20.     The applicable nonbankruptcy set-off law is "determined by applying the
law of the state where the operative facts occurred." *In re Williams,* 61 B.R. 567, 571
(Bankr.N.D.Tex.1986). Here, the franchise agreements and the WDA were entered into
in New York, which is the Debtor's principal place of business. The Court should
therefore look to New York law to determine Debtor's right of setoff.

21.     New York recognizes both equitable and statutory set-off. Statutory setoff
is governed by Debtor and Creditor Law § 151, which provides,

Every debtor shall have the right upon:

(a) the filing of a petition under any of the provisions of the federal bankruptcy act or
amendments thereto ... by or against a creditor ...

* * * * * *

to setoff and apply against any indebtedness, whether matured or unmatured, of such
creditor to such debtor, *any amount owing* from such debtor to such creditor, *at or after,*
the happening of [the filing of a bankruptcy petition].

* * * * * *

the ... right of set off may be exercised by such debtor against such creditor or against any
trustee in bankruptcy [or] debtor in possession ... claiming through or against such
creditor or such trustee in bankruptcy [or] debtor in possession ...

New York Debtor and Creditor Law, § 151 (McKinney's Supp.1991) (emphasis adeed).

7

22.     To be available for setoff under § 151, GM's debt to the Debtor can be

matured or unmatured, but it cannot be contingent *In re Prudential Lines, Inc.*,

148 B.R. 730, 752 (Bankr..S.D.N.Y.1992); *Trojan Hardware Co. v. Bonacquisti*

*Construction Corp.*, 141 A.D.2d 278, 534 N.Y.S.2d 789, 791 (N.Y.A.D. 3rd Dept.1988).

An unmatured debt is generally evidenced by a contract and can be expected in the

normal course of events to be due and owing in the future, although the obligation has not

yet ripened. A contingent liability, however, is marked by uncertainty as to whether any

obligation will ever arise. *Id.*

23.     As set forth above, it is clear that GM's debts to the Debtor under the

WDA were contingent upon the Debtor satisfying certain "pre-conditions" subsequent to

the Petition Date.  For this reason, GM maintains no right of set-off under Section 553 of

the Bankruptcy Code."[3]

## B.    GM HAS NO RIGHT OF SETOFF OF GENERAL MOTORS CLAIMS, IN ANY EVENT, UNDER SECTION 553(a)(2) BECAUSE GM IS ASSERTING SET-OFF RIGHTS WITHIN 90 DAYS OF THE PETITION DATE.

24.     As set forth above, there is little doubt that the Debtor's claim against GM

under the WDA arose post-petition. However, if this Court should determine that the

Debtor's claims against GM arose pre-petition, then GM, by virtue of its assignment of

General Motors claims as part of the sale, could not have obtained that claim prior to July

10, 2009. See Response, ¶¶1, 2 ("on July 10, 2009, [GM] purchased substantially all of

the assets of the GM Debtors....and assigned to GM certain Wind-Down Agreements.").

---

[3]GM's clearly has a problem articulating when the Debtor's claim for the Wind Down Money is due for obvious reasons: if it argues that the Wind Down Money became due pre-petition to preserve its set-off rights, it is in violation of the automatic stay and in contempt. However, if it argues that the Wind Down Money is not due until after the Petition Date, it maintains its defense to the stay violation but destroys its ability to demonstrate set-off. For this reason, it argues both! Compare ¶¶45, 50 of Response (WDA payment claim arose pre-petition, "notwithstanding that Ramp needed to meet certain conditions for final payment") with ¶51 (Ramp is not entitles to payment until certain pre-conditions, including issuance of a tax clearance letter and payments of sums due to affiliates, are satisfied).

25.    Section 553(a)(2)(B) of the Bankruptcy Code prohibits set-offs that occur by assignment, within 90 days of the bankruptcy[4]. In the present case, since the Debtor filed for Chapter 11 relief on October 5, 2009, eighty-seven days later, GM may not assert any claims it obtained by assignment.[5] Therefore, any claim assigned by the General Motors Corporation to GM cannot be set-off, even if Debtor' claim arose prior to the Petition Date.

## C.    GM HAS NO RIGHT TO SETOFF AFFILIATE CLAIMS BECAUSE THE DEBTS ARE NOT MUTUAL.

26.    The set-off claims of GM, as set forth in the POC, have two components: i) an unpaid rent claim due to Argonaut Holdings, Inc. ("Argonaut"), an affiliate of GM; and ii) the chargeback claims due to General Motors Corporation and assigned to GM. As set forth immediately above, GM has no right to set-off any assigned claims under Section 553(a)(2)(B).

27.    To the extent: i) the rent claim due by the Debtor to Argonaut was not assigned to GM[6]; and ii) are otherwise able to be set-off under Section 553, GM would still be unable to set-off the Argonaut claim. As set forth in the Response (¶10), $450,000 of the $699,000 claim is for rent due not to either General Motors Corporation or GM, but to Argonaut. While the WDA allows GM to set-off claims against sums owed by the Debtor to affiliates, such "triangular" set-off are not permissible under the Bankruptcy Code.

---

[4] Section 553(a)(2) states, in relevant part: "this title does not effect the right of a creditor to offset a mutual debt..., except to the extent that-...(2) such claim was transferred, by an entity other than the debtor to such creditor---...(B)—(i) after 90 days before the filing of the petition; and (ii) while the debtor was insolvent....".
[5] The statute also requires that the Debtor be insolvent as of the transfer (July 10, 2010). There is a presumption of insolvency under Section 553(c) that has not been rebutted.
[6] This seems to ne GM's position because it continually argues that it is not required to make any payments to the Debtor since its affiliates are owed money. Response, ¶ 51.

9

28.    Setoff is appropriate in bankruptcy only when a creditor both enjoys an independent right of setoff under applicable non-bankruptcy law, and meets the further Code-imposed requirements and limitations set forth in section 553. *See, e.g., In re Tarbuck,* 318 B.R. 78, 81 (Bankr.W.D.Pa.2004) (holding that courts must look to state law to determine whether a right to setoff exists, but that "the granting or denial of a right to setoff depends upon the terms of section 553, and not upon the terms of state statutes or laws."); *see also In re Garden Ridge Corp.,* 338 B.R. 627, 632 (Bankr.D.Del. 2006).

29.    The additional restrictions imposed by section 553 are well-settled. In order to effectuate a setoff in bankruptcy, courts construing the Code have long held that the debts to be offset must be mutual, prepetition debts. *See, e.g., Scherling v. Hellman Elec. Corp. (In re Westchester Structures, Inc.),* 181 B.R. 730, 738-39 (Bankr. S.D.N.Y.1995).

30.    The case law is also clear that debts are considered "mutual" only when "they are due to and from the same persons in the same capacity." *Westinghouse Credit Corp. v. D'Urso,* 278 F.3d 138, 149 (2d Cir. 2002)(*citing Westchester,* 181 B.R. at 740). Put another way, mutuality requires that "each party must own his claim in his own right severally, with the right to collect in his own name against the debtor in his own right and severally." *Garden Ridge,* 338 B.R. at 633-34 (quoting *Braniff Airways, Inc. v. Exxon Co., U.S.A.,* 814 F.2d 1030, 1036 (5th Cir.1987)).

31.    Because of the mutuality requirement in section 553(a), courts have routinely held that triangular setoffs are impermissible in bankruptcy. *See, e.g., Matter of United Sciences of America, Inc.,* 893 F.2d 720, 723 (5th Cir.1990) ("The mutuality requirement is designed to protect against 'triangular' set-off; for example, where the

10

creditor attempts to set off its debt to the debtor with the latter's debt to a third party."); *In re Elcona Homes Corp. (Green Tree Acceptance, Inc.)*, 863 F.2d 483, 486 (7th Cir.1988) (holding that the Code speaks of a "mutual debt" and "therefore precludes 'triangular' set offs"). Moreover, because each corporation is a separate entity from its sister corporations absent a piercing of the corporate veil, "a subsidiary's debt may not be set off against the credit of a parent or other subsidiary, or vice versa, because no mutuality exists under the circumstances." *Sentinel Products Corp.*, 192 B.R. at 46 (*citing MNC Commercial Corp. v. Joseph T. Ryerson & Son, Inc.*, 882 F.2d 615, 618 n. 2 (2d Cir.1989)).

32.    In *In re Semi-Crude, LLP*, 399 B.R. 388 (Bankr. D.Del. 2009), the Bankruptcy Court in Delaware recently had the opportunity to address the identical issue that is presented here: can parties agree to a triangular set-off, despite the fact that said agreement violates the mutuality requirement of Section 553 of the Bankruptcy Code. The Bankruptcy Court, construing the definition of "mutuality" narrowly, denied the set-off:

> The Court finds the definition of "mutuality" embraced by other courts to be instructive in this matter. The overwhelming majority of courts to consider the issue have held that debts are mutual only if "they are due to and from the same persons in the same capacity." See, e.g., Westinghouse, 278 F.3d at 149; Garden Ridge, 338 B.R. at 633; Westchester, 181 B.R. at 740. It is also widely accepted that "mutuality is strictly construed against the party seeking setoff." In re Bennett Funding Group, Inc., 212 B.R. 206, 212 (2d Cir. BAP 1997). See also Garden Ridge, 338 B.R. at 634; In re Clemens, 261 B.R. 602, 606 (Bankr.M.D.Pa.2001). The effect of this narrow construction is that "each party must own his claim in his own right severally, with the right to collect in his own name against the debtor in his own right and severally."

11

> Garden Ridge, 338 B.R. at 633-34 (quoting Braniff
> Airways, Inc., 814 F.2d at 1036).

> Construing the generally accepted definition of mutuality
> narrowly, as it is obliged to do, the Court concludes that
> mutuality cannot be supplied by a multi-party agreement
> contemplating a triangular setoff. Unlike a guarantee of
> debt, where the guarantor is liable for making a payment on
> the debt it has guaranteed payment of, an agreement to
> setoff funds does not create an indebtedness from one party
> to another. An agreement to setoff funds, such as the one
> claimed by Chevron in this case, does not give rise to a
> debt that is "due to" Chevron and "due from" SemCrude. A
> party such as SemCrude does not have to actually pay
> anything to a creditor such as Chevron under a tripartite
> setoff agreement; rather, it only sees one of its receivables
> reduced in size or eliminated. SemCrude does not owe
> anything to Chevron, thus there are no debts in this dispute
> owed between the "same persons in the same capacity."

*Semi-Crude*, 399 B.R. 396-97.

33.    Therefore, not only is GM prohibited from setting-off the rent due to

Argonaut, because its obligation to pay the Wind-Down Money arose post-petition, it

cannot set-off the Wind-Down money against the rent due to a lack of mutuality.

**D.    GM MAY NOT SET-OFF THE CHARGEBACKS BECAUSE IT DID NOT
TIMELY ASSERT THE CHARGEBACKS UNDER APPLICABLE LAW.**

34.    The Debtor has already established two independent reasons why GM may

not set off the $292,524.63 related to the charge-back audit: i) the Wind Down Money is

a post-petition obligation, which cannot be set-off against this pre-petition claim; and

ii) since GM obtained an assignment of this claim under Section 553(a)(2), within 90

days of the Petition Date, it is not capable of set-off. There is a third reason why this

claim is not capable of set-off.

35.    As set forth in the Objection, GM conducted the audit in an untimely

manner. (Objection, pp. 8-10). GM does not dispute this in the Objection, but claims,

442980v1

instead, that the chargeback audit: i) was the result of fraud; ii) cannot be claimed by the Debtor under the Wind Down Agreement. Response, pp. 24-25.

36.    Other than the self-serving statements of GM's counsel, there is absolutely no evidence of any fraudulent conduct by the Debtor, and the self serving comments by GM's lawyer contained in the Response comes no where near the evidence necessary for GM to satisfy its burden of set-off.

37.    As to the Debtor's alleged release of its right to assert this claim (Objection, ¶57) the WDA, and the Deferred Termination Agreement ("DTA"), annexed thereto (Response, Ex. A) speak for themselves. Under the DTA, all waivers by the Debtor are effective "upon the termination of the Dealer Agreement as provided in Section 2 and Section 3 of the Agreement,.... (DTA, ¶5). According to ¶3(a) of the DTA, termination is "to be effective October 31, 2010". As a result, the Debtor has not waived any rights to make any claims, because the WDA has not terminated as of this date.

## E.    GM HAS WAIVED IT RIGHT TO SETOFF BY NOT RAISING THESE DEFENSES IN A TIMELY MANNER

38.    A creditor waives its right to setoff unless it takes affirmative steps necessary to effectuate a setoff. *In re Lykes Bros. SS Co.*, Inc., 217 B.R. 304, 312 (Bankr. M.D. Fla. 1997).

39.    In the Motion to Assume (Objection, Ex. C), as set forth in the Objection, Debtor states, unequivocally, that it is entitled to the full $1,304,613. See Motion to Assume, ¶9. The Order approving the Motion to Assume "direct[s GM] to remit the Wind-Down Money [defined in the Motion as $1,304,613] to the Debtor." (Objection,

13

Ex. D).  Despite this language, GM did not interpose any objection to either the Motion

to Assume or the Order approving the Motion to Assume entered on February 3, 2010.

40.    It was not until seven months later, when GM filed the GM POC, did GM

allege a setoff.  And, even at that time, GM never sought to modify the stay to effectuate

a set-off but, instead, the Debtor was forced to seek an order holding GM in contempt.  In

fact, GM, to this day, has still not sought to modify the stay to effectuate a set-off, even

though it assures this Court that it would be entitled to such relief if it ever requested it.

Response, fn 8.

41.    Therefore, in addition to the four reasons enumerated above as to why GM

has not met its burden of demonstrating its right to set-off, this Court should also

determine that GM has waived its right to seek such relief by not raising the defense

when the Motion to Assume was filed.[7]

III.

### GM HAS NO RIGHT OF RECOUPMENT

A.    **GM MAINTAINS NO RIGHT OF RECOUPMENT BECAUSE THE
OBLIGATIONS THAT FLOW FROM GM AND THE DEBTOR ARISE
FROM SEPARATE AGREEMENTS**

42.    As admitted by GM, the right to recoupment is limited to only those

"obligations arising out of the same contract or transaction."  Response, pp. 23-24 (citing

*In re Bill Heard Enterprises*, 400 B.R. 813, 822 (Bankr.N.D. Ala. 2009).

43.    Courts have applied one of two primary approaches in determining

whether the obligations at issue meet the "same transaction" requirement.  One approach

is the "logical relationship test" articulated by the Supreme Court in *Moore v. New York*

---

[7] The Debtor reserves the right to argue that the set-off by GM is improper under Section 553(b)(the
"Improvement of Position" test)  of the Bankruptcy Code should GM articulate when it effectuated the set-
off in question.

14

442980v1

*Cotton Exchange,* 270 U.S. 593, 610, 46 S.Ct. 367, 70 L.Ed. 750 (1926) ("Transaction is a word of flexible meaning. It may comprehend a series of many occurrences, depending not so much upon the immediateness of their connection as upon their logical relationship.") (internal quotations omitted). *See also Newberry Corp. v. Fireman's Fund Ins. Co.,* 95 F.3d at 1402-03.

44.    The second approach, adopted by the Second Circuit, incorporates a more restrictive "single integrated transaction test." *See Westinghouse Credit Corp. v. D'Urso,* 278 F.3d 138 (2d Cir.2002) ("Recoupment may only be applied in bankruptcy where 'both debts ... arise out of a *single integrated transaction* so that it would be *inequitable* for the debtor to enjoy the benefits of that transaction without also meeting its obligations.' ") (citing *Malinowski v. New York State Dep't of Labor (In re Malinowski),* 156 F.3d 131, 133 (2d Cir.1998)) (quoting *Univ. Med. Ctr. v. Sullivan (In re Univ. Med. Ctr.),* 973 F.2d 1065, 1081 (3d Cir.1992)) (emphasis in *Malinowski). See also Anes v. Dehart (In re Anes),* 195 F.3d 177, 182-83 (3d Cir.1999); *Conoco, Inc. v. Styler (In re Peterson Distributing, Inc.),* 82 F.3d 956, 959-61 (10th Cir.1996); *United States ex rel. United States Postal Serv. v. Dewey Freight Sys., Inc.,* 31 F.3d 620, 623 (8th Cir.1994), *reh'g denied,* 1994 U.S.App. LEXIS 30564 (8th Cir. Nov. 2, 1994).

45.    The Second Circuit requires more than a " 'mere logical relationship'... to bring ... mutual debts within the 'same transaction.' " *BNY Fin. Corp. v. Masterwear Corp. (In re Masterwear Corp.),* 229 B.R. 301, 311 (Bankr.S.D.N.Y.1999) (citations omitted). In other words, "[w]hen the circumstances that gave rise to the credit and those giving rise to the creditor's obligation to the debtor do not result from a set of reciprocal

442980v1

contractual obligations or from the same set of facts, they are not part of the same transaction." *In re Malinowski,* 156 F.3d at 134.

     46.    In the present case: i) the right to the Wind Down Money arises from the WDA between the Debtor, General Motors Corporation and GM, by assignment, executed during 2009; ii) the debts owed to Argonaut (and not to GM) arise out of the sub-lease between the Debtor and Argonaut, pursuant to a sub-lease executed during 2007; and iii) the Franchise Agreement, which allows the Debtor to seek the SFE funds, was executed prior to the General Motors bankruptcy proceeding.  Three separate agreements, executed years apart. Hardly a single integrated transaction sufficient for GM to meet its very high burden of proving recoupment.

B.    **GM HAS NO RIGHT OF RECOUPMENT BECAUSE THERE HAS BEEN NO OVERPAYMENT.**

     47.    In addition to the requirement that the recoupment arise from a single integrated transaction, is the requirement that there must be an over payment. *In re Health Management Ltd. Partnership*, 336 B.R. 392 (Bankr. C.D.Ill. 2005); *In re Public Service Co. of New Hampshire,* 107 B.R. 441, 445 (Bankr. D.N.H. 1989).

     48.    In the present case, not only is their no over payment, but, regardless as to the outcome of the objection, it is undisputed that the Debtor will still be owed the sum of $279,363.79.  See Objection, ¶15.  Therefore, GM has no right to recoupment for this additional reason as well.

IV.

**GM SHOULD BE HELD IN CONTEMPT FOR VIOLATING THE STAY FOR FAILING TO REMIT THE $113,265.28 IT WITHHELD FROM THE DEBTOR POST-PETITION ON ACCOUNT OF ITS PRE-PETITION CLAIM.**

16

49.    The Objection also contains a cross-motion seeking to hold GM in contempt for failing and refusing to pay the sum of $113,265.28 that GM withheld subsequent to the Petition Date and applied to the Open Account on account of its pre-petition claim. Objection, pp. 6-7. GM did not response to the Objection to the extent it seeks this relief. Therefore, the Court should direct GM to remit to the Debtor the $113,265.28 sum in addition to the relief sought in the Objection.

## CONCLUSION

For all of the reasons set forth herein and in the Objection, the Debtor respectfully requests that this Court enter an order: (i) granting the relief sought therein; and (ii) for such other and further relief as this Court deems just and proper.

Dated: New York, New York
       October 26, 2010

                                    WILK AUSLANDER LLP
                                    Attorneys for the Debtor


                                    By:___/s/ Eric J. Snyder_____
                                         Eric J. Snyder, Esq. (ES-8032)
                                    675 Third Avenue
                                    New York, New York 10017
                                    (212) 421-2233

17

# EXHIBIT C

**WILK AUSLANDER LLP**
675 Third Avenue
New York, New York 10017
Ph: (212) 421-2233
Eric J. Snyder (ES-8032)
Counsel for the Debtor

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| RAMP CHEVROLET, INC., | Case No.: 09-77513 (reg) |
| Debtor. | |

## SUPPLEMENTAL REPLY OF DEBTOR

Ramp Chevrolet, Inc., submit this supplemental reply in further support of both its Objection to the proof of claim filed by General Motors Corporation and for related relief (Docket # 63) and its Reply (Docket #73) to GM's response to the Objection. At the hearing on the Objection, the Debtor argued GM had waived its right to seek setoff under the GM POC because it did not raise the setoff issue prior to the entry of the Assumption Order. This issue is summarily addressed in the Reply (Argument II.E). For the additional reasons set forth below, the Debtor maintains that GM, by failing to interpose an objection to the Assumption Motion, cannot now seek to recover those funds pursuant to the doctrine of *res judicata.*

1.      The non-bankrupt party to an unexpired lease or executory contract "bears [the] burden to assert any defaults prior to the assumption." *In re Cellnet Data Systems, Inc.,* 313 B.R. 604, 608 (Bankr.D.Del.2004)("*Cellnet*"), *quoting In re Diamond Mfg. Co.,* 164 B.R. 189, 199 (Bankr.S.D.Ga.1994). For this reason, when a bankruptcy court approves the assumption of an executory contract, it necessarily finds that *no*

uncured defaults exist. *In Re Lykes Bros. Steamship Co.,* 221 B.R. 881, 883 (Bankr.M.D.Fla.1997) ("If prior to the assumption of any executory contract there is no allegation of any existing default, *the order approving the contract determines that no default exists.*"); *In re Diamond Mfg. Co.,* 164 B.R. at 197 (emphasis added); *NCL Corp. v. Lone Star Bldg. Centers (Eastern), Inc.,* 144 B.R. 170, 179 (S.D.Fla.1992)(same).

2.      When the nonbankrupt party has knowledge of facts sufficient to place the party on notice that a "potential" breach has occurred, *res judicata* bars that party from later asserting a claim based upon the pre-petition breach. *In re Ali Properties, Inc.,* 334 B.R. 455 (Bankr. D. Kan. 2005); *Cellnet,* 313 B.R. at 608-09; *Diamond Mfg. Co.,* 164 B.R. at 201. *See also, In re West 74th Street Drug Corp.,* 59 B.R. 747, n.6 (Bankr. S.D.N.Y. 1984)(cure claims are waived if not raised prior to assumption); *In re Harry C. Partridge & Sons, Inc.,* 43 B.R. 669 (Bankr. S.D.N.Y. 1984)(same). *In re Sapolin Paints, Inc.* 5 B.R. 412, 419 (Bankr. E.D.N.Y. 1980)(waiver and estoppel preclude raising cure issues subsequent to assumption.).

3.      When this Court entered the Assumption Order, it blessed the assumption of the WDA's and made an implicit finding that the WDAs had been cured. GM was certainly aware of the potential claims asserted by both Old GM and Argonaut (Objection, Exs.A&B) and received actual notice of the Assumption Motion. (Docket # 22, p.8). Despite this, GM interposed no objection to the Assumption Motion and the Assumption Order was entered, which did not require the Debtor to cure any defaults to GM. By seeking to set-off the Wind Down Money now, GM seeks to litigate a claim it could have made when the Assumption Motion was filed. *Res judicata* precludes that.[1]

---

[1] The elements of *res judicata* are: a final judgment on the merits in the prior action; an identity between claims raised in the prior and subsequent action; and an identity or privity of parties. *In re*

## CONCLUSION

For all of the foregoing reasons, and for the reasons set forth in both the Objection

and Reply, it is respectfully requested that the Court enter and order: i) sustaining the

Objection; and ii) for such other and further relief as this Court deems just and proper.

Dated: New York, New York
November 2, 2010

WILK AUSLANDER LLP
Attorneys for the Debtor

By:___ /s/ Eric J. Snyder_____
Eric J. Snyder, Esq. (ES-8032)
675 Third Avenue
New York, New York 10017
(212) 421-2233

---

*InteliQuest Media Corp.,* 326 B.R. 825, 829-31 (10th Cir. B.A.P. 2005). All of these elements are present here. *Plotner v. AT & T Corp.,* 224 F.3d 1161, 1170 (10th Cir.2000) (essential to application of *res judicata* is the principle that the previously unlitigated claim to be precluded could and should have been brought in the earlier litigation.)

# EXHIBIT D

BINGHAM McCUTCHEN LLP
Seth J. Pruss
399 Park Avenue
New York, NY 10022-4689
Telephone No. (212) 705-7000
Facsimile No.: (212) 752-5378

BINGHAM McCUTCHEN LLP
John R. Skelton
Evan J. Benanti
One Federal Street
Boston, MA 02110-1726
Telephone No. (617) 951-8000
Facsimile No.: (617) 951-8736

*Attorneys for General Motors LLC*

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| In re | Chapter 11 |
| RAMP CHEVROLET, INC., | Case No. 09-77513 (REG) |
| Debtor. | Hearing Date: October 27, 2010 |
|  | Hearing Time: 1:30 p.m. |

**SUPPLEMENTAL MEMORANDUM OF GENERAL MOTORS LLC IN SUPPORT OF OBJECTION TO DEBTOR'S CONTEMPT MOTION AND CROSS-MOTION TO CONTINUE HEARING**

## I.   INTRODUCTION

General Motors LLC ("GM" or "New GM") hereby submits this supplemental memorandum in support of its objection to the Motion filed by the Debtor Ramp Chevrolet, Inc. ("Debtor" or "Ramp") for an Order finding GM in Violation of the Automatic Stay (the "Contempt Motion").[1]

---

[1]"Motion of Debtor for Order: (1) Finding General Motors in Violation of the Automatic Stay for: (A) Applying Debtor's Post-Petition Payables To Its Pre-Petition Claim; and (B) For Failing to Receive Bankruptcy Court Approval Before Effectuating a Set-Off; (2) Holding General Motors in Contempt for Deliberately Violating the Stay; (3) Compelling General Motors to Remit to the Debtor the Outstanding Wind-Down Money, Pursuant to Wind-Down Order Assuming the WDA; and (4) Granting Its Objection and Reclassifying and Reducing Claim #21,

As made clear at the hearing on October 27, the Debtor's motion challenging New GM's determination of the final Wind-Down payment amount pursuant to ¶3(c) of the WDA is premised entirely on what the Debtor characterizes as an improper "set off" by New GM.[2]  In order to avoid implicating the continuing jurisdiction provision which requires all disputes concerning the WDA be litigated in the Old GM bankruptcy case (WDA ¶12), the Debtor acknowledged that (i) it is not challenging any of the particular charges New GM used to determine the final wind-down payment or (ii) any of the actual terms of ¶3(c) of the WDAs, which, if applied, would reduce the final wind-down payment as calculated by New GM. Instead, the Debtor argues that even though it assumed the WDAs without any limitations, New GM still may not enforce ¶3(c) because the assumption of the WDAs (including ¶3(c)) does not vitiate the various §553 defenses that otherwise might be available.  According to Ramp, on its face, ¶3(c) is an improper "set off" provision and its assumption of the WDAs *cum onere* does not mean that ¶3(c) is enforceable.

At the October 27 hearing, the Court identified the scope of this *"cum onere"* assumption issue as the initial question needing to be addressed because if the Debtor's assumption was subject to New GM's rights under ¶3(c), notwithstanding Debtor's §553 arguments, then the Debtor's motion must be denied.  The Court granted GM leave to file this supplemental memorandum to address why the Debtor's assumption of the WDAs entitles GM to enforce ¶3(c) even if it is read to include state law set off rights that might otherwise be subject to challenge under §553.

Assumption *cum onere* means that when the Debtor assumes an executory contract to get its benefits, it but must also accept all of the burdens.  While there are very limited exceptions to this rule, such as when a particular contractual provision is expressly rendered unenforceable by

---

the Proof of Claim of General Motors" (docket no. 63).  Any capitalized term used herein but not defined will have the meaning given in GM's initial objection (docket no. 71).

[2] For the Court's convenience, a copy of one of the WDAs is attached hereto as **Exhibit A**.

the Bankruptcy Code (i.e., an *ipso facto* clause), or the Bankruptcy Court concludes that the particular provision was specifically designed to thwart essential bankruptcy policies and a refusal to enforce would not cause a substantial economic detriment to the non-debtor party, neither of those exceptions is applicable here. Indeed, consistent with the rule that once a debtor assumes a contract it assumes all provisions, including those that are burdensome, the Debtor's assumption prevents it now from seeking to challenge the terms of ¶3(c) whether pursuant to §553 or otherwise. The payment provisions under the WDA, including the qualifiers included in ¶3(c), reflect an essential aspect the underlying bargain between New GM and the 1000+ dealers offered WDAs, and refusal to enforce ¶3(c) will cause a substantial economic detriment to New GM.

Significant here is the fact that the bankruptcy court overseeing Old GM's bankruptcy specifically approved the WDAs, including ¶3(c). In doing so, that Court certainly did not believe any of the provisions to be inconsistent with the Bankruptcy Code or that they would thwart any essential bankruptcy policies. On the other hand, the GM Bankruptcy Court undoubtedly recognized the significant obligation New GM was undertaking in offering the WDAs to 1000+ dealers and that absent each and every term being fully enforceable, New GM may not have gone through with the §363 sale.

As stated in the introductory phrase, ¶3(c) is not just a codification of otherwise available set off rights, but rather defines (and limits) the basic payment obligation of New GM to the more than 1,000 dealers offered WDAs. Because ¶3(c) on its face is not contrary to an express provision of the Bankruptcy Code (again, such as the prohibition in §365(e)(1) of an *ipso facto* clause), a determination that the Court should nonetheless exercise discretion and refuse to enforce ¶3(c) as thwarting essential bankruptcy policies but not causing a substantial economic detriment to New GM would necessarily require an interpretation of the essential nature of the bargain intended by ¶3(c), and that decision should be made only by the Old GM's Bankruptcy Court. By assuming the WDAs, including the continuing jurisdiction provision in ¶12, Ramp specifically agreed to litigate disputes like this in the Old GM bankruptcy.

3

A/73552828.3

## II.    ARGUMENT

**A.    Once it Assumed the WDAs, The Debtor Assumed And Thus Is Bound By All Provisions, Even Those That Might Otherwise Have Been Subject To A Challenge Under §553.**

1.    At the October 27 hearing, the Court framed this initial "assumption *cum onere*" issue as whether the Debtor could avoid the provisions of ¶3(c) of the WDAs by challenging the application of ¶3(c) as an "improper set off" even though it has already assumed the WDAs in full and without any restrictions or limitations. As New GM made clear at the October 27 hearing, by assuming the WDAs *cum onere*, the Debtor agreed that GM could enforce the provisions of ¶3(c) in determining the amount and timing of the final Wind-Down payment.

2.    It is well established that once a debtor elects to assume an executory contract, it assumes the contract *cum onere*. *See NLRB v. Bildisco and Bildisco*, 465 U.S. 513, 531-32 (1984). This means that a debtor "cannot simply retain the favorable and excise the burdensome provisions of an agreement." *In re Kopel*, 232 B.R. 57, 63-64 (Bankr. E.D.N.Y. 1999). While the Debtor's reply memorandum dated October 26 (Docket No. 73) addresses in detail its substantive §553 arguments, it does not cite a single case for the proposition that notwithstanding its assumption of the WDA (without limitations), New GM may not enforce ¶3(c) as assumed. The Debtor's supplemental memorandum, filed on November 2 (Docket No. 75) addressing its "waiver" argument similarly does not cite any law in support of its claim that assumption *cum onere* doesn't really mean *cum onere.*

3.    Here, Ramp assumed the WDAs in order to get the benefit of the final Wind-Down payment as set forth in ¶3. Especially since that assumption was without any qualifications, it reflected a considered decision to take the benefits of the ¶3(a) Wind-Down payment subject to the provisions of ¶¶3(b) and 3(c) which defined the terms and circumstances under which New GM was to make the final Wind-Down payment. As noted below, had the Debtor's assumption motion challenged the application of ¶3(c) or made clear that the Debtor was only seeking to assume the benefit of ¶3(a) and that it did not intend to be bound by either

4

the pre-conditions in ¶3(b) or the final payment qualifiers in ¶3(c) then that motion could not have been approved.[3]

4.    While *Bildisco* provides that when a debtor assumes an executory contract, all of the contract provisions are fully enforceable, Courts have recognized, however, that in very limited circumstances certain contractual provisions still may not be enforced in a bankruptcy context post-assumption. First, this limited exception provides that even post-assumption those provisions that are "expressly rendered unenforceable by the Bankruptcy Code" are not enforceable against a debtor in bankruptcy. *See e.g., In re Kopel*, 232 B.R. 53, 64 (Bankr. E.D.N.Y. 1999). The types of provisions that explicitly violate express contractual protections provided by the Bankruptcy Code include those that violate: §108(b), which extends certain time periods that otherwise would expire after the petition date; §365(e)(1), which makes *ipso facto* clauses unenforceable; and §365(f)(1), which makes certain contractual clauses restricting assignment unenforceable. *In re Village Rathskeller, Inc.*, 147 B.R. 665, 671-72 (Bankr. S.D.N.Y. 1992); *Kopel,* 233 B.R. at 64.

5.    Paragraph 3(c) of the WDA is not a provision that explicitly violates express contractual protections under the Bankruptcy Code. Paragraph 3(c) provides:

> *In addition to any other set off rights under the Dealer Agreement* payment of all or any part of the Wind-Down Payment amount may, in GM's or the 363 Acquirer's reasonable discretion, be (i) reduced by any amount owed by Dealer to GM or the 363 Acquirer, as applicable, or their Affiliates, and/or (ii) delayed in the event GM or the 363 Acquirer, as applicable, has a reasonable basis to believe that any party has or claims any interest in the assets or properties of Dealer

---

[3] At the time it filed the Assumption motion, Ramp obviously knew it owed both the rent and the audit chargeback. Indeed, because ¶3 of the WDA specifically states that the Wind-Down payments were to be made pursuant to a credit to the open account and the rent charges had allegedly been posted to the open account, if the Debtor wanted to challenge open account charges, it was obligated to raise those arguments specifically as part of the assumption motion. Many of the Debtor's §553 arguments are technical timing arguments.

Further, if the Debtor intended to "overrule" New GM's rights under the WDAs then an assumption motion was not the proper procedure. Instead, the Debtor was required to seek a declaratory judgment pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure. Of course, the Debtor did not do so because any request for a declaratory judgment concerning the WDAs would need to have been heard by the Old GM bankruptcy court.

A/73552828.3

Relating to the Subject Dealership Operations including, but not limited to, all or any part of the Wind-Down Payment Amount. WDA, ¶3(c) (emphasis added).

Indeed, as New GM argued at the October 27 hearing, ¶3(c) is not simply a codification of existing state law set off (or recoupment) rights, but rather specifically reflects that it includes something more than just "set off." Of course, §553 does not prohibit all "set off" but rather simply makes otherwise enforceable state law rights subject to certain qualifications and defenses.

6.      Even if ¶3(c) is read to implicate setoff otherwise subject to challenge under §553, it is not a provision that explicitly violates express contractual protections under the circumstances here such that should enforcement be denied. Courts have found similar provisions enforceable post-assumption. In *In re Monroeville Dodge, Ltd.*, 166 B.R. 264, 267-68 (Bankr. W.D. Pa. 1994), the court found that the debtor dealer assumed its dealer agreement *cum onere* and therefore, pursuant to the agreement's netting provision, the counterparty manufacturer was permitted to apply post-petition credits owing to the debtor against the manufacturer's allowed administrative claim. In doing so, the court specifically rejected "the proposition that the *cum onere* principle does not apply to a provision in an assumed executory contract that violates §553(a) of the Code." *Id.* at 268. Similarly, in *United States v. Gerth*, 991 F.2d 1428, 1429-30 (8th Cir. 1993), the U.S. Department of Agriculture's Agricultural Stabilization and Conservation Service sought stay relief to set off pursuant to §553 payments due to the debtor farmer, pursuant to certain Conservation Reserve Program contracts that the debtor had assumed, against a debt which the debtor owed the government. In reversing the bankruptcy court's denial of stay relief, the Eighth Circuit noted that the debtor had evaluated the contract, assumed it as beneficial to the estate, and having received the benefits, could not seek to avoid the burdens. *Id.* at 1432-33. The Eighth Circuit specifically noted that the bankruptcy court's order approving the assumption of the contract provided that "the debtor shall accept and assume the responsibilities contracted for under his contract for the Conservation Reserve Program." *Id.*

A/73552828.3

7.      So here, even if it only was intended to incorporate state law set off rights, the netting provision in ¶3(c) of the WDAs is still enforceable given the Debtor's assumption. By choosing to receive the benefits of the WDAs, (here even after the application of the ¶3(c) reconciliation, approximately $275,000) the Debtor assumed all of the provisions and in doing so voluntarily relinquished certain rights, including any right to challenge GM's netting of obligations as violative of §553.

8.      The second limited exception to the *cum onere* rule is that a Bankruptcy Court may refuse post-assumption enforcement of a contractual provision in a bankruptcy context if it finds that the provision was clearly "designed to thwart policies underlying the Bankruptcy Code by circumventing certain of its provisions,'" and "there is no substantial economic detriment to the [contract counter party] shown and where enforcement would preclude the bankruptcy estate from realizing the intrinsic value of is assets." *Rathskeller,* 147 B.R. at 672. A critical qualifier to this limited exception, especially relevant here, is that a court may exercise its equitable discretion and refuse to enforce a provision in an assumed contract only if there is "no substantial economic detriment to the [non-debtor counterparty]," i.e., New GM, and where enforcement of the provision at issue would "preclude the bankruptcy estate from realizing the intrinsic value of its assets." *Rathskeller, Inc.,* 147 B.R. at 672 (*citing In re Joshua Slocum Ltd.,* 922 F.2d 1081, 1092 (3d Cir. 1992)).

9.      There is no basis here that would permit the Court to refuse to enforce ¶3(c) on equitable grounds. This provision was an essential part of New GM's bargain when it purchased Old GM's assets and offered WDAs to 1000+ dealers. Indeed, the Old GM bankruptcy court specifically blessed this netting provision, and certainly would not have approved a contract that contained provisions that are "expressly unenforceable" under the Code or designed to thwart the policies underlying the Bankruptcy Code. Indeed, the WDAs were not just another run of the mill pre-petition agreement negotiated between two parties. Rather, the WDAs at issue here are agreements that were specifically approved by the Old GM bankruptcy court as part of a transaction under §§363 and 365 of the Bankruptcy Code affecting more than 1,000 dealers. As

7

such, the terms by which New GM would be obligated to make Wind-Down Payments to those 1000+ dealers were an essential part of the transaction, and thus, ¶3(c) cannot be and should not be overridden lightly. *E.g., Rathskeller*, 147 B.R. at 673 (recognizing "a subordination provision is an economic term of the landlord's bargain and ought not lightly be overridden."). The fact that the WDAs affected so many dealers is one of the reasons why the continuing jurisdiction provision in ¶12 was so important to New GM. Having one Court retain jurisdiction over disputes involving the essential bargain reflected by the WDAs is essential if there is to be uniformity of interpretation and application of those rights.

10.    The *Kopel* and *Rathskeller* cases reflect why ¶3(c) is enforceable post-assumption. First, in *Kopel*, the debtor veterinarian entered into a transaction by which he purchased the practice of his employer. The transaction included several agreements that the court found to be a single transaction, including an asset acquisition agreement, a lease, a consulting agreement, and a note and pledge agreement. *Kopel*, 232 B.R. at 60-61. There were cross default provisions, so that if the debtor defaulted on the obligations of any one agreement, the seller could step in and take over the practice. Post-petition, while the debtor paid rent, it did not make the payments owing on the other agreements. Not surprisingly, the enforceability of the cross default provisions became a significant issue. The Debtor argued that the cross-default provision in the lease was unenforceable as contrary to essential bankruptcy policy and, thus need not be cured as part of the proposed lease assumption. The *Kopel* court framed the issue as: "whether enforcement of a cross-default provision, requiring the satisfaction of obligations under nominally separate contracts, would so contravene the policy of providing debtors an unrestricted right to assume and assign valuable contracts that such enforcement must be refused." *Kopel*, 232 B.R. at 63. While recognizing that assumption is normally *cum onere*, the court noted that in "limited circumstances," a court "may exercise equitable discretion to refuse to enforce a provision where there is no substantial economic detriment to the non-debtor counterparty shown and where enforcement would preclude the bankruptcy estate from realizing

8

the intrinsic value of its assets." *Id.* at 64 (*citing In re Joshua Slocum Ltd.*, 922 F.2d 1081, 1092 (3d Cir. 1992)).

11.      Ultimately, the court in *Kopel* upheld the enforceability of the cross-default provisions post-assumption. *Kopel*, 232 B.R. at 67-68. In doing so, the court specifically considered the impact of non-enforcement on the non-debtor counterparty's bargain: "enforcement of a cross-default provision should not be refused where to do so would thwart the non-debtor party's bargain." *Id.* at 66. While acknowledging the real possibility that enforcing the cross-default provision and requiring cure of the defaults under the other agreements upon assumption of the lease would hamper the debtors' reorganization, the *Kopel* court nonetheless found "no federal bankruptcy policy [was] offended by enforcing the cross-default provision linking the Note and the Lease." *Id.* at 67-68.

12.      While enforcement of the cross-default in *Kopel* likely precluded any reorganization prospects, here, of course, enforcement of ¶3(c) simply means that the Debtor would only receive $275,000 as its final wind-down payment as opposed to the full amounts identified in ¶3(a). While obviously less than what it wants, a final payment of $275,000 is certainly not insignificant.

13.      Similarly, in *Rathskeller*, the court found that a subordination provision in an assumed lease was enforceable post-assumption. There, the debtor tenant assumed the lease, which was far below market rent, but the lease was subject to the lien of a mortgagee which was in the process of foreclosing. Because the lease did not include a non-disturbance agreement the subordination provision meant that the foreclosure would wipe out the otherwise valuable lease. The *Rathskeller* court, like the *Kopel* court, considered the importance of the non-debtor counterparty's bargain and noted that the subordination provision was part of the landlord's bargain and should not be overridden lightly. *Rathskeller*, 147 B.R. at 673.

14.    As made clear in *Rathskeller* and *Kopel,* in deciding whether the Debtor's decision to assume the WDAs (without any purported restriction)[4] overrides its ability to challenge now the enforceability of ¶3(c), this Court must consider the importance of New GM's bargain when it entered into the sale transaction and agreed to be bound by WDAs being offered to 1000+ dealers.[5]  Of course, the potential economic detriment that would be imposed if ¶3(c) were deemed unenforceable would be significant.  The express terms first make clear that ¶3(c) is designed to protect New GM from the situation where more than 1,000 dealers with WDAs could incur huge debts to New GM, refuse to pay those debts, file for bankruptcy protection, assume the WDAs without limitation and then seek to compel payment of the full wind-down payments regardless of the monies owed to GM.  The second qualifier in ¶3(c) is designed to protect New GM from a potential "double pay" situation where a dealer seeks to enforce a wind-down payment even through there may be competing claims being asserted by a third party.

15.    That is precisely what is at stake here.  First, the Debtor intentionally stopped paying rent, thus increasing its debt owed to New GM even though it knew that under the terms of the applicable leases any such unpaid rent would be added to the open account reducing the final Wind-Down payment amount.  It also knew when it executed the WDA that New GM asserted an audit charge back for incentive payments fraudulently earned.  Second, and significantly, there is a competing claim by the New York Taxing authority putting New GM at risk of paying twice. (The Debtor still has yet to provide to GM a release by the State of New

---

[4] In *Rathskeller*, the court noted that in assuming the lease the debtor did not raise the subordination clause or otherwise seek to limit its enforceability in connection with its assumption motion. *Rathskeller,* 147 B.R. at 667.

[5] The procedural posture in *Kopel* is also significant.  The *Kopel* court was considering cross motions for summary judgment in an adversary proceeding, including the debtor's request for a declaration that the cross-default provision was unenforceable.  *Kopel,* 232 B.R. at 59-60.  In *Kopel,* the Debtor specifically challenged the enforceability of the cross-default as contrary to basic bankruptcy policies before assumption.  Here, the Debtor did not raise the enforceability of ¶3(c) at the time it moved to assume the WDA.  It also has not filed an adversary proceeding to seek a declaratory judgment that ¶3(c) of the WDAs is unenforceable.  Instead of following the requirements of Fed. R. Bankr. P. 7001, the Debtor sought a finding of contempt for alleged violation of the automatic stay (assuming, of course, that there was a stay violation), presumably because it recognized that filing a declaratory judgment action concerning the enforceability of ¶3(c) was an action that pursuant to its agreement in ¶12 of the WDAs must be brought before the Old GM bankruptcy court.

10

York which confirms that it does not intend to pursue any claims against GM for any tax liability of Ramp.)

16.    Because New GM did not bargain for a transaction that would require it to pay dealers in full when those dealers deliberately increased their debts to GM, or created the risk of double payment, the ¶3(c) netting provision was an essential part of the consideration for the Old GM to New GM sale. Of course, if there is any question whether New GM would have entered into the transaction if it thought ¶3(c) could be eviscerated simply by a dealer entering into bankruptcy and assuming the WDA (or if there are other questions concerning its enforcement), those are precisely the types of disputes that Ramp and New GM agreed in ¶12 of the WDA would be determined in the Old GM bankruptcy.

17.    Of course, compared to the potentially enormous economic detriment faced by New GM, the application and enforcement of ¶3(c) will not prevent the Debtor from realizing the intrinsic value of its assets. Assuming there is resolution of the New York State tax issue, the Debtor still has a right to a payment "pursuant to the terms of the WDA," *see* Assumption Order at 2, currently slated to be approximately $275,000.

**B.    GM Has Not Waived the Right to Object to Debtor's Attempt to Eviscerate the WDAs.**

18.    After the October 27 hearing, the Debtor sought leave to file a supplemental memorandum asserting that by New GM not objecting to the Assumption Motion or not asserting that the Debtor was "in default," New GM essentially waived its right to object to the Debtor's interpretation of the WDAs or otherwise to enforce ¶3(c) of the WDAs. There is no waiver. "Waiver is the intentional relinquishment of a known right. Waiver must be evidenced by a clear manifestation of intent and be unmistakable and unambiguous." *In re Jamesway Corp.*, 201 B.R. 73, 76-77 (Bankr. S.D.N.Y. 1996). It is the Debtor's burden to prove waiver. *Id.* As presented by the Debtor, GM had no reason to object to the Assumption Motion or otherwise declare the debtor in default.

A/73552828.3

19.    Nowhere in the Debtor's Assumption Motion did it specifically state that ¶3(c) was not enforceable, that New GM was not entitled to calculate the final Wind-Down payment pursuant to the terms of the WDA, or that any enforcement of the WDAs would be anything but "pursuant to" their terms.  Indeed, the proposed order included with the Assumption Motion specifically provided that any payment by New GM of the Wind-Down Payment would be pursuant to the terms of the WDA.  Similar to the bankruptcy court's order in *Gerth*, the Assumption Order entered by this Court specifically provides that any payment by GM of the Wind-Down Payment is to be "pursuant to the terms of the WDA."  Assumption Order at 2.  As such, New GM could reasonably conclude that its rights under the WDAs were fully protected and that the Debtor's assumption of the WDAs did not alter any of those rights.

20.    Further, when the Debtor filed its Assumption Motion, it did not disclose to the Court that it still had not yet complied with the pre-conditions to its right to payment.  The Debtor did not disclose the disputed nature of its right to payment until it filed the first amended disclosure statement on August 19.  This failure is particularly important given the issue of the Debtor's New York tax obligations, which represent a competing claim that would allow New GM to defer from making any payment until such claim is resolved.  Certainly, had the Debtor intended its Assumption Motion to be, in effect, a declaratory judgment action nullifying certain provisions of the WDA, then it was obligated to make any such assertion clear in its papers.  If it now claims that the Assumption Motion was intended as an adjudication of disputed issues under the WDAs, then that motion was intentionally misleading.

21.    In the end, if the Debtor wanted a determination that it could use bankruptcy "defenses" post-petition to override the express terms of the WDAs (or that other provisions of the WDAs are not enforceable) then it was obligated not simply to move to assume, but to seek a declaratory judgment.  At the very least, if the Debtor wanted to bind GM by the assumption motion, it was obligated to make clear in the motion that it did not intend to assume the WDAs *cum onere,* that the Debtor would not be bound by all terms of the WDAs, and that GM's rights under the WDAs were at issue.  Because it did not, if there was a waiver by anyone it was the

A/73552828.3

Debtor. Once the Debtor chose to assume the WDAs without any limitations or challenges (unlike the debtors in *Kopel* and *Rathskeller*), it should not be permitted to assert that challenge now.

### III.    CONCLUSION

For all of the reasons stated herein, New GM respectfully requests that the Court (i) defer or continue consideration of the Debtor's Contempt Motion, including this "assumption" issue, pending the GM Bankruptcy Court's resolution of GM's motion; (ii) if considered on the merits, rule that by assuming the WDAs and proposing an order that New GM's wind-down payment was to be "pursuant to the terms" of the WDA, ¶3(c) and any other applicable terms of the WDA are fully enforceable now; (iii) if considered on the merits and the Court concludes that assumption does not override the Debtor's potential §553 defenses, order that any further consideration of New GM's rights and obligations under ¶3(c) of the WDA, including whether §3(c) includes rights and terms in addition to set off, be brought in conformance with the continuing jurisdiction provision set forth in ¶12 of the WDA; and (iv) grant GM such other and further relief as the Court may deem proper.

Dated: November 9, 2010

BINGHAM McCUTCHEN LLP

By /s/ John R. Skelton
    John R. Skelton (*admitted pro hac vice*)
    Evan J. Benanti (*admitted pro hac vice*)
    One Federal Street
    Boston, MA 02110-1726
    Telephone No. (617) 951-8000
    Facsimile No.: (617) 951-8736

    *Attorneys for General Motors LLC*