# EXHIBIT A

HEARING DATE: AUGUST 23, 2010
HEARING TIME: 1:30 P.M.

WILK AUSLANDER LLP
675 Third Avenue
New York, New York 10017
Ph: (212) 421-2233
Eric J. Snyder (ES-8032)
Counsel for the Debtor

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| RAMP CHEVROLET, INC., | Case No.: 09-77513 (reg) |
| Debtor. | |

## RESPONSE OF DEBTOR TO OBJECTION OF CERTAIN PARTIES TO DEBTOR'S DISCLOSURE STATEMENT

**TO:    THE HONORABLE ROBERT E. GROSSMAN,
UNITED STATES BANKRUPTCY JUDGE:**

Ramp Chevrolet, Inc., the debtor and debtor-in-possession herein ("Debtor"), by

its counsel, submits this response to the objections (the "Objections") filed by Bank of

Smithtown, 1581 Holdings, LLC and General Motors LLC to the Debtor's proposed

disclosure statement. In support of the Response, the Debtor states as follows:

1.    The aforementioned three entities filed the Objections to the Disclosure

Statement. In response, the Debtor has amended the Disclosure Statement to address the

issues raised regarding disclosure.  A copy of the amended disclosure statement,

including a "black-lined" version to reflect changes, are annexed hereto as Exhibits A &

B, respectively.

2.    One of the issues raised by 1581 Holdings relates to the linking of

effective date of the proposed plan to the receipt of the Wind-Down Money.  This issue

431915v1

does not go to disclosure, but to confirmation of the proposed plan. Therefore, it is more

appropriately addressed when determining the confirmability of the plan under Section

1129 and the related provisions of the Bankruptcy Code.

### CONCLUSION

For all of the reasons set forth above, the Debtor respectfully requests that this

Court enter an order: (i) determining that the Disclosure Statement, as amended, contains

"adequate information" as that term is defined under Section 1125 of the Bankruptcy

Code; and (ii) for such other and further relief as this Court deems just and proper.

Dated: New York, New York
August 19, 2010

> WILK AUSLANDER LLP
> Counsel for the Debtor
>
>
> By:___ /s/ Eric J. Snyder_____
>      Eric J. Snyder, Esq. (ES-8032)
> 675 Third Avenue
> New York, New York 10017
> (212) 421-2233

431915v1

# EXHIBIT A

WILK AUSLANDER LLP
Counsel for the Debtor
675 Third Avenue
New York, New York 10017
(212) 421-2233
Eric J. Snyder, Esq. (ES 8032)

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x
In re:

                                            Chapter 11

RAMP CHEVROLET, INC.,

                          Debtor.                      Case No: 09-77513-REG
--------------------------------------------------------x

## AMENDED DISCLOSURE STATEMENT

This Amended Disclosure Statement (the "Disclosure Statement") is filed

pursuant to Section 1125 of Title 11, United States Code, on behalf of Ramp Chevrolet,

Inc., Debtor and Debtor-in-Possession.

## A. INTRODUCTION/NOTICE OF HEARING AND SOURCE OF INFORMATION

Pursuant to Section 1125 of Title 11 of the United States Code (the "Bankruptcy

Code"), Ramp Chevrolet, Inc., the debtor herein (the "Debtor") provides this Disclosure

Statement (the "Disclosure Statement") to all of the known Creditors of the Debtor and

other parties in interest in order to provide information deemed by the Debtor to be

material and necessary to enable such Creditors and parties in interest to make a

reasonable informed decision in the exercise of their rights to vote on and participate in

Debtor's Plan of Liquidation (the "Plan"). The Plan is annexed hereto as Exhibit "A".

The information contained in this Disclosure Statement is based on the representations

made by the Debtor in its Petition and Schedules and all other documents provided by

counsel for the Debtor and are believed to be accurate. It has not been subject to certified

audit or independent review. Therefore, no representation or warranty is made as to its

1

416650v2

accuracy or completeness. However, the Debtor has reasonably endeavored to obtain and supply all material information.

Terms utilized in this Disclosure Statement, if not defined herein, shall have the same meaning as such terms are used or defined in the Plan unless the context hereof requires a different meaning.

**THE BANKRUPTCY COURT HAS SET AUGUST __ 2010 AT 1:30 P.M. OF THAT DAY AS THE DATE AND TIME OF THE HEARING ON CONFIRMATION OF THE PLAN AND OBJECTIONS THERETO, WHICH HEARING WILL BE HELD IN THE COURTROOM OF THE HONORABLE ROBERT E. GROSSMAN, UNITED STATES COURTHOUSE-ROOM 860, CENTRAL ISLIP, NEW YORK 11722. CREDITORS OF, AND HOLDERS OF INTERESTS IN, THE DEBTOR MAY ATTEND SUCH HEARING. THE BANKRUPTCY COURT HAS FIXED JULY __, 2010 AS THE DATE AND TIME BY WHICH ALL WRITTEN OBJECTIONS TO CONFIRMATION OF THE PLAN SHALL BE FILED WITH THE BANKRUPTCY COURT AND SERVED UPON THE ATTORNEY FOR THE DEBTOR AND UPON THE UNITED STATES TRUSTEE.**

**A BALLOT ACCOMPANIES THIS DISCLOSURE STATEMENT FOR YOUR USE IN VOTING ON THE PLAN. IN ORDER TO BE CONFIRMED, THE PLAN MUST BE ACCEPTED BY A MAJORITY IN NUMBER AND TWO-THIRDS IN AMOUNT OF THOSE VOTING IN EACH CLASS IMPAIRED UNDER THE PLAN.**

2

**YOU ARE URGED TO REVIEW THE PLAN, THIS DISCLOSURE STATEMENT, AND THE BALLOT WITH COUNSEL OF YOUR CHOICE. HOLDERS OF CLAIMS OR INTERESTS WHICH ARE IMPAIRED UNDER THE PLAN MAY VOTE TO ACCEPT OR REJECT THE PLAN BY COMPLETING AND MAILING THE ENCLOSED BALLOT ON OR BEFORE JULY __, 2010, TO COUNSEL FOR THE DEBTOR AT THE ADDRESS SET FORTH BELOW:**

**WILK AUSLANDER LLP**
**675 Third Avenue**
**New York, New York 10017-5704**
**Attn: Eric J. Snyder, Esq.**

**THE DEBTOR BELIEVES THE TREATMENT OF UNSECURED CREDITORS THAT ARE IMPAIRED UNDER THE PLAN CONTEMPLATES A GREATER RECOVERY FOR SUCH CREDITORS THAN WOULD BE AVAILABLE UNDER ANY ALTERNATIVE PLAN OR IN A CHAPTER 7 LIQUIDATION.**

**ACCORDINGLY, THE DEBTOR BELIEVES THAT CONFIRMATION OF THE PLAN IS IN THE BEST INTERESTS OF THE IMPAIRED GENERAL UNSECURED CREDITORS AND RECOMMENDS THAT ALL SUCH CREDITORS VOTE TO ACCEPT THE PLAN.**

Other than the information set forth in this Disclosure Statement, the Debtor has authorized no person or entity to make representations concerning the Debtor, its business, its future income, the value of the Debtor's assets, or the amounts to be distributed under the Plan. Any representations or inducements made to secure your

3

acceptance of the Plan which is other than as contained in this Disclosure Statement should not be relied upon by you in determining whether to accept or reject the Plan.

## B. DEBTOR'S BUSINESS

The Debtor is a New York corporation. Its shareholders are John and Charles Rampone, Jr.  The Debtor owns and operates Chevrolet, Chevrolet Truck and Hummer franchises (the "Dealerships"), pursuant to franchise agreements (the "Franchise Agreements") by and between the Debtor and the General Motors Company ("GM"). The Dealerships are located at 1395 Route 112, Port Jefferson, New York.

## C. PRE-PETITION HISTORY OF THE DEBTOR

During June, 2009, GM filed for Chapter 11 relief. Immediately thereafter, GM informed the Debtor that it would be terminating the Franchise Agreements.

To this end, on June 12, 2009, the Debtor entered into three agreements (the "Wind-Down Agreements") with GM to "wind-down" the operations of the Dealerships. Pursuant to the Wind-Down Agreements, upon the sale of the Debtor's new car inventory of each franchise, the Debtor is required to close the Dealership. In exchange, GM has agreed to pay to the Debtor the sum of $1,304,613 (the "Wind-Down Money"), in total, for consideration in terminating the three Dealerships. During August, 2009, 25% of the Wind-Down Amount, $326,154.75, was paid to the Debtor by GM.

416650v2

For the quarters ending November 30, 2009, February 28, 2009 and May 31, 2009, the Debtor failed to remit sales tax to the New York State Department of Taxation & Finance ("DTF") in the amounts of $1,442,636.09, $639,750.04 and $425,993.96, respectively, totaling $2,508,380.09 (the "DTF Claim"). Of this amount, the sum of $2,082,386.13 ("DTF Secured Claim") is subject to Tax Warrants.

As of that date, the Debtor also owed GMAC, the entity that financed the purchase of the vehicles for the Dealerships, the sum of $587,201.92 (the "GMAC Claim"), secured by all of the Debtor's assets.

On October 2, 2009, DTF sought to enforce its rights under the Tax Warrants and changed the locks on the Dealerships. As a result, the Debtor was compelled to seek Chapter 11 relief.

## D. HISTORY OF THE CHAPTER 11 CASE

As stated above, as of the Petition Date, the Debtor owed GMAC the sum of approximately $507,201.92 and the DTF approximately $2,082,386.13. As a result of the DTF's secured status as of the Petition Date, it was necessary for the Debtor to seek the use of the cash collateral of GMAC and the DTF, pursuant to Section 363(c)(2)(B) of the Bankruptcy Code. By motion dated October 6, 2009, Debtor sought authority to use GMAC's and DTF's cash collateral. Pursuant to a Stipulation and Order dated October 20, 2009, the Debtor and GMAC entered into a Stipulation authorizing the Debtor to use cash collateral through November 4, 2009. On or about that date, the GMAC Claim was satisfied.

On December 3, 2009, the Debtor filed a motion (the "Assumption Motion"), pursuant to Section 365 of the Bankruptcy Code, to assume the Wind-Down Agreements.

416650v2

Pursuant to an order of the Court, dated February 3, 2010, the Assumption Motion was granted.

During November, 2009, the Debtor sold the last of its retail vehicles. As a result, under the Wind-Down Agreements, the Debtor became eligible to collect the Wind-Down Money. To this end, the Debtor has requested the commencement of the procedures to terminate the Franchise Agreement by December 31, 2009 and to obtain the Wind-Down Money.

On February 8, 2010, the Office of the United States Trustee filed a motion (the "Conversion Motion") to convert or dismiss the Debtor's bankruptcy case. In order to resolve the Conversion Motion, the DTF agreed to allow a portion of the Wind-Down Money to be paid to satisfy Administrative Expenses and the Class 3 Claims, on a *pro rata* basis, as set forth below.

On July 23, 2010, GM filed a proof of claim in the bankruptcy proceeding asserting a secured claim of $699,096.01 (the "Set-Off Amount") based on set off and recoupment rights.

On August 18, 2010, the Debtor provided to GM all of the documents GM stated it requires under the Wind-Down Agreement in order for the Debtor to obtain the Wind-Down Money, The Debtor shall immediately seek to compel GM to pay to the Debtor the $279,363.79 in Wind-Down Money that is not disputed. Since the Debtor believes that GM's attempt to set-off the Set-Off Amount is improper, the Debtor shall also seek to compel GM to remit the remainder of the Wind-Down Money for the benefit of the Debtor's creditors.

416650v2

**E. THE LIQUIDATING DEBTOR**

The Debtor is no longer operating. Its remaining assets are: a) vehicle parts, equal to approximately $100,000; b) the right to receive the remainder of the Wind-Down Money equal to approximately $975,000, totaling up to $1,075,000.

**F. INSIDER TRANSACTIONS**

Within one year of the Petition Date, the Debtor made no payments or transfers to any insider as that term is defined pursuant to the Bankruptcy Code, other than: i) the payments of salaries to the Rampone, as officers of the Debtor; and ii) the payment of $100,000, on August 20, 2010, by the Debtor to United Bus Co., an entity owned by the Rampones.

This $100,000 used to make this transfer to United Bus was deposited also on August 20, 2010 by Charles Rampone into the Debtor's bank account, even though he did not owe any money to the Debtor at that time, for the sole purpose of paying it over to United Bus and the Debtor.

**G. CLASSIFICATION, AMOUNT AND NUMBER OF CLAIMS**

1.     The Plan divides all Claims and Interest into five Classes, plus Administrative Claims.

Administrative Claims consist of the allowed claims of Debtor's duly retained professionals, not paid during the bankruptcy proceeding and any other Administrative Expenses allowed under Section 503 of the Bankruptcy Code. Holders of Administrative Claims, as of May 31, 2010, are the sums owed Debtor's counsel in the amount of approximately $50,000, including a retainer received by counsel prior to the Petition in

7

the sum of $25,000 and the claim of 1581 Holding, LLC, the Debtor's former landlord,

in the amount of $14,000. There are no other accrued unpaid Administrative Expenses

except for any unpaid fees owed to the Office of the United States Trustee, for the

Second Quarter 2010, in the amount of approximately $5,000, in total. The obligation to

pay quarterly fees to the United States Trustee continues until the entry of the Final

Decree by the Bankruptcy Court.

2.      Class 1, consists of one claim, the secured claim of the DTF, in the

amount of $2,082,386.13.

3.      Class 2 consists of one claim, the priority sales tax claim of the DTF in the

amount of $425,993.96.

4.      Class 3 consists of approximately 100 Allowed General Unsecured

Claims, not including the claims of insiders, as that term is defined in the Bankruptcy

Code, in the aggregate amount of approximately $7,573,925.

5.      Class 4 claims consist of the Claims of the Debtor's insiders, in the

amount of approximately $3,500,000.

6.      Class 5 consists of the Interests of the Debtor held by John and Charles

Rampone, Jr.

## H. REQUIREMENTS FOR CONFIRMATION OF THE PLAN

### 1. Confirmation Hearing.

The Bankruptcy Court has set July __, 2010 at 1:30 p.m. as the date and time for a

hearing to determine whether the Plan has been accepted by the requisite number of

Creditors and Interest holders and whether the other requirements for confirmation of the

Plan have been satisfied.

8

Each Creditor and Interest Holder will receive notice of the Confirmation

Hearing.

## 2. Requirements for Confirmation.

In order to confirm the Plan, Section 1129 of the Bankruptcy Code requires the

Bankruptcy Court to make a series of determinations concerning the Plan, including that:

    a.  the Plan classifies Claims and Interests in a permissible manner;

    b.  the Plan complies with the technical requirements of Chapter 11 of the
Bankruptcy Code;

    c.  the proponent of the Plan (here the Debtor) has proposed the Plan in good
faith;

    d.  the Plan proponent's disclosures concerning the Plan have been adequate and
have included information concerning all payments and distributions to be
made in connection with the Plan; and

The Debtor believes that all of these conditions have been met or will be met by the time

of the Confirmation Hearing, and the Debtor will seek a determination of the Bankruptcy

Court to this effect at the Confirmation Hearing.

## 3. Acceptances Necessary for Confirmation.

The Bankruptcy Code requires that the Plan place each Creditor's Claim and each

Interest in a class with other Claims or Interests which are substantially similar.  The

Debtor believes that the classification system in the Plan meets the Bankruptcy Code's

standard.  Although the Bankruptcy Court must independently conclude that the Plan's

classification system is legally authorized, any Creditor or Interest holder who believes

that the Plan has improperly classified any group of Claims or Interests may object to

Confirmation of the Plan.

9

The Bankruptcy Code requires that the Plan be accepted by requisite votes of

Creditors and Interest Holders. At the Confirmation Hearing, the Bankruptcy Court must

determine, among other things, whether the Plan has been accepted by each Class of

Creditors and Interest holders whose Claims or Interests are impaired under the Plan.

Under Section 1126 of the Bankruptcy Code, any impaired Class is deemed to accept the

Plan if it is accepted by at least two-thirds in amount and more than one-half in number

of the Allowed Claims or Interests of Class members who have voted on the Plan.

Further, at least one impaired Class must accept the Plan, without counting the

vote of Insiders of the Debtor.

Finally, unless there is unanimous acceptance of the Plan by an impaired Class,

the Court must also determine that under the Plan, Class members will receive property

of value as of the Effective Date of the Plan that is not less than the amount such Class

members would receive or retain if the Debtor were liquidated under Chapter 7 of the

Bankruptcy Code on the Effective Date. Under the Plan, the holder of the Allowed

Classes 1 and 3 will receive a partial distribution, on account of their Allowed Claims.

As set forth in the liquidation analysis, annexed hereto as Exhibit B, the holders of Class

3 Claims are receiving a greater distribution under the Plan than if the Debtor's case were

converted to a case under Chapter 7 of the Bankruptcy Code.

**4. Confirmation of Plan Without Necessary Acceptances**.

The Plan may be confirmed even if it is not accepted by all of the impaired classes

if the Court finds that the Plan was accepted by at least one impaired Class and does not

discriminate unfairly against, and is fair and equitable with respect to, all non-accepting

impaired Classes. This provision is set forth in Section 1129(b) of the Bankruptcy Code

416650v2

and requires, among other things, that the holders of Claims or Interests which are
impaired must either receive or retain the full value of their Claims or, if they receive
less, no Class with a junior priority may receive anything.

**5. Absolute Priority Rule**.

With certain exceptions, one of the requirements for Confirmation is that a plan
not provide for any payments to a junior Class unless all senior Classes are paid in full.
Since General Unsecured Claims are superior to Interests, stockholders may not retain
their Interests unless one of three situations occurs:

     (i)     The plan provides for full payment to general unsecured creditors; or

     (ii)     The stockholders seeking to retain their equity interests contribute "money
     or money's worth" in the form of needed capital to the reorganized debtor
     reasonably equivalent in value to that of the equity interest sought to be
     retained; or

     (iii)     The class of unsecured creditors waives their rights by consenting to the
     plan as proposed. In the present case, Class 5 Equity Interests will be
     cancelled. Therefore, the absolute priority rule will be satisfied.

**6. Persons Entitled to Vote on the Plan**.

Only the votes of Classes whose Claims or Interests are impaired by the Plan will
be counted in connection with Confirmation. Generally, this includes any holders of
Claims who, under the Plan, will receive less than payment in full of the Allowed
Amount of their Claims on the Effective Date. Holders of Administrative Claims are not
impaired and are not entitled to vote. Classes 1 and 3 Claims are impaired and entitled to
vote. Holders of Class 2 and 4 Claims and Class 5 Interests will not receive a distribution
under the Plan and are deemed to have rejected the Plan.

In determining the acceptance of the Plan, votes will be counted only if submitted
by a holder of a Claim whose Claim is scheduled by the Debtor as undisputed, non-

contingent, and liquidated, or who timely filed with the Bankruptcy Court a proof of claim which has not been objected to or disallowed.

**7. Solicitation of Acceptances.**

This Disclosure Statement must be approved by the Bankruptcy Court in accordance with Section 1125 of the Bankruptcy Code and be provided to each holder of a Claim who has been scheduled by the Debtor or who has filed a proof of claim. This Disclosure Statement is intended to assist holders of Claims which are impaired in evaluating the Plan and in determining whether to accept or reject the Plan. Under the Bankruptcy Code, a determination that the Disclosure Statement contains "adequate information", as required by the Bankruptcy Code, does not constitute a recommendation by the Bankruptcy Court either for or against the Plan.

**8. Voting Procedures.**

All persons or entities entitled to vote on the Plan may cast their votes for or against the Plan by completing, dating, and signing the ballot for accepting or rejecting the Plan to be sent to them under separate cover, and delivering same to counsel for the Debtor, Eric J. Snyder, Esq., Wilk Auslander LLP, 675 Third Avenue, New York, New York 10017. In order to be counted, all ballots must be received by Wilk Auslander LLP on or before July __, 2010.

**I. DESCRIPTION OF THE PLAN**

The following is a summary of certain provisions of the Plan. **IT IS NOT A COMPLETE STATEMENT OF THE PLAN AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO PROVISIONS OF THE PLAN.** The Plan (annexed thereto as Exhibit "A"), which is subject to the provisions of the Bankruptcy

416650v2

Code, provides for treatment of all holders of Claims and Interests of the Debtor. **SINCE THE PLAN DEALS WITH SOPHISTICATED LEGAL CONCEPTS, AND INCORPORATES THE DEFINITIONS AND REQUIREMENTS OF THE BANKRUPTCY CODE, YOU MAY WISH TO CONSULT WITH COUNSEL OF YOUR CHOICE IN MAKING ANY DECISIONS REGARDING YOUR VOTING ON THE PLAN.**

**1. Summary of Classifications and
   Treatment of Claims and Interests under the Plan.**

The Plan divides Claims and Interests of the Debtor into Administrative Claims and five (5) Classes of Claims and Interests. The Classes and payments to be made in respect of, or treatment proposed to be accorded to Allowed Claims and Interests of each Class under the Plan are summarized and described below. The term "Allowed Claim" is defined in the Plan. The Plan also defines "Disputed Claim(s)" and proposes the treatment to be accorded to Disputed Claims. The proposed treatment of Disputed Claims is also summarized and described below.

**A. ADMINISTRATIVE CLAIMS.**

In order to Confirm the Plan, it is necessary for the Debtor to satisfy the Administrative Claims on the Effective Date or to have the holders of the Administrative Claims agree to different treatment.

DTF, the holder of the Class 1 Claim, has agreed to allow the payment of the following amounts (the "Carve-Out"), upon receipt by the Debtor of the Wind-Down Money: a) professionals to be paid up to the sum of $25,000, on account of their Allowed Claim; b) the claim of 1581 Holdings, LLC, in the amount of $14,000; and c) the sum of $50,000 to be shared *pro rata* with all Allowed Class 3 Claims, as set forth below.

13

416650v2

Upon approval of the Bankruptcy Court, the Administrative Claims of Debtor's professionals shall be paid either on the Confirmation Date or as otherwise agreed to by the parties.

## B. CLASS 1 CLAIM (SECURED CLAIM OF DTF)

Subsequent to the payment of the Carveout Amount set forth above, and on the Effective Date, DTF will be paid up to the amount of its Allowed Class 1 Claim The Class 1 Claim shall retain its lien on the Debtor's property until satisfied in full. The Class 1 Claim is impaired and entitled to vote.

## C. CLASS 2 (PRIORITY CLAIMS OF THE TAXING AUTHORITIES)

The holder of the Class 2 Claims shall not receive a distribution on account of their Class 2 Claim. As a result, the Class 2 Claims are impaired and are deemed to have rejected the Plan.

## D. CLASS 3 (GENERAL UNSECURED CLAIMS)

On the Effective Date, the holder of the Class 3 Claims shall receive a distribution on account of their Class 3 Claim equal to a pro rata distribution of the $50,000 that the Debtor shall receive, pursuant to the Carve-Out, from the Wind-Down Money. As a result, the Class 3 Claims are impaired and are entitled to vote.

416650v2

## E. CLASS 4 (SUBORDINATED INSIDER GENERAL UNSECURED CLAIMS)

Class 4 Subordinated General Unsecured Claims shall not receive a distribution under the Plan. As a result, the Class 4 Claims are impaired and are deemed to have rejected their treatment under the Plan.

## F. CLASS 5 (EQUITY INTERESTS)

The Class 5 Interests will be cancelled on the Effective Date. As a result, the Class 5 Interests are impaired and are deemed to have rejected his treatment under the Plan.

## G. CLAIMS OBJECTIONS

The Debtor reserves the right to bring claims objections within 90 days of the Confirmation Date.

## H. VALUE OF EQUITY INTERESTS TO BE RETAINED

On the date all of the Wind-Down Money is received, all the rights and interest of the holder of the Class 5 Interests will be extinguished.

## I. TAX CONSEQUENCES OF THE PLAN

### 1. General Consequences.

THE FOLLOWING DISCUSSION IS A SUMMARY OF CERTAIN SELECTED SIGNIFICANT FEDERAL INCOME TAX CONSEQUENCES BUT NOT STATE, LOCAL OR FOREIGN TAX CONSEQUENCES, OF THE PLAN TO THE DEBTOR, HOLDERS OF CLAIMS AND HOLDERS OF INTERESTS. THESE TAX CONSEQUENCES MAY BE AFFECTED BY SUCH FACTORS AS CHANGES IN THE STRUCTURE OF THE DEBTOR FROM THAT

15

DESCRIBED HEREIN. THE FEDERAL INCOME TAX CONSEQUENCES TO
HOLDERS OF CLAIMS AND INTERESTS MAY VARY SIGNIFICANTLY
DEPENDING ON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER.
MOREOVER, THE FEDERAL INCOME TAX CONSEQUENCES OF
CERTAIN ASPECTS OF THE PLAN ARE UNCERTAIN BECAUSE OF THE
LACK OF APPLICABLE LEGAL PRECEDENT AND THE POSSIBILITY OF
CHANGES IN FEDERAL INCOME TAX LAWS. ACCORDINGLY, EACH
HOLDER OF AN ALLOWED CLAIM OR INTEREST IS STRONGLY ADVISED
TO CONSULT WITH SUCH HOLDER'S OWN TAX ADVISOR REGARDING
THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF
THE PLAN.

In general, the federal income tax consequences to the Debtor and to each holder
of an Allowed Claim will depend on numerous factors. These factors include but are not
limited to the following:

a.   The identity and status of the particular Claimant for federal income tax
     purposes;

b.   The financial status of the Claimant and the Debtor, including the amount
     and character of any current tax attributes and tax attribute carryovers or
     carrybacks of the Claimant and/or the Debtor;

c.   The nature (recourse or nonrecourse) and terms of the debt instrument(s)
     to be restructured including the allocation of payments between principal
     and accrued but unpaid interest;

d.   The accounting method of the Claim holder;

e.   The relationship, if any, between the Debtor and the Claim holder;

f.   The residency, alienage or place of legal incorporation or formation
     (foreign or U.S.) of the Claim holder and/or the persons owning beneficial
     equity interests in the Claim holder.

16

g.      The type or method of debt restructure adopted by the Debtor and the
Claim holder and the timing of such debt restructure.

The application of the factors to each Claim holder will depend on the Claim

holder's individual facts and circumstances. In addition the federal income tax

consequences to the Debtor and Claim holder may depend on events which occur several

years after the Plan is implemented.

**THE DEBTOR'S LEGAL COUNSEL DOES NOT HAS SUFFICIENT**

**INFORMATION TO DETERMINE ALL OF THE SPECIFIC FEDERAL**

**INCOME TAX CONSEQUENCES TO EACH OF THE CLAIM AND INTEREST**

**HOLDERS RESULTING FROM THE PLAN.  ACCORDINGLY, EACH**

**HOLDER OF A CLAIM OR INTEREST IS STRONGLY ADVISED TO**

**CONSULT WITH SUCH HOLDER'S OWN TAX ADVISOR REGARDING THE**

**FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE**

**PLAN.**

**NO RULINGS HAVE BEEN OR ARE EXPECTED TO BE REQUESTED**

**FROM THE INTERNAL REVENUE SERVICE (THE "IRS") OR ANY STATE**

**TAX AGENCY CONCERNING ANY OF THE TAX MATTERS DESCRIBED**

**HEREIN. THERE CAN BE NO ASSURANCE THAT THE IRS OR ANY STATE**

**TAX AGENCY WILL NOT CHALLENGE THE POSITIONS TAKEN BY THE**

**DEBTOR WITH RESPECT TO ANY OF THE ISSUES ADDRESSED HEREIN**

**OR THAT A COURT OF COMPETENT JURISDICTION WOULD NOT**

**SUSTAIN SUCH A CHALLENGE.**

**2. Tax Consequences of Cash Payments to Holders of Allowed Claims.**

416650v2

The federal income tax consequences with respect to payments of Cash to holders of Allowed Claims in partial or full satisfaction of debt, or pursuant to a tax free recapitalization or other restructuring, depend on the allocation of such payments to principal and interest owed on the debt. The allocation of payments between interest and principal may affect:

    a.    the existence and timing of recognition of interest income by a cash basis Claim holder;

    b.    the existence and timing of interest deductions on a cash basis (and sometimes to an accrual basis) Debtor;

    c.    the amount (and possibly the character) of worthless debt loss recognized by the Claim holder;

    d.    the amount of cancellation of indebtedness income recognized by the Debtor; and

    e.    the amount of gain or loss recognized by the Claim holder pursuant to a recapitalization under Internal Revenue Code § 368(a)(1)(E).

A holder of an Allowed Claim will recognize ordinary income to the extent that any stock, debt securities, other premises, or cash received is attributable to interest (including original issue discount) which has accrued while the Claim holder held the debt and which the Claim holder previously included in income, exceeds the fair market value of stock, debt and cash received by the Claim holder which is attributable to such accrued interest.

In addition, such Claim holders will realize gain on such amount equal to the excess of the fair market value of stock, debt, other premises and cash received (excluding amounts attributable to interest and discussed above) over the cost or other tax basis of the debt claims surrendered (excluding any tax basis allocated to accrued interest). The gain may be a capital gain or ordinary gain unless the exchange has the

416650v2

effect of the distribution of a dividend under Internal Revenue Code § 305 (discussed below) in which case gain recognized that is not in excess of earnings and profits of the Debtor will be treated as a dividend. A corporate Claim holder who receives a dividend may qualify for a dividend received deduction with respect to the dividend.

The rules regarding taxation of payments to Claim holders which are attributable to other accrued but unpaid income items (*e.g.*, rents, compensation, royalties, dividends, *etc.*) are similar to the rules described above for payments allocated to interest.

### 3. Importance of Obtaining professional Tax Assistance.

**THE FOREGOING IS INTENDED TO BE ONLY A SUMMARY OF SELECTED FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN, AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH, AND RECEIPT OF ADVISE FROM, A TAX PROFESSIONAL. THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN THAT ARE DESCRIBED HEREIN AND THE STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE PLAN THAT ARE NOT ADDRESSED HEREIN, ARE COMPLEX AND, IN SOME CASES, UNCERTAIN. SUCH CONSEQUENCES MAY ALSO VARY BASED ON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER OF A CLAIM. ACCORDINGLY, EACH CLAIMANT AND EQUITY HOLDER IS STRONGLY URGED TO CONSULT WITH ITS OWN TAX ADVISOR REGARDING THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE PLAN.**

416650v2

## J. ACCOUNTING PROCESS

The financial information contained in this Disclosure Statement was derived from the Petition, Schedules and monthly operating reports filed by the Debtor in this case as well as based on certain assumptions made by the Debtor.

## K. POST-PETITION ASSETS AND LIABILITIES

The Debtor has acquired no significant assets since the filing of the Chapter 11 and has incurred no significant liabilities.

## L. EXECUTORY CONTRACTS

The only executory contracts related to the operation of Debtor's business are the Wind-Down Agreements that were assumed.

## M. RETENTION OF JURISDICTION

Following Confirmation, the Bankruptcy Court shall retain such jurisdiction as is legally permissible, including, without limitation, for the purposes set forth in Article XII of the Plan. These purposes include, among other things: (i) to determine the allowability, classification, or priority of Claims or Interests; (ii) to construe and to take any action to enforce and execute the Plan, the Confirmation Order, or any other order of the Bankruptcy Court; (iii) to issue such orders as may be necessary for the implementation, execution, performance, and consummation of the Plan; (iv) to determine any and all applications for allowance of compensation and expense reimbursement of Professional Persons; (v) to determine any other request for payment of Administrative Claims; (vi) to determine all applications, motions, adversary proceedings, contested matters, and any other litigated matters instituted prior to the closing of the Reorganization Case, including litigation commenced to set aside or avoid

416650v2

any transfers pursuant to Bankruptcy Code Sections 544, 545, 547, 548, 549, 550 and 553; (vii) to modify the Plan under Bankruptcy Code Section 1127, to remedy any defect or omission in the Plan, (vii) to enforce the Debtor's right to compel the payment of the Wind-Down Money from GM, if necessary; and (viii) or to reconcile any inconsistency in the Plan, or to reconcile any inconsistency in the Plan so as to carry out its intent and purposes.

## N. DISTRIBUTIONS UNDER THE PLAN

### 1. Cash Payments.

Cash payments made pursuant to the Plan will be in U.S. dollars by checks drawn on a domestic bank selected by the Debtor, or by wire transfer from a domestic bank, at the option of the Debtor.

### 2. Transmittal of Distributions.

All distributions shall be deemed made at the time such distribution is deposited in the United States mail, postage prepaid. Except as otherwise agreed with the holder of an Allowed Claim or Allowed Interest, any distribution on account of an Allowed Claim or Allowed Interest shall be distributed by mail to (i) the latest mailing address filed of record for the party entitled thereto or to a holder of a power of attorney designated by such holder to receive such distributions or (ii) if no such mailing address has been so filed, the mailing address reflected on the filed Schedules of Assets and Liabilities or in the Debtor's books and records.

### 3. Undeliverable Distributions.

If any distribution is returned to the Debtor as undeliverable, no further distributions shall be made to the holder of the Allowed Claim or Allowed Interest on

21

which such distribution was made unless and until the Debtor is notified in writing of

such holder's then current address. Undeliverable distributions shall remain in the

possession of the Debtor until such time as a distribution becomes deliverable or is

deemed canceled (as hereinafter provided). Any unclaimed distribution held by the

Debtor shall be accounted for separately, but the Debtor shall be under no duty to invest

any such unclaimed distribution in any manner. Any holder of an Allowed Claim or

Allowed Interest that does not present a Claim for an undeliverable distribution within

one hundred and twenty (120) days after the date upon which a distribution is first made

available to such holder shall have its right to such distribution discharged pursuant to

Section 1141 of the Bankruptcy Code and shall be forever barred from asserting any such

Claim or Interest against the Debtor or its property. All unclaimed or undistributed

distributions shall be redistributed to the remaining holders of Allowed Claims in the

same Class as the holder of the unclaimed or undistributed distribution.

## O. LEGAL EFFECTS OF CONFIRMATION AND EFFECTIVENESS OF THE PLAN

### 1. Discharge and Injunction.

Since the Debtor is liquidating substantially all of its assets, confirmation of the

Plan will not result in a discharge of Claims pursuant to Section 1141 of the Bankruptcy

Code.

### 2. Revesting of Property of the Estate and Release of Liens.

Except as otherwise provided in the Plan, any contract, instrument, or other

agreement or document created in connection with the Plan, or the Confirmation Order,

on the Effective Date, all property of the estate, wherever situated, shall be revested in the

Debtor free and clear of all Claims, mortgages, deeds of trust, liens, security interests,

22

encumbrances, and other interests of any Person, and the Debtor may thereafter operate

its business and may use, acquire, and dispose of property and compromise or settle any

Claims or Interests without the supervision or approval of the Bankruptcy Court, free of

any restrictions of the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy

Rules of the United States Bankruptcy Court for the Eastern District of New York, and

the guidelines and requirements of the Office of the United States Trustee for the Eastern

District of New York.

## P. MODIFICATION OR REVOCATION OF THE PLAN

Subject to the restrictions on modification set forth in Section 1127 of the

Bankruptcy Code, the Debtor reserves the right to alter, amend, or modify the Plan before

or after the Effective Date. No alterations, amendments, or modifications may be made

by any party except the Debtor. If the Plan is modified by the Debtor, it may be

necessary to amend the Disclosure Statement and to resolicit ballots from all or some

voting Classes. A hearing on such issues and any resolicitation of ballots likely would

significantly delay Confirmation and, consequently, significantly delay distributions

under the Plan.

The provisions of the Plan are not severable unless such severance is agreed to by

the Debtor and such severance would constitute a permissible modification of the Plan

pursuant to Bankruptcy Code Section 1127.

416650v2

**Q. ANALYSIS OF POTENTIAL RECOVERIES UNDER SECTIONS 542 THROUGH 550 OF THE BANKRUPCTCY CODE.**

The Debtor has undertaken an analysis as to whether any causes of action exist under Sections 542 through 550 of Title 11. the Debtor has concluded that no viable causes of action exist under these sections of the Bankruptcy Code.

**R. SUMMARY OF CERTAIN OTHER PROVISIONS OF THE PLAN**

Except as otherwise provided in the Plan, agreements entered into in connection therewith, the Confirmation Order, or in agreements previously approved by Final Order of the Bankruptcy Court, the Debtor may, pursuant to Bankruptcy Code Section 553 or applicable nonbankruptcy law, setoff against any Allowed Claim (before any distribution is made on account of such Claim) any and all of the Claims, rights and causes of action of any nature that the Debtor may hold against the holder of such Allowed Claim.

**S. MEANS OF IMPLEMENTING THE PLAN**

The funds required for the Confirmation and performance of this Plan shall be provided from the fund currently in the Debtor's possession, the liquidation of the parts inventory and the collection of the Wind-Down Money.

416650v2

## CONCLUSION

The Debtor believes that the Plan affords Creditors the potential for the greatest

realization from the Debtor's assets and, therefore, is in the best interest of the Creditors.

Accordingly, the Debtor urges all Secured and Unsecured Creditors to cast their ballots in

favor of accepting the Plan.

Dated: New York, New York                              WILK AUSLANDER LLP
      August 19,  2010                                 Attorney for Debtor


                                 By:____/s/Eric J. Snyder_____
                                       Eric J. Snyder (ES-8032)
                                       675 Third Avenue
                                       New York, New York 11207
                                       (516) 997-0999

416650v2

# EXHIBIT B

SILLER WILK AUSLANDER LLP
Counsel for the Debtor
675 Third Avenue
New York, New York 10017
(212) 421-2233
Eric J. Snyder, Esq. (ES 8032)

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
In re:

                                     Chapter 11

RAMP CHEVROLET, INC.,

                           Debtor.               Case No: 09-77513-REG
-------------------------------------------------------x

## AMENDED DISCLOSURE STATEMENT

This **Amended** Disclosure Statement **(the "Disclosure Statement")** is filed

pursuant to Section 1125 of Title 11, United States Code, on behalf of Ramp Chevrolet,

Inc., Debtor and Debtor-in-Possession.

## A. INTRODUCTION/NOTICE OF HEARING AND SOURCE OF INFORMATION

      Pursuant to Section 1125 of Title 11 of the United States Code (the "Bankruptcy

Code"), Ramp Chevrolet, Inc., the debtor herein (the "Debtor") provides this Disclosure

Statement (the "Disclosure Statement") to all of the known Creditors of the Debtor and

other parties in interest in order to provide information deemed by the Debtor to be

material and necessary to enable such Creditors and parties in interest to make a

reasonable informed decision in the exercise of their rights to vote on and participate in

Debtor's Plan of Liquidation (the "Plan"). The Plan is annexed hereto as Exhibit "A".

The information contained in this Disclosure Statement is based on the representations

made by the Debtor in its Petition and Schedules and all other documents provided by

counsel for the Debtor and isare believed to be accurate. It has not been subject to

certified audit or independent review. Therefore, no representation or warranty is made

1

as to its accuracy or completeness. However, the Debtor has reasonably endeavored to obtain and supply all material information.

Terms utilized in this Disclosure Statement, if not defined herein, shall have the same meaning as such terms are used or defined in the Plan unless the context hereof requires a different meaning.

**THE BANKRUPTCY COURT HAS SET AUGUST __ 2010 AT 1:30 P.M. OF THAT DAY AS THE DATE AND TIME OF THE HEARING ON CONFIRMATION OF THE PLAN AND OBJECTIONS THERETO, WHICH HEARING WILL BE HELD IN THE COURTROOM OF THE HONORABLE ROBERT E. GROSSMAN, UNITED STATES COURTHOUSE-ROOM 860, CENTRAL ISLIP, NEW YORK 11722. CREDITORS OF, AND HOLDERS OF INTERESTS IN, THE DEBTOR MAY ATTEND SUCH HEARING. THE BANKRUPTCY COURT HAS FIXED JULY __, 2010 AS THE DATE AND TIME BY WHICH ALL WRITTEN OBJECTIONS TO CONFIRMATION OF THE PLAN SHALL BE FILED WITH THE BANKRUPTCY COURT AND SERVED UPON THE ATTORNEY FOR THE DEBTOR AND UPON THE UNITED STATES TRUSTEE.**

**A BALLOT ACCOMPANIES THIS DISCLOSURE STATEMENT FOR YOUR USE IN VOTING ON THE PLAN. IN ORDER TO BE CONFIRMED, THE PLAN MUST BE ACCEPTED BY A MAJORITY IN NUMBER AND TWO-THIRDS IN AMOUNT OF THOSE VOTING IN EACH CLASS IMPAIRED UNDER THE PLAN.**

2

**YOU ARE URGED TO REVIEW THE PLAN, THIS DISCLOSURE
STATEMENT, AND THE BALLOT WITH COUNSEL OF YOUR CHOICE.
HOLDERS OF CLAIMS OR INTERESTS WHICH ARE IMPAIRED UNDER
THE PLAN MAY VOTE TO ACCEPT OR REJECT THE PLAN BY
COMPLETING AND MAILING THE ENCLOSED BALLOT ON OR BEFORE
JULY __, 2010, TO COUNSEL FOR THE DEBTOR AT THE ADDRESS SET
FORTH BELOW:**

**SILLER WILK AUSLANDER LLP
675 Third Avenue
New York, New York 10017-5704
Attn: Eric J. Snyder, Esq.**

**THE DEBTOR BELIEVES THE TREATMENT OF UNSECURED
CREDITORS THAT ARE IMPAIRED UNDER THE PLAN CONTEMPLATES A
GREATER RECOVERY FOR SUCH CREDITORS THAN WOULD BE
AVAILABLE UNDER ANY ALTERNATIVE PLAN OR IN A CHAPTER 7
LIQUIDATION.**

**ACCORDINGLY, THE DEBTOR BELIEVES THAT CONFIRMATION
OF THE PLAN IS IN THE BEST INTERESTS OF THE IMPAIRED GENERAL
UNSECURED CREDITORS AND RECOMMENDS THAT ALL SUCH
CREDITORS VOTE TO ACCEPT THE PLAN.**

Other than the information set forth in this Disclosure Statement, the Debtor has
authorized no person or entity to make representations concerning the Debtor, its
business, its future income, the value of the Debtor's assets, or the amounts to be
distributed under the Plan.  Any representations or inducements made to secure your

3

431937v1

acceptance of the Plan which ~~are~~is other than as contained in this Disclosure Statement

should not be relied upon by you in determining whether to accept or reject the Plan.

## B. DEBTOR'S BUSINESS

The Debtor is a New York corporation. Its shareholders are John and Charles

Rampone, Jr. The Debtor owns and operates Chevrolet, Chevrolet Truck and Hummer

franchises (the "Dealerships"), pursuant to franchise agreements (the "Franchise

Agreements") by and between the Debtor and the General Motors Company ("GM").

The Dealerships are located at 1395 Route 112, Port Jefferson, New York.

## C. PRE-PETITION HISTORY OF THE DEBTOR

During June, 2009, GM filed for Chapter 11 relief. Immediately thereafter, GM

informed the Debtor that it would be terminating the Franchise Agreements.

To this end, on June 12, 2009, the Debtor entered into three agreements (the

"Wind-Down Agreements") with GM to "wind-down" the operations of the Dealerships.

Pursuant to the Wind-Down Agreements, upon the sale of the Debtor's new car inventory

of each franchise, the Debtor is required to close the Dealership. In exchange, GM has

agreed to pay to the Debtor the sum of $1,304,613 (the "Wind-Down Money"), in total,

for consideration in terminating the three Dealerships. During August, 2009, 25% of the

Wind-Down Amount, $326,154.75, was paid to the Debtor by GM.

4

For the quarters ending November 30, 2009, February 28, 2009 and May 31, 2009, the Debtor failed to remit sales tax to the New York State Department of Taxation & Finance ("DTF") in the amounts of $1,442,636.09, $639,750.04 and $425,993.96, respectively, totaling $2,508,380.09 (the "DTF Claim"). Of this amount, the sum of $2,082,386.13 ("DTF Secured Claim") is subject to Tax Warrants.

As of that date, the Debtor also owed GMAC, the entity that financed the purchase of the vehicles for the Dealerships, the sum of $587,201.92 (the "GMAC Claim"), secured by all of the Debtor's assets.

On October 2, 2009, DTF sought to enforce its rights under the Tax Warrants and changed the locks on the Dealerships. As a result, the Debtor was compelled to seek Chapter 11 relief.

## D. HISTORY OF THE CHAPTER 11 CASE

As stated above, as of the Petition Date, the Debtor owed GMAC the sum of approximately $507,201.92 and the DTF approximately $2,082,386.13. As a result of the DTF's secured status as of the Petition Date, it was necessary for the Debtor to seek the use of the cash collateral of GMAC and the DTF, pursuant to Section 363(c)(2)(B) of the Bankruptcy Code. By motion dated October 6, 2009, Debtor sought authority to use GMAC's and DTF's cash collateral. Pursuant to a Stipulation and Order dated October 20, 2009, the Debtor and GMAC entered into a Stipulation authorizing the Debtor to use cash collateral through November 4, 2009. On or about that date, the GMAC Claim was satisfied.

On December 3, 2009, the Debtor filed a motion (the "Assumption Motion"), pursuant to Section 365 of the Bankruptcy Code, to assume the Wind-Down Agreements.

5

Pursuant to an order of the Court, dated February 3, 2010, the Assumption Motion was granted.

During November, 2009, the Debtor sold the last of its retail vehicles. As a result, under the Wind-Down Agreements, the Debtor became eligible to collect the Wind-Down Money. To this end, the Debtor has requested the commencement of the procedures to terminate the Franchise Agreement by December 31, 2009 and to obtain the Wind-Down Money.

On February 8, 2010, the Office of the United States Trustee filed a motion (the "Conversion Motion") to convert or dismiss the Debtor's bankruptcy case. In order to resolve the Conversion Motion, the DTF agreed to allow a portion of the Wind-Down Money to be paid to satisfy Administrative Expenses and the Class 3 Claims, on a *pro rata* basis, as set forth below.

**On July 23, 2010, GM filed a proof of claim in the bankruptcy proceeding asserting a secured claim of $699,096.01 (the "Set-Off Amount") based on set off and recoupment rights.**

**On August 18, 2010, the Debtor provided to GM all of the documents GM stated it requires under the Wind-Down Agreement in order for the Debtor to obtain the Wind-Down Money. The Debtor shall immediately seek to compel GM to pay to the Debtor the $279,363.79 in Wind-Down Money that is not disputed. Since the Debtor believes that GM's attempt to set-off the Set-Off Amount is improper, the Debtor shall also seek to compel GM to remit the remainder of the Wind-Down Money for the benefit of the Debtor's creditors.**

6

## E. THE LIQUIDATING DEBTOR

The Debtor is no longer operating. Its remaining assets are: a) vehicle parts, equal to approximately $100,000; b) the right to receive the remainder of the Wind-Down Money equal to approximately $975,000, totaling ~~approximately~~**up to** $1,075,000.

## F. INSIDER TRANSACTIONS

Within one year of the Petition Date, the Debtor made no payments or transfers to any insider as that term is defined pursuant to the Bankruptcy Code, other than**: i)** the payments of salaries to the ~~Rampones~~**Rampone**, as officers of the Debtor.**; and ii) the payment of $100,000, on August 20, 2010, by the Debtor to United Bus Co., an entity owned by the Rampones.**

**This $100,000 used to make this transfer to United Bus was deposited also on August 20, 2010 by Charles Rampone into the Debtor's bank account, even though he did not owe any money to the Debtor at that time, for the sole purpose of paying it over to United Bus and the Debtor.**

## G. CLASSIFICATION, AMOUNT AND NUMBER OF CLAIMS

1.    The Plan divides all Claims and Interest into five Classes, plus Administrative Claims.

Administrative Claims consist of the allowed claims of Debtor's duly retained professionals, not paid during the bankruptcy proceeding and any other Administrative Expenses allowed under Section 503 of the Bankruptcy Code. Holders of Administrative Claims, as of May 31, 2010, are the sums owed Debtor's counsel in the amount of approximately $50,000, including a retainer received by counsel prior to the Petition in

7

the sum of $25,000 and the claim of 1581 Holding, LLC, the Debtor's former landlord, in the amount of $14,000. There are no other accrued unpaid Administrative Expenses except for any unpaid fees owed to the Office of the United States Trustee, for the Second Quarter 2010, in the amount of approximately $5,000, in total. The obligation to pay quarterly fees to the United States Trustee continues until the entry of the Final Decree by the Bankruptcy Court.

2.     Class 1, consists of one claim, the secured claim of the DTF, in the amount of $2,082,386.13.

3.     Class 2 consists of one claim, the priority sales tax claim of the DTF in the amount of $425,993.96.

4.     Class 3 consists of approximately 100 Allowed General Unsecured Claims, not including the claims of insiders, as that term is defined in the Bankruptcy Code, in the aggregate amount of approximately $1,500,000.7,573,925.

5.     Class 4 claims consist of the Claims of the Debtor's insiders, in the amount of approximately $3,500,000.

6.     Class 5 consists of the Interests of the Debtor held by John and Charles Rampone, Jr.

## H. REQUIREMENTS FOR CONFIRMATION OF THE PLAN

### 1. Confirmation Hearing.

The Bankruptcy Court has set July __, 2010 at 1:30 p.m. as the date and time for a hearing to determine whether the Plan has been accepted by the requisite number of Creditors and Interest holders and whether the other requirements for confirmation of the Plan have been satisfied.

8

Each Creditor and Interest Holder will receive notice of the Confirmation
Hearing.

## 2. Requirements for Confirmation.

In order to confirm the Plan, Section 1129 of the Bankruptcy Code requires the
Bankruptcy Court to make a series of determinations concerning the Plan, including that:

 a. the Plan classifies Claims and Interests in a permissible manner;

 b. the Plan complies with the technical requirements of Chapter 11 of the
Bankruptcy Code;

 c. the proponent of the Plan (here the Debtor) has proposed the Plan in good
faith;

 d. the Plan proponent's disclosures concerning the Plan have been adequate and
have included information concerning all payments and distributions to be
made in connection with the Plan; and

The Debtor believes that all of these conditions have been met or will be met by the time
of the Confirmation Hearing, and the Debtor will seek a determination of the Bankruptcy
Court to this effect at the Confirmation Hearing.

## 3. Acceptances Necessary for Confirmation.

The Bankruptcy Code requires that the Plan place each Creditor's Claim and each
Interest in a class with other Claims or Interests which are substantially similar. The
Debtor believes that the classification system in the Plan meets the Bankruptcy Code's
standard. Although the Bankruptcy Court must independently conclude that the Plan's
classification system is legally authorized, any Creditor or Interest holder who believes
that the Plan has improperly classified any group of Claims or Interests may object to
Confirmation of the Plan.

9

431937v1

The Bankruptcy Code requires that the Plan be accepted by requisite votes of Creditors and Interest Holders. At the Confirmation Hearing, the Bankruptcy Court must determine, among other things, whether the Plan has been accepted by each Class of Creditors and Interest holders whose Claims or Interests are impaired under the Plan. Under Section 1126 of the Bankruptcy Code, any impaired Class is deemed to accept the Plan if it is accepted by at least two-thirds in amount and more than one-half in number of the Allowed Claims or Interests of Class members who have voted on the Plan.

Further, at least one impaired Class must accept the Plan, without counting the vote of Insiders of the Debtor.

Finally, unless there is unanimous acceptance of the Plan by an impaired Class, the Court must also determine that under the Plan, Class members will receive property of value as of the Effective Date of the Plan that is not less than the amount such Class members would receive or retain if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code on the Effective Date. Under the Plan, the holder of the Allowed Classes 1 and 3 will receive a partial distribution, on account of their Allowed Claims. As set forth in the liquidation analysis, annexed hereto as Exhibit B, the holders of Class 3 Claims are receiving a greater distribution under the Plan than if the Debtor's case were converted to a case under Chapter 7 of the Bankruptcy Code.

**4. Confirmation of Plan Without Necessary Acceptances.**

The Plan may be confirmed even if it is not accepted by all of the impaired classes if the Court finds that the Plan was accepted by at least one impaired Class and does not discriminate unfairly against, and is fair and equitable with respect to, all non-accepting impaired Classes. This provision is set forth in Section 1129(b) of the Bankruptcy Code

10

and requires, among other things, that the holders of Claims or Interests which are

impaired must either receive or retain the full value of their Claims or, if they receive

less, no Class with a junior priority may receive anything.

**5. Absolute Priority Rule**.

With certain exceptions, one of the requirements for Confirmation is that a plan

not provide for any payments to a junior Class unless all senior Classes are paid in full.

Since General Unsecured Claims are superior to Interests, stockholders may not retain

their Interests unless one of three situations ~~occur~~**occurs**:

    (i)     The plan provides for full payment to general unsecured creditors; or

    (ii)    The stockholders seeking to retain their equity interests contribute "money or money's worth" in the form of needed capital to the reorganized debtor reasonably equivalent in value to that of the equity interest sought to be retained; or

    (iii)   The class of unsecured creditors ~~waive~~**waives** their rights by consenting to the plan as proposed. In the present case, Class 5 Equity Interests will be cancelled. Therefore, the absolute priority rule will be satisfied.

**6. Persons Entitled to Vote on the Plan**.

Only the votes of Classes whose Claims or Interests are impaired by the Plan will

be counted in connection with Confirmation. Generally, this includes any holders of

Claims who, under the Plan, will receive less than payment in full of the Allowed

Amount of their Claims on the Effective Date. Holders of Administrative Claims are not

impaired and are not entitled to vote. Classes 1 and 3 Claims are impaired and entitled to

vote. Holders of Class 2 and 4 Claims and Class 5 Interests will not receive a distribution

under the Plan and are deemed to have rejected the Plan.

In determining the acceptance of the Plan, votes will be counted only if submitted

by a holder of a Claim whose Claim is scheduled by the Debtor as undisputed, non-

11

contingent, and liquidated, or who timely filed with the Bankruptcy Court a proof of
claim which has not been objected to or disallowed.

**7. Solicitation of Acceptances**.

This Disclosure Statement must be approved by the Bankruptcy Court in
accordance with Section 1125 of the Bankruptcy Code and be provided to each holder of
a Claim who has been scheduled by the Debtor or who has filed a proof of claim. This
Disclosure Statement is intended to assist holders of Claims which are impaired in
evaluating the Plan and in determining whether to accept or reject the Plan. Under the
Bankruptcy Code, a determination that the Disclosure Statement contains "adequate
information", as required by the Bankruptcy Code, does not constitute a recommendation
by the Bankruptcy Court either for or against the Plan.

**8. Voting Procedures**.

All persons or entities entitled to vote on the Plan may cast their votes for or
against the Plan by completing, dating, and signing the ballot for accepting or rejecting
the Plan to be sent to them under separate cover, and delivering same to counsel for the
Debtor, Eric J. Snyder, Esq., ~~Siller~~ Wilk~~,~~ **Auslander** LLP, 675 Third Avenue, New York,
New York 10017. In order to be counted, all ballots must be received by ~~Siller~~ Wilk
**Auslander** LLP on or before July __, 2010.

**I. DESCRIPTION OF THE PLAN**

The following is a summary of certain provisions of the Plan. **IT IS NOT A
COMPLETE STATEMENT OF THE PLAN AND IS QUALIFIED IN ITS
ENTIRETY BY REFERENCE TO PROVISIONS OF THE PLAN**. The Plan
(annexed thereto as Exhibit "A"), which is subject to the provisions of the Bankruptcy

12

431937v1

Code, provides for treatment of all holders of Claims and Interests of the Debtor. **SINCE THE PLAN DEALS WITH SOPHISTICATED LEGAL CONCEPTS, AND INCORPORATES THE DEFINITIONS AND REQUIREMENTS OF THE BANKRUPTCY CODE, YOU MAY WISH TO CONSULT WITH COUNSEL OF YOUR CHOICE IN MAKING ANY DECISIONS REGARDING YOUR VOTING ON THE PLAN.**

**1. Summary of Classifications and
    Treatment of Claims and Interests under the Plan.**

The Plan divides Claims and Interests of the Debtor into Administrative Claims and five (5) Classes of Claims and Interests. The Classes and payments to be made in respect of, or treatment proposed to be accorded to Allowed Claims and Interests of each Class under the Plan are summarized and described below. The term "Allowed Claim" is defined in the Plan. The Plan also defines "Disputed Claim(s)" and proposes the treatment to be accorded to Disputed Claims. The proposed treatment of Disputed Claims is also summarized and described below.

**A. ADMINISTRATIVE CLAIMS.**

In order to Confirm the Plan, it is necessary for the Debtor to satisfy the Administrative Claims on the Effective Date or to have the holders of the Administrative Claims agree to different treatment.

DTF, the holder of the Class 1 Claim, has agreed to allow the payment of the following amounts (the "Carve-Out"), upon receipt by the Debtor of the Wind-Down Money: a) professionals to be paid up to the sum of $25,000, on account of their Allowed Claim; b) the claim of 1581 Holdings, LLC, in the amount of $14,000; and c) the sum of $50,000 to be shared *pro rata* with all Allowed Class 3 Claims, as set forth below.

13

Upon approval of the Bankruptcy Court, the Administrative Claims of Debtor's professionals shall be paid either on the Confirmation Date or as otherwise agreed to by the parties.

## B. CLASS 1 CLAIM (SECURED CLAIM OF DTF)

Subsequent to the payment of the Carveout Amount set forth above, and on the Effective Date, DTF will be paid up to the amount of its Allowed Class 1 Claim The Class 1 Claim shall retain its lien on the Debtor's property until satisfied in full. The Class 1 Claim is impaired and entitled to vote.

## C. CLASS 2  (PRIORITY CLAIMS OF THE TAXING AUTHORITIES)

The holder of the Class 2 Claims shall not receive a distribution on account of their Class 2 Claim.  As a result, the Class 2 Claims are impaired and are deemed to have rejected the Plan.

## D. CLASS 3  (GENERAL UNSECURED CLAIMS)

On the Effective Date, the holder of the Class 3 Claims shall receive a distribution on account of their Class 3 Claim equal to a pro rata distribution of the $50,000 that the Debtor shall receive, pursuant to the Carve-Out, from the Wind-Down Money.  As a result, the Class 3 Claims are impaired and are entitled to vote.

14

### E.  CLASS 4 (SUBORDINATED INSIDER GENERAL UNSECURED CLAIMS)

Class 4 Subordinated General Unsecured Claims shall not receive a distribution under the Plan.  As a result, the Class 4 Claims are impaired and are deemed to have rejected their treatment under the Plan.

### F. CLASS 5 (EQUITY INTERESTS)

The Class 5 Interests will be cancelled on the Effective Date.  As a result, the Class 5 Interests are impaired and are deemed to have rejected his treatment under the Plan.

### G. CLAIMS OBJECTIONS

The Debtor reserves the right to bring claims objections within 90 days of the Confirmation Date.

### H. VALUE OF EQUITY INTERESTS TO BE RETAINED

On the date all of the Wind-Down Money is received, all the rights and interest of the holder of the Class 5 Interests will be extinguished.

### I. TAX CONSEQUENCES OF THE PLAN

### 1. General Consequences.

**THE FOLLOWING DISCUSSION IS A SUMMARY OF CERTAIN SELECTED SIGNIFICANT FEDERAL INCOME TAX CONSEQUENCES BUT NOT STATE, LOCAL OR FOREIGN TAX CONSEQUENCES, OF THE PLAN TO THE DEBTOR, HOLDERS OF CLAIMS AND HOLDERS OF INTERESTS. THESE TAX CONSEQUENCES MAY BE AFFECTED BY SUCH FACTORS AS CHANGES IN THE STRUCTURE OF THE DEBTOR FROM THAT**

15

DESCRIBED HEREIN. THE FEDERAL INCOME TAX CONSEQUENCES TO
HOLDERS OF CLAIMS AND INTERESTS MAY VARY SIGNIFICANTLY
DEPENDING ON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER.
MOREOVER, THE FEDERAL INCOME TAX CONSEQUENCES OF
CERTAIN ASPECTS OF THE PLAN ARE UNCERTAIN BECAUSE OF THE
LACK OF APPLICABLE LEGAL PRECEDENT AND THE POSSIBILITY OF
CHANGES IN FEDERAL INCOME TAX LAWS. ACCORDINGLY, EACH
HOLDER OF AN ALLOWED CLAIM OR INTEREST IS STRONGLY ADVISED
TO CONSULT WITH SUCH HOLDER'S OWN TAX ADVISOR REGARDING
THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF
THE PLAN.

In general, the federal income tax consequences to the Debtor and to each holder
of an Allowed Claim will depend on numerous factors. These factors include but are not
limited to the following:

a. The identity and status of the particular Claimant for federal income tax
purposes;

b. The financial status of the Claimant and the Debtor, including the amount
and character of any current tax attributes and tax attribute carryovers or
carrybacks of the Claimant and/or the Debtor;

c. The nature (recourse or nonrecourse) and terms of the debt instrument(s)
to be restructured including the allocation of payments between principal
and accrued but unpaid interest;

d. The accounting method of the Claim holder;

e. The relationship, if any, between the Debtor and the Claim holder;

f. The residency, alienage or place of legal incorporation or formation
(foreign or U.S.) of the Claim holder and/or the persons owning beneficial
equity interests in the Claim holder.

16

g.    The type or method of debt restructure adopted by the Debtor and the Claim holder and the timing of such debt restructure.

The application of the factors to each Claim holder will depend on the Claim holder's individual facts and circumstances. In addition the federal income tax consequences to the Debtor and Claim holder may depend on events which occur several years after the Plan is implemented.

**THE DEBTOR'S LEGAL COUNSEL DOES NOT ~~HAVE~~HAS SUFFICIENT INFORMATION TO DETERMINE ALL OF THE SPECIFIC FEDERAL INCOME TAX CONSEQUENCES TO EACH OF THE CLAIM AND INTEREST HOLDERS RESULTING FROM THE PLAN. ACCORDINGLY, EACH HOLDER OF A CLAIM OR INTEREST IS STRONGLY ADVISED TO CONSULT WITH SUCH HOLDER'S OWN TAX ADVISOR REGARDING THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE PLAN.**

**NO RULINGS HAVE BEEN OR ARE EXPECTED TO BE REQUESTED FROM THE INTERNAL REVENUE SERVICE (THE "IRS") OR ANY STATE TAX AGENCY CONCERNING ANY OF THE TAX MATTERS DESCRIBED HEREIN. THERE CAN BE NO ASSURANCE THAT THE IRS OR ANY STATE TAX AGENCY WILL NOT CHALLENGE THE POSITIONS TAKEN BY THE DEBTOR WITH RESPECT TO ANY OF THE ISSUES ADDRESSED HEREIN OR THAT A COURT OF COMPETENT JURISDICTION WOULD NOT SUSTAIN SUCH A CHALLENGE.**

**2. Tax Consequences of Cash Payments to Holders of Allowed Claims**.

17

431937v1

The federal income tax consequences with respect to payments of Cash to holders

of Allowed Claims in partial or full satisfaction of debt, or pursuant to a tax free

recapitalization or other restructuring, depend on the allocation of such payments to

principal and interest owed on the debt.  The allocation of payments between interest and

principal may affect:

a.   the existence and timing of recognition of interest income by a cash basis
     Claim holder;

b.   the existence and timing of interest deductions on a cash basis (and
     sometimes to an accrual basis) Debtor;

c.   the amount (and possibly the character) of worthless debt loss recognized
     by the Claim holder;

d.   the amount of cancellation of indebtedness income recognized by the
     Debtor; and

e.   the amount of gain or loss recognized by the Claim holder pursuant to a
     recapitalization under Internal Revenue Code § 368(a)(1)(E).

A holder of an Allowed Claim will recognize ordinary income to the extent that

any stock, debt securities, other premises, or cash received is attributable to interest

(including original issue discount) which has accrued while the Claim holder held the

debt and which the Claim holder previously included in income, exceeds the fair market

value of stock, debt and cash received by the Claim holder which is attributable to such

accrued interest.

In addition, such Claim holders will realize gain on such amount equal to the

excess of the fair market value of stock, debt, other premises and cash received

(excluding amounts attributable to interest and discussed above) over the cost or other tax

basis of the debt claims surrendered (excluding any tax basis allocated to accrued

interest). The gain may be a capital gain or ordinary gain unless the exchange has the

18

effect of the distribution of a dividend under Internal Revenue Code § 305 (discussed

below) in which case gain recognized that is not in excess of earnings and profits of the

Debtor will be treated as a dividend.  A corporate Claim holder who receives a dividend

may qualify for a dividend received deduction with respect to the dividend.

The rules regarding taxation of payments to Claim holders which are attributable

to other accrued but unpaid income items (*e.g.*, rents, compensation, royalties, dividends,

*etc.*) are similar to the rules described above for payments allocated to interest.

**3. Importance of Obtaining professional Tax Assistance.**

**THE FOREGOING IS INTENDED TO BE ONLY A SUMMARY OF**

**SELECTED FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN, AND**

**IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH, AND**

**RECEIPT OF ADVISE FROM, A TAX PROFESSIONAL. THE FEDERAL**

**INCOME TAX CONSEQUENCES OF THE PLAN THAT ARE DESCRIBED**

**HEREIN AND THE STATE, LOCAL AND FOREIGN TAX CONSEQUENCES**

**OF THE PLAN THAT ARE NOT ADDRESSED HEREIN, ARE COMPLEX AND,**

**IN SOME CASES, UNCERTAIN. SUCH CONSEQUENCES MAY ALSO VARY**

**BASED ON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER OF A**

**CLAIM. ACCORDINGLY, EACH CLAIMANT AND EQUITY HOLDER IS**

**STRONGLY URGED TO CONSULT WITH ITS OWN TAX ADVISOR**

**REGARDING THE FEDERAL, STATE, LOCAL AND FOREIGN TAX**

**CONSEQUENCES OF THE PLAN.**

431937v1

## J. ACCOUNTING PROCESS

The financial information contained in this Disclosure Statement was derived from the Petition, Schedules and monthly operating reports filed by the Debtor in this case as well as based on certain assumptions made by the Debtor.

## K. POST-PETITION ASSETS AND LIABILITIES

The Debtor has acquired no significant assets since the filing of the Chapter 11 and has incurred no significant liabilities.

## L. EXECUTORY CONTRACTS

The only executory contracts related to the operation of Debtor's business are the Wind-Down Agreements that were assumed.

## M. RETENTION OF JURISDICTION

Following Confirmation, the Bankruptcy Court shall retain such jurisdiction as is legally permissible, including, without limitation, for the purposes set forth in Article XII of the Plan.  These purposes include, among other things: (i) to determine the allowability, classification, or priority of Claims or Interests; (ii) to construe and to take any action to enforce and execute the Plan, the Confirmation Order, or any other order of the Bankruptcy Court; (iii) to issue such orders as may be necessary for the implementation, execution, performance, and consummation of the Plan; (iv) to determine any and all applications for allowance of compensation and expense reimbursement of Professional Persons; (v) to determine any other request for payment of Administrative Claims; (vi) to determine all applications, motions, adversary proceedings, contested matters, and any other litigated matters instituted prior to the closing of the Reorganization Case, including litigation commenced to set aside or avoid

431937v1

any transfers pursuant to Bankruptcy Code Sections 544, 545, 547, 548, 549, 550 and

553; (vii) to modify the Plan under Bankruptcy Code Section 1127, to remedy any defect

or omission in the Plan, (vii) to enforce the Debtor's right to compel the payment of the

Wind-Down Money from GM, if necessary; and (viii) or to reconcile any inconsistency

in the Plan, or to reconcile any inconsistency in the Plan so as to carry out its intent and

purposes.

## N. DISTRIBUTIONS UNDER THE PLAN

### 1. Cash Payments.

Cash payments made pursuant to the Plan will be in U.S. dollars by checks drawn

on a domestic bank selected by the Debtor, or by wire transfer from a domestic bank, at

the option of the Debtor.

### 2. Transmittal of Distributions.

All distributions shall be deemed made at the time such distribution is deposited

in the United States mail, postage prepaid.  Except as otherwise agreed with the holder of

an Allowed Claim or Allowed Interest, any distribution on account of an Allowed Claim

or Allowed Interest shall be distributed by mail to (i) the latest mailing address filed of

record for the party entitled thereto or to a holder of a power of attorney designated by

such holder to receive such distributions or (ii) if no such mailing address has been so

filed, the mailing address reflected on the filed Schedules of Assets and Liabilities or in

the Debtor's books and records.

### 3. Undeliverable Distributions.

If any distribution is returned to the Debtor as undeliverable, no further

distributions shall be made to the holder of the Allowed Claim or Allowed Interest on

which such distribution was made unless and until the Debtor is notified in writing of

such holder's then current address. Undeliverable distributions shall remain in the

possession of the Debtor until such time as a distribution becomes deliverable or is

deemed canceled (as hereinafter provided). Any unclaimed distribution held by the

Debtor shall be accounted for separately, but the Debtor shall be under no duty to invest

any such unclaimed distribution in any manner. Any holder of an Allowed Claim or

Allowed Interest that does not present a Claim for an undeliverable distribution within

one hundred and twenty (120) days after the date upon which a distribution is first made

available to such holder shall have its right to such distribution discharged pursuant to

Section 1141 of the Bankruptcy Code and shall be forever barred from asserting any such

Claim or Interest against the Debtor or its property. All unclaimed or undistributed

distributions shall be redistributed to the remaining holders of Allowed Claims in the

same Class as the holder of the unclaimed or undistributed distribution.

## O. LEGAL EFFECTS OF CONFIRMATION AND EFFECTIVENESS OF THE PLAN

### 1. Discharge and Injunction.

Since the Debtor is liquidating substantially all of its assets, confirmation of the

Plan will not result in a discharge of Claims pursuant to Section 1141 of the Bankruptcy

Code.

### 2. Revesting of Property of the Estate and Release of Liens.

Except as otherwise provided in the Plan, any contract, instrument, or other

agreement or document created in connection with the Plan, or the Confirmation Order,

on the Effective Date, all property of the estate, wherever situated, shall be revested in the

Debtor free and clear of all Claims, mortgages, deeds of trust, liens, security interests,

22

encumbrances, and other interests of any Person, and the Debtor may thereafter operate

its business and may use, acquire, and dispose of property and compromise or settle any

Claims or Interests without the supervision or approval of the Bankruptcy Court, free of

any restrictions of the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy

Rules of the United States Bankruptcy Court for the Eastern District of New York, and

the guidelines and requirements of the Office of the United States Trustee for the Eastern

District of New York.

## P. MODIFICATION OR REVOCATION OF THE PLAN

Subject to the restrictions on modification set forth in Section 1127 of the

Bankruptcy Code, the Debtor reserves the right to alter, amend, or modify the Plan before

or after the Effective Date. No alterations, amendments, or modifications may be made

by any party except the Debtor. If the Plan is modified by the Debtor, it may be

necessary to amend the Disclosure Statement and to resolicit ballots from all or some

voting Classes. A hearing on such issues and any resolicitation of ballots likely would

significantly delay Confirmation and, consequently, significantly delay distributions

under the Plan.

The provisions of the Plan are not severable unless such severance is agreed to by

the Debtor and such severance would constitute a permissible modification of the Plan

pursuant to Bankruptcy Code Section 1127.

23

## Q.  ANALYSIS OF POTENTIAL RECOVERIES UNDER SECTIONS 542 THROUGH 550 OF THE BANKRUPCTCY CODE.

**The Debtor has undertaken an analysis as to whether any causes of action exist under Sections 542 through 550 of Title 11. the Debtor has concluded that no viable causes of action exist under these sections of the Bankruptcy Code.**

## R. SUMMARY OF CERTAIN OTHER PROVISIONS OF THE PLAN

Except as otherwise provided in the Plan, agreements entered into in connection therewith, the Confirmation Order, or in agreements previously approved by Final Order of the Bankruptcy Court, the Debtor may, pursuant to Bankruptcy Code Section 553 or applicable nonbankruptcy law, setoff against any Allowed Claim (before any distribution is made on account of such Claim) any and all of the Claims, rights and causes of action of any nature that the Debtor may hold against the holder of such Allowed Claim.

## RS. MEANS OF IMPLEMENTING THE PLAN

The funds required for the Confirmation and performance of this Plan shall be provided from the fund currently in the Debtor's possession, the liquidation of the parts inventory and the collection of the Wind-Down Money.

24

## CONCLUSION

The Debtor believes that the Plan affords Creditors the potential for the greatest

realization from the Debtor's assets and, therefore, is in the best interest of the Creditors.

Accordingly, the Debtor urges all Secured and Unsecured Creditors to cast their ballots in

favor of accepting the Plan.

Dated: New York, New York                        ~~SILLER~~ WILK
**AUSLANDER** LLP
    ~~June 16,~~**August 19,** 2010                    Attorney for
Debtor


By:    /s/Eric J. Snyder
      Eric J. Snyder (ES-8032)
      675 Third Avenue
      New York, New York 11207
      (516) 997-0999

25

431937v1

Document comparison by Workshare Professional on Thursday, August 19, 2010
5:04:19 PM

| Input: | |
|---|---|
| Document 1 ID | file://X:\WDOX\SWCF\03146\01\~VER\1\00416650.DOC |
| Description | 00416650 |
| Document 2 ID | file://X:\WDOX\SWCF\03146\01\00416650.DOC |
| Description | 00416650 |
| Rendering set | standard no colors |

| Legend: | |
|---|---|
| **Insertion** | |
| ~~Deletion~~ | |
| ~~Moved from~~ | |
| <u>Moved to</u> | |
| Style change | |
| Format change | |
| ~~Moved deletion~~ | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 26 |
| Deletions | 17 |
| Moved from | 0 |
| Moved to | 0 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 43 |