TOGUT, SEGAL & SEGAL LLP                    **HEARING DATE:  TO BE DETERMINED**
One Penn Plaza
New York, New York 10119
Telephone:  (212) 594-5000
Facsimile:  (212) 967-4258
Albert Togut
Frank A. Oswald
*Conflicts Counsel for the Debtors*
 *and Debtors in Possession*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x
                                                      :

In re:                                                    :    Chapter 11
                                                      :

MOTORS LIQUIDATION COMPANY, *et al.*,    :    Case No. 09-50026 (REG)
f/k/a General Motors Corp., *et al.*,              :
                                                      :

                                    Debtors.    :    (Jointly Administered)
                                                      :
-------------------------------------------------------------x

## SECOND APPLICATION OF TOGUT, SEGAL & SEGAL LLP AS CONFLICTS COUNSEL FOR THE DEBTORS FOR ALLOWANCE OF INTERIM COMPENSATION FOR SERVICES RENDERED FOR THE PERIOD JUNE 1, 2010 THROUGH SEPTEMBER 30, 2010, AND FOR REIMBURSEMENT OF EXPENSES

TO THE HONORABLE ROBERT E. GERBER,
UNITED STATES BANKRUPTCY JUDGE:

        Togut, Segal & Segal LLP (the "Togut Firm"), as conflicts counsel for

Motors Liquidation Company (f/k/a General Motors Corporation) ("MLC") and the

other above-captioned debtors and debtors in possession (collectively, the "Debtors"),

respectfully makes this application (the "Application") for allowance of interim

compensation for professional services rendered for the period June 1, 2010 through

September 30, 2010 (the "Second Interim Period"), and for reimbursement of expenses

incurred in connection with such services.  In support of this Application, the Togut

Firm states:

<u>**PRELIMINARY STATEMENT**</u>

The bankruptcy of the General Motors Corporation was a historically unique event.  The Togut Firm was retained as conflicts counsel in December 2009 to handle certain post-sale transaction matters because of its experience and expertise in the field.

Thus far, on behalf of the Debtors and their creditors, the Togut Firm has challenged a $24 million purported setoff against the Debtors and achieved over $137 million in savings related to various rejection claims asserted against the Debtors.

We respectfully submit that, as summarized below and reflected in the detailed time records filed with this Court as part of its monthly fee statements, the Togut Firm has rendered beneficial services to the Debtors during the Second Interim Period in an efficient and economical manner.

**I.    FEES AND EXPENSES FOR**
<u>**WHICH ALLOWANCE IS SOUGHT**</u>

1.    This Application is made pursuant to sections 330 and 331 of title 11 of the United States Code (the "Bankruptcy Code"), Rule 2016(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and this Court's Order, Pursuant to Sections 105(a) and 331 of the Bankruptcy Code, Bankruptcy Rule 2016(a) and Local Bankruptcy Rule 2016-1, Establishing Procedures for Interim Monthly Compensation for Professionals (Docket No. 1334) (the "Interim Compensation Order") for allowance of interim compensation for services rendered to the Debtors in the amount of $113,600[1]

---

[1]    The Togut Firm has reduced its' fees related to the preparation of monthly fee statements by 50%, aggregating a reduction of $486, incurred during the Second Interim Fee Period.

and for reimbursement of expenses in the amount of $581.46 that were incurred during the Second Interim Period.

2.     The Togut Firm's attorneys and paraprofessionals expended a total of 211.6 hours during the Second Interim Period for which compensation is requested. A schedule setting forth the number of hours expended by the partners, counsel, associates and paraprofessionals of the Togut Firm, their respective hourly rates and the year in which each attorney was admitted to practice is attached as Exhibit "1." A schedule specifying the type of expenses for which the Togut Firm is seeking reimbursement and the total amount for each category is attached as Exhibit "2." To the extent that time or disbursement charges for services rendered or disbursements incurred relate to the Second Interim Period, but are not processed until after the date of this Application, the Togut Firm reserves the right to request additional compensation and reimbursement in a future application.

3.     The Togut Firm maintains computerized records of the daily time slips completed by all attorneys and paraprofessionals.  Preceding the time entries is a chart listing the names, billing rates and time spent by each of the attorneys and paraprofessionals rendering services on behalf of the Debtors.  In support of this Application, copies of these computerized records, together with a computer generated detailed itemization of the expenses incurred by the Togut Firm for which reimbursement is sought, have been furnished to the Notice Parties (as defined in the Interim Compensation Order).

4.     On or about August 5, 2010, the Togut Firm filed is first interim application for compensation and reimbursement of expenses for the period December 21, 2009 through May 31, 2010 for fees in the amount of $529,364 and expenses of $3,107.43.  In response to certain issues raised by the Fee Examiner, the

3

Togut Firm voluntarily reduced its fees by $1,989.  Following a hearing held on

October 26, 2010, this Court allowed the Togut Firm's fees, subject to a 10% holdback

plus full reimbursement of expenses.  This Court has not previously allowed any

compensation or reimbursement of expenses for professional services rendered by the

Togut Firm.  The Togut Firm did not receive a retainer and, other than the payments

described below made in accordance with the terms of the Interim Compensation

Order, the Togut Firm has not received payment of any compensation or

reimbursement of expenses in these chapter 11 cases.

5.      Pursuant to the terms of the Interim Compensation Order, the

Togut Firm submitted two monthly invoices during the Second Interim Period:  (i) for

the period from June 1, 2010 through June 30, 2010 in the amounts of $58,600.50 for fees

and $296 for expenses;  (ii) for the period July 1, 2010 through August 31, 2010 in the

amounts of $52,631.50 for fees and $285.46 for expenses;  and (iii) for the period

September 1, 2010 through September 30, 2010 in the amount of $2,368 for fees;  there

were no expenses incurred during the month.

6.      In accordance with the Interim Compensation Order, the Togut

Firm has received payment, as of the date of this Application, in the amount of 80% of

its fees and 100% of its expenses for the period through August 31, 2010.  Pursuant to

the Interim Compensation Order, the Debtors maintain a 20% holdback of the Togut

Firm's fees incurred during the Second Interim Period aggregating $22,720 (the

"Holdback").

7.      As set forth in the Certification of Frank A. Oswald, a member of

the Togut Firm, attached as Exhibit "3", all of the services for which interim

compensation is sought were rendered for and on behalf of the Debtors in connection

with their chapter 11 cases.

4

## II.   **RETENTION OF THE TOGUT FIRM**

8.      The Debtors retained the Togut Firm in late December 2010 to serve as conflicts counsel.  At the time the Togut Firm was retained, the Debtors, represented by Weil, Gotshal & Manges LLP ("WG&M"), were engaged in complicated disputes involving adversaries with which WG&M had potential or actual conflicts.  Because of those conflicts, the Debtors sought to retain the Togut Firm as conflicts counsel to handle then existing matters where WG&M had conflicts and any future matters which the Debtors may encounter that are not appropriately handled by WG&M or other professionals because of a potential conflict of interest or, alternatively, which can be more efficiently handled by the Togut Firm.

9.      The Togut Firm is a highly specialized "boutique."  For more than 30 years, the firm's practice has been limited, almost exclusively, to insolvency and bankruptcy matters pending in this Court.  The Togut Firm has considerable experience in representing high-profile chapter 11 debtors, and has acted in a professional capacity in hundreds of cases representing the interests of debtors, creditors' committees, secured creditors and trustees.

10.      The Togut Firm has been actively involved in major chapter 11 cases, and has represented debtors in many cases in this Court and others including, without limitation:  *In re AbitibiBowater Inc., et al.*, Case No. 09-11296 (KJC);  *In re Saint Vincents Catholic Medical Centers of New York, et al.*, Case No. 10-11963 (CGM);  Finlay Enterprises, Inc., *et al.*, Case No. 09-14873 (JMP);  *In re Old Carco LLC (f/k/a Chrysler LLC), et al.*, Case No. 09-50002 (AJG);  *In re Charter Communications, Inc., et al.*, Case No. 09-11435 (JMP);  *In re Tronox Inc., et al.*, Case No. 09-10156 (ALG);  *In re Neff Corp., et al.*, Case No. 10-12610 (SCC);  *In re Frontier Airlines Holdings, Inc., et al.*, Case No. 08-11298 (RDD);  *In re Delphi Corp., et al.*, Case No. 05-44481 (RDD);  *In re Enron Corp., et al.*, Case

No. 01-16034 (AJG);  *In re Saint Vincents Catholic Medical Centers of New York d/b/a Saint Vincent Catholic Medical Centers, et al.*, Case No. 05-14945 (PCB);  *In re Tower Auto., Inc.*, Case No. 05-10578 (ALG);  *In re Allegiance Telecom, Inc.*, Case No. Case No. 03-13057 (RDD);  *In re Guilford Mills, Inc.*, Case No. 02-40667 (BRL);  *In re Ames Department Stores*, Case No. 01-42217 (REG);  *In re Loews Cineplex Entertainment Corp.*, Case No. 01-40346 (ALG);  *Onsite Access, Inc.*, Case No. 01-12879 (RLB);  *Daewoo International (America) Corp.*, Case No. 00-11050 (BRL);  *Contifinancial Corp.*, Case No. 00-12184 (ALG);  *Lois/USA, Inc.*, Case No. 99-45910 (REG);  and *Rockefeller Center Properties*, Case No. 95-420789 (PCB).

11.     Each of the members and counsel, as well as many associates, of the Togut Firm have been practicing bankruptcy law almost exclusively since their graduation from law school.  Certain of the Togut Firm's members, counsel and associates have clerked for Bankruptcy Judges, and all of them are members in good standing of the bar of the State of New York and the United States District Court for the Southern District of New York.

12.     The paraprofessionals employed by the Togut Firm are all college graduates.  Paraprofessionals are billed based upon their experience.  Recent graduates are billed at lower hourly rates than those with a year or more experience.

13.     The work encompassed by this Application and for which the Togut Firm seeks interim compensation was performed efficiently and at the lowest cost to the estates.  The manner in which staffing has been done has enabled the Togut Firm to bill fewer hours than would have otherwise been possible.

14.     All of the work summarized in this Application was performed in a manner to ensure minimal duplication of services in an effort to keep the administration expenses to a minimum.

6

### III. SERVICES RENDERED BY THE TOGUT
### FIRM DURING THE SECOND INTERIM PERIOD

15.     The following is a summary description of the primary services

rendered by the Togut Firm during the Second Interim Period, which highlights the

benefits conferred upon the Debtors and their estates as a result of the Togut Firm's

efforts.  All of the professional services rendered by the Togut Firm are set forth in the

computerized time records maintained by the Togut Firm, and the Court is respectfully

referred to those records for the details of all of the work performed.

16.     The Togut Firm has rendered extensive professional services on

behalf of the Debtors and their estates in fulfilling its professional responsibilities

during this interim period.  These large and highly complex chapter 11 cases have

required thoughtful effort by the members, counsel, associates and paraprofessionals of

the Togut Firm.  Whenever possible, potential disputes have been resolved without

resort to the Court;  when necessary, the Togut Firm has actively represented the

Debtors' interests before the Court.

17.     In its representation of the Debtors, the Togut Firm has coordinated

its efforts with WG&M, as general bankruptcy counsel to the Debtors, to avoid

duplication of effort.  The Togut Firm has achieved this goal in an efficient manner,

always mindful of the costs to the Debtors' estates.

### A.     Deutsche Bank AG Setoff

18.     The Togut Firm has continued to expend substantial time

representing the Debtors' concerning Deutsche Bank AG's Motion for Relief from

Automatic Stay to Effect Setoff (the "Motion").  The Motion seeks to set off

approximately $24 million that Deutsche Bank ("DB") admits it owes to GM as a result

of terminated interest rate swap transactions against an equivalent amount of MLC's public indebtedness.

19.     Preparatory to responding to the Motion, the Togut Firm engaged in discussions with New GM concerning the respective rights of MLC and New GM to the $24 million DB owes GM and responsibility for any sums that DB is properly permitted to set off. New GM initially maintained that it was entitled to receive all of DB's $24 million swap payment and that MLC was responsible to pay DB any sums it is entitled to set off. If that position were accepted, MLC would have been $24 million out of pocket if DB was permitted to effectuate a setoff. On the other hand, if MLC were to prevail against both DB and New GM, it would obtain a $24 million payment from DB and not owe anything by way of setoff. Consequently, approximately $48 million was at stake from MLC's perspective.

20.     At the request of New GM's counsel, the Togut Firm prepared a formal written position statement and negotiated with New GM concerning the parties' respective rights. Responding to New GM's arguments required the Togut Firm to analyze the lengthy and complex sale agreement between MLC and New GM, its later supplements, communications concerning assumption of contracts and the Court's sale order. The Togut Firm was also required to examine the facts concerning the parties' treatment of similar rights and disputes. In addition, the Togut Firm was required to analyze ISDA Master Agreements and conduct research concerning novel legal issues raised by certain of their terms because some of New GM's arguments were based on the relevant Master Agreement's terms.

21.     After the Togut Firm began negotiating with New GM and briefed MLC concerning the issues in dispute, the parties reached a tentative agreement resolving their relative rights and responsibilities with respect to DB's Motion.

8

22.    The Togut Firm also expended considerable effort investigating a series of novel issues concerning setoff rights that are implicated by DB's Motion.  The Togut Firm prepared a draft response to the Motion and has spent significant amounts of time in coordinating with the Creditors' Committee, New GM and others concerning it.

23.    The Motion and draft Response raise novel and complex issues of law.  These issues include whether a swap transaction terminated after the petition date yields a pre- or post-petition claim and whether setoffs can properly be executed against a debtor's bond obligations.  Researching those issues has required evaluation of, among other things, multiple ISDA Master Agreements and Schedules, trade confirmations, U.S.-issued bonds and bond indentures, euro bonds, fiscal and paying agency agreements, cases, books and other materials analyzing the issues at stake.

24.    The Debtors' Response, which was filed on June 18, 2010, presents three main independent bases for denying DB the right to set off all or part of the $24 million it owes:  an argument that DB's swap obligation to GM cannot be set off because it is post-petition, an argument that the setoff provision in the parties' ISDA Master Agreement bars setoff, and an argument that the indentures governing the GM bonds at issue preclude setoff.  Because these arguments are novel, extensive research was required to develop them and determine their validity.  Also, the Togut Firm has been required to monitor very recent decisions in this jurisdiction because some have been relevant to issues relating to the nature of swap claims and potential setoff rights that are presented by DB's Motion.

25.    The Togut Firm coordinated extensively with other parties-in-interest in preparing the Response, and expanded the Togut Firm's research to evaluate arguments suggested by other parties-in-interest for possible inclusion in the Response.  The Togut Firm also had discussions with Wilmington Trust concerning the possibility

of its filing a joinder, and when Wilmington Trust agreed, the Togut Firm reviewed and commented on drafts of the joinder.

26.    DB filed its reply brief on July 12, 2010.  TSS reviewed DB's brief and began researching the issues raised.  In addition, because MLC had cross-moved for immediate payment in responding to DB, MLC drafted a substantial portion of the reply it was entitled to file in support of the cross-motion.

27.    While the Togut Firm was working on MLC's reply, MLC and New GM asked the Togut Firm to arrange to extend the due date for MLC's reply until after MLC and New GM had finalized a settlement relevant to the setoff issue.  The Togut Firm negotiated a stipulation extending the due date as requested and coordinated with other parties concerning it.

**B.**    **Airplane Lease Termination Issues**

28.    As described in the Togut Firm's First Interim Fee Application, it was asked to handle certain aircraft lease rejection claim matters and during the Second Interim Fee Period it concluded settlement agreements to reduce the claims asserted by SunTrust Leasing and Equipment Co. ("SunTrust") and AVN Air, LLC ("AVN"), aggregating in excess of $200 million, which arose from the rejection of certain aircraft leases (the "Leases").  The Togut Firm was successful in concluding favorable settlements concerning these rejection claims during the Second Interim Period.

29.    At the outset of the claims process, the Togut Firm conducted an in depth review of Lease terms, with a particular emphasis on liquidated damages provisions and payment schedules.  The SunTrust claim arose from two separate leases (the "SunTrust Leases").  The AVN claim arose from the rejection of five separate leases (the "AVN Leases").

30.    The AVN claim was not supported by complete documentation so the Togut Firm worked closely with Alix Partners, the Debtors' restructuring advisors ("Alix"), to identify and collect all relevant documents and contracts between the parties.  Once assembled, the Togut Firm was able to conduct a comprehensive review and analysis of AVN's rejection damage claims.

31.    Prior to engaging AVN's counsel in settlement discussions, the Togut Firm had to identify several key issues central to the dispute.  With Alix's assistance, the Togut Firm was able to calculate the stipulated loss values of the airplanes and compare them to the fair market value of the airplanes.  Once this chasm of values was determined, the Togut Firm was able to focus on more nuanced issues related to the Leases and the rejection claims.

32.    Mitigation of losses was identified as a key element regarding the Leases' true value.  Through an in-depth review of the lease terms and consultation with Alix, the Togut Firm was able to determine the aircraft lessors' rights and obligations regarding the commercially reasonable disposition of the aircrafts, contract discount rates and the Debtors' rights concerning lease termination claims and conduct.

33.    Once these factual issues were determined, the Togut Firm began the process of identifying and examining the relevant legal issues.  Through legal research, the Togut Firm counseled the Debtors regarding the enforcement and validity of stipulated loss values and liquidated damages provisions in the Leases.  The legal analysis of recent decisions within this jurisdiction that dealt specifically with liquidated damages in the context of aircraft leases proved integral in assessing the Debtors' liability and establishing a negotiation strategy.

34.    Once that strategy was in place, the Togut Firm conducted negotiations with claimants' counsel that included an exchange of additional

documents and information.  These negotiations commenced with discussions regarding the alternative dispute resolution procedures established by the Debtors and approved by this Court.  The Togut Firm reviewed the alternate dispute resolution processes and commenced discussions with opposing counsel about the execution of "capping letters," whereby the parties would agree to cap the claims at a certain amount.  Ultimately these letters proved unnecessary as settlement discussions were so productive as to render them moot.

35.    With regard to the AVN Leases, discussions started with negotiations for a confidentiality agreement with AVN covering proprietary post rejection aircraft sale/disposition information.  The Togut Firm negotiated the terms of the agreement with opposing counsel and counsel for the Creditors Committee.  Once the agreement was finalized and executed, the Togut Firm was able to engage in meaningful settlement negotiations with AVN's counsel concerning the value of the aircrafts, the stipulated loss provisions of the Leases, AVN's mitigation of lease rejection damages and its ancillary rejection claim damages (i.e. attorneys fees, etc.).

36.    Discussions regarding the finalization of the settlement agreement memorializing the AVN claim reduction are in their final stages, and the Togut Firm expects that the AVN rejection claim will ultimately be reduced by approximately $95 million.

37.    With regard to the SunTrust leases, negotiations focused on the fair market value of the underling aircraft which has not yet been sold to mitigate Sun Trust's damages.  After an exchange of information and a number of settlement conferences, the Togut Firm was able to obtain a $42 million reduction of the SunTrust claim which was well within the parameters acceptable to the Debtors and the Creditors Committee.

38.     Upon the completion of these successful discussions, the Togut Firm negotiated, prepared and finalized a settlement agreement memorializing the SunTrust claim reduction.  The Togut Firm coordinated with counsel for the Creditors Committee so as to comply with the requirements of this Court's claims settlement procedures order.

## C.     Motion to Rescind Assumption

39.     During the First Interim Period, the Togut Firm was requested to handle a matter concerning New GM's motion to rescind the alleged assumption and assignment of a sublease agreement with the Knowledge Learning Corporation ("KLC").  This matter was successfully concluded in the Debtors' favor during the Second Interim Fee Period as is described below.

40.     Prior to the Petition Date, KLC subleased property from the Debtors on which it provided subsidized childcare for unionized employees at the Saturn Spring Hill manufacturing facilities (the "Sublease").  Additionally, MLC and KLC were parties to a 2010 Model Year Competitive Assistance Program Agreement (the "CAP Agreement"), pursuant to which KLC was to receive discounts on GM-brand vehicles during the 2010 model year.

41.     GM argued that it was entitled to a declaratory judgment that the CAP Agreement – not the Sublease – was assumed by the Debtors and assigned to New GM.  In the alternative, New GM argued that it was entitled to relief under Rule 60(b)(1) to obtain relief from an order on the basis of mistake, inadvertence, surprise or excusable neglect.  New GM also argued that the cure agreement which had been executed as part of the assumption and assignment process should be rescinded on the basis of mutual mistake of fact.

13

42.     Initially, the Togut Firm reviewed the various contracts underlying the motion, including the Sublease and the CAP Agreement.

43.     The Togut Firm then investigated the facts leading up to the assumption and assignment of the Sublease, and spent significant time communicating with representatives of MLC and New GM concerning the assumption and assignment to determine whether a mistake had been made.

44.     Additionally, legal research was conducted by the Togut Firm regarding, *inter alia*, Federal Rule 60(b), which allows the court to relieve a party from final judgment order or proceeding for mistake inadvertence, surprise or excusable neglect, and the applicable case law regarding the same.

45.     Prior to engaging in settlement discussions with opposing counsel, the Togut Firm had to identity several key issues relating to the potential administrative expense claims that might be asserted against the estate if New GM's motion was granted.  Through in-depth due diligence and consultation with Alix, as well as with counsel for the Creditors Committee, the Togut Firm was able to determine the amount of any post assumption and assignment administrative expense claims that might arise.

46.     It was concluded that so long as the Debtors' estates were indemnified and held harmless as to any such post assumption and assignment claims, the Debtors and the Creditors Committee would not oppose New GM's motion. Ultimately, a settlement was reached between New GM and KLC which will provide for such indemnification in favor of the Debtors.  The Togut Firm reviewed and commented a draft settlement agreement which was finalized and approved by this Court on September 3, 2010 thereby avoiding not less than $1.3 million in claims against the Debtors' estates.

**D.**    **Miscellaneous Matters Addressed by the Togut Firm**

47.    During the Second Interim Period, the Togut Firm was required to
provide services in a variety of miscellaneous matters:

- Communicated with WG&M, lead counsel to the Debtors, concerning, among other things, coordination of the Togut Firm's role in the Debtors' case and delegation of projects to promote coordination and avoid duplication of effort;

- Participated in calls, meetings, e-mails and correspondence with parties in interest as needed, including counsel for the Creditors Committee, representatives of the Debtors, and the United States Trustee;  and

- Reviewed various motions and related pleadings filed with the Court regarding case and project strategy, and potential issues of concern.

**IV.**    **THE COMPENSATION REQUESTED**

48.    There are numerous factors to be considered by the Court in
determining allowances of compensation.  *See, e.g.*, *In re First Colonial Corp. of America*,
544 F.2d 1291 (5th Cir. 1977);  *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th
Cir. 1974);  *In re Drexel Burnham Lambert Group Inc.*, 133 B.R. 13 (Bankr. S.D.N.Y. 1991).
*See also In re Nine Associates, Inc.*, 76 B.R. 943 (S.D.N.Y. 1987);  *In re Cuisine Magazine, Inc.*,
61 B.R. 210 (Bankr. S.D.N.Y. 1986).

49.    The perspective from which an application for an allowance of
compensation should be viewed in a reorganization case was aptly stated by
Congressman Edwards on the floor of the House of Representatives on September 28,
1978, when he made the following statement in relation to section 330 of the Bankruptcy
Code:

> [B]ankruptcy legal services are entitled to command
> the same competency of counsel as other cases.  In
> that light, the policy of this section is to compensate
> attorneys and other professionals serving in a case

> under title 11 at the same rate as the attorney or other professional would be compensated for performing comparable services other than in a case under title 11. Contrary language in the Senate report accompanying S.2266 is rejected, and *Massachusetts Mutual Life Insurance Company v. Brock*, 405 F.2d 429, 432 (5th Cir. 1968) is overruled. Notions of economy of the estate in fixing fees are outdated and have no place in a bankruptcy code.

124 Cong. Rec. H11,092 (daily ed. Sept. 28, 1978). *See also In re McCombs*, 751 F.2d 286 (8th Cir. 1984); *In re Drexel Burnham Lambert Group Inc.*, 133 B.R. 13 (Bankr. S.D.N.Y. 1991); *In re Carter*, 101 B.R. 170 (Bankr. D.S.D. 1989); *In re Public Service Co. of New Hampshire*, 93 B.R. 823, 830 (Bankr. D.N.H. 1988); *In re White Motor Credit Corp.*, 50 B.R. 885 (Bankr. N.D. Ohio 1985).

50. The philosophy underlying the adoption of section 330 of the Bankruptcy Code is equally applicable to interim compensation. The Bankruptcy Code provides that the same considerations apply to making interim awards of compensation under section 331 as to final allowances under section 330. *See In re Public Service Co. of New Hampshire*, 93 B.R. at 826; *In re International Horizons, Inc.*, 10 B.R. 895 (Bankr. N.D. Ga. 1981). Section 331 of the Bankruptcy Code provides:

> A trustee, an examiner, a debtor's attorneys, or any professional person employed under section 327 or 1103 of this title may apply to the court not more than once every 120 days after an order for relief in a case under this title, or more often if the court permits, for such compensation for services rendered before the date of such an application or reimbursement for expenses incurred before such date as is provided under section 330 of this title. After notice and a hearing, the Court may allow and disburse to such application such compensation or reimbursement.

11 U.S.C § 331.

51. In awarding compensation pursuant to sections 330 and 331 of the Bankruptcy Code to professional persons employed under section 327, the Court must

16

take into account, among other factors, the cost of comparable non-bankruptcy services.

Section 330 of the Bankruptcy Code provides, in pertinent part, for payment of:

- reasonable compensation for actual, necessary services rendered by the trustee, examiner, professional person, or attorney and by any paraprofessional persons employed by such person; and

- reimbursement for actual, necessary expenses.

11 U.S.C. § 330(a)(1).

52.    As the court in *In re Drexel Burnham Lambert Group Inc.* stated:

> With due recognition of the historical position of Bankruptcy Courts in compensation matters, we recognize that creditors have agreed to pay rates for retained counsel of their choice because of the needs of the particular case. One could posit other situations or cases where a presumption of prior informed judgment might not be as strong. Here, however, we have a multi-debtor, multi-committee case involving sophisticated creditors who have determined that the rates charged and tasks undertaken by attorneys are appropriate. We should not, and will not, second guess the determination of those parties, who are directed by Congress, under the Bankruptcy Code, to shape and resolve the case, and who are in fact bearing the cost. To do so, of course, would be to continue what Congress specifically intended to stop in 1978: Courts, instead of markets, setting rates, with the inevitable consequence that all the legal specialists required by the debtor or official committees would demur to participate.

133 B.R. at 20-21.

53.    The Togut Firm respectfully submits that the professional services rendered during the Second Interim Period were actual and necessary to ensure an efficient and effective administration of the Debtors' estates. The Togut Firm managed its work well and staffed it tightly with professionals and paraprofessionals with

17

appropriate experience and billing rates.  It handled every type of matter efficiently and expertly.

54.    Time and labor devoted is only one of many factors to be considered in awarding attorney compensation.  The number of hours expended must be considered in light of (i) the amount involved and the results achieved to date, (ii) the novelty and difficulty of the questions presented, (iii) the skill requisite to perform properly the legal services, (iv) the preclusion of other employment on behalf of other clients, (v) the customary fee charged to a private client for the services rendered, (vi) awards in similar cases, (vii) time constraints required by the exigencies of the case, including the frequency and amount of time required to be devoted other than during regular business hours, (viii) the experience, reputation and ability of the attorneys rendering services, and (ix) the nature and length of the professional relationship with the client (the "Johnson Factors").  *See Johnson v. Georgia Highway Express*, 488 F.2d at 717-19 (enumerating factors to be considered in awarding attorneys' fees in equal employment opportunities cases under Title VII);  *In re First Colonial Corp. of America*, 544 F.2d at 1294 (applying the Johnson Factors in bankruptcy cases).

55.    The majority of the Johnson Factors are codified in section 330(a) of the Bankruptcy Code, and have been applied by various courts in making determinations that requested attorneys' fees constitute reasonable compensation. It is well settled that the "lodestar method,"[2] as opposed to an application solely of

---

[2]    Application of the "lodestar method" involves multiplying the number of hours reasonably expended on the case by the reasonable hourly rate of compensation for each attorney.  *See Shaw v. Travelers Indemnity Co. (In re Grant Assocs.)*, 154 B.R. 836, 843 (S.D.N.Y. 1993).  This method of calculating attorney fees is appropriate in light of section 330(a) of the Bankruptcy Code, which serves as a starting point, permitting bankruptcy courts, in their own discretion, to consider other factors, such as the novelty and difficulty of the issues, the special skills of counsel, and their results obtained.  *See In re Copeland*, 154 B.R. 693, 698 (Bankr. W.D. Mich. 1993).

the Johnson Factors, is the best means of determining attorney fees in bankruptcy cases.[3]  The Supreme Court, however, has clearly articulated that the "lodestar method" is presumed to subsume the Johnson Factors, as does section 330(a) of the Bankruptcy Code.  *Delaware Valley I*, 478 U.S. at 563;  *Cena's Fine Furniture*, 109 B.R. at 581.

56.     The Togut Firm respectfully submits that application of the foregoing criteria more than justifies the compensation requested in this Application.  This is an application for interim compensation.  Therefore, such compensation is reviewable by the Court when it considers the Togut Firm's application for final compensation in these cases.

57.     The Togut Firm has encountered novel and difficult legal problems during the course of the Second Interim Period, involving several areas of legal expertise in bankruptcy and litigation.  The professional services rendered in these chapter 11 cases have been performed by attorneys with broad expertise and high levels of skill in their practice areas or specialty.

58.     During the Second Interim Period, the Togut Firm has been required to furnish extensive services that have often fully occupied the time of its attorneys, frequently to the preclusion of other firm matters and clients.  If this were not a case under the Bankruptcy Code, the Togut Firm would charge the Debtors, and expect to receive on a current basis, an amount at least equal to the amounts requested herein for the professional services rendered.  Pursuant to the criteria normally

---

[3]     See, *e.g.*, Pennsylvania v. Delaware Valley Citizens Counsel for Clean Air, 483 U.S. 711 ("Delaware Valley II"), on remand, 826 F.2d 238 (3d Cir. 1987);  Pennsylvania v. Delaware Valley Citizens Counsel for Clean Air, 478 U.S. 546 (1986) ("Delaware Valley I");  United States Football League v. National Football League, 887 F.2d 408, 413 (2d Cir. 1989), cert. denied, 493 U.S. 1071  (1990);  Lindy Bros. Builders Inc. v. American Radiator and Standard Sanitary Corp., 487 F.2d 161 (3rd Cir. 1973), vacated on other grounds, 540 F.2d 102 (3d Cir. 1976);  In re Cena's Fine Furniture, Inc., 109 B.R. 575 (E.D.N.Y. 1990);  In re Drexel Burnham Lambert Group Inc., 133 B.R. 13, 21 (Bankr. S.D.N.Y. 1991).

examined in bankruptcy cases, and based upon the factors to be considered in accordance with sections 330 and 331 of the Bankruptcy Code, the results that have been achieved during the Second Interim Period more than substantiate charges in that amount. The services that the Togut Firm has rendered thus far have produced benefits that have inured to the Debtors, their estates and creditors.

59.    In view of the foregoing, the Togut Firm respectfully requests that it be allowed reasonable interim compensation in the amount of $113,600 for services rendered in connection with the Debtors' chapter 11 cases. During the period covered by this Application, the Togut Firm's hourly billing rates for attorneys, paralegals and law clerks ranged from $145 to $935 per hour.

60.    The prosecution of these chapter 11 cases to date justifies interim compensation in the amount requested. In view of the policy underlying section 330 and 331 of the Bankruptcy Code that attorneys in bankruptcy cases be compensated on parity with attorneys practicing in other fields, it is respectfully submitted that interim compensation should be allowed as requested.

## V.    DISBURSEMENTS

61.    As set forth in Exhibit "2", the Togut Firm incurred $581.46 in expenses in providing professional services during the Second Interim Period.

62.    For photocopying expenses, the Togut Firm charges all of its clients $.10 per page. For facsimile expenses, the Togut Firm excludes charges for incoming facsimile transmissions, and includes charges for long distance outgoing facsimiles at the actual cost charged to the Togut Firm by its telephone carrier (there are no local fax charges included in the Togut Firm's disbursements). These charges are intended to cover the Togut Firm's direct operating costs for photocopying and facsimile facilities,

which costs are not incorporated into the Togut Firm's hourly billing rates. Only clients who actually use photocopying, facsimile, and other office services of the types set forth in Exhibit "2" are separately charged for such service. The effect of including such expenses as part of the hourly billing rates would impose that cost upon clients who do not require extensive photocopying, facsimile, and document production facilities and services. The amount of the standard photocopying and facsimile charge is intended to allow the Togut Firm to cover the related expenses of its photocopying and telecopying service. A determination of the actual expenses per page for photocopying and telecopying, however, is dependent on both the volume of copies and the total expenses attributable to photocopying and telecopying on an annual basis.

63.    The time constraints frequently imposed by the circumstances of these cases has required the Togut Firm's attorneys and other employees at times to devote time during the evenings and on weekends performing legal services on behalf of the Debtors.

64.    Consistent with firm policy, attorneys and other employees of the Togut Firm who worked late into the evenings were reimbursed for their reasonable meal costs and their cost for transportation home. The Togut Firm's regular practice is not to include components for those charges in overhead when establishing billing rates and to charge its clients for these and all other out-of-pocket disbursements incurred during the regular course of providing services. In addition, due to the exigent nature of the Debtors' chapter 11 cases, same day and overnight delivery of documents and other materials was required as a result of deadlines and/or emergencies necessitating the use of such express services. These disbursements are not included in the Togut Firm's overhead for the purpose of setting billing rates. The Togut Firm has made every effort to minimize its disbursements in these cases. The actual expenses incurred

in providing professional services were absolutely necessary, reasonable and justified

under the circumstances to serve the needs of the Debtors, their estates and creditors.

65.    None of the travel-related expenses of the Togut Firm 's attorneys

were for first-class airfare, luxury accommodations, or deluxe meals.

## VI.    CONCLUSION

66.    The legal services summarized by this Application and rendered by

the Togut Firm to the Debtors during the Second Interim Period were substantial,

professional, and beneficial to the Debtors' chapter 11 cases.  They were reasonable and

necessary to the preservation and maximization of the Debtors' estates.

67.    In light of (a) the complexity of these chapter 11 cases, (b) the

results achieved, (c) the significant contributions made and time devoted, often under

severe time constraints and to the preclusion of other matters, (d) awards of

compensation in similar cases, and (e) other factors pertinent to the allowance of

compensation, it is respectfully submitted that the compensation sought is fair and

reasonable and is authorized under the relevant provisions of the Bankruptcy Code.

68.    All services for which compensation is sought were performed for

and on behalf of the Debtors and their estates, and not on behalf of any other creditor or

party in interest.  The Togut Firm is charging its standard hourly rate for professionals

performing services.  Other than payments made in connection with Orders of this

Court, no payments have been made or promised to the Togut Firm for post-petition

services rendered, or to be rendered, in connection with these cases.  The Togut Firm

has not entered into any agreement, express or implied, with any other party in interest

for the purpose of fixing or sharing fees or other compensation to be paid for

professional services rendered in these cases.

22

**WHEREFORE,** the Togut Firm respectfully requests that this Court enter an order (a) awarding to the Togut Firm (i) interim compensation and reimbursement of actual and necessary expenses in the amount of $113,114 and $581.46, respectively, for the Second Interim Period (b) directing payment of the foregoing amounts to the extent not already paid pursuant to the Interim Compensation Order, and (c) granting such other and further relief as this Court deems just and proper.

Dated:  New York, New York
        November 15, 2010

TOGUT, SEGAL & SEGAL LLP
Conflicts Counsel for the Debtors
  and Debtors in Possession
By:


/s/ Frank A. Oswald
ALBERT TOGUT
FRANK A. OSWALD
Members of the Firm
One Penn Plaza, Suite 3335
New York, New York  10119
Telephone:    (212) 594-5000
Facsimile:    (212) 967-4258