Page 1

1

2    UNITED STATES BANKRUPTCY COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    Case No. 09-50026 (REG)

5    - - - - - - - - - - - - - - - - - - - - -x

6    In the Matter of:

7

8    MOTORS LIQUIDATION COMPANY, et al.,

9    f/k/a GENERAL MOTORS CORP., et al.,

10

11              Debtors.

12

13   - - - - - - - - - - - - - - - - - - - - -x

14

15              U.S. Bankruptcy Court

16              One Bowling Green

17              New York, New York

18

19              November 9, 2010

20              9:52 AM

21

22   B E F O R E:

23   HON. ROBERT E. GERBER

24   U.S. BANKRUPTCY JUDGE

25

Page 2

1

2    HEARING re Debtors' Motion for an Order (I) Approving Notice of

3    Disclosure Statement Hearing; (II) Approving Disclosure

4    Statement; (III) Establishing a Record Date; (IV) Establishing

5    Notice and Objection Procedures for Confirmation of the Plan;

6    (V) Approving Solicitation Packages; and Procedures for

7    Distribution Thereof; (VI) Approving the Forms of Ballots and

8    Establishing Procedures for Voting on the Plan; and (VII)

9    Approving the Form of Notices to Non-Voting Classes Under the

10   Plan (the "Debtors' Disclosure Statement Motion") [Docket No.

11   6854]

12

13   HEARING re Debtors' Ninth Omnibus Motion Pursuant to 11 U.S.C.

14   Section 365 to Reject Certain Executory Contracts and Unexpired

15   Leases of Nonresidental Real Property ("Debtors' Rejection

16   Motion") [Docket No. 4437]

17

18   HEARING re Debtors' Objection to Proof of Claim No. 67357 Filed

19   by New United Motor Manufacturing, Inc. ("NUMMI") [Docket No.

20   5404]

21

22   HEARING re Supplemental Submission of General Motors, LLC in

23   Support of Order Pursuant to 11 U.S.C. Section 105(a) Enforcing

24   363 Sale Order with Respect to Deutsch ("New GM's Supplemental

25   Submission") [Docket No. 6834]

Page 3

1

2   HEARING re Motion of General Motors, LLC (f/k/a General Motors

3   Company) to Enforce the 363 Sale Order [Docket No. 7527]

4

5   HEARING re Debtors' 109th Omnibus Objection to Claims

6   (Incorrectly Classified Claims) [Docket No. 7261]

7

8   HEARING re Debtors' (i) Objection to Proofs of Claim Nos. 1206,

9   7587, and 10162 and, in the Alternative, (ii) Motion to

10   Estimate Proofs of Claim Nos. 1206, 7587, and 10162 [Docket No.

11   5845] ("Apartheid Objection")

12

13

14

15

16

17

18

19

20

21

22

23

24   Transcribed By:  Clara Rubin

25

Page 4

1

2     A P P E A R A N C E S :

3     WEIL GOTSHAL & MANGES LLP

4           Attorneys for the Debtors and Debtors-in-Possession

5           767 Fifth Avenue

6           New York, NY 10153

7

8     BY:   STEPHEN KAROTKIN, ESQ.

9           ANTHONY J. ALBANESE, ESQ.

10          JOSEPH H. SMOLINSKY, ESQ.

11          EVAN S. LEDERMAN, ESQ.

12

13

14    WEIL GOTSHAL & MANGES LLP

15          Attorneys for the Debtors and Debtors-in-Possession

16          200 Crescent Court

17          Suite 300

18          Dallas, TX 75201

19

20    BY:   ANGELA C. ZAMBRANO, ESQ.

21

22

23

24

25

Page 5

1

2    HONIGMAN MILLER SCHWARTZ AND COHN LLP

3         Special Counsel to the Debtors and Debtors-in-Possession

4         2290 First National Building

5         660 Woodward Avenue

6         Detroit, MI 48226

7

8    BY:   ROBERT B. WEISS, ESQ.

9

10

11   JONES DAY

12        Special Counsel for the Debtors

13        901 Lakeside Avenue

14        Cleveland, OH 44114

15

16   BY:   HEATHER LENNOX, ESQ.

17

18

19   AKIN GUMP STRAUSS HAUER & FELD LLP

20        Attorneys for Claimant Green Hunt Wedlake, Inc. as

21         Trustee of General Motors Nova Scotia Finance Company

22        One Bryant Park

23        New York, NY 10036

24

25   BY:   NATALIE E. LEVINE, ESQ.

Page 6

1

2    CAPLIN & DRYSDALE

3         Attorneys for Official Committee of Unsecured Creditors

4          Holding Asbestos-Related Claims

5         One Thomas Circle, NW

6         Suite 1100

7         Washington, DC 20005

8

9    BY:   RONALD E. REINSEL, ESQ.

10

11   CLEARY GOTTLIEB STEEN & HAMILTON LLP

12        Attorneys for UAW

13        One Liberty Plaza

14        New York, NY 10006

15

16   BY:   DEBORAH M. BUELL, ESQ.

17        LUKE A. BAREFOOT, ESQ.

18

19   FOLEY & LARDNER LLP

20        Attorneys for Toyota Motor Corporation

21        321 North Clark Street

22        Suite 2800

23        Chicago, IL 60610

24

25   BY:   JEFFREY A. SOBLE, ESQ.

Page 7

1

2      HAUSFELD LLP

3            Attorneys for the Balintulo Plaintiffs

4            11 Broadway

5            Suite 615

6            New York, NY 10004

7

8      BY:   STEIG D. OLSON, ESQ.

9

10

11     KIRKLAND & ELLIS LLP

12           Attorneys for New United Motor Manufacturing, Inc.

13           601 Lexington Avenue

14           New York, NY 10022

15

16     BY:   RAY C. SCHROCK, ESQ.

17

18

19     KIRKLAND & ELLIS LLP

20           Attorneys for New United Motor Manufacturing, Inc.

21           555 California Street

22           San Francisco, CA 94104

23

24     BY:   MARK MCKANE, ESQ.

25

Page 8

1

2     KRAMER LEVIN NAFTALIS & FRANKEL LLP

3          Attorneys for the Official Committee of Unsecured

4           Creditors

5          1177 Avenue of the Americas

6          New York, NY 10036

7

8     BY:   THOMAS MOERS MAYER, ESQ.

9          ROBERT T. SCHMIDT, ESQ.

10

11    MADDIN HAUSER WARTELL ROTH & HELLER, P.C.

12          Attorneys for M-Tech Associates

13          28400 Northwestern Highway

14          Third Floor

15          Southfield, MI 48034

16

17    BY:   KATHLEEN H. KLAUS, ESQ.

18

19    NAGEL RICE, LLP

20          Attorneys for the Botha Claimants

21          103 Eisenhower Parkway

22          Roseland, NY 07068

23

24    BY:   DIANE E. SAMMONS, ESQ.

25

Page 9

1

2    THE LAW OFFICES OF BARRY NOVACK

3         Attorneys for Sanford Deutsch, as Personal Representative

4          of the Deutsch Estate

5         8383 Wilshire Boulevard

6         Beverly Hills, CA 90211

7

8    BY:   BARRY NOVACK, ESQ.

9

10

11   U.S. DEPARTMENT OF JUSTICE - U.S. ATTORNEY'S OFFICE

12        Attorneys for the United States of America

13        86 Chambers Street

14        New York, NY 10007

15

16   BY:   DAVID S. JONES, ESQ., DEPUTY CHIEF

17

18

19   CALIFORNIA DEPARTMENT OF JUSTICE

20        For the State of California

21        300 South Spring Street

22        Suite 1702

23        Los Angeles, CA 90013

24

25   BY:   OLIVIA W. KARLIN, DAG (TELEPHONICALLY)

Page 10

1

2    CUYLER BURK, P.C.

3         Attorneys for Creditor, All State Insurance Company

4         Parsippany Corporate Center

5         Third Floor

6         Four Century Drive

7         Parsippany, NJ 07054

8

9    BY:   ANDREW K. CRAIG, ESQ. (TELEPHONICALLY)

10

11   NEW YORK STATE DEPARTMENT OF LAW - ENVIRONMENTAL PROTECTION

12   BUREAU

13         Attorneys for the State of New York

14         The Capitol

15         Albany, New York 12224

16

17   BY:   MAUREEN F. LEARY, AAG (TELEPHONICALLY)

18

19   ROPERS MAJESKI KOHN BENTLEY PC

20         Attorneys for Creditor, Remey

21         17 State Street

22         Suite 2400

23         New York, NY 10004

24

25   BY:   GEOFFREY W. HEINEMAN, ESQ. (TELEPHONICALLY)

Page 11

1

2    SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

3         Attorneys for Interested Party, DPH Holdings Corporation

4         155 N. Wacker Drive

5         Chicago, IL 60606

6

7    BY:   ALBERT L. HOGAN III, ESQ. (TELEPHONICALLY)

8

9    SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

10        Attorneys for Interested Party, DPH Holdings Corporation

11        201 Spear Street

12        Suite 1000

13        San Francisco, CA 94105

14

15   BY:   KATHLEEN STRICKLAND, ESQ. (TELEPHONICALLY)

16

17   STUTZMAN, BROMBERG, ESSERMAN & PLIFKA, P.C.

18        Attorneys for Dean Trafelet, the Future Claimants'

19         Representative

20        2323 Bryan Street, Suite 2200

21        Dallas, TX 75201

22

23   BY:   ROBERT T. BROUSSEAU, ESQ. (TELEPHONICALLY)

24        JACOB L. NEWTON, ESQ. (TELEPHONICALLY)

25

Page 12

1

2    ARROWGRASS CAPITAL SERVICES UK

3          Interested Party

4    BY:   SIMON WEST (TELEPHONICALLY)

5

6    AURELIUS CAPITAL MANAGEMENT

7          Interested Party

8    BY:   DENNIS A. PRIETO (TELEPHONICALLY)

9

10   BARCLAYS CAPITAL, INC.

11         Interested Party

12   BY:   JOHN NOVAK (TELEPHONICALLY)

13

14   CREDIT SUISSE

15         Interested Party

16   BY:   SHAUN WONG (TELEPHONICALLY)

17

18   CRT CAPITAL GROUP, LLC

19         Interested Party

20   BY:   JUSTIN GARD (TELEPHONICALLY)

21

22   GSO CAPITAL PARTNERS

23         Creditor

24   BY:   MICHAEL FABIANO (TELEPHONICALLY)

25

Page 13

1

2    JPMORGAN CHASE & CO.

3          Interested Party

4    BY:   CONRAD FLAKE (TELEPHONICALLY)

5

6    MORGENS, WATERFALL, VINTIADIS & CO.

7          Interested Party

8    BY:   MICHELE WHALEN (TELEPHONICALLY)

9

10   OCH-ZIFF

11         Interested Party

12   BY:   DANIEL YOUSIF (TELEPHONICALLY)

13

14   PENTWATER CAPITAL MANAGEMENT

15         For the Debtors

16   BY:   DAN MURPHY (TELEPHONICALLY)

17

18   TALAMOD ASSET MANAGEMENT, LLC

19         Interested Party

20   BY:   JAY STEEN (TELEPHONICALLY)

21

22   ANDREW ANDERSON, IN PROPRIA PERSONA (TELEPHONICALLY)

23

24

25

MOTORS LIQUIDATION COMPANY, et al.

Page 14

1                    P R O C E E D I N G S

2            THE COURT:  We're here on GM.  Folks, I don't know

3    what people were thinking when they put so many disputed

4    matters on the calendar for a single day, all of which are

5    going to require oral argument and where I would have thought,

6    if I were you, I would want dictated decisions either at the

7    conclusion of oral argument or after a relatively modest

8    recess.  With everything that was set up for today's schedule,

9    not even counting the apartheid class action claims that are on

10   for this afternoon, I'm going to be in a position to give you

11   only one dictated decision today, aside from hearing what you

12   have to say on status conferences of course, although possibly,

13   because of some concerns that I'll articulate on the NUMMI

14   controversy, when we get to it, I may come to the view that,

15   instead of trying to provide any major substantive rulings on

16   that, I'm going to dismiss the claim with leave to replead.

17           Mr. Karotkin, you and your guys are going to have to

18   detail somebody going forward to ascertain how much can

19   appropriately be handled on a single day.  I am prepared

20   substantively on all five of the matters that I got to deal

21   with today, but you're not going to get rulings on five matters

22   today.  And while GM may be the largest case on my watch, it's

23   not the only one, and we're going to have to do better.

24           The M-Tech matter is one where I'll be in a position

25   to give you a dictated decision today, and therefore since it

Page 15

1   will likely take a long time to dictate, and where I will not

2   necessarily be in a position to do it without a break, I would

3   recommend that we do it last.  I would recommend that, if there

4   are matters where you have many people for things that are

5   short, we deal with them first.

6          I will take argument on the Deutsche matter but I'm

7   not going to dictate a decision on that.  And I would assume

8   that I will get major argument on the NUVI (sic) matter.  And

9   of course I'm not going to dictate anything in M-Tech without

10  hearing oral argument first, although of course the papers give

11  me a pretty good indication of how I should rule on that.

12         I gather we have two status conferences:  one on

13  disclosure statement related matters, and one on the

14  controversy between the UAW and New GM.  I think it might be

15  helpful to get those out of the way.  And you can deal with

16  your unopposed stuff any time you choose.  What's your

17  pleasure, Mr. Karotkin?

18         MR. KAROTKIN:  Thank you, Your Honor.  Stephen

19  Karotkin, Weil, Gotshal & Manges, for the debtors.

20         We can -- I think we can handle the disclosure

21  statement status conference relatively quickly.  And with

22  respect to the UAW matter, that's being handled by other

23  counsel.  I don't know how long they anticipate that will take.

24  One of the problems we had today in trying to manage the

25  calendar was, there were a number of different counsel

09-50026-mg    Doc 7836    Filed 11/10/10    Entered 11/18/10 11:40:50    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 16 of 164

Page 16

1    involved, and --

2           THE COURT:  Yeah, but there's only one judge.

3           MR. KAROTKIN:  Yes, that's for sure.  -- and we were

4    not able to get people to agree to adjourn things, and it was a

5    little bit out of our control, and we apologize for that.

6           If you'd like, Your Honor, I can proceed with the

7    status conference on the disclosure statement.

8           THE COURT:  I think that would be helpful.

9           MR. KAROTKIN:  Okay.  As you know, we were here on

10   October 21st at the hearing to consider approval of the

11   disclosure statement.  And at the end of that hearing, after

12   you had ruled on a number of objections that had been raised,

13   and ordered certain revisions to the disclosure statement as

14   well as the inclusion of certain exhibits in the solicitation

15   package that would go out in connection with voting on the

16   plan, we went back and worked on finalizing the document.

17   Unfortunately, Your Honor, it's taking a bit longer than we

18   anticipated.  For example, we just received on Friday, this

19   past Friday, Your Honor, from the asbestos claimants' committee

20   and the future claimants' representative, initial drafts of the

21   asbestos trust agreement and the claims resolution procedures,

22   which they had insisted be attached as exhibits to the

23   disclosure statement.  We have not yet had a chance to go

24   through those documents.  And we also received just yesterday

25   from those same parties some proposed language that they want

MOTORS LIQUIDATION COMPANY, et al.

Page 17

1    included in the disclosure statement, reflecting their views on

2    the debtors' asbestos liability, both with respect to present

3    and future claims.  And, again, we haven't reviewed that, nor

4    has any other party had a chance to have a look at that.

5         The form of the -- what is called the GUC Trust

6    Agreement has not yet been finalized, which is also to be an

7    exhibit to the disclosure statement.

8         THE COURT:  Which trust agreement is this, Mr.

9    Karotkin?

10        MR. KAROTKIN:  That's the General Unsecured Creditors'

11   Trust, the agreement that governs how that trust will operate,

12   Your Honor.  From what we understand, the -- certain states,

13   the U.S. Treasury and the unsecured creditors' committee have

14   certain outstanding issues with respect to that document that

15   still need to be resolved.  And, additionally, there are

16   certain, I would say, material open issues with respect to the

17   projections to be attached to the disclosure statement, which

18   in effect are the budgets going forward with respect to each of

19   the trusts and how they will -- the amounts that will be funded

20   under the plan by, in effect, the DIP loan with respect to the

21   administration of those trusts.  And there are ongoing

22   discussions among the debtors, the unsecured creditors'

23   committee and the United States Treasury with respect to those

24   budgets and how those will be finalized, and that is a major

25   issue that has not yet been resolved.

1          Based on where we are, Your Honor, I would suggest

2    that we further adjourn this matter for approximately two

3    weeks, of course subject to your schedule, hopefully during the

4    week of November 22nd.  And either by that time we will have

5    hopefully, Your Honor, resolved these issues.  And if they

6    can't be resolved, we may need to come back to you to get some

7    rulings with respect to certain matters.

8          THE COURT:  Um-hum.

9          Mr. Mayer, Mr. Reinsel, either of you guys want to be

10   heard on this?

11         MR. REINSEL:  Tom Mayer for the creditors' committee.

12   I think Mr. Karotkin capsulated it pretty well.

13         THE COURT:  Okay.

14         Mr. Reinsel?

15         MR. REINSEL:  We agree, Your Honor.

16         THE COURT:  All right.  Well, we're obviously not in a

17   position to do anything today.  The week of the 22nd is the

18   Thanksgiving week, and we're talking about, tops, the 22nd and

19   23rd.  I don't have Ms. Blum before me now, I can call her in,

20   and I guess I will.  I got to caution you that a lot of people

21   are competing for relatively limited time, so we'll have to

22   stand by on that.

23         Mr. Mayer?

24         MR. MAYER:  It just occurred to me, Your Honor, you

25   have the term loan litigation set down for summary judgment the

Page 19

1   following week, I think?

2           THE COURT:  I thought it was for the first or second

3   week in December.  I'd have to look at my calendar.  Hang on a

4   minute.  I'll tell you that in a moment too.

5       (Pause; court and clerk confer)

6           MR. MAYER:  I apologize, Your Honor, I thought that

7   was going to be a helpful statement, but it probably isn't.

8           THE COURT:  No, actually, it's fine, Mr. Mayer.  I set

9   the term loan summary judgment on Friday, December 3.

10          MR. MAYER:  We have no problem with the 22nd or 23rd

11  if Your Honor's calendar permits.  If things start to slide, it

12  may or may not be useful to have that date in mind as something

13  to have a hearing after.

14          THE COURT:  Well, fair enough.  I could give you

15  Monday the 22nd for disclosure statement issues, and I will do

16  it now.  If it slips, that's -- the next available day I would

17  have -- because I assume if it slips on the 22nd it will have

18  effectively slipped on the 23rd as well -- the week that begins

19  the 29th.  I might be able to give you the 29th, but I wonder

20  if it's wise to keep your feet to the fire for the 22nd.

21          MR. KAROTKIN:  My suggestion is we leave it at the

22  22nd and see what happens.

23          THE COURT:  Okay.

24          MR. KAROTKIN:  9:45?

25          THE COURT:  The 22nd, it'll be -- just keep in mind

Page 20

```
 1    that the longer you go without rescheduling, tables at the

 2    restaurant tend to get filled.

 3              Okay, you got the 22nd.

 4              MR. KAROTKIN:  I'm sorry, Your Honor.  9:45?

 5              THE COURT:  Yes.

 6              Okay.  If there's anybody who was here just on

 7    disclosure statement, do we have anything else on that?

 8              MR. KAROTKIN:  We do not, sir.

 9              THE COURT:  All right, anybody who was here only for

10    that is free to leave if he or she wants to.

11              MR. MAYER:  Thank you, Your Honor.

12              THE COURT:  I'd like to go to the UAW matter next.

13         (Pause)

14              THE COURT:  I want to get appearances on this.  Is it

15    Ms. Buell?

16              MS. BUELL:  Yes, it is.

17              THE COURT:  Yeah, I haven't --

18              MS. BUELL:  Good morning, Your Honor.

19              THE COURT:  -- seen you in a while.  How are you

20    doing?

21              MS. BUELL:  Very well.

22              THE COURT:  Okay, thank you.

23              And for New GM?

24              MS. LENNOX:  Good morning, Your Honor.  Heather Lennox

25    of Jones Day, on behalf of New GM.
```

Page 21

```
 1            THE COURT:  All right, Ms. Lennox.

 2            You folks can correct me if my memory is off, but my

 3      understanding was that you folks were going to agree upon a

 4      briefing schedule to deal with what we called the threshold

 5      issues.  And then you were going to report back to me and, if

 6      the schedule were reasonable, I was going to approve it.  And

 7      then I would decide that and then we'd see where we stand at

 8      that point in terms of our effect on Judge Cohn out in the

 9      Eastern District of Michigan.  Am I leaving something out, or

10      did -- don't be diplomatic; did I get it wrong?

11            MS. LENNOX:  No, Your Honor.  You stated it exactly

12      correctly.  And after Your Honor -- after the last status

13      conference that the parties had on October 28th and your order

14      that followed, the parties did confer and meet, and we have

15      worked out a proposed discovery schedule and a briefing

16      schedule with respect solely to the threshold issue that Your

17      Honor articulated.

18            We filed yesterday afternoon the proposed form of

19      stipulation and order.  I have extra copies here if Your Honor

20      would like to see them.

21            THE COURT:  Yeah, it would be helpful if you could

22      hand it up.  I was doing other stuff yesterday --

23            MS. LENNOX:  Understand, Your Honor.

24            THE COURT:  -- and --

25            MS. LENNOX:  May I approach?
```

Page 22

1          THE COURT:  Right, thank you.

2     (Pause)

3          THE COURT:  Rather than making me read it --

4          MS. LENNOX:  Yes.

5          THE COURT:  -- while you're all waiting, Ms. Lennox,

6     why don't you tell me what the deal points of it are?

7          MS. LENNOX:  Certainly, Your Honor.  Briefly, the

8     parties did determine to engage in some very limited discovery.

9     Those discovery requests are being served this week.  In fact,

10    we received the UAW's request last evening.  Discovery

11    responses are due between the parties the first couple days of

12    December.  Then the UAW will file an opening brief on December

13    22nd, New GM will file an opening brief on February 7th, and

14    there will be replies two weeks following -- successive two

15    weeks following.  That would take us, Your Honor, to March 7th

16    when briefing will be completed.

17         THE COURT:  Okay.  So the last reply would be Monday,

18    March 7?

19         MS. LENNOX:  Yes, Your Honor.

20         THE COURT:  Uh-huh.

21         Ms. Buell, did she get it right?

22         MS. BUELL:  Yes, Your Honor.

23         THE COURT:  Okay.  And then presumably you'd get an

24    oral-argument date sometime after I'd had a chance to read the

25    papers?

1        MS. LENNOX:  Correct, Your Honor.

2        THE COURT:  That's fine.  And the stip is now before

3    me for approval?

4        MS. LENNOX:  Yes, Your Honor.

5        THE COURT:  All right, unless I see something in it

6    that you haven't described to me, it's going to be approved.

7        MS. LENNOX:  Thank you, Your Honor.

8        THE COURT:  And you can, for the time being at least,

9    plan your lives accordingly.

10        MS. LENNOX:  Thank you, Your Honor.

11        THE COURT:  To what extent have you kept Judge Cohn in

12    the loop on what's going on?

13        MS. LENNOX:  Judge, the parties did go forward with

14    the status conference in front of Judge Cohn on November 3rd.

15    And on November 3rd Judge Cohn, based on your conversation with

16    him, Your Honor, issued an order staying all proceedings in the

17    Michigan case until Your Honor rules on the threshold issue.

18        THE COURT:  Okay.  Fair enough.

19        Do we have further business on this?

20        MS. LENNOX:  No, Your Honor.  May I approach Mr. Habbu

21    with a disk?

22        THE COURT:  I'm going to ask you to drop it off with

23    my courtroom deputy Ms. Blum across the hall.

24        MS. LENNOX:  I will do that, Your Honor.

25        THE COURT:  Okay.  Anything else, then, on UAW-New GM?

1          MS. LENNOX:  No, Your Honor.

2          THE COURT:  Okay, thanks.

3          You're excused, guys, if you want to be.

4          MS. LENNOX:  Thank you.

5          THE COURT:  All right.

6          MR. KAROTKIN:  Your Honor?

7          THE COURT:  Yes?

8          MR. KAROTKIN:  If I may, with respect to item II on

9   page 6 --

10         THE COURT:  I got to find that agenda.  Tell me what

11  it is in conceptual terms.

12         MR. KAROTKIN:  It's the 109th omnibus objection to

13  claims.

14         THE COURT:  Oh, yeah, that was in the unopposed

15  category?

16         MR. KAROTKIN:  Yes, sir.  There were no responsive

17  pleadings, and we have a proposed order.

18         THE COURT:  That's fine.  Drop it off with Ms. Blum

19  across the hall.

20         MR. KAROTKIN:  Thank you.  And as to item number IV,

21  Roman IV, on the same page --

22         THE COURT:  Of page what?  6?

23         MR. KAROTKIN:  Yes, sir.

24         THE COURT:  The resolved matter with --

25         MR. KAROTKIN:  Yes.

Page 25

1          THE COURT:  -- New York State?

2          MR. KAROTKIN:  Yeah.  New York State has withdrawn its

3    proof of claim, so that motion is resolved as to all parties.

4    And we can submit a proposed order to just finalize that.

5          THE COURT:  That's fine.

6          MR. KAROTKIN:  And I believe that takes care of the

7    uncontested matters and the status conferences.

8          THE COURT:  Okay.  Then let's get on to the

9    substantive arguments.  On Deutsch, do I have counsel for

10   Deutsch either in the courtroom or --

11         MR. KAROTKIN:  Yes, Your Honor.

12         THE COURT:  Okay.  And who's going to be arguing?  Is

13   it Mr. Novack?  I've forgotten.

14         MR. KAROTKIN:  Yes, Your Honor.

15         THE COURT:  Okay.  Who's going to be arguing in

16   opposition to Mr. Novack?

17         MR. KAROTKIN:  I am, Your Honor.

18         THE COURT:  All right, Mr. Karotkin.  Here's where I

19   want help from you folks.  I've now read -- I've read the

20   papers, including the supplemental papers.  I think I know what

21   the relevant language of the purchase and sale agreement is,

22   and here's where I need help from each of you:  Mr. Novack

23   makes the point, which is a fairly obvious one, that when

24   you're reading a contract, or for that matter an order, you try

25   to give every word meaning and you don't want anything to be

09-50026-mg    Doc 7836    Filed 11/10/10    Entered 11/18/10 11:40:50    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 26 of 164

Page 26

1    surplusage.  And he makes the point, in substance, and of

2    course I'm paraphrasing, that "incident" must mean something

3    different than "accident", because somebody in his or her

4    wisdom used both words.  So "incident" must mean something

5    apart from "accident".

6          Mr. Karotkin, when it's your turn, I want you to tell

7    me what you think "incident" means and what it's supposed to

8    convey or cover if, as I'm inclined to rule, it doesn't by

9    itself mean "accident".

10         Mr. Novack, when it's your turn, I need you to help me

11   with a legal maxim that I remember from forty years ago back

12   when I was in law school.  I think -- I had long since

13   forgotten the name of the maxim, but my recollection on it was

14   refreshed and it was called "noscitur a sociis", and basically

15   what it provides is that when you got words grouped in a list,

16   they should be given related meaning.

17         So while my tentative California-style, subject to

18   your guys being heard, would be that "incident" has to mean

19   something different than "accident", my further tentative would

20   be that "incident" has to be something roughly related or

21   similar to "accident" under the principles of that maxim and

22   that that maxim would be appropriate for use in this context,

23   although of course each of you guys would argue your meaning as

24   to what "related" means and how close or separate or the

25   opposite of close that should be.

MOTORS LIQUIDATION COMPANY, et al.

1           Another thing that I want both sides to address --

2    maybe you're better suited to do it, Mr. Karotkin, or you're

3    the guy who would know -- is to what extent is there stuff in

4    the record back from the time that helps me in a nonsubjective

5    way get my arms around what you guys were trying to accomplish

6    at that time.  Back in June of 2009, and I remember this time

7    pretty well because it was a period of about thirty days when I

8    wasn't focusing on much else, I have a memory that there was a

9    lot of discussion -- I don't remember whether it was from

10   counsel, whether it was from Treasury, whether it was from the

11   President of the United States, or some combination of that --

12   that people were concerned, at the time, about the trauma of

13   the bankruptcy and its effect on GM's ability to sell cars.

14   And I had the impression, fairly or unfairly, that GM put some

15   provision in its documents so that New GM would cover some

16   types of obligations, because you wanted to give the Joe Smith

17   out there who'd be buying a car after the sale the comfort

18   that, even if the car had been built before the sale, if he got

19   hurt after the sale, after he bought the car, New GM wouldn't

20   be saying 'That ain't my problem.'  But I don't know the extent

21   to which I have any of that in the form of admissible evidence

22   or stuff as to which I can fairly take judicial notice, and the

23   rules under the Federal Rules of Evidence for taking judicial

24   notice don't leave much room for inference.  It's got to be

25   stuff that was -- and I'd have to go back to what Rules 201 and

Page 28

1    202 say, but in substance I think they got to be either in the

2    record and uncontroversial or widely known through the

3    community.  It can't be somebody's argumentative position about

4    something.  And of course if my memory is wrong as to what was

5    going on at the time or what the motivation is, then either

6    side should have the ability to be heard on that.

7           So, Mr. Karotkin, I think, technically speaking, this

8    is your motion to enforce the earlier order and you should be

9    heard first.  And then I'm going to give Mr. Novack a chance to

10   respond, you to reply, and for him to surreply, although in

11   each case limited to what was said after the first round.

12          MR. KAROTKIN:  Stephen Karotkin for General Motors

13   Company.

14          Your Honor, looking at the language, and I think that

15   our pleadings are very, very clear on this issue, the language

16   of the applicable provision of the master sale and purchase

17   agreement -- and there was some confusion about this at the

18   last hearing, because I think that some people were focusing on

19   the provision prior to its amendment.  And as I'm sure you

20   recall, Your Honor, the -- that provision was amended in its

21   entirety in the first amendment, which was entered into prior

22   to -- and I think this is important, prior to the time that the

23   363 sale transaction was approved.  So --

24          THE COURT:  In the week prior, as best I recall?

25          MR. KAROTKIN:  It was June 30th.  It was entered into

09-50026-mg    Doc 7836    Filed 11/10/10    Entered 11/18/10 11:40:50    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 29 of 164

Page 29

1    on June 30th.  Your ruling was on July 5th, as I recall.  And

2    the order approving the 363 sale transaction has annexed to it

3    the master sale and purchase agreement, as well as the

4    amendment.  So there is no mistake that, prior to the time you

5    approved the transaction, that Section 2.3(a)(ix) is the

6    operative provision.

7         And there was some confusion at the last hearing with

8    words in the prior iteration dealing with discrete incident,

9    and that's what Mr. Novack focused on, and I think that that

10    was -- confused the parties as to the language and the

11    operative language, which is absolutely clear.  I mean --

12         THE COURT:  It's those two words "accident" or

13    "incident"?

14         MR. KAROTKIN:  It's those two words, and it says that

15    the only liabilities that are assumed by New GM are claims

16    which arise directly out of death -- then it says personal

17    injury or other injury -- caused by accidents or incidents

18    first occurring on or after the closing date.  It's impossible,

19    Your Honor, with all due respect to Mr. Novack, to interpret

20    that in the way that he is asking the Court to interpret it.

21    There is no question, Your Honor, that the alleged accident or

22    incident that caused the death -- and those are the operative

23    words.  What caused the death?  If you read his pleadings,

24    despite the fact that he was very clever and amended them after

25    Your Honor signed the order, there is no question that this

09-50026-mg   Doc 7836   Filed 11/10/10   Entered 11/18/10 11:40:50   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 30 of 164

Page 30

1   death or the accident or incident which caused the death

2   happened two years prior to the purchase agreement being

3   approved by the Court.  There is no question.  There was an

4   accident in June of 2007; that's in his -- that's in the

5   original complaint.

6           Now, interestingly Mr. Novack, after Your Honor ruled

7   and approved the sale and purchase agreement, cleverly amended

8   the complaint to try to fit it within the language of this

9   provision.  And all of a sudden in the new complaint there is

10  no reference to when the accident occurred.  But of course no

11  one can deny the fact, Your Honor, that the accident occurred

12  in June 2007, June 27, 2007, and I think Mr. Novack would

13  acknowledge that.  And there is no question that the death

14  arose from that accident.  Nothing else happened.  Ms. Deutsch

15  was hurt, there was a car accident, it happened two years prior

16  to the closing of the transaction, and that caused her death.

17  And as far as we are concerned, that's the end of the analysis.

18  It's very simple.  There is no way that these provisions can be

19  read any other way.

20          Now -- and Your Honor asked the question at the

21  opening what is the difference between accident or incident?

22  First I would say it's irrelevant.  It's really irrelevant to

23  the discussion, because, again, there is no question that this

24  accident occurred two years prior, and it is that accident

25  which gave rise to the death.  And the claim arises from the

Page 31

1    death, and that accident occurred two years prior to the

2    filing; end of discussion.

3            Now, what's the difference between an accident or an

4    incident, if it were relevant with respect to product liability

5    claims?  And I think there's an easy answer.  You could have a

6    car accident.  Or you could have a car catching on fire; that's

7    not necessarily an accident; that's an incident.  Or a car

8    could blow up with someone in the car.  Or something else could

9    happen; some other malfunction could cause a fire or injury to

10   someone, not an accident with another vehicle necessarily; or

11   an accident where you ran off the road.  So I think that's

12   easily explained.

13           But I really am abso -- I really don't know how there

14   is any other logical interpretation to the words.  The words

15   are not ambiguous.  The words are very clear.  There is no

16   allegation here, Your Honor, that Ms. Deutsch's death was

17   caused by either an accident or incident first occurring on or

18   after the 363 closing date.  As they state in their pleadings,

19   her death was caused by either an accident, and I think he will

20   acknowledge it was an accident, or an incident that occurred on

21   June 27, 2007.  And there is no dispute as to that.  And under

22   those facts, the language is absolutely clear.  You cannot

23   reach any other conclusion.

24           And I know Mr. Novack thinks it's unfair, I know Mr.

25   Novack thinks that his client ought to have a claim here, but

Page 32

```
 1    that's what the agreement says, and it doesn't give him or his

 2    client license to try to bootstrap their claim by manipulating

 3    the language or trying to change their complaint over other

 4    claims of people similarly situated.  And as far as we are

 5    concerned, no other interpretation of the contract makes any

 6    possible sense.

 7            THE COURT:  Okay, thank you.

 8            Mr. Novack?

 9            MR. NOVACK:  Good morning, Your Honor.  Barry Novack,

10    N-O-V-A-C-K, on behalf of Sanford Deutsch as personal

11    representative of the estate.

12            We were here over five months ago, Your Honor, and at

13    that time the Court requested that the parties explain two

14    things:  number one, what does the term "incident" mean and,

15    number two, why were the words "distinct and discrete events"

16    removed from the agreement.  General Motors' documentation is

17    totally silent on those two issues that the Court asked General

18    Motors to address when we were here over five months ago.

19            Our position concerning the language is quite clear:

20    There is a relationship between accident and incident, but it

21    doesn't mean the same thing.  The fact that both words were

22    used in the agreement means, as Your Honor pointed out when we

23    were here last time, both words have to be given meaning within

24    the context of the agreement.  Our interpretation of General

25    Motors' language gives that meaning.
```

Page 33

1           While the car crash, the accident itself, occurred

2    back in 2007, our incident, the basis upon which our claim is

3    being made, occurred after New GM was created.  And our

4    incident, meaning the events giving rise to our cause of

5    action, are the complications that Ms. Deutsche had leading to

6    her death.

7           And so we have a situation where, although the

8    accident originally occurred in 2007, the incident which gives

9    rise to General Motors' liability for that accident took place

10   after New GM was created.  And using that interpretation gives

11   plain meaning to the words that General Motors put into the

12   agreement.

13          THE COURT:  Well, it gives meaning.  I'm not as sure

14   that it gives it plain meaning.

15          MR. NOVACK:  Well --

16          THE COURT:  It's a plausible explanation, but do you

17   contend that it's the only one?

18          MR. NOVACK:  Well, if there are multiple

19   interpretations of that word, each one of which may apply, then

20   there are multiple bases upon which their liability has been

21   assumed.  There is no one definition of "incident".  They left

22   out a definition of "incident".  They opened it up to multiple

23   interpretation.  It's their contract.

24          And so if somebody else comes up with a different

25   argument as to what "incident" may mean which falls within the

Page 34

```
 1    context of the agreement, they may as well likewise find

 2    liability on behalf of New GM.  And so the language "or

 3    incidents" made it broader.  Had they merely used the word

 4    "accident first occurring afterwards", I would agree:  Our

 5    accident occurred before, we wouldn't be standing here.  But

 6    they, for whatever reason, added words "or incidents".  Maybe

 7    they wanted to include more claims; we don't know.  But just

 8    looking at the language and looking at the interpretation that

 9    Deutsch is putting forth, the two of them comport with one

10    another.  And there's no basis using their agreement to exclude

11    the Deutsch claim.

12            THE COURT:  Okay, thank you.

13            Mr. Karotkin, reply?

14            MR. KAROTKIN:  Your Honor, what Mr. Novack ignores is

15    the language of the provision.  The language says very clearly

16    the death must be caused by an accident or incident that

17    occurred post-closing, in order to be an assumed liability.  It

18    must be caused by it.  He ignores that language.  Ms. Deutsch's

19    death was not caused by the incident that was her death.  What

20    he's saying is the -- her death was the incident which caused

21    her death.  It doesn't make any sense.  You can't ignore the

22    first few words of the relevant portion of the provision.

23            And as I said, it's very, very simple.  That section

24    says the claim, the claim, must arise directly out of death

25    caused by an accident or incident first occurring after the
```

09-50026-mg   Doc 7836   Filed 11/10/10   Entered 11/18/10 11:40:50   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 35 of 164

Page 35

1    closing.  Her death was not caused by her death, which occurred

2    post-closing.  That's what he's asking you to say.  It's

3    absurd.

4              THE COURT:  Thank you.

5              MR. KAROTKIN:  I have nothing further.

6              THE COURT:  Mr. Novack, surreply?

7              MR. NOVACK:  Your Honor, we are not saying her death

8    was caused by her death.  We are saying her death was caused by

9    an event, an incident, which were medical complications.  It

10   led to her death, but we're not saying death is death.

11             THE COURT:  Okay.  Gentlemen, I'm taking this one

12   under submission.  Thank you.

13             MR. NOVACK:  Thank you, Your Honor.

14             THE COURT:  Just give me a moment before anybody comes

15   up on anything else.

16        (Pause)

17             THE COURT:  Okay, NUMMI.  I want to get appearances

18   and then I want everybody to sit down.  I have preliminary

19   comments.

20             MR. ALBANESE:  Good morning, Your Honor.  Anthony

21   Albanese from Weil Gotshal.  I'll be arguing the NUMMI matter.

22             THE COURT:  Okay, Mr. Albanese.

23             MR. MCKANE:  Good morning, Your Honor.  Mark McKane

24   and Ray Schrock, Kirkland & Ellis, on behalf of NUMMI.

25             MR. SCHROCK:  Good morning, Your Honor.

09-50026-mg    Doc 7836    Filed 11/10/10    Entered 11/18/10 11:40:50    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 36 of 164

Page 36

1          THE COURT:  Your colleague, Mr. McKane?

2          MR. MCKANE:  Mr. Schrock.

3          THE COURT:  Schrock?  Okay.

4          MR. SOBLE:  Good morning, Your Honor.  Jeff Soble of

5    Foley & Lardner, on behalf of Toyota Motor Corporation.

6          THE COURT:  Forgive me.  I saw the name on the

7    pleadings but I didn't get it now.

8          MR. SOBLE:  I'm sorry.  It's Jeff Soble, S-O --

9          THE COURT:  Soble.  Okay.

10          MR. SOBLE:  -- B-L-E.

11          THE COURT:  Gentlemen, make your presentations as you

12    see fit, but I have some fundamental, almost systemic, problems

13    in getting my arms around this controversy.  NUMMI is trying to

14    get a 450 million dollar claim in this case, an environment

15    where, for all practical purposes, I have a plenary litigation

16    which is presently in the mode of a 9014 contested matter.

17    This controversy walks, talks and quacks like a plenary

18    lawsuit, and I think it's appropriate, if not essential, for me

19    to manage it the same way.

20          What that means from the perspective of a judge who

21    cares about procedure and fairness is that under Rule 9014 I

22    need to invoke the power that 9014 gives me to make civil

23    rules, "civil rules" of course being the jargon that we use for

24    the Federal Rules of Civil Procedure in contrast to the Federal

25    Rule of Bankruptcy Procedure applicable, in particular Rules

09-50026-mg    Doc 7836    Filed 11/10/10    Entered 11/18/10 11:40:50    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 37 of 164

Page 37

1    12, which is, as a practical matter, the context in which Old

2    GM wants me to deal with the NUMMI claim, and also Rule 8,

3    because, as I was trying to get my arms around this

4    controversy, I thought of this in the terms that I used to

5    think of things for the first twenty or so years of my career

6    when I was a general-purpose litigator before I became a

7    bankruptcy litigator.  And I have the power to make Rules 8 and

8    12 applicable to this contested matter, but I think that before

9    I do it I need to give you guys notice and opportunity to be

10   heard.  If you're prepared to waive any further notice and

11   opportunity to be heard, we can do it from the get-go, but

12   that's a matter of concern to me.

13           And let me tell you where I'm headed, because I'm

14   troubled by certain aspects of what I read.  I tried to get my

15   arms around this stuff as best I could given the time

16   constraints that I have with the other matters that I all had

17   on for today.  I was always brought up, long before Twombly and

18   Iqbal were decided, to believe that, when you bring a contract

19   action, you allege the contractual provisions that you say were

20   violated, that, and maybe I was a traditionalist, you would

21   attach as an exhibit to the complaint the full contract and

22   then, in a paragraph of the complaint, you would say the

23   contract in paragraph yada-yada provided this and the defendant

24   breached that provision by doing that.  Trying to get my arms

25   around this controversy, recognizing as I do that over the

09-50026-mg    Doc 7836    Filed 11/10/10    Entered 11/18/10 11:40:50    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 38 of 164

Page 38

1   years the proof of claim has allowed claims to be filed without

2   a great deal of attention, to pleading niceties, that's a

3   problem when you're trying to get 450 million bucks out of

4   somebody.  And try as I might, when I read the NUMMI claim, I

5   had trouble understanding what contractual provisions NUMMI was

6   saying were violated.

7          Now, obviously I understand good faith and fair

8   dealing and the contention that that implied covenant was

9   violated.  And implied covenants, by definition, don't appear

10  expressly in contracts.  But there were other claims as well,

11  and I need help from the NUMMI side on that.  I also need help

12  from the NUMMI side on how a fifty percent shareholder can be

13  liable to its -- to the company of which that fifty percent

14  shareholder is a shareholder, for breach of fiduciary duty, at

15  least in a situation when you're talking about the GM side of

16  that ownership structure, where the other shareholder, Toyota,

17  had both fifty percent of the stock and the ability, by reason

18  of contractual provisions, to select an additional director.

19          We have a number of options here.  I think that there

20  is a very substantial likelihood that I am going to neither

21  dismiss this claim in its entirety nor disregard what I see as

22  pleading deficiencies.  Where I tend to be headed, call it a

23  tentative California-style, is to dismiss the most obviously

24  deficient claim, which is the breach-of-fiduciary-duty claim,

25  and to make Rules 8 and 12 applicable, dismiss the remaining

MOTORS LIQUIDATION COMPANY, et al.

Page 39

1     claims with leave to replead, so I can better get my arms

2     around the contractual violations and the promissory estoppel

3     claim.

4              I don't see how I can evaluate this 450 million dollar

5     claim consistent with the requirements of Twombly and Iqbal,

6     and I guess you can try to argue to me that they don't apply in

7     bankruptcy when you're trying to assert a bankruptcy claim,

8     although I think that would be a Hail Mary.  I think what I

9     need is a more traditional complaint that helps me get my arms

10    better around these things.  I'm inclined at this point to give

11    neither side a whole lot of satisfaction either in the sense of

12    unequivocal dismissal, nor comfort that this is a complaint

13    that the judge is comfortable can fly and be sufficient to get

14    past a Rule 12 motion.

15             I think, accordingly, that I need to flip-flop the

16    traditional order on what would otherwise be, you know, the

17    order in which you would hear a motion to dismiss, with the

18    motion and then the opposition and then the reply and then any

19    surreply, because I want to know from NUMMI whether it wants to

20    be heard on whether I should apply Rules 8 and 12 and whether

21    it would -- assuming we have those, and assuming that I'm going

22    to manage this like a traditional plenary litigation, whether

23    it wants to just say right now that it's going to replead or

24    whether it wants to double-down and argue as to whether I

25    should have the power and exercise my power to do that or not.

1          Yeah, come on up, please.

2          MR. MCKANE:  Thank you.  Good morning, Your Honor.

3     For the record, Marc McKane of Kirkland & Ellis, on behalf of

4     NUMMI.  And I just want to go straight to the issues that you

5     raised, and I can be swift.  We believe 8 and 12 should apply,

6     and we've cited those, you know, Twombly and Iqbal, as part of

7     our initial response.  I think some context is appropriate.

8     Our firm was brought in after the proof of claim; actually

9     immediately before the objection was filed.  And we did our own

10    independent assessment and analysis of the claim.  And in our

11    initial response, we dropped the breach-of-fiduciary-duty

12    claim.  We moved forward on --

13         THE COURT:  I'm sorry, should I have picked that up in

14    the papers?

15         MR. MCKANE:  No.  No.

16         THE COURT:  You don't need to be diplomatic.

17         MR. MCKANE:  No, not at all.  Not at all.  I think we

18    should have probably spelled it out even more that what we're

19    trying to move forward on are four breach-of-contract theories

20    and a promissory-estoppel theory.  But as to should you be

21    managing this as a plenary piece of litigation, I think the

22    fact of the matter is the answer's yes.  Since the objection

23    was filed, the parties have tried to resolve the matter.  I

24    think fundamentally there's a gating item here as it relates to

25    whether our contract claims are viable.

09-50026-mg    Doc 7836    Filed 11/10/10    Entered 11/18/10 11:40:50    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 41 of 164

Page 41

1          And so to the extent that the Court is asking us to

2     evaluate whether we're willing to drop the breach-of-fiduciary-

3     duty claim, we are.  Whether we're willing to replead the

4     contract claims, we are.  And I think what may be best is -- I

5     think what we'll hear from our adversaries at MLC is that, even

6     with those contract claims, even if we replead them, they

7     believe that, as a matter under 12(b)(6), we cannot state a

8     claim under the contracts.  And so it may be best to set a

9     schedule now that we file a full-on complaint and we set a

10    schedule for a 12(b)(6)-type hearing, because I think that's

11    what we're going to hear from the other side.

12          THE COURT:  Mr. Albanese, may I get your perspective,

13    please?

14          MR. ALBANESE:  I can come up to the podium.  Your

15    Honor, we're fine with this being treated as a plenary

16    proceeding, as you outlined.  If the Court wants to allow NUMMI

17    to replead their claim, that's fine with us.  We don't believe

18    they'll be able to sufficiently plead a claim, but we can

19    reserve our right and make those arguments at a later time.

20          Also, as far as the claims process, to the extent that

21    they are bringing new claims, we don't think that should be

22    allowed, because of the bar date.  But to the extent they're

23    going to replead their existing claims, that would be fine with

24    us.

25          THE COURT:  Well, to the extent they're new claims.

09-50026-mg    Doc 7836    Filed 11/10/10    Entered 11/18/10 11:40:50    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 42 of 164

Page 42

1    There's a lot of law on whether or not it relates back and

2    whether they're sufficiently related, and the last thing, of

3    course, any guy in my position would do is make a judgment on

4    that now.  It would seem to me, subject to your rights to be

5    heard, for you -- that you guys should, consistent with what

6    Mr. McKane said, set up a mutually satisfactory schedule for

7    him to give you an amended pleading for you to answer, move or

8    otherwise respond.  You've been around the block a few times,

9    so you know the vocabulary and the drill.  And if you want to

10   contend that it either doesn't pass muster under 12(b)(6) and

11   similar doctrine, or that it reflects such new claims as they

12   don't relate back to what was already in the proof of claim,

13   you got the usual rights on that, and Mr. McKane has the usual

14   rights to be heard in opposition.

15          MR. ALBANESE:  We're happy to proceed in that fashion,

16   Your Honor.

17          THE COURT:  Okay.  Then what I would be of a mind to

18   do, although I haven't heard yet from Toyota -- frankly, I'm

19   not exactly sure what Toyota's standing is in this controversy,

20   but I'll give it a chance to be heard on it.  And my tentative,

21   subject to your ability, all three of you, to comment, is to

22   direct you to come up with a stip or consent order that papers

23   your procedural game plan for going forward.

24          I would like to have a classic complaint here.  And I

25   would like NUMMI to say in baby talk the contractual provisions

09-50026-mg    Doc 7836    Filed 11/10/10    Entered 11/18/10 11:40:50    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 43 of 164

Page 43

1    that it alleges were violated.  And everybody's got

2    reservations of rights up and down the road.

3            Mr. McKane?

4            MR. MCKANE:  One other issue -- it's related -- is

5    that, along with this consented and stipulated scheduling

6    order, NUMMI does intend to file a motion, a 3018 motion, so

7    we're able to vote the claim.  And what we've asked is that, as

8    part of that scheduling order, at the same time that we file

9    the amended proof of claim or complaint, we will file that

10   motion as well.

11           THE COURT:  In other words, to estimate it for voting

12   purposes?

13           MR. MCKANE:  That's -- well, we -- that's correct.

14   That's correct.  We'd like to vote the claim.

15           THE COURT:  Sure.  Can you at least have a talk with

16   Mr. Albanese, or perhaps more appropriately Mr. Smolinsky or

17   Mr. Karotkin, to see if you can agree upon some number, so I

18   have one less issue to have to adjudicate on a nonconsensual

19   basis?

20           MR. MCKANE:  Yes, Your Honor.  We're going to do our

21   best to reach a number just for voting purposes, and I

22   understand there will be lots of reservations and

23   qualifications that it would not be used for other purposes.

24           THE COURT:  I guess I'm fine with it.  I guess the

25   question is, if you had a grand slam and you collect 450

Page 44

1   million dollars, would it make a difference in the claims

2   picture in this case?

3           MR. MCKANE:  Well, we don't believe so, given the

4   numbers that are at issue here.  I mean, I -- you have to

5   understand, NUMMI's in the midst of its own wind-down and has

6   not yet filed Chapter 11; we're trying to do it out of court.

7   So 450 million may not seem a lot here; to us, it's a lot of

8   money.

9           THE COURT:  Oh, sure, I understand that, but of

10  course, if you win, aren't we talking about an unsecured claim?

11          MR. MCKANE:  Yes.  Yes, that's recognized.  It's still

12  an unsecured claim.  So in a grand scheme of what the unsecured

13  claims are here, no.  It's more than a rounding error, but it's

14  not --

15          THE COURT:  All right, I'm not going to micromanage it

16  and I'm not going to try to play chessmaster here.  Certainly

17  you have the right file a 3018 if you can't deal with it

18  consensually, but I'd like you to try.

19          MR. MCKANE:  Understood, Your Honor.

20          THE COURT:  Okay.

21          Toyota want to be heard?  Mr. Soble?  I'll give you

22  that opportunity now.  I do have reservations about your 1109

23  standing, but go ahead.

24          MR. SOBLE:  Your Honor, for the record, Jeff Soble

25  from Foley & Lardner, for Toyota Motor Corp.

09-50026-mg    Doc 7836    Filed 11/10/10    Entered 11/18/10 11:40:50    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 45 of 164

Page 45

1        The contracts at issue, the VSA and the 2006 MOU, my

2    clients also are party to.  We have claims based on breaches of

3    the same contracts, and your construction of the language in

4    those contracts could very well be used against Toyota with

5    respect to Toyota's claims.  If it's favorable for MLC and, on

6    the same token, if it's favorable for Toyota, we obviously

7    would use that, but it's the same contract language being

8    construed.

9        Prior to today, we were asked to attend settlement

10   negotiations between MLC and NUMMI, as both MLC and NUMMI

11   recognized that our claims were based on the same contracts,

12   many of the same legal issues and many of the same facts.  So

13   with that in mind, Toyota did not want this issue to go forward

14   without a chance to be heard, so that it would not have its

15   legal positions decided in the case without it having a chance

16   to speak for itself.

17        THE COURT:  Well, fair enough, and that's not a bad

18   answer to my question.  So I guess, then, what I would ask is,

19   would it be constructive for you to talk to the other two

20   parties to see whether -- if your claims should be coordinated

21   just like you have, you know, MDL type of coordinated discovery

22   and sometimes pre-trial management, so that nobody's

23   reinventing the wheel, putting aside the extent, if any, to

24   which collateral estoppel or res judicata, or even stare

25   decisis, might come back against you, and whether I should be

Page 46

1    suggesting to you, or ordering, that you take your claims, put

2    them in the form of a complaint and that they be dealt with in

3    some kind of joint administration, kind of by analogy to how we

4    deal with separate debtors without substantive consolidation?

5          MR. SOBLE:  That's precisely what we think should

6    happen, Your Honor; otherwise, if they're not, if the --

7    because there's no objection to our claims currently, we'll be

8    back here at the same point, come what I presume will be a

9    motion to dismiss on NUMMI's claims, filing a brief in support

10   of our own position, because otherwise those issues will be

11   decided.  So we do think we should also file a complaint and

12   that they should be -- you know, discovery should be done all

13   together and the issues should be decided at the same time.

14         THE COURT:  All right.  Let me get Mr. Albanese's

15   thoughts vis-a-vis this part.

16         MR. ALBANESE:  Yeah, I mean, Your Honor, we'll confer

17   with our client, but we think that's a reasonable suggestion

18   that they file a complaint, so we'll be able to see what their

19   claims are, laid out in detail in the complaint.  And we're

20   happy to coordinate the two proceedings, where sensible, and to

21   avoid any overlap.

22         THE COURT:  Okay.

23         Mr. McKane, I assume you're cool with that approach as

24   well?

25         MR. MCKANE:  Very much so.

09-50026-mg    Doc 7836    Filed 11/10/10    Entered 11/18/10 11:40:50    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 47 of 164

Page 47

1            THE COURT:  Okay.

2            All right, gentlemen, then do you think that we now

3    have a satisfactory basis for going forward?  And is there

4    anything that we've not dealt with today that is more

5    appropriately dealt with today?

6            MR. ALBANESE:  I don't think so, Your Honor.  I think

7    we have a good plan laid out now.

8            THE COURT:  Okay, Mr. McKane?

9            MR. MCKANE:  I'm satisfied as well.  Thank you for

10   your time.

11           THE COURT:  Okay, Mr. Soble?

12           MR. SOBLE:  Same here, Your Honor.  Thank you.

13           THE COURT:  Very well.  Okay.  Then you guys as well

14   are excused.  And let me take a look at my agenda.  I think --

15   I'm wondering if I'm now up to M-Tech.

16           MR. KAROTKIN:  I think that's right, Your Honor.

17   That's the last matter on the calendar.

18           THE COURT:  For the morning?

19           MR. KAROTKIN:  For the morning.

20      (Pause)

21           THE COURT:  Okay, folks, I'd like to get appearances,

22   and then I have some preliminary comments and questions that I

23   would like you folks to help me with when it's your time.

24           MS. KRAUS:  Good morning, Your Honor.  Kate Klaus from

25   Maddin Hauser, on behalf of M-Tech.

09-50026-mg   Doc 7836   Filed 11/10/10   Entered 11/18/10 11:40:50   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 48 of 164

Page 48

 1            THE COURT:  Okay, Ms. Klaus.

 2            MR. WEISS:  Good morning, Your Honor.  Robert Weiss,

 3     Honigman Miller Schwartz and Cohn, on behalf of General Motors

 4     LLC.

 5            THE COURT:  Right, Mr. Weiss.

 6            MR. SMOLINSKY:  Good morning, Your Honor.  Joseph

 7     Smolinsky, Weil, Gotshal & Manges, on behalf of the debtors.

 8            THE COURT:  Okay.

 9            Folks, I've read the papers, and make your arguments

10     as you see fit, but I want you to deal with the following

11     questions and concerns I have.

12            Ms. Klaus, as I understand the chronology or the

13     events that took place back in 2009, at the time when the

14     original assignment -- assume-and-assign issue came up, you or

15     your client originally didn't get the password or username or

16     whatever it took to get access to the Web site where you could

17     see -- and by "you" I mean you all, Southern-style -- what Old

18     GM was proposing to do.  But some days or weeks later,

19     something happened that caused you to amend your objection and

20     you no longer were stating in what I'll call objection number 2

21     that you didn't have access to the Web site.

22            Can I infer from that that, by the time that happened,

23     you or your client did have access to the Web site and you

24     could see what the Web site said?  And as I understand it, it

25     said, insofar as your client was concerned, that a -- I think

Page 49

1    the words that were used was blanket agreement was proposed to

2    be assumed and assigned.  And it was identified with a number

3    which matched up to the number that Old GM had stuck on its

4    so-called purchase order, but it never used the word "lease".

5    Nevertheless, each of your first and your second objection

6    talked about what it would take to cure on the lease.  And you

7    can help me by understanding what you thought the basis was for

8    talking about cure under the lease back then when the proposed

9    assume and assign didn't mention the word "lease".

10           Now, with that said, Mr. Weiss, when it's your turn I

11   want help from you as to why, when you got an objection that,

12   from your perspective, not necessarily mine, would have been

13   off the wall, because you're ships passing in the night, why

14   either by a pleading or submission or a phone call there wasn't

15   a call to Ms. Klaus or -- and I'd have to go back to see

16   whether she was the original signer of those two objections,

17   and say 'Hey, we're not talking about the same thing.'  Now, I

18   don't know whether that's because you had something like 600 of

19   these assume-and-assign objections at the time, or because it

20   wasn't on your radar screen, or you missed the subtleties,

21   which now at least are arguably relevant.  But that is unclear

22   to me.

23           I can read the documents and I can construe the

24   documents, but there are certain documents where I don't know

25   whether or not I should be construing them, and in particular

Page 50

1    I'm thinking about the other one, the so-called schedule or

2    schedules -- I've seen it referred to both ways -- where the

3    lease is identified, and I'm paraphrasing, as a "reject later".

4    If that had been communicated to Ms. Klaus where she can be

5    charged with knowledge of that, that might potentially be

6    relevant.  But she makes the point in her reply or surreply, or

7    whatever we're up to in the chain of documents, that it's

8    hearsay.  And whether or not it's hearsay depends on what you

9    want to use that for.  And in particular, when you say that was

10   conveyed to M-Tech, if in fact you do contend that it was

11   conveyed to M-Tech, if it was conveyed to M-Tech at some

12   meaningful time, then you might be arguing that it's relevant

13   for notice and that hearsay is irrelevant.  On the other hand,

14   if it is like some private confirmation that that's what you're

15   always thinking of, it seems to me that if you're not

16   contending that it was conveyed to M-Tech, then she may be

17   right that you got hearsay issues, unless you're trying to

18   argue solely that it's a prior consistent statement, which is

19   admissible to the extent, but only the extent, that it's

20   offered to rebut the inference of fabrication, as best I

21   remember the rule, again, from forty years ago or -- I can't

22   say it's forty.  I actually used that rule from time to time

23   over the thirty years I was a lawyer.

24          But I don't see anything in the record before me

25   establishing when that scheduling showing the reject later was

Page 51

1  conveyed to M-Tech or to Ms. Klaus.  So I need help from you in

2  that regard.

3          Ms. Klaus, with that said, I need help from you as to

4  why the -- I shouldn't find, based upon the documents, putting

5  aside all the arguments you guys are making, that the only

6  agreement that was assumed and assigned was the one that was

7  shown on the Web site as being assumed and assigned.  And the

8  law in this district in particular -- I think it's become

9  pretty much the nationwide law, but certainly in this

10 district -- is we don't find assumptions of contracts by

11 implication.  The guy up in the robe, or the woman in the robe,

12 has to make that decision, because, especially in light of

13 Second Circuit law, a case we call Klein Sleep, improvident

14 assumptions can be disastrous for an estate.  Now, of course

15 when it's an assume coupled with an assign, it's not as

16 disastrous, but we still maintain control.  And if the separate

17 lease wasn't assumed, then it would seem to me that it can

18 still be rejected, unless you can bring some law or document to

19 my attention that I'm not aware of from the homework I did in

20 getting ready for today.

21         So with that said, I think here, because my concerns

22 are directed at both of you folks, and there's no obvious order

23 in which to hear them, I'll go -- first hear from you, Mr.

24 Weiss, then Ms. Klaus, and then give you a chance to reply and

25 give her a chance to surreply.

1          MR. WEISS:  For the record, Robert Weiss on behalf of

2     General Motors LLC.

3          Your Honor, my remarks will be very brief, but first

4     let me address the Court's questions.  First with regard to --

5          THE COURT:  Mr. Weiss, can you pull that mic a little

6     closer to you, please?

7          MR. WEISS:  Sure.  Your Honor, first with regard to

8     the question of why General Motors LLC didn't contact the

9     debtors -- excuse me, M-Tech, when we -- when their objection

10    was filed, basically that was an inadvertence.  Because of the

11    number of objections, there was a database that was maintained,

12    and that database, for whatever reason, did not include that

13    objection.  So there wasn't a conscious decision not to

14    respond.  It basically just didn't come within our purview.

15         With regard to the information relating to the

16    schedule, Your Honor, we're not maintaining that M-Tech was

17    privy to that schedule.  That was from a contract database that

18    was maintained by AlixPartners identifying contracts that were

19    contemplated to be rejected.  That was not something that the

20    M-Tech had access to.

21         We presented it basically to indicate, to the extent

22    intention was relevant, General Motors LLC and the debtors,

23    rather, intention at that time to reject.  It has not been

24    authenticated.  It was our understanding, and perhaps

25    incorrectly, that it was not necessarily to authenticate

MOTORS LIQUIDATION COMPANY, et al.

Page 53

1    documents for the purposes of this hearing and that if it were

2    necessary, if there were a dispute with regard to facts, et

3    cetera, that then we'd have the opportunity to be able to

4    present --

5              THE COURT:  Well, you understand --

6              MR. WEISS:  -- testimony.

7              THE COURT:  -- my case management order right, but of

8    course the authentication wasn't so much a matter of concern to

9    me as Ms. Klaus' underlying evidentiary objection and the

10   related substantive rule, which is that as a general matter in

11   the law of contracts, uncommunicated intentions, intentions not

12   communicated to one's counterparty, for the most part aren't

13   admissible or relevant.

14             If -- do you think that's not a fair characterization

15   of the law?

16             MR. WEISS:  No, I think that's a fair characterization

17   of the law, Your Honor.  And if, in fact -- we included that in

18   case the Court thought that for some reason, based upon

19   whatever arguments that were presented to it, the Court felt

20   that intention was relevant.  But we happen to agree with you.

21   We don't think the intention -- it's not necessary for the

22   Court to come to that issue.

23             THE COURT:  When was that document created?

24             MR. WEISS:  That document -- actually, I think we have

25   several different snapshots but I believe the dates were some

09-50026-mg   Doc 7836   Filed 11/10/10   Entered 11/18/10 11:40:50   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 54 of 164

Page 54

1    time -- we showed three different snapshots.  One in, I

2    believe, July.

3            THE COURT:  Of '09?

4            MR. WEISS:  Correct, Your Honor.

5            THE COURT:  Uh-huh.

6            MR. WEISS:  There were --

7            UNIDENTIFIED SPEAKER:   May, I think they began.

8            MR. WEISS:  Maybe May, July.  There were three

9    different snapshots --

10           UNIDENTIFIED SPEAKER:  June 4th.

11           MR. WEISS:  -- of that document we tried to present to

12   show consistency with regard to the debtor's intention with

13   regard to that document.

14           THE COURT:  Well, my tentative, subject to your rights

15   to be heard and Ms. Klaus' rights to be heard, is you could use

16   it as a prior consistent statement.  If you can prove that it

17   was created then, is indicating that you didn't later fabricate

18   your position but that you can't use it affirmatively against

19   them.

20           MR. WEISS:  Okay, Your Honor.  If I may, just very

21   briefly.  And we'll rely on the documents and any other

22   questions the Court may have but I think based on the objection

23   that M-Tech has filed today, the issue before this Court is to

24   determine what was the contract that was assumed and assigned.

25   And I think the debtor -- there's no dispute as between the

MOTORS LIQUIDATION COMPANY, et al.

Page 55

1   debtor and the party assuming and assigning the contract and

2   General Motors, LLC.  It was the blanket order as identified

3   on -- by the debtor.

4        There's no dispute further -- and I think it's

5   confirmed by the confirmation that was received by M-Tech,

6   which they have presented to the Court as an exhibit to their

7   pleadings, which was jointly presented by both the debtor and

8   by General Motors, LLC, at that time, again confirming that the

9   only document agreement that was being assumed and assigned was

10  the blanket order.  According to Your Honor, there's absolutely

11  not a scintilla of evidence before this Court, and no basis

12  even in M-Tech's argument, that there ever was a lease that was

13  assumed and assigned in connection with this matter.

14       According -- Your Honor, we ask the Court to look at

15  the four corners of the evidence that have been presented to it

16  and rule that, in fact, it was the blanket order that was

17  assumed and assigned and no other document.  Thank you, Your

18  Honor.

19       THE COURT:  Okay.  Thank you.  Ms. Klaus.

20       MS. KLAUS:  Thank you, Your Honor.  Again, for the

21  record, Kate Klaus on behalf of M-Tech.

22       Answering your questions, Your Honor, it was a very

23  confusing time for creditors like M-Tech.  We did get notice

24  that a contract was going to be assumed and assigned.  From

25  M-Tech's point of view, there's one contract and that's the

09-50026-mg   Doc 7836   Filed 11/10/10   Entered 11/18/10 11:40:50   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 56 of 164

Page 56

1   lease.  We had no notice of any kind of blanket order or that

2   GM considered there to be a separate contract for the

3   janitorial services.

4        And our basis for this assumption is the fact that the

5   lease itself contains a provision that requires us to provide

6   janitorial services.  We had no idea that GM considered there

7   to be -- the lease to be, essentially, bifurcated, one for

8   renting the property and the other for providing these

9   janitorial services, because we had an integrated contract as

10  of 1986 when the document was first created.

11       When we first got notice, we didn't get the password

12  that would allow us to enter the website and find out the

13  amount -- the cure amount which is what we were concerned with

14  because we believed there was only one contract.  When we

15  finally did get that -- and we filed an objection because we

16  didn't get the password and wanted to preserve our rights.

17       When we did get a password, we went on and saw that GM

18  contended, or the debtor contended, that there was no amount to

19  cure the default.  And we disagreed with this and believed that

20  there was about 65,000 dollars some of which was rent and some

21  of which was for past due invoices for janitorial services.  We

22  therefore filed a --

23       THE COURT:  Pause right there.  So, the component of

24  what your client perceived to be what it would take to cure was

25  the sum of amounts that would have due on the lease, presumably

09-50026-mg   Doc 7836   Filed 11/10/10   Entered 11/18/10 11:40:50   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 57 of 164

Page 57

1   stub rent or something like that, and in addition unpaid sums

2   that would have been due if the purchase order was a separate

3   contract?

4          MS. KLAUS:  Correct, Your Honor, because we saw it as

5   one contract requiring two types of payments:  rent, and then

6   excess janitorial services.  And you can tell by our objection

7   that this was our belief because we lumped them together.

8   65,000 dollars, about 35,000 of which was rent, which was paid

9   after the assumption, and the rest remains due and that's for

10  past due pre-petition janitorial services.

11         And that's why we filed the objection the way we did

12  and our objection was limited to the cure amount.  Again, some

13  of which was satisfied upon assumption.

14         THE COURT:  Now, you may be hitting this next but, you

15  know, just like I'm taking a deposition, let me go with what

16  you just said.  Presumably, there would have then been a

17  dialogue on cure amounts where you would say you owe me or my

18  client x dollars for rent and y dollars for supplemental

19  janitorial services.  And what did GM say when you asked for

20  the lease component?

21         MS. KLAUS:  They continued to pay rent -- well,

22  actually, the debtor paid the cure amount rent and then GM paid

23  rent after the assumption date.  They also paid the property

24  taxes.

25         THE COURT:  Wait.  Old GM paid pre-petition rent?

09-50026-mg    Doc 7836    Filed 11/10/10    Entered 11/18/10 11:40:50    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 58 of 164

Page 58

1              MS. KLAUS:  correct.  It was actually the month

2      between the bankruptcy and the assumption and assignment was

3      paid my M-Tech -- or MLC.  Starting with the month after the

4      assignment, New GM paid the rent, which, again, to us, was

5      confirmation that they were the new tenant under the lease.

6      They also paid property taxes, which, again, was a tenant

7      obligation and not an obligation under the transfer services

8      agreement which is one of the arguments GM raises as proof of

9      why it did not assume the lease.

10              So from our point of view, we got notice of an

11     assumption, the notice and the confirmation both referred to

12     blanket order but we had no idea what a blanket order was.  And

13     when we contacted the phone number on the notice, we just got a

14     response -- kind of like, we'll look into it and left it at

15     that.  And so we assumed, once the contract was assumed and we

16     started receiving rent from the new tenant, that that's what

17     happened.  The contract was assumed and assigned to New GM.

18              And the first we heard otherwise was sometime in

19     September after several months when Jay Alix's folks told my

20     people on site that we're moving out and this lease is going to

21     be rejected.  That's the first time we learned that GM

22     contended it had assumed this blanket order and not the lease.

23     And the reason why the blanket order could not have been the

24     contract that was assumed is because it was not a contract,

25     Your Honor.  The purchase order attached as Exhibit 3 to GM's

09-50026-mg   Doc 7836   Filed 11/10/10   Entered 11/18/10 11:40:50   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 59 of 164

Page 59

1    pleading indicates that it's -- the commodity being purchased

2    through the purchase order is a property lease.  It's not a

3    separate contract but just a method -- a mechanism of payment.

4    Rent got paid from one arm of GM, janitorial services got paid

5    through another arm.

6            We would issue an invoice showing what janitorial

7    services we provided.  GM would then -- or the debtor I guess,

8    would then turn around and issue a purchase order reflecting

9    those services and we would issue a request for payment.  In no

10   way, shape or form was the purchase order for services a

11   separate contract.  There's no dispute that something was

12   assumed and assigned to New GM.  And because there was only one

13   contract between my client and the debtor, that's the contract

14   that had to be assumed.  And granted, it did not refer to lease

15   but it did refer to a blanket order which in turn, we learned

16   after the assumption and assignment, incorporated the lease.

17   There's one integrated contract and that's what was assumed and

18   assigned.

19            THE COURT:  Okay.  Thank you.  Mr. Weiss?

20            MR. WEISS:  Your Honor, very briefly.  With regard to

21   the blanket order, M-Tech, in its response, acknowledges the

22   fact and they said, just to quote, "At some point, the Debtor

23   began issuing purchase orders after M-Tech issued an invoice

24   for services."  So, they knew that there was separate process,

25   if you will, an agreement with regard to this blanket order.

09-50026-mg    Doc 7836    Filed 11/10/10    Entered 11/18/10 11:40:50    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 60 of 164

Page 60

1    It contemplated services that were not provided for under the

2    lease.  Janitorial services in excess of the amount that was

3    contemplated in these.

4           So they knew, they're on notice, that there is a

5    separate agreement and order, however they characterize it

6    today, that was part of the relationship between General Motors

7    and M-Tech.  And that was a blanket order.  So, the bottom

8    line, I think, Your Honor, from our perspective, is they should

9    have been on notice to inquire further, to confirm the fact

10   that, in fact, the leases weren't going to be assumed and, in

11   fact, to assume by virtue of the fact that the blanket order is

12   being assumed without any other description, we think is

13   unreasonable.

14          So again, Your Honor, we believe you have to look to

15   what the notice provided, what the confirmation provided and it

16   was a blanket order that was being assumed and nothing else.

17          THE COURT:  Thank you.  Ms. Klaus, anything further?

18          MS. KLAUS:  Very quickly, Your Honor.  Again, Kate

19   Klaus on behalf of M-Tech.

20          Your Honor, the purchase orders didn't require

21   anything other than what was provided in the lease.  Paragraph

22   12 of the rider to the original 1986 lease provides that "M-

23   Tech will invoice for excess janitorial services and the debtor

24   will, in turn, pay for those."  That's in the initial lease.

25   The purchase orders were an internal payment mechanism for GM

Page 61

1    and in no way, shape or form a contract.  So I just wanted to

2    clarify what Mr. Weiss said.

3         THE COURT:  Okay.  All right.  We'll take a recess.  I

4    can't guarantee you that I'll be ready by 11:30.  But I would

5    like you all back at that time.  We're in recess.

6         MS. KLAUS:  Thank you, Your Honor.

7         (Recess from 11:16 a.m. until 12:00 p.m.)

8         THE COURT:  I apologize for keeping you all waiting.

9         In this contested matter, in the Chapter 11 cases of

10   Motors Liquidation Company and its affiliates, M-Tech

11   Associates, the lessor of real property that Old GM owns in

12   Sterling Heights, Michigan, objects to Old GM's motion to

13   reject the Sterling Heights properties lease.  M-Tech contends

14   that Old GM had previously assumed and assigned that lease to

15   New GM when Old GM assumed and assigned a so-called "blanket

16   order" for services relating to the Sterling Heights property.

17        I believe that the undisputed facts establish that the

18   communications between the parties were faulty and that most,

19   though not all, of the blame for that lies at the feet of Old

20   GM and New GM.  But finding, as I do, that Old GM did not seek

21   or obtain leave to assume the M-Tech lease and that the

22   documents related to the prior assumption and assignment were

23   conspicuously silent in even referring to the lease or an

24   intention to assign it, Old GM's motion for leave to reject is

25   granted and M-Tech's objection is overruled.  My findings of

Page 62

1   fact and conclusions of law follow.

2        There here are no material disputed issues of fact.

3   Neither side asked for an evidentiary hearing.  My case

4   management order, which provides in substance that factual

5   assertions and motion papers are deemed true except where

6   disputed, did its job and neither party has shown any basis for

7   disputing the others' assertions of underlying fact as

8   contrasted, of course, to conclusions, inferences or any

9   resulting conclusions of law.

10        As facts, I find that in 1986, Old GM and M-Tech

11   entered into the Sterling Heights property lease.  Paragraph 12

12   of a rider to the Sterling Heights property lease said that

13   "M-Tech would provide all services required by the tenant

14   including maintenance repairs, janitorial and snow removal

15   services for which Old GM was obligated to pay additional rent

16   of 12,000 dollars per year.  But Old GM was additionally

17   required to pay any costs which exceeded the 12,000 dollars per

18   year annual allowance and for real estate taxes and insurance.

19   Old GM had full discretion regarding the level of services and

20   could direct M-Tech as to who would provide those services.

21        The Sterling Heights property lease was extended and

22   amended from time to time but none of the amendments altered

23   that paragraph 12 of the rider.  Though I'm doubtful that this

24   fact ultimately is relevant, M-Tech notes, and it's undisputed,

25   that the lease had an integration clause providing that it

Page 63

1   couldn't be modified except by an agreement in writing signed

2   by lessor and lessee.

3            Over the next twenty-three years or so, M-Tech

4   performed the services described in the rider and sent the

5   debtor invoices for any services exceeding the annual

6   allotment.  Old GM paid the invoices.  At some point, Old GM

7   began issuing purchase orders after M-Tech issued an invoice or

8   perhaps before it did so.  In approximately 1996, Old GM issued

9   what it refers to as a "blanket" purchase order, TCB02218, to

10  M-Tec, without an h, Associates, for the services provided by

11  M-Tech exceeding the one thousand dollar per month allowance

12  under the rider.  A modified purchase order was thereafter

13  issued, dated February 26, 2009, which provided that it would

14  expire on February 28, 2010.  After Old GM issued the purchase

15  order, each month Old GM provided M-Tech with a "release

16  number" relating to the purchase order for the services

17  exceeding the one thousand dollar per month allowance under the

18  rider.  Each of M-Tech's monthly invoices for services

19  exceeding the one thousand dollar per month allowance under the

20  rider referenced the applicable "release number".

21           M-Tech says that the purchase orders mirrored the

22  invoices.  What that means isn't exactly clear to me.  I don't

23  know if it's right or not as it appears that the invoices

24  reference the applicable release number making it pretty clear

25  either that M-Tech knew what number each release number would

09-50026-mg    Doc 7836    Filed 11/10/10    Entered 11/18/10 11:40:50    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 64 of 164

Page 64

1    later bear or issued the invoices after the releases were

2    issued.

3            M-Tech further states that it understood that each

4    purchase order was used in order to facilitate payment and that

5    it assumed it was an internal accounting procedure for Old GM

6    as contrasted to a contract that superseded or modified the

7    lease.

8            Of course, M-Tech's understanding, in the absence of a

9    showing that the understanding was expressed to Old GM and Old

10   GM agreed to it, is irrelevant.  But to the extent it matters,

11   and ultimately I conclude that it doesn't, I don't find M-

12   Tech's belief, irrespective of which came first, the invoices

13   or the releases, to be an unreasonable one.  Its understanding

14   might well have been correct but, ultimately, it's

15   inconclusive.

16           Very early in Old GM's Chapter 11 case, on June 2nd, I

17   entered an order approving the sale procedures that would

18   ultimately result in the 363 sale which took place about a

19   month later.  That order set up procedures for the assumption

20   and assignment of designated executory contracts.  In

21   connection with that, Old GM set up a secured website that

22   listed each executory contract, that New GM's predecessor had

23   designated to be an assumable executory contract.  When the

24   website was in operation as intended, each contract

25   counterparty could view current information regarding the

09-50026-mg    Doc 7836    Filed 11/10/10    Entered 11/18/10 11:40:50    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 65 of 164

Page 65

1    status of its contract or lease with Old GM and the proposed

2    cure amount that would be associated with it.  For each

3    contract designated for assumption and assignment, the

4    procedures obligated Old GM to notify the counterparty with

5    instructions for accessing the information on the website and

6    the procedures for objecting to the assumption and assignment.

7            In addition to the contract website, Old GM maintained

8    a database which it referred to as the "schedule" of all

9    executory contracts to which Old GM was a party.  The database

10   identified which contracts were subject to assumption and which

11   were to be rejected, though, at least often, the schedule

12   didn't set forth when that would happen.

13           It is undisputed that by no later than May 16, 2009

14   the database showed the lease as to be rejected.  The database

15   used the notation "reject later" and never changed that.

16           The lease never appeared under the database with a

17   designation saying that it would be "assumed", "assigned", or

18   any words other than "reject".  But it's further undisputed

19   that this understanding on old GM's part was not timely

20   conveyed to M-Tech.  Indeed, so far as I can tell, that

21   intention was never conveyed to M-Tech before this controversy

22   blew up.  So I can't rely on what that schedule said and, in

23   particular, its use of the word "reject" as affirmative proof

24   of GM's different intention.

25           Assuming, as I do, in the interests of litigation

09-50026-mg   Doc 7836   Filed 11/10/10   Entered 11/18/10 11:40:50   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 66 of 164

Page 66

1    efficiency, that GM will be able to establish that it was

2    authentic and not backdated, I can rely on what the schedule

3    said only as a prior consistent statement, expressing an intent

4    before either Old GM or New GM had the motivation to fabricate.

5            Old GM says that it intended to occupy the Sterling

6    Heights property for only a brief period, but in the absence of

7    any indication that either Old GM or New GM conveyed that

8    alleged intention to M-Tech or that M-Tech agreed to it I can

9    place no reliance on this stated intention either.  Ultimately,

10   I must rely solely on what the documents said.

11           Conversely, by no later than May 16, 2009, Old GM

12   listed the purchase order on the schedule and designated it for

13   assumption using the notation "assume".  But here, too, that

14   suffers from the same affliction that the unstated in the

15   intention vis-a-vis -- unstated assumption intention in the

16   schedule vis-a-vis the lease and the intention to reject

17   suffers from.  It's admissible only to the very limited extent

18   that the law of evidence permits me to consider prior

19   consistent statements as negating the inference of fabrication.

20           Folks, Old GM's and New GM's conduct in this matter

21   was not a model of good communication, and M-Tech's erroneous

22   assumptions as to Old GM's and New GM's intentions are easily

23   explainable.  But the underlying fact is, that as the documents

24   made clear, Old GM was referring solely to the purchase

25   agreement and never expressed an intention to assume the lease

09-50026-mg   Doc 7836   Filed 11/10/10   Entered 11/18/10 11:40:50   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 67 of 164

Page 67

1    and assign the lease.

2           On some date in 2009 M-Tech contends that it received

3    notice that the lease was going to be assumed by Old GM and

4    assigned to New GM.  Here I find that assertion to be

5    contradicted by the relevant documents and the other undisputed

6    evidence.  Thus, I must find to the contrary.  The relevant

7    document captioned "Assumption and Assignment Confirmation

8    Letter" was dated September 1, 2009.  It was on a letterhead

9    jointly bearing the names of each of Old GM and New GM.  It

10   described the "vendor", as "M-Tec", again without an h,

11   "Associates", and had a "vendor identification" of "807178108".

12   It provided, in relevant part, "This letter confirms that the

13   executory contract(s) identified on Schedule A hereto was/were

14   assumed by [Old GM] and assigned ... to [New GM] as of an

15   effective date set forth on Schedule A annexed here to", here

16   and to being separated.  That's the way it is in the original.

17   The Schedule A as relevant here included a table with seven

18   columns which had entries in five of the columns and which were

19   blank in the other two.  Those that were filled out provided

20   for a number "5716-00087452", under a column that's illegible.

21   Another number, "YC802210," for "GM Contract ID", "M-Tec",

22   again without an h, "Associates" as the "counterparty name",

23   "blanket order" under contract type, and "assumed July 10,

24   2009" for contract status.

25           The columns under "Contract Name/Description" and

Page 68

1    "Business Unit/Functional Area" were left blank.

2    Significantly, neither Schedule A nor the letter that

3    transmitted it used the word "lease".

4            On June 10, 2009 M-Tech filed an objection to Old GM's

5    motion to assume and assign, matters with respect to rejection

6    not having come up yet.  In its objection M-Tech stated that it

7    hadn't been able to access the Web site as it hadn't yet

8    received a user name and password.  In addition, M-Tech sought

9    adequate assurance that Old GM would pay the cure amount and

10   renew the liability insurance policy, compensate M-Tech for the

11   default, though M-Tech didn't say how or in what amount, and

12   continue to honor its obligations under the lease.

13           It's clear from a reading of that objection that M-

14   Tech was then talking about the lease and not the purchase

15   order, or at least not solely the purchase order, perhaps

16   because M-Tech hadn't seen what was on the Web site and

17   especially, the schedules.

18           M-Tech's later objection, dated six days later, and

19   which was said to supersede its predecessor, no longer made

20   reference to the lack of a password and an inability to access

21   the Web site, but it continued to talk about the lease and not

22   the purchase order or, at least, solely the purchase order.

23           Why M-Tech continued to refer to the lease when it had

24   knowledge of what was posted on the Web site by then, and

25   review of what was on the Web site would have revealed no

Page 69

1     mention of the lease, is not apparent from the record.  But it

2     can't be disputed that what was posted on the Web site made no

3     mention of the lease, and, instead, referred to the purchase

4     order and deed with numbers that corresponded to the purchase

5     order.  The lease did not have such numbers on it, nor could it

6     reasonably have been construed to be a "blanket order".

7           I can find no reference in the motion papers to any

8     reply by Old GM in which Old GM stated, in words or in

9     substance, what are you talking about?  We were talking about

10    the purchase order and not the lease.  We're not trying to

11    assume and assign the lease.  I wish Old GM or New GM had said

12    that.  A response of that character at that time would have

13    been helpful.  But there is no evidence that either Old GM or

14    New GM said, in words or substance, that the lease was being

15    assumed either.  The intention to assume the lease, as compared

16    and contrasted to the purchase order, was never expressed to

17    M-Tech.

18          A little less than two months later, on September 1st,

19    Old GM and New GM sent the letter I described a few minutes

20    ago.  At this time, too, they did not make the "what are you

21    talking about" observation that I think would have been

22    helpful, but once more they made reference to what can only be

23    read as the purchase order and did not identify the lease as

24    having been assumed or express any desire to assume the lease.

25    About three months after that Old GM informed M-Tech that it

09-50026-mg    Doc 7836    Filed 11/10/10    Entered 11/18/10 11:40:50    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 70 of 164

Page 70

1    was rejecting the lease, occasioning the objection we have

2    here.

3            Turning now to my conclusions of law or, to the extent

4    they might be regarded as such, mixed questions of fact and

5    law, M-Tech contends, in substance, that the lease cannot now

6    be rejected because it already was assumed.  I cannot agree.

7    Though I can't rule out the possibility that M-Tech, by making

8    assumptions and/or failing to ask, was subjectively under the

9    erroneous understanding that the lease was being assigned,

10   neither Old GM nor New GM said anything about assigning the

11   lease.  Any view on M-Tech's part to the contrary was unfounded

12   based upon anything that the documents actually said.  The

13   lease was not a "blanket order," and had no GM contract ID.

14   The contract ID was instead the one on the purchase order, and

15   that was apparent on inspection of the two documents at the

16   time.

17           As importantly, or more so, Old GM did not take any of

18   the actions required by the documents or the sale agreement or

19   the law to assume and assign the lease.  The lease wasn't

20   identified in that or any other notice.  The lease wasn't

21   listed on M-Tech's contract Web site.

22           By noting these facts and holding in this fashion I

23   mean no disrespect to M-Tech or its counsel, nor do I find

24   fault with either of them.  This is not a finding of negligence

25   or estoppel.  If either M-Tech or its counsel had contacted Old

09-50026-mg   Doc 7836   Filed 11/10/10   Entered 11/18/10 11:40:50   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 71 of 164

Page 71

1    GM or New GM or the counsel for either and said we understand

2    that you're assigning the lease M-Tech or its counsel would

3    simply have been told, consistent with the schedule that was

4    then in existence but hadn't been handed over or shown to M-

5    Tech, that the lease wasn't being assigned.  The unlikely event

6    that either Old GM or New GM told M-Tech something different,

7    we then might have had an estoppel or a different factual

8    finding, but, of course, that, here, isn't the case.

9            Nor can I agree that the lease could be deemed to be

10   assumed by implication.  First, as a factual matter, while Old

11   GM and New GM may have made payments on the lease, including on

12   pre-petition debt, that M-Tech might have understandably

13   regarded as curing defaults under the lease and being

14   consistent with an assumption of the lease, there's no evidence

15   in the record that either Old GM nor New GM said, in words or

16   substance, that Old GM had assumed the lease or that New GM had

17   taken an assignment of it.

18           More fundamentally, even if Old GM or New GM had, in

19   fact, said something to that effect, it wouldn't be legally

20   effective.  Well, one can find a few cases around the country

21   supporting the notion than an executory contract can be assumed

22   by implication.  Those cases run contrary to express provisions

23   of the code, which require the Court's approval on an

24   assumption, and especially run contrary to the case law in this

25   district, which doesn't permit assumption by implication or by

09-50026-mg    Doc 7836    Filed 11/10/10    Entered 11/18/10 11:40:50    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 72 of 164

Page 72

1    conduct.

2         As my colleague, Judge Gropper, noted in Tower

3    Automotive, 2007 B.R. LEXIS 2219 (Bankr. S.D.N.Y. June 29,

4    2007), and I'm quoting, "It is not uncommon for litigants to

5    assert that a debtor's post-petition acts constitute implied

6    assumption of a contract. Courts have not favored this concept,

7    as it would burden an estate with administrative claims that

8    have never been brought to light and subjected to creditor

9    scrutiny and judicial approval."  That's at *9 of that

10   decision.  And as my colleague Chief Judge Gonzalez observed in

11   Enron, relying on the First Circuit's decision in the Filene's

12   Basement case and late Judge Schwartzberg's Child World

13   decision many years ago in this district, and, again, I'm

14   quoting, "The assumption of a contract cannot be implied

15   because notice to creditors and court approval is specifically

16   required before contractual burdens can be imposed on an

17   estate".  In re Child World, 147 B.R. 847, 852 (Bankr. S.D.N.Y.

18   1992).

19         "Court approval ... provides protection to the

20   unsecured creditors whose claims could be prejudiced by

21   potentially burdensome contracts - ones that may have driven

22   the business into bankruptcy in the first place ....  It also

23   insures that the [unsecured creditors] committee has an

24   opportunity to object."  In re FBI Distribution Corp., 300 F.3d

25   45.  FBI Distribution Corp. is, of course, the name for the

09-50026-mg    Doc 7836    Filed 11/10/10    Entered 11/18/10 11:40:50    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 73 of 164

Page 73

1   successor debtor in the Filene's Basement case.

2          My colleague Judge Drain has held similarly.  See In

3   re A.C.E. Elevator Company, 347 B.R. 473, 484 (Bankr. S.D.N.Y.

4   2006) ("Implied assumption has no place in the law of executory

5   contracts").

6          Frankly, folks, I'm not sure whether the purchase

7   order was itself an executory contract, as its mutuality of

8   obligation was a little soft, and it may well have been, as

9   M-Tech argues, duplicative of the lease and adding nothing new

10  in the way of obligations.  But it wasn't unreasonable for Old

11  GM to regard the purchase order as executory, and, assuming

12  that the purchase order wasn't, that doesn't mean that Old GM

13  assumed and assigned the lease, which had a broader array of

14  obligations, instead.  As I've noted, the lease itself was

15  never designated or noticed for assumption, and the lease's

16  assumption was never approved by me or by any other judge of

17  the Bankruptcy Court.

18         Whether or not the purchase order was properly assumed

19  and assigned or could have been assumed and assigned is,

20  ultimately, irrelevant to whether the lease, which was not

21  mentioned in the assumption motion or related schedules, was,

22  itself, assumed and assigned.

23         Finally, I agree with Old GM's and New GM's point that

24  because of M-Tech's objection, as stated back in 2009, nothing

25  could have been assumed.  It was practical back in 2009 for Old

09-50026-mg    Doc 7836    Filed 11/10/10    Entered 11/18/10 11:40:50    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 74 of 164

Page 74

1    GM and New GM to provide that if objections were based solely

2    on the cure amounts for the contracts proposed to be assumed

3    and assigned they'd be assumed first, and cure amounts would be

4    fixed later.  That so, because New GM was willing to pay

5    whatever was agreed upon, or a Court would later rule in the

6    way of cure costs on the contracts that it took.

7            But comparable arrangements couldn't be made if more

8    fundamental objections to assumption and assignment were

9    raised, such as those that the contract wasn't executory or

10   that the contract to be assumed and assigned and another

11   contract to be rejected were inseverable (sic) for assumption

12   and separate rejection.  Both kinds of contentions would be

13   showstoppers, as my decision in In re Adelphia Business

14   Solutions, 322 B.R. 51 (Bankr. S.D.N.Y. 2005) makes clear.  For

15   objections of that character M-Tech's objection couldn't have

16   been considered on the merits without consideration of the

17   issues that were deferred for subsequent judicial determination

18   under sale order sections 2(b) or 2(c).  "determining whether a

19   particular Assumable Executory Contract is an executory

20   contract that may be assumed and/or assigned," or "challenging,

21   as to a particular Assumable Executory Contract whether the

22   debtors have assumed or are attempting to assume such contract

23   in its entirety or whether the debtors are seeking to assume

24   only part of such contract" that they are attempting to assume.

25           Objections based on either of these contentions

Page 75

1    weren't then adjudicated, and, instead, the objector's rights

2    were reserved.

3           Though my order, contrary to New GM's contentions,

4    didn't expressly say that executory contracts couldn't be

5    assumed and assigned in the face of such objections, a judge

6    couldn't responsibly have permitted a contract subject to a

7    2(b) or 2(c) objection then to be assigned.

8           M-Tech, or other creditors or counterparties with

9    similar contentions wouldn't lose their rights to the

10   consideration of objections of that character, but, at the same

11   time, with objections based on such premises or with objections

12   of such breadth, there couldn't yet be an assumption and

13   assignment either.

14          M-Tech contends in its surreply on this motion that

15   the "schedules" to which New GM referred in New GM's earlier

16   reply, which showed the lease as a contract to be rejected but

17   lacked evidence that that thought or intention was ever

18   conveyed to M-Tech, can't be relied upon.  I agree with M-Tech,

19   in part, but, ultimately, only in part.  As I noted in oral

20   argument today, and as I've noted in a different context above

21   several times, I think, parties can't base substantive rights

22   on intentions that weren't expressed to the other side.  But

23   M-Tech has contended in its surreply that the schedules were

24   "probably created for the purposes of this motion", see

25   surreply at 2, and, in essence, it's raised the contention of

09-50026-mg    Doc 7836    Filed 11/10/10    Entered 11/18/10 11:40:50    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 76 of 164

Page 76

1    fabrication, of eleventh hour fabrication.

2          If authenticated as having been duly created by Old GM

3    and having been created before this controversy came up, which

4    we're now in a position, this having done, there the

5    paradigmatic example of a prior consistent statement as having

6    been prepared before Old GM had a motion to fabricate.  They're

7    inadmissible for showing the point which Old GM and New GM

8    would presumably love to use them for, that there was an

9    express inattention to reject and not to assume.  But they're

10   admissible for the limited purpose of refuting the accusation

11   of eleventh hour fabrication.

12          Other statements by M-Tech, for example that "there

13   was only one contract between the debtors and M-Tech," surreply

14   at 2 are ultimately just one party's view of the evidence or

15   are contradicted by the documents.  Similarly, M-Tech's

16   contention that the payment of rent under the lease after July

17   10, 2009 wasn't "assumption by implication," but, instead, was

18   "assumption by conduct consistent with the Court's procedures

19   for the assumption and assignment of the contract" is,

20   ultimately, a distinction without a difference.  And it's just

21   as contrary to the law in this district precluding findings of

22   assumption by implication or, simply, precluding findings of

23   assumption except upon a court order in which creditors and the

24   Court know what the estate is proposing to do.

25          Old GM is to settle an order in accordance with the

MOTORS LIQUIDATION COMPANY, et al.

Page 77

1    foregoing, providing, in substance, for the rejection of the

2    lease.  It is not to purport to characterize the lengthy ruling

3    that I just dictated.  Instead, it is to merely say that for

4    the reasons set forth by the Court on the record the motion to

5    reject is granted.

6           The time for M-Tech to move to appeal this

7    determination will run from the time of entry of the ensuing

8    order and not from the date that I'm now dictating this

9    decision.  Am I correct that we have no further business today?

10          MS. KLAUS:  Thank you, Your Honor.

11          THE COURT:  All right.  Thank you.  We're adjourned.

12       (Recess from 12:39 p.m. until 2:11 p.m.)

13          THE COURT:  Good afternoon.  Have seats, please.

14   Okay, we're out here again in Motors Liquidation Company.  We

15   have the apartheid claims.  Let me get appearances and then

16   I'll ask you sit down.  I'll have a couple of questions.

17          MS. ZAMBRANO:  Good afternoon, Your Honor.  Angela

18   Zambrano --

19          THE COURT:  Your name again, please?  Could you pull

20   the mic --

21          MS. ZAMBRANO:  Sure.  Angela Zambrano with Weil,

22   Gotshal & Manges, on behalf of the debtors --

23          THE COURT:  Okay.

24          MS. ZAMBRANO:  -- here with my colleague, Joseph

25   Smolinsky.

09-50026-mg    Doc 7836    Filed 11/10/10    Entered 11/18/10 11:40:50    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 78 of 164

Page 78

1              THE COURT:  Right.  Okay.

2              MS. SAMMONS:  Your Honor, Diane Sammons with the law

3      firm of Nagel Rice, on behalf of the Botha claimants.

4              THE COURT:  Okay.

5              MR. OLSON:  Good afternoon, Your Honor.  Steig Olson

6      from the firm Hausfeld, LLP, for the Balintulo plaintiffs.

7              THE COURT:  Okay.  Folks, after the Second Circuit

8      issued its Royal Dutch Petroleum Company, the debtors submitted

9      a supplemental submission giving me that decision.  If the

10     class plaintiffs responded to it, we don't have a record of any

11     response.  That case, subject to your rights to be heard, has

12     the potential for being a major showstopper

13             I'll need help from the class plaintiffs as to whether

14     this claim is still being prosecuted in light of that holding,

15     and if so, why there wasn't a submission to help me understand

16     the continuing basis upon which the claim would continue to

17     survive after that.

18             I would also like parties -- assuming that there is a

19     continuing basis for the prosecution of the claim -- to slice

20     and dice the underlying class action issues with a bifurcated

21     approach, dealing with them at the traditional plenary

22     litigation civil procedure level, and then impressing upon the

23     analysis any additional considerations which seemingly are

24     imposed in bankruptcy courts.

25             I do need help, first though, in understanding, Ms.

Page 79

1    Sammons and Mr. Olson, what your position is with respect to

2    Royal Dutch Petroleum.  I think I'd better hear from the class

3    plaintiffs first.  Mr. Olson?

4           MR. OLSON:  Absolutely, Your Honor.

5           THE COURT:  Main lectern, if you would, please.

6           MR. OLSON:  Say that again, please?

7           THE COURT:  Would you come to the main lectern,

8    please?

9           MR. OLSON:  Yes, Your Honor.  Again, Steig Olson from

10   Hausfeld, LLP.

11          Let me begin with the Kiobel ruling.  The first

12   question -- the answer to your first question is that we did

13   not submit a supplemental brief to the Court, so you haven't

14   overlooked anything.

15          The reason why -- and we apologize if that would have

16   been the expectation in bankruptcy court.  We're admittedly new

17   in bankruptcy court and certainly may not appreciate all the

18   typical practice.  The reason why we didn't submit a brief is,

19   one, we knew we'd be here today, shortly after the supplemental

20   brief was filed and would have the opportunity to address the

21   case with Your Honor.  And number two, just procedurally, it

22   wasn't clear to us that a supplemental brief was appropriate.

23   There wasn't a new motion filed for us to respond to, so that

24   was our judgment.  And again, we apologize if the Court would

25   have appreciated a supplemental brief.

09-50026-mg   Doc 7836   Filed 11/10/10   Entered 11/18/10 11:40:50   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 80 of 164

Page 80

1          THE COURT:  You understand the perspective of a judge

2     who very often has to rule on the same day as an argument, in

3     trying to be prepared beforehand?

4          MR. OLSON:  Well, I do.  Again, admittedly, you know,

5     and I did -- I've clerked for two different judges.  But

6     neither of the judges I've clerked for typically would rule on

7     a matter like this on the same day.  And again, if that's what

8     Your Honor typically does, I certainly apologize for not having

9     advised the Court sufficiently in advance of the hearing what

10    our position was.

11         The other aspect of it is, this is an evolving

12    situation that we're dealing with.  The Kiobel decision came

13    down in mid-September.  It's not in our case, of course.  One

14    of the attorneys who is in our case does work on the case, and

15    we've been in contact with that attorney to learn about the

16    decision and what's going on before the Second Circuit relating

17    to the Kiobel decision.  And that has been an evolving process,

18    such that I believe on Friday, the plaintiffs in the Kiobel

19    case filed a request to file a reply to their motion for en

20    banc reconsideration.  So we've been gathering that

21    information.  And now the briefing on en banc reconsideration

22    is complete.

23         The other sense in which it is an ongoing situation

24    such that if we had filed something the beginning of -- or

25    directly after this brief may have become mooted very quickly,

MOTORS LIQUIDATION COMPANY, et al.

Page 81

1    is that we just don't know, very candidly, Your Honor, the

2    effect of Kiobel on our case.  And I understand that's the

3    Court's main concern.

4         It would certainly have been one possible outcome that

5    after the Kiobel decision the Second Circuit panel that heard

6    our appeal -- and at any time, Your Honor, I'm happy to review

7    any of the procedural history -- but we argued the appeal by

8    the non-GM defendants in our case in January of this year,

9    2010.  One possible outcome of the Kiobel decision was that the

10   panel in our case would have very quickly or relatively quickly

11   issued a two-paragraph summary order dismissing the appeal,

12   perhaps dismissing the case, perhaps issuing some other mandate

13   to the district court, in light of the Kiobel decision, because

14   on its face the Kiobel decision certainly has an effect on our

15   case.

16        We have been waiting to see if that would happen.  It

17   has not happened.  It could happen today, it could happen

18   tomorrow, we don't know.  But we anticipate that the Second

19   Circuit will do something in light of the Kiobel decision.

20        But that raises what I think is the most important

21   point for us to communicate to the Court.  Which is that the

22   Kiobel decision was extremely surprising.  It literally came

23   out of -- not literally.  It came out of left field in the

24   sense that the issue of corporate liability under the Alien

25   Tort Statute was never an issue in that case ever.  There was

Page 82

1    not one brief that was argued that argued that point on either

2    side.  The issues on appeal did not involve corporate liability

3    under the Alien Tort Statute.  The argument did not touch on

4    corporate liability under the Alien Tort Statute.  The

5    defendants in that case did not raise it as an appealable

6    issue.  No briefing was requested on it.

7            The first time that anyone had any notice that there

8    was an issue in the case was in the middle of September, when

9    the Second Circuit issued its decision finding there was no

10   corporate liability under the Alien Tort Statute.

11           So that was surprising and it's extremely unusual.

12   It's extremely unusual that two judges of the Second Circuit

13   would issue an opinion on a very significant question, which,

14   incidentally, made the Second Circuit the first circuit to ever

15   hold that and is contrary to the holding of another circuit

16   directly contrary.

17           It's extremely unusual that there would be a ruling

18   like that without literally any argument or briefing on the

19   matter at all.

20           THE COURT:  Pause, please, Mr. Olson.

21           MR. OLSON:  Yes.

22           THE COURT:  I guess what I was taught, or at least an

23   assumption under which I've been proceeding for the last forty

24   years, ten as a judge, is that to raise an issue on appeal

25   you've got to preserve it or raise it below.  Are you telling

Page 83

1    me that that wasn't done here?

2            MR. OLSON:  Absolutely, Your Honor.

3            Not only that, the parties in Kiobel; the defendants,

4    didn't raise it on appeal.  They not only didn't preserve it

5    below, they didn't raise it on appeal.

6            Now, the answer to Your Honor's correct instinct about

7    why it seems bizarre that the Second Circuit would do that, the

8    hook that the two judges of the panel used, was to rule that

9    corporate liability under the statute was an issue of subject

10   matter jurisdiction.

11           THE COURT:  Which can never be waived or neglected.

12           MR. OLSON:  Absolutely.  And -- yes.

13           THE COURT:  I understand that.  But what I'd like to

14   have a dialogue with you on, Mr. Olson, and although you may

15   not appear that much in bankruptcy court, but let's all make

16   believe,  And I'll fantazise for the extra eight percent in

17   pay, that I'm a district judge.  No matter how -- let me use a

18   delicate word, ill-advised the ruling by the panel might have

19   been -- or the majority of the panel, am I missing something or

20   is what they say binding upon me?

21           MR. OLSON:  Well, let me skip ahead.  I was giving the

22   Court some background.

23           Essentially, Your Honor, the significant point is that

24   there's been an en banc petition for rehearing filed in the

25   Kiobel decision.  That -- briefing on that just recently

09-50026-mg   Doc 7836   Filed 11/10/10   Entered 11/18/10 11:40:50   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 84 of 164

Page 84

1    completed -- has been completed and hasn't been ruled upon.

2           The reason why I give the Court the background is

3    because we believe that the en banc petition actually raises

4    very significant issues and has a reasonably solid chance of

5    success.  The reasons for that are specifically, there was an

6    extremely vigorous dissent in the case itself by Judge Leval.

7    And --

8           THE COURT:  I'm aware of that.

9           MR. OLSON:  You're aware of that, of course.

10          Now -- and just to finish, if I may.  In our -- one

11   would expect that in light of a decision like that the panel in

12   our case might have very quickly said well, your case is done

13   because of Kiobel.  But they haven't.  And now it's been, you

14   know, two months.

15          So there's also reasonable expectation that at lest

16   two of the judges in our case have very serious concerns with

17   the Kiobel decision.  And I can go into that in greater detail

18   if the Court would like.  But we believe there's quite a few

19   signs pointing in that direction.  So that's three judges and

20   there are other reasons to think that there -- a lot of the

21   judges on the Second Circuit have concerns.

22          So there's no question that Kiobel is potentially --

23   it's potentially fatal to our case.  Not necessarily, but

24   potentially, if it stands.  But it's by no means certain that

25   it is.  And it's by no mean certain that that decision will

09-50026-mg    Doc 7836    Filed 11/10/10    Entered 11/18/10 11:40:50    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 85 of 164

Page 85

1    stand.  And so that's -- as I said, it's one reason why we

2    didn't immediately fire off something to the Court because this

3    is an evolving situation.

4         What we think would not make sense would be for this

5    Court to immediately issue a ruling that would not only assume

6    that Kiobel will stand, but that it has a decisive impact on

7    our case.  Because those things are just simply not the case.

8         Now, I think the Court has some options in that

9    regard.  And, again, I'm sure you have a much better sense of

10   your options than I do.  But what we would think would make

11   sense would be to not do anything which would prejudice our

12   class claims in this matter, until it's -- the final status of

13   that Kiobel panel decision is clear, and very likely it's clear

14   of the effect of the Kiobel decision on our case.  Because

15   depending on a variety of circumstances, Kiobel could be fatal,

16   it might not necessarily be.

17        Now, how the Court gets there I'm not exactly sure.  I

18   do understand that one option would be to estimate the class

19   claims in this case.  And that would -- by doing that, as I

20   understand it, the approval of the plan would not be held up.

21   And we are willing to work with the Court and with the debtor

22   in any regard to have that happen.  We have no desire to have

23   the plan held up.  And then we could revisit this issue once

24   the legal landscape is a lot clearer, which we would expect it

25   would be.

09-50026-mg    Doc 7836    Filed 11/10/10    Entered 11/18/10 11:40:50    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 86 of 164

Page 86

1          THE COURT:  Uh-huh.

2          MR. OLSON:  So that's essentially our point under

3    Kiobel.  I could go into why we think the merits of the

4    decision are wrong.  I could explore anything else.  And I

5    could also proceed --

6          THE COURT:  Well, the problem I have, Mr. Olsen, is

7    that between you and me I don't always agree with every

8    decision of the Second Circuit, especially on areas where I

9    have some expertise; like bankruptcy.

10          But I've never considered myself allowed to make that

11    kind of a determination in any way other than in private to my

12    law clerks and to my wife.  And I do what the Second Circuit

13    tells me and I got to follow controlling law of the Second

14    Circuit.

15          The rule, for instance, is not the same with respect

16    to district judges.  And if I think district judges have blown

17    it I feel like I've got a lot of walking around room, but I

18    don't feel like I have that same luxury with the circuit.

19          Apart from that I have concerns that are unique to

20    bankruptcy about the late certification motion, the effect on

21    the remainder of the creditor community, and the delay that

22    would be occasioned by holding up distributions to the creditor

23    community in my case, who've suffered plenty.  Because of the

24    potential for any class claim to have such a dilutive effect

25    upon their recoveries.

1        Subject to your opponent's rights to be heard, I would

2    think that individual claims on behalf of your clients, and

3    keeping them alive, would be no big deal.  But I had thought

4    until I started getting into the implications of the Kiobel

5    case that there were some fairly serious hurdles for you to get

6    over as a matter of pure bankruptcy law, which at least

7    seemingly would impair the ability to certify a class even if

8    they wouldn't be show stoppers on the individual class

9    representatives recoveries in their own name.

10        MR. OLSON:  Yes, Your Honor.  Let me address those

11    briefly.

12        First, absolutely, we would never suggest the Court

13    should not follow Second Circuit precedent.  We just make two

14    points.

15        One, given the pendency of the rehearing motion I

16    don't think it would be prudent for any judge in the Southern

17    District of New York or in the Southern District of New York

18    Bankruptcy Court to assume that the decision by two members of

19    the Second Circuit in a panel decision is final.  It's just not

20    final in that sense.  There's a rehearing petition pending, it

21    has not been ruled upon.  And not only that which we think is

22    sufficient as we've explained to the Court, there are very good

23    reasons why we think that the case will be heard -- will be

24    reheard en banc.

25        So I just -- I don't think any -- I don't think it

MOTORS LIQUIDATION COMPANY, et al.

Page 88

1    would be prudent for a judge trying to follow the Second

2    Circuit's instruction to take a potentially prejudicial action

3    in a case when the Kiobel panel decision may well not be the

4    ruling of the Second Circuit.  Number one.

5         Number two, as I mentioned, our case is on appeal in

6    the Second Circuit.  And notably, the Second Circuit has not

7    ruled on our case.  So that's we believe a very significant

8    sign.  The Second Circuit has in no way indicated to this Court

9    that our case must be dismissed.  It may do that but it

10   certainly may not.  So we don't think that -- we think that the

11   prudent approach by a judge, who, of course, has to follow

12   Second Circuit precedent, would be to simply wait to see what

13   the Second Circuit's final holding is in this matter.

14        Now, as far as the timeliness of our certification

15   motion.  I understand the Court's reference that it was late.

16   We would submit, Your Honor, that, you know, in terms of

17   following circuit court precedent, it's by no means clear that

18   our motion was late.

19        The Second Circuit has never ruled that it would be

20   even proper to file a motion under Bankruptcy Rule 9014 for

21   7023 treatment prior to an objection to the class claim being

22   filed, which creates a contested matter.  The Second Circuit

23   has not ruled that.

24        The only circuit that I'm aware of that has ruled on

25   that issue is the Eleventh Circuit in the Charter Company case.

09-50026-mg   Doc 7836   Filed 11/10/10   Entered 11/18/10 11:40:50   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 89 of 164

Page 89

1    And the Eleventh Circuit ruled that it would not have been

2    timely for us to file our motion until there was a contested

3    matter when the debtor contested our class claim.  And, in

4    fact, until that point we are entitled to presume that our

5    class claim was not objected to and there was not a contested

6    matter.

7            So putting the practicalities aside for a moment, as a

8    legal matter, we don't believe our motion was late under any

9    precedent.  We recognize that Southern District of New York

10   courts have gone back and forth on this.  But even Judge Rakoff

11   in the Ephedra case, who said, you know what, you don't have to

12   wait for the objection.  At the same time said the rules are so

13   opaque that I would never -- I don't know if he said I would

14   never.  That I would not take a prejudicial holding against

15   someone who did wait for the objection to be filed.

16           So we believe we -- our motion was timely under the

17   law.

18           As a practical matter, the Court referred to the

19   creditor community.  Which, of course, has to be the Court's

20   primary objective to protect that community.  The point we

21   would make there, Your Honor, is that we believe that we're a

22   member of that community.

23           It should be pointed out that we have pursued these

24   claims on behalf of a humble group of plaintiffs for eight

25   years, very doggedly.  We've been up against incredibly well-

09-50026-mg    Doc 7836    Filed 11/10/10    Entered 11/18/10 11:40:50    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 90 of 164

Page 90

1    funded multinational corporations and law firms who have taken

2    us through two district court judges, up to the Second Circuit

3    twice, up to the Supreme Court, and our claims are still

4    standing.  And they're very significant claims.  In some

5    respects the eyes of the human rights community worldwide have

6    been on our case for the last eight years.  And there are

7    thousands of people in South Africa who believe strongly in

8    this case, and believe strongly that they have claims against

9    GM.  And they're creditors too, as I understand bankruptcy law.

10          And so we would respectfully request that when the

11   Court considers the interest of the creditor community that it

12   does not overlook the people in our case.

13          Now, the question then becomes is it fair to the

14   absent class members who didn't file proofs of claims to

15   expunge their claims, and only let the named plaintiffs

16   proceed.  And here, Your Honor, I respectfully suggest we

17   believe we're on very solid ground, that that would be

18   completely improper.  And the reason for that is the notice

19   that was given in this case cannot be defended as reasonable or

20   justifiable to reach the absent class members in this case.

21   Absent class members that GM knew about.

22          For eight years we've litigated this case, it's been a

23   significant case to GM.  And they know where these people are.

24   They know they're in South Africa.  They know they're

25   impoverished.  They know they are poor victims of horrific

09-50026-mg    Doc 7836    Filed 11/10/10    Entered 11/18/10 11:40:50    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 91 of 164

Page 91

1    violence, in many cases.  They know that these people are not

2    educated.  That they are living in segregated communities.

3    That they are subject to many issues as far as education and

4    health.  They know that they live in townships that are

5    segregated.  And that for many of them English is not their

6    primary language.

7              Now, the standard for notice as GM, itself, stated in

8    its motion to expunge on page 16, was "The proper inquiry is

9    whether the debtor acted reasonably in selecting means likely

10   to inform persons affected by the bar date."  That's the

11   standard.

12             So GM today must defend its decision in light of it

13   knowing of this group of creditors, to publish notice in the

14   international editions of the Financial Times, the Wall Street

15   Journal and USA Today.  Those are the only publications which

16   even, arguably, might have reached South Africa.

17             Now, we recognize, Your Honor, that publication notice

18   has often been accepted.  And we recognize that you can't

19   always design publication notice in a way that reaches

20   everyone.  But at the same time the notice requirement of the

21   due process clause must have some teeth.  It cannot be rendered

22   a nullity.

23             The Supreme Court in Mullane v. Central Hanover Bank &

24   Trust, ruled that "When notice is a person's due, process which

25   is a mere gesture is not due process.  The means employed must

09-50026-mg   Doc 7836   Filed 11/10/10   Entered 11/18/10 11:40:50   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 92 of 164

Page 92

1    be such as one desirous of actually informing the absentee

2    might reasonably adopt to accomplish it."

3         So for GM to prevail on the notion that sufficient

4    notice was provided to this unidentified group of people in

5    South Africa, it must demonstrate that it would have been

6    reasonable for one actually trying to notify those people that

7    they had a right to file a claim because they were potential

8    creditors.  That it would have been reasonable to reach them,

9    someone really wanting to do that, by publishing in the

10   Financial Times, the Wall Street Journal and USA Today.

11        That we believe, Your Honor, is just facially an

12   unacceptable proposition.  Particularly in light of the fact

13   that as we demonstrated in our papers, reasonable and

14   inexpensive alternatives were disregarded.  We have shown in

15   our papers that there were many South African national or

16   regional publications that could have very cheaply been a forum

17   for notice to these people.  And if that had happened we

18   wouldn't have a notice argument.  But it didn't happen, and GM

19   knew of these people.  And so we must presume that there was a

20   reason that those venues were not utilized.

21        And so given that, Your Honor, we think that it would

22   be patently unjust and unfair to expunge the claims of these

23   creditors, the creditors, because they never had an

24   opportunity.  They weren't given due process, they weren't

25   given notice.

09-50026-mg   Doc 7836   Filed 11/10/10   Entered 11/18/10 11:40:50   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 93 of 164

Page 93

1        In light of that, we believe that the Court should

2    exercise its discretion to permit class treatment in this case.

3    Because it's really the only way in light of what has happened

4    to assemble the full group of creditors that should be

5    assembled in this case.

6        As we understand it, the purpose of Chapter 11

7    bankruptcy is to determine what the debtors' entire debts are.

8    And to determine based on this who is entitled to what.  And if

9    class treatment isn't utilized in this case, a group of

10   creditors will have been expunged without notice, without

11   process, and without reason.

12       In this case the named plaintiffs are the champions of

13   the rights of those people.  As the Second Circuit observed in

14   the American Reserve case "Sometimes holders of contingent

15   claims need a champion of their rights to appear in bankruptcy

16   court."  And this is one of those times.

17       Now, as far as the appropriateness of class

18   certification, we understand this is generally a two-step

19   inquiry.  One is should the Court use class treatment, should

20   it apply Rule 7023.

21       THE COURT:  Yes.  That's the bankruptcy issue.  From

22   what I would call a plenary litigation perspective.  I don't

23   have too much in the way of concerns vis-a-vis your 23(a)

24   showing, but I do have your concerns about your 23(b)(3)

25   showing.

Page 94

1          MR. OLSON:  Absolutely.  And that's where I was

2     moving, Your Honor.

3          I will say that Ms. Sammons was going to touch on

4     these issues, as well, but perhaps --

5          THE COURT:  That's fine.

6          MR. OLSON:  -- I'll set the table on them.

7          We believe, Your Honor, that certification of this

8     class under Rule 23(b)(3), which asks the question whether

9     common questions of fact and law will predominate in the case.

10    Not whether all questions in the case are common, but whether

11    the common questions will predominate.

12         We believe this case meets that standard.  There's no

13    question that this case presents some complex issues, primarily

14    legal issues.  Some mixed questions of law and fact.  But it is

15    clear that the predominant questions in the case are ones that

16    are common to class members.

17         The resolution of this case, as the Second Circuit

18    proceedings show, will focus predominately on questions of law

19    and fact that are common to class members.  After all, in this

20    case which makes it distinguishable from the Talisman case that

21    GM talks about, and distinguishable from many cases where class

22    certification is denied --

23         THE COURT:  Talisman being Judge Coates' decision?

24         MR. OLSON:  Yes.  The reason we have this case is

25    because the class members were targeted precisely because they

Page 95

1    were members of a class.  That's what apartheid was about.  It

2    was not treating people based on their individual factors, it

3    was not looking at the individual merits of people and deciding

4    who would be rounded up and segregated and deprived of an

5    education and deprived of healthcare.  And in some cases,

6    physically terrorized in the most gruesome forms.

7            Apartheid didn't focus on individual characteristics,

8    that was what the problem was.  Apartheid inflicted injury

9    systematically pursuant to a national policy precisely because

10   people belonged to a disfavored class.

11           So in other words, our case, and the class members,

12   have a coherence with Rule 23 in that what's challenged is

13   class treatment.  And that's why class treatment is an

14   appropriate mechanism for pursuing liability for that.

15           Now, if you move from that to the questions in the

16   case, which is what Rule 23(b)(3) says to focus on, perhaps the

17   most significant question in this case of law and fact will be

18   what GM knew about the purposes to which its vehicles were

19   being put, and whether GM acted with the intention of helping,

20   through the provision of those vehicles, to oppress, terrorize

21   and inflict injury on black and colored South Africans.  That's

22   the question that must be answered.

23           We can talk at any time, Your Honor, about how we get

24   to the resolution of that question, but that's the predominant

25   question in this case.  If this case is tried or resolved in

09-50026-mg    Doc 7836    Filed 11/10/10    Entered 11/18/10 11:40:50    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 96 of 164

Page 96

1    any manner that's the question that will override anything in

2    the case.  That question will focus squarely on the conduct of

3    GM.  It won't focus on the conduct of the individual class

4    members.  And the resolution of that question will be one of

5    the primary vehicles for resolving this case.

6              THE COURT:  Wait --

7              MR. OLSON:  Other --

8              THE COURT:  Pause, please, Mr. Olson.  Because when I

9    was preparing for this I wasn't thinking so much that the

10   conduct of the individual class members will be that major a

11   factor.  But what I was concerned about is that if one grants

12   what you said, which was one reason why I thought that on 23(a)

13   existence of there being some common issues, wasn't one that

14   troubled me.  I think it's at least a fair inference, and,

15   certainly, would meet, both Bell Atlantic and Twombly

16   standards, for you to make an allegation that folks in South

17   Africa were targeting their citizens.  Maybe blacks weren't

18   considered citizens, their folks, because of their race.  The

19   way by which they targeted them, they way by which they acted

20   offensively to them wouldn't presume -- would at least

21   seemingly vary in so many respects.  That's what's really

22   bugging me.

23             MR. OLSON:  Understood, Your Honor.  So let me address

24   that.

25             First of all, this case is -- here we have GM, will be

Page 97

1   a little narrower than that.  I think the question, the primary

2   question in this case will be what GM did to support the

3   security forces of the apartheid regime, and what it knew when

4   it did it, and what it intended when it knew what it was doing.

5   Those are going to be the primary questions.

6           And Rule 23 does talk about commonality.  But we

7   shouldn't gloss over the fact that Rule 23(b)(3) says it's

8   satisfied if questions of law or fact will predominate in the

9   resolution of the action.  And we believe those questions will

10  predominate.

11          Now, the issue the Court raises we believe doesn't go

12  to GM's liability, which is what we think will predominate in

13  this case.  But it goes into the question of injury.  In other

14  words, you know, people are injured in different ways.  And,

15  you know, how will the Court address that.

16          We recognize that that is true to some degree.

17  However, Your Honor, in virtually every case where there's

18  class certification injuries vary to some degree.  But many

19  courts have recognized that where the issues of liability will

20  be the truly predominant issues in the case, the fact that the

21  Court may have to find some ways to address differences in

22  injury should not be an impediment to class certification.

23          For example, consider the Talisman case, which -- the

24  Judge Coates' case which GM primarily relies on.  There Judge

25  Coates didn't deny class certification because well, some

Page 98

1     people were shot and some people were maimed or injured in some

2     different way.  Judge Coates denied class certification because

3     she determined that finding out the core question of liability

4     could not be done on a common basis.  Because that case

5     involved a long history of inner-tribal warfare and civil war

6     in the Sudan.  So you couldn't just recognize that a class

7     member was injured and attribute it to some national policy

8     there.  It could have been one of many, many different people

9     who caused the injury on the class member there.

10          And so there wasn't this core question of conduct by

11    the defendant which would take you most of the way to resolving

12    the case.  But that's very different here.  The class members

13    here were -- there's no question of tribal warfare or who

14    injured them, or determining those types of questions and

15    unraveling complex tribal or civil war issues.  The people who

16    were injured here were injured because of the national policy.

17    And that's what -- as, again, I'll turn this over to Ms.

18    Sammons in a moment, that's what makes this case more like the

19    cases -- the admittedly complex cases sometimes, where class

20    certification is granted.

21          For example, we refer the Court to the Klay v. Humana

22    case.  Second Circuit case -- sorry, I apologize.  An Eleventh

23    Circuit case from 2004.  The case that the debtor, itself,

24    cited.  It drew the distinction that I'm talking about.  There

25    the breadth of the class was tremendous.  It was, essentially,

09-50026-mg    Doc 7836    Filed 11/10/10    Entered 11/18/10 11:40:50    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 99 of 164

Page 99

1    almost all doctors in the United States.

2         But because the core question in the case involved a

3    policy that affected all those people in some common way, the

4    Eleventh Circuit recognized that the RICO claim in that case

5    could be certified, notwithstanding the fact that there may be

6    some differences in injury that would have to be sorted out in

7    some sense.

8         So that's why we believe, Your Honor, that yes, there

9    may be some individual issues that arise with respect to

10   injury.  But that's not prohibitive of class treatment.  And in

11   a case like this where the case is about injury because the

12   members were members of a class those members of a class should

13   be permitted to proceed.

14        The only other thing I would add on this note, Your

15   Honor, is that some of the issues that may look messy at first

16   blush in this case, some of the factual issues about injury,

17   have actually been a long -- there's been a lot that gets them

18   very close to resolution.

19        We know, for example, that the Truth and

20   Reconciliation Commission in South Africa held six years of

21   hearings where it interviewed the victims of apartheid.  And

22   extensive records and governmental findings were made about the

23   types of injuries that those people suffered, and many of those

24   people are class members in this case.

25        So there are -- there's a record that would be

Page 100

1    available to the Court as in the Marcos case to deal with the

2    injury component of the case once we get there.  But it will be

3    the liability component of the case that will predominate, and

4    that's why we think class treatment is appropriate.

5         THE COURT:  Pause.  Are you telling me that that would

6    be usable for collateral estoppel, is GM participating in that?

7         MR. OLSON:  I don't believe GM participated.  So I'm

8    not sure we'd argue --

9         MS. SAMMONS:  They didn't.  GM did not participate.

10   None of the corporate defendants, Your Honor, participated in

11   the TRC.

12        MR. OLSON:  They were invited to, they -- and I can't

13   say specifically whether GM was, but multinational corporations

14   who operated were invited to participate, but generally just

15   refused to.  So I'm not --

16        THE COURT:  Well, my instinct, Mr. Olson, would be

17   subject to your rights to be heard, that knowing the results of

18   that and your conclusions would help you -- would be pretty

19   much rock solid defense against anybody making claims that --

20   making irresponsible allegations, but would be much tougher for

21   you to use as affirmative proof because of the traditional

22   constraints under American law of use or imposition of

23   collateral estoppel.

24        MR. OLSON:  Well, I agree.  I'm not necessarily

25   suggesting that we've used collateral estoppel.  But I think

Page 101

1    there are some mechanisms that could utilize that record that

2    could create efficiencies in this case.

3           Now, it may come down to whether GM wants to fight,

4    you know, how much every person was injured, out or not, or

5    would be willing to stipulate to some -- in some manner to

6    those findings.

7           THE COURT:  Well, you know, you're referring to GM.

8    And it may have been GM when it was doing allegedly bad things,

9    but the debtor that's on my watch, which is aptly called Motors

10   Liquidation Company, is a fiduciary for a creditor community

11   which, if anybody did anything bad it wasn't them.  And we're

12   beyond the point where GM could be saving its own skin in terms

13   of its future survival.  Right now the stakeholders in this

14   case are the creditors or, as you articulated, the other

15   creditors of the Motors Liquidation estate, which from the

16   perspective of a lawyer who's counsel for a debtor-in-

17   possession in a liquidating case, that would be instinctive to

18   him.  He ain't got a client anymore except that creditor

19   constituency, and to a much, much lesser extent the people like

20   AlixPartners who are trying to maximize the value of that

21   estate.

22           MR. OLSON:  And I understand that, Your Honor, and I

23   apologize for referring to GM.

24           But I actually think that the point Your Honor makes

25   counsels in favor of finding a way to resolve the creditor

09-50026-mg    Doc 7836    Filed 11/10/10    Entered 11/18/10 11:40:50    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 102 of 164

Page 102

1    claims by the absent members here on a classwide basis.

2    Because as Your Honor points out MLC is not, you know -- let me

3    put it differently, one of MLC's objectives is as a fiduciary

4    to creditors.  And as I pointed out there are people in South

5    Africa who we believe have claims against the estate that MLC

6    is overseeing.

7            But those people, and I don't think there's any way

8    around this, didn't receive notice that would have allowed them

9    to file claims.

10           So what are the options?  The options are for MLC to

11   convince the Court that those people should just have no

12   claims.  And their rights as creditors should be completely

13   expunged, even though I think we can likely agree, very likely

14   none of them received any notice that their claims were going

15   to be expunged.  That's one option.  But it doesn't seem to me

16   to be consistent with the fiduciary responsibility of an entity

17   like MLC.

18           The other alternative, it seems to me, would be for

19   the Court to permit class treatment and us to work with MLC and

20   the non-governmental associations that we worked with in South

21   Africa, to find a way to permit that community of creditors to

22   have its rights respected and to participate.  And I can assure

23   the Court that we don't have any other objective than to be

24   completely reasonable and efficient in allowing that process to

25   take place.

Page 103

1         It seems to me those are the two options.  And the

2    first one, we submit, violates the due process clause and is --

3    would be unjust.  So, again, this is where I get to the edge of

4    in the expertise, but when I refer to the Truth and

5    Reconciliation Commission it doesn't seem to me to be obvious

6    that it would have to be an issue of collateral estoppel, but

7    rather that some procedures could be reached between the Court,

8    between MLC, and between the class group if class treatment is

9    permitted.  That would allow for the estimation and then

10   resolution of the class claims.  And that would respect the

11   right of that community of creditors that we believe should be

12   respected.

13         THE COURT:  All right, thank you, Mr. Olson.  You want

14   to hand off to your co-counsel now?

15         MR. OLSON:  Yes.

16         THE COURT:  Ms. Sammons.

17         MS. SAMMONS:  Yes, your Honor.  Diane Sammons with the

18   firm of Nagel, Rice on behalf of the Botha plaintiffs.

19         Your Honor, I think my co-counsel has articulated in

20   large part an outline of why class certification would be

21   appropriate in this case.  And I think he's done his best to

22   address the Court's concerns regarding predominance.

23         Subject to Your Honor's specific questions, I would

24   only add that with regards to the predominance argument that

25   the notion of human rights cases being subjected to class

Page 104

1    treatment is not unusual.  And there's a series of cases upon

2    which the Court can look to with regards to assistance, in that

3    regard.

4            And I would suggest, the first case was the In re

5    Holocaust Asset case.  Which was a case in the Eastern

6    District, Your Honor, where specifically there was class

7    treatment.  And a case against corporate defendants regarding

8    the keeping of certain assets by defendant banks that were

9    properly the subject of Holocaust survivors, and that was

10   afforded class treatment.

11           I would suggest Doe v. The Gap, which is a Ninth

12   Circuit -- well, it's not a Ninth Circuit case, it's a district

13   court case, the Marios (ph.) Islands, but it's in the Ninth

14   Circuit, Your Honor.

15           Similar case, multiple defendants stemming from --

16   involved in -- and all the folks that were involved in this

17   case were from different factual backgrounds, working for

18   different employees.  They were suffering different injuries.

19   And there were allegations that they were subject to

20   involuntary hours; unreasonable hours with regards to their

21   work.  Involuntary servitude was the human rights claim that

22   was brought against those particular defendants.

23           And despite the fact that there were multiple

24   differences in terms of the damages, the court acknowledged and

25   agreed that would bound the action together and the class

Page 105

1    together, was a common policy with regards to how the

2    defendants were treating these individuals.  And they allowed

3    class treatment to proceed in that case.

4           Likewise, Doe v. Karadzic.  Another case involving

5    Bosnian human rights violations.  Multiple violations similar

6    to the violations alleged here; torture, CDIT.  Each of those

7    claims the court, again, allowed to proceed forward on a class

8    action basis.

9           Julio v. The Estate of Marcos, a Ninth Circuit case

10   1996.  And that class was even more broadly defined, Your

11   Honor, than this case.  All civilian citizens of the

12   Philippines who between 1972 and 1986; that's a period of

13   fourteen years, who were tortured, some were summarily executed

14   or disappeared by Philippine military or paramilitary groups,

15   and survivors of the deceased class members.

16          In a very interesting procedure, Your Honor, the court

17   separated liability from damages and then split the damaged

18   part into three claims.  I'm sorry, into three separate trials.

19   One for compensatory damages and one for exemplatory (sic)

20   damages.

21          And the court used inferential methods to estimate the

22   value of the damage claims in that case.  But it did proceed

23   forward.  And one of the things that the Court looks at in

24   those cases is not just the common scheme, which is consistent

25   throughout these human rights cases, but also common questions

Page 106

1    of defense.

2         So in the Agent Orange case, another case where it was

3    afforded class treatment, the court looked at common defenses,

4    particularly whether or not in that particular case whether or

5    not there was a military contract or immunity that would apply

6    to all the particular defendants in the case.

7         Likewise here, the case on appeal raises multiple

8    issues that are common.  For instance, questions of political

9    question and international comity, practical consequences,

10   whether or not the ATS is meant to apply extraterritorially.

11   So the fact that there are common defenses provides even a

12   further foothold for this Court to find that there are, indeed,

13   common issues.  And those common issues do, in fact,

14   predominate.

15        I would suggest that there's a series of cases that

16   are now out of the Second Circuit that are very similar.

17   They're not human rights cases, Your Honor, but I think they're

18   worthy of merit.

19        One is Brown v. Kelly, it's a Second Circuit case that

20   came down in June of this year.  And it involved the DA's

21   office; Bronx DA.  And cops had a policy of enforcement of a

22   particular law deemed to be unconstitutional; it was loitering.

23   And even though the defendant suffered differing injuries as a

24   result of arrest, the court said that because the DA's office

25   and the police department had a common plan and scheme to

1   engage in improper arrests or unconstitutional arrests, that

2   was the commonality that held the case together, even though

3   there were differing individual injuries.

4          Likewise, Your Honor, in the Nassau strip case,

5   another Second Circuit case in 2006.  The police department

6   there had a strip search policy on all misdemeanors, regardless

7   of whether or not there was probable cause.  And, again, the

8   defendants had different injuries, yet the court held that the

9   policy, itself, and the common policy, and the systematic

10  nature of the policy was enough that predominance was suggested

11  and ruled in that particular case.  And there was class

12  certification granted.

13         There are other cases, Your Honor, that I can point

14  to, but I think those cases are a good guideline for this Court

15  in terms of similar situations.

16         I would suggest that our case is even stronger for the

17  reasons that my colleague had mentioned.  Which is this is a

18  classic case where our particular plaintiffs were treated

19  differently because of their class.  Apartheid by it's very

20  nature created a system where there was systematic oppression.

21  And that is what the court primarily looks at when it's looking

22  at predominances, was there a common plan?  And you can't get

23  anymore common than treating a class differently by virtue of

24  its race, than what we have in this case.  And I don't think

25  that's consistent with the other cases --

Page 108

 1          THE COURT:  But pause, please, Ms. Sammons.  You're

 2    conflating the plan of the South African government, or the

 3    South African decision makers, with a former General Motors'

 4    management.

 5          MS. SAMMONS:  I don't think so, Your Honor.  Because

 6    if you go back to the complaint the complaint alleges -- and

 7    I'll speak specifically to the Botha complaint.  But the

 8    complaint alleges, indeed, extreme particularity the actions of

 9    GM management and how they participated with the security

10    forces in South Africa to enforce the apartheid structure.  And

11    it's very specific.

12          And by that I mean, Your Honor, there are allegations

13    such as the fact that GM management were the ones that actually

14    conveyed the employees who were actively involved in opposition

15    to the apartheid regime.  And as a result of them leaking that

16    information to the police and the security forces in South

17    Africa, these people were arrested and tortured and abused.

18    And I would refer the Court, specifically, to the complaint.

19    And I'm going to read from a particular paragraph in the

20    complaint.  This is the Botha complaint at paragraph 90.

21          And it describes one of our plaintiffs.  And his name

22    was Mr. Tamboer.  And Mr. Tamboer was a shop steward in a

23    particular organization NAAWU.  He was required to inform GM

24    when he left work for union activities.  He was arrested on

25    numerous occasions as a result of providing such notification

1  because of GM's collaboration with the government.

2       For example, on one occasion in '82, Tamboer was

3  arrested and detained for weeks.  During his detention he was

4  interrogated and tortured because of his union activities at

5  GM.

6       And, Your Honor, it goes on to explain, certainly the

7  extreme nature of the torture.  And, again, this torture was a

8  result of GM's management indicating to the police that he was

9  engaged in this activity.  And I'm quoting now from paragraph

10 93, page 28 of our complaint.

11      "During his imprisonment Tamboer was repeatedly

12 questioned by security forces about strike activity at GM.

13 They choked him and bashed his head against the wall.  Security

14 forces also kicked him in the ribs and stomped on his ankles as

15 part of their torture techniques.  Tamboer suffered permanent

16 brain damage and epilepsy as a result of injuries suffered

17 during his arrest and imprisonment."

18      So, Your Honor, our intent is to plainly show specific

19 instances where GM management was acting alongside with the

20 police to engage in this improper activity.

21      Your Honor, aside from that I can certainly address

22 typicality, ascertain ability or superiority if those are

23 issues where the Court has concerns.

24      THE COURT:  I have a limited amount of time I can

25 spend on oral argument.  I've already spent about six times

MOTORS LIQUIDATION COMPANY, et al.

Page 110

1    what an appellate court would.

2           MS. SAMMONS:  And we appreciate that, Your Honor.

3           THE COURT:  Do you have anything further to say about

4    bankruptcy doctrine before I give your opponent a chance to be

5    heard?

6           MS. SAMMONS:  No, Your Honor, I don't.

7           THE COURT:  All right.  I'll hear from Motors

8    Liquidation now.

9           MS. ZAMBRANO:  Your Honor, as you know and as we've

10   talked about, there are four reasons why these claims should be

11   expunged in their entirety.

12          I don't want to belabor Kiobel, but I do want to make

13   a couple of points about it.

14          First of all, respectfully, the claimants are, of

15   course, just guessing as to whether there is an -- an en banc

16   petition will be granted.

17          Certainly there has been briefing but there has been

18   no decision.  So Your Honor is correct that that is the law of

19   the land presently.

20          I do want to note, though, that the Kiobel case was

21   specifically grounded in Supreme Court decision in Sosa.  In

22   which they specifically instructed courts to look at whether

23   the defendant at issue was subject to liability and

24   international human rights laws.  And, so, respectfully, I

25   don't believe that it was a surprise at all.  Indeed, I am told

09-50026-mg   Doc 7836   Filed 11/10/10   Entered 11/18/10 11:40:50   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 111 of 164

Page 111

1    and I have seen that in the appeal in this case there was

2    specific request for briefing on the issue of human -- of the

3    jurisdictional question.  And so I don't know whether Kiobel

4    parties were surprised or not.  But, certainly, that issue was

5    involved in this case.

6           THE COURT:  Well, I'm a little confused, Ms. Zambano

7    (sic).  Did I get your name right?

8           MS. ZAMBRANO:  Zambrano.

9           THE COURT:  Zambrano, forgive me.  I'm not as -- this

10   is all with the assumption that I'm allowed to make subjective

11   decisions about how to deal with a circuit decision that is now

12   good law, but which may not be good law, depending on the

13   outcome of events that are beyond speculation.

14          But while I and other judges try to guess movements in

15   the law, what you said about inviting people to brief these

16   issues strikes me as the more traditional way of --

17          MS. ZAMBRANO:  Agree --

18          THE COURT:  -- dealing with hard issues.  I take it

19   that if you disagreed with Mr. Olson's remarks to me about this

20   not being raised earlier and not having invited briefing by the

21   parties it may be equally binding on me, but it does raise my

22   eyebrows.

23          MS. ZAMBRANO:  I guess what I would say is I don't

24   believe that the Kiobel decision was as much of a shock to the

25   community as is being represented.  Particularly to the

Page 112

1    claimants at issue here, given that they briefed and they

2    reported to Your Honor in the briefing on this issue, that the

3    issue of whether a corporation could be liable under the Alien

4    Tort Statute was an issue in the case.  It's neither here nor

5    there, probably.  But I wanted to note it because I don't

6    believe it was the shock to these claimants that was

7    represented, given that they had briefed it and the court is

8    specifically deciding it in their appeal.

9         Let me move on and just speak briefly about the Kiobel

10   decision.  And I won't belabor it.

11        The Second Circuit, as Your Honor has noted, has held

12   squarely that corporations are not liable under the Alien Tort

13   Statute.  In that case, the Court, as you probably have

14   reviewed by now, painstakingly went through the international

15   tribunals that had considered the question.  Going so far as to

16   quote Nuremberg, looking at the international criminal courts,

17   jurisdiction decision where it was specifically discussed and

18   requested that corporate liability be permitted.  And it was

19   rejected.

20        Again, the tribunal decided that it was individual men

21   and women who were responsible, not corporate bodies.  The

22   Kiobel court also noted, of course, that more recent charters

23   establishing international tribunals in Rwanda and the former

24   Yugoslavia had also rejected corporate liabilities.  So

25   reviewing a lot of precedent, the Second Circuit determined

1   that no corporation has ever been liable for a human rights

2   violation, whether it's civil or criminal, ever been liable

3   under customary international law of human rights.

4          And so it found that there was not only -- there was

5   not just a unit -- there was not only a discernible -- there

6   was no discernible norm of customary human rights violations

7   that corporations could be liable, there was certainly not a

8   universal rule that they could be liable.

9          So, of course, the sole basis of not just the putative

10  class members, but, of course, the named plaintiffs,

11  themselves, their sole basis in this action is an Alien Tort

12  Claims act.  And so the extent that the Court feels bound by

13  Kiobel, and we would submit that it is, that the claim should

14  be expunged in its entirety.

15         Now, notwithstanding the fact that we think it's

16  dispositive --

17         THE COURT:  Pause, please, Ms. Zambrano.  Because if

18  there was not a pending motion for en banc reconsideration of

19  Kiobel it would be game set and match for you.  Your opponent;

20  Mr. Olson, has suggested an approach which --

21         MS. ZAMBRANO:  You're referring to the delay?

22         THE COURT:  Yes.  But I'm trying to articulate it in a

23  delicate way, which accounts for my pause, which, while it may

24  not be practical, as long as this is a class action, because of

25  the extraordinary, if dilutive, effect of a claim of this type

Page 114

 1    on the remainder of MLC's creditor community, might suggest

 2    that I rule only on the class action issues and that I continue

 3    neither allowing or disallowing the individual claims to give

 4    the circuit a little time to decide what it's going to do on

 5    the en banc motion, and/or for me to consider what it would do

 6    in the similar issues that Mr. Olson's non-MLC defendants might

 7    be subject to.

 8          Am I right in my assumption if this isn't a class

 9    action you don't muchly (sic) care whether I continue the

10    matter?

11          MS. ZAMBRANO:  I would say this, we believe the Kiobel

12    decision is binding.  And even estimating the claims of these

13    named plaintiffs is going to burdensome on this estate.  It's

14    going to require them under the Second Circuit Talisman

15    decision to prove that MLC, in its prior form GM, aided and

16    abetted apartheid.  And that these particular people suffered

17    injury as a result of that.  And I don't think that's an easy

18    task.

19          And so, respectfully, I think under the law in its

20    present form, the claim should be expunged.

21          THE COURT:  Uh-huh.  Continue.

22          MS. ZAMBRANO:  I'm going to turn then to the second

23    reason the claim should be expunged, and that's, of course, as

24    the Court has referred to, the Botha and Balintulo's belated

25    request for bankruptcy class treatment in this case.

Page 115

1          As this Court knows Rule 90 -- Rule 23 does not

2    automatically apply to the claims process in bankruptcy.

3    Instead, a class claimant must first specifically move under

4    Rule 9014 for an order directing that 7023 apply.  And, of

5    course, 7023 at that point would incorporate Rule 23.

6          It is well established that the failure to timely file

7    a Rule 9014 motion and request that the Court direct Rule 23 to

8    apply to a claim, can be fatal to a claimant's ability to

9    assert a class claim in bankruptcy, because of the radical

10   effect that a class claim can have on a debtor's reorganization

11   process.  And I would say this is particularly true in a case

12   like this where we have an unliqiudated claim of injuries that

13   are quite unspecified and quite disparate as well, like the

14   ones that we have here.

15         The question then is when is a claimant -- when are

16   claimants supposed to seek approval from the Court to assert a

17   class claim?  The answer to that question is found in our case

18   law.  If you look back briefly at it it's -- the limited

19   ability, of course, is not found in the code it is found in

20   this case law.

21         Until 1989 it was widely accepted that claimants could

22   not file a class claim.  And in that year Judge Easterbrook of

23   the Seventh Circuit decided In re American Reserve, the claims

24   could be permissible -- could be permissible under the

25   Bankruptcy Code.  Although, the Tenth Circuit has not followed

1   that decision, the majority of courts around the country,

2   including in this district, have, of course, permitted it.  But

3   they permitted it in limited circumstances based on this

4   discretion of the bankruptcy court.

5        All of these courts have insisted that the claimants

6   timely request permission from the bankruptcy court to proceed

7   as a class, so that the class action does not, in the words of

8   Judge Easterbrook, gum up the bankruptcy estate.

9        As Judge Bernstein explained in In re Woodward, one of

10  the earlier decisions on this issue, "As the case moves forward

11  toward its conclusion it is more likely that a delay in

12  resolving certification issue will interfere with the

13  administration of the estate."

14       For that reason, the Southern District of New York has

15  consistently insisted that a claimant seeking class treatment

16  ask the Court to apply Rule 7023 as soon as practicable.

17       There has been debates about -- among the Court

18  outside of this jurisdiction about the first time that a

19  claimant has to seek class -- first opportunity that a claimant

20  has to seek class treatment.

21       Some courts have held that the request should not be

22  made until an objection to the proof of claim has been filed.

23  And claimant's counsel referred to that law.  But that is

24  simply not the law in the Southern District.

25       This issue was squarely addressed by Judge Rakoff in

09-50026-mg    Doc 7836    Filed 11/10/10    Entered 11/18/10 11:40:50    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 117 of 164

Page 117

1    the Ephedra Products litigation in 2005.  In Ephedra, Judge

2    Rakoff held that the filing of a proof of claim constitutes in

3    a contested matter triggering the courts discretion at that

4    point to apply Rule 7023 under Rule 9014.  Indeed, Judge Rakoff

5    specifically considered the question and found that the

6    claimant had the right to move for class certification from the

7    moment the Chapter 11 petition was filed.

8             He squarely rejected the view that claimants were

9    supposed to sit on their hands and it could not move into Rule

10   9014 until the debtor objected to the claim.  He reasoned

11   that, and soundly reasoned, that if that were the law it would

12   mean that a debtor could prevent class claims by simply waiting

13   to the end of a matter before asking the bankruptcy court to

14   apply Rule 23.  And then objecting on the eve of confirmation,

15   moving to expunge.  And at that point saying that applying Rule

16   23 would unduly delay administration.

17            Bankruptcy courts -- not just Ephedra, bankruptcy

18   courts in the Southern District have recognized Ephedra as

19   binding on that point.

20            Judge Gropper in In re Northwest Airlines and Judge

21   Bernstein in In re Musicland.  So there is no case that says

22   that that's the law.

23            THE COURT:  Pause, please, Ms. Zambrano, because you

24   probably know and certainly your bankruptcy partners know, that

25   a district judge's decision isn't binding on a bankruptcy

Page 118

1    judge.

2           Was that a shorthand for they thought it was real

3    persuasive or did they actually say that they thought it was

4    binding?

5           MS. ZAMBRANO:  They probably did not use -- let me --

6    I can quote the exact words, but they --

7           THE COURT:  I mean, obviously --

8           MS. ZAMBRANO:  -- there's not debat --

9           THE COURT:  -- Judge Rakoff is a very respected judge

10   and when he says something, like E.F. Hutton, I listen.  But

11   even Jed Rakoff isn't binding on me.

12          MS. ZAMBRANO:  That's correct, Your Honor.  I would

13   suggest that the intimation -- actually, the direct assertion

14   by the claimants that there is some up and down or back and

15   forth amongst the judges in this circuit as to whether someone

16   has to wait until an objection has been filed to a claim before

17   they can assert to file a 9014 motion, is just not accurate.

18   There is no such law.  The three decisions on this point --

19          THE COURT:  Are all uniform --

20          MS. ZAMBRANO:  that's correct.

21          THE COURT:  -- and, of course, I'm on record in my

22   published decisions as talking about uniformity within the

23   Southern District of New York.

24          MS. ZAMBRANO:  Judge Bernstein had a very early

25   decision in which he sort of wandered around the point, but he

Page 119

1    came back in, In re Musicland and agreed with the Ephedra

2    decision and Judge Rakoff's reasoning.

3          So applying these principles here, as the Court knows,

4    this debtor filed for bankruptcy on June 1st, 2009.  On

5    September 16th, 2009, the Court entered the bar date order that

6    established November 39th, 2009 as the bar date.  During this

7    entire period of time, despite the plaintiff's -- the

8    claimant's counsel receiving notice of this order and the bar

9    date.  They did nothing to assert a clai -- a class claim.

10   They simply filed their class claim along with the other,

11   approximately, 70,000 that the debtor received.  Only when the

12   debtors objected to the claim, did the claimant seek to apply

13   Rule 7023.

14         In this district, I would assert that that's not

15   appropriate under our case law.  Whether it's, as you say,

16   binding so far or not, there is no case law that suggests that

17   that's an appropriate behavior for a class claimant who is

18   supposed to be protected the rights of their putative clients.

19         THE COURT:  Pause, please, Ms. Zambrano.  The

20   principal authority for saying you can wait is the Eleventh

21   Circuit's decision in Charter?

22         MS. ZAMBRANO:  That's as I understand it, yes, Your

23   Honor.

24         THE COURT:  To what extent have bankruptcy courts in

25   this district followed the Charter approach?

09-50026-mg   Doc 7836   Filed 11/10/10   Entered 11/18/10 11:40:50   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 120 of 164

Page 120

1          MS. ZAMBRANO:  I haven't seen anyone except for that

2     early decision by Judge Bernstein -- and I can get the cite if

3     you'd like.  But I don't think that was the most important

4     point in the earlier Judge Bernstein decision.

5          Mr. Smolinsky would like me to read from In re

6     North -- the passage that I quoted him earlier from In re

7     Northwest Airlines Corp.

8          THE COURT:  That would be Judge Gropper, of course.

9          MS. ZAMBRANO:  Yes.  And this is when the courts are

10    wrestling with this issue. He says, "The reasoning of Charter

11    with respect to the procedural issues has been rejected in this

12    circuit."  That's where I get the binding.  "As stated in the

13    Ephedra case, the Court disagreed with the Charter's view that

14    an objection was necessary to have a contested matter

15    triggering the Court's discretion under Rule 9014."  Some

16    other --

17          THE COURT:  Could you read that slower, please, Ms.

18    Zambrano?

19          MS. ZAMBRANO:  Sure.  The intro to the quote says as

20    follows, "Moreover, the reasoning of Charter with respect to

21    the procedural issues has been rejected in this district.  As

22    stated in the Ephedra case," Ephedra being Rakoff's --

23          THE COURT:  With that being Judge --

24          MS. ZAMBRANO:  Rakoff.

25          THE COURT:  -- Rakoff's decision.

Page 121

1          MS. ZAMBRANO:  -- "the Court disagreed with the

2     Charter's", the Eleventh Circuit's, "view that an objection was

3     necessary in order to have a contested matter" --

4          THE COURT:  Okay.  That's why I asked you to slow

5     down.  Where I need help from you is that Judge Gropper's

6     saying he disagrees with Charter or saying that he agrees with

7     Rakoff when Rakoff disagrees with Charter?  Who was it who

8     first said he disagreed with Charter?

9          MS. ZAMBRANO:  I believe it was Judge Rakoff in the

10    Ephedra case.

11         THE COURT:  And then Allan Gropper agreed with Judge

12    Rakoff?

13         MS. ZAMBRANO:  As well as Judge Bernstein in the In re

14    Musicland case.

15         THE COURT:  Now I'm with you.  Now I'm with you,

16    continue, please.

17         MS. ZAMBRANO:  Okay.  Excuse me.  "Of course it is the

18    claimants who are supposed to be protecting the rights of these

19    putative class members and who have the burden of timely

20    prosecuting these claims.  It cannot be, regardless of this

21    dec -- these decisions, that it's the debtors' objection to a

22    class claim after the bar date gives the claimants more time to

23    proceed as a class.  Rather, the claimants here were required

24    to obtain permission to proceed as a class as soon as

25    practicable."

MOTORS LIQUIDATION COMPANY, et al.

Page 122

1         And that language is in all of the Southern District

2   of New York cases regarding these issues.  What that means here

3   is that they could have requested permission to proceed as a

4   class as early as the petition and as late as the bar date

5   order -- the bar date, excuse me, on November 30th.

6         Now, I want to note something specifically here, Your

7   Honor.  We -- I have appeared before Your Honor on class action

8   matters and it is important to note that there are class

9   plaintiffs who did recognize their obligation to move under

10  Rule 9014 and approached the debtors.  And recognizing this

11  obligation that they needed authority to proceed as a class in

12  these bankruptcy matter, negotiated stipulations with the

13  debtors and Your Honor entered orders --

14        THE COURT:  That was --

15        MS. ZAMBRANO:  -- on those.

16        THE COURT:  -- in the context in which you had

17  appeared before me.

18        MS. ZAMBRANO:  I entered -- I appeared before on a

19  class action claim that had not been certified but was

20  resolv -- was settled and resolved.

21        THE COURT:  I see.

22        MS. ZAMBRANO:  But it was certified before and that

23  being obviously different here.

24        THE COURT:  A pre-petition certification?

25        MS. ZAMBRANO:  Correct.

09-50026-mg    Doc 7836    Filed 11/10/10    Entered 11/18/10 11:40:50    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 123 of 164

Page 123

1          THE COURT:  Well, that makes all the difference in the

2     world.  At least in terms of taking an issue off the table,

3     doesn't it?

4          MS. ZAMBRANO:  It does, but it eve -- but it suggests

5     why -- if you aren't certified, why would you expect that you

6     do not have to move under Rule 9014?  If you're certified,

7     courts have held that it's more reasonable for people in you

8     class to expect that you are representing them and so there's

9     more forgiveness there.

10          Here, there was every reason in the world that they

11     should have come to us or filed a motion and asked the Court to

12     permit them to assert a claim on behalf of these claimants.  I

13     think I heard one of the claimant's counsel say that there were

14     thousands of people in South Africa who believe they have

15     claims against GM.  Well, why didn't they file a proof of claim

16     in this bankruptcy?  Why didn't the plaintiff's counsel who has

17     specifically had notice, Ms. Sammons who is here today, of the

18     bar date order indicate to these plaintiffs that they needed to

19     file a proof of claim or otherwise effect notice?

20          THE COURT:  Ms. Zambrano, lower the tone a little.  I

21     understand that you're passionate.  I'm sure your opponents are

22     passionate, too, but they kept their voices under control.  I'd

23     appreciate it if you did likewise.

24          MS. ZAMBRANO:  I will.

25          Let's focus on the bar date for a moment.  What the

MOTORS LIQUIDATION COMPANY, et al.

Page 124

1    claimants are really attempting to do in my view is to extend

2    the bar date which passed, of course, nearly a year ago.  Such

3    an extension would violate due process rights of other

4    creditors that Your Honor has referred to today, who timely

5    filed their proofs of claim.  And it simply should not be

6    permitted.

7           And for these reasons, not withstanding the Kiobel

8    decision, we believe that the class proof of claim -- excuse

9    me, the class claimants' claim should be expunged.

10          MS. ZAMBRANO:  Then the second reason that they should

11   be expunged was that even if the Court were to overlook Kiobel

12   and if they were to -- even if you were to allow the untimely

13   request to apply Rule 7023, the Court should not exercise its

14   discretion to apply Rule 7023 here.

15          In determining whether to permit a class proof of

16   claim, courts consider whether the benefits that generally

17   support class certification in civil litigation are realizable

18   in the bankruptcy matter.  Many courts have held that the

19   benefits derived from the use of the class action device are

20   not consistent with the bankruptcy setting.  As explained by

21   Judge Bernstein in In re Musicland, bankruptcy provides the

22   same procedural advantages as class actions.  In fact, it

23   provides more advantages.  To use his words, "Creditors, even

24   corporate creditors, don't have to hire a lawyer and they can

25   participate in the distribution for a price of a stamp.  They

1    need only fill out and return the proof of claim form."  Time

2    and again then, courts have emphasized that the discretion to

3    permit a class claim in bankruptcy should be exercised most

4    sparingly and this is setting aside the timely issue.

5             And so in general, courts have only allowed class

6    claims to proceed in bankruptcy in two situations; one in which

7    the class was certified prepetition by a bankruptcy court --

8    excuse me, by a non-bankruptcy court and second where there has

9    been no actual or constructive notice to the class members of

10   the bankruptcy case and the bar date.

11            While courts have consistently noted that classes

12   certified prepetition are the best candidates for class

13   treatment in bankruptcy, some courts have even decided that

14   classes that were certified prior to bankruptcy cannot be

15   certified in the -- cannot be allowed to proceed as a class in

16   bankruptcy.

17            It is stipulated here by the claimants, of course,

18   that there has been no class certified in either of the

19   putative class complaints attached to their proofs of claim.

20   Indeed, although these cases have been pending since 2000 --

21   2002 and 2003, no motion for class certification has ever been

22   filed and no -- importantly, no class certification discovery

23   has ever occurred.

24            THE COURT:  You mean in the plenary actions in the

25   period from 2002-2003 to 2009 when the MLC case was filed?

09-50026-mg    Doc 7836    Filed 11/10/10    Entered 11/18/10 11:40:50    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 126 of 164

Page 126

1          MS. ZAMBRANO:  Correct.  Correct.

2          THE COURT:  Do you have knowledge or belief that isn't

3    speculation as to why?  That's a long time.  Normally -- well

4    again, I'm going back to when I was a litigator and maybe

5    things have changed over the years but normally, class action

6    certification would be considered very early in a plenary

7    litigation.

8          MS. ZAMBRANO:  The rule says, Federal Rule of Civil

9    Procedure 23 says, of course, it should be considered as soon

10   as practicable.  I wasn't involved in litigation.  I did hear

11   from claimant's counsel today and I have seen on the docket

12   that there were -- had been a number of appeals of the Court's

13   denial -- of the motions to dismiss rulings.

14         Right before the bankruptcy filing in April of 2009,

15   there was the second motion -- denial of the second motion to

16   dismiss which, of course, was appealed by the non-GM, non-MLC

17   defendants.  And that we've referred to that today that's on

18   appeal.

19         THE COURT:  Uh-huh.

20         MS. ZAMBRANO:  The debtors have not found any decision

21   in the Southern District of New York or otherwise in which an

22   uncertified class action has been permitted to proceed in a

23   class -- as a class in the bankruptcy and the claimants have

24   not cited one either.  Thus, the claimant's attempt to rely on

25   a very narrow exception for allowing class claims in bankruptcy

09-50026-mg   Doc 7836   Filed 11/10/10   Entered 11/18/10 11:40:50   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 127 of 164

Page 127

1   complaining of the worldwide notice of the bar date that was

2   provided by the debtors at a cost to the estate of nearly 1.3

3   million dollars.  Effectively what they're asking the Court to

4   do is to declare that the notice provided to the putative class

5   of millions of people in South Africa was not sufficient and

6   certify a class in the bankruptcy so that additional notice can

7   be provided to those same claimants at the expense of the

8   estate.

9          This must be rejected for three reasons.  First, as we

10  talked about in our papers, non-US citizens such as those that

11  we're dealing with here -- there are exceptions but like the

12  ones that we're dealing with here who are not in this country

13  and do not have any property in this country, they are not

14  entitled to due process notice under our constitution.  And

15  I'll talk more about that in a moment.

16         Second, even if due process did apply to the

17  claimants, the constructive notice provided to these claimants

18  was sufficient according to the standards articulated by our

19  Supreme Court in Mullaney.

20         And third --

21         THE COURT:  Well, pause, Ms. Zambrano.  Even John

22  Roberts who normally can be pretty tough on plaintiffs, when he

23  found that there was a practical way to give notice to somebody

24  and that didn't materialize, he found that notice

25  unsatisfactory.  I've forgotten the name of the case.  Your

Page 128

```
 1    opponent, Mr. Olson, argues in substance that if you wanted to

 2    give notice to the Black South African community in South

 3    Africa, there were a zillion better ways of doing it than using

 4    the international edition of The Wall Street Journal or USA

 5    Today or whatever that third publication was -- was it The

 6    Times?

 7            If you didn't have to give notice because you could

 8    rely on class plaintiffs or the fact that they don't have the

 9    rights that folks in the U.S. would, that of course moots of

10    all of these concerns, but if I wanted to give notice to that

11    community I wouldn't have chosen those three papers to do it.

12            MS. ZAMBRANO:  Well let me start with the Supreme

13    Court's words.  What they said is, "It has been recognized that

14    in the case of persons missing or unknown, employment of an

15    indirect and even a probably futile means of notification is

16    all that the situation permits and creates no constitutional

17    bar to a final decree foreclosing their rights."

18            Now what I found interesting about --

19            THE COURT:  That's from Mullaney?

20            MS. ZAMBRANO:  That's from Mullaney.  What I found

21    interesting about the claimants' complaints about the

22    publication notice was that there -- they admit that there is

23    not a single primary language for the majority of the putative

24    class.  They identify seven -- excuse me, eleven South African

25    publications that are purportedly more likely to reach
```

Page 129

1    according to them, the putative class members but even then,

2    none of them are asserted to be sufficient to reach a majority

3    of the class members.  Instead they seem to suggest that the

4    only notice that would be adequate for these unknown alleged

5    claimants would be a comprehensive outreach to all Black South

6    Africans and they refer to in their papers, non-governmental

7    intermediaries.  That's what they're suggesting would be

8    sufficient.  And, Your Honor, in our view under Mullaney,

9    that's not required.

10           I would also note that to the extent that the

11   claimants counsel believed that the procedures that Your Honor

12   was setting up with respect to the notice were inappropriate or

13   would not satisfy due process with respect to their claimants.

14   They could have been objected and been heard in that process

15   when the debtor was constructing and negotiating with the

16   creditors committee about how much money and how to effect

17   notice to the various claimants around the world.

18           There are claimants across the world that filed claims

19   against GM.  And so really what they're asking you to do is to

20   find that for these particular claimants, the bar date should

21   be extended.

22           Should I go ahead and go to the Ah Robins case about

23   due process?  Maybe that would be --

24           THE COURT:  Sure.

25           MS. ZAMBRANO:  The Fourth Circuit in that case -- and

09-50026-mg    Doc 7836    Filed 11/10/10    Entered 11/18/10 11:40:50    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 130 of 164

Page 130

1     this is good law, Your Honor.  It has not been overturned and

2     there is not any -- when you pull it up on Westlaw there is not

3     a red flag or even a yellow flag.  It is good law.  And what

4     they found replying on -- relying, excuse me, on Supreme Court

5     precedent, held that foreign claimants are not entitled to due

6     process notice of a bar date.

7              Now the Ah Robins case, of course, was different in

8     that there was a broader notice provided but what was

9     interesting --

10             THE COURT:  This was on Dalkon Shields?

11             MS. ZAMBRANO:  That's correct.  What's interesting

12    about that though, it goes exactly to the point that I just

13    raised, the claimants and counsel in those cases objected to

14    the bar -- or to the notice procedures early on claimed that

15    they were not going to be sufficient.  So they required the

16    debtors to go out and revamp their notice procedures,

17    notwithstanding all that, the Court -- its initial holding is

18    that non-foreign or excuse me, foreign -- non-United States

19    citizens are not entitled to due process notice of a bar date.

20             Now there is a variety of cases that are cited in, I

21    think it's the reply in support of their motion to -- under

22    7023, that deal with this point and essentially they are all

23    not on point because they are dealing with foreign claimants

24    who have either a property right in the United States or they

25    are non-resident aliens that are here.  And of course the

1   Supreme Court has treated that and Circuit Courts have treated

2   them differently because they do have due process -- there are

3   due process implications when someone comes in our country.

4        But when you're talking about foreign claimants that

5   are across the world and have no property interests here, the

6   Court ruled squarely, squarely that they are not entitled to

7   due process notice.  Now notwithstanding that, of course, we

8   did the publication notice.  And as I've described, I believe

9   that it was reasonable in these circumstances.  It was

10  published internationally in over ninety countries at a cost of

11  1.3 million dollars to this very strained estate.  More

12  specifically, we published in not just one, but we did publish

13  in three publications that are distributed throughout South

14  Africa.

15       THE COURT:  That being The Times, The Wall Street

16  Journal and USA Today?

17       MS. ZAMBRANO:  That's correct, Your Honor.  And of

18  course as I noted earlier, we did specifically direct notice to

19  the plaintiff's counsel, as well.

20       THE COURT:  So what are you trying to give notice to

21  the South African hedge funds?

22       MS. ZAMBRANO:  I believe, Your Honor --

23       THE COURT:  Look, I understand your points about Ah

24  Robins, I understand a lot of other things but if you're trying

25  to give notice to a certain community, are you looking me in

Page 132

1    the eye and telling me that that was the way that was

2    calculated to give notice to those people?

3            MS. ZAMBRANO:  I'm looking you in the eye and telling

4    you that this was a very large estate as Your Honor is much

5    close to than I am, and that in these circumstances the debtors

6    with the creditor constituencies spent significant effort in

7    determining what would be an appropriate notice procedure.  And

8    under the circumstances, and with the resources that we have,

9    we believe we did the best job that we could. And -- as to all

10   claimants and that's why we think the bar date is sufficient.

11           THE COURT:  Well why don't you try to protect your

12   credibility on your stronger points?

13           MS. ZAMBRANO:  Okay, Your Honor.  Let me move to then

14   what would be the harm at this point to permitting, basically

15   effectively to allow these particular claimants to extend the

16   bar date for them and come in.  I believe, Your Honor, that at

17   this juncture the Court, you know, of course has just set a

18   hearing, hopefully a final hearing on the approval of the

19   debtors' disclosure statement.  The debtors have through great

20   effort negotiated that plan of liquidation with their creditors

21   and hopefully solicitation and confirmation will occur soon.

22           Noticing and liquidating a class action of the nature

23   and the size that we're talking about here involving at a

24   minimum by plaintiffs' own estimates, tens of thousands, I

25   would submit that it's more like millions of people in --

Page 133

```
 1    across the world would seriously delay the distribution of the

 2    debtors' estates.

 3          We, of course, did ask in the alternative for Your

 4    Honor to help us estimate the claims if you don't outright

 5    expunge them.  Frankly, we're not even sure how to do that in

 6    an expedited way.  There are simply too many factual

 7    circumstances and short of doing what the claimants' counsel

 8    referred to in Hilao which has been specifically criticized in

 9    this jurisdiction, she referred to the assumptions regarding

10    liability and assumptions regarding damages.  What the Court

11    did was basically put people in buckets:  If you were tortured,

12    this is how much you received; if you were raped, this is how

13    much you received.  That was specifically rejected by Judge

14    Cote in the Talisman case and for some -- for a lot of good

15    reasons.

16          But without doing that which we think is not

17    appropriate, how do you do this?

18          THE COURT:  Well Denise Cote wouldn't be using a

19    502(c) estimation mechanism.  She was talking about the

20    underlying claims allowance process or the district court

21    equivalent of that; am I correct?

22          MS. ZAMBRANO:  She was but she was noting in that

23    discussion that the constitutional concerns that that raised

24    for a defendant as to a finding of liability with respect to

25    that plaintiff and that defendant and damages of that plaintiff
```

Page 134

1    and that particular defendant, primarily the liability and the

2    constitutional issue.  And so I think it is germane that the

3    Court said that that -- she had great concerns and rejected

4    that type of treatment.

5         And I do want to note as well that that decision, the

6    Hilao decision out of the Ninth Circuit was before the Supreme

7    Court's decision in Amchem, which radically changed Rule 23's

8    interpretation.

9         The fourth reason that the claims should be expunged

10   is that even if the Court overlooks Kiobel, even if the Court

11   would permit the filing of a class or a motion to treat -- to

12   allow a class claim at this late point and exercise its

13   discretion to apply Rule 7023, the benefits of Rule 23 could

14   not be realized in this bankruptcy proceeding because the

15   claimants simply cannot satisfy Rule 23.  And listening to Your

16   Honor's opening remarks, I'm going to focus specifically on

17   Rule 23(b)(3).  We, of course, do not concede Rule 23(a)'s

18   requirements but I'll focus on 23(b)(3).

19        THE COURT:  Which of the 23(a)s do you have a problem

20   with?

21        MS. ZAMBRANO:  I think typicality is particularly

22   difficult here.  The plaintiffs have -- the claimants have

23   suggested in their papers quite openly that there are

24   subclasses of GM defendants or GM plaintiffs but respectfully,

25   that's just not the case.  There are allegations that would go

09-50026-mg    Doc 7836    Filed 11/10/10    Entered 11/18/10 11:40:50    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 135 of 164

Page 135

1    to the automobile industry or the -- in some cases there are

2    specific references to GM but I don't think that you can say

3    that a particular plaintiffs' case claims are typical of any

4    other plaintiffs' claims in this case based on the class

5    certification -- based on the fact that we don't have class

6    certification discovery looking at this from the abstract.  We

7    don't even know which of the class -- the named class

8    plaintiffs allege any harm by -- against -- by MLC formerly

9    known as GM.  So, I don't think that they can say that their

10   claims are typical yet but I will focus on Rule 23(b)(3).

11          THE COURT:  Well I thought you were going to say the

12   mirror image of that.  I mean Ms. Sammons read to me two or

13   three paragraphs from the complaint where they talk about GM

14   reporting union activity, picking on one guy in particular and

15   so forth.  Now I can see why you would say that that guy's

16   circumstances aren't typical of others but it isn't that they

17   failed to allege GM involvement in certain of the wrongful --

18   alleged wrongful conduct.

19          Is it your point, and if so I think I'd understand it,

20   that that guy's experiences which I think most right thinking

21   people would consider pretty awful and pretty offensive, have

22   not been shown to be typical of other people who were treated

23   as badly as he was and/or in the fashion in which he was.

24          MS. ZAMBRANO:  Exactly, Your Honor.  Exactly.  And

25   again, some of that is without the benefit of class

Page 136

1    certification discovery.  I don't know which of their named

2    plaintiffs have received that abhorrent kind of treatment

3    versus which ones haven't.  I just don't think that we can

4    admit at this stage that their claims are typical.  But I would

5    concede --

6              THE COURT:  And that would be a 23(a)(2) issue if I --

7    well I'd have to go back and see which --

8              MS. ZAMBRANO:  That's correct.

9              THE COURT:  -- of the four subsections is which but

10   that's your point.

11             MS. ZAMBRANO:  Me, too and that's correct.

12             THE COURT:  Okay.

13             MS. ZAMBRANO:  Yes.  So 23(b)(3), of course, requires

14   that the Court find that questions of law or fact that are

15   common to the members of the class predominate such that --

16   excuse me, over any questions affecting only individual members

17   and that a class action be superior to other available methods

18   for the fair and efficient adjudication of the controversy.

19   Focusing on predominance for a second, and of course these

20   requirements are referred to as the predominance and

21   superiority aspects of Rule 23(b)(3), many, many reasons they

22   do not satisfy these requirements.

23             I want to make clear, however, that -- and I've

24   referred to this a few times, in the event that the Court were

25   allowed -- were inclined to allow these claims to proceed we

MOTORS LIQUIDATION COMPANY, et al.

Page 137

1    would, of course, need class certification discovery to fully

2    address these issues.  We are making these arguments based on

3    the allegations alone.

4         The individualized proofs required to be presented to

5    establish the tens of thousands of claimants are entitled to

6    relief under this statute, the alien tort statute, for actions

7    that took place across the world for over a span of decades to

8    millions of people in a factual -- in a multitude of factual

9    circumstances would quite simply swamp the proof on any common

10   issues of liability.

11        The plaintiffs claims that GM aided and abetted the

12   South African government's violations of the alien tort statute

13   requiring highly individualized and specific, fact-specific

14   finding, in addition to showing that each plaintiff was a

15   victim of the tort alleged, the plaintiff must demonstrate the

16   elements of an aiding and abetting claim with respect to each

17   plaintiff.  These elements were outlined in the Second

18   Circuit's decision in Talisman, Presbyterian Church of Sudan v.

19   Talisman Energy.  And we've been referring to Talisman a couple

20   of times today so I want to make clear, this is the Second

21   Circuit's decision in which after Judge Cote denied class

22   certification, the individual named plaintiffs proceeded and

23   the case went to the Second Circuit.  And in that case --

24        THE COURT:  Proceeded as a non-class action.

25        MS. ZAMBRANO:  Correct, Your Honor.  And in that

09-50026-mg    Doc 7836    Filed 11/10/10    Entered 11/18/10 11:40:50    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 138 of 164

Page 138

1    decision then the Court was wrestled with what is the

2    appropriate showing that a plaintiff needs to make to establish

3    aiding and abetting liability.  And what they found was that

4    they must show that with respect to each plaintiff, that the

5    defendant provided practical assistance to the principal that

6    has a substantial affect on the perpetration of the crime and

7    does so with the purpose of facilitating the commission of that

8    crime.

9            Indeed, the Second Circuit made clear that there was

10   no basis for imposing liability on individuals who even

11   knowingly but not purposefully aided, abetted -- and aided and

12   abetted a violation of international law.  So it's not just

13   that GM, former GM would have had to know about it.  They need

14   to prove with respect to each putative claimant that GM -- the

15   former GM purposefully aided and abetted a violation of

16   international law.

17           So for each class member, they must prove the tort

18   occurred, that GM provided practical assistance that had a

19   substantial affect on the perpetration of that tort and that a

20   GM employee did so with the purpose of facilitating the

21   commission of that crime.  So the example that claimants'

22   counsel gave you is just one of the multitude of different

23   factual scenarios that they would be required to prove on

24   behalf of every claimant.  And that is why we believe that the

25   proof on the individual issues would swamp any proof required

09-50026-mg   Doc 7836   Filed 11/10/10   Entered 11/18/10 11:40:50   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 139 of 164

Page 139

1    on common issues.

2         The plaintiffs are really alleging a mass tort and

3    mass torts involve critical individualized issues including

4    causation and damages.  The majority of courts therefore have

5    refused to certify class actions in mass tort cases.  Courts in

6    this district and I'm going to refer now back to Judge Cote's

7    decision when considering whether to certify a class in cases

8    alleging claims quite similar to the apartheid claims have

9    refused to do so.  In that district court decision in Talisman,

10   current and former residents of Southern Sudan brought suit

11   under the alien tort claims act against a Canadian energy

12   company and the government of Sudan alleging that they were

13   victims basically of the same crimes here; extrajudicial

14   killing, genocide, crimes against humanity, torture, rape and

15   other violations of international law.  And that all resulted

16   from the defendants' ethnic cleansing of an area around the oil

17   fields.  The plaintiffs' sought certification of a very large

18   class, a putative class of certain non-Muslim African Sudanese

19   citizens who had been injured by the Sudan military or allied

20   malicious war crimes.  In particular, areas around those oil

21   fields.  The total number of claimants estimated was between

22   114,000 to 250,000.  And the claims involved hundreds of

23   separate attacks.

24        In Talisman, the Court denied class certification

25   after going through all of the cases that were existing at that

1    time that claimants' counsel has discussed today and

2    specifically held that the plaintiffs would have to show with

3    respect to each individual class member that the injuries for

4    which they were claiming damages were actually caused by the

5    campaign of genocide and crimes against humanity targeting non-

6    Muslim African Sudanese.

7         And to do that, factual issues that were individual to

8    each attack, to each instance, would have to be determined.

9    Given the need for evidence of proximate causation, not some

10   sort of a general causation that the Talisman Energy Group was

11   in coordination with -- was working in coordination with the

12   government of Sudan but with proximate cause as to each

13   particular class plaintiff.  And the allegations would be --

14   involve hundreds of thousands of class members, hundreds of

15   individual attacks, massive geographic area and six and a half

16   year time period; the Court found that the challenge of

17   presenting individual proof on behalf of thousands of class

18   members even if it were logically feasible would quickly

19   dominate the proof regarding any common issues.

20        The parallels between the putative class action in

21   Talisman that Judge Cote grappled with and the putative class

22   in this matter are plain.  In both cases you have a proposed

23   class definitions that link membership with the merits of the

24   plaintiffs' claims, that allege liability of the corporate

25   defendant stems from the alleged activities of a sovereign

1    nation.  The putative class period spans many years.  The

2    allegations involve hundreds or as we say, probably millions

3    here, of claimants in individual attacks.  Each member of the

4    putative class would be required to show that the act that

5    caused the harm he has alleged to have suffered was the product

6    of collaboration, again with purpose by GM, former GM in the

7    apartheid regime.

8           The impossibility of this task is apparent in the face

9    of a class consisting here of thousands of individuals alleged

10   to be injured in separate instances occurring at different

11   times over several decades and spread across the entire country

12   of South Africa.

13          Now plaintiffs argue that Talisman is not on point

14   primarily because of the tribal warfare that was going on in

15   that country and that explains the Court's focus on proximate

16   cause but I want to read a brief quote from Talisman that

17   squarely addresses that and rejects it.  "In any event, the

18   dilemma of proving proximate causation would exist in this case

19   even in the absence of intertribal warfare that the Talisman

20   trumpets."  She said that "The plaintiffs apparently envisioned

21   simply establishing in a general fashion that the campaign

22   existed and will leave for another day the specific proof of

23   attacks pursuant to the campaign that injured individual class

24   members.  It is the need for evidence of such linkage for

25   evidence of proximate causation that signals the doom for Rule

Page 142

1    23(b)(3) certification, given the only way to proof proximate

2    causation," not damages as the claimants suggest but "proximate

3    causation for claimants is through individual proof.

4    Litigation through representatives will not suffice.  The

5    challenge of presenting that individual proof on behalf of

6    thousands of class members even if it were logistically

7    possible or feasible," excuse me, "will quickly dominate the

8    proof regarding the common issues."

9            And so, Your Honor, I liken this to a situation in

10   securities law which I do a little of where a general fraud

11   claim versus a claim under the Federal Securities Act in which

12   the --

13           THE COURT:  By Federal Securities Act you mean the 33

14   Act?

15           MS. ZAMBRANO:  Correct.  And so -- or the 34 Act for

16   that matter.

17           THE COURT:  Well 34 Act permits fraud on the market

18   cases which are more capable of being handled in a class action

19   than say 12-2 cases face-to-face fraud type cases and so forth.

20           MS. ZAMBRANO:  And that's the analogy I'm drawing.

21   This is not a situation in -- for example, one of the cases

22   that they cited and that was spoken about today was the Doe v.

23   Gap case and that was the Saipan workers.  And in that case, a

24   class action was certified because there was -- the proximate

25   causation -- I know it's reliance and securities fraud but the

Page 143

1    analogy being there -- that it could be established on a class

2    wide basis that if there were a policy of involuntary

3    servitude, basically you would establish that you worked at

4    that time and then the damages would be your hours.  And that

5    could work.

6            But contrast that in the analogy to a securities fraud

7    case versus a general fraud case where courts have consistently

8    declined to permit class treatment because the reliance issue

9    has such individual ramifications and individual, factual

10   circumstances.  And I think that is an appropriate analogy.

11           There are certainly mass tort cases in which courts

12   have certified class actions but that is the distinction.  The

13   distinction is whether there is some class wide issue that can

14   be result.  Reliance can be presumed.  Causation can be

15   established because of a policy.  We cannot establish a policy

16   just of apartheid in this case.  It has to be that the

17   particular plaintiffs suffered harm because of the aiding and

18   abetting that MLC, previously GM, participated in and caused

19   damages to these plaintiffs.  That's what's required under the

20   Second Circuit precedent in Talisman on aiding and abetting.

21           Finally, Your Honor, I just want to note that given

22   the -- well two things with respect to where we go next.  I

23   have already addressed Your Honor's question regarding whether

24   to wait is sufficient here.  Your Honor, we believe that that

25   would not be prudent given that the overhang that this class

Page 144

1    claim represents in this bankruptcy, we do need to move on. The

2    Second Circuit decision is on point as much as it could be and

3    we believe that we need -- that the claims should be expunged,

4    not --

5              THE COURT:  Well let me ask you a question on that and

6    I would well understand if you'd want to talk to Mr. Smolinsky

7    about it.  I have existing law that says yes, I am bound to

8    dismiss the claim.  The Circuit could grant en banc review or

9    it might not.  It might do it in the next two weeks before the

10   disclosure statement's finalized or it could do it in 2011 or

11   God knows what else.

12             502(j) of the Code provides for a court, if a claim

13   has been -- and I'm putting it in context -- disallowed, it may

14   be reconsidered for cause.  Would you agree that if the Circuit

15   did vacate the panel decision upon which the claim would be

16   disallowed it would be appropriate for 502(j) reconsideration?

17             MS. ZAMBRANO:  I am going to consult with Mr.

18   Smolinsky.

19             THE COURT:  I would if I were you as well.

20        (Counsel confer)

21             THE COURT:  Mr. Smolinsky?

22             MR. SMOLINSKY:  Good afternoon, Your Honor.  Joe

23   Smolinsky at Weil Gotshal for the debtors.

24             I have been listening to this entire afternoon of

25   argument and I guess I certainly recognize that 502(j) exists.

1    I certainly understand that this appeal were the en banc

2    request is out there.  The problem that we have is that we

3    can't put a box around this allegation.  I haven't heard what

4    the definition of the class is.

5            According to my Google search, there are 49 million

6    residents of South Africa, seventy-nine percent of those are

7    Black South Africans.  Is that the class that we're talking

8    about?  Are we talking about forty million potential claimants?

9    Are we talking about tens of thousands?

10           If we're only talking here about the named claimants,

11   then we could probably put a box around it and we could address

12   Your Honor's concerns if your decision is based solely on

13   whether Kiobel gets affirmed or approved by the en banc panel.

14           But with this unknown potential class of tens of

15   millions of claimants, it becomes -- the 502(j) is just not

16   practical because by the time that we got through what would be

17   months and months and months of class certification discovery,

18   the most -- most of the distributions in this case hopefully

19   will have been made already.

20           THE COURT:  Thanks.  Okay.  I'm not sure if you were

21   done or not, Ms. Zambrano.

22           MS. ZAMBRANO:  I have one more brief point and I don't

23   know how well it will be received but I do want to note that in

24   the proposed -- we submitted a second proposed order because in

25   the event that Your Honor was inclined to grant a request to

09-50026-mg   Doc 7836   Filed 11/10/10   Entered 11/18/10 11:40:50   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 146 of 164

Page 146

1   expunge these claims for the reason that Mr. Smolinsky just

2   noted, we don't want to though on the other hand have to

3   reserve for these claims given the impossible box that we're

4   forced to try to draw around these claims.  And so therefore,

5   the proposed order that we submitted specifically indicates

6   that we do not have to reserve for these claims in light of any

7   appeal which we think would be not successful given Kiobel, of

8   course -- our view of Kiobel.  And I wanted to bring that to

9   the Court's attention that we did that specifically so that we

10  won't have the claims expunged but then be really in a catch 22

11  because we would have to deal with any issues on appeal and

12  reserve and that question not be decided.  So we specifically

13  clarified that in the proposed order.  Thank you for your time,

14  Your Honor.

15          THE COURT:  Thank you.  Okay. I'll take reply but

16  obviously it's got to be a lot shorter than what I heard on the

17  first round from each of you.

18          MR. OLSON:  Thank you, Your Honor.  Again, Steig Olson

19  from Hausfeld, LLP.  I'll try to keep this as brief as I can

20  and pick up on Your Honor's cues about what interests you or

21  not.

22          On Kiobel, I can set the matter straight for the

23  Court, it's true that the corporate liability issue was raised

24  in our case and briefed.  Not only that, significantly we

25  filed, I don't know maybe ten amicus briefs or ten amicus

Page 147

1   briefs were filed on our behalf by some of the world's most

2   distinguished legal scholars.  So that issue was presented in

3   our appeal.

4           Now for whatever reason, Judge Cabranes couldn't get

5   another judge in our case to agree with him that there was no

6   corporate liability under the ATS and in fact, you know, no

7   court's ever held that.  But Judge Cabranes was also on the

8   Kiobel panel and as MLC didn't dispute, there's not only no

9   briefing, there was no -- none of the amicus briefs were

10  presented to the judges in that panel.  They simply had no

11  argument at all on that.

12          THE COURT:  Pause please.  When you said Judge

13  Cabranes couldn't get two others to convert, is that sensed --

14  something you sensed from the oral argument?  I didn't

15  understand that there was actually a written decision on yours.

16          MR. OLSON:  Oh, I only say that because there was no

17  ruling in our case.  And it would --

18          THE COURT:  And Judge Cabranes was on the panel.

19          MR. OLSON:  Yes.

20          THE COURT:  And were there two other Circuit judges or

21  a visiting judge or a district judge?  Who else was on the

22  panel?

23          MR. OLSON:  It was Judge Hall and Judge Livingston,

24  both Circuit judges.

25          THE COURT:  Uh-huh.

Page 148

```
 1              MR. OLSON:  And this is a bit of conjecture but, of

 2    course, the issue was presented in our case.  It was briefed.

 3    There were the amicus briefs.  So it would seem logical to --

 4    if that ruling was going to be reached to have been in our

 5    case, as well as opposed to another case that Judge Cabranes

 6    also happened to be in where the issue was literally not

 7    briefed, where the judges there received no benefits of legal

 8    scholarship from amicus briefs.  But Judge Cabranes evidently

 9    found one judge there who shared his opinion and --

10              THE COURT:  That being Judge Jacobs.

11              MR. OLSON:  Yes, the Chief Judge; yes.  And, of

12    course, Judge Leval who strongly dissented.  And so I say that

13    because I know Your Honor wants to understand the landscape

14    there but also because I think --

15              THE COURT:  Well on one level I do want to understand

16    the landscape.  On the other level, I am not such a lawless

17    beast that I disregard binding authority from the Second

18    Circuit.

19              MR. OLSON:  Well I can't imagine, Your Honor, that any

20    judge would be accused of being a lawless beast by not taking

21    action that would have a prejudicial effect immediately after a

22    decision, while an en banc petition is pending particularly

23    where there can really be no doubt that procedurally there were

24    some oddities that as Your Honor noted raised eyebrows about

25    the decision.  I think that was --
```

Page 149

```
 1              THE COURT:  Well I don't know all the facts.  All I

 2      know is that some of the things you said I found a little

 3      surprising.  I'm not being judgmental in that regard.

 4              MR. OLSON:  Oh, absolutely and I understand that, Your

 5      Honor.  If the Court was interested, we do have a copy of the

 6      en banc petition.  Unfortunately we only have one.  I've

 7      highlighted one or two sentences.

 8              THE COURT:  Is it a publicly available on the internet

 9      on the Circuit's ECF?

10              MR. OLSON:  It should be, yes, Your Honor.

11              THE COURT:  Then give enough for your opponent to find

12      it and hand me up what you've got if you can spare it.

13              MR. OLSON:  Okay.  The docket number for this case is

14      06-4800 and there's another docket number which is 06-4876 and

15      I will hand to your clerk the petition for rehearing and

16      rehearing en banc for plaintiffs' appellants, cross-appellees

17      that's dated October 15, 2010.

18              THE COURT:  Okay.

19              MR. OLSON:  And I do that partly because I know Your

20      Honor just wants to know the facts of that matter and that lays

21      them out.  It also addresses the merits, MLC's counsel has

22      addressed the merits and attempted to defend the Kiobel

23      decision.  I don't see any reason to really go down that path

24      in the time we have.  But I --

25              THE COURT:  Whether the panel got Kiobel right or not,
```

09-50026-mg   Doc 7836   Filed 11/10/10   Entered 11/18/10 11:40:50   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 150 of 164

Page 150

1    is not something consistent with my pay grade.  Whatever the

2    Circuit said or ultimately says is what is binding on me.

3             MR. OLSON:  I understand.  So that -- I won't spend

4    any time on that.

5             THE COURT:  Right.

6             MR. OLSON:  The only thing I would mention is, of

7    course, the panel in our case hasn't ruled and it's -- there

8    are ways that the Kiobel decision could be interpreted and that

9    we could react to, we believe, that would allow our case to

10   move forward.  So we don't -- even if the --

11            THE COURT:  You've got to help me on that.  I thought

12   Motors Liquidation Company is a corporation.

13            MR. OLSON:  Motors Liquidation Corporation (sic) is a

14   corporation.  It also has officers and directors who were

15   involved --

16            THE COURT:  Sure.  But I haven't heard them objecting

17   to your going after officers and directors.

18            MR. OLSON:  Well I --

19            THE COURT:  And that doesn't impact upon MLC's

20   creditor community.

21            MR. OLSON:  Well what if -- and again, you know, we

22   haven't explored all of our options here.  We've considered

23   some but it seems to us it could be possible that the GM entity

24   and now the MLC entity, could be liable for actions of officers

25   and directors that took place in the capacity as their agents.

Page 151

```
 1            THE COURT:  Isn't that what any suit against a

 2      corporation is about?

 3            MR. OLSON:  Well I --

 4            THE COURT:  I mean corporations act through their

 5      agents.  Before Cabranes and Jacobs ruled that you can't go

 6      after a corporation, the liability of the corporation would

 7      have been based on the actions of its agents.

 8            MR. OLSON:  Yes, that's right.  And the ruling says

 9      that you can't sue the corporation.

10            THE COURT:  Right.

11            MR. OLSON:  But we -- the ruling may mean that you can

12      name the officers and directors and the corporation would

13      indemnify them in some sense.

14            THE COURT:  Do you remember what I told Ms. Zambrano

15      about not blowing your credibility and saving your energy on

16      your stronger points?

17            MR. OLSON:  Okay.

18            THE COURT:  Okay.

19            MR. OLSON:  So I'll move on from Kiobel to timeliness.

20            THE COURT:  Yes.

21            MR. OLSON:  A couple of points here.  I'll just review

22      the case laws as we see it briefly because we see it a little

23      differently.  There is the Southern District of New York's case

24      from In re Chateaugay Corp.

25            THE COURT:  Chateaugay.  It's a very familiar case to
```

09-50026-mg   Doc 7836   Filed 11/10/10   Entered 11/18/10 11:40:50   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 152 of 164

Page 152

1      those of us in the bankruptcy community.  It involves the LTV

2      Corporation.

3              MR. OLSON:  Okay.  And the Court knows as well that

4      the judge there ruled that "Prior to objection, proofs of

5      claims made on behalf of a class must be presumed valid and may

6      be filed as of right."  That's at page 634 of the decision.

7      And so that is, of course, supportive of our argument that

8      there's some tension.  And the Court also said, "The bankruptcy

9      court must exercise its discretion pursuant to Rule 9014 to

10     apply or not to apply Rule 7023 once an objection has been made

11     to those claims."  That was the holding of that court.

12             Now we move forward to the Ephedra decision which has

13     been discussed and the Ephedra decision traced sort of a

14     dispute but significantly said that "Because of the opacity of

15     the code and rules it would not rest a decision on a procedural

16     default even if it disagreed that claimants in a case like ours

17     had to wait for an objection to be filed."  And that's at page

18     77 of that decision.  That was in 2005.

19             Now in 2007, there's the In re Musicland case.  This

20     is after Ephedra and that decision expressly noted that there

21     is some question whether the motion could have been made any

22     sooner, referring to this issue.  So as of 2007, after the

23     Ephedra decision, the Musicland court recognized that there was

24     question that remained about this issue and we don't read the

25     Musicland decision and I'll let the Court read it for itself,

Page 153

1    as resting its holding in any way on a ruling that claimants

2    must move prior to an objection being filed.

3          But what this really raises, Your Honor, is probably

4    the more significant point which is that no court, certainly

5    not any of those three, has ever ruled that the mere fact that

6    a claimant did not file until right after an objection was a

7    sufficient procedural default somehow to expunge their claims.

8    There's no -- no court has ever ruled that.

9          Instead, the standard that has to be applied, that

10   every court has applied, is the standard of legal prejudice as

11   we say in our -- as we showed in our brief.  For example, in

12   Ephedra the problem that Judge Rakoff had was that the motion

13   for class treatment only came after the liquidating plan had

14   been submitted to creditors for a vote.  Similarly in the In re

15   Woodward & Lothrop Holdings case, class treatment was denied

16   because the class representative only raised the issue after

17   the plan was confirmed and seventy percent of the assets were

18   distributed.  In the Thomson McKinnon case, the class

19   representative never filed a motion at all.

20         So no court has ever reflexively held that a class

21   claim will be barred simply because the claimants waited for an

22   objection to be filed.  Now --

23         THE COURT:  The problem I have, Mr. Olson, is that you

24   articulated that so carefully that you carved out of that

25   statement other types of dispositions that would hurt you

MOTORS LIQUIDATION COMPANY, et al.

Page 154

1    almost as badly.  Ms. Zambrano stated when it was her turn,

2    that so far as she was aware, I'm not sure if she qualified it

3    that way, I understood it to be that way, no court in this

4    district, no bankruptcy court in this district has ever

5    certified a class that had not been certified as a class prior

6    to the filing of the bankruptcy petition.  Do you disagree with

7    her on that?

8             MR. OLSON:  I do not disagree with her on that, Your

9    Honor, but I must add a significant addendum.  No court in

10   those circumstances has denied class treatment on that ground.

11   First of all, no court has ever held that that's a dispositive

12   ground on its own.  It's a fact that is looked to --

13            THE COURT:  I don't think it is. However, it does tend

14   to inform the discretion of a judge who is concerned about

15   factors such as laches and potential prejudice to the remainder

16   of the creditor community and other things that I think were

17   allowed to take into account in making the discretionary call.

18            MR. OLSON:  Understood, Your Honor.  And the point I

19   was going to add is that in all of those cases where courts

20   have previously said that the fact of prepetition certification

21   was significant or its absence was significant, all or a

22   substantial portion of the class received actual notice of the

23   bar date.  And we lay out this in our papers.  And it's our

24   submission that those two things must go hand in hand.

25            Now, there's a lot we could say on this.  I mean the

Page 155

1    prepetition certification issue that some courts have raised is

2    they don't want people swooping in and filing class claims

3    shortly before bankruptcy.  And in that circumstance, that

4    should cut against allowing the class claims in bankruptcy.

5    But that's of course not at all what happened here.

6         Your Honor asked a little bit about the procedural

7    history.  We've litigated this case aggressively for eight

8    years, limited -- very limited progress in discovery was made

9    partly because of appeals that have tied us up at various

10   times.  We've been up and down to the Second Circuit a couple

11   of times.

12        That said, we finally came back from the Second

13   Circuit, filed an amended complaint in compliance with the

14   Second Circuit.  There were motions to dismiss filed by the

15   defendants before Judge Scheindlin, and she denied them in

16   significant respect, moved the case forward and set an

17   aggressive schedule for discovery.  And the parties exchanged

18   disclosures and were -- document requests and were nearly on

19   the eve of filing our or producing the documents that we were

20   supposed to produce in the case when there was a stay in the

21   Second Circuit.

22        Now GM's bankruptcy occurred sometime before then but

23   although there has not -- although GM did not produce any

24   documents, GM and the plaintiffs went through the process of

25   the document requests, the objections, document collection and

09-50026-mg    Doc 7836    Filed 11/10/10    Entered 11/18/10 11:40:50    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 156 of 164

Page 156

1    so we anticipate that GM has available to it documents that

2    would be responsive to the certification discovery that was

3    served in the case.

4           But getting back to the prepetition certification

5    issue, and how it relates to notice, in a case where there has

6    not been notice, actual or constructive, to claimants, no court

7    that we're aware of and we don't believe MLC has cited any, has

8    held that the absence of prepetition certification is even one

9    ground to deny class treatment.

10           And we believe, Your Honor, that the notice issue is

11    just one that has to be dealt with here.  It raises

12    constitutional and due process concerns and there must be some

13    method to address it, whether the Court permits class treatment

14    or invites or allows a very short timeframe for class members

15    in South Africa to actually submit individual claims.

16           To address the notice issues raised by MLC very

17    briefly, there is the claim that foreign claimants do not have

18    due process rights.  The point we'd make there, we make in our

19    papers.  That rests entirely on one decision from the Fourth

20    Circuit and counsel for MLC said you go to Westlaw and you

21    check that case and there's no red flags.  And the reason for

22    that, Your Honor, is because no court has ever relied on that

23    holding in the twenty-five years since it was issued.  No court

24    has ever relied on Ah Robins or cited it for the proposition

25    that foreign claimants don't have due process rights.

1        And we cited on page 6 of our reply, a variety of

2    cases that point in the other direction and we think that it

3    would be a mistake for this court respectfully to hold that

4    foreign claimants do not have any due process rights.

5        And given that, there's a problem that we don't think

6    MLC can just walk away from which is that no one reasonable

7    could defend the notice here as one reasonably calculated to

8    give notice to the actual claimants involved in this case.

9        Counsel here today indicates some confusion about

10   who's in the case.  They say they have no idea who's in the

11   case.  They say there maybe millions.  I won't get into that in

12   great detail but GM's lawyers have been litigating this case

13   for eight years and these have been issues that have been

14   addressed.  The scope of the class has been an issue that's

15   been addressed many times throughout the case.  They knew who

16   these people were.  They knew where they lived.  They knew that

17   most of these people are in their eighties and nineties.

18   They're very old at this time.  They're elderly.  They have

19   great egregious needs.  And if they had thought about these

20   people, they could have provided notice for them.  The argument

21   that I hear from MLC is somehow what we're suggesting should

22   have taken place is outrageous and it would have involved some

23   comprehensive outreach program that would just have been overly

24   burdensome but it's just simply not true.

25       At page 8 of our reply, we pointed out that MLC could

09-50026-mg    Doc 7836    Filed 11/10/10    Entered 11/18/10 11:40:50    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 158 of 164

Page 158

 1    have chosen publication in South Africa's most widely

 2    circulated national newspaper that's read by people of

 3    different social classes, that's not just targeted at the

 4    affluent business elite, The Sunday Times.  We even told how

 5    much it would have cost to put in a very large ad in that paper

 6    and it would have been ten thousand dollars.

 7          GM still has a plant over in an area of South Africa

 8    and some of the claims in this case arise from issues that

 9    happened around that plant and GM knew that.  And the cost of

10    publication in that paper would have cost a thousand dollars.

11          Now if GM had done that, we wouldn't have stood up

12    here today and said that notice was ineffective.  We recognize

13    that publication notice as the Supreme Court said in Mullaney,

14    sometimes is fine.  In fact, often it's fine, you know?  I'm a

15    class action lawyer.  We have class action settlements.  We

16    have to deal with notice.  We recognize it's not always a

17    perfect process and sometimes there's a little bit of legal

18    fiction involved.  But if GM had published in South Africa's

19    most widely read newspaper, and maybe addition -- you know,

20    additional thousand dollars in this place where they knew

21    claimants lived, we would have had no argument.  But they

22    didn't do that.  And in light of that, there's just a notice

23    problem that only we believe class treatment or some other

24    mechanism like an additional short window should provide.

25          Now getting back to the timeliness issue as it relates

MOTORS LIQUIDATION COMPANY, et al.

Page 159

1   to this, I just have to make this point quickly, we don't --

2   we're concerned about these arguments that our actions caused

3   prejudice in this case because although we're only here today,

4   we do have to note that we filed our motion for class treatment

5   back on June 22.  That was well before MLC proposed a

6   distribution plan and there's no legal prejudice.  They were

7   aware when they developed the plan of our class claims.  They

8   were aware of those claims since we filed them.  Our motion was

9   filed prior to the plan being developed. In fact, they had

10  argued to this -- moved to this court for estimation in the

11  alternative before they developed their plan.

12          When they developed their plan, our actions in the

13  motion we had filed permitted them to take our class claims

14  into account when they developed it.  We -- even if the Court

15  were to say, you know, I review SDNY cases and I think these

16  guys should have known that they didn't have to wait for an

17  objection, that still doesn't indicate that there is, in fact,

18  no prejudice by our actions here.  We moved promptly as soon as

19  there was an objection.

20          The only things I'll say on the Rule 23, Your Honor,

21  very briefly is typicality shouldn't be no -- a barrier here.

22  That typicality doesn't require everyone's the same, doesn't

23  require them to have the same circumstances or the fact pattern

24  be exactly the same.  It just means that their claims are the

25  same.    And the important thing to recognize here and this

1    goes to the Rule 23(b)(3) issues is that the claims here as

2    recognized by Judge Scheindlin involve GM's aiding and abetting

3    of the crime of apartheid.  That's a claim that she

4    specifically sustained.  And in that sense, this is a unique

5    case for the reasons my colleague and I have said and it's

6    different than the Talisman case.

7          So the focus here is not going to be on specific

8    actions that GM took to specific people.  Those are examples of

9    what will be proven.  The question here is did GM aid and abet

10   apartheid as a crime and did it do so with the right mens rea?

11   That is, did it aid and abet the crime of apartheid

12   intentionally?  We don't -- you know, that's going to be the

13   core question in the case and that question we believe is

14   entirely susceptible to class treatment.

15         The final thing I'd say, Your Honor, is the Court has

16   referred to the dilutive effect of entertaining these claims.

17   The only thing I would say on this and I know the Court has a

18   lot to weigh, is we believe the notice issue is significant

19   there as well because as I indicated, this class and we visited

20   them in their modest homes, in many cases consists of elderly

21   people who have carried with them injuries now for twenty,

22   thirty years from the apartheid regime.  They are humble

23   people.  They suffered genuine injuries.  They are not seeking

24   millions of dollars.  They are seeking money finally from some

25   of the multi-national corporations that allowed these injuries

Page 161

1    to occur and cause these injuries to occur.  Multinational

2    corporations have never stepped up.  But in this case, if those

3    people had been given an opportunity to file claims or if they

4    were now given one, the Court would not see millions of claims.

5    It would see the people who genuinely need assistance and

6    redress filing claims.  These are humble people.  They're not

7    going to, in our view, fundamentally tax in any way the estate

8    but they are genuine creditors who are worthy of the Court's

9    consideration.  And that's all I have unless the Court has any

10    questions.

11              THE COURT:  All right.  No, I don't.  I'm not going to

12    be in a position to decide this off the bench and I'm not going

13    to be in a position to decide it tomorrow and I don't know when

14    it will be forthcoming.  I will take it under advisement and I

15    will get back to you as soon as I can.  We're adjourned.

16              (Whereupon these proceedings were concluded at 4:21 p.m.)

17

18

19

20

21

22

23

24

25

Page 162

1

2                        I N D E X

3

4                      R U L I N G S

5    DESCRIPTION                          PAGE      LINE

6    Discovery and briefing schedules in the    23        6

7    UAW-New GM matter, approved.

8

9    Debtors' 109th Omnibus Objection to Claims    24       18

10   (Incorrectly Classified Claims), approved.

11

12   Debtors' Thirty Eighth Omnibus Objection    25        5

13   to Claims (Tax Claims Assumed by General

14   Motors, LLC), approved.

15

16   Supplemental Submission of General Motors,    35       12

17   LLC in Support of Order Enforcing 363 Sale

18   Order with Respect to Deutsch, taken under

19   submission.

20

21   Debtors' Ninth Omnibus Motion to Reject    61       25

22   Certain Executory Contracts and Unexpired

23   Leases of Nonresidental Real Property,

24   granted.

25

Page 163

1

2                        R U L I N G S  (cont'd.)

3    DESCRIPTION                              PAGE      LINE

4    Debtors' (i) Objection to Proof of Claims    161        14

5    Nos. 1206, 7587 and 10162 and, in the

6    Alternative, (ii) Motion to estimate

7    Proofs of Claim Nos. 1206, 7587 and

8    10162 - decision reserved.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 164

1

2                      C E R T I F I C A T I O N

3

4    I, Clara Rubin, certify that the foregoing transcript is a true

5    and accurate record of the proceedings.

6

7    _____

8    Clara Rubin

9    AAERT Certified Electronic Transcriber (CET**D-491)

10

11   Veritext

12   200 Old Country Road

13   Suite 580

14   Mineola, NY 11501

15

16   Date: November 10, 2010

17

18

19

20

21

22

23

24

25