Hearing Date and Time: To Be Determined
Response Deadline: December 13, 2010
**EVIDENTIARY HEARING REQUESTED**

BUTZEL LONG, a professional corporation
Barry N. Seidel
Eric B. Fisher
Katie L. Cooperman
380 Madison Avenue, 22nd Floor
New York, New York 10017
Telephone:  (212) 818-1110

*Special Counsel to the Official Committee of Unsecured
Creditors of Motors Liquidation Company f/k/a General
Motors Corporation*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------x
:
In re                                                 :        Chapter 11
:
**MOTORS LIQUIDATION COMPANY**, *et al.*,      :        **Case No.:  09-50026 (REG)**
:
**Debtors.**              :        **(Jointly Administered)**
:
-----------------------------------------------------------------x

**OFFICIAL COMMITTEE OF UNSECURED CREDITORS' FIRST
AMENDED OBJECTION TO CLAIMS FILED BY GREEN HUNT
WEDLAKE, INC. AND NOTEHOLDERS OF GENERAL MOTORS NOVA
SCOTIA FINANCE COMPANY AND MOTION FOR OTHER RELIEF**

BUTZEL LONG, a professional corporation
Barry N. Seidel
Eric B. Fisher
Katie L. Cooperman
380 Madison Avenue, 22nd Floor
New York, New York 10017
Tel: (212) 818-1110
Fax: (212) 818-0494

*Special Counsel to the Official Committee of
Unsecured Creditors of Motors Liquidation
Company f/k/a General Motors Corporation*

# TABLE OF CONTENTS

Page

INTRODUCTION ..................................................................................................................... 2

JURISDICTION AND VENUE ................................................................................................ 4

PARTIES .................................................................................................................................... 5

BACKGROUND ....................................................................................................................... 5

    I.        Corporate Relationships ........................................................................................ 5

    II.      The 2003 Notes Offering ...................................................................................... 6

    III.    The Swaps ............................................................................................................. 6

    IV.    The Intercompany Loans ...................................................................................... 7

    V.      The Nova Scotia Action ........................................................................................ 7

    VI.    The Nova Scotia Response ................................................................................... 8

    VII.   The Lock-Up Agreement ..................................................................................... 9

             A.  Guarantee Obligations ....................................................................... 10

             B.  Deficiency Obligation and Nova Scotia Finance's Consent to Bankruptcy ......... 10

             C.  Reversal of Swap Liability ................................................................. 11

             D.  Consent Fee ........................................................................................ 12

             E.  Release of Intercompany Loans .......................................................... 13

    VIII.  Post-Petition Implementation of the Lock-Up Agreement ........................................ 13

    IX.    Assumption of the Lock-Up Agreement ................................................................ 14

    X.      Proofs of Claim ................................................................................................... 15

RELIEF REQUESTED ............................................................................................................ 16

             A.  The Claims Should be Disallowed Under Section 502(d) of the Bankruptcy Code Because the Noteholders Received and Retained the Consent Fee ............. 16

                  1.  The Consent Fee is Avoidable Under Sections 544, 547 and/or 548 of the Bankruptcy Code ................................................................ 17

                  2.  Alternatively, the Consent Fee is Avoidable Under Section 549 of the Bankruptcy Code .......................................................................... 18

             B.  Old GM's Obligations Under the Lock-Up Agreement are Avoidable Under Applicable Law ............................................................................ 18

                    1.  Old GM's Obligations Under the Lock-Up Agreement are Avoidable Under Section 548 of the Bankruptcy Code and the NYDCL ...................... 18

                  2.  Alternatively, the Lock-Up Agreement Constitutes an Unauthorized Settlement Under Rule 9019 of the Federal Rules of Bankruptcy Procedure ........................................................................................... 20

i

C.  Alternatively, the Claims are Duplicative and Far in Excess of the
Underlying Obligation .........................................................................................21

D.  In any Event, the Claims Should be Equitably Subordinated Under Section
510 of the Bankruptcy Code...............................................................................21

E.  The Committee is Entitled to Relief Under Rule 60(b) of the Federal Rules
of Civil Procedure and Rule 9024 of the Federal Rules of Bankruptcy
Procedure..............................................................................................................22

RESERVATION OF RIGHTS.................................................................................................23

NOTICE ....................................................................................................................................23

Hearing Date and Time: November 18, 2010 at 9:45 a.m. (Prevailing Eastern Time)
Response Deadline: November 15, 2010 at 12:00 p.m. (Prevailing Eastern Time)
**EVIDENTIARY HEARING REQUESTED**

BUTZEL LONG, a professional corporation
Barry N. Seidel
Eric B. Fisher
Katie L. Cooperman
380 Madison Avenue, 22nd Floor
New York, New York 10017
Telephone:  (212) 818-1110

*Special Counsel to the Official Committee of Unsecured
Creditors of Motors Liquidation Company f/k/a General
Motors Corporation*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x
                                        :
In re                                   :        Chapter 11
                                        :
MOTORS LIQUIDATION COMPANY, *et al.*,   :        Case No.:  09-50026 (REG)
                                        :
                         Debtors.       :        (Jointly Administered)
                                        :
                                        :
---------------------------------------------------------------x

### OFFICIAL COMMITTEE OF UNSECURED CREDITORS' FIRST AMENDED OBJECTION TO CLAIMS FILED BY GREEN HUNT WEDLAKE, INC. AND NOTEHOLDERS OF GENERAL MOTORS NOVA SCOTIA FINANCE COMPANY AND MOTION FOR OTHER RELIEF

The Official Committee of Unsecured Creditors of Motors Liquidation Company f/k/a

General Motors Corporation (the "**Committee**"), by its attorneys Butzel Long, a professional

corporation, respectfully submits this: (i) objection to claims set forth in Exhibit A attached

hereto filed by, or on behalf of, certain holders of notes (the "**Noteholders**") issued by General

Motors Nova Scotia Finance Company ("**Nova Scotia Finance**") against Motors Liquidation

Company f/k/a General Motors Corporation ("**Old GM**") and certain of its subsidiaries

(collectively, the "**Debtors**") in the aggregate amount of $1,072,557,531.72 (the "**Guarantee**

**Claims**"); (ii) objection to claim no. 66319 filed by Green Hunt Wedlake, Inc., trustee of Nova

Scotia Finance (the "**Nova Scotia Finance Trustee**") against the Debtors in the amount of

$1,607,647,592.49 (the "**Duplicative Claim**," and together with the Guarantee Claims, the

"**Claims**"); and (iii) motion for relief under Rule 60(b) of the Federal Rules of Civil Procedure

and Rule 9024 of the Federal Rules of Bankruptcy Procedure.  This objection amends the

*Official Committee of Unsecured Creditors' Objection to Claims Filed by Green Hunt Wedlake,*

*Inc. and Noteholders of General Motors Nova Scotia Finance Company and Motion for Other*

*Relief* (Docket No. 6248), filed on July 2, 2010 in this bankruptcy proceeding.[1]  In support of this

application, the Committee states as follows:

## **INTRODUCTION**

1.        This objection concerns claims that arise out of an agreement between Old GM

and a consortium of hedge-fund noteholders,[2] which was entered into just minutes before Old

GM filed for bankruptcy on June 1, 2009.  The agreement, known as the "**Lock-Up**

**Agreement**," was grossly one-sided, disproportionately benefiting the Noteholders and leaving

Old GM's estate depleted to the detriment of its creditors.

2.        Before entering into the Lock-Up Agreement, the Noteholders had an

approximately one billion dollar claim against Old GM, as guarantor of Notes (defined below)

issued by Nova Scotia Finance, a subsidiary of Old GM.  The proceeds from issuance of the

Notes were loaned by Nova Scotia Finance to General Motors of Canada Limited ("**GM**

---

[1]        The Committee respectfully requests the Court's permission, pursuant to Rule 3007(b) of the Federal Rules of Bankruptcy Procedure, to join these objections to the Claims in a single filing because the Claims were all asserted for the benefit of the Noteholders and involve common facts and circumstances.

[2]        The hedge-fund Noteholders party to the Lock-Up agreement are Aurelius Capital Partners, LP, Aurelius Capital Master, Ltd., Drawbridge DSO Securities LLC, Drawbridge OSO Securities LLC, Elliot International, L.P., FCOF UB Securities LLC, Appaloosa Investment Limited Partnership I, The Liverpool Limited Partnership, Palomino Fund Ltd., Thoroughbred Master Ltd. and Thoroughbred Fund LP, and are hereinafter referred to as the "**Lock-Up Noteholders**."

**Canada**") in documented intercompany transactions. Through the Lock-Up Agreement, the Noteholders are now effectively asserting a claim against Old GM that is well more than double their maximum one billion dollar claim under the Old GM guarantee:

3.      First, under the Lock-Up Agreement, the Noteholders have already been paid an exorbitant "consent fee" in excess of $369 million, funded by Old GM. *The "consent fee" paid to the Noteholders was a disguised principal payment on the Notes that should have been credited against the principal amount due to the Noteholders under the Notes, thereby reducing the total exposure on Old GM's unsecured guarantee of the Notes to approximately $703 million ($1.072 billion minus $369 million).*

4.      Second, under the Lock-Up Agreement, Old GM is obligated to allow and not contest the Guarantee Claims and the Duplicative Claim with a combined face amount of approximately $2.67 billion for the benefit of the Noteholders. *If allowed, these combined claims would total more than 3.7 times the $703 million net principal amount due to the Noteholders under the Notes.*

5.      Third, under the Lock-Up Agreement, GM Canada's intercompany obligations to Nova Scotia Finance were released. Consequently, pursuant to the terms of the Lock-Up Agreement, Old GM became obligated to pay amounts owed on the Notes without any contribution from GM Canada, which would have, and should have, correspondingly reduced Old GM's obligation under the guarantee of the Notes. In essence, creditors of GM Canada were given a "free ride" at the expense of Old GM's creditors.

6.      In sum, the Lock-Up Agreement transformed what should have been, at the very most, a $703 million guarantee claim against Old GM based upon the balance owed by Nova Scotia Finance on the principal amount under the Notes into claims against the Old GM estate

3

that exceed $2.67 billion.  In exchange for incurring all of the above obligations, Old GM received only a release from certain trumped up litigation claims filed by certain Noteholders, which posed minimal litigation risk to Old GM.

7.      The circumstances surrounding the Lock-Up Agreement and the terms thereof demonstrate that the Lock-Up Noteholders behaved inequitably, attempting to opt out of the consequences of Old GM's bankruptcy by virtue of a private, pre-bankruptcy agreement that benefited the Noteholders at the expense of Old GM's creditors.

8.      These Claims, however, are not insulated from this Court's scrutiny.  According to the Lock-Up Agreement, Old GM consented to these Claims, but only to the fullest extent permitted under applicable law.  For the reasons set forth herein, the Court should disallow the Claims in their entirety or, alternatively, reduce the Claims because they far exceed what is permitted by applicable law.  To the extent the Claims are not disallowed, the Court should equitably subordinate them.

## **JURISDICTION AND VENUE**

9.      The Committee seeks the relief requested herein under 11 U.S.C. §§ 105(a), 502 and 510, Rule 60(b) of the Federal Rules of Civil Procedure, and Rules 3007 and 9024 of the Federal Rules of Bankruptcy Procedure.

10.     This Court has subject matter jurisdiction to consider and determine this matter pursuant to 28 U.S.C. §§ 1334 and 157.  This matter constitutes a "core" proceeding within the meaning of 28 U.S.C. §§ 157(b)(1) and 157(b)(2)(A), (B) and (O).

## PARTIES

11.    The Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") on June 1, 2009 (the "**Petition Date**") in the United States Bankruptcy Court for the Southern District of New York.

12.    On June 3, 2009, the United States Trustee for the Southern District of New York appointed the Committee, pursuant to section 1102 of the Bankruptcy Code.

13.    The Nova Scotia Finance Trustee was appointed bankruptcy trustee of the estate of Nova Scotia Finance on October 9, 2009.

14.    The Lock-Up Noteholders are those entities listed in footnote 2 above, all of which are parties to the Lock-Up Agreement.

15.    The Noteholders are those entities on behalf of which Claims were filed.

## BACKGROUND

### I.    Corporate Relationships

16.    The Lock-Up Agreement involves the Lock-Up Noteholders, Old GM and various entities related to Old GM, including Nova Scotia Finance, General Motors Nova Scotia Investments Limited ("**Nova Scotia Investments**") and GM Canada.  At all relevant times, Old GM was a publicly-traded corporation incorporated under the laws of Delaware and engaged in the automotive business.

17.    At all relevant times Nova Scotia Finance was a Nova Scotia unlimited liability company whose sole shareholder was Old GM.  Nova Scotia Finance was organized on September 28, 2001 and was a direct, wholly-owned subsidiary of Old GM.

5

18.    At all relevant times Nova Scotia Investments was a Nova Scotia limited company whose sole shareholder was Old GM.

19.    At all relevant times GM Canada was a Canadian corporation whose sole shareholder was Old GM.

## II.    The 2003 Notes Offering

20.    On July 10, 2003, Nova Scotia Finance issued £350,000,000 principal amount of 8.375% guaranteed notes due December 7, 2015 (the "**2015 Notes**") and £250,000,000 principal amount of 8.875% guaranteed notes due July 10, 2023 (the "**2023 Notes**" and together with the 2015 Notes, the "**Notes**") to certain beneficial owners.

21.    The Notes were guaranteed by Old GM and issued under a fiscal and paying agency agreement dated July 10, 2003 among Nova Scotia Finance as issuer, Old GM as guarantor, Deutsche Bank Luxembourg S.A., as fiscal agent, and Banque Générale du Luxembourg S.A., as paying agent.

22.    The July 9, 2003 disclosure provided in connection with issuance of the Notes (the "**Offering Circular**") stated that the proceeds therefrom would be provided, directly or indirectly, to Old GM as part of an overall effort to improve Old GM's balance sheet.

## III.    The Swaps

23.    Upon issuance of the Notes, Nova Scotia Finance entered into two currency swap transactions with Old GM on July 10, 2003, whereby Old GM exchanged pounds sterling for Canadian dollars on such date.  One swap transaction was related to the 2015 Notes, for £350,000,000/CDN$778,204,000, and would expire in 2015 (the "**2015 Swap**").  The other swap transaction was related to the 2023 Notes, for £250,000,000/CDN$555,860,000, and would expire in 2023 (the "**2023 Swap**," and together with the 2015 Swap, the "**Swap Transactions**").

6

24.     In general, the Swap Transactions contemplated annual exchanges of interest payments between the parties based upon then-existing currency rates.  Upon termination, assuming appreciation of the Canadian dollar, Old GM would be in the "winning" position and would be "in the money."  In other words, in the event that the Canadian dollar appreciated as to the pound sterling, Nova Scotia Finance would be liable to Old GM based on the Swap Transactions (the "**Swap Liability**").

IV.     **The Intercompany Loans**

25.     Upon issuance of the Notes and conversion of the proceeds from pounds sterling to Canadian dollars, Nova Scotia Finance loaned such proceeds to GM Canada pursuant to two loan agreements dated July 10, 2003.  Pursuant to one loan agreement, Nova Scotia Finance loaned GM Canada CDN$778,204,000, at an annual interest rate of 9.42%, which principal amount would be due and payable on December 7, 2015 (the "**2015 Intercompany Loan**"). Pursuant to the other loan agreement, Nova Scotia Finance loaned GM Canada CDN$555,860,000 at an annual interest rate of 10.20%, which principal amount would be due and payable on July 10, 2023 (the "**2023 Intercompany Loan**," and together with the 2015 Intercompany Loan, the "**Intercompany Loans**").

V.      **The Nova Scotia Action**

26.     During 2009, Lock-Up Noteholders Aurelius Capital Partners, LP, Aurelius Capital Master, Ltd., Drawbridge DSO Securities LLC, Drawbridge OSO Securities LLC, FCOF UB Securities LLC, Appaloosa Investment Limited Partnership I, Palomino Fund Ltd., Thoroughbred Master Ltd. and Thoroughbred Fund LP, owning approximately 63% of the Notes, became concerned about collecting the principal amount of their Notes upon maturity.

7

27.     In an attempt to secure payment on their Notes by any means possible, those
Lock-Up Noteholders filed a lawsuit on March 2, 2009 (the "**Nova Scotia Complaint**") against
Old GM, Nova Scotia Finance, Nova Scotia Investments, GM Canada and certain individual
officers and directors of such entities in the Supreme Court of Nova Scotia (the "**Nova Scotia
Action**").

28.     The crux of the Nova Scotia Complaint was directed at Nova Scotia Finance,
alleging that the ability of Nova Scotia Finance to satisfy its obligations under the Notes was
dependent upon Nova Scotia Finance's receipt of amounts owed to it by Nova Scotia
Investments and GM Canada.  The Nova Scotia Complaint alleged, among other things,
oppressive conduct by the defendants named therein.

29.     As to Old GM, the claims asserted in the Nova Scotia Complaint lacked a strong
legal basis.  The Nova Scotia Complaint challenged the legality of various transfers from Nova
Scotia Finance and Nova Scotia Investments to Old GM, despite the clear language in the
Offering Circular that the proceeds of the Notes were intended to benefit Old GM.

30.     Specifically, the Nova Scotia Complaint challenged, among other transactions,
two May 22, 2008 transfers, of CDN$16,000,000 and $500,000 respectively, from Nova Scotia
Finance to Old GM and another May 22, 2008 transfer of CDN$576,672,670 from Nova Scotia
Investments to Old GM (collectively, the "**May 22, 2008 Transfers**").

## VI.    The Nova Scotia Response

31.     As set forth in the April 21, 2009 amended statement of defense filed by the
defendants in the Nova Scotia Action (the "**Nova Scotia Response**"), the allegations contained
in the Nova Scotia Complaint were without merit.  In particular, as noted in the Nova Scotia
Response, the Offering Circular expressly advised the Noteholders that all or substantially all of

the proceeds from the Notes would be used to benefit Old GM.  Furthermore, Nova Scotia

Finance had no legal obligation to maintain any level of assets or share capital, and was not

required to satisfy any test of solvency before making the May 22, 2008 Transfers.  Accordingly,

Old GM's financial exposure from the Nova Scotia Action was minimal.

## VII.    **The Lock-Up Agreement**

32.    Although notice of the May 22, 2008 Transfers was publicly filed at the Registry

of Joint Stock Companies of Nova Scotia on May 27, 2008, such Noteholders waited until Old

GM was in an extremely precarious position before suing, in an attempt to extract

disproportionate value from Old GM.  These Noteholders succeeded in this tactic, preying upon

Old GM's vulnerable position to negotiate an outrageous settlement of the Nova Scotia Action.

33.    On June 1, 2009, the same day that Old GM filed for bankruptcy protection, the

settlement negotiations between Old GM and these Noteholders resulted in an agreement with

the Lock-Up Noteholders, Nova Scotia Finance, GM Canada and Nova Scotia Investments

identified as the "Lock-Up Agreement."  The Lock-Up Agreement was an attempt by the Lock-

Up Noteholders to avoid the impending automatic stay and obtain preferential treatment from

Old GM.  Although the Lock-Up Agreement was executed on Old GM's Petition Date, it was

contingent upon the passage of an "extraordinary resolution" by Nova Scotia Finance to be voted

upon by all Noteholders, which vote could not occur until June 25, 2009.  (A copy of the Lock-

Up Agreement is annexed hereto as Exhibit B.)

34.    As described below, under the Lock-Up Agreement, the Lock-Up Noteholders

agreed to settle the Nova Scotia Action based on Old GM incurring a slew of obligations out of

all proportion to the limited benefit conferred on Old GM by the Lock-Up Noteholders.  The

obligations incurred by Old GM under the Lock-Up Agreement included, among others, (a)

allowing and not contesting guarantee claims for the full amount of the Notes aggregating in excess of $1 billion; (b) consenting to a duplicative "deficiency claim" for Nova Scotia Finance's underlying liability on those same Notes; (c) allowing Nova Scotia Finance, through a trustee, to assert a claim against Old GM based upon the Swap Liability in excess of $564 million, even though the Swap Liability was, in fact, owed by Nova Scotia Finance to Old GM; (d) funding a consent fee to the Lock-Up Noteholders in an amount in excess of $369 million; and (e) releasing intercompany loans that, if not released, would have substantially reduced Old GM's exposure on its guarantee.  These obligations are summarized below:

### A.    Guarantee Obligations

35.    Notwithstanding the substantial additional consideration conveyed to the Lock-Up Noteholders under the Lock-Up Agreement, Old GM agreed to acknowledge that the Noteholders' claims based on Old GM's guarantee of the Notes would be enforceable, valid and allowed when asserted in their full amount without reduction (the "**Guarantee Obligations**"), but only to the fullest extent permitted under applicable law.

### B.    Deficiency Obligation and Nova Scotia Finance's Consent to Bankruptcy

36.    By consenting to entry of a bankruptcy order under Canada's Bankruptcy and Insolvency Act as required by the Lock-Up Agreement, Nova Scotia Finance provided two claims to the Noteholders on account of a single obligation: the principal amount due under the Notes.  Pursuant to that Canadian bankruptcy order, a bankruptcy trustee was to be appointed in order to assert an allowed claim for contribution against Old GM, as sole shareholder of Nova Scotia Finance, based on Nova Scotia Finance's structure as an unlimited liability company.

10

37.     This provision of the Lock-Up Agreement was designed to enable the Lock-Up Noteholders to claim the amounts owed on the Notes from Old GM through the Nova Scotia Finance Trustee as a "doubling up" on the Guarantee Obligations.  In fact, an internal Old GM accounting memorandum dated as of July 20, 2009 states that "[r]ecognition of a guarantee liability in addition to the original bond payable would effectively double-count the obligation." As creditors of Nova Scotia Finance, the Noteholders had no direct recourse against Old GM, except under the Guarantee Obligations.  Nevertheless, by consenting to the Canadian bankruptcy proceeding mentioned above, Old GM voluntarily opened itself up to liability on the Nova Scotia Finance Trustee's claim for contribution for any amounts unpaid to the Noteholders without correspondingly reducing its exposure on the Guarantee Obligations.

### C.     *Reversal of Swap Liability*

38.     Old GM had a claim against Nova Scotia Finance for the Swap Liability, the amount of which (approximately $564 million) Old GM agreed could be included as part of the Nova Scotia Finance Trustee's Duplicative Claim against Old GM, putatively based upon Nova Scotia Finance's status as an unlimited liability company under Nova Scotia law.  Further, to the extent any portion of the inflated Duplicative Claim were to be disallowed, Old GM's claim for the Swap Liability would be subordinated to the Claims.  Thus, under the Lock-Up Agreement, any amounts received by Old GM on the Swap Liability were to be held in trust by Old GM and then paid over for the benefit of the Noteholders.  Through this artifice, the Swap Liability was transformed from an amount owed to Old GM into an amount payable from Old GM, ultimately for the benefit of Nova Scotia Finance's creditors – the Noteholders.

39.     As part of the section 363 sale in these bankruptcy proceedings, the swap contract was transferred to General Motors LLC ("**New GM**"), thereby putting the swap beyond Old

11

GM's control.  New GM has asserted a claim against Nova Scotia Finance for the full amount of

the Swap Liability ($564 million) (the "**New GM Swap Claim**"), resulting in the inclusion of

that amount in the Duplicative Claim against Old GM.  To the extent that New GM is bound by

the Lock-Up Agreement's subordination provision with respect to the Swap Liability, any

payments to the Nova Scotia Finance Trustee based upon the New GM Swap Claim will be for

the benefit of the Noteholders until the Noteholders are paid in full on the Notes.  The magnitude

of the Swap Liability and the significance of its transfer to New GM was never discussed or

explained to Old GM's creditors, even though that transfer has resulted in the assertion of a $564

million claim against Old GM.  At a minimum, Old GM's creditors should have been notified

that the transfer of the Swap Liability would ultimately result in the assertion of a $564 million

claim against Old GM for the benefit of the Noteholders, and also should have been afforded a

meaningful opportunity to object to the transfer.

### D.    Consent Fee

40.    Under the Lock-Up Agreement, the Lock-Up Noteholders also received a

"consent fee" of £223,303,500 (or approximately $369 million) plus reimbursement of their legal

costs (the "**Consent Fee**").  Although these amounts were putatively to be paid by Nova Scotia

Finance, in reality, it was Old GM that funded the Consent Fee based on a transfer of funds on

May 29, 2009 to GM Canada just three days before Old GM filed its bankruptcy petition.

Notwithstanding that Old GM was the ultimate source of funds and that those funds had already

been transferred to GM Canada "to be held in trust" for Nova Scotia Finance, Old GM's June 1,

2009 8-K stated only that GM Canada would provide the funding for the Consent Fee.

41.    Although the Consent Fee is exorbitant on its face and plainly constitutes a thinly-

disguised payment towards the principal amount due under the Notes, the Lock-Up Agreement

provides that the Consent Fee would not reduce, limit or impair the outstanding principal under the Notes, Old GM's Guarantee Obligations or Old GM's "deficiency claim."

### E.    Release of Intercompany Loans

42.    Under the Lock-Up Agreement, GM Canada was released by Nova Scotia Finance from its obligation to repay the Intercompany Loans it owed to Nova Scotia Finance. As a result of this release, Old GM became the sole source of funds available to Nova Scotia Finance to pay its debts, further eliminating any possibility that the obligations under the Notes would be borne by any parties other than Old GM's creditors.

43.    Thus, through the Lock-Up Agreement, Old GM and the Lock-Up Noteholders wrongfully ensured that debts and obligations of GM Canada and Nova Scotia Finance would be satisfied on the backs of Old GM's creditors.

## VIII.    Post-Petition Implementation of the Lock-Up Agreement

44.    All of the transactions that were key to implementing the Lock-Up Agreement occurred post-petition.  On June 25, 2009, nearly a month after the Petition Date, the extraordinary resolution authorizing the Lock-Up Agreement was passed.  On that same date, escrow funds that had been committed by Old GM for payment of the Consent Fee were released to the Lock-Up Noteholders.

45.    Also on June 25, 2009, as contemplated by the Lock-Up Agreement, Nova Scotia Finance and GM Canada entered into a settlement agreement releasing the Intercompany Loans. As already explained above, as a result of the release of these Intercompany Loans, GM Canada extricated itself from financial responsibility for any amounts due to the Noteholders, thereby burdening Old GM with liability for the Notes pursuant to the Guarantee Claims and the Duplicative Claim.

### IX. Assumption of the Lock-Up Agreement

46.    On July 5, 2009, upon the Debtors' motion, this Court approved the sale of substantially all of the Debtors assets to New GM in the Order (I) Authorizing Sale of Assets Pursuant to Amended and Restated Master Sale and Purchase Agreement; (II) Authorizing Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection with the Sale; and (III) Granting Related Relief (Docket No. 2968) (the "**Assumption Order**").

47.    Among other things, the Assumption Order provides that the Debtors are authorized and directed to assume and assign to New GM those assumable executory contracts that have been designated by New GM for assumption.

48.    Upon information and belief, at some time thereafter, Old GM purported to assume the Lock-Up Agreement and assign it to New GM.  The Committee was not provided with any notice of Old GM's intention to assume the Lock-Up Agreement, even though the Lock-Up Agreement substantially and detrimentally affects the interests of Old GM's unsecured creditors.  These actions were intended to improperly insulate the Lock-Up Agreement from meaningful scrutiny by Old GM's creditors and this Court.

49.    Given the extraordinary scope and unusual nature of the Lock-Up Agreement, Old GM should have been required to make a showing that the Lock-Up Agreement was an executory contract under the Bankruptcy Code susceptible to being assumed, and that assumption of the Lock-Up Agreement was a proper exercise of Old GM's sound business judgment and in the best interests of its estate.  Old GM made no such showing.

50.    The Committee anticipates that the Noteholders and the Nova Scotia Finance Trustee will assert that Old GM's assumption of the Lock-Up Agreement bars, in whole or in

part, the Committee's current objection to the Claims, as well as future objections and litigation

potentially to be filed by the Committee. While such a defense would be without merit, in an

abundance of caution, the Committee hereby requests that this Court void the Assumption Order

under Rule 60(b) of the Federal Rules of Civil Procedure and Rule 9024 of the Federal Rules of

Bankruptcy Procedure, but only to the extent that the Assumption Order authorized the Debtors

to assume and/or assign the Lock-Up Agreement and any other obligations incident thereto,

including those concerning the Swap Transactions.

**X.**    **Proofs of Claim**

51.    On November 30, 2009, the Nova Scotia Finance Trustee filed the Duplicative

Claim.[3] More than one billion dollars of the Duplicative Claim relates to the principal amount

owed under the Notes by Nova Scotia Finance to the Noteholders. The remainder of the

Duplicative Claim relates to the Swap Liability described above, which became a purported

obligation of Old GM only by virtue of the Lock-Up Agreement.

52.    Also, on November 30, 2009, fourteen Noteholders filed their respective

Guarantee Claims (claim nos. 66216, 66217, 66218, 66265, 66266, 67429, 67499, 66267, 66312,

67428, 67430, 67498, 67500 and 67501). In addition to those fourteen claims, forty one

Guarantee Claims were filed by or on behalf of various Noteholders (claim nos. 1558, 12042,

31168, 31868, 31167, 37319, 60567, 61481, 63955, 64332, 64340, 65554, 65765, 65784, 70201,

66206, 68705, 68941, 1556, 23323, 29128, 29379, 29647, 29648, 49548, 60234, 60547, 60566,

61915, 64298, 66769, 67345, 70200, 67244, 67245, 69306, 69307, 69308, 69309, 69552 and

69734). (All of the individual guarantee claims are listed in <u>Exhibit A</u> hereto and are referred to

as the "**Individual Claims**.") Because the Individual Claims concern Old GM's guarantee of the

---

[3]    The Duplicative Claim is referred to in the Lock-Up Agreement as the "Deficiency Claim."

principal amount of the Notes, they are entirely duplicative of the guarantee component of the

Duplicative Claim filed by the Nova Scotia Finance Trustee for the benefit of the Noteholders.

In addition, the Individual Claims fail to account for the fact that, on the eve of bankruptcy, Old

GM paid the Lock-Up Noteholders more than $369 million – an amount that should

correspondingly reduce Old GM's obligation under the guarantee.

53.    On December 10, 2009, Greenberg Traurig, LLP filed Guarantee Claim no. 69551

in the amount of $314,071,424.08[4] on behalf of all Noteholders other than those who filed the

fourteen claims referred to in the first sentence of paragraph 52 above (the "**Protective Claim**").

Because the Protective Claim is also a Guarantee Claim, it concerns Old GM's guarantee of the

principal amount of the Notes, and thus, like the Individual Claims, it is entirely duplicative of

the guarantee component of the Duplicative Claim filed by the Nova Scotia Finance Trustee for

the benefit of the Noteholders.  Like the Individual Claims, the Protective Claim fails to account

for the fact that, on the eve of bankruptcy, Old GM paid the Lock-Up Noteholders more than

$369 million.

## RELIEF REQUESTED

**A.    *The Claims Should be Disallowed Under Section 502(d) of the
Bankruptcy Code Because the Noteholders Received and Retained the
Consent Fee***

54.    Section 502(d) of the Bankruptcy Code provides that the court shall disallow any

claim of any entity that is a transferee of a transfer avoidable under, among others, sections 544,

547, 548 or 549 of the Bankruptcy Code.

---

[4]    Paragraph 3 of the attachment to claim no. 69551 describes the amount of such claim as $1,072,557,531.72 less the amount of certain individual proofs of claim listed on Exhibit C annexed to such attachment.  The total amount of individual proofs of claim listed on Exhibit C is $758,486,107.64. Accordingly, claim no. 69551 represents the difference, which is equal to $314,071,424.08.

    1.       The Consent Fee is Avoidable Under Sections
              544, 547 and/or 548 of the Bankruptcy Code

55.      Section 547 of the Bankruptcy Code provides that any transfer of an interest of the debtor in property is avoidable if such transfer was (i) to or for the benefit of a creditor, (ii) for or on account of an antecedent debt owed by the debtor before such transfer was made, (iii) made on or within ninety days before the petition date and (iv) enabled such creditor to receive more than such creditor would receive if the case were under chapter 7 of title 11 of the Bankruptcy Code.  Section 548 of the Bankruptcy Code provides that any transfer of an interest of the debtor in property on or within two years before the petition date is avoidable if the debtor received less than reasonably equivalent value in exchange for such transfer.  Sections 273 and 278 of the New York Debtor and Creditor Law (the "**NYDCL**"), made applicable by section 544 of the Bankruptcy Code, provide that every conveyance made by an insolvent entity is fraudulent as to creditors and therefore avoidable if such conveyance is made without fair consideration.

56.      Here, Old GM transferred the Consent Fee merely three days before the Petition Date, for the benefit of the Lock-Up Noteholders on account of its guarantee of the Notes, which enabled the Lock-Up Noteholders to receive more than they would if this case were under chapter 7 of title 11 of the Bankruptcy Code.  Because Old GM's transfer of the Consent Fee for the benefit of the Noteholders is avoidable under section 547 of the Bankruptcy Code, the Claims should be disallowed under section 502(d) of the Bankruptcy Code.

57.      Similarly, Old GM did not receive reasonably equivalent value or fair consideration in exchange for its transfer of the Consent Fee.  In accordance with the Lock-Up Agreement, Old GM agreed to fund the Consent Fee for the benefit of the Lock-Up Noteholders in exchange for a release from litigation that posed minimal risk to Old GM.  Because Old GM's transfer of the Consent Fee is avoidable under section 548 of the Bankruptcy Code, as well as

17

sections 273 and 278 of the NYDCL, the Claims should be disallowed under section 502(d) of the Bankruptcy Code because the Lock-Up Noteholders have not returned the Consent Fee.

2.  Alternatively, the Consent Fee is Avoidable
    Under Section 549 of the Bankruptcy Code

58.  Section 549 of the Bankruptcy Code provides that a transfer of property of the estate that occurs after the petition date and that is not authorized by the court is avoidable.

59.  Payment of the Consent Fee required several post-petition transfers of estate property that were not authorized by this Court.  As explained above, on or about June 25, 2009, nearly a month after the Petition Date, escrow funds that had been committed by Old GM for payment of the Consent Fee were transferred to Nova Scotia Finance and then released to the Lock-Up Noteholders.  To the extent that the Consent Fee is deemed to have been transferred post-petition, the payment of the Consent Fee to the Noteholders is avoidable under section 549 of the Bankruptcy Code.  Accordingly, the Claims should be disallowed under section 502(d) of the Bankruptcy Code because the Lock-Up Noteholders have not returned the Consent Fee.

**B.  Old GM's Obligations Under the Lock-Up Agreement are Avoidable Under Applicable Law**

1.  Old GM's Obligations under the Lock-Up Agreement are Avoidable
    Under Section 548 of the Bankruptcy Code and the NYDCL

60.  The Noteholders and the Nova Scotia Finance Trustee should not be permitted to rely upon the Lock-Up Agreement as a basis for asserting claims beyond what is permitted by applicable law because Old GM's obligations under the Lock-Up Agreement are avoidable under section 548 of the Bankruptcy Code and sections 273, 276 and 278 of the NYDCL.

61.  Section 548 of the Bankruptcy Code provides that any transfer of an interest of the debtor in property and any obligation incurred by the debtor on or within two years before

the petition date is avoidable if the debtor (a) received less than reasonably equivalent value in exchange for such transfer or obligation or (b) made such transfer or incurred such obligation with actual intent to hinder, delay or defraud creditors.  The NYDCL provides that every conveyance made and obligation incurred by an insolvent entity is fraudulent as to creditors and therefore avoidable if such conveyance is made or obligation is incurred (a) without fair consideration (NYDCL §§ 273 and 278) or (b) with actual intent to hinder, delay or defraud either present or future creditors (NYDCL §§ 276 and 278).

62.    Here, Old GM did not receive reasonably equivalent value or fair consideration in exchange for the obligations it incurred under the Lock-Up Agreement.  As explained above, in exchange for a release from litigation that posed minimal risk to Old GM, Old GM agreed to (a) allow and not contest guarantee claims for the full amount of the Notes aggregating in excess of $1 billion; (b) consent to a duplicative "deficiency claim" for Nova Scotia Finance's underlying liability on those same Notes; (c) acknowledge Nova Scotia Finance's consent to entry of a bankruptcy order under Canada's Bankruptcy and Insolvency Act so that Nova Scotia Finance, through the Nova Scotia Finance Trustee, could assert such a "deficiency claim" against Old GM based on Nova Scotia Finance's structure as an unlimited liability company; (d) allow Nova Scotia Finance, through the Nova Scotia Finance Trustee, to assert a claim against Old GM based upon the Swap Liability in excess of $564 million, even though the Swap Liability was, in fact, owed by Nova Scotia Finance to Old GM; (e) fund a consent fee to the Lock-Up Noteholders in an amount in excess of $369 million; and (f) release intercompany loans that, if not released, would have substantially reduced Old GM's exposure on its guarantee.

63.    Further, Old GM incurred the obligations under the Lock-Up Agreement with actual intent to hinder, delay, or defraud its creditors, which intent can be inferred from the "badges of fraud" noted above.

64.    Because the Lock-Up Agreement is avoidable under section 548 of the Bankruptcy Code and sections 273, 276 and 278 of the NYDCL, it cannot serve as a basis for the Nova Scotia Finance Trustee and the Noteholders to argue that their inflated Claims should be allowed.

2.    <u>Alternatively, the Lock-Up Agreement Constitutes an Unauthorized Settlement Under Rule 9019 of the Federal Rules of Bankruptcy Procedure</u>

65.    Rule 9019 of the Federal Rules of Bankruptcy Procedure requires bankruptcy court approval of a post-petition compromise or settlement, after notice and a hearing.

66.    Here, implementation of the Lock-Up Agreement required several post-petition events and transfers of estate property that were not authorized by the Court, and as to which notice was not provided.  As explained above, on or about June 25, 2009, nearly a month after the Petition Date, (a) the extraordinary resolution authorizing the Lock-Up Agreement was passed, (b) escrow funds that had been committed by Old GM for payment of the Consent Fee were transferred to Nova Scotia Finance and then released to the Lock-Up Noteholders, (c) Nova Scotia Finance and GM Canada entered into a settlement agreement releasing the Intercompany Loans and (d) Nova Scotia Finance consented to entry of a bankruptcy order under Canada's Bankruptcy and Insolvency Act.

67.    To the extent that the settlement reflected in the Lock-Up Agreement occurred post-petition, the settlement was unauthorized under Rule 9019 of the Federal Rules of Bankruptcy Procedure for lack of notice and court approval.

20

C.    *Alternatively, the Claims are Duplicative and Far in Excess of the
      Underlying Obligation*

68.    To the extent that the Guarantee Claims are allowed at all, as a matter of basic

claims administration, it is necessary to reduce the Protective Claim by the Individual Claims to

prevent overstating the total amount of Guarantee Claims asserted against Old GM.  Further, the

face amount of the Guarantee Claims should be reduced by the amount of the Consent Fee

because it constitutes a payment towards the principal amount due under the Notes.

69.    More fundamentally, however, the Duplicative Claim should be disallowed

entirely because it is duplicative of the Guarantee Claims.  It is well established that multiple

recoveries for the same injury are disallowed in bankruptcy.  To allow the Noteholders to

double-dip by recovering on duplicative claims against Old GM would be wholly at odds with

fundamental bankruptcy policy favoring equality of distribution among similarly-situated

creditors.  The Duplicative Claim and the Guarantee Claims seek to recover twice on a single

obligation: namely, the principal amount still due under the Notes.  Because the Duplicative

Claim is premised on the same underlying obligation as the Guarantee Claims, it should be

disallowed in its entirety.

D.    *In any Event, the Claims Should be Equitably Subordinated Under
      Section 510 of the Bankruptcy Code*

70.    The Claims should be equitably subordinated pursuant to section 510(c) of the

Bankruptcy Code to the extent they are deemed allowed.

71.    As set forth above, the Lock-Up Noteholders engaged in, and benefited from,

inequitable conduct that resulted in injury to Old GM's creditors and conferred an unfair

advantage upon the Noteholders.  Moreover, the magnitude of the Swap Liability and the

significance of its transfer to New GM were never disclosed to Old GM's creditors.  At a

minimum, Old GM's creditors should have been notified that the transfer of the Swap Liability would ultimately result in the assertion of the New GM Swap Claim against Old GM (via the Duplicative Claim) for the benefit of the Noteholders, and also should have been afforded a meaningful opportunity to object to the transfer. The aforementioned inequitable conduct will result in diminished recoveries to creditors of Old GM. The Lock-Up Noteholders' conduct, and that of New GM, has been inequitable, unconscionable and outrageous and has harmed Old GM's creditors and other stakeholders. Such conduct can and should be imputed to the Nova Scotia Finance Trustee.

72.      In equity and good conscience, the Claims should be equitably subordinated to the fullest extent permitted by law.

### E.       The Committee is Entitled to Relief Under Rule 60(b) of the Federal Rules of Civil Procedure and Rule 9024 of the Federal Rules of Bankruptcy Procedure

73.      Finally, for the reasons already set forth above, the Committee requests an order voiding the Assumption Order under Rule 60(b) of the Federal Rules of Civil Procedure and Rule 9024 of the Federal Rules of Bankruptcy Procedure, but only to the extent that the Assumption Order authorized the Debtors to assume and/or assign the Lock-Up Agreement and any other obligations incident thereto, including those concerning the Swap Transactions. This request for relief is asserted protectively, in anticipation of the need to respond to the Noteholders' argument that the purported assumption of the Lock-Up Agreement by Old GM, or the transfer of the swap claim to New GM, or the transfer of certain avoidance actions to New GM bars any challenge to the Claims.

## RESERVATION OF RIGHTS

74.     The Committee respectfully reserves all of its rights under federal, state and

Canadian law with respect to the Claims and all other claims asserted by, or for the benefit of,

the Lock-Up Noteholders, including but not limited to the right to seek standing from this Court

to file an adversary proceeding concerning such claims and seek recovery of all payments made

to, or for the benefit of, the Lock-Up Noteholders.  The Committee further reserves its right to

supplement or amend this application based upon information learned through discovery in this

matter.

## NOTICE

75.     The Committee has provided notice of this application to parties-in-interest in

accordance with the Third Amended Order Pursuant to 11 U.S.C. § 105(a) and Fed. R. Bankr. P.

1015(c) and 9007 Establishing Notice and Case Management Procedures, dated April 29, 2010

(Docket No. 5670).  The Committee submits that such notice is sufficient and further notice need

not be provided.  No previous request for the relief sought in this application has been made by

the Committee to this or any other court.

**WHEREFORE**, the Committee requests entry of an order:

(a) disallowing the Claims in their entirety under section 502(d) of the Bankruptcy Code;

(b) alternatively, reducing the total Claims to an amount equal to the principal amount of

the Notes less the Consent Fee, which Consent Fee should be recharacterized as a payment

against the principal amount of the Notes;

(c) to the extent the Claims are allowed, equitably subordinating the Claims to the claims

of all other general unsecured creditors;

23

(d) voiding the Assumption Order under Rule 60(b) of the Federal Rules of Civil

Procedure and Rule 9024 of the Federal Rules of Bankruptcy Procedure, but only to the extent

that the Assumption Order authorized the Debtors to assume the Lock-Up Agreement and any

other obligations incident thereto, including those concerning the Swap Transactions; and

(e) granting the Committee such other and further relief as the Court deems just and

proper.

Dated: New York, New York
      November 19, 2010

Respectfully submitted,

BUTZEL LONG, a professional corporation

By:    */s/ Eric B. Fisher*
        Barry N. Seidel
        Eric B. Fisher
        Katie L. Cooperman
        380 Madison Avenue, 22nd Floor
        New York, New York 10017
        Tel: (212) 818-1110
        Fax: (212) 818-0494

*Special Counsel to the Official Committee
of Unsecured Creditors of Motors
Liquidation Company f/k/a General
Motors Corporation*