# Exhibit A

FILED

8/27/09

Date

CLERK. U. S. DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
F.T. MYERS, FLORIDA

Initials

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

2009 AUG 17 AM 11: 54

U.S. DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS, FLORIDA

BILLY R. KIDWELL          :
5064 Silver Bell Drive    :
Port Charlotte, FL. 33948, :
        Plaintiff Person   :     **Case No. 2:09-CV-18-FtM-99DNF**
                          :
    v.                    :
                          :
G. RICHARD WAGONER        :
*GM CEO Sued in a Personal* :
*Capacity*                :
300 Renaissance Center    :
Detroit, MI. 48265-3000   :
        Defendant Person   :     PLAINTIFF'S AMENDED COMPLAINT
                          :     SEEKING PUNITIVE DAMAGES,
                          :     DECLARATORY, AND INJUNCTIVE,
And                       :     RELIEF FOR;
                          :
PERCY N. BARMEVIK,        :
*GM Board of Directors Sued in a* :     1. OBSTRUCTION AND FRAUD ON
*Personal Capacity*       :        THE FLORIDA STATE LEMON LAW
300 Renaissance Center    :        PROCESS
Detroit, MI. 48265-3000   :
        Defendant Person   :
                          :
And                       :     2. OBSTRUCTION AND FRAUD ON
                          :        THE COURT IN FLORIDA'S
ERSKINE B. BOWLES,        :        STATE COURT SYSTEM
*GM Board of Directors Sued in a* :
*Personal Capacity*       :
300 Renaissance Center    :
Detroit, MI. 48265-3000   :     3. OBSTRUCTION AND FRAUD ON
        Defendant Person   :        THE COURT IN THE UNITED
                          :        STATES DISTRICT COURT
                          :
And                       :
                          :
JOHN H. BRYAN,            :     4. SPOLIATION OF EVIDENCE
*GM Board of Directors Sued in a* :
*Personal Capacity*       :
300 Renaissance Center    :     5. FEDERAL RICO VIOLATIONS
Detroit, MI. 48265-3000   :
        Defendant Person   :

-1-

| | |
|---|---|
| And | : 6. STATE RICO VIOLATIONS |
| ARMANDO M. CODINA, | : |
| *GM Board of Directors Sued in a* | : 7. CONSPIRACY TO OBSTRUCT |
| *Personal Capacity* | : |
| 300 Renaissance Center | : |
| Detroit, MI. 48265-3000 | : 8. DIVERSITY |
|     Defendant Person | : |
| | : |
| And | : 9. BAILOUT MONEY FRAUD |
| GEORGE M.C. FISHER, | : |
| *GM Board of Directors Sued in a* | : 10.CONSTITUTIONAL VIOLATIONS |
| *Personal Capacity* | : |
| 300 Renaissance Center | : |
| Detroit, MI. 48265-3000 | : 11.FRAUDULENT ADVERTISING |
|     Defendant Person | : |
| | : |
| And | : 12. WIRE AND MAIL FRAUD |
| KAREN KATEN, | : |
| *GM Board of Directors Sued in a* | : 13. VIOLATION OF MAGNUSON- |
| *Personal Capacity* | :    MOSS WARRANTY ACT |
| 300 Renaissance Center | : |
| Detroit, MI. 48265-3000 | : |
|     Defendant Person | : 14. BREACH OF WARRANTY |
| | : |
| And | : |
| KENT KRESA, | : 15. RETALIATION AGAINST |
| *GM Board of Directors Sued in a* | :    PLAINTIFF FOR EXERCISING |
| *Personal Capacity* | :    RIGHTS |
| 300 Renaissance Center | : |
| Detroit, MI. 48265-3000 | : |
|     Defendant Person | : 16. UNJUST ENRICHMENT |
| | : |
| And | : |
| ELLEN J. KULLMAN, | : |
| *GM Board of Directors Sued in a* | : |
| *Personal Capacity* | : |
| 300 Renaissance Center | : |
| Detroit, MI. 48265-3000 | : WITH DEMAND FOR JURY TRIAL |
|     Defendant Person | : |
| | : |
| And | : |

PHILLIP A. LASKAWY,                        :
*GM Board of Directors Sued in a* :
*Personal Capacity*                        :
300 Renaissance Center                     :
Detroit, MI. 48265-3000                    :
      Defendant Person          :
                                       :
                                       :
And                                        :
                                       :
E. STANLEY O'NEAL,                         :
*GM Board of Directors Sued in a* :
*Personal Capacity*                        :
300 Renaissance Center                     :
Detroit, MI. 48265-3000                    :
      Defendant Person          :
                                       :
And                                        :
                                       :
ECKHARD PFEIFFER,                          :
*GM Board of Directors Sued in a* :
*Personal Capacity*                        :
300 Renaissance Center                     :
Detroit, MI. 48265-3000                    :
      Defendant Person          :
                                       :
And                                        :
                                       :
CAROLYN WESTBERG,                          :
*Unknown Co-Defendant Being* :
*Concealed by this Court for the* :
*GM Defendants* :
Her Address and Status is                  :
Unknown as a Result of this                :
Court helping the GM Defendants            :
Conceal this Defendant,                    :
      Defendant Person          :
                                       :
And                                        :
                                       :
GENERAL MOTORS COMPANY,                    :
P.O. Box 33170                             :
Detroit, MI 48232-5170,                    :
      Defendant Person          :
                                       :

## I. PRELIMINARY STATEMENT

1. This is a lawsuit that is similar to the storyline in the movie the Perfect Storm, only in this case instead of different events coming together to make a horrible storm, a group of individuals have come together to make a Corporate Rico Crime Family, and a complete farce, and mockery, of Florida's Lemon Law Process, Florida's Court System, the Federal Court System, the United States Constitution, and Plaintiff's rights.

2. The former General Motors Corporation[1], by means of its governance, who are named as Defendants in this lawsuit, operated the GM Corporation like an Organized Crime Family, spreading massive amounts of money around with lobbyists, to buy government "*influence*", while setting a number of illegal, and extremely dishonest, "*Policies*", some of which caused as many as 500 deaths a year, and others that caused extreme harm to America's Judicial Systems, and Plaintiff.

3. Those GM "*Policies*" resulted in numerous **Rico Predicate Acts**, ranging from advertising fraud, using the wire, air waves, and United States Mail, to defraud consumers, including Plaintiff, to intentional Manslaughter for a profit, and an intentional Fraud on America's Lemon Law Processes, and Court Systems, including a Fraud on this Court, to intentionally deny GM Customers, in this case the

---

[1] General Motors Corporation no longer exists due to a Chapter 11 bankruptcy filing. Hereinafter it is referred to as simply "*GM Corporation*".

Plaintiff, their Statutory, and Constitutional, Rights to obtain redress, when harmed by GM.

4. One of the GM Defendant's most appalling "*Policies*" is to intimidate law firms, by hiring massive, and sometimes multiple, law firms, *when sued*, to engage in all sorts of litigation abuse, and dilatory tactics, using any means, no matter how wrong, or illegal, to harass, and frustrate the victim, while greatly increasing the cost of litigation, rendering the litigation process a farce, so that most law firms are extremely reluctant in accepting cases against General Motors.

5. Because of the "*Policy*" of the Defendants to intimidate attorneys the severely disabled Plaintiff has been unable to obtain counsel and has been forced to proceed *Pro Se*.

6. This case is simple, despite the GM Defendant's Attorneys using massive smokescreens, in the form of slick shyster tricks, such as legal double-talk, creative technicalities, habitual lying, and other "*legal tactics*", **that no honest person would use**, to conceal the truth. [Emphasis added.]

The truth is;

(a) The GM Defendants intentionally violated the Magnuson-Moss Warranty Act and intentionally deceived the Plaintiff about the GM Warranty being administered by the Sitel Corporation, and the extremely dishonest way General Motors Operates.

(b) If Plaintiff was told the truth about the GM Warranty, prior
to his purchase, *as required by the Magnuson-Moss Warranty Act*,
he would have purchased a Ford Truck, instead of the General
Motors Junk he did buy.

(c) If Plaintiff had any idea there was an Ivey Report[2], and that
General Motors put a value of $2.20 on the lives of whole
families, in a GM Vehicle, and made their manufacturing, and
safety, decisions based on that $2.20 per vehicle value of human
lives, the Plaintiff would have never purchased a GM Vehicle.

(d) The intentional deception, and Magnuson-Moss Violations, by
the GM Defendants resulted in Plaintiff purchasing a GM Truck.

(e) It was litigated in Florida's Lemon Law Process, and found,
that the GM Truck sold to Plaintiff was a complete Lemon, with a
knocking motor, slipping transmission, leaking doors, and
windows, door handles that fell off, a gas gauge that never
worked, electrical shorts, engine that wouldn't start, and an
interior full of mold due to all the water leaks, all of which
render the truck not fit for use, and unsafe.

(f) Despite it being litigated, and adjudicated, that Plaintiff
paid over $26,000 for a Lemon Truck that won't even start, and
is not safe to drive, *if it could be started*, the GM Defendants

---

[2] A report made by General Motors, the famous "*Ivey Report*" found that it is
more "*Cost-effective*" to kill families in a GM Vehicle, known by GM to be
defective, than for GM to spend more than $2.20 per vehicle to make the
vehicle safe. Florida Courts, and juries, have found that GM operates based
on that $2.20 value of human lives, and have knowingly caused the deaths of
whole families rather than spend more than $2.20 to make the vehicle safe.

are determined to spend unlimited taxpayer bailout dollars, to
harass, and steal from a disabled Veteran, and not provide him
with what he paid the GM Defendants for.

(g) It has been litigated, and decided in Florida's Lemon Law
Process, that the GM Defendants took some $26,000 from the
disabled Plaintiff, and never provided him with what he paid
them for, which was a safe, working truck.

(h) Instead of dealing honestly, the GM Defendants went to the
United States Congress, and intentionally lied to the Congress,
and intentionally deceived Congress, about their needs for
bailout money, and lying as to how it would be spent.

(i) No "*Reasonable Person*" would ever believe that if the GM
Defendants had honestly informed Congress that they were going
to use over a million taxpayer bailout dollars, on three
different major law firms, to steal a mere $26,000 from a
disabled Veteran, and to mass-violate the Magnuson-Moss Warranty
Act, <u>deceiving every person that purchases a GM Vehicle</u>, that
Congress would have provided them with bailout funds.

(j) Plaintiff has been terrorized by the ongoing wrongful
policies of the Defendants, and the "*New*" General Motors, and
cheated, as has every American that pays taxes, and he seeks
redress with this lawsuit.


## II. JURY DEMAND

7. Plaintiff <u>DEMANDS</u> a Jury Trial in the instant case.

### III. JURISDICTION AND VENUE

8. The events giving rise to the claims in this lawsuit
   occurred in Charlotte County Florida.

9. Plaintiff seeks jurisdiction pursuant to the Federal Civil
   Rico Statutes, concurrent with Diversity.

10. At all times in this case Plaintiff resided in Charlotte
    County Florida, while GM Defendants reside in Michigan. The
    amount in controversy greatly exceeds seventy-five thousand
    dollars ($75,000), thereby authorizing jurisdiction
    pursuant to diversity, in addition to the other Claims.

11. Plaintiff also seeks to resolve a couple of Constitutional
    Questions.

12. Plaintiff seeks declaratory relief, compensatory, and
    punitive damages, and injunctive relief, as well as any
    other relief that he is entitled to.


### IV. Parties

13. Plaintiff, Billy Ray Kidwell, is a male resident of the
    State of Florida. He is a disabled person within the
    meaning of the Americans with Disabilities Act, and is
    rated at 100% Total Service-Connected by the Department of
    Veterans Affairs, and was found by Federal Administrative

Law Judge, Farr, to be totally disabled. Plaintiff's
address is; Billy Kidwell, 5064 Silver Bell Drive, Port
Charlotte, FL. 33948.

14. Defendant, G. RICHARD WAGONER, is the former CEO of GM,
however he is being sued in a Personal Capacity for
wrongful conduct not authorized by GM, as a member in a
*Rico Association-In-Fact Enterprise* for personal gain. This
Defendant is concealing the address of his place of usual
abode however his business address is; CEO G. Richard
Wagoner, General Motors Corporation, 300 Renaissance
Center, Detroit, MI. 48265-3000.

15. Defendant, PERCY N. BARMEVIK, at all times described in
this Complaint, was on the Board of Directors for GM,
however he is being sued in a Personal Capacity for
wrongful conduct not authorized by GM, as a member in a
*Rico Association-In-Fact Enterprise* for personal gain. This
Defendant is concealing the address of his place of usual
abode however his business address is; Percy N. Barmevik,
Board of Directors, General Motors Corporation, 300
Renaissance Center, Detroit, MI. 48265-3000.

16. Defendant, ERSKINE B. BOWLES, at all times described in
this Complaint, was on the Board of Directors for GM,
however he is being sued in a Personal Capacity for
wrongful conduct not authorized by GM, as a member in a
*Rico Association-In-Fact Enterprise* for personal gain. This
Defendant is concealing the address of his place of usual
abode however his business address is; Erskine B. Bowles,
Board of Directors, General Motors Corporation, 300
Renaissance Center, Detroit, MI. 48265-3000.

17. Defendant, JOHN H. BRYAN, at all times described in this
    Complaint, was on the Board of Directors for GM, however he
    is being sued in a Personal Capacity for wrongful conduct
    not authorized by GM, as a member in a *Rico Association-In-
    Fact Enterprise* for personal gain. This Defendant is
    concealing the address of his place of usual abode however
    his business address is; John H. Bryan, Board of Directors,
    General Motors Corporation, 300 Renaissance Center,
    Detroit, MI. 48265-3000.

18. Defendant, ARMANDO M. CODINA, at all times described in
    this Complaint, was on the Board of Directors for GM,
    however he is being sued in a Personal Capacity for
    wrongful conduct not authorized by GM, as a member in a
    *Rico Association-In-Fact Enterprise* for personal gain. This
    Defendant is concealing the address of his place of usual
    abode however his business address is; Armando M. Codina,
    Board of Directors, General Motors Corporation, 300
    Renaissance Center, Detroit, MI. 48265-3000.

19. Defendant, GEORGE M.C. FISHER, at all times described in
    this Complaint, was on the Board of Directors for GM, however
    he is being sued in a Personal Capacity for wrongful conduct
    not authorized by GM, as a member in a *Rico Association-In-
    Fact Enterprise* for personal gain. This Defendant is
    concealing the address of his place of usual abode however his
    business address is; George M.C. Fisher, Board of Directors,
    General Motors Corporation, 300 Renaissance Center, Detroit,
    MI. 48265-3000.

20. Defendant, KAREN KATEN, at all times described in this
Complaint, was on the Board of Directors for GM, however
she is being sued in a Personal Capacity for wrongful
conduct not authorized by GM, as a member in a *Rico
Association-In-Fact Enterprise* for personal gain. This
Defendant is concealing the address of her place of usual
abode however her business address is; Karen Katen, Board
of Directors, General Motors Corporation, 300 Renaissance
Center, Detroit, MI. 48265-3000.

21. Defendant, KENT KRESA, at all times described in this
Complaint, was on the Board of Directors for GM, however he
is being sued in a Personal Capacity for wrongful conduct
not authorized by GM, as a member in a *Rico Association-In-
Fact Enterprise* for personal gain. This Defendant is
concealing the address of his place of usual abode however
his business address is; Kent Kresa, Board of Directors,
General Motors Corporation, 300 Renaissance Center,
Detroit, MI. 48265-3000.

22. Defendant, ELLEN J. KULLMAN, at all times described in this
Complaint, was on the Board of Directors for GM, however
she is being sued in a Personal Capacity for wrongful
conduct not authorized by GM, as a member in a *Rico
Association-In-Fact Enterprise* for personal gain. This
Defendant is concealing the address of her place of usual
abode however her business address is; Ellen J. Kullman,
Board of Directors, General Motors Corporation, 300
Renaissance Center, Detroit, MI. 48265-3000.

23. Defendant, PHILLIP A. LASKAWY, at all times described in
this Complaint, was on the Board of Directors for GM,

however he is being sued in a Personal Capacity for
wrongful conduct not authorized by GM, as a member in a
**Rico Association-In-Fact Enterprise** for personal gain. This
Defendant is concealing the address of his place of usual
abode however his business address is; Phillip A. Laskawy,
Board of Directors, General Motors Corporation, 300
Renaissance Center, Detroit, MI. 48265-3000.

24. Defendant, E. STANLEY O'NEAL, at all times described in
this Complaint, was on the Board of Directors for GM,
however he is being sued in a Personal Capacity for
wrongful conduct not authorized by GM, as a member in a
**Rico Association-In-Fact Enterprise** for personal gain. This
Defendant is concealing the address of his place of usual
abode however his business address is; E. Stanley O'Neal,
Board of Directors, General Motors Corporation, 300
Renaissance Center, Detroit, MI. 48265-3000.

25. Defendant, ECKHARD PFEIFFER, at all times described in this
Complaint, was on the Board of Directors for GM, however he
is being sued in a Personal Capacity for wrongful conduct
not authorized by GM, as a member in a **Rico Association-In-
Fact Enterprise** for personal gain. This Defendant is
concealing the address of his place of usual abode however
his business address is; Eckhard Pfeiffer, Board of
Directors, General Motors Corporation, 300 Renaissance
Center, Detroit, MI. 48265-3000.

26. Defendant, CAROLYN WESTBERG, had her status litigated, and
was found, to be a GM Employee at Florida's Lemon Law
Process, and in Plaintiff's State Lawsuit against General

Motors. The GM Defendant's Attorney, Phyllis Sumner, now
contradicts her clients, and those judgments, and says
Carolyn Westberg was never a GM Employee, so Plaintiff is
confused as to the truth. This Court has refused to abide
by the law, is concealing Carolyn Westberg, to keep
Plaintiff from serving this Defendant. She is being sued in
a Personal Capacity, as a member in a **Rico Association-In-
Fact Enterprise**. The GM Governance Defendants, their
attorneys, and this Court are concealing the address of
CAROLYN WESTBERG's, usual place of abode.

27. Defendant, General Motors Company, is the new company
formed as a result of the bankruptcy of the old General
Motors Corporation. This Defendant's address is; General
Motors, P.O. Box 33170, Detroit, MI 48232-5170.

## V. TERMS USED

28. The term **"GM Corporation"** refers to the former General
Motors Corporation.

29. The term **"GM Company"** refers to the new General Motors
Company.

30. The term **"Named GM Board of Directors"** refers to Defendant
Persons, PERCY N. BARMEVIK, ERSKINE B. BOWLES, JOHN H.
BRYAN, ARMANDO M. CODINA, GEORGE M.C. FISHER, KAREN KATEN,
KENT KRESA, ELLEN J. KULLMAN, PHILLIP A. LASKAWY, E.

STANLEY O'NEAL, and ECKHARD PFEIFFER, both individually,
and as a group.

31. The term **"GM Corporate Governance Defendants"** means all of
the Defendants named in section 29 above plus Defendant
former GM CEO Rick Wagoner.

32. The term **"Defendants"** refers to all Defendants.

33. The term **"GM Rico Crime Family"** refers to the General
Motors Association-In-Fact Rico Enterprise that is being
sued in this case, and consists of the Defendants in this
lawsuit.


## VI. FACTS OF CASE

### (A). Fraudulent Advertising and Fraud

34. The GM Corporation, and GM Corporate Governance Defendants,
used television, radio, newspapers, and magazines to
advertise, interstate, that General Motors Vehicles were
dependable, safe, and had a solid General Motors Warranty,
and a *"Mr. Goodwrench"* to care for their new GM Vehicle.

35. The GM Corporation, and GM Corporate Governance Defendants,
knew when they ran those advertisements that they were not
just mere puffery, but were fraudulent as to the actual
material facts, and part of an intentional Rico scheme by

the GM Corporate Governance Defendants, to intentionally
deceive potential GM Customers, including the Plaintiff.

36. The GM Corporate Governance Defendants knew when they ran
    the advertising, described above, that there was no GM
    Warranty, but rather that the alleged GM Warranty was
    administered by a third party, the Sitel Corporation.

37. Gm had a right to have a third party like the Sitel
    Corporation administer it's warranty, only if GM were
    honest, and informed consumers about the third party
    administering the GM Warranty, prior to their purchasing a
    GM Vehicle, so a potential customer could compare
    warranties, and decide if they wanted to purchase a vehicle
    with a third party warranty.

38. One of the main reasons Congress passed the Magnuson-Moss
    Warranty Act was so that consumers could compare warranties
    on products before making a purchase decision.

39. The Magnuson-Moss Warranty Act specifically requires
    honesty, and truthfulness, from the warrantor.

40. The GM Corporate Governance Defendants were intentionally
    secretive, and sneaky, about having a third party
    administer their warranty, and the Plaintiff was completely
    deceived, and did not learn about the Sitel Corporation
    administrating the GM Warranty until recently, which is
    some five (5) years AFTER purchasing his GM Truck.

41. The GM Corporate Governance Defendants failed to be honest, and truthful, in their advertising, and in their warranty.

42. The GM Corporate Governance Defendants also knew when they ran the advertising, described above, that what Vehicle Warranty the GM Defendants did provide, was provided arbitrarily, and capriciously, with warranty decisions often based on a cost-effectiveness basis, and not on the written warranty, or GM's promises, or representations.

43. The GM Corporate Governance Defendants were dishonest in their advertising as to how they responded to, and dishonestly treated, GM Customers who purchased a GM Vehicle that turned out to be a lemon.

44. The advertising by the GM Corporate Governance Defendants also was deceptive, and did not honestly tell about GM's "*Policy*" of litigation abuse, should a GM Consumer have to file suit because of GM's failure to honor their warranty.

45. The advertising, described above, also fraudulently portrayed GM Trucks as being "*Built like a Rock*", and being dependable, and safe.

46. The GM Corporate Governance Defendants knew when they ran the advertising, described above, that they had set a "*Cost-effective*" Policy whereby if GM knew a vehicle was not safe, and could kill the consumer, if it cost over $2.20 to make the vehicle safe, GM would not fix the vehicle. [See GM's Ivey Report].

47. The fraudulent advertising claimed that GM cared about
consumers, when nothing could be further from the truth, in
that GM has allowed as many as 500 GM Consumers a year to
die horrible deaths in unsafe GM Vehicles, because GM
decided it was more cost-effective to let them die, than to
spend $5.00[3], or less, to make the vehicles safe.

48. The GM Corporate Governance Defendants failed to provide
the Plaintiff with an honest, truthful, warranty <u>prior</u> to
his truck purchase so that the Plaintiff could compare
warranties, <u>prior</u> to a vehicle purchase, as intended by
Congress with the Magnuson-Moss Warranty Act.

49. From at least 1996, to the present, the Florida Plaintiff,
Billy Ray Kidwell has been a customer of Comcast, watching
television stations such as WGN-TV from Illinois, CNBC from
Manhattan, and TNT out of Atlanta at his home on cable.

50. In September, November, and December of 2002, prior to the
purchase by Plaintiff of a 2003 Chevy S-10, the GM
Corporate Governance Defendants approved, and caused to be
broadcast in interstate commerce on television stations,
including WGN-TV, CNBC, and TNT, many fraudulent GM Ads as
described in the paragraphs above.

51. Those interstate commerce ads were far beyond "*mere
puffery*", and made false factual representations, as
described herein, that were intentionally deceptive, and

---

[3] General Motors <u>OWN</u> Ivey Report, and Florida Courts, have found that GM
places a $2.20 price, as their value of a human life.

part of a Rico scheme by the GM Corporate Governance
Defendants to create a fraudulent representation of GM
Vehicles.

52. Those interstate commerce ads were broadcast in bad faith
to defraud, and cheat, prospective GM Consumers, including
Plaintiff, out of money, by means of false, and fraudulent
pretenses, in direct violation of Title 18 § 1343.

53. At the time the GM Corporate Governance Defendants
approved, and ran the fraudulent GM Truck Ads, described
above, said Defendants were fully aware that thousands, and
thousands, of GM Trucks had a Piston Slap Problem.

54. At the time the GM Corporate Governance Defendants ran the
fraudulent GM Truck Ads, described above, said Defendants
were fully aware that some GM Trucks had a defective Gas
Gauge.

55. When the GM Corporate Governance Defendants approved, and
ran the fraudulent GM Truck Ads, described above, said
Defendants were fully aware that some of their GM Trucks
had a Transmission Whine, or slipping transmission.

56. When the GM Corporate Governance Defendants approved, and
ran the fraudulent GM Truck Ads, described above, said
Defendants were fully aware that some GM Trucks had a door
water leak, or a window, or windshield leak.

57. When the GM Corporate Governance Defendants approved, and
    ran the fraudulent GM Truck Ads, described above, said
    Defendants were fully aware that some GM Trucks had an
    electrical short, or electrical problems.

58. When the GM Corporate Governance Defendants approved, and
    ran the fraudulent GM Truck Ads, described above, said
    Defendants were fully aware that some GM Trucks had a third
    door problem, where the plastic door handle would break.

59. When the GM Corporate Governance Defendants approved, and
    ran the fraudulent GM Truck Ads, described above, said
    Defendants were fully aware that some GM Trucks had
    problems with the brake system.

60. GM Corporate Governance knew that such a substantial number
    of 2003 GM Trucks had problems of one kind or another, as
    is described above, that it rendered the GM Defendants
    interstate radio, and television, ads claiming Chevy Trucks
    are "*Built Like a Rock*", and that "*Chevy is the most
    Dependable Truck*", factually untrue, and harmful to
    potential GM consumers, including Plaintiff.

61. The Plaintiff, being completely deceived by the GM
    Corporate Governance Defendant's fraudulent, and deceptive,
    advertising purchased a new 2003 Chevy S-10.

## (B) Wire and Mail Fraud

62. Plaintiff watched, at a minimum, thirty (30) of those
    fraudulent GM Truck Ads by the GM Defendants in September,
    November, and December of 2002, falsely claiming that GM
    Trucks were "*Built Like a Rock*", while said ads were
    completely silent as to the truth about a third party
    administrating the GM Warranty.

63. Those thirty (30) fraudulent ads described in paragraph
    sixty-two (62) above were untrue as to the actual material
    facts and intended by Defendants to create a fraudulent
    representation of GM Trucks.

64. Those thirty (30) fraudulent ads described in paragraph
    sixty-two (62) above constituted thirty (30) separate acts
    of wire fraud in interstate commerce in violation of Title
    18 § 1343 by the GM Defendants.

65. In September, November, and December of 2002, the GM
    Defendants caused to be broadcast in interstate commerce on
    television stations, including WGN-TV, CNBC, and TNT, a
    minimum of thirty (30) fraudulent GM Ads claiming GM Trucks
    have a written warranty, with the ads either stating, or
    strongly implying, that GM honored it's written warranty,
    which is factually not true.

66. Defendants Television ads, as described in paragraph sixty-
    five (65) above was factually untrue and intended by
    Defendants to create a false, or fraudulent, representation

of GM Trucks, thereby constituting thirty (30) intentional
acts of wire fraud in direct violation of Title 18 § 1343.

67. As a direct result of the wire fraud by the GM Defendants
fraudulent advertising scheme in direct violation of Title
18 § 1343, the Plaintiff purchased a brand new Chevy S-10
for $26,157.63.


(C) Breach of Warranty

68. Plaintiff after being deceived into purchasing a new 2003
S-10 Pickup from the GM Defendants found that the dash
lights, and sometimes headlights, would go out at night due
to an electrical short of some kind.

69. Plaintiff's new Chevy Truck started knocking when the
engine idled, and the engine would sometimes not start, and
stall at traffic lights.

70. Plaintiff noticed red fluid all over his driveway, and the
transmission started whining, and slipping.

71. Plaintiff's new truck would shimmy, and go all over the
road, endangering everyone in the truck when you went over
forty (40) miles an hour.

72. Plaintiff's gas gauge would say there was half a tank of
gas, and the truck would run out of gas, leaving Plaintiff
stranded, severely harming Plaintiff, who is severely

disabled, and can't walk far, and would burn up in the hot
Florida sun.

73. The doors would let water run in when it rained which
filled the truck with dangerous mold.

74. Plaintiff took the truck to Palm Auto Mall, which after six
months told Plaintiff they were giving up, and would not
try to fix the truck anymore because it was clearly a
Lemon.

75. Because the GM Dealership would not honor the warranty, or
even try to fix Plaintiff's truck anymore, the Plaintiff
started sending many letters to former CEO Richard Wagoner,
to the GM Board of Directors, to the President, and Vice
President of General Motors for North America, and to other
Corporate Governance of General Motors, advising them that
he was making substantial monthly payments on his GM Truck,
and that the truck would not even start, and that Plaintiff
wanted his defective truck fixed, as promised by the
written warranty.

76. It was the Plaintiff's hope that he would find just one
honest person in the governance of General Motors that
would either provide him with a working truck, like he paid
Defendants for, or return his money.

77. Despite sending letter, after letter, to the CEO of General
Motors, G. Richard Wagoner, and to each GM Board of
Directors Member, explaining the facts, there was not one
honest person running GM, that would simply provide

Plaintiff with what he had paid them for, a safe, working, truck, or be honest enough to return the money they stole from Plaintiff.

78. In those letters to GM CEO, G. Richard Wagoner, and to each member of the GM Board of Directors, the Plaintiff made those Defendants fully aware that Plaintiff is on a fixed income and that it was causing the Plaintiff Great Harm, and undue financial hardship, by his having to pay $386.26 a month, for a S-10 Truck that would not even start, and endangered those that drove it, *if they could get it running*.

79. Plaintiff also explained in those letters to Defendant, G. Richard Wagoner, and to each member of the GM Board of Directors, that because the S-10 would not start, or run, and GM would not honor it's warranty, that Plaintiff, who received a small government disability to live on, not only suffered a great financial hardship from paying every month, for a truck that would start, or run, but Plaintiff also had to pay for a replacement vehicle that would run, while Plaintiff had to store the non-running truck that GM refused to repair.

80. Plaintiff also explained in those letters to Defendant, G. Richard Wagoner, and to each member of the GM Board of Directors, that Plaintiff had been promised by GM's attorneys several times that they were sending someone to "*inspect*" the defective, unsafe, non-running, lemon truck but that no one had ever showed up.

81. From 1-20-2003, the date the Plaintiff purchased his new
Chevy Truck, to the present, the GM Defendants have
absolutely refused to honor their Written, or advertised,
warranty and have left the un-running truck in Plaintiff's
driveway causing Plaintiff great inconvenience, since
Plaintiff is disabled, and has a bad leg, and the un-
running truck is blocking Plaintiff's driveway.

82. To keep Plaintiff from junking the truck, to get it out of
his driveway, about every six months the GM Defendants have
their attorneys tell the Plaintiff they are sending someone
to "*inspect*" the non-running truck, just to harass
Plaintiff, since no one ever shows up.

83. The GM Defendants refuse to give the Plaintiff any reason
they will not honor the warranty and fix the defective
truck.

(D) Fraud on Florida's Lemon Law Process

84. Pursuant to Florida Statute 681.104(1)(a) after three
attempts were made to repair the same non-conformity the
Plaintiff gave written notification to the manufacturer, as
Plaintiff was instructed by the GM Dealership to do, by
sending a Lemon Law Complaint to the Chevy Motor Division,
Customer Assistance Center, P.O. Box 33170, Detroit, MI
48232 by Registered Mail.

85. Plaintiff also sent similar Lemon Law Complaints to CEO
    Richard Wagoner, and to each GM Board of Directors member
    named in this lawsuit.


86. In those Lemon Law Complaint Letters, the Plaintiff gave
    the GM Defendants Formal **NOTICE** that should he not prevail
    in the Lemon Law Process that Plaintiff was pursuing this
    matter to Federal Court, and would be filing this Federal
    Lawsuit.


87. Florida Statute 681.104(1)(a) does not allow the Lemon Law
    Complaint to go to a third party, and specifically requires
    that the Lemon Complaint be filed with the manufacturer.


88. To commit a Fraud on Florida's Lemon Law Process the GM
    Defendants fraudulently claimed that Sitel Corporation
    Employee, Carolyn Westberg, is a GM Employee.


89. Unknown to the Plaintiff at the time, the GM Defendants
    had Lemon Law Complaints, including Plaintiff's Lemon Law
    Complaint, that were sent to the Chevy Customer Assistance
    Center in Detroit, secretly forwarded to the Sitel
    Corporation, which is a third party, and not allowed,
    according to F.S. 681.104(1)(a), to be served with the
    Lemon Law Complain, since Florida Law <u>REQUIRES</u> service <u>ONLY</u>
    on the manufacturer.


90. Florida Statute, F.S. 681.104(1)(a) is very clear that <u>ONLY</u>
    the manufacturer is to be served the consumer's Lemon Law
    Complaint.

91. *In addition*, Florida Law requires that the consumer in a
    Lemon Law Process be provided with all evidence, and this
    requirement was intentionally violated by the GM Defendants
    as they kept secret that it was not General Motors that was
    involved in the Lemon Law Process with Plaintiff, as
    required by Florida Law, but rather the Sitel Corporation.

92. The address of the Sitel Corporation, and Carolyn Westberg,
    have been kept secret from the Plaintiff by General Motors
    using its own Corporate address, and secretly forwarding
    the correspondence the Plaintiff sends, deceiving the
    Plaintiff into believing he is dealing with General Motors.

93. To further intentionally violate Chapter 681, and deceive
    the Plaintiff about the involvement of the Sitel
    Corporation, the GM Defendants created, or manufactured, a
    number of fake letters misrepresenting that Carolyn
    Westberg was a GM Employee.

94. To further the scheme of the GM Defendants, to commit a
    fraud on Florida's Lemon Law Process, the GM Defendants
    suborned Perjury from Steven Nichols, a GM Employee in
    Tampa, Florida, who committed Perjury, and testified, under
    oath at Plaintiff's Lemon Law Hearing, that Carolyn
    Westberg is a GM Employee.

95. As a result of this intentional Fraud on Florida's Lemon
    Law Process by the GM Defendants, both Plaintiff, and the
    Lemon Law Hearing Officer were deceived into believing that
    Carolyn Westberg is a GM Employee.

96. As a result of this intentional Fraud on Florida's Lemon
    Law Process by the GM Defendants, the Lemon Law Hearing
    Officer ruled that Carolyn Westberg was a GM Employee.

97. And based solely on Carolyn Westberg being a GM Employee,
    who had submitted a letter claiming the Plaintiff did not
    serve her by Registered Mail as required by Florida's
    Chapter 681, the Plaintiff was denied Lemon Law Relief.

98. As Plaintiff's Lemon Law Judgment makes extremely clear, if
    Carolyn Westberg was not a GM Employee, the Plaintiff would
    have prevailed in Florida's Lemon Law Process.

99. Plaintiff's Lemon Law Judgment clearly states Plaintiff met
    **ALL** requirements for Lemon Law Relief, and a letter from **GM
    Employee** Carolyn Westberg was the sole reason Plaintiff was
    denied Florida Lemon Law Relief. [Emphasis added].

100.    Now in this lawsuit, after the GM Defendants have
    litigated in Florida's Lemon Law Process, and even had GM
    Employee, Steven Nichols, testify under oath that Carolyn
    Westberg was a GM Employee, their attorney, Phyllis Sumner,
    has informed this Court that it was all lies.

101.    According to the GM Defendant's Attorney in this
    lawsuit, Phyllis Sumner, the Defendant, Carolyn Westberg,
    was **NEVER** a GM Employee, but rather worked for the Sitel
    Corporation.

102.    If Attorney Phyllis Sumner is telling the truth that
means that her clients, the GM Defendants, committed a
***Fraud on Florida's Lemon Law Process***, and intentionally
lied about Carolyn Westberg being a GM Employee. [Emphasis
added.]

103.    It would mean that the GM Defendants suborned the
Perjury of GM Employee, Steven Nichols, to intentionally
deceive the Florida Lemon Law Officer, committing a Fraud
on Florida's Lemon Law Process.

104.    It would mean that the GM Defendants obtained a
favorable Lemon Law Judgment against Plaintiff solely by a
Fraud on Florida's Lemon Law Process.

105.    It would mean that the Plaintiff was, and is, legally
entitled to Florida Lemon Law Relief, including the return
of the money he paid for the Lemon GM Truck, less the
amounts authorized by law.

106.    It would mean that the Plaintiff is entitled to fifty
dollars ($50.00) a day since the date of his Lemon Law
Judgment, as authorized by Florida Law, until the GM
Defendants pay him.

107.    It means that Plaintiff is entitled to reasonable
storage fees for having to store the Lemon GM Truck on his
property.

108.    It means that Plaintiff is entitled to reasonable
damages for the intentional aggravation of his health by
Defendants, for the heart problems, and possible Stress-
Caused Heart Attack, intentionally inflicted on Plaintiff
by Defendants, for the years of aggravation, damages for
all the work, time, expenses, filing fees, and all other
costs, and damages caused by Defendants intentionally
committing a Fraud on Florida's Lemon Law Process, and
harming Plaintiff.

109.    Plaintiff is entitled to all damages, and harm,
wrongly inflicted on him by the Defendant's **Fraud on
Florida's Lemon Law System**[4] in Plaintiff's case.

110.    Plaintiff was informed by both the Better Business
Bureau, and GM Employee Steven Nichols, that GM had a copy
of all the Lemon Law Records, including a true, and
correct, tape recording of the Lemon Law Hearing, and is
required by law to keep, and care, for that evidence, since
Plaintiff had given prior formal NOTICE he would pursue
this matter to Federal Court.


(E) The Doctrine of Collateral Estoppel or Issue Preclusion


111.    With the same, exact, GM Defendants that are in this
lawsuit, Florida's Second District Court of Appeals has

---

[4] Since the Lemon Law Hearing was a Quasi-Judicial Hearing, a Fraud on that
hearing by Defendants, is similar to a Fraud on the Courts.

ruled that Plaintiff's Lemon Law Hearing was a Quasi-
Judicial Hearing.

112.   At Plaintiff's Lemon Law Hearing, with the same,
exact, GM Defendants that are in this lawsuit, it was
litigated, and decided by the Lemon Law Hearing Officer,
that Plaintiff paid the GM Defendants, in excess of
$26,000, for what was supposed to be a working, safe, Chevy
Truck, and the Plaintiff never received from the GM
Defendants what he paid them for.

113.   Plaintiff was swindled.

114.   At Plaintiff's Lemon Law Hearing, with the same,
exact, GM Defendants that are in this lawsuit, it was
litigated, and decided by the Lemon Law Hearing Officer,
that Carolyn Westberg is, and was at all times, a GM
Employee.

115.   At Plaintiff's Lemon Law Hearing, with the same,
exact, GM Defendants that are in this lawsuit, it was
litigated, and decided by the Lemon Law Hearing Officer,
that Plaintiff's GM Truck is a complete Lemon with an
engine knock, an engine that won't start, a gas gauge that
never worked, a transmission that whines, and slips, doors

that leak water, a windshield with a leak, door handles

that break, and doors that won't open, seats that are

broke, an electrical short, and an interior that is "*shot*"

and full of mold, due to all the water leaks.


116.    At Plaintiff's Lemon Law Hearing, with the same,

exact, GM Defendants that are in this lawsuit, it was

litigated, and decided by the Lemon Law Hearing Officer,

that the defects listed in the paragraph above

substantially impair the vehicle, and that Plaintiff's

truck is not fit for its intended purpose.


117.    At Plaintiff's Lemon Law Hearing, with the same,

exact, GM Defendants that are in this lawsuit, it was

litigated, and decided by the Lemon Law Hearing Officer,

that the Plaintiff met all requirements for Lemon Law

Relief, except for a letter from GM Employee Carolyn

Westberg claiming that Plaintiff's First Lemon Law

Complaint sent to her was not by Registered Mail.


118.    The GM Defendant's Attorney, Phyllis Sumner, now

claims that Carolyn Westberg was never a GM Employee, which

means that Plaintiff met ALL the requirements, pursuant to

Florida Law, for Lemon Law Relief.

119.    Pursuant to the well-settled doctrine of Collateral
        Estoppel, those findings, that were fairly litigated among
        the same parties, are binding on this Court.


120.    Pursuant to the well-settled doctrine of Issue
        Preclusion, those findings, that were fairly litigated
        among the same parties, are binding on this Court.


(F) A Fraud on the Florida State Courts

121.    On July 26, 2005 the Plaintiff filed a State Lawsuit
        against General Motors in Charlotte County Florida, Case
        05-1747-CA.


122.    From July 26, 2005 until the present the GM Defendants
        have litigated in the Florida State Court that Carolyn
        Westberg is a General Motors Employee, with the title of
        being a General Motors Customer Relationship Manager.


123.    When the Plaintiff appealed parts of his State Court
        Lawsuit with the Second District Court of Appeals in
        Florida the GM Defendants continued their litigation that
        Carolyn Westberg is a GM Employee, with the Official Title
        of General Motors Customer Relationship Manager.

124.    It has been litigated in two Florida State Courts by
the GM Defendants for over four years that Carolyn Westberg
is a GM Employee.

125.    On February 24, 2009 the General Motors Legal
Department, in the form of Attorney Michael Gruskin,
informed the Plaintiff that Carolyn Westberg was never a GM
Employee, which meant that General Motors had been
committing a Fraud on Florida's Lemon Law Process, and
State Court System, and even obtained judgments against the
Plaintiff by Fraud.

126.    On March 4, 2009 the GM Defendant's Attorney, Phyllis
Sumner, contacted Plaintiff and also claimed that Carolyn
Westberg never worked for General Motors, and had worked
for a Sitel Corporation.

127.    So according to GM Attorneys Michael Gruskin, and
Phyllis Sumner, for over four years their clients have been
committing a fraud on Florida's Lemon Law Process, and on
two Florida Courts about Carolyn Westberg being a GM
Employee.

128.    That means that the General Motors Defendants
fraudulent manufactured, or caused to be fraudulently

-33-

manufactured, the fake letter Exhibit they used in the
Lemon Law Process to claim Carolyn Westberg was a GM
Employee, and which was the sole reason Plaintiff was
denied Lemon Law Relief.

129.    According to GM Attorneys Michael Gruskin, and Phyllis
Sumner, for over four years their clients have
intentionally violated the Florida Chapter 681 Rights of
the Plaintiff.

130.    According to GM Attorneys, Michael Gruskin, and
Phyllis Sumner, for over four years their clients have
intentionally violated the Magnuson-Moss Warranty Rights of
Plaintiff.

131.    According to GM Attorneys, Michael Gruskin, and
Phyllis Sumner, for over four years their clients have
intentionally violated the First Amendment Rights of
Plaintiff to *"Meaningful"* Access to the Courts, and
Plaintiff's Fourteenth Amendment, Due Process Rights with
their four years of lies about Carolyn Westberg.

132.    All of this constituted a Fraud on Florida's Court
System.

133.    Plaintiff has not only had his statutory, and
Constitutional, Rights violated for over four years by the
GM Defendant's Fraud on the State Courts, and their lies
about Carolyn Westberg, but said wrongful conduct strongly
contributed to a Stress-Caused Heart Attack Plaintiff
suffered, and caused substantial aggravation of Plaintiff's
health.

134.    The GM Defendant's Fraud on the Courts has cause
Plaintiff four years of loss of sleep, stomach problems, to
be constantly sick four years, undue stress, to work day,
and night trying to get at the truth, and massive amounts
of related harm.

## (G) Rico Predicate Acts

135.    The GM Corporate Governance Defendants, have a long,
well-documented history, pattern, and custom of
Obstruction, the Spoliation of Evidence, and other
litigation abuse in the Courts.

136.    The GM Corporate Governance Defendants have set a bad
faith "*Policy*" for General Motors to Obstruct Justice, and
for General Motors Employees, and Attorneys, to lie, and
engage in the Spoliation of Evidence, and do whatever it
takes, to violate the rights of GM consumers, including

Plaintiff, and deny them "*Meaningful*" access to state Lemon
Law Processes, and the Courts.

137.    The GM Policy, set by the GM Corporate Governance
Defendants, is to prevail against the consumer, when the
consumer makes a Complaint, no matter how dishonest the
tactics, and methods used are.


138.    The GM Policy of OBSTRUCTION, and a FRAUD ON THE
COURTS resulted in the Obstruction to Florida's Lemon Law
System, and Florida's Courts, for Plaintiff, as described
above, which constituted Rico Predicate Acts.


139.    The GM Defendants used the United States Mail in their
scheme to Obstruct Plaintiff's Access to Florida's Lemon
Law Process, and the Courts, by sending fake, and
falsified, documents to Plaintiff, Lemon Law Officials, and
the Courts through the U.S. Mail System, which furthered
their criminal scheme, and constituted Mail Fraud.

140.    Each act of mail fraud constituted a separate Rico
Predicate Act.


141.    The OBSTRUCTION to the Lemon Law Process, and Courts,
by using criminal "*Tactics*", such as falsifying evidence,
and committing Perjury, constituted Predicate Rico Acts.

142.    From September of 2002 to the present, GM CEO G.
Richard Wagoner, and the named GM Board of Directors,
approved, and caused to be broadcast in interstate commerce
on television stations, thousands of advertisements,
fraudulently claiming that they have a *"Mr. Goodwrench"*
mechanic at their dealerships that is honest with
consumers.


143.    In reality General Motors instructed its *"Mr.
Goodwrench"* mechanics at its dealerships to purposefully
lie to consumers, and fraudulently claim that the engine
piston slap, or engine knock problem, and other vehicle
defects, and engine noises, are *"normal"*.


144.    When the *Pro Se Litigant* kept complaining about the
engine knock, and related engine problems, *"Mr. Goodwrench"*
at Palm Chevy in Punta Gorda kept lying to the *Pro Se
Litigant*, and kept telling him the engine knock was
*"normal"*, and that General Motors Engines produce more
horsepower by knocking.


145.    The claim by Defendants G. Richard Wagoner, and the
named GM Board of Directors, that engines with a piston
slap produce more horsepower, is an out, and out, lie.


146.    All of the thousands of television ads by Defendants
G. Richard Wagoner, and the named GM Board of Directors,
from September of 2002 to the present, about a *"Mr.
Goodwrench"*, are fraudulent, as to the actual material
facts, and constitute thousands of acts of wire Fraud in

violation of Title 18 § 1343, and separate Rico Predicate
Acts.

147.    The Plaintiff received advertisements by U.S. Mail in
which Defendants G. Richard Wagoner, and the GM Board of
Directors, made similar fraudulent claims, as they did in
their television advertising, that *"GM Trucks were Built
Like a Rock"*, that they were the most dependable trucks,
that they had a written warranty, and those written
advertisements were worded to make the consumer, including
Plaintiff, believe GM abided by said written warrant.

148.    Those sporadic fraudulent mail advertisements by GM
Corporate Governance, CEO G. Richard Wagoner, and the named
GM Board of Directors, also often contained fraudulent
statements about a *"Mr. Goodwrench"* being at GM
Dealerships.

149.    Those sporadic fraudulent mail advertisements by GM
Corporate Governance, CEO G. Richard Wagoner, and the named
GM Board of Directors, constituted intentional acts of Mail
Fraud, in direct violation of Title 18 § 1341, and also
separate Rico Predicate Acts.

150.    CEO G. Richard Wagoner, and the named GM Board of
Directors, knew that the advertising they caused to be sent
by U.S. Mail was not truthful, and that it was part of a
scheme to defraud thousands of prospective GM Customers,
including Plaintiff, out of money, by U.S. Mail, and
constituted Rico Predicate Acts.

151.    Plaintiff was deceived, and severely harmed, as a
result of the fraudulent U.S. Mail advertising by those
Defendants.

152.    Defendants scheme to defraud was advanced, concealed,
and furthered by the Wire, and Mail Fraud, as described
herein, and also by a conspiracy among Defendants, which
also constituted Rico Predicate Acts.

153.    As a result of the Wire, and Mail Fraud, described
here-in Plaintiff was tricked into buying a defective Chevy
S-10.


(H) The Association-In-Fact Rico Enterprise

154.    CEO G. Richard Wagoner, the named GM Board of
Directors, Defendant Carolyn Westberg, and the "New"
General Motors Company are members of a General Motors
Association-In-Fact Rico Enterprise.

155.    GM CEO G. Richard Wagoner, the named GM Board of
Directors, Defendant Carolyn Westberg, and the General
Motors Company, are all "persons" as described at Title 18
§ 1961(3).

156.    This Rico Enterprise is composed of a relatively
loose-knit group of people, and the legal entity of the
General Motors Company that form an Enterprise, as
described in Title 18 § 1961(4), very similar to a Mafia
Crime Family, or Organized Crime Family.

157.   The Rico "*Enterprise*" described in this lawsuit
possesses three characteristics, a continuity of structure,
and personnel, a common or shared purpose, and an
ascertainable structure distinct from that inherent in the
pattern of racketeering.

158.   This Rico "*Enterprise*" has a continuity of structure,
and personnel, with GM CEO Richard Wagoner, and the GM
Board of Directors in charge, similar to a Mafia Don, and
his Lieutenants, with Defendants Carolyn Westberg, and the
General Motors Company being "*soldiers*", much like in the
mob, in that they operate at the leader's whim.

159.   The members of this GM Rico Crime Family have a shared
purpose of profiting, or enhancing their employment, or lot
in life, by the Racketeering Acts described in this Civil
Complaint.

160.   Sometimes their shared purpose is to cover-up prior
wrongful acts, or crimes, committed by members of their
Rico Enterprise, such as the Fraud in the Courts.

161.   The members of the GM Rico Crime Family also have a
shared purpose of doing whatever it takes to make sure the
truth is concealed, and never makes it to a Lemon Law
Hearing, or to the Courts, when a victim, such as the
Plaintiff, seeks redress for a Lemon GM Vehicle.

162.    This Rico "*Enterprise*" is separate, and distinct, from
the predicate Rico Acts, and contains an Organizational
Pattern, beyond what was necessary to perpetrate the
predicate crime(s).

163.    GM CEO G. Richard Wagoner, the named GM Board of
Directors, Defendant Carolyn Westberg, and the General
Motors Company operate, and manage, the Rico Enterprise.

(I) On February 24, 2009 Plaintiff First Discovers the Fraud on
the Lemon Law Process, and Fraud on the Courts, and Other
Violations

164.    In December of 2008 the Pro Se Plaintiff first
received, by means of discovery from the GM Defendants, in
his State Lawsuit, three alleged letters from Carolyn
Westberg that were unsigned, and looked fake.

165.    Then on February 24, 2009 GM Attorney, Michael
Gruskin, sent an e-mail to Plaintiff advising that his
clients had been lying all along about Carolyn Westberg,
informing Plaintiff that Carolyn Westberg was never a GM
Employee.

166.    Another GM Attorney, Phyllis Sumner, on March 4, 2009,
confirmed that the GM Defendants had used fraud on
Florida's Lemon Law Process, and Courts, by fraudulently

claiming that Carolyn Westberg a GM Employee, when in fact
she had never been employed by General Motors.


167.    Those attorney statements revealed to the Plaintiff,
for the first time, that the Defendants in this lawsuit are
members of a Rico Association-In Fact Enterprise, and
liable pursuant to Federal Rico Statutes, for triple
damages.


168.    Plaintiff, with due diligence, had no way of
discovering about this Rico Association-In-Fact Enterprise,
that he is a victim of, or the many Acts of Racketeering by
Defendants, other than by means of the discovery documents,
Defendants were concealing, and did not provide to
Plaintiff until December of 2008, and the follow-up GM
Attorney Admissions.


169.    The Rico Violations complained about in this lawsuit
started in 2003 and are ongoing, and continue today.



(J) Rico Scheme to OBSTRUCT Plaintiff's Access to Florida Law
Chapter 681 "The Motor Vehicle Warranty Enforcement Act"



170.    To protect consumers in situations, such as this, the
Florida Legislature passed Chapter 681, cited as the Motor
Vehicle Warranty Enforcement Act, and known as the Florida
Lemon Law.

171.   On July 12, 2004 Plaintiff sent a Notice of lemon
defects on his truck to GM, exactly as required by Chapter
681, by certified mail.

172.   Pursuant to F.S. 681.104(a) the GM Defendants had a
time period of exactly ten (10) days to respond, or forever
lose their right to make a final attempt to cure the
nonconformities.

173.   Defendants did not respond and Plaintiff kept sending
letter, after letter, to GM by certified mail demanding his
Lemon Law Rights.

174.   Five months later in December of 2004 Defendant,
Carolyn Westberg, called the Plaintiff and said that she
was sorry that she had not responded within the ten (10)
day limit, and stated that she had lost Plaintiff's file
for several months, and she promised someone would attempt
to fix Plaintiff's defective truck right away.

175.   GM had clearly violated the F.S. 681.104(a) ten day
time limits, and the *Pro Se Plaintiff* was legally entitled
to return of his money paid for the truck.

176.   Defendant, Carolyn Westberg, who is familiar with the
Lemon Law Process, knew exactly what was necessary for GM
to prevail against the Plaintiff, and she intentionally
started falsifying the GM record of Plaintiff's Truck,
creating fraudulent documents in Plaintiff's case, to deny
Plaintiff "*Meaningful*" Access to the Lemon Law Process, and

the Courts, by concealing the truth about GM's violation of
F.S. 681.104(4) and GM's failure to respond within ten (10)
days.

177.    It is clear from the Lemon Law Records that Defendant,
Carolyn Westberg, conspired with other members of the Rico
Enterprise to conceal, and falsify, GM records to deceive
the Lemon Law Officer, and the State Courts.

178.    Defendant Carolyn Westberg lied about the letter
Plaintiff sent on July 12, 2004 giving Notice of lemon
defects on his truck, and fraudulently claimed that it was
not sent by certified mail.

179.    Defendants had GM Lemon Law Representative, Stephen
Nichols, commit perjury at the Lemon Law Hearing and lie
about the phone call in December where Defendant, Carolyn
Westberg, called Plaintiff and ADMITTED losing Plaintiff's
file, and not responding for over four months.

180.    Now the Plaintiff discovers that Carolyn Westberg was
never a GM Employee at all and his whole Florida Lemon Law
Process was a sham, based on lies by Defendants, and fake
documents.

181.    The Defendants were clearly engaged in a scheme to
deceive the Hearing Officer about the GM Defendants
violating the ten (10) day time limit to make a repair
attempt.

182.    Defendant Carolyn Westberg falsified more GM records
        by fraudulently claiming that she attempted to call
        Plaintiff in August 6, 2004 and that Plaintiff's phone was
        disconnected.

183.    Phone records prove this was a lie.

184.    Defendant Westberg was so busy falsifying GM records
        that she became confused and actually created three
        separate fake letters for December 14, 2004, that she
        fraudulently claims were sent to Plaintiff, that actually
        conflict with each other.

185.    None of those letters were sent to Plaintiff, and
        would not have made sense to send, since they contradicted
        each other.

186.    The only reason Plaintiff was denied relief from the
        Lemon Law Process was because of Defendant Westberg's
        fraudulent documents Plaintiff did not see until December
        2008.

187.    At the hearing another GM employee, Stephen Nichols,
        testified, under oath, that a magic hurricane came to Port
        Charlotte and stopped mail, and phone service, at
        Plaintiff's house on August 6, 2004.

188.    Just as Defendant Westberg because confused lying so
        much and created three conflicting fake letters in one day,
        the GM Lemon Law Representative, Stephen Nichols, became

confused lying and forgot that hurricane Charlie <u>did not
hit Florida until August 14, 2004</u>, some eight days <u>AFTER</u>
the date he testified under oath a hurricane stopped mail
at Plaintiff's house.

189.   Plaintiff's phone records prove Plaintiff's phone
operated perfect on August 6, 2004.

190.   National Weather Service Records prove the weather was
bright and clear on August 6, 2004, when GM had its
employees commit perjury, <u>under oath</u>, fraudulently claiming
a hurricane was stopping mail, and phone service, at
Plaintiff's house.

191.   Defendants used the Rico Predicate Crimes of Fraud,
Perjury, and Obstruction to deny Plaintiff *"Meaningful"*
access to Florida's Lemon Law Process.

192.   It is now going on five years since Plaintiff has
served the GM Defendants a Certified Lemon Law Notice that
his Brand New Truck will not start, or run, and is not safe
to drive if it could be started, and Defendants have not
made a single attempt to repair said Vehicle, or to honor
their warranty.

193.   It is now a year since the Written Warranty has run
out and Defendants have, <u>for the full time period of their
written warranty</u>, refused to honor said warranty or make
any attempt to get Plaintiff's now old truck running.

194.    Defendants have clearly intended to criminally defraud
        Plaintiff.

195.    Plaintiff's S-10 has not started, or moved, since
        sometime in 2004.

196.    Plaintiff has sent a minimum of nine separate
        Complaint Letters addressed personally to the CEO of
        General Motors, G. Richard Wagoner, and to each GM Board of
        Directors Member, Defendant, Percy N. Barmevick, Defendant,
        Erskine B. Bowles, Defendant, John H. Bryan, Defendant,
        Armando M. Codina, Defendant, George M.C. Fisher,
        Defendant, Karen Katen, Defendant, Kent Kresa, Defendant,
        Ellen J. Kullman, Defendant, Phillip A. Laskawy, Defendant,
        E. Stanley O'Neal, Defendant, Eckhard Pfeiffer, fully
        explaining that Plaintiff's S-10 Truck is defective,
        undrivable, and won't start, requesting that they honor
        their advertised "*Corporate Responsibility*" and provide
        Plaintiff with a working truck, like he paid them for.

197.    In those letters to GM CEO, G. Richard Wagoner, and to
        each member of the GM Board of Directors, the Plaintiff
        described the facts contained in this lawsuit.

198.    Plaintiff in addition to constantly contacting the CEO
        of General Motors, and each member of the GM Board of
        Directors, also asked the attorneys for GM, Rumberger, Kirk
        & Caldwell, a number of times to abide by the BBB Chapter
        681 Decision and to make a last effort to repair the
        defective lemon truck that was sitting in Plaintiffs
        driveway not running.

199.   The failure of the CEO, G. Richard Wagoner, and each
       member of the GM Board of directors, to abide by Chapter
       681 decision and either have the defective, lemon, truck
       repaired, or replace it intentionally caused the Plaintiff
       to suffer massive pecuniary, and other, damages.

200.   Those damages include the loss of use of his driveway
       for five years in this ongoing violation, loss of use of a
       new truck, which is what Plaintiff paid Defendants for.

201.   Plaintiff suffered extreme financial hardship due to
       the loss of a large part of Plaintiff's fixed income, as he
       has had to pay for a service (another truck for
       transportation) since Defendants have not provided
       Plaintiff a working truck, despite charging him for one.

202.   Plaintiff had to pay insurance on a non-running
       vehicle for years, until he simply did not have enough
       money to buy food, and support a non-running truck too.

203.   Plaintiff had to pay interest on a loan for a non-
       running vehicle.

204.   Plaintiff had to borrow money due to the extreme
       financial hardship intentionally inflicted on Plaintiff by
       Defendants dishonest business practices, and violations of
       Chapter 618.

205.   Plaintiff suffered severe damage to Plaintiff's health
       due to massive, undue stress intentionally inflicted on

Plaintiff by Defendants, with this wrongful conduct,
despite their knowing Plaintiff has a severe stress
disorder, and that undue stress caused the Plaintiff
massive medical harm.

206.    Plaintiff has suffered severe damage to Plaintiff's
health due to having to walk miles in the hot Florida sun
while disabled, with a bad back in severe pain, a bad heart
causing pain, a bad leg, and numb side, at least nine times
due to the defective truck.

207.    Plaintiff, a highly decorated 100% disabled Service-
Connected Veteran, and his family, had to suffer a much
lower standard of living, in essence losing five years of
his life, due to the extreme financial hardship
intentionally inflicted on him by the multi-millionaire
Defendants, with their inhuman greed, and lack of ethics.

208.    In those letters to GM CEO, G. Richard Wagoner, and to
each member of the GM Board of Directors, the Plaintiff
made those Defendants fully aware that Plaintiff is a 100%
Service-Connected Severely Veteran with a stress disorder,
and a history of stress-caused heart attacks, and that the
conduct of CEO G. Richard Wagoner, and the named GM Board
of Directors in not providing Plaintiff with a working
vehicle, like he paid them for, and their engaging in the
other wrongful conduct described herein was causing extreme
harm to Plaintiff's health.

209.    GM CEO, G. Richard Wagoner, and each member of the GM
Board of Directors, fully knowing that they were causing

extreme harm to Plaintiff's health, continued to
intentionally harm him, with a specific intent to harm the
Plaintiff, as described in this Complaint, removing any cap
on Punitive Damages.

210.    The motive of GM CEO G. Richard Wagoner, and the named
        GM Board of Directors, in intentionally harming Plaintiff
        was to intentionally steal his money by not providing
        Plaintiff with what he paid them for.

211.    Defendant, Carolyn Westberg's motive for the illegal
        falsifying of Plaintiff's GM truck records was to enhance
        her employment with the Sitel Corporation, and possibly
        receive perks, bonuses, or a pay raise.

212.    Plaintiff has suffered damages from years of inhuman
        torture at the hands of this Rico Enterprise, and the
        harassment has harmed Plaintiff so much most of the time he
        is bed ridden, and unable function.

213.    The wrongful conduct of the Defendants towards the
        disabled Plaintiff, as described herein, has caused
        Plaintiff to suffer undue stress, constant heart pains,
        loss of sleep, a stomach disorder, many nerve related
        problems, and is endangering the life of the Plaintiff and
        could cause his death with a Stress-Caused Heart Attack.

214.    Defendants G. Richard Wagoner, and the named GM Board
        of Directors, use a Racketeering Scheme, that when victims
        of their mail, or Wire Fraud, attempt to use a Lemon Law
        Process, or sue in Court, the Defendants "*rig*" the process,

and OBSTRUCT, victims, like the Plaintiff, violating their
rights, while denying them *"Meaningful"* access to the Lemon
Process, or the Courts.


## (K)  The New General Motors Company

215.    It should be noted that while the wrongful conduct
described herein started under a different entity, the old
General Motors Corporation, that some of the named GM
Defendants are now part of the New General Motors Company,
and have carried the same wrongful *"Policies"*, and wrongful
conduct towards the Plaintiff, over to the New GM Company.

216.    The New General Motors Company is using funds provided
to them pursuant to the United States Congress for a
*"Bailout"* of General Motors to continue the prior GM
Corporation's policy of dishonesty, Obstruction in the
Courts, Retaliation, and Harassment of the *Pro Se Litigant*.

217.    Despite having a bankruptcy filed by the old GM
Corporation, the GM Defendants in this case have not asked
this Court to suspend the prosecution of this lawsuit, as
would be **required by statute** if the funds for the GM
Defendant's ongoing harassment, and illegal conduct,
towards the Plaintiff, were being paid by the old GM
Corporation, now known as *"Motors Liquidation Company"*.

218.    The facts in paragraph two hundred Seventeen (217)
above prove that the GM Defendants named in this lawsuit
are part of the New General Motors Company, and acting for

the New General Motors Company, and that the New GM is
liable for that wrongful conduct.


## (L) Punitive Damages

219.   Defendant's goal is to make a dishonest profit by
failing to provide consumers, such as Plaintiff, a
dependable, safe, vehicle, like he paid them for.

220.   The appalling wrongful conduct of CEO G. Richard
Wagoner, the named General Motors Board of Directors, and
New General Motors Company is motivated solely by
unreasonable financial gain, their greed, despite their
knowing there was a high likelihood of Plaintiff, and/or
other consumers, being harmed by their wrongful conduct.

221.   Defendants, after being made fully aware that their
conduct was harming the *Pro Se Plaintiff*, engaged in a
specific intent to harm the Plaintiff, and did
intentionally cause additional harm to the Plaintiff, which
effectively removes any cap on Punitive Damages.

222.   The wrongful conduct of the Defendants is ongoing.

223.   This lawsuit, and the illegal conduct of Defendants as
described herein, is the very reason Congress passed the
Rico Act.

## FIRST CAUSE OF ACTION FOR FRAUDULENT ADVERTISING

224.    The *Pro Se Plaintiff* re-alleges, and incorporates, by
reference paragraphs 1-223 above.

225.    The GM Defendants did intentionally engage in
Fraudulent Advertising with the intent to harm, and
defraud, customers, including Plaintiff, and did
specifically harm Plaintiff.

226.    Plaintiff was harmed and defrauded by the GM
Defendant's fraudulent advertising as described herein.

227.    Plaintiff seeks actual damages, in an amount to be
determined by a jury, and all other damages, and relief
that he is legally entitled to, for this Cause of Action.

228.    Plaintiff seeks Punitive Damages, in an amount to be
determined by a jury, but no less than ten million dollars
($10,000,000.00) to punish Defendants for the Fraudulent
Advertising.

## SECOND CAUSE OF ACTION FOR WIRE AND MAIL FRAUD

229.    The *Pro Se Plaintiff* re-alleges, and incorporates, by
reference paragraphs 1-223 above.

230.    The GM Defendants did intentionally engage in Wire,
        and Mail Fraud, as described herein, with the intent to
        harm, and defraud, customers, including Plaintiff, and did
        specifically harm Plaintiff.

231.    Plaintiff was harmed and defrauded by the GM
        Defendant's Mail, and Wire, Fraud as described herein.

232.    Plaintiff seeks actual damages, in an amount to be
        determined by a jury, and all other damages, and relief
        that he is legally entitled to, for this Cause of Action.

233.    Plaintiff seeks Punitive Damages, in an amount to be
        determined by a jury, but no less than ten million dollars
        ($10,000,000.00) to punish Defendants for the Wire, and
        Mail Fraud.


                THIRD CAUSE OF ACTION FOR BREACH OF WARRANTY

234.    The *Pro Se Plaintiff* re-alleges, and incorporates, by
        reference paragraphs 1-223 above.

235.    The GM Defendants did intentionally Breach the
        advertised, and written, warranty for Plaintiff's GM Truck,
        as described herein, with the intent to harm, and defraud,
        the Plaintiff, and did specifically harm Plaintiff.

236.    Plaintiff was harmed and defrauded by the GM
        Defendant's Breach of Warranty as described herein.

237.   Plaintiff seeks actual damages, in an amount to be
       determined by a jury, and all other damages, and relief
       that he is legally entitled to, for this Cause of Action.

238.   Plaintiff seeks Punitive Damages, in an amount to be
       determined by a jury, but no less than ten million dollars
       ($10,000,000.00) to punish Defendants for the intentional
       Breach of Warranty.

## FOURTH CAUSE OF ACTION FOR INTENTIONAL FRAUD ON FLORIDA'S
## LEMON LAW PROCESS

239.   The *Pro Se Plaintiff* re-alleges, and incorporates, by
       reference paragraphs 1-223 above.

240.   The GM Defendants, and Defendant Carolyn Westberg, did
       intentionally commit a Fraud on Florida's Lemon Law
       Process, as described herein, with the intent to harm, and
       defraud, the Plaintiff, and did specifically harm
       Plaintiff.

241.   Plaintiff was harmed by the GM Defendant's, and
       Defendant Carolyn Westberg's, Fraud on Florida's Lemon Law
       Process as described herein.

242.   Plaintiff seeks actual damages, in an amount to be
       determined by a jury, and all other damages, and relief
       that he is legally entitled to, for this Cause of Action.

243.    Plaintiff seeks Punitive Damages, in an amount to be
        determined by a jury, but no less than ten million dollars
        ($10,000,000.00) to punish Defendants for the intentional
        Fraud on Florida's Lemon Law Process.


FIFTH CAUSE OF ACTION FOR VIOLATIONS OF F.S. CHAPTER 681

244.    The *Pro Se Plaintiff* re-alleges, and incorporates, by
        reference paragraphs 1-223 above.

245.    The GM Defendants, and Defendant Carolyn Westberg, did
        intentionally violate Florida Chapter 681, as described
        herein, with the intent to harm, and defraud, the
        Plaintiff, and did specifically harm Plaintiff.

246.    Plaintiff was harmed by the GM Defendant's, and
        Defendant Carolyn Westberg's, violations of Florida Chapter
        681 as described herein.

247.    Plaintiff seeks actual damages, in an amount to be
        determined by a jury, and all other damages, and relief
        that he is legally entitled to, for this Cause of Action.

248.    Plaintiff seeks all damages, and relief, specifically
        authorized by Florida Chapter 681.

249.    Plaintiff seeks Punitive Damages, in an amount to be
        determined by a jury, but no less than ten million dollars

($10,000,000.00) to punish Defendants for the intentional
violations of Florida Chapter 681.


### SIXTH CAUSE OF ACTION FOR FRAUD ON THE STATE COURTS

250.    The *Pro Se Plaintiff* re-alleges, and incorporates, by
reference paragraphs 1-223 above.

251.    The GM Defendants, Defendant Carolyn Westberg, and the
New General Motors Company did intentionally commit a Fraud
on Florida's State Courts, as described herein, with the
intent to harm, and defraud, the Plaintiff, and did
specifically harm Plaintiff.

252.    The GM Defendants, Defendant Carolyn Westberg, and the
New General Motors Company are involved in an ongoing Fraud
on Florida's State Courts, as described herein, with the
intent to harm, and defraud, the Plaintiff, and are
specifically harming Plaintiff.

253.    Plaintiff was harmed by the GM Defendant's, Defendant
Carolyn Westberg's, and the New General Motors Company's
Fraud on Florida's State Courts as described herein.

254.    Plaintiff seeks actual damages, in an amount to be
determined by a jury, and all other damages, and relief
that he is legally entitled to, for this Cause of Action.

255.    Plaintiff seeks Punitive Damages, in an amount to be
determined by a jury, but no less than ten million dollars
($10,000,000.00) to punish Defendants for the intentional
Fraud on Florida's State Courts.


## SEVENTH CAUSE OF ACTION FOR VIOLATIONS OF THE MAGNUSON-MOSS
## WARRANTY ACT

256.    The *Pro Se Plaintiff* re-alleges, and incorporates, by
reference paragraphs 1-223 above.

257.    The GM Defendants, Defendant Carolyn Westberg, and the
New General Motors Company did intentionally violate, and
continue to violate, the Magnuson-Moss Warranty Rights of
Plaintiff, as described herein, with the intent to harm,
and defraud, the Plaintiff, and did specifically harm
Plaintiff.

258.    The GM Defendants, Defendant Carolyn Westberg, and the
New General Motors Company are involved in ongoing
violations of the Magnuson-Moss Warranty Act against
Plaintiff, as described herein, with the intent to harm,
the Plaintiff, and are specifically harming Plaintiff.

259.    Plaintiff was harmed by the GM Defendant's, Defendant
Carolyn Westberg's, and the New General Motors Company's
Magnuson-Moss Warranty Act violations as described herein.

260.    Plaintiff seeks actual damages, in an amount to be
determined by a jury, and all other damages, and relief
that he is legally entitled to, for this Cause of Action.

261.    Plaintiff seeks Punitive Damages, in an amount to be
determined by a jury, but no less than ten million dollars
($10,000,000.00) to punish Defendants for the intentional
violations of Plaintiff's Magnuson-Moss Warranty Act
Rights.

## EIGHTH CAUSE OF ACTION FOR VIOLATIONS OF PLAINTIFF'S STATE STATUTORY RIGHTS

262.    The *Pro Se Plaintiff* re-alleges, and incorporates, by
reference paragraphs 1-223 above.

263.    The GM Defendants, Defendant Carolyn Westberg, and the
New General Motors Company did intentionally violate, and
continue to violate, the Plaintiff's State Statutory Rights
relating to access to State Courts, and State Civil Rights,
as described herein, with the intent to harm the Plaintiff,
and did specifically harm Plaintiff.

264.    The GM Defendants, Defendant Carolyn Westberg, and the
New General Motors Company are involved in ongoing
violations of Plaintiff's State Statutory Rights relating
to access to State Courts, and State Civil Rights, as
described herein, and are specifically harming Plaintiff.

265.   Plaintiff was harmed by the GM Defendant's, Defendant
Carolyn Westberg's, and the New General Motors Company's
violations of Plaintiff's State Rights as described herein.

266.   Plaintiff seeks actual damages, in an amount to be
determined by a jury, and all other damages, and relief
that he is legally entitled to, for this Cause of Action.

267.   Plaintiff seeks Punitive Damages, in an amount to be
determined by a jury, but no less than ten million dollars
($10,000,000.00) to punish Defendants for the intentional
violations of Plaintiff's State Statutory Rights.

NINTH CAUSE OF ACTION FOR VIOLATIONS OF PLAINTIFF'S FEDERAL
STATUTORY RIGHTS

268.   The *Pro Se Plaintiff* re-alleges, and incorporates, by
reference paragraphs 1-223 above.

269.   The GM Defendants, Defendant Carolyn Westberg, and the
New General Motors Company did intentionally violate, and
continue to violate, the Plaintiff's Federal Statutory
Rights relating to access to Federal Courts, and Federal
Civil Rights, as described herein, with the intent to harm
the Plaintiff, and did specifically harm Plaintiff.

270.   The GM Defendants, Defendant Carolyn Westberg, and the
New General Motors Company are involved in ongoing
violations of Plaintiff's Federal Statutory Rights relating

to access to Federal Courts, and Federal Civil Rights, as
described herein, and are specifically harming Plaintiff.

271.    Plaintiff was harmed by the GM Defendant's, Defendant
Carolyn Westberg's, and the New General Motors Company's
violations of Plaintiff's Federal Rights as described
herein.

272.    Plaintiff seeks actual damages, in an amount to be
determined by a jury, and all other damages, and relief
that he is legally entitled to, for this Cause of Action.

273.    Plaintiff seeks Punitive Damages, in an amount to be
determined by a jury, but no less than ten million dollars
($10,000,000.00) to punish Defendants for the intentional
violations of Plaintiff's Federal Statutory Rights.


TENTH CAUSE OF ACTION FOR VIOLATIONS OF PLAINTIFF'S
CONSTITUTIONAL RIGHTS

274.    The *Pro Se Plaintiff* re-alleges, and incorporates, by
reference paragraphs 1-223 above.

275.    The GM Defendants, Defendant Carolyn Westberg, and the
New General Motors Company did intentionally violate, and
continue to violate, the Plaintiff's Constitutional Rights
pursuant to the First, Fifth, and Fourteenth Amendments by
their Fraud on Plaintiff's Lemon Law Hearing, and Fraud on
the Courts against Plaintiff, denying Plaintiff

-61-

"*Meaningful*" Access, and Due Process, with the intent to
harm the Plaintiff, and which did specifically harm
Plaintiff.

276.    The GM Defendants, Defendant Carolyn Westberg, and the
New General Motors Company are involved in ongoing
violations of Plaintiff's Constitutional Rights, as
described herein, and are specifically harming Plaintiff.

277.    Plaintiff was harmed by the GM Defendants, Defendant
Carolyn Westberg's, and the New General Motors Company's
violations of Plaintiff's Constitutional Rights as
described herein.

278.    Plaintiff seeks actual damages, in an amount to be
determined by a jury, and all other damages, and relief
that he is legally entitled to, for this Cause of Action.

279.    Plaintiff seeks Punitive Damages, in an amount to be
determined by a jury, but no less than ten million dollars
($10,000,000.00) to punish Defendants for the intentional
violations of Plaintiff's Constitutional Rights.

## ELEVENTH CAUSE OF ACTION FOR VIOLATION OF RICO, 18 U.S.C. § 1962(C) OPERATION OF ENTERPRISE THROUGH RACKETEERING ACTIVITY

280.    The *Pro Se Plaintiff* re-alleges, and incorporates, by
reference paragraphs 1-223 above.

281.    Plaintiff alleges that Defendants are associated with
each other, and engaged in conduct that constitutes a Rico
Pattern of Racketeering Activity.


282.    Defendants are engaged in, and constitute, a Rico
Enterprise, as described in this Complaint.


283.    Defendants constitute a loosely knit Association-In-
Fact Rico Enterprise.


284.    Defendants engaged in Racketeering Activity by
committing, or aiding, and abetting, and/or conspiring to
commit the crimes below;

>    (a)    Mail Fraud in violation of Title 18 § 1341.
>    (b)    Wire Fraud in violation of Title 18 § 1343.
>    (c)    Violating Title 18 § 241.
>    (d)    Violating Title 18 § 242.
>    (e)    Manslaughter.
>    (f)    Violating Title 18 § 1952.
>    (g)    Violating Title 18 § 1957.
>    (h)    Interstate Advertising Fraud.
>    (i)    Obstructing Plaintiff to Florida's Lemon Law
>           Process.
>    (j)    Obstructing Plaintiff to Florida's State
>           Court.
>    (k)    A Fraud on Florida's Lemon Law Process.
>    (l)    A Fraud on Florida's State Courts.
>    (m)    The Swindling of over $26,000.00 from
>           Plaintiff.

-63-

     (n)   Intentionally harming a Disabled Person, the
           Plaintiff, which is a felony in Florida.

     (o)   Intentionally stealing from a Disabled Person,
           the Plaintiff, by means of fraud, which is a
           felony in Florida.

285.   Plaintiff seeks TRIPLE damages for all harm he has
suffered at the hands of the Rico Defendants, including,
but not limited to, triple damages for the thief of
$26,000.00 the GM Defendants swindled him out of with a
non-running Lemon Truck, TRIPLE reasonable costs for
storage of that truck all the time it has not been running,
and blocking Plaintiff's driveway as Defendants refused to
honor their warranty, TRIPLE damages for all financing
costs, interest, and all fees, and costs related to
Plaintiff's Lemon Truck, including Replacement, and other
transportation costs while the truck has failed to provide
same for Plaintiff.

286.   Plaintiff seeks TRIPLE damages for all the medical
harm he has suffered at the hands of the Rico Defendants,
including all costs of medical care, and irreparable harm
to Plaintiff's health, including aggravation of pre-
existing medical conditions.

287.   Plaintiff has suffered substantial damages, due to bad
faith, and/or intentional wrongful conduct by Defendants,
far more appalling, and wrongful than cases where judgments
of two or three hundred million dollars were awarded
against Defendant(s), and therefore Plaintiff seeks the
amount of One Billion Dollars ($1,000,000,000) in Punitive

Damages from Defendants, or an amount this Court deems to
be appropriate, and adequate, to punish, and "*Chill*" the
ongoing illegal conduct of the extremely wealthy GM
Defendants, since past massive Punitive Damage Awards have
not been large enough to "*chill*" Defendants wrongful
conduct, the conduct of a multibillion dollar corporation
that is actively involved, and considers itself far above
the law.


<u>TWELFTH CAUSE OF ACTION FOR VIOLATION OF RICO, 18 U.S.C. §</u>
<u>1962(D) CONSPARICY TO VIOLATE 18 U.S.C. § 1962(C)</u>

288.   The *Pro Se Plaintiff* re-alleges, and incorporates, by
reference paragraphs 1-223 above.

289.   Defendants are associated with the aforementioned Rico
Enterprise and they have agreed, and conspired, to violate
18 U.S.C. § 1962(c).

290.   Defendants conspiracy to violate Title 18 § 1962 (c)
is a violation of Title 18 § 1962 (d).

291.   Plaintiff seeks TRIPLE damages for all harm he has
suffered at the hands of the Rico Defendants, including,
but not limited to, triple damages for the thief of
$26,000.00 the GM Defendants swindled him out of with a
non-running Lemon Truck, TRIPLE reasonable costs for
storage of that truck all the time it has not been running,
and blocking Plaintiff's driveway as Defendants refused to
honor their warranty, TRIPLE damages for all financing

costs, interest, and all fees, and costs related to
Plaintiff's Lemon Truck, including Replacement, and other
transportation costs while the truck has failed to provide
same for Plaintiff.

292.    Plaintiff seeks TRIPLE damages for all the medical
harm he has suffered at the hands of the Rico Defendants,
including all costs of medical care, and irreparable harm
to Plaintiff's health, including aggravation of pre-
existing medical conditions.

293.    Plaintiff has suffered substantial damages, due to bad
faith, and/or intentional wrongful conduct by Defendants,
far more appalling, and wrongful than cases where judgments
of two or three hundred million dollars were awarded
against Defendant(s), and therefore Plaintiff seeks the
amount of One Billion Dollars ($1,000,000,000) in Punitive
Damages from Defendants, or an amount this Court deems to
be appropriate, and adequate, to punish, and "*Chill*" the
ongoing illegal conduct of the extremely wealthy GM
Defendants, since past massive Punitive Damage Awards have
not been large enough to "*chill*" Defendants wrongful
conduct, the conduct of a multibillion dollar corporation
that is actively involved, and considers itself far above
the law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

1.  Declare that the actions of the Defendants violated the
    right(s) of Plaintiff as described herein.

2.  Enter a permanent injunction directing Defendants to take
    all affirmative actions necessary to remedy the illegal
    conduct described herein.

3.  Issue an Emergency Injunction, and/or Restraining ORDER
    requiring the Defendants to notify Florida State Officials
    about their Fraud on the Lemon Law System in Plaintiff's
    case, and their misrepresentations, and blatant lies about
    Carolyn Westberg being a GM Employee, and the forced
    letters submitted as Exhibits claiming, or strongly
    implying Carolyn Westberg was a GM Employee.

4.  Issue an Emergency Injunction, and/or Restraining ORDER
    requiring the Defendants to notify Florida State Officials
    about their Fraud on Florida's Court System in Plaintiff's
    case, and their misrepresentations, and blatant lies about
    Carolyn Westberg being a GM Employee, and the forced
    letters submitted as Exhibits claiming, or strongly
    implying Carolyn Westberg was a GM Employee.

5.  Award Plaintiff the damages sought in each specific Cause
    of Action in this document, as specifically stated herein,
    or an amount determined to be fair, and just, by a jury.

6. Award Plaintiff the amount of Punitive Damages sought in each specific Cause of Action in this document, as specifically stated herein, or an amount determined to be fair, and just, by a jury.

7. Award the *Pro Se Litigant* any, and all, damages authorized by law for the harm wrongly inflicted on him.

8. Award Plaintiff any other damages, or relief, that this Court deems to be proper, and just.

Respectfully submitted,

_Billy Kidwell_

Billy Kidwell, *Pro Se*

August 12, 2009

## VERIFICATION

I, Billy Kidwell, certify the facts in this Verified Complaint are true and correct to the best of my knowledge and beliefs.

_Billy Kidwell_

August 12, 2009

Billy Kidwell

5064 Silver Bell Drive

Port Charlotte, FL. 33948

941-627-0433

## CERTIFICATE OF COMPLIANCE

The *Pro Se Plaintiff*, Billy Ray Kidwell, is unable to
comply with Local Rule 3.01(g) to discuss these matters with
Defendants because Defendant's Attorney, Phyllis Sumner has
stated that she will not communicate with the *Pro Se Plaintiff*
to attempt to resolve, or narrow, issues. Plaintiff sought to
resolve as many disagreements among the parties, as possible, to
avoid wasting this Court's valuable time but Attorney Sumner
advised Plaintiff she will not make any attempt to save this
Court's valuable resources, by attempting to address, and
resolve, issues the parties disagree about.

_____
Billy Ray Kidwell


## CERTIFICATE OF SERVICE

I, Billy Ray Kidwell, hereby certify that a true and correct
copy of the attached Amended Complaint was served on Defendants
on this the 12th day of August 2009 by mailing a true and correct
copy of same to their Attorney, Phyllis B. Sumner, King &
Spalding LLP, 1180 Peachtree Street, NE, Atlanta, GA 30309-3521,
and the law firm of Cole, Scott & Kissane, 9150 South Dadeland
Boulevard, Suite 1400, P.O. Box 569015, Miami, FL. 33156.

_____
Billy Ray Kidwell