# EXHIBIT B

```
                                                                    1
        0AKUMOTC
  1     UNITED STATES DISTRICT COURT
  1     SOUTHERN DISTRICT OF NEW YORK
  2     ------------------------------------x
  2
  3     IN RE
  3
  4
  4     MOTORS LIQUIDATION COMPANY, et al.,     M-47
  5
  5
  6     ------------------------------------x
  6                                          New York, N.Y.
  7                                          October 20, 2010
  7                                          10:40 a.m.
  8
  8     Before:
  9
  9              HON. ROBERT P. PATTERSON, JR.
 10
 10                                          District Judge
 11
 11                     APPEARANCES
 12
 12     WILK AUSLANDER LLP
 13          Attorneys for Movant Rally Auto Group
 13     BY:  ERIC J. SNYDER
 14          -and-
 14     BELLAVIA GENTILE & ASSOCIATES, LLP
 15     BY:  STEVEN H. BLATT
 15
 16     ISAACS CLOUSE CROSE & OXFORD LLP
 16          Attorneys for General Motors LLC
 17     BY:  GREGORY R. OXFORD
 17          -and-
 18     KING & SPALDING
 18     BY:  SCOTT DAVIDSON
 19
 19
 20
 21
 22
 23
 24
 25
                     SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
```

2

0AKUMOTC

1           THE DEPUTY CLERK:   In Re Motors Liquidation Company,
2    et al.
3           Counsel, please state your name for the record.
4           MR. SNYDER:  Good morning, your Honor.
5           Eric Snyder, Wilk Auslander, for the movant Rally Auto
6    Group.
7           MR. BLATT:  Good morning, your Honor.
8           Steven Blatt, Bellavia Gentile, also for the movant
9    Rally Auto.
10          THE COURT:  Good morning, Mr. Snyder, Mr. Blatt.
11          MR. OXFORD:  Good morning, your Honor.
12          Greg Oxford for General Motors LLC.
13          MR. DAVIDSON:  Good morning, your Honor.
14          Scott Davidson from King & Spalding for General Motors
15   LLC.
16          THE COURT:  Good morning, Mr. Oxford and Mr. Davidson.
17          This is a motion by Rally, so I guess that we will
18   hear from Mr. Snyder or Mr. Blatt, whoever you prefer.
19          MR. SNYDER:  First, I would like to thank your Honor
20   and the Court for taking this on such a truncated schedule.
21   The concern not only for the stay, but also the wind-down
22   agreements that are the subject of GM's motion to the
23   bankruptcy court take effect or terminate on October 31st, and
24   that is why it was important that we be heard quickly and,
25   again, I thank your Honor and chambers.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

3

0AKUMOTC

1          As the Court is aware, Bankruptcy 8005 is similar to
2     the Federal Rules with respect to what a movant needs to obtain
3     in order to seek a stay.  And, your Honor, based on the case
4     law, I would first like to start with discussing the likelihood
5     of succeeding on the merits since that, I would think, would be
6     the overriding factor that the courts or this Court should
7     consider in determining whether to grant the stay.
8          Your Honor, we believe that Rally is likely to succeed
9     on the merits because the issue that was in front of the
10    bankruptcy court and is again in front of your Honor is whether
11    the bankruptcy court has sole and exclusive jurisdiction to
12    decide whether Rally might seek judicial review of a
13    determination by an arbitrator under the Dealer Arbitration
14    Act.  If the bankruptcy court does not have this sole and
15    exclusive jurisdiction, your Honor, I don't think it is
16    disputed that the district court in California where this
17    action was commenced does have the jurisdiction.  And I believe
18    Judge Gerber --
19          THE COURT:  You say it is not disputed?
20          MR. SNYDER:  Your Honor, that is the subject of the
21    dispute, whether the bankruptcy court has sole and exclusive
22    jurisdiction.
23          THE COURT:  Or any.
24          MR. SNYDER:  Or any jurisdiction.
25          THE COURT:  I think the defendants dispute that

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

4

0AKUMOTC
1    California jurisdiction.
2          MR. SNYDER:  Your Honor, if I may, I don't believe
3    that's the case.  I think what they have argued consistently
4    and, first, I think Judge Gerber admitted at the hearing in his
5    decision -- I cite to pages 57 and 58 -- that, at a minimum,
6    the California court has diversity jurisdiction.  I don't think
7    there is an issue of whether the California court has federal
8    question jurisdiction.  I think the issue is that the
9    bankruptcy court "trumps" -- I believe is the word Judge Gerber
10    used -- jurisdiction of the district court because, according
11    to Judge Gerber, the sale order in July conferred sole and
12    exclusive jurisdiction.
13          So I don't believe it is an issue and certainly GM can
14    speak to that, whether the district court has any jurisdiction.
15    The issue is, despite the fact that another court might have
16    the jurisdiction, that the bankruptcy court can use its core
17    jurisdiction power to trump --
18          THE COURT:  As I understand it, they raise the issue
19    of the Supreme Court case involving a provision passed by
20    Congress in which the Supreme Court said Congress, in its
21    wisdom, conferred binding arbitration, and there is no
22    jurisdiction and didn't provide for appeal.  And Congress has
23    that power and, therefore, there would be no jurisdiction
24    elsewhere in the district court --
25          MR. SNYDER:  Your Honor, I believe it is the Thomas v.

5

0AKUMOTC

1    Union Carbide case that your Honor is referring to.
2              THE COURT:  Yes, that's the one, the Thomas case.
3              MR. SNYDER:  That's correct.  The court, I believe,
4    felt comfortable with the fact that there was a regulatory
5    framework in place under FIFRA that would allow for judicial
6    review for instances of fraud, of bribery.
7              THE COURT:  We don't have that situation here.
8              MR. SNYDER:  That's correct.  We don't know if we have
9    the situation here but --
10             THE COURT:  I know that there was discussion before
11   Judge Gerber about that probability, but I don't think that it
12   was really resolved by him one way or the other.
13             MR. SNYDER:  That's correct.  And at least with
14   respect to whether the bankruptcy court has sole and exclusive
15   jurisdiction, I don't believe that the matter that is addressed
16   by the Supreme Court in Thomas, that is an issue of whether the
17   bankruptcy court can hear issues where there is no judicial
18   review.
19             THE COURT:  Don't you acknowledge that the bankruptcy
20   court has some jurisdiction, having issued the order and that
21   required, as a result of the arbitration, some amendment to its
22   wind-down agreements that it approved?
23             MR. SNYDER:  Your Honor, to the extent you phrase it
24   as an amendment, under 28, U.S.C., 157(b)(2)(A), which is the
25   subsections of (b)(2) that list what a core proceeding is, the
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

6

OAKUMOTC

1    interpretation of a sale order is a core proceeding.  There is
2    no dispute about that.  The right of a bankruptcy judge to
3    enforce his or her own orders under Millennium Sea Carriers,
4    Petrie Retail and the Eveleth Mines case are core proceedings.
5    We do not dispute that as well.  What we do dispute is whether
6    a statute codified six months after the wind-down agreements
7    were executed could be used in a way that was not contemplated,
8    certainly by Rally.  Remember, your Honor, the motion states
9    that Rally should be bound -- this is paragraph 13 of the
10   motion -- to its agreement not to sue.
11            Now, there was no agreement not to sue under the
12   Dealer Arbitration Act because it had not been codified until
13   December 2009.  When Rally signed that agreement in 2009, it
14   agreed to a covenant not to sue.  Six months later, Congress
15   revived the right to sue.
16            THE COURT:  Didn't revive the right to sue.  What it
17   did is, it gave a right to have binding arbitration before the
18   American Bar Association or American Arbitration --
19            MR. SNYDER:  It gave them a right that they didn't
20   have under the wind-down agreement because the wind-down
21   agreement specifically prohibited them from attempting to
22   reinstate, and the statute is silent as to judicial review.  So
23   when the arbitrator decided thumbs up on three brands and
24   thumbs down on one brand --
25            THE COURT:  Four.

7

0AKUMOTC

 1          MR. SNYDER:  That's correct, but Pontiac went out of
 2   business so, in reality, it is only three, but the Court is
 3   correct.
 4          But Rally was placed in a position where if it sought
 5   to seek judicial review of the arbitration for manifest errors
 6   of law.
 7          THE COURT:  What are those errors that it sought?
 8          MR. SNYDER:  Under the petition, it sought the errors
 9   that are enumerated under the Federal Arbitration Act which is
10   manifest --
11          THE COURT:  What are the errors that you are claiming?
12          MR. SNYDER:  The primary error, your Honor, is that
13   there was a manifest disregard of law, that the definition of a
14   covered dealership under the Arbitration Act required GM to
15   approve all five brands, and it couldn't split the brands and
16   say thumbs up on four and thumbs down on one because the
17   argument is, it was an integrated agreement that required -- if
18   it was acceptable on the four, to accept all five, that the
19   statute does not allow to pick and choose what is a covered
20   dealership under one document.  And GM has stated and Judge
21   Gerber has opined that that is not the case.
22          But the issue is whether Judge Gerber has jurisdiction
23   to make that determination.  We argued up and back and there
24   are clearly facts as to what is a "covered dealership" under
25   Section 747.  But that question itself is an interpretation of

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

8

0AKUMOTC

```
 1    a federal statute that had not been codified until after Rally
 2    executed the wind-down agreement.
 3              So what were Rally's choices, your Honor?
 4              In June, when the arbitrator came down with that
 5    determination, according to Judge Gerber, both Rally and the
 6    600 other dealers that lost certain brands should have come
 7    back to him.  And what I am suggesting is what it means to
 8    enforce your order is not to seek judicial review of a
 9    non-bankruptcy statute codified six months later.
10              THE COURT:  If you look at the statute, the statute
11    requires GM to support its decision by certain records that are
12    kept, records that have to do with the number of sales and all
13    of the vehicles, etc.  It clearly contemplates it, it seems to
14    me, that the individual brands would have to be separately
15    dealt with -- just the nature of the obligations that the
16    statute provided that GM had to adhere to would require them
17    to, by brand, state what the sales had been for the previous
18    whatever periods of time were covered and what other grounds GM
19    had for not continuing the dealership.
20              So it seems to me that, in the argument about this is
21    a single agreement covering five brands.  It has to be dealt
22    with all or nothing.  It flies in the face of the legislation
23    passed by Congress.  I don't think that is a substantial issue
24    for consideration by any court.
25              Do you have some other issue in connection with the
```

0AKUMOTC

9

```
 1    decision of the arbitrators?
 2            MR. SNYDER:  Excuse me one second, your Honor.
 3            THE COURT:  It says "such continuation of
 4    reinstatement or addition shall be limited to each brand owned
 5    and manufactured by the covered manufacturer."
 6            Clearly, it seems to me, reading it, it wanted figures
 7    with respect to each brand.
 8            The arbitrator, I saw somewhere in your papers that
 9    you say, oh, they exceeded their powers because they granted
10    Chevrolet to another dealer.  And I read the order of the
11    arbitrator, and it didn't grant the dealership to another
12    dealer.  It only denied the brand to Rally.
13            MR. SNYDER:  Your Honor, in response to your question,
14    under Section 747(d) of the statute which defines "covered
15    dealership."
16            THE COURT:  Yes, I see that.
17            MR. SNYDER:  It only grants the authority to "decide
18    based on the balancing whether or not the covered dealership
19    should be added to the dealer network of the covered
20    manufacturer."
21            THE COURT:  I know it says that there, but you go down
22    and you read what GM was required to do, and it is clear to me
23    that they expected it to be done by brand.
24            MR. SNYDER:  Your Honor, if I may, the definition of
25    "covered dealership" under 747(a)(2) is defined as an
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

10

0AKUMOTC

1    automobile dealership that has a franchise agreement for the
2    sale and service of a vehicle of a brand or brands within a
3    covered manufacturer --
4            THE COURT:  That's true.
5            MR. SNYDER:  There was one dealership agreement for
6    all the brands.
7            THE COURT:  You go on, and they require GM to break it
8    down by brand.
9            Anyway, that is only one issue on this.  It doesn't
10   sound to me as if it is a fairly substantial issue or that you
11   have much likelihood of success.
12           MR. SNYDER:  That, your Honor, on the issue of whether
13   it is a covered brand under the Dealer Arbitration Act, what we
14   are seeking for as part of the stay is that this Court stay the
15   bankruptcy court solely to the extent of allowing Rally to go
16   to the California court and make a determination on that issue.
17   It is our position, consistent with that, that the bankruptcy
18   court did not have the jurisdiction, that we started this in
19   California.  They attempted to enforce the bankruptcy court's
20   jurisdiction after that.
21           And all we are looking for -- we are not looking to
22   extend the October 31st date here.  We are not looking to hurt
23   the potential dealer who is coming in and taking the dealership
24   that Rally has had for 41 years and is being given to its
25   competitor.  What we are simply looking to do is go where we

                                                                    11
     0AKUMOTC
 1   started, back to California.  And perhaps the district court in
 2   California will reach the same conclusion as this Court does,
 3   that the statute is constitutional, even though it doesn't
 4   provide for judicial review, that the regulatory framework is
 5   in place to provide due process and that the arbitrator could
 6   go thumbs up on four and thumbs down on one.
 7            It is our position that the bankruptcy court is not
 8   enforcing its own order by coming to that decision under the
 9   Dealer Arbitration Act.  And it is not an interpretation under
10   the wind-down agreement, and we are not suing under the
11   wind-down agreement and so --
12            THE COURT:  Let me ask you a question.  Supposing GM
13   had refused to abide by the arbitration, where would you go?
14            MR. SNYDER:  The same place that we went, California
15   district court -- the same place that General Motors went when
16   one of the dealers wouldn't sign the letter of intent, they
17   went to California district court.  That's where we would have
18   gone.  We wouldn't have gone to the bankruptcy court any more
19   than GM went to the bankruptcy court when they had a
20   recalcitrant dealer.  Why would it be any different for a
21   recalcitrant manufacturer?  We would have gone to the district
22   court asking the district court --
23            THE COURT:  The wind-down agreement ends on October
24   31st, is that right?
25            MR. SNYDER:  That's correct, your Honor.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

0AKUMOTC

```
 1              THE COURT:  And here you are, assuming that GM says,
 2     we are not going to give you Cadillac and Buick or whatever the
 3     other brands are, the hell with you, you guys have been enough
 4     of a thorn in our side, and where would you go as a practical
 5     matter to enforce the agreement?
 6              MR. SNYDER:  Your Honor, that was my point exactly in
 7     front of Judge Gerber.  I brought up the same scenario.  And I
 8     said, where would we go?  We would go to the district court
 9     where the dealership is venued.  We would ask that the
10     arbitration -- because every state as well as the --
11              THE COURT:  You wouldn't want to try to get an
12     amendment to the wind-down agreement?
13              MR. SNYDER:  No.
14              THE COURT:  You wouldn't?
15              MR. SNYDER:  No.  There are a couple of reasons, and
16     GM pointed them out.  One of them is that the right to appeal
17     has expired, that the wind-down agreement prohibits us from
18     seeking any modification or any amendment.
19              THE COURT:  That was before the legislation passed.
20              MR. SNYDER:  And the legislation passed, your Honor,
21     which gave the dealers certain rights.  It gave them the right
22     to get their dealerships back.  Consistent with that, if you go
23     to the district court -- when GM wanted to do the same thing,
24     it didn't go back to the bankruptcy court in September in
25     Louisiana when it sought to have an interpretation of the
```

13

0AKUMOTC

1   Dealer Arbitration agreement in the Lessan case.  It went to
2   the district court in Louisiana.  And when it sought to seek
3   the enforcement --
4           THE COURT:  I've got inconsistent approaches by GM,
5   there's no question.
6           MR. SNYDER:  Your Honor, I am addressing that because
7   it came up.  But certainly, GM has done, and I asked Judge
8   Gerber that -- strike that.  Judge Gerber asked counsel for GM,
9   are you saying you could have gone into New York and
10  California, and he says sure.  And then GM says you, Rally, you
11  have to come to New York.
12          So it seems, if you look at what the doctrine of
13  judicial estoppel or the doctrine of inconsistent positions is,
14  they took a position in one court and later took an
15  inconsistent position in the bankruptcy court.  The first
16  court, at least in Santa Monica but certainly the case was
17  removed in Louisiana in the Lessan case, rely on their
18  statement of jurisdiction.
19          Your Honor, we were not aware of the Lessan case when
20  we put in on our papers because GM did not remove that until
21  September 27th.  We put in our papers a week earlier.  In
22  Lessan, the dealer seeking an interpretation of the Dealer
23  Arbitration Act, that the letter of intent was not customary as
24  defined under the act.
25          GM didn't go to the bankruptcy court in New York.  GM
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

14

OAKUMOTC

```
 1   removed it to the Eastern District of Louisiana, and on what
 2   grounds -- diversity jurisdiction, federal question.  And in
 3   their papers when you ask them why, they state on page 38,
 4   because we wanted to maintain a federal jurisdiction.
 5        And then they state, your Honor, we never said the
 6   bankruptcy court didn't have sole and exclusive jurisdiction.
 7   And they cite to docket number 7269 where they made a motion in
 8   the bankruptcy court for Lessan not to go forward in Louisiana.
 9        Your Honor, it is a bit disingenuous to not give the
10   date of the docket, and your Honor can take notice it was four
11   days after Judge Gerber's decision.  So after Judge Gerber gave
12   them the green light, they swept the Louisiana case -- or are
13   attempting to -- into the bankruptcy court.  They never
14   intended to go into bankruptcy court or they would have made
15   the motion before October 4.  They were pulling cases into the
16   district court because that's where they believed they have
17   jurisdiction and that is inconsistent.
18        As to taking unfair advantage, we are here now.  But
19   now that they have Judge Gerber's decision, they are bringing
20   them all into bankruptcy court, and that is an unfair
21   advantage.  That is what estoppel is there for, to not penalize
22   other parties by taking inconsistent positions.  So now that
23   they have a favorable decision they have gone so far as to
24   start pulling them into bankruptcy court, because only the
25   bankruptcy court has sole and exclusive jurisdiction under
```

0AKUMOTC

1  (b)(2)(M).
2          And I think the case law, especially in New Hampshire
3  v. Maine, is that they can't do that.  They can't argue that
4  the bankruptcy court has sole and exclusive jurisdiction when
5  they relied on the jurisdiction of at least two other federal
6  courts, and on Santa Monica and on Commercial Rules, to ask
7  that court to take action, to ask that court to exercise its
8  jurisdiction.
9          Now that they are winning, they are back in New York,
10  and that is what estoppel is there to prevent.  So not only do
11  we believe that estoppel exists, we still have not addressed --
12  and I did not see Judge Gerber do it either, your Honor --
13  whether this is enforcing an order, enforcing the wind-down or
14  simply saying, we are not allowing you to have judicial review
15  of the Dealer Arbitration Act, because in Millennium Sea
16  Carriers, in Petrie, they dealt with issues arising out of the
17  sale.  The covenant not to sue, while arising out of the sale,
18  the landscape changed when the Dealer Arbitration Act was
19  codified.  We can argue on to what extent it changed, but all
20  Rally is doing is seeking, as a natural extension of the Dealer
21  Arbitration Act, judicial review.
22          Under the Commercial Rules, your Honor, it doesn't
23  matter if GM consented or not.  That was another issue that
24  continues to come up.  Under Rule 48(c), under the Second
25  Circuit decision in Idea Nuova, it doesn't matter what the

16

OAKUMOTC

1   parties agree to as long as the arbitration rules are applied,
2   then there is a final judgment that the courts can seek review
3   in a court of competent jurisdiction.
4           Heck, your Honor, GM did in Santa Monica.  They relied
5   on the AAA rules as being their bases of the federal court in
6   California being a court of competent jurisdiction.  That is
7   all we are seeking to do.  It is just stunning that they can
8   say they can go into New York and California and we can't.  All
9   we are looking to do is have that California court make that
10  decision.  And for someone to state why under (b)(2) and this
11  is an enforcement of an order of the court.
12          So with respect to the likelihood of success on the
13  merits, your Honor, those are the two main issues, whether:  1)
14  this is enforcement of an order; and 2) whether the doctrine of
15  inconsistent position applies.
16          What is compelling about the Lessan case, which is the
17  most recent one, they state in their papers that Santa Monica
18  wasn't an interpretation of the Dealer Arbitration Act; it was
19  to compel a party to sign a settlement agreement, but the
20  Lessan case was a specific request for interpretation of the
21  Dealer Arbitration Act.  And on September 27th, the papers they
22  filed were not with the bankruptcy court in New York; they were
23  with the district court in Louisiana to have it removed.  That
24  is the inconsistent position.
25          With respect to irreparable harm, we cite to the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

17

0AKUMOTC

1  Second Circuit authority, losing a franchise that they have had
2  for 41 years, we would suggest, is irreparable harm.  That
3  would be gone to them.
4          THE COURT:  You lost that dealership in the bankruptcy
5  court.
6          MR. SNYDER:  We lost the dealership in the bankruptcy
7  court?
8          THE COURT:  Right.
9          MR. SNYDER:  That's correct.
10          THE COURT:  That's where it was lost, right?
11          MR. SNYDER:  That's correct.  The Arbitration Act gave
12  the parties a chance to try to get that brand back, as a
13  covered dealership or not.
14          THE COURT:  So you really can't rely on the Act.  It
15  was giving you a chance to get your dealerships back.
16          MR. SNYDER:  Your Honor, the Court is correct, and let
17  me be a little more precise.
18          Irreparable harm is losing the right to have the
19  California court decide the issue.  Yes, to the extent that we
20  don't have it, but if you don't stay this, the California court
21  can make an ultimate determination on this issue.  So it is a
22  loss of property right, but it is a loss of a substantive right
23  since it bars the ability for the California court to decide
24  this issue.
25          Your Honor, with respect to the public policy

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

18

0AKUMOTC

1   argument, Judge Gerber at the end said it was a wash.
2           THE COURT:  You said Judge Gerber said what was a
3   wash?
4           MR. SNYDER:  The public interest factor of whether it
5   weighs to the extent of plaintiff or defendant.  He said,
6   because it is a private right, the issue of the effect on the
7   public interest -- he didn't go into specific details -- it was
8   a wash because these were both private non-debtor parties.
9           THE COURT:  But isn't that the question?  It is the
10  arbitrators determinations, isn't it?  The arbitrator had the
11  power to do that, to determine whether the public interest was
12  served by resurrecting the dealership for Chevrolet.  They are
13  the ones that have to make that determination, aren't they, the
14  arbitrators?
15          MR. SNYDER:  I don't believe --
16          THE COURT:  The public interest is in there.  I may be
17  wrong.  I just have a recollection, and I haven't had as much
18  chance as you all to study this.
19          Down in (d) of 747 under "covered manufacturer," "the
20  arbitrator shall balance the economic interests of the covered
21  dealership, the economic interests of the manufacturer, and the
22  economic interests of the public at large and shall decide,
23  based on that balancing, whether or not the dealership should
24  be ended."
25          I am concerned whether there is jurisdiction in the
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

0AKUMOTC

```
 1   bankruptcy court to review and approve or disapprove the
 2   decision of the arbitrator, but whether the California court
 3   has jurisdiction is a separate issue too.  I am not sure that
 4   they do.
 5            MR. SNYDER:  Your Honor, let me address that briefly
 6   because, in our papers, we cited to four independent ways that
 7   the district court in California has jurisdiction.  One was
 8   diversity which Judge Gerber -- at least the way the transcript
 9   seems to read -- seems to admit that the California court, GM
10   being a Michigan resident and Rally being a California
11   resident, a complete diversity exists.
12            The second ground is the AAA rules which the Court can
13   agree or disagree as to what is meant by allowing Rally to go
14   to a court of competent jurisdiction.  But I don't believe that
15   there is any dispute under the scheduling order that the AAA
16   rules apply, that Rule 48(c) allows a party to seek a judgment
17   in a court of competent jurisdiction.  Whether that means the
18   right to modify, vacate or amend the judgment, again, we
19   believe that that is something that the district court in
20   California can address.
21            There is also a federal question, your Honor.  At
22   least in our opinion, the issue is whether Chevy is a "covered
23   dealership" as that term is defined under the Dealer
24   Arbitration Act.  That's a straight federal question.  We cite
25   to the Supreme Court case in Baden, how the Supreme Court has
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

20

0AKUMOTC

1   allowed federal courts to now look behind arbitration to see if
2   federal questions exists.
3           Neither GM in its opposition in the bankruptcy court,
4   GM in its opposition in this Court or Judge Gerber even address
5   the issue of whether there is federal question jurisdiction.
6   It seems, obviously, you have a federal statute and we are
7   asking the Court whether it is a covered dealership under that
8   statute that it would satisfy the definition of a federal
9   question in Baden.  Again, your Honor, GM had no problem in
10  both Louisiana and in California saying it was a federal
11  question and looking to the district courts there.
12          The fourth issue, your Honor, is the
13  constitutionality, and we have discussed whether you can have a
14  statute that doesn't allow for judicial review.
15          THE COURT:  Why doesn't the Thomas case deal with
16  that.
17          MR. SNYDER:  It may, but I didn't see anything in
18  anybody's papers that gives the right of the bankruptcy court
19  to decide whether a non-Title 11 statute is constitutional or
20  provides the analytical framework.  And Thomas starts, by the
21  way, by citing Marathon and the ability of what Article I
22  judges can and can't do as core proceedings.
23          If we go back to 157(b)(2) and the enumerated 13
24  subsections, there is nothing in there that would allow the
25  bankruptcy court to say the Federal Arbitration Act is

0AKUMOTC

 1    constitutional because it satisfies Thomas.  I didn't see any
 2    cases cited by GM that allows an Article 1 court --
 3             THE COURT:  You are not claiming that this act is
 4    unconstitutional?  No one is arguing that?
 5             MR. SNYDER:  That's correct.  We are arguing that the
 6    absence of judicial review violates Rally's due process.  If in
 7    fact someone holds that there is no place for them to go,
 8    because in Thomas there was, as I stated, FIFRA had a
 9    regulatory framework.  It gave guidelines to what the
10    arbitrator could or could not do.  And the court specifically
11    said the due process considerations, the Article 3 court would
12    always have jurisdiction.
13             THE COURT:  If you start arguing that act is
14    unconstitutional, then the arbitration decision goes out of the
15    window and you don't get the four dealerships that you want.
16             MR. SNYDER:  It is not the statute that is
17    unconstitutional.  It is only the due process considerations
18    with respect to review, what a dealership can do if it
19    disagrees.  We can talk about the shortcomings in the statute.
20    Rally is not unique.  Obviously, Lessan and there are other
21    cases where other dealerships are also seeking judicial review,
22    where are they to go?  Judge Gerber said the 600 dealers that
23    sought arbitrations under the Dealer Arbitration Act should
24    come back to him.
25             But with respect to it being a federal question as to

                                                                            22
0AKUMOTC
1    what is a covered dealership or in Lessan in Louisiana, what is
2    a customary letter of intent.  We didn't go to the bankruptcy
3    court and neither did GM.  The proper court is where the matter
4    is venued.  For Lessan, GM went to the Eastern District of
5    Louisiana, and for us, we went to the Southern District of
6    California.  And that's because that's where the issue is
7    venued, and that is the Article 3 court that should
8    determine -- if we go to California, I have no doubt that
9    General Motors' first argument will be that they are
10   constitutionally protected, there is no right for judicial
11   review.
12          Judge, you don't even have to decide whether there are
13   five agreements or one.  They are free to make that argument to
14   a Title 3 judge, but a non-Title 11 statute for a bankruptcy
15   court to pass on the constitutionality of that, it is not in
16   Title 28.  There is nothing that gives the court the
17   jurisdiction to make a finding --
18          THE COURT:  I don't see that the bankruptcy court can
19   pass on constitutionality.
20          MR. SNYDER:  Your Honor, I believe what the court said
21   in citing Thomas that Article 1 courts can pass on an issue
22   where there is no judicial review.  We had raised the due
23   process concerns in our response that a statute that does not
24   allow for any judicial review -- and we cite to Thomas and they
25   cite to Thomas and somebody has it right and somebody has it

                          SOUTHERN DISTRICT REPORTERS, P.C.
                                  (212) 805-0300

23

0AKUMOTC

1    wrong -- but when there is no regulatory framework, an issue
2    that needs to be decided as to constitutionality, should be
3    decided by an Article 3 court.  And the judge said the statute
4    is fine.
5         There are lots of statutes that are silent.  He cites
6    to Thomas and Switchmen for standing for the proposition that
7    there are Article 1 judges that can pass on statutes.  We would
8    just suggest that, because there is no regulatory framework,
9    those cases don't apply, but I am not sure what allowed Judge
10   Gerber to make that determination, that the statute satisfies
11   the due process requirements of the Constitution as to Rally.
12   That's a determination an Article 3 court should make.
13        And if it decides it does satisfy it, then we don't
14   even get to the substantive issue of whether it is a covered
15   dealership.  The court says that the constitutional and
16   equitable considerations are met, but Thomas does not stand for
17   the proposition that due process goes out the window just
18   because there is a statute with respect to judicial review.  It
19   specifically reserved as to due process considerations, as it
20   must.
21        What is Rally to do?  It loses.  GM says, we are not
22   giving you the other four.  Come back into the bankruptcy
23   court.  The bankruptcy court had nothing to do with the
24   arbitration.
25             THE COURT:  You are not raising the due process issue

24

0AKUMOTC

1   in your papers?
2           MR. SNYDER:  I believe we do, your Honor.
3           THE COURT:  You are not raising the due process issue
4   in California, are you?
5           MR. SNYDER:  Your Honor, I believe in both our
6   objections and in the motion here, GM made it very clear in the
7   papers, both in their response, they come right out and say it.
8   The statute is silent as to judicial review, and Rally has no
9   right to seek such judicial review in cases like Thomas which
10  we cite in our opposition.
11          They say in their response, it stands for the
12  proposition that an Article 1 court can pass on the statute
13  when there is no judicial review.  We don't read Thomas that
14  way, but certainly the issue of due process, of whether a
15  statute that provides for no judicial review was addressed.
16  And we would suggest, it is even more of an issue when the
17  judge determining that issue is an Article 1 judge because that
18  is not a core proceeding, the issue of whether a --
19          THE COURT:  Do I have it right that you are not
20  raising a due process issue before the California court?
21          MR. SNYDER:  Your Honor, if I may, we didn't need to
22  raise it in California because in California we assume that the
23  court has subject matter jurisdiction.  We brought that
24  complaint in July before any of this came up.
25          THE COURT:  But you were not raising any due process

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

0AKUMOTC

1    issue with respect to what went on under arbitration?  You are
2    arguing merely an interpretation of the statute?
3           MR. SNYDER:  Our issue about due process is the right
4    of judicial review, your Honor, that the statute that doesn't
5    allow for -- we didn't need to make that argument in California
6    because no one had objected to it.  We filed the lawsuit --
7           THE COURT:  As of now, doesn't the arbitrator have the
8    right to determine the scope of the responsibilities delegated
9    to him by the arbitration agreement or, in this case, by the
10   statute?
11          MR. SNYDER:  Your Honor, yes, in this case he did.  He
12   said that the Commercial Rules of the AAA apply.  That's
13   binding on both parties.  And Rule 48(c) allows for a party to
14   go to a court of competent jurisdiction to obtain a judgment.
15   So it is absolutely binding.  That is exactly it, and we didn't
16   think that someone was going to tell us --
17          THE COURT:  I don't recall the arbitrator saying that
18   the parties can go to the court for binding judgment.  I didn't
19   see that.
20          MR. SNYDER:  Your Honor, I apologize.  Perhaps I
21   misspoke.
22          THE COURT:  Your argument, as I understand it, is that
23   the American Arbitration rules allow for that.
24          MR. SNYDER:  I didn't want to implicate or intimate
25   that the arbitrator made any finding on the jurisdiction.  All

26

0AKUMOTC

```
 1   the arbitrator did in the scheduling order was state that the
 2   Commercial Rules apply.  And one of the Commercial Rules allows
 3   for the party to seek a judgment in a court of competent
 4   jurisdiction.
 5               THE COURT:  I had better hear from the other side.
 6            You haven't got anything else to cover?
 7            MR. SNYDER:  I don't, your Honor.
 8            MR. OXFORD:  Good morning, your Honor.
 9            THE COURT:  Good morning, Mr. Oxford.
10            MR. OXFORD:  Let me start where I think we have common
11   ground, and that is that the bankruptcy court clearly does have
12   jurisdiction to enforce its own 363 sale order and the
13   wind-down agreement.
14            THE COURT:  How does this matter come under that?
15            MR. OXFORD:  The way it comes under that, I was just
16   about to say, your Honor, is because they are raising the
17   alleged right to judicial review as a defense to enforcement of
18   the 363 sale order and the wind-down agreement.
19            And taking one of the points that your Honor made
20   earlier, I think that in one sense your Honor has it quite
21   right, there is an issue of jurisdiction here not only as to
22   the bankruptcy court, but as to the California court because if
23   there is no right to judicial review as we argue, then, in a
24   sense, neither court has jurisdiction --
25            THE COURT:  That's what bothers me because if neither
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

27

0AKUMOTC

1  court has jurisdiction, then how can you enjoin another court?
2          MR. OXFORD:  The subtlety, I think, your Honor, is
3  whether the bankruptcy court which is confronted --
4          THE COURT:  How can he do anything?  Does he have
5  jurisdiction to do anything, because the statute says binding
6  arbitration and it doesn't provide for judicial review?
7          MR. OXFORD:  From our perspective, in one sense,
8  that's the end.  Why are we here?  Let's all go home.
9          THE COURT:  Except this is an appeal from an order of
10  a bankruptcy judge that was entered and maybe it should be
11  void, but that's what sort of bothers me.
12          MR. OXFORD:  I don't reach that conclusion, your
13  Honor, because the bankruptcy court obviously has to have the
14  ability to enforce its order.  The status quo right now is that
15  Rally is required to wind down its dealer agreement by the
16  bankruptcy court's order.  And they are asserting by way of
17  defense that there is a right to judicial review.
18          The question is, who has jurisdiction to tell them
19  that there isn't a right to judicial review.  That's how it
20  comes up, I think, your Honor.  I don't think it is disputed,
21  the statute does not provide a right for judicial review.  It
22  is not disputed, really, that there is a constitutional
23  requirement to provide judicial review, and if there is, the
24  whole statute falls because under the one Supreme Court case we
25  cite, Commodity Futures Trading Commission v. Schor, it isn't

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

28

0AKUMOTC

1  up to Judge Gerber or your Honor to rewrite a statute silent as
2  to the right of judicial review, to provide one when Congress
3  didn't provide it.  That's where we are.
4        I would also say that the judicial estoppel argument,
5  I think, goes nowhere, your Honor, because their own authority,
6  New Hampshire v. Maine, says that doctrine only applies when a
7  party takes factual positions in two cases, and here that is
8  not the issue.  There is an issue here of whether GM took
9  different legal attacks on jurisdiction in these cases, but
10  that is not, under New Hampshire v. Maine, a ground for
11  invoking the doctrine of judicial estoppel.
12        I would also say that the facts in these three cases
13  are all completely different.  Here, we are trying to enforce a
14  bankruptcy court order.  The appropriate place to go to enforce
15  a court order is to the court that entered it.
16        In the Santa Monica case, I was the lawyer in the
17  Santa Monica case.  We were hit with a last-minute we are not
18  going to settle, we want to go back to arbitration.  And we
19  went to the local court on short notice to try to get an order,
20  basically, to enforce under state contract law a written
21  settlement agreement.  Completely different than the facts
22  here.  No factual inconsistency whatsoever.
23        As far as the Lessan case, I wasn't directly involved
24  in that case, your Honor, but all that happened there was that
25  the dealer took this to the Louisiana New Motor Vehicle
              SOUTHERN DISTRICT REPORTERS, P.C.
                    (212) 805-0300

0AKUMOTC

1   Commission and, basically, GM simply relying on a dealer's
2   request for relief, removed that to the local federal court so
3   that it could basically freeze that proceeding in time to move
4   to a bankruptcy court, which it has now done, to enforce the
5   sale order against that dealership.
6           So at least going forward, GM is taking a completely
7   consistent position in these dealership cases that, to the
8   extent it implicates an interpretation or an enforcement of a
9   wind-down agreement, that's a matter for Judge Gerber.
10          THE COURT:  Let me see how it does that.  Take me
11  through the sale agreement and the wind-down agreement so that
12  I can see that he has continuing jurisdiction here.  I need to
13  have it pointed out to me.
14          Mr. Blatt gave me a big thick document, and I had an
15  order to show cause yesterday for a TRO, and here I have one
16  today.
17          MR. OXFORD:  I am going to apologize for both parties
18  for the amount of paperwork, your Honor, but the circumstances
19  demanded it.
20          THE COURT:  Be sure that you have the essentials of
21  the sale order and the document in mind.
22          MR. OXFORD:  We really have to talk about the sale
23  approval order and the master sale and purchase agreement which
24  it approved.  I think I am going to get the numbers right, but
25  I believe that the wind-down agreements were provided for in

0AKUMOTC
```
 1   Section 6.7.
 2            THE COURT:  They are not tabbed, so I have a lot of
 3   difficulty here.  I tabbed some of them.
 4            MR. OXFORD:  I know the problem you are talking about.
 5   I have had my own trouble wrestling with this order.  It is
 6   about 198 pages.
 7            THE COURT:  My old secretary who retired last year
 8   would not have accepted your papers.  She would have said, go
 9   back and get this tabbed.  She was an old-time legal secretary
10   who knew her business.  I don't have that.  She retired and you
11   can't get a replacement.
12            MR. OXFORD:  It is hard to get good help.
13            If your clerk can find the master sale and purchase
14   agreement probably about halfway down through the entire
15   document, I think we will find Section 6.7.  I don't have it in
16   front of me, so I am flying a little bit blind myself.
17            THE LAW CLERK:  Do you know which exhibit letter it
18   is?
19            MR. OXFORD:  It is actually page 65 of the master sale
20   and purchase agreement which is Exhibit A to the order.
21            Mr. Davidson handed it to me.  It is about that far
22   down.  It is page 65.  It is Exhibit 1 to my declaration.
23            THE COURT:  OK.  We have it, the amended and restated
24   master sale and purchase agreement.
25            MR. OXFORD:  Section 6.7 is basically the provision
```

31

0AKUMOTC

```
 1    that says that Old GM will try to get all of the dealers to
 2    sign one of these wind-down agreements.
 3              THE COURT:  6.7.
 4              MR. OXFORD:  Page 65.
 5              THE COURT:  You are going to take me from "deferred
 6    termination agreement."
 7              MR. OXFORD:  In the vernacular, what this paragraph is
 8    about, it is saying Old GM will get the dealers to sign
 9    wind-down agreements so that they can be assigned to new GMs.
10    And that is in fact what happened with the exception of a very
11    small number who didn't sign wind-down agreements and had their
12    agreements rejected under Section 365.
13              THE COURT:  And for the avoidance of doubt, it is
14    "each deferred termination agreement," is that what you are
15    referring to?
16              MR. OXFORD:  Yes.  There is a definition in the actual
17    order which defines "deferred termination agreements"
18    specifically to include wind-down agreements.  That is not
19    right here, but it is back in the recital JJ to the sale
20    approval order.
21              THE COURT:  What do I look at?
22              MR. OXFORD:  Page 18 of the sale approval order,
23    paragraph JJ.
24              THE COURT:  That is where, the next document?
25              MR. OXFORD:  It is in the first document.  We were
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

0AKUMOTC

1    looking at the second document, way up towards the front on
2    page 18.
3            THE COURT:  Item JJ?
4            MR. OXFORD:  Yes.  It defines "deferred termination
5    agreement."  It says "collectively, wind-down agreements and
6    deferred termination agreements."  If we go further in --
7            THE COURT:  I just want to see why this confers
8    continuing jurisdiction on the bankruptcy court.
9            MR. OXFORD:  I am coming to that.  I have one more
10   step first.
11           THE COURT:  All right.
12           MR. OXFORD:  Paragraph 31 of the sale approval order
13   approves the wind-down agreements, and that is on page 34,
14   paragraph 31.
15           THE COURT:  This is the same agreement?
16           MR. OXFORD:  Same order.
17           THE COURT:  Page 34.
18           MR. OXFORD:  When you are ready for the next one, it
19   is on page 48.
20           THE COURT:  I want to read which one it is on 34.
21   Paragraph 31?
22           MR. OXFORD:  Paragraph 31 approves the wind-down
23   agreement.
24           THE COURT:  They are valid and binding contracts.
25           MR. OXFORD:  Right.  To enforce that finding, among
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

33

0AKUMOTC

 1    other things, we come to paragraph 71 of the sale approval
 2    order which is on page 48.
 3              THE COURT:  71?
 4              MR. OXFORD:  Paragraph 71.  The most pertinent
 5    provision is sub F, although the prefatory language is also
 6    significant.
 7              THE COURT:  You said 71?
 8              MR. OXFORD:  Subparagraph F, is the most directly
 9    relevant concerning deferred termination agreements which
10    includes wind-down agreements.
11              THE COURT:  OK.  I see it.
12              MR. OXFORD:  I think that answers your Honor's
13    question, unless I missed part of it.
14              THE COURT:  I think so.
15              MR. OXFORD:  I only want to say about three more
16    things --
17              THE COURT:  Is this a dispute of the deferred
18    termination agreement?
19              MR. OXFORD:  It is a dispute about whether that
20    deferred termination agreement should be enforced.  And they
21    are asserting, by way of defense, it shouldn't be enforced
22    because we have a right of judicial review of the arbitration
23    award.
24              THE COURT:  Well, Congress determined --
25              MR. OXFORD:  There is not a right to judicial review,
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

34

0AKUMOTC

 1    and just like any other issue of state or federal law that a
 2    bankruptcy court comes across in the course of performing its
 3    core functions it is confronted with and has the power to
 4    decide that issue.
 5                THE COURT:  Your authority?
 6                MR. OXFORD:  I believe we cited cases --
 7                THE COURT:  Do you have a deferred termination
 8    agreement also for me to look at?
 9                MR. OXFORD:  I believe that the wind-down agreement is
10    Exhibit B to Mr. Blatt's declaration.  I may not have that
11    letter right, but I know it is in his declaration.
12                THE COURT:  Exhibit B is dated January 13, 2010.
13                MR. OXFORD:  I'm sorry.  I don't remember which
14    exhibit in Mr. Blatt's declaration is the wind-down agreement,
15    but I believe it is in there.
16                THE COURT:  It is marked Exhibit B, but it is dated
17    January 13, 2010 in my copy, and then it has attached to that,
18    it has 747.
19                MR. OXFORD:  It may be Exhibit A or Exhibit C.  I
20    don't remember.  Maybe Mr. Blatt could help us find --
21                MR. BLATT:  I believe it is Exhibit B to my
22    declaration.
23                THE COURT:  I have an Exhibit B.
24                MR. SNYDER:  Your Honor, the first page would be a
25    letter dated January 13, 2010.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

0AKUMOTC

```
 1              THE COURT:  Then I have attached to that a dealership.
 2         MR. BLATT:  Your Honor, you are right.
 3              THE COURT:  And then attached to that --
 4         MR. BLATT:  I apologize, your Honor.
 5         MR. OXFORD:  I have a copy of the wind-down agreement
 6    here that I took out of my briefcase, and I will show it to
 7    Mr. Snyder.
 8              THE COURT:  I gather these agreements were entered
 9    into before the bankruptcy sale, before the transfer of the
10    assets to GM?
11         MR. OXFORD:  Yes, that's correct, your Honor.
12              THE COURT:  The dealer then agreed to allow GM, the
13    Old GM to assign to the New GM the deal --
14         MR. OXFORD:  Also correct.
15         THE COURT:  -- this agreement?
16         MR. OXFORD:  Yes.
17              THE COURT:  What in this agreement requires
18    enforcement because of the dealer arbitrations?
19         MR. OXFORD:  Again, the Dealer Arbitration Act was
20    raised by way of defense.  What we were trying to do is to
21    enforce the agreement.  They are trying to raise the defense of
22    a right to judicial review under the Arbitration Act.
23              Therefore, in order to decide whether or not to
24    enforce the wind-down agreement, Judge Gerber was confronted
25    with the issue of whether there was a right to judicial review.
```

36

0AKUMOTC

```
 1   He decided, correctly, we think, that there is not, and went on
 2   to find that, even if there was a right to judicial review,
 3   there was not a substantial question raised with respect to the
 4   separate dealer agreements, which is the only issue that I have
 5   heard here this morning being asserted by Rally as a basis for
 6   disturbing the arbitration award.
 7            THE COURT:  That is the only basis I have heard this
 8   morning.
 9            MR. OXFORD:  From our perspective, your Honor, that
10   argument flies in the face of the contract language and the
11   language of the statute.  The language of the statute basically
12   says that a covered dealership is someone who has a franchise
13   agreement.  And then the statute goes on to say that the
14   arbitrator is to determine whether the franchise agreement, of
15   which there are four here, your Honor, should be reinstated or
16   not, which is exactly what this arbitrator did.
17            Mr. Davidson calls my attention to also that the
18   exclusive jurisdiction is specifically referenced in paragraph
19   13 of the wind-down agreement that is before you.  So Rally,
20   essentially when it signed this agreement, consented to the
21   bankruptcy court's exercise of exclusive jurisdiction over
22   issues including whether or not the wind-down agreement would
23   be enforced.
24            THE COURT:  I see that on 13.  OK.
25            MR. OXFORD:  I would like to say just briefly about
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

37

0AKUMOTC

1   the Commercial Arbitration rules, the record is clear, GM did
2   not sign onto them in toto and, in particular, reserved its
3   right to object to any rule that was inconsistent with the
4   Dealership Arbitration Act.  Since the Dealership Arbitration
5   Act contains no right to judicial review, that rule which
6   suggests -- which appellant suggests -- provides for judicial
7   review is inconsistent with the Dealer Arbitration Act, perhaps
8   even preempted by it.  Even if that rule were applicable, as
9   Judge Gerber noted, it provides for enforcement of an
10  arbitration award, not an appeal from the arbitration award.
11  What we have here, basically, is an attempt to appeal an
12  unappealable arbitration award.
13          Passing to the four factors governing a stay, I have
14  obviously already talked about the likelihood of success on the
15  merits.  If there is no likelihood of success on the merits,
16  the cases say you don't have to look at the other factors for
17  the obvious reason that a stay would be futile.
18          As to irreparable harm, I think your Honor said this,
19  they lost the dealership in bankruptcy on the 363 sale order
20  and the wind-down agreement, not because the arbitration award
21  didn't give them a chance to get this particular franchise
22  back.
23          THE COURT:  Let me just make sure that I follow that.
24  They lost the arbitration award.  The arbitration does
25  not provide for -- it does provide that Chevrolet will continue

38

0AKUMOTC
1  until October 31st.
2           MR. OXFORD:  That's right, your Honor.
3           Essentially what happened is, none of us would be here
4  if Old GM hadn't declared bankruptcy or there hadn't been a 363
5  sale order or a wind-down agreement, but there was.  So the
6  status quo as of July 10th was, Rally Chevrolet was out of
7  business.
8           Congress came in, and without disturbing the wind-down
9  agreement or the 363 sale order or the bankruptcy court's
10  jurisdiction, said, here, Mr. Dealer, here is your chance for
11  binding arbitration to try to get back in.  They got back in
12  for three out of four.  But, basically, the status quo right
13  now is not that they have the right to continue operating
14  Chevrolet forever.  The status quo is, they are required to
15  terminate at the end of the month.  So a stay would essentially
16  alter the status quo, not preserve it.
17          The Sullivan declaration, I think, goes through the
18  problems the continued operation of a Rally dealership presents
19  from the standpoint of GM being saddled with Rally as a slow
20  performing dealer from a sales perspective and the damage to
21  the incoming dealer who is either going to have to compete with
22  Rally or may not even be able to go into business at all during
23  a period where there are critical launch products.
24          THE COURT:  I am not sure that is before me.  I saw
25  that, but is that really the issue -- well, I guess it is on

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

39

0AKUMOTC

1   balancing the hardships.
2          MR. OXFORD:  It goes to balancing of hardships, that
3   is exactly right, your Honor.  I will say it again, I don't
4   think we ever get there.  There is no likelihood of success on
5   the merits that has been shown by Rally in this case.
6          For that reason, unless your Honor has other
7   questions, I would simply submit that Rally has not shown the
8   necessary facts of law for your Honor to grant the stay.
9          MR. SNYDER:  Your Honor, just quickly, the Supreme
10  Court in New Hampshire v. Maine does not limit the judicial
11  estoppel to solely factual issues.  I cited to the three
12  factors, and I direct the Court to 532 U.S. 749 where the court
13  cites the three factors.  And then the next sentence is:  "In
14  enumerating these factors, inconsistent positions, reliance and
15  unfair advantage, we do not establish inflexible prerequisites
16  on exhaustive formula in determining the applicability of
17  judicial estoppel."
18         Second, the right of judicial review is not a defense.
19  It is exactly what it is.  Either there is a right under the
20  statute for the district court to look as to whether there were
21  any manifest errors or patent disregard of the law by the
22  arbitrator or there is not.  The law didn't exist when Rally
23  executed the agreement and it is not a defense under the
24  wind-down agreement.
25         It doesn't matter, your Honor, whether GM consented to
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

40

0AKUMOTC

```
 1    the AAA rules or not.  That is the bogeyman that they keep
 2    throwing up.  They apply.  The scheduling order said they
 3    applied.  And when the scheduling order was entered saying they
 4    applied to this and every other arbitration, GM didn't run into
 5    the bankruptcy court and say they can't apply the AAA rules.
 6    They didn't go into a district court and say, you can't apply
 7    the AAA rules.  They apply whether they like it or not.  They
 8    apply.  And one of the AAA rules is Rule 48(c).  Mr. Oxford may
 9    be correct that the language under 48(c) that discusses the
10    ability of a movant to seek a judgment might not allow to
11    modify --
12            THE COURT:  You are taking a factual issue with
13    respect to whether GM preserved its rights with respect to the
14    AAA rules?
15            MR. SNYDER:  I am saying that, under the Second
16    Circuit decision in Idea Nuova, and the fact that GM did
17    nothing -- it interposed its objection.  And the arbitrator
18    said OK.  We've got your objection.  Here is my scheduling
19    order.  The AAA rules apply.  The fact that GM objected,
20    reserved the right, doesn't mean that the rules don't apply.
21    It means that the court took into consideration their
22    objection, but nonetheless applied the Commercial Arbitration
23    Rules.
24            THE COURT:  They did not necessarily consent.
25            MR. SNYDER:  They did not consent.  Legally, it is not
```

41

0AKUMOTC

1  relevant because the judge applied the rules.
2          As your Honor pointed out, there were findings of fact
3  here.  Why?  As the Court pointed out, they are required to
4  have findings of fact.  The rules say, if there is a final and
5  binding judgment, a movant can go to a court of competent
6  jurisdiction.  That is all they are looking to do.
7          THE COURT:  I don't know whether the arbitrator had
8  that in mind or not.
9          MR. SNYDER:  I don't either.
10          Just the last point, page 16 of our brief, we point to
11  the fact that the mooting of an appeal is also harm or
12  irreparable harm that the Court can consider when deciding the
13  facts.
14          I have nothing further.
15          MR. OXFORD:  Just briefly as to the last point, your
16  Honor, they waited two months after the arbitration award to
17  file a legal challenge.  If they had acted sooner, we could
18  have the appeal decided by now.
19          THE COURT:  They waited two months after the
20  arbitration award?
21          MR. OXFORD:  The June 8th arbitration award and the
22  August 13th filing of the petition in California.
23          THE COURT:  What is the significance of waiting two
24  months?  It is too long?
25          MR. OXFORD:  Laches, your Honor.  They are here at the
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

42

0AKUMOTC

1  eve of the expiration, having waited two months, and they want
2  a stay to go past that date.  That's all.
3          MR. SNYDER:  Your Honor, let me extend the timeline a
4  little further.  GM then waited 30 days, filed its answer and
5  moved into bankruptcy court three days later.  It didn't move
6  to dismiss.  It filed its answer on September 10th, and
7  September 13th moved in the bankruptcy court which gave us
8  almost no time.  So if you extend the deadline, two months
9  isn't laches, but waiting 30 days to answer and then running to
10 the bankruptcy court is why we are here on the 11th hour.
11         THE COURT:  Doesn't sound as if I can rely on that
12 schedule.  Off the top of my head I cannot determine whether
13 either party has acted negligently.
14         I guess we have to render a decision in the next ten
15 days.
16         MR. OXFORD:  Yes, your Honor.
17         THE COURT:  Thank you very much.
18         MR. OXFORD:  Thank you very much for hearing us on
19 short notice.
20
21                         o    0   o
22
23
24
25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300