FOLEY & LARDNER LLP
Victor A. Vilaplana (*admitted pro hac vice*)
Matthew J. Riopelle (*admitted pro hac vice*)
402 West Broadway, Suite 2100
San Diego, CA 92101
Telephone: (619) 234-6655
Facsimile: (619) 234-3510

FOLEY & LARDNER LLP
Jeffrey A. Soble (*admitted pro hac vice*)
321 North Clark Street, Suite 2800
Chicago, IL 60654-5313
Telephone: (312) 832-4500
Facsimile: (312) 832-4700

*Attorneys for Toyota Motor Corporation*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| MOTORS LIQUIDATION COMPANY, *et al.*, | : | Case No. 09-50026 (REG) |
| f/k/a General Motors Corp., *et al.* | : | |
| | : | (Jointly Administered) |
| Debtors | : | |
| | : | |

-------------------------------------------------------------X

| | | |
|---|---|---|
| TOYOTA MOTOR CORPORATION, | : | Adversary Proceeding |
| | : | |
| Plaintiff. | : | Case No. 10-_____ |
| | : | |
| vs. | : | |
| | : | |
| MOTORS LIQUIDATION COMPANY, | : | |
| f/k/a General Motors Corp., | : | |
| | : | |
| Defendant. | : | |
| | : | |

-------------------------------------------------------------X

## <u>COMPLAINT</u>

Comes now Plaintiff, Toyota Motor Corporation ("TMC"), and for its Complaint against

Defendant, Motors Liquidation Company (f/k/a General Motors Corporation) ("MLC"), states as

follows:

## THE PARTIES

1.      TMC is a Japanese corporation and fifty percent (50%) shareholder of New

United Motor Manufacturing, Inc. ("NUMMI").

2.      MLC is a Delaware corporation and fifty percent (50%) shareholder of NUMMI.

3.      On June 1, 2009, MLC and certain of its subsidiaries filed voluntary petitions for

relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the

Southern District of New York ("Court").

4.      On July 10, 2009, after obtaining Court approval, MLC sold substantially all of its

assets to General Motors, LLC ("New GM").  MLC's fifty percent (50%) interest in NUMMI

was not included in the sale to New GM.  Instead, MLC retained its interest in NUMMI to evade

its obligations to NUMMI and avoid transferring those liabilities to New GM.

## JURISDICTION AND VENUE

5.      This action is brought pursuant to Rules 7008, 7012 and 9014 of the Federal

Rules of Bankruptcy Procedure to seek relief in accordance with Sections 501 and 502 of Title

11 of the United States Code ("Bankruptcy Code").

6.      This Court has jurisdiction over this matter under 28 U.S.C. §§ 1334 and 157.

The matter concerns the allowance of claims against the estate and is therefore a core proceeding

under 28 U.S.C. § 157(b)(2)(B).

7.      Venue is proper in this District under 28 U.S.C. §§ 1408 and 1409.

## FACTUAL BACKGROUND

I.      **The NUMMI Joint Venture.**

8.      NUMMI is a unique joint venture between two major automotive companies: MLC and TMC.  MLC and TMC agreed to establish NUMMI as an equally owned joint venture to manufacture MLC (and later TMC) vehicles in an old MLC plant in Fremont, California ("Fremont Plant").  The parties memorialized their joint venture agreement in a Memorandum of Understanding executed on February 17, 1983 (the "1983 MOU"), attached hereto as Exhibit "A".

9.      As TMC's joint venture partner, MLC has a special relationship with TMC that is unlike routine customer-supplier relationships in the automotive industry.  As a result of the NUMMI joint venture, TMC and MLC forged a special relationship, stricter than the morals of the market, that must be upheld and enforced.

10.     The 1983 MOU provided the foundation for NUMMI, which ultimately manufactured millions of vehicles for MLC and provided MLC (and New GM) with billions of dollars of institutional knowledge prior to MLC's decision to abandon its obligations as a joint venture partner to TMC and NUMMI.

11.     In February 1984, TMC and MLC implemented the 1983 MOU by entering into that certain Shareholders' Agreement, as amended, originally dated February 21, 1984 (the "SHA"), attached hereto as Exhibit "B", and various other organizational documents for the NUMMI joint venture.  Both TMC and MLC made significant initial contributions to NUMMI: MLC contributed the Fremont Plant and TMC contributed $100 million in cash.

12.     In addition to its investment of cash, TMC also agreed to design vehicles for NUMMI to manufacture.  On December 18, 1984, a yellow Chevrolet Nova became the first MLC vehicle manufactured by NUMMI.  Between 1984 and 1986, NUMMI exclusively

2

manufactured TMC designed cars that NUMMI sold to MLC, and that MLC in turn sold to customers as MLC badged Chevrolet Novas.    Beginning in 1986, NUMMI also began manufacturing the Toyota Corolla FX for TMC.

13.    More recently, NUMMI manufactured the Pontiac Vibe for MLC.  Over the past 25 years, MLC has sold almost two million cars badged under its various brands that that TMC designed and NUMMI manufactured.

14.    NUMMI's purpose was not just to produce cars.  The NUMMI venture was designed as a way for MLC to learn Toyota's manufacturing methods from TMC.  In fact, the Federal Trade Commission ("FTC"), in its final approval of the NUMMI joint venture, noted that TMC and MLC's joint venture "promises substantial benefits for American consumers, for American labor, and for the American manufacturing sector in general."  *In re General Motors Corp.*, 103 F.T.C. 374 (1984) (Douglas, G., concurring).

15.    As noted by the FTC, the three principal benefits of the NUMMI joint venture are: (1) an "increase [in] the total number of small cars available in America, thus allowing consumers a greater choice at lower prices, despite present restrictions on Japanese imports;" (2) "the joint venture car will cost less to produce than if GM were forced to rely immediately on some other production source;" and (3) "the joint venture offers a valuable opportunity for GM to complete its learning of more efficient Japanese manufacturing and management techniques." 103 F.T.C. 374 (Miller III, J., concurring).  The FTC added "to the extent the [joint] venture demonstrates the Japanese system can be successfully adapted to the United States, the [joint] venture should lead to the development of a more efficient and competitive U.S. industry. Evidence obtained during the Commission's investigation persuasively establishes that a

successful experiment at [NUMMI] could serve as a predicate for other domestic auto makers and their unionized employees to work out similar flexibility in work rules and practices." *Id.*

16.    NUMMI became an award winning plant, producing high quality vehicles for MLC.

17.    Further, NUMMI became a training ground for MLC's managers and executives who studied the Toyota Production System in place at NUMMI.  The knowledge, experience and business acumen that MLC gained from TMC through this joint venture is priceless and was spread to all of MLC's (and now New GM's) manufacturing facilities.  MLC has acknowledged that its involvement in NUMMI was positive, beneficial and lucrative, resulting in MLC gaining billions of dollars worth of knowledge from TMC and NUMMI.

18.    In 2006, MLC agreed to an annual allocation of at least 65,000 Pontiac Vibes per year from NUMMI pursuant to the 2006 MOU.  MLC did in fact purchase 60,000 Vibes in 2006, 50,000 Vibes in 2007 and over 70,000 Vibes in 2008.

19.    On June 4, 2009, MLC announced that it would stop purchasing Vibes from NUMMI.  In August 2009, the last Pontiac Vibe was manufactured by NUMMI.

20.    In honoring its obligations under the 2006 Memorandum of Understanding ("2006 MOU"), attached hereto as Exhibit "C", and to support MLC's Pontiac Vibe purchases, TMC spent hundreds of millions of dollars on research and development to design the Pontiac Vibe for MLC.  MLC's decision to cease ordering the Vibe left TMC with over $73 million of unrecoverable research and development expenditures that never would have been spent if MLC had not executed the 2006 MOU.

21.     MLC's failure to work with NUMMI and TMC to seek alternatives to the Pontiac Vibe and its ultimate decision to withdraw from NUMMI necessitated the wind down of NUMMI.

## II.     TMC Timely Filed Proofs of Claim Against MLC.

22.     TMC timely filed a Proof of Claim against MLC for the research and development costs rendered unrecoverable as a result of MLC's breach of the Vehicle Supply Agreement ("VSA"), attached hereto as Exhibit "D", and the 2006 MOU ("TMC's VSA/2006 MOU Claim")

23.     On July 30, 2010, TMC filed an amended and consolidated proof of claim for the VSA and 2006 MOU.  A true and correct copy of the amended and consolidated proof of claim is referred to herein as TMC's VSA/2006 MOU Claim and is attached hereto as Exhibit "E".

24.     TMC also filed Proofs of Claim for certain costs incurred by TMC related to the wind down of NUMMI as required under the Shareholders' Agreement between TMC, MLC and NUMMI ("TMC's NUMMI Claim", together with TMC's VSA/2006 MOU Claim, the "TMC Claims").  A true and correct copy of TMC's NUMMI Claim is attached hereto as Exhibit "F".

25.     On November 9, 2010, the Court held a hearing regarding the objection to NUMMI's Claim filed by MLC.  At the hearing, the Court proposed and the Parties agreed to treat the claims raised in TMC's Claims and NUMMI's Proof of Claim as a plenary litigation subject to Federal Rule of Bankruptcy Procedure 9014 and Federal Rules of Civil Procedure 8 and 12.  (Joint Stipulation and [Proposed] Scheduling Order, Dkt. # 7913.)

## III.    TMC's VSA/2006 MOU Claim

### A.     TMC's Unique Contractual Obligation to Design Vehicles for MLC.

26.     Between 1983 and 2009, TMC, MLC and NUMMI entered into numerous contracts regarding the parties' obligations.  The relevant contracts are:

- Memorandum of Understanding executed on February 17, 1983;

- Shareholders' Agreement, as amended, originally dated February 21, 1984;

- Vehicle Supply Agreement, as amended, originally dated February 21, 1984;

- Vehicle License Agreement, as amended, originally dated February 21, 1984;

- Purchase Procedures Manual, dated December 4, 1984;

- Manual for Allocation of NUMMI Production Between GM and TMS, dated September 1, 1986; and

- Memorandum of Understanding dated March 22, 2006.

27.    The contracts memorialized TMC's agreement to design, in consultation with MLC, MLC badged vehicles to be manufactured by NUMMI.  From the first Chevrolet Nova to the last Pontiac Vibe, TMC designed and collaborated with MLC on each vehicle that MLC purchased from NUMMI.

28.    TMC invested hundreds of millions of dollars to design vehicles for MLC.  MLC collaborated with TMC and knew that TMC was investing hundreds of millions of dollars for MLC's benefit, and MLC approved of TMC's continued expenditures through 2012 in the 2006 MOU.  *See* Ex. "A", 1983 MOU at pgs. 1-2; Ex. "D", VSA at §§ 3.1, 3.3(a), & 3.3(c); & Ex. "C", 2006 MOU at §§ 4 & 6.

29.    TMC, with MLC's collaboration and consent, fulfilled its obligations under the joint venture agreements resulting in the production of almost two million vehicles sold under MLC's brands and billions of dollars worth of institutional knowledge for MLC.

**B.      MLC's Obligation to Purchase Pontiac Vibes Under the VSA and 2006 MOU.**

30.      In the VSA, MLC committed to purchase vehicles from NUMMI on a "continuous and stable basis." Ex. "D", VSA at § 4.1(b).  The VSA contains one of the first commitments by MLC to purchase Vibes from NUMMI.

> The parties hereto are establishing supply and purchase arrangements under which the **JV Company shall supply and GM shall purchase the Products on a continuous and stable basis**.  **It is acknowledged that the JV Company is making substantial amounts of capital expenditures in its facilities relying upon GM's present projection that market demand for the Vehicles will exceed 200,000 units per annum.**  However, it is further acknowledged that market demand for the Products that can be generated in the areas in which GM expects to sell them will govern the purchase commitments of the parties as to all Products.  (Ex. "D", VSA § 4.1(b) (emphasis added))

31.      The Manual for Allocation of NUMMI Production Between GM and TMS (the "Manual Of Allocation"), attached hereto as Exhibit "G", explained that "the parties recognize that **it is of great importance to keep a smoothed production flow** for the purpose of maintaining high quality vehicles and facilitating high efficiency in NUMMI's production and in GM's and [Toyota's] distribution and marketing of vehicles." Ex. "G" at § I (emphasis added).

32.      Although MLC committed to purchase a minimum number of vehicles under the contracts, the parties understood that MLC's obligation to purchase vehicles from NUMMI must be subject to some flexibility to account for fluctuating market demand and manufacturing capabilities.

33.      To maintain flexibility, but accomplish continuous and stable purchasing necessary to ensure the viability of the joint venture, the parties agreed that the specific production schedule would be agreed upon by the parties by entering into individual sale contracts (each an "Individual Sales Contract"). The procedures for entering into an Individual

Sales Contract included a "purchase procedures manual pursuant to which specific delivery, packaging and other procedures relating to the supply and purchase of the Products" were set forth in the Purchase Procedures Manual (the "<u>Purchase Procedures Manual</u>"), attached as Exhibit "H", and the Manual Of Allocation.

34.      Together, the Manual Of Allocation and the Purchase Procedures Manual worked as follows:

A.      Each year, NUMMI developed an annual production and allocation plan and notified MLC and TMC.  The annual plan contained monthly allocations and the parties would negotiate any requested adjustments or other unresolved issues.  A finalized annual plan was then agreed upon and was set forth on a calendar week basis.  Ex. "G" at § III.A.

B.      Then, on a bi-monthly or quarterly basis, MLC, TMC and NUMMI met both separately and together to revisit the annual production plan.  At the various meetings, the parties agreed to "a fixed allocation of total production capacity for the third month following the specific month of the meeting."  Ex. "G" at § III.B(1).  In other words, MLC and TMC set a finalized monthly production level **three months in advance** so that NUMMI could anticipate MLC's and TMC's needs.

C.      Finally, each week, MLC submitted orders to NUMMI for its vehicles.  This step of the process was laid out in the Purchase Procedures Manual.  Ex. "H" at § III.C.  MLC submitted a "Final Requirement Schedule" to NUMMI every week that set the production level for the following week.[1]  Ex. "H" at § III.A(1).  Unless NUMMI

---

[1]      At the same time, MLC submitted "Fixed Requirement Schedules," which set production for the third through seventh week after submission, and "Preliminary Requirements Schedules," which covered the eighth through eleventh week after submission.  (Ex. "H" at § III.A(1).)

notified MLC otherwise, the "Final Requirement Schedule" became an Individual Sales Contract for that following week. Ex. "H" at § III.A(4).

D.      Thus, under the VSA (and through the Manual Of Allocation and the Purchase Procedures Manual), MLC and NUMMI formed an Individual Sales Contract every week.

E.      MLC made daily payments to NUMMI. The payments were pegged to NUMMI's deliveries and generally occurred three to four days after a delivery. Ex. "H" at § III.D(2).

35.     In addition to setting NUMMI's production levels, the various meetings between the parties were strategy sessions. The parties discussed NUMMI's financial results, vehicle specifications, overall productivity, capital projects and labor issues, among other topics. MLC and TMC often assessed NUMMI's performance, expressed views regarding how NUMMI fit with their respective businesses and made new proposals for NUMMI's product line.

36.     While the 1984 VSA generally discussed MLC's obligations to purchase vehicles, the 2006 MOU explicitly addresses MLC's obligations to purchase Pontiac Vibes from NUMMI. Pursuant to Section 1(3) of the 2006 MOU (Ex. "C"):

> The Parties understand that, assuming that 225,000 units of the Products are scheduled to be produced in a year, the Products will be allocated between TMC and GMC under the following formula, where each of TMC and GMC will have a right to, but not an obligation to, purchase the Products from NUMMI.

|  |  |
|---|---|
| TMC Corolla | at least 160,000 (71.11%) |
| GMC Vibe | at least 65,000 (28.89%) |

Thus, MLC committed to account for almost 30% of NUMMI's production.

37.     However, even within the 2006 MOU, MLC made it clear that it hoped to purchase more than its expected allocation of 65,000 Vibes:

> TMC recognizes that **irrespective of the planned or actual production volume of the Product in 2008, GMC desires to have 72,000 units of Vibe allocated to GM**C, ...  (Ex. "C", 2006 MOU at § 1(3) (emphasis added))

38.    MLC made it plain that one reason that it wanted this increased allocation was because "NUMMI represents the single plant manufacturing Vibes for GMC." *Id.*

39.    Concomitant with MLC's express obligation to purchase at least 65,000 Vibes per year through 2012, MLC agreed in advance with TMC that TMC would provide the designs for a mid model change to take place in 2011.

> The Parties agree that the expected model life of Vibe and Corolla shall run from January 2008 through December 2012...Should the need arise to lengthen or shorten the expected model life, the Parties will discuss and determine countermeasures.  Expected mid minor model change of Vibe will take place commencing with the 2011 model.  As for additional minor model changes to the Products, if any, the timing of them may be made as separately agreed upon among the Parties. (Ex. "C", 2006 MOU § 6)

40.    Just as in the VSA, the 2006 MOU recognized two critical aspects of all of the contracts between the parties: (1) the viability of NUMMI was of tantamount importance in all dealings among the parties; and (2) some degree of flexibility was necessary in the contracts.

> The Parties understand that changes in the market conditions for the Products might make the contents described in this Memorandum of Understanding inconsistent with the continued viability of NUMMI and the profitability on sales of the Products. Therefore, the Parties agree that they will annually review all the contents described herein to **ensure that NUMMI will remain viable**, and that the results from NUMMI's operations continue to be acceptable for TMC and GMC.  (Ex. "C", 2006 MOU § 7 (emphasis added)

**C.    MLC's Obligation to Use Best Efforts.**

41.    In the 2006 MOU, MLC explicitly acknowledged that it had an obligation to use its best efforts to purchase the minimum number of Pontiac Vibes as agreed among the parties in the 2006 MOU.

> The Parties understand the importance of realizing annual production volume of 230,000 units of the Products.  Both TMC and **GMC will make best effort to maximize the production volume during the model life in consideration of maintaining the stability of operations at NUMMI**.  (Ex. "C", 2006 MOU § 1(2) (emphasis added))

42.    Using its best efforts, MLC purchased 60,000 Vibes in 2006, 50,000 Vibes in 2007 and over 70,000 Vibes in 2008.  In fact, in 2008 MLC agreed to the "transfer price" it paid for Vibes by $1,000 per vehicle in 2008 to insure NUMMI would remain viable.

**D.    MLC's Breach of the VSA and MOU.**

43.    In the spring of 2009, after MLC filed for bankruptcy, MLC acknowledged that there were ways to continue the joint venture and that MLC was required to pursue them.  In April 2009, in the midst of MLC's, TMC's and NUMMI's efforts to execute a viability plan for NUMMI, MLC informed NUMMI that it was considering eliminating the Pontiac brand, which could terminate Vibe production.  If it decided to cancel Pontiac, MLC warned, the parties would have to consider repositioning the Vibe to another brand and the impact on NUMMI.  Yet, MLC affirmed that it remained committed to NUMMI and that it wanted to provide an advanced warning and as much time as possible to pull together contingency plans in the event the Pontiac brand is discontinued.

44.    On April 27, 2009, MLC announced that it was discontinuing Pontiac.  Despite the termination of Pontiac, MLC, in a letter dated May 4, 2009, told NUMMI and TMC that it remained committed to work with NUMMI and TMC to seek alternatives to assist NUMMI as it transitions out of the production of the Pontiac Vibe.  Indeed, MLC stated that the long phase out period for the Pontiac brand was driven by MLC's desire to provide flexibility for sale of Vibes in support of NUMMI.  In the May 4 letter, MLC pledged to find solutions for the shortfall that the Vibe cancellation would create for NUMMI.

45.     MLC reaffirmed its ongoing obligations to NUMMI in subsequent letters.  On May 11, 2009, MLC informed TMC that it had been working on a plan to repurpose the Pontiac Vibe to a GMC Vibe and was also reviewing additional options to support NUMMI.  On May 14, MLC again stated that it was currently working to develop a replacement for the Vibe and was interested in seeing a new product from NUMMI.

46.     Only a week later, however, MLC abruptly changed course and proposed that NUMMI build a MLC derivative of the Toyota Tacoma—an award-winning light truck that NUMMI had been building for TMC since 1995.  MLC unilaterally made an agreement on an MLC version of the Tacoma a precondition to NUMMI's continued existence.  MLC stated that without an agreement on the Tacoma, MLC and TMC will need to work together to discuss the dissolution of MLC's interest in NUMMI.

47.     On June 4, 2009, as the parties discussed MLC's Tacoma proposal, MLC informed TMC and NUMMI that it would discontinue Vibe purchases in August 2010.  Only eight days later, on June 12, MLC moved that date up to August 2009.  MLC also demanded a decision on the MLC Tacoma by June 25, 2009 – in only 13 days.  NUMMI told MLC that, regardless of the Tacoma project, it was unlikely to remain viable without Vibe production.  Even with this warning, MLC confirmed its intention to continue the NUMMI business as a joint venture.

48.     On June 26, 2009, MLC changed course again and announced that it would withdraw from NUMMI.  NUMMI produced its last Vibe at the beginning of August.

**E.     TMC's Research and Design Costs in Developing the Pontiac Vibe for MLC.**

49.     TMC incurred over $100 million in research and development costs for the Pontiac Vibe.  Of those costs, $73.8 million were rendered uncollectable as a result of MLC's breach of the VSA and 2006 MOU.  These costs included, without limitation, labor,

subcontracting, and prototype production for the initial Vibe model and the 2011 minor-model changes. In addition, TMC incurred costs in the advanced prototype production of the chassis, body and engine design for multiple TMC designed vehicles, including the Pontiac Vibe. TMC paid for all of these hard costs prior to MLC's breach.

50.     TMC incurred these costs in reliance on MLC's contractual commitment to continue purchasing Pontiac Vibes from NUMMI. TMC's research and development costs would have been recovered from various agreements between NUMMI and TMC, including the royalty paid by NUMMI pursuant to the Vehicle License Agreement ("VLA"), attached hereto as Exhibit "I", had MLC not breached the contracts with TMC and NUMMI. Instead, MLC breached the VSA and 2006 MOU leaving TMC with only the TMC Claims for the uncollectable research and development costs.

**IV.     MLC's Abandonment of NUMMI.**

51.     In the months leading up to MLC's bankruptcy, MLC misled NUMMI and TMC by explaining that it remained committed to the NUMMI joint venture. Notwithstanding its prior commitments, on June 26, 2009, MLC reversed course and announced that it intended to withdraw from NUMMI and cease purchasing vehicles from NUMMI in August, 2009. On August 17, 2009, the final Pontiac Vibe was produced, becoming the last MLC vehicle to be manufactured at NUMMI. In electing to abandon NUMMI, MLC also abandoned NUMMI's 4,500 workers and a countless number of suppliers and regional businesses that depended on NUMMI. This was a *purely* economic decision by MLC.

52.     MLC made an economic decision to discontinue purchasing Vibes from NUMMI. MLC's economic decision was not beyond its own control.

V.    **TMC's NUMMI Claim.**

53.    Between 1960 and 1982, MLC operated a manufacturing facility at the Fremont Plant.  As a result of a decline in demand, MLC shutdown the Fremont Plant in 1982.  Upon the formation of NUMMI MLC transferred the Fremont Plant to NUMMI.

54.    While MLC owned the Fremont Plant, MLC caused significant environmental contamination of the Fremont Plant.

55.    TMC's NUMMI Claim includes the cost of remediating the environmental damage at the Fremont Plant that was caused by MLC prior to the formation of NUMMI.  MLC, as a prior owner and contaminator, is obligated to pay those remediation costs.

56.    TMC's NUMMI Claim is also comprised of the unpaid workers' compensation costs for which NUMMI is liable.  TMC provided a guarantee to the California Department of Industrial Relations ("DIR") to cover NUMMI's workers' compensation liability.  To date, NUMMI has paid in excess of $200 million in workers' compensation liability.  The outstanding workers' compensation liability is guaranteed by TMC.

<u>COUNT I</u>

<u>BREACH OF THE VEHICLE SUPPLY AGREEMENT</u>

57.    TMC incorporates and re-alleges Paragraphs 1 – 56 above as though fully set forth herein.

58.    The VSA is a valid and enforceable contract.

59.    TMC performed is obligations under the VSA.  TMC spent hundreds of millions of dollars in research and development for the Pontiac Vibe manufactured by NUMMI and sold by MLC.  Only upon MLC's termination of orders for Pontiac Vibes did TMC stop its research and development for 2011 mid model year change for the Pontiac Vibe.  Therefore, TMC

performed its obligations under the contracts and was excused from future performance as a result of MLC's breach.

60.    MLC rejected the VSA pursuant to the Eleventh Omnibus Motion to Reject Executory Contracts.  *See* Ex. "J".  Pursuant to Section 365(g) of the Bankruptcy Code, the rejection of an executor contract "constitutes a breach of such contract."  11 U.S.C. § 365(g).

61.    Not only did MLC breach the VSA by virtue of the rejection, but MLC breached Section 4.1(b) of the VSA.

62.    Pursuant to Section 4.1(b) of the VSA, MLC agreed that it would "purchase the Products on a continuous and stable basis."  *See* Ex. "D".  MLC's decision to cease ordering all Pontiac Vibes from NUMMI is a material breach of Section 4.1(b) of the VSA.

63.    Moreover, MLC breached Section 4.1(c) of the VSA by failing to accommodate NUMMI's manufacture of the Vibes on a volume basis.

64.    In reliance on MLC's commitment in the VSA to purchase vehicles from NUMMI on a continuous and stable basis, TMC expended hundreds of millions of dollars for research and development of the Pontiac Vibe for MLC.  Had MLC fulfilled its contractual obligations, these costs would have been recovered by TMC.  Therefore, as a direct and proximate cause of MLC's failure to purchase Pontiac Vibes under 4.1(b), TMC suffered foreseeable damages in the amount of $73,798,976.28.

WHEREFORE, Plaintiff, Toyota Motor Corporation, prays that this Court enter judgment in its favor against Defendant, Motors Liquidation Company (f/k/a General Motors Corporation), for damages in an amount of $73,798,976.28 for all costs and expenses incurred by Plaintiff as a result of Defendant's breach of the VSA, and grant any further and other relief, including court costs, and pre and post judgment interest, as this Court deems fair and just.

## COUNT II

## BREACH OF THE 2006 MEMORANDUM OF UNDERSTANDING

65.    TMC incorporates and re-alleges Paragraphs 1 – 64 above as though fully set forth herein.

66.    The 2006 MOU is a valid and enforceable contract.

67.    TMC performed is obligations under the 2006 MOU.  TMC spent hundreds of millions of dollars in research and development for the Pontiac Vibe manufactured by NUMMI and sold by MLC.

68.    MLC rejected the 2006 MOU pursuant to the Ninth Omnibus Motion to Reject Executory Contracts.  *See* Ex. "K".  Pursuant to Section 365(g) of the Bankruptcy Code, the rejection of an executor contract "constitutes a breach of such contract."  11 U.S.C. § 365(g).

69.    Not only did MLC breach the 2006 MOU by virtue of the rejection, but MLC breached Sections 1(3) and 1(4) of the 2006 MOU.  *See* Ex. "C".  Section 1(3) of the 2006 MOU obligated MLC to purchase at least 65,000 Vibes per year from NUMMI.  Section 1(4) of the 2006 MOU stated MLC's desire and intent to have "72,000 units of Vibe allocated to [MLC]..." *See* Ex. "C".  MLC breached its obligation to purchase Pontiac Vibes under the VSA by cancelling the purchase of Pontiac Vibes.

70.    MLC also breached Section 1(2) of the 2006 MOU.  Section 1(2) of the 2006 MOU requires MLC to use its best efforts "to maximize the production volume during the model life in consideration of maintaining the stability of operations at NUMMI." *See* Ex. "C".  MLC materially breached this section by failing to use its best efforts to work with NUMMI and TMC to rebrand the Vibe or order an alternative vehicle which would keep NUMMI's annual manufacturing volume above the target of 225,000 cars.

71.    MLC also breached Section 1(5) of the 2006 MOU.  Section 1(5) requires that:

The Parties agree that, each fall, **they will decide the planned production volume of the Products at NUMMI** for the subsequent three calendar years and that, each spring they will review and modify such planned production volume if appropriate. In the event that **it is decided among the Parties** that NUMMI's planned production volume of the Products is not 225,000 units, then that planned production volume will be allocated proportionally between TMC and [MLC] based on the allocation formula mentioned in paragraph (3) above. However, a final allocation plan will be established **that is mutually agreeable to the Parties**, consistent with the spirit of the Joint Venture. (Ex. "C", 2006 MOU at § 1(5) (emphasis added)).

72.     Section 1(5) of the 2006 MOU makes it clear that MLC and TMC will agree, "among the Parties" and "mutually" concerning production levels and allocations at NUMMI. By unilaterally ceasing all Pontiac Vibe production, MLC did not work "among the Parties" or "mutually" with TMC to determine production levels and allocations of vehicles "based on the allocation formula mentioned in paragraph (3)..." *See* Ex. "C". In failing to do so, MLC breached Section 1(5) of the 2006 MOU.

73.     MLC also breached Section 7 of the 2006 MOU. Section 7 requires that:

7. Annual Review

The Parties understand that changes in market conditions for the Products might make the contents described in this Memorandum of Understanding inconsistent with the continued viability of NUMMI and the profitability on sales of the Products. Therefore, **the Parties agree that they will annually review all the contents described herein to ensure that NUMMI will remain viable**, and that the results of NUMMI's operations continue to be acceptable for TMC and [MLC]. (Ex. "C", 2006 MOU at § 7 (emphasis added)).

74.     Section 7 makes it clear that MLC and TMC were acutely aware how market conditions could affect production at NUMMI. They therefore agreed to annually review their agreement under the 2006 MOU with one goal in mind: "to ensure that NUMMI will remain viable..." *See* Ex. "C". By unilaterally ceasing all Pontiac Vibe purchases and withdrawing from

NUMMI, MLC failed to review the contents of the 2006 MOU and failed to ensure that NUMMI will remain viable, thus breaching Section 7 of the MOU.

75.    In reliance on MLC's commitments under the 2006 MOU to purchase vehicles from NUMMI on a continuous and stable basis, TMC expended hundreds of millions of dollars for research and development of the Pontiac Vibe for MLC.  Had MLC fulfilled its contractual obligations, these costs would have been recovered by TMC.  Therefore, as a direct and proximate cause of MLC's failure to purchase Pontiac Vibes under 4.1(b), TMC suffered foreseeable damages in the amount of $73,798,976.28.

WHEREFORE, Plaintiff, Toyota Motor Corporation, prays that this Court enter judgment in its favor against Defendant, Motors Liquidation Company (f/k/a General Motors Corporation), for damages in an amount of $73,798,976.28 for all costs and expenses incurred by Plaintiff as a result of Defendant's breach of the 2006 MOU, and grant any further and other relief, including court costs, and pre and post judgment interest, as this Court deems fair and just.

## COUNT III

### BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING

76.    TMC incorporates and re-alleges Paragraphs 1 – 75 above as though fully set forth herein.

77.    MLC had an implied duty of good faith and fair dealing under the VSA and 2006 MOU.

78.    By misleading TMC and NUMMI about Vibe production commitments before unilaterally changing course, MLC breached its duty of good faith and fair dealing, creating a separate cause of action against MLC.

79.    Here, TMC incurred significant research and development costs in expectation and reliance on MLC's agreement to order 65,000 Pontiac Vibes per year from 2008 through

2012. Thus, MLC breached its duty of good faith and fair dealing by abandoning TMC and NUMMI.

80.    Moreover, MLC's refusal to perform under the contracts constitutes a breach of its duty of good faith and fair dealing and entitles TMC to recover research and development and capital expenditures, respectively, from MLC.

81.    MLC's willful breach of the duty of good faith and fair dealing proximately caused TMC's damages for the unrecoverable research and development costs in the amount of $73,798,976.28.

WHEREFORE, Plaintiff, Toyota Motor Corporation, prays that this Court enter judgment in its favor against Defendant, Motors Liquidation Company (f/k/a General Motors Corporation), for damages in an amount of $73,798,976.28 for all costs and expenses incurred by Plaintiff as a result of Defendant's breach of the implied duty of good faith and fair dealing under the VSA and 2006 MOU, and grant any further and other relief, including court costs, and pre and post judgment interest, as this Court deems fair and just.

## COUNT IV

## PROMISSORY ESTOPPEL

82.    TMC incorporates and re-alleges Paragraphs 1 – 81 above as though fully set forth herein.

83.    TMC is entitled to recover the uncollectable research and development costs and capital expenditures, respectively, under the doctrine of promissory estoppel.

84.    MLC promised to purchase "at least 65,000" Pontiac Vibes per year between 2008 and 2012 from NUMMI. Ex. "C", 2006 MOU § 1(3). As a result of MLC's promises, TMC, in consultation with MLC, spent hundreds of millions of dollars on research and development of the Pontiac Vibe for MLC. Although TMC was responsible for the design, MLC

cooperated and collaborated with TMC on the design. TMC had "design authority … in consultation … with GM." Ex. "A", 1983 MOU at Pgs 1-2. Further, the 2006 MOU provided that "all changes of Vibe's specifications which are visible to the customer … must be discussed … and agreed upon among the Parties prior to determination of implementation." Ex. "C", 2006 MOU § 4.

85.    TMC suffered direct and foreseeable damages in the amount of $73,798,976.28 as a result of TMC's reliance on MLC's promise to purchase at least 65,000 Pontiac Vibes.

WHEREFORE, Plaintiff, Toyota Motor Corporation, prays that this Court enter judgment in its favor against Defendant, Motors Liquidation Company (f/k/a General Motors Corporation), for damages in an amount of $73,798,976.28 for all costs and expenses incurred by Plaintiff pursuant to the doctrine of promissory estoppel, and grant any further and other relief, including court costs, and pre and post judgment interest, as this Court deems fair and just.

## COUNT V

## STATUTORY ENVIRONMENTAL LIABILITY

86.    TMC incorporates and re-alleges Paragraphs 1 - 85 above as though fully set forth herein.

87.    MLC is the prior owner and contaminator of the Fremont Plant currently owned by NUMMI. From 1960 – 1982, MLC owned and operated the Fremont Plan. During the time that MLC owned and operated the Fremont Plant, MLC caused environmental contamination at the Fremont Plant. Therefore, MLC is liable for environmental clean up costs required at the Fremont Plant as a result of MLC's dumping and/or disposal of hazardous substances at Fremont Plant.

88.     The environmental remediation costs constitute a significant component of NUMMI's wind down costs and MLC, as a prior owner, is obligated to pay those remediation costs.

89.     TMC is entitled to a direct claim against MLC for the environmental damage that MLC caused during its ownership of NUMMI.

90.     Based on the foregoing, TMC is entitled to an allowed claim in an amount of to be proven at trial for environmental remediation costs at NUMMI.

WHEREFORE, Plaintiff, Toyota Motor Corporation, prays that this Court enter judgment in its favor against Defendant, Motors Liquidation Company (f/k/a General Motors Corporation), for damages suffered by Plaintiff as a result of Defendant's statutory environmental liability, and grant any further and other relief, and grant any further and other relief, including court costs, and pre and post judgment interest, as this Court deems fair and just.

## COUNT VI

## DECLARATORY RELIEF REGARDING ENVIRONMENTAL LIABILITY

91.     TMC incorporates and re-alleges Paragraphs 1 – 90 above as though fully set forth herein.

92.     MLC owned and operated the Fremont Plant prior to transferring title to NUMMI. During MLC's ownership of the Fremont Property, MLC caused environmental contamination at the property.

93.     MLC has informed TMC and NUMMI that it will not pay for the environmental remediation at NUMMI.

94.     There is an actual controversy between the parties as to MLC's obligation to pay for environmental remediation at NUMMI.

95.    Entry of a declaratory judgment as to MLC's obligations as to the environmental remediation costs at NUMMI will settle the controversy currently existing between the parties.

WHEREFORE, Plaintiff, Toyota Motor Corporation, prays that this Court enter a declaratory judgment in its favor and against Defendant, Motors Liquidation Company (f/k/a General Motors Corporation), declaring that as the prior owner, operator and contaminator of the Fremont Plant, MLC is obligated to pay for the environmental remediation at the Fremont Plant.

## COUNT VII

## STATUTORY WORKERS' COMPENSATION LIABILITY

96.    TMC incorporates and re-alleges Paragraphs 1 – 95 above as though fully set forth herein.

97.    MLC is liable for NUMMI's workers' compensation liabilities if NUMMI is unable to cover its workers' compensation costs.  Pursuant to Section 3717 of the California Labor Code, if an employer fails to make the required workers' compensation and the California DIR is required to make that employers' workers' compensation payments, the employer shall be jointly and severally liable for the payments with all substantial shareholders.

98.    MLC is a substantial shareholder of NUMMI as MLC owns more than fifteen percent (15%) of NUMMI.  Thus, MLC is liable with NUMMI for any of NUMMI's unpaid workers' compensation payments.

99.    Based on the foregoing, TMC is entitled to an allowed claim in an amount to be proven at trial for MLC's share of NUMMI's workers' compensation liability.

WHEREFORE, Plaintiff, Toyota Motor Corporation, prays that this Court enter judgment in its favor against Defendant, Motors Liquidation Company (f/k/a General Motors Corporation), for damages suffered by Plaintiff as a result of Defendant's share of the statutory workers'

compensation liability, and grant any further and other relief, including court costs, and pre and post judgment interest, as this Court deems fair and just.

## COUNT VIII

## DECLARATORY RELIEF REGARDING WORKERS' COMPENSATION LIABILITY

100.    TMC incorporates and re-alleges Paragraphs 1 – 99 above as though fully set forth herein.

101.    MLC is a substantial shareholder of NUMMI.

102.    NUMMI is liable for a significant amount of unpaid workers' compensation liability.

103.    MLC has informed TMC and NUMMI that it will not pay for NUMMI's unpaid workers' compensation liabilities.

104.    There is an actual controversy between the parties as to MLC's obligation to pay for NUMMI's unpaid workers' compensation liabilities.

105.    Entry of a declaratory judgment as to MLC's obligations as to the NUMMI's unpaid workers' compensation costs will settle the controversy currently existing between the parties.

*[Remainder of Page Intentionally Left Blank]*

WHEREFORE, Plaintiff, Toyota Motor Corporation, prays that this Court enter a

declaratory judgment in its favor and against Defendant, Motors Liquidation Company (f/k/a

General Motors Corporation), declaring that MLC is obligated to pay for NUMMI's unfunded

workers' compensation liability.

Dated:  November 23, 2010                FOLEY & LARDNER LLP


                                         /s/ Matthew J. Riopelle
                                         Victor A. Vilaplana (*admitted pro hac vice*)
                                         Matthew J. Riopelle (*admitted pro hac vice*)
                                         402 West Broadway, Suite 2100
                                         San Diego, CA 92101
                                         Telephone: (619) 234-6655
                                         Facsimile: (619) 234-3510

                                         Jeffery A. Soble (*admitted pro hac vice*)
                                         321 North Clark Street, Suite 2800
                                         Chicago, IL 60654-5313
                                         Telephone: (312) 832-4500
                                         Facsimile: (312) 832-4700

                                         *Attorneys for Toyota Motor Corporation*