# EXHIBIT "D"

---

VEHICLE SUPPLY AGREEMENT


by and among


NEW UNITED MOTOR MANUFACTURING, INC.,


GENERAL MOTORS CORPORATION


and


TOYOTA MOTOR CORPORATION

---

## TABLE OF CONTENTS

Page

I.    DEFINITIONS ················································   1

      Section 1.1.    Terms Defined in Shareholders'
                      Agreement ·····························   1

II.   TERM OF AGREEMENT ·······································   2

      Section 2.1.    Agreement Term ·······················   2

III.  PRODUCTS ················································   2

      Section 3.1.    Preliminary Technical Information ·····   2
      Section 3.2.    The Products ·························   2
      Section 3.3.    Changes ······························   3
      Section 3.4.    Manuals ······························   4

IV.   SUPPLY AND PURCHASE OBLIGATIONS AND
      ARRANGEMENTS ············································   4

      Section 4.1.    General Understanding ················   4
      Section 4.2.    Individual Sales Contracts ············   5
      Section 4.3.    Unit Prices, Etc. ····················   5
      Section 4.4.    Delivery of Products ················   7
      Section 4.5.    Acceptance of Products ···············   7
      Section 4.6.    Title and Risk of Loss ···············   8
      Section 4.7.    Payment ······························   8
      Section 4.8.    Buyer's Brand ·······················   8
      Section 4.9.    Warranties ··························   8
      Section 4.10.   Compliance with Vehicle Safety
                      Regulations ·························   9
      Section 4.11.   Emissions ··························  11
      Section 4.12.   Governmental Regulations ·············  12

V.    TECHNICAL ASSISTANCE BY THE JV COMPANY
      AND PILOTS, ETC. ········································  12

      Section 5.1.    Technical Assistance ·················  12
      Section 5.2.    Pilots ······························  12

                                                                    Page

VI.    MISCELLANEOUS ··········································    13

        Section 6.1.    Force Majeure ·····················    13
        Section 6.2.    Limitations of Liability ···········    13
        Section 6.3.    Survival ·························    14

VII.   GENERAL PROVISIONS ····································    14

        Section 7.1.    Assignability ····················    14
        Section 7.2.    Persons Authorized to Act
                        for the Parties ··················    14
        Section 7.3.    Notices ·························    14
        Section 7.4.    Third Persons ····················    15
        Section 7.5.    Governing Language ···············    16
        Section 7.6.    Choice of Law ····················    16
        Section 7.7.    Entire Agreement, Etc. ············    16
        Section 7.8.    Enforcement of this Agreement ······    16

ANNEX A: Feasibility Study
ANNEX B: Index

## VEHICLE SUPPLY AGREEMENT

This VEHICLE SUPPLY AGREEMENT (this "Agreement") is made and entered into on and as of the 21st day of February, 1984, by and among New United Motor Manufacturing, Inc. (the "JV Company"), a close corporation organized and existing under the laws of the State of California, General Motors Corporation ("GM"), a corporation organized and existing under the laws of the State of Delaware, and Toyota Motor Corporation ("Toyota"), a corporation organized and existing under the laws of Japan;

### WITNESSETH:

WHEREAS, the JV Company, which is under the joint control of, but is separate and distinct from, GM and Toyota, was formed for the limited purpose of manufacturing in the United States a specific automotive vehicle not heretofore manufactured and certain components related thereto;

NOW, THEREFORE, the parties hereto agree as follows:

## I.   DEFINITIONS

1.1.   Terms Defined in Shareholders' Agreement:   In addition to the terms which have been previously, or are here- after, defined herein, terms used herein which are defined in Section 1.1 of the Shareholders' Agreement (the "Shareholders'

- 1 -

Agreement"), dated the date hereof, among the parties hereto are
used herein as so defined unless otherwise defined in this
Agreement.

## II.   TERM OF AGREEMENT

2.1.   Agreement Term:   This Agreement shall become
binding upon its execution by each of the parties hereto and
shall remain in full force and effect for a period of 12 years
following the date (the "Production Commencement Date") of
commencement of the production of the Vehicles (as that term is
hereafter defined).   The parties shall execute a certificate
fixing the Production Commencement Date as soon as practicable
after the Vehicle production has commenced.

## III.   PRODUCTS

3.1.   Preliminary Technical Information:   Toyota has
previously furnished to GM preliminary technical information and
specifications for the initial Vehicle (as that term is hereafter
defined) to be manufactured by the JV Company for sale to GM.

3.2.   The Products:   The products to be supplied and
purchased hereunder shall be certain automotive vehicles
manufactured for sale to GM by the JV Company under license
from Toyota (the "Vehicles") and optional equipment therefor
manufactured or procured by the JV Company (the "Optional
Equipment").   The Vehicles and the Optional Equipment
(collectively, the "Products") will be more particularly

- 2 -

~~described~~ in technical advance information (the "Technical

Advance Information") to be furnished from time to time by the

~~JV Company~~ to GM.

3.3.  Changes:  (a)  As Modifications will probably be
made to the "Sprinter" or "Corolla" over time in accordance with
market demand, Toyota will effect similar changes in the design
of the Vehicles if such changes are deemed desirable by the
parties.  Such changes shall be effected in accordance with
Section 3.3(c) hereof.

(b)  If model changes or Specification Changes in the
Vehicle are necessary, Toyota, GM and the JV Company will agree
upon these model changes or Specification Changes.  Any such
model changes or Specification Changes shall be made in
accordance with Section 3.3(c) hereof.

(c)  Toyota will present to the JV Company the plan for
any Modifications, Specification Changes or model changes
concerned.  The JV Company will thereafter submit to and nego-
tiate with GM the planned Modifications, Specification Changes
or model changes together with the planned price changes.  The
Modifications, Specification Changes or model changes and the
price changes thereof will be made as agreed upon by the JV
Company and GM.  For purposes of this Section 3.3, the terms
"Modifications" and "Specification Changes" mean changes in
specifications appearing, or which if made would appear, in the
Technical Advance Information.

- 3 -

3.4.  <u>Manuals</u>:  The JV Company, GM and Toyota shall
agree upon a quality manual pursuant to which the JV Company and
GM shall measure and inspect the quality of the Products and a
purchase procedures manual pursuant to which specific delivery,
packaging and other procedures relating to the supply and pur-
chase of the Products shall be set forth.

IV.  <u>SUPPLY AND PURCHASE OBLIGATIONS AND ARRANGEMENTS</u>

4.1.  <u>General Understanding</u>:  (a)  The general princi-
ples contained in this Section 4.1 will apply to supply and
purchase arrangements under this Agreement.

(b)  The parties hereto are establishing supply and
purchase arrangements under which the JV Company shall supply
and GM shall purchase the Products on a continuous and stable
basis.  It is acknowledged that the JV Company is making
substantial amounts of capital expenditures in its facilities
relying upon GM's present projection that market demand for the
Vehicles will exceed 200,000 units per annum.  However, it is
further acknowledged that market demand for the Products that can
be generated in the areas in which GM expects to sell them will
govern the purchase commitments of the parties as to all
Products.

(c)  In setting forth supply and purchase arrangements
under this Article, the JV Company and GM agree that their mutual
interests can be served only if orderly procedures are followed,
and that a degree of flexibility is necessary in the negotiation

- 4 -

第1次修正て条项追加

of the applicable items to accommodate GM's marketing and
purchasing requirements and the JV Company's interest in
endeavoring to manufacture the Products on a volume basis.

4.2.  <u>Individual Sales Contracts</u>:  (a)  Within the
general principles set forth in Section 4.1 hereof, each pur-
chase and sale transaction between the JV Company and GM relat-
ing to the Products shall be governed by an individual sales con-
tract, it being agreed within that context that the JV Company
has no obligation to supply and GM has no obligation to purchase
any Products until the parties enter such a contract.  The terms
of this Agreement (insofar as applicable) shall apply to each
such sales contract.

(b)  The parties shall from time to time negotiate and
agree upon procedures relating to ordering, delivery, packaging
and similar matters involved in the supply and purchase of the
Products as provided in Section 3.4 hereof.

4.3.  <u>Unit Prices, Etc.</u>:  (a)  The initial selling
price of the Vehicles to be sold by the JV Company to GM during
the 1985 model year shall be determined at least 60 calendar days
prior to the expected Production Commencement Date by negotiation
between the JV Company and GM.  This negotiation shall be based
upon the production cost estimated by the JV Company 90 calendar
days prior to the expected Production Commencement Date, with
estimates of such cost to be guided by the feasibility study
prepared in 1982 by Toyota and GM and attached hereto as Annex A.
In no event, however, shall such initial selling price be higher

- 5 -

than the upper limit or lower than the lower limit, each as set forth in the following sentence. The upper limit shall be determined by adjusting for feature differences the dealer net price (that is, the dealers' port of entry cost as referred to in the Kelley Blue Book New Car Price Manual) less 8% for Toyota's then-current United States model front-wheel drive Corolla equipped comparably to the Vehicles concerned, and the lower limit shall be determined by adjusting for feature differences such dealer net price (that is, the dealers' port of entry cost as referred to in the Kelley Blue Book New Car Price Manual) less 11% of such Corolla. The adjustment for feature differences between such Corolla and the initial Vehicle shall be made by agreement between the JV Company and GM.

(b)  After determination of the initial selling price pursuant to Section 4.3(a) hereof, although there may be exceptions, the selling price for the Vehicles shall be revised and determined for each model year. The new selling price for the Vehicles in each new model year shall be determined by applying to the selling price for the previous model year the Index set forth in Annex B hereto. If the calculations embodied in such Index occasionally yield a selling price for the Vehicles which is at significant variance with then-current market conditions, the JV Company and GM shall negotiate a more appropriate selling price for the Vehicles.

(c)  In the event that Toyota and other members of the Toyota Group shall cease to distribute the front-wheel drive

- 6 -

Corolla in the United States, the JV Company and GM shall nego-
tiate appropriate amendments to this Section 4.3 consistent with
the intent and purposes hereof.

(d)    The methodology to be employed in pricing the
Optional Equipment (both initial and subsequent) will be
comparable to that described in Section 4.3(a) through Section
4.3(c) hereof and as described in Section 3.3(c) hereof.

(e)    If it is anticipated that continuation of the
foregoing methods for determination of the selling prices of the
Products would cause those prices to be at such levels as the JV
Company would incur losses which could endanger its normal
operation, Toyota, the JV Company and GM shall negotiate and take
necessary measures.

4.4.    Delivery of Products:    The Products shall be
delivered by the JV Company to GM by physically delivering the
same through the gate of the shipping canopy located just west of
the Marshalling Area identified in Section 5.1 of the Share-
holders' Agreement.

4.5.    Acceptance of Products:    (a)    Within three busi-
ness days after delivery of the Products, GM shall conduct visual
and operational inspections to determine whether the Products
conform to the applicable specifications and inspection standards
as separately agreed upon by the parties pursuant to Section 3.4
hereof.

(b)    GM shall accept all the Products which shall have
passed said inspections and return the Products which shall have

- 7 -

failed said inspections to the JV Company with a written notice
in a form designated by the JV Company specifying the reasons for
such failure in reasonable detail.

(c)  If GM fails to return the Products within three
business days after their delivery, they shall be deemed accepted
by GM.

4.6.  <u>Title and Risk of Loss</u>:  Title to and risk of
loss of the Products shall pass from the JV Company to GM upon
the delivery thereof by the JV Company to GM pursuant to Section
4.4 hereof.

4.7.  <u>Payment</u>:  (a)  On each business day, the JV
Company shall issue to GM a summary invoice for the Products
delivered to GM.

(b)  The payment for the Products by GM to the JV
Company shall be made promptly after GM receives such summary
invoice in accordance with the terms and conditions separately
agreed upon by the parties.  Such payment shall in any event be
made by GM within two business days after GM receives such sum-
mary invoice.

(c)  Overdue payments, if any, shall bear interest at a
rate equal to the rate set forth in Section 7.2 of the Share-
holders' Agreement.

4.8.  <u>Buyer's Brand</u>:  The Products will be marketed by
GM under the trademarks of GM.

4.9.  <u>Warranties</u>:  (a)  The JV Company warrants to GM
that upon delivery of the Products to GM, GM shall have good and

- 8 -

marketable title to the Products.

(b)  THE OBLIGATIONS OF THE JV COMPANY SET FORTH IN THE PRA AND THE WARRANTY SET FORTH IN SECTION 4.9(a) HEREOF ARE EXCLUSIVE AND ARE IN LIEU OF ANY OTHER EXPRESS OR IMPLIED WARRANTIES, INCLUDING WITHOUT LIMITATION ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

(c)  Nothing in this Agreement shall affect the rights and obligations of the parties as provided in the PRA.  The parties' obligations in respect of any defect or noncompliance with any laws or governmental standards or regulations, actual or alleged, of the Vehicles as accepted by GM under Section 4.5 hereof shall be as set forth in the PRA.

4.10.  Compliance with Vehicle Safety Regulations:  (a) Toyota shall, as soon as necessary tests have been completed with satisfactory results, issue to the JV Company and GM a certificate to the effect that the Products as designed by Toyota meet the applicable Federal Motor Vehicle Safety Standards (as such term is defined below).  The JV Company will not start regular production of the Products until it and GM have received such certificate appropriate to the Products to be produced.  In connection therewith, Toyota shall conduct such tests of the Products and provide such information as Toyota may deem necessary, desirable or appropriate to enable the JV Company and, with respect to consumer information requirements under the United States statute entitled the "National Traffic and Motor Vehicle Safety Act of 1966" and all amendments thereto ("Safety

- 9 -

Act"), GM, as the case may be, in reliance upon such information, to make such certifications or provide such consumer information as may be necessary pursuant to applicable federal motor vehicle safety standards ("Federal Motor Vehicle Safety Standards") and rules, regulations and procedures promulgated from time to time by the United States National Highway Traffic Safety Administration of the United States Department of Transportation or any successor administrative agency ("NHTSA") under the Safety Act ("NHTSA Regulations").

(b)  GM shall submit to NHTSA the necessary reports and data called for by Section 573.8 of the NHTSA Regulations and any revisions thereto on behalf of the JV Company and shall furnish to the JV Company and Toyota copies of such reports and data.

(c)  The JV Company, in reliance upon information furnished by Toyota, shall be responsible for obtaining all necessary safety approvals of any governmental authority of any state or political subdivision thereof or of the United States, including approvals for required labeling, and such renewals as may be required, either directly or through its suppliers, in connection with the Products that the JV Company will manufacture and supply under this Agreement, and the JV Company shall furnish to GM copies of the approvals so obtained.  The JV Company will not start regular production of the Vehicles until GM has received from the JV Company copies of all such approvals appropriate to the Products to be produced.  In connection with inquiries received from any such authority regarding safety

requirements for any such Products, the JV Company shall, after consultation with GM and Toyota, act on behalf of itself, Toyota and GM and shall keep Toyota and GM advised of the progress of such matters.

(d)   The above provisions regarding compliance with Federal Motor Vehicle Safety Standards shall apply to requirements of Title 1 of the Federal Motor Vehicle Cost Savings and Information Act, commonly known as "Bumper Standards".

(e)   Toyota recognizes and will comply with the obligations under Section 110(e) of the Safety Act to designate an agent in the United States for service of process.

4.11.   Emissions:   (a)   Toyota shall make all necessary submissions, on behalf of the JV Company, and obtain all necessary certifications for the Vehicles from the United States Environmental Protection Agency or any successor administrative agency ("EPA"). Copies of such certifications shall be given to GM and the JV Company. The JV Company will not start regular production of the Vehicles until it and GM have received copies of such certifications appropriate to the Vehicles to be produced.

(b)   GM, based upon information supplied by Toyota, shall furnish owners of the Products the maintenance and use instructions required by Section 207 of the United States statute entitled the "Clean Air Act of 1963" and all amendments thereto ("Clean Air Act") and will furnish copies thereof to Toyota and the JV Company.

- 11 -

(c)  All of the provisions above regarding the emissions control standards promulgated from time to time by the EPA under the Clean Air Act and the rules, regulations and procedures promulgated from time to time by the EPA under the Clean Air Act shall also apply to the emissions control requirements and regulations of the State of California.

4.12.  Governmental Regulations:  The JV Company will use its best efforts, with cooperation of GM and Toyota, to comply with all applicable governmental requirements and regulations.

### V.  TECHNICAL ASSISTANCE BY THE JV COMPANY AND PILOTS, ETC.

5.1.  Technical Assistance:  If the JV Company's assistance is requested by GM for the purpose of ensuring the performance of new Vehicle warranty service on the Products, the JV Company and GM shall in good faith negotiate on a cost basis for such required assistance, including, but not limited to, the dispatch of the JV Company's personnel or a third party designated by the JV Company to GM.

5.2.  Pilots:  (a)  If GM requests the JV Company, in a reasonably timely manner, to manufacture and supply pilot vehicles for any Vehicle model or series, the JV Company and GM shall in good faith negotiate the terms and conditions applicable to the pilot vehicles desired by GM, provided, however, that the JV Company shall have no obligation to manufacture or supply

- 12 -

such pilot vehicles until agreement is reached by the JV Company and GM with respect thereto.

(b)  In every case, the price of each pilot vehicle shall be the same as the price of such Vehicle model or series in commercial production determined or to be determined in accordance with the provisions of Section 4.3 hereof.

(c)  GM agrees not to resell pilot vehicles supplied pursuant to this Section 5.2.  PILOT VEHICLES WILL BE SOLD TO GM IN AN "AS IS" CONDITION and will be used by GM at its own risk.

## VI.  MISCELLANEOUS

6.1.  Force Majeure:  Any delay in or failure of the performance of any party hereunder shall be excused if and to the extent caused by occurrences beyond such party's control, including, but not limited to, acts of God; fire or flood; war; governmental regulations, policies or actions; closure of foreign exchange markets; any labor, material, transportation or utility shortage or curtailment; discontinuance or curtailment of the manufacture of the Products ordered; or any labor trouble in the manufacturing plants of the JV Company in Fremont, California or any of its suppliers.

6.2.  Limitations of Liability:  Except as provided in the PRA, IN NO EVENT SHALL ANY PARTY TO THIS AGREEMENT BE LIABLE TO ANY OTHER PARTY TO THIS AGREEMENT FOR INCIDENTAL, SPECIAL OR CONSEQUENTIAL DAMAGES, WHETHER BASED UPON BREACH OF CONTRACT, BREACH OF EXPRESS OR IMPLIED WARRANTY, TORT, STRICT LIABILITY OR OTHERWISE.

- 13 -

第1次修正で文言変更

6.3. <u>Survival</u>: All representations, warranties and indemnities, liabilities and disclaimers and limitations of the foregoing made, furnished or imposed herein or arising hereunder shall survive any termination of this Agreement or dissolution of the JV Company.

## VII.   GENERAL PROVISIONS

7.1. <u>Assignability</u>: Neither this Agreement nor any right (other than a right to receive the payment of money) or obligation hereunder may be assigned or delegated in whole or in part to any other person or entity.

7.2. <u>Persons Authorized to Act for the Parties</u>: Each change, variation or modification of this Agreement shall be effective only when made in writing signed by an authorized officer or representative of each of the parties.

7.3. <u>Notices</u>: In any case where any notice or other communication is required or permitted to be given under this Agreement (including without limitation any change in the information set forth in this Section) such notice or communication shall be in writing and (i) personally delivered, (ii) sent by postage prepaid registered airmail (which notice or other communication shall be immediately confirmed by a telex marked "Important"), or (iii) transmitted by electronic facsimile transfer marked "Important" (which notice or other communication shall be immediately confirmed by a telex marked "Important") as follows:

- 14 -

If to Toyota, to:

        Toyota Motor Corporation
        1, Toyota-Cho, Toyota
        Aichi 471 Japan
        Telex/Answerback:  4528371/TOYOTA J
        Facsimile Model:  UF 520 III
        Facsimile Call No.:  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
        Attention:  General Manager, Overseas Project Office

If to GM, to:

        Chevrolet Motor Division
        General Motors Corporation
        30001 Van Dyke Avenue
        Warren, Michigan 48090 U.S.A.
        Telex/Answerback:  235547/CHEV CO WARN
        Facsimile Model:  Rapicom 1500
        Facsimile Call No.:  313-492-6842
        Attention:  General Manager

If to the JV Company, to:

        New United Motor Manufacturing, Inc.
        45500 Fremont Boulevard
        Fremont, California 94537 U.S.A.
        Telex/Answerback:  (To be supplied)
        Facsimile Model:  (To be supplied)
        Facsimile Call No.:  (To be supplied)
        Attention:  Executive Vice President

All such notices or other communications shall be deemed to have been given or received (i) upon receipt if personally delivered, (ii) on the tenth business day following posting if by postage prepaid registered airmail, and (iii) 24 hours following confirmation by telex with confirmed answerback if notice is given by electronic facsimile transfer.

      7.4.  Third Persons:  Except as contemplated in this Agreement as to the parties hereto, nothing in this Agreement is intended or shall be construed to confer upon or to give any person or entity any legal or equitable rights or remedies under or by reason of this Agreement.

7.5.  Governing Language:  This Agreement and all other
agreements, instruments and notices that are referred to herein
or are supplementary hereto shall be prepared or furnished in and
governed and controlled by the English language.

7.6.  Choice of Law:  This Agreement shall be construed
and enforced in accordance with and governed by the laws of the
State of California, without giving effect to the principles of
conflict of laws thereof.

7.7.  Entire Agreement, Etc.:  This Agreement consti-
tutes the entire agreement of the parties hereto with respect to
the subject matter hereof.  To the extent that provisions in any
of the Prior Agreements (as that term is hereafter defined) are
inconsistent with any provision of this Agreement, this Agreement
supersedes all prior agreements and understandings, oral and
written, among the parties hereto with respect to the subject
matter hereof, including without limitation the Memorandum of
Understanding (the "Memorandum"), dated February 17, 1983, as
amended, between Toyota and GM and all letter agreements, minutes
of meetings and similar documents dated prior to the date hereof
to which GM, Toyota or any of their respective representatives
are parties (the Memorandum and such letter agreements, minutes
and similar documents being referred to herein as the "Prior
Agreements").

7.8.  Enforcement of this Agreement:  Each party to
this Agreement, solely in connection with any action or
proceeding brought by any other party to this Agreement (on its

- 16 -

own behalf or on behalf of the JV Company) arising out of or
related to this Agreement, hereby (i) agrees that any such action
or proceeding shall be brought only in a federal or state court
of competent subject matter jurisdiction in the State of
California (and no such action or proceeding shall be brought in
any other state or country) and (ii) consents to personal
jurisdiction in any such court provided that service of process
shall be duly made.  Each party hereby agrees that in any such
action or proceeding process may be served upon it by any means
authorized by applicable statutes, rules, treaties and/or
conventions.  In this regard, if such service of process shall be
duly made by any means as aforesaid, no party shall contest the
same or the personal jurisdiction of any such California court in
any court.  The parties' obligations under this Section 7.8 shall
survive the expiration or termination of this Agreement or the
dissolution of the JV Company.  Nothing herein shall be construed
to mean that any party to this Agreement has hereby submitted to
the personal jurisdiction of any such court in connection with
any other action or proceeding whatsoever.

IN WITNESS WHEREOF, each of the parties has caused this
Agreement to be duly executed by their respective duly authorized
representatives as of the day and year first above written.


NEW UNITED MOTOR MANUFACTURING,
INC.

By _____
                    President


GENERAL MOTORS CORPORATION

By _____
                    ~~President~~
        CHAIRMAN OF THE BOARD

TOYOTA MOTOR CORPORATION

By _____
                    President


- 18 -

## Feasibility Study

In the Feasibility Study, Toyota and GM have had discussion on the conditions and procedures for estimating product cost of the JV vehicle and the parties have reached the following conclusions.

I.  Basic Conditions
   a.  Model                        ·····  4 Door Sedan DLX
   b.  Annual Production Volume     ·····  200,000 vehicles

II.  Cost Estimate
    Cost Structure

| | |
|---|---|
| Direct Material Cost | Japan Sourced Parts<br>U.S. Sourced Parts<br>Open Parts ··· Japan Sourced<br>··· U.S. Sourced<br>Material Cost for Major Body Panels<br>Other Stamping Parts<br>Paint Cost |
| Manufacturing Cost | Labor Cost ··· Hourly<br>Facility Operation Cost<br>··· Indirect Material<br>··· Utility Cost<br>Depreciation |
| Administration and Other Cost | Labor Cost ··· Salary<br>Tax and Insurance<br>Royalty ··· Initial<br>··· Running<br>Interest for Investment and Inventory<br>Start-up Cost |

III. Conditions and Procedures for Cost Estimate

1) Direct Materials

  a. Parts
   · Toyota to propose the Basic Concept for Parts Sourcing
     Classification and to provide GM with a "Parts List" which
     specifies the sourcing.  (All parts to be classified into
     three sources by Toyota in the List: Japan, U.S. and Open
     sources.)

   · In the next step, "Open" parts to be decided to be either
     Japan- or U.S.-sourced based on co-quotation by the
     parties.  (attachment Ⓐ)

   · Toyota to submit the price of Japan-sourced parts and GM
     to submit that of U.S.-sourced parts as of June, 1982.

   · The prices shall be used only for the Feasibility Study.

  b. Major Body Panels

     (Cost of major body panels produced by the JV)

   · Toyota to provide GM with Technical Information for the
     parts and then GM to calculate the cost based on Toyota's
     information.  (attachment Ⓑ)

  c. Other Stamping Parts

     (Cost of small stamping parts attached to the Major
     stamping parts.  (attachment Ⓒ)

   · These parts are to be sourced from Japan and Toyota is to
     estimate the cost.

  d. Paint and Others

     (Cost of paint and other indirect materials such as
     Gasoline, Engine Oil, Transmission Oil, L.L.C., Brake
     Fluid, etc.  (attachment Ⓓ)

   · Average of Toyota- and GM-estimated costs to be used for
     the study.

2) Manufacturing Cost

   a. Labor Cost (Hourly)

     · Toyota to estimate the number of workers of the JV plant based on comparison study of manpower in Wilmington and Takaoka under the following parameters. (attachment Ⓔ)

        Plant   ····· Fremont

        Line Rate ··· 60 jobs per hour

        Shift   ····· 2 shifts

     · GM to estimate annual working hours and hourly rate of the plant to calculate the cost.

   b. Facility Operation Cost

     · Toyota to specify the factors included in facility operation cost and then GM to estimate the cost. (attachment Ⓕ)

   c. Depreciation

     · Toyota to calculate the cost based on investment cost for modification and addition to the Fremont Plant estimated by the Joint Production Team. (attachment Ⓖ)

3) Administration and Other Cost

   a. Labor Cost (Salary)

     · Toyota to estimate the number of workers.

     · GM to estimate average salary used for the cost estimate.

   b. Tax & Insurance

     · GM to estimate the amount of property tax and insurance.

   c. Royalty

     · 3% of U.S. value added to be paid as Running Royalty.

Each party to respectively estimate production cost of the JV vehicle based on the above Feasibility Study.

## Agreed Items of Product Cost

|  | Cost per unit |
|---|---|
| **Direct Materials** | |
| 1. Japan Sourced Parts | $1,973 |
| 2. U.S. Sourced Parts | 636 |
| 3. Open Parts | |
| · Sourced to Japan | 817 |
| · Sourced to U.S. | 458 |
| 4. Material Cost for Major Body Panels | 137 |
| 5. Other Stamping Parts | 120 |
| 6. Paint, Sealer, Gasoline, Engine Oil, T/M Oil, L.L.C., Brake Fluid | 70 |
| | |
| **Manufacturing Cost** | |
| 1. Labor Cost (Hourly) | 454 |
| 2. Facility Operation Cost | 152 |
| 3. Depreciation Amortization – New Facilities | 206 |
| | |
| **Administration and Other Cost** | |
| 1. Labor Cost (Salary) | 101 |
| 2. Tax | 27 |
| 3. Royalty | 84 |
| 4. Other Administrative Cost | 20 |

Cost reduction targets, start-up costs, depreciation amortization
relating to existing facilities, and interest costs are not
reflected above.

Attachment Ⓐ

## JOINT VENTURE CAR COMPONENTS

| Fig. No. | Part Name | Qty. | Japan/ U.S./ Open | Japan Source | U.S. Source | Japan Open | U.S. Open |
|---|---|---|---|---|---|---|---|
| 1-1 | Engine Assy, W/Clutch | 1 | J | 750.00 | | | |
| 1-2 | Cleaner Assy, Air W/Element | 1 | J | 23.88 | | | |
| 1- | Bolt, Stud | 1 | J | INC. BELOW | | | |
| 1- | Nut, Wing W/Washer | 1 | J | " " | | | |
| 1- | Bolt, W/Washer | 1 | J | " " | | | |
| 1- | Hose, Air Cleaner | 1 | J | 1.62 | | | |
| 1- | Clamp, Hose | 1 | J | INC. BELOW | | | |
| 1- | Hose, Air Cleaner, No. 1 | 1 | J | 1.58 | | | |
| 1- | Clamp, Hose | 1 | J | INC. BELOW | | | |
| 1- | Clamp, Hose | 1 | J | " " | | | |
| 1- | Hose, Air Cleaner, No. 2 | 1 | J | 2.50 | | | |
| 1- | Bolt, W/Washer | 1 | J | INC. BELOW | | | |
| 1- | Hose, Air Cleaner, No. 3 | 1 | J | 3.29 | | | |
| 1- | Nut, Lock | 2 | J | INC. BELOW | | | |
| | Bolt, Nut and Clamp | | | .72 | | | |
| | Valve Assy, Thermostatic Vacuum Switch | | | 3.25 | | | |
| | Valve Assy, Electric Bleed Control | | | 14.02 | | | |
| | Hose, Air, No. 1 | | | 1.54 | | | |
| 2-1 | Insulator, Engine Mounting, FR | 1 | J | 5.16 | | | |
| 2-2 | Bracket, Engine Mounting, FR | 1 | J | 1.06 | | | |
| 2-3 | Insulator, Engine Mounting, LH | 1 | J | 3.82 | | | |
| 2-4 | Bracket, Engine Mounting, LH | 1 | J | 1.16 | | | |
| 2-5 | Insulator, Engine Mounting, RR | 1 | J | 3.40 | | | |
| 2-6 | Bracket, Engine Mounting, RR | 1 | J | 1.05 | | | |

## JOINT VENTURE CAR COMPONENTS

| Fig.-No. | Part Name | Qty. | Japan/U.S./Open | Japan Source | U.S. Source | Japan Open | U.S. Open | |
|---|---|---|---|---|---|---|---|---|
| 3-1 | Radiator Assy | 1 | O | | | | 25.95 | HARRISON |
| 3-2 | Support, Radiator | 2 | O | | | | .58 | C.E.C. |
| 3-3 | Hose Radiator, No. 1 | 1 | O | | | | 1.99 | C.E.C. |
| 3-4 | Hose Radiator, No. 2 | 1 | O | | | 1.79 | | |
| 3-4 | Hose, Water Inlet | 1 | O | | | | .09 | C.E.C. |
| 3-5 | Clip | 4 | J | INC. BELOW | | | | |
| 3-6 | Hose, Water By-Pass, No. 1 | 1 | J | "  " | | | | |
| 3-6 | Pipe, Water By-Pass, No. 2 | 1 | J | 2.80 | | | | |
| 3-6 | Pipe, Water By-Pass, No. 1 | 1 | J | 2.16 | | | | |
| 3-7 | Clamp, Hose | 2 | J | INC. BELOW | | | | |
| 3-8 | Fan Assy, W/Motor | 1 | O | | | | 11.41 | DELCO PRODUCTS |
| 3- | Reservetank Assy, Radiator CLIP, HOSE AND CLAMP | 1 | O | 1.30 | | | 1.09 | C.E.C. |
| 4-1 | Pipe Sub-Assy, Exhaust, FR | 1 | O | | | | 13.87 | |
| 4-2 | Gasket, Exhaust Pipe | 1 | J | INC. ON NEXT PAGE | | | | |
| 4-3 | Nut | 2 | J | "  " | " | " | | |
| 4-4 | Bolt, Washer Based Head Hex. | 2 | J | "  " | " | " | " | |
| 4-5 | Gasket, Exhaust Pipe | 1 | J | "  " | " | | " | |
| 4-6 | Converter Assy, Monolithic | 1 | O | | | | 122.04 | |
| 4-7 | Bolt, U | 1 | J | INC. ON NEXT PAGE | | | | |
| 4-8 | Clamp, Air Suction Pipe | 1 | J | "  " | " | " | " | |

## JOINT VENTURE CAR COMPONENTS

| Fig. No. | Part Name | Qty. | Japan/ U.S./ Open | Japan Source | U.S Source | Japan Qty. | U.S. Open | Source |
|---|---|---|---|---|---|---|---|---|
| 4-9 | Nut, Lock | 2 | J | INC. BELOW | | | | |
| 4-10 | Pipe, Converter Air Inlet | 1 | 0 | | | | 1.82 | G.E.C. |
| 4-11 | Bolt, Flange | 1 | J | INC. BELOW | | | | |
| 4-12 | Clamp | 1 | J | " " | | | | |
| 4-13 | Support Sub-Assy, Cat. Con. | 1 | J | .95 | | | | |
| 4-14 | Pipe Assy, Exhaust Center | 1 | 0 | | | 7.97 | | |
| 4-15 | Gasket, Exhaust Pipe | 1 | J | INC. BELOW | | | | |
| 4-16 | Bolt | 2 | J | " " | | | | |
| 4-17 | Nut, Lock | 2 | J | " " | | | | |
| 4-18 | Pipe Assy, Exhaust Tail | 1 | 0 | | | 14.73 | | |
| 4-19 | Bolt, U | 1 | J | INC. BELOW | | | | |
| 4-20 | Clamp, Pipe | 1 | J | " " | | | | |
| 4-21 | Nut | 2 | J | " " | | | | |
| 4-22 | Bracket, Catalytic Con., RH | 1 | J | " " | | | | |
| 4-23 | Bracket, Catalytic Con., LH | 1 | J | " " | | | | |
| 4-24 | Bracket, Exht. Pipe Sup. No. 1 | 1 | J | " " | | | | |
| 4-25 | Bracket, Exht. Pipe Sup. No. 2 | 1 | J | " " | | | | |
| 4-26 | Bracket, Exht. Pipe Sup. No. 4 | 1 | J | " " | | | | |
| 4-27 | Support, Exhaust Pipe, No. 4 | 4 | J | " " | | | | |
| 4-28 | Ring, O | 2 | J | " " | | | | |
| GASKET, NUT, BOLT, CLAMP, BRACKET, SUPPORT AND RING | | | | 6.02 | | | | |

METAL STAMPINGS TECHNICAL INFORMATION
36 MAJOR PANELS PRODUCED IN THE JOINT VENTURE STAMPING PLANT

| PARTS LIST | | PART NAME | MATERIAL | T (mm) | COIL WIDTH X LENGTH (mm) | NP | Material Cost /vehicle |
|---|---|---|---|---|---|---|---|
| PAGE | FIG.NO | | | | | | |
| 30 | 1 | PANEL, HOOD | (AS35RB) | 0.8 | 1450 x 1210 | 1 | 7.67 |
| | 1 | PANEL, HOOD INNER | SPCC | 0.65 | 1450 x 1230 | 1 | 5.17 |
| | 6 | PANEL, FRONT FENDER RH | (ASP 2) | 0.7 | 1325 x 730 | 1 | 4.07 |
| | 7 | PANEL, FRONT FENDER LH | do. | do. | do. | do. | 4.07 |
| 32 | 2 | PANEL, DASH | SPCC | 0.8 | 1450 x 860 | 1 | 4.26 |
| 33 | 1 | MEMBER, FRONT SIDE RH | (ASP 1) | 1.6 | 1000 x 1010 | 2 | 4.67 |
| | 2 | MEMBER, FRONT SIDE LH | do. | do. | do. | do. | 4.67 |
| | 3 | MEMBER, RR FLOOR SIDE FRONT RH | SAPH45 | 2.0 | 1000 x 592 | 2 | 2.98 |
| | 4 | MEMBER, RR FLOOR SIDE FRONT LH | do. | do. | do. | do. | 2.98 |
| | 3 | MEMBER, RR FLOOR SIDE REAR RH | SAPH45 | 1.2 | 675 x 480 | 2 | 1.02 |
| | 4 | MEMBER, RR FLOOR SIDE REAR LH | do. | do. | do. | do. | 1.02 |
| 34 | 4 | PANEL, COWL TOP OUTER | SPCC | 0.7 | 900 x 1560 | 2 | 2.21 |
| | 4 | PANEL, COWL TOP INNER | (SPMY) | 0.7 | 1000 x 1650 | 2 | 2.65 |
| 35 | 7 | PAN, FRONT FLOOR | SPCC | 0.75 | 1450 x 1370 | 1 | 6.36 |

Note:  T = Plate Thickness
       NP = Number of Products taken out of the material

36 MAJOR PANELS PRODUCED IN THE JOINT VENTURE STAMPING PLANT

| PARTS LIST | | PART NAME | MATERIAL | T (mm) | COIL WIDTH X LENGTH (mm) | NP | Material Cost /vehicle |
|---|---|---|---|---|---|---|---|
| PAGE | FIG.NO | | | | | | |
| 35 | 11 | PAN, REAR FLOOR | (SPMY) | 0.7 | 1450 x 1800 | 1 | 8.35 |
| 36 | 15 | PANEL, ROCKER OUTER RH | (ASP 1) | 1.0 | 1050 x 1830 | 3 | 3.81 |
| | 16 | PAENL, ROCKER OUTER LH | do. | do. | do. | do. | 3.81 |
| | 17 | PANEL, QUARTER RH | (ASP 2) | 0.75 | 1450 x 2100 | 2 | 6.80 |
| | 18 | PANEL, QUARTER LH | (ASP 3) | 0.75 | 1450 x 2100 | 2 | 6.80 |
| 38 | 1 | PANEL, ROOF | SPCC | 0.85 | 1275 x 1585 | 1 | 7.56 |
| 39 | 1 | PANEL, LUGGAGE COMPARTMENT OUTER | (SAFC35 RB) | 0.75 | 1450 x 1000 | 1 | 4.90 |
| | 1 | PANEL, LUGGAGE COMPARTMENT INNER | (SPMY) | 0.7 | 1500 x 1000 | 1 | 4.80 |
| 40 | 1 | PANEL, FRONT DOOR INSIDE RH | SPCC | 0.7 | 700 x 1160 | 1 | 2.54 |
| | 2 | PANEL, FRONT DOOR INSIDE LH | do. | do. | do. | do. | 2.54 |
| | 1 | BEAM, FR DOOR SIDE IMPACT PROTECTION | APFC60 | 1.4 | 975 x 450 | 1 | 2.91 |
| | 2 | do. | do. | do. | do. | do. | 2.91 |
| | 1 | PANEL, FRONT DOOR OUTSIDE RH | (AS35RB) | 0.7 | 675 x 1090 | 1 | 2.71 |
| | 2 | PANEL, FRONT DOOR OUTSIDE LH | do. | do. | do. | do. | 2.71 |

Note: T = Plate Thickness
      NP = Number of Products taken out of the material

36 MAJOR PANELS PRODUCED IN THE JOINT VENTURE STAMPING PLANT

| PARTS LIST PAGE | FIG.NO | PART NAME | MATERIAL | T (mm) | COIL WIDTH X LENGTH (mm) | NP | Material Cost /vehicle |
|---|---|---|---|---|---|---|---|
| 43 | 1 | PANEL, RR DOOR INSIDE RH | SPCC | 0.7 | 725 x 1050 | 1 | 2.43 |
| | 2 | PANEL, RR DOOR INSIDE LH | do. | do. | do. | do. | 2.43 |
| | 1 | BEAM, RR DOOR SIDE IMPACT PROTECTION | APFC60 | 1.2 | 980 x 591 | 2 | 1.92 |
| | 2 | do. | do. | do. | do. | do. | 1.92 |
| | 1 | PANEL RR DOOR OUTSIDE RH | (AS35RB) | 0.7 | 700 x 962 | 1 | 2.54 |
| | 2 | do. | do. | do. | do. | do. | 2.54 |
| 48 | 2 | TANK, FUEL, UPPER | (TMY) | 0.8 | 825 x 930 | 1 | 3.31 |
| | 2 | TANK, FUEL, POWER | do. | 1.0 | 700 x 940 | 1 | 3.55 |
| | | Total | | | | | 137.59 |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

Note:  T = Plate Thickness
        NP = Number of Products taken out of the material

Details of Other Stamping Parts

| Page | Fig. No. | Sub-Assy | Main Part Name (Total : 36 Parts) | Other Parts |
|------|----------|----------|-----------------------------------|-------------|
| 30 | 1 | Hood Sub-Assy | Panel, Hood<br><br>Panel, Hood Inner | Hook Sub-Assy, Hood Lock<br><br>Other Small Parts |
| | 6 | Fender Sub-Assy, FR RH | Panel, FR Fender RH | Extension FR Fender RR R/F RH<br><br>Other Small Parts |
| | 7 | Fender Sub-Assy, FR LH | Panel, FR FEnder LH | Extension FR Fender RR R/F LH<br><br>Other Small Parts |
| 32 | 2 | Panel Sub-Assy, Dash | Panel, Dash | Sheet Dash Panel Insulator, No.1<br><br>Other Small Parts |
| 33 | 1 | Member Sub-Assy, FR Side RH | Member, FR Side RH | Plate FR Side Member FR RH<br><br>Plate FR Side Member RR RH<br><br>Brace Lwr Arm Bracket RH<br><br>Reinforcement FR Side Member No.2 RH<br><br>Other Small Parts |
| | 2 | Member Sub-Assy, FR Side LH | Member, FR Side LH | Support Battery Carrier<br><br>Plate FR Side Member FR LH<br><br>Plate FR Side Member RR LH<br><br>Brace Lwr Arm Bracket LH<br><br>Reinforcement FR Side Member No.2 LH<br>Other Small Parts |

| Page | Fig. No. | Sub-Assy | Main Part Name | Other Parts |
|---|---|---|---|---|
| 33 | 3 | Member Sub-Assy, RR Floor Side RH | Member, RR Floor Side, FR RH | Bracket RR Strut Bar RH |
| | | | Member, RR Floor Side RR RH | Reinforcement Belt Anchor No.1 RH |
| | | | | Other Small Parts |
| | 4 | Member Sub-Assy, RR Floor Side LH | Member, RR Floor Side, FR LH | Bracket RR Strut Bar LH |
| | | | Member, RR Floor Side, RR LH | Reinforcement Belt Anchor No.1 LH |
| | | | | Other Small Parts |
| 34 | 4 | Panel Assy, Cowl Top | Panel, Cowl Top Outer | Stopper Sub-Assy, Hood, RH |
| | | | Panel, Cowl Top Inner | Reinforcement Sub-Assy, Hood Lock MT |
| | | | | Panel, Cowl Top Side RH |
| | | | | Panel, Cowl Top Side Inner RH |
| | | | | Panel, Cowl Top Side LH |
| | | | | Panel, Cowl Top Side Inner LH |
| | | | | Other Small Parts |
| 35 | 7 | Pan, FR Floor | | |
| | 11 | Pan Sub-Assy, RR Floor | Pan, RR Floor | Extension RR Floor Pan RH |
| | | | | Extension RR Floor Pan LH |
| | | | | Other Small Parts |

| Page | Fig No. | Sub-Assy | Main Part Name | Other Parts |
|------|---------|----------|----------------|-------------|
| 36 | 15 | Panel Sub-Assy, Rocker, Outer RH | Panel, Rocker, Outer RH | Reinforcement Rocker Panel RH<br><br>Other Small Parts |
| | 16 | Panel Sub-Assy, Rocker, Outer LH | Panel, Rocker, Outer LH | Reinforcement Rocker Panel LH<br><br>Other Small Parts |
| | 17 | Panel Sub-Assy, Quarter RH | Panel, Quarter RH | Duct Sub-Assy, Quarter Vent RH<br><br>Support RR Bumper Side RH<br><br>Other Small Parts |
| | 18 | Panel Sub-Assy, Quarter LH | Panel, Quarter LH | Duct Sub-Assy, Quarter Vent LH<br><br>Support RR Bumper Side LH<br><br>Other Small Parts |
| 38 | 1 | Panel Sub-Assy, Roof | Panel, Roof | Panel Windshield Header Inner<br><br>Frame Back Window Upr<br><br>Other Small Parts |
| 39 | 1 | Panel Sub-Assy, Luggage Compartment, Door | Panel, Luggage Compartment, Door Outer<br><br>Panel, Luggage Compartment, Door Inner | Reinforcement Luggage Compartment Door<br><br>Other Small Parts |
| 40 | 1 | Panel Sub-Assy, FR Door RH | Panel, FR Door, Inside RH<br><br>Beam, FR Door Side Impact Protection<br><br>Panel, FR Door, Outside RH | Frame Sub-Assy, FR Door Window RH<br><br>Panel FR Door Hinge Side RH<br><br>Other Small Parts |

| Page | Fig. No. | Sub-Assy | Main Part Name | Other Parts |
|---|---|---|---|---|
| 40 | 2 | Panel Sub-Assy, FR Door LH | Panel, FR Door Inside LH<br><br>Beam, FR Door Side-Impact Protection<br><br>Panel, FR Door Outside LH | Frame Sub-Assy, FR Door Window LH<br><br>Panel FR Door Hinge Side LH<br><br>Other Small Parts |
| 43 | 1 | Panel Sub-Assy, RR Door RH | Panel, RR Door Inside RH<br><br>Beam RR Door Side-Impact Protection RH<br><br>Panel, RR Door Outside RH | Frame Sub-Assy, RR Door Window RH<br><br>Panel RR Door Hinge Side RH<br><br>Other Small Parts |
|  | 2 | Panel Sub-Assy, RR Door LH | Panel, RR Door Inside LH<br><br>Beam, RR Door Side-Impact Protection LH<br><br>Panel, RR Door Outside LH | Frame Sub-Assy, RR Door Window LH<br><br>Panel RR Door Hinge Side LH<br><br>Other Small Parts |
| 48 | 2 | Tank Sub-Assy, Fuel | Tank, Fuel Upr<br><br>Tank, Fuel Lwr | Tube Sub-Assy, Fuel Tank Breather<br><br>Retainer Fuel Gage<br><br>Other Small Parts |

Total

$120

Attachment (D)

## Paint Cost and Indirect Materials Cost

(specifiable utilization rate for a vehicle)

| | | | | Cost per vehicle | |
|---|---|---|---|---|---|
| | | | | Toyota | GM |
| **PAINTING MATERIALS** | | | | | |
| PHOSPHATE | (1) | DEGREASING | | .22 | |
| | (2) | PHOSPHATE | | .68 | |
| PRIMER | (1) | ELPO(ED) | | } 8.35 | |
| | (2) | SOLVENT(thinner) | | | |
| MID COAT | (1) | PRIMER-SURFACER | | 3.23 | |
| | (2) | SOLVENT(thinner) | | 1.38 | |
| TOP COAT | (1) | 50% HI-SOLID ENAMEL (note 1) | | } 30.64 | |
| (color:red) | (2) | SOLVENT(thinner) | | | |
| CHIP | (1) | VINYL CHLORIDE PLASTISOL | | } | |
| RESISTANT | | (underfloor, wheel-house) | | .80 | |
| COATING | (2) | POLYESTER RESIN COATING MATERIAL | | | |
| | | (rocker panel) | | | |
| | | | | 45.30 | 60.29 |
| **INDIRECT MATERIALS** (ASSEMBLY) | | | | | |
| GASOLINE | | | | 1.80 | } |
| ENGINE OIL (10W-30-SEQ) | | | | 2.22 | |
| TRANSMISSION OIL (JWS 2318) | | | | 1.53 | } 20.02 |
| LLC 50% | | | | 2.19 | |
| BRAKE FLUID | | | | .52 | |
| SEALER | | | | 7.00 | |
| Total | | | | 60.56 | 80.31 |

note 1 : Unit prices for the paint samples which Mr. Nakai
asked you on July 18 to send to his office -

Average
$70.44

MANNING & LABOR COST ESTIMATION

payroll related (incl. overtime) & benefits

|  |  |  | Manpower | | Ave.Hrly. Rate (monthly slry) | Hrs./yr. |
|---|---|---|:---:|:---:|:---:|:---:|
|  |  |  | (T) | (G) |  |  |
| DIRECT | HOURLY | Manufacturing Dept. |  |  |  |  |
|  |  | Workers: Stamping | 80 |  |  |  |
|  |  | Body | 480 |  |  |  |
|  |  | Painting | 340 |  |  |  |
|  |  | Assembly | 820 |  |  |  |
|  |  | Transportation: |  |  |  |  |
|  |  | Stamping | 10 |  |  |  |
|  |  | Body | 100 |  |  |  |
|  |  | Painting | — |  |  |  |
|  |  | Assembly | 224 |  |  |  |
|  |  | Inspection: |  |  | $18.71 | 1,880 hs |
|  |  | Stamping | 6 |  |  |  |
|  |  | Body | 40 |  |  |  |
|  |  | Painting | 12 |  |  |  |
|  |  | Assembly | 90 |  |  |  |
|  |  | Maintenance: |  |  |  |  |
|  |  | Stamping | 50 |  |  |  |
|  |  | Body | 100 |  |  |  |
|  |  | Painting | 56 |  |  |  |
|  |  | Assembly | 34 |  |  |  |
|  |  | Inspection Dept. | 50 |  |  |  |
|  |  | Power Plant & Facility Maintenance | 90 |  |  |  |
|  |  | HOURLY TOTAL | 2,582 |  |  |  |
| INDIRECT | SALARY | Manager & Supervisor | 20 |  |  |  |
|  |  | Manufacturing Dept. | 62 |  |  |  |
|  |  | Inspection Dept. | 30 |  |  |  |
|  |  | Administration (A) | 106 |  | ($4,010) |  |
|  |  | Administration (B) | 200 |  |  |  |
|  |  | SALARY TOTAL | 418 |  |  |  |
|  |  | GRAND TOTAL | 3,000 |  |  |  |

CONTENTS: Administration (A)...... Safety & Health, Scheduling, Quality
Control, Material   (Mfg. related)

Administration (B)...... Personnel, Financial, Purchasing,
Data Processing, Car Distribution &
Scheduling, Public Information, etc.

Inspection Dept. ....... Engineering, Inspection & Audit

Manpower of (T)..........Estimated manpower based on the pro-
posed data which Mr. Nakai had handed
to your production team on August 4 and 5.

### REQUEST FOR DATA OFFERING OF FACILITY OPERATION COST

For the purpose of cost estimation of a JV vehicle, please sum up all,
(but labor cost, depreciation expense, tax and insurance), of the facility
operation cost of the Fremont plant.

If you have any items which you can hardly classify them to any of Energy,
Indirect nor Maintenance cost, please add them up to the column of "OTHERS"
with identifying its names.

PREMISES       PLANT:  Fremont

PRODUCTION VOLUME:  200,000 JOBS/YEAR

PRODUCT:  TVX

DATA: Estimated data of Framont plant in annual base

CONTENTS OF EACH COST: Refer to the following

| COST ELEMENTS | PROCESS | CONTENTS |
|---|---|---|
| ENERGY COST | Stamping<br>Body<br>Painting<br>Assembly | electricity, natural gas, water |
| INDIRECT MATERIAL COST | Stamping | processing oil, detergent oil, lubricating oil, hydraulic oil, gloves, assembly tools(consumable), etc. |
| | Body | welding electrode tip, welding rod, welding wire, solder, adhesive, carbon dioxide, argon gas, gloves, etc. |
| | Painting | butan gas, kerosine, cleaning thinner, chemicals, maintenance expense for hangers, etc. |
| | Assembly | adhesive, gloves, assembly tools (con-sumable), etc. |
| MAINTENANCE COST | Stamping<br>Body<br>Painting<br>Assembly | expense for periodic inspection, pre-ventive maintenance, overhaul<br>(1) payment for subcontract workers<br>(2) facility parts ocst, if jobs are done by company workers |
| OTHERS | | |

* Please do not include materials such as PAINT, GASOLINE, ENGINE OIL, ets.
which we had already asked you to offer.

Attachment (F) - 2

## FACILITY OPERATION COSTS

| | Stamping | Assembly | Total | Fixed | Varriable |
|---|---|---|---|---|---|
| | $/Per Unit | | | | |
| **Utility Costs** | | | | | |
| Electricity | | 20 | | | |
| Gas | | 17 | | | |
| Water | | 6 | | | |
| Other | | | | | |
| Total Utilities | 3.84 | 43 | 46.84 | 5 | 38 |
| | | | | | |
| **Indirect Material** | | | | | |
| Supplies | 0.80 | } 12 | } 12.96 | – | 12 |
| Expense Tools | 0.16 | | | | |
| Maintenance | 2.28 | 30 | 32.28 | 3 | 27 |
| Scrap | 1.41 | 12 | 13.41 | | 12 |
| Total Indirect Material | 4.65 | 54 | 58.65 | 3 | 51 |
| | | | | | |
| **Other** | | | | | |
| Housekeeping | 2.18 | 23 | | 2 | 21 |
| Data Processing | 0.27 | 21 | | 21 | |
| Taxes | } 9.00 | } 18 | 27 | 18 | |
| Insurance | | | | | |
| Other | | | | | |
| Total Other | 11.45 | 62 | 73.45 | 41 | 21 |
| | | | | | |
| **TOTAL** | 19.94 | 159 | 178.94 | 49 | 110 |
| | | | | 159 | |
| Excl. Taxes, Insurance, Other (178.94 – 27) | | | 151.94 | | |

INVESTMENT IN THE JOINT VENTURE PLANT (FOR THE DEPRECIATION COST ESTIMATION)

The following investments are the result of our last discussion on August 4 and 5.

|  | STAMPING | | | BODY | | | PAINTING | | | ASSEMBLY | | | TOTAL | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| NEW INVESTMENT | INVEST. $1,000 | UL YR. | DEP.COST /VEHICLE $ | INVEST. $1,000 | UL YR. | DEP.COST /VEHICLE $ | INVEST. $1,000 | UL YR. | DEP.COST /VEHICLE $ | INVEST. $1,000 | UL YR. | DEP.COST /VEHICLE $ | INVEST. $1,000 | DEP.COST /VEHICLE $ |
| BUILDING (note 1) | 33,057 | 30 | 5.51 |  |  |  |  |  |  |  |  |  | 33,057 | 5.51 |
| ATTACHED STRUCTURE | 9,876 | 15 | 3.29 |  |  |  |  |  |  |  |  |  | 9,876 | 3.29 |
| MACHINES | 64,476 | 7 | 46.05 | 62,429 | 8 | 39.01 | 46,133 | 8 | 28.83 | 19,005 | 8 | 11.88 | 192,043 | 125.77 |
| TOOLS (note 2) | 15,120 | 4 | 18.90 | 41,804 | 4 | 52.26 |  |  |  |  |  |  | 56,924 | 71.16 |
| TOTAL | 122,529 |  | 73.75 | 104,233 |  | 91.27 | 46,133 |  | 28.83 | 19,005 |  | 11.88 | 291,900 | 205.73 |

note 1 ------ utilities, cranes, scrap-system
note 2 ------ (stamping) die, checking fixtures, try-out
               (body) multi-spot, small-sub-assembly-line, checking fixtures, try-out

* UL stands for USEFUL LIFE.

Annex B

## INDEX

The ten best-selling models among the sub-compacts will be the models which constitute the market-basket index. The models shall be revised at the start of every model year on the basis of model volume in the U.S.A, using the latest R. L. Polk registration data for the previous 12 months.

For reference, the ten best-selling models in 1982 were as follows:

Chevrolet Cavalier          Mercury Lynx
Chevrolet Chevette          Nissan Sentra
Ford Escort                 Subaru DL
Honda Accord                Toyota Corolla
Honda Civic                 Volkswagen Rabbit

The "Index" shall be the weighted average rate of wholesale price fluctuations of these models from the prior model year to the current model year, weighting the Toyota Corolla at 30% versus 70% for all other comparable models combined without regard of model volumes in the U.S.A.

For this purpose, the wholesale price shall be adjusted by eliminating the value of equipment changes and product improvements in comparison with the previous year's models. To this end, the JV Company will evaluate and determine the value of equipment changes and product improvements, taking into account the opinions of Toyota and GM.

When competitive models are replaced by new models, or additional competitive models are brought in, neither the old model nor the new or additional model will be included in the calculation of the Index for the model year when such model changes take place. It will, however, be included in the calculation of the Index for subsequent model years.

第3次修正で文言変更

AMENDMENT

TO

VEHICLE SUPPLY AGREEMENT


by and among


NEW UNITED MOTOR MANUFACTURING, INC.,


GENERAL MOTORS CORPORATION

and

TOYOTA MOTOR CORPORATION

AMENDMENT

TO

VEHICLE SUPPLY AGREEMENT


This Amendment is entered into this 31st day of March, 1986 among New United Motor Manufacturing, Inc. ("JV Company"), General Motors Corporation ("GM") and Toyota Motor Corporation ("Toyota").

WHEREAS, the parties executed the Vehicle Supply Agreement on February 21, 1984; and

WHEREAS, the parties now wish to make the appropriate amendments to the Vehicle Supply Agreemnt;

NOW, THEREFORE, the parties hereto agree as follows:

1, Addition in Section 4.1: The following sub-section shall be and is hereby added in Section 4.1 of the Vehicle Supply Agreement:

"(d)  The provisions of this Section 4.1 and any individual sales contract made under Section 4.2 hereof shall be subject to and within the limitation of the relevant provisions of the Agreement on Manufacture of Toyota-Specific Vehicles, dated March 31, 1986, among the parties hereto."

- 1 -

2.  Amendment to Section 4.4: Section 4.4 of the Vehicle
Supply Agreement shall be and is hereby amended to read in its
entirety as follows:

"4.4.  <u>Delivery of Products</u>:  The Products shall be
delivered to GM by the physical delivery of the same outside
the Foreign Trade Subzone of the JV Company."

3.  <u>Amendment to Section 4.5</u>: Section 4.5 of the Vehicle
Supply Agreement shall be and is hereby amended to read in its
entirety as follows:

"4.5.  <u>Acceptance of Products</u>:  (a)  GM shall, immediately
after tendering of the Products by the JV Company, conduct
visual and operational inspections in the Foreign Trade
Subzone of the JV Company to determine whether the Products
conform to the applicable specifications and inspection
standards as separately agreed upon by the parties pursuant to
Section 3.4 hereof.

(b)  GM shall accept all the Products which shall have
passed said inspections.  GM shall provide a written notice
in a form designated by the JV Company for those Products
which shall have failed said inspection.  This written notice
shall specify the reason for such failure in reasonable
detail.  These Products shall be repaired by the JV Company at
no charge to GM.

- 2 -

(c)  The Products which have passed said inspections and have been moved to a point outside the Foreign Trade Subzone through the gate of the shipping canopy located just west of the Marshalling Area identified in Section 5.1 of the Shareholders' Agreement shall be deemed to have been accepted by GM.

(d)  The JV Company shall at its cost repair or correct any discrepancies in the Products attributable to the JV Company if (i) they are discovered while the Products are within the confines of the Marshalling Area, and (ii) they are notified to the JV Company within a three business day period after acceptance of the Products."

4.  Amendment to Section 4.7:  Sub-sections 4.7(a) and 4.7(b) of the Vehicle Supply Agreement shall be and are hereby deleted and the following sub-section shall be and is hereby substituted for said two sub-sections:

"(a)  The payment for the Products by GM to the JV Company shall be made as follows:  Payment for the Products delivered prior to the commencement of second shift on day one shall be made on business day three, and payment for the Products delivered after the commencement of second shift on such day one and prior to the commencement of second shift on day two shall be made on business day four."

5.  Addition to New Section 6.4:  The following section shall be and is hereby added after Section 6.3 of the Vehicle Supply Agreement:

- 3 -

"6.4.  <u>Nondisclosure of Information</u>:  The JV Company and GM
agree that any confidential information related to product
planning, prices of the Products, systems and planning for
vehicle ordering, distribution and option selections, and
quality related information furnished by GM to the JV Company
shall not be disclosed by the JV Company to Toyota or any
third party, except that the JV Company may disclose such
information to Toyota only when necessary for the management
and operation of the JV Company, and in accordance with the
Order issued by the Federal Trade Commission, In the Matter of
General Motors Corporation, et.al., Docket No. C-3132."

6.  <u>Other Terms</u>:  It is understood that, except as expressly
amended hereby, the Vehicle Supply Agreement shall remain
unchanged.

The parties have executed this Amendment on the date first above
written.

NEW UNITED MOTOR MANUFACTURING, INC.

By _____
    Tatsuro Toyoda, President

GENERAL MOTORS CORPORATION

By _____
    J. R. Edman, Vice President
    and Group Executive,
    Finance Group

TOYOTA MOTOR CORPORATION

By _____
    Hiroshi Okuda, Director

- 4 -

SECOND AMENDMENT TO
<u>VEHICLE SUPPLY AGREEMENT</u>

TOYOTA MOTOR CORPORATION ("Toyota"), a corporation organized and existing under the laws of Japan, NEW UNITED MOTOR MANUFACTURING, INC. (the "JV Company"), a close corporation organized and existing under the laws of the State of California, and GENERAL MOTORS CORPORATION ("GM"), a corporation organized and existing under the laws of the State of Delaware, hereby agree to amend the Vehicle Supply Agreement, dated February 21, 1984, (the "Agreement") and the Amendment to Vehicle Supply Agreement, dated March 31, 1986, (the "First Amendment") as follows:

1.    Article IV of the Agreement, entitled "Supply and Purchase Obligations and Arrangements," as amended in the First Amendment, is hereby further amended by adding the following paragraph:

"4.13 <u>CAFE Regulations:</u>

The obligations of the parties with respect to U.S. fuel economy laws are as stated in the Letter of Understanding dated April 24, 1989 among Toyota, the JV Company and GM."

2.   This Second Amendment shall be effective as of April 24,
1989.


IN WITNESS WHEREOF, the parties have caused three copies of this
Second Amendment to be signed by their duly authorized
representatives.


TOYOTA MOTOR CORPORATION          GENERAL MOTORS CORPORATION


By: _____          By: _____

Title: __Director_____          Title: __Assistant Treasurer__



NEW UNITED MOTOR MANUFACTURING, INC.


By: _____

Title: __President_____


- 2 -

**THIRD AMENDMENT TO**
**VEHICLE SUPPLY AGREEMENT**

TOYOTA MOTOR CORPORATION ("Toyota"), a corporation organized and existing under the laws of Japan, NEW UNITED MOTOR MANUFACTURING, INC. (the "JV Company"), a close corporation organized and existing under the laws of the State of California, and GENERAL MOTORS CORPORATION ("GM"), a corporation organized and existing under the laws of the State of Delaware, hereby agree to amend the Vehicle Supply Agreement, dated February 21, 1984, (the "Agreement"), the Amendment to Vehicle Supply Agreement, dated March 31, 1986, and the Second Amendment to Vehicle Supply Agreement, dated April 24, 1989, as follows:

1. Article 4.3(b) is hereby deleted and substituted with the following paragraph:

    "The selling price for the Vehicles shall be revised and determined for each model year. The new selling price for the Vehicles in each new model year shall be determined by applying to the selling price for the previous model year the Index set forth in Annex B hereto."

2. Annex B of the Agreement is hereby deleted and substituted with the following:

    "Annex B

Index

    As a general principle, the ten best-selling models among the subcompacts will be the models which constitute the marketbasket index. At the beginning of a new model cycle for the JV car, the parties may agree to change the models in the marketbasket to include other subcompacts or compacts. Unless there are exceptional circumstances, the models so included shall remain in the marketbasket through-out the model cycle of the JV car. From time to time, upon mutual agreement, the parties will review the components of the marketbasket formula to ensure that the formula reflects current market conditions.

    For reference, the ten best-selling subcompact models in 1992 were as follows:

| | |
|---|---|
| Cavalier | Mustang |
| Civic | Probe |
| Corolla | Sentra |
| Escort | Sundance |
| Excel | Tercel |

The 'Index' shall be the weighted average rate of wholesale price fluctuations of these models from the prior model year to the current model year, weighing the Toyota Corolla at 30% versus 70% for all other comparable models combined without regard of model volumes in the U.S.A.

For this purpose, the wholesale price shall be adjusted by eliminating the value of equipment changes and product improvements in comparison with the previous year's models. To this end, the JV Company will evaluate and determine the value of equipment changes and product improvements, taking into account the opinions of Toyota and GM.  Incentives will not be included in the calculation.

When competitive models are replaced by new models, or additional competitive models are brought in, neither the old model nor the new or additional model will be included in the calculation of the Index for the model year when such model changes take place.  It will, however, be included in the calculation of the Index for subsequent model years."

3.    This Third Amendment shall be effective as of August 26, 1992.

IN WITNESS WHEREOF, the parties have caused three copies of this Third Amendment to be signed by their duly authorized representatives.

TOYOTA MOTOR CORPORATION                GENERAL MOTORS CORPORATION


By: _____          By: _____
    K. Kato                                M. T. Hogan
    Managing Director                      Executive Director of
                                           Planning, North American
                                           Operations

NEW UNITED MOTOR MANUFACTURING, INC.


By: _____
    O. Kimura
    President

- 2 -

## FOURTH AMENDMENT TO
## VEHICLE SUPPLY AGREEMENT

NEW UNITED MOTOR MANUFACTURING, INC., a corporation organized and existing under the laws of the State of California ("JV Company"), GENERAL MOTOR CORPORATION, a corporation organized and existing under the laws of the State of Delaware ("GM"), and TOYOTA MOTOR CORPORATION, a corporation organized and existing under the laws of Japan ("Toyota"), hereby agree to amend the VEHICLE SUPPLY AGREEMENT dated February 21, 1984, as amended on March 31, 1986, April 24, 1989 and August 26, 1992 ("Agreement"), as follows:

1.      Section 2.1. of the Agreement, entitled "Agreement Term," is hereby deleted and replaced by the following Section:

   "2.1. Agreement Term:  This Agreement shall become binding upon its execution by each of the parties hereto and shall remain in full force and effect until the dissolution of JV Company."

2.      Section 3.2 of the Agreement, entitled "The Products" is hereby deleted and replaced by the following Section:

   "3.2    The Products:  The products to be supplied and purchased hereunder shall be certain automotive vehicles manufactured for sale to GM by the JV Company under license from Toyota which are variations of Toyota's front-wheel drive "Sprinter" ("Vehicles" or "GM-Specific Vehicles") and optional equipment therefor manufactured or procured by the JV Company (the "Optional Equipment").  The Vehicles and the Optional Equipment (collectively, the "Products") will be more particularly described in technical advance information (the "Technical Advance Information") to be furnished from time to time by the JV Company to GM.  Any additional automotive vehicle manufactured for sale to GM by the JV Company under license from Toyota will be the subject of a separate agreement between GM, Toyota and the JV Company."

3.    This Amendment shall be effective as of February 1, 1997.

IN WITNESS WHEREOF, the parties have caused this Amendment to be executed in duplicate by their duly authorized representatives.

NEW UNITED MOTOR
MANUFACTURING, INC.

GENERAL MOTORS CORPORATION

By: _____

    Iwao Itoh
    President

By: _____

    Paul W. Schmidt
    Executive in Charge
    NAO Finance

TOYOTA MOTOR CORPORATION

By: _____

    Koichiro Noguchi
    Director

3. This Amendment shall be effective as of February 1, 1997.

IN WITNESS WHEREOF, the parties have caused this Amendment to be executed in duplicate by their duly authorized representatives.

NEW UNITED MOTOR                     GENERAL MOTORS CORPORATION
MANUFACTURING, INC.


By: _____          By: _____
    Iwao Itoh                           Paul W. Schmidt
    President                            Executive in Charge
                                         NAO Finance


TOYOTA MOTOR CORPORATION



By: _____
    Koichiro Noguchi
    Director