Richard M. Cieri
Ray C. Schrock (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY  10022-4611
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

Mark E. McKane (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
555 California Street, 27th Floor
San Francisco, CA  94104
Telephone:    (415) 439-1400
Facsimile:    (415) 439-1500

*Attorneys for*
*NEW UNITED MOTOR MANUFACTURING, INC.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re** | Chapter 11 |
| **MOTORS LIQUIDATION COMPANY,** *et al.,* **f/k/a General Motors Corp.,** *et al.,* | Case No.:  09-50026 (REG) |
| **Debtors.** | (Jointly Administered) |
| **NEW UNITED MOTORS MANUFACTURING, INC.,** Plaintiff, v. **MOTORS LIQUIDATION COMPANY**, Defendant. | Adversary Proceeding Case No.: |

New United Motors Manufacturing, Inc. ("**NUMMI**") hereby brings this Complaint

against Motors Liquidation Company ("**MLC**") to commence an Adversary Proceeding and to

1

amend its timely-filed Proof of Claim numbered 67357 filed in the above-captioned proceeding

on November 24, 2009.  NUMMI alleges as follows:

## INTRODUCTION

1.      NUMMI files this Complaint to assert breach of contract claims and a promissory

estoppel claim against MLC for violating its contractual commitments and promises to NUMMI.

2.      Since its creation in 1983, NUMMI produced over one million MLC vehicles and

provided billions of dollars of manufacturing know-how that MLC employed in its facilities

around the world.  NUMMI is unique joint venture, unlike MLC's tier-one suppliers.

3.      In 1983, during a time of financial hardship for MLC, MLC and Toyota

Manufacturing Company ("**TMC**") partnered as joint venturers to form NUMMI.  Operating the

last auto assembly plant on the West Coast, NUMMI was a fertile testing ground for MLC that

charted new territory in the industry by combining a Japanese production model with an

American workforce.  Recognizing what it could gain from NUMMI, MLC made key

contractual and other commitments to ensure NUMMI's viability.  MLC promised to support

NUMMI's business, buy tens of thousands of NUMMI's vehicles per year and be responsible for

NUMMI's financial needs.

4.      Until 2009, MLC met its contractual obligations to NUMMI.  NUMMI built an

award-winning manufacturing plant that produced millions of vehicles for the American market.

MLC not only received vehicles for resale, but it also learned Japanese manufacturing techniques

through its collaboration with NUMMI and TMC, bringing new efficiencies to its entire business

and obtaining billions of dollars of value.  NUMMI operated as a joint venture.  MLC and TMC

were both integral to NUMMI's operations and business planning.  And when NUMMI needed

additional funding or pricing relief, MLC (and TMC) supported NUMMI.

5.      MLC was handsomely rewarded for participating in NUMMI with award-

winning vehicles and immense manufacturing know-how, until the whole venture came to sudden stop last year.

6.      In mid-2009, MLC chose to cease production at NUMMI, remove its board of directors appointees, and end its active participation in NUMMI.  Those decisions breached MLC's commitments to NUMMI and sounded its death knell.  MLC's withdrawal caused NUMMI to go out of business, eliminating over 4,500 jobs in Fremont, California and tens of thousands of supplier and support jobs in the surrounding communities.  As the direct result of MLC's abandonment of NUMMI, NUMMI is now winding down its business.

7.       At NUMMI's inception and through a series of contractual commitments over the years, MLC agreed to:

    a.      Keep NUMMI viable;

    b.      Purchase its products on a "continuous and stable" basis; and

    c.      Share NUMMI's deficit equally with TMC in the event of dissolution or wind down.

8.      In addition, in or around 2005, and then again through a contract in 2006, MLC promised to purchase a sufficient number of an updated vehicle model—the Pontiac Vibe (the "**Vibe**")—to support NUMMI through at least 2012.  As a result of this commitment, NUMMI made a significant capital investment in developing and producing the Vibe.

9.      NUMMI has not yet recovered the capital expenditures it made in 2006 for the Vibe.  And, unlike TMC, MLC has refused to contribute to NUMMI's deficit during the wind down.  As set forth below, NUMMI is entitled to damages from MLC for its unrecovered Vibe investment and its wind down deficit based on MLC's breach of its contracts with NUMMI, MLC's breach of the implied covenant of good faith and fair dealing and its failure to fulfill its

3

promise related to Vibe production.

## PARTIES

10.    NUMMI was founded as a joint venture between MLC and TMC in 1983.  In 1984, NUMMI was incorporated under the laws of the State of California.  Its principal place of business is Fremont, California.  Under the Shareholders' Agreement between MLC and TMC, each party is a 50% shareholder in NUMMI.  Until MLC withdrew, NUMMI's board of directors consisted of four MLC appointees and four TMC appointees, with NUMMI's president serving as the ninth director.

11.    MLC is "Old GM," the primary debtor in these chapter 11 proceedings commenced on June 1, 2009 in this Court.  GM (General Motors) was an American automobile manufacturer that owned and marketed its vehicles under the Buick, Chevrolet, GMC and Pontiac brands, among others.  On July 10, 2009, after obtaining Court approval, MLC sold substantially all of its assets to General Motors, LLC ("**New GM**").  MLC's fifty percent (50%) interest in NUMMI was not included in the sale to New GM.

12.    TMC is a Japanese automobile manufacturer that markets its vehicles under the Toyota brand.

## JURISDICTION AND VENUE

13.    This action is brought pursuant to Rules 7008, 7012 and 9014 of the Federal Rules of Bankruptcy Procedure to seek relief in accordance with Sections 501 and 502 of Title 11 of the United States Code.

14.    This Court has jurisdiction over this matter under 28 U.S.C. §§ 1334 and 157. The matter concerns the allowance of claims against the estate and is therefore a core proceeding under 28 U.S.C. § 157(b)(2)(B).

15.    Venue is proper in this District under 28 U.S.C. §§ 1408 and 1409.

## GENERAL ALLEGATIONS

### I.    FORMATION OF THE NUMMI JOINT VENTURE

16.    In 1982, MLC shut its manufacturing plant in Fremont, California as part of company-wide downsizing due to severe economic losses and production problems.  Not long after, MLC and TMC began discussions about a joint venture that would restart automobile manufacturing in Northern California and provide both companies with vehicles for the American market.

17.    In 1983, MLC and TMC signed a Memorandum Of Understanding (the "**1983 MOU**") as the basis for their NUMMI joint venture.  Through this agreement, both TMC and MLC pledged their support to NUMMI by promising to "enhance[] [NUMMI's] success[,]" "increas[e] its production to the maximum extent possible[,]" price its vehicles "to provide a reasonable profit" to NUMMI, "take necessary measures" if NUMMI was "endanger[ed]" and provide guarantees to NUMMI's lenders as needed.  (Ex. A at 1, 3, 4, 7.)

18.    In addition, MLC and TMC agreed that "[a]ny surplus or deficit of the JV as at termination of the JV will be shared equally by [TMC] and [MLC], in line with [TMC's] and [MLC's] ownership."  (Ex. A at 10.)

19.    With this agreement in place, NUMMI incorporated in 1984.  The Shareholders' Agreement between MLC and TMC contained and incorporated many of the provisions of the 1983 MOU.  For example:

   a.    Section 3.1(b) stated that MLC and TMC "shall assist [NUMMI] in increasing its production to the maximum extent possible . . .";

   b.    Section 6.2 provided that the parties will work together to set vehicle prices to "provide a reasonable profit" to NUMMI; and

   c.    Section 4.2 repeated MLC's and TMC's promise to sign guarantees as

needed for NUMMI's financing.

(Ex. B.)

20.    The Shareholders' Agreement did not remove the obligation that "[a]ny surplus or deficit of the JV as at termination of the JV will be shared equally by [TMC] and [MLC], in line with [TMC's] and [MLC's] ownership."  Section 4.3 of the Shareholders' Agreement preserved the 1983 MOU obligation to share in any deficit that existed at NUMMI's termination:

> Except as otherwise provided in any agreement or instrument to which the parties signatory hereto are parties, [NUMMI] shall be responsible for the payment of all of its own expenses.

(Ex. B.)  In other words, although NUMMI was generally responsible for its expenses, upon termination of the joint venture, TMC and MLC remained responsible for any remaining deficit because this commitment was "otherwise provided" for in the 1983 MOU.

21.    In 1984, the parties entered into a series of other agreements to facilitate information sharing between TMC and NUMMI and MLC (collectively, the "**Information Sharing Agreements**").  Under the Vehicle License Agreement, TMC provided "technical information" to NUMMI and MLC.  Examples of "technical information" included "[k]now-how and services concerning plant design (process planning, building design, layout, equipment planning and similar matters)[,]" and "services concerning equipment procurement and installation."  (Ex. C at § 3.1(b)-(c).)  Under the Memorandum On Technical Assistance between TMC and MLC, TMC provided MLC with specifications for the parts of vehicles NUMMI would make, as well as owners' manuals and repair manuals.  (Ex. D at § 2.1(a), (d).)  Under the Service Parts License Agreement, TMC provided MLC with "drawings for services parts and engineering standards" for the vehicles that NUMMI would produce.  (Ex. E at § 2.1).

22.    In sum, NUMMI's purpose was not just to produce cars.  The NUMMI venture was designed as a way for MLC to learn Japanese manufacturing methods from TMC, which

was famous for its own cars and manufacturing plants.   NUMMI would also help MLC by introducing it to TMC's teamwork-based production environment.

23.    Indeed, in its final approval of the NUMMI joint venture, the Federal Trade Commission ("**FTC**") noted that TMC and MLC's joint venture "promises substantial benefits for American consumers, for American labor, and for the American manufacturing sector in general." *In re General Motors Corp.*, 103 F.T.C. 374 (1984) (Douglas, G., concurring).   The FTC emphasized three principal benefits of the NUMMI joint venture:  (1) an "increase [in] the total number of small cars available in America, thus allowing consumers a greater choice at lower prices, despite present restrictions on Japanese imports;" (2) "the joint venture car will cost less to produce than if GM were forced to rely immediately on some other production source;" and (3) "the joint venture offers a valuable opportunity for GM to complete its learning of more efficient Japanese manufacturing and management techniques."   103 F.T.C. 374 (Miller III, J., concurring).   The FTC added "to the extent the [joint] venture demonstrates the Japanese system can be successfully adapted to the United States, the [joint] venture should lead to the development of a more efficient and competitive U.S. industry.   Evidence obtained during the Commission's investigation persuasively establishes that a successful experiment at [NUMMI] could serve as a predicate for other domestic auto makers and their unionized employees to work out similar flexibility in work rules and practices." *Id*.

24.    Thus, under the 1983 MOU, the Shareholders Agreement and the Information Sharing Agreements, both MLC and TMC understood NUMMI to be a "joint venture," "partnership" and "friendship," and they used these terms when discussing NUMMI and its viability.   TMC and MLC had a special relationship with NUMMI that was unlike standard customer-supplier relationships in the automotive industry.   As discussed below, the parties'

course of performance shows that they acted accordingly.

## II.    NUMMI'S BUSINESS AND LABOR RELATIONS

25.    NUMMI was located in its Fremont, California facility, which comprised 5.5 million square feet on approximately 380 acres.  NUMMI's core values were based on five cornerstones:  teamwork, challenge, *kaizen* ("improvement"), respect and *genchi genbutsu* ("go and see" or the principle that in order to understand and improve production processes, one needs to closely observe and study them).

26.    NUMMI invited MLC's former employees from the Fremont plant to apply for positions.  New employees received rigorous training based on TMC's production model.  Many employees traveled to Japan for weeks of classroom and on-the-job training.  Soon, NUMMI conducted this training at its own facility.

27.    In December 1984, the first NUMMI vehicle—a Chevrolet Nova—rolled off of the assembly line.  The Chevrolet Nova was recognized for its quality and compared favorably to TMC's cars manufactured in Japan.  By December 1985, NUMMI was running two shifts at full capacity.  It produced its 500,000th vehicle in 1988, its 1,000,000th vehicle in 1991 and its 2,000,000th vehicle in 1994.

28.    Over the years, NUMMI generated thousands of jobs.  NUMMI was also recognized for its collaborative approach to labor relations.  It signed a unique collective bargaining agreement with the United Automobile Workers ("**UAW**") that emphasized the philosophy of mutual trust and respect.  It contained a number of concepts not found in most labor agreements, including non-confrontational problem-resolution procedures, advance consultation with the UAW on relevant business issues, minimum job classifications that provided work flexibility and a "no strike" provision over safety standards.  At its peak, NUMMI had 5,700 employees.

29.    As of its shut down, NUMMI was the last automobile manufacturer in the western United States.

## III.    NUMMI'S UNIQUE PRODUCTION MODEL

30.    From 1984 to June 2009—when MLC withdrew from NUMMI and rejected its contracts with NUMMI—NUMMI produced nearly two million vehicles for MLC.  MLC, TMC and NUMMI worked to develop a new vehicle model every four to five years.  Then, every two years, NUMMI would implement a set of model upgrades to the existing model.  Through this production cycle, MLC and TMC were able to bring new models to market every other year.  To support the production of MLC's and TMC's vehicles, NUMMI made significant capital expenditures for each production cycle.  These expenditures included separate categories for model-specific machinery and equipment, furniture and fixtures, computer hardware and software, platform tooling and other tooling.

31.    NUMMI produced many award-winning vehicles, including the Toyota Corolla, the Toyota Tacoma truck and the Pontiac Vibe.  Other models included the Geo Prizm (an MLC vehicle) and the Toyota Voltz.

32.    NUMMI received over 50 corporate and quality awards from organizations and agencies including the United States Environmental Protection Agency, the California Integrated Waste Management Board and J.D. Power and Associates.

33.    Just as NUMMI's production process emphasized teamwork, the business mechanism that calibrated NUMMI's production levels and pricing structure was a true collaboration between MLC, TMC and NUMMI.

34.    NUMMI's operations were governed by the Vehicle Supply Agreement (the "**VSA**"), which MLC, TMC and NUMMI signed in 1984 and repeatedly renewed.  The VSA stated that NUMMI was under "the joint-control of" MLC and TMC.  (Ex. F at 1.)  It required

MLC to "purchase [NUMMI-produced vehicles] on a continuous and stable basis." (Ex. F at § 4.1(b).) Specifically, the VSA stated that the parties' intended for MLC to purchase over 200,000 cars per year from NUMMI. (Ex. F at § 4.1(b).) Later, NUMMI began producing vehicles for TMC as well. NUMMI's production levels were consistently above the VSA's 200,000 vehicles-per-year benchmark.

35. To implement the VSA, MLC and NUMMI "agree[d] that their mutual interests c[ould] be served only if orderly procedures are followed, and that a degree of flexibility is necessary in the negotiation of the applicable items to accommodate [MLC]'s marketing and purchasing requirements and [NUMMI]'s interest in endeavoring to manufacture the Products on a volume basis." (Ex. F at § 4.1(c).) Thus, specific orders for NUMMI's vehicles were governed by individual sales contracts (each an "**Individual Sales Contract**"). (Ex. F at § 4.2.) Section 4.2 of the VSA stated that "[NUMMI] has no obligation to supply and [MLC] has no obligation to purchase any Products until the parties enter into [an Individual Sales Contract]." But this section also stated that the "general principles" of Section 4.1 applied: for MLC to purchase NUMMI's vehicles on "a continuous and stable basis." The VSA's broad mandate required MLC to purchase vehicles from NUMMI because it required MLC to place orders through the Individual Sales Contracts on a continuous basis. And that is what MLC did until it walked away from NUMMI.

36. The procedures for entering into an Individual Sales Contract included a "purchase procedures manual pursuant to which specific delivery, packaging and other procedures relating to the supply and purchase of the Products" were set forth (the "**Purchase Procedures Manual**") and the Manual For Allocation Of NUMMI Production (the "**Manual Of Allocation**"). (Exs. G, H.)

37. Together, the Manual Of Allocation and the Purchase Procedures Manual worked as follows:

    a. Each year, NUMMI developed an annual production and allocation plan and notified MLC and TMC. The annual plan contained monthly allocations and the parties would negotiate any requested adjustments or other unresolved issues. A finalized annual plan was then agreed upon and was set forth on a calendar week basis. (Ex. G at § III.A.)

    b. Then, on a bi-monthly or quarterly basis, MLC and TMC met with NUMMI met to revisit the annual production plan. Often all three parties met together (each a "**<u>Three-Party Meeting</u>**"). Through bilateral meetings and Three-Party Meetings, the parties agreed to "a fixed allocation of total production capacity for the third month following the specified month of the meeting." (Ex. G at § III.B(1)). In other words, MLC and TMC set a finalized monthly production level three months in advance so that NUMMI could anticipate MLC's and TMC's needs.

    c. Finally, each week, MLC submitted orders to NUMMI for its vehicles. This step of the process was laid out in the Purchase Procedures Manual. (Ex. H at § III.C.) MLC submitted a "Final Requirement Schedule" to NUMMI every week that set the production level for the following week. (Ex. H at § III.A(1).) Unless NUMMI notified MLC otherwise, the "Final Requirement Schedule" became an Individual Sales Contract for that following week. (Ex. H at § III.A(4).)

    d. Thus, under the VSA (and through the Manual Of Allocation and the

11

Purchase Procedures Manual), MLC and NUMMI formed an Individual

Sales Contract every week.

e.    MLC made daily payments to NUMMI.  The payments were pegged to

NUMMI's deliveries and generally occurred three to four days after a

delivery.  (Ex. H at § III.D(2).)

38.    In addition to setting NUMMI's production levels, the Three-Party Meetings were strategy sessions.  The parties discussed NUMMI's financial results, vehicle specifications, overall productivity, capital projects and labor issues, among other topics.  MLC and TMC often assessed NUMMI's performance, expressed views regarding how NUMMI fit with their respective businesses and made new proposals for NUMMI's product line.  Thus, apart from board meetings, NUMMI's entire business was constantly being monitored and steered by MLC and TMC.  All parties worked together and had a special relationship.

## IV.    THE PONTIAC VIBE PRODUCTION CYCLE

39.    In 2005, MLC, TMC and NUMMI embarked on what would be their final major model upgrade:  the Vibe.  The Vibe was a compact four-door hatchback car marketed under MLC's Pontiac brand.  It first came on the market in 2002 and was generally targeted to younger buyers due, in part, to its "sports utility vehicle"-like features.

40.    At a three party meeting in December 2005 (prior to the 2006 MOU), MLC promised that if NUMMI developed the Vibe, MLC would purchase enough of them to keep NUMMI viable through 2012.  Specifically, MLC represented that it would purchase a total of 325,000 Vibes from 2008 to 2012.  This promise formed the basis for a March 2, 2006 Memorandum Of Understanding (the "**2006 MOU**") that built off of the VSA and continued the NUMMI joint venture.  (Ex. I.)

41.    In the 2006 MOU, the parties agreed on the production of new car models for

2008 through 2012 "to help ensure that all Parties remain viable." (Ex. I.) Consistent with the

1983 MOU, the Shareholders' Agreement and the VSA, the parties repeatedly emphasized their

commitment to NUMMI's continued viability in other provisions of the 2006 MOU:

a.      Section 1(2) provides: "The Parties understand the importance of
realizing annual production volume of 230,000 units of products. Both
TMC and [MLC] will make best efforts to maximize the production
volume during the model life in consideration of maintaining the stability
of operations at NUMMI." (Ex. I.)

b.      Section 2(1) provides: "The Parties recognize the important of adequate
contribution margin to support NUMMI's viability. The Parties agree to
set the weighted average amount of NUMMI's initial contribution margin"
at acceptable levels. (Ex. I.)

c.      Section 7 provides: "The Parties agree that they will annually review all
of the contents described herein to ensure that NUMMI will remain viable
and that the results from NUMMI's operations continue to be acceptable
for TMC and MLC." (Ex. I.)

42.     Under the 2006 MOU, MLC indicated that it would purchase "at least 65,000

Vibes" per year from 2008 to 2012 based on a total production volume of 225,000 units per year.

(Ex. I at § 1(3).) In fact, MLC "desired" to have 72,000 Vibes allocated to MLC for 2008. (Ex.

I at § 1(4).) MLC wanted this increased allocation because "NUMMI represents the single plant

manufacturing Vibes for GMC." (Ex. I at § 1(4).)

43.     While the 2006 MOU stated that MLC had "a right, but not an obligation" to

purchase at least 65,000 Vibes per year based on that production volume, this language refers to

the allocation between MLC and TMC vehicles, and it did not limit MLC's overarching obligations to "help ensure that all Parties remain viable" and "make best effort[s] to maximize the production volume . . . in consideration of maintaining the stability of operations at NUMMI."  (Ex. I at §§ 1(2)-(3).)

44.     The parties also agreed to set the "planned production volume" of the Vibe every year for the upcoming three year period and to establish "a final allocation plan" that "is mutually agreeable to the Parties, consistent with the spirit of the Joint Venture."  (Ex. I at § 5.)

45.     Based on MLC's promises and in anticipation for Vibe production under the 2006 MOU, NUMMI made capital expenditures in excess of $1.6 billion for the latest generation of MLC and TMC vehicles, including the Vibe.  This amount consisted of, among other items, nearly $700 million for machinery and equipment, approximately $200 million for platform tooling and over $30 million for computer hardware and software.  NUMMI had manufactured over one hundred and fifty thousand Vibes for MLC through August 2009, when MLC submitted its final order.

## V.     MLC'S COMMITMENTS TO NUMMI AND MLC'S COURSE OF PERFORMANCE

46.     As a summary of the foregoing, NUMMI's history shows that MLC was committed to NUMMI (that is, before MLC decided to leave the joint venture).  MLC understood that the benefits it would receive from NUMMI extended beyond the vehicles that NUMMI produced from MLC.  MLC knew that the new production and management techniques it would learn from TMC could be applied to other segments of its business and improve its overall operations.

47.     Accordingly, MLC made express and lasting contractual commitments to NUMMI including, without limitation, the following:

a.    ***MLC agreed to keep NUMMI "viable."***  This commitment is reflected in the 1983 MOU, the Shareholders Agreement and the VSA and was expressly enumerated in the 2006 MOU.

b.    ***MLC agreed to purchase vehicles from NUMMI on a "continuous and stable basis."***  The VSA contains this language and this obligation was implemented through the Manual Of Allocation and the Purchase Procedures Manual.  The 2006 MOU reaffirmed this commitment.

c.    ***MLC agreed to share NUMMI's deficit upon termination of the joint venture.***  This commitment was contained in the 1983 MOU (and was not altered by the Shareholders' Agreement and is not inconsistent with the Shareholders' Agreements' other terms).

48.    MLC demonstrated its commitment to NUMMI over the years.  For example, in addition to continuously purchasing vehicles and playing its part in directing NUMMI's production and allocation process, MLC helped develop NUMMI's long-term business plans.  At the Three-Party Meetings, MLC reviewed long-term financial projections for NUMMI, some of which were presented to NUMMI's board of directors.  These four to five year projections were often collaborations based on the parties anticipated production metrics and marketing plans.

49.    Further, MLC made additional capital contributions when NUMMI encountered difficulties.  In 1989, when NUMMI incurred losses well beyond shareholder equity, MLC and TMC each contributed $30 million to NUMMI by amending their Subscription Agreement.  (Ex. J.)  In 1992, NUMMI again needed additional capital and MLC and TMC provided another $25 million each (amending the Subscription Agreement again).  (Ex. K.)

50.    Later, under the 2006 MOU, MLC was proactive in supporting the NUMMI joint

venture. MLC purchased approximately 60,000 Vibes in 2006 and 50,000 Vibes in 2007. Even when MLC asked for pricing adjustments in 2006, MLC promised to maintain a purchase level of at least 47,000 vehicles per year for 2008. In fact, MLC purchased over 70,000 Vibes in 2008. Further, when NUMMI informed MLC and TMC in early 2008 that the Vibe model was losing money for NUMMI, MLC agreed to help close the gap by increasing the "transfer price" it paid for each Vibe by $1,000—a $65 million yearly contribution. That is, consistent with its contractual obligations, and despite its own financial difficulties, MLC agreed to pay $1000 *more* for each vehicle in 2008.

51.     In the end, NUMMI was a successful venture for over 25 years. All parties benefiting from their relationship. Aside from the nearly two million vehicles it received, MLC benefited from the NUMMI partnership by studying NUMMI to improve its own manufacturing efficiency and business culture. At a special meeting in June 2009, MLC's representative summarized its history with NUMMI by referring to the "billions of dollars worth of learnings we had garnered from NUMMI."

## VI.    MLC WITHDRAWS FROM NUMMI

52.     MLC engaged in restructuring efforts during 2008 and 2009.

53.     As MLC continued with its restructuring in the spring of 2009, it reaffirmed its commitment to NUMMI even though it said it was considering cancelling the Pontiac brand.

54.     On April 27, 2009, MLC announced that it was discontinuing Pontiac. Around this time, MLC confirmed that it was still committed to NUMMI's viability and production stability. MLC stated that it would explore alternatives to the Vibe for NUMMI to produce.

55.     MLC reaffirmed its commitment to NUMMI in subsequent letters to TMC. MLC did not state that it would stop purchasing the Vibe or a rebadged version.

56.     NUMMI engaged in good faith discussions with MLC about re-branding the Vibe

16

to another MLC brand.  NUMMI and MLC likely could have reached a beneficial agreement on a substitute for the Vibe that would have met MLC's needs and kept NUMMI in business.

57.    Yet on May 21, 2009, MLC stated that it would not continue to explore possibilities for NUMMI to continue to produce the Vibe or a similar product.  Instead, MLC proposed that NUMMI manufacture a version of the Toyota Tacoma—an award-winning light truck that NUMMI had been building for TMC since 1995—for MLC.  MLC made agreeing on a MLC version of the Tacoma a precondition to NUMMI's continued existence.

58.    On June 4, 2009, as the parties discussed MLC's Tacoma proposal, MLC informed TMC and NUMMI that it would discontinue Vibe purchases in August 2010.  On June 12, MLC moved that date up to August 2009.  MLC also set a June 25 deadline for a decision on the MLC Tacoma.

59.    NUMMI informed MLC that, regardless of the Tacoma project, it was unlikely to remain viable without Vibe production.  NUMMI was prepared to continue Vibe production and meet all of its other obligations to MLC and TMC.

60.    On June 26, 2009, MLC announced that it would withdraw from NUMMI. NUMMI produced its last Vibe in the beginning of August and MLC's board appointees resigned on August 12, 2009.

61.    MLC has not participated in NUMMI's operations, purchased any NUMMI vehicles or provided it with funding since August 2009.  MLC's decision to withdraw from the NUMMI joint venture was an economic decision that was not beyond its own control.

62.    NUMMI has not recouped over $185 million in capital outlays under the 2006 MOU related to the Vibe.

## VII.    NUMMI'S WIND DOWN

63.    MLC's decision to exit NUMMI ended its collaborative management structure and its information-sharing purpose.

64.    Two weeks after MLC's board members resigned from NUMMI, TMC announced that it would stop NUMMI's production of TMC vehicles in March 2010.

65.    NUMMI produced its last automobile on April 1, 2010.  Over 4,500 employees have lost or will lose their jobs.  NUMMI is currently working to ensure that its pension program is funded.  NUMMI also potentially faces considerable claims from third party suppliers and other vendors.

66.    MLC's allocated portion of NUMMI's total wind down deficit may exceed $180 million.  Significant drivers of the total potential wind down costs include funding workers' compensation claims, defined pension plan funds, land and building clean up, post-production operational wind down costs and potential product liability claims.

67.    TMC is participating in NUMMI's wind down.  A TMC appointees remains on NUMMI's board, its representatives are assisting in the NUMMI plant closure and it is providing financial assistance to NUMMI for the wind down.

68.    On November 24, 2009, NUMMI filed a timely Proof of Claim (No. 67357) against MLC for the contractual and other damages alleged herein.  (Ex. L.)  The Proof of Claim sought damages in the amount of $500 million and reserved NUMMI's right to amend, modify or supplement its claims.

69.    On November 9, 2010, the Court held a hearing regarding the objection to NUMMI's Proof of Claim filed by MLC.  At the hearing, the Court proposed and the parties agreed to treat the claims raised in TMC's separately-filed Proofs of Claims and NUMMI's Proof of Claim as a plenary litigation subject to Federal Rule of Bankruptcy Procedure 9014 and

Federal Rules of Civil Procedure 8 and 12.  NUMMI files this Complaint pursuant to Court's request and the parties' Joint Stipulation and [Proposed] Scheduling Order, filed on November 24, 2010 (Docket No. 7913).

## CAUSES OF ACTION

### OVERVIEW

70.     NUMMI's causes of action are based on four separate contractual obligations and, in the alternative, promises that MLC made to NUMMI.

71.     *First*, NUMMI asserts claims based on MLC's contractual obligations under the 1983 MOU, the Shareholders' Agreement and the 2006 MOU to keep NUMMI *viable*.

72.     *Second*, NUMMI asserts claims based on MLC's contractual obligation under the VSA and the 2006 MOU to purchase vehicles on a ***continuous and stable basis***, including the obligation to purchase Vibes through 2012.

73.     *Third*, NUMMI asserts claims based on MLC's contractual obligation under the 1983 MOU to share NUMMI's ***"deficit"*** at termination.

74.     *Fourth*, NUMMI asserts a claim based on ***the implied covenant of good faith and fair dealing*** inherent in all of the above-referenced agreements arising from MLC's refusal to negotiate in good faith to find an alternative for Vibe production at NUMMI.

75.     *Fifth*, as an alternative basis for relief, NUMMI asserts a promissory estoppel claim based on MLC's promises to purchase Vibes from NUMMI through 2012.

**FIRST SET OF OBLIGATIONS: "VIABILITY"**

**COUNT 1:     BREACH OF CONTRACT (1983 MOU AND SHAREHOLDERS' AGREEMENT § 3.1(b))**

76.     NUMMI hereby incorporates by reference each of the paragraphs above, as though fully set forth herein.

77.     The 1983 MOU was a validly executed contract in which MLC promised to keep NUMMI viable by "assist[ing] [NUMMI] in increasing its production to the maximum extent possible . . . ."  (Ex. A at 3.)

78.     The Shareholders' Agreement was a validly executed contract in which MLC promised to keep NUMMI viable by "assist[ing] [NUMMI] in increasing its production to the maximum extent possible . . . ."  (Ex. B at § 3.1.(b).)

79.     NUMMI is entitled to enforce the 1983 MOU and the Shareholders' Agreement as a third party beneficiary of those contracts.  As the basis for NUMMI's existence, those agreements were entered into with the intent to benefit NUMMI.

80.     NUMMI performed its obligations under its contracts with MLC by, among other things, maintaining agreed-upon production levels at its facility and delivering the vehicles that MLC ordered in a timely manner.  NUMMI ceased producing vehicles for MLC only because MLC breached its agreements with NUMMI and TMC and ended the joint venture.

81.     MLC's decision to withdraw from the NUMMI venture breached its contractual duty to assist NUMMI in maximizing its production under both the 1983 MOU and the Shareholders' Agreement.

82.     MLC's breach of its obligations to assist NUMMI in maximizing its production has caused damages to NUMMI because it forced NUMMI to wind down.  After MLC withdrew from NUMMI, the purpose of the joint venture was defeated.  In reliance on MLC's commitment

20

in the 1983 MOU and the Shareholders' Agreement to assist in maximizing production, NUMMI expended hundreds of millions of dollars in capital expenditures for Pontiac Vibe production. Had MLC fulfilled its contractual obligations, NUMMI would have recovered these costs.

83.    NUMMI's damages include (i) its uncovered capital expenditures relating to the 2008-2012 Vibe production cycle in an amount approximating $185 million or an amount to be proven at trial and (ii) MLC's share of NUMMI's deficit during wind down, which is estimated to be in excess of $180 million or an amount to be proven at trial.

**COUNT 2:    BREACH OF CONTRACT (2006 MOU § 1(2))**

84.    NUMMI hereby incorporates by reference each of the paragraphs above, as though fully set forth herein.

85.    The 2006 MOU was a validly executed contract in which MLC promised to keep NUMMI viable by "mak[ing] best efforts to maximize the production volume during the model life in consideration of maintaining the stability of operations at NUMMI."  (Ex. I at § 1(2).)

86.    NUMMI performed its obligations under its contracts with MLC by, among other things, maintaining agreed-upon production levels at its facility and delivering the vehicles that MLC ordered in a timely manner.  NUMMI ceased producing vehicles for MLC only because MLC breached its agreements with NUMMI and TMC and ended the joint venture.

87.    MLC's decision to withdraw from the NUMMI venture breached its contractual duty to "maximize the production volume during the model life" for the Vibe under the 2006 MOU.

88.    MLC's breach of its obligation to assist NUMMI in maximizing its production volume during the model life of the Vibe has caused damages to NUMMI because it forced NUMMI to wind down.  After MLC withdrew from NUMMI, the purpose of the joint venture was defeated.  In reliance on MLC's commitment in the 2006 MOU to assist in maximizing

21

production volume during the model life of the Vibe, NUMMI expended hundreds of millions of dollars in capital expenditures for Pontiac Vibe production.  Had MLC fulfilled its contractual obligations, NUMMI would have recovered these costs.

89.    NUMMI's damages include (i) its uncovered capital expenditures relating to the 2008-2012 Vibe production cycle in an amount approximating $185 million or an amount to be proven at trial and (ii) MLC's share of NUMMI's deficit during wind down, which is estimated to be in excess of $180 million or an amount to be proven at trial.

**COUNT 3:    BREACH OF CONTRACT (2006 MOU § 7)**

90.    NUMMI hereby incorporates by reference each of the paragraphs above, as though fully set forth herein.

91.    The 2006 MOU was a validly executed contract in which MLC promised to "review all the contents described herein to ensure that NUMMI will remain viable . . . ."  (Ex. I at § 7.)

92.    NUMMI performed its obligations under its contracts with MLC by, among other things, maintaining agreed-upon production levels at its facility and delivering the vehicles that MLC ordered in a timely manner.  NUMMI ceased producing vehicles for MLC only because MLC breached its agreements with NUMMI and TMC and ended the joint venture.

93.    MLC's decision to withdraw from the NUMMI venture breached its contractual duty to "ensure that NUMMI will remain viable" under the 2006 MOU.

94.    MLC's breach of its obligation to ensure that NUMMI remained viable has caused damages to NUMMI because it forced NUMMI to wind down.  After MLC withdrew from NUMMI, the purpose of the joint venture was defeated.  In reliance on MLC's commitment in the 2006 MOU to ensure that NUMMI remained viable, NUMMI expended hundreds of millions of dollars in capital expenditures for Pontiac Vibe production.  Had MLC fulfilled its

22

contractual obligations, NUMMI would have recovered these costs.

95.     NUMMI's damages include (i) its uncovered capital expenditures relating to the 2008-2012 Vibe production cycle in an amount approximating $185 million or an amount to be proven at trial and (ii) MLC's share of NUMMI's deficit during wind down, which is estimated to be in excess of $180 million or an amount to be proven at trial.

### SECOND SET OF OBLIGATIONS: "CONTINUOUS AND STABLE PURCHASES"
### COUNT 4:     BREACH OF CONTRACT (VSA § 4.1)

96.     NUMMI hereby incorporates by reference each of the paragraphs above, as though fully set forth herein.

97.     The VSA is a validly executed contract in which MLC promised to purchase vehicles from NUMMI on a "continuous and stable basis."  (Ex. F at § 4.1.)

98.     NUMMI performed its obligations under its contracts with MLC by, among other things, maintaining agreed-upon production levels at its facility and delivering the vehicles that MLC ordered in a timely manner.  NUMMI ceased producing vehicles for MLC only because MLC breached its agreements with NUMMI and TMC and ended the joint venture.

99.     MLC's decision to stop purchasing vehicles from NUMMI breached its contractual duty to purchase NUMMI's vehicles on a continuous and stable basis under the VSA.

100.    MLC's breach of its agreement to purchase vehicles from NUMMI on a continuous and stable basis has caused damages to NUMMI because it forced NUMMI to wind down.  After MLC stopped purchasing vehicles from NUMMI, the purpose of the joint venture was defeated.  In reliance on MLC's commitment in the VSA to purchase NUMMI vehicles on a continuous and stable basis, NUMMI expended hundreds of millions of dollars in capital expenditures for Pontiac Vibe production.  Had MLC fulfilled its contractual obligations,

NUMMI would have recovered these costs.

101.    NUMMI's damages include its uncovered capital expenditures relating to the 2008-2012 Vibe production cycle in an amount approximating $185 million or an amount to be proven at trial.

**COUNT 5:    BREACH OF CONTRACT (2006 MOU § 1(3))**

102.    NUMMI hereby incorporates by reference each of the paragraphs above, as though fully set forth herein.

103.    The 2006 MOU is a validly executed contract in which MLC promised to purchase Vibes from NUMMI from 2008 to 2012.  (Ex. I at § 1(3).)

104.    NUMMI performed its obligations under its contracts with MLC by, among other things, maintaining agreed-upon production levels at its facility and delivering the vehicles that MLC ordered in a timely manner.  NUMMI ceased producing vehicles for MLC only because MLC breached its agreements with NUMMI and TMC and ended the joint venture.

105.    MLC's decision to stop purchasing Vibes from NUMMI breached its contractual duty under the 2006 MOU to purchase Vibes from NUMMI through 2012.

106.    MLC's breach of its agreement to purchase Vibes from NUMMI through 2006 has caused damages to NUMMI because it forced NUMMI to wind down.  After MLC stopped purchasing vehicles from NUMMI, the purpose of the joint venture was defeated.  In reliance on MLC's commitment in the 2006 MOU to purchase Vibes from 2008 to 2012, NUMMI expended hundreds of millions of dollars in capital expenditures for Pontiac Vibe production.  Had MLC fulfilled its contractual obligations, NUMMI would have recovered these costs.

107.    NUMMI's damages include (i) its uncovered capital expenditures relating to the 2008-2012 Vibe production cycle in an amount approximating $185 million or an amount to be proven at trial and (ii) MLC's share of NUMMI's deficit during wind down, which is estimated

to be in excess of $180 million or an amount to be proven at trial.

## THIRD OBLIGATION:  "DEFICIT AT TERMINATION"

**COUNT 6:      BREACH OF CONTRACT (1983 MOU)**

108.    NUMMI hereby incorporates by reference each of the paragraphs above, as though fully set forth herein.

109.    The 1983 MOU was a validly executed contract in which MLC promised to share NUMMI's deficit equally with TMC at NUMMI's termination.  (Ex. A at 10.)

110.    NUMMI is entitled to enforce the 1983 MOU as a third party beneficiary of that contract.  As the basis for NUMMI's existence, this agreement was entered into with the intent to benefit NUMMI.

111.    NUMMI performed any obligations it had under the 1983 MOU by maintaining agreed-upon production levels at its facility and delivering the vehicles that MLC ordered in a timely manner.  NUMMI ceased producing vehicles for MLC only because MLC breached its agreements with NUMMI and TMC and ended the joint venture.

112.    MLC has breached its contractual duty to contribute equally with TMC to NUMMI's deficit at termination by refusing to contribute anything to NUMMI's wind down.

113.    MLC's breach of its agreement to be responsible for NUMMI's deficit during its wind down has caused damages to NUMMI in the amount of MLC's share of NUMMI's deficit during wind down, which is estimated to be in excess of $180 million or an amount to be proven at trial.

## FOURTH OBLIGATION:  GOOD FAITH AND FAIR DEALING

**COUNT 7:    BREACH OF CONTRACT (IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING)**

114.    NUMMI hereby incorporates by reference each of the paragraphs above, as though fully set forth herein.

115.    The 1983 MOU, the Shareholders Agreement, the VSA and the 2006 MOU are validly executed contracts that each include the implied covenant of good faith and fair dealing.

116.    NUMMI is entitled to enforce the 1983 MOU and the Shareholders Agreement as a third party beneficiary of those contracts.   As the basis for NUMMI's existence, those agreements were entered into with the intent to benefit NUMMI.

117.    NUMMI performed its obligations under its contracts with MLC by, among other things, maintaining agreed-upon production levels at its facility and delivering the vehicles that MLC ordered in a timely manner.   NUMMI ceased producing vehicles for MLC only because MLC breached its agreements with NUMMI and TMC and ended the joint venture.   NUMMI also negotiated in good faith with MLC and TMC regarding alternatives models or re-branded models to continue production at NUMMI to benefit all parties.

118.    MLC's decision to withdraw from the NUMMI venture breached the covenant of good faith and fair dealing inherent in the agreements between the parties because MLC refused to negotiate in good faith for a vehicle for NUMMI to produce as a replacement to the Vibe, because MLC did not properly evaluate the other options available to the parties and because MLC otherwise refused to continue as a partner in NUMMI.   Rather than negotiate in good faith to find an acceptable arrangement for the parties that would have continued the NUMMI joint venture, MLC attempted to extract and agreement from NUMMI to produce a light-truck model at an unworkable price.

119.    MLC's breach of the covenant of good faith and fair dealing has caused damages to NUMMI because it forced NUMMI to wind down.  After MLC withdrew from NUMMI, the purpose of the joint venture was defeated.  In reliance on MLC's commitment in all of the contracts discussed above to continue the joint venture in good faith, NUMMI expended hundreds of millions of dollars in capital expenditures for Pontiac Vibe production.  Had MLC fulfilled its contractual obligations, NUMMI would have recovered these costs.

120.    NUMMI's damages include (i) its uncovered capital expenditures relating to the 2008-2012 Vibe production cycle in an amount approximating $185 million or an amount to be proven at trial and (ii) MLC's share of its wind down costs, which are estimated to be in excess of $180 million or and amount to be proven at trial.

## PROMISSORY ESTOPPEL

**COUNT 8:    PROMISSORY ESTOPPEL**

121.    NUMMI hereby incorporates by reference each of the paragraphs above, as though fully set forth herein.

122.    NUMMI asserts this promissory estoppel count as an alternative basis for relief from its breach of contract claims.

123.    In 2005, MLC promised to purchase NUMMI's a new Vibe vehicle from NUMMI at high enough levels to sustain NUMMI through 2012.  MLC renewed this promise in 2006, 2007 and 2008.

124.    NUMMI relied on MLC's promises by investing over $1.6 billion to upgrade its plant and develop the Vibe.  NUMMI's conduct was reasonable given the parties long history of developing new vehicle models—NUMMI had always recouped its capital expenditures for new vehicle development in the past.  NUMMI's conduct was foreseeable because MLC knew that

NUMMI could not develop the new Vibe without making the capital expenditures.

125.    NUMMI was harmed by its reliance on MLC's promise to purchase Vibes at substantial levels from 2008 to 2012 because MLC stopped purchasing Vibes in 2009 and, as a result, NUMMI has not recovered its capital expenditures for the Vibe project.  Had MLC fulfilled its promises to NUMMI, NUMMI would have recovered these costs.

126.    NUMMI has suffered damages equalling its uncovered capital expenditures relating to the 2008-2012 Vibe production cycle in an amount exceeding $185 million or an amount to be proven at trial.

## REQUEST FOR RELIEF

WHEREFORE, New United Motors Manufacturing, Inc. demands judgment against Motors Liquidation Corporation as follows:

A.    As to Count One, a judgment in an amount in excess of $365 million, plus interest and costs;

B.    As to Count Two, a judgment in an amount in excess of $365 million, plus interest and costs;

C.    As to Count Three, a judgment in an amount in excess of $365 million, plus interest and costs;

D.    As to Count Four, a judgment in an amount in excess of $185 million, plus interest and costs;

E.    As to Count Five, a judgment in an amount in excess of $365 million, plus interest and costs;

F.    As to Count Six, a judgment in an amount in excess of $180 million, plus interest and costs;

G.      As to Count Seven, a judgment in an amount in excess of $365 million, plus

interest and costs; and

H.      As to Count Eight, a judgment in an amount in excess of $185 million, plus

interest and costs;

I.      As to all Counts, a total judgment not to exceed $500 million without further

amendment or modification of this Complaint; and

J.      Such other and further relief as the Court deems just and proper.


New York, New York.
Dated:  November 24, 2010                    KIRKLAND & ELLIS LLP


                                             By:  _____*/s/ Mark E. McKane*_____
                                                    Richard M. Cieri
                                                    Ray C. Schrock (admitted *pro hac vice*)
                                                    Mark E. McKane (admitted *pro hac vice*)


                                             *Attorneys for*
                                             *NEW UNITED MOTOR MANUFACTURING, INC.*