Page 1

1

2  UNITED STATES BANKRUPTCY COURT

3  SOUTHERN DISTRICT OF NEW YORK

4  Case No. 09-50026(REG)

5  - - - - - - - - - - - - - - - - - - - - -x

6  In the Matter of:

7

8  MOTORS LIQUIDATION COMPANY, et al.

9        f/k/a General Motors Corporation, et al.,

10

11        Debtors.

12

13  - - - - - - - - - - - - - - - - - - - - -x

14

15            United States Bankruptcy Court

16            One Bowling Green

17            New York, New York

18

19            November 22, 2010

20            9:51 AM

21

22

23  B E F O R E:

24  HON. ROBERT E. GERBER

25  U.S. BANKRUPTCY JUDGE

1

2    HEARING re Debtors' Motion for an Order (i)Approving Notice of

3    Disclosure Statement Hearing; (ii)Approving Disclosure

4    Statement; (iii)Establishing a Record Date; (iv)Establishing

5    Notice and Objection Procedures for Confirmation of the Plan;

6    (v)Approving Solicitation Packages; and Procedures for

7    Distribution Thereof; (vi)Approving the Forms of Ballots and

8    Establishing Procedures for Voting on the Plan; and

9    (vii)Approving the Form of Notices to Non-Voting Classes Under

10   the Plan

11

12   HEARING re Order Pursuant to Bankruptcy Rule 2004 Authorizing

13   the Official Committee of Unsecured Creditors of Motors

14   Liquidation Company to Obtain Discovery from (i)the Claims

15   Processing Facilities for Certain Trusts Created Pursuant to 11

16   U.S.C. § 524(g); (ii)the Trusts; and (iii)General Motors, LLC

17   and the Debtors

18

19

20

21

22

23

24

25   Transcribed by:  Lisa Bar-Leib

Page 3

1

2    A P P E A R A N C E S :

3    WEIL GOTSHAL & MANGES LLP

4         Attorneys for the Debtors and Debtors-in-Possession

5         767 Fifth Avenue

6         New York, NY 10153

7

8    BY:  STEPHEN KAROTKIN, ESQ.

9

10   KRAMER LEVIN NAFTALIS & FRANKEL LLP

11        Attorneys for the Official Committee of Unsecured

12         Creditors

13        1177 Avenue of the Americas

14        New York, NY 10036

15

16   BY:  THOMAS MOERS MAYER, ESQ.

17        PHILIP BENTLEY, ESQ.

18        DAVID E. BLABEY, JR., ESQ.

19        JENNIFER SHARRET, ESQ. (TELEPHONICALLY)

20

21

22

23

24

25

```
                                                    Page 4

 1

 2     CAPLIN & DRYSDALE

 3          Attorneys for Official Committee of Unsecured Creditors

 4           Holding Asbestos-Related Claims

 5          One Thomas Circle, NW

 6          Suite 1100

 7          Washington, DC 20005

 8

 9     BY:  TREVOR W. SWETT, ESQ.

10

11     U.S. DEPARTMENT OF JUSTICE

12          United States Attorney's Office

13          Southern District of New York

14          86 Chambers Street

15          New York, NY 10007

16

17     BY:  DAVID S. JONES, DEPUTY CHIEF, CIVIL DIVISION

18

19     AKIN GUMP STRAUSS HAUER & FELD LLP

20          Attorneys for Claimant Green Hunt Wedlake, Inc. as

21           Trustee of General Motors Nova Scotia Finance Company

22          One Bryant Park

23          New York, NY 10036

24

25     BY:  NATALIE E. LEVINE, ESQ.
```

Page 5

```
 1

 2    FRIEDMAN KAPLAN SEILER & ADELMAN LLP

 3         Attorneys for Manville Personal Injury Settlement Trust

 4          and Claims Resolution Management Corporation

 5         1633 Broadway

 6         New York, NY 10019

 7

 8    BY:  EMILY A. STUBBS, ESQ.

 9

10    GREENBERG TRAURIG, LLP

11         Attorneys for Certain Noteholders of General Motors Nova

12          Scotia Finance Company

13         MetLife Building

14         200 Park Avenue

15         New York, NY 10166

16

17    BY:  JOHN H. BAE, ESQ.

18

19

20

21

22

23

24

25
```

Page 6

1

2    MORVILLO, ABRAMOWITZ, GRAND, IASON, ANELLO & BOHRER, P.C.

3         Attorneys for Armstrong World Industries, Inc. Asbestos

4          Personal Injury Settlement Trust, the Babcock & Wilcox

5          Company Asbestos Personal Injury Settlement Trust, the

6          Owens Corning/Fibreboard Asbestos Personal Injury Trust,

7          the DII Industries, LLC Asbestos PI Trust, the United

8          States Gypsum Asbestos Personal Injury Settlement Trust,

9          and the Delaware Claims Processing Facility

10        565 Fifth Avenue

11        New York, NY 10017

12

13    BY:  STEPHEN M. JURIS, ESQ.

14

15    SIMMONS, BROWDER, GIANARIS, ANGELIDES & BARNERD LLC

16        Attorneys for Objecting Mesothelioma Victims

17        707 Berkshire Boulevard

18        East Alton, IL 62024

19

20    BY:  ROBERT W. PHILLIPS, ESQ.

21

22

23

24

25

Page 7

1

2   SIMON EDDINS & GREENSTONE LLP

3        Attorneys for Objecting Mesothelioma Victims

4        3232 McKinney Avenue

5        Suite 610

6        Dallas, TX 75204

7

8   BY:  JEFFREY B. SIMON, ESQ.

9

10   STUTZMAN, BROMBERG, ESSERMAN & PLIFKA, P.C.

11        Attorneys for Future Claims Representative

12        2323 Bryan Street

13        Suite 2200

14        Dallas, TX 75201

15

16   BY:  SANDER L. ESSERMAN, ESQ.

17

18   CALIFORNIA DEPARTMENT OF JUSTICE

19        For the State of California

20        300 South Spring Street

21        Suite 1702

22        Los Angeles, CA 90013

23

24   BY:  OLIVIA W. KARLIN, DAG

25        (TELEPHONICALLY)

Page 8

1

2    CAMPBELL & LEVINE

3        Attorneys for Delaware Claims Processing Facility

4        800 North King Street

5        Suite 300

6        Wilmington, DE 19801

7

8    BY:  MARLA R. ESKIN, ESQ.

9        (TELEPHONICALLY)

10

11    CUYLER BURK, P.C.

12        Attorneys for Creditor, All State Insurance Company

13        Parsippany Corporate Center

14        Third Floor

15        Four Century Drive

16        Parsippany, NJ 07054

17

18    BY:  ANDREW K. CRAIG, ESQ.

19        (TELEPHONICALLY)

20

21

22

23

24

25

Page 9

1

2    KEATING MUETHING & KLEKAMP PLL

3        Attorneys for Delaware Claims Processing Facility

4        One East Fourth Street

5        Suite 1400

6        Cincinnati OH 45202

7

8    BY:  JENNIFER J. MORALES, ESQ.

9        (TELEPHONICALLY)

10

11   NEW YORK STATE DEPARTMENT OF LAW

12       Environmental Protection Bureau

13       The Capitol

14       Albany, NY 12224

15

16   BY:  MAUREEN F. LEARY, AAG

17       (TELEPHONICALLY)

18

19

20

21

22

23

24

25

Page 10

1

2    ROPERS, MAJESKI, KOHN & BENTLEY

3        Attorneys for Creditor, Remy International, Inc.

4        201 Spear Street

5        Suite 1000

6        San Francisco, CA 94105

7

8    BY:  N. KATHLEEN STRICKLAND, ESQ.

9        (TELEPHONICALLY)

10

11   YOUNG CONAWAY STARGATT & TAYLOR LLP

12       Attorneys for Delaware Claims Processing Facility

13       The Brandywine Building

14       1000 West Street

15       17th Floor

16       Wilmington, DE 19801

17

18   BY:  JENNIFER R. NOEL, ESQ.

19       (TELEPHONICALLY)

20

21

22

23

24

25

Page 11

1

2    ZAMLER, MELLEN & SHIFFMAN, P.C.

3         Attorneys for Certain Asbestos Claimants

4         23077 Greenfield Road

5         Suite 557

6         Southfield, MI 48075

7

8    BY:  MARGARET H. JENSEN, ESQ.

9         (TELEPHONICALLY)

10

11

12    ANDREW ANDERSON, IN PROPRIA PERSONA

13         (TELEPHONICALLY)

14

15

16

17

18

19

20

21

22

23

24

25

MOTORS LIQUIDATION COMPANY, et al.

Page 12

1              P R O C E E D I N G S

2         THE COURT:  Okay.  GM.  Motors Liquidation.  We have

3    a couple of matters on the calendar for today.  Mr. Karotkin,

4    you want to take the lead and give me an update on where we are

5    and what we need to do?

6         MR. KAROTKIN:  Good morning, Your Honor.  Stephen

7    Karotkin, Weil Gotshal & Manges, for the debtors.  There are, I

8    think, only two matters on the calendar today.  One is the

9    adjourned hearing on the disclosure statement and the other

10   relates to the 2004 examinations requested by the unsecured

11   creditors' committee.

12        With respect to the disclosure statement, I think I

13   can be fairly brief.  I think we are well on the way to

14   resolving all of the issues and getting an amended disclosure

15   statement out for review.  There are, however, two fairly

16   significant open issues that the parties are discussing at

17   length.  And that relates to the -- primarily to the budgets

18   for the various trusts to be created under the plan.  And the

19   unsecured creditors' committee, the Treasury and ourselves have

20   been involved in those discussions.  And at least I am hopeful

21   that in the next week or so, we can reach a consensus, but

22   that's not necessarily guaranteed.

23        My suggestion, Your Honor, subject, of course, to

24   your schedule is that we further adjourn the hearing to -- I

25   think you have a date with us on the 2nd, if you could

MOTORS LIQUIDATION COMPANY, et al.

Page 13

1    accommodate us then.  It is my hope, and maybe I'm being

2    optimistic, that we can be finished by then.

3        (Pause)

4             THE COURT:  Okay.  That's Thursday the 2nd?

5             MR. KAROTKIN:  Yes, sir.  I guess at 9:45?

6             THE COURT:  All right.  We'll add it to the list.

7    Yep.

8             MR. KAROTKIN:  9:45?

9             THE COURT:  Um-hmm.  Mr. Jones?

10            MR. JONES:  Your Honor, thank you.  David Jones from

11   the U.S. Attorney's Office.  This is a matter of importance to

12   us so I'll just speak briefly, if I may, although the requested

13   scheduling change --

14            THE COURT:  Can I ask you to come to the main lectern

15   and replace Mr. Karotkin, please?

16            MR. JONES:  Yes, Your Honor.  Thank you.  Sorry, Your

17   Honor.  Again, David Jones from the U.S. Attorney's Office.  We

18   do consent to and agree that this request at extension makes

19   sense.  We very much hope that all matters can be resolved and

20   the disclosure statement can be approved as of that date.

21   Treasury has been talking and had a constructive conversation

22   with the committee, particularly last Friday, and received

23   additional information that we had long been seeking last night

24   to sort of corroborate and provide a firmed-up estimate of

25   hours to be spent by professionals in the post-effective date

MOTORS LIQUIDATION COMPANY, et al.

Page 14

1    period.  We are working very hard to be able to reach agreement

2    on something the Treasury agrees is reasonable.  And I won't go

3    into details of the discussions at all.  But the main thing I

4    want to rise to say is that we've been a bit frustrated at the

5    pace of progress lately which has been too slow but we think

6    we're in a position to push.  And we hope that all parties will

7    join us in making a concerted effort so that we can get final

8    approval next Thursday.

9              THE COURT:  Okay.  Mr. Mayer?

10             MR. MAYER:  The committee also has no objection to

11   moving the hearing -- the status conference to December 2.  We

12   have our own frustrations.  Your Honor, I think, without

13   getting into details, we have differences with Treasury on a

14   number of different items.  And as -- we are hopeful that if we

15   cannot compromise on principles, we will at least compromise on

16   numbers and that will avoid us having to come to this Court for

17   decisions on principles.  But if we can't reach agreement on

18   December 2 or shortly thereafter, if it doesn't look like it's

19   going to happen, I anticipate at some point in the near future,

20   we will ask Your Honor for some court time in January to deal

21   with the issues of principle that divide the parties.  And

22   that's all I wanted to say.

23             THE COURT:  All right.  I see no useful purpose in

24   saying anything more than that.  Why don't you guys redouble

25   your efforts to put these issues to bed.  I have a memory that

MOTORS LIQUIDATION COMPANY, et al.

Page 15

1    we had actually talked about getting this plan confirmed or at

2    least the disclosure statement approved back in April or

3    something like that.  The difficulties you all are reaching or

4    disclosing to me, some of which were mentioned, some of

5    which -- can I have quiet on the phone, please -- some of which

6    haven't yet been addressed but I'm going to hear later this

7    morning are a source of some frustration to me.

8           What's our next matter?  Asbestos?

9           MR. MAYER:  Your Honor, may those of us who were here

10   just for the disclosure statement be excused?

11          THE COURT:  Sure.

12          MR. MAYER:  Thank you.

13          MR. KAROTKIN:  Yes, Your Honor.  I think it's the

14   committee's 2004 examination and the objections raised by, I

15   believe, the attorneys for the various claimants.

16          THE COURT:  All right.  Then I'll hear brief argument

17   on those.  I'm going to need pretty compelling reason to divert

18   from my earlier rulings on the subject.  They are not res

19   judicata or collateral estoppel but there sure as heck stare

20   decisis.  And at the risk of stating the obvious, just as I

21   believe in following the opinions of my brother and sister

22   judges in this district, my brother and sister bankruptcy

23   judges, I follow my own rulings.  I'll hear from anybody who

24   wants to raise any different concerns or can convince me very

25   briefly how I blew it last time.

MOTORS LIQUIDATION COMPANY, et al.

Page 16

1        (Pause)

2            THE COURT:  I think it's the last two times to be

3    more exact.  Go ahead.

4            MR. SIMON:  Thank you, Your Honor.  My name is

5    Jeffrey Simon.  I'm with the law firm of Simon Eddins and

6    Greenstone.  We represent several claimants that the UCC has

7    sought to subpoena submissions to bankrupt trust facilities.

8    I'm here on their behalf as well as present and future

9    mesothelioma clients of ours who I would like to show the Court

10   would be substantially and irreparably harmed by disclosure of

11   the trust information to Bates White in particular.

12           In my review --

13           THE COURT:  Pause, please, Mr. Simon.  I understand

14   how you can speak for present clients.  How are you speaking

15   for future clients?

16           MR. SIMON:  Because the information that I believe

17   will be used to negatively affect my clients in the tort system

18   will be used by Bates White through its dual identity of

19   Litigation Resolution Group both now and in the future.  It's

20   simply -- that's simply the point I'm trying to make.  It's a

21   problem that will continue rather than simply be --

22           THE COURT:  Do you represent them now or don't you?

23           MR. SIMON:  I don't -- I don't actively represent

24   future clients, of course.

25           THE COURT:  But why do you say "actively"?

09-50026-mg    Doc 7966    Filed 11/23/10    Entered 12/02/10 09:27:42    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 17 of 88

Page 17

 1              MR. SIMON:  I anti --

 2              THE COURT:  I need straight answers from you, Mr.

 3      Simon.  I understand you may be appearing before me for the

 4      first time but this is at least the third, perhaps the fourth,

 5      hearing I've had.  And if you haven't appeared before me

 6      before, you can explain away bad facts but I need you to be

 7      precise and not cute when you're describing the facts.  Once we

 8      have the facts under our belts then we'll argue about what's

 9      appropriate policy.  But first, I'm told, that you don't

10      actually represent them.  And then there was another

11      qualification.  I need statements that I can rely upon without

12      trying to ascertain what you're leaving out between the lines.

13      Do I make myself clear?

14              MR. SIMON:  Yes, Your Honor.

15              THE COURT:  Then continue, please.

16              MR. SIMON:  I represent mesothelioma clients today

17      some of whom have filed claims against GM, some of whom

18      haven't.  What I contend is that the information from the

19      trust, if disclosed to Bates White in the manner that I

20      understand it is to be disclosed, will negatively affect my

21      clients who have mesothelioma who are currently in the tort

22      system.  The reason that I contend that is that, from my review

23      of the record, I don't believe that anyone adequately disclosed

24      to Your Honor the depth of the real conflict of interest of

25      Bates White, that Bates White seeks to be an active defendant

MOTORS LIQUIDATION COMPANY, et al.

Page 18

1    in the tort system through its other identity in the

2    litigation, Litigation Resolution Group.  A principal of both

3    Bates White and Litigation Resolution Group is Dr. Charles

4    Mullin.  What Dr. Charles Mullin advertises on the web is that

5    they have expertise in not only estimating the liabilities of

6    solvent tort defendants but providing a mechanism wherein they

7    provide those defendants with financial certainty by acquiring

8    those liabilities and handling the defense of asbestos cases

9    for them.

10           Dr. Mullin testified in the Leslie Controls

11   bankruptcy proceedings how the kinds of information that is

12   contained in the trusts would benefit him in his cause of

13   assisting defendants in the tort system, specifically, that one

14   of the features of information in trust information is where

15   certain products were used; specifically, products which were

16   manufactured or sold by entities now in bankruptcy.  And that

17   with that information, he would have a resource to go to

18   defendants and say, I am aware of where the proverbial bodies

19   are buried insofar as I know what you may not know about the

20   fact that Owens Corning products were used here and Johns

21   Manville products were used there.  And I can assist you in the

22   defense of your claims in several ways.  One is is that I can

23   tell you what the likely outcome, the likely settlement

24   dollars, as it were, for bankrupt trust facilities would be

25   based on information about what kinds of claimants can get how

09-50026-mg    Doc 7966    Filed 11/23/10    Entered 12/02/10 09:27:42    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 19 of 88

Page 19

1    much money from the different trusts based on the nature of

2    their exposure and where they were.  Secondly, I have access,

3    in this hypothetical now, to tell you how much money they're

4    likely to get which, in comparative fault schemes where there

5    are settlement credits, is a crucial piece of information.

6          In the Leslie Controls bankruptcy, Dr. Mullin

7    testified specifically that anything that affects the end game

8    affects settlement.  And two things that he defines as

9    affecting the end game are knowing how much money a claimant is

10   likely to receive from trust facilities whether they actually

11   have filed the trust submissions or will in the future; and

12   secondly, how to develop the alternative exposure theories that

13   the so-called chrysotile defendants seek.  For example, Owens

14   Corning Kaylo, a pipe insulation, contained amosite asbestos as

15   well as chrysotile.  One of the common themes of defending

16   asbestos cases around the country is to contend as a defense

17   that a gentleman or woman's mesothelioma was caused not by the

18   chrysotile containing asbestos product but rather by some

19   amosite or crocidolite, another kind of asbestos-containing

20   product.  Sometimes, through all their diligence, they don't

21   find such exposure, either because they can't or it doesn't

22   exist.

23          Giving them information that this job site and that

24   job site and the other job site are Kaylo sites, according to

25   the work of some plaintiffs' firm that has developed evidence

```
 1    to that effect allows them to, simply through the mechanism of
 2    the GM bankruptcy, know there is an alternative exposure theory
 3    that we can now, actively handling the defense of the case, go
 4    after.  We can develop the witnesses if there's information to
 5    that effect because sometimes that kind of information is
 6    available.  But it simply tells them where to look, how to look
 7    for it and affects the tort system by providing them defenses
 8    that the work of a simple discovery in a simple case did not
 9    provide.  And I believe that the extent to which they are
10    interested in this very proposition was not brought to the
11    Court's attention with sufficient clarity.
12              We are left in the position that if the subpoenas are
13    to go forward, we'll have to move to disqualify Bates White --
14    I don't know, obviously, with what outcome, but we'll feel
15    compelled to do that.
16              THE COURT:  You mean, before me or some other
17    litigation where that other court is the battleground at the
18    time for the asbestos wars?
19              MR. SIMON:  Admittedly, I don't have the precise
20    answer to that.  And I'm deferring to Mr. Swett on that point.
21    I don't know the procedural components about how that should be
22    pursued.  I'm simply saying that it seems to us that the
23    conflict of interest is one that we simply need to try to
24    illuminate in whatever means of -- the process provides.
25              THE COURT:  Isn't a traditional means of illuminating
```

Page 21

1    conflicts of interest by cross-examination?

2            MR. SIMON:  The problem is, is that the disclosure

3    itself is what gives them what they want.  In other words,

4    assume just for the sake of discussion, if I might, Your Honor,

5    that down the road they're asked in cross-examination, well,

6    how is it you now know that the so-and-so site is an Owens

7    Corning site.  And how is it you now know that claimants like

8    that typically, over the broad section of 7500 claimants whose

9    trust matters you've subpoenaed are going to get that much

10   money from the bankruptcy system?  The answer I would expect,

11   which would be similar to an answer that was provided by Dr.

12   Mullin in the Leslie Controls bankruptcy deposition, would be,

13   gee, over the vast data sources that I have and the experience

14   that I have and all the things I bring to bear in reaching my

15   opinions, I don't know what the individual data source was.

16   But I'm sure I learned it from lots of places and all of them

17   are wholesome.

18           What I contend, Your Honor, is that even though the

19   confidentiality order is precise and clearly drafted with care,

20   it's not just that a confidentiality wall can't be effectively

21   put in the mind of Dr. Mullin.  Even with Dr. Mullin's best

22   efforts and best intentions, if we simply grant them, down the

23   road he really may not know exactly how it is he knows this

24   information which is affecting the current tort system.  But

25   he'll know it just the same.  And he'll use it just the same.

MOTORS LIQUIDATION COMPANY, et al.

Page 22

1          I have nothing further to add unless I can otherwise

2     confer for just a moment to make sure that is so.

3        (Pause)

4          MR. SIMON:  Thank you, Your Honor.

5          MR. PHILLIPS:  Your Honor, Robert Phillips at the

6     Simmons firm on behalf of the objecting claimants.

7          THE COURT:  Your name again, please?

8          MR. PHILLIPS:  Robert Phillips, Your Honor.

9          THE COURT:  Phillips?

10         MR. PHILLIPS:  Phillips, like the gas station chain.

11         THE COURT:  Okay.

12         MR. BENTLEY:  Your Honor, I'm sorry to interrupt.

13    But the Phillips firm and the Simons firm from whom you just

14    heard together filed a single pleading.  I'm not sure it's

15    appropriate for two of them to be arguing seriatim.

16         THE COURT:  Mr. Bentley, have at any time in the

17    history of the General Motors case, have I ever said that

18    because Mr. Mayer speaks, you can't speak or because Mr. Miller

19    speaks, Mr. Karotkin can't.  I'm not going to take repetitive

20    argument.  But I'm not going to hoist lawyers around in that

21    fashion.

22         MR. BENTLEY:  Okay.  Fair enough, Your Honor.  I

23    apologize.

24         MR. PHILLIPS:  Well, I certainly won't cover the

25    ground covered by Mr. Simon and I wanted to keep myself very

MOTORS LIQUIDATION COMPANY, et al.

Page 23

 1    brief here.  There's also -- there's the granular issue is a

 2    word thrown around in the pleadings and in the discussions

 3    about this.  But there's also an overarching issue.  One unique

 4    facet which is alluded to in the reply by the unsecured

 5    creditors' committee to our objections is there's a relatively

 6    concentrated aspect to asbestos tort litigation.  There's a

 7    limited number of law firms out there prosecuting claims on

 8    behalf of claimants.  There's a relatively limited number of

 9    defense firms compared to the larger landscape of law firm

10    practice everywhere in product liability.

11            What that means, Your Honor, is that information is

12    especially at a premium because information disclosed about one

13    or other parties or groups of parties has a significant impact

14    because of the concentrated nature.  For example, my firm was

15    subpoenaed with roughly 1300 claimants out of the 7,000.  I

16    think it was 1296 sticks in my mind.  I haven't looked at the

17    number this morning -- which is a significant number of the

18    number of claimants we've represented over the years.  A large

19    number of them have had settlements against GM, one might infer

20    from that.

21            For that reason, Your Honor, if the UCC, and

22    specifically Bates Whites that we're worried about here, is

23    given information about our clients and certainly about such a

24    large number and a large proportion -- and we represent

25    approximately twenty percent of the mesothelioma clients in the

MOTORS LIQUIDATION COMPANY, et al.

Page 24

1    litigation.  If he's given that information and will have

2    substantial impact on the settlement process today with our

3    claims and, as Mr. Simon and your colloquy mentioned earlier,

4    it will have an effect in the future because there will be a

5    substantial fill-in of the information gap which exists -- many

6    of the exhibits attached to various pleadings in this matter

7    are articles written by either Charles Bates or Charles Mullin

8    about the asbestos tort system.  There's one called "Show Me

9    the Money".  There's another one, "Having Their Cake and Eat

10   it, Too" is a very close paraphrase of the title, in which

11   Bates Whites has attempted to close the circle on information

12   and say this is what we think the average asbestos mesothelioma

13   claim is worth in the tort system.  And they go through and

14   they look at SEC reports and they rely on the information they

15   know from the clients they represent despite the fact that

16   presumably that information is confidential.  But they use it

17   for purposes of preparing these articles.  The big gap in their

18   information, Your Honor, is the bankruptcy trust.  And they say

19   as much expressly in these articles.  And what this is today,

20   the concentrated effort by Bates Whites and the people they

21   represent to close that gap of information, square the circle

22   and find out what people make -- and as I said, Your Honor, it

23   makes a difference to know about firms and about types of

24   claims because they want to know ideally what do Simmons firm

25   clients get because they're twenty percent of the litigation.

MOTORS LIQUIDATION COMPANY, et al.

Page 25

1    If we know that this is what they're getting, combined with

2    what we already know, we're going to be in a substantially

3    improved position to negotiate with them.  If we know what the

4    Simon Eddins firm, Mr. Simon up here earlier, which is prone to

5    take verdicts more often than many firms, they're going to be

6    in a substantially improved position to know whether or not to

7    risk verdict.  That has to do with the law firms, Your Honor.

8              And as was alluded to by Mr. Simon, there's an issue

9    about types of claimants.  One of the things that's being

10   talked about in litigation now is perhaps a slight shift from

11   the welders and insulators and heavy industry workers of the

12   first wave of litigation with a lot of take-home cases,

13   construction trade cases and such that are becoming more

14   prevalent in the litigation.  For that reason, knowing the kind

15   of trust claims being made by categories or buckets of

16   people -- the average take-home woman gets this; the average

17   insulator who still exists in litigation gets that.  And Your

18   Honor may say that the confidentiality protocol that's been

19   agreed to by the parties that were here earlier in the case

20   seems to protect against that.  I would say it does not,

21   however, Your Honor, because while certain steps and better

22   steps can certainly be taken to protect the information at a

23   very, very low level, granular level, nothing can erase, could

24   possible erase, from the minds of Charles Mullin and Charles

25   Bates, big picture items about firms and how well they do or

MOTORS LIQUIDATION COMPANY, et al.

Page 26

```
 1    about buckets of categories.  You know, one would say there's a
 2    half dozen to ten different types of general buckets of
 3    claimants who come across the desk of defense firms'
 4    litigation, remembering, well, this group gets this much money
 5    and this group knocks the ball out of the park with regard to
 6    the trusts is crucial information and will have a substantial
 7    impact, Your Honor, on the tort system.  It will affect
 8    settlement, it will affect the number of trials because if the
 9    plaintiffs' firms face increased resistance by defense firms
10    and by companies' litigation based on this sort of information,
11    it will force the hand of plaintiffs' firms to fight back, to
12    try more cases and all we hear, Your Honor, is about the
13    overburden tort system and the needless use of trials in these
14    matters and forcing firms to go to trial over and over and over
15    to counteract the disclosure of information that, in this case,
16    isn't going to be proven relevant 'cause it's not admissible at
17    trial anyway -- but I won't relitigate the 408 arguments, Your
18    Honor -- seems like a pointless and dangerous tact to take.
19    Given the fact that Bates Whites has never done an estimation
20    with this sort of information, there's been no track record of
21    it even being useful, I fail to understand why Your Honor is
22    risking the opportunity to substantially impact the tort
23    litigation and to change the landscape of asbestos tort
24    litigation for the sake of this argument.  Thank you, Your
25    Honor.
```

MOTORS LIQUIDATION COMPANY, et al.

1          THE COURT:  All right.  Are there any other

2     objectors?  Mr. Swett?

3          MR. SWETT:  Your Honor, may I be heard?

4          THE COURT:  Yes.

5          MR. SWETT:  Good morning, Your Honor.  Trevor Swett,

6     Caplin & Drysdale, for the official committee of asbestos

7     claimants.  Your Honor, I have two propositions.  One is that

8     if we took ourselves back to August 9th of this year when you

9     first heard argument on the 2004 application, the revelations

10    that have come to light about Bates Whites entrepreneurial

11    branch, as I would characterize it, the Litigation Resolution

12    Group, would have cast a different light on the stated need for

13    the information, on Your Honor's evaluation of the balancing of

14    all the factors that go into delineating the proper scope of

15    discovery for the aggregate estimation particularly under the

16    time constraints that the debtor is operating under and that

17    the rest of us are straining to meet.  It would have

18    introduced a factor completely different than any other expert

19    in that the Litigation Resolution Group had an undisclosed

20    active interest in seeking out asbestos liabilities to take

21    upon itself, in order to speculate, that the values will come

22    down and it would be making money between the bid and the ask

23    in the tort system.  That's a material fact that wasn't in your

24    view, it wasn't in my view, perhaps wasn't in Mr. Bentley's

25    view when those issues were first aired.  And I contend that

MOTORS LIQUIDATION COMPANY, et al.

1    they would have had a significant impact.

2         Second, asbestos in this case is not the factor that

3    it is in most cases where there are significant estimation

4    proceedings.  In this case, there are twenty-seven billion

5    dollars of bond debt.  The asbestos liability is certainly not

6    the 800 pound gorilla in the room.  And yet, for reasons that

7    remain obscure to me, the UCC has lent its case, in effect, to

8    Bates White for Bates White's quest to create an unparalleled

9    unique fund of information bearing on the tort system.

10        This is not the appropriate case in which to

11   experiment with radical innovations in the methodology of

12   asbestos forecasting and estimation in the aggregate for plan

13   formulation purposes.  This is a case where that process, as

14   Mr. Karotkin has continually urged, should be straightforward.

15   It should be a matter of informed expert testimony within the

16   limits of reasonably available information.

17        Another reason why it shouldn't be necessary in this

18   case is that it is an aggregate estimation.  We shouldn't

19   trigger the due process rights of individuals to come in and

20   concern themselves with this process.  And it is, I think,

21   clear from the arguments made by the tort counsel that,

22   unwittingly, Your Honor's 2004 application does threaten

23   significant impact on the tort litigation which is

24   diametrically the opposite of what you set out to prevent when

25   you ruled on August 9th that you would entertain procedures for

MOTORS LIQUIDATION COMPANY, et al.

1    ensuring that the claimant specific information that would come

2    forth in this case for estimation purposes not leak out into

3    one on one claim liquidation proceedings, be they in other

4    bankruptcies, in this bankruptcy or in the tort system.  That's

5    the goal you set.  It does reflect you appreciation of the fact

6    that the bankruptcy process is not supposed to distort the

7    applicable nonbankruptcy law.  So it is a fundamental

8    structural point and it's an important one.  And it has

9    warranted Your Honor's patience with these proceedings 'cause

10   the issue is complicated and it affects many people who are not

11   in this courtroom or who have appeared in this courtroom only

12   pursuant to the limited opportunity to argue to you about their

13   view that the protections that you have tried to carefully

14   design are not sufficient for the purpose.  Given that one --

15   the party that is to receive the claimant specific information

16   has an active interest in opposing those claims in the tort

17   system for its own financial gain which puts it in a position

18   completely unlike that of any other expert.  It's not a mere

19   expert; it is a venturer in the tort system and its venture was

20   not previously disclosed.

21           I assure Your Honor that if -- moving now from August

22   9th to October 22nd -- had I known that Charles Mullin, who was

23   in the courtroom and prepared to testify why the anonymity

24   protocol that we had proposed involving a neutral which would

25   have prevented Bates White from receiving claimant specific

09-50026-mg    Doc 7966    Filed 11/23/10    Entered 12/02/10 09:27:42    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 30 of 88

Page 30

1   information and given them only anonymized information at an

2   aggregate level, he was prepared to testify to you why that

3   would have crippled his estimation process.  Now, Your Honor,

4   by that time, was signaling some impatience, understandably,

5   with the details of this issue.  And the combination of those

6   two things persuaded me to accept a compromise under which --

7   under the present anonymity protocol, the claimant specific

8   details will go to that very Charles Mullin who is the chief

9   entrepreneur of the Litigation Resolution Group --

10          THE COURT:  Pause, please, Mr. Swett.  Refresh my

11  recollection as to the deal points of the final compromise.  Is

12  that what you were about to do before I interrupted you?

13          MR. SWETT:  Let me see if I can recite, Judge.  Under

14  the anonymity protocol as agreed, and I would argue as agreed

15  under false pretenses, the trusts are to produce the claimant

16  specific information pertaining to each GM mesothelioma

17  claimant who appears in their respective databases as a

18  claimant against the several trusts.  That information, in its

19  raw form, within the agreed limits of the data fields that are

20  to be produced, goes to Bates White.  Bates White, under that

21  anonymity protocol, which I'm not calling into question, has

22  the privilege of linking that data to any other data set it has

23  and is available for its use in order to build more data

24  concerning the same claimants.  At that point -- that is

25  supposed to be a separate and discreet database combining all

09-50026-mg   Doc 7966   Filed 11/23/10   Entered 12/02/10 09:27:42   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 31 of 88

Page 31

```
 1    this what we'll call matched data.  At that point, it's

 2    supposed to put aside the raw production of the claimant

 3    specific trust details.  And Your Honor ruled that that

 4    production would not be subject to subpoena by any other

 5    persons for any other reason.  It would just sit there

 6    available to Bates White and the other experts to defend their

 7    matching process or to attack some other expert's matching

 8    process if they went through that sort of thing.  And then the

 9    other discreet matched database would be stripped of certain

10    identifying details and the experts' analyses for the

11    substantive purposes of the estimation and their reports and

12    their exhibits would be generated based upon that anonymized

13    data set.

14            Now, I must tell you that that was not, even at that

15    time, a happy result for us because the experts were clear that

16    in the right hands with the right computers and the right

17    algorithms, they could easily reverse engineer and figure out

18    exactly who those supposedly anonymized data points pertain to,

19    at least within the contours of certainty that would suffice

20    for their purposes.  But we had to accept that compromise

21    because of the lay of the land as it then stood including the

22    fact that Dr. Mullin, with his undisclosed commercial interest

23    in exploiting this information for other purposes, was prepared

24    to come and testify to you putting on his hat as an expert why

25    it would distort his methodology not to give him this claimant
```

MOTORS LIQUIDATION COMPANY, et al.

Page 32

1    specific information even though Bates White has made

2    innumerable estimations on behalf of bankruptcy parties and on

3    behalf of financial reporters with SEC obligations that have

4    never concerned themselves with this level of claimant specific

5    detail over the course of a couple decades.

6          This is an innovative push on their part and it

7    didn't stop here.  And this, too, I think would have put a

8    different light on matters back in August had you been made

9    aware of them.  Bates White has persuaded other cooperating

10   bankruptcy parties citing your August 9th decision as precedent

11   to issue 2004s in their own cases seeking the entire databases,

12   lock, stock and barrel, of every asbestos trust ever created.

13   That's going on in the Bondex case and that's going on in the

14   Garlock case, both Chapter 11 asbestos driven bankruptcies

15   unlike this one.

16         Now, I am not suggesting to you that you should

17   concern yourself with whether or not those applications get

18   granted.  However --

19         THE COURT:  You mean, in Bondex and Garlock?

20         MR. SWETT:  In Bondex and Garlock.  We understand

21   you're dealing with your case.  But your precedent has been

22   cited there and it does illustrate two things:  the spillover

23   effects from your decision which I would contend was made

24   without the benefit of some material disclosures that should

25   have been made; and second, the ambitions of the Bates White

09-50026-mg    Doc 7966    Filed 11/23/10    Entered 12/02/10 09:27:42    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 33 of 88

Page 33

1    firm vastly exceeding anything that any other expert has ever

2    attempted to do in terms of gathering in one place the universe

3    of claimant specific information about asbestos claimants.

4            Now, Dr. Mullin and Dr. Bates have specifically noted

5    in their publications that in the tort system, everyone,

6    plaintiff and defendant, operates under limits of information.

7    Nobody has the full picture.  The plaintiffs' lawyers know what

8    they get for their clients from particular defendants.  Those

9    defendants know what they pay.  They jealously guard their

10   settlement information from all other defendants.  It is a

11   pervasive practice in the tort system that the settlements are

12   confidential.  The only way the settlement numbers come forth

13   is when a defendant takes a verdict and then says I'm entitled

14   to measure my offsets.  And at that point, in a one-off, case

15   by case basis, the plaintiff is obliged under local practices

16   that vary throughout the country to come forth with the amount

17   of money he's received from settling defendants so that that

18   defendant doesn't pay more than its share.  That's a discreet

19   narrow window and very, very few asbestos cases go to trial,

20   less than one percent.  It's a settlement system; it's not a

21   trial system.  And the settlement system has as one of its

22   fundamental facts the disadvantage to all that they operate

23   without complete information as to what the other guys is

24   paying.

25           Now, if in the tort system, General Motors had said,

09-50026-mg    Doc 7966    Filed 11/23/10    Entered 12/02/10 09:27:42    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 34 of 88

Page 34

```
 1    General Electric, Georgia Pacific, Foster Wheeler, Union

 2    Carbide, you solvent asbestos defendants, here's a subpoena,

 3    give me all your settlement information.  Well, why?  Because I

 4    want to know it when I decide how much to pay for a claim.

 5    That would have been laughable in the tort system.  It wouldn't

 6    have been entertained for a moment.  Yet, these trusts stand in

 7    for former defendants.  They are, in effect, co-defendants.

 8    And the substance of GM's demand, through the UCC, lending its

 9    good offices to the ambitious Bates White/Litigation Resolution

10    Group firms is precisely that.  Give me all your settlement

11    information so I can decide how much I would pay if I were

12    still in the tort system.  Perversely, we are required in this

13    case, as a matter of doctrine, to estimate what it would cost

14    General Motors to resolve all its asbestos claims in the tort

15    system were there no bankruptcy.  That's the mission for plan

16    formulation purposes, to decide how much of the estate goes to

17    the trust.  Well, in order to do that, based upon their

18    ostensible needs, without disclosure of their ulterior

19    commercial interests, they have persuaded the Court to give

20    them discovery that they could never get in the tort system,

21    that they have complained in print is not available to parties

22    in the tort system, and where they have an active interest in

23    cultivating a position as a defendant in the tort system.  They

24    are seeking to create unilateral advantage.  No one else has

25    it.  And they are seizing on the bankruptcy cases for that
```

MOTORS LIQUIDATION COMPANY, et al.

Page 35

1    purpose.  I submit that is a fundamental perversion of the

2    bankruptcy process.

3           And it cannot be prevented, despite all due care,

4    through the confidentiality agreement or the anonymity

5    protocol.  Because you can't lobotomize Dr. Bates and Dr.

6    Mullin when they see the patterns, when they work with the

7    data, when they form their impressions.  So that when Dr.

8    Mullin, in his other capacity, should he get a book of business

9    of asbestos claims to manage for his own firm's profit, sits

10   down with a plaintiff's firm to negotiate a settlement, nothing

11   in the anonymity protocol or the confidentiality agreement will

12   prevent him from using in his mind and in his strategy and in

13   his approach to the settlement, the information and the

14   patterns emerged from it, and the knowledge gained from it, all

15   as a result of GM's liquidation.  What an ironic, perverse

16   situation to have created through a bankruptcy.

17          It wasn't your intention.  And I contend that had the

18   matter been fully spread on the record before you in August,

19   based on full and fair disclosure, and all of the other

20   considerations being brought to bear, you would have come out

21   differently.  There's another reason I say that.

22          We have had, over the last month, a hearing in

23   Garlock that has involved testimony by the experts, as a

24   preliminary matter, to decide how that case would be

25   administered from the standpoint of the asbestos claims.  Quite

MOTORS LIQUIDATION COMPANY, et al.

Page 36

1    unlike that case -- I should say, quite unlike this case, that

2    is a bankruptcy driven entirely by asbestos.  There are

3    essentially no commercial creditors.

4         Now, Dr. Bates took the stand and testified on a

5    couple of different occasions.  And in the end he gave what I

6    consider to be a very important admission for Your Honor's

7    purposes.  And I define that as figuring out what the heck to

8    do to push this estimation forward within the limits of the

9    available time here, with fairness to all parties.

10        And this is his admission:  For the purposes of

11   aggregate estimation, as opposed to figuring out, as he wants

12   to do in Garlock, which claimants are old and stale and have

13   abandoned their claims or never had one in the first place, and

14   so they really shouldn't vote -- as opposed to that claimant's

15   specific inquiry, for the purposes of aggregate claim

16   estimation for plan formulation purposes, a sample is enough.

17        Here is the testimony.  It appears on page 848 of the

18   transcript of October 28th in the Garlock case.  He first --

19   when first confronted with the question on sampling he referred

20   to the question of whether the information is expensive to

21   obtain.  He then proceeded to say the following in response --

22        THE COURT:  Mr. Bentley, you're standing without

23   saying anything.  What do you want?

24        MR. BENTLEY:  Could I ask to have a copy of the

25   transcript that counsel is reading from, Your Honor?

Page 37

```
 1              MR. SWETT:  You can, but I don't have it at the

 2    podium.  I'll show you briefly.

 3              MR. BENTLEY:  Your Honor, this is a little unfair.  I

 4    haven't had a chance to read it.  This is a little unfair to go

 5    into this --

 6              THE COURT:  The facts -- Mr. Bentley, I'm going to

 7    give you a chance to be heard.  But the facts that are -- I'm

 8    hearing about for the first time today, are a matter of concern

 9    for me.  Maybe there's a satisfactory answer for it.  But

10    there -- fairness issues go in both directions, and they're of

11    many different types.  And I'm looking forward to your

12    explanation as to how I didn't hear about this guy investing in

13    this litigation, if those allegations are true.

14              MR. BENTLEY:  I'm looking forward --

15              THE COURT:  Now, what your opponents say is not

16    testimony.  But I assume that when lawyers make representations

17    to me I'm getting accurate facts.  If I have to have an

18    evidentiary hearing, I will.  But I got a problem here, Mr.

19    Bentley.  So don't talk to me about fairness unless we talk

20    about the totality of the fairness.

21              Read it.  Mr. Swett is going to finish.  Then he's

22    going to hand you that transcript.  And then you can make such

23    points as you see fit.  And if you need a continuance to

24    respond, then I'll do it.  But I got to tell you, this is a

25    matter of concern to me.  Do I make myself clear?
```

MOTORS LIQUIDATION COMPANY, et al.

Page 38

1        MR. BENTLEY:  You do, Your Honor.  And I'm looking

2   forward to responding, because I think what you've heard rests

3   on a lot of inaccuracies.

4        THE COURT:  Very well.  Give him -- read the

5   transcript; give it back to Mr. Swett; and then when Mr. Swett

6   is done, he's going to give it to you and I'll take a recess to

7   enable you to read it more thoroughly if you find that

8   necessary or appropriate.

9        MR. SWETT:  Thank you, Your Honor.  In Garlock, the

10  Bates White firm is the proponent of large data-gathering

11  exercise that the committee that I represent opposes.  And two

12  rationales are given for it, one of which is irrelevant to this

13  case, the other of which is quite directly relevant to this

14  case, and that is the issue of when co-defendants settle, do

15  they have a fair approximation in mind of what their several

16  share of the asbestos liability is, given that most of the

17  claimants have claims against many different defendants.

18        On that particular issue, at page 848 of the

19  transcript of October 28th, counsel for the legal

20  representative of future claimants asked this question:

21  "Right.  But forgive me, what information you get from the

22  trust and what you do with it isn't an issue.  We are focused

23  now on the proof of claim and whether you can ask for a limited

24  sample, rather than requiring 15,000 claimants to give detailed

25  information.  And as I understand your testimony, that is

MOTORS LIQUIDATION COMPANY, et al.

1    something you could do, correct?"

2         Here's the answer:  "From a valuation standpoint on

3    the aggregate class, yes."  Then he goes on to say, "From the

4    standpoint of knowing which individual claims would have -- I

5    mean, I think it would certainly help.  A sample could be used

6    to help resolve the issue over how many were stale claims and

7    how many weren't.  It would bring forth information on how many

8    wouldn't, but I don't know how you resolve the information

9    through that sample on which claims are which."

10        He's referring there to the issue that's not relevant

11   to GM, which is supposedly old, cold, stale, invalid, non-

12   malignant claims, as opposed to the estimate of the aggregate

13   liability for mesothelioma, for which he says, from a valuation

14   standpoint on the aggregate class, which is what we're

15   concerned with in this case, Judge, yes, sampling suffices.

16        Now, the reason that matters is because as part of

17   their 2004, you may remember, one branch was addressed to the

18   trust and another branch was addressed to New General Motors.

19   And Bates White drew a statistical sample of 650 litigation

20   files.  And New GM called upon all that defense network out

21   there to muster their resources and pull those 650 files and

22   give them to Bates White for whatever purposes it wants to use

23   them for.  And it has those files and has had them now for

24   months.

25        Moreover, the legal representative has drawn a

09-50026-mg   Doc 7966   Filed 11/23/10   Entered 12/02/10 09:27:42   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 40 of 88

Page 40

1    similar sample, also of 650 litigation files.  We, the asbestos

2    claimants' committee, regard the individual files as completely

3    irrelevant to the aggregate estimation, so we haven't drawn

4    one.  But they're welcome to use those for the sampling

5    purposes and statistical extrapolation that is consistent with

6    the purposes of an aggregate estimation.  Had we gone that

7    route exclusively, we wouldn't be here today having triggered

8    the due process rights of many, many thousands of individual

9    claimants who now must concern themselves with this proceeding.

10          Now, given that sampling is adequate by Dr. Bates'

11   own admission, for an aggregate estimation; given that sampling

12   would not require the production from third parties as opposed

13   to from GM of vast amounts of confidential settlement

14   information that wouldn't be available to GM in the tort

15   system, it seems to me, especially when weighed in the context

16   of the desired timeline in this case and the need to have an

17   estimation quickly, one of its virtues being that it can be

18   done quickly and thus can prevent unreasonable delays in plan

19   formulation, we ought to go there.

20          And had you had Dr. Bates' admission in front of you

21   in August instead of hyperbolic contentions about the great

22   need, the indispensable need, for this claimant-specific

23   information that Dr. Bates never got over twenty years of

24   making estimations, including for investors to rely upon in the

25   capital markets, well, I think we would have gone there.  I

MOTORS LIQUIDATION COMPANY, et al.

Page 41

1    believe it would have presented itself to you in a different

2    light.

3              Now, to save time, as the ACC regards this all as a

4    great fuss; inevitably has to be fought through if the program

5    doesn't change; there must be appeals; there will be stay

6    requests.  And we have also --

7              THE COURT:  Appeals of what?  Stay requests of what?

8              MR. SWETT:  Your Honor, the committee feels

9    constrained to take this issue up if we are unsuccessful in

10   persuading Your Honor that the 2004 and the anonymity protocol

11   should be --

12             THE COURT:  What issue up?  A discovery dispute?

13             MR. SWETT:  The fundamental question of whether the

14   discovery here improvidently affects the tort system.  But I

15   don't wish --

16             THE COURT:  I lost you, Mr. Swett.  I've been a judge

17   for ten years and I've been a lawyer for forty.  I've never

18   known an appeal of a discovery dispute.

19             MR. SWETT:  Your Honor, my contention is that this

20   particular discovery dispute, relating as it does to the Bates

21   White firm's goal of tilting the table in the tort system,

22   contrary to your stated goal, is something more than an

23   ordinary discovery dispute.  But I accept the difficulties of

24   the situation, if we come to that.

25             My effort now is to persuade Your Honor that you

MOTORS LIQUIDATION COMPANY, et al.

Page 42

1    didn't have in front of you the full information you needed to

2    make the right call here.  But there is still an opportunity --

3    first let me explain that we have found it necessary, if we're

4    going to face this claimant-specific information in the hands

5    of Bates White, for the purpose of their arguing that the

6    dominant factor in the tort system that explains GM's claim

7    values and the pattern that emerges over the last few years

8    outside of the bankruptcy court in GM settlements, is the onset

9    of trust settlement payments -- that's one of the rationales

10   you were given.  If we're going to be forced into that

11   artificial debate, as though the whole tort system could be

12   reduced to the dynamic between one defendant's settlements and

13   the resumption of pennies-on-the-dollar payments from trusts

14   standing in for formerly paying but now bankrupt defendants,

15   then we need to expand the lens.

16          And in that scenario, we would press for the

17   settlement data of solvent co-defendants to examine those

18   patterns in a more realistic way.  We don't want to go there.

19   We don't think it's the right thing to do.  But we must meet

20   what they are permitted to do.  Now --

21          THE COURT:  Let me get this straight.  And you're the

22   guy who's standing up there.  Bentley's going to be standing up

23   in a minute, and I have equal problems from both of you.

24          I have thousands of innocent GM creditors who are

25   waiting for their distributions, and this is not an asbestos-

Page 43

1    driven case.  And this effort by the two of you to move the

2    asbestos wars into my courtroom and to fight your respective

3    agendas here, and then to take the results of them elsewhere,

4    has the potential, if not the certainty of delaying

5    distributions to literally thousands of innocent creditors.

6           What am I missing?

7           MR. SWETT:  Your Honor, we don't want that to happen.

8    And I'm about to offer an alternative.  I've offered the

9    alternative of sampling, which they already have the means for

10   already in the discovery that they have received from General

11   Motors.  You could direct Bates White to conduct its analysis,

12   to the extent it feels the need to descend to the level of

13   claimant-specific information.  It can do that based on the

14   sample, subject to the constraints of the confidentiality

15   agreement and order, and to the extent applicable, the

16   anonymity protocol.

17          But in addition, precisely because we do not want to

18   be in the position of standing in front of an oncoming train

19   freighted by many thousands of innocent creditors who just

20   don't happen to be asbestos creditors, but have their

21   entitlements too -- we don't want to be in that position -- and

22   regard this discovery as completely beside the point, so here's

23   what we offer.  We would offer a stipulation that every General

24   Motors mesothelioma claimant, full stop, has received or would

25   be entitled to receive, from each of the respondent trusts, the

MOTORS LIQUIDATION COMPANY, et al.

Page 44

1    published average compensation for mesothelioma as set forth in

2    that trust's trust distribution procedures, which are a plan

3    document approved in their respective bankruptcy cases.

4         Now, to unpack that a little bit.  Dr. Bates has

5    taken to offering opinions in the tort system on what

6    particular tort claimants would receive from trusts should this

7    defendant take a verdict so they can compute offsets that way.

8    Those reports haven't yet been received in evidence.  No court

9    has granted them.  But that's their methodology now.

10         THE COURT:  Say that slower, please, Mr. Swett.

11         MR. SWETT:  Okay.  Dr. Bates offers in the tort

12    system an opinion as to what particular tort claimants will

13    receive from various bankrupt trusts.  Here's how he does it.

14    He takes the discovery material --

15         THE COURT:  Particular tort defendants?

16         MR. SWETT:  I'm sorry -- a particular tort plaintiff

17    would receive by way of compensation from the different

18    bankruptcy Section 524(g) settlement trusts.  He wants the

19    defendant to be able to go in front of the jury and say, this

20    claimant isn't deserving of any further compensation; he has

21    received a million dollars from a combination of trusts or will

22    receive in the future.

23         I footnote, no court has been willing so far to

24    accept that testimony, but he writes these reports.

25         THE COURT:  No bankruptcy court with the estimation

Page 45

1      power or no court in any plenary litigation?

2              MR. SWETT:  No tort suit, Judge.  No court presiding

3      over a tort suit, which is where these opinions are offered.

4              Now, we will give him the substantial equivalent.

5      Because what he does there is he takes the discovery documents

6      from the particular case and he says, well this guy worked at

7      such and such a place and he was a pipefitter, and he changed

8      jobs and worked for these other employers at these other

9      locations.  And we know from the published approved site lists

10     that some defendants who are bankrupt put out on their trust

11     website, we can link him to those people's products at these

12     various sites, and that'll give him a claim against these

13     trusts.  And we will assume that he will get the scheduled

14     value which is set forth in the trust distribution procedures.

15     And he'll add them all up, and he'll say, this fellow would

16     receive 850,000 dollars all in from the other trusts before the

17     jury even considers what this tort defendant should now pay

18     him.

19             Well, we offer to stipulate for the purposes of

20     saving time and narrowing the issues, and solely for the

21     purposes of the estimation proceeding in this case, a

22     stipulation.  Bates White can assume for purposes of its

23     aggregate estimate that every one of the 7,400 mesothelioma

24     claimants who sued GM had other exposures for which these

25     respondent trusts are now responsible.  He can assume that.

Page 46

1    And he can also assume that each one of them received the

2    average mesothelioma payment, which is a scheduled amount that

3    the trusts set forth in their respective trust distribution

4    procedures.

5              That is a number that the trusts set as their goal

6    for ensuring that whether a claimant submits his claim for

7    expedited review, as it's called, where there are certain

8    presumptive criteria, and if you meet them you get X dollars;

9    or individual review, where you say, no, no, my claim is worth

10   more than X dollars, I want you to look at the particulars of

11   my claim trust, and if I win, I want you to pay me more than X.

12             Well, the trust, because of that variable, the

13   unknown as to how those individual reviews are going to come

14   out, sets itself the goal, it must not pay in the aggregate

15   more than the average mesothelioma value that it publishes in

16   its TDP, lest it run out of resources to pay other people

17   fairly.

18             THE COURT:  Pause, please, Mr. Swett.  Because I

19   understand the higher and lower aspect of what you just told

20   me.  But where I'm confused is getting my arms around the

21   uncertainty as to which the universe of GM asbestos claimants

22   would have claims from all, none, or something in between of

23   the various trusts out there.

24             MR. SWETT:  You can only determine -- no one knows

25   that answer.  You can only determine it by the kind of

09-50026-mg    Doc 7966    Filed 11/23/10    Entered 12/02/10 09:27:42    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 47 of 88

Page 47

1    discovery he now wants that he doesn't get in the tort system.

2    Because in the tort system, he's left to draw inferences based

3    upon evidence.  Here he wants something no tort defendant has

4    ever gotten, he wants the co-defendant settlement information.

5    And he will draw inferences from that.

6            Well, we're making it easy for him.  He can assume

7    product exposure on the part of every GM mesothelioma claimant

8    with respect to each defendant for which these trusts now stand

9    in.  He can bring to bear the --

10           THE COURT:  Whether or not they in fact worked for a,

11   or were present at a facility, where that trust might be within

12   the target zone?

13           MR. SWETT:  We give him that stipulation to narrow

14   the issues.  It is something that we intend to be binding only

15   here.  It's simply a concession to the shortness of life and to

16   the need to get on with this estimation.  It's an econo -- he

17   doesn't concern himself in the end with the nitty-gritty

18   individual details.  He's told you that himself.  He is driving

19   here towards an aggregate estimate.  We disagree with the

20   emphasis he places on the granular details.  But we'll give it

21   to him in the form of an issue-narrowing concession, that he

22   can draw the economic inferences on the basis that every GM

23   claimant had exposure to these other defendants' products and

24   would get what those trusts can only pay on average.  If they

25   paid more than that, they'd go bust too.  And their own plans

MOTORS LIQUIDATION COMPANY, et al.

Page 48

1   of reorganization and their mandatory provisions of their TDPs

2   prevent it.

3          That's as good as it gets for Charles Bates in the

4   context of this estimation; in the context of this liquidating

5   11 where asbestos is not the major factor and shouldn't consume

6   inordinate amounts of time.

7          I submit to you, Your Honor, that if that concession

8   isn't satisfactory, it only serves to underscore ulterior

9   purposes on the Bates White's firm part.  I also submit that it

10   would be far better to finesse these complicated disputatious,

11   contentious and time-consuming issues in this case, and let

12   them fight it out in Bondex.  Let them fight it out in Garlock,

13   where they seek the whole universe of trust databases.  It's

14   not an appropriate fight to consume resources and time in this

15   case.

16          In short, Your Honor, I contend that had you known

17   what was out there, unbeknownst to us, when you made your

18   original 2004 ruling, and when you accepted the compromise that

19   we made on the anonymity protocol, conceding the key point that

20   the nitty-gritty client-specific information would go to Bates

21   White, albeit under restrictions -- we gave that up, because

22   Charles Mullin was here to testify to you, without having

23   disclosed to us his ulterior purposes.  That's not a fair

24   position for us to be in or for you to be in.

25          There's a cure for it.  Because these issues are

MOTORS LIQUIDATION COMPANY, et al.

Page 49

```
 1    really collateral in this case.  And there is a shorter, more
 2    direct path to the estimation that everybody wants to conclude
 3    here.
 4           Now, I would, if Your Honor would entertain it, I
 5    would like to file a brief tomorrow to put these things in
 6    writing, by way of seeking reconsideration and allowing
 7    opposing counsel the opportunity to respond if they care to do
 8    so.  And I would be at their disposal in terms of how long they
 9    needed to fairly evaluate those issues.  I'm not trying to ruin
10    their Thanksgivings.  We'll cooperate with them on matters of
11    scheduling.  But you need to see this stuff laid out in the
12    light of day.  And we are offering our efforts to put it before
13    you.
14           Now, I should mention one thing that eluded my
15    mention up to now in this discussion.  This outfit, Litigation
16    Resource (sic) Group, according to Dr. Mullin's recent
17    testimony, doesn't presently have a book of business.  But he
18    also testified that they're out there looking and they hope to
19    be successful.  So it is no less material from that standpoint
20    than it would be if they were already managing a portfolio of
21    asbestos liabilities to take advantage of what they hope will
22    be the decline in values.  That is their aspiration.  It is
23    their commercial purpose.  We submit it's what drives this
24    agenda, which otherwise is completely perplexing to us in the
25    context of this case, so remote is it from the issues you
```

1    really have to concern yourself with.

2            And we hope that the combination of Dr. Bates'

3    concession in sworn testimony that I will give to Mr. Bentley,

4    that for aggregate estimation a sample is enough; and the fact

5    that he has already drawn a sample and already has those

6    materials; and the fact that we offer in any event the

7    stipulation that would take this issue completely off the table

8    for the limited purposes of this estimation, should point the

9    way to a better path towards a swift estimation so that we are

10   not put in the unhappy position of having to insist on our

11   clients' rights in the face of the oncoming train, of a much

12   desired conclusion to this case.  Thank you, Judge.

13           Unless you have questions for me, I'll stand down.

14           THE COURT:  No.

15           Mr. Esserman, are you rising?

16           MR. ESSERMAN:  Yes, I am, Your Honor.  May I

17   approach?

18           THE COURT:  Yes.

19           MR. ESSERMAN:  Sandy Esserman, for the record.  I

20   have nothing to add.  I just wanted to make sure that I put my

21   marker in.  I'm generally supportive of what I heard today; a

22   little surprised by some of it.  And we look forward to

23   reviewing any proposed stipulation in writing.  Thank you.

24           THE COURT:  What does that last thing mean, Mr.

25   Esserman?  Does that mean that if, although the asbestos

 1   committee were prepared to agree with it, the future claimants

 2   would not?

 3            MR. ESSERMAN:  I suspect we would, Your Honor.  But

 4   I've got to run it by my expert.  I haven't seen the proposed

 5   stipulation.  It sounds like it probably would be something

 6   that we would agree to.  But I do have a different expert, and

 7   he's not in the courtroom today, and I suspect he'll be fine

 8   with it also.  But I just need to make sure that he is.

 9            THE COURT:  All right.

10            MR. ESSERMAN:  Thank you.

11            THE COURT:  Have I heard from everybody on the

12   claimants' side?

13            Mr. Karotkin, I very much want to hear what you're

14   going to have to say, but I think I want to hear from Mr.

15   Bentley first.

16            MR. KAROTKIN:  That's fine, Your Honor.  I was hoping

17   to go last anyway.

18            THE COURT:  All right.

19            MR. SWETT:  Mr. Bentley, I've got the transcript.

20            MR. BENTLEY:  I'll look at it latter, thank you.

21            Your Honor, Mr. Swett has made a lot of very strong

22   allegations.  We -- let me say at the outset, we very strongly

23   dispute them.  And I'm going to attempt to show Your Honor that

24   they rest on a lot of distortions if not outright inaccuracies.

25   I take very seriously what he said.  And I'm frankly a little

Page 52

1    bit shocked by some of the things he said.

2         I believe the things he said, the principal points

3    that we'd like to respond to, each of which we think is deeply

4    inaccurate, fall into about four categories, depending on how

5    you count.  The first, he actually used the word "false

6    pretenses"; that Bates White came to this court with false

7    pretenses and snookered -- not his word, but a fair

8    paraphrase -- snookered this Court, snookered him and his

9    clients.  That is absolutely untrue.  And I'd like to address

10   that first.

11        Just to preview the other points, he also says that

12   Bates White is unlike any other expert in that they have a

13   financial stake.  This is also untrue, Your Honor.  In fact

14   there are other parties involved in the asbestos litigation who

15   have a much greater financial stake, who regularly have access

16   to highly confidential information which they use in exactly

17   the same way that he is accusing the Bates White firm of using

18   it.  That will be point two, Your Honor.

19        Point three is the suggestion that the anonymity

20   protocol that the ACC negotiated -- and I would say with full

21   knowledge of Bates White's business activities, which have

22   always been public, have never been concealed; they're on the

23   website.  They regularly --

24        THE COURT:  They haven't been public to me, Mr.

25   Bentley.

MOTORS LIQUIDATION COMPANY, et al.

Page 53

1          MR. BENTLEY:  Yes.  And my apologies for that, Your

2     Honor.  But let me explain why.  This is a -- this relates to a

3     company known as Litigation Resolution --

4          THE COURT:  Resources Group?

5          MR. BENTLEY:  -- Resolution Group or LRG.

6          THE COURT:  Litigation Resolution Group?

7          MR. BENTLEY:  Correct, Your Honor.  That is a company

8     in which a couple of Bates White personnel have an interest.

9     Charlie Bates, the lead person in this engagement and the

10    person who I believe signed the retention application in this

11    case, is not involved with LRG.  That's why it didn't show up

12    in our retention application in this case.  Charlie Bates is

13    not involved with LRG.

14          The lead person at LRG is Charlie Mullin -- there are

15    two Charlies, Your Honor.  Charlie Mullin has never appeared

16    and may never appear as an expert witness in this case.  And if

17    he ever does, you can be sure we will disclose this and any --

18    every other pertinent matter in connection with his testimony.

19    And if he were to put in an expert report, you can be sure,

20    this would be in the report.  So that is one reason we didn't

21    disclose it.

22          Another reason, Your Honor, is that -- I have to use

23    strong words, Your Honor, because Mr. Swett used very strong

24    words -- there has been a serious mischaracterization of what

25    LRG does.  And the suggestion -- it has been said that they

have an undisclosed commercial interest that is somehow different from interests held by other experts. That's not true, Your Honor. LRG is a startup company, as I think has been accurately stated. The hope of LRG is that they will be able, in some case, to find a party that has capital. They do not have capital, Your Honor. They do not put their own capital into deals. The suggestion was that they did. It wasn't stated, but that was the suggestion. They do not.

They receive a fee -- or their hope, if they ever do a deal -- they've never once done a deal, Your Honor. This is a startup that's hoping to do business. If they ever do a deal, the structure that's contemplated is they would receive a fee, much like any estimation expert receives a fee, when it does due diligence with respect to a proposed, say, merger or transaction involving a company with asbestos liabilities. The estimation expert would then be paid, perhaps hourly and perhaps also a success fee, if the transaction closes, for vetting the asbestos exposure of the company that's being looked up.

That's the sort of fee. That is exactly the sort of fee that if LRG ever got business, it would receive. That is no different, Your Honor, from the sorts of fees that the other experts in this case -- I can't say every single one of them, but certainly an awful lot of estimation experts regularly do this sort of due diligence work, and they're not just paid

Page 55

1    hourly; they receive a success fee.  So that's the only --

2           THE COURT:  How is success measured?

3           MR. BENTLEY:  Well, I believe -- when they're doing

4    due diligence, I believe the standard practice is, it hinges on

5    whether the transaction closes or not.  And in LRG's case, it

6    would simply hinge on whether the party that's coming in and

7    supplying the capital in fact closes on the deal.  They would

8    then receive a fee -- a flat fee for putting the deal together.

9    They are something as a broker.  That's the way Dr. Mullin has

10   described it to me.  So that's quite different, Your Honor,

11   from what I think was suggested to this Court.

12           And if one wants to ask, are there parties in this

13   litigation world that in fact have a financial interest --

14           THE COURT:  I still don't understand, Mr. Bentley.

15   As I discussed in my recent published decision in Chemtura,

16   so-called success fees can be of many different types.

17   They're almost always relevant to the credibility of witnesses.

18   The more difficult issue is whether they rise to the level of

19   disqualifying the witness.  And in Chemtura I said, I've been

20   around the block a few times.  I know enough about it, and it's

21   enough for me to cause everybody to take a hit against

22   credibility.

23           But one of the success fees was if that guy's

24   constituency got more.  Another guy's success fee was if the

25   plan got confirmed.  Another was if a plan satisfactory to the

09-50026-mg   Doc 7966   Filed 11/23/10   Entered 12/02/10 09:27:42   Main Document
Pg 56 of 88
MOTORS LIQUIDATION COMPANY, et al.

Page 56

1    creditors' committee got confirmed.  The contingent interest in

2    a constituency's recovery, I found to be the most egregious.

3    But I further ruled that if, as I assumed, the success fee for

4    a plan being confirmed or a satisfactory plan being confirmed

5    wasn't simply a disguised way to pay investment bankers more,

6    that that was another kind of incentivization.

7           Now, within those confines or otherwise, help me

8    better understand the role of this guy's success fee.  What is

9    the event that measures success, and what is the guy doing, and

10   what is the nexus between the two of them?

11          MR. BENTLEY:  The most important point, I think, Your

12   Honor, is in this case, in connection with Bates White's

13   services in this case, there's no success fee whatsoever.

14          THE COURT:  That isn't what I understood the

15   allegation against Mullin to be.  The allegation was that he

16   was gathering up data to use in a private enterprise, unrelated

17   to this case, in which he would be making a profit.  Now, if

18   that is an incorrect understanding of what I heard from Mr.

19   Swett and from the two tort lawyers, correct me.  But please

20   tell me the facts as you understand them.

21          MR. BENTLEY:  And first, Your Honor, what you just

22   summarized, I think, is an accurate summary of what you heard

23   from Mr. Swett.  So I may have not been fully clear.  I'm

24   trying to distinguish between two things, Your Honor:  first,

25   is he receiving any success fee from the creditors' committee

1    in this case --

2            THE COURT:  I understood that from the get-go, but

3    that wasn't --

4            MR. BENTLEY:  Okay.  The answer is no.

5            THE COURT:  -- the allegation that was being made

6    either.

7            MR. BENTLEY:  Okay.  So let me turn to that, Your

8    Honor.  And I'm pausing a little bit, because the allegation is

9    about transactions that haven't yet occurred.  And so we are,

10   all of us, speculating as to what the fee might be.  But what I

11   can represent to Your Honor, is what Dr. Mullin has represented

12   to me about what he contemplates the success fee would be if

13   LRG were to ever get business.  And his contemplation is that

14   if a deep-pocketed institution comes to him and essen --

15           THE COURT:  An institution that is going to fund him

16   or an institution that's the target of litigation?

17           MR. BENTLEY:  The basic model, Your Honor, is if you

18   have a defendant that say, is in bankruptcy -- or might be

19   outside of bankruptcy, that the basic idea is that they would

20   offload their asbestos liabilities to Warren Buffet, just to

21   pick a name as an example -- to Warren Buffet or some other

22   financial insti -- an institution run by him or some other

23   financial institution.  And this institution, let's call it

24   Warren Buffet, would essentially insure the asbestos

25   liabilities.

Page 58

1           Very different from most asbestos insurance which was

2     granted way back before people knew there was an asbestos

3     problem.  This is asbestos insurance offered right in the

4     middle of the asbestos litigation.  So it obviously would be

5     much pricier than insurance purchased before people knew that

6     it was a problem.

7           THE COURT:  Kind of like a credit default swap for

8     asbestos defendants?

9           MR. BENTLEY:  I'm not sure if that's the right

10    analogy, Your Honor.  But it's essentially a new defendant --

11    I'm sorry -- a new party coming in and saying whatever the

12    liability is, we'll be on the hook for it.  And you -- say, GM

13    or W.R. Grace -- let's say W.R. Grace -- you, W.R. Grace, will

14    pay us X billion dollars.  And in exchange, whatever the hit

15    turns out to be, we'll be good for it.  And the financial

16    institution would be hoping that the liability would come in at

17    less.  And the financial institution would be looking to Dr.

18    Mullin and LRG for the advice on which it made that financial

19    bet.

20          THE COURT:  And your opponent alleges or at least

21    implies that Mullin getting the data which he's going to use to

22    advise people in making those financial bets, takes the data to

23    which Bates White is being given access to a new purpose or a

24    new level that facilitates the efforts in the asbestos wars,

25    unrelated to the needs and concerns of this case.

09-50026-mg   Doc 7966   Filed 11/23/10   Entered 12/02/10 09:27:42   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 59 of 88

Page 59

1    MR. BENTLEY:  That is the allegation, Your Honor.

2    And there's a number of big flaws in that allegation.  I'm

3    pausing for a second to think which I should address first.

4    THE COURT:  Well, why don't you try addressing them

5    all.

6    MR. BENTLEY:  Certainly, Your Honor.  Maybe let me

7    just tick off the broad topics and then I'll turn in detail to

8    whichever one Your Honor would like me to start with.

9    One problem is the suggestion that Bates White

10   actually could do that.  And we believe it's very clear that

11   the confidentiality order that was heavily negotiated by the

12   ACC and the trusts, and the anonymity protocol that Your Honor

13   will recall was heavily negotiated by the trusts and Mr. Swett

14   in the hallway of this courtroom -- that those would make it

15   virtually impossible for Bates White to do what they're saying.

16   And I'll explain.

17   But if I may, let me just mention the several other

18   huge flaws here, so Your Honor gets the big picture as we see

19   it.  The other -- another huge flaw, Your Honor, is that the

20   ACC, when they negotiated those protections that I just

21   mentioned, that they didn't know that Bates White is engaged or

22   hopes to be -- I'm sorry; strike that -- that LRG, in which one

23   Bates White senior person, Dr. Mullin, and a few of his junior

24   colleagues are principals -- that LRG -- I'm sorry, I lost my

25   thread, Your Honor.

MOTORS LIQUIDATION COMPANY, et al.

Page 60

1          My point was that ACC was -- the ACC was well aware

2    of the connection between Bates White and LRG at the time it

3    negotiated these protections.  And I say that for a couple of

4    reasons, Your Honor.  One is, Your Honor may be aware, there

5    are regular conferences sponsored by HB and others -- it used

6    to be Mealey's --

7          THE COURT:  Who is HB?

8          MR. BENTLEY:  HB is the successor to Mealey's.  Does

9    Your Honor remember the Mealey's Litigation Reporters?  They

10   sponsor conferences.

11         THE COURT:  Mr. Bentley, since August 9th, I had a

12   major contested confirmation hearing with a four-day trial, and

13   I've had six billion dollar cases.  You better refresh my

14   recollection on the things that have transpired since August in

15   the vocabulary and jargon you use --

16         MR. BENTLEY:  Okay, I'm sorry, Your Honor.  I know

17   there is a lot of jargon in this case.

18         The point is not the name of who sponsors the

19   conference, but there are regular conferences that are

20   regularly attended by Bates White, by Dr. Peterson, by Joe

21   Weiss, by lots of the major players in the asbestos litigation.

22   They occur, you know, ten, twenty times a year.  Bates White

23   has been disclosing for many months, going back long before

24   this summer, its -- the LRG business that some of its people

25   are engaged in.  Frankly, it's been pitching that business at

MOTORS LIQUIDATION COMPANY, et al.

1    these conferences, attended by all the ACC's clients, and

2    frankly, I would venture, attended by members of Caplin &

3    Drysdale, because they regularly appear at these conferences.

4           Mr. Karotkin appears at these conference.  I

5    sometimes appear at these conferences.  These are regular

6    things and everybody goes.  And Bates White has been regularly

7    disclosing this.

8           In addition, something that Your Honor can take

9    judicial notice of, is if you Google Charles H. Mullin -- I did

10   that this morning -- the third hit you'll see is Charles H.

11   Mullin/LRG.  And if you click on the link, you get to one of

12   the exhibits that's annexed to the Motley Rice/Peter Angelos

13   objection.  That's the objection that addresses these issues.

14          One of their very exhibits is pulled of the LRG

15   website.  And you or I or anybody can easily find it just by

16   Googling Dr. Mullin.  And if Your Honor likes, I'm happy to

17   hand up -- I actually printed --

18          THE COURT:  Mr. Bentley, do you understand how judges

19   do their jobs?  They don't go out Googling to find out

20   information that might be discerned if any of the litigants

21   before them chose to say something in court or in a brief.

22   We're not free-roving inquirers to find out stuff that might be

23   potentially relevant to the rulings we issue.  In fact, some

24   might regard that as textbook violation of due process.

25          MR. BENTLEY:  Your Honor, my apologies if I wasn't

MOTORS LIQUIDATION COMPANY, et al.

Page 62

1    clear.  I didn't mean to suggest for a moment that this is

2    something Your Honor or your chambers should have done.  But my

3    point was that the ACC clearly put a lot of work -- you'll

4    remember in August all the briefs that were filed -- clearly

5    they and their counsel and the trusts' many counsel did a lot

6    of work here.  And it was the simplest of things for them to

7    discover these facts, if they hadn't already known them from

8    these conferences.

9            That was my point, Your Honor.  Not to suggest that

10   Your Honor should have discovered it, but that it is very clear

11   that this is public information to which the ACC had ample

12   access, and in fact, which they'd heard about directly at these

13   many conferences and which they could have found on the web.

14   That was my --

15           THE COURT:  To what extent is Mullin walled off from

16   access to this under the existing confidentiality stay?

17           MR. BENTLEY:  He is a member of the team, Your Honor.

18   But let me tell you how he's walled off --

19           THE COURT:  The team that going to be appearing in

20   the GM case?

21           MR. BENTLEY:  The team that's doing the work that

22   will support Dr. Bates' expert report and Dr. Bates' testimony.

23           But if I may, Your Honor, I'd like to tell you how

24   he's walled off from the data that the ACC is concerned about.

25   And there -- and my starting point, Your Honor, was, when the

MOTORS LIQUIDATION COMPANY, et al.

Page 63

1    ACC negotiated the protective order and the anonymity protocol,

2    they were aware of this issue and they addressed it.  And the

3    anonymity protocol makes it essentially impossible for Dr.

4    Bates or Dr. Mullin or anybody else to use the confidential

5    information in the way they're suggesting.

6            And let me remind Your Honor what the basic

7    provisions are that I'm referring to.  First off, they make a

8    commitment that they won't use any of the confidential data

9    obtained in this case in any other capacity.  So first off,

10   we're trusting that they will honor their commitments.  And a

11   point I made a month or a few months ago is, there's never been

12   any suggestion that they have ever done anything other than

13   that -- that they've ever breached any commitment.

14           But beyond that, let's assume hypothetically -- and I

15   do want to stress hypothetically -- that one didn't trust Bates

16   White.  Now, I know that the ACC is vociferously untrusting of

17   Bates White.  We think that's entirely unwarranted.  We think

18   there are reasons for that which I can mention if Your Honor

19   wants to go there.  But my point is, let's assume

20   hypothetically that they were untrustworthy and that there were

21   a reason to believe they wouldn't honor their commitments.

22           They couldn't use this data.  And the reason is,

23   there's a very rigorous process that was worked out and that's

24   embodied in the stipulation that Your Honor so ordered back on

25   October 22, last month, when we were last here before you.  And

1    that provides that the individual specific data, names and

2    Social Security numbers, is used only for one very limited

3    purpose, and that is the matching of data concerning a claimant

4    from one dataset with the data concerning that claimant from

5    another dataset.

6            It's used -- the sensitive information, the name and

7    the Social Security number, is used only for that purpose.

8    Once the matching is completed, then the name and the Socials

9    are stripped away.  And they're put in a vault, essentially.

10   And from then on, Dr. Mullin, Dr. Bates, everybody else, is

11   working off what we call an anonymized database, which gives

12   rise to none of the concerns that we're talking about.

13           So if we pause for a moment and imagine, this

14   fantasy -- and I think it's just that, Your Honor, it's a

15   fantasy.  What would they have to do -- you know, if you

16   couldn't trust them to honor their commitments, what would they

17   have to do to breach their commitments?  They'd have to

18   memorize Social Security numbers and memorize the specific --

19   claimant-specific information to which it relates.  And we're

20   talking as to seven and a half thousand individuals.  It's

21   nuts, Your Honor.  It's a complete fantasy.  And there's --

22   it's completely unrealistic.

23           Let me turn Your Honor to a related point, and that

24   is Dr. Peterson, the plaintiff's expert, regularly has access

25   to data that's just like this, and he's under much less

MOTORS LIQUIDATION COMPANY, et al.

Page 65

1    stringent constraints.  And he regularly admits that he uses

2    that data in performing his estimations.  That's something you

3    didn't hear from the ACC, and that's a huge distortion in the

4    picture that was presented to Your Honor.

5             Dr. Peterson, as was stated in his retention

6    application to this Court, which I can hand up if it's helpful

7    to Your Honor -- Dr. Peterson disclosed in his retention

8    application that he's a consultant to twenty-six of the biggest

9    asbestos trusts:  Johns Manville -- practically every large

10   asbestos trust that's been created in an asbestos-driven

11   bankruptcy.  He's a consultant to the trust.

12            As such, he has access to all the data we're talking

13   about -- all the most sensitive data.  He's not subject to any

14   anonymity protocol.  He then goes on and puts in his expert

15   reports, he's going to put in an expert report in this case,

16   and all these special advantages you heard that Bates White

17   has -- this is perhaps the biggest fallacy of all, Your

18   Honor -- there's no special advantage.  Bates White is getting

19   nothing that Dr. Peterson and the other experts in this case

20   don't have.  All of these experts routinely appear and estimate

21   asbestos liabilities.  They also routinely do due diligence

22   works as to a company's asbestos if it's outside of bankruptcy.

23            In that capacity, they're exposed to all this data,

24   Your Honor.  And they're not subject to the stringent orders

25   that, at Your Honor's insistence, were negotiated here.  And

Page 66

1    they go on and they use them in other cases.  So Bates White is

2    far more constrained than any of the other experts in this

3    case.

4            And, Your Honor, if we're talking about financial

5    incentive, this was another huge misimpression that was

6    provided to the Court.  Who has the real financial incentive

7    here?  The plaintiffs' law firms.  As Your Honor knows, they're

8    regularly exposed to all this data.  They'll negotiate on

9    behalf of hundreds if not thousands of claimants against, say,

10   Owens Corning or W.R. Grace or any other defendant you can

11   name.  In each settlement, they're bound to not disclose the

12   amount of the settlement.  It's confidential.  Just as the data

13   here is confidential.

14           They then go on to negotiate settlements on behalf of

15   other clients of theirs for which they receive a contingency

16   fee of a third or sometimes thirty-five percent or more, for

17   other clients.  And just as you heard -- you know, Dr. Bates

18   can't blot out of his mind what's he's learned, these

19   plaintiffs' firms are bound to not use what they learned when

20   they go on and negotiate settlements with the same defendant on

21   behalf of other plaintiffs.  But of course they can't blot it

22   out of their mind.  And of course, it's enormously valuable,

23   because they know what each defendant's proclivities are, what

24   each defendant is willing to pay.  That's a financial

25   incentive, Your Honor.  They get thirty-five percent or thirty-

MOTORS LIQUIDATION COMPANY, et al.

1    three percent of the take.

2         Bates White doesn't get anything remotely like that.

3    They get paid -- I'm sorry.  LRG, this bogeyman you've heard

4    about, they don't get anything remotely like that.  As I said,

5    they don't have a direct financial stake.  At most they get

6    this flat fee for putting a transaction together.  So the real

7    party that has the financial stake is the plaintiffs.

8         Now, Your Honor, we haven't sought to disqualify

9    anybody.  We haven't said Dr. Peterson can't appear hear

10   because he has access to all this confidential information,

11   subject to much less constraint than Bates White; because we're

12   content to assume that Dr. Peterson won't violate the terms of

13   the confis that he's agreed to.

14        And if we turn back, Your Honor, to August, that was

15   one of the central points Your Honor made.  Your Honor said,

16   for hundreds of years, a basic premise in the litigation system

17   is people agree to confis, even when it's the Coke secret

18   formula that's involved.  We don't deprive them of getting the

19   data.  We assume that they'll honor their confi.

20        So we're prepared to follow that rule with respect to

21   Dr. Peterson.  And we submit that that in itself would be

22   sufficient to alleviate any concerns that have been raised with

23   respect to Bates White.  But as I mentioned a moment ago, at

24   Your Honor's insistence we've gone way beyond that.  And we've

25   entered into this elaborate anonymity proposal that strips them

MOTORS LIQUIDATION COMPANY, et al.

1    of the ability to misuse this information.

2         Your Honor, if I may, I have one or two other points,

3    if you can give me a moment to look at my notes?

4         THE COURT:  Yeah.

5         MR. BENTLEY:  Well, my final point I'll go into if

6    Your Honor wishes, but I won't if Your Honor would prefer to

7    move on.  You heard extensive reargument --

8         THE COURT:  Well, you can say what you want.  What I

9    mainly care about is hearing what Mr. Karotkin has to say,

10   because perhaps, of the various parties in the room, his

11   interests might be closest to mine in terms of getting on with

12   an expeditious hearing and getting money into the pockets of

13   creditors of all persuasions.

14        MR. BENTLEY:  Okay.  Well, let me be very brief, and

15   then I'll cede the podium to Mr. Karotkin.

16        We share, by the way, his interest in moving this

17   along quickly.  And we were distressed by what we heard from

18   Mr. Swett and by the filing they made, I think it was last

19   week, in which they sought additional discovery which would

20   exponentially slow down this proceeding.

21        We think that what's happened, Your Honor, is they

22   are very, very distressed by the prospect of having to turn

23   over this information.  Mr. Swett argued there's no relevance.

24   I can state the relevance of it very briefly and succinctly if

25   Your Honor wishes.  But the basic -- Your Honor, their central

MOTORS LIQUIDATION COMPANY, et al.

1    contention back in August when they said this is not relevant,

2    was they said the amounts that were paid by the trusts and co-

3    defendants are not relevant because they were baked into the

4    amounts that GM paid to the plaintiffs prior to its bankruptcy.

5           Our central contention, Your Honor, is a factual one,

6    and that is, no, they weren't baked in.  Because GM didn't know

7    the payments that these plaintiffs were getting and GM didn't

8    know the exposure allegations that these plaintiffs were making

9    to the various trusts, which were inconsistent with the

10   disclosures that were being made to GM.

11          And that -- if Your Honor -- if we get the discovery

12   we want, if it shows that, that will have a fundamental impact

13   on this estimation.  It also explains, I think, why the ACC is

14   so determined to not let us get this information and why, Your

15   Honor, Mr. Swett didn't mention a few weeks ago, they actually

16   made a motion in front of Judge Fitzgerald down in Delaware, in

17   which they sought an order that by its terms would actually bar

18   the discovery that Your Honor has granted.

19          We filed a big objection saying this is inconsistent.

20          THE COURT:  We, on behalf of whom?

21          MR. BENTLEY:  Sorry, we?  The unsecured creditors'

22   committee in this case -- we filed an objection before --

23          THE COURT:  In Judy Fitzgerald's case?

24          MR. BENTLEY:  We, as the creditors' committee in GM

25   filed an objection to what Caplin & Drysdale had filed before

09-50026-mg   Doc 7966   Filed 11/23/10   Entered 12/02/10 09:27:42   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 70 of 88

Page 70

1    Judge Fitzgerald, saying that this order that they're asking

2    her to enter would bar the discovery that Your Honor has

3    permitted.  That it's an attempt to collaterally attack Your

4    Honor's ruling, which you'll recall, back in August, counsel

5    for the trusts represented they would not do.  This order, by

6    its terms, would have that effect.

7              Now, to be fair, Your Honor, they didn't serve this

8    order on us.  I don't know if that was deliberate or not.  And

9    after we filed our objection they called us up and they said

10   oh, we're not trying to do that, and we'll negotiate a

11   modification of the order that will make that clear.  But this

12   was an order that by its terms would have had that effect.

13             And that's just an example, Your Honor, of how

14   there's a lot more going on here than confidentiality.  They're

15   concerned that this is going to have a big impact on how they

16   conduct litigation.  And that, I submit, is what's behind

17   everything you heard from Mr. Swett.

18             And by the way, there were a lot of other

19   misrepresentations or inaccurate statements that I won't go

20   into unless Your Honor wants me to, like that this is discovery

21   that's not available in the tort system.  We addressed that in

22   our briefs before Your Honor in August and then again in

23   October.  And it's just not true.  But I don't think we need to

24   go there.

25             I'm happy to yield to Mr. Karotkin at this point,

MOTORS LIQUIDATION COMPANY, et al.

Page 71

1    Your Honor.

2              THE COURT:  Before you do, Mr. Swett said listen,

3    he'll just stipulate that you get the credit for the average

4    amount that was dished out by each of those trusts.  You want

5    to comment on the strengths and weaknesses of that?  It sounds

6    to me like -- I wondered, and sometimes my wondering doesn't

7    turn out to be justified or not -- that he's sufficiently upset

8    about Mullin getting this stuff, that he's willing to give you

9    credit for the average amount in each of those other cases and

10   give to you kind of what you're looking for.

11             MR. BENTLEY:  And, Your Honor, I've just been handed

12   a note, because we've been trading e-mails with Bates White

13   about the proposed stip.  And I think the short answer, Your

14   Honor, is we would like to consider that.  The stip falls far

15   short of the relevant information that we'd be getting through

16   the discovery.  It doesn't tell us about variation law firm by

17   law firm, state by state.  It doesn't tell us what exposure

18   allegations were made to the various trusts, which is relevant

19   for the reason I mentioned a few minutes ago.

20             Neverthe -- so we think it's a pale substitute for

21   the discovery we'd be getting.  Nevertheless, it's a

22   substantial proposal.  It's a significant one.  We're prepared

23   to consider it.  And I'd prefer not to do it on one foot, so to

24   speak.

25             THE COURT:  I understand.

MOTORS LIQUIDATION COMPANY, et al.

Page 72

1          Mr. Karotkin, can I get your perspective, please?

2          MR. KAROTKIN:  Thank you, Your Honor.  Stephen

3     Karotkin for the debtors.

4          I would like to think my interests are always closest

5     to yours, Your Honor, in these cases.  I think -- you know,

6     Your Honor, I think you put your finger on it, I think it was

7     at the beginning of Mr. Bentley's comments, that asbestos --

8     this is not an asbestos-driven case, not even close -- not even

9     close.  And what was supposed to be a minor sideshow has now,

10    unfortunately, in my view and I think perhaps in the Court's

11    view, becoming a main event and threatening to hold up

12    distributions with respect to, you know, let's say thirty-five

13    billion dollars of other claims.

14         And I think what has happened here, Your Honor, is

15    that the novel approach that the unsecured creditors'

16    committee, the Bates White firm, has taken in this case, to how

17    the estimation process ought to take place, has driven us in

18    that direction.  And I think that what Mr. Swett indicated in

19    his comments are very telling and very true.  This has never

20    been done before.

21         I know that Mr. Swett has been involved in a lot more

22    estimation proceedings than I have.  We have spoken with our

23    expert.  And this information and this approach has never been

24    used before in estimating asbestos claims, in real asbestos

25    cases.  And what has happened here is we have embarked --

MOTORS LIQUIDATION COMPANY, et al.

Page 73

1           THE COURT:  In real asbestos cases, you mean

2    asbestos-driven as --

3           MR. KAROTKIN:  Yes.

4           THE COURT:  -- Chapter 11s?

5           MR. KAROTKIN:  Yes.  And for example, I do have some

6    experience.  I was involved in the original EaglePicher case,

7    which was the first 524(g) injunction after the statute was

8    enacted.  I represented the debtor there.  Many of the same

9    experts were involved -- not the Bates White firm.  This

10   information was not -- the trusts didn't exist back then, but

11   no one embarked on this type of path.  In Armstrong I

12   represented the debtor, Your Honor.  And the estimation

13   proceeding was rather straightforward.

14          And it's interesting to note what's occurred here.

15   And it all occurred based upon the initial 2004 examination

16   sought by the creditors' committee, which goes back, I believe,

17   to August.  And that's what has turned this into a real -- in

18   my view, a real donnybrook.  And let's sort of put that in

19   perspective.

20          They made their motion back in August.  The result of

21   that was Your Honor granted certain relief.  The original

22   confidentiality order, Your Honor, that was negotiated in that

23   case, the confidentiality provisions, took over a week to

24   negotiate.  It was the most incredible process in which I've

25   ever been involved.  All of the lawyers involved in that

09-50026-mg    Doc 7966    Filed 11/23/10    Entered 12/02/10 09:27:42    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 74 of 88

Page 74

1   process were on the phone for countless hours every day

2   negotiating what I would have thought was a simple

3   confidentiality agreement.  That cost the estate several

4   hundred thousand dollars, just that one agreement.

5          And it's interesting.  None of these firms have a

6   financial stake in this.  Unfortunately, it's all being funded

7   out of the estate -- it's really all being funded by the United

8   States government.  They have no financial stake to drag this

9   out and to use this for whatever leverage they have.

10          The anonymity protocol, I am sure, cost another

11  several hundred thousand dollars.  Your Honor, I'm sure you are

12  aware of the many pleadings that were filed, the letters you

13  received, the number of hours and time that was spent in court

14  and then negotiating that document in the conference room.  Now

15  we have the objections today.  And it goes on and on.

16          And Mr. Bentley alluded to the 2004 requests that the

17  asbestos committee recently served.  I don't know if you've had

18  a chance to look at that.  But that's entirely -- entirely

19  prompted, as Mr. Swett indicated, by what is going on here with

20  the unsecured creditors' committee.  Now that they've embarked

21  on this escapade, the asbestos committee is now moving forward

22  and asking Your Honor to approve their escapade, because

23  they've got to combat or allegedly combat whatever Mr. Bates is

24  doing and his firm is doing and Mr. Mullin or whatever they're

25  doing.

MOTORS LIQUIDATION COMPANY, et al.

Page 75

1          And you will see, Your Honor, in that motion, they're

2     seeking discovery from New GM.  They're seeking discovery from

3     Old GM.  There are I believe thirty-seven different document

4     requests -- that doesn't include the subparts.  And of course

5     we'll address that in a responsive pleading.  Document

6     discovery, depositions.  But let's not leave it at that.  It

7     also asks you to permit discovery from sixteen -- sixteen other

8     co-defendants in the system, including not just document

9     requests, but deposition testimony.

10          I don't even think they were served with this 2004

11     request, the other sixteen defendants.  Perhaps Mr. Swett

12     knows.  I don't know.  But I don't think so.

13          And again, solely in response to the unsecured

14     creditors' committee's unique approach to an estimation -- an

15     aggregate estimation.  And as I said, none of it is necessary.

16     And I said that initially, Your Honor.  Our concern with this

17     was that this whole process -- embarking on this process was

18     going to delay these cases unnecessarily, and that if there

19     were going to be an estimation hearing, it can be a traditional

20     estimation hearing.

21          And all of the experts -- all of them -- have the

22     information necessary to do the same type of estimation that's

23     been done in every other case.  They have the entire database.

24     They've had it for months.  The asbestos committee was granted

25     some additional discovery on a consensual basis.  Everybody has

Page 76

1   everything they need.  And we have proposed to Your Honor an

2   estimation motion and a schedule to move forward on a rather

3   expedited basis.  But again, people can do that now.  People

4   can prepare their expert reports now.  And we can move forward

5   and we can get this finished.  And we can get this finished,

6   obviously subject to your schedule, in January or early

7   February.

8           An estimation hearing, Your Honor, is not really

9   difficult.  Again, I know it's going to encompass a lot of your

10  time.  It can be done in one day.  It's four experts

11  testifying.  It's relatively simple.  That's all it is.  And

12  I've been through them; they've been through them.  And it

13  takes a day or two to get finished with it.

14          And I will assure you, Your Honor, if you stop this

15  process now, and let the parties proceed like they've always

16  proceeded, we will get a consensual resolution of this mighty

17  quickly, and we will be done with this, and you won't have that

18  hearing.  And that's our interest.  We're not interested in

19  spending any more money on this.  I'm sure the Treasury's not

20  interested in spending any more money on this.

21          I hate to tell you what the fees have been running

22  with the various experts in connection with this proceeding.

23  And we have the classic tail wagging the dog.  And, Your Honor,

24  I agree with Mr. Swett.  I think it's time to put an end to it.

25  I frankly was surprised by the Bates White and Mr. Mullin's

MOTORS LIQUIDATION COMPANY, et al.

Page 77

1  relationships.  I think that the offer that Mr. Swett made, in

2  terms of his proposed stipulation, was entirely reasonable.  I

3  believe that he said, with that being done, they don't have the

4  need for any further discovery.  And I think no other party

5  will have the need for further discovery.  And we can move on

6  and we can get this case finished.  Thank you.

7         THE COURT:  All right.

8         MR. BENTLEY:  Your Honor, thirty seconds, before --

9         THE COURT:  If you can honor that promise, Mr.

10  Bentley.

11        MR. BENTLEY:  Even if Your Honor were to permit the

12  trust discovery, there's an order that Your Honor already

13  entered that will enable the discovery to be completed in a

14  timely fashion.

15        THE COURT:  Well, the implicit assumption under which

16  I've heard argument for the last almost two hours is that the

17  combination of the failure to disclose to me the interests of

18  Mullin and the Litigation Resolution Group and the points that

19  Mr. Karotkin made, collectively provide a basis for Rule 59 --

20  Bankruptcy Rule 9024 relief.  So yes, I understand that I have

21  an existing order.

22        MR. BENTLEY:  I was --

23        THE COURT:  But the reason I've heard so much

24  argument is because I'm trying to get my arms around whether

25  that earlier order, in light of new facts I have, and the way

MOTORS LIQUIDATION COMPANY, et al.

Page 78

1    you guys are going at it hammer and tong, has made that order

2    one for which relief under Rule 59 doctrine is appropriate

3              MR. BENTLEY:  I was actually referring to a different

4    order, Your Honor.  I understand that Your Honor has issues

5    before you that you need to consider.  I was making a different

6    point -- trying to make a different point.

7              THE COURT:  Go ahead.

8              MR. BENTLEY:  And that is, Your Honor will remember,

9    you entered an order on October 22 -- a stipulated order that

10   implemented the anonymity protocol.  There was a provision in

11   there about timing.

12             THE COURT:  About what?

13             MR. BENTLEY:  Timing.  Specifically it said -- the

14   ACC agreed that under -- and it's put into the order -- that

15   initial expert reports will be filed six weeks after the trust

16   production will be made.  Under the prior order, the trust

17   production will be made seven weeks after Your Honor rules on

18   the meso claimant objections.

19             So my point is simply, that order is in itself a

20   ground for Your Honor to say to the ACC, you can't take new

21   discovery now, you've waited too long to do it, if the new

22   discovery would delay the January 10 deadline.  If Your Honor

23   were to enter an order today or later this week resolving the

24   meso claimant objections, then under the October 22 order,

25   initial expert reports would be due January 10.  We're locked

1    in.  The ACC agreed to that.  Your Honor so ordered it.

2          They've now waited three and a half months to make

3    this latest discovery request.  Your Honor would have ample

4    grounds to say, ACC you agreed to this expert report deadline

5    and the implicit notion that discovery -- fact discovery would

6    be completed weeks in advance of that.  You can't now change

7    course and ask for discovery that would delay that deadline.

8    We have a deadline that's already in place.  That was simply my

9    point, Your Honor.

10          THE COURT:  All right.  I'm going to take a ten --

11   Mr. Swett?

12          MR. SWETT:  Yes, sir.

13          THE COURT:  What is it?

14          MR. SWETT:  Well, I have some points.  I don't want

15   to belabor it or test your patience.  But I have some points in

16   response --

17          THE COURT:  Well, you're not the first guy in this

18   room who's tested my patience.  I'll give you the same amount

19   of time I gave Bentley just now.

20          MR. SWETT:  First, with regard to the deadline that

21   Mr. Bentley refers to, that was part and parcel of the

22   compromise anonymity protocol which was negotiated with Dr.

23   Mullin in the room, with his being the ultimate arbiter for the

24   UCC of whether or not particular provisions were acceptable,

25   and with his insistence on matching the individual claimants

09-50026-mg   Doc 7966   Filed 11/23/10   Entered 12/02/10 09:27:42   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 80 of 88

Page 80

1    from the trust data to his other data sources.  Had I known --

2    and I did not -- of Dr. Mullin's mixed capacity, I would not

3    have agreed to that anonymity protocol.  And that's part of the

4    issue that you will need to consider under Rule 59.

5            Now, in the Delaware proceeding that the -- some

6    trusts and trust advisory committees have --

7            THE COURT:  Which -- this is the one before Judy

8    Fitzgerald?

9            MR. SWETT:  Yes, it --

10           THE COURT:  Which case is that, by the way?

11           MR. SWETT:  -- it's a new adversary proceeding filed

12   in the Bondex case and in the other bankruptcy cases from which

13   the trusts emerged.  It has no reference to General Motors.  We

14   recognized that this case was too far along.  And we didn't

15   bring them in.  And when they misunderstood what we were trying

16   to do, and filed an objection, we promptly called them up and

17   said that is not our intention.  We will give you a stipulation

18   that keeps you out of this.

19           We are respecting the separate track that this case

20   is on and the separate and very important timetable that it's

21   on.  So I just wanted to clarify that.

22           Dr. Mullin's business model in the LRG group -- and I

23   should say, it's not just Dr. Mullin.  The website lists three

24   key people for LRG:  Dr. Mullin, Andrew Evans and Peter Kelso.

25   They all work on the UCC's team in this case.  They're all time

1   keepers in that engagement.  And they're listed on the website

2   as the key people for LRG.

3           LRG's website also explains its business model.  It

4   says that through capped indemnification, the client tenders

5   claims to LRG; LRG handles the litigation, pays claims, manages

6   liability, and pursues any applicable insurance.  And in his

7   testimony, in the Leslie Controls case, which was where that --

8   when that deposition was brought to my attention, is where I've

9   learned of these matters -- he was asked this question:  "Are

10  you buying the liabilities from them?  Is that what you're

11  doing?  Or are they selling you the liabilities, I should say?"

12          He says, "Neither is exactly right."  He goes on to

13  say that it depends on what the company's needs are.  He does

14  testify that the idea is they take the financial risk off of

15  the customer, and they're the ones who gain if the cases are

16  settled cheaply or lose if the claim values rise.

17          And that is also set forth in website material that

18  includes, for instance, this statement:  "Assuming LRG is able

19  to manage the litigation successfully, residual funds are

20  released to us and our investors.  If instead there are adverse

21  developments in the litigation, LRG and its investors lose some

22  or all of the additional assets contributed."  They are

23  speculators in the management and resolution of the asbestos

24  liabilities.

25          That was entirely unknown to me.  It should have been

MOTORS LIQUIDATION COMPANY, et al.

Page 82

1    in the retention application, in which case, both the Court and

2    the ACC would have had it right in front of them.  But the

3    inferences that Mr. Bentley is trying to raise about how this

4    was open and notorious, if that's true, it wasn't so open and

5    notorious as to come to my attention when I'm busily working on

6    a case.

7            Now, Dr. Mullin and Dr. Bates are very closely tied.

8    They are the co-authors of virtually all of the publications

9    that Bates White has put out on asbestos litigation.  And they

10   are not readily divisible.

11           Consider the scenario that I described to you before,

12   where Dr. Mullin puts off his Bates White hat, dons his LRG hat

13   and sits down to negotiate the resolution of a bunch of

14   asbestos claims with a particular law firm.  Assume also -- say

15   it's the Simmons firm; 1,300 GM mesothelioma claimants in that

16   data.  And Dr. Mullin's insisted on the trust production

17   including the law firm that represents the individual client.

18   So when they do whatever they do with that data by way of

19   matching and analyzing and slicing and dicing, he's going to

20   form impressions of how the Simmons firm has fared in the

21   negotiation of resolutions with other defendants.

22           He may not remember that, You know, JQ -- John Q.

23   Public got X dollars on a particular date, but he will

24   certainly remember that the Simmons firm produced results

25   within a given range, according to certain factors.  And he

MOTORS LIQUIDATION COMPANY, et al.

Page 83

1    will bring that knowledge with him to the table when he sits

2    down with the Simmons firm or some competitor of the Simmons

3    firm, to play out the hand in negotiating the resolution of a

4    book of business that he has acquired, he hopes, from a solvent

5    tort defendant.  And that's going to affect the negotiation.

6    And that's going to affect the outcome.

7           And you set the goal at the first hearing, Your

8    Honor, when you were inclined to grant the 2004, that that sort

9    of thing not be permitted.  And there's simply no practical way

10   that the anonymity protocol and the confidentiality agreement

11   can protect that, can prevent that from happening, because in

12   the end, they insisted and we knuckled under, not knowing of

13   Dr. Mullin's conflicting interests, to the direct production of

14   the claimant-specific information from the trusts, to Dr.

15   Mullin and his Bates White colleagues who also work in LRG.

16          So we feel very strongly that the order should be

17   revisited.  We are prepared to make that motion at the earliest

18   date.

19          THE COURT:  Mr. Bentley, I've heard enough.

20          We're going to take a recess.  And I want everybody

21   back by noon.

22      (Recess from 11:42 a.m. until 12:06 p.m.)

23          THE COURT:  Have seats, please.  I gather from my

24   chambers folks that you reached some agreement that would

25   obviate the need for me to rule?

1         MR. BENTLEY:  Correct, Your Honor, should I --

2         THE COURT:  Yes.

3         MR. BENTLEY:  -- go to the podium?

4     (Pause)

5         MR. BENTLEY:  For the record, Philip Bentley.  Yes,

6    Your Honor, I'm glad to say that -- here's the understanding

7    and the agreement that we've reached.

8         We, the unsecured creditors' committee -- I'm sorry.

9    I, as counsel to the unsecured creditors' committee, am going

10    to recommend to our client -- we need to get the client's

11    approval -- but I'm going to recommend to them that they accept

12    the stipulation that Mr. Swett offered in court today.

13        One additional wrinkle.  And that is, we had some

14    discussions, myself, Mr. Karotkin and Mr. Swett, about what

15    impact does this have on the pending -- the ACC's pending Rule

16    2004 request.  And the agreement we came to is that assuming my

17    committee approves this stipulation, the ACC will withdraw its

18    Rule 2004 application as to all parties other than the debtors

19    and New GM.  And as to the request to take discovery from the

20    debtors and New GM, both the ACC and the debtors and New GM

21    reserve their respective rights.

22        THE COURT:  Um-hum.  Mr. Swett first, then Mr.

23    Karotkin.  Did he get it right?

24        MR. SWETT:  He was correct as far as it went, but he

25    neglected to mention that his subpoenas will be withdrawn.  We

MOTORS LIQUIDATION COMPANY, et al.

Page 85

1    would ask, in addition, that the ruling pursuant to which they

2    were issued in the first place be vacated.  He hasn't agreed to

3    that.  We'd tender it to Your Honor.

4           But we will withdraw the 2004 subpoenas issued to

5    third parties other than New GM.  We will meet and confer with

6    the Weil Gotshal folks over whatever discovery's been directed

7    to the debtors; likewise New GM, in an effort to come to

8    agreement on what work remains to be done in the discovery mode

9    there.  We're not looking to expand it or protract it.

10          So there's the stipulation that we offered on the

11   record earlier.  There is the withdrawal of the subpoenas all

12   around as they relate to third parties other than New GM.  We

13   withdraw ours against solvent defendants.  They withdraw theirs

14   against the trusts.

15          And in addition, outside of the bargain, we would ask

16   Your Honor to indicate on the record that you consider the

17   prior rulings vacated, so that they will not have the spillover

18   effects that we fear.  Thank you, Judge.

19          THE COURT:  All right.  Mr. Karotkin?

20          MR. KAROTKIN:  Yes.  I think it's accurately stated.

21   As to the pending 2004 requests, hopefully we can work that out

22   with Mr. Swett.  If not, we'll be back here on December 2nd,

23   which is the return date.  And we all reserve our rights.  And

24   my only hope, Your Honor, is that this proposed stipulation

25   does not take nearly the amount of time to draft as the

Page 86

1     confidentiality agreement.

2              THE COURT:  Um-hum.  Mr. Bentley, do you have any

3     problems with what Mr. Swett said?

4              MR. BENTLEY:  Everything he said was accurate.  Your

5     Honor, I did omit to mention that we certainly -- pursuant to

6     this deal, we certainly would be withdrawing our subpoenas.

7              THE COURT:  All right.  Nothing was said as the

8     deal points of the prospective stip or consent order is

9     offensive to me.

10             I was very near issuing a ruling on what I heard

11    today which, under the circumstances, I will not deliver,

12    except to the limited extent of saying that the concerns that

13    Mr. Karotkin articulated were a matter of substantial concern

14    to me, and ultimate agreement with the most important points

15    that Mr. Karotkin made, which I understood to be that we cannot

16    allow this process to continue in the way that it's been going,

17    with the associated expense and delay and prejudice to the

18    creditor body as a whole in the GM case.

19             When the two committees go back -- when counsel for

20    the two committees go back to their respective committees to

21    get whatever ratification they perceive to be necessary or

22    appropriate, I want both counsel to share with their committees

23    the substance of what I said, and as important as the words

24    that I said on the record, the body language, which I'm sure

25    both sides saw.

Page 87

1          We worked so hard in this case to get to the point

2     where we are now, that it's a matter of substantial frustration

3     to me that we're not over the goal line yet.  And I think we

4     need to redouble our efforts to remember why we're all here.

5          All right.  Am I correct that we have no further

6     business?

7          MR. KAROTKIN:  Yes, sir.

8          THE COURT:  All right.  We're adjourned.

9          MR. KAROTKIN:  Thank you, sir.

10    (Whereupon these proceedings were concluded at 12:13 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 88

1

2                     C E R T I F I C A T I O N

3

4      I, Lisa Bar-Leib, certify that the foregoing transcript is a

5      true and accurate record of the proceedings.

6              Lisa Bar-Leib      Digitally signed by Lisa Bar-Leib
                                  DN: cn=Lisa Bar-Leib, o, ou,
                                  email=digital1@veritext.com, c=US
7      _____    Date: 2010.11.23 14:17:10 -05'00'

8      LISA BAR-LEIB

9      AAERT Certified Electronic Transcriber (CET**D-486)

10

11     Veritext

12     200 Old Country Road

13     Suite 580

14     Mineola, NY 11501

15

16     Date:  November 23, 2010

17

18

19

20

21

22

23

24

25