Hearing Date and Time: December 15, 2010 at 2:00 p.m. (Prevailing Eastern Time)
Objection Date and Time: December 8, 2010 at 4:00 p.m. (Prevailing Eastern Time)

Timothy F. Nixon
Katherine Stadler (*Pro Hac Vice*)
GODFREY & KAHN, S.C.
780 North Water Street
Milwaukee, Wisconsin 53202
Telephone: (414) 273-3500
Facsimile: (414) 273-5198

*Attorneys for Fee Examiner*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------- x
                                                           :
In re:                                                     :   Chapter 11
                                                           :
MOTORS LIQUIDATION COMPANY, *et al.,*                      :   Case No. 09-50026
    f/k/a General Motors Corp., *et al.,*                  :   (Jointly Administered)
                                                           :
                Debtors.                                   :   Honorable Robert E. Gerber
                                                           :
---------------------------------------------------------- x

**FEE EXAMINER'S REPORT AND STATEMENT OF LIMITED
OBJECTION TO THE FOURTH INTERIM FEE APPLICATION OF
<u>KRAMER LEVIN NAFTALIS & FRANKEL LLP</u>**

TO:  **THE HONORABLE ROBERT E. GERBER**
     **UNITED STATES BANKRUPTCY JUDGE**

The Fee Examiner of General Motors Corporation (n/k/a Motors Liquidation Company), appointed on December 23, 2009 (the "**Fee Examiner**"), submits this *Report and Statement of Limited Objection* in connection with the *Fourth Interim Application of Kramer Levin Naftalis & Frankel LLP, as Counsel for the Official Committee of Unsecured Creditors, for Allowance of Compensation for Professional Services Rendered and for Reimbursement of Actual and Necessary Expenses Incurred for the Period from June 1, 2010 Through September 30, 2010* [Docket No. 7804] ("**Fourth Fee Application**"). With this *Report and Statement of Limited*

*Objection*, the Fee Examiner identifies $32,555.75 in fees and expenses, from a total of $1,947,181.26 requested in the Fourth Fee Application, that are objectionable. The Fee Examiner respectfully represents:

**SUMMARY STATEMENT**

In general, the Fourth Fee Application appears substantively sound—with several exceptions that have long-term implications. It requests a total of $1,947,181.26. On December 1, 2010, counsel for the Fee Examiner provided Kramer Levin Naftalis & Frankel LLP ("**Kramer Levin**") with a draft of this *Report and Statement of Limited Objection*. On December 6, 2010, Kramer provided additional information ("**December 6 Kramer Levin Response**") by e-mail, and the Fee Examiner has incorporated all of Kramer Levin's responses into this report.

This *Report and Statement of Limited Objection* summarizes the Fee Examiner's analysis in support of a total suggested disallowance of $32,555.75 in fees from a total request of $1,947,181.26 in compensation and expenses.

**BACKGROUND**

1. Commencing on June 1, 2009, General Motors Corp. and certain of its affiliates ("**Debtors**") filed in this Court voluntary cases under chapter 11 of the Bankruptcy Code. The Debtors' chapter 11 cases have been consolidated procedurally and are being jointly administered pursuant to Federal Rule of Bankruptcy Procedure 1015(b). The Debtors are authorized to operate their businesses and manage their properties as debtors-in-possession pursuant to 11 U.S.C. §§ 1107(2) and 1108.

2. On August 31, 2010, the Debtors filed a Joint Chapter 11 Plan and Disclosure Statement [Docket Nos. 6829 and 6830].[1] Plan confirmation is anticipated in 2011.

3. On November 16, 2009, Kramer Levin filed its first interim fee application [Docket No. 4459], seeking fees and expenses in the amount of $4,678,958.27 ("**First Fee Application**"). On April 22, 2010, the Fee Examiner filed the *Fee Examiner's Report and Statement of Limited Objection to the First Interim Fee Application of Kramer Levin Naftalis & Frankel LLP* (the "**First Kramer Levin Report**"), identifying $520,863.97 in fees and expenses that were objectionable [Docket No. 5555]. That report and statement is incorporated by reference. On May 21, 2010, the Court entered an omnibus order approving a series of interim fee applications for the first interim fee period, including Kramer Levin's. *Order Granting Applications for Allowance of Interim Compensation for Professional Services Rendered and Reimbursement of Expenses Incurred from June 1, 2009 through September 30, 2009* [Docket No. 5834]. Through that order, the Court approved Kramer's first interim fee application in the amount of $4,479,062.50 in fees and $84,569.10 in expenses, authorizing payment of $4,031,156.25 and $84,569.10 in expenses, and requiring a continued holdback of 10 percent of Kramer Levin's awarded fees.

4. On March 17, 2010, Kramer Levin filed its second interim fee application [Docket No. 5296] seeking fees and expenses in the amount of $1,181,142.06. On May 18, 2010, Kramer Levin filed an amendment to its second interim fee application, seeking fees and expenses in the amount of $1,180,081.04 (the "**Second Fee Application**"). On June 22, 2010, the Fee Examiner filed the *Fee Examiner's Report and Statement of Limited Objection to Second Interim Fee Application of Kramer Levin Naftalis & Frankel LLP* (the "**Second Kramer**

---

[1] On December 7, 2010, the Debtors filed *Debtors' Amended Joint Chapter 11 Plan* and a *Disclosure Statement for Debtors' Amended Joint Chapter 11 Plan* [Docket Nos. 8014 and 8015].

3

**Report**"), identifying $58,851.45 in fees and expenses that were objectionable [Docket No. 6091]. That report and statement is incorporated by reference. On July 22, 2010, the Court entered an omnibus order approving a series of interim fee applications for the second period, including Kramer Levin's. *Order Granting (I) Applications for Allowance of Interim Compensation for Professional Services Rendered and Reimbursement of Expenses Incurred from October 1, 2009 through January 31, 2010 and (II) Applications for Allowance of Interim Compensation for Professional Services Rendered and Reimbursement of Expenses Incurred from June 1, 2009 through September 30, 2009* (the "**Second Omnibus Order**") [Docket No. 6402]. The Second Omnibus Order authorized payment to Kramer Levin of $1,118,312.88 for fees (which included the 10 percent holdback) and $27,868.83 for expenses.

5. On August 5, 2010, Kramer Levin filed its third fee application [Docket No. 6538], seeking fees and expenses in the amount of $652,531.51. On September 17, 2010, the Fee Examiner filed the *Fee Examiner's Report and Statement of Limited Objection to the Third Interim Fee Application of Kramer Levin Naftalis & Frankel LLP*, identifying $52,401.50 in fees and expenses that were objectionable [Docket No. 6979]. That report and statement is incorporated by reference. On November 24, 2010, the Court entered an omnibus order approving a series of interim fee applications for the third interim fee period, including Kramer Levin's. *Order Granting (I) Applications for Allowance of Interim Compensation for Professional Services Rendered and Reimbursement of Expenses Incurred from February 1, 2010 Through May 31, 2010 and (II) the Application of LFR, Inc. for Allowance of Interim Compensation for Professional Services Rendered and Reimbursement of Expenses Incurred from October 1, 2009 Through January 31, 2010* [Docket No. 7910]. Through that order, the Court approved Kramer Levin's third interim fee application in the amount of $592,552.75 in

4

fees and $7,577.26 in expenses, authorizing payment of $533,297.47 in fees and $7,577.26 in expenses, and requiring a "carve-out" of $52,386.50 pending a decision by the Court on a specific issue and a continued holdback of 10 percent of Kramer Levin's requested fees.

6. On November 16, 2010, Kramer Levin filed the Fourth Fee Application, seeking fees in the amount of $1,910,485.75 and expenses in the amount of $36,695.51 for total requested compensation of $1,947,181.26.

7. As a result of the Court's *Order Pursuant to 11 U.S.C. §§ 105(a) and 331 Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals* [Docket No. 3711] (the "**Compensation Order**"), Kramer Levin reports that as of the date of the Fourth Fee Application, it has previously submitted monthly statements and received payments from the Debtors totaling $626,086.14 for the period covered by the Fourth Fee Application, consisting of 80 percent of requested fees and 100 percent of requested expenses for Kramer Levin's June and July 2010 statements.

## APPLICABLE STANDARDS

8. The Fourth Fee Application has been evaluated for compliance with the *Amended Guidelines for Fees and Disbursements for Professionals in Southern District of New York Bankruptcy Cases*, Administrative Order M-389 (Bankr. S.D.N.Y. Nov. 25, 2009) (the "**Local Guidelines**"), the *Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed Under 11 U.S.C. § 330*, 28 C.F.R. Part 58, Appendix A (the "**UST Guidelines**"), the *Fee Examiner's First Status Report and Advisory* [Docket No. 5002] (the "**First Advisory**"), and the *Fee Examiner's Second Status Report and Advisory* [Docket No. 5463] (the "**Second Advisory**"), as well as this Court's Compensation Order—including the extent, if any, that variation has been expressly permitted by order. In addition, the Fee

5

Examiner provided all of the professionals in this proceeding with a draft memorandum summarizing the Court's April 29, 2010 and July 6, 2010 rulings on fees and expenses.

9. On November 16, 2010, the Fee Examiner also provided all of the professionals with notice that, effective for the fourth interim fee period, commencing June 1, 2010, the Fee Examiner would discontinue the uniform practice, followed for earlier compensation periods, of raising questions and concerns about an applicant's fee application in a formal letter at least one week prior to providing a copy of the draft report to the applicant.

10. On November 23, 2010, the Court issued a bench decision on two open questions involving professional fees. It decided, prospectively, that "[r]etained professionals are to provide written notice of upcoming increases in their [hourly] billing rates..." to give interested parties an opportunity to object and be heard. *In re Motors Liquidation Company*, *et al.*, Bench Decision on Pending Fee Issues, at 2, No. 09-50026 (Bankr. S.D.N.Y. Nov. 23, 2010) [Docket No. 7896]. It eliminated any requirement to more widely "post notice of upcoming increases on ECF." *Id.*

11. With respect to time spent responding to fee objections or inquiries, the Court held that it would "authorize payment of the costs of defending against the objection if the fee applicant substantially prevails." In contrast, the applicant "should indeed bear its own legal expenses for addressing the objection to its fees" in instances where "the outcome is a split decision, or the fee applicant otherwise fails to substantially prevail." *Id.*

12. In applying this Court's ruling to the fee applications for the fourth interim period—and to the "carved-out" amounts in fee applications for the third interim period[2]—the Fee Examiner now has established a recommended "safe harbor" for fees related to Fee Examiner and U.S. Trustee inquiries and objections ("**Fee Inquiry Time**").

A. The Fee Examiner will not object to the lesser of: either (i) the first $10,000 of Fee Inquiry Time or (ii) Fee Inquiry Time calculated as 20 percent of the total compensation requested in the pending fee application, whichever is smaller.[3]

B. For professionals whose fee applications contain requests for compensation for "fees on fees" beyond the amount of this safe harbor, the Fee Examiner has reviewed the time detail, all communications with the professional, the nature of the inquiry or deficiencies raised in the Fee Examiner's or U.S. Trustee's objection, the relative magnitude of the deficiencies in comparison to each other and to the professional's overall fee request (past and present), and whether the professional "substantially prevailed" on each inquiry or deficiency the Fee Examiner or U.S. Trustee raised. On the basis of this review, the Fee Examiner has calculated or will calculate a

---

[2] On November 30, 2010, Kramer Levin e-mailed the Fee Examiner stating that it had "substantially prevailed" on all of the contested fee issues and, accordingly, that 100 percent of the carved-out amount should be paid to Kramer Levin. Kramer Levin proposed that whether a firm has "substantially prevailed" should be determined in terms of the percentage reduction or adjustment in comparison to the face amount of the initial application. Under that standard, of course, all of the "fees on fees" would be compensable because neither the Fee Examiner nor the U.S. Trustee has yet challenged an entire application or even a significant part of an entire application. The Fee Examiner disagrees with Kramer Levin's proposed treatment of the carve-out. Rather, the focus should be on whether the applicant "substantially prevailed" on the individual questions raised or the matters placed at issue in the fee review process and the time spent on those items. The Fee Examiner will work with Kramer Levin to try to resolve the "carve-out" disagreement consensually, or, if necessary, schedule an on-the-record conference call to resolve any remaining issues.

[3] In other words, the safe harbor for Fee Inquiry Time spent in connection with any application where total compensation exceeds $50,000 will be $10,000. For any application where that compensation is less than $50,000, the safe harbor will be 20 percent of the total compensation requested.

7

suggested disallowance, ranging from zero percent to 50 percent for professionals requesting compensation for Fee Inquiry Time.[4]

## COMMENTS

13. **Voluntary Deductions**. Pursuant to this Court's prior rulings, Kramer Levin has voluntarily reduced its billings for the fourth interim fee period by more than $30,000. *See* Fourth Fee Application at ¶ 18. Descriptions of those activities, appropriately "written off," which includes 50 percent of Kramer Levin's time for the preparation of monthly fee statements and non-working travel, generally do not appear in Kramer Levin's detailed description of services rendered.

14. **Billing Rates**. For the fourth interim fee period, Kramer Levin seeks $105,170.75 attributable to three separate rate increases on September 1, 2009, January 1, 2010, and September 1, 2010. To date, Kramer Levin's fees have been at least $175,000 in total greater than if its rates had been frozen in June 2009. Kramer Levin has represented that the September 2009 and 2010 rate increases were the result of associates' advancing seniority, and the January 2010 rate increase was a firm-wide market adjustment. Kramer Levin has further represented, as it has before, that both the original and increased billable rates charged in this bankruptcy matter are the same rates charged in comparable non-bankruptcy matters during the same time frame.

15. In its November 23, 2010 decision, and in response to the Fee Examiner's request, the Court required Retained Professionals to give notice, prospectively, of hourly rate increases.[5]

---

[4] This protocol applies only to activities that do not "go beyond normal advocacy or negotiation." *See In re Adelphia Commc'ns Corp.*, Decision and Order on Estate's Payment of Non-Fiduciaries' Professional Fees at 5-6, No. 02-41729 (Bankr. S.D.N.Y. Nov. 18, 2010) [Adelphia Docket No. 14445]. If any applicant engages in abusive, destructive or "scorched earth" tactics, the Fee Examiner will recommend higher deductions than applicable under this protocol.

[5] Kramer Levin provided notice of its September 1, 2010 associate rate increases both in the Fourth Fee Application and in a letter to the Fee Examiner dated November 24, 2010. The Fee Examiner has received no notice of any future rate increases from Kramer Levin.

The Court did not address, nor was it asked to address, the reasonableness of hourly rate increases as part of the section 330 review process. *See*, *e.g.*, *In re Teraforce Tech. Corp.*, 347 B.R. 838, 860 (Bankr. N.D. Tex. 2006); *In re Hale-Halsell Co.*, 391 B.R. 459, 462 (Bankr. N.D. Okla. 2008); *In re Lee Tractor Co., Inc.*, 2008 WL 2788413, at *2 (Bankr. E.D.N.C. 2008) (not reported). That reasonableness inquiry is always timely because each application embodies an hourly rate that either has been or could have been increased, and the increases over time—both from application to application and from the outset of the case to its conclusion—have significant financial impact.

16. Hourly rate increases that exceed five percent in any 12-month period raise, at the least, a question of reasonableness given the survey data reporting that law firms, generally, have limited hourly rate increases in 2009 and 2010 and, prospectively, in 2011 in light of economic conditions.

17. One year ago, at the end of 2009, survey data suggested that major law firms were approaching 2010 with conservative plans for rate increases. "In the latest survey …, firms reported they project an average overall increase in rates of 3.2 percent in 2010." Molly McDonough, *Billing Rates Projected to Increase 3.2% in 2010*, A.B.A. J. (Dec. 1, 2009, 2:36 PM) http://www.abajournal.com/news/article/billing_rates_projected_to_increase_3.2_ in_2010. "Firms with more than 1,000 lawyers put the increase at 4 percent." *Id.* The *National Law Journal*'s survey noted that the "average [annual] firmwide billing rate" increased by 2.5 percent in 2009 over the 2008 billing rate compared with rate increases of 4.3 percent in 2008 and 7.7 percent in 2007. A majority of the country's 200 largest firms (77 percent) said they anticipated rate increases of five percent or less. *See* Karen Sloan, *Reality Dawns on Hourly Rates*, Nat'l L.J. (Dec. 7, 2009) http://www.law.com/jsp/nlj/PubArticleNLJ.jsp?id=

9

1202436065834. According to a leading legal consulting firm, only slightly more than six percent of firms anticipated 2010 rate changes greater than five percent.

18. New data available just this month suggest that, prospectively, the largest firms are planning to take the same conservative approach for 2011 hourly rate increases that they took at the beginning of 2010.

> As firms come to terms with the new legal landscape, they are pondering modest increases in billing rates in 2011. Ninety percent of our respondents say they are preparing to increase their billing rates by 5 percent or less, up from 77 percent of respondents a year ago. Another 7 percent of respondents said that they plan to boost rates more than 5 percent; 4 percent of respondents planned to make that same increase last year.

Claire Zillman, *The New Normal*, Am. Law., Dec. 1, 2010, http://www.law.com/jsp/tal/PubArticleTAL.jsp?id=1202475032294 [hereinafter "**New Normal**"].

19. *The National Law Journal*'s just released 2010 survey of billing rates (as of September 30, 2010) reported that the average firm-wide billing rate, among the 250 largest firms, increased by 2.7 percent in 2010, "the second straight year of growth rates less than 3%...." Karen Sloan, *Billing Realities*, Nat'l L.J., Dec. 6, 2010, http://www.law.com/jsp/nlj/PubArticleNLJ.jsp?id=1202475696179 [hereinafter "**Billing Realities**"]. *The American Lawyer* survey reported that 90 percent of the 200 most profitable firms expect to increase hourly rates in 2011 by five percent or less. *See New Normal*. "Instead of raising rates firmwide by class level—as many have done in years past—firms are taking a more individual approach that looks at attorneys, their clients and their practices....," said one expert on firm billing. *Billing Realities*.

20. Whatever the methodology, surveys depend on sampling and averages. They do not reflect all individual firm practices, whether for rate increases that are across-the-board or

10

tied to seniority or entry class status. Nor do they compare, within a firm or externally, rate increases for bankruptcy matters and non-bankruptcy matters. Nevertheless, the market over the last two years for legal services appears to have been generally and firmly resistant to annual rate increases greater than five percent.

21. Accordingly, in the absence of specific justification for higher increases or newer data, the Fee Examiner plans to recommend a deduction to compensate for hourly rate increases that exceed market rates. *See*, *e.g.*, *In re Ames Dep't Stores*, 76 F.3d 66, 71-72 (2d Cir. 1996), overruled in part by *Lamie v. United States Tr.*, 540 U.S. 526 (2004) (adopting a "market-driven" approach, based on the Bankruptcy Code, to review for reasonableness in billing in bankruptcy cases); *In re Busy Beaver Building Centers*, 19 F.3d 833, 849 (3d Cir. 1994) ("the principal emphasis [in a market-driven analysis is] on the cost of comparable services (market rates)"); *In re Motors Liquidation Company, et al.*, No. 09-50026, Tr. of PM Hr'g, at 29:10-11 (Bankr. S.D.N.Y. Apr. 29, 2010) (Gerber, J.) [Docket No. 5699] ("In general, at least, lawyer's fees are set in the marketplace.").

22. In this application, the hourly rates for at least four timekeepers reflect rate increases in excess of five percent over the preceding application, both of which seek compensation for time wholly within this calendar year. Compared with the first application, which spanned June-September, 2009 (that is, the same period one year ago), at least 11 timekeepers had hourly rate increases in excess of five percent. Some associates working on these matters have now seen their rates increase for a *third* time. Examples:

| Associate Name | Date of Bar Admission | 6/3/09 Starting Rate | 9/1/2009 Rate Increase to: | 1/1/2010 Rate Increase to: | 9/1/2010 Rate Increase to: | Total Rate Increase (%) |
|---|---|---|---|---|---|---|
| Amster, J. | 2006 | 520.00 | --- | --- | 585.00 | 13 |
| Blabey, D. | 2005 | 560.00 | Unknown | 615.00 | 630.00 | 13 |
| Blades, M. | 2005 | 520.00 | 560.00 | 585.00 | --- | 13 |

| Associate Name | Date of Bar Admission | 6/3/09 Starting Rate | 9/1/2009 Rate Increase to: | 1/1/2010 Rate Increase to: | 9/1/2010 Rate Increase to: | Total Rate Increase (%) |
|---|---|---|---|---|---|---|
| Daggan, C. | 2010 | --- | 385.00 (11/2/09) | 390.00 | 455.00 | 18 |
| Errea, J. | 2007 | --- | 520.00 | --- | 550.00 | 6 |
| Folb, K. | 2001 | 635.00 | 650.00 | 680.00 | 690.00 | 9 |
| Friedman, J. | Not admitted | --- | 385.00 (10/30/09) | 390.00 | 455.00 | 18 |
| Macksound, L. | 2004 | 585.00 | 600.00 | 630.00 | 645.00 | 10 |
| Rosenaft, J. | 2004 | ---- | 600.00 (9/24/09) | 630.00 | 645.00 | 7 |
| Sharret, J. | 2008 | 440.00 | 485.00 | 505.00 | 550.00 | 25 |
| Taylor, Jeffrey | 2001 | 635.00 | 650.00 | 680.00 | --- | 7 |
| Temkin, M. | 2009 | --- | --- | 455.00 | 505.00 | 11 |

Kramer Levin did not address this issue in its response to the draft report. *See* December 6 Kramer Levin Response.

*Suggested disallowance for billing rates: None at this time. The issue of rate increases, since the commencement of this case, will be addressed in conjunction with subsequent interim applications and/or the final fee hearing, at which time a market-based 12-month percentage increase cap will be recommended. Based on the data available today, it would seem difficult to justify any 12-month increase greater than five percent.*

23. **Fee Applications, Budgets and Monthly Fee Statements**. Kramer Levin is seeking combined compensation for $131,423.75 in services related to preparing and serving monthly billing statements on the Debtors, preparing and serving monthly budgets on the Fee Examiner, and preparing and filings its fee applications. Kramer Levin has discounted its fees for preparing its monthly statements by 50 percent, consistent with this Court's ruling on the compensability of fees for billing activities. Those billing activities include "review of time entries by the bankruptcy professionals to ensure compliance with local rules, United States Trustee Guidelines and this Court's rulings for the First and Second Interim Fee Applications." Fourth Fee Application, ¶ 51.

12

24. Kramer Levin seeks an additional $7,913.00 in fees related to time detail review in preparation for filing its fee applications, billed at full rates. *See* Fourth Fee Application, Billing Code 00019. In response, Kramer Levin agreed that, consistent with this Court's ruling, such fees are compensable at only 50 percent.

*Suggested disallowance for time detail review erroneously billed at full rates: $3,956.50.*

25. **Fee Inquiry Time**. The Fee Examiner identified $ 77,060.50 in Fee Inquiry Time. *See* Fourth Fee Application, Billing Code 00019. This figure exceeds the Fee Inquiry Time safe harbor by $67,060.50. *See* ¶ 12, *supra.*

26. The objections to Kramer Levin's second interim fee application were sustained in part and overruled in part. The objections resulted in substantial reductions to Kramer Levin's Second Fee Application based upon repeated instances of non-compliance with billing norms and guidelines, such as those governing block billing, vague, and repetitive time entries. Although disagreeing with the safe harbor protocol and its application, Kramer Levin noted "that Kramer Levin has substantially reduced 'objectionable amounts' in their fee applications." December 6 Kramer Levin Response. It has. Implicit, of course, in this response is an acknowledgement that Kramer Levin could and should address the areas of concern raised by the Fee Examiner, and that those concerns were grounded in fact.

27. Accordingly, in the Fee Examiner's judgment, based on the factors described in paragraph 12(B) above, a further reduction in this billing category is warranted, notwithstanding Kramer's assertion that the deduction is "punitive."

*Suggested disallowance for Fee Inquiry Time: $26,824.20 (constituting 40 percent of fees in excess of safe harbor), to be resolved at an on-the-record conference call between the parties and the Court.*

28.  **Term Loan Litigation**.  Kramer Levin spent time in a number of billing categories on work related to the Term Loan Litigation.  That litigation, due to a conflict disclosed by Kramer Levin, is being managed by Butzel Long as conflicts counsel to the Unsecured Creditors' Committee.  Nonetheless, Kramer Levin billed 60 hours ($43,451.00) to "work with Committee co-counsel, Butzel Long, to analyze and monitor this adversary proceeding and to be available to answer any inquiries of Committee members."  Fourth Fee Application at ¶ 30.

29.  Kramer Levin billed an additional 14.9 hours ($10,923.00) "reviewing and analyzing various documents related to the DIP Order, especially in reference to the Term Loan Litigation," as well as substantial time (subsumed within the "Motions" billing category) drafting a motion to obtain an order clarifying the Unsecured Creditors' Committee's ownership of the Term Loan Litigation proceeds.  Kramer Levin, however, did not disclose the result of the motion: denial, without prejudice, on jurisdictional grounds.  *See* Order Denying Motion Without Prejudice [Docket No. 7642].

30.  Finally, Kramer Levin billed a substantial amount of time to begin "drafting the Avoidance Action Trust agreement" that will hold and manage distributions related to the proceeds (if any) of the Term Loan Litigation.

31.  The reasonableness and necessity of the significant expenditure of time, both in this and prior application periods, on the Term Loan Litigation and related issues, once again, cannot be determined in the absence of the final outcome.[6]  As the U.S. Treasury noted, in response to Kramer Levin's DIP motion, "[t]here is no reason for the Court to devote judicial

---

[6] Kramer Levin, unsurprisingly, disputes the conclusion that the reasonableness and necessity of its services in this area cannot be determined on the present facts.

14

resources, nor for the parties to litigate (with costs potentially borne by Treasury), when the potential dispute may ultimately prove to be about how to allocate a zero recovery."

*Suggested disallowance for Term Loan Litigation: none at this time.*

32. **Tort/Asbestos Issues**. Kramer Levin billed 861.7 hours ($522,094.50—or more than 25 percent of its application and more than $200,000 above its expected expenditure as disclosed in Kramer Levin's monthly budgets) to researching asbestos estimation issues, preparing for the possibility of future litigation regarding asbestos claims, and preparing discovery motions related to the asbestos claims estimation process.[7] At least seven other professionals have also billed the estate for asbestos-related services during the current, and prior, fee periods.

33. Clearly, now and in the future, asbestos matters will consume a significant portion of the administrative expense budget in these cases. The Debtors' Joint Plan of Reorganization establishes an Asbestos Trust, with a currently undefined cash corpus, to administer asbestos claims, but the ultimate impact of the asbestos claims estimation process (and related matters) is still unknown.

34. Acknowledging the significance of asbestos issues and the necessity of an adversary system to resolve disputes surrounding the Asbestos Trust and the claims estimation process, the Fee Examiner remains concerned about the mounting evidence of duplicative

---

[7] Much of Kramer Levin's time, and that of the other Retained Professionals dealing with asbestos issues, involved protracted disputes over the protection of personally identifying information in the asbestos claims data, the procedures for and scope of discovery related to claims estimation process, and related matters. Most of the disputes in this regard seem to have been consensually resolved. *See*, *e.g.*, *Agreement Regarding Rule 2004 Applications among the ACC, New GM, the Debtors and the Legal Representative for Future Asbestos Claimants* dated August 5, 2010; *Order Pursuant to Bankruptcy Rule 2004 Authorizing the Official Committee of Unsecured Creditors of Motors Liquidation Company to Obtain Discovery from (i) the Claims Processing Facilities for Certain Trusts Created Pursuant to Bankruptcy Code Section 524(g), (ii) the Trusts, and (iii) General Motors LLC and the Debtors* [Docket No. 6749]; *Notice of Withdrawal of The Application of the Official Committee of Unsecured Creditors Holding Asbestos-Related Claims for an Order Pursuant to Bankruptcy Rule 2004 Authorizing the Taking of Document Discovery and Deposition Testimony from the Debtors, from General Motors, LLC, Its Subsidiaries and Affiliated Companies, and From Certain Nonbankrupt Asbestos Defendants* [Docket No. 7940].

services between and among the various asbestos professionals. Altogether, at least eight Retained Professionals are involved in this process.[8]

*The Fee Examiner does not recommend a reduction for work on asbestos-related matters at this time but will make comprehensive recommendations with respect to asbestos professionals when the final Asbestos Trust terms and the outcome of the claims estimation process can be better determined.*

35. **Expenses**. Kramer Levin seeks reimbursement for flights to Detroit on September 13 and 21 that exceed $1,200 each. Kramer Levin has stated that these fares were for coach class travel, but has not provided the documentation the Fee Examiner has requested.

*Suggested disallowance for unreasonable travel expenses: $1,775.05 (amounts in excess of $350 per flight).*

*Total fees suggested for disallowance: $30,780.70.*

*Total expenses suggested for disallowance: $1,775.05.*

*Total fees and expenses recommended for disallowance: $32,555.75.*

## CONCLUSION

This report is intended to advise the Court, the professionals, and the U.S. Trustee of the limited basis for objections to the Fourth Fee Application. It is not intended to be an exhaustive or exclusive list of possible objections and does not preclude or limit the Fee Examiner's scope of review or objection on subsequent interim fee applications or on final fee applications. All professionals subject to the Fee Examiner's review should be aware, as well, that while the Fee

---

[8] These professionals (not including the Debtors' counsel) are Analysis Research & Planning Corporation; Bates White, LLC; Caplin & Drysdale, Chartered; Hamilton, Rabinovitz & Associates, Inc.; Kramer Levin Naftalis & Frankel LLP; Legal Analysis Systems, Inc.; Stutzman, Bromberg, Essermann & Plifka, A Professional Corporation; and Dean M. Trafelet.

16

Examiner has made every effort to apply standards uniformly across the universe of professionals in this case, some degree of subjective judgment will always be required.

WHEREFORE, the Fee Examiner respectfully submits this *Report and Statement of Limited Objection* to the Fourth Fee Application.

Dated: Madison, Wisconsin
December 8, 2010.

>GODFREY & KAHN, S.C.
>
>By:    /s/ *Katherine Stadler*
>Katherine Stadler (KS 6831)
>Timothy F. Nixon (TN 2644)
>
>GODFREY & KAHN, S.C.
>780 North Water Street
>Milwaukee, Wisconsin 53202
>Telephone: (414) 273-3500
>Facsimile: (414) 273-5198
>E-mail: kstadler@gklaw.com
>       tnixon@gklaw.com
>
>*Attorneys for Fee Examiner*

5648825_2

17