**Hearing Date and Time:  December 15, 2010 at 2:00 p.m. (Prevailing Eastern Time)**
**Objection Date and Time:  December 8, 2010 at 4:00 p.m. (Prevailing Eastern Time)**

Timothy F. Nixon
Eric J. Wilson (*Pro Hac Vice*)
GODFREY & KAHN, S.C.
780 North Water Street
Milwaukee, Wisconsin 53202
Telephone: (414) 273-3500
Facsimile: (414) 273-5198

*Attorneys for Fee Examiner*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-------------------------------------------------------- x
                                                          :
In re:                                                    :    Chapter 11
                                                          :
MOTORS LIQUIDATION COMPANY, et al.,                       :    Case No. 09-50026
        f/k/a General Motors Corp., et al.,               :    (Jointly Administered)
                                                          :
                Debtors.                                  :    Honorable Robert E. Gerber
                                                          :
-------------------------------------------------------- x
```

### FEE EXAMINER'S REPORT AND STATEMENT OF LIMITED OBJECTION
### TO THE FOURTH INTERIM FEE APPLICATION
### <u>OF WEIL, GOTSHAL & MANGES LLP</u>

**TO:    THE HONORABLE ROBERT E. GERBER**
**        UNITED STATES BANKRUPTCY JUDGE**

The Fee Examiner of General Motors Corporation (n/k/a Motors Liquidation Company),

appointed on December 23, 2009 (the "**Fee Examiner**"), submits this *Report and Statement of*

*Limited Objection* in connection with the *Fourth Application of Weil, Gotshal & Manges LLP, as*

*Attorneys for the Debtors, for Interim Allowance of Compensation for Professional Services*

*Rendered and Reimbursement of Actual and Necessary Expenses Incurred From June 1, 2010,*

*Through September 30, 2010* [Docket No. 7762] (the "**Fourth Fee Application**").  With this

*Report and Statement of Limited Objection*, the Fee Examiner identifies $89,641.46 in fees and

expenses, from a total of $7,036,238.66 requested in the Fourth Fee Application, that are

objectionable.[1]  The Fee Examiner respectfully represents:

## SUMMARY STATEMENT

With certain exceptions recounted in this report, the Fourth Fee Application submitted by

Weil, Gotshal & Manges LLP ("**Weil**") was generally sound and well-supported.  The great

majority of Weil timekeepers recorded their time in accordance with the applicable guidelines

and rules.  Notably, certain timekeepers who had submitted problematic time entries in the past

no longer submitted such entries with this application.  Weil appears to be making a concerted

effort to respond to concerns raised by the Fee Examiner and the U.S. Trustee.  Nonetheless, the

Fee Examiner has identified some problematic areas, most notably in time charged to reviewing

billing records and time charged for clerical and administrative tasks.

In response to the Fourth Fee Application, the Fee Examiner sent some preliminary

inquiries to Weil by email on November 22, 2010.  The Fee Examiner then sent a draft of this

report to Weil on December 1, 2010.  On December 7, 2010, and December 8, 2010, counsel for

the Fee Examiner had a number of productive discussions with Weil attorneys.  As a result,

rather than contesting the objections raised by the Fee Examiner individually, Weil and the Fee

Examiner have agreed to a suggested disallowance of $88,254.75 in fees and $1,386.71 in

expenses, for a total suggested disallowance of $89,641.46.[2]

## BACKGROUND

1.        Commencing on June 1, 2009, General Motors Corp. and certain of its affiliates

("**Debtors**") filed in this Court voluntary cases under chapter 11 of the Bankruptcy Code.  The

---

[1] A portion of the suggested disallowance relates to issues from the Third Fee Application.  *See infra* ¶ 8.

[2] To facilitate the discussions that occurred immediately prior to the Fee Examiner filing this report, Weil and
counsel to the Fee Examiner stipulated to its filing on December 9, 2010.

Debtors' chapter 11 cases have been consolidated procedurally and are being jointly administered pursuant to Federal Rule of Bankruptcy Procedure 1015(b). The Debtors are authorized to operate their businesses and manage their properties as debtors-in-possession pursuant to 11 U.S.C. §§ 1107(2) and 1108.

2.      On August 31, 2010, the Debtors filed a Joint Chapter 11 Plan and Disclosure Statement [Docket Nos. 6829 and 6830].[3] Plan confirmation is anticipated in 2011.

3.      On January 13, 2010, Weil filed its first interim fee application [Docket No. 4803] (the "**First Fee Application**"), seeking fees and expenses in the amount of $18,506,169.92 for the period from June 1, 2009 through September 30, 2009 (the "**First Compensation Period**"). On April 22, 2010, the Fee Examiner filed the *Fee Examiner's Report and Statement of Limited Objection to the First Interim Fee Application of Weil, Gotshal & Manges LLP* (the "**Fee Examiner's First Report**"), identifying $1,290,391.90 in fees and expenses that were objectionable [Docket No. 5563]. That report and statement is incorporated by reference. On April 29, 2010, this Court issued an oral ruling that granted the First Fee Application in part but required a continued holdback of 10 percent of Weil's requested fees. On May 21, 2010, in accordance with the specific findings made by the Court in its bench ruling, the Court entered an omnibus order approving a series of interim fee applications, including the application submitted by Weil. *Order Granting Applications for Allowance of Interim Compensation for Professional Services Rendered and Reimbursement of Expenses Incurred from June 1, 2009 through September 30, 2009* (the "**First Omnibus Order**") [Docket No. 5834]. The First Omnibus Order authorized payment to Weil of $17,686,445.97 for fees (which included the 10 percent holdback) and $550,260.95 for expenses.

---

[3] On December 7, 2010, the Debtors filed *Debtors' Amended Joint Chapter 11 Plan* and a *Disclosure Statement for Debtors' Amended Joint Chapter 11 Plan* [Docket Nos. 8014 and 8015].

4.      On March 17, 2010, Weil filed its second interim fee application [Docket

No. 5295] (the "**Second Fee Application**"), seeking fees and expenses in the amount of

$6,302,627.06 for the period from October 1, 2009 through January 31, 2010 (the "**Second**

**Compensation Period**").  On June 22, 2010, the Fee Examiner filed the *Fee Examiner's Report*

*and Statement of Limited Objection to the Second Interim Fee Application of Weil, Gotshal &*

*Manges LLP* (the "**Fee Examiner's Second Report**"), identifying $194,352.31 in fees and

expenses that were objectionable [Docket No. 6095].  That report and statement is incorporated

by reference.  On July 6, 2010, this Court issued an oral ruling that granted the Second Fee

Application in part but continued to require a holdback of 10 percent of Weil's requested fees.

On July 22, 2010, in accordance with the specific findings made by the Court in its bench ruling,

the Court entered an omnibus order approving a series of interim fee applications, including the

Second Fee Application submitted by Weil.  *Order Granting (I) Applications for Allowance of*

*Interim Compensation for Professional Services Rendered and Reimbursement of Expenses*

*Incurred from October 1, 2009 through January 31, 2010 and (II) Applications for Allowance of*

*Interim Compensation for Professional Services Rendered and Reimbursement of Expenses*

*Incurred from June 1, 2009 through September 30, 2009* (the "**Second Omnibus Order**")

[Docket No. 6402].  The Second Omnibus Order authorized payment to Weil of $5,807,621.90

for fees (which included the 10 percent holdback) and $373,937.96 for expenses.

5.      On August 5, 2010, Weil filed its third interim fee application [Docket No. 6554]

(the "**Third Fee Application**"), seeking fees and expenses in the amount of $5,457,612.27 for

the period from February 1, 2010 through May 31, 2010 (the "**Third Compensation Period**").

On September 17, 2010, the Fee Examiner filed the *Fee Examiner's Report and Statement of*

*Limited Objection to the Third Interim Fee Application of Weil, Gotshal & Manges LLP* (the

"**Fee Examiner's Third Report**"), identifying $284,467.99 in fees and expenses that were

objectionable [Docket No. 6984]. That report and statement is incorporated by reference. On

November 24, 2010, the Court entered an omnibus order approving a series of interim fee

applications for the third interim fee period, including Weil's. *Order Granting (I) Applications*

*for Allowance of Interim Compensation for Professional Services Rendered and Reimbursement*

*of Expenses Incurred from February 1, 2010 Through May 31, 2010 and (II) the Application of*

*LFR, Inc. for Allowance of Interim Compensation for Professional Services Rendered and*

*Reimbursement of Expenses Incurred from October 1, 2009 Through January 31, 2010* [Docket

No. 7910]. Through that order, the Court approved the Third Fee Application in the amount of

$5,155,524.18 in fees and $140,036.16 in expenses, requiring a continued holdback of ten

percent of Weil's approved fees. Carved out of the order were $48,370.50 in fees related to

compensation for the fee review process, pending a decision on that issue by the Court.

6.      In the Fourth Fee Application, pursuant to the Court's *Order Pursuant to*

*11 U.S.C. §§ 105(a) and 331 Establishing Procedures for Interim Compensation and*

*Reimbursement of Expenses of Professionals* [Docket No. 3711] (the "**Compensation Order**"),

Weil reports it has previously submitted monthly statements and received payments from the

Debtors totaling $4,296,871.77 for the Fourth Compensation Period, consisting of 80 percent of

the requested fees and 100 percent of the requested expenses invoiced for June 2010, July 2010,

and August 2010. *See* Fourth Fee Application, ¶ 12. As of the date of the Fourth Fee

Application, Weil reported it had not yet received payment for the fees or expenses invoiced for

September 2010. *Id.*

7.      After reviewing the Fourth Fee Application and supporting documentation, on

November 22, 2010, counsel for the Fee Examiner sent Weil email correspondence inquiring

about the time entries of certain timekeepers to better evaluate the tasks billed.  Counsel for the

Fee Examiner also asked Weil to explain its calculated deductions in certain airfare expenses to

equate them to coach fare.  The Fee Examiner then sent a draft of this *Report and Statement of*

*Limited Objection* to Weil on December 1, 2010.

8.      On December 7, 2010, and December 8, 2010, counsel for the Fee Examiner had

several conversations with Weil attorneys.  Rather than contesting the objections raised by the

Fee Examiner individually, Weil and the Fee Examiner have agreed on a suggested disallowance

of $88,254.75 in fees and $1,386.71 in expenses, for a total suggested disallowance of

$89,641.46.  *See* **Exhibit A**.  The agreed disallowance encompasses the issues for which the Fee

Examiner presently seeks a disallowance, as listed in **Exhibit A**, as well as two lingering issues

from the previous compensation period.  *See infra* at ¶¶ 31, 33.  Given the fees already carved

out from the Third Fee Application, the net suggested disallowance from the upcoming

compensation order is $41,270.96.  *See* Exhibit A.  Notwithstanding this agreement, Weil and

counsel for the Fee Examiner have reserved all rights with respect to the substantive issues raised

in the Fee Examiner's report.[4]  Specifically, by agreeing to a single disallowance for a number of

contested items, neither party accepts the other's characterization of any particular fee request.

## APPLICABLE STANDARDS

9.      The Fourth Fee Application has been evaluated for compliance with the *Amended*

*Guidelines for Fees and Disbursements for Professionals in Southern District of New York*

*Bankruptcy Cases*, Administrative Order M-389 (Bankr. S.D.N.Y. Nov. 25, 2009) (the "**Local**

**Guidelines**"), the *Guidelines for Reviewing Applications for Compensation and Reimbursement*

*of Expenses Filed Under 11 U.S.C. § 330*, 28 C.F.R. Part 58, Appendix A (the "**UST**

---

[4] For example, the Fee Examiner reserves the right to seek additional guidance from the Court regarding the
appropriate analysis of particular issues, such as the review of billing records.  *See infra* at ¶¶ 25-31.

**Guidelines**"), the *Fee Examiner's First Status Report and Advisory* [Docket No. 5002] (the

"**First Advisory**"), and the *Fee Examiner's Second Status Report and Advisory* [Docket

No. 5463] (the "**Second Advisory**"), as well as this Court's Compensation Order and Quarterly

Reporting Order—including the extent, if any, that variation has been expressly permitted by

order. In addition, the Fee Examiner has provided Weil with a draft memorandum summarizing

the Court's April 29 and July 6, 2010 rulings on fees and expenses.

10.    On November 16, 2010, the Fee Examiner also provided all of the professionals

with notice that, effective for the fourth interim fee period, commencing June 1, 2010, the Fee

Examiner would discontinue the uniform practice, followed for earlier compensation periods, of

raising questions and concerns about an applicant's fee application in a formal letter at least one

week prior to providing a copy of the draft report to the applicant.

11.    On November 23, 2010, the Court issued a bench decision on two open questions

involving professional fees. It decided, prospectively, that "[r]etained professional are to provide

written notice of upcoming increases in their [hourly] billing rates . . . " to give interested parties

an opportunity to object and be heard. *In re Motors Liquidation Company, et al.*, Bench

Decision on Pending Fee Issues, at 2, No. 09-50026 (Bankr. S.D.N.Y. Nov. 23, 2010) [Docket

No. 7896]. It eliminated any requirement to more widely "post notice of upcoming increases on

ECF." *Id.*

12.    With respect to time spent responding to fee objections or inquiries, the Court

held that it would "authorize payment of the costs of defending against the objection if the fee

applicant substantially prevails." In contrast, the applicant "should indeed bear its own legal

expenses for addressing the objection to its fees" in instances where "the outcome is a split

decision, or the fee applicant otherwise fails to substantially prevail." *Id.*

13.     In applying this Court's ruling to the fee applications for the fourth interim period—and to the "carved-out" amounts in fee applications for the third interim period—the Fee Examiner now has established a recommended "safe harbor" for fees related to Fee Examiner and U.S. Trustee inquiries and objections ("**Fee Inquiry Time**").

A.     The Fee Examiner will not object to the lesser of: either (i) the first $10,000 of Fee Inquiry Time or (ii) Fee Inquiry Time calculated as 20 percent of the total compensation requested in the pending fee application, whichever is smaller.[5]

B.     For professionals whose fee applications contain requests for compensation for "fees on fees" beyond the amount of this safe harbor, the Fee Examiner has reviewed the time detail, all communications with the professional, the nature of the inquiry or deficiencies raised in the Fee Examiner's or U.S. Trustee's objection, the relative magnitude of the deficiencies in comparison to each other and to the professional's overall fee request (past and present), and whether the professional "substantially prevailed" on each inquiry or deficiency the Fee Examiner or U.S. Trustee raised.  On the basis of this review, the Fee Examiner has calculated or will calculate a suggested disallowance, ranging from zero percent to 50 percent for professionals requesting compensation for Fee Inquiry Time.[6]

---

[5] In other words, the safe harbor for Fee Inquiry Time spent in connection with any application where total compensation exceeds $50,000 will be $10,000.  For any application where that compensation is less than $50,000, the safe harbor will be 20 percent of the total compensation requested.

[6] This protocol applies only to activities that do not "go beyond normal advocacy or negotiation."  *See In re Adelphia Commc'ns Corp.*, Decision and Order on Estate's Payment of Non-Fiduciaries' Professional Fees at 5-6, No. 02-41729 (Bankr. S.D.N.Y. Nov. 18, 2010) [Adelphia Docket No. 14445].  If any applicant engages in abusive, destructive or "scorched earth" tactics, the Fee Examiner will recommend higher deductions than applicable under this protocol.

## COMMENTS

14.     **Project Staffing**.  Services provided by Weil reflect three position titles for attorneys (partner, counsel and associate) and various titles for non-attorneys (law clerks, paralegals, clerks, library staff and "other non-legal staff").  The hourly billing rates for partner-level attorneys ranged from $362.50 to $990—with a blended rate of $889.34 for all 32 partner-level attorneys providing services in the Fourth Compensation Period.  *See* **Exhibit B**, at 2.  The hourly billing rate for counsel-level attorneys ranged from $350 to $775—with a blended rate of $686.85 for all eight counsel-level attorneys providing services during the same period.  *See id.*  The hourly billing rate for associate-level attorneys ranged from $227.50 to $695—with a blended rate of $555.84 for all 62 associate-level attorneys providing services during the same period.  The hourly billing rate for the non-attorneys providing services ranged from $75 to $275.  *See id.* at 4-6.  The blended rate for all timekeepers was $577.24.  *See id.* at 7.

15.     Similar to the first three compensation periods, and as a general matter,[7] Weil continued to distribute work during the Fourth Compensation Period appropriately between timekeepers of varying seniority levels.  As outlined in Exhibit B, 20.41 percent of the hours billed during the Fourth Compensation Period were at partner-level rates.  *See id.* at 2.  In contrast, 58.29 percent of the hours billed during the same time frame were at associate-level rates.  *See id.* at 4.

        *Suggested disallowance for project staffing:  None.*

16.     **Billable Rates**.  Since the commencement date of these proceedings, approximately 18 months ago, several Weil timekeepers who have billed significant time to this matter have increased their rates substantially.  For example, Weil has increased its billable rate

---

[7] Nonetheless, this report highlights one instance where Weil does not appear to have allocated time efficiently.  *See infra* at ¶¶ 36-38.

for at least four associates from $415 to $515—an increase of greater than 20 percent each.  The additional fees attributable solely to the rate increases for these four associates alone exceed $200,000.  The burden is on the applicant to justify rate increases such as these in this market.

17.     On November 23, 2010, the Court in its written decision required applicants to give notice of prospective increases in hourly rates for professionals.  *See In re Motors Liquidation Company, et al.*, Bench Decision on Pending Fee Issues, at 2, No. 09-50026 (Bankr. S.D.N.Y. Nov. 23, 2010) [Docket No. 7896].  The Court did not address, nor was it asked to address, the reasonableness of hourly rate increases as part of its section 330 review.  *See*, *e.g.*, *In re Teraforce Tech. Corp.*, 347 B.R. 838, 860 (Bankr. N.D. Tex. 2006); *In re Hale-Halsell Co.*, 391 B.R. 459, 462 (Bankr. N.D. Okla. 2008); *In re Lee Tractor Co., Inc.*, 2008 WL 2788413, at *2 (Bankr. E.D.N.C. 2008) (not reported).  That reasonableness inquiry is always timely because each application embodies an hourly rate that either has been, will be or could have been increased, and the increases over time—both from application to application and from the outset of the case to its conclusion—have significant financial impact.

18.     Those rate increases have become increasingly noteworthy, especially in light of the widely-reported reluctance of major law firms generally to increase hourly rates through 2009, 2010 and into 2011.  By contrast, since this case began, Weil has increased hourly rates for several timekeepers by percentages that appear to exceed the market average.  The aggregate financial impact of these increases will continue to be significant.

19.     The "market rate" concept for fees in corporate reorganizations, established in the 1978 Code, has always been practically elusive because there is no apparent way (other than discovery) to determine whether, in fact and without exception, a professional firm's hourly rates in a Chapter 11 are no greater than its (or that of comparable firms) normal hourly rates for

non-bankruptcy matters.[8]  Like the Court and the U.S. Trustee, moreover, the Fee Examiner

relies on the certification of this, as fact, filed with each application.  However, the literature and

new data on hourly rate increases, particularly among the major firms, provide more immediate

guidance.

20.      One year ago, at the end of 2009, survey data suggested that major law firms were

approaching 2010 with conservative plans for rate increases.  "In the latest survey …, firms

reported they project an average overall increase in rates of 3.2 percent in 2010."  *See* Molly

McDonough, *Billing Rates Projected to Increase 3.2% in 2010*, A.B.A. J. (Dec. 1, 2009,

2:36 PM) http://www.abajournal.com/news/article/billing_rates_projected_to_increase_3.2_

in_2010.  "Firms with more than 1,000 lawyers put the increase at 4 percent."  *Id.*  The *National

Law Journal*'s survey noted that the "average [annual] firmwide billing rate" increased by

2.5 percent in 2009 over the 2008 billing rate compared with rate increases of 4.3 percent in

2008 and 7.7 percent in 2007.  A majority of the country's 200 largest firms (77 percent) said

they anticipated rate increases of five percent or less.  *See* Karen Sloan, *Reality Dawns on Hourly

Rates*, Nat'l L.J. (Dec. 7, 2009) http://www.law.com/jsp/nlj/PubArticleNLJ.jsp?id=

1202436065834.  According to a leading legal consulting firm, only slightly more than six

percent of firms anticipated 2010 rate changes greater than five percent.

21.      New data available just this month suggest that, prospectively, the largest firms

are planning to take the same conservative approach for 2011 hourly rate increases that they took

at the beginning of 2010.

---

[8] With respect to market rates, it is at least footnote-worthy that the two investment banks coordinating the IPO for
General Motors agreed to charge 25 percent of their typical fees for underwriting an offering.  Aaron Lucchetti
*et al.*, *GM Will Pay a Cut-Rate Price to Do Its New IPO*, Wall St. J., June 12, 2010, at B1.  Since the last fee hearing
in this case, moreover, a major New York firm not involved in this proceeding agreed to represent a municipality
considering Chapter 9 *pro bono*.  Romy Varghese, *Harrisburg Hires Cravath Swaine--Law Firm to Review Case for
Bankruptcy*, Wall St. J., Nov. 11, 2010, at C10.

> As firms come to terms with the new legal landscape, they are
> pondering modest increases in billing rates in 2011.  Ninety
> percent of our respondents say they are preparing to increase their
> billing rates by 5 percent or less, up from 77 percent of
> respondents a year ago.  Another 7 percent of respondents said that
> they plan to boost rates more than 5 percent; 4 percent of
> respondents planned to make that same increase last year.

Claire Zillman, *The New Normal*, Am. Law., Dec. 1, 2010, http://www.law.com/jsp/tal/

PubArticleTAL.jsp?id=1202475032294 [hereinafter "***New Normal***"].

22.    *The National Law Journal*'s just released 2010 survey of billing rates (as of

September 30, 2010) reported that the average firm-wide billing rate, among the 250 largest

firms, increased by 2.7 percent in 2010, "the second straight year of growth rates less

than 3% . . . ."  Karen Sloan, *Billing Realities*, Nat'l L.J., Dec. 6, 2010, http://www.law.com/

jsp/nlj/PubArticleNLJ.jsp?id=1202475696179 [hereinafter "***Billing Realities***"].  *The American

Lawyer* survey reported that 90 percent of the 200 most profitable firms expect to increase hourly

rates in 2011 by five percent or less.  *See New Normal*.  "Instead of raising rates firmwide by

class level—as many have done in years past—firms are taking a more individual approach that

looks at attorneys, their clients and their practices . . . . ," said one expert on firm billing.  *Billing

Realities*.

23.    Whatever the methodology, surveys depend on sampling and averages.  They do

not reflect all individual firm practices, whether for rate increases that are across-the-board or

tied to seniority or entry class status.  Nor do they compare, within a firm or externally, rate

increases for bankruptcy matters and non-bankruptcy matters.  Nevertheless, the market over the

last two years for legal services appears to have been generally and firmly resistant to annual rate

increases greater than five percent.

24.    Accordingly, in the absence of specific justification for higher increases or newer

data, the Fee Examiner plans to recommend a deduction to compensate for hourly rate increases

that exceed market rates.  *See*, *e.g.*, *In re Ames Dep't Stores*, 76 F.3d 66, 71-72 (2d Cir. 1996),

overruled in part by *Lamie v. United States Tr.*, 540 U.S. 526 (2004) (adopting a "market-driven"

approach to review for reasonableness in billing in bankruptcy cases); *In re Busy Beaver*

*Building Centers*, 19 F.3d 833, (3d Cir. 1994) ("the principal emphasis [in a market-driven

analysis is] on the cost of comparable services (market rates)"); *In re Motors Liquidation*

*Company, et al.*, No. 09-50026, Tr. of PM Hr'g, at 29:10-11 (Bankr. S.D.N.Y. Apr. 29, 2010)

(Gerber, J.) ("In general, at least, lawyer's fees are set in the marketplace.").

> *Suggested disallowance for billing rates:  none at this time.  The issue of rate increases, since the commencement of this case, will be addressed in conjunction with subsequent interim applications and/or the final fee hearing, at which time a market-based 12-month percentage increase cap will be recommended.  Based on the data available today, it would seem difficult to justify any 12-month increase greater than five percent.*

25.    **Review of Billing Records**.  During the Fourth Compensation Period, Weil billed

more than $110,000 on matters relating to its own compensation.  Many of these entries relate to

time spent preparing its own fee application (as such and fully compensable), or preparing

budgets to forward to the Fee Examiner, or compiling data in LEDES format to submit to the Fee

Examiner.  The Fee Examiner does not recommend a disallowance for any of the time spent on

such tasks.

26.    During this latest fee period, the time Weil charged overall on issues relating to its

own compensation decreased:  the fees represent less than two percent of the total fees requested,

less than the previous compensation period, when such fees represented almost six percent of the

total fee application.

27.    Despite the overall decrease in the amount of time it spent on matters relating to

its own compensation, Weil still charged an unusual amount of time to review of its own billing

records.  During the Fourth Compensation Period, nine Weil timekeepers spent more than

400 hours on tasks relating to the review of billing records.  *See* **Exhibit C** (detailing 424.6

hours spent by eight timekeepers). When printed, the time and expense entries submitted by

Weil in connection with the Fourth Fee Application spanned 702 pages. To spend the amount of

time that Weil timekeepers logged in connection with review of their own billing records, one

person would have to spend more than 35 minutes looking at *each page* of these billing records.

  28.  This represents a marked decrease from prior compensation periods, both in terms

of the number of timekeepers reviewing billing records and the amount of time those

timekeepers billed to the task. *See*, *e.g.*, *Fee Examiner's Report and Statement of Limited

Objection to the First Interim Fee Application of Weil, Gotshal & Manges LLP* [Docket

No. 5563], ¶ 28 (noting that 26 Weil timekeepers billed 940.00 hours during the First

Compensation Period for reviewing billing records); *Fee Examiner's Report and Statement of

Limited Objection to the Second Interim Fee Application of Weil, Gotshal & Manges LLP*

[Docket No. 6095], ¶ 15 (noting that 15 Weil timekeepers billed 670.40 hours during the Second

Compensation Period for reviewing billing records); *Fee Examiner's Report and Statement of

Limited Objection to the Third Interim Fee Application of Weil, Gotshal & Manges LLP* [Docket

No. 6984], ¶ 28 (noting that 18 Weil timekeepers billed 645.20 hours during the Third

Compensation Period for reviewing billing records).

  29.  But the amount of time Weil spent on this task is still noteworthy. In its prior

ruling, the Court said it would apply a 50 percent disallowance to prospective fee applications for

time spent reviewing billing records. *In re Motors Liquidation Company, et al.*, Second Interim

Fee Ruling Tr. at 14:13-19 and 15:22-24, No. 09-50026 (Bankr. S.D.N.Y. July 6, 2010) (noting

that the total amount of time spent by Weil reviewing billing records was "plainly

inappropriate") [Docket No. 6369] ("Tr. 07-06-2010").[9] In addition to the 50 percent

---

[9] *See also In re CCT Communications, Inc.*, Memorandum Decision Regarding Final Fee Applications by Robinson
Brog Leinwand Greene Genovese & Gluck P.C. and Wiley Rein LLP, at 19, No. 07-10210 (Bankr. S.D.N.Y.

disallowance applied due to the inherent nature of the billable activity, the time entries for
reviewing billing records are also subject to review for their reasonableness.

30.    Notwithstanding this latest fee application, Weil does not appear, based on the
face of its applications, to have altered its timekeeping practices sufficiently in response to
rulings by the Court.  Therefore, in addition to the 50 percent reduction already applied by the
Court to the review of billing records by all professionals, Tr. 07-06-2010 at 14:13-19, an
additional reduction is appropriate.

31.    This issue also remains unresolved from the Third Fee Application, when Weil
timekeepers billed 645.20 hours—or more than one hour for each page—for reviewing their own
billing records.  *See* Fee Examiner's Third Report at ¶¶ 25-29; Exhibit E to Fee Examiner's
Third Report (detailing $176,847 in fees).  Weil has taken the position that the Court's
50 percent ruling represents the maximum permissible disallowance for this issue.  The Fee
Examiner maintains that the 50 percent ruling applies to all professionals for review of billing
records but that the hours spent on that task always remain subject to reasonableness review.

*Suggested disallowance for time billed to reviewing billing records during the Third
Compensation Period and the Fourth Compensation Period:  see supra ¶ 8.*

32.    **Fee Inquiry Time**.  The Fourth Fee Application includes $28,872.50 of fees
corresponding to Fee Inquiry Time, which exceeds the safe harbor by $18,872.50.  *See*
**Exhibit D**.  These entries relate to objections raised in connection with the Second Fee
Application and Third Fee Application filed by Weil.  With one exception relating to the
appropriate treatment of local transportation expenses, Weil did not "substantially prevail" on
any of the issues raised by the Fee Examiner in response to these fee applications.

---

Aug. 24, 2010) ("[T]he review and editing of time records—as opposed to fee applications—is not compensable.
Outside of bankruptcy, lawyers presumably do not charge their clients for preparing time records.") (Bernstein, J.)).

33.    This issue also remains unresolved from the Third Fee Application, when Weil agreed to carve out $48,370.50 in fees related to Fee Inquiry Time, pending a decision on the issue by the Court.  The time entries comprising these fees relate to objections raised in connection with the First Fee Application filed by Weil.  Weil did "substantially prevail" on some, but not all, of the issues in connection with that fee application.

*Suggested adjustment for responding to the Fee Examiner:  see supra ¶ 8.*

34.    **Vague Entries**.  To be compensable, all time entries must be sufficiently detailed to allow the Court to determine their compliance with applicable codes, rules, standards, and guidelines.  During the Fourth Compensation Period, one Weil associate billed more than 150 hours (totaling just under $100,000 in fees) to matters variously described as her efforts to "coordinate" mediation proceedings.  *See* **Exhibit E**.  Given the vague nature of these entries, a disallowance is appropriate.

*Suggested disallowance for vague entries:  see supra ¶ 8.*

35.    **Time Increments**.  The same associate who recorded time vaguely also recorded more than 40 percent of her tasks (168 out of 418 tasks billed) in half-hour or whole hour time increments.  *See* **Exhibit F** (showing $155,295 in fees recorded in half-hour or whole-hour increments).  The UST Guidelines require time entries to be recorded in tenths of an hour.  *See* UST Guidelines, (b)(4)(v).  Given the number of time entries involved for this attorney, it is reasonable to conclude that she did not record her time accurately in tenth of an hour increments as required by the UST Guidelines. A disallowance is appropriate.

*Suggested disallowance for time increment issues:  see supra ¶ 8.*[10]

---

[10] Of the entries included in Exhibit F, 23 entries amounting to $32,445 in fees also appear on Exhibit E.  *See* Exhibit F at 13.  The Fee Examiner took this into account when assessing the appropriate disallowance.

16

36.    **Strasbourg Transaction**.  During the fourth interim compensation period, a partner in Weil's Paris office billed almost $200,000 in connection with work on the transaction in which Motors Liquidation Company sold a plant in Strasbourg, France, to the new General Motors Corporation.  *See* **Exhibit G** (detailing $197,977.50 in fees).  In response to an inquiry from the Fee Examiner, Weil explained that this attorney was the lead partner on the transaction in the Paris office.  Weil noted that he personally negotiated aspects of the transaction and was heavily involved in the closing.  He also supervised associates and law clerks from the Paris office who billed a total of 413.7 hours and $208,204.50 in fees to the project code associated with the Strasbourg transaction.

37.    The time billed to this project in the Paris office appears to run counter to Weil's normal and laudable practice of allocating work appropriately between timekeepers of different billing levels.  *See supra* at ¶ 15.  During the fourth compensation period, the lead partner in the Paris office billed 34 percent of the hours in that office to this transaction – far greater than the 20 percent participation rate by partners in the case overall during the same period.  *See* Exhibit B at 2.  Given that his hourly billing rate exceeded $900, the fee percentages are even more pronounced.  During the fourth compensation period, the lead partner in the Paris office billed 49 percent of all fees in the Paris office relating to this transaction – which again far exceeds the 31 percent of fees billed by all Weil partners during the same period.

38.    In contrast to the more than 200 hours of time billed to the Strasbourg transaction during this compensation period by the lead partner in the Paris office, the lead Weil attorney for the entire transaction (a partner in the New York office) billed fewer than 15 hours.  In addition, the entries for the Paris attorney often were billed vaguely—such as "follow up on closing re: GM Strasbourg."  *See* Exhibit G at 6.  In sum, Weil does not appear to have allocated work in its

usual fashion in the Paris office on this project.  This may help explain why Weil exceeded its

budget on this project code by over $180,000 during the fourth compensation period.  A

disallowance is appropriate.

*Suggested disallowance for Strasbourg transaction entries:  see supra ¶ 8.*

39.    **Mediation Binders**.  During the fourth interim compensation period, three Weil

paralegals spent a total of 408 hours preparing binders for mediation proceedings.  *See*

**Exhibit H** (detailing $85,487 in fees).  Normally, clerical and administrative tasks that are most

appropriate for secretarial staff should be considered part of a law firm's overhead expenses.

While the Fee Examiner acknowledges that the assistance of a paralegal is sometimes necessary

and valuable in compiling materials for litigation, the sheer amount of time billed by these

paralegals to these tasks appears excessive:  these three paralegals billed the equivalent of almost

*three months of time* exclusively to binder preparation.  In addition, these paralegals appeared to

work frequently in concert with each other, raising concerns about duplicated effort.  Lastly, in

describing their work, the language used in their time entries—often for large periods of time—

was frequently repetitive, raising concerns about vagueness.  A disallowance is appropriate.

*Suggested disallowance for preparation of mediation binders:  see supra ¶ 8.*

40.    **Non-Working Travel Time**.  Non-working travel time is compensable at

50 percent.  *See In re Fibermark, Inc.*, 349 B.R. 385, 406 (Bankr. D. Vt. 2006) (travel time

should be billed at one-half the professional's customary rate); *Wilder v. Bernstein*, 975 F. Supp.

276, 283-84 (S.D.N.Y. 1997) ("courts in this circuit customarily reimburse attorneys for travel

time at fifty percent of their hourly rates") (citations omitted).

41.    In accordance with this authority, Weil used a special project code for

non-working travel time and billed time recorded under this code at half its normal billing rates.

Two time entries for non-working travel were not billed to this code, however, resulting in

charges at full rates.  **Exhibit I** shows questionably coded time entries billed at full rates, which totaled $455.  If properly coded, those entries would have been billed at half the normal billing rate, for a total of $227.50.

*Disallowance for non-working travel time:  see supra ¶ 8.*

42.    **Asbestos Issues**.  During the fourth interim compensation period, several Weil timekeepers billed time to issues relating to asbestos claims.  Clearly, now and in the future, asbestos matters will consume a significant portion of the administrative expense budget in these cases.  The Debtors' Joint Plan of Reorganization establishes an Asbestos Trust, with a currently undefined cash corpus, to administer asbestos claims, but the ultimate impact of the asbestos claims estimation process (and related matters) is still unknown.

43.    Acknowledging the significance of asbestos issues and the necessity of an adversary system to resolve disputes surrounding the Asbestos Trust and the claims estimation process, the Fee Examiner remains concerned about the evidence of duplicative services between and among the various asbestos professionals.  Altogether, at least eight Retained Professionals are involved in this process.[11]

> *The Fee Examiner does not recommend a reduction for work on asbestos-related matters at this time but will make comprehensive recommendations with respect to all professionals when the final Asbestos Trust terms and the outcome of the claims estimation process can be determined.*

44.    **Transient Billers**.  The Fee Examiner continues to have concerns about timekeepers who performed nominal tasks that may well have been unnecessary in light of efforts by the many others devoted full-time to the case.  For example, the only time billed by one Weil paralegal during the fourth interim compensation period was one hour on one day

---

[11] These professionals (not including the Debtors' counsel) are Analysis Research & Planning Corporation; Bates White, LLC; Caplin & Drysdale, Chartered; Hamilton, Rabinovitz & Associates, Inc.; Kramer Levin Naftalis & Frankel LLP; Legal Analysis Systems, Inc.; Stutzman, Bromberg, Essermann & Plifka, A Professional Corporation; and Dean M. Trafelet.

reviewing an "FOIA response letter." Rather than recommend a specific disallowance for this or

other timekeepers, however, the Fee Examiner will reserve any objection until the final fee

hearing, when the contributions of each Weil timekeeper can be evaluated in context and over

the course of the entire proceeding.

   *Suggested disallowance for transient billers: None.*

   45.   **Administrative Expenses**.  **Exhibit J** outlines $328.50 in expenses for

velobinding and coil binding that are more properly considered overhead.

   *Agreed disallowance for administrative expenses:  $328.50.*

   46.   **Meal Expenses**.  Weil submitted three meal expenses exceeding the $20 per

person limit.  *See* **Exhibit K**.  With respect to these meals, the Fee Examiner recommends

disallowance of $129.65, or the amount in excess of the $20 per person limit.

   *Agreed disallowance for meal expenses:  $129.65.*

   47.   **Local Transportation Expenses**.  **Exhibit L** details $308.75 of expenses for

apparent overtime transportation where the timekeeper invoiced fewer than six hours on that day.

In accordance with the Court's prior ruling, the Fee Examiner recommends disallowance of these

expenses as overhead.  Tr. 07-06-2010 at 24:1-2.

   *Agreed disallowance for local transportation expenses:  $308.75.*

   48.   **Airfare Expenses**.  The UST Guidelines generally prohibit professionals from

seeking reimbursement for air travel that is not coach class.  *See* UST Guidelines, at (b)(5)(i)

("first class and other luxurious travel mode or accommodations will normally be

objectionable").  In the Fourth Fee Application, Weil submitted three expenses totaling

$2,645.61 for air travel that was not coach travel.  *See* **Exhibit M.**

   49.   With regard to the first expense, for $579.59, Weil explained the ticket was a last-

minute travel arrangement and that the first-class ticket was the only ticket available.  The Fee

Examiner accepts this explanation and does not recommend a disallowance, especially given the amount involved.  With regard to the remaining two airfare expenses totaling $2,066.02, however, in the absence of specific information regarding coach fares for the those routes and dates of travel, a reduction is appropriate.

*Agreed disallowance for travel expenses:  $619.81.*

**Total fees suggested for disallowance:  $88,254.75.**

**Total expenses suggested for disallowance:  $1,386.71.**

**Total fees and expenses suggested for disallowance:  $89,641.46.**

**Net suggested disallowance, less fees previously carved out:  $41,270.96**

**CONCLUSION**

This report is intended to advise the Court, the professionals, and the U.S. Trustee of the limited basis for objections to the Fourth Fee Application.  It is not intended to be an exhaustive or exclusive list of possible objections and does not preclude or limit the Fee Examiner's scope of review or objection on future interim fee applications or on final fee applications.  All professionals subject to the Fee Examiner's review should be aware, as well, that while the Fee Examiner has made every effort to apply standards uniformly across the universe of professionals in this case, some degree of subjective judgment will always be required.

WHEREFORE, the Fee Examiner respectfully submits this *Report and Statement of Limited Objection* to the Fourth Fee Application.

Dated:  Madison, Wisconsin
            December 8, 2010.

GODFREY & KAHN, S.C.

By:        /s/ *Eric J. Wilson*
            Timothy F. Nixon (TN 2644)
            Eric J. Wilson (EW 1047241)

            GODFREY & KAHN, S.C.
            780 North Water Street
            Milwaukee, Wisconsin 53202
            Telephone: (414) 273-3500
            Facsimile: (414) 273-5198
            E-mail: tnixon@gklaw.com
                        ewilson@gklaw.com

            *Attorneys for Fee Examiner*

5672871_3