Hearing Date and Time: December 15, 2010 at 2:00 p.m. (Prevailing Eastern Time)

Timothy F. Nixon
Katherine Stadler (*Pro Hac Vice*)
GODFREY & KAHN, S.C.
780 North Water Street
Milwaukee, Wisconsin 53202
Telephone: (414) 273-3500
Facsimile: (414) 273-5198

*Attorneys for Fee Examiner*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------ x
                                                             :
In re:                                                       :   Chapter 11
                                                             :
MOTORS LIQUIDATION COMPANY, *et al.,*                        :   Case No. 09-50026
    f/k/a General Motors Corp., *et al.,*                    :   (Jointly Administered)
                                                             :
                    Debtors.                                 :   Honorable Robert E. Gerber
                                                             :
------------------------------------------------------------ x

### FEE EXAMINER'S TWELVE-MONTH REPORT AND SUMMARY OF RESPONSES TO FOURTH INTERIM FEE APPLICATIONS

On December 15, the Court will hear the fourth round of fee applications, totaling $18.7 million, for the period from June 1 – September 30, 2010. The case is in its 18th month—with the plan filed on August 31, 2010 and the disclosure statement approved. A plan confirmation hearing has been scheduled for March 3, 2011. The fee review process is just shy of an anniversary: the Court ordered the Fee Examiner's stipulated appointment almost precisely a year ago. Again, as with the third set of applications heard on October 26, 2010, many of the issues that have arisen in connection with the 21 pending applications have been resolved consensually, including the issues involving the application of the Debtors' principal counsel.

***Fourth Interim Period***

The fourth set of applications is distinguished for the issues they do not raise. With few exceptions, the problems involving vague entries, incremental billing, expenses exceeding the U.S. Trustee guidelines, and block billing have largely disappeared.[1] The Court's earlier decisions—on April 29, 2010, July 6, 2010 and November 23, 2010—have provided more certainty and direction that, again with some exceptions, most applicants have taken to heart.

Not only has the amount of time the Fee Examiner and the Court have spent on the section 330 process gradually decreased, but the amount of time the applicants have spent has decreased as well. The ultimate beneficiary has been the estate—here, Motors Liquidation Company but, ultimately, the U.S. Treasury and the taxpayers who have funded the unique structure that split the pre-petition company.

The applications for this period, summarized on the attached **Exhibit A**, totaled 3,362 pages. The adjustments and objections have decreased in number and amount, relative to the first three application periods. However, the Bankruptcy Code requires not only a focus on the face of the applications but on an assessment of the necessity and "value" of professional services as part of the statutory analysis. In several significant areas, that assessment is necessarily deferred.

The "value" of the legal work on the litigation surrounding the alleged release of a $1.5 billion security interest, for example, and the asbestos claims estimation and resolution process has yet to be determined. Undoubtedly significant, those matters remain open, and they will be for some time. The plan of reorganization has been drafted, filed, and amended, but not yet resolved. A meaningful determination of the reasonableness and necessity of professional

---

[1] Recognizing this and saving estate funds, the Fee Examiner has discontinued the practice of sending a letter outlining questions and concerns to each applicant before sending each applicant a draft of the final report.

2

fees in these, and other, areas necessarily will await a hearing on subsequent applications or a final hearing. In several areas, however, the reports in this cycle express concern about duplication of services and efficiency without making a specific recommendation for reduction.

This is true as well for one subject that the Court has addressed procedurally though not substantively. On November 23, 2010, the Court in its written decision required applicants to give notice of prospective increases in hourly rates for professionals. The Court did not address, nor was it asked to address, the reasonableness of hourly rate increases as part of its section 330 review. *See*, *e.g.*, *In re Teraforce Tech. Corp.*, 347 B.R. 838, 860 (Bankr. N.D. Tex. 2006); *In re Hale-Halsell Co.*, 391 B.R. 459, 462 (Bankr. N.D. Okla. 2008); *In re Lee Tractor Co., Inc.*, 2008 WL 2788413, at *2 (Bankr. E.D.N.C. 2008) (not reported). That reasonableness inquiry is always timely because each application embodies an hourly rate that either has been, will be or could have been increased, and the increases over time—both from application to application and from the outset of the case to its conclusion—have significant financial impact.

Those rate increases have become increasingly noteworthy, especially in light of the widely-reported reluctance of major law firms generally to increase hourly rates through 2009, 2010 and into 2011. By contrast, some firms here have incrementally increased hourly rates for mid-level associates in this proceeding by a total of 25 percent or more since the case began. The aggregate financial impact of these increases is significant by any measure—perhaps approaching $1 million. In this regard, it cannot be said often enough that the burden of proof on every fee application always rests with the applicant—whether for a basic hourly rate or an increase in an hourly rate. *See In re Northwest Airlines Corp.*, 400 B.R. 393, 398 (Bankr. S.D.N.Y. 2009) ("Under Section 330(a), '[t]he applicant bears the burden of proof on its claim for compensation.'"); *see also* 11 U.S.C. § 330(a)(2) ("The court may, on its own motion or on

the motion of the United States Trustee ... or any other party in interest, award compensation that is less than the amount of compensation that is requested.").

The "market rate" concept for fees in corporate reorganizations, established in the 1978 Code, has always been practically elusive because there is no apparent way (other than discovery) to determine whether, in fact and without exception, a professional firm's hourly rates in a Chapter 11 are no greater than its (or that of comparable firms) normal hourly rates for non-bankruptcy matters.[2] Like the Court and the U.S. Trustee, moreover, the Fee Examiner relies on the professional's certification of this comparability, as fact, filed with each application. However, the literature and new data on hourly rate increases, particularly among the major firms, now provide more immediate and practical guidance.

One year ago, at the end of 2009, survey data suggested that major law firms were approaching 2010 with conservative plans for rate increases. "In the latest survey …, firms reported they project an average overall increase in rates of 3.2 percent in 2010." Molly McDonough, *Billing Rates Projected to Increase 3.2% in 2010*, A.B.A. J. (Dec. 1, 2009, 2:36 PM) http://www.abajournal.com/news/article/billing_rates_projected_to_increase_3.2_in_2010. "Firms with more than 1,000 lawyers put the increase at 4 percent." *Id.* The *National Law Journal*'s survey noted that the "average [annual] firmwide billing rate" increased by 2.5 percent in 2009 over the 2008 billing rate compared with rate increases of 4.3 percent in 2008 and 7.7 percent in 2007. A majority of the country's 200 largest firms (77 percent) said they anticipated rate increases of five percent or less. *See* Karen Sloan, *Reality Dawns on Hourly*

---

[2] With respect to market rates, it is at least footnote-worthy that the two investment banks coordinating the IPO for General Motors agreed to charge 25 percent of their typical fees for underwriting an offering. *See* Aaron Lucchetti et al., *GM Will Pay a Cut-Rate Price to Do Its New IPO*, Wall St. J., June 12, 2010, at B1. Since the last fee hearing in this case, moreover, a major New York firm not involved in this proceeding agreed to represent a municipality considering Chapter 9 *pro bono*. Romy Varghese, *Harrisburg Hires Cravath Swaine--Law Firm to Review Case for Bankruptcy*, Wall St. J., Nov. 11, 2010, at C10.

4

*Rates*, Nat'l L.J. (Dec. 7, 2009) http://www.law.com/jsp/nlj/PubArticleNLJ.jsp?id= 1202436065834. According to a leading legal consulting firm, only slightly more than six percent of firms anticipated 2010 rate changes greater than five percent.

New data available just this month suggest that, prospectively, the largest firms are planning to take the same conservative approach for 2011 hourly rate increases that they took at the beginning of 2010.

> As firms come to terms with the new legal landscape, they are pondering modest increases in billing rates in 2011. Ninety percent of our respondents say they are preparing to increase their billing rates by 5 percent or less, up from 77 percent of respondents a year ago. Another 7 percent of respondents said that they plan to boost rates more than 5 percent; 4 percent of respondents planned to make that same increase last year.

Claire Zillman, *The New Normal*, Am. Law., Dec. 1, 2010, http://www.law.com/jsp/tal/ PubArticleTAL.jsp?id=1202475032294 [hereinafter "***New Normal***"].

*The National Law Journal*'s just released 2010 survey of billing rates (as of September 30, 2010) reported that the average firm-wide billing rate, among the 250 largest firms, increased by 2.7 percent in 2010, "the second straight year of growth rates less than 3%...." Karen Sloan, *Billing Realities*, Nat'l L.J., Dec. 6, 2010, http://www.law.com/ jsp/nlj/PubArticleNLJ.jsp?id=1202475696179 [hereinafter "***Billing Realities***"]. *The American Lawyer* survey reported that 90 percent of the 200 most profitable firms expect to increase hourly rates in 2011 by five percent or less. *See New Normal*. "Instead of raising rates firmwide by class level—as many have done in years past—firms are taking a more individual approach that looks at attorneys, their clients and their practices....," said one expert on firm billing. *Billing Realities*.

Whatever the methodology, surveys depend on sampling and averages. They do not reflect all individual firm practices, whether for rate increases that are across-the-board or tied to

seniority or entry class status. Nor do they literally compare, within a firm or externally, rate increases for bankruptcy matters and non-bankruptcy matters. Nevertheless, the market over the last two years for legal services appears to have been generally and firmly resistant to annual hourly rate increases greater than five percent.

Accordingly, in the absence of specific justification for higher increases or newer data, the Fee Examiner plans to recommend a deduction to compensate for hourly rate increases that exceed market rates. *See*, *e.g.*, *In re Ames Dep't Stores*, 76 F.3d 66, 71-72 (2d Cir. 1996), overruled in part by *Lamie v. United States Tr.*, 540 U.S. 526 (2004) (adopting a "market-driven" approach, based on the Bankruptcy Code, to review for reasonableness in billing in bankruptcy cases); *In re Busy Beaver Building Centers*, 19 F.3d 833, 849 (3d Cir. 1994) ("the principal emphasis [in a market-driven analysis is] on the cost of comparable services (market rates)"); *In re Motors Liquidation Company, et al.*, No. 09-50026, Tr. of PM Hr'g, at 29:10-11 (Bankr. S.D.N.Y. Apr. 29, 2010) (Gerber, J.) [Docket No. 5699] ("In general, at least, lawyer's fees are set in the marketplace.").

The individual interim reports in this cycle do *not* request reductions or roll-backs in hourly rate increases. A firm that has increased associate rates—once, twice or three times since June 1, 2009—may choose at the beginning of 2011 not to increase rates. As an example, during the course of the proceeding an hourly rate increase that exceeds an otherwise objectionable 20 percent over the first 18 months of the case could decline as a percentage if confirmation does not occur until the 30th month and there are no further rate increases. Therefore, assessing the impact of rate increases—whether during a portion of the case or over the entire course of the proceedings—requires the benefit of perspective over time.

6

In its November 23, 2010 decision, the Court also addressed the question of "fees on fees," in response to the Fee Examiner's request, establishing a standard for determining the compensability for professionals' time spent to address inquiries and objections from the U.S. Trustee and the Fee Examiner. To implement the Court's articulated standard, the reports and summaries scheduled for hearing on December 15 reflect a proposed protocol that establishes a "safe harbor" and an approach to determining whether an applicant has "substantially prevailed" on an issue or area and, accordingly, is entitled to full compensation. Several professionals have responded to the Fee Examiner's proposed protocol with vigorous objections, both to the protocol itself and the Fee Examiner's proposed application of it.

The Court undoubtedly anticipated disagreements on this issue in its November 23, 2010 Bench Decision on Pending Fee Issues:

> I'll determine, by on-the-record conference call, whether the applicant has substantially prevailed, to the extent it isn't obvious and the applicant and the objector cannot agree.

Unless the parties can resolve the matters, on-the-record conference calls will need to be scheduled at the Court's convenience to resolve any remaining "fees on fees" disagreements on the following applications for the pending amounts:

| Professional | Application Period | Amount in Dispute |
| --- | --- | --- |
| Butzel Long | Third Interim | $12,479.75 |
| Caplin & Drysdale | Fourth Interim | $12,771.25 |
| FTI Consulting | Third Interim | $23,177.44 |
| Kramer Levin | Third Interim | $52,386.50 |
| Kramer Levin | Fourth Interim | $26,824.20 |

With the exception of this narrow issue, all other applications are prepared to proceed—most, but not all, uncontested—for hearing on December 15.

7

***Annual Summary***

Over four interim periods—16 months of compensation since June 1, 2009 and four hearings—applicants have requested Court approval for a total of $79,681,891.58 in professional services and $3,210,936.65 in expenses. (This total does not include fees and expenses for AP Services and Evercore, whose fee reports have not yet been the subject of a detailed review.) Their applications have aggregated almost 15,000 pages. For the most part, the Debtors pay 80 percent of the monthly statements and all of the expenses on a monthly or periodic basis, pending Court approval. The amounts approved for interim payment have been subject to a 10 percent holdback. Firms continue to hold $20.7 million in the Debtors' cash assets in trust as "retainers."

The fee review process has resulted in adjustments or reductions, consensually or at the Court's direction, totaling at least $1,549,131.02 from the face amount of the filed applications over the four periods. The Court approved the First Consolidated Fee Examiner's and Godfrey & Kahn, S.C.'s consolidated application for compensation and expense reimbursement, totaling $732,971.23, and a second application awaits hearing—with no objections on file—on December 15 with all of the other applications. With Court approval, the Fee Examiner used the services of Stuart Maue, an auditing firm, at the estate's expense for the most significant applications in the first three interim periods.[3] Stuart Maue has submitted $481,692.49 in fees and expenses for Court approval.

While the amount "saved" through the interim fee review process equals or exceeds the amount submitted by the Fee Examiner (and Stuart Maue) for compensation, that should not be the measure of the effectiveness of the process. Nor, for several reasons, will the results of the

---

[3] The Fee Examiner may request authority to re-engage Stuart Maue for the final fee hearing or, as an expense paid by Godfrey & Kahn, S.C., for specific interim applications.

8

final application process necessarily be a measure. It is not possible, for example, to quantify the beneficial impact of the process on the progressively improving billing judgment and precision exercised by applicants, resulting in fees and expenses neither billed nor submitted for approval to the Court. It is equally impossible to measure the public perception of the effectiveness of the statutory fee process and, ultimately, Chapter 11 itself as an indispensable part of the country's economic recovery. Yet public trust in the transparency and accountability of the process is no less important than adherence to the letter of the code.

Dated: Madison, Wisconsin
December 9, 2010.

                GODFREY & KAHN, S.C.

By:    /s/ *Katherine Stadler*
       Katherine Stadler (KS 6831)
       Timothy F. Nixon (TN 2644)

       GODFREY & KAHN, S.C.
       780 North Water Street
       Milwaukee, Wisconsin 53202
       E-mail: kstadler@gklaw.com
              tnixon@gklaw.com

*Attorneys for Fee Examiner*

5717145_1

# EXHIBIT A

INTERIM FEE APPLICATIONS NOTICED FOR HEARING ON
DECEMBER 15, 2010 AT 2:00 P.M. (PREVAILING EASTERN TIME)

MOTORS LIQUIDATION COMPANY, *et al.*, DEBTORS
CHAPTER 11 CASE NO. 09-50026 (REG)

| NAME OF RETAINED PROFESSIONAL | DATE FEE APPLICATION SUBMITTED [DKT. NO.] | PERIOD COVERED BY FEE APPLICATION | AMOUNTS REQUESTED | | AMOUNTS RECOMMENDED FOR DISALLOWANCE / STATUS[1] | | AMOUNTS ALREADY PAID TO RETAINED PROFESSIONALS 80% OF FEES AND 100% OF EXPENSES[2] | | AMOUNTS ALLOWED BY THE COURT | | HOLDBACK ON FEES (10% RECOMMENDED) | | EXAMINER'S REPORT/ STATEMENT [DKT. NO.] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | FEES | COSTS | FEES | COSTS | FEES | COSTS | FEES | COSTS | FEES | COSTS | |
| 1. Analysis Research Planning Corp. | 11/15/2010 [7748] | 06/01/2010-09/30/2010 | $205,538.50 | $857.22 | **0.00** | **0.00** | 97,418.00 | 857.22 | | | | | 12/08/2010 [8033] |
| 2. Bates White LLC | 11/15/2010 [7774] | 06/01/2010-09/30/2010 | 906,669.25 | 6,426.41 | 26,249.38 | 10.73 | 602,597.80 | 50.73 | | | | | 12/08/2010 [8025] |
| 3. Brownfield Partners, LLC | 08/05/2010 [6541] | 02/01/2010-05/31/2010 | 416,398.80 | 14,930.47 | 26,616.60 | 1,185.51 | 291,294.80 | 14,730.89 | | | | | 12/08/2010 [8037] |
| 4. Brownfield Partners, LLC | 11/15/2010 [7759] | 06/01/2010-09/30/2010 | 58,415.68 | 20,125.99 | 0.00 | 18,187.99 | 10,117.66 | 1,938.00 | | | | | 12/08/2010 [8037] |
| **5. Butzel Long, a Professional Corporation** | 11/15/2010 [7754] | 06/01/2010-09/30/2010 | 433,892.50 | 32,647.29 | **0.00** | **159.00** | 296,576.20 | 12,377.74 | | | | | 12/08/2010 [8036] |
| 6. Caplin & Drysdale, Chartered | 11/15/2010 [7777] | 06/01/2010-09/30/2010 | 593,511.50 | 36,161.57 | 56,636.38 | 630.54 | 224,497.40 | 12,025.84 | | | | | 12/08/2010 [8030] |
| 7. Deloitte Tax, LLP | 11/15/2010 [7780] | 06/01/2010-09/30/2010 | 369,592.00 | 55.00 | 11,848.35 | 0.00 | 0.00 | 0.00 | | | | | 12/08/2010 [8035] |

---

[1]  Entries in boldface type indicate that the Retained Professional stipulates to the amounts recommended for disallowance by the Fee Examiner.

[2]  These figures may include additional payments made by the Debtors subsequent to the submission of the first, second, third and fourth interim fee applications but *does not* include any of the payments reported in rounded numbers in the Debtors' Monthly Operating Reports.

| | | | AMOUNTS REQUESTED | | AMOUNTS RECOMMENDED FOR DISALLOWANCE / STATUS[1] | | AMOUNTS ALREADY PAID TO RETAINED PROFESSIONALS 80% OF FEES AND 100% OF EXPENSES[2] | | AMOUNTS ALLOWED BY THE COURT | | HOLDBACK ON FEES (10% RECOMMENDED) | | EXAMINER'S REPORT/ STATEMENT [DKT. NO.] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| NAME OF RETAINED PROFESSIONAL | DATE FEE APPLICATION SUBMITTED [DKT. NO.] | PERIOD COVERED BY FEE APPLICATION | FEES | COSTS | FEES | COSTS | FEES | COSTS | FEES | COSTS | FEES | COSTS | |
| 8. FTI Consulting, Inc. | 11/15/2010 [7775] | 06/01/2010- 09/30/2010 | 2,000,000.00 | 4,827.53 | 36,178.19 | 0.00 | 1,200,000.00 | 5,224.24 | | | | | 12/08/2010 [8041] |
| **9. Hamilton Rabinovitz & Associates, Inc.** | 11/15/2010 [7778] | 06/01/2010- 09/30/2010 | 28,462.50 | 0.00 | **0.00** | **0.00** | 0.00 | 0.00 | | | | | 12/08/2010 [8034] |
| **10. Jenner & Block, LLP** | 11/15/2010 [7751 and 7758] | 06/01/2010- 09/30/2010 | 14,239.00 | 721.46 | **8,179.40** | **0.00** | 6,423.28 | 564.71 | | | | | 12/08/2010 [8026] |
| 11. Kramer Levin Naftalis & Frankel LLP | 11/16/2010 [7804] | 06/01/2010- 09/30/2010 | 1,910,485.75 | 36,695.51 | 30,780.70 | 0.00 | 616,220.00 | 9,866.14 | | | | | 12/08/2010 [8028] |
| 12. Legal Analysis Systems, Inc. | 11/15/2010 [7776] | 06/01/2010- 09/30/2010 | 166,956.50 | 2,510.26 | 21,638.33 | 0.00 | 19,594.00 | 0.00 | | | | | 12/08/2010 [8029] |
| 13. LFR, Inc. | 08/05/2010 [6539] | 02/01/2010- 05/31/2010 | 1,010,871.20 | 387,715.62 | 21,282.59 | 156,144.60 | 343,042.69 | 387,715.62 | | | | | 12/08/2010 [8040] |
| 14. LFR, Inc. | 11/15/2010 [7756] | 06/01/2010- 09/30/2010 | 217,990.50 | 33,226.15 | 4,834.10 | 15,194.69 | 37,975.04 | 3,019.14 | | | | | 12/08/2010 [8040] |
| **15. Plante & Moran, PLLC** | 11/11/2010 [7733] | 06/01/2010- 09/30/2010 | 289,673.05 | 3,871.79 | **0.00** | **0.00** | 197,979.29 | 3,871.79 | | | | | 12/08/2010 [8031] |
| 16. Pricewaterhouse Coopers | 11/15/2010 [7779] | 06/01/2009- 07/09/2010 | 1,777,725.90 | 187,269.80 | 127,286.98 | 71,520.84 | 0.00 | 0.00 | | | | | 12/08/2010 [8032] |
| **17. Stutzman, Bromberg, Esserman & Plifka, a Professional Corporation** | 11/15/2010 [7749] | 06/01/2010- 09/30/2010 | 315,498.50 | 4,271.59 | **1,470.38** | **0.00** | 192,463.55 | 4,271.59 | | | | | 12/08/2010 [8038] |
| 18. The Claro Group, LLC | 11/09/2010 [7706] | 06/01/2010- 09/30/2010 | 46,810.50 | 402.43 | 2,303.37 | 0.00 | 11,628.00 | 108.13 | | | | | 12/08/2010 [8042] |

| NAME OF RETAINED PROFESSIONAL | DATE FEE APPLICATION SUBMITTED [DKT. NO.] | PERIOD COVERED BY FEE APPLICATION | AMOUNTS REQUESTED | | AMOUNTS RECOMMENDED FOR DISALLOWANCE / STATUS[1] | | AMOUNTS ALREADY PAID TO RETAINED PROFESSIONALS 80% OF FEES AND 100% OF EXPENSES[2] | | AMOUNTS ALLOWED BY THE COURT | | HOLDBACK ON FEES (10% RECOMMENDED) | | EXAMINER'S REPORT/ STATEMENT [DKT. NO.] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | FEES | COSTS | FEES | COSTS | FEES | COSTS | FEES | COSTS | FEES | COSTS | |
| 19. Togut Segal & Segal, LLP | 11/15/2010 [7767 and 7769] | 06/01/2010-09/30/2010 | 113,600.00 | 581.46 | **319.00** | **0.00** | 90,880.00 | 581.46 | | | | | 12/08/2010 [8027] |
| 20. Dean M. Trafelet in his Capacity as Legal Representative for Future Asbestos Personal Injury Claimants | 11/15/2010 [7747] | 06/01/2010-09/30/2039 | 42,036.75 | 95.75 | **0.00** | **0.00** | 23,788.87 | 95.75 | | | | | 12/08/2010 [8039] |
| 21. Weil, Gotshal & Manges, LLP | 11/15/2010 [7762] | 06/01/2010-09/30/2014 | 6,903,518.50 | 132,720.16 | **88,254.75** | **1,386.71** | 4,199,541.79 | 97,329.98 | | | | | 12/08/2010 [8044] |
| | | **TOTAL Interim Fee Applications Noticed for Hearing on Dec. 15, 2010** | **$17,821,886.88** | **$906,113.46** | | | | | | | | | |

| QUARTERLY REPORTS | | PERIOD covered by QUARTERLY REPORT | FEES | EXPENSES | | | |
|---|---|---|---|---|---|---|---|
| AP Services, LLC | 10/15/2010 | 06/01/2010 – 08/31/2010 | $8,169,519.22 | $439,359.61 | | | |
| | | **TOTAL QUARTERLY REPORTS:** | **$8,169,519.22** | **$439,359.61** | | | |

5424464_3

3