HEARING DATE AND TIME: December 15, 2010 at 10:00 a.m.
OBJECTION DATE AND TIME:  December 13, 2010 at 4:00 p.m. (Eastern Time)

KING & SPALDING LLP
1185 Avenue of the Americas
New York, New York 10036
Telephone:  (212) 556-2100
Facsimile:  (212) 556-2222
Arthur Steinberg, Esq.
Scott Davidson, Esq.

*Counsel to General Motors LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-------------------------------------------------------------x
                                        :
In re:                                  :        Chapter 11
                                        :
MOTORS LIQUIDATION COMPANY, et al.,     :        Case No.: 09-50026 (REG)
      f/k/a General Motors Corp., et al. :
                                        :        (Jointly Administered)
              Debtors.                  :
                                        :
-------------------------------------------------------------x
```

**RESPONSE BY GENERAL MOTORS LLC TO THE OFFICIAL**
**COMMITTEE OF UNSECURED CREDITORS' FIRST AMENDED**
**OBJECTION TO CLAIMS FILED BY GREEN HUNT WEDLAKE, INC.**
**AND NOTEHOLDERS OF GENERAL MOTORS NOVA SCOTIA**
**FINANCE COMPANY AND MOTION FOR OTHER RELIEF**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................ 1

BACKGROUND ................................................................................................. 5

    A.    GM Canada and the Lock-Up Agreement ............................................. 6

    B.    The Committee was Aware or Should Have Been Aware of the Lock-Up
        Agreement .......................................................................................... 7

    C.    The Committee Consented to the Assumption and Assignment Procedures
        Approved by the Court ......................................................................... 8

    D.    Benefits of the Lock-Up Agreement ..................................................... 8

    E.    The Court-Approved Sale and the Committee's Support Thereof ......... 9

RESPONSE ..................................................................................................... 10

    A.    The Consent Fee ............................................................................... 11

    B.    Intercompany Loans .......................................................................... 13

    C.    Swap Liability ................................................................................... 14

    D.    The "Obligations" Under the Lock-Up Agreement Cannot Be Avoided ............ 15

    E.    New GM Believes the Guarantee Obligations and the Wind-Up Claim are Valid
        and Not Duplicative, But the Issues Regarding the Merits of Each has been
        Preserved ........................................................................................... 16

    F.    There Was No Unauthorized Settlement ............................................. 17

    G.    The Committee is Not Entitled to Relief Under Civil Rule 60(b) ......... 18

    H.    The Value of the Purchased Assets Must be Preserved ......................... 19

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**FEDERAL CASES**

*Durso Supermarkets, Inc. v. D'urso (In re Durso Supermarkets, Inc.)*,
　　Case Nos. 94 Civ. 6035 (LLS), 94 Civ. 6036 (LLS), 94 Civ. 5784 (LLS), 94 Civ.
　　5786 (LLS), 94 Civ. 4974 (LLS), 1995 WL 739549 (S.D.N.Y. Dec. 14, 1995)....................12

**STATUTES**

§ 135 of the *Companies Act* (Nova Scotia)............................................................................16, 17

**RULES**

Bankruptcy Rule 9019 ............................................................................................................17

Rule 60(b) of the Federal Rules of Civil...................................................................3, 4, 11, 18, 19

General Motors LLC (f/k/a General Motors Company) ("**New GM**"), by and through its

undersigned counsel, hereby submits this response ("**Response**") to the *Official Committee of*

*Unsecured Creditors' First Amended Objection to Claims Filed by Green Hunt Wedlake, Inc.*

*and Noteholders of General Motors Nova Scotia Finance Company and Motion for Other Relief,*

dated November 19, 2010 ("**Claims Objection**")[1] and, in support thereof, New GM respectfully

represents as follows:

<u>PRELIMINARY STATEMENT</u>

1.      The elimination of approximately CDN$1.3 billion of GM Canada's liabilities

and the resolution of the Nova Scotia Action, all as set forth in the Lock-Up Agreement, were

important pieces of Old GM's restructuring plan and facilitated the sale to New GM.  If the

Lock-Up Agreement was not entered into, GM Canada would have sought bankruptcy protection

in Canada.  A GM Canada bankruptcy would have (i) negatively affected the value of GM

Canada; (ii) significantly delayed the sale ("**Sale**") of Old GM's assets to New GM with a

substantial loss in value of the enterprise; and (iii) increased the costs and complexity associated

with the Sale, including the substantial expenses related to coordinating a Canadian insolvency

proceeding with the U.S. bankruptcy cases.  In short, the execution of the Lock-Up Agreement

prior to the Petition Date insulated GM Canada from having to commence a bankruptcy

proceeding, which unquestionably preserved GM Canada's value, but, more importantly, ensured

that the Sale could proceed expeditiously and avoid the material loss in value to all parties in

interest that would have necessarily resulted from a protracted Chapter 11 case.

2.      The Committee is pressing its Claims Objection at this late date, even though it

knew about the Lock-Up Agreement shortly after these bankruptcy cases commenced.  Its

belated attempt to upset a critical piece of the Sale to New GM is prejudicial to, among others,

---

[1]   Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Claims Objection.

Old GM, New GM and GM Canada, who have relied on the binding effect of the terms contained in the Sale for over a year.

3.      Moreover, upsetting the Lock-Up Agreement in the manner which the Committee seeks would cause severe detriment to the Committee's own constituency.  Undoing the Lock-Up Agreement and the repayment of the Consent Fee could expose GM Canada to claims of over a billion dollars.  GM Canada is wholly owned by New GM, and the creditors of Old GM are stakeholders in New GM.  This exposure to the ongoing welfare of GM Canada will adversely impact the value of the New GM enterprise to the direct detriment and prejudice of all New GM stakeholders, including Old GM creditors who shortly will be receiving their distribution of New GM stock.

4.      The Claims Objection misses the mark by a wide margin for the following reasons:

**(a)**      Much of the Claims Objection is focused on the Consent Fee and the Committee's ability to avoid that payment.  However, as explained herein, all cash above a certain threshold was purchased by New GM as part of the Sale.  Thus, even assuming the funds loaned by Old GM to GM Canada for payment by Nova Scotia Finance of the Consent Fee were never advanced, those funds would have remained with Old GM and ultimately transferred to New GM as part of the Sale.  Simply put, creditors of Old GM were not impacted by the payment of the Consent Fee.

**(b)**      The Committee does not have standing to pursue any avoidance actions on behalf of the Debtors' estates.  Even if it did, the avoidance actions contemplated by the Claims Objection -- those relating to certain intercompany transfers between Old GM and GM Canada -- were purchased by New GM as part of the Sale.  They are no longer property of the Debtors'

2

estates and, thus, neither the Debtors nor the Committee can commence avoidance actions in connection with the payment of the Consent Fee.

(c)     The Consent Fee was paid by Nova Scotia Finance (a non-Debtor) to the Noteholders.  Neither Old GM nor the Committee has the authority to use an "avoiding power" claim to recover a payment made by a non-Debtor to a third party.

(d)     The payment of the Consent Fee resulted in the elimination of the Intercompany Loans at a steep discount, which allowed GM Canada to avoid having to file a bankruptcy proceeding.  It is with the perspective of this overall beneficial purpose that the payment of the Consent Fee and the terms of the Lock-Up Agreement must be viewed.

(e)     While the Claims Objection primarily seeks to disallow the claims filed by the Noteholders and the Nova Scotia Finance Trustee, it also seeks, in an opaque way, to void the Assumption Order pursuant to Rule 60(b) of the Federal Rules of Civil Procedures ("**Civil Rules**").  The Assumption Order is a final, non-appealable order and the Court should not grant any relief which could, in any way, undermine one of the most important orders in these bankruptcy cases.  The unintended consequences caused by the Committee's untimely and unnecessary attempt to vacate the Assumption Order is extremely detrimental to New GM, Old GM and GM Canada.  The Committee states that its request to void the assumption and assignment of the Lock-Up Agreement is merely "protective" (an undefined and unprecedented concept).  In any event, the Committee is required to set forth a basis for Civil Rule 60(b) relief, and it has not done so.

(f)     Attacking the assumption and assignment of the Lock-Up Agreement through Civil Rule 60(b) relief serves no purpose.  New GM wanted the Lock-Up Agreement assigned to it in order to ensure that the "cooperation" covenant imposed on Old GM therein was

complied with.   The "cooperation covenant" was the only significant remaining executory provision of the Lock-Up Agreement at the time of the assignment.  New GM's objective was to protect GM Canada.   More importantly, from New GM's perspective, while the Debtors acknowledged the validity of the Guarantee Obligations and the Wind-Up Claim, the Lock-Up Agreement, by its terms, did not constitute the allowance of any claims by the Noteholders or the Nova Scotia Finance Trustee.   It is New GM's belief that the assumption and assignment of the Lock-Up Agreement did not change that result.   The operative language remained the same: Old GM agreed not to object to the claims of the Noteholders or the Nova Scotia Finance Trustee, but the terms of the Lock-Up Agreement provide that those claims would only be allowed "to the fullest extent permitted under applicable law."  Lock-Up Agreement, ¶ 6(a).  New GM believes that the Committee's right to object to the claims has always been preserved.  The Civil Rule 60(b) relief is not necessary.

    **(g)**    In attempting to buttress the relief it seeks, the Committee takes issue with the negotiations and execution of the Lock-Up Agreement and the assumption and assignment of the Lock-Up Agreement to New GM, arguing at one point that the actions of New GM were "inequitable, unconscionable and outrageous and has harmed Old GM's creditors and stakeholders."  Claims Objection, ¶ 71.  However, the only accusatory allegation regarding New GM in the Claims Objection concerns the purported transfer of the Swap Liability from Old GM to New GM.  As explained herein, New GM purchased the Swap Liability as part of the Sale, and its value was taken into account in the purchase price paid by New GM to Old GM.  There was nothing improper about New GM's actions in this regard, and the Committee was aware, or should have been aware, of this term of the Sale.

(h)    The Committee supported the Sale and the procedures approved by the Court regarding the assumption and assignment of executory contracts.  To now complain of the Sale terms and the assumption and assignment procedures is disingenuous.

(i)    The Guarantee Obligations and the claims of the Nova Scotia Finance Trustee (the "**Wind-Up Claim**") were not created by the Lock-Up Agreement.  The Guarantee Obligations have been in existence for years and the Wind-Up Claim was statutorily created pursuant to the laws of Nova Scotia upon the bankruptcy of Nova Scotia Finance.  The Lock-Up Agreement did not cause a Nova Scotia Finance bankruptcy.  The failure to pay the Noteholders resulted in the Nova Scotia Finance bankruptcy.

(j)    New GM notes the claims being challenged by the Committee were asserted by different parties, based on different legal concepts.  New GM believes these claims are valid and enforceable, and are not duplicative.  This Court will ultimately decide that issue.

(k)    In the event the Courts grants any relief on account of the Claims Objection -- which New GM does not support -- New GM requests that any relief granted specifically provide that there has been no breach of the Lock-Up Agreement by Old GM, New GM or GM Canada.  It is of paramount concern to New GM that the Court's ultimate ruling has no affect on GM Canada, or any of the assets purchased by New GM under the Assumption Order.

## **BACKGROUND**

5.    Unless otherwise supplemented or modified in this Response, the Court is referred to the "Factual Background" section contained in the *Response of Certain Noteholders in Opposition to the Official Committee of Unsecured Creditors' First Amended Objection to Claims Filed by Green Hunt Wedlake, Inc. and Noteholders of General Motors Nova Scotia Finance Company and Motion for Other Relief*, dated December 13, 2010 ("**Noteholders'**

**Response**"), filed by the Responding Parties (as defined in the Noteholders' Response) for a general recitation of the underlying facts surrounding the negotiations and execution of the Lock-Up Agreement.

## A.    GM Canada and the Lock-Up Agreement

6.    Old GM's restructuring plan was based on completing an expedited sale to New GM, an entity sponsored and funded by the governments of the United States and Canada. One important aspect of the transaction was that Old GM would sell its equity interest in GM Canada to New GM. While Old GM's restructuring plan could have conceivably been accomplished if GM Canada was forced into an insolvency proceeding, all parties -- including Old GM, and the United States and Canadian governments -- agreed that in order to expedite the Sale and to preserve the value of the GM enterprise, it was important to keep GM Canada out of bankruptcy. Indeed, an 11th hour GM Canada bankruptcy filing presented a substantial risk to the execution of the Sale and the exposure of Old GM to a protracted Chapter 11 case with not only a significant impairment in value to the business enterprise but also a substantial negative impact on Old GM's vast supplier chain and the entire U.S. economy. By keeping GM Canada out of bankruptcy, the value of GM Canada was enhanced, an expedited sale of Old GM was accomplished much more quickly, and the Sale was substantially less complex and costly.

7.    To avoid a GM Canada bankruptcy, Old GM had to come to an agreement with the Lock-Up Noteholders. Shortly before the Petition Date, Old GM and the Lock-Up Noteholders began what turned into a round-the-clock negotiation to try and come up with an acceptable agreement that took into account, *inter alia,* claims based on the Notes, the Swap Transaction, the Intercompany Loans and the Nova Scotia Action. An agreement was ultimately reached between the parties and the Lock-Up Agreement was executed in the early morning of June 1, 2009, shortly before the Debtors commenced their bankruptcy cases. The negotiations

6

leading up to the execution of the Lock-Up Agreement were extraordinarily complex and difficult. At all times, the negotiations were conducted at arms' length and in good faith, with the United States and Canadian governments overseeing the process and approving the terms of the agreement.

**B.      The Committee was Aware or Should Have
            Been Aware of the Lock-Up Agreement**

8.      The Committee was aware or should have been aware of the Lock-Up Agreement and the terms contained therein well before its initial objection to claims was filed on July 2, 2010. Specifically, the Lock-Up Agreement was referenced in the following documents that were either publicly filed or available to the Committee:

> (i)      the Form 8-K filed by Old GM with the Securities and Exchange Commission on June 1, 2009 ("**Form 8-K**"); the Lock-Up Agreement is specifically referred to as a "Material Definitive Agreement," the terms of which were expressly set forth in the Form 8-K. A copy of the 8-K is annexed hereto as Exhibit "A;"

> (ii)      the *First Amendment, Consent and Waiver Under Debtor-In-Possession Credit Agreement*, dated June 25, 2009 ("**First Amendment**"), which, again, specifically references the Lock-Up Agreement. *See* First Amendment, ¶ 7. A copy of the First Amendment is annexed hereto as Exhibit "B;"

> (iii)      the *First Update to Sellers' Disclosure Schedule*, dated June 26, 2009 ("**First Updated Schedule**"),[2] which references "Canadian Matters" and, specifically, the Lock-Up Agreement. *See* First Updated Schedule, at Section 6.2 (pp. 106-107). Relevant portions of the First Updated Schedule are annexed hereto as Exhibit "C;" and

> (iv)      *Notice of Interim Report*, filed by the Debtors on August 11, 2009 ("**Interim Report**"), which specifically references the Lock-Up Agreement and the amendment to the Fiscal and Paying Agency Agreement, wherein the Noteholders agreed to limit their claims against Old GM to a recovery on the Guarantee Obligations and the Wind-Up Claim asserted by the Nova Scotia Finance Trustee. *See* Interim Report, Exhibit "A,"¶ 10(a)(iii) and (iv) (pp. 7-8). A copy of the Interim Report is annexed hereto as Exhibit "D."

---

[2]      The version of the First Updated Schedule filed with the Court only contains 96 pages. Nonetheless, New GM believes that the Committee was provided with the complete version of the First Updated Schedule.

In short, the Lock-Up Agreement was never hidden from the Committee, or anyone else.

**C.**     **The Committee Consented to the Assumption
and Assignment Procedures Approved by the Court**

9.     The Assumption Order, *inter alia*, included procedures for the assumption and assignment by Old GM of executory contracts after the entry of the Assumption Order ("**Assumption and Assignment Procedures**").  *See* Assumption Order, at ¶ E.  In this regard, pursuant to the Amended and Restated Master Sale and Purchase Agreement, dated as of June 26, 2009 ("**MSPA**"), New GM had until 30 days after the closing of the Sale (or such other date mutually agreed upon by Old GM and New GM) to designate contracts to be assumed and assigned.  *See* MSPA, at § 6.6(a).  The Assumption and Assignment Procedures were approved by the Court and consented to by the Committee.  The Committee should not now be permitted to challenge these procedures.

10.     The Lock-Up Agreement contains a cooperation clause which states as follows: "[Old GM] agrees and covenants that it will not take any action or assert any position inconsistent with this Section 6 and, if called upon by the Holders, will confirm its agreement with the positions confirmed herein in writing or at a court hearing as reasonably requested by the Holders."  Lock-Up Agreement, ¶ 6(b)(vii). In order to ensure that this provision would be adhered to, New GM requested that the Lock-Up Agreement be assigned to it.  There was no other purpose or intended consequence for the assignment of the Lock-Up Agreement.

**D.**     **Benefits of the Lock-Up Agreement**

11.     The Lock-Up Agreement provided substantial benefits to Old GM and its creditors, including:

>     (i)     GM Canada was relieved of its liability under the Intercompany Loans (CDN$1.3 billion) in exchange for the payment of the Consent Fee ($369 million);

8

(ii)     GM Canada was not forced to file for bankruptcy protection in Canada; as a result, the value of GM Canada was enhanced and the Sale to New GM was able to be accomplished more expeditiously and with less cost; and

(iii)     The increased value of GM Canada and the ability to consummate the Sale expeditiously inured to the benefit of New GM and, ultimately, the Committee's constituency, who are receiving stock in New GM.

**E.     The Court-Approved Sale and the Committee's Support Thereof**

12.     The Assumption Order, *inter alia*, approved the Sale to New GM pursuant to the terms of the MSPA, in which New GM purchased numerous categories of assets from Old GM, including the following:

(i)     "all cash and cash equivalents . . . other than the Excluded Cash and Restricted Cash." MSPA, § 2.2(a)(i). Restricted Cash (except certain Restricted Cash not applicable here) was also a "Purchased Asset" (as defined in the MSPA). See MSPA, §§ 2.2(a)(ii) and 2.2(b)(ii). Excluded Cash was defined as "cash or cash equivalents in an amount equal to $950,000,000 . . . ." MSPA, § 2.2(b)(i);

(ii)     "all accounts and notes receivable and other such Claims for money due to Sellers . . . ." MSPA, § 2.2(a)(iii); and

(iii)     "all intercompany obligations . . . owed or due, directly or indirectly, to Sellers by any Subsidiary of a seller or joint venture or other entity in which a Seller or a Subsidiary of a Seller has any equity Interest." MSPA, § 2.2(a)(iv).

13.     Moreover, while most avoidance actions were not sold to New GM as part of the Sale, "[a]ny and all Claims arising from, relating to or in connection with, any payments by or to, or other transfers or assignments by or to, any Purchased Subsidiary" were sold to New GM. *See* MSPA, § 2.2(b)(xi); First Update to Sellers' Disclosure Schedule, § 2.2(b)(xi). GM Canada was a "Purchased Subsidiary." These provisions cover all transfers from Old GM to GM Canada, including the funds which ultimately were used by Nova Scotia Finance to pay the Consent Fee.

14.     The Purchase Price (as defined in the MSPA) included, among other things, "the valid issuance by Purchaser of (A) 50,000,000 shares of Common Stock . . . and (B) the Parent Warrants." MSPA, § 3.2(a)(iii). Moreover, the MSPA contained a mechanism to increase the

9

number of shares transferred to Old GM if the aggregate amount of allowed general unsecured claims exceeded a certain threshold.  *Id*. at §3.2(c).  Thus, the unsecured creditors of Old GM have a material and continuing interest in New GM.

15.     The Committee endorsed the Sale to New GM, and, therefore, came to the conclusion that the Sale and the Assumption and Assignment Procedures were fair, reasonable and in the best interest of the Debtors' estates.  The Court ultimately entered the Assumption Order.  In doing so, it approved the Assumption and Assignment Procedures, finding them "fair, appropriate and effective . . . ."  Assumption Order, at ¶ GG.

16.     The sale closed on July 10, 2009.  As noted, on July 24, 2009, in accordance with the Assumption and Assignment Procedures, Old GM assumed and assigned the Lock-Up Agreement to New GM.

<u>**RESPONSE**</u>

17.     The Committee's Claims Objection is improperly premised on claims previously sold to New GM as part of the Sale, or on rights that the Committee does not possess.  For example, as discussed in more detail below, the Committee's argument regarding the Consent Fee fails because all cash and accounts receivable were sold to New GM as part of the Sale.  If the cash was not advanced by Old GM to fund the ultimate payment of the Consent Fee, it would have been sold to New GM.  The intercompany receivable owed by GM Canada to Old GM that relates to the funds advanced for the ultimate payment of the Consent Fee was also sold to New GM, as were avoiding power claims relating to intercompany payments made by Old GM to GM Canada.  Similarly, the Swap Liability was a Purchased Asset (as defined in the MSPA).  Assets which were sold to New GM cannot form the basis for the relief requested by the Committee.

18.     The Committee's argument that Old GM should not have consented to the "allowance" of the Guarantee Obligations and Wind-Up Claim is misplaced.  To be clear, New

10

GM believes that these claims are valid and enforceable, and not duplicative. However, New GM believes that these claims -- which were not created by the Lock-Up Agreement -- have not been "allowed" for purposes of these bankruptcy cases. While Old GM acknowledged these claims in the Lock-Up Agreement, it agreed that they were valid and binding only to the "fullest extent permitted under applicable law." New GM believes that the Committee's right to challenge these claims was preserved, and has never been waived. Recognizing this principle should eliminate the Committee's requested Civil Rule 60(b) relief.

## A.    **The Consent Fee**

19.    Under the Lock-Up Agreement the Noteholders received the Consent Fee in the approximate amount of $369 million. The Claims Objection asserts that the Consent Fee was funded by Old GM prior to the Petition Date and that, because of this, the payment of the Consent Fee is avoidable by the Committee. However, the Claims Objection ignores the material fact that any claims relating to the payment of the Consent Fee were sold to New GM pursuant to the MSPA:

> (i)    **All Cash was Transferred to New GM**. All cash other then Excluded Cash or Restricted Cash (as defined in the MSPA) was a Purchased Asset as defined in the MSPA. *See* MSPA, § 2.2(a)(i). Excluded Cash was defined in the MSPA as "cash or cash equivalents in an amount equal to $950,000,000 . . . ." MSPA, § 2.2(b)(i). All Restricted Cash, other then restricted cash that was exclusively related to Excluded Assets or Retained Liabilities, was also a Purchased Asset. *See* MSPA, §§ 2.2(a)(ii) and 2.2(b)(ii). The clear import of these various sections is that cash above $950 million was purchased by New GM pursuant to the MSPA. Accordingly, even if the cash used for the Consent Fee was not advanced to GM Canada and remained with Old GM, that cash would have been transferred to New GM as part of the Sale; creditors of Old GM were, therefore, not harmed by the payment of the Consent Fee because the amount of Excluded Cash -- *i.e.*, the cash that remained with Old GM -- would not have changed.

> (ii)    **All Accounts Receivable Were Sold to New GM.** The funds needed to pay the Consent Fee were loaned to GM Canada by Old GM prior to the Petition Date; this loan was evidenced by a promissory note executed by GM Canada and in favor of Old GM. Pursuant to the MSPA, all of Old GM's accounts and notes

receivable were sold to New GM. *See* MSPA, § 2.2(a)(iii). The obligations relating to the loan to GM Canada were, thus, sold to New GM and were reflected in the purchase price paid by New GM to Old GM.

**(iii)** **The Intercompany Avoidance Actions at Issue were Sold to New GM.** While most Bankruptcy Avoidance Actions (as defined in Section 2.2(b)(xi) of the MSPA) were considered Excluded Assets, Bankruptcy Avoidance Actions "relating to or in connection with, any payments by or to, or other transfers or assignments by or to, any Purchased Subsidiary" were expressly carved out of this provision and constituted Purchased Assets. *See* Sellers' Disclosure Schedule, § 2.2(b)(xi). GM Canada was a Purchased Subsidiary under the MSPA. *See* definitions in MSPA. Accordingly, any avoidance actions relating to the Consent Fee are now owned by New GM and are not owned by the Debtors' estates or creditors. Thus, the Committee cannot utilize the Debtors' avoiding powers -- even if it obtained standing to do so (which it has not)[3] -- to avoid the payment of the Consent Fee.

20.    While funds were transferred by Old GM to GM Canada prepetition, it was Nova Scotia Finance (not a Debtor herein) who ultimately paid the Consent Fee to the Noteholders. The Committee has not set forth any authority that would allow Old GM or the Committee to use bankruptcy statute avoiding power claims to recover a payment made by a non-Debtor to a third party.

21.    Moreover, under Canadian law, Nova Scotia Finance could not effectively compromise the Intercompany Loans with GM Canada, constituting virtually the entirety of its assets, without obtaining the consent of the Noteholders, who held almost all of the debt of Nova Scotia Finance. Accordingly, it was critical that the Noteholders consent to the release of the Intercompany Loans in order to keep GM Canada out of a bankruptcy proceeding. This is why the Consent Fee was paid to the Noteholders. Indeed, it was the principal motivating purpose of the transaction documented in the Lock-Up Agreement.

---

[3]    At this point, only the Debtors have standing to bring avoiding power claims on behalf of the Debtors' estates. The Committee has no independent standing to bring such actions and has not requested authority to do so. *See Durso Supermarkets, Inc. v. D'urso (In re Durso Supermarkets, Inc.)*, Case Nos. 94 Civ. 6035 (LLS), 94 Civ. 6036 (LLS), 94 Civ. 5784 (LLS), 94 Civ. 5786 (LLS), 94 Civ. 4974 (LLS), 1995 WL 739549, at *8 (S.D.N.Y. Dec. 14, 1995) ("Creditors' committees have no independent standing under the Bankruptcy Code to avoid fraudulent transfers, but rather may do so 'only when the trustee or debtor-in-possession unjustifiably failed to bring suit or abused its discretion in not suing.'").

22.    The interplay between the provisions of the MSPA, Section 2.2(b)(xi) of the Sellers' Disclosure Schedule and the transactions reflected in the Lock-Up Agreement was not accidental.    The Lock-Up Agreement provides for severe consequences if the Consent Fee is required to be repaid.    Specifically, it states:

> "[I]n the event that the payment of the Consent Fee is successfully challenged by any person in a future proceeding and, as a result, an amount equal to the Consent Fee has been repaid, the settlement between [Nova Scotia Finance] and GM Canada of the amount owing under the Loan Agreements as contemplated in this Transaction shall be null and void and the full amount owing under the Loan Agreements as of the date hereof shall be immediately due and payable according to their terms as they exist as of the date hereof.

Lock-Up Agreement, ¶5(b).    The MSPA was specifically drafted to avoid this result and protect the Consent Fee.

23.    As previously noted, the Lock-Up Agreement and the payment of the Consent Fee was (i) an integral part of Old GM's restructuring plan and the sale to New GM; (ii) implemented with the knowledge and consent of the U.S. and Canadian governments; and (iii) publicly disclosed at the onset of the Debtors' bankruptcy case.    There is no basis for the Committee to avoid the Consent Fee.

**B.    Intercompany Loans**

24.    In the Claims Objection, the Committee asserts that the release of the Intercompany Loans harmed the creditors of Old GM because it "eliminate[ed] any possibility that the obligations under the Notes would be borne by any parties other than Old GM's creditors."    Claims Objection, ¶ 42.    However, the motivating purpose of the Lock-Up Agreement was to enhance the value of GM Canada and keep it out of a Canadian bankruptcy proceeding.    The elimination of the Intercompany Loans at a steep discount to effectuate this result was a benefit paid for by New GM and is reflected in the purchase price received by Old GM.

25.     Moreover, the Intercompany Loans were between two non-Debtors -- GM Canada and Nova Scotia Finance.  The Committee's standing to challenge transactions between these non-Debtor entities is dubious.

26.     Also, as noted, claims relating to loans between Old GM and GM Canada were sold to New GM as part of the Sale.

27.     In addition, as part of the Purchase Price (as defined in the MSPA) the creditors of Old GM are receiving stock in New GM.  *See* MSPA, § 3.2(a).  The enhanced value of GM Canada caused by the elimination of the Intercompany Loans is a benefit to New GM and its stockholders, which includes the creditors of Old GM.  Accordingly, the elimination of the Intercompany Loans was a direct benefit to Old GM, GM Canada, New GM and, consequently, the creditors of Old GM.

28.     Accordingly, the Committee has no basis to object to the release of the Intercompany Loans.  In particular, the Committee should not now be permitted to single out one aspect of a beneficial transaction approved by the Court so as to create a new purported benefit for the Debtors' creditors (who may ultimately be harmed by the very relief the Committee seeks).

## C.     **Swap Liability**

29.     In the Claims Objection, the Committee complains about the inability of Old GM to collect on the Swap Liability.  However, again, any liability owed to Old GM by Nova Scotia Finance was a Purchased Asset under the MSPA.  *See* MSPA, § 2.2(a)(iv) (Purchased Assets included "all intercompany obligations . . . owed or due, directly or indirectly, to Sellers by any Subsidiary of a Seller or joint venture or other entity in which a Seller or a Subsidiary of a Seller has any Equity Interest").  Accordingly, any claim relating to the Swap Liability was purchased

14

by New GM and is no longer an asset of Old GM that could be recovered for the benefit of the Debtors' creditors.

30.    The consideration paid by New GM to Old GM took into account all of the assets being purchased as part of the Sale.  This included the Swap Liability. It was entirely appropriate for New GM to assert a claim in the Nova Scotia Finance bankruptcy proceeding on account of this liability.  This was all done pursuant to the Sale, which was supported by the Committee. The fact that the Nova Scotia Finance Trustee has asserted the Wind-Up Claim against Old GM, and that the Swap Liability is one component of that claim, does not demonstrate that New GM acted in an "inequitable, unconscionable and outrageous" manner, as the Committee would have this Court believe.  The reality is that the Swap Liability became a component of the Wind-Up Claim by virtue of Nova Scotia law -- a fact that was not hidden from anyone.

31.    It should be noted that the Lock-Up Agreement contains a provision that states: "[i]f for any reason any portion of the Wind-Up Claim is disallowed, [Old GM] agrees that the Swap Liability is subordinated to the prior, indefeasible payment of the Notes."[4]  Lock-Up Agreement, ¶ 6(b)(v).  This subordination right was bargained for by the Noteholders.  As a result, New GM cannot modify the Swap Liability without the consent of the Noteholders.

**D.    The "Obligations" Under the Lock-Up Agreement Cannot Be Avoided**

32.    Although the Committee seeks to "avoid" the "obligations under the Lock-Up Agreement" (Claims Objection, ¶ 60), aside from seeking avoidance of the Consent Fee, it is not clear what other relief the Committee is seeking.  In the Lock-Up Agreement, Old GM agreed that the Guarantee Obligations and the Wind-Up Claim were valid and enforceable "to the fullest

---

[4]   The above-cited provision also illustrates that the parties to the Lock-Up Agreement were aware that the Wind-Up Claim could be challenged.

extent permitted under applicable law."  Lock-Up Agreement, ¶ 6(a).  It was entirely within Old

GM's ability to make this acknowledgement.

33.     Moreover, it was within Old GM's power to "acknowledge Nova Scotia Finance's

consent to a bankruptcy order" (Claims Objection, ¶ 62); it is not clear what exactly the

Committee is seeking to "avoid" here.  In any event, the fact that Old GM consented to Nova

Scotia Finance's bankruptcy should be of no moment as the Noteholders would have been able

to force Nova Scotia Finance into a bankruptcy proceeding without Old GM's consent, thereby,

achieving the same result.

34.     Old GM did not "allow" Nova Scotia Finance to assert a claim against Old GM

for the Swap Liability.  The claim is derived from the terms of the MSPA, the sale of the Swap

Liability to New GM contemplated thereby, and the resulting affect of Nova Scotia law.

35.     Lastly, Old GM did not release the Intercompany Loans -- Nova Scotia Finance

did.  Accordingly, aside from the Consent Fee (which cannot be avoided as explained above),

there are no "obligations" under the Lock-Up Agreement to be "avoided" by the Committee.

**E.     New GM Believes the Guarantee Obligations and
       the Wind-Up Claim are Valid and Not Duplicative, But
       the Issues Regarding the Merits of Each has been Preserved**

36.     Contrary to the argument advanced by the Committee, the Guarantee Obligations

and the Wind-Up Claim are not duplicative.  Initially, New GM notes that these two independent

claims asserted by different parties were not created by the Lock-Up Agreement; the Lock-Up

Agreement merely provides that such claims are, in Old GM's view, valid and enforceable.

Moreover, as acknowledged by the Committee, the Guarantee Obligations were created years

ago in connection with the issuance of the Notes; specifically, in 2003, Old GM agreed to

guarantee the obligations evidenced by Notes.  *See* Claims Objection, ¶ 21.  The Wind-Up Claim

is created pursuant to Section 135 of the *Companies Act* (Nova Scotia); it arises upon the

16

winding-up of Nova Scotia Finance in its bankruptcy proceeding.[5]  The genesis of these claims cannot be disputed by the Committee.  Accordingly, the Guarantee Obligations and the Wind-Up Claim were not created by the Lock-Up Agreement, but are based on separate theories of liabilities for separate parties.  New GM believes such claims are not duplicative.

37.    Old GM, through the Lock-Up Agreement, acknowledged that the Guarantee Obligations and the Wind-Up Claim are valid and enforceable obligations and agreed not to challenge the claims.  By virtue of the assignment of the Lock-Up Agreement, New GM is now bound by the same acknowledgements made by Old GM.  However, as previously noted, New GM believes that the aforesaid acknowledgements do not constitute the "allowance" of Guarantee Obligations and the Wind-Up Claim.

## F.    There Was No Unauthorized Settlement

38.    The Committee also makes a passing argument that the Lock-Up Agreement may have been an unauthorized settlement pursuant to Bankruptcy Rule 9019.  *See* Claims Objection, ¶ 67 ("To the extent that the settlement reflected in the Lock-Up Agreement occurred post-petition, the settlement was unauthorized . . . .").  However, it is undisputed that the Lock-Up Agreement was executed prepetition.  Moreover, any activity that took place post-petition was undertaken by entities that are not Debtors (*i.e.*, GM Canada, Nova Scotia Finance, the Noteholders).  There simply was no post-petition act performed by any Debtor.  Accordingly, Bankruptcy Rule 9019 has no application here.

---

[5]  Section 135 of the *Companies Act* provides, in relevant part, as follows:  "In the event of a company being wound up, every present and past member shall, subject to this Section, be liable to contribute to the assets of the company to an amount sufficient for payment of its debts and liabilities and the costs, charges, and expenses of the winding up . . . ."

### G.    The Committee is Not Entitled to Relief Under Civil Rule 60(b)

39.    As noted, the Committee seeks to "void" the Assumption Order, but only in what they have called a "protective" fashion and only to the limited extent that the Assumption Order authorized Old GM to assume the Lock-Up Agreement and assign it to New GM.  However, even though the Committee seeks limited, "protective" relief, such relief must be denied here as the Committee has completely failed to set forth any cognizable basis for setting aside the Assumption Order.  It points to no express provision in Civil Rule 60(b) that would authorize such relief; it merely references generally Civil Rule 60(b) and contends it applies.  There is no analysis of the standard for such relief or a reference to relevant facts that would justify such relief.

40.    The Committee has not made any showing that exceptional circumstances, good cause or highly convincing evidence exists to grant the relief requested.  In this regard, New GM incorporates by reference the arguments made by the Responding Parties in the Noteholders' Response with respect to the Committee's Civil Rule 60(b) relief.

41.    Moreover, application of Civil Rule 60(b) relief at this juncture would impose an undue hardship on New GM.  Specifically, New GM relied on the terms of the Lock-Up Agreement and the enhanced value of GM Canada when it purchased substantially all of the assets from Old GM.  Through the Lock-Up Agreement, approximately CDN$1.3 billion of liabilities were removed from GM Canada's balance sheet.  The terms of the Lock-Up Agreement and the resulting increased value of GM Canada, as well as the value of other assets, were relied on by New GM when agreeing on the purchase price to be paid by New GM to Old GM.  To grant the relief requested by the Committee now has the potential of negatively affecting the value of GM Canada and the other assets purchased by New GM, which, in turn would unjustly deprive New GM of the benefits of the bargain struck with Old GM.

42.     In any event, it is New GM's understanding that the Committee is only seeking Civil Rule 60(b) relief to counter the Responding Parties' anticipated argument that the assumption and assignment of the Lock-Up Agreement translates into the allowance of the Guarantee Obligations and the Wind-Up Claim in these bankruptcy cases.  New GM does not believe this is the case as the Lock-Up Agreement, as noted, specifically states that these claims are valid and enforceable, but only "to the fullest extent permitted under applicable law."  The issue regarding the allowance of these claims remains open for the Court to determine.

43.     Accordingly, based on the foregoing, the Committee's request to void that portion of the Assumption Order that authorized Old GM to assume the Lock-Up Agreement and assign it to New GM should be denied.

**H.**     **The Value of the Purchased Assets Must be Preserved**

44.     It is New GM's view that the value of GM Canada will only be impacted if the Consent Fee is required to be repaid.  As established, the Committee may not do so.  New GM asks this Court to make sure that any relief granted to the Committee does not affect GM Canada, or any of the other assets purchased by New GM pursuant to the MSPA.

WHEREFORE, New GM respectfully requests that the Court (i) deny the relief requested

in the Claims Objection in its entirety, and (ii) grant to New GM such other and further relief as

is just and proper.

Dated: New York, New York
      December 13, 2010

                KING & SPALDING LLP

                By: /s/ Arthur Steinberg
                    Arthur Steinberg
                    Scott Davidson
                1185 Avenue of the Americas
                New York, NY  10036
                (212) 556-2100

                *Counsel to General Motors LLC*

20