Hearing Date and Time:  December 15, 2010 at 2:00 p.m. (Prevailing Eastern Time)

Timothy F. Nixon
Katherine Stadler (*Pro Hac Vice*)
GODFREY & KAHN, S.C.
780 North Water Street
Milwaukee, Wisconsin 53202
Telephone: (414) 273-3500
Facsimile: (414) 273-5198

*Attorneys for Fee Examiner*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------- x
                                                        :
In re:                                                  :   Chapter 11
                                                        :
MOTORS LIQUIDATION COMPANY, *et al.,*                   :   Case No. 09-50026
    f/k/a General Motors Corp., *et al.,*               :   (Jointly Administered)
                                                        :
                         Debtors.                       :   Honorable Robert E. Gerber
                                                        :
------------------------------------------------------- x

**FEE EXAMINER'S AMENDED REPORT AND STATEMENT OF LIMITED
OBJECTION TO THE SECOND INTERIM FEE APPLICATION OF
<u>BATES WHITE, LLC</u>**

TO:    THE HONORABLE ROBERT E. GERBER
       UNITED STATES BANKRUPTCY JUDGE

The Fee Examiner of General Motors Corporation (n/k/a Motors Liquidation Company),

appointed on December 23, 2009 (the "**Fee Examiner**"), submits this *Amended Report and*

*Statement of Limited Objection* pursuant to the *Stipulation and Order With Respect to*

*Appointment of a Fee Examiner* [Docket No. 4708] (the "**Fee Examiner Order**") in connection

with the *Second Interim Application of Bates White, LLC, as Asbestos Liability Consultant to the*

*Official Committee of Unsecured Creditors, for Allowance of Compensation for Professional*

*Services Rendered and For Reimbursement of Actual and Necessary Expenses Incurred for the*

*Period From June 1, 2010 Through September 30, 2010* [Docket No. 7774] (the "**Second Fee**

**Application**"). The Court appointed the Fee Examiner to monitor the fees and expenses incurred by professionals in these chapter 11 cases and to provide periodic reports to the Court, separately or in conjunction with applications submitted for approval by the professionals, with or without a filed objection.

With this *Amended Report and Statement of Limited Objection*, the Fee Examiner identifies a stipulated amount of $15,111.51 in fees and expenses, from a total of $913,095.66 requested in the Second Fee Application, that are objectionable. The Fee Examiner respectfully represents:

## SUMMARY STATEMENT

The applicant and the Fee Examiner have reached agreement, resolving any concerns about the Second Fee Application. As adjusted, the amount sought can be approved by the Court.

In general, the Second Fee Application appears substantively sound. It requests a total of $913,095.66. On December 1, 2010, counsel for the Fee Examiner provided Bates White, LLC ("**Bates White**") with a draft of the *Report and Statement of Limited Objection* ("**Second Report**") [Docket No. 8025]. On December 2 and 3 ("**December 2 First Response**," "**December 2 Second Response**" and "**December 3 Third Response**," respectively), Bates White provided additional information, which the Fee Examiner incorporated into the Second Report in advance of filing it on December 8, 2010 [Docket No. 8025]. On December 9, 2010, the parties reached a consensual resolution of all outstanding issues.

2

This *Amended Report and Statement of Limited Objection* summarizes the Fee Examiner's analysis in support of a total agreed disallowance of $15,111.51 in fees and expenses, from a total request of $913,095.66 in compensation and expenses.[1]

## BACKGROUND

1. Commencing on June 1, 2009, General Motors Corp. and certain of its affiliates ("**Debtors**") filed in this Court voluntary cases under chapter 11 of the Bankruptcy Code. The Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Federal Rule of Bankruptcy Procedure 1015(b). The Debtors are authorized to operate their businesses and manage their properties as debtors-in-possession pursuant to 11 U.S.C. §§ 1107(2) and 1108.

2. On August 31, 2010, the Debtors filed a Joint Chapter 11 Plan and Disclosure Statement [Docket Nos. 6829 and 6830].[2] Plan confirmation is anticipated in 2011.

3. On August 5, 2010, Bates White filed its first interim fee application ("**First Fee Application**") [Docket No. 6537], seeking fees and expenses in the amount of $199,396.00. On October 19, 2010, the Fee Examiner filed the *Fee Examiner's Report and Statement of Limited Objection to the First Interim Fee Application of Bates White, LLC*, identifying a stipulated amount of $4,905.88 in fees and expenses that were objectionable [Docket No. 7412]. That report and statement is incorporated by reference. On November 24, 2010, the Court entered an omnibus order approving a series of interim fee applications for the third interim fee period,

---

[1] This report does not address allegations raised at the November 22, 2010 hearing by several interested parties, including counsel for the Official Committee of Unsecured Creditors Holding Asbestos-Related Claims, that Bates White failed to provide full disclosure of its professionals' relationships with Litigation Resolution Group. *See In re Motors Liquidation Company, et al.*, Tr. of Hr'g, No. 09-50026 (Bankr. S.D.N.Y. Nov. 22, 2010) (Gerber, J.) [Docket No. 7966]. Whether Bates White's alleged failure to fully disclose—at the time of its retention—raises any question about its compensation by the Debtors' estates is, at least for now, beyond the Fee Examiner's jurisdiction.

[2] On December 7, 2010, the Debtors filed *Debtors' Amended Joint Chapter 11 Plan* and a *Disclosure Statement for Debtors' Amended Joint Chapter 11 Plan* [Docket Nos. 8014 and 8015].

3

including Bates White, LLC. *Order Granting (I) Applications for Allowance of Interim Compensation for Professional Services Rendered and Reimbursement of Expenses Incurred from February 1, 2010 Through May 31, 2010 and (II) the Application of LFR, Inc. for Allowance of Interim Compensation for Professional Services Rendered and Reimbursement of Expenses Incurred from October 1, 2009 Through January 31, 2010* [Docket No. 7910]. Through that order, the Court approved Bates White's first interim fee application in the amount of $193,714.12 in fees and $776.00 in expenses, authorizing payment of $193,714.12 in fees and $776.00 in expenses and requiring a continued holdback of 10 percent of Bates White's requested fees.

4. On November 15, 2010, Bates White filed the Second Fee Application, seeking fees in the amount of $906,669.25 and expenses in the amount of $6,426.41 for total requested compensation of $913,095.66.

5. According to Bates White, it has received payments from the Debtors totaling $602,648.53 for the value of services provided and expenses incurred between June 1, 2010 and August 31, 2010. Second Fee Application, ¶ 16. As of the date of the Second Fee Application, Bates White reported it had not yet received any payments from the Debtors for services rendered or expenses incurred during the month of September. *Id*.

## APPLICABLE STANDARDS

6. The Second Fee Application has been evaluated for compliance with the *Amended Guidelines for Fees and Disbursements for Professionals in Southern District of New York Bankruptcy Cases*, Administrative Order M-389 (Bankr. S.D.N.Y. Nov. 25, 2009) (the "**Local Guidelines**"), the *Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed under 11 U.S.C. § 330*, 28 C.F.R. Part 58, Appendix A (the "**UST Guidelines**"), the *Fee Examiner's First Status Report and Advisory* [Docket No. 5002] (the

4

"**First Advisory**"), and the *Fee Examiner's Second Status Report and Advisory* [Docket No. 5463] (the "**Second Advisory**"), as well as this Court's Compensation Order and Quarterly Reporting Order—including the extent, if any, that variation has been expressly permitted by order. In addition, the Fee Examiner provided Bates White with a draft memorandum summarizing the Court's April 29 and July 6, 2010 rulings on fees and expenses.

7. On November 16, 2010, the Fee Examiner also provided all of the professionals with notice that, effective for the fourth interim fee period, commencing June 1, 2010, the Fee Examiner would discontinue the uniform practice, followed for earlier compensation periods, of raising questions and concerns about an applicant's fee application in a formal letter at least one week prior to providing a copy of the draft report to the applicant.

8. On November 23, 2010, the Court issued a bench decision on two open questions involving professional fees. It decided, prospectively, that "[r]etained professionals are to provide written notice of upcoming increases in their [hourly] billing rates..." to give interested parties an opportunity to object and be heard. *In re Motors Liquidation Company*, Bench Decision on Pending Fee Issues, at 2, No. 09-50026 (Bankr. S.D.N.Y. Nov. 23, 2010) [Docket No. 7896]. It eliminated any requirement to more widely "post notice of upcoming increases on ECF." *Id.*

9. With respect to time spent responding to fee objections or inquiries, the Court held that it would "authorize payment of the costs of defending against the objection if the fee applicant substantially prevails." In contrast, the applicant "should indeed bear its own legal expenses for addressing the objection to its fees" in instances where "the outcome is a split decision, or the fee applicant otherwise fails to substantially prevail." *Id.*

10.     In applying this Court's ruling to the fee applications for the fourth interim period—and to the "carved-out" amounts in fee applications for the third interim period—the Fee Examiner now has established a recommended "safe harbor" for fees related to Fee Examiner and U.S. Trustee inquiries and objections ("**Fee Inquiry Time**").

A.     The Fee Examiner will not object to the lesser of: either (i) the first $10,000 of Fee Inquiry Time or (ii) Fee Inquiry Time calculated as 20 percent of the total compensation requested in the pending fee application, whichever is smaller.[3]

B.     For professionals whose fee applications contain requests for compensation for "fees on fees" beyond the amount of this safe harbor, the Fee Examiner has reviewed the time detail, all communications with the professional, the nature of the inquiry or deficiencies raised in the Fee Examiner's or U.S. Trustee's objection, the relative magnitude of the deficiencies in comparison to each other and to the professional's overall fee request (past and present), and whether the professional "substantially prevailed" on each inquiry or deficiency the Fee Examiner or U.S. Trustee raised. On the basis of this review, the Fee Examiner has calculated or will calculate a suggested disallowance, ranging from zero percent to 50 percent for professionals requesting compensation for Fee Inquiry Time.[4]

---

[3] In other words, the safe harbor for Fee Inquiry Time spent in connection with any application where total compensation exceeds $50,000 will be $10,000. For any application where that compensation is less than $50,000, the safe harbor will be 20 percent of the total compensation requested.

[4] This protocol applies only to activities that do not "go beyond normal advocacy or negotiation." *See In re Adelphia Commc'ns Corp.*, Decision and Order on Estate's Payment of Non-Fiduciaries' Professional Fees at 5-6, No. 02-41729 (Bankr. S.D.N.Y. Nov. 18, 2010 ) [Adelphia Docket No. 14445]. If any applicant engages in abusive, destructive or "scorched earth" tactics, the Fee Examiner will recommend higher deductions than applicable under this protocol.

**COMMENTS**

11. **Billing Rates and Task Allocation**.  The firm's blended rate—$329.18—is slightly lower than the $386.50 blended rate for services billed for the First Fee Application.  The blended rate for the Second Fee Application corresponds to a "Manager" billing rate, which appears to be a mid-level position in Bates White's hierarchical structure.

*Suggested disallowance for billing rates:  none.*

12. **Vague Task Descriptions**.  Some Bates White timekeepers continue to describe the services they provided in vague terms, or by using incomplete[5] or technical[6] task descriptions.  Several timekeepers who recorded time to the "Data Gathering & Processing" project category, for example, repeatedly failed to identify the data with which they were working, making it impossible to review the time for reasonableness or duplication with services provided by other timekeepers.  After receiving the initial draft of this report, Bates White provided supplemental information, resolving this concern.

13. Services provided in the "Expert Time" project category, which totals $92,905[7] in fees, were also routinely described without sufficient detail to define the non-duplicative role, if any, played by the single timekeeper recording time in that category, billing at an hourly rate of $850.  Bates White was reminded of the requirement to describe the services it performs with sufficient detail during the prior fee period.  In response to the Fee Examiner raising the issue in the draft of this report, Bates White provided supplemental information on some (but not all) of the time entries in this project category.

---

[5] For example, "[r]eviewing master namings database and."

[6] For example, "[d]ownloading the SEER data."

[7] Bates White erroneously identified $93,160 in fees for services performed in this category by including $255 in fees for reviewing time records, which is subject to a 50 percent reduction pursuant to this Court's ruling. Therefore, the correct amount is $92,905.

7

14. The supplemental information does not resolve all of the Fee Examiner's concerns for at least two reasons. First, many of the "Expert Time" entries were edited in ways that do not aid the Fee Examiner's review.[8] Second, the supplemental information is not sufficiently detailed to distinguish this timekeeper's role in, for example, developing the namings database, designing a general model to forecast the Debtors' asbestos liability, developing discovery requests, or preparing the Rule 2004 application filed by the Official Committee of Unsecured Creditors. Numerous other mid- and senior-level Bates White professionals provided similar services in these subject areas, and general entries such as "[w]ork on general model to forecast Debtors asbestos liability" are too vague to discern a given timekeeper's role. Because Bates White has not met its burden of proof to demonstrate the necessity and reasonableness of these services, a reduction is appropriate.

*Agreed reduction for vague timekeeping: $12,077.65 (constituting 13 percent of the "Expert Time" category).*

15. **Billing Increments**. Several Bates White timekeepers continue to record a disproportionate amount of time in half or full hour increments. The UST Guidelines require time entries to be recorded in tenths of an hour, and compliance with that guideline is not voluntary. *See In re Motors Liquidation Company, et al.*, Tr. of Hr'g at 16-17, No. 09-50026 (Bankr. S.D.N.Y. July 6, 2010) [Docket No. 6369]. In response to the Fee Examiner's inquiry on the First Fee Application, Bates White responded that part of the reason for billing patterns may be due to timekeepers working around internal meetings—which are routinely scheduled in half- and full-hour increments. In response to the same inquiry related to a single timekeeper on the Second Fee Application, Bates White stated that the timekeeper has administrative duties in addition to her professional duties and, consequently:

---

[8] For example, "[w]ork on client presentation" was edited to "[w]ork on presentation to counsel."

8

> [Her] days are often segmented in periods of 30 minutes
> increments. For example, a meeting on a unrelated case can be
> scheduled 12:30 to 1:30 and a staffing meeting can be scheduled
> 3:00 to 3:30. If I start summarizing arguments for a MLC
> application at 1:30 I am forced to stop my work at 3:00, exactly an
> hour and a half after I started it, to attend the staffing meeting. I
> then resume my work on the application at 3:30, after the meeting
> is over.

*See* December 2 Bates White Response. This explanation was, and continues to be, at best incomplete. Rarely are meetings, whether professional or administrative, so perfectly timed that a timekeeper is "forced to stop...exactly" in precise increments. Professionals providing estate-paid services in bankruptcy must record their time in increments of .1 hour. There is no exception to the rule for professionals who require their employees to segregate time artificially, for whatever reason.

16.     Bates White has significant experience in bankruptcy cases and, therefore, is presumed fully aware of billing requirements. The Fee Examiner did not recommend any disallowance for billing increment issues in relation to the First Fee Application, but he suggests that a disallowance for the continuing problem is now appropriate.

*Agreed reduction for billing increments: $1,909.63 (constituting one percent of billings by the timekeeper R. Grinberg).*

17.     **Unnecessary Services**. Bates White seeks compensation for 1.2 hours ($306) to review and understand background information recorded by a timekeeper in the Data Gathering and Processing category. The timekeeper did not record having provided any other services during the fee period. Bates White also seeks compensation for 2.4 hours ($924) devoted to "distance calculations" in the Consulting project category between August 4 and August 6, 2010. In response to the Fee Examiner's inquiry, Bates White explained that the distance calculations were necessary to determine subpoena procedures. Bates White did not provide any explanation for the necessity of the background information services.

9

*Agreed reduction for unnecessary services: $306.00.*

18. **Fee Application Services**. Bates White seeks compensation for 9.3 hours of services related to preparing its first interim fee application.[9] This amount includes 1.8 hours to review information related to preparing fee applications. The timekeeper recording the time played no role in preparing the fee application—at least no role apparent in the application itself. In response to the Fee Examiner's inquiry, Bates White explained that the timekeeper played a principal role in reviewing Bates White's time entries for compliance and, accordingly, needed to review information about the fee application process to better provide these services.

*Suggested disallowance for unnecessary fee application services: none.*

19. **Reviewing Time Detail**. Bates White segregated its time detail review into a separate project category, containing 14.4 hours of services, billed at half the timekeepers' usual rates. Bates White also seeks compensation for 0.3 hours ($255.00) of time detail review appearing in the "Expert Time" category that was not discounted by half as required by the Court's ruling. *In re Motors Liquidation Company, et al.*, Tr. of Hr'g at 14-15 No. 09-50026 (Bankr. S.D.N.Y. July 6, 2010) (Gerber, J.) [Docket No. 6369]. In response to the Fee Examiner's inquiry, Bates White voluntarily agreed to reduce its request by 50 percent of the entry.

*Agreed reduction for time detail review: $127.50.*

20. **Fee Inquiry Time**. Bates White is not seeking compensation for any time spent responding to the inquiries from the Fee Examiner or U.S. Trustee.

*Suggested disallowance for Fee Inquiry Time: none.*

---

[9] Kramer Levin also seeks compensation for several hours of review and assistance offered in the preparation of Bates White's First Fee Application.

10

21.     **Erroneous billing**.  Bates White seeks compensation of $680 (in the "Expert Time" and "Consulting" categories) for services related to the bankruptcy filing by Bondex International.[10]  It appears unrelated to this case.  In response to the Fee Examiner's inquiry, Bates White confirmed that the fees had been billed in error.

*Agreed reduction for erroneous billing:  $680.00.*

22.     **Tort/Asbestos Issues**.  At least seven other professionals, in addition to Bates White, have billed the estate for asbestos-related services during the current, and prior, fee periods.[11]

23.     Clearly, now and in the future, asbestos matters will consume a significant portion of the administrative expense budget in these cases.  The Debtors' Joint Plan of Reorganization establishes an Asbestos Trust with a currently undefined cash corpus to administer asbestos claims, but the ultimate impact of the asbestos claims estimation process (and related matters) is still unknown.

24.     Acknowledging the significance of asbestos issues and the necessity of an adversary system to resolve disputes surrounding the Asbestos Trust and the claims estimation process, the Fee Examiner remains concerned about the evidence of duplicative services between

---

[10] This error in billing was not discovered in time to be included in the draft report provided to Bates White on December 1, 2010.  Counsel to the Fee Examiner communicated the concern to Bates White on December 6, 2010, which responded the same day.

[11] Much of the time spent by Retained Professionals dealing with asbestos issues involved protracted disputes over the protection of personally identifying information in the asbestos claims data, the procedures for and scope of discovery related to claims estimation process, and related matters.  Most of the disputes in this regard seem to have been consensually resolved.  *See*, *e.g.*, *Agreement Regarding Rule 2004 Applications among the ACC, New GM, the Debtors and the Legal Representative for Future Asbestos Claimants* dated August 5, 2010; *Order Pursuant to Bankruptcy Rule 2004 Authorizing the Official Committee of Unsecured Creditors of Motors Liquidation Company to Obtain Discovery from (i) the Claims Processing Facilities for Certain Trusts Created Pursuant to Bankruptcy Code Section 524(g), (ii) the Trusts, and (iii) General Motors LLC and the Debtors* [Docket No. 6749]; *Notice of Withdrawal of The Application of the Official Committee of Unsecured Creditors Holding Asbestos-Related Claims for an Order Pursuant to Bankruptcy Rule 2004 Authorizing the Taking of Document Discovery and Deposition Testimony from the Debtors, from General Motors, LLC, Its Subsidiaries and Affiliated Companies, and From Certain Nonbankrupt Asbestos Defendants* [Docket No. 7940].

and among the various asbestos professionals. Altogether, at least eight Retained Professionals are involved in this process.[12]

*The Fee Examiner does not recommend a reduction for work on asbestos-related matters at this time but will make comprehensive recommendations with respect to asbestos professionals when the final Asbestos Trust terms and the outcome of the claims estimation process can be better determined.*

25. **Expenses**. Bates White seeks reimbursement for $6,375.68 in "Optical Character Recognition" services provided by a vendor. Bates White submitted no backup documentation, nor did it explain the per-page rate charged. Bates White also seeks reimbursement for $50.73 for a lunch meal for two professionals, which exceeds the $20 per person cap. In response to the Fee Examiner's draft report, Bates White provided the rate information and invoices requested, resolving the concern about the Optical Character Recognition charges, and voluntarily agreed to reduce its meal reimbursement request by $10.73.

*Agree reduction for meal expenses in excess of $20 cap: $10.73*

*Total Fees Suggested for Disallowance: $15,100.78.*

*Total Expenses Suggested for Disallowance: $10.73.*

*Total Fees and Expenses Suggested for Disallowance: $15,111.51.*

## CONCLUSION

This report is intended to advise the Court, the professionals, and the U.S. Trustee of the limited basis for objections to the Second Fee Application. It is not intended to be an exhaustive or exclusive list of possible objections and does not preclude or limit the Fee Examiner's scope

---

[12] These professionals (not including the Debtors' counsel) are Analysis Research & Planning Corporation; Bates White, LLC; Caplin & Drysdale, Chartered; Hamilton, Rabinovitz & Associates, Inc.; Kramer Levin Naftalis & Frankel LLP; Legal Analysis Systems, Inc.; Stutzman, Bromberg, Essermann & Plifka, A Professional Corporation; and Dean M. Trafelet.

12

of review or objection on future interim fee applications or on final fee applications. All professionals subject to the Fee Examiner review should be aware, as well, that while the Fee Examiner has made every effort to apply standards uniformly across the universe of professionals in this case, some degree of subjective judgment will always be required. The conclusions and recommendations in this report are, therefore, subject to further refinement upon each professional's submission of its subsequent and final fee applications.

WHEREFORE, the Fee Examiner respectfully submits this *Amended Report and Statement of Limited Objection* to the Second Fee Application.

Dated: Madison, Wisconsin
December 13, 2010.

GODFREY & KAHN, S.C.

By:  /s/ *Katherine Stadler*
Katherine Stadler (KS 6831)
Timothy F. Nixon (TN 2644)

GODFREY & KAHN, S.C.
780 North Water Street
Milwaukee, Wisconsin 53202
Telephone: (414) 273-3500
Facsimile: (414) 273-5198
E-mail: kstadler@gklaw.com
tnixon@gklaw.com

*Attorneys for Fee Examiner*

5648744_3

13