**Hearing Date: December 15, 2010 at 10:00 a.m.**
**Response Deadline: December 13, 2010**

GREENBERG TRAURIG, LLP
Bruce R. Zirinsky, Esq.
Nancy A. Mitchell, Esq.
John H. Bae, Esq.
Gary D. Ticoll, Esq.
MetLife Building
200 Park Avenue
New York, New York 10166
Telephone: (212) 801-9200
Facsimile: (212) 801-6400
Email: zirinskyb@gtlaw.com
        mitchelln@gtlaw.com
        baej@gtlaw.com
        ticollg@gtlaw.com

*Counsel for Appaloosa Management L.P., Aurelius Capital Management, LP,
Elliott Management Corporation, and Fortress Investment Group LLC*


UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------x
                                            :
In re                                       :    Chapter 11
                                            :
MOTORS LIQUIDATION COMPANY, et al.,         :    Case No. 09-50026 (REG)
f/k/a General Motors Corp., et al.,         :
                                            :
                                            :
                                            :
Debtors.                                    :    (Jointly Administered)
                                            :
--------------------------------------------------------------x


**RESPONSE OF CERTAIN NOTEHOLDERS IN OPPOSITION TO
OFFICIAL COMMITTEE OF UNSECURED CREDITORS' FIRST AMENDED
OBJECTION TO CLAIMS FILED BY GREEN HUNT WEDLAKE, INC.,
AND NOTEHOLDERS OF GENERAL MOTORS NOVA
SCOTIA FINANCE COMPANY AND MOTION FOR OTHER RELIEF**

# TABLE OF CONTENTS

Page

I.    **PRELIMINARY STATEMENT** ................................................................. 1

II.   **FACTUAL BACKGROUND** ..................................................................... 9

    A.    The Claims ...................................................................................... 9

        1.    The Guaranty Claims ................................................... 9

        2.    The Wind-Up Claims .................................................. 10

        3.    The Nova Scotia Proceeding ....................................... 11

    B.    The Restructuring Negotiations ................................................... 12

    C.    The Lock-Up Agreement .............................................................. 14

    D.    The 363 Sale ................................................................................ 19

III.  **ARGUMENT** ......................................................................................... 23

    A.    There is No Basis in Law or in Fact for the Committee's Fraudulent Conveyance or Preference Claims ................................................. 23

        1.    As a Matter of Law, the Avoidance Claims Must be Dismissed ............. 23

            a.    The Sale of Avoidance Actions Under the MPA Bars the Committee from Asserting Fraudulent Conveyance and Preference Claims ......................................................... 23

            b.    There Was No Transfer of Estate Property ................................... 25

            c.    The Claims Cannot Be Disallowed Under Section 502(d) Because the Committee's Alleged Avoidance Claims Have Not Been Adjudicated .................................................. 26

            d.    The Committee Does Not Have Standing to Challenge The Lock-Up Agreement or Consent Fee as an Avoidable Transfer ......................................................... 28

            e.    Judicial Estoppel Bars the Committee from Challenging The Lock-Up Agreement or the Consent Fee ......................... 29

            f.    The Assumption and Assignment of the Lock-Up Agreement Pursuant to the Sale Order Conclusively Bars

i

the Committee from Challenging the Lock-Up Agreement
and Consent Fee ............................................................................ 30

2. The Consent Fee and the Lock-Up Agreement Are Not Avoidable
Under Sections 547, 548 or 549 of the Bankruptcy Code or New
York Law ..................................................................................... 33

a. The Consent Fee is Not Avoidable Under Section 547 of
the Bankruptcy Code................................................... 34

b. The Consent Fee is Not Avoidable Under Section 549 of
the Bankruptcy Code................................................... 38

c. The Committee's Contention That The Lock-Up Agreement
Is A Constructive Fraudulent Conveyance Fails Because
MLC Received Reasonably Equivalent Value ............................ 40

d. The Committee's Contention That The Lock-Up Agreement
Is An Actual Fraudulent Conveyance Fails Because The
Facts Establish That MLC Did Not Enter Into The Lock-Up
Agreement With Actual Intent To Hinder, Delay, Or
Defraud Its Creditors................................................... 44

3. There is No Basis for Committee Allegation That Consent Fee
Was a Disguised Principal Payment ........................................ 46

B. The Wind-Up Claim and  the Guaranty Claims Are Separate Claims and Should
Each Be Allowed ................................................................................ 47

1. The Committee is Barred From Seeking to Disallow the Wind-Up
Claim or the Guaranty Claims Because the Lock-Up Agreement
was Assumed .................................................................. 47

2. The Nova Scotia Trustee's Statutory Wind-Up Claim Pursuant to
Section 135 of The *Companies Act* (Nova Scotia) is a Separate
Claim ......................................................................... 48

C. There is No Basis in Law or in Fact for the Committee's Request to Equitably
Subordinate the Claims ........................................................................ 53

D. The Lock-Up Agreement Is Not An Unauthorized Settlement Under Rule 9019 57

E. The Committee Is Not Entitled to Relief Under Rule 60(b) ................................. 58

1. The Objection Fails to Satisfy The Requirements of Rule 60(b).............. 59

a. The Committee Did Not Allege "Exceptional
Circumstances" ........................................................... 59

b.     The Committee Has Not Demonstrated That "Good Cause" Exists ........................................................................................... 60

c.     The Committee Fails To Proffer "Highly Convincing" Evidence ....................................................................................... 60

d.     Application of Rule 60(b) Imposes "Undue Hardship" ............... 62

2.    The Committee's Request is Not Timely................................................... 63

IV.    **THE OBJECTION CAN BE DISPOSED OF    WITH A NON-EVIDENTIARY HEARING** ........................................................................................................ 67

V.    **CONCLUSION** ........................................................................................................ 69

## <u>TABLE OF AUTHORITIES</u>

Page(s)

### <u>Federal Cases</u>

*Alan Gable Oil Dev. Co. v. Hoyer (In re Alan Gable Oil Development Co.),*
    1992 WL 329419 (4th Cir. Nov. 12, 1992) .......................................................................... 62, 63

*Amoco Overseas Oil Co., v. Compagnie National Algeriennes de Navigation,*
    60f F.2d 648 (2d Cir. 1979) ....................................................................................................... 64

*Bankers' Trust Co. v. Irving Trust Co. (In re United Cigar Stores Co. of America),*
    73 F.2d 296 (2d Cir. 1934)......................................................................................................... 49

*Bankr. Services, Inc. v. Ernst & Young LLP (In re CBI Holding Company, Inc.),*
    529 F.3d 432 (2d Cir. 2008)....................................................................................................... 24

*Bates v. Long Island R.R.,*
    997 F.2d 1028 (2d Cir. 1993)..................................................................................................... 29

*Coudert Bros. LLP v. 1114 6th Ave. Co. LLC (In re Coudert Bros. LLP),*
    2009 WL 2868722 (S.D.N.Y. Sept. 4, 2009)...................................................................... 31, 47

*Davis v. Wakelee,*
    156 U.S. 680 (1985).................................................................................................................... 29

*Durso Supermarkets, Inc.,*
    Case Nos. 94 Civ. 6035 (LLS), 94 Civ. 6036 (LLS), 94 Civ. 5784 (LLS), 94 Civ. 5786
    (LLS), 94 Civ. 4974 (LLS), 1995 WL 739549 (S.D.N.Y. Dec. 14, 1995) .............................. 28

*Eastern Airlines, Inc. v. Ins. Co. of the State of Pa. (In re Ionosphere Clubs, Inc.),*
    85 F. 3d 992 (2d Cir. 1996)............................................................................................. 31, 32, 47

*Enron Corp. v. Springfield Assocs. L.L.C. (In re Enron Corp.),*
    379 B.R. 425 (S.D.N.Y. 2007).............................................................................................. 26, 27

*Freedom, N.Y., Inc. v. U.S.,*
    438 F. Supp. 2d 457 (S.D.N.Y. 2006).................................................................................. 60, 61

*N.H. v. Me.,*
    532 U.S. 742 (2001).................................................................................................................... 29

*Holloway v. IRS (In re Odom Antennas, Inc.),*
    340 F. 3d 705 (8th Cir. 2003) ..................................................................................................... 27

*In re 80 Nassau Assocs.,*
    169 B.R. 832 (Bankr. S.D.N.Y. 1994) ................................................................................. 53, 54

*In re Andrew Velez Constr., Inc.,*
    373 B.R. 262 (Bankr. S.D.N.Y. 2007)....................................................................................... 44

*In re Asbestos Litig.,*
    173 F.R.D. 87 (S.D.N.Y. 1997) ................................................................................................. 61

*In re Daley,*
    224 B.R. 307 (Bankr. S.D.N.Y. 1998) ....................................................................................... 28

iv

*In re Davis*,
    889 F. 2d 658 (5th Cir. 1989) ............................................................. 27

*In re Delta Air Lines*,
    370 B.R. 552 (Bankr. S.D.N.Y. 2007).................................................. 52

*In re Dreier LLP*,
    429 B.R. 112 (Bankr. S.D.N.Y. 2010).................................................. 25

*In re F.W.D.C.*,
    158 B.R. 523 (Bankr. S.D. Fla. 1993).................................................. 49

*In re KDI Holdings, Inc.*,
    277 B.R. 493 (Bankr. S.D.N.Y. 1999)............................................. 55, 56

*In re Miner*,
    185 B.R. 362 (N.D. Fla. 1995).............................................................. 26

*In re Motors Liquidation Co.*,
    407 B.R. 463 (Bankr. S.D.N.Y. 2009), aff'd, 430 B.R. 65 (S.D.N.Y. 2010) ................ 23, 6, 42

*In re Old Carco LLC*,
    423 B.R. 40 (Bankr. S.D.N.Y. 2010)..................................................... 59

*In re Owens Corning*,
    419 F.3d 195 (3d Cir. 2005).................................................................. 48

*In re PT-1 Commc'ns, Inc.*,
    403 B.R. 250 (Bankr. E.D.N.Y. 2009).................................................. 28

*In re Tara of N. Hills*,
    116 B.R. 455 (E.D.N.C. 1989).............................................................. 66

*In re Tower Air, Inc.*,
    397 F.3d 191 (3d Cir. 2005).................................................................. 49

*In re Worldcom, Inc.*,
    No. 0-13533, 2003 WL 23861928 (Bankr. S.D.N.Y. Oct 31, 2003) .......... 43

*Lesser v. Jewel Factors Corp.*,
    470 F.2d 108 (2d Cir. 1972)................................................................. 45

*Matter of U.S. Abatement Corp.*,
    39 F.3d 556 (5th Cir. 1994) ................................................................. 54

*Meiburger v. Ocwen Fed. Bank, FSB (In re Marshall)*,
    307 B.R. 517 (Bankr. E.D. Va. 2003)................................................... 24

*Nemaizer v. Baker*,
    793 F.2d 58 (2d Cir. 1986)................................................................... 59

*Nisselson v. Empyrean Inv. Fund, L.P. (In re MarketXT Holdings Corp.)*,
    376 B.R. 390 (Bankr. S.D.N.Y. 2007).................................................. 45

*Northwestern Mut. Life Ins. Co. v. Delta Air Lines, Inc. (In re Delta Air Lines, Inc.)*,
    608 F.3d 139 (2d Cir. 2010)............................................................ 50, 51

*Office Com. of Unsecured Creditors v. Aust (In re Network Access Solutions, Inc.)*,
    330 B.R. 67 (Bankr. D. Del. 2005) ................................................................ 29, 31, 32, 33, 57

*Palermo v. Pritam Realty, Inc. (In re Pritam Realty, Inc.)*,
    233 B.R. 619 (D.P.R. 1999) ............................................................................................ 63

*Parker v. Motors Liquidation Co. (In re Motors Liquidation Co.)*,
    430 B.R. 65 (S.D.N.Y. 2010) ................................................................................... passim

*Picard v. Taylor (In re Park South Securities, LLC)*,
    326 B.R. 505 (Bankr. S.D.N.Y. 2005) ........................................................................... 44

*Radack v. Norwegian Am. Line Agency, Inc.*,
    318 F.2d 538 (2d Cir. 1963) ............................................................................................ 60

*Richard C. Breeden v. Bennett (In re The Bennett Funding Group, Inc.)*,
    220 B.R. 743 (Bankr. N.D.N.Y. 1997) ........................................................................... 26

*Sasso v. M. Fine Lumber Co., Inc.*,
    144 F.R.D. 185 (E.D.N.Y. 1992) ............................................................................... 64, 66

*Seta Corp. v. Atl. Computer Sys. (In re Atlantic Computer Sys.)*,
    173 B.R. 858 (S.D.N.Y. 1994) ........................................................................................ 27

*Springel v. Prosser (In re Prosser)*,
    2009 WL 3270762 (Bankr. D.V.I. Oct. 9, 2009) ............................................................ 27

*Stupakoff v. Otto (In re Spiegel, Inc.)*,
    269 Fed. Appx. 56 (2d Cir. 2008) ............................................................................. 64, 66

*United States Lines, Inc. v. United States (In re McLean Indus., Inc.)*,
    30 F.3d 385 (2d Cir. 1994) ............................................................................................. 26

*United Student Aid Funds, Inc. v. Espinosa*,
    130 S. Ct. 1367 (2010) ................................................................................................... 66

*Unsecured Claims Estate Representative of Teligent, Inc. v. Cigna Healthcare, Inc. (In re
    Teligent, Inc.)*,
    326 B.R. 219 (S.D.N.Y. 2005) ........................................................................ 60, 62, 64, 66

*Unsecured Creditors Comm. v. Noyes ( In re STN Enters.)*,
    779 F.2d 901 (2d Cir. 1985) ..................................................................................... 28, 56

*Wight v. BankAmerica Corp.*,
    219 F.3d 79 (2d Cir. 2000) ............................................................................................. 29

## Federal Statutes

11 U.S.C. § 502 .................................................................................... 5, 8, 26, 27, 28, 68

11 U.S.C. § 544 ................................................................................ 19, 23, 24, 27, 28, 33

11 U.S.C. § 548 .................................................... 8, 23, 24, 25, 27, 28, 33, 34, 30, 44

11 U.S.C. § 549 ............................................ 8, 23, 24, 27, 28, 33, 34, 38, 39

## **State Statutes**

N.Y. Debtor & Creditor Law § 273 ............................................................................................. 40

N.Y. Debtor & Creditor Law § 276 ............................................................................................. 44

## **Federal Rules**

Fed. R. Civ. P. 60 .............................................................................................................. passim

Fed. R. Civ. P. 9 ....................................................................................................................... 44

Appaloosa Management L.P. ("Appaloosa"), Aurelius Capital Management, LP ("Aurelius"), Elliott Management Corporation ("Elliott"), and Fortress Investment Group LLC ("Fortress") (collectively, the "Responding Parties"), each on behalf of their managed entities which hold Notes (as defined below) of General Motors Nova Scotia Finance Company ("GM Nova Scotia"), submit this response (the "Response") in opposition to the *Official Committee of Unsecured Creditors' First Amended Objection to Claims Filed by Green Hunt Wedlake, Inc. and Noteholders of General Motors Nova Scotia Finance Company and Motion for Other Relief*, dated November 19, 2010 (the "Objection").

## I.    PRELIMINARY STATEMENT[1]

The Responding Parties are holders of two series of publicly traded Notes issued by GM Nova Scotia on July 10, 2003 in the aggregate principal amount of £600,000,000.  Following the issuance of the Notes, GM Nova Scotia loaned the proceeds of the issuance to General Motors of Canada Limited ("GM Canada") pursuant to two intercompany loans aggregating approximately CDN$1.3 billion (the "Intercompany Loans").  Payment of the principal, interest and other amounts due and owing under the Notes was unconditionally guaranteed by Motors Liquidation Company f/k/a General Motors Corporation ("MLC") pursuant to the guaranty.  Proofs of claim have been filed against MLC on behalf of the Responding Parties and the other holders of the Notes (collectively, the "Noteholders") based upon the guaranty (the "Guaranty Claims").[2]  In

---

[1] Capitalized terms not otherwise defined in the Preliminary Statement shall have the meanings ascribed to them below.

[2] On November 9, 2009, Greenberg Traurig, LLP ("GT") filed a motion in connection with the bar date order on behalf of Aurelius Capital Management, LP, Drawbridge Special Opportunities Advisors, LLC, Fortress Credit Opportunities Advisors, LLC, Appaloosa Management L.P., Elliott Associates, LP, Perry Partners, L.P. and Perry Partners International, Inc. (the "GT-Represented Noteholders").  At a hearing held on November 20, 2009, the Court ruled that the GT-Represented Noteholders and any other Noteholders that had communicated with GT (the "Contacting Noteholders") were required to file individual proofs of claim.  The Court also authorized GT to file a group proof of claim for Noteholders other than the GT-Represented Noteholders and the Contacting Noteholders (the "Other Noteholders").  An order consistent with the Court's bench ruling was entered on December 23, 2009.  Consistent with Court's ruling, (i) the GT-Represented Noteholders and the Contacting Noteholders filed the following claims: Nos. 67498, 66265, 67428, 67500, 66266, 67499, 67429, 66217, 69347, 69346, 67430, 66267,

addition, the Nova Scotia Trustee has filed a proof of claim against MLC in an amount exceeding $1.6 billion based upon the liabilities of MLC pursuant to Section 135 of the *Companies Act* (Nova Scotia) (the "Wind-Up Claim").

By the Objection, the Official Committee of Unsecured Creditors (the "Committee") seeks to unwind the June 1, 2009 Lock-Up Agreement (the "Lock-Up Agreement")[3] pursuant to which the Noteholders, MLC, GM Canada and GM Nova Scotia resolved, among other things, litigation related to the Notes and the Intercompany Loans (the "Nova Scotia Proceeding"), thus enabling MLC to proceed with its consensual restructuring, which involved selling substantially all of its assets to New GM.  As explained below, the Committee's effort to describe the Lock-Up Agreement as improperly obtained from the GM counterparties is wholly without merit and should be rejected.  The Lock-Up Agreement represents a fair compromise among its signatories, each of whom was represented by able professionals, which had the support of the governments of the United States and Canada.  All parties were required to make concessions for the purpose of obtaining the benefits embodied in the Lock-Up Agreement.

During the months and weeks prior to MLC's chapter 11 filing, the GM Parties, the governments of the United States and Canada, the labor unions, secured and unsecured creditors, dealerships and numerous other constituencies engaged in negotiations in an effort to pave the way for MLC's consensual restructuring.  These efforts included the unsuccessful Exchange Offer made to the Noteholders and certain other holders of notes issued by MLC, which was withdrawn just days prior to the chapter 11 filing.

---

66216, and 67501(collectively, the "Individual Noteholder Claims") and (ii) GT filed a global proof of claim (claim no. 69551) on behalf of the Other Noteholders in the amount of $1,072,557,531.72 less the aggregate amount of the Individual Noteholder Claims (the "Global Noteholder Claim").  In addition, certain other claims have been filed by other Noteholders which may be duplicative in part of the claims covered by the Global Noteholder Claim (the "Other Individual Claims").

[3] The Lock-Up Agreement was entered into between and among the Responding Parties and MLC, GM Nova Scotia, GM Canada, and GM Investments Ltd. ("GM Investments" and collectively with GM Nova Scotia and GM Canada, the "Canadian Entities" and the Canadian Entities together with MLC, the "GM Parties").

2

After the withdrawal of the Exchange Offer and agreements by MLC with certain other constituents, the Responding Parties and the GM Parties commenced around-the-clock negotiations in an effort to reach agreement on a deal that would facilitate MLC's restructuring and resolve the Nova Scotia Proceedings, the Intercompany Loans, and other claims of the Noteholders.  During those negotiations all parties were represented by highly-qualified U.S. and Canadian attorneys and financial advisors.  The terms being negotiated were fully vetted by the GM Parties with the active participation of the U.S. Treasury Department and the Canadian and Ontario Governments.  The UAW also was apprised of the negotiations.  The resulting settlement was memorialized in the Lock-Up Agreement.  Representatives of the Canadian government met with the parties prior to the execution and delivery of the Lock-Up Agreement, shortly before MLC filed for bankruptcy.  The Lock-Up Agreement and its terms were publicly announced on June 1, 2009 in a press release and filings with the Securities and Exchange Commission (the "SEC") and widely reported in the U.S. and Canadian media.

MLC and the other GM Parties derived substantial benefits from the Lock-Up Agreement and the transactions contemplated thereby.  With the consent of the Noteholders, GM Canada was relieved of a CDN$1.3 billion liability under the Intercompany Loans owed to GM Nova Scotia.  The benefit of this debt relief inured in full to MLC as the sole shareholder of GM Canada.  In addition, the cancellation of GM Canada's obligations under the Intercompany Loans facilitated the sale of MLC's Canadian assets and businesses to New GM without the disruption, cost, risk and delay of a GM Canada CCAA proceeding.  MLC obtained the support of the Noteholders for its restructuring transactions in the U.S. and Canada and the release of the Nova Scotia Proceeding.  MLC was able to satisfy the conditions established by the U.S. and Canadian governments for their financial support of MLC's chapter 11 filing and their funding of

the acquisition of the assets and businesses of MLC, including the equity of GM Canada, by New GM.

The Committee complains that GM Canada, which is not a Debtor in these cases, transferred $369 million to GM Nova Scotia for payment of the Consent Fee to the Noteholders. However, the Committee ignores the valuable consideration provided to the GM Parties, including MLC, by the Noteholders in consideration for the Consent Fee and other benefits provided to the Noteholders under the Lock-Up Agreement. In particular, GM Canada was relieved of a CDN$1.3 billion[4] liability under the Intercompany Loans, which, as noted above, inured 100% to the benefit of the estate and creditors of MLC, GM Canada's sole shareholder. Additionally, MLC avoided the substantial costs and attendant delay that would have resulted from filing a Canadian insolvency proceeding for GM Canada.

New GM *elected* to assume the obligations of MLC under the Lock-Up Agreement in accordance with the Sale Order. Notably, the terms of the Lock-Up Agreement did *not* require its assumption or assignment to New GM. New GM's determination to assume the Lock-Up Agreement speaks volumes as to the importance of the benefits derived by New GM and MLC under the Lock-Up Agreement. The Committee's suggestion that MLC entered into the Lock-Up Agreement with a gun to its head is absurd, particularly when less than one month later MLC voluntarily assumed the Lock-Up Agreement and assigned it to New GM as part of its restructuring.

Although the Guaranty Claims arise from the Guaranty and the Wind-Up Claim arises from Nova Scotia statute, the Committee mistakenly states that the Claims arise from the Lock-Up Agreement and principally bases its Objection on arguments that the Lock-Up Agreement

---

[4] This amount equates to approximately US $1.13 billion based on the exchange rate on June 25, 2009, the date of the Extraordinary Resolution.

and the Consent Fee (paid by GM Nova Scotia, a non-Debtor) are avoidable under the Bankruptcy Code.  As a matter of law, these contentions by the Committee must be rejected for at least six independent reasons:

- Any claim to avoid the Lock-Up Agreement or any transfer or payment by MLC to GM Canada (including the Consent Fee) was purchased by New GM as part of the MPA approved by the Sale Order, and the estate of MLC does not own any such avoidance claims.

- The Consent Fee was funded by GM Canada and paid by GM Nova Scotia, neither of which is a Debtor.

- Even if the MLC estate still owned the avoidance claims that were sold to New GM, under section 502(d) of the Bankruptcy Code, the Committee cannot object to the Claims on the contention that the Lock-Up Agreement was a fraudulent conveyance or that payment of the Consent Fee was a preferential transfer unless and until the Court has entered a judgment that the Lock-Up Agreement constituted a fraudulent conveyance and payment of the Consent Fee was a preferential transfer.

- The Court has not authorized the Committee (nor has the Committee sought authorization) to bring an avoidance action against the Noteholders.

- The Lock-Up Agreement was assumed by MLC under section 365 of the Bankruptcy Code and, having assumed the Lock-Up Agreement, MLC's estate is barred from seeking to avoid its obligations under the Lock-Up Agreement.

- Judicial estoppel bars the Committee from challenging the Lock-Up Agreement or the Consent Fee.

New GM and MLC and its creditors have received the benefits of the Lock-Up Agreement and the transactions contemplated thereby.  The governments of the United States and Canada, through New GM, provided substantial consideration to MLC for the benefit of its creditors.  GM Canada, which successfully restructured its indebtedness with the full consent and cooperation of the Noteholders without the necessity of a CCAA filing, was a critical part of the sale.  The purchase price received by MLC includes value for GM Canada, which was substantially enhanced by the release of its obligations under the Intercompany Loans.  Notably, the Canadian and Ontario governments contributed more than $7 billion to the purchase price,

principally on account of GM Canada.[5]  The value of GM Canada, as restructured, inured not only to the benefit of New GM, but to the creditors of MLC who will benefit from MLC's substantial share of equity in New GM.  The Noteholders have in good faith performed their obligations and have forgone other substantial rights in reliance upon the Lock-Up Agreement and the transactions contemplated thereby.  The Committee's allegations of bad faith and its belated attacks on the Lock-Up Agreement defy credulity.

In attacking the Lock-Up Agreement and the Noteholders, the Committee has also chosen to attack the integrity and responsibility of the GM Parties who participated in the Lock-Up Agreement and the transactions taken in furtherance thereof.  By seeking to avoid the Lock-Up Agreement and the payment of the Consent Fee, the Committee has also put GM Canada (and thereby New GM as well) at risk, because, pursuant to the Lock-Up Agreement, the Intercompany Loans owing by GM Canada to GM Nova Scotia of CDN$1.3 billion will be reinstated and become immediately due and payable if the Consent Fee is successfully challenged.  Such a result would undo a critical component of the Court-approved sale  to the detriment of New GM, GM Canada and all their equity holders, including the governments of Canada and the United States.   Ironically, however, if this event were to occur, the recovery by GM Nova Scotia on the Intercompany Loans from GM Canada would be more than sufficient to pay in full the Noteholders and GM Nova Scotia's other creditors.

---

[5] Following the sale of MLC's assets to New GM, the Canadian government owned 11.7% of New GM's common stock on an undiluted basis, as well as $400 million of New GM Series A Preferred Stock.  *See In re Gen. Motors Corp.*, 407 B.R. 463, 482 (Bankr. S.D.N.Y. 2009), *aff'd*, 430 B.R. 65 (S.D.N.Y. 2010); *see also* MPA, § 5.4(c) (stating that Canadian government will hold 58,368,644 shares of Common Stock at 16,101,695 shares of Series A Preferred Stock).  In exchange for this ownership interest, the Canadian government contributed (i) $2.6 billion in certain existing loans made to GM Canada, (ii) Export Development Canada's $3.4 billion portion of the DIP Facility, and (iii) the loans made under the July 10, 2009 Canadian Loan Agreement in an amount of CDN$1.5 billion (equivalent to $1.3 billion USD).  *See* General Motors 10-K, filed April 7, 2010.

The Objection, filed just days before the anniversary of the Sale Order[6] and the expiration of the twelve-month bar date for relief under Rule 60(b) of the Federal Rules of Civil Procedure, also seeks to modify the Sale Order, which approved the unprecedented and historic sale of MLC's assets to New GM – an entity sponsored by the governments of the United States and Canada and created to acquire those assets. The Committee's proposed modification of the Sale Order would set aside MLC's assumption and assignment to New GM of the Lock-Up Agreement. The Committee's request for relief under Rule 60(b) which is contained in the Objection (the "60(b) Motion") fails to allege, let alone establish, a basis for relief under Rule 60(b).

Among other things, the Committee fails to explain why it has waited more than a year after the full and public disclosure of the transactions under the Lock-Up Agreement and almost a full year after entry of the Sale Order to attack the Lock-Up Agreement and its assumption by MLC and assignment to New GM. The Committee knew about these transactions at the time of the sale, yet made no objection. Indeed, the Committee strongly endorsed and supported the sale, fully realizing the only alternative was a liquidation with no recovery for unsecured creditors. Having supported the sale and having derived substantial benefits therefrom, it is improper for the Committee to seek to nullify a component of the sale that it belatedly decided it no longer favors.

For the reasons set forth above and, as described specifically and in detail, below, the Responding Parties submit that the Rule 60(b) Motion should be denied and the Objection overruled in its entirety, with prejudice.

As a procedural matter, the Committee has requested an evidentiary hearing on its Rule 60(b) Motion and Objection. The Responding Parties submit that the Court can dispose of the

---

[6] The Committee filed the original version of its Objection on July 2, 2010.

Rule 60(b) Motion and the Objection without holding an evidentiary hearing, for the following

reasons:

1) <u>Avoidance Claims</u>:

✓ MLC sold to New GM avoidance actions relating to the Consent Fee and the Lock-Up Agreement; thus, the Committee is barred from objecting to the Claims based on avoidance claims under sections 547, 548, or 549 of the Bankruptcy Code.

✓ Because MLC assumed and assigned the Lock-Up Agreement, the Committee is barred from pursuing the alleged avoidance claims.

✓ The Committee does not have, and has not requested, standing to challenge any alleged avoidable transfers of MLC's property.

✓ Judicial estoppel bars the Committee, which consented to the assumption and assignment procedures and strongly supported the sale, from pursuing the alleged avoidance claims.

✓ The Claims cannot be disallowed under section 502(d) of the Bankruptcy Code because the alleged avoidance claims have not been adjudicated; thus the Committee may not object to the Claims based on allegations that the Lock-Up Agreement or transactions in connection therewith, constituted a fraudulent transfer or preferential transfer.

2) <u>Equitable Subordination</u>:

✓ The Committee's request to equitably subordinate the Claims must be denied because the Committee fails to allege facts to support such a claim.

✓ Because MLC assumed and assigned the Lock-Up Agreement, the Committee is barred from pursuing equitable subordination claims in connection therewith.

✓ The Committee has improperly sought equitable subordination without filing an adversary proceeding as required by Rule 7001(8) of the Federal Rules of Bankruptcy Procedure.

✓ The Committee does not have, and has not requested, standing to seek equitable subordination.

✓ Judicial estoppel bars the Committee, which consented to the assumption and assignment procedures and strongly supported the sale, from pursuing the equitable subordination claims.

3) <u>Rule 9019</u>: The Committee's Objection based on the allegation that the Lock-Up Agreement constitutes an unauthorized post-petition settlement under Rule 9019 of the Federal Rules of Bankruptcy Procedure must be overruled because it is undisputable that the Lock-Up Agreement was entered into pre-petition and that the post-petition transfers alleged by the Committee did not involve property of any Debtor's estate.

    4) <u>Duplicative Claim Allegation</u>:

      ✓ As there are no material facts at issue, the Court can make a determination as a matter of law whether the Wind-Up Claim should be disallowed as duplicative of the Guaranty Claims.

      ✓ Because MLC assumed and assigned the Lock-Up Agreement, the Committee is barred from pursuing objections to allowing in full both the Wind-Up Claim and the Guaranty Claims.

    5) <u>Rule 60(b) Motion</u>:  As there are no material facts at issue, the Court should deny the Rule 60(b) Motion based on the law and the undisputed facts because the Committee has utterly failed to allege any facts to support its burden under Rule 60(b).

Accordingly, the interests of judicial economy mandate holding an initial non-evidentiary hearing on the Rule 60(b) Motion and the Objection.  The Responding Parties believe that the Court will overrule the Objection on the law and the undisputed facts.  Even if the Court were to find that certain of the objections require an evidentiary hearing for the Court to resolve, the Noteholders respectfully submit that this process will significantly narrow the breadth and scope of discovery, and streamline the resolution of the Objection.

## II.    **FACTUAL BACKGROUND**

A.    <u>The Claims</u>

    1.    <u>The Guaranty Claims</u>

GM Nova Scotia is a Nova Scotia unlimited company and a wholly-owned direct subsidiary of MLC.  On July 10, 2003, GM Nova Scotia issued (a) £350,000,000 principal amount of 8.375% Guaranteed Notes due December 7, 2015 (the "<u>2015 Notes</u>") and (b) £250,000,000 principal amount of 8.875% Guaranteed Notes due July 10, 2023 (the "<u>2023 Notes</u>" and together with the 2015 Notes, the "<u>Notes</u>"), pursuant to the terms and conditions of that certain Fiscal and Paying Agency Agreement, dated as of July 10, 2003, between and among GM Nova Scotia, MLC, Deutsche Bank Luxembourg S.A., as fiscal agent, and Banque Général du Luxembourg S.A., as paying agent (the "<u>Fiscal and Paying Agency Agreement</u>").  The Notes

9

were guaranteed by MLC pursuant to Section 5 of Schedule 1 to the Fiscal and Paying Agency

Agreement (the "Guaranty").  *See* Fiscal Paying and Agency Agreement, which is attached as

Exhibit "A" at 4.

On December 10, 2009, pursuant to order of the Court, a proof of claim bearing Claim

No. 69551 in the aggregate amount of $1,072,557,531.72 as well as other claims on behalf of

certain individual holders of the Notes were filed with the Court.  The Guaranty Claims arise

from MLC's contractual Guaranty.  *See* Noteholders' Proofs of Claim and Guaranty Claims,

which are attached as Exhibit "B."

2.    The Wind-Up Claims

Immediately after the issuance of the Notes by GM Nova Scotia, GM Nova Scotia loaned

the proceeds of the Notes to GM Canada, pursuant to separate loan agreements, resulting in

Intercompany Loans payable by GM Canada to GM Nova Scotia in the aggregate principal

amount of approximately CDN$1.3 billion.  *See* Objection, at ¶ 25.  Also, in connection with the

issuance of Notes, GM Nova Scotia entered into two currency swap transactions with MLC,

which resulted in a liability owed by GM Nova Scotia to MLC in the amount of $564,493,957

(the "Swap Liability").  Under the MPA, MLC sold to New GM its claim related to the Swap

Liability. *See* Proof of Claim of General Motors LLC ("New GM") in the Matter of the

Bankruptcy of General Motors Nova Scotia Finance Company, dated November 9, 2009, which

is attached as Exhibit "C."

Under Section 135 of the *Companies Act* (Nova Scotia), MLC, as the direct parent of GM

Nova Scotia, is statutorily liable to GM Nova Scotia for the debts and liabilities of GM Nova

Scotia in the event of its winding-up (the "Wind-Up Obligations").  *See* Section 135 of the

*Companies Act* (Nova Scotia), which is attached as Exhibit "D."  The Wind-Up Obligations are

an asset of GM Nova Scotia which, together with the Intercompany Loans, comprise

substantially all of the assets of GM Nova Scotia available to repay the Notes and its other liabilities.

On October 9, 2009, the Supreme Court of Nova Scotia adjudged GM Nova Scotia bankrupt and issued an order on that date pursuant to the *Bankruptcy and Insolvency Act* (Canada) appointing Green Hunt Wedlake Inc. as trustee of the estate of GM Nova Scotia ("Nova Scotia Trustee").   *See* Bankruptcy Order, which is attached as Exhibit "F."   On November 30, 2009, the Nova Scotia Trustee filed its Wind-Up Claim bearing Claim No. 66319 in the amount of $1,607,647,592.49 (the Wind-Up Claim together with the Guaranty Claims are collectively referred to as the "Claims").   The Wind-Up Claim is separate and apart from the Guaranty Claims as it arises from MLC's Wind-Up Obligations that include the amounts due under the Notes, the Swap Liability, and certain other obligations.[7]   *See* Wind-Up Claim, which, in pertinent part, is attached as Exhibit "G."

3.     The Nova Scotia Proceeding

Because GM Nova Scotia had few other material assets prior to the Petition Date, the ability of GM Nova Scotia to satisfy its obligations under the Notes was dependent upon the ability of GM Canada and GM Investments (which owed significant amounts of money to GM Nova Scotia) to satisfy their financial obligations owed to GM Nova Scotia.   Nonetheless, in or about May 2008, at a time when MLC was insolvent or on the brink of insolvency, MLC (as sole shareholder) caused GM Investments to take certain actions that effectively stripped it of its assets, thereby impairing its ability to satisfy its obligations owing to GM Nova Scotia.

---

[7] The components of the Wind-up Claim include the following debts and liabilities of GM Nova Scotia: CDN$589,292,176 related to the Swap Liability; CDN$1,088,542,512.01 related to the Notes; and CDN$436,222.14 in other obligations, aggregating CDN$1,678,270,910.68 which, when converted to US Dollars at the date of the bankruptcy of GM Nova Scotia at the exchange rate of 0.957919, equals US$1,607,647,592.49.

11

First, GM Investments reduced its paid up capital by CDN$576,672,670 and paid that amount to MLC.  In addition, in the same time period, MLC caused GM Nova Scotia to reduce its paid up capital by more than CDN$16,000,000 and pay that amount to MLC.  Then, on February 11, 2009, at a time when MLC was insolvent and GM Canada was approaching the minimum cash reserve levels required to meet its obligations, MLC and GM Canada amended their credit agreement to, among other things, allow GM Canada to guarantee the indebtedness of other affiliates and provide its assets as collateral security for any such indebtedness, whether new or pre-existing.  The amendment to the credit agreement made possible the impairment of GM Canada's ability to repay its obligations to GM Nova Scotia, including the Intercompany Loans.  Under section 241 of the Canada Business Corporations Act, the foregoing actions gave rise to, among other things, oppression claims by the Noteholders against various parties, including MLC, GM Canada, GM Investments, and GM Nova Scotia.

On March 2, 2009, in connection with the oppression claims, the Notes, the Guaranty, and the Intercompany Loans, certain of the Noteholders commenced the Nova Scotia Proceeding in the Supreme Court of Nova Scotia (*Aurelius Capital Partners, LP, et al. v. General Motors Corp., et al.*, Court File No. HFX No. 308066), naming as defendants, among others, MLC, GM Canada, GM Investments, and GM Nova Scotia.  *See* Notice of Action entitled *Aurelius Capital Partners, LP, et al. v. General Motors Corp., et al.*, Court File No. HFX No. 308066, which is attached as Exhibit "E."

B.    The Restructuring Negotiations

Commencing in December 2008, in connection with the emergency bailout of the U.S. automobile industry, the U.S. government advanced billions of dollars to MLC.  In return, the U.S. government required that MLC submit a viable restructuring plan.  On March 30, 2009, after rejecting the initial plan submitted by MLC, the U.S. government granted MLC 60 days to

12

"address the tough issues to improve the long-term viability of the company, including the restructuring of the financial obligations to the bondholders, unions and other stakeholders." *See* Press Release, General Motors Co., *GM Statement on Auto Industry Restructuring* (March 30, 2009), which is attached as Exhibit "H."  If MLC failed to submit a credible plan prior to such deadline, the U.S. government indicated that it would not provide additional financing, and MLC would be forced to liquidate.

As part of MLC's restructuring efforts, on April 27, 2009, MLC and GM Nova Scotia jointly solicited all holders of their respective notes, aggregating approximately $27.2 billion, to exchange their notes for common stock (the "Exchange Offer").[8]  The Exchange Offer was not successful.

To prevent its liquidation and produce a viable restructuring plan supported by its stakeholders, MLC entered into negotiations with numerous constituencies, seeking their support and cooperation.  In late May 2009, as the government-imposed deadline approached, MLC concluded agreements with, and obtained the support of, its U.S. bondholders and the UAW.  *See* Michael J. de la Merced and Micheline Maynard, *G.M. Plan Gets Support From Key Bondholders*, THE NEW YORK TIMES, May 28, 2009, which is attached as Exhibit "I."

MLC's restructuring plan was based on completing an expedited sale to New GM, an entity sponsored and funded by the governments of the U.S. and Canada.  MLC's sale of its equity interest in GM Canada to New GM without GM Canada filing a CCAA proceeding was an important aspect of the transaction.  As the debtors stated, "the Purchaser – the only potential purchaser – will walk away if the sale is not pursued in the context of an expedited sale proceeding and approved by July 10, 2009."  *See* Debtors' Reply to Sale Objections [Docket #

---

[8] MLC offered to issue 225 shares of MLC common stock for each $1,000 principal amount of notes and to pay in cash all accrued but unpaid interest due on the notes.

2645].  Completion of the expedited sale by the deadline required GM Canada to avoid filing a Canadian proceeding.

To enable GM Canada to avoid a CCAA proceeding, MLC and GM Canada required agreements with the Canadian automobile dealers, the CAW, and the Noteholders.  On May 22, 2009, after two weeks of around-the-clock negotiations, the CAW agreed to cost-cutting measures which it stated were necessary to keep GM Canada from being liquidated.  *See* Press Release, General Motors of Canada, Ltd., *GM Canada Settlement* (May 22, 2009), which is attached as Exhibit "J."  On June 1, 2009, the Canadian dealers whose franchise agreements were to be terminated in the restructuring agreed to payout terms.  *See* Nicolas Van Praet, *Washington, Ottawa Bet US$60-Billion GM Will Rise Again*, FINANCIAL POST, June 1, 2009, which is attached Exhibit "K."

During this period, MLC, on behalf of itself, GM Canada, and GM Nova Scotia began negotiations with the Noteholders to resolve their claims.[9]  MLC initiated those negotiations presumably because prompt resolution of the Noteholders' claims was necessary to prevent GM Canada from filing a CCAA proceeding. which was an integral component of the 363 strategy. *See* Jacquie McNish and Shawn McCarthy, *GM Canada Bondholders Feared Public Reprisal*, THE GLOBE AND MAIL, June 2, 2009, which is attached as Exhibit "L."  ("If the bondholders had not acquiesced by 6:00 a.m. ET yesterday, the company would have filed for court protection in Toronto under the CCAA").

C.    The Lock-Up Agreement

The negotiations between the GM Parties and the Noteholders concerned, among other things, the Notes, the Guaranty, the Intercompany Loans, the Wind-Up Obligations, and the

---

[9]  Although beginning in January 2009, the Responding Parties repeatedly expressed to the GM Parties their desire to negotiate, MLC did not enter into negotiations with the Noteholders until four days prior to its chapter 11 filing.

Nova Scotia Proceeding.  The GM Parties were represented in these negotiations by Weil, Gotshal & Manges, LLP as attorneys and Morgan Stanley as financial advisors.  The negotiations were conducted by the GM Parties with the knowledge and in consultation with the U.S. Treasury Department, the Canadian and Ontario governments and the UAW.  Indeed, prior to finalizing the Lock-Up Agreement, representatives and attorneys for the Canadian government met with the GM Parties and the Noteholders to discuss the terms of the Lock-Up Agreement.

Upon completion of the negotiations, the Lock-Up Agreement was executed by the Responding Parties and the GM Parties.  The settlement embodied in the Lock-Up Agreement (which is attached as Exhibit "M") enabled MLC to effect a prompt sale under section 363 of title 11 of the United States Code (the "Bankruptcy Code").

The Lock-Up Agreement was well publicized.  MLC filed a Form 8-K, dated June 1, 2009, disclosing the Lock-Up Agreement and its terms.  *See* Exhibit "N."  In addition, there were press reports describing the Lock-Up Agreement.  *See* Brian Kalish, *GM Nova Scotia Unit In Pact To Settle Canada Bondholder Suit*, Dow Jones Factiva, June 1, 2009, which is attached as Exhibit "O" ("If the resolution is successfully passed, GM Nova Scotia will make a cash payment of GBP 366.46 per GBP 1,000 par value of outstanding Nova Scotia notes due 2015 and GBP 380.17 per GBP 1,000 par value of outstanding Nova Scotia notes due 2023.  GM said the funding for such payment will be provided by GM of Canada and in connection therewith the intercompany loan obligations owed by GM of Canada to GM Nova Scotia will be extinguished."); *see also* Notice of Interim Report, at ¶ 10 [Docket # 3762].

In addition, the First Amendment, Consent and Waiver Under Debtor-in-Possession Credit Agreement, dated as of June 25, 2009 (the "DIP Amendment") referenced the Lock-Up Agreement and provided that the Debtors' post-petition lenders consented to the commencement

15

of a BIA proceeding for GM Nova Scotia as set forth in Section 6(b) of the Lock-Up Agreement.

*See* DIP Amendment, which is attached as Exhibit "P" at ¶ 7.

MLC and the other GM Parties derived substantial benefits under the Lock-Up Agreement including:

> 1.      With the consent of the Noteholders, GM Canada was relieved of its liability under the Intercompany Loans; provided, however, if the Consent Fee were ever successfully challenged and an amount equal to the Consent Fee repaid, the settlement will be null and void and the full amount owing under the Intercompany Loans will be immediately due and payable. *See* Lock-Up Agreement, Exhibit "M" at ¶ 5(b); June 1, 2009 8-K, Exhibit "N;"

> 2.      As the sole owner of GM Canada, MLC garnered the benefit of the increased value of GM Canada that resulted from the elimination of GM Canada's CDN$1.3 billion liability under the Intercompany Loans;

> 3.      MLC was able to sell its assets including the stock of GM Canada to New GM without the disruption, cost, risk and delay of a GM Canada CCAA proceeding;

> 4.      The Noteholders agreed to vote in favor of an extraordinary resolution (the "Extraordinary Resolution"), which is attached as Exhibit "Q," providing for the release by the Noteholders of all claims and demands raised against the defendants in the Nova Scotia Proceeding; provided, however, if the Consent Fee were ever successfully challenged, the Noteholders could pursue any claims against the GM Parties, including, *inter alia*, the claims raised in the Nova Scotia proceeding against, *inter alia*, GM Nova Scotia, GM Investments and GM Canada, including in respect of the Intercompany Loans. *See* Lock-Up Agreement, which is attached as Exhibit "M," at ¶¶ 1(a), (b), 3; ¶ 6; June 1, 2009 8-K, Exhibit "N;" and

> 5.      MLC was able to satisfy the conditions imposed by the governments of the U.S. and Canada on the sale.

The Noteholders also obtained benefits from the Lock-Up Agreement.  Those benefits included:

1.      The Noteholders received a Consent Fee from GM Nova Scotia in the amount of approximately $369 million which was funded by GM Canada into an escrow account (the "Escrow Account").[10]  The Consent Fee was for the pro rata benefit of all Noteholders, not just the Responding Parties.  *See* Extraordinary Resolution, which is attached as Exhibit "Q," at A-4; June 1, 2009 8-K, Exhibit "N;"

2.      MLC confirmed, acknowledged and agreed that the Guaranty Claims would be allowed general unsecured claims in MLC's bankruptcy for the full amount due under the Guaranty. *See* Lock-Up Agreement, Exhibit "M," at ¶ 6; June 1, 2009 8-K, Exhibit "N;"

3.      MLC confirmed, acknowledged and agreed that the Nova Scotia Trustee would be entitled to an allowed general unsecured claim in MLC's bankruptcy on account of its Wind-Up Obligations arising under Nova Scotia law, including, without limitation, amounts due under the Notes and the Swap Liability. The allowance of both the Guaranty Claims and the Wind-Up Claim was a critical element of the agreement among the parties. *See* Lock-Up Agreement, Exhibit "M," at ¶¶ 19(b), 6(b)(iii), (iv); June 1, 2009 8-K, Exhibit "N;" and

4.      MLC agreed that any claim against GM Nova Scotia on account of its Swap Liability would be subordinated to payment in full of the Notes if any portion of the Wind-Up Claim were disallowed.   *See* Lock-Up Agreement, Exhibit "M," at ¶6(b)(v).[11]

The Committee's Objection rests on the flawed premise that the Wind-Up Claim and the

Guaranty Claims are obligations of MLC arising under the Lock-Up Agreement.  In fact, MLC's

---

[10] On or about May 29, 2009, MLC loaned to GM Canada $450 million, a portion of which GM Canada used to fund the Consent Fee.  The loan was evidenced by a promissory note executed by GM Canada in favor of MLC (the "GM Canada Promissory Note"), attached hereto as Exhibit R.  As described, *infra* below, pursuant to the MPA, MLC sold the GM Canada Promissory Note to New GM.  *See* MPA § 2.2(a)(iii).

[11] In the Objection, the Committee incorrectly alleges that under the Lock-Up Agreement, MLC relinquished its claim on account of the Swap Liability (the "Swap Liability Claim").  *See* Objection at ¶ 38.  In fact, under the Lock-Up Agreement, MLC only agreed to subordinate that claim "if any portion of the Wind-Up Claim were disallowed."  However, under the MPA and the Sale Order, MLC sold the Swap Liability Claim to New GM. (Under the MPA, Purchased Assets include "all intercompany obligations . . . owed or due, directly or indirectly, to Sellers by any Subsidiary of a Seller or joint venture or other entity in which a Seller or a Subsidiary of a Seller has any Equity Interest."  *See* MPA § 2.2(a)(iv).  GM Nova Scotia is a Subsidiary under the MPA.  *See* MPA § 1.1.)

liability for both the Wind-Up Claim and the Guaranty Claims arose prior to the execution of the Lock-Up Agreement. In that regard, the effect of the Lock-Up Agreement was simply to confirm those pre-existing Claims.

The Wind-Up Claim arises under Section 135 of the *Companies Act* (Nova Scotia). Section 135 provides in part:

> In the event of a company being wound up, every present and past member shall, subject to this Section, be liable to contribute to the assets of the company to an amount sufficient for payment of its debts and liabilities and the costs, charges, and expenses of the winding up . . . .

Under this statute, once an unlimited company is "being wound up," its members are required to contribute assets to satisfy the debts and liabilities of the unlimited company. Here, GM Nova Scotia is an unlimited company and MLC is its sole member. By virtue of being a debtor under the BIA, GM Nova Scotia's business and affairs are "being wound up" within the meaning of the term as interpreted by the Canadian courts. *See Re Irma Co-Operative Company Limited* (1924), 5 C.B.R. 367, 1924 CarswellAlta 70 at 21-22 (Alta. S.C.). The Wind-Up Claim arises from Section 135 – it is not based on the Lock-Up Agreement.

With respect to the Guaranty Claims, MLC guaranteed GM Nova Scotia's obligations under the Notes. Pursuant to Section 5 of Schedule 1 to the Fiscal Paying and Agency Agreement, MLC, defined as the "Guarantor" under the Fiscal Paying and Agency Agreement, guarantees the "due and punctual payment" of all amounts due on account of the Notes. The Fiscal Paying and Agency Agreement further provides that "the Guarantee is absolute and unconditional, irrespective of any circumstance that might otherwise constitute a legal or equitable discharge of a surety or guarantor." *Id.* By the plain terms of the Fiscal Paying and Agency Agreement, MLC guaranteed, and is liable for, all of GM Nova Scotia's obligations on account of the Notes. The Guaranty Claims are not based on the Lock-Up Agreement.

18

Accordingly, prior to the execution of the Lock-Up Agreement, the Wind-Up Claim and the Guaranty Claims were valid and enforceable claims against MLC. Under the Lock-Up Agreement, MLC simply acknowledged and agreed that the Claims would be allowed, general unsecured claims in its bankruptcy.

D.    The 363 Sale

On June 1, 2009 (the "Petition Date"), MLC and certain of its subsidiaries commenced these chapter 11 cases. GM Canada and GM Investments did not file, and have not subsequently filed, bankruptcy proceedings in the United States or in Canada. New GM agreed to purchase MLC's assets, which included the shares of GM Canada and GM Investments unencumbered by claims arising from the Intercompany Loans and the Nova Scotia Proceeding, and entered into the Master Sale and Purchase Agreement ("MPA"). *See* MPA, attached to the Sale Order as Exhibit "A" [Docket # 2968]. Under the MPA, avoidance actions arising under sections 544 through 551, 553, 558 and any other applicable provisions of the Bankruptcy Code that arise from, relate to, or are in connection with, any payments by or to, or other transfers or assignments by or to a Purchased Subsidiary (as defined in the MPA) were purchased by New GM (the "Purchased Avoidance Claims"). *See* MPA, at §§ 2.2(a)(xiii), 2.2(b)(xi); *see also* § 2.2(b)(xi) of Seller's Disclosure Schedule. Each of GM Canada and GM Investments is a Purchased Subsidiary under the MPA. *See* MPA, at § 4.4; *see also* § 4.4 of Seller's Disclosure Schedule. Also, pursuant to the MPA, all of MLC's accounts and notes receivable were sold to New GM, including the GM Canada Promissory Note. *See* MPA § 2.2(a)(iii).

On the Petition Date, the Debtors filed a motion seeking, *inter alia*, approval of procedures for the sale of their assets pursuant to the MPA and establishing assumption and assignment procedures (the "Sale Motion") [Docket # 92]. On June 2, 2010, the Court entered an order approving sale procedures (the "Sale Procedures Order") [Docket # 274]. The Sale

Procedures Order provided procedures for the assumption and assignment of executory contracts, including notice procedures (the "Original Assumption and Assignment Procedures").

Although the Committee supported the sale, it filed a limited objection to the sale as well as to the Original Assumption and Assignment Procedures on the ground that "[t]here should be greater transparency with respect to the assumption and rejection of Assumable Executory Contracts."  *See* Exhibit A to Limited Objection [Docket # 2362].  Subsequently, the Committee withdrew its limited objection to the Sale Motion.  At the July 2, 2009 hearing, counsel for the Committee stated:

> The committee remains in support of the transaction going forward.  The particular objections that we had to features of the order, those are withdrawn, and so you can view the papers that we have filed the withdrawal of those objections as being in support of the transaction.

*See* July 2, 2009 Sale Hearing Tr., 106:7; 107:1-4  [Docket # 3062].

On July 5, 2009, the Court entered the Sale Order.  *See* Sale Order [Docket # 2968].  At the time, virtually all constituents urged the Court to approve the sale to avoid the economic consequences of an MLC liquidation.  Indeed, the Committee strongly supported entry of the Sale Order:

> The simple fact is that there are no other viable bids – indeed no serious expressions of interest – to purchase GM's assets and no other feasible way for GM to restructure its business to remain viable.  The current transaction is the only option on the table.  The Court is thus faced with a clear choice: to approve the proposed sale transaction, preserve the going-concern value of the Debtors' businesses, and maximize substantial value for stakeholders (despite the pain that this course will inflict on numerous innocent parties), or to reject the transaction and precipitate the dismantling and liquidation of GM to the detriment of all involved.

Committee's Limited Objection, at ¶ 3.  [Docket # 2362]; *see also* July 1, 2009 Sale Hearing Tr. ("7/1Tr."), 237:10-20.

The Sale Order included modifications to the Original Assumption and Assignment Procedures (as modified, the "Modified Assumption and Assignment Procedures").  *See* Sale Order, at ¶ E.  Among other things, pursuant to the Sale Order, the Sale Procedures Order, and the MPA, New GM had until 30 days after the closing of the sale (or such other date mutually agreed upon by MLC and New GM) to designate contracts to be assumed and assigned.  *See* MPA, at § 6.6(a), Sale Procedures Order, at ¶ 10.  Under the Modified Assumption and Assignment Procedures, which were consented to by the Committee and approved by the Court, the Debtors were required to maintain a secure website (the "Contract Website") containing, for each executory contract designated to be assigned (each, an "Assumable Executory Contract"), identification of the Assumable Executory Contract and the cure amount. *See* Sale Procedures Order, ¶ 10.  The Modified Assumption and Assignment Procedures required that the Debtors provide notice to the non-Debtor counterparty to each Assumable Executory Contract setting forth, among other things, instructions for accessing the information on the Contract Website relating to such counterparty's Assumable Executory Contract.  *Id.*  The Modified Assumption and Assignment Procedures did not require notice to any other party, including the Committee.

At the three-day hearing on the approval of the sale (the "Sale Hearing"), the Court asked whether anybody thought that the Modified Assumption and Assignment Procedures were not fair:  "Is there anybody who thinks that the mechanisms you proposed aren't fair?  I mean I understand why they want their needs and concerns taken care of, but there aren't any real procedural objections, am I correct?"  Neither the Committee nor any other party raised any objection in response to the Court's query.  *See* 7/1 Tr., at 235:14-18.

In approving the Sale Order and assumption and assignment of executory contracts, the Court made the following findings:

The Debtors have demonstrated that it is an exercise of their sound business judgment to assume and assign the Purchased Contracts to the Purchaser in connection with the consummation of the 363 Transaction, and the assumption and assignment of the Purchased Contracts is in the best interests of the Debtors, their estates and creditors, and other parties in interest. **The Purchased Contracts being assigned to, and the liabilities being assumed by, the Purchaser are an integral part of the Purchased Assets being purchased by the Purchaser, and, accordingly, such assumption and assignment of the Purchased Contracts and liabilities are reasonable, enhance the value of the Debtors' estates, and do not constitute unfair discrimination**. *See* Sale Order, at ¶ EE (emphasis added).

**The Modified Assumption and Assignment Procedures are fair, appropriate, and effective** and, upon the payment by the Purchaser of all Cure Amounts (as hereinafter defined) and approval of the assumption and assignment for a particular Purchased Contract thereunder, the Debtors shall be forever released from any and all liability under the Purchased Contracts."

*See* Sale Order, at ¶ GG (emphasis added).

In June 2009, pursuant to Section 6.5, Section 6.6, and Section 6.26 of the MPA, MLC delivered First Update to Sellers' Disclosure Schedule (attached hereto as Exhibit S, the "Disclosure Schedule").[12]   Section 6.2 of the Disclosure Schedule provides, *inter alia*, that "Sellers may do all things necessary in furtherance of consummation" of (a) the Lock-Up Agreement; (b) the discharge of GM Canada's obligations to GM Nova Scotia under the Intercompany Loans; (c) the approval of the Extraordinary Resolution; (d) the payment of the Consent Fee; (e) the subordination of the Swap Liability Claim; and (f) the agreement of MLC not to set off the Swap Liability Claim against any amounts MLC may owe to GM Nova Scotia. *See* Disclosure Schedule § 6.2 (Canadian Matters ¶ 2 at page 106).

The sale closed on July 10, 2009.  On July 24, 2009, pursuant to the Sale Order and the Modified Assumption and Assignment Procedures, MLC assumed and assigned the Lock-Up Agreement to New GM.  *See* Assignment Notice, which is attached as Exhibit "T;" *see also*

---

[12] On June 26, 2009, the Debtors filed the Disclosure Schedule truncated at page 96. [Docket # 2649]

Assumption & Assignment Confirmation Letter, which is attached as Exhibit "U." Notably, under the Lock-Up Agreement, MLC was *not* required to assume the Lock-Up Agreement.

As a result of the expeditious closing of the sale, MLC received (i) $45 billion of consideration from New GM; (ii) 10% of the post-closing outstanding shares of New GM; and (iii) two warrants, each to acquire 7.5% of the post-closing outstanding shares of New GM, with an exercise price based on certain agreed valuations. *See In re Gen. Motors Corp.*, 407 B.R. 463, 482 (Bankr. S.D.N.Y. 2009), *aff'd*, 430 B.R. 65 (S.D.N.Y. 2010).

## III.    ARGUMENT

A.    There is No Basis in Law or in Fact for the Committee's Fraudulent Conveyance or Preference Claims

1.    As a Matter of Law, the Avoidance Claims Must be Dismissed

The Committee contends that the Lock-Up Agreement and the Consent Fee are avoidable under sections 544, 548 and 549 of the Bankruptcy Code and New York State law. According to the Committee, because the Lock-Up Agreement and the Consent Fee are purportedly avoidable, the Guaranty Claims and the Wind-Up Claim should be disallowed. These assertions fail *as a matter of law* for at least six independent reasons.

a.    The Sale of Avoidance Actions Under the MPA Bars the Committee from Asserting Fraudulent Conveyance and Preference Claims

The Committee's avoidance claims are based on the loan of $450 million by MLC to GM Canada on May 29, 2010, allegedly "for the benefit of the Noteholders." Objection at ¶ 56. Under the MPA approved by the Sale Order, avoidance actions arising under sections 544 through 551, 553, 558 and any other applicable provisions of the Bankruptcy Code which arise from, relate to, or are in connection with, any payments by or to, or other transfers or assignments by or to a Purchased Subsidiary (as defined in the MPA) are Purchased Avoidance Claims sold to New GM. Because GM Canada is a Purchased Subsidiary and the avoidance

23

claims alleged by the Committee (the "Alleged Avoidance Claims") arise under sections 544, 548 and 549 of the Bankruptcy Code and relate to the alleged transfer to GM Canada of the funds for payment of the Consent Fee, the Alleged Avoidance Claims are Purchased Avoidance Claims and are not property of the Debtors' estates.    Thus, neither the Debtors nor the Committee own the Alleged Avoidance Claims which the Committee seeks to raise as defenses to the Claims.  *See Bankr. Servs., Inc. v. Ernst & Young LLP* (*In re CBI Holding Co., Inc.*), 529 F.3d 432, 459 (2d Cir. 2008) (noting that bankruptcy trustee cannot assert claims that have not been assigned to it because "such claims are not part of the bankrupt's estate"); *Meiburger v. Ocwen Fed. Bank, FSB* (*In re Marshall*), 307 B.R. 517, 520 (Bankr. E.D. Va. 2003) ("[I]f the cause of action ceases to be property of the estate, the trustee no longer has a cause of action that he may pursue . . .").  Since the Alleged Avoidance Claims are not property of the Debtors' estates, the Committee cannot pursue them.  The sale to New GM of the Alleged Avoidance Claims was a critical component of the MPA and permitting the Committee to assert the Alleged Avoidance Claims will work to unravel a complex transaction to the detriment of GM Canada and New GM.

Under the Lock-Up Agreement, GM Canada agreed that, if the Consent Fee were ever successfully challenged and an amount equal to the Consent Fee repaid, the full amount owing under the Intercompany Loans will be immediately reinstated.  *See* Lock-Up Agreement, Exhibit "M" at ¶ 5(b).  In addition, assuming *arguendo*, that the Lock-Up Agreement were avoided in its entirety, the result would be reinstatement of the Intercompany Loans to the detriment of New GM.  *See, e.g., Banner v. Gibney-Campbell (In re Balco Equities Ltd., Inc.)*, Bankr. No. 04-35777 (CGM), Adv. No. 05-09005 (CGM), 2006 WL 898042, at *9 (Bankr. S.D.N.Y. Mar. 28, 2006) (holding that a successful fraudulent conveyance claim against one of the parties to a

settlement agreement would mean that all of the transactions between the parties would have to be unwound); *In re Revco D.S., Inc.*, 118 B.R. 468, 522 (Bankr. N.D. Ohio 1990) ("the case law endorses a creative approach to achieve the equitable result of ordering priorities by putting the parties back where theoretically they would have been but for the fraudulent conveyance"); *In re First Fin. Assocs., Inc.*, 371 B.R. 877, 917 (Bankr. N.D. Ind. 2007) ("The focus of fraudulent conveyance actions is to return the parties to the position they were in prior to the conveyance. . . ."); *Fleet Nat'l Bank v. Gray* (*In re BankVest Capital Corp.*), Bankr. No. 99-47760-JBR, Adv. No. 01-4387, Civ. A. No. 02-40100-DPW, civ. A. No. 02-40101-DPW, 2003 WL 1700978, at *8 (D. Mass. Mar. 28, 2003) ("success by the Debtor's representative in the avoidance action simply means that the parties are returned to the 'status quo' at the time of the [transaction]."). *See, also, Sec. First Nat'l Bank v. Brunson (In re Coutee)*, 984 F.2d 138, 141 (5th Cir. 1993) ("Because the payment to the [creditor] was an avoidable preference, the parties are returned to the *status quo ante*; it is as if the payment was never made.").

For valuable consideration, New GM purchased the Alleged Avoidance Claims to obtain certainty that neither the Committee nor any other estate representative would seek to challenge the Consent Fee or the Lock-Up Agreement, triggering liability for GM Canada (a non-Debtor) if such a challenge were successful. By its Objection, the Committee is seeking improperly to deprive New GM of the benefit of the bargain it negotiated and paid for.

b.    There Was No Transfer of Estate Property

Because the Consent Fee was funded by GM Canada and paid by GM Nova Scotia, both non-Debtor entities, the Consent Fee cannot be avoided as a fraudulent transfer. A trustee's avoiding powers under the Bankruptcy Code only extend to transfers that are property of the estate; the transfer of non-debtor property is outside the scope of section 548 of the Bankruptcy Code. *See In re Dreier LLP*, 429 B.R. 112, 125 (Bankr. S.D.N.Y. 2010) ("If the transfer did not

25

involve property of the debtor under non-bankruptcy law, the trustee cannot avoid and recover the transfer or its value"); *see also Breeden v. Bennett* (*In re The Bennett Funding Group, Inc.*), 220 B.R. 743, 772 (Bankr. N.D.N.Y. 1997) (holding that the court is without authority to avoid transfers of non-debtor property because "[t]he reach of [a trustee's] avoidance power [under Code § 550] is limited to transfers of 'property of the debtor'") (internal citations omitted); *Miner v. Bay Bank & Trust Co.* (*In re Miner*), 185 B.R. 362, 365 (N.D. Fla. 1995) (property sold at foreclosure sale which was owned by corporation of which debtor was sole stockholder was not subject to avoidance; "property of the debtor" cannot be read so liberally as to include property of a corporation controlled by the debtor).   Here, GM Nova Scotia paid the Consent Fee.   The Consent Fee was not MLC's property, so it cannot be avoided as a fraudulent transfer.

        c.      **The Claims Cannot Be Disallowed Under Section 502(d) Because the Committee's Alleged Avoidance Claims Have Not Been Adjudicated**

The Committee's request to disallow the Claims based on allegations of fraudulent conveyance and preferential transfer must be overruled because section 502(d) of the Bankruptcy Code is an enforcement provision that is only triggered after a trustee or debtor in possession successfully prosecutes an avoidance action and obtains a judgment requiring the turnover of property to the estate, and the recipient of the avoidable transfer fails to return the avoidable transfer.   *See United States Lines (S.A.), Inc. v. U.S. (In re McLean Indus., Inc.)*, 30 F.3d 385, 388 (2d Cir. 1994).   As this court stated in *Enron Corp. v. Springfield Assocs. L.L.C. (In re Enron Corp.)*:

> First . . . court action is necessary in order to disallow a claim. Section 502(d) states that the court shall disallow a claim if it meets the requirements of the statute.   *Thus, it is the court that must determine whether the claim is of the type to which disallowance is properly applied.*   Second, *disallowance of a claim under the terms of section 502(d) is completely contingent on the refusal or failure to return the avoidable transfer by the recipient of that avoidable*

*transfer.*

379 B.R. 425, 438 (S.D.N.Y. 2007) (emphasis added).  *See also Holloway v. IRS (In re Odom Antennas, Inc.)*, 340 F.3d 705, 708 (8th Cir. 2003) (a claim can be disallowed under section 502(d) only after claimant is first adjudged liable and fails to pay).  Section 502(d) provides in pertinent part:

> Notwithstanding subsections (a) and (b) of this section, the court shall disallow any claim of any entity from which property is recoverable under section 542, 543, 550, or 553 of this title or that is a transferee of a transfer avoidable under section . . . 544, 545, 547, 548, 549, or 724 (a) of this title, unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable under section . . . 502 . . . of this title.

11 U.S.C. § 502(d).

The purpose of section 502(d) is to ensure the compliance with judicial orders.  *See In re Odom Antennas, Inc.*, 340 F.3d at 708; *Campbell v. U.S. (In re Davis)*, 889 F.2d 658, 661 (5th Cir. 1989).  The plain language of section 502(d) provides that an entity's claim is not disallowed unless the "entity or transferee has paid the amount or, turned over any such property, *for which such entity or transferee is liable* . . . ."  11 U.S.C. § 502(d) (emphasis added).  As the Eighth Circuit stated:  "This language indicates that section 502(d) should be used to disallow a claim after the entity is first adjudged liable; otherwise the court could not determine if the exception applies."  *In re Odom Antennas Inc.*, 340 F. 3d at 708.

Here, neither the Responding Parties, the Nova Scotia Trustee, nor any of the Noteholders have been adjudged liable under sections 544 545, 547, 548, 549, or 724(a) of the Bankruptcy Code and accordingly, as a matter of law, the Claims cannot be disallowed under section 502(d).  *See Springel v. Prosser (In re Prosser)*, 2009 WL 3270765 at *13 (Bankr. D.V.I. Oct. 9, 2009) (section 502(d) is not applicable until the trustee successfully prosecutes an avoidance action); *Seta Corp. of Boca, Inc. v. Atl. Computer Sys. (In re Atl. Computer Sys.)*, 173

B.R. 858, 861-62 (S.D.N.Y. 1994) (section 502(d) "envisions some sort of determination of the claimant's liability before its claims are disallowed, and in the event of an adverse determination, the provision of some opportunity to turn over the property"). Thus, because the Noteholders have not been adjudged to have received an avoidable transfer in a properly commenced adversary proceeding, the Committee's Objection to the Claims pursuant to section 502(d) of the Bankruptcy Code must be overruled.

> d.    The Committee Does Not Have Standing to Challenge
> The Lock-Up Agreement or Consent Fee as an Avoidable Transfer

The Bankruptcy Code does not confer standing on the Committee to challenge any alleged avoidable transfers of MLC's property. *See Durso Supermarkets, Inc. v. D'urso (In re Durso Supermarkets, Inc.)*, Bankr. No. 92-43864 (PBA), Adv. Nos. 94-8471A, 94-9462A, Case Nos. 94 Civ. 6035 (LLS), 94 Civ. 6036 (LLS), 94 Civ. 5784 (LLS), 94 Civ. 5786 (LLS), 94 Civ. 4974 (LLS), 1995 WL 739549, at *8 (S.D.N.Y. Dec. 14, 1995) ("The Bankruptcy Code confers standing to avoid a fraudulent transfer of the debtor's property on the trustee . . . or, in a chapter 11 case in which no trustee has been appointed, on the debtor-in-possession.") (citing 11 U.S.C. §§ 544, 1107); *see also In re PT-1 Commc'ns, Inc.*, 403 B.R. 250, 265 (Bankr. E.D.N.Y. 2009) (recognizing that "the power to bring avoidance actions pursuant to §§ 544, 547, 548 and 549, is expressly conferred on the bankruptcy trustee" unless it is assigned to the creditor's committee). "Creditors' committees have no independent standing under the Bankruptcy Code to avoid fraudulent transfers, but rather may do so 'only when the trustee or debtor-in-possession unjustifiably failed to bring suit or abused its discretion in not suing.'" *D'urso*, 1995 WL 739549, at *8 (quoting *Unsecured Creditors Comm. v. Noyes (In re STN Enters.)*, 779 F.2d 901, 904 (2d Cir. 1985)); *see also Liddle & Robinson L.L.P. v. Daley (In re Daley)*, 224 B.R. 307, 310-11 (Bankr. S.D.N.Y. 1998) (finding that, "pursuant to 11 U.S.C. § 544(b), only the trustee

has standing to bring a fraudulent conveyance action to avoid the debtor's transfer, unless a creditor or creditors' committee has been given approval by the bankruptcy court to sue in the trustee's stead.").

The Committee has not requested authority from the Court to bring the Alleged Avoidance Claims against the Noteholders.  Moreover, to support such a request, the Committee would have to demonstrate that the Alleged Avoidance Claims are colorable and that MLC unjustifiably refused to prosecute them  – an unsupportable proposition here because, among other things, the avoidance actions at issue were sold to New GM and are not property of MLC's estate.  The Committee lacks standing to pursue an avoidance action against the Noteholders or to object to the allowance of the Guaranty Claims and the Wind-Up Claim based on any avoidance allegation, including fraudulent conveyance and preferential transfer.

      e.      Judicial Estoppel Bars the Committee from Challenging
             The Lock-Up Agreement or the Consent Fee

The doctrine of judicial estoppel also bars the Committee from challenging the Lock-Up Agreement or the Consent Fee.  Judicial estoppel is an equitable doctrine designed to "prevent a party who plays fast and loose with the courts from gaining unfair advantage through the deliberate adoption of inconsistent positions in successive suits."  *Wight v. BankAmerica Corp.*, 219 F.3d 79, 89 (2d Cir. 2000), (citing *Bates v. Long Island R.R. Co.*, 997 F.2d 1028, 1037-38 (2d Cir. 1993)).  Thus, "[w]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him."  *N.H. v. Me.*, 532 U.S. 742-43, 749 (2001), (citing *Davis v. Wakelee*, 156 U.S. 680, 689 (1985)).  *See also Official Comm. of Unsecured Creditors v. Aust (In re Network Access Solutions, Corp.)*, 330 B.R. 67, 78 (Bankr. D. Del. 2005)

(judicial estoppel bars committee from seeking to avoid payments made under assumed employment agreements when committee had supported the assumption as a sound exercise of the debtor's business judgment).

Here, the Committee vigorously supported the Sale Order (including the Modified Assumption and Assignment Procedures) in order to reap the benefits of the 363 sale, which enabled MLC to receive $45 billion plus 10% of the common stock of New GM and warrants for 15% of the common stock of New GM.  By seeking to modify the Sale Order and attacking the Lock-Up Agreement and the Claims, the Committee is taking a position that is completely at odds with the position it advocated at the Sale Hearing.  The Committee should not now be permitted to argue that the assumption and assignment of the Lock-Up Agreement is no longer in the best interests of the estate.  In light of the well-settled authorities cited above, the Committee is barred from seeking to challenge the Lock-Up Agreement, the Consent Fee and the Claims unless the Committee can vacate or modify the Sale Order under Rule 60(b), which it cannot do.  Accordingly, the Noteholders are entitled to all their rights and benefits under the Lock-Up Agreement.

        f.       The Assumption and Assignment of the Lock-Up Agreement
                   Pursuant to the Sale Order Conclusively Bars the Committee
                   from Challenging the Lock-Up Agreement and Consent Fee

The Court has already concluded that the sale transaction and the assumption of Purchased Contracts, including the Lock-Up Agreement, was an exercise of the Debtors' "sound business judgment."  *See* Sale Order, at ¶ EE [Docket # 2968] ("The Debtors have demonstrated that it is an exercise of their sound business judgment to assume and assign the Purchased Contracts to the Purchaser in connection with the consummation of the 363 Transaction, and the assumption and assignment of the Purchased Contracts is in the best interests of the Debtors, their estates and creditors, and other parties in interest.").  It would not have been a sound

30

exercise of MLC's business judgment to enter into the sale transaction, including assuming the Lock-Up Agreement as a Purchased Contract, if MLC were not receiving reasonably equivalent value or if the sale transaction was being entered into with actual intent to hinder, delay, or defraud creditors. The court also found that the "Debtors are receiving fair value for the assets being sold." *See* Sale Order, at ¶ G.

Because the Lock-Up Agreement was assumed by MLC and assigned to New GM pursuant to this Court's Sale Order, the Committee is barred from attacking the Lock-Up Agreement and the transfers made in connection therewith (including payment of the Consent Fee). Courts have consistently held that once a contract is assumed under section 365 of the Bankruptcy Code, the rights and obligations under that contract may not be attacked on any ground, including fraudulent conveyance. *See E. Air Lines, Inc. v. Ins. Co of the State of Pa. (In re Ionosphere Clubs, Inc.)*, 85 F.3d 992 (2d Cir. 1996); *Dev. Specialists, Inc. v. 1114 6th Ave. Co. LLC (In re Coudert Bros. LLP)*, No. 09 Civ 5047 (DLC), 2009 WL 2868722, at *1 (S.D.N.Y. Sept. 4, 2009) (where debtor tries to avoid a contract it previously assumed as a fraudulent transfer, dismissal of the avoidance action is appropriate); *In re Network Access Solutions, Inc.*, 330 B.R. 67 (same). This rule ensures that once a debtor assumes a contract, it is bound by its terms and that parties cannot take positions that are inconsistent with the assumption of the contract.

The *Coudert* case is instructive as it involves facts similar to this case. In that case, the debtor assumed and assigned a real estate lease for its office premises during its chapter 11 case. 2009 WL 2868722 at *1. Thereafter, the plan administrator filed a complaint to avoid a lease amendment, where the debtor surrendered numerous floors in exchange for $8.9 million, on the ground that the debtor should have received $10 million more than it did and, therefore, the

transfers were constructive fraudulent conveyances. Bankruptcy Judge Drain dismissed the complaint, concluding that the plan administrator's attempt to avoid the transfers prescribed in the lease amendment was barred because the debtor previously had assumed its lease, as modified by the lease amendment. *Id.* at *2. On appeal, the district court directly addressed the question as to whether a fraudulent transfer claim to avoid a contract can survive where the contract had been previously assumed. In affirming the dismissal of the fraudulent conveyance claim, the court concluded that "if a debtor in bankruptcy assumes a contract, it must honor its obligations under that contract." *Id.* at *3. The court also noted that equitable estoppel would bar a debtor "'to escape its obligation to perform the contract it assumed.'" *Id.* (quoting *In re Ionosphere Clubs, Inc.*, 85 F.3d at 1000).

Similarly, in *In re Network Access Solutions, Corp.*, 330 B.R. at 79, the court held that where employment agreements had been assumed during the chapter 11 case, the creditors' committee could not seek to avoid such agreements as either constructive or actual fraudulent transfers. The court found:

> [t]o approve the assumption motion, the Court had to find that [the debtor] was acting on an informed basis, in good faith, and with the honest belief that the assumption of the employment agreements was in the best interests of [the debtor] and the estate. This finding is too antithetical to the Committee's causes of action to allow for the recovery of any unauthorized transfers from [the debtor] to the [officers] under their respective employment agreements.

*Id.* at 75.

Just as the court held in *Network Access*, this Court, in approving the Sale Order, found that the assumption and assignment of the Purchased Contracts (which included the Lock-Up Agreement) was a sound exercise of MLC's business judgment in connection with the consummation of the 363 sale and was in the best interests of creditors, the Debtors and their

estates.  *See* Sale Order at ¶ GG.  As such, this finding is wholly inconsistent with the Committee's claims challenging the Lock-Up Agreement and the transfers related thereto as fraudulent conveyances.

In dismissing the constructive and actual fraudulent conveyance claims, the *Network Access* court reasoned that the earlier finding in the order assuming the employment agreements – that assumption was a sound exercise of the debtor's business judgment – precluded such avoidance claims because an agreement cannot be in the debtor's sound business judgment if the debtor did not receive fair and equivalent value or if the transfers under the agreement were made with the actual intent to hinder, delay and defraud creditors.  330 B.R. at 76-77.  Likewise, this Court's findings in the Sale Order of good faith and sound business judgment bar the Committee's attack on the Lock-Up Agreement, the Claims and the transfers made in connection therewith.

2.      The Consent Fee and the Lock-Up Agreement Are Not Avoidable Under <u>Sections 547, 548 or 549 of the Bankruptcy Code or New York Law</u>

The Committee has not − and cannot − establish that the Lock-Up Agreement or the payment of the Consent Fee is an avoidable transfer under sections 547, 548, or 549 of the Bankruptcy Code or a fraudulent transfer under New York law.[13]  First, the Court has already found that the assumption and assignment of the assumed executory contracts was a sound exercise of MLC's business judgment and that MLC received fair value for the sale.  Second, the facts demonstrate that MLC received fair and equivalent value in exchange for the Lock-Up Agreement and the Consent Fee, and did not enter into the Lock-Up Agreement with actual intent to hinder, delay, or defraud its creditors.  Third, the Lock-Up Agreement did not provide for any post-petition transfers of estate property.  Finally, the payment of the Consent Fee was

---

[13] Section 544 of the Bankruptcy Code makes state law fraudulent conveyance law applicable to bankruptcy cases. 11 U.S.C. § 544.  The Lock-Up Agreement is governed by New York law.

not on account of antecedent debt; to the contrary, the Lock-Up Agreement expressly provides that the Consent Fee does *not* reduce the outstanding amount under the Notes. Thus, the Committee's contention that the Lock-Up Agreement and the Consent Fee are avoidable under sections 547, 548, and 549 of the Bankruptcy Code and New York law should be rejected.

a.      The Consent Fee is Not Avoidable Under Section 547<br>of the Bankruptcy Code

According to the Committee, the Consent Fee is avoidable as a preferential transfer under section 547 of the Bankruptcy Code because MLC made a loan to GM Canada on May 29, 2009 (the "GM Canada Loan"). To establish that the Consent Fee was a preferential transfer, the Committee must demonstrate, among other things, that the transfer was (i) for the benefit of the Noteholders; and (ii) for or on account of an antecedent debt owed by MLC before such transfer was made. 11 U.S.C. § 547. The Committee, however, has failed to satisfy its burden. The Committee's conclusory contention that the Consent Fee is avoidable based solely on the allegation that MLC made the GM Canada Loan to GM Canada, which provided funding for the Consent Fee, three days before the Petition Date fails to establish that the payment was a preferential transfer. Objection at ¶ 56.

In fact, prior to the Petition Date, MLC made the GM Canada Loan to GM Canada and received the GM Canada Promissory Note (in the amount of $450 million) as consideration for the funds it transferred to GM Canada. Neither the Noteholders nor GM Nova Scotia was a party to that transaction, which occurred prior to an agreement on the terms of the Lock-Up Agreement, and which is not provided for in the Lock-Up Agreement. Thus, the Committee is wrong to argue that the GM Canada Loan was made for the benefit of the Noteholders.

The Committee also fails to satisfy its burden because the transfer was not made on account of antecedent debt. It is indisputable that MLC made the GM Canada Loan in exchange

34

for the GM Canada Promissory Note.  There is no basis for the Committee to contend that MLC

made the GM Canada Loan to GM Canada to satisfy the Noteholders' Claims against MLC.

Under virtually identical facts, the Sixth Circuit refused to find a transfer made in exchange for a

note to constitute a preferential transfer.  In *DuVoisin v. Foster (In re S. Indus. Banking Corp.)*,

809 F.2d 329, 330 (6th Cir. 1987), the creditor paid $400,000 to the debtor for four investment

certificates.  A month before the certificates were scheduled to mature, the creditor took out a

$470,000 loan from the debtor and executed a promissory note in favor of the debtor in the

amount of $480,956.  *Id.*  A month later, the debtor filed for bankruptcy.  *Id.*  The liquidating

trustee for the debtor sought to avoid the debtor's transfer of the $470,000 to the creditor as a

preferential transfer under section 547(b) of the Bankruptcy Code.  The bankruptcy court held

that the transfer of the funds was not a preferential transfer.  On appeal, the Sixth Circuit stated:

> The bankruptcy court found that the $470,000 transfer of [the debtor's]
> property to [the creditor] was not a preferential transfer under 11
> U.S.C. § 547(b)(2) because the transfer was not for or on account of an
> antecedent debt.  Because [the debtor] transferred the $470,000 to [the
> creditor] in exchange for his promissory note (rather than in payment
> of [the debtor's] antecedent debt under the Certificates), the
> transaction did not satisfy this element of § 547(b).

*Id.* at 332, n.1.[14]  Here, the transfer from MLC to GM Canada was made in exchange for the

GM Promissory Note.  It was not made for or on account of the Claims the Noteholders hold

against MLC.  Thus, the Committee cannot satisfy this element of section 547(b).

Without providing any factual or legal basis, in the Objection, the Committee appears to

suggest that the Court should ignore the various distinct and separate transactions between

separate and distinct legal entities and treat the loan from MLC to GM Canada as payment of the

Consent Fee by MLC to the Noteholders.  Even were the Court to disregard the fact that MLC

loaned the funds to GM Canada, and assume that the loan was made for the benefit of the

---

[14] The appeal was taken on other grounds.  The Sixth Circuit affirmed the decision of the Bankruptcy Court.

Noteholders, the Committee still would not be able to demonstrate that the payment was made on account of an antecedent debt. As the Third Circuit held in *Lewis v. Diethorn*, 893 F.2d 648, 650 (3d Cir. 1990), payments made in settlement of a pending litigation are not made on account of an antecedent debt.

In *Lewis,* prior to the petition date, purchasers brought an action in state court against the debtor seeking specific performance of a sale agreement pursuant to which the debtor was required to construct a house. Pre-petition, the debtor entered into a settlement agreement with the purchasers, providing for the return of their $3,000 earnest money, and paying them an additional $15,500 as part of the settlement. *Id.* In exchange for those payments, the purchasers agreed to discontinue their suit in state court and to lift the *lis pendens* they had placed on the property. *Id.* That same month, the debtor filed a petition under chapter 7. *Id.* The chapter 7 trustee filed a complaint against the purchasers, seeking to avoid the transfer as preferential under section 547 of the Bankruptcy Code and to recover the $15,500 for the debtor's estate. *Id.* The bankruptcy court found that the transfer of the $15,500 was a preferential transfer and entered an order for the trustee, and the district court affirmed. *Id.*

On appeal, the Third Circuit reversed, holding that a payment to settle a lawsuit was not a preference because it was not on account of antecedent debt. *Id.* at 650. The Third Circuit found:

> Section 547 of the Bankruptcy Code specifies when a payment by a bankrupt debtor may be avoided by the trustee. The transfer of the $15,500 from [the debtor] to the [purchasers] does not meet the statutory specifications. To be sure, it was a transfer of [the debtor's] property, to or for the benefit of the [purchasers], made while the debtor was presumptively insolvent and within 90 days before the filing of the petition in bankruptcy. But it was not "for or on account of an antecedent debt owed by the debtor before such transfer was made." [The debtor] paid the $15,500 to the [purchasers] in exchange for their undertaking to terminate the lawsuit in Pennsylvania court and so to

36

> remove the *lis pendens* from the property index.  What [the debtor]
> received was not the freedom from liability on an antecedent debt, but
> the freedom from the risk of litigation, together with the rise in the value
> of the property which resulted when the *lis pendens* was lifted.

*Id.* at 649-50 (citations omitted).

The Third Circuit also found that the settlement fell within the statutory exception to the

trustee's avoidance power as set out in section 547(c)(1), because it "was intended by both

parties to be a 'contemporaneous exchange for new value . . . and [was] in fact a substantially

contemporaneous exchange.'"  *Id.* at 650 (quoting 11 U.S.C. § 547(c)(1)).  "The trustee may not

avoid such transfers."  *Id.*

Similarly, here, even if the Court were to collapse the transactions and deem the loan

from MLC to GM Canada to have been made for the benefit of the Noteholders, the transfer is

not on account of antecedent debt.  Rather, the payment of the Consent Fee was in exchange for

the Noteholders' consent to the Extraordinary Resolution and the termination of the Nova Scotia

Proceeding.  In addition, MLC received the rise in value of its wholly-owned subsidiary – GM

Canada – resulting from GM Canada being relieved of the Intercompany Loans.  Indeed, the

Lock-Up Agreement expressly provides that the "Consent Fee payment does not reduce, limit or

impair the Notes, the Guaranty Claim or the Deficiency Claim."  *See* Lock-Up Agreement,

Exhibit "M" at ¶ 6(b)(iv).

Also, as with the settlement agreement in *Lewis*, the Lock-Up Agreement falls within the

statutory exception to the trustee's avoidance power pursuant to section 547(c)(1) of the

Bankruptcy Code, because it was intended by the parties to be a contemporaneous exchange for

new value and was, in fact, a contemporaneous exchange.  In that regard, the Lock-Up

Agreement expressly provides that payment of the Consent Fee will be made "upon approval of

the Extraordinary Resolution."  *See* Lock-Up Agreement, Exhibit "M" at ¶ 2.  The Noteholders

approved the Extraordinary Resolution on June 25, 2009 and GM Nova Scotia paid the Consent

Fee on that same day.   Accordingly, the Committee simply cannot demonstrate that the GM

Canada Loan was an avoidable preference.   The Court should overrule the Committee's

objection based on section 547 of the Bankruptcy Code.

b.      The Consent Fee is Not Avoidable Under Section 549
         of the Bankruptcy Code

In the Objection, the Committee asks the Court to avoid the Consent Fee as an

unauthorized post-petition transfer, based solely on the suggestion that the Court could "deem"

the *prepetition* GM Canada Loan to have occurred post-petition.   *See* Objection at ¶ 59.

However, the Committee fails to cite any case law or statutory basis for this incredible

proposition, simply suggesting that the Court could deem the GM Canada Loan post-petition

because GM Nova Scotia paid the Consent Fee after the Petition Date.

Section 549(a) of the Bankruptcy Code "allows [a] trustee/debtor to avoid postpetition

transfers of estate property if not authorized by the court or the Bankruptcy Code."   *Hackeling v.

Rael Automatic Sprinkler Co., Inc. (In re Luis Elec. Contracting Corp.)*, 165 B.R. 358, 363

(Bankr. E.D.N.Y. 1992) (citing 11 U.S.C. § 549(a)).   "[T]he recovery by a Trustee of post-

petition transfers from the bankruptcy estate requires, under the Statute, the satisfaction of four

elements: (1) a transfer, (2) of property of the estate, (3) ***made after the commencement of the***

***case***, and (4) that is not authorized under the Bankruptcy Code or by the bankruptcy court."

*Devan v. Phoenix Am. Life. Ins. Co. (In re Merry-Go-Round Enters., Inc.)*, 400 F.3d 219, 224

(4th Cir. 2005) (emphasis added).   Here, it is undisputed that the transfer from MLC in

connection with the GM Canada Loan occurred prepetition and was ***not*** made after the

commencement of the chapter 11 case.   Thus, the Committee fails to satisfy the section 549(a)

requirements.

38

In *Carlson v. Farmers Home Admin. (In re Newcomb)*, 744 F.2d 621, 626 (8th Cir. 1984), the debtor placed funds in an escrow account to be delivered to a third party upon the completion of certain events. The conditions precedent to the release of the funds occurred pre-petition, but the funds were not released to the third party prior to the bankruptcy filing. *Id.* at 627. The trustee sought to have the potential release of funds avoided as a post-petition transfer under section 549 of the Bankruptcy Code, arguing that "the relevant transfer will occur only when the funds are physically turned over from the escrow agent to the [third party]." *Id.* The Eighth Circuit disagreed and found that the transaction was not implicated by section 549, because the debtor transferred its interest in the funds pre-petition, and at the time the funds were to be transferred, they would not be property of the estate. *Id.* The Eighth Circuit held:

> Obviously, this turnover will constitute a physical transfer of the funds from the escrow agent to the [third party]. However, all interest in the escrowed funds was transferred to the [third party] when the condition of the escrow was met. Therefore, the physical transfer from the escrow agent to the [third party] will not be a transfer of property of the estate, as is required for an avoidable post-petition transfer under § 549.

*Id.* (internal citations omitted).

Similarly here, all interest in the funds related to the GM Canada Loan were transferred to GM Canada on May 29, 2009, prior to the Petition Date. Accordingly, any transfer made by GM Canada or GM Nova Scotia (neither of which are Debtors) was not a transfer of "property of the estate," as required for an avoidable post-petition transfer under section 549 of the Bankruptcy Code, and payment of the Consent Fee is not avoidable under section 549 of the Bankruptcy Code.

c.    The Committee's Contention That The Lock-Up Agreement Is A
Constructive Fraudulent Conveyance Fails Because MLC
Received Reasonably Equivalent Value

The Committee's assertion that the Lock-Up Agreement is voidable as a constructive fraudulent conveyance is without merit.  Under applicable state law and section 548(a) of the Bankruptcy Code, the trustee may avoid a transfer of an interest in the debtor in property if, *inter alia*, the debtor received less than reasonably equivalent value in exchange for such transfer.  *See* 11 U.S.C. § 548(a)(1)(A); N.Y. Debtor & Creditor Law § 273; *Official Comm. of Unsecured Creditors of Veristar, Inc. v. Am. Tower Corp. (In re Verestar, Inc.)*, 343 B.R. 444, 468 (Bankr. S.D.N.Y. 2006).  Here, the Committee cannot satisfy either of these requirements because there was no transfer of MLC's property and the Noteholders provided "reasonably equivalent value" and "fair consideration" in exchange for the consideration they received under the Lock-Up Agreement.  Indeed, the Court has determined that assumption and assignment of the Purchased Contracts *enhanced* the value of the Debtors' estates.  *See* Sale Order, ¶ EE.

Moreover, the Objection is based primarily on the Committee's incorrect assertion that MLC's Guaranty and Wind-Up Obligations arise under the Lock-Up Agreement.  That assertion is incorrect.  In fact, MLC's liability for both the Wind-Up Claim and the Guaranty Claims arose prior to the execution of the Lock-Up Agreement.

The Guaranty Claims arise under the Fiscal Paying and Agency Agreement pursuant to which MLC guaranteed the "due and punctual payment" of all amounts due on account of the Notes.  Regardless of the Lock-Up Agreement, the Noteholders have valid and enforceable Guaranty Claims against MLC of approximately $1.1 billion.  The Guaranty Claims are not based on the Lock-Up Agreement.  The Wind-Up Claim arises under Section 135 of the *Companies Act* (Nova Scotia).  In accordance with that statute, regardless of the Lock-Up

40

Agreement, the Nova Scotia Trustee has a valid and enforceable Wind-Up Claim against MLC in an amount exceeding $1.6 billion. The Wind-Up Claim is not based on the Lock-Up Agreement.

Under the Lock-Up Agreement, MLC simply acknowledged and agreed that the Claims would be allowed, general unsecured claims in its bankruptcy. Thus, absent the Lock-Up Agreement, the Noteholders would still have had valid and enforceable Guaranty Claims against MLC and the Nova Scotia Trustee would still have had a valid and enforceable Wind-Up Claim against MLC. However, absent the Lock-Up Agreement, New GM would not have been able to acquire GM Canada free and clear of the Nova Scotia Proceeding and GM Canada's CDN$1.3 billion liability to GM Nova Scotia, for which GM Canada had no defense and an absolute obligation to pay.

Under any commercial interpretation, the benefits of the Lock-Up Agreement to MLC and its stakeholders far exceeded any value that MLC provided under the Lock-Up Agreement, including the payment of the Consent Fee to the Noteholders by non-Debtor GM Nova Scotia. Among the significant benefits provided to MLC was a release of GM Canada from its CDN$1.3 billion obligation to GM Nova Scotia. MLC was also able to resolve a significant litigation commenced by the Noteholders against MLC and the non-debtor Canadian Entities. Without a resolution of the Nova Scotia Proceeding and GM Nova Scotia's CDN$1.3 billion claim, the expeditious sale to New GM would not have been possible unless New GM was prepared to assume the liability of GM Canada for the Intercompany Loans or that liability was otherwise released, compromised or settled with the Noteholders' consent or through a GM Canada CCAA proceeding. The filing of a CCAA proceeding by GM Canada would have resulted in significant delay inconsistent with the terms of the financing and sale transaction offered by the U.S. and Canadian governments. As a result of the expeditious closing of the sale, MLC received

41

significant consideration from New GM, which can be distributed to MLC's creditors.  In the absence of the Lock-Up Agreement, the sale could not have been consummated in a timely manner because of the delays associated with a GM Canada CCAA filing, and MLC's creditors would have received substantially smaller recoveries (if any recoveries at all) if the sale had been delayed or MLC had been forced to liquidate as a result of the delay.[15]  In exchange, all that was required of MLC was to confirm the validity of the pre-existing Guaranty Claims and Wind-Up Claim while GM Nova Scotia (a non-debtor) paid the Consent Fee of $369 million.  Under the Lock-Up Agreement, GM Canada – **not** MLC – was required to fund the Escrow Account and GM Nova Scotia – **not** MLC – was obligated to pay the Consent Fee subject to the Extraordinary Resolution.  MLC had no obligation to transfer any of its property under the terms of the Lock-Up Agreement.

It is undisputed that MLC did not fund the Escrow Account or pay the $369 million Consent Fee.  It is indisputable that the Lock-Up Agreement did not require MLC to fund the Consent Fee or any other payments to the Noteholders.  If the Committee contends that the prepetition loan from MLC to GM Canada was a fraudulent conveyance, then any fraudulent conveyance claim would have to be asserted against **GM Canada**, **not** the Noteholders or the Nova Scotia Trustee.[16]  Moreover, the Committee's fraudulent transfer theory still fails for a number of reasons.  First, GM Canada provided reasonably equivalent value to MLC in the form of the GM Canada Promissory Note.  Pursuant to the MPA supported by the Committee and approved by the Court, MLC sold the GM Canada Promissory Note to New GM.  The value of

---

[15] As determined by the Court, "the [Sale] Transaction was the Debtors' only viable option and . . . **the Debtors' sole alternative was a liquidation that would have yielded a mere fraction of the sale assets' going concern value to the Debtors and nothing at all for the Debtors' general unsecured creditors** . . . ." *In re Gen. Motors Corp.*, 430 B.R. at 79 (emphasis added).

[16] To the extent the Committee seeks to avoid any transfers made by MLC to GM Canada, which it has not sought, the Committee would have to be granted standing by the Bankruptcy Court and commence an adversary proceeding against GM Canada.

the GM Canada Promissory Note was reflected in the purchase price paid by New GM to MLC. After having benefited from the sale of the GM Canada Promissory Note to New GM, it is egregious and inappropriate for the Committee now to seek to avoid the Consent Fee.

In addition, because GM Canada was a wholly-owned subsidiary of MLC, MLC benefited equally from any improvement in GM Canada's balance sheet as a result of the elimination of GM Canada's obligations under the Intercompany Loans. The payment of $369 million in exchange for the release of a CDN$1.3 billion claim is clearly reasonably equivalent value. That benefit was realized in the consideration that MLC and its creditors received in the 363 sale, which included the stock of New GM unencumbered by obligations arising from the Intercompany Loans owed by GM Canada. Finally, any transfer from MLC to it's wholly-owned subsidiary, GM Canada, is deemed to be for reasonably equivalent value. *See, e.g., In re Worldcom, Inc.*, No. 02-13533, 2003 WL23861928, at *41 (Bankr. S.D.N.Y. Oct 31, 2003) ("Courts generally find reasonably equivalent value for a transfer from a parent to its wholly owned subsidiary, because the parent, as the sole stockholder of the subsidiary corporation, receives a benefit in the form of increased stock value resulting from the increased financial strength of the parent.").

Because MLC received reasonably equivalent value for any transfer it allegedly made under the Lock-Up Agreement, the Lock-Up Agreement does not constitute a fraudulent conveyance. For that reason and because the Court has found that the sale transaction including the assumption and assignment of the Purchased Contracts enhanced the value of the Debtors' estates, the Objection should be overruled.

> d.    The Committee's Contention That The Lock-Up Agreement Is An
> Actual Fraudulent Conveyance Fails Because The Facts Establish
> That MLC Did Not Enter Into The Lock-Up Agreement With
> Actual Intent To Hinder, Delay, Or Defraud Its Creditors

The Committee has failed to allege any facts, with particularity or otherwise, establishing that MLC entered into the Lock-Up Agreement with actual intent to hinder, delay, or defraud its creditors.[17]  Nor has the Committee alleged any facts of actual fraudulent intent as to the Noteholders or GM Nova Scotia, as required under New York law.  *See* N.Y. Debtor & Creditor Law § 276; *see also Picard v. Taylor (In re Park S. Sec., LLC)*, 326 B.R. 505, 517 (Bankr. S.D.N.Y. 2005) (under section 276 of the N.Y. Debtor & Creditor Law, a plaintiff "must establish both the debtors' *and* the transferee's actual fraudulent intent.") (emphasis in original).  The Committee's objection to the Lock-Up Agreement on the grounds of actual fraudulent transfer under section 548(a)(1)(A) and New York law must therefore be overruled.

To determine whether a transfer was made with actual intent to hinder, delay, or defraud creditors, the Court must undertake a subjective inquiry into MLC's state of mind at the time the transfer was made.  *See* 5 Collier on Bankruptcy ¶ 548.04[2][a] (15th ed. rev. 2010).  As direct proof of a debtor's intent is rare, the Committee may rely on "badges of fraud" to establish fraudulent intent.  *In re Park S. Sec., LLC,* 326 B.R. at 518.  "[T]he presence of a single badge of fraud is insufficient to establish actual fraudulent intent."  *Id.*  However, "the confluence of several" badges of fraud "can constitute conclusive evidence of an actual intent to defraud" − but only in the absence of "'significantly clear' evidence of a legitimate supervening purpose."  *Id.*; *see also* 5 Collier on Bankruptcy ¶ 548.04[1] at 548-26 (15th ed. rev. 2006) (observing that to prevail on a claim of actual fraud, a plaintiff must demonstrate that the transferor "acted under

---

[17] The Committee's allegations of actual fraudulent transfer pursuant to section 548(a)(1)(A) and New York law must be plead with particularity pursuant to Fed. R. Civ. P. 9(b).  *See In re Andrew Velez Constr., Inc.*, 373 B.R. 262, 269 (Bankr. S.D.N.Y. 2007).

circumstances that preclude any reasonable conclusion other than that the purpose of the transfer was fraudulent as to creditors.") (citing *Lesser v. Jewel Factors Corp.*, 470 F.2d 108, 110 (2d Cir. 1972)).   The Committee is required to prove MLC's intent by "clear and convincing evidence."  *Nisselson v. Empyrean Investment Fund, L.P. (In re MarketXT Holdings Corp.)*, 376 B.R. 390, 403-04 (Bankr. S.D.N.Y. 2007).

In the Objection, the Committee's discussion of actual fraud is limited to a single conclusory sentence contending simply that the fraudulent intent can be inferred from the general argument "above."  *See* Objection at ¶ 63.  The Committee alleges no facts and fails to cite any badges of fraud or any authority to support its baseless allegation.   The facts belie the Committee's allegations of actual fraudulent intent, and demonstrate that MLC entered into the Lock-Up Agreement for a legitimate purpose.[18]

Far from being a secret deal hidden from creditors, the Lock-Up Agreement was negotiated between MLC (on behalf of itself and certain of its wholly-owned subsidiaries, including GM Canada and GM Nova Scotia) and the Responding Parties, with the knowledge of the UAW and in consultation with the U.S. Treasury Department and the Canadian and Ontario governments.  In fact, representatives and attorneys from the Canadian government met with MLC and the Responding Parties to discuss the terms of the Lock-Up Agreement prior to its finalization.  In addition, the Lock-Up Agreement was well publicized in MLC's SEC filings, in the Interim Report that MLC filed with the Court and in press reports.  Thus, the Lock-Up

---

[18] The Committee alleges elsewhere in the Objection that the Noteholders took advantage of leverage due to MLC's "precarious position" to "negotiate an outrageous settlement of the Nova Scotia Action."  *See* Objection, at ¶ 32. This allegation is completely devoid of merit.  The Lock-Up Agreement was the product of arm's-length negotiations conducted by sophisticated parties represented by counsel and financial advisors.  Whether or not the Noteholders possessed any leverage in their discussions with MLC speaks to MLC's financial condition at the time − it is neither an indicia of fraud, nor evidence of a lack of good faith.  *Cf. Parker v. Motors Liquidation Co. (In re Motors Liquidation Co.)*, 430 B.R. 65, 78-79 (S.D.N.Y. 2010)(noting, in the context of an appeal of the Sale Order, that although the United States Treasury Department was GM's "lender of last resort" and thus had "leverage" over GM, "that leverage speaks to GM's desperate financial condition in the [sic] early 2009, not to the Government's bad faith.").

Agreement was not a secret deal that was hidden from creditors.  More importantly, the Lock-Up

Agreement was entered into for a legitimate purpose:  it enabled MLC to consummate a section

363 sale of its assets to New GM, including GM Canada unencumbered by claims arising from

the Intercompany Loans and the Nova Scotia Proceeding.  As the Court found: had MLC failed

to effect the sale to New GM there would have been "**nothing at all for the Debtors' general**

**unsecured creditors** . . . ."  *In re Motors Liquidation Co.*, 430 B.R. at 79 (emphasis added).

Finally, in light of the Court's explicit findings that the sale was in good faith, that the

assumption and assignment of the Purchased Contracts was "an exercise of [the Debtors'] sound

business judgment," and that the debtors did not enter into the MPA or propose to consummate

the 363 sale "for the purpose of hindering, delaying or defrauding the Debtors' present or future

creditors," the Committee's assertion that the Lock-Up Agreement is avoidable as an actual

fraudulent conveyance is without merit, and the Court should overrule the Objection.

> 3.      There is No Basis for Committee Allegation That Consent Fee Was a
>          Disguised Principal Payment

The Committee also alleges that the Consent Fee "was a disguised principal payment on

the Notes that should have been credited against the amount owed on the Notes."  Objection at

¶3.  The Committee seems to suggest that the Claims should be reduced by the amount of the

Consent Fee, but fails to cite any authority for such relief, because no basis exists.  In fact, under

the Lock-Up Agreement, the parties expressly agreed that the Consent Fee is ***not*** a payment of

principal, and the Lock-Up Agreement provides that "the Consent Fee payment does not reduce,

limit or impair the Notes, the Guarantee Claim[s] or the [Wind-Up] Claim."  *See* Lock-Up

Agreement, Exhibit "M" at ¶ 6(b)(iv).  There is no factual basis for the Committee's allegation

and no legal basis for the relief the Committee seeks.

B.      The Wind-Up Claim and  the Guaranty Claims Are Separate Claims and Should
        Each Be Allowed

        1.      The Committee is Barred From Seeking to Disallow the Wind-Up Claim
                or the Guaranty Claims Because the Lock-Up Agreement was Assumed

As an initial matter, the Committee cannot seek to disallow the Wind-Up Claim or the

Guaranty Claims because the Court approved the assumption and assignment of the Lock-Up

Agreement.  Pursuant to the Lock-Up Agreement, MLC acknowledged and agreed to the validity

and enforceability of the Guaranty Claims in the full amount of the Notes and agreed that the

Guaranty Claims would be allowed as general unsecured claims against MLC on a pari passu

basis with other general unsecured claims.  MLC also confirmed, acknowledged and agreed to

the validity and enforceability of the Wind-Up Claim in the full amount of the debts and

liabilities of GM Nova Scotia.  MLC also agreed that the Wind-Up Claim would be allowed as a

general unsecured claim against MLC on a pari passu basis with other general unsecured claims.

Because the Lock-Up Agreement was assumed by MLC and assigned to New GM

pursuant to this Court's Sale Order, the Committee is barred from attacking the Lock-Up

Agreement including the allowance of the Guaranty and Wind-Up Claims.  As set forth in detail

above, courts have consistently held that once a contract is assumed under section 365 of the

Bankruptcy Code, the rights and obligations under that contract may not be attacked on any

ground.  *Se, e.g., Ionosphere Clubs,* 85 F. 3d at 992; *In re Coudert Bros.*, 2009 WL 2868722, at

\*1.  This rule ensures that once a debtor assumes a contract it is bound by its terms and that

parties cannot take positions that are inconsistent with the assumption of the contract.  Thus, the

Committee is barred from seeking to disallow the Claims based on allegations that they are

duplicative, or any other grounds.   Nonetheless, as demonstrated below, the Claims are not

duplicative and allowance in full of both Claims does not result in a double recovery.

47

2.      The Nova Scotia Trustee's Statutory Wind-Up Claim Pursuant to Section
135 of The *Companies Act* (Nova Scotia) is a Separate Claim

The Committee asserts that the Wind-Up Claim should be disallowed because it is duplicative of the Guaranty Claims.  *See* Objection, at ¶ 53.  The Committee's assertion is incorrect.  A creditor may assert multiple claims arising from the same injury.  Thus, a creditor (such as the Noteholders) is entitled to assert its claims in full against both a guarantor debtor (such as MLC) and a principal debtor obligor (such as GM Nova Scotia) for the same debt until the creditor receives payment in full.  Indeed, limiting a creditor's claim to a claim against one debtor fundamentally deprives a creditor of its lawfully bargained for or statutorily granted rights.  The Court of Appeals for the Third Circuit has rejected debtors' efforts to impede creditors' rights to assert multiple claims arising from the same debt against distinct debtors.  *See In re Owens Corning*, 419 F.3d 195, 216 (3d Cir. 2005) (recognizing the rights of "creditors who have lawfully bargained prepetition for unequal treatment by obtaining guarantees of separate entities" and noting that "[e]quality among creditors who have lawfully bargained for different treatment is not equity but its opposite") (citation and quotation marks omitted).

In *Owens Corning*, a syndicate of banks ("Banks") extended a $2 billion loan to primary debtor obligor Owens Corning ("OCD") and certain of its debtor subsidiaries ("OCD Borrowers").  *Id.* at 199.  A portion of the loan was guaranteed by different, non-borrowing debtor OCD subsidiaries ("OCD Guarantors").  *Id.*  Subsequently, the OCD Borrowers and the OCD Guarantors (collectively, the "OCD Debtors") filed for reorganization under chapter 11 of the Bankruptcy Code.  *Id.* at 201-02.  The District Court granted a motion to consolidate the assets and liabilities of the OCD Debtors and certain non-debtor OCD subsidiaries in anticipation of a plan of reorganization, which would have eliminated the guarantees to the Banks.  *Id.* at 199.  In reversing the District Court's decision, the Third Circuit recognized that the guarantees

48

provided the Banks with direct claims against the OCD Guarantors for any payment defaults on the loan, which other creditors of OCD did not have. *Id.* at 212. Specifically, the Third Circuit stated that:

> . . . OCD (no less than [the Banks]) negotiated the . . . lending transaction premised on the separateness of all OCD affiliates. . . . In this context, OCD and the other Plan Proponents cannot now ignore, or have us ignore, the very ground rules OCD put in place. Playing by these rules means that obtaining the guarantees of separate entities, made separate by OCD's choice of how to structure the affairs of its affiliate group of companies, entitles a lender, in bankruptcy or out, to look to any (or all) guarantor(s) for payment when the time comes.

*Id.* at 212-213. As a result of the Third Circuit's decision, the Banks retained the right to assert separate claims against the appropriate debtors. *Id.*

A creditor's right to assert separate claims against multiple debtors is subject only to the limitation that a creditor may not recover in the aggregate more than the full amount owed to the creditor. *See, e.g., Bankers' Trust Co. v. Irving Trust Co. (In re United Cigar Stores Co. of Am.)*, 73 F.2d 296, 298 (2d Cir. 1934) ("In no case can the appellant recover from all sources more than the full amount of its claim"); *In re F.W.D.C. Inc.*, 158 B.R. 523, 528 (Bankr. S.D. Fla. 1993) (*citing Ivanhoe Bldg. & Loan Ass'n v. Orr*, 295 U.S. 243, 245 (1935)) (allowing a creditor, who had recovered sums on account of its debt, to prove the total amount of a claim against a guarantor-debtor while noting that such creditor may not ultimately collect more than the total amount of the indebtedness). *See also Stanziale v. Finova Capital Corp (In re Tower Air, Inc.)*, 397 F.3d 191, 200 (3d Cir. 2005) (where a party will "recover less than its entire debt" a "double recovery is impossible").

Here, MLC, as guarantor, is liable to the Noteholders under the Guaranty for the full amount of principal and interest due under the Notes and the Fiscal and Paying Agency Agreement. GM Nova Scotia, as issuer, is liable to the Noteholders for the full amount of

49

principal and interest due under the Notes and the Fiscal and Paying Agency Agreement. In turn, MLC is liable to GM Nova Scotia pursuant to Section 135 of the *Companies Act* (Nova Scotia) for all unpaid liabilities owed to GM Nova Scotia's creditors, including GM Nova Scotia's obligations under the Notes and the Fiscal and Paying Agency Agreement. *See* Section 135 of the *Companies Act* (Nova Scotia) ("In the event of a company being wound up, every present and past member shall . . . be liable to contribute to the assets of the company to an amount sufficient for payment of its debts and liabilities and the costs, charges, and expenses of the winding up").

The Committee confuses the rights of GM Nova Scotia with those of its creditors. The Wind-Up Claim belongs to the estate of GM Nova Scotia. The Wind-Up Claim is a separate and independent obligation of MLC that arose under Nova Scotia law by virtue of GM Nova Scotia's corporate structure as an unlimited company. The Wind-Up Claim is a claim for the full amount of the liabilities of GM Nova Scotia, including all principal and interest due under the Notes for which GM Nova Scotia is liable, the Swap Liability Claim, the amount due a Canadian law firm for services rendered and the statutory obligation to pay the "costs, charges, and expenses" associated with the winding-up pursuant to Section 135. The Guaranty Claims belong to the Noteholders and are limited to amounts due and owed by MLC under the Notes. These are separate obligations of MLC to separate creditors that arise from independent legal bases and, as such, cannot be duplicative claims.

A recent decision involving facts similar to those presented here directly rejects the notion that creditors, such as the Nova Scotia Trustee and the Noteholders, cannot both assert and recover on their separate claims. In *Northwestern Mutual Life Ins. Co. v. Delta Air Lines, Inc. (In re Delta Air Lines, Inc.)*, 608 F.3d 139 (2d Cir. 2010), owner participants in leveraged

leases of aircraft filed claims under their tax indemnity agreements ("TIA") for tax losses that

arose when certain indenture trustees foreclosed on the aircraft and thereby forced the owner

participants to recapture prior accelerated depreciation deductions. *Delta*, 608 F.3d at 144.  In

addition to the TIA, the stipulated loss value ("SLV") clause of the leases also provided a

protection mechanism intended to ensure that an owner participant could take full advantage of

the accelerated depreciation provisions of the leveraged leases. *Id.* at 142.  The TIA required the

debtor, Delta Air Lines Inc. ("Delta"), to compensate each owner participant if an aircraft was

foreclosed upon and the Internal Revenue Service ("IRS") sought to recapture any deductions

that the owner participant had taken for accelerated depreciation. *Id.* at 142.  In turn, the SLV

required Delta to pay the lessor (or an indenture trustee, as an assignee of an interest in the lease)

an agreed amount if Delta defaulted under the lease, which included an agreed-upon return to the

owner participants accounting for "all adverse tax consequences." *Id.* at 142.  Delta argued that

the owner participants were seeking compensation under the TIA for losses as to which the

indenture trustees' SLV claims had already been allowed. *Id.* at 149.

The Second Circuit held that where "claims arise under agreements (1) between different

parties, (2) addressing different events, and (3) providing for different remedies," the claims are

both allowable. *Id.* at 149.  The Second Circuit also rejected Delta's assertion that "a single loss

can only give rise to a single claim in bankruptcy." *Id.* at 149.  Rather, the Second Circuit

determined that:

> If a component of the SLV claim under the Lease is calculated by
> reference to the owner participant's tax consequences which are
> indemnified under the TIA (the "overlap" Delta objects to), so be
> it.  That is what Delta agreed to and what both the owner
> participant and the indenture trustee relied upon in negotiating the
> agreements.  If Delta has contracted to pay duplicative claims, then
> it must pay both − it cannot repudiate its duty to party A under

> contract A by asserting that it contracted to pay the same amount to
> party B under contract B.

*Id.* at 149 (quoting *In re Delta Air Lines*, 370 B.R. 552, 557 (Bankr. S.D.N.Y. 2007)).

Similarly, the Wind-Up Claim and the Guaranty Claims are claims of different creditors, address different events, and provide for different remedies.  The Wind-Up Claim arises from MLC's statutory obligation to GM Nova Scotia.  The Guaranty Claims arise from MLC's contractual obligations under the Guaranty for the benefit of the Noteholders.  The remedies also differ.  With respect to the Guaranty Claims, the Noteholders, as beneficiaries of the Guaranty, are entitled to the amount due under the Notes in accordance with the terms of the Fiscal and Paying Agency Agreement.  In contrast, the Wind-Up Claim entitles GM Nova Scotia to a claim equal to all of its unpaid obligations to all of its creditors (including amounts due under the Notes, the Swap Liability, and other obligations) plus "the costs, charges, and expenses of the winding up."  *See* Section 135 of the *Companies Act* (Nova Scotia).  As in *Delta*, MLC should not be permitted to repudiate its independent statutory duty to GM Nova Scotia under Section 135 of the *Companies Act* (Nova Scotia) by asserting that it contracted to pay the same amount to the Noteholders under the Fiscal and Paying Agency Agreement.  Like the claimants in *Delta*, GM Nova Scotia has "suffered an actual loss that has not been compensated" and as to which it is entitled to recover pursuant to Section 135 of the *Companies Act* (Nova Scotia).  *Delta*, 608 F. 3d at 150.

There is no reason that the Nova Scotia Trustee and the Noteholders should be denied the benefit of their bargain; the Wind-Up Claim held by GM Nova Scotia pursuant to Section 135 of the *Companies Act* (Nova Scotia) and the Guaranty Claims held by the Noteholders under the Fiscal and Paying Agency Agreement are not duplicative.

C.    There is No Basis in Law or in Fact for the Committee's Request to Equitably Subordinate the Claims

Without providing any factual basis (other than baldly alleging that Responding Parties' conduct has been "inequitable, unconscionable and outrageous" and has harmed MLC's creditors) (Objection, at ¶ 71), the Committee requests that the Court equitably subordinate the Claims pursuant to section 510(c) of the Bankruptcy Code.  The Court should reject this request.

Section 510(c) of the Bankruptcy Code provides that the court may, "under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest . . . .".  *See* 11 U.S.C. § 510(c).  Equitable subordination is an unusual remedy which is applied only in limited circumstances.  Courts uniformly apply a three part test: (1) The claimant engaged in some type of inequitable conduct; (2) The misconduct caused injury to the creditors or conferred an unfair advantage on the claimant; (3) Equitable subordination of the claim is consistent with bankruptcy law.  *80 Nassau Assocs. v. Crossland Fed. Sav. Bank (In re 80 Nassau Assocs.)*, 169 B.R. 832, 837 (Bankr. S.D.N.Y. 1994).[19]

The first prong, inequitable conduct, is generally the most difficult to meet.  Inequitable conduct is conduct that may be lawful, yet shocks one's good conscience.  The Committee identifies only one act to purportedly support its claim of inequitable conduct by the Noteholders – the alleged undisclosed transfer to New GM by MLC of the Swap Liability Claim.  This allegation is specious for a number of reasons.  The Lock-Up Agreement does *not* provide for the transfer of the Swap Liability Claim, which was sold by MLC to New GM pursuant to the MPA

---

[19] Courts have stated that "the third prong of the *Mobile Steel* test carries minimal significance today because the current Bankruptcy Code provides explicitly for the remedy of equitable subordination, whereas the former Bankruptcy Act-under which *In re Mobile Steel Co.* was decided-did not."  *See, e.g., Official Comm. of Unsecured Creditors of Hydrogen, L.L.C. v. Blomen (In re Hydrogen, L.L.C.)*, 431 B.R. 337, 360-61 (Bankr. S.D.N.Y. 2010) (citing *In re Verestar, Inc.*, 343 B.R. at 461); *accord Nassau Assocs.*, 169 B.R. at 841 (stating that the third prong of the equitable subordination test is "likely to be moot").

supported by the Committee and approved by this Court.   Moreover, it is absurd for the
Committee to assert that any alleged lack of disclosure of the transfer of the Swap Liability
Claim is evidence of inequitable conduct by *Noteholders*, who were not a party to the MPA and
had no role in its negotiation or implementation.   Finally, it is disingenuous at best for the
Committee to contend that the sale of the Swap Liability Claim was not disclosed as, pursuant to
section 2.2(a)(iv) of the MPA, the term "Purchased Assets" includes "all intercompany
obligations owed or due, directly or indirectly, to Sellers by any Subsidiary of a Seller . . ."   *See*
MPA, § 2.2(a)(iv).   Thus, as the Swap Liability was an obligation owed by GM Nova Scotia to
MLC (Seller), the sale of the Swap Liability Claim to New GM was clearly disclosed.

Moreover, the actions of non-insider or non-fiduciary creditors (such as the Responding
Parties) will be deemed inequitable if the Responding Parties "dominated or controlled the
debtor to gain an unfair advantage" or breached "an existing, legally recognized duty arising
under contract, tort or other area of law." *80 Nassau*, 169 B.R. at 840.   The Committee does not
allege any factual basis to satisfy this prong because there is no factual basis.   The Responding
Parties had no duty to MLC or to any other GM Parties under contract, tort or otherwise.
Moreover, it would be absurd to allege that the Responding Parties "dominated or controlled"
MLC which was represented by sophisticated counsel and financial advisors, and which was
working closely with the governments of the United States and Canada.   Furthermore, equitable
subordination is largely confined to three general paradigms (1) when a fiduciary of the debtor
misuses his position to the disadvantage of other creditors; (2) when a third party controls the
debtor to the disadvantage of other creditors; and (3) when a third party actually defrauds other
creditors.   *Matter of U.S. Abatement Corp.*, 39 F.3d 556, 561 (5th Cir. 1994).   None of these
paradigms exists here and the Committee does not and cannot identify any facts to the contrary.

Under the second prong, the Committee must prove that entry into the Lock-Up Agreement caused injury to the debtor or its creditors, or resulted in an unfair advantage to the claimant.  Under this prong it is sufficient to allege that the general creditors are less likely to collect their debts as a result of the alleged inequitable conduct.  *In re KDI Holdings, Inc.*, 277 B.R. at 514.  As demonstrated above, the Lock-Up Agreement enhanced the value of MLC.  Not only did the Lock-Up Agreement enable MLC to resolve the Nova Scotia Proceeding and release GM Nova Scotia's CDN$1.3 billion claim against GM Canada, but the Lock-Up Agreement enabled MLC to move forward with its 363 sale to New GM without the overhang of the CDN$1.3 billion claim against GM Canada, thus enhancing the value of MLC, GM Canada's sole shareholder.  This allowed MLC to receive in excess of $45 billion of consideration from the sale to New GM.  Thus, there is no basis for the Committee's contention that the Claims should be equitably subordinated.

In addition to the Committee's failure to state a claim with respect to its equitable subordination objection, there are at least three other reasons that the Court should overrule this objection.

First, Rule 7001(8) of the Federal Rules of Bankruptcy Procedure requires that any proceeding to subordinate a claim to another claim is an adversary proceeding.  *See In re Danbury Square Assocs., Ltd. P'ship*, 153 B.R. 657, 661 (Bankr. S.D.N.Y. 1993).  Moreover, Rule 3007(b) of the Federal Rules provides that a: "party in interest shall not include a demand for relief specified in Rule 7001 in an objection to the allowance of a claim, but may include the objection in an adversary proceeding."  Because the Committee has improperly sought equitable subordination relief by motion and not by an adversary proceeding, the Court should reject this claim.

Second, under established case law in the Second Circuit, a creditors' committee may not seek to equitably subordinate the claim of one creditor to that of other creditors without first obtaining permission from the bankruptcy court. *Official Comm. of Unsecured Creditors v. Austin Fin. Servs., Inc. (In re KDI Holdings, Inc.)*, 277 B.R. 493, 504 (Bankr. S.D.N.Y. 1999). Before a bankruptcy court will grant the creditors' committee standing to commence an adversary proceeding to equitably subordinate a claim, the creditors' committee must show that the trustee or debtor in possession has unjustifiably failed to bring suit or abused its discretion in not bringing a suit. *Official Comm. of Unsecured Creditors v. Halifax Fund, L.P. (In re AppliedTheory Corp.)*, 493 F.3d 82, 85-86 (2d Cir. 2007) (citing *In re STN Enters.*, 779 F.2d at 904). Alternatively, a creditors' committee may be granted standing to bring a claim for equitable subordination, when it has the debtor's consent and the bankruptcy court's approval, so long as the court finds that the suit is "(a) in the best interests of the bankruptcy estate, and (b) is necessary and beneficial to the fair and efficient resolution of the bankruptcy proceedings." *Id.* at 86 (quoting *Commodore Int'l Ltd. v. Gould (In re Commodore Int'l Ltd.)*, 262 F.3d 96, 100 (2d Cir. 2001)). Here the Committee has not requested standing from the Court to pursue equitable subordination of the Claims and it could not satisfy the requirements if it were to make such a request of the Court. Accordingly, the Court should overrule the Committee's objection.

Third, as with the Committee's fraudulent conveyance allegations, the assumption and assignment of the Lock-Up Agreement pursuant to the Sale Order bars the Committee from seeking to equitably subordinate the Claims based on allegations of misconduct in connection with the Lock-Up Agreement. As discussed above, in the Sale Order, the Court found that the assumption and assignment of the Purchased Contracts (including the Lock-Up Agreement) was an exercise of the Debtors' sound business judgment. This finding is too antithetical to the

Committee's allegations of inequitable conduct to allow for equitable subordination of the Claims. *See In re Network Access Solutions, Corp.*, 330 B.R. at 79 (denying creditors' committee's request to avoid assumed employment agreements because the Court's finding that the debtor assumed the agreements with the honest belief that the assumption was in the best interests of its estate was too antithetical to the committee's causes of action). The Court should overrule the Objection.

D.   The Lock-Up Agreement Is Not An Unauthorized Settlement Under Rule 9019

The Committee contends that the Lock-Up Agreement constitutes an unauthorized settlement under Rule 9019 of the Federal Rules of Bankruptcy Procedure because allegedly, "implementation of the Lock-Up Agreement required several post-petition events and transfers of estate property." Once again, the Committee fails to cite any statute or case law to support its novel proposition that the Court should treat a pre-petition settlement as a post-petition settlement simply because the settlement allegedly provides for certain post-petition transactions. In fact, it is black letter law that Rule 9019 only applies to settlements made during bankruptcy. *See Official Comm. of Unsecured Creditors of Tower Auto. v. Tower Auto., Inc. (In re Tower Auto. Inc.)*, 241 F.R.D. 162, 170 (S.D.N.Y. 2006) ("Bankruptcy Rule 9019 applies to bankruptcy settlements"); *see, also, In re High Tech Packaging, Inc.*, 397 B.R. 369, 371 (Bankr. N.D. Ohio 2008) (holding that the purpose of Bankruptcy Rule 9019 is to "facilitate settlements in bankruptcy"); *In re Cincinnati Microwave, Inc.*, 210 B.R. 130, 133 (Bankr. S.D. Ohio 1997) (stating that Rule 9019 has no application to settlements reached prior to bankruptcy).

Moreover, the Committee fails to identify any post-petition actions taken by a Debtor pursuant to the Lock-Up Agreement. The four "events" the Committee lists do not qualify: (a) the Extraordinary Resolution was passed, (b) funds that had been placed in escrow by GM Canada for payment of the Consent Fee were released to the Noteholders, (c) GM Nova Scotia

and GM Canada entered into a settlement agreement (the "Settlement") releasing GM Canada from its obligations to GM Nova Scotia under the Intercompany Loans, and (d) GM Nova Scotia consented to entry of a bankruptcy order under Canada's Bankruptcy and Insolvency Act.

None of the four "events" listed by the Committee involves transfers of property of any Debtor, including MLC. GM Canada (a non-Debtor) – not MLC – was party to the Escrow Agreement, and the funds in escrow were the property of GM Canada, not the property of any Debtor's estate. Moreover, the loan from MLC to GM Canada (which was *not* provided for in the Lock-Up Agreement) occurred pre-petition. With respect to the Settlement, neither GM Nova Scotia nor GM Canada is a Debtor in these chapter 11 cases; thus the Court did not have, and does not have, jurisdiction over either of these entities and approval of the Court was not required for them to agree to, or implement, the Settlement. Similarly, GM Nova Scotia is a Canadian entity and not a Debtor; thus it is patently ridiculous for the Committee to suggest that this Court's approval was required for it to consent to a Canadian insolvency proceeding. Accordingly, because the Lock-Up Agreement is a pre-petition settlement and there were no post-petition transfers of estate property or agreements by Debtors pursuant to the Lock-Up Agreement, there is clearly no basis for the Committee's contention that the Lock-Up Agreement constitutes an unauthorized settlement under Rule 9019.

E.    The Committee Is Not Entitled to Relief Under Rule 60(b)

The Committee is asking the Court to modify the Sale Order and set aside MLC's assumption and assignment to New GM of the Lock-Up Agreement. As set forth above, none of the Claims arises from the Lock-Up Agreement. Moreover, the assumption of the Lock-Up Agreement provides only one of many independent bases for the Court to overrule the Committee's objections to the Claims. Even if the assumption of the Lock-Up Agreement were set aside, as demonstrated above, there would still be ample legal and factual basis to overrule

every objection to the Claims raised by the Committee.  Nonetheless, the Committee has utterly

failed to satisfy the requirements of Rule 60(b).

1.    The Objection Fails to Satisfy The Requirements of Rule 60(b)

The Committee has failed to satisfy Rule 60(b)'s requirements for voiding or modifying

the Sale Order.  Indeed, Rule 60(b) affords "extraordinary judicial relief" only if the Committee

can show "exceptional circumstances."  *In re Old Carco LLC*, 423 B.R. at 45 (quoting *Nemaizer*

*v. Baker*, 793 F.2d 58, 61 (2d Cir. 1986)).  In addition, the Committee bears the burden of

demonstrating that (1) the supporting evidence is "highly convincing"; (2) good cause exists for

its failure to act sooner; and (3) application of Rule 60(b) will not impose "undue hardship" on

other parties.  *Id.*  The Committee cannot meet this burden.[20]

a.    The Committee Did Not Allege "Exceptional Circumstances"

The Committee has failed to allege any "exceptional circumstances" warranting

"extraordinary judicial relief" under Rule 60(b).  The Lock-Up Agreement did not reduce

recoveries for the creditors of MLC since the Noteholders' contractual Guaranty Claims and GM

Nova Scotia's statutory Wind-Up Claim are independent of the Lock-Up Agreement.  To the

contrary, by facilitating a rapid asset sale and increasing the value of GM Canada – MLC's

wholly-owned subsidiary – the Lock-Up Agreement enhanced significantly the recoveries for

MLC's creditors.  By entering into the Lock-Up Agreement, MLC obtained a release from the

Noteholders of all claims and demands raised in the Nova Scotia Proceeding, obtained a

settlement and compromise of GM Nova Scotia's claim under the Intercompany Loans against

GM Canada, and avoided having to place GM Canada in a CCAA proceeding.  *See* Lock-Up

Agreement, Exhibit "M;" June 1, 2009 8-K, Exhibit "N."  As a result, MLC was able to obtain

---

[20] Moreover, the 60(b) Motion has not been served upon the Responding Parties or the GM Parties, each of which is
a necessary party in an adjudication of the 60(b) Motion.

59

debtor-in-possession financing from the U.S. and Canadian governments and consummate an asset sale to New GM, including its equity interest in GM Canada unencumbered by liabilities arising from the Nova Scotia Proceeding and Intercompany Loans, which provided MLC with in excess of $45 billion of consideration.   In light of the foregoing, the Committee cannot demonstrate "exceptional circumstances" under Rule 60(b).   *See Unsecured Claims Estate Representative of Teligent, Inc. v. Cigna Healthcare, Inc. (In re Teligent, Inc.)*, 326 B.R. 219, 227 (S.D.N.Y. 2005) (holding that the possibility of a greater distribution to unsecured creditors, if the assumption order was voided, did not rise to the level of "extraordinary circumstances" such as might warrant relief from the assumption order).

### b.    The Committee Has Not Demonstrated That "Good Cause" Exists

Nor has the Committee demonstrated that "good cause" exists for its delay in filing its 60(b) Motion until nearly one year after entry of the Sale Order.   The sole basis proffered by the Committee for its failure to timely file, *i.e.*, that allegedly it was not provided with notice of MLC's intention to assume the Lock-Up Agreement under the Sale Order, is insufficient to vacate or modify the Sale Order.   *See Radack v. Norwegian Am. Line Agency, Inc.*, 318 F.2d 538, 542-43 (2d Cir. 1963) ("[L]ack of notice does not ipso facto mean that a judgment must, can or should be reopened," as relief under Rule 60(b) should only be granted where the "lack of notice has operated to prejudice a substantial right or remedy that would otherwise have been available.").

### c.    The Committee Fails To Proffer "Highly Convincing" Evidence

The Committee also fails to satisfy the "highly convincing" standard of Rule 60(b). Evidence proffered in support of a Rule 60(b) motion is "highly convincing" if the determination in the proceeding from which relief is being sought would have been resolved differently if the movant had raised its concern in the original proceeding.   *Freedom, N.Y., Inc. v. U.S.*, 438

F. Supp. 2d 457, 463 (S.D.N.Y. 2006).    Here, the Committee has failed to offer any

evidence − "highly convincing" or otherwise − that the Court would have denied approval of the

Sale Order and the assumption and assignment of the Lock-Up Agreement if the Committee had

objected to the assumption of the Lock-Up Agreement.    Indeed, the Lock-Up Agreement was a

critical component of the complex sale transaction negotiated by MLC, New GM, and New

GM's sponsors, including the U.S. government, the governments of Canada and Ontario, and the

UAW.    As the Court determined:  "The Purchased Contracts being assigned to . . . the Purchaser

are an integral part of the Purchased Assets being purchased by the Purchaser, and, accordingly,

such assumption and assignment of the Purchased Contracts . . . are reasonable, enhance the

value of the Debtors' estates, and do not constitute unfair discrimination."  *See* Sale Order, at

¶ EE (Docket No. 2968).  The Court also found:

> The uncontroverted evidence before the Bankruptcy Court
> established that the [Sale] Transaction was the Debtors' only
> viable option and that the Debtors' sole alternative was a
> liquidation that would have yielded a mere fraction of the sale
> assets' going concern value to the Debtors and nothing at all for
> the Debtors' general unsecured creditors . . . .

*Parker v. Motors Liquidation Co. (In re Motors Liquidation Co.)*, 430 B.R. 65, 79 (S.D.N.Y.

2010) (Sweet, J.) (citing 7/1 Tr. at 57).

Accordingly, particularly in light of the Court's findings, the Committee cannot

demonstrate that the Court would not have approved the Sale Order had the Committee timely

raised its objection to the assumption and assignment of the Lock-Up Agreement.  Therefore, the

Court should deny the Committee's 60(b) Motion.  *See Freedom*, 438 F. Supp. 2d at 463 (finding

that new evidence presented was not highly convincing because it would not have changed the

lower court's conclusion); *In re Asbestos Litig.*, 173 F.R.D. 87, 92 (S.D.N.Y. 1997) (new

evidence would not have changed the bankruptcy court's initial determination).

d.    Application of Rule 60(b) Imposes "Undue Hardship"

Application of Rule 60(b) will also impose "undue hardship" on the Noteholders and New GM as well as on other parties. The assumption of the Lock-Up Agreement was part of a complex sale transaction authorized by the Sale Order. Based on the understanding that the parties would be bound by the terms of the Lock-Up Agreement, the Noteholders passed an Extraordinary Resolution authorizing the discontinuance of the Nova Scotia Proceeding and the release of GM Nova Scotia's CDN$1.3 billion claim against GM Canada. Indeed, the Noteholders and GM Nova Scotia relinquished their right to prosecute their claims against GM Canada, which never commenced an insolvency proceeding in Canada or the United States, in reliance on the consideration to be paid them pursuant to the Lock-Up Agreement. Likewise, in structuring the sale transaction and determining the consideration to be paid, New GM relied on the implementation of the Lock-Up Agreement, including the acquisition of GM Canada free and clear of the Nova Scotia Proceeding and its obligations to GM Nova Scotia under the Intercompany Loans. The Committee is asking the Court to deprive the Noteholders and New GM of the benefit of their bargain, even though the Committee supported the Sale Order and derived substantial benefit under the Lock-Up Agreement. *See In re Teligent*, 326 B.R. at 228 (relief pursuant to Rule 60(b) should not be granted and the "Bankruptcy Court should not vacate an order where, as is the case here, intervening rights have vested in reliance on that order").[21]

---

[21] Nor should the Committee be permitted to unwind the assets New GM acquired as a good faith purchaser. *See, e.g., Alan Gable Oil Dev. Co. v. Hoyer (In re Alan Gable Oil Dev. Co.)*, 1992 WL 329419, at *4 (4th Cir. Nov. 12, 1992) ("though section 363(m) does not in the strictest sense apply to [the plaintiff's] Rule 60(b) motion, the policy favoring protection of good faith purchasers of estate property does. Not only does [the plaintiff] bear the burden of establishing that the district court abused its discretion, he must do so in light of the strong policy favoring good faith purchasers of bankruptcy assets."); *Matter of Edwards*, 962 F.2d 641, 645 (7th Cir. 1992) ("The strong policy of finality of bankruptcy sales embodied in section 363(m) provides . . . strong support for the principle that a bona fide purchaser at a bankruptcy sale gets good title, even if the section does not of its own force preclude collateral attack on such sales. Rule 60(b) must be interpreted in light of this policy . . . ."). Here, in approving the sale, the Court determined that New GM was "a purchaser in good faith[,]" that the Debtors exercised good business judgment, and that there was no viable alternative to the sale. *In re General Motors Corp.*, 407 B.R. 463, 486 (Bankr. S.D.N.Y. 2009). The parties to the Lock-Up Agreement should be able to rely on that finding, and the

In reliance on the Sale Order becoming effective, New GM has entered "countless new transactions . . . and the ownership of New GM is held by diverse partners including, [the U.S. government], the governments of Canada and Province of Ontario, the UAW, and [MLC] on behalf of its claimants." *In re Motors Liquidation Co.*, 430 B.R. at 82. In entering into such transactions, those parties, and others, have relied on the finality of the Sale Order. *Id.* (request to modify Sale Order would "'knock the props out' from under the transactions that have occurred since the sale" of assets from MLC to New GM "was consummated"). Accordingly, the Committee's attempt to unwind the Sale Order, including the assumption and assignment of the Lock-Up Agreement to New GM, is equitably moot. *See Palermo v. Pritam Realty, Inc. (In re Pritam Realty, Inc.)*, 233 B.R. 619, 624 (D.P.R. 1999) (affirming denial of motion to vacate sale order under Rule 60(b) where "the general doctrine of equitable mootness bars [] consideration of the relief requested" and "[t]o vacate said sale at this juncture would run counter to the essential principal of finality that is particularly important in the bankruptcy context.").

> 2.   The Committee's Request is Not Timely

A motion for relief under Rule 60(b) must be made within a reasonable time from the entry of an order, and the failure to timely seek relief is fatal to the motion. *See* Fed. R. Civ. P. 60(c)(1) ("A motion under Rule 60(b) must be made within a reasonable time – and for reasons (1), (2), and (3) no more than a year after the entry of the judgment or order or the date of the proceeding."). The Committee did not file its 60(b) Motion seeking to void or modify the Sale Order until July 2, 2010. *See* Objection [Docket # 6248]. Thus, the Committee delayed seeking relief under Rule 60(b) for nearly one year after the Court's entry of the Sale

---

Committee should not be permitted to challenge that finding a year after the Sale Order was entered. *See In re Alan Gable*, 1992 WL 329419 at *4 ("If purchasers at judicially approved sales of property of a bankrupt estate, and their lenders, cannot rely on the deed that they receive at sale, it will be difficult to liquidate bankrupt estates at positive prices.").

Order on July 5, 2010 and MLC's assumption and assignment of the Lock-Up Agreement to

New GM on July 24, 2009. *See* Sale Order [Docket # 2968]; Exhibit "T," Assignment Notice;

Exhibit "U," Assumption and Assignment Confirmation Letter.  The sole ground the Committee

asserts for its failure to timely file is that it was not provided with notice of MLC's intention to

assume the Lock-Up Agreement under the Sale Order.  *See* Objection, at ¶ 48 [Docket # 6248].

The Committee's alleged ignorance is belied by the facts and the Committee has failed to

provide any evidence for its failure to act sooner.  Therefore, the Committee's 60(b) Motion

should be denied as untimely.

The filing of the 60(b) Motion within the one-year limitation period does not *per se*

establish that the motion was timely filed.  Rather, as "the delay in making the motion

approaches one year there should be a corresponding increase in the burden that must be carried

to show that the delay was 'reasonable.'"  *Sasso v. M. Fine Lumber Co., Inc.*, 144 F.R.D. 185,

188-89 (E.D.N.Y. 1992) (internal quotations omitted) (citing *Amoco Overseas Oil Co. v.*

*Compagnie Nationale Algeriennes de Navigation*, 605 F.2d 648, 656 (2d Cir. 1979)).  The

reasonableness of a delay in filing a Rule 60(b) motion thus depends on when the movant

became aware of the facts giving rise to such request. *Stupakoff v. Otto (In re Spiegel, Inc.)*, 269

Fed. Appx. 56, 58 (2d Cir. 2008).  Indeed, a motion under Rule 60(b) "is not a substitute for a

timely appeal" of an order, particularly where "intervening rights have become vested in reliance

on" such an order.  *See, e.g., In re Teligent, Inc)*, 326 B.R. at 228.

Here, the Committee has failed to provide a credible reason or any evidentiary basis for

its nearly one year delay in filing its 60(b) Motion.  Ample evidence demonstrates that the

Committee either knew or should have known of the Lock-Up Agreement and its assumption and

assignment by MLC to New GM pursuant to the Sale Order:[22]

- As of June 1, 2009, the resolution of the CDN$1.3 billion Intercompany Loans and the Nova Scotia Proceeding pursuant to the Lock-Up Agreement was well publicized. *See* Exhibit "O," Brian Kalish, *GM Nova Scotia Unit In Pact To Settle Canada Bondholder Suit*, DOW JONES FACTIVA, June 1, 2009; *see also* Notice of Interim Report, at ¶ 10 [Docket # 3762].

- On June 1, 2009, MLC filed a Form 8-K detailing the terms of the Lock-Up Agreement. *See* Exhibit "N," June 1, 2009 8-K.

- The DIP Amendment, dated as of June 25, 2009, provided that the Debtors' post-petition lenders consent to provisions of the Lock-Up Agreement.

- The Disclosure Schedule delivered in June 2009 pursuant to the MPA expressly provided for consummation of the Lock-Up Agreement, and specifically payment of the Consent Fee and extinguishment of the Intercompany Loans, among other things.

- On June 24, 2009, the Committee filed a limited objection to MLC's motion seeking authority to assume and assign its executory contracts based on a purported lack of transparency with respect to the contracts being assumed and assigned. *See* Exhibit "A" to Limited Objection [Docket # 2362].

- On July 2, 2009, after negotiations with the Debtors, the Committee withdrew its limited objection and actively supported the entry of the Sale Order, which included the procedures for assuming and assigning executory contracts without having to provide notice to the Committee. *See* July 2, 2009 Sale Hearing Tr., 102:7-22 [Docket # 3062]. Whether or not the Committee should have been entitled to actual notice of the assumption and assignment of the Lock-Up Agreement under the procedures the Court approved is irrelevant as to whether the Committee is entitled to relief under Rule 60(b). Having affirmatively supported the entry of the Sale Order and having withdrawn its objection to the Modified Assumption and Assignment Procedures, the Committee is bound to the procedures the Court ultimately approved, irrespective of whether the procedures permitted MLC to assume and assign contracts without providing notice to the Committee. If the Committee were permitted to attack any contract that was assumed in accordance with the Sale Order based solely on the basis that it was not given notice, the Committee could attack the assumption of tens of thousands of contracts that were assumed and assigned to New GM under the Sale Order. It defies logic to think that the Court would have approved the procedures for the

---

[22] To the extent the Committee alleges that this Court erred in determining that the Lock-Up Agreement may be assumed and assigned, the "Second Circuit has determined that when a 60(b)(1) motion concerns a court's own substantive error, such motion may not be made after the time for appeal has elapsed." *In re Old Carco LLC*, 423 B.R. 40, 46 (Bankr. S.D.N.Y. 2010).

assumption and assignment of executory contracts with the expectation that the
Committee could come back at any time to attack the very transactions that the
Court expressly found were integral to the sale, particularly given the fact that the
Court found that the prescribed "**notice was good and sufficient, reasonable,
appropriate under the particular circumstances . . . and reasonably
calculated to reach and apprise all holders . . . of claims . . . about the
assumption and assignment of the Assumable Executory Contracts** . . . ." *See*
Sale Order, at ¶ E (emphasis added).

- On July 5, 2009, the Court entered the Sale Order. *See* Sale Order [Docket
  # 2968].

The Committee thus actively participated in MLC's efforts to assume and assign

executory contracts to New GM. As the Committee was given a full and fair opportunity to

litigate entry of the Sale Order, it cannot rely on its failure to participate as a basis for Rule 60(b)

relief. *United Student Aid Funds, Inc. v. Espinosa*, 130 S. Ct. 1367, 1380 (2010) ("Where . . . a

party is notified of a plan's contents and fails to object to confirmation of the plan before the

time for appeal expires, that party has been afforded a full and fair opportunity to litigate, and the

party's failure to avail itself of that opportunity will not justify Rule 60(b)(4) relief."); *In re Tara

of N. Hills*, 116 B.R. 455, 462 n.2 (E.D.N.C. 1989) ("failure to timely object demonstrates the

equitable predicate for the exercise of the bankruptcy court's judicial discretion" to deny relief

under Rule 60(b)).

Accordingly, the Committee should not be permitted to avail itself of Rule 60(b) almost a

full year after the Sale Order was entered. The Court should deny the Committee's 60(b) Motion

on this basis alone. *See, e.g., In re Spiegel*, 269 Fed. Appx. at 58 (finding a delay in filing a

Rule 60(b) motion to modify debtor's plan seven months after becoming aware of the plan's

existence was unreasonable); *Sasso*, 144 F.R.D. at 188-89 (denying Rule 60(b) motion where

movant failed to file motion until nine months after entry of judgment of which it was aware); *In

re Teligent, Inc.*, 326 B.R. at 228 (denying estate representative's Rule 60(b) motion to unwind

assumption of executory contract made less than seven months following entry of order

approving such assignment, finding that representative knew of the assumption order and failed

to appeal).

### IV.    THE OBJECTION CAN BE DISPOSED OF
### WITH A NON-EVIDENTIARY HEARING

The Committee has requested an evidentiary hearing on its Rule 60(b) Motion and

Objection.  However, the Court can dispose of the Rule 60(b) Motion and the Objection on the

law and the undisputed facts as set forth in detail above and summarized below:

1) Because the Alleged Avoidance Claims were sold to New GM under the MPA approved by the Sale Order, as a matter of law, such claims are not property of the Debtors' estates and thus the Committee may not object to the Claims based on allegations that the Lock-Up Agreement or transactions in connection therewith, including, without limitation, any funding by MLC of the Consent Fee, constituted a fraudulent transfer or a preferential transfer;

2) Because MLC assumed and assigned the Lock-Up Agreement, as a matter of law, the Committee is barred from pursuing the Alleged Avoidance Claims or objecting to the Claims on any theories relating to the Lock-Up Agreement or the circumstances in connection with its negotiation and execution, including, *inter alia*, theories of fraudulent transfer, preferential transfer and equitable subordination;

3) As a matter of law, the Consent Fee cannot be avoided because it was funded by GM Canada and paid by GM Nova Scotia, neither of which are Debtors; accordingly the payment of the Consent Fee is not a transfer of a Debtor's property and does not constitute an avoidable transfer;

4) As a matter of law, the Committee does not have standing to challenge any alleged avoidable transfers of MLC's property or to pursue equitable subordination claims, and thus the Committee may not object to the Claims based on allegations of inequitable conduct or theories that the Lock-Up Agreement or transactions in connection therewith, including, without limitation, any funding by MLC of the Consent Fee, constituted a fraudulent transfer or preferential transfer;

5) As a matter of law, judicial estoppel bars the Committee, which consented to the Modified Assumption and Assignment Procedures and strongly supported the sale, from challenging the Lock-Up Agreement and from pursuing the Alleged Avoidance Claims or objecting to the Claims on any theories relating to the Lock-Up Agreement or the circumstances in connection with its negotiation and execution, including, *inter alia*, theories of fraudulent transfer, preferential transfer and equitable subordination;

6) As a matter of law, the Claims cannot be disallowed under section 502(d) of the Bankruptcy Code because the Alleged Avoidance Claims and allegations of inequitable conduct have not been adjudicated; thus the Committee may not object to the Claims based on allegations of inequitable conduct or theories that the Lock-Up Agreement or transactions in connection therewith, including, without limitation, any funding by MLC of the Consent Fee, constituted a fraudulent transfer or preferential transfer;

7) As a matter of law, the Committee's request to equitably subordinate the Claims must be denied because the Committee fails to allege facts to support such a claim;

8) As a matter of law, to the extent the Committee's Objection is based on allegations that the Lock-Up Agreement constitutes an unauthorized post-petition settlement under Rule 9019, the Objection must be overruled because the Lock-Up Agreement was entered into pre-petition and the post-petition transfers alleged by the Committee did not involve property of the estate;

9) As there are no material facts at issue, the Court can make a determination as a matter of law whether the Wind-Up Claim should be disallowed as duplicative of the Guaranty Claims; and

10) As there are no material facts at issue, the Court should deny the Rule 60(b) Motion based on the law and the undisputed facts because the Committee has utterly failed to allege any facts to support its burden under Rule 60(b).

Accordingly, the interests of judicial economy mandate the holding of an initial non-evidentiary hearing on the Objection and the Rule 60(b) Motion.  The Responding Parties believe that the Court will overrule the Objection on the law and the undisputed facts.  However, if the Court finds at the non-evidentiary hearing that it cannot dispose of the Objection because there are material issues of fact at issue, an evidentiary hearing could be scheduled at that time to resolve the factual issues identified by the Court.  This process will minimize – if not eliminate – what could otherwise be costly, time-consuming and unnecessary discovery.

## V.    <u>CONCLUSION</u>

For all of the foregoing reasons, the Responding Parties respectfully request the Court to

deny the Committee's Rule 60(b) motion, overrule the Objection and grant the Responding

Parties such further relief as is just and proper.

Dated: New York, New York
December 13, 2010
       GREENBERG TRAURIG, LLP


      By: <u>*/s/ Gary D. Ticoll*</u>
       Bruce R. Zirinsky, Esq.
       Nancy A. Mitchell, Esq.
       John H. Bae, Esq.
       Gary D. Ticoll, Esq.
       200 Park Avenue
       New York, New York 10166
       Telephone: (212) 801-9200
       Facsimile: (212) 801-6400
       Email: zirinskyb@gtlaw.com
          mitchelln@gtlaw.com
          baej@gtlaw.com
          ticollg@gtlaw.com

      Counsel for Appaloosa Management L.P., Aurelius
      Capital Management, LP, Elliott Management
      Corporation, and Fortress Investment Group LLC