# <u>EXHIBIT C</u>

**IN THE MATTER OF THE
BANKRUPTCY OF
GENERAL MOTORS NOVA SCOTIA
FINANCE COMPANY
OF THE CITY OF HALIFAX,
PROVINCE OF NOVA SCOTIA**

**AND THE CLAIM OF GENERAL
MOTORS LLC, CREDITOR**

**PROOF OF CLAIM**

(Section 50.1, subsections 65.2(4), 81.2(1), 102(2), 124(2), 128(1), and paragraphs
51(1)(e) and 66.14(b) of the Act)

All notices or correspondence regarding this claim must be forwarded to the following
address:

General Motors LLC
400 Renaissance Center
Detroit, MI 48265
Attn: Lawrence S. Buonomo

And copied to:

Osler, Hoskin & Harcourt LLP
Box 50, 1 First Canadian Place
Toronto, Ontario, Canada M5X 1B8
Attn: Steven G. Golick

IN THE MATTER of the bankruptcy of General Motors Nova Scotia Finance Company
of the City of Halifax in the Province of Nova Scotia ("Debtor") and the claim of General
Motors LLC, formerly known as General Motors Company and NGMCo, Inc.,
("Creditor").

I, Lawrence S. Buonomo, of the City of Detroit in the State of Michigan, do hereby
certify:

    1.    I am an attorney employed by General Motors LLC.

    2.    That I have knowledge of all the circumstances connected with the claim
referred to below.

3.      That the Debtor was, at the date of bankruptcy, namely the 9th day of October, 2009, and still is, indebted to the Creditor in the sum of US$ 564,493,957 as specified in the statement of account attached and marked Schedule "A", after deducting any counterclaims to which the Debtor is entitled. General Motors LLC acquired rights in the account as of July 10, 2009 pursuant to its acquisition of substantially all of the assets of Motors Liquidation Company, formerly known as General Motors Corporation, as approved by the United States Bankruptcy Court for the Southern District of New York ("Bankruptcy Court") in its Sale Approval Order dated July 5, 2009. The Sale Approval Order is voluminous and is therefore not attached to this Proof of Claim. However, it is publicly available in the docket of the Bankruptcy Court and on the internet at http://docs.motorsliquidationdocket.com/pdflib/2968_order.pdf.    MLC was, and on information and belief still is, the 100% shareholder in the Debtor.

4.

☒    **A.    UNSECURED CLAIM OF** US$ 564,493,957.
That in respect of this debt, the Creditor does not hold any assets of the Debtor as security and

    ☒    Regarding the amount of US$ 564,493,957, the Creditor does not claim a right to a priority.

    ❏    Regarding the amount of $●, the Creditor claims a right to a priority under section 136 of the Act.

❏    **B.    CLAIM OF LANDLORD FOR DISCLAIMER OF A LEASE**
**$●**
The Creditor hereby makes a claim under subsection 65.2(4) of the Act, particulars of which are as follows:

❏    **C.    SECURED CLAIM OF $●**
That in respect of this debt, the Creditor holds assets of the Debtor valued at $●  as security, particulars of which are as follows:

❏    **D. CLAIM BY FARMER, FISHERMAN OR AQUACULTURIST OF**
**$●**
The Creditor hereby makes a claim under subsection 81.2(1) of the Act for the unpaid amount of $●

❏    **E. CLAIM AGAINST DIRECTOR $●**
The Creditor hereby makes a claim under subsection 50(13) of the Act, particulars of which are as follows:

5.     That, to the best of my knowledge, the Creditor is not related to the Debtor within the meaning of section 4 of the Act.

6.     That the following are the payments that the Creditor has received from, and the credits that the Creditor has allowed to, the Debtor within three months   immediately before the date of the initial bankruptcy event within the meaning of Section 2 of the Act: **None**

DATED at Detroit, Michigan, USA, this 9th day of November, 2009.


WITNESS: _Sheila D. White_
Name: Sheila White
Phone Number: 313-665-7370
Fax Number: 313-665-7395

_L. S. Buonomo_
**LAWRENCE S. BUONOMO**
Title: Attorney
**GENERAL MOTORS LLC**
Phone Number: 313-665-7390
Fax Number: 248-267-4291
E-mail: Lawrence.S.Buonomo@GM.com

**Schedule A**
**Statement of Account – Proof of Claim**

Claims of General Motors LLC, Representing Amounts Outstanding Under Currency
Swap Contracts as of October 9, 2009

1.   GBP 250,000/ CAD $555,860,000 Currency Swap (Confirmation Attached)

2.   GBP 350,000/ CAD $778,204,000 Currency Swap (Confirmation Attached)

Mark to Market Value

| (Values in US Dollars) | 10/09/2009 Valuation |
|---|---|
| 250MM Swap | 264,521,957 |
| 350MM Swap | 299,972,000 |
| Claim | 564,493,957 |

See detailed calculations attached.

## 10/09/2009 Valuation

### 250MM Swap

| Payment Dates | Payments(Pay) - GBP* | Payments(Rcv) - CAD | Payments(Rcv) - Equivalent GBP** | Fwd FX | Net Payments | Discount | Net PV |
|---|---|---|---|---|---|---|---|
| 07/12/2010 | (22,309,076) | 55,052,222 | 33,419,451 | 0.60705 | 11,110,376 | 0.992964 | 11,032,657 |
| 07/11/2011 | (22,126,712) | 54,602,204 | 33,177,828 | 0.60763 | 11,051,118 | 0.971765 | 10,738,977 |
| 07/10/2012 | (22,187,500) | 54,752,210 | 33,296,630 | 0.60813 | 11,109,180 | 0.938606 | 10,426,021 |
| 07/10/2013 | (22,187,500) | 54,752,210 | 33,359,427 | 0.60928 | 11,171,927 | 0.900981 | 10,054,576 |
| 07/10/2014 | (22,187,500) | 54,752,210 | 33,379,364 | 0.60964 | 11,191,864 | 0.863160 | 9,659,937 |
| 07/10/2015 | (22,187,500) | 54,752,210 | 33,433,784 | 0.61062 | 11,246,284 | 0.825432 | 9,283,471 |
| 07/11/2016 | (22,309,075) | 55,052,222 | 33,672,141 | 0.61164 | 11,363,066 | 0.790558 | 8,983,163 |
| 07/10/2017 | (22,126,712) | 54,602,204 | 33,457,243 | 0.61228 | 11,310,531 | 0.755743 | 8,547,577 |
| 07/10/2018 | (22,187,500) | 54,752,210 | 33,498,552 | 0.61182 | 11,311,052 | 0.722092 | 8,167,281 |
| 07/10/2019 | (22,187,500) | 54,752,210 | 33,892,990 | 0.60969 | 11,205,490 | 0.689277 | 7,723,886 |
| 07/10/2020 | (22,248,288) | 54,802,216 | 33,908,845 | 0.60909 | 11,060,557 | 0.657374 | 7,270,923 |
| 07/12/2021 | (22,309,075) | 55,052,222 | 33,183,958 | 0.60285 | 10,884,882 | 0.626471 | 6,810,083 |
| 07/11/2022 | (22,126,712) | 54,602,204 | 32,709,341 | 0.59905 | 10,582,629 | 0.597493 | 6,322,412 |
| TOTAL | (272,125,712) | 610,452,204 | 383,227,463 | | 91,100,741 | | 61,904,101 |

USD/ GBP** | 1.58440 | GBP
USD

*GM receives payment in CAD
** USD/GBP Rate, Fwd FX Rates and Discount Rates as of 10/09/2009 from Bloomberg

### 350MM Swap

| Payment Dates | Payments(Pay) - GBP* | Payments(Rcv) - CAD | Payments(Rcv) - Equivalent GBP** | Fwd FX | Net Payments | Discount | Net PV |
|---|---|---|---|---|---|---|---|
| 12/07/2009 | (29,292,192) | 70,386,724 | 42,884,704 | 0.609696 | 13,492,612 | 0.999161 | 13,391,288 |
| 12/07/2010 | (29,312,500) | 70,563,103 | 42,892,904 | 0.607985 | 13,580,490 | 0.996077 | 13,361,417 |
| 12/07/2011 | (29,312,500) | 70,563,103 | 42,873,235 | 0.607415 | 13,560,735 | 0.969151 | 13,006,622 |
| 12/07/2012 | (29,392,808) | 70,776,481 | 43,076,902 | 0.609633 | 13,684,094 | 0.920076 | 12,651,445 |
| 12/06/2013 | (29,473,116) | 70,969,880 | 43,282,517 | 0.609590 | 13,789,400 | 0.884904 | 12,202,295 |
| 12/06/2014 | (29,232,192) | 70,389,724 | 42,925,077 | 0.609633 | 13,693,785 | 0.847729 | 11,606,619 |
| TOTAL | (979,292,192) | 848,693,724 | 518,585,808 | | 139,353,618 | | 113,095,887 |

USD/ GBP*** | 1.58440 | GBP
USD

*GM receives payment in CAD
** USD/GBP Rate, Fwd FX Rates and Discount Rates as of 10/09/2009 from Bloomberg

PORTFOLIO TOTAL | $554,493,367

<u>Currency</u>
<u>Swaps Confirmation</u>

July 10, 2003

General Motors Nova Scotia Finance Company
1908 Colonel Sam Dr.
Oshawa, Ontario, L1H 8P7

SUBJECT: GBP 250,000,000/CAD $555,860,000 Currency Swaps

Ladies and Gentlemen:

The purpose of this letter agreement is to confirm the terms and conditions of the
Transaction entered into between General Motors Nova Scotia Finance Company
("Party A") and General Motors Corporation ("Party B") on the Trade Date listed below
(the "Swap Transaction"). This letter constitutes a "Confirmation" as referred to in the
ISDA Agreement specified below.

1.    The definitions and provisions contained in the 1991 Definitions (the
      "Definitions"), as published by the International Swap Dealers Association, Inc.
      ("ISDA"), are incorporated into this Confirmation. In the event of any
      inconsistency between those definitions and provisions and this Confirmation,
      this Confirmation will govern. The parties agree that this transaction is a
      Transaction under the Master Agreement of the parties dated October 15, 2001.
      The master agreement is comprised of the printed form of such agreement as
      published by ISDA, as supplemented and modified by a Schedule (the "ISDA
      Agreement").

      With regards to clause (f) on <u>Payments on Early Termination</u> of the Schedule to
      the Master Agreement, section (i) the Market Quotation Method will not hold, but
      instead the parties will pay each other the amounts of the Final Exchange plus
      any accrued and unpaid amounts.

      This Confirmation constitutes a binding agreement between you and us and will
      supplement, form part of, and be subject to the ISDA Agreement described
      above.

2.    The particular terms of the Underlying Transaction are as follows:

      Transaction Type:          Currency Swap

Notional Amount:            GBP 250,000,000

Trade Date:                 July 10, 2003

Effective Date:             July 10, 2003

Termination Date:           July 10, 2023

Fixed Amounts:

    Fixed Rate Payer:            Party B

    Fixed Rate Payer
    Currency Amount:            GBP 250,000,000.

    Fixed Rate Payer
    Payment Dates:            Each year, beginning on July 10, 2003 and
                           ending on July 10, 2023 subject to adjustment
                           in accordance with following Business Day
                           convention. <u>Business Days</u>: New York, London,
                           Toronto

    Fixed Rate:            8.875%

    Fixed Rate Day
    Count Fraction:            Actual/365

Fixed Amounts:

    Fixed Rate Payer:            Party A

    Fixed Rate Payer
    Currency Amount:            CAD 555,860,000

    Fixed Rate Payer
    Payment Dates:            Each year, beginning on July 10, 2004, and
                            ending on July 10, 2023, subject to adjustment
                           in accordance with following Business Day
                           convention. <u>Business Days</u>: New York,
                           London, Toronto

    Fixed Rate:            9.85%

| | |
|---|---|
| Fixed Rate Day Count Fraction: | Actual/365 |

Initial Exchange:

| | |
|---|---|
| Party A Initial Exchange Amount: | GBP 248,230,000 |
| Party B Initial Exchange Amount: | CAD 551,924,511 |

Final Exchange:

| | |
|---|---|
| Party A Final Exchange Amount: | CAD 555,860,000. |
| Party B Final Exchange Amount: | GBP 250,000,000 |

| | |
|---|---|
| Business Days: | New York, London, Toronto |
| Default Rate: | The rate determined under the option entitled "USD Federal Funds - H.15" plus 1% using daily Reset Dates. The Default Rate will be applied on the basis of Compounding as if the overdue amount were a Notional Amount and using daily Compounding Dates, and interest will accrue and be payable before as well as after judgment. |

Account Details:

Payments to Party A:

Account for GBP payments:

| | |
|---|---|
| Bank: | Deutsche Bank Frankfurt |
| Swift Code: | DEUTDEFF |
| Account No: | 961577400 |
| Corresponding Bank: | Deutsche Bank London DEUTGB2L |
| Beneficiary: | General Motors Coordination Center |
| For Further Credit: | General Motors Nova Scotia Finance Company |

Account for CAD payments:

|  |  |
|---|---|
| Beneficiary: | General Motors Nova Scotia Finance Company<br>Oshawa, Ontario, Canada |
| For Credit: | Toronto-Dominion Bank<br>King Street at Simcoe Street – Transit 31842<br>Oshawa, Ontario, Canada<br>CDN Account No. 0395-5200772 |
| Bank ID: | SWIFT Code TDOMCATTTOR |

Payments to Party B:

|  |  |
|---|---|
| Account for GBP payments: | Midland Bank PLC<br>London, England<br>Sort Code No. 40-50-20<br>Seift MIDLGB21 |
| Account of: | Bank One, London<br>Acct. # 00494580<br>Favor of General Motors Corporation |

Account for CAD payments:

|  |  |
|---|---|
| Beneficiary: | General Motors Corporation |
| For Credit: | Bank of Nova Scotia<br>Toronto, Canada |
| Account Of: | Bank One N.A., London |
| Account No.: | 3174-11 |
| Bank ID: | SWIFT Code NOSCCATT |

5. Calculation Agent:          Party B

Please confirm that the foregoing correctly sets forth the terms of our agreement by executing one enclosed copy of this Confirmation and returning it to us.

GENERAL MOTORS CORPORATION

By: _____

Sanjiv Khattri
Assistant Treasurer

Accepted and confirmed as of the date first written:

General Motors Nova Scotia Finance Company

By: _____

Arthur Lim
Assistant Secretary

<u>Currency
Swaps Confirmation</u>

July 10, 2003

General Motors Nova Scotia Finance Company
1908 Colonel Sam Dr.
Oshawa, Ontario, L1H 8P7

SUBJECT: GBP 350,000,000/CAD $778,204,000 Currency Swaps

Ladies and Gentlemen:

The purpose of this letter agreement is to confirm the terms and conditions of the
Transaction entered into between General Motors Nova Scotia Finance Company
("Party A") and General Motors Corporation ("Party B") on the Trade Date listed below
(the "Swap Transaction"). This letter constitutes a "Confirmation" as referred to in the
ISDA Agreement specified below.

1.    The definitions and provisions contained in the 1991 Definitions (the
       "Definitions"), as published by the International Swap Dealers Association, Inc.
       ("ISDA"), are incorporated into this Confirmation. In the event of any
       inconsistency between those definitions and provisions and this Confirmation,
       this Confirmation will govern. The parties agree that this transaction is a
       Transaction under the Master Agreement of the parties dated October 15, 2001.
       The master agreement is comprised of the printed form of such agreement as
       published by ISDA, as supplemented and modified by a Schedule (the "ISDA
       Agreement").

       With regards to clause (f) on <u>Payments on Early Termination</u> of the Schedule to
       the Master Agreement, section (i) the Market Quotation Method will not hold, but
       instead the parties will pay each other the amounts of the Final Exchange plus
       any accrued and unpaid amounts.

       This Confirmation constitutes a binding agreement between you and us and will
       supplement, form part of, and be subject to the ISDA Agreement described
       above.

2.    The particular terms of the Underlying Transaction are as follows:

       Transaction Type:          Currency Swap

Notional Amount:          GBP 350,000,000

Trade Date:               July 10, 2003

Effective Date:           July 10, 2003

Termination Date:         December 7, 2015

Fixed Amounts:

    Fixed Rate Payer:        Party B

    Fixed Rate Payer
    Currency Amount:         GBP 350,000,000.

    Fixed Rate Payer
    Payment Dates:           Each year, beginning on December 7, 2003 and
                             ending on December 7, 2015 subject to
                             adjustment in accordance with following
                             Business Day convention. <u>Business Days</u>: New
                             York, London, Toronto

    Fixed Rate:              8.375%

    Fixed Rate Day
    Count Fraction:          Actual/365

Fixed Amounts:

    Fixed Rate Payer:        Party A

    Fixed Rate Payer
    Currency Amount:         CAD 778,204,000

    Fixed Rate Payer
    Payment Dates:           Each year, beginning on December 7, 2003,
                             and ending on December 7, 2015, subject to
                             adjustment in accordance with following
                             Business Day convention. <u>Business Days</u>:
                             New York, London, Toronto

    Fixed Rate:              9.07%

| | |
|---|---|
| Fixed Rate Day Count Fraction: | Actual/365 |

Initial Exchange:

| | |
|---|---|
| Party A Initial Exchange Amount: | GBP 346,871,000 |
| Party B Initial Exchange Amount: | CAD 771,246,856 |

Final Exchange:

| | |
|---|---|
| Party A Final Exchange Amount: | CAD 778,204,000. |
| Party B Final Exchange Amount: | GBP 350,000,000 |

| | |
|---|---|
| Business Days: | New York, London, Toronto |
| Default Rate: | The rate determined under the option entitled "USD Federal Funds - H.15" plus 1% using daily Reset Dates.  The Default Rate will be applied on the basis of Compounding as if the overdue amount were a Notional Amount and using daily Compounding Dates, and interest will accrue and be payable before as well as after judgment. |

Account Details:

Payments to Party A:

Account for GBP payments:

| | |
|---|---|
| Bank: | Deutsche Bank Frankfurt |
| Swift Code: | DEUTDEFF |
| Account No: | 961577400 |
| Corresponding Bank: | Deutsche Bank London DEUTGB2L |
| Beneficiary: | General Motors Coordination Center |
| For Further Credit: | General Motors Nova Scotia Finance Company |

Account for CAD payments:

|  |  |
|---|---|
| Beneficiary: | General Motors Nova Scotia Finance Company<br>Oshawa, Ontario, Canada |
| For Credit: | Toronto-Dominion Bank<br>King Street at Simcoe Street – Transit 31842<br>Oshawa, Ontario, Canada<br>CDN Account No. 0395-5200772 |
| Bank ID: | SWIFT Code TDOMCATTTOR |

Payments to Party B:

| Account for GBP payments: | Midland Bank PLC<br>London, England<br>Sort Code No. 40-50-20<br>Seift MIDLGB21 |
|---|---|
| Account of: | Bank One, London<br>Acct. # 00494580<br>Favor of General Motors Corporation |

Account for CAD payments:

| Beneficiary: | General Motors Corporation |
|---|---|
| For Credit: | Bank of Nova Scotia<br>Toronto, Canada |
| Account Of: | Bank One N.A., London |
| Account No.: | 3174-11 |
| Bank ID: | SWIFT Code NOSCCATT |

5. Calculation Agent:          Party B

Please confirm that the foregoing correctly sets forth the terms of our agreement by executing one enclosed copy of this Confirmation and returning it to us.

GENERAL MOTORS CORPORATION

By: _____

Sanjiv Khattri
Assistant Treasurer

Accepted and confirmed as of the date first written:

General Motors Nova Scotia Finance Company

By: _____

Arthur Lim
Assistant Secretary

# <u>EXHIBIT D</u>

# An Act Respecting Joint Stock Companies

## LIABILITY OF MEMBERS

**Limits of liability**

**135 In the event of a company being wound up, every present and past member shall, subject to this Section, be liable to contribute to the assets of the company to an amount sufficient for payment of its debts and liabilities and the costs, charges, and expenses of the winding up and for the adjustments of the rights of the contributories among themselves, with the qualifications following:**

**(a) a past member shall not be liable to contribute if he has ceased to be a member for one year or upwards before the commencement of the winding up;**

**(b) a past member shall not be liable to contribute in respect of any debt or liability of the company contracted after he ceased to be a member;**

**(c) a past member shall not be liable to contribute unless it appears to the court that the existing members are unable to satisfy the contributions required to be made by them in pursuance of this Act;**

**(d) in the case of a company limited by shares, no contribution shall be required from any member exceeding the amount, if any, unpaid on the shares in respect of which he is liable as a present or past member;**

**(e) in the case of a company limited by guarantee, no contribution shall be required from any member exceeding the amount undertaken to be contributed by him to the assets of the company in the event of its being wound up;**

**(ea) in the case of an unlimited company, no contribution exceeding the amount, if any, unpaid on the shares in respect of which the member is liable as a past member, shall be required from a past member who was not a member of the company at any time on or after the time the company became unlimited;**

**(f) nothing in this Act shall invalidate any provision contained in any contract whereby the liability of the individual members of the**

contract is restricted, or whereby the funds of the company are alone made liable in respect of the policy or contract;

**(g)** a sum due to any member of a company, in his character of a member, by way of dividends, profits or otherwise, shall not be deemed to be a debt of the company, payable to that member in a case of competition between himself and any other creditor not a member of the company, but any such sum may be taken into account for the purpose of the final adjustment of the rights of the contributories among themselves. *R.S., c. 81, s. 135; 2007, c. 34, s. 40.*

# **<u>EXHIBIT E</u>**

Hfx No. *308066*

Supreme Court of Nova Scotia

Court Administration

MAR 0 2 2009

Halifax, N.S.

Between:

Aurelius Capital Partners, LP, Aurelius Capital Master, Ltd., Drawbridge DSO Securities LLC,
Drawbridge OSO Securities LLC, FCOF UB Securities LLC, Appaloosa Investment Limited
Partnership I, Palomino Fund Ltd., Thoroughbred Master Ltd. and Thoroughbred Fund L.P.

Plaintiffs

- and -

General Motors Corporation, General Motors Nova Scotia Finance Company, General Motors
Nova Scotia Investments Ltd., General Motors of Canada Limited, Neil J. Macdonald,
Mercedes Michel and John P. Stapleton

Defendants

### Notice of Action

**To:**    General Motors Corporation
General Motors Nova Scotia Finance Company
General Motors Nova Scotia Investments Ltd.
General Motors of Canada Limited
Neil J. Macdonald
Mercedes Michel
John P. Stapleton

## Action has been started against you

The plaintiffs take action against you.

The plaintiffs started the action by filing this notice with the court on the date certified by the
prothonotary.

The plaintiffs claim the relief described in the attached statement of claim. The claim is based on
the grounds stated in the statement of claim.

## Deadline for defending the action

To defend the action, you or your counsel must file a notice of defence with the court no more
than the following number of days after the day this notice of action is delivered to you:

- 15 days if delivery is made in Nova Scotia

- 30 days if delivery is made elsewhere in Canada

- 45 days if delivery is made anywhere else

- 2 -

## Judgment against you if you do not defend

The court may grant an order for the relief claimed without further notice, unless you file the notice of defence before the deadline.

## You may demand notice of steps in the action

If you do not have a defence to the claim or you do not choose to defend it you may, if you wish to have further notice, file a demand for notice.

If you file a demand for notice, the plaintiffs must notify you before obtaining an order for the relief claimed and, unless the court orders otherwise, you will be entitled to notice of each other step in the action.

## Rule 57 – Action for Damages Under $100,000

Civil Procedure Rule 57 limits pretrial and trial procedures in a defended action so it will be more economical. The Rule applies if the plaintiffs state the action is within the Rule. Otherwise, the Rule does not apply, except as a possible basis for costs against the plaintiffs.

This action is not within Rule 57.

## Filing and delivering documents

Any documents you file with the court must be filed at the office of the prothonotary: 1815 Upper Water Street, Halifax, Nova Scotia (telephone # 902-424-4900)

When you file a document you must immediately deliver a copy of it to each other party entitled to notice, unless the document is part of an *ex parte* motion, the parties agree delivery is not required, or a judge orders it is not required.

## Contact information

The plaintiffs designate the following address:

Cox, Palmer
Purdy's Wharf
1100-1959 Upper Water Street
Halifax, Nova Scotia  B3J 3N2

Attention: John A. Keith

Documents delivered to this address are considered received by the plaintiffs on delivery.

Further contact information is available from the prothonotary.

- 3 -

## Proposed place of trial

The plaintiffs propose that, if you defend this action, the trial will be held in Halifax, Nova Scotia.

## Signature

Signed March 2, 2009

Jeff Galway
Blake, Cassels & Graydon LLP
199 Bay Street, Suite 2800
Commerce Court West
Toronto, ON  M5L 1A9

Tel: 416-863-3859
Fax: 416-863-2653
E-mail: jeff.galway@blakes.com

John A. Keith
Cox & Palmer
Purdy's Wharf, Tower 1
1100-1959 Upper Water Street
Halifax, NS  B3J 3E5

Tel: 902-491-4217
Fax: 902-421-3130
E-mail: JKeith@coxandpalmer.com

Counsel for the Plaintiffs

## Prothonotary's certificate

I certify that this notice of action, including the attached statement of claim, was filed with the court on March 2, 2009.

Prothonotary
Deputy

# STATEMENT OF CLAIM

## The Plaintiffs

1.          Aurelius Capital Partners, LP is a limited partnership organized under the laws of the State of Delaware.

2.          Aurelius Capital Master, Ltd. is an exempted company organized under the laws of the Cayman Islands.

3.          Drawbridge DSO Securities LLC is a limited liability company organized under the laws of the State of Delaware.

4.          Drawbridge OSO Securities LLC is a limited liability company organized under the laws of the State of Delaware.

5.          FCOF UB Securities LLC, is a limited liability company organized under the laws of the State of Delaware.

6.          Appaloosa Investment Limited Partnership I is a limited partnership organized under the laws of the State of Delaware.

7.          Palomino Fund Ltd. is a corporation organized under the laws of the British Virgin Islands.

8.          Thoroughbred Master Ltd. is a corporation organized under the laws of the British Virgin Islands.

9.          Thoroughbred Fund LP is a limited partnership organized under the laws of the State of Delaware.

## The Defendants

10.          General Motors Corporation ("GM US") is a publicly traded corporation incorporated under the laws of Delaware that manufactures and sells automobiles and trucks. GM US's head office is in Detroit, Michigan. GM US is insolvent absent a government bailout and debt restructuring, and thus on the brink of bankruptcy.

- 2 -

11.     General Motors Nova Scotia Finance Company ("Finance") is an unlimited company incorporated under the Nova Scotia *Companies Act*. The sole shareholder of Finance is GM US.

12.     General Motors Nova Scotia Investments Ltd. ("Investments") is a limited company incorporated under the Nova Scotia *Companies Act*. The sole shareholder of Investments is GM US.

13.     Finance and Investments were incorporated by GM US for the purpose of making loans to related parties and issuing debt instruments.

14.     General Motors of Canada Limited ("GM Canada") is a corporation incorporated under the *Canada Business Corporations Act* ("CBCA") that manufactures and sells automobiles and trucks. GM Canada's head office is Oshawa, Ontario. The sole shareholder of GM Canada is GM US. GM Canada is approaching the minimum cash reserve levels required to meet its obligations.

15.     GM US, Investments and GM Canada are all affiliates of Finance for the purposes of the *Companies Act* and the CBCA.

16.     Neil J. Macdonald ("Macdonald") resides in Oshawa, Ontario and is the Vice President, General Counsel and Secretary of GM Canada. At all material times Macdonald was an officer and director of Finance, Investments and GM Canada.

17.     Mercedes Michel ("Michel") resides in New York New York, and is a Director of the Treasurer's Office of GM US. At all material times Michel was an officer and director of Finance and Investments and an executive of GM US.

18.     John P. Stapleton ("Stapleton") resides in Oshawa, Ontario and is Vice President Finance, Treasurer and Chief Financial Officer of GM Canada. At all material times, Stapleton was an officer and director of Finance, Investments and GM Canada.

- 3 -

Finance's Indebtedness to the Plaintiffs

19.        In 2003, Finance issued two series of notes (the "Notes") as follows:

   (a)        notes in the aggregate amount of £350,000,000 with an interest rate of 8.375% which are repayable in 2015 (the "2015 Notes"); and

   (b)        notes in the aggregate amount of £250,000,000 with an interest rate of 8.875% which are repayable in 2023 (the "2023 Notes").

20.        GM US guaranteed Finance's obligations under both the 2015 Notes and the 2023 Notes.

21.        The Plaintiffs are the holders of £216,248,000 (approximately 62%) of the outstanding principal amount of the 2015 Notes and £160,450,000 (approximately 64%) of the outstanding principal amount of the 2023 Notes.

22.        As a result of their status as holders of Notes issued by Finance, the Plaintiffs are "complainants" within the meaning of section 7 of the Third Schedule of the *Companies Act* in respect of oppression claims concerning Finance or its affiliates commenced under section 5 of the said Schedule and are "complainants" within the meaning of section 238 of the CBCA in respect of oppression claims concerning GM Canada and its affiliates commenced under section 241 of the CBCA.

The Inter-Corporate Obligations

23.        At all material times Finance was a major creditor of both Investments and (directly or indirectly) GM Canada.

24.        The ability of Finance to satisfy its obligations under the Notes has been and remains dependent upon the receipt by Finance of amounts owing to it by Investments and GM Canada.

Finance Reduces Paid Up Capital - May 2008

- 4 -

25.        In or about May 2008 Macdonald, Michel and Stapleton, as directors of Finance, purported to determine that a portion of the paid up capital of the issued and outstanding common shares of Finance in the amount of $16 million Canadian and $500,000 U.S. was "in excess of the wants" of Finance and that it would be desirable to reduce the paid up capital on the issued and outstanding common shares of Finance by the aggregate amount of $16 million Canadian and $500,000 U.S. and to pay such amounts to GM US in cash as a repayment of capital.

26.        In reliance on this purported determination by Macdonald, Michel and Stapleton, GM US as the sole shareholder of Finance resolved on May 22, 2008 that the paid up capital of Finance be reduced by $16 million Canadian and by $500,000 U.S. and that such amounts be paid to GM US. The paid up capital of Finance was subsequently so reduced and Finance paid GM US $16 million Canadian and $500,000 U.S. At this time GM US was to the knowledge of Macdonald, Michel and Stapleton either insolvent or on the brink of insolvency.

27.        At the time that Macdonald, Michel and Stapleton purported to determine that it would be desirable for Finance to reduce its paid up capital as referred to in paragraph 25 above, and at the time the payments referred to in paragraph 26 were in fact made, Macdonald, Michel, Stapleton, Finance and GM US knew that Finance was indebted to the holders of the Notes, that GM US would not be able to honour its guarantee obligations to the holders of the Notes in full and that any return of capital to GM US would prejudice Finance's ability to repay its obligations under the Notes and thus be prejudicial to the interests of Finance's creditors including the Plaintiffs.

28.        By recommending and supporting a repayment of capital by Finance to GM US, Macdonald, Michel and Stapleton breached the fiduciary duties and duties of care they, as directors, owed to Finance.

29.        By recommending and supporting a repayment of capital by Finance to GM US, Michel had an irreconcilable conflict of interest between her role as director of Finance and her role as an executive in GM US's Treasury since GM US controls Finance and was the beneficiary of the repayment of capital.

- 5 -

30.     The acts of Macdonald, Michel and Stapleton in recommending and supporting a payment by Finance to GM US of $16 million Canadian and $500,000 U.S. as a purported return of capital, the payment of such amounts by Finance, and the receipt of such amounts by GM US has prejudiced the ability of Finance to repay its obligations under the Notes.  Such acts by Macdonald, Michel, Stapleton, Finance and GM US were oppressive, unfairly prejudicial to and unfairly disregarded the interests of Finance and its creditors including the Plaintiffs.

31.     As a result of the facts set out in paragraphs 25-30 above, GM US has been or will be unjustly enriched at the expense of Finance and its creditors, there having been an enrichment, a corresponding deprivation and the absence of any juristic reason for the enrichment.

Investments Reduces Paid Up Capital - May 2008

32.     In or about May 2008 Macdonald, Michel and Stapleton also purported to determine that a portion of the paid up capital of the issued and outstanding common shares of Investments in the amount of $576,672,670 Canadian was "in excess of the wants" of Investments and that it would be desirable to reduce the paid up capital on the issued and outstanding common shares of Investments by the $576,672,670 Canadian and to pay such amount to GM US in cash as a repayment of capital.

33.     In reliance on this purported determination by Macdonald, Michel and Stapleton, GM US as the sole shareholder of Investments resolved on May 22, 2008 that the paid up capital of Investments be reduced by $576,672,670 Canadian and that such amounts be paid to GM US. The paid up capital of Investments was subsequently so reduced and Investments paid GM US $576,672,670 Canadian.  At this time GM US was to the knowledge of Macdonald, Michel and Stapleton either insolvent or on the brink of insolvency.

34.     Following the above payment by Investments to GM US, the paid up capital of Investments was reduced from $576,672,770 Canadian to $100 Canadian.

35.     At the time that Macdonald, Michel and Stapleton purported to determine that it would be desirable for Investments to reduce its paid up capital as referred to in paragraph 32 above, and at the time the payment referred to in paragraph 33 was in fact made, Macdonald, Michel, Stapleton, Finance, Investments and GM US knew that (i) Investments was indebted to

- 6 -

Finance, (ii) Finance was indebted to the holders of the Notes (iii) GM US would not be able to honour its guarantee obligations to the holders of the Notes in full and (iv) any return of capital by Investments to GM US would prejudice Investments' ability to repay Finance and in turn prejudice Finance's ability to repay its obligations under the Notes and thus be prejudicial to the interests of Finance's creditors including the Plaintiffs.

36.        By recommending and supporting a repayment of capital by Investments to GM US, Macdonald, Michel and Stapleton had an irreconcilable conflict of interest between the duties they owed as officers and directors to Finance and the duties they owed to Investments. Michel's role as an executive in GM US's Treasury posed an additional conflict of interest since GM US controls Finance and was the beneficiary of the repayment of capital.

37.        As directors of Finance, a creditor of Investments, Macdonald's, Michel's and Stapleton's duty was to protect the interests of Finance. Instead of causing Finance, as a creditor of Investments, to object to the proposed reduction by Investments of its paid up capital, Macdonald, Michel and Stapleton not only recommended such course of action but caused Investments to implement it. Macdonald, in fact, swore an affidavit in support of a court order pursuant to sections 59 and 60 of the *Companies Act* in which he failed to disclose the extent of Investments' obligations to Finance, failed to disclose Finance's obligation to the holders of the Notes, and swore that no creditor would be adversely affected or prejudiced by the proposed reduction in the paid up capital of Investments. The plaintiffs plead that Macdonald, Michel and Stapleton breached the fiduciary duty and duty of care they, as directors, owed to Finance.

38.        The acts of Macdonald, Michel and Stapleton in recommending, supporting and implementing a payment by Investments to GM US of $576,672,670 Canadian as a purported return of capital, the failure of Finance to object to the proposed reduction in Investments' paid up capital, the payment of such amount by Investments, and the receipt of such amount by GM US has prejudiced the ability of Investments to repay its obligations to Finance and in turn prejudiced the ability of Finance to repay its obligations under the Notes. Such acts by Macdonald, Michel, Stapleton, Finance, Investments and GM US were oppressive, unfairly prejudicial to and unfairly disregarded the interests of Finance and its creditors including the Plaintiffs.

- 7 -

39.        As a result of the facts set out in paragraphs 32-38 above, GM US has been or will be unjustly enriched at the expense of Finance and its creditors, there having been an enrichment, a corresponding deprivation and the absence of any juristic reason for the enrichment.

GM Canada Undermines Value of its Obligations to Finance

40.        On February 11, 2009, at a time that GM Canada was indebted (directly or indirectly) to Finance, at a time when GM US was insolvent and at a time when GM Canada was approaching the minimum cash reserve levels required to meet its obligations, GM US and GM Canada amended their July 20, 2006 Credit Agreement with a syndicate of lenders. Among other things, the amended Credit Agreement allows GM Canada to guarantee the indebtedness of other entities and provide its assets as collateral security for indebtedness regardless of whether such indebtedness is that of GM Canada or of other entities and regardless of whether such indebtedness is new or pre-existing. By agreeing to the amendment to the Credit Agreement, GM Canada made possible the impairment of its ability to repay the obligations it owes (directly or indirectly) to Finance.

41.        As officers and directors of GM Canada, Macdonald and Stapleton were instrumental in conceiving, approving and implementing the course of conduct referred to in paragraph 40 above. Macdonald and Stapleton had an irreconcilable conflict of interest between the duties they owed as officers and directors of Finance and the duties they owed to GM Canada. By supporting and failing to object to the above course of action, Macdonald and Stapleton breached the fiduciary duties and duties of care they, as directors, owed to Finance.

42.        The course of conduct undertaken by Macdonald, Stapleton and GM Canada and referred to in paragraphs 40-41 is oppressive, unfairly prejudicial to, and unfairly disregards the interests of Finance and its creditors including the Plaintiffs.

Claim for Relief

43.        These parties claim an order providing the following remedies:

- 8 -

(a)     a declaration that the conduct of Finance, Macdonald, Michel, Stapleton and GM
US as set out in paragraphs 25-30 above was oppressive, unfairly prejudicial to
and unfairly disregarded the interests of the creditors of Finance including the
Plaintiffs;

(b)     a declaration that the conduct of Finance, Investments, Macdonald, Michel,
Stapleton and GM US as set out in paragraphs 32-38 above was oppressive,
unfairly prejudicial to and unfairly disregarded the interests of the creditors of
Finance including the Plaintiffs;

(c)     a declaration that the conduct of GM Canada, Macdonald and Stapleton set out in
paragraphs 40-42 above is oppressive, unfairly prejudicial to and unfairly
disregards the interests of the creditors of Finance including the Plaintiffs;

(d)     an order pursuant to section 5(3)(h) of the Third Schedule to the *Companies Act*
setting aside the transaction referred to in paragraphs 25-26 above wherein
Finance purported to reduce its paid up capital and paid $16 million Canadian and
$500,000 U.S. to GM US;

(e)     an order pursuant to section 5(3)(h) of the Third Schedule to the *Companies Act*
setting aside the transaction referred to in paragraphs 32-33 above wherein
Investments purported to reduce its paid up capital and paid $576,672,670
Canadian to GM US;

(f)     an interlocutory and permanent order pursuant to section 241(a) of the CBCA
restraining GM Canada from guaranteeing the obligations of any other entity or
from pledging its assets or granting security in respect of the indebtedness of any
other entity.

(g)     a declaration that GM US has been unjustly enriched as a result of its receipt of
the $16 million Canadian and $500,000 U.S. referred to in paragraphs 25-30
above and an order requiring GM US to disgorge such amounts to Finance;

- 9 -

(h)     a declaration that GM US has been unjustly enriched as a result of its receipt of the $576,672,670 Canadian referred to in paragraphs 32-38 above and an order requiring GM US to disgorge such amount to Investments;

(i)     judgment jointly and severally against all of the defendants pursuant to section 5(3)(h) and/or (j) of the Third Schedule to the *Companies Act* and /or section 241(j) of the CBCA for damages and compensation in an amount to be determined plus interest at the rates prescribed by the Notes;

(j)     costs of this action; and

(k)     such further and other relief as counsel may advise and the court permit.

**Signature**

Signed March 2, 2009

Jeff Galway
Blake, Cassels & Graydon LLP
199 Bay Street, Suite 2800
Commerce Court West
Toronto, ON  M5L 1A9

Tel: 416-863-3859
Fax: 416-863-2653
E-mail: jeff.galway@blakes.com

John A. Keith
Cox & Palmer
Purdy's Wharf, Tower 1
1100-1959 Upper Water Street
Halifax, NS  B3J 3E5

Tel: 902-491-4217
Fax: 902-421-3130
E-mail: JKeith@coxandpalmer.com

Counsel for the Plaintiffs

# <u>EXHIBIT F</u>

**EXHIBIT A**

2009

Hfx No. 318069
Hfx No. 318077
Hfx No. 318078

## SUPREME COURT OF NOVA SCOTIA

### IN BANKRUPTCY AND INSOLVENCY

### IN THE MATTER OF THE BANKRUPTCY OF
GENERAL MOTORS NOVA SCOTIA FINANCE COMPANY



### BANKRUPTCY ORDER

Sgd.
GRPM, J.BEFORE THE HONOURABLE JUSTICE GERALD R.P. MOIR IN CHAMBERS:

ON THE APPLICATIONS of Aurelius Investment, LLC, Drawbridge DSO Securities LLC, Drawbridge OSO Securities LLC, FCOF UB Securities LLC, Appaloosa Investment Limited Partnership I, Palomino Fund Ltd., Thoroughbred Master Ltd., and Thoroughbred Fund LP (collectively the "Applicants"), each a creditor of General Motors Nova Scotia Finance Company, of the City of Halifax, in the Province of Nova Scotia, filed on October 8, 2009,

UPON READING the Applications for Bankruptcy Order of the Applicants, the Affidavits of Truth of Statements in Application sworn by Dan Gropper, Constantine M. Dakolias, and James E. Bolin, the Affidavit of Nathan Cheifetz, the Consent of Green Hunt Wedlake Inc., and the Consent of General Motors Nova Scotia Finance Company, and upon hearing counsel for the Applicants, and it appearing to the Court that the following acts of bankruptcy have been committed within the six months next preceding the filing of this Application:

(a)     General Motors Nova Scotia Finance Company has ceased to meet its liabilities generally as they become due.

1.      THE COURT ORDERS that the time for giving notice of the applications brought by the Applicants be and is hereby abridged so that each such application is properly returnable today.

*00396/0196/1072344v5

2.        **THIS COURT FURTHER ORDERS** that each of the applications brought by the Applicants be and is hereby consolidated into one application pursuant to Section 43(4) of the *Bankruptcy and Insolvency Act.*

3.        **THIS COURT FURTHER ORDERS** that General Motors Nova Scotia Finance Company, carrying on business at Purdy's Wharf Tower II, 1300-1969 Upper Water Street, in the City of Halifax, in the Province of Nova Scotia, be adjudged bankrupt by virtue of a Bankruptcy Order hereby made on this date.

4.        **THIS COURT FURTHER ORDERS** that Green Hunt Wedlake Inc. of 7001 Mumford Road, Suite 315, Tower 1, Halifax, Nova Scotia, B3L 4N9, be appointed as Trustee of the estate of the bankrupt.

5.        **THIS COURT FURTHER ORDERS** that the costs of the Applicant be paid out of the estate of the bankrupt on taxation of the estate.

6.        **THIS COURT FURTHER ORDERS** that the Trustee give security in cash or by bond without delay in accordance with Section 16(1) of the *Bankruptcy and Insolvency Act.*

**DATED** at Halifax, this 9th day of October, 2009.

_____

Sally LeRue
Deputy Registrar

IN THE SUPREME COURT
COUNTY OF HALIFAX, N.S.

I hereby certify that the foregoing is a
true copy of the original order on file
herein.

Dated the 9th day of October
A.D., 20 09

DEPUTY REGISTRAR

# <u>EXHIBIT G</u>

| UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK | | PROOF OF CLAIM |
|---|---|---|

**Name of Debtor (Check Only One):**                                    **Case No.**

☒ Motors Liquidation Company (f/k/a General Motors Corporation)      09-50026 (REG)
☐ MLCS, LLC (f/k/a Saturn, LLC)                                      09-50027 (REG)
☐ MLCS Distribution Corporation (f/k/a Saturn Distribution Corporation)  09-50028 (REG)
☐ MLC of Harlem, Inc. (f/k/a Chevrolet Saturn of Harlem, Inc.)       09-13558 (REG)

**Your Claim is Scheduled As Follows:**

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case, but may be used for purposes of asserting a claim under 11 U.S.C. § 503 (b) (9) (see Item #5). All other requests for payment of an administrative expense should be filed pursuant to 11 U.S.C. § 503.

**Name of Creditor (the person or other entity to whom the debtor owes money or property: Green Hunt Wedlake, Trustee**

**Name and address where notices should be sent:**

Green Hunt Wedlake Inc., Trustee          Cox & Palmer
Suite 315, Tower 1                        Purdy's Warf Tower I
7001 Mumford Road                         1100-1959 Upper Water Street
Halifax, Nova Scotia B3L 4N9              Halifax, Nova Scotia B3J 3N2
Attn: Peter Wedlake, FCIRP               Attn: Robert G. MacKeigan, Q.C.
Tel: (902) 453-6600                       Tel: (902) 491-4121

☒ Check this box to indicate that this claim amends a previously filed claim.

**Court Claim Number:**
_(If known)_

**Filed on:** ___/25/09

**Name and address where payment should be sent (if different from above):**

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check this box if you are the debtor or trustee in this case.

**Telephone number:**

If an amount is identified above, you have a claim scheduled by one of the Debtors as shown. (This scheduled amount of your claim may be an amendment to a previously scheduled amount.) If you agree with the amount and priority of your claim as scheduled by the Debtor and you have no other claim against the Debtor, you do not need to file this proof of claim form, EXCEPT AS FOLLOWS: If the amount shown is listed as DISPUTED, UNLIQUIDATED, or CONTINGENT, a proof of claim MUST be filed. In order to receive any distribution in respect of your claim. If you have already filed a proof of claim in accordance with the attached instructions, you need not file again.

**1. Amount of Claim as of Date Case Filed, June 1, 2009:** US $ 1,607,647,592.49  Subject to the attachment

If all or part of your claim is secured, complete item 4 below; however if all of your claim is unsecured, do not complete item 4. If all or part of your claim is entitled to priority, complete item 5. If all or part of your claim is asserted pursuant to 11 U.S.C. § 503(b)(9), complete item 5.

☒ Check this box if claim includes interest or other charges in addition to the principal amount of claim. Attach itemized statement of interest or charges.

**2. Basis for Claim:** ___See Attachment___
(See instruction #2 on reverse side.)

**3. Last four digits of any number by which creditor identifies debtor:** _____
    **3a. Debtor may have scheduled account as:** _____
    (See instruction #3a on reverse side.)

**4. Secured Claim (See instruction #4 on reverse side.)**
Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.

Nature of property or right of setoff:  ☐ Real Estate   ☐ Motor Vehicle   ☐ Equipment   ☐ Other
Describe:

Value of Property: $ _____   Annual Interest Rate _____ %

Amount of arrearage and other charges as of time case filed included in secured claim, if any: $ _____

Basis for perfection:

Amount of Secured Claim: $ _____   Amount Unsecured: $ _____

**5. Amount of Claim Entitled to Priority under 11 U.S.C. § 507(a).** If any portion of your claim falls in one of the following categories, check the box and state the amount.

Specify the priority of the claim.

☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries, or commissions (up to $10,950*) earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier – 11 U.S.C. § 507(a)(4).

☐ Contributions to an employee benefit plan – 11 U.S.C. § 507(a)(5).

☐ Up to $2,425* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. § 507(a)(7).

☐ Taxes or penalties owed to governmental units – 11 U.S.C. § 507(a)(8).

☐ Value of goods received by the Debtor within 20 days before the date of commencement of the case – 11 U.S.C. § 503(b)(9) (§ 507(a)(2))

☐ Other – Specify applicable paragraph of 11 U.S.C. § 507(a)(_).

Amount entitled to priority:
$ _____

*Amounts are subject to adjustment on 4/1/10 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.

**6. Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim.

**7. Documents:** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. You may also attach a summary. Attach redacted copies of documents providing evidence of perfection of a security interest. You may also attach a summary. (See instruction 7 and definition of "redacted" on reverse side.)

DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

If the documents are not available, please explain in an attachment.

| Date: 11/30/09 | Signature: The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any.

_Peter Wedlake, President_ | FOR COURT USE ONLY |

Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.
Modified B10 (GCG) (12/08)

*28913/0001/1109073v6

**Attachment to Amended Proof of Claim of Green Hunt Wedlake Inc., Trustee of
General Motors Nova Scotia Finance Company, in bankruptcy
Against Motors Liquidation Company f/k/a General Motors Corp., Debtor,
Chapter 11 Case No. 09-50026 (REG)**

1.      Green Hunt Wedlake Inc. ("Claimant") holds a trustee's license under the *Bankruptcy and Insolvency Act* (Canada) ("BIA").  On October 9, 2009 the Supreme Court of Nova Scotia adjudged General Motors Nova Scotia Finance Company ("Finance") bankrupt and issued a Bankruptcy Order on that date pursuant to the BIA appointing the Claimant as trustee of the estate of Finance.  A copy of the order issued by the Supreme Court of Nova Scotia on October 9, 2009 is annexed hereto as Exhibit A.

2.      As trustee of Finance, the Claimant is an officer of the Supreme Court of Nova Scotia and the legal representative of Finance.  It has certain duties pursuant to the BIA including the duty to realize on the assets of Finance as much as possible for the benefit of its creditors.  Prior to any distribution, a trustee under the BIA reviews proofs of claim filed in the bankruptcy, obtains further information and evidence where required with a view to allowing or disallowing such claims.

3.      Finance, incorporated on September 28, 2001 under the *Companies Act* of Nova Scotia, Canada as an unlimited company, is a direct, wholly-owned subsidiary of Motors Liquidation Company f/k/a General Motors Corporation (the "Debtor").  As an "unlimited company" under Nova Scotia corporate law the Debtor, as the sole member of Finance, is liable to contribute to the assets of Finance an amount sufficient for the payment of Finance's debts and liabilities and the costs, charges and expenses of the bankruptcy.  *See* s. 135 of the *Companies Act* (Nova

Scotia), being Chapter 81 of the Revised Statutes of Nova Scotia, 1989, as amended

(the "Nova Scotia Companies Act"). Pursuant to the provisions of section 77 of the

BIA, the amount which the Debtor is liable to contribute is deemed to be an asset of

Finance and a debt payable to the Claimant as Trustee forthwith on the bankruptcy of

Finance.

4.       As required by the BIA, a representative of Finance has filed with the

Claimant a sworn Statement of Affairs showing the particulars of the assets and

liabilities of Finance and certain other information required.   A copy of the said

Statement of Affairs is attached as Exhibit B.    Exhibit B shows the total liabilities of

Finance as at October 9, 2009 as CDN $1,678,270,910.68.   Exhibit B also shows

the total assets estimated by Finance to produce CDN $175,887.35 but the Claimant

has not as yet determined what amount, if any, net of costs will be realized from

these assets.

5.       Exhibit B refers to Noteholders having an unsecured claim of CDN

$1,088,542,512.01 as at October 9, 2009.   These constitute holders of Series

8.375% and 8.875% Notes due 2015 and 2023.   According to the records of

Finance, these notes were issued pursuant to the terms and conditions of that

certain Fiscal and Paying Agency Agreement, dated as of July 10, 2003, among

Finance, the Debtor, Deutsche Bank Luxembourg S.A., as fiscal agent, and Banque

Général du Luxembourg S.A., as paying agent, (the "Fiscal and Paying Agency

Agreement"), pursuant to which Finance issued £350,000,000 in principal amount

of 8.375% Guaranteed Notes due December 7, 2015 (the "2015 Notes"), and

£250,000,000 in principal amount of 8.875% Guaranteed Notes due July 10, 2023

(the "2023 Notes" and together with the 2015 Notes, the "Notes").   As at October 9,

2

2009, there is outstanding a total of £374,649,137.75 on the 2015 Notes and £277,750,900.61 on the 2023 Notes. The total outstanding on these notes, when converted at the exchange rate on October 9, 2009 of 1.66852 results in there being outstanding CDN $1,088,542,512.01 as shown on Exhibit B. A copy of the Fiscal and Paying Agency Agreement is annexed hereto as Exhibit C. Certain provisions of the Fiscal and Paying Agency Agreement were amended at a meeting of the holders of each series of the Notes held on June 25, 2009. Annexed as Exhibit D are: the Notice of Meetings of the holders of each series of the Notes; the Extraordinary Resolution containing certain amendments to the Fiscal and Paying Agency Agreement; the Voting Record of the June 25, 2009 meeting of the holders of the 2015 Notes; the Voting Record of the June 25, 2009 meeting of the holders of the 2023 Notes; copies of the voting cards (Voting Card 1 for the holders of the 2015 Notes, Voting Card 2 for the holders of the 2015 Notes, Voting Card 1 for the holders of the 2023 Notes and Voting Card 2 for the holders of the 2023 Notes) evidencing the votes taken at the June 25, 2009 meeting; and the Scrutineer's Report of Passing of Extraordinary Resolution.

6.    Finance and the Debtor entered into certain currency swap arrangements which give rise to certain liabilities of Finance (the "Swap Liability"). General Motors LLC, as successor to the Debtor, has filed a claim in the bankruptcy of Finance claiming a Swap Liability of US $564,493,957.00 or CDN $589,292,176.53, which is the amount shown in Exhibit B, converted at the exchange rate of 1.04393. Copies of the swap agreements received by the Claimant from General Motors LLC are attached as Exhibit E.

3

7.      As a result of the foregoing, the Claimant claims payment from the Debtor the full amount of the liabilities of Finance disclosed in Exhibit B, namely CDN $1,678,270,910.68 which, when converted to US Dollars at the date of the bankruptcy of Finance at the exchange rate of 0.957919, amounts to US $1,607,647,592.49.

8.      This Proof of Claim also makes claim to all other amounts due under or relating to any other liabilities of Finance for which the Debtor is liable under the Nova Scotia Companies Act and BIA including, without limitation, any additional or increased amounts under or in connection with the 2015 Notes and the 2023 Notes and/or the Swap Liability (such other amounts together with the claims related to the 2015 Notes and the 2023 Notes and the Swap Liability are collectively referred to as the "Claims").

9.      In addition to the foregoing, the Debtor was and is now indebted and liable to the Claimant for the following unliquidated amounts:

a.  All other amounts due or relating to the Claims, including, but not limited to principal, premiums, interest, and interest accruing after June 1, 2009 (the "Petition Date");

b.  Claimant's fees, costs, expenses, disbursements, and advances (including without limitation, compensation, fees, expenses and disbursements of Claimant's agents and counsel);

c.  the amount of interest, default interest or defaulted interest, and interest payable on overdue installments of interest at the rates provided in the governing documents; and

4

    d.   damages for breach of any covenant representation, warranty or other

        provision of the Fiscal and Paying Agent Agreement or other contract

        evidencing the applicable liability of Finance.

10.    Notices regarding this Proof of Claim should be sent to:

        Green Hunt Wedlake Inc., Trustee
        Suite 315, Tower 1
        7001 Mumford Road
        Halifax, Nova Scotia B3L 4N9
        Attn: Peter Wedlake

        Cox & Palmer
        Purdy's Warf Tower I
        1100-1959 Upper Water Street
        Halifax, Nova Scotia B3J 3N2
        Attn: Robert G. MacKeigan, Q.C.

        Greenberg Traurig, LLP
        200 Park Avenue
        New York, NY 10166 USA
        Attn:    Bruce Zirinsky, Esq.
                Nancy A. Mitchell, Esq.

11.    Claimant reserves the right to attach or bring forth additional documents supporting this Proof of Claim and additional documents that may become available after further investigation and discovery.

12.    To the extent that Claimant has or may have a right to subrogation under 11 U.S.C. § 509 or any other equitable claim under common law against the Debtor, Claimant expressly preserves such right.

13.    This Proof of Claim is secured to the extent of any right of setoff, recoupment or other entitlement to security, and except to the extent entitled to administrative priority, this Proof of Claim is a general unsecured claim.

14.    Claimant expressly reserves its right to (a) amend, clarify, modify, update and/or supplement this Proof of Claim at any time and in any respect,

including, without limitation, to assert additional claims at law or in equity or additional grounds for its claim and/or to specify the amount of any contingent, unmatured or unliquidated claim as they become non-contingent, matured and/or liquidated, and (b) file additional proofs of claim at any time and in any respect, and replace, amend or supplement this Proof of Claim to include any claim at law or in equity. The filing of this Proof of Claim shall not be deemed a waiver of any other claim in law or in equity that Claimant may have against the Debtor, its affiliates, General Motors of Canada Limited or General Motors Nova Scotia Investments Ltd., including, but not limited to, administrative or other priority claims, constructive trust claims, claims for reimbursement of attorneys' fees and expenses or the right to assert claims that are otherwise warranted in any related action.

15.    The filing of this Proof of Claim is not intended to be and should not be construed as (a) a consent by Claimant to the jurisdiction of this Court with respect to the subject matter of this claim, any objection or other proceeding commenced in this case or otherwise involving Claimant; (b) a waiver of the rights and remedies against any other person or entity who may be liable for all or part of the claims set forth herein, whether an affiliate or guarantor of the Debtor or otherwise; (c) a waiver or release of Claimant's right to trial by jury, or a consent to trial by jury, in this or any other court; (d) a waiver of Claimant's right to have final orders in non-core matters entered only after *de novo* review by a United States District Court Judge; or (e) a waiver of any right to (i) withdraw the reference, or otherwise challenge the jurisdiction of this court, with respect to the subject matter of this claim, any objection or other proceeding commenced in this case against or otherwise involving Claimant; or (ii) assert that the reference has already been withdrawn with respect to

6

the subject matter of this claim, any objection or other proceeding commenced with respect thereto or any other proceeding commenced in this case against or otherwise involving Claimant.

16.    The Claimant specifically reserves all of its procedural and substantive defenses and rights with respect to any claim that may be asserted against Claimant.

17.    The creditors of Finance may have separate direct and indirect claims against the Debtor, its affiliates or others which are not included in this Proof of Claim, and nothing contained herein shall prejudice such claims.

18.    This Proof of Claim does not encompass claims that the Claimant may have that arise after the Petition Date and are entitled to administrative priority, and the Claimant expressly reserves its right to file such claim or any similar claim at the appropriate time.

# EXHIBIT H

- Choose: United States : English

# Select a Country:

- United States | English
- Europe | English
- Middle East | English
- الشرق الأوسط | اللغة العربية
- Albania | English
- Armenia | Русский | English
- Argentina | Espanol
- Australia | English
- Azerbaijan | Русский | English
- Bahrain | English
- البحرين | اللغة العربية
- Беларусь | Русский | English
- Belgium | Deutsch
- Belgium | Français
- Belgium | Nederlands
- Bosnia and Herzegovina | English
- Brasil | Portugues
- България | Български
- Canada | English
- Canada | Francais
- Chile | Espanol
- China | English
- China | Chinese
- Colombia | Espanol
- Croatia | Croatian
- Czech Republic | Czech
- Danmark | Dansk
- Deutschland | Deutsch
- Ecuador | Espanol
- Ελλάδα | Ελληνικά
- Egypt | English
- España | Español
- Eesti | Eesti keel
- France | Français
- Georgia | Русский | English
- India | English
- Iraq | English
- العراق | اللغة العربية
- Ireland | English
- Italia | Italiano
- Japan | Japanese
- Jordan | English
- الأردن | اللغة العربية
- Kazakhstan | Русский | English
- Kuwait | English
- الكويت | Arabic

- Kyrgyzstan | Русский | English
- Latvija | Latviešu
- Lebanon | English
- لبنان | اللغة العربية
- Lietuva | Lietuvių
- Macedonia | English
- Magyarország | Magyar
- Mexico | Espanol
- Moldova | Русский | English
- Montenegro | English
- Nederland | Nederlands
- Norge | Norsk
- Oman | English
- عمان | Arabic
- Österreich | Deutsch
- Polska | Polski
- Portugal | Português
- Qatar | English
- قطر | اللغة العربية
- România | Română
- Россия | Русский
- Kingdom of Saudi Arabia | English
- اللغة العربية | المملكة العربية السعودية
- Serbia | Serbian
- Slovakia | Slovakian
- Slovenia | Slovenian
- South Africa | English
- South Korea | □□□
- Sverige | Svenska
- Switzerland | Deutsch
- Switzerland | Français
- Switzerland | Italiano
- Syria | English
- سوريا | اللغة العربية
- Tajikistan | Русский | English
- Thailand | English
- Thailand | ไทย
- Turkey | Turkish
- Turkmenistan | Русский | English
- U.A.E. | English
- الاماراتي | اللغة العربية
- United Kingdom | English
- Ukraine | Русский | English
- Uzbekistan | Русский | English
- Venezuela | Espanol
- Восточная Европа и Центральная Азия | English

# Select a Brand:

GO!!

☐ **Remember this Choice**

Check this box, and we will remember your Country, Language and Brand the next time you visit media.gm.com

- Brands in Country
- 
- 
- 
- 
- 
- 



# News | **United States**

- [Help](#)|
- [Contacts](#)|
- [Login](#)

`Search Text` 🔍

- [News](#)
- [Vehicles](#)
- [Photos](#)
- [Press Kits](#)
- [Videos](#)
- [Company Information](#)

## GM Statement on Auto Industry Restructuring

2009-03-30

« [Back](#)

➕ Add This

Today's announcement by President Obama begins a new era for the U.S. auto industry. It also marks a defining moment in the history of General Motors.

The U.S. Treasury will provide working capital financing for GM for 60 days while GM completes a more accelerated and aggressive restructuring to put the company on sound long-term financial footing. We understand the historic opportunity this presents, and we are fully committed to successfully completing the reinvention of GM.

As President Obama said today, the success of this reinvention is vital for GM, for the U.S. and global economies, and for the millions of employees, suppliers, dealers, retirees and others who depend on the company.

During the next 60 days, GM will address the tough issues to improve the long-term viability of the company, including the restructuring of the financial obligations to the bond holders, unions and other stakeholders. Our strong preference is to complete this restructuring out of court. However, GM will take whatever steps are necessary to successfully restructure the company, which could include a court-supervised process.

The men and women of GM, including our dealers, suppliers and other key partners, know what we must do to accomplish this task. We are fully committed to making this successful. We owe that to the GM community, to our customers, and to the U.S. taxpayers, who are providing support during this exceptionally challenging time.

**Quotes attributable to Fritz Henderson, GM CEO**

"The U.S. Treasury has said that it strongly believes that a substantial restructuring will lead to a viable GM. Over the next 60 days, we will work around the clock, with all parties, to meet the aggressive requirements that have been set by the Task Force, and to make the fundamental and lasting changes necessary to reinvent GM for the long-term."

"We have significant challenges ahead of us, and a very tight timeline. I am confident that the GM team will succeed, and that a stronger, healthier GM will play an important role in revitalizing America's economy and re-establishing its technology leadership and energy independence."

"The administration has made it clear that it expects GM to expand and accelerate its restructuring efforts. I want the American people to know that we understand and accept this guidance. The road is tough, but the ultimate goal – a leaner, stronger, viable GM – is one we share."

General Motors Corp. (NYSE: GM), one of the world's largest automakers, was founded in 1908, and today manufactures cars and trucks in 34 countries. With its global headquarters in Detroit, GM employs 243,000 people in every major region of the world, and sells and services vehicles in some 140 countries. In 2008, GM sold 8.35 million cars and trucks globally under the following brands: Buick, Cadillac, Chevrolet, GMC, GM Daewoo, Holden, Hummer, Opel, Pontiac, Saab, Saturn, Vauxhall and Wuling. GM's largest national market is the United States, followed by China, Brazil, the United Kingdom, Canada, Russia and Germany. GM's OnStar subsidiary is the industry leader in vehicle safety, security and information services. More information on GM can be found at www.gm.com.

GM is the majority shareholder in GM Daewoo Auto & Technology Co. of South Korea, and has product, powertrain and purchasing collaborations with Suzuki Motor Corp. and Isuzu Motors Ltd. of Japan. GM also has advanced technology collaborations with Chrysler LLC, Daimler AG, BMW AG and Toyota Motor Corp. and vehicle manufacturing ventures with several automakers around the world, including Toyota, Suzuki, Shanghai Automotive Industry Corp. of China, AVTOVAZ of Russia and Renault SA of France.

Genuine GM Parts and accessories are sold under the GM, GM Performance Parts, GM Goodwrench and ACDelco brands through GM Service and Parts Operations, which supplies GM dealerships and distributors worldwide. GM engines and transmissions are marketed through GM Powertrain.



**You must be logged in to view Media Contacts**


**Login** | **Consumer Contacts**

## Contacts



**You must be logged in to view Media Contacts**


**Login** | **Consumer Contacts**

GENERAL MOTORS

© Copyright General Motors  Privacy Policy

# <u>EXHIBIT I</u>



# G.M. Plan Gets Support From Key Bondholders

Tony Ptak of the United Automobile Workers voted Thursday in Warren, Mich., on G.M.'s concession plan as the automaker's bondholders were offered a larger owner stake than the union.

By MICHAEL J. de la MERCED and MICHELINE MAYNARD
Published: May 28, 2009

DETROIT — As General Motors moved closer to a bankruptcy filing, possibly early next week, attention on Thursday turned again to the bondholders, the most important group that the company has yet to win over for its efforts to start fresh.

Early Thursday, G.M. proposed a deal in which bondholders would receive up to a 25 percent stake — a bigger share than G.M. offered the autoworkers union — if they do not oppose its bankruptcy reorganization, and then said that a group representing many of the largest bondholders had accepted the offer.

The proposal came as administration officials and G.M. began to discuss how the carmaker would look once it emerged from a court reorganization. The company is expected to seek bankruptcy protection by Monday, the deadline set by the Obama administration to restructure outside bankruptcy.

In a regulatory filing, G.M. set Saturday afternoon as the

**MOST POPULAR - BUSINESS**

| E-MAILED | BLOGGED | VIEWED |

1. Economic Scene: The Case for $320,000 Kindergarten Teachers
2. Move to Restrict Pain Killers Puts Onus on Doctors
3. With Squeeze on Credit, Microlending Blossoms
4. Fed Member's Deflation Warning Hints at Policy Shift
5. Wind Drives Growing Use of Batteries
6. Theo Albrecht, Who Helped Build the Aldi Grocery Chain, Dies at 88
7. Job Subsidies Also Provide Help to Private Sector
8. Wealth Matters: If It Causes Stress, Is It Really a Vacation Home?
9. In Study, 2 Economists Say Intervention Helped Avert a 2nd Depression
10. You're the Boss: Trial and Error with AdWords and S.E.O.

Go to Complete List »

**Readers' Comments**

Readers shared their
thoughts on this article.
Read All Comments (103) »

Delphi in Talks to Emerge From
Bankruptcy (May 29, 2009)
Auto Parts Makers File for Chapter
11 (May 29, 2009)
Times Topics: General Motors
Corporation

**Add to Portfolio**

General Motors Corp

Go to your Portfolio »

deadline for other bondholders to support the plan. In addition to an ad hoc committee that supports the G.M. plan, which represents about 20 percent of G.M.'s debt, people with knowledge of the discussions said a second group, with about 30 percent of G.M.'s debt, was in talks with the Treasury.

Administration officials said they considered the development positive. While the officials said there was no specific threshold for approval by the bondholders, a person briefed on the matter said that G.M. was seeking support from investors holding about 50 percent of G.M.'s $27 billion in bond debt.

G.M. and the Treasury will re-examine the results after 5 p.m. on Saturday to gauge support before deciding how to proceed. Administration officials said Thursday that 15 percent of bondholders approved the first debt-for-equity swap. (G.M. had wanted 90 percent.) With that group added to the 20 percent represented by the ad hoc committee, which had opposed the earlier offer, officials believe they have a good starting point.

In a regulatory filing, G.M. filled in many of the details of how it would look once it completed its reorganization, devised under the eye of the Treasury Department. G.M. said the government, which is to provide bankruptcy financing of about $50 billion, initially would hold 72.5 percent of G.M., with the United Automobile Workers union receiving 17.5 percent, and bondholders receiving 10 percent.

But the percentages held by the bondholders and the union could conceivably be larger because each are being offered warrants in the new G.M., which would be created in bankruptcy.

Under the terms of the plan, bondholders would initially receive 10 percent. They could then exercise their warrants for an additional 7.5 percent when the new G.M. rises to about $15 billion in value. The second set of warrants for the final 7.5 percent would be exercisable when new G.M. rises to $30 billion in value.

The union would initially receive a 17.5 percent stake to finance a health care trust for its retirees. It has also received warrants to raise that holding to 20 percent — but those warrants are exercisable only if new G.M.'s value hits $75 billion.

Once the union and bondholders achieve their full stakes, the government's share would drop to 55 percent.

The hope is to create a new G.M. by late August, people with knowledge of the matter said.

During a briefing on Thursday, administration officials said they expected that G.M. would emerge from bankruptcy in 60 to 90 days, but would probably not be a publicly traded company until sometime later, possibly after a public offering. Until then, there would not be a ready market for the equity holdings of former bondholders and others.

The administration officials said that G.M.'s balance sheet going forward could make a $15 billion market capitalization possible within a relatively short period of time, but did not offer details on how its value would rise to that level. The current market capitalization, said an administration official close to the negotiations, reflected a capital structure that was unacceptable.

G.M.'s current market capitalization is about $683.8 million; it was close to $22 billion a



**The play on Madoff, without Wiesel**

ALSO IN THEATER »
Budget cuts affect London's theaters
Connect with Theater on Facebook

**nytimes.com**                    THEATER

ADVERTISEMENTS

Find your dream home with
The New York Times Real Estate

Follow The New York Times on
Twitter

Watch today's top videos

See the news in the making. Watch
TimesCast, a daily news video.


The New York Times
The Weekender
Save 50%    » GO

**INSIDE NYTIMES.COM**

Bondholders Get a New Proposal From G.M. - NYTimes.com                    Page 3 of 4

*Michael J. de la Merced reported from New York, and Micheline Maynard from Detroit. David E. Sanger contributed reporting from Washington, and Bill Vlasic from New York.*

A version of this article appeared in print on May 29, 2009, on page          **More Articles in Business »**
B1 of the New York edition.

**Times Reader 2.0: Daily delivery of The Times - straight to your computer. Subscribe for just $4.62 a week.**

Ads by Google                                        what's this?

**Don't Declare Bankruptcy**
Don't Declare Business Bankruptcy Until You've Seen This Alternative!
www.CompanyRecovery.com

**Chapter 7 Means Test**
Do You Qualify For Chapter 7 Bankruptcy? Free Info & Review!



www.Chapter7.me

**FIU Online MBA - No GMAT**
$10k-20k Scholarships. AACSB accred Classes start 9/27 - 18 month prog
www.FIU.edu

**Past Coverage**

U.S. Expected to Own 70% of Restructured G.M. (May 27, 2009)
Magna's Bid for Opel Draws Berlin's Attention (May 27, 2009)
Bankruptcy for G.M. Would Tax the Experts (May 26, 2009)
Europe Feels the Strain of Protecting Workers and Plants (May 26, 2009)

**Related Searches**

| | |
|---|---|
| Automobiles | Get E-Mail Alerts |
| General Motors Corp | Get E-Mail Alerts |
| Subprime Mortgage Crisis | Get E-Mail Alerts |
| Bankruptcies | Get E-Mail Alerts |

U.S. »   ART & DESIGN »   OPINION »   HOME & GARDEN »   OPINION »   FASHION & STYLE »

**What's Next for Arizona?**
A Room for Debate forum on the legal and political fallout of a ruling on the state's tough immigration law.

**In Haiti, a Lesson for U.S. Health Care**
A strategy for keeping private clinics in Haiti open could work in the United States, writes James Wilentz.

In Roosevelt Archive, History as He Made It

Marveling at Wonders Out of This World

Monitoring Mom and Dad

Mona Simpson Writes for Crowds, and Avoids Them

Home | World | U.S. | N.Y. / Region | Business | Technology | Science | Health | Sports | Opinion | Arts | Style | Travel | Jobs | Real Estate | Automobiles | Back to Top

Copyright 2009 The New York Times Company | Privacy Policy | Search | Corrections | RSS | First Look | Help | Contact Us | Work for Us | Site Map

# **EXHIBIT J**

- Choose: Canada : English

# Select a Country:

- United States | English
- Europe | English
- Middle East | English
- الشرق الأوسط | اللغة العربية
- Albania | English
- Armenia | Русский | English
- Argentina | Espanol
- Australia | English
- Azerbaijan | Русский | English
- Bahrain | English
- البحرين | اللغة العربية
- Беларусь | Русский | English
- Belgium | Deutsch
- Belgium | Français
- Belgium | Nederlands
- Bosnia and Herzegovina | English
- Brasil | Portugues
- България | Български
- Canada | English
- Canada | Francais
- Chile | Espanol
- China | English
- China | Chinese
- Colombia | Espanol
- Croatia | Croatian
- Czech Republic | Czech
- Danmark | Dansk
- Deutschland | Deutsch
- Ecuador | Espanol
- Ελλάδα | Ελληνικά
- Egypt | English
- España | Español
- Eesti | Eesti keel
- France | Français
- Georgia | Русский | English
- India | English
- Iraq | English
- العراق | اللغة العربية
- Ireland | English
- Italia | Italiano
- Japan | Japanese
- Jordan | English
- الأردن | اللغة العربية
- Kazakhstan | Русский | English
- Kuwait | English
- الكويت | Arabic

- Kyrgyzstan | Русский | English
- Latvija | Latviešu
- Lebanon | English
- لبنان | اللغة العربية
- Lietuva | Lietuvių
- Macedonia | English
- Magyarország | Magyar
- Mexico | Espanol
- Moldova | Русский | English
- Montenegro | English
- Nederland | Nederlands
- Norge | Norsk
- Oman | English
- عمان | Arabic
- Österreich | Deutsch
- Polska | Polski
- Portugal | Português
- Qatar | English
- قطر | اللغة العربية
- România | Română
- Россия | Русский
- Kingdom of Saudi Arabia | English
- اللغة العربية | المملكة العربية السعودية
- Serbia | Serbian
- Slovakia | Slovakian
- Slovenia | Slovenian
- South Africa | English
- South Korea | □□□
- Sverige | Svenska
- Switzerland | Deutsch
- Switzerland | Français
- Switzerland | Italiano
- Syria | English
- سوريا | اللغة العربية
- Tajikistan | Русский | English
- Thailand | English
- Thailand | ไทย
- Turkey | Turkish
- Turkmenistan | Русский | English
- U.A.E. | English
- الامارات | اللغة العربية
- United Kingdom | English
- Ukraine | Русский | English
- Uzbekistan | Русский | English
- Venezuela | Espanol
- Восточная Европа и Центральная Азия | English

# Select a Brand:

GO!!

☐ **Remember this Choice**

Check this box, and we will remember your Country, Language and Brand the next time you visit
media.gm.com

- Brands in Country
-
-
-
-
-



# Media | Canada

- [Help](#)|
- [Contacts](#)|
- [Login](#)

| Search Text |  |

- [News & Information](#)
- [Vehicles](#)
- [Photos](#)
- [Videos](#)
- [Company Information](#)

## GM Canada Statement

2009-05-22

« [Back](#)
 Add This

**Oshawa, ON, May 22, 2009** — GM Canada extends its sincere appreciation to the CAW leadership for
its forthright commitment and determination in reaching today's tentative agreement which was required
to meet competitive cost benchmarks and the expectations of the Ontario and Federal governments for
significant further reductions in the company's longer term liabilities.

The tentative agreement is a critical step forward toward ensuring GM's future in Canada and to further
the demonstrated industry leadership GM Canada's employees continue to demonstrate in manufacturing
quality, productivity, safety and environmental excellence. GM Canada will continue to work tirelessly
with the governments and our other key partners to complete our broader restructuring activities in
Canada and maintain our automotive sales leadership in Canada.

General Motors of Canada (GMCL) is headquartered in Oshawa Ontario and employs 12,000 people
nationwide.  GM of Canada manufactures vehicles, vehicle powertrains, and markets the full range of
General Motors vehicles and related services through approximately 700 dealerships and retailers across
Canada.

For media enquiries contact:



### You must be logged in to view Contacts

**Login** | **Login**



# Contacts



### You must be logged in to view Contacts

**Login** | **Login**

GENERAL MOTORS

© Copyright General Motors  Privacy Policy

# <u>EXHIBIT K</u>

# Financial Post

News

# Washington, Ottawa bet US$60-billion GM will rise again

In this story:  | F US$12.97 ▲ $0.08 | TM US$69.97 ▲ $0.19 |

Data delayed at least 15 min



Canadians could stay shareholders in General Motors Corp. until as long as 2018 in an unprecedented and risky cross-border rescue of the ailing automaker by political leaders who    Reuters
insist not helping the company would have triggered an economic collapse of untold proportions.

**Nicolas Van Praet, Financial Post** · Monday, Jun. 1, 2009

Canadians could stay shareholders in General Motors Corp. until as long as 2018 in an unprecedented and risky cross-border rescue of the ailing automaker by political leaders who insist not helping the company would have triggered an economic collapse of untold proportions.

The governments of the United States, Canada and Ontario Monday announced they would collectively pledge US$60-billion in loans to GM to help the bankrupt company reinvent itself over the next several years. Canadian taxpayers alone will contribute US$9.5-billion to the manufacturer, split two-thirds federally and one-third provincially. Part of the money will let GM pay its underfunded pension liabilities.

"GM and its stakeholders have produced a viable, achievable plan that will give this iconic American company a chance to rise again," U.S. President Barack Obama said. "Executing this plan will require a substantial amount of money that only a government can provide."

The aid comes one month after Canadian lawmakers pledged $3.8-billion in a separate aid package for Chrysler LLC. Both companies are now in bankruptcy protection in the United States after going broke from years of mismanagement and a final crippling blow dealt by the global financial meltdown.

"It's not a normal call," Prime Minister Stephen Harper said in justifying the aid. "It's not just that the companies are huge. It's that we are faced with the unusual situation where for a huge part of the industry it's all or nothing. We either save our part of it or we have zero."

The U.S. government of George W. Bush first decided to help GM and Chrysler, Mr. Harper noted. He said Canada's choice was to join the United States in offering aid to the companies or see their Canadian manufacturing presence pulled out of the country.

"Without Canadian money in the game, we would be out of the game," Ontario Premier Dalton McGuinty said. "If you think this

side's dark, take a look at the other side and understand the full economic consequences of that."

Letting GM fail in Canada and leave the country would trigger six-figure job losses very quickly as suppliers and every company tied to GM absorbed the effects, Mr. Harper said. "That is just not feasible for our economy."

It would flatten auto cities like Oshawa, St. Catharines and Ingersoll, Mr. McGuinty added. And it would hurt Canada's other three automakers not asking for aid.

Critics countered that taxpayers are the biggest losers in the rescue, a third of whom don't even have company or union pensions of their own.

The cost of helping the two automakers to every Canadian who will likely buy a new vehicle other than a GM or Chrysler this year would in fact be about $14,705 per person, enough to buy new small car, according to the Frontier Centre, a think-tank based in Winnipeg. Seen another way, the money spent on GM and Chrysler represents half of all the tax profitable businesses will pay in Canada in 2009, said Frontier research director Mark Milke.

"In the bizarre new world created by Ottawa and Washington D.C., healthy companies — hello Ford, Toyota, and other non-troubled automakers and their employees – are punished due to General Motors and Chrysler," Mr. Milke said. "The latter gave away the farm on pay, pensions and health benefits and apparently have managers, employees, and retirees who now expect others to pay for such profligacy... As if there exists a right to the paycheques of others."

Never before have the Canadian and U.S. governments staged an industrial intervention of this size.

Under the plan, Ottawa and Queen's Park would receive 12% of the common shares of a revamped GM as well as about US$1.7-billion in debt and preferred stock. It will have the right to name one director on GM's 13-member board.

The governments will sell their stake over time under favourable market conditions.

After a period of private ownership that would stabilize GM with state aid, the automaker will become a public company again in 2010, a senior government official said. The federal and Ontario governments will sell a minimum of 5% of their GM shares per year with a goal of shedding its ownership stake completely by 2018.

Federal officials acknowledged it is a massive bet on an auto company that has been shedding market share for years. But they said the government is not looking at it in strict profit-loss terms.

"We're not going into the deal because we want to play the stock market with taxpayer money," a senior federal official said. "We think there are very important benefits."

Under the deal hammered out with GM's Canadian arm, the automaker must maintain a 19% share of GM's combined Canada-United States production capacity. GM will also commit to invest in a new engine module for its St. Catharines motor factory, spend $2.2-billion through 2016 on capital investments in its Canadian plants, and another $1-billion on research and development.

No specific job level requirements were set. GM has said it will employ barely 5,500 people in Canada by 2014.

GM's Canadian and U.S. unions have both agreed to concessions to help the automaker cut costs, a key condition of the government aid. A slight majority of GM's U.S. bondholders have also agreed to a sweetened offer that would give them a 10% initial stake in the company, plus warrants for another 15%.

A last-minute deal was struck with a group of bondholders suing GM Canada that helped the automaker avoid a bankruptcy protection filing in Canada. Some 84% of 240 GM dealers in Canada whose franchise agreements are being terminated also agreed to payout terms, GM said.

"This is a turnaround story," GM North America President Troy Clarke said in an interview with the National Post. "And it's got that drama with it."

Get the National Post newspaper delivered to your home

## WHAT DO YOU THINK?

**New to the site?**

To leave a comment, you
need to  Sign Up.

**Already a member?**

To comment, please login.

E-mail

Password

Forgot Password?

| Login |

powered by ⚙ Pluck

© 2010 National Post Inc. All rights reserved. Unauthorized distribution, transmission or republication strictly prohibited.

# **EXHIBIT L**

# Report on Business

## GM Canada bondholders feared public reprisal

JACQUIE McNISH AND SHAWN McCARTHY

OTTAWA — From Tuesday's Globe and Mail Published on Tuesday, Jun. 02, 2009 12:00AM EDT Last updated on Wednesday, Jun. 03, 2009 4:06AM EDT

It took the threat of public criticism by the Prime Minister to convince bondholders to approve an early morning deal yesterday that allowed General Motors of Canada Ltd. GM-N to avoid the expense and uncertainty of a Canadian court proceeding.

According to people familiar with the discussions, holders of about $1.3-billion of bonds issued by a Nova Scotia-based finance arm of General Motors were the last holdouts to the company's plan to restructure its Canadian operations outside of court.

After weeks of what insiders described as sometimes stormy negotiations in Toronto and over conference calls, a majority of mostly U.S.-based funds were still refusing by Sunday to accept a company offer that sources said would pay them about 33 cents for every dollar owed. Some of the largest investors included U.S. funds such as Aurelius Capital Partners and Appaloosa Investment Ltd., which specialize in buying distressed company assets on the bet that they can profit from corporate makeovers.

Unable to win over the recalcitrant investors, sources said GM Canada officials called for help. Their plea went to Ottawa. Could the government help break the stalemate?

The answer came at shortly after 8 p.m. ET Sunday, when the government announced that Prime Minister Stephen Harper, Industry Minister Tony Clement and Ontario Premier Dalton McGuinty would be speaking at 1 p.m. yesterday in Toronto. No public explanation was offered for the news conference. Privately, however, sources said General Motors officials and their advisers worked the phones through the night to warn the investors that the notice meant the Prime Minister was preparing to single out the bondholders for failing to support a bailout of the troubled auto maker.

"We told the bondholders that the Prime Minister of Canada was going to stand up before the country and say that a reasonable corporate solution had failed and the Canadian operations had landed in bankruptcy proceedings because of the bondholders," said one person involved in the discussions.

Adding pressure on the investors, GM Canada's lawyers arranged a hearing with a Superior Court of Ontario judge yesterday morning for a potential filing to place the Canadian operations in bankruptcy court protection under the Companies' Creditors Arrangement Act (CCAA). If the bondholders had not acquiesced by 6 a.m. ET yesterday, the company would have filed for court protection in Toronto under the CCAA.

The deadline was set in stone because U.S. President Barack Obama was set to speak yesterday morning to announce the details of GM's bankruptcy filing in Washington.

"We went right to the 6 a.m. deadline before we had the support we needed," said another person involved.

Last month, President Obama sent a cold blast through capital markets when he publicly remonstrated Chrysler Corp. bondholders for failing to support a bailout of the auto maker that also called for the investors to give up about 67 per cent of the value of their holdings. Since then, most of the Chrysler bondholders have agreed to approve the tough terms.

A spokesperson for the GM Canada bondholders declined to comment. According to an 8-K filing by General Motors to the Securities and Exchange Commission, a majority of holders of bonds issued by General Motors Nova Scotia Finance Co. have agreed to a plan that will pay them 33 cents on the dollar for their bonds.

The bondholders' approval is an important victory for General Motors and officials on Washington's auto task force who are leading the ambitious strategy to overhaul the auto sector. U.S. officials are seeking to quickly pull the Detroit parent out of U.S. bankruptcy court. The aggressive timetable would not have been possible if the Canadian operations had become entangled in court proceedings.

Under Canadian law, creditors can have more clout than their U.S. counterparts, which sometimes means that bankruptcy proceedings take longer and are more unpredictable.

# <u>EXHIBIT M</u>

EXECUTION COPY

## LOCK UP AGREEMENT

   This Lock Up Agreement (this "**Agreement**"), dated as of June 1, 2009, is entered into by and among General Motors Nova Scotia Finance Company, a Nova Scotia unlimited company (the "**Company**"), General Motors of Canada Limited, a Canadian federal corporation ("**GM Canada**" or "**GMCL**"), GM Nova Scotia Investments Ltd., a Nova Scotia company ("**GM Investments**" and, collectively with the Company and GM Canada, the "**Canadian Entities**"), General Motors Corporation, a Delaware corporation (the "**Guarantor**"), and each of the undersigned beneficial owners (each a "**Holder**" and collectively, the "**Holders**") of the Company's 8.375% Guaranteed Notes due December 7, 2015 (the "**2015 Notes**") or the Company's 8.875% Guaranteed Notes due July 10, 2023 (the "**2023 Notes**" and together with the 2015 Notes, the "**Notes**"). The Holders, the Canadian Entities, the Guarantor and any subsequent person that becomes a party hereto in accordance with the terms hereof are referred to herein as the "**Parties**." Each of the terms used herein not defined herein shall have the meaning given such term in the Fiscal and Paying Agency Agreement, dated as of July 10, 2003 (the "**Fiscal and Paying Agency Agreement**"), among the Company, the Guarantor, Deutsche Bank Luxembourg S.A., as fiscal agent (the "**Fiscal Agent**") and Banque Générale du Luxembourg S.A. governing each series of Notes.

## RECITALS

   WHEREAS, the Guarantor and certain of its subsidiaries and affiliates who shall be debtors in the Chapter 11 Cases (as defined below) intend to commence on or about June 1, 2009 jointly administered chapter 11 cases (the "**Chapter 11 Cases**") by filing voluntary petitions for relief under chapter 11, title 11 of the United States Code (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**");

   WHEREAS, the Holders, the Canadian Entities and the Guarantor desire to, among other things, take certain actions and consummate certain transactions contemplated hereby to facilitate the resolution and settlement of various direct, indirect or derivative claims and causes of action of the Holders against one or more of the Canadian Entities and the Guarantor and to facilitate the business and financial restructuring of the Guarantor, the other debtors in the Chapter 11 Cases and certain of the Canadian Entities;

   WHEREAS, the Company has requested and the Holders have agreed to vote to amend the Fiscal and Paying Agency Agreement and the global securities representing the Notes as contemplated by this Agreement, in exchange for certain cash payments and the preservation in the Chapter 11 Cases of certain direct, indirect or derivative claims and causes of action of the Holders and the Company against the Guarantor;

   WHEREAS, in furtherance of the foregoing, the Company shall, in accordance with the terms of the Fiscal and Paying Agency Agreement, convene a meeting (the "**Meeting**") of holders of the Notes for the purpose of passing an extraordinary resolution to amend the Fiscal and Paying Agency Agreement and the global securities representing the Notes to provide for the waiver of certain rights of the holders of the Notes, the release and discharge of certain claims

ERROR! UNKNOWN DOCUMENT PROPERTY NAME.

and demands by such holders and the payment of certain amounts by the Company to the holders of the Notes upon the terms set forth in the form of extraordinary resolution attached hereto as Exhibit A (the "**Extraordinary Resolution**").

WHEREAS, in connection with the transactions contemplated by this Agreement and in accordance with the terms and subject to the conditions hereof, Holders beneficially owning at least two-thirds of the aggregate principal amount of the 2015 Notes and Holders beneficially owning at least two-thirds of the aggregate principal amount of the 2023 Notes intend to vote such Notes in favor of the Extraordinary Resolution;

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1. Support of the Extraordinary Resolution; Additional Covenants.

(a)    Each Holder agrees (i) that the Extraordinary Resolution, when duly passed at a Meeting, shall be binding on such Holder; (ii) to deliver or cause to be delivered irrevocably within three Business Days after the date of this Agreement voting instructions, in such form as specified by the Company, in favor of the Extraordinary Resolution at the Meeting at which the Extraordinary Resolution is to be submitted in respect of the principal amount of each series of Notes held by such Holder as set forth on the signature page of such Holder or over which such Holder has voting power; provided such instruction shall cease to be irrevocable and shall become void and of no further force and effect automatically upon termination of this Agreement; (iii) to the extent permitted under the terms of the Fiscal and Paying Agency Agreement, to waive compliance with all covenants contained in the Fiscal and Paying Agency Agreement (other than those applicable to the Company's or the Guarantor's obligations hereunder) and to forebear from exercising their rights thereunder resulting from any default or event of default so long as this Agreement is in effect; and (iv) to cooperate in good faith in satisfying any other conditions required for the passage of the Extraordinary Resolution and the consummation of the transactions contemplated thereby (the "**Transactions**"), including effecting the voting commitments hereunder and the negotiation of any documents or agreements to be executed or implemented in connection therewith, or otherwise contemplated thereby, each of which documents and agreements shall be consistent in all material respects with this Agreement and the Extraordinary Resolution (all such proxies, instructions, documents and agreements, collectively, the "**Transaction Documents**").

(b)    Each Holder agrees that it shall not (i) take any action that would cause the acceleration of the payment of principal of or interest on the Notes other than in connection with the liquidation referred to in section 6(b) and except as a result of the Chapter 11 Case of the Guarantor; (ii) propose, vote for, consent to, support or participate in the formulation of any plan or resolution other than Transactions, the Extraordinary Resolution and the Transaction Documents; (iii) other than as provided in Section 6(b) below, directly or indirectly seek, solicit, support or

encourage any plan or resolution, including but not limited to any decree or order for relief in respect of any of the Company, the Guarantor or GM Canada in an involuntary case under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect, or appointing a receiver, liquidator, assignee, custodian, trustee, sequestrator (or similar official) of the Guarantor or GM Canada or for any substantial part of its property, or ordering the winding-up or liquidation of its affairs, other than the Transactions, the Extraordinary Resolution and the Transaction Documents, or any plan or resolution that reasonably could be expected to prevent, delay or impede the successful passage of the Extraordinary Resolution or implementation of the Transactions; or (iv) directly or indirectly sell, assign, pledge, hypothecate, grant an option on, or otherwise dispose of (each, a "**Transfer**") or permit to subsist any pledge or security interest (save in the normal course of prime brokerage activity) over any of the Notes held by such Holder on the date hereof; provided, however, that any Holder may Transfer any of such Notes to any entity that executes and delivers to the Company a duly executed counterpart of this Agreement. This Agreement shall in no way be construed to preclude any Holder from acquiring additional Notes; provided, however, that any such additional Notes shall automatically be deemed to be subject to all of the terms of this Agreement.

(c)     The Company agrees (i) following the giving of the notice in accordance with clause (ii) of this Section 1(c), to convene the Meeting at the earliest time practicable under the terms of the Fiscal and Paying Agency Agreement for the purpose of passing the Extraordinary Resolution in accordance with the requirements of the Fiscal and Paying Agency Agreement, including, without limitation, the requirements of Schedule 4 (Provisions for Meetings of Noteholders) to the Fiscal and Paying Agency Agreement; (ii) within three Business Days after the date of this Agreement to give a notice in respect of the Meeting to holders of the Notes for the purpose of passing the Extraordinary Resolution, which notice shall specify the place, day and hour of the Meeting in accordance with the requirements of the Fiscal and Paying Agency Agreement; (iii) to take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary, proper or advisable under applicable laws and regulations to facilitate the compliance by the Holders with their obligations in Section 1(a) of this Agreement; (iv) to otherwise take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary, proper or advisable under applicable laws and regulations to satisfy all conditions required to be satisfied by the Company and the Paying Agent under the Fiscal and Paying Agency Agreement (including the schedules thereto) for the passage of the Extraordinary Resolution and the consummation of the Transactions, (v) to provide written confirmation to the Holders in the event that the Company elects not to move forward with the Transactions, and (vi) to cooperate in good faith in satisfying any other conditions required for the passage of the Extraordinary Resolution and the consummation of the Transactions, including the negotiation of the Transaction Documents, all of which shall be consistent in all material respects with this Agreement and the Extraordinary Resolution.

(d) The Company, GMCL and the Holders agree within three Business Days after the date of this Agreement to establish an escrow account and enter into an escrow agreement with an escrow agent mutually satisfactory to the Parties, which agreement shall incorporate the terms of Exhibit B hereto ("Escrow Agreement").

(e) The Holders agree not to object to the treatment of unsecured creditors previously disclosed in the Current Report on Form 8-K filed by the Guarantor on May 28, 2009.

2. Amounts Payable. The Company agrees that upon approval of the Extraordinary Resolution, it shall pay the amounts specified therein in accordance therewith (the "Consent Fee"). The Company further agrees that within three business days after the approval of the Extraordinary Resolution, the Canadian Entities shall reimburse affiliates of Aurelius Capital Management, LP, Appaloosa Management L.P. and Fortress Investment Group LLC for legal fees and costs in the amount of US$2,000,000.

3. Termination of Agreement. This Agreement shall terminate or be terminable, as follows (such date of termination, the "Termination Date"): (i) by any Holder upon written notice to the Company on or after July 9, 2009, unless on or prior to such date the Meeting has been convened, the Extraordinary Resolution has been approved and the Company and the Paying Agent have paid of all amounts specified in the Extraordinary Resolution to the holders of the Notes in accordance therewith; (ii) by a Party not then in material breach of this Agreement upon written notice to the other Parties, upon the material breach by any non-terminating Party of any of the representations, warranties or covenants contained in this Agreement or the taking of any action by any non-terminating Party that is otherwise materially inconsistent with this Agreement; (iii) automatically upon the commencement prior to the date on which the Extraordinary Resolution is passed of any voluntary or involuntary case commenced under the Bankruptcy Code (or any proceedings therein), under any Canadian insolvency statutes, the Companies' Creditors Arrangement Act (Canada), the Bankruptcy and Insolvency Act (Canada), or any statute, law, legislation, rule or regulation in respect of corporate reorganization or which provides for the appointment of an interim receiver, receiver, receiver and manager or liquidator, against or involving GM Canada or the Company or any of their assets or properties; or (iv) by any Holder upon written notice to the Company on or after the Transactions contemplated in this Agreement shall have been enjoined or otherwise prohibited by law and such injunction or prohibition is not vacated or otherwise terminated on or before the 10th day after the effectiveness of such injunction or prohibition. Upon termination of this Agreement, all obligations under this Agreement shall terminate and shall be of no further force and effect; provided, however, that (a) any claim for breach of this Agreement shall survive termination and all rights and remedies with respect to such claims shall not be prejudiced in any way; (b) all claims of the Holders with respect to the Consent Fee or any funds held in escrow under the terms of the Escrow Agreement as provided therein shall survive termination and all rights and remedies with respect to such claims shall not be prejudiced in any way, and (c) all rights and remedies set forth in Section 8 shall survive termination and shall not be prejudiced in any way. (i) Upon termination of this Agreement other than as a result of a material breach by the Holders prior to the date of payment of the Consent Fee to the Holders, or (ii) if after the date on which the Extraordinary Resolution is passed the Holders are required to turnover the Consent Fee by reason of any legal proceeding or by reason of any order or judgment of any court or governmental authority requiring such amounts be returned to the Company, all direct, indirect

or derivative claims, causes of action, remedies, defenses, setoffs, rights or other benefits of the Holders against or from one or more of the Canadian Entities and the Guarantor except in the case of clause (ii) of this sentence the individual defendants in the Nova Scotia Proceeding shall be fully preserved without any estoppel, evidentiary or other effect of any kind or nature whatsoever, including, without limitation, all claims and causes of action referred to in Section 5 of this Agreement and the full amount owing under the Loan Agreements as of the date hereof shall be immediately due and payable according to their terms as they exist as of the date hereof.

    4.  <u>Representations and Warranties</u>.  Each of the Parties represents and warrants to each of the other Parties that the following statements are true, correct and complete as of the date hereof:

    (a) <u>Power and Authority</u>.  It has all requisite power and authority to enter into this Agreement and to carry out the transactions contemplated by, and perform its respective obligations under, this Agreement.

    (b) <u>Authorization</u>.  The execution and delivery of this Agreement by it and the performance of its obligations hereunder have been duly authorized by all necessary action on its part.

    (c) <u>Binding Obligation</u>.  Upon execution as set forth in Section 10, this Agreement is the legally valid and binding obligation of it, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability.

    (d) <u>No Conflicts</u>.  The execution, delivery and performance by it of this Agreement do not and shall not (i) violate any provision of law, rule or regulation applicable to it or its certificate of incorporation, by-laws, unlimited company agreement or other organizational document or (ii) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under, or give rise to a right of, or result in any termination, cancellation or acceleration of any obligation or to loss of a material benefit under, any material contractual obligation, covenant or condition to which it is a party or under its certificate of incorporation or by-laws (or other organizational documents).

    (e) <u>Governmental Consents</u>.  The execution, delivery and performance by it of this Agreement do not and shall not require it to obtain or make any registration or filing with, consent or approval of, or notice to, or other action to, with or by, any supranational, national, Federal, state, local, municipal, foreign or provincial government or any court of competent jurisdiction, tribunal, judicial or arbitral body, administrative or regulatory agency (including any stock exchange), public authority, commission or board or other governmental department, bureau, branch, agency, or any instrumentality of any of the foregoing, including, without limitation, the United States Treasury, the Bankruptcy Court or any other United States or Canadian court of competent jurisdiction, or any other third party, which has not already been obtained.

(f) No Proceedings. There is no civil, criminal, administrative or arbitral action, suit, claim, hearing, investigation or proceeding pending or, to the knowledge of such Party, threatened, against such Party or any of its affiliates or subsidiaries that questions the validity of this Agreement or any action taken or to be taken by such Party in connection with the performance or consummation of any transactions contemplated by this Agreement.

(g) Signing Holders. If the undersigned is a Holder, (i) the undersigned is either (A) a "qualified institutional buyer" as defined in Rule 144A promulgated under the Securities Act of 1933, as amended or (B) if resident in Canada, an "accredited investor" as defined in National Instrument 45-106 – *Prospectus and Registration Exemptions*; (ii) the undersigned has such knowledge and experience in financial and business affairs that the undersigned is capable of evaluating the merits and risks of the Transactions; (iii) the undersigned represents and warrants that the principal amount of each series of Notes held by such Holder as set forth on the signature page of such Holder is an accurate amount and that it is the beneficial owner of such Notes free and clear of all liens or other encumbrances, including any encumbrances on the right to vote such Notes under the Fiscal and Paying Agency Agreement; and (iv) the undersigned has the requisite power and authority to vote and grant proxies to vote the aggregate principal amount of the Notes represented as beneficially owned by it.

(h) No Other Creditors of the Company. The Company represents and warrants to the Holders that other than the indebtedness evidenced by the Notes and the Swap Liability (as defined below), the Company has no outstanding direct or indirect liability, indebtedness, obligation, commitment, expense, claim, deficiency, guaranty or endorsement of or by any person or entity of any type, whether accrued, absolute, contingent, matured, unmatured or otherwise in excess of an aggregate of US$2,000,000.

5.    Certain Claims.

(a) Nova Scotia Proceeding. Upon the execution of this agreement by the Parties all proceedings in the proceeding in the Supreme Court of Nova Scotia titled Aurelius Capital Partners, LP et al. v. General Motors Corporation et al., Court File No. HFX No. 308066 (the "Nova Scotia Proceeding") shall be held in abeyance pending the approval of the Extraordinary Resolution by the Holders of the Notes at the Meeting. Upon the approval of the Extraordinary Resolution at the Meeting and the payment by the Company and the Paying Agent of the Consent Fee to each of the Holders in accordance therewith, each Holder hereby releases and discharges the defendants in the Nova Scotia Proceeding (and the past and/or present directors, officers, employees, partners, insurers, co-insurers, controlling shareholders, attorneys, advisers, consultants, accountants or auditors, personal or legal representatives, predecessors, successors, parents, subsidiaries, divisions, joint ventures, assigns, spouses, heirs, related and/or affiliated entities of each of them) from all claims and demands that are raised in the Nova Scotia Proceeding, and agrees to discontinue the Nova Scotia Proceeding on a without costs basis. Nothing contained in this Agreement shall preclude any Holder from pursuing any of the claims raised in the Nova Scotia Proceeding against any of the Canadian Entities or the Guarantor or any of the other debtors in the Chapter 11 Cases in the event that the

payment of the Consent Fee is successfully challenged by any person in a future proceeding and, as a result, an amount equal to the Consent Fee has been repaid provided, that, this Agreement precludes each Noteholder from pursuing any of the claims raised in the Nova Scotia Proceeding against any of Neil Macdonald, John Stapleton, Mercedes Michel and Maurita Sutedja (and their respective heirs, administrators and assigns) in the event that the payment of the Consent Fee is successfully challenged by any person in a future proceeding.

(b) <u>Intercompany Loan</u>.  Upon the approval of the Extraordinary Resolution at the Meeting and the payment by the Company and the Paying Agent of the Consent Fee to each of the Holders in accordance therewith, each Holder waives all (and shall cease to have any) rights and claims against the Company in respect of the Loan Agreements (as defined below), including with respect to any compromise or settlement of the loans thereunder, and such Holder's rights in the Loan Agreements, and each Holder hereby releases and discharges GM Canada (and its past and present officers, directors and employees), Neil Macdonald, John Stapleton, Mercedes Michel and Maurita Sutedja (and their respective heirs, administrators and assigns) from all claims and demands whatsoever, presently known or unknown, which the Holders ever had, now have or may hereafter have against them by reason of claims and demands arising from or in connection with those certain loan agreements between the Company and GM Canada each dated as of July 10, 2003 and pursuant to which GM Canada borrowed from the Company the sum of five hundred fifty-five million, eight hundred sixty thousand Canadian dollars (C$555,860,000), and the sum of seven hundred seventy-eight million, two hundred four thousand Canadian dollars (C$778,204,000), respectively (collectively, the "**Loan Agreements**"), provided that nothing contained in this Agreement shall preclude the Holders from pursuing any claim in respect of the parties and claims otherwise released in this paragraph  in the event that the payment of the Consent Fee is successfully challenged by any person in a future proceeding.  Furthermore, in the event that the payment of the Consent Fee is successfully challenged by any person in a future proceeding and, as a result, an amount equal to the Consent Fee has been repaid, the settlement between the Company and GM Canada of the amount owing under the Loan Agreements as contemplated by this Transaction shall be null and void and the full amount owing under the Loan Agreements as of the date hereof shall be immediately due and payable according to their terms as they exist as of the date hereof.

(c) <u>Other Claims</u>.  Upon the approval of the Extraordinary Resolution at the Meeting and the payment by the Company and the Paying Agent of the Consent Fee to each of the Holders in accordance therewith, with respect to any other claim it may have against the Canadian Entities or the Guarantor in its capacity as a holder of the Notes, each Holder covenants and agrees not to pursue any claim it may have other than in connection with the advancement of its claim under the Guarantee, the advancement of its claim against GM Nova Scotia in respect of the Notes and the Deficiency Claim (each as defined below). Nothing contained in this Agreement shall preclude the Holder from pursuing any other claim it may have against the Canadian Entities or the Guarantor or any of the other debtors in the Chapter 11 Cases in the event that the payment of the Consent Fee is successfully challenged by any person in a future proceeding.  For purposes of this Agreement, the "**Guarantee**" shall mean that certain guarantee of the

Notes by the Guarantor included in the Fiscal and Paying Agency Agreement and the Notes.

(d) For purposes of clarity, it is understood and agreed that nothing contained in this Agreement shall: (i) release in any respect whatsoever any claim against the Company on the Notes or any claim against the Guarantor on the Guarantee, or (ii) preclude a Holder from pursuing any claim it may have against the Guarantor or any of the other debtors in the Chapter 11 Cases or any other Party that is not based on such Holder's ownership of Notes.

(e) Legal Costs. The defendants in the Nova Scotia Proceeding release and waive any claim against the Holders for fees and costs related to that proceeding.

6.    Stipulations and Acknowledgements.

(a) Acknowledgement of Deficiency Claim and Guarantee Claim. Each of the Parties hereto hereby expressly acknowledges, agrees and confirms that nothing contained in this Agreement is in any way intended to, nor shall it in any way operate to, directly or indirectly, limit, waive, impair or restrict, any rights, interests, remedies or claims (whether at law or in equity, and whether now or hereafter existing) which any Holder may have against, or to which any Holder is due or owed from, the Company in respect of the Notes or the Guarantor in respect of the Guarantee Claim or the Deficiency Claim (as defined below). Each of the Company and the Guarantor hereby expressly acknowledges, agrees and confirms that (i) the Deficiency Claim is a valid and enforceable claim of the Company and shall be enforceable against the Guarantor as allowed pre-petition general unsecured claims (the "**Allowed Claims**") to the fullest extent permitted under applicable laws, (ii) the Notes are valid and enforceable claims of the Holders and shall be enforceable against the Company in their full amount, and (iii) the Guarantee Claim is a valid and enforceable claim of the Holders and shall be enforceable against the Guarantor in the Chapter 11 Cases as Allowed Claims to the fullest extent permitted under applicable laws.

(b) Guarantor Insolvency Claims. The Company and Guarantor stipulate and acknowledge as follows:

(i)    forthwith after execution of this Agreement, the Company shall provide the Holders with a consent to a bankruptcy order pursuant to the Bankruptcy and Insolvency Act (Canada), which shall be executed by the duly authorized officers and directors of the Company in form satisfactory to the Holders. The Holders are hereby authorized for and on behalf of the Company to add to the executed consent the court file number for the application for the bankruptcy order once issued by the relevant court, and proceed to obtain the bankruptcy order. GMCL agrees to provide all necessary funding to the trustee in bankruptcy of the Company as may be required for it to administer the estate and to fully advance the Deficiency Claim (defined below) in the bankruptcy or insolvency proceedings of the Guarantor, including the payment of a retainer in

the amount not to exceed $100,000, on the date that the Extraordinary Resolution is passed;

(ii)     holders of the 2015 Notes and the 2023 Notes would and shall be entitled to a general unsecured claim in the bankruptcy or insolvency proceedings of the Guarantor for the full amount of the outstanding principal, interest and costs due on such Notes by virtue of the Guarantor's Guarantee (the "**Guarantee Claim**");

(iii)     the trustee in bankruptcy of the Company would and shall be entitled to a general unsecured claim for contribution for any amounts unpaid to the Company's creditors, namely the amount outstanding under the Notes, the Swap Liability (defined below) and any other liabilities (collectively, a "**Deficiency Claim**"), in the bankruptcy and insolvency proceedings of the Guarantor;

(iv)     for greater certainty, the Consent Fee payment does not reduce, limit or impair the Notes, the Guarantee Claim or the Deficiency Claim;

(v)     the Guarantor confirms that its only claim against the Company is the Swap Liability.  If for any reason any portion of the Deficiency Claim is disallowed, the Guarantor agrees that the Swap Liability is subordinated to the prior, indefeasible payment in full of the Notes.  In any event, any and all other undisclosed indebtedness, claims, liabilities or obligations of the Company to the Guarantor other than the Swap Liability are subordinated to the prior, indefeasible payment in full of the Notes. To the extent of the subordination provided for herein, the Guarantor agrees that should it receive any payments from the Company or a trustee in bankruptcy of the Company, it will hold such payment in trust and immediately pay over such amounts to the paying agent for the Notes;

(vi)     the Guarantor shall not assert any right of set-off in respect of the Deficiency Claim; and

(vii)     the Guarantor agrees and covenants that it will not take any action or assert any position inconsistent with this Section 6 and, if called upon by the Holders, will confirm its agreement with the positions confirmed herein in writing or at a court hearing as reasonably requested by the Holders.

For purposes of this Agreement, "**Swap Liability**" shall mean the obligations of the Company to the Guarantor, under currency swap arrangements between the Guarantor and the Company.

7.     Non-Public Information.  The Holders hereby acknowledge that: (i) each of the Company and the Guarantor may be, and each Holder is proceeding on the assumption that the Company and the Guarantor are, in possession of material, non-public information concerning themselves and their respective direct and indirect subsidiaries (the "**Information**") which is not or may not be known to the Holders and that neither the Company nor the Guarantor has disclosed to the Holders; (ii) each Holder is voluntarily assuming all risks associated with the

ERROR! UNKNOWN DOCUMENT PROPERTY NAME.          9

Transactions and expressly warrants and represents that (x) neither the Company nor the Guarantor has made, and except as expressly provided in this Agreement, each Holder disclaims the existence of or its reliance on, any representation by the Company or the Guarantor concerning the Company, the Guarantor or the Notes and (y) except as expressly provided in this Agreement, it is not relying on any disclosure or non-disclosure made or not made, or the completeness thereof, in connection with or arising out of the Transactions, and therefore has no claims against the Company or the Guarantor with respect thereto; (iii) if any such claim may exist, each Holder, recognizing its disclaimer of reliance and reliance by the Company and the Guarantor on such disclaimer as a condition to entering into the Transactions, covenants and agrees not to assert it against the Company, the Guarantor or any of their respective officers, directors, shareholders, partners, representatives, agents or affiliates; and (iv) neither the Company nor the Guarantors shall have any liability, and each Holder waives and releases any claim that such Holder might have against the Company, the Guarantor or any of their respective officers, directors, shareholders, partners, representatives, agents and affiliates whether under applicable securities law or otherwise, based on the knowledge, possession or nondisclosure by the Company or the Guarantors to each Holder of the Information. Each Holder further represents and acknowledges that is has received and reviewed (a) a copy of the prospectus, dated April 27, 2009, as amended and supplemented to date (or if resident in Canada, a copy of the Canadian offering memorandum dated April 27, 2009 which incorporates the prospectus, as amended and supplemented to date), relating to the offers by the Company and the Guarantor to exchange certain series of securities, including the Notes, which includes and incorporates by reference material public information concerning the Company and the Guarantors and (b) the Form 8-K filed by the Guarantor on May 28, 2009 relating to the proposed sale by the Guarantor of substantially all of its assets pursuant to Section 363(b) of the U.S. Bankruptcy Code.

8.  <u>Specific Performance</u>.  Each of the Parties hereto recognizes and acknowledges that a breach by any of the Parties hereto of any covenants or agreements contained in this Agreement will cause the other Parties to sustain damages for which such Parties would not have an adequate remedy at law for money damages, and therefore each Party hereto agrees that in the event of any such breach the other Parties shall be entitled to the remedy of specific performance of such covenants and agreements and injunctive and other equitable relief in addition to any other remedy to which such Parties may be entitled, at law or in equity.

9.  <u>Remedies Cumulative</u>.  All rights, powers and remedies provided under this Agreement or otherwise available in respect hereof at law or in equity shall be cumulative and not alternative, and the exercise of any right, power or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power or remedy by such Party.

10.  <u>Effectiveness; Amendments</u>.  This Agreement shall not become effective and binding on a Party unless and until a counterpart signature page to this Agreement has been executed and delivered by such Party. Except as otherwise provided herein, once effective, this Agreement may not be modified, amended or supplemented except in a writing signed by each of the Parties hereto.

11.  <u>No Waiver</u>.  The failure of any Party hereto to exercise any right, power or remedy provided under this Agreement or otherwise available in respect hereof at law or in equity, or to

insist upon compliance by any other Party hereto with its obligations hereunder, and any custom or practice of the Parties at variance with the terms hereof, shall not constitute a waiver by such Party of its right to exercise any such or other right, power or remedy or to demand such compliance.

12. No Admission. Neither this Agreement nor the settlement contained herein, nor any act performed or document executed pursuant to or in furtherance of this Agreement or the settlement: (a) is or may be deemed to be or may be used as an admission of, or evidence of, the validity of any claims released pursuant to Section 5 above, or of any wrongdoing or liability of or damage by any of the Parties hereto or their directors; or (b) is or may be deemed to be or may be used as an admission of, or evidence of, any fault or omission of any of the Parties hereto or their respective directors in any civil, criminal or administrative proceeding in any court, administrative proceeding in any court, administrative agency or other tribunal. The Parties and the Released Persons may file this Agreement and Exhibits in any action that may be brought against them in order to support a defense or counterclaim based on principles of *res judicata*, collateral estoppel, release, good faith settlement, judgment bar or reduction, or any other theory of claim preclusion or issue preclusion or similar defense or counterclaim.

13. Governing Law; Jurisdiction. This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, regardless of the laws that might otherwise govern under applicable principles of conflict of laws of the State of New York. The Parties hereby irrevocably and unconditionally submit to the jurisdiction of any federal or state court located within the borough of Manhattan of the City, County and State of New York over any dispute for purposes of any action, suit or proceeding arising out of or relating to this Agreement or any of the transactions contemplated hereby. Each party irrevocably waives any objection it may have to the venue of any action, suit or proceeding brought in such court or to the convenience of the forum.

14. Notices. All notices and consents hereunder shall be in writing and shall be deemed to have been duly given upon receipt if personally delivered by courier service, messenger, facsimile, or by certified or registered mail, postage prepaid return receipt requested, to the following addresses, or such other addresses as may be furnished hereafter by notice in writing, to the following parties:

        If to any one Holder, to:

        such Holder at the address shown for such Holder on the applicable signature page hereto, to the attention of the person who has signed this Agreement on behalf of such Holder

        with copies to:

Greenberg Traurig, LLP
200 Park Avenue
New York, NY 10166
Facsimile No.: (212) 801-9362
Attn:   Bruce R. Zirinsky
        Clifford E. Neimeth
        Anthony J. Marsico

And

Fried, Frank, Harris, Shriver & Jacobson LLP
One New York Plaza
New York, NY 10004
Facsimile No.: (212) 859-8583
Attn: Brian D. Pfeiffer

If to the Company, to:

General Motors Nova Scotia Finance Company
1300-1969 Upper Water Street
Purdy's Wharf Tower Tower II
Halifax, Nova Scotia, Canada B3J 3R7

Facsimile No.: (905) 644-7319
Attn:   Chief Executive Offer, Chief Financial Officer and
        Principal Accounting Officer

with a copy to:
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Facsimile No.: (212) 310-8007
Attn: Todd R. Chandler

    15. <u>Representation by Counsel</u>. Each Party acknowledges that it has been represented by counsel in connection with this Agreement and the transactions contemplated by this Agreement. Accordingly, any rule of law or any legal decision that would provide any Party with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel shall have no application and is expressly waived.

    16. <u>Consideration</u>. It is hereby acknowledged by the Parties that, other than the agreements, covenants, representations and warranties of the Parties, as more particularly set forth herein, no consideration shall be due or paid to the Company for their agreement to use their commercially reasonable efforts to consummate the Transactions and the Extraordinary Resolutions in accordance with the terms and conditions of this Agreement.

17. <u>Headings</u>.  The headings of the sections and subsections of this Agreement are inserted for convenience only and shall not affect the interpretation hereof.

18. <u>Successors and Assigns</u>.  This Agreement is intended to bind and inure to the benefit of the Parties and their respective permitted successors, assigns, heirs, executors, administrators and representatives.

19. <u>Several, Not Joint, Obligations</u>.  The agreements, representations and obligations of the Parties under this Agreement are, in all respects, several and not joint.

20. <u>Prior Negotiations</u>.  This Agreement supersedes all prior negotiations with respect to the subject matter hereof but shall not supersede the Extraordinary Resolution or the Transaction Documents.

21. <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which shall constitute one and the same Agreement. Delivery of an executed signature page of this Agreement by facsimile or e-mail shall be as effective as delivery of a manually executed signature page of this Agreement.

22. <u>No Third-Party Beneficiaries</u>.  Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties, and no other person or entity shall be a third party beneficiary hereof.

23. <u>Severability</u>.  Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof or affecting the validity or enforceability of such provision in any other jurisdiction.

24. <u>Additional Parties</u>.  Without in any way limiting the provisions hereof, additional holders of the Notes may elect to become Parties by executing and delivering to the Company a counterpart hereof.  Such additional holder shall become a party to this Agreement as a Holder in accordance with the terms of this Agreement.

IN WITNESS WHEREOF, each of the Parties has caused this Agreement to be executed and delivered by its duly authorized officer as of the date first above written.

GENERAL MOTORS NOVA SCOTIA FINANCE COMPANY

By: _____
    Name:
    Title:


GENERAL MOTORS CORPORATION

By: _____
    Name:
    Title:


GENERAL MOTORS OF CANADA LIMITED

By: _____
    Name:
    Title:


GM NOVA SCOTIA INVESTMENTS LTD.

By: _____
    Name:
    Title:

ERROR! UNKNOWN DOCUMENT PROPERTY NAME.

**Signature Page to Lockup Agreement**

**HOLDERS:**

Firm:

By:

By:_____

Name:

Title:

Principal amount of 2015 Notes held:  $_____

Principal amount of 2023 Notes held:  $_____

Date:  _____

Address:

Attention:

Fax:

**Signature Page to Lockup Agreement**

Exhibit A

## Extraordinary Resolution

Set out below in a combination form is the text of the Extraordinary Resolution. For clarity, the opening text for the Extraordinary Resolution in respect of each series has been set out separately.

*For the 2015 Notes:*

"THAT THIS MEETING (the "**2015 Meeting**") of the holders of the 2015 Notes (the "**2015 Holders**") and benefiting from the provisions of the fiscal and paying agency agreement among General Motors Nova Scotia Finance Company (the "**Company**"), General Motors Corporation, Deutsche Bank Luxembourg S.A. (the "**Fiscal Agent**") and Banque Générale du Luxembourg S.A. (the "**Paying Agent**" and together with the Fiscal Agent, the "**Agents**") dated as of July 10, 2003 (the "**Fiscal and Paying Agency Agreement**"), by Extraordinary Resolution (the "**Extraordinary Resolution**"), HEREBY: "

*For the 2023 Notes:*

"THAT THIS MEETING (the "**2023 Meeting**") of the holders of the 2023 Notes (the "**2023 Holders**") and benefiting from the provisions of the fiscal and paying agency agreement among General Motors Nova Scotia Finance Company (the "**Company**"), General Motors Corporation, Deutsche Bank Luxembourg S.A. (the "**Fiscal Agent**") and Banque Générale du Luxembourg S.A. (the "**Paying Agent**" and together with the Fiscal Agent, the "**Agents**") dated as of July 10, 2003 (the "**Fiscal and Paying Agency Agreement**"), by Extraordinary Resolution (the "**Extraordinary Resolution**"), HEREBY: "

*For the 2015 and 2023 Notes (each series voting separately)*

**RESOLVES** by special quorum an Extraordinary Resolution in accordance with the proviso to paragraph 5 of Schedule 4 of the Fiscal and Paying Agency Agreement to authorize and direct the addition of a new provision at the end of, and forming part of, Condition 6 of Schedule 1 of the Fiscal and Paying Agency Agreement, which also forms a part of the Global Notes representing the 2015 Notes and the 2023 Notes, as follows:

"**Certain Claims**

Upon the approval of the Extraordinary Resolution at the Meeting and the payment by the Company and the Paying Agent of the Consent Fee to each of the Noteholders in accordance therewith, each Noteholder hereby releases and discharges the defendants in the Nova Scotia Proceeding (and the past and/or present directors, officers, employees, partners, insurers, co-insurers, controlling shareholders, attorneys, advisers, consultants, accountants or auditors, personal or legal representatives, predecessors, successors, parents, subsidiaries, divisions, joint ventures, assigns, spouses, heirs, related and/or affiliated entities of each of them) from all claims and demands that are raised in

the proceeding in the Supreme Court of Nova Scotia titled Aurelius Capital Partners, LP v. General Motors Corporation et al, Court File No. HFX No. 308066 (the "**Nova Scotia Proceeding**"), and agrees to discontinue the Nova Scotia Proceeding on a without costs basis. Nothing contained in this Extraordinary Resolution shall preclude any Noteholder from pursuing any of the claims raised in the Nova Scotia Proceeding against any of the Canadian Entities or the Guarantor or any of the other debtors in the Chapter 11 Cases in the event that the payment of the Consent Fee is successfully challenged by any person in a future proceeding and, as a result, an amount equal to the Consent Fee has been repaid; provided, that, this Extraordinary Resolution precludes each Noteholder from pursuing any of the claims raised in the Nova Scotia Proceeding against any of Neil Macdonald, John Stapleton, Mercedes Michel and Maurita Sutedja (and their respective heirs, administrators and assigns) in the event that the payment of the Consent Fee is successfully challenged by any person in a future proceeding.

Upon the approval of the Extraordinary Resolution at the Meeting and the payment by the Company and the Paying Agent of the Consent Fee to each of the Noteholders in accordance therewith, each Noteholder waives all (and shall cease to have any) rights and claims against the Company in respect of the Loan Agreements (as defined below), including with respect to any compromise or settlement of the loans thereunder, and such Noteholder's rights in the Loan Agreements, and each Noteholder hereby releases and discharges GM Canada (and its past and present officers, directors and employees), Neil Macdonald, John Stapleton, Mercedes Michel and Maurita Sutedja (and their respective heirs, administrators and assigns) from all claims and demands whatsoever, presently known or unknown, which the Noteholders ever had, now have or may hereafter have against them by reason of claims and demands arising from or in connection with those certain loan agreements between the Company and GM Canada each dated as of July 10, 2003 and pursuant to which GM Canada borrowed from the Company the sum of five hundred fifty-five million, eight hundred sixty thousand Canadian dollars (C$555,860,000), and the sum of seven hundred seventy-eight million, two hundred four thousand Canadian dollars (C$778,204,000), respectively (collectively, the "**Loan Agreements**"), provided that nothing contained in this Extraordinary Resolution shall preclude the Noteholders from pursuing any claim in respect of the parties and claims otherwise released in this paragraph in the event that the payment of the Consent Fee is successfully challenged by any person in a future proceeding and, as a result, an amount equal to the Consent Fee has been repaid. Furthermore, in the event that the payment of the Consent Fee is successfully challenged by any person in a future proceeding, and, as a result, an amount equal to the Consent Fee has been repaid, the settlement between the Company and GM Canada of the amount owing under the Loan Agreements as contemplated by this Transaction shall be null and void and the full amount owing under the Loan Agreements as of the date hereof shall be immediately due and payable according to their terms as they exist as of the date hereof.

Upon the approval of the Extraordinary Resolution at the Meeting and the payment by the Company and the Paying Agent of the Consent Fee to each of the Noteholders in accordance therewith, with respect to any other claim it may have against

the Canadian Entities or the Guarantor in its capacity as a holder of the Notes, the Noteholder covenants and agrees not to pursue any claim it may have other than in connection with the advancement of its claim under the Guarantee, the advancement of its claim against GM Nova Scotia in respect of the Notes and the Deficiency Claim (each as defined below). Nothing contained in this Extraordinary Resolution shall preclude the Noteholder from pursuing any other claim it may have against the Canadian Entities or the Guarantor or any of the other debtors in the Chapter 11 Cases in the event that the payment of the Consent Fee is successfully challenged by any person in a future proceeding. For purposes of this Extraordinary Resolution, the "**Guarantee**" shall mean that certain guarantee of the Notes by the Guarantor included in the Fiscal and Paying Agency Agreement and the Notes.

Nothing contained in this Extraordinary Resolution is in any way intended to, nor shall it in any way operate to, directly or indirectly, limit, waive, impair or restrict, any rights, interests, remedies or claims (whether at law or in equity, and whether now or hereafter existing) which any Noteholder may have against, or to which any Noteholder is due or owed from, the Company in respect of the Notes or the Guarantor in respect of the Guarantee Claim or the Deficiency Claim (as such terms are defined in the Lock-up Agreement). It is hereby expressly acknowledged, agreed and confirmed that that (i) the Deficiency Claim is a valid and enforceable claim of the Company and shall be enforceable against the Guarantor as allowed pre-petition general unsecured claims (the "**Allowed Claims**") to the fullest extent permitted under applicable laws, (ii) the Notes are valid and enforceable claims to the Noteholders and shall be enforceable against the Company in their full amount, and (iii) the Guarantee Claim is a valid and enforceable claim of the Noteholders and shall be enforceable against the Guarantor as Allowed Claims to the fullest extent permitted under applicable laws.

For purposes of clarity, it is understood and agreed that nothing contained in this Extraordinary Resolution shall: (i) release in any respect whatsoever any claim against the Company on the Notes or any claim against the Guarantor on the Guarantee, or (ii) preclude a Noteholder from pursuing any claim it may have against the Guarantor or any of the other debtors in the Chapter 11 Cases or any other Party that is not based on such Holder's ownership of Notes.

The Consent Fee payment does not reduce, limit or impair the Notes, the Guarantee Claim or the Deficiency Claim.

The Guarantor confirms that its only claim against the Company is the Swap Liability. If for any reason any portion of the Deficiency Claim is disallowed, the Guarantor agrees that the Swap Liability is subordinated to the prior, indefeasible payment in full of the Notes. In any event, any and all other undisclosed indebtedness, claims, liabilities or obligations of the Company to the Guarantor other than the Swap Liability are subordinated to the prior, indefeasible payment in full of the Notes. To the extent of the subordination provided for herein, the Guarantor agrees that should it receive any payments from the Company or a trustee in bankruptcy of the Company, it will hold such payment in trust and immediately pay over such amounts to the paying

agent for the Notes. For purposes of this Extraordinary Resolution, "**Swap Liability**" shall mean the obligations of the Company to the Guarantor, under currency swap arrangements between the Guarantor and the Company.

The Guarantor shall not assert any right of set-off in respect of the Deficiency Claim.

**RESOLVES** by special quorum an Extraordinary Resolution in accordance with Schedule 4 of the Fiscal and Paying Agency Agreement to pay, subject to the approval of the foregoing Extraordinary Resolution by the requisite Noteholders, an amount equal to £366.46 per £1,000 of principal amount of the 2015 Notes outstanding and £380.17 per £1,000 of principal amount of the 2023 Notes outstanding (the "**Consent Fee**"), immediately following the approval of the foregoing Extraordinary Resolution by the requisite Noteholders. The Consent Fee shall be paid to the common depository by wire transfer, and Euroclear and Clearstream, as applicable, will credit the relevant accounts of their participants on the payment date. Payments in respect of Notes not evidenced by Global Notes shall be made by wire transfer, direct deposit or check mailed to the address of the holder entitled thereto as such address shall appear on the register of the Company.

**RESOLVES** by ordinary quorum an Extraordinary Resolution in accordance with the proviso to paragraph 5 of Schedule 4 of the Fiscal and Paying Agency Agreement to authorize and direct the following:

(a) authorizes, directs and empowers the Agents to concur in, approve, and execute, and do all such deeds, instruments, acts and things that may be necessary to carry out and give effect to these resolutions;

(b) sanctions, assents to and approves any necessary or consequential amendment to the Fiscal and Paying Agency Agreement to effect these resolutions; and

(c) acknowledges that capitalized terms used in these resolutions have the same meanings as those defined in the Fiscal and Paying Agency Agreement, as applicable.

**Exhibit B**

**Escrow Term Sheet**

| | |
|---|---|
| **Escrow Agent** | A Canadian institutional trustee mutually satisfactory to the parties, acting reasonably |

**Deposit**  GMCL deposits the Consent Fee (the "Escrow Amount") into a segregated account maintained on behalf of GMCL and GM Nova Scotia and the Holders with the Escrow Agent with a Canadian financial institution ("Escrow Account #1")

**Release upon passing of extraordinary resolution**  Upon receipt by the Escrow Agent of the scrutineer's report for the noteholder Meeting evidencing that the Extraordinary Resolution has been duly passed by the requisite majority of noteholders, the Escrow Agent shall cause the Escrow Amount to be deposited into a new segregated account opened on behalf of GM Nova Scotia and maintained by the Escrow Agent with a Canadian financial institution ("Escrow Account #2").

Upon deposit of the Escrow Amount in Account #2, GM Nova Scotia shall be deemed to have acknowledged and agreed that the loans under the Loan Agreements shall have been settled and compromised in full subject to the terms of the Lock-Up Agreement.

Immediately upon the deposit of the Escrow Amount into Account #2, the Escrow Agent shall release the Escrow Amount and cause the Escrow Amount to be deposited with the Fiscal Paying Agent into the account specified by the Fiscal Paying Agent on Schedule A to the Escrow Agreement.

**Release of funds to GMCL**  The Escrow Agent shall cause the Escrow Amount to be released from Escrow Account #1 to GMCL and deposited into the account specified by GMCL on Schedule B to the Escrow Agreement in the following circumstances:

(i) if GM Nova Scotia and all of the Holders notify the Escrow Agent that the Meeting called for the passage of the Extraordinary Resolution has failed to occur prior to July 9, 2009 due to circumstances which are outside GM Nova Scotia's control and the Lockup Agreement has been terminated by the Holders; or

(ii) upon receipt by the Escrow Agent of the scrutineer's report for the noteholder Meeting evidencing that after holding the Meeting, the Extraordinary Resolution failed to be passed by the requisite majority of

ERROR! UNKNOWN DOCUMENT PROPERTY NAME.

- 2 -

noteholders.

**Release upon Bankruptcy or Failure to hold meeting**

Upon receipt of notice by the Requisite Holders of any of the following events, the Escrow Agent shall cause the Escrow Amount to be released from Escrow Account #1 to all of the Holders and deposited into such accounts as may be specified in writing by each relevant Holder:

(a)   Bankruptcy, CCAA or any similar proceeding of GM Nova Scotia initiated directly or indirectly or fomented in any way by GM Nova Scotia or one of its affiliates;

(b)   a bankruptcy, CCAA or any similar proceeding of GMCL initiated directly or indirectly or fomented in any way by GMCL or one of its affiliates; or

(c)   a failure to hold the Meeting by July 9, 2009 due to circumstances which are within GM Nova Scotia's control.

For purposes of this section, **"Requisite Holders"** means Holders representing at least 51% of the outstanding principal amount of each series of Notes.

**Release upon disputed Material Breach**

In the case of a material breach of the Lockup Agreement other than those referred to above, the Escrow Agent shall retain the Escrow Amount in Escrow Account #1 until the Escrow Agent receives a final court order determining that such Material Breach has occurred. In such circumstances, the Escrow Agent shall pay out the Escrow Amount from Escrow Account #1 in a manner consistent with such court order (it being understood that if a Material Breach has occurred, the Escrow Amount shall be paid to the Holders).

**Interest**

Accrues to benefit of GMCL from date of Escrow Agreement to June 30, 2009 inclusive; thereafter accrues for the benefit of the Holders.

**Currency**

British Pounds

**Fees**

All fees of the Escrow Agent shall be for the account of GMCL. Fees and expenses of the Escrow Agent arising from court proceedings will be paid by GMCL subject to a right of reimbursement from the Escrow Amount in the event that GMCL is successful in such court

- 3 -

proceedings.

**Indemnity**          GMCL (unless broader indemnity required by Escrow Agent).

**Termination**        The Escrow Agreement shall be entered into no later than Wednesday
                       June 4, 2009.

**Definitions**        Defined terms shall have the meanings set out in the Lock-Up
                       Agreement.

**Governing Law**      Ontario

# EXHIBIT N

8-K 1 d8k.htm FORM 8-K

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, DC 20549-1004

# FORM 8-K

### CURRENT REPORT
### PURSUANT TO SECTION 13 OR 15(d) OF
### THE SECURITIES EXCHANGE ACT OF 1934

Date of Report (Date of earliest event reported) May 27, 2009

# GENERAL MOTORS CORPORATION
(Exact Name of Registrant as Specified in its Charter)

| | |
|---|---|
| **DELAWARE** | **38-0572515** |
| (State or other jurisdiction of incorporation) | (I.R.S. Employer Identification No.) |
| **300 Renaissance Center, Detroit, Michigan** | **48265-3000** |
| (Address of Principal Executive Offices) | (Zip Code) |

**(313) 556-5000**
(Registrant's telephone number, including area code)

**Not Applicable**
(Former name or former address, if changed since last report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐   Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐   Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐   Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐   Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**ITEM 1.01  Entry into a Material Definitive Agreement**

**ITEM 2.03  Creation of a Direct Financial Obligation or an Obligation under an Off-Balance Sheet Arrangement of a Registrant**

The U.S. Government previously announced that it would establish a warranty program (the "Warranty Program") pursuant to which a separate account would be created and funded with cash contributed by GM and a loan from the U.S. Treasury to ensure the payment for repairs covered by GM's limited warranty obligations in respect of each new vehicle (the "Subject Vehicles") sold to retail customers in the United States and Mexico by GM during GM's restructuring period.

On May 27, 2009, GM entered into Amendment Number Four ("Amendment Four") to the Loan and Security Agreement dated as of December 31, 2008 (as amended, the "Loan Agreement") between GM, as borrower, and the U.S. Treasury, as lender. Amendment Four increased the aggregate maximum amount available for GM to borrow under the Loan Agreement by $360.6 million to $19.76 billion. On May 29, GM borrowed $360.6 million under the Loan Agreement (the "Warranty Advance") and delivered an additional note payable to the U.S. Treasury (the "Additional Note") in a principal amount of $24.1 million as additional compensation for the Warranty Advance, pursuant to the terms of the Warrant Agreement dated as of December 31, 2008 between GM and the U.S. Treasury. The proceeds of the Warranty Advance funded the separate account associated with the Warranty Program that was established by GM Warranty LLC ("GM Warranty"), a new special purpose subsidiary of GM that was formed for purposes of the Warranty Program. Also on May 29, 2009 we made a cash contribution to GM Warranty of $49.2 million.

The Warranty Advance bears an interest rate per annum equal to the three-month LIBOR rate plus 3.5%, and is scheduled to mature 36 months after the end of GM's restructuring period. The Additional Note is due on December 30, 2011, and bears interest, payable quarterly, at a rate per annum equal to the three-month LIBOR rate plus 3.5%. The Warranty Advance and the Additional Note are each subject to the same events of default applicable to all other advances and additional notes under the Loan Agreement, except that a bankruptcy of GM will not cause an automatic acceleration of the Warranty Advance.

GM's obligations under the Warranty Advance are only guaranteed by, and are only secured by the assets of, GM Warranty. This $409.8 million of cash at GM Warranty (comprised of the $360.6 million Warranty Advance and the $49.2 million GM contribution) equals 125% of the costs projected by us to be required to satisfy anticipated claims under the limited warranty issued on the Subject Vehicles during GM's restructuring period. As required by the Loan Agreement, prior to receiving the Warranty Advance, GM provided a statement describing its intended use of the proceeds of the Warranty Advance.

**ITEM 1.01  Entry into a Material Definitive Agreement**

On June 1, 2009, GM and its subsidiaries General Motors Nova Scotia Finance Company ("GM Nova Scotia"), General Motors of Canada Limited ("GM of Canada") and General Motors Nova Scotia Investments Limited entered into a lock up agreement (the "Agreement") with certain holders (the "Participating Holders") of GM Nova Scotia's 8.375% guaranteed notes due December 7, 2015 and 8.875% guaranteed notes due July 10, 2023 issued by GM Nova Scotia which are guaranteed by GM (the "Nova Scotia Notes"). The Agreement provides for contingent settlement of the case *Aurelius Capital Partners LP et al v. General Motors Corporation et al*, initiated on March 2, 2009 in the Supreme Court of Nova Scotia and for a release of all defendants to that proceeding.

Under the Agreement, the Participating Holders also agreed to vote in favor of an extraordinary resolution where the holders of Nova Scotia Notes waive all rights and claims against GM Nova Scotia in respect of the intercompany loan obligations in the principal amount of C$1,334,064,000 owed by GM of Canada to GM Nova Scotia. The Participating Holders hold more than two thirds of the aggregate principal amount of each series of Nova Scotia Notes, which is the amount required to pass an extraordinary resolution. The extraordinary resolution is expected to be voted on at a forthcoming meeting of holders of Nova Scotia Notes.

If such extraordinary resolution is successfully passed, GM Nova Scotia will make a cash payment of £366.46 per £1,000 par value of outstanding Nova Scotia Notes due 2015 and £380.17 per £1,000 par value of outstanding Nova Scotia Notes due 2023. The funding for such payment will be provided by GM of Canada and in connection therewith the intercompany loan obligations owed by GM of Canada to GM Nova Scotia will be extinguished. The cash payment will not reduce the principal amount outstanding of the Nova Scotia Notes and the GM guarantee will remain in force.

The Agreement further acknowledges the existence of a deficiency claim in an amount sufficient (if paid in full) for GM Nova Scotia to pay its debts and liabilities, including those with respect to the Nova Scotia Notes, running from GM Nova Scotia to GM, that will not be reduced by the settlement payment. The Agreement further provides that, under certain circumstances, GM will subordinate its claims against GM Nova Scotia to that deficiency obligation.

As part of the foregoing transaction and subject to a confidentiality agreement, the Participating Holders received certain financial information with respect to GM of Canada (the "Subject Financial Information"). GM is furnishing the Subject Financial Information in Exhibit 99.1 to this Form 8-K. This information consists of certain preliminary unaudited financial information with respect to GM of Canada as of and for the year ending December 31, 2008 and certain previously reported and preliminary unaudited financial information of GM of Canada as of and for the year ending December 31, 2007. The Subject Financial Information is prepared in accordance with accounting principals generally accepted in Canada and does not purport to show the financial statements of GM of Canada in accordance with accounting principals generally accepted in the United States of America ("U.S. GAAP") and, therefore, certain information would be different under U.S. GAAP. GM cautions readers not to place undue reliance on the Subject Financial Information. Additionally, the columns not identified as previously reported are preliminary, unaudited information and subject to adjustment. GM does not undertake any duty to update the Subject Financial Information. The furnishing of the information set forth in Exhibit 99.1 is not intended to, and does not, constitute a determination or confirmation as to the materiality or completeness of such information or its adequacy for any purpose.

**ITEM 9.01 Financial Statements and Exhibits**

Number    Description
99.1      General Motors of Canada Limited Financial Information

Form 8-K                                                                 Page 4 of 5

---

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

GENERAL MOTORS CORPORATION
(Registrant)

June 1, 2009                        By:    /s/ Nick S. Cyprus
(Date)                                     Nick S. Cyprus
                                           Controller and Chief Accounting Officer

Form 8-K                                                                                    Page 5 of 5

---

**EXHIBIT INDEX**

| Number | Description |
|--------|-------------|
| 99.1 | General Motors of Canada Limited Financial Information |

# **EXHIBIT O**

CORRECT: GM Nova Scotia Unit In Pact To Settle Canada Bondholder Suit Dow Jones News
Service June 1, 2009 Monday 7:23 PM GMT

 **LexisNexis®**

FOCUS - 28 of 63 DOCUMENTS

Copyright 2009 Factiva ®, from Dow Jones
All Rights Reserved
Dow Jones Factiva

(c) 2009 Dow Jones & Company, Inc.
Dow Jones Newswires
Dow Jones News Service

**June 1, 2009 Monday 7:23 PM GMT**

**LENGTH:** 304 words

**HEADLINE:** CORRECT: **GM Nova Scotia** Unit In Pact To **Settle** Canada Bondholder Suit

**BODY:**

DOW JONES NEWSWIRES

("**GM Nova Scotia** Unit In Pact To **Settle** Canada Bondholder Suit," published at 2:58 p.m. EDT, incorrectly stated the principal amount owed by **GM** of Canada to **GM Nova Scotia** in the fourth paragraph. A correct version follows.)

**General Motors** Corp. (**GM**) said Monday that its **Nova Scotia** units have entered an **agreement to settle** a Canadian bondholder suit.

The units, **General Motors Nova Scotia** Finance Co., **General Motors** of Canada Ltd., and **General Motors Nova Scotia** Investments Ltd. have entered into a pact to **settle** the suit, brought in March, by investment funds including Aurelius Capital Partners LP.

The suit alleged that **GM** wrongfully pulled about $600 million from a Canadian **subsidiary** in 2008 to address a growing liquidity problem in the U. S.

In the pact, entered into Monday, the participating holders have also agreed to vote in favor of an "extraordinary resolution" where the holders of **Nova Scotia** notes waive all rights and claims against **GM Nova Scotia** in respect of the intercompany loan obligations in the principal amount of $1C.33 billion owed by **GM** of Canada to **GM Nova Scotia**.

Those holders hold more than two-thirds of the aggregate principal amount of each series of **Nova Scotia** notes, which is the amount required to pass an extraordinary resolution.

CORRECT: GM Nova Scotia Unit In Pact To Settle Canada Bondholder Suit Dow Jones News
Service June 1, 2009 Monday 7:23 PM GMT

If the resolution is successfully passed, **GM Nova Scotia** will make a cash payment of
GBP366.46 per GBP1,000 par value of outstanding **Nova Scotia** notes due 2015 and GBP380.17
per GBP1,000 par value of outstanding **Nova Scotia** notes due 2023.

**GM** said the funding for such payment will be provided by **GM** of Canada and in connection
therewith the intercompany loan obligations owed by **GM** of Canada to **GM Nova Scotia** will be
extinguished.

-By Brian Kalish; Dow Jones Newswires; 202-862-1350; brian.kalish@dowjones.com [ 06-
01-09 1523ET ]

**NOTES:**
PUBLISHER: Dow Jones & Company, Inc.

**LOAD-DATE:** June 2, 2009

# **EXHIBIT P**

EXECUTION VERSION

## FIRST AMENDMENT, CONSENT AND WAIVER UNDER
## DEBTOR-IN-POSSESSION CREDIT AGREEMENT

FIRST AMENDMENT, CONSENT AND WAIVER UNDER DEBTOR-IN-POSSESSION CREDIT AGREEMENT, dated as of June 25, 2009 (this "Amendment"), to the SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT, dated as of June 3, 2009 (as amended, supplemented, extended or restated, or otherwise modified from time to time, the "DIP Credit Agreement"), among GENERAL MOTORS CORPORATION, a Delaware corporation, as the Borrower, the UNITED STATES DEPARTMENT OF THE TREASURY, as a Lender, EXPORT DEVELOPMENT CANADA, as a Lender, and the Guarantors party thereto from time to time.

### RECITALS

WHEREAS, the Borrower has requested that the Lenders make certain amendments to the DIP Credit Agreement; and

WHEREAS, the Lenders have agreed to amend the DIP Credit Agreement solely upon the terms and conditions set forth herein;

NOW, THEREFORE, in consideration of the premises and the agreements hereinafter set forth, the parties hereto hereby agree as follows:

1.    Defined Terms.  Unless otherwise noted herein, terms defined in the DIP Credit Agreement and used herein shall have the meanings given to them in the DIP Credit Agreement.

2.    Amendment to Section 1.1 (Defined Terms) of the DIP Credit Agreement.  The following new definitions shall hereby be added to Section 1.1 of the DIP Credit Agreement in the appropriate alphabetical order:

"'Delphi Transaction Documents': collectively, (i) that certain Master Disposition Agreement dated as of June 1, 2009, executed by Delphi Corporation, GM Components Holdings, LLC, General Motors Corporation, Parnassus Holdings II, LLC ("PH II"), a Delaware limited liability company, and the other sellers and buyers party thereto, (ii) that certain Securities Purchase Agreement dated as of June 1, 2009 (the "Securities Purchase Agreement") among Parnassus Holdings I, LLC, a Delaware limited liability company, PH II and General Motors Corporation, (iii) that certain Amended and Restated GM-Delphi Agreement dated as of June 1, 2009 among Delphi Corporation, the subsidiaries of Delphi Corporation party thereto and General Motors Corporation, and (iv) a Credit Agreement substantially in the form attached as Exhibit A to the Securities Purchase Agreement, pursuant to which General Motors Corporation agrees to make a loan to PH II in the amount set forth therein, each as in effect or in the form proposed, as applicable, as of June 1, 2009.

'Delphi Alternative Transactions': transactions similar to the Delphi Proposed Transactions that (i) have terms that, taken as a whole, are, in the Borrower's judgment, equally or more advantageous to the Borrower than the Delphi Proposed Transactions, (ii) do not require the aggregate amount of the Borrower's Investments made in

connection with such transactions to exceed the amount of the Borrower's Investments contemplated by the Delphi Proposed Transactions and (iii) are approved in advance, in writing by the Required Lenders and, if required, authorized by the Bankruptcy Court.

'Delphi Proposed Transactions': the transactions to be entered by the Borrower and its Subsidiaries pursuant to or as contemplated by the terms of any of the Delphi Transaction Documents.

'Delphi Transactions': either the Delphi Proposed Transactions or the Delphi Alternative Transactions, as applicable.".

3.    Amendments to Section 1.1 (Defined Terms) of the DIP Credit Agreement.  The definition of "Permitted Investments" set forth under Section 1.1 of the DIP Credit Agreement is hereby amended by (i) deleting the "and" as it appears at the end of clause (r); (ii) deleting the "." as it appears at the end of clause (s) and inserting in lieu thereof "; and", and (iii) adding the following language as new clause (t):

"(t)    any of the Delphi Transactions.".

4.    Amendments to Section 6.21(b) (Financial Condition Covenants; Total Cash Disbursements) of the DIP Credit Agreement.  Section 6.21(b) (Financial Condition Covenants; Total Cash Disbursements) is hereby amended and restated in its entirety and replaced with the following:

"(b)    Total Cash Disbursements.  The Borrower shall not permit, at any date, the net amount of cash disbursements (excluding disbursements applied against the outstanding balances of the Prepetition Term Loan Agreement, the Prepetition Revolver Credit Agreement, Contingency Reserve Loans and disbursements made by the Borrower provided for in the agreements that document the Delphi Transactions) made from the Petition Date until such date to exceed the total amount permitted for such date in Schedule 6.21(b).".

5.    Amendment to Section 8.1 (Amendments and Waivers).    Section 8.1 (Amendments and Waivers) is hereby amended by deleting the reference to "6.21(b)" as it appears in Section 8.1 and inserting in lieu thereof "6.21(c)".

6.    Amendment to Schedule 6.21(a) (Maximum Borrowing Amount Excluding Contingency Reserve Loans).  Schedule 6.21(a) (Maximum Borrowing Amount Excluding Contingency Reserve Loans) is hereby amended by inserting at the end of the note set forth at the end of such Schedule the words "and such other documents acceptable to the Required Lenders in their sole discretion".

7.    Consent.  The Required Lenders hereby consent to GM Nova Scotia's having provided a consent to an order under the Bankruptcy and Insolvency Act (Canada) as set forth in Section 6(b) of that certain Lock Up Agreement, dated as of June 1, 2009 (as in effect on such date, the "Lock-Up Agreement") by and among the Borrower, General Motors Nova Scotia Finance Company, a Nova Scotia unlimited company ("GM Nova Scotia"), General Motors of Canada Limited, a Canadian federal corporation ("GM Canada"), GM Nova Scotia Investments Ltd., a Nova Scotia company and certain beneficial owners of notes issued by GM Nova Scotia; provided that (i) if the conditions required for effectiveness of the waivers, releases and discharges provided by the Holders (as defined in the Lock Up Agreement) in Section 5(b) of the Lock Up Agreement are not satisfied or (ii) if such releases and discharges cease to be effective to preclude the Holders from pursuing any claim in respect of GM

Canada otherwise released pursuant to Section 5(b) of the Lock Up Agreement, then, in either case, this consent shall automatically cease to be effective.

8.    <u>Waiver</u>.  The Required Lenders hereby waive any Default or Event of Default that may have occurred under the DIP Credit Agreement solely to the extent that such Default or Event of Default would not have occurred if the amendments and consent set forth in Sections 2 through 7 hereof effected hereby were made prior to the occurrence of such Default or Event of Default; <u>provided</u> that any waiver set forth in this Section 8 with respect to the consent set forth in Section 7 above shall not be effective if such consent ceases to be effective as provided in Section 7.

9.    <u>Representations and Warranties</u>.  To induce the other parties hereto to enter into this Amendment, the Borrower hereby represents and warrants to each of the Lenders that the representations and warranties contained in Section 3 of the DIP Credit Agreement are true and correct in all material respects on and as of the date hereof with the same effect as though made on and as of the date hereof, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties were true and correct in all material respects as of such earlier date).

10.    <u>Conditions to Effectiveness</u>.  This Amendment shall become effective, as of the date first written above, upon the execution and delivery of counterparts of this Amendment duly executed by the Borrower.

11.    <u>Limited Effect</u>.  Except as expressly provided hereby, all of the terms and provisions of the DIP Credit Agreement and the other Loan Documents are and shall remain in full force and effect.  The amendments contained herein shall not be construed as a waiver or amendment of any other provision of the DIP Credit Agreement or the other Loan Documents or for any purpose except as expressly set forth herein or a consent to any further or future action on the part of the Borrower that would require the waiver or consent of the Lenders.  This Amendment shall constitute a "Loan Document" for all purposes of the DIP Credit Agreement and the other Loan Documents.

12.    **<u>GOVERNING LAW</u>.  THIS AMENDMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS AMENDMENT SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK AND, TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE.**

13.    <u>Counterparts</u>.  This Amendment may be executed in any number of counterparts, all of which taken together shall constitute one and the same agreement, and any of the parties hereto may execute this Amendment by signing any such counterpart.  Delivery of an executed counterpart hereof by facsimile or email transmission shall be effective as delivery of a manually executed counterpart hereof.

14.    <u>Headings</u>.  Section or other headings contained in this Amendment are for reference purposes only and shall not in any way affect the meaning or interpretation of this Amendment.

[SIGNATURE PAGES FOLLOW]

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be duly executed and delivered by their proper and duly authorized officers as of the day and year first above written.

GENERAL MOTORS CORPORATION, on its own behalf and as agent for the other Loan Parties

By: _____

Name: Walter G [bert]

Title: Treasurer

UNITED STATES DEPARTMENT OF THE
TREASURY, as a Lender

By: _____

Name: Herbert M. Allison, Jr.
Title:  Assistant Secretary for Financial
Stability

EXPORT DEVELOPMENT CANADA, as a
Lender

By: _____

Name:     DAVID  STEVENSON
Title:    LOAN  PORTFOLIO
          MANAGER

CHRISTOPHER WILSON

ASSET MANAGER

JUNE 25, 2009

# **<u>EXHIBIT Q</u>**



### NOTICE OF MEETINGS
of the holders of

**General Motors Nova Scotia Finance Company**
*(incorporated under the laws of Nova Scotia)*
Guaranteed absolutely and unconditionally by
**General Motors Corporation**
*(incorporated with limited liability under the laws of the State of Delaware, United States of America)*

£350,000,000,000 8.375 per cent. Notes due 2015 (the "2015 Notes")
(ISIN: XS0171922643)

£250,000,000,000 8.875 per cent. Notes due 2023 (the "2023 Notes")
(ISIN: XS0171908063)

(together the "GM Nova Scotia Notes")

NOTICE IS HEREBY GIVEN that, a meeting of the holders of each series of the GM Nova Scotia Notes is convened by General Motors Nova Scotia Finance Company and will be held at 12:00 noon (London time) on June 25, 2009 for the 2015 Notes, and at 12:30 p.m. (London time) on June 25, 2009 for the 2023 Notes, in each case at the offices of Weil, Gotshal & Manges located at One South Place, London EC2M 2WG, for the purpose of separately considering and, if thought fit, passing the following resolutions which will be proposed as Extraordinary Resolutions in accordance with the provisions of the fiscal and paying agency agreement dated as of July 10, 2003 (as made among, *inter alia*, General Motors Nova Scotia Finance Company, General Motors Corporation, Deutsche Bank Luxembourg S.A. (the "Fiscal Agent") and Banque Générale du Luxembourg (the "Paying Agent") (the "Fiscal and Paying Agency Agreement")).

The 2015 Meeting and the 2023 Meeting are referred to in this Notice of Meetings as the "Meetings" and each, a "Meeting". The 2015 Holders and the 2023 Holders are referred to in this notice as the "Holders" and each, a "Holder".

*For the 2015 Notes:*

"THAT THIS MEETING (the "2015 Meeting") of the holders of the 2015 Notes (the "2015 Holders") and benefiting from the provisions of the fiscal and paying agency agreement among General Motors Nova Scotia Finance Company (the "Company"), General Motors Corporation, Deutsche Bank Luxembourg S.A. (the "Fiscal Agent") and Banque Générale du Luxembourg S.A. (the "Paying Agent" and together with the Fiscal Agent, the "Agents") dated as of July 10, 2003 (the "Fiscal and Paying Agency Agreement"), by Extraordinary Resolution (as defined in the Fiscal and Paying Agency Agreement) (the "Extraordinary Resolution"), HEREBY: "

*For the 2023 Notes:*

"THAT THIS MEETING (the "2023 Meeting") of the holders of the 2023 Notes (the "2023 Holders") and benefiting from the provisions of the fiscal and paying agency agreement among General Motors Nova Scotia Finance Company (the "Company"), General Motors Corporation, Deutsche Bank Luxembourg S.A. (the "Fiscal Agent") and Banque Générale du Luxembourg S.A. (the "Paying Agent" and together with the Fiscal Agent, the "Agents") dated as of July 10, 2003 (the "Fiscal and Paying Agency Agreement"), by Extraordinary Resolution (as defined in the Fiscal and Paying Agency Agreement) (the "Extraordinary Resolution"), HEREBY: "

*For the 2015 and 2023 Notes (each series voting separately)*

RESOLVES by special quorum an Extraordinary Resolution in accordance with the proviso to paragraph 5 of Schedule 4 of the Fiscal and Paying Agency Agreement to authorize and direct the addition of a new provision at the end of, and forming part of, Condition 6 of Schedule 1 of the Fiscal and Paying Agency

Agreement, which also forms a part of the Global Notes representing the 2015 Notes and the 2023 Notes, as follows:

"Certain Claims

Upon the approval of the Extraordinary Resolution at the Meeting and the payment by the Company and the Paying Agent of the Consent Fee to each of the Noteholders in accordance therewith, each Noteholder hereby releases and discharges the defendants in the Nova Scotia Proceeding (and the past and/or present directors, officers, employees, partners, insurers, co-insurers, controlling shareholders, attorneys, advisers, consultants, accountants or auditors, personal or legal representatives, predecessors, successors, parents, subsidiaries, divisions, joint ventures, assigns, spouses, heirs, related and/or affiliated entities of each of them) from all claims and demands that are raised in the proceeding in the Supreme Court of Nova Scotia titled Aurelius Capital Partners, LP v. General Motors Corporation et al, Court File No. HFX No. 308066 (the "Nova Scotia Proceeding"), and agrees to discontinue the Nova Scotia Proceeding on a without costs basis. Nothing contained in this Extraordinary Resolution shall preclude any Noteholder from pursuing any of the claims raised in the Nova Scotia Proceeding against any of the Company, General Motors of Canada Limited, GM Nova Scotia Investments Ltd., or the Guarantor or any of the other debtors in the Chapter 11 Cases in the event that the payment of the Consent Fee is successfully challenged by any person in a future proceeding and, as a result, an amount equal to the Consent Fee has been repaid; provided, that, this Extraordinary Resolution precludes each Noteholder from pursuing any of the claims raised in the Nova Scotia Proceeding against any of Neil Macdonald, John Stapleton, Mercedes Michel and Maurita Sutedja (and their respective heirs, administrators and assigns) in the event that the payment of the Consent Fee is successfully challenged by any person in a future proceeding.

Upon the approval of the Extraordinary Resolution at the Meeting and the payment by the Company and the Paying Agent of the Consent Fee to each of the Noteholders in accordance therewith, each Noteholder waives all (and shall cease to have any) rights and claims against the Company in respect of the Loan Agreements (as defined below), including with respect to any compromise or settlement of the loans thereunder, and such Noteholder's rights in the Loan Agreements, and each Noteholder hereby releases and discharges General Motors of Canada Limited (and its past and present officers, directors and employees), Neil Macdonald, John Stapleton, Mercedes Michel and Maurita Sutedja (and their respective heirs, administrators and assigns) from all claims and demands whatsoever, presently known or unknown, which the Noteholders ever had, now have or may hereafter have against them by reason of claims and demands arising from or in connection with those certain loan agreements between the Company and General Motors of Canada Limited each dated as of July 10, 2003 and pursuant to which General Motors of Canada Limited borrowed from the Company the sum of five hundred fifty-five million, eight hundred sixty thousand Canadian dollars (C$555,860,000), and the sum of seven hundred seventy-eight million, two hundred four thousand Canadian dollars (C$778,204,000), respectively (collectively, the "Loan Agreements"), provided that nothing contained in this Extraordinary Resolution shall preclude the Noteholders from pursuing any claim in respect of the parties and claims otherwise released in this paragraph in the event that the payment of the Consent Fee is successfully challenged by any person in a future proceeding. Furthermore, in the event that the payment of the Consent Fee is successfully challenged by any person in a future proceeding, and, as a result, an amount equal to the Consent Fee has been repaid, the settlement between the Company and General Motors of Canada Limited of the amount owing under the Loan Agreements as contemplated by this transaction shall be null and void and the full amount owing under the Loan Agreements as of the date hereof shall be immediately due and payable according to their terms as they exist as of the date hereof.

Upon the approval of the Extraordinary Resolution at the Meeting and the payment by the Company and the Paying Agent of the Consent Fee to each of the Noteholders in accordance therewith, with respect to any other claim it may have against the Company, General Motors of Canada Limited, GM Nova Scotia Investments Ltd. or the Guarantor in its capacity as a holder of the Notes, the Noteholder covenants and agrees not to pursue any claim it may have other than in connection with the advancement of its claim under the Guarantee, the advancement of its claim against the Company in respect of the Notes and the Deficiency Claim (as defined below). Nothing contained in this Extraordinary Resolution shall preclude the Noteholder from pursuing any other claim it may have against the Company, General Motors of Canada Limited, GM Nova Scotia Investments Ltd. or the Guarantor or any of the other debtors in the chapter 11 cases (the "Chapter 11 Cases") filed as voluntary petitions for relief under chapter 11, title 11 of the United States Code, in the United States Bankruptcy Court for the Southern District of New York, commenced on or about June 1, 2009, which are jointly administered by the Guarantor and certain of its subsidiaries and affiliates who are debtors in the Chapter 11 Cases, in the event that the payment of the Consent Fee is successfully challenged by any person in a future proceeding. For purposes of this Extraordinary Resolution, the "Guarantee" shall mean that certain guarantee of the Notes by the Guarantor included in the Fiscal and Paying Agency Agreement and the Notes.

Nothing contained in this Extraordinary Resolution is in any way intended to, nor shall it in any way operate to, directly or indirectly, limit, waive, impair or restrict, any rights, interests, remedies or claims (whether at law or in equity, and whether now or hereafter existing) which any Noteholder may have against, or to which any Noteholder is due or owed from, the Company in respect of the Notes or the Guarantor in respect of a general unsecured claim to which the 2015 Holders and the 2023 Holders are entitled in the bankruptcy or insolvency proceedings of the Guarantor for the full amount of the outstanding principal, interest and costs due on such Notes by virtue of the Guarantor's Guarantee (the "Guarantee Claim") or the general unsecured claim to which the trustee in bankruptcy of the Company is entitled for contribution for any amounts unpaid to the Company's creditors, namely the amount outstanding under the Notes, the Swap Liability (defined below) and any other liabilities (collectively, a "Deficiency Claim"), in the bankruptcy and insolvency proceedings of the Guarantor. It is hereby expressly acknowledged, agreed and confirmed that (i) the Deficiency Claim is a valid and enforceable claim of the Company and shall be enforceable against the Guarantor as allowed pre-petition general unsecured claims (the "Allowed Claims") to the fullest extent permitted under applicable laws, (ii) the Notes are valid and enforceable claims to the Noteholders and shall be enforceable against the Company in their full amount, and (iii) the Guarantee Claim is a valid and enforceable claim of the Noteholders and shall be enforceable against the Guarantor as Allowed Claims to the fullest extent permitted under applicable laws.

For purposes of clarity, it is understood and agreed that nothing contained in this Extraordinary Resolution shall: (i) release in any respect whatsoever any claim against the Company on the Notes or any claim against the Guarantor on the Guarantee, or (ii) preclude a Noteholder from pursuing any claim it may have against the Guarantor or any of the other debtors in the Chapter 11 Cases or any other party that is not based on such Holder's ownership of Notes.

The Consent Fee payment does not reduce, limit or impair the Notes, the Guarantee Claim or the Deficiency Claim.

The Guarantor confirms that its only claim against the Company is the Swap Liability. If for any reason any portion of the Deficiency Claim is disallowed, the Guarantor agrees that the Swap Liability is subordinated to the prior, indefeasible payment in full of the Notes. In any event, any and all other undisclosed indebtedness, claims, liabilities or obligations of the Company to the Guarantor other than the Swap Liability are subordinated to the prior, indefeasible payment in full of the Notes. To the extent of the subordination provided for herein, the Guarantor agrees that should it receive any payments from the Company or a trustee in bankruptcy of the Company, it will hold such payment in trust and immediately pay over such amounts to the paying agent for the Notes. For purposes of this Extraordinary Resolution, "Swap Liability" shall mean the obligations of the Company to the Guarantor, under currency swap arrangements between the Guarantor and the Company.

The Guarantor shall not assert any right of set-off in respect of the Deficiency Claim.";

RESOLVES by special quorum an Extraordinary Resolution in accordance with Schedule 4 of the Fiscal and Paying Agency Agreement to pay, subject to the approval of the foregoing Extraordinary Resolution by the requisite Noteholders, an amount equal to £366.46 per £1,000 of principal amount of the 2015 Notes outstanding and £380.17 per £1,000 of principal amount of the 2023 Notes outstanding (the "Consent Fee"), immediately following the approval of the foregoing Extraordinary Resolution by the requisite Noteholders. The Consent Fee shall be paid to the common depository by wire transfer, and Euroclear and Clearstream, as applicable, will credit the relevant accounts of their participants on the payment date. Payments in respect of Notes not evidenced by Global Notes shall be made by wire transfer, direct deposit or check mailed to the address of the holder entitled thereto as such address shall appear on the register of the Company;

RESOLVES by ordinary quorum an Extraordinary Resolution in accordance with the proviso to paragraph 5 of Schedule 4 of the Fiscal and Paying Agency Agreement to authorize and direct the following:

(a) authorizes, directs and empowers the Agents to concur in, approve, and execute, and do all such deeds, instruments, acts and things that may be necessary to carry out and give effect to these resolutions;

(b) sanctions, assents to and approves any necessary or consequential amendment to the Fiscal and Paying Agency Agreement to effect these resolutions; and

(c) acknowledges that capitalised terms used in these resolutions have the same meanings as those defined in the Fiscal and Paying Agency Agreement, as applicable.

## Background

The notes are listed on the Luxembourg Stock Exchange.

The Company reserves the right to cancel the meeting and withdraw the submission of the Extraordinary Resolutions for a vote.

**Documents Available for Inspection or Collection**

Noteholders may, at any time during normal business hours on any weekday (Saturdays, Sundays and bank and other public holidays excepted) prior to the Meeting inspect copies of the following documents at the specified office of the Fiscal Agent set out below and at the specified office of the Paying Agent in Luxembourg being:

- the Fiscal and Paying Agency Agreement;
- the Offering Circular dated July 9, 2003 relating to the issue of the 2015 and 2023 Notes.

**General**

The attention of holders is particularly drawn to the quorum required for their respective Meeting and for any adjourned Meeting which is set out in *"Voting and Quorum"* below. Having regard to such requirements, Holders are strongly urged either to attend their respective Meeting or to take steps to be represented at such Meeting, as referred to below, as soon as possible.

Neither the Company nor GM expresses any view as to the merits of submitting voting instructions in respect of the Extraordinary Resolutions. The Fiscal Agent has not been involved in preparing the Extraordinary Resolutions and does not represent that all relevant information has been disclosed to the holders in or pursuant to this Notice of Meetings. Holders who are unsure of the impact of the Extraordinary Resolutions should seek their own independent financial and legal advice.

**Voting and Quorum**

1. The provisions governing the convening and holding of the Meetings or any adjourned such Meetings are set out in respect of the 2015 Notes and 2023 Notes, in Schedule 4 to the Fiscal and Paying Agency Agreement, copies of which are available for inspection as referred to above.

2. Holders who have sent a valid electronic instruction notice at least one business day before the time appointed for the holding of their respective Meeting need take no further action in relation to voting at such Meeting. Such electronic instruction notice contains an irrevocable instruction (subject to certain exceptions) to the relevant Paying Agent to appoint persons nominated by the Tabulation Agent as their proxy in relation to such Meeting and instruct it to vote as directed in the electronic instruction notice. Insofar as the electronic instruction notice is being provided with respect to Notes of Holders under the Lock Up Agreement (as defined below), the instruction is being provided subject to the terms of a Lock Up Agreement, dated as of June 1, 2009, by and among General Motors Nova Scotia Finance Company, General Motors of Canada Limited, GM Nova Scotia Investments Ltd., General Motors Corporation, and the beneficial owners of notes named therein (the "Lock Up Agreement"). Under the Lock Up Agreement, the instruction insofar as it relates to a Holder under the Lock Up Agreement shall automatically be void and of no further force and effect immediately upon termination of the Lock Up Agreement in accordance with its terms, without any further action on the part of the Holder.

   Paragraphs 3 to 6 below apply only to Holders who have not sent valid electronic instruction notices at least one business day before the time appointed for their respective Meeting and who wish to vote at such Meeting.

3. Holders wishing to attend and vote at their respective Meetings or any adjourned such Meeting in person (or appoint another person other than the Tabulation Agent's nominee as provided above to do so on its behalf) must produce at such Meeting either the relevant Notes, as applicable, or a valid voting certificate issued by the relevant Paying Agent relating to such Notes, in respect of which it wishes to vote.

4. A holder not wishing to attend and vote at their respective Meeting in person (or appoint another person as aforesaid to do so on its behalf) may give a voting instruction as described in paragraph 5(b) below.

5. Notes may, not less than one business day before the time fixed for the relevant Meeting (or, if applicable, any adjourned such Meeting) and within the relevant time limit specified by the relevant Clearing System, be deposited with the relevant Paying Agent or (to its satisfaction) held to its order or under its control by the relevant Clearing System for the purpose of:

   (a) obtaining a voting certificate from such Paying Agent; or

4

(b) such Paying Agent completing a block voting instruction in respect of such Notes appointing a proxy to attend and vote at such Meeting (or, if applicable, any adjourned such Meeting) in accordance with the instructions (including an electronic instruction notice) of the holder. A holder will need to give voting instructions (such voting instructions being neither revocable nor capable of alteration by the holder during the period commencing one business day prior to the time fixed for such Meeting (or, if applicable, any adjourned such Meeting) and within the relevant time limit specified by the relevant Clearing System) on a voting instruction form obtainable from the specified office of a relevant Paying Agent or in the form of an electronic voting instruction in accordance with the standard procedures of the relevant Clearing System (including in either case an electronic instruction notice), to a relevant Paying Agent, not less than one business day before the time fixed for such Meeting (or, if applicable, any adjourned such Meeting) to enable such Paying Agent to complete the block voting instruction.

6. Notes so deposited or held will not be released:

 (a) in the case of Notes in respect of which a voting certificate has been issued, until the first to occur of:

  (i) the conclusion of the Meeting specified in such certificate or, if later, of any adjourned such Meeting; and

  (ii) the surrender of the certificate to the relevant Paying Agent who issued the same; and

 (b) in the case of Notes in respect of which a block voting instruction has been issued, until the first to occur of:

  (i) the conclusion of the Meeting specified in such document or, if later, of any adjourned such Meeting; and

  (ii) the surrender to the relevant Paying Agent not less than one business day before the time for which such Meeting or any adjourned Meeting is convened of the receipt issued by such Paying Agent in respect of each such deposited Notes which is to be released or (as the case may require) the Notes ceasing with the agreement of the Paying Agent to be held to its order or under its control and the giving of notice by the Paying Agent to the Issuer of the necessary amendment to the block voting instruction.

7. To be passed at the Meetings, the special quorum Extraordinary Resolutions to amend Condition 6 of Schedule 1 of the Fiscal and Paying Agency Agreement and to pay the Consent Fee, each require the affirmative vote of one or more persons present holding Notes of the applicable series or voting certificates or being proxies and holding or representing in aggregate not less than 66 2/3 percent of the principal amount of the Notes of the applicable series for the time being outstanding (as defined in the Fiscal and Paying Agency Agreement).

If passed, the Extraordinary Resolutions shall be binding upon all the holders of the Notes of the relevant Series, whether present or not present at the Meeting and whether or not voting, and upon all holders of interest coupons appertaining thereto.

If, within fifteen minutes after the time appointed for the relevant Meeting, a quorum is not present, the Meeting shall stand adjourned for such period, being not less than 14 days nor more than 42 days, and at such place as may be appointed by the chairman of the relevant Meeting (the "Chairman") and approved by the relevant Fiscal Agent. To be passed at an adjourned Meeting, the Extraordinary Resolutions requires the affirmative vote of one or more persons present holding Notes of the applicable Series or voting certificates or being proxies and holding or representing in the aggregate not less than a clear majority of the principal amount of Notes of the applicable series for the time being outstanding.

8. Notice of any adjourned Meeting shall be given in the same manner as notice of the original Meeting by 10 days' notice, in each case containing the information required for the notice of the original Meeting and such notice stating the relevant quorum.

9. Every question submitted to the relevant Meeting shall be decided by a show of hands and a poll, and the Chairman shall both on a show of hands and on a poll have a casting vote in addition to the vote or votes (if any) to which he may be entitled as a holder or as a holder of a voting certificate or as a proxy. A poll will be demanded by the Chairman (before or on the declaration of the result of the show of hands). On a show of hands every person who is present in person and produces a Note of the relevant series, as applicable, or a voting certificate or is a proxy shall have one vote. On the

poll every person who is so present shall have one vote in respect of each minimum integral amount of the relevant Series, in each case so produced or represented by the voting certificate so produced or for which he is a proxy.

10. This Notice of Meetings is governed by, and shall be construed in accordance with, New York law.

11. The Fiscal Agent and Paying Agents in respect of the 2015 and 2023 Notes are:

Fiscal Agent and Paying Agent

Deutsche Bank Luxembourg S.A.
2, Bld Konrad Adenauer
L-1115 Luxembourg

Paying Agent

Banque Générale du Luxembourg
50 Avenue J.P. Kennedy
L-2951 Luxembourg

12. The Tabulation Agent in respect of the 2015 and 2023 Notes is:

Deutsche Bank AG London
Winchester House
1 Great Winchester Street
London EC2N 2DB

13. The Vote Solicitation and Information Agent in respect of the 2015 and 2023 Notes is:

D. F. King (Europe) Limited
One Ropemaker Street
London, EC2Y 9HT
Telephone: +44 20 7920 9700
Email: gm@dfking.com

This Notice of Meetings does not contain or constitute an offer or solicitation to any person in any jurisdiction in which such offer or solicitation is unlawful.

## Exhibit A

### Extraordinary Resolution

Set out below in a combination form is the text of the Extraordinary Resolution. For clarity, the opening text for the Extraordinary Resolution in respect of each series has been set out separately.

*For the 2015 Notes:*

"THAT THIS MEETING (the "2015 Meeting") of the holders of the 2015 Notes (the "2015 Holders") and benefiting from the provisions of the fiscal and paying agency agreement among General Motors Nova Scotia Finance Company (the "Company"), General Motors Corporation, Deutsche Bank Luxembourg S.A. (the "Fiscal Agent") and Banque Générale du Luxembourg S.A. (the "Paying Agent" and together with the Fiscal Agent, the "Agents") dated as of July 10, 2003 (the "Fiscal and Paying Agency Agreement"), by Extraordinary Resolution (the "Extraordinary Resolution"), HEREBY: "

*For the 2023 Notes:*

"THAT THIS MEETING (the "2023 Meeting") of the holders of the 2023 Notes (the "2023 Holders") and benefiting from the provisions of the fiscal and paying agency agreement among General Motors Nova Scotia Finance Company (the "Company"), General Motors Corporation, Deutsche Bank Luxembourg S.A. (the "Fiscal Agent") and Banque Générale du Luxembourg S.A. (the "Paying Agent" and together with the Fiscal Agent, the "Agents") dated as of July 10, 2003 (the "Fiscal and Paying Agency Agreement"), by Extraordinary Resolution (the "Extraordinary Resolution"), HEREBY: "

*For the 2015 and 2023 Notes (each series voting separately)*

RESOLVES by special quorum an Extraordinary Resolution in accordance with the proviso to paragraph 5 of Schedule 4 of the Fiscal and Paying Agency Agreement to authorize and direct the addition of a new provision at the end of, and forming part of, Condition 6 of Schedule 1 of the Fiscal and Paying Agency Agreement, which also forms a part of the Global Notes representing the 2015 Notes and the 2023 Notes, as follows:

"Certain Claims

Upon the approval of the Extraordinary Resolution at the Meeting and the payment by the Company and the Paying Agent of the Consent Fee to each of the Noteholders in accordance therewith, each Noteholder hereby releases and discharges the defendants in the Nova Scotia Proceeding (and the past and/or present directors, officers, employees, partners, insurers, co-insurers, controlling shareholders, attorneys, advisers, consultants, accountants or auditors, personal or legal representatives, predecessors, successors, parents, subsidiaries, divisions, joint ventures, assigns, spouses, heirs, related and/or affiliated entities of each of them) from all claims and demands that are raised in

the proceeding in the Supreme Court of Nova Scotia titled Aurelius Capital Partners, LP v. General Motors Corporation et al, Court File No. HFX No. 308066 (the "Nova Scotia Proceeding"), and agrees to discontinue the Nova Scotia Proceeding on a without costs basis. Nothing contained in this Extraordinary Resolution shall preclude any Noteholder from pursuing any of the claims raised in the Nova Scotia Proceeding against any of the Canadian Entities or the Guarantor or any of the other debtors in the Chapter 11 Cases in the event that the payment of the Consent Fee is successfully challenged by any person in a future proceeding and, as a result, an amount equal to the Consent Fee has been repaid; provided, that, this Extraordinary Resolution precludes each Noteholder from pursuing any of the claims raised in the Nova Scotia Proceeding against any of Neil Macdonald, John Stapleton, Mercedes Michel and Maurita Sutedja (and their respective heirs, administrators and assigns) in the event that the payment of the Consent Fee is successfully challenged by any person in a future proceeding.

Upon the approval of the Extraordinary Resolution at the Meeting and the payment by the Company and the Paying Agent of the Consent Fee to each of the Noteholders in accordance therewith, each Noteholder waives all (and shall cease to have any) rights and claims against the Company in respect of the Loan Agreements (as defined below), including with respect to any compromise or settlement of the loans thereunder, and such Noteholder's rights in the Loan Agreements, and each Noteholder hereby releases and discharges GM Canada (and its past and present officers, directors and employees), Neil Macdonald, John Stapleton, Mercedes Michel and Maurita Sutedja (and their respective heirs, administrators and assigns) from all claims and demands whatsoever, presently known or unknown, which the Noteholders ever had, now have or may hereafter have against them by reason of claims and demands arising from or in connection with those certain loan agreements between the Company and GM Canada each dated as of July 10, 2003 and pursuant to which GM Canada borrowed from the Company the sum of five hundred fifty-five million, eight hundred sixty thousand Canadian dollars (C$555,860,000), and the sum of seven hundred seventy-eight million, two hundred four thousand Canadian dollars (C$778,204,000), respectively (collectively, the "Loan Agreements"), provided that nothing contained in this Extraordinary Resolution shall preclude the Noteholders from pursuing any claim in respect of the parties and claims otherwise released in this paragraph in the event that the payment of the Consent Fee is successfully challenged by any person in a future proceeding and, as a result, an amount equal to the Consent Fee has been repaid. Furthermore, in the event that the payment of the Consent Fee is successfully challenged by any person in a future proceeding, and, as a result, an amount equal to the Consent Fee has been repaid, the settlement between the Company and GM Canada of the amount owing under the Loan Agreements as contemplated by this Transaction shall be null and void and the full amount owing under the Loan Agreements as of the date hereof shall be immediately due and payable according to their terms as they exist as of the date hereof.

Upon the approval of the Extraordinary Resolution at the Meeting and the payment by the Company and the Paying Agent of the Consent Fee to each of the Noteholders in accordance therewith, with respect to any other claim it may have against

the Canadian Entities or the Guarantor in its capacity as a holder of the Notes, the Noteholder covenants and agrees not to pursue any claim it may have other than in connection with the advancement of its claim under the Guarantee, the advancement of its claim against GM Nova Scotia in respect of the Notes and the Deficiency Claim (each as defined below). Nothing contained in this Extraordinary Resolution shall preclude the Noteholder from pursuing any other claim it may have against the Canadian Entities or the Guarantor or any of the other debtors in the Chapter 11 Cases in the event that the payment of the Consent Fee is successfully challenged by any person in a future proceeding. For purposes of this Extraordinary Resolution, the "Guarantee" shall mean that certain guarantee of the Notes by the Guarantor included in the Fiscal and Paying Agency Agreement and the Notes.

Nothing contained in this Extraordinary Resolution is in any way intended to, nor shall it in any way operate to, directly or indirectly, limit, waive, impair or restrict, any rights, interests, remedies or claims (whether at law or in equity, and whether now or hereafter existing) which any Noteholder may have against, or to which any Noteholder is due or owed from, the Company in respect of the Notes or the Guarantor in respect of the Guarantee Claim or the Deficiency Claim (as such terms are defined in the Lock-up Agreement). It is hereby expressly acknowledged, agreed and confirmed that that (i) the Deficiency Claim is a valid and enforceable claim of the Company and shall be enforceable against the Guarantor as allowed pre-petition general unsecured claims (the "Allowed Claims") to the fullest extent permitted under applicable laws, (ii) the Notes are valid and enforceable claims to the Noteholders and shall be enforceable against the Company in their full amount, and (iii) the Guarantee Claim is a valid and enforceable claim of the Noteholders and shall be enforceable against the Guarantor as Allowed Claims to the fullest extent permitted under applicable laws.

For purposes of clarity, it is understood and agreed that nothing contained in this Extraordinary Resolution shall: (i) release in any respect whatsoever any claim against the Company on the Notes or any claim against the Guarantor on the Guarantee, or (ii) preclude a Noteholder from pursuing any claim it may have against the Guarantor or any of the other debtors in the Chapter 11 Cases or any other Party that is not based on such Holder's ownership of Notes.

The Consent Fee payment does not reduce, limit or impair the Notes, the Guarantee Claim or the Deficiency Claim.

The Guarantor confirms that its only claim against the Company is the Swap Liability. If for any reason any portion of the Deficiency Claim is disallowed, the Guarantor agrees that the Swap Liability is subordinated to the prior, indefeasible payment in full of the Notes. In any event, any and all other undisclosed indebtedness, claims, liabilities or obligations of the Company to the Guarantor other than the Swap Liability are subordinated to the prior, indefeasible payment in full of the Notes. To the extent of the subordination provided for herein, the Guarantor agrees that should it receive any payments from the Company or a trustee in bankruptcy of the Company, it will hold such payment in trust and immediately pay over such amounts to the paying

A-3

agent for the Notes.  For purposes of this Extraordinary Resolution, "Swap Liability" shall mean the obligations of the Company to the Guarantor, under currency swap arrangements between the Guarantor and the Company.

The Guarantor shall not assert any right of set-off in respect of the Deficiency Claim.

**RESOLVES** by special quorum an Extraordinary Resolution in accordance with Schedule 4 of the Fiscal and Paying Agency Agreement to pay, subject to the approval of the foregoing Extraordinary Resolution by the requisite Noteholders, an amount equal to £366.46 per £1,000 of principal amount of the 2015 Notes outstanding and £380.17 per £1,000 of principal amount of the 2023 Notes outstanding (the "Consent Fee"), immediately following the approval of the foregoing Extraordinary Resolution by the requisite Noteholders.  The Consent Fee shall be paid to the common depository by wire transfer, and Euroclear and Clearstream, as applicable, will credit the relevant accounts of their participants on the payment date.  Payments in respect of Notes not evidenced by Global Notes  shall be made by wire transfer, direct deposit or check mailed to the address of the holder entitled thereto as such address shall appear on the register of the Company.

**RESOLVES** by ordinary quorum an Extraordinary Resolution in accordance with the proviso to paragraph 5 of Schedule 4 of the Fiscal and Paying Agency Agreement to authorize and direct the following:

(a)  authorizes, directs and empowers the Agents to concur in, approve, and execute, and do all such deeds, instruments, acts and things that may be necessary to carry out and give effect to these resolutions;

(b)  sanctions, assents to and approves any necessary or consequential amendment to the Fiscal and Paying Agency Agreement to effect these resolutions; and

(c)  acknowledges that capitalized terms used in these resolutions have the same meanings as those defined in the Fiscal and Paying Agency Agreement, as applicable.

A-4

**General Motors Nova Scotia Finance Company**
*(incorporated under the laws of Nova Scotia)*
**Guaranteed absolutely and unconditionally by**
**General Motors Corporation**
*(incorporated with limited liability under the laws of the State of Delaware, United States of America)*

£350,000,000 8.375 per cent. Notes due 2015 (the "2015 Notes")

**Voting Record**

For use in connection with the meeting of the holders of the outstanding 2015 Notes (the "2015 Holders")
convened for 12:00 noon (London time) on Thursday June 25, 2009 (the "2015 Meeting") at
Weil, Gotshal & Manges, One South Place, London EC2M 2WG
and any adjourned such meeting.

**To be handed to the Chairman**
**after votes cast on poll and added up**

| | | |
|---|---|---|
| 1 | Total number of votes cast on the special quorum Extraordinary Resolution to amend Condition 6 of Schedule 1 to the fiscal and paying agency agreement dated as of July 10, 2003 (as made among General Motors Nova Scotia Finance Company, General Motors Corporation, Deutsche Bank Luxembourg S.A. (the "Fiscal Agent") and Banque Générale du Luxembourg S.A. (together with the Fiscal Agent, the "Paying Agents") (the "Fiscal and Paying Agency Agreement")) (the "first special quorum Extraordinary Resolution") | 337,290............................. |
| 2 | Total number of votes cast in favour of the first special quorum Extraordinary Resolution | 336,748............................. |
| 3 | Total number of votes cast against the first special quorum Extraordinary Resolution | 542............................. |
| 4 | % of votes representing the principal amount of 2015 Notes outstanding cast in favour of the first special quorum Extraordinary Resolution | 96.2............................. |
| 5 | Total number of votes cast on the special quorum Extraordinary Resolution to pay the Consent Fee (the "second special quorum Extraordinary Resolution") | 337,290............................. |
| 6 | Total number of votes cast in favour of the second special quorum Extraordinary Resolution | 336,748............................. |
| 7 | Total number of votes cast against the second special quorum Extraordinary Resolution | 542............................. |

| 8 | % of votes representing the principal amount of 2015 Notes outstanding cast in favour of the second special quorum Extraordinary Resolution | 96.2............................. |
|---|---|---|
| 9 | Total number of votes cast on the ordinary quorum Extraordinary Resolution | 337,290........................... |
| 10 | Total number of votes cast in favour of the ordinary quorum Extraordinary Resolution | 336,748........................... |
| 11 | Total number of votes cast against the ordinary quorum Extraordinary Resolution | 542.............................. |
| 12 | % of votes representing the principal amount of 2015 Notes outstanding cast in favour of the ordinary quorum Extraordinary Resolution | 96.2............................. |

First special quorum Extraordinary Resolution        passed/not passed

Second special quorum Extraordinary Resolution        passed/not passed

Ordinary quorum Extraordinary Resolution        passed/not passed

Signed by Tellers

2

**General Motors Nova Scotia Finance Company**
*(incorporated under the laws of Nova Scotia)*
**Guaranteed absolutely and unconditionally by**
**General Motors Corporation**
*(incorporated with limited liability under the laws of the State of Delaware, United States of America)*

£250,000,000 8.875 per cent. Notes due 2023 (the "2023 Notes")

**Voting Record**

For use in connection with the meeting of the holders of the outstanding 2023 Notes (the "2023 Holders")
convened for 12:30 p.m. (London time) on Thursday June 25, 2009 (the "2023 Meeting") at
Weil, Gotshal & Manges, One South Place, London EC2M 2WG
and any adjourned such meeting.

**To be handed to the Chairman**
**after votes cast on poll and added up**

| | | |
|---|---|---|
| 1 | Total number of votes cast on the special quorum Extraordinary Resolution to amend Condition 6 of Schedule 1 to the fiscal and paying agency agreement dated as of July 10, 2003 (as made among General Motors Nova Scotia Finance Company, General Motors Corporation, Deutsche Bank Luxembourg S.A. (the "Fiscal Agent") and Banque Générale du Luxembourg S.A. (together with the Fiscal Agent, the "Paying Agents") (the "Fiscal and Paying Agency Agreement")) (the "first special quorum Extraordinary Resolution") | 248,117........................ |
| 2 | Total number of votes cast in favour of the first special quorum Extraordinary Resolution | 248,114........................ |
| 3 | Total number of votes cast against the first special quorum Extraordinary Resolution | 3................................ |
| 4 | % of votes representing the principal amount of 2023 Notes outstanding cast in favour of the first special quorum Extraordinary Resolution | 99.25............................ |
| 5 | Total number of votes cast on the special quorum Extraordinary Resolution to pay the Consent Fee (the "second special quorum Extraordinary Resolution") | 248,117........................ |
| 6 | Total number of votes cast in favour of the second special quorum Extraordinary Resolution | 248,114........................ |
| 7 | Total number of votes cast against the second special quorum Extraordinary Resolution | 3................................ |

| 8 | % of votes representing the principal amount of 2023 Notes outstanding cast in favour of the second special quorum Extraordinary Resolution | 99.25............................... |
| 9 | Total number of votes cast on the ordinary quorum Extraordinary Resolution | 248,117............................... |
| 10 | Total number of votes cast in favour of the ordinary quorum Extraordinary Resolution | 248,114............................... |
| 11 | Total number of votes cast against the ordinary quorum Extraordinary Resolution | 3............................... |
| 12 | % of votes representing the principal amount of 2023 Notes outstanding cast in favour of the ordinary quorum Extraordinary Resolution | 99.25............................... |

First special quorum Extraordinary Resolution      passed/not passed

Second special quorum Extraordinary Resolution     passed/not passed

Ordinary quorum Extraordinary Resolution           passed/not passed

Signed by Tellers

**General Motors Nova Scotia Finance Company**
*(Incorporated under the laws of Nova Scotia)*
**Guaranteed absolutely and unconditionally by**
**General Motors Corporation**
*(incorporated with limited liability under the laws of the State of Delaware, United States of America)*

£350,000,000 8.375 per cent. Notes due 2015 (the "2015 Notes")

Voting Card 1

For use on a poll vote at the meeting of the holders of the outstanding 2015 Notes (the "2015 Holders")
convened for 12:00 noon (London time) on Thursday June 25, 2009 (the "2015 Meeting") at
Weil, Gotshal & Manges, One South Place, London EC2M 2WG
and any adjourned such meeting.

1     Principal amount of the outstanding 2015 Notes held or produced or represented: £336,748,000

1.1     Total number of votes attributable to the 2015 Notes so held or produced or represented (one vote in respect of each £1,000 in aggregate face amount of the outstanding 2015 Notes produced or represented): 336,748

2     Number of votes cast FOR the special quorum Extraordinary Resolution to amend Condition 6 of Schedule 1 to the fiscal and paying agency agreement dated as of July 10, 2003 (as made among General Motors Nova Scotia Finance Company, General Motors Corporation, Deutsche Bank Luxembourg S.A. (the "Fiscal Agent") and Banque Générale du Luxembourg S.A. (together with the Fiscal Agent, the "Paying Agents") (the "Fiscal and Paying Agency Agreement")) (the "first special quorum Extraordinary Resolution"): 336,748

3     Number of votes cast AGAINST the first special quorum Extraordinary Resolution: 0

4     Number of votes cast FOR the second special quorum Extraordinary Resolution to pay the Consent Fee (the "second special quorum Extraordinary Resolution"): 336,748

5     Number of votes cast AGAINST the second special quorum Extraordinary Resolution: 0

6     Number of votes cast FOR the ordinary quorum Extraordinary Resolution: 336,748

7     Number of votes cast AGAINST the ordinary quorum Extraordinary Resolution: 0

Signed (Teller)

**General Motors Nova Scotia Finance Company**
*(incorporated under the laws of Nova Scotia)*
**Guaranteed absolutely and unconditionally by**
**General Motors Corporation**
*(incorporated with limited liability under the laws of the State of Delaware, United States of America)*

£350,000,000 8.375 per cent. Notes due 2015 (the "2015 Notes")

**Voting Card 2**

For use on a poll vote at the meeting of the holders of the outstanding 2015 Notes (the "2015 Holders")
convened for 12:00 noon (London time) on Thursday June 25, 2009 (the "2015 Meeting") at
Weil, Gotshal & Manges, One South Place, London EC2M 2WG
and any adjourned such meeting.

1    Principal amount of the outstanding 2015 Notes held or produced or represented: £542,000

1.1    Total number of votes attributable to the 2015 Notes so held or produced or represented (one vote in respect of each £1,000 in aggregate face amount of the outstanding 2015 Notes produced or represented): 542

2    Number of votes cast FOR the special quorum Extraordinary Resolution to amend Condition 6 of Schedule 1 to the fiscal and paying agency agreement dated as of July 10, 2003 (as made among General Motors Nova Scotia Finance Company, General Motors Corporation, Deutsche Bank Luxembourg S.A. (the "Fiscal Agent") and Banque Générale du Luxembourg S.A. (together with the Fiscal Agent, the "Paying Agents") (the "Fiscal and Paying Agency Agreement")) (the "first special quorum Extraordinary Resolution"): 0

3    Number of votes cast AGAINST the first special quorum Extraordinary Resolution: 542

4    Number of votes cast FOR the special quorum Extraordinary Resolution to pay the Consent Fee (the "second special quorum Extraordinary Resolution"): 0

5    Number of votes cast AGAINST the second special quorum Extraordinary Resolution: 542

6    Number of votes cast FOR the ordinary quorum Extraordinary Resolution: 0

7    Number of votes cast AGAINST the ordinary quorum Extraordinary Resolution: 542

*[signature]*

Signed (Teller)

**General Motors Nova Scotia Finance Company**
*(incorporated under the laws of Nova Scotia)*
**Guaranteed absolutely and unconditionally by**
**General Motors Corporation**
*(incorporated with limited liability under the laws of the State of Delaware, United States of America)*

£250,000,000 8.875 per cent. Notes due 2023 (the "2023 Notes")

**Voting Card 1**

For use on a poll vote at the meeting of the holders of the outstanding 2023 Notes (the "2023 Holders")
convened for 12:30 p.m. (London time) on Thursday June 25, 2009 (the "2023 Meeting") at
Weil, Gotshal & Manges, One South Place, London EC2M 2WG
and any adjourned such meeting.

1     Principal amount of the outstanding 2023 Notes held or produced or represented: £248,114,000

1.1   Total number of votes attributable to the 2023 Notes so held or produced or represented (one vote in
respect of each £1,000 in aggregate face amount of the outstanding 2023 Notes produced or represented):
248,114

2     Number of votes cast FOR the special quorum Extraordinary Resolution to amend Condition 6 of Schedule
1 to the fiscal and paying agency agreement dated as of July 10, 2003 (as made among General Motors
Nova Scotia Finance Company, General Motors Corporation, Deutsche Bank Luxembourg S.A. (the
"Fiscal Agent") and Banque Générale du Luxembourg S.A. (together with the Fiscal Agent, the "Paying
Agents")) (the "Fiscal and Paying Agency Agreement")) (the "first special quorum Extraordinary
Resolution"): 248,114

3     Number of votes cast AGAINST the first special quorum Extraordinary Resolution: 0

4     Number of votes cast FOR the special quorum Extraordinary Resolution to pay the Consent Fee (the
"second special quorum Extraordinary Resolution"): 248,114

5     Number of votes cast AGAINST the second special quorum Extraordinary Resolution: 0

6     Number of votes cast FOR the ordinary quorum Extraordinary Resolution: 248,114

7     Number of votes cast AGAINST the ordinary quorum Extraordinary Resolution: 0

Signed (Teller)

**General Motors Nova Scotia Finance Company**
*(incorporated under the laws of Nova Scotia)*
**Guaranteed absolutely and unconditionally by
General Motors Corporation**
*(incorporated with limited liability under the laws of the State of Delaware, United States of America)*

£250,000,000 8.875 per cent. Notes due 2023 (the "2023 Notes")

**Voting Card 2**

For use on a poll vote at the meeting of the holders of the outstanding 2023 Notes (the "2023 Holders")
convened for 12:30 p.m. (London time) on Thursday June 25, 2009 (the "2023 Meeting") at
Weil, Gotshal & Manges, One South Place, London EC2M 2WG
and any adjourned such meeting.

1      Principal amount of the outstanding 2023 Notes held or produced or represented: £3,000

1.1    Total number of votes attributable to the 2023 Notes so held or produced or represented (one vote in
       respect of each £1,000 in aggregate face amount of the outstanding 2023 Notes produced or represented): 3

2      Number of votes cast FOR the special quorum Extraordinary Resolution to amend Condition 6 of Schedule
       1 to the fiscal and paying agency agreement dated as of July 10, 2003 (as made among General Motors
       Nova Scotia Finance Company, General Motors Corporation, Deutsche Bank Luxembourg S.A. (the
       "Fiscal Agent") and Banque Générale du Luxembourg S.A. (together with the Fiscal Agent, the "Paying
       Agents") (the "Fiscal and Paying Agency Agreement")) (the "first special quorum Extraordinary
       Resolution"): 0

3      Number of votes cast AGAINST the first special quorum Extraordinary Resolution: 3

4      Number of votes cast FOR the special quorum Extraordinary Resolution to pay the Consent Fee (the
       "second special quorum Extraordinary Resolution"): 0

5      Number of votes cast AGAINST the second special quorum Extraordinary Resolution: 3

6      Number of votes cast FOR the ordinary quorum Extraordinary Resolution: 0

7      Number of votes cast AGAINST the ordinary quorum Extraordinary Resolution: 3

Signed (Teller)

CIBC Mellon Trust Company
320 Bay Street, P.O. Box 1
Toronto, ON  M5H 4A6
Attention:  Executive Director,
Corporate Trust Services
Fax No.: 416-643-5870

Scrutineer's Report of passing of Extraordinary Resolution

To:    CIBC MELLON TRUST COMPANY

A.    GMNS has issued £350,000,000 principal amount of 8.375% guaranteed notes, due December 7, 2015 (the "2015 Notes") and £250,000,000 principal amount of 8.875% guaranteed notes, due July 10, 2023 (the "2023 Notes" and together with the 2015 Notes, the "Notes") to certain beneficial owners (the "Noteholders"). Each series of Notes are governed by a fiscal and paying agency agreement (the "Fiscal and Paying Agency Agreement"), dated as of July 10, 2003, among GMNS, General Motors Corporation, a Delaware corporation ("GMC"), Deutsche Bank Luxembourg S.A. (the "Fiscal Paying Agent") and Banque Générale du Luxembourg S.A.

B.    Certain Noteholders, including Aurelius Capital Partners, LP, Aurelius Capital Master, Ltd., Drawbridge DSO Securities LLC, Drawbridge OSO Securities LLC, FCOF UB Securities LLC, Appaloosa Investment Limited Partnership I, Palomino Fund Ltd., Thoroughbred Master Ltd., Thoroughbred Fund LP, Elliot International, L.P., and The Liverpool Partnership (the "Holders") have agreed, pursuant to the terms of a lock up agreement (the "Lock Up Agreement"), dated as of June 1, 2009, among GMNS, GMC, GMCL, GM Nova Scotia Investments Ltd, and the Holders, to vote in favour of certain extraordinary resolutions (the "Extraordinary Resolutions"), to be considered at a meeting (the "2015 Meeting") of the holders of the outstanding 2015 Notes and a meeting (the "2023 Meeting") of the holders of the outstanding 2023 Notes, to amend the Fiscal and Paying Agency Agreement and the global securities representing the Notes in exchange for certain cash payments, including the Escrow Amount (as defined herein).

C.    The 2015 Meeting and the 2023 Meeting were held today and the Extraordinary Resolutions were passed by the Noteholders.

Dated the 25th day of June, 2009.

_____
Scrutineer of Meeting

12306210.2

# **EXHIBIT R**

## PROMISSORY NOTE

**May 29, 2009**

### USD 450,000,000

1.      **Promise to Pay.**   FOR VALUE RECEIVED, the undersigned, **General Motors of Canada Limited** (the "**Borrower**"), hereby unconditionally promises to pay to the order of **General Motors Corporation** (the "**Lender**") and its successors or assigns, the principal amount of **Four Hundred and Fifty Million United States Dollars (USD 450,000,000)** (the "**Principal Amount**"), together with interest on the unpaid principal amount of this Note outstanding from the time, and in the manner provided herein and in accordance with the terms and conditions set forth in the trust agreement dated May 29, 2009 between the Borrower and the Lender (the "**Trust Agreement**").

2.      **Use of funds:**   The Borrower covenants that the Principal Amount shall be held in trust on the terms and conditions set forth in the Trust Agreement.

3.      **Prepayment of the Principal Amount.**   The Borrower shall be entitled to prepay all or any portion of the Principal Amount outstanding and any accrued and unpaid interest pursuant to this Note without notice, bonus or penalty.

4.      **Interest.**   The Borrower shall pay to the Lender interest on the Principal Amount outstanding from and after June 15, 2009 until the Note is repaid in full to the Lender, both before and after demand, default and judgment (except to the extent waived by the Lender) at a rate of **5.00% per annum** (which amount is three hundred basis points (3.00%) above LIBOR, where LIBOR means the greater of (a) 2.00% and (b) the rate (adjusted for statutory reserve requirements for eurocurrency liabilities) for Eurodollar deposits for a period equal to three months appearing on Reuters Screen LIBOR01 Page at 11:00 a.m. on May 28, 2009, the "**Interest Rate**").   Interest shall be calculated and accrue daily on the outstanding Principal Amount and when not in default shall be payable in arrears on January 15 and July 15 of each year, with the first interest payment due and payable on January 15, 2010 and after default shall be payable on demand.   Interest will be calculated on the basis of a year of 365 days (or 366 days as the case may be) for the actual number of days elapsed.

Any principal and interest not paid when due (whether at scheduled maturity, by reason of acceleration, or otherwise) will bear interest from and including the date due but excluding the date paid in full at a yield per annum equal to the Interest Rate plus a per annum amount of 1%, such interest to be payable on demand and on any repayment of principal.

Notwithstanding anything to the contrary contained in this Note, in no event may the total of all interest or other charges payable under this Note that are or could be held to be in the nature of interest exceed the maximum rate permitted to be charged under applicable law. Should the Lender receive any payment that is or would be in excess of that permitted to be charged under such applicable law, then such payment will be deemed to have been made in error and shall automatically be applied to reduce the principal sum outstanding under this Note.

5.      **Maturity.**   The Principal Amount outstanding and accrued and unpaid interest are due and payable on **May 29, 2012** or otherwise in accordance with the terms of the Trust Agreement, unless the Borrower and Lender agree in writing to extend the Note beyond that date.

If any payment under this Note is due on a day that is not a Business Day, such payment shall be due on the next succeeding Business Day.   As used in this Note, "**Business Day**" means a day other than a Saturday or a Sunday that is not a day on which banks and foreign exchange markets in New York City or Toronto are generally authorized or obligated by law or executive order to close.

1

General Motors Corporation
General Motors of Canada Limited
Promissory Note dated May 29, 2009

6.    **Payments.**   Unless otherwise directed by the Lender, all interest and principal payments under this Note will be made in the currency of the United States of America and in immediately available funds, to and for the account of the Lender:

> JP Morgan Chase
> ABA#: 021-000-021
> Acct. #: 910-200-2095
> Account Name: General Motors Corporation
> Swift Code: CHASUS33

7.    **Representations.**   The Borrower represents and warrants that (i) it has full authority to execute and perform this Note, (ii) this Note constitutes, when executed and delivered in accordance with the terms hereof, legal, valid, and binding obligations of the Borrower, and (iii) no contractual restriction against borrowings prevents the satisfactory performance of this Note by the Borrower.

8.    **Events of Default.**   If any of the following events of default occur and are continuing:

   (a)    the Borrower fails to make payment when due of the principal of or interest on the Note and such failure continues unremedied for more than ten (10) days after written notice thereof has been given to the Borrower by the Lender;

   (b)    the Borrower fails to perform or observe any other agreement or covenant herein and such failure continues unremedied for more than fifteen (15) days after written notice thereof has been given to the Borrower by the Lender;

   (c)    any representation or warranty made by the Borrower in this Note proves to have been incorrect in any material respect when made; or

   (d)    the Borrower becomes insolvent (however such insolvency many be evidenced) or proceedings are instituted by or against the Borrower under any bankruptcy, reorganization or insolvency law or other law for the relief of debtors

THEN, in any such case the Lender may, by written notice to the Borrower, terminate this Note and may, by written notice to the Borrower, declare all amounts due under the Note to be due and payable, together with accrued interest, whereupon, the Note will become immediately due and payable without demand, presentment, protest, notice of dishonor or any other notice or demand whatsoever.  The remedies set forth herein are not exclusive.  In addition, the Lender has all other rights and remedies to which it is entitled under applicable law.

9.    **Expenses.**   The Borrower shall reimburse the Lender on demand for all reasonable costs, expenses, and charges in connection with the performance or enforcement of this Note.

10.    **Waiver by the Borrower.**   The Borrower waives presentment, notice of dishonor, notice of protest, and any other notice or formality with respect to this Note.

11.    **No Waiver by the Lender.**   Neither the extension of time for making any payment which is due and payable under this Note at any time or times, nor the failure, delay, or omission of the Lender to exercise or enforce any of its rights or remedies under this Note, shall constitute a waiver by the Lender of its right to enforce any such rights and remedies subsequently. The single or partial exercise of any such right or remedy shall not preclude the Lender's further exercise of such right or remedy or any other right or remedy.

12.    **Jurisdiction.**   The Borrower consents to the non-exclusive jurisdiction and the venue of the state or federal courts located in the State of New York, City of New York, Southern District.

2

General Motors Corporation
General Motors of Canada Limited
Promissory Note dated May 29, 2009

Service of process by the Lender in connection with any dispute will be binding on the Borrower if
sent to the Borrower by registered mail at the address specified below.

13.      **Governing Law.**   This Note will be governed by and constructed in accordance with the
laws of the State of New York, USA, without regard to the principles relating to conflicts of laws.

14.      **Notices**

Address for Lender notices:        General Motors Corporation
                                   767 Fifth Avenue
                                   New York, NY 10153
                                   Attention: Treasury Operations Group

Address for Borrower notices:      General Motors of Canada Limited
                                   1908 Colonel Sam Drive
                                   Oshawa, Ontario L1H 8P7
                                   Mail Code: CA1-015-001
                                   Attention: Vice President of Finance

15.      **Amendment.**   No amendment, supplement, modification, waiver, or termination of this
Note and, unless otherwise specified, no consent or approval by any party, shall be binding
unless executed in writing by the party to be bound.

General Motors Corporation
General Motors of Canada Limited
Promissory Note dated May 29, 2009

**GENERAL MOTORS OF CANADA LIMITED:**

Name: John Stapleton
Title: CFO/VP Finance, General Motors Canada
For and on behalf of the Borrower.