**Hearing Date and Time: December 15, 2010 at 2:00 p.m.**
**Response Deadline: December 13, 2010**

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
(212) 872-1000 (Telephone)
(212) 872-1002 (Facsimile)
Daniel H. Golden
Philip C. Dublin
Sean E. O'Donnell

*Counsel for Green Hunt Wedlake, Inc.,*
*Trustee of General Motors Nova Scotia Finance Company*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------------------
|  |  | : |  |
| In re: |  | : | Chapter 11 |
|  |  | : |  |
| Motors Liquidation Company., *et al.,* |  | : | Case No. 09-50026 (REG) |
| *f/k/a General Motors Corp., et al.,* |  |  |  |
|  |  | : |  |
|  | Debtors. | : | (Jointly Administered) |
|  |  | : |  |
--------------------------------------------------------------------------

**RESPONSE OF GREEN HUNT WEDLAKE, INC., TRUSTEE**
**OF GENERAL MOTORS NOVA SCOTIA FINANCE COMPANY,**
**TO OFFICIAL COMMITTEE OF UNSECURED CREDITORS'**
**FIRST AMENDED OBJECTION TO CLAIMS FILED BY GREEN HUNT**
**WEDLAKE, INC. AND NOTEHOLDERS OF GENERAL MOTORS**
**NOVA SCOTIA FINANCE COMPANY AND MOTION FOR OTHER RELIEF**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................................................... 1

BACKGROUND ................................................................................................................. 2

    A.   GM Nova Scotia and the Nova Scotia Trustee ................................................. 2

    B.   The Nova Scotia Notes, the Intercompany Loan and the Swap Arrangements ................. 4

    C.   The Two Proofs of Claim at Issue ................................................................ 5

    D.   The Lock Up Agreement ........................................................................... 6

RESPONSE ...................................................................................................................... 8

    A.   The Claims are Not Duplicative ................................................................. 8

    B.   The Committee's Other Objections are Without Merit ..................................... 12

        1.     Bankruptcy Code Section 502(d) is Inapplicable .................................. 12

        2.     There are No Grounds to Equitably Subordinate the Section 135 Claim .............. 14

        3.     The Lock Up Agreement Does Not Constitute an Unauthorized 9019
             Settlement ................................................................................... 16

        4.     Application of the Consent Fee to Principal is Inappropriate, but in Any Case
             Would Not Impact the Section 135 Claim ............................................ 17

    C.   The Committee's Request for Relief Under Federal Rule of Civil Procedure 60(b) and
       Bankruptcy Rule 9024 is Inappropriate and Should Be Rejected .................................... 18

CONCLUSION ................................................................................................................. 20

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Benjamin v. Diamond (In re Mobile Steel Co.),*
   563 F.2d 692 (5th Cir. 1977) ......................................................................................14, 15

*Chemical Bank New York Trust Co. v. Kheel,*
   369 F.2d 845 (2d Cir. 1966).....................................................................................11

*EEE Commercial Corp. v. Holmes (In re ASI Reactivation, Inc.),*
   934 F.2d 1315 (4th Cir. 1991) ..................................................................................15

*Enron Corp. v. Springfield Assocs., L.L.C. (In re Enron Corp.),*
   379 B.R. 425 (S.D.N.Y. 2007)...........................................................................13, 15, 16

*In re Asia Global Crossing, Ltd.,*
   333 B.R. 199 (S.D.N.Y. 2005).................................................................................14

*In re Owens Corning,*
   419 F.3d 195 (3d Cir. 2005)...............................................................................10, 11

*Northwestern Mut. Life Ins. Co. v. Delta Air Lines, Inc. (In re Delta Air Lines, Inc.),*
   608 F.3d 139 (2d Cir. 2010)...........................................................................9, 10, 11

*Official Comm. of Unsecured Creditors of Hydrogen, L.L.C. v. Blomen (In re Hydrogen,
   L.L.C.),* 431 B.R. 337 (Bankr. S.D.N.Y. 2010) ..............................................................14, 15

*Official Comm. of Unsecured Creditors of Verestar, Inc. v. American Tower Corp. (In re
   Verestar, Inc.),* 343 B.R. 444 (Bankr. S.D.N.Y. 2006)..........................................................14

*U.S. v. Noland,*
   517 U.S. 535 (1996).......................................................................................14, 16

*Wilson v. Huffman (In re Missionary Baptist Found. of America, Inc.),*
   712 F.2d 206 (5th Cir. 1983) ....................................................................................15

*Wilson v. Huffman (In re Missionary Baptist Found. of America, Inc.),*
   818 F.2d 1135 (5th Cir. 1987) ...................................................................................15

STATUTES

11 U.S.C. § 502(d). ..................................................................................12, 13, 14, 16

11 U.S.C. § 510(c) ......................................................................................15

Bankruptcy and Insolvency Act, R.S.C. 2010, c. B-3 (Can.) ....................................................2, 7, 9

Bankruptcy and Insolvency Act, R.S.C. 2010, c. B-3, s. 77 (Can.)............................................2, 9

Companies Act, R.S.N.S., 1989, c. 81 (Can.)..............................................................................2, 8

Companies Act, R.S.N.S., 1989, c. 81, s. 135 (Can.) ...................................................................3, 9

**RULES**

Fed. R. Bankr. P. 9019....................................................................................................12, 16, 17

Fed. R. Bankr. P. 9024................................................................................................................18

Fed. R. Civ. P. 60(b) ..................................................................................................................18

Green Hunt Wedlake, Inc., in its capacity as trustee (the "**Nova Scotia Trustee**") for

General Motors Nova Scotia Finance Company ("**GM Nova Scotia**"), by and through its

undersigned counsel, hereby submits this response (the "**Response**") to the *Official Committee of*

*Unsecured Creditors' First Amended Objection to Claims Filed by Green Hunt Wedlake, Inc. and*

*Noteholders of General Motors Nova Scotia Finance Company and Motion for Other Relief*

(Docket No. 7859) (the "**Objection**").[1]  In support of this Response, the Nova Scotia Trustee

respectfully represents as follows:

## PRELIMINARY STATEMENT[2]

1.      By its Objection, the Committee seeks to expunge, reduce and/or subordinate (i)

claims asserted by the Nova Scotia Trustee on account of Old GM's statutory obligations to GM

Nova Scotia, and (ii) claims asserted by certain holders of notes (the "**Noteholders**") issued by

GM Nova Scotia and unconditionally guaranteed by Old GM on account of such guarantee.

2.      The Committee bases its Objection primarily on the allegation that when Old GM,

GM Nova Scotia and the Noteholders negotiated a prepetition lock up agreement to facilitate the

sale of substantially all of Old GM's assets to New GM (the "**363 Sale**"), the Noteholders and

New GM allegedly engaged in inequitable conduct to the detriment of Old GM, its estate and its

creditors—despite the undisputed input and oversight of the United States and Canadian

governments throughout these negotiations.  Specifically, the Committee asserts that the

Noteholders and New GM managed to take advantage of (i) Old GM's precarious financial

position, (ii) its need to resolve prepetition litigation with the Noteholders and (iii) the conditions

precedent placed on Old GM by the US and Canadian governments in connection with the 363

---

[1] The Nova Scotia Trustee also joins in the *Response Of Certain Noteholders In Opposition to Official Committee of Unsecured Creditors' First Amended Objection to Claims Filed by Green Hunt Wedlake, Inc., And Noteholders of General Motors Nova Scotia Finance Company And Motion for Other Relief* (Docket No. 8084) (the "**Noteholders' Response**").

[2] Terms not otherwise defined herein shall have the meanings ascribed to such terms in the Objection.

Sale to extract hundreds of millions of dollars in consent fees and other benefits that depleted the

value of Old GM's assets and provided the Noteholders with a double recovery on their notes.

The Committee's protestations are belied by the facts and the law and cannot be sustained.

3.       As set forth in detail below, (i) the prepetition lock-up agreement was negotiated

at arm's length and in good faith among the parties thereto—with the supervision and approval

of the US and Canadian governments to facilitate the 363 Sale; (ii) the obligations incurred by

the parties under the lock-up agreement were incurred in exchange for fair and just

consideration; and (iii) the claims asserted by the Nova Scotia Trustee and the Noteholders are

wholly separate and distinct.  Accordingly, the claims should be allowed and the Committee's

Objection should be overruled.

## BACKGROUND

### A.       GM Nova Scotia and the Nova Scotia Trustee

4.       On October 9, 2009, the Supreme Court of Nova Scotia (i) adjudged GM Nova

Scotia bankrupt under the Canadian Bankruptcy and Insolvency Act (the "**BIA**") and

(ii) appointed the Nova Scotia Trustee as an officer of the court and the fiduciary charged with

overseeing GM Nova Scotia's winding up proceeding, including realizing on GM Nova Scotia's

assets and satisfying its liabilities. *See (Re) Bankruptcy of General Motors Nova Scotia Finance*

*Co.* (2009), [Hfx. No. 318069] (Can. N.S. Sup. Ct.) (attached as Exhibit A); Bankruptcy and

Insolvency Act, R.S.C. 2010, c. B-3, s. 77 (Can.) (any amount owed by a shareholder or member

of a bankrupt corporation is an asset of the corporation and payable to the trustee).  GM Nova

Scotia is a Nova Scotia unlimited liability company (a "**ULC**") formed under the *Companies Act*

(Nova Scotia), being Chapter 81 of the Revised Statutes of Nova Scotia, 1989, as amended (the

"**Companies Act**") and is a direct, wholly-owned subsidiary of Old GM.

2

5.      Old GM formed GM Nova Scotia as a financing vehicle for the General Motors

group of companies in 2001 in order to take advantage of favorable tax laws in Canada and the

United States.  At the time GM Nova Scotia was created, the Nova Scotia ULC structure was

widely used by US companies in tax planning for investments in Canada because, under the law

at that time and without causing other adverse tax consequences, a ULC could be classified as a

corporation for Canadian income tax purposes and as a branch (or a disregarded entity) for US

federal income tax purposes.  This corporate structure, coupled with the structuring of funds

transfers from one Canadian entity to another, afforded a multi-faceted, multinational

corporation like Old GM and its affiliates the opportunity to obtain significant tax savings.[3]

6.      While the ULC structure provided a US parent corporation, such as Old GM, with

the potential for substantial tax benefits, pursuant to Section 135 of the Companies Act, if the

ULC ever became insolvent, the US parent corporation would become primarily liable for all of

the ULC's unpaid liabilities. *See* Companies Act, R.S.N.S., 1989, c. 81, s. 135 (Can.).  Section

135 provides:

> In the event of a company being wound up, every present and past
> member shall, subject to this Section, be liable to contribute to the
> assets of the company to an amount sufficient for payment of its

---

[3] For example, under a widely employed financing strategy using a Nova Scotia ULC, the ULC would borrow from an unrelated bank and then transfer the proceeds of that borrowing to a Canadian sister company as an intercompany loan for Canadian income tax purposes. The Canadian sister company would then use the funds from the ULC in its normal operations (including possibly to refinance existing debt) and it could take a tax deduction for Canadian income tax purposes on the interest it paid on the intercompany loan to the ULC.  The ULC, in turn would be entitled to an interest deduction for such purposes for interest it paid to the third party lender.  For US income tax purposes, the ULC is treated as a branch of the US parent company and, as a result, the parent is entitled to deduct any interest the ULC pays to the third party lender.  If the "loan" from the ULC to the Canadian sister company can be structured as equity for US income tax purposes, it is possible to structure the payments from the Canadian sister company to the ULC (which are considered to be made directly to the US parent company for US income tax purposes) to be largely tax free for US income tax purposes.  If this plan could be successfully implemented, the global group would effectively enjoy a double deduction for the interest incurred on the ULC's debt.  In the years at issue, this type of planning in the US-Canadian context was only possible because of the characteristics of the ULC. There are also many other ways in which ULCs were used by multinational corporations to implement US-Canadian tax planning, some of which may have been applicable to GM Nova Scotia and Old GM. *See* Barry D. Horne, *The Nova Scotia Unlimited Liability Company: Surf and Turf, in* Report of Proceedings of the Fifty-Seventh Tax Conference convened by the Canadian Tax Foundation 26:1, 26:25–29 (2005) (attached hereto as <u>Exhibit B</u>).

3

debts and liabilities and the costs, charges, and expenses of the winding up . . . .

*Id.*

**B.    The Nova Scotia Notes, the Intercompany Loan and the Swap Arrangements**

7.    On July 10, 2003, GM Nova Scotia issued £350,000,000 in principal amount of 8.375% Guaranteed Notes due December 7, 2015 (the "**2015 Notes**") and £250,000,000 in principal amount of 8.875% Guaranteed Notes due July 10, 2023 (the "**2023 Notes**" and, together with the 2015 Notes, the "**Nova Scotia Notes**") pursuant to that certain Fiscal and Paying Agency Agreement among GM Nova Scotia, General Motors Corp., Deutsche Bank Luxembourg S.A., as fiscal agent, and Banque Général du Luxembourg S.A., as paying agent, dated as of July 10, 2003 (the "**Fiscal and Paying Agency Agreement**").  Pursuant to the Fiscal and Paying Agency Agreement, Old GM fully and unconditionally guaranteed the repayment of the Nova Scotia Notes (the "**Guarantee**").

8.    In furtherance of the ULC tax structure, the proceeds of the Nova Scotia Notes were loaned by GM Nova Scotia to General Motors of Canada Limited ("**GM Canada**") in a series of intercompany transactions resulting in intercompany obligations owing from GM Canada to GM Nova Scotia (collectively, the "**Intercompany Loan**").  GM Canada then used the proceeds of the Intercompany Loan to assist in the funding of the General Motors group's global operations.

9.    At the same time GM Nova Scotia issued the Nova Scotia Notes, it entered into a series of currency swap arrangements with Old GM (the "**Swap Arrangements**").  Pursuant to an ISDA master agreement and two currency swap confirmations dated July 10, 2003 (one for each issuance of the Nova Scotia Notes), GM Nova Scotia exchanged the British pounds it received in respect of the issuance of the Nova Scotia Notes for Canadian dollars.  The swap

4

agreement contemplated annual payments between the parties, based on the exchange rates and the rates set forth in the swap confirmations.

10.    As of the date GM Nova Scotia was declared bankrupt by the Canadian Supreme Court, CDN $1,088,542,512.01 (US $1,042,735,554.56) in unpaid principal and interest (the "**Note Liability**") was outstanding on account of the Nova Scotia Notes and CDN $589,292,176.53 (US $564,493,957.00) was owed by GM Nova Scotia to New GM under the Swap Arrangements (the "**Swap Liability**").[4]  In addition, GM Nova Scotia had other unpaid ordinary course liabilities, and the Nova Scotia Trustee has incurred and continues to incur costs, charges and expenses associated with GM Nova Scotia's bankruptcy (collectively with the Note Liability and the Swap Liability, the "**GM Nova Scotia Liabilities**").

### C.    The Two Proofs of Claim at Issue

11.    In accordance with Section 135 of the Companies Act and applicable provisions of the United States Bankruptcy Code, on November 25, 2009, the Nova Scotia Trustee filed an initial proof of claim (claim no. 65814) against Old GM for not less than US $1,607,647,592.49 on account of the GM Nova Scotia Liabilities (the "**Initial Section 135 Claim**").  On November 30, 2009, the Nova Scotia Trustee filed an amended proof of claim (claim no. 66319), providing additional detail regarding the Initial Section 135 Claim (the "**Section 135 Claim**").[5]

12.    Unlike other chapter 11 cases where an indenture trustee or other representative files a global proof of claim on behalf of the noteholders, in the instant case, the fiscal and paying agents have *not* filed proofs of claim.  On November 30, 2009, certain of the Noteholders filed proofs of claim (claim nos. 66216, 66217, 66218, 66265, 66266, 67429, 67499, 66312,

---

[4] Old GM transferred all of its rights in connection with the Swap Arrangement to New GM pursuant to the 363 Sale.

[5] On November 8, 2010, the Initial Section 135 Claim was expunged from Old GM's claims register, with the Section 135 Claim remaining as the sole proof of claim filed by the Nova Scotia Trustee against Old GM.

66267, 67428, 67430, 67498 67500, 67501) against Old GM for a total of US $758,486,107.64

based on Old GM's specific contractual obligations to the Noteholders pursuant to Old GM's

guarantee on the Nova Scotia Notes (the "**Guarantee Claim**").  Out of an abundance of caution,

Greenberg Traurig, LLP, as counsel to certain of the Noteholders, filed an additional claim

(claim no. 69551) for the full amount of the Guarantee Claim (US $1,072,557,531.72), minus the

amounts asserted in the Noteholders' individual proofs of claim, for a total claim of US

$314,071,424.08.  Additional Noteholders have also filed proofs of claim on account of Old

GM's liability under the Guarantee of the Nova Scotia Notes.

> **D.**    **The Lock Up Agreement**

13.    Prior to the commencement of these chapter 11 cases, Old GM and its

subsidiaries, including GM Nova Scotia, engaged in a number of unsuccessful attempts to

restructure their debts including, among other things, a failed exchange offer in respect of the

Nova Scotia Notes. *See Disclosure Statement for Debtors' Amended Joint Chapter 11 Plan*

(Docket No. 8023) (the "**Amended Disclosure Statement**") 13–14.  Once the out-of-court

restructuring efforts failed, the only viable option for Old GM was to sell substantially all of its

assets to New GM pursuant to the 363 Sale. *Id.* at 16.

14.    In order for New GM to agree to the 363 Sale, however, Old GM was required to

work with its creditor constituencies to create a viable and acceptable restructuring transaction

within a sixty day deadline. *Id.* at 12–13.  Had Old GM been unable to meet this sixty-day

deadline, the US and Canadian governments would have refused to provide essential funding for

Old GM's continued business operations or to facilitate the 363 Sale to New GM, and Old GM

would have liquidated. *Id.* at 12–13, 29.

15.    Equally critical to Old GM's restructuring was the sale of its equity interest in

GM Canada to New GM.  But in order to complete this sale by the US and Canadian

governments' deadline, GM Canada had to be kept out of bankruptcy, which required an
immediate deleveraging of GM Canada's balance sheet, including the elimination of the
Intercompany Loan owed by GM Canada to GM Nova Scotia.  To compromise the
Intercompany Loan and facilitate the sale of GM Canada to New GM, GM Nova Scotia signed
an agreement with GM Canada, Old GM and certain of the Noteholders providing for their
mutual cooperation in connection with the 363 Sale and Old GM's restructuring (the "**Lock Up**
**Agreement**").

16.    The Lock Up Agreement was the product of extensive, arm's length negotiations
among Old GM, GM Canada and their significant creditor constituencies.  Each of these parties
was represented by experienced counsel and financial advisors.  And with the oversight and
approval of the US and Canadian governments, the Lock Up Agreement was signed on June 1,
2009.  It contained the following material agreements:

- GM Nova Scotia, GM Canada and Old GM agreed that (i) the Section 135 Claim
  is enforceable against Old GM as a general unsecured claim to the fullest extent
  permitted by applicable laws, (ii) the Nova Scotia Notes are enforceable against
  GM Nova Scotia in their full amount and (iii) the Guarantee Claim is enforceable
  against Old GM as a general unsecured claim to the fullest extent permitted by
  applicable laws. *See* Lock Up Agreement ¶ 6(a), (b)(ii).

- GM Nova Scotia agreed to consent to entry of an order under the BIA and to the
  appointment of the Nova Scotia Trustee. *See* Lock Up Agreement ¶ 6(b)(i).[6]

- GM Canada funded the Consent Fee into an escrow account, which would be
  payable to the Noteholders upon their passing an extraordinary resolution (the
  "**Extraordinary Resolution**"). *See* Lock Up Agreement ¶ 2.

- GM Canada was relieved of its liability in respect of the Intercompany Loan;
  provided, however, that if the Consent Fee was ever successfully challenged, the
  full amount owing under the Intercompany Loan would be automatically
  reinstated and be deemed immediately due and payable by GM Canada to GM
  Nova Scotia. *See* Lock Up Agreement ¶ 5(b).

---

[6] Although GM Nova Scotia agreed not to contest the winding up petition, based on the Supreme Court of Nova
Scotia's finding that GM Nova Scotia was insolvent, GM Nova Scotia would have been adjudged bankrupt
regardless of the consent provided under the Lock Up Agreement.

- The Noteholders agreed to discontinue prosecution of certain litigation against GM Nova Scotia, GM Canada, Old GM and their respective officers and directors, provided that the action could be reinstituted if the Consent Fee was required to be disgorged. *See* Lock Up Agreement ¶ 5(a).

- Old GM agreed that if, for any reason, any portion of the Section 135 Claim was disallowed, GM Nova Scotia's liability to Old GM in respect of the Swap Liability would be subordinated to full repayment of the Nova Scotia Notes. Old GM further agreed not to assert any setoff rights with respect to the Section 135 Claim. *See* Lock Up Agreement ¶ 6(b)(v), (vi).

- GM Nova Scotia agreed to convene a meeting of the Noteholders to pass the Extraordinary Resolution to amend the Fiscal and Paying Agency Agreement to reflect the foregoing material agreements.

In connection with the 363 Sale, Old GM assumed and assigned the Lock Up Agreement to New GM.

17.    Consistent with its obligation under the Lock Up Agreement, GM Nova Scotia convened a meeting of the Noteholders on June 25, 2009 to consider the Extraordinary Resolution in accordance with the procedures required by the Fiscal and Paying Agency Agreement to amend the same to reflect the compromises set forth in the Lock Up Agreement. Pursuant to the Fiscal and Paying Agency Agreement, a special quorum of the Noteholders was required to approve the Extraordinary Resolution to make the provisions of the Lock Up Agreement binding on the remaining Noteholders. As demonstrated by Exhibit D to the Section 135 Claim, this approval was obtained.

**RESPONSE**

A.    **The Claims are Not Duplicative**

18.    The Section 135 Claim and the Guarantee Claim are separate, distinct claims. As outlined above, the Section 135 Claim arises directly as a result of Old GM purposefully creating GM Nova Scotia as a ULC under the Companies Act. Again, structuring GM Nova Scotia as a ULC allowed Old GM the opportunity to reap substantial tax benefits, but also required it to pay

8

all of GM Nova Scotia's debts in the event that GM Nova Scotia commenced a winding up

proceeding under the BIA.  In accordance with its statutory mandate, the Nova Scotia Trustee is

in the process of winding up GM Nova Scotia, and Old GM, having already received the benefits

associated with structuring GM Nova Scotia as a ULC, is required to satisfy the liabilities set

forth in the Section 135 Claim that it statutorily assumed through the use the ULC structure.

Indeed, allowance of the Section 135 Claim is in accord with Canadian law and consistent with

applicable provisions of the Bankruptcy Code. Bankruptcy and Insolvency Act, R.S.C. 2010, c.

B-3, s. 77 (Can.); Companies Act, R.S.N.S., 1989, c. 81, s. 135 (Can.).

19.     By contrast, the Guarantee Claim asserted by the Noteholders is a direct contract

claim that the Noteholders have against Old GM pursuant to the express Guarantee contained in

the Fiscal and Paying Agency Agreement.  The Guarantee provides the Noteholders with an

avenue of recovery on the Nova Scotia Notes in addition to their claims against GM Nova

Scotia.  The mere fact that Old GM is required to satisfy the Guarantee Claim and the Section

135 Claim does not render such claims duplicative.  Rather, as shown by applicable legal

precedent in this Circuit, so long as the Noteholders do not receive more than payment in full on

account of the Nova Scotia Notes, the allowance of both the Guarantee Claim and the Section

135 Claim in the amounts asserted is appropriate. *See Northwestern Mut. Life Ins. Co. v. Delta

Air Lines, Inc. (In re Delta Air Lines, Inc.),* 608 F.3d 139 (2d Cir. 2010).

20.     In *Delta*, the debtor objected to the claims filed by creditors, who owned planes

leased by the debtor, to recover under tax indemnity agreements ("**TIAs**"). *Id.* at 144.  The TIAs

were negotiated to provide the creditors reimbursement for tax benefits lost upon foreclosure of

the creditors' planes in the event Delta defaulted on its lease payments. *Id.* at 143.  The leases

also provided that Delta pay a stipulated loss value ("**SLV**"), which similarly reimbursed the

creditors under the lease for lost tax benefits, if Delta defaulted on its lease payments. *Id.* Once

Delta defaulted on the leases, the creditors filed claims in respect of the SLV and the TIAs. *Id.* at

144. Delta objected to the claims arguing that they were duplicative. *Id.* at 149. The Second

Circuit, however, found that the parties intended that payment of the TIAs was mandated only if

the SLV was not paid *in full*. *Id.* at 149. Acknowledging that as a result of a bankruptcy,

unsecured creditors may receive less than a 100% recovery on account of their claims, the

Second Circuit allowed both the TIA claim and the SLV claim, subject to an aggregate recovery

to the creditors of 100%. *Id.* at 147.

21.    In so holding, the Second Circuit expressly rejected the very same argument made

by the Committee in its Objection (i.e., that "multiple recoveries for the same injury are

disallowed in bankruptcy" Committee Objection at 21). *Id.* at 149–50. The Second Circuit held:

> As an alternative basis for affirmance, Delta argues that a single loss can
> only give rise to a single claim in bankruptcy . . . notwithstanding that the
> TIA claims and SLV claims arise under agreements (1) between different
> parties, (2) addressing different events, and (3) providing for different
> remedies. In light of these facts, we agree with the bankruptcy court that:
> Each agreement was freely negotiated and fully supported by fair
> consideration on both sides. If a component of the SLV claim under the
> Lease is calculated by reference to the owner participant's tax
> consequences which are indemnified under the TIA (the 'overlap' Delta
> objects to), so be it. That is what Delta agreed to and what both the owner
> participant and the indenture trustee relied upon in negotiating the
> agreements. If Delta has contracted to pay duplicative claims, then it must
> pay both - it cannot repudiate its duty to party A under contract A by
> asserting that it contracted to pay the same amount to party B under
> contract B.

*Id.* at 149.

22.    Cases addressing the issue of substantive consolidation are also instructive. For

example, in *In re Owens Corning,* 419 F.3d 195 (3d Cir. 2005), a number of subsidiaries of

Owens Corning had provided guarantees in order to induce banks to make a loan to their parent,

Owens Corning. *Id.* at 201. Owens Corning and the subsidiaries subsequently filed for chapter

11, and Owens Corning sought to substantively consolidate all of the debtor entities for plan of

reorganization purposes. *Id.* at 202. As this Court is aware, substantive consolidation would

have resulted in the banks having only a single claim against the consolidated Owens Corning

enterprise for the amount outstanding on the loan as opposed to multiple claims on account of its

debt against each of the parent company and the guarantor subsidiaries. The banks objected to

the proposed consolidation, arguing that such a result would destroy the benefit they bargained

for when agreeing to the loan, i.e., the right to pursue its claim against each of the subsidiary

guarantors. *Id.* at 212-13. The Third Circuit agreed, holding that the Owens Corning entities

should not be consolidated because it would punish the bank, overlook its bargained-for benefit,

and disrupt the corporate structure that had been created by the debtors. *Id.* at 212–13, 216. The

Court found, in part:

> [The banks] loaned $2 billion to [the parent] and enhanced the credit of
> that unsecured loan indirectly by subsidiary guarantees covering less than
> half the initial debt. What the [bank] got in lending lingo was "structural
> seniority"— a direct claim against the guarantors (and thus against their
> assets levied on once a judgment is obtained) that other creditors of [the
> parent] did not have. This kind of lending occurs every business day. To
> undo this bargain is a demanding task.

*Id.* at 212; *accord Chemical Bank New York Trust Co. v. Kheel,* 369 F.2d 845, 848 (2d Cir. 1966)

("Equality among creditors who have lawfully bargained for different treatment is not equity but

its opposite.").

    23.    What *Delta* and *Owens Corning* have in common is a recognition that debtors in

bankruptcy must live with the contracts and corporate structures they established pre-bankruptcy.

This case should be no different. Here, Old GM elected to use the tax-saving ULC structure to

help fund its operations. The Noteholders then lent money to the ULC—GM Nova Scotia—and

negotiated for and received a guarantee from Old GM. Just as in *Delta* and *Owens Corning*, Old

GM is bound by the corporate structure it elected to utilize *and* the Guarantee it agreed to issue

in connection with the notes offering.  To hold otherwise would have the inequitable result of

permitting Old GM the opportunity to reap the substantial tax benefits associated with the ULC

structure while avoiding the risks attendant thereto and, at the same time, denying the

Noteholders the benefit of their bargain regarding the Guarantee.

> **B.    The Committee's Other Objections are Without Merit**

24.    In addition to its unpersuasive argument that the Section 135 Claim and the

Guarantee claim are duplicative, the Committee also seeks disallowance or subordination of both

claims under the following, equally meritless theories: (i) that Bankruptcy Code section 502(d)

mandates disallowance of the claims because the payment of the Consent Fee is avoidable as a

preference or fraudulent conveyance; (ii) that both claims should be equitably subordinated

because the Noteholders took undue advantage of their bargaining power in connection with the

Lock Up Agreement; (iii) that the Lock Up Agreement constituted an unauthorized Bankruptcy

Rule 9019 settlement and must be unwound; and (iv) that the Consent Fee should be deemed a

principal paydown on the Nova Scotia Notes.  Each of these theories is addressed below.

> *1.    Bankruptcy Code Section 502(d) is Inapplicable*

25.    The Committee asserts in its Objection that the Section 135 Claim and the

Guarantee Claim should be disallowed under Bankruptcy Code section 502(d) because Old

GM's loan to GM Canada that was subsequently transferred to GM Nova Scotia in settlement of

independent obligations and used for payment of the Consent Fee was avoidable as a preference

or fraudulent conveyance.  This argument is factually and legally flawed.

26.    First, as discussed in detail in the Noteholders' Response, in order for the

Committee to rely on Bankruptcy Code section 502(d), the Committee must have obtained a

finding by the Court that the Consent Fee was an avoidable transfer and that the Noteholders or

GM Nova Scotia are liable for the turnover of such amounts under the Bankruptcy Code.  As no
such judgment exists, Bankruptcy Code section 502(d) is inapplicable.

27.    Second, to the extent Old GM had a viable cause of action under chapter 5 of the
Bankruptcy Code to avoid the loan by Old GM to GM Canada or the payment of the Consent
Fee—which it does not—all avoidance actions related to the loan were transferred by Old GM to
New GM in connection with the 363 Sale and, thus, Old GM's estate does not own such cause of
action or have an entitlement to any proceeds therefrom.

28.    Third, the funds received by GM Nova Scotia to pay the Consent Fee did not
constitute property of the Old GM's estate because GM Nova Scotia received the funds from
GM Canada in exchange for significant value, including the release of intercompany loans in
excess of $1 billion.  As neither GM Nova Scotia nor the Noteholders are in possession of
property of Old GM's estate that could be returned, the Committee's 502(d) argument fails.  *See
Enron Corp. v. Springfield Assocs., L.L.C. (In re Enron Corp.),* 379 B.R. 425, 443 (S.D.N.Y.
2007) (noting that the purpose of section 502(d) is to compel a recipient of an avoidable transfer
to return proceeds to the estate and holding "[t]hat purpose would not be served if a claim in the
hands of a claimant could be disallowed even where that claimant never received the preference
to begin with, and as a result, could not be coerced to return it").

29.    Fourth, the Committee's attempt to argue that Old GM's entry into the Lock Up
Agreement itself is avoidable and would prevent a recovery under the Section 135 Claim is
unsupportable.  As discussed in detail above, the Section 135 Claim is an independent statutory
claim against Old GM as the parent of GM Nova Scotia.  The Section 135 Claim does not arise
under, nor is it dependent upon, the Lock Up Agreement.  Moreover, in the unlikely event this
Court finds that there were obligations incurred under the Lock Up Agreement that are avoidable

13

as to GM Nova Scotia, Bankruptcy Code section 502(d) remains inapplicable to the Section 135

Claim.  Bankruptcy Code section 502(d) does not require disallowance of a claim on the basis

that a creditor was the recipient of an avoidable *obligation* incurred by the debtor; the avoidance

of the obligation is sufficient relief. *See In re Asia Global Crossing, Ltd.,* 333 B.R. 199, 202

(S.D.N.Y. 2005) (holding that 502(d) applies to avoidable transfers but not to avoidable

obligations).  Thus, avoidance of the Lock Up Agreement would in no way absolve Old GM of

liability on the Section 135 Claim, which exists under Canadian law.

> 2.    *There are No Grounds to Equitably Subordinate the Section 135 Claim*

30.    In the Committee's one-paragraph request for equitable subordination, which

notably lacks any reference to governing case law, the Committee does not allege inequitable

conduct by the Nova Scotia Trustee.  Rather, the Committee merely argues that the conduct of

the Noteholders and New GM "can and should be imputed" to the Nova Scotia Trustee.  This

argument does not withstand scrutiny.

31.    A majority of courts have adopted a three-part test to determine whether a claim

should be equitably subordinated, which test was first articulated in *In re Mobile Steel Co.* (the

"*Mobile Steel* **Test**"):  (i) the claimant must have engaged in some type of inequitable conduct;

(ii) the misconduct must have resulted in injury to the creditors or conferred an unfair advantage

on the claimant; <u>and</u> (iii) equitable subordination of the claim must not be inconsistent with the

provisions of the Bankruptcy Code. *See Benjamin v. Diamond (In re Mobile Steel Co.),* 563 F.2d

692, 699–700 (5th Cir. 1977); *accord U.S. v. Noland*, 517 U.S. 535, 538–39, 116 S. Ct. 1524,

1526 (1996); *but cf. Official Comm. of Unsecured Creditors of Verestar, Inc. v. American Tower

Corp*. (*In re Verestar, Inc*.), 343 B.R. 444, 461 (Bankr. S.D.N.Y. 2006) (noting that the third

prong of the Mobile Steel Test is "likely to be moot" because, as it exists today, the Bankruptcy

Code specifically provides for equitable subordination); s*ee also Official Comm. of Unsecured*

14

*Creditors of Hydrogen, L.L.C. v. Blomen* (*In re Hydrogen, L.L.C.*), 431 B.R. 337, 360–61

(Bankr. S.D.N.Y. 2010) (same).  The bankruptcy court must make explicit findings on each of

the three elements when granting equitable subordination. *See EEE Commercial Corp. v. Holmes*

*(In re ASI Reactivation, Inc.),* 934 F.2d 1315, 1321 (4th Cir. 1991) (citing *Wilson v. Huffman (In*

*re Missionary Baptist Found. of America, Inc.),* 712 F.2d 206, 212 (5th Cir. 1983)).

32.     The most obvious failure of the Committee's allegations is with respect to the first

prong—a requirement that the claimant have engaged in inequitable conduct.  The Committee

alleges only that the actions of the Noteholders and New GM should be imputed to the Nova

Scotia Trustee, a statutory representative of GM Nova Scotia appointed well after the alleged

inequitable conduct.  The Committee cites no precedent for imputing the conduct of third parties

to a holder of an independent claim, and for good reason: courts have warned against such

imputation to an uninvolved bystander. *See, e.g., Wilson v. Huffman (In re Missionary Baptist*

*Found. of America, Inc.),* 818 F.2d 1135, 1146 (5th Cir. 1987) (differentiating imputation of

inequitable conduct from one partner to another, the latter having been involved in all

transactions with the former, from imputation to an "uninvolved bystander" where, the Court

reasoned, imputation "would be contrary to the principles of equitable subordination as they have

developed in the courts").

33.     Furthermore, applicable legal precedent is clear that equitable subordination must

be applied narrowly and in only the most egregious of circumstances. *In re Enron,* 379 B.R. at

443 ("At bottom, equitable subordination is a drastic and unusual remedy.  As a result, it is

important to apply section 510(c) narrowly.").  The Committee's request to "impute" the conduct

of third parties to the Nova Scotia Trustee would only serve to expand the statute to punish an

innocent creditor for the alleged conduct of other parties.  Since its appointment, the Nova Scotia

Trustee's conduct has been beyond reproach and entirely consistent with its obligations under

Nova Scotia law.  This Court should not countenance the Committee's attempts to expand this

circuit's narrow application of equitable subordination to appease creditors that disapprove of the

Debtors' prepetition choice to form a ULC as its financing subsidiary.

34.    Having failed to establish inequitable conduct by the Nova Scotia Trustee under

the first prong of the test, examination of the other two prongs is unnecessary.  However, the

third prong of the *Mobile Steel* Test remains informative and an analysis of such prong provides

support for allowance of both the Section 135 Claim and the Guarantee Claim.  Indeed, courts

have generally interpreted the requirement that equitable subordination be consistent with the

terms of the Bankruptcy Code to be a "reminder to the bankruptcy court that although it is a

court of equity, it is not free to adjust the legally valid claim of an innocent party who asserts the

claim in good faith merely because the court perceives that the result is inequitable." *In re Enron,*

379 B.R. at 434 (citing *Noland,* 517 U.S. at 539, 116 S. Ct. at 1526).  Thus, although the

Committee believes that allowance of both the Section 135 Claim and the Guarantee Claim

would be "inequitable" because such claims provide multiple, yet different ultimate avenues of

recovery on the Nova Scotia Notes, there is no legal basis for either claim to be disallowed.

3.    *The Lock Up Agreement Does Not Constitute an Unauthorized 9019
Settlement*

35.    Further evidencing the specious objections that the Committee has to the

allowance of the Section 135 Claim and the Guarantee Claim, the Committee argues that the

Lock Up Agreement constitutes an unauthorized Bankruptcy Rule 9019 settlement.[7]  In support

of this argument, the Committee complains of four specific actions: (i) the Noteholders' passing

an extraordinary resolution which prevented subsequent automatic termination of the prepetition

---

[7] The Committee does not explain how an unauthorized 9019 settlement would entitle the Committee to use 502(d)
to defeat either the Guarantee Claim or the Section 135 Claim.

Lock Up Agreement, (ii) GM Nova Scotia's payment of the Consent Fee, (iii) GM Nova Scotia's release of the Intercompany Loans, and (iv) GM Nova Scotia's consent to entry of a bankruptcy order. Each action complained of fails to pose an issue under Bankruptcy Rule 9019 for two reasons. First, by its terms, the Lock Up Agreement was consummated prepetition and the actions complained of were taken *in furtherance* of, instead of in implementation thereof. Second, and more important, each action was taken by a *non-debtor* and, thus, is not subject to Bankruptcy Rule 9019. Accordingly, the Committee's argument that the Lock Up Agreement is an unauthorized 9019 settlement must fail.

        4.      *Application of the Consent Fee to Principal is Inappropriate, but in Any Case Would Not Impact the Section 135 Claim*

36.      The Committee does not, and cannot, provide any legal support for its demand that the Court apply the Consent Fee to the principal amount outstanding on the Nova Scotia Notes. Such an unprecedented remedy is inappropriate and unwarranted where the Debtors, sophisticated parties represented by able counsel, aware of all relevant facts and supported in the negotiation by the United States and Canadian governments, participated in good faith negotiations with the Debtors' creditors. It was in this context that the Lock Up Agreement was struck, with the Debtors specifically agreeing that the Consent Fee was not payment on principal and may not be treated as such.

37.      However, in the unlikely event that the Noteholders are stripped of the negotiated-for Consent Fee, the Intercompany Loan from GM Nova Scotia to GM Canada would be automatically reinstated and deemed immediately due and payable in the full amount due on the Nova Scotia Notes. In such circumstance, the Nova Scotia Trustee would have two avenues to satisfy its obligations (the Intercompany Loan and the Section 135 Claim) and the Nova Scotia Trustee would receive a 100% recovery on its claims as opposed to the impaired recovery it will

17

receive under Old GM's plan of reorganization.  What appears to be lost on the Committee, however, is that if the Intercompany Loan is reinstated, GM Nova Scotia would benefit from access to additional assets; and as a result, the value of New GM stock—the consideration for all unsecured creditors in the Debtors' chapter 11 cases—would be diminished by the draw on the assets of GM Canada.  Thus, it is not in the best interests of the creditors' of Old GM to disallow or recharacterize the Consent Fee.

**C.    The Committee's Request for Relief Under Federal Rule of Civil Procedure 60(b) and Bankruptcy Rule 9024 is Inappropriate and Should Be Rejected**

38.    Finally, the Committee's request under Rule 60(b) of the Federal Rules of Civil Procedure ("**Rule 60(b)**") and Rule 9024 of the Federal Rules of Bankruptcy Procedure ("**Rule 9024**") to void limited portions of the *Order (I) Authorizing Sale of Assets Pursuant to Amended and Restated Master Sale and Purchase Agreement with NGMCO, Inc., a U.S Treasury-Sponsored Purchaser; (II) Authorizing Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection with the Sale; and (III) Granting Related Relief* (Docket No. 2968) (the "***Sale Order***") for its own benefit is inappropriate and should be rejected. As an initial matter, even if the Court were to entertain this request—which it should not—it would do nothing to eliminate the Nova Scotia Trustee's claim because the Section 135 Claim is statutory and, as such, valid irrespective of any modification to the Sale Order.

39.    Additionally, the Nova Scotia Trustee joins in the arguments set forth in the Noteholders' Response that (i) the Committee's Rule 60(b) application is untimely; (ii) the Committee has totally failed to allege the requisite "exceptional circumstances," "good cause," or "highly convincing evidence" necessary to obtain relief under Rule 60(b); and (iii) application of Rule 60(b) would result in "undue hardship" on a variety of parties.

18

40.     Finally, the Nova Scotia Trustee further opposes this relief due to the implications it could have to the value of New GM stock.  The Lock Up Agreement—which the Committee seeks to undo—is a central cog in the larger structure that allowed the 363 Sale to New GM to close, ensure the continued viability of General Motors and provide substantial consideration in the form of New GM stock to creditors of the Debtors' estates.  Undoing the Sale Order now would jeopardize New GM's ability to move forward, and thereby represents a serious risk to the value of New GM's stock and the recoveries for all creditors of the Debtors' estates.

## CONCLUSION

WHEREFORE, for all of the foregoing reasons, the Nova Scotia Trustee respectfully

requests that the Court (i) overrule the Objection; (ii) allow the Section 135 Claim in its entirety

and (iii) grant the Nova Scotia Trustee such other and further relief as this Court deems just,

proper and equitable.

Dated: December 13, 2010

Respectfully Submitted,

*/s/      Philip C. Dublin*
Daniel H. Golden
Philip C. Dublin
Sean E. O'Donnell
Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, NY 10036
Telephone:  (212) 872-1000
Facsimile:  (212) 872-1002

*Counsel for Green Hunt Wedlake, Inc.*
*Trustee of General Motors Nova Scotia Finance*
*Company*