Exhibit B

# The Nova Scotia Unlimited Liability
# Company: Surf and Turf

*Barry D. Horne**

McInnes Cooper, Halifax. BComm (1986) Dalhousie University;
LLB (1989) Dalhousie Law School. Member of the Board of
Governors of the Canadian Tax Foundation.

## Abstract

The author summarizes the corporate law on the Nova Scotia unlimited liability
company (NSULC) and describes the proposals to improve that law (for example,
adopting the Business Corporations Act approach to amalgamations as an
alternative to the court process). The NSULC is compared with the new Alberta
unlimited liability corporation, and the relative strengths and weaknesses of each
of the entities are highlighted. Finally, the unlimited liability company is analyzed
from a US income tax perspective. The author describes how the unlimited liability
company is used, with particular emphasis on why its characterization from a US
income tax perspective facilitates cross-border planning.

**Keywords**   Unlimited liability; check-the-box; cross-border; hybrids; United States.

*The reports of my death are greatly exaggerated.*

Mark Twain (1835-1910)

## Introduction

The purpose of this paper is not to exhaustively discuss the US check-the-box
rules or the company law governing the Nova Scotia unlimited liability company
(NSULC).[1] The paper begins with a brief outline of the history of the Companies
Act.[2] The discussion of Nova Scotia company law is limited to the develop-
ments in the law since the publication of Paul Festeryga's paper in an earlier
conference report[3] and to the material differences between the NSULC and the
Alberta unlimited liability corporation (AULC) (both their advantages and their

_____

    *  I would like to express my gratitude to Jamshed J. Patel of the Milwaukee office of Foley &
       Lardner LLP for his very helpful comments on the US tax components of this paper; to my
       colleague Mike Simms for his contribution to the corporate section of the paper; and to my
       colleagues André Gallant and Laurie Jones for their assistance. Any omissions or errors are
       solely my own.

disadvantages). In the course of that discussion, some statements about Nova Scotia corporate law in recently published articles comparing the NSULC and the AULC will be corrected. Finally, the ULCs will be discussed from a tax perspective—in particular, the meaning of "unlimited liability" in the check-the-box rules; how transactions with a ULC may have unplanned US tax consequences; and examples of transactions involving the use of a ULC (principally, inbound planning with some discussion of outbound planning). The last part of this paper has a heavy US income tax component, with commentary on some Canadian income tax issues. An understanding of the US components is important to ensure that the Canadian advice is sensitive to the US tax planning.

## Description of the Company Law

### A Brief History of the NSCA

The first statute governing the incorporation of companies in Nova Scotia was enacted in 1862[4] and was modelled largely on the federal legislation of 1854, which in turn was largely borrowed from the legislation then in place in New York.[5] The JSCA (1862) provided for the incorporation of two different types of companies—the "double liability company" and the "unlimited liability company."

A double liability company was incorporated by five or more people filing a declaration with the office of the Provincial Secretary and with the Registrar of Deeds for the county where the company's place of business was to be situated. Every member of such a company was personally liable, during membership and for a period of six months after the filing of the certificate of transfer of his or her shares, for the debts and liabilities of the company "up to an amount equal to double the stock held by him, deducting therefrom the amount actually paid to the company on such stock." Such companies could neither remain in existence beyond the year 1875 nor be incorporated for the purposes of banking, insurance, or ordinary mercantile and commercial business.

An unlimited liability company was incorporated by three or more people filing a similar declaration. However, the declaration had to contain a statement that the members did not seek limited liability. Accordingly, the members of such a company had personal liability for all debts and undertakings of the unlimited liability company. Unlike the double liability company, an unlimited liability company could be incorporated "for any lawful purpose or business" and did not have any limit on the duration of its existence. Thus, even under the earliest Nova Scotia statute for the incorporation of companies, it was possible to incorporate both a limited liability company and an unlimited liability company.

The JSCA (1862) was not commonly used and was eventually repealed in 1883 upon the enactment of the Nova Scotia Joint Stock Companies Act,[6] which was largely copied from the act in force in Ontario at the time.[7] Incorporation under the NJSCA (1883) was by letters patent granted by the governor in council. Five or more persons could petition the governor in council for a charter constituting

them and any others who joined "a body corporate and politic for any purpose or objects to which the legislative authority of the Parliament of Nova Scotia extends, except the construction and working of railways and loan companies." A company incorporated under the NJSCA (1883) had a legal personality (separate and distinct from its members) and perpetual existence, and the shareholders had limited liability.

In 1900, a new Nova Scotia Companies Act[8] was passed, which reverted to the English-style registration system in which incorporation was achieved by the registration of a memorandum of association and articles of association, as opposed to the previous letters patent system. The NSCA (1900) was modelled largely after the legislation in England—the Companies Act, 1862,[9] as amended to 1900.[10] The NJSCA (1883) and the NSCA (1900) were in force concurrently until 1902, when a statute was passed prohibiting the granting of any more letters patent under the NJSCA (1883).[11]

Since 1900, with the exception of companies incorporated by special statute, all companies incorporated in Nova Scotia have been incorporated by registration of a memorandum of association and articles of association.[12] One important aspect of the Nova Scotia model of incorporation, unlike the BCA model, is that it is effectively contractual in nature. (In some respects, the Nova Scotia company is similar to a Delaware limited liability company, which is governed by a limited liability company agreement, also referred to as an operating agreement.) The NSCA is not intended to be a complete code of corporate law. The law that governs a Nova Scotia company (including an NSULC) is a combination of statute and jurisprudence.[13] This important distinction between BCA statutes and the NSCA helps to explain why statutory principles of interpretation applicable to the interpretation of a BCA statute do not necessarily apply to the NSCA.

## Types of Companies That Can Be Formed Under the NSCA

Three different kinds of companies can be formed under the NSCA: (1) companies limited by shares, (2) companies limited by guarantee, and (3) NSULCs. Companies limited by shares must have share capital, whereas companies limited by guarantee and NSULCs may or may not have share capital (although in virtually every case an NSULC will have share capital).

## The Nature of an NSULC

An NSULC is, for Canadian corporate law purposes, like any other company: it is a separate legal entity with perpetual existence and with the powers of a natural person (unless limited by its memorandum of association); however, the members of an NSULC do not have limited liability for the debts and obligations of the company, unlike the shareholders of most other Canadian companies (with the exception of the shareholders of an AULC).

The main difference between an NSULC and a company limited by shares (or a company limited by guarantee) is that the liability of the members of an NSULC for the debts and liabilities of the company on a winding up is unlimited. The NSCA contains a number of provisions that apply only to companies limited by shares. For example, the reduction of capital of a company limited by shares must be approved by a special resolution of the shareholders and confirmed by the court.[14] Accordingly, an NSULC may resolve to return paid-up capital to its shareholders in the manner provided for in its articles of association without court approval.[15]

Generally speaking, the sections of the NSCA applicable only to companies limited by shares were originally inserted to protect those people who deal with such companies and to give those companies the powers that they were restricted from exercising as a consequence of jurisprudence. For example, in the case of a return of paid-up capital, it was ultra vires a company limited by shares to return paid-up capital, on the theory that those dealing with such companies relied upon the statement in the memorandum of association as to the capital of the company; there was no recourse to the members if the company was ultimately unable to meet its obligations.[16] The paid-up capital restriction imposed by the courts was relaxed by an amendment to the UK legislation permitting a return of paid-up capital so long as, among other things, it was approved by the court.

On the other hand, the creditors of an unlimited liability company could, upon a winding up, look to the company's members if it was unable to satisfy its obligations; thus, the common-law restriction on reducing paid-up capital was not applicable to an unlimited liability company, and the enactment of any statutory relief was therefore unnecessary.[17]

### The Nature of Unlimited Liability

The NSCA defines the liability of the members of a Nova Scotia company as follows:

> In the event of a company being wound up, every present and past member shall, subject to this Section, be liable to contribute to the assets of the company to an amount sufficient for payment of its debts and liabilities and the costs, charges, and expenses of the winding up and for the adjustments of the rights of the contributors among themselves.[18]

An exception is made for companies limited by shares. A member of such a company will not be required to contribute any amount in excess of the amount, if any, unpaid on the shares in respect of which such member is liable (there is a similar limit for companies that are limited by guarantee, the limit being the amount that the members agree to guarantee).

The liability of a past member of an NSULC is limited to a period of one year after the member ceases to be a member, and liability does not extend to any

debts or liabilities contracted after the member ceases to be a member. Furthermore, before approaching a past member, a liquidator will first require the current members of an NSULC to contribute to the payment of the NSULC's debts and the costs of the winding up.

The members of an NSULC are not directly liable to the NSULC's creditors. The liability of a past or present member of an NSULC is crystallized only when the NSULC's creditors petition the court for a winding-up order (or when the NSULC becomes bankrupt) and the company's debts and liabilities have not been satisfied. In such a case, the past or present member (if liable) owes the amount to the NSULC, not to the creditor. The liquidator will collect those amounts from the past and present members, and those amounts will be available to satisfy the claims of the creditors against the NSULC.

Care should be taken when incorporating an NSULC or converting an existing company into an NSULC to ensure that an appropriate intermediary is interposed between a shareholder with assets and the NSULC (this is usually accomplished by making the direct shareholder of the NSULC a trust, a US shell company, or a limited partnership), so that in the event of the winding up of the NSULC the shareholder who is exposed to liability will not have material assets that can be called upon to satisfy the debts and liabilities of the NSULC. The timing of the interposition of the intermediary is very important in the case of a conversion of a company into an NSULC when one is using the arrangement method. The timing issue is discussed in greater detail below.

Lenders and others who take a pledge of shares in the capital of an NSULC must ensure that they will not be considered shareholders of the NSULC in the event that it is wound up. In the context of a pledge of shares, the legal title in the shares should not be transferred to the pledgee to create a charge, and the pledgee (or an affiliate) should not consent to become a member of the NSULC without taking a deliberate action within its control. The pledgee should not be a member if it merely takes possession of the share certificate(s) of the NSULC endorsed for transfer in blank, and is not entered on the register of members. The pledge agreement should be carefully reviewed and should contain language sufficient to ensure that the pledgee does not, by entering into the agreement, have the immediate right to be entered on the register of members.

## Incorporation of an NSULC

A new NSULC may be incorporated in the same way as any other company under the NSCA. There are no special requirements for the incorporation of an NSULC. Essentially, the memorandum of association and articles of association are prepared and filed with the Registrar of Joint Stock Companies (Nova Scotia) ("the registrar"), together with a statutory declaration stating that all of the requirements of the NSCA have been met. The registrar then issues a certificate of incorporation for the company, which is deemed to be incorporated from the date shown on the certificate.

## Conversion of an Existing Company into an NSULC

There are essentially two ways to convert an existing company into an NSULC without using a dissolution. Both of these methods require, as a prerequisite, that the company be a Nova Scotia company. Thus, a preliminary step in both cases, if the existing company is incorporated in another jurisdiction, is to continue the company into Nova Scotia as a company limited by shares. The NSCA, unlike the Alberta Business Corporations Act (ABCA),[19] does not permit the direct continuance of a company into Nova Scotia as an NSULC. This is a fairly routine matter when one is continuing a company from another Canadian jurisdiction, and a little more complex when one is continuing a limited liability company or corporation from the United States. A continuance from a Canadian province can usually be accomplished in a few days (assuming that there are no complications in the exporting jurisdiction). One of the preliminary steps prior to continuance is to ensure that any contributed surplus in the company is first capitalized into stated capital to the extent that it does not give rise to any Canadian income tax consequences.[20]

In order to become an NSULC, a company limited by shares may amalgamate with a shell company (which may be either a company limited by shares or an NSULC). The amalgamation agreement provides that the amalgamated company will be an NSULC. The process involves the companies entering into an amalgamation agreement, which is then approved by the members of each company. An application is then made to the Supreme Court of Nova Scotia for an order approving the amalgamation agreement. Once the order is obtained, a copy of the order, together with the amalgamation agreement, must be filed with the registrar, who then issues a certificate of amalgamation. Until the amalgamation agreement and order are filed with the registrar, the amalgamation cannot have effect. On and from the date of the certificate of amalgamation, the companies are amalgamated and continue as one company. The amalgamated company possesses all of the property, rights, privileges, and franchises and is subject to all of the liabilities, contracts, and debts of each of the amalgamating companies.

An alternative method of converting a company limited by shares into an NSULC involves the company entering into an arrangement with its members pursuant to section 130 of the NSCA. The company and its members enter into a plan of arrangement whereby the company's memorandum of association is amended to remove the statement that the liability of the members is limited, and to substitute therefor the statement that the liability of the members is unlimited. The name of the company is also changed to replace the words "Limited" or "Incorporated" with one of the following: "Company," "Co.," "Corporation," "Corp.," "Unlimited Liability Company," or "ULC." The memorandum of association and articles of association of the company are then amended and restated to reflect the fact that the company is an NSULC.

The implementation of an arrangement is commenced by an application to the Supreme Court of Nova Scotia for an order directing the calling and holding

of a meeting of the members to consider the arrangement. Once this order is granted, the company calls a meeting of the members as set out in the order (although, commonly, where the company is closely held, the order provides that the approval of the shareholders may be by written resolution).

For the arrangement to be accepted, a majority in number representing three-fourths in value of the members present either in person or by proxy at the meeting must approve the plan of arrangement. If the arrangement is accepted by the required majority of the members, an application is then made to the Supreme Court of Nova Scotia for an order sanctioning the arrangement. If the arrangement is sanctioned by the court, it has no effect until a certified copy of the order is delivered to the registrar for registration. A copy of every such order must be annexed to every copy of the memorandum of association of the company issued after the order has been made.

An amalgamation has the advantage of being a little less time-consuming than an arrangement, provided that creditor consents can be obtained quickly. The disadvantages of an amalgamation compared with an arrangement are that the amalgamation is more expensive (an arrangement avoids the $6,000 ULC tax; creditor consents must be obtained; there is a greater probability of commercial issues;[21] and tax consequences (for example, a deemed year-end) may be triggered.

An arrangement has become the method of choice to convert a company into an NSULC because it is cheaper, it avoids the consequences of an amalgamation, and it avoids the requirement to obtain creditor consents (although there is a theoretical risk that the court may require consents). However, there is a potential liability risk for past shareholders if a company is converted into an NSULC using the arrangement method. If the shareholder wants to interpose an intermediary between itself and the Nova Scotia limited liability company before it becomes an NSULC because of liability concerns, the interposition should occur before the company becomes subject to the NSCA. If the shareholder causes the intermediary to be interposed after the company becomes subject to the NSCA and before it becomes an NSULC, the shareholder may still be subject to unlimited liability as a past shareholder of the NSULC because the company and the NSULC are the same body corporate (the arrangement is, in effect, merely an amendment to the memorandum of association and articles of association). The original shareholder, as a past member of the NSULC, is liable for up to one year for the debts of the company that were in existence at the time it transferred its shares in the company to the intermediary.

### Conversion of an NSULC into a Company Limited by Shares

An NSULC can easily be converted into a company limited by shares. Under section 68 of the NSCA, an NSULC can, by special resolution, resolve to register as a company limited by shares. A brief application is then made to the registrar,

who closes the company's registration as an NSULC and opens a new registration for the company as a company limited by shares. The conversion to a limited company does not result in any negative tax consequences, since the company is the same body corporate both before and after conversion.

## A Comparison of the NSCA and the ABCA

There are differences between the NSCA and the ABCA because of the origin and unique history of the respective statutes. The following is an overview of some of the major differences between an NSULC and an AULC.

### Unlimited Liability

The liability of the members of an NSULC is unlimited. However, the liability of the members of an NSULC does not arise until the NSULC is wound up. The jurisprudence concerning who is a member for the purposes of being added to the list of contributories is well developed. The law is clear on when liability is extended to a past member and on the liabilities of the NSULC for which a past member is responsible. An additional method of dealing with the unlimited liability of being a shareholder of an NSULC is to re-register it as a limited company under section 68 of the NSCA. Arguably, re-registration does not preserve a creditor's rights (this is not the case with an AULC). The shareholders of an AULC also have unlimited liability; it is, however, owed directly to the creditors of the AULC. Presumably, a creditor could pursue a shareholder directly so long as it establishes its claim against the AULC. A number of issues also arise in respect of, among other things, when the liability of a shareholder of an AULC ceases and whether or not a former shareholder of an AULC (or of an Alberta limited corporation that has been converted into an AULC) is liable for the debts of the AULC that arise after it ceases to be a shareholder. The liability concern for a shareholder has also been raised if it ceases to be a shareholder of an Alberta limited corporation and that corporation is subsequently converted into an AULC. These issues are more fully dealt with by Don R. Sommerfeldt in his paper on the AULC.[22]

### Authorized Capital

Under the NSCA, the memorandum of association of a company limited by shares must set out, in the case of par value shares, the amount of share capital and the division thereof into shares of a fixed amount.[23] For shares without par value, the total number of shares the company proposes to issue must be specified. The share capital of an NSULC is set out in its articles of association.[24] A Nova Scotia company cannot have an authorized capital consisting of an unlimited number of shares; ABCA corporations may have an unlimited number of shares.

**Residence of Directors**

There are no residency requirements for directors under the NSCA. Under the ABCA, the general rule is that a minimum of 25 percent of the directors must be resident Canadians; if there are fewer than four directors, at least one director must be a resident Canadian.[25]

**No Par Value Shares**

The NSCA permits shares to be issued with or without par value, and a company may have both par value and no par value shares.[26] Shares of ABCA corporations are required to be without nominal or par value.[27]

**Paid-Up Capital**

Under the NSCA, the paid-up capital of shares without par value is the aggregate amount of the consideration paid for their issuance; for shares that have a par value, the paid-up capital is equal to the total par value of the issued and outstanding shares.[28] For an ABCA corporation, the full amount paid for shares must be added to the stated capital account maintained for that class of shares, except where the corporation is permitted by the ABCA to add a lesser amount, such as in the case of a transfer of property to the corporation.[29] The ABCA provides a mechanism to capitalize contributed surplus into paid-up capital; the NSCA does not provide a comparable mechanism. A potential remedy for dealing with the capitalization issue under the NSCA is to undertake an arrangement of the capital of the NSULC. The contributed surplus would be converted into paid-up capital in the course of exchanging the currently issued and outstanding shares, with new shares having an aggregate par value equal to the desired paid-up capital.

**Investment in Parent Company**

Under the NSCA, a company may hold shares in its parent company. Except in limited circumstances or for a limited period of time (a maximum of 30 days), this is not possible under the ABCA for an Alberta corporation.[30]

**Management Powers**

The NSCA does not confer management powers on the directors. This is usually done through the articles of association, but it need not be done (some or all of the power to manage the company could be retained by the shareholders, or the shareholders could retain the power to withdraw, from time to time, the power of the directors to manage the company). The ABCA specifically requires the directors to manage, or supervise the management of, the business and affairs of the corporation, subject to any unanimous shareholder agreement.[31]

**Dividends**

The NSCA does not contain any provisions restricting the declaration and pay-
ment of dividends. The only limitation on the declaration and payment of
dividends, other than any limitation that may be imposed by the memorandum
of association and articles of association of a company, is the common-law
restriction that dividends may not be paid out of the capital of the company
(such a common-law restriction does not apply to an NSULC). The capital of a
company for the purposes of this test is essentially the paid-up capital, and
dividends may, subject to the articles of association, be paid out of share pre-
mium, contributed surplus, or retained earnings. The ABCA, on the other hand,
provides that dividends may be paid only if there are no reasonable grounds for
believing that the corporation is (or after the payment would be) unable to pay
its liabilities as they become due, or that the realizable value of the corporation's
assets would, as a consequence of the payment of the dividend, be less than the
aggregate of its liabilities and stated capital of all classes.[32]

**Issuance of Shares**

Under the ABCA, the consideration for shares may be paid in money or in property
or past services that are not less in value than the fair equivalent of the money
the corporation would have received had the shares been issued for money.[33]
Under the NSCA, shares are deemed to have been issued and to be held subject
to the payment of the par value, or subscription price, depending on whether the
shares have a par value, in cash, unless otherwise determined by a written con-
tract.[34] A Nova Scotia company can issue shares that are not fully paid, subject
to the company's right to call for payment of the unpaid portion. ABCA corpora-
tions cannot issue shares that are not fully paid, and cannot accept promissory
notes or other promises to pay as consideration for the issuance of shares.[35]

**Shareholders' Resolutions**

Under the NSCA, a special resolution must be passed by three-fourths of the votes
cast by the members entitled to vote who are present at the meeting in person or
by proxy. Unless the resolution is unanimously passed, it must be confirmed by
a majority of the members entitled to vote at a subsequent meeting.[36] Under the
ABCA, a special resolution is required to be passed by a majority of not less than
two-thirds of the votes cast by the shareholders who voted on the resolution.[37]

**Unanimous Shareholders' Agreements**

A shareholders' agreement made among the shareholders of a Nova Scotia com-
pany does not have the same status as a unanimous shareholders' agreement under
the ABCA. A shareholders' agreement among the shareholders of the Nova Scotia
company is not enforceable against the company to the extent that it purports to

restrict the powers of the directors to manage the business of the company if such powers are granted to the directors by the company's articles of association. The constating documents of a Nova Scotia company must be amended to give effect to those provisions in the shareholders' agreement that are otherwise contrary to the articles of association (for example, provisions dealing with the management of the company). The ABCA permits the powers of the directors to be restricted, in whole or in part, by a unanimous written agreement among all of the shareholders.[38]

### Amalgamation

Under the NSCA, an amalgamation must be approved by the Supreme Court of Nova Scotia. Under the ABCA, an amalgamation agreement must be approved by a special resolution.[39] The ABCA also provides for vertical and horizontal short-form amalgamations that dispense with many of the formalities of other amalgamations, such as the need for an amalgamation agreement and shareholder approval.[40] The ABCA also permits a triangular amalgamation.

### Financial Assistance

The ABCA permits a corporation to provide financial assistance to any person for any reason. However, the corporation must disclose to its shareholders the financial assistance given by the corporation for the purpose of or in connection with the purchase of shares issued or to be issued by the corporation or an affiliated corporation.[41] The NSCA, subject to certain exceptions, prohibits companies from providing financial assistance, whether directly or indirectly, and whether by means of a loan, a guarantee, the provision of security, or otherwise for the purpose of or in connection with a purchase made or to be made of any shares in the company, unless the company satisfies a solvency test.[42]

### Duties of Directors

The ABCA imposes an objective test with respect to the duty of care of directors, who are required (1) to act honestly and in good faith with a view to the best interests of the corporation, and (2) to exercise the care, diligence, and skill that a reasonably prudent person would exercise in comparable circumstances.[43] In Nova Scotia, the common-law duty of care (a subjective test) applies; further, section 153 gives the court discretion to relieve a director in certain cases if he or she has acted honestly and reasonably.

### Liability of Directors

The liabilities imposed on directors are generally more onerous under the ABCA than they are under the NSCA.[44] The NSCA does not address the liability of

directors in an organized manner; however, several miscellaneous provisions impose liability on directors, including sections 39(2), 40(2), 42(2), 55(2), 65, 111(2), and 116(3).

### Amendment of Authorized Capital

Under the NSCA, a company may increase its authorized capital, including by means of the creation of a class of shares (or other changes to its authorized capital) by shareholder resolution. Although notice to the registrar is required, the change is effective when the resolution is passed (that is, there is no formal filing requirement to give effect to the change).[45] However, under the ABCA, a change to the authorized capital is not effective until articles of amendment are filed and a certificate of amendment is issued by the registrar.

### Revival

The NSCA allows a company to voluntarily surrender its certificate of incorporation and be dissolved,[46] but it does not allow a company dissolved in this manner to be revived. The ABCA allows any corporation to be revived, even if it was voluntarily dissolved.[47]

### Return of Capital

Under the ABCA, a corporation may reduce its stated capital with the approval of a special resolution if the applicable solvency test is met.[48] A corporation can thereby distribute an amount not exceeding the stated capital of a class or series of shares to the holders of shares of that class or series. A court application is required to return capital to the shareholders of a Nova Scotia company limited by shares;[49] however, an NSULC may resolve to return paid-up capital to its shareholders in the manner provided for in its articles of association.[50]

### Formation of a ULC

Under the ABCA, an AULC can be formed by incorporation, by amalgamation, by an amendment to the articles of incorporation, or by continuing an existing company (either limited or unlimited) from another jurisdiction under the ABCA as an AULC.[51] Under the NSCA, an NSULC can be formed by incorporation, by amalgamation, or by an amendment to the memorandum of association of a Nova Scotia company limited by shares through an arrangement. A company formed outside Nova Scotia cannot be directly continued under the NSCA as an NSULC; the company must first be continued as a limited company and then converted into an NSULC by amalgamation or by an amendment to its memorandum of association.

**Cost**

The taxes paid to the Nova Scotia government for the incorporation of an NSULC are $6,000 in the first year and $2,000 every year thereafter; for the conversion of a company into an NSULC using an amalgamation, $6,000 in the first year and $2,000 every year thereafter; and for the conversion of a company into an NSULC using an arrangement, $235 in the first year and (depending on the renewal date) $2,000 every year thereafter. The cost of incorporating an AULC is $100; the cost of converting a company into an AULC by an amalgamation or an amendment is the same. No fees are payable to the Alberta government in respect of the AULC to maintain its existence in subsequent years.

## Proposals for Amendments to the NSCA

Service Nova Scotia and Municipal Relations (a department of the Nova Scotia government) has recently indicated that it is considering amendments to the NSCA. To this end, it solicited comments from corporate law practitioners in the province and then commissioned a discussion paper entitled *Proposals for Amendments to the Nova Scotia Companies Act*.[52] The proposals were released for public comment on October 23, 2005.

The following is an overview of some of the relevant proposed amendments. The amendments were neither proposed by nor sanctioned by Service Nova Scotia and Municipal Relations or any other arm of the Nova Scotia government, and it is uncertain at this point whether or when they will result in amendments to the NSCA.

### Amalgamations

The current amalgamation procedure, under which an application is made to the Supreme Court of Nova Scotia for approval of an amalgamation agreement, should be retained because of its flexibility. However, it has also been proposed that a supplementary alternative procedure, which mirrors that found in BCA-style statutes, be adopted. The alternative procedure provides for an amalgamation to be effected by a special resolution of each company, or by a directors' resolution if the companies are related, and the filing of an amalgamation agreement to which is attached the memorandum and articles of association of the proposed amalgamated entity together with a statutory declaration of an officer or director of each company indicating that the company is able to meet a solvency test on amalgamation and that creditors of each company either are not prejudiced by the amalgamation or have been notified of the proposed amalgamation and have not objected. This alternative procedure would streamline simple amalgamations and reduce the time and cost of such transactions. The benefit of retaining the existing procedure is that companies could be amalgamated even if they did not technically satisfy a BCA-style solvency test.

**Conversion**

An existing Nova Scotia company limited by shares should be permitted to convert to an NSULC by altering its memorandum of association through a unanimous resolution of its members (rather than using the more complex arrangement procedure to accomplish this result); it should then be able to re-register as an NSULC. Furthermore, it has been proposed that a company continuing into Nova Scotia be permitted to elect to become an NSULC upon continuance. These proposals would greatly reduce the time and cost of creating an NSULC: they would dispense with the artifice of an amalgamation with a shell company and the arrangement process, both of which are costly and time-consuming relative to the proposed methodologies.

**Reduction in Capital**

Currently, a company limited by shares must receive court approval to reduce its capital. Other jurisdictions in Canada address this process by placing statutory restrictions on when capital may be reduced, by providing creditor remedies in the event that capital is distributed contrary to the legislated criteria, and, alternatively, by use of the oppression remedy in cases where the conduct of the majority of the shareholders of the company is oppressive or unfairly prejudicial to the interests of minority shareholders. It has been proposed that the current sections of the NSCA dealing with the reduction of capital be repealed and replaced with a solvency test coupled with a provision that the shareholders of a company that reduces its capital in contravention of the NSCA be compelled to repay the amount. The statutory language concerning the purchase for cancellation or redemption of shares in a company that is an NSULC should be modified so that it is clear that those provisions do not apply to an NSULC.

**Restoration**

The NSCA currently provides for the restoration of a company struck off the register upon application to the court. The proposals recommend that the NSCA be amended to permit the application for restoration to be made to the registrar; once restored, the company would be continued as if it had never been struck off. The proposals also recommend that the Corporations Registration Act be amended to permit the registrar to determine that the certificate of registration under the legislation be deemed not to have been revoked in the context of the restoration of a struck-off company. The proposals provide for a mechanism whereby the decision of the registrar concerning the restoration of a struck-off company be subject to review by the court upon application by any aggrieved person.

**Alteration of Memorandum**

Under the NSCA, a company may not alter its memorandum of association except as specifically provided for therein. Some of those alterations require

court approval or an arrangement. The proposals recommend that an amendment to the memorandum be approved by special resolution, except in the case of a conversion to an NSULC, in which case the approval must be unanimous.

### Financial Assistance

Under the proposals, the financial assistance provisions set out in section 110(5) of the NSCA would be repealed; the restriction on financial assistance given by a company for the purpose of, or in connection with, the acquisition of shares in the company's capital would be removed and replaced with an express statement that financial assistance is permitted.

### Paid-up Capital on Continuance

The proposals recommend that the NSCA be revised to include a provision confirming that the paid-up capital of a class of shares of a company continued under the NCSA be the same as the paid-up capital or the stated capital, as the case may be, of the company in the exporting jurisdiction. This provision is similar to provisions in most BCA jurisdictions, and would create greater certainty as to the amount of the paid-up capital of a company upon continuance.

### Unlimited Share Capital

The proposals recommend that the number of shares of a class of shares in the capital of a Nova Scotia company be permitted to be unlimited.

### Special Resolutions

The proposals recommend that the threshold for passing a special resolution be reduced from three-quarters to two-thirds and that the requirement for a confirmatory meeting (in the case of an actual meeting) be removed.

## Characterization of the ULC from a US Tax Perspective

## The Canadian Versus the US Approach to Entity Characterization

The determination of whether or not an entity (to use the term loosely) is a corporation[53] or a partnership[54] for Canadian income tax purposes involves the application of Canadian non-tax legal principles. In the United States, however, the characterization of an entity as an association, partnership, or disregarded entity depends on the rules set out in the Internal Revenue Code[55] and the regulations issued thereunder.

## The US Approach to Entity Characterization

Prior to the check-the-box regulations, the test for the characterization of an entity for federal tax purposes depended upon the application of a six-factor test ("the Kintner rules") that had its genesis in US case law.[56] Only four of those factors were relevant for the purpose of determining whether or not an entity was a partnership or an association. Under the Kintner rules, an NSULC was determined to be an entity that could be treated as either a partnership or an association, depending on whether or not it failed at least two of the four tests (limited liability, centralization of management, free transferability of interests, and continuity of life). If an entity did not satisfy at least two of the four tests, it would be treated as a partnership.

In a private letter ruling dealing with the classification of an NSULC as a partnership, the Internal Revenue Service (IRS) made the following comments concerning whether or not a member of an NSULC had limited liability:

> An organization has the corporate characteristic of limited liability if under local law there is no member who is personally liable for the debts of or claims against the organization. Section 301.7701-2(d)(1).
>
> Section 135 of the Companies Act provides that during wind up the members of an unlimited company are liable to contribute to the company's assets in an amount sufficient for the payment of its liabilities together with the expense of winding up.
>
> Z's Memorandum of Association states that Z is an unlimited company. Therefore, Z's members are liable to contribute an unlimited amount to pay Z's liabilities when Z is wound up. Thus, Z does not have the corporate characteristic of limited liability.[57]

Clearly, the IRS believed that a member of an NSULC did not have limited liability within the meaning of the Kintner rules. Presumably, the IRS did not interpret Treasury regulation section 301.7701-2(d)(1), as it then read under the Kintner rules,[58] as requiring a member to have a direct liability to the creditor notwithstanding that the language of the provision suggested otherwise.[59] Under the NSCA, a member (or a past member in certain circumstances) has a liability to the NSULC, not to its creditors.

The check-the-box rules, for the purposes of Canadian entities, effectively simplified the rules for the characterization of a Canadian corporation or company[60] by focusing solely on whether or not the members had unlimited liability and, if they had unlimited liability, the number of members. The approach taken by the Treasury in the check-the-box rules was to first classify a corporation and company in Canada as a corporation,[61] subject to the exception, which originally read, "with regard to Canada, any corporation or company formed under any federal or provincial law which provides that the liability of all of the members of such corporation or company will be unlimited," and was subsequently reworded to read, "with regard to Canada, a Nova Scotia unlimited liability company (or

any other company or corporation, all of whose owners have unlimited liability pursuant to federal or provincial law)."[62] The reason for the subsequent amendment to the exception was explained by the Treasury as follows:

> These regulations also clarify the exception to per se corporate treatment for Canadian companies and corporations. When the final check-the-box regulations were promulgated, the only company or corporation that could be formed where the liability of all of its members was unlimited pursuant to any federal or provincial statute (as opposed to through side agreements of the members), was a Nova Scotia Unlimited Liability Company (NSULC). However, in order to avoid changing the regulations if any other province, or the federal government, subsequently allowed for the formation of unlimited liability companies by statute, these regulations did not specifically list the NSULC. In response to questions from taxpayers, the regulation is clarified, with effect from January 1, 1997, by specifically naming the NSULC, while still providing for any other unlimited liability company that might subsequently be allowed by any other federal or provincial statute.[63]

## Meaning of "Unlimited Liability"

As explained above, an NSULC and federally and provincially incorporated companies (or corporations) whose members have unlimited liability are "eligible entities" (that is, they can elect their classification for US tax purposes). Unfortunately, there is no definition of "unlimited liability" for the purposes of determining whether or not a federally or provincially incorporated corporation or company is an eligible entity.

The only definition concerning the liability of a member is the definition of limited liability for the purposes of determining the default classification of what is otherwise an "eligible entity." The definition of limited liability is, practically speaking, not relevant in its application to a Canadian corporation or company because the definition is not applicable unless the corporation or company is an "eligible entity," which would mean that a determination would first have to be made that the shareholders have "unlimited liability." Nevertheless, the definition may provide some guidance on the meaning of unlimited liability.

For the purpose of determining whether or not a person has limited liability for the purpose of the default classification rules, a member of a foreign eligible entity is treated by Treasury regulation section 301.7701-3(b)(2)(ii) as having limited liability if

> the member has no personal liability for the debts of or claims against the entity by reason of being a member. This determination is based solely on the statute or law pursuant to which the entity is organized, except that if the underlying statute or law allows the entity to specify in its organizational documents whether the members will have limited liability, the organizational

documents may also be relevant. For the purpose of this section, a member
has personal liability if the creditors of the entity may seek satisfaction of
all or any portion of the debts or claims against the entity from the member
as such. A member has personal liability for the purpose of this paragraph
even if the member makes an agreement under which another person
(whether or not a member of the entity) assumes such liability or agrees to
indemnify that member for any such liability.

The definition of limited liability (albeit for the purposes of the default
classification rules) is effectively the definition used in the Kintner rules to
determine the status of a ULC as either a partnership or a corporation. The
definition may be construed broadly on the basis of the above-noted hypothesis
that a person does not have limited liability if the corporate debts are not limited
to the corporation's assets. In light of the previous rulings, the definition of
limited liability, and the genesis of the original meaning of limited liability, the
conclusion should be that a Canadian corporation or company will be an "eligi-
ble entity" so long as the liability of the shareholders for the liabilities of the
corporation or company is either indirect (as in the case of an NSULC) or direct
(as in the case of an AULC).

## Different Characterizations Under
## the Check-the Box Rules

In effect, a ULC can be treated as an association, a partnership, or a disregarded
entity. If a ULC has only one member,[64] unless it elects to be treated as an
association it will be disregarded as an entity separate from its owner. More
particularly, the ULC's activities are treated as if the ULC were a sole proprietor-
ship, branch, or division of the owner.[65] If the ULC is treated as a partnership and
does not elect to be treated as a corporation, the ULC is a partnership for US tax
purposes; thus, for the most part, transactions between it and its members are
not ignored. The fictions created by the check-the-box election are important for
the purposes of determining how the ULC assists with Canada-US tax planning.

## Change in Classification Without Election

In some cases, a client will establish a ULC and not seek US advice regarding a
change in the entity or a transaction that may affect the number of its members
or the way its assets are held. In those cases, there could be adverse US income
tax consequences. For example, if a US corporation (USco) enters into a joint
venture with a Canadian corporation (Canco) whereby USco acquires 25 common
shares and Canco acquires 75 common shares, the ULC will be treated as a foreign
partnership so long as it does not check the box to be treated as a corporation. If
the ULC subsequently transfers its business to another Canadian company that is
not a ULC for shares, or if it acquires a Canadian company that is not a ULC with

*THE NOVA SCOTIA UNLIMITED LIABILITY COMPANY: SURF AND TURF*    26:19

significant assets or earnings, the original check-the-box planning will be af-
fected. USco should ensure that there are sufficient covenants in the constating
documents or shareholders' agreement for the ULC to ensure that such transfers
or acquisitions will involve ULCs and not Canadian limited companies.

Another example is the case where there is an increase in the number of
members of a ULC that is treated as a disregarded entity. If another person
becomes a member of the ULC, the ULC will cease to be a disregarded entity and
will be treated as a partnership for US tax purposes.[66] The consequences of a
change in the number of members of a limited liability company (LLC) from a
disregarded entity to a partnership is described in Revenue ruling 99-5.[67]

In Revenue ruling 99-5, the IRS considered the consequences of a single-
member LLC becoming a partnership in two situations: the new member ("B")
(1) acquiring 50 percent of the interest in the LLC from the original member
("A"), and (2) subscribing for a 50 percent interest in the LLC. In the case of a
purchase, A is treated as selling 50 percent of its interest in the assets of the LLC
to B and therefore recognizing the associated gain on its 50 percent interest in
those assets. A and B are then treated as contributing those assets to the LLC, a
partnership, with A having a cost in its partnership interest equal to its original
cost in the assets that it is treated as having retained and B having a cost equal to
the amount that it paid to A for its interest in the LLC. The subscription by B for
a 50 percent interest in the LLC is treated as a contribution of assets to a partner-
ship on a tax-deferred basis without any income recognition by A. Although this
Revenue ruling dealt with an LLC, the same analysis should be equally applica-
ble to a ULC, even though the ULC would be treated as a foreign partnership
(rather than as a domestic partnership) for US tax purposes. Accordingly, the
consequences of an investment in a ULC that is disregarded must be carefully
considered when the effect of the investment is to cause the ULC to be treated as
a partnership (an entity) for US tax purposes.

Another example of the negative tax consequences flowing from a ULC chang-
ing from a disregarded entity to a partnership is the case where the ULC owes
money to its member.[68] Even though the debt is disregarded for US tax purposes,
it is an obligation that exists under commercial law. The conversion caused by
the addition of members is treated from a US tax perspective, as outlined above,
as a sale of assets (if there is a sale of a portion of the member's interest) and a
contribution of assets by both the original member and the new member to a
partnership. Prior to the contribution, the debt owed to the original member is
ignored; however, after the contribution, the partnership is treated as owing that
amount to the original owner, since a partnership is recognized as an entity. In
the end, the original member is treated as contributing the assets to a partnership
(the ULC) in exchange for a partnership interest and boot. Subject to certain
exceptions,[69] the original member is treated as selling a portion of the assets for
the note. (The income inclusion is not dependent on whether or not the amount
of the debt exceeds the member's basis in the assets of the ULC.) Accordingly,
even though from a Canadian income tax perspective there may not be any tax

consequences when another member subscribes for shares in the ULC, there may be a US income tax liability.

## Uses of the ULC

### Flowthrough of Losses

A US person cannot claim a loss realized in Canada as a deduction against its other income unless the loss is realized either directly or indirectly through a partnership.[70] If the US person desires to carry on that business through a corporation for Canadian tax purposes, the ULC could be the vehicle of choice, since, in the case of a disregarded entity, the loss will be treated as its own or, in case of a partnership, the US person will be able to deduct its share of the loss of the ULC from its income (applying US tax rules for partnerships). Loss planning using an NSULC may be preferred over planning using an AULC if a "liability blocker" between the ULC and the US shareholder defeats the US tax planning.[71]

Nevertheless, consideration must be given to the dual consolidated loss (DCL) rules.[72] The purpose of the DCL rules is to prohibit a "dual consolidated loss" from offsetting the taxable income of a domestic affiliate. More particularly, a dual consolidated loss of a dual-resident corporation cannot offset the taxable income of any domestic affiliate in a taxable year in which the losses are recognized or in any other taxable year, regardless of whether the loss offsets income of another person under the income tax laws of a foreign country and regardless of whether the income that the loss may offset in the foreign country is, has been, or will be subject to tax in the United States.[73]

A "dual-resident corporation" is a domestic corporation that is subject to the income tax of a foreign country on its worldwide income or on a residence basis. For the purpose of applying these rules, a "separate unit" of a domestic corporation is treated as a separate domestic corporation.[74] A hybrid entity, such as a ULC, is treated as a "separate unit" for these purposes.[75] Accordingly, a ULC is treated as a dual-resident corporation for the purposes of the DCL rules.[76] The common exception to the DCL rules is the making of an election by the consolidated group that the losses, expenses, or deductions of the ULC have not been (or will not be) used to offset the income of another person under foreign law (in this case, Canada).[77]

### Indirect Foreign Tax Credit

A US C corporation can claim an indirect foreign tax credit for the underlying tax of a Canadian limited corporation so long as it owns 10 percent or more of its voting shares.[78] The indirect foreign tax credit for foreign tax paid by a Canadian limited corporation is unavailable to US shareholders who are individuals (including trusts or estates) holding those shares either directly or through a limited liability company, partnership, or S corporation. If the Canadian corporation

is a ULC, the shareholders will be eligible to claim a direct foreign tax credit for any tax paid by the ULC on its income, subject to complicated numerical limitations described in Code section 904.

## Foreign Tax Credit Planning

A ULC can be used to control a US corporation's foreign tax credit position. A US company can be either in an excess foreign tax credit position (that is, it has more foreign tax credits than US income tax, which could be utilized to offset that US income tax on repatriated income) or in an excess limitation position (that is, the foreign tax credits are exceeded by the corresponding US income tax that would arise on repatriated income).

A US multinational (USco) may wish to avoid having the foreign tax credit watered down by mixing low-taxed and high-taxed foreign-source income. For example, it could implement the following transactions (illustrated in figure 1) that involve the use of a ULC:

1) USco forms two foreign entities (F1 and F2) that are flowthrough entities in the foreign jurisdiction but eligible entities that USco has elected to treat as corporations for US tax purposes (therefore, they are controlled foreign corporations, or CFCs).
2) F1 and F2 form a Dutch CV, which is a partnership for Dutch income tax purposes.
3) USco contributes to F1 and F2 its foreign subsidiaries (including, in the case of F1, its Canadian operating company (Canco)) subject to high rates of tax and its foreign subsidiaries subject to low rates of tax. In the case of the contribution of Canco to F1, another Luxembourg (or Netherlands) entity could be interposed between F1 and Canco so that the holder could access the lower rate of withholding tax under the relevant income tax convention.
4) The low-taxed and high-taxed foreign subsidiaries are converted by F1 and F2 into "eligible entities" (for example, Canco is converted into a ULC) and check-the-box elections are made where necessary to treat those subsidiaries as disregarded entities.[79]
5) F1 and F2 contribute the foreign subsidiaries that are disregarded entities to the Dutch CV.
6) The terms of the partnership agreement governing the Dutch CV provides that 90 percent of the earnings from the high-taxed foreign subsidiaries, such as the ULC (including related high foreign taxes) and 10 percent of the earnings from the low-taxed foreign subsidiaries (including related low foreign taxes) are allocated to F1, and 90 percent of the earnings from the low-taxed foreign subsidiaries (including related low foreign taxes) and 10 percent of the earnings from the high-taxed foreign subsidiaries (including related high foreign taxes) are allocated to F2.[80]

**Figure 1**



USco can then pick and choose between the high-taxed and low-taxed pools of earnings and profits (E & P) by controlling the timing of the dividend payments from F1 and F2. If USco is in an excess foreign tax credit position, dividends can be paid from F2; if USco is in an excess limitation position, dividends can be paid from F1.

USco can also structure a sale of Canco if it wishes to deal with its excess foreign tax credit position. (See figure 2.) USco would structure the following transactions, assuming that Canco is owned by a Luxembourg entity (Luxco) that is treated as a CFC for US tax purposes:

1) Canco is converted into a ULC so that it is treated as a disregarded entity. No Canadian income tax consequences are associated with the conversion.
2) Luxco sells the shares in the ULC to another CFC within the affiliated group for cash. The transfer of the shares is not subject to Canadian income tax by virtue of the Canada-Luxembourg income tax convention so long as the value of the shares is not derived primarily from real property situated in Canada that is not used in the business of the ULC.[81]

The conversion of Canco into a ULC will not give rise to any US income tax. The subsequent sale of the shares in the ULC to a CFC will not give rise to any Canadian income tax on the gain from the disposition of the shares and will be treated as a sale of the assets of the ULC to the CFC without any related foreign tax. The income from the sale of the assets from a US income tax perspective will not be treated as subpart F income so long as the assets of the ULC were used in

**Figure 2**



an active business.[82] When a dividend is subsequently paid to USco it will be able to use its excess foreign tax credits to shelter its US domestic tax paid on the low-taxed E & P repatriated from Luxco.

## Conversion of a Stock Reorganization into a Transfer of Assets for US Income Tax Purposes

The transfer by USco of a CFC to another CFC for shares can be accomplished without any immediate tax on the gain so long as USco complies with the requirements of Code section 367(a). One of the requirements is that USco and the transferee CFC enter into a gain recognition agreement. In effect, the gain recognition agreement will require USco and the transferee CFC to agree that USco will not dispose of the shares in the transferred CFC (or substantially all of the assets of the transferred CFC) for a period of five years. If the shares (or substantially all of the underlying assets) are transferred during that period, USco must recognize the gain that existed at the time of the original transfer; the gain is treated as having been realized in the year of the original transfer.

Accordingly, USco will have to pay the income tax on the gain that was deferred, and it would have to pay interest on that tax liability calculated from the date of the original transfer. However, if Canco is converted into a ULC and a check-the-box election is made immediately before or after the transfer of the shares by USco to the CFC, the transaction will be treated as a "foreign-to-foreign" reorganization of Canco and the transferee CFC, rather than as an "outbound" transfer of the shares of Canco.[83] In that case, Code section 367(b) rather than section 367(a) applies, and there is no need for a gain recognition agreement.

## Worthless Stock Deduction

A US taxpayer may claim a loss on its shares in a Canadian company (Canco) in the course of its dissolution.[84] The loss can be claimed on an actual liquidation or on a liquidation caused as a consequence of converting Canco into a ULC. In the context of a check-the-box election, the IRS has considered whether or not a check-the-box election could trigger a worthless stock deduction.[85]

In Revenue ruling 2003-125,[86] the IRS ruled that in the event of a deemed liquidation of a wholly owned subsidiary into its parent company that results from a check-the-box election, the non-recognition provisions of Code section 332 that would normally apply in such a case will not apply if the subsidiary is insolvent (that is, the fair market value of the subsidiary's assets, including goodwill, is less than its liabilities). If the non-recognition provisions of Code section 332 are not applicable, the parent company is entitled under Code section 165(g) to recognize any loss on its shares in the subsidiary.

The amount of the loss is the holder's cost in the shares that are treated as being disposed of in the course of the dissolution. The loss will be a capital loss (rather than an ordinary loss) unless the holder of the shares is a US domestic corporation, the foreign subsidiary is affiliated[87] with that corporation, and more than 90 percent of the subsidiary's gross receipts over the term of its existence is from qualifying (non-passive) sources.[88] A number of issues must be considered in the course of using the check-the-box election to claim a worthless stock deduction.[89]

## Check-and-Sell Planning

A gain from the sale of shares in a Canadian company (Canco) held by another CFC of a US person gives rise to subpart F income.[90] However, if the underlying assets of Canco are used in an active business, the disposition of those assets will not give rise to subpart F income.[91]

Accordingly, in the event that a CFC is going to sell the shares in Canco, a wholly owned subsidiary, the conversion of Canco into a ULC, a disregarded entity, will be considered a tax-free liquidation of Canco into the CFC.[92] The subsequent sale of the shares in the ULC will be treated as a sale of the underlying assets for US tax purposes not giving rise to subpart F income or any immediate income recognition in USco, since the income is realized in the CFC. If there is a tax treaty between the CFC's country of residence and Canada, the gain on the sale of the shares of Canco is not subject to Canadian income tax so long as the value of the shares in Canco do not derive their value principally from real property situated in Canada (in some cases, the treaty relief is even broader).

The IRS is concerned about this type of planning. In non-precedential guidance, the IRS stated that the dissolution of a CFC through a check-the-box election and the subsequent sale of the shares in the former CFC (a disregarded

entity) would not be respected for technical reasons.[93] The next response was the introduction of proposed regulations that invalidated a check-the-box election if there was an "extraordinary transaction" involving a foreign corporation (in effect, an extraordinary transaction was the conversion of a foreign entity treated as a corporation for US income tax purposes into a disregarded entity, followed by a sale of the interest in the entity within a certain time). The extraordinary-transaction regulations were subsequently withdrawn after significant protests from the tax community.[94]

The IRS's technical arguments against check-and-sell planning were defeated in *Dover*.[95] In that case, the IRS argued that Code section 332 was not available to the CFC that held the shares in the foreign corporation converted into a disregarded entity. The basis for its argument was that the assets had not been used by the CFC (notwithstanding the check-the–box election) in its trade or business, and the corporation's trade or business could not be attributed to the CFC. The court concluded that a check-the-box election to cause a single-member entity to be a disregarded entity had the same effect as if the entity had actually been dissolved. Accordingly, since the IRS had previously ruled in Revenue ruling 75-223[96] that Code section 332 was applicable to an actual liquidation, the court held that the same treatment should be extended to a deemed liquidation.

A more recent US policy development relating to check-the-box planning in the international area is the recommendation of the Joint Committee on Taxation.[97] The committee observed that check-the-box planning has facilitated subpart F planning. For example, the committee noted that payments between foreign entities do not give rise to subpart F income if one of the entities is a disregarded entity. The committee also mentioned the planning in *Dover*.

The committee is also concerned with hybrid branch structures, which permit a deduction in a foreign jurisdiction without an income inclusion in the United States under the subpart F rules. The committee's fear is that this type of planning distorts investment decisions by causing US persons to invest capital abroad. Although the committee did consider that this type of inconsistent treatment between the United States and other countries is to be expected in a world with different tax systems, it recommended that a single-member foreign eligible entity not be permitted to elect to be a disregarded entity for US tax purposes.

### Financing Structure

The ULC can also be used in the course of financing a purchase of a Canadian company by a US person or injecting additional debt in a Canadian subsidiary. For example, USco can undertake the following transactions in the case of a share purchase (illustrated in figure 3):

1) USco incorporates a ULC to be the acquisition vehicle.
2) The ULC is capitalized with debt and equity by USco within the thin capitalization limitations.[98]

**Figure 3**



- 3) The ULC uses the borrowed funds and equity to acquire another Canadian corporation ("the target").
- 4) USco makes a section 338 election in connection with the acquisition of the target, and USco steps up the cost of all of the underlying assets of the target to their fair market value for US tax purposes. The section 338 election can result in the recognition of goodwill in the target, which can be amortized for US income tax purposes because the target is treated as a new corporation that has acquired all of the assets of the target immediately before the making of the election.[99]
- 5) The target and the ULC are amalgamated to form a ULC (Amalco).[100]

The effect of these transactions is that USco has a mechanism to extract its purchase price from Canada for Canadian tax purposes without incurring any Canadian income tax through either a repayment of the debt or a return of paid-up capital.[101] From a US tax perspective, USco has full basis in the underlying assets of the target and possibly will have created amortizable goodwill, and Amalco will be a branch of USco. The non-depreciable capital properties owned by the target (such as subsidiaries and land) will be eligible for the paragraph 88(1)(d) bump as a consequence of the target's amalgamation with the ULC.

Amalco will be able to deduct interest from its income on the debt owed to USco, and USco will have to pay 10 percent withholding tax on any interest paid or credited to it. The interest paid on the debt owed by Amalco to USco will not be recognized for US tax purposes because Amalco is a disregarded entity (therefore, USco is treated as both the borrower and the lender). However, the income attributable to USco from its branch operations in Canada for US tax purposes will be higher than it is for Canadian purposes, all other things being

equal, because the interest deduction will not be recognized in calculating its income from those operations. The deferral of this income is the benefit of the use of a "reverse hybrid" structure, which is discussed below.

In order to obtain a deferral, a reverse hybrid (that is, a partnership treated as a flowthrough for Canadian income tax purposes and a corporation for US income tax purposes) can be used together with a ULC, in which case the deferral will generally last until the reverse hybrid makes actual distributions. Consider the following structure in the context of an asset purchase (illustrated in figure 4):

1) USco incorporates two ULCs (a C corporation could be inserted between USco and the ULCs to deal with the unlimited liability issue), which are disregarded for US tax purposes.
2) The two ULCs form a Canadian limited partnership (Canadian LP), and USco checks the box to treat Canadian LP as a corporation for US tax purposes. USco selects one of the ULCs to be the limited partner (ULC LP) and the other to be the general partner (ULC GP). ULC LP and ULC GP are entitled to 99.9 percent and 0.1 percent, respectively, of the profits and losses of Canadian LP.
3) USco borrows funds from a US bank. USco capitalizes ULC LP with debt and equity within the thin capitalization limitations. ULC LP invests the money in Canadian LP in exchange for additional equity in Canadian LP.
4) Canadian LP purchases the assets from the Canadian vendor using the money received from ULC LP.

For Canadian tax purposes, ULC GP will include in its income (or claim a loss) equal to 0.1 percent of the profits (or losses) of Canadian LP. ULC LP will include in its income (or claim a loss) equal to 99.9 percent of the income of Canadian LP. ULC LP gets an interest deduction for the interest payable on the loan to USco. USco pays 10 percent Canadian withholding tax on any interest paid or credited to it from ULC LP.

USco does not recognize the interest income on the loan to ULC LP because ULC LP is a disregarded entity. Canadian LP is treated as a CFC for US tax purposes. USco claims a direct foreign tax credit for the Canadian withholding tax paid on the interest from ULC LP and the Canadian income tax paid by both ULC GP and ULC LP in respect of their share of the income allocated from Canadian LP. USco is able to claim a direct foreign tax credit because ULC LP and ULC GP are liable for the Canadian income tax,[102] and such liability is attributed to USco because the ULCs are disregarded. Even though USco gets to claim a direct foreign tax credit for the Canadian income tax of ULC GP and ULC LP, USco does not have to include the income allocated to them for Canadian income tax purposes because Canadian LP is a corporation for US tax purposes.[103] Any distribution by Canadian LP to ULC LP or ULC GP is treated for US tax purposes as a payment of dividends by Canadian LP to USco to the extent of the E & P in Canadian LP.

**Figure 4**



> The loan between ULC LP and USco is ignored. ULC LP gets an
> interest deduction for Canadian tax purposes, and USco gets an interest
> deduction for US tax purposes. USco gets a foreign tax credit for the
> Canadian withholding tax on the interest payments and the Canadian
> income tax of the ULCs (without picking up any of the related income).
> Any distribution by Canadian LP to ULC LP or ULC GP is treated as a
> dividend to the extent of the E & P of Canadian LP.

The Canadian vendor may be unwilling to sell assets and may wish to sell the
shares of a Canadian company (Canco). The reverse hybrid structure described
above can still be used, subject to certain changes. In addition to the steps
outlined above, Canadian LP will incorporate another ULC, which is capitalized
with debt and equity. The debt is disregarded because the ULC is a disregarded
entity. The ULC purchases the shares of Canco, makes a Code section 338 elec-
tion, and then amalgamates with Canco after closing to form a ULC (Amalco).
USco does not have the same foreign tax credit advantage associated with
purchasing assets. USco will not be able to recognize an immediate direct foreign
tax credit for the Canadian income tax on Amalco's income after the amalgama-
tion because ULC LP and ULC GP are not liable for the Canadian income tax
payable on that income.

Another alternative, which ends up with the same structure as an asset acqui-
sition using the reverse hybrid described above, is to have USco form a ULC and
capitalize it with debt and equity for the purposes of the acquisition of Canco.
The ULC then purchases the shares of Canco, makes a Code section 338 election,
and amalgamates with Canco after closing to form a ULC (Amalco). Amalco
incorporates another ULC, and each of them forms a limited partnership that
checks the box to be treated as a corporation. Amalco then transfers its assets to
the limited partnership for a partnership interest. In effect, the structure is the
same as that shown in figure 4, with USco being able to claim a direct foreign
tax credit for all of the Canadian income tax payable on Canco's income that is

now earned through a limited partnership, in contrast to the scenario described in the immediately preceding paragraph.

## Tower Structures

ULCs are also used in tower structures. A tower structure is used by Canadian companies to acquire or finance operations in the United States. Assume, for example, that Canco owns a foreign affiliate (FA) in the United States that has to refinance its existing US credit facility. Canco decides that the facility should be replaced with a Canadian facility and implements the following transactions (illustrated in figure 5):

1) Canco incorporates another Canadian subsidiary (Subco). Canco and Subco each form a US limited partnership (US LP); each of them contributes $500,000 to US LP for a 50 percent interest.
2) Canco and Subco check the box to treat US LP as a C corporation for US tax purposes.
3) US LP incorporates a ULC, which is a disregarded entity for US tax purposes.
4) The ULC forms an LLC, which is a disregarded entity for US tax purposes.
5) US LP borrows money ("loan 1") from the US branch of a Canadian bank or the Canadian branch of a US bank.
6) US LP uses the borrowed funds to subscribe for additional shares in the ULC.
7) The ULC uses the borrowed funds to subscribe for additional membership interests in the LLC.
8) LLC on-lends the funds ("loan 2") to FA on terms substantially the same as those of loan 1.
9) FA repays its US credit facility.

From a US tax perspective, the payment of any interest on loan 2 will be treated as a payment of interest by FA to US LP, which is a "domestic corporation" for US tax purposes because it was formed under state law. The interest is treated as paid by FA directly to US LP because the LLC and the ULC are disregarded entities. For US tax purposes, the payment of interest by US LP on loan 1 will be deductible by US LP for the purpose of calculating its income on the income that it earns on loan 2. No US withholding tax will be payable on loan 1 if it is owed to the Canadian bank so long as loan 1 is effectively connected with a US permanent establishment of the bank.[104] If the interest on loan 1 is payable to a US bank, no Canadian withholding tax should be payable if loan 1 is effectively connected with a Canadian branch of the bank or, alternatively, the interest is not treated as being paid by one of the partners.[105] For US tax purposes, FA will be able to deduct the interest on loan 2 from its income.

From a Canadian tax perspective, the interest on loan 2 is treated as income from an active business and not foreign accrual property income so long as FA is carrying on an active business.[106] The payment of the interest received by the

**Figure 5**



LLC to the ULC as a dividend will be treated as a payment out of the LLC's exempt surplus so that the ULC will be able to claim a corresponding deduction for that amount from its income for Canadian income tax purposes.[107] The payment of the dividend from the ULC to US LP will be considered to be income of the US LP, which is a Canadian partnership for Canadian income tax purposes,[108] and US LP will be able to deduct the interest that it pays on loan 1 to the bank in calculating its income for Canadian income tax purposes. The amount of the income in the partnership is nominal, since the dividend payments approximate (after tax) the interest payable on loan 1. The income from US LP is then allocated between the two Canadian partners. Each of the Canadian partners will be able to claim a deduction from its income for the amount of the dividend paid by the ULC to US LP, resulting in a loss for each of the partners which they can then deduct from their other sources of income.[109] No Canadian withholding tax is payable on the dividend paid by the ULC to US LP because it is treated as a Canadian partnership for the purposes of Canadian withholding tax.

The purpose of using a ULC between US LP and the LLC is to deal with the uncertainty that would otherwise result if US LP owned the membership interests in the LLC directly. In such a case, for the purposes of having the interest recharacterized as income from an active business, the LLC must be a "foreign affiliate" of the corporate partners, and they must have a "qualifying interest" in the LLC.

The issue is whether or not the fiction created by section 93.1 of the ITA, which treats a corporate partner for certain purposes as owning the shares of a corporation that are owned (or deemed to be owned) by a partnership, extends to the recharacterization rule. The fiction created by section 93.1 is relevant only for certain purposes of the ITA; arguably, it is not relevant for the purposes of

applying subparagraph 95(2)(a)(ii).[110] The ULC avoids the problem, since it has a qualifying interest in the LLC and the LLC is a foreign affiliate of the ULC.

## US Beneficiary of a Canadian Trust

If a Canadian trust has a non-resident beneficiary, the trust is subject to part XII.2 tax on its "designated income."[111] If a US person is to be a beneficiary of the trust, part XII.2 tax can be avoided if the US person holds its interest in the trust through a ULC.

## Canadian Partnership

The residence of a partnership is determined differently for Canadian tax purposes than it is for US tax purposes. The ITA does not classify a partnership for Canadian income tax purposes on the basis of where it is formed, but, in certain cases, on the basis of the residence of its members. For US tax purposes, the residence of a partnership is determined by whether or not the partnership is formed under US law or foreign law. Accordingly, a partnership can be a domestic partnership for US tax purposes if formed under US state law, and a "Canadian partnership" for Canadian tax purposes so long as its members are residents of Canada.

A partnership is treated as a non-resident for the purposes of Canadian withholding tax if at least one of its members is not a resident of Canada. As well, certain rollovers involving a partnership are not available unless all of the members of the partnership are residents of Canada. If the status of the partnership as a "Canadian partnership" is relevant for Canadian income tax purposes (for example, the partnership may be receiving passive income, which will be subject to Canadian withholding tax if it is not a Canadian partnership), a US person can participate in the partnership without tainting its status and can be treated as a member of the partnership for US tax purposes if it holds its interest in the partnership through a ULC.

## Services Performed by Non-Residents in Canada

A non-resident who performs services in Canada either directly, through its own employees, or indirectly, through Canadian subcontractors, is subject to certain withholding obligations.[112] More particularly, a payer is obligated to withhold 15 percent from any payment of a fee, commission, or other amount to a non-resident person in respect of services rendered in Canada.

If a US resident has a contract in Canada and does not wish to seek section 105 relief, it can divide its contract between Canadian services and US services and incorporate a ULC to perform those services that have to be physically performed in Canada. The payment of those amounts by the payer to the ULC will not be considered subject to the section 105 withholding requirements, because the payment is made to a Canadian resident, not to its US shareholder.[113]

## Leased Equipment

A US person may use substantial machinery in the course of its business. If there is no restriction on the geographic use of the equipment, the US person is free to use the equipment in its business either in the United States or in Canada. If the US person obtains a contract in Canada to perform services in Canada, not only will the non-resident have to deal with the section 105 issues discussed above, but it will also, from a Canadian income tax perspective, be treated as a Canadian resident with respect to the use of the equipment in Canada. Accordingly, the US person will be obligated to withhold the applicable rate of Canadian withholding tax on any lease payments to its US lessor.[114]

The commercial consequences of subjecting the US lessor to Canadian withholding tax can be avoided by having the US person sublease the equipment to a ULC formed by the US person. The ULC will then use that equipment and the applicable employees (subject to the 105 withholding considerations described above) to perform its obligations under the Canadian contract. The withholding obligation will then be imposed on any lease payments made by the ULC to its US shareholder.[115]

## Synthetic Section 338 Election

There may be circumstances in which a Code section 338 election cannot be made by a US purchaser that wants to purchase the shares of a Canadian company (Canco). For example, the purchaser may not be a corporation, or there may be negative tax consequences to the vendor. The US purchaser can implement a synthetic section 338 election after the purchase by undertaking the following transactions (see figure 6):

1) USco incorporates two Canadian limited corporations (Holdco 1 and Holdco 2).
2) Holdco 1 and Holdco 2 each acquire 50 percent of the shares of Canco from the vendor.[116]
3) Within 29 days of the acquisition of Canco, Canco is converted into a ULC, and a check-the-box election is made to treat it as a partnership for US tax purposes.

Canco is treated as having been liquidated for US tax purposes and its assets contributed to a partnership (in this case, a foreign partnership).[117] Accordingly, there is a disposition of the shares in Canco by Holdco 1 and Holdco 2, which are CFCs, pursuant to Code section 331, and a disposition by Canco of its assets for fair market value pursuant to Code section 336. There should be little gain on the disposition of the shares in the course of the liquidation because Holdco 1 and Holdco 2 should have full basis in the shares.

The gain on any passive assets of Canco will be subpart F income; however, there will not be any income inclusion to Holdco 1 or Holdco 2 because the

**Figure 6**



shares will have been held for less than 30 days.[118] The income received by
Canco between its acquisition and conversion presumably increases the value of
the Canco shares and will thus cause Holdco 1 and Holdco 2 to recognize some
gain on the conversion, but no portion of this gain will be recognized as a
dividend under Code section 1248.[119]

The liquidation of Canco will eliminate the associated E & P. There will be a
step-up in the basis of the assets of Canco to their fair market value as a conse-
quence of the dissolution: the rollover under section 332 is not applicable, because
neither Holdco 1 nor Holdco 2 owns 80 percent or more of the shares in Canco.
Advance planning must be undertaken in connection with the implementation of
this type of transaction, since it must be completed within 30 days after the
acquisition of Canco if subpart F is to be avoided.

An alternative synthetic section 338 transaction involves the following trans-
actions:

- The vendor converts Canco into a ULC before sale. Part of the planning
  involves the vendor interposing an intermediary between Canco and itself
  to avoid any unlimited liability as a member or shareholder of the ULC.
- The vendor causes its intermediary to sell the shares of the ULC to USco.

The vendor can accomplish the pre-closing transactions and subsequent sale
without incurring any more Canadian income tax than it would otherwise incur
if it sold Canco directly, unless the vendor is an individual who wants to sell the
shares personally.[120] The subsequent sale of the shares in the ULC by the vendor
to USco will be treated as a sale of the ULC's underlying assets by the vendor.
USco will obtain full basis in those assets and no E & P. The ULC will be treated

as a branch of USco after the acquisition. An NSULC rather than an AULC is the preferred ULC, because the risk of unlimited liability incurred by the vendor is less than it would be if the ULC was an AULC.

## Like-Kind Exchange with a Bankruptcy Remote Entity

A ULC can also be used for like-kind exchange planning.[121] There may be circumstances in which the exchange of one property for another property requires bank financing when the proceeds from the sale of the first property are insufficient to finance the acquisition of the replacement property. The lender may not be comfortable with the owner acquiring the property directly because, even though the lender may have security, the replacement property will be subject to the other liabilities of the owner. Accordingly, the lender may demand that the US person create a bankruptcy remote entity to acquire the property.

The like-kind exchange rules will not defer the US tax liability unless the owner of the original property acquires the replacement property directly. The acquisition of the property by a disregarded entity may satisfy the lender's concerns and still permit a rollover for the borrower.[122]

In the Canadian context, the US owner can use a ULC as the holder of the property that will replace a Canadian property. The US owner will incorporate a ULC and own all of the voting common shares. One share of a second class of shares in the ULC without any entitlement to dividends, liquidation proceeds, or votes (except in limited circumstances) will be issued to a Canadian limited company (or a foreign entity, such as an LLC). The lender will hold a share in this other company. All decisions of the ULC will be made solely by the US owner. However, so long as the loan is outstanding from the lender to the ULC, without the approval of the second company (with the approval of all of its directors) the ULC may not

- file or consent to the filing of a bankruptcy or an insolvency petition or otherwise institute insolvency proceedings;
- dissolve, liquidate, merge, consolidate, or dispose of all or substantially all of its assets;
- engage in any business activities other than those specified in its constating documents;
- borrow money or incur indebtedness other than normal trade accounts payable or any other indebtedness, unless expressly permitted by the lending documents;
- take or permit any action that would violate any provision of the lending documents; or
- amend any provision of the constating documents dealing with the items referred to above.

In addition, the written consent of the lender will be necessary if the ULC attempts any of those actions. In the situation outlined, the ULC should be

treated as a single-member entity, and therefore all of the assets and liabilities of the ULC should be treated as the assets and liabilities of the US owner for the purposes of the like-kind exchange provisions. The corporate owner should be ignored, since it has no right to participate in the management of the ULC and it has no right to profits or income associated with its participation in the ULC.

## Moving Cash Among Foreign Corporations Under a CFC

Interest, dividends, royalties, etc. (subject to certain exceptions, such as the same-country exception) are treated as subpart F income for US tax purposes when paid between CFCs. A payment by a foreign entity to a CFC will not be subject to subpart F income treatment if that entity is a disregarded entity. Accordingly, dividends, interest, royalties, and other passive amounts paid to a CFC by a ULC that is a disregarded entity will not give rise to subpart F income.

A popular US holding company structure involves, for example, a ULC that is wholly owned by a Luxembourg entity (Luxco). Luxembourg has treaties with Canada and the United States. Any dividends paid by the ULC to Luxco will result in Canadian withholding tax at the rate of 5 percent and will be ignored for US tax purposes. Luxco will have no income inclusion in Luxembourg because of the participation exemption. Any interest paid by ULC to Luxco is subject to Canadian withholding tax of 10 percent, and any gain on the disposition of its shares is not subject to Canadian income tax so long as the shares do not derive their value from immovable property situated in Canada that is not used in its business.[123] Luxembourg imposes a withholding tax of 5 percent on dividends paid to a US company under the US-Luxembourg tax convention. The withholding tax and the Luxembourg capital tax can be avoided by using PECs (preferred equity certificates), which are treated as equity for US purposes but as debt for Luxembourg purposes. Luxembourg imposes no withholding tax on interest paid to non-residents.

## Hybrid Debt Instrument

A US person can also use hybrid debt to finance Canadian operations.[124] A ULC may be used in this type of structure. A hybrid debt structure can take on many forms. The following structure (illustrated in figure 7) may be used by USco to finance an acquisition or in the course of a new financing of its Canadian operations carried on through a Canadian company (Canco):

1) USco incorporates a ULC.
2) USco transfers the shares of Canco to the ULC.
3) The ULC borrows money from a Canadian bank or a US bank with a Canadian branch (or from a bank within the United States if the borrowed funds satisfy the domestic exemption from Canadian withholding tax)[125]

**Figure 7**



on a term basis; repayment is due on a specified date in the future ("the maturity date").

4) The ULC on-lends the proceeds from the loan on an unsecured basis to Canco for a slight spread in interest rates ("the hybrid note"). The hybrid note requires that the principal amount be paid in full on the maturity date in an amount equal to the amount of the loan. The terms of the hybrid note also provide that interest will be paid in common shares.[126]

5) Canco retires its debt to its existing bank using the proceeds from the hybrid note.

6) The ULC and Canco enter into a forward purchase agreement whereby
   a) the ULC agrees to purchase a certain number of common shares in Canco on the same date as the maturity date for an amount equal to the amount due under the hybrid note or on an earlier date if the hybrid note is repaid. The fair market value of the common shares on the date of their issue is determined to be equal to the amount of the hybrid note.
   b) Canco agrees to accept as payment of the subscription price for the common shares on the same date as the maturity date for the hybrid note (or on an earlier date if the hybrid note is prepaid) the delivery of the hybrid note if Canco does not repay the hybrid note on the maturity date; and
   c) Canco can repay the hybrid note by the issuance of the common shares on the maturity date if the ULC does not subscribe for the common shares in cash on that date.

7) USco subscribes for additional common shares from time to time in the ULC so that the ULC will have sufficient funds to pay interest on the loan.

8) On the maturity date, Canco borrows money on a daylight basis and uses those funds to repay the hybrid note. The ULC subscribes for the common shares in Canco by paying to it an amount equal to the amount received under the hybrid note. Canco repays the daylight loan. USco subscribes for

additional common shares in the ULC in an amount equal to the amount of the loan, and the ULC repays the loan with the amount received from USco.

From a US perspective, it is important to ensure that the hybrid note and the forward purchase agreement are not considered severable. Accordingly, the basic structure should, among other things, contain a number of other features that make it difficult to sever those instruments, such as

- a prohibition on the assignment of the hybrid note unless the assignee also assumes the responsibility of the assignor under the forward purchase agreement;
- a prohibition on the assignment of the forward purchase agreement without an assumption of the assignor's liability under the hybrid note; and
- a pledge by Canco of its rights under the forward purchase agreement as security for the hybrid note.

From a Canadian income tax perspective, each of the ULC and Canco should be entitled to a deduction for the interest. A possible Canadian issue is potential debt forgiveness if the interest or principal payments are settled in shares and they have a fair market value that is less than the interest or principal due at the time of their issue. From a US perspective, the ULC is disregarded, and USco is treated as owning the shares in Canco and as owing the loan to the bank. USco gets an interest deduction for the interest payments that it funds when it subscribes for shares in the ULC that is then used by the ULC to make payments to the bank. From a US tax perspective, the payment of interest and principal by Canco to the ULC and the subscription for common shares in Canco will be treated as a stock dividend of common shares and will not be subject to US income tax. If the note is severable from the forward purchase agreement, the hybrid note may be treated as debt from a US tax perspective, in which case USco must accrue the income on the hybrid note.

In summary, the effect of a hybrid debt structure utilizing the ULC is to permit USco to obtain a deduction for US tax purposes and Canco to obtain a deduction for Canadian purposes, with no income inclusion on payments under the hybrid note or the recognition of any of the income of Canco in USco since Canco is a CFC for US tax purposes. There are many issues with the use of this structure. For example, there is a certain amount of tension between Canadian and US tax law as it relates to the integration of the instruments. That is, from a US tax perspective a US adviser desires to have the transactions linked together as closely as possible, whereas from a Canadian perspective there is a concern about linking those instruments together too tightly.[127]

One consideration in using this type of structure is its impact on the future foreign tax credit that can be claimed by USco, since the effect of the structure is to create low-taxed E & P in Canco (that is, the E & P of Canco will be higher because the interest expense is not recognized in calculating Canco's E & P, and the Canadian tax will be lower because of the effect of the interest deduction).

## Subpart F Planning

A ULC can also be used to minimize subpart F income inclusion in a US corporation (USco). USco, for example, may have a number of foreign subsidiaries (including a Canadian corporation (Canco)) that generate losses under a Luxembourg entity (Luxco). If Canco is converted into a ULC, the calculation of subpart F income in Luxco can be reduced, since the ULC's losses will reduce the E & P in Luxco.[128]

In this type of planning, other factors must be taken into account. For example, converting Canco into a ULC may eliminate the benefit of multiplying the de minimis $1 million exemption from the subpart F income inclusion.[129] Another risk is that all the income of Luxco could become subject to subpart F if 70 percent or more of its income is characterized as subpart F income, which could occur if subpart F income from a number of entities is aggregated into one entity.[130]

## Conclusion

Neither an NSULC nor an AULC is better from a US tax perspective. However, the restraints (or flexibility) imposed (or conferred) by one corporate jurisdiction on the other may have an impact on which ULC will be used for a particular transaction. At present, the AULC, from a cost perspective, is far cheaper to use ($100) than the NSULC ($6,000). Although the difference in cost may not be material for many transactions, the cost has proved to be an aggravation. It is hoped that the Nova Scotia government will respond to this issue now that taxpayers have an alternative vehicle.

The AULC and the NSULC each have corporate advantages and disadvantages. The principal advantages of the NSULC are that the members' liability is restricted and can end (through a section 68 re-registration or by ceasing to be a member (subject to the one-year lookback rule)), and no Canadian residence requirements are imposed on directors. Nevertheless, there are concerns about the use of the NSULC (for example, the complicated process of converting a corporation into an NSULC, and financial assistance). The proposals recommend a number of amendments to the NSCA that deal with some of these corporate law issues. However, other corporate law issues (such as capitalizing contributed surplus) still need to be addressed.

In conclusion, the NSULC (surf) and the AULC (turf) can co-exist side by side. Which of the ULCs will be chosen for a particular transaction depends on the type of transaction and how the corporate law governing the particular ULC facilitates the implementation of the client's objectives.

## Notes

1  A Nova Scotia unlimited liability company and an Alberta unlimited liability corporation are hereinafter referred to as an "NSULC" and an "AULC," respectively, and a reference to "ULC" is a reference to either one of them. A detailed description of the company law of the

NSULC can be found in Paul W. Festeryga, "Nova Scotia Unlimited Liability Companies: What Are They and How Do They Work?" in *Report of Proceedings of the Fiftieth Tax Conference*, 1998 Conference Report (Toronto: Canadian Tax Foundation, 1999), 17:1-28.

2   RSNS 1989, c. 81, as amended (herein referred to as "NSCA"). Statutes and jurisdictions that follow the Business Corporations Act model are identified with the abbreviation "BCA."

3   Supra note 1.

4   An Act for the Incorporation and Winding Up of Joint Stock Companies, SNS 1862, c. 2 (herein referred to as "JSCA (1862)").

5   F.W. Wegenast, *The Law of Canadian Companies* (Toronto: Burroughs and Company [Eastern] Limited, 1931), 24.

6   An Act Respecting the Incorporation of Joint Stock Companies by Letters Patent, SNS 1883, c. 24 (herein referred to as "NSJCA (1883)").

7   See Wegenast, supra note 5, at 24.

8   SNS 1900, c. 128 (herein referred to as "NSCA (1900)").

9   25 & 26 Vict., c. 89.

10  See Wegenast, supra note 5, at 24.

11  An Act To Amend the Nova Scotia Companies Act, 1900, SNS 1902, c. 8, section 9.

12  The NSCA (1900) was subsequently repealed and replaced several times, most recently by the Nova Scotia Companies Act, 1935, SNS 1935, c. 6.

13  See L.C.B. Gower, *The Principles of Modern Company Law*, 2d ed. (London: Stevens, 1957), 8.

14  NSCA section 57(1).

15  *In re Borough Commercial and Building Society*, [1893] 2 Ch. 242 (Ch. D.).

16  *Trevor v. Whitworth* (1887), 12 App. Cas. 409 (HL) imposed this restriction on the return of paid-up capital by a company limited by shares.

17  Supra note 15.

18  NSCA section 135.

19  RSA 2000, c. B-9, as amended (herein referred to as "ABCA").

20  The increase in the stated capital of the company or corporation before the continuance can give rise to a deemed dividend pursuant to subsection 84(1) of the Income Tax Act, RSC 1985, c. 1 (5th Supp.), as amended (ITA), unless the exception described in paragraph 84(1)(c.3) is applicable. Experience shows that many US shareholders who contribute capital to a wholly owned Canadian corporation do not go through the formal step of issuing shares. Accordingly, the amounts contributed increase the cost of the shares and create contributed surplus in the Canadian corporation. In most BCA jurisdictions it is a relatively simple process to move, by resolution, the amount from contributed surplus to stated capital. Unfortunately, there is no express authority in the NSCA to capitalize the contributed surplus into paid-up capital. In such a case, a Nova Scotia arrangement would have to be undertaken to increase the contributed surplus—a more complex process than a resolution passed prior to the continuance.

21  Licences may not, by their terms, flow through as an asset of the amalgamated company. Also, agreements containing negative covenants are more likely to be triggered if there is an amalgamation rather than an arrangement.

22  See Don Sommerfeldt, "Alberta Unlimited Liability Corporations: A Corporate and Tax Overview," elsewhere in this volume.

23  NSCA section 10.

24  NSCA section 20(3).

25  ABCA section 105(3).

26  NSCA sections 10 and 12.

27  ABCA section 26(1).

28  NSCA section 26(17).

29  ABCA section 28(3).

30  ABCA section 32.

31  ABCA section 101.

32  ABCA section 43.

33  ABCA section 27.

34  ABCA section 109.

35  ABCA section 27.

36  NSCA section 87.

37  ABCA section 1(ii).

38  ABCA sections 145 and 146.

39  ABCA section 183(5).

40  ABCA section 184.

41  ABCA section 45.

42  NSCA section 110(5).

43  ABCA section 122.

44  ABCA sections 118 and 119.

45  NSCA sections 23 and 55.

46  NSCA section 137.

47  ABCA section 210.

48  ABCA section 38.

49  NSCA section 57.

50  See supra note 15.

51  The registrar will not currently permit an NSULC or a Nova Scotia limited company to
    continue into Alberta directly as an AULC because under NSCA section 133(5), the registrar
    must be satisfied that the shareholders cannot be prejudiced as a consequence of this continu-
    ance. The change in the nature of the liability of the shareholders if the NSULC is continued
    into Alberta as an AULC is considered to be an event that would prejudice the shareholders.

52  Cox Hansen O'Reilly Matheson, *Proposals for Amendments to the Nova Scotia Companies Act:
    A Discussion Paper* (Halifax: Service Nova Scotia and Municipal Relations, 2005) (online:
    http://www.gov.ns.ca/snsmr/rjsc/pdf/discussion_paper.pdf) (herein referred to as "the proposals").

53  CRA document no. 2003-0051301E5, August 3, 2004; CRA document no. 2003-0004415,
    October 23, 2003; CRA document no. 2003-0018027, July 22, 2003; CRA document no.
    2003-0057765, April 28, 2003; CRA document no. 2003-0007347, April 28, 2003; CRA
    document no. 2002-0143957, September 9, 2002; CRA document no. 2002-0120085, May 16,
    2002; CRA document no. 9829875, February 10, 1999; CRA document no. 9642195, Septem-
    ber 24, 1997; CRA document no. 9623967, June 23, 1997; CRA document no. 9610765,
    February 5, 1997; CRA document no. 9625015, January 28, 1997; CRA document no. 9624595,
    July 30, 1996; CRA document no. 9503045, August 30, 1995; CRA document no. 9415705,
    January 25, 1995; CRA document no. 9337725, June 29, 1994; CRA document no. 9410410,
    April 21, 1994; CRA document no. 9305495, June 30, 1993; *TaxPartner* (Toronto: Carswell)
    (CD-ROM database), document no. 5-6134, September 15, 1988, document no. A-9637, April
    16, 1988, document no. rrrr75, May 11, 1983, CRA document no. rrrr76, May 1983, document

no. 12-2161, March 17, 1983, and document no. rrrr59, March 23, 1982; *Interpretation Bulletin* IT-343R, "Meaning of the Term Corporation," September 26, 1977; Angelo Nikolakakis, *Taxation of Foreign Affiliates* (Toronto: Carswell) (looseleaf), section 2.2.1; Vern Krishna, *The Fundamentals of Canadian Income Tax*, 6th ed. (Toronto: Carswell, 2000), 1126-28; and David G. Roberts, "Business Organization: Corporation, Partnership, or Other?" in the 1998 Conference Report, supra note 1, 48:1-29.

54  See, for example, CRA document no. 2001-0108715, August 13, 2002; CRA document no. 2000-0025855, September 25, 2000; CRA document no. 2000-0056715, November 28, 2000; CRA document no. 2000-0057765, November 28, 2000; CRA document no. 2000-0062015, December 21, 2000; *Interpretation Bulletin* IT-90, "What Is a Partnership?" February 9, 1973; *Income Tax Technical News* no. 20, June 14, 2001; Tanvi Vithlani, "The Application of Treaty Benefits to Partnerships: Characterization of a Foreign Entity," Corporate Tax Planning feature (2004) vol. 52, no. 1 *Canadian Tax Journal* 294-314; Yvette Morelli, "Structuring Venture Capital Funds" (2003) vol. 51, no. 2 *Canadian Tax Journal* 806-62; Ash Gupta, "Characterization of Foreign Entities" (2003) vol. 9, no. 2 *Business Vehicles* 438-47; and Allan R. Lanthier and Kerry L. Plutte, "International Hybrids: Pitfalls and Practice," in *Report of Proceedings of the Fifty-First Tax Conference*, 1999 Conference Report (Toronto: Canadian Tax Foundation, 2000), 46:1-38.

55  Internal Revenue Code of 1986, as amended (herein referred to as "the Code").

56  *Morrissey v. Commissioner, 296 US 344 (1935)*. The decision in *Morrissey* is the basis for the pre-1997 check-the-box regulations, which were promulgated in response to the decision in *United States v. Kintner*, 216 F. 2d 418 (9th Cir. 1954).

57  Internal Revenue Service Private Letter Ruling (PLR) 9538020, June 22, 1995.

58  The definition of "limited liability" for the purposes of applying the Kintner rules in former Treas. reg. section 301.7701-2(d)(1) read as follows: "An organization has the corporate characteristics of limited liability if under local law there is no member who is personally liable for the debts of or claims against the organization. Personal liability means that a creditor of an organization may seek personal satisfaction from a member of the organization to the extent that the assets of such organization are insufficient to satisfy the creditor's claim." An earlier ruling, Rev. rul. 88-8, 1988-1 CB 403, applied this rule to a UK ULC and concluded that "[a]s permitted under the Act, the Memorandum provides that the members' liability to contribute to the payment of *M*'s debts and liabilities is unlimited. Consequently, *M* lacks the corporate characteristic of limited liability."

59  A possible explanation may be the description of the attribute of limited liability for a corporation in former Treas. reg. section 301.7701-2(a)(1). The attribute is not described in that prior regulation as limited liability but as "the corporate debts being limited to corporate property." Arguably, an NSULC does not have that attribute because its corporate debts can be collected from the members by the liquidator of the NSULC.

60  Under the Kintner rules, an NSULC could not be characterized as a disregarded entity, only as a partnership or a corporation.

61  Treas. reg. section 301.7701-2(b)(8).

62  Treas. reg. section 301.7701-2(b)(8)(ii)(A)(1).

63  TD 8844, 1999-2 CB 661.

64  For the purpose of determining the number of members, US tax rules would be applied. Accordingly, if a ULC had two members from a Canadian legal perspective, the ULC could still be treated as having one member if each of those members was disregarded for US tax purposes and those members are held by one person.

65  Treas. reg. section 301.7701-2(a).

66  Treas. reg. section 301.7701-3(f)(2).

67  1999-1 CB 434. In the example, the LLC had no outstanding liabilities.

68  See Todd Voss, "*Disregarded Entities and Springing Boot" (2005) vol.* 83, no. 8 *Taxes: The Tax Magazine* 29-40. The article analyzed Rev. rul. 80-228, 1980-2 CB 115, which dealt with the transfer by a corporation of assets of a division together with a "notional payable" to a corporation. The IRS held that a gain had to be realized, since the rollover under section 351(a) was not available because the transferor received "other property" (that is, an account receivable arose as a consequence of the contribution of the division to, and the assumption of the liabilities of the division by, the transferee corporation).

69  Treas. reg. sections 1.707-4 and 5.

70  A limited exception is in the case of US companies that own shares in a Canadian company where under the laws of Canada the business can only be carried on through a Canadian corporation.

71  For example, for state tax purposes, a US corporation may not be entitled to consolidate a liability blocker that is a wholly owned domestic subsidiary. Accordingly, for state tax purposes, the US corporation would not be able to access the losses of the ULC that flow through to the domestic subsidiary. As outlined above, the liability associated with being a shareholder of an AULC is direct and cannot be capped or eliminated as it can for an NSULC through NSCA section 68. Furthermore, the liability of a past member of an NSULC lasts only for one year after it ceases to be a member, whereas for a shareholder of an AULC the liability does not, at the very least, end until the liability is satisfied.

72  Code section 1503(d).

73  Treas. reg. section 1.1503-2(b)(1).

74  Treas. reg. section 1.1503-2(c)(1).

75  Treas. reg. section 1.1503-2(c)(4) provides that a "separate unit" is defined as including an interest in an entity that is not taxable as an association for US income tax purposes but is subject to income tax in a foreign country as a corporation (or otherwise at the entity level) either on its worldwide income or on a residence basis.

76  Treas. reg. section 1.1503-2(c)(2).

77  Temp. Treas. reg. section 1.503-2T(g).

78  The foreign tax credit is claimed when a dividend is paid by the foreign corporation, in which case the domestic corporation claims a direct foreign tax credit for any withholding tax levied on the dividend pursuant to Code section 901 in addition to any of the underlying foreign tax associated with the earnings and profits of the foreign corporation that paid the dividends pursuant to Code section 902.

79  See the discussion below under the heading "Conversion of a Stock Reorganization into a Transfer of Assets for US Income Tax Purposes" on the US tax treatment of the contribution of the foreign subsidiaries by USco to F1 and F2, followed by a check-the-box election to have them treated as disregarded entities.

80  Temp. Treas. reg. section 1.704-1T(b)(1)(ii)(b) deals with partnership allocations of foreign expenditures. The temporary regulations should not affect this planning.

81  Articles 13(4) and (5) of the Convention Between the Government of Canada and the Government of the Grand Duchy of Luxembourg for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income and on Capital, signed at Luxembourg on September 10, 1999.

82  Any US person that owns directly, or indirectly, 10 percent or more of the shares of a CFC is taxable immediately on its share of any subpart F income earned by the CFC.

83  For an analysis of the recharacterization of a transaction as a contribution of assets, see Rev. rul. 67-274, 1967-2 CB 141; PLR 9327010, March 23, 1993; and Rev. rul. 2004-83, 2004-2 CB 157.

84  Code section 165(g).

85  Rev. rul. 2003-125, 2003-2 CB 1243.

86  Ibid.

87  Code section 1504(a)(2).

88  Code section 165(g)(3).

89  For example, for the purpose of establishing the value of the underlying assets, a valuation should be obtained. "All" assets (including intangibles) that may not appear on the balance sheet (for example, goodwill) are to be included in the valuation. If the holder of the shares has advanced amounts to the foreign subsidiary and those amounts are characterized as debt for the purposes of the calculations, the true nature of those amounts must be confirmed; if the amounts are treated as equity for US tax purposes, there is a possibility that the corporation is solvent, in which case E & P may be recognized as a dividend in the course of the dissolution pursuant to Code section 367(b).

90  Code section 954(c)(1)(B).

91  Treas. reg. section 1.954-2(e)(1).

92  Code section 332.

93  Internal Revenue Service Technical Assistance 199937038, June 28, 1999.

94  Notice 2003-46, 2003-2 CB 53, indicating the intention to withdraw the proposed regulations, and Announcement 2003-78, 2003-2 CB 1172, withdrawing those regulations.

95  *Dover Corporation and Subsidiaries*, 122 TC 324 (May 5, 2004).

96  1975-1 CB 109.

97  United States, Staff of the Joint Committee on Taxation, *Options To Improve Tax Compliance and Reform Tax Expenditures*, JCS-2-05 (Washington, DC: Joint Committee on Taxation, January 27, 2005), 182-85.

98  Subsection 18(4) of the ITA.

99  This will have no tax consequence to the vendor so long as the vendor is not subject to US tax. If the vendor is subject to US tax, there could be an income inclusion to the vendor if the recognition of any of the income in the target will give rise to subpart F income. There will be no income inclusion to the target so long as it does not have any assets that are effectively connected with a US trade or business.

100  If the target is not already in the jurisdiction in which the ULC has been formed, it will have to be continued into Alberta or Nova Scotia, as the case may be.

101  Section 212.1 of the ITA is not an issue, since a Canadian corporation was used as the vehicle to acquire the shares in the target. Section 212.1 becomes an issue if USco acquires the shares in the target directly and then tries to step up the paid-up capital in the target to the cost in the shares by a transfer of those shares to another Canadian corporation.

102  Treas. reg. section 1.901-2(f)(1) provides that the person by whom tax is considered paid for the purposes of claiming a direct foreign tax credit in Code sections 901 and 903 is the person on whom foreign law imposes legal liability for such tax, even if another person (for example, a withholding agent) remits such tax.

103  The disconnect between the foreign tax credit and the related taxable income (that is, the non-recognition of the related income for US tax purposes) was considered in *Guardian Industries Corp. & Subs v. US*, 95 AFTR 2d 2005-1692 (Ct. Fed. Cl., March 31, 2005). The court in that case permitted a refund claim by the plaintiff for a direct foreign tax credit for the Luxembourg tax that was paid or incurred by the Luxembourg parent in respect of other consolidated Luxembourg corporations, even though the Luxembourg parent did not have to recognize the income of those corporations under Luxembourg law.

104 Treas. reg. section 1.1441-4(a).

105 Paragraph 212(13.1)(a) of the ITA will not deem the partnership to be a resident of Canada for
the purposes of the withholding tax provisions so long as the partnership does not have
income from a source in Canada. However, in CRA document no. 2003-0039231E5, May 25,
2004, the CRA wrote that although paragraph 212(13.1)(a) is not applicable, the interest paid
by a partnership with Canadian resident partners to a US bank could still be subject to
Canadian withholding tax, even though the partnership does not have Canadian-source in-
come, if the partnership can be looked through and it is the partners that owe the debt and
who pay the interest.

106 Subparagraph 95(2)(a)(ii) of the ITA.

107 Paragraph 113(1)(a) of the ITA and related regulations.

108 The difference in the Canadian and US tax characterization of the residence of a partnership
is discussed below under the heading "Canadian Partnership."

109 Subsection 112(1) of the ITA permits a corporation to deduct from its income an amount equal
to the amount of a dividend "received" from a taxable Canadian corporation. The question of
whether corporate partners are able to claim the deduction under subsection 112(1) in respect
of dividends allocated from a partnership (that is, whether the dividends are received) was
answered in the affirmative in CRA document no. 2003-0027745, September 18, 2003. For a
fuller discussion of why a partner should be treated as receiving a dividend through a partner-
ship when the amounts are not credited to the partner's account, see Brian Felesky and John
Burghardt, "Oil and Gas Taxation: Developments and Issues" (2004) vol. 17, no. 1 *Canadian
Petroleum Tax Journal* 49-91. Under the limited partnership laws of most states, a US limited
partnership is generally treated as a person separate from its members for nearly all purposes.

110 See CRA document no. 2003-0048251E5, July 14, 2005.

111 Designated income is, effectively, the taxable gains and losses on taxable Canadian property,
income from real property (other than Canadian resource property, timber resource proper-
ties, and Canadian resource properties), and income from businesses carried on in Canada.

112 Paragraph 153(1)(g) of the ITA and regulation 105(1) of the Income Tax Regulations.

113 The arrangement must be carefully structured to counter the argument that the ULC is acting
as an agent or nominee for the US shareholder.

114 If the US lessor is an LLC, the applicable rate of Canadian withholding tax would be 25 percent:
the Canada-US income tax convention is not applicable because the LLC is not treated as a
resident of the United States for the purposes of the convention unless it checks the box to be
treated as a corporation.

115 The applicable rate of withholding tax will depend on the status of the US person for treaty
purposes. If the US person is an LLC, the rate of withholding is 25 percent. If the US person
is an individual, an S corporation, a qualified subchapter S subsidiary, a C corporation, or a
partnership, all of the members of which are US residents for treaty purposes, the applicable
rate of withholding tax is 10 percent.

116 It is important that neither of the two Canadian corporations own directly 80 percent or more
of the shares of the Canadian target; otherwise, there will be no basis step-up because of the
operation of Code section 332, which would result in a carryover of the existing basis in the assets.

117 Treas. reg. section 301.7701-3(g)(1)(ii).

118 Treas. reg. section 1.951-1(a).

119 Code sections 964(e) and 1248 treat a gain realized on the shares of a foreign corporation
transferred by a CFC as a dividend subject to subpart F to the extent of the E & P in the
foreign corporation. However, section 1248 is not applicable in this case so long as the shares
are held for less than one year pursuant to the exception in Code section 1248(g)(2)(C).

Accordingly, any gain on the shares that accrues on the shares during the transition period should not be converted into a dividend.

120 In such a case, the individual vendor can transfer the shares in Canco to a Canadian trust in which it is the sole beneficiary. A limited company will be the trustee of the trust and will therefore be the shareholder of Canco when it is converted into a ULC. The vendor can realize the gain on the transfer to the trust (sufficient measures should be undertaken to ensure that the transaction with USco will close) or, alternatively, the shares in Canco can be transferred to an alter ego trust and the gain deferred until the shares in the ULC are sold by the trust. The trust arrangement must be structured in such a manner that the trustee will not have a right of indemnity against the vendor, as a beneficiary, or be considered a nominee of the vendor.

121 In effect, a US person can avoid immediate taxation on the exchange of one property for another property. These rules are much broader than the replacement-property rules in the ITA.

122 See, for example, PLR 199911033, March 22, 1999.

123 The definition of "immovable property" is narrower in the Canada-Luxembourg income tax convention than it is in the Canada-US tax convention because under the latter convention the shares are tainted regardless of whether or not the immovable property is used in the business of the ULC.

124 For another description of this type of arrangement, see John M. Ulmer, "Cross-Border Financing Structures for Inbound Investment," in *Report of Proceedings of the Fifty-Sixth Tax Conference*, 2004 Conference Report (Toronto: Canadian Tax Foundation, 2005), 17:1-45, at 17:32-34; and Jim McKee, "Café Annie's Tasty Inbound Financing" (2002) vol. 15, no. 1 *Canadian Petroleum Tax Journal* 67-87.

125 The loan will not be subject to Canadian withholding tax by virtue of subparagraph 212(1)(b)(vii) of the ITA if the borrower is not obligated to repay more than 25 percent of the principal amount of the loan within the first five years from the date of issue.

126 Other structures deal with the payment of interest by having the interest payments under the hybrid note payable in cash and having the forward purchase agreement extend to the interest obligation with a commitment imposed on USco to subscribe for further common shares in Canco in an amount equal to the interest payable under the hybrid note. For a more detailed discussion of the question whether interest paid in shares is deductible under paragraph 20(1)(c) of the ITA, see Brian D. Segal, "Non-Residents Investing in and Disposing of Canadian Rental Real Estate," in *1998 Ontario Tax Conference* (Toronto: Canadian Tax Foundation, 1998), tab 5. The Tax Court's recent decision in *Alcatel Canada Inc. v. The Queen*, 2005 TCC 149, at paragraphs 25-33, should also be considered along with the cases referred to by Segal, supra, at 56-60.

127 Attempts by some judges to recharacterize several transactions or properties into one have become less and less common over the past 10 years, thanks in large part to the Supreme Court of Canada's decisions in cases such as *Shell Canada Ltd. v. The Queen*, [1999] 3 SCR 622, at paragraphs 19 and 41, and *The Queen v. Singleton*, [2001] 2 SCR 1046, at paragraphs 33-35. In *Singleton*, the attempt by the Federal Court of Appeal to consider one legal document (the debenture agreements) together with another legal document (the forward exchange contract) in determining the deductibility of interest was completely shut down on appeal to the Supreme Court. In recent years, though, the Federal Court of Appeal has enforced the legal reality doctrine. See, for example, *The Queen v. Canadian Pacific Ltd.*, 2001 FCA 398, at paragraphs 32-33; *Novopharm Ltd. v. The Queen*, 2003 FCA 112, at paragraphs 7-13; and, more recently, *Rezek v. The Queen*, 2005 FCA 227, at paragraphs 34-52.

128 Subpart F income inclusion cannot exceed the E & P of a CFC.

129 A CFC is, on a company-by-company basis, provided with a maximum $1 million exemption from subpart F income under Code section 954 (b)(3)(A). The effect of combining a number

of CFCs through a check-the-box election may cause the aggregate subpart F income to exceed the maximum $1 million exemption when such income, calculated on a company-by-company basis, could have otherwise been exempt from subpart F income if each amount earned by a CFC did not exceed $1 million.

130  Code section 954 (b)(3)(B) provides that if the sum of foreign base company income and gross insurance income for the taxable year of a CFC exceeds 70 percent of its gross income, the entire gross income for the taxable year will be treated as foreign base income or insurance income, as the case may be.