**IN THE UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| MOTORS LIQUIDATION COMPANY, *et al.*, f/k/a General Motors Corp., *et al.*, | Case No. 09- 50026 (REG) (Jointly Administered) |
| Debtors. | **Hearing Date:  December 15, 2010 Objection Deadline:  December 14, 2010** |

**RESPONSE OF CAPLIN & DRYSDALE TO FEE EXAMINER'S REPORT
AND STATEMENT OF LIMITED OBJECTION TO CAPLIN & DRYSDALE'S
<u>SECOND INTERIM FEE APPLICATION</u>**

Caplin & Drysdale, Chartered ("**<u>Caplin & Drysdale</u>**"), counsel for The Official Committee of Unsecured Creditors Holding Asbestos-Related Claims, hereby responds (the "**<u>Response</u>**") to Fee Examiner's Report and Statement of Limited Objection (the "**<u>Limited Objection</u>**") to Caplin & Drysdale's Second Interim Fee Application (the "**<u>Second Interim Fee Application</u>**"), and respectfully requests that the Limited Objection be overruled.

**<u>BACKGROUND</u>**

1.      On June 1, 2010 (the "**<u>Petition Date</u>**"), the Debtor filed a voluntary petition for relief under Chapter 11 under Title 11 of the United States Code (the "**<u>Bankruptcy Code</u>**").

2.      From the Petition Date through the date of this Objection, the Debtor has continued to operate its businesses and manage its properties as debtor-in-possession, pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.      On March 2, 2010, the Office of the United States Trustee appointed the Asbestos Claimants Committee pursuant to section 1102 of the Bankruptcy Code.  The Asbestos Claimants Committee is comprised entirely of persons who hold pending claims against the Debtor for asbestos-related personal injury or wrongful death.

4.      On March 18, 2010, the Asbestos Claimants Committee filed and served its

Application to Employ Caplin & Drysdale, Chartered as The Official Committee of Unsecured

Creditors Holding Asbestos-Related Claims *Nunc Pro Tunc* to October 6, 2009.  On April 21,

2010, the Court entered an order, approving the retention application to March 5, 2010.

5.      On July 16, 2010, the Bankruptcy Court filed an additional order approving the

retention of Caplin & Drysdale *Nunc Pro Tunc* to October 6, 2009, as counsel to The Official

Committee of Unsecured Creditors Holding Asbestos Related Claims.

6.      On November 15, 2010, Caplin & Drysdale filed the Second Interim Fee

Application, for the period from June 1, 2010 to September 30, 2010 (the **"Application**

**Period"**), seeking fees in the amount of $593,511.50 and expenses in the amount of $36,161.57,

for total requested compensation of $629,673.07.

7.      By correspondence dated November 19, 2010, counsel to the Fee Examiner

requested supplemental information from Caplin & Drysdale as part of the Fee Examiner's

review of the Second Interim Fee Application (the **"Initial Review"**).  Caplin & Drysdale

submitted a detailed response (the **"C&D Response"**) to the Fee Examiner's queries on

December 6, 2010.

8.      On December 8, 2010, the Fee Examiner filed the Limited Objection, in which the

Fee Examiner recommended disallowance (the **"Suggested Reductions"**) of $56,636.38

(approximately 10%) in Caplin & Drysdale's fees, and $630.54 in expenses, for a total of

$57,266.92 in Suggested Reductions.

9.      While Caplin & Drysdale accepts several of the Suggested Reductions (see

below), we believe that, in general, the objections on which the Suggested Reductions are based

are unfounded.    Therefore, we ask that the Court overrule the Limited Objection to the extent

described and requested below.

## DISCUSSION

### I.    Accepted Suggested Reductions

10.    Caplin & Drysdale either has accepted or will accept the Suggested Reductions

regarding $630.54 in expenses.  *See Limited Objection* at ¶¶ 25-29.

11.    In addition, Caplin & Drysdale accepts a 50% reduction in fees charged for

preparing or reviewing the fee applications of other Committee professionals, or a $3,059.00

reduction in fees.  *See id.* at ¶ 13.

### II.    Caplin & Drysdale's Billing Rates And Task Allocations Were Commensurate With The Work Performed

12.    The Fee Examiner suggests a disallowance of $29,675.58 (five percent of the total

fees billed) for "rates not commensurate with the tasks performed."  *See Limited Objection* at

¶ 12(A)-(D).  Caplin & Drysdale disputes the contention that its rates were not commensurate

with the tasks performed by its professionals, and also disputes the Fee Examiner's predicate

contentions that (1) senior professionals performed junior level tasks and (2) the Fee Examiner

was unable to provide a detailed list of such alleged misallocation of tasks due to alleged

"consistent use of vague time entries by certain timekeepers."  *See id.*

#### A.    Caplin & Drysdale's Rates At Most Experience Levels Are Significantly Lower That Those Of Comparable Professionals In These Cases

13.    Caplin & Drysdale accepts the Fee Examiner's assertion that the blended rate for

Caplin & Drysdale's professional services during the Application Period, as calculated based on

the hourly rates and total requested fees disclosed in the Second Interim Fee Application, is

$511.39.  *See id.* at ¶ 12.  Caplin & Drysdale questions, however, the Fee Examiner's note that

3

Caplin & Drysdale's hourly rates at most experience levels are "on a par with their higher billing peers." *See id.* at ¶ 12(A).

14.     In fact, Caplin & Drysdale's hourly rates are significantly lower than those of high billers in these bankruptcy matters.

15.     In addition, the Fee Examiner's methodology is ambiguous and, therefore flawed, in that it measures "commensurate rates," not by the task performed, but rather by the fee structures of the law firms performing services.

16.     Specifically, although two of Caplin & Drysdale's senior partners, Elihu Inselbuch ($950 per hour) and Peter Lockwood ($860 per hour), charge hourly rates that are on a par with their peers at, for example, Weil, Gotshal & Manges LLP ("**Weil, Gotshal**") and Kramer Levin Naftalis & Frankel LLP ("**Kramer Levin**"), these two attorneys billed, respectively, 22 hours and 8.2 hours to these bankruptcy cases during the Application Period. *See Second Interim Application* at ¶ 28.

17.     Further, as indicated in the Second Interim Fee Application, the majority of the services provided by Caplin & Drysdale during the Application Period were performed by senior partner Trevor W. Swett (219.7 hours); and junior partners James Wehner (222.5 hours) and Kevin Maclay (218.5 hours), respectively.   *See id.* at ¶¶ 25, 28.

18.     Moreover, as also noted in the Second Interim Fee Application, Mr. Swett has 29 years of experience as an attorney, and bills time at a rate of $675 per hour, while Mr. Wehner and Mr. Maclay have 15 and 16 years of such experience, respectively, and bill time at a rate of $510 per hour. *See id.* at ¶¶  25, 28.

19.     In comparison*, every one* of the Weil members and senior counsel who billed time during the Application Period did so at higher hourly rates than Mr. Swett.  (*See Summary of*

*Fourth Interim Fee Application* (the **"Weil Application"**) *of Weil Gotshal & Manges LLP for Service Rendered for the Period June 1, 2010 Through September 30, 2010).* Moreover, lead counsel Stephen Karotkin and Joseph Smolinsky billed at $990 and $900 per hour, respectively, *see Weil Application* at pp. 3-4, far higher than Mr. Swett's rate of $675.

20.    Further, Weil, Gotshal charges higher hourly rates for the services of four associates who were admitted in 2009 – *i.e.*, who have merely one year of experience practicing law – than Caplin & Drysdale does for Messrs. Wehner and Maclay, each of whom has at least 15 years of experience practicing law. *See Weil Application* at pp. 5-6. At least five associates admitted in 2008 – *i.e.,* who have merely two years of legal experience – bill at higher rates that Messrs. Wehner and Maclay. *See id.*

21.    Similarly, Kramer Levin's senior counsel, Thomas Mayer Moers and Phillip Bentley, bill at $950 and $795 per hour, respectively, and each partner or special counsel at Kramer Levin bills at higher hourly rates than Mr. Swett. *See Summary of Fourth Interim Fee Application of Kramer Levin Naftalis & Frankel LLP for Services Rendered for the Period June 1, 2010 Through September 30, 2010* (the **"Kramer Application"**) at p. 2. Further, several Kramer Levin junior associates, admitted between 2007 and 2009, are billed at rates comparable to those of Caplin & Drysdale partners Wehner and Maclay. *See Kramer Application at pp. 2-3.*

22.    Finally, Weil, Gotshal states a blended rate for the Application Period of $645.53, including law clerks, paraprofessionals, "other staff," while Kramer, Levin discloses a blended rate of $622.75, including paralegals and "Other Timekeepers." *See Weil Application* at p. 9; *Kramer Application* at p. 3.

23.    While Caplin & Drysdale does not take issue with the hourly rates charged by Weil, Gotshal, Kramer, Levin, or other professionals approved by the Court in the MLC

5

bankruptcy cases, we do dispute the Fee Examiner's contention that our rates "at most experience levels" are "on a par" with our peers. *See Suggested Reduction* at ¶ 12. Indeed, as indicated by the experience level and billing rates of the lead attorneys and associates at each firm, and the firms' respective blended rates, Caplin & Drysdale's rates at most experience levels are *significantly lower* that those of our peers, the Debtor's counsel and counsel for the UCC. *See Second Interim Fee Application* at ¶¶ 25, 28; *Weil Application* at p. 9; *Kramer Application* at p. 3.

24.     Moreover, it makes no sense for the Fee Examiner to assert that Caplin & Drysdale's rates are not "commensurate with the tasks performed," and suggest a five percent reduction in the total fees billed, when first year associates at comparable firms are charging higher rates than two out of three of the Committee's experienced attorneys.   Undoubtedly the services performed by those junior associates are considerably less complex than those provided by either Mr. Wehner or Mr. Maclay.

25.     In sum, the Fee Examiner's standard of measurement is ambiguous and relative, in that he appears to measure the appropriateness of the fee requested, not by the task performed or the rate charged, but rather by internal fee structure of the law firm that performs the task.

26.     Further, as argued below, the tasks assigned to Caplin & Drysdale attorneys were appropriate for the rank and skill level of the attorneys performing the work.  The Fee Examiner's purported examples to the contrary are misleading and his contention that he could not provide more and better examples because Caplin time entries were "consistently vague," *see Limited Objection* at ¶ 12(E), is unsubstantiated and, indeed, is belied by his own Limited Objection.

27.     In short, the Fee Examiner attempts to predicate a wholesale, five-percent fee

reduction without factual support.  Accordingly, the Court should reject the attempt.

**B.      Caplin & Drysdale's Staffing Decisions Were Reasonable and Appropriate**

28.     As disclosed in the Second Interim Fee Application, Caplin & Drysdale employs

only a small number of associates.  *See Second Interim Fee Application* at ¶¶ 25, 28.  Our

litigation practice consists chiefly of partners and senior attorneys, most of whom bill at hourly

rates lower than those of most associates at the firms employed by the Debtors and UCC.  *See id.*

29.     Much of the work performed in these cases by Caplin & Drysdale is therefore

necessarily performed by partners or senior counsel.   Although he claims not to dispute this

"predictable" result, the Fee Examiner nonetheless contends that Caplin & Drysdale has staffed

"junior level" tasks with senior attorneys.  *See Limited Objection* at ¶12 (D).

30.     In support of his contention, the Fee Examiner provides a list of seven time

entries, each of which purports to record a "junior level" task assigned to a senior lawyer.  *See id.*

The Fee Examiner further claims that he was "unable to itemize each of the specific tasks for

which Caplin seeks compensation at a higher rate than commensurate with the task, in part, due

to the consistent use of vague time entries by certain timekeepers."  *See id.*

31.     The Fee Examiner does not provide the names of such purported timekeepers,

however, or list any such vague entries.  *See id.*  Indeed, the only timekeeper to whose entries the

Fee Examiner objects is Caplin & Drysdale attorney, Kevin C. Maclay.  *See id.* at ¶ 20, Exhibit.

A.  Moreover, rather than providing a list of such purportedly vague time entries, the Fee

Examiner merely attaches as Exhibit A the entire run of Mr. Maclay's 218 hours of time,

claiming without further specification that "numerous entries are repetitively described as

'Review/analyze filings to evaluate impact on ACC interests,' or recording tasks such as "scheduling, organizing files, and creating to-do lists." *See id.*

32.     The Fee Examiner's list of seven time entries supposedly exemplifying the inappropriate assignment of tasks is heavily edited and therefore misleading.  These were not junior level tasks, but rather were appropriately assigned to senior lawyers.  Mr. Maclay's time entries are not vague and, for that reason and because they concern one timekeeper and a limited amount of time, do not provide the basis on which to demand a five-percent reduction of Caplin & Drysdale's overall fees.

### C.     The List Provided By The Fee Examiner Is Heavily Edited And Misleading

33.     The Fee Examiner provides a list of seven time entries that purport to show that senior level attorneys inappropriately performed junior level tasks.   These seven entries, and the bald assertion that no additional examples could be provided due to alleged, unspecified  vague time descriptions, form the entire evidentiary basis for the Fee Examiner's Suggested Reduction of five-percent of Caplin & Drysdale's total fees for the Application Period.

34.     First, each of the seven entries included in the Limited Objection has been edited by the Fee Examiner so that the actual amount of time billed by the timekeeper is omitted.   In fact, as indicated in the full entry, included in Exhibit A to the Second Interim Fee Application and reproduced below (with bold font indicating the particular portions extracted by the Fee Examiner from more extensive entries), the total amount of time comprised by the Fee Examiner's seven entries is 1.9 hours, for a total of a mere $1,197.50 in fees:

| | | | | |
|---|---|---|---|---|
| 6/23/2010 | TWS | 675.00 | 0.30 | Organize files |
| 7/20/2010 | RCT | 545.00 | 0 .90 | **Draft notice re filing of 2004 motion (0.4)**; TCs and emails KCM and TEP re motion, notice, timing |

| | | | | |
|---|---|---|---|---|
| | | | | and service requirements (0.2); conference EB re filing of 2004 motion (0.1); TC KCM re time descriptions and other requirements as per J. Gerber's July Order (0.2) |
| 8/3/2010 | JPW | 510.00 | 7.30 | **Telephone conference with Judge Gerber's chambers re scheduling (.2)**; telephone conference with TWS re reply brief (.2); review GM estimation production (2.3); draft reply in support of Rule 2004 application (4.6) |
| 8/3/2010 | TWS | 675.00 | 0.40 | Teleconference H. Blum re ACC R. 2004 application; follow-up re request for chambers copies; prep amended notice of hearing and send to E. Benetos for service. |
| 8/3/2010 | TWS | 675.00 | 0.20 | Teleconference H. Blum re hearing date on ACC rule 224 app.; email to JPW re same. |
| 8/4/2010 | TWS | 675.00 | 6.40 | E-mail to J. Hartwick re court call to extend Rule 2004 objection deadline; telephone conference with J. Hartwick re same (.2); cull J. Hartwick and H. Blum to effect Rule 2004 extension (.1); **prepare amended notice re Rule 2004 hearing and e-mail to Court (.3)**; review proposed agreement to resolve Rule 2004 applications (.7); conference with JPW re arguments for responding to Rule 2004 objection (.1); review draft agreement for resolving Rule 2004 application and prepare comments (.7); telephonic meet-and-confer re counsel for FCR, counsel and representatives of MLC, and counsel for New GM re Rule 2004 application and proposed resolution (.8); telephone conference with S. |

|  |  |  |  | Juris re upcoming hearing on USS Rule 2004 application (.2); review, revise and redline proposed agreement to resolve Rule 2004 application (2004) (.8); further meet and confer re FCR's and UCC's Rule 2004 application (1.4); draft proposed e-mail to J. Smolinsky and R. Weiss re UCC's Rule 2004 requests (.2); conference with JPW re evidentiary issues to anticipate if asbestos estimate is contested (.1); review revised agreement re rule 2004 request (.2); final session of meet and confer to conclude agreement (.6) |
| 8/17/2010 | TWS | 675.00 | 0.10 | Prepare to do list. |

35.    Hence, the Fee Examiner's editing omits the fact that he is, in essence, proposing a $29,675.48, or five-percent overall, fee disallowance, based on a mere $1,199.00 in specified, purportedly misallocated tasks.

36.    As indicated by the highlighted portions of the above-listed time entries, the Fee Examiner's editing also omits the context in which three of the specified services were provided: Ms. Tobin's services on July 20, 2010; Mr. Wehner's services on August 3, 2010; and Mr. Swett's services on August 3, 2010.

37.    While, when taken out of context, the tasks question may seem to be of a kind more appropriately delegated to junior attorneys, in context it is clear that they were merely a part of the flow of work performed by a senior attorney as part of a more complex set of services, each of which was then broken out and reported separately, as required by the rule prohibiting "block billing."  *See United States Trustee Guidelines* (**"UST Guidelines"**) at II (D) (5).

38.     Specifically, on July 20, 2010, Ms. Tobin, who serves as New York local counsel for Caplin & Drysdale, a Washington D.C.-based law firm, communicated with Mr. Maclay and Caplin & Drysdale associate Todd E. Phillips regarding the Southern District Bankruptcy Court filing, timing and service requirements governing the Committee's Rule 2004 motion. In performing these tasks, and acting as local counsel, Ms. Tobin spent a brief amount of time drafting the notice that accompanied that filing.

39.     Similarly, on August 3, 2010, Mr. Wehner made a brief phone call to Judge Gerber's office in connection with drafting and preparing to file a reply brief in support of the Committee's Rule 2004 motion. This task was part and parcel of the larger project on which Mr. Wehner worked that day.

40.     Further, on August 3, 2010, Mr. Swett spent a good portion of the day speaking to various parties regarding the Rule 2004 motion and, in the course of such efforts, a very small amount of time – 18 minutes - amending the notice of hearing on that motion. That time was duly broken out and noted in his time records.

41.     In short, only by plucking the subject entries from their context is the Fee Examiner able to paint them as misallocations of "junior" tasks to a senior counsel in three of his seven purported "examples." Caplin & Drysdale attorneys were merely following the rules in separately recording such time.

42.     Further, regarding Mr. Swett's list and schedule preparation, it is necessary in the course of these or any multi-faceted, complex cases for senior attorneys to organize their efforts and their files. Such work clearly reflects the preparing attorney's thought processes and organizational decision-making and there is no indication here that such necessary organizational tasks took inordinate amounts of time.

43.     There is nothing vague or ambiguous about Mr. Swett's entries; and it is

unrealistic to suggest that each organizational task connected with his work could have been

delegated efficiently to a junior associate.  Finally, more specific descriptions of such work lists

and files are protected work product, and need not be disclosed in a fee application.  *See Tr. 07-*

*06-2010 Hearing* at 10:24-11:6.

44.     In sum, each and every time entry challenged by the Fee Examiner describes a

task appropriately performed by the timekeeper in question; the Fee Examiner edited at least

three of those seven time entries in a manner that distorts the nature of the task performed; and

he edited all of those time entries to omit the very small amount of time spent on the tasks

involved.

45.     The Fee Examiner goes on to assert that he was unable to itemize additional tasks

that Caplin & Drysdale allegedly inappropriately assigned to senior personnel, because Caplin &

Drysdale's entries were too vague to permit him to do so.  *See* Limited Objection at ¶ 12(D).

46.     Yet despite his apparent line-by-line cherry-picking and parsing of time entries,

the Fee Examiner does not cite a single additional example of an allegedly junior task assigned to

a senior attorney.  Instead, he attaches Kevin Maclay's time run – all of it – to the Limited

Objection, and makes the conclusory assertion that much of Mr. Maclay's time entries are

repetitive.

47.      As argued more fully below, Caplin & Drysdale does not believe that any of Mr.

Maclay's time entries fall below the standard required by bankruptcy code and U.S. Trustee

Guidelines.   Moreover, in most instances, the descriptions supplied by Mr. Maclay are far more

detailed that the Fee Examiner suggests.  Indeed, we have identified only approximately 6 hours

of entries, out of a total of 218.0 hours billed by Mr. Maclay during the Interim Period, in which

the service provided is described merely as "Review/analyze filing to evaluate impact on ACC interests." Instead, in most instances, Mr. Maclay identifies the nature of those filings that he reviews. Moreover, even in instances in which entries have been edited to protect work product, Mr. Maclay's descriptions are well within the parameters of both the *UST Guidelines* and Judge Gerber's work product ruling. *See UST Guidelines* at II(D)(5); *Tr. O7-06-2010 Hearing* at 10:24-11.6.

48.    Therefore, Mr. Maclay's time entries do not support the Fee Examiner's contention that he could not specify further examples of inappropriately assigned services due to the "vagueness" of Caplin & Drysdale's time entries: first, because the only entries cited are those of Mr. Maclay; second, because no specific time entries by Mr. Maclay are specified; third, because those time entries that do not specify the documents reviewed are few; and last, because none of Mr. Maclay's time entries fail to meet specified guidelines.

49.    Nor can the time entries involved justify a wholesale, five-percent disallowance of fees.

50.    In short, the Fee Examiner has built a spider-web cathedral on a shifting foundation, employing edited, misleading time entries that detail a negligible amount of time, and an inaccurate characterization regarding the entries of a single timekeeper, to ask the Court to disallow five percent of Caplin & Drysdale's total fees. *See Limited Objection* at ¶ 12. His recommendation should therefore be rejected out of hand.

51.    Further, the case cited by the Fee Examiner for the idea that the Court should second-guess a law firm's staffing decisions, *In re Stover*, No. 10-6192, ___ B.R. ____, 2010 WL 4439248 at *5 (Bankr. W.D. Mich, Nov. 5, 2010), is inapposite. In that case, after stating that "given the confidential and sensitive nature of the attorney-client relationship, courts are

reluctant to second-guess staffing decisions," *see In re Stover,* 2010 WL 4439248 at *4, the

court went on to note that, not only had the firm's three shareholders performed approximately

94% of the post-petition services for which compensation had been requested, but

"approximately 1/3 of the 90.2 hours reflected in the Application involved preparing the petition,

schedules and SOFA." *See id.* at *5. On this basis – *i.e.*, because of the predominance of lower

level services provided and the absence of significant time entries by associates in comparison to

those by partners, the court concluded that senior personnel must necessarily have performed

lower level tasks. *See id. at* *5 (internal citations omitted).

52.      The Fee Examiner does not and cannot claim that here, as in *Stover,* the

preponderance of services described in the Second Interim Fee Application are basic, lower-level

tasks that could have been performed by junior attorneys and paralegals.[1] Indeed, as set out in

detail in Exhibit A to and section IV of the Second Interim Fee Application, the great

preponderance of Caplin & Drysdale's services provided during the Application Period involved

difficult, complex issues.   *See Second Interim Fee Application* at Section IV & Exhibit A; 11

U.S.C. § 330(a)-(f).

**III.     Caplin & Drysdale Should Be Fully Compensated For Its Fee Inquiry Time**

53.      The Fee Examiner requests a reduction of $12,771.25 regarding Caplin &

Drysdale's Fee Inquiry Time, claiming to have substantially prevailed regarding his objections to

Caplin & Drysdale's First Interim Fee Application (the **"First Interim Fee Application"**). *See*

*Limited Objection* at ¶ 19.

---

[1] Another issue in *Stover* that played a role in the Court's decision to reduce fees, was the likely
duplication of services by the applicant law firm pre- and post-petition. *See id.* at *3, *5.  There
are no such issues in dispute regarding the Second Interim Fee Applications.

54.     In fact, the Fee Examiner's method of measuring whether he substantially prevailed is flawed.  Moreover, when the correct standard of measurement – namely, whether Caplin & Drysdale ultimately obtained most of the challenged fees – is applied, it is clear that the Fee Examiner did not substantially prevail.

55.     The Fee Examiner states that he identified "numerous questions" regarding the First Interim Fee Application, but concedes that "Caplin ultimately resolved [most of them] by providing additional information."  *See id.* at ¶ ¶ 15, 16.

56.     The Fee Examiner further states that Caplin & Drysdale "stipulated to reductions for deficiencies on established points of law," agreeing "to reduce fees for reviewing its time detail in advance of filing its fee application; for a paralegal who failed to bill in tenth-of-an hour increments; for block billing, for billing errors; for car service on days with fewer than six hours worked; and, for out-of town meals exceeding the $20 per-meal cap."  *See id* at ¶ 17.

57.     The Fee Examiner further states that "many of the Fee Examiner's objections were based on established law, Caplin was unable to provide satisfactory explanations in response to many objections, and Caplin's original application did not initially contain all the elements, required by the UST guidelines necessary for the statutory analysis for reasonableness."  *See id.* at ¶ 19.  "Accordingly" the Fee Examiner concludes, "Caplin did not substantially prevail with respect to the issues raised involving the First Interim Fee Application."  *See id.*

58.      At the outset, it must be said that the Fee Examiner errs in his apparent belief that the mere fact that he asks questions suggests that a fee application is in some way deficient.  *See id.* at 15.  Indeed, to base fee and expense reductions on the mere fact that the Fee Examiner challenged certain entries would beg the question of whether his potential objections had merit,

and thus eviscerate the Court's ruling that an applicant that substantially prevailed against the

Fee Examiner's objections should be paid.  *See Bench Decision on Pending Fee Issues* (Nov. 23,

2010) (the **"Fee Inquiry Ruling"**), Gerber, J. at pp. 1-2.  ("Failing to allow professionals the

costs of defending meritless objections would dilute fee awards, and encourage parties to file

frivolous objections") (footnote omitted).

59.     Moreover, the Fee Examiner is also inaccurate in suggesting that the reductions

accepted by Caplin & Drysdale regarding the First Interim Fee Application constituted

"stipulations" by Caplin & Drysdale to "deficiencies" in that Application.  *See Limited Objection*

at ¶ 17.

60.     The Fee Examiner's potential objections to the First Interim Fee Application were

set forth in a letter to Caplin & Drysdale, dated September 20, 2010.  *See generally*, *Letter to*

*Rita C. Tobin from Katherine Stadler, dated September 2, 2010* (the **"Initial First Interim**

**Report"**).  Such potential objections included challenges to Caplin & Drysdale's billing rates

and work assignments; questions regarding task code descriptions (which, contrary to the Fee

Examiner's examples, had been provided in the First Interim Fee Application); a general

objection to so-called "vague communications and tasks"; a general objection to so-called "block

billing"; and a request for additional information regarding Caplin & Drysdale's filing agent,

Epiq Solutions, Inc.

61.     Although the Fee Examiner did not provide a total dollar amount regarding his

potential objections, *see generally, Amended Report,* they potentially affected the majority of the

fees requested by Caplin & Drysdale in the First Interim Fee Application.

62.     Moreover, other than regarding a few, minor expense charges and clerical errors,

and acknowledgment of the Court's ruling concerning a reduction of fee application-related fees,

Caplin & Drysdale made *no* concessions regarding the Fee Examiner's objections, agreeing instead to a global settlement in which, with no fault acknowledged, Caplin & Drysdale accepted a stipulated reduction of a mere $13,875.09 in fees or expenses. *See Fee Examiner's Amended Report* (**"Amended Report"**) *and Statement of Limited Objection to the First Interim Fee Application of Caplin & Drysdale, Chartered.*

63.     Further, the specific examples provided by the Fee Examiner in his attempt to demonstrate that Caplin & Drysdale "stipulated to reductions for deficiencies on established points of law, including matters previously in this case through prior fee ruling," do not prove his apparent point that Caplin & Drysdale "should have known better" than to have made such alleged errors, had acknowledged such errors, and should be penalized for them. *See Limited Objection* at ¶ 17.

64.     First and foremost, the stipulated reduction was merely a settlement, entered into by Caplin & Drysdale in good faith, and without acknowledgment of fault.

65.     Second, the standard announced by the Court in its November 23, 2010 ruling regarding the payment of fee inquiry-related fees was that such payment should be made where an applicant had *substantially prevailed* against the Fee Examiner's objections (*see 11/23/10 Dkt. Entry No. 7896*), not that the applicant should have conceded no points to the Fee Examiner, settled no objections, or made no minor errors that were later corrected. *See id*.

66.     Therefore, the Fee Examiner's contention that Caplin & Drysdale acknowledged errors regarding matters of law, or points that had previously been established by the Court, is irrelevant to the determination of whether Caplin & Drysdale should receive payment.

67.     Regarding block billing – one of the Fee Examiner's examples of Caplin & Drysdale's supposed acknowledgement of "deficiency" – Caplin & Drysdale specifically stated,

in an e-mail sent by attorney Rita C. Tobin to the Fee Examiner's office, that the agreement was

reached "*without acknowledging* that any of our time was block billed."  *See* E-mail *from Rita C.*

*Tobin to Katherine Stadler, dated September 17, 2010 at 2:44 p.m.*, attached hereto as Exhibit 1.

68.     In addition, regarding fee application preparation time, as both Ms. Tobin's e-

mail, and the Fee Examiner's later action demonstrate, at the time of the filing and evaluation by

the Fee Examiner of the First Interim Fee Application, neither the Fee Examiner nor the parties

had prior experience in applying the Court's July 6 fee order (the **"July 6 Fee Order"**), and the

application of that order to prior fee-application time was still an open question.

69.     In fact, as pointed out by Ms. Tobin in her e-mail, the Fee Examiner had

misapplied the Court's ruling, suggesting a 50% reduction, rather than the 35% reduction

required by the July 6 Fee Order, regarding Caplin & Drysdale's fee application time for period

prior to July 6.  Recognizing his error, on September 20, 2010, the Fee Examiner filed an

Amended Limited Objection (the **"Amended Objection"**) to the First Interim Fee Application

(Dkt. No. 7006).  Caplin & Drysdale can hardly be penalized for misapplying an Order that the

Fee Examiner did not understand himself.

70.     The Fee Examiner does not specify to which objections Caplin & Drysdale was

"unable to provide satisfactory explanations."  *See Limited Objection* at ¶ 19.   Ultimately, the

Fee Examiner decided not to file additional objections, which suggests that he recognized that

such objections would have been meritless.  *See Amended Report; Bench Decision on Pending*

*Fee Issues* (Nov. 23, 2010) (the **"Fee Inquiry Ruling"**), Gerber, J. at pp. 1-2.  ("Failing to allow

professionals the costs of defending meritless objections would dilute fee awards, and encourage

parties to file frivolous objections" (footnote omitted).)  *See Limited Objection* at ¶ 19.

71.     The remainder of the Fee Examiner's examples amount to a tiny fraction of the potential objections that he raised in his initial inquiry regarding the First Interim Fee Application in the Amended Report.  In fact, after responding to objections that potentially affected a substantial portion of its fees, Caplin & Drysdale recovered, with the Fee Examiner's approval, all but $13,780.54 in fees and $94.55 in expenses, out of a total of $487,190.25 in fees and $50,070.63 in expenses.  *See Amended Report*; *see generally, Initial First Interim Report*.

72.     In short, Caplin & Drysdale "substantially prevailed" against the Fee Examiner's objections.  Therefore, we request full compensation for our fees for responding to the Fee Examiner.

## IV.        Caplin & Drysdale's Task Descriptions Were Detailed And Not Repetitive

73.     The Fee Examiner alleges that several Caplin & Drysdale professionals "routinely used vague and/or repetitive descriptions of the tasks performed."  *See Limited Objection* at ¶ 20. He requests a reduction of $11,130.75, or 10% of the time billed by Caplin & Drysdale attorney, Kevin C. Maclay.

74.     Initially, the Fee Examiner identified two timekeepers whose entries were allegedly vague; as stated in the Limited Objection, the Fee Examiner accepted Caplin & Drysdale's explanation regarding that the entries questioned regarding one of those timekeepers was protected work product.  *See id.* at ¶ 20.

75.     The Fee Examiner does not specify which of Mr. Maclay's entries are purportedly "vague," but merely attaches a list all of Mr. Maclay's entries – 218 hours of time entries – as Exhibit A to the Limited Objections.  *See id.* at ¶ 21, Exhibit A.

76.     In addition, the Fee Examiner states that Mr. Maclay's alleged "numerous" entries repetitively described tasks as "Review/analyze filings to evaluate impact on ACC interests."  *See*

19

*id.* (The Fee Examiner's laundry list of entries regarding scheduling, organizing files and creating to-do lists are an apparent reference to a very few, discrete entries of Mr. Swett, discussed above.)

77.    Mr. Maclay's role in the MLC bankruptcy includes reviewing filings on the bankruptcy docket to determine which ones potentially affect the interests of the asbestos constituency.   Such preliminary reviews must be performed to determine whether and when Committee action is needed.   This work is both necessary and reasonable to discharge the Committee's responsibilities.

78.    More detailed description of the docket items reviewed would be unduly time consuming and expensive and specific descriptions of the documents determined to require potential action by the Committee would impair the Committee's work product privileges. *See* F.R.C.P. 26(b)(3)(A),(B).

79.     Further, in most instances, the descriptions supplied by Mr. Maclay are far more detailed than the Fee Examiner suggests.  Indeed, we have identified approximately 6 hours of entries, out of a total of 218.0 hours billed by Mr. Maclay during the Interim Period, in which the service provided is described merely as "Review/analyze filing to evaluate impact on ACC interests."   It is ludicrous and inequitable to ratchet a mere six hours of time into a 10% reduction – $11,130.75 – of Mr. Maclay's total fees billed during the Application Period.

80.    Finally, not only does Mr. Maclay generally identify the nature of filings that he reviews, but even when the work product privilege must be protected, Mr. Maclay's descriptions fall, well within the parameters of both the *UST Guidelines* and the Court's work product rulings.

81.    Therefore, we request that the Fee Examiner's requested reduction regarding Mr. Maclay's fees be rejected in its entirety.

**V.    The Fee Examiner Has No Cause To Weigh
In On Fees For Asbestos-Related Services**

82.    The Fee Examiner states his "concern" that at least seven professionals in

addition to Caplin & Drysdale have billed for asbestos-related services during the course of the

MLC bankruptcy matter, and states that he will "make comprehensive recommendations with

respect to asbestos professionals" when the final Asbestos Trust terms and outcome of claims

estimation can be better determined."  *See Limited Objection* at ¶ 24.

83.    The Fee Examiner worries that such services might prove to be "duplicative," *see

Limited Objection* at ¶ 24, and lists among the professionals regarding whom he has such

concerns Legal Analysis Systems, the Committee's claims estimation expert.

84.    Asbestos claims estimation and the amount of funding to be provided to an

Asbestos Trust are highly contested matters in these cases – hence the appointment of the

Committee by the United States Trustee.   Those issues affect the interests of several different

constituencies, including those of the UCC, the ACC, and the Future Claims Representative.

85.    There is no basis to infer that, merely because several parties and their

professionals are working on asbestos issues, the efforts of those professionals are in any sense

duplicative.

86.    Further, the Fee Examiner's role in this case is to monitor fees, not determine

whether the outcome of claims estimation and the reorganization process, including the

establishment of an Asbestos Trust, provides sufficient benefit to asbestos claimants.  That

determination is made, not by the Fee Examiner, but by the Court.

87.    For these reasons, Caplin & Drysdale does not concede the authority of the Fee

Examiner to weigh in on the questions of whether the services of Committee professionals,

21

including Caplin & Drysdale, are duplicative of those of the Committee's adversaries, or whether such services provide sufficient benefits to the Committee's constituency to warrant payment of professional fees.

## CONCLUSION

For all the foregoing reasons, but for those reductions to which Caplin & Drysdale has herein agreed, the Limited Objection should be rejected.

CAPLIN & DRYSDALE, CHARTERED

 /s/ Ronald E. Reinsel
Ronald E. Reinsel
rer@capdale.com
Caplin & Drysdale, Chartered
One Thomas Circle, NW
Washington, DC 20005
(202) 862-5000

Elihu Inselbuch
ei@capdale.com
Rita C. Tobin
rct@capdale.com
375 Park Avenue, 35th Floor
New York, NY 10152-3500
(212) 319-7125

*Counsel for the Official Committee*
*Of Unsecured Creditors Holding Asbestos-*
*Related Claims of Motors Liquidation Company*

Dated: December 13, 2010