**Exhibit B**
**Proof of Claim No. 59632**


01807757
APS0605984027

**UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**   |   **PROOF OF CLAIM**

| Name of Debtor (Check Only One) | Case No |
|---|---|
| ☐ Motors Liquidation Company (f/k/a General Motors Corporation) | 09-50026 (REG) |
| ☐ MLCS, LLC (f/k/a Saturn, LLC) | 09-50027 (REG) |
| ☐ MLCS Distribution Corporation (f/k/a Saturn Distribution Corporation) | 09-50028 (REG) |
| ☐ MLC of Harlem, Inc (f/k/a Chevrolet-Saturn of Harlem, Inc ) | 09-13558 (REG) |

Your Claim is Scheduled As Follows:

FILED - 59632
MOTORS LIQUIDATION COMPANY
F/K/A GENERAL MOTORS CORP
SDNY # 09-50026 (REG)

NOTE  This form should not be used to make a claim for an administrative expense arising after the commencement of the case  but may be used for purposes of asserting a claim under 11 U S C § 503(b)(9) (see Item # 5)  All other requests for payment of an administrative expense should be filed pursuant to 11 U S C § 503

Name of Creditor (the person or other entity to whom the debtor owes money or property)    HAMMOND TAMMY

Name and address where notices should be sent

HAMMOND TAMMY
HAMMOND TAMMY
2110 N BELTLINE BLVD STE A
COLUMBIA  SC 29204-3999
C/o Strom Law Firm LLC

Telephone number  803 252 4800
Email Address  mpacella@stromlaw.com

Name and address where payment should be sent (if different from above)

Tammy Hammond
14 Clover Crest Court
Columbia SC 29229

Telephone number  803-238-3807

☐ Check this box to indicate that this claim amends a previously filed claim

Court Claim Number _____
(If known)

Filed on _____

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim  Attach copy of statement giving particulars

☐ Check this box if you are the debtor or trustee in this case

*(stamp)* THE GARDEN CITY GROUP, INC   NOV 27 2009

If an amount is identified above you have a claim scheduled by one of the Debtors as shown (This scheduled amount of your claim may be an amendment to a previously scheduled amount)  If you agree with the amount and priority of your claim as scheduled by the Debtor and you have no objection to the Debtor, you do not need to file this proof of claim form, EXCEPT AS FOLLOWS  If the amount shown is listed as DISPUTED, UNLIQUIDATED or CONTINGENT a proof of claim MUST be filed in order to receive any distribution in respect of your claim  If you have already filed a proof of claim in accordance with the attached instructions, you need not file again

**1** Amount of Claim as of Date Case Filed, June 1, 2009    $  Undetermined

If all or part of your claim is secured, complete item 4 below, however, if all of your claim is unsecured, do not complete item 4  If all or part of your claim is entitled to priority, complete item 5  If all or part of your claim is asserted pursuant to 11 U S C § 503(b)(9), complete item 5

☐ Check this box if claim includes interest or other charges in addition to the principal amount of claim  Attach itemized statement of interest or charges

**2** Basis for Claim   See attached  Class action complaint and consolidated complaint
(See instruction #2 on reverse side )

**3** Last four digits of any number by which creditor identifies debtor  _____
(See instruction #3a on reverse side )

   **3a** Debtor may have scheduled account as  _____
(See instruction #3a on reverse side )

**4** Secured Claim (See instruction #4 on reverse side )
Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information

Nature of property or right of setoff    ☐ Real Estate   ☐ Motor Vehicle   ☐ Equipment   ☐ Other
Describe

Value of Property  $_____   Annual Interest Rate ___%

Amount of arrearage and other charges as of time case filed included in secured claim, if any  $_____

Basis for perfection  _____

Amount of Secured Claim  $_____   Amount Unsecured  $_____

**5** Amount of Claim Entitled to Priority under 11 U S C § 507(a)  If any  portion of your claim falls in one of the following categories, check the box and state the amount

Specify the priority of the claim

☐ Domestic support obligations under 11 U S C § 507(a)(1)(A) or (a)(1)(B)

☐ Wages, salaries, or commissions (up to $10,950*) earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business  whichever is earlier – 11 U S C § 507(a)(4)

☐ Contributions to an employee benefit plan – 11 U S C § 507(a)(5)

☐ Up to $2,425* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U S C § 507(a)(7)

☐ Taxes or penalties owed to governmental units – 11 U S C § 507(a)(8)

☐ Value of goods received by the Debtor within 20 days before the date of commencement of the case – 11 U S C § 503(b)(9)  507 (a)(2))

☐ Other – Specify applicable paragraph of 11 U S C § 507(a)(___)

Amount entitled to priority

$_____

*Amounts are subject to adjustment on 4/1/10 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment

**6** Credits  The amount of all payments on this claim has been credited for the purpose of making this proof of claim

**7** Documents  Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements or running accounts, contracts, judgments, mortgages, and security agreements  You may also attach a summary  Attach redacted copies of documents providing evidence of perfection of a security interest  You may also attach a summary  (See instruction 7 and definition of "redacted" on reverse side )

DO NOT SEND ORIGINAL DOCUMENTS  ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING

If the documents are not available, please explain in an attachment

| Date 11.24.09 | Signature  The person filing this claim must sign it  Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above  Attach copy of power of attorney, if any    *Tammy Hammond* | FOR COURT USE ONLY |
|---|---|---|

Penalty for presenting fraudulent claim  Fine of up to $500,000 or imprisonment for up to 5 years, or both  18 U S C §§ 152 and 3571
Modified B10 (GCG) (12/08)

## INSTRUCTIONS FOR PROOF OF CLAIM FORM

*The instructions and definitions below are general explanations of the law. In certain circumstances, such as bankruptcy cases not filed voluntarily by the debtor, there may be exceptions to these general rules. The attorneys for the Debtors and their court-appointed claims agent, The Garden City Group, Inc., are not authorized and are not providing you with any legal advice.*

### A SEPARATE PROOF OF CLAIM FORM MUST BE FILED AGAINST EACH DEBTOR

PLEASE SEND YOUR ORIGINAL, COMPLETED CLAIM FORM AS FOLLOWS: IF BY MAIL: THE GARDEN CITY GROUP, INC., ATTN: MOTORS LIQUIDATION COMPANY CLAIMS PROCESSING, PO BOX 9386, DUBLIN, OH 43017-4286. IF BY HAND OR OVERNIGHT COURIER: THE GARDEN CITY GROUP, INC., ATTN: MOTORS LIQUIDATION COMPANY CLAIMS PROCESSING, 5151 BLAZER PARKWAY, SUITE A, DUBLIN, OH 43017. PROOFS OF CLAIM MAY ALSO BE HAND DELIVERED TO THE UNITED STATES BANKRUPTCY COURT, SDNY, ONE BOWLING GREEN, ROOM 534, NEW YORK, NEW YORK 10004. ANY PROOF OF CLAIM SUBMITTED BY FACSIMILE OR E-MAIL WILL NOT BE ACCEPTED

**THE GENERAL AND GOVERNMENTAL BAR DATE IS NOVEMBER 30, 2009 AT 5 00 PM (PREVAILING EASTERN TIME)**

**Court, Name of Debtor, and Case Number**
These chapter 11 cases were commenced in the United States Bankruptcy Court for the Southern District of New York on June 1, 2009 You should select the debtor against which you are asserting your claim
**A SEPARATE PROOF OF CLAIM FORM MUST BE FILED AGAINST EACH DEBTOR**

**Creditor's Name and Address**
Fill in the name of the person or entity asserting a claim and the name and address of the person who should receive notices issued during the bankruptcy case Please provide us with a valid email address A separate space is provided for the payment address if it differs from the notice address The creditor has a continuing obligation to keep the court informed of its current address See Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

1 **Amount of Claim as of Date Case Filed:**
State the total amount owed to the creditor on the date of the bankruptcy filing Follow the instructions concerning whether to complete items 4 and 5 Check the box if interest or other charges are included in the claim

2 **Basis for Claim**
State the type of debt or how it was incurred Examples include goods sold, money loaned, services performed, personal injury/wrongful death car loan, mortgage note, and credit card If the claim is based on the delivery of health care goods or services, limit the disclosure of the goods or services so as to avoid embarrassment or the disclosure of confidential health care information You may be required to provide additional disclosure if the debtor, trustee or another party in interest files an objection to your claim

3 **Last Four Digits of Any Number by Which Creditor Identifies Debtor**
State only the last four digits of the debtor's account or other number used by the creditor to identify the debtor, if any

3a **Debtor May Have Scheduled Account As**
Use this space to report a change in the creditor's name, a transferred claim, or any other information that clarifies a difference between this proof of claim and the claim as scheduled by the debtor

4 **Secured Claim**
Check the appropriate box and provide the requested information if the claim is fully or partially secured Skip this section if the claim is entirely unsecured (See DEFINITIONS, below) State the type and value of property that secures the claim, attach copies of lien documentation, and state annual interest rate and the amount past due on the claim as of the date of the bankruptcy filing

5 **Amount of Claim Entitled to Priority Under 11 U S C § 507(a)**
If any portion of your claim falls in one or more of the listed categories, check the appropriate box(es) and state the amount entitled to priority (See DEFINITIONS, below ) A claim may be partly priority and partly non-priority For example, in some of the categories, the law limits the amount entitled to priority

For claims pursuant to 11 U S C § 503(b)(9), indicate the amount of your claim arising from the value of any goods received by the debtor within 20 days before June 1, 2009, the date of commencement of these cases (See DEFINITIONS, below) Attach documentation supporting such claim

6 **Credits**
An authorized signature on this proof of claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the Debtor credit for any payments received toward the debt

7 **Documents**
Attach to this proof of claim form redacted copies documenting the existence of the debt and of any lien securing the debt You may also attach a summary You must also attach copies of documents that evidence perfection of any security interest You may also attach a summary FRBP 3001(c) and (d) If the claim is based on the delivery of health care goods or services, see instruction 2 Do not send original documents, as attachments may be destroyed after scanning

**Date and Signature**
The person filing this proof of claim must sign and date it FRBP 9011 If the claim is filed electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what constitutes a signature Print the name and title, if any, of the creditor or other person authorized to file this claim State the filer's address and telephone number if it differs from the address given on the top of the form for purposes of receiving notices Attach a complete copy of any power of attorney Criminal penalties apply for making a false statement on a proof of claim

---

### DEFINITIONS

**Debtor**
A debtor is the person, corporation, or other entity that has filed a bankruptcy case
The Debtors in these Chapter 11 cases are

| | |
|---|---|
| Motors Liquidation Company | |
| (f/k/a General Motors Corporation) | 09-50026 (REG) |
| MLCS, LLC | |
| (f/k/a Saturn, LLC) | 09-50027 (REG) |
| MLCS Distribution Corporation | |
| (f/k/a Saturn Distribution Corporation) | 09-50028 (REG) |
| MLC of Harlem, Inc | |
| (f/k/a Chevrolet-Saturn of Harlem, Inc ) | 09-13558 (REG) |

**Creditor**
A creditor is the person, corporation, or other entity owed a debt by the debtor on the date of the bankruptcy filing

**Claim**
A claim is the creditor's right to receive payment on a debt that was owed by the Debtor on the date of the bankruptcy filing See 11 U S C § 101(5) A claim may be secured or unsecured

**Proof of Claim**
A proof of claim is a form used by the creditor to indicate the amount of the debt owed by the debtor on the date of the bankruptcy filing The creditor must file the form with The Garden City Group, Inc as described in the instructions above and in the Bar Date Notice

**Secured Claim Under 11 U S C § 506(a)**
A secured claim is one backed by a lien on property of the debtor The claim is secured so long as the creditor has the right to be

paid from the property or other creditors The amount of the secured claim cannot exceed the value of the property Any amount owed to the creditor in excess of the value of the property is an unsecured claim Examples of liens on property include a mortgage on real estate or a security interest in a car A lien may be voluntarily granted by a debtor or may be obtained through a court proceeding In some states, a court judgment is a lien A claim also may be secured if the creditor owes the debtor money (has a right to setoff)

**Section 503(b)(9) Claim**
A Section 503(b)(9) claim is a claim for the value of any goods received by the debtor within 20 days before the date of commencement of a bankruptcy case in which the goods have been sold to the debtor in the ordinary course of such debtor's business

**Unsecured Claim**
An unsecured claim is one that does not meet the requirements of a secured claim A claim may be partly unsecured if the amount of the claim exceeds the value of the property on which the creditor has a lien

**Claim Entitled to Priority Under 11 U S C § 507(a)**
Priority claims are certain categories of unsecured claims that are paid from the available money or property in a bankruptcy case before other unsecured claims

**Redacted**
A document has been redacted when the person filing it has masked, edited out, or otherwise deleted, certain information A creditor should redact and use only the last four digits of any social-security, individual's

tax-identification, or financial-account number, all but the initials of a minor's name and only the year of any person's date of birth

**Evidence of Perfection**
Evidence of perfection may include a mortgage, lien, certificate of title, financing statement, or other document showing that the lien has been filed or recorded

**Acknowledgment of Filing of Claim**
To receive acknowledgment of your filing from The Garden City Group, Inc please provide a self-addressed, stamped envelope and a copy of this proof of claim when you submit the original claim to The Garden City Group, Inc

**Offers to Purchase a Claim**
Certain entities are in the business of purchasing claims for an amount less than the face value of the claims One or more of these entities may contact the creditor and offer to purchase the claim Some of the written communications from these entities may easily be confused with official court documentation or communications from the debtor These entities do not represent the bankruptcy court or the debtor The creditor has no obligation to sell its claim However, if the creditor decides to sell its claim, any transfer of such claim is subject to FRBP 3001(e), any applicable provisions of the Bankruptcy Code (11 U S C § 101 et seq ), and any applicable orders of the bankruptcy court

**Additional Information**
If you have any questions with respect to this claim form, please contact Alix Partners at 1 (800) 414-9607 or by e-mail at claims@motorsliquidation com

### INFORMATION

# GERGEL, NICKLES & SOLOMON, P.A.
## - ATTORNEYS AT LAW -
Post Office Box 1866
Columbia, South Carolina 29202 - 1866

Richard Mark Gergel
W Allen Nickles, III
Carl L. Solomon
Dona L Guffey
Dwayne T Mazyck

1519 Richland Street
Telephone (803) 779-8080
Facsimile (803) 256-1816
www.gnslaw.com

November 25, 2009

**SEN VIA OVERNIGHT MAIL**
The Garden City Group, Inc.
**Attn: Motors Liquidation Company Claims Processing**
5151 Blazer Parkway, Suite A
Dublin, Ohio 43017

      RE: **Tammy Hammond v. Onstar Corporation and General Motors Corporation**
           **Master File No.: 07-1867**

Dear Sir or Madam:

    Enclosed please find the following

    1  Proof of Claim-United States Bankruptcy Court for the Southern District of New York,
    2  Class Action Complaint, and
    3.  Second Master Amended Class Action Complaint

    Thank you for your attention to this matter. If you have any questions or concerns, please do not hesitate to contact me

                  Sincerely,

                  Carl L. Solomon

Enclosures

cc:    Mario Pacello (Proof of Claim ONLY)
       Tammy Hammond (Proof of Claim ONLY)

CLS/ cvc
File #07-401

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
## COLUMBIA DIVISION

| | | |
|---|---|---|
| TAMMY HAMMOND, on behalf of herself and others similarly situated, | ] ] ] | |
| Plaintiff, | ] ] | |
| vs | ] ] | **CLASS ACTION COMPLAINT** |
| ONSTAR CORPORATION and GENERAL MOTORS CORPORATION, | ] ] ] | |
| Defendants | ] | |

## INTRODUCTION

Plaintiff brings this class action against OnStar Corporation and General Motors Corporation due to their plans to terminate OnStar service to vehicles equipped with analog-only OnStar equipment pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure  OnStar is a unique in-vehicle telecommunication safety system that provides automatic crash notification to emergency responders, stolen vehicle location, remote door unlock and remote diagnostics in the event of problems with airbags, anti-lock brakes or other systems    According to OnStar in a filing before the Federal Communications Commission

> [OnStar provides] critical communications links among members of the Public, emergency medical service providers and emergency dispatch Providers, public safety, fire service and law enforcement officals, And hospital emergency and trauma care facilities
> The life-saving benefits of OnStar are intended not only for initial vehicle purchasers but also for subsequent owners over the life of the vehicle

As a result of defendants' actions, plaintiffs and thousands of other OnStar owners, lessees and subscribers will lose the benefits of this safety system, will be exposed to an

increased risk of serious personal injury and harm, and their motor vehicles will lose substantial value    Plaintiffs seek damages and appropriate injunctive relief for themselves and all others similarly situated

### The Parties

1      Plaintiff Tammy Hammond is a resident of Columbia, South Carolina

2      Defendant OnStar Corporation ("OnStar") is a corporation engaged in the business of, among other things, providing a safety, security and communications system called "OnStar" for vehicles with OnStar equipment    OnStar does business in South Carolina    OnStar maintains offices at 400 Renaissance Center, Detroit, Michigan

3      Defendant General Motors Corporation ("GM") is a corporation engaged in the business of, among other things, the manufacture and sale of motor vehicles    GM does business in South Carolina    GM maintains offices at 100 Renaissance Center, Detroit, Michigan

4      OnStar is a wholly-owned subsidiary of GM and was at all times expressly and impliedly controlled and directed by GM

5      At all relevant times, GM and OnStar were engaged in a joint venture to promote the sale of vehicles with OnStar safety equipment and OnStar service    In furtherance of that joint venture and purpose, defendants acted together and as principals and agents for each other as co-venturers

### Background

6.      OnStar is a telematic safety communications system for motor vehicles which is integrated into the vehicle    By the press of a button, OnStar enables vehicle

occupants to receive emergency service and information anywhere in the United States and portions of Canada  OnStar describes the system on its internet website as

> OnStar's in-vehicle safety, security, and information services
> Use Global Positioning System (GPS) satellite and cellular
> Technology to link the vehicle and driver to the OnStar Center
> At the OnStar Center, advisors offer real-time, personalized
> help 24 hours a day, 365 days a year

7    OnStar service is a unique system which is not available from other sources

8    GM and OnStar have developed and operated the OnStar system throughout the United States and Canada since about 1998

9    At all relevant times, GM maintained the policy and practice of selling OnStar equipped vehicles and providing service and parts for safety components through a network of authorized dealers

10    From its inception and for a considerable period of time thereafter, GM and OnStar used analog cellular technology for the OnStar system  Occupants of an OnStar equipped vehicle communicate with the OnStar Center by analog cellular service, with confidential access numbers, arranged by defendants with third-party cellular service providers  Vehicles with analog only OnStar equipment only function on analog cellular systems

11    GM manufactured and/or supplied the analog-only OnStar equipment used in OnStar's system

12    For a considerable period of time prior to 2003 and continuing thereafter, GM and OnStar knew or should have known that cellular providers were converting to

digital systems and that OnStar analog only equipment would not function on digital only cellular systems

13    OnStar service for new vehicles equipped with OnStar is typically free for the first 12 months and thereafter provided on a subscription basis

### Jurisdiction and Venue

14    At all times relevant hereto, Defendants were engaged in the business of manufacturing, marketing, promoting, selling and/or distributing OnStar equipment

15    At all relevant times, Defendants transacted, solicited, and conducted business in the State of South Carolina and is hence subject to the jurisdiction of this court

16    This court has federal question jurisdiction pursuant to 28 U S C § 1331 The Court has supplemental jurisdiction over the state law claims pursuant to 28 U S C § 1367

17    Venue is appropriate in this District because the Plaintiff resides within it and a substantial part of the events giving rise to the claims at issue arose in this District

### Facts As To The Representative Plaintiff

18    In 2003, plaintiff purchased a used 2001 GMC Yukon from an authorized General Motors dealership in Columbia, South Carolina

19    Plaintiff purchased the vehicle for personal, family and household use

20    At the time of purchase, OnStar and GM expressly and impliedly represented to plaintiff that their OnStar system would provide them with safety and security and would function and be available for the life of the vehicle

21      OnStar made these representations OnStar Owner's guide (the "Guide") which contained terms and conditions for OnStar service

22      In the Guide, OnStar represented to plaintiff that

(a)      OnStar is a safety device that "uses sophisticated      technology to provide the communications link and seemless integration into their vehicle" so that OnStar "Advisors" can provide plaintiffs with a "a range of helpful services to protect [plaintiffs] and [their] vehicle"

(b)      OnStar will put "Safety, Security and Convenience at [plaintiff's] Fingertips"

(c)      "The ease of the hands-free communications service allows [plaintiff] to enjoy an even greater level of safety, security and convenience while driving"

(d)      OnStar's service center and Advisors are available "24 hours a day, seven days a week   Even on weekends and holidays, there is always someone ready to help"

(e)      Plaintiff can renew their Safe & Sound plan "for excellent protection, 24/7, 365 days a year"   and

(f)      "If [plaintiff] purchased additional years [of service] or upgraded [their] OnStar service, when [plaintiff] purchased additional  years [of service] or upgraded [their] OnStar service, when [plaintiff] dispose of the vehicle, [plaintiff]   may transfer the remaining service to the new owner"

23      GM's implied warranties included its custom and practice of providing repair parts and service for defective safety components for the reasonable life of a

vehicle    This custom and practice was part of plaintiff's bargain to purchase their vehicle

24        At the time of purchase, GM and OnStar did not disclose to plaintiffs that their OnStar system was analog only and would not function on digital only cellular systems

25        By letter dated February 12, 2007, OnStar advised consumers with analog only systems that their OnStar service was terminated as of January 1, 2008, because their vehicle's OnStar equipment was analog only and that OnStar would not repair or replace their OnStar equipment to function using digital cellular service

26        Prior to February 12, 2007, OnStar and GM concealed from plaintiff that their OnStar equipment would be incompatable with the OnStar system, that OnStar and GM would not provide them with or make available compatible equipment, that their OnStar equipment would be inoperable and that their OnStar service would be terminated involuntarily

27        The analog OnStar equipment in plaintiff's vehicle is defective and was defective at the time of purchase

28        The analog OnStar equipment in plaintiff's vehicle is not suited for its intended purpose

29        GM and OnStar refuse to provide plaintiff with OnStar safety and security services as promised

30        Plaintiff has requested that OnStar and GM directly repair and/or replace the OnStar safety equipment in the vehicles of plaintiff and all other class members so

that they will operate on digital cellular networks but defendants have failed and refused to do so

31      Plaintiff has requested GM and OnStar to arrange for continued analog cellular service for the OnStar equipment in the vehicles of plaintiff and all other class members but defendants have failed and refused to do so

32      Solely as a result of defendants' conduct

(a)      plaintiff and class members will incur costs and expenses to replace and/or repair the analog OnStar system in their vehicle to function with digital cellular service,

(b)      plaintiff and class members will suffer significant depreciation and the loss of value of their vehicle due to the nonfunctional analog OnStar system, and

(c)      plaintiff and class members will be exposed to an increased risk of serious personal injury and harm

### Class Action Allegations

33      Plaintiffs bring this action individually and on behalf of the following class and subclasses

All individuals who own an analog only OnStar equipped motor vehicle

34      OnStar and GM have acted in the same or similar manner with respect to all class members

35      All class members purchased the same or similar incompatible, defective and unsuitable analog only OnStar equipment, received the same representations, have the same express and implied agreements for basic OnStar services and warranties

received the same notices of termination, and have or will sustain the same or similar damages

36      The class and subclasses are so numerous that joinder of all members is impracticable

(a)      Plaintiffs believe that OnStar presently provides OnStar service to subscribers who own or lease the following model vehicles in the United States which have analog only OnStar equipment    Chevrolet, Pontiac, Oldsmobile, Buick, Cadillac, GMC, Saturn, Hummer, Saab, Acura, Audi, Isuzu and Subaru

(b)      Plaintiffs believe that there are presently many thousands of OnStar subscribers with analog only equipment who have received notice of termination, who will have stranded investments in their motor vehicles, and who maya be stranded on the highways and exposed to an increased risk of serious personal injury and harm if GM and OnStar do not repair and/or replace their analog OnStar equipment or arrange for continued analog OnStar service

37      There are numerous questions of law and fact that are common to all class members and that predominate over individual questions, if any   Common questions of law and fact include

(a)      Whether OnStar equipment was defective and not suited for use with the OnStar system

(b)      Whether GM and OnStar made the same express and implied representations and warranties to all class members

(c)      Whether GM maintains the same customs, policies and practices regarding service and repairs for safety components

(d)    Whether GM and OnStar concealed and failed to disclose the information regarding the defects in analog OnStar equipment and the failure to provide analog cellular service

(e)    Whether GM and OnStar refuse to provide class members with analog OnStar service, repairs, replacements, devices or other means to receive OnStar digital service

(f)    Whether All class members have suffered the same or similar damage as a result of defendants' conduct

(g)    Whether OnStar and GM breach its express warranties?

(h)    Whether OnStar and GM breached its implied warranty of merchantability?

(i)    Whether OnStar and GM breached its implied warranty of fitness for particular purpose?

(j)    Whether OnStar and GM violated the Magnuson-Moss Act with respect to the Consumer Subclass?

(vii)    Is the Subscriber Subclass entitled to injunctive or declaratory relief?

38    Plaintiff's claims are typical of the claims of the class and subclass members  Plaintiff is a member of the class and subclasses  Plaintiff asserts are asserting the same rights, making the same claims, and seeking the same relief for herself and for all other class members

39    Plaintiff will fairly and adequately represent and protect the interests of the class.  Plaintiffs have no interests that conflict with or which are adverse to the

interests of other class or subclass members   Plaintiffs have retained qualified counsel

who are able and experienced in class action litigation

    40     A class action is a fair and efficient method to adjudicate this controversy

    (a)    Common questions of law and fact predominate over individual

questions

    (b)    Proof of plaintiff's claims will effectively prove the claims of all

other class and subclass members

    (c)    Resolution of the claims of the class and subclasses will depend on

the application of common principles of law

    (d)    A class action will permit a large number of relatively small claims

involving similar facts and legal issues to be resolved efficiently in one proceeding

based on common proof

    (e)    This case is manageable as a class action in that

    (1)    The material evidence is relatively simple and centralized

    (2)    GM and OnStar maintain computer and business records

which will enable plaintiffs to identify class members, and establish liability and

damages

    (3)    Damages for class members can be calculated in the same

or similar manner

    41     Plaintiffs incorporate all of the above paragraphs into all the Counts of the

Complaint set forth below

## FOR A FIRST CAUSE OF ACTION
## BREACH OF EXPRESS WARRANTIES

42    Plaintiff reaffirms and realleges paragraphs 1 through 41 of the Complaint and incorporates them herein by reference

43    Defendants OnStar and GM provided Plaintiff with written and/or oral express warranties regarding her OnStar equipment

44    Defendants breached the express warranties, which resulted in damages to Plaintiff

45    Plaintiff notified Defendants OnStar and GM of this breach within a reasonable time after discovery of the breach

46    Therefore, Plaintiff is entitled to actual, consequential, and special damages, as a result of the Defendants' breaches

## FOR A SECOND CAUSE OF ACTION
## BREACH OF IMPLIED WARRANTIES

47    Plaintiff reaffirms and realleges paragraphs 1 through 46 of the Complaint and incorporates them herein by reference

48    Defendants OnStar and GM provided Plaintiff with implied warranties of merchantability and fitness for a particular purpose regarding her OnStar equipment

49    Defendants breached the implied warranties, which resulted in damages to Plaintiff

50    Plaintiff notified Defendants OnStar and GM of this breach within a reasonable time after discovery of the breach

51    Therefore, Plaintiff is entitled to actual, consequential, and special damages, as a result of the Defendants' breaches

## FOR A THIRD CAUSE OF ACTION
## VIOLATION OF THE MAGNUSON-MOSS ACT

52    Plaintiff reaffirms and realleges paragraphs 1 through 51 of the Complaint and incorporates them herein by reference

53    OnStar equipment is a consumer product used for personal, family or household purposes

54    GM is a supplier and/or warrantor with the meaning of the Magnuson-Moss Warranty Act, 15 U S C §2301

55    GM has failed to comply with its obligations under its written and implied promises, warranties and representations despite having a reasonable opportunity to do so

56    Plaintiff and the Class are therefore entitled to recover compensatory damages together with reasonable attorney's fees and costs

WHEREFORE, plaintiffs, individually and on behalf of all class members, request judgment in their favor and against defendant, GM, and request the following relief

(a)    certification of the plaintiff class, the appointment of plaintiff as the class representatives, and the appointment of plaintiffs' counsel as class counsel, pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure,

(b)    compensatory damages for the class to be determined at trial, together with interest and costs,

(c)    reasonable attorney's fees pursuant to 15 U S C §2310(d)(2), and

(d)    such other relief as may be just, necessary or appropriate

## JURY DEMAND

Plaintiff demands a jury trial

Respectfully submitted, this 18th day of July, 2007

Strom Law Firm, LLC

s/ J  Preston Strom, Jr
J  Preston Strom, Jr
Fed  I D  No  4354
Mario A  Pacella
Fed  I D  No  7538
2110 Beltline Boulevard, Suite A
Columbia, SC 29204
Telephone  (803) 252-4800
Fax  (803) 252-4801

Gergel, Nickles & Solomon, P A
Carl L  Solomon
Post Office Box 1866
1519 Richland Street
Columbia, South Carolina 29202
Telephone  (803) 779-8080

Whatley Drake & Kallas
Joe R  Whatley, Jr
1540 Broadway, 37th Floor
New York, New York 35203
Telephone  (212) 447-7070

3 07-cv-02303-CMC    Date Filed 07/18/2007    Entry Number 1    Page 14 of 14



# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MICHIGAN

IN RE GENERAL MOTORS ONSTAR
LITIGATION

Master File No  07-1867

THIS DOCUMENT RELATES TO   All Actions

## SECOND MASTER AMENDED CLASS ACTION COMPLAINT

### Introduction

1        Plaintiffs bring this class action against General Motors Corporation ("GM"), American Honda Motor Company ("Honda"), Subaru of America ("Subaru") and Volkswagen of America ("VW") (collectively the "Manufacturer Defendants") and OnStar Corporation ("OnStar") due to the failure of analog OnStar equipment in their vehicles and the resulting termination of OnStar service

2        OnStar is a unique in-vehicle telecommunication safety system that provides automatic crash notification to emergency responders, stolen vehicle location, remote door unlock and remote diagnostics in the event of problems with airbags, anti-lock brakes or other systems   According to OnStar

> [OnStar provides] critical communications links among members of the public, emergency medical service providers and emergency dispatch providers, public safety, fire service and law enforcement officials, and hospital emergency and trauma care facilities

> * * *

> The life-saving benefits of OnStar are intended not only for initial vehicle purchasers but also for subsequent owners over the life of the vehicle

3    In August 2002, the Federal Communications Commission ("FCC") ruled that cellular telephone companies need not continue to carry analog cellular signals  The FCC allowed for a "sunset" period to allow companies whose products were reliant upon analog signals to transition to digital equipment

4    In 2002 the Defendants' OnStar equipment relied on analog cellular signals to function

5    All of the Defendants knew by August 2002 that their analog-based OnStar equipment would stop working on February 18, 2008  Despite the knowledge that their equipment would stop working in 2008, Defendants continued to sell analog equipment to customers without notifying those customers that the equipment would cease to function Defendants intentionally concealed from consumers the material fact that their equipment would stop working on February 18, 2008

6    After selling consumers equipment they knew would stop working, Defendants belatedly began warning consumers that their equipment was going to stop working by February 2008  Defendants required those customers whose equipment could be upgraded to a digital signal to pay to for such upgrades to keep their OnStar equipment working

7    Because of Defendants' intentional concealment of the material fact that the equipment they sold to consumers would stop working in 2008, hundreds of thousands of consumers across the country either have equipment that is now useless or have paid to purchase new digital equipment

8    As a result of the Defendants' actions, Plaintiffs and thousands of other owners and lessees of OnStar equipped vehicles have lost the benefits of this safety system and are exposed to an increased risk of serious personal injury and harm, or were forced to pay for upgrades to

keep their systems functioning   Plaintiffs seek damages for themselves and all others similarly situated

## The Parties

### Plaintiffs

9   Plaintiff Jack Jacovelli is a citizen and resident of New Jersey   His address is 5 Dorado Road, Laurel Springs, NJ

10   Plaintiff Janice Rhodes is a citizen and resident of Michigan   Her address is 3151 Kendalwood Court, Grand Rapids, Michigan

11   Plaintiffs Betty and Melvin Rubertt ("Rubertts") are citizens and residents of Washington   Their address is 3308 E 21st Street, Spokane, Washington

12   Plaintiff Bruce Johnson is a citizen and resident of the State of Washington   His address is P O  Box 670 Edmonds, Washington

13   Plaintiff Walter Rochow is a citizen and resident of Connecticut   His address is 25 Hamden Hills Drive, Hamden, Connecticut

14   Plaintiff Irene Nary is a citizen and resident of Ohio   Her address is 31 Periwinkle Drive, Olmsted Falls, Ohio

15   Plaintiffs Susan Nelson and Norman Nelson ("Susan and Norman Nelson") are citizens and residents of California  Their address is 6405 Bonsall Dr , Malibu, California

16   Plaintiff David Busch is a citizen and resident of New York   His address is 43 Moffat Road, Washingtonville, New York

17   Plaintiffs Marjory Gill and Larnell Gill are citizens and residents of California  Their address is 4081 Barnsdale Way, Sacramento, California

3

18    Plaintiff John Irvine is a citizen and resident of California   His address is 3622 Delancey Lane, Concord, California

19    Plaintiff Sandra Williams is a citizen and resident of California   Her address is 3101 82nd Avenue, Oakland, California

20    Plaintiff Carey Stein is a citizen and resident of Illinois   Her address is 1000 Portwine Road, Riverwoods, Illinois

21    Plaintiff Wanda Hoover is a citizen and resident of Illinois   Her address is 1912 W Hood Avenue, Apt 2B, Chicago, Illinois

22    Plaintiff Cheryl Nicholas is a citizen and resident of Louisiana

23    Plaintiff Sharon Schueter is a citizen and resident of Missouri   Her address is 1410 Summerhaven Drive, St Louis, Missouri

24    Plaintiffs Michael and Jacqueline Tchoukaleff are citizens and residents of Illinois   Their address is 1506 Paris Drive, Godfrey, Illinois

25    Plaintiff Bradley Reich is a citizen and resident of Colorado   His address is 3713 S Andes Way, Aurora, Colorado

26    Plaintiff Angela Imbierowicz is a citizen and resident of Illinois   Her address is 1301 W 22nd Street, Oakbrook, Illinois

27    Plaintiff John C Kuller is a citizen and resident of Washington   His address is 581 Pinecrest Drive, Port Townsend, Washington

28    Plaintiff Charlie Allenson is a citizen and resident of New York   His address is 315 E 68th Street, 7F, New York, New York

29    Plaintiff Robert Golish is a citizen and resident of California   His address is 501 N. Clementine, Anaheim, California

4

30    DELETED

31    Plaintiff Mark Vamos is a citizen and resident of Texas  His address is 5112 Victor Street, Dallas, Texas

32    Plaintiff Robert Schatz is a citizen and resident of Colorado  His address is 5678 Alkire Street, Arvada, Colorado

33    Plaintiff Christian P Borum is a citizen and resident of Virginia  Her address is 257 E 40th Street, Norfolk, Virginia

34    Plaintiffs Gordon and Ann Erdenberger are citizens and residents of Pennsylvania Their address is 220 Farm Lane, Doylestown, Pennsylvania

35    Plaintiff Murle Kemp is a citizen and resident of Oregon  His address is 3355 N Delta Highway #9, Eugene, Oregon

36    Plaintiff R S Reishman is a citizen and resident of West Virginia  He resides in Kanawha County

**Defendants**

37    Defendant GM is a Delaware corporation with its principal place of business and national headquarters located at 300 Renaissance Center, Detroit, Michigan  GM designs, tests, manufactures, markets, advertises, warrants, distributes, sells or leases cars, trucks and sports utility trucks under several prominent brand names, including, but not limited to  GMC, Chevrolet, Pontiac, Oldsmobile, Buick, Cadillac, Saturn and Saab throughout the United States

38    Defendant VW is a corporation engaged in the sale and distribution of motor vehicles in the United States under various brands and models including Audi and Volkswagen Phaetons and Passats  Audi of America is a wholly-owned subsidiary of VW  At the time of the

5

filing of the Amended Master Class Action Complaint VW maintained corporate headquarters in Auburn Hills, Michigan   VW now maintains corporate headquarters in Herndon, Virginia

39    Defendant Honda is a corporation engaged in the sale and distribution of motor vehicles in the United States under various brands, including "Acura"   Honda maintains corporate headquarters at 1919 Torrance Boulevard, Torrance, California

40    Defendant Subaru is the exclusive United States marketer of Subaru products manufactured by Fuji Heavy Industries Ltd of Japan   Subaru is headquartered in Cherry Hill, New Jersey   GM owned 20 percent of Fuji Heavy Industries from 1999-2005

41    Defendant OnStar is a wholly owned subsidiary of GM and was at all times expressly and impliedly controlled and directed by GM   OnStar also maintains headquarters in Detroit, Michigan

42    At all relevant times, OnStar engaged in co-ventures with each of the Manufacturer Defendants with respect to the sale and distribution of OnStar equipment

43    At all relevant times, Defendants acted by and through their agents, servants, workers and employees who were then and there acting within the course and scope of their permission, agency, employment and authority, in furtherance of Defendants' businesses, and otherwise on behalf of Defendants

### Jurisdiction and Venue

44    Plaintiffs bring this action seeking class-action status and alleging violations of the Michigan Consumer Fraud Act, violations of the consumer fraud laws of each of the 50 states, breach of express and implied warranties, and violations of the Magnuson-Moss Warranty Act   This Court has jurisdiction over these claims pursuant to 28 U S C 1332 (d).

45    Venue is proper in this District because Defendants GM, VW and OnStar are headquartered in this District and many of the acts and transactions giving rise to the violations of law alleged herein occurred within and emanated from Defendants' offices in this District Specifically, the marketing and sales materials discussing OnStar, and containing the material misstatements and omissions alleged herein, were designed, developed and approved by GM, VW and OnStar personnel at facilities in this District

46    Additionally, the OnStar subscription agreements expressly provide that Michigan law will apply

### Background

47    In the 1990s OnStar developed the OnStar telematic system

48    The OnStar telematic system is a cellular communication and global positioning device that is incorporated into motor vehicles as factory installed equipment   The OnStar system enables occupants of vehicles with OnStar equipment and service to receive emergency service and information anywhere in the United States and portions of Canada   OnStar describes the system on its website this way

> OnStar's in-vehicle safety, security, and information services use Global Positioning System (GPS) satellite and cellular technology to link the vehicle and driver to the OnStar Center   At the OnStar Center, advisors offer real-time, personalized help 24 hours a day, 365 days a year
>
> http //www onstar com/us_english/jsp/explore/onstar_basics/technology js p

49    OnStar has developed and operated the OnStar system throughout the United States and Canada since about 1998

50   At all relevant times, each of the Manufacturer Defendants maintained the policy and practice of manufacturing and selling OnStar equipped vehicles and providing service and parts for safety components through a network of authorized dealers

51   OnStar equipment and service for Manufacturer Defendants' vehicles is unique and is not available from other sources or as an after-market product

52   By December 2006 there were approximately two and a half million OnStar subscribers who owned or leased vehicles manufactured by Defendants GM, VW, Honda and Subaru with analog equipment

### The Types Of OnStar Equipment Sold By Defendants

53   OnStar's cellular system used both the Advanced Mobile Phone System ("AMPS") and the Code Division Multiple Access ("CDMA") cellular standards AMPS is analog, CDMA is digital Although the two standards are not compatible, by 2001 most cellular equipment (i e, cell phones) had both capabilities and could switch back and forth, depending on the kind of signal available

54   OnStar and the Manufacturer Defendants touted and sold analog OnStar systems as standard and optional equipment that would provide added safety, security and convenience When sold as optional equipment, customers would be charged fees of several hundred dollars for the OnStar equipment

55   At various times, OnStar capable vehicles were equipped with three types of wireless cellular equipment  a) Analog-Only, b) Analog/Digital-Ready, and c) Dual-Mode (Analog/Digital)

56   Vehicles with analog-only equipment were manufactured to operate only on analog wireless networks   The Manufacturer Defendants are not offering their customers any

opportunity to upgrade analog-only equipment to operate on digital networks   Analog-only
telematics systems ceased working on or about December 31, 2007

57   Vehicles with analog/digital-ready equipment have wiring and sensors that permit
the vehicle to operate on digital networks by replacing the communications module with dual-
mode (analog/digital) modules   All Manufacturer Defendants are charging their customers to
upgrade their analog/digital-ready equipment

58   At the time of purchase, the Manufacturer Defendants did not disclose to Plaintiffs
and other purchasers and lessees the type of OnStar equipment installed in their vehicles   Thus,
Plaintiffs and class members did not know that the OnStar equipment in their vehicles was
analog-only and would not function on digital cellular systems, or that their equipment was
analog/digital-ready and would not function on digital cellular systems without substantial
expenditure

### Defendants Knew That Analog OnStar Systems Would be Inoperable as of February 2008

59   On May 17, 2001, the FCC proposed eliminating the requirement that wireless
phone carriers operate analog-based networks, and allowing carriers to provide only digital-
based networks   *Notice of Proposed Rule Making*, 16 FCC Rcd  11169 (May 17, 2001)

60   Defendants were aware of the FCC's proposed rule change and understood that
such a rule change would result in wireless carriers ceasing to provide analog networks

61   Despite this, Defendants chose to not disclose to their customers that their vehicles
had analog OnStar systems that would be rendered inoperable and/or obsolete once this switch to
a digital network infrastructure took place   Instead, Defendants pocketed the money for the sale
of the OnStar equipment and the monthly subscription fees, all the while omitting this material
fact

9

### The Defendants' Statements to the FCC

62    Defendants' knowledge of the impending switch to a digital network infrastructure and its adverse impact on OnStar users is evidenced by the fact that OnStar and the Manufacturer Defendants made various presentations and submissions to the FCC concerning the elimination of analog service

63    Indeed, GM and OnStar filed comments and objections to the FCC's proposal on July 2, 2001 and August 1, 2001    These comments reveal GM and OnStar's knowledge that a shift away from analog service would harm their customers

64    On or about March 29, 2002, OnStar submitted to the FCC a document entitled, "Re Ex Parte Submission, In the Matter of the Year 2000 Biennial Regulatory Review – Amendment of Part 22 of the Commission's Rules to Modify or Eliminate Outdated Rules Affecting Cellular Radio Telephone Service And Other Commercial Mobile Radio Services, WT Docket No 01-108 "

65    In its March 29, 2002 *Ex Parte* submission, OnStar explicitly recognized that a shift to a digital network infrastructure (to the exclusion of analog network capability), as was being contemplated at the time, would adversely affect OnStar customers    In this regard, OnStar submitted to the FCC that

> If the Commission uses this proceeding to establish or propose a phase out AMPS, OnStar urges the Commission to *take into account the consequences for the initial owners as well as the second and subsequent owners of the fleet of vehicles with installed analog systems.*  By the end of model Year 2006, Onstar estimates the industry installed analog base is likely to be six to seven million vehicles    *Onstar believes any Commission action establishing a phase out for the analog compatibility requirement should permit these consumers the maximum opportunity to secure the safety, security and other benefits from their investment before implementing regulatory changes that could potentially strand that investment*   Existing embedded analog systems are not susceptible to being easily replaced with digital technology and compatible antennas

10

> *With the ownership of a new vehicle averaging three to four years for lessees, and six to seven years for purchasers, the five-year time frame proposed by some commentators in this proceeding is insufficient to allow even the first owners of 2005 or 2006 model year vehicles with analog systems any substantial benefit from the safety and security features provided by their embedded telematics systems* (emphasis added)

66    Following that *Ex Parte* submission, representatives from OnStar met with representatives from the FCC to discuss the adverse impact that would be borne by owners and lessees of vehicles equipped with analog OnStar equipment if a complete switch to an exclusively digital network infrastructure were to happen    As a follow-up to one of these meetings, OnStar submitted a letter to the FCC, memorializing the discussions between OnStar and FCC personnel    In that May 21, 2002 letter, OnStar again reiterated that

> In addition, OnStar expressed the belief that any change to the analog compatibility standard should also take into account the investment of the owners of the current fleet of vehicles with analog systems    OnStar reiterated its recommendation that the Commission should not take action that would potentially strand that consumer investment before the owners have an opportunity to benefit from the investment for a reasonable period of time considering the average ownership and lease periods of vehicles over their product life

67    Further, OnStar's comments to the FCC acknowledged that the average car had a lifespan of 8-9 years, and that almost 40 percent of vehicles on the road were over 10 years old    OnStar also acknowledged that the "life saving benefits of OnStar are intended not only for initial vehicle purchasers but for subsequent owners over the life of the vehicle "    OnStar stated that its analog equipment would not work without an analog wireless phone network

68    On July 30, 2002 the President of GM North America, Gary Cowger, wrote to the FCC to say that GM and OnStar were moving to digital equipment, but that the transition would take at least three years

69   Mr Cowger then addressed the "difficult issue of a legacy fleet" and advised that, due to the cost and practicability, retrofitting future and current vehicles "appears impractical"

70   While GM, through OnStar, told these important facts to the FCC, GM elected not to tell its customers  GM never told its customers that their equipment was analog-only and would not operate over digital only cellular networks  Instead, GM continued to sell its vehicles with analog telematic equipment and with the promise that its OnStar product would continue to provide "emergency services"

71   Furthermore, on July 31, 2002, a News Release from GM touted the benefits of a new version of OnStar by stating that "the next-generation GM automatic crash notification system linked with OnStar will assist even more customers by taking this potentially life-saving service beyond air bag deployments"  GM's news release did not mention the fact that its new system was still analog and would not operate after 2007  That critical fact was not revealed to GM's customers

### Volkswagen and Honda Statements to FCC:

72   Volkswagen/Audi and Honda also filed comments and objections in attempt to persuade the FCC to abandon its proposed May 17, 2001 Rule Change

73   On May 2, 2002, Audi filed comments with the FCC asserting that "Audi believes initial and subsequent owners of these vehicles should have a reasonable opportunity to benefit from their investment in the safety and security features of these vehicles before the Commission takes any action that could have the potential effect of stranding their investment" *Ex Parte Submission, In the Matter of the Year 2000 Biennial Regulatory Review – Amendment of Part 22 of the Commission's Rules to Modify or Eliminate Outdated Rules Affecting Cellular Radio Telephone Service and Other Commercial Mobile Radio Services*, WT Docket No 01-108

12

74   Thus, Audi argued that if the FCC adopted the May 17, 2001 Rule Change, its customers who purchased the analog-based OnStar equipment would not be receiving the benefits of the equipment that they bargained for, as the Rule Change would have the "effect of stranding their investment "

75   Likewise, on June 24, 2002, Honda filed comments with the FCC stating that "Honda believes that both the first and subsequent owners of vehicles with embedded telematics systems should have a reasonable opportunity to benefit from the safety and security features in which they have invested, prior to any Commission action." *Ex Parte Submission, In the Matter of the Year 2000 Biennial Regulatory Review – Amendment of Part 22 of the Commission's Rules to Modify or Eliminate Outdated Rules Affecting Cellular Radio Telephone Service and Other Commercial Mobile Radio Services*, WT Docket No 01-108

76   Thus, Honda also acknowledged in June 2002 that its customers with analog-based equipment would not be receiving the full benefits of OnStar

### The FCC Rule Change is Announced

77   On August 24, 2002 the FCC issued a Report and Order announcing that it would modify its rules to eliminate the requirement that wireless carriers provide analog service for mobile phone networks   The FCC provided for a 5 year transition period, which ended on February 18, 2008

78   The FCC Order made it clear that analog service would not be available after February 2008  The FCC stated that the purpose was to switch all cellular service to digital and provided for a 5-year sunset provision to allow sufficient time to accomplish this goal   For example, the FCC stated

> We need not keep in place a twenty year-old technical standard to ensure roaming, as we are confident that demand from consumers for ubiquitous

access generally will provide sufficient incentive to cellular carriers to resolve problems relating to roaming and interoperability

\*\*\*

the elimination of the cellular analog requirement will increase the demand for the development and commercial implementation of multimode/multiband handsets, a process that is already occurring

79    In fact, CTIA (the cellular providers trade association) as well as AT&T and Cingular specifically told the FCC that " due to the growth of the mobile telephony services market and increased competitiveness, the analog standard has served its original purposes and is no longer necessary " They based their position on the fact that the previous rule requiring analog cellular service had significant costs and creates inefficiency

80    No ruling of the FCC or any other agency regulates whether any of the Manufacturer Defendants or OnStar is permitted to sell an analog OnStar system without disclosing that the system may be rendered obsolete or inoperable by Defendants' actions

81    Thus, by August 24, 2002, each Manufacturer Defendant and OnStar knew of the FCC ruling, and thus knew or should have known that its analog OnStar equipment was certain to become useless and would stop working on February 18, 2008, was not fit for its ordinary and intended use, and would not perform in accordance with the advertisements, marketing materials and warranties they disseminated, nor with the reasonable expectations of ordinary consumers

82    However, even though all of the Manufacturer Defendants knew that their equipment would become useless in a relatively short period, they intentionally failed to advise their customers and concealed from them that their OnStar equipment was analog and would not work as of a date certain, or would require a costly upgrade to function and remain operable Defendants continued to equip their vehicles with, and provide customers, analog equipment, all

the while touting OnStar as an important safety feature, and with knowledge that they would not provide or make available compatible equipment, upgrades or repairs

83    On its website OnStar admits that it was aware of the FCC rule change and the pending loss of analog service   In the FAQ (Frequently Asked Questions) section, OnStar lists the question "Why Didn't OnStar Begin to Utilize Digital Technology Sooner"   OnStar's answer is not that it did not realize that analog technology would not be available, rather, OnStar's answer is that at the time of the FCC ruling there were competing digital technologies, and that OnStar could not determine which one would prevail

http //www onstar com/us english/jsp/explore/onstar_basics/helpful_info j sp?infoview=tech_equip

### Defendants' Affirmative Representations And Warranties

84    At the time of purchase or lease, Manufacturer Defendants expressly and impliedly represented to Plaintiffs and the Class that their OnStar equipment would provide safety and security and would function and be available for the life of their vehicles

85    OnStar, along with the Manufacturer Defendants, designed and prepared "OnStar Owner's Guides" for each Manufacturer Defendants' dealers to distribute with OnStar equipped vehicles at the time of purchase

86    In the OnStar Owner's Guide, OnStar and the Manufacturer Defendants represented that

(a)    OnStar is a safety device that "uses sophisticated    technology to provide the communications link and seamless integration into their vehicle" so that OnStar "Advisors" can provide plaintiffs with "a range of helpful services to protect [Plaintiffs] and [their] vehicle",

15

(b)      OnStar will put "Safety, Security and Convenience at [plaintiff's] Fingertips",

(c)      "The ease of the hands-free communications service allows [plaintiff] to enjoy an even greater level of safety, security and convenience while driving",

(d)      OnStar's service center and Advisors are available "24 hours a day, seven days a week   Even on weekends and holidays, there is always someone ready to help",

(e)      Plaintiffs can renew their Safe & Sound plan "for excellent protection, 24/7, 365 days a year", and

(f)      "If [Plaintiffs] purchased additional years [of service] or upgraded [their] OnStar service, when [Plaintiffs] dispose of the vehicle, [Plaintiffs]   may transfer the remaining service to the new owner "

87   At various times, OnStar also told its customers that OnStar hardware was warranted as part of the manufacturer's new vehicle limited warranty

### GM's Warranties

88   At the time of purchase or lease, GM provided all Plaintiffs and Class members with a "Bumper to Bumper" warranty covering "the complete vehicle" for three years or 36,000 miles, whichever occurs first   These warranties were expressly extended to subsequent owners and lessees

89   In its new vehicle and extended warranties, GM expressly represented and warranted to the purchasers, lessees, and subsequent owners and lessees that during the warranty period GM would provide repairs, upgrades and, if necessary, replacement, to "correct any vehicle defect related to materials or workmanship" at no cost to them

16

90   In December 2006 GM's North American President, Troy Clark, affirmatively stated that GM would not "walk away from" its analog OnStar customers or leave them "in the lurch " These statements expressly extended GM's various warranties for its analog OnStar equipment

### VW's Warranties

91   At the time of sale or lease, VW provided Plaintiffs and all Class members who purchased or leased VW vehicles with a new car warranty  These warranties provided owners and lessees with the following

> The New Vehicle Warranty period is 4 years or 50,000 miles, whichever occurs first

> * * *

> This warranty covers any repair to correct a manufacturer's defect in material or workmanship

> * * *

> Repairs under this warranty are free of charge  Your authorized Volkswagen dealer will repair the defective part or replace it with a new or remanufactured genuine Volkswagen part

92   The New Vehicle Warranty also specifically provided that "OnStar hardware is warranted as part of the New Vehicle Limited Warranty"

93   At the time of purchase or lease, VW expressly and impliedly represented and warranted to Plaintiffs and the Class that the OnStar equipment in their vehicles was free of defects and would be suitable for use in the OnStar system

### Subaru's Warranties

94   At the time of sale or lease, Subaru provided Plaintiffs and all Class members who purchased or leased Subaru vehicles with a new car warranty  These warranties cover any

17

"repairs needed to correct defects in material or workmanship reported during the applicable warranty period and which occurs under normal use" including "Subaru Optional Accessories installed on the car prior to delivery" The "Basic Coverage" is for 3 years or 36,000 miles, whichever comes first

95   In its new vehicle and extended warranties, Subaru expressly represented and warranted to the purchasers, lessees, and subsequent owners and lessees that during the warranty period Subaru would provide repairs, upgrades and if necessary, replacement, to "correct any vehicle defect related to materials or workmanship" at no cost to them

96   At the time of purchase or lease, Subaru expressly and impliedly represented and warranted to Plaintiffs and the Class that the OnStar equipment in their vehicles was free of defects and would be suitable for use in the OnStar system

### Honda's Warranties

97   At the time of sale or lease, Honda provided Plaintiffs and all Class members who purchased or leased Acura vehicles with a new car warranty The Acura warranty stated

**Time and Mileage Period**

This warranty begins on the date the vehicle is put into use

Your vehicle is covered for 4 years or 50,000 miles, whichever comes first

**Warranty Coverage**

Acura will repair or replace any part that is defective in material or workmanship under normal use    All repairs/replacements made under his warranty are free of charge   The replaced or repaired parts are covered only until this New Vehicle Warranty expires

### Accessory Limited Warranty

This warranty applied to any accessory distributed by American Honda and purchased from an Acura automobile dealer in the United States, Puerto Rico, or the U S Virgin Islands

**Time and Mileage Period**

**Accessories Installed Prior to Retail Sale:**

This warranty begins on the same date as the New Vehicle Limited Warranty (see page 11) All accessories are covered for the length of the New Vehicle Limited Warranty 4 years or 50,000 miles, whichever comes first

\* \* \*

**Warranty Coverage**

Acura will repair or replace any Acura accessory that is defective in material or workmanship under normal use Acura will decide if an accessory will be repaired or replaced If the accessory was installed by an Acura dealer, all parts and labor costs are covered If the accessory was installed by someone else, the cost of all parts to repair or replace it are covered by Acura, but you must pay the labor cost

98   At the time of purchase or lease, each Manufacturer Defendant expressly and impliedly represented and warranted to Plaintiffs and the Class that the OnStar equipment in their vehicles was free of defects and would be suitable for use in the OnStar system

99   Each Manufacturer Defendant's implied warranties included its custom and practice of providing repair parts and service for defective safety components for the reasonable life of a vehicle This custom and practice was part of Plaintiffs' bargain to purchase their vehicles

100  Thus, the OnStar equipment in Plaintiffs' vehicles and the vehicles of all Class members was covered by their new vehicle warranties and various implied warranties

### Unreasonableness And Unconscionability Of
### Durational Limitations On Manufacturers' Warranties

101  The Manufacturer Defendants' limitations on their express and implied warranties were unreasonable and unconscionable in that

(a)   OnStar is a safety device

    (b)    The Manufacturer Defendants knew at the time of sale that analog-only OnStar equipment would cease functioning at the latest, February 18, 2008

    (c)    The Manufacturer Defendants knew at the time of sale that analog/digital dual mode equipment would cease functioning at the latest, February 18, 2008

    (d)    Plaintiffs reasonably anticipated that safety features provided by the equipment would last the life of the vehicle

    (e)    Plaintiffs reasonably believed that the safety features provided by the equipment could be repaired and/or upgraded and that Defendants would make replacement parts and service available at least for the anticipated reasonable life of the vehicle, which was typically 8-10 years

    (f)    The Manufacturer Defendants knew of Plaintiffs' reasonable expectations

    (g)    The Manufacturer Defendants intentionally and knowingly concealed from Plaintiffs at the time of sale that analog-only OnStar devices would fail and could not be repaired

    (h)    The Manufacturer Defendants knew at the time of sale that the failure of analog-only OnStar equipment would remove a safety function of the vehicle and increase the risk of personal injury and property damage to Plaintiffs

    (i)    The Manufacturer Defendants knew at the time of sale that OnStar analog devices were not merchantable and not fit for their intended purpose

    (j)    The Manufacturer Defendants and OnStar refused to make after-market parts and upgrades available to convert the equipment from analog to digital

(k)    It was unconscionable for the Manufacturer Defendants to conceal this material information about a safety feature and at the same time limit the duration of their warranties

(l)    The durational limitations were imposed on a take-it-or-leave-it basis and were not the product of negotiation

(m)    Plaintiffs and the class are less sophisticated in business and telematics technology than Defendants

(n)    There was great economic disparity between the parties    Plaintiffs had weak bargaining power vis-à-vis Defendants and did not have access to relevant facts which were concealed from them

(o)    Plaintiffs could not obtain repairs or upgrades from analog to digital equipment from any other source   The Manufacturer Defendants were the sole source of repairs and/or upgrades to digital, but refused to make them available to Plaintiffs

(p)    The durational limitations were substantively unfair and one sided   They were imposed by the Manufacturer Defendants based on undisclosed material information known to defendants but concealed from Plaintiffs

(q)    The durational limitations unreasonably favored the Manufacturer Defendants

(r)    The durational limitations constitute overreaching

### Defendants' Refusal to Honor their Warranties

102   Plaintiffs and all Class members purchased and leased their vehicles and purchased OnStar service for personal, family and household use

103  Plaintiffs and the Class have performed all of their obligations with respect to their OnStar accounts

104  Plaintiffs and all Class members purchased the same or similar defective and unsuitable analog OnStar equipment, received the same representations, have the same express and implied agreements for OnStar equipment and warranties, received the same notices of termination, and have or will sustain the same or similar damages

105  The analog OnStar equipment in Plaintiffs' vehicles and all Class members' vehicles was manufactured with poor workmanship, and at the time of purchase and/or lease was faulty, defective and dysfunctional    These defects and poor workmanship occurred and manifested themselves during the relevant warranty period and were made known to Manufacturer Defendants' during the relevant warranty period

106  The analog OnStar equipment in Plaintiffs' vehicles and all Class members' vehicles is not suited for its intended purpose and is unmerchantable

107  Defendants have refused to provide Plaintiffs and all Class members with OnStar safety and security products as promised, and have failed and refused to provide necessary repairs

108  Contrary to the Manufacturer Defendants written warranties, the Manufacturer Defendants and OnStar have stated on the OnStar website that they do not believe the imminent failure of the analog OnStar equipment is covered under any applicable warranty

### Defendants Required Plaintiffs and the Class to Pay for the Fix

109  Beginning in about January 2007, OnStar and the Manufacturer Defendants began notifying Plaintiffs and the Class that their vehicles had analog equipment and that unless their

vehicles were upgraded, their equipment would cease to function and OnStar service would terminate after December 31, 2007

110  All Manufacturer Defendants and OnStar continued to mislead customers by claiming that certain vehicles, with analog-only equipment, could not be upgraded to digital telematics when, in fact, they knew such vehicles could be upgraded, but chose not to incur the costs associated with an upgrade

111  OnStar's internet website advised owners, lessees and subscribers with analog-only equipment that their systems would not function because "a decision was made [by General Motors] to support a different network in the cellular industry "

112  When the Defendants belatedly began to inform Plaintiffs and the Class of the imminent failure of their OnStar equipment, those vehicle owners and lessees with analog/digital-ready equipment were advised that they could continue to receive OnStar service by upgrading to analog/digital dual mode equipment for a fee of $15 and entering into a service agreement for additional years

113  Even though analog cellular service would be available throughout the country for a period after January 1, 2008, Defendants unilaterally decided to terminate OnStar service and effectively disable the OnStar equipment in plaintiffs' vehicles and the vehicles of all Class members as of January 1, 2008

114  All class members are either original purchasers or lessees, or are successors and assignees of the original purchasers and lessees with respect to the rights and claims asserted herein

115  Plaintiffs believe that Defendants have acted in the same or similar manner with respect to all Class members

116  Solely as a result of Defendants' conduct, Plaintiffs and all Class members were damaged including, *inter alia*, costs and expenses to replace and/or repair the analog OnStar equipment in their vehicles to function with digital cellular service

### Facts With Respect to Lost Prepaid Minutes

117  Many OnStar subscribers exercised the option offered by OnStar to prepay for a set amount of cellular phone service, or minutes, on their OnStar equipment  Class members with analog-only or analog/digital-ready equipment who had prepaid minutes as of December 31, 2007, when analog service was cut off, lost the value of those minutes  OnStar has refused to credit Class members who lost prepaid minutes due to the cessation of analog service

118  In 2007 and for many years prior, OnStar offered subscribers the option to prepay for a set number of cellular telephone minutes ("Prepaid Minutes") for use on their OnStar equipment

119  Subscribers paid for Prepaid Minutes by authorizing OnStar to charge their credit cards for the purchase

(a)    The transaction would appear on the subscriber's credit card statement OnStar did not provide the subscriber with a paper receipt or record of the transaction, nor any statement showing the status of the account

(b)    After a subscriber purchased Prepaid Minutes, OnStar assigned the minutes to the subscriber's account and tracked the usage

(c)    When the subscriber's Prepaid Minutes were nearly exhausted, OnStar sent an electronic message to the subscriber's OnStar equipment information screen that their Prepaid Minutes were low and that the subscriber could purchase additional Prepaid Minutes, in various amounts, and at various prices

24

(d)    When analog service was available, subscribers could determine the status of their account by calling OnStar or by pressing a button on the OnStar device in their motor vehicle  Subscribers with analog-only or analog/digital-ready equipment no longer have access to their OnStar account information  They presently have no means of obtaining information about the status of their account and the number of or dollar amount of unused minutes  This information is in OnStar's exclusive possession and control

120  Many OnStar subscribers exercised the option to purchase Prepaid Minutes

121  Many thousands of class members with analog-only and analog/digital-ready equipment lost the value of unused Prepaid Minutes in their accounts when OnStar terminated analog service as of January 1, 2008

122  OnStar gave subscribers no prior notice that if they did not use their Prepaid Minutes before termination of analog service, their Prepaid Minutes would be lost

123.  OnStar failed to disclose to its analog-only or analog/digital-ready subscribers that unused minutes would be lost and that they would not be entitled to refunds when OnStar analog service was no longer available

124. In the event that OnStar gave subscribers such disclosures, they were so inconspicuous, confusing and/or misleading that Plaintiffs could not reasonably understand the disclosures' purpose or meaning  Such disclosures, if any, were substantively and procedurally unconscionable and invalid

125  OnStar has refused to refund class members with analog-only or analog/digital-ready equipment who lost Prepaid Minutes due to the cessation of analog service

### Facts As To Representative Plaintiff Johnson

126  In March 2005, Plaintiff Bruce Johnson Purchased a Buick Park Avenue sedan with manufacturer-installed OnStar telematic equipment from Liberty Buick, an authorized GM dealer in Peoria, Arizona  At the time of purchase, Plaintiff Johnson was not told 1) the type of telematics equipment in his vehicle, 2) that the equipment would fail after December 31, 2007, 3) that the Manufacturer would not fix, repair or upgrade analog-only devices, and 4) that he would have to pay to upgrade analog/digital-ready equipment  Mr Johnson also purchased an extended GM warranty for the vehicle  His extended warranty was expressly extended to subsequent owners and lessees  He has continuously subscribed to the OnStar service since acquiring this vehicle

127  By form letter dated February 12, 2007, GM, through its OnStar subsidiary, advised Mr Johnson that his OnStar equipment was "analog-only," meaning that it was not capable of receiving or transmitting digital signals, that it would not function and  would be completely inoperable after December 31, 2007  GM further advised that it would not repair, modify or replace his OnStar equipment

128  On February 12, 2007 Mr Johnson's Buick had less than 36,000 miles and was less than three years old

### Facts as to Representative Plaintiff Jacovelli

129  Plaintiff Jack Jacovelli purchased two GM vehicles, both through DeSimone Cadillac in Marlton, NJ, an authorized GM dealer  He purchased a 2002 Cadillac DTS on or about September 2003 and a 2005 Cadillac STS on or about June 2006  At the time of purchase, Plaintiff Jacovelli was not told 1) the type of telematics equipment in his vehicles, 2) that the equipment would fail after December 31, 2007, 3) that the Manufacturer would not fix, repair or

upgrade analog-only devices, and 4) that he would have to pay to upgrade analog/digital-ready

equipment  He has continuously subscribed to the OnStar service since acquiring these vehicles

130  In 2007, by form letters, GM, through its OnStar subsidiary, advised Mr Jacovelli

that with respect to his 2002 Cadillac DTS, his hardware was analog-only, would not function

after December 31, 2007, and that his OnStar service was terminated as of January 1, 2008  He

was further advised that GM would not repair, replace or upgrade his OnStar equipment in this

vehicle  With respect to his 2005 Cadillac STS, GM advised Mr Jacovelli that his hardware was

analog but could be upgraded to digital for an additional cost of $15 and an additional

subscription fee, and that without the upgrade and additional payment, Mr Jacovelli's OnStar

equipment would not work after December 31, 2007  He was further advised that GM would not

repair, replace or upgrade his OnStar equipment without charge  At the time, Plaintiff was a

subscriber to the OnStar service

### Facts As To Representative Plaintiff Rochow

131  On or about August 19, 2003, Mr Rochow purchased a 2004 Buick Park Avenue

with manufacturer-installed OnStar telematic equipment from a GM dealer in Connecticut  At

the time of purchase, Plaintiff Rochow was not told 1) the type of telematics equipment in his

vehicle, 2) that the equipment would fail after December 31, 2007, 3) that the Manufacturer

would not fix, repair or upgrade analog-only devices, and 4) that he would have to pay to

upgrade analog/digital-ready equipment  He has continuously subscribed to the OnStar service

since acquiring this vehicle

132    By form letter dated March 20, 2007, OnStar advised Mr Rochow that his OnStar equipment was analog only, would not function after December 31, 2007 and that his service would be terminated as of that date    He was further advised that GM would not repair, replace or upgrade his OnStar equipment

### Facts As To Representative Plaintiff Nary

133    On or about October 28, 2003, Ms Nary purchased a 2003 Buick Park Avenue with manufacturer-installed OnStar telematic equipment from Spitzer Buick-Cadillac in Parma, Ohio At the time of purchase, Plaintiff Nary was not told 1) the type of telematics equipment in her vehicle, 2) that the equipment would fail after December 31, 2007, 3) that the Manufacturer would not fix, repair or upgrade analog-only devices, and 4) that she would have to pay to upgrade analog/digital-ready equipment    She has continuously subscribed to the OnStar service since acquiring this vehicle

134    By form letter dated February 12, 2007, OnStar advised Ms Nary that her OnStar equipment was analog-only, would not function after December 31, 2007 and that her OnStar service was terminated as of January 1, 2008    She was further advised that GM would not repair, replace or upgrade her OnStar equipment

### Facts As To Representative Plaintiffs Nelson

135    In July 2004, Plaintiffs Susan and Norman Nelson purchased a new 2004 Cadillac Escalade with manufacturer-installed OnStar telematic equipment from Rydell GM Auto Center in Grand Forks, North Dakota    They also purchased an extended warranty on the vehicle at that time which is still in effect    At the time of purchase, Plaintiffs Nelson were not told 1) the type of telematics equipment in their vehicle, 2) that the equipment would fail after December 31, 2007, 3) that the Manufacturer would not fix, repair or upgrade analog-only devices, and 4) that

they would have to pay to upgrade analog/digital-ready equipment  They have continuously subscribed to the OnStar service since acquiring this vehicle

136  By form letter dated April 24, 2007, addressed to Plaintiff Susan Nelson, GM, through its OnStar subsidiary, advised these Plaintiffs that the hardware on their 2004 Escalade was analog and will not operate on a digital network unless it is upgraded for an additional cost of $15 00, plus a new subscription fee of $199  Without the upgrade and additional payment, the letter stated that the OnStar equipment would cease to operate after December 31, 2007

### Facts as to Representative Plaintiff Busch

137  On March 9, 2004, Mr Busch purchased a new 2004 Volkswagen Passat from Heart Chevrolet in Kingston, New York, an authorized Volkswagen dealer  The car had OnStar telematic equipment as a manufacturer installed option, with a manufacturer sticker price of $699  At the time of purchase, Plaintiff Busch was not told  1) the type of telematics equipment in his vehicle, 2) that the equipment would fail after December 31, 2007, 3) that the Manufacturer would not fix, repair or upgrade analog-only devices, and 4) that he would have to pay to upgrade analog/digital-ready equipment

138  In 2007, by form letter, OnStar advised Mr Busch that his OnStar equipment was analog-only, would not function after December 31, 2007, and that his OnStar service was terminated as of January 1, 2008  He was further advised that Volkswagen would not repair, replace or upgrade his OnStar equipment  At the time, Plaintiff was a subscriber to the OnStar service

### Facts As To Representative Plaintiffs Gill

139  On February 6, 2003, Mr and Mrs Gill leased a new 2003 Acura 3 5 RL with manufacturer installed OnStar telematic equipment from Acura of Serramonte, located in Colma,

California   At the time of purchase, Plaintiffs Gill were not told  1) the type of telematics equipment in their vehicle, 2) that the equipment would fail after December 31, 2007, 3) that the Manufacturer would not fix, repair or upgrade analog-only devices, and 4) that they would have to pay to upgrade analog/digital-ready equipment

140  In 2007, by form letter, OnStar advised Mr and Mrs  Gill that their OnStar equipment was analog-only, would not function after December 31, 2007, and that their OnStar service was terminated as of January 1, 2008   They were further advised that Acura would not repair, replace or upgrade their OnStar equipment   At the time, Plaintiffs were subscribers to the OnStar service

### Facts As To Representative Plaintiff Irvine

141  On September 11, 2002, Mr Irvine purchased a new 2002 Cadillac Seville with manufacturer installed OnStar telematic equipment from Wayne Stead Cadillac, located in Walnut Creek, California   At the time of purchase, Plaintiff Irvine was not told  1) the type of telematics equipment in his vehicle, 2) that the equipment would fail after December 31, 2007, 3) that the Manufacturer would not fix, repair or upgrade analog-only devices, and 4) that he would have to pay to upgrade analog/digital-ready equipment

142  In 2007, by form letter, OnStar advised Mr  Irvine that his hardware was analog but could be upgraded to digital for an additional cost of $15 and an additional subscription fee, and that without the upgrade and additional payment, Mr  Irvine's OnStar equipment would not work after December 31, 2007 and that his OnStar service was terminated as of January 1, 2008   He was further advised that GM would not repair, replace or upgrade his OnStar equipment without charge   At the time, Plaintiff was a subscriber to the OnStar service

### Facts As To Representative Plaintiff Williams

143  On October 20, 2002, Ms Williams purchased a new 2003 GMC Envoy with manufacturer installed OnStar telematic equipment from Marina Pontiac & GMC, located in San Leandro, California   At the time of purchase, Plaintiff Williams was not told  1) the type of telematics equipment in her vehicle, 2) that the equipment would fail after December 31, 2007, 3) that the Manufacturer would not fix, repair or upgrade analog-only devices, and 4) that she would have to pay to upgrade analog/digital-ready equipment

144  In 2007, by form letter, OnStar advised Ms  Williams that her hardware was analog but could be upgraded to digital for an additional cost of $15 and an additional subscription fee, and that without the upgrade and additional payment, Ms  William's OnStar equipment would not work after December 31, 2007 and that her OnStar service was terminated as of January 1, 2008   She was further advised that GM would not repair, replace or upgrade her OnStar equipment  At the time, Plaintiff was a subscriber to the OnStar service

### Facts As To Representative Plaintiff Stein

145  In September 2004, Ms  Stein leased a new 2004 Cadillac CTS with manufacturer installed OnStar telematic equipment from Weil Cadillac, located in Libertyville, Illinois   At the time of purchase, Plaintiff Stein was not told  1) the type of telematics equipment in her vehicle, 2) that the equipment would fail after December 31, 2007, 3) that the Manufacturer would not fix, repair or upgrade analog-only devices, and 4) that she would have to pay to upgrade analog/digital-ready equipment

146  In 2007, by form letter, OnStar advised Ms  Stein that her OnStar equipment was analog-only, would not function after December 31, 2007, and that her OnStar service was

terminated as of January 1, 2008   She was further advised that GM would not repair, replace or

upgrade her OnStar equipment   At the time, Plaintiff was a subscriber to the OnStar service

## Facts As To Representative Plaintiff Hoover

147   On November 9, 2002, Ms  Hoover purchased a new 2002 Oldsmobile Intrigue

GLS with manufacturer installed OnStar telematic equipment from Martino Motor Sales, located

in Lansing, Illinois   At the time of purchase, Plaintiff Hoover was not told  1) the type of

telematics equipment in her vehicle, 2) that the equipment would fail after December 31, 2007,

3) that the Manufacturer would not fix, repair or upgrade analog-only devices, and 4) that she

would have to pay to upgrade analog/digital-ready equipment

148   In 2007, by form letter, OnStar advised Ms  Hoover that her OnStar equipment was

analog-only, would not function after December 31, 2007, and that her OnStar service was

terminated as of January 1, 2008   She was further advised that GM would not repair, replace or

upgrade her OnStar equipment   At the time, Plaintiff was a subscriber to the OnStar service

## Facts As To Representative Plaintiff Nicholas

149   On October 22, 2002, Ms  Nicholas purchased a new 2003 Chevrolet Trailblazer

with manufacturer installed OnStar telematic equipment from Graves Chevrolet, Baker,

Louisiana   At the time of purchase, Plaintiff Nicholas was not told  1) the type of telematics

equipment in her vehicle, 2) that the equipment would fail after December 31, 2007, 3) that the

Manufacturer would not fix, repair or upgrade analog-only devices, and 4) that she would have

to pay to upgrade analog/digital-ready equipment

150   In 2007, by form letter, OnStar advised Ms  Nicholas that her OnStar equipment

was analog-only, would not function after December 31, 2007, and that her OnStar service was

terminated as of January 1, 2008  She was further advised that GM would not repair, replace or upgrade her OnStar equipment  At the time, Plaintiff was a subscriber to the OnStar service

### Facts As To Representative Plaintiff Schueter

151  On November 28, 2002, Ms  Schueter purchased a new 2002 GMC Yukon XLT with manufacturer installed OnStar telematic equipment from Frank Bommarito Olds, located in Ellisville, Missouri  At the time of purchase, Plaintiff Schueter was not told  1) the type of telematics equipment in her vehicle, 2) that the equipment would fail after December 31, 2007, 3) that the Manufacturer would not fix, repair or upgrade analog-only devices, and 4) that she would have to pay to upgrade analog/digital-ready equipment

152  In 2007, by form letter, OnStar advised Ms  Schueter that her OnStar equipment was analog-only, would not function after December 31, 2007, and that her OnStar service was terminated as of January 1, 2008  She was further advised that GM would not repair, replace or upgrade her OnStar equipment  At the time, Plaintiff was a subscriber to the OnStar service

### Facts As To Representative Plaintiffs Tchoukaleff

153  On November 15, 2003, Mr  and Mrs  Tchoukaleff purchased a new 2004 Cadillac Escalade with manufacturer installed OnStar telematic equipment from Jim Lynch Cadillac in Hazelwood, Missouri

154  At the time of purchase, Plaintiffs Tchoukaleff were not told  1) the type of telematics equipment in their vehicle, 2) that the equipment would fail after December 31, 2007, 3) that the Manufacturer would not fix, repair or upgrade analog-only devices, and 4) that they would have to pay to upgrade analog/digital-ready equipment  By form letter, OnStar advised Mr  and Mrs  Tchoukaleff that, with respect to their 2004 Cadillac Escalade, their hardware was analog but could be upgraded to digital for an additional cost of $15 and an additional

subscription fee, and that without the upgrade and additional payment, their OnStar equipment would not work after December 31, 2007   At the time, Plaintiffs were subscribers to the OnStar service

### Facts As To Representative Plaintiff Reich

155  In 2003, Mr Reich purchased a new 2003 Saab 9-3 with manufacturer installed OnStar telematic equipment from Mike Shaw Buick/Saab in Denver, Colorado   At the time of purchase, Plaintiff Reich was not told  1) the type of telematics equipment in his vehicle, 2) that the equipment would fail after December 31, 2007, 3) that the Manufacturer would not fix, repair or upgrade analog-only devices, and 4) that he would have to pay to upgrade analog/digital-ready equipment

156  In 2007, by form letter, OnStar advised Mr Reich that his OnStar equipment was analog-only, would not function after December 31, 2007, and that his OnStar service was terminated as of January 1, 2008   He was further advised that Saab would not repair, replace or upgrade his OnStar equipment   At the time, Plaintiff was a subscriber to the OnStar service

### Facts As To Representative Plaintiff Imbierowicz

157  In 2003, Ms Imbierowicz purchased a new 2003 Saab 9-3 from an authorized Saab dealer with manufacturer installed OnStar telematic equipment   At the time of purchase, Plaintiff Imbierowicz was not told  1) the type of telematics equipment in her vehicle, 2) that the equipment would fail after December 31, 2007, 3) that the Manufacturer would not fix, repair or upgrade analog-only devices, and 4) that she would have to pay to upgrade analog/digital-ready equipment

158  In 2007, by form letter, OnStar advised Ms Imbierowicz that her OnStar equipment was analog-only, would not function after December 31, 2007, and that her OnStar service was

terminated as of January 1, 2008  She was further advised that Saab would not repair, replace or upgrade her OnStar equipment  At the time, Plaintiff was a subscriber to the OnStar service

### Facts As To Representative Plaintiff Kuller

159  On October 16, 2003, Mr Kuller purchased a new 2004 Acura RL with manufacturer installed OnStar telematic equipment from Hinshaw's Acura, located in Fife, Washington  At the time of purchase, Plaintiff Kuller was not told 1) the type of telematics equipment in his vehicle, 2) that the equipment would fail after December 31, 2007, 3) that the Manufacturer would not fix, repair or upgrade analog-only devices, and 4) that he would have to pay to upgrade analog/digital-ready equipment

160  In 2007, by form letter, OnStar advised Mr Kuller that his OnStar equipment was analog-only, would not function after December 31, 2007, and that his OnStar service was terminated as of January 1, 2008  He was further advised that Acura would not repair, replace or upgrade his OnStar equipment  At the time, Plaintiff was a subscriber to the OnStar service

### Facts As To Representative Plaintiff Allenson

161  In August 2003, Mr Allenson purchased a new 2003 Acura TL with manufacturer installed OnStar telematic equipment from Acura of Westchester, located in Larchmont, New York  At the time of purchase, Plaintiff Allenson was not told 1) the type of telematics equipment in his vehicle, 2) that the equipment would fail after December 31, 2007, 3) that the Manufacturer would not fix, repair or upgrade analog-only devices, and 4) that he would have to pay to upgrade analog/digital-ready equipment

162  In 2007, by form letter, OnStar advised Mr Allenson that his OnStar equipment was analog-only, would not function after December 31, 2007, and that his OnStar service was

terminated as of January 1, 2008  He was further advised that Acura would not repair, replace or upgrade his OnStar equipment  At the time, Plaintiff was a subscriber to the OnStar service

### Facts As To Representative Plaintiff Golish

163  On May 15, 2005, Mr Golish purchased a new 2005 Volkswagen Phaeton with manufacturer installed OnStar telematic equipment from Commonwealth VW in Costa Mesa, California  At the time of purchase, Plaintiff Golish was not told  1) the type of telematics equipment in his vehicle, 2) that the equipment would fail after December 31, 2007, 3) that the Manufacturer would not fix, repair or upgrade analog-only devices, and 4) that he would have to pay to upgrade analog/digital-ready equipment

164  In 2007, by form letter, OnStar advised Mr Golish that his OnStar equipment was analog-only, would not function after December 31, 2007, and that his OnStar service was terminated as of January 1, 2008  He was further advised that Volkswagen would not repair, replace or upgrade his OnStar equipment  At the time, Plaintiff was a subscriber to the OnStar service

### DELETED SECTION

165  DELETED

166. DELETED

### Facts As To Representative Plaintiff Vamos

167. On February 28, 2004, Mr Vamos purchased a new 2004 Volkswagen Passat Wagon with manufacturer installed OnStar telematic equipment from VW of Onenta, located in Oneonta, New York  At the time of purchase, Plaintiff Vamos was not told  1) the type of telematics equipment in his vehicle, 2) that the equipment would fail after December 31, 2007,

3) that the Manufacturer would not fix, repair or upgrade analog-only devices, and 4) that he would have to pay to upgrade analog/digital-ready equipment

168  In 2007, by form letter, OnStar advised Mr Vamos that his OnStar equipment was analog-only, would not function after December 31, 2007, and that his OnStar service was terminated as of January 1, 2008  He was further advised that Volkswagen would not repair, replace or upgrade his OnStar equipment  At the time, Plaintiff was a subscriber to the OnStar service

### Facts As To Representative Robert Schatz

169  On September 30, 2003, Mr Schatz purchased a new 2004 Audi A4 from McDonald Automotive, located in Littleton, Colorado  The Audi had OnStar telematic equipment as a manufacturer installed option, with a manufacturer sticker price of $750  At the time of purchase, Plaintiff Schatz was not told  1) the type of telematics equipment in his vehicle, 2) that the equipment would fail after December 31, 2007, 3) that the Manufacturer would not fix, repair or upgrade analog-only devices, and 4) that he would have to pay to upgrade analog/digital-ready equipment

170  In 2007, by form letter, OnStar advised Mr Schatz that his OnStar equipment was analog-only, would not function after December 31, 2007, and that his OnStar service was terminated as of January 1, 2008  He was further advised that Audi would not repair, replace or upgrade his OnStar equipment  At the time, Plaintiff was a subscriber to the OnStar service

### Facts As To Representative Plaintiff Borum

171  In January 2004, Mr. Borum purchased a new 2004 Subaru Outback with manufacturer installed OnStar telematic equipment from RK Chevrolet & Subaru, located in Virginia Beach, Virginia  At the time of purchase, Plaintiff Borum was not told  1) the type of

telematics equipment in his vehicle, 2) that the equipment would fail after December 31, 2007,
3) that the Manufacturer would not fix, repair or upgrade analog-only devices, and 4) that he
would have to pay to upgrade analog/digital-ready equipment

172  In 2007, by form letter, OnStar advised Mr Borum that his OnStar equipment was
analog-only, would not function after December 31, 2007, and that his OnStar service was
terminated as of January 1, 2008  He was further advised that Subaru would not repair, replace
or upgrade his OnStar equipment  At the time, Plaintiff was a subscriber to the OnStar service

### Facts As To Representative Plaintiffs Erdenberger

173  On September 2, 2003, Mr and Mrs Erdenberger purchased a new 2003 Subaru
Legacy with manufacturer installed OnStar telematic equipment from Glanzmann Subaru,
located in Jenkintown, Pennsylvania  At the time of purchase, Plaintiffs Erdenberger were not
told 1) the type of telematics equipment in their vehicle, 2) that the equipment would fail after
December 31, 2007, and, 3) that the Manufacturer would not fix, repair or upgrade analog-only
devices

174  In 2007, by form letter, OnStar advised Mr and Mrs Erdenberger that their OnStar
equipment was analog-only, would not function after December 31, 2007, and that their OnStar
service was terminated as of January 1, 2008  They were further advised that Subaru would not
repair, replace or upgrade their OnStar equipment  At the time, Plaintiffs were subscribers to the
OnStar service

### Facts As To Representative Plaintiff Kemp

175  On February 13, 2004, Mr Kemp purchased a new 2004 Subaru Outback with
manufacturer installed OnStar telematic equipment from Kendall Subaru, located in Eugene,
Oregon  At the time of purchase, Plaintiff Kemp was not told 1) the type of telematics

equipment in his vehicle, 2) that the equipment would fail after December 31, 2007, 3) that the Manufacturer would not fix, repair or upgrade analog-only devices, and 4) that he would have to pay to upgrade analog/digital-ready equipment

176  In 2007, by form letter, OnStar advised Mr Kemp that his OnStar equipment was analog-only, would not function after December 31, 2007, and that his OnStar service was terminated as of January 1, 2008  He was further advised that Subaru would not repair, replace or upgrade his OnStar equipment  At the time, Plaintiff was a subscriber to the OnStar service

### Facts As To Representative Plaintiff Reishman

177  In May 2004, Mr Reishman purchased a new 2004 Audi A8 with manufacturer installed OnStar telematic equipment from Bert Wolfe Audi, located in Charlestown, West Virginia  At the time of purchase, Plaintiff Reishman was not told  1) the type of telematics equipment in his vehicle, 2) that the equipment would fail after December 31, 2007, 3) that the Manufacturer would not fix, repair or upgrade analog-only devices, and 4) that he would have to pay to upgrade analog/digital-ready equipment

178  In 2007, by form letter, OnStar advised Mr Reishman that his OnStar equipment was analog-only, would not function after December 31, 2007, and that his OnStar service was terminated as of January 1, 2008  He was further advised that Audi would not repair, replace or upgrade his OnStar equipment  At the time, Plaintiff was a subscriber to the OnStar service

### Facts As To Representative Plaintiff Rhodes

179  On March 29, 2004, plaintiff Janice Rhodes lease-purchased a new Chevrolet Avalanche with manufacturer installed OnStar telematic equipment from Kool Chevrolet, an authorized GM dealer in Grand Rapids, Michigan. The purchase was completed on December 8, 2006  At the time, Plaintiff Rhodes was not told  1) the type of telematics equipment in her

vehicle, 2) that the equipment would fail after December 31, 2007, and 3) that the Manufacturer would not fix, repair, or upgrade analog-only devices

180    In 2007, OnStar advised Ms Rhodes by form letter that her OnStar equipment was analog-only, would not function after December 31, 2007, and that her service would terminate as of January 1, 2008  She was further advised that GM would not repair, replace or upgrade her OnStar equipment  At the time, Ms Rhodes was a subscriber to the OnStar service

### Facts As to Representative Plaintiffs Rubertt

181    On March 21, 2004, the Rubertts purchased a new 2004 Subaru Outback from Appleway Automotive Group in Spokane Washington  Their vehicle came equipped with OnStar telematic equipment  At the time, the Rubertts were not told  1) the type of telematics equipment in their vehicle, 2) that the equipment would fail after December 31, 2007, and 3) that the Manufacturer would not fix, repair, or upgrade analog-only devices

182    In 2007, OnStar advised the Rubertts by form letter that their OnStar equipment was analog-only, would not function after December 31, 2007, and that their service would terminate as of January 1, 2008  They were further advised that GM would not repair, replace or upgrade their OnStar equipment  At the time, the Rubertts were subscribers to the OnStar service

183    From the time of purchase until about December 31, 2007, the Rubertts were OnStar subscribers

184    As OnStar subscribers, the Rubertts would from time to time purchase prepaid minutes from OnStar

185    On December 12, 2007, the Rubertts purchased 30 Prepaid Minutes for the sum of $17 62  OnStar charged the purchase to the Rubertts' credit card

186  On or about January 1, 2008, the Rubertts' OnStar analog service and equipment ceased to function  At the time, the Rubertts had 34 Prepaid Minutes remaining in their account

187  Since January 1, 2008 the Rubertts have been unable to upgrade or repair their analog OnStar equipment

188  At no time prior to January 1, 2008 did OnStar notify the Rubertts that they would lose any Prepaid Minutes that were not used prior to their analog Onstar service and equipment ceasing to function

189  The Rubertts have asked OnStar to reimburse them for the cost of their unused Prepaid Minutes, but OnStar has failed and refused to do so

### Estoppel From Pleading and Tolling of Applicable Statutes of Limitation

190  Any applicable statute of limitations that might otherwise bar Plaintiffs' and Class members' claims should be tolled because notwithstanding the exercise of due diligence, Plaintiffs and the Class could not reasonably have been expected to learn or discover the fact that Defendants had concealed material information concerning the telematic equipment  Therefore, the claims being asserted by Plaintiffs and the Class present the archetypical scenario in which the discovery rule is applicable

191  Defendants are also estopped from relying on any statutes of limitation by virtue of their acts of fraudulent concealment

192  By reason of the FCC's proposed rule making and the Manufacturer Defendants and OnStar's participation in those rule making proceedings, Manufacturer Defendants and OnStar knew or should have known that analog OnStar equipment would not function after February 18, 2008 and that they intended to shut down OnStar service as of December 31, 2007

Notwithstanding this knowledge, Manufacturer Defendants and OnStar concealed from owners and lessees of OnStar equipped vehicles the impending failure of their OnStar equipment

## Class Action Allegations

193  Plaintiffs bring this action individually and on behalf of the following classes

### GM Class

All individuals and entities in the United States who, as of December 31, 2007, either owned or leased a GM vehicle originally sold or leased on or after August 8, 2002 and equipped with analog-only or analog/digital-ready OnStar equipment which had not been upgraded or who paid for an upgrade on or before December 31, 2007

### VW Class

All individuals and entities in the United States who, as of December 31, 2007, either owned or leased a VW vehicle originally sold or leased on or after August 8, 2002 and equipped with analog-only or analog/digital-ready OnStar equipment which had not been upgraded or who paid for an upgrade on or before December 31, 2007

### Honda Class

All individuals and entities in the United States who, as of December 31, 2007, either owned or leased a Honda vehicle originally sold or leased on or after August 8, 2002 and equipped with analog-only or analog/digital-ready OnStar equipment which had not been upgraded or who paid for an upgrade on or before December 31, 2007

### Subaru Class

All individuals and entities in the United States who, as of December 31, 2007, either owned or leased a Subaru vehicle originally sold or leased on or after August 8, 2002 and

equipped with analog-only or analog/digital-ready OnStar equipment which had not been
upgraded or who paid for an upgrade on or before December 31, 2007

### OnStar Class

All individuals and entities in the United States who were OnStar subscribers and, as of
December 31, 2007, owned or leased a vehicle originally sold or leased by GM, VW, Honda or
Subaru on or after August 8, 2002 and equipped with analog-only or analog/digital-ready OnStar
equipment which had not been upgraded or who paid for an upgrade on or before December 31,
2007

### Lost Prepaid Minute Class (Against OnStar Only)

All individuals and entities in the United States who, as of December 31, 2007,   1) were
OnStar subscribers, 2) owned or leased a motor vehicle with analog-only or analog/digital-ready
OnStar equipment, and 3) had unused Prepaid Minutes on account with OnStar

194    Excluded from all Classes are OnStar, GM, VW, Subaru and Honda, and any of
their respective subsidiaries, affiliates, officers and directors, or entities in which any Defendant
has a controlling interest

195    Plaintiffs reserve the right to modify the Class definitions at any time up to and
including trial

196    Numerosity    The Classes are so numerous that joinder of all members is
impracticable

### GM

(a)    GM sold and installed as original factory equipment OnStar equipment to
persons in the United States who purchased or leased Chevrolet, Pontiac, Oldsmobile, Buick,
Cadillac, GMC, Saturn and Saab model vehicles

(b)    There are over 450,000 OnStar subscribers who own or lease GM vehicles equipped with analog-only equipment who have received notice of termination, who will have stranded investments in their motor vehicles, and who may be stranded on the highways and exposed to an increased risk of serious personal injury and harm if GM does not repair and/or replace their analog OnStar equipment or arrange for continued OnStar service

(c)    There are approximately 1,500,000 OnStar subscribers who own or lease GM vehicles with analog equipment who will require costly upgrades for their equipment to function and to receive service after December 31, 2007

## VW

(d)    VW sold and installed as original factory equipment OnStar equipment to persons in the United States who purchased or leased Audi and Volkswagen model vehicles

(e)    Plaintiffs believe that there are thousands of OnStar subscribers who own or lease VW vehicles equipped with analog-only equipment who have received notice of termination, who will have stranded investments in their motor vehicles, and who may be stranded on the highways and exposed to an increased risk of serious personal injury and harm if VW does not repair and/or replace their analog OnStar equipment or arrange for continued OnStar service   Indeed, an Affidavit from David DiMusto, an OnStar OEM Account Manager, states that Audi sold 22,300 vehicle with analog-only OnStar equipment during the relevant time period

(f)    Plaintiffs believe that there are thousands of OnStar subscribers who own or lease VW vehicles with analog equipment who will require costly upgrades for their equipment to function and to receive service after December 31, 2007

44

**Subaru**

(g)    Subaru sold and installed as original factory equipment OnStar equipment to persons in the United States who purchased or leased Subaru motor vehicles

(h)    Plaintiffs believe that there are thousands of OnStar subscribers who own or lease Subarus equipped with analog-only equipment who have received notice of termination, who will have stranded investments in their motor vehicles, and who will be stranded on the highways and exposed to an increased risk of serious personal injury and harm if Subaru does not repair and/or replace their analog OnStar equipment or arrange for continued OnStar service

(i)    Plaintiffs believe that there are thousands of OnStar subscribers who own or lease Subarus with analog equipment who will require costly upgrades for their equipment to function and to receive service after December 31, 2007

**Honda**

(j)    Honda sold and installed as original factory equipment OnStar equipment to persons in the United States who purchased or leased Honda motor vehicles

(k)    Plaintiffs believe that there are thousands of OnStar subscribers who own or lease Hondas equipped with analog-only equipment who have received notice of termination, who will have stranded investments in their motor vehicles, and who will be stranded on the highways and exposed to an increased risk of serious personal injury and harm if Honda does not repair and/or replace their analog OnStar equipment or arrange for continued OnStar service

(l)    Plaintiffs believe that there are thousands of OnStar subscribers who own or lease Hondas with analog equipment who will require costly upgrades for their equipment to function and to receive service after December 31, 2007

**OnStar**

(m)    Plaintiffs believe there are millions of persons who were OnStar subscribers and, as of December 31, 2007, owned or leased a vehicle originally sold or leased by GM, VW, Honda or Subaru on or after August 8, 2002 and equipped with analog-only or analog/digital-ready OnStar equipment which had not been upgraded or who paid for an upgrade on or before December 31, 2007

**Lost Prepaid Minutes**

(n)    Plaintiffs believe that there are thousands of OnStar subscribers with analog-only or analog/digital-ready who had unused Prepaid Minutes when their analog OnStar equipment ceased to function on or about January 1, 2008

197    <u>Commonality</u>    There are numerous questions of law and fact that are common to all Class members and that predominate over individual questions, if any

(a)    Common questions of fact include but are not limited to

(i)    All Class members purchased or leased a vehicle with analog Onstar equipment

(ii)    OnStar equipment is a consumer product for all class members

(iii)    All Class members' OnStar equipment was defective and not suited for use with the OnStar system

(iv)    All Class members' OnStar equipment will not function after December 31, 2007

(v)    Each Manufacturer Defendant and OnStar made the same or similar express and implied representations and warranties to all Class members

(vi)   Each Manufacturer Defendant maintained the same or similar customs, policies and practices regarding service and repairs for safety components

(vii)   Each Manufacturer Defendant and OnStar concealed and failed to disclose the same information regarding the defects in its analog OnStar equipment

(viii)   Each Manufacturer Defendant and OnStar concealed and failed to disclose termination of analog service to their subscribers with analog OnStar equipment

(ix)   All Class members were given the same or similar notices of termination of analog service

(x)   Each Manufacturer Defendant refuses to provide Class members with repairs, replacements, devices or other means to receive OnStar digital service

(xi)   All Class members have suffered the same or similar damage as a result of Defendants' conduct

(xii)   All class members with Prepaid Minutes lost the value of their prepaid minutes when their OnStar service and equipment ceased to function,

(xiii)   OnStar concealed and failed to disclose to all OnStar subscribers with Prepaid Minutes that they would lose the value of their Prepaid Minutes if they were not used prior to December 31, 2007,

(xiv)   OnStar has failed to and refused to provide refunds to any class member with unused Prepaid Minutes,

(xv)   All Defendants concealed and failed to disclose that they would not repair or upgrade analog only OnStar equipment,

(xvi)   All Defendants concealed and failed to disclose that they would charge to repair or upgrade analog/digital ready OnStar equipment

          (xvii) OnStar concealed and failed to disclose that it would not provide refunds to OnStar subscribers with unused Prepaid Minutes

      (b)     Common questions of law include but are not limited to

           (i)     Is Michigan law applicable to all Class members and all claims?

           (ii)     Did all Manufacturer Defendants and OnStar engage in unfair and deceptive trade practices under the Michigan Consumer Protection Act ("MCPA")?

           (iii)     Did each Manufacturer Defendants and OnStar fail to disclose and/or omit material facts relating to their OnStar equipment?

           (iv)     Did each Manufacturer Defendant breach its express warranties?

           (v)     Did each Manufacturer Defendant breach its implied warranties of merchantability?

           (vi)     Did all Manufacturer Defendant breach its implied warranties of fitness for particular purpose?

           (vii)     Are the Manufacturer Defendants and OnStar legally responsible for the Class' damages?

           (viii)     Alternatively, did each Manufacturer Defendant engage in unfair and deceptive trade practices under the laws of each state?

           (ix)     Did the Defendants' representations, omissions and practices violate the Michigan Consumer Protection Act?

           (x)     Did the Defendants' representations, omissions and practices violate the consumer protection laws of various other states?

           (xi)     Are the durational limitations on warranties of GM, Honda, Subaru and VW unconscionable?

(xii)   With respect to class members with claims for lost Prepaid Minutes

(1)   Did OnStar breach its implied contract?

(2)   Was OnStar unjustly enriched?

(3)   Is OnStar liable for equitable or legal restitution?

(4)   Is OnStar liable for money had and received?

(5)   Did OnStar's representations, omissions and practices violate the Michigan Consumer Protection Act?

(6)   Did OnStar's representations, omissions and practices violate the consumer protection laws of various other states?

198   Typicality   Plaintiffs' claims are typical of the claims of Class members   Plaintiffs are members of the Class   Plaintiffs are asserting the same rights, making the same claims, and seeking the same relief for themselves and for all other Class members

199   Adequate and Fair Representation   Plaintiffs will fairly and adequately represent and protect the interests of the class   Plaintiffs have no interests that conflict with or which are adverse to the interests of other class members   Plaintiffs have retained qualified counsel who are able and experienced in class action litigation

200   Fairness and Efficiency   A class action is a fair and efficient method to adjudicate this controversy

(a)   Common questions of law and fact predominate over individual questions

(b)   The claims of Plaintiffs and the Class are based on the same common nucleus of operative facts   Proof of Plaintiffs' claims will effectively prove the claims of all other Class members

      (c)     Resolution of the claims of the Class will depend on the application of common principles of law

      (d)     A class action will permit a large number of relatively small claims involving similar facts and legal issues to be resolved efficiently in one proceeding based on common proof

      (e)     This case is manageable as a class action in that

          (i)     The material evidence is relatively simple and centralized

          (ii)     Manufacturer Defendants and OnStar maintain computer and business records which will enable Plaintiffs to identify Class members and establish liability and damages

          (iii)     Damages for Class members can be calculated in the same or similar manner

          (iv)     The claims of individual Class members are not sufficiently large enough to support litigation on an individual, case-by-case basis

          (v)     A class action will result in an orderly and expeditious administration of claims and will foster economies of time, effort and expense

          (vi)     A class action will contribute to uniformity of decisions concerning Defendants' conduct

          (vii)     This class action is the best available method, and indeed the only realistic method, by which Plaintiffs and the Class can seek redress for the harm caused by Defendants

**Count I**
**Plaintiffs and The Classes v. All Defendants**
**Violations Of The Michigan Consumer Protection Act**

201  Plaintiffs incorporate all other paragraphs of the Complaint by reference

202  As Plaintiffs and all Class members used their Manufacturer Defendants' vehicles and OnStar equipment and service for personal, family and household purposes, the Manufacturer Defendants and OnStar engaged in trade or commerce within the meaning of the MCPA §445 902(g)

203  Plaintiffs and all other Class members who purchased vehicles manufactured by Manufacturer Defendants are consumers and each of the Manufacturer Defendants and OnStar are sellers and therefore subject to the MCPA

204  Manufacturer Defendants' and OnStar's statements, representations, omissions, and practices made in connection with their sale or lease of OnStar equipment and service as alleged herein were in violation of the following sections of the MCPA § 445 903

a § 445 903(c) by representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities, which they do not have or that a person has sponsorship, approval, status, affiliation, or connection, which he does not have

b § 445 903(n) by causing a probability of confusion or of misunderstanding as to the legal rights, obligations or remedies of a party to a transaction

c § 445 903(p) by disclaiming or limiting the implied warranty of merchantability and fitness for use, without clearly and conspicuously disclosing a disclaimer

d § 445 903(s) by failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer

e § 445 903(bb) by making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is

f § 445 903(cc) by failing to reveal facts which are material to the transaction in light of representations of fact made in a positive manner

g §445 903(g) by failing to advertise or represent goods and services with intent not to dispose of them as advertised and represented

h §445 903(y) by failing to provide promised benefits and making gross discrepancies between oral and written representations

205  Defendants' unilateral decision to render the Class' OnStar systems obsolete effective January 1, 2008, to wait to disclose to customers that their analog systems will be obsolete and that they will be without OnStar service, their refusal to upgrade or repair analog OnStar systems without charge, and their refusal to compensate Class members also amounts to unfair, unconscionable and/or deceptive business practices in violation of the MCPA

206  Defendants' violations of the MCPA proximately caused damages to Plaintiffs and Class members who purchased or leased vehicles manufactured by GM, VW, Honda and Subaru and will cause them to suffer imminent harm and loss, including but not limited to

(a)     the amount paid for their OnStar equipment and prepaid minutes,

(b)     the cost for repair, replacement or upgrade,

(c)     additional fees and costs to renew service, and

(d)     their inability to obtain OnStar service after December 31, 2007

WHEREFORE, Plaintiffs, individually and on behalf of all Class members, request judgment in their favor and against each Defendant, jointly and severally with OnStar, and request the following relief

(a)     certification of the Class, the appointment of Plaintiffs as class representatives, and the appointment of Plaintiffs' counsel as class counsel,

(b)     compensatory damages for the Class to be determined at trial, together with interest, costs and attorneys' fees,

52

(c)    exemplary damages, and

(d)    such other relief as may be just, necessary or appropriate

### COUNT I – A
#### Plaintiffs and the Classes v. OnStar
#### Violation of the Michigan Consumer Protection Act
#### Lost Prepaid Minutes

207  Each of the preceding paragraphs is incorporated by reference as though fully set forth herein

208  OnStar's statements, representations, omissions and practices made in connection with the sale of Prepaid Minutes were in violation of the following sections of the MCPA

(a)    Section 445 903(c)  by representing that Prepaid Minutes have characteristics, uses, benefits or quantities, which they do not have

(b)    Section 445 903(n) by causing a probability of confusion or of misunderstanding as to the legal rights, obligations or remedies of a party to a transaction for the purchase of Prepaid Minutes

(c)    Section 445 903(cc) by failing to reveal facts which are material to the transaction for the purchase of Prepaid Minutes in light of representations of fact made in a positive manner

(d)    Section 445 903(g) by advertising or representing Prepaid Minutes with intent not to dispose of them as advertised and represented

209  OnStar's decision to sell Prepaid Minutes to subscribers with analog-only or analog/digital-ready equipment without notice that the subscribers would lose those minutes after December 31, 2007, and OnStar's refusal to provide refunds, amount to unfair, unconscionable and/or deceptive business practices in violation of the MCPA

210  OnStar's violations of the MCPA proximately caused damages to Plaintiffs and class members who purchased Prepaid Minutes and will cause them to suffer imminent harm and loss, including but not limited to the amount paid for Prepaid Minutes

WHEREFORE, Plaintiffs individually and on behalf of all class members with analog-only or analog/digital-ready equipment and unused Prepaid Minutes, request judgment in their favor and against OnStar, and request the following relief

(a)    certification of the Class, the appointment of Plaintiffs as class representatives and the appointment of Plaintiffs' counsel as class counsel,

(b)    compensatory damages for the Class to be determined at trial, together with interest costs and attorney's fees,

(c)    exemplary damages except with respect to damages caused to Plaintiffs and members of the Class in the State of New York (per February 19, 2009 Opinion and Order Granting In Part And Denying In Part Defendants' Motions to Dismiss), and

(d)    such other relief as may be just, necessary or appropriate

### Count II
#### Plaintiffs and the Classes v. All Defendants
#### Unfair and Deceptive Trade Practices In
#### Violation Of All States' Consumer Protection Acts

211  Each of the preceding paragraphs is incorporated by reference as though fully set forth herein

212  Alternatively, each Manufacturer Defendant's and OnStar's actions, as complained of herein, constitute unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of various state consumer protection statutes listed below

(a)    Each Manufacturer Defendant and OnStar have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ala. Code § 8-19-1, *et seq* ,

(b)    Each Manufacturer Defendant and OnStar have engaged in unfair competition or unfair or deceptive acts or practices in violation of Alaska Stat Code § 45 50 471, *et seq*,

(c)    Each Manufacturer Defendant and OnStar have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ariz Rev Stat § 44-1522, *et seq*,

(d)    Each Manufacturer Defendant and OnStar have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ark Code § 4-88-101, *et seq*,

(e)    Each Manufacturer Defendant and OnStar have engaged in unfair competition or unfair or deceptive acts or practices in violation of Cal Bus & Prof Code § 17200, *et seq* and the Consumers legal Remedies Act, Cal Bus & Prof Code § 1750, *et seq*,

(f)    Each Manufacturer Defendant and OnStar have engaged in unfair competition or unfair or deceptive acts or practices or have made false representations in violation of Colo Rev Stat § 6-1-105, *et seq*,

(g)    Each Manufacturer Defendant and OnStar have engaged in unfair competition or unfair or deceptive acts or practices in violation of Conn Gen Stat § 42-110b, *et seq*,

(h)    Each Manufacturer Defendant and OnStar have engaged in unfair competition or unfair or deceptive acts or practices in violation of 6 Del Code § 2511, *et seq*,

(i)    Each Manufacturer Defendant and OnStar have engaged in unfair competition or unfair or deceptive acts or practices or made false representations in violation of D C Code § 28-3901, *et seq*,

(j)    Each Manufacturer Defendant and OnStar have engaged in unfair competition or unfair or deceptive acts or practices in violation of Fla Stat § 501 201, *et seq*,

(k)    Each Manufacturer Defendant and OnStar have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ga Stat § 10-1-392, *et seq*,

(l)    Each Manufacturer Defendant and OnStar have engaged in unfair competition or unfair or deceptive acts or practices in violation of Haw Rev Stat § 480, *et seq*,

(m)    Each Manufacturer Defendant and OnStar have engaged in unfair competition or unfair or deceptive acts or practices in violation of Idaho Code § 48-601, *et seq*,

(n)    Each Manufacturer Defendant and OnStar have engaged in unfair competition or unfair or deceptive acts or practices in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS § 505/1, *et seq*,

(o)    Each Manufacturer Defendant and OnStar have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ind Code Ann § 24-5-0 5 1, *et seq*,

(p)    Each Manufacturer Defendant and OnStar have engaged in unfair competition or unfair or deceptive acts or practices in violation of Iowa Code § 714 1b, *et seq*,

(q)    Each Manufacturer Defendant and OnStar have engaged in unfair competition or unfair or deceptive acts or practices in violation of Kan Stat § 50-623, *et seq*,

(r)    Each Manufacturer Defendant and OnStar have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ky Rev Stat § 367 110, *et seq*,

(s)    Each Manufacturer Defendant and OnStar have engaged in unfair competition or unfair or deceptive acts or practices in violation of La Rev Stat § 51 1401, *et seq* ,

(t)    Each Manufacturer Defendant and OnStar have engaged in unfair competition or unfair or deceptive acts or practices in violation of 5 Me Rev Stat § 207, *et seq* ,

(u)    Each Manufacturer Defendant and OnStar have has engaged in unfair competition or unfair or deceptive acts or practices in violation of Md Com Law Code § 13-101, *et seq* ,

(v)    Each Manufacturer Defendant and OnStar have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mass Gen L Ch 93A, *et seq* ,

(w)    Each Manufacturer Defendant and OnStar have engaged in unfair competition or unfair or deceptive acts or practices in violation of Minn. Stat § 325F 67, *et seq* ,

(x)    Each Manufacturer Defendant and OnStar have engaged in unfair competition or unfair or deceptive acts or practices in violation of Miss Code Ann § 75-24-1, *et seq* ,

(y)    Each Manufacturer Defendant and OnStar have engaged in unfair competition or unfair or deceptive acts or practices in violation of Vernon's Mo Rev Stat § 407 010, *et seq* ,

(z)    Each Manufacturer Defendant and OnStar have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mont Code § 30-14-101, *et seq* ,

(aa)    Each Manufacturer Defendant and OnStar have engaged in unfair competition or unfair or deceptive acts or practices in violation of Neb Rev Stat § 59-1601, *et seq*,

(bb)    Each Manufacturer Defendant and OnStar have engaged in unfair competition or unfair or deceptive acts or practices in violation of Nev Rev Stat § 598 0903, *et seq*,

(cc)    Each Manufacturer Defendant and OnStar have engaged in unfair competition or unfair or deceptive acts or practices in violation of N H Rev Stat § 358-A 1, *et seq*,

(dd)    Each Manufacturer Defendant and OnStar have engaged in unfair competition or unfair, unconscionable or deceptive acts or practices in violation of N J Stat Ann § 56 8-1, *et seq*,

(ee)    Each Manufacturer Defendant and OnStar have engaged in unfair competition or unfair or deceptive acts or practices in violation of N M Stat Ann § 57-12-1 *et seq*,

(ff)    Each Manufacturer Defendant and OnStar have engaged in unfair competition or unfair or deceptive acts or practices in violation of N Y Gen Bus Law § 349, *et seq*,

(gg)    Each Manufacturer Defendant and OnStar have engaged in unfair competition or unfair or deceptive acts or practices in violation of N C Gen Stat § 75-1 1, *et seq*,

(hh)    Each Manufacturer Defendant and OnStar have engaged in unfair competition or unfair or deceptive acts or practices in violation of N D Cent Code § 51-15-01, *et seq*,

(ii)    Each Manufacturer Defendant and OnStar have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ohio Rev Stat § 1345 01, *et seq*,

(jj)    Each Manufacturer Defendant and OnStar have engaged in unfair competition or unfair or deceptive acts or practices or made false representations in violation of Okla Stat tit 15 § 751, *et seq*,

(kk)    Each Manufacturer Defendant and OnStar have engaged in unfair competition or unfair or deceptive acts or practices in violation of Or Rev Stat § 646 605, *et seq*,

(ll)    Each Manufacturer Defendant and OnStar have engaged in unfair competition or unfair or deceptive acts or practices in violation of 73 Pa Stat § 201-1, *et seq*,

(mm)    Each Manufacturer Defendant and OnStar have engaged in unfair competition or unfair or deceptive acts or practices in violation of R I Gen Laws § 6-13 1-1, *et seq*,

(nn)    Each Manufacturer Defendant and OnStar have engaged in unfair competition or unfair or deceptive acts or practices in violation of S C Code Laws § 39-5-10, *et seq*,

(oo)    Each Manufacturer Defendant and OnStar have engaged in unfair competition or unfair or deceptive acts or practices in violation of S D Code Laws § 37-24-1, *et seq*,

(pp)    Each Manufacturer Defendant and OnStar have engaged in unfair competition or unfair or deceptive acts or practices in violation of Tenn Code § 47-18-101, *et seq* ,

(qq)    Each Manufacturer Defendant and OnStar have engaged in unfair competition or unfair or deceptive or practices in violation of Tex Bus & Com Code § 17 41, *et seq* ,

(rr)    Each Manufacturer Defendant and OnStar have engaged in unfair competition or unfair or deceptive acts or practices in violation of Utah Code Ann § 13-1 1-1, *et seq* ,

(ss)    Each Manufacturer Defendant and OnStar have engaged in unfair competition or unfair or deceptive acts or practices in violation of Vt Stat Ann tit 9, § 245 1, *et seq* ,

(tt)    Each Manufacturer Defendant and OnStar have engaged in unfair competition or unfair or deceptive acts or practices in violation of Va Code § 59 1-196, *,et seq*

(uu)    Each Manufacturer Defendant and OnStar have engaged in unfair competition or unfair, deceptive or fraudulent acts or practices in violation of Wash Rev Code § 19 86 010, *et seq* ,

(vv)    Each Manufacturer Defendant and OnStar have engaged in unfair competition or unfair or deceptive acts or practices in violation of W Va Code § 46A-6-101 , *et seq* ,

(ww)    Each Manufacturer Defendant and OnStar have engaged in unfair competition or unfair or deceptive acts or practices in violation of Wis Stat § 100 20, *et seq* , and

(xx)    Each Manufacturer Defendant and OnStar have engaged in unfair competition or unfair or deceptive acts or practices in violation of Wyo Stat § 40-12-100, *et seq*

213   Defendants' violations of the state consumer protection statutes listed above proximately caused damage to Plaintiffs and members of the Class

WHEREFORE, Plaintiffs, individually and on behalf of all Class members, request judgment in their favor and against all Defendants, and request the following relief

(a)    certification of the Plaintiff Class, the appointment of Plaintiffs as Class representatives, and the appointment of Plaintiffs' counsel as class counsel,

(b)    compensatory damages for the Class to be determined at trial, together with interest, costs and attorneys' fees,

(c)    exemplary damages, except with respect to damages caused to Plaintiffs and members of the Class in the State of New York, and

(d)    such other relief as may be just, necessary or appropriate

## Count III
### Plaintiffs and the Classes v. All Manufacturer Defendants
### Breach of Express Warranty

214   Plaintiffs incorporate all other paragraphs of the Complaint by reference

215   Each Manufacturer Defendant expressly warranted to Plaintiffs and all other Class members who purchased or leased their vehicles that the OnStar equipment in their vehicle would be free of defects in workmanship and materials during the warranty period, and that the Manufacturer Defendant would repair or replace such defective equipment at no cost to Plaintiffs and all other Class members

216  The OnStar equipment in all of the Manufacturer Defendants' vehicles purchased or leased by plaintiff and other Class members was covered by their new motor vehicle warranties The OnStar equipment in many Class members' vehicles was covered by an extended warranty

217  At the time that Class members were given notice that their OnStar equipment was defective, numerous Class members were within the mileage and term of their original and extended warranties

218  The OnStar equipment sold and delivered to Plaintiffs and all other Class members was manufactured with faulty and defective workmanship and materials, are defective, and will not function and will not perform its intended purpose during the warranty period

219  The OnStar equipment would not function during the reasonable life expectancy of plaintiffs' vehicles

220  The durational limitations in the Manufacturer Defendants' warranties with respect to analog OnStar equipment was unreasonable

221  The durational limitations in the Manufacturer Defendants' warranties with respect to analog OnStar equipment was unconscionable, invalid and unenforceable

222  Contrary to their warranties, each Manufacturer Defendant has expressly or implicitly given notice to Plaintiffs and all other OnStar subscribers who purchased or leased their vehicles that it will not repair or replace their defective OnStar equipment so that it will operate on digital cellular networks, at no cost to Plaintiffs and the Class, and continue to refuse to do so

223  Each Manufacturer Defendant breached its express warranties to Plaintiffs and all other Class members to repair and/or replace OnStar equipment so that it is in good operational condition and repair and suitable for use in the OnStar system

224  The Manufacturer Defendants' breach of these express warranties proximately caused damages to Plaintiffs and members of the Class

WHEREFORE, Plaintiffs, individually and on behalf of all Class members, request judgment in their favor and against the Manufacturer Defendants, and request the following relief

(a)    certification of the Plaintiff Class, the appointment of Plaintiffs as Class representatives, and the appointment of Plaintiffs' counsel as Class counsel,

(b)    compensatory damages for the Class to be determined at trial, together with interest, costs and attorneys' fees,

(c)    such other relief as may be just, necessary or appropriate

### Count IV
### Plaintiffs and the Classes v. All Manufacturer Defendants
### Breach Of Implied Warranties

225  Plaintiffs incorporate all other paragraphs of the Complaint by reference

226  At the time of contracting, each Manufacturer Defendant impliedly warranted to Plaintiffs and to all other Class members who purchased or leased their vehicles that their OnStar equipment was of merchantable quality and suitable for ordinary use

227  The OnStar equipment sold, leased and delivered to Plaintiffs and all other Class members was not of merchantable quality and was not suited for ordinary use

228  The OnStar equipment would not function during the reasonable life expectancy of plaintiffs' vehicles

229  To the extent that the Manufacturer Defendants attempt to limit the duration of implied warranties to the duration of their express warranties or for any period shorter than the reasonable life expectancy of the vehicle, such limitations are unreasonable

230   To the extent that the Manufacturer Defendants attempt to limit the duration of implied warranties to the duration of their express warranties or for any period shorter than the reasonable life expectancy of the vehicle, such limitations are unconscionable, invalid and unenforceable for the reasons set forth above

231   Each Manufacturer Defendant breached its implied warranty of merchantability of its OnStar equipment to Plaintiffs and all Class members who purchased or leased their vehicles

232   Each Manufacturer Defendant breached its implied warranty of fitness for a particular purpose of its OnStar equipment to Plaintiffs and all Class members who purchased or leased their vehicles

233   Each Manufacturer Defendant breached its implied warranty of fitness for a particular purpose of its OnStar equipment to Plaintiffs and all Class members who purchased or leased their vehicles

234   Each Manufacturer Defendant's breach of warranties proximately caused damages to Plaintiffs and all Class members who purchased or leased their vehicles

WHEREFORE, Plaintiffs, individually and on behalf of all Class members, request judgment in their favor and against the Manufacturer Defendants, and request the following relief

(a)   certification of the Class, the appointment of Plaintiffs as class representatives, and the appointment of Plaintiffs' counsel as class counsel,

(b)   compensatory damages for the Class to be determined at trial, together with interest, costs and attorneys' fees,

(c)   such other relief as may be just, necessary or appropriate

## Count V
### Plaintiffs and the Classes v. All Manufacturer Defendants
### Violation of The Magnuson-Moss Warranty Act

235   Plaintiffs incorporate all other paragraphs of this Complaint by reference

236   OnStar equipment is a consumer product used for personal, family or household purposes

237   Each Manufacturer Defendant is a supplier and/or warrantor within the meaning of the Magnuson-Moss Warranty Act, 15 U S C § 2301

238   Each Manufacturer Defendant has failed to comply with its obligations under its written and implied promises, warranties and representations despite having a reasonable opportunity to do so

239   Plaintiffs and the Classes are therefore entitled to recover compensatory damages together with interest, reasonable attorney's fees and costs

WHEREFORE, Plaintiffs, individually and on behalf of all Class members, request judgment in their favor and against each Manufacturer Defendant and request the following relief

(a)   certification of the Class, the appointment of Plaintiffs as class representatives, and the appointment of Plaintiffs' counsel as class counsel,

(b)   compensatory damages for the Class to be determined at trial, together with interest, costs and attorneys' fees, and

(c)   such other relief as may be just, necessary or appropriate

## COUNT VI
### Breach of Contract
### Damages for Lost Prepaid Minutes

240  Each of the preceding paragraphs is incorporated by reference as though fully set forth herein

241  OnStar broke its agreement by selling Prepaid Minutes to class members with analog-only or analog/digital-ready equipment and refusing to refund them the cost of unused Prepaid Minutes when their OnStar service and equipment ceased to function

242  Class members with analog-only or analog/digital-ready equipment and unused Prepaid Minutes are entitled to restitution

243  Class members with analog-only or analog/digital-ready equipment and unused Prepaid Minutes are entitled to the return and refund of money they paid

244  WHEREFORE, Plaintiffs, individually and on behalf of all class members with analog-only or analog/digital-ready equipment and unused Prepaid Minutes, request judgment in their favor and against OnStar and request the following relief

    (a)    certification of the Class, the appointment of plaintiffs as class representatives and the appointment of plaintiffs' counsel as class counsel,

    (b)    compensatory damages for the Class to be determined at trial, together with interest costs and attorney's fees,

    (c)    such other relief as may be just, necessary or appropriate

## COUNT VII
### Unjust Enrichment
### Damages For Lost Prepaid Minutes

245  Each of the preceding paragraphs is incorporated by reference as though fully set forth herein

246  Class members with analog-only or analog/digital-ready equipment and unused Prepaid Minutes have conferred a substantial monetary benefit on OnStar

247  Class members with analog-only or analog/digital-ready equipment and unused Prepaid Minutes have been unable to use their Prepaid Minutes and therefore suffered substantial financial loss

248  OnStar has retained substantial monetary benefit from the class members who have or had analog-only or analog/digital-ready equipment and unused Prepaid Minutes remaining when OnStar's analog equipment ceased to function

249  OnStar has been unjustly enriched

250  Class members with analog-only or analog/digital-ready equipment and unused Prepaid Minutes are entitled to equitable restitution and/or damages

WHEREFORE, plaintiffs individually and on behalf of all class members with analog-only or analog/digital-ready equipment and unused Prepaid Minutes, request judgment in their favor and against OnStar and request the following relief

(a)    certification of the Class, the appointment of plaintiffs as class representatives and the appointment of plaintiffs' counsel as class counsel,

(b)    compensatory damages for the Class to be determined at trial, together with interest costs and attorney's fees,

(c)    such other relief as may be just, necessary or appropriate

**JURY DEMAND**

Plaintiffs demand a jury trial of 12

Respectfully submitted,

Dated   April 30, 2009

   /s/ David H. Fink
David H. Fink (P28235)
E. Powell Miller (P39487)
Marc L. Newman (P51393)
The Miller Law Firm PC
Interim Lead Counsel for Plaintiffs
950 W. University Dr, Suite 300
Rochester, MI 48307
248-841-2200
dhf@millerlawpc.com
www.millerlawpc.com

Jeffrey L. Kodroff
John A. Macoretta
Spector Roseman & Kodroff PC
1818 Market St., Suite 2500
Philadelphia, PA 19103
215-496-0300
jkodroff@srk-law.com
jmacoretta@srk-law.com

C. Donald Amamgbo
Amamgbo & Assoc,
1940 Embarcadero
Oakland, CA 94606
510-434-7800
Donald@amamgbolaw.com

N. Albert Bacharach, Jr.
115 NE 6th Avenue
Gainesville, FL 32601
352-378-9859
n.a.bacharach@att.net

John W. Barrett
Jonathan R. Marshall
Bailey & Glasser LLP
227 Capitol Street
Charleston, WV 25301



jbarrett@baileyglasser com

Mark R Bendure
Bendure & Thomas
645 Griswold, Suite 4100
Detroit, MI 48226
313-961-1525
bendurelaw@cs com

Larry W Bennett
Giarmarco Mullins
101 W Big Beaver Rd, 10th Fl
Troy, MI 48084
248-457-7037
lbennett@gmhpc com

Philip Bohrer
Scott Brady
Bohrer Law Firm LLC
8712 Jefferson Hgwy, Suite B
Baton Rouge, LA 70809
225-925-5297
phil@bohrerlaw com
scott@bradylawfirmllc com

Patrick E Cafferty
101 N Main Street, Suite 450
Ann Arbor, MI 48104
734-769-2144
pcafferty@caffertyfaucher com

Marc C Calahan
6451 Drexel Avenue
Los Angeles, CA 90048
310-717-2484
mccalahan@yahoo com

Edward W Cochren
20030 Marchmont Road
Shaker Heights, OH 44122
216-751-5546
edwardcochren@adelphia net

Lanny H Darr
Schrempf, Blaine, Kelly, Naap



307 Henry Street, Suite 415
Alton, IL 62002
618-465-2311
ldarr@sbkdlaw com

Daniel A Edelman
Edelman Combs Latturner
120 S LaSalle St , Suite 1800
Chicago, IL 60603
312-739-4200
dedelman@edcombs com
courtecl@edcombs com
tgoodwin@edcombs com
zjacobs@edcombs com

Marc Edelson
45 W Court Street
Doylestown, PA 18901
(215) 230-8043
medelson@edelson-law com

Frederic S Fox
Larry D King
Donald R Hall
Kaplan Fox & Kilsheimer LLP
850 Third Ave , 14th Floor
New York, NY 10022
212-687-1980
ffox@kaplanfox com
lking@kaplanfox com
dhall@kaplanfox com

Philip Stephen Fuoco
Joseph A Osefchen
24 Wilkins Place
Haddonfield, NJ 08033
856-354-1100
pfuoco@msn com
josefchen@msn com

Eric H Gibbs
Daniel T LeBel
Girard Gibbs LLP
601 California Street, 14th Fl
San Francisco, CA 94108
415-981-4800



ehg@girardgibbs com
dtl@girardgibbs com

Steven E Goren
Goren Goren & Harris PC
30400 Telegraph Rd, Suite 470
Bingham Farms, MI 48025
248-540-3100
sgoren@gorenlaw com

Mary Ellen Gurewitz
1000 Farmer
Detroit, MI 48226-2899
313-965-3464
megurewitz@sachwaldman com

Greg Hafif
Law Offices of Herbert Hafif
269 W Bonita Avenue
Claremont, CA 91711
909-624-1671
ghafif@hafif com

Daniel Harris
150 N Wacker Dr, Suite 3000
Chicago, IL
312-960-1802
lawofficedh@yahoo com

Dennis J Johnson
Johnson & Perkinson
1690 Williston Road
S Burlington, VT 05403
802-862-0030
djohnson@jpclasslaw com

Franklin D Julian, Jr
1620 S Bend Ave
South Bend, IN 46617
574-247-1234
fdj@theverdict com

Roy A Katriel, Esq
The Katriel Law Firm
1101 30th St, NW Suite 500
Washington, DC 20007



202-625-4342
rak@katriellaw com

Irwin B Levin
Richard E Shevitz
Vess A Miller
One Indiana Square, Suite 1400
Indianapolis, IN 46204
317-636-6481
ilevin@cohenandmalad com
rshevitz@cohenandmalad com
vmiller@cohenandmalad com

Jonathan K Levine
601 California St, Suite 1400
San Francisco, CA 94108
415-981-4800
jkl@girardgibbs com

Peter L Masnik
Kalikman & Masnik
30 Washington Avenue
Haddonfield, NJ 08033
856-428-5222
PMasnik@aol com

Gary E Mason
The Mason Law Firm PC
1225 19th St NW, Suite 500
Washington, DC 20036
202-429-2290
gmason@masonlawdc com

Kevin L Oufnac
Kahn Gauthier Swick
650 Poydras St , Suite 2150
New Orleans, LA 70130
504-455-1400
Kevin oufnac@kgscounsel com

Mario A Pacella
Strom Law Firm LLC
2110 Beltline Blvd, Suite A
Columbia, SC 29204
803-252-4800
mpacella@stromlaw com

72



Ethan Preston
Kamber Edelson LLC
53 W Jackson Blvd, Suite 1530
Chicago, IL 60604
epreston@kamberedelson com

Michael F Ram
Levy Ram & Olson
639 Front St , 4th Fl
San Francisco, CA 94111
415-433-4749
mfr@lrolaw com

Paul S Rothstein
626 NE 1st Street
Gainesville, FL 32601
352-376-7650
psr@rothsteinforjustice com

Peter Safirstein,
Andrew Morgani
Jennifer Czeisler
(Milberg Weiss)
1 Pennsylvania Plaza
New York, NY 10119-0165
212-594-5300
psafirstein@milbergweiss com
amorganti@milbergweiss com
jczeisler@milbergweiss com

Fred W Schultz
320 W 8th St , Suite 100
Bloomington, IN 47401
866-685-6800
fred@greeneschultz com

Ronald J Smolow
Michael H Landis
Smolow & Landis LLC
204 Two Neshaminy Interplex
Trevose, PA 19053
215-244-0880
rsmolow@smolowlandis com
mlandis@smolowlandis com



Stephen M Sohmer
Sohmer Law Firm LLC
One Passaic Avenue
Fairfield, NJ 07004
973-227-7080
counsel@sohmerlawfirm com

Carol L Solomon
Geigel Nickles & Solomon PA
PO Box 1866
Columbia, SC 29202
803-779-8080
csolomon@gnslaw com

Kim D Stephens
Beth E Terrell
Tousley Brain
1700 Seventh Ave , Suite 2200
Seattle, WA 98101
206-682-2992
kstephens@tousley com,
bterrell@tousley com

J Preston Strom, Jr
Mario A Pacella
2110 Beltline Blvd, Suite A
Columbia, SC 29204
803-252-4800
petestrom@stromlaw com,
mpacella@stromlaw com

Francis E Sweeney Jr
323 W Lakeside Ave, Suite 450
Cleveland, OH 44113
216-928-9288
skip900@roadrunner com

Reginald Terrell, Esq
Terrell Law Group
223 25th Street
Richmond, CA 94804
510-237-9700
ReggieT2@aol com

Frank H Tomlinson
15 N 21st St , Suite 302

74



Birmingham, Al 35203
205-326-6626
htomlinson@bellsouth net

Joe R Whatley, Jr
1540 Broadway, 37th Fl
New York, NY 10036
212-447-7070
jwhatley@wdklaw com

Brian C Witter
Vincent DiTommaso
Peter S Lubin
DiTommaso Lubin
17200 W 22nd St
Oakbrook Terrace, IL 60181
630-333-0004
bcw@ditommasolaw com
vlt@ditommasolaw com
psl@ditommasolaw com

John P Wolff
Christopher K Jones
Keogh Cox & Wilson LTD
701 Main Street
Baton Rouge, LA 70802
225-383-3796
jwolff@kcwlaw com
cjones@kcwlaw com

Leroy H Wulfmeier
Cox Hodgman
101 W Big Beaver Rd, 10th Fl
Troy, MI 48084
248-457-7077
lwulfmeier@chglaw com

Lance Young
43311 Joy Road #244
Canton, MI 48187
734-446-6932
younglcy@hotmail com

### CERTIFICATE OF SERVICE

I hereby certify that on April 30, 2009, I electronically filed the foregoing paper with the

Clerk of the Court using the ECF system which will send such notification to all ECF attorneys

of record  Pursuant to the Court's Case Management Order No  1 dated January 25, 2008 at §

XIII, service is not required on any party not registered for ECF



  /s/ David H  Fink
David H  Fink (P28235)
E  Powell Miller (P39487)
Darryl G  Bressack (P67820)
**THE MILLER LAW FIRM, P.C.**
Interim Lead Counsel for Plaintiffs
950 W  University Drive, Suite 300
Rochester, Michigan 48307
(248) 841-2200