Oiling Nozzle, which was defectively designed to restrict the flow of oil into the Oiling

Nozzle   The pintle valve is located on the inside of the Oiling Nozzle behind the brass

washer

### Figure 10(a):  Oiling Nozzle



83      Figure 10(b) shows the concave opening of the Oiling Nozzle out of which

oil flows to the Timing Chain once enough oil pressure is exerted to pass the oil through

the brass washer and open the pintle valve

### Figure 10(b)



84      Figure 10(c) shows the Oiling Nozzle bolted to the engine block above the

crankshaft sprocket, poised to oil the Timing Chain

**Figure 10(c)**



85      As admitted by Defendants on April 12, 2006 (¶¶ 106-108 below), this

design defect, which restricted the flow of oil to the Timing Chain at low and idle speeds,

led to "insufficient lubrication" of the Timing Chain at low and idle speeds, which caused

excess friction and heat buildup, thereby causing the Timing Chains to become brittle and

break

86      As discussed above, Defendants knowingly designed a less robust Timing

Chain in order to reduce engine noise in Saturn vehicles

87      As a result of the foregoing, Defendants unquestionably knew at the start

of production of the Class Vehicles that the Class Vehicles were defectively designed,

because Defendants knew (i) as of June 1997 that, in order to properly lubricate the

timing chains, a constant flow of oil onto the Timing Chain was necessary, and (ii) that

they were using an even less robust Timing Chain than was in production prior to 1999,

the result of which was to make it far more likely that these less robust Timing Chains

would break when not properly lubricated.

## VII.  DEFENDANTS HAD ACTUAL KNOWLEDGE OF THE FACT THAT THE TIMING CHAINS AND OILING NOZZLES WERE DEFECTIVELY DESIGNED BECAUSE OF THE DELUGE OF COMPLAINTS CONCERNING BROKEN TIMING CHAINS

### Consumers Post Scores of Complaints of Broken Timing Chains in Class Vehicles on NHTSA's and Various Consumer Websites

88    The Office of Defects Investigation ("ODI") of NHTSA has been

collecting complaints from owners of Saturn vehicles regarding their defective Timing

Chains from 2000 to the present  Excerpts of some of these complaints are set forth

below

| ODI  ID # | Comments |
|---|---|
| 10196053 | \*THE CONTACT OWNS A 2002 SATURN L200  WHILE PROCEEDING THROUGH A GREEN LIGHT AT 5 MPH, **THE VEHICLE SHUT OFF IN THE MIDDLE OF THE INTERSECTION**  THE FAILURE OCCURRED WITHOUT WARNING WHILE THE VEHICLE COASTED, THE CONTACT WAS ABLE TO TURN THE STEERING WHEEL TO THE RIGHT AND PULL OVER  THE VEHICLE WAS TOWED TO THE DEALER WHO DIAGNOSED THE CAUSE OF FAILURE AS THE TIMING CHAIN. THE DEALER FOUND OTHER RELATED FAILURES AS WELL.  THE CONTACT PAID $3,000 FOR THE REPAIR  THE POWERTRAIN WAS UNKNOWN  THE CURRENT MILEAGE IS 38,850 AND FAILURE MILEAGE WAS 38,800  (Emphasis Added) |
| 10115682 | '**WHILE DRIVING AT 65 MPH** ENGINE FAILED DUE TO TIMING CHAIN WHICH CAUSED THE VALVES IN THE ENGINE TO BEND. HAD A LOCAL MECHANIC CHECK ENGINE AND WAS TOLD **CONSUMER NEEDED A NEW ENGINE** (Emphasis Added) Customer had only 36,000 Miles when the Vehicle failed |
| 10125864 | STARTED VEHICLE AND LEFT GAS STATION WHEN THE ENGINE QUIT  THE CAR WOULD NOT START AND **DID NOT GIVE ANY DIAGNOSTIC INFORMATION ON THE DASH DISPLAY. EVERYTHING LOOKED NORMAL** AFTER SEEING A MECHANIC FOUND OUT THAT THE TIMING CHAIN IS BROKE AND **WILL COST ME $3600 TO REPLACE** ACCORDING TO THE SATURN DEALER. AFTER LOOKING AROUND ON THE INTERNET THIS IS A VERY BIG PROBLEM AND IS OCCURING VERY OFTEN  THERE IS A TECHNICAL SERVICE BULLETIN TO THE SATURN DEALERS, ACCORDING TO A ARTICLE I READ, THAT STATES THAT THERE IS A KNOWN PROBLEM WITH THE OIL SENDING UNIT THAT LUBRICATES THE TIMING CHAIN  THE OIL SENDING UNIT DOES NOT SUPPLY ENOUGH OIL TO THE TIMING CHAIN CAUSING THE FAILURE  **SATURN NEEDS TO RECALL THIS ENGINE SO PEOPLE LIKE ME WITH A DAUGHTER IN COLLEGE DOES NOT HAVE TO** |

| | |
|---|---|
| | OCCUR THIS KIND OF EXPENSE WITH A CAR THAT ONLY HAS 52,000 MILES ON IT (Emphasis Added) |
| 10126994 | DRIVING DOWN A 4-LANE HIGHWAY AT 60 MPH THE ENGINE JUST QUIT RUNNING  THERE WERE NO UNUSUAL SOUNDS OR WARNING LIGHTS LUCKILY, WE WERE ABLE TO COAST OVER TO THE BERM OF THE ROAD OUT OF THE PATH OF TRAFFIC WITHOUT BEING HIT  THE CAR WAS TOWED TO THE DEALERSHIP  WITHIN APPROXIMATELY 1-2 HOURS OF RECEIVING THE CAR, THE DEALERSHIP INFORMED ME THAT THE TIMING CHAIN HAD BROKE AND DAMAGED SOME VALVES IN THE PROCESS.  THE CAR HAS 53,000 AND IS OUT OF WARRANTY AND THE TOTAL COST FOR REPAIRS WAS $2,300.00  I INFORMED SATURN THAT I HAVE FOLLOWED BASIC MAINTENANCE ACTIVITIES AND THE CAR IS PRIMARILY DRIVEN TO AND FROM HOME AND THE OFFICE  IN ADDITION, I INFORMED THEM THAT THERE ARE OTHER DOCUMENTED CASES OF THE TIMING CHAIN FAILURE ON THE INTERNET RANGING FROM 30,000-65,000 MILES  SATURN SAID THERE IS NOT A PROBLEM WITH THE TIMING CHAIN IN THESE VEHICLES AND "THINGS JUST BREAK". THEY DID, HOWEVER, WITHIN 24 HRS OF RECEIVING MY CAR AT THE DEALERSHIP OFFER TO REIMBURSE ME 50% OF THE REPAIR COST  HOWEVER, WHEN A VEHICLE SUDDENLY LOSES POWER ON A HIGHWAY IT BECOMES A ROLLING DEATH TRAP AND THE PROBLEM WITH THE TIMING CHAINS NEEDS TO BE RECTIFIED BEFORE THE PROBLEMS RESULTS IN A FATALITY (Emphasis Added) |
| 10112117 | TIMING CHAIN WENT ON MY 2000 SATURN LS JUST AT FIVE YEARS WITH 53,700 MILES SATURN IS TRYING TO SAY ITS MY FAULT FROM 11 MONTHS AGO I DID NOT HAVE THE OIL FLUSHED OUT BUT IN SEARCHING TO SEE IF I WAS THE ONLY ONE I'M NOT AND THERE HAS BEEN OTHER PROBLEMS THAT WERE COVERED ON AND OFF WARRANTY I HAVE BROUGHT THIS TO THE ATTENTION OF BBB AND TO MY LOCAL DMV I HOPE THAT YOU CAN DO SOME THING ABOUT THIS BECAUSE WERE GETTING RIPPED OFF. (Emphasis Added) |
| 10047912 | 'WHILE DRIVING AT 65 MPH AND  WITHOUT ANY WARNING, THE VEHICLE  STOPPED STALLED  THERE WAS NO INDICATION THAT ANYTHING WAS WRONG WITH THE VEHICLE. THE VEHICLE WAS TAKEN TO THE DEALER WHO INFORMED THE CONSUMER THAT THE TIMING CHAIN SNAPPED AND A NEW ENGINE WAS NEEDED. (Emphasis Added) |
| 10128706 | 'THE TIMING CHAIN ON MY 2001 SATURN L200 SNAPPED AT 45,000 MILES I HAD TO HAVE MY CAR TOWED, FIRST TO MY MECHANIC AND THEN TO A SATURN DEALER  THE TIMING CHAIN DAMAGED PARTS OF MY ENGINE AND IT COST ME $2200 TO REPAIR  THERE HAD BEEN A TSB TO UPGRADE THE TIMING CHAIN FOR THIS VEHICLE, BUT OWNERS WERE NOT MADE AWARE OF IT  I WAS TOLD THAT THEY WILL NOT USE THE OLD TIMING CHAIN KIT AS REPLACEMENTS BECAUSE OF THE UPGRADE. SATURN HAS REFUSED ANY MONETARY HELP WITH THIS ISSUE (Emphasis Added) |
| 10192850 | MY FAMILY AND I WERE TRAVELING ON U S 301 AT 9 00 A M ON OUR WAY HOME IN OUR 2001 SATURN (L100) COUPE  THERE WAS A CLICKING SOUND COMING FROM THE ENGINE THAT HAD STARTED WHILE DRIVING HOME WHILE GOING 65 MPH, THERE WAS A POPPING SOUND AND THE OIL LIGHT CAME ON  THE CAR QUICKLY LOST POWER AND FORCED US TO THE SIDE OF THE ROAD. WE WERE SHAKEN BY THE THOUGHT WHAT COULD HAVE HAPPEN IF WE WERE IN AN AREA WITH HEAVY TRAFFIC I WAS ABLE TO FLAG DOWN A PASSING TOW TRUCK TO HELP US OUT  THE ROAD SERVICE UNIT DROPPED THE CAR OFF AT A LOCAL MECHANIC AND THE FAMILY AT HOME  □THE LOCAL CAR MECHANIC COULD NOT DETERMINE WHAT WAS WRONG WITH THE CAR UNTIL IT WAS TAKEN APART AND EXAMINED  THE FIRST EXAMINATION DETERMINED THAT THE TIMING CHAIN AND HAD FAILED AND WOULD HAVE TO BE REPLACED  THE |

| | |
|---|---|
| | MECHANIC ALSO EXPLAIN THAT THE ENGINE WOULD HAVE TO BE TAKEN APART TO DETERMINE THE EXTENT OF THE DAMAGE I SAID YES, ALTHOUGH I KNOW IT WOULD BE AN EXPENSIVE REPAIR   I THOUGHT <u>WITH THE LOW MILES (58,767) ON THE CAR</u>, THE WORK WOULD BE WORTH WHILE    THE EXAMINATION OF THE ENGINE REVEALED A DAMAGED HEAD AND BENT VALVES. <u>WHAT LOOKED LIKE A $1000.00 TIMING CHANGE REPLACEMENT QUICKLY WENT TO SEVERAL THOUSAND DOLLARS WORTH OF DAMAGE!</u> I CALLED THE SATURN DEALER TO SEE ABOUT WARRANTIES THAT WENT WITH THE CAR AND WHAT HELP THEY COULD PROVIDE THEY EXPLAIN THAT THEY COULDN'T CONSIDER A WARRANTY WITHOUT FIRST EXAMING THE CAR IN THEIR OWN SHOP AND HAVING ALL THE MAINTENANCE RECORDS PROVIDED TO THEM WITH THE ADDITIONAL TOWING FEES, EXAMINATION FEES FROM THE LOCAL MECHANIC, AND NO GURANTEES FROM THE SATURN DEALER, I DECIDE TO ALLOW THE LOCAL MECHANIC TO DO THE WORK <u>THE FOLLOWING PARTS HAD TO BE REPLACE DUE TO THE 'PREMATURE" FAILURE OF THE TIMING CHAIN: HEAD, HEAD GASKET, VALVE GASKET, FRONT COVER GASKET, TIMING CHAIN KIT, VALVES, BELT, SPARK PLUGS, WIRE SET, FILTER, OIL, AND ANTIFREEZE. THE TOTAL BILL CAME TO $2,480 80.</u> THE CAR IS RUNNING FINE NOW  (Emphasis Added) |
| 10179145 | I HAVE A 2001 SATURN L SERIES  A FEW MONTHS AGO I STARTED HEARING LITTLE NOISES IN THE ENGINE WHEN IT WAS COLD, AND AS THE ENGINE WARMED UP THE NOISE WOULD STOP  I HAVE THE CAR SERVICED PRETTY REGULARLY, AND HAVE NOT HAD ANY BAD EXPERIENCES WITH THE CAR  2 DAYS AGO, I DROVE ONE MILE FROM MY WORK,AND WITH NO WARNING AT ALL  I HEARD A LOUD POP IN THE ENGINE AND EVERYTHING STOPPED  I WAS SURPRISED TO KNOW THAT THE TIMING CHAIN HAD BROKE AND THE REAR CAM WAS COMPLETELY FROZEN  I HAD THE CAR TOWED TO MY HOUSE AND THERE IT WILL SIT FOR AWHILE  I CANNOT AFFORD TO FIX IT AS THE ESTIMATED COST TO JUST GET INTO IT IS $400, AND THEN MOST LIKELY WILL NEED A NEW ENGINE, <u>I AM ON A MODEST INCOME, AND   I AM STILL MAKING PAYMENTS ON THIS VEHICLE AND HAVE TO CONTINUE TO MAKE PAYMENTS ON A CAR I CAN'T DRIVE. THIS IS MY PRIMARY TRANSPORTATION TO AND FROM WORK, SO IT WILL MOST LIKELY AFFECT MY LIVELIHOOD</u>  I CONTACTED SATURN AND THEY TOLD ME THEY HAD NOT SERVICED THE CAR SINCE 2001 AND PRETTY MUCH I WAS ON MY OWN  I HAD SERVICED THE CAR REGULARLY, BUT NOT AT THE DEALERSHIP **THIS HAPPENED AT 89000 MILES**  I THINK THAT SATURN SHOULD STAND BEHIND THIS PROBLEM AS IT IS A SAFETY ISSUE  APPARENTLY BY THE RESEARCH I HAVE DONE, THIS IS A COMMON PROBLEM WITH SATURNS AND I WANT THEM TO REPLACE MY ENGINE, PARTS AND LABOR AND STAND BEHIND THEIR WORK AS WELL, <u>I FEEL LIKE WITH ALL THE COMPLAINTS THAT THERE SHOULD BE A RECALL, AS WELL AS A CLASS-ACTION SUIT AGAINST SATURN.</u> (Emphasis Added) |

89    A sampling of complaints NHTSA received from owners of Saturn Vue

Class Vehicles similarly report the following information:

Make :              SATURN
Model :             Vue
Year :              2002
VIN :               5GZCZ33D82S
Manufacturer :      GENERAL MOTORS CORP
ODI ID Number :     0162604
Date of Failure:    December 1, 2002
Component:          ENGINE AND ENGINE COOLING
Summary:            THE CONTACT STATED THE VEHICLE HAS
                    IMING CHAIN FAILURE WHICH CAUSES
                    VEHICLE TO STALL  THE CHECK ENGINE LIGHT
                    ILLUMINATED AND THE DEALER CANNOT FIND
                    THE CAUSE OF THE ILLUMINATION  THE
                    TRANSMISSION ALSO HAS PROBLEMS AS WELL
                    AS THE BRAKES


Make :              SATURN
Model :             Vue
Year :              2003
VIN :               n/a
Manufacturer :      GENERAL MOTORS CORP
ODI ID Number :     10166400
Date of Failure:    December 4, 2004
Component:          ENGINE AND ENGINE COOLING
Summary:            I WENT OUT TO START MY CAR  IT MADE A
                    SOUND LIKE IT WAS A DIESEL TRUCK ENGINE  I
                    HAD IT TOWED TO SATURN IN NORWOOD MA
                    ON RT 1  IT WAS MY TIMING CHAIN  IT WAS
                    COVERED UNDER WARRANTY  I AM JUST
                    REPORTING THIS NOW BECAUSE I SAW YOU
                    WERE INVESTIGATING THE BELTS ON OTHER
                    SATURN'S  I READ THAT IT HADN'T EFFECTED
                    THE VUE BUT I WANTED YOU TO KNOW IT
                    DOES  I AM LOOKING UP PROBLEMS WITH THIS
                    CAR BECAUSE I HAVE HAD SO MANY  THE
                    INCIDENT DATE IS ESTIMATED  I PICK MY VUE
                    UP(AGAIN) TODAY FROM THE DEALER I WILL
                    GET A PRINT OUT OF THE EXACT DATE THIS
                    OCCURRED *JB

| | |
|---|---|
| Make : | SATURN |
| Model : | Vue |
| Year : | 2002 |
| VIN : | 5GZCZ23D72S |
| Manufacturer : | GENERAL MOTORS CORP |
| ODI ID Number : | 10223559 |
| Date of Failure: | April 6, 2008 |
| Component: | ENGINE AND ENGINE COOLING |
| | ENGINE GASOLINE BELTS AND |
| | ASSOCIATED PULLEYS |
| Summary: | THE CONTACT OWNS A 2002 SATURN VUE WHILE DRIVING APPROXIMATELY 40 MPH, THE CHECK ENGINE LIGHT AND THE LOW POWER LIGHT ILLUMINATED ON THE INSTRUMENT PANEL THE VEHICLE SHUT OFF COMPLETELY AND WOULD NOT RESTART AFTER SEVERAL ATTEMPTS THE VEHICLE WAS DIAGNOSED AS HAVING TIMING CHAIN FAILURE THE VIN WAS NOT INCLUDED IN NHTSA CAMPAIGN ID NUMBER 07V519000 (ENGINE AND ENGINE COOLING) THE CURRENT AND FAILURE MILEAGES WERE 125,000 |

| | |
|---|---|
| Make : | SATURN |
| Model : | Vue |
| Year : | 2002 |
| VIN : | n/a |
| Manufacturer : | GENERAL MOTORS CORP |
| ODI ID Number : | 10212646 |
| Date of Failure: | November 6, 2007 |
| Component: | ENGINE AND ENGINE COOLING |
| | ENGINE GASOLINE BELTS AND |
| | ASSOCIATED PULLEYS |
| Summary: | THE ONLY "EVENT" WHICH LED TO THE FAILURE WAS ACCELERATING TO THEN MERGE INTO ONCOMING TRAFFIC THE TIMING CHAIN FAILED/BROKE DURING ACCELERATION WHILE MERGING WITH ONCOMING TRAFFIC POWER WAS THEN LOST,THE VEHICLE DIED WHILE GOING DOWNHILL THIS CAUSED LOSS OF FULL BRAKES AND STEERING WHILE THE VEHICLE ROLLED TO A STOP THE CHAIN THEN DAMAGED MULTIPLE VALVES LEADING TO A POTENTIAL MINIMUM $2000 REPAIR *TR |

Make :            SATURN
Model :           Vue
Year :            2002
VIN :             n/a
Manufacturer :    GENERAL MOTORS CORP
ODI ID Number :   10183344
Date of Failure:  February 18, 2007
Component:        ENGINE AND ENGINE COOLING
                  ENGINE
Summary:          DRIVING AT @ 35 MILES PER HOUR IN OUR 2002
                  SATURN VUE WHEN IT STOPPED  JUST
                  STOPPED  WAITED 2 HOURS IN FRIGID
                  CONDITIONS FOR A TOW  FOUND OUT THE
                  FOLLOWING DAY THAT THE TIMING CHAIN
                  HAD SNAPPED  THIS IN TURN DAMAGED TWO
                  OF THE ENGINE VALVES CAUSING 1400
                  DOLLARS IN DAMAGE  VEHICLE HAS ONLY
                  65,000 MILES  *NM

Make :            SATURN
Model :           Vue
Year :            2002
VIN :             5GZCZ23D62S
Manufacturer :    GENERAL MOTORS CORP
ODI ID Number :   10177030
Date of Failure:  December 18, 2006
Component:        ENGINE AND ENGINE COOLING ENGINE
Summary:          INCIDENT = SECOND INSTANCE IN 54,438 MILES
                  OF  TIMING CHAIN 'SLIPPED' DUE TO LACK OF
                  LUBRICATION  THIS IS ON MY 2002 SATURN
                  VUE, 4 CYL  ENGINE - FRONT WHEEL DRIVE
                  SATURN BLAMES ME FOR NOT KEEPING UP
                  WITH THE EVERY 3000 MILE OIL CHANGE
                  REQUIREMENT  (AND IS SATISFIED TO LOOK NO
                  FURTHER FOR OTHER CAUSES ) I HAVE SEEN A
                  REPORT, ON THIS SITE, OF AN INVESTIGATION
                  INTO FREQUENT TIMING CHAIN FAILURES IN L-
                  SERIES MODELS (HAVING THE SAME ENGINE)
                  THE REPORT REFERENCES LACK OF OIL FLOW
                  TO THE TIMING CHAIN WHEN OPERATING AT
                  LOW RPM  (THIS IS THE TYPE OF DRIVING I DO )
                  THE REPORT ALSO REFERENCES "ALL TIMING
                  CHAIN SERVICE KITS NOW AVAILABLE WILL
                  INCLUDE AN OILING NOZZEL, A NEW DESIGN
                  THAT WILL INCREASE OIL FLOW TO THE
                  TIMING CHAIN UNDER LOW RPM OPERATING
                  CONDITIONS"  THE FIRST INSTANCE WAS
                  COVERED UNDER WARRANTEE AT 24,663
                  MILES  THE CURRENT INSTANCE OCCURRED AT
                  54,438 MI  , AND IS NOW OUT OF WARRANTEE

38

DAMAGE RESULTING = ENGINE DAMAGE FOR THE SECOND INSTANCE IS "BEYOND REPAIR", AND I AM TOLD THE ENGINE MUST BE REPLACED EVEN THOUGH THE VEHICLE IS OUT OF WARANTEE, SATURN OFFERS TO PAY 50% OF THE COST OF A REBUILT ENGINE REPLACEMENT BUT, I CANNOT AFFORD EVEN 50% AT THIS TIME I HAVE OPENNED A CASE WITH SATURN TO GET MORE SUPPORT THE CASE IS CURRENTLY AWAITING ACTION BY THE DISTRICT MANAGER WHO IS ON VACATION UNTIL THE FIRTST OF THE YEAR *NM

| | |
|---|---|
| Make : | SATURN |
| Model . | Vue |
| Year : | 2002 |
| VIN : | 5GZCZ23D72S |
| Manufacturer : | GENERAL MOTORS CORP |
| ODI ID Number : | 10223553 |
| Date of Failure: | April 6, 2008 |
| Component: | ENGINE AND ENGINE COOLING |
| Summary: | I BEGAN TO HEAR A LITTLE BIT MORE ENGINE NOISE THAN NORMAL, LIKE A TAPPING NOISE I HAD THE OIL CHANGED AS I DID REGULARLY AND WITHIN MANUFACTURERS RECOMMENDATION LOCAL MECHANIC SAID IT WAS THE TIMING CHAIN AND TO CONTINUE WITH FREQUENT OIL CHANGES CAR DIED WHILE TRAVELING AT 40 MPH LOCALLY ON THE WEEKEND, BUT COULD HAVE HAPPENED WHILE TRAVELING 65MPH ON MY WAY TO WORK IF IT WAS A WEEKDAY LUCKILY, I WAS ABLE TO PULL IMMEDIATELY INTO A SIDE STREET AND HAVE THE CAR TOWED TO LOCAL GOODYEAR SERVICE CENTER I'VE SEEN INTERNET POSTINGS CITING THE SAME PROBLEMS ON SATURN MODELS WITH THE SAME ENGINE THERE MAY EVEN BE A RECALL FOR THE L-CLASS SATURN CARS WITH THE SAME ENGINE AND NOT THE VUE? *TR |

| | |
|---|---|
| Make : | SATURN |
| Model : | Vue |
| Year : | 2002 |
| VIN : | 5GZCZ23D72S |
| Manufacturer · | GENERAL MOTORS CORP |
| ODI ID Number . | 10215980 |
| Date of Failure: | January 18, 2008 |
| Component: | ENGINE AND ENGINE COOLING ENGINE |
| Summary: | THE CONTACT OWNS A 2002 SATURN VUE WHILE DRIVING APPROXIMATELY 60 MPH, THE CONTACT NOTICED THAT THE ENGINE AND REDUCED POWER LIGHTS ILLUMINATED ON THE INSTRUMENT CONTROL PANEL  THE VEHICLE COMPLETELY LOST POWER  THE CONTACT HAD TO SHIFT INTO NEUTRAL IN ORDER TO PULL OFF THE ROAD  THE VEHICLE WAS TOWED TO A LOCAL DEALER AND THEY STATED THAT THE TIMING CHAIN FAILED  SHE HAS PICTURES OF THE FAILED COMPONENT  THE CONTACT FILED A FORMAL COMPLAINT WITH THE MANUFACTURER  THE FAILURE AND CURRENT MILEAGES WERE 117,000  UPDATED 02/15/08  *LJ |

| | |
|---|---|
| Make : | SATURN |
| Model : | Vue |
| Year : | 2002 |
| VIN : | 5GZCZ23D52S |
| Manufacturer : | GENERAL MOTORS CORP |
| ODI ID Number : | 10198171 |
| Date of Failure: | July 27, 2007 |
| Component: | ENGINE AND ENGINE COOLING |
| Summary: | THE CONTACT OWNS 2002 SATURN VUE  WHILE DRIVING 70 MPH, HE HEARD A NOISE IN THE ENGINE  THE CHECK ENGINE AND REDUCE POWER LIGHT WERE ALSO ILLUMINATED  THE VEHICLE DRIFTED INTO THE SLOW LANE ALLOWING HIM TO STOP  THE VEHICLE WOULD NOT RESTART  THE VEHICLE WAS TOWED AND THE MECHANIC STATED THAT FAULTY WIRING CAUSED THE FAILURE  THE MECHANIC REPAIRED THE WIRING, HOWEVER, THE TIMING CHAIN FELL OFF  VEHICLE MAINTENANCE HAS BEEN UP TO DATE SINCE HE PURCHASED THE VEHICLE  THE TIMING CHAIN SHOULD NOT HAVE FAILED DUE TO THE MILEAGE  THE CURRENT AND FAILURE MILEAGES WERE 88,165 |

40

| | |
|---|---|
| Make : | SATURN |
| Model . | Vue |
| Year : | 2002 |
| VIN : | 5GZCZ23D92S |
| Manufacturer : | GENERAL MOTORS CORP |
| ODI ID Number : | 10192916 |
| Date of Failure: | June 4, 2007 |
| Component: | ENGINE AND ENGINE COOLING |
| Summary: | THE TIMING CHAIN ON MY 2002 SATURN VUE, THAT HAS ONLY 55,000 MILES ON IT, BROKE, CAUSING THE ENGINE TO BE DESTROYED (ENGINE DESTROYED WAS VERIFIED BY THE DEALERSHIP I TOOK IT TO, THEY SAID IT WAS SOMETHING THEY HAD NEVER SEEN HAPPEN, YET I SEE MANY COMPLAINTS ABOUT THEIR L SERIES HERE MY CAR HAS THE SAME ENGINE AS IT WAS THE FIRST YEAR THE VUE WAS MADE AND THE ENGINE WAS THE SAME AS THE L SERIES THAT YEAR) *TR |

| | |
|---|---|
| Make : | SATURN |
| Model : | Vue |
| Year : | 2002 |
| VIN : | JT4RN81A1N0 |
| Manufacturer : | GENERAL MOTORS CORP |
| ODI ID Number : | 10169554 |
| Date of Failure: | September 26, 2006 |
| Component: | ENGINE AND ENGINE COOLING |
| Summary: | 2002 SATURN VUE (65,000 MILES) MAKING NOISE  WOULD NOT START, TOWED TO MECHANIC  TIMING CHAIN FAILURE CAUSING ENGINE DAMAGE  ESTIMATED COST IS $3000, LOSS OF VEHICLE FOR AT LEAST A WEEK WHILE BEING REPAIRED  CURRENTLY AT THE MECHANICS AWAITING REPAIR. *JB |

| | |
|---|---|
| Make : | SATURN |
| Model : | Vue |
| Year : | 2002 |
| VIN : | 5GZCZ63B92S |
| Manufacturer : | GENERAL MOTORS CORP |
| ODI ID Number : | 10168290 |
| Date of Failure: | August 25, 2006 |
| Component: | ENGINE AND ENGINE COOLING |
| Summary: | WHILE DRIVING ON THE HIGHWAY, OUR 2002 VUE MADE A GRINDING NOISE AND THEN BEGAN TO LOSE POWER  AS WE WERE PULLING OFF TO THE SIDE, THE VEHICLE STALLED AND THEN WOULD NOT RE-START  THE SATURN |

DEALERSHIP TOWED THE VUE TO THEIR LOT
AND INFORMED US , THAT THE TIMING CHAIN
HAD SKIPPED AND BLEW THE MOTOR  THE
TIMING CHAIN WAS SUPPOSED TO BE NO
MAINTENANCE AND DIDN'T EVEN NEED TO BE
CHECKED UNTIL 100,000 MILES  MY VUE HAD
65,000 MILES  AFTER 3 WEEKS WE WERE TOLD
THAT THEY WOULD REBUILD THE ENGINE AT A
COST OF $3500- $3800 AND SATURN WOULD PAY
HALF OF THAT COST  SEVERAL WEEKS PRIOR,
THE VEHICLE WAS STALLING WHILE DRIVING
AND WOULD NOT RESTART UNTIL IT COOLED
OFF  WE TOOK IT TO THE DEALERSHIP AND
THEY REPLACED A SENSOR FOR THE CAM
SHAFT  THE SWITCH FOR THE BACK WIPER HAS
BEEN REPLACED AND WE WERE TOLD BY
SATURN TECH'S THAT THE MOTOR FOR THE
BACK WIPER ALSO NEEDS TO BE REPLACED,
AGAIN AT OUR COST. *JB

90    Consumer websites are inundated with consumer complaints of Saturn

Class Vehicles with broken Timing Chains  The following are a sampling from

http //www topix com/forum/state/nc/T7FEOD6MENJBK4OGA/p4

Reply »

**Walt**
**Birmingham,**
**MI**

Mar 4 2007
I want to encourage everyone that had a timing chain issue with his or her Saturn L200 or LW200 to write to the NHTSA
When my chain broke last December (on a 50 MPH 2-lane highway)  I wrote to the NHTSA to complain  Just this week
(March 2 2007), the NHTSA responded for a request for additional information  They stated that the case has been re-
opened do to the growing number of reported chain failures  They are especially interested in chains that broke while the
car was on the road (GM maintains it is not a safety issue as the chain usually breaks at start up )  While it cost ~$2500 to fix
our car  I am more concern with the safety aspect  We came close on being hit when our chain broke  We need to give the
NHTSA enough information to force GM to fix this problem before someone gets hurt or worse  The NHTSA web site is
http //www nhtsa dot gov

**Dennis P**
**Brigham City,**
**UT**

Mar 13, 2007
I have a 2001 LS200  it has 155,000 miles and at 75,000 the timing chain had to be replaced, just like clockwork at 150 000
it had to be replaced again  Each time cost me about $600

**James**
**Lanning**
**Greenville, SC**

Mar 15  2007
I had a Saturn 2002 LS200, it hit 75000 miles and the timing chain broke  The dealer give me a price of $2941 40 for a
rebuild motor with a one year warranty  They told me the chain broke because I went over the 3000 mile oil change to many
times  That was bull and they knew it when they told me  Thats why I said I had a Saturn, I now have another Hyundai

**Wesley**
**DeVries**
**Waterford,**
**Canada**

Mar 29  2007
2002 Saturn  Just broke the timing chain at 160 000 KM  I've had a lemon Windstar & Caravan!  You'd think I would have
learned

I bought a Honda  Life is better now!

**J Tohlen**
**Langhorne,**
**PA**

Mar 31  2007
Mine 2002 Saturn L200  timing chain broke  absolutely no warning whatsoever  51000 Miles while doing about 65 miles an

hour  Never forget the Saturn service manager saying well you should have heard or noticed something wrong  not to
mention her refusal to acknowledge the TSB that I found on the oil nozzle  After screaming at Saturn customer service and
the regional Saturn representative they did it as if I had the worst possible extended warranty, so my rebuilt engine only cost
me 2000 bucks  I loved my Saturn up to that very minute the chain broke  but considering one of the major reasons I picked
it over the Accord was the fact it had a chain the Accord still had a belt, after that I could care less about the car and will
never buy another Saturn

| | |
|---|---|
| **A Props** <br> _Mulberry, IN_ | **Apr 9  2007** <br> Has anyone found out if the timing chain has been recalled? I have a 2000 LS1 and it just stopped and won't start  We checked the starter and battery  Both are fine  My husband thinks it is the timing chain |
| **brazzle** <br> _Tors Cove,_ <br> _Canada_ | **Apr 23  2007** <br> I have a 2001 l2oo  my timming chain broke last week and desroyed the heads     it is 499 99+tax for the chain kit but I got lucky with an engine with only 15 000kms for 640 00+tax  the car only had 120 000kms  there is definitly a problem with these cars and satum refuses to do anything about it   needless to say SATURN SUCKS!!!!! |
| **Wayne** <br> _Schaumburg,_ <br> _IL_ | **Apr 25  2007** <br> Timing chain broke on my 2001 LS200 with 78 000 well maintained miles  Problem was defective oil nozzle which is a well documented problem  Saturn never issued a recall and is soaking all us poor slobs  even going so far as to blame US for not changing oil properly (apparently  this is the Corporate response to all their loyal customers!) Needlee to say  I will NEVER purchase another GM or Saturn vehicle and am in the process of taking them to small claims court (had to pay $3,100 for a USED engine) I suggest everyone write to the NHTSA and the Attorney General's office regarding this scam |
| **John** <br> AOL | My timing chain broke driving down a two lane highway yesterday  May 11  2007  There was no warning  the dealership has told me it will be $2300 00 to fix  Out of warranty  I definitely feel it is a safety issue  GM needs to warn and recall  My 2002 L series has less than 40  000 miles |
| **Harold** <br> _Billerica, MA_ | **May 15  2007** <br> I have a 2000 LS with a timing chain which was just told may have jumped and caused the values to bend $$$$ I called Saturn of Medford MA and they said they can do nothing for me |
| **tasher** <br> _Moline, MI_ | **May 19  2007** <br> I took my 2003 Saturn Ion in because of engine noise  I have always changed my oil regulary and only have 20 800 miles on the car, have never had any warning lights come on and it has always shown that it is operating at proper operating temperatures <br><br> I first took it to a local mechanic and they said they thought the timing chain was going and suggested I take it to Saturn and that I shouldn t drive it to prevent further damage <br><br> I contacted Saturn and was told by Customer Satisfaction and by the Service Manager that they would help me  They agreed that the mileage was awfully low to be having this kind of problem <br><br> Now I am being blamed for the problem "oil deprevation"  The entire engine needs to be replaced  I don't think I should be responsible for the defects the car obviously has  If I were to get the car fixed  I don't think I could trust to drive it again  In another 20 000 miles is it going to happen again? <br><br> I m not getting anywhere with Saturn  If anyone has any suggestions, any advise would be greatly appreciated |

91      The following is a sampling of the 122 consumer complaints of broken

Timing Chains on Vue, Ion and L-Series Class Vehicles, which caused thousands of

dollars of damages to Class Vehicles, as well as complaints of GM's refusal to take

responsibility for repairing the damaged vehicles

*See* http //www carsurvey org/viewmorecomments_review_56674_5 html

### 31st Mar 2007, 14:31

On March 29, I was sitting in my 2001 Saturn L-100 waiting for traffic to clear I stepped on the gas and the engine revved up as usual, and the car accelerated almost to highway speed At about 45 mph, the car completely lost power and I coasted it to the side of the road The problem? You guessed it, timing chain failure I will be going to the local dealership on Monday, but I have very little hope that the problem will be solved to my satisfaction I will be keeping you all posted on the results of the visit

### 1st Apr 2007, 01:46

OK Yet another one Friday morning my L200 wouldn't start - made a whirring sound and the engine didn't turn over. Had it towed to the dealer and same story

1400 to take apart the motor and see what the damage is JUST TO SEE WHAT IT IS 4k to fix it probably

They also said that it would be worth something as a trade in if I want a new car

Fine My car is paid for- I'm going to go there this week and sell it to them for whatever they want it as a trade

I'm probably never going to buy a Saturn again

### 14th Apr 2007, 12:11

April 14, 2007

This will be short Read any of the aforementioned horror stories and it would be the same as mine My 2001 L200 Saturn with 54,000 miles had its timing chain go yesterday and I have no idea of the cost of repairs as of yet It went out at 40 MPH while driving in heavy traffic on Hwy 101 in Washington State So far $116 00 tow bill I will get on the phone on Monday April 16,2007 to start my round of complaints

### 27th Apr 2007, 11:18

Ditto on another timing chain problem 2000 Saturn LS1 @ 80,000 miles In the shop with $1400 repair estimate and no help from Saturn

### 13th May 2007, 14:49

My timing chain broke driving down a two lane highway May 11, 2007 There was no warning The dealership has told me it will be $2300 00 to fix Out of warranty I definitely feel it is a safety issue GM needs to warn and recall My 2002 L series has less than 40, 000 miles It looks like I am the latest in a long

line of owners who have had this problem I will be contacting NHTSA this week

### 13th Jun 2007, 16:07

I am yet another Saturn 2000 L Series owner with a failed timing chain at 46322 miles It is very sad to see how GM's Saturn Division has turned their backs on an obvious design flaw that they created We all bought their products based upon their track record of being honest and responsible This is why my company car is a Nissan GM, wake up, do the right thing and compete rather then complain I don't have much faith that they will, but I wonder if they care?

### 22nd Jun 2007, 09:06

What august company I find myself in - we had a failure while in operation at 84,700 while in Richmond on April 17, 2007 on our 2001 L200, bought new from Saturn of Fairfax in June 2001 It was the 2nd of what would become four Saturn purchases between 1999 and 2004 I was pulling out of a stop sign, when poof! Was told on April 19, 2007 by Saturn of Manassas that the chain is to be replaced at the 90,000 mile scheduled service, an interval not yet reached The vehicle had a 60000 mile car-care/extended warranty plan on it - and it seems certain that Saturn knew of the problem well before that period expired

Saturn, aside from being inept in the customer assistance center in Tennessee, has taken to offering a pittance of 15% off of a warranty price, still totalling some $3000 Their "area managers" won't give a last name and claim they have no supervisor When pressed, they give up the name of the General Manager of Saturn Corporation I had 9 pages of email thread on my case with them - they pretend to be a liaison between customer and local facility, yet they did a very poor job at that

Their General Manager (Jill Lajdziak) will not answer letters, nor will the higher-ups at GM whom it was copied to - G Richard Wagoner, Jr , Troy A Clarke and Mark R LaNeve It has been four weeks since my four-page letter to Ms Lajdziak was received by Fedex - nothing I was so annoyed at the lack of response that I sent a fresh letter just to Mr LaNeve yesterday by FedEx, and then heard him on the Sean Hannity show yesterday afternoon (My only contact since then? A postcard from Saturn of Manassas on June 12, 2007 advertising new car lease rates!)

I have taken to blogging about my poor experience at http //dontbuysaturn blogspot com/, as I feel it is important that the story be told of how GM will not stand behind their product I filed my own NHTSA complaint on May 18, 2007 after Saturn made its insulting offer

I fear for the safety of my family in our remaining Saturn, a 2004 VUE AWD V6, for I have lost faith in Saturn and GM I suppose the only upside is the 2004 year had a Honda engine and transmission The whole situation, now 66 days and running, has put additional miles on the VUE, as well as the inconvenience of being down to one vehicle

Rob McKeever, Manassas VA  robmckii@aol com

### 30th Jun 2007, 19:50

I've joined the club, and you all have my empathy  Timing chain failed at 80k
two days ago, 2001 L200, which I bought used from Saturn almost three years
ago with 39k on it  I tried to start it the other day and the chain beat the heck out
of the top of the engine  Total repair cost  $2,900  Because it's a holiday
week/weekend, I'm waiting for my return call  PLEASE--EVERYONE--make a
complaint with NHTSA  I just got back last week from a trip to KY for a funeral
and thank God this didn't happen on I-75 in the hills!  After reading all these
experiences, it is a miracle that no one has died

### 4th Jul 2007, 19:49

Here we go again  I will not burden everyone with a long story  just read the
past entries  It's the same story over and over again  This is almost
criminal  2002 Saturn L200 broken timing chain while my 18 Year old daughter
was driving through an interstate interchange  Same story as many others
Saturn and dealer denying any responsibility  are you kidding me  we all need
to contact our State Attorney Generals and have something done about this  In
the meantime NEVER buy a Saturn  especially from Saturn of Medford
Massachusetts

### 6th Jul 2007, 15:39

Just want to add to all the other posts  Saturn 2001 L200 Wagon 88k miles
Timing chain broke while I was traveling around 30 MPH  Lost power steering
and brakes, but got it safely parked  Had chain replaced, but now told I have
engine damage  extent being determined  Already posted an incident report on
the NHTSA site  Never had a single problem other than battery replacement until
today

### 11th Jul 2007, 11:28

May 14, 2007  I am the next victim of the failed timing chain  At 75,000 miles,
the engine had only ever had Synthetic Oil and the Saturn Technician commented
on how clean the inside was  Given my automotive engineering background, I
(like many of you) also know how most of the NHTSA and OEM Technical
Service Bulletin processes work

I learned of the NHTSA investigations, the TSB and gained access to all the data
GM had to supply the NHTSA as part of the investigation  The facts are that GM
is aware of a 4 month build window of the Ecotec 2 2L engine in which the
timing chain failure rate was 10 times greater than normal, affecting over 25,000
cars  In addition, the Saturn sales force marketed the high durability of the 2 2l
metal timing chain as a strength over the 6 cylinder with a Kevlar belt that must

be changed at 100k  Most of this was known all the way back in 2002 and the preventive measure of performing the work in the TSB would have been cheaper as compared to a new engine  I would have gladly paid to prevent the cost of a new or rebuilt engine

The result  I had a great perception of Saturn til now  Saturn made no attempt to inform me and therefore denied me the ability to prevent damage to my property  In addition, I was offended by the treatment toward me, especially as I approached the issue with facts, logic and the openness to resolution  Saturn has lost this customer and GM appears to be sticking to the "trick your customer" approach as opposed to the "keep your customer" approach  Pretty short-sighted

Saturn offered to pay for half a new engine    still over $3k out of my pocket

**27th Aug 2007, 19:23**
Saturday our dealer maintained and cared for 2000 L300m (54,000 miles) suffered a sudden and completely unexpected timing chain break that will cost hundreds to fix, only to get it to where the dealer (or another reputable shop we also had look at it) will be able to determine if valves and pistons are also damaged  According to both, this is highly likely  In searching tonight, I was shocked to see both the sheer number of similar problems, as well as the fact that Saturn has apparently known of this and offered an upgrade Oiling kit (also expensive) as a means of attempting to prevent this serious defect from destroying other motors  The Saturn maintenance schedule clearly states the timing chain should be replaced at 100,000 miles  I, too, would like to know about these 412,000 alleged complaints and how to verify that number  As an attorney, I intend to explore this vigorously

**30th Aug 2007, 10:49**
Before I spent $813 dollars on a timing chain replacement - I wanted to know how many L200's were built (Saturn would not tell me) and I wanted to know how many had broken chains (again - according to Saturn, no one knows - and they say they have no way of finding out)

Their responses to the two NHSTA investigations, their redesign of the components, and their inability to discuss this subject in an honest way .  scared me

I spent the money to fix the car  GM may be willing to play the odds with my family's safety - but I'm not

**5th Oct 2007, 20:43**
I have a 2001 Saturn L200 (seems to be quite the popular car    on here at least!)  I took my car in to get a new ignition cylinder/housing  Went to pick up my car (hours after it was originally supposed to be done), and the mechanic started the

car it started up fine He turned it off to do some paperwork. He got in the car
to pull it out of the garage and, low and behold, they come back to tell us that my
timing chain has just broken¹¹ First, I'm thinking   you broke it, you fix it Now,
as I'm sitting here thinking about Monday, when I get the nice call from the Area
Manager, who knows I'm seeking financial assistance (I didn't know this was a
problem with my series of car before speaking to them), I can pretty much
predict what he'll have to say to me

I just wish GM would realize there is a mistake with the car, take the losses, and
move on "Wish" being the key word there

**16th Dec 2007, 20:34**
Just want to add my experience in with all these others  64,000 miles, highway
speed, chain broke  Towed in, extended warranty covered $100 of the $130 tow
The windshield that was bashed in during it's 16 hour sit on the highway was out
of my pocket ($208)  the dealer demanded maintainence records which I
produced  If I had not been able to produce these records, I'm sure they would
have denied the claim on the extended used car warranty plan  As it is, it is being
repaired and should be fixed tomorrow or tuesday  I think it's BS that the dealers
are leaning on this "oil hasn't been changed" story to try and deny any known
problems  I'm in on a class action if it gets started  Contact me at
midnitemaster@hotmail com

Steve

VIII.  **DEFENDANTS SECRETLY RE-DESIGN THE DEFECTIVE TIMING
CHAINS AND OILING NOZZLES BUT CONTINUE TO DENY THE
EXISTENCE OF A DEFECT OR LIABILITY TO CLASS VEHICLE
OWNERS**

**Defendants Advise Saturn Dealers in June 2003
of "Design Changes" to the Timing Chains
and Oiling Nozzles**

92    In late 2001 or early 2002, Defendants re-designed both the Timing Chain

and Oiling Nozzle  According to statements made by Defendants to NHTSA in 2006,

Defendants no longer incorporated the original Timing Chain and Oiling Nozzle in the

vehicles after  (i) April 22, 2002 in Saturn vehicles assembled at the Tonawanda vehicle

plant, and (ii) May 1, 2002 in Saturn vehicles assembled at the Springhill vehicle plant

93      Defendants, however, then waited more than a year before they issued Technical Service Bulletin (TSB) No 03-06-01-017 on June 9, 2003  This TSB notified the Service Departments at Saturn Dealerships that, when they encountered a Class Vehicle that required a Timing Chain repair, the Service Technician should replace the Timing Chain and Oiling Nozzle with a re-designed Timing Chain and Oiling Nozzle

94      More specifically, TSB 03-06-01-017 stated in relevant part

Service Information – Timing Chain Design Change and Revised Service Procedures
2000-2003 Saturn L-Series with 2 2L Engine (VIN F—RPO L61)
2002-2003 Saturn VUE with 2.2L Engine (VIN D – RPO L61)
2003 Saturn ION Vehicles

General Manager, Fixed Operations Manager, Technician

Purpose

The purpose of this bulletin is to communicate updated service procedures to the timing chain and timing chain oiling nozzle due to design changes that have been made to both components  All timing chain kits now available in service will include the Oiling nozzle  **This newer nozzle has higher flow rate characteristics that will increase oil flow to the timing chain under low RPM conditions.**  Whenever replacing a timing chain, it is important to replace the Oiling nozzle

(Emphasis added )

95      *Thus, while publicly denying the existence of any defect associated with the Timing Chain in the Class Vehicles and refusing to cover any non-warranty repairs necessitated by broken Timing Chains in the Class Vehicles, Defendants were secretly informing Saturn Dealers' Service Departments that they should make repairs using the redesigned Timing Chain and Oiling Nozzle – at Class Vehicle owners' expense*

96      Remarkably, as discussed below, it was not until December 2007 -- after this lawsuit was commenced -- that Defendants notified a fraction of purchasers and

49

lessees of the Class Vehicles about the Class Vehicles' defective design, and undertook to retrofit a very limited number of the Class Vehicles with the re-designed Timing Chains and Oiling Nozzles, at Defendants' expense

IX.    **CLASS VEHICLE OWNERS' COMPLAINTS MOUNT AS DEFENDANTS CONTINUE TO PUBLICLY DENY LIABILITY FOR REPAIRING CLASS VEHICLES WHILE SECRETLY ADMITTING A DEFECT**

A.    **NHTSA Begins an Investigation of Timing Chain Breakages in 2000 - 2003 Saturn L- Series and 2003 Saturn Ion Vehicles**

97    The North Carolina Consumers Council, Inc ("NCCC"), a non-profit consumer advocacy group with a large membership base spanning the United States, petitioned NHTSA to open an investigation into Timing Chain failures in Saturn vehicles On December 12, 2005, NCCC's Executive Director, Brad Lamb, issued a "Defect Petition" to NHTSA requesting that NHTSA perform a defect investigation into Saturn L-Series vehicles for Timing Chain failures, in response to the twenty-six consumer complaints it received from drivers alleging Timing Chain failures

98    On the NCCC website, Brad Lamb stated that the Defendants had actual knowledge of the problem, as evidenced through their actions of producing and releasing the modified timing chain and modified timing chain oiling nozzle (as discussed above) Mr Lamb is quoted as saying "The manufacturer knew there was a problem, and knew the problem could happen as early as 25,000 miles  **They would rather the consumer incur the expense of a new engine rather than make the up to $900 upgrade."** (Emphasis added )    *See    Saturn    Defect    Petition,    available    at* http //www ncconsumei org/story22 html The website continues to report that "since the filing of our petition, consumer complaints continue to grow at an astonishing rate " (*Id* )

**B.    NHTSA Grants the Petition and Opens
a Preliminary Evaluation to Assess the Defect**

99    On February 6, 2006, NHTSA announced that it had granted the NCCC's

petition and reported its commencement of Preliminary Evaluation 06-006 ("PE06-006")

"to assess the frequency, trend, scope and safety consequences associated with the

alleged defect in the subject vehicles."

100    By letter dated February 16, 2006, Jeffrey L. Quandt, NHTSA's Chief,

Vehicle Control Division, Office of Defects Investigation (ODI), notified GM's Director

of Product Investigations, Gay P. Kent, that ODI had opened PE06-006 and was

investigating Timing Chain failures in 2000 – 2003 Saturn L- Series and 2003 Saturn Ion

vehicles. Pursuant to PE06-006, the ODI requested that GM produce information relating

to the defective Timing Chain and the defective Oiling Nozzle by March 29, 2006

> This letter is to inform you that the Office of Defects Investigation of the
> National Highway Traffic Safety Administration has opened a Preliminary
> Evaluation (PE06-006) to investigate allegations of timing chain breakage
> resulting in engine stall in certain model year (MY) 2000 to 2003 Saturn
> L-Series and MY Saturn Ion vehicles manufactured by General Motors,
> and to request certain information

> ODI has received 31 complaints alleging timing chain failures in MY
> 2000-2003 Saturn L-Series vehicles equipped with the 2 2L L4 engine In
> most of the complaints the timing chain failure allegedly resulted in a
> sudden loss of power and engine stall

**C.    GM's Response to NHTSA's Information Request
Admits that Defendants had Actual Knowledge
of the Design Defect in the Class Vehicles as Early as 1999**

101.    In a letter dated April 12, 2006, GM responded to the ODI's February 16th

information request (the "April 12, 2006 GM Letter").

102    The April 12, 2006 GM Letter disclosed that GM had (ı) received over 1,020 consumer reports or field reports that indicated that the Timing Chains were broken or replaced, and (ıı) 2,203 Warranty Claims involving broken Timing Chains in the 2000 – 2003 Saturn L-Series vehicles   The sheer number of complaints and Warranty Claims once again proves, beyond all doubt, that Defendants had knowledge of the existence of the defect in the Class Vehicles

103    The April 12, 2006 GM Letter further admits that Defendants were on notice of the defective condition of the Timing Chains and Oiling Nozzles in the Class Vehicles shortly after the first of the L-Series Class Vehicles rolled off the assembly lines in 1999   (Tellingly, Defendants never acknowledge to NHTSA the contents of the June 1997 TSB 03-06-01-017, wherein Defendants secretly admitted the need for a continuous flow of oil to the timing chains )

104    Table B of the April 12, 2006 GM Letter "summarizes the actions performed by GM that relates to the subject condition," ı e , the broken Timing Chains in the Class Vehicles   According to the first entry in Table B, GM began investigating Timing Chain failures in 1999, at the beginning of the introduction of the L-Series Class Vehicles   Specifically, Table B states that, beginning with "Start of Production 1999" the GM Powertrain engineering group,

> Perform[ed] engine teardowns on certain returned engines to determine root cause of failures   Not all returned engines are analyzed This process is typically utilized as an early feedback tool at production launches or requested for specific issues

> Summary of Action   Generate engine teardown detail report and communicate findings to GM Powertrain engineering, Vehicle Engineering, Engine Assembly Plant personnel, and part suppliers as deemed necessary.

(Emphasis added )

105    Table B of the April 12, 2006 GM Letter further states that, even though

GM engineers were seeing broken Timing Chains as early as 1999, GM did not begin

investigating the issue until August 2001, when GM began "investigat[ing] 2000-2001

MY Saturn L-series with broken timing chains where the vehicle suddenly stops running

or stalls " Under "Summary of Action," GM stated

> Reviewed warranty claims   **Considering the S-pin timing chain
> released for the higher performance applications to improve
> robustness** Start development and validation testing of the S-pin timing
> chain

(Emphasis added )

106    It was not until August 2002, however, that GM implemented a "fix" to

the Timing Chain problem  Moreover, GM admitted that its only motivation to come up

with a "fix" was to reduce its cost of warranty repairs, and not to remove unsafe vehicles

from the roads or spare its customers from expensive repairs  According to the April 12,

2006 GM Letter, Table B

> Start Date   August 2002

> **Description   Eliminate occurrences where engines are returned with
> broken timing chains, cylinder head damage, and head gasket
> failures**

> Summary of Action   **Warranty cost reduction was achieved** by
> **increasing component robustness.  A full time flow oil nozzle with
> torque limiting sleeve and the S-pin timing chain (double chromised
> pins) was released to address lubrication and wear conditions.**

(Emphasis added )

53

107    Thus, acknowledging what it knew in June 1997, GM replaced the Oiling

Nozzle, which restricted the flow of oil to the Timing Chain at low and idle speeds, with

a "full time flow oil nozzle," which "enhance[d] timing chain lubrication at low speeds "

108    According to the April 12, 2006 GM Letter, the original Oiling Nozzle

> [W]as originally a pintle valve and regulator spring design  In this design,
> the nozzle flow rate was 700ccm at an oil pressure of 100kPa, **with
> reduced oil flow at lower pressures**  In 2002, it was speculated that
> **excessive idling in traffic could possibly contribute to conditions
> leading to insufficient lubrication of the timing chain components** on
> some engines  As such, enhancements were made in May 2002 to the
> oiling system to insure lubrication under all idling conditions        **The
> design change included increasing the size of the nozzle orifice and
> elimination of the pintle valve**

(Emphasis added )

109    In addition to being aware that the Timing Chain was less robust (e g , had

smaller pitch and smaller pins) than the steel timing chains used prior to 1999,

Defendants also switched to an "S-pin timing chain (double chromised pins) " One

material difference between the new timing chain and the defective Timing Chain was

that there was approximately 35% more chrome on the pins of the new timing chain,

which was done in order to increase the strength of the timing chain

110    Seeking to limit its cost of addressing the Timing Chain issue, Defendants,

however, proclaimed to NHTSA that the Timing Chain problem was isolated within

certain L-Series Class Vehicles manufactured during a 4 month period and, therefore,

deceptively indicated that the failures were a localized problem  In support of this

position, Defendants pointed to what they claimed to be a statistically higher incidence of

broken Timing Chains in L-Series Class Vehicles built from November 2000 through

February 2001

> Review of the warranty IPTV [Incidents Per Thousand Vehicles] by build of
> month suggests there was a **quality issue on some vehicles built from
> November 2000 through February 2001 (2001 Model Year L-Series)**

(Emphasis added )

111    As demonstrated below, GM's own analysis showed that Timing Chains

were breaking in all of the Class Vehicles manufactured between 1999 and 2002

112    Moreover, in an effort to downplay the safety risk of the defect, GM

asserted that it believed that a "majority of warranty incidents [i e , broken Timing

Chains] occurred while the vehicle was parked since the timing chain is more likely to

break during high chain load situations, such as engine startup " This assertion ignored

the hundreds, if not thousands, of complaints from Saturn owners whose Timing Chains

broke while the vehicles were moving (many at high speeds on highways), thereby

causing a serious safety issue

113    This false assertion regarding safety was later contradicted by NHTSA  In

ODI's closing resume issued on November 9, 2007, in which both ODI and GM data

concerning the defect was reported, ODI stated in relevant part

> During this engineering analysis GM and ODI contacted Saturn owners
> that had warranty work performed related to timing chain replacements or
> repairs in order to determine certain safety consequences associated with
> timing chain failure  Based on analysis of warranty claim verbatim text
> for indications of stall while driving (SWD) and the results from a
> survey of warranty claims with ambiguous text, <u>GM estimated that
> 55% of all timing chain warranty repairs involved SWD incidents.
> ODI's analysis estimated approximately 76% of warranty repairs may
> have involved a SWD</u>  The surveys were also used to assess the safety
> consequences of the SWD incidents  The calls found that none of the
> vehicles that experiencing [sic] stalls due to timing chain failure could be
> restarted  <u>In addition, approximately one-third of the stalls occurred at
> speeds greater than 40 mph and about 20% indicated that they were
> not able to get the vehicle out of traffic after the engine died.</u> GM's
> statistical analyses of failure data estimated stall while driving rates of

1 7% and 5 2% at 3 and 6 years in service  ODI's analyses estimated
slightly higher rates of 2.3% and 7 0% at 3 and 6 years in service

(Emphasis added )

### D.    NHTSA Upgrades the Investigation
Based on the High Rate of Consumer Complaints

114    Dissatisfied with GM's responses to the information requests and in

recognition of. (a) the safety hazards implicated by the defect, (b) the high volume of

consumer complaints, and (c) the large numbers of warranty repairs for broken Timing

Chains, on June 6, 2006, NHTSA's ODI upgraded its investigation to an "Engineering

Analysis," the highest level within NHTSA's investigatory structure   The ODI Resume

status update stated

> On April 12, 2006, ODI received information from GM concerning timing
> chain failures in approximately 412,000 Model Year 2000 through 2003
> Saturn L-Series and ION Vehicles with 2 2L engines  GM's response
> included *1,020 owner complaints and field reports concerning timing
> chain failure, including 228 that alleged the failure caused the vehicle to
> stall while driving*  GM also provided Warranty Claim data that showed
> 1,902 subject Vehicles receiving timing chain repairs, including 261
> which indicated that a stall while driving resulted from the failure....
> GM's data showed elevated failure rates in approximately 20,500 Model
> Year 2001 L-Series Vehicles produced during a four month period from
> November 2000 through February 2001  Over one-third of GM's total
> complaints and field reports (34 3%) and Warranty Claims (38 2%)
> involved L-Series vehicles built during the 4-month period, which are only
> 5% of subject vehicle production  The timing chain failure rate in the
> vehicles built during this range is over 10 times greater than the remaining
> subject vehicle population .  **GM's statistical modeling of the failure
> data initially concluded that the failure rates were declining with age
> and mileage for any set of Warranty Data analyze (e.g. stall while
> driving, other or combined). However, subsequent analysis showed
> that the timing failure rates are increasing.**  Based on the high
> complaint and warranty rates for timing chain failure in the 4-month
> *production period for the Model Year 2001 L-Series Vehicles*, an
> Engineering Analysis has been opened to further assess the frequency of
> stall incidents due to timing chain failures in those Vehicles "

(Emphasis added.)

115    Due to the overwhelming number of failures and subsequent complaints about the Class Vehicles, NHTSA Engineering Analysis remained ongoing until November 9, 2007, two days after Defendants had announced they were recalling certain 2001 Saturn L-Series Class Vehicles

## X.    IN ORDER TO AVOID THE EXPENSE OF A NHTSA MANDATED RECALL OF ALL CLASS VEHICLES DEFENDANTS INSTITUTE A LIMITED RECALL

116    Concerned that NHTSA could require GM to recall all of the Class Vehicles in order to replace the Timing Chains and Oiling Nozzles (and reimburse owners for the cost of prior repairs related to Timing Chain failure), GM "voluntarily" instituted a limited recall of Saturn L-Series Class Vehicles manufactured during a four (4) month period (the Recalled Vehicles)

117    On November 7, 2007 GM notified NHTSA that Defendants had

[D]ecided that a defect, which relates to motor vehicle safety, exists in certain 2001 model year Saturn L-Series vehicles equipped with a 2 2L 4-cylinder (RPO L61 – VIN F) engine. An elevated rate of engine timing chain link separation has occurred

118    In an attachment to GM's November 7, 2007 letter to NHTSA, Defendants identified a mere 20,514 Class Vehicles subject to the recall, out of the total universe of approximately 412,419 Class Vehicles produced with the defective Timing Chains and Oiling Nozzles According to Defendants, all of the Recalled Vehicles are confined to Saturn 2001 L-Series Class Vehicles manufactured between November 2000 and February 2001 (VIN 1Y504884 through 1Y559453)

119    In December 2007, GM issued Recall Bulletin No. 06074, publicly announcing a "Product Safety Recall," stating, in relevant part

57

— - -

Subject        Timing Chain Engine Stall

Models        Certain 2001 Saturn L-Series
              Equipped with 2 2L 4-Cylinder (RPO L61 – VIN F)

CONDITION

General Motors had decided that a defect, which relates to motor vehicle
safety, exists in **certain** model year Saturn L-Series model vehicles,
equipped with a 2 2L 4-cylinder (RPO L61 – VIN F) engine. If the timing
chain fails while the engine is running, the engine will stall and will not
restart

VEHICLES INVOLVED

Involved are **certain** 2001 model year Saturn L-Series model vehicles,
equipped with a 2 2L 4-cylinder (RPO L61 – VIN F) engine built within
these VIN breakpoints

| Year | Division | Model    | From     | Through  |
|------|----------|----------|----------|----------|
| 2001 | Saturn   | L-Series | 1Y504884 | 1Y559453 |

(Emphasis in original )

120    As set forth below, this limited recall has left, by GM's own estimate, the

owners of 391,635 Class Vehicles to  (a) bear the cost of replacing the Timing Chain

before it breaks, at a cost of anywhere from $600 to $900; or (b) bear the expense of the

repairs to their Class Vehicles when the Timing Chains break, more often than not,

causing thousands of dollars in damages to the Class Vehicles

XI.    **DEFENDANTS' LIMITED RECALL OF THE DEFECTIVE
       CLASS VEHICLES IS UNTIMELY AND IGNORES
       HUNDREDS OF THOUSANDS OF DEFECTIVE
       CLASS VEHICLES**

121    Defendants "voluntarily" issued a limited recall of certain 2001 model

year Saturn L-Series Class Vehicles (the Recalled Vehicles) almost nine (9) years after it

first learned of the defect and only after Plaintiffs in this action acted to protect their

interests, and the personal safety and financial interests of others who purchased the defective Class Vehicles, by filing class action lawsuits

122    As set forth above, as a result of the design defect, thousands of owners of the Class Vehicles have experienced Timing Chain failures since 2000, as evidenced by Defendants' own admissions and by the hundreds (if not thousands) of complaints on the Internet

### A.    The Limited Recall is Contrary to TSB 03-06-01-017 and Clearly Evidences Defendants' Wrongful Conduct by Their Refusal to Accept Financial Responsibility for the Defective Timing Chains and Oiling Nozzles

123    As discussed above, when Defendants issued TSB 03-06-01-017 on June 9, 2003, Defendants silently directed its Saturn dealers that, when they encountered any Class Vehicle that required a Timing Chain repair, the Service Technician should repair the Class Vehicle using the redesigned timing chain and oiling nozzle – at the Class Vehicle owner's expense

124    Ignoring the admission made by way of this TSB, and seeking to avoid the cost of recalling all of the defective Class Vehicles, Defendants decided to recall and repair only Saturn model year 2001 L-Series Class Vehicles manufactured between November 2000 and February 2001 (the Recalled Vehicles)

### B.    All of the Class Vehicles Are Defectively Designed

125    In an attachment to its November 7, 2007 letter, GM claims that the defective Timing Chains and Oiling Nozzles are only found in L-Series Class Vehicles that were manufactured from November 2000 through February 2001 Such a claim is patently false, as Defendants' own data demonstrates that Timing Chains have broken in

59

model year 2000 - 2003 Saturn L-Series vehicles, model year 2002 – 2003 Saturn Vue

vehicles, and model year 2003 Saturn Ion vehicles

126    Defendants have admitted that GM produced the following number of

Class Vehicles

| Make/Model | Model Year | 2000 | 2001 | 2002 | 2003 | Total |
|---|---|---|---|---|---|---|
| Saturn L-Series | | 53,255 | 60,892 | 70,984 | 58,393 | 243,504 |
| Saturn Vue | | N/A | N/A | 13,083 | 59,250 | 72,333 |
| Saturn ION | | N/A | N/A | N/A | 96,312 | 96,312 |
| | TOTALS | 53,255 | 60,892 | 84,067 | 213,955 | 412,149 |

127    Defendants have further admitted that, according to their own warranty

records, they received warranty (three years or 36,000 miles, whichever comes first) and

extended warranty claims (optional coverage available at time of purchase) relating to

broken Timing Chains on 2,203 of the Class Vehicles, as follows·

| Make/Model/Model Year | 2000 | 2001 | 2002 | 2003 | Total |
|---|---|---|---|---|---|
| Saturn L-Series | 392 | 926 | 315 | 17 | 1650 |
| Saturn Vue | N/A | N/A | 97 | 334 | 431 |
| Saturn ION | N/A | N/A | N/A | 122 | 122 |
| TOTALS | 392 | 926 | 412 | 473 | 2,203 |

128    The foregoing 2,203 Class Vehicles which suffered broken Timing Chains

do not include Class Vehicles in which Timing Chains broke either after the warranty

expired and/or the repair work was done at a dealership or facility other than a Saturn

dealership

129    Moreover, since many Timing Chains have broken after 36,000 miles, there are thousands more Class Vehicles which experienced broken Timing Chains that are not included in GM's warranty data

130    Finally, since the limited recall applies to only 20,514 model year 2001 L-Series Class Vehicles manufactured between November 2000 and February 2001, according to GM's own production numbers, there are an additional 391,635 Class Vehicles with defective Timing Chains and Oiling Nozzles that are not covered by the recall.

131    This is further borne out by the hundreds of consumer complaints received by NHTSA and other consumer websites which demonstrate broken Timing Chains across all of the Class Vehicle models and model years   This also demonstrates that defective Class Vehicles were manufactured by Defendants outside the four month period identified subject to the recall

132    The North Carolina Consumers Council (NCCC) has criticized the inadequacy of Defendants' limited recall  In a statement posted to its website, the NCCC wrote.

> The complaint data listed on the NHTSA website indicates that the timing chain problem is **not isolated to vehicles produced during this four-month period**. In fact, a 2001 Saturn L-Series vehicle with a 2 2L engine owned by a former NCCC Board Member experienced a timing chain failure  His vehicle was built in September 2000, two months BEFORE the vehicles affected by recall 07V519000

*See New Saturn Recall*, available at http //www ncconsumer org/story49 html> (last visited Mar  6, 2008) (emphasis added)

## TOLLING OF THE STATUTE OF LIMITATIONS

133    The causes of action alleged herein accrued upon discovery of the latently defective nature of the Class Vehicles.  Because the defect and limitations alleged herein are latent and because Defendants took steps to conceal the true character, nature and quality of the Class Vehicles, among other reasons, Plaintiffs and the other members of the Class did not discover and could not have discovered the problems and defects alleged herein through the exercise of reasonable diligence

134    Any applicable statutes of limitations have been tolled by Defendants' knowing and active concealment and denial of the facts as alleged herein  Plaintiffs and the other members of the Class have been kept ignorant of vital information essential to the pursuit of these claims, without any fault or lack of diligence on their part.  Plaintiffs and the other members of the Class could not reasonably have discovered the defects and problems alleged herein because of Defendants' fraudulent concealment

135    Defendants were and are under a continuous duty to disclose to Plaintiffs and the other members of the Class the true character, quality, and nature of the Class Vehicles  Defendants knowingly, affirmatively, and/or actively concealed, and continue to conceal, the true character, quality and nature of the Class Vehicles

136    Defendants knew or should have known that Plaintiffs and the other members of the Class would reasonably rely upon Defendants' knowing, affirmative, and/or active concealment  Based on the foregoing, Defendants are estopped from relying on any statutes of limitation in defense of this action

## CLASS ACTION ALLEGATIONS

137.    Plaintiffs bring this class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and all persons who purchased the Class Vehicles in the Class States whose Timing Chain has failed (the Class)  Excluded from the Class are the Recalled Vehicles, Defendants, any entity that has a controlling interest in Defendants and Defendants' current or former directors or officers.  Any claims for personal injury or consequential damages are expressly excluded from this class action

138    Plaintiffs meet the prerequisites to bring this action on behalf of the Class because

(a)    Numerosity·  The Class consists of thousands of individuals and is so numerous that joinder of all members as individual plaintiffs is impracticable   While the exact number of Class members is unknown and can only be ascertained via discovery, Plaintiffs believe that there are thousands of Class members

(b)    Commonality  There are questions of law and fact common to the Class, including

(i)    Whether Defendants were unjustly enriched by ascertaining benefits conferred by Plaintiffs and the other members of the Class,

(ii)    Whether the Class Vehicles are defective because they were equipped with the defective Timing Chains and the defective Oiling Nozzles,

63

(iii)  Whether Defendants knew or should have known about the defects,

(iv)  Whether Defendants concealed from Plaintiffs and the other members of the Class the material fact that the Class Vehicles were defective;

(v)  Whether Defendants violated the Uniform Deceptive Trade Practices Act codified under Neb Rev. Stat §87-302 (a)(5) and §87-302 (a)(7),

(vi)  Whether Defendants violated the Implied Warranty of Merchantability Pursuant To Iowa Code § 554 2314,

(vii)  Whether GM breached its implied warranty to the Class,

(viii)  Whether the Class Vehicles are merchantable as a result of the design defect; and

(ix)  Whether, as a result of Defendants' misconduct, Plaintiffs and the Class are entitled to damages, restitution, equitable relief or other relief, and the amount and nature of such relief.

(c)  Typicality. Plaintiffs' claims are typical of the claims of the Class because Plaintiffs and members of the Class each sustained damages arising out of Defendants' wrongful conduct as complained of herein; and

(d)  Adequacy  Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs have no interests that are antagonistic to, or in conflict

with, the interests of the Class as a whole, and have engaged competent

counsel, highly experienced in class actions and complex litigation

139    A class action is superior to all other available methods for this

controversy because (i) the prosecution of separate actions by the members of the Class

would create a risk of adjudications with respect to individual members of the Class that

would, as a practical matter, be dispositive of the interests of the other members not

parties to the adjudications, or substantially impair or impede their ability to protect their

interests; (ii) the prosecution of separate actions by the members of the Class would

create a risk of inconsistent or varying adjudications with respect to the individual

members of the Class, which would establish incompatible standards of conduct for

Defendants; (iii) Defendants acted or refused to act on grounds generally applicable to

the Class, and (iv) questions of law and fact common to members of the Class

predominate over any questions affecting only individual members, and a class action is

superior to other available methods for the fair and efficient adjudication of the

controversy

## COUNT I

### (By Plaintiff Faust, Individually, And On Behalf Of All Members Of The Class Who Purchased Or Leased Their Class Vehicles In The State Of Iowa, For Unjust Enrichment Under Iowa Common Law)

140    The allegations of paragraphs 1 through 135 are re-alleged and

incorporated herein by reference

141    This Count is brought against Defendants pursuant to the common law

doctrine of Unjust Enrichment

142    At all times mentioned herein, Defendants developed, manufactured, marketed and sold the Class Vehicles  The Class Vehicles are defective because they were equipped with (i) Oiling Nozzles that failed to properly lubricate the Timing Chains, causing the Timing Chains to break and fail to function properly, and (ii) Timing Chains that are less robust than was in production prior to 1999, the result of which was that these less robust Timing Chains would break when not properly lubricated

143.    Defendants had knowledge of the design defects in as early as 1999 as a result of Defendants' internal investigation of Timing Chain failures  Defendants also had knowledge of the design defect as reflected in the June 1997 TSB 97-T-15A.

144    Furthermore, Defendants had actual knowledge of the design defect because of complaints received from owners and lessees of Class Vehicles whose Timing Chains failed, and NHTSA's investigation of the design defect and the continuous contact and updates provided to Defendants in connection therewith

145    Defendants failed to disclose to Plaintiff Faust and the other members of the Class the material fact that the Class Vehicles contained defective Timing Chains and defective Oiling Nozzles

146    Plaintiff Faust and the other members of the Class did not have knowledge of the defect at the time of purchase or lease and therefore, conferred non-gratuitous benefits, either directly or indirectly, upon Defendants by paying monies to retailers in exchange for their Class Vehicles  A portion of such monies was paid to and received by Defendants

147    Defendants retained these non-gratuitous benefits from Plaintiff Faust and the other members of the Class, regardless of the fact that Defendants failed to

66

disclose the design defect of which Defendants had actual knowledge  The retention of these benefits by Defendants under these circumstances was unjust and inequitable

148    The unjust and inequitable retention of these benefits by Defendants derived from the purchases or leases of the defective Class Vehicles by Plaintiff Faust and the other members of the Class violates the principles of justice and equity Therefore, Defendants must provide restitution to Plaintiff Faust and the other members of the Class in a manner established by the Court

149    Defendants' express warranty is limited to defects in material and workmanship and, accordingly, does not govern the subject matter of this design defect litigation or preclude this cause of action

## COUNT II

**(By Plaintiff Faust, Individually, And On Behalf Of All Members Of The Class Who Purchased Or Leased Their Class Vehicles In The State Of Iowa For Violations Of the Implied Warranty Of Merchantability, Pursuant To Iowa Code § 554.2314 *et seq.*)**

150    The allegations of paragraph 1 through 135, except those that are particular to Count I, are re-alleged and incorporated herein by reference.

151.    The Class Vehicles are "goods" within the meaning of the Iowa Code governing the Implied Warranty of Merchantability

152    Defendants are "merchants" within the meaning of the Iowa Code governing the Implied Warranty of Merchantability because they are sellers and manufacturers of Class Vehicles.

153    The Implied Warranty of Merchantability is implied in the sale of the Class Vehicles and requires, among other things, that the Class Vehicles pass without

objection in the trade and are fit for the ordinary purposes for which the Class Vehicles are used

154    The Class Vehicles do not function in their ordinary capacity and were not merchantable at the time of sale because they were defectively designed.

155    The defect in the Class Vehicles rendered the Class Vehicles non-merchantable because they could not be used for their ordinary purposes and thereby proximately caused the economic damages suffered by Plaintiff Faust and the other members of the Class

156.    Plaintiff Faust provided Defendants with notice of the defect via email correspondence on or about December 5, 2006

157    Any purported disclaimer or limitation of the Implied Warranty of Merchantability on the part of Defendants is unconscionable and unenforceable because, *inter alia*, Defendants had knowledge of the defect

### COUNT III

**(By Plaintiffs Faust and Cardwell, Individually, And On Behalf Of All Members Of The Class Who Either: i) Resided In Nebraska At The Time Of Purchase Or Lease Of The Class Vehicles Or ii) Purchased Or Leased Their Class Vehicles In Nebraska For Violations Of The Neb. Uniform Deceptive Trade Practices Act, R.R.S. Neb. §87-302(a)(5) and §87-302 (a)(7) (2008))**

158    The allegations of paragraphs 1 through 135, except those that are particular to Counts I and II, are re-alleged and incorporated herein by reference

159    At all relevant times herein, Nebraska's Uniform Deceptive Trade Practices Act codified under R R.S. NEB § 87-302 (2008) was in effect. The Nebraska Uniform Deceptive Trade Practices Act prohibits any "deceptive trade practices."

160    Plaintiffs Faust and Cardwell and the other members of the Class are "consumers"

161.    During the Class Period, Defendants manufactured the Class Vehicles, the design of which was defective

162    The Class Vehicles are defective because they were equipped with defective Timing Chains and defective Oiling Nozzles

163    Defendants had knowledge of the design defect in as early as 1999 as a result of Defendants' internal investigation of Timing Chain failures    Defendants also had knowledge of the design defect as reflected in the June 1997 TSB 97-T-15A

164    Furthermore, Defendants had actual knowledge of the design defect because of complaints received from owners and lessees of Class Vehicles whose Timing Chains failed, and NHTSA's investigation of the design defect and the continuous contact and updates provided to Defendants in connection therewith

165    Defendants failed to disclose to Plaintiffs Faust and Cardwell and the other members of the Class the material fact that the Class Vehicles contained defective Timing Chains and defective Oiling Nozzles

166    The omission of this material fact by the Defendants resulted in the purchase or lease of the Class Vehicles by Plaintiffs Faust and Cardwell and the members of the Class, thereby unfairly benefiting Defendants

167    In order to prevent the unfair and deceptive trade practices from continuing, as alleged herein, Defendants must be enjoined from manufacturing and selling the defective Class Vehicles without disclosure of the defect, as permitted by Neb Rev Stat § 87-303(a)

## COUNT IV

**(By Plaintiffs Faust and Cardwell, Individually, And On Behalf Of All Members Of
The Class Who Either: i) Resided In Nebraska at The Time of Purchase Or Lease
Of The Class Vehicles Or ii) Purchased Or Leased Their Class Vehicles In Nebraska
For Violations Of The Nebraska Consumer Protection Act, R.R.S. NEB. §59-1601, *et
seq.* (2008))**

168     The allegations of paragraphs 1 through 135, except those that are
particular to Counts I through III, are re-alleged and incorporated herein by reference

169     At all relevant times herein, Nebraska's Consumer Protection Act codified
under R R S NEB § 59-1601 *et seq* (2008), was in effect  The Nebraska Consumer
Protection Act prohibits any "deceptive acts or practices in the conduct of any trade or
commerce "

170     Defendants are "persons" engaged in "trade or commerce" as those terms
are contemplated in the Consumer Protection Act, Neb  Rev  Stat  § 59-1601

171     During the Class Period, Defendants manufactured the Class Vehicles, the
design of which was defective

172.     The Class Vehicles are defective because they were equipped with
defective Timing Chains and defective Oiling Nozzles

173.     Defendants had knowledge of the design defect in as early as 1999 as a
result of Defendants' internal investigation of Timing Chain failures   Defendants also
had knowledge of the design defect as reflected in the June 1997 TSB 97-T-15A.

174     Furthermore, Defendants had actual knowledge of the design defect
because of complaints received from owners and lessees of Class Vehicles whose Timing
Chains failed, and NHTSA's investigation of the design defect and the continuous
contact and updates provided to Defendants in connection therewith

70

175    Defendants failed to disclose to Plaintiffs Faust and Cardwell and the other members of the Class the material fact that the Class Vehicles contained defective Timing Chains and defective Oiling Nozzles

176    The omission of this material fact by the Defendants resulted in the purchase or lease of these defective Class Vehicles by Plaintiffs Faust and Cardwell and the other members of the Class, thereby unfairly benefiting Defendants

177    This omission constitutes a violation of the Neb Consumer Protection Act, Neb Rev Stat § 59-1601 and entitles Plaintiffs Faust and Cardwell and the other members of the Class to statutory and actual damages, injunctive relief and attorney fees and costs

### COUNT V

**(By Plaintiff Cardwell, Individually, And On Behalf Of All Members Of The Class Who Purchased Or Leased Their Class Vehicles In The State Of Nebraska For Unjust Enrichment Under Nebraska Common Law)**

178    The allegations of paragraphs 1 through 135 are re-alleged and incorporated herein by reference, except those particular to Counts I through IV

179    This Count is brought against Defendants pursuant to the common law doctrine of Unjust Enrichment

180    At all times mentioned herein, Defendants developed, manufactured, marketed and sold the Class Vehicles The Class Vehicles are defective because they were equipped with (i) Oiling Nozzles that failed to properly lubricate the Timing Chains, causing the Timing Chains to break and fail to function properly, and (ii) Timing Chains that are less robust than was in production prior to 1999, the result of which was that these less robust Timing Chains would break when not properly lubricated

71

181    Defendants had knowledge of the design defect in as early as 1999 as a result of Defendants' internal investigation of timing chain failures   Defendants also had knowledge of the design defect as reflected in the June 1997 TSB 97-T-15A.

182    Furthermore, Defendants had actual knowledge of the design defect because of complaints received from owners and lessees of Class Vehicles whose Timing Chains failed, and NHTSA's investigation of the design defect and the continuous contact and updates provided to Defendants in connection therewith.

183    Plaintiff Cardwell and the other members of the Class did not have knowledge of the defect at the time of purchase or lease and therefore, conferred non-gratuitous benefits, either directly or indirectly, upon Defendants by paying monies to retailers in exchange for their Class Vehicles   A portion of such monies was paid to and was received by Defendants

184    Defendants retained these non-gratuitous benefits from Plaintiff Cardwell and the other members of the Class, regardless of the fact that Defendants failed to disclose the design defect of which Defendants had actual knowledge   The retention of these benefits by Defendants under these circumstances was unjust and inequitable

185    The unjust and inequitable retention of these benefits by Defendants derived from the purchases or leases of the defective Class Vehicles by Plaintiff Cardwell and the other members of the Class violates the principles of justice and equity Therefore, Defendants must provide restitution to Plaintiff Cardwell and the other members of the Class in a manner established by the Court

72

186    Defendants' express warranty is limited to defects in material and workmanship and, accordingly, does not govern the subject matter of this design defect litigation or preclude this cause of action

## COUNT VI

**(By Plaintiff Cardwell, Individually, And On Behalf Of All Members Of The Class Who Purchased Or Leased Their Class Vehicles In The State Of Nebraska For Violations Of The Implied Warranty Of Merchantability Pursuant To R.R.S. NEB. (U.C.C.) § 2-314 *et seq.* (2008))**

187    The allegations of paragraph 1 through 135, except those that are particular to Counts I through V, are re-alleged and incorporated herein by reference

188    The Class Vehicles are "goods" within the meaning of the Nebraska Code governing the Implied Warranty of Merchantability

189    Defendants are "merchants" within the meaning of the Nebraska Code governing the Implied Warranty of Merchantability because they are sellers and manufacturers of Class Vehicles

190    The Implied Warranty of Merchantability is implied in the sale of the Class Vehicles and requires, among other things, that the Class Vehicles pass without objection in the trade and are fit for the ordinary purposes for which the Class Vehicles are used

191.    The Class Vehicles do not function in their ordinary capacity and were not merchantable at the time of sale because they were defectively designed

192    The defect in the Class Vehicles rendered the Class Vehicles non-merchantable because they could not be used for their ordinary purposes and thereby proximately caused the economic damages suffered by Plaintiff Cardwell and the other members of the Class

193    Plaintiff Cardwell provided Defendants with notice of the defect on or about January 4, 2008

194    Any purported disclaimer or limitation of the Implied Warranty of Merchantability on the part of Defendants is unconscionable and unenforceable because, *inter alia*, Defendants had knowledge of the defect

## COUNT VII

**(By Plaintiff Burgos Individually, And On Behalf
Of All Members Of The Class Who Purchased  Or Leased Their Class Vehicles
In The State Of Pennsylvania For Violations Of The Implied Warranty Of
Merchantability Pursuant To 13 PA. CONS. STAT. § 2314 *et seq.* (2007))**

195    The allegations of paragraph 1 through 135, except those that are *particular to Counts I through VI, are re-alleged and incorporated herein by reference*

196    The Class Vehicles are "goods" within the meaning of the Pennsylvania statute governing the Implied Warranty of Merchantability

197.    Defendants are "merchants" within the meaning of the Pennsylvania statute governing the Implied Warranty of Merchantability because they are sellers and manufacturers of Class Vehicles

198    The Implied Warranty of Merchantability is implied in the sale of the Class Vehicles and requires, among other things, that the Class Vehicles pass without objection in the trade and are fit for the ordinary purposes for which the Class Vehicles are used

199    The Class Vehicles do not function in their ordinary capacity and were not merchantable at the time of sale because they were defectively designed.

200    The defect in the Class Vehicles rendered the Class Vehicles non-merchantable because they could not be used for their ordinary purposes and thereby

74

proximately caused the economic damages suffered by Plaintiff Burgos and the other members of the Class

201    Plaintiff Burgos provided Defendants with notice of the defect on or about January 28, 2007

202    Any purported disclaimer or limitation of the Implied Warranty of Merchantability on the part of Defendants is unconscionable and unenforceable because, *inter alia*, Defendants had knowledge of the defect

## COUNT VIII

**(By Plaintiff Scott, Individually, And On Behalf Of All Members Of The Class Who Purchased Or Leased A Class Vehicle In The State Of Michigan For Unjust Enrichment Under Michigan Common Law)**

203    The allegations of paragraph 1 through 135, except those that are particular to Counts I through VII, are re-alleged and incorporated herein by reference

204.    This Count is brought against Defendants pursuant to the common law doctrine of Unjust Enrichment

205    At all times mentioned herein, Defendants developed, manufactured, marketed and sold the Class Vehicles The Class Vehicles are defective because they were equipped with (i) Oiling Nozzles that failed to properly lubricate the Timing Chains, causing the Timing Chains to break and fail to function properly, and (ii) Timing Chains that are less robust than was in production prior to 1999, the result of which was that these less robust Timing Chains would break when not properly lubricated

206    Defendants had knowledge of the design defect in as early as 1999 as a result of Defendants' internal investigation of timing chain failures  Defendants also had knowledge of the design defect as reflected in the June 1997 TSB 97-T-15A

207    Furthermore, Defendants had actual knowledge of the design defect because of complaints received from owners and lessees of Class Vehicles whose Timing Chains failed, and NHTSA's investigation of the design defect and the continuous contact and updates provided to Defendants in connection therewith

208    Defendants failed to disclose to Plaintiff Scott and the other members of the Class the material fact that the Class Vehicles contained defective Timing Chains and defective Oiling Nozzles

209.    Plaintiff Scott and the other members of the Class did not have knowledge of the defect at the time of purchase or lease and therefore, conferred non-gratuitous benefits, either directly or indirectly, upon Defendants by paying monies to retailers in exchange for their Class Vehicles    A portion of such monies was paid to and was received by Defendants

210    Defendants retained these non-gratuitous benefits from Plaintiff Scott and the other members of the Class, regardless of the fact that Defendants failed to disclose the design defect of which Defendants had actual knowledge    The retention of these benefits by Defendants under these circumstances was unjust and inequitable.

211    The unjust and inequitable retention of these benefits by Defendants derived from the purchases or leases of the defective Class Vehicles by Plaintiff Scott and the other members of the Class violates the principles of justice and equity.    Therefore, Defendants must provide restitution to Plaintiff Scott and the other members of the Class in a manner established by the Court

212    Defendants' express warranty is limited to defects in material and workmanship and, accordingly, does not govern the subject matter of this design defect litigation or preclude this cause of action

## COUNT IX

### (By Plaintiff Scott Individually, And On Behalf
### Of All Members Of The Class Who Purchased Or Leased Their Class Vehicles
### In The State Of Michigan For Violations of the Implied Warranty Of
### Merchantability Pursuant To MCLS § 440.2314)

213    The allegations of paragraph 1 through 135, except those that are particular to Counts I through VIII, are re-alleged and incorporated herein by reference

214    The Class Vehicles are "goods" within the meaning of the Michigan statute governing the Implied Warranty of Merchantability

215.    Defendants are "merchants" within the meaning of the Michigan statute governing the Implied Warranty of Merchantability because they are sellers and manufacturers of Class Vehicles

216    The Implied Warranty of Merchantability is implied in the sale of the Class Vehicles and requires, among other things, that the Class Vehicles pass without objection in the trade and are fit for the ordinary purposes for which the Class Vehicles are used

217    The Class Vehicles do not function in their ordinary capacity and were not merchantable at the time of sale because they were defectively designed

218    The defect in the Class Vehicles rendered the Class Vehicles non-merchantable because they could not be used for their ordinary purposes and thereby proximately caused the economic damages suffered by Plaintiff Scott and the other members of the Class

219   Plaintiff Scott provided Defendants with notice of the defect via email correspondence on or about September 25, 2007

220   Any purported disclaimer or limitation of the Implied Warranty of Merchantability on the part of Defendants is unconscionable and unenforceable because, *inter alia*, Defendants had knowledge of the defect

## COUNT X

**(By Plaintiff Bauer, Individually, And On Behalf Of All Members Of The Class Who Purchased Or Leased A Class Vehicle In The State Of Missouri For Unjust Enrichment Under Missouri Common Law)**

221   The allegations of paragraph 1 through 135, except those that are particular to Counts I through IX, are re-alleged and incorporated herein by reference

222   This Count is brought against Defendants pursuant to the common law doctrine of Unjust Enrichment

223   At all times mentioned herein, Defendants developed, manufactured, marketed and sold the Class Vehicles  The Class Vehicles are defective because they were equipped with  (i) Oiling Nozzles that failed to properly lubricate the Timing Chains, causing the Timing Chains to break and fail to function properly; and (ii) Timing Chains that are less robust than was in production prior to 1999, the result of which was that these less robust Timing Chains would break when not properly lubricated

224   Defendants had knowledge of the design defect in as early as 1999 as a result of Defendants' internal investigation of timing chain failures  Defendants also had knowledge of the design defect as reflected in the June 1997 TSB 97-T-15A

225   Furthermore, Defendants had actual knowledge of the design defect because of complaints received from owners and lessees of Class Vehicles whose Timing

Chains failed, and NHTSA's investigation of the design defect and the continuous contact and updates provided to Defendants in connection therewith

226    Defendants failed to disclose to Plaintiff Bauer and the other members of the Class the material fact that the Class Vehicles contained defective Timing Chains and defective Oiling Nozzles.

227    Plaintiff Bauer and the other members of the Class did not have knowledge of the defect at the time of purchase or lease and, therefore, conferred non-gratuitous benefits, either directly or indirectly, upon Defendants by paying monies to retailers in exchange for their Class Vehicles   A portion of such monies was paid to and was received by Defendants

228    Defendants retained these non-gratuitous benefits from Plaintiff Bauer and the other members of the Class, regardless of the fact that Defendants failed to disclose the design defect of which Defendants had actual knowledge   The retention of these benefits by Defendants under these circumstances was unjust and inequitable

229    The unjust and inequitable retention of these benefits by Defendants derived from the purchases or leases of the defective Class Vehicles by Plaintiff Bauer and the other members of the Class violates the principles of justice and equity Therefore, Defendants must provide restitution to Plaintiff Bauer and the other members of the Class in a manner established by the Court.

230    Defendants' express warranty is limited to defects in material and workmanship and, accordingly, does not govern the subject matter of this design defect litigation or preclude this cause of action.

## COUNT XI

**(By Plaintiff Bauer, Individually, And On Behalf Of All Members Of The Class Who Purchased Or Leased Their Class Vehicles In The State Of Missouri For Violations Of The Implied Warranty Of Merchantability Pursuant To Mo. Rev. Stat. § 400.2-314 *et seq.*)**

231    The allegations of paragraph 1 through 135, except those that are particular to Counts I through X, are re-alleged and incorporated herein by reference

232    The Class Vehicles are "goods" within the meaning of the Missouri Statute governing the Implied Warranty of Merchantability.

233    Defendants are "merchants" within the meaning of the Missouri Statute governing the Implied Warranty of Merchantability because they are sellers and manufacturers of Class Vehicles

234    The Implied Warranty of Merchantability is implied in the sale of the Class Vehicles and requires, among other things, that the Class Vehicles pass without objection in the trade and are fit for the ordinary purposes for which the Class Vehicles are used

235    The Class Vehicles do not function in their ordinary capacity and were not merchantable at the time of sale because they were defectively designed

236    The defect in the Class Vehicles rendered the Class Vehicles non-merchantable because they could not be used for their ordinary purposes and thereby proximately caused the economic damages suffered by Plaintiff Bauer and the other members of the Class

237    Any purported disclaimer or limitation of the Implied Warranty of Merchantability on the part of Defendants is unconscionable and unenforceable because, *inter alia*, Defendants had knowledge of the defect

## COUNT XII

**(By Plaintiff Bauer, Individually, And On Behalf Of All Members Of The
Class Who Purchased Or Leased A Class Vehicle In The State Of Missouri
For Violations Of Mo. Rev. Stat. §§ 407.010 through 407.307)**

238.    The allegations of paragraphs 1 through 135 except those that are
particular to Counts I through XI, are re-alleged and incorporated herein by reference

239.    This Count is brought against Defendants pursuant to the Missouri
Merchandising Practices Act (the "MMPA")

240.    The MMPA prohibits the use or employment of an omission of a material
fact in connection with the sale or advertisement of any merchandise in trade or
commerce

241.    At all times mentioned herein, Defendants developed, manufactured,
marketed and sold the Class Vehicles. The Class Vehicles are defective because they
were equipped with: (i) Oiling Nozzles that failed to properly lubricate the Timing
Chains, causing the Timing Chains to break and fail to function properly, and (ii) Timing
Chains that are less robust than was in production prior to 1999, the result of which was
that these less robust Timing Chains would break when not properly lubricated

242.    Defendants had knowledge of the design defects as early as 1999 as a
result of Defendants' internal investigation of Timing Chain failures  Defendants also
had knowledge of the design defect as reflected in the June 1997 TSB 97-T-15A

243.    Furthermore, Defendants had actual knowledge of the design defect
because of complaints received from owners and lessees of Class Vehicles whose Timing
Chains failed, and NHTSA's investigation of the design defect and the continuous
contact and updates provided to Defendants in connection therewith

244    Defendants failed to disclose to Plaintiff Bauer and the other members of the Class the material fact that the Class Vehicles contained defective Timing Chains and defective Oiling Nozzles at the time Plaintiff Bauer and the other members of the Class purchased or leased their Class Vehicles

245    Plaintiff Bauer and members of the Class purchased their Class Vehicles for personal, family, or household use

246    As a result of Defendants' violations of the MMPA, Plaintiff Bauer and the other members of the Class have thereby suffered ascertainable losses in an amount to be determined at trial

247    As a result of Defendants' violations of the MMPA, Defendants are liable to Plaintiff Bauer and the other members of the Class for the fees paid for services not performed, interest on those fees, costs of suit, including attorneys' and experts' fees, punitive damages, and such other costs which the Court determines

### COUNT XIII

**(By Plaintiff Leal, Individually, And On Behalf Of All Members Of The Class Who Purchased Or Leased A Class Vehicle In The State Of Florida For Violation Of The Florida Deceptive And Unfair Trade Practices Act, FLA. STAT. § 501.201 *et seq.*, Florida Statutes ("FDUTPA"))**

248    The allegations of paragraph 1 through 135, except those that are particular to Counts I through XII, are re-alleged and incorporated herein by reference

249    Plaintiff Leal and the other members of the Class are "consumers" as that term is defined in FLA STAT § 501 203(7)

250    Plaintiff Leal and the other members of the Class are "persons" as that term is used in FLA STAT § 501 211, and as that term is defined in FLA STAT § 1 01(3)

82

251    FDUTPA makes unlawful any unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce

252    At all times mentioned herein, Defendants developed, manufactured, marketed and sold the Class Vehicles. The Class Vehicles are defective because they were equipped with (i) Oiling Nozzles that failed to properly lubricate the Timing Chains, causing the Timing Chains to break and fail to function properly, and (ii) Timing Chains that are less robust than was in production prior to 1999, the result of which was that these less robust Timing Chains would break when not properly lubricated

253    Defendants had knowledge of the design defect in as early as 1999 as a result of Defendants' internal investigation of timing chain failures   Defendants also had knowledge of the design defect as reflected in the June 1997 TSB 97-T-15A

254    Furthermore, Defendants had actual knowledge of the design defect because of complaints received from owners and lessees of Class Vehicles whose Timing Chains failed, and NHTSA's investigation of the design defect and the continuous contact and updates provided to Defendants in connection therewith.

255    Defendants failed to disclose to Plaintiff Leal and the other members of the Class the material fact that the Class Vehicles contained defective Timing Chains and defective Oiling Nozzles   Defendants' failure to disclose this information constituted a violation of FDUTPA

256    Had Defendants informed Plaintiff Leal and the other members of the Class about the defect, Plaintiff Leal and the other members of the Class would not have purchased the defective Class Vehicles