1   Payam Shahian (State Bar No. 228406)
    STRATEGIC LEGAL PRACTICES, APC
2   e-mail: pshahian@slpattorney.com
3   1875 Century Park East., Suite 700
    Los Angeles, CA 90067
4   Telephone: (310) 277-1040
    Facsimile: (310) 943-3838
5

6   Robert L. Starr (State Bar No. 183052)
    THE LAW OFFICE OF ROBERT L. STARR
7   e-mail: starresq@hotmail.com
    23277 Ventura Boulevard
8   Woodland Hills, California, 91364-1002
    Telephone: (818) 225-9040
9   Facsimile: (818) 225-9042

10  Dara Tabesh (State Bar No. 230434)
    e-mail: DTabesh@hotmail.com
11  201 Spear St. Ste. 1100
12  San Francisco, CA 94105
    Telephone: (415) 595-9208
13  Facsimile: (310) 693-9083

14  Attorneys for Plaintiff Rodolfo F. Mendoza

15

16                  UNITED STATES DISTRICT COURT

17        CENTRAL DISTRICT OF CALIFORNIA—WESTERN DIVISION

18

19  RODOLFO FIDEL MENDOZA,              CASE NO. CV 10-2683 AHM (VBK)
20  individually, and on behalf of a class of
    similarly situated individuals,        Hon. A. Howard Matz
21
                                           **DECLARATION OF DARA TABESH
22            Plaintiff,                    IN SUPPORT OF MEMORANDUM
                                           OF POINTS AND AUTHORITIES IN
23       v.                                OPPOSITION TO PLAINTIFF'S
                                           MOTION TO DISMISS OR
24  GENERAL MOTORS, LLC,                   TRANSFER**
25            Defendant.
                                           Hearing Date: October 11, 2010
26                                         Time:        10:00 a.m.
27                                         Courtroom:   14

28

    **Case No.**: CV 10-2683 AHM (VBK)

    **TABESH DECLARATION IN SUPPORT OF OPPOSITION**

I, Dara Tabesh, Declare as follows:

1.     I am attorney of record for the Plaintiff in the above-entitled action.

2.     I am duly licensed and certified to practice law in the State of California.

3.     I have personal knowledge of the facts set forth herein, except where statements are specifically based upon information and belief, and as to those statements, I am so informed after reasonable investigation and believe them to be true.

4.     If called to testify to the statements in the Declaration, I could and would competently do so under oath.

5.     This Declaration is submitted in regards to Plaintiff's Request for Judicial Notice and Plaintiff's Memorandum of Points and Authorities in Opposition to Motion to Dismiss or Transfer ("Opposition").

6.     Attached as Exhibit 1 to this Declaration is a true and correct copy of the June 26, 2009 Amended and Restated Master Sale and Purchase Agreement ("MPA").

7.      Attached as Exhibit 2 to this Declaration is a true and correct copy of the Order (I) Authorizing Sale of Assets Pursuant to Amended and Restated Master Sale and Purchase Agreement With NGMCO, Inc., a U.S. Treasury-Sponsored Purchaser; (II) Authorizing Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection With the Sale; and (III) Granting Related Relief ) ("Sale Approval Order").

8.     Attached as Exhibit 3 to this Declaration is a true and correct copy of *In re General Motors Corp., et al., Debtors*, 407 B.R. 463 (S.D.N.Y. Bkrpt. July 5, 2009).

9.     Attached as Exhibit 4 to this Declaration is a true and correct copy of *Ehrlich, et al. v. BMW of North America, LLC*, No. 10-1151-ABC-PJWx, Docket No. 28 (C.D. Cal. Aug. 11, 2010).

1      10.    Attached as Exhibit 5 to this Declaration is a true and correct copy of

2  *Marsikian, et al. v. Mercedes Benz USA, LLC, et al.*, No. 2:08-cv-04876-AHM-

3  JTL, Docket No. 46 (C.D. Cal. May 4, 2009).

4      11.    Attached as Exhibit 6 to this Declaration is a true and correct copy of

5  the Report of the Senate Committee on Judiciary regarding Senate Bill 486 for a

6  hearing dated May 4, 1993.

7      12.    Attached as Exhibit 7 to this Declaration is a true and correct copy of

8  *Winn, et al. v. Chrysler Group, LLC*, No. 2:09-cv-02805-MCE-GGH, 2009 WL

9  5206647 (E.D. Cal. 2009).

10      13.    Attached as Exhibit 8 to this Declaration is a true and correct copy of

11  the Chrysler LLC et al., Sale Approval Order: Old Carco LLC f/k/a Chrysler LLC,

12  No. 09-5002 (Bankr. S.D.N.Y. May 20, 2009) (Docket No. 3232).

13      14.    Attached as Exhibit 9 to this Declaration is a true and correct copy of

14  *Winn v. Chrysler Group*, LLC, No. 2:09-02805-MCE-GGH, 2010 WL 1416749

15  (E.D. Cal. 2010).

16

17  Executed this 27th day of September, 2010, at San Francisco, California.

18

19                        /s/

20                        Dara Tabesh, Declarant

21

22

23

24

25

26

27

28

# Exhibit 1

**EXECUTION COPY**

**AMENDED AND RESTATED**

**MASTER SALE AND PURCHASE AGREEMENT**

**BY AND AMONG**

**GENERAL MOTORS CORPORATION,**

**SATURN LLC,**

**SATURN DISTRIBUTION CORPORATION**

**AND**

**CHEVROLET-SATURN OF HARLEM, INC.,**

*as Sellers*

**AND**

**NGMCO, INC.,**

*as Purchaser*

**DATED AS OF**

**JUNE 26, 2009**

## TABLE OF CONTENTS

**DESCRIPTION**                                                                     **PAGE**


ARTICLE I DEFINITIONS ................................................................................ 2

Section 1.1            Defined Terms. ........................................................................2
Section 1.2            Other Interpretive Provisions. ..................................................23

ARTICLE II PURCHASE AND SALE .......................................................... 23

Section 2.1            Purchase and Sale of Assets; Assumption of Liabilities............................23
Section 2.2            Purchased and Excluded Assets...................................................23
Section 2.3            Assumed and Retained Liabilities. ...............................................28
Section 2.4            Non-Assignability. ...................................................................32

ARTICLE III CLOSING; PURCHASE PRICE ........................................... 33

Section 3.1            Closing. ......................................................................................33
Section 3.2            Purchase Price............................................................................34
Section 3.3            Allocation....................................................................................35
Section 3.4            Prorations. ..................................................................................35
Section 3.5            Post-Closing True-up of Certain Accounts...............................36

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF SELLERS ........................... 37

Section 4.1            Organization and Good Standing.............................................37
Section 4.2            Authorization; Enforceability. ..................................................37
Section 4.3            Noncontravention; Consents......................................................37
Section 4.4            Subsidiaries.................................................................................38
Section 4.5            Reports and Financial Statements; Internal Controls.................38
Section 4.6            Absence of Certain Changes and Events. ................................39
Section 4.7            Title to and Sufficiency of Assets.............................................41
Section 4.8            Compliance with Laws; Permits. ..............................................41
Section 4.9            Environmental Laws. .................................................................42
Section 4.10           Employee Benefit Plans. ...........................................................42
Section 4.11           Labor Matters..............................................................................44
Section 4.12           Investigations; Litigation. ..........................................................45
Section 4.13           Tax Matters. ...............................................................................45
Section 4.14           Intellectual Property and IT Systems.........................................46
Section 4.15           Real Property. ...........................................................................47
Section 4.16           Material Contracts......................................................................48
Section 4.17           Dealer Sales and Service Agreements for Continuing Brands. .................49
Section 4.18           Sellers' Products. ......................................................................49
Section 4.19           Certain Business Practices. .......................................................49
Section 4.20           Brokers and Other Advisors.......................................................50

Section 4.21          Investment Representations. ........................................................50
Section 4.22          No Other Representations or Warranties of Sellers. ..................................51

ARTICLE V REPRESENTATIONS AND WARRANTIES OF PURCHASER ........................ 51

Section 5.1           Organization and Good Standing. ..............................................................51
Section 5.2           Authorization; Enforceability. ...................................................................52
Section 5.3           Noncontravention; Consents. ....................................................................52
Section 5.4           Capitalization. ..........................................................................................53
Section 5.5           Valid Issuance of Shares. ..........................................................................54
Section 5.6           Investment Representations. ......................................................................54
Section 5.7           Continuity of Business Enterprise. ............................................................55
Section 5.8           Integrated Transaction. .............................................................................55
Section 5.9           No Other Representations or Warranties of Sellers. ..................................55

ARTICLE VI COVENANTS ................................................................................................. 56

Section 6.1           Access to Information. ...............................................................................56
Section 6.2           Conduct of Business. ................................................................................57
Section 6.3           Notices and Consents. ...............................................................................60
Section 6.4           Sale Procedures; Bankruptcy Court Approval. ..........................................61
Section 6.5           Supplements to Purchased Assets. .............................................................62
Section 6.6           Assumption or Rejection of Contracts. ......................................................62
Section 6.7           Deferred Termination  Agreements; Participation Agreements. ................65
Section 6.8           [Reserved] ................................................................................................66
Section 6.9           Purchaser Assumed Debt; Wind Down Facility. .......................................66
Section 6.10          Litigation  and Other Assistance. ..............................................................66
Section 6.11          Further Assurances. ..................................................................................67
Section 6.12          Notifications. ............................................................................................68
Section 6.13          Actions by Affiliates. ................................................................................69
Section 6.14          Compliance Remediation. .........................................................................69
Section 6.15          Product Certification, Recall and Warranty Claims. ..................................69
Section 6.16          Tax Matters; Cooperation. ........................................................................69
Section 6.17          Employees; Benefit Plans; Labor Matters. ................................................74
Section 6.18          TARP. ......................................................................................................79
Section 6.19          Guarantees; Letters of Credit. ...................................................................79
Section 6.20          Customs Duties. .......................................................................................79
Section 6.21          Termination of Intellectual Property Rights. .............................................79
Section 6.22          Trademarks. ..............................................................................................80
Section 6.23          Preservation of Records. ...........................................................................81
Section 6.24          Confidentiality. ........................................................................................81
Section 6.25          Privacy Policies. .......................................................................................82
Section 6.26          Supplements to Sellers' Disclosure Schedule. ..........................................82
Section 6.27          Real Property Matters. ..............................................................................82
Section 6.28          Equity Incentive Plans. .............................................................................84
Section 6.29          Purchase of Personal Property Subject to Executory Contracts. ................84

Section 6.30      Transfer of Riverfront Holdings, Inc. Equity Interests or Purchased Assets;
                  Ren Cen Lease. ........................................................................................84
Section 6.31      Delphi Agreements. ...............................................................................85
Section 6.32      GM Strasbourg S.A. Restructuring. ........................................................85
Section 6.33      Holding Company Reorganization. .........................................................85
Section 6.34      Transfer of Promark Global Advisors Limited and Promark Investment
                  Trustees Limited Equity Interests. ..........................................................86
Section 6.35      Transfer of Equity Interests in Certain Subsidiaries. ...............................86

ARTICLE VII CONDITIONS TO CLOSING .......................................................... 86

Section 7.1       Conditions to Obligations of Purchaser and Sellers. ................................86
Section 7.2       Conditions to Obligations of Purchaser. ..................................................87
Section 7.3       Conditions to Obligations of Sellers. ......................................................91

ARTICLE VIII TERMINATION ............................................................................ 93

Section 8.1       Termination. ..........................................................................................93
Section 8.2       Procedure and Effect of Termination. .....................................................94

ARTICLE IX MISCELLANEOUS .......................................................................... 95

Section 9.1       Survival of Representations, Warranties, Covenants and Agreements and
                  Consequences of Certain Breaches. .........................................................95
Section 9.2       Notices. .................................................................................................95
Section 9.3       Fees and Expenses; No Right of Setoff. ..................................................97
Section 9.4       Bulk Sales Laws. ...................................................................................97
Section 9.5       Assignment. ..........................................................................................97
Section 9.6       Amendment. ..........................................................................................98
Section 9.7       Waiver. ..................................................................................................98
Section 9.8       Severability. ..........................................................................................98
Section 9.9       Counterparts; Facsimiles. .......................................................................98
Section 9.10      Headings. ..............................................................................................98
Section 9.11      Parties in Interest. .................................................................................98
Section 9.12      Governing Law. .....................................................................................99
Section 9.13      Venue and Retention of Jurisdiction. ......................................................99
Section 9.14      Waiver of Jury Trial. ..............................................................................99
Section 9.15      Risk of Loss. .........................................................................................99
Section 9.16      Enforcement of Agreement. ....................................................................99
Section 9.17      Entire Agreement. ...............................................................................100
Section 9.18      Publicity. .............................................................................................100
Section 9.19      No Successor or Transferee Liability. ...................................................100
Section 9.20      Time Periods. ......................................................................................101
Section 9.21      Sellers' Disclosure Schedule. ...............................................................101
Section 9.22      No Binding Effect. ...............................................................................101

# EXHIBITS

| | |
|---|---|
| Exhibit A | Form of Parent Warrant A |
| Exhibit B | Form of Parent Warrant B |
| Exhibit C | UAW Active Labor Modifications |
| Exhibit D | Form of UAW Retiree Settlement Agreement |
| Exhibit E | Form of VEBA Warrant |
| Exhibit F | Certain Excluded Owned Real Property |
| Exhibit G | Certain Retained Workers' Compensation Claims |
| Exhibit H | Form of Sale Procedures Order |
| Exhibit I | Form of Sale Approval Order |
| Exhibit J-1 | Form of Deferred Termination Agreement for Saturn Discontinued Brand Dealer Agreements |
| Exhibit J-2 | Form of Deferred Termination Agreement for Hummer Discontinued Brand  Dealer Agreements |
| Exhibit J-3 | Form of Deferred Termination Agreement for non-Saturn and non-Hummer Discontinued Brand Dealer Agreements and Excluded Continuing Brand Dealer Agreements |
| Exhibit K | Form of Participation Agreement |
| Exhibit L | Form of Subdivision Master Lease |
| Exhibit M | Form of Assignment and Assumption of Willow Run Lease |
| Exhibit N | Form of Ren Cen Lease |
| Exhibit O | Form of Equity Registration Rights Agreement |
| Exhibit P | Form of Bill of Sale |
| Exhibit Q | Form of Assignment and Assumption Agreement |
| Exhibit R | Form of Novation Agreement |
| Exhibit S | Form of Government Related Subcontract Agreement |
| Exhibit T | Form of Intellectual Property Assignment Agreement |
| Exhibit U | Form of Transition Services Agreement |
| Exhibit V | Form of Assignment and Assumption of Real Property Leases |
| Exhibit W | Form of Assignment and Assumption of Harlem Lease |
| Exhibit X | Form of Master Lease Agreement |
| Exhibit Y | Form of Certificate of Designation of Purchaser for Preferred Stock |
| Exhibit Z | VEBA Note Term Sheet |

## AMENDED AND RESTATED MASTER SALE AND PURCHASE AGREEMENT

THIS AMENDED AND RESTATED MASTER SALE AND PURCHASE AGREEMENT (this "Agreement"), dated as of June 26, 2009, is made by and among General Motors Corporation, a Delaware corporation ("Parent"), Saturn LLC, a Delaware limited liability company ("S LLC"), Saturn Distribution Corporation, a Delaware corporation ("S Distribution"), Chevrolet-Saturn of Harlem, Inc., a Delaware corporation ("Harlem," and collectively with Parent, S LLC and S Distribution, "Sellers," and each a "Seller") and NGMCO, Inc., a Delaware corporation and successor-in-interest to Vehicle Acquisition Holdings LLC, a Delaware limited liability company ("Purchaser").

WHEREAS, on June 1, 2009 (the "Petition Date"), the Parties entered into that certain Master Sale and Purchase Agreement (the "Original Agreement"), and, in connection therewith, Sellers filed voluntary petitions for relief (the "Bankruptcy Cases") under Chapter 11 of Title 11, U.S.C. §§ 101 et seq., as amended (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court");

WHEREAS, pursuant to Sections 363 and 365 of the Bankruptcy Code, Sellers desire to sell, transfer, assign, convey and deliver to Purchaser, and Purchaser desires to purchase, accept and acquire from Sellers all of the Purchased Assets (as hereinafter defined) and assume and thereafter pay or perform as and when due, or otherwise discharge, all of the Assumed Liabilities (as hereinafter defined), in each case, in accordance with the terms and subject to the conditions set forth in this Agreement and the Bankruptcy Code;

WHEREAS, on the Petition Date, Purchaser entered into equity subscription agreements with each of Canada, Sponsor and the New VEBA (each as hereinafter defined), pursuant to which Purchaser has agreed to issue, on the Closing Date (as hereinafter defined), the Canada Shares, the Sponsor Shares, the VEBA Shares, the VEBA Note and the VEBA Warrant (each as hereinafter defined);

WHEREAS, pursuant to the equity subscription agreement between Purchaser and Canada, Canada has agreed to (i) contribute on or before the Closing Date an amount of Indebtedness (as hereinafter defined) owed to it by General Motors of Canada Limited ("GMCL"), which results in not more than $1,288,135,593 of such Indebtedness remaining an obligation of GMCL, to Canada immediately following the Closing (the "Canadian Debt Contribution") and (ii) exchange immediately following the Closing the $3,887,000,000 loan to be made by Canada to Purchaser for additional shares of capital stock of Purchaser;

WHEREAS, the transactions contemplated by this Agreement are in furtherance of the conditions, covenants and requirements of the UST Credit Facilities (as hereinafter defined) and are intended to result in a rationalization of the costs, capitalization and capacity with respect to the manufacturing workforce of, and suppliers to, Sellers and their Subsidiaries (as hereinafter defined);

WHEREAS, it is contemplated that Purchaser may, in accordance with the terms of this Agreement, prior to the Closing (as hereinafter defined), engage in one or more related transactions (the "Holding Company Reorganization") generally designed to reorganize

Purchaser and one or more newly-formed, direct or indirect, wholly-owned Subsidiaries of Purchaser into a holding company structure that results in Purchaser becoming a direct or indirect, wholly-owned Subsidiary of a newly-formed Delaware corporation ("Holding Company"); and

WHEREAS, it is contemplated that Purchaser may, in accordance with the terms of this Agreement, direct the transfer of the Purchased Assets on its behalf by assigning its rights to purchase, accept and acquire the Purchased Assets and its obligations to assume and thereafter pay or perform as and when due, or otherwise discharge, the Assumed Liabilities, to Holding Company or one or more newly-formed, direct or indirect, wholly-owned Subsidiaries of Holding Company or Purchaser.

NOW, THEREFORE, in consideration of the foregoing and the mutual agreements contained in this Agreement, and for other good and valuable consideration, the value, receipt and sufficiency of which are acknowledged, the Parties (as hereinafter defined) hereby agree as follows:

## ARTICLE I
## DEFINITIONS

*Section 1.1    Defined Terms.*    As used in this Agreement, the following terms have the meanings set forth below or in the Sections referred to below:

"Adjustment Shares" has the meaning set forth in **Section 3.2(c)(i)**.

"Advisory Fees" has the meaning set forth in **Section 4.20**.

"Affiliate" has the meaning set forth in Rule 12b-2 of the Exchange Act.

"Affiliate Contract" means a Contract between a Seller or a Subsidiary of a Seller, on the one hand, and an Affiliate of such Seller or Subsidiary of a Seller, on the other hand.

"Agreed G Transaction" has the meaning set forth in **Section 6.16(g)(i)**.

"Agreement" has the meaning set forth in the Preamble.

"Allocation" has the meaning set forth in **Section 3.3**.

"Alternative Transaction" means the sale, transfer, lease or other disposition, directly or indirectly, including through an asset sale, stock sale, merger or other similar transaction, of all or substantially all of the Purchased Assets in a transaction or a series of transactions with one or more Persons other than Purchaser (or its Affiliates).

"Ancillary Agreements" means the Parent Warrants, the UAW Active Labor Modifications, the UAW Retiree Settlement Agreement, the VEBA Warrant, the Equity Registration Rights Agreement, the Bill of Sale, the Assignment and Assumption Agreement, the Novation Agreement, the Government Related Subcontract Agreement, the Intellectual Property Assignment Agreement, the Transition Services Agreement, the Quitclaim Deeds, the

Assignment and Assumption of Real Property Leases, the Assignment and Assumption of Harlem Lease, the Master Lease Agreement, the Subdivision Master Lease (if required), the Saginaw Service Contracts (if required), the Assignment and Assumption of Willow Run Lease, the Ren Cen Lease, the VEBA Note and each other agreement or document executed by the Parties pursuant to this Agreement or any of the foregoing and each certificate and other document to be delivered by the Parties pursuant to **ARTICLE VII**.

"Antitrust Laws" means all Laws that (i) are designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade or the lessening of competition through merger or acquisition or (ii) involve foreign investment review by Governmental Authorities.

"Applicable Employee" means all (i) current salaried employees of Parent and (ii) current hourly employees of any Seller or any of its Affiliates (excluding Purchased Subsidiaries and any dealership) represented by the UAW, in each case, including such current salaried and current hourly employees who are on (a) long-term or short-term disability, military leave, sick leave, family medical leave or some other approved leave of absence or (b) layoff status or who have recall rights.

"Arms-Length Basis" means a transaction between two Persons that is carried out on terms no less favorable than the terms on which the transaction would be carried out by unrelated or unaffiliated Persons, acting as a willing buyer and a willing seller, and each acting in his own self-interest.

"Assignment and Assumption Agreement" has the meaning set forth in **Section 7.2(c)(v)**.

"Assignment and Assumption of Harlem Lease" has the meaning set forth in **Section 7.2(c)(xiii)**.

"Assignment and Assumption of Real Property Leases" has the meaning set forth in **Section 7.2(c)(xii)**.

"Assignment and Assumption of Willow Run Lease" has the meaning set forth in **Section 6.27(e)**.

"Assumable Executory Contract" has the meaning set forth in **Section 6.6(a)**.

"Assumable Executory Contract Schedule" means Section 1.1A of the Sellers' Disclosure Schedule.

"Assumed Liabilities" has the meaning set forth in **Section 2.3(a)**.

"Assumed Plans" has the meaning set forth in **Section 6.17(e)**.

"Assumption Effective Date" has the meaning set forth in **Section 6.6(d)**.

"Bankruptcy Avoidance Actions" has the meaning set forth in **Section 2.2(b)(xi)**.

-3-

"<u>Bankruptcy Cases</u>" has the meaning set forth in the Recitals.

"<u>Bankruptcy Code</u>" has the meaning set forth in the Recitals.

"<u>Bankruptcy Court</u>" has the meaning set forth in the Recitals.

"<u>Benefit Plans</u>" has the meaning set forth in **Section 4.10(a)**.

"<u>Bidders</u>" has the meaning set forth in **Section 6.4(c)**.

"<u>Bids</u>" has the meaning set forth in **Section 6.4(c)**.

"<u>Bill of Sale</u>" has the meaning set forth in **Section 7.2(c)(iv)**.

"<u>Business Day</u>" means any day that is not a Saturday, Sunday or other day on which banks are required or authorized by Law to be closed in the City of New York, New York.

"<u>CA</u>" has the meaning set forth in **Section 6.16(g)(i)**.

"<u>Canada</u>" means 7176384 Canada Inc., a corporation organized under the Laws of Canada, and a wholly-owned subsidiary of Canada Development Investment Corporation, and its successors and assigns.

"<u>Canada Affiliate</u>" has the meaning set forth in **Section 9.22**.

"<u>Canada Shares</u>" has the meaning set forth in **Section 5.4(c)**.

"<u>Canadian Debt Contribution</u>" has the meaning set forth in the Recitals.

"<u>Claims</u>" means all rights, claims (including any cross-claim or counterclaim), investigations, causes of action, choses in action, charges, suits, defenses, demands, damages, defaults, assessments, rights of recovery, rights of set-off, rights of recoupment, litigation, third party actions, arbitral proceedings or proceedings by or before any Governmental Authority or any other Person, of any kind or nature, whether known or unknown, accrued, fixed, absolute, contingent or matured, liquidated or unliquidated, due or to become due, and all rights and remedies with respect thereto.

"<u>Claims Estimate Order</u>" has the meaning set forth in **Section 3.2(c)(i)**.

"<u>Closing</u>" has the meaning set forth in **Section 3.1**.

"<u>Closing Date</u>" has the meaning set forth in **Section 3.1**.

"<u>Collective Bargaining Agreement</u>" means any collective bargaining agreement or other written or oral agreement, understanding or mutually recognized past practice with respect to Employees, between any Seller (or any Subsidiary thereof) and any labor organization or other Representative of Employees (including the UAW Collective Bargaining Agreement, local agreements, amendments, supplements and letters and memoranda of understanding of any kind).

"Common Stock" has the meaning set forth in **Section 5.4(b)**.

"Confidential Information" has the meaning set forth in **Section 6.24.**

"Confidentiality Period" has the meaning set forth in **Section 6.24**.

"Continuing Brand Dealer Agreement" means a United States dealer sales and service Contract related to one or more of the Continuing Brands, together with all other Contracts between any Seller and the relevant dealer that are related to the dealership operations of such dealer other than Contracts identified on Section 1.1B of the Sellers' Disclosure Schedule, each of which Contract identified on Section 1.1B of the Sellers' Disclosure Schedule shall be deemed to be a Rejectable Executory Contract.

"Continuing Brands" means each of the following vehicle line-makes, currently distributed in the United States by Parent or its Subsidiaries: Buick, Cadillac, Chevrolet and GMC.

"Contracts" means all purchase orders, sales agreements, supply agreements, distribution agreements, sales representative agreements, employee or consulting agreements, leases, subleases, licenses, product warranty or service agreements and other binding commitments, agreements, contracts, arrangements, obligations and undertakings of any nature (whether written or oral, and whether express or implied).

"Copyright Licenses" means all Contracts naming a Seller as licensee or licensor and providing for the grant of any right to reproduce, publicly display, publicly perform, distribute, create derivative works of or otherwise exploit any works covered by any Copyright.

"Copyrights" means all domestic and foreign copyrights, whether registered or unregistered, including all copyright rights throughout the universe (whether now or hereafter arising) in any and all media (whether now or hereafter developed), in and to all original works of authorship (including all compilations of information or marketing materials created by or on behalf of any Seller), acquired, owned or licensed by any Seller, all applications, registrations and recordings thereof (including applications, registrations and recordings in the United States Copyright Office or in any similar office or agency of the United States or any other country or any political subdivision thereof) and all reissues, renewals, restorations, extensions and revisions thereof.

"Cure Amounts" means all cure amounts payable in order to cure any monetary defaults required to be cured under Section 365(b)(1) of the Bankruptcy Code or otherwise to effectuate, pursuant to the Bankruptcy Code, the assumption by the applicable Seller and assignment to Purchaser of the Purchased Contracts.

"Damages" means any and all Losses, other than punitive damages.

"Dealer Agreement" has the meaning set forth in **Section 4.17**.

"Deferred Executory Contract" has the meaning set forth in **Section 6.6(c)**.

"Deferred Termination Agreements" has the meaning set forth in **Section 6.7(a)**.

"Delayed Closing Entities" has the meaning set forth in **Section 6.35**.

"Delphi" means Delphi Corporation.

"Delphi Motion" means the motion filed by Parent with the Bankruptcy Court in the Bankruptcy Cases on June 20, 2009, seeking authorization and approval of (i) the purchase, and guarantee of purchase, of certain assets of Delphi, (ii) entry into certain agreements in connection with the sale of substantially all of the remaining assets of Delphi to a third party, (iii) the assumption of certain Executory Contracts in connection with such sale, (iv) entry into an agreement with the PBGC in connection with such sale and (v) entry into an alternative transaction with the successful bidder in the auction for the assets of Delphi.

"Delphi Transaction Agreements" means (i) either (A) the MDA, the SPA, the Loan Agreement, the Operating Agreement, the Commercial Agreements and any Ancillary Agreements (in each case, as defined in the Delphi Motion), which any Seller is a party to, or (B) in the event that an Acceptable Alternative Transaction (as defined in the Delphi Motion) is consummated, any agreements relating to the Acceptable Alternative Transaction, which any Seller is a party to, and (ii) in the event that the PBGC Agreement is entered into at or prior to the Closing, the PBGC Agreement (as defined in the Delphi Motion) and any ancillary agreements entered into pursuant thereto, which any Seller is a party to, as each of the agreements described in clauses (i) or (ii) hereof may be amended from time to time.

"DIP Facility" means that certain Secured Superpriority Debtor-in-Possession Credit Agreement entered into or to be entered into by Parent, as borrower, certain Subsidiaries of Parent listed therein, as guarantors, Sponsor, as lender, and Export Development Canada, as lender.

"Discontinued Brand Dealer Agreement" means a United States dealer sales and service Contract related to one or more of the Discontinued Brands, together with all other Contracts between any Seller and the relevant dealer that are related to the dealership operations of such dealer other than Contracts identified on Section 1.1B of the Sellers' Disclosure Schedule, each of which Contract identified on Section 1.1B of the Sellers' Disclosure Schedule shall be deemed to be a Rejectable Executory Contract.

"Discontinued Brands" means each of the following vehicle line-makes, currently distributed in the United States by Parent or its Subsidiaries: Hummer, Saab, Saturn and Pontiac.

"Disqualified Individual" has the meaning set forth in **Section 4.10(f)**.

"Employees" means (i) each employee or officer of any of Sellers or their Affiliates (including (a) any current, former or retired employees or officers, (b) employees or officers on long-term or short-term disability, military leave, sick leave, family medical leave or some other approved leave of absence and (c) employees on layoff status or with recall rights); (ii) each consultant or other service provider of any of Sellers or their Affiliates who is a former employee, officer or director of any of Sellers or their Affiliates; and (iii) each individual recognized under any Collective Bargaining Agreement as being employed by or having rights to

employment by any of Sellers or their Affiliates.  For the avoidance of doubt, Employees includes all employees of Sellers or any of their Affiliates, whether or not Transferred Employees.

"Employment-Related Obligations" means all Liabilities arising out of, related to, in respect of or in connection with employment relationships or alleged or potential employment relationships with Sellers or any Affiliate of Sellers relating to Employees, leased employees, applicants, and/or independent contractors or those individuals who are deemed to be employees of Sellers or any Affiliate of Sellers by Contract or Law, whether filed or asserted before, on or after the Closing.   "Employment-Related Obligations" includes Claims relating to discrimination, torts, compensation for services (and related employment and withholding Taxes), workers' compensation or similar benefits and payments on account of occupational illnesses and injuries, employment Contracts, Collective Bargaining Agreements,  grievances originating under a Collective Bargaining Agreement, wrongful discharge, invasion of privacy, infliction of emotional distress, defamation, slander, provision of leave under the Family and Medical Leave Act of 1993, as amended, or other similar Laws, car programs, relocation, expense-reporting, Tax protection policies, Claims arising out of WARN or employment, terms of employment, transfers, re-levels, demotions, failure to hire, failure to promote, compensation policies, practices and treatment, termination of employment, harassment, pay equity, employee benefits (including post-employment welfare and other benefits), employee treatment, employee suggestions or ideas, fiduciary performance, employment practices, the modification or termination of Benefit Plans or employee benefit plans, policies, programs, agreements and arrangements of Purchaser, including decisions to provide plans that are different from Benefit Plans, and the like.   Without limiting the generality of the foregoing, with respect to any Employees, leased employees, and/or independent contractors or those individuals who are deemed to be employees of Sellers or any Affiliate of Sellers by Contract or Law, "Employment-Related Obligations" includes payroll and social security Taxes, contributions (whether required or voluntary) to any retirement, health and welfare or similar plan or arrangement, notice, severance or similar payments required under Law, and obligations under Law with respect to occupational injuries and illnesses.

"Encumbrance" means any lien (statutory or otherwise), charge, deed of trust, pledge, security interest, conditional sale or other title retention agreement, lease, mortgage, option, charge, hypothecation, easement, right of first offer, license, covenant, restriction, ownership interest of another Person or other encumbrance.

"End Date" has the meaning set forth in **Section 8.1(b)**.

"Environment" means any surface water, groundwater, drinking water supply, land surface or subsurface soil or strata, ambient air, natural resource or wildlife habitat.

"Environmental Law" means any Law in existence on the date of the Original Agreement relating to the management or Release of, or exposure of humans to, any Hazardous Materials; or pollution; or the protection of human health and welfare and the Environment.

"Equity Incentive Plans" has the meaning set forth in **Section 6.28**.

"Equity Interest" means, with respect to any Person, any shares of capital stock of (or other ownership or profit interests in) such Person, warrants, options or other rights for the purchase or other acquisition from such Person of shares of capital stock of (or other ownership or profit interests in) such Person, securities convertible into or exchangeable for shares of capital stock of (or other ownership or profit interests in) such Person or warrants, options or rights for the purchase or other acquisition from such Person of such shares (or such other ownership or profits interests) and other ownership or profit interests in such Person (including partnership, member or trust interests therein), whether voting or nonvoting.

"Equity Registration Rights Agreement" has the meaning set forth in **Section 7.1(c)**.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and the rules and regulations promulgated thereunder.

"ERISA Affiliate" means any trade or business (whether or not incorporated) that is part of the same controlled group, or under common control with, or part of an affiliated service group that includes any Seller, within the meaning of Section 414(b), (c), (m) or (o) of the Tax Code or Section 4001(a)(14) of ERISA.

"Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

"Excluded Assets" has the meaning set forth in **Section 2.2(b)**.

"Excluded Cash" has the meaning set forth in **Section 2.2(b)(i)**.

"Excluded Continuing Brand Dealer Agreements" means all Continuing Brand Dealer Agreements, other than those that are Assumable Executory Contracts.

"Excluded Contracts" has the meaning set forth in **Section 2.2(b)(vii)**.

"Excluded Entities" has the meaning set forth in **Section 2.2(b)(iv)**.

"Excluded Insurance Policies" has the meaning set forth in **Section 2.2(b)(xiii)**.

"Excluded Personal Property" has the meaning set forth in **Section 2.2(b)(vi)**.

"Excluded Real Property" has the meaning set forth in **Section 2.2(b)(v)**.

"Excluded Subsidiaries" means, collectively, the direct Subsidiaries of Sellers included in the Excluded Entities and their respective direct and indirect Subsidiaries, in each case, as of the Closing Date.

"Executory Contract" means an executory Contract or unexpired lease of personal property or nonresidential real property.

"Executory Contract Designation Deadline" has the meaning set forth in **Section 6.6(a)**.

"Existing Internal VEBA" has the meaning set forth in **Section 6.17(h)**.

"Existing Saginaw Wastewater Facility" has the meaning set forth in **Section 6.27(b)**.

"Existing UST Loan and Security Agreement" means the Loan and Security Agreement, dated as of December 31, 2008, between Parent and Sponsor, as amended.

"FCPA" has the meaning set forth in **Section 4.19**.

"Final Determination" means (i) with respect to U.S. federal income Taxes, a "determination" as defined in Section 1313(a) of the Tax Code or execution of an IRS Form 870-AD and, (ii) with respect to Taxes other than U.S. federal income Taxes, any final determination of Liability in respect of a Tax that, under applicable Law, is not subject to further appeal, review or modification through proceedings or otherwise, including the expiration of a statute of limitations or a period for the filing of Claims for refunds, amended Tax Returns or appeals from adverse determinations.

"Final Order" means (i) an Order of the Bankruptcy Court or any other court or adjudicative body as to which the time to appeal, petition for certiorari or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari or other proceedings for reargument or rehearing shall then be pending, or (ii) in the event that an appeal, writ of certiorari, reargument or rehearing thereof has been sought, such Order of the Bankruptcy Court or any other court or adjudicative body shall have been affirmed by the highest court to which such Order was appealed, or certiorari has been denied, or from which reargument or rehearing was sought, and the time to take any further appeal, petition for certiorari or move for reargument or rehearing shall have expired; provided, however, that no Order shall fail to be a Final Order solely because of the possibility that a motion pursuant to Rule 60 of the Federal Rules of Civil Procedure or Bankruptcy Rule 9024 may be filed with respect to such Order.

"FSA Approval" has the meaning set forth in **Section 6.34**.

"G Transaction" has the meaning set forth in **Section 6.16(g)(i)**.

"GAAP" means the United States generally accepted accounting principles and practices as in effect from time to time, consistently applied throughout the specified period.

"GMAC" means GMAC LLC.

"GM Assumed Contracts" has the meaning set forth in the Delphi Motion.

"GMCL" has the meaning set forth in the Recitals.

"Governmental Authority" means any United States or non-United States federal, national, provincial, state or local government or other political subdivision thereof, any entity, authority, agency or body exercising executive, legislative, judicial, regulatory or administrative functions of any such government or political subdivision, and any supranational organization of sovereign states exercising such functions for such sovereign states.

"Government Related Subcontract Agreement" has the meaning set forth in **Section 7.2(c)(vii)**.

"Harlem" has the meaning set forth in the Preamble.

"Hazardous Materials" means any material or substance that is regulated, or can give rise to Claims, Liabilities or Losses, under any Environmental Law or a Permit issued pursuant to any Environmental Law, including any petroleum, petroleum-based or petroleum-derived product, polychlorinated biphenyls, asbestos or asbestos-containing materials, lead and any noxious, radioactive, flammable, corrosive, toxic, hazardous or caustic substance (whether solid, liquid or gaseous).

"Holding Company" has the meaning set forth in the Recitals.

"Holding Company Reorganization" has the meaning set forth in the Recitals.

"Indebtedness" means, with respect to any Person, without duplication:  (i) all obligations of such Person for borrowed money (including all accrued and unpaid interest and all prepayment penalties or premiums in respect thereof); (ii) all obligations of such Person to pay amounts evidenced by bonds, debentures, notes or similar instruments (including all accrued and unpaid interest and all prepayment penalties or premiums in respect thereof); (iii) all obligations of others, of the types set forth in clauses (i)-(ii) above that are secured by any Encumbrance on property owned or acquired by such Person, whether or not the obligations secured thereby have been assumed, but only to the extent so secured; (iv) all unreimbursed reimbursement obligations of such Person under letters of credit issued for the account of such Person; (v) obligations of such Person under conditional sale, title retention or similar arrangements or other obligations, in each case, to pay the deferred purchase price for property or services, to the extent of the unpaid purchase price (other than trade payables and customary reservations or retentions of title under Contracts with suppliers, in each case, in the Ordinary Course of Business); (vi) all net monetary obligations of such Person in respect of interest rate, equity and currency swap and other derivative transaction obligations; and (vii) all guarantees of or by such Person of any of the matters described in clauses (i)-(vi) above, to the extent of the maximum amount for which such Person may be liable pursuant to such guarantee.

"Intellectual Property" means all Patents, Trademarks, Copyrights, Trade Secrets, Software, all rights under the Licenses and all concepts, ideas, know-how, show-how, proprietary information, technology, formulae, processes and other general intangibles of like nature, and other intellectual property to the extent entitled to legal protection as such, including products under development and methodologies therefor, in each case acquired, owned or licensed by a Seller.

"Intellectual Property Assignment Agreement" has the meaning set forth in **Section 7.2(c)(viii)**.

"Intercompany Obligations" has the meaning set forth in **Section 2.2(a)(iv)**.

"Inventory" has the meaning set forth in **Section 2.2(a)(viii)**.

"IRS" means the United States Internal Revenue Service.

"Key Subsidiary" means any direct or indirect Subsidiary (which, for the avoidance of doubt, shall only include any legal entity in which a Seller, directly or indirectly, owns greater than 50% of the outstanding Equity Interests in such legal entity) of Sellers (other than trusts) with assets (excluding any Intercompany Obligations) in excess of Two Hundred and Fifty Million Dollars ($250,000,000) as reflected on Parent's consolidated balance sheet as of March 31, 2009 and listed on Section 1.1C of the Sellers' Disclosure Schedule.

"Knowledge of Sellers" means the actual knowledge of the individuals listed on Section 1.1D of the Sellers' Disclosure Schedule as to the matters represented and as of the date the representation is made.

"Law" means any and all applicable United States or non-United States federal, national, provincial, state or local laws, rules, regulations, directives, decrees, treaties, statutes, provisions of any constitution and principles (including principles of common law) of any Governmental Authority, as well as any applicable Final Order.

"Landlocked Parcel" has the meaning set forth in **Section 6.27(c)**.

"Leased Real Property" means all the real property leased or subleased by Sellers, except for any such leased or subleased real property subject to any Contracts designated as Excluded Contracts.

"Lemon Laws" means a state statute requiring a vehicle manufacturer to provide a consumer remedy when such manufacturer is unable to conform a vehicle to the express written warranty after a reasonable number of attempts, as defined in the applicable statute.

"Liabilities" means any and all liabilities and obligations of every kind and description whatsoever, whether such liabilities or obligations are known or unknown, disclosed or undisclosed, matured or unmatured, accrued, fixed, absolute, contingent, determined or undeterminable, on or off-balance sheet or otherwise, or due or to become due, including Indebtedness and those arising under any Law, Claim, Order, Contract or otherwise.

"Licenses" means the Patent Licenses, the Trademark Licenses, the Copyright Licenses, the Software Licenses and the Trade Secret Licenses.

"Losses" means any and all Liabilities, losses, damages, fines, amounts paid in settlement, penalties, costs and expenses (including reasonable and documented attorneys', accountants', consultants', engineers' and experts' fees and expenses).

"LSA Agreement" means the Amended and Restated GM-Delphi Agreement, dated as of June 1, 2009, and any ancillary agreements entered into pursuant thereto, which any Seller is a party to, as each such agreement may be amended from time to time.

"Master Lease Agreement" has the meaning set forth in **Section 7.2(c)(xiv)**.

"Material Adverse Effect" means any change, effect, occurrence or development that, individually or in the aggregate, has or would reasonably be expected to have a material adverse effect on the Purchased Assets, Assumed Liabilities or results of operations of Parent and its

Purchased Subsidiaries, taken as a whole; <u>provided</u>, <u>however</u>, that the term "Material Adverse Effect" does not, and shall not be deemed to, include, either alone or in combination, any changes, effects, occurrences or developments: (i) resulting from general economic or business conditions in the United States or any other country in which Sellers and their respective Subsidiaries have operations, or the worldwide economy taken as a whole; (ii) affecting Sellers in the industry or the markets where Sellers operate (except to the extent such change, occurrence or development has a disproportionate adverse effect on Parent and its Subsidiaries relative to other participants in such industry or markets, taken as a whole); (iii) resulting from any changes (or proposed or prospective changes) in any Law or in GAAP or any foreign generally accepted accounting principles; (iv) in securities markets, interest rates, regulatory or political conditions, including resulting or arising from acts of terrorism or the commencement or escalation of any war, whether declared or undeclared, or other hostilities; (v) resulting from the negotiation, announcement or performance of this Agreement or the DIP Facility, or the transactions contemplated hereby and thereby, including by reason of the identity of Sellers, Purchaser or Sponsor or any communication by Sellers, Purchaser or Sponsor of any plans or intentions regarding the operation of Sellers' business, including the Purchased Assets, prior to or following the Closing; (vi) resulting from any act or omission of any Seller required or contemplated by the terms of this Agreement, the DIP Facility or the Viability Plans, or otherwise taken with the prior consent of Sponsor or Purchaser, including Parent's announced shutdown, which began in May 2009; and (vii) resulting from the filing of the Bankruptcy Cases (or any other bankruptcy, insolvency or similar proceeding filed by any Subsidiary of Parent) or from any action approved by the Bankruptcy Court (or any other court in connection with any such other proceedings).

"<u>New VEBA</u>" means the trust fund established pursuant to the Settlement Agreement.

"<u>Non-Assignable Assets</u>" has the meaning set forth in **Section 2.4(a)**.

"<u>Non-UAW Collective Bargaining Agreements</u>" has the meaning set forth in **Section 6.17(m)(i)**.

"<u>Non-UAW Settlement Agreements</u>" has the meaning set forth in **Section 6.17(m)(ii)**.

"<u>Notice of Intent to Reject</u>" has the meaning set forth in **Section 6.6(b)**.

"<u>Novation Agreement</u>" has the meaning set forth in **Section 7.2(c)(vi)**.

"<u>Option Period</u>" has the meaning set forth in **Section 6.6(b)**.

"<u>Order</u>" means any writ, judgment, decree, stipulation, agreement, determination, award, injunction or similar order of any Governmental Authority, whether temporary, preliminary or permanent.

"<u>Ordinary Course of Business</u>" means the usual, regular and ordinary course of business consistent with the past practice thereof (including with respect to quantity and frequency) as and to the extent modified in connection with (i) the implementation of the Viability Plans; (ii) Parent's announced shutdown, which began in May 2009; and (iii) the Bankruptcy Cases (or any other bankruptcy, insolvency or similar proceeding filed by or in respect of any Subsidiary of

Parent), in the case of clause (iii), to the extent such modifications were approved by the Bankruptcy Court (or any other court or other Governmental Authority in connection with any such other proceedings), or in furtherance of such approval.

"Organizational Document" means (i) with respect to a corporation, the certificate or articles of incorporation and bylaws or their equivalent; (ii) with respect to any other entity, any charter, bylaws, limited liability company agreement, certificate of formation, articles of organization or similar document adopted or filed in connection with the creation, formation or organization of a Person; and (iii) in the case of clauses (i) and (ii) above, any amendment to any of the foregoing other than as prohibited by **Section 6.2(b)(vi)**.

"Original Agreement" has the meaning set forth in the Recitals.

"Owned Real Property" means all real property owned by Sellers (including all buildings, structures and improvements thereon and appurtenances thereto), except for any such real property included in the Excluded Real Property.

"Parent" has the meaning set forth in the Preamble.

"Parent Employee Benefit Plans and Policies" means all  (i) "employee benefit plans" (as defined in Section 3(3) of ERISA) and all pension, savings, profit sharing, retirement, bonus, incentive, health, dental, life, death, accident, disability, stock purchase, stock option, stock appreciation, stock bonus, other equity, executive or deferred compensation, hospitalization, post-retirement (including retiree medical or retiree life, voluntary employees' beneficiary associations, and multiemployer plans (as defined in Section 3(37) of ERISA)), severance, retention, change in control, vacation, cafeteria, sick leave, fringe, perquisite, welfare benefits or other employee benefit plans, programs, policies, agreements or arrangements (whether written or oral), including those plans, programs, policies, agreements and arrangements with respect to which any Employee covered by the UAW Collective Bargaining Agreement is an eligible participant, (ii) employment or individual consulting Contracts and (iii) employee manuals and written policies, practices or understandings relating to employment, compensation and benefits, and in the case of clauses (i) through (iii), sponsored, maintained, entered into, or contributed to, or required to be maintained or contributed to, by Parent.

"Parent SEC Documents" has the meaning set forth in **Section 4.5(a)**.

"Parent Shares" has the meaning set forth in **Section 3.2(a)(iii)**.

"Parent Warrant A" means warrants to acquire 45,454,545 shares of Common Stock issued pursuant to a warrant agreement, substantially in the form attached hereto as **Exhibit A**.

"Parent Warrant B" means warrants to acquire 45,454,545 shares of Common Stock issued pursuant to a warrant agreement, substantially in the form attached hereto as **Exhibit B**.

"Parent Warrants" means collectively, Parent Warrant A and Parent Warrant B.

"Participation Agreement" has the meaning set forth in **Section 6.7(b)**.

"Parties" means Sellers and Purchaser together, and "Party" means any of Sellers, on the one hand, or Purchaser, on the other hand, as appropriate and as the case may be.

"Patent Licenses" means all Contracts naming a Seller as licensee or licensor and providing for the grant of any right to manufacture, use, lease, or sell any invention, design, idea, concept, method, technique or process covered by any Patent.

"Patents" means all inventions, patentable designs, letters patent and design letters patent of the United States or any other country and all applications (regular and provisional) for letters patent or design letters patent of the United States or any other country, including applications in the United States Patent and Trademark Office or in any similar office or agency of the United States, any state thereof or any other country or any political subdivision thereof, and all reissues, divisions, continuations, continuations in part, revisions, reexaminations and extensions or renewals of any of the foregoing.

"PBGC" has the meaning set forth in **Section 4.10(a)**.

"Permits" has the meaning set forth in **Section 2.2(a)(xi)**.

"Permitted Encumbrances" means all (i) purchase money security interests arising in the Ordinary Course of Business; (ii) security interests relating to progress payments created or arising pursuant to government Contracts in the Ordinary Course of Business; (iii) security interests relating to vendor tooling arising in the Ordinary Course of Business; (iv) Encumbrances that have been or may be created by or with the written consent of Purchaser; (v) mechanic's, materialmen's, laborer's, workmen's, repairmen's, carrier's liens and other similar Encumbrances arising by operation of law or statute in the Ordinary Course of Business for amounts that are not delinquent or that are being contested in good faith by appropriate proceedings and for which appropriate reserves have been established; (vi) liens for Taxes, the validity or amount of which is being contested in good faith by appropriate proceedings, and statutory liens for current Taxes not yet due, payable or delinquent (or which may be paid without interest or penalties); (vii) with respect to the Transferred Real Property that is Owned Real Property, other than Secured Real Property Encumbrances at and following the Closing: (a) matters that a current ALTA/ACSM survey, or a similar cadastral survey in any country other than the United States, would disclose, the existence of which, individually or in the aggregate, would not materially and adversely interfere with the present use of the affected property; (b) rights of the public, any Governmental Authority and adjoining property owners in streets and highways abutting or adjacent to the applicable Owned Real Property; (c) easements, licenses, rights-of-way, covenants, servitudes, restrictions, encroachments, site plans, subdivision plans and other Encumbrances of public record or that would be disclosed by a current title commitment of the applicable Owned Real Property, which, individually or in the aggregate, would not materially and adversely interfere with the present use of the applicable Owned Real Property; and (d) such other Encumbrances, the existence of which, individually or in the aggregate, would not materially and adversely interfere with or affect the present use or occupancy of the applicable Owned Real Property; (viii) with respect to the Transferred Real Property that is Leased Real Property: (1) matters that a current ALTA/ACSM survey, or a similar cadastral survey in any country other than the United States, would disclose; (2) rights of the public, any Governmental Authority and adjoining property owners in streets and highways

abutting or adjacent to the applicable Leased Real Property; (3) easements, licenses, rights-of-way, covenants, servitudes, restrictions, encroachments, site plans, subdivision plans and other Encumbrances of public record or that would be disclosed by a current title commitment of the applicable Leased Real Property or which have otherwise been imposed on such property by landlords; (ix) in the case of the Transferred Equity Interests, all restrictions and obligations contained in any Organizational Document, joint venture agreement, shareholders agreement, voting agreement and related documents and agreements, in each case, affecting the Transferred Equity Interests; (x) except to the extent otherwise agreed to in the Ratification Agreement entered into by Sellers and GMAC on June 1, 2009 and approved by the Bankruptcy Court on the date thereof or any other written agreement between GMAC or any of its Subsidiaries and any Seller, all Claims (in each case solely to the extent such Claims constitute Encumbrances) and Encumbrances in favor of GMAC or any of its Subsidiaries in, upon or with respect to any property of Sellers or in which Sellers have an interest, including any of the following: (1) cash, deposits, certificates of deposit, deposit accounts, escrow funds, surety bonds, letters of credit and similar agreements and instruments; (2) owned or leased equipment; (3) owned or leased real property; (4) motor vehicles, inventory, equipment, statements of origin, certificates of title, accounts, chattel paper, general intangibles, documents and instruments of dealers, including property of dealers in-transit to, surrendered or returned by or repossessed from dealers or otherwise in any Seller's possession or under its control; (5) property securing obligations of Sellers under derivatives Contracts; (6) rights or property with respect to which a Claim or Encumbrance in favor of GMAC or any of its Subsidiaries is disclosed in any filing made by Parent with the SEC (including any filed exhibit); and (7) supporting obligations, insurance rights and Claims against third parties relating to the foregoing; and (xi) all rights of setoff and/or recoupment that are Encumbrances in favor of GMAC and/or its Subsidiaries against amounts owed to Sellers and/or any of their Subsidiaries with respect to any property of Sellers or in which Sellers have an interest as more fully described in clause (x) above; it being understood that nothing in this clause (xi) or preceding clause (x) shall be deemed to modify, amend or otherwise change any agreement as between GMAC or any of its Subsidiaries and any Seller.

"Person" means any individual, partnership, firm, corporation, association, trust, unincorporated organization, joint venture, limited liability company, Governmental Authority or other entity.

"Personal Information" means any information relating to an identified or identifiable living individual, including (i) first initial or first name and last name; (ii) home address or other physical address, including street name and name of city or town; (iii) e-mail address or other online contact information (e.g., instant messaging user identifier); (iv) telephone number; (v) social security number or other government-issued personal identifier such as a tax identification number or driver's license number; (vi) internet protocol address; (vii) persistent identifier (e.g., a unique customer number in a cookie); (viii) financial account information (account number, credit or debit card numbers or banking information); (ix) date of birth; (x) mother's maiden name; (xi) medical information (including electronic protected health information as defined by the rules and regulations of the Health Information Portability and Privacy Act, as amended); (xii) digitized or electronic signature; and (xiii) any other information that is combined with any of the above.

"Personal Property" has the meaning set forth in **Section 2.2(a)(vii)**.

"Petition Date" has the meaning set forth in the Recitals.

"PLR" has the meaning set forth in **Section 6.16(g)(i)**.

"Post-Closing Tax Period" means any taxable period beginning after the Closing Date and the portion of any Straddle Period beginning after the Closing Date.

"Pre-Closing Tax Period" means any taxable period ending on or before the Closing Date and the portion of any Straddle Period ending on the Closing Date.

"Preferred Stock" has the meaning set forth in **Section 5.4(b)**.

"Privacy Policy" means, with respect to any Person, any written privacy policy, statement, rule or notice regarding the collection, use, access, safeguarding and retention of Personal Information or "Personally Identifiable Information" (as defined by Section 101(41A) of the Bankruptcy Code) of any individual, including a customer, potential customer, employee or former employee of such Person, or an employee of any of such Person's automotive or parts dealers.

"Product Liabilities" has the meaning set forth in **Section 2.3(a)(ix)**.

"Promark UK Subsidiaries" has the meaning set forth in **Section 6.34**.

"Proposed Rejectable Executory Contract" has the meaning set forth in **Section 6.6(b)**.

"Purchase Price" has the meaning set forth in **Section 3.2(a)**.

"Purchased Assets" has the meaning set forth in **Section 2.2(a)**.

"Purchased Contracts" has the meaning set forth in **Section 2.2(a)(x)**.

"Purchased Subsidiaries" means, collectively, the direct Subsidiaries of Sellers included in the Transferred Entities, and their respective direct and indirect Subsidiaries, in each case, as of the Closing Date.

"Purchased Subsidiaries Employee Benefit Plans" means any (i) defined benefit or defined contribution retirement plan maintained by any Purchased Subsidiary and (ii) severance, change in control, bonus, incentive or any similar plan or arrangement maintained by a Purchased Subsidiary for the benefit of officers or senior management of such Purchased Subsidiary.

"Purchaser" has the meaning set forth in the Preamble.

"Purchaser Assumed Debt" has the meaning set forth in **Section 2.3(a)(i)**.

"Purchaser Expense Reimbursement" has the meaning set forth in **Section 8.2(b)**.

"Purchaser Material Adverse Effect" has the meaning set forth in **Section 5.3(a)**.

"Purchaser's Disclosure Schedule" means the Schedule pertaining to, and corresponding to the Section references of this Agreement, delivered by Purchaser immediately prior to the execution of the Original Agreement.

"Quitclaim Deeds" has the meaning set forth in **Section 7.2(c)(x)**.

"Receivables" has the meaning set forth in **Section 2.2(a)(iii)**.

"Rejectable Executory Contract" has the meaning set forth in **Section 6.6(b)**.

"Release" means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, migrating, dumping, discarding, burying, abandoning or disposing into the Environment of Hazardous Materials that is prohibited under, or reasonably likely to result in a Liability under, any applicable Environmental Law.

"Relevant Information" has the meaning set forth in **Section 6.16(g)(ii)**.

"Relevant Transactions" has the meaning set forth in **Section 6.16(g)(i)**.

"Ren Cen Lease" has the meaning set forth in **Section 6.30**.

"Representatives" means all officers, directors, employees, consultants, agents, lenders, accountants, attorneys and other representatives of a Person.

"Required Subdivision" has the meaning set forth in **Section 6.27(a)**.

"Restricted Cash" has the meaning set forth in **Section 2.2(a)(ii)**.

"Retained Liabilities" has the meaning set forth in **Section 2.3(b)**.

"Retained Plans" means any Parent Employee Benefit Plan and Policy that is not an Assumed Plan.

"Retained Subsidiaries" means all Subsidiaries of Sellers and their respective direct and indirect Subsidiaries, as of the Closing Date, other than the Purchased Subsidiaries.

"Retained Workers' Compensation Claims" has the meaning set forth in **Section 2.3(b)(xii)**.

"RHI" has the meaning set forth in **Section 6.30**.

"RHI Post-Closing Period" has the meaning set forth in **Section 6.30**.

"S Distribution" has the meaning set forth in the Preamble.

"S LLC" has the meaning set forth in the Preamble.

"Saginaw Landfill" has the meaning set forth in **Section 6.27(b)**.

"Saginaw Metal Casting Land" has the meaning set forth in **Section 6.27(b)**.

"Saginaw Nodular Iron Land" has the meaning set forth in **Section 6.27(b)**.

"Saginaw Service Contracts" has the meaning set forth in **Section 6.27(b)**.

"Sale Approval Order" has the meaning set forth in **Section 6.4(b)**.

"Sale Hearing" means the hearing of the Bankruptcy Court to approve the Sale Procedures and Sale Motion and enter the Sale Approval Order.

"Sale Procedures and Sale Motion" has the meaning set forth in **Section 6.4(b)**.

"Sale Procedures Order" has the meaning set forth in **Section 6.4(b)**.

"SEC" means the United States Securities and Exchange Commission.

"Secured Real Property Encumbrances" means all Encumbrances related to the Indebtedness of Sellers, which is secured by one or more parcels of the Owned Real Property, including Encumbrances related to the Indebtedness of Sellers under any synthetic lease arrangements at the White Marsh, Maryland GMPT - Baltimore manufacturing facility and the Memphis, Tennessee (SPO - Memphis) facility.

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"Seller" or "Sellers" has the meaning set forth in the Preamble.

"Seller Group" means any combined, unitary, consolidated or other affiliated group of which any Seller or Purchased Subsidiary is or has been a member for federal, state, provincial, local or foreign Tax purposes.

"Seller Key Personnel" means those individuals described on Section 1.1E of the Sellers' Disclosure Schedule.

"Seller Material Contracts" has the meaning set forth in **Section 4.16(a)**.

"Sellers' Disclosure Schedule" means the Schedule pertaining to, and corresponding to the Section references of this Agreement, delivered by Sellers to Purchaser immediately prior to the execution of this Agreement, as updated and supplemented pursuant to **Section 6.5**, **Section 6.6** and **Section 6.26**.

"Series A Preferred Stock" has the meaning set forth in **Section 5.4(b)**.

"Settlement Agreement" means the Settlement Agreement, dated February 21, 2008 (as amended, supplemented, replaced or otherwise altered from time to time), among Parent, the UAW and certain class representatives, on behalf of the class of plaintiffs in the class action of

*Int'l Union, UAW, et al. v. General Motors Corp.*, Civil Action No. 07-14074 (E.D. Mich. filed Sept. 9, 2007).

"<u>Shared Executory Contracts</u>" has the meaning set forth in **Section 6.6(d)**.

"<u>Software</u>" means all software of any type (including programs, applications, middleware, utilities, tools, drivers, firmware, microcode, scripts, batch files, JCL files, instruction sets and macros) and in any form (including source code, object code, executable code and user interface), databases and associated data and related documentation, in each case owned, acquired or licensed by any Seller.

"<u>Software Licenses</u>" means all Contracts naming a Seller as licensee or licensor and providing for the grant of any right to use, modify, reproduce, distribute or create derivative works of any Software.

"<u>Sponsor</u>" means the United States Department of the Treasury.

"<u>Sponsor Affiliate</u>" has the meaning set forth in **Section 9.22**.

"<u>Sponsor Shares</u>" has the meaning set forth in **Section 5.4(c)**.

"<u>Straddle Period</u>" means a taxable period that includes but does not end on the Closing Date.

"<u>Subdivision Master Lease</u>" has the meaning set forth in **Section 6.27(a)**.

"<u>Subdivision Properties</u>" has the meaning set forth in **Section 6.27(a)**.

"<u>Subsidiary</u>" or "<u>Subsidiaries</u>" means, with respect to any Person, any corporation, limited liability company, partnership or other legal entity (in each case, other than a joint venture if such Person is not empowered to control the day-to-day operations of such joint venture) of which such Person (either alone or through or together with any other Subsidiary) owns, directly or indirectly, more than fifty percent (50%) of the Equity Interests, the holder of which is entitled to vote for the election of the board of directors or other governing body of such corporation, limited liability company, partnership or other legal entity.

"<u>Superior Bid</u>" has the meaning set forth in **Section 6.4(d)**.

"<u>TARP</u>" means the Troubled Assets Relief Program established by Sponsor under the Emergency Economic Stabilization Act of 2008, Public Law No. 110-343, effective as of October 3, 2008, as amended by Section 7001 of Division B, Title VII of the American Recovery and Reinvestment Act of 2009, Public Law No. 111-5, effective as of February 17, 2009, as may be further amended and in effect from time to time and any guidance issued by a regulatory authority thereunder and other related Laws in effect currently or in the future in the United States.

"<u>Tax</u>" or "<u>Taxes</u>" means any federal, state, provincial, local, foreign and other income, alternative minimum, accumulated earnings, personal holding company, franchise, capital stock,

net worth or gross receipts, income, alternative or add-on minimum, capital, capital gains, sales, use, ad valorem, franchise, profits, license, privilege, transfer, withholding, payroll, employment, social, excise, severance, stamp, occupation, premium, goods and services, value added, property (including real property and personal property taxes), environmental, windfall profits or other taxes, customs, duties or similar fees, assessments or charges of any kind whatsoever, together with any interest and any penalties, additions to tax or additional amounts imposed by any Governmental Authority, including any transferee, successor or secondary liability for any such tax and any Liability assumed by Contract or arising as a result of being or ceasing to be a member of any affiliated group or similar group under state, provincial, local or foreign Law, or being included or required to be included in any Tax Return relating thereto.

"Tax Code" means the Internal Revenue Code of 1986, as amended, and the rules and regulations promulgated thereunder.

"Taxing Authority" means, with respect to any Tax, the Governmental Authority thereof that imposes such Tax and the agency, court or other Person or body (if any) charged with the interpretation, administration or collection of such Tax for such Governmental Authority.

"Tax Return" means any return, report, declaration, form, election letter, statement or other information filed or required to be filed with any Governmental Authority with respect to Taxes, including any schedule or attachment thereto or amendment thereof.

"Trademark Licenses" means all Contracts naming any Seller as licensor or licensee and providing for the grant of any right concerning any Trademark together with any goodwill connected with and symbolized by any such Trademark or Trademark Contract, and the right to prepare for sale or lease and sell or lease any and all products, inventory or services now or hereafter owned or provided by any Seller or any other Person and now or hereafter covered by such Contracts.

"Trademarks" means all domestic and foreign trademarks, service marks, collective marks, certification marks, trade dress, trade names, business names, d/b/a's, Internet domain names, designs, logos and other source or business identifiers, and all general intangibles of like nature, now or hereafter owned, adopted, used, acquired, or licensed by any Seller, all applications, registrations and recordings thereof (including applications, registrations and recordings in the United States Patent and Trademark Office or in any similar office or agency of the United States, any state thereof or any other country or any political subdivision thereof) and all reissues, extensions or renewals thereof, together with all goodwill of the business symbolized by or associated with such marks.

"Trade Secrets" means all trade secrets or Confidential Information, including any confidential technical and business information, program, process, method, plan, formula, product design, compilation of information, customer list, sales forecast, know-how, Software, and any other confidential proprietary intellectual property, and all additions and improvements to, and books and records describing or used in connection with, any of the foregoing, in each case, owned, acquired or licensed by any Seller.

"<u>Trade Secret Licenses</u>" means all Contracts naming a Seller as licensee or licensor and providing for the grant of any rights with respect to Trade Secrets.

"<u>Transfer Taxes</u>" means all transfer, documentary, sales, use, stamp, registration and other similar Taxes and fees (including any penalties and interest) incurred in connection with this Agreement and the transactions contemplated hereby and not otherwise exempted under the Bankruptcy Code, including relating to the transfer of the Transferred Real Property.

"<u>Transfer Tax Forms</u>" has the meaning set forth in **Section 7.2(c)(xi)**.

"<u>Transferred Employee</u>" has the meaning set forth in **Section 6.17(a)**.

"<u>Transferred Entities</u>" means all of the direct Subsidiaries of Sellers and joint venture entities or other entities in which any Seller has an Equity Interest, other than the Excluded Entities.

"<u>Transferred Equity Interests</u>" has the meaning set forth in **Section 2.2(a)(v)**.

"<u>Transferred Real Property</u>" has the meaning set forth in **Section 2.2(a)(vi)**.

"<u>Transition Services Agreement</u>" has the meaning set forth in **Section 7.2(c)(ix)**.

"<u>Transition Team</u>" has the meaning set forth in **Section 6.11(c)**.

"<u>UAW</u>" means the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America.

"<u>UAW Active Labor Modifications</u>" means the modifications to the UAW Collective Bargaining Agreement, as agreed to in the 2009 Addendum to the 2007 UAW-GM National Agreement, dated May 17, 2009, the cover page of which is attached hereto as **<u>Exhibit C</u>** (the 2009 Addendum without attachments), which modifications were ratified by the UAW membership on May 29, 2009.

"<u>UAW Collective Bargaining Agreement</u>" means any written or oral Contract, understanding or mutually recognized past practice between Sellers and the UAW with respect to Employees, including the UAW Active Labor Modifications, but excluding the agreement to provide certain retiree medical benefits specified in the Memorandum of Understanding Post-Retirement Medical Care, dated September 26, 2007, between Parent and the UAW, and the Settlement Agreement.    For purpose of clarity, the term "<u>UAW Collective Bargaining Agreement</u>" includes all special attrition programs, divestiture-related memorandums of understanding or implementation agreements relating to any unit or location where covered UAW-represented employees remain and any current local agreement between Parent and a UAW local relating to any unit or location where UAW-represented employees are employed as of the date of the Original Agreement.  For purposes of clarity, nothing in this definition extends the coverage of the UAW-GM National Agreement to any Employee of S LLC, S Distribution, Harlem, a Purchased Subsidiary or one of Parent's Affiliates; nothing in this Agreement creates a direct employment relationship with a Purchased Subsidiary's employee or an Affiliate's Employee and Parent.

"<u>UAW Retiree Settlement Agreement</u>" means the UAW Retiree Settlement Agreement to be executed prior to the Closing, substantially in the form attached hereto as **Exhibit D**.

"<u>Union</u>" means any labor union, organization or association representing any employees (but not including the UAW) with respect to their employment with any of Sellers or their Affiliates.

"<u>United States</u>" or "<u>U.S.</u>" means the United States of America, including its territories and insular possessions.

"<u>UST Credit Bid Amount</u>" has the meaning set forth in **Section 3.2(a)(i)**.

"<u>UST Credit Facilities</u>" means (i) the Existing UST Loan and Security Agreement and (ii) those certain promissory notes dated December 31, 2008, April 22, 2009, May 20, 2009, and May 27, 2009, issued by Parent to Sponsor as additional compensation for the extensions of credit under the Existing UST Loan and Security Agreement, in each case, as amended.

"<u>UST Warrant</u>" means the warrant issued by Parent to Sponsor in consideration for the extension of credit made available to Parent under the Existing UST Loan and Security Agreement.

"<u>VEBA Shares</u>" has the meaning set forth in **Section 5.4(c)**.

"<u>VEBA Note</u>" has the meaning set forth in **Section 7.3(g)(iv)**.

"<u>VEBA Warrant</u>" means warrants to acquire 15,151,515 shares of Common Stock issued pursuant to a warrant agreement, substantially in the form attached hereto as **Exhibit E**.

"<u>Viability Plans</u>" means (i) Parent's Restructuring Plan for Long-Term Viability, dated December 2, 2008; (ii) Parent's 2009-2014 Restructuring Plan, dated February 17, 2009; (iii) Parent's 2009-2014 Restructuring Plan:  Progress Report, dated March 30, 2009; and (iv) Parent's Revised Viability Plan, all as described in Parent's Registration Statement on Form S-4 (Reg. No 333-158802), initially filed with the SEC on April 27, 2009, in each case, as amended, supplemented and/or superseded.

"<u>WARN</u>" means the Workers Adjustment and Retraining Notification Act of 1988, as amended, and similar foreign, state and local Laws.

"<u>Willow Run Landlord</u>" means the Wayne County Airport Authority, or any successor landlord under the Willow Run Lease.

"<u>Willow Run Lease</u>" means that certain Willow Run Airport Lease of Land dated October 11, 1985, as the same may be amended, by and between the Willow Run Landlord, as landlord, and Parent, as tenant, for certain premises located at the Willow Run Airport in Wayne and Washtenaw Counties, Michigan.

"<u>Willow Run Lease Amendment</u>" has the meaning set forth in **Section 6.27(e)**.

"Wind Down Facility" has the meaning set forth in **Section 6.9(b)**.

Section 1.2    *Other Interpretive Provisions.*  The words "hereof", "herein" and "hereunder" and words of similar import when used in this Agreement refer to this Agreement as a whole (including the Sellers' Disclosure Schedule) and not to any particular provision of this Agreement, and all Article, Section, Sections of the Sellers' Disclosure Schedule and Exhibit references are to this Agreement unless otherwise specified. The words "include", "includes" and "including" are deemed to be followed by the phrase "without limitation." The meanings given to terms defined herein are equally applicable to both the singular and plural forms of such terms.  Whenever the context may require, any pronoun includes the corresponding masculine, feminine and neuter forms.  Except as otherwise expressly provided herein, all references to "Dollars" or "$" are deemed references to lawful money of the United States.  Unless otherwise specified, references to any statute, listing rule, rule, standard, regulation or other Law (a) include a reference to the corresponding rules and regulations and (b) include a reference to each of them as amended, modified, supplemented, consolidated, replaced or rewritten from time to time, and to any section of any statute, listing rule, rule, standard, regulation or other Law, including any successor to such section.  Where this Agreement states that a Party "shall" or "will" perform in some manner or otherwise act or omit to act, it means that the Party is legally obligated to do so in accordance with this Agreement.

## ARTICLE II
## PURCHASE AND SALE

Section 2.1    *Purchase and Sale of Assets; Assumption of Liabilities.*  On the terms and subject to the conditions set forth in this Agreement, other than as set forth in **Section 6.30**, **Section 6.34** and **Section 6.35**, at the Closing, Purchaser shall (a) purchase, accept and acquire from Sellers, and Sellers shall sell, transfer, assign, convey and deliver to Purchaser, free and clear of all Encumbrances (other than Permitted Encumbrances), Claims and other interests, the Purchased Assets and (b) assume and thereafter pay or perform as and when due, or otherwise discharge, all of the Assumed Liabilities.

Section 2.2    *Purchased and Excluded Assets.*

(a)    The "Purchased Assets" shall consist of the right, title and interest that Sellers possess and have the right to legally transfer in and to all of the properties, assets, rights, titles and interests of every kind and nature, owned, leased, used or held for use by Sellers (including indirect and other forms of beneficial ownership), whether tangible or intangible, real, personal or mixed, and wherever located and by whomever possessed, in each case, as the same may exist as of the Closing, including the following properties, assets, rights, titles and interests (but, in every case, excluding the Excluded Assets):

(i)    all cash and cash equivalents, including all marketable securities, certificates of deposit and all collected funds or items in the process of collection at Sellers' financial institutions through and including the Closing, and all bank deposits, investment accounts and lockboxes related thereto, other than the Excluded Cash and Restricted Cash;

(ii)      all restricted or escrowed cash and cash equivalents, including restricted marketable securities and certificates of deposit (collectively, "Restricted Cash") other than the Restricted Cash described in **Section 2.2(b)(ii)**;

(iii)      all accounts and notes receivable and other such Claims for money due to Sellers, including the full benefit of all security for such accounts, notes and Claims, however arising, including arising from the rendering of services or the sale of goods or materials, together with any unpaid interest accrued thereon from the respective obligors and any security or collateral therefor, other than intercompany receivables (collectively, "Receivables");

(iv)      all intercompany obligations ("Intercompany Obligations") owed or due, directly or indirectly, to Sellers by any Subsidiary of a Seller or joint venture or other entity in which a Seller or a Subsidiary of a Seller has any Equity Interest;

(v)      (A) subject to **Section 2.4**, all Equity Interests in the Transferred Entities (collectively, the "Transferred Equity Interests") and (B) the corporate charter, qualification to conduct business as a foreign corporation, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, corporate seal, minute books, stock transfer books, blank stock certificates and any other documents relating to the organization, maintenance and existence of each Transferred Entity;

(vi)      all Owned Real Property and Leased Real Property (collectively, the "Transferred Real Property");

(vii)      all machinery, equipment (including test equipment and material handling equipment), hardware, spare parts, tools, dies, jigs, molds, patterns, gauges, fixtures (including production fixtures), business machines, computer hardware, other information technology assets, furniture, supplies, vehicles, spare parts in respect of any of the foregoing and other tangible personal property (including any of the foregoing in the possession of manufacturers, suppliers, customers, dealers or others and any of the foregoing in transit) that does not constitute Inventory (collectively, "Personal Property"), including the Personal Property located at the Excluded Real Property and identified on Section 2.2(a)(vii) of the Sellers' Disclosure Schedule;

(viii)      all inventories of vehicles, raw materials, work-in-process, finished goods, supplies, stock, parts, packaging materials and other accessories related thereto (collectively, "Inventory"), wherever located, including any of the foregoing in the possession of manufacturers, suppliers, customers, dealers or others and any of the foregoing in transit or that is classified as returned goods;

(ix)      (A) all Intellectual Property, whether owned, licensed or otherwise held, and whether or not registrable (including any Trademarks and other Intellectual Property associated with the Discontinued Brands), and (B) all rights

and benefits associated with the foregoing, including all rights to sue or recover for past, present and future infringement, misappropriation, dilution, unauthorized use or other impairment or violation of any of the foregoing, and all income, royalties, damages and payments now or hereafter due or payable with respect to any of the foregoing;

(x)     subject to **Section 2.4**, all Contracts, other than the Excluded Contracts (collectively, the "Purchased Contracts"), including, for the avoidance of doubt, (A) the UAW Collective Bargaining Agreement and (B) any Executory Contract designated as an Assumable Executory Contract as of the applicable Assumption Effective Date;

(xi)     subject to **Section 2.4**, all approvals, Contracts, authorizations, permits, licenses, easements, Orders, certificates, registrations, franchises, qualifications, rulings, waivers, variances or other forms of permission, consent, exemption or authority issued, granted, given or otherwise made available by or under the authority of any Governmental Authority, including all pending applications therefor and all renewals and extensions thereof (collectively, "Permits"), other than to the extent that any of the foregoing relate exclusively to the Excluded Assets or Retained Liabilities;

(xii)     all credits, deferred charges, prepaid expenses, deposits, advances, warranties, rights, guarantees, surety bonds, letters of credit, trust arrangements and other similar financial arrangements, in each case, relating to the Purchased Assets or Assumed Liabilities, including all warranties, rights and guarantees (whether express or implied) made by suppliers, manufacturers, contractors and other third parties under or in connection with the Purchased Contracts;

(xiii)     all Claims (including Tax refunds) relating to the Purchased Assets or Assumed Liabilities, including the Claims identified on Section 2.2(a)(xiii) of the Sellers' Disclosure Schedule and all Claims against any Taxing Authority for any period, other than Bankruptcy Avoidance Actions and any of the foregoing to the extent that they relate exclusively to the Excluded Assets or Retained Liabilities;

(xiv)     all books, records, ledgers, files, documents, correspondence, lists, plats, specifications, surveys, drawings, advertising and promotional materials, reports and other materials (in whatever form or medium), including Tax books and records and Tax Returns used or held for use in connection with the ownership or operation of the Purchased Assets or Assumed Liabilities, including the Purchased Contracts, customer lists, customer information and account records, computer files, data processing records, employment and personnel records, advertising and marketing data and records, credit records, records relating to suppliers, legal records and information and other data;

(xv)    all goodwill and other intangible personal property arising in connection with the ownership, license, use or operation of the Purchased Assets or Assumed Liabilities;

(xvi)    to the extent provided in **Section 6.17(e)**, all Assumed Plans;

(xvii)    all insurance policies and the rights to the proceeds thereof, other than the Excluded Insurance Policies;

(xviii)    any rights of any Seller, Subsidiary of any Seller or Seller Group member to any Tax refunds, credits or abatements that relate to any Pre-Closing Tax Period or Straddle Period; and

(xix)    any interest in Excluded Insurance Policies, only to the extent such interest relates to any Purchased Asset or Assumed Liability.

(b)    Notwithstanding anything to the contrary contained in this Agreement, Sellers shall retain all of their respective right, title and interest in and to, and shall not, and shall not be deemed to, sell, transfer, assign, convey or deliver to Purchaser, and the Purchased Assets shall not, and shall not be deemed to, include the following (collectively, the "Excluded Assets"):

(i)    cash or cash equivalents in an amount equal to $950,000,000 (the "Excluded Cash");

(ii)    all Restricted Cash exclusively relating to the Excluded Assets or Retained Liabilities;

(iii)    all Receivables (other than Intercompany Obligations) exclusively related to any Excluded Assets or Retained Liabilities;

(iv)    all of Sellers' Equity Interests in (A) S LLC, (B) S Distribution, (C) Harlem and (D) the Subsidiaries, joint ventures and the other entities in which any Seller has any Equity Interest and that are identified on Section 2.2(b)(iv) of the Sellers' Disclosure Schedule (collectively, the "Excluded Entities");

(v)    (A) all owned real property set forth on **Exhibit F** and such additional owned real property set forth on Section 2.2(b)(v) of the Sellers' Disclosure Schedule (including, in each case, any structures, buildings or other improvements located thereon and appurtenances thereto) and (B) all real property leased or subleased that is subject to a Contract designated as an "Excluded Contract" (collectively, the "Excluded Real Property");

(vi)    all Personal Property that is (A) located at the Transferred Real Property and identified on Section 2.2(b)(vi) of the Sellers' Disclosure Schedule, (B) located at the Excluded Real Property, except for those items identified on Section 2.2(a)(vii) of the Sellers' Disclosure Schedule or (C) subject to a Contract

designated as an Excluded Contract (collectively, the "Excluded Personal Property");

(vii)    (A) all Contracts identified on Section 2.2(b)(vii) of the Sellers' Disclosure Schedule immediately prior to the Closing, (B) all pre-petition Executory Contracts designated as Rejectable Executory Contracts, (C) all pre-petition Executory Contracts (including, for the avoidance of doubt, the Delphi Transaction Agreements and GM Assumed Contracts) that have not been designated as or deemed to be Assumable Executory Contracts in accordance with **Section 6.6** or **Section 6.31**, or that are determined, pursuant to the procedures set forth in the Sale Procedures Order, not to be assumable and assignable to Purchaser, (D) all Collective Bargaining Agreements not set forth on the Assumable Executory Contract Schedule and (E) all non-Executory Contracts for which performance by a third-party or counterparty is substantially complete and for which a Seller owes a continuing or future obligation with respect to such non-Executory Contracts (collectively, the "Excluded Contracts"), including any accounts receivable arising out of or in connection with any Excluded Contract; it being understood and agreed by the Parties hereto that, notwithstanding anything to the contrary herein, in no event shall the UAW Collective Bargaining Agreement be designated or otherwise deemed or considered an Excluded Contract;

(viii)    all books, records, ledgers, files, documents, correspondence, lists, plats, specifications, surveys, drawings, advertising and promotional materials, reports and other materials (in whatever form or medium) relating exclusively to the Excluded Assets or Retained Liabilities, and any books, records and other materials that any Seller is required by Law to retain;

(ix)    the corporate charter, qualification to conduct business as a foreign corporation, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, corporate seal, minute books, stock transfer books, blank stock certificates and any other documents relating to the organization, maintenance and existence of each Seller and each Excluded Entity;

(x)    all Claims against suppliers, dealers and any other third parties relating exclusively to the Excluded Assets or Retained Liabilities;

(xi)    all of Sellers' Claims under this Agreement, the Ancillary Agreements and the Bankruptcy Code, of whatever kind or nature, as set forth in Sections 544 through 551 (inclusive), 553, 558 and any other applicable provisions of the Bankruptcy Code, and any related Claims and actions arising under such sections by operation of Law or otherwise, including any and all proceeds of the foregoing (the "Bankruptcy Avoidance Actions"), but in all cases, excluding all rights and Claims identified on Section 2.2(b)(xi) of the Sellers' Disclosure Schedule;

(xii)    all credits, deferred charges, prepaid expenses, deposits and advances, warranties, rights, guarantees, surety bonds, letters of credit, trust arrangements and other similar financial arrangements, in each case, relating exclusively to the Excluded Assets or Retained Liabilities;

(xiii)    all insurance policies identified on Section 2.2(b)(xiii) of the Sellers' Disclosure Schedule and the rights to proceeds thereof (collectively, the "Excluded Insurance Policies"), other than any rights to proceeds to the extent such proceeds relate to any Purchased Asset or Assumed Liability;

(xiv)    all Permits, to the extent that they relate exclusively to the Excluded Assets or Retained Liabilities;

(xv)    all Retained Plans; and

(xvi)    those assets identified on Section 2.2(b)(xvi) of the Sellers' Disclosure Schedule.

*Section 2.3    Assumed and Retained Liabilities.*

(a)    The "Assumed Liabilities" shall consist only of the following Liabilities of Sellers:

(i)    $7,072,488,605 of Indebtedness incurred under the DIP Facility, to be restructured pursuant to the terms of **Section 6.9** (the "Purchaser Assumed Debt");

(ii)    all Liabilities under each Purchased Contract;

(iii)    all Intercompany Obligations owed or due, directly or indirectly, by Sellers to (A) any Purchased Subsidiary or (B) any joint venture or other entity in which a Seller or a Purchased Subsidiary has any Equity Interest (other than an Excluded Entity);

(iv)    all Cure Amounts under each Assumable Executory Contract that becomes a Purchased Contract;

(v)    all Liabilities of Sellers (A) arising in the Ordinary Course of Business during the Bankruptcy Case through and including the Closing Date, to the extent such Liabilities are administrative expenses of Sellers' estates pursuant to Section 503(b) of the Bankruptcy Code and (B) arising prior to the commencement of the Bankruptcy Cases to the extent approved by the Bankruptcy Court for payment by Sellers pursuant to a Final Order (and for the avoidance of doubt, Sellers' Liabilities in clauses (A) and (B) above include Sellers' Liabilities for personal property Taxes, real estate and/or other ad valorem Taxes, use Taxes, sales Taxes, franchise Taxes, income Taxes, gross receipt Taxes, excise Taxes, Michigan Business Taxes and Michigan Single Business Taxes), in each case, other than (1) Liabilities of the type described in

**Section 2.3(b)(iv)**, **Section 2.3(b)(vi)** and **Section 2.3(b)(ix)**, (2) Liabilities arising under any dealer sales and service Contract and any Contract related thereto, to the extent such Contract has been designated as a Rejectable Executory Contract, and (3) Liabilities otherwise assumed in this **Section 2.3(a)**;

(vi)     all Transfer Taxes payable in connection with the sale, transfer, assignment, conveyance and delivery of the Purchased Assets pursuant to the terms of this Agreement;

(vii)     (A) all Liabilities arising under express written warranties of Sellers that are specifically identified as warranties and delivered in connection with the sale of new, certified used or pre-owned vehicles or new or remanufactured motor vehicle parts and equipment (including service parts, accessories, engines and transmissions) manufactured or sold by Sellers or Purchaser prior to or after the Closing and (B) all obligations under Lemon Laws;

(viii)     all Liabilities arising under any Environmental Law (A) relating to conditions present on the Transferred Real Property, other than those Liabilities described in **Section 2.3(b)(iv)**, (B) resulting from Purchaser's ownership or operation of the Transferred Real Property after the Closing or (C) relating to Purchaser's failure to comply with Environmental Laws after the Closing;

(ix)     all Liabilities to third parties for death, personal injury, or other injury to Persons or damage to property caused by motor vehicles designed for operation on public roadways or by the component parts of such motor vehicles and, in each case, manufactured, sold or delivered by Sellers (collectively, "Product Liabilities"), which arise directly out of accidents, incidents or other distinct and discreet occurrences that happen on or after the Closing Date and arise from such motor vehicles' operation or performance (for avoidance of doubt, Purchaser shall not assume, or become liable to pay, perform or discharge, any Liability arising or contended to arise by reason of exposure to materials utilized in the assembly or fabrication of motor vehicles manufactured by Sellers and delivered prior to the Closing Date, including asbestos, silicates or fluids, regardless of when such alleged exposure occurs);

(x)     all Liabilities of Sellers arising out of, relating to, in respect of, or in connection with workers' compensation claims against any Seller, except for Retained Workers' Compensation Claims;

(xi)     all Liabilities arising out of, relating to, in respect of, or in connection with the use, ownership or sale of the Purchased Assets after the Closing;

(xii)     all Liabilities (A) specifically assumed by Purchaser pursuant to **Section 6.17** and (B) arising out of, relating to or in connection with the salaries and/or wages and vacation of all Transferred Employees that are accrued and unpaid (or with respect to vacation, unused) as of the Closing Date;

-29-

(xiii)    (A) all Employment-Related Obligations and (B) Liabilities under any Assumed Plan, in each case, relating to any Employee that is or was covered by the UAW Collective Bargaining Agreement, except for Retained Workers Compensation Claims;

(xiv)    all Liabilities of Sellers underlying any construction liens that constitute Permitted Encumbrances with respect to Transferred Real Property; and

(xv)    those other Liabilities identified on Section 2.3(a)(xv) of the Sellers' Disclosure Schedule.

(b)    Each Seller acknowledges and agrees that pursuant to the terms and provisions of this Agreement, Purchaser shall not assume, or become liable to pay, perform or discharge, any Liability of any Seller, whether occurring or accruing before, at or after the Closing, other than the Assumed Liabilities.  In furtherance and not in limitation of the foregoing, and in all cases with the exception of the Assumed Liabilities, neither Purchaser nor any of its Affiliates shall assume, or be deemed to have assumed, any Indebtedness, Claim or other Liability of any Seller or any predecessor, Subsidiary or Affiliate of any Seller whatsoever, whether occurring or accruing before, at or after the Closing, including the following (collectively, the "Retained Liabilities"):

(i)    all Liabilities arising out of, relating to, in respect of or in connection with any Indebtedness of Sellers (other than Intercompany Obligations and the Purchaser Assumed Debt), including those items identified on  Section 2.3(b)(i) of the Sellers' Disclosure Schedule;

(ii)    all Intercompany Obligations owed or due, directly or indirectly, by Sellers to (A) another Seller, (B) any Excluded Subsidiary or (C) any joint venture or other entity in which a Seller or an Excluded Subsidiary has an Equity Interest (other than a Transferred Entity);

(iii)    all Liabilities arising out of, relating to, in respect of or in connection with the Excluded Assets, other than Liabilities otherwise retained in this **Section 2.3(b)**;

(iv)    all Liabilities (A) associated with noncompliance with Environmental Laws (including for fines, penalties, damages and remedies); (B) arising out of, relating to, in respect of or in connection with the transportation, off-site storage or off-site disposal of any Hazardous Materials generated or located at any Transferred Real Property; (C) arising out of, relating to, in respect of or in connection with third-party Claims related to Hazardous Materials that were or are located at or that migrated or may migrate from any Transferred Real Property, except as otherwise required under applicable Environmental Laws; (D) arising under Environmental Laws related to the Excluded Real Property; or (E) for environmental Liabilities with respect to real property formerly owned, operated or leased by Sellers (as of the Closing), which, in the case of clauses (A),

(B) and (C), arose prior to or at the Closing, and which, in the case of clause (D) and (E), arise prior to, at or after the Closing;

(v)        except for Taxes assumed in **Section 2.3(a)(v)** and **Section 2.3(a)(vi)**, all Liabilities with respect to any (A) Taxes arising in connection with Sellers' business, the Purchased Assets or the Assumed Liabilities and that are attributable to a Pre-Closing Tax Period (including any Taxes incurred in connection with the sale of the Purchased Assets, other than all Transfer Taxes), (B) other Taxes of any Seller and (C) Taxes of any Seller Group, including any Liability of any Seller or any Seller Group member for Taxes arising as a result of being or ceasing to be a member of any Seller Group (it being understood, for the avoidance of doubt, that no provision of this Agreement shall cause Sellers to be liable for Taxes of any Purchased Subsidiary for which Sellers would not be liable absent this Agreement);

(vi)        all Liabilities for (A) costs and expenses relating to the preparation, negotiation and entry into this Agreement and the Ancillary Agreements (and the consummation of the transactions contemplated by this Agreement and the Ancillary Agreements, which, for the avoidance of doubt, shall not include any Transfer Taxes), including Advisory Fees, (B) administrative fees, professional fees and all other expenses under the Bankruptcy Code and (C) all other fees and expenses associated with the administration of the Bankruptcy Cases;

(vii)        all Employment-Related Obligations not otherwise assumed in **Section 2.3(a)** and **Section 6.17**, including those arising out of, relating to, in respect of or in connection with the employment, potential employment or termination of employment of any individual (other than any Employee that is or was covered by the UAW Collective Bargaining Agreement) (A) prior to or at the Closing (including any severance policy, plan or program that exists or arises, or may be deemed to exist or arise, as a result of, or in connection with, the transactions contemplated by this Agreement) or (B) who is not a Transferred Employee arising after the Closing and with respect to both clauses (A) and (B) above, including any Liability arising out of, relating to, in respect of or in connection with any Collective Bargaining Agreement (other than the UAW Collective Bargaining Agreement);

(viii)        all Liabilities arising out of, relating to, in respect of or in connection with Claims for infringement or misappropriation of third party intellectual property rights;

(ix)        all Product Liabilities arising in whole or in part from any accidents, incidents or other  occurrences that happen prior to the Closing Date;

(x)        all Liabilities to third parties for death, personal injury, other injury to Persons or damage to property, in each case, arising out of asbestos exposure;

(xi)    all Liabilities to third parties for Claims based upon Contract, tort or any other basis;

(xii)    all workers' compensation Claims with respect to Employees residing in or employed in, as the case may be as defined by applicable Law, the states set forth on **Exhibit G** (collectively, "Retained Workers' Compensation Claims");

(xiii)    all Liabilities arising out of, relating to, in respect of or in connection with any Retained Plan;

(xiv)    all Liabilities arising out of, relating to, in respect of or in connection with any Assumed Plan or Purchased Subsidiaries Employee Benefit Plan, but only to the extent such Liabilities result from the failure of such Assumed Plan or Purchased Subsidiaries Employee Benefit Plan to comply in all respects with TARP or such Liability related to any changes to or from the administration of such Assumed Plan or Purchased Subsidiaries Employee Benefit Plan prior to the Closing Date;

(xv)    the Settlement Agreement, except as provided with respect to Liabilities under Section 5A of the UAW Retiree Settlement Agreement; and

(xvi)    all Liabilities arising out of, related to or in connection with any (A) implied warranty or other implied obligation arising under statutory or common law without the necessity of an express warranty or (B) allegation, statement or writing by or attributable to Sellers.

*Section 2.4    Non-Assignability.*

(a)    If any Contract, Transferred Equity Interest (or any interest therein), Permit or other asset, which by the terms of this Agreement, is intended to be included in the Purchased Assets is determined not capable of being assigned or transferred (whether pursuant to Sections 363 or 365 of the Bankruptcy Code) to Purchaser at the Closing without the consent of another party thereto, the issuer thereof or any third party (including a Governmental Authority) ("Non-Assignable Assets"), this Agreement shall not constitute an assignment thereof, or an attempted assignment thereof, unless and until any such consent is obtained.  Subject to **Section 6.3**, Sellers shall use reasonable best efforts, and Purchaser shall use reasonable best efforts to cooperate with Sellers, to obtain the consents necessary to assign to Purchaser the Non-Assignable Assets before, at or after the Closing; provided, however, that neither Sellers nor Purchaser shall be required to make any expenditure, incur any Liability, agree to any modification to any Contract or forego or alter any rights in connection with such efforts.

(b)    To the extent that the consents referred to in **Section 2.4(a)** are not obtained by Sellers, except as otherwise provided in the Ancillary Documents to which one or more Sellers is a party, Sellers' sole responsibility with respect to such Non-Assignable Assets shall be to use reasonable best efforts, at no cost to Sellers, to (i) provide to Purchaser the benefits of any Non-Assignable Assets; (ii) cooperate in any

reasonable and lawful arrangement designed to provide the benefits of any Non-Assignable Assets to Purchaser without incurring any financial obligation to Purchaser; and (iii) enforce for the account of Purchaser and at the cost of Purchaser any rights of Sellers arising from any Non-Assignable Asset against such party or parties thereto; provided, however, that any such efforts described in clauses (i) through (iii) above shall be made only with the consent, and at the direction, of Purchaser. Without limiting the generality of the foregoing, with respect to any Non-Assignable Asset that is a Contract of Leased Real Property for which a consent is not obtained on or prior to the Closing Date, Purchaser shall enter into a sublease containing the same terms and conditions as such lease (unless such lease by its terms prohibits such subleasing arrangement), and entry into and compliance with such sublease shall satisfy the obligations of the Parties under this **Section 2.4(b)** until such consent is obtained.

(c)    If Purchaser is provided the benefits of any Non-Assignable Asset pursuant to **Section 2.4(b)**, Purchaser shall perform, on behalf of the applicable Seller, for the benefit of the issuer thereof or the other party or parties thereto, the obligations (including payment obligations) of the applicable Seller thereunder or in connection therewith arising from and after the Closing Date and if Purchaser fails to perform to the extent required herein, Sellers, without waiving any rights or remedies that they may have under this Agreement or applicable Laws, may (i) suspend their performance under **Section 2.4(b)** in respect of the Non-Assignable Asset that is the subject of such failure to perform unless and until such situation is remedied, or (ii) perform at Purchaser's sole cost and expense, in which case, Purchaser shall reimburse Sellers' costs and expenses of such performance immediately upon receipt of an invoice therefor.  To the extent that Purchaser is provided the benefits of any Non-Assignable Asset pursuant to **Section 2.4(b),** Purchaser shall indemnify, defend and hold Sellers harmless from and against any and all Liabilities relating to such Non-Assignable Asset and arising from and after the Closing Date (other than such Damages that have resulted from the gross negligence or willful misconduct of Sellers).

(d)    For the avoidance of doubt, the inability of any Contract, Transferred Equity Interest (or any other interest therein), Permit or other asset, which by the terms of this Agreement is intended to be included in the Purchased Assets to be assigned or transferred to Purchaser at the Closing shall not (i) give rise to a basis for termination of this Agreement pursuant to **ARTICLE VIII** or (ii) give rise to any right to any adjustment to the Purchase Price.

## ARTICLE III
## CLOSING; PURCHASE PRICE

Section 3.1    Closing.    The closing of the transactions contemplated by this Agreement (the "Closing") shall occur on the date that falls at least three (3) Business Days following the satisfaction and/or waiver of all conditions to the Closing set forth in **ARTICLE VII** (other than any of such conditions that by its nature is to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions), or on such other date as the Parties mutually agree, at the offices of Jenner & Block LLP, 919 Third Avenue, New York City, New York 10022-3908, or at such other place or such other date as the Parties may agree in

writing. The date on which the Closing actually occurs shall be referred to as the "Closing Date," and except as otherwise expressly provided herein, the Closing shall for all purposes be deemed effective as of 9:00 a.m., New York City time, on the Closing Date.

Section 3.2    Purchase Price.

(a)    The purchase price (the "Purchase Price") shall be equal to the sum of:

(i)    a Bankruptcy Code Section 363(k) credit bid in an amount equal to: (A) the amount of Indebtedness of Parent and its Subsidiaries as of the Closing pursuant to the UST Credit Facilities, and (B) the amount of Indebtedness of Parent and its Subsidiaries as of the Closing under the DIP Facility, less $8,022,488,605 of Indebtedness under the DIP Facility (such amount, the "UST Credit Bid Amount");

(ii)    the UST Warrant (which the Parties agree has a value of no less than $1,000);

(iii)    the valid issuance by Purchaser to Parent of (A) 50,000,000 shares of Common Stock (collectively, the "Parent Shares") and (B) the Parent Warrants; and

(iv)    the assumption by Purchaser or its designated Subsidiaries of the Assumed Liabilities.

(b)    On the terms and subject to the conditions set forth in this Agreement, at the Closing, Purchaser shall (i) offset, pursuant to Section 363(k) of the Bankruptcy Code, the UST Credit Bid Amount against Indebtedness of Parent and its Subsidiaries owed to Purchaser as of the Closing under the UST Credit Facilities and the DIP Facility; (ii) transfer to Parent, in accordance with the instructions provided by Parent to Purchaser prior to the Closing, the UST Warrant; and (iii) issue to Parent, in accordance with the instructions provided by Parent to Purchaser prior to the Closing, the Parent Shares and the Parent Warrants.

(c)

(i)    Sellers may, at any time, seek an Order of the Bankruptcy Court (the "Claims Estimate Order"), which Order may be the Order confirming Sellers' Chapter 11 plan, estimating the aggregate allowed general unsecured claims against Sellers' estates. If in the Claims Estimate Order, the Bankruptcy Court makes a finding that the estimated aggregate allowed general unsecured claims against Sellers' estates exceed $35,000,000,000, then Purchaser will, within five (5) days of entry of the Claims Estimate Order, issue 10,000,000 additional shares of Common Stock (the "Adjustment Shares") to Parent, as an adjustment to the Purchase Price.

(ii)    The number of Adjustment Shares shall be adjusted to take into account any stock dividend, stock split, combination of shares, recapitalization,

-34-

merger, consolidation, reorganization or similar transaction with respect to the Common Stock, effected from and after the Closing and before issuance of the Adjustment Shares.

(iii)    At the Closing, Purchaser shall have authorized and, thereafter, shall reserve for issuance the Adjustment Shares that may be issued hereunder.

Section 3.3    *Allocation.*    Following the Closing, Purchaser shall prepare and deliver to Sellers an allocation of the aggregate consideration among Sellers and, for any transactions contemplated by this Agreement that do not constitute an Agreed G Transaction pursuant to **Section 6.16**, Purchaser shall also prepare and deliver to the applicable Seller a proposed allocation of the Purchase Price and other consideration paid in exchange for the Purchased Assets, prepared in accordance with Section 1060, and if applicable, Section 338, of the Tax Code (the "Allocation").    The applicable Seller shall have thirty (30) days after the delivery of the Allocation to review and consent to the Allocation in writing, which consent shall not be unreasonably withheld, conditioned or delayed.    If the applicable Seller consents to the Allocation, such Seller and Purchaser shall use such Allocation to prepare and file in a timely manner all appropriate Tax filings, including the preparation and filing of all applicable forms in accordance with applicable Law, including Forms 8594 and 8023, if applicable, with their respective Tax Returns for the taxable year that includes the Closing Date and shall take no position in any Tax Return that is inconsistent with such Allocation; provided, however, that nothing contained herein shall prevent the applicable Seller and Purchaser from settling any proposed deficiency or adjustment by any Governmental Authority based upon or arising out of such Allocation, and neither the applicable Seller nor Purchaser shall be required to litigate before any court, any proposed deficiency or adjustment by any Taxing Authority challenging such Allocation.    If the applicable Seller does not consent to such Allocation, the applicable Seller shall notify Purchaser in writing of such disagreement within such thirty (30) day period, and thereafter, the applicable Seller shall attempt in good faith to promptly resolve any such disagreement.    If the Parties cannot resolve a disagreement under this **Section 3.3**, such disagreement shall be resolved by an independent accounting firm chosen by Purchaser and reasonably acceptable to the applicable Seller, and such resolution shall be final and binding on the Parties.    The fees and expenses of such accounting firm shall be borne equally by Purchaser, on the one hand, and the applicable Seller, on the other hand.    The applicable Seller shall provide Purchaser, and Purchaser shall provide the applicable Seller, with a copy of any information described above required to be furnished to any Taxing Authority in connection with the transactions contemplated herein.

Section 3.4    *Prorations.*

(a)    The following prorations relating to the Purchased Assets shall be made:

(i)    Except as provided in **Section 2.3(a)(v)** and **Section 2.3(a)(vi)**, in the case of Taxes with respect to a Straddle Period, for purposes of Retained Liabilities, the portion of any such Tax that is allocable to Sellers with respect to any Purchased Asset shall be:

(A)    in the case of Taxes that are either (1) based upon or related to income or receipts, or (2) imposed in connection with any sale or other transfer or assignment of property (real or personal, tangible or intangible), other than Transfer Taxes, equal to the amount that would be payable if the taxable period ended on the Closing Date; and

(B)    in the case of Taxes imposed on a periodic basis, or otherwise measured by the level of any item, deemed to be the amount of such Taxes for the entire Straddle Period (after giving effect to amounts which may be deducted from or offset against such Taxes) (or, in the case of such Taxes determined on an arrears basis, the amount of such Taxes for the immediately preceding period), multiplied by a fraction, the numerator of which is the number of days in the period ending on the Closing Date and the denominator of which is the number of days in the entire Straddle Period.

In the case of any Tax based upon or measured by capital (including net worth or long-term debt) or intangibles, any amount thereof required to be allocated under this clause (i) shall be computed by reference to the level of such items on the Closing Date. All determinations necessary to effect the foregoing allocations shall be made in a manner consistent with prior practice of the applicable Seller, Seller Group member, or Seller Subsidiary.

(ii)    All charges for water, wastewater treatment, sewers, electricity, fuel, gas, telephone, garbage and other utilities relating to the Transferred Real Property shall be prorated as of the Closing Date, with Sellers being liable to the extent such items relate to the Pre-Closing Tax Period, and Purchaser being liable to the extent such items relate to the Post-Closing Tax Period.

(b)    If any of the foregoing proration amounts cannot be determined as of the Closing Date due to final invoices not being issued as of the Closing Date, Purchasers and Sellers shall prorate such items as and when the actual invoices are issued to the appropriate Party.  The Party owing amounts to the other by means of such prorations shall pay the same within thirty (30) days after delivery of a written request by the paying Party.

*Section 3.5    Post-Closing True-up of Certain Accounts.*

(a)    Sellers shall promptly reimburse Purchaser in U.S. Dollars for the aggregate amount of all checks, drafts and similar instruments of disbursement, including wire and similar transfers of funds, written or initiated by Sellers prior to the Closing in respect of any obligations that would have constituted Retained Liabilities at the Closing, and that clear or settle in accounts maintained by Purchaser (or its Affiliates) at or following the Closing.

(b)    Purchaser shall promptly reimburse Sellers in U.S. Dollars for the aggregate amount of all checks, drafts and similar instruments of disbursement, including

wire and similar transfers of funds, written or initiated by Sellers following the Closing in respect of any obligations that would have constituted Assumed Liabilities at the Closing, and that clear or settle in accounts maintained by Sellers (or their Affiliates) at or following the Closing.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF SELLERS

Except as disclosed in the Parent SEC Documents or in the Sellers' Disclosure Schedule, each Seller represents and warrants severally, and not jointly, to Purchaser as follows:

*Section 4.1    Organization and Good Standing.*  Each Seller and each Purchased Subsidiary is duly organized and validly existing under the Laws of its jurisdiction of organization.  Subject to the limitations imposed on Sellers as a result of having filed the Bankruptcy Cases, each Seller and each Purchased Subsidiary has all requisite corporate, limited liability company, partnership or similar power, as the case may be, and authority to own, lease and operate its properties and assets and to carry on its business as now being conducted.  Each Seller and each Purchased Subsidiary is duly qualified or licensed or admitted to do business, and is in good standing in (where such concept is recognized under applicable Law), the jurisdictions in which the ownership of its property or the conduct of its business requires such qualification or license, in each case, except where the failure to be so qualified, licensed or in good standing would not reasonably be expected to have a Material Adverse Effect.  Sellers have made available to Purchaser prior to the execution of this Agreement true and complete copies of Sellers' Organizational Documents, in each case, as in effect on the date of this Agreement.

*Section 4.2    Authorization; Enforceability.*    Subject to the entry and effectiveness of the Sale Approval Order, each Seller has the requisite corporate or limited liability company power and authority, as the case may be, to (a) execute and deliver this Agreement and the Ancillary Agreements to which such Seller is a party; (b) perform its obligations hereunder and thereunder; and (c) consummate the transactions contemplated by this Agreement and the Ancillary Agreements to which such Seller is a party.  Subject to the entry and effectiveness of the Sale Approval Order, this Agreement constitutes, and each Ancillary Agreement, when duly executed and delivered by each Seller that is a party thereto, shall constitute, a valid and legally binding obligation of such Seller (assuming that this Agreement and such Ancillary Agreements constitute valid and legally binding obligations of Purchaser), enforceable against such Seller in accordance with its respective terms and conditions, except as enforceability may be limited by applicable bankruptcy, reorganization, insolvency, moratorium, fraudulent transfer and other similar Laws relating to or affecting the enforcement of creditors' rights generally from time to time in effect and by general equitable principles relating to enforceability, including principles of commercial reasonableness, good faith and fair dealing.

*Section 4.3    Noncontravention; Consents.*

(a)    Subject, in the case of clauses (i), (iii) and (iv), to the entry and effectiveness of the Sale Approval Order, the execution, delivery and performance by each Seller of this Agreement and the Ancillary Agreements to which it is a party, and (subject to the entry of the Sale Approval Order) the consummation by such Seller of the

transactions contemplated hereby and thereby, do not (i) violate any Law to which the Purchased Assets are subject; (ii) conflict with or result in a breach of any provision of the Organizational Documents of such Seller; (iii) result in a material breach or constitute a material default under, or create in any Person the right to terminate, cancel or accelerate any material obligation of such Seller pursuant to any material Purchased Contract (including any material License); or (iv) result in the creation or imposition of any Encumbrance, other than a Permitted Encumbrance, upon the Purchased Assets, except for any of the foregoing in the case of clauses (i), (iii) and (iv), that would not reasonably be expected to have a Material Adverse Effect.

(b)    Subject to the entry and effectiveness of the Sale Approval Order, no consent, waiver, approval, Order, Permit, qualification or authorization of, or declaration or filing with, or notification to, any Person or Governmental Authority (other than the Bankruptcy Court) is required by any Seller for the consummation by each Seller of the transactions contemplated by this Agreement or by the Ancillary Agreements to which such Seller is a party or the compliance by such Seller with any of the provisions hereof or thereof, except for (i) compliance with the applicable requirements of any Antitrust Laws and (ii) such consent, waiver, approval, Order, Permit, qualification or authorization of, or declaration or filing with, or notification to, any Person or Governmental Authority, the failure of which to be received or made would not reasonably be expected to have a Material Adverse Effect.

*Section 4.4    Subsidiaries.*    Section 4.4 of the Sellers' Disclosure Schedule identifies each Purchased Subsidiary and the jurisdiction of organization thereof.  There are no Equity Interests in any Purchased Subsidiary issued, reserved for issuance or outstanding.  All of the outstanding shares of capital stock, if applicable, of each Purchased Subsidiary have been duly authorized, validly issued, are fully paid and nonassessable and are owned, directly or indirectly, by Sellers, free and clear of all Encumbrances other than Permitted Encumbrances. Sellers, directly or indirectly, have good and valid title to the outstanding Equity Interests of the Purchased Subsidiaries and, upon delivery by Sellers to Purchaser of the outstanding Equity Interests of the Purchased Subsidiaries (either directly or indirectly) at the Closing, good and valid title to the outstanding Equity Interests of the Purchased Subsidiaries will pass to Purchaser (or, with respect to any Purchased Subsidiary that is not a direct Subsidiary of a Seller, the Purchased Subsidiary with regard to which it is a Subsidiary will continue to have good and valid title to such outstanding Equity Interests).  None of the outstanding Equity Interests in the Purchased Subsidiaries has been conveyed in violation of, and none of the outstanding Equity Interests in the Purchased Subsidiaries has been issued in violation of (a) any preemptive or subscription rights, rights of first offer or first refusal or similar rights or (b) any voting trust, proxy or other Contract (including options or rights of first offer or first refusal) with respect to the voting, purchase, sale or other disposition thereof.

*Section 4.5    Reports and Financial Statements; Internal Controls.*

(a)    (i) Parent has filed or furnished, or will file or furnish, as applicable, all forms, documents, schedules and reports, together with any amendments required to be made with respect thereto, required to be filed or furnished with the SEC from April 1, 2007 until the Closing (the "Parent SEC Documents"), and (ii) as of their respective

filing dates, or, if amended, as of the date of the last such amendment, the Parent SEC Documents complied or will comply in all material respects with the requirements of the Securities Act and the Exchange Act, as applicable, and none of the Parent SEC Documents contained or will contain any untrue statement of a material fact or omitted or will omit to state any material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading, subject, in the case of Parent SEC Documents filed or furnished during the period beginning on the date of the Original Agreement and ending on the Closing Date, to any modification by Parent of its reporting obligations under Section 12 or Section 15(d) of the Exchange Act as a result of the filing of the Bankruptcy Cases.

(b)    (i) The consolidated financial statements of Parent included in the Parent SEC Documents (including all related notes and schedules, where applicable) fairly present or will fairly present in all material respects the consolidated financial position of Parent and its consolidated Subsidiaries, as at the respective dates thereof, and (ii) the consolidated results of their operations and their consolidated cash flows for the respective periods then ended (subject, in the case of the unaudited statements, to normal year-end audit adjustments and to any other adjustments described therein, including the notes thereto) in conformity with GAAP (except, in the case of the unaudited statements, as permitted by the SEC) applied on a consistent basis during the periods involved (except as may be indicated therein or in the notes thereto), subject, in the case of Parent SEC Documents filed or furnished during the period beginning on the date of the Original Agreement and ending on the Closing Date, to any modification by Parent of its reporting obligations under Section 12 or Section 15(d) of the Exchange Act as a result of the filing of the Bankruptcy Cases.

(c)    Parent maintains a system of internal control over financial reporting designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for inclusion in the Parent SEC Documents in accordance with GAAP and maintains records that (i) in reasonable detail accurately and fairly reflect the transactions and dispositions of the assets of Parent and its consolidated Subsidiaries, (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with GAAP, and that receipts and expenditures are made only in accordance with appropriate authorizations and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of assets. There are no (A) material weaknesses in the design or operation of the internal controls of Parent or (B) to the Knowledge of Sellers, any fraud, whether or not material, that involves management or other employees of Parent or any Purchased Subsidiary who have a significant role in internal control.

*Section 4.6    Absence of Certain Changes and Events.* From January 1, 2009 through the date hereof, except as otherwise contemplated, required or permitted by this Agreement, there has not been:

(a)    (i) any declaration, setting aside or payment of any dividend or other distribution (whether in cash, securities or other property or by allocation of additional Indebtedness to any Seller or any Key Subsidiary without receipt of fair value) with

respect to any Equity Interests in any Seller or any Key Subsidiary or any repurchase for value of any Equity Interests or rights of any Seller or any Key Subsidiary (except for dividends and distributions among its Subsidiaries) or (ii) any split, combination or reclassification of any Equity Interests in Sellers or any issuance or the authorization of any issuance of any other Equity Interests in respect of, in lieu of or in substitution for Equity Interests of Sellers;

(b)    other than as is required by the terms of the Parent Employee Benefit Plans and Policies, the Settlement Agreement, the UAW Collective Bargaining Agreement or consistent with the expiration of a Collective Bargaining Agreement or as may be required by applicable Law, in each case, as may be permitted by TARP or under any enhanced restrictions on executive compensation agreed to by Parent and Sponsor, any (i) grant to any Seller Key Personnel of any increase in compensation, except increases required under employment Contracts in effect as of January 1, 2009, or as a result of a promotion to a position of additional responsibility, (ii) grant to any Seller Key Personnel of any increase in retention, change in control, severance or termination compensation or benefits, except as required under any employment Contracts in effect as of January 1, 2009, (iii) other than in the Ordinary Course of Business, adoption, termination of, entry into or amendment or modification of, in a material manner, any Benefit Plan, (iv) adoption, termination of, entry into or amendment or modification of, in a material manner, any employment, retention, change in control, severance or termination Contract with any Seller Key Personnel or (v) entry into or amendment, modification or termination of any Collective Bargaining Agreement or other Contract with any Union of any Seller or Purchased Subsidiary;

(c)    any material change in accounting methods, principles or practices by any Seller, Purchased Subsidiary or Seller Group member or any material joint venture to which any Seller or Purchased Subsidiary is a party, in each case, materially affecting the consolidated assets or Liabilities of Parent, except to the extent required by a change in GAAP or applicable Law, including Tax Laws;

(d)    any sale, transfer, pledge or other disposition by any Seller or any Purchased Subsidiary of any portion of its assets or properties not in the Ordinary Course of Business and with a sale price or fair value in excess of $100,000,000;

(e)    aggregate capital expenditures by any Seller or any Purchased Subsidiary in excess of $100,000,000 in a single project or group of related projects or capital expenditures in excess of $100,000,000 in the aggregate;

(f)    any acquisition by any Seller or any Purchased Subsidiary (including by merger, consolidation, combination or acquisition of any Equity Interests or assets) of any Person or business or division thereof (other than acquisitions of portfolio assets and acquisitions in the Ordinary Course of Business) in a transaction (or series of related transactions) where the aggregate consideration paid or received (including non-cash equity consideration) exceeded $100,000,000;

(g)    any discharge or satisfaction of any Indebtedness by any Seller or any Purchased Subsidiary in excess of $100,000,000, other than the discharge or satisfaction of any Indebtedness when due in accordance with its terms;

(h)    any alteration, whether through a complete or partial liquidation, dissolution, merger, consolidation, restructuring, reorganization or in any other manner, the legal structure or ownership of any Seller or any Key Subsidiary or any material joint venture to which any Seller or any Key Subsidiary is a party, or the adoption or alteration of a plan with respect to any of the foregoing;

(i)    any amendment or modification to the material adverse detriment of any Key Subsidiary of any material Affiliate Contract or Seller Material Contract, or termination of any material Affiliate Contract or Seller Material Contract to the material adverse detriment of any Seller or any Key Subsidiary, in each case, other than in the Ordinary Course of Business;

(j)    any event, development or circumstance involving, or any change in the financial condition, properties, assets, liabilities, business, or results of operations of Sellers or any circumstance, occurrence or development (including any adverse change with respect to any circumstance, occurrence or development existing on or prior to the end of the most recent fiscal year end) of Sellers that has had or would reasonably be expected to have a Material Adverse Effect; or

(k)    any commitment by any Seller, any Key Subsidiary (in the case of clauses (a), (g) and (h) above) or any Purchased Subsidiary (in the case of clauses (b) through (f) and clauses (h) and (j) above) to do any of the foregoing.

Section 4.7    *Title to and Sufficiency of Assets.*

(a)    Subject to the entry and effectiveness of the Sale Approval Order, at the Closing, Sellers will obtain good and marketable title to, or a valid and enforceable right by Contract to use, the Purchased Assets, which shall be transferred to Purchaser, free and clear of all Encumbrances other than Permitted Encumbrances.

(b)    The tangible Purchased Assets of each Seller are in normal operating condition and repair, subject to ordinary wear and tear, and sufficient for the operation of such Seller's business as currently conducted, except where such instances of noncompliance with the foregoing would not reasonably be expected to have a Material Adverse Effect.

Section 4.8    *Compliance with Laws; Permits.*

(a)    Each Seller and each Purchased Subsidiary is in compliance with and is not in default under or in violation of any applicable Law, except where such non-compliance, default or violation would not reasonably be expected to have a Material Adverse Effect.    Notwithstanding anything contained in this **Section 4.8(a)**, no representation or warranty shall be deemed to be made in this **Section 4.8(a)** in respect of

the matters referenced in **Section 4.5**, **Section 4.9**, **Section 4.10**, **Section 4.11** or **Section 4.13**, each of which matters is addressed by such other Sections of this Agreement.

(b)      (i) Each Seller has all Permits necessary for such Seller to own, lease and operate the Purchased Assets and (ii) each Purchased Subsidiary has all Permits necessary for such entity to own, lease and operate its properties and assets, except in each case, where the failure to possess such Permits would not reasonably be expected to have a Material Adverse Effect.  All such Permits are in full force and effect, except where the failure to be in full force and effect would not reasonably be expected to have a Material Adverse Effect.

Section 4.9      *Environmental Laws.*  Except as would not reasonably be expected to have a Material Adverse Effect, to the Knowledge of Sellers, (a) each Seller and each Purchased Subsidiary has conducted its business on the Transferred Real Property in compliance with all applicable Environmental Laws; (b) none of the Transferred Real Property currently contains any Hazardous Materials, which could reasonably be expected to give rise to an undisclosed Liability under applicable Environmental Laws; (c) as of the date of this Agreement, no Seller or Purchased Subsidiary has received any currently unresolved written notices, demand letters or written requests for information from any Governmental Authority indicating that such entity may be in violation of any Environmental Law in connection with the ownership or operation of the Transferred Real Property; and (d) since April 1, 2007, no Hazardous Materials have been transported in violation of any applicable Environmental Law, or in a manner reasonably foreseen to give rise to any Liability under any Environmental Law, from any Transferred Real Property as a result of any activity of any Seller or Purchased Subsidiary.  Except as provided in **Section 4.8(b)** with respect to Permits under Environmental Laws, Purchaser agrees and understands that no representation or warranty is made in respect of environmental matters in any Section of this Agreement other than this **Section 4.9**.

Section 4.10      *Employee Benefit Plans.*

(a)      Section 4.10 of the Sellers' Disclosure Schedule sets forth all material Parent Employee Benefit Plans and Policies and Purchased Subsidiaries Employee Benefit Plans (collectively, the "Benefit Plans").  Sellers have made available, upon reasonable request, to Purchaser true, complete and correct copies of (i) each material Benefit Plan, (ii) the three (3) most recent annual reports on Form 5500 (including all schedules, auditor's reports and attachments thereto) filed with the IRS with respect to each such Benefit Plan (if any such report was required by applicable Law), (iii) the most recent actuarial or other financial report prepared with respect to such Benefit Plan, if any, (iv) each trust agreement and insurance or annuity Contract or other funding or financing arrangement relating to such Benefit Plan and (v) to the extent not subject to confidentiality restrictions, any material written communications received by Sellers or any Subsidiaries of Sellers from any Governmental Authority relating to a Benefit Plan, including any communication from the Pension Benefit Guaranty Corporation (the "PBGC"), in respect of any Benefit Plan, subject to Title IV of ERISA.

(b)      Except as would not reasonably be expected to have a Material Adverse Effect, (i) each Benefit Plan has been administered in accordance with its terms, (ii) each

of Sellers, any of their Subsidiaries and each Benefit Plan is in compliance with the applicable provisions of ERISA, the Tax Code, all other applicable Laws (including Section 409A of the Tax Code, TARP or under any enhanced restrictions on executive compensation agreed to by Sellers with Sponsor) and the terms of all applicable Collective Bargaining Agreements, (iii) there are no (A) investigations by any Governmental Authority, (B) termination proceedings or other Claims (except routine Claims for benefits payable under any Benefit Plans) or (C) Claims, in each case, against or involving any Benefit Plan or asserting any rights to or Claims for benefits under any Benefit Plan that could give rise to any Liability, and there are not any facts or circumstances that could give rise to any Liability in the event of any such Claim and (iv) each Benefit Plan that is intended to be a Tax-qualified plan under Section 401(a) of the Tax Code (or similar provisions for Tax-registered or Tax-favored plans of non-United States jurisdictions) is qualified and any trust established in connection with any Benefit Plan that is intended to be exempt from taxation under Section 501(a) of the Tax Code (or similar provisions for Tax-registered or Tax-favored plans of non-United States jurisdictions) is exempt from United States federal income Taxes under Section 501(a) of the Tax Code (or similar provisions under non-United States law).  To the Knowledge of Sellers, no circumstance and no fact or event exists that would be reasonably expected to adversely affect the qualified status of any Benefit Plan.

(c)     None of the Parent Employee Benefit Plans and Policies or any material Purchased Subsidiaries Employee Benefit Plans that is an "employee pension benefit plan" (as defined in Section 3(2) of ERISA) has failed to satisfy, as applicable, the minimum funding standards (as described in Section 302 of ERISA or Section 412 of the Tax Code), whether or not waived, nor has any waiver of the minimum funding standards of Section 302 of ERISA or Section 412 of the Tax Code been requested.

(d)     No Seller or any ERISA Affiliate of any Seller (including any Purchased Subsidiary) (i) has any actual or contingent Liability (A) under any employee benefit plan subject to Title IV of ERISA other than the Benefit Plans (except for contributions not yet due), (B) to the PBGC (except for the payment of premiums not yet due), which Liability, in each case, has not been fully paid as of the date hereof, or, if applicable, which has not been accrued in accordance with GAAP or (C) under any "multiemployer plan" (as defined in Section 3(37) of ERISA), or (ii) will incur withdrawal Liability under Title IV of ERISA as a result of the consummation of the transactions contemplated hereby, except for Liabilities with respect to any of the foregoing that would not reasonably be expected to have a Material Adverse Effect.

(e)     Neither the execution of this Agreement or any Ancillary Agreement nor the consummation of the transactions contemplated hereby (alone or in conjunction with any other event, including termination of employment) will entitle any member of the board of directors of Parent or any Applicable Employee who is an officer or member of senior management of Parent to any increase in compensation or benefits, any grant of severance, retention, change in control or other similar compensation or benefits, any acceleration of the time of payment or vesting of any compensation or benefits (but not including, for this purpose, any retention, stay bonus or other incentive plan, program, arrangement that is a Retained Plan) or will require the securing or funding of any

compensation or benefits or limit the right of Sellers, any Subsidiary of Sellers or Purchaser or any Affiliates of Purchaser to amend, modify or terminate any Benefit Plan. Any new grant of severance, retention, change in control or other similar compensation or benefits to any Applicable Employee, and any payout to any Transferred Employee under any such existing arrangements, that would otherwise occur as a result of the execution of this Agreement or any Ancillary Agreement (alone or in conjunction with any other event, including termination of employment), has been waived by such Applicable Employee or otherwise cancelled.

(f)     No amount or other entitlement currently in effect that could be received (whether in cash or property or the vesting of property) as a result of the actions contemplated by this Agreement and the Ancillary Agreements (alone or in combination with any other event) by any Person who is a "disqualified individual" (as defined in Treasury Regulation Section 1.280G-1) (each, a "Disqualified Individual") with respect to Sellers would be an "excess parachute payment" (as defined in Section 280G(b)(1) of the Tax Code). No Disqualified Individual or Applicable Employee is entitled to receive any additional payment (e.g., any Tax gross-up or any other payment) from Sellers or any Subsidiaries of Sellers in the event that the additional or excise Tax required by Section 409A or 4999 of the Tax Code, respectively is imposed on such individual.

(g)     All individuals covered by the UAW Collective Bargaining Agreement are either Applicable Employees or employed by a Purchased Subsidiary.

(h)     Section 4.10(h) of the Sellers' Disclosure Schedule lists all non-standard individual agreements currently in effect providing for compensation, benefits and perquisites for any current and former officer, director or top twenty-five (25) most highly paid employee of Parent and any other such material non-standard individual agreements with non-top twenty-five (25) employees.

*Section 4.11    Labor Matters.*  There is not any labor strike, work stoppage or lockout pending, or, to the Knowledge of Sellers, threatened in writing against or affecting any Seller or any Purchased Subsidiary. Except as would not reasonably be expected to have a Material Adverse Effect: (a) none of Sellers or any Purchased Subsidiary is engaged in any material unfair labor practice; (b) there are not any unfair labor practice charges or complaints against Sellers or any Purchased Subsidiary pending, or, to the Knowledge of Sellers, threatened, before the National Labor Relations Board; (c) there are not any pending or, to the Knowledge of Sellers, threatened in writing, union grievances against Sellers or any Purchased Subsidiary as to which there is a reasonable possibility of adverse determination; (d) there are not any pending, or, to the Knowledge of Sellers, threatened in writing, charges against Sellers or any Purchased Subsidiary or any of their current or former employees before the Equal Employment Opportunity Commission or any state or local agency responsible for the prevention of unlawful employment practices; (e) no union organizational campaign is in progress with respect to the employees of any Seller or any Purchased Subsidiary and no question concerning representation of such employees exists; and (f) no Seller nor any Purchased Subsidiary has received written communication during the past five (5) years of the intent of any Governmental Authority responsible for the enforcement of labor or employment Laws to conduct an investigation of or

affecting Sellers or any Subsidiary of Sellers and, to the Knowledge of Sellers, no such investigation is in progress.

Section 4.12    *Investigations; Litigation.*  (a) To the Knowledge of Sellers, there is no investigation or review pending by any Governmental Authority with respect to any Seller that would reasonably be expected to have a Material Adverse Effect, and (b) there are no actions, suits, inquiries or proceedings, or to the Knowledge of Sellers, investigations, pending against any Seller, or relating to any of the Transferred Real Property, at law or in equity before, and there are no Orders of or before, any Governmental Authority, in each case that would reasonably be expected to have a Material Adverse Effect.

Section 4.13    *Tax Matters.*  Except as would not reasonably be expected to have a Material Adverse Effect, (a) all Tax Returns required to have been filed by, with respect to or on behalf of any Seller, Seller Group member or Purchased Subsidiary have been timely filed (taking into account any extension of time to file granted or obtained) and are correct and complete in all respects, (b) all amounts of Tax required to be paid with respect to any Seller, Seller Group member or Purchased Subsidiary (whether or not shown on any Tax Return) have been timely paid or are being contested in good faith by appropriate proceedings and have been reserved for in accordance with GAAP in Parent's consolidated audited financial statements, (c) no deficiency for any amount of Tax has been asserted or assessed by a Taxing Authority in writing relating to any Seller, Seller Group member or Purchased Subsidiary that has not been satisfied by payment, settled or withdrawn, (d) there are no audits, Claims or controversies currently asserted or threatened in writing with respect to any Seller, Seller Group member or Purchased Subsidiary in respect of any amount of Tax or failure to file any Tax Return, (e) no Seller, Seller Group member or Purchased Subsidiary has agreed to any extension or waiver of the statute of limitations applicable to any Tax Return, or agreed to any extension of time with respect to a Tax assessment or deficiency, which period (after giving effect to such extension or waiver) has not yet expired, (f) no Seller, Seller Group member or Purchased Subsidiary is a party to or the subject of any ruling requests, private letter rulings, closing agreements, settlement agreements or similar agreements with any Taxing Authority for any periods for which the statute of limitations has not yet run, (g) no Seller, Seller Group member or Purchased Subsidiary (A) has any Liability for Taxes of any Person (other than any Purchased Subsidiary), including as a transferee or successor, or pursuant to any contractual obligation (other than pursuant to any commercial Contract not primarily related to Tax), or (B) is a party to or bound by any Tax sharing agreement, Tax allocation agreement or Tax indemnity agreement (in every case, other than this Agreement and those Tax sharing, Tax allocation or Tax indemnity agreements that will be terminated prior to Closing and with respect to which no post-Closing Liabilities will exist), (h) each of the Purchased Subsidiaries and each Seller and Seller Group member has withheld or collected all Taxes required to have been withheld or collected and, to the extent required, has paid such Taxes to the proper Taxing Authority, (i) no Seller, Seller Group member or Purchased Subsidiary will be required to make any adjustments in taxable income for any Tax period (or portion thereof) ending after the Closing Date, including pursuant to Section 481(a) or 263A of the Tax Code or any similar provision of foreign, provincial, state, local or other Law as a result of transactions or events occurring, or accounting methods employed, prior to the Closing, nor is any application pending with any Taxing Authority requesting permission for any changes in accounting methods that relate to any Seller, Seller Group member or Purchased Subsidiary, (j) the Assumed Liabilities were incurred through the

Ordinary Course of Business, (k) there are no Tax Encumbrances on any of the Purchased Assets or the assets of any Purchased Subsidiary (other than Permitted Encumbrances for which appropriate reserves have been established (and to the extent that such liens relate to a period ending on or before December 31, 2008, the amount of any such Liability is accrued or reserved for as a Liability in accordance with GAAP in the audited consolidated balance sheet of Sellers at December 31, 2008)), (l) none of the Purchased Subsidiaries or Sellers has been a "distributing corporation" or a "controlled corporation" in a distribution intended to qualify under Section 355(a) of the Tax Code, (m) none of the Purchased Subsidiaries, Sellers or Seller Group members has participated in any "listed transactions" or "reportable transactions" within the meaning of Treasury Regulations Section 1.6011-4, (n) there are no unpaid Taxes with respect to any Seller, Seller Group member or Purchased Asset for which Purchaser will have liability as a transferee or successor and (o) the most recent financial statements contained in the Parent SEC Documents reflect an adequate reserve for all Taxes payable by Sellers, the Purchased Subsidiaries and the members of all Seller Groups for all taxable periods and portions thereof through the date of such financial statements.

*Section 4.14    Intellectual Property and IT Systems.*

(a)    Except as would not reasonably be expected to have a Material Adverse Effect: (i) each Seller and each Purchased Subsidiary owns, controls, or otherwise possesses sufficient rights to use, free and clear of all Encumbrances (other than Permitted Encumbrances) all Intellectual Property necessary for the conduct of its business in substantially the same manner as conducted as of the date hereof; and (ii) all Intellectual Property owned by Sellers that is necessary for the conduct of the business of Sellers and each Purchased Subsidiary as conducted as of the date hereof is subsisting and in full force and effect, has not been adjudged invalid or unenforceable, has not been abandoned or allowed to lapse, in whole or in part, and to the Knowledge of Sellers, is valid and enforceable.

(b)    Except as would not reasonably be expected to have a Material Adverse Effect, all necessary registration, maintenance and renewal fees in connection with the Intellectual Property owned by Sellers have been paid and all necessary documents and certificates in connection with such Intellectual Property have been filed with the relevant patent, copyright, trademark or other authorities in the United States or applicable foreign jurisdictions, as the case may be, for the purposes of prosecuting, maintaining or renewing such Intellectual Property.

(c)    Except as would not reasonably be expected to have a Material Adverse Effect, no Intellectual Property owned by Sellers is the subject of any licensing or franchising Contract that prohibits or materially restricts the conduct of business as presently conducted by any Seller or Purchased Subsidiary or the transfer of such Intellectual Property.

(d)    Except as would not reasonably be expected to have a Material Adverse Effect: (i) the Intellectual Property or the conduct of Sellers' and the Purchased Subsidiaries' businesses does not infringe, misappropriate, dilute, or otherwise violate or conflict with the trademarks, patents, copyrights, inventions, trade secrets, proprietary

-46-

information and technology, know-how, formulae, rights of publicity or any other intellectual property rights of any Person; (ii) to the Knowledge of Sellers, no other Person is now infringing or in conflict with any Intellectual Property owned by Sellers or Sellers' rights thereunder; and (iii) no Seller or any Purchased Subsidiary has received any written notice that it is violating or has violated the trademarks, patents, copyrights, inventions, trade secrets, proprietary information and technology, know-how, formulae, rights of publicity or any other intellectual property rights of any third party.

(e)    Except as would not reasonably be expected to have a Material Adverse Effect, no holding, decision or judgment has been rendered by any Governmental Authority against any Seller, which would limit, cancel or invalidate any Intellectual Property owned by Sellers.

(f)    No action or proceeding is pending, or to the Knowledge of Sellers, threatened, on the date hereof that (i) seeks to limit, cancel or invalidate any Intellectual Property owned by Sellers or such Sellers' ownership interest therein; and (ii) if adversely determined, would reasonably be expected to have a Material Adverse Effect.

(g)    Except as would not reasonably be expected to have a Material Adverse Effect, Sellers and the Purchased Subsidiaries have taken reasonable actions to (i) maintain, enforce and police their Intellectual Property; and (ii) protect their material Software, websites and other systems (and the information therein) from unauthorized access or use.

(h)    Except as would not reasonably be expected to have a Material Adverse Effect: (i) each Seller and Purchased Subsidiary has taken reasonable steps to protect its rights in, and confidentiality of, all the Trade Secrets, and any other confidential information owned by such Seller or Purchased Subsidiary; and (ii) to the Knowledge of Sellers, such Trade Secrets have not been disclosed by Sellers to any Person except pursuant to a valid and appropriate non-disclosure, license or any other appropriate Contract that has not been breached.

(i)    Except as would not reasonably be expected to have a Material Adverse Effect, there has not been any malfunction with respect to any of the Software, electronic data processing, data communication lines, telecommunication lines, firmware, hardware, Internet websites or other information technology equipment of any Seller or Purchased Subsidiary since April 1, 2007, which has not been remedied or replaced in all respects.

(j)    Except as would not reasonably be expected to have a Material Adverse Effect: (i) the consummation of the transactions contemplated by this Agreement will not cause to be provided or licensed to any third Person, or give rise to any rights of any third Person with respect to, any source code that is part of the Software owned by Sellers; and (ii) Sellers have implemented reasonable disaster recovery and back-up plans with respect to the Software.

*Section 4.15    Real Property.*    Each Seller owns and has valid title to the Transferred Real Property that is Owned Real Property owned by it and has valid leasehold or

subleasehold interests, as the case may be, in all of the Transferred Real Property that is Leased Real Property leased or subleased by it, in each case, free and clear of all Encumbrances, other than Permitted Encumbrances. Each of Sellers and the Purchased Subsidiaries has complied with the terms of each lease, sublease, license or other Contract relating to the Transferred Real Property to which it is a party, except any failure to comply that would not reasonably be expected to have a Material Adverse Effect.

*Section 4.16    Material Contracts.*

(a)    Except for this Agreement, the Parent Employee Benefit Plans and Policies, except as filed with, or disclosed or incorporated in, the Parent SEC Documents or except as set forth on Section 4.16 of the Sellers' Disclosure Schedule, as of the date hereof, no Seller is a party to or bound by (i) any "material contract" (as such term is defined in Item 601(b)(10) of Regulation S-K of the SEC); (ii) any non-compete or exclusivity agreement that materially restricts the operation of Sellers' core business; (iii) any asset purchase agreement, stock purchase agreement or other agreement entered into within the past six years governing a material joint venture or the acquisition or disposition of assets or other property where the consideration paid or received for such assets or other property exceeded $500,000,000 (whether in cash, stock or otherwise); (iv) any agreement or series of related agreements with any supplier of Sellers who directly support the production of vehicles, which provided collectively for payments by Sellers to such supplier in excess of $250,000,000 during the 12-month period ended December 31, 2008; (v) any agreement or series of related agreements with any supplier of Sellers who does not directly support the production of vehicles, which, provided collectively for payments by Sellers to such supplier in excess of $100,000,000 during the 12-month period ended April 30, 2009; (vi) any Contract relating to the lease or purchase of aircraft; (vii) any settlement agreement where a Seller has paid or may be required to pay an amount in excess of $100,000,000 to settle the Claims covered by such settlement agreement; (viii) any material Contract that will, following the Closing, as a result of transactions contemplated hereby, be between or among a Seller or any Retained Subsidiary, on the one hand, and Purchaser or any Purchased Subsidiary, on the other hand (other than the Ancillary Agreements); and (ix) agreements entered into in connection with a material joint venture (all Contracts of the type described in this **Section 4.16(a)** being referred to herein as "Seller Material Contracts").

(b)    No Seller is in breach of or default under, or has received any written notice alleging any breach of or default under, the terms of any Seller Material Contract or material License, where such breach or default would reasonably be expected to have a Material Adverse Effect. To the Knowledge of Sellers, no other party to any Seller Material Contract or material License is in breach of or default under the terms of any Seller Material Contract or material License, where such breach or default would reasonably be expected to have a Material Adverse Effect. Except as would not reasonably be expected to have a Material Adverse Effect, each Seller Material Contract or material License is a valid, binding and enforceable obligation of such Seller that is party thereto and, to the Knowledge of Sellers, of each other party thereto, and is in full force and effect, except as enforceability may be limited by applicable bankruptcy, reorganization, insolvency, moratorium, fraudulent transfer and other similar Laws

relating to or affecting the enforcement of creditors' rights generally from time to time in effect and by general equitable principles relating to enforceability, including principles of commercial reasonableness, good faith and fair dealing.

Section 4.17   *Dealer Sales and Service Agreements for Continuing Brands.* Parent is not in breach of or default under the terms of any United States dealer sales and service Contract for Continuing Brands other than any Excluded Continuing Brand Dealer Agreement (each, a "Dealer Agreement"), where such breach or default would reasonably be expected to have a Material Adverse Effect.  To the Knowledge of Sellers, no other party to any Dealer Agreement is in breach of or default under the terms of such Dealer Agreement, where such breach or default would not reasonably be expected to have a Material Adverse Effect.  Except as would not reasonably be expected to have a Material Adverse Effect, each Dealer Agreement is a valid and binding obligation of Parent and, to the Knowledge of Sellers, of each other party thereto, and is in full force and effect, except as enforceability may be limited by applicable bankruptcy, reorganization, insolvency, moratorium, fraudulent transfer and other similar Laws relating to or affecting the enforcement of creditors' rights generally from time to time in effect and by general equitable principles relating to enforceability, including principles of commercial reasonableness, good faith and fair dealing.

Section 4.18   *Sellers' Products.*

(a)   To the Knowledge of Sellers, since April 1, 2007, neither Sellers nor any Purchased Subsidiary has conducted or decided to conduct any material recall or other field action concerning any product developed, designed, manufactured, sold, provided or placed in the stream of commerce by or on behalf of any Seller or any Purchased Subsidiary.

(b)   As of the date hereof, there are no material pending actions for negligence, manufacturing negligence or improper workmanship, or material pending actions, in whole or in part, premised upon product liability, against or otherwise naming as a party any Seller, Purchased Subsidiary or any predecessor-in-interest of any of the foregoing Persons, or to the Knowledge of Sellers, threatened in writing or of which Seller has received written notice that involve a product liability Claim resulting from the ownership, possession or use of any product manufactured, sold or delivered by any Seller, any Purchased Subsidiary or any predecessor-in-interest of any of the foregoing Persons, which would reasonably be expected to have a Material Adverse Effect.

(c)   To the Knowledge of Sellers and except as would not reasonably be expected to have a Material Adverse Effect, no supplier to any Seller has threatened in writing to cease the supply of products or services that could impair future production at a major production facility of such Seller.

Section 4.19   *Certain Business Practices.*  Each of Sellers and the Purchased Subsidiaries is in compliance with the legal requirements under the Foreign Corrupt Practices Act, as amended (the "FCPA"), except for such failures, whether individually or in the aggregate, to maintain books and records or internal controls as required thereunder that are not

material. To the Knowledge of Sellers, since April 1, 2007, no Seller or Purchased Subsidiary, nor any director, officer, employee or agent thereof, acting on its, his or her own behalf or on behalf of any of the foregoing Persons, has offered, promised, authorized the payment of, or paid, any money, or the transfer of anything of value, directly or indirectly, to or for the benefit of: (a) any employee, official, agent or other representative of any foreign Governmental Authority, or of any public international organization; or (b) any foreign political party or official thereof or candidate for foreign political office for the purpose of influencing any act or decision of such recipient in the recipient's official capacity, or inducing such recipient to use his, her or its influence to affect any act or decision of such foreign government or department, agency or instrumentality thereof or of such public international organization, or securing any improper advantage, in the case of both clause (a) and (b) above, in order to assist any Seller or any Purchased Subsidiary to obtain or retain business for, or to direct business to, any Seller or any Purchased Subsidiary and under circumstances that would subject any Seller or any Purchased Subsidiary to material Liability under any applicable Laws of the United States (including the FCPA) or of any foreign jurisdiction where any Seller or any Purchased Subsidiary does business relating to corruption, bribery, ethical business conduct, money laundering, political contributions, gifts and gratuities, or lawful expenses.

Section 4.20    *Brokers and Other Advisors.*    No broker, investment banker, financial advisor, counsel (other than legal counsel) or other Person is entitled to any broker's, finder's or financial advisor's fee or commission (collectively, "Advisory Fees") in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Sellers or any Affiliate of any Seller.

Section 4.21    *Investment Representations.*

(a)    Each Seller is acquiring the Parent Shares for its own account solely for investment and not with a view to, or for sale in connection with, any distribution thereof in violation of the Securities Act or the applicable securities Laws of any jurisdiction. Each Seller agrees that it shall not transfer any of the Parent Shares, except in compliance with the Securities Act and with the applicable securities Laws of any other jurisdiction.

(b)    Each Seller is an "Accredited Investor" as defined in Rule 501(a) promulgated under the Securities Act.

(c)    Each Seller understands that the acquisition of the Parent Shares to be acquired by it pursuant to the terms of this Agreement involves substantial risk. Each Seller and its officers have experience as an investor in the Equity Interests of companies such as the ones being transferred pursuant to this Agreement and each Seller acknowledges that it can bear the economic risk of its investment and has such knowledge and experience in financial or business matters that it is capable of evaluating the merits and risks of its investment in the Parent Shares to be acquired by it pursuant to the transactions contemplated by this Agreement.

(d)    Each Seller further understands and acknowledges that the Parent Shares have not been registered under the Securities Act or under the applicable securities Laws of any jurisdiction and agrees that the Parent Shares may not be sold, transferred, offered

for sale, pledged, hypothecated or otherwise disposed of without registration under the Securities Act or under the applicable securities Laws of any jurisdiction, or, in each case, an applicable exemption therefrom.

(e)     Each Seller acknowledges that the offer and sale of the Parent Shares has not been accomplished by the publication of any advertisement.

*Section 4.22    No Other Representations or Warranties of Sellers.*  EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES CONTAINED IN THIS **ARTICLE IV**, NONE OF SELLERS AND ANY PERSON ACTING ON BEHALF OF A SELLER MAKES ANY OTHER EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY WITH RESPECT TO SELLERS, ANY OF THEIR AFFILIATES, SELLERS' BUSINESS, THE PURCHASED ASSETS, THE ASSUMED LIABILITIES OR WITH RESPECT TO ANY OTHER INFORMATION PROVIDED TO PURCHASER OR ANY OF ITS AFFILIATES OR REPRESENTATIVES IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT.  WITHOUT LIMITING THE FOREGOING, EXCEPT AS SET FORTH IN THE REPRESENTATIONS AND WARRANTIES OF SELLERS CONTAINED IN THIS **ARTICLE IV**, SELLERS MAKE NO REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AT LAW OR IN EQUITY, WITH RESPECT TO (A) MERCHANTABILITY, FITNESS FOR ANY PARTICULAR PURPOSE OR USE, TITLE OR NON-INFRINGEMENT OF THE PURCHASED ASSETS, (B) ANY INFORMATION, WRITTEN OR ORAL AND IN ANY FORM PROVIDED OR MADE AVAILABLE (WHETHER BEFORE OR, IN CONNECTION WITH ANY SUPPLEMENT, MODIFICATION OR UPDATE TO THE SELLERS' DISCLOSURE SCHEDULE PURSUANT TO **SECTION 6.5**, **SECTION 6.6** OR **SECTION 6.26,** AFTER THE DATE HEREOF) TO PURCHASER OR ANY OF ITS AFFILIATES OR REPRESENTATIVES, INCLUDING IN "DATA ROOMS" (INCLUDING ON-LINE DATA ROOMS), MANAGEMENT PRESENTATIONS, FUNCTIONAL "BREAK-OUT" DISCUSSIONS, RESPONSES TO QUESTIONS SUBMITTED ON BEHALF OF THEM OR OTHER COMMUNICATIONS BETWEEN THEM OR ANY OF THEIR REPRESENTATIVES, ON THE ONE HAND, AND SELLERS, THEIR AFFILIATES, OR ANY OF THEIR REPRESENTATIVES, ON THE OTHER HAND, OR ON THE ACCURACY OR COMPLETENESS OF ANY SUCH INFORMATION, OR ANY PROJECTIONS, ESTIMATES, BUSINESS PLANS OR BUDGETS DELIVERED TO OR MADE AVAILABLE TO PURCHASER OR ANY OF ITS AFFILIATES OR REPRESENTATIVES OR (C) FUTURE REVENUES, EXPENSES OR EXPENDITURES, FUTURE RESULTS OF OPERATIONS (OR ANY COMPONENT THEREOF), FUTURE CASH FLOWS OR FUTURE FINANCIAL CONDITION (OR ANY COMPONENT THEREOF) OF SELLERS' BUSINESS OR THE PURCHASED ASSETS.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby represents and warrants to Sellers as follows:

*Section 5.1    Organization and Good Standing.*  Purchaser is a legal entity duly organized, validly existing and in good standing under the Laws of its jurisdiction of

incorporation. Purchaser has the requisite corporate power and authority to own, lease and operate its assets and to carry on its business as now being conducted.

Section 5.2    *Authorization; Enforceability.*

(a)    Purchaser has the requisite corporate power and authority to (i) execute and deliver this Agreement and the Ancillary Agreements to which it is a party; (ii) perform its obligations hereunder and thereunder; and (iii) consummate the transactions contemplated by this Agreement and the Ancillary Agreements to which it is a party.

(b)    This Agreement constitutes, and each of the Ancillary Agreements to which Purchaser is a party, when duly executed and delivered by Purchaser, shall constitute, a valid and legally binding obligation of Purchaser (assuming that this Agreement and such Ancillary Agreements constitute valid and legally binding obligations of each Seller that is a party thereto and the other applicable parties thereto), enforceable against Purchaser in accordance with its respective terms and conditions, except as may be limited by applicable bankruptcy, reorganization, insolvency, moratorium, fraudulent transfer and other similar Laws relating to or affecting the enforcement of creditors' rights generally from time to time in effect and by general equitable principles relating to enforceability, including principles of commercial reasonableness, good faith and fair dealing.

Section 5.3    *Noncontravention; Consents.*

(a)    The execution and delivery by Purchaser of this Agreement and the Ancillary Agreements to which it is a party, and (subject to the entry of the Sale Approval Order) the consummation by Purchaser of the transactions contemplated hereby and thereby, do not (i) violate any Law to which Purchaser or its assets is subject; (ii) conflict with or result in a breach of any provision of the Organizational Documents of Purchaser; or (iii) create a breach, default, termination, cancellation or acceleration of any obligation of Purchaser under any Contract to which Purchaser is a party or by which Purchaser or any of its assets or properties is bound or subject, except for any of the foregoing in the cases of clauses (i) and (iii), that would not reasonably be expected to have a material adverse effect on Purchaser's ability to consummate the transactions contemplated hereby or thereby or to perform any of its obligations under this Agreement or any Ancillary Agreement to which it is a party (a "Purchaser Material Adverse Effect").

(b)    No consent, waiver, approval, Order, Permit or authorization of, or declaration or filing with, or notification to, any Person or Governmental Authority is required by Purchaser for the consummation by Purchaser of the transactions contemplated by this Agreement or the Ancillary Agreements to which it is a party or the compliance by Purchaser with any of the provisions hereof or thereof, except for (i) compliance with the applicable requirements of any Antitrust Laws and (ii) such consent, waiver, approval, Order, Permit, qualification or authorization of, or declaration or filing with, or notification to, any Governmental Authority, the failure of which to be received

or made would not, individually or in the aggregate, reasonably be expected to have a Purchaser Material Adverse Effect.

Section 5.4    Capitalization.

(a)    As of the date hereof, Sponsor holds beneficially and of record 1,000 shares of common stock, par value $0.01 per share, of Purchaser, which constitutes all of the outstanding capital stock of Purchaser, and all such capital stock is validly issued, fully paid and nonassessable.

(b)    Immediately following the Closing, the authorized capital stock of Purchaser (or, if a Holding Company Reorganization has occurred prior to the Closing, Holding Company) will consist of 2,500,000,000 shares of common stock, par value $0.01 per share ("Common Stock"), and 1,000,000,000 shares of preferred stock, par value $0.01 per share ("Preferred Stock"), of which 360,000,000 shares of Preferred Stock are designated as Series A Fixed Rate Cumulative Perpetual Preferred Stock, par value $0.01 per share (the "Series A Preferred Stock").

(c)    Immediately following the Closing, (i) Canada or one or more of its Affiliates will hold beneficially and of record 58,368,644 shares of Common Stock and 16,101,695 shares of Series A Preferred Stock (collectively, the "Canada Shares"), (ii) Sponsor or one or more of its Affiliates collectively will hold beneficially and of record 304,131,356 shares of Common Stock and 83,898,305 shares of Series A Preferred Stock (collectively, the "Sponsor Shares") and (iii) the New VEBA will hold beneficially and of record 87,500,000 shares of Common Stock and 260,000,000 shares of Series A Preferred Stock (collectively, the "VEBA Shares").  Immediately following the Closing, there will be no other holders of Common Stock or Preferred Stock.

(d)    Except as provided under the Parent Warrants, VEBA Warrants, Equity Incentive Plans or as disclosed on the Purchaser's Disclosure Schedule, there are and, immediately following the Closing, there will be no outstanding options, warrants, subscriptions, calls, convertible securities, phantom equity, equity appreciation or similar rights, or other rights or Contracts (contingent or otherwise) (including any right of conversion or exchange under any outstanding security, instrument or other Contract or any preemptive right) obligating Purchaser to deliver or sell, or cause to be issued, delivered or sold, any shares of its capital stock or other equity securities, instruments or rights that are, directly or indirectly, convertible into or exercisable or exchangeable for any shares of its capital stock.  There are no outstanding contractual obligations of Purchaser to repurchase, redeem or otherwise acquire any shares of its capital stock or to provide funds to, or make any material investment (in the form of a loan, capital contribution or otherwise) in, any other Person.  There are no voting trusts, shareholder agreements, proxies or other Contracts or understandings in effect with respect to the voting or transfer of any of the shares of Common Stock to which Purchaser is a party or by which Purchaser is bound. Except as provided under the Equity Registration Rights Agreement or as disclosed in the Purchaser's Disclosure Schedule, Purchaser has not granted or agreed to grant any holders of shares of Common Stock or securities

convertible into shares of Common Stock registration rights with respect to such shares under the Securities Act.

(e)    Immediately following the Closing, (i) all of the Canada Shares, the Parent Shares and the Sponsor Shares will be duly and validly authorized and issued, fully paid and nonassessable, and will be issued in accordance with the registration or qualification provisions of the Securities Act or pursuant to valid exemptions therefrom and (ii) none of the Canada Shares, the Parent Shares or the Sponsor Shares will be issued in violation of any preemptive rights.

Section 5.5    *Valid Issuance of Shares.* The Parent Shares, Adjustment Shares and the Common Stock underlying the Parent Warrants, when issued, sold and delivered in accordance with the terms and for the consideration set forth in this Agreement and the related warrant agreement, as applicable, will be (a) validly issued, fully paid and nonassessable and (b) free of restrictions on transfer other than restrictions on transfer under applicable state and federal securities Laws and Encumbrances created by or imposed by Sellers. Assuming the accuracy of the representations of Sellers in **Section 4.21**, the Parent Shares, Adjustment Shares and Parent Warrants will be issued in compliance with all applicable federal and state securities Laws.

Section 5.6    *Investment Representations.*

(a)    Purchaser is acquiring the Transferred Equity Interests for its own account solely for investment and not with a view to, or for sale in connection with, any distribution thereof in violation of the Securities Act or the applicable securities Laws of any jurisdiction. Purchaser agrees that it shall not transfer any of the Transferred Equity Interests, except in compliance with the Securities Act and with the applicable securities Laws of any other jurisdiction.

(b)    Purchaser is an "Accredited Investor" as defined in Rule 501(a) promulgated under the Securities Act.

(c)    Purchaser understands that the acquisition of the Transferred Equity Interests to be acquired by it pursuant to the terms of this Agreement involves substantial risk. Purchaser and its officers have experience as an investor in Equity Interests of companies such as the ones being transferred pursuant to this Agreement and Purchaser acknowledges that it can bear the economic risk of its investment and has such knowledge and experience in financial or business matters that it is capable of evaluating the merits and risks of its investment in the Transferred Equity Interests to be acquired by it pursuant to the transactions contemplated hereby.

(d)    Purchaser further understands and acknowledges that the Transferred Equity Interests have not been registered under the Securities Act or under the applicable securities Laws of any jurisdiction and agrees that the Transferred Equity Interests may not be sold, transferred, offered for sale, pledged, hypothecated or otherwise disposed of without registration under the Securities Act or under the applicable securities Laws of any jurisdiction, or, in each case, an applicable exemption therefrom.

(e)    Purchaser acknowledges that the offer and sale of the Transferred Equity Interests has not been accomplished by the publication of any advertisement.

Section 5.7    *Continuity of Business Enterprise.*  It is the present intention of Purchaser to directly, or indirectly through its Subsidiaries, continue at least one significant historic business line of each Seller, or use at least a significant portion of each Seller's historic business assets in a business, in each case, within the meaning of Treas. Reg. § 1.368-1(d).

Section 5.8    *Integrated Transaction.*  Sponsor has contributed, or will, prior to the Closing, contribute the UST Credit Facilities, a portion of the DIP Facility that is owed as of the Closing and the UST Warrant to Purchaser solely for the purposes of effectuating the transactions contemplated by this Agreement.

Section 5.9    *No Other Representations or Warranties of Sellers.*  PURCHASER HEREBY ACKNOWLEDGES AND AGREES THAT, EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES CONTAINED IN **ARTICLE IV**, NONE OF SELLERS AND ANY PERSON ACTING ON BEHALF OF A SELLER MAKES ANY OTHER EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY WITH RESPECT TO SELLERS, ANY OF THEIR AFFILIATES, SELLERS' BUSINESS, THE PURCHASED ASSETS, THE ASSUMED LIABILITIES OR WITH RESPECT TO ANY OTHER INFORMATION PROVIDED TO PURCHASER OR ANY OF ITS AFFILIATES OR REPRESENTATIVES IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT.  WITHOUT LIMITING THE FOREGOING, EXCEPT AS SET FORTH IN THE REPRESENTATIONS AND WARRANTIES OF SELLERS CONTAINED IN **ARTICLE IV**, PURCHASER FURTHER HEREBY ACKNOWLEDGES AND AGREES THAT SELLERS MAKE NO REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AT LAW OR IN EQUITY, WITH RESPECT TO (A) MERCHANTABILITY, FITNESS FOR ANY PARTICULAR PURPOSE OR USE, TITLE OR NON-INFRINGEMENT OF THE PURCHASED ASSETS, (B) ANY INFORMATION, WRITTEN OR ORAL AND IN ANY FORM PROVIDED OR MADE AVAILABLE (WHETHER BEFORE OR, IN CONNECTION WITH ANY SUPPLEMENT, MODIFICATION OR UPDATE TO THE SELLERS' DISCLOSURE SCHEDULE PURSUANT TO **SECTION 6.5**, **SECTION 6.6** OR **SECTION 6.26,** AFTER THE DATE HEREOF) TO PURCHASER OR ANY OF ITS REPRESENTATIVES, INCLUDING IN "DATA ROOMS" (INCLUDING ON-LINE DATA ROOMS), MANAGEMENT PRESENTATIONS, FUNCTIONAL "BREAK-OUT" DISCUSSIONS, RESPONSES TO QUESTIONS SUBMITTED ON BEHALF OF IT OR OTHER COMMUNICATIONS BETWEEN IT OR ANY OF ITS AFFILIATES OR REPRESENTATIVES, ON THE ONE HAND, AND SELLERS, THEIR AFFILIATES, OR ANY OF THEIR REPRESENTATIVES, ON THE OTHER HAND, OR ON THE ACCURACY OR COMPLETENESS OF ANY SUCH INFORMATION OR (C) ANY PROJECTIONS, ESTIMATES, BUSINESS PLANS OR BUDGETS DELIVERED TO OR MADE AVAILABLE TO PURCHASER OR ANY OF ITS AFFILIATES OR REPRESENTATIVES OR (D) FUTURE REVENUES, EXPENSES OR EXPENDITURES, FUTURE RESULTS OF OPERATIONS (OR ANY COMPONENT THEREOF), FUTURE CASH FLOWS OR FUTURE FINANCIAL CONDITION (OR ANY COMPONENT THEREOF) OF SELLERS' BUSINESS OR THE PURCHASED ASSETS.

**ARTICLE VI**
**COVENANTS**

*Section 6.1      Access to Information.*

(a)      Sellers agree that, until the earlier of the Executory Contract Designation Deadline and the termination of this Agreement, Purchaser shall be entitled, through its Representatives or otherwise, to have reasonable access to the executive officers and Representatives of Sellers and the properties and other facilities, businesses, books, Contracts, personnel, records and operations (including the Purchased Assets and Assumed Liabilities) of Sellers and their Subsidiaries, including access to systems, data, databases for benefit plan administration; provided however, that no such investigation or examination shall be permitted to the extent that it would, in Sellers' reasonable determination, require any Seller, any Subsidiary of any Seller or any of their respective Representatives to disclose information subject to attorney-client privilege or in conflict with any confidentiality agreement to which any Seller, any Subsidiary of any Seller or any of their respective Representatives are bound (in which case, to the extent requested by Purchaser, Sellers will use reasonable best efforts to seek an amendment or appropriate waiver, or necessary consents, as may be required to avoid such conflict, or restructure the form of access, so as to permit the access requested); provided further, that notwithstanding the notice provisions in **Section 9.2** hereof, all such requests for access to the executive officers of Sellers shall be directed, prior to the Closing, to the Chief Financial Officer of Parent or his designee, and following the Closing, to the Chief Restructuring Officer of Parent or his or her designee.  If any material is withheld pursuant to this **Section 6.1(a)**, Seller shall inform Purchaser in writing as to the general nature of what is being withheld and the reason for withholding such material.

(b)      Any investigation and examination contemplated by this **Section 6.1** shall be subject to restrictions set forth in **Section 6.24** and under applicable Law.  Sellers shall cooperate, and shall cause their Subsidiaries and each of their respective Representatives to cooperate, with Purchaser and its Representatives in connection with such investigation and examination, and each of Purchaser and its Representatives shall use their reasonable best efforts to not materially interfere with the business of Sellers and their Subsidiaries.  Without limiting the generality of the foregoing, subject to **Section 6.1(a),** such investigation and examination shall include reasonable access to Sellers' executive officers (and employees of Sellers and their respective Subsidiaries identified by such executive officers), offices, properties and other facilities, and books, Contracts and records (including any document retention policies of Sellers) and access to accountants of Sellers and each of their respective Subsidiaries (provided that Sellers and each of their respective Subsidiaries, as applicable, shall have the right to be present at any meeting between any such accountant and Purchaser or Representative of Purchaser, whether such meeting is in person, telephonic or otherwise) and Sellers and each of their respective Subsidiaries and their Representatives shall prepare and furnish to Purchaser's Representatives such additional financial and operating data and other information as Purchaser may from time to time reasonably request, subject, in each case, to the confidentiality restrictions outlined in this **Section 6.1**.  Notwithstanding anything contained herein to the contrary, Purchaser shall consult with Sellers prior to conducting

any environmental investigations or examinations of any nature, including Phase I and Phase II site assessments and any environmental sampling in respect of the Transferred Real Property.

   Section 6.2    *Conduct of Business.*

   (a)    Except as (i) otherwise expressly contemplated by or permitted under this Agreement, including the DIP Facility; (ii) disclosed on Section 6.2 of the Sellers' Disclosure Schedule; (iii) approved by the Bankruptcy Court (or any other court or other Governmental Authority in connection with any other bankruptcy, insolvency or similar proceeding filed by or in respect of any Subsidiary of Parent); or (iv) required by or resulting from any changes to applicable Laws, from and after the date of this Agreement and until the earlier of the Closing and the termination of this Agreement, Sellers shall and shall cause each Purchased Subsidiary to (A) conduct their operations in the Ordinary Course of Business, (B) not take any action inconsistent with this Agreement or with the consummation of the Closing, (C) use reasonable best efforts to preserve in the Ordinary Course of Business and in all material respects the present relationships of Sellers and each of their Subsidiaries with their respective customers, suppliers and others having significant business dealings with them, (D) not take any action to cause any of Sellers' representations and warranties set forth in **ARTICLE IV** to be untrue in any material respect as of any such date when such representation or warranty is made or deemed to be made and (E) not take any action that would reasonably be expected to materially prevent or delay the Closing.

   (b)    Subject to the exceptions contained in clauses (i) through (iv) of **Section 6.2(a)**, each Seller agrees that, from and after the date of this Agreement and until the earlier of the Closing and the termination of this Agreement, without the prior written consent of Purchaser (which consent shall not be unreasonably withheld, conditioned or delayed), such Seller shall not, and shall not permit any of the Key Subsidiaries (and in the case of clauses (i), (ix), (xiii) or (xvi), shall not permit any Purchased Subsidiary) to:

      (i)    take any action with respect to which any Seller has granted approval rights to Sponsor under any Contract, including under the UST Credit Facilities, without obtaining the prior approval of such action from Sponsor;

      (ii)    issue, sell, pledge, create an Encumbrance or otherwise dispose of or authorize the issuance, sale, pledge, Encumbrance or disposition of any Equity Interests of the Transferred Entities, or grant any options, warrants or other rights to purchase or obtain (including upon conversion, exchange or exercise) any such Equity Interests;

      (iii)    declare, set aside or pay any dividend or make any distribution (whether in cash, securities or other property or by allocation of additional Indebtedness to any Seller or any Key Subsidiary without receipt of fair value with respect to any Equity Interest of Seller or any Key Subsidiary), except for dividends and distributions among the Purchased Subsidiaries;

(iv)     directly or indirectly, purchase, redeem or otherwise acquire any Equity Interests or any rights to acquire any Equity Interests of any Seller or Key Subsidiary;

(v)     materially change any of its financial accounting policies or procedures or any of its methods of reporting income, deductions or other material items for financial accounting purposes, except as permitted by GAAP, a SEC rule, regulation or policy or applicable Law, or as modified by Parent as a result of the filing of the Bankruptcy Cases;

(vi)     adopt any amendments to its Organizational Documents or permit the adoption of any amendment of the Organizational Documents of any Key Subsidiary or effect a split, combination or reclassification or other adjustment of Equity Interests of any Purchased Subsidiary or a recapitalization thereof;

(vii)     sell, pledge, lease, transfer, assign or dispose of any Purchased Asset or permit any Purchased Asset to become subject to any Encumbrance, other than a Permitted Encumbrance, in each case, except in the Ordinary Course of Business or pursuant to a Contract in existence as of the date hereof (or entered into in compliance with this **Section 6.2**);

(viii)     (A) incur or assume any Indebtedness for borrowed money or issue any debt securities, except for Indebtedness for borrowed money incurred by Purchased Subsidiaries under existing lines of credit (including through the incurrence of Intercompany Obligations) to fund operations of Purchased Subsidiaries and Indebtedness for borrowed money incurred by Sellers under the DIP Facility or (B) assume, guarantee, endorse or otherwise become liable or responsible (whether directly, contingently or otherwise) for the obligations of any other Person, except for Indebtedness for borrowed money among any Seller and Subsidiary or among the  Subsidiaries;

(ix)     discharge or satisfy any Indebtedness in excess of $100,000,000 other than the discharge or satisfaction of any Indebtedness when due in accordance with its originally scheduled terms;

(x)     other than as is required by the terms of a Parent Employee Benefit Plan and Policy (in effect on the date hereof and set forth on Section 4.10 of the Sellers' Disclosure Schedule), any Assumed Plan (in effect on the date hereof) the UAW Collective Bargaining Agreement or consistent with the expiration of a Collective Bargaining Agreement, the Settlement Agreement, the UAW Retiree Settlement Agreement or as may be required by applicable Law or TARP or under any enhanced restrictions on executive compensation agreed to by Sellers and Sponsor, (A) increase the compensation or benefits of any Employee of Sellers or any Purchased Subsidiary (except for increases in salary or wages in the Ordinary Course of Business with respect to Employees who are not current or former directors or officers of Sellers or Seller Key Personnel), (B) grant any severance or termination pay to any Employee of Sellers or any Purchased

Subsidiary except for severance or termination pay provided under any Parent Employee Benefit Plan and Policy or as the result of a settlement of any pending Claim or charge involving a Governmental Authority or litigation with respect to Employees who are not current or former officers or directors of Sellers or Seller Key Personnel), (C) establish, adopt, enter into, amend or terminate any Benefit Plan (including any change to any actuarial or other assumption used to calculate funding obligations with respect to any Benefit Plan or any change to the manner in which contributions to any Benefit Plan are made or the basis on which such contributions are determined), except where any such action would reduce Sellers' costs or Liabilities pursuant to such plan, (D) grant any awards under any Benefit Plan (including any equity or equity-based awards), (E) increase or promise to increase or provide for the funding under any Benefit Plan, (F) forgive any loans to Employees of Sellers or any Purchased Subsidiary (other than as part of a settlement of any pending Claim or charge involving a Governmental Authority or litigation in the Ordinary Course of Business or with respect to obligations of Employees whose employment is terminated by Sellers or a Purchased Subsidiary in the Ordinary Course of Business, other than Employees who are current or former officers or directors of Sellers or Seller Key Personnel or directors of Sellers or a Purchased Subsidiary) or (G) exercise any discretion to accelerate the time of payment or vesting of any compensation or benefits under any Benefit Plan;

(xi)    modify, amend, terminate or waive any rights under any Affiliate Contract or Seller Material Contract (except for any dealer sales and service Contracts or as contemplated by **Section 6.7**) in any material respect in a manner that is adverse to any Seller that is a party thereto, other than in the Ordinary Course of Business;

(xii)    enter into any Seller Material Contract other than as contemplated by **Section 6.7**;

(xiii)    acquire (including by merger, consolidation, combination or acquisition of Equity Interests or assets) any Person or business or division thereof (other than acquisitions of portfolio assets and acquisitions in the Ordinary Course of Business) in a transaction (or series of related transactions) where the aggregate consideration paid or received (including non-cash equity consideration) exceeds $100,000,000;

(xiv)    alter, whether through a complete or partial liquidation, dissolution, merger, consolidation, restructuring, reorganization or in any other manner, the legal structure or ownership of any Key Subsidiary, or adopt or approve a plan with respect to any of the foregoing;

(xv)    enter into any Contract that limits or otherwise restricts or that would reasonably be expected to, after the Closing, restrict or limit in any material respect (A) Purchaser or any of its Subsidiaries or any successor thereto or (B) any Affiliates of Purchaser or any successor thereto, in the case of each of

clause (A) or (B), from engaging or competing in any line of business or in any geographic area;

(xvi)      enter into any Contracts for capital expenditures, exceeding $100,000,000 in the aggregate in connection with any single project or group of related projects;

(xvii)      open or reopen any major production facility; and

(xviii)      agree, in writing or otherwise, to take any of the foregoing actions.

Section 6.3     Notices and Consents.

(a)      Sellers shall and shall cause each of their Subsidiaries to, and Purchaser shall use reasonable best efforts to, promptly give all notices to, obtain all material consents, approvals or authorizations from, and file all notifications and related materials with, any third parties (including any Governmental Authority) that may be or become necessary to be given or obtained by Sellers or their Affiliates, or Purchaser, respectively, in connection with the transactions contemplated by this Agreement.

(b)      Each of Purchaser and Parent shall, to the extent permitted by Law, promptly notify the other Party of any communication it or any of its Affiliates receives from any Governmental Authority relating to the transactions contemplated by this Agreement and permit the other Party to review in advance any proposed substantive communication by such Party to any Governmental Authority.  Neither Purchaser nor Parent shall agree to participate in any material meeting with any Governmental Authority in respect of any significant filings, investigation (including any settlement of the investigation), litigation or other inquiry unless it consults with the other Party in advance and, to the extent permitted by such Governmental Authority, gives the other Party the opportunity to attend and participate at such meeting; provided, however, in the event either Party is prohibited by applicable Law or such Governmental Authority from participating in or attending any such meeting, then the Party who participates in such meeting shall keep the other Party apprised with respect thereto to the extent permitted by Law.  To the extent permitted by Law, Purchaser and Parent shall coordinate and cooperate fully with each other in exchanging such information and providing such assistance as the other Party may reasonably request in connection with the foregoing, including, to the extent reasonably practicable, providing to the other Party in advance of submission, drafts of all material filings, submissions, correspondences or other written communications, providing the other Party with an opportunity to comment on the drafts, and, where practicable, incorporating such comments, if any, into the final documents.  To the extent permitted by applicable Law, Purchaser and Parent shall provide each other with copies of all material correspondences, filings or written communications between them or any of their Representatives, on the one hand, and any Governmental Authority or members of its staff, on the other hand, with respect to this Agreement or the transactions contemplated by this Agreement.

(c)    None of Purchaser, Parent or their respective Affiliates shall be required to pay any fees or other payments to any Governmental Authorities in order to obtain any authorization, consent, Order or approval (other than normal filing fees and administrative fees that are imposed by Law on Purchaser), and in the event that any fees in addition to normal filing fees imposed by Law may be required to obtain any such authorization, consent, Order or approval, such fees shall be for the account of Purchaser.

(d)    Notwithstanding anything to the contrary contained herein, no Seller shall be required to make any expenditure or incur any Liability in connection with the requirements set forth in this **Section 6.3**.

Section 6.4    *Sale Procedures; Bankruptcy Court Approval.*

(a)    This Agreement is subject to approval by the Bankruptcy Court and the consideration by Sellers and the Bankruptcy Court of higher or better competing Bids with respect to an Alternative Transaction.  Nothing contained herein shall be construed to prohibit Sellers and their respective Affiliates and Representatives from soliciting, considering, negotiating, agreeing to, or otherwise taking action in furtherance of, any Alternative Transaction but only to the extent that Sellers determine in good faith that such actions are permitted or required by the Sale Procedures Order.

(b)    On the Petition Date, Sellers filed with the Bankruptcy Court the Bankruptcy Cases under the Bankruptcy Code and a motion (and related notices and proposed Orders) (the "Sale Procedures and Sale Motion"), seeking entry of (i) the sale procedures order, in the form attached hereto as **Exhibit H** (the "Sale Procedures Order"), and (ii) the sale approval order, in the form attached hereto as **Exhibit I** (the "Sale Approval Order").    The Sale Approval Order shall declare that if there is an Agreed G Transaction, (A) this Agreement constitutes a "plan" of Parent and Purchaser solely for purposes of Sections 368 and 354 of the Tax Code and (B) the transactions with respect to Parent described herein, in combination with the subsequent liquidation of Sellers, are intended to constitute a reorganization of Parent pursuant to Section 368(a)(1)(G) of the Tax Code.  To the extent reasonably practicable, Sellers shall consult with and provide Purchaser and the UAW a reasonable opportunity to review and comment on material motions, applications and supporting papers prepared by Sellers in connection with this Agreement prior to the filing or delivery thereof in the Bankruptcy Cases.

(c)    Purchaser acknowledges that Sellers may receive bids ("Bids") from prospective purchasers (such prospective purchasers, the "Bidders") with respect to an Alternative Transaction, as provided in the Sale Procedures Order.  All Bids (other than Bids submitted by Purchaser) shall be submitted with two copies of this Agreement marked to show changes requested by the Bidder.

(d)    If Sellers receive any Bids, Sellers shall have the right to select, and seek final approval of the Bankruptcy Court for, the highest or otherwise best Bid or Bids from the Bidders (the "Superior Bid"), which will be determined in accordance with the Sale Procedure Order.

(e)    Sellers shall use their reasonable best efforts to obtain entry of the Sale Approval Order on the Bankruptcy Court's docket as soon as practicable, and in no event no later than July 10, 2009.

(f)    Sellers shall use reasonable best efforts to comply (or obtain an Order from the Bankruptcy Court waiving compliance) with all requirements under the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure in connection with obtaining approval of the transactions contemplated by this Agreement, including serving on all required Persons in the Bankruptcy Cases (including all holders of Encumbrances and parties to the Purchased Contracts), a notice of the Sale Procedures and Sale Motion, the Sale Hearing and the objection deadline in accordance with Rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure (as modified by Orders of the Bankruptcy Court), the Sale Procedures Order or other Orders of the Bankruptcy Court, including General Order M-331 issued by the Bankruptcy Court, and any applicable local rules of the Bankruptcy Court.

(g)    Sellers shall provide Purchaser with a reasonable opportunity to review and comment on all motions, applications and supporting papers prepared by Sellers in connection with this Agreement (including forms of Orders and of notices to interested parties) prior to the filing or delivery thereof in the Bankruptcy Cases.  All motions, applications and supporting papers prepared by Sellers and relating to the approval of this Agreement (including forms of Orders and of notices to interested parties) to be filed or delivered on behalf of Sellers shall be reasonably acceptable in form and substance to Purchaser.  Sellers shall provide written notice to Purchaser of all matters that are required to be served on Sellers' creditors pursuant to the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure.  In the event the Sale Procedures Order and the Sale Approval Order is appealed, Sellers shall use their reasonable best efforts to defend such appeal.

(h)    Purchaser agrees, to the extent reasonably requested by Sellers, to cooperate with and assist Sellers in seeking entry of the Sale Procedures Order and the Sale Approval Order by the Bankruptcy Court, including attending all hearings on the Sale Procedures and Sale Motion.

*Section 6.5    Supplements to Purchased Assets.*  Purchaser shall, from the date hereof until the Executory Contract Designation Deadline, have the right to designate in writing additional Personal Property it wishes to designate as Purchased Assets if such Personal Property is located at a parcel of leased real property where the underlying lease has been designated as a Rejectable Executory Contract pursuant to **Section 6.6** following the Closing.

*Section 6.6    Assumption or Rejection of Contracts.*

(a)    The Assumable Executory Contract Schedule sets forth a list of Executory Contracts entered into by Sellers that Sellers may assume and assign to Purchaser in accordance with this **Section 6.6(a)** (each, an "Assumable Executory Contract").  Any Contract identified on Section 6.6(a)(i) of the Sellers' Disclosure Schedule and Section 6.6(a)(ii) of the Sellers' Disclosure Schedule shall automatically be designated as an

Assumable Executory Contract and deemed to be set forth on the Assumable Executory Contract Schedule. Purchaser may, until the Executory Contract Designation Deadline, designate in writing any additional Executory Contract it wishes to designate as an Assumable Executory Contract and include on the Assumable Executory Contract Schedule, or any Assumable Executory Contract it no longer wishes to designate as an Assumable Executory Contract and remove from the Assumable Executory Contract Schedule; provided, however, that (i) Purchaser may not designate as an Assumable Executory Contract any (A) Rejectable Executory Contract, unless Sellers have consented to such designation in writing or (B) Contract that has previously been rejected by Sellers pursuant to Section 365 of the Bankruptcy Code, and (ii) Purchaser may not remove from the Assumable Executory Contract Schedule (v) the UAW Collective Bargaining Agreement, (w) any Contract identified on Section 6.6(a)(i) of the Sellers' Disclosure Schedule or Section 6.6(a)(ii) of the Sellers' Disclosure Schedule, (x) any Contract that has been previously assumed by Sellers pursuant to Section 365 of the Bankruptcy Code, (y) any Deferred Termination Agreement (or the related Discontinued Brand Dealer Agreement or Continuing Brand Dealer Agreement) or (z) any Participation Agreement (or the related Continuing Brand Dealer Agreement). Except as otherwise provided above, for each Assumable Executory Contract, Purchaser must determine, prior to the Executory Contract Designation Deadline, the date on which it seeks to have the assumption and assignment become effective, which date may be the Closing Date or a later date (but not an earlier date). The term "Executory Contract Designation Deadline" shall mean the date that is thirty (30) calendar days following the Closing Date, or if such date is not a Business Day, the next Business Day, or if mutually agreed upon by the Parties, any later date up to and including the Business Day immediately prior to the date of the confirmation hearing for Sellers' plan of liquidation or reorganization. For the avoidance of doubt, the Executory Contract Designation Deadline may be extended by mutual agreement of the Parties with respect to any single unassumed and unassigned Executory Contract, groups of unassumed and unassigned Executory Contracts or all of the unassumed and unassigned Executory Contracts.

(b)     Sellers may, until the Closing, provide written notice (a "Notice of Intent to Reject") to Purchaser of Sellers' intent to designate any Executory Contract (that has not been designated as an Assumable Executory Contract) as a Rejectable Executory Contract (each a "Proposed Rejectable Executory Contract"). Following receipt of a Notice of Intent to Reject, Purchaser shall as soon as reasonably practicable, but in no event later than fifteen (15) calendar days following receipt of a Notice of Intent to Reject (the "Option Period"), provide Sellers written notice of Purchaser's designation of one or more Proposed Rejectable Executory Contracts identified in such Notice of Intent to Reject as an Assumable Executory Contract. Each Proposed Rejectable Executory Contract that has not been designated by Purchaser as an Assumable Executory Contract during the applicable Option Period shall automatically, without further action by Sellers, be designated as a Rejectable Executory Contract. A "Rejectable Executory Contract" is an Executory Contract that Sellers may, but are not obligated to, reject pursuant Section 365 of the Bankruptcy Code.

(c)     Immediately following the Closing, each Executory Contract entered into by Sellers and then in existence that has not previously been designated as an Assumable

Executory Contract, a Rejectable Executory Contract or a Proposed Rejectable Executory Contract, and that has not otherwise been assumed or rejected by Sellers pursuant to Section 365 of the Bankruptcy Code, shall be deemed to be an Executory Contract subject to subsequent designation by Purchaser as an Assumable Executory Contract or a Rejectable Executory Contract (each a "Deferred Executory Contract").

(d)     All Assumable Executory Contracts shall be assumed and assigned to Purchaser on the date (the "Assumption Effective Date") that is the later of (i) the date designated by the Purchaser and (ii) the date following expiration of the objection deadline if no objection, other than to the Cure Amount, has been timely filed or the date of resolution of any objection unrelated to Cure Amount, as provided in the Sale Procedures Order; provided, however, that in the case of each (A) Assumable Executory Contract identified on Section 6.6(a)(i) of the Sellers' Disclosure Schedule, (2) Deferred Termination Agreement (and the related Discontinued Brand Dealer Agreement or Continuing Brand Dealer Agreement) designated as an Assumable Executory Contract and (3) Participation Agreement (and the related Continuing Brand Dealer Agreement) designated as an Assumable Executory Contract, the Assumption Effective Date shall be the Closing Date and (B) Assumable Executory Contract identified on Section 6.6(a)(ii) of the Sellers' Disclosure Schedule, the Assumption Effective Date shall be a date that is no later than the date set forth with respect to such Executory Contract on Section 6.6(a)(ii) of the Sellers' Disclosure Schedule.  On the Assumption Effective Date for any Assumable Executory Contract, such Assumable Executory Contract shall be deemed to be a Purchased Contract hereunder.  If it is determined under the procedures set forth in the Sale Procedures Order that Sellers may not assume and assign to Purchaser any Assumable Executory Contract, such Executory Contract shall cease to be an Assumable Executory Contract and shall be an Excluded Contract and a Rejectable Executory Contract.  Except as provided in **Section 6.31**, notwithstanding anything else to the contrary herein, any Executory Contract that has not been specifically designated as an Assumable Executory Contract as of the Executory Contract Designation Deadline applicable to such Executory Contract, including any Deferred Executory Contract, shall automatically be deemed to be a Rejectable Executory Contract and an Excluded Contract hereunder.  Sellers shall have the right, but not the obligation, to reject, at any time, any Rejectable Executory Contract; provided, however, that Sellers shall not reject any Contract that affects both Owned Real Property and Excluded Real Property (whether designated on **Exhibit F** or now or hereafter designated on Section 2.2(b)(v) of the Sellers' Disclosure Schedule), including any such Executory Contract that involves the provision of water, water treatment, electric, fuel, gas, telephone and other utilities to any facilities located at the Excluded Real Property, whether designated on **Exhibit F** or now or hereafter designated on Section 2.2(b)(v) of the Sellers' Disclosure Schedule (the "Shared Executory Contracts"), without the prior written consent of Purchaser.

(e)     From and after the Closing and during the applicable period specified below, Purchaser shall be obligated to pay or cause to be paid all amounts due in respect of Sellers' performance (i) under each Proposed Rejectable Executory Contract, during the pendency of the applicable Option Period under such Proposed Rejectable Executory Contract, (ii) under each Deferred Executory Contract, for so long as such Contract remains a Deferred Executory Contract, (iii) under each Assumable Executory Contract,

as long as such Contract remains an Assumable Executory Contract and (iv) under each
GM Assumed Contract, until the applicable Assumption Effective Date.  At and after the
Closing and until such time as any Shared Executory Contract is either (y) rejected by
Sellers pursuant to the provision set forth in this **Section 6.6** or (z) assumed by Sellers
and subsequently modified with Purchaser's consent so as to no longer be applicable to
the affected Owned Real Property, Purchaser shall reimburse Sellers as and when
requested by Sellers for Purchasers' and its Affiliates' allocable share of all costs and
expenses incurred under such Shared Executory Contract.

(f)    Sellers and Purchaser shall comply with the procedures set forth in the
Sale Procedures Order with respect to the assumption and assignment or rejection of any
Executory Contract pursuant to, and in accordance with, this **Section 6.6**.

(g)    No designation of any Executory Contract for assumption and assignment
or rejection in accordance with this **Section 6.6** shall give rise to any right to any
adjustment to the Purchase Price.

(h)    Without limiting the foregoing, if, following the Executory Contract
Designation Deadline, Sellers or Purchaser identify an Executory Contract that has not
previously been identified as a Contract for assumption and assignment, and such
Contract is important to Purchaser's ability to use or hold the Purchased Assets or operate
its businesses in connection therewith, Sellers will assume and assign such Contract and
assign it to Purchaser without any adjustment to the Purchase Price; provided that
Purchaser consents and agrees at such time to (i) assume such Executory Contract and (ii)
and discharge all Cure Amounts in respect hereof.

Section 6.7    *Deferred Termination Agreements; Participation Agreements.*

(a)    Sellers shall, and shall cause their Affiliates to, use reasonable best efforts
to enter into short-term deferred voluntary termination agreements in substantially the
form attached hereto as **Exhibit J-1** (in respect of all Saturn Discontinued Brand Dealer
Agreements), **Exhibit J-2** (in respect of all Hummer Discontinued Brand Dealer
Agreements) and **Exhibit J-3** (in respect of all non-Saturn and non-Hummer
Discontinued Brand Dealer Agreements and all Excluded Continuing Brand Dealer
Agreements) that will, when executed by the relevant dealer counterparty thereto, modify
the respective Discontinued Brand Dealer Agreements and selected Continuing Brand
Dealer Agreements (collectively, the "Deferred Termination Agreements").  For the
avoidance of doubt, (i) each Deferred Termination Agreement, and the related
Discontinued Brand Dealer Agreement or Continuing Brand Dealer Agreement modified
thereby, will automatically be an Assumable Executory Contract hereunder upon valid
execution of such Deferred Termination Agreement by the parties thereto and (ii) all
Discontinued Brand Dealer Agreements that are not modified by a Deferred Termination
Agreement, and all Continuing Brand Dealer Agreements that are not modified by either
a Deferred Termination Agreement or a Participation Agreement, will automatically be a
Rejectable Executory Contract hereunder.

(b)      Sellers shall, and shall cause their Affiliates to, use reasonable best efforts to enter into agreements, substantially in the form attached hereto as **Exhibit K** that will modify all Continuing Brand Dealer Agreements (other than the Continuing Brand Dealer Agreements that are proposed to be modified by Deferred Termination Agreements) (the "Participation Agreements").  For the avoidance of doubt, (i) all Participation Agreements, and the related Continuing Brand Dealer Agreements, will automatically be Assumable Executory Contracts hereunder upon valid execution of such Participation Agreement and (ii) all Continuing Brand Dealer Agreements that are proposed to be modified by a Participation Agreement and are not modified by a Participation Agreement will be offered Deferred Termination Agreements pursuant to **Section 6.7(a)**.

Section 6.8      *[Reserved]*

Section 6.9      *Purchaser Assumed Debt; Wind Down Facility.*

(a)      Purchaser shall use reasonable best efforts to agree with Sponsor on the terms of a restructuring of the Purchaser Assumed Debt so as to be assumed by Purchaser immediately prior to the Closing.  Purchaser shall use reasonable best efforts to enter into definitive financing agreements with respect to the Purchaser Assumed Debt so that such agreements are in effect as promptly as practicable but in any event no later than the Closing.

(b)      Sellers shall use reasonable best efforts to agree with Sponsor on the terms of a restructuring of $950,000,000 of Indebtedness accrued under the DIP Facility (as restructured, the "Wind Down Facility") to provide for such Wind Down Facility to be non-recourse, to accrue payment-in-kind interest at LIBOR plus 300 basis points, to be secured by all assets of Sellers (other than the Parent Shares, Adjustment Shares, Parent Warrants and any securities received in respect thereof), and to be subject to mandatory repayment from the proceeds of asset sales (other than the sale of Parent Shares, Adjustment Shares, Parent Warrants and any securities received in respect thereof).  Sellers shall use reasonable best efforts to enter into definitive financing agreements with respect to the Wind Down Facility so that such agreements are in effect as promptly as practicable but in any event no later than the Closing.

Section 6.10    *Litigation  and Other Assistance.*  In the event and for so long as any Party is actively contesting or defending against any action, investigation, charge, Claim or demand by a third party in connection with any transaction contemplated by this Agreement, the other Parties shall reasonably cooperate with the contesting or defending Party and its counsel in such contest or defense, make available its personnel and provide such testimony and access to its books, records and other materials as shall be reasonably necessary in connection with the contest or defense, all at the sole cost and expense of the contesting or defending Party; provided, however, that no Party shall be required to provide the contesting or defending party with any access to its books, records or materials if such access would violate the attorney-client privilege or conflict with any confidentiality obligations to which the non-contesting or defending Party is subject.  In addition, the Parties agree to cooperate in connection with the making or filing of claims, requests for information, document retrieval and other activities in connection with any

and all Claims made under insurance policies specified on Section 2.2(b)(xiii) of the Sellers' Disclosure Schedule to the extent any such Claim relates to any Purchased Asset or Assumed Liability. For the avoidance of doubt, this **Section 6.10** shall not apply to any action, investigation, charge, Claim or demand by any of Sellers or their Affiliates, on the one hand, or Purchaser or any of its Affiliates, on the other hand.

*Section 6.11    Further Assurances.*

(a)    Upon the terms and subject to the conditions set forth in this Agreement, each of the Parties shall use their reasonable best efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all actions necessary, proper or advisable to consummate and make effective as promptly as practicable, the transactions contemplated by this Agreement in accordance with the terms hereof and to bring about the satisfaction of all other conditions to the other Parties' obligations hereunder; provided, however, that nothing in this Agreement shall obligate Sellers or Purchaser, or any of their respective Affiliates, to waive or modify any of the terms and conditions of this Agreement or any documents contemplated hereby, except as expressly set forth herein. The Parties acknowledge that Sponsor's acquisition of interest is a sovereign act and that no filings should be made by Sponsor or Purchaser in non-United States jurisdictions.

(b)    The Parties shall negotiate the forms, terms and conditions of the Ancillary Agreements, to the extent the forms thereof are not attached to this Agreement, on the basis of the respective term sheets attached to this Agreement, in good faith, with such Ancillary Agreements to set forth terms on an Arms-Length Basis and incorporate usual and customary provisions for similar agreements.

(c)    Until the Closing, Sellers shall maintain a team of appropriate personnel (each such team, a "Transition Team") to assist Purchaser and its Representatives in connection with Purchaser's efforts to complete prior to the Closing the activities described below. Sellers shall use their reasonable best efforts to cause the Transition Team to (A) meet with Purchaser and its Representatives on a regular basis at such times as Purchaser may reasonably request and (B) take such action and provide such information, including background and summary information, as Purchaser and its Representatives may reasonably request in connection with the following activities:

(i)    evaluation and identification of all Contracts that Purchaser may elect to designate as Purchased Contracts or Excluded Contracts, consistent with its rights under this Agreement;

(ii)    evaluation and identification of all assets and entities that Purchaser may elect to designate as Purchased Assets or Excluded Assets, consistent with its rights under this Agreement;

(iii)    maintaining and obtaining necessary governmental consents, permits, authorizations, licenses and financial assurance for operation of the business by Purchaser following the Closing;

(iv)    obtaining necessary third party consents for operation of the business by Purchaser following the Closing;

(v)    implementing the optimal structure for Purchaser and its subsidiaries to acquire and hold the Purchased Assets and operate the business following the Closing;

(vi)    implementing the assumption of all Assumed Plans and otherwise satisfying the obligations of Purchaser as provided in **Section 6.17** with respect to Employment Related Obligations; and

(vii)    such other transition matters as Purchaser may reasonably determine are necessary for Purchaser to fulfill its obligations and exercise its rights under this Agreement.

*Section 6.12    Notifications.*

(a)    Sellers shall give written notice to Purchaser as soon as practicable upon becoming aware of any event, circumstance, condition, fact, effect or other matter that resulted in, or that would reasonably be likely to result in (i) any representation or warranty set forth in **ARTICLE IV** being or becoming untrue or inaccurate in any material respect as of any date on or after the date hereof (as if then made, except to the extent such representation or warranty is expressly made only as of a specific date, in which case, as of such date), (ii) the failure by Sellers to comply with or satisfy in any material respect any covenant, condition or agreement to be complied with or satisfied by Sellers under this Agreement or (iii) a condition to the Closing set forth in **Section 7.1** or **Section 7.2** becoming incapable of being satisfied; provided, however, that no such notification shall affect or cure a breach of any of Sellers' representations or warranties, a failure to perform any of the covenants or agreements of Sellers or a failure to have satisfied the conditions to the obligations of Sellers under this Agreement.  Such notice shall be in form of a certificate signed by an executive officer of Parent setting forth the details of such event and the action which Parent proposes to take with respect thereto.

(b)    Purchaser shall give written notice to Sellers as soon as practicable upon becoming aware of any event, circumstance, condition, fact, effect or other matter that resulted in, or that would reasonably be likely to result in (i) any representation or warranty set forth in **ARTICLE V** being or becoming untrue or inaccurate in any material respect with respect to Purchaser as of any date on or after the date hereof (as if then made, except to the extent such representation or warranty is expressly made only as of a specific date, in which case as of such date), (ii) the failure by Purchaser to comply with or satisfy in any material respect any covenant, condition or agreement to be complied with or satisfied by Purchaser under this Agreement or (iii) a condition to the Closing set forth in **Section 7.1** or **Section 7.3** becoming incapable of being satisfied; provided, however, that no such notification shall affect or cure a breach of any of Purchaser's representations or warranties, a failure to perform any of the covenants or agreements of Purchaser or a failure to have satisfied the conditions to the obligations of Purchaser under this Agreement.  Such notice shall be in a form of a certificate signed by

an executive officer of Purchaser setting forth the details of such event and the action which Purchaser proposes to take with respect thereto.

Section 6.13    *Actions by Affiliates.*    Each of Purchaser and Sellers shall cause their respective controlled Affiliates, and shall use their reasonable best efforts to ensure that each of their respective other Affiliates (other than Sponsor in the case of Purchaser) takes all actions reasonably necessary to be taken by such Affiliate in order to fulfill the obligations of Purchaser or Sellers, as the case may be, under this Agreement.

Section 6.14    *Compliance Remediation.*    Except with respect to the Excluded Assets or Retained Liabilities, prior to the Closing, Sellers shall use reasonable best efforts to, and shall use reasonable best efforts to cause their Subsidiaries to use their reasonable best efforts to, cure in all material respects any instances of non-compliance with Laws or Orders, failures to possess or maintain Permits or defaults under Permits.

Section 6.15    *Product Certification, Recall and Warranty Claims.*

(a)    From and after the Closing, Purchaser shall comply with the certification, reporting and recall requirements of the National Traffic and Motor Vehicle Safety Act, the Transportation Recall Enhancement, Accountability and Documentation Act, the Clean Air Act, the California Health and Safety Code and similar Laws, in each case, to the extent applicable in respect of vehicles and vehicle parts manufactured or distributed by Seller.

(b)    From and after the Closing, Purchaser shall be responsible for the administration, management and payment of all Liabilities arising under (i) express written warranties of Sellers that are specifically identified as warranties and delivered in connection with the sale of new, certified used or pre-owned vehicles or new or remanufactured motor vehicle parts and equipment (including service parts, accessories, engines and transmissions) manufactured or sold by Sellers or Purchaser prior to or after the Closing and (ii) Lemon Laws.   In connection with the foregoing clause (ii), (A) Purchaser shall continue to address Lemon Law Claims using the same procedural mechanisms previously utilized by the applicable Sellers and (B) for avoidance of doubt, Purchaser shall not assume Liabilities arising under the law of implied warranty or other analogous provisions of state Law, other than Lemon Laws, that provide consumer remedies in addition to or different from those specified in Sellers' express warranties.

(c)    For the avoidance of doubt, Liabilities of the Transferred Entities arising from or in connection with products manufactured or sold by the Transferred Entities remain the responsibility of the Transferred Entities and shall be neither Assumed Liabilities nor Retained Liabilities for the purposes of this Agreement.

Section 6.16    *Tax Matters; Cooperation.*

(a)    Prior to the Closing Date, Sellers shall prepare and timely file (or cause to be prepared and timely filed) all Tax Returns required to be filed prior to such date (taking into account any extension of time to file granted or obtained) that relate to Sellers, the Purchased Subsidiaries and the Purchased Assets in a manner consistent with

past practices (except as otherwise required by Law), and shall provide Purchaser prompt opportunity for review and comment and shall obtain Purchaser's written approval prior to filing any such Tax Returns.  After the Closing Date, at Purchaser's election, Purchaser shall prepare, and the applicable Seller, Seller Subsidiary or Seller Group member shall timely file, any Tax Return relating to any Seller, Seller Subsidiary or Seller Group member for any Pre-Closing Tax Period or Straddle Period due after the Closing Date or other taxable period of any entity that includes the Closing Date, subject to the right of the applicable Seller to review any such material Tax Return.  Purchaser shall prepare and file all other Tax Returns required to be filed after the Closing Date in respect of the Purchased Assets.  Sellers shall prepare and file all other Tax Returns relating to the Post-Closing Tax Period of Sellers, subject to the prior review and approval of Purchaser, which approval may be withheld, conditioned or delayed with good reason.  No Seller or Seller Group member shall be entitled to any payment or other consideration in addition to the Purchase Price with respect to the acquisition or use of any Tax items or attributes by Purchaser, any Purchased Subsidiary or Affiliates thereof.  At Purchaser's request, any Seller or Seller Group member shall designate Purchaser or any of its Affiliates as a substitute agent for the Seller Group for Tax purposes.  Purchaser shall be entitled to make all determinations, including the right to make or cause to be made any elections with respect to Taxes and Tax Returns of Sellers, Seller Subsidiaries, Seller Groups and Seller Group members with respect to Pre-Closing Tax Periods and Straddle Periods and with respect to the Tax consequences of the Relevant Transactions (including the treatment of such transactions as an Agreed G Transaction) and the other transactions contemplated by this Agreement, including (i) the "date of distribution or transfer" for purposes of Section 381(b) of the Tax Code, if applicable; (ii) the relevant Tax periods and members of the Seller Group and the Purchaser and its Affiliates; (iii) whether the Purchaser and/or any of its Affiliates shall be treated as a continuation of Seller Group; and (iv) any other determinations required under Section 381 of the Tax Code.  Purchaser shall have the sole right to represent the interests, as applicable, of any Seller, Seller Group member or Purchased Subsidiary in any Tax proceeding in connection with any Tax Liability or any Tax item for any Pre-Closing Tax Period, Straddle Period or other Tax period affecting any such earlier Tax period.  After the Closing, Purchaser shall have the right to assume control of any PLR or CA request filed by Sellers or any Affiliate thereof, including the right to represent Sellers and their Affiliates and to direct all professionals acting on their behalf in connection with such request, and no settlement, concession, compromise, commitment or other agreements in respect of such PLR or CA request shall be made without Purchaser's prior written consent.

(b)    All Taxes required to be paid by any Seller or Seller Group member for any Pre-Closing Tax Period or any Straddle Period shall be timely paid.  To the extent a Party hereto is liable for a Tax pursuant to this Agreement and such Tax is paid or payable by another Party or such other Party's Affiliates, the Party liable for such Tax shall make payment in the amount of such Tax to the other Party no later than three (3) days prior to the due date for payment of such Tax, unless a later time for payment is agreed to in writing by such other Party.  To the extent that any Seller or Seller Group member receives or realizes the benefit of any Tax refund, abatement or credit that is a Purchased Asset, such Seller or Seller Group member receiving the benefit shall transfer

an amount equal to such refund, abatement or credit to Purchaser within fourteen (14) days of receipt or realization of the benefit.

(c)    Purchaser and Sellers shall provide each other with such assistance and non-privileged information relating to the Purchased Assets as may reasonably be requested in connection with any Tax matter, including the matters contemplated by this **Section 6.16**, the preparation of any Tax Return or the performance of any audit, examination or other proceeding by any Taxing Authority, whether conducted in a judicial or administrative forum.  Purchaser and Sellers shall retain and provide to each other all non-privileged records and other information reasonably requested by the other and that may be relevant to any such Tax Return, audit, examination or other proceeding.

(d)    After the Closing, at Purchaser's election, Purchaser shall exercise exclusive control over the handling, disposition and settlement of any inquiry, examination or proceeding (including an audit) by a Governmental Authority (or that portion of any inquiry, examination or proceeding by a Governmental Authority) with respect to Sellers, any Subsidiary of Sellers or any Seller Group, provided that to the extent any such inquiry, examination or proceeding by a Governmental Authority could materially affect the Taxes due or payable by Sellers, Purchaser shall control the handling, disposition and settlement thereof, subject to reasonable consultation rights of Sellers.  Each Party shall notify the other Party (or Parties) in writing promptly upon learning of any such inquiry, examination or proceeding.  The Parties and their Affiliates shall cooperate with each other in any such inquiry, examination or proceeding as a Party may reasonably request.  Neither Parent nor any of its Affiliates shall extend, without Purchaser's prior written consent, the statute of limitations for any Tax for which Purchaser or any of its Affiliates may be liable.

(e)    Notwithstanding anything contained herein, Purchaser shall prepare and Sellers shall timely file all Tax Returns required to be filed in connection with the payment of Transfer Taxes.

(f)    From the date of this Agreement to and including the Closing Date, except to the extent relating solely to an Excluded Asset or Retained Liability, no Seller, Seller Group member or Purchased Subsidiary shall, without the prior written consent of Purchaser (which consent shall not be unreasonably withheld, conditioned or delayed, and shall not be withheld if not resulting in any Tax impact on Purchaser or any Purchased Asset), (i) make, change, or terminate any material election with respect to Taxes (including elections with respect to the use of Tax accounting methods) of any Seller, Seller Group member or Purchased Subsidiary or any material joint venture to which any Seller or Purchased Subsidiary is a party, (ii) settle or compromise any Claim or assessment for Taxes (including refunds) that could be reasonably expected to result in any adverse consequence on Purchaser or any Purchased Asset following the Closing Date, (iii) agree to an extension of the statute of limitations with respect to the assessment or collection of the Taxes of any Seller, Seller Group member or Purchased Subsidiary or any material joint venture of which any Seller or Purchased Subsidiary is a party or (iv) make or surrender any Claim for a refund of a material amount of the Taxes of any of

Sellers or Purchased Subsidiaries or file an amended Tax Return with respect to a material amount of Taxes.

(g)

(i)    Purchaser shall treat the transactions with respect to Parent described herein, in combination with the subsequent liquidation of Sellers (such transactions, collectively, the "Relevant Transactions"), as a reorganization pursuant to Section 368(a)(1)(G) of the Tax Code with any actual or deemed distribution by Parent qualifying solely under Sections 354 and 356 of the Tax Code but not under Section 355 of the Tax Code (a "G Transaction") if (x) the IRS issues a private letter ruling ("PLR") or executes a closing agreement ("CA"), in each case reasonably acceptable to Purchaser, confirming that the Relevant Transactions shall qualify as a G Transaction for U.S. federal income Tax purposes, or (y) Purchaser determines to treat the Relevant Transactions as so qualifying (clause (x) or (y), an "Agreed G Transaction").  In connection with the foregoing, Sellers shall use their reasonable best efforts to obtain a PLR or execute a CA with respect to the Relevant Transactions at least seven (7) days prior to the Closing Date.  At least three (3) days prior to the Closing Date, Purchaser shall advise Parent in writing as to whether Purchaser has made a determination regarding the treatment of the Relevant Transactions for U.S. federal income Tax purposes and, if applicable, the outcome of any such determination.

(ii)    On or prior to the Closing Date, Sellers shall deliver to Purchaser all information in the possession of Sellers and their Affiliates that is reasonably related to the determination of whether the Relevant Transactions constitute an Agreed G Transaction ("Relevant Information"), and, after the Closing, Sellers shall promptly provide to Purchaser any newly produced or obtained Relevant Information.  For the avoidance of doubt, the Parties shall cooperate in taking any actions and providing any information that Purchaser determines is necessary or appropriate in furtherance of the intended U.S. federal income Tax treatment of the Relevant Transactions and the other transactions contemplated by this Agreement.

(iii)    If Purchaser has not determined as of the Closing Date whether to treat the Relevant Transactions as an Agreed G Transaction, Purchaser shall make such determination in accordance with this **Section 6.16** prior to the due date (including validly obtained extensions) for filing the corporate income Tax Return for Parent's U.S. affiliated group (as defined in Section 1504 of the Tax Code) for the taxable year in which the Closing Date occurs, and shall convey such decision in writing to Parent, which decision shall be binding on Parent.

(iv)    If the Relevant Transactions constitute an Agreed G Transaction under this **Section 6.16**: (A) Sellers shall use their reasonable best efforts, and Purchaser shall use reasonable best efforts to assist Sellers, to effectuate such treatment and the Parties shall not take any action or position inconsistent with, or

fail to take any necessary action in furtherance of, such treatment (subject to **Section 6.16(g)(vi)**); (B) the Parties agree that this Agreement shall constitute a "plan" of Parent and Purchaser for purposes of Sections 368 and 354 of the Tax Code; (C) the board of directors of Parent and Purchaser shall, by resolution, approve the execution of this Agreement and expressly recognize its treatment as a "plan" of Parent and Purchaser for purposes of Sections 368 and 354 of the Tax Code, and the treatment of the Relevant Transactions as a G Transaction for federal income Tax purposes; (D) Sellers shall provide Purchaser with a statement setting forth the adjusted Tax basis of the Purchased Assets and the amount of net operating losses and other material Tax attributes of Sellers and any Purchased Subsidiary that are available as of the Closing Date and after the close of any taxable year of any Seller or Seller Group member that impacts the numbers previously provided, all based on the best information available, but with no Liability for any errors or omissions in information; and (E) Sellers shall provide Purchaser with an estimate of the cancellation of Indebtedness income that Sellers and any Seller Group member anticipate realizing for the taxable year that includes the Closing Date, and shall provide revised numbers after the close of any taxable year of any Seller or Seller Group member that impacts this number.

(v)      If the Relevant Transactions do not constitute an Agreed G Transaction under this **Section 6.16**, the Parties hereby agree, and Sellers hereby consent, to treat the sale of the Purchased Assets by Parent as a taxable asset sale for all Tax purposes, to make any elections pursuant to Section 338 of the Tax Code requested by Purchaser, and to report consistently herewith for purposes of **Section 3.3**.  In addition, the Parties hereby agree, and Sellers hereby consent, to treat the sales of the Purchased Assets by S Distribution and Harlem as taxable asset sales for all Tax purposes, to make any elections pursuant to Section 338 of the Tax Code requested by Purchaser, and to report consistently herewith for purposes of **Section 3.3**.

(vi)      No Party shall take any position with respect to the Relevant Transactions that is inconsistent with the position determined in accordance with this **Section 6.16**, unless, and then only to the extent, otherwise required to do so by a Final Determination.

(vii)      Each Seller shall liquidate, as determined for U.S. federal income Tax purposes and to the satisfaction of Purchaser, no later than December 31, 2011, and each such liquidation may include a distribution of assets to a "liquidating trust" within the meaning of Treas. Reg. § 301.7701-4, the terms of which shall be satisfactory to Purchaser.

(viii)      Effective no later than the Closing Date, Purchaser shall be treated as a corporation for federal income Tax purposes.

*Section 6.17    Employees; Benefit Plans; Labor Matters.*

(a)    *Transferred Employees.*  Effective as of the Closing Date, Purchaser or one of its Affiliates shall make an offer of employment to each Applicable Employee. Notwithstanding anything herein to the contrary and except as provided in an individual employment Contract with any Applicable Employee or as required by the terms of an Assumed Plan, offers of employment to Applicable Employees whose employment rights are subject to the UAW Collective Bargaining Agreement as of the Closing Date, shall be made in accordance with the applicable terms and conditions of the UAW Collective Bargaining Agreement and Purchaser's obligations under the Labor Management Relations Act of 1974, as amended.  Each offer of employment to an Applicable Employee who is not covered by the UAW Collective Bargaining Agreement shall provide, until at least the first anniversary of the Closing Date, for (i) base salary or hourly wage rates initially at least equal to such Applicable Employee's base salary or hourly wage rate in effect as of immediately prior to the Closing Date and (ii) employee pension and welfare benefits, Contracts and arrangements that are not less favorable in the aggregate than those listed on Section 4.10 of the Sellers' Disclosure Schedule, but not including any Retained Plan, equity or equity-based compensation plans or any Benefit Plan that does not comply in all respects with TARP.  For the avoidance of doubt, each Applicable Employee on layoff status, leave status or with recall rights as of the Closing Date, shall continue in such status and/or retain such rights after Closing in the Ordinary Course of Business.  Each Applicable Employee who accepts employment with Purchaser or one of its Affiliates and commences working for Purchaser or one of its Affiliates shall become a "Transferred Employee."  To the extent such offer of employment by Purchaser or its Affiliates is not accepted, Sellers shall, as soon as practicable following the Closing Date, terminate the employment of all such Applicable Employees.  Nothing in this **Section 6.17(a)** shall prohibit Purchaser or any of its Affiliates from terminating the employment of any Transferred Employee after the Closing Date, subject to the terms and conditions of the UAW Collective Bargaining Agreement.  It is understood that the intent of this **Section 6.17(a)** is to provide a seamless transition from Sellers to Purchaser of any Applicable Employee subject to the UAW Collective Bargaining Agreement.  Except for Applicable Employees with non-standard individual agreements providing for severance benefits, until at least the first anniversary of the Closing Date, Purchaser further agrees and acknowledges that it shall provide to each Transferred Employee who is not covered by the UAW Collective Bargaining Agreement and whose employment is involuntarily terminated by Purchaser or its Affiliates on or prior to the first anniversary of the Closing Date, severance benefits that are not less favorable than the severance benefits such Transferred Employee would have received under the applicable Benefit Plans listed on Section 4.10 of the Sellers' Disclosure Schedule.  Purchaser or one of its Affiliates shall take all actions necessary such that Transferred Employees shall be credited for their actual and credited service with Sellers and each of their respective Affiliates, for purposes of eligibility, vesting and benefit accrual (except in the case of a defined benefit pension plan sponsored by Purchaser or any of its Affiliates in which Transferred Employees may commence participation after the Closing that is not an Assumed Plan), in any employee benefit plans (excluding equity compensation plans or programs) covering Transferred Employees after the Closing to the same extent as such Transferred Employee was

entitled as of immediately prior to the Closing Date to credit for such service under any similar employee benefit plans, programs or arrangements of any of Sellers or any Affiliate of Sellers; provided, however, that such crediting of service shall not operate to duplicate any benefit to any such Transferred Employee or the funding for any such benefit. Such benefits shall not be subject to any exclusion for any pre-existing conditions to the extent such conditions were satisfied by such Transferred Employees under a Parent Employee Benefit Plan as of the Closing Date, and credit shall be provided for any deductible or out-of-pocket amounts paid by such Transferred Employee during the plan year in which the Closing Date occurs.

(b)  *Employees of Purchased Subsidiaries*.  As of the Closing Date, those employees of Purchased Subsidiaries who participate in the Assumed Plans, may, subject to the applicable Collective Bargaining Agreement, for all purposes continue to participate in such Assumed Plans, in accordance with their terms in effect from time to time.  For the avoidance of any doubt, Purchaser shall continue the employment of any current Employee of any Purchased Subsidiary covered by the UAW Collective Bargaining Agreement on the terms and conditions of the UAW Collective Bargaining Agreement in effect immediately prior to the Closing Date, subject to its terms; provided, however, that nothing in this Agreement shall be construed to terminate the coverage of any UAW-represented Employee in an Assumed Plan if such Employee was a participant in the Assumed Plan immediately prior to the Closing Date. Further provided, that nothing in this Agreement shall create a direct employment relationship between Parent or Purchaser and an Employee of a Purchased Subsidiary or an Affiliate of Parent.

(c)  *No Third Party Beneficiaries*. Nothing contained herein, express or implied, (i) is intended to confer or shall confer upon any Employee or Transferred Employee any right to employment or continued employment for any period of time by reason of this Agreement, or any right to a particular term or condition of employment, (ii) except as set forth in **Section 9.11**, is intended to confer or shall confer upon any individual or any legal Representative of any individual (including employees, retirees, or dependents or beneficiaries of employees or retirees and including collective bargaining agents or representatives) any right as a third-party beneficiary of this Agreement or (iii) shall be deemed to confer upon any such individual or legal Representative any rights under or with respect to any plan, program or arrangement described in or contemplated by this Agreement, and each such individual or legal Representative shall be entitled to look only to the express terms of any such plans, program or arrangement for his or her rights thereunder. Nothing herein is intended to override the terms and conditions of the UAW Collective Bargaining Agreement.

(d)  *Plan Authority.*  Nothing contained herein, express or implied, shall prohibit Purchaser or its Affiliates, as applicable, from, subject to applicable Law and the terms of the UAW Collective Bargaining Agreement, adding, deleting or changing providers of benefits, changing, increasing or decreasing co-payments, deductibles or other requirements for coverage or benefits (e.g., utilization review or pre-certification requirements), and/or making other changes in the administration or in the design, coverage and benefits provided to such Transferred Employees.  Without reducing the obligations of Purchaser as set forth in **Section 6.17(a)**, no provision of this Agreement

shall be construed as a limitation on the right of Purchaser or its Affiliates, as applicable, to suspend, amend, modify or terminate any employee benefit plan, subject to the terms of the UAW Collective Bargaining Agreement. Further, (i) no provision of this Agreement shall be construed as an amendment to any employee benefit plan, and (ii) no provision of this Agreement shall be construed as limiting Purchaser's or its Affiliate's, as applicable, discretion and authority to interpret the respective employee benefit and compensation plans, agreements arrangements, and programs, in accordance with their terms and applicable Law.

(e) *Assumption of Certain Parent Employee Benefit Plans and Policies.* As of the Closing Date, Purchaser or one of its Affiliates shall assume (i) the Parent Employee Benefit Plans and Policies set forth on Section 6.17(e) of the Sellers' Disclosure Schedule as modified thereon, and all assets, trusts, insurance policies and other Contracts relating thereto, except for any that do not comply in all respects with TARP or as otherwise provided in **Section 6.17(h)** and (ii) all employee benefit plans, programs, policies, agreements or arrangements (whether written or oral) in which Employees who are covered by the UAW Collective Bargaining Agreement participate and all assets, trusts, insurance and other Contracts relating thereto (the "<u>Assumed Plans</u>"), for the benefit of the Transferred Employees and Sellers and Purchaser shall cooperate with each other to take all actions and execute and deliver all documents and furnish all notices necessary to establish Purchaser or one of its Affiliates as the sponsor of such Assumed Plans including all assets, trusts, insurance policies and other Contracts relating thereto. Other than with respect to any Employee who was or is covered by the UAW Collective Bargaining Agreement, Purchaser shall have no Liability with respect to any modifications or changes to Benefit Plans contemplated by Section 6.17(e) of the Sellers' Disclosure Schedule, or changes made by Parent prior to the Closing Date, and Purchaser shall not assume any Liability with respect to any such decisions or actions related thereto, and Purchaser shall only assume the Liabilities for benefits provided pursuant to the written terms and conditions of the Assumed Plan as of the Closing Date. Notwithstanding the foregoing, the assumption of the Assumed Plans is subject to Purchaser taking all necessary action, including reduction of benefits, to ensure that the Assumed Plans comply in all respects with TARP. Notwithstanding the foregoing, but subject to the terms of any Collective Bargaining Agreement to which Purchaser or one of its Affiliates is a party, Purchaser and its Affiliates may, in its sole discretion, amend, suspend or terminate any such Assumed Plan at any time in accordance with its terms.

(f) *UAW Collective Bargaining Agreement.* Parent shall assume and assign to Purchaser, as of the Closing, the UAW Collective Bargaining Agreement and all rights and Liabilities of Parent relating thereto (including Liabilities for wages, benefits and other compensation, unfair labor practices, grievances, arbitrations and contractual obligations). With respect to the UAW Collective Bargaining Agreement, Purchaser agrees to (i) recognize the UAW as the exclusive collective bargaining representative for the Transferred Employees covered by the terms of the UAW Collective Bargaining Agreement, (ii) offer employment to all Applicable Employees covered by the UAW Collective Bargaining Agreement with full recognition of all seniority rights, (iii) negotiate with the UAW over the terms of any successor collective bargaining agreement upon the expiration of the UAW Collective Bargaining Agreement and upon timely

demand by the UAW, (iv) with the agreement of the UAW or otherwise as provided by Law and to the extent necessary, adopt or assume or replace, effective as of the Closing Date, employee benefit plans, policies, programs, agreements and arrangements specified in or covered by the UAW Collective Bargaining Agreement as required to be provided to the Transferred Employees covered by the UAW Collective Bargaining Agreement, and (v) otherwise abide by all terms and conditions of the UAW Collective Bargaining Agreement. For the avoidance of doubt, the provisions of this **Section 6.17(f)** are not intended to (A) give, and shall not be construed as giving, the UAW or any Transferred Employee any enhanced or additional rights or (B) otherwise restrict the rights that Purchaser and its Affiliates have, under the terms of the UAW Collective Bargaining Agreement.

(g)    *UAW Retiree Settlement Agreement.*  Prior to the Closing, Purchaser and the UAW shall have entered into the UAW Retiree Settlement Agreement.

(h)    *Assumption of Existing Internal VEBA.*  Purchaser or one of its Affiliates shall, effective as of the Closing Date, assume from Sellers the sponsorship of the voluntary employees' beneficiary association trust between Sellers and State Street Bank and Trust Company dated as of December 17, 1997, that is funded and maintained by Sellers ("Existing Internal VEBA") and, in connection therewith, Purchaser shall, or shall cause one of its Affiliates to, (i) succeed to all of the rights, title and interest (including the rights of Sellers, if any) as plan sponsor, plan administrator or employer) under the Existing Internal VEBA, (ii) assume any responsibility or Liability relating to the Existing Internal VEBA and each Contract established thereunder or relating thereto, and (iii) to operate the Existing Internal VEBA in accordance with, and to otherwise comply with the Purchaser's obligations under, the New UAW Retiree Settlement Agreement between Purchaser and the UAW, effective as of the Closing and subject to approval by a court having jurisdiction over this matter, including the obligation to direct the trustee of the Existing Internal VEBA to transfer the UAW's share of assets in the Existing Internal VEBA to the New VEBA. The Parties shall cooperate in the execution of any documents, the adoption of any corporate resolutions or the taking of any other reasonable actions to effectuate such succession of the settlor rights, title, and interest with respect to the Existing Internal VEBA. For avoidance of doubt, Purchaser shall not assume any Liabilities relating to the Existing Internal VEBA except with respect to such Contracts set forth in Section 6.17(h) of the Sellers' Disclosure Schedule.

(i)    *Wage and Tax Reporting.*  Sellers and Purchaser agree to apply, and cause their Affiliates to apply, the standard procedure for successor employers set forth in Revenue Procedure 2004-53 for wage and employment Tax reporting.

(j)    *Non-solicitation.*  Sellers shall not, for a period of two (2) years from the Closing Date, without Purchaser's written consent, solicit, offer employment to or hire any Transferred Employee.

(k)    *Cooperation.*  Purchaser and Sellers shall provide each other with such records and information as may be reasonably necessary, appropriate and permitted under applicable Law to carry out their obligations under this **Section 6.17**; provided, that all

records, information systems data bases, computer programs, data rooms and data related to any Assumed Plan or Liabilities of such, assumed by Purchaser, shall be transferred to Purchaser.

(l)    *Union Notifications.*    Purchaser and Sellers shall reasonably cooperate with each other in connection with any notification required by Law to, or any required consultation with, or the provision of documents and information to, the employees, employee representatives, the UAW and relevant Governmental Authorities and governmental officials concerning the transactions contemplated by this Agreement, including any notice to any of Sellers' retired Employees represented by the UAW, describing the transactions contemplated herein.

(m)    *Union-Represented Employees (Non-UAW).*

(i)    Effective as of the Closing Date, Purchaser or one of its Affiliates shall assume the collective bargaining agreements, as amended, set forth on Section 6.17(m)(i) of the Sellers' Disclosure Schedule (collectively, the "Non-UAW Collective Bargaining Agreements") and make offers of employment to each current employee of Parent who is covered by them in accordance with the applicable terms and conditions of such Non-UAW Collective Bargaining Agreements, such assumption and offers conditioned upon (A) the non-UAW represented employees' ratification of the amendments thereto (including termination of the application of the Supplemental Agreements Covering Health Care Program to retirees and the reduction to retiree life insurance coverage) and (B) Bankruptcy Court approval of Settlement Agreements between Purchaser and such Unions and Proposed Memorandum of Understanding Regarding Retiree Health Care and Life Insurance between Sellers and such Unions, as identified on Section 6.17(m)(ii) of the Sellers' Disclosure Schedule and satisfaction of all conditions stated therein.  Each such non-UAW hourly employee on layoff status, leave status or with recall rights as of the Closing Date shall continue in such status and/or retain such rights after the Closing in the Ordinary Course of Business, subject to the terms of the applicable Non-UAW Collective Bargaining Agreement.  Other than as set forth in this **Section 6.17(m)**, no non-UAW collective bargaining agreement shall be assumed by Purchaser.

(ii)    Section 6.17(m)(ii) of the Sellers' Disclosure Schedule sets forth agreements relating to post-retirement health care and life insurance coverage for non-UAW retired employees (the "Non-UAW Settlement Agreements"), including those agreements covering retirees who once belonged to Unions that no longer have any active employees at Sellers.  Conditioned on both the approval of the Bankruptcy Court and the non-UAW represented employees' ratification of the amendments to the applicable Non-UAW Collective Bargaining Agreement providing for such coverage as described in **Section 6.17(m)(i)** above, Purchaser or one of its Affiliates shall assume and enter into the agreements identified on Section 6.17(m)(ii) of the Sellers' Disclosure Schedule.  Except as set forth in those agreements identified on Section 6.17(m)(i) and Section 6.17(m)(ii) of the Sellers' Disclosure Schedule,  Purchaser shall not assume any Liability to provide

post-retirement health care or life insurance coverage for current or future hourly non-UAW retirees.

(iii)      Other than as expressly set forth in this **Section 6.17(m)**, Purchaser assumes no Employment-Related Obligations for non-UAW hourly Employees. For the avoidance of doubt, (A) the provisions of **Section 6.17(f)** shall not apply to this **Section 6.17(m)** and (B) the provisions of this **Section 6.17(m)** are not intended to (y) give, and shall not be construed as giving, any non-UAW Union or the covered employee or retiree of any Non-UAW Collective Bargaining Agreement any enhanced or additional rights or (z) otherwise restrict the rights that Purchaser and its Affiliates have under the terms of the Non-UAW Collective Bargaining Agreements identified on Section 6.17(m)(i) of the Sellers' Disclosure Schedule.

Section 6.18    *TARP.*  From and after the date hereof and until such time as all amounts under the UST Credit Facilities have been paid in full, forgiven or otherwise extinguished or such longer period as may be required by Law, subject to any applicable Order of the Bankruptcy Court, each of Sellers and Purchaser shall, and shall cause each of their respective Subsidiaries to, take all necessary action to ensure that it complies in all material respects with TARP or any enhanced restrictions on executive compensation agreed to by Sellers and Sponsor prior to the Closing.

Section 6.19    *Guarantees; Letters of Credit.*  Purchaser shall use its reasonable best efforts to cause Purchaser or one or more of its Subsidiaries to be substituted in all respects for each Seller and Excluded Entity, effective as of the Closing Date, in respect of all Liabilities of each Seller and Excluded Entity under each of the guarantees, letters of credit, letters of comfort, bid bonds and performance bonds (a) obtained by any Seller or Excluded Entity for the benefit of the business of Sellers and their Subsidiaries and (b) which is assumed by Purchaser as an Assumed Liability.  As a result of such substitution, each Seller and Excluded Entity shall be released of its obligations of, and shall have no Liability following the Closing from, or in connection with any such guarantees, letters of credit, letters of comfort, bid bonds and performance bonds.

Section 6.20    *Customs Duties.*  Purchaser shall reimburse Sellers for all customs-related duties, fees and associated costs incurred by Sellers on behalf of Purchaser with respect to periods following the Closing, including all such duties, fees and costs incurred in connection with co-loaded containers that clear customs intentionally or unintentionally under any Seller's importer or exporter identification numbers and bonds or guarantees with respect to periods following the Closing.

Section 6.21    *Termination of Intellectual Property Rights.*  Each Seller agrees that any rights of any Seller, including any rights arising under Contracts, if any, to any and all of the Intellectual Property transferred to Purchaser pursuant to this Agreement (including indirect transfers resulting from the transfer of the Transferred Equity Interests and including transfers resulting from this **Section 6.21**), whether owned or licensed, shall terminate as of the Closing. Before and after the Closing, each Seller agrees to use its reasonable best efforts to cause the Retained Subsidiaries to do the following, but only to the extent that such Seller can do so

without incurring any Liabilities to such Retained Subsidiaries or their equity owners or creditors as a result thereof: (a) enter into a written Contract with Purchaser that expressly terminates any rights of such Retained Subsidiaries, including any rights arising under Contracts, if any, to any and all of the Intellectual Property transferred to Purchaser pursuant to this Agreement (including indirect transfers resulting from the transfer of the Transferred Equity Interests), whether owned or licensed; and (b) assign to Purchaser or its designee(s): (i) all domestic and foreign trademarks, service marks, collective marks, certification marks, trade dress, trade names, business names, d/b/a's, Internet domain names, designs, logos and other source or business identifiers and all general intangibles of like nature, now or hereafter owned, adopted, used, acquired, or licensed by any Seller, all applications, registrations and recordings thereof (including applications, registrations and recordings in the United States Patent and Trademark Office or in any similar office or agency of the United States, any state thereof or any other country or any political subdivision thereof), and all reissues, extensions or renewals thereof, together with all goodwill of the business symbolized by or associated with such marks, in each case, that are owned by such Retained Subsidiaries and that contain or are confusingly similar with (whether in whole or in part) any of the Trademarks; and (ii) all other intellectual property owned by such Retained Subsidiaries.  Nothing in this **Section 6.21** shall preserve any rights of Sellers or the Retained Subsidiaries, or any third parties, that are otherwise terminated or extinguished pursuant to this Agreement or applicable Law, and nothing in this **Section 6.21** shall create any rights of Sellers or the Retained Subsidiaries, or any third parties, that do not already exist as of the date hereof.  Notwithstanding anything to the contrary in this **Section 6.21**, Sellers may enter into (and may cause or permit any of the Purchased Subsidiaries to enter into) any of the transactions contemplated by Section 6.2 of the Sellers' Disclosure Schedule.

Section 6.22    Trademarks.

(a)    At or before the Closing (i) Parent shall take any and all actions that are reasonably necessary to change the corporate name of Parent to a new name that bears no resemblance to Parent's present corporate name and that does not contain, and is not confusingly similar with, any of the Trademarks; and (ii) to the extent that the corporate name of any Seller (other than Parent) or any Retained Subsidiary resembles Parent's present corporate name or contains or is confusingly similar with any of the Trademarks, Sellers (including Parent) shall take any and all actions that are reasonably necessary to change such corporate names to new names that bear no resemblance to Parent's present corporate name, and that do not contain and are not confusingly similar with any of the Trademarks.

(b)    As promptly as practicable following the Closing, but in no event later than ninety (90) days after the Closing (except as set forth in this **Section 6.22(b)**), Sellers shall cease, and shall cause the Retained Subsidiaries to cease, using the Trademarks in any form, whether by removing, permanently obliterating, covering, or otherwise eliminating all Trademarks that appear on any of their assets, including all signs, promotional or advertising literature, labels, stationery, business cards, office forms and packaging materials.  During such time period, Sellers and the Retained Subsidiaries may continue to use Trademarks in a manner consistent with their usage of the Trademarks as of immediately prior to the Closing, but only to the extent reasonably necessary for them to continue their operations as contemplated by the Parties as of the

Closing.  If requested by Purchaser within a reasonable time after the Closing, Sellers and Retained Subsidiaries shall enter into a written agreement that specifies quality control of such Trademarks and their underlying goods and services.  For signs and the like that exist as of the Closing on the Excluded Real Property, if it is not reasonably practicable for Sellers or the Retained Subsidiaries to remove, permanently obliterate, cover or otherwise eliminate the Trademarks from such signs and the like within the time period specified above, then Sellers and the Retained Subsidiaries shall do so as soon as practicable following such time period, but in no event later than one-hundred eighty (180) days following the Closing.

(c)    From and after the date of this Agreement and, until the earlier of the Closing or termination of this Agreement, each Seller shall use its reasonable best efforts to protect and maintain the Intellectual Property owned by Sellers that is material to the conduct of its business in a manner that is consistent with the value of such Intellectual Property.

(d)    At or prior to the Closing, Sellers shall provide a true, correct and complete list setting forth all worldwide patents, patent applications, trademark registrations and applications and copyright registrations and applications included in the Intellectual Property owned by Sellers.

Section 6.23    Preservation of Records.    The Parties shall preserve and keep all books and records that they own immediately after the Closing relating to the Purchased Assets, the Assumed Liabilities and Sellers' operation of the business related thereto prior to the Closing for a period of six (6) years following the Closing Date or for such longer period as may be required by applicable Law, unless disposed of in good faith pursuant to a document retention policy.  During such retention period, duly authorized Representatives of a Party shall, upon reasonable notice, have reasonable access during normal business hours to examine, inspect and copy such books and records held by the other Parties for any proper purpose, except as may be prohibited by Law or by the terms of any Contract (including any confidentiality agreement); provided that to the extent that disclosing any such information would reasonably be expected to constitute a waiver of attorney-client, work product or other legal privilege with respect thereto, the Parties shall take all reasonable best efforts to permit such disclosure without the waiver of any such privilege, including entering into an appropriate joint defense agreement in connection with affording access to such information.  The access provided pursuant to this **Section 6.23** shall be subject to such additional confidentiality provisions as the disclosing Party may reasonably deem necessary.

Section 6.24    Confidentiality.    During the Confidentiality Period, Sellers and their Affiliates shall treat all trade secrets and all other proprietary, legally privileged or sensitive information related to the Transferred Entities, the Purchased Assets and/or the Assumed Liabilities (collectively, the "Confidential Information"), whether furnished before or after the Closing, whether documentary, electronic or oral, labeled or otherwise identified as confidential, and regardless of the form of communication or the manner in which it is or was furnished, as confidential, preserve the confidentiality thereof, not use or disclose to any Person such Confidential Information and instruct their Representatives who have had access to such information to keep confidential such Confidential Information.  The "Confidentiality Period"

shall be a period commencing on the date of the Original Agreement and (a) with respect to a trade secret, continuing for as long as it remains a trade secret and (b) for all other Confidential Information, ending four (4) years from the Closing Date.  Confidential Information shall be deemed not to include any information that (i) is now available to or is hereafter disclosed in a manner making it available to the general public, in each case, through no act or omission of Sellers, any of their Affiliates or any of their Representatives, or (ii) is required by Law to be disclosed, including any applicable requirements of the SEC or any other Governmental Authority responsible for securities Law regulation and compliance or any stock market or stock exchange on which any Seller's securities are listed.

Section 6.25    *Privacy Policies.*  At or prior to the Closing, Purchaser shall, or shall cause its Subsidiaries to, establish Privacy Policies that are substantially similar to the Privacy Policies of Parent and the Purchased Subsidiaries as of immediately prior to the Closing, and Purchaser or its Affiliates, as applicable, shall honor all "opt-out" requests or preferences made by individuals in accordance with the Privacy Policies of Parent and the Purchased Subsidiaries and applicable Law; provided that such Privacy Policies and any related "opt-out" requests or preferences are delivered or otherwise made available to Purchaser prior to the Closing, to the extent not publicly available.

Section 6.26    *Supplements to Sellers' Disclosure Schedule.*  At any time and from time to time prior to the Closing, Sellers shall have the right to supplement, modify or update Section 4.1 through Section 4.22 of the Sellers' Disclosure Schedule (a) to reflect changes and developments that have arisen after the date of the Original Agreement and that, if they existed prior to the date of the Original Agreement, would have been required to be set forth on such Sellers' Disclosure Schedule or (b) as may be necessary to correct any disclosures contained in such Sellers' Disclosure Schedule or in any representation and warranty of Sellers that has been rendered inaccurate by such changes or developments.  No supplement, modification or amendment to Section 4.1 through Section 4.22 of the Sellers' Disclosure Schedule shall without the prior written consent of Purchaser, (i) cure any inaccuracy of any representation and warranty made in this Agreement by Sellers or (ii) give rise to Purchaser's right to terminate this Agreement unless and until this Agreement shall be terminable by Purchaser in accordance with **Section 8.1(f)**.

Section 6.27    *Real Property Matters.*

(a)    Sellers and Purchaser acknowledge that certain real properties (the "Subdivision Properties") may need to be subdivided or otherwise legally partitioned in accordance with applicable Law (a "Required Subdivision") so as to permit the affected Owned Real Property to be conveyed to Purchaser separate and apart from adjacent Excluded Real Property.  Section 6.27 of the Sellers' Disclosure Schedule contains a list of the Subdivision Properties that was determined based on the current list of Excluded Real Property.  Section 6.27 of the Sellers' Disclosure Schedule may be updated at any time prior to the Closing to either (i) add additional Subdivision Properties or (ii) remove any Subdivision Properties, which have been determined to not require a Required Subdivision or for which a Required Subdivision has been obtained.  Purchaser shall pay for all costs incurred to complete all Required Subdivisions.  Sellers shall cooperate in good faith with Purchaser in connection with the completion with all Required

Subdivisions, including executing all required applications or other similar documents
with Governmental Authorities.  To the extent that any Required Subdivision for a
Subdivision Property is not completed prior to Closing, then at Closing, Sellers shall
lease to Purchaser only that portion of such Subdivision Property that constitutes Owned
Real Property pursuant to the Master Lease Agreement (Subdivision Properties)
substantially in the form attached hereto as **Exhibit L** (the "Subdivision Master Lease").
Upon completion of a Required Subdivision affecting an Owned Real Property that is
subject to the Subdivision Master Lease, the Subdivision Master Lease shall be
terminated as to such Owned Real Property and such Owned Real Property shall be
conveyed to Purchaser by Quitclaim Deed for One Dollar ($1.00) in stated consideration.

(b)      Sellers and Purchaser acknowledge that the Saginaw Nodular Iron facility
in Saginaw, Michigan (the "Saginaw Nodular Iron Land") contains a wastewater
treatment facility (the "Existing Saginaw Wastewater Facility") and a landfill (the
"Saginaw Landfill") that currently serve the Owned Real Property commonly known as
the GMPT - Saginaw Metal Casting facility (the "Saginaw Metal Casting Land").  The
Saginaw Nodular Iron Land has been designated as an Excluded Real Property under
Section 2.2(b)(v) of the Sellers' Disclosure Schedule.  At the Closing (or within sixty
(60) days after the Closing with respect to the Saginaw Landfill), Sellers shall enter into
one or more service agreements with one or more third party contractors (collectively, the
"Saginaw Service Contracts") to operate the Existing Saginaw Wastewater Facility and
the Saginaw Landfill for the benefit of the Saginaw Metal Casting Land.  The terms and
conditions of the Saginaw Service Contracts shall be mutually acceptable to Purchaser
and Sellers; provided that the term of each Saginaw Service Contract shall not extend
beyond December 31, 2012, and Purchaser shall have the right to terminate any Saginaw
Service Contract upon prior written notice of not less than forty-five (45) days.  At any
time during the term of the Saginaw Service Contracts, Purchaser may elect to purchase
the Existing Saginaw Wastewater Facility, the Saginaw Landfill, or both, for One Dollar
($1.00) in stated consideration; provided that (i) Purchaser shall pay all costs and fees
related to such purchase, including the costs of completing any Required Subdivision
necessary to effectuate the terms of this **Section 6.27(b)**, (ii) Sellers shall convey title to
the Existing Saginaw Wastewater Facility, the Saginaw Landfill and/or such other portion
of the Saginaw Nodular Iron Land as is required by Purchaser to operate the Existing
Saginaw Wastewater Facility and/or the Saginaw Landfill, including lagoons, but not any
other portion of the Saginaw Nodular Iron Land, to Purchaser by quitclaim deed and (iii)
Sellers shall grant Purchaser such easements for utilities over the portion of the Saginaw
Nodular Iron Land retained by Sellers as may be required to operate the Existing Saginaw
Wastewater Facility and/or the Saginaw Landfill.

(c)      Sellers and Purchaser acknowledge that access to certain Excluded Real
Property owned by Sellers or other real properties owned by Excluded Entities and
certain Owned Real Property that may hereafter be designated as Excluded Real Property
on Section 2.2(b)(v) of the Sellers' Disclosure Schedule (a "Landlocked Parcel") is
provided over land that is part of the Owned Real Property.   To the extent that direct
access to a public right-of-way is not obtained for any Landlocked Parcel by the Closing,
then at Closing,  Purchaser, in its sole election, shall for each such Landlocked Parcel
either (i) grant an access easement over a mutually agreeable portion of the adjacent

Owned Real Property for the benefit of the Landlocked Parcel until such time as the Landlocked Parcel obtains direct access to the public right-of-way, pursuant to the terms of a mutually acceptable easement agreement, or (ii) convey to the owner of the affected Landlocked Parcel by quitclaim deed such portion of the adjacent Owned Real Property as is required to provide the Landlocked Parcel with direct access to a public right-of-way.

(d)    At and after Closing, Sellers and Purchasers shall cooperate in good faith to investigate and resolve all issues reasonably related to or arising in connection with Shared Executory Contracts that involve the provision of water, water treatment, electricity, fuel, gas, telephone and other utilities to both Owned Real Property and Excluded Real Property.

(e)    Parent shall use reasonable best efforts to cause the Willow Run Landlord to execute, within thirty (30) days after the Closing, or at such later date as may be mutually agreed upon, an amendment to the Willow Run Lease which extends the term of the Willow Run Lease until December 31, 2010 with three (3) one-month options to extend, all at the current rental rate under the Willow Run Lease (the "Willow Run Lease Amendment").  In the event that the Willow Run Lease Amendment is approved and executed by the Willow Run Landlord, then Purchaser shall designate the Willow Run Lease as an Assumable Executory Contract and Parent and Purchaser, or one of its designated Subsidiaries, shall enter into an assignment and assumption of the Willow Run Lease substantially in the form attached hereto as **Exhibit M** (the "Assignment and Assumption of Willow Run Lease").

*Section 6.28    Equity Incentive Plans.*    Within a reasonable period of time following the Closing, Purchaser, through its board of directors, will adopt equity incentive plans to be maintained by Purchaser for the benefit of officers, directors, and employees of Purchaser that will provide the opportunity for equity incentive benefits for such persons ("Equity Incentive Plans").

*Section 6.29    Purchase of Personal Property Subject to Executory Contracts.* With respect to any Personal Property subject to an Executory Contract that is nominally an unexpired lease of Personal Property, if (a) such Contract is recharacterized by a Final Order of the Bankruptcy Court as a secured financing or (b) Purchaser, Sellers and the counterparty to such Contract agree, then Purchaser shall have the option to purchase such personal property by paying to the applicable Seller for the benefit of the counterparty to such Contract an amount equal to the amount, as applicable (i) of such counterparty's allowed secured Claim arising in connection with the recharacterization of such Contract as determined by such Order or (ii) agreed to by Purchaser, Sellers and such counterparty.

*Section 6.30    Transfer of Riverfront Holdings, Inc. Equity Interests or Purchased Assets; Ren Cen Lease.*  Notwithstanding anything to the contrary set forth in this Agreement, in lieu of or in addition to the transfer of Sellers' Equity Interest in Riverfront Holdings, Inc., a Delaware corporation ("RHI"), Purchaser shall have the right at the Closing or at any time during the RHI Post-Closing Period, to require Sellers to cause RHI to transfer good and marketable title to, or a valid and enforceable right by Contract to use, all or any portion of the assets of RHI

to Purchaser.  Purchaser shall, at its option, have the right to cause Sellers to postpone the transfer of Sellers' Equity Interest in RHI and/or title to the assets of RHI to Purchaser up until the earlier of (i) January 31, 2010 and (ii) the Business Day immediately prior to the date of the confirmation hearing for Sellers' plan of liquidation or reorganization (the "RHI Post-Closing Period"); provided, however, that (a) Purchaser may cause Sellers to effectuate said transfers at any time and from time to time during the RHI-Post Closing Period upon at least five (5) Business Days' prior written notice to Sellers and (b) at the closing, RHI, as landlord, and Purchaser, or one of its designated Subsidiaries, as tenant, shall enter into a lease agreement substantially in the form attached hereto as **Exhibit N** (the "Ren Cen Lease") for the premises described therein.

     *Section 6.31    Delphi Agreements.*    Notwithstanding anything to the contrary in this Agreement, including **Section 6.6**:

     (a)    Subject to and simultaneously with the consummation of the transactions contemplated by the MDA or of an Acceptable Alternative Transaction (in each case, as defined in the Delphi Motion), (i) the Delphi Transaction Agreements shall, effective immediately upon and simultaneously with such consummation, (A) be deemed to be Assumable Executory Contracts and (B) be assumed and assigned to Purchaser and (ii) the Assumption Effective Date with respect thereto shall be deemed to be the date of such consummation.

     (b)    The LSA Agreement shall, effective at the Closing, (i) be deemed to be an Assumable Executory Contract and (B) be assumed and assigned to Purchaser and (ii) the Assumption Effective Date with respect thereto shall be deemed to be the Closing Date. To the extent that any such agreement is not an Executory Contract, such agreement shall be deemed to be a Purchased Contract.

     *Section 6.32    GM Strasbourg S.A. Restructuring.*    The Parties acknowledge and agree that General Motors International Holdings, Inc., a direct Subsidiary of Parent and the direct parent of GM Strasbourg S.A., may, prior to the Closing, dividend its Equity Interest in GM Strasbourg S.A. to Parent, such that following such dividend, GM Strasbourg S.A. will become a wholly-owned direct Subsidiary of Parent.  Notwithstanding anything to the contrary in this Agreement, the Parties further acknowledge and agree that following the consummation of such restructuring at any time prior to the Closing, GM Strasbourg S.A. shall automatically, without further action by the Parties, be designated as an Excluded Entity and deemed to be set forth on Section 2.2(b)(iv) of the Sellers' Disclosure Schedule.

     *Section 6.33    Holding Company Reorganization.*    The Parties agree that Purchaser may, with the prior written consent of Sellers, reorganize prior to the Closing such that Purchaser may become a direct or indirect, wholly-owned Subsidiary of Holding Company on such terms and in such manner as is reasonably acceptable to Sellers, and Purchaser may assign all or a portion of its rights and obligations under this Agreement to Holding Company (or one or more newly formed, direct or indirect, wholly-owned Subsidiaries of Holding Company) in accordance with **Section 9.5**.  In connection with any restructuring effected pursuant to this **Section 6.33**, the Parties further agree that, notwithstanding anything to the contrary in this Agreement (a) Parent shall receive securities of Holding Company with the same rights and

privileges, and in the same proportions, as the Parent Shares and the Parent Warrants, in each case, in lieu of the Parent Shares and Parent Warrants, as Purchase Price hereunder, (b) Canada, New VEBA and Sponsor shall receive securities of Holding Company with the same rights and privileges, and in the same proportions, as the Canada Shares, VEBA Shares, VEBA Warrant and Sponsor Shares, as applicable, in each case, in connection with the Closing and (c) New VEBA shall receive the VEBA Note issued by the same entity that becomes the obligor on the Purchaser Assumed Debt.

Section 6.34 *Transfer of Promark Global Advisors Limited and Promark Investment Trustees Limited Equity Interests.* Notwithstanding anything to the contrary set forth in this Agreement, in the event approval by the Financial Services Authority (the "FSA Approval") of the transfer of Sellers' Equity Interests in Promark Global Advisors Limited and Promark Investments Trustees Limited (together, the "Promark UK Subsidiaries") has not been obtained as of the Closing Date, Sellers shall, at their option, have the right to postpone the transfer of Sellers' Equity Interests in the Promark UK Subsidiaries until such time as the FSA Approval is obtained. If the transfer of Sellers' Equity Interests in the Promark UK Subsidiaries is postponed pursuant to this **Section 6.34**, then (a) Sellers and Purchaser shall effectuate the transfer of Sellers' Equity Interests in the Promark UK Subsidiaries no later than five (5) Business Days following the date that the FSA Approval is obtained and (b) Sellers shall enter into a transitional services agreement with Promark Global Advisors, Inc. in the form provided by Promark Global Advisors, Inc., which shall include terms and provisions regarding: (i) certain transitional services to be provided by Promark Global Advisors, Inc. to the Promark UK Subsidiaries, (ii) the continued availability of director and officer liability insurance for directors and officers of the Promark UK Subsidiaries and (iii) certain actions on the part of the Promark UK Subsidiaries to require the prior written consent of Promark Global Advisors, Inc., including changes to employee benefits or compensation, declaration of dividends, material financial transactions, disposition of material assets, entry into material agreements, changes to existing business plans, changes in management and the boards of directors of the Promark UK Subsidiaries and other similar actions.

Section 6.35 *Transfer of Equity Interests in Certain Subsidiaries.* Notwithstanding anything to the contrary set forth in this Agreement, the Parties may mutually agree to postpone the transfer of Sellers' Equity Interests in those Transferred Entities as are mutually agreed upon by the Parties ("Delayed Closing Entities") to a date following the Closing.

## ARTICLE VII
## CONDITIONS TO CLOSING

Section 7.1 *Conditions to Obligations of Purchaser and Sellers.* The respective obligations of Purchaser and Sellers to consummate the transactions contemplated by this Agreement are subject to the fulfillment or written waiver (to the extent permitted by applicable Law), prior to or at the Closing, of each of the following conditions:

(a)    The Bankruptcy Court shall have entered the Sale Approval Order and the Sale Procedures Order on terms acceptable to the Parties and reasonably acceptable to the UAW, and each shall be a Final Order and shall not have been vacated, stayed or

reversed; provided, however, that the conditions contained in this **Section 7.1(a)** shall be satisfied notwithstanding the pendency of an appeal if the effectiveness of the Sale Approval Order has not been stayed.

(b)    No Order or Law of a United States Governmental Authority shall be in effect that declares this Agreement invalid or unenforceable or that restrains, enjoins or otherwise prohibits the consummation of the transactions contemplated by this Agreement.

(c)    Sponsor shall have delivered, or caused to be delivered to Sellers and Purchaser an equity registration rights agreement, substantially in the form attached hereto as **Exhibit O** (the "Equity Registration Rights Agreement"), duly executed by Sponsor.

(d)    Canada shall have delivered, or caused to be delivered to Sellers and Purchaser the Equity Registration Rights Agreement, duly executed by Canada.

(e)    The Canadian Debt Contribution shall have been consummated.

(f)    The New VEBA shall have delivered, or caused to be delivered to Sellers and Purchaser, the Equity Registration Rights Agreement, duly executed by the New VEBA.

(g)    Purchaser shall have received (i) consents from Governmental Authorities, (ii) Permits and (iii) consents from non-Governmental Authorities, in each case with respect to the transactions contemplated by this Agreement and the ownership and operation of the Purchased Assets and Assumed Liabilities by Purchaser from and after the Closing, sufficient in the aggregate to permit Purchaser to own and operate the Purchased Assets and Assumed Liabilities from and after the Closing in substantially the same manner as owned and operated by Sellers immediately prior to the Closing (after giving effect to (A) the implementation of the Viability Plans; (B) Parent's announced shutdown, which began in May 2009; and (C) the Bankruptcy Cases (or any other bankruptcy, insolvency or similar proceeding filed by or in respect of any Subsidiary of Parent).

(h)    Sellers shall have executed and delivered definitive financing agreements restructuring the Wind Down Facility in accordance with the provisions of **Section 6.9(b)**.

*Section 7.2    Conditions to Obligations of Purchaser.*    The obligations of Purchaser to consummate the transactions contemplated by this Agreement are subject to the fulfillment or written waiver, prior to or at the Closing, of each of the following conditions; provided, however, that in no event may Purchaser waive the conditions contained in **Section 7.2(d)** or **Section 7.2(e)**:

(a)    Each of the representations and warranties of Sellers contained in **ARTICLE IV** of this Agreement shall be true and correct (disregarding for the purposes of such determination any qualification as to materiality or Material Adverse Effect) as of

the Closing Date as if made on the Closing Date (except for representations and warranties that speak as of a specific date or time, which representations and warranties shall be true and correct only as of such date or time), except to the extent that any breaches of such representations and warranties, individually or in the aggregate, have not had, or would not reasonably be expected to have, a Material Adverse Effect.

(b)     Sellers shall have performed or complied in all material respects with all agreements and obligations required by this Agreement to be performed or complied with by Sellers prior to or at the Closing.

(c)     Sellers shall have delivered, or caused to be delivered, to Purchaser:

(i)     a certificate executed as of the Closing Date by a duly authorized representative of Sellers, on behalf of Sellers and not in such authorized representative's individual capacity, certifying that the conditions set forth in **Section 7.2(a)** and **Section 7.2(b)** have been satisfied;

(ii)     the Equity Registration Rights Agreement, duly executed by Parent;

(iii)     stock certificates or membership interest certificates, if any, evidencing the Transferred Equity Interests (other than in respect of the Equity Interests held by Sellers in RHI, Promark Global Advisors Limited, Promark Investments Trustees Limited and the Delayed Closing Entities, which the Parties agree may be transferred following the Closing in accordance with **Section 6.30**, **Section 6.34** and **Section 6.35**), duly endorsed in blank or accompanied by stock powers (or similar documentation) duly endorsed in blank, in proper form for transfer to Purchaser, including any required stamps affixed thereto;

(iv)     an omnibus bill of sale, substantially in the form attached hereto as **Exhibit P** (the "Bill of Sale"), together with transfer tax declarations and all other instruments of conveyance that are necessary to effect transfer to Purchaser of title to the Purchased Assets, each in a form reasonably satisfactory to the Parties and duly executed by the appropriate Seller;

(v)     an omnibus assignment and assumption agreement, substantially in the form attached hereto as **Exhibit Q** (the "Assignment and Assumption Agreement"), together with all other instruments of assignment and assumption that are necessary to transfer the Purchased Contracts and Assumed Liabilities to Purchaser, each in a form reasonably satisfactory to the Parties and duly executed by the appropriate Seller;

(vi)     a novation agreement, substantially in the form attached hereto as **Exhibit R** (the "Novation Agreement"), duly executed by Sellers and the appropriate United States Governmental Authorities;

(vii)      a government related subcontract agreement, substantially in the form attached hereto as **Exhibit S** (the "Government Related Subcontract Agreement"), duly executed by Sellers;

(viii)      an omnibus intellectual property assignment agreement, substantially in the form attached hereto as **Exhibit T** (the "Intellectual Property Assignment Agreement"), duly executed by Sellers;

(ix)      a transition services agreement, substantially in the form attached hereto as **Exhibit U** (the "Transition Services Agreement"), duly executed by Sellers;

(x)      all quitclaim deeds or deeds without warranty (or equivalents for those parcels of Owned Real Property located in jurisdictions outside of the United States), in customary form, subject only to Permitted Encumbrances, conveying the Owned Real Property to Purchaser (the "Quitclaim Deeds"), duly executed by the appropriate Seller;

(xi)      all required Transfer Tax or sales disclosure forms relating to the Transferred Real Property (the "Transfer Tax Forms"), duly executed by the appropriate Seller;

(xii)      an assignment and assumption of the leases and subleases underlying the Leased Real Property, in substantially the form attached hereto as **Exhibit V** (the "Assignment and Assumption of Real Property Leases"), together with such other instruments of assignment and assumption that are necessary to transfer the leases and subleases underlying the Leased Real Property located in jurisdictions outside of the United States, each duly executed by Sellers; provided, however, that if it is required for the assumption and assignment of any lease or sublease underlying a Leased Real Property that a separate assignment and assumption for such lease or sublease be executed, then a separate assignment and assumption of such lease or sublease shall be executed in a form substantially similar to **Exhibit V** or as otherwise required to assume or assign such Leased Real Property;

(xiii)      an assignment and assumption of the lease in respect of the premises located at 2485 Second Avenue, New York, New York, substantially in the form attached hereto as **Exhibit W** (the "Assignment and Assumption of Harlem Lease"), duly executed by Harlem;

(xiv)      an omnibus lease agreement in respect of the lease of certain portions of the Excluded Real Property that is owned real property, substantially in the form attached hereto as **Exhibit X** (the "Master Lease Agreement"), duly executed by Parent;

(xv)      *[Reserved]*;

(xvi)    the Saginaw Service Contracts, if required, duly executed by the appropriate Seller;

(xvii)    any easement agreements required under **Section 6.27(c)**, duly executed by the appropriate Seller;

(xviii)    the Subdivision Master Lease, if required, duly executed by the appropriate Sellers;

(xix)    a certificate of an officer of each Seller (A) certifying that attached to such certificate are true and complete copies of (1) such Seller's Organizational Documents, each as amended through and in effect on the Closing Date and (2) resolutions of the board of directors of such Seller, authorizing the execution, delivery and performance of this Agreement and the Ancillary Agreements to which such Seller is a party, the consummation of the transactions contemplated by this Agreement and such Ancillary Agreements and the matters set forth in **Section 6.16(e)**, and (B) certifying as to the incumbency of the officer(s) of such Seller executing this Agreement and the Ancillary Agreements to which such Seller is a party;

(xx)    a certificate in compliance with Treas. Reg. §1.1445-2(b)(2) that each Seller is not a foreign person as defined under Section 897 of the Tax Code;

(xxi)    a certificate of good standing for each Seller from the Secretary of State of the State of Delaware;

(xxii)    their written agreement to treat the Relevant Transactions and the other transactions contemplated by this Agreement in accordance with Purchaser's determination in **Section 6.16**;

(xxiii)    payoff letters and related Encumbrance-release documentation (including, if applicable, UCC-3 termination statements), each in a form reasonably satisfactory to the Parties and duly executed by the holders of the secured Indebtedness; and

(xxiv)    all books and records of Sellers described in **Section 2.2(a)(xiv)**.

(d)    The UAW Collective Bargaining Agreement shall have been ratified by the membership, shall have been assumed by the applicable Sellers and assigned to Purchaser, and shall be in full force and effect.

(e)    The UAW Retiree Settlement Agreement shall have been executed and delivered by the UAW and shall have been approved by the Bankruptcy Court as part of the Sale Approval Order.

(f)    The Canadian Operations Continuation Agreement shall have been executed and delivered by the parties thereto in the form previously distributed among them.

*Section 7.3      Conditions to Obligations of Sellers.*  The obligations of Sellers to consummate the transactions contemplated by this Agreement are subject to the fulfillment or written waiver, prior to or at the Closing, of each of the following conditions; provided, however, that in no event may Sellers waive the conditions contained in **Section 7.3(h)** or **Section 7.3(i)**:

(a)      Each of the representations and warranties of Purchaser contained in **ARTICLE V** of this Agreement shall be true and correct (disregarding for the purpose of such determination any qualification as to materiality or Purchaser Material Adverse Effect) as of the Closing Date as if made on such date (except for representations and warranties that speak as of a specific date or time, which representations and warranties shall be true and correct only as of such date or time), except to the extent that any breaches of such representations and warranties, individually or in the aggregate, have not had, or would not reasonably be expected to have, a Purchaser Material Adverse Effect.

(b)      Purchaser shall have performed or complied in all material respects with all agreements and obligations required by this Agreement to be performed or complied with by it prior to or at the Closing.

(c)      Purchaser shall have delivered, or caused to be delivered, to Sellers:

(i)      Parent Warrant A (including the related warrant agreement), duly executed by Purchaser;

(ii)      Parent Warrant B (including the related warrant agreement), duly executed by Purchaser;

(iii)      a certificate executed as of the Closing Date by a duly authorized representative of Purchaser, on behalf of Purchaser and not in such authorized representative's individual capacity, certifying that the conditions set forth in **Section 7.3(a)** and **Section 7.3(b)** are satisfied;

(iv)      stock certificates evidencing the Parent Shares, duly endorsed in blank or accompanied by stock powers duly endorsed in blank, in proper form for transfer, including any required stamps affixed thereto;

(v)      the Equity Registration Rights Agreement, duly executed by Purchaser;

(vi)      the Bill of Sale, together with all other documents described in **Section 7.2(c)(iv)**, each duly executed by Purchaser or its designated Subsidiaries;

(vii)      the Assignment and Assumption Agreement, together with all other documents described in **Section 7.2(c)(v)**, each duly executed by Purchaser or its designated Subsidiaries;

(viii)      the Novation Agreement, duly executed by Purchaser or its designated Subsidiaries;

(ix)    the Government Related Subcontract Agreement, duly executed by Purchaser or its designated Subsidiary;

(x)    the Intellectual Property Assignment Agreement, duly executed by Purchaser or its designated Subsidiaries;

(xi)    the Transition Services Agreement, duly executed by Purchaser or its designated Subsidiaries;

(xii)    the Transfer Tax Forms, duly executed by Purchaser or its designated Subsidiaries, to the extent required;

(xiii)    the Assignment and Assumption of Real Property Leases, together with all other documents described in **Section 7.2(c)(xii)**, each duly executed by Purchaser or its designated Subsidiaries;

(xiv)    the Assignment and Assumption of Harlem Lease, duly executed by Purchaser or its designated Subsidiaries;

(xv)    the Master Lease Agreement, duly executed by Purchaser or its designated Subsidiaries;

(xvi)    *[Reserved]*;

(xvii)    the Subdivision Master Lease, if required, duly executed by Purchaser or its designated Subsidiaries;

(xviii)    any easement agreements required under **Section 6.27(c)**, duly executed by Purchaser or its designated Subsidiaries;

(xix)    a certificate of a duly authorized representative of Purchaser (A) certifying that attached to such certificate are true and complete copies of (1) Purchaser's Organizational Documents, each as amended through and in effect on the Closing Date and (2) resolutions of the board of directors of Purchaser, authorizing the execution, delivery and performance of this Agreement and the Ancillary Agreements to which Purchaser is a party, the consummation of the transactions contemplated by this Agreement and such Ancillary Agreements and the matters set forth in **Section 6.16(g)**, and (B) certifying as to the incumbency of the officer(s) of Purchaser executing this Agreement and the Ancillary Agreements to which Purchaser is a party; and

(xx)    a certificate of good standing for Purchaser from the Secretary of State of the State of Delaware.

(d)    *[Reserved]*

(e)       Purchaser shall have filed a certificate of designation for the Preferred Stock, substantially in the form attached hereto as **Exhibit Y**, with the Secretary of State of the State of Delaware.

(f)       Purchaser shall have offset the UST Credit Bid Amount against the amount of Indebtedness of Parent and its Subsidiaries owed to Purchaser as of the Closing under the UST Credit Facilities pursuant to a Bankruptcy Code Section 363(k) credit bid and delivered releases and waivers and related Encumbrance-release documentation (including, if applicable, UCC-3 termination statements) with respect to the UST Credit Bid Amount, in a form reasonably satisfactory to the Parties and duly executed by Purchaser in accordance with the applicable requirements in effect on the date hereof, (iii) transferred to Sellers the UST Warrant and (iv) issued to Parent, in accordance with instructions provided by Parent, the Purchaser Shares and the Parent Warrants (duly executed by Purchaser).

(g)       Purchaser shall have delivered, or caused to be delivered, to Canada, Sponsor and/or the New VEBA, as applicable:

(i)       certificates representing the Canada Shares, the Sponsor Shares and the VEBA Shares in accordance with the applicable equity subscription agreements in effect on the date hereof;

(ii)       the Equity Registration Rights Agreement, duly executed by Purchaser;

(iii)       the VEBA Warrant (including the related warrant agreement), duly executed by Purchaser; and

(iv)       a note, in form and substance consistent with the terms set forth on **Exhibit Z** attached hereto, to the New VEBA (the "VEBA Note").

(h)       The UAW Collective Bargaining Agreement shall have been ratified by the membership, shall have been assumed by Purchaser, and shall be in full force and effect.

(i)       The UAW Retiree Settlement Agreement shall have been executed and delivered, shall be in full force and effect, and shall have been approved by the Bankruptcy Court as part of the Sale Approval Order.

## ARTICLE VIII
## TERMINATION

*Section 8.1    Termination.*    This Agreement may be terminated, and the transactions contemplated hereby may be abandoned, at any time prior to the Closing Date as follows:

(a)       by the mutual written consent of Sellers and Purchaser;

(b)　　by either Sellers or Purchaser, if (i) the Closing shall not have occurred on or before August 15, 2009, or such later date as the Parties may agree in writing, such date not to be later than September 15, 2009 (as extended, the "End Date"), and (ii) the Party seeking to terminate this Agreement pursuant to this **Section 8.1(b)** shall not have breached in any material respect its obligations under this Agreement in any manner that shall have proximately caused the failure of the transactions contemplated hereby to close on or before such date;

(c)　　by either Sellers or Purchaser, if the Bankruptcy Court shall not have entered the Sale Approval Order by July 10, 2009;

(d)　　by either Sellers or Purchaser, if any court of competent jurisdiction in the United States or other United States Governmental Authority shall have issued a Final Order permanently restraining, enjoining or otherwise prohibiting the transactions contemplated by this Agreement or the sale of a material portion of the Purchased Assets;

(e)　　by Sellers, if Purchaser shall have breached or failed to perform in any material respect any of its representations, warranties, covenants or other agreements contained in this Agreement, and such breach or failure to perform has not been cured by the End Date, provided that (i) Sellers shall have given Purchaser written notice, delivered at least thirty (30) days prior to such termination, stating Sellers' intention to terminate this Agreement pursuant to this **Section 8.1(e)** and the basis for such termination and (ii) Sellers shall not have the right to terminate this Agreement pursuant to this **Section 8.1(e)** if Sellers are then in material breach of any its representations, warranties, covenants or other agreements set forth herein;

(f)　　by Purchaser, if Sellers shall have breached or failed to perform in any material respect any of its representations, warranties, covenants or other agreements contained in this Agreement, which breach or failure to perform (i) would (if it occurred or was continuing as of the Closing Date) give rise to the failure of a condition set forth in **Section 7.2(a)** or **Section 7.2(b)** to be fulfilled, (ii) cannot be cured by the End Date, provided that (i) Purchaser shall have given Sellers written notice, delivered at least thirty (30) days prior to such termination, stating Purchaser's intention to terminate this Agreement pursuant to this **Section 8.1(f)** and the basis for such termination and (iii) Purchaser shall not have the right to terminate this Agreement pursuant to this **Section 8.1(f)** if Purchaser is then in material breach of any its representations, warranties, covenants or other agreements set forth herein; or

(g)　　by either Sellers or Purchaser, if  the Bankruptcy Court shall have entered an Order approving an Alternative Transaction.

Section 8.2　　*Procedure and Effect of Termination.*

(a)　　If this Agreement is terminated pursuant to **Section 8.1**, this Agreement shall become null and void and have no effect, and all obligations of the Parties hereunder shall terminate, except for those obligations of the Parties set forth this **Section 8.2** and **ARTICLE IX**, which shall remain in full force and effect; provided that nothing

herein shall relieve any Party from Liability for any material breach of any of its representations, warranties, covenants or other agreements set forth herein. If this Agreement is terminated as provided herein, all filings, applications and other submissions made pursuant to this Agreement shall, to the extent practicable, be withdrawn from the agency or other Person to which they were made.

(b)    If this Agreement is terminated by Sellers or Purchaser pursuant to **Section 8.1(a)** through **Section 8.1(d)** or **Section 8.1(g)** or by Purchaser pursuant to **Section 8.1(f)**, Sellers, severally and not jointly, shall reimburse Purchaser for its reasonable, out-of-pocket costs and expenses (including reasonable attorneys' fees) incurred by Purchaser in connection with this Agreement and the transactions contemplated hereby (the "Purchaser Expense Reimbursement"). The Purchaser Expense Reimbursement shall be paid as an administrative expense Claim of Sellers pursuant to Section 503(b)(1) of the Bankruptcy Code.

(c)    Except as expressly provided for in this **Section 8.2**, any termination of this Agreement pursuant to **Section 8.1** shall be without Liability to Purchaser or Sellers, including any Liability by Sellers to Purchaser for any break-up fee, termination fee, expense reimbursement or other compensation as a result of a termination of this Agreement.

(d)    If this Agreement is terminated for any reason, Purchaser shall, and shall cause each of its Affiliates and Representatives to, treat and hold as confidential all Confidential Information, whether documentary, electronic or oral, labeled or otherwise identified as confidential, and regardless of the form of communication or the manner in which it was furnished. For purposes of this **Section 8.2(d)**, Confidential Information shall be deemed not to include any information that (i) is now available to or is hereafter disclosed in a manner making it available to the general public, in each case, through no act or omission of Purchaser, any of its Affiliates or any of their Representatives, or (ii) is required by Law to be disclosed.

## ARTICLE IX
## MISCELLANEOUS

Section 9.1    *Survival of Representations, Warranties, Covenants and Agreements and Consequences of Certain Breaches.*  The representations and warranties of the Parties contained in this Agreement shall be extinguished by and shall not survive the Closing, and no Claims may be asserted in respect of, and no Party shall have any Liability for any breach of, the representations and warranties.   All covenants and agreements contained in this Agreement, including those covenants and agreements set forth in **ARTICLE II** and **ARTICLE VI**, shall survive the Closing indefinitely.

Section 9.2    *Notices.*  Any notice, request, instruction, consent, document or other communication required or permitted to be given under this Agreement shall be in writing and shall be deemed to have been sufficiently given or served for all purposes (a) upon delivery when personally delivered; (b) on the delivery date after having been sent by a nationally or internationally recognized overnight courier service (charges prepaid); (c) at the time received

when sent by registered or certified mail, return receipt requested, postage prepaid; or (d) at the time when confirmation of successful transmission is received (or the first Business Day following such receipt if the date of such receipt is not a Business Day) if sent by facsimile, in each case, to the recipient at the address or facsimile number, as applicable, indicated below:

If to any Seller:
General Motors Corporation
300 Renaissance Center
Tower 300, 25th Floor, Room D55
M/C 482-C25-D81
Detroit, Michigan 48265-3000
Attn: General Counsel
Tel.: 313-667-3450
Facsimile: 248-267-4584

With copies to:
Jenner & Block LLP
330 North Wabash Avenue
Chicago, Illinois 60611-7603
Attn:  Joseph P. Gromacki
       Michael T. Wolf
Tel.:  312-222-9350
Facsimile:  312-527-0484

and

Weil Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attn: Harvey R. Miller
      Stephen Karotkin
      Raymond Gietz
Tel.: 212-310-8000
Facsimile: 212-310-8007

If to Purchaser:
NGMCO, Inc.
c/o The United States Department of the Treasury
1500 Pennsylvania Avenue, NW
Washington D.C. 20220
Attn: Chief Counsel Office of Financial Stability
Facsimile: 202-927-9225

With a copy to:          Cadwalader, Wickersham & Taft LLP
                         One World Financial Center
                         New York, New York 10281
                         Attn:   John J. Rapisardi
                                 R. Ronald Hopkinson
                         Tel.:  212-504-6000
                         Facsimile:  212-504-6666

provided, however, if any Party shall have designated a different addressee and/or contact information by notice in accordance with this **Section 9.2**, then to the last addressee as so designated.

Section 9.3     *Fees and Expenses; No Right of Setoff.*     Except as otherwise provided in this Agreement, including **Section 8.2(b)**, Purchaser, on the one hand, and each Seller, on the other hand, shall bear its own fees, costs and expenses, including fees and disbursements of counsel, financial advisors, investment bankers, accountants and other agents and representatives, incurred in connection with the negotiation and execution of this Agreement and each Ancillary Agreement and the consummation of the transactions contemplated hereby and thereby.  In furtherance of the foregoing, Purchaser shall be solely responsible for (a) all expenses incurred by it in connection with its due diligence review of Sellers and their respective businesses, including surveys, title work, title inspections, title searches, environmental testing or inspections, building inspections, Uniform Commercial Code lien and other searches and (b) any cost (including any filing fees) incurred by it in connection with notarization, registration or recording of this Agreement or an Ancillary Agreement required by applicable Law.  No Party nor any of its Affiliates shall have any right of holdback or setoff or assert any Claim or defense with respect to any amounts that may be owed by such Party or its Affiliates to any other Party (or Parties) hereto or its or their Affiliates as a result of and with respect to any amount that may be owing to such Party or its Affiliates under this Agreement, any Ancillary Agreement or any other commercial arrangement entered into in between or among such Parties and/or their respective Affiliates.

Section 9.4     *Bulk Sales Laws.*     Each Party hereto waives compliance by the other Parties with any applicable bulk sales Law.

Section 9.5     *Assignment.*     Neither this Agreement nor any of the rights, interests or obligations provided by this Agreement may be assigned or delegated by any Party (whether by operation of law or otherwise) without the prior written consent of the other Parties, and any such assignment or delegation without such prior written consent shall be null and void; provided, however, that, without the consent of Sellers, Purchaser may assign or direct the transfer on its behalf on or prior to the Closing of all, or any portion, of its rights to purchase, accept and acquire the Purchased Assets and its obligations to assume and thereafter pay or perform as and when due, or otherwise discharge, the Assumed Liabilities, to Holding Company or one or more newly-formed, direct or indirect, wholly-owned Subsidiaries of Holding Company or Purchaser; provided, further, that no such assignment or delegation shall relieve Purchaser of any of its obligations under this Agreement.  Subject to the preceding sentence and except as otherwise expressly provided herein, this Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and permitted assigns.

*Section 9.6      Amendment.*  This Agreement may not be amended, modified or supplemented except upon the execution and delivery of a written agreement executed by a duly authorized representative or officer of each of the Parties.

*Section 9.7      Waiver.*  At any time prior to the Closing, each Party may (a) extend the time for the performance of any of the obligations or other acts of the other Parties; (b) waive any inaccuracies in the representations and warranties contained in this Agreement or in any document delivered pursuant hereto; or (c) waive compliance with any of the agreements or conditions contained herein (to the extent permitted by Law).  Any such waiver or extension by a Party (i) shall be valid only if, and to the extent, set forth in a written instrument signed by a duly authorized representative or officer of the Party to be bound and (ii) shall not constitute, or be construed as, a continuing waiver of such provision, or a waiver of any other breach of, or failure to comply with, any other provision of this Agreement.  The failure in any one or more instances of a Party to insist upon performance of any of the terms, covenants or conditions of this Agreement, to exercise any right or privilege in this Agreement conferred, or the waiver by said Party of any breach of any of the terms, covenants or conditions of this Agreement shall not be construed as a subsequent waiver of, or estoppel with respect to, any other terms, covenants, conditions, rights or privileges, but the same will continue and remain in full force and effect as if no such forbearance or waiver had occurred.

*Section 9.8      Severability.*  Whenever possible, each term and provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable Law. If any term or provision of this Agreement, or the application thereof to any Person or any circumstance, is held to be illegal, invalid or unenforceable, (a) a suitable and equitable provision shall be substituted therefore in order to carry out, so far as may be legal, valid and enforceable, the intent and purpose of such illegal, invalid or unenforceable provision and (b) the remainder of this Agreement or such term or provision and the application of such term or provision to other Persons or circumstances shall remain in full force and effect and shall not be affected by such illegality, invalidity or unenforceability, nor shall such invalidity or unenforceability affect the legality, validity or enforceability of such term or provision, or the application thereof, in any jurisdiction.

*Section 9.9      Counterparts; Facsimiles.*  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, and all of which taken together shall constitute one and the same agreement.  All signatures of the Parties may be transmitted by facsimile or electronic delivery, and each such facsimile signature or electronic delivery signature (including a pdf signature) will, for all purposes, be deemed to be the original signature of the Party whose signature it reproduces and be binding upon such Party.

*Section 9.10      Headings.*  The descriptive headings of the Articles, Sections and paragraphs of, and Schedules and Exhibits to, this Agreement, and the table of contents, table of Exhibits and table of Schedules contained in this Agreement, are included for convenience only, do not constitute a part of this Agreement and shall not be deemed to limit, modify or affect any of the provisions hereof.

*Section 9.11     Parties in Interest.*  This Agreement shall be binding upon and inure solely to the benefit of each Party hereto and their respective permitted successors and

assigns; <u>provided</u>, that (a) for all purposes each of Sponsor, the New VEBA, and Canada shall be express third-party beneficiaries of this Agreement and (b) for purposes of **Section 2.2(a)(x)** and **(xvi)**, **Section 2.2(b)(vii)**, **Section 2.3(a)(x)**, **(xii)**, **(xiii)** and **(xv)**, **Section 2.3(b)(xv)**, **Section 4.6(b)**, **Section 4.10**, **Section 5.4(c)**, **Section 6.2(b)(x)**, **(xv)** and **(xvii)**, **Section 6.4(a)**, **Section 6.4(b)**, **Section 6.6(a)**, **(d)**, **(f)** and **(g)**, **Section 6.11(c)(i)** and **(vi)**, **Section 6.17**, **Section 7.1(a)** and **(f)**, **Section 7.2(d)** and **(e)** and **Section 7.3(g)**, **(h)** and **(i)**, the UAW shall be an express third-party beneficiary of this Agreement.  Subject to the preceding sentence, nothing express or implied in this Agreement is intended or shall be construed to confer upon or give to any Person, other than the Parties, their Affiliates and their respective permitted successors or assigns, any legal or equitable Claims, benefits, rights or remedies of any nature whatsoever under or by reason of this Agreement.

Section 9.12    *Governing Law.*  The construction, interpretation and other matters arising out of or in connection with this Agreement (whether arising in contract, tort, equity or otherwise) shall in all respects be governed by and construed (a) to the extent applicable, in accordance with the Bankruptcy Code, and (b) to the extent the Bankruptcy Code is not applicable, in accordance with the Laws of the State of New York, without giving effect to rules governing the conflict of laws.

Section 9.13    *Venue and Retention of Jurisdiction.*  Each Party irrevocably and unconditionally submits to the exclusive jurisdiction of the Bankruptcy Court for any litigation arising out of or in connection with this Agreement and the transactions contemplated hereby (and agrees not to commence any litigation relating thereto except in the Bankruptcy Court, other than actions in any court of competent jurisdiction to enforce any judgment, decree or award rendered by any such court as described herein); <u>provided</u>, <u>however</u>, that this **Section 9.13** shall not be applicable in the event the Bankruptcy Cases have closed, in which case the Parties irrevocably and unconditionally submit to the exclusive jurisdiction of the federal courts in the Southern District of New York and state courts of the State of New York located in the Borough of Manhattan in the City of New York for any litigation arising out of or in connection with this Agreement and the transactions contemplated hereby (and agree not to commence any litigation relating thereto except in the federal courts in the Southern District of New York and state courts of the State of New York located in the Borough of Manhattan in the City of New York, other than actions in any court of competent jurisdiction to enforce any judgment, decree or award rendered by any such court as described herein).

Section 9.14    *Waiver of Jury Trial.*  EACH PARTY WAIVES THE RIGHT TO A TRIAL BY JURY IN ANY DISPUTE IN CONNECTION WITH OR RELATING TO THIS AGREEMENT OR ANY MATTERS DESCRIBED OR CONTEMPLATED HEREIN, AND AGREES TO TAKE ANY AND ALL ACTION NECESSARY OR APPROPRIATE TO EFFECT SUCH WAIVER.

Section 9.15    *Risk of Loss.*  Prior to the Closing, all risk of loss, damage or destruction to all or any part of the Purchased Assets shall be borne exclusively by Sellers.

Section 9.16    *Enforcement of Agreement.*  The Parties agree that irreparable damage would occur in the event that any provision of this Agreement were not performed in accordance with its specific terms or were otherwise breached.  It is accordingly agreed that the

Parties shall, without the posting of a bond, be entitled, subject to a determination by a court of competent jurisdiction, to an injunction or injunctions to prevent any such failure of performance under, or breaches of, this Agreement, and to enforce specifically the terms and provisions hereof and thereof, this being in addition to all other remedies available at law or in equity, and each Party agrees that it will not oppose the granting of such relief on the basis that the requesting Party has an adequate remedy at law.

> Section 9.17  *Entire Agreement.*  This Agreement (together with the Ancillary Agreements, the Sellers' Disclosure Schedule and the Exhibits) contains the final, exclusive and entire agreement and understanding of the Parties with respect to the subject matter hereof and thereof and supersedes all prior and contemporaneous agreements and understandings, whether written or oral, among the Parties with respect to the subject matter hereof and thereof.  Neither this Agreement nor any Ancillary Agreement shall be deemed to contain or imply any restriction, covenant, representation, warranty, agreement or undertaking of any Party with respect to the transactions contemplated hereby or thereby other than those expressly set forth herein or therein, and none shall be deemed to exist or be inferred with respect to the subject matter hereof.

> Section 9.18  *Publicity.*    Prior to the first public announcement of this Agreement and the transactions contemplated hereby, Sellers, on the one hand, and Purchaser, on the other hand, shall consult with each other regarding, and share with each other copies of, their respective communications plans, including draft press releases and related materials, with regard to such announcement.  Neither Sellers nor Purchaser shall issue any press release or public announcement concerning this Agreement or the transactions contemplated hereby without obtaining the prior written approval of the other Party or Parties, as applicable, which approval shall not be unreasonably withheld, conditioned or delayed, unless, in the sole judgment of the Party intending to make such release, disclosure is otherwise required by applicable Law, or by the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement or by the applicable rules of any stock exchange on which Purchaser or Sellers list securities; <u>provided</u>, that the Party intending to make such release shall use reasonable best efforts consistent with such applicable Law or Bankruptcy Court requirement to consult with the other Party or Parties, as applicable, with respect to the text thereof; <u>provided</u>, further, that, notwithstanding anything to the contrary contained in this section, no Party shall be prohibited from publishing, disseminating or otherwise making public, without the prior written approval of the other Party or Parties, as applicable, any materials that are derived from or consistent with the materials included in the communications plan referred to above.  In an effort to coordinate consistent communications, the Parties shall agree upon procedures relating to all press releases and public announcements concerning this Agreement and the transactions contemplated hereby.

> Section 9.19  *No Successor or Transferee Liability.*  Except where expressly prohibited under applicable Law or otherwise expressly ordered by the Bankruptcy Court, upon the Closing, neither Purchaser nor any of its Affiliates or stockholders shall be deemed to (a) be the successor of Sellers; (b) have, de facto, or otherwise, merged with or into Sellers; (c) be a mere continuation or substantial continuation of Sellers or the enterprise(s) of Sellers; or (d) other than as set forth in this Agreement, be liable for any acts or omissions of Sellers in the conduct of Sellers' business or arising under or related to the Purchased Assets.  Without limiting

the generality of the foregoing, and except as otherwise provided in this Agreement, neither Purchaser nor any of its Affiliates or stockholders shall be liable for any Claims against Sellers or any of their predecessors or Affiliates, and neither Purchaser nor any of its Affiliates or stockholders shall have any successor, transferee or vicarious Liability of any kind or character whether known or unknown as of the Closing, whether now existing or hereafter arising, or whether fixed or contingent, with respect to Sellers' business or any obligations of Sellers arising prior to the Closing, except as provided in this Agreement, including Liabilities on account of any Taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the operation of Sellers' business prior to the Closing.

Section 9.20    *Time Periods.*    Unless otherwise specified in this Agreement, an action required under this Agreement to be taken within a certain number of days or any other time period specified herein shall be taken within the applicable number of calendar days (and not Business Days); provided, however, that if the last day for taking such action falls on a day that is not a Business Day, the period during which such action may be taken shall be automatically extended to the next Business Day.

Section 9.21    *Sellers' Disclosure Schedule.*    The representations and warranties of Sellers set forth in this Agreement are made and given subject to the disclosures contained in the Sellers' Disclosure Schedule.  Inclusion of information in the Sellers' Disclosure Schedule shall not be construed as an admission that such information is material to the business, operations or condition of the business of Sellers, the Purchased Assets or the Assumed Liabilities, taken in part or as a whole, or as an admission of Liability of any Seller to any third party.  The specific disclosures set forth in the Sellers' Disclosure Schedule have been organized to correspond to Section references in this Agreement to which the disclosure may be most likely to relate; provided, however, that any disclosure in the Sellers' Disclosure Schedule shall apply to, and shall be deemed to be disclosed for, any other Section of this Agreement to the extent the relevance of such disclosure to such other Section is reasonably apparent on its face.

Section 9.22    *No Binding Effect.*    Notwithstanding anything in this Agreement to the contrary, no provision of this Agreement shall (i) be binding on or create any obligation on the part of Sponsor, the United States Government or any branch, agency or political subdivision thereof (a "Sponsor Affiliate") or the Government of Canada, or any crown corporation, agency or department thereof (a "Canada Affiliate") or (ii) require Purchaser to initiate any Claim or other action against Sponsor or any Sponsor Affiliate or otherwise attempt to cause Sponsor, any Sponsor Affiliate, Government of Canada or any Canada Affiliate to comply with or abide by the terms of this Agreement.  No facts, materials or other information received or action taken by any Person who is an officer, director or agent of Purchaser by virtue of such Person's affiliation with or employment by Sponsor, any Sponsor Affiliate, Government of Canada or any Canada Affiliate shall be attributed to Purchaser for purposes of this Agreement or shall form the basis of any claim against such Person in their individual capacity.

[Remainder of the page left intentionally blank]

**IN WITNESS WHEREOF**, each of the Parties hereto has caused this Agreement to be executed by its duly authorized officer, in each case as of the date first written above.

GENERAL MOTORS CORPORATION

By: _____
    Name:  Frederick A. Henderson
    Title:   President and Chief Executive
           Officer

SATURN LLC

By: _____
    Name:  Jill Lajdziak
    Title:   President

SATURN DISTRIBUTION CORPORATION

By: _____
    Name:  Jill Lajdziak
    Title:   President

CHEVROLET-SATURN OF HARLEM, INC.

By: _____
    Name:  Michael Garrick
    Title:   President

NGMCO, INC.

By: _____
    Name:  Sadiq A. Malik
    Title:   Vice President and Treasurer

**IN WITNESS WHEREOF,** each of the Parties hereto has caused this Agreement to be executed by its duly authorized officer, in each case as of the date first written above.

GENERAL MOTORS CORPORATION

By: _____
　　　Name:  Frederick A. Henderson
　　　Title:　President and Chief Executive
　　　　　　　Officer

SATURN LLC

By: _____
　　　Name:　Jill Lajdziak
　　　Title:　President

SATURN DISTRIBUTION CORPORATION

By: _____
　　　Name:　Jill Lajdziak
　　　Title:　President

CHEVROLET-SATURN OF HARLEM, INC.

By: _____
　　　Name:  Michael Garrick
　　　Title:　President

NGMCO, INC.

By: _____
　　　Name:  Sadiq A. Malik
　　　Title:　Vice President and Treasurer

IN WITNESS WHEREOF, each of the Parties hereto has caused this Agreement to be executed by its duly authorized officer, in each case as of the date first written above.

GENERAL MOTORS CORPORATION

By: _____

Name: Frederick A. Henderson
Title: President and Chief Executive Officer

SATURN LLC

By: _____

Name: Jill Lajdziak
Title: President

SATURN DISTRIBUTION CORPORATION

By: _____

Name: Jill Lajdziak
Title: President

CHEVROLET-SATURN OF HARLEM, INC.

By: _____

Name: Michael Garrick
Title: President

NGMCO, INC.

By: _____

Name: Sadiq A. Malik
Title: Vice President and Treasurer

**IN WITNESS WHEREOF,** each of the Parties hereto has caused this Agreement to be executed by its duly authorized officer, in each case as of the date first written above.

GENERAL MOTORS CORPORATION

By: _____
      Name:  Frederick A. Henderson
      Title:   President and Chief Executive
              Officer

SATURN LLC

By: _____
      Name:  Jill Lajdziak
      Title:   President

SATURN DISTRIBUTION CORPORATION

By: _____
      Name:  Jill Lajdziak
      Title:   President

CHEVROLET-SATURN OF HARLEM, INC.

By: _____
      Name:  Michael Garrick
      Title:   President

NGMCO, INC.

By: _____
Name: Sadiq A. Malik
      Title:   Vice President and Treasurer

SIGNATURE PAGE TO THE AMENDED AND RESTATED MASTER SALE AND PURCHASE AGREEMENT

# FIRST AMENDMENT TO AMENDED AND RESTATED MASTER SALE AND PURCHASE AGREEMENT

THIS FIRST AMENDMENT TO AMENDED AND RESTATED MASTER SALE AND PURCHASE AGREEMENT, dated as of June 30, 2009 (this "Amendment"), is made by and among General Motors Corporation, a Delaware corporation ("Parent"), Saturn LLC, a Delaware limited liability company ("S LLC"), Saturn Distribution Corporation, a Delaware corporation ("S Distribution"), Chevrolet-Saturn of Harlem, Inc., a Delaware corporation ("Harlem," and collectively with Parent, S LLC and S Distribution, "Sellers," and each a "Seller"), and NGMCO, Inc., a Delaware corporation and successor-in-interest to Vehicle Acquisition Holdings LLC, a Delaware limited liability company ("Purchaser").

WHEREAS, Sellers and Purchaser have entered into that certain Amended and Restated Master Sale and Purchase Agreement, dated as of June 26, 2009 (the "Purchase Agreement"); and

WHEREAS, the Parties desire to amend the Purchase Agreement as set forth herein.

NOW, THEREFORE, in consideration of the foregoing and the mutual agreements contained in this Agreement, and for other good and valuable consideration, the value, receipt and sufficiency of which are acknowledged, the Parties hereby agree as follows:

Section 1.    *Capitalized Terms.*  All capitalized terms used but not defined herein shall have the meanings specified in the Purchase Agreement.

Section 2.    *Amendments to Purchase Agreement.*

(a)    **Section 2.3(a)(v)** of the Purchase Agreement is hereby amended and restated in its entirety to read as follows:

(v)    all Liabilities of Sellers (A) arising in the Ordinary Course of Business during the Bankruptcy Cases through and including the Closing Date, to the extent such Liabilities are administrative expenses of Sellers' estates pursuant to Section 503(b) of the Bankruptcy Code and (B) arising prior to the commencement of the Bankruptcy Cases, to the extent approved by the Bankruptcy Court for payment by Sellers pursuant to a Final Order (and for the avoidance of doubt, Sellers' Liabilities in clauses (A) and (B) above include all of Sellers' Liabilities for personal property Taxes, real estate and/or other ad valorem Taxes, use Taxes, sales Taxes, franchise Taxes, income Taxes, gross receipt Taxes, excise Taxes, Michigan Business Taxes and Michigan Single Business Taxes and other Liabilities mentioned in the Bankruptcy Court's Order - Docket No. 174), in each case, other than (1) Liabilities of the type described in **Section 2.3(b)(iv)**, **Section 2.3(b)(vi)**, **Section 2.3(b)(ix)** and **Section 2.3(b)(xii)**, (2) Liabilities arising under any dealer sales and service Contract and any Contract related thereto, to the extent such Contract has been designated as

a Rejectable Executory Contract, and (3) Liabilities otherwise assumed in this **Section 2.3(a)**;

(b)    **Section 2.3(a)(ix)** of the Purchase Agreement is hereby amended and restated in its entirety to read as follows:

(ix)    all Liabilities to third parties for death, personal injury, or other injury to Persons or damage to property caused by motor vehicles designed for operation on public roadways or by the component parts of such motor vehicles and, in each case, manufactured, sold or delivered by Sellers (collectively, "Product Liabilities"), which arise directly out of death, personal injury or other injury to Persons or damage to property caused by accidents or incidents first occurring on or after the Closing Date and arising from such motor vehicles' operation or performance (for avoidance of doubt, Purchaser shall not assume, or become liable to pay, perform or discharge, any Liability arising or contended to arise by reason of exposure to materials utilized in the assembly or fabrication of motor vehicles manufactured by Sellers and delivered prior to the Closing Date, including asbestos, silicates or fluids, regardless of when such alleged exposure occurs);

(c)    **Section 2.3(b)(xii)** of the Purchase Agreement is hereby amended and restated in its entirety to read as follows:

(xii)    all workers' compensation Claims with respect to Employees residing or employed in, as the case may be and as defined by applicable Law, (A) the states set forth on **Exhibit G** and (B) if the State of Michigan (1) fails to authorize Purchaser and its Affiliates operating within the State of Michigan to be a self-insurer for purposes of administering workers' compensation Claims or (2) requires Purchaser and its Affiliates operating within the State of Michigan to post collateral, bonds or other forms of security to secure workers' compensation Claims, the State of Michigan (collectively, "Retained Workers' Compensation Claims");

(d)    **Section 6.6(d)** of the Purchase Agreement is hereby amended and restated in its entirety to read as follows:

(d)    All Assumable Executory Contracts shall be assumed and assigned to Purchaser on the date (the "Assumption Effective Date") that is the later of (i) the date designated by the Purchaser and (ii) the date following expiration of the objection deadline if no objection, other than to the Cure Amount, has been timely filed or the date of resolution of any objection unrelated to Cure Amount, as provided in the Sale Procedures Order; provided, however, that in the case of each (A) Assumable Executory Contract identified on Section 6.6(a)(i) of the Sellers' Disclosure Schedule, (2) Deferred Termination Agreement (and the related Discontinued Brand Dealer Agreement or Continuing Brand Dealer Agreement)

2

designated as an Assumable Executory Contract and (3) Participation Agreement (and the related Continuing Brand Dealer Agreement) designated as an Assumable Executory Contract, the Assumption Effective Date shall be the Closing Date and (B) Assumable Executory Contract identified on Section 6.6(a)(ii) of the Sellers' Disclosure Schedule, the Assumption Effective Date shall be a date that is no later than the date set forth with respect to such Executory Contract on Section 6.6(a)(ii) of the Sellers' Disclosure Schedule.  As soon as reasonably practicable following a determination that an Executory Contract shall be designated as an Assumable Executory Contract hereunder, Sellers shall use reasonable best efforts to notify each third party to such Executory Contract of their intention to assume and assign such Executory Contract in accordance with the terms of this Agreement and the Sale Procedures Order.  On the Assumption Effective Date for any Assumable Executory Contract, such Assumable Executory Contract shall be deemed to be a Purchased Contract hereunder.  If it is determined under the procedures set forth in the Sale Procedures Order that Sellers may not assume and assign to Purchaser any Assumable Executory Contract, such Executory Contract shall cease to be an Assumable Executory Contract and shall be an Excluded Contract and a Rejectable Executory Contract.  Except as provided in **Section 6.31**, notwithstanding anything else to the contrary herein, any Executory Contract that has not been specifically designated as an Assumable Executory Contract as of the Executory Contract Designation Deadline applicable to such Executory Contract, including any Deferred Executory Contract, shall automatically be deemed to be a Rejectable Executory Contract and an Excluded Contract hereunder.  Sellers shall have the right, but not the obligation, to reject, at any time, any Rejectable Executory Contract; provided, however, that Sellers shall not reject any Contract that affects both Owned Real Property and Excluded Real Property (whether designated on **Exhibit F** or now or hereafter designated on Section 2.2(b)(v) of the Sellers' Disclosure Schedule), including any such Executory Contract that involves the provision of water, water treatment, electric, fuel, gas, telephone and other utilities to any facilities located at the Excluded Real Property, whether designated on **Exhibit F** or now or hereafter designated on Section 2.2(b)(v) of the Sellers' Disclosure Schedule (the "Shared Executory Contracts"), without the prior written consent of Purchaser.

Section 3.    *Effectiveness of Amendment.*  Upon the execution and delivery hereof, the Purchase Agreement shall thereupon be deemed to be amended and restated as set forth in Section 2, as fully and with the same effect as if such amendments and restatements were originally set forth in the Purchase Agreement.

Section 4.    *Ratification of Purchase Agreement; Incorporation by Reference.*  Except as specifically provided for in this Amendment, the Purchase Agreement is hereby confirmed and ratified in all respects and shall be and remain in full force and effect in accordance with its terms.  This Amendment is subject to all of the terms, conditions and limitations set forth in the Purchase Agreement, including **Article IX** thereof, which sections are hereby incorporated into this Amendment, mutatis mutandis, as if they were set forth in their entirety herein.

*Section 5.* *Counterparts.* This Amendment may be executed in one or more counterparts, each of which shall be deemed an original, and all of which taken together shall constitute one and the same agreement. All signatures of the Parties may be transmitted by facsimile or electronic delivery, and each such facsimile signature or electronic delivery signature (including a pdf signature) will, for all purposes, be deemed to be the original signature of the Party whose signature it reproduces and be binding upon such Party.

[Remainder of page intentionally left blank]

**IN WITNESS WHEREOF,** each of the Parties hereto has caused this Amendment to be executed by its duly authorized officer, in each case as of the date first written above.

GENERAL MOTORS CORPORATION

By: *[signature]*

Name: Frederick A. Henderson
Title:   President and Chief Executive
        Officer

SATURN LLC

By: _____

Name: Jill Lajdziak
Title:   President

SATURN DISTRIBUTION CORPORATION

By: _____

Name: Jill Lajdziak
Title:   President

CHEVROLET-SATURN OF HARLEM, INC.

By: _____

Name: Michael Garrick
Title:   President

NGMCO, INC.

By: _____

Name: Sadiq Malik
Title:   Vice President and Treasurer

**IN WITNESS WHEREOF,** each of the Parties hereto has caused this Amendment to be
executed by its duly authorized officer, in each case as of the date first written above.

GENERAL MOTORS CORPORATION


By: _____
    Name: Frederick A. Henderson
    Title:  President and Chief Executive
            Officer


SATURN LLC


By: _____
    Name: Jill Lajdziak
    Title:  President


SATURN DISTRIBUTION CORPORATION


By: _____
    Name: Jill Lajdziak
    Title:  President


CHEVROLET-SATURN OF HARLEM, INC.


By: _____
    Name: Michael Garrick
    Title:  President


NGM CO, INC.


By: _____
    Name: Sadiq Malik
    Title:  Vice President and Treasurer

IN WITNESS WHEREOF, each of the Parties hereto has caused this Amendment to be executed by its duly authorized officer, in each case as of the date first written above.

GENERAL MOTORS CORPORATION

By: _____
    Name:  Frederick A. Henderson
    Title:   President and Chief Executive
            Officer

SATURN LLC

By: _____
    Name:  Jill Lajdziak
    Title:   President

SATURN DISTRIBUTION CORPORATION

By: _____
    Name:  Jill Lajdziak
    Title:   President

CHEVROLET-SATURN OF HARLEM, INC.

By: _____
    Name:  Michael Garrick
    Title:   President

NGMCO, INC.

By: _____
    Name:  Sadiq Malik
    Title:   Vice President and Treasurer

**IN WITNESS WHEREOF,** each of the Parties hereto has caused this Amendment to be
executed by its duly authorized officer, in each case as of the date first written above.

GENERAL MOTORS CORPORATION

By: _____
    Name:  Frederick A. Henderson
    Title:   President and Chief Executive
           Officer

SATURN LLC

By: _____
    Name:  Jill Lajdziak
    Title:   President

SATURN DISTRIBUTION CORPORATION

By: _____
    Name:  Jill Lajdziak
    Title:   President

CHEVROLET-SATURN OF HARLEM, INC.

By: _____
    Name:  Michael Garrick
    Title:   President

NGMCO, INC.

By: _____
    Name:  Sadiq Malik
    Title:   Vice President and Treasurer

## SECOND AMENDMENT TO AMENDED AND RESTATED MASTER SALE AND PURCHASE AGREEMENT

THIS SECOND AMENDMENT TO AMENDED AND RESTATED MASTER SALE AND PURCHASE AGREEMENT, dated as of July 5, 2009 (this "Amendment"), is made by and among General Motors Corporation, a Delaware corporation ("Parent"), Saturn LLC, a Delaware limited liability company ("S LLC"), Saturn Distribution Corporation, a Delaware corporation ("S Distribution"), Chevrolet-Saturn of Harlem, Inc., a Delaware corporation ("Harlem," and collectively with Parent, S LLC and S Distribution, "Sellers," and each a "Seller"), and NGMCO, Inc., a Delaware corporation and successor-in-interest to Vehicle Acquisition Holdings LLC, a Delaware limited liability company ("Purchaser").

WHEREAS, Sellers and Purchaser have entered into that certain Amended and Restated Master Sale and Purchase Agreement, dated as of June 26, 2009 (as amended, the "Purchase Agreement");

WHEREAS, Sellers and Purchaser have entered into that certain First Amendment to Amended and Restated Master and Purchase Agreement; and

WHEREAS, the Parties desire to amend the Purchase Agreement as set forth herein.

NOW, THEREFORE, in consideration of the foregoing and the mutual agreements contained in this Agreement, and for other good and valuable consideration, the value, receipt and sufficiency of which are acknowledged, the Parties hereby agree as follows:

Section 1.    *Capitalized Terms.*  All capitalized terms used but not defined herein shall have the meanings specified in the Purchase Agreement.

Section 2.    *Amendments to Purchase Agreement.*

(a)    The following new definition of "Advanced Technology Credits" is hereby included in **Section 1.1** of the Purchase Agreement:

"Advanced Technology Credits" has the meaning set forth in **Section 6.36**.

(b)    The following new definition of "Advanced Technology Projects" is hereby included in **Section 1.1** of the Purchase Agreement:

"Advanced Technology Projects" means development, design, engineering and production of advanced technology vehicles and components, including the vehicles known as "the Volt", "the Cruze" and components, transmissions and systems for vehicles employing hybrid technologies.

(c)    The definition of "Ancillary Agreements" is hereby amended and restated in its entirety to read as follows:

"Ancillary Agreements" means the Parent Warrants, the UAW Active Labor Modifications, the UAW Retiree Settlement Agreement, the VEBA Warrant, the Equity Registration Rights Agreement, the Bill of Sale, the Assignment and Assumption Agreement, the Intellectual Property Assignment Agreement, the Transition Services Agreement, the Quitclaim Deeds, the Assignment and Assumption of Real Property Leases, the Assignment and Assumption of Harlem Lease, the Master Lease Agreement, the Subdivision Master Lease (if required), the Saginaw Service Contracts (if required), the Assignment and Assumption of Willow Run Lease, the Ren Cen Lease, the VEBA Note and each other agreement or document executed by the Parties pursuant to this Agreement or any of the foregoing and each certificate and other document to be delivered by the Parties pursuant to **ARTICLE VII**.

(d)    The following new definition of "Excess Estimated Unsecured Claim Amount" is hereby included in **Section 1.1** of the Purchase Agreement:

"Excess Estimated Unsecured Claim Amount" has the meaning set forth in **Section 3.2(c)(i)**.

(e)    The definition of "Permitted Encumbrances" is hereby amended and restated in its entirety to read as follows:

"Permitted Encumbrances" means all (i) purchase money security interests arising in the Ordinary Course of Business; (ii) security interests relating to progress payments created or arising pursuant to government Contracts in the Ordinary Course of Business; (iii) security interests relating to vendor tooling arising in the Ordinary Course of Business; (iv) Encumbrances that have been or may be created by or with the written consent of Purchaser; (v) mechanic's, materialmen's, laborer's, workmen's, repairmen's, carrier's liens and other similar Encumbrances arising by operation of law or statute in the Ordinary Course of Business for amounts that are not delinquent or that are being contested in good faith by appropriate proceedings; (vi) liens for Taxes, the validity or amount of which is being contested in good faith by appropriate proceedings, and statutory liens for current Taxes not yet due, payable or delinquent (or which may be paid without interest or penalties); (vii) with respect to the Transferred Real Property that is Owned Real Property, other than Secured Real Property Encumbrances at and following the Closing: (a) matters that a current ALTA/ACSM survey, or a similar cadastral survey in any country other than the United States, would disclose, the existence of which, individually or in the aggregate, would not materially and adversely interfere with the present use of the affected property; (b) rights of the public, any Governmental Authority and adjoining property owners in streets and highways abutting or adjacent to the applicable Owned Real Property; (c) easements, licenses, rights-of-way, covenants, servitudes, restrictions, encroachments, site plans, subdivision plans and other Encumbrances of public record or that would be disclosed by a current title commitment of the applicable Owned Real Property, which, individually or in the aggregate, would not materially and adversely interfere with the present use

of the applicable Owned Real Property; and (d) such other Encumbrances, the existence of which, individually or in the aggregate, would not materially and adversely interfere with or affect the present use or occupancy of the applicable Owned Real Property; (viii) with respect to the Transferred Real Property that is Leased Real Property: (1) matters that a current ALTA/ACSM survey, or a similar cadastral survey in any country other than the United States, would disclose; (2) rights of the public, any Governmental Authority and adjoining property owners in streets and highways abutting or adjacent to the applicable Leased Real Property; (3) easements, licenses, rights-of-way, covenants, servitudes, restrictions, encroachments, site plans, subdivision plans and other Encumbrances of public record or that would be disclosed by a current title commitment of the applicable Leased Real Property or which have otherwise been imposed on such property by landlords; (ix) in the case of the Transferred Equity Interests, all restrictions and obligations contained in any Organizational Document, joint venture agreement, shareholders agreement, voting agreement and related documents and agreements, in each case, affecting the Transferred Equity Interests; (x) except to the extent otherwise agreed to in the Ratification Agreement entered into by Sellers and GMAC on June 1, 2009 and approved by the Bankruptcy Court on the date thereof or any other written agreement between GMAC or any of its Subsidiaries and any Seller, all Claims (in each case solely to the extent such Claims constitute Encumbrances) and Encumbrances in favor of GMAC or any of its Subsidiaries in, upon or with respect to any property of Sellers or in which Sellers have an interest, including any of the following: (1) cash, deposits, certificates of deposit, deposit accounts, escrow funds, surety bonds, letters of credit and similar agreements and instruments; (2) owned or leased equipment; (3) owned or leased real property; (4) motor vehicles, inventory, equipment, statements of origin, certificates of title, accounts, chattel paper, general intangibles, documents and instruments of dealers, including property of dealers in-transit to, surrendered or returned by or repossessed from dealers or otherwise in any Seller's possession or under its control; (5) property securing obligations of Sellers under derivatives Contracts; (6) rights or property with respect to which a Claim or Encumbrance in favor of GMAC or any of its Subsidiaries is disclosed in any filing made by Parent with the SEC (including any filed exhibit); and (7) supporting obligations, insurance rights and Claims against third parties relating to the foregoing; and (xi) all rights of setoff and/or recoupment that are Encumbrances in favor of GMAC and/or its Subsidiaries against amounts owed to Sellers and/or any of their Subsidiaries with respect to any property of Sellers or in which Sellers have an interest as more fully described in clause (x) above; it being understood that nothing in this clause (xi) or preceding clause (x) shall be deemed to modify, amend or otherwise change any agreement as between GMAC or any of its Subsidiaries and any Seller.

(f)    The following new definition of "Purchaser Escrow Funds" is hereby included in **Section 1.1** of the Purchase Agreement:

"Purchaser Escrow Funds" has the meaning set forth in **Section 2.2(a)(xx)**.

(g)    **Section 2.2(a)(xii)** of the Purchase Agreement is hereby amended and restated in its entirety to read as follows:

(xii)    all credits, Advanced Technology Credits, deferred charges, prepaid expenses, deposits, advances, warranties, rights, guarantees, surety bonds, letters of credit, trust arrangements and other similar financial arrangements, in each case, relating to the Purchased Assets or Assumed Liabilities, including all warranties, rights and guarantees (whether express or implied) made by suppliers, manufacturers, contractors and other third parties under or in connection with the Purchased Contracts;

(h)    **Section 2.2(a)(xviii)** of the Purchase Agreement is hereby amended and restated in its entirety to read as follows:

(xviii) any rights of any Seller, Subsidiary of any Seller or Seller Group member to any Tax refunds, credits or abatements that relate to any Pre-Closing Tax Period or Straddle Period;

(i)    **Section 2.2(a)(xix)** of the Purchase Agreement is hereby amended and restated in its entirety to read as follows:

(xix)    any interest in Excluded Insurance Policies, only to the extent such interest relates to any Purchased Asset or Assumed Liability; and

(j)    A new **Section 2.2(a)(xx)** is hereby added to the Purchase Agreement to read as follows:

(xx)    all cash and cash equivalents, including all marketable securities, held in (1) escrow pursuant to, or as contemplated by that certain letter agreement dated as of June 30, 2009, by and between Parent, Citicorp USA, Inc., as Bank Representative, and Citibank, N.A., as Escrow Agent or (2) any escrow established in contemplation or for the purpose of the Closing, that would otherwise constitute a Purchased Asset pursuant to **Section 2.2(a)(i)** (collectively, "Purchaser Escrow Funds");

(k)    **Section 2.2(b)(i)** of the Purchase Agreement is hereby amended and restated in its entirety to read as follows:

(i)    cash or cash equivalents in an amount equal to $1,175,000,000 (the "Excluded Cash");

(l)    **Section 2.2(b)(ii)** of the Purchase Agreement is hereby amended and restated in its entirety to read as follows:

(ii)    all Restricted Cash exclusively relating to the Excluded Assets or Retained Liabilities, which for the avoidance of doubt, shall not be deemed to include Purchaser Escrow Funds;

(m)    **Section 2.3(a)(viii)** of the Purchase Agreement is hereby amended and restated in its entirety to read as follows:

(viii)    all Liabilities arising under any Environmental Law (A) relating to the Transferred Real Property, other than those Liabilities described in **Section 2.3(b)(iv)**, (B) resulting from Purchaser's ownership or operation of the Transferred Real Property after the Closing or (C) relating to Purchaser's failure to comply with Environmental Laws after the Closing;

(n)    **Section 2.3(a)(xii)** of the Purchase Agreement is hereby amended and restated in its entirety to read as follows:

(xii)    all Liabilities (A) specifically assumed by Purchaser pursuant to **Section 6.17** or (B) arising out of, relating to or in connection with the salaries and/or wages and vacation of all Transferred Employees that are accrued and unpaid (or with respect to vacation, unused) as of the Closing Date;

(o)    **Section 2.3(b)(iv)** of the Purchase Agreement is hereby amended and restated in its entirety to read as follows:

(iv)    all Liabilities (A) associated with noncompliance with Environmental Laws (including for fines, penalties, damages and remedies); (B) arising out of, relating to, in respect of or in connection with the transportation, off-site storage or off-site disposal of any Hazardous Materials generated or located at any Transferred Real Property; (C) arising out of, relating to, in respect of or in connection with third party Claims related to Hazardous Materials that were or are located at or that were Released into the Environment from Transferred Real Property prior to the Closing, except as otherwise required under applicable Environmental Laws; (D) arising under Environmental Laws related to the Excluded Real Property, except as provided under Section 18.2(e) of the Master Lease Agreement or as provided under the "Facility Idling Process" section of Schedule A of the Transition Services Agreement; or (E) for environmental Liabilities with respect to real property formerly owned, operated or leased by Sellers (as of the Closing), which, in the case of clauses (A), (B) and (C), arose prior to or at the Closing, and which, in the case of clause (D) and (E), arise prior to, at or after the Closing;

(p)    **Section 2.3(b)(xii)** of the Purchase Agreement is hereby amended and restated in its entirety to read as follows:

(xii)    all workers' compensation Claims with respect to Employees residing or employed in, as the case may be and as defined by applicable Law, the states set forth on **Exhibit G** (collectively, "Retained Workers' Compensation Claims");

(q)    **Section 3.2(a)** of the Purchase Agreement is hereby amended and restated in its entirety to read as follows:

5

(a)    The purchase price (the "<u>Purchase Price</u>") shall be equal to the sum of:

(i)    a Bankruptcy Code Section 363(k) credit bid in an amount equal to: (A) the amount of Indebtedness of Parent and its Subsidiaries as of the Closing pursuant to the UST Credit Facilities, and (B) the amount of Indebtedness of Parent and its Subsidiaries as of the Closing under the DIP Facility, <u>less</u> $8,247,488,605 of Indebtedness under the DIP Facility (such amount, the "<u>UST Credit Bid Amount</u>");

(ii)    the UST Warrant (which the Parties agree has a value of no less than $1,000);

(iii)    the valid issuance by Purchaser to Parent of (A) 50,000,000 shares of Common Stock (collectively, the "<u>Parent Shares</u>") and (B) the Parent Warrants; and

(iv)    the assumption by Purchaser or its designated Subsidiaries of the Assumed Liabilities.

For the avoidance of doubt, immediately following the Closing, the only indebtedness for borrowed money (or any guarantees thereof) of Sellers and their Subsidiaries to Sponsor, Canada and Export Development Canada is amounts under the Wind Down Facility.

(r)    **Section 3.2(c)** of the Purchase Agreement is hereby amended and restated in its entirety to read as follows:

(c)

(i)    Sellers may, at any time, seek an Order of the Bankruptcy Court (the "<u>Claims Estimate Order</u>"), which Order may be the Order confirming Sellers' Chapter 11 plan, estimating the aggregate allowed general unsecured claims against Sellers' estates. If in the Claims Estimate Order, the Bankruptcy Court makes a finding that the estimated aggregate allowed general unsecured claims against Sellers' estates exceed $35,000,000,000, then Purchaser will, within five (5) Business Days of entry of the Claims Estimate Order, issue additional shares of Common Stock (the "<u>Adjustment Shares</u>") to Parent, as an adjustment to the Purchase Price, based on the extent by which such estimated aggregate general unsecured claims exceed $35,000,000,000 (such amount, the "<u>Excess Estimated Unsecured Claim Amount</u>;" in the event this amount exceeds $7,000,000,000 the Excess Estimated Unsecured Claim Amount will be reduced to a cap of $7,000,000,000).  The number of Adjustment Shares to be issued will be equal to the number of shares, rounded up to the next whole share, calculated by multiplying (i) 10,000,000 shares of Common Stock (adjusted to take into account any stock dividend, stock split, combination of shares, recapitalization, merger, consolidation, reorganization or similar transaction with respect to the

6

Common Stock, effected from and after the Closing and before issuance of the Adjustment Shares) and (ii) a fraction, (A) the numerator of which is Excess Estimated Unsecured Claim Amount (capped at $7,000,000,000) and (B) the denominator of which is $7,000,000,000.

(ii)    At the Closing, Purchaser will have authorized and, thereafter, will reserve for issuance the maximum number of shares of Common Stock issuable as Adjustment Shares.

(s)    **Section 6.9(b)** of the Purchase Agreement is hereby amended and restated in its entirety to read as follows:

(b)    Sellers shall use reasonable best efforts to agree with Sponsor on the terms of a restructuring of $1,175,000,000 of Indebtedness accrued under the DIP Facility (as restructured, the "Wind Down Facility") to provide for such Wind Down Facility to be non-recourse, to accrue payment-in-kind interest at the Eurodollar Rate (as defined in the Wind-Down Facility) plus 300 basis points, to be secured by all assets of Sellers (other than the Parent Shares, Adjustment Shares, Parent Warrants and any securities or proceeds received in respect thereof). Sellers shall use reasonable best efforts to enter into definitive financing agreements with respect to the Wind Down Facility so that such agreements are in effect as promptly as practicable but in any event no later than the Closing.

(t)    **Section 6.17(e)** of the Purchase Agreement is hereby amended and restated in its entirety to read as follows:

(e)    *Assumption of Certain Parent Employee Benefit Plans and Policies*. As of the Closing Date, Purchaser or one of its Affiliates shall assume (i) the Parent Employee Benefit Plans and Policies set forth on Section 6.17(e) of the Sellers' Disclosure Schedule as modified thereon, and all assets, trusts, insurance policies and other Contracts relating thereto, except for any that do not comply in all respects with TARP or as otherwise provided in **Section 6.17(h)** and (ii) all employee benefit plans, programs, policies, agreements or arrangements (whether written or oral) in which Employees who are covered by the UAW Collective Bargaining Agreement participate and all assets, trusts, insurance and other Contracts relating thereto (collectively, the "Assumed Plans"), and Sellers and Purchaser shall cooperate with each other to take all actions and execute and deliver all documents and furnish all notices necessary to establish Purchaser or one of its Affiliates as the sponsor of such Assumed Plans including all assets, trusts, insurance policies and other Contracts relating thereto. Other than with respect to any Employee who was or is covered by the UAW Collective Bargaining Agreement, Purchaser shall have no Liability with respect to any modifications or changes to Benefit Plans contemplated by Section 6.17(e) of the Sellers' Disclosure Schedule, or changes made by Parent prior to the Closing Date, and Purchaser shall not assume any Liability with respect to any such decisions or actions related thereto, and Purchaser shall only assume the Liabilities for benefits provided pursuant to the written terms and conditions of

the Assumed Plan as of the Closing Date. Notwithstanding the foregoing, the assumption of the Assumed Plans is subject to Purchaser taking all necessary action, including reduction of benefits, to ensure that the Assumed Plans comply in all respects with TARP.  Notwithstanding the foregoing, but subject to the terms of any Collective Bargaining Agreement to which Purchaser or one of its Affiliates is a party, Purchaser and its Affiliates may, in its sole discretion, amend, suspend or terminate any such Assumed Plan at any time in accordance with its terms.

(u)    A new **Section 6.17(n)** is hereby added to the Purchase Agreement to read as follows:

(n)    *Harlem Employees*.    With respect to non-UAW employees of Harlem, Purchaser or one of its Affiliates may make offers of employment to such individuals at its discretion.  With respect to UAW-represented employees of Harlem and such other non-UAW employees who accept offers of employment with Purchaser or one of its Affiliates, in addition to obligations under the UAW Collective Bargaining Agreement with respect to UAW-represented employees, Purchaser shall assume all Liabilities arising out of, relating to or in connection with the salaries and/or wages and vacation of all such individuals that are accrued and unpaid (or with respect to vacation, unused) as of the Closing Date. With respect to non-UAW employees of Harlem who accept such offers of employment, Purchaser or one of its Affiliates shall take all actions necessary such that such individuals shall be credited for their actual and credited service with Sellers and each of their respective Affiliates, for purposes of eligibility, vesting and benefit accrual in any employee benefit plans (excluding equity compensation plans or programs) covering such individuals after the Closing; provided, however, that such crediting of service shall not operate to duplicate any benefit to any such individual or the funding for any such benefit. Purchaser or one of its Affiliates, in its sole discretion, may assume certain employee benefit plans maintained by Harlem by delivering written notice (which such notice shall indentify such employee benefit plans of Harlem to be assumed) to Sellers of such assumption on or before the Closing, and upon delivery of such notice, such employee benefit plans shall automatically be deemed to be set forth on Section 6.17(e) of the Sellers' Disclosure Schedules.  All such employee benefit plans that are assumed by Purchaser or one of its Affiliates pursuant to the preceding sentence shall be deemed to be Assumed Plans for purposes of this Agreement.

(v)    A new **Section 6.36** is hereby added to the Purchase Agreement to read as follows:

*Section 6.36  Advanced Technology Credits*.    The Parties agree that Purchaser shall, to the extent permissible by applicable Law (including all rules, regulations and policies pertaining to Advanced Technology Projects), be entitled to receive full credit for expenditures incurred by Sellers prior to the Closing towards Advanced Technology Projects for the purpose of any current or future program sponsored by a Governmental Authority providing financial assistance in

connection with any such project, including any program pursuant to Section 136 of the Energy Independence and Security Act of 2007 ("<u>Advanced Technology Credits</u>"), and acknowledge that the Purchase Price includes and represents consideration for the full value of such expenditures incurred by Sellers.

(w)    **Section 7.2(c)(vi)** of the Purchase Agreement is hereby amended and restated in its entirety to read as follows:

> (vi)    *[Reserved]*;

(x)    **Section 7.2(c)(vii)** of the Purchase Agreement is hereby amended and restated in its entirety to read as follows:

> (vii)    *[Reserved]*;

(y)    **Section 7.3(c)(viii)** of the Purchase Agreement is hereby amended and restated in its entirety to read as follows:

> (viii)    *[Reserved]*;

(z)    **Section 7.3(c)(ix)** of the Purchase Agreement is hereby amended and restated in its entirety to read as follows:

> (ix)    *[Reserved]*;

(aa)    **Section 7.3(f)** of the Purchase Agreement is hereby amended and restated in its entirety to read as follows:

> (f)    Purchaser shall have (i) offset the UST Credit Bid Amount against the amount of Indebtedness of Parent and its Subsidiaries owed to Purchaser as of the Closing under the UST Credit Facilities and the DIP Facility pursuant to a Bankruptcy Code Section 363(k) credit bid and delivered releases and waivers and related Encumbrance-release documentation (including, if applicable, UCC-3 termination statements) with respect to the UST Credit Bid Amount, in a form reasonably satisfactory to the Parties and duly executed by Purchaser in accordance with the applicable requirements in effect on the date hereof, (ii) transferred to Sellers the UST Warrant and (iii) issued to Parent, in accordance with instructions provided by Parent, the Purchaser Shares and the Parent Warrants (duly executed by Purchaser).

(bb)    **<u>Exhibit R</u>** to the Purchase Agreement is hereby deleted in its entirety.

(cc)    **<u>Exhibit S</u>** to the Purchase Agreement is hereby deleted in its entirety.

(dd)    **<u>Exhibit  U</u>** to the Purchase Agreement is hereby replaced in its entirety with **<u>Exhibit U</u>** attached hereto.

(ee)    **Exhibit X** to the Purchase Agreement is hereby replaced in its entirety with **Exhibit X** attached hereto.

(ff)    Section 2.2(b)(iv) of the Sellers' Disclosure Schedule is hereby replaced in its entirety with Section 2.2(b)(iv) of the Sellers' Disclosure Schedule attached hereto.

(gg)    Section 4.4 of the Sellers' Disclosure Schedule is hereby replaced in its entirety with Section 4.4 of the Sellers' Disclosure Schedule attached hereto.

(hh)    Section 6.6(a)(i) of the Sellers' Disclosure Schedule is hereby replaced in its entirety with Section 6.6(a)(i) of the Sellers' Disclosure Schedule attached hereto.

Section 3.    *Effectiveness of Amendment.*    Upon the execution and delivery hereof, the Purchase Agreement shall thereupon be deemed to be amended and restated as set forth in Section 2, as fully and with the same effect as if such amendments and restatements were originally set forth in the Purchase Agreement.

Section 4.    *Ratification of Purchase Agreement; Incorporation by Reference.*    Except as specifically provided for in this Amendment, the Purchase Agreement is hereby confirmed and ratified in all respects and shall be and remain in full force and effect in accordance with its terms.    This Amendment is subject to all of the terms, conditions and limitations set forth in the Purchase Agreement, including **Article IX** thereof, which sections are hereby incorporated into this Amendment, mutatis mutandis, as if they were set forth in their entirety herein.

Section 5.    *Counterparts.* This Amendment may be executed in one or more counterparts, each of which shall be deemed an original, and all of which taken together shall constitute one and the same agreement.    All signatures of the Parties may be transmitted by facsimile or electronic delivery, and each such facsimile signature or electronic delivery signature (including a pdf signature) will, for all purposes, be deemed to be the original signature of the Party whose signature it reproduces and be binding upon such Party.

[Remainder of page intentionally left blank]

IN WITNESS WHEREOF, each of the Parties hereto has caused this Amendment to be executed by its duly authorized officer, in each case as of the date first written above.

GENERAL MOTORS CORPORATION

By: _____

Name: Frederick A. Henderson
Title: President and Chief Executive
Officer

SATURN LLC

By: _____

Name: Jill Lajdziak
Title: President

SATURN DISTRIBUTION CORPORATION

By: _____

Name: Jill Lajdziak
Title: President

CHEVROLET-SATURN OF HARLEM, INC.

By: _____

Name: Michael Garrick
Title: President

NGMCO, INC.

By: _____

Name: Sadiq Malik
Title: Vice President and Treasurer

**IN WITNESS WHEREOF,** each of the Parties hereto has caused this Amendment to be executed by its duly authorized officer, in each case as of the date first written above.

GENERAL MOTORS CORPORATION

By: _____
Name: Frederick A. Henderson
Title: President and Chief Executive
Officer

SATURN LLC

By: _____
Name: Jill Lajdziak
Title: President

SATURN DISTRIBUTION CORPORATION

By: _____
Name: Jill Lajdziak
Title: President

CHEVROLET-SATURN OF HARLEM, INC.

By: _____
Name: Michael Garrick
Title: President

NGM CO, INC.

By: _____
Name: Sadiq Malik
Title: Vice President an Treasurer

IN WITNESS WHEREOF, each of the Parties hereto has caused this Amendment to be executed by its duly authorized officer, in each case as of the date first written above.

GENERAL MOTORS CORPORATION

By: _____
    Name:  Frederick A. Henderson
    Title:   President and Chief Executive
            Officer

SATURN LLC

By: _____
    Name:  Jill Lajdziak
    Title:   President

SATURN DISTRIBUTION CORPORATION

By: _____
    Name:  Jill Lajdziak
    Title:   President

CHEVROLET-SATURN OF HARLEM, INC.

By: _____
    Name:  Michael Garrick
    Title:   President

NGMCO, INC.

By: _____
    Name: Sadiq Malik
    Title:   Vice President and Treasurer

**IN WITNESS WHEREOF,** each of the Parties hereto has caused this Amendment to be executed by its duly authorized officer, in each case as of the date first written above.

GENERAL MOTORS CORPORATION

By: _____
    Name:  Frederick A. Henderson
    Title:   President and Chief Executive
           Officer

SATURN LLC

By: _____
    Name:  Jill Lajdziak
    Title:   President

SATURN DISTRIBUTION CORPORATION

By: _____
    Name:  Jill Lajdziak
    Title:   President

CHEVROLET-SATURN OF HARLEM, INC.

By: _____
    Name:  Michael Garrick
    Title:   President

NGMCO, INC.

By: _____
    Name:  Sadiq Malik
    Title:   Vice President and Treasurer

# Exhibit 2

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-----------------------------------------------------------------x
                                          :
In re                                     :        Chapter 11 Case No.
                                          :
GENERAL MOTORS CORP., et al.,             :        09-50026 (REG)
                                          :
              Debtors.                    :        (Jointly Administered)
                                          :
-----------------------------------------------------------------x
```

### ORDER (I) AUTHORIZING SALE OF ASSETS PURSUANT TO AMENDED AND RESTATED MASTER SALE AND PURCHASE AGREEMENT WITH NGMCO, INC., A U.S. TREASURY-SPONSORED PURCHASER; (II) AUTHORIZING ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES IN CONNECTION WITH THE SALE; AND (III) GRANTING RELATED RELIEF

Upon the motion, dated June 1, 2009 (the "**Motion**"), of General Motors

Corporation ("**GM**") and its affiliated debtors, as debtors in possession (collectively, the

"**Debtors**"), pursuant to sections 105, 363, and 365 of title 11, United States Code (the

"**Bankruptcy Code**") and Rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy

Procedure (the "**Bankruptcy Rules**") for, among other things, entry of an order authorizing and

approving (A) that certain Amended and Restated Master Sale and Purchase Agreement, dated as

of June 26, 2009, by and among GM and its Debtor subsidiaries (collectively, the "**Sellers**") and

NGMCO, Inc., as successor in interest to Vehicle Acquisition Holdings LLC (the "**Purchaser**"),

a purchaser sponsored by the United States Department of the Treasury (the "**U.S. Treasury**"),

together with all related documents and agreements as well as all exhibits, schedules, and

addenda thereto (as amended, the "**MPA**"), a copy of which is annexed hereto as Exhibit "A"

(excluding the exhibits and schedules thereto); (B) the sale of the Purchased Assets[1] to the

---

[1] Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to such terms in the Motion or the MPA.

US_ACTIVE:\43085833\07\43085833_7.DOC\.

Purchaser free and clear of liens, claims, encumbrances, and interests (other than Permitted

Encumbrances), including rights or claims based on any successor or transferee liability; (C) the

assumption and assignment of the Assumable Executory Contracts; (D) the establishment of

certain Cure Amounts; and (E) the UAW Retiree Settlement Agreement (as defined below); and

the Court having jurisdiction to consider the Motion and the relief requested therein in

accordance with 28 U.S.C. §§ 157 and 1334 and the Standing Order M-61 Referring to

Bankruptcy Judges for the Southern District of New York of Any and All Proceedings Under

Title 11, dated July 10, 1984 (Ward, Acting C.J.); and consideration of the Motion and the relief

requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being

proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of

the Motion having been provided in accordance with this Court's Order, dated June 2, 2009 (the

"**Sale Procedures Order**"), and it appearing that no other or further notice need be provided;

and a hearing having been held on June 30 through July 2, 2009, to consider the relief requested

in the Motion (the "**Sale Hearing**"); and upon the record of the Sale Hearing, including all

affidavits and declarations submitted in connection therewith, and all of the proceedings had

before the Court; and the Court having reviewed the Motion and all objections thereto (the

"**Objections**") and found and determined that the relief sought in the Motion is necessary to

avoid immediate and irreparable harm to the Debtors and their estates, as contemplated by

Bankruptcy Rule 6003 and is in the best interests of the Debtors, their estates and creditors, and

other parties in interest and that the legal and factual bases set forth in the Motion establish just

cause for the relief granted herein; and after due deliberation and sufficient cause appearing

therefor, it is

FOUND AND DETERMINED THAT:

A.    The findings and conclusions set forth herein and in the Court's Decision dated July 5, 2009 (the "**Decision**") constitute the Court's findings of fact and conclusions of law pursuant to Fed. R. Bankr. P. 7052, made applicable to this proceeding pursuant to Fed. R. Bankr. P. 9014.

> Formatted: Font: Bold

B.    To the extent any of the following findings of fact or Findings of Fact in the Decision constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law or Conclusions of Law in the Decision constitute findings of fact, they are adopted as such.

C.    This Court has jurisdiction over the Motion, the MPA, and the 363 Transaction pursuant to 28 U.S.C. §§ 157 and 1334, and this matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (N).  Venue of these cases and the Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

D.    The statutory predicates for the relief sought in the Motion are sections 105(a), 363, and 365 of the Bankruptcy Code as supplemented by Bankruptcy Rules 2002, 6004, and 6006.

E.    As evidenced by the affidavits and certificates of service and Publication Notice previously filed with the Court, in light of the exigent circumstances of these chapter 11 cases and the wasting nature of the Purchased Assets and based on the representations of counsel at the Sale Procedures Hearing and the Sale Hearing, (i) proper, timely, adequate, and sufficient notice of the Motion, the Sale Procedures, the 363 Transaction, the procedures for assuming and assigning the Assumable Executory Contracts as described in the Sale Procedures Order and as modified herein (the "**Modified Assumption and Assignment Procedures**"), the UAW Retiree

Settlement Agreement, and the Sale Hearing have been provided in accordance with Bankruptcy

Rules 2002(a), 6004(a), and 6006(c) and in compliance with the Sale Procedures Order; (ii) such

notice was good and sufficient, reasonable, and appropriate under the particular circumstances of

these chapter 11 cases, and reasonably calculated to reach and apprise all holders of liens, claims,

encumbrances, and other interests, including rights or claims based on any successor or

transferee liability, about the Sale Procedures, the sale of the Purchased Assets, the 363

Transaction, and the assumption and assignment of the Assumable Executory Contracts, and to

reach all UAW-Represented Retirees about the UAW Retiree Settlement Agreement and the

terms of that certain Letter Agreement, dated May 29, 2009, between GM, the International

Union, United Automobile, Aerospace and Agricultural Implement Workers of America (the

"**UAW**"), and Stember, Feinstein, Doyle & Payne, LLC (the "**UAW Claims Agreement**")

relating thereto; and (iii) no other or further notice of the Motion, the 363 Transaction, the Sale

Procedures, the Modified Assumption and Assignment Procedures, the UAW Retiree Settlement

Agreement, the UAW Claims Agreement, and the Sale Hearing or any matters in connection

therewith is or shall be required.  With respect to parties who may have claims against the

Debtors, but whose identities are not reasonably ascertainable by the Debtors (including, but not

limited to, potential contingent warranty claims against the Debtors), the Publication Notice was

sufficient and reasonably calculated under the circumstances to reach such parties.

      F.    On June 1, 2009, this Court entered the Sale Procedures Order approving

the Sale Procedures for the Purchased Assets.  The Sale Procedures provided a full, fair, and

reasonable opportunity for any entity to make an offer to purchase the Purchased Assets.  The

Debtors received no bids under the Sale Procedures for the Purchased Assets.  Therefore, the

Purchaser's bid was designated as the Successful Bid pursuant to the Sale Procedures Order.

G.      As demonstrated by (i) the Motion, (ii) the testimony and other evidence proffered or adduced at the Sale Hearing, and (iii) the representations of counsel made on the record at the Sale Hearing, in light of the exigent circumstances presented, (a) the Debtors have adequately marketed the Purchased Assets and conducted the sale process in compliance with the Sale Procedures Order; (b) a reasonable opportunity has been given to any interested party to make a higher or better offer for the Purchased Assets; (c) the consideration provided for in the MPA constitutes the highest or otherwise best offer for the Purchased Assets and provides fair and reasonable consideration for the Purchased Assets; (d) the 363 Transaction is a sale of deteriorating assets and the only alternative to liquidation available for the Debtors; (e) if the 363 Transaction is not approved, the Debtors will be forced to cease operations altogether; (f) the failure to approve the 363 Transaction promptly will lead to systemic failure and dire consequences, including the loss of hundreds of thousands of auto-related jobs; (g) prompt approval of the 363 Transaction is the only means to preserve and maximize the value of the Debtors' assets; (h) the 363 Transaction maximizes fair value for the Debtors' parties in interest; (i) the Debtors are receiving fair value for the assets being sold; (j) the 363 Transaction will provide a greater recovery for the Debtors' creditors than would be provided by any other practical available alternative, including liquidation under chapters 7 or 11 of the Bankruptcy Code; (k) no other entity has offered to purchase the Purchased Assets for greater economic value to the Debtors or their estates; (l) the consideration to be paid by the Purchaser under the MPA exceeds the liquidation value of the Purchased Assets; and (m) the Debtors' determination that the MPA constitutes the highest or best offer for the Purchased Assets and that the 363 Transaction represents a better alternative for the Debtors' parties in interest than an immediate liquidation constitute valid and sound exercises of the Debtors' business judgment.

H.    The actions represented to be taken by the Sellers and the Purchaser are appropriate under the circumstances of these chapter 11 cases and are in the best interests of the Debtors, their estates and creditors, and other parties in interest.

I.    Approval of the MPA and consummation of the 363 Transaction at this time is in the best interests of the Debtors, their creditors, their estates, and all other parties in interest.

J.    The Debtors have demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for the sale of the Purchased Assets pursuant to the 363 Transaction prior to, and outside of, a plan of reorganization and for the immediate approval of the MPA and the 363 Transaction because, among other things, the Debtors' estates will suffer immediate and irreparable harm if the relief requested in the Motion is not granted on an expedited basis.  In light of the exigent circumstances of these chapter 11 cases and the risk of deterioration in the going concern value of the Purchased Assets pending the 363 Transaction, time is of the essence in (i) consummating the 363 Transaction, (ii) preserving the viability of the Debtors' businesses as going concerns, and (iii) minimizing the widespread and adverse economic consequences for the Debtors, their estates, their creditors, employees, the automotive industry, and the national economy that would be threatened by protracted proceedings in these chapter 11 cases.

K.    The consideration provided by the Purchaser pursuant to the MPA (i) is fair and reasonable, (ii) is the highest and best offer for the Purchased Assets, (iii) will provide a greater recovery to the Debtors' estates than would be provided by any other available alternative, and (iv) constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia.

L.      The 363 Transaction must be approved and consummated as promptly as practicable in order to preserve the viability of the business to which the Purchased Assets relate as a going concern.

M.      The MPA was not entered into and none of the Debtors, the Purchaser, or the Purchasers' present or contemplated owners have entered into the MPA or propose to consummate the 363 Transaction for the purpose of hindering, delaying, or defrauding the Debtors' present or future creditors.  None of the Debtors, the Purchaser, nor the Purchaser's present or contemplated owners is entering into the MPA or proposing to consummate the 363 Transaction fraudulently for the purpose of statutory and common law fraudulent conveyance and fraudulent transfer claims whether under the Bankruptcy Code or under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia, or any other applicable jurisdiction with laws substantially similar to any of the foregoing.

N.      In light of the extensive prepetition negotiations culminating in the MPA, the Purchaser's commitment to consummate the 363 Transaction is clear without the need to provide a good faith deposit.

O.      Each Debtor (i) has full corporate power and authority to execute the MPA and all other documents contemplated thereby, and the sale of the Purchased Assets has been duly and validly authorized by all necessary corporate action of each of the Debtors, (ii) has all of the corporate power and authority necessary to consummate the transactions contemplated by the MPA, (iii) has taken all corporate action necessary to authorize and approve the MPA and the consummation by the Debtors of the transactions contemplated thereby, and (iv) subject to entry of this Order, needs no consents or approvals, other than those expressly provided for in the MPA which may be waived by the Purchaser, to consummate such transactions.

US_ACTIVE:\43085833\07\43085833_7.DOC\.                    7

P.     The consummation of the 363 Transaction outside of a plan of

reorganization pursuant to the MPA neither impermissibly restructures the rights of the Debtors'

creditors, allocates or distributes any of the sale proceeds, nor impermissibly dictates the terms of

a liquidating plan of reorganization for the Debtors.  The 363 Transaction does not constitute a

*sub rosa* plan of reorganization.  The 363 Transaction in no way dictates distribution of the

Debtors' property to creditors and does not impinge upon any chapter 11 plan that may be

confirmed.

Q.     The MPA and the 363 Transaction were negotiated, proposed, and entered

into by the Sellers and the Purchaser without collusion, in good faith, and from arm's-length

bargaining positions.  Neither the Sellers, the Purchaser, the U.S. Treasury, nor their respective

agents, officials, personnel, representatives, and advisors, has engaged in any conduct that would

cause or permit the MPA to be avoided under 11 U.S.C. § 363(n).

R.     The Purchaser is a newly-formed Delaware corporation that, as of the date

of the Sale Hearing, is wholly-owned by the U.S. Treasury.  The Purchaser is a good faith

purchaser under section 363(m) of the Bankruptcy Code and, as such, is entitled to all of the

protections afforded thereby.

S.     Neither the Purchaser, the U.S. Treasury, nor their respective agents,

officials, personnel, representatives, or advisors is an "insider" of any of the Debtors, as that term

is defined in section 101(31) of the Bankruptcy Code.

T.     Upon the Closing of the 363 Transaction, the Debtors will transfer to the

Purchaser substantially all of its assets.  In exchange, the Purchaser will provide the Debtors with

(i) cancellation of billions of dollars in secured debt; (ii) assumption by the Purchaser of a

portion of the Debtors' business obligations and liabilities that the Purchaser will satisfy; and (iii)

no less than 10% of the Common Stock of the Purchaser as of the Closing (100% of which the

Debtors' retained financial advisor values at between $38 billion and $48 billion) and warrants to purchase an additional 15% of the Common Stock of the Purchaser as of the Closing, the combination of which the Debtors' retained financial advisor values at between $7.4 billion and $9.8 billion (which amount, for the avoidance of doubt, does not include any amount for the Adjustment Shares).

       U.    The Purchaser, not the Debtors, has determined its ownership composition and capital structure.  The Purchaser will assign ownership interests to certain parties based on the Purchaser's belief that the transfer is necessary to conduct its business going forward, that the transfer is to attain goodwill and consumer confidence for the Purchaser and to increase the Purchaser's sales after completion of the 363 Transaction.  The assignment by the Purchaser of ownership interests is neither a distribution of estate assets, discrimination by the Debtors on account of prepetition claims, nor the assignment of proceeds from the sale of the Debtors' assets.  The assignment of equity to the New VEBA (as defined in the UAW Retiree Settlement Agreement) and 7176384 Canada Inc. is the product of separately negotiated arm's-length agreements between the Purchaser and its equity holders and their respective representatives and advisors.  Likewise, the value that the Debtors will receive on consummation of the 363 Transaction is the product of arm's-length negotiations between the Debtors, the Purchaser, the U.S. Treasury, and their respective representatives and advisors.

       V.    The U.S. Treasury and Export Development Canada ("**EDC**"), on behalf of the Governments of Canada and Ontario, have extended credit to, and acquired a security interest in, the assets of the Debtors as set forth in the DIP Facility and as authorized by the interim and final orders approving the DIP Facility (Docket Nos. 292 and 2529, respectively).  Before entering into the DIP Facility and the Loan and Security Agreement, dated as of December 31, 2008 (the "**Existing UST Loan Agreement**"), the Secretary of the Treasury, in

consultation with the Chairman of the Board of Governors of the Federal Reserve System and as

communicated to the appropriate committees of Congress, found that the extension of credit to

the Debtors is "necessary to promote financial market stability," and is a valid use of funds

pursuant to the statutory authority granted to the Secretary of the Treasury under the Emergency

Economic Stabilization Act of 2008, 12 U.S.C. §§ 5201 et seq. ("**EESA**").  The U.S. Treasury's

extension of credit to, and resulting security interest in, the Debtors, as set forth in the DIP

Facility and the Existing UST Loan Agreement and as authorized in the interim and final orders

approving the DIP Facility, is a valid use of funds pursuant to EESA.

       W.    The DIP Facility and the Existing UST Loan Agreement are loans and

shall not be recharacterized.  The Court has already approved the DIP Facility.  The Existing

UST Loan Agreement bears the undisputed hallmarks of a loan, not an equity investment.

Among other things:

       (i)    The U.S. Treasury structured its prepetition transactions with GM
as (a) a loan, made pursuant to and governed by the Existing UST Loan Agreement, in
addition to (b) a separate, and separately documented, equity component in the form of
warrants;

       (ii)    The Existing UST Loan Agreement has customary terms and
covenants of a loan rather than an equity investment.  For example, the Existing UST
Loan Agreement contains provisions for repayment and pre-payment, and provides for
remedies in the event of a default;

       (iii)    The Existing UST Loan Agreement is secured by first liens
(subject to certain permitted encumbrances) on GM's and the guarantors' equity interests
in most of their domestic subsidiaries and certain of their foreign subsidiaries (limited in
most cases to 65% of the equity interests of the pledged foreign subsidiaries), intellectual
property, domestic real estate (other than manufacturing plants or facilities) inventory
that was not pledged to other lenders, and cash and cash equivalents in the United States;

       (iv)    The U.S. Treasury also received junior liens on certain additional
collateral, and thus, its claim for recovery on such collateral under the Existing UST Loan
Agreement is, in part, junior to the claims of other creditors;

       (v)    the Existing UST Loan Agreement requires the grant of security by
its terms, as well as by separate collateral documents, including:  (a) a guaranty and

security agreement, (b) an equity pledge agreement, (c) mortgages and deeds of trust, and
(d) an intellectual property pledge agreement;

(vi)    Loans under the Existing UST Loan Agreement are interest-
bearing with a rate of 3.00% over the 3-month LIBOR with a LIBOR floor of 2.00%.
The Default Rate on this loan is 5.00% above the non-default rate.

(vii)    The U.S. Treasury always treated the loans under the Existing UST
Loan Agreement as debt, and advances to GM under the Existing Loan Agreement were
conditioned upon GM's demonstration to the United States Government of a viable plan
to regain competitiveness and repay the loans.

(viii)    The U.S. Treasury has acted as a prudent lender seeking to protect
its investment and thus expressly conditioned its financial commitment upon GM's
meaningful progress toward long-term viability.

Other secured creditors of the Debtors also clearly recognized the loans under the Existing UST

Loan Agreement as debt by entering into intercreditor agreements with the U.S. Treasury in

order to set forth the secured lenders' respective prepetition priority.

X.    This Court has previously authorized the Purchaser to credit bid the

amounts owed under both the DIP Facility and the Existing UST Loan Agreement and held the

Purchaser's credit bid to be, for all purposes, a "Qualified Bid" under the Sale Procedures Order.

Y.    The Debtors, the Purchaser, and the UAW, as the exclusive collective

bargaining representative of the Debtors' UAW-represented employees and the authorized

representative of the persons in the Class and the Covered Group (as described in the UAW

Retiree Settlement Agreement) (the "**UAW-Represented Retirees**") under section 1114(c) of

the Bankruptcy Code, engaged in good faith negotiations in conjunction with the 363

Transaction regarding the funding of "retiree benefits" within the meaning of section 1114(a) of

the Bankruptcy Code and related matters.  Conditioned upon the consummation of the 363

Transaction and the approval of the Bankruptcy Court granted in this Order, the Purchaser and

the UAW will enter into that certain Retiree Settlement Agreement, dated as of the Closing Date

(the "**UAW Retiree Settlement Agreement**"), which is Exhibit D to the MPA, which resolves

issues with respect to the provision of certain retiree benefits to UAW-Represented Retirees as

described in the UAW Retiree Settlement Agreement.  As set forth in the UAW Retiree

Settlement Agreement, the Purchaser has agreed to make contributions of cash, stock, and

warrants of the Purchaser to the New VEBA (as defined in the UAW Retiree Settlement

Agreement), which will have the obligation to fund certain health and welfare benefits for the

UAW-Represented Retirees.  The New VEBA will also be funded by the transfer of assets from

the Existing External VEBA and the assets in the UAW Related Account of the Existing Internal

VEBA (each as defined in the UAW Retiree Settlement Agreement).  GM and the UAW, as the

authorized representative of the UAW-Represented Retirees, as well as the representatives for

the class of plaintiffs in a certain class action against GM (the "**Class Representatives**"),

through class counsel, Stemper, Feinstein, Doyle and Payne LLC ("**Class Counsel**"), negotiated

in good faith the UAW Claims Agreement, which requires the UAW and the Class

Representatives to take actions to effectuate the withdrawal of certain claims against the Debtors,

among others, relating to retiree benefits in the event the 363 Transaction is consummated and

the Bankruptcy Court approves, and the Purchaser becomes fully bound by, the UAW Retiree

Settlement Agreement, subject to reinstatement of such claims to the extent of any adverse

impact to the rights or benefits of UAW-Represented Retirees under the UAW Retiree

Settlement Agreement resulting from any reversal or modification of the 363 Transaction, the

UAW Retiree Settlement Agreement, or the approval of the Bankruptcy Court thereof, the

foregoing as subject to the terms of, and as set forth in, the UAW Claims Agreement.

Z.    Effective as of the Closing of  the 363 Transaction, the Debtors will

assume and assign to the Purchaser the UAW Collective Bargaining Agreement and all liabilities

thereunder.  The Debtors, the Purchaser, the UAW and Class Representatives intend that their

actions in connection with the UAW Retiree Settlement Agreement and related undertakings

incorporate the compromise of certain claims and rights and shall be deemed to satisfy the

requirements of 29 U.S.C. § 186(c)(2).

AA.    The transfer of the Purchased Assets to the Purchaser will be a legal, valid,

and effective transfer of the Purchased Assets and, except for the Assumed Liabilities, will vest

the Purchaser with all right, title, and interest of the Sellers to the Purchased Assets free and clear

of liens, claims, encumbrances, and other interests (other than Permitted Encumbrances),

including rights or claims (for purposes of this Order, the term "claim" shall have the meaning

ascribed to such term in section 101(5) of the Bankruptcy Code) based on any successor or

transferee liability, including, but not limited to (i) those that purport to give to any party a right

or option to effect any forfeiture, modification, right of first refusal, or termination of the Sellers'

or the Purchaser's interest in the Purchased Assets, or any similar rights and (ii) (a) those arising

under all mortgages, deeds of trust, security interests, conditional sale or other title retention

agreements, pledges, liens, judgments, demands, encumbrances, rights of first refusal or charges

of any kind or nature, if any, including, but not limited to, any restriction on the use, voting,

transfer, receipt of income, or other exercise of any attributes of ownership and (b) all claims

arising in any way in connection with any agreements, acts, or failures to act, of any of the

Sellers or any of the Sellers' predecessors or affiliates, whether known or unknown, contingent

or otherwise, whether arising prior to or subsequent to the commencement of these chapter 11

cases, and whether imposed by agreement, understanding, law, equity or otherwise, including,

but not limited to, claims otherwise arising under doctrines of successor or transferee liability.

BB.    The Sellers may sell the Purchased Assets free and clear of all liens,

claims, encumbrances, and other interests of any kind or nature whatsoever (other than Permitted

Encumbrances), including rights or claims based on any successor or transferee liability,

because, in each case, one or more of the standards set forth in section 363(f)(1)-(5) of the

Bankruptcy Code has been satisfied.  Those (i) holders of liens, claims, encumbrances, and other

interests, including rights or claims based on any successor or transferee liability, and (ii) non-

Debtor parties to the Assumable Executory Contracts who did not object, or who withdrew their

Objections, to the 363 Transaction or the Motion are deemed to have consented pursuant to

section 363(f)(2) of the Bankruptcy Code.  Those (i) holders of liens, claims, and encumbrances,

and (ii) non-Debtor parties to the Assumable Executory Contracts who did object, fall within one

or more of the other subsections of section 363(f) of the Bankruptcy Code and, to the extent they

have valid and enforceable liens or encumbrances, are adequately protected by having such liens

or encumbrances, if any, attach to the proceeds of the 363 Transaction ultimately attributable to

the property against or in which they assert a lien or encumbrance.  To the extent liens or

encumbrances secure liabilities that are Assumed Liabilities under this Order and the MPA, no

such liens or encumbrances shall attach to the proceeds of the 363 Transaction.

   CC. Under the MPA, GM is transferring all of its right, title, and interest in the

Memphis, TN SPO Warehouse and the White Marsh, MD Allison Transmission Plant (the "**TPC**

**Property**") to the Purchaser pursuant to section 363(f) of the Bankruptcy Code free and clear of

all liens (including, without limitation, the TPC Liens (as hereinafter defined)), claims, interests,

and encumbrances (other than Permitted Encumbrances).  For purposes of this Order, "**TPC**

**Liens**" shall mean and refer to any liens on the TPC Property granted or extended pursuant to the

TPC Participation Agreement and any claims relating to that certain Second Amended and

Restated Participation Agreement and Amendment of Other Operative Documents (the "**TPC**

**Participation Agreement**"), dated as of June 30, 2004, among GM, as Lessee, Wilmington

Trust Company, a Delaware corporation, not in its individual capacity except as expressly stated

herein but solely as Owner Trustee (the "**TPC Trustee**") under GM Facilities Trust No. 1999-I

(the "**TPC Trust**"), as Lessor, GM, as Certificate Holder, Hannover Funding Company LLC, as

CP Lender, Wells Fargo Bank Northwest, N.A., as Agent, Norddeutsche Landesbank Girozentrale (New York Branch), as Administrator, and Deutsche Bank, AG, New York Branch, HSBC Bank USA, ABN AMRO Bank N.V., Royal Bank of Canada, Bank of America, N.A., Citicorp USA, Inc., Merrill Lynch Bank USA, Morgan Stanley Bank, collectively, as Purchasers (collectively, with CP Lender, Agent and Administrator, the "**TPC Lenders**"), together with the Operative Documents (as defined in the TPC Participation Agreements (the "**TPC Operative Documents**").

DD.    The Purchaser would not have entered into the MPA and would not consummate the 363 Transaction (i) if the sale of the Purchased Assets was not free and clear of all liens, claims, encumbrances, and other interests (other than Permitted Encumbrances), including rights or claims based on any successor or transferee liability or (ii) if the Purchaser would, or in the future could, be liable for any such liens, claims, encumbrances, and other interests, including rights or claims based on any successor or transferee liability (collectively, the "**Retained Liabilities**"), other than, in each case, the Assumed Liabilities.  The Purchaser will not consummate the 363 Transaction unless this Court expressly orders that none of the Purchaser, its affiliates, their present or contemplated members or shareholders (other than the Debtors as the holder of equity in the Purchaser), or the Purchased Assets will have any liability whatsoever with respect to, or be required to satisfy in any manner, whether at law or equity, or by payment, setoff, or otherwise, directly or indirectly, any liens, claims, encumbrances, and other interests, including rights or claims based on any successor or transferee liability or Retained Liabilities, other than as expressly provided herein or in agreements made by the Debtors and/or the Purchaser on the record at the Sale Hearing or in the MPA.

EE.    The Debtors have demonstrated that it is an exercise of their sound business judgment to assume and assign the Purchased Contracts to the Purchaser in connection

with the consummation of the 363 Transaction, and the assumption and assignment of the

Purchased Contracts is in the best interests of the Debtors, their estates and creditors, and other

parties in interest.  The Purchased Contracts being assigned to, and the liabilities being assumed

by, the Purchaser are an integral part of the Purchased Assets being purchased by the Purchaser,

and, accordingly, such assumption and assignment of the Purchased Contracts and liabilities are

reasonable, enhance the value of the Debtors' estates, and do not constitute unfair discrimination.

> FF.    For the avoidance of doubt, and notwithstanding anything else in this

Order to the contrary:

- The Debtors are neither assuming nor assigning to the Purchaser the agreement to provide certain retiree medical benefits specified in (i) the Memorandum of Understanding Post-Retirement Medical Care, dated September 26, 2007, between the Company and the UAW, and (ii) the Settlement Agreement, dated February 21, 2008, between the Company and the UAW (together, the "**VEBA Settlement Agreement**");

- at the Closing, and in accordance with the MPA, the UAW Collective Bargaining Agreement, and all liabilities thereunder, shall be assumed by the Debtors and assigned to the Purchaser pursuant to section 365 of the Bankruptcy Code.  Assumption and assignment of the UAW Collective Bargaining Agreement is integral to the 363 Transaction and the MPA, are in the best interests of the Debtors and their estates, creditors, employees, and retirees, and represent the exercise of the Debtors' sound business judgment, enhances the value of the Debtors' estates, and does not constitute unfair discrimination;

- the UAW, as the exclusive collective bargaining representative of employees of the Purchaser and the "authorized representative" of the UAW-Represented Retirees under section 1114(c) of the Bankruptcy Code, GM, and the Purchaser engaged in good faith negotiations in conjunction with the 363 Transaction regarding the funding of retiree health benefits within the meaning of section 1114(a) of the Bankruptcy Code.  Conditioned upon the consummation of the 363 Transaction, the UAW and the Purchaser have entered into the UAW Retiree Settlement Agreement, which, among other things, provides for the financing by the Purchaser of modified retiree health care obligations for the Class and Covered Group (as defined in the UAW Retiree Settlement Agreement) through contributions by the Purchaser (as referenced in paragraph Y herein).  The New VEBA will also be funded by the transfer of the UAW Related Account from the Existing Internal VEBA and the assets of the Existing External VEBA to the New VEBA (each as defined in the UAW Retiree Settlement Agreement).  The Debtors, the

Purchaser, and the UAW specifically intend that their actions in connection
with the UAW Retiree Settlement Agreement and related undertakings
incorporate the compromise of certain claims and rights and shall be deemed
to satisfy the requirements of 29 U.S.C. § 186(c)(2);

- the Debtors' sponsorship of the Existing Internal VEBA (as defined in the
UAW Retiree Settlement Agreement) shall be transferred to the Purchaser
under the MPA.

GG.    The Debtors have (i) cured and/or provided adequate assurance of cure
(through the Purchaser) of any default existing prior to the date hereof under any of the
Purchased Contracts that have been designated by the Purchaser for assumption and assignment
under the MPA, within the meaning of section 365(b)(1)(A) of the Bankruptcy Code, and (ii)
provided compensation or adequate assurance of compensation through the Purchaser to any
party for any actual pecuniary loss to such party resulting from a default prior to the date hereof
under any of the Purchased Contracts, within the meaning of section 365(b)(1)(B) of the
Bankruptcy Code, and the Purchaser has provided adequate assurance of future performance
under the Purchased Contracts, within the meaning of section 365(b)(1)(C) of the Bankruptcy
Code.  The Modified Assumption and Assignment Procedures are fair, appropriate, and effective
and, upon the payment by the Purchaser of all Cure Amounts (as hereinafter defined) and
approval of the assumption and assignment for a particular Purchased Contract thereunder, the
Debtors shall be forever released from any and all liability under the Purchased Contracts.

HH.    The Debtors are the sole and lawful owners of the Purchased Assets, and
no other person has any ownership right, title, or interest therein.  The Debtors' non-Debtor
Affiliates have acknowledged and agreed to the 363 Transaction and, as required by, and in
accordance with, the MPA and the Transition Services Agreement, transferred any legal,
equitable, or beneficial right, title, or interest they may have in or to the Purchased Assets to the
Purchaser.

II.    The Debtors currently maintain certain privacy policies that govern the use

of "personally identifiable information" (as defined in section 101(41A) of the Bankruptcy Code)

in conducting their business operations.  The 363 Transaction may contemplate the transfer of

certain personally identifiable information to the Purchaser in a manner that may not be

consistent with certain aspects of their existing privacy policies.  Accordingly, on June 2, 2009,

the Court directed the U.S. Trustee to promptly appoint a consumer privacy ombudsman in

accordance with section 332 of the Bankruptcy Code, and such ombudsman was appointed on

June 10, 2009.  The Privacy Ombudsman is a disinterested person as required by section 332(a)

of the Bankruptcy Code.  The Privacy Ombudsman filed his report with the Court on July 1,

2009 (Docket No. 2873) (the "**Ombudsman Report**") and presented his report at the Sale

Hearing, and the Ombudsman Report has been reviewed and considered by the Court.  The Court

has given due consideration to the facts, including the exigent circumstances surrounding the

conditions of the sale of personally identifiable information in connection with the 363

Transaction.  No showing has been made that the sale of personally identifiable information in

connection with the 363 Transaction in accordance with the provisions of this Order violates

applicable nonbankruptcy law, and the Court concludes that such sale is appropriate in

conjunction with the 363 Transaction.

JJ.    Pursuant to Section 6.7(a) of the MPA, GM offered Wind-Down

Agreements and Deferred Termination Agreements (collectively, the "**Deferred Termination**

**Agreements**") in forms prescribed by the MPA to franchised motor vehicle dealers, including

dealers authorized to sell and service vehicles marketed under the Pontiac brand (which is being

discontinued), dealers authorized to sell and service vehicles marketed under the Hummer,

Saturn and Saab brands (which may or may not be discontinued depending on whether the

brands are sold to third parties) and dealers authorized to sell and service vehicles marketed

under brands which will be continued by the Purchaser.  The Deferred Termination Agreements

were offered as an alternative to rejection of the existing Dealer Sales and Service Agreements of

these dealers pursuant to section 365 of the Bankruptcy Code and provide substantial additional

benefits to dealers which enter into such agreements.  Approximately 99% of the dealers offered

Deferred Termination Agreements accepted and executed those agreements and did so for good

and sufficient consideration.

KK.    Pursuant to Section 6.7(b) of the MPA, GM offered Participation

Agreements in the form prescribed by the MPA to dealers identified as candidates for a long

term relationship with the Purchaser.  The Participation Agreements provide substantial benefits

to accepting dealers, as they grant the opportunity for such dealers to enter into a potentially

valuable relationship with the Purchaser as a component of a reduced and more efficient dealer

network.  Approximately 99% of the dealers offered Participation Agreements accepted and

executed those agreements.

LL.    This Order constitutes approval of the UAW Retiree Settlement

Agreement and the compromise and settlement embodied therein.

MM.    This Order constitutes a final order within the meaning of 28 U.S.C. §

158(a).  Consistent with Bankruptcy Rules 6004(h) and 6006(d), the Court expressly finds that

there is no just reason for delay in the implementation of this Order to the full extent to which

those rules provide, but that its Order should not become effective instantaneously.  Thus the

Court will shorten, but not wholly eliminate, the periods set forth in Fed.R.Bankr.P. 6004(h) and

6006, and expressly directs entry of judgment as set forth in accordance with the provisions of

Paragraph 70 below.

NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND

DECREED THAT:

**Deleted:** Notwithstanding

**Deleted:** herein

**General Provisions**

1.       The Motion is granted as provided herein, and entry into and performance under, and in respect of, the MPA and the 363 Transaction is approved.

2.       All Objections to the Motion or the relief requested therein that have not been withdrawn, waived, settled, or resolved, and all reservation of rights included in such Objections, are overruled on the merits other than a continuing Objection (each a "**Limited Contract Objection**") that does not contest or challenge the merits of the 363 Transaction and that is limited to (a) contesting a particular Cure Amount(s) (a "**Cure Objection**"), (b) determining whether a particular Assumable Executory Contract is an executory contract that may be assumed and/or assigned under section 365 of the Bankruptcy Code, and/or (c) challenging, as to a particular Assumable Executory Contract, whether the Debtors have assumed, or are attempting to assume, such contract in its entirety or whether the Debtors are seeking to assume only part of such contract.  A Limited Contract Objection shall include, until resolved, a dispute regarding any Cure Amount that is subject to resolution by the Bankruptcy Court , or pursuant to the dispute resolution procedures established by the Sale Procedures Order or pursuant to agreement of the parties, including agreements under which an objection to the Cure Amount was withdrawn in connection with a reservation of rights under such dispute resolution procedures.  Limited Contract Objections shall not constitute objections to the 363 Transaction, and to the extent such Limited Contract Objections remain continuing objections to be resolved before the Court, the hearing to consider each such Limited Contract Objection shall be adjourned to August 3, 2009 at 9:00a.m. (the "**Limited Contract Objection Hearing**"). Within two (2) business days of the entry of this Order, the Debtors shall serve upon each of the counterparties to the remaining Limited Contract Objections a notice of the Limited Contract Objection Hearing.  The Debtors or any party that withdraws, or has withdrawn, a Limited

| Deleted: July __ |
| Deleted: __:__ _. |

Contract Objection without prejudice shall have the right, unless it has agreed otherwise, to

schedule the hearing to consider a Limited Contract Objection on not less than fifteen (15) days

notice to the Debtors, the counterparties to the subject Assumable Executory Contracts, the

Purchaser, and the Creditors' Committee, or within such other time as otherwise may be agreed

by the parties.

### Approval of the MPA

3.     The MPA, all transactions contemplated thereby, and all the terms and

conditions thereof (subject to any modifications contained herein) are approved.  If there is any

conflict between the MPA, the Sale Procedures Order, and this Order, this Order shall govern.

4.     Pursuant to sections 105, 363, and 365 of the Bankruptcy Code, the

Debtors are authorized to perform their obligations under, and comply with the terms of, the

MPA and consummate the 363 Transaction pursuant to, and in accordance with, the terms and

provisions of the MPA and this Order.

5.     The Debtors are authorized and directed to execute and deliver, and

empowered to perform under, consummate, and implement, the MPA, together with all

additional instruments and documents that the Sellers or the Purchaser deem necessary or

appropriate to implement the MPA and effectuate the 363 Transaction, and to take all further

actions as may reasonably be required by the Purchaser for the purpose of assigning, transferring,

granting, conveying, and conferring to the Purchaser or reducing to possession the Purchased

Assets or as may be necessary or appropriate to the performance of the obligations as

contemplated by the MPA.

6.     This Order and the MPA shall be binding in all respects upon the Debtors,

their affiliates, all known and unknown creditors of, and holders of equity security interests in,

any Debtor, including any holders of liens, claims, encumbrances, or other interests, including

rights or claims based on any successor or transferee liability, all non-Debtor parties to the

Assumable Executory Contracts, all successors and assigns of the Purchaser, each Seller and

their Affiliates and subsidiaries, the Purchased Assets, all interested parties, their successors and

assigns, and any trustees appointed in the Debtors' chapter 11 cases or upon a conversion of any

of such cases to cases under chapter 7 of the Bankruptcy Code and shall not be subject to

rejection.  Nothing contained in any chapter 11 plan confirmed in any of the Debtors' chapter 11

cases or the order confirming any such chapter 11 plan shall conflict with or derogate from the

provisions of the MPA or this Order.

### Transfer of Purchased Assets Free and Clear

7.    Except for the Assumed Liabilities, pursuant to sections 105(a) and 363(f)

of the Bankruptcy Code, the Purchased Assets shall be transferred to the Purchaser in accordance

with the MPA, and, upon the Closing, shall be free and clear of all liens, claims, encumbrances,

and other interests of any kind or nature whatsoever (other than Permitted Encumbrances),

including rights or claims based on any successor or transferee liability, and all such liens,

claims, encumbrances, and other interests, including rights or claims based on any successor or

transferee liability, shall attach to the net proceeds of the 363 Transaction in the order of their

priority, with the same validity, force, and effect that they now have as against the Purchased

Assets, subject to any claims and defenses a Seller or any other party in interest may possess

with respect thereto.

8.    Except as expressly permitted or otherwise specifically provided by the

MPA or this Order, all persons and entities, including, but not limited to, all debt security

holders, equity security holders, governmental, tax, and regulatory authorities, lenders, trade

creditors, dealers, employees, litigation claimants, and other creditors, holding liens, claims,

encumbrances, and other interests of any kind or nature whatsoever, including rights or claims

based on any successor or transferee liability, against or in a Seller or the Purchased Assets

(whether legal or equitable, secured or unsecured, matured or unmatured, contingent or

noncontingent, senior or subordinated), arising under or out of, in connection with, or in any way

relating to, the Sellers, the Purchased Assets, the operation of the Purchased Assets prior to the

Closing, or the 363 Transaction, are forever barred, estopped, and permanently enjoined (with

respect to future claims or demands based on exposure to asbestos, to the fullest extent

constitutionally permissible) from asserting against the Purchaser, its successors or assigns, its

property, or the Purchased Assets, such persons' or entities' liens, claims, encumbrances, and

other interests, including rights or claims based on any successor or transferee liability.

> 9.      This Order (a) shall be effective as a determination that, as of the Closing,

(i) no claims other than Assumed Liabilities, will be assertable against the Purchaser, its

affiliates, their present or contemplated members or shareholders, successors, or assigns, or any

of their respective assets (including the Purchased Assets); (ii) the Purchased Assets shall have

been transferred to the Purchaser free and clear of all claims (other than Permitted

Encumbrances); and (iii) the conveyances described herein have been effected; and (b) is and

shall be binding upon and govern the acts of all entities, including, without limitation, all filing

agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds,

registrars of deeds, registrars of patents, trademarks, or other intellectual property, administrative

agencies, governmental departments, secretaries of state, federal and local officials, and all other

persons and entities who may be required by operation of law, the duties of their office, or

contract, to accept, file, register, or otherwise record or release any documents or instruments, or

who may be required to report or insure any title or state of title in or to any lease; and each of

the foregoing persons and entities is directed to accept for filing any and all of the documents

and instruments necessary and appropriate to consummate the transactions contemplated by the

MPA.

10.     The transfer of the Purchased Assets to the Purchaser pursuant to the MPA

constitutes a legal, valid, and effective transfer of the Purchased Assets and shall vest the

Purchaser with all right, title, and interest of the Sellers in and to the Purchased Assets free and

clear of all liens, claims, encumbrances, and other interests of any kind or nature whatsoever

(other than Permitted Encumbrances), including rights or claims based on any successor or

transferee liability, other than the Assumed Liabilities.

11.     On the Closing of the 363 Transaction, each of the Sellers' creditors and

any other holder of a lien, claim, encumbrance, or other interest, is authorized and directed to

execute such documents and take all other actions as may be necessary to release its lien, claim,

encumbrance (other than Permitted Encumbrances), or other interest in the Purchased Assets, if

any, as such lien, claim, encumbrance, or other interest may have been recorded or may

otherwise exist.

12.     If any person or entity that has filed financing statements, mortgages,

mechanic's liens, lis pendens, or other documents or agreements evidencing a lien, claim,

encumbrance, or other interest in the Sellers or the Purchased Assets (other than Permitted

Encumbrances) shall not have delivered to the Sellers prior to the Closing, in proper form for

filing and executed by the appropriate parties, termination statements, instruments of satisfaction,

releases of all liens, claims, encumbrances, or other interests, which the person or entity has with

respect to the Sellers or the Purchased Assets or otherwise, then (a) the Sellers are authorized and

directed to execute and file such statements, instruments, releases, and other documents on

behalf of the person or entity with respect to the Sellers or the Purchased Assets, and (b) the

Purchaser is authorized to file, register, or otherwise record a certified copy of this Order, which

shall constitute conclusive evidence of the release of all liens, claims, encumbrances, and other

interests of any kind or nature whatsoever in the Sellers or the Purchased Assets.

13.    All persons or entities in possession of any of the Purchased Assets are

directed to surrender possession of such Purchased Assets to the Purchaser or its respective

designees at the time of Closing of the 363 Transaction.

14.    Following the Closing of the 363 Transaction, no holder of any lien,

claim, encumbrance, or other interest (other than Permitted Encumbrances) shall interfere with

the Purchaser's title to, or use and enjoyment of, the Purchased Assets based on, or related to,

any such lien, claim, encumbrance, or other interest, or based on any actions the Debtors may

take in their chapter 11 cases.

15.    All persons and entities are prohibited and enjoined from taking any action

to adversely affect or interfere with the ability of the Debtors to transfer the Purchased Assets to

the Purchaser in accordance with the MPA and this Order; *provided, however*, that the foregoing

restriction shall not prevent any person or entity from appealing this Order or opposing any

appeal of this Order.

16.    To the extent provided by section 525 of the Bankruptcy Code, no

governmental unit may deny, revoke, suspend, or refuse to renew any permit, license, or similar

grant relating to the operation of the Purchased Assets sold, transferred, or conveyed to the

Purchaser on account of the filing or pendency of these chapter 11 cases or the consummation of

the 363 Transaction contemplated by the MPA.

17.    From and after the Closing, the Purchaser shall comply with the

certification, reporting, and recall requirements of the National Traffic and Motor Vehicle Safety

Act, as amended and recodified, including by the Transportation Recall Enhancement,

Accountability and Documentation Act, the Clean Air Act, the California Health and Safety

Code, and similar Laws, in each case, to the extent applicable in respect of motor vehicles, vehicles, motor vehicle equipment, and vehicle parts manufactured or distributed by the Sellers prior to the Closing.

18.    Notwithstanding anything to the contrary in this Order or the MPA, (a) any Purchased Asset that is subject to any mechanic's, materialman's, laborer's, workmen's, repairman's, carrier's liens and other similar Encumbrances arising by operation of law or statute in the Ordinary Course of Business for amounts that are not delinquent or that are being contested in good faith by appropriate proceedings, or any lien for Taxes, the validity or amount of which is being contested in good faith by appropriate proceedings, and statutory liens for current Taxes not yet due, payable, or delinquent (or which may be paid without interest or penalties) shall continue to be subject to such lien after the Closing Date if and to the extent that such lien (i) is valid, perfected and enforceable as of the Commencement Date (or becomes valid, perfected and enforceable after the Commencement Date as permitted by section 546(b) or 362(b)(18) of the Bankruptcy Code), (ii) could not be avoided by any Debtor under sections 544 to 549, inclusive, of the Bankruptcy Code or otherwise, were the Closing not to occur; and (iii) the Purchased Asset subject to such lien could not be sold free and clear of such lien under applicable non-bankruptcy law, and (b) any Liability as of the Closing Date that is secured by a lien described in clause (a) above (such lien, a "**Continuing Lien**") that is not otherwise an Assumed Liability shall constitute an Assumed Liability with respect to which there shall be no recourse to the Purchaser or any property of the Purchaser other than recourse to the property subject to such Continuing Lien. The Purchased Assets are sold free and clear of any reclamation rights, *provided, however,* that nothing, in this Order or the MPA shall in any way impair the right of any claimant against the Debtors with respect to any alleged reclamation right to the extent such reclamation right is not subject to the prior rights of a holder of a security interest in

the goods or proceeds with respect to which such reclamation right is alleged, or impair the

ability of a claimant to seek adequate protection against the Debtors with respect to any such

alleged reclamation right. Further, nothing in this Order or the MPA shall prejudice any rights,

defenses, objections or counterclaims that the Debtors, the Purchaser, the U.S. Treasury, EDC,

the Creditors' Committee or any other party in interest may have with respect to the validity or

priority of such asserted liens or rights, or with respect to any claim for adequate protection.

### Approval of the UAW Retiree Settlement Agreement

19.     The UAW Retiree Settlement Agreement, the transactions contemplated

therein, and the terms and conditions thereof, are fair, reasonable, and in the best interests of the

retirees, and are approved.  The Debtors, the Purchaser, and the UAW are authorized and

directed to perform their obligations under, or in connection with, the implementation of the

UAW Retiree Settlement Agreement and to comply with the terms of the UAW Retiree

Settlement Agreement, including the obligation of the Purchaser to reimburse the UAW for

certain expenses relating to the 363 Transaction and the transition to the New VEBA

arrangements.  The amendments to the Trust Agreement (as defined in the UAW Retiree

Settlement Agreement) set forth on Exhibit E to the UAW Retiree Settlement Agreement, are

approved, and the Trust Agreement is reformed accordingly.

20.     In accordance with the terms of the UAW Retiree Settlement Agreement,

(I) as of the Closing, there shall be no requirement to amend the Pension Plan as set forth in

section 15 of the Henry II Settlement (as such terms are defined in the UAW Retiree Settlement

Agreement); (II) on the later of December 31, 2009, or the Closing of the 363 Transaction (the

"**Implementation Date**"), (i) the committee and the trustees of the Existing External VEBA (as

defined in the UAW Retiree Settlement Agreement) are directed to transfer to the New VEBA all

assets and liabilities of the Existing External VEBA and to terminate the Existing External

VEBA within fifteen (15) days thereafter, as provided under Section 12.C of the UAW Retiree

Settlement Agreement, (ii) the trustee of the Existing Internal VEBA is directed to transfer to the

New VEBA the UAW Related Account's share of assets in the Existing Internal VEBA within

ten (10) business days thereafter as provided in Section 12.B of the UAW Retiree Settlement

Agreement, and, upon the completion of such transfer, the Existing Internal VEBA shall be

deemed to be amended to terminate participation and coverage regarding Retiree Medical

Benefits for the Class and the Covered Group, effective as of the Implementation Date (each as

defined in the UAW Retiree Settlement Agreement); and (III) all obligations of the Purchaser

and the Sellers to provide Retiree Medical Benefits to members of the Class and Covered Group

shall be governed by the UAW Retiree Settlement Agreement, and, in accordance with section

5.D of the UAW Retiree Settlement Agreement, all provisions of the Purchaser's Plan relating to

Retiree Medical Benefits for the Class and/or the Covered Group shall terminate as of the

Implementation Date or otherwise be amended so as to be consistent with the UAW Retiree

Settlement Agreement (as each term is defined in the UAW Retiree Settlement Agreement), and

the Purchaser shall not thereafter have any such obligations as set forth in Section 5.D of the

UAW Retiree Settlement Agreement.

### Approval of GM's Assumption of the UAW Claims Agreement

21.    Pursuant to section 365 of the Bankruptcy Code, GM's assumption of the

UAW Claims Agreement is approved, and GM, the UAW, and the Class Representatives are

authorized and directed to perform their obligations under, or in connection with, the

implementation of the UAW Claims Agreement and comply with the terms of the UAW Claims

Agreement.

**Assumption and Assignment to the Purchaser of Assumable Executory Contracts**

22.     Pursuant to sections 105(a), 363, and 365 of the Bankruptcy Code and subject to and conditioned upon (a) the Closing of the 363 Transaction, (b) the occurrence of the Assumption Effective Date, and (c) the resolution of any relevant Limited Contract Objections, other than a Cure Objection, by order of this Court overruling such objection or upon agreement of the parties, the Debtors' assumption and assignment to the Purchaser of each Assumable Executory Contract (including, without limitation, for purposes of this paragraph 22) the UAW Collective Bargaining Agreement) is approved, and the requirements of section 365(b)(1) of the Bankruptcy Code with respect thereto are deemed satisfied.

23.     The Debtors are authorized and directed in accordance with sections 105(a) and 365 of the Bankruptcy Code to (i) assume and assign to the Purchaser, effective as of the Assumption Effective Date, as provided by, and in accordance with, the Sale Procedures Order, the Modified Assumption and Assignment Procedures, and the MPA, those Assumable Executory Contracts that have been designated by the Purchaser for assumption pursuant to sections 6.6 and 6.31 of the MPA and that are not subject to a Limited Contract Objection other than a Cure Objection, free and clear of all liens, claims, encumbrances, or other interests of any kind or nature whatsoever (other than Permitted Encumbrances), including rights or claims based on any successor or transferee liability, other than the Assumed Liabilities, and (ii) execute and deliver to the Purchaser such documents or other instruments as the Purchaser reasonably deems may be necessary to assign and transfer such Assumable Executory Contracts and Assumed Liabilities to the Purchaser.  The Purchaser shall Promptly Pay (as defined below) the following (the "**Cure Amount**"):  (a) all amounts due under such Assumable Executory Contract as of the Commencement Date as reflected on the website established by the Debtors (the "**Contract Website**"), which is referenced and is accessible as set forth in the Assumption and Assignment

Notice or as otherwise agreed to in writing by an authorized officer of the parties (for this purpose only, Susanna Webber shall be deemed an authorized officer of the Debtors) (the "**Prepetition Cure Amount**"), less amounts, if any, paid after the Commencement Date on account of the Prepetition Cure Amount (such net amount, the "**Net Prepetition Cure Amount**"), plus (b) any such amount past due and owing as of the Assumption Effective Date, as required under the Modified Assumption and Assignment Procedures, exclusive of the Net Prepetition Cure Amount.  For the avoidance of doubt, all of the Debtors' rights to assert credits, chargebacks, setoffs, rebates, and other claims under the Purchased Contracts are purchased by and assigned to the Purchaser as of the Assumption Effective Date.  As used herein, "**Promptly Pay**" means (i) with respect to any Cure Amount (or portion thereof, if any) which is undisputed, payment as soon as reasonably practicable, but not later than five (5) business days after the Assumption Effective Date, and (ii) with respect to any Cure Amount (or portion thereof, if any) which is disputed, payment as soon as reasonably practicable, but not later than five (5) business days after such dispute is resolved or such later date upon agreement of the parties and, in the event Bankruptcy Court approval is required, upon entry of a final order of the Bankruptcy Court.  On and after the Assumption Effective Date, the Purchaser shall (i) perform any nonmonetary defaults that are required under section 365(b) of the Bankruptcy Code; *provided* that such defaults are undisputed or directed by this Court and are timely asserted under the Modified Assumption and Assignment Procedures, and (ii) pay all undisputed obligations and perform all obligations that arise or come due under each Assumable Executory Contract in the ordinary course.  Notwithstanding any provision in this Order to the contrary, the Purchaser shall not be obligated to pay any Cure Amount or any other amount due with respect to any Assumable Executory Contract before such amount becomes due and payable under the applicable payment terms of such Contract.

US_ACTIVE:\43085833\07\43085833_7.DOC\.                    30

24.     The Debtors shall make available a writing, acknowledged by the

Purchaser, of the assumption and assignment of an Assumable Executory Contract and the

effective date of such assignment (which may be a printable acknowledgment of assignment on

the Contract Website). The Assumable Executory Contracts shall be transferred and assigned to,

pursuant to the Sale Procedures Order and the MPA, and thereafter remain in full force and

effect for the benefit of, the Purchaser, notwithstanding any provision in any such Assumable

Executory Contract (including those of the type described in sections 365(b)(2), (e)(1), and (f) of

the Bankruptcy Code) that prohibits, restricts, or conditions such assignment or transfer and,

pursuant to section 365(k) of the Bankruptcy Code, the Sellers shall be relieved from any further

liability with respect to the Assumable Executory Contracts after such assumption and

assignment to the Purchaser. Except as may be contested in a Limited Contract Objection, each

Assumable Executory Contract is an executory contract or unexpired lease under section 365 of

the Bankruptcy Code and the Debtors may assume each of their respective Assumable Executory

Contracts in accordance with section 365 of the Bankruptcy Code. Except as may be contested

in a Limited Contract Objection other than a Cure Objection, the Debtors may assign each

Assumable Executory Contract in accordance with sections 363 and 365 of the Bankruptcy

Code, and any provisions in any Assumable Executory Contract that prohibit or condition the

assignment of such Assumable Executory Contract or terminate, recapture, impose any penalty,

condition renewal or extension, or modify any term or condition upon the assignment of such

Assumable Executory Contract, constitute unenforceable antiassignment provisions which are

void and of no force and effect in connection with the transactions contemplated hereunder. All

other requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the

assumption by the Debtors and assignment to the Purchaser of each Assumable Executory

Contract have been satisfied, and, pursuant to section 365(k) of the Bankruptcy Code, the

Debtors are hereby relieved from any further liability with respect to the Assumable Executory

Contracts, including, without limitation, in connection with the payment of any Cure Amounts

related thereto which shall be paid by the Purchaser.  At such time as provided in the Sale

Procedures Order and the MPA, in accordance with sections 363 and 365 of the Bankruptcy

Code, the Purchaser shall be fully and irrevocably vested in all right, title, and interest of each

Purchased Contract.  With respect to leases of personal property that are true leases and not

subject to recharacterization, nothing in this Order or the MPA shall transfer to the Purchaser an

ownership interest in any leased property not owned by a Debtor.  Any portion of any of the

Debtors' unexpired leases of nonresidential real property that purport to permit the respective

landlords thereunder to cancel the remaining term of any such leases if the Sellers discontinue

their use or operation of the Leased Real Property are void and of no force and effect and shall

not be enforceable against the Purchaser, its assignees and sublessees, and the landlords under

such leases shall not have the right to cancel or otherwise modify such leases or increase the rent,

assert any Claim, or impose any penalty by reason of such discontinuation, the Sellers' cessation

of operations, the assignment of such leases to the Purchaser, or the interruption of business

activities at any of the leased premises.

    25.  Except in connection with any ongoing Limited Contract Objection, each

non-Debtor party to an Assumable Executory Contract is forever barred, estopped, and

permanently enjoined from (a) asserting against the Debtors or the Purchaser, their successors or

assigns, or their respective property, any default arising prior to, or existing as of, the

Commencement Date, or, against the Purchaser, any counterclaim, defense, or setoff (other than

defenses interposed in connection with, or related to, credits, chargebacks, setoffs, rebates, and

other claims asserted by the Sellers or the Purchaser in its capacity as assignee), or other claim

asserted or assertable against the Sellers and (b) imposing or charging against the Debtors, the

Purchaser, or its Affiliates any rent accelerations, assignment fees, increases, or any other fees as a result of the Sellers' assumption and assignment to the Purchaser of the Assumable Executory Contracts. The validity of such assumption and assignment of the Assumable Executory Contracts shall not be affected by any dispute between the Sellers and any non-Debtor party to an Assumable Executory Contract.

26.    Except as expressly provided in the MPA or this Order, after the Closing, the Debtors and their estates shall have no further liabilities or obligations with respect to any Assumed Liabilities other than certain Cure Amounts as provided in the MPA, and all holders of such claims are forever barred and estopped from asserting such claims against the Debtors, their successors or assigns, and their estates.

27.    The failure of the Sellers or the Purchaser to enforce at any time one or more terms or conditions of any Assumable Executory Contract shall not be a waiver of such terms or conditions, or of the Sellers' and the Purchaser's rights to enforce every term and condition of the Assumable Executory Contracts.

28.    The authority hereunder for the Debtors to assume and assign an Assumable Executory Contract to the Purchaser includes the authority to assume and assign an Assumable Executory Contract, as amended.

29.    Upon the assumption by a Debtor and the assignment to the Purchaser of any Assumable Executory Contract and the payment of the Cure Amount in full, all defaults under the Assumable Executory Contract shall be deemed to have been cured, and any counterparty to such Assumable Executory Contract shall be prohibited from exercising any rights or remedies against any Debtor or non-Debtor party to such Assumable Executory Contract based on an asserted default that occurred on, prior to, or as a result of, the Closing, including the type of default specified in section 365(b)(1)(A) of the Bankruptcy Code.

30.    The assignments of each of the Assumable Executory Contracts are made in good faith under sections 363(b) and (m) of the Bankruptcy Code.

31.    Entry by GM into the Deferred Termination Agreements with accepting dealers is hereby approved.  Executed Deferred Termination Agreements represent valid and binding contracts, enforceable in accordance with their terms.

32.    Entry by GM into the Participation Agreements with accepting dealers is hereby approved and the offer by GM of entry into the Participation Agreements and entry into the Participation Agreements was appropriate and not the product of coercion.  The Court makes no finding as to whether any specific provision of any Participation Agreement governing the obligations of Purchaser and its dealers is enforceable under applicable provisions of state law. Any disputes that may arise under the Participation Agreements shall be adjudicated on a case by case basis in an appropriate forum other than this Court.

33.    Nothing contained in the preceding two paragraphs shall impact the authority of any state or of the federal government to regulate Purchaser subsequent to the Closing.

34.    Notwithstanding any other provision in the MPA or this Order, no assignment of any rights and interests of the Debtors in any federal license issued by the Federal Communications Commission ("**FCC**") shall take place prior to the issuance of FCC regulatory approval for such assignment pursuant to the Communications Act of 1934, and the rules and regulations promulgated thereunder.

### TPC Property

35.    The TPC Participation Agreement and the other TPC Operative Documents are financing transactions secured to the extent of the TPC Value (as hereinafter defined) and shall be Retained Liabilities.

36.     As a result of the Debtors' interests in the TPC Property being transferred to the Purchaser free and clear of all liens, claims, interests, and encumbrances (other than Permitted Encumbrances), including, without limitation, the TPC Lenders' Liens and Claims, pursuant to section 363(e) of the Bankruptcy Code, the TPC Lenders shall have an allowed secured claim in a total amount equal to the fair market value of the TPC Property on the Commencement Date under section 506 of the Bankruptcy Code (the "**TPC Value**"), as determined at a valuation hearing conducted by this Court or by mutual agreement of the Debtors, the Purchaser, and the TPC Lenders (such claim, the "**TPC Secured Claim**").  Either the Debtors, the Purchaser, the TPC Lenders, or the Creditors' Committee may file a motion with this Court to determine the TPC Value on twenty (20) days notice.

37.     Pursuant to sections 361 and 363(e) of the Bankruptcy Code, as adequate protection for the TPC Secured Claim and for the sole benefit of the TPC Lenders, at the Closing or as soon as commercially practicable thereafter, but in any event not later than five (5) business days after the Closing, the Purchaser shall place $90,700,000 (the "**TPC Escrow Amount**") in cash into an interest-bearing escrow account (the "**TPC Escrow Account**") at a financial institution selected by the Purchaser and acceptable to the other parties (the "**Escrow Bank**"). Interest earned on the TPC Escrow Amount from the date of deposit through the date of the disposition of the proceeds of such account (the "**TPC Escrow Interest**") will follow principal, such that interest earned on the amount of cash deposited into the TPC Escrow Account equal to the TPC Value shall be paid to the TPC Lenders and interest earned on the balance of the TPC Escrow Amount shall be paid to the Purchaser.

38.     Promptly after the determination of the TPC Value, an amount of cash equal to the TPC Secured Claim plus the TPC Lenders' pro rata share of the TPC Escrow Interest shall be released from the TPC Escrow Account and paid to the TPC Lenders (the "**TPC**

**Payment**") without further order of this Court.  If the TPC Value is less than $90,700,000, the

TPC Lenders shall have, in addition to the TPC Secured Claim, an aggregate allowed unsecured

claim against GM's estate equal to the lesser of (i) $45,000,000 and (ii) the difference between

$90,700,000 and the TPC Value (the "**TPC Unsecured Claim**").

          39.    If the TPC Value exceeds $90,700,000, the TPC Lenders shall be entitled

to assert a secured claim against GM's estate to the extent the TPC Lenders would have an

allowed claim for such excess under section 506 of the Bankruptcy Code (the "**TPC Excess**

**Secured Claim**"); *provided, however*, that any TPC Excess Secured Claim shall be paid from the

consideration of the 363 Transaction as a secured claim thereon and shall not be payable from

the proceeds of the Wind-Down Facility; *and provided further, however,* that the Debtors, the

Creditors' Committee, and all parties in interest shall have the right to contest the allowance and

amount of the TPC Excess Secured Claim under section 506 of the Bankruptcy Code (other than

to contest the TPC Value as previously determined by the Court).  All parties' rights and

arguments respecting the determination of the TPC Secured Claim are reserved; *provided,*

*however*, that in consideration of the settlement contained in these paragraphs, the TPC Lenders

waive any legal argument that the TPC Lenders are entitled to a secured claim equal to the face

amount of their claim under section 363(f)(3) or any other provision of the Bankruptcy Code

solely as a matter of law, including, without limitation, on the grounds that the Debtors are

required to pay the full face amount of the TPC Lenders' secured claims in order to transfer, or

as a result of the transfer of, the TPC Property to the Purchaser.  After the TPC Payment is made,

any funds remaining in the TPC Escrow Account plus the Purchasers' pro rata share of the TPC

Escrow Interest shall be released and paid to the Purchaser without further order of this Court.

Upon the receipt of the TPC Payment by the TPC Lenders, other than any right to payment from

GM on account of the TPC Unsecured Claim and the TPC Excess Secured Claim, the TPC

Lenders' Claims relating to the TPC Property shall be deemed fully satisfied and discharged, including, without limitation, any claims the TPC Lenders might have asserted against the Purchaser relating to the TPC Property, the TPC Participation Agreement, or the TPC Operative Documents.  For the avoidance of doubt, any and all claims of the TPC Lenders arising from or in connection with the TPC Property, the TPC Participation Agreement, or the TPC Operative Documents shall be payable solely from the TPC Escrow Account or GM and shall be nonrecourse to the Purchaser.

40.    The TPC Lenders shall not be entitled to payment of any fees, costs, or expenses (including legal fees) except to the extent that the TPC Value results in a TPC Excess Secured Claim and is thereby oversecured under the Bankruptcy Code and such claim is allowed by the Court as a secured claim under section 506 of the Bankruptcy Code.

41.    In connection with the foregoing, and pursuant to Section 11.2 of the TPC Trust Agreement, GM, as the sole Certificate Holder and Beneficiary under the TPC Trust, together with the consent of GM as the Lessee, effective as of the date of the Closing, (a) exercises its election to terminate the TPC Trust and (b) in connection therewith, assumes all of the obligations of the TPC Trust and TPC Trustee under or contemplated by the TPC Operative Documents to which the TPC Trust or TPC Trustee is a party and all other obligations of the TPC Trust or TPC Trustee incurred under the TPC Trust Agreement (other than obligations set forth in clauses (i) through (iii) of the second sentence of Section 7.1 of the TPC Trust Agreement).

42.    As a condition precedent to the 363 Transaction, in connection with the termination of the TPC Trust, effective as of the date of the Closing, all of the assets of the TPC Trust (the "**TPC Trust Assets**") shall be distributed to GM, as sole Certificate Holder and beneficiary under the TPC Trust, including, without limitation, the following:

(i)       Industrial Development Revenue Real Property Note (General Motors Project) Series 1999-I, dated November 18, 1999, in the principal amount of $21,700,000, made by the Industrial Development Board of the City of Memphis and County of Shelby, Tennessee, to PVV Southpoint 14, LLC, as assigned by Assignment and Assumption of Loan and Loan Documents dated as of November 18, 1999, between PVV Southpoint 14, LLC, as Assignor, to the TPC Trustee of the TPC Trust, as Assignee, recorded as JW1268 in the records of the Shelby County Register of Deeds (the "**TPC Tennessee Ground Lease**");

(ii)       Real Property Lease Agreement dated as of November 18, 1999, between the Industrial Development Board of the City of Memphis and County of Shelby, Tennessee, as Lessor, and PVV Southpoint 14, LLC, as Lessee, recorded as JW1262 in the records of the Shelby County Register of Deeds, as assigned by Assignment and Assumption of Real Property Lease dated as of November 18, 1999, between PVV Southpoint 14, LLC, as Assignor, to the TPC Trustee of the TPC Trust, as Assignee, recorded as JW1267 in the records of the Shelby County Register of Deeds;

(iii)       Deed of Trust dated as of November 18, 1999, between the Industrial Development Board of the City of Memphis and County of Shelby, Tennessee, as Grantor, in favor of Mid-South Title Corporation, as Trustee, for the benefit of PVV Southpoint 14, LLC, Beneficiary, recorded as JW1263 in the records of the Shelby County Register of Deeds, as assigned by Assignment and Assumption of Loan and Loan Documents dated as of November 18, 1999, between PVV Southpoint 14, LLC, as Assignor, to the TPC Trustee of the TPC Trust, as Assignee, recorded as JW1268 in the records of the Shelby County Register of Deeds;

(iv)       Assignment of Rents and Lease dated as of November 18, 1999, between the Industrial Development Board of the City of Memphis and County of Shelby, Tennessee, as Assignor, and PVV Southpoint 14, LLC, as Assignee, recorded as JW1264 in the records of the Shelby County Register of Deeds, as assigned by Assignment and Assumption of Loan and Loan Documents dated as of November 18, 1999, between PVV Southpoint 14, LLC, as Assignor, to the TPC Trustee of the TPC Trust, as Assignee, recorded as JW1268 in the records of the Shelby County Register of Deeds;

(v)       The Tennessee Master Lease (as defined in the TPC Participation Agreement);

(vi)       A certain tract of land being known and designated as Lot 1, as shown on  a Subdivision Plat entitled "Final Plat – Lot 1, Whitemarsh Associates, LLC Property," which Plat is recorded among the Land Records of Baltimore County in Plat Book SM No. 71 at folio 144, Maryland, together with a certain tract of land being known and designated as "1.1865 Acre of Highway Widening," as shown on a Subdivision Plat entitled "Final Plat – Lot 1, Whitemarsh Associates, LLC Property," which Plat is recorded among the Land Records of Baltimore County in Plat Book SM No. 71 at folio 144, Baltimore, Maryland, saving and excepting from the above described property all that land conveyed to the State of Maryland to the use of the State Highway Administration of the Department of Transportation dated November 24, 2003, and

recorded among the Land Records of Baltimore County in Liber 19569, folio 074, Maryland, together with all rights, easements, covenants, licenses, and appurtenances associated with the ownership thereof in any way, including, without limitation, those easements benefiting Parcel 1 set forth in the Declaration and Agreement Respecting Easements, Restrictions and Operations, between the TPC Trust, GM, and Whitemarsh Associates, LLC, recorded among the Land Records of Baltimore County in Liber 14019, folio 430, as amended (collectively, the "**Maryland Property**");

(vii)    alternatively to the transfer of a direct interest in the Maryland Property pursuant to item (vi) above, if such documents are still extant, the following interests shall be transferred:  (a) Ground Lease Agreement dated as of September 8, 1999, between the TPC Trustee of the TPC Trust. as lessor, and Maryland Economic Development Corporation, as lessee, recorded among the Land Records of Baltimore County in Liber 14019, folio 565, (b) Sublease Agreement dated as of September 8, 1999, between the Maryland Economic Development Corporation, as sublessor, and the TPC Trustee of the TPC Trust, as sublessee, recorded among the Land Records of Baltimore County in Liber 14019, folio 589, together with (c) all agreements, loan agreements, notes, rights, obligations, and interests held by the TPC Trustee of the TPC Trust and/or issued by the TPC Trustee of the TPC Trust in connection therewith; and

(viii)    The Maryland Master Lease (as defined in the TPC Participation Agreement).

43.    As a result of the distribution of the TPC Trust Assets, effective as of the date of the Closing, title to the leasehold interest of the TPC Trustee of the TPC Trust under the TPC Tennessee Ground Lease and the lessor's interest under the Tennessee Master Lease shall be held by GM, as are the lessor's and lessee's interests under the Tennessee Master Lease, and as permitted by the TPC Trust Agreement, the Tennessee Master Lease shall hereby be terminated, and GM shall succeed to all rights of the lessor thereunder to the property leased thereby, together with all rights, easements, covenants, licenses, and appurtenances associated with the ownership thereof in any way.

44.    As a result of the distribution of the TPC Trust Assets, effective as of the date of the Closing, title to the Maryland Property, the lessor's and lessee's interests under the Maryland Master Lease shall be held by GM, and as permitted by the TPC Trust Agreement, the Maryland Master Lease shall hereby be terminated, and GM shall succeed to all rights of the

lessor thereunder to the property leased thereby, together with all rights, easements, covenants,
licenses, and appurtenances associated with the ownership thereof in any way.

45.    All of the TPC Trust Assets and the TPC Property are Purchased Assets
under the MPA and shall be transferred by GM pursuant thereto to the Purchaser free and clear
of all liens, claims, encumbrances, and interests (other than Permitted Encumbrances), including,
without limitation, any liens, claims, encumbrances, and interests of the TPC Lenders.  To the
extent any of the TPC Trust Assets are executory contracts and unexpired leases, they shall be
Assumable Executory Contracts, which shall be assumed by GM and assigned to Purchaser
pursuant to section 365 of the Bankruptcy Code and the Sale Procedures Order.

### Additional Provisions

46.    Except for the Assumed Liabilities expressly set forth in the MPA, none of
the Purchaser, its present or contemplated members or shareholders, its successors or assigns, or
any of their respective affiliates or any of their respective agents, officials, personnel,
representatives, or advisors shall have any liability for any claim that arose prior to the Closing
Date, relates to the production of vehicles prior to the Closing Date, or otherwise is assertable
against the Debtors or is related to the Purchased Assets prior to the Closing Date.  The
Purchaser shall not be deemed, as a result of any action taken in connection with the MPA or any
of the transactions or documents ancillary thereto or contemplated thereby or in connection with
the acquisition of the Purchased Assets, to:  (i) be a legal successor, or otherwise be deemed a
successor to the Debtors (other than with respect to any obligations arising under the Purchased
Assets from and after the Closing); (ii) have, de facto or otherwise, merged with or into the
Debtors; or (iii) be a mere continuation or substantial continuation of the Debtors or the
enterprise of the Debtors.  Without limiting the foregoing, the Purchaser shall not have any
successor, transferee, derivative, or vicarious liabilities of any kind or character for any claims,

including, but not limited to, under any theory of successor or transferee liability, de facto

merger or continuity, environmental, labor and employment, and products or antitrust liability,

whether known or unknown as of the Closing, now existing or hereafter arising, asserted, or

unasserted, fixed or contingent, liquidated or unliquidated.

47.     Effective upon the Closing and except as may be otherwise provided by

stipulation filed with or announced to the Court with respect to a specific matter or an order of

the Court, all persons and entities are forever prohibited and enjoined from commencing or

continuing in any manner any action or other proceeding, whether in law or equity, in any

judicial, administrative, arbitral, or other proceeding against the Purchaser, its present or

contemplated members or shareholders, its successors and assigns, or the Purchased Assets, with

respect to any (i) claim against the Debtors other than Assumed Liabilities, or (ii) successor or

transferee liability of the Purchaser for any of the Debtors, including, without limitation, the

following actions:  (a) commencing or continuing any action or other proceeding pending or

threatened against the Debtors as against the Purchaser, or its successors, assigns, affiliates, or

their respective assets, including the Purchased Assets; (b) enforcing, attaching, collecting, or

recovering in any manner any judgment, award, decree, or order against the Debtors as against

the Purchaser, its successors, assigns, affiliates, or their respective assets, including the

Purchased Assets; (c) creating, perfecting, or enforcing any lien, claim, interest, or encumbrance

against the Debtors as against the Purchaser or its successors, assigns, affiliates, or their

respective assets, including the Purchased Assets; (d) asserting any setoff, right of subrogation,

or recoupment of any kind for any obligation of any of the Debtors as against any obligation due

the Purchaser or its successors, assigns, affiliates, or their respective assets, including the

Purchased Assets; (e) commencing or continuing any action, in any manner or place, that does

not comply, or is inconsistent with, the provisions of this Order or other orders of this Court, or

the agreements or actions contemplated or taken in respect thereof; or (f) revoking, terminating,

or failing or refusing to renew any license, permit, or authorization to operate any of the

Purchased Assets or conduct any of the businesses operated with such assets.  Notwithstanding

the foregoing, a relevant taxing authority's ability to exercise its rights of setoff and recoupment

are preserved.

48.    Except for the Assumed Liabilities, or as expressly permitted or otherwise

specifically provided for in the MPA or this Order, the Purchaser shall have no liability or

responsibility for any liability or other obligation of the Sellers arising under or related to the

Purchased Assets.  Without limiting the generality of the foregoing, and except as otherwise

specifically provided in this Order and the MPA, the Purchaser shall not be liable for any claims

against the Sellers or any of their predecessors or Affiliates, and the Purchaser shall have no

successor, transferee, or vicarious liabilities of any kind or character, including, but not limited

to, any theory of antitrust, environmental, successor, or transferee liability, labor law, de facto

merger, or substantial continuity, whether known or unknown as of the Closing, now existing or

hereafter arising, whether fixed or contingent, asserted or unasserted, liquidated or unliquidated,

with respect to the Sellers or any obligations of the Sellers arising prior to the Closing.

49.    The Purchaser has given fair and substantial consideration under the MPA

for the benefit of the holders of liens, claims, encumbrances, or other interests.  The

consideration provided by the Purchaser for the Purchased Assets under the MPA is greater than

the liquidation value of the Purchased Assets and shall be deemed to constitute reasonably

equivalent value and fair consideration under the Bankruptcy Code and under the laws of the

United States, any state, territory, possession, or the District of Columbia.

50.     The consideration provided by the Purchaser for the Purchased Assets under the MPA is fair and reasonable, and the Sale may not be avoided under section 363(n) of the Bankruptcy Code.

51.     If there is an Agreed G Transaction (determined no later than the due date, with extensions, of GM's tax return for the taxable year in which the 363 Transaction occurs), (i) the MPA shall, and hereby does, constitute a "plan" of GM and the Purchaser solely for purposes of sections 368 and 354 of the Tax Code, and (ii) the 363 Transaction, as set forth in the MPA, and the subsequent liquidation of the Sellers, are intended to constitute a tax reorganization of GM pursuant to section 368(a)(1)(G) of the Tax Code.

52.     This Order (a) shall be effective as a determination that, except for the Assumed Liabilities, at Closing, all liens, claims, encumbrances, and other interests of any kind or nature whatsoever existing as to the Sellers with respect to the Purchased Assets prior to the Closing (other than Permitted Encumbrances) have been unconditionally released and terminated, and that the conveyances described in this Order have been effected, and (b) shall be binding upon and govern the acts of all entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Purchased Assets.

53.     Each and every federal, state, and local governmental agency or department is authorized to accept any and all documents and instruments necessary or appropriate to consummate the transactions contemplated by the MPA.

54.     Any amounts that become payable by the Sellers to the Purchaser pursuant
to the MPA (and related agreements executed in connection therewith, including, but not limited
to, any obligation arising under Section 8.2(b) of the MPA) shall (a) constitute administrative
expenses of the Debtors' estates under sections 503(b)(1) and 507(a)(1) of the Bankruptcy Code
and (b) be paid by the Debtors in the time and manner provided for in the MPA without further
Court order.

55.     The transactions contemplated by the MPA are undertaken by the
Purchaser without collusion and in good faith, as that term is used in section 363(m) of the
Bankruptcy Code, and were negotiated by the parties at arm's length, and, accordingly, the
reversal or modification on appeal of the authorization provided in this Order to consummate the
363 Transaction shall not affect the validity of the 363 Transaction (including the assumption
and assignment of any of the Assumable Executory Contracts and the UAW Collective
Bargaining Agreement), unless such authorization is duly stayed pending such appeal.  The
Purchaser is a purchaser in good faith of the Purchased Assets and the Purchaser and its agents,
officials, personnel, representatives, and advisors are entitled to all the protections afforded by
section 363(m) of the Bankruptcy Code.

56.     The Purchaser is assuming the obligations of the Sellers pursuant to and
subject to conditions and limitations contained in their express written warranties, which were
delivered in connection with the sale of vehicles and vehicle components prior to the Closing of
the 363 Transaction and specifically identified as a "warranty."  The Purchaser is not assuming
responsibility for Liabilities contended to arise by virtue of other alleged warranties, including
implied warranties and statements in materials such as, without limitation, individual customer
communications, owner's manuals, advertisements, and other promotional materials, catalogs,
and point of purchase materials.  Notwithstanding the foregoing, the Purchaser has assumed the

Sellers' obligations under state "lemon law" statutes, which require a manufacturer to provide a

consumer remedy when the manufacturer is unable to conform the vehicle to the warranty, as

defined in the applicable statute, after a reasonable number of attempts as further defined in the

statute, and other related regulatory obligations under such statutes.

57.    Subject to further Court order and consistent with the terms of the MPA

and the Transition Services Agreement, the Debtors and the Purchaser are authorized to, and

shall, take appropriate measures to maintain and preserve, until the consummation of any chapter

11 plan for the Debtors, (a) the books, records, and any other documentation, including tapes or

other audio or digital recordings and data in, or retrievable from, computers or servers relating to

or reflecting the records held by the Debtors or their affiliates relating to the Debtors' business,

and (b) the cash management system maintained by the Debtors prior to the Closing, as such

system may be necessary to effect the orderly administration of the Debtors' estates.

58.    The Debtors are authorized to take any and all actions that are

contemplated by or in furtherance of the MPA, including transferring assets between subsidiaries

and transferring direct and indirect subsidiaries between entities in the corporate structure, with

the consent of the Purchaser.

59.    Upon the Closing, the Purchaser shall assume all liabilities of the Debtors

arising out of, relating to, in respect of, or in connection with workers' compensation claims

against any Debtor, except for workers' compensation claims against the Debtors with respect to

Employees residing in or employed in, as the case may be as defined by applicable law, the

states of Alabama, Georgia, New Jersey, and Oklahoma.

60.    During the week after Closing, the Purchaser shall send an e-mail to the

Debtors' customers for whom the Debtors have usable e-mail addresses in their database, which

will provide information about the Purchaser and procedures for consumers to opt out of being

contacted by the Purchaser for marketing purposes.  For a period of ninety (90) days following

the Closing Date, the Purchaser shall include on the home page of GM's consumer web site

(www.gm.com) a conspicuous disclosure of information about the Purchaser, its procedures for

consumers to opt out of being contacted by the Purchaser for marketing purposes, and a notice of

the Purchaser's new privacy statement.  The Debtors and the Purchaser shall comply with the

terms of established business relationship provisions in any applicable state and federal

telemarketing laws.  The Dealers who are parties to Deferred Termination Agreements shall not

be required to transfer personally identifying information in violation of applicable law or

existing privacy policies.

　　　　　　　61.　　　　Nothing in this Order or the MPA releases, nullifies, or enjoins the

enforcement of any Liability to a governmental unit under Environmental Laws or regulations

(or any associated Liabilities for penalties, damages, cost recovery, or injunctive relief) that any

entity would be subject to as the owner, lessor, or operator of property after the date of entry of

this Order.  Notwithstanding the foregoing sentence, nothing in this Order shall be interpreted to

deem the Purchaser as the successor to the Debtors under any state law successor liability

doctrine with respect to any Liabilities under Environmental Laws or regulations for penalties for

days of violation prior to entry of this Order.  Nothing in this paragraph should be construed to

create for any governmental unit any substantive right that does not already exist under law.

　　　　　　　62.　　　　Nothing contained in this Order or in the MPA shall in any way (i)

diminish the obligation of the Purchaser to comply with Environmental Laws, or (ii) diminish the

obligations of the Debtors to comply with Environmental Laws consistent with their rights and

obligations as debtors in possession under the Bankruptcy Code.  The definition of

Environmental Laws in the MPA shall be amended to delete the words "in existence on the date

of the Original Agreement."  For purposes of clarity, the exclusion of asbestos liabilities in

US_ACTIVE:\43085833\07\43085833_7.DOC\.                46

section 2.3(b)(x) of the MPA shall not be deemed to affect coverage of asbestos as a Hazardous

Material with respect to the Purchaser's remedial obligations under Environmental Laws.

63.    No law of any state or other jurisdiction relating to bulk sales or similar

laws shall apply in any way to the transactions contemplated by the 363 Transaction, the MPA,

the Motion, and this Order.

64.    The Debtors shall comply with their tax obligations under 28 U.S.C.

§ 960, except to the extent that such obligations are Assumed Liabilities.

65.    Notwithstanding anything contained in their respective organizational

documents or applicable state law to the contrary, each of the Debtors is authorized and directed,

upon and in connection with the Closing, to change their respective names, and any amendment

to the organizational documents (including the certificate of incorporation) of any of the Debtors

to effect such a change is authorized and approved, without Board or shareholder approval.

Upon any such change with respect to GM, the Debtors shall file with the Court a notice of

change of case caption within two (2) business days of the Closing, and the change of case

caption for these chapter 11 cases shall be deemed effective as of the Closing.

66.    The terms and provisions of the MPA and this Order shall inure to the

benefit of the Debtors, their estates, and their creditors, the Purchaser, and their respective

agents, officials, personnel, representatives, and advisors.

67.    The failure to specifically include any particular provisions of the MPA in

this Order shall not diminish or impair the effectiveness of such provision, it being the intent of

the Court that the MPA be authorized and approved in its entirety, except as modified herein.

68.    The MPA and any related agreements, documents, or other instruments

may be modified, amended, or supplemented by the parties thereto and in accordance with the

terms thereof, without further order of the Court, provided that any such modification,

amendment, or supplement does not have a material adverse effect on the Debtors' estates.  Any such proposed modification, amendment, or supplement that does have a material adverse effect on the Debtors' estates shall be subject to further order of the Court, on appropriate notice.

69.    The provisions of this Order are nonseverable and mutually dependent on each other.

70.    As provided in Fed.R.Bankr.P. 6004(h) and 6006(d), this Order shall not be stayed for ten days after its entry, and instead shall be effective as of 12:00 noon, EDT, on Thursday, July 9, 2009.  The Debtors and the Purchaser are authorized to close the 363 Transaction on or after 12:00 noon on Thursday, July 9.  Any party objecting to this Order must exercise due diligence in filing any appeal and pursuing a stay or risk its appeal being foreclosed as moot in the event Purchaser and the Debtors elect to close prior to this Order becoming a Final Order.

**Deleted:** Pursuant to Bankruptcy Rules 6004(h) and 6006(d), this Order shall not be stayed for ten days after its entry and shall be effective immediately upon entry, and the Debtors and the Purchaser are authorized to close the 363 Transaction immediately upon entry of this Order.

71.    This Court retains exclusive jurisdiction to enforce and implement the terms and provisions of this Order, the MPA, all amendments thereto, any waivers and consents thereunder, and each of the agreements executed in connection therewith, including the Deferred Termination Agreements, in all respects, including, but not limited to, retaining jurisdiction to (a) compel delivery of the Purchased Assets to the Purchaser, (b) compel delivery of the purchase price or performance of other obligations owed by or to the Debtors, (c) resolve any disputes arising under or related to the MPA, except as otherwise provided therein, (d) interpret, implement, and enforce the provisions of this Order, (e) protect the Purchaser against any of the Retained Liabilities or the assertion of any lien, claim, encumbrance, or other interest, of any kind or nature whatsoever, against the Purchased Assets, and (f) resolve any disputes with respect to or concerning the Deferred Termination Agreements.  The Court does not retain jurisdiction to hear disputes arising in connection with the application of the Participation

Agreements, stockholder agreements or other documents concerning the corporate governance of

the Purchaser, and documents governed by foreign law, which disputes shall be adjudicated as

necessary under applicable law in any other court or administrative agency of competent

jurisdiction.

Dated: New York, York
      July **5**, 2009

                                                _____s/Robert E. Gerber_____
                                                UNITED STATES BANKRUPTCY JUDGE

# Exhibit 3

Westlaw.

Page 1

407 B.R. 463, 51 Bankr.Ct.Dec. 225
**(Cite as: 407 B.R. 463)**



United States Bankruptcy Court,
S.D. New York.
In re GENERAL MOTORS CORP., et at., Debtors.
**No. 09-50026 (REG).**

July 5, 2009.

**Background:** Motion was filed for approval of proposed sale of assets of bankrupt automobile manufacturer outside the ordinary course of its business to government-sponsored purchaser. Variety of objections were raised, including objection that sale amounted to improper sub rosa Chapter 11 plan.

**Holdings:** The Bankruptcy Court, Robert E. Gerber, J., held that:

(1) "good business reason" existed for allowing debtor to sell its assets immediately to purchaser sponsored by government, rather than having to wait for confirmation of plan;

(2) government-sponsored purchaser had to be deemed as acting in "good faith";

(3) proposed sale was not an impermissible "sub rosa plan";

(4) "debt" that debtor owed to government, for financing that government had made available in order to keep manufacturer afloat until it could enter bankruptcy and to assist it with its reorganization, could not be restructured as "equity," so as to prevent government from credit-bidding amount of debt;

(5) government's claim could not be equitably subordinated;

(6) debtor's assets could be sold free and clear of successor liability claims;

(7) Chapter 11 plan confirmation requirement, which prevented court from confirming proposed plan unless it provided for "continuation after its effective date of payment of all retiree benefits," was not implicated in connection with sale outside the ordinary course;

(8) debtor did not have to choose between either assuming its dealer agreements and assigning them to purchaser or rejecting them outright but could seek to ameliorate effects of immediate rejection and to provide dealers with softer landing by negotiating deferred termination agreements;

(9) court could not utilize its equitable power to enter "necessary or appropriate" orders, in order to force purchaser to assume certain liabilities of the old deb-

tor-manufacturer based on court's notions of equity;

(10) any objection to use of Troubled Asset Relief Program (TARP) funds in connection with financing that government had provided to debtor was moot; and

(11) debtor's shareholders were not parties aggrieved, with ability to challenge proposed sale.

Sale approved.

West Headnotes

**[1] Bankruptcy 51 3069**

51 Bankruptcy
   51IX Administration
     51IX(B) Possession, Use, Sale, or Lease of Assets
      51k3067 Sale or Assignment of Property
       51k3069 k. Time for sale; emergency and sale outside course of business. Most Cited Cases
Sale outside the ordinary course of business may be used to dispose of all or the bulk of Chapter 11 debtor's assets, outside context of Chapter 11 reorganization plan. 11 U.S.C.A. §§ 363(b), 1123(b)(4).

**[2] Courts 106 96(7)**

106 Courts
   106II Establishment, Organization, and Procedure
     106II(G) Rules of Decision
      106k88 Previous Decisions as Controlling or as Precedents
       106k96 Decisions of United States Courts as Authority in Other United States Courts
        106k96(7) k. Particular questions or subject matter. Most Cited Cases
While opinion of one bankruptcy judge in judicial district is not, strictly speaking, binding on another, it is practice of bankruptcy court to grant great respect to earlier bankruptcy court precedents from same district.

**[3] Bankruptcy 51 3069**

51 Bankruptcy
   51IX Administration
     51IX(B) Possession, Use, Sale, or Lease of Assets
      51k3067 Sale or Assignment of Property
       51k3069 k. Time for sale; emergency and

407 B.R. 463, 51 Bankr.Ct.Dec. 225
**(Cite as: 407 B.R. 463)**

sale outside course of business. Most Cited Cases
Even entirety of Chapter 11 debtor's business may be sold, without waiting for plan confirmation, in connection with sale outside the ordinary course of business, if there is good business reason for doing so. 11 U.S.C.A. § 363(b).

**[4] Bankruptcy 51 ☜3069**

51 Bankruptcy
　　51IX Administration
　　　　51IX(B) Possession, Use, Sale, or Lease of Assets
　　　　　　51k3067 Sale or Assignment of Property
　　　　　　　　51k3069 k. Time for sale; emergency and sale outside course of business. Most Cited Cases
In deciding whether there is "good business reason" for allowing Chapter 11 debtor to sell all or substantially all of its assets prior to confirmation of plan, in connection with sale outside the ordinary course of business, bankruptcy court should consider all of the salient factors pertaining to proceeding and act to further diverse interests of debtor, creditors and equity holders. 11 U.S.C.A. § 363.

**[5] Bankruptcy 51 ☜3069**

51 Bankruptcy
　　51IX Administration
　　　　51IX(B) Possession, Use, Sale, or Lease of Assets
　　　　　　51k3067 Sale or Assignment of Property
　　　　　　　　51k3069 k. Time for sale; emergency and sale outside course of business. Most Cited Cases
In deciding whether there is "good business reason" for allowing Chapter 11 debtor to use, sell or lease the bulk of its assets prior to confirmation of plan, in connection with sale outside the ordinary course of business, bankruptcy court may consider the following nonexclusive factors: (1) proportionate value of assets to estate as whole; (2) amount of elapsed time since the filing; (3) likelihood that plan of reorganization will be proposed and confirmed in near future; (4) effect of proposed disposition on future plans of reorganization; (5) proceeds to be obtained from the disposition vis-a-vis any appraisals of property; (6) which of the alternatives of use, sale or lease the proposal envisions; (7) whether property is increasing or decreasing in value; (8) whether estate has the liquidity to survive until confirmation of plan; (9) whether the sales opportunity will still exist at time of plan confirmation and, if not, the likelihood of satisfactory alternative sales opportunities or a stand-alone plan alternative that is equally desirable, or better, for creditors; and (10) whether there is material risk that, if court defers the sale, the patient will die on operating table. 11 U.S.C.A. § 363(b).

**[6] Bankruptcy 51 ☜3069**

51 Bankruptcy
　　51IX Administration
　　　　51IX(B) Possession, Use, Sale, or Lease of Assets
　　　　　　51k3067 Sale or Assignment of Property
　　　　　　　　51k3069 k. Time for sale; emergency and sale outside course of business. Most Cited Cases
In deciding whether there is "good business reason" for allowing Chapter 11 debtor to sell all or substantially all of its assets prior to confirmation of plan, in connection with sale outside the ordinary course of business, bankruptcy court must consider whether those opposing the sale have produced some evidence that sale is not justified. 11 U.S.C.A. § 363(b).

**[7] Bankruptcy 51 ☜3069**

51 Bankruptcy
　　51IX Administration
　　　　51IX(B) Possession, Use, Sale, or Lease of Assets
　　　　　　51k3067 Sale or Assignment of Property
　　　　　　　　51k3069 k. Time for sale; emergency and sale outside course of business. Most Cited Cases
Chapter 11 debtor, as part of sale outside the ordinary course of business, may not enter into transaction that would amount to a *sub rosa* plan of reorganization or an attempt to circumvent Chapter 11 requirements for confirmation of plan of reorganization. 11 U.S.C.A. § 363(b).

**[8] Bankruptcy 51 ☜3069**

51 Bankruptcy
　　51IX Administration
　　　　51IX(B) Possession, Use, Sale, or Lease of Assets
　　　　　　51k3067 Sale or Assignment of Property
　　　　　　　　51k3069 k. Time for sale; emergency and sale outside course of business. Most Cited Cases
If proposed sale of Chapter 11 debtor's assets outside the ordinary course of its business has proper business justification which has potential to lead toward confirmation of plan and is not to evade plan confirmation process, then transaction may be authorized. 11 U.S.C.A. § 363(b).

**[9] Bankruptcy 51 ☜3069**

51 Bankruptcy
　　51IX Administration
　　　　51IX(B) Possession, Use, Sale, or Lease of Assets

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

407 B.R. 463, 51 Bankr.Ct.Dec. 225
**(Cite as: 407 B.R. 463)**

51k3067 Sale or Assignment of Property
51k3069 k. Time for sale; emergency and
sale outside course of business. Most Cited Cases

**Bankruptcy 51 ☞3556**

51 Bankruptcy
51XIV Reorganization
51XIV(B) The Plan
51k3548 Requisites of Confirmable Plan
51k3556 k. Sale or liquidation. Most Cited Cases

Under bankruptcy statute dealing with sales outside the ordinary course of business, Chapter 11 debtor may sell substantially all of its assets as going concern and later submit plan of liquidation providing for distribution of proceeds of the sale, where, for example, there is need to preserve "going concern" value because revenues are not sufficient to support continued operation of debtor's business and there are no viable sources for financing. 11 U.S.C.A. § 363(b).

**[10] Bankruptcy 51 ☞3069**

51 Bankruptcy
51IX Administration
51IX(B) Possession, Use, Sale, or Lease of Assets
51k3067 Sale or Assignment of Property
51k3069 k. Time for sale; emergency and
sale outside course of business. Most Cited Cases

"Good business reason" existed for allowing automobile manufacturer that had filed for Chapter 11 relief to sell its assets immediately to purchaser sponsored by the United States government as transaction outside the ordinary course, rather than having to wait for confirmation of plan, where government financing that allowed manufacturer to operate was set to expire if sale was not completed, where there were no other available sources of financing, and where only alternative was liquidation of manufacturer's business in which unsecured creditors would receive nothing. 11 U.S.C.A. § 363(b).

**[11] Bankruptcy 51 ☞3069**

51 Bankruptcy
51IX Administration
51IX(B) Possession, Use, Sale, or Lease of Assets
51k3067 Sale or Assignment of Property
51k3069 k. Time for sale; emergency and
sale outside course of business. Most Cited Cases

After determining that requisite sound business justification existed for a proposed sale of all or substantially all of Chapter 11 debtor's assets outside the ordinary course of its business, court's inquiry then turned to whether the routine requirements for any sale outside the ordinary course were met, and to whether "business judgment rule" had been satisfied. 11 U.S.C.A. § 363(b).

**[12] Bankruptcy 51 ☞3069**

51 Bankruptcy
51IX Administration
51IX(B) Possession, Use, Sale, or Lease of Assets
51k3067 Sale or Assignment of Property
51k3069 k. Time for sale; emergency and
sale outside course of business. Most Cited Cases

**Bankruptcy 51 ☞3071**

51 Bankruptcy
51IX Administration
51IX(B) Possession, Use, Sale, or Lease of Assets
51k3067 Sale or Assignment of Property
51k3071 k. Notice. Most Cited Cases

**Bankruptcy 51 ☞3072(2)**

51 Bankruptcy
51IX Administration
51IX(B) Possession, Use, Sale, or Lease of Assets
51k3067 Sale or Assignment of Property
51k3072 Manner and Terms
51k3072(2) k. Adequacy of price; appraisal. Most Cited Cases

In order to authorize sale outside the ordinary course of business, court must be satisfied (1) that notice has been given to all creditors and interested parties; (2) that sale contemplates a fair and reasonable price; and (3) that purchaser is proceeding in good faith. 11 U.S.C.A. § 363(b).

**[13] Bankruptcy 51 ☞3069**

51 Bankruptcy
51IX Administration
51IX(B) Possession, Use, Sale, or Lease of Assets
51k3067 Sale or Assignment of Property
51k3069 k. Time for sale; emergency and
sale outside course of business. Most Cited Cases

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

407 B.R. 463, 51 Bankr.Ct.Dec. 225
**(Cite as: 407 B.R. 463)**

**Bankruptcy 51 ☞3071**

51 Bankruptcy
    51IX Administration
        51IX(B) Possession, Use, Sale, or Lease of Assets
          51k3067 Sale or Assignment of Property
            51k3071 k. Notice. Most Cited Cases

**Bankruptcy 51 ☞3072(2)**

51 Bankruptcy
    51IX Administration
        51IX(B) Possession, Use, Sale, or Lease of Assets
          51k3067 Sale or Assignment of Property
            51k3072 Manner and Terms
               51k3072(2) k. Adequacy of price; appraisal. Most Cited Cases
Proposed sale outside the ordinary course of assets of bankrupt automobile manufacturer to purchaser sponsored by the United States government complied with statutory requirements that such a sale could be approved only on appropriate "notice" and on "fair and reasonable" terms, where proposed sale was extensively publicized and notice was given to interested parties, where no other, much less a better, offer had been received, and where proponents of sale had obtained fairness opinion from reputable advisors. 11 U.S.C.A. § 363(b).

**[14] Bankruptcy 51 ☞3069**

51 Bankruptcy
    51IX Administration
        51IX(B) Possession, Use, Sale, or Lease of Assets
          51k3067 Sale or Assignment of Property
          51k3069 k. Time for sale; emergency and sale outside course of business. Most Cited Cases

**Bankruptcy 51 ☞3776.5(5)**

51 Bankruptcy
    51XIX Review
        51XIX(B) Review of Bankruptcy Court
          51k3776 Effect of Transfer
            51k3776.5 Supersedeas or Stay
               51k3776.5(5) k. Effect of want of stay; conclusiveness of sale. Most Cited Cases
Government-sponsored purchaser of assets of bankrupt automobile manufacturer had to be seen as acting in "good faith," not only for purpose of deciding whether sale could proceed as sale outside the ordinary course of deb-tor-manufacturer's business but for purpose of triggering statutory protection for purchaser's expectations in finality of sale, where proposed sale was the result of intense arm's-length negotiations, and there was no evidence of any efforts to take advantage over other bidders, of whom there were none. 11 U.S.C.A. § 363(b, m).

**[15] Bankruptcy 51 ☞3067.1**

51 Bankruptcy
    51IX Administration
        51IX(B) Possession, Use, Sale, or Lease of Assets
          51k3067 Sale or Assignment of Property
           51k3067.1 k. In general. Most Cited Cases

**Bankruptcy 51 ☞3776.5(5)**

51 Bankruptcy
    51XIX Review
        51XIX(B) Review of Bankruptcy Court
          51k3776 Effect of Transfer
            51k3776.5 Supersedeas or Stay
               51k3776.5(5) k. Effect of want of stay; conclusiveness of sale. Most Cited Cases
"Good faith" of purchaser of debtor's assets is shown by integrity of his conduct during course of sales proceedings; when there is lack of such integrity, "good faith" finding may not be made, for purpose of triggering statutory protection for good faith purchaser's expectations in finality of sale. 11 U.S.C.A. § 363(m).

**[16] Bankruptcy 51 ☞3776.5(5)**

51 Bankruptcy
    51XIX Review
        51XIX(B) Review of Bankruptcy Court
          51k3776 Effect of Transfer
            51k3776.5 Supersedeas or Stay
               51k3776.5(5) k. Effect of want of stay; conclusiveness of sale. Most Cited Cases
Purchaser of debtor's assets cannot be found to have acted in "good faith," for purpose of bankruptcy statute protecting good faith purchaser's expectations in finality of sale, if purchaser has engaged in fraud, colluded with other bidders or trustee, or attempted to take grossly unfair advantage of other bidders. 11 U.S.C.A. § 363(m).

**[17] Bankruptcy 51 ☞3069**

51 Bankruptcy

407 B.R. 463, 51 Bankr.Ct.Dec. 225
**(Cite as: 407 B.R. 463)**

51IX Administration
   51IX(B) Possession, Use, Sale, or Lease of Assets
    51k3067 Sale or Assignment of Property
     51k3069 k. Time for sale; emergency and sale outside course of business. Most Cited Cases
Decision by bankrupt automobile manufacturer's board of directors to accept offer to sell debtor-manufacturer's assets to government-sponsored purchaser on terms offered, which were only terms available to it, and to avoid only other alternative of Chapter 7 liquidation, in which it was estimated that debtor's assets would be sold for less than 10% of $82 billion at which they were booked, an amount woefully inadequate to satisfy its roughly $172 billion in debt, not only passed muster under the business judgment test applicable to such transactions outside the ordinary course, but would withstand ab initio review. 11 U.S.C.A. § 363(b).

**[18] Bankruptcy 51 ☞3069**

51 Bankruptcy
   51IX Administration
    51IX(B) Possession, Use, Sale, or Lease of Assets
     51k3067 Sale or Assignment of Property
      51k3069 k. Time for sale; emergency and sale outside course of business. Most Cited Cases
Requirements of business judgment rule, as applied in connection with proposed sale of debtor's assets outside the ordinary course of its business, entail the following: (1) a business decision; (2) disinterestedness; (3) due care; (4) good faith; and possibly (5) no abuse of discretion or waste of corporate assets. 11 U.S.C.A. § 363(b).

**[19] Bankruptcy 51 ☞3069**

51 Bankruptcy
   51IX Administration
    51IX(B) Possession, Use, Sale, or Lease of Assets
     51k3067 Sale or Assignment of Property
      51k3069 k. Time for sale; emergency and sale outside course of business. Most Cited Cases
Proposed sale outside the ordinary course of assets of bankrupt automobile manufacturer to purchaser sponsored by the United States government was not an impermissible "sub rosa plan"; sales agreement did not dictate terms of Chapter 11 plan of reorganization by attempting to restructure rights of creditors of estate, but merely brought in value. 11 U.S.C.A. § 363(b).

**[20] Bankruptcy 51 ☞3069**

51 Bankruptcy
   51IX Administration
    51IX(B) Possession, Use, Sale, or Lease of Assets
     51k3067 Sale or Assignment of Property
      51k3069 k. Time for sale; emergency and sale outside course of business. Most Cited Cases
Chapter 11 debtor and bankruptcy court should not be able to short circuit requirements for confirmation of Chapter 11 plan by establishing terms of plan sub rosa in connection with sale of debtor's assets outside ordinary course of its business. 11 U.S.C.A. § 363(b).

**[21] Bankruptcy 51 ☞3069**

51 Bankruptcy
   51IX Administration
    51IX(B) Possession, Use, Sale, or Lease of Assets
     51k3067 Sale or Assignment of Property
      51k3069 k. Time for sale; emergency and sale outside course of business. Most Cited Cases
Proposed sale outside the ordinary course of debtor's business may be objectionable when aspects of transaction dictate terms of ensuing plan or constrain parties in exercising their confirmation rights, such as by placing restrictions on creditors' rights to vote on plan. 11 U.S.C.A. § 363(b).

**[22] Bankruptcy 51 ☞3069**

51 Bankruptcy
   51IX Administration
    51IX(B) Possession, Use, Sale, or Lease of Assets
     51k3067 Sale or Assignment of Property
      51k3069 k. Time for sale; emergency and sale outside course of business. Most Cited Cases
Proposed sale outside ordinary course of Chapter 11 debtor's business may be objectionable as "sub rosa plan" if the sale itself seeks to allocate or dictate distribution of sale proceeds among different classes of creditors. 11 U.S.C.A. § 363(b).

**[23] Bankruptcy 51 ☞3069**

51 Bankruptcy
   51IX Administration
    51IX(B) Possession, Use, Sale, or Lease of Assets
     51k3067 Sale or Assignment of Property
      51k3069 k. Time for sale; emergency and sale outside course of business. Most Cited Cases

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

407 B.R. 463, 51 Bankr.Ct.Dec. 225
**(Cite as: 407 B.R. 463)**

Proposed sale of Chapter 11 debtor's assets outside ordinary course of its business does not "dictate terms" of subsequent plan, so as to be objectionable as "sub rosa plan," simply because sales proceeds are insufficient to permit dividend to certain class of creditors. 11 U.S.C.A. § 363(b).

**[24] Bankruptcy 51 ☞3069**

51 Bankruptcy
    51IX Administration
        51IX(B) Possession, Use, Sale, or Lease of Assets
            51k3067 Sale or Assignment of Property
                51k3069 k. Time for sale; emergency and sale outside course of business.
Proposed sale of Chapter 11 debtor's assets outside ordinary course of its business is not objectionable as "sub rosa plan" based solely on fact that purchaser is to assume some, but not all, of debtor's liabilities, or because some contract counterparties' contracts will not be assumed. 11 U.S.C.A. § 363(b).

**[25] Bankruptcy 51 ☞2827**

51 Bankruptcy
    51VII Claims
        51VII(A) In General
            51k2827 k. Claims by insiders and by attorneys in excess of value. Most Cited Cases
Factors that bankruptcy courts consider in deciding whether secured debt should be recharacterized as equity are as follows: (1) names given to the instruments, if any, evidencing indebtedness; (2) presence or absence of fixed maturity date and schedule of payments; (3) presence or absence of a fixed rate of interest and interest payments; (4) source of repayments; (5) adequacy or inadequacy of capitalization; (6) identity of interest between creditor and stockholder; (7) security, if any, for the advances; (8) corporation's ability to obtain financing from outside lending institutions; (9) extent to which advances were subordinated to claims of outside creditors; (10) extent to which advances were used to acquire capital assets; and (11) presence or absence of sinking fund to provide repayments.

**[26] Bankruptcy 51 ☞2827**

51 Bankruptcy
    51VII Claims
        51VII(A) In General

            51k2827 k. Claims by insiders and by attorneys in excess of value. Most Cited Cases

**Bankruptcy 51 ☞3072(1)**

51 Bankruptcy
    51IX Administration
        51IX(B) Possession, Use, Sale, or Lease of Assets
            51k3067 Sale or Assignment of Property
                51k3072 Manner and Terms
                    51k3072(1) k. In general. Most Cited Cases
"Debt" that bankrupt automobile manufacturer owed to the federal government, for financing that government had made available in order to keep manufacturer afloat until it could enter bankruptcy and to assist it with its reorganization, could not be restructured as "equity," so as to prevent government from credit-bidding amount of that debt in connection with sale of debtor-manufacturer's assets outside the ordinary course to purchaser sponsored by government, where financing was fully documented as a secured loan, complete with intercreditor agreements to address priority issues with other secured lenders, had interest terms, albeit at better than market rates, and maturity terms, and had separate equity features, providing for warrants to accompany the debt instruments.

**[27] Bankruptcy 51 ☞2967.5**

51 Bankruptcy
    51VII Claims
        51VII(F) Priorities
            51k2967 Subordination
                51k2967.5 k. Inequitable conduct. Most Cited Cases
Party seeking to equitably subordinate a claim must first prove the following: (1) that holder of claim engaged in inequitable conduct; (2) that this inequitable conduct resulted in injury to creditors or conferred an unfair advantage on claimant; and (3) that equitable subordination is not inconsistent with provisions of the Bankruptcy Code. 11 U.S.C.A. § 510.

**[28] Bankruptcy 51 ☞2967.5**

51 Bankruptcy
    51VII Claims
        51VII(F) Priorities
            51k2967 Subordination
                51k2967.5 k. Inequitable conduct. Most

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

407 B.R. 463, 51 Bankr.Ct.Dec. 225
**(Cite as: 407 B.R. 463)**

Cited Cases

**Bankruptcy 51 ☞3072(1)**

51 Bankruptcy
   51IX Administration
      51IX(B) Possession, Use, Sale, or Lease of Assets
         51k3067 Sale or Assignment of Property
            51k3072 Manner and Terms
               51k3072(1) k. In general. Most Cited Cases

Federal government's claim against bankrupt automobile manufacturer, for financing that government had made available in order to keep manufacturer afloat until it could enter bankruptcy and to assist it with its reorganization, could not be equitably subordinated to other debt, so as to prevent government from credit-bidding amount of that debt in connection with sale of debtor-manufacturer's assets outside the ordinary course to purchaser sponsored by government, given complete lack of evidence of any inequitable conduct by government in advancing funds to help thousands of creditors, citizens, employees of manufacturer and employees of suppliers that depended on manufacturer. 11 U.S.C.A. § 510.

**[29] Corporations 101 ☞445.1**

101 Corporations
   101XI Corporate Powers and Liabilities
      101XI(C) Property and Conveyances
         101k441 Conveyances by Corporations
            101k445.1 k. Assumption of transferor's liabilities. Most Cited Cases

As general rule, purchaser of assets does not assume liabilities of the seller unless the purchaser expressly agrees to do so or an exception to this rule exists.

**[30] Corporations 101 ☞445.1**

101 Corporations
   101XI Corporate Powers and Liabilities
      101XI(C) Property and Conveyances
         101k441 Conveyances by Corporations
            101k445.1 k. Assumption of transferor's liabilities. Most Cited Cases

Successor liability is equitable exception to general rule that purchaser of assets does not assume liabilities of the seller.

**[31] Bankruptcy 51 ☞3073**

51 Bankruptcy
   51IX Administration
      51IX(B) Possession, Use, Sale, or Lease of Assets
         51k3067 Sale or Assignment of Property
            51k3073 k. Adequate protection; sale free of liens. Most Cited Cases

Term "interest," as used in bankruptcy statute providing for sale of estate assets free and clear of any interest in such assets possessed by entity other than estate, was broad enough to include successor liability claims, so as to authorize assets of a bankrupt automobile manufacturer to be sold free and clear of successor liability claims. 11 U.S.C.A. § 363(f).

**[32] Bankruptcy 51 ☞3073**

51 Bankruptcy
   51IX Administration
      51IX(B) Possession, Use, Sale, or Lease of Assets
         51k3067 Sale or Assignment of Property
            51k3073 k. Adequate protection; sale free of liens. Most Cited Cases

Term "interest," as it is used in bankruptcy statute providing for sale of estate assets free and clear of any interest in such assets possessed by an entity other than estate, includes more than just liens. 11 U.S.C.A. § 363(f).

**[33] Bankruptcy 51 ☞3073**

51 Bankruptcy
   51IX Administration
      51IX(B) Possession, Use, Sale, or Lease of Assets
         51k3067 Sale or Assignment of Property
            51k3073 k. Adequate protection; sale free of liens. Most Cited Cases

Congress's use of the word "interest," in bankruptcy statute providing for sale of estate assets free and clear of any interest in such assets possessed by entity other than estate, while elsewhere providing in Chapter 11 provision that "property dealt with by the plan is free and clear of all claims and interests," was not indication that term "interest," as used in the former provision, should not be interpreted to include claims; provisions were disparate provisions, and no conclusion could be drawn from this variance in terminology between them. 11 U.S.C.A. §§ 363(f), 1141(c).

**[34] Courts 106 ☞96(7)**

407 B.R. 463, 51 Bankr.Ct.Dec. 225
**(Cite as: 407 B.R. 463)**

106 Courts
   106II Establishment, Organization, and Procedure
     106II(G) Rules of Decision
      106k88 Previous Decisions as Controlling or as
Precedents
       106k96 Decisions of United States Courts as
Authority in Other United States Courts
        106k96(7) k. Particular questions or sub-
ject matter. Most Cited Cases
Bankruptcy judge presiding over Chapter 11 case of au-
tomobile manufacturer would follow the decisions of other
bankruptcy judges in the same district, in absence of plain
error, in recognition of the importance of predictability in
commercial bankruptcy cases.

**[35] Courts 106 ☞89**

106 Courts
   106II Establishment, Organization, and Procedure
     106II(G) Rules of Decision
      106k88 Previous Decisions as Controlling or as
Precedents
       106k89 k. In general. Most Cited Cases
Stare decisis is particularly important in commercial
bankruptcy cases.

**[36] Bankruptcy 51 ☞3070**

51 Bankruptcy
   51IX Administration
     51IX(B) Possession, Use, Sale, or Lease of Assets
      51k3067 Sale or Assignment of Property
       51k3070 k. Order of court and proceedings
therefor in general. Most Cited Cases
Language in order approving proposed sale of assets of
bankrupt automobile manufacturer to govern-
ment-sponsored purchaser free and clear of successor
liability claims would be modified, for benefit of holders of
future asbestos claims that had not yet sustained any inju-
ries due to their exposure to asbestos, to clarify that in-
junction against pursuit of successor liability claims
against purchaser of debtor's assets would be enforceable
only "to the fullest extent constitutionally permissible." 11
U.S.C.A. § 363(f).

**[37] Bankruptcy 51 ☞3073**

51 Bankruptcy
   51IX Administration
     51IX(B) Possession, Use, Sale, or Lease of Assets

      51k3067 Sale or Assignment of Property
       51k3073 k. Adequate protection; sale free of
liens. Most Cited Cases

**Bankruptcy 51 ☞3079**

51 Bankruptcy
   51IX Administration
     51IX(B) Possession, Use, Sale, or Lease of Assets
      51k3067 Sale or Assignment of Property
       51k3079 k. Rights and liabilities of pur-
chasers, and right to purchase. Most Cited Cases
While, pursuant to order approving proposed sale of assets
of bankrupt automobile manufacturer to govern-
ment-sponsored purchaser free and clear of successor
liability claims, purchaser could not be held liable, as
successor in interest, for the environmental liabilities of the
old debtor-manufacturer, purchaser would be liable from
day that it received any such properties for its own envi-
ronmental responsibilities going forward. 11 U.S.C.A. §
363(f).

**[38] Bankruptcy 51 ☞3069**

51 Bankruptcy
   51IX Administration
     51IX(B) Possession, Use, Sale, or Lease of Assets
      51k3067 Sale or Assignment of Property
       51k3069 k. Time for sale; emergency and
sale outside course of business. Most Cited Cases

**Bankruptcy 51 ☞3079**

51 Bankruptcy
   51IX Administration
     51IX(B) Possession, Use, Sale, or Lease of Assets
      51k3067 Sale or Assignment of Property
       51k3079 k. Rights and liabilities of pur-
chasers, and right to purchase. Most Cited Cases

**Bankruptcy 51 ☞3113**

51 Bankruptcy
   51IX Administration
     51IX(C) Debtor's Contracts and Leases
      51k3110 Grounds for and Objections to As-
sumption, Rejection, or Assignment
       51k3113 k. Collective bargaining agree-
ments. Most Cited Cases
Bankruptcy statute dealing with responsibilities of Chapter

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

407 B.R. 463, 51 Bankr.Ct.Dec. 225
**(Cite as: 407 B.R. 463)**

11 trustee or debtor-in-possession with respect to retiree benefits of debtor's retired workers imposed such responsibilities only on trustee or debtor-in-possession, not on purchaser outside the ordinary course of Chapter 11 debtor's assets, which had no liability to retirees unless it assumed them. 11 U.S.C.A. §§ 363(b), 1114.

**[39] Bankruptcy 51 ☞3069**

51 Bankruptcy
    51IX Administration
        51IX(B) Possession, Use, Sale, or Lease of Assets
            51k3067 Sale or Assignment of Property
                51k3069 k. Time for sale; emergency and sale outside course of business. Most Cited Cases
Chapter 11 plan confirmation requirement, which prevented court from confirming proposed plan unless it provided for "continuation after its effective date of payment of all retiree benefits," was not implicated in connection with sale outside the ordinary course of assets of bankrupt car manufacturer, where court had already determined that proposed sale was not sub rosa plan. 11 U.S.C.A. §§ 363(b), 1129(a)(13).

**[40] Bankruptcy 51 ☞3070**

51 Bankruptcy
    51IX Administration
        51IX(B) Possession, Use, Sale, or Lease of Assets
            51k3067 Sale or Assignment of Property
                51k3070 k. Order of court and proceedings therefor in general. Most Cited Cases
Automobile dealers' association which did not represent any of dealers with which debtor/car manufacturer had relationships, but which actually represented competing dealers and which had filed amicus brief opposing proposed sale of debtor's assets outside the ordinary course to government-sponsored purchaser, lacked standing to have its comments deemed an objection to proposed sale. 11 U.S.C.A. § 363(b).

**[41] Bankruptcy 51 ☞3101**

51 Bankruptcy
    51IX Administration
        51IX(C) Debtor's Contracts and Leases
            51k3101 k. In general. Most Cited Cases

**Bankruptcy 51 ☞3102.1**

51 Bankruptcy
    51IX Administration
        51IX(C) Debtor's Contracts and Leases
            51k3102 Assumption, Rejection, or Assignment
                51k3102.1 k. In general. Most Cited Cases
Chapter 11 debtor, in connection with a proposed sale of its automobile manufacturing business to purchaser sponsored by federal government, did not have to choose between either assuming its dealer agreements and assigning them to purchaser or rejecting them outright but could seek to ameliorate effects of immediate rejection and to provide dealers with softer landing by negotiating deferred termination agreements, without fear that these deferred termination agreements would be subject to collateral attack based upon claims of coercion. 11 U.S.C.A. §§ 363(b), 365.

**[42] Bankruptcy 51 ☞2125**

51 Bankruptcy
    51II Courts; Proceedings in General
        51II(A) In General
            51k2124 Power and Authority
                51k2125 k. Equitable powers and principles.
Most Cited Cases

**Bankruptcy 51 ☞3069**

51 Bankruptcy
    51IX Administration
        51IX(B) Possession, Use, Sale, or Lease of Assets
            51k3067 Sale or Assignment of Property
                51k3069 k. Time for sale; emergency and sale outside course of business. Most Cited Cases

**Bankruptcy 51 ☞3079**

51 Bankruptcy
    51IX Administration
        51IX(B) Possession, Use, Sale, or Lease of Assets
            51k3067 Sale or Assignment of Property
                51k3079 k. Rights and liabilities of purchasers, and right to purchase. Most Cited Cases
Bankruptcy court, in connection with proposed sale outside the ordinary course of assets of bankrupt automobile manufacturer to purchaser sponsored by the United States government, could not utilize its equitable power to enter "necessary or appropriate" orders, in order to force purchaser to assume certain liabilities of the old debtor-manufacturer based on court's notions of equity. 11

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

407 B.R. 463, 51 Bankr.Ct.Dec. 225
**(Cite as: 407 B.R. 463)**

U.S.C.A. § 105(a).

**[43] Bankruptcy 51 🗝️2125**

51 Bankruptcy
    51II Courts; Proceedings in General
        51II(A) In General
           51k2124 Power and Authority
                51k2125 k. Equitable powers and principles.
Most Cited Cases
Bankruptcy court is not free to use its equitable powers to circumvent the Bankruptcy Code. 11 U.S.C.A. § 105(a).

**[44] Bankruptcy 51 🗝️2126**

51 Bankruptcy
    51II Courts; Proceedings in General
        51II(A) In General
           51k2124 Power and Authority
                51k2126 k. Carrying out provisions of Code.
Most Cited Cases
Bankruptcy judges, in exercise of their power to enter "necessary or appropriate" orders, are not free to do whatever feels right. 11 U.S.C.A. § 105(a).

**[45] Bankruptcy 51 🗝️2852**

51 Bankruptcy
    51VII Claims
        51VII(B) Secured Claims
           51k2852 k. Amount secured; partial security.
Most Cited Cases
"Equal and ratable" provision in indenture for bonds, which provided for enhancement of status of unsecured bondholders to that of secured creditors if liens were thereafter placed on certain manufacturing facilities owned by bankrupt issuer of bonds, was not triggered, in connection with prepetition secured financing that issuer received from federal government where, pursuant to terms of financing agreement, transaction did not place lien on certain excluded collateral, which was defined to include anything that would trigger "equal and ratable" provision; accordingly, bondholders were not entitled to be treated as secured creditors in issuer's Chapter 11 case.

**[46] Bankruptcy 51 🗝️3069**

51 Bankruptcy
    51IX Administration
        51IX(B) Possession, Use, Sale, or Lease of Assets

           51k3067 Sale or Assignment of Property
                51k3069 k. Time for sale; emergency and sale outside course of business. Most Cited Cases

**Bankruptcy 51 🗝️3072(1)**

51 Bankruptcy
    51IX Administration
        51IX(B) Possession, Use, Sale, or Lease of Assets
           51k3067 Sale or Assignment of Property
                51k3072 Manner and Terms
                    51k3072(1) k. In general. Most Cited Cases

**Federal Courts 170B 🗝️13**

170B Federal Courts
    170BI Jurisdiction and Powers in General
        170BI(A) In General
           170Bk12 Case or Controversy Requirement
                170Bk13 k. Particular cases or questions, justiciable controversy. Most Cited Cases
Any objection to use of Troubled Asset Relief Program (TARP) funds in connection with financing that government had provided to troubled automobile manufacturer was moot after government had used such TARP funds to provide financing, not only before, but after commencement of manufacturer's Chapter 11 case pursuant to post-petition financing order of bankruptcy court; party who had raised no objection to use of TARP funds in connection with post-petition financing order could not belatedly raise issue as basis to object to government's being able to credit-bid the debt associated with financing that it had previously provided in connection with sale of debtor-manufacturer's assets outside ordinary course to purchaser sponsored by government. 11 U.S.C.A. § 363(b).

**[47] Bankruptcy 51 🗝️3070**

51 Bankruptcy
    51IX Administration
        51IX(B) Possession, Use, Sale, or Lease of Assets
           51k3067 Sale or Assignment of Property
                51k3070 k. Order of court and proceedings therefor in general. Most Cited Cases
Unsecured creditor opposed to proposed sale of assets of bankrupt automobile manufacturer outside the ordinary course of business on credit bid by federal government did not have standing to object to government's use of

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

407 B.R. 463, 51 Bankr.Ct.Dec. 225
**(Cite as: 407 B.R. 463)**

Troubled Asset Relief Program (TARP) funds in connection with financing that underlay its credit bid; even assuming that proposed sale somehow injured unsecured creditor, despite undisputed evidence that manufacturer's assets were worth tens of billions of dollars less than its liabilities, and that alternative to proposed sale would be Chapter 7 liquidation in which creditor would receive nothing, creditor could not show that any such injury was fairly traceable to government's use of TARP funds. 11 U.S.C.A. § 363(b).

**[48]** Bankruptcy 51 ☞3070

51 Bankruptcy
    51IX Administration
        51IX(B) Possession, Use, Sale, or Lease of Assets
            51k3067 Sale or Assignment of Property
                51k3070 k. Order of court and proceedings therefor in general. Most Cited Cases
Bankrupt automobile manufacturer's shareholders were not parties aggrieved, with ability to challenge proposed sale of manufacturer's assets outside the ordinary course of business to government-sponsored purchaser, where only alternative to proposed sale was Chapter 7 liquidation, in which it was estimated that debtor's assets would be sold for less than 10% of $82 billion at which they were booked, an amount woefully inadequate to satisfy its roughly $172 billion in debt. 11 U.S.C.A. § 363(b).
**\*471** Appearances: [FN1]

> FN1. Principal participants are shown here. A full listing will be posted when practicable.

Weil, Gotshal & Manges LLP, by Harvey R. Miller (argued), Stephen Karotkin (argued), Joseph H. Smolinsky (argued), New York, NY, for Debtors and Debtors in Possession.

Kramer Levin Naftalis & Frankel LLP, by Kenneth H. Eckstein (argued), Thomas Moers Mayer (argued), Robert Schmidt, Jeffrey S. Trachtman, New York, NY, for the Official Committee of Unsecured Creditors.

Lev L. Dassin, Acting United States Attorney for the Southern District of New York, by David S. Jones (argued), Jeffrey S. Oestericher, Matthew L. Schwartz (argued), Joseph N. Cordaro, and Cadwalader, Wickersham & Taft LLP, by John J. Rapisardi, New York, NY, Counsel to the United States of America.

Cleary Gottlieb Steen & Hamilton, by James L. Bromley (argued), Avram E. Luft, Cohen, Weiss and Simon LLP, by Babette A. Ceccotti (argued), New York, NY, for The International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, AFL-CIO.

Patton Boggs LLP, by Michael P. Richman (argued), Mark A. Salzberg (pro hac vice) (argued), James C. Chadwick (pro hac vice), Melissa Iachan, New York, NY, for The Unofficial Committee Of Family & Dissident GM Bondholders.

The Coleman Law Firm, by Steve Jakubowski (argued), Elizabeth Richert, Chicago, IL, for Individual Tort Litigants Callan Campbell, Kevin Junso, Edwin Agosto, Kevin Chadwick, and Joseph Berlingieri.

Schnader Harrison Segal & Lewis LLP, by Barry E. Bressler (pro hac vice) (argued), Richard A. Barkasy (pro hac vice), Benjamin P. Deutsch, New York, NY, for Ad Hoc Committee of Consumer Victims of General Motors.

Stutzman, Bromberg, Esserman & Plifka P.C. by Sander L. Esserman (pro hac vice) (argued), Robert T. Brousseau (pro hac vice), Peter D'Apice, Jo E. Hartwick (pro hac vice), Dallas, TX, for Ad Hoc Committee of Asbestos Personal Injury Claimants.

Orrick, Herrington & Sutcliffe LLP, by Roger Frankel (argued), Richard H. Wyron, Washington, D.C., by Lorraine S. McGowen, Alyssa D. Englund, New York, NY, counsel to the Unofficial GM Dealers Committee.

Kennedy, Jennik & Murray, P.C., by Thomas M. Kennedy (argued), Susan M. Jennik, New York, NY, for IUE-CWA.

Nebraska Attorney General Jon Bruning, by Leslie C. Levy, Karen Cordry (argued), Lincoln, NE, for the State of Nebraska and on behalf of the Ad Hoc Committee of State Attorneys General.

Oliver Addison Parker, Lauderdale By The Sea, FL, pro se.

N.W. Bernstein & Associates, LLC, by: Norman W. Bernstein (argued), Rye Brook, NY, for the Trustees of Environmental Conservation and Chemical Corporation Site Trust Fund.

Caplin & Drysdale Chartered, by Elihu Inselbuch, Esq., Rita C. Tobin, Esq., New York, NY, by Peter Van N.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

407 B.R. 463, 51 Bankr.Ct.Dec. 225
**(Cite as: 407 B.R. 463)**

Lockwood, Esq., Ronald E. Reinsel, Esq. (pro hac vice) (argued), Washington, D.C., for Mark Buttita, personal representative of Salvatore Buttita.

Vedder Price P.C., by Michael J. Edelman, Michael L. Schein (argued), Erin Zavalkoff-Babej, New York, NY, for Export Development Canada.

**\*472** Robinson Brog Leinwand Greene, Genovese & Cluck, P.C., by Russell P. McRory (argued), Fred B. Ringel, Mitchell Greene, Robert R. Leinwand, New York, NY, and Myers & Fuller P.A., by Richard Sox (pro hac vice), Shawn Mercer (pro hac vice), Robert Byerts (pro hac vice), Tallahassee, FL, for the Greater New York Automobile Dealers Association.

Gibson, Dunn & Crutcher LLP, by David Feldman (argued), Matthew J. Williams, Adam H. Offenhartz, New York, NY, for Wilmington Trust Company, Indenture Trustee.

Kelley, Drye & Warren LLP, by David E. Retter, Pamela Bruzzese-Szczygiel, Jennifer A. Christian (argued), New York, NY, for Law Debenture Trust Company of New York, as Proposed Successor Indenture Trustee.

New York State Department of Law by Susan Taylor (argued). Albany, NY, for Environmental Protection Bureau.

Levy Ratner, P.C., New York, NY, by Suzanne Hepner, for United Steelworkers.

Gorlick Kravitz & Listhaus P.C., by Barbara Mehlsack, New York, NY, for International Union of Operating Engineers Locals 18S, 101S, and 832S.

Farella Braun & Martel LLP, by Neil A. Goteiner (argued), Dean M. Gloster (pro hac vice), Nan E. Joesten (pro hac vice), San Francisco, CA, for General Motors Retirees Association.

Public Citizen Litigation Group, by Adina H. Rosenbaum, Allison M. Zieve, Washington, DC, for Center for Auto Safety, Consumer Action, Consumers for Auto Reliability and Safety, National Association of Consumer Advocates, and Public Citizen.

Otterbourg, Steindler, Houston & Rosen, P.C., by Jonathan N. Helfat, Steven B. Soll, New York, NY, for GMAC LLC.

Attorneys for the State of Texas, by J. Casey Roy (argued), Austin, TX, on behalf of the Texas Dep't of Transportation, Motor Vehicle Division.

Diana G. Adams, by Diana G. Adams, Linda A. Riffkin, Tracy Hope Davis, Andrew D. Velez-Rivera, Brian Shoichi Masumoto, New York, NY, United States Trustee.

DECISION ON DEBTORS' MOTION FOR APPROVAL OF (1) SALE OF ASSETS TO VEHICLE ACQUISITION HOLDINGS LLC; (2) ASSUMPTION AND ASSIGNMENT OF RELATED EXECUTORY CONTRACTS; AND (3) ENTRY INTO UAW RETIREE SETTLEMENT AGREEMENT

ROBERT E. GERBER, Bankruptcy Judge.

TABLE OF CONTENTS

| | | |
|---|---|---|
| Findings of Fact | | 475 |
| 1. | Background | 475 |
| 2. | GM's Dealer Network | 475 |
| 3. | GM's Suppliers | 476 |
| 4. | GM's Financial Distress | 476 |
| 5. | U.S. Government Assistance | 476 |
| 6. | GM's First Quarter Results | 479 |
| 7. | The 363 Transaction | 479 |
| 8. | The Liquidation Alternative | 481 |

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

407 B.R. 463, 51 Bankr.Ct.Dec. 225
**(Cite as: 407 B.R. 463)**

| | | |
|---|---|---|
| 9. | Fairness of the Transaction | 481 |
| 10. | Specifics of the Transaction | 481 |
| | (a)  Acquired and Excluded Assets | 481 |
| | (b)  Assumed and Excluded Liabilities | 481 |
| | (c)  Consideration | 482 |
| | (d)  Ownership of New GM | 482 |
| | (e)  Other Aspects of Transaction | 483 |
| | (f)  The Proposed Sale Order | 483 |
| 11. | Contingent Liabilities | 483 |
| 12. | Agreement with UAW | 484 |
| 13. | Need for Speed | 484 |
| 14. | Ultimate Facts | 485 |

| | | |
|---|---|---|
| Discussion | | 486 |
| 1. | Sale Under Section 363 | 486 |
| | (a)  Utilization of Section 363 | 486 |
| | (b)  Compliance with Standards for Approval of Section 363 Sales | 493 |
| | (c)  "Sub Rosa" Plan | 495 |
| | (d)  Recharacterization or Subordination of U.S. Treasury Debt | 498 |
| | (e)  Asserted Inability to Credit Bid | 499 |
| 2. | Successor Liability Issues | 499 |
| | (a)  Textual Analysis | 501 |
| | (b)  Caselaw | 503 |
| 3. | Asbestos Issues | 506 |
| 4. | Environmental Issues | 507 |
| 5. | Splinter Union Retiree Issues | 509 |
| 6. | Dealer Issues | 512 |
| 7. | ECC Trust | 516 |
| 8. | "Equally and Ratably" Issues | 517 |
| 9. | Unauthorized Use of TARP Funds Issues | 518 |
| 10. | Cure Objections | 519 |
| 11. | UAW Settlement Objections | 519 |
| 12. | Stockholder Objections | 520 |
| 13. | Miscellaneous Objections | 520 |

| | | |
|---|---|---|
| Conclusion | | 520 |

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

407 B.R. 463, 51 Bankr.Ct.Dec. 225
**(Cite as: 407 B.R. 463)**

**\*473** In this contested matter in the jointly administered chapter 11 cases of Debtors **General Motors** Corporation and certain of its subsidiaries (together, "**GM**"), the Debtors move for an order, pursuant to section 363 of the Bankruptcy Code, approving GM's sale of the bulk of its assets (the "**363 Transaction**"), pursuant to a "Master Sale and Purchase Agreement" and related documents (the "**MPA**"), to Vehicle Acquisitions Holdings LLC (the "**Purchaser**") FN2-a purchaser sponsored by the U.S. Department of the Treasury (the "**U.S. Treasury**")-free and clear of liens, claims, encumbrances, and other interests. The Debtors also seek approval of the assumption and assignment of the executory contracts that would be needed by the Purchaser, and of a settlement with the United Auto Workers ("**UAW**") pursuant to an agreement (the "**UAW Settlement Agreement**") under which GM would satisfy obligations to an estimated 500,000 retirees.

> FN2. When discussing the mechanics of the 363 Transaction, the existing GM will be referred to as "**Old GM**," and the Purchaser will be referred to as "**New GM**."

GM's motion is supported by the Creditors' Committee; the U.S. Government (which has advanced approximately $50 billion to GM, and is GM's largest pre-and post-petition creditor); the Governments of Canada and Ontario (which ultimately will have advanced about $9.1 billion); the UAW (an affiliate of which is GM's single largest unsecured creditor); **\*474** the indenture trustees for GM's approximately $27 billion in unsecured bonds; and an ad hoc committee representing holders of a majority of those bonds.

But the motion has engendered many objections and limited objections, by a variety of others. The objectors include, among others, a minority of the holders of GM's unsecured bonds (most significantly, an ad hoc committee of three of them (the "**F & D Bondholders Committee**"), holding approximately .01% of GM's bonds),FN3 who contend, among other things, that GM's assets can be sold only under a chapter 11 plan, and that the proposed section 363 sale amounts to an impermissible "*sub rosa*" plan.

> FN3. When it filed its objection, the F & D Bondholders Committee, identifying itself as the "Family & Dissident" Bondholders Committee, said it was "representing the interests of" 1,500 bondholders, with bond holdings "believed to exceed $400 million." (F & D Bondholder

Comm. Obj. at 1). But even after it filed the second of its Fed.R.Bankr.P.2019 statements, it identified no other bondholders for whom it was speaking, or provide the holdings, purchases and sales information for any others that Rule 2019 requires. Under these circumstances, the Court must consider that the committee speaks for just those three bondholders.

Objectors and limited objectors also include tort litigants who object to provisions in the approval order limiting successor liability claims against the Purchaser; asbestos litigants with similar concerns, along with concerns as to asbestos ailments that have not yet been discovered; and non-UAW unions ("**Splinter Unions**") speaking for their retirees, concerned that the Purchaser does not plan to treat their retirees as well as the UAW's retirees.

On the most basic issue, whether a 363 sale is proper, GM contends that this is exactly the kind of case where a section 363 sale is appropriate and indeed essential-and where under the several rulings of the Second Circuit and the Supreme Court in this area, GM's business can be sold, and its value preserved, before the company dies. The Court agrees. GM cannot survive with its continuing losses and associated loss of liquidity, and without the governmental funding that will expire in a matter of days. And there are no options to this sale-especially any premised on the notion that the company could survive the process of negotiations and litigation that characterizes the plan confirmation process.

As nobody can seriously dispute, the only alternative to an immediate sale is liquidation-a disastrous result for GM's creditors, its employees, the suppliers who depend on GM for their own existence, and the communities in which GM operates. In the event of a liquidation, creditors now trying to increase their incremental recoveries would get nothing.

Neither the Code, nor the caselaw-especially the caselaw in the Second Circuit-requires waiting for the plan confirmation process to take its course when the inevitable consequence would be liquidation. Bankruptcy courts have the power to authorize sales of assets at a time when there still is value to preserve-to prevent the death of the patient on the operating table.

Nor can the Court accept various objectors' contention that there here is a *sub rosa* plan. GM's assets simply are being sold, with the consideration to GM to be hereafter distributed to stakeholders, consistent with their statutory

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

407 B.R. 463, 51 Bankr.Ct.Dec. 225
**(Cite as: 407 B.R. 463)**

priorities, under a subsequent plan. Arrangements that will be made by the Purchaser do not affect the distribution of the *Debtor's* property, and will address wholly different needs and concerns-arrangements that the Purchaser needs to create a new GM **\*475** that will be lean and healthy enough to survive.

Issues as to how any approval order should address *successor liability* are the only truly debatable issues in this case. And while textual analysis is ultimately inconclusive and caselaw on a nationwide basis is not uniform, the Court believes in *stare decisis;* it follows the caselaw in this Circuit and District in holding that to the extent the Purchaser has not voluntarily agreed to accept successor liability, GM's property-like that of Chrysler, just a few weeks ago-may be sold free and clear of claims.

Those and other issues are addressed below. GM's motion is granted. The following are the Court's Findings of Fact, Conclusions of Law, and bases for the exercise of its discretion in connection with this determination.

*Findings of Fact* [FN4]

> [FN4.] To avoid making this lengthy decision even longer, the Court has limited its citations in its Findings of Fact to those matters where they are most useful.

After an evidentiary hearing, [FN5] the Court makes the following Findings of Fact.

> [FN5.] In accordance with the Court's Case Management Order # 1, direct testimony was presented by affidavit and cross-examination and subsequent questioning proceeded live. After cross-examination, the Court found all witnesses credible, and takes their testimony as true.

*1. Background*

GM is primarily engaged in the worldwide production of cars, trucks, and parts. It is the largest Original Equipment Manufacturer ("**OEM**") in the U.S., and the second largest in the world.

GM has marketed cars and trucks under many brands-most of them household names in the U.S.-including Buick, Cadillac, Chevrolet, Pontiac, GMC, Saab, Saturn, HUMMER, and Opel. It operates in virtually every country in the world.

GM maintains its executive offices in Detroit, Michigan, and its major financial and treasury operations in New York, New York. As of March 31, 2009, GM employed approximately 235,000 employees worldwide, of whom 163,000 were hourly employees and 72,000 were salaried. Of GM's 235,000 employees, approximately 91,000 are employed in the U.S. Approximately 62,000 (or 68%) of those U.S. employees were represented by unions as of March 31, 2009. The UAW represents by far the largest portion of GM's U.S. unionized employees, representing approximately 61,000 employees.

As of March 31, 2009, GM had consolidated reported global assets and liabilities of approximately $82 billion, and $172 billion, respectively. However, its assets appear on its balance sheet at book value, as contrasted to a value based on any kind of valuation or appraisal. And if GM had to be liquidated, its liquidation asset value, as discussed below, would be less than 10% of that $82 billion amount.

While GM has publicly traded common stock, no one in this chapter 11 case has seriously suggested that GM's stock is "in the money," or anywhere close to that. By any standard, there can be no doubt that GM is insolvent. In fact, as also discussed below, if GM were to liquidate, its unsecured creditors would receive nothing on their claims.

*2. GM's Dealer Network*

Substantially all of GM's worldwide car and truck deliveries (totaling 8.4 million vehicles in 2008) are marketed through independent retail dealers or distributors. **\*476** GM relies heavily on its relationships with dealers, as substantially all of its retail sales are through its network of independent retail dealers and distributors.

The 363 Transaction contemplates the assumption by GM and the assignment to New GM of dealer franchise agreements relating to approximately 4,100 of its 6,000 dealerships, modified in ways to make GM more competitive (as modified, "**Participation Agreements**"). But GM cannot take all of the dealers on the same basis. At the remaining dealer's option, GM will either reject those agreements, or assume modified agreements, called "**Deferred Termination Agreements.**"

The Deferred Termination Agreements will provide dealers with whom GM cannot go forward a softer landing and

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

407 B.R. 463, 51 Bankr.Ct.Dec. 225
**(Cite as: 407 B.R. 463)**

orderly termination. GM is providing approximately 17 months' notice of termination.

As of the time of the hearing on this motion, approximately 99% of the continuing dealers had signed Participation Agreements and 99% of the dealers so affected had signed Deferred Termination Agreements.

The agreements of both types include waivers of rights that dealers would have in connection with their franchises. In accordance with a settlement with the Attorneys General of approximately 45 states (the "**AGs**"), the Debtors and the Purchaser agreed to modifications to the Purchase Agreement and the proposed approval order under which (subject to the more precise language in the proposed order) the Court makes no finding as to the extent any such modifications are enforceable, and any disputes as to that will be resolved locally.

*3. GM's Suppliers*

As the nation's largest automobile manufacturer, GM uses the services of thousands of suppliers-resulting in approximately $50 billion in annual supplier payments. In North America alone, GM uses a network of approximately 11,500 suppliers. In addition, there are over 600 suppliers whose sales to GM represent over 30% of their annual revenues. Thus hundreds, if not thousands, of automotive parts suppliers depend, either in whole or in part, on GM for survival.

*4. GM's Financial Distress*

Historically, GM was one of the best performing OEMs in the U.S. market. But with the growth of competitors with far lower cost structures and dramatically lower benefit obligations, GM's leadership position in the U.S. began to decline. At least as a result of that lower cost competition and market forces in the U.S. and abroad (including jumps in the price of gasoline; a massive recession (with global dislocation not seen since the 1930s); a dramatic decline in U.S. domestic auto sales; and a freeze-up in consumer and commercial credit markets), GM suffered a major drop in new vehicle sales and in market share-from 45% in 1980 to a forecast 19.5% in 2009.

The Court does not need to make further factual findings as to the many causes for GM's difficulties, and does not do so. Observers might differ as to the causes or opine that there were others as well, and might differ especially with

respect to which causes were most important. But what is clear is that, especially in 2008 and 2009, GM suffered a steep erosion in revenues, significant operating losses, and a dramatic loss of liquidity, putting its future in grave jeopardy.

*5. U.S. Government Assistance*

By the fall of 2008, GM was in the midst of a severe liquidity crisis, and its ability to continue operations grew more and more **\*477** uncertain with each passing day. As a result, in November 2008, GM was compelled to seek financial assistance from the U.S. Government.

The U.S. Government understood the draconian consequences of the situation-one that affected not just GM, but also Chrysler, and to a lesser extent, Ford (the "**Big Three**"). And the failure of any of the Big Three (or worse, more than one of them) might well bring grievous ruin on the thousands of suppliers to the Big Three (many of whom have already filed their own bankruptcy cases, in this District, Delaware, Michigan and elsewhere); other businesses in the communities where the Big Three operate; dealers throughout the country; and the states and municipalities who looked to the Big Three, their suppliers and their employees for tax revenues.

The U.S. Government's fear-a fear this Court shares, if GM cannot be saved as a going concern-was of a systemic failure throughout the domestic automotive industry and the significant harm to the overall U.S. economy that would result from the loss of hundreds of thousands of jobs [FN6] and the sequential shutdown of hundreds of ancillary businesses if GM had to cease operations.

> [FN6.] More than 500,000 workers are employed by companies in the U.S. that manufacture parts and components used by automakers.

Thus in response to the troubles plaguing the American automotive industry, the U.S. Government, through the U.S. Treasury and its Presidential Task Force on the Auto Industry (the "**Auto Task Force**"), implemented various programs to support and stabilize the domestic automotive industry-including support for consumer warranties and direct loans. Thus at GM's request in late 2008, the U.S. Treasury determined to make available to GM billions of dollars in emergency secured financing in order to sustain GM's operations while GM developed a new business plan. At the time that the U.S. Treasury first extended credit to GM, there was absolutely no other source of financing

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

**407 B.R. 463, 51 Bankr.Ct.Dec. 225**
**(Cite as: 407 B.R. 463)**

available. No party other than Treasury conveyed its willingness to loan funds to GM and thereby enable it to continue operating.

The first loan came in December 2008, after GM submitted a proposed viability plan to Congress. That plan contemplated GM's shift to smaller, more fuel-efficient cars, a reduction in the number of GM brand names and dealerships, and a renegotiation of GM's agreement with its principal labor union. As part of its proposed plan, GM sought emergency funding in the form of an $18 billion federal loan.

But the U.S. Government was not of a mind to extend a loan that large, and after negotiations, the U.S. Treasury and GM entered into a term loan agreement on December 31, 2008 (the "**Treasury Prepetition Loan**"), that provided GM up to $13.4 billion in financing on a senior secured basis. Under that facility, GM immediately borrowed $4 billion, followed by $5.4 billion less than a month later, and the remaining $4 billion on February 17, 2009.

At the time this loan was made, GM was in very weak financial condition, and the loan was made under much better terms than could be obtained from any commercial lender-if any lender could have been found at all. But the Court has no doubt whatever, and finds, that the Treasury Prepetition Loan was intended to be, and was, a loan and not a contribution of equity. As contrasted with other TARP transactions that involved the U.S. Treasury making direct investments in troubled **\*478** companies in return for common or preferred equity, the U.S. Treasury structured the Treasury Prepetition Loan as a loan with the only equity received by the U.S. Treasury being in the form of two warrants. The agreement had terms and covenants of a loan rather than an equity investment. The U.S. Treasury sought and received first liens on many assets, and second liens on other collateral. The transaction also had separate collateral documents. And the U.S. Treasury entered into intercreditor agreements with GM's other senior secured lenders in order to agree upon the secured lenders' respective prepetition priorities.

The Court further finds, as a fact or mixed question of fact and law, looking at the totality of the circumstances, that there was nothing inequitable about the way the U.S. Treasury behaved in advancing these funds. Nor did the U.S. Treasury act inequitably to GM's creditors, who were assisted, and not injured, by the U.S. Treasury's efforts to keep GM alive and to forestall a liquidation of the com-

pany.

GM had provided a business plan to Congress under which GM might restore itself to profitability, but it was widely perceived to be unsatisfactory. The U.S. Treasury required GM to submit a proposed business plan to demonstrate its future competitiveness that went significantly farther than the one GM had submitted to Congress. As conditions to the U.S. Treasury's willingness to provide financing, GM was to:

(i) reduce its approximately $27 billion in unsecured public debt by no less than two-thirds;

(ii) reduce its total compensation to U.S. employees so that by no later than December 31, 2009, such compensation would be competitive with Nissan, Toyota, or Honda in the U.S.;

(iii) eliminate compensation or benefits to employees who had been discharged, furloughed, or idled, other than customary severance pay;

(iv) apply, by December 31, 2009, work rules for U.S. employees in a manner that would be competitive with the work rules for employees of Nissan, Toyota, or Honda in the U.S.; and

(v) make at least half of the $20 billion contribution that GM was obligated to make to a VEBA [FN7] Trust for UAW retirees ("**VEBA Trust**") in the form of common stock, rather than cash.

> [FN7.] GM has used trusts qualified as "voluntary employee beneficiary associations" under the Internal Revenue Code (each, a "**VEBA**"), to hold reserves to meet GM's future obligations to provide healthcare and life insurance benefits ("**OPEB**") to its salaried and hourly employees upon retirement. In substance, the employer makes contributions to the VEBA, and the VEBA funds the health benefits to the retirees.

Thereafter, in March 2009, Treasury indicated that if GM was unable to complete an effective out-of-court restructuring, it should consider a new, more aggressive, viability plan under an expedited Court-supervised process to avoid further erosion of value. In short, GM was to file a bankruptcy petition and take prompt measures to preserve its value while there was still value to save.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

407 B.R. 463, 51 Bankr.Ct.Dec. 225
**(Cite as: 407 B.R. 463)**

The Treasury Prepetition Loan agreement (whose formal name was "Loan and Security Agreement," or "**LSA**") provided that, if, by March 31, 2009, the President's designee hadn't issued a certification that GM had taken all steps necessary to achieve long-term viability, then the loans due to Treasury would become due and payable 30 days thereafter. And on March 30, the President announced that the viability plan proposed by GM was not **\*479** satisfactory, and didn't justify a substantial new investment of taxpayer dollars.

But rather than leaving GM to simply go into liquidation, the President stated that the U.S. Government would provide assistance to avoid such a result, *if* GM took the necessary additional steps to justify that assistance-including reaching agreements with the UAW, GM's bondholders, and the VEBA Trust. The conditions to federal assistance required substantial debt reduction and the submission of a revised business plan that was more aggressive in both scope and timing.

As an alternative to liquidation, the President indicated that the U.S. Treasury would extend to GM adequate working capital for a period of another 60 days to enable it to continue operations. And as GM's largest secured creditor, the U.S. Treasury would negotiate with GM to develop and implement a more aggressive and comprehensive viability plan. The President also stated that GM needed a "fresh start to implement the restructuring plan," which "may mean using our [B]ankruptcy [C]ode as a mechanism to help [it] restructure quickly and emerge stronger." The President explained:

What I'm talking about is using our existing legal structure as a tool that, with the backing of the U.S. Government, can make it easier for General Motors ... to *quickly* clear away old debts that are weighing [it] down so that [it] can get back on [its] feet and onto a path to success; a tool that we can use, even as workers stay on the job building cars are being sold.

What I'm not talking about is a process where a company is simply broken up, sold off, and no longer exists. We're not talking about that. And what I'm *not talking about is a company that's stuck in court for years, unable to get out.*[FN8]

FN8. Emphasis added.

The U.S. Treasury and GM subsequently entered into amended credit agreements for the Treasury Prepetition Loan to provide for an additional $2 billion in financing that GM borrowed on April 24, 2009, and another $4 billion that GM borrowed on May 20, 2009. The funds advanced to GM under the Treasury Prepetition Loan-ultimately $19.4 billion in total (all on a senior secured basis)-permitted GM to survive through the date of the filing of its bankruptcy case.

On June 1, 2009 (the "**Filing Date**"), GM filed its chapter 11 petition in this Court.

*6. GM's First Quarter Results*

On May 8, 2009, about three weeks before the Filing Date, GM announced its first quarter 2009 results. They presented a grim financial picture, and equally grim trends. Specifically:

(a) GM's total net revenue decreased by $20 billion (or 47.1%) in the first three months of 2009, as compared to the corresponding period in 2008;

(b) Operating losses increased by $5.1 billion from the prior quarter;

(c) During this same period, GM had negative cash flow of $9.4 billion;

(d) Available liquidity deteriorated by $2.6 billion; and

(e) Sales by GM dealers in the U.S. fell to approximately 413,000 vehicles in that first quarter-a decline of approximately 49% as compared to the corresponding period in 2008.

*7. The 363 Transaction*

As noted above, in connection with providing financing, Treasury advised GM **\*480** that, if an out-of-court restructuring was not possible,[FN9] GM should consider the bankruptcy process. That would enable GM to implement a transaction under which substantially all GM's assets would be purchased by a Treasury-sponsored purchaser (subject to any higher or better offer), in an expedited process under section 363 of the Code.

FN9. GM tried to accomplish an out-of-court re-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

407 B.R. 463, 51 Bankr.Ct.Dec. 225
**(Cite as: 407 B.R. 463)**

structuring, as suggested, but was unsuccessful.

Under this game plan, the Purchaser would acquire the purchased assets; create a New GM; and operate New GM free of any entanglement with the bankruptcy cases. If the sale could be accomplished quickly enough, before GM's value dissipated as a result of continuing losses and consumer uncertainty, the 363 sale would thereby preserve the going concern value; avoid systemic failure; provide continuing employment; protect the many communities dependent upon the continuation of GM's business, and restore consumer confidence.

To facilitate the process, the U.S. Treasury and the governments of Canada and Ontario (through their Export Development Canada ("**EDC**")) [FN10] agreed to provide DIP financing for GM through the chapter 11 process. But they would provide the DIP financing *only* if the sale of the purchased assets occurred on an *expedited* basis. That condition was imposed to:

> [FN10.] The Canadian EDC participation was sizeable-approximately $3 billion with approximately an additional $6 billion to be provided later.

(i) preserve the value of the business;

(ii) restore (or at least minimize further loss of) consumer confidence;

(iii) mitigate the increasing damage that GM itself, and the industry, would suffer if GM's major business operations were to remain in bankruptcy; and

(iv) avoid the enormous costs of financing a lengthy chapter 11 case.

Treasury also agreed to provide New GM with adequate post-acquisition financing.

Importantly, the DIP financing to be furnished by the U.S. Treasury and EDC is the only financing that is available to GM. The U.S. Treasury (with its Canadian EDC co-lender) is the only entity that is willing to extend DIP financing to GM. Other efforts to obtain such financing have been unsuccessful. Absent adequate DIP financing, GM will have no choice but to liquidate. But the U.S. Government has stated it will not provide DIP financing without the 363 Transaction, and the DIP financing will come to an end if

the 363 Transaction is not approved by July 10. Without such financing, these cases will plunge into a liquidation.

Alternatives to a sale have turned out to be unsuccessful, and offer no hope of success now. In accordance with standard section 363 practice, the 363 Transaction was subject to higher and better offers, but none were forthcoming. The Court finds this hardly surprising. Only the U.S. and Canadian Governmental authorities were prepared to invest in GM-and then not so much by reason of the economic merit of the purchase, but rather to address the underlying societal interests in preserving jobs and the North American auto industry, the thousands of suppliers to that industry, and the health of the communities, in the U.S. and Canada, in which GM operates.

In light of GM's substantial secured indebtedness, approximately $50 billion, the only entity that has the financial wherewithal and is qualified to purchase the **\*481** assets-and the only entity that has stepped forward to make such a purchase-is the U.S. Treasury-sponsored Purchaser. But the Purchaser is willing to proceed only under an expedited sale process under the Bankruptcy Code.

*8. The Liquidation Alternative*

In connection with its consideration of alternatives, GM secured an analysis (the "**Liquidation Analysis**"), prepared by AlixPartners LLP, of what GM's assets would be worth in a liquidation. The Liquidation Analysis concluded that the realizable value of the assets of GM (net of the costs of liquidation) would range between approximately $6 billion and $10 billion. No evidence has been submitted to the contrary. This was in the context of an assumed $116.5 billion in general unsecured claims, though this could increase with lease and contract rejection claims and pension termination claims.

While the Liquidation Analysis projected some recoveries for secured debt and administrative and priority claims, it concluded that there would be *no recovery whatsoever* for unsecured creditors. The Court has no basis to doubt those conclusions. The Court finds that in the event of a liquidation, unsecured creditors would recover nothing.

*9. Fairness of the Transaction*

Before the 363 Transaction was presented for Court approval, GM's Board of Directors (the "**Board**") (all but one of whose members were independent, and advised by the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

407 B.R. 463, 51 Bankr.Ct.Dec. 225
**(Cite as: 407 B.R. 463)**

law firm of Cravath, Swaine & Moore), received a fairness opinion, dated May 31, 2009 (the "**Fairness Opinion**"), from Evercore Group L.L.C. ("**Evercore**").

The Fairness Opinion's conclusion was that the purchase price was fair to GM, from a financial point of view. No contrary evidence has been submitted to the Court.

*10. Specifics of the Transaction*

The sale transaction, as embodied in the MPA and related documents, is complex. Its "deal points" can be summarized as follows:

*(a) Acquired and Excluded Assets*

Under the Sale, New GM will acquire all of Old GM's assets, with the exception of certain assets expressly excluded under the MPA (respectively, the "**Purchased Assets**" and the "**Excluded Assets**"). The Excluded Assets chiefly consist of:

(i) $1.175 billion in cash or cash equivalents;

(ii) equity interests in certain Saturn and other entities;

(iii) certain real and personal property;

(iv) bankruptcy avoidance actions;

(v) certain employee benefit plans; and

(vi) certain restricted cash and receivables.

*(b) Assumed and Excluded Liabilities*

Old GM will retain all liabilities except those defined in the MPA as "**Assumed Liabilities.**" The Assumed Liabilities include:

(i) product liability claims arising out of products delivered at or after the Sale transaction closes (the "***Closing***");

(ii) the warranty and recall obligations of both Old GM and New GM;

(iii) all employment-related obligations and liabilities under any assumed employee benefit plan relating to

employees that are or were covered by the UAW collective bargaining agreement;

and-by reason of an important change that was made in the MPA after the filing of the motion-

**\*482** (iv) broadening the first category substantially, *all* product liability claims arising from accidents or other discrete incidents arising from operation of GM vehicles occurring subsequent to the closing of the 363 Transaction, ***regardless*** *of when the product was purchased.*

The liabilities being retained by Old GM include:

(i) product liability claims arising out of products delivered prior to the Closing (to the extent they weren't assumed by reason of the change in the MPA after the filing of objections);

(ii) liabilities for claims arising out of exposure to asbestos;

(iii) liabilities to third parties for claims based upon "[c]ontract, tort or any other basis";

(iv) liabilities related to any implied warranty or other implied obligation arising under statutory or common law; and

(v) employment-related obligations not otherwise assumed, including, among other obligations, those arising out of the employment, potential employment, or termination of any individual (other than an employee covered by the UAW collective bargaining agreement) prior to or at the Closing.

*(c) Consideration*

Old GM is to receive consideration estimated to be worth approximately $45 billion, plus the value of equity interests that it will receive in New GM. It will come in the following forms:

(i) a credit bid by the U.S. Treasury and EDC, who will credit bid the majority of the indebtedness outstanding under their DIP facility and the Treasury Prepetition Loan;

(ii) the assumption by New GM of approximately $6.7 billion of indebtedness under the DIP facilities, plus an

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

407 B.R. 463, 51 Bankr.Ct.Dec. 225
**(Cite as: 407 B.R. 463)**

additional $1.175 billion to be advanced by the U.S. Treasury under a new DIP facility (the "**Wind Down Facility**") whose proceeds will be used by Old GM to wind down its affairs;

(iii) the surrender of the warrant that had been issued by Old GM to Treasury in connection with the Treasury Prepetition Loan;

(iv) 10% of the post-closing outstanding shares of New GM, plus an additional 2% if the estimated amount of allowed prepetition general unsecured claims against Old GM exceeds $35 billion;

(v) two warrants, each to purchase 7.5% of the post-closing outstanding shares of New GM, with an exercise price based on a $15 billion equity valuation and a $30 billion equity valuation, respectively; and

(vi) the assumption of liabilities, including those noted above.

*(d) Ownership of New GM*

Under the terms of the Sale, New GM will be owned by four entities.

(i) Treasury will own 60.8% of New GM's common stock on an undiluted basis. It also will own $2.1 billion of New GM Series A Preferred Stock;

(ii) EDC will own 11.7% of New GM's common stock on an undiluted basis. It also will own $400 million of New GM Series A Preferred Stock;

(iii) A New Employees' Beneficiary Association Trust ("**New VEBA**") will own 17.5% of New GM's common stock on an undiluted basis. It also will own $6.5 billion of New GM's Series A Preferred Stock, and a 6-year warrant to acquire 2.5% of New GM's common stock, with an exercise price based on $75 billion total equity value; and

**\*483** (iv) Finally, if a chapter 11 plan is implemented as contemplated under the structure of the Sale transaction, Old GM will own 10% of New GM's common stock on an undiluted basis. In addition, if the allowed prepetition general unsecured claims against Old GM exceed $35 billion, Old GM will be issued an additional 10 million shares, amounting to approximately 2% of

New GM's common stock. Old GM will also own the two warrants mentioned above.

*(e) Other Aspects of Transaction*

New GM will make an offer of employment to all of the Sellers' non-unionized employees and unionized employees represented by the UAW. Substantially all of old GM's executory contracts with direct suppliers are likely to be assumed and assigned to New GM.

After the Closing, New GM will assume all liabilities arising under express written emission and limited warranties delivered in connection with the sale of new vehicles or parts manufactured or sold by Old GM.

One of the requirements of the U.S. Treasury, imposed when the Treasury Prepetition Loan was put in place, was the need to negotiate a new collective bargaining agreement which would allow GM to be fully competitive, and "equitize"-*i.e.,* convert to equity-at least one half of the obligation GM had to the UAW VEBA. Ultimately GM did so. New GM will make future contributions to the New VEBA that will provide retiree health and welfare benefits to former UAW employees and their spouses. Also, as part of the 363 Transaction, New GM will be the assignee of revised collective bargaining agreements with the UAW, the terms of which were recently ratified-though contingent upon the approval of the entirety of these motions.

*(f) The Proposed Sale Order*

Though GM's request has been narrowed, as noted above, to provide that New GM will assume liability for product liability claims arising from operation of GM vehicles occurring after the closing of the 363 Transaction ( **regardless** of when the product was purchased), GM asks this Court, as in the *Chrysler* case, to authorize the Sale free and clear of all other "liens, claims, encumbrances and other interests," including, specifically, "all successor liability claims."

To effectuate this result, GM has submitted a proposed order to the Court (the "**Proposed Sale Order**") that contains provisions directed at cutting off successor liability except in the respects where successor liability was contractually assumed.

First, the Proposed Sale Order contains a finding-and a decretal provision to similar effect-that the Debtors may

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

407 B.R. 463, 51 Bankr.Ct.Dec. 225
**(Cite as: 407 B.R. 463)**

sell the Purchased Assets free and clear of all liens, claims, encumbrances, and other interests, including rights or claims based on any successor or transferee liability.

Second, the Proposed Sale Order would enjoin all persons (including "litigation claimants") holding liens, claims, encumbrances, and other interests, including rights or claims based on any successor or transferee liability, from asserting them against New GM or the Purchased Assets. [FN11]

  [FN11.] Proposed Sale Order ¶ 8.

*11. Contingent Liabilities*

Certain types of GM liabilities are contingent and difficult to quantify. GM's most recent quarterly report noted present valued contingent liabilities of $934 million for product liability, $627 million **\*484** for asbestos liability, $307 million for other litigation liability, and $294 million for environmental liability.

*12. Agreement with UAW*

Workers in the U.S. do not have government provided healthcare benefits of the type that the employees of many of GM's foreign competitors do. Over the years, GM and the other members of the Big Three committed themselves to offer many of those healthcare benefits, resulting in decreased competitiveness and enormous liabilities. GM tried to reduce the costs of healthcare benefits for its employees, but these costs continued to substantially escalate. Many of these costs were in the form of obligations to pay healthcare costs of union employees on retirement.

In 2007 and 2008, GM settled various controversies with respect to its healthcare obligations by entering into an agreement (the "**2008 UAW Settlement Agreement**"), generally providing that responsibility for providing retiree healthcare would permanently shift from GM to a new plan that was independent of GM. GM would no longer have to pay for the benefits themselves, but instead would have to make specified contributions aggregating approximately $20.56 billion to be made by GM into the VEBA Trust. The 2008 UAW Settlement Agreement, therefore, fixed and capped GM's obligations-but in a very large amount.

As part of the 363 Transaction, the Purchaser and the UAW have reached a resolution addressing the ongoing provision of those benefits. New GM will make contribu-

tions to the New VEBA, which will have the obligation to fund the UAW retiree health and welfare benefits. And under the "**UAW Retiree Settlement Agreement,**" New GM will put value into the New VEBA, which will then have the obligation to fund retiree medical benefits for the Debtors' retirees and surviving spouses represented by the UAW (the "**UAW-Represented Retirees**").

New GM will also assume modified and duly ratified collective bargaining agreements entered into by and between the Debtors and the UAW.

*13. Need for Speed*

GM and the U.S. Treasury say that the 363 Transaction must be approved and completed quickly. The Court finds that they are right.

Absent prompt confirmation that the sale has been approved and that the transfer of the assets will be implemented, GM will have to liquidate. There are no realistic alternatives available.

There are no merger partners, acquirers, or investors willing and able to acquire GM's business. Other than the U.S. Treasury and EDC, there are no lenders willing and able to finance GM's continued operations. Similarly, there are no lenders willing and able to finance GM in a prolonged chapter 11 case.

The continued availability of the financing provided by Treasury is expressly conditioned upon approval of this motion by July 10, and prompt closing of the 363 Transaction by August 15. Without such financing, GM faces immediate liquidation.

The Court accepts as accurate and truthful the testimony by GM CEO Fritz Henderson at the hearing:

  Q. Now, if the U.S. Treasury does not fund on July 10th and the sale order is not entered by that date, what options are there for GM at that point?

  A. Well, if they don't continue, we would liquidate. [FN12]

    [FN12.] Audio Recording of Testimony of June 30, 2009.

**\*485** The July 10 deadline is important because the U.S.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

407 B.R. 463, 51 Bankr.Ct.Dec. 225
**(Cite as: 407 B.R. 463)**

Treasury, like GM itself, has been very concerned about the business status of the company in a bankruptcy process.[FN13] GM did worse than expected in fleet sales in June, as fleet sales customers pulled back their orders because they didn't know their status in the bankruptcy. Although the company did *better* on retail sales than expected in June, it did so for a number of reasons, one of which was the expectation that the chapter 11 case would move quickly, and that the company, in the 363 process, would be successful.[FN14] And results were "still terrible."[FN15]

FN13. *Id.* at 85.

FN14. *Id.* at 85-86.

FN15. *Id.* at 103.

Even if funding were available for an extended bankruptcy case, many consumers would not consider purchasing a vehicle from a manufacturer whose future was uncertain and that was entangled in the bankruptcy process.

Thus the Court agrees that a lengthy chapter 11 case for the Debtors is not an option. It also agrees with the Debtors and the U.S. Government that it is not reasonable to expect that a reorganization plan could be confirmed in the next 60 days (*i.e.,* 90 days from the Filing Date).

The Auto Task Force talked to dozens of experts, industry consultants, people who had observed **General Motors** for decades, management, and people who were well versed in the **bankruptcy** process as part of its planning and work on this matter. None of them felt that GM could survive a traditional chapter 11 process. The Auto Task Force learned of views by one of the leading commentators on GM that GM would be making a tragic mistake by pursuing a bankruptcy filing. It became clear to the Auto Task Force that a bankruptcy with a traditional plan confirmation process would be so injurious to GM as to not allow for GM's viability going forward.[FN16]

FN16. Audio Recording of Testimony of July 1, 2009.

The Court accepts this testimony, and so finds. A 90 day plan confirmation process would be wholly unrealistic. In fact, the notion that a reorganization with a plan confirmation could be completed in 90 days in a case of this size and complexity is ludicrous, especially when one is al-

ready on notice of areas of likely controversy.

*14. Ultimate Facts*

The Court thus makes the following findings of ultimate facts:

1. There is a good business reason for proceeding with the 363 Transaction now, as contrasted to awaiting the formulation and confirmation of a chapter 11 plan.

2. There is an articulated business justification for proceeding with the 363 Transaction now.

3. The 363 Transaction is an appropriate exercise of business judgment.

4. The 363 Transaction is the only available means to preserve the continuation of GM's business.

5. The 363 Transaction is the only available means to maximize the value of GM's business.

6. There is no viable alternative to the 363 Transaction.

7. The only alternative to the 363 Transaction is liquidation.

8. No unsecured creditor will here get less than it would receive in a liquidation.

9. The UAW Settlement is fair and equitable, and is in the best interests**486** of both the estate and UAW members.

10. The secured debt owing to the U.S. Government and EDC (both post-petition and, to the extent applicable, prepetition) is not subject to recharacterization as equity or equitable subordination, and could be used for a credit bid.

11. The Purchaser is a purchaser in good faith.

*Discussion*

The substantive objections break down into a number of categories by concept, and the Court thus considers them in that fashion.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

407 B.R. 463, 51 Bankr.Ct.Dec. 225
**(Cite as: 407 B.R. 463)**

*1. Sale Under Section 363*

Determining the propriety of the 363 Transaction requires confirming that section 363 can be utilized for the sale of this much of GM's assets before confirmation of a reorganization plan; that the necessary showings for approval of any section 363 sale have been made; that the 363 Transaction is not a "*sub rosa*" plan; and that various related issues have been satisfactorily resolved. The Court considers these in turn.

*(a) Utilization of Section 363*

[1] The F & D Bondholders, bondholder Oliver Addison Parker ("**Parker**") and several other objectors contend that by disposing of so much of its assets in a single section 363 sale, GM improperly utilizes section 363. Implicit in that argument is the contention that even under the facts here, section 363 cannot be used to dispose of all or the bulk of a debtor's assets, and that such can be achieved only by means of a reorganization plan. The Court disagrees.

As usual, the Court starts with textual analysis. With exceptions not relevant here, section 363 of the Bankruptcy Code provides, in relevant part:

(b)(1) The trustee,[ [FN17] ] after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate....

FN17. In all respects relevant here, where (as here, and as is the norm) the debtor remains in possession and the court has not ordered otherwise, the debtor has the rights of the trustee. *See* Bankruptcy Code section 1107(a) ("Subject to ... such limitations or conditions as the court prescribes, a debtor in possession shall have all the rights, other than the right to compensation ... of a trustee serving in a case under this chapter.").

Notably, section 363 has no carveouts from its grant of authority when applied in cases under chapter 11. Section 363 does not provide, in words or substance, that it may not be used in chapter 11 cases for dispositions of property exceeding any particular size, or where the property is of such importance that it should alternatively be disposed of under a plan. Nor does any other provision of the Code so provide.

Then, section 1123 of the Code-captioned "Contents of

plan," a provision in chapter 11 which sets forth provisions that a chapter 11 reorganization plan *must* do or contain, and *may* do or contain-provides, as one of the things that a plan *may* do:

provide for the sale of all or substantially all of the property of the estate, and the distribution of the proceeds of such sale among holders of claims or interests.... [FN18]

FN18. Section 1123(b)(4).

But neither section 363 nor section 1123(b)(4) provides that resort to 1123(b)(4) is the *only* way by which all or substantially all of the assets can be sold in **\*487** a chapter 11 case. Most significantly, neither section 1123(b)(4) nor any other section of the Code trumps or limits section 363, which by its plain meaning permits what GM here proposes to do.

[2] However, the issue cannot be addressed by resort to "plain meaning" or textual analysis alone. GM's ability to sell the assets in question under section 363 is governed by an extensive body of caselaw. Bankruptcy courts in this Circuit decide issues of the type now before the Court under binding decisions of the U.S. Supreme Court and the Second Circuit Court of Appeals, each of which (particularly the latter) has spoken to the issues here. And bankruptcy courts also look to other bankruptcy court decisions, which, in this District and elsewhere, have dealt with very similar facts. While an opinion of one bankruptcy judge in this District is not, strictly speaking, binding on another, it is the practice of this Court to grant great respect to the earlier bankruptcy court precedents in this District,[FN19] particularly since they frequently address issues that have not been addressed at the Circuit level.

FN19. *See, e.g., In re Adelphia Communications Corp.,* 359 B.R. 65, 72 n. 13 (Bankr.S.D.N.Y.2007) ("This Court has been on record for many years as having held that the interests of predictability in this District are of great importance, and that where there is no controlling Second Circuit authority, it follows the decisions of other bankruptcy judges in this district in the absence of clear error.").

Here this Court has the benefit of the decisions of Bankruptcy Judge Gonzalez in the *Chrysler* chapter 11 cases [FN20]-affirmed by the Second Circuit, for substantially the reasons Judge Gonzalez set forth in his opinion-on facts

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

407 B.R. 463, 51 Bankr.Ct.Dec. 225
**(Cite as: 407 B.R. 463)**

extraordinarily similar to those here.[FN21] Even more importantly, this Court also has the benefit of the Second Circuit's decisions in *Lionel,*[FN22] *LTV,*[FN23] *Financial News Network,*[FN24] *Gucci,*[FN25] and **\*488***Iridium,*[FN26] which confirm that section 363 sales of major assets may be effected before confirmation, and lay out the circumstances under which that is appropriate. And this Court also can draw upon the Supreme Court's decision in *Piccadilly Cafeterias,*[FN27] which, while principally addressing other issues, recognized the common practice in chapter 11 cases of selling the bulk of a debtor's assets in a section 363 sale, to be followed by confirmation of a liquidating plan.

> FN20. *See In re Chrysler LLC,* 405 B.R. 84 (Bankr.S.D.N.Y.2009) ( " *Chrysler* "), and 405 B.R. 79 (Bankr.S.D.N.Y.2009) (" *Chrysler-Standing* ") (Gonzalez, J.), *aff'd for substantially the reasons stated in the opinions below,* No. 09-2311-bk (2d Cir. Jun. 5, 2009) ("*Chrysler-Circuit* "), *temporary stay vacated and further stay denied,* --- U.S. ----, 129 S.Ct. 2275, 173 L.Ed.2d 1285 (2009).

> FN21. Though the similarities between this case and *Chrysler* are many, there is a noteworthy difference, as that case had one issue not before the Court here. In *Chrysler,* Judge Gonzalez had to analyze rights of participants in a secured lending facility who quarreled with their administrative agent's decision to consent to a sale free and clear of secured creditor claims and interests. *See Chrysler,* 405 B.R. at 100-104. Here there was no objection by secured creditors, other than a single limited objection by a secured creditor with a lien on property to be transferred, looking for adequate protection as part of the sale. Here the objecting bondholders are holders of *unsecured* debt, and thus lack the greater rights that secured creditors have in bankruptcy cases. Of course, the *Chrysler* case never really concerned, as some asserted, an assault on secured creditors' rights; it merely involved dissident minority participants in a secured lending facility being bound by the actions of their agent, pursuant to contractual agreements with the agent that they or their predecessors had agreed to.

> FN22. *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.),* 722 F.2d 1063, (2d Cir.1983) (" *Lionel* ").

> FN23. *Official Comm. of Unsecured Creditors of LTV Aerospace & Defense Co. v. LTV Corp. (In re Chateaugay Corp.),* 973 F.2d 141 (2d Cir.1992) (" *LTV* ").

> FN24. *Consumer News & Bus. Channel P'ship v. Fin. News Network Inc. (In re Fin. News Network Inc.),* 980 F.2d 165 (2d Cir.1992) ( " *FNN* ").

> FN25. *Licensing By Paolo, Inc. v. Sinatra (In re Gucci),* 126 F.3d 380 (2d Cir.1997) (" *Gucci* ").

> FN26. *Motorola v. Comm. of Unsecured Creditors (In re Iridium Operating LLC),* 478 F.3d 452 (2d Cir.2007) (" *Iridium* ").

> FN27. *Florida Dept. of Revenue v. Piccadilly Cafeterias, Inc.,* 554 U.S. 33, 128 S.Ct. 2326, 2331 n. 2, 171 L.Ed.2d 203 (2008) ( " *Piccadilly Cafeterias* ").

In *Chrysler,* Judge Gonzalez discussed at great length the evolution of the law in this area and its present requirements,[FN28] and this Court need not do so in comparable length. Judge Gonzalez, and the Second Circuit affirming him, dealt with the exact issue presented here: whether under Bankruptcy Code section 363, the bulk of the assets of an estate can be sold before confirmation. As Judge Gonzalez noted, *Lionel*-upon whose standards all of the cases considering pre-confirmation section 363 sales have been based-speaks directly to whether assets of a bankruptcy estate can be sold "out of the ordinary course of business and prior to acceptance and outside of any plan of reorganization."[FN29]

> FN28. *See Chrysler,* 405 B.R. at 94-96.

> FN29. *Id.* at 94.

The *Lionel* court expressly recognized that section 363(b) "seems on its face to confer upon the bankruptcy judge virtually unfettered discretion" to authorize sales out of the ordinary course.[FN30] And the *Lionel* court further declared that "a bankruptcy judge must not be shackled with unnecessarily rigid rules when exercising the undoubtedly broad administrative power granted him under the Code,"[FN31] and that:

> FN30. 722 F.2d at 1069.

407 B.R. 463, 51 Bankr.Ct.Dec. 225
**(Cite as: 407 B.R. 463)**

FN31. *Id.*

To further the purposes of Chapter 11 reorganization, a bankruptcy judge must have substantial freedom to tailor his orders to meet differing circumstances. This is exactly the result a liberal reading of § 363(b) will achieve. [FN32]

FN32. *Id.*

Nevertheless, the Circuit considered it inappropriate to authorize use of section 363(b) to the full extent that section 363(b)'s plain language-with its absence of any express limitations-would suggest. Instead, the Circuit established a standard that was in substance one of common law, but grounded in the overall structure of the Bankruptcy Code. The Second Circuit "reject[ed] the requirement that only an emergency permits the use of § 363(b)." [FN33] But it also "reject[ed] the view that § 363 grants the bankruptcy judge carte blanche." [FN34] Concerned that such a construction would "swallow[ ] up Chapter 11's safeguards," [FN35] the *Lionel* court established the more nuanced balancing test that the lower courts in this Circuit have applied for more than 25 years. The Circuit declared:

FN33. *Id.*

FN34. *Id.*

FN35. *Id.*

The history surrounding the enactment in 1978 of current Chapter 11 and the logic underlying it buttress our conclusion that *there must be some articulated business justification,* other than appeasement*489 of major creditors, for using, selling or leasing property out of the ordinary course of business before the bankruptcy judge may order such disposition under section 363(b). [FN36]

FN36. *Id.* at 1070 (emphasis added).

It went on to say that:

Resolving the apparent conflict between Chapter 11 and § 363(b) does not require an all or nothing approach. Every sale under § 363(b) does not automatically short-circuit or side-step Chapter 11; nor are these two statutory provisions to be read as mutually exclusive. Instead, if a bankruptcy judge is to administer a business reorganization successfully under the Code, then ...

some play for the operation of both § 363(b) and Chapter 11 must be allowed for. [FN37]

FN37. *Id.* at 1071,

And it went on to set forth the rule for which *Lionel* is remembered:

The rule we adopt requires that a judge determining a § 363(b) application expressly find from the evidence presented before him at the hearing *a good business reason* to grant such an application. [FN38]

FN38. *Id.* (emphasis added).

[3] With no less than five decisions from the Circuit holding similarly [FN39]-not counting the Circuit's recent affirmance of *Chrysler*-it is plain that in the Second Circuit, as elsewhere, [FN40] even the entirety of a debtor's business may be sold without waiting for confirmation when there is a good business reason for doing so. Likewise, in *Piccadilly Cafeterias,* the Supreme Court, while principally addressing a different issue, [FN41] recognized the use of *490 section 363 sales under which all or substantially all of a debtor's assets are sold. The Supreme Court stated:

FN39. *See Lionel; LTV,* 973 F.2d at 143-44 ("In *Lionel,* we adopted a rule that 'requires that a judge determining a § 363(b) application expressly find from the evidence presented before him at the hearing a good business reason to grant such an application,' " and, quoting *Lionel,* reiterating that "First and foremost is the notion that a bankruptcy judge must not be shackled with unnecessarily rigid rules when exercising the undoubtedly broad administrative power granted him under the Code," and that "a bankruptcy judge must have substantial freedom to tailor his orders to meet differing circumstances."); *FNN,* 980 F.2d at 169 (in considering sale outside of a plan of reorganization, "a bankruptcy judge must not be shackled with unnecessarily rigid rules when exercising the undoubtedly broad administrative power granted him under the [Bankruptcy] Code"); *Gucci,* 126 F.3d at 387 ("A sale of a substantial part of a Chapter 11 estate ... may be conducted if a good business reason exists to support it."); *Iridium,* 478 F.3d at 466 ("In this Circuit, the sale of an asset of the estate under § 363(b) is permissible if the judge determining

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

407 B.R. 463, 51 Bankr.Ct.Dec. 225
**(Cite as: 407 B.R. 463)**

[the] § 363(b) application expressly find[s] from the evidence presented before [him or her] at the hearing [that there is] a good business reason to grant such an application.").

FN40. *See, e.g., In re Decora Indus., No. 00-4459, 2002 WL 32332749, at \*3 (D.Del. May 20, 2002)* (Farnan, J.) (approving a 363 sale, finding a "sound business purpose" where "the Court understands the precarious financial and business position of Debtors"; their only source of outside financing was a DIP facility that would soon expire, with no source of alternative financing, and where the alternatives were either the proposed sale transaction or termination of business operations and liquidation).

*See also* 3 COLLIER ON BANKRUPTCY ¶ 363.02[3] (15th ed. rev.2009) ( "**Collier** ") (While sales of substantial portions of a debtor's assets under section 363 must be scrutinized closely by the court, "[i]t is now generally accepted that section 363 allows such sales in chapter 11, as long as the sale proponent demonstrates a good, sound business justification for conducting the sale before confirmation (other than appeasement of the loudest creditor), that there has been adequate and reasonable notice of the sale, that the sale has been proposed in good faith, and that the purchase price is fair and reasonable.").

FN41. There the issue involved the debtor's entitlement to the "stamp-tax" exemption of Bankruptcy Code section 1146, after a 363 sale of the entirety of the debtor's assets and confirmation of a plan distributing the proceeds of the earlier 363 sale.

Chapter 11 bankruptcy proceedings ordinarily culminate in the confirmation of a reorganization plan. *But in some cases, as here, a debtor sells all or substantially all its assets under § 363(b)(1) before seeking or receiving plan confirmation.* In this scenario, the debtor typically submits for confirmation a plan of liquidation (rather than a traditional plan of reorganization) providing for the distribution of the proceeds resulting from the sale.[FN42]

FN42. 128 S.Ct. at 2331 n. 2 (emphasis added).

[4][5][6] In making the determination as to whether there is a good business reason to effect a 363 sale before confirmation, the *Lionel* court directed that a court should consider all of the "salient factors pertaining to the proceeding" and "act to further the diverse interests of the debtor, creditors and equity holders."[FN43] It then set forth a nonexclusive list to guide a court in its consideration of the issue:

FN43. 722 F.2d at 1071.

(a) the proportionate value of the asset to the estate as a whole;

(b) the amount of elapsed time since the filing;

(c) the likelihood that a plan of reorganization will be proposed and confirmed in the near future;

(d) the effect of the proposed disposition on future plans of reorganization;

(e) the proceeds to be obtained from the disposition vis-a-vis any appraisals of the property;

(f) which of the alternatives of use, sale or lease the proposal envisions; and "most importantly perhaps,"[FN44]

FN44. *Id.*

(g) whether the asset is increasing or decreasing in value.[FN45]

FN45. *Id.* at 1071.

Importantly, the *Lionel* court also declared that a bankruptcy court must consider if those opposing the sale produced some evidence that the sale was not justified.[FN46]

FN46. *Id.*

As the *Lionel* court expressly stated that the list of salient factors was not exclusive,[FN47] this Court might suggest a few more factors that might be considered, along with the preceding factors, in appropriate cases:

FN47. *Id.* ("This list is not intended to be exclusive, but merely to provide guidance to the bankruptcy judge."); *accord Iridium,* 478 F.3d at

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

407 B.R. 463, 51 Bankr.Ct.Dec. 225
**(Cite as: 407 B.R. 463)**

466 n. 21.

(h) Does the estate have the liquidity to survive until confirmation of a plan?

(i) Will the sale opportunity still exist as of the time of plan confirmation?

(j) If not, how likely is it that there will be a satisfactory alternative sale opportunity, or a stand-alone plan alternative that is equally desirable (or better) for creditors? And

(k) Is there a material risk that by deferring the sale, the patient will die on the operating table?

Each of the factors that the *Lionel* court listed, and the additional ones that this Court suggests, go to the ultimate questions that the *Lionel* court identified: Is there an "articulated business justification" and a "good business reason" for proceeding with the sale without awaiting the final confirmation of a plan.

**\*491** [7][8][9] As discussed in Section 1(c) below, a debtor cannot enter into a transaction that "would amount to a *sub rosa* plan of reorganization" or an attempt to circumvent the chapter 11 requirements for confirmation of a plan of reorganization.[FN48] If, however, the transaction has "a proper business justification" which has the potential to lead toward confirmation of a plan and is not to evade the plan confirmation process, the transaction may be authorized.[FN49] Thus as observed in *Chrysler:*

FN48. *See Chrysler,* 405 B.R. at 95-96.

FN49. *Id.* at 96.

A debtor may sell substantially all of its assets as a going concern and later submit a plan of liquidation providing for the distribution of the proceeds of the sale. This strategy is employed, for example, when there is a need to preserve the going concern value because revenues are not sufficient to support the continued operation of the business and there are no viable sources for financing.[FN50]

FN50. *Id.* (citations omitted).

As further observed in *Chrysler,* several sales seeking to preserve going concern value have recently been approved

in this district, and going back further, many more have been, as debtors not infrequently could not survive until a plan could be confirmed. In addition to *BearingPoint,* which Judge Gonzalez expressly noted, many other 363 sales have been approved in chapter 11 cases on this Court's watch, after appropriate consideration of *Lionel* and its progeny. In *Our Lady of Mercy Hospital,*[FN51] for example, the hospital was sold as a going concern before it ran out of money, saving about 2,300 jobs and a critical supplier of medical services in the Bronx.

FN51. No. 07-10609(REG), ECF # 284.

In *Adelphia,*[FN52] a sale under a *plan* was originally proposed by the debtors, but a section 363 sale had to be effected instead, when intercreditor disputes made it impossible to confirm a plan in time to save the sale opportunity, and more than $17 billion in sale proceeds nearly was lost.[FN53] Anyone with a knowledge of chapter 11 cases in this District can well understand why none of Harry Wilson's advisors thought that GM could survive a normal plan confirmation process.

FN52. No. 02-41729(REG).

FN53. *See In re Adelphia Commc'ns Corp.,* 368 B.R. 140, 169 (Bankr.S.D.N.Y.2007) (" Adelphia-Confirmation") (describing the history).

[10] After *Lionel, LTV, FNN, Gucci, Iridium* and, of course, *Chrysler,* it is now well established that a chapter 11 debtor may sell all or substantially all its assets pursuant to section 363(b) prior to confirmation of a chapter 11 plan, when the court finds a good business reason for doing so. And here the Court has made exactly such a finding. In fact, it is hard to imagine circumstances that could more strongly justify an immediate 363 sale. As the Court's Findings of Fact set forth at length, GM, with no liquidity of its own and the need to quickly address consumer and fleet owner doubt, does not have the luxury of selling its business under a plan.

And if that is not by itself enough, the U.S. Treasury's willingness to fund GM is contingent upon the approval of the 363 Transaction by July 10. The Court fully understands the unwillingness of the Government to keep funding GM indefinitely-especially to await the resolution of disputes amongst creditors trying to maximize their recoveries. If the 363 Transaction is disapproved, GM will lose its funding**\*492** and its liquidity on July 10, and its only alternative will be liquidation.[FN54]

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

407 B.R. 463, 51 Bankr.Ct.Dec. 225
**(Cite as: 407 B.R. 463)**

FN54. Thus the Court needn't spend extensive time in individualized discussion of each of the more specific factors articulated in *Lionel,* and by this Court, as aids in determining "good business reason." Where the proportionate value of the assets being sold is high, as they are here, Factor (a) (proportionate value of the assets to the estate as a whole) suggests that the situation be given close factual scrutiny-which the Court has attempted to do, in its rather lengthy Findings of Fact above-but at most Factor (a) tips only mildly against approval here. The same is true with respect to Factor (b) (elapsed time since the filing)-since where the need is most pressing, it would be foolhardy to wait. Factors (d) (effect on reorganization), (e) (proceeds to be realized), and (f) (which alternative is proposed) are inapplicable or favor immediate sale, as the Court finds that a standalone plan of reorganization is not possible, that the sale would not change distribution priorities in any ultimate plan, and there are no opportunities to realize greater value. And all of the other factors weigh *heavily* in favor of approval. Factor (g) (whether the asset is increasing or decreasing in value), expressly stated by the Circuit to be most important, *compels* and not just favors immediate sale. So do Factors (h) (lack of liquidity); (i) (no alternative sale opportunity later); (j) (same, along with no stand-alone plan alternative); and (k) the certainty or near certainty that in the absence of this sale, the patient will indeed die on the operating table. (If it matters, the same conclusion follows even if one does not consider the additional factors this Court suggested.)

The Court also notes the critically important absence of proof tending to support a contrary finding, as also required by *Lionel. See Lionel,* 722 F.2d at 1071. Opponents of the sale have produced no evidence that the sale is *not* justified.

In its summation, the F & D Bondholders Committee stated that it was not inclined to second guess *GM's* view that it had to proceed with a 363 sale, given GM's lack of alternatives, but that the *Court* should step in to tell everyone that a 363 sale was unacceptable. The premise underlying this contention was that the U.S. Government's July 10 deadline was just posturing, and that the Court

should assume that the U.S. Government cares so much about GM's survival that the U.S. Government would never let GM die.

The Court declines to accept that premise and take that gamble. The problem is not that the U.S. Treasury would walk away from GM if this Court took an extra day or so to reach its decision. The problem is that if the 363 Transaction got off track, especially by the disapproval the F & D Bondholders Committee seeks, the U.S. Government would see that there was no means of early exit for GM; that customer confidence would plummet; and that the U.S. Treasury would have to keep funding GM while bondholders (and, then, perhaps others) jousted to maximize their individual incremental recoveries. The Court fully takes Harry Wilson at his word.

In another matter in the *Adelphia* cases, this Court was faced with quite similar circumstances. The Government had the ability to effect a forfeiture of Adelphia assets, and even to indict Adelphia (as a corporation, in addition to the Rigases), which would destroy most, if not all, of Adelphia's value. The Government had indicted Arthur Andersen, with those exact consequences, but many Adelphia creditors argued that the Government would never do it again. And they objected to an Adelphia settlement that paid $715 million to the Government, to forestall all of those potential consequences, among others. This Court approved the settlement, and its determination was affirmed on appeal. This Court stated:

Would the DoJ have indicted Adelphia, with the threat to the recoveries for innocent stakeholders that such an indictment would have entailed? One would think not, but the DoJ had done **\*493** exactly that to Arthur Andersen, with those exact consequences. It was at least prudent for Adelphia's Board to protect the entity under its stewardship from its destruction, and to avoid taking such a gamble.[FN55]

FN55. *In re Adelphia Commc'ns Corp.,* 327 B.R. 143, 166 (Bankr.S.D.N.Y.2005) (" *Adelphia Settlement-Bankruptcy* "), *aff'd* 337 B.R. 475 (S.D.N.Y.2006) (Kaplan, J.)(" *Adelphia Settlement-District* "), *appeal dismissed,* 222 Fed.Appx. 7 (2d Cir.2006), *cert. denied,* 552 U.S. 941, 128 S.Ct. 114, 169 L.Ed.2d 244 (2007).

This Court further stated that "[o]nce more, the Adelphia Board cannot be faulted for declining to bet the company on what would be little more than a guess as to the decision

407 B.R. 463, 51 Bankr.Ct.Dec. 225
**(Cite as: 407 B.R. 463)**

the DoJ would make." [FN56]

FN56. *Adelphia Settlement-Bankruptcy,* 327 B.R. at 167.

GM's counsel noted in summation that the F & D Bond-holders Committee was expecting this Court to play Russian Roulette, and the comparison was apt. So that the F & D Bondholders Committee could throw GM into a plan negotiation process, the Court would have to gamble on the notion that the U.S. Government didn't mean it when it said that it would not keep funding GM. There is no reason why any fiduciary, or any court, would take that gamble. This is hardly the first time that this Court has seen creditors risk doomsday consequences to increase their incremental recoveries, and this Court-which is focused on preserving and maximizing value, allowing suppliers to survive, and helping employees keep their jobs-is not of a mind to jeopardize all of those goals.

Thus there is more than "good business reason" for the 363 Transaction here. The Creditors' Committee in this case put it better than this Court could:

> The simple fact is that there are no other viable bids-indeed no serious expressions of interest-to purchase GM's assets and no other feasible way for GM to restructure its business to remain viable. The current transaction is the only option on the table. The Court is thus faced with a clear choice: to approve the proposed sale transaction, preserve the going-concern value of the Debtors' businesses, and maximize substantial value for stakeholders (despite the pain that this course will inflict on numerous innocent parties), or reject the transaction and precipitate the dismantling and liquidation of GM to the detriment of all involved. *Preventing this harm serves the core purposes of the Bankruptcy Code and constitutes a strong business justification under Section 363 of the Code to sell the debtors' assets outside of a plan process.* [FN57]

FN57. Creditors' Comm. Ltd. Obj. ¶ 3 (emphasis added).

While because of the size of this case and the interests at stake, GM's chapter 11 case can hardly be regarded as routine, GM's proposed section 363 sale breaks no new ground. This is exactly the type of situation where under the Second Circuit's many holdings, there is good business reason for an immediate sale. GM does not have the luxury to wait for the ultimate confirmation of a plan, and the only

alternative to an immediate sale is liquidation.

*(b) Compliance with Standards for Approval of Section 363 Sales*

[11][12] With the Court having concluded that the requisite sound business justification exists for a proposed sale of the type proposed here, the inquiry turns to whether the routine requirements for any section 363 sale, and appropriate exercise of the business judgment rule, have been satisfied. The court must be satisfied that (i) notice has been given to all **\*494** creditors and interested parties; (ii) the sale contemplates a fair and reasonable price; and (iii) the purchaser is proceeding in good faith. [FN58]

FN58. *See, e.g., In re Betty Owens Sch., Inc.,* 1997 WL 188127, at \*4 (S.D.N.Y. Apr.17, 1997) (Leisure, J.), citing *In re Del. & Hudson Ry. Co.,* 124 B.R. 169, 176 (D.Del.1991) (Longobardi, J.). *See also* Judge Farnan's more recent decision in *Decora Industries,* 2002 WL 32332749, at \*2.

[13] These factors are all satisfied here. Notice was extensively given, and it complied with all applicable rules. As to the sufficiency of the purchase price, the Court is equally satisfied. No other, much less better, offer was received, and the GM Board even secured a fairness opinion from reputable advisors, expressing the opinion that the consideration was, indeed, fair.

[14] Finally, the Court has found that the Purchaser has acted in good faith, and as mixed questions of fact and law, the Court now determines (i) that this legal requirement for a sale has been satisfied, and (ii) that the Purchaser is entitled to a good faith purchaser finding-matters that are relevant to the determination under *Betty Owens Schools* and the other cases articulating like requirements, and also to the section 363(m) finding that the U.S. Government understandably desires. In ruling that the U.S. Government has indeed acted in good faith, for both of the purposes for which that ruling is relevant, the Court sees no basis for finding material differences in the standard.

[15][16] While the Bankruptcy Code does not define the "good faith" that protects transactions pursuant to section 363(m) (or, for that matter, the "good faith" that courts require in approving section 363 sales in the first place), the Second Circuit has explained that:

> Good faith of a purchaser is shown by the integrity of his

407 B.R. 463, 51 Bankr.Ct.Dec. 225
**(Cite as: 407 B.R. 463)**

conduct during the course of the sale proceedings; where there is a lack of such integrity, a good faith finding may not be made. A purchaser's good faith is lost by 'fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.' [FN59]

> FN59. *Gucci,* 126 F.3d at 390 (quoting *In re Rock Indus. Mach. Corp.,* 572 F.2d 1195, 1198 (7th Cir.1978)); *accord id.* (noting also that the relevant fraudulent, collusive actions are those "specifically intended to affect the sale price or control the outcome of the sale."); *Chrysler,* 405 B.R. at 106 (same).

Here there is no proof that the Purchaser (or its U.S. and Canadian governmental assignors) showed a lack of integrity in any way. To the contrary, the evidence establishes that the 363 Transaction was the product of intense arms'-length negotiations. And there is no evidence of any efforts to take advantage of other bidders, or get a leg up over them. In fact, the sad fact is that there *were no* other bidders.

Thus, the Court finds that the Purchaser is a good faith purchaser, for sale approval purposes, and also for the purpose of the protections section 363(m) provides.

[17][18] The Court additionally determines that it finds GM to be in compliance with the requirements of the business judgment rule, commonly used in consideration of 363 sales in this District and elsewhere. [FN60] As noted in this Court's decision in *Global Crossing,* and Judge Mukasey's decision in *Integrated Resources,* that rule **495 entails "(1) a business decision, (2) disinterestedness, (3) due care, (4) good faith, and (5) according to some courts and commentators, no abuse of discretion or waste of corporate assets." [FN61]

> FN60. *See In re Global Crossing Ltd.,* 295 B.R. 726, 742-44 (Bankr.S.D.N.Y.2003), relying heavily on *Official Comm. of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated Resources, Inc.),* 147 B.R. 650 (S.D.N.Y.1992)* (Mukasey, C.J.).

> FN61. *Global Crossing,* 295 B.R., at 743.

Here the Court finds it unnecessary to state, one more time, all of the facts that support a finding that such requirements

have been satisfied. The GM Board's decision would withstand *ab initio* review, far more than the business judgment test requires. [FN62]

> FN62. When the Court considers "disinterestedness," it looks to the disinterestedness of GM's Board and management, and particularly its Board, which is the ultimate decision maker for any corporation. The Court heard no evidence that either the Board or management chose the sale opportunity over any other alternative either because of a conflict of interest, or because the Government told them to. The Court finds instead that GM's Board and management took the pending opportunity to save the company because it was the only responsible alternative available.

> Finally, the U.S. and Canadian governments did not become "insiders" skewing any disinterestedness analysis by reason of their assistance to GM. *See Chrysler,* 405 B.R. at 107 ("Nor did the Governmental Entities control the Debtors in that regard [with respect to the *Chrysler* sale transaction] or become 'insiders' of the Debtors.").

*(c) "Sub Rosa" Plan*

[19] The F & D Bondholders, Parker and other objectors also contend that by proposing the 363 Transaction, GM has proposed the implementation of a forbidden "*sub rosa*" plan. The Court disagrees.

[20][21][22] While neither section 363 nor any other provision of the Code defines or otherwise mentions "*sub rosa*" plans, or provides that they are impermissible, caselaw (including caselaw in this Circuit and District) recognizes the impropriety of *sub rosa* plans in instances in which they genuinely exist. [FN63] The idea underlying the prohibition against *sub rosa* plans appears in *Braniff,* the case from which the prohibition emerged. It is that "the debtor and the Bankruptcy Court should not be able to short circuit the requirements of Chapter 11 for confirmation of a reorganization plan by establishing the terms of the plan *sub rosa* in connection with a sale of assets." [FN64] A proposed 363 sale may be objectionable, for example, when aspects of the transaction dictate the terms of the ensuing plan or constrain parties in exercising their confirmation rights, [FN65] such as by placing restrictions on creditors' rights to vote on a plan. [FN66] A 363 sale may also may be objectionable as a *sub rosa* plan if the sale itself seeks to

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

407 B.R. 463, 51 Bankr.Ct.Dec. 225
**(Cite as: 407 B.R. 463)**

allocate or dictate the distribution of sale proceeds among different classes of creditors.[FN67]

> FN63. *See* *Iridium,* 478 F.3d at 466 (citing *Pension Benefit Guar. Corp. v. Braniff Airways, Inc. (In re Braniff Airways, Inc.),* 700 F.2d 935, 940 (5th Cir.1983); *Chrysler,* 405 B.R. at 95-96).

> FN64. 700 F.2d at 940.

> FN65. *See* *Abel v. Shugrue (In re Ionosphere Clubs, Inc.),* 184 B.R. 648, 654 & n. 6 (S.D.N.Y.1995).

> FN66. *See* *Official Comm. of Unsecured Creditors v. Cajun Elec. Power Coop., Inc. (In re Cajun Elec. Power Coop., Inc.),* 119 F.3d 349, 354 (5th Cir.1997).

> FN67. *See* *Contrarian Funds, LLC v. Westpoint Stevens Inc. (In re Westpoint Stevens Inc.),* 333 B.R. 30, 51 (S.D.N.Y.2005) (Swain, J.).

But none of those factors is present here. The MPA does not dictate the terms of a plan of reorganization, as it does not attempt to dictate or restructure the rights of the creditors of this estate. It merely brings in value. Creditors will **\*496** thereafter share in that value pursuant to a chapter 11 plan subject to confirmation by the Court. A transaction contemplating that does not amount to a *sub rosa* plan.[FN68]

> FN68. *See* *In re Naron & Wagner, Chartered,* 88 B.R. 85, 88 (Bankr.D.Md.1988) (the "sale proposed here is not a *sub rosa* plan because it seeks only to liquidate assets, and the sale will not restructure [the] rights of creditors.").

[23] In the *TWA* chapter 11 case,[FN69] substantially all of the airline's assets were sold to American Airlines, in a 363 sale. There too the contention was made that the 363 sale was a *sub rosa* plan. Judge Walsh rejected the contention. He explained:

> FN69. *See* *In re Trans World Airlines, Inc.,* 2001 WL 1820326, at *11 (Bankr.D.Del. Apr.2, 2001) (Walsh, J.).

It is true, of course, that TWA is converting a group of volatile assets into cash. It may also be true that the value generated is not enough for a dividend to certain groups

of unsecured creditors. *It does not follow, however, that the sale itself dictates the terms of TWA's future chapter 11 plan.* The value generated through the Court approved auction process reflects the market value of TWA's assets and the conversion of the assets into cash is the contemplated result under § 363(b).[FN70]

> FN70. 2001 WL 1820326, at *12 (emphasis added).

Here the objectors principally base their arguments on things the *Purchaser* intends to do. They complain of the Purchaser's intention, in connection with the 363 Transaction, to

(i) be assigned substantially all executory contracts with direct suppliers,

(ii) make offers of employment to all of the Debtors' nonunionized employees and employees represented by the UAW, and

(iii) be assigned a modified collective bargaining agreement with the UAW, including an agreement to contribute to the New VEBA to fund retiree medical benefits for UAW members and their surviving spouses.

But these do not give rise to a *sub rosa* plan when the first is merely an example of an element of almost *every* 363 sale (where purchasers designate the contracts to be assumed and assigned), and the second and third are actions by the *Purchaser.*

The Court senses a disappointment on the part of dissenting bondholders that the Purchaser did not choose to deliver consideration to them in any manner other than by the Purchaser's delivery of consideration to GM as a whole, pursuant to which bondholders would share like other unsecured creditors-while many supplier creditors would have their agreements assumed and assigned, and new GM would enter into new agreements with the UAW and the majority of the dealers. But that does not rise to the level of establishing a *sub rosa* plan. The objectors' real problem is with the decisions of the Purchaser, not with the Debtor, nor with any violation of the Code or caselaw.

[24] Caselaw also makes clear that a section 363(b) sale transaction is not objectionable as a *sub rosa* plan based on the fact that the purchaser is to assume *some,* but not all, of the debtor's liabilities, or because some contract counter-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

407 B.R. 463, 51 Bankr.Ct.Dec. 225
**(Cite as: 407 B.R. 463)**

parties' contracts would not be assumed. As Judge Walsh observed in *TWA:*

[N]othing in § 363 suggests that disparate treatment of creditors, such as is likely to occur here, disqualifies a transaction from court approval. The purpose of a § 363(b) sale is to transform **\*497** assets ... into cash in an effort to maximize value. *Distribution of the value generated in accordance with § 1129 and other priority provisions occurs and is intended to occur subsequent to the sale.*

He further stated:

The treatment of creditors in a § 363(b) context is dictated by the fair market value of those assets of the debtor that the purchaser in its business judgment elects to purchase. A purchaser cannot be told to assume liabilities that do not benefit its purchase objective. *Thus, the disparate treatment of creditors occurs as a consequence of the sale transaction itself and is not an attempt by the debtor to circumvent the distribution scheme of the Code.* [FN71]

FN71. 2001 WL 1820326, at \*11 (emphasis added).

Last, but hardly least, the *sub rosa* plan contention was squarely raised, and rejected, in *Chrysler*, [FN72] which is directly on point and conclusive here.

FN72. *See* 405 B.R. at 97-100.

The *Chrysler* transaction was structured in a fashion very similar to that here, with a combination of sale proceeds to be provided to the seller, assignments of contracts with suppliers, taking on seller employees, and contribution to a VEBA. Judge Gonzalez rejected the contention that the transaction amounted to a *sub rosa* plan. He noted that:

(i) there was no attempt to allocate sale proceeds away from the objectors (there, first lien lenders); [FN73]

FN73. *Id.* at 98.

(ii) the fact that counterparties whose executory contracts were being assumed and assigned under section 365, at the election of the purchaser, gave counterparties a *Code-authorized* "more favorable treatment," which neither violated the priority rules nor transformed the

sale into a *sub rosa* plan; [FN74]

FN74. *Id.* at 99.

(iii) the purchaser's ability to choose which contracts it considered valuable did not change that result; [FN75]

FN75. *Id.*

(iv) in negotiating with groups essential to its viability (such as its workforce) the purchaser was free to provide ownership interests in the new entity as it saw fit; [FN76] and that

FN76. *Id.*

(v) the purchaser's allocation of value in its own enterprise did not elevate its measures into a *sub rosa* plan. [FN77]

FN77. *Id.* at 99-100.

In connection with the last two points, Judge Gonzalez made a critically important point-that the allocation of value by the purchaser did not affect the *debtor's* interest. In that connection, Judge Gonzalez observed:

In negotiating with those groups essential to its viability, New Chrysler made certain agreements and provided ownership interests in the new entity, which was neither a diversion of value from the Debtors' assets nor an allocation of the proceeds from the sale of the Debtors' assets. *The allocation of ownership interests in the new enterprise is irrelevant to the estates' economic interests.* [FN78]

FN78. *Id.* at 99 (emphasis added).

Similarly, Judge Gonzalez noted that what the UAW, the VEBA and the U.S. Treasury would be getting in New Chrysler was not on account of any entitlements any of them might have in the case before him. He observed:

**\*498** In addition, the UAW, VEBA, and the Treasury are not receiving distributions on account of their prepetition claims. Rather, consideration to these entities is being provided under separately-negotiated agreements with New Chrysler. [FN79]

407 B.R. 463, 51 Bankr.Ct.Dec. 225
**(Cite as: 407 B.R. 463)**

FN79. *Id.* As he further observed, the UAW in *Chrysler* was providing substantial consideration to New Chrysler in the form of "unprecedented modifications" to the UAW's collective bargaining agreement. *Id.* at 100. The record supports a similar finding here.

As in *Chrysler* and *TWA,* the Court rules that the 363 Transaction does not constitute an impermissible *sub rosa* plan.

*(d) Recharacterization or Subordination of U.S. Treasury Debt*

The F & D Bondholders and Bondholder Parker contend that some or all of the U.S. Government's secured debt should be recharacterized as equity-or, alternatively, equitably subordinated to unsecured debt-as a predicate for their next contention that it cannot be used as the basis for a credit bid. The Court disagrees with each contention.

In another of its decisions in the *Adelphia* chapter 11 cases,[FN80] this Court likewise considered allegations that a secured creditor's debt should be recharacterized as equity. In doing so, the Court applied standards articulated by the Fourth Circuit and Sixth Circuit in the *Dornier Aviation* [FN81] and *AutoStyle Plastics* [FN82] cases, which in turn had been based on tax law precedent.

FN80. *See Adelphia Commc'ns Corp. v. Bank of America (In re Adelphia Commc'ns Corp.),* 365 B.R. 24, 73-75 (Bankr.S.D.N.Y.2007) ( " *Adelphia-Bank of America* "), *aff'd as to all but an unrelated issue,* 390 B.R. 80 (S.D.N.Y.2008) (McKenna, J.).

FN81. *In re Official Comm. of Unsecured Creditors for Dornier Aviation (North America), Inc.,* 453 F.3d 225, 233-34 (4th Cir.2006).

FN82. *In re AutoStyle Plastics, Inc.,* 269 F.3d 726, 749-50 (6th Cir.2001).

[25] Factors listed in those cases are:

(1) the names given to the instruments, if any, evidencing the indebtedness;

(2) the presence or absence of a fixed maturity date and schedule of payments;

(3) the presence or absence of a fixed rate of interest and interest payments;

(4) the source of repayments;

(5) the adequacy or inadequacy of capitalization;

(6) the identity of interest between the creditor and the stockholder;

(7) the security, if any, for the advances;

(8) the corporation's ability to obtain financing from outside lending institutions;

(9) the extent to which the advances were subordinated to the claims of outside creditors;

(10) the extent to which the advances were used to acquire capital assets; and

(11) the presence or absence of a sinking fund to provide repayments. [FN83]

FN83. *See Adelphia-Bank of America,* 365 B.R. at 74 (*citing, inter alia, Dornier Aviation* and *AutoStyle* ).

[26] Here the Court finds that GM was inadequately capitalized at the time the loans were made; that GM could not obtain financing from outside lending institutions, and that the record does not show the presence of a sinking fund to provide repayments-three of the eleven factors that would suggest recharacterization. But of the remainder, every single factor supports finding that this was genuine debt. Among other factors, as noted in the Court's Findings of Fact above, this ***499** transaction was fully documented as a loan; was secured debt, complete with intercreditor agreements to address priority issues with other secured lenders; had interest terms (albeit at better than market rate) and maturity terms, and, significantly, had *separate* equity features-providing for warrants to accompany the debt instruments. The Court has previously found, as a fact and mixed question of fact and law, that the Prepetition Secured Debt was, in fact, debt, and the Court now determines that as a conclusion of law.[FN84]

FN84. There is no basis for recharacterizing the

407 B.R. 463, 51 Bankr.Ct.Dec. 225
**(Cite as: 407 B.R. 463)**

$33 billion that was the subject of the DIP loans provided by the U.S. Treasury and EDC. These were presented to the Court as loans, seeking approval for post-petition financing under section 364 of the Code.

[27][28] Likewise, the Court disagrees with contentions (principally by bondholder Parker) that the secured debt held by the U.S. Treasury (and, presumably, EDC) should be equitably subordinated. The Court addressed the development of the law of equitable subordination (and its first cousin, equitable disallowance) in its decision in *Adelphia-Bank of America,* and need not discuss it in comparable length here. It is sufficient for the purposes of this decision to say that as originally stated in the famous case of *Mobile Steel,*[FN85] a party seeking to establish equitable subordination must prove that (i) the holder of the claim being subordinated engaged in inequitable conduct; (ii) the inequitable conduct resulted in injury to creditors or conferred an unfair advantage on the claimant; and (iii) equitable subordination is not inconsistent with the provisions of the Bankruptcy Code.[FN86] None of those factors has been established here.

FN85. *Benjamin v. Diamond (In re Mobile Steel Co.),* 563 F.2d 692 (5th Cir.1977).

FN86. *Id.* at 700.

First the Court finds that none of the U.S. Treasury, the Government of Canada, the Government of Ontario, or EDC acted inequitably in any way. They advanced funds to help thousands of creditors, citizens, employees of GM, and employees of suppliers and others. Their efforts to ensure that they were not throwing their money away in a useless exercise, and were expecting GM to slim down so it could survive without governmental assistance, are hardly inequitable; they were common sense.

Similarly, the Court finds no harm to creditors; without the challenged efforts, GM would have had to liquidate. Nor was there any special benefit to any of the Government entities.

Finally, treating the governmental lenders as lenders is hardly inconsistent with the provisions of the Bankruptcy Code. There is, in short, no basis for equitable subordination here.

*(e) Asserted Inability to Credit Bid*

In light of the conclusions reached in the preceding section, the U.S. Treasury and EDC may, if they choose, assign their secured debt to the Purchaser, and there is then no reason why the Purchaser may not credit bid.

*2. Successor Liability Issues*

Many objectors-including the Ad Hoc Committee of Consumer Victims (the "**Consumer Victims Committee**"), individual accident litigants ("the **Individual Accident Litigants**"), and attorneys for asbestos victim litigants (collectively, "the **Asbestos Litigants**") object to provisions in the proposed sale order that would limit any "successor liability" that New GM might have. Successor liability claims normally are for money damages-as, for example,**\*500** the claims by the Individual Accident Litigants. If permitted, such claims would be asserted against the successor in ownership of property that was transferred from the entity whose alleged wrongful acts gave rise to the claim.

[29][30] "As a general rule, a purchaser of assets does not assume the liabilities of the seller unless the purchaser expressly agrees to do so or an exception to the rule exists."[FN87] Successor liability is an equitable exception to that general rule.[FN88] Successor liability depends on state law, and the doctrines vary from state to state,[FN89] but generally successor liability will not attach unless particular requirements imposed by that state have been satisfied.[FN90]

FN87. 3 *Collier* at ¶ 363.06[7].

FN88. *Id.*

FN89. *Id.*

FN90. *See id.*

If a buyer cannot obtain protection against successor liability, "it may pay less for the assets because of the risk."[FN91] When the transfer of property takes place in a 363 sale, and the buyer has sought and obtained agreement from the debtor that the sale will be free and clear, the bankruptcy court is invariably asked to provide, in its approval order, that the transferee does not assume liability for the debtor's pre-sale conduct.

FN91. *Id.* Whether the U.S. and Canadian Governments would have lent and ultimately bid a

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

407 B.R. 463, 51 Bankr.Ct.Dec. 225
**(Cite as: 407 B.R. 463)**

lesser amount here is doubtful, but this consideration provides the context for deciding legal issues that presumably will extend beyond this case.

Such a request was likewise made here. Under the proposed order, in its latest form, New GM would voluntarily assume liability for warranty claims, and for product liability claims asserted by those injured after the 363 Transaction-even if the vehicle was manufactured before the 363 Transaction. But New GM would not assume any Old GM liabilities for injuries or illnesses that arose before the 363 Transaction. And the proposed order has a number of provisions making explicit findings that New GM is not subject to successor liability for such matters, and that claims against New GM of that character are enjoined.[FN92]

FN92. The principal provisions in the proposed order provide, in relevant part:

Except for the Assumed Liabilities, pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, the Purchased Assets shall be transferred to the Purchaser in accordance with the MPA, and, upon the Closing, shall be free and clear of all liens, claims, encumbrances, and other interests of any kind or nature whatsoever ... including rights or claims based on any successor or transferee liability....

Proposed Order ¶ 7.

... [A]ll persons and entities ... holding liens, claims, encumbrances, and other interests of any kind or nature whatsoever, including rights or claims based on any successor or transferee liability, against or in a Seller or the Purchased Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or noncontingent, senior or subordinated), arising under or out of, in connection with, or in any way relating to, the Sellers, the Purchased Assets, the operation of the Purchased Assets prior to the Closing, or the 363 Transaction, are forever barred, estopped, and permanently enjoined from asserting against the Purchaser, its successors or assigns, its property, or the Purchased Assets, such persons' or entities' liens, claims, encumbrances, and other interests, including rights or claims based on any successor or transferee liability.

Proposed Order ¶ 8. Similar provisions are in the MPA.

[31] The issues as to the successor liability provisions in the approval order are the most debatable of the issues now before**501 the Court. Textual analysis is ultimately inconclusive as to the extent to which a 363 order can bar successor liability claims premised upon the transfer of property, and cases on a nationwide basis are split. But principles of *stare decisis* dictate that under the caselaw in this Circuit and District, the Court should, and indeed must, rule that property can be sold free and clear of successor liability claims.

*(a) Textual Analysis*

As before, the Court starts with textual analysis. Section 363(f) provides, in relevant part:

The trustee may sell property under subsection (b) ... of this section free and clear of any interest in such property of an entity other than the estate, only if-

(1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(2) such entity consents;

(3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4) such interest is in bona fide dispute; or

(5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

Application of section 363(f)'s authority to issue a "free and clear" order with respect to a successor liability claim turns, at least in the first instance, on whether such a claim is an "interest in property." But while "claim" is defined in the Code,[FN93] neither "interest" nor "interest in property" is likewise defined.

FN93. *See* Section 101(5) of the Code.

So in the absence of statutory definitions of either "inter-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

407 B.R. 463, 51 Bankr.Ct.Dec. 225
**(Cite as: 407 B.R. 463)**

est" or "interest in property," what can we discern from the text of the Code as to what those words mean?

[32] First, we know that "interest" includes more than just a lien. Subsection (f)(3) makes clear that "interest" is broader, as there otherwise would be no reason for (f)(3) to deal with the subset of interests where "such interest is a lien." *Collier* observes that:

> Section 363(f) permits the bankruptcy court to authorize a sale free of "any interest" that an entity has in property of the estate. Yet the Code does not define the concept of "interest," of which the property may be sold free. Certainly a lien is a type of "interest" of which the property may be sold free and clear. This becomes apparent in reviewing section 363(f)(3), which provides for particular treatment when "such interest is a lien." *Obviously there must be situations in which the interest is something other than a lien;* otherwise, section 363(f)(3) would not need to deal explicitly with the case in which the interest is a lien.[FN94]

> FN94. 3 *Collier* at ¶ 363.06[1] (emphasis added).

Second, we know that an "interest" is something that may accompany the transfer of the underlying property, and where bankruptcy policy, as implemented by the drafters of the Code, requires specific provisions to ensure that it *will not* follow the transfer.

The Individual Accident Litigants contend that here the Court should presume that "equivalent words have equivalent meaning when repeated in the same statute."[FN95] But while that is often a useful aid **502** to construction, we cannot do so here. That is because "interest" has wholly different meanings as used in various places in the Code,[FN96] and assumptions that they mean the same thing here are unfounded.

> FN95. Indiv. Accident Litigants Br. 4, *quoting Cohen v. de la Cruz,* 523 U.S. 213, 220, 118 S.Ct. 1212, 140 L.Ed.2d 341 (1998).

> FN96. *See* Postings of Stephen Lubben, Professor at Seton Hall Law School, to Credit Slips, *http:// www. creditslips. org/ creditslips/ 2009/ 06/ claim- or- interest. html* (June 13, 2009, 8:25 PM EST); and *http:// www. creditslips. org/ credit- slips/ 2009/ 06/ claim- or- interest- part- 2. html* (June 14, 2009, 6:42 PM EST). Blogs are a fairly

recent phenomenon in the law, providing a useful forum for interchanges of ideas. While comments in blogs lack the editing and peer review characteristics of law journals, and probably should be considered judiciously, they may nevertheless be quite useful, especially as food for thought, and may be regarded as simply another kind of secondary authority, whose value simply turns on the rigor of the analysis in the underlying ideas they express.

Thus, those in the bankruptcy community know, upon considering the usage of "interest" in any particular place in the Code, that "interest" means wholly different things in different contexts:

> (i) a nondebtor's *collateral*-as used, for example, in consideration of adequate protection of an interest under sections 361 and 362(d)(1), use of cash collateral under section 363(c)(2), or in many 363(f) situations, such as where a creditor has a lien;

> (ii) *a legal or equitable ownership of property*-as used, for example, in section 541 of the Code, or in other section 363(f) situations, where a nondebtor asserts competing ownership, a right to specific performance, or the like-or, quite differently,

> (iii) *stock* or other equity in the debtor, *as contrasted to debt*-as used, for example, in section 1111 ("[a] proof of claim or interest is deemed filed under section 501"), or where a reorganization plan is to establish classes of claims and interests, under sections 1122 and 1123.

[33] The Individual Accident Litigants place particular emphasis on section 1141(c) of the Code, asking this Court to compare and contrast it. They argue that

> In contrast, § 1141(c) of the Bankruptcy Code provides that "property dealt with by the plan is free and clear of all *claims and interests ... in* the debtor." (Emphasis added). Section 363 and 1141(c) are two mechanisms for transfer of estate property (one through a sale, the other through a plan). The difference between the words chosen by Congress in these two closely related sections shows that Congress did not intend a sale under § 363(f) to be free and clear of "*claims,*" but only of "*interests in* such property" because " 'it is generally presumed that Congress actions intentionally and purposely' when it 'includes particular language in one section of a statute but omits it in another.' "[FN97]

407 B.R. 463, 51 Bankr.Ct.Dec. 225
**(Cite as: 407 B.R. 463)**

FN97. Indiv. Accident Litigants Br. 4.

But this is not an apt comparison, since when "interests" is used in section 1141(c), it is used with the wholly different definition of (iii) above–*i.e.,* as stock or another type of equity-in contrast to the very different definitions in (i) and (ii) above, which are ways by which "interests in property" may be used in section 363(f).

Thus, as Lubben suggests, and the Court agrees, in section 1141 "interest" matches up with "equity," and "claim" matches up with debt.FN98 Section 1141 is of no assistance in determining whether litigation rights transmitted through transfers**503 of property fall within the meaning of "interests in property." Section 1141 does not provide a yardstick by which section 363(f)'s meaning can be judged.

FN98. *See* Posting of Stephen Lubben, Professor at Seton Hall Law School, to Credit Slips, *http:// www. creditslips. org/ creditslips/ 2009/ 06/ claim- or- interest. html* (June 13, 2009, 8:25 PM EST).

So where does textual analysis leave us? It tells us that "interest" means more than a lien, but it does not tell us how much more. Textual analysis does not support or foreclose the possibility that an "interest in property" covers a right that exists against a new party solely by reason of a transfer of property to that party. Nor does textual analysis support or foreclose the idea that an "interest" is a right that travels with the property-or that it would do so unless the Code cut it off. Ultimately textual analysis is inconclusive. Neither the Code nor interpretive aids tells us how broadly or narrowly-in the particular context of section 363(f)-"interest in property" should be deemed to be defined.FN99

FN99. The Individual Accident Litigants also place heavy reliance on *Butner v. United States,* 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979), *see* Indiv. Accident Litigants Br. 8, suggesting that *Butner* requires deference to state law that might impose successor liability and that this would require excluding successor liability damages claims from any definition of "interest." But the Court cannot agree. First, when quoted in full, *Butner* (whose bottom line was that the issue of whether a security interest extended to rents derived from the property was governed by state law) stated:

The Bankruptcy Act does include provisions invalidating certain security interests as fraudulent, or as improper preferences over general creditors. Apart from these provisions, however, Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law.

440 U.S. at 54, 99 S.Ct. 914. *Butner* further stated (in language the Individual Accident Litigants did not quote):

Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding.

*Id.* at 55, 99 S.Ct. 914. But the *Butner* court laid out principles by which we determine what is property of the estate; it did not address the different issue of whether a state may impose liability on a transferee of estate property by reason of something the debtor did before the transfer. Moreover, *Butner* noted that provisions of the Code can and do sometimes trump state law. And section 363(f), for as much or as little as it covers, is exactly such a provision. In fact, 363(f) is a classic example of an instance where a "federal interest requires a different result." *Butner* neither supports nor defeats either party's position here.

*(b) Caselaw*

Therefore, once again-as in the Court's earlier consideration of *Lionel* and its progeny and the cases establishing the judge-made law of *sub rosa* plans-the Court must go beyond the words of the Code to the applicable caselaw.

Viewed nationally, the caselaw is split in this area, both at the Circuit Court level and in the bankruptcy Courts. Some courts have held that section 363(f) provides a basis for selling free and clear of successor liability claims,FN100 and others have held that it does not.FN101

FN100. *See, e.g., Chrysler,* 405 B.R. at 111; *In re Trans World Airlines, Inc.,* 322 F.3d 283, 288-90 (3d Cir.2003) (" *TWA* "); *United Mine Workers of*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

407 B.R. 463, 51 Bankr.Ct.Dec. 225
**(Cite as: 407 B.R. 463)**

*Am.1992 Benefit Plan v. Leckie Smokeless Coal Co. (In re Leckie Smokeless Coal Co.),* 99 F.3d 573, 581-82 (4th Cir.1996).

FN101. *See, e.g., Michigan Empl. Sec. Comm. v. Wolverine Radio Co., Inc. (In re Wolverine Radio Co.),* 930 F.2d 1132, 1147-48 (6th Cir.1991); *Precision Indus., Inc. v. Qualitech Steel SBQ, LLC (In re Qualitech Steel Corp.),* 327 F.3d 537, 545-46 (7th Cir.2003); *Fairchild Aircraft Corp. v. Cambell (In re Fairchild Aircraft Corp.),* 184 B.R. 910, 918 (Bankr.W.D.Tex.1995), *vacated as moot on equitable grounds,* 220 B.R. 909 (Bkrt-cy.W.D.Tex.1998).

*See also Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.),* 75 B.R. 944, 948 (Bankr.N.D.Ohio 1987) (concluding that 363(f) could not be utilized, but that section 105(a) could be used to effect 363 sale free and clear of claims).

***504** But the caselaw is *not* split in this Circuit and District. In *Chrysler,* Judge Gonzalez expressly considered and rejected the efforts to impose successor liability. And more importantly, the Second Circuit, after hearing extensive argument on this issue along with others, affirmed Judge Gonzalez's *Chrysler* order for substantially the reasons Judge Gonzalez set forth in his *Chrysler* decision.

This Court has previously noted how *Chrysler* is so closely on point, and this issue is no exception. Judge Gonzalez expressly considered it. In material reliance on the Third Circuit's decision in *TWA,* "the leading case on this issue," Judge Gonzalez held that *TWA:*

makes clear that such tort claims are interests in property such that they are extinguished by a free and clear sale under section 363(f)(5) and are therefore extinguished by the Sale Transaction. The Court follows *TWA* and overrules the objections premised on this argument.... [I]n personam claims, including any potential state successor or transferee liability claims against New Chrysler, as well as in rem interests, are encompassed by section 363(f) and are therefore extinguished by the Sale Transaction.[FN102]

FN102. 405 B.R. at 111.

[34][35] This Court has already noted its view of the importance of *stare decisis* in this district,[FN103] and feels no differently with respect to this issue. This Court follows the decisions of its fellow bankruptcy judges in this district, in the absence of plain error, because the interests of predictability in commercial bankruptcy cases are of such great importance. Apart from the underlying reasons that have caused *stare decisis* to be embedded in American decisional law, *stare decisis* is particularly important in commercial bankruptcy cases because of the expense and trauma of any commercial bankruptcy, and the need to deal with foreseeable events, by pre-bankruptcy planning, to the extent they can be addressed. Likewise, litigation, while a fact of life in commercial bankruptcy cases, takes money directly out of the pockets of creditors, and predictability fosters settlements, since with predictability, parties will have an informed sense as to how any disputed legal issues will be decided.

FN103. *See* 486-87, n. 19 above.

Though for all of these reasons, this Court would have followed *Chrysler* even if that case had no subsequent history, we here have a hugely important additional fact. The Circuit affirmed *Chrysler, and* for "substantially for the reasons stated in the opinion below."

Those two matters are somewhat different, and each merits attention. Appellate courts review judgments (or orders), not statements in opinions. [FN104] With the Circuit having affirmed, application of that principle would not, in the absence of more, necessarily suggest agreement with any reasoning Judge Gonzalez utilized in reaching his conclusion. But it would necessarily support agreement with his bottom line-at least on matters that were argued to the Circuit on appeal. Otherwise, the Circuit would not have affirmed.

FN104. *See, e.g., O'Brien v. State of Vermont (In re O'Brien),* 184 F.3d 140, 142 (2d Cir.1999); *Mangosoft, Inc. v. Oracle Corp.,* 525 F.3d 1327, 1330 (Fed.Cir.2008).

Here, of course, there is more-because the Circuit did not simply affirm without opinion, but it stated, as part of its order, that Judge Gonzalez's decision was affirmed "for substantially the reasons stated in the opinions below." While that might hint that the Circuit generally agreed with Judge Gonzalez's reasoning as ***505** well, it does not compel that conclusion. At this point, the Court concludes merely that the Circuit agreed with Judge Gonzalez's suc-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

407 B.R. 463, 51 Bankr.Ct.Dec. 225
**(Cite as: 407 B.R. 463)**

cessor liability issues bottom line.

But that alone is very important. One of the matters argued at length before the Circuit on the appeal was successor liability, both with respect to present claims [FN105] and unknown future claims.[FN106] They were hardly trivial elements of the appeal, and were a subject of questioning by members of the panel.[FN107] If the Circuit did not agree with Judge Gonzalez's conclusions on successor liability, after so much argument on that exact issue, it would not have affirmed.

> FN105. *See* Tr. of Arg. before Second Circuit, No. 09-2311 (2d Cir. June 5, 2009) ("2d Cir. Arg. Tr.") at 17-22 (current tort claims); 47-49 (current tort claims); 60-62 (current tort claims).

> FN106. 2d Cir. Arg. Tr. at 22-26 (future and, to a limited extent, current, product liability claims); 26-29 (current and future asbestos claims); 45-46 (future asbestos and tort claims); 62-64 (future asbestos claims).

> FN107. This Court has previously noted that it is hesitant to draw too much from the questions judges ask in argument. *See In re Adelphia Commc'ns Corp., 336 B.R. 610, 636 n. 44* ("Thoughts voiced by judges in oral argument do not always find their way into final decisions, often intentionally and for good reason.") Thus the Court does not rely on anything that was said in the way of questions in the *Chrysler* appeal for the purpose of trying to predict the Circuit's thinking or leanings. This Court looks to the *Chrysler* argument questioning solely for the purpose of noting the issues that were before the Circuit, and that got its substantive attention.

Thus the Court has, at the least, a judgment by the Second Circuit that 363(f) may appropriately be invoked to sell free and clear of successor liability claims. The claims sought to be preserved here are identical to those in *Chrysler.* And *Chrysler* is not distinguishable in any legally cognizable respect.[FN108] On this issue, it is not just that the Court feels that it *should* follow *Chrysler.* It *must* follow *Chrysler.* The Second Circuit's *Chrysler* affirmance, even if reduced solely to affirmance of the judgment, is controlling authority.[FN109]

> FN108. The Court cannot agree with the suggestion that *Chrysler* is distinguishable because the

purchaser there, Fiat, was a commercial entity, and that the purchaser here is an entity formed by the U.S. and Canadian Governments. We are talking about an issue of statutory interpretation here, and the Code makes no distinction in that regard.

> FN109. *Collier* states that "[a]lthough some courts have limited the term ["interest in property," as used in section 363(f) ] to *in rem* interests in the property, the trend seems to be in favor of a broader definition that encompasses other obligations that may flow from ownership of the property." 3 *Collier* at ¶ 363.06[1]. Though *Collier* is of course consistent with this Court's conclusion, the Court regards the caselaw holdings in this Circuit and District as more important.

This Court fully understands the circumstances of tort victims, and the fact that if they prevail in litigation and cannot look to New GM as an additional source of recovery, they may recover only modest amounts on any allowed claims-if, as is possible, they do not have other defendants who can also pay.[FN110] But the law in this Circuit and District is clear; the Court will permit GM's assets to pass to the purchaser free and clear of successor liability claims, and in that connection, will issue the requested findings and associated **\*506** injunction.[FN111]

> FN110. They may have resort to dealers, and the proposed sale motion also contemplates that New GM will indemnify dealers for losses of this type, whenever the claims arose. While this would seemingly greatly reduce the number of instances where a plaintiff cannot recover meaningful amounts if liability is established, the Court does not suggest that it will cover all of them.

> FN111. Findings and an injunction of the character requested were issued in each of *Chrysler* and *TWA. See Chrysler,* No. 09-50002 (Bankr.S.D.N.Y. June 1, 2009) (Order Granting 363 Sale ¶¶ W-BB, 9-23); *TWA, 322 F.3d at 286-87.*

*3. Asbestos Issues*

[36] The Asbestos Litigants raise the same successor liability issues just addressed, and additionally advance the interests of future victims of asbestos ailments (though their counsel do not represent any); *future* victims would

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

407 B.R. 463, 51 Bankr.Ct.Dec. 225
**(Cite as: 407 B.R. 463)**

not yet know that they have any asbestos ailments, or to whom they might look to bring litigation, if necessary. The Asbestos Litigants' concerns as to a sale free and clear of asbestos liability claims, like those of tort litigants, have already been discussed, and the Court, while also sympathetic to asbestos victims, must rule similarly.

But the Court must separately address the separate issues concerning asbestos ailments, in light of the reality that those ailments may take many years to be discovered, during which asbestos victims would not know that they should be filing claims.

The Asbestos Litigants object to GM's effort to "channel all present and future asbestos personal injury claims to Old GM and to shield New GM from 'successor liability' claims ... without the appointment of a future claims representative and the other express requirements mandated by Congress in 11 U.S.C. § 524(g)." FN112 But that overstates, in material part, what GM is trying to do. It is unnecessary to "channel" present asbestos injury claims to GM, as that is where they already are, and belong. And New GM has not yet done anything wrong, if it ever will. So the bulk of the Asbestos Litigants' contention is simply a variant of the successor liability issues that the Court just addressed, and must be decided the same way.

FN112. Asbestos Br. at 2.

Where there *is* a separate issue is claims for *future* injuries that people exposed to asbestos might suffer when they don't yet know of their ailments or the need to sue or assert a claim. The Court refers to those as "**Future Claims,**" while noting that they are not yet "claims" as defined in the Bankruptcy Code. Efforts to deal with such circumstances led to the enactment of section 524(g) of the Code, which *inter alia* authorizes injunctions, under a reorganization plan, to enjoin actions against nondebtors by those who have a right of recovery from a trust created to address their claims, in accordance with more detailed provisions set out in section 524(g). (Those provisions also include the appointment of a future claims representative.)

The Debtors ask for findings that New GM will not be deemed to be a successor of Old GM, and ask for an injunction barring those holding Future Claims, like others, from pursuing New GM. The Asbestos Litigants contend that such an injunction would walk, talk and quack like a section 524(g) injunction, and that it thus is impermissible. The Debtors respond that we do not yet have a request to approve a plan, and that these issues are now prema-

ture-better to be considered if and when they ever ask for a 524(g) injunction.

The Court does not have to decide these issues now, except in a modest way. The Asbestos Litigants' counsel represent only individuals with *present* asbestos ailments, and do not represent future claimants. Thus the Court has material difficulty in seeing how they have standing to assert *other's* needs and concerns, or how they *507 would be persons aggrieved, on any appeal, if the Court ruled adversely to them on future claims issues.

By the same token, the Court fully recognizes that the notice given on this motion was not fully effective, since without knowledge of an ailment that had not yet manifested itself, any recipient would be in no position to file a present claim.FN113

> FN113. *See Chrysler* Arg. Tr. at 46, 47, 72-73 (colloquy, principally with Judge Sack, with respect to this issue). Once more, the Court does not read those questions as telegraphing any views or decision of the Circuit as to these issues, but rather as helping this Court focus on matters worthy of consideration.

This objection raises classic standing *and* ripeness issues. And, in addition, the Court does not know if anyone in the future would have a legally valid objection as to the requested injunction-especially if Old GM were still in existence, and a claim could be filed with Old GM. The Court is doubtful that it should be erecting barriers to GM's ability to reorganize by creating hurdles at the behest of people who lack standing, but at the same time, is not of a mind to do anything that might be constitutionally suspect. The Future Claims issues, in the Court's view, are best addressed here by adding language to the injunction paragraph to which objection has been made, applicable (only) to asbestos claims and demands, making the injunction enforceable "to the fullest extent constitutionally permissible." That limitation should address both sides' legitimate future claims concerns. The Court's order will read accordingly.

*4. Environmental Issues*

[37] Certain objectors-most notably, New York's Attorney General (the "**New York AG**"), who enforces New York's environmental laws, and the St. Regis Mohawk Tribe (the "**Tribe**"), in upstate New York (together, the "**Environmental Matters Objectors**")-have voiced concerns as to

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

407 B.R. 463, 51 Bankr.Ct.Dec. 225
**(Cite as: 407 B.R. 463)**

whether any approval order would too broadly release either Old GM or New GM from their respective duties to comply with environmental laws and cleanup obligations. Objections of this character were a matter of concern to this Court as well, but they were addressed-very well, in this Court's view-by amendments to the proposed order that were made after objections were due. The additional language provides that:

> Nothing in this Order or the MPA releases, nullifies, or enjoins the enforcement of any Liability to a governmental unit under Environmental Laws or regulations (or any associated Liabilities for penalties, damages, cost recovery, or injunctive relief) that any entity would be subject to as the owner, lessor, or operator of property after the date of entry of this Order. Notwithstanding the foregoing sentence, nothing in this Order shall be interpreted to deem the Purchaser as the successor to the Debtors under any state law successor liability doctrine with respect to any Liabilities under Environmental Laws or regulations for penalties for days of violation prior to entry of this Order. Nothing in this paragraph should be construed to create for any governmental unit any substantive right that does not already exist under law.[FN114]

> FN114. Proposed Order ¶ 61

Another paragraph goes on to say:

> Nothing contained in this Order or in the MPA shall in any way (i) diminish the obligation of the Purchaser to comply with Environmental Laws, or (ii) diminish the obligations of the Debtors to comply with Environmental Laws consistent with their rights and obligations**508 as debtors in possession under the Bankruptcy Code. The definition of Environmental Laws in the MPA shall be amended to delete the words "in existence on the date of the Original Agreement." For purposes of clarity, the exclusion of asbestos liabilities in section 2.3(b)(x) of the MPA shall not be deemed to affect coverage of asbestos as a Hazardous Material with respect to the Purchaser's remedial obligations under Environmental Laws.[FN115]

> FN115. *Id.* ¶ 62.

Especially collectively, they make it quite clear that neither Old GM nor New GM will be relieved of its duty to comply with environmental laws.

Those changes deal with much, but not all, of the Environmental Matters Objectors' concerns. The remaining objections, however, must be overruled.

The Environmental Matters Objectors understandably would like New GM to satisfy cleanup obligations that were the responsibility of Old GM, on theories of successor liability. For reasons articulated in the Court's "Successor Liability Issues" discussion in Section 2 above, however, the property may be sold free and clear of such claims.

Indeed, further reinforcing that view (as well as the Court's decision to follow *Chrysler* ) is this Court's decision, seven years ago, in *Mag. Corp.*[FN116] There, upon the sale of property with substantial environmental issues, this Court was faced with the exact same issue-to what extent could that property be sold free and clear of environmental claims under 363(f). This Court ruled that one had to make a distinction. Under section 363(f), there could be no successor liability imposed on the purchaser for the seller MagCorp's monetary obligations related to cleanup costs, or any other obligations that were obligations of the seller. But the purchaser would have to comply with its environmental responsibilities starting with the day it got the property, and if the property required remediation as of that time, any such remediation would be the buyer's responsibility:

> FN116. Tr. of Hr'g, *In re Magnesium Corporation of America,* No. 01-14312, 2002 WL 32772333 (Bankr.S.D.N.Y. June 4, 2002) (ECF # 290).

> When you are talking about free and clear of liens, it means you don't take it subject to claims which, in essence, carry with the property. It doesn't absolve you from compliance with the law going forward.[FN117]

> FN117. *Id.* at 129.

Those same principles will be applied here. Any Old GM properties to be transferred will be transferred free and clear of successor liability,[FN118] but New GM will be liable from the day it gets any such properties for its environmental responsibilities going forward. And if the State of New York (or, to the extent it has jurisdiction, the Tribe) feels a need to cause any acquirer of Old GM property to engage in remedial action because of environmental issues existing even at the outset of the acquirer's ownership,

407 B.R. 463, 51 Bankr.Ct.Dec. 225
**(Cite as: 407 B.R. 463)**

nothing in this Court's order will stand in its way.

> FN118. The Court understands that the Purchaser
> does not want the Massena site and that it will not
> be transferred to New GM, but it is unclear to the
> Court whether Old GM will want to sell the
> Massena site to someone else or abandon it.
> Certainly, if the Purchaser does not wish to take
> the Massena site, it does not have to. If Old GM
> wishes to abandon the Massena site, the Envi-
> ronmental Matters Objectors, or some of them,
> will have rights to be heard, and may have subs-
> tantive future rights. The Court does not decide
> any of those additional issues at this time.

**\*509 5. Splinter Union Retiree Issues**

Three unions-the IUE, the Steelworkers, and the Operating
Engineers (referred to by all parties as the "**Splinter Un-
ions**") also have filed an objection. The Splinter Unions
submit affidavits from many of their retirees, describing, in
moving detail, their difficulties in getting by, and how
decreased medical benefits would directly impact them.
The hardship would be particularly great on those not yet
eligible for Medicare, as the U.S. does not yet have com-
parable medical insurance for those below the qualifying
age, if it ever will.

[38] But fully acknowledging, as one must, the hardship
that the Splinter Union Retirees would suffer, the legal
issue before this Court is whether section 1114 of the Code
applies to a transaction of the type we have here, and
whether a purchaser of assets must assume liabilities that it
does not want to voluntarily assume. The answer to each of
those questions must be "no."

The Splinter Unions understandably rely on section 1114
of the Code, a provision that was added to the Code to
provide additional rights as to retiree insurance benefits,
most significantly, medical and life insurance (for the
purposes of this discussion, "**Retiree Benefits**"). Gener-
ally speaking, section 1114 attempts to balance the needs
and concerns of retirees with the reality that large legacy
Retiree Benefits obligations not infrequently can impair
debtors' ability to reorganize, and that chapter 11 debtors
often cannot afford to pay Retiree Benefits as they were
previously offered.

While section 1114 is too long to quote here in full, it
provides, in substance, for a procedure that must be com-
plied with before a chapter 11 debtor can modify or not pay

Retiree Benefits. Modifying or ending benefits requires a
motion to be approved by the bankruptcy court. Prior to
filing such a motion, the debtor or trustee must first make a
proposal to the retirees' representative-usually their union,
if there is one, or alternatively a committee to act on their
behalf.

The proposal is supposed to provide "for those necessary
modifications in the retiree benefits that are necessary to
permit the reorganization of the debtor and assure [ ] that
all creditors, the debtor and all of the affected parties are
treated fairly and equitably...." The parties are then "to
confer in good faith in attempting to reach mutually satis-
factory modifications of such retiree benefits."

If agreement is not forthcoming, the motion may proceed
further. Under section 1114(g) (with exceptions and pro-
visos not relevant here):

> The court shall enter an order providing for modification
> in the payment of retiree benefits if the court finds that-
>
>> (1) the trustee has, prior to the hearing, made a
>> proposal that fulfills the requirements of subsection
>> (f);
>>
>> (2) the authorized representative of the retirees has
>> refused to accept such proposal without good cause;
>> and
>>
>> (3) such modification is necessary to permit the re-
>> organization of the debtor and assures that all credi-
>> tors, the debtor, and all of the affected parties are
>> treated fairly and equitably, and is clearly favored by
>> the balance of the equities....

Here GM has stated that before Old GM stops paying or
modifies Retiree Benefits, it will comply with section
1114. But as a practical matter, Old GM will be liquidat-
ing, and it will not be able to keep making these payments
very much longer. After that, even if Old GM makes a
proposal in good faith (as the Court assumes it will), **\*510**
the Splinter Union retirees may well be left with unsecured
claims, with the relatively low recoveries on their unse-
cured claims that all other unsecured creditors will receive,
and with the delays in getting distributions on allowed
claims that are an unfortunate reality of the bankruptcy
process.

And New GM has not agreed to assume liability for the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

407 B.R. 463, 51 Bankr.Ct.Dec. 225
**(Cite as: 407 B.R. 463)**

Splinter Union Retiree Benefits.[FN119] It declined to do so, while going further for other unions, especially the UAW, because with very limited exceptions, the Splinter Unions no longer have active employees working for GM, and the U.S. Treasury-triaging its ability to undertake obligations, and trying to make New GM as lean and as viable as possible-allocated its available money to spend it only where necessary to build a new and stronger GM.[FN120]

> FN119. New GM has offered to assume the liability to provide Retiree Benefits to a certain extent, but in, dramatically reduced amount. Its proposal in that regard was unacceptable to the Splinter Unions and a counterproposal by the Splinter Unions has not been accepted. On July 2, the Court approved settlements between GM and other non-UAW unions under which New GM would assume Retiree Benefits for them, but again in dramatically reduced amounts.

> FN120. The obligations in question are very sizeable-more than $3 billion in retiree health care and hundreds of millions more for retirement life insurance. Splinter Union Obj. ¶ 4. Those large figures show why the Splinter Unions care about the issue, and why New GM feels that it cannot assume those obligations when such a small number of Splinter Union members will be working for New GM.

With that by way of backdrop, the Court considers the legal issues. The Splinter Unions argue in substance, that the 363 Transaction constitutes a forbidden *sub rosa* plan. But this contention has previously been addressed. The remaining issue is the extent, if any, to which special 1114 rights for retirees make an otherwise permissible transaction impermissible.

Once more the Court starts with textual analysis, and looks to the words of the statute. The most relevant portions of section 1114 are the portions that impose the continuing duties to pay retiree benefits; not to end or modify them; and to negotiate with unions or other retiree representatives before changing them. Apropos the first (the continuing duty to pay), section 1114(e) is relevant. It provides, in relevant part:

> (e)(1) Notwithstanding any other provision of this title, *the debtor in possession, or the trustee if one has been appointed under the provisions of this chapter (hereinafter in this section "trustee" shall include a*

*debtor in possession), shall timely pay and shall not* modify any retiree benefits, except that-

> (A) the court, on motion of the trustee or authorized representative, and after notice and a hearing, may order modification of such payments, pursuant to the provisions of subsections (g) and (h) of this section, or

> (B) the trustee and the authorized representative of the recipients of those benefits may agree to modification of such payments,

after which such benefits as modified shall continue to be paid by the *trustee.*[FN121]

> FN121. Section 1114(e) (emphasis added).

Thus, under the words of the statute, these are duties imposed upon the trustee (which includes, by express reference, the debtor in possession)-not anyone else.

With respect to the second (the duty not to end or modify), the relevant portion is that same section 1114(e) ("the debtor in **511** possession, or the trustee if one has been appointed ... shall not modify any retiree benefits"). Once more, the duty not to end or modify is not statutorily imposed on anyone else.

With respect to the third (the duty to negotiate before filing a motion to modify benefits) the relevant portion is 1114(f):

> (f)(1) Subsequent to filing a petition and prior to filing an application seeking modification of the retiree benefits, the *trustee* shall-

> (A) make a proposal to the authorized representative of the retirees....

Here too, by the words of the Code, the duty is imposed upon the trustee.

Finally, the Court notes that section 363 is silent with respect to any need to first comply with section 1114 before effecting a section 363 sale.

Turning beyond textual analysis to the caselaw, the Court has seen nothing to establish a violation of law. The Splinter Unions cite no authority holding or suggesting that

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

407 B.R. 463, 51 Bankr.Ct.Dec. 225
**(Cite as: 407 B.R. 463)**

a purchaser of assets from an entity with section 1114 obligations must assume the debtor seller's duty to comply with section 1114's provisions. Nor do they cite such law considering section 1113 of the Code, which, while dealing with collective bargaining agreements, imposes similar duties.

On the other hand, *Chrysler* is helpful, though it did not expressly address this issue. In considering a closely similar transaction, Judge Gonzalez did not find there to be section 1114 impediments, even for non-UAW retirees.
FN122

> FN122. With respect to section 1114 matters and related issues, he stated:

> > The objecting retirees represented by the UAW objected to the modification of retiree benefits under the settlement agreement between New Chrysler and the UAW, but those objections are overruled because the UAW was the objectors' authorized representative under section 1114, and the modifications were negotiated in good faith pursuant to that section. The objecting retirees not represented by the UAW whose benefits are adversely impacted may have unsecured claims against the Debtors' estates, but the purchased assets are sold free and clear of those potential unsecured claims. For those reasons, their objections to the Sale Motion are overruled. Further, the Court finds that if the Sale Motion were not approved, which would likely result in the Debtors' liquidation, there would likely be no value to distribute any retirees, all of whom would be unsecured creditors.

> > 405 B.R.at 110.

The Splinter Unions argue that "section 1114 cannot be ignored in the § 363 process," FN123 but that is not what GM is asking the Court to do. GM acknowledges its duties to comply with section 1114, and so far as the record reflects, has not failed in any of its duties in that respect so far. If, in the future, GM does not comply with its section 1114 duties (or is perceived to be failing to comply in that regard), the Splinter Unions, or anyone else with standing, could of course bring that to the Court's attention. But the Splinter Union's real objection is that the Purchaser is not volunteering to comply with section 1114, and under the words of the statute, the Purchaser is not within the zone of persons upon whom section 1114 places duties.

> FN123. Splinter Union Obj. ¶ 79.

[39] The Splinter Unions note that there is another arguably relevant provision of the Code that must be considered, section 1129(a)(13). Section 1129 sets forth the requirements for confirmation of a chapter 11 plan, and the provisions in its subsection (a) include a list of requirements for confirmation of any chapter 11 plan. Section 1129(a) provides, in relevant part:

> **\*512** (a) The court shall confirm a plan only if all of the following requirements are met:

> ...

> (13) The plan provides for the continuation after its effective date of payment of all retiree benefits, as that term is defined in section 1114 of this title, at the level established pursuant to subsection (e)(1)(B) or (g) of section 1114 of this title, at any time prior to confirmation of the plan, for the duration of the period the debtor has obligated itself to provide such benefits.

There can be no doubt that compliance with section 1129(a)(13), along with the other 15 subsections of section 1129(a), is a requirement for confirmation of a plan. But the Court has already addressed arguments of this character, as raised by bondholders in different contexts. The Court is not here considering confirmation of a plan; it is considering a section 363 transaction, and because there is a good business reason for selling the assets now, and there is not here a *sub rosa* plan, requirements of section 1129, including section 1129(a)(13), do not apply.

The Court fully realizes that UAW retirees will get a better result, after all is said and done, than Splinter Union Retirees will, but that is not by reason of any violation of the Code or applicable caselaw. It is because as a matter of reality, the Purchaser needs a properly motivated workforce to enable New GM to succeed, requiring it to enter into satisfactory agreements with the UAW-which includes arrangements satisfactory to the UAW for UAW retirees. And the Purchaser is not similarly motivated, in triaging its expenditures, to assume obligations for retirees of unions whose members, with little in the way of exception, no longer work for GM.

The Court has also considered the Splinter Unions' point that in pre-bankruptcy planning, GM and the U.S. Treasury

407 B.R. 463, 51 Bankr.Ct.Dec. 225
**(Cite as: 407 B.R. 463)**

focused on the duties to Splinter Union Retirees, and made a conscious decision that Splinter Union retirees would not be offered as good a deal as others. But the Court cannot find that there was any "conspiracy" in that regard, nor that there was any intention to disregard applicable law. The U.S. Treasury, in making hard decisions about where to spend its money and make New GM as viable as possible, made business decisions that it was entitled to make, and the fact that there were so few Splinter Union employees still working for GM was an understandable factor in that decision. The Court's responsibility is not to make fairness judgments as to those decisions, but merely to gauge those decisions under applicable law.

The Splinter Unions' objection must be overruled.

*6. Dealer Issues*

As noted, the 363 Transaction contemplates that GM's present dealer network of about 6,000 dealers will be made more efficient, continuing approximately 4,100 of its dealers, and ending its relationship, though not instantly, with approximately 1,900 others.<sup>FN124</sup> In cooperation with State AGs, and the Unofficial Dealers Committee <sup>FN125</sup> (the "**Dealer Committee**"), GM and the Purchaser agreed on additional language**\*513** in the sale order for the protection of dealers, and the AGs and the Dealer Committee withdrew their objections to the sale. However, a local dealers association, the Greater New York Automobile Dealers Association (the "**New York Dealers Association**"), seeking to be heard as an *amicus,* filed a brief contending that the Participation Agreements and Deferred Termination Agreements that more than 99% of GM dealers entered into were coerced and unlawful.

FN124. Henderson Decl. ¶¶ 92-93.

FN125. The Unofficial GM Dealers Committee was formed prior to the filing of GM's chapter 11 case by the GM National Dealer Council in coordination with the National Automobile Dealers Association. It was formed to act as a voice for the dealer body's collective interests in connection GM's restructuring efforts. Its members sell and service vehicles under GM brands in locations all over the country.

[40] Initially, the Court deals with a matter of standing, to which it became more sensitive, after oral argument, upon rereading the New York Dealers Association's *amicus* brief. The New York Dealers Association does not purport

to speak for a single identified GM dealer. It does not seek standing under section 1109. It speaks only as an *amicus.* And in addition, the main thrust of the New York Dealers Association *amicus* brief is not the protection of *GM* dealers. It is the protection of their *competitors.* The interests of *GM* dealers were the subject of the negotiations with the Dealer Committee and the AGs, and resolved to their satisfaction. While the New York Dealers Association objection professes to be speaking for the interests of GM dealers, its principal thrust is very different; it is to protect the interests of others who are competing with GM and (especially since it is a dealers' organization), competing with GM dealers.<sup>FN126</sup>

FN126. *See, e.g.,* N.Y. Auto Dealers Obj. at ¶¶ 19, 20 ("GM seeks, through this proceeding, to gain advantage over other manufacturers."); *id.* ("Permitting GM in bankruptcy, to ignore state dealer laws upsets the competitive balance among GM and every other automotive manufacturer.").

Under these circumstances, the Court must note the lack of standing and that the New York Dealers Association may be heard as nothing more than as an *amicus;* note that the New York Dealers Association does not have section 1109 rights; and note that at least seemingly, if not plainly, the New York Dealers Association has interests largely adverse to those whom it is professing to help.<sup>FN127</sup>

FN127. It also at least seemingly would not be a person aggrieved with standing to appeal, but that is an issue for the appellate courts.

[41] Then, turning to the merits of the New York Dealers Association arguments (assuming that, as *amicus,* it has any standing to make them), any objection that the New York Dealers Association might make-though it never says that it is making an "objection"-would have to be overruled, and to the extent it is making an objection, it *is* overruled. While the Court understands the unattractive choices that many dealers had to face, the Court cannot go so far as to hold that these agreements were "coerced" or are unlawful-even if (as the Court assumes, without deciding) those dealer rights could not be so modified outside of bankruptcy.

Implementation of federal bankruptcy policy permits debtors, for the benefit of the creditor body as a whole, to alter creditors' and contract counterparties' contractual rights. Corporate reorganization, by its nature, requires parties in interest to consider unattractive choices. One of

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

407 B.R. 463, 51 Bankr.Ct.Dec. 225
**(Cite as: 407 B.R. 463)**

the relevant rights in bankruptcy is the right of a debtor to reject an executory contract with its contract counterparty, for the benefit of the debtor's other creditors. All concerned with GM's future knew that GM had to slim down and improve its dealer network, and that this required modifying dealer agreements before they were assumed and assigned-a process **\*514** that led to the Participation Agreements. Similarly, as an alternative to simply leaving dealers who would otherwise be terminated in the lurch, GM proposed giving them a soft landing, in exchange for waivers of other rights-a process that led to the Deferred Termination Agreements. Those offers secured widespread acceptance; 99% of the continuing dealers accepted, and 99% of the dealers who eventually would be terminated took the offer.

The alternative, in each case was rejection. Contract counterparties do not have to accept what they are offered, and they may elect to stand on their rights. But here GM was not obligated, as a matter of law, to choose between leaving its dealer contracts unmodified or rejecting them. It could, if it wished, offer its contract counterparties deals that would more appropriately meet each side's needs and concerns, without fear that such deals would be subject to collateral attack by reason of assertions of coercion.

Directly on point are comments this Court made at the bankruptcy court level, and Judge Kaplan made at the district court level, in the *Adelphia* chapter 11 cases. There, in connection with the DoJ Settlement discussed above, Adelphia agreed to provide $715 million to the United States Government (on behalf of both the DoJ and the SEC) in exchange for dropping threats of indictment and forfeiture, and settling claims that might otherwise have been pursued by the SEC. The settlement was attacked by Adelphia creditors, who charged that it was the result of unlawful coercion. In the same decision to which this Court previously referred, this Court disagreed, and on appeal, so did Judge Kaplan.

FN128. *See* discussion at 492-93, above.

This Court stated:

[W]here the "coercion" results from differences in bargaining power, as a consequence of law or fact, or governmentally granted authority and discretion (such as the authority and discretion we grant to prosecutors, to achieve a common good), that is a wholly different kind of "coercion." As one of the banks' counsel aptly noted in argument on this motion, it is what we call "leverage."

FN129

FN129. *Adelphia Settlement-Bankruptcy,* 327 B.R. at 166.

Judge Kaplan, affirming, agreed-even going so far as to quote the language this Court just used-and continued:

What the appellants characterize as coercion was no different in principle than the pressure that leads the overwhelming majority of defendants in criminal cases to plead guilty-the risk that a conviction after trial will result in a harsher sentence than is likely to be imposed following a guilty plea. Yet guilty pleas in such circumstances rightly are considered voluntary and uncoerced in any relevant sense.FN130

FN130. *Adelphia Settlement-District,* 337 B.R. at 477.

For decades, counterparties to executory contracts with bankruptcy debtors have known that their agreements could be rejected, and debtors and contract counterparties have negotiated deals as alternatives to that scenario. When they have been so negotiated (with all knowing that the debtor has the option to reject if the existing deal is not modified to its satisfaction), that has never been regarded as unlawful coercion. Rather, it has been recognized as an appropriate use of the leverage that Congress has given to debtors for the benefit of all of the other creditors who are not contract counterparties,**\*515** and for whom the restructuring of contractual arrangements is important to any corporate restructuring.

The Court's observation in questioning at oral argument, with respect to dealer contract modifications, that "no good deed goes unpunished" (perhaps naively thinking at the time that the New York Dealers Association was advocating the interests of *GM* dealers) was, as it probably sounded, an indication of frustration with the New York Dealers Association's argument. And what the Court could have said then, and what it is saying now, is that the *last* thing bankruptcy courts should be doing is to be forcing debtors and their contract counterparties into situations where rejection is the only lawful alternative, subjecting other creditors to dilution on their recoveries by running up rejection damages, and subjecting contract counterparties to the full hardships of an executory contract rejection. There is no basis in law or fact for holding that these contractual modifications were unlawfully "coerced." Disapproving contractual modifications of the type here would

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

407 B.R. 463, 51 Bankr.Ct.Dec. 225
**(Cite as: 407 B.R. 463)**

be squarely inconsistent with the goals of corporate reorganization.

As a practical matter, modifications negotiated by the Dealers Committee and the AGs mooted out many, if not all, of the New York Auto Dealers' complaints about the loss of dealer protection laws. To the extent they did not, however, the Court notes that Judge Gonzalez dealt with these same contentions in another decision in *Chrysler.* After concluding that Chrysler's rejection of dealership agreements constituted a valid exercise of business judgment, Judge Gonzalez found that the state franchise laws at issue, like those at issue here, frustrated the purposes of (and, thus, were preempted by) section 365. [FN131] To the extent that laws of the type relied upon by the New York Dealers Association-either state or federal-impair the ability to reject, or to assume and assign, they must be trumped by federal bankruptcy law. And to the extent that nonbankruptcy law prohibits debtors and their contract counterparties from finding mutually satisfactory less draconian alternatives to rejection, it likewise must be trumped.

> FN131. *See In re Old Carco LLC,* 406 B.R. 180, 199-206 (Bankr.S.D.N.Y.2009); *see also id.* at 205-06 ("Where a state law 'unduly impede[s] the operation of federal bankruptcy policy, the state law [will] have to yield' ") (quoting *In re City of Vallejo,* 403 B.R. 72, 77 (Bankr.E.D.Cal.2009)).

As Judge Gonzalez explained:

> Specifically and by no means exclusively, statutory notice periods of, *e.g.,* 60 or 90 days before termination clearly frustrate § 365's purpose to allow a debtor to reject a contract as soon as the debtor has the court's permission (and there is no waiting period under the Bankruptcy Rules). Buy-back requirements also frustrate § 365's purpose to free a debtor of obligations once the debtor has rejected the contract. Good cause hearings frustrate § 365's purpose of giving a bankruptcy court the authority to determine whether a contract may be assumed or rejected. Strict limitations on grounds for nonperformance frustrate § 365's purpose of allowing a debtor to exercise its business judgment and reject contracts when the debtor determines rejection benefits the estate. So-called "blocking rights," which impose limitations on the power of automobile manufacturers to relocate dealers or establish new dealerships or modify existing dealerships over a dealer's objection, frustrate § 365's purpose of giving a debtor the power to decide

which contracts **\*516** it will assume and assign or reject by allowing other dealers to restrict that power. [FN132]

> FN132. 406 B.R. at 205-06; *see also Vallejo,* 403 B.R. at 77 (holding that "Congress enacted section 365 to provide debtors the authority to reject executory contracts. This authority preempts state law by virtue of the Supremacy Clause [and] the Bankruptcy Clause.") (internal citation omitted).

Judge Gonzalez also made clear that 28 U.S.C. § 959(b), on which the New York Dealers Association's *amicus* brief heavily relies, did not alter the Court's "preemption analysis," because that provision "does not de-limit the precise conditions on contract rejection"-particularly where, as in *Chrysler* and here, the pertinent state laws concern "consumer convenience and costs and the protection of local businesses, rather than a concern over public safety." [FN133]

> FN133. 406 B.R. at 202-05. *See also* 406 B.R. at 204 ("In sum, the Dealer Statutes ... are concerned with protecting economic or commercial interests and are thus preempted by the Bankruptcy Code notwithstanding 28 U.S.C. § 959(b)") (citing *In re Baker & Drake, Inc.,* 35 F.3d 1348, 1353 (9th Cir.1994)); *id.* at 206 n. 32 (stating that "state law protections cannot be used to negate the Debtors' rejection powers under § 365.... 'The requirement that the debtor in possession continue to operate *according to* state law requirements imposed on the debtor in possession (i.e., § 959(b)) does not imply that its powers under the Code are *subject to* the state law protections.' ") (quoting *In re PSA, Inc.,* 335 B.R. 580, 587 (Bankr.D.Del.2005) (emphasis in original)).

To the extent that the New York Auto Dealers Association complains that GM gets a "competitive advantage over others not in bankruptcy," [FN134] that likewise is a complaint with respect to federal bankruptcy policy, which gives companies a chance to reorganize and shed burdensome obligations to achieve a greater good. That GM's reorganization will make New GM and GM dealers more competitive is not a bad thing; it is exactly the point.

> FN134. N.Y. Auto Dealers Obj. ¶ 20.

The New York Auto Dealers' Association lacks standing to have its comments deemed to be an objection. To the extent that its *amicus* comments can be deemed to constitute an objection, any such objection is overruled.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

407 B.R. 463, 51 Bankr.Ct.Dec. 225
**(Cite as: 407 B.R. 463)**

*7. ECC Trust*

The Environmental Conservation and Chemical Corporation Site Trust Fund (the "**ECC Trust**") has also filed a limited objection. The ECC Trust was created as a means to implement a consent decree that GM and other parties entered into with the United States and the State of Indiana to clean up hazardous materials at the EnviroChem Superfund Site in Zionsville, Indiana (the "**Zionsville Site**"). The consent decree was approved in 1991 by the United States District Court for the Southern District of Indiana. Under the authority of the consent decree, the Trustee for the ECC Trust issued an assessment on April 20, 2009, requiring GM to pay approximately $63,000 into the ECC Trust. Shortly before the due date, GM notified the ECC Trust that it would not be paying its share, and filed its chapter 11 petition shortly thereafter.

The ECC Trust requests that this Court, using its "equitable powers," require that the Purchase Agreement be modified such that the ECC Trust's claim be designated an "Assumed Liability." Unfortunately, the Court cannot do that.

This Court need not, at this juncture, decide the vast majority of the issues presented by the parties at oral argument-including, especially, whether a consent decree is considered a contract or a judicial decree for enforcement purposes, and **\*517** whether this particular consent decree created a monetary obligation, which would be regarded like any other unsecured claim, or was in fact a mandatory injunction to clean up the Site.

For now it is sufficient to note that the ECC Trust's present rights are against *Old GM*. Under the ECC Trust's best case scenario, as argued, the ECC Trust may be able to secure equitable relief against Old GM. But whether the ECC Trust can enforce an injunction against Old GM, or must instead live with an unsecured claim, is an issue for another day.

[42][43][44] Whatever the ECC Trust's rights are against Old GM, there is no basis for this Court to use its "equitable powers" to force the Purchaser to assume this liability. This Court has found that the Purchaser is entitled to a free and clear order. The Court cannot create exceptions to that by reason of this Court's notions of equity. As this Court noted in another of its *Adelphia* decisions, it is not free to use its equitable powers to circumvent the Code.[FN135] Decisions of the Second Circuit make it clear that, even with the presence of section 105(a), bankruptcy judges are not

free to do whatever feels right.[FN136]

FN135. *See In re Adelphia Commc'ns Corp., 336 B.R. 610, 664 (Bankr.S.D.N.Y.2006).*

FN136. *See, e.g., In re Momentum Mfg. Corp., 25 F.3d 1132, 1136 & n. 4 (2d Cir.1994)* ("It is well settled that bankruptcy courts are courts of equity, empowered to invoke equitable principles to achieve fairness and justice in the reorganization process.... We have repeatedly emphasized the importance of the bankruptcy court's equitable power." But "[t]his power is not unlimited. Thus, a bankruptcy court may not exercise this power in contravention of provisions of the Code."); *In re Joint Eastern & Southern District Asbestos Litig., 982 F.2d 721, 751 (2d Cir.1992)* (*"Asbestos Litigation"*) ("[A] reorganization is assuredly governed by equitable considerations, but that guiding principle is not a license to courts to invent remedies that overstep statutory limitations."); *see also In re Aquatic Dev. Group, Inc., 352 F.3d 671, 680 (2d Cir.2003)* (Straub, J., concurring) (" *Aquatic Development* ") ("[T]his Court has repeatedly cautioned that 105(a) 'does not "authorize the bankruptcy courts to create substantive rights that are otherwise unavailable under applicable law, or constitute a roving commission to do equity." ' "), quoting *In re Dairy Mart Convenience Stores, Inc., 351 F.3d 86, 92 (2d Cir.2003)* (" *Dairy Mart* "), in turn quoting *U.S. v. Sutton, 786 F.2d 1305, 1308 (5th Cir.1986).*

Insufficient justification has been provided for this Court to force the Purchaser to assume this liability, in the face of section 363(f)'s explicit language allowing the sale of property "free and clear" of such liabilities. The Court is aware that the requested relief would have a very modest impact on the Purchaser, but is nevertheless required to issue a principled decision.

*8. "Equally and Ratably" Issues*

[45] Pro se unsecured bondholders Parker and Radha R.M. Narumanchi raise objections that they should be treated as secured creditors, and have not been. They contend that the indenture for their bonds (the 1995 issue, whose indenture trustee, represented by skilled counsel, did not raise a similar objection) had an "equal and ratable clause," boosting their bonds to secured debt status if liens were

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

407 B.R. 463, 51 Bankr.Ct.Dec. 225
**(Cite as: 407 B.R. 463)**

thereafter put on certain manufacturing facilities. They then contend that when the 2008 Prepetition Financing was put in place, it triggered their equal and ratable clauses, making them secured.

The Court agrees that the bonds have an equal and ratable clause. But it cannot agree that it was triggered. The 2008 Prepetition Financing Documents expressly carved out from the grant of the security interest under those documents any instance**518** where it would trigger, *inter alia,* the equal and ratable clause.

The 2008 Prepetition Financing granted the U.S. Treasury a lien, subject to exceptions not applicable here, on a wide array of property. But it expressly did not put a lien on what it called "**Excluded Collateral.**" [FN137] Excluded Collateral included, among other things:

> FN137. *See* 2008 Prepetition Agreement Section 4.01 (proviso generally providing that collateral would not include "Excluded Collateral," a term defined elsewhere in that agreement).

(v) any Property, including any debt or Equity Interest and any manufacturing plan or facility which is located within the continental United States, to the extent that the grant of a security interest therein to secure the Obligations *will result in a lien, or an obligation to grant a lien, in such Property to secure any other obligation.* [FN138]

> FN138. *Id.* Section 1.01-"Excluded Collateral" (v) ( "Definitions") (emphasis added).

Thus when liens were granted in favor of the U.S. Treasury in December 2008, the U.S. Treasury was not granted a lien on any of the Excluded Collateral-including, as relevant here, anything that would trigger the equal and ratable clause. [FN139]

> FN139. It does not matter if, as Parker suggested but did not prove, the U.S. Treasury unintentionally or even intentionally recorded a mortgage or UCC-1 covering the property mentioned in the equal and ratable clause. Doing so would only have *perfected* a lien, assuming that one was granted in the first place. Here there was no grant of any lien, and perfecting such a nonexistent lien would be meaningless.

*9. Unauthorized Use of TARP Funds Issues*

Bondholder Parker (so far as the Court can tell, the only one of the 850 objectors) objects to the 363 Transaction on the additional ground that the U.S. Government was not authorized to use TARP funds to assist the auto industry, and hence that the 363 Transaction is unlawful. The Court agrees with the United States Attorney that the issue of the U.S. Treasury's lending authority now is moot, and that Mr. Parker lacks standing to raise the issue. Thus the Court does not need to reach the third issue.

[46] First, the Court agrees that the objection is moot. The 363 Transaction does not involve any expenditure of TARP funds. It simply provides a credit bid by the Purchaser-as an assignee of secured debt held by EDC (as to whom no objection is made) and the U.S. Treasury-of amounts due on previous loans under the U.S. Treasury Prepetition Loan and the DIP Financing Facility.

No party objected to the use of TARP funds in connection with the DIP Financing Facility, or when GM got the assistance it did before the filing of GM's chapter 11 case. And the Court approved the DIP Financing Facility after full hearing and notice. It was *then* that the U.S. Treasury became a lender, not now. Complaints that the U.S. Treasury should not have lent the money to GM are now moot.

[47] Second, the Court once more agrees with the United States Attorney that Mr. Parker lacks standing to challenge the U.S. Government's lending authority here. Judge Gonzalez addressed this exact issue in *Chrysler-Standing,* [FN140] the second of the two decisions that were affirmed by the Circuit.

> FN140. *See* 405 B.R. at 83.

The Court does not need to repeat all of the elements of Judge Gonzalez's analysis in *Chrysler-Standing,* nor what this Court has stated previously with respect to the importance of *stare decisis,* or its compliance**519** with decisions of the Second Circuit. Here, as in *Chrysler-Standing,* an unsecured creditor like Mr. Parker does not establish the injury-in-fact necessary to establish constitutional standing under Article III because "all holders of unsecured claims are receiving no less than what they would receive in a liquidation." [FN141] And even assuming that the 363 Transaction itself injured bondholders like Mr. Parker (though it is difficult to see how, since without the 363 Transaction, GM would have to liquidate), Mr. Parker cannot demonstrate standing because he cannot show that

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

407 B.R. 463, 51 Bankr.Ct.Dec. 225
**(Cite as: 407 B.R. 463)**

any such injury is "fairly traceable" to the Government's use of TARP funds, as opposed to the 363 Transaction itself.

FN141. *Chrysler-Standing,* 405 B.R. at 83.

As Judge Gonzalez explained in *Chrysler-Standing,* "[i]f a non-governmental entity were providing the funding in this case, the [objectors] would be alleging the same injury.... In this light, it is not the actions of the lender that the [objectors] are challenging but rather the transaction itself. Specifically, the [objectors'] alleged injury is not fairly traceable to the U.S. Treasury's actions because the [objectors] would suffer the same injury **regardless** of the identity of the lender." [FN142]

FN142. *Id.*

Under these circumstances, the Court need not address Mr. Parker's third point. This objection is overruled.

*10. Cure Objections*

Many contract counterparties-more than 500-voiced objections to GM's estimated cure amounts, generally expressing different perceptions as to the exact amounts GM owes them. These differences would eventually have to be resolved, since to assume an executory contract (and GM is assuming thousands of them), most prepetition defaults would have to be cured.

GM proposed a mechanism for fixing the cure amount entitlements-an amalgam of exchanges of information, negotiation, ADR, and court determination, if needed. Significantly, while many parties had differing views as to the amounts to which they were entitled, none voiced objections to the method GM proposed. As those counterparties will remain eligible for their full legal entitlements, the Court finds the proposed mechanism fully satisfactory, and it is unnecessary and inappropriate to rule on all of the cure amount issues here.

*11. UAW Settlement Objections*

Approximately 56 UAW retirees-somewhat numerous in number, but a miniscule portion of the estimated 500,000 covered under the UAW Settlement Agreement-object to the UAW Settlement Agreement. In general, they express (understandable) disappointment with a settlement that results in a reduction of their health benefits. But they do

not articulate objections legally cognizable under the law.

The Curson testimony, in particular, evidences the sensitivity to member and retiree needs and concerns of the UAW leadership. As discussed at considerable length above, the UAW had to make very hard decisions as to concessions it would make on behalf of its members and retirees to preserve GM's viability-and to avoid a liquidation that would be disastrous for the people the UAW was trying to help. The UAW was successful in preserving an acceptable level of core medical benefits. And as the UAW properly observes in its brief, if the UAW had not done as well as it did, its agreement would not have been ratified.

**\*520** Given the alternatives, it is easy to find that the UAW settlement is fair and equitable, from the perspective of both the GM estate and UAW members. It falls well within the range of reasonableness from GM's perspective, and is fair, reasonable and in the best interest of the UAW retirees.

*12. Stockholder Objections*

[48] Many GM stockholders, understandably disappointed that the 363 Transaction will leave them with no recovery, have voiced objections. Once again, the Court is sensitive to their concerns, but cannot help them. GM is hopelessly insolvent, and there is nothing for stockholders now. And if GM liquidates, there will not only be nothing for stockholders; there will be nothing for unsecured creditors.

Under those circumstances, GM stockholders cannot claim to be aggrieved by the transactions before the Court here.

*13. Miscellaneous Objections*

The Court cannot lengthen this decision further by specifically addressing any more of the approximately 850 objections that were raised on this motion. The Court has canvassed them and satisfied itself that no material objections other than those it has specifically addressed were raised and have merit. To the extent those objections were not expressly addressed in this decision, they are overruled.

*Conclusion*

The 363 Transaction is approved. The Court is entering an order in accordance with this Decision.[FN143]

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

407 B.R. 463, 51 Bankr.Ct.Dec. 225
**(Cite as: 407 B.R. 463)**

> FN143. The order entered by the Court differs from the revised proposed order submitted by the Debtors in a few respects: The order entered by the Court adds this Decision to the places where Findings of Fact are set forth and where Conclusions of Law may be found. It adds "to the fullest extent constitutionally permissible" in connection with the injunction as to successor liability claims, to address notice or other due process issues that might otherwise exist with respect to future asbestos claims or "demands" as discussed above. And like the order entered by Judge Gonzalez in *Chrysler,* the order shortens the Fed.R.Bankr.P. 6004(h) and 6006(d) periods, but still provides 4 days, so as to avoid effectively precluding any appellate review.

Bkrtcy.S.D.N.Y.,2009.
In re General Motors Corp.
407 B.R. 463, 51 Bankr.Ct.Dec. 225

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

# Exhibit 4

09-50026-mg   Doc 8200-25   Filed 12/21/10   Entered 12/21/10 08:14:50   Declaration
in Opposition to Motion   Pg 243 of 353

O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| MARTIN EHRLICH, individually, and on behalf of a class of similarly situated individuals;<br><br>                Plaintiff,<br><br>     v.<br><br>BMW OF NORTH AMERICA, LLC;<br><br>                Defendant. | CV 10-1151 ABC (PJWx)<br><br>ORDER RE: MOTION TO DISMISS CLASS ACTION COMPLAINT OF PLAINTIFF MARTIN EHRLICH PURSUANT TO FED. R. CIV. P. 12(b)(6) |

Pending before the Court is Defendant BMW of North America, LLC's ("BMW's") Motion to Dismiss Class Action Complaint of Plaintiff Martin Ehrlich Pursuant to Fed. R. Civ. P. 12(b)(6), filed on May 7, 2010. Plaintiff Martin Ehrlich opposed on June 28, 2010 and BMW replied on July 12, 2010. The Court found the matter appropriate for resolution without oral argument and vacated the August 9, 2010 hearing date. Fed. R. Civ. P. 78; Local Rule 7-15. For the reasons below, the motion is GRANTED IN PART and DENIED IN PART. Leave to amend is GRANTED within the limits discussed below.

1                       **FACTUAL ALLEGATIONS**[1]

2         Plaintiff has brought this action against BMW on his own behalf

3   and "on behalf of all similarly situated persons who own or lease, or

4   have owned or leased . . . certain defective vehicles manufactured and

5   sold by" BMW.  (First Amended Compl. ("FAC") ¶ 1.)  He alleges that

6   BMW designed, manufactured, and sold BMW MINIs from 2001 to 2010 that

7   it knew contained a design flaw that caused the windshield in those

8   vehicles to have a high propensity to crack or chip under

9   circumstances that would not cause non-defective windshields to

10  similarly fail.  (FAC ¶¶ 2—3.)

11        Plaintiff purchased a new 2005 BMW Mini Cooper S from a BMW

12  dealer in Monrovia, California in December of 2004.  (FAC ¶ 20.)  In

13  March 2008, the windshield of Plaintiff's Mini cracked when he used

14  the sponge portion of a squeegee on it at a gas station.  (FAC ¶ 21.)

15  At that time, Plaintiff's MINI had approximately 51,933 miles on it

16  (FAC ¶ 22), which was beyond the New Car Warranty of 4 years or 50,000

17  miles, whichever occurs first (FAC ¶ 67; Kizirian Decl., Ex. 1 at 4).

18  When he brought it into a BMW dealership, the dealer informed him that

19  the windshield would not be covered by his warranty, so Plaintiff paid

20  $929.14 to replace it.  (FAC ¶ 22.)  In November 2008, the replacement

21  windshield cracked while the vehicle was parked overnight in

22  Plaintiff's garage, so Plaintiff paid $225 to replace the second

23  ─────────────────────

24        [1]The facts are taken from Plaintiff's First Amended Complaint.
    (Docket No. 4.)  The Court also GRANTS BMW's request for judicial
25  notice of Exhibits 1 and 2 of the Kizirian Declaration, which are the
    relevant express warranty for Plaintiff's MINI and the "Technical
26  Service Bulletin" alleged in the FAC.  See Knievel v. ESPN, 393 F.3d
    1068, 1076 (9th Cir. 2005) (stating that a court may consider
27  documents "whose contents are alleged in a complaint and whose
    authenticity no party questions, but which are not physically attached
28  to the [plaintiff's] pleading." (brackets in original)).

                                       2

windshield with a non-MINI windshield.  (FAC ¶ 23.)

Many putative class members have reported that their windshields also have cracked or broken for no apparent reason; others reported that even slight impacts would cause windshields to crack.  (FAC ¶ 34.)  Replacement windshields suffer from the same defect, forcing some class members to replace their windshields multiple times.  (FAC ¶ 35.)  In the FAC, Plaintiff has quoted several complaints from consumers about cracking windshields, which were posted on the National Highway Traffic Safety Administration ("NTHSA") website. (FAC ¶ 35.)

BMW learned about the cracking defect from sources unavailable to the class, such as through pre-release testing data, early consumer complaints to BMW and dealers, testing done in response to complaints, replacement part sales data, aggregate data from BMW dealers, and other internal sources.  (FAC ¶ 37.)  Despite its awareness, BMW has actively concealed the existence and nature of the cracking defect at the time Plaintiff and class members purchased their Minis and after, forcing Plaintiff and the class to pay for repair and replacement of cracked windshields.  (FAC ¶¶ 38–39.)

BMW has engaged in a "very aggressive marketing campaign" to lure customers to purchase MINIs by promoting safety features, such as airbags, traction and stability control, and strong occupant safety cage construction, in part because the Mini is a small car and has a higher propensity to cause passenger injuries in multiple-vehicle accidents.  (FAC ¶¶ 41–45 & n.1.)  In the FAC, Plaintiff quotes several statements on BMW's website and marketing materials discussing these safety features, including one statement under a section entitled "Collision Protection" that "each critical section of a MINI

3

is ingeniously designed to absorb and spread energy in a manner that will keep harms as far away from the passenger as possible" and "what should be increasingly clear is that almost every component of the car helps to protect its Motorers at all times." (FAC ¶¶ 43—45.)

Although Plaintiff does not identify any marketing or other materials that so state, Plaintiff alleges that the windshield is part of a MINI's safety restraint system ("SRS"), playing a "major role in the structural integrity of a vehicle's passenger compartment," so the windshield's propensity to crack poses a safety risk. (FAC ¶¶ 5—7.) For example, if a MINI with a cracked windshield is in a roll-over accident, the windshield can become dislodged, compromising roof-crush resistance. (FAC ¶ 52.) This could cause serious head and neck injuries, failure of the passenger side airbag to deploy, or the ejection of passengers from the vehicle. (FAC ¶ 52.) Moreover, a cracked windshield would not protect passengers from frontal penetration. (FAC ¶ 52.) Plaintiff has not alleged that any class members have actually been injured in these kinds of accidents because the windshield has a propensity to crack.

In order to conceal the cracking defect it knew about prior to selling any MINIs, BMW has instructed dealers to conduct a "pen test." (FAC ¶ 48.) The test involves tracing a windshield crack with pen and if the pen hangs up on the slightest pit or blemish, that is deemed evidence of an impact, and dealers have been instructed to refuse coverage under warranty in that circumstance. (FAC ¶ 49.) According to Plaintiff, the pen test can and does frequently produce false positives, but BMW nevertheless uses it as a reason to deny warranty coverage. (FAC ¶ 48—50.)

Although some class members have paid for four or more

replacement windshields, Plaintiff claims that replaced MINI windshields still do not provide the same level of occupant protection as the factory-installed windshield. (FAC ¶ 51.) For example, the majority of replacements are performed incorrectly. (FAC ¶ 53.) Likewise, the conditions of factory installation are optimal for the seal between the windshield and vehicle, and those conditions cannot be replicated by a replacement. (FAC ¶ 53.) Thus, a replaced windshield cannot provide appropriate support during a roll-over accident or withstand passenger-side airbag deployment, which puts additional stress on the windshield in an accident. (FAC ¶ 53.)

In February 2009, BMW issued a Technical Service Bulletin ("TSB"), which Plaintiff alleges contains evidence that BMW acknowledged the windshield defect, but attempted to attribute the problem to "very isolated circumstances": "Under very isolated circumstances, a stress crack may form due to a combination of glass position and heavy torsional loads on the body of the vehicle. These cracks always start from an outside edge of the glass. Most often the cracks begin at one of the corners of the windshield." (FAC ¶¶ 55—57, 63; Kizirian Decl., Ex. 2.) The TSB directs dealers to replace the windshield and submit the repair order "for a warranty claim where a stress crack is the root cause." (FAC ¶ 56.) The TSB calls for using the pen test to determine whether the crack is due to "outside influence": "Run a non-permanent felt tip pen or small marker over the length of the damaged area. Even very minor surface damage will be felt." (Kizirian Decl., Ex. 2.)

In Plaintiff's view, the purpose of the TSB was two-fold: to make it appear to government regulators, courts, and class members that BMW has taken affirmative steps to resolve the windshield-cracking issue;

Case 2:09-cv-01151-ABC-PJW   Document 23   Filed 11/31/10   Page 6 of 28   Page ID #:292
09-50026-mg   Doc 8200-25   Filed 12/21/10   Entered 12/31/10 08:14:50   Declaration
in Opposition to Motion   Pg 248 of 353

and to make it appear that the cracking defect is less extensive than it actually is. (FAC ¶ 57.) Both before and after the TSB, for some vehicles like Plaintiff's that suffered stress cracks beyond the 4-year/50,000 mile MINI New Passenger Car Limited Warranty, or for vehicles with cracks attributed to influences other than stress, BMW allegedly instituted a clandestine program to secretly pay for windshield replacements to mollify customers who complained loudly enough. (FAC ¶ 67.) Plaintiff was not among those consumers who obtained payment from BMW after complaining about replacing his cracked windshields.

Plaintiff alleges that, had class members known about the defective windshields, they would have had the opportunity to factor the existence of the defect into their decisions to purchase MINI vehicles. (FAC ¶ 60.) Class members would have also had the chance to present cracked windshields for warranty repairs. (FAC ¶ 60.)

Plaintiff has alleged four causes of action under California law: (1) violation of California's Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750 et seq.; (2) violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, based upon a violation of California's Secret Warranty Law, Cal. Civ. Code § 1795.90 et seq.; (3) violation of the UCL for acts other than violating the Secret Warranty Law; and (4) breach of implied warranty under the Song-Beverly Consumer Warranty Act, Cal. Civ. Code §§ 1792 and 1791.1 et seq.

For the first cause of action, Plaintiff claims that, under the CLRA, the class members are "consumers," and BMW violated California Civil Code section 1770(a)(5) and (7) by representing that the MINI windshields had characteristics and benefits that they did not have

and were of a particular standard and quality when they were not, and by knowingly deceiving the purchasing public with representations that created serious safety risks. (FAC ¶ 91.) Plaintiff also alleges that BMW had a duty to disclose the defective windshields because it was in a superior position to know of the safety defect, it actually knew about the defect, and Plaintiff and the class could not have reasonably discovered the defect until the windshields cracked. (FAC ¶ 93-94.) Plaintiff alleges the windshield defect is material because reasonable consumers would have considered the information important in deciding to purchase a MINI or would have paid a lesser price for a MINI. (FAC ¶ 96.) Class members reasonably expected their windshields to last for the life of their vehicles. (FAC ¶ 97.)

For Plaintiff's second claim under the UCL for an "unlawful" practice of violating the Secret Warranty Law, Plaintiff alleges that a "secret warranty" is created when an automaker establishes a policy to pay for repair of a defect without making either the defect or the repair policy known to the general public. (FAC ¶ 61.) This usually occurs in situations where a large number of consumers complain about a defect not covered by a factory warranty, but the manufacturer decides to offer warranty coverage to individual consumers when they complain. (FAC ¶ 61.) The secret warranty can manifest itself in TSBs issued by a manufacturer to local dealers, instructing dealers on addressing the defect for consumers who complain. (FAC ¶ 61.)

Plaintiff alleges that BWM had a secret warranty because it would replace windshields for customers who complained loudly enough, even though those customers' express warranties had expired or the crack was attributed to something other than stress. (FAC ¶ 67.) Code names for this policy were "good-will adjustments" or "policy

Case 2:12-cv-01151-ABC-PJW   Document 25   Filed 08/17/12   Page 4 of 28   Page ID #:294
09-50026-mg   Doc 8200-25   Filed 12/21/10   Entered 12/21/10 08:14:50   Declaration
in Opposition to Motion   Pg 250 of 353

1  adjustments." (FAC ¶ 67.) As a result, BMW violated the Secret
2  Warranty Law (and the UCL) by failing to notify all consumers of the
3  warranty and by refusing to reimburse consumers for windshield
4  replacement costs. (FAC ¶ 68.)

5      Plaintiff's non-Secret-Warranty-Act UCL claims rest on his
6  allegations that BMW engaged in unfair competition and engaged in
7  unlawful, unfair, and fraudulent business practices by knowingly
8  concealing the cracking defect when it had a duty to disclose it — a
9  practice capable of deceiving a substantial portion of the purchasing
10  public. (FAC ¶¶ 116–17.)

11      Finally, Plaintiff's claim under the Song-Beverly Act rests upon
12  his allegations that BMW provided consumers with an implied warranty
13  that MINIs and their parts were merchantable and fit for the ordinary
14  purpose for which they were sold: safe and reliable transportation.
15  (FAC ¶ 127.) That implied warranty was breached by the cracking
16  defect, which rendered the MINIs not reliable, durable, or safe for
17  transportation. (FAC ¶ 127.)

18  **LEGAL STANDARD**

19      The Supreme Court has recently clarified the level of pleading
20  necessary to survive a motion to dismiss under Rule 12(b)(6). <u>See</u>
21  <u>Ashcroft v. Iqbal</u>, __ U.S. __, __, 129 S. Ct. 1937, 1950–52 (2009);
22  <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 557–58 (2007). Federal Rule
23  of Civil Procedure 8(a)(2) requires a "short and plain statement of
24  the claim showing that the pleader is entitled to relief," which does
25  not require "detailed factual allegations," but it "demands more than
26  an unadorned, the-defendant-unlawfully-harmed-me accusation." <u>Iqbal</u>,
27  __ U.S. at __, 129 S. Ct. at 1949. A claim must be "plausible on its
28  face," which means that the Court can "draw the reasonable inference

that the defendant is liable for the mis0conduct alleged." Id.; see Twombly, 550 U.S. at 556, 570. In other words, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555 (internal quotations and alterations omitted). Allegations of fact are taken as true and construed in the light most favorable to the nonmoving party. See 598 F.3d 638, 642 (9th Cir. 2010).

In analyzing the sufficiency of the complaint, the Court must first look at the requirements of the causes of action alleged. See Iqbal, __ U.S. at __, 129 S. Ct. at 1947. The Court may then identify and disregard any legal conclusions, which are not subject to the requirement that the Court must accept as true all of the allegations contained in the complaint. Id. at __, 129 S. Ct. at 1949. The Court must then decide whether well-pleaded factual allegations, when assumed true, "plausibly give rise to an entitlement to relief." Id. at __, 129 S. Ct. at 1950. In doing so, the Court may not consider material beyond the pleadings, but may consider judicially noticeable documents, documents attached to the complaint, or documents to which the complaint refers extensively or which form the basis of the plaintiff's claims in the complaint. See United States v. Ritchie, 342 F.3d 903, 908 (9th Cir. 2003).

### DISCUSSION

#### A. Duty to Disclose under the UCL and CLRA

The CLRA prohibits certain acts that are "unfair" or "deceptive," including:

> (5) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities

which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he or she does not have.

. . .

(7) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another.

Cal. Civ. Code § 1770(a)(5) & (7).  The UCL similarly prohibits "fraudulent" business practices.  Cal. Civ. Code § 17200.

In a fraudulent omissions case like this one,[2] a plaintiff can state a cause of action when the "'omission [is] contrary to a representation actually made by the defendant, or an omission of a fact the defendant was obligated to disclose.'"  <u>Falk v. Gen. Motors Corp.</u>, 496 F. Supp. 2d 1088, 1094—95 (N.D. Cal. 2007) (brackets in original).  The plaintiff may allege an "obligation to disclose" a defect in one of four ways: "(1) when the defendant is in a fiduciary relationship with the plaintiff; (2) when the defendant has exclusive knowledge of material facts not known to the plaintiff; (3) when the defendant actively conceals a material fact from the plaintiff; and (4) when the defendant makes partial representations but also suppresses some material facts."  <u>Id.</u> at 1095.  Plaintiff does not allege a fiduciary relationship with BMW or argue that BMW made only partial representations about windshields.  Therefore, the Court focuses on the second and third grounds to determine whether a duty to disclose exists.

In an omissions case, omitted information is material if a

---

[2] Plaintiff does not say so explicitly, but the Court interprets his fraud-based UCL and CLRA allegations as claiming fraudulent omissions, which rest on BMW's failure to disclose the cracking defect.

1   plaintiff can allege that, "had the omitted information been

2   disclosed, one would have been aware of it and behaved differently."

3   Mirkin v. Wasserman, 5 Cal. 4th 1082, 1093 (1993); see also Falk, 496

4   F. Supp. 2d at 1095 (same).  Materiality is viewed from the

5   prospective of the reasonable consumer.  Falk, 496 F. Supp. 2d at

6   1095.

7       BMW argues that materiality cannot exist in this case because

8   Plaintiff's defective windshield cracked after the expiration of the

9   express warranty on his MINI.  See Clemens v. Daimlerchrysler Corp.,

10  534 F.3d 1017, 1026—27 (9th Cir. 2008); Daugherty v. Am. Honda Motor

11  Co., 144 Cal. App. 4th 824, 834—39 (Ct. App. 2006); see also Bardin v.

12  Daimlercrysler Corp., 136 Cal. App. 4th 1255, 1276 (Ct. App. 2006).

13  In Daugherty, the plaintiffs sued an automobile manufacturer for

14  failing to disclose an engine defect that did not cause malfunctions

15  in vehicles until after an express warranty expired.  144 Cal. App.

16  4th at 827.  The court sustained the defendant's demurrer to the

17  plaintiffs' CLRA claims because the plaintiffs failed to identify "any

18  representation by Honda that its automobiles had any characteristic

19  they do not have, or are of a standard or quality they are not."  Id.

20  at 834.  The plaintiffs were obligated to allege "suppression of a

21  fact by one who is bound to disclose it or who gives information of

22  other facts which are likely to mislead for want of communication of

23  that fact," Bardin, 136 Cal. App. 4th at 1276, which they failed to do

24  in light of the engine's performance during the express warranty

25  period, Daugherty, 144 Cal. App. 4th at 836.  In light of the express

26  warranty, "[t]he only expectation buyers could have had about the F22

27  engine was that it would function properly for the length of Honda's

28  express warranty, and it did.  Honda did nothing that was likely to

11

deceive the general public by failing to disclose that its F22 engine

might, in the fullness of time, eventually dislodge the front balancer

shaft oil seal and cause an oil leak." Id. at 838.

Similarly, in Clemens, the plaintiff sued an automaker for

defective head gaskets in certain vehicles, claiming that the

defendant concealed the defect during an express warranty period.  534

F.3d at 1021.  The Ninth Circuit affirmed summary judgment for the

defendant on the plaintiff's fraud claims under the UCL based on

Bardin and Daugherty, explaining that California courts have viewed

post-warranty fraudulent concealment claims with "some skepticism."

Id. at 1026.  The court found that the plaintiff "produced no evidence

to suggest that a reasonable consumer would have expected or assumed

any particular head gasket lifespan in excess of the warranty period"

and the evidence in the record did not establish that the warranty

period for the gasket was material to the plaintiff's own purchasing

decision.  Id.

Plaintiff points out that Clemens, Daugherty, and Bardin did not

involve alleged safety defects, which Plaintiff argues are material

facts that can, in fact, create a duty to disclose, even when a defect

does not occur until after an express warranty expires.  For example,

in Daugherty, the court took care to note that the case did not

involve a defect that created an "unreasonable risk" to the safety of

consumers, and suggested that a safety-based duty to disclose might

exist in some circumstances: "The complaint is devoid of factual

allegations showing any instance of physical injury or any safety

concerns posed by the defect."  144 Cal. App. 4th at 836; see also

Bardin, 136 Cal. App. 4th at 1270 (noting that plaintiffs "did not

allege any personal injury or safety concerns related to" the alleged

12

defect).[3]

The district court in <u>Falk</u> interpreted this language in <u>Daugherty</u> to provide the safety exception on which Plaintiff relies.  496 F. Supp. 2d at 1094.  In <u>Falk</u>, the plaintiffs brought both CLRA and UCL fraudulent omissions claims, alleging that the speedometers in the defendant's vehicles ceased to function properly after the vehicles' express warranty expired.  <u>Id.</u> at 1092.  The court explained that "<u>Daugherty</u> emphasized that an 'unreasonable' safety risk would lead to a duty to disclose" and concluded that a duty to disclose existed under the circumstances.  <u>Id.</u> at 1094.  The court refused to dismiss the CLRA claim based upon <u>Daugherty</u> and <u>Bardin</u>, finding instead a duty to disclose because the plaintiffs alleged that the faulty speedometers could cause vehicles to travel at "unsafe speeds" and could cause accidents.  <u>Id.</u> at 1096 & n.*.  Those allegations constituted material facts and distinguished the case from <u>Daugherty</u>, where no safety issues were alleged.  <u>Id.</u>  The court also refused to dismiss the UCL fraud claim for the same reason.  <u>Id.</u> at 1098.[4]

---

[3]Counsel for BMW was also counsel for Honda in <u>Daugherty</u> and he notes that the issue of safety was not pled or argued in the trial court, and was raised only in a reply brief on appeal, prompting the court at oral argument to decline to consider the issue.  Even if true, the written and published opinion in <u>Daugherty</u> left open the possibility of a safety exception.

[4]Other courts have recognized the safety exception in <u>Daugherty</u>. <u>See, e.g.</u>, <u>Marsikian v. Mercedes Benz USA, LLC</u>, No. CV 08-4876 AHM (JTLx), 2009 U.S. Dist. LEXIS 117012, at *13—17 (C.D. Cal. May 4, 2009);  <u>In re OnStar Contract Litig.</u>, 600 F. Supp. 2d 861, 869—70 (E.D. Mich. 2009); <u>Oestreicher v. Alienware Corp.</u>, 544 F. Supp. 2d 964, 969—73 (N.D. Cal. 2008) (recognizing safety exception and finding defect was not safety-related), <u>aff'd</u> 322 F. App'x 489 (9th Cir. 2009).  The Court declines to follow the non-precedential decision in <u>Larsen v. Nissan N. Am.</u>, No. A121838, 2009 WL 1766797, at *4 (Cal. Ct. App. June 23, 2009), which rejected in a brief footnote the plaintiffs' belatedly raised argument that their conclusory

Consistent with Falk and Daugherty, the Court concludes that a safety-based exception exists that might create a duty to disclose a defect even after the period of an express warranty expires[5] and Plaintiff has sufficiently alleged that the defective windshields in the MINIs create an unreasonable safety risk that would be material to a reasonable consumer.  Plaintiff alleges that each MINI's windshield is part of the vehicle's safety restraint system and if a MINI with a cracked windshield is in a roll-over accident, the windshield can become dislodged, compromising roof-crush resistance and causing serious head and neck injuries, failure of the passenger side airbag to deploy, or the ejection of passengers from the vehicle.[6]  Moreover, replacement windshields are expensive for the average consumer, and Plaintiff adequately alleges that a reasonable consumer would have paid less for a MINI or not bought it at all, if the consumer had known that the windshield was defective.

BMW points out that Plaintiff has not alleged that the defective windshields have actually caused injuries in any rollover accidents, relying on Tietsworth v. Sears, Roebuck & Co., ___ F. Supp. 2d ___, ___, No. 5:09-CV-288 JF (HRL), 2010 WL 1268093, at *7 (N.D. Cal. March 31, 2010).  BMW further speculates that injuries would not occur unless an owner makes a conscious decision to drive a MINI with a cracked

---

allegations of a safety risk created a duty to disclose under the CLRA.

[5]Although Falk was decided before Clemens, Clemens did not mention or discuss a potential safety exception under the UCL, the only statute at issue in that case, so the Court does not view Clemens as disapproving of Falk's analysis of Daugherty.

[6]The Court declines to consider BMW's conclusory argument, raised in a footnote in its opening brief and abandoned in its reply, that Plaintiff should have reported any safety defects to NHTSA.

windshield and then gets into a rollover accident.

The Court is not persuaded by Tietsworth or BMW's arguments that Plaintiff must plead that consumers have been injured by the alleged unreasonable safety risk. Tietsworth approached the safety defect issue in terms of actual injury to the named plaintiffs, finding that they "lacked standing" to pursue their claims based on merely posited injuries. Id. Here, Plaintiff has alleged that he was injured by the defective windshields by having to replace the cracked windshield in his MINIs twice; BMW has not argued that he lacks standing to pursue those claims. The alleged unreasonable risk of safety created by compromised windshields during rollover accidents is relevant to the materiality of BMW's omissions, and Plaintiff has alleged a plausible unreasonable safety risk that would have been material to the reasonable consumer. See, e.g., Marsikian v. Mercedes Benz USA, LLC, No. CV 08-4876 AHM (JTLx), 2009 U.S. Dist. LEXIS 117012, at *16-17 (C.D. Cal. May 4, 2009) (refusing to dismiss CLRA claim based on allegations of a "plausible prospect of a safety problem" in a defective air intake system, as well as the "monetary cost and inconvenience of water damage in the car," which would have been material to a reasonable consumer's decision to buy a car at the prices offered). Taking Plaintiff's allegations as true, he has sufficiently pled a plausible claim that the defect creates unreasonable safety risks.

Moreover, Plaintiff has adequately alleged that the defect was within BMW's exclusive knowledge. Plaintiff alleges that, since 2001, BMW has learned about the cracking defect from sources unavailable to the class, such as through pre-release testing data, early consumer complaints to BMW and dealers, testing done in response to complaints,

replacement part sales data, aggregate data from BMW dealers, and
other internal sources.  Despite its awareness, BMW did not disclose
the existence and nature of the cracking defect at the time Plaintiff
and class members purchased their Minis, forcing Plaintiff and the
class to pay for repair and replacement of cracked windshields.  These
allegations are nearly identical to those in <u>Falk</u>, which the court
found adequately pled exclusive knowledge.  See <u>Falk</u>, 496 F. Supp. 2d
at 1096—97 (finding allegations of "aggregate data from dealers,"
"pre-release testing data," and customer complaints, all within the
defendant's exclusive knowledge, were sufficient).

Finally, Plaintiff has adequately alleged that BMW actively
concealed the windshield defect.[7]  For example, Plaintiff alleges that
BMW withheld information about the defect it had learned through
internal sources and customer complaints (FAC ¶¶ 38—40), that it
replaced defective windshields only for the most vocal customers
without disclosing the replacement program to all consumers and
concealing the program by calling the replacements "goodwill"
adjustments (FAC ¶¶ 61—71), and that it used the "pen test" to
determine replacements, even though the test frequently produced false
positive results (FAC ¶¶ 48—50).  This is more than enough to allege
active concealment that would create a duty to disclose.  See <u>Falk</u>,
496 F. Supp. 2d at 1097 (finding that plaintiffs sufficiently pled
active concealment by alleging that manufacturer did not notify
consumers of defect in light of complaints and replaced defective
parts with other defective parts in order to conceal defects); <u>see</u>

---

[7]Although Plaintiff identifies the "active concealment" theory as
creating a duty for BMW to disclose the defect, BMW does not appear to
attack the sufficiency of the FAC on this basis.

Case 2:10-cv-09151-AB-PJW Document 28 Filed 08/11/10 Page 17 of 28 Page ID #:303
09-50026-mg Doc 8200-25 Filed 12/21/10 Entered 12/21/10 08:14:50 Declaration
in Opposition to Motion Pg 259 of 353

1  also Marsikian, 2009 U.S. Dist. LEXIS 117012, at *14 (finding

2  sufficient to state a claim for active concealment allegations that

3  internal service bulletins, "goodwill" adjustments given to the most

4  vocal owners, and temporary fixes concealed the defect from the

5  general customer base).

6      Thus, the Court finds that Plaintiff has sufficiently alleged a

7  duty to disclose the cracking defect and BMW's motion to dismiss

8  Plaintiff's fraud-based CLRA and UCL claims on this ground is DENIED.

9      **B.  Actual Reliance under the CLRA and UCL**

10     For fraud-based claims under the CLRA and UCL, Plaintiff must

11  also plead actual reliance. See In re Tobacco II Cases, 46 Cal. 4th

12  298, 326 (2009) (fraud claims under UCL); Buckland v. Threshold

13  Enters., 155 Cal. App. 4th 798, 810 (Ct. App. 2007) (CLRA claims

14  "sounding in fraud").  Actual reliance is presumed (or at least

15  inferred) when the omission is material.  Tobacco II, 46 Cal. 4th at

16  327.  As discussed above, Plaintiff has sufficiently alleged that the

17  windshield cracking defect would have been material to a reasonable

18  consumer looking to purchase a MINI.  See Falk, 496 F. Supp. 2d at

19  1095.  Thus, the Court may reasonably infer Plaintiff's and class

20  members' actual reliance on the omission of that material information.

21     BMW nevertheless argues that Plaintiff cannot establish

22  materiality sufficient to establish actual reliance on BMW's omissions

23  because he has not alleged that, "had the omitted information been

24  disclosed, [he] would have been aware of it and behaved differently."

25  Mirkin, 5 Cal. 4th at 1093 (emphasis added).  Plaintiff does not

26  allege that, before he bought his MINI, he reviewed any brochure,

27  website, or promotional material that might have contained a

28  disclosure of the cracking defect.  Plaintiff does not respond to this

point in his brief.

Given the alleged importance of the cracking defect, had BMW
chosen to disclose it to prospective buyers, presumably Plaintiff, as
a member of the buying public, would have become aware of the defect
in the course of making his purchasing decision.  Nevertheless, the
Court agrees with BMW that the FAC is devoid of allegations that
Plaintiff would have plausibly been aware of the cracking defect
before he purchased his MINI had BMW publicized this information.  <u>See</u>
<u>Sanchez v. Wal Mart Stores</u>, No. 06-CV-2573 JAM-KJM, 2009 U.S. Dist.
LEXIS 89057, at *6—7 (E.D. Cal. Sept. 11, 2009) (finding no
materiality because, <u>inter alia</u>, plaintiff did not prove she would
have been aware of any missing warning that might have been placed on
product).  The Court GRANTS BMW's motion to dismiss the fraud-based
CLRA and UCL claims on this ground, but GRANTS Plaintiff leave to
amend his Complaint to satisfy this pleading failure.

**C.    UCL "Unlawful" Claim Based Upon Secret Warranty Law**

Plaintiff alleges an "unlawful" practices claim under the UCL
based upon violation of California's Secret Warranty Law, California
Civil Code section 1795.90 <u>et seq.</u>  The Secret Warranty Law regulates
"Adjustment Programs," defined as

> any program or policy that expands or extends
> the consumer's warranty beyond its stated
> limit or under which a manufacturer offers to
> pay for all or any part of the cost of
> repairing, or to reimburse consumers for all
> or any part of the cost of repairing, any
> condition that may substantially affect
> vehicle durability, reliability, or
> performance, other than service provided
> under a safety or emission-related recall
> campaign.  "Adjustment program" does not
> include ad hoc adjustments made by a
> manufacturer on a case-by-case basis.

1   Cal. Civ. Code § 1795.90(d).  The Secret Warranty Law requires a

2   manufacturer to, "within 90 days of the adoption of an adjustment

3   program, subject to priority for safety or emission-related recalls,

4   notify by first-class mail all owners or lessees of motor vehicles

5   eligible under the program of the condition giving rise to and the

6   principal terms and conditions of the program."  Cal. Civ. Code §

7   1795.92(a).

8        BMW argues that the TSB conclusively demonstrates that, instead

9   of instituting a secret warranty for defective windshields, BMW

10  engaged in the type of "ad hoc adjustments made by a manufacturer on a

11  case-by-case basis" permitted by statute.  However, that determination

12  cannot possibly be made on a motion to dismiss because it rests on the

13  parties' conflicting interpretations of Plaintiff's allegations.  BMW

14  contends that the TSB merely reaffirmed that a stress crack, which can

15  arise in "very isolated circumstances," was covered under the original

16  warranty and any other kind of crack was not.  However, Plaintiff

17  sufficiently alleges that BMW violated the Secret Warranty Law by

18  instituting a "clandestine program to secretly pay for the cost of

19  replacing or repairing" cracked windshields for some customers even if

20  the crack was not stress-related and even if the cracks occurred

21  outside of the New Car Warranty for those customers who were the most

22  vocal and persistent, using code names for the repairs like "goodwill"

23  or "policy adjustments."  (FAC ¶ 14-15, 67.)  Crediting those

24  allegations, Plaintiff has readily stated a claim for a violation of

25  the Secret Warranty Law.  See Marsikian, 2009 U.S. Dist. LEXIS 117012,

26  at *18—19 (finding plaintiff stated Secret Warranty Law violation by

27  alleging that defendant sent out temporary service bulletin that it

28  would provide temporary fixes for a defect only to the most vocal

customers without notifying plaintiffs and other owners).  Thus,
Plaintiff has stated an "unlawful" practices UCL claim based upon
violations of the Secret Warranty Law.[8]

**D.  Song-Beverly Act**

The Song-Beverly Act provides in pertinent part: "Unless
disclaimed in the manner prescribed by this chapter, every sale of
consumer goods that are sold at retail in this state shall be
accompanied by the manufacturer's and the retail seller's implied
warranty that the goods are merchantable.  The retail seller shall
have the right of indemnity against the manufacturer in the amount of
any liability under this section."  Cal. Civ. Code § 1792.  In
general, the warranty of merchantability ensures that goods are fit
"'for the ordinary purpose for which such goods are used.'"  Mexia v.
Rinker Boat Co., 174 Cal. App. 4th 1297, 1303 (Ct. App. 2009).  While
the Song-Beverly Act is similar to the California Commercial Code, the
Song-Beverly Act was intended to "provide greater protections and
remedies for consumers" than the Commercial Code.  Id.  Thus, "[t]o
'the extent that the [Song-Beverly] Act gives rights to the buyers of
consumers goods, it prevails over conflicting provisions of the
Uniform Commercial Code.'"  Id. at 1304 (second brackets in original).

BMW moves to dismiss Plaintiff's Song-Beverly Act claim on two
grounds: (1) Plaintiff cannot allege vertical privity, which is
required for a Song-Beverly Act claim; and (2) if BMW did breach any
implied warranty under the Song-Beverly Act, that breach occurred both

---

[8]Plaintiff also argues that he stated a claim under the "unfair"
clause in the UCL.  BMW does not attack the FAC on this basis and the
Court declines to address the issue.

after any implied or express warranty expired and after the statute of
limitations expired.

 1.   <u>Vertical Privity</u>

Under the California Commercial Code section 2314, which imposes
an implied warranty of merchantability in any sale of goods, vertical
privity between a consumer and manufacturer is required.  See <u>Clemens</u>,
534 F.3d at 1023 (holding that, under section 2314, "a plaintiff
asserting breach of warranty claims must stand in vertical contractual
privity with the defendant.").  However, the Court agrees with
Plaintiff and the weight of authority that the plain language of
section 1792 of the Song-Beverly Act does not impose a similar
vertical privity requirement.  See <u>Nvidia GPU Litig.</u>, No. 08-4312 JW,
2009 WL 4020104, at *4 & n.7 (N.D. Cal. Nov. 19, 2009) (noting split
in case law and finding no privity requirement); <u>Gonzalez v. Drew
Indus.</u>, No. CV 06-8233 DDP (JWJx), 2007 U.S. Dist. LEXIS 35952, at
*32—33 (C.D. Cal. May 10, 2007) (finding no privity requirement based
on plain language of statute); <u>Gusse v. Damon Corp.</u>, 470 F. Supp. 2d
1110, 1116 n.9 (C.D. Cal. 2007) (finding that privity requirement
"ignores the plain language of the Song-Beverly Act" that all goods
sold at retail must be accompanied by the manufacturer's implied
warranty); 4 B.E. Witkin, <u>Summary of California Law</u> § 98 (10th ed.
2005) (explaining that the Song-Beverly Act "eliminates the
requirement of privity between the buyer and the manufacturer or
distributor, by implying warranties in retail sales of consumer goods

unless disclaimed.").[9] The Court DENIES BMW's motion to dismiss Plaintiff's Song-Beverly Act claim on this basis.

### 2. Breach During Implied Warranty Period

The Song-Beverly Act limits the time period for the duration of the implied warranty of merchantability:

> The duration of the implied warranty of merchantability and where present the implied warranty of fitness shall be coextensive in duration with an express warranty which accompanies the consumer goods, provided the duration of the express warranty is reasonable; but in no event shall such implied warranty have a duration of less than 60 days nor more than one year following the sale of new consumer goods to a retail buyer. Where no duration for an express warranty is stated with respect to consumer goods, or parts thereof, the duration of the implied warranty shall be the maximum period prescribed above.

Cal. Civ. Code § 1791.1(c). Because BMW's express warranty on Plaintiff's MINI extended for longer than one year, the maximum duration of one year applies under section 1791.1.

BMW relies on this provision to argue that Plaintiff's implied warranty claim under the Song-Beverly Act is barred. It claims that the one-year duration for any implied warranty section 1791.1 expired in December 2006, one year after Plaintiff purchased his MINI, even though the cracking defect did not manifest until over three years after his purchase. To rebut this argument, Plaintiff relies on Mexia v. Rinker Boat Co., 174 Cal. App. 4th 1297, 1305—06 (Ct. App. 2009). In Mexia, the plaintiff brought a claim for breach of the implied warranty of merchantability under the Song-Beverly Act for a boat he

---

[9]The courts that have implied a vertical privity requirement have done so without reference to the statutory language, which this Court views as dispositive of the matter. See Tietsworth, 2010 WL 1268093, at *14; In re Whirlpool Corp. Front-Loading Washer Prods. Liability Litig., 684 F. Supp. 2d 942, 956 (N.D. Ohio 2009).

purchased that contained a latent defect causing its engine to corrode.  Id. at 1301.  The plaintiff had purchased the boat on April 12, 2003, and the alleged defect arose in July 2005.  Id. at 1301—02. The plaintiff took it an authorized boat dealer for repairs, but the condition persisted and the plaintiff sued on November 27, 2006, for a violation of the Song-Berverly Act.  Id. at 1302.

Citing the statute, the defendants argued that the plaintiff's latent defect claim expired one year after purchase, even though the defect manifested itself two years after purchase.  Id. at 1308.  The court concluded at the demurrer stage that the plaintiff's warranty claim over the alleged latent defect was not barred by the one-year duration provision in the Song-Berverly Act.  "The implied warranty of merchantability may be breached by a latent defect undiscoverable at the time of sale," so "[i]n the case of a latent defect, a product is rendered unmerchantable, and the warranty of merchantability is breached, by the existence of the unseen defect, not by its subsequent discovery."  Id. at 1304—05.

The court first rejected the argument because it "ignores the distinction between unmerchantability caused by a latent defect and the subsequent discovery of the defect; the fact that the alleged defect resulted in destructive corrosion two years after the sale of the boat does not necessarily mean that the defect did not exist at the time of the sale."  Id.  While the failure to seek repairs on the boat for two years might suggest it was merchantable at the time of the sale and the corrosion was only a later maintenance issue, the court assumed the plaintiff's allegations that the defect existed during the one-year period after purchase were true.  Id.

Case 2:10-cv-09159-ABC-PJW   Document 26   Filed 06/11/12   Page 244 of 328   Page ID #:810
09-50026-mg   Doc 8200-25   Filed 12/21/10   Entered 12/21/10 08:14:50   Declaration
in Opposition to Motion   Pg 266 of 353

1   The court then squarely rejected the defendants' primary argument
2   that the duration provision "precludes an action for breach of the
3   implied warranty of merchantability under the Song-Beverly Act when
4   the action is based upon a latent condition that is not discovered by
5   the consumer and reported to the seller within the duration period."
6   Id. at 1308—09.   The court found no support in the text of the
7   duration provision that would require discovery of a latent defect
8   during the maximum one-year period of the implied warranty, and
9   indeed, importing a discovery requirement "would create a notification
10  deadline that would apply even if the consumer has not discovered or
11  could not have discovered the breach within the duration period."  Id.
12  at 1310 (emphasis in original).

13  The court reasoned that the defendants' interpretation would
14  provide fewer rights for purchasers than the protections in the
15  Commercial Code, which requires a buyer to notify a seller of a defect
16  within a "reasonable time," but "only after the point the purchaser
17  knew or should have known of the breach."  Id. (emphasis removed).
18  While the court was sympathetic to the defendants' arguments that this
19  interpretation could very well place a significant "burden and expense
20  on small businesses in defending implied warranty claims years after
21  the sale," it found that was a concern better addressed by the
22  legislature, and not the court.  Id. at 1311.

23  BMW cites Hovsepian v. Apple, Inc., No. 08-5788 JF (PVT), 2009 WL
24  2591445, at *6—8 (N.D. Cal. Aug. 21, 2009), to argue that the Court
25  should not follow Mexia's analysis.  In Hovsepian, the plaintiffs
26  brought claims for breach of implied warranty under the California
27  Uniform Commercial Code when their computer screens malfunctioned
28  after the expiration of a one-year express warranty.  Id. at *1.  They

Case 2:10-cv-09115-ABC-JPR   Document 25   Filed 06/21/17   Page 25 of 28   Page ID #:311
09-50026-mg   Doc 8200-25   Filed 12/21/10   Entered 12/21/10 08:14:50   Declaration
in Opposition to Motion   Pg 267 of 353

had not pled claims under the Song-Beverly Act, and the court
addressed <u>Mexia</u> in dicta in a footnote. <u>Id.</u> at *8 n.7. The court
explained that the "<u>Mexia</u> decision appears to be contrary to
established California case law with respect to the duration of the
implied warranty of merchantability as set forth in § 1791.1 of the
Song-Beverly Act." <u>Id.</u> (citing <u>Atkinson v. Elk Corp.</u>, 142 Cal. App.
4th 212, 230 (Ct. App. 2006)).[10]  The court expressed skepticism of
<u>Mexia</u>'s holding because "any component failure could be characterized
as having been caused by a latent defect, and thus if <u>Mexia</u> were read
broadly the time limitation imposed by § 1791.1 would be meaningless."
<u>Id.</u>  Nevertheless, the court distinguished <u>Mexia</u> on its facts because,
in that case, "the court appeared to discuss latent defects that
rendered the product unmerchantable from the outset," whereas in
<u>Hovsepian</u>, the plaintiffs admitted that their computer screens worked
properly for more than a year.  <u>Id.</u>[11]  Other federal district courts
have suggested <u>Mexia</u>'s holding was anomalous, though none has
expressly rejected it.  <u>See, e.g.</u>, <u>Tietsworth v. Sears, Roebuck & Co.</u>,
No. 5:09-CV-288 JF (HRL), 2009 WL 3320486, at *12 (N.D. Cal. Oct. 13,
2009) (calling <u>Mexia</u> "something of an outlier," but ruling on
different grounds); <u>Butler v. Sears, Roebuck & Co.</u>, No. 06 C 7023,

---

[10]In <u>Atkinson</u>, the court concluded that the one-year duration
provision in section 1791.1 applied to claims under the federal
Magnuson-Moss Warranty Act. 142 Cal. App. 4th at 230—31.  It then
found that a defect in roofing shingles arising six years after
installation did not support a breach of implied warranty claim
because the defect occurred beyond the one-year limit in section
1791.1.  <u>Id.</u> at 231.  However, there is no indication that the
plaintiff in <u>Atkinson</u> alleged that a latent defect existed at the time
of installation.

[11]The Court also cited the unpublished California appellate
decision in <u>Larsen</u>, which the Court declines to follow both because it
is non-precedential and did not cite or discuss <u>Mexia</u>.

1  2009 WL 3713687, at *3 n.4 (N.D. Ill. Nov. 4, 2009) (noting decision

2  in Mexia and Hovsepian without addressing issue).

3      The Court will follow Mexia, rather than Hovsepian, to find that

4  Plaintiff can pursue his Song-Beverly Act claim. Mexia directly

5  addressed and rejected the precise argument BMW makes here, holding

6  that, so long as a latent defect existed within the one-year period,

7  its subsequent discovery beyond that time did not defeat an implied

8  warranty claim. 174 Cal. App. 4th at 1310—11. Hovsepian, in

9  contrast, only addressed the issue in dicta in a footnote and involved

10 a defect that the plaintiffs had not alleged existed at the time of

11 purchase. The Court must "defer to the California Court of Appeal's

12 interpretation of [a state statute] unless there is convincing

13 evidence that the California Supreme Court would decide the matter

14 differently." Cal. Pro-Life Council, Inc. v. Getman, 328 F.3d 1088,

15 1099 (9th Cir. 2003). Hovsepian is not "convincing evidence" that

16 Mexia would be rejected by the California Supreme Court.

17     BMW also tries to distinguish Mexia on its facts, arguing that

18 the plaintiff in that case alleged a latent defect that existed within

19 the one-year time limit, whereas here, Plaintiff cannot claim that his

20 MINI was not merchantable when he bought it because it provided safe

21 and reliable transportation for over three years. However, Plaintiff

22 has alleged a latent defect in the windshield existed at the time he

23 purchased his MINI, and that the defect eventually caused the

24 windshield to crack over three years after his purchase. As Mexia

25 held, the fact that the alleged defect resulted in a cracked

26 windshield three years after the sale of the MINI "does not

27 necessarily mean that the defect did not exist at the time of sale."

28 174 Cal. App. 4th at 1308. Plaintiff has therefore adequately alleged

Case 2:10-cv-09151-AB2-PJW   Document 28   Filed 06/11/10   Page 21 of 28   Page ID #:813
09-50026-mg   Doc 8200-25   Filed 12/21/10   Entered 12/21/10 08:14:50   Declaration
in Opposition to Motion    Pg 269 of 353

a breach of the implied warranty that satisfies the one-year time
period of section 1791.1.[12]

BMW argues that Plaintiff's claim is nevertheless barred by the
four-year limitations period, which it claims began to run when
Plaintiff purchased his MINI in December 2004, but expired in December
2008, long before Plaintiff filed suit in February 2010. California
courts have applied the four-year statute of limitations in California
Commercial Code section 2725 to Song-Beverly Act claims. <u>See</u> <u>Mexia</u>,
174 Cal. App. 4th at 1305—06. Commercial Code section 2725 states in
relevant part:

> (1) An action for breach of any contract for sale
> must be commenced within four years after the
> cause of action has accrued. . . .
>
> (2) A cause of action accrues when the breach
> occurs, regardless of the aggrieved party's
> lack of knowledge of the breach. A breach of
> warranty occurs when tender of delivery is
> made, except that where a warranty explicitly
> extends to future performance of the goods
> and discovery of the breach must await the
> time of such performance the cause of action
> accrues when the breach is or should have
> been discovered.

Cal. Comm. Code § 2725(1), (2).

BMW's argument fails because it ignores the existence of the 4-
year/50,000-mile express warranty, which is a warranty that
"explicitly extends to future performance of the goods." That
warranty tolled the statute of limitations until Plaintiff reasonably

---

[12]BMW cites <u>American Suzuki Motor Corp. v. Superior Court</u>, 37
Cal. App. 4th 1291, 1298 (Ct. App. 1995) to suggest that Plaintiff's
MINI was fit for its ordinary purpose, but that case is
distinguishable because few class members in that case had ever
experienced any damage due to an alleged design defect in the vehicles
at issue; Plaintiff here alleges that he and many class members
experienced cracked windshields due to the windshield defect, albeit
after the express warranty expired.

1  knew that his MINI would not perform as it should, which did not occur
2  until his windshield cracked and BMW would not replace it.  <u>Krieger v.</u>
3  <u>Nick Alexander Imports, Inc.</u>, 234 Cal. App. 3d 205, 215—17 (Ct. App.
4  1991).  The statute of limitations for Plaintiff's breach of implied
5  warranty claim thus began running in March 2008, when he first
6  discovered that BMW would not repair his defective windshield.  (FAC
7  ¶¶ 21—22.)  His complaint, filed only two years later, was therefore
8  timely.  Thus, the Court DENIES BMW's motion to dismiss Plaintiff's
9  Song-Beverly Act claim.[13]

### CONCLUSION

11  BMW's motion to dismiss is DENIED in all respects, except that
12  the Court DISMISSES WITHOUT PREJUDICE Plaintiff's fraud-based UCL and
13  CLRA claims for his failure to plead actual reliance.  He is GRANTED
14  LEAVE TO AMEND his complaint to remedy that defect, but any amended
15  complaint must be filed **no later than 20 days from the filing of this**
16  **Order.  Failure to do so will result in dismissal of his fraud-based**
17  **CLRA and UCL claims WITH PREJUDICE.**

18  IT IS SO ORDERED.

20  DATED:   August 11, 2010                    _____
21                                              **AUDREY B. COLLINS**
                                                **UNITED STATES DISTRICT JUDGE**

26  _____

27  [13]As a result, the Court need not address Plaintiff's argument
    that his second defective windshield nevertheless saves his implied
    warranty claims by satisfying the one-year duration requirement and
28  the statute of limitations.

# Exhibit 5

O

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 08-04876 AHM (JTLx) | Date | May 4, 2009 |
|---|---|---|---|

| Title | ARUTYUN MARSIKIAN, *et al.* v. MERCEDES BENZ USA, LLC, *et al.* |
|---|---|

| Present: The Honorable | A. HOWARD MATZ, U.S. DISTRICT JUDGE |
|---|---|

| Stephen Montes | Not Reported | |
|---|---|---|
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

Attorneys **NOT** Present for Plaintiffs:          Attorneys **NOT** Present for Defendants:

**Proceedings:**          IN CHAMBERS (No Proceedings Held)

## I.    INTRODUCTION

Plaintiffs Arutyun Marskian and Payam Saadat filed this putative class action on behalf of themselves and similarly situated California consumers, alleging that Defendant Mercedes-Benz USA, LLC failed to disclose a defect in the air intake system in two classes of Mercedes-Benz vehicles in violation of California law.  Upon stipulation, they filed a First Amended Complaint and a Second Amended Complaint.  The Second Amended Complaint asserts six claims for relief for (1) violation of the Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750 *et seq.*; (2) violation of Cal. Bus. & Prof. Code § 17200 *et seq.* ("UCL"), based on a violation of the California Secret Warranty Law, Cal. Civ. Code § 1795.90 *et seq.* (3) unfair business practices under the UCL; (4) unjust enrichment; (5) fraud by omission; and (6) breach of express warranty. Plaintiffs seek various forms of monetary and injunctive relief.

Before this Court is Defendant's motion to dismiss the Second Amended Complaint ("SAC").  For the reasons stated below, the Court GRANTS IN PART AND DENIES IN PART the motion.[1]  The Court grants the motion as to the express warranty claim for a technical, curable reason, and the unjust enrichment claim, and denies the motion as to the other claims.

## II.    PLAINTIFFS' ALLEGATIONS

---
[1]Docket No. 29.

O

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 08-04876 AHM (JTLx) | Date | May 4, 2009 |
|---|---|---|---|

| Title | ARUTYUN MARSIKIAN, *et al.* v. MERCEDES BENZ USA, LLC, *et al.* |
|---|---|

Plaintiffs allege that Defendant manufactured and subsequently sold and leased to California consumers Mercedes-Benz S-Class W-220 and W-215 vehicles ("Class Vehicles") from the 2001 to 2006 model years knowing that they contained a defective Air Intake System ("AIS"). The AIS is part of the vehicle's climate control system; it obtains fresh air from outside the vehicle. It is shaped like a box. There is a grate on the top that is designed to prevent leaves and other objects from entering the box. At the bottom of the box there is a reed valve that serves as a drain. SAC ¶ 33. The grate on the top of the vehicle is not fine enough to prevent some leaves, twigs and other objects from entering the box, yet the reed valve is more restrictive. Thus, the reed valve is susceptible to clogging, which then causes the AIS to fill with water when it is raining or when the vehicle is washed. When this occurs, many vehicles have suffered substantial electrical failure due to water damaging the computer, electrical system, and other components. *Id.* ¶ 34.

The defectively designed AIS is a safety hazard because the flooding of the AIS with water while the vehicle is in operation may cause catastrophic engine and electrical system failure, which in turn may cause traffic accidents. *Id.* ¶ 3. It also results in substantial out-of-pocket costs to Class Members who have to repair or replace the water damaged components. *Id.* ¶ 4.

Defendant knew or should have known that the AIS installed on the Class Vehicles is defective and would fail prematurely. *Id.* ¶ 5. Since 2001, Defendant did know about the defective AIS as a result of its own internal testing, customer complaints, dealership repair orders, as well as various other sources. SAC ¶¶ 34-36. It actively concealed and failed to disclose the defect to Plaintiffs and Class Members at the time of purchase or lease and thereafter. *Id.* ¶¶ 5-6.

On or about March 2001 and again in 2005 Defendant issued -- but only to its own dealers -- internal bulletins acknowledging the defect. Defendant recommended an alternative design and advised its dealers to offer what amounted to a one-time temporary fix. Defendant instructed dealers to offer to clear the reed valve for some Class Vehicles and only for those customers who made a service visit to the dealerships. SAC ¶¶ 6, 10, 37, 49-50. In addition, MBZ also implemented a policy of offering to replace the AIS or repair the defect-related damage of only those consumers who complained loudly enough. *Id.* ¶¶ 8, 54. However, MBZ failed to notify Plaintiffs, or any other owner or

O

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 08-04876 AHM (JTLx) | | Date | May 4, 2009 |
|---|---|---|---|---|
| Title | ARUTYUN MARSIKIAN, *et al.* v. MERCEDES BENZ USA, LLC, *et al.* | | | |

lessee of the Class Vehicles, of these available fixes for the AIS and has refused to reimburse Plaintiffs and Class Members for their repair costs. *Id.* ¶¶ 8, 57-59.

Moreover, MBZ knew that the valve clearing would not even fix the AIS defect. Nonetheless, MBZ devised the valve clearing policy to prolong the amount of time that would elapse before the AIS failed and to ensure that when the AIS fails it would be outside of warranty, so that Defendant can shift the financial responsibility for the AIS defect onto customers. SAC ¶¶ 7, 9, 12-18.

Plaintiffs and Class Members have a reasonable expectation that the AIS would function properly for the life of the vehicle. SAC ¶ 83. A reasonable consumer would have considered the undisclosed defect to be important in deciding whether to purchase the vehicles. Had Plaintiffs and Class Members known the defective nature of the AIS, they would not have purchased them or would have paid less for them. *Id.* ¶ 82.

## III. STANDARDS GOVERNING RULE 12(b)(6) MOTIONS

On a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim, the allegations of the complaint must be accepted as true and are to be construed in the light most favorable to the nonmoving party. *Wyler Summit P'ship v. Turner Broad. Sys., Inc.*, 135 F.3d 658, 661 (9th Cir. 1998). A Rule 12(b)(6) motion tests the legal sufficiency of the claims asserted in the complaint. Thus, if the complaint states a claim under any legal theory, even if the plaintiff erroneously relies on a different legal theory, the complaint should not be dismissed. *Haddock v. Bd. of Dental Examiners*, 777 F.2d 462, 464 (9th Cir. 1985).

Federal Rule of Civil Procedure 8(a)(2) requires

> only "a short and plain statement of the claim showing that the
> pleader is entitled to relief," in order to "give the defendant fair
> notice of what the . . . claim is and the grounds upon which it
> rests[.]" . . . While a complaint attacked by a Rule 12(b)(6)
> motion to dismiss does not need detailed factual allegations . . .,
> a plaintiff's obligation to provide the "grounds" of his
> "entitle[ment] to relief" requires more than labels and

O

### UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 08-04876 AHM (JTLx) | Date | May 4, 2009 |
|---|---|---|---|
| Title | ARUTYUN MARSIKIAN, *et al.* v. MERCEDES BENZ USA, LLC, *et al.* | | |

conclusions, and a formulaic recitation of the elements of a
cause of action will not do . . . . Factual allegations must be
enough to raise a right to relief above the speculative level . . . .

*Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1964-65 (2007) (internal citations
omitted).

Fed. R. Civ. P. 9(b) imposes a heightened pleading standard for claims of fraud.
Rule 9(b) provides: "[i]n alleging fraud or mistake, a party must state with particularity
the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other
conditions of a person's mind may be alleged generally." Rule 9(b) "ensures that
allegations of fraud are specific enough to give defendants notice of the particular
misconduct which is alleged to constitute the fraud charged so that they can defend
against the charge and not just deny that they have done anything wrong." *See Semegen v.
Weidner*, 780 F.2d 727, 731 (9th Cir. 1986); *Schreiber Dist. Co. v. Serv-Well Furniture
Co.*, 806 F.2d 1393, 1400 (9th Cir. 1986). In order to comply with Rule 9(b), the pleader
must allege the "time, place and specific content of the false representations as well as the
identities of the parties to the misrepresentation." *See Schreiber*, 806 F.2d at 1401. In
addition, the pleader must explain why the alleged statement or omission was false or
misleading *when made*. *See In re Glenfed Inc. Securities Litig.*, 42 F.3d 1541, 1548-49
(9th Cir. 1994) (*en banc*).

"Generally, a district court may not consider any material beyond the pleadings in
ruling on a Rule 12(b)(6) motion. . . . However, material which is properly submitted as
part of the complaint may be considered" on a motion to dismiss. *Hal Roach Studios,
Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1555 n.19 (9th Cir. 1990) (citations
omitted). Documents whose contents are alleged in a complaint and whose authenticity
no party questions, but which are not physically attached to the pleading, may be
considered in ruling on a Rule 12(b)(6) motion to dismiss without converting the motion
to dismiss into a motion for summary judgment. *Lee v. City of Los Angeles*, 250 F.3d
668, 689 (9th Cir. 2001). If the documents are not physically attached to the complaint,
they may be considered if their "authenticity . . . is not contested" and "the plaintiff's
complaint necessarily relies" on them. *Parrino v. FHP, Inc.*, 146 F.3d 699, 705-06 (9th
Cir. 1998). Furthermore, under Fed. R. Evid. 201, a court may take judicial notice of
"matters of public record." *Mack v. South Bay Beer Distribs.*, 798 F.2d 1279, 1282 (9th

O

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 08-04876 AHM (JTLx) | Date | May 4, 2009 |
|---|---|---|---|
| Title | ARUTYUN MARSIKIAN, *et al.* v. MERCEDES BENZ USA, LLC, *et al.* | | |

Cir. 1986), *abrogated on other grounds by Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104 (1991).. "The district court will not accept as true pleading allegations that are contradicted by facts that can be judicially noticed or by other allegations or exhibits attached to or incorporated in the pleading." 5C Wright & Miller, *Fed. Prac. & Pro.* § 1363 (3d ed. 2004).

Where a motion to dismiss is granted, a district court should provide leave to amend unless it is clear that the complaint could not be saved by any amendment. *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008) (citation omitted).

## IV.    DISCUSSION

Defendant seeks dismissal of the express warranty, CLRA, Secret Warranty Law, and UCL claims for legally insufficient pleading. Defendant also argues that preemption bars the remedy of court-ordered notification and recall and that the doctrine of primary jurisdiction requires a stay and referral of the alleged safety problem to the National Highway Traffic Safety Administration. The Court addresses each of Defendant's arguments in turn.

### A.    Express Warranty Claim

Defendant argues that Plaintiffs' claim for breach of express warranty is insufficient because they failed to allege the specific written terms on which they base the claim. Although the pleading is arguably deficient in that respect, Plaintiff's omission did not deprive Defendant of actual notice of the basis for the claim. Defendant knows (and Plaintiffs have confirmed) the language in the warranty that is the basis for the claim: the provision on page 13 of the respective warranty documents for the two classes of cars, under the heading "Items Which Are Covered," that says "defects in material or workmanship arising during the warranty period." *See* Mot. at 6; Declaration of [defense counsel] Derek S. Whitefield, Ex. 1, p. 13, Ex. 2, p. 13; Opp'n at 25 n. 14.

Defendant then argues that this warranty provision could not be violated because Plaintiffs fail to allege facts showing that the problem is in the material or workmanship. Defendant characterizes the problem with the AIS as "environmental exposure," caused

O

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 08-04876 AHM (JTLx) | Date | May 4, 2009 |
|---|---|---|---|

| Title | ARUTYUN MARSIKIAN, *et al.* v. MERCEDES BENZ USA, LLC, *et al.* |
|---|---|

by external factors such as leaves and rain. It points to the provision in the warranty that excludes damage from the environment and the provision that states that normal maintenance is the owner's responsibility. *See* Whitefield Decl., Ex. 1, pp. 15-16, Ex. 2, pp. 15-16. The Court rejects these arguments. Plaintiffs have adequately alleged that the AIS flooding problem is caused by both the design of the box (specifically, the design of the grate and reed valve) and exposure to environmental conditions. Design defects fall within the "material and workmanship" provision on its face. Defendant has not argued otherwise. It even concedes on reply that whether there is warranty coverage depends on causal factors, which entails a factual question that cannot be resolved on the pleadings. *See* Reply at 11.

The Court will dismiss the claim in order to allow Plaintiffs to amend their pleading to state the exact language in the warranty giving rise to the claim.

### B.    The Duty to Disclose

The bulk of the motion is directed at the core question of whether the allegations adequately support a legal duty under California law to disclose the alleged defect. Without a duty to disclose, Plaintiffs cannot maintain a CLRA claim based on nondisclosure. As the parties apparently understand it, the UCL claim, to the extent it is based on a CLRA violation, and the common law fraud claim would also fail if Defendant did not have a duty to disclose.

Plaintiffs' CLRA claim is based on Cal. Civ. Code § 1750(a)(5) and (a)(7), which prohibit:
> (5) Representing that goods or services have sponsorship, approval, characteristics, ingredients, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he or she does not have. . .

> (7) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another.

The parties agree that *Bardin v. DaimlerChrysler Corp.*, 126 Cal.App.4th 1255

O

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 08-04876 AHM (JTLx) | Date | May 4, 2009 |
|---|---|---|---|
| Title | ARUTYUN MARSIKIAN, *et al.* v. MERCEDES BENZ USA, LLC, *et al.* | | |

(Cal. Ct. App. 2006), *Daugherty v. Am. Honda Motor Co., Inc.*, 144 Cal.App.4th 824 (Cal. Ct. App. 2007), and *Falk v. General Motors Corp.*, 496 F. Supp. 2d 1088 (N.D. Cal. 2007) govern the analysis of the CLRA claim. These cases establish that the CLRA only bans omissions when a duty to disclose exists, and they provide the standards for determining whether a plaintiff has alleged facts demonstrating that an automobile manufacturer had such a duty. *Bardin* involved exhaust manifolds that were made out of a material subject to higher failure rates, while *Daugherty* dealt with a defect in Honda engines that would result in the dislodgment of a front balancer shaft oil seal. In both cases, the appellate courts dismissed the CLRA claim because plaintiffs failed to allege facts showing that the manufacturer had any duty to disclose the alleged defect. *Bardin*, 136 Cal.App.4th at 1276; *Daugherty*, 144 Cal.App.4th at 836. In these two cases, the problems surfaced only after the expiration of the car's warranty. In contrast, *Falk* involved defective speedometers in relatively new cars. Relying on the standards articulated in those two cases, the Northern District of California in *Falk* concluded that the plaintiff in its case had alleged facts to support a duty to disclose.

The parties essentially agree on the standards arising from these cases. As the *Falk* court succinctly put it, "*Bardin* and *Daugherty* allow CLRA claims for certain omissions. . . when the "'omission [is] contrary to a representation actually made by the defendant, or an omission of a fact the defendant was obliged to disclose.'" 496 F. Supp. 2d at 1094 (citing *Daugherty*, 144 Cal.App.4th at 835). As to the second basis for a CLRA claim, the common law provides that a failure to disclose or concealment can constitute actionable fraud in four circumstances:

> (1) when the defendant is in a fiduciary relationship with the plaintiff; (2) when the defendant had exclusive knowledge of material facts not known to the plaintiff; (3) when the defendant actively conceals a material fact from the plaintiff; and (4) when the defendant makes partial representations but also suppresses some material fact.

*Id.* at 1095 (quoting *LiMandri v. Judkins*, 52 Cal.App.4th 326, 337 (Cal. Ct. App. 1997)). An example of a material fact that *Daugherty* emphasized is an unreasonable safety risk. *Daugherty*, 144 Cal.App.4th at 836.

The parties disagree on whether Plaintiffs' allegations state a CLRA nondisclosure

O

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 08-04876 AHM (JTLx) | Date | May 4, 2009 |
|---|---|---|---|

| Title | ARUTYUN MARSIKIAN, *et al.* v. MERCEDES BENZ USA, LLC, *et al.* |
|---|---|

claim under these standards. Plaintiffs liken their case to *Falk* and distinguish *Bardin* and *Daugherty*. Plaintiffs argue that like the *Falk* plaintiffs, they have sufficiently alleged that Defendant had exclusive knowledge of material facts not known to the plaintiffs and that defendant actively concealed material facts. Defendant dismisses Plaintiffs' attempt to mimic *Falk*, arguing that their allegations are too conclusory. Not so.

Plaintiffs' allegations of knowledge and concealment are plainly sufficient. According to the SAC, Defendant had exclusive knowledge of material facts not known to them, "through its own testing, records of customer complaints, dealership repair orders, as well as various other sources. . . ." SAC ¶ 36. Mercedes-Benz "was in a superior position to know" that the AIS might flood. *Falk*, 496 F. Supp. 2d at 1096-76. Indeed, in 2001 and 2005 Defendant issued internal bulletins to dealers about this problem. It also provided services -- good will adjustments or policy adjustments -- to certain owners who complained loudly enough. But it did not inform all owners of affected vehicles. Moreover, even with the 2001 and 2005 service campaign Defendant provided only a temporary fix, thereby concealing the full extent of the problem. These allegations indicate that Defendant knew about the problem, developed measured and selective responses to owners' complaints, but concealed the problem from the general customer base. SAC ¶¶ 5-6, 8, 10, 34-37, 49-50, 54.

Defendant's primary challenge to the sufficiency of the allegations is directed not at allegations of what it knew or did, but at allegations concerning the materiality of the nondisclosure. For undisclosed information to be material, a plaintiff must show that a reasonable consumer aware of the information would have behaved differently. *Falk*, 496 F. Supp. 2d at 1095 (citations omitted). In Defendant's view, the fact that exposure to certain environmental conditions could in some cases lead to clogging of the reed valve and water damage is not material. Defendant dismisses as purely speculative Plaintiff's allegations that the clogging of the reed valve is a safety hazard and that this fact would have affected a reasonable consumer's decision to buy the car. *See* SAC ¶ 3, 82. It emphasizes that Plaintiffs do not allege any specific incidents suggesting that there might be a safety problem; for example, they do not allege that their clogged reed valves caused any safety problems for them. In addition, Defendant disputes Plaintiffs' assertion that it is reasonable for consumers to expect the AIS to function properly for the life of their vehicles, because, it argues, vehicle components such as the climate control system often require maintenance and repair.

O

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 08-04876 AHM (JTLx) | Date | May 4, 2009 |
|---|---|---|---|
| Title | ARUTYUN MARSIKIAN, *et al.* v. MERCEDES BENZ USA, LLC, *et al.* | | |

Such contentions are better raised on summary judgment. Plaintiffs' allegations, which must be construed favorably to them, satisfy the applicable pleading standards. *See Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955, 1965 (2007) ("a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and "that a recovery is very remote and unlikely."). Although the safety implications of a flooded climate control system are not as obvious to a lay person as the danger posed by a defective speedometer, *see Falk*, 496 F. Supp. 2d at 1096, it is not implausible that the flooding would cause "catastrophic engine and electrical system failure" while the car is on the road. SAC ¶ 3. Given the plausible prospect of a safety problem, as well as the monetary cost and inconvenience of water damage in the car, Plaintiffs' allegations that the omitted information would have affected a reasonable consumer's willingness to buy the car at the prices offered are also plausible and plainly sufficient. Similarly, it is plausible that a reasonable consumer would expect the AIS, and the entire climate control system, to not fail as a result of a clogged reed valve.

The complaints in *Bargin* and *Daugherty* did not include any safety allegations (the plaintiffs sought only monetary damages based on the cost of repair and replacement). That fact alone distinguishes those cases. As the *Daugherty* court pointed out, without any safety allegations, "the alleged defect posed no unreasonable risk" and hence triggered no duty to disclose. *Daugherty*, 144 Cal.App.4th at 836 (quotation marks and citation omitted). That is not the case here.

Plaintiffs' complaint contains more than mere labels and conclusions. Based on the facts they allege, it would be a reasonable inference to conclude that Defendant had a duty to disclose that the AIS could become clogged and cause flooding, thereby raising their right to relief under the CLRA "above the speculative level." *Bell Atlantic Corp.*, 127 S. Ct. at 1965.

### C.    Secret Warranty Law Violation

Plaintiffs' second claim for relief alleges a violation of the "unlawful" prong of the UCL, Cal. Bus. & Prof. Code § 17200 *et seq.*, based on a violation of the California Secret Warranty Law. The Secret Warranty Law imposes certain duties on automobile manufacturers, among them the duty to notify consumers of warranty adjustment

O

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 08-04876 AHM (JTLx) | Date | May 4, 2009 |
|---|---|---|---|

| Title | ARUTYUN MARSIKIAN, *et al.* v. MERCEDES BENZ USA, LLC, *et al.* |
|---|---|

programs.[2] Cal. Civ. Code § 1795.92. It also requires dealers to provide notice to consumers about service bulletins and adjustment programs. *Id.* § 1795.91. Plaintiffs allege that Defendant's policy of providing temporary fixes for clogged reed valves constituted an adjustment of the warranty because maintenance of the reed valve is not included in the original warranty. SAC ¶ 55. They allege also that Defendant extended the warranty even further to the most vocal complainants, under the code names "good will adjustments" or "policy adjustments." *Id.* ¶ 54. Plaintiffs and other owners and lessees were not informed of these adjustment programs and, when they requested a free repair or replacement, they were refused. *Id.* ¶¶ 8, 57-58. Finally, they allege that Defendant, as a dealer, did not comply with the notification provision. *Id.* ¶ 60.

Defendant's arguments concerning the Secret Warranty Law (confined to page 16 of the opening brief) lack merit. It cites no legal authority to support their contention that Plaintiffs' allegations fail to state a violation of the Secret Warranty Law, and some of its characterizations of selective portions of Plaintiff's allegations are misleading, such as that Plaintiffs failed to allege that "they" were denied the available fix. (The SAC alleges that Defendant refused to reimburse Plaintiffs for the costs of repairing the damage and that owners and lessees were denied the fix. SAC ¶¶ 8, 57-59.) Plaintiffs' allegations at SAC ¶¶ 43-61 are sufficient to state an unfair competition claim based on a violation of the Secret Warranty Law.

**D.    Section 17200 Claim**

Defendant's challenge to the unfair business practices claim turns on whether the allegations support a duty to disclose known and material defects. For the reasons already stated, Plaintiffs have stated a viable claim of failure to disclose. Accordingly,

---

[2]The Secret Warranty Law defines an "adjustment program" as "any program or policy that expands or extends the consumer's warranty beyond its stated limit or under which a manufacturer offers to pay for all or any part of the cost of repairing, or to reimburse consumers for all or any part of the cost of repairing, any condition that may substantially affect vehicle durability, reliability, or performance, other than service provided under a safety or emission-related recall campaign." It excludes "ad hoc adjustments made by a manufacturer on a case-by-case basis." Cal. Civ. Code § 1795.90(d).

O

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 08-04876 AHM (JTLx) | Date | May 4, 2009 |
|---|---|---|---|

| Title | ARUTYUN MARSIKIAN, *et al.* v. MERCEDES BENZ USA, LLC, *et al.* |
|---|---|

they have stated claims for unlawful, fraudulent, and unfair business practices. As noted, they have also stated an unlawful business practices claim based on the Secret Warranty Law.

### E.    Fraud By Omission Claim

The fifth claim for relief is entitled "fraud by omission," but Plaintiffs also alleged that Defendant made "partial disclosures." SAC ¶ 113(b). In their opposition brief, Plaintiffs confirmed that this claim is based solely on a theory of omission.

Plaintiffs' allegations of nondisclosure satisfy the heightened pleading requirements of Fed. R. Civ. P. 9(b). They allege specific facts showing Defendant's knowledge and concealment of the alleged defect. They allege that Defendant was obligated to, but did not, disclose specific material facts about the AIS from 2001 onward for specified model years of specified vehicles. They alleged justifiable reliance in that a reasonable customer would not have purchased the car or would have paid less for it had the defect been disclosed, and they allege actual damages for the expense of repairing the AIS and related damage. *See Falk*, 496 F. Supp. 2d at 1099 (holding similar allegations to be sufficient under Rule 9(b)).

### F.    Unjust Enrichment Claim

The Court will dismiss Plaintiff's unjust enrichment claim because it is not clear whether unjust enrichment is a cause of action or merely an equitable remedy and including such a claim would not enlarge the range of remedies Plaintiffs may otherwise seek. *See Baggett v. Hewlett-Packard Co.*, 582 F. Supp. 2d 1261, 1270-71 (C.D. Cal. 2007) (Guilford, J.) (dismissing unjust enrichment claim for the same reasons); *Falk*, 496 F. Supp. 2d at 1099-1100 (same).

### G.    Preemption of Recall Remedy

Defendant argues that to the extent Plaintiffs seek Court-ordered notification and recall, such relief would frustrate Congressional objectives behind the Motor Vehicle Safety Act and thus would be preempted under the doctrine of implied conflict preemption. Among other things, Plaintiffs' request for injunctive relief seeks an order

O

### UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 08-04876 AHM (JTLx) | Date | May 4, 2009 |
|---|---|---|---|
| Title | ARUTYUN MARSIKIAN, *et al.* v. MERCEDES BENZ USA, LLC, *et al.* | | |

"to remove and replace Plaintiffs' and Class Members' AIS with a suitable alternative product." SAC ¶ 126. Plaintiffs respond that they seek a range of injunctive remedies that does not necessarily include a recall. In their reply, Defendant insists that Plaintiffs are effectively seeking a recall. It is not clear to the Court whether the relief Plaintiffs seek actually amounts to a recall and what disposition Defendant seeks at this pleading stage. In that respect, Defendant's request to bar a recall is premature.

In any event, Defendant has not shown that preemption doctrine would bar a recall remedy. The Court finds persuasive the reasoning of *Chamberlan v. Ford Motor Co.*, 314 F. Supp. 2d 952 (N.D. Cal. 2004), which held that conflict preemption did not bar state law claims based on motor vehicle defects. Like here, the *Chamberlan* plaintiffs alleged that the car manufacturer failed to disclose a safety defect. *Id.* at 955. They likewise argued that the remedy they sought might fall short of a recall. *Id.* at 958. Judge Wilken began by explaining that a presumption against preemption applied because the regulatory fields in question -- motor vehicle safety and unfair business practices -- were areas of traditional State police power. *Id.* at 958-59. Then, in an extremely thorough analysis, the court determined that Congress did not intend that there be an exclusive and uniform federal remedy for motor vehicle defects. *Id.* at 962-64. Thus, the court concluded, the Ford Motor Company had not met its burden of showing that allowing plaintiffs to pursue their state law claims would frustrate any Congressional objectives. *Id.* at 967.

Defendant's position here is that the Northern District was simply mistaken. Yet it makes the same arguments that the Ford Motor Company made, arguments that the Northern District rejected with well-reasoned explanations. It relies on cases that are less similar to this case than *Chamberlan*. And it asserts that the presumption against preemption to cases might not apply to cases involving conflict preemption, a position that can no longer be persuasive in light of *Wyeth v. Levine*, 129 S.Ct. 1187, 1194 (2009) (calling the presumption against preemption one of the "two cornerstones of our preemption jurisprudence").

### H.    Doctrine of Primary Jurisdiction

Defendant asks that the Court stay this action and refer the issue of whether a safety defect exists to the NHTSA under the doctrine of primary jurisdiction. The Court

O

### UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 08-04876 AHM (JTLx) | Date | May 4, 2009 |
|---|---|---|---|

| Title | ARUTYUN MARSIKIAN, *et al.* v. MERCEDES BENZ USA, LLC, *et al.* |
|---|---|

denies this request.

Courts may find that an administrative agency has "primary jurisdiction" over a judicially cognizable claim where "enforcement of the claim requires the resolution of issues, which, under a regulatory scheme, have been placed within the special competence of an administrative body." *United States v. Western Pacific Railroad Co.*, 352 U.S. 65, 77 S.Ct. 161, 165 (1956). *Western* involved the determination under the Transportation Act of 1940 of shipment rates for steel aerial bomb cases filled with napalm gel. *Id.* at 163. Several railroads charged the Army the higher rate applicable to "incendiary bombs." *Id.* Applying the primary jurisdiction doctrine, the Supreme Court concluded that because this issue implicated basis questions of national transportation policy, effectuation of the statutory purposes of the Interstate Commerce Act required that the Interstate Commerce Commission have a "first pass" on the question of whether the higher tariff applied. *Id.* at 166, 168. *See Farmers Ins. Exchange v. Superior Court*, 2 Cal.4th 377, 397 (Cal. 1992) (agreeing with other courts that insurance rate-making often poses issues requiring specialized agency fact-finding and expertise and determining that the insurance rate-making questions in the case at hand called for initial action by the Insurance Commissioner).

Defendant cites no cases from federal or California courts that analyze the applicability of the primary jurisdiction doctrine in a case involving automobile safety, much less cases that hold that the NHTSA does have primary jurisdiction.[3] Nor does Defendant provide any specific reasons why the doctrine should apply to the warranty

---

[3]The only automobile defect case cited by Defendant is an unpublished trial court decision from North Carolina, where the court held the NHTSA had primary jurisdiction to order a recall. *See Coker v. DaimlerChrysler Corp.*, 2004 WL 32676 (N.C. Sup. Ct., Jan. 5. 2004). The few federal cases cited by Defendant did not apply the primary jurisdiction doctrine and only addressed the appropriateness of a recall remedy in the context of class certification. *See Chin v. Chrysler Corp.*, 182 F.R.D. 448, 464 n. 6 (D.N.J. 1998) (questioning the appropriateness of the recall sought by plaintiffs in dicta on a motion for class certification); *Walsh v. Ford Motor Co.*, 130 F.R.D. 260, 267 (D.D.C. 1990) (denying certification of a Rule 23(b)(2) class of all owners seeking recall and retrofit based on concern that the court could not enforce a recall remedy and desire to avoid entanglement with regulatory scheme).

O

## UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 08-04876 AHM (JTLx) | Date | May 4, 2009 |
|---|---|---|---|
| Title | ARUTYUN MARSIKIAN, *et al.* v. MERCEDES BENZ USA, LLC, *et al.* | | |

and failure to disclose claims in this case. Unlike *Western* and *Farmers Ins. Exchange*, this action presents no claims arising under any statutes that the NHTSA enforces, only claims that primarily rest on contract and tort principles. Other than its questionable assertion that this case involves a request for a recall, Defendant does not specify any particular issues within the NHTSA's special competence that must be resolved in this action.

## V.    CONCLUSION

For the foregoing reasons, the Court GRANTS the motion as to the express warranty claim and the unjust enrichment claim, and DENIES the motion as to the other claims. The Court dismisses the express warranty claim with leave to amend and orders Plaintiffs to file a Third Amended Complaint by May 11, 2009 in accordance with the Court's ruling on that claim. The Court dismisses the unjust enrichment claim without leave to amend.

No hearing is necessary. Fed. R. Civ. P. 78; L. R. 7-15.

| | : |
|---|---|
| Initials of Preparer | SMO |

# Exhibit 6

**SENATE COMMITTEE ON JUDICIARY**
**Bill Lockyer, Chairman**
**1993-94 Regular Session**

S
B

SB 486 (Rosenthal)
As amended May 3
Hearing date: May 4, 1993
Civil Code
ART

4
8
6

## MOTOR VEHICLES: DISCLOSURE OF "SECRET WARRANTIES"

### HISTORY

Source:  Author

Prior Legislation:  None

Support:  Motor Voters; Mac Music Magic; Concerned Citizens for
Fairness; Consumers' Union; California Trial Lawyers
Association; American Association of Retired Persons;
The Trauma Foundation

Opposition:  No Known

(THIS ANALYSIS REFLECTS AUTHOR'S AMENDMENTS TO BE OFFERED IN
COMMITTEE.

### PURPOSE

Existing law, the Song-Beverly Warranty Act, requires manufacturers
of consumer goods, including new motor vehicles, to comply with
certain requirements when they sell goods in the State of
California and expressly warrant these goods.

There is no State statutory duty on a motor vehicle manufacturer or
dealer to provide consumers with information about defects or
extended warranty programs before or after the sale of new cars.

New car dealers would have the following duties under this bill:

(1) post conspicuously in the showroom a notice to prospective car
buyers and lessees explaining where they can obtain copies of
bulletins describing defects filed by automobile manufacturers
with the National Highway Traffic Safety Administration.

(More)

SB 486 (Rosenthal)
Page 2

The sign shall also state that upon a consumer request the
following information shall be provided: (1) any adjustment program
applicable to a particular vehicle; (2) any unrepaired
manufacturer's defect in a particular vehicle that has been
described in a service bulletin.

(2) shall disclose to consumers seeking repairs for a particular
condition at its repair shop, the principal terms and
conditions of the manufacturer's adjustment program covering
the condition, if the dealer has received a service bulletin
concerning the adjustment program or otherwise has knowledge of
it.

(3) shall provide the purchaser of a new motor vehicle a notice
outlining the provisions in the bill and the rights and
remedies available. The written notice shall state the
following:

> Sometimes (insert manufacturer's name) offers a
> special adjustment program to pay all or part of
> the cost of certain repairs beyond the terms of the
> warranty. Check with your dealer or the
> manufacturer to determine whether any adjustment
> program is applicable to your motor vehicle.

Automobile manufacturers would have the following duties:

(1) shall, within 90 days of adopting an adjustment program, notify
by first-class mail all owners or lessees of motor vehicles
eligible under the program (an adjustment program means any
program or policy that expands or extends the consumer's
warranty beyond its stated limit or under which a manufacturer
offers to pay for all or any part of the cost of repairing, or
to reimburse consumers for the cost of repairing, any condition
that may substantially affect vehicle durability, reliability,
or performance).

(2) shall, within 30 days of adopting an adjustment program, notify
the dealer in writing of all the terms and conditions of the
program.

(3) shall implement procedures to assure reimbursement of each
consumer eligible under an adjustment program who incurs
expenses for repair of a condition subject to the program prior
to acquiring knowledge of the program.

This bill provides the following remedies to consumers:

(1) allows the consumer to file with the manufacturer a claim for
reimbursement for expenses incurred in repairing the condition
subject to the adjustment program. Such claim shall be in
writing to the manufacturer within two years of the date of the
consumer's paying for the repairs. The manufacturer has 21 days
of receiving the claim to respond to the consumer whether the

(More)

SB 486 (Rosenthal)
Page 3

claim will be allowed or denied. If denied, the specific
reasons for the denial must be stated.

(2) would allow any consumer damaged by the failure of a
manufacturer, importer, distributor, or dealer to comply with
the requirements of this bill to bring an unfair or deceptive
trade practice action.

(3) consumers can bring an action to recover damages, including
reasonable attorneys fees and costs. Furthermore, if the buyer
establishes that the failure to comply was willful, the
judgment may include, a civil penalty not to exceed two times
the amount of actual damages.

(4) consumers may file a complaint with the Department of Motor
Vehicles, which may consider the suspension or revocation of
the dealer's license.

(5) furthermore, these remedies are in addition to any other laws
available to consumers.

This bill also defines consumer, manufacturer, dealer, motor
vehicle, lessee, adjustment program and service bulletins.

The purpose of this bill is to require certain disclosures by
manufacturers and dealers that would help consumers learn of
so-called "secret warranties" which are available but not offered
by car manufacturers.

**COMMENTS**

1. Stated need for legislation

According to the author, this bill is needed because auto
manufacturers currently engage in the practice of issuing
"secret warranties" (also known as silent recalls) to minimize
consumer awareness about defects in their vehicles. Enactment
of SB 486 will require automakers and dealers to inform car
shoppers and existing owners how to obtain information on these
defects and whether the manufacturer has offered to pay to
repair such defects.

2. Federal law and safety related defects: recalls mandated

The National Highway Traffic and Motor Vehicle Safety Act
(NHTSA) was enacted by Congress to reduce traffic accidents and
deaths and injuries to persons resulting from traffic
accidents.

When vehicles are recalled because of specific safety-related
defects the Act requires manufacturers to notify current owners
so that corrective steps may be taken by the dealers. The

(More)

SB 486 (Rosenthal)
Page 4

dealers must also fix the problem on any cars still in their possession before selling them.

The Act requires notice to owners not only where vehicle fails when used in conformity with manufacture's instructions, but also where there is inadequate margin of safety to protect against failure during reasonably expected vehicle operations. <u>United States</u> v. <u>General Motors Corp.</u> (1975) 171 App DC 27 [518 F2d 420].

The defects may be those discovered by the manufacturer itself or those defects discovered by the government through testing, inspection, investigation or research carried out pursuant to the Act.

The defects must relate to motor vehicle safety. This requirement, i.e. safety-related defects, fails to provide consumers protection in three ways:

(1) there is too much discretion left to automakers to decide what's "safety-related";

(2) even non-safety-related defects can reduce a vehicle's durability, reliability, performance, appearance, and re-sale value;

(3) new car buyers don't find out about so-called non-safety defects until <u>after</u> their purchase, when they receive the manufacturer's recall notice.

According to supporters of the bill, manufacturer's to avoid recalls -- either because the defect is minor or to avoid publicity and higher costs -- often issue "technical service bulletins" to their dealers. Copies of these service bulletins are sent to NHTSA, whether or not they are safety related, but not directly to the owners of the cars.

Consumers in the market for a new car are in the dark. Dealers do not routinely disclose to customers that a particular vehicle has a known defect (unless the manufacturer has issued a safety-related recall, in which case the dealer cannot sell it until its fixed). This prevents new car buyers from factoring this information into their purchasing decision.

3. <u>Pre-notification of non-safety related defects</u>

The proponents believe that it is not uncommon for auto manufacturers to minimize the safety implications of certain defects. In such cases, there is no requirement that owners be notified; information is merely passed along to NHTSA via technical service bulletins and to the dealers. Proponents point to the following examples:

Ford did not notify owners or buyers about faulty gas gauges,

(More)

SB 486 (Rosenthal)
Page 5

saying they did not pose a serious risk.  Apparently, they had
to settled with a man who lost his leg when his car
unexpectedly ran out of gas and he was hit.

GM decided a computer chip in 600,000 of its new cars did not
pose a safety risk.  They issued a service bulletin to dealers
to replace the chips for customers who complained.  The
defective chip caused a 3-day-old 1988 Chevrolet Silverado to
stall at an intersection and the car was hit by a truck,
killing a boy and injuring the driver.

This bill requires dealers to post a notice specifying to
prospective purchasers and lessees how to receive copies of
service bulletins.  The notice needs to be posted in a
conspicuous place in the showroom and must include the
following statements:

FEDERAL LAW REQUIRES MANUFACTURERS TO FURNISH THE NATIONAL
HIGHWAY TRAFFIC SAFETY ADMINISTRATION (N.H.T.S.A.) WITH
BULLETINS DESCRIBING ANY DEFECTS IN THEIR VEHICLES.

YOU MAY OBTAIN COPIES OF THESE BULLETINS FROM EITHER OF THE
FOLLOWING:

THE MANUFACTURER (ASK YOUR DEALER FOR THE TOLL-FREE NUMBER).  A
FEE MAY BE CHARGED.

N.H.T.S.A. -- (202) 366-2768.  A FEE WILL BE CHARGED.

IN ADDITION, CERTAIN CONSUMER PUBLICATIONS PUBLISH THESE
BULLETINS AND SOME COMPANIES WILL MAIL THEM TO YOU, FOR A FEE.

4.  Post notification of Secret Warranties

When a new automobile has a major defect that occurs after its
warranty expires, the manufacturer frequently establishes an
warranty adjustment program or policy to pay for the repairs.
Since the manufacturer never notifies the consumer, the policy
or program is known as a "secret warranty".  This "secret
warranty" only applies to consumers who either complain loudly
enough or to the right person.

Secret warranties, according to the Center for Auto Safety
(CAS), are a long-standing industry practice. The practice of
issuing these warranty adjustment program or policy is an
attempt to deal with the many thousands of complaints at once
as oppose to dealing with complaints on an individual basis.
The program works like this:  a widespread problem is
acknowledged in the notification, with instructions on how to
correct the defect, what parts are needed, and how much time is
required to complete the repair.  Authorization to provide free
repairs is given.  Yet auto manufacturers never notify the
owners of the cars covered by the warranty adjustment program.
Most of the times, the auto manufacturer communicates the

(More)

SB 486 (Rosenthal)
Page 6

policy only to its regional offices; sometimes not even the dealers are notified. Therefore, only the consumer who complains loudly enough gets covered by the secret warranty.

CAS has compiled a list of 10 major post-warranty reimbursement programs established by different auto makers. Some of these "secret warranties" include:

(1) premature tire wear, 1985-86 GM mid- and full-size cars, pickups and vans;
(2) floor pan cracks, 1979-83 Ford Mustangs and Mercury Capri's;
(3) cracked blocks and cracked heads, 1982-84 GM cars with four-cylinder engines;
(4) seat belts, 1970-86 Honda cars, all models;
(5) power steering failure, 1980-84 GM front-wheel-drive A, J and X-cars.

This bill would simply require dealers to provide a written notice to new motor vehicle buyers making them aware that the specific manufacturer may offer special adjustment program beyond the terms of the warranty. The notice would further state to consumers to check with the dealers or the manufactures to determine whether any adjustment program applies to the motor vehicle being purchased by the buyer.

> Sometimes (insert manufacturer's name) offers a special adjustment program to pay all or part of the cost of certain repairs beyond the terms of the warranty. Check with your dealer or the manufacturer to determine whether any adjustment program is applicable to your motor vehicle.

6. **Comments by Toyota Motor Sales, USA**

Although not formally oppose to this legislation, Toyota has requested that the bill be amended to substantially conform with the Connecticut adjustment warranty law. Specifically, Toyota opposes provisions in this legislation which are different from the Connecticut law. This bill differs from the Connecticut law in that (1) it requires pre-sale notice about service bulletins and; (2) it establishes a private right of action for civil penalties resulting from a violation of the act.

**Pre-sale notice:** Toyota believes "[t]he state should not intervene and create a state-mandated referral process to help federal agencies disseminate consumer information. NHTSA's information is already public and available --responsibility for information dissemination should not be assumed by the state or dealers/manufacturers."

**Penalty provisions:** Toyota believes that the enforcement of warranty adjustment law should be left to public and private

SB 486 (Rosenthal)
Page 7

litigants via the state's unfair competition act. Furthermore,
they state, there is no pre-enactment data to suggest that a
new warranty adjustment law will be ignored by dealers and the
public prosecutors will not aggressively enforce the new law.

**********

# Exhibit 7

Slip Copy, 2009 WL 5206647 (E.D.Cal.)
**(Cite as: 2009 WL 5206647 (E.D.Cal.))**

**H**Only the Westlaw citation is currently available.

United States District Court,
E.D. California.
Daniel Stacey WINN, individually and assuccessor in
interest to Petra Monika Winn, deceased, Kory Mi-
chael Winn, individually and as successor in interest
to Petra Monika Winn, deceased, Breeonna Winn,
individually and as successor in interest to Petra Mo-
nika Winn, deceased, Erika Winn, individually and as
successor in interest to Petra Monika Winn, deceased,
Plaintiffs,
v.
CHRYSLER GROUP, LLC, a Delaware corporation,
successor in interest to Daimler Chrysler Corporation;
Magna Powertrain, Inc.; Magna International of
America, Inc. also known as Magna Powertain; Great
Valley Chrysler Jeep, an unknown business entity;
Enterprise Rent-a-Car Company, a California corpo-
ration; S.J. Denham, Inc., a California corporation,
Deborah Matisengle; and Does 1 through 100, inclu-
sive, Defendants.
**No. 2:09-cv-02805-MCE-GGH.**

Dec. 24, 2009.

R. Ben Hogan, Hogan Law Office, P.C., Birmingham,
AL, Todd Everitt Slaughter, Reiner, Simpson and
Slaughter, Redding, CA, for Plaintiffs.

John Garland Gherini, Wayne Allen Wolff, Sedgwick,
Detert, Moran & Arnold LLP, Stephen S. Walters,
Allen Matkins Leck Gamble Mallory & Natsis LLP,
San Francisco, CA, Audrey Ann Smith, Howie &
Smith, LLP, San Mateo, CA, for Defendants.

**MEMORANDUM AND ORDER**

MORRISON C. ENGLAND, JR., District Judge.

**\*1** Plaintiffs have moved to remand this case back to
the Superior Court of the State of California in and for
the County of Shasta, where it originated, on grounds
that the claims against Defendant Chrysler Group,
who removed the case to this Court, do not arise under
federal law. Alternatively, Plaintiffs also argue for
remand on equitable grounds and further assert that

this Court should abstain from hearing the matter. As
set forth below, Plaintiffs' Motion to Remand will be
granted.

**BACKGROUND**

This wrongful death case arises from a motor vehicle
accident that occurred in Shasta County, California on
August 13, 2007 as Plaintiffs' decedent, Petra Monika
Winn, was driving a 2004 Chrysler Sebring automo-
bile. Ms. Winn was killed as a result of the accident.
Through this action, Plaintiffs seeks damages against
alleged manufacturers/suppliers of the Chrysler ve-
hicle and its component parts (Defendants Chrysler
Group, LLC/Daimler AG and Defendants Magna
Powertrain/Magna International, who allegedly fur-
nished the gas tank utilized in the vehicle). Addition-
ally, Defendants include Great Valley Chrysler Jeep,
who purportedly sold the Chrysler vehicle to Defen-
dant Enterprise Rent-a-Car, S.J. Denham, Inc. who
bought the vehicle from Great Valley and sold it to
Plaintiffs' decedent, and Defendant Deborah Mati-
sengle, who apparently drove the other vehicle in-
volved in the accident.

Defendant Chrysler Group removed the action to this
Court on grounds that under the terms of its purchase
of Chrysler assets from Chrysler Group's predecessor
in interest, Chrysler Corp. LLC (who is not a Defen-
dant in this lawsuit), any successor liability on
Chrysler Group's part was specifically excepted. Be-
cause that agreement was approved by the bankruptcy
court overseeing Chrysler Corp.'s bankruptcy pro-
ceeding, Defendant Chrysler Group removed Plain-
tiff's entire case to federal court pursuant to 28 U.S.C
§§ 1452(a) and 1334, which provide for federal juris-
diction on cases arising under or related to bankruptcy
proceedings under Title 11.

Plaintiffs argue that because the bankruptcy proceed-
ings as to Defendant Chrysler Group's predecessor at
most give rise to a defense available to Chrysler Group
in this matter, it does not arise under federal law be-
cause it does not derive from the allegations of Plain-
tiffs' complaint itself. Plaintiffs further contend that
equitable grounds also mandate remand. They point
out that their complaint itself alleges only state law
causes of action, argue that Chrysler Group's potential

Slip Copy, 2009 WL 5206647 (E.D.Cal.)
**(Cite as: 2009 WL 5206647 (E.D.Cal.))**

bankruptcy defense relates only to one of several different defendants sued in this matter, and emphasize that the bankruptcy debtor, Chrysler Corp. LLC, is not even a party to this lawsuit.

Defendant Chrysler Group argues that federal jurisdiction is invoked because this matter qualifies as a "core" proceeding with regard to Chrysler Corp's bankruptcy. Chrysler Group alternatively argues that Plaintiffs' claims against it are "related" to the bankruptcy case in that they directly challenge the bankruptcy debtor's sale of assets.

**\*2** Finally, Chrysler Group argues that this Court has exclusive jurisdiction over bankruptcy issues like those raised herein, and that in any event the equities weigh in favor of exercising jurisdiction.

### STANDARD

A defendant may remove any civil action from state court to federal district court if the district court has original jurisdiction over the matter. 28 U.S.C. § 1441(a). Generally, district courts have original jurisdiction over civil actions in two instances: (1) where there is complete diversity between the parties, or (2) where a federal question is presented in an action arising under the Constitution, federal law, or treaty. 28 U.S.C. §§ 1331 and 1332.

The removing party bears the burden of establishing federal jurisdiction. Ethridge v. Harbor House Rest., 861 F.2d 1389, 1393 (9th Cir.1988). Furthermore, courts construe the removal statute strictly against removal. Gaus v. Miles, Inc., 980 F.2d 564, 566 (9th Cir.1992) (citations omitted). If there is any doubt as to the right of removal in the first instance, remand must be granted. See Gaus, 980 F.2d at 566. Therefore, if it appears before final judgment that a district court lacks subject matter jurisdiction, the case shall be remanded to state court. 28 U.S.C. § 1447(c).

The district court determines whether removal is proper by first determining whether a federal question exists on the face of the plaintiff's well-pleaded complaint. Caterpillar, Inc. v. Williams, 482 U.S. 386, 392, 107 S.Ct. 2425, 96 L.Ed.2d 318 (1987). If a complaint alleges only state-law claims and lacks a federal question on its face, then the federal court must grant the motion to remand. See 28 U.S.C. § 1447(c); Caterpillar, 482 U.S. at 392. Nonetheless, there are

rare exceptions when a well-pleaded state-law cause of action will be deemed to arise under federal law and support removal. They are "(1) where federal law completely preempts state law, (2) where the claim is necessarily federal in character, or (3) where the right to relief depends on the resolution of a substantial, disputed federal question." ARCO Envtl. Remediation L.L.C. v. Dep't of Health & Envtl. Quality of Mont., 213 F.3d 1108, 1114 (9th Cir.2000) (internal citations omitted).

### ANALYSIS

Defendant Chrysler Group does not dispute Plaintiffs' assertion that diversity is unavailable as a basis for federal jurisdiction on grounds that several of the Defendants, like Plaintiffs, are California residents. Instead, Chrysler argues that a federal question confers jurisdiction on this Court. Although the causes of action pled in the Complaint itself are claims for negligence, products liability, and related claims arising under state law, Chrysler maintains that the bankruptcy of its predecessor in interest, Chrysler Corp. LLC, provides the requisite link to federal law.

Chrysler Group makes this contention despite the fact that Chrysler Corp. LLC, the debtor in bankruptcy, is not a Defendant to this lawsuit, and despite the fact that the bankruptcy proceedings are not mentioned in Plaintiffs' Complaint.

**\*3** Generally, "a cause of action arises under federal law only when the plaintiff's well-pleaded complaint raises issues of federal law." Metropolitan Life Ins. Co. v. Taylor, 481 U.S. 58, 63, 107 S.Ct. 1542, 95 L.Ed.2d 55 (1987). A case cannot usually be removed to federal court on the basis of a federal defense, alone. See Caterpillar Inc. v. Williams, 482 U.S. 386, 393, 107 S.Ct. 2425, 96 L.Ed.2d 318 (1987). An exception is recognized if the controlling force of a federal statute is so strong that it "completely preempts" an area of state law. Taylor, 481 U.S. at 63-64.

Defendant Chrysler Group argues that the sale of Chrysler Corp. LLC's assets, as approved by the bankruptcy court, is a "core" bankruptcy proceeding under 11 U.S.C. §§ 157(b) and 363(f). According to the Chrysler Group, this case qualifies as a core proceeding because Plaintiffs' Complaint challenges the bankruptcy court's sale order in the Chrysler Corp.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 5206647 (E.D.Cal.)
**(Cite as: 2009 WL 5206647 (E.D.Cal.))**

LLC bankruptcy case, by allegedly contending that the elimination of successor liability to Chrysler Group was improper. Defendant Chrysler Group argues that in core proceedings, a bankruptcy court has "comprehensive power and may enter appropriate orders and judgments." *In re Petrie Retail Inc.,* 304 F.3d 223, 228 (2d Cir.2002).

Defendant Chrysler further argues that because Plaintiffs filed a proof of claim in the Chrysler Corp. LLC bankruptcy case, they necessarily submitted to the bankruptcy court's jurisdiction, making this a core proceeding on that basis as well. Alternatively, Defendant Chrysler urges the court to assert subject matter jurisdiction on grounds that this proceeding is "related to" the bankruptcy case under 28 U.S.C. § 1334(b) since its outcome could conceivably effect the bankruptcy estate. *See In re Fietz,* 852 F.2d 455, 457 (9th Cir.1988).

Underlying all these asserted bases for federal jurisdiction is Defendant Chrysler's contention that Plaintiffs' claims against the Chrysler Group are a "direct challenge" to the bankruptcy court's Sale Order, with Plaintiff's state common law claims essentially amounting to "disguised" bankruptcy claims. *See* Def.s' Opp'n, 15:13-15, 18:10. These contentions are specifically directed to the Plaintiffs' successor-in-interest claims against Chrysler Group.

Defendant Chrysler Group's claims in this regard lack merit inasmuch as Plaintiffs have voluntarily dismissed all of the successor claims against it; namely, the First through Fourth Causes of Action for Strict Liability, Negligence [FN1] and Breach of Implied Warranty, respectively.

> FN1. Both Plaintiffs' Second and Third Causes of Action sound in negligence.

Without those successor claims, even Defendant Chrysler's Opposition to this Motion makes it clear that any reasoned basis for federal jurisdiction is absent since it is only the successor claims that Defendant Chrysler identifies as running afoul of the bankruptcy court's Sales Order, which specifically exempted such claims in Chrysler Group's asset purchase. Plaintiffs' remaining claims against Defendant Chrysler Group, as set forth in the Fifth and Sixth Causes of Action, are for indemnity arising from Defendant Chrysler's alleged obligations to its dealers.

Nowhere does the Chrysler Group allege that those claims are successive in nature, and nowhere does Chrysler contend that those claims are governed by the terms of Chrysler Group. LLC's bankruptcy proceedings.

**\*4** The Court is consequently unpersuaded that the remaining claims against Chrysler Group are core bankruptcy claims because they are neither unique to, or uniquely affected by, Chrysler Corp. LLC's bankruptcy proceedings, and further do not directly affect core bankruptcy functions. *In re Petrie Retail, Inc.* 304 F.3d at 230. As set forth above, Defendant Chrysler Group implicated only the successor claims in that regard, and those claims have been dismissed. Defendant Chrysler's contention that Plaintiffs' claims are "related to" the bankruptcy proceeding are undercut for the same reason: no viable argument has been made that the remaining indemnity claims vis-a-vis Chrysler Group's dealers will affect the handling and administration of Chrysler Corp. LLC's bankruptcy estate.

Finally, the Court rejects as wholly illogical the contention that just because Plaintiffs filed a proof of claim against a non-party to the present lawsuit (Chrysler Corp. LLC), its claims against Defendant Chrysler Group and the other Defendants automatically become core proceedings subject to the jurisdiction of the bankruptcy court.

The Court's conclusion that no cognizable federal claim is presented, and that this matter should accordingly be remanded to the originating state court, is further underscored by consideration of the factors governing equitable remand, which also demonstrate that this matter should go back to state court. To determine whether remand is warranted on equitable grounds, the following factors should be considered: "(1) the effect of the action on the administration of the bankruptcy estate; (2) the extent to which the issues of state law predominate; (3) the difficulty of applicable state law: (4) comity; (5) the relatedness or remoteness of the action to the bankruptcy case: (6) the existence of a right to jury trial; and (7) prejudice to the party involuntarily removed from state court. *In re Baptist Foundation of Arizona,* 2000 WL 35575676 at \*7 (D.Ariz.1996), citing *Williams v. Shell Oil Co.,* 169 B.R. 684, 692 (S.D.Cal.1994).

Here, as already indicated, the bankruptcy debtor,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 5206647 (E.D.Cal.)
**(Cite as: 2009 WL 5206647 (E.D.Cal.))**

Chrysler Corp. LLC, is not even a party to this lawsuit. In the absence of the successor claims, Chrysler Group has not demonstrated how the indemnity claims will impact the handling of the bankruptcy estate. More-over, to the extent that bankruptcy is a potential issue, it affects only a single affirmative defense available to one defendant in a multiple-defendant case, and is consequently remote with regard to the case as a whole. Finally, to the extent that a bankruptcy defense is appropriate as to Defendant Chrysler Group, there is no reason in any event why the defense cannot be asserted in state court. State law issues clearly pre-dominate, and trying this case together in state court, in a forum that can adjudicate this entire matter through a unitary jury trial, clearly favors concerns of both judicial economy and comity. Contrary to De-fendant Chrysler's contention, given the case as it now stands this is not an attempt by Plaintiffs to relitigate the issue of successor liability in another forum.

## CONCLUSION

**\*5** Based on the foregoing, the Court finds this this case should be remanded to the originating state court, the Superior Court of the State of California in and for the County of Shasta, for final adjudication.

Plaintiffs' Motion to Remand (Docket No. 15) is ac-cordingly GRANTED. [FN2] Defendant Chrysler Group's Motion to Transfer Venue (Docket No. 8) to the United States District Court for the Southern Dis-trict of New York, for referral to the United States Bankruptcy Court in that District is DENIED as moot.

> FN2. Because oral argument will not be of material assistance, the Court ordered this matter submitted on the briefs. E.D. Cal. Local Rule 230(g).

IT IS SO ORDERED.

E.D.Cal.,2009.
Winn v. Chrysler Group, LLC
Slip Copy, 2009 WL 5206647 (E.D.Cal.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

# Exhibit 8"*r ctv'3"qh'4+

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------------------x
```
|   |   |
|---|---|
| In re | : |
|   | : Chapter 11 |
| Chrysler LLC, *et al.,* | : |
|   | : Case No. 09-50002 (AJG) |
|   | : |
| Debtors. | : (Jointly Administered) |
|   | : |

```
------------------------------------------------------------x
```

### ORDER (I) AUTHORIZING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES, (II) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES IN CONNECTION THEREWITH AND RELATED PROCEDURES AND (III) GRANTING RELATED RELIEF

This matter coming before the Court on the motions, dated May 3, 2009 and

May 22, 2009 (Docket Nos. 190 and 1742) (collectively, the "Sale Motion")[1] filed by the above-

captioned debtors and debtors in possession (collectively, the "Debtors") for entry of an order

(the "Sale Order"), pursuant to sections 105, 363 and 365 of the United States Bankruptcy Code,

11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), Rules 2002, 6004, 6006, 9008 and 9014 of

the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rules 2002-1, 6004-1,

6006-1 and 9006-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for

the Southern District of New York:  (i) authorizing and approving the entry into, performance

under and terms and conditions of the Master Transaction Agreement, dated as of April 30, 2009

(collectively with all related agreements, documents or instruments and all exhibits, schedules

and addenda to any of the foregoing, and as amended, the "Purchase Agreement"), substantially

---

[1]     Unless otherwise stated, all capitalized terms not defined herein shall have the meanings given to them in the Sale Motion and the Bidding Procedures Order (as defined below).

in the form attached hereto as Exhibit A (without all of its voluminous exhibits), between and

among Fiat S.p.A. ("Fiat"), New CarCo Acquisition, LLC (the "Purchaser"), a Delaware limited

liability company formed by Fiat, and the Debtors,[2] whereby the Debtors have agreed to sell, and

the Purchaser has agreed to purchase the "Purchased Assets" (as such term is defined in Section

2.06 of the Purchase Agreement), which Purchased Assets include, without limitation, the

Assumed Agreements (as defined below), substantially all of the Debtors' tangible, intangible

and operating assets related to the research, design, manufacturing, production, assembly and

distribution of passenger cars, trucks and other vehicles (including prototypes) under brand

names that include Chrysler, Jeep® or Dodge (the "Business"), certain of the facilities related

thereto and all rights, intellectual property, trade secrets, customer lists, domain names, books

and records, software and other assets used in or necessary to the operation of the Business or

related thereto to the Purchaser (collectively, and including all actions taken or required to be

taken in connection with the implementation and consummation of the Purchase Agreement, the

"Sale Transaction"); (ii) authorizing and approving the sale by the Debtors of the Purchased

Assets, free and clear of liens, claims (as such term is defined by section 101(5) of the

Bankruptcy Code), liabilities, encumbrances, rights, remedies, restrictions and interests and

encumbrances of any kind or nature whatsoever whether arising before or after the Petition

---

[2]     The following Debtors are "Sellers" under the Purchase Agreement:  Alpha Holding, LP ("Alpha"),
Chrysler, LLC; Chrysler Aviation Inc.; Chrysler Dutch Holding LLC; Chrysler Dutch Investment LLC;
Chrysler Dutch Operating Group LLC; Chrysler Institute of Engineering; Chrysler International
Corporation; Chrysler International Limited, L.L.C.; Chrysler International Services, S.A.; Chrysler Motors
LLC; Chrysler Realty Company LLC; Chrysler Service Contracts Florida, Inc.; Chrysler Service Contracts
Inc.; Chrysler Technologies Middle East Ltd.; Chrysler Transport Inc.; Chrysler Vans LLC; DCC 929, Inc.;
Dealer Capital, Inc.; Global Electric Motorcars, LLC; NEV Mobile Service, LLC; NEV Service, LLC;
Peapod Mobility LLC; TPF Asset, LLC; TPF Note, LLC; and Utility Assets LLC.

Date,[3] whether at law or in equity, including all claims or rights based on any successor or

transferee liability, all environmental claims, all change in control provisions, all rights to object

or consent to the effectiveness of the transfer of the Purchased Assets to the Purchaser or to be

excused from accepting performance by the Purchaser or performing for the benefit of the

Purchaser under any Assumed Agreement and all rights at law or in equity (collectively,

"Claims") (other than certain liabilities that are expressly assumed or created by the Purchaser, as

set forth in the Purchase Agreement or as described herein (collectively, the "Assumed

Liabilities")); (iii) authorizing the assumption and assignment to the Purchaser of certain

executory contracts and unexpired leases of the Debtors (collectively, the "Assumed

Agreements") in accordance with the Contract Procedures set forth in the Bidding Procedures

Order, the Purchase Agreement and this Sale Order; (iv) authorizing and approving the entry

into, performance under and terms and conditions of the UAW Retiree Settlement Agreement (as

defined herein); and (v) granting other related relief; the Court having conducted a hearing on the

Sale Motion on May 27, 2009 through May 29, 2009 (collectively, the "Sale Hearing") at which

time all interested parties were offered an opportunity to be heard with respect to the Sale

Motion; the Court having reviewed and considered, among other things, (i) the Sale Motion and

the exhibits thereto, (ii) the Purchase Agreement attached hereto as Exhibit A, (iii) this Court's

prior order (Docket No. 492), dated May 8, 2009 (the "Bidding Procedures Order") approving

competitive bidding procedures for the Purchased Assets (the "Bidding Procedures"), (iv) all

objections to the Sale Transaction filed in accordance with the Bidding Procedures Order or

raised on the record at the Sale Hearing, (v) Memorandum of Law in Support of Sale Motion

---

[3]     As used herein, "Petition Date" refers to (a) April 30, 2009 for all of the Debtors other than Alpha and
(b) May 19, 2009 for Alpha.

(Docket No. 191), (vi) Supplemental Memorandum of Law in Support of Sale Motion (Docket

No. 2130), (vii) the Consolidated Reply to Objections to the Sale Motion (Docket Nos. 2155 and

2565), (viii) the Statement of the United States Department of the Treasury in Support of the

Commencement of Chrysler LLC's Chapter 11 Case (Docket No. 69), (ix) the Statement of the

Official Committee of Unsecured Creditors in Support of Debtors Motion for Order Authorizing

the Sale of Substantially All of the Debtors' Assets Free and Clear of Liens, Claims, Interests and

Encumbrances (the "Creditors' Committee Statement"), and the related Memorandum of Law

(Docket No. 1846 and 2147); (x) the Response to Various Objections Relating to Successor

Liability Issues (Docket No. 2111); (xi) the Response of International Union, United

Automobile, Aerospace and Agricultural Implement Workers of America to Motion of the

Debtors and Debtors in Possession for an Order Authorizing the Sale of Substantially All of the

Debtors' Operating Assets and Other Relief (Docket No. 2085); (xii) the Supplemental Statement

of the International Union, United Automobile, Aerospace, and Agricultural Implement Workers

Union of America, AFL-CIO in Support of Motion of the Debtors and Debtors in Possession for

an Order Authorizing the Sale of Substantially All of the Debtors' Operating Assets and Other

Relief and Response to Individual Retiree Statements Concerning Approval of UAW Retiree

Settlement Agreement (Docket No. 2094) and (xiii) the arguments of counsel made, and the

evidence proffered or adduced, at the Sale Hearing; and it appearing that due notice of the Sale

Motion and the Bidding Procedures Order has been provided in accordance with the Bidding

Procedures Order and that the relief requested in the Sale Motion is in the best interests of the

Debtors, their estates and creditors and other parties in interest; and upon the record of the Sale

Hearing and these cases; and after due deliberation thereon; and good and sufficient cause

appearing therefore, including for the reasons set forth in the Court's Opinion dated May 31,

2009 (Docket No. 3073);

**IT IS HEREBY FOUND AND DETERMINED THAT:**

### THE DEBTORS AND THESE CASES

A.    As of the Petition Date and for a period of more than a year before the

commencement of these chapter 11 cases, the Debtors worked with financial advisors and with

their various constituencies to try to raise capital or implement a viable transaction that would

allow them to continue the Debtors' operations.  (See DX 20; May 27, 2009 Hearing Tr.

(Testimony of Tom Lasorda); May 28, 2009 Hearing Tr. (Testimony of Robert Nardelli);

Deposition of Scott Garberding, May 24, 2009, Exhibit 2, at 87-92).  The Debtors presented

credible evidence that, as of the Petition Date, they had explored strategic alternatives for

the Business over an extended period of time and had communicated with more than 15 parties

about possible sales, mergers, combinations and alternatives regarding debt or equity capital

investments or financing and had prepared standalone business plans in the event that strategic

alternatives did not materialize or were insufficient.  (See Id.).  The Sale Transaction is the result

of the Debtors' extensive efforts.

### JURISDICTION, FINAL ORDER AND STATUTORY PREDICATES

B.    This Court has jurisdiction over the Sale Motion, the Sale Transaction and

the Purchase Agreements pursuant to 28 U.S.C. §§ 157(b)(1) and 1334(a), and this matter is a

core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (N) and (O).  Venue of these cases and

the Sale Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.  Debtor Peapod

Mobility LLC ("Peapod") is a New York limited liability company.  Debtor Chrysler Realty

Company LLC ("Chrysler Realty") is the owner of certain valuable real property located on

11th Avenue in New York, New York. Debtor Chrysler is the direct or indirect parent of
Peapod, Chrysler Realty and each of the other Debtors.

      C.     This Sale Order constitutes a final and appealable order within the
meaning of 28 U.S.C. § 158(a). Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), the
Court expressly finds that there is no just reason for delay in the implementation of this Sale
Order, and expressly directs entry of judgment as set forth herein.

      D.     The statutory predicates for the relief sought in the Sale Motion and
granted in this Sale Order include, without limitation, sections 105(a), 363(b), (f) and (m) and
365(a), (b) and (f) of the Bankruptcy Code, and Bankruptcy Rules 2002, 6004 and 6006.

### JUDICIAL NOTICE

      E.     Pursuant to Federal Rule of Evidence 201(c), incorporated into these
proceedings pursuant to Bankruptcy Rule 9017, the Court takes judicial notice of the
(1) March 30, 2009 Remarks by the President of the United States on the American Automotive
Industry; (2) April 30, 2009 Remarks by the President of the United States on the Auto Industry;
and (3) the fact of the publication of the Notice of Proposed Sale of Substantially All of the
Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances and Final Sale
Hearing Related Thereto in the national editions of *The New York Times* on May 12, 2009, *The
Wall Street Journal* on May 12, 2009 and *USA Today* on May 13, 2009, and the worldwide
edition of *The Financial Times* on May 13, 2009. (See DX 8; DX 18; DX 19).

### SOUND BUSINESS PURPOSE

      F.     The Debtors seek to convey the Purchased Assets, including those related
to the research, design, manufacture (at 16 domestic manufacturing facilities), assembly (at
seven domestic assembly plants) and wholesale distribution of passenger cars and trucks under

the brand names Chrysler, Jeep® and Dodge, all of which are subject to Claims, including those held by the Debtors' prepetition secured lenders. (See DX 64, at §2.06).

      G.    In the second half of 2008, Chrysler began to experience an "unprecedented" loss of cash (See May 28, 2009 Hearing Tr. (Testimony of Robert Nardelli)). Currently, the Debtors are losing over $100 million dollars per day. (See Deposition of Matthew Feldman, May 26, 2009, at 65:18-66:5). Unless the Sale Transaction is approved without delay, the Debtors' assets will continue to erode, and they will be forced to liquidate in the near term. (See May 28, 2009 Hearing Tr. (Testimony of Robert Nardelli); Deposition of Frank Ewasyshyn, May 24, 2009, at Exhibit 1, at 7-29)).

      H.    The Debtors have demonstrated, and the Purchase Agreement reflects, both (1) good, sufficient and sound business purposes and justifications for the immediate approval of the Purchase Agreement and the Sale Transaction (May 28, 2009 Hearing Tr. (Testimony James Chapman); May 28, 2009 Hearing Tr. (Testimony of Robert Nardelli)); and (2) compelling circumstances for the approval of the Purchase Agreement and the Sale Transaction outside of the ordinary course of the Debtors' business pursuant to section 363(b) of the Bankruptcy Code prior to, and outside of, a plan of reorganization in that, among other things, the Debtors' estates will suffer immediate and irreparable harm if the relief requested in the Sale Motion is not granted on an expedited basis (See May 28, 2009 Hearing Tr. (Testimony of Alfredo Altavilla); May 28, 2009 Hearing Tr. (Testimony of Robert Nardelli); Deposition of Scott Garberding, May 24, 2009, Exhibit 2, at 9-27; Deposition of Frank Ewasyshyn, May 24, 2009, Exhibit 1, at 8-29). In light of the exigent circumstances of these chapter 11 cases and the risk of deterioration in the going concern value of the Purchased Assets pending the proposed Sale Transaction, time is of the essence in (a) consummating the Sale Transaction, (b) preserving

the viability of the Debtors' businesses as going concerns and (c) minimizing the widespread and

adverse economic consequences for the Debtors' estates, their creditors, employees, retirees, the

automotive industry and the broader economy that would be threatened by protracted

proceedings in these chapter 11 cases. (See DX 13; DX 14; May 27, 2009 Hearing Tr.

(Testimony of Thomas Lasorda); May 28, 2009 Hearing Tr. (Testimony of Ronald Nardelli);

May 27, 2009 Hearing Tr. (Testimony of Alfredo Altavilla); May 28, 2009 Hearing Tr.

(Testimony of James Chapman); Deposition Tr. of Ronald Bloom, at 65; see generally DX 20).

      I.     The consummation of the Sale Transaction outside of a plan of

reorganization pursuant to the Purchase Agreement neither impermissibly restructures the rights

of the Debtors' creditors nor impermissibly dictates the terms of a liquidating plan of

reorganization for the Debtors. The Sale Transaction does not constitute a *sub rosa* plan of

reorganization. (See DX 4; DX 5; DX 10; May 27, 2009 Hearing Tr. (Testimony of Robert

Manzo)).

      J.     Entry of an order approving the Purchase Agreement and all the

provisions thereof is a necessary condition precedent to the Purchaser's consummation of the

Sale Transaction, as set forth in the Purchase Agreement. (See DX 64, at § 8.02(q)).

      K.     The Purchase Agreement was not entered into, and none of the Debtors,

the Purchaser or the Purchaser's present or contemplated owners, have entered into the Purchase

Agreement or propose to consummate the Sale Transaction, for the purpose of hindering,

delaying or defrauding the Debtors' present or future creditors. None of the Debtors,

the Purchaser nor the Purchaser's present or contemplated owners is entering into the Purchase

Agreement, or proposing to consummate the Sale Transaction, fraudulently for the purpose of

statutory and common law fraudulent conveyance and fraudulent transfer claims whether under

the Bankruptcy Code or under the laws of the United States, any state, territory, possession

thereof, or the District of Columbia or any other applicable jurisdiction with laws substantially

similar to the foregoing.  (See DX 5; DX 6; DX 10; May 27, 2009 Hearing Tr. (Testimony of

Altavilla)).

### HIGHEST AND BEST OFFER

L.    On May 8, 2009, this Court entered the Bidding Procedures Order

approving Bidding Procedures for the Purchased Assets.  The Bidding Procedures provided a

full, fair and reasonable opportunity for any entity to make an offer to purchase the Purchased

Assets.  No additional Qualifying Bids for the Purchased Assets were received by the Debtors.

Therefore, the Purchaser's bid, as reflected in the Purchase Agreement, is the only Qualified Bid

for the Purchased Assets and was designated as the Successful Bid pursuant to the Bidding

Procedures Order (Docket No. 492).  Likewise, no party came forward at the Sale Hearing with a

bid or offer.  As such, no Auction was conducted, and the Purchaser's bid, as reflected in the

Purchase Agreement, was presented to the Court as the Successful Bid. (See May 27, 2009

Hearing Tr. (Testimony of Robert Manzo)).

M.    As demonstrated by the testimony and other evidence proffered or

adduced prior to or at the Sale Hearing, and in light of the exigent circumstances presented and

emergency nature of the relief requested (1) the Debtors have adequately marketed the Purchased

Assets (See May 27, 2009 Hearing Tr. (Testimony of Thomas Lasorda); May 28, 2009 Hearing

Tr. (Testimony of Robert Nardelli); Deposition of Scott Garberding, May 24, 2009, Exhibit 2, at

87-92)); (2) the Purchased Assets are deteriorating rapidly in value and there are good business

reasons to sell these assets outside of a plan of reorganization (See May 28, 2009 Hearing Tr.

(Testimony of Robert Nardelli); Deposition of Frank Ewasyshyn, May 24, 2009, at Exhibit 1, at

7-29; Deposition of Matthew Feldman, May 26, 2009, at 65:21-66:5)); (3) the consideration

provided for in the Purchase Agreement constitutes the highest or otherwise best offer for the

Purchased Assets and provides fair and reasonable consideration for the Purchased Assets (See

May 27, 2009 Hearing Tr. (Testimony of Robert Manzo); May 28, 2009 Hearing Tr. (Testimony

of Robert Nardelli)); (4) the Sale Transaction, as a transfer of deteriorating assets, is an

extraordinary, non-market transaction, the consideration for which exceeds what would have

been obtainable in a transaction subject to ordinary market forces (See Deposition of Ronald

Bloom, May 26, 2009, at 65:4-66:10); (5) the Sale Transaction is the only alternative to

liquidation available to the Debtors (See May 28, 2009 Hearing Tr. (Testimony of Robert

Nardelli)); (6) if the Sale Transaction is not approved and consummated, the Debtors will have

no alternative but to cease operations and liquidate (See May 28, 2009 Hearing Tr. (Testimony

of Robert Nardelli)); (7) the Sale Transaction will provide a greater recovery for the Debtors'

creditors than would be provided by any other practical available alternative, including, without

limitation, liquidation whether under chapter 11 or chapter 7 of the Bankruptcy Code (See DX;

May 27, 2009 Hearing Tr. (Testimony of Robert Manzo)); (8) no other party or group of parties

has offered to purchase the Purchased Assets for greater economic value to the Debtors or their

estates (See May 27, 2009 Hearing Tr. (Testimony of Robert Manzo); May 27, 2009 Hearing Tr.

(Testimony of Thomas Lasorda); May 28, 2009 Hearing Tr. (Testimony of Robert Nardelli));

(9) the consideration to be paid by the Purchaser under the Purchase Agreement exceeds the

liquidation value of the Purchased Assets (See May 27, 2009 Hearing Tr. (Testimony of Robert

Manzo)) and (10) the consideration to be paid by the Purchaser under the Purchase Agreement

constitutes reasonably equivalent value and fair consideration (as those terms may be defined in

each of the Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act and

section 548 of the Bankruptcy Code) under the Bankruptcy Code and under the laws of the

United States, any state, territory or possession thereof or the District of Columbia, or any other

applicable jurisdiction with laws substantially similar to the foregoing. (See DX 14; DX 15;

May 28, 2009 Hearing Tr. (Testimony of James Chapman); May 28, 2009 Hearing Tr.

(Testimony of Robert Nardelli)). The Debtors' determination that the Purchase Agreement

constitutes the highest and best offer for the Purchased Assets constitutes a valid and sound

exercise of the Debtors' business judgment. (See May 27, 2009 Hearing Tr. (Testimony of

Thomas Lasorda); May 28, 2009 Hearing Tr. (Testimony of James Chapman); May 28, 2009

Hearing Tr. (Testimony of Robert Nardelli)).

      N.     Neither the Purchaser nor Fiat have furnished the Debtors with a good

faith deposit in connection with the Purchase Agreement. The Debtors submit that in light of the

extensive prepetition negotiations culminating in the various complex agreements with the

Debtors, the United States Department of the Treasury (the "U.S. Treasury"), the International

Union, United Automobile, Aerospace and Agricultural Implement Workers of America

(the "UAW") and other stakeholders, as well as Fiat's substantial investment of time and

resources, the Purchaser's and Fiat's commitment to consummate the Fiat Transaction is clear

without the need to provide a good faith deposit. See May 27, 2009 Hearing Tr. (Testimony of

Alfredo Altavilla); May 28, 2009 (Testimony of David Curson); May 28, 2009 (Testimony of

Robert Nardelli); May 28, 2009 (Testimony of James Chapman); Deposition of Matthew

Feldman, May 26, 2009, at 37:21-39:1)).

### BEST INTEREST OF CREDITORS

      O.     Approval of the Purchase Agreement and the consummation of the Sale

Transaction with the Purchaser at this time is in the best interests of the Debtors, their estates,

creditors, employees, retirees and other parties in interest. (See DX 6; Creditors' Committee

Statement, at ¶ 2, Docket No. 1846; May 28, 2009 Hearing Tr. (Testimony of David Curson)).

### DESCRIPTION OF THE PURCHASER AND THE PURCHASER'S GOOD FAITH

P.      The Purchaser is a newly formed Delaware limited liability company that
as of the date of the Sale Hearing, is a wholly-owned subsidiary of Fiat. The Purchaser is not an
"insider" of any of the Debtors, as that term is defined by section 101(31) of the Bankruptcy
Code. (See DX 64, at Art. IV-A).

Q.      Upon the closing of the Sale Transaction (the "Closing"), (1) Fiat will
contribute to the Purchaser certain valuable technology and management expertise, (2) the U.S.
Treasury and Export Development Canada ("EDC") will lend the Purchaser approximately
$8 billion in new financing and (3) the UAW Retiree Settlement Agreement, the entry into which
is a condition to the UAW CBA (as defined below) and its assumption and assignment to
Purchaser, will become effective. Following the making of the foregoing contributions to the
Purchaser, Fiat, the VEBA (as defined below), the U.S. Treasury and EDC, through 7169931
Canada Inc., will hold 100% of the equity in the Purchaser. (DX 3; DX 64, Exhibit J, K).

R.      The Purchaser is a person with whom the Debtors are associated within
the meaning of section 525 of the Bankruptcy Code.

S.      The Purchase Agreement and each of the transactions contemplated
therein were negotiated, proposed and entered into by the Debtors and the Purchaser in good
faith, without collusion and from arm's-length bargaining positions. The Purchaser has
proceeded in good faith in all respects in connection with this proceeding, is a "good faith
purchaser" within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled
to all the protections afforded thereby. None of the Debtors, the Purchaser nor the Purchaser's
present or contemplated owners have engaged in any conduct that (1) would cause or permit the
Purchase Agreement or any of the transactions contemplated thereby to be avoided; (2) would
tend to hinder, delay or defraud creditors; or (3) impose costs and damages under section 363(n)

of the Bankruptcy Code. (See May 27, 2009 Hearing Tr. (Testimony of Alfredo Altavilla);

May 27, 2009 (Testimony of Robert Manzo); May 28, 2009 Hearing Tr. (Testimony of David

Curson); May 28, 2009 Hearing Tr. (Testimony of Robert Nardelli); Deposition of Matthew

Feldman, May 26, 2009, at 37:21-39:1; Deposition Tr. of Ronald Bloom, at 87).

### NOTICE OF THE SALE MOTION, AND THE CURE AMOUNTS

T.    As evidenced by the affidavits and certificates of service filed with the

Court, in light of the exigent circumstances of these cases and the wasting nature of the Debtors'

temporarily idled facilities and assets and based upon the representations of counsel at the Sale

Hearing and the testimony of the Debtors' claims and noticing agent, the Court finds that:

(1) proper, timely, adequate and sufficient notice of the Sale Motion, the Bidding Procedures

Order, the Sale Hearing and the UAW Retiree Settlement Agreement has been provided by

the Debtors in accordance with the Bidding Procedures Order; (2) such notice, and the form and

manner thereof, was good, sufficient, reasonable and appropriate under the exigent

circumstances prevailing in these chapter 11 cases; and (3) no other or further notice of the Sale

Motion, the Sale Transaction, the Bidding Procedures, the Sale Hearing or the UAW Retiree

Settlement Agreement is or shall be required. (See DX 7; May 27, 2009 Hearing Tr. (Testimony

of Daniel McElhinney)). In light of the need to grant the relief requested in the Sale Motion on

an expedited basis to avoid any erosion in the going concern value of the Purchased Assets, a

reasonable opportunity to object or be heard with respect to the Sale Motion and the relief

requested therein has been afforded to all interested persons and entities, including, but not

limited to, the following:

> (i)    counsel to the Official Committees of Unsecured Creditors appointed in
> these chapter 11 cases under section 1102 of the Bankruptcy Code (the "Creditors
> Committee");

(ii)    the U.S. Treasury, a prepetition lender and the provider of the debtor in possession financing approved by this Court on a final basis on May 20, 2009 (the "DIP Financing Facility")"), outside counsel to the U.S. Treasury and the Acting United States Attorney for the Southern District of New York;

(iii)    counsel to EDC, a lender under the DIP Financing Facility;

(iv)    counsel to the UAW;

(v)    counsel to the Purchaser;

(vi)    counsel to the administrative agent and collateral agent for the Debtors' prepetition secured First Lien Lenders (as defined below);

(vii)    counsel to Cerberus;

(viii)    counsel to Daimler;

(ix)    parties who, in the past year, have expressed in writing to the Debtors an interest in acquiring the Purchased Assets;

(x)    nondebtor parties (collectively, the "Non-Debtor Counterparties") to the Assumed Agreements;

(xi)    all parties who are known or reasonably believed to have asserted a lien, encumbrance, claim or other interest in the Purchased Assets or who are reflected as secured parties in lien searches conducted by the Debtors;

(xii)    the Securities and Exchange Commission;

(xiii)    the Internal Revenue Service;

(xiv)    all applicable state attorneys general, local environmental enforcement agencies and local regulatory authorities;

(xv)    all applicable state and local taxing authorities;

(xvi)    the Office of the United States Trustee for the Southern District of New York;

(xvii)    the Federal Trade Commission;

(xviii)    the United States Attorney General/Antitrust Division of Department of Justice;

(xix)    the Environmental Protection Agency;

(xx)    the United States Attorney;

-14-

(xxi)    the Pension Benefit Guaranty Corporation;

(xxii)    applicable foreign regulatory authorities in non-U.S. countries in which the Debtors do business;

(xxiii)    all parties that filed objections to the Sale Motion;

(xxiv)    all entities that have requested notice in these chapter 11 cases under Bankruptcy Rule 2002;

(xxv)    the Debtors' retirees and surviving spouses represented by the UAW, including the members of the "Class" as defined in the UAW Retiree Settlement Agreement;

(xxvi)    all employees of the Debtors;

(xxvii)    all dealers with current agreements for the sale or leasing of Chrysler, Jeep or Dodge brand vehicles;

(xxviii)    any other party identified on the creditor matrix in these cases.

(See DX 7).

U.    Additionally, the Debtors published notice of the Sale Transaction in the national editions of *USA Today*, *The Wall Street Journal* and *The New York Times*, as well as the worldwide edition of *The Financial Times*. (See DX 8). With regard to parties who have claims against the Debtors, but whose identities are not reasonably ascertainable by the Debtors (including, but not limited to, parties with potential contingent warranty claims against the Debtors), the Court finds that such publication notice was sufficient and reasonably calculated under the circumstances to reach such parties.

V.    In accordance with the Contract Procedures as set forth in the Bidding Procedures Order, the Debtors have provided notice or shall provide notice (an "Assignment Notice") of their intent to assume and assign the Assumed Agreements and of the related proposed amounts ("Cure Costs") to cure prepetition and postpetition defaults under Assumed Agreements with each such Non-Debtor Counterparty. See Notices of Filing of Schedules of Designated Agreements (DX 16; DX 62; DX 63; Deposition of Scott Garberding, May 24, 2009,

Exhibit 1).  The service and provision of the Assignment Notices that were served in accordance

with the Bidding Procedures Order, was good, sufficient and appropriate under the circumstances

and no further notice need be given with respect to the Cure Costs for the Assumed Agreements

described by the Assignment Notices and the assumption and assignment of the Assumed

Agreements.  (See Affidavits of Service (Docket Nos. 1041, 1996, 1997, 1998, 2003, 2004,

2016, 2017, 2018, 2019, 2020, 2022, 2023, 2025, 2026, 2027, 2028, 2029, 2030, 2081 and

2108).  All Non-Debtor Counterparties to the Assumed Agreements have had an opportunity to

object to both the Cure Costs listed in the Assignment Notices and the assumption and

assignment of the Assumed Agreements (including objections related to the adequate assurance

of future performance and objections based on whether applicable law excuses the Non-Debtor

Counterparty from accepting performance by, or rendering performance to, the Purchaser for

purposes of section 365(c)(1) of the Bankruptcy Code).  With respect to executory contracts or

unexpired leases that are designated by the Debtors as Assumed Agreements pursuant to the

Contract Procedures and Section 2.10 of the Purchase Agreement and for which responses to

Assignment Notices are due after the entry of this Sale Order, the Contract Procedures provide

all Non-Debtor Counterparties to such Assumed Agreements with the opportunity to object to

both the Cure Costs identified in any Assignment Notice delivered to any such Non-Debtor

Counterparty and the assumption and assignment of the applicable Assumed Agreement

(including objections related to the adequate assurance of future performance and objections

based on whether applicable law excuses the Non-Debtor Counterparty from accepting

performance by, or rendering performance to, the Purchaser for purposes of section 365(c)(1) of

the Bankruptcy Code).

## Section 363(f) Requirements Met for Free and Clear Sale

W.    The Debtors may sell the Purchased Assets free and clear of all Claims

because, in each case where a Claim is not an Assumed Liability, one or more of the standards

set forth in section 363(f)(1)-(5) of the Bankruptcy Code have been satisfied.  Except as provided

in this Sale Order, the assumption and assignment of each of the Assumed Agreements is also

free and clear of all Claims other than the payment of the Cure Costs.

X.    The Debtors are the sole and lawful owners of the Purchased Assets and

no other person has any ownership right title or interest therein.  The Debtors' non-Debtor

affiliates have acknowledged and agreed to the sale and, as required by and in accordance with

the Transition Services Agreement, transferred any legal, equitable or beneficial right, title or

interest they may have in or to the Purchased Assets to the Purchaser.  (See DX 64).

Y.    The transfer of Purchased Assets constituting "Collateral" as defined

under that certain Second Amended and Restated Collateral Trust Agreement (the "CTA"), dated

as of January 2, 2009, among, inter alia, certain of the Debtors and their subsidiaries, JPMorgan

Chase Bank, N.A. as both First Priority Agent ("First Priority Agent") and Second Priority

Agent, the U.S. Treasury as Third Priority Agent and Wilmington Trust Company as Collateral

Trustee (the "Collateral Trustee") has been consented to for purposes of section 363(f)(2) of the

Bankruptcy Code, subject to and in accordance with that certain Consent to Sale and Liquidation

of Collateral delivered by the First Priority Agent as "Controlling Party" under the CTA to the

Debtors (the "First Priority Consent"), subject to the terms of the First Priority Consent,

including, without limitation, to the indefeasible payment by the Purchaser immediately upon the

sale of the Purchased Assets of $2 billion in immediately available funds to the First Priority

Agent to be applied as set forth in the First Priority Consent.  The First Priority Consent binds all

parties holding debt under the First Lien Credit Agreement in their capacity as such (collectively,

the "First Lien Lenders"). (See DX 55; DX 57).

        Z.     In addition, those holders of Claims who did object fall within one or more

of the other subsections of sections 363(f) and 365 of the Bankruptcy Code as (1) the

consideration received in exchange for the Purchased Assets is greater than the aggregate value

of all liens on the Purchased Assets (See May 27, 2009 Hearing Tr. (Testimony of Robert

Manzo)), (2) there is a *bona fide* dispute with respect to certain of the Claims asserted (e.g.,

claims of certain dealers relating to the proposed rejection of their dealership agreements) (See

May 28, 2009 Hearing Tr. (Testimony of Peter Grady); May 27, 2009 Hearing Tr. (Testimony of

Alfredo Altavilla)); or (3) such holders could be compelled in a legal or equitable proceeding to

accept a money satisfaction of their Claims. The transfer of the Purchased Assets to the

Purchaser under the Purchase Agreement will be a legal, valid and effective transfer of all of the

legal, equitable and beneficial right, title and interest in and to the Purchased Assets free and

clear of all Claims that are not Assumed Liabilities (including, specifically and without

limitation, any products liability claims, environmental liabilities, employee benefit plans and

any successor liability claims), except as otherwise provided in this Sale Order. All holders of

Claims are adequately protected — and the Sale Transaction thus satisfies section 363(e) of the

Bankruptcy Code — by having their Claims, if any, attach to the proceeds of the Sale

Transaction ultimately attributable to the property against which they have a Claim or other

specifically dedicated funds, in the same order of priority and with the same validity, force and

effect that such Claim holder had prior to the Sale Transaction, subject to any rights, claims and

defenses of the Debtors or their estates, as applicable, or as otherwise provided herein.

AA.    The Purchaser would not have entered into the Purchase Agreement and
would not consummate the Sale Transaction, thus adversely affecting the Debtors, their estates,
creditors, employees, retirees and other parties in interest if the sale of the Purchased Assets was
not free and clear of all Claims other than Assumed Liabilities, or if the Purchaser would, or in
the future could, be liable for any such Claims, including, without limitation and as applicable,
certain liabilities (collectively, the "Excluded Liabilities") that expressly are not assumed by the
Purchaser, as set forth in the Purchase Agreement or in this Sale Order.  The Purchaser asserts
that it will not consummate the Sale Transaction unless the Purchase Agreement specifically
provides and this Court specifically orders that none of the Purchaser, its affiliates, their present
or contemplated members or shareholders (other than the Debtors as the holder of equity in
Purchaser), or the Purchased Assets will have any liability whatsoever with respect to, or be
required to satisfy in any manner, whether at law or in equity, whether by payment, setoff or
otherwise, directly or indirectly, (a) any Claim other than (x) an Assumed Liability or (y) a
Claim against any "Purchased Company" (as such term is defined in the Purchase Agreement) or
(b) any successor liability for any of the Debtors.  (See May 27, 2009 Hearing Tr. (Testimony of
Alfredo Altavilla)).

BB.    Without limiting the generality of the foregoing, the Purchase Agreement
provides the Debtors with reasonably equivalent value and fair consideration (as those terms are
defined in the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act and
the Bankruptcy Code), and was not entered into for the purpose or, nor does it have the effect of,
hindering, delaying or defrauding creditors of any of the Debtors under any applicable laws.
Except for the Assumed Liabilities, the Sale Transaction shall not impose or result in the
imposition of any liability or responsibility on Purchaser or its affiliates, successors or assigns or

any of their respective assets (including the Purchased Assets), and the transfer of the Purchased

Assets to the Purchaser does not and will not subject the Purchaser or its affiliates, successors or

assigns or any of their respective assets (including the Purchased Assets), to any liability for any

Claims, including, without limitation, for any successor liability or any products liability for the

sale of any vehicles by the Debtors or their predecessors or affiliates, except as expressly

identified as an Assumed Liability.

### ASSUMPTION AND ASSIGNMENT OF THE ASSUMED AGREEMENTS

CC.    The assumption and assignment of the Assumed Agreements are integral

to the Purchase Agreement, are in the best interests of the Debtors and their estates and represent

the reasonable exercise of the Debtors' sound business judgment.  (See May 27, 2009 Hearing

Tr. (Testimony of Alfredo Altavilla); May 28, 2009 Hearing Tr. (Testimony of David Curson);

May 28, 2009 Hearing Tr. (Testimony of Peter Grady); May 27, 2009 Hearing Tr. (Testimony of

Thomas Lasorda); May 28, 2009 Hearing Tr. (Testimony of Robert Nardelli); May 28, 2009

Hearing Tr. (Testimony of James Chapman)).

DD.    With respect to each of the Assumed Agreements, the Debtors have met

all requirements of section 365(b) of the Bankruptcy Code.  Further, the Purchaser has provided

all necessary adequate assurance of future performance under the Assumed Agreements in

satisfaction of sections 365(b) and 365(f) of the Bankruptcy Code.  (See May 27, 2009 Hearing

Tr. (Testimony of Alfredo Altavilla)).  Accordingly, the Assumed Agreements can be assumed

by the Debtors and assigned to the Purchaser, as provided for in the Contract Procedures set forth

in the Bidding Procedures Order, the Sale Motion and the Purchase Agreement.  The Contract

Procedures are fair, appropriate and effective and, upon the payment by the Purchaser of all Cure

Costs (which costs are the sole obligation of the Purchaser under the Purchase Agreement) and

the payment of such other obligations assumed pursuant to this Sale Order and approval of the

assumption and assignment for a particular Assumed Agreement thereunder, the Debtors shall be

forever released from any and all liability under the Assumed Agreement.

EE.    The Purchaser has acknowledged that it will be required to comply with

the National Traffic and Motor Vehicle Safety Act, as amended and recodified ("NTMVSA"), as

applicable to the business of the Purchaser after the Closing Date. In addition, the Purchaser has

agreed to assume as Assumed Liabilities under the Purchase Agreement and this Sale Order the

Debtors' notification, remedy and other obligations under 49 U.S.C. §§ 30116 through 30120 of

the NTMVSA relating to vehicles manufactured by the Debtors prior to the Closing Date that

have a defect related to motor vehicle safety or do not to comply with applicable motor vehicle

safety standards prescribed under the NTMVSA. The Purchaser shall not otherwise be liable for

any failure by the Debtors to comply with the provisions of the NTMVSA.

FF.    For the avoidance of doubt, and notwithstanding anything else in this Sale

Order to the contrary:

- the Debtors are neither assuming nor assigning to the Purchaser the settlement
  agreement (the "2008 Settlement Agreement") between the Debtors, the UAW
  and certain of the Debtors' retirees, dated March 31, 2008, which was approved
  by the United States District Court for the Eastern District of Michigan on
  July 31, 2008, in the class action of *Int'l Union, UAW, et al. v. Chrysler, LLC*,
  Case No. 07-CV-14310 (E.D. Mich. filed Oct. 11, 2007) and established, among
  other things, an independent Voluntary Employee Beneficiary Association
  (the "VEBA") that would become responsible for retiree health care on behalf of
  current and future UAW retirees of the Debtors and their surviving spouses and
  eligible dependents (the "*English* Case VEBA") (DX 4; May 28, 2009 Hearing Tr.
  (Testimony of David Curson));

- the 2007 Chrysler-UAW National Agreement, including (1) the Production,
  Maintenance and Parts National Agreement, (2) the Engineering Office &
  Clerical National Agreement, (3) the Toledo Assembly Plant/Jeep Unit, Local 12
  Agreement, (4) Daimler Chrysler Financial Services North America, LLC
  (Farmington) and (5) Daimler Chrysler Financial Services North America, LLC
  (Detroit), and all appendices, memoranda of understanding, supplemental
  agreements, local agreements and benefit plans, as modified effective
  April 30, 2009 (the "UAW CBA"), shall be assumed by the Debtors and assigned
  to the Purchaser pursuant to this Sale Order and section 365 of the Bankruptcy

Code.  Assumption and assignment of the UAW CBA is integral to the Sale
Transaction and the Purchase Agreement, is in the best interests of the Debtors
and their estates, creditors, employees and retirees and represent the reasonable
exercise of the Debtors' sound business judgment (See May 28, 2009 Hearing Tr.
(Testimony of David Curson));

- the UAW, as the exclusive collective bargaining representative of employees of
  the Purchaser and the "authorized representative" of UAW-represented retirees of
  the Debtors under section 1114(c) of the Bankruptcy Code, and the Purchaser
  engaged in good faith negotiations in conjunction with the Sale Transaction
  regarding the funding of retiree health benefits within the meaning of
  section 1114(a) of the Bankruptcy Code.  Conditioned upon the consummation of
  the Sale Transaction and the assumption and assignment of the UAW CBA, the
  UAW and the Purchaser have entered into a Retiree Settlement Agreement
  (the "UAW Retiree Settlement Agreement"), which, among other things, provides
  for the financing by the Purchaser of modified retiree health care obligations for
  the Class and Covered Group (as defined in the UAW Retiree Settlement
  Agreement) through contributions by the Purchaser to the *English* Case VEBA.
  The Debtors, the Purchaser and the UAW specifically intend that their actions in
  connection with the UAW Retiree Settlement Agreement and related undertakings
  incorporate the compromise of certain claims and rights and shall be deemed to
  satisfy the requirements of 29 U.S.C. § 186(c)(2) (See DX 4; May 28, 2009
  Hearing Tr. (Testimony of David Curson)); and

- the Debtors' sponsorship of the Internal Existing VEBA (as defined in the UAW
  Retiree Settlement Agreement) shall be transferred to the Purchaser under the
  Purchase Agreement (See DX 64, at § 6.08).

### VALIDITY OF THE TRANSFER

GG.    As of the closing of the Sale Transaction (the "Closing"), the transfer of

the Purchased Assets to the Purchaser will be a legal, valid and effective transfer of the

Purchased Assets, and will vest the Purchaser with all right, title and interest of the Debtors in

and to the Purchased Assets, free and clear of all Claims other than Assumed Liabilities.

HH.    With the entry of this Sale Order, the Debtors (1) have full corporate

power and authority to execute the Purchase Agreement and all other documents contemplated

thereby, and the Sale Transaction has been duly and validly authorized by all necessary corporate

action of the Debtors; (2) have all of the corporate power and authority necessary to consummate

the transactions contemplated by the Purchase Agreement; (3) have taken all actions necessary to

authorize and approve the Purchase Agreement and the consummation by the Debtors of the

transactions contemplated thereby; and (4) upon entry of this Sale Order, need no consents or

approvals, other than those expressly provided for in the Purchase Agreement, which may be

waived by the Purchaser, to consummate such transactions. (See DX 38; DX 64 at Art. IV-A).

      II.     To the extent that the right, title and interest of the Debtors in and to any

of the Purchased Assets ultimately is transferred to the Purchaser after the Closing pursuant to a

plan of reorganization confirmed in these chapter 11 cases, such transfer shall be deemed a

transfer pursuant to section 1146 of the Bankruptcy Code and shall not be taxed under any law

imposing a stamp, transfer or any other similar tax.

### PERSONALLY IDENTIFIABLE INFORMATION

      JJ.     The Debtors currently maintain certain privacy policies that govern the use

of "personally identifiable information" (as such term is defined by section 101(41A) of the

Bankruptcy Code) in the operation of their businesses. The Debtors propose to sell certain assets

containing personally identifiable information in a manner that is not in compliance with their

current existing privacy policies. As such, in the Bidding Procedures Order, the Court directed

the U.S. Trustee to promptly appoint a consumer privacy ombudsman in accordance with

section 332 of the Bankruptcy Code, and Alan Chapell, CIPP (the "Privacy Ombudsman") was

appointed as a consumer privacy ombudsman under section 332 of the Bankruptcy Code on

May 11, 2009 (Docket No. 594). The Privacy Ombudsman is a disinterested person as required

by section 332(a) of the Bankruptcy Code. The Privacy Ombudsman filed his report with the

Court on May 28, 2009 (Docket No. 2790) (the "Ombudsman Report") and presented his report

at the Sale Hearing, and the Ombudsman Report has been reviewed and considered by the Court.

The Court has given due consideration to the (1) facts, (2) exigent circumstances surrounding

and (3) the conditions of the sale of personally identifiable information in connection with the

NYI-4178439v24                                   -23-

Sale Transaction, including as set forth in the Ombudsman Report. No showing has been made that the sale of personally identifiable information in connection with the Sale Transaction violates applicable non-bankruptcy law, and the Court concludes that such sale is appropriate in conjunction with the Sale Transaction.

**NOW THEREFORE, IT IS HEREBY
ORDERED, ADJUDGED, AND DECREED THAT:**

GENERAL PROVISIONS

1.    The Sale Motion is granted in its entirety and entry into and performance under and in respect of the Purchase Agreement and the Sale Transaction is approved, as set forth in this Sale Order.

2.    The findings of fact and conclusions of law set forth in the Court's Opinion, dated May 31, 2009 (Docket No. 3073), as supplemented by the findings of fact stated above and conclusions of law stated herein shall constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent any finding of fact later shall be determined to be a conclusion of law, it shall be so deemed, and to the extent any conclusion of law later shall be determined to be a finding of fact, it shall be so deemed.

3.    All objections, if any, to the Sale Motion or the relief requested therein that have not been withdrawn, waived or settled as announced to the Court at the Sale Hearing or by stipulation filed with the Court, and all reservations of rights included therein, are hereby overruled on the merits with prejudice, except as expressly provided herein. Attached hereto as Exhibit B is a summary schedule of filed objections and the treatment of each.

# Exhibit 8 (part 4 of 2)

### APPROVAL OF THE PURCHASE AGREEMENT

4.    The Purchase Agreement, all transactions contemplated therein and all of
the terms and conditions thereof are hereby approved, subject to the terms and conditions of this
Sale Order to the extent of any express conflict herewith.  In the event of any direct conflict
between the terms and conditions of the Purchase Agreement and those of this Sale Order as in
effect at the Closing Date, the terms and conditions of this Sale Order shall govern, provided that
no change to this Sale Order made after the Closing Date without the consent of the Purchaser
shall affect the rights or obligations of the Purchaser arising out of or relating to the Purchase
Agreement in any manner.

5.    Pursuant to sections 105, 363 and 365 of the Bankruptcy Code, the
Debtors are authorized and directed to perform their obligations under and comply with the terms
of the Purchase Agreement and consummate the Sale Transaction, pursuant to and in accordance
with the terms and conditions of the Purchase Agreement and this Sale Order.

6.    The Debtors, as well as their affiliates, officers, employees and agents, are
authorized and directed to execute and deliver, and empowered to perform under, consummate
and implement, the Purchase Agreement, in substantially the same form as the Purchase
Agreement attached hereto as Exhibit A, together with all additional instruments and documents
that may be reasonably necessary or desirable to implement the Purchase Agreement and to take
all further actions and execute such other documents as may be (a) reasonably requested by the
Purchaser for the purpose of assigning, transferring, granting, conveying and conferring to the
Purchaser, or reducing to possession, the Purchased Assets (including, but not limited to, all
necessary transition services to be provided to the Purchaser by the Debtors), (b) necessary or
appropriate to the performance of the obligations contemplated by the Purchase Agreement and
(c) as may be reasonably requested by Purchaser to implement the Purchase Agreement and

consummate the Sale Transaction in accordance with the terms thereof, all without further order

of the Court.

7.    This Sale Order and the Purchase Agreement shall be binding in all

respects upon the Purchaser, the Debtors, their affiliates, any trustees appointed in the Debtors'

cases (whether under chapter 11 or chapter 7 of the Bankruptcy Code), all creditors (whether

known or unknown) of any Debtors, all interested parties and their successors and assigns,

including, but not limited to, any party asserting a Claim and any Non-Debtor Counterparty to

the Assumed Agreements. Nothing contained in any chapter 11 plan confirmed in these

bankruptcy cases or the order confirming any such chapter 11 plan shall conflict with or derogate

from the provisions of the Purchase Agreement or this Sale Order, and to the extent of any

conflict or derogation between this Sale Order or the Purchase Agreement and such future plan

or order, the terms of this Sale Order and the Purchase Agreement shall control to the extent of

such conflict or derogation.

8.    All amounts, if any, to be paid by Debtors' pursuant to the Purchase

Agreement shall constitute administrative expenses pursuant to sections 503(b) and 507(a)(1) of

the Bankruptcy Code and shall be due and payable if and when any Debtors' obligations arise

under the Purchase Agreement without further order of the Court.

### TRANSFER OF PURCHASED ASSETS FREE AND CLEAR

9.    Pursuant to sections 105(a) and 363(f) of the Bankruptcy Code,

the Debtors are authorized and directed to transfer the Purchased Assets in accordance with the

terms of the Purchase Agreement. The Purchased Assets shall be transferred to the Purchaser,

and upon consummation of the Purchase Agreement, such transfer (a) shall be a valid, legal,

binding and effective transfer; (b) shall vest the Purchaser with all right, title and interest of

the Debtors in the Purchased Assets; and (c) shall be free and clear of all Claims except for

Assumed Liabilities with all such Claims to attach to the proceeds of the Sale Transaction

ultimately attributable to the Purchased Assets against or in which such Claims are asserted, or

other specifically dedicated funds, in the order of their priority, with the same validity, force and

effect which they now have as against the Purchased Assets, subject to any rights, claims and

defenses the Debtors or their estates, as applicable, may possess with respect thereto.

        10.     In connection with the transfer of the Purchased Assets to the Purchaser

(a) the Debtors are authorized and directed to execute, deliver and perform their obligations

under the First Priority Consent, including by indefeasibly paying, or causing the indefeasible

payment of, immediately upon consummation of such transfer of the Purchased Assets,

$2 billion in immediately available funds to the First Priority Agent to be applied as set forth in

the First Priority Consent; and (b) Wilmington Trust Company as Collateral Trustee under the

CTA is authorized and directed to comply with the Direction Letter dated as of May 27, 2009

delivered to it by the First Priority Agent as "Controlling Party" under the CTA, including by

executing and delivering such documents as are necessary to permit the transfer of the Purchased

Assets free and clear of liens on the Purchased Assets held by Wilmington Trust Company as

Collateral Trustee under the CTA.

        11.     Notwithstanding paragraph 15 below or anything to the contrary in this

Sale Order or the Purchase Agreement, (a) any Purchased Asset that is subject to any mechanics',

carriers', workers', repairers', shippers', marine cargo, construction, toolers', molders' or similar

lien or any statutory lien on real and personal property for property taxes not yet due shall

continue to be subject to such lien after the Closing Date if and to the extent that such lien (i) is

valid, perfected and enforceable as of the Petition Date (or becomes valid, perfected and

enforceable after the Petition Date as permitted by section 546(b) or 362(b)(18) of the

Bankruptcy Code), (ii) could not be avoided by any Debtor under sections 544 to 549, inclusive,

of the Bankruptcy Code or otherwise, were the Closing not to occur; and (iii) the Purchased

Asset subject to such lien could not be sold free and clear of such lien under applicable non-

bankruptcy law, and (b) any Liability as of the Closing Date that is secured by a lien described in

clause (a) above (such lien, a "Continuing Lien") that is not otherwise an Assumed Liability shall

constitute an Assumed Liability with respect to which there shall be no recourse to the Purchaser

or any property of the Purchaser other than recourse to the property subject to such Continuing

Lien. The Purchased Assets are sold free and clear of any reclamation rights; *provided, however,*

that nothing, in this Sale Order or the Purchase Agreement shall in any way impair the right of

any claimant against the Debtors with respect to any alleged reclamation right to the extent such

reclamation right is not subject to the prior rights of a holder of a security interest in the goods or

proceeds with respect to which such reclamation right is alleged, or impair the ability of a

claimant to seek adequate protection against the Debtors with respect to any such alleged

reclamation right.  Further, nothing in this Sale Order or the Purchase Agreement shall prejudice

any rights, defenses, objections or counterclaims that the Debtors, the Purchaser,

the U.S. Treasury, EDC, the Creditors' Committee or any other party in interest may have with

respect to the validity or priority of such asserted liens or rights, or the type (or amount), if any,

of required adequate protection.

        12.    Except as otherwise provided in the Purchase Agreement, all persons and

entities (and their respective successors and assigns), including, but not limited to, all debt

security holders, equity security holders, affiliates, governmental, tax and regulatory authorities,

lenders, customers, dealers, employees, trade creditors, litigation claimants and other creditors,

holding Claims (whether legal or equitable, secured or unsecured, known or unknown, matured

or unmatured, contingent or non-contingent, liquidated or unliquidated, senior or subordinated)
except for Assumed Liabilities or Claims against any Purchased Company, arising under or out
of, in connection with, or in any way relating to, the Debtors, the Purchased Assets, the operation
of the Business prior to Closing or the transfer of the Purchased Assets to the Purchaser, are
hereby forever barred, estopped and permanently enjoined from asserting such Claims against
the Purchaser, its successors or assigns, its property or the Purchased Assets. No such persons or
entities shall assert against the Purchaser or their successors in interest any Claim arising from,
related to or in connection with the ownership, sale or operation of any Asset prior to the
Closing, except for Assumed Liabilities.

       13.    This Sale Order (a) shall be effective as a determination that, as of the
Closing, (i) no Claims other than (x) Assumed Liabilities relating to the Purchased Assets or
(y) Claims against any Purchased Company, will be assertable against the Purchaser, its
affiliates, successors or assigns or any of their respective assets (including the Purchased Assets),
(ii) the Purchased Assets shall have been transferred to the Purchaser free and clear of all Claims
and (iii) the conveyances described herein have been effected; and (b) is and shall be binding
upon and govern the acts of all entities, including, without limitation, all filing agents, filing
officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of
deeds, registrars of patents, trademarks or other intellectual property, administrative agencies,
governmental departments, secretaries of state, federal and local officials and all other persons
and entities who may be required by operation of law, the duties of their office or contract, to
accept, file, register or otherwise record or release any documents or instruments, or who may be
required to report or insure any title or state of title in or to any lease; and each of the foregoing
persons and entities is hereby directed to accept for filing any and all of the documents and

instruments necessary and appropriate to consummate the transactions contemplated by the

Purchase Agreement.

14.    If any person or entity that has filed financing statements, mortgages,

mechanic's liens, *lis pendens* or other documents or agreements evidencing Claims against or in

the Debtors or the Purchased Assets shall not have delivered to the Debtors prior to the Closing

of the Sale Transaction, in proper form for filing and executed by the appropriate parties,

termination statements, instruments of satisfaction, releases of all interests that the person or

entity has with respect to the Debtors or the Purchased Assets or otherwise, then only with regard

to Purchased Assets that are purchased by the Purchaser pursuant to the Purchase Agreement and

this Sale Order (a) the Debtors are hereby authorized and directed to execute and file such

statements, instruments, releases and other documents on behalf of the person or entity with

respect to the Purchased Assets; and (b) the Purchaser is hereby authorized to file, register or

otherwise record a certified copy of this Sale Order, which, once filed, registered or otherwise

recorded, shall constitute conclusive evidence of the release of all Claims against the applicable

Purchased Assets other than the Assumed Liabilities.  This Sale Order is deemed to be in

recordable form sufficient to be placed in the filing or recording system of each and every

federal, state, or local government agency, department or office.

15.    All persons or entities in possession of some or all of the Purchased Assets

are directed to surrender possession of such Purchased Assets to the Purchaser or its respective

designees at the time of the Closing of the Sale Transaction.

16.    Following the Closing of the Sale Transaction, no holder of any Claim

shall interfere with the Purchaser's title to or use and enjoyment of the Purchased Assets based

on or related to any such Claim, or based on any actions the Debtors may take in their chapter 11

cases.

17.    All persons and entities are prohibited and enjoined from taking any action

to adversely affect or interfere with the ability of the Debtors to transfer the Purchased Assets to

the Purchaser in accordance with the Purchase Agreement and this Sale Order.

18.    To the extent provided by section 525 of the Bankruptcy Code, no

governmental unit may revoke or suspend any permit or license relating to the operation of the

Purchased Assets sold, transferred or conveyed to the Purchaser on account of the filing or

pendency of these chapter 11 cases or the consummation of the Sale Transaction contemplated

by the Purchase Agreement.

19.    Notwithstanding anything else contained herein or in the Purchase

Agreement, in connection with the purchase of the Debtors' brands and related Purchased Assets,

the Purchaser, from and after the Closing, will recognize, honor and pay liabilities under Lemon

Laws for additional repairs, refunds, partial refunds (monetary damages) or replacement of a

defective vehicle (including reasonable attorneys' fees, if any, required to be paid under such

Lemon Laws and necessarily incurred in obtaining those remedies), and for any regulatory

obligations under such Lemon Laws arising now, including but not limited to cases resolved

prepetition or in the future, on vehicles manufactured by the Debtors in the five years prior to the

Closing (without extending any statute of limitations provided under such Lemon Laws), but in

any event not including punitive, exemplary, special, consequential or multiple damages or

penalties and not including any claims for personal injury or other consequential damages that

may be asserted in relationship to such vehicles under the Lemon Laws.  As used herein, "Lemon

Law" means a federal or state statute, including, but not limited to, claims under the Magnuson-

Moss Warranty Act based on or in conjunction with a state breach of warranty claim, requiring a

manufacturer to provide a consumer remedy when the manufacturer is unable to conform the

vehicle to the warranty after a reasonable number of attempts as defined in the applicable statute.

In connection with the foregoing, the Purchaser has agreed to continue addressing Lemon Law

claims (to the extent that they are Assumed Liabilities) using the same or substantially similar

procedural mechanisms previously utilized by the Debtors.

20.    The Purchased Owned Real Property and PP&E (as such terms are defined

in the Purchase Agreement) that, as of the Closing, are subject to existing statutory liens or any

liens that may be created or perfected in accordance with section 362(b)(18) of the Bankruptcy

Code shall be transferred to the Purchaser subject to (a) any applicable property taxes for the tax

year 2009 (collectively, the "2009 Property Taxes") owed to state and local taxing authorities in

the United States (collectively, the "Relevant Taxing Authorities") and (b) any liens related to

such 2009 Property Taxes. The 2009 Property Taxes shall be paid by the Purchaser; however, as

between the Purchaser and the Debtors such 2009 Property Taxes shall be prorated as of the

Closing Date and settled upon receipt of the relevant property tax bills. The Relevant Taxing

Authorities shall bill their 2009 Property Taxes to the Purchaser in the ordinary course, not as an

expedited or jeopardy assessment.

21.    The Debtors shall deposit designated funds in the amount of $63 million in

a dedicated escrow account (the "Tax Escrow") to satisfy sales and use taxes, Michigan business

taxes and other taxes owed to the Relevant Taxing Authorities in respect of any of the Debtors

(including predecessors of the Debtors) and not covered by paragraph 20 above, to the extent

such taxes are (a) secured taxes or may become secured by liens that may be created or perfected

in accordance with section 362(b)(18) of the Bankruptcy Code or (b) of the nature authorized to

be paid under the Order, Pursuant to Sections 105(a), 363(b), 507(a) and 541 of the Bankruptcy

Code, Authorizing the Debtors and Debtors in Possession to Pay Certain Prepetition Taxes

(Docket No. 355) to the extent such taxes were or may be asserted or assessed against

individuals (collectively, the "Additional Taxes"). Any Claims for Additional Taxes shall attach

to, and be satisfied from, the Tax Escrow.

   22. (a) Notwithstanding any contrary provision of this Sale Order or the

Purchase Agreement, the 61 Vehicles, as described and defined in the response of Wilmington

Trust Company to the Sale Motion (Docket No. 1188), will be treated as Excluded Assets that

will not be transferred to the Purchaser.

    (b) Pursuant to sections 105(a), 363 and 365 of the Bankruptcy Code,

the Debtors' assumption and assignment to the Purchaser of all of the Debtors' right, title and

interest in or under the Debtors' guaranteed depreciation program agreement and ancillary

agreements related thereto (collectively, the "GDP Agreement") with Dollar Thrifty Automotive

Group, Inc. and its affiliates (collectively, "DTAG") are hereby approved, and all requirements

of section 365 of the Bankruptcy Code are hereby deemed satisfied as of the date of, and

effective only upon, the Closing of the Sale Transaction. DTAG has consented to such

assumption and assignment and agrees that, subject to payment of Cure Costs, such assumption

and assignment shall not constitute an event of default thereunder or permit the termination

thereof. The Debtors and DTAG shall confer in good faith to determine the amount of the Cure

Costs to be paid under the GDP Agreement. If the Debtors and DTAG are unable to reach a

resolution of such cure cost amount, either of such parties may apply to the Court for an order,

upon notice and a hearing, determining the correct Cure Cost amount.

(c)    All obligations of Chrysler LLC under the GMAC MAFA Term

Sheet (the "GMAC Term Sheet") attached to the Purchase Agreement as Exhibit A, or if

executed, the definitive GMAC Master Autofinance Agreement, which agreement shall be

substantially on the same terms as the GMAC Term Sheet or the Annexes thereto, as well as any

intellectual property licensing agreements entered into connection therewith and all the other

agreements that are specified in the GMAC Term Sheet, including, without limitation, one or

more repurchase agreements with substantially the same terms as set forth in Annex D to

Exhibit A of the Purchase Agreement (collectively with the GMAC Term Sheet, the "GMAC

MAFA Documents") shall be assigned by the Debtors to the Purchaser, and the Purchaser shall

be deemed to have assumed the GMAC MAFA Documents, pursuant to this Sale Order and the

Bidding Procedures Order, and each non-Debtor party to the GMAC MAFA Documents shall be

deemed to have consented to such assumption and assignment. Assumption and assignment of

the GMAC MAFA Documents are integral to the Sale Transaction and the Purchase Agreement,

are in the best interests of the Debtors and their estates, creditors, employees and retirees and

represent the reasonable exercise of the Debtors' sound business judgment.

(d)    At the Purchaser's written election, to be made by notice to

Chrysler Financial Services Americas LLC ("Chrysler Financial") no later than June 12, 2009, or

such other date as the Purchaser and Chrysler Financial may agree, either: (i) (A) the vehicles

related to unperformed or partially unperformed repurchase obligations arising from or related to

agreements between the Debtors and dealers whose dealerships were terminated prepetition, or

arising from or related to prepetition agreements between Chrysler Financial and the Debtors

(collectively, the "Repurchased Vehicles"), and (B) the vehicles commonly referred to by

Chrysler Financial and the Debtors as "conversion vehicles" that are currently in the possession

of entities that convert such vehicles into "conversion vehicles" (together with Repurchased

Vehicles, the "Conversion and Repurchased Vehicles"), will be treated as "Excluded Assets" that

will not be transferred to the Purchaser; or (ii) will be treated as Purchased Assets and the alleged

liens in favor of Chrysler Financial or its affiliates on the Conversion and Repurchased Vehicles

will be Continuing Liens to the extent they meet the requirements of subparagraphs 11(a)(i)

through (iii) above.

(e)    Chrysler Financial and its affiliates object to the sale to the

Purchaser of any insurance policy, surety bond or related indemnity arrangement to the extent

that it (i) is an executory contract to extend a financial accommodation or a personal services

contract and therefore not assumable and assignable to the Purchaser pursuant to section

365(c)(1) or (c)(2) of the Bankruptcy Code or (ii) is property the sale of which is not permitted

under state or contract law and that entitles Chrysler Financial and its affiliates to adequate

protection pursuant to section 363(e) of the Bankruptcy Code or that may not be sold free and

clear of the interests of Chrysler Financial and its affiliates pursuant to section 363(f) of the

Bankruptcy Code.  The parties reserve all rights (including, without limitation, any rights under

the Contract Procedures and, in the case of the Purchaser, any rights against the Debtors pursuant

to Sections 2.11 and 2.12 of the Purchase Agreement) and agree that no such policy, bond or

arrangement shall be deemed to be transferred to Purchaser and that no liens, rights of setoff,

equitable subrogation or equitable lien arising in favor of Chrysler Insurance Company, as

insurer or surety, as against any Debtor's estate shall be terminated, diminished or affected by

reason of any provision of the Purchase Agreement or this Sale Order until such objections are

resolved by the Court.

23.     Nothing in this Sale Order or in the Purchase Agreement releases, nullifies or enjoins the enforcement of any liability to a governmental unit under police and regulatory statutes or regulations that any entity would be subject to as the owner or operator of property after the date of entry of this Sale Order.

### APPROVAL OF UAW RETIREE SETTLEMENT AGREEMENT

24.     The UAW Retiree Settlement Agreement, all transactions contemplated therein and all of the terms and conditions thereof are fair, reasonable and in the best interests of the retirees and are hereby approved.  The Debtors, the Purchaser and the UAW are authorized to perform their obligations under, or in connection with, the implementation of the UAW Retiree Settlement Agreement and comply with the terms of the UAW Retiree Settlement Agreement pursuant to and in accordance with the terms and conditions of the UAW Retiree Settlement Agreement and this Sale Order.  The Trust Amendments are hereby approved and the *English Case* VEBA Trust Agreement is reformed accordingly (as such terms are defined in the UAW Retiree Settlement Agreement).

### ASSUMPTION AND ASSIGNMENT OF ASSUMED AGREEMENTS

25.     Pursuant to sections 105(a), 363 and 365 of the Bankruptcy Code, and in accordance with the Contract Procedures, the Debtors' assumption and assignment or other transfer to the Purchaser of all of the Debtors' right, title and interest in or under the Assumed Agreements are hereby approved, with only such exceptions as Purchaser may agree in writing, and all requirements of section 365 of the Bankruptcy Code are hereby deemed satisfied.  For the avoidance of doubt, subject to the Contract Procedures (including the resolution of any Section 365 Objection and the issuance of a Confirmation Notice, as set forth in the Bidding Procedures Order), the Debtors shall be deemed to have assumed and assigned each of the Assumed Agreements as of the date of and effective only upon the Closing of the Sale Transaction and,

absent such Closing, each of the Assumed Agreements shall neither be deemed assumed nor

assigned and shall in all respects be subject to subsequent assumption or rejection by the Debtors

under the Bankruptcy Code.

26.    Except as provided herein, the Debtors are hereby authorized in

accordance with sections 105(a) and 365 of the Bankruptcy Code and the Contract Procedures to

assume and assign, sell and otherwise transfer the Assumed Agreements of all of the Debtors'

right, title or interest therein or thereunder to the Purchaser free and clear of all Claims, and to

execute and deliver to the Purchaser such documents or other instruments as may be necessary to

assign and transfer the Assumed Agreements to the Purchasers.

27.    In accordance with the Contract Procedures, the Assumed Agreements

shall be transferred to, and remain in full force and effect for the benefit of, the Purchaser in

accordance with their respective terms, notwithstanding any provision in any such Assumed

Agreement (including those of the type described in sections 365(e)(1) and (f) of the Bankruptcy

Code) that prohibits, restricts or conditions such assignment or transfer.  There shall be no rent

accelerations, assignment fees, penalties, increases or any other fees charged to the Purchaser or

the Debtors as a result of the assumption or assignment of the Assumed Agreements.  No

Assumed Agreement may be terminated, or the rights of any party modified in any respect,

including pursuant to any "change of control" clause, by any other party thereto as a result of the

transactions contemplated by the Purchase Agreement.

28.    To the extent that the Purchaser exercises its right to exclude any Assumed

Agreement from the Sale Transaction prior to the applicable Agreement Assumption Date, such

Assumed Agreement shall (a) be deemed never to have been assumed by the Debtors or assigned

to the Purchaser and (b) remain subject to assumption, rejection or assignment by the Debtors at any time in the future.

29.    Except as may be otherwise agreed to by the parties to an Assumed Agreement, the Cure Costs under the Assumed Agreements shall be paid by the Purchaser as soon as practicable and in no event later than ten days after the later of (a) the Closing of the Sale Transaction or (b) following the date on which such Assumed Agreement is deemed assumed and assigned in accordance with the Contract Procedures. With respect to Disputed Cure Costs, the Purchaser shall reserve sufficient funds to pay the full amount of any Disputed Cure Costs related to the Sale Transaction until such time as there is a resolution among the parties or a final order of this Court determining the correct Cure Costs. In addition to the Cure Costs (but without duplication), the Purchaser will assume and pay, in the ordinary course of business and as they come due, all amounts for goods delivered and services provided prepetition for which payment was not due as of the Petition Date and for postpetition goods delivered and services provided to the Debtors under each Assumed Agreement to the extent due and payable and not otherwise paid by the Debtors.

30.    Payment of the Cure Costs shall be a full satisfaction of any and all defaults under the Assumed Agreements, whether monetary or non-monetary, and upon payment of the Cure Costs any default of the Debtors thereunder shall have been irrevocably cured. Upon the assumption and assignment of an Assumed Agreement under the Contract Procedures, the Debtors shall be released from any liability whatsoever arising under the Assumed Agreements and the Cure Costs and ongoing obligations under the Assumed Agreement shall be solely the obligation of the Purchaser. Except as otherwise provided in this Sale Order, each Non-Debtor Counterparty to an Assumed Agreement hereby is forever barred, estopped and

permanently enjoined from asserting against the Debtors or the Purchaser, their successors or

assigns or the property of any of them, any default existing as of the date of the assumption of

the Assumed Agreement.

31.    The failure of the Debtors or the Purchaser to enforce at any time one or

more terms or conditions of any Assumed Agreement shall not be a waiver of such terms or

conditions, or of the Debtors' and the Purchaser's rights to enforce every term and condition of

the Assumed Agreements.

32.    Upon the Agreement Assumption Date (or such earlier date as set forth in

the Contract Procedures), the Purchaser shall be fully and irrevocably vested with all right, title

and interest of the Debtors under the Assumed Agreements.

33.    The assignments of each of the Assumed Agreements are made in good

faith under sections 363(b) and (m) of the Bankruptcy Code.

34.    In connection with the foregoing and consistent with the Contract

Procedures, the Purchaser and the Creditors' Committee have agreed to the following:  (a) no

later than the second calendar day after the initial Section 365 Objection Deadline, the Purchaser

will serve Confirmation Notices on the applicable Non-Debtor Counterparties; (b) no later than

the second calendar day after the initial Section 365 Hearing, the Purchaser will serve additional

Confirmation Notices on the applicable Non-Debtor Counterparties; (c) the Purchaser and the

Creditors' Committee acknowledge that, if the Closing occurs prior to June 12, 2009, the terms

of the Contract Procedures provide that the Assurance Letter procedure will not apply; and

(d) paragraph 20 of the Bidding Procedures Order is clarified to provide that all Designated

Agreements (rather than all contracts) that have not become Confirmed Contracts as of the

Closing Date shall constitute "Excluded Contracts" for purposes of the Purchase Agreement

(without any requirement to update the Company Disclosure Letter) unless such Designated

Agreements subsequently become Confirmed Contracts in accordance with the Contract

Procedures. The failure of the Purchaser to deliver a Confirmation Notice with respect to any

Non-Debtor Counterparty as contemplated in clause (a) and (b) of this paragraph 34, whether

because the parties have not agreed to Cure Costs or otherwise, shall not preclude the ability of

the Purchaser to deliver a Confirmation Notice to such Non-Debtor Counterparty after such time

and prior to the "Final Designation Date" (as defined in the Bidding Procedures Order).

### ADDITIONAL PROVISIONS

35.    Except for the Assumed Liabilities expressly set forth in the Purchase

Agreement or described therein or Claims against any Purchased Company, none of the

Purchaser, its successors or assigns or any of their respective affiliates shall have any liability for

any Claim that (a) arose prior to the Closing Date, (b) relates to the production of vehicles prior

to the Closing Date or (c) otherwise is assertable against the Debtors or is related to the

Purchased Assets prior to the Closing Date. The Purchaser shall not be deemed, as a result of

any action taken in connection with the Purchase Agreement or any of the transactions or

documents ancillary thereto or contemplated thereby or the acquisition of the Purchased Assets,

to:  (a) be a legal successor, or otherwise be deemed a successor to the Debtors (other than with

respect to any obligations arising under the Assumed Agreements from and after the Closing);

(b) have, *de facto* or otherwise, merged with or into the Debtors; or (c) be a mere continuation or

substantial continuation of the Debtors or the enterprise of the Debtors. Without limiting the

foregoing, the Purchaser shall not have any successor, derivative or vicarious liabilities of any

kind or character for any Claims, including, but not limited to, on any theory of successor or

transferee liability, *de facto* merger or continuity, environmental, labor and employment,

products or antitrust liability, whether known or unknown as of the Closing, now existing or
hereafter arising, asserted or unasserted, fixed or contingent, liquidated or unliquidated.

36.     The Purchaser (or its designee) is authorized and directed, in accordance
with Section 5.20 of the Purchase Agreement, to substitute, backstop or replace, as the case may
be, in a manner reasonably satisfactory to the Debtors, those letters of credit existing as of the
Closing that secure future obligations of the Purchaser under an Assumed Agreement and are
identified in writing by the Debtors as part of the Cure Costs. The Purchaser shall cause the
originals of any such substituted or replaced letters of credit to be returned to the Debtors or the
issuer thereof with no further drawings made thereunder.

37.     The Purchaser is hereby granted a first priority lien and super-priority
administrative claim over the proceeds of any tax refunds (including interest thereon), returns of
withholding taxes or similar payments, and any proceeds of tax sharing, contribution or similar
agreements (in each case, other than on refunds due to be paid to third parties pursuant to the
Original Contribution Agreement, as defined in the Purchase Agreement) to secure the payment
of all amounts due to the Purchaser from any of the Debtors under the tax indemnities in
Article 9 of the Purchase Agreement.

38.     Effective upon the Closing and except as otherwise set forth herein or
provided by stipulations filed with or announced to the Court with respect to a specific matter, all
persons and entities are forever prohibited and enjoined from commencing or continuing in any
matter any action or other proceeding, whether in law or equity, in any judicial, administrative,
arbitral or other proceeding against the Purchaser, its successors and assigns, or the Purchased
Assets, with respect to any (a) Claim other than (i) Assumed Liabilities or (ii) Claims against any
Purchased Company or (b) successor liability of the Purchaser for any of the Debtors, including,

without limitation, the following actions with respect to clauses (a) and (b):  (i) commencing or

continuing any action or other proceeding pending or threatened against the Debtors as against

the Purchaser, or its successors, assigns, affiliates or their respective assets, including the

Purchased Assets; (ii) enforcing, attaching, collecting or recovering in any manner any judgment,

award, decree or order against the Debtors as against the Purchaser or its successors, assigns,

affiliates or their respective assets, including the Purchased Assets; (iii) creating, perfecting or

enforcing any lien, claim, interest or encumbrance against the Debtors as against the Purchaser or

its successors, assigns, affiliates or their respective assets, including the Purchased Assets;

(iv) asserting any setoff, right of subrogation or recoupment of any kind (in the case of

recoupment only, except as a defense for payment of an obligation other than an Assumed

Agreement) for any obligation of any of the Debtors as against any obligation due the Purchaser

or its successors, assigns, affiliates or their respective assets, including the Purchased Assets;

(v) commencing or continuing any action, in any manner or place, that does not comply, or is

inconsistent with, the provisions of this Sale Order or other orders of this Court, or the

agreements or actions contemplated or taken in respect thereof; or (vi) revoking, terminating or

failing or refusing to renew any license, permit or authorization to operate any of the Purchased

Assets or conduct any of the businesses operated with such assets.

   39. Except for the applicable Assumed Liabilities, the Purchaser shall not

have any liability or other obligation of the Debtors or their affiliates arising under or related to

the Purchased Assets.  Without limiting the generality of the foregoing, and except as otherwise

specifically provided herein or in the Purchase Agreement, the Purchaser shall not be liable for

any claims against the Debtors or any of their predecessors or affiliates, and the Purchaser shall

have no successor or vicarious liabilities of any kind or character, including, but not limited to,

any theory of antitrust, environmental, successor or transferee liability, labor law, *de facto*
merger or substantial continuity, whether known or unknown as of the Closing, now existing or
hereafter arising, whether fixed or contingent, asserted or unasserted, liquidated or unliquidated,
with respect to the Debtors or their affiliates or any obligations of the Debtors or their affiliates
arising prior to the Closing, including, but not limited to, liabilities on account of any taxes
arising, accruing or payable under, out of, in connection with, or in any way relating to the
operation of the Purchased Assets prior to the Closing of the Sale Transaction.

    40.    Upon the Debtors' assignment of the Assumed Agreements to the
Purchaser under the provisions of this Sale Order and any additional order contemplated by the
Purchase Agreement, no default shall exist under any Assumed Agreement, and no counterparty
to any Assumed Agreement shall be permitted to declare a default by the Purchaser under such
Assumed Agreement or otherwise take action against the Purchaser as a result of any Debtor's
financial condition, bankruptcy or failure to perform any of its obligations under the relevant
Assumed Agreement.

    41.    For the avoidance of doubt:

    (a)    with respect to each Excluded Contract, the Purchaser is not acquiring any
right, title or interest in, to and under such Excluded Contract, including
without limitation any claim, cause of action, right of recoupment or
receivable (whether for money or property), and all rights of a Non-Debtor
Counterparty against the Debtors arising under such Excluded Contract,
including rights of setoff, are not modified or waived;

    (b)    with respect to each Assumed Agreement, nothing in this Sale Order or
the Purchase Agreement affects the contractual rights and remedies of a
Non-Debtor Counterparty under such Assumed Agreement, including,
without limitation, any right of setoff, recoupment, subrogation, indemnity
rights and any defenses to performance, except to the extent such
contractual rights and remedies result from the financial condition or
bankruptcy of a Debtor or arise out of or relate to a default or failure to
perform under such Assumed Agreement at or prior to the time of
assumption and assignment;

(c) with respect to Purchased Assets (whether Assumed Agreements or other Purchased Assets such as Claims and receivables), nothing in this Sale Order or the Purchase Agreement affects any other defense or right of the non-Debtor obligor under applicable law, *provided that* a non-Debtor obligor may not assert any setoff, recoupment or other right or defense to the extent (a) resulting from the financial condition or bankruptcy of a Debtor or arising out of or relating to a default or failure to perform under such Assumed Agreement at or prior to the time of assumption and assignment or (b) arising out of or relating to an Excluded Liability; and

(d) with respect to leases, nothing in this Sale Order or the Purchase Agreement shall (a) affect the rights of any lessor of property leased by a Debtor under an unexpired lease except to the extent such unexpired lease becomes an Assumed Agreement in accordance with the Contract Procedures and applicable law, (b) sell to the Purchaser any leased property not owned by a Debtor or (c) with respect to leases that are Excluded Contracts, affect possessory or ownership rights as against any Debtor or the Purchaser.

42. The Purchaser has given substantial consideration under the Purchase Agreement for the benefit of the holders of Claims. The discrete consideration given by the Purchaser shall constitute valid and valuable consideration for the releases of any potential claims of successor liability of the Purchaser, which releases shall be deemed to have been given in favor of the Purchaser by all holders of any Claims of any kind whatsoever.

43. While the Debtors' bankruptcy cases are pending, this Court shall retain jurisdiction to, among other things, interpret, enforce and implement the terms and provisions of this Sale Order and the Purchase Agreement, all amendments thereto, any waivers and consents thereunder (and of each of the agreements executed in connection therewith in all respects), to adjudicate disputes related to this Sale Order or the Purchase Agreement and to enter any orders under sections 105, 363 and/or 365 (or other relevant provisions) of the Bankruptcy Code with respect to the Assumed Agreements.

44. Nothing in this Sale Order or the Purchase Agreement releases, nullifies, or enjoins the enforcement of any liability to a governmental unit under environmental statutes or

regulations (or any associated liabilities for penalties, damages, cost recovery or injunctive relief)
that any entity would be subject to as the owner or operator of property after the date of entry of
this Sale Order. Notwithstanding the foregoing sentence, nothing in this Sale Order shall be
interpreted to deem the Purchaser as the successor to the Debtors under any state law successor
liability doctrine with respect to any liabilities under environmental statutes or regulations for
penalties for days of violation prior to entry of this Sale Order or for liabilities relating to off-site
disposal of wastes by the Debtors prior to entry of this Sale Order. Nothing in this paragraph
should be construed to create for any governmental unit any substantive right that does not
already exist under law.

45.     No bulk sales law, or similar law of any state or other jurisdiction shall
apply in any way to the transactions contemplated by the Purchase Agreement, the Sale Motion
and this Sale Order.

46.     The transactions contemplated by the Purchase Agreement are undertaken
by the Purchaser in good faith, as that term is used in section 363(m) of the Bankruptcy Code,
and accordingly, the reversal or modification on appeal of the authorization provided herein to
consummate the Sale Transaction shall not affect the validity of the Sale Transaction (including
the assumption and assignment of the Assumed Agreements), unless such authorization is duly
stayed pending such appeal.

47.     The consideration provided by the Purchaser for the Purchased Assets
constitutes reasonably equivalent value and fair consideration (as those terms may be defined in
each of the Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act and
section 548 of the Bankruptcy Code) under the Bankruptcy Code and under the laws of the

United States, any state, territory or possession thereof or the District of Columbia or any other

applicable jurisdiction with laws substantially similar to the foregoing.

48.    The Sale Transaction may not be avoided under section 365(n) of the

Bankruptcy Code.

49.    The terms and provisions of the Purchase Agreement and this Sale Order

shall be binding in all respects upon, and shall inure to the benefit of, the Debtors, their estates,

their creditors, the Purchaser, the respective affiliates, successors and assigns of each, and any

affected third parties, including, but not limited to, all persons asserting claims in the Purchased

Assets to be sold to the Purchaser pursuant to the Purchase Agreement, notwithstanding any

subsequent appointment of any trustee(s), examiner(s) or receiver(s) under any chapter of the

Bankruptcy Code or any other law, and all such provisions and terms shall likewise be binding

on such trustee(s), examiner(s) or receiver(s) and shall not be subject to rejection or avoidance by

the Debtors, their estates, their creditors, their shareholders or any trustee(s), examiner(s), or

receiver(s).

50.    The failure specifically to include any particular provision of the Purchase

Agreement in this Sale Order shall not diminish or impair the effectiveness of such provision, it

being the intent of the Court that the Purchase Agreement and its exhibits and ancillary

documents be authorized and approved in their entirety.

51.    The Purchase Agreement may be modified, amended or supplemented by

the parties thereto, in a writing signed by both parties, and in accordance with the terms thereof,

without further order of the Court, provided that any such modification, amendment or

supplement does not materially change the terms of the Purchase Agreement or modify the

express terms of this Sale Order.

52.    Each and every federal, state and local governmental agency, department
or official is hereby directed to accept any and all documents and instruments necessary and
appropriate to consummate the transactions contemplated by the Purchase Agreement.

53.    Subject to further order of the Court and consistent with the terms of the
Purchase Agreement and the Transition Services Agreement, the Debtors and the Purchaser are
authorized to, and shall, take appropriate measures to maintain and preserve, until the
consummation of any chapter 11 plan for the Debtors, the books, records and any other
documentation, including tapes or other audio or digital recordings and data in or retrievable
from computers or servers relating to or reflecting the records held by the Debtors or their
affiliates relating to the Debtors' businesses.

54.    Consistent with the terms of the Purchase Agreement and the Transition
Services Agreement, the Debtors have agreed to transfer to the Purchaser (or one or more of its
subsidiaries, as applicable) a substantial portion of the Debtors' cash management system
maintained pursuant to an order of this Court (Docket No. 1303) entered on May 20, 2009,
including, without limitation, several bank accounts maintained by the Debtors.  Such cash
management system assets, including such bank accounts, constitute Purchased Assets under the
Purchase Agreement.  Notwithstanding the foregoing transfers, the Debtors will maintain such
bank accounts and a cash management system that is necessary to effect the orderly
administration of the Debtors' chapter 11 estates, including any modifications thereof after the
Closing, to ensure a reasonable accounting and segregation of the Debtors' cash  To the extent
any funds of the Debtors that do not constitute Purchased Assets are held in accounts transferred
to the Purchaser (or one or more of its subsidiaries), such funds shall be promptly returned to the
appropriate Debtor, and such funds shall remain subject to any and all liens of the Debtors'

lienholders thereon. Likewise, to the extent that any funds that constitute Purchased Assets are held in accounts maintained by one or more Debtors after the Closing, such funds shall be promptly transferred to the Purchaser. The applicable Debtors and the Purchaser (and/or one or more of its subsidiaries, as applicable), may execute any agreement, assignment, novation, instrument or other document the parties deem necessary or appropriate to effectuate the transfers described in this paragraph, which is consistent with the general authority to the same provided in paragraph 6 hereof.

57.    Those powers of attorney granted by Chrysler LLC and any of the other Debtors and any related documentation entered into by such entities for the purpose of (a) effectuating the transfers of such entities' interests in their non-debtor foreign affiliates to the Purchaser, Chrysler Motors LLC or their respective designees in connection with consummation of the Sale Transaction or (b) effectuating the transfers of interests in certain foreign affiliates to Chrysler LLC or any of the other Debtors prior to consummation of the Sale Transaction are here by ratified and approved in all respects, regardless of whether such powers of attorney or other documentation were issued or entered into prior to or subsequent to the Petition Date.

56.    The Debtors are hereby authorized and empowered, upon and in connection with the Closing, to change their corporate names and the caption of these chapter 11 cases, consistent with applicable law. The Debtors shall file a notice of change of case caption within one business day of the Closing, and the change of case caption for these chapter 11 cases shall be deemed effective as of the Closing.

57.    As provided by Bankruptcy Rules 6004(h) and 6006(d), this Sale Order shall not be stayed for ten days after its entry and shall be effective as of 12:00 noon, Eastern Time, on Friday June 5, 2009, and the Debtors and the Purchaser are authorized to close the Sale

Transaction on or after 12:00 noon, Eastern Time, on Friday June 5, 2009.[4]  Any party objecting

to this Sale Order must exercise due diligence in filing an appeal and pursuing a stay or risk its

appeal being foreclosed as moot in the event Purchaser and the Debtors elect to close prior to this

Sale Order becoming a Final Order.

      58.    Any amounts payable to the Purchaser shall be paid by the Debtors in the

manner provided in the Purchase Agreement without further order of this Court, shall be an

allowed administrative claim under sections 503(b) and 507(a)(2) of the Bankruptcy Code, shall

be protected as provided in the Bidding Procedures Order and shall not be altered, amended,

discharged or affected by any plan proposed or confirmed in these cases without the prior written

consent of the Purchaser.

      59.    This Court retains jurisdiction to interpret, implement and enforce the

terms and provisions of this Sale Order including to compel delivery of the Purchased Assets, to

protect the Purchaser against any Claims and to enter any orders under sections 105, 363 or 365

(or other applicable provisions) of the Bankruptcy Code to transfer the Purchased Assets and the

Assumed Agreements to the Purchaser.

Dated:  New York, New York
       June 1, 2009

                           **s/Arthur J. Gonzalez**
                           UNITED STATES BANKRUPTCY JUDGE

---

[4] The Court considered the Debtor's request for a waiver of the stay imposed, pursuant to Bankruptcy Rules 6004(h) and 6006(d), objections filed to that request, and Debtors' modified request as of June 1, 2009, whereby Debtors' sought a waiver of the stay imposed to permit a closing to take place on Thursday, June 4, 2009 at 9:00 a.m.  In their modified request, the Debtors reference the deposition testimony of Matthew Feldman, an advisor to the President's Auto Task Force, indicating that the Debtors are losing $100 million a day, and the other exigent circumstances facing Chrysler, including the continuing deterioration of its asset value, its supply chain, and its going-concern value.  The Court determines that a partial waiver of the stay is justified.  Any request to further modify the stay should be made to the appellate court.

# Exhibit 9

Slip Copy, 2010 WL 1416749 (E.D.Cal.)
**(Cite as: 2010 WL 1416749 (E.D.Cal.))**

**H**Only the Westlaw citation is currently available.

United States District Court,
E.D. California.
Daniel Stacey WINN, individually and as successor
in interest to Petra Monika Winn, deceased, Kory
Michael Winn, individually and as successor in inter-
est to Petra Monika Winn, deceased, Breeonna Winn,
individually and as successor in interest to Petra Mo-
nika Winn, deceased, Erika Winn, individually and as
successor in interest to Petra Monika Winn, deceased,
Plaintiffs,
v.
CHRYSLER GROUP, LLC, a Delaware corporation,
successor in interest to Daimler Chrysler Corpora-
tion; Magna Powertrain, Inc.; Magna International of
America, Inc., also known as Magna Powertain;
Great Valley Chrysler Jeep, an unknown business
entity; Enterprise Rent-a-Car Company, a California
corporation; S.J. Denham, Inc., a California corpora-
tion, Deborah Matisengle; et al., Defendants.
**No. 2:09-cv-02805-MCE-GGH.**

April 8, 2010.

R. Ben Hogan, PHV, Hogan Law Office, P.C., Bir-
mingham, AL, Todd Everitt Slaughter, Reiner, Simp-
son and Slaughter, Redding, CA, for Plaintiffs.

John Garland Gherini, Wayne Allen Wolff, Sedg-
wick, Detert, Moran & Arnold LLP, Stephen S. Wal-
ters, Allen Matkins Leck Gamble Mallory & Natsis
LLP, San Francisco, CA, Audrey Ann Smith, Howie
& Smith, LLP, San Mateo, CA, for Defendants.

**ORDER**

MORRISON C. ENGLAND, JR., District Judge.

**\*1** By Memorandum and Order filed December 24,
2009, this Court granted Plaintiffs' Motion to Re-
mand the above-captioned matter back to the Supe-
rior Court of the State of California in and for the
County of Shasta for further adjudication. On De-
cember 31, 2009, Defendant Chrysler Group, LLC
("Chrysler") submitted an Ex Parte Application ask-
ing that the remand order be stayed in order to permit

further briefing. That request was granted on January
29, 2010, with the Court staying this matter pending
its adjudication of a Motion for Reconsideration.
Now before the Court is that reconsideration request,
filed February 10, 2010.

A court should not revisit its own decisions unless
extraordinary circumstances show that its prior deci-
sion was clearly erroneous or would work a manifest
injustice. *Christianson v. Colt Indus. Operating
Corp.,* 486 U.S. 800, 816, 108 S.Ct. 2166, 100
L.Ed.2d 811 (1988). This principle is generally em-
bodied in the law of the case doctrine. That doctrine
counsels against reopening questions once resolved
in ongoing litigation. *Pyramid Lake Paiute Tribe of
Indians v. Hodel,* 882 F.2d 364, 369 (9th Cir.1989).
Nonetheless, in certain limited situations the court
may reconsider its prior decisions.

Reconsideration may be appropriate where 1) the
court is presented with newly discovered evidence; 2)
the court committed clear error or the initial decision
was manifestly unjust; or 3) there is an intervening
change in controlling law. *See Turner v. Burlington
N. Santa Fe R.R. Co.,* 338 F.3d 1058, 1063 (9th
Cir.2003); *School Dist. No. 1J, Multnomah County v.
ACandS, Inc.,* 5 F.3d 1255, 1263 (9th Cir.1993) (cita-
tions and quotations omitted). Local Rule 230(j) si-
milarly requires a party seeking reconsideration to
demonstrate "what new or different facts or circums-
tances are claimed to exist which did not exist or
were not shown upon such prior motion, or what oth-
er grounds exist for the motion," and "why the facts
or circumstances were not shown at the time of the
prior motion."

"Motions for reconsideration serve a limited func-
tion: to correct manifest errors of law or fact or to
present newly discovered evidence." *Ayala v. KC
Envtl. Health,* 426 F.Supp.2d 1070, 1098
(E.D.Cal.2006) (emphasis in original) (internal
citations omitted). Mere dissatisfaction with the court's
order, or belief that the court is wrong in its decision,
are accordingly not sufficient. Reconsideration re-
quests are addressed to the sound discretion of the
district court. *Turner v. Burlington N. Santa Fe R.R.,
supra,* 338 F.3d at 1063.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1416749 (E.D.Cal.)
**(Cite as: 2010 WL 1416749 (E.D.Cal.))**

According to Chrysler, it initially emphasized Plaintiffs' successor liability claims in opposing Plaintiffs' Motion to Remand because in Chrysler's view those claims clearly ran counter to the terms of prior bankruptcy proceedings (which approved its purchase of assets from Chrysler's predecessor in interest, Chrysler Corp. LLC) and accordingly supported the exercise of federal jurisdiction in order to safeguard the bankruptcy court's orders. The successor liability claims against Chrysler were, however, dismissed at a point after briefing on the original Motion to Remand had been completed. Given that change of circumstances, and in view of Chrysler's argument that it would not have relied so exclusively on the successor liability claims to support federal jurisdiction had it known those claims would be dismissed, the Court permitted this Motion in order to afford Chrysler the opportunity to show that a different result is indicated and that the Court should retain jurisdiction on the basis of Plaintiffs' breach of contract claims against Chrysler, alone. [FN1] Consequently, Chrysler urges that the Court reconsider its prior ruling based on facts that had not been previously adduced given the earlier complexion of this case.

> FN1. Those claims are set forth in the Sixth and Seventh Causes of Action contained within Plaintiffs' First Amended Complaint. In its December 14, 2009 Order (at 8:6-9), those claims were identified in error as the Fifth and Sixth Causes of Action.

**\*2** In satisfying its burden in that regard, Chrysler primarily points to the fact that in purchasing its predecessor's assets, it did not expressly assume liabilities arising from the dealership agreement reached with one of the so-called "dealer" defendants involved in this case, Great Valley Chrysler Jeep ("Great Valley").

Chrysler argues that because it can assert that defense with regard to any liability it may have with respect to Great Valley, the Court should retain jurisdiction over this entire case,[FN2] despite the fact that the lawsuit admittedly only alleges claims grounded in state law, and despite the fact Chrysler does not contest that it assumed liability with respect to the other two named dealer defendants, R.J. Denham, Inc. and Enterprise Rent-aCar Company.[FN3]

> FN2. Specifically, Chrysler states as fol-

lows: "Plaintiffs' breach of contract claims, which attempt to enforce the Great Valley Chrysler dealership agreement, are completely contrary to the Bankruptcy Court's Sale Order." Def.'s Mot., 9:23-25. As such, Chrysler maintains that the entire action belongs in federal court so that the bankruptcy court, in turn, can resolve such claims.

> FN3. See Reply, 4:3-9.

The gravamen of Chrysler's argument, then, is because any claims as to the Great Valley dealership agreement undermine the terms of the Sales Order as approved by the bankruptcy court, those claims "have a direct impact on the administration of the bankruptcy estate" and consequently fall within the bankruptcy court's "retained jurisdiction to interpret the force and effect of its Sales Order." Reply, 3:23-26.

This contention loses sight of what appears to be a relatively minor role of Great Valley in this case as a whole. As set forth in the Court's December 24, 2009 Memorandum and Order, this lawsuit is a wrongful death action which claims damages against the manufacturers/suppliers of the Chrysler vehicle driven by Plaintiffs' decedent, Petra Winn, at the time of ths subject accident.

Other named defendants include S.J. Denham, the dealership who bought the Chrysler from Enterprise Rent-a-Car and sold it to Ms. Winn, and the driver of the other vehicle involved in the accident, Deborah Matisengle. Great Valley's dealership role appears to be two layers removed from Petra Winn: the sales transaction it brokered was the initial purchase, by Enterprise. Enterprise, in turn, sold the vehicle to Denham and it was Denham that sold the car to Petra Winn herself. As indicated above, because Chrysler has already assumed the dealership agreements applicable to both Enterprise and Denham, only the first sales transaction (and the one arguably most remote from Petra Winn) falls within the purview of Chrysler's argument for invoking this Court's jurisdiction.

Under 28 U.S.C. § 1334(b), this Court has original, but not exclusive, jurisdiction over cases that either "arise under" or are "related to" bankruptcy cases under Title 11. *Mann v. GTCR Golder Rauner, LLC, 483 F.Supp.2d 884, 894 n. 8 (D.Ariz.2007).* While this Court consequently has the discretion to retain

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1416749 (E.D.Cal.)
**(Cite as: 2010 WL 1416749 (E.D.Cal.))**

this matter to the extent that it bears some relation to the bankruptcy proceedings of Chrysler's predecessor in interest (which it assuredly does), care must nonetheless be taken to avoid construing § 1334(b) too broadly so as to bring into federal court matters that should be left for state courts to decide. *See, e.g., In Matter of FedPak Systems, Inc.,* 80 F.3d 207, 213-14 (7th Cir.1996).

**\*3** As stated in its December 24, 2009 Memorandum and Order, under principles of equitable remand it is proper for this matter to be adjudicated in state court. Equitable remand focuses on the consideration of several factors: "(1) the effect of the action on the administration of the bankruptcy estate; (2) the extent to which the issues of state law predominate; (3) the difficulty of applicable state law: (4) comity; (5) the relatedness or remoteness of the action to the bankruptcy case: (6) the existence of a right to jury trial; and (7) prejudice to the party involuntarily removed from state court. *In the Matter of: Baptist Foundation of Arizona,* 2000 WL 35575676 at \*7 (D.Ariz.1996), citing *Williams v. Shell Oil Co.,* 169 B.R. 684, 692 (S.D.Cal.1994).

As the Court has already explained, weighing these factors tips decisively in favor of remanding this matter back to state court. The actual debtor in bankruptcy, Chrysler Corp. LLC, is not even a party to this lawsuit. Plaintiffs' lawsuit asserts claims sounding exclusively in state law, and to the extent that bankruptcy is a potential issue at all, it affects only a single affirmative defense available to one defendant in this multiple-defendant case. The issue of bankruptcy is therefore, at best, an attenuated one. Finally, to the extent that a bankruptcy defense is appropriate as to Defendant Chrysler, there is no reason why the defense cannot be asserted in state court. State law issues clearly predominate as a whole, and trying this case together in state court, in a forum that can adjudicate this entire matter through a unitary jury trial (a procedure not normally available in bankruptcy court), clearly favors concerns of both judicial economy and comity.

The only reason advanced by Chrysler for federal jurisdiction is to allow its single federal defense as to one defendant to be adjudicated by federal court. This is not enough to counter all the other reasons which plainly favor resolution in state court. Significantly, too, Chrysler has already assumed liability for the

two other dealer defendants, Denham and Enterprise, and is therefore a proper defendant in state court on the breach of contract claims in any event.[FN4]

> [FN4.] These circumstances alone distinguish this case from district court decisions coming to a contrary result, as cited by Chrysler and attached as Exhibits E-G to the Declaration of John Gherini filed in support of the instant Motion. In those cases, unlike the case at bar, there was no indication that Chrysler had properly assumed liability with respect to agreements inuring to the benefit of any other defendant. Moreover, the Court's review of those cases indicates that they revolve primarily around straightforward successor liability, a factor no longer at issue here given Plaintiffs' dismissal of all causes of action directly dependent on such liability.

For all the foregoing reasons, Defendant Chrysler's for Reconsideration (Docket No. 43) is DENIED.[FN5] Plaintif request that the Court assess costs against Chrysler for this Motion is, however, also DENIED. Finally, the stay on remanding this case back to Shasta County is lifted. The case is transferred and the Clerk of this Court is ordered to the file.

> [FN5.] Because oral argument was not of material assistance, the Court ordered this matter submitted on the briefs. E.D. Cal. Local Rule 230(g).

IT IS SO ORDERED.

E.D.Cal.,2010.
Winn v. Chrysler Group, LLC
Slip Copy, 2010 WL 1416749 (E.D.Cal.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.