Payam Shahian (State Bar No. 228406)
STRATEGIC LEGAL PRACTICES, APC
e-mail: pshahian@slpattorney.com
1875 Century Park East., Suite 700
Los Angeles, CA 90067
Telephone: (310) 277-1040
Facsimile: (310) 943-3838

Robert L. Starr (State Bar No. 183052)
THE LAW OFFICE OF ROBERT L. STARR
e-mail: starresq@hotmail.com
23277 Ventura Boulevard
Woodland Hills, California, 91364-1002
Telephone: (818) 225-9040
Facsimile: (818) 225-9042

Dara Tabesh (State Bar No. 230434)
e-mail: DTabesh@hotmail.com
201 Spear St. Ste. 1100
San Francisco, CA 94105
Telephone: (415) 595-9208
Facsimile: (310) 693-9083

Attorneys for Plaintiff Rodolfo F. Mendoza

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA—WESTERN DIVISION

|  |  |
|---|---|
| RODOLFO FIDEL MENDOZA, individually, and on behalf of a class of similarly situated individuals, <br><br> Plaintiff, <br><br> v. <br><br> GENERAL MOTORS, LLC, <br><br> Defendant. | CASE NO. CV 10-2683 AHM (VBK) <br><br> Hon. A. Howard Matz <br><br> **MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION TO DISMISS OR TRANSFER** <br><br> Hearing Date: October 11, 2010 <br> Time:          10:00 a.m. <br> Courtroom:    14 |

# TABLE OF CONTENTS

I.   INTRODUCTION ........................................................................... 4

II.  STATEMENT OF FACTS ........................................................... 4

III. ARGUMENT..................................................................................... 7

    A.   Plaintiff's Claims Are the "Assumed Liabilities" of GM...................... 7

        1.   New GM Assumed Liabilities for the Economic Loss Suffered by
Plaintiff and Prospective Class Members ...................................... 7

            a)   By its express terms, the MPA and Sale Approval
Order cover damage to the Class Vehicles.............................. 9

            b)   Non-Disclosure and active concealment of material
information resulting in economic loss are actionable ......... 12

        2.   New GM must comply with the reporting requirements of the
California Secret Warranty Law .................................................. 13

            a)   Plaintiff has adequately alleged the existence of a secret
warranty adjustment program............................................... 13

            b)   Under the Closing Documents, GM's Secret Warranty
program must be reported to the Class Members ................. 17

    B.   Plaintiff Does Not "Saddle" New GM With Old GM's Liabilities ..... 18

    C.   This Federal Bankruptcy Court Does Not Have Jurisdiction Over This
Case............................................................................................... 20

        1.   Plaintiff's state law claims are not core proceedings because they
do not arise under title 11 or in a case under title 11 ................... 22

        2.   Plaintiff's claims are not grounded in theories of successor
liability because they implicate GM's "assumed liabilities" ....... 26

    D.   Transfer to the New York Bankruptcy Court Would Serve Neither the
Interests of Justice nor the Convenience of the Parties ...................... 27

IV.  CONCLUSION............................................................................... 28

# TABLE OF AUTHORITIES

## CASES

*LiMandri v. Judkins*, 52 Cal. App. 4th 326 (1997)...............................................16

## STATUTES

Civil Code § 1795.90 *et seq.* ...............................................11
Civil Code § 1795.92 ...............................................11

## RULES

*Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 6-11 (2003)...............................19
*Caterpillar v. Williams*, 482 U.S. 386, 393 (1987)...........................................19
*Chamberlan* v. *Ford Motor Co.,* 314 F. Supp. 2d 952 (N.D. Cal. 2004)............14
*D.H. Blair & Co., Inc. v. Gottdiener*, 462 F.3d 95, 106-07 (2d Cir. 2006) ........24
*Ehrlich et al. v. BMW of North America, LLC*, No. 2:10-cv-01151, slip op. at
    16:11-17:8 (C.D. Cal. Aug. 11, 2010)....................................................9, 16, 17
*Falk v. General Motors Corp.,* 496 F. Supp. 2d 1088, 1097 (N.D. Cal. 2007) . 13,
    16, 17
*Franchise Tax Bd. v. Construction Laborers Vacation Trust*, 463 U.S. 1, 27-28
    (1983)........................................................................................................19
*In re Cinematronics*, 916 F.2d 1444, 1451 (9th Cir. 1990) ...............................18
*In re Dumont*, 383 B.R. 481, 490 (9th Cir. BAP 2007).....................................25
*In re Eveleth Mines, LLC*, 312 B.R. 634, 644-45 (Bankr. D. Minn. 2007)... 20, 21
*In re Fietz*, 852 F.2d 455, 457 (9th Cir. 1988) ..................................................25
*In re GMC*, 407 B.R. 463, 482 (2009)..............................................................8
*In re Harris Pine Mills,* 44 F. 3d 1431, 1435 (9th Cir. 1995)............................20
*In re Int'l Nutronics*, 28 F.3d 965, 969 (9th Cir. 1994) .....................................20
*In re Johnson*, 960 F.2d 396, 399 (4th Cir. 1992) ............................................17
*In re Marcus Hook Dev't Park, Inc.*, 943 F.2d 261, 264 (3d Cir. 1991) ............17

1   *In re Tobacco II Cases*, 46 Cal. 4th 298, 328 (2009) ......................................... 13

2   *In re Wood*, 825 F.2d 90, 96-97 (5th Cir. 1987)................................................... 18

3   *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994)......................... 17

4   *Marine Iron Co. et al. v. City of Duluth*, 104 B.R. 976, 980 (Bankr. Minn. 1989)

5       ............................................................................................................... 19

6   *Marsikian v. Mercedes Benz USA, LLC, et al.*, No. 2:08-04876 (C.D. Cal. May 4,

7       2009)...............................................................................................13, 14, 16, 17

8   *Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58, 63-64 (1987) ................................. 19

9   *Morris v. BMW*, 2007 U.S. Dist. Lexis 85513, at *18 (N.D. Cal. 2009) ............ 11

10  *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50 (1982) 18

11  *Rich Prods. Corp. v. Kemutec, Inc.*, 241 F.3d 915, 918 (7th Cir. 2000)............. 10

12  *Ryan v. Foster & Marshall, Inc.*, 556 F.2d 460, 464 (9th Cir. 1977) ................. 10

13  *Winn v Chrysler Group, LLC*, 2009 WL 5206647 (E.D. Cal. 2009) .......21, 22, 23

14

15  ### Treatises

16  28 U.S.C. § 1334(a)........................................................................................ 17

17  28 U.S.C. § 1334(b) ............................................................................18, 22, 25

18  28 U.S.C. § 1412 ............................................................................................ 24

19  28 U.S.C. § 157(a) ......................................................................................... 18

20  28 U.S.C. § 157(b)(1)..................................................................................... 18

21  28 U.S.C. § 157(c) ......................................................................................... 18

22

23  ### Constitutional Provisions

24  3 David G. Epstein et al., Bankruptcy § 12-2 at 203 (1992)............................... 18

25

26

27

28

## I.   INTRODUCTION

General Motors, LLC ("GM," "New GM," or "Defendant") wants it both ways. It asks the Court to interpret the provisions of documents governing sale of assets from General Motors Corp. ("Old GM") to New GM and dismiss Plaintiff's First Amended Complaint ("FAC"), because according to GM, Plaintiff's claims are not the "Assumed Liabilities" of New GM. If this fails, however, GM contends that this Court lacks jurisdiction to rule on Plaintiff's Motion to Dismiss or Alternatively, for Transfer ("MTD"), because Plaintiff's claims are "core proceedings" arising under Title 11 or in a bankruptcy case, and so should be transferred to the New York bankruptcy court. GM is wrong on both counts.

As part of its acquisition of the assets of Old GM in bankruptcy, New GM agreed to assume certain liabilities, including for property damage caused by defects in certain vehicles, regardless of when they were purchased or manufactured, so long as the defects manifest themselves after the close of the acquisition of Old GM's assets. Despite its contentions otherwise, these "Assumed "Liabilities" are more than what is required by express warranty.

Further, responsibility for such liabilities does not flow from principles of successor liability; rather, it arises by New GM's express agreement to be bound. Indeed, New GM can hardly contend it is saddled with Old GM's responsibilities when it continues to perpetuate the same wrongs committed by Old GM: active concealment of a water leak defect and the existence of a Secret Warranty program.

GM should not be allowed to force transfer of this case to the bankruptcy court by manufacturing ambiguity in an otherwise clear agreement. That GM may interpret provisions of its agreement to assume liabilities differently that Plaintiff does not invoke the bankruptcy court's jurisdiction. As explained below, this is not a "core proceeding." Jurisdiction in this Court, not the New York bankruptcy court, is therefore proper, and accordingly, GM's MTD should be denied.

## II.    STATEMENT OF FACTS

Plaintiff brings this action against GM on behalf of himself and all similarly situated persons ("Class Members") who purchased or leased a Chevrolet Equinox sport utility vehicle ("SUV") of model years 2005 to 2009 and Pontiac Torrent SUV of model years 2006 to 2009 (collectively, the "Class Vehicles").  (FAC ¶ 1.)

On or about July 2009 ("Closing Date"), Defendant acquired the assets of Old GM.  (*Id.* ¶ 1.)  As part of its acquisition, Defendant expressly agreed (as discussed in more detail below) to assume certain liabilities of Old GM, including liabilities for the Class Vehicles, regardless of when they were purchased, as long as the defect contained in the Class Vehicles manifested itself after the Closing Date.  (*Id.* ¶ 2; *see* fn. 6, *infra*.)  Separately, Defendant also agreed to comply with the certification, reporting, and recall requirements of NHTSA and similar state laws, which includes California's Secret Warranty Law.  (*Id.* ¶ 2.)

As alleged in the FAC, in or around the Closing Date, Defendant immediately became aware that the Class Vehicles contain one or more design flaws and/or structural defects that causes them to be highly prone to water leaks and flooding ("water leak defect"), including but not limited to water leaks that result in damage to the vehicles' front lights and taillights, as well as water leaks into the vehicles' interior cabins, causing mold and electrical failure due to water damaging the computer, electrical system, and interior components of the Class Vehicles.  (FAC ¶¶ 3 & 54; *see also id.* ¶ 41.)[1]

Since the Closing Date, Defendant has also known that the water leak defect presents a safety hazard and is unreasonably dangerous to consumers for several reasons, including safety hazards that can result in sudden and catastrophic engine or electrical system failure and mold growth which can trigger numerous health

---

[1] Defendant acquired its knowledge of the water leak defect through internal sources not available to Class Members, including aggregate data from Defendant's dealers, and from other internal sources.  (*Id.* ¶¶ 10 & 40.)

1    problems.  (*Id.* ¶¶ 3, 4-11, 38-39 & 54.)  In addition to these safety hazards, the

2    costs of the water leak defect to consumers can be exorbitant because consumers

3    will be required to pay hundreds, if not thousands, of dollars to repair the water

4    leaks and the related damage that it causes.  (*Id.* ¶¶ 9, 19, 26-28 & 43-44.)

5          Despite the fact that it has been fully aware of the water leak defect

6    contained in the Class Vehicles since the Closing Date, Defendant has nevertheless

7    actively concealed and/or failed to disclose the existence and nature of the defect to

8    Plaintiff and prospective Class Members.  (*Id.* ¶¶ 10 and 42.)  Instead of disclosing

9    its existence, in July 2009, Defendant formally adopted an internal Technical

10   Service Bulletin ("TSB"), a clandestine program in which Defendant acknowledges

11   the existence of the water leak defect to only its dealers and provides a cheaper,

12   albeit temporary, fix: mainly replacing and/or resealing (with a special "3M ™

13   Ultrapro Autobody Sealant Clear or [its] equivalent") various structural

14   components of the Class Vehicles that are defective, in part, because of

15   insufficient, inadequate, or improperly applied body sealer.  (*Id.* ¶¶ 11, 50, fn. 4 &

16   54-55.)  While Defendant normally attributes water leaks to outside influences and

17   does not cover them under warranty (*see, e.g.*, *id.* ¶ 57 fn. 5), Defendant has

18   instructed its dealers to perform the resealing and/or replacement program at no

19   cost to consumers.  (*Id.* ¶¶ 14 & 60.)  Defendant's clandestine program to

20   temporarily fix the water leak defect with a special sealer, however, is strictly

21   limited to the most persistent customers and only those who visited the dealer and

22   complained loudly enough about the problem.  (*Id.* ¶ 15.)  In addition, to mollify

23   those consumers who complain loudly enough, in July 2009, Defendant

24   implemented another clandestine program to secretly reimburse or pay for repair

25   costs of those Class Vehicles that suffer from the water leak defect and the related

26   damage that it causes, even when the water leak defect and the related damage that

27

28

**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION TO DISMISS OR TRANSFER**

1  it causes occurs outside the vehicle's 3-year/36,000-mile express warranty period.

2  (*Id.* ¶ 18, 26 & 59.)[2]

3      When Defendant adopted these clandestine programs in July 2009,

4  Defendant knew that Old GM had not disclosed the existence of the TSB to

5  consumers, or the California New Motor Vehicle Board, as is required by

6  California's Secret Warranty Law.  (*Id.* ¶¶ 48-53.)  GM also knew that as a result

7  of having formally adopted this internal bulletin under the Amended and Restated

8  Master Sales and Purchase Agreement ("MPA") (Declaration of Dara Tabesh in

9  Support of Opposition ("Tabesh Decl.") Ex. 1) and pursuant to California's Secret

10  Warranty Law it had a duty (after its acquisition of Old GM's assets and liabilities)

11  to immediately disclose the TSB to the various entities and failed to do so.  (*Id.* ¶¶

12  2 & 12.)  Despite this knowledge, GM did not notify Plaintiff or Class Members

13  about its cost-free repairs and reimbursement program (*e.g.*, replacement of interior

14  carpets, as well as other components within the vehicle damaged by the water leak

15  defect).  (*Id.* ¶¶ 62-63.)  Thus, by its conduct, GM violated the California Secret

16  Warranty law.  (*Id.* ¶¶ 48-66.)

17  **III.   ARGUMENT**

18      **A.   Plaintiff's Claims Are the "Assumed Liabilities" of GM**

19          **1.   <u>New GM Assumed Liabilities for the Economic Loss</u>**

20              **<u>Suffered by Plaintiff and Prospective Class Members</u>**

21      In a misguided attempt to distract the Court from the most pertinent issues,

22  Defendant repeatedly invokes provisions in its Order Authorizing Sale of Assets

23  ("Sale Approval Order") (Tabesh Decl. Ex. 2) and MPA (collectively, the "Closing

24  Documents") related to "express warranty" law.  (*See, e.g.*, MTD at 2:4-6, 2:26-28

25  _____

26      [2] For example, Defendant refused to replace Plaintiff's indoor carpeting
damaged by the water leak defect while agreeing to replace or reimburse the floor

27  carpeting and other similar items which is similar to the manner in which
Defendant deals with the most persistent customers who complain loudly enough.

28  (FAC ¶¶ 25-28.)

1   (fn.1), 5:5-8, 6:3-6 & 7:9-13.)  Plaintiff, however, is not bringing a breach of

2   express warranty claim; Plaintiff brings claims for violations of the CLRA and the

3   UCL, which transcend the law of warranty.[3]  Despite GM's contention that it can

4   only be liable for breach of express warranty claims after the Closing Date, it

5   cannot avoid liability for that which it has assumed under the Closing Documents.

6   (Sale Approval Order ¶¶ AA ("The transfer of the Purchased Assets to the

7   Purchaser will be a legal, valid, and effective transfer of the Purchased Assets and,

8   *except for the Assumed Liabilities*, will vest the Purchaser with all right, title, and

9   interest of the Sellers to the Purchased Assets free and clear of liens, claims,

10  encumbrances, and other interests . . . ." (emphasis added)); ¶ 7 ("*Except for the*

11  *Assumed Liabilities*, pursuant to sections 105(a) and 363(f) of the Bankruptcy

12  Code, the Purchased Assets shall be transferred to the Purchaser in accordance with

13  the MPA, and, upon the Closing, shall be free and clear of all liens, claims,

14  encumbrances, and other interests of any kind or nature whatsoever . . . ."

15  (emphasis added)); ¶ 9 ("[N]o claims other than Assumed Liabilities, will be

16  assertable against the Purchaser . . . ."); *see also id.* ¶¶ 10, 46-48 & 52; MPA §§

17  2.3(a) & 9.19.)  Indeed, when purchasing the assets of Old GM, Defendant was

18  provided assurance that it would not be forced to deal with certain claims that

19  would otherwise be brought against Old GM: "Effective upon the Closing . . . all

20  persons and entities are forever prohibited and enjoined from commencing or

21  continuing in any manner any action or other proceeding, whether in law or equity,

22  in any judicial…proceeding against the Purchaser…or the Purchased Assets, with

23  respect to any (i) claim against the Debtors *other than Assumed Liabilities* . . . ."

24

25

26  _____

27  [3] Indeed, the California legislature passed the CLRA and the UCL in large

28  part because traditional warranty and tort doctrines did not provide consumers
    sufficient legal remedies.

**Case No**. CV 10-2683 AHM (VBK)          Page 8

1  (Sale Approval Order ¶ 47 (emphasis added).)  As explained below, Plaintiff's

2  claims are the "Assumed Liabilities" of New GM.[4]

### a)    By its express terms, the MPA and Sale Approval Order cover damage to the Class Vehicles

Incredibly, GM argues that "because plaintiff's nondisclosure claims are not

claims for wrongful death, personal injury or property damage 'arising directly from

accidents or incidents or other distinct and discreet [sic] occurrences that happen on

or after the Closing Date,' the only product liabilities New GM agreed to assume,

see MPA § 2.3(a)(ix),[5] paragraphs 8, 46 and 47 of the Sale Approval Order

expressly enjoin plaintiff from asserting these claims against New GM."  (MTD 2:7-

12.)  This is a gross mischaracterization of Plaintiff's claims.  Plaintiff's FAC is

replete with allegations of "property damage" that arose "after the Closing Date" and

which arose "directly from accidents or incidents or other distinct and discrete

occurrences that happen on or after the closing date."

Plaintiff alleges that the Class Vehicles are damaged because they are "highly

prone to water leaks and flooding . . . including but not limited to water leaks that

result in flooding of the trunk and spare tire well, water leaks that result in damage

to the vehicles' front lights and taillights, as well as water leaks to the car's interior

cabin, causing mold and electrical failure due to the water damaging the computer,

electrical system, and interior components of the Class Vehicles."  (FAC ¶ 3; *see

also id.* ¶ 5 ("The water leak defect is also known to cause tail lights to fail or

---

[4] As discussed below, in a separate provision that Defendant failed to discuss in its motion, New GM also agreed to be bound by California's Secret Warranty law.  (*See, e.g.*, Sale Approval Order ¶ 17.)

[5] The Assumed Liabilities under MPA § 2.3(a)(ix) are described as: "all Liabilities to third parties for death, personal injury, or other injury to Persons or damage to property caused by motor vehicles designed for operation on public roadways or by the component parts of such motor vehicles and, in each case, manufactured, sold or delivered by Sellers . . . which arise directly out of accidents, incidents or other distinct and discreet [sic] occurrences that happen on or after the Closing Date and arise from such motor vehicles' operation or performance . . . ."

1  malfunction."); ¶ 6 ("[T]he water leak defect . . . can promote mold growth."); ¶¶

2  19-21 and 87-90.)  Indeed, Plaintiff's vehicle was "damaged" by the water leak

3  defect.  For example, in December 2009 and during the express warranty period,

4  Plaintiff's daughter "noticed a pungent odor emanating from the vehicle that caused

5  her light headaches and breathing difficulties."  (FAC ¶ 23.)  She later noticed that

6  the rear passenger and driver side seat of the vehicle were all wet.  (*Id.* ¶ 23.)  When

7  she complained and attempted to repair the problem, the first GM dealer told her to

8  "just air it out" and that "it happens here all the time."  (*Id.* ¶ 24.)  Not satisfied with

9  that response, Ms. Mendoza visited a second GM dealer, who verified the water

10 leak, and noted the presence of mold, which was causing a mildew odor in the

11 vehicle, but did not provide Plaintiff with the fixes that Defendant had outlined in its

12 clandestine TSB program.  (*Id.* ¶¶ 24 & 26.)  The dealer also refused to replace the

13 moldy carpets. (*Id.* ¶ 26.)  Plaintiff and his daughter were ultimately forced to pay

14 out of pocket to repair the damage caused by the water leak defect.  And despite

15 paying to fix the problems, the vehicle continues to smell like mildew and continues

16 to experience other problems associated with the water leak defect.  (*Id.* ¶¶ 27 & 28;

17 *see also id.* ¶ 41.)  These show without a doubt that Class Members have suffered

18 and continue to suffer "property damage" due to the water leak defect.

19     Further, Plaintiff's Class definition specifically excludes "all claims for out-

20 of-pocket water leak defect related expenses that were incurred prior to July 2009.

21 (*Id.* ¶ 72.)  Indeed, the above-referenced allegations of damage to Plaintiff's vehicle

22 (as well as his daughter's personal property) occurred in December 2009.  (*Id.* ¶ 23.)

23 Plaintiff even cites to NHTSA complaints of damage caused by the water leak defect

24 after the Closing Date.  (*See, e.g.*, *id.* ¶ 41 at 10:17-11.4) ("*On Jan. 11, 2010*, I

25 started my car to let it warm up . . . .  the car shut down and all of the warning lights

26 on the dashboard came on . . . water had leaked down the right front passenger side

27 of the window, freezing, thawing and backing up which got to the wiring and burnt

28 it out." (emphasis added).)

1    Indeed, GM is wrong to contend that "the Sale Approval Order bars plaintiff's

2    claims in their entirety, including claims for reimbursement of expenses incurred

3    after the Closing Date, because, among other things, the alleged design defect clearly

4    i) '*relates to the production of vehicles prior to the Closing Date . . . .*'" (emphasis

5    added) (citing Sale Approval Order ¶ 46).)  The threshold question is not whether

6    the vehicles were manufactured before the Closing Date, but rather, whether the

7    incidents (*i.e.*, manifestation of the defect) giving rise to liability arose after the

8    Closing Date.  As Judge Gerber of the Bankruptcy Court noted in ruling on the sale

9    of assets that gave rise to New GM and objections thereto, the Assumed Liabilities

10    include "*all* product liability claims arising from accidents or other discrete incidents

11    arising from operation of GM vehicles occurring subsequent to the closing . . .

12    *regardless of when the product was purchased*."  *In re GMC*, 407 B.R. 463, 482

13    (2009) (emphasis in original) (Tabesh Decl. Ex. 3).  By this logic—and contrary to

14    GM's assertion otherwise—GM maintains liability for defects in vehicles

15    manufactured and sold before the Closing Date so long as the facts giving rise to

16    these claims occur after the Closing Date.[6]  Here, Plaintiff limits its allegations to

17    such occurrences.

18    _____

19    [6] Indeed, had the Closing Document drafter intended to exclude these types
of claims, they would have done so expressly.  No fewer than 16 "Retained

20    Liabilities" of Old GM are listed, and they do not include such claim types.  (*See*
MPA § 2.3(b).)  The only plausibly relevant clause is, "all Liabilities arising out of,

21    related to or in connection with any (A) implied warranty or other implied
obligation arising under statutory or common law without the necessity of an

22    express warranty . . . ."  (*Id.* § 2.3(b)(xvi).)  Plaintiff, however, has dropped his
implied warranty claim, Cal. Civ. Code § 1791.1, and his CLRA and UCL claims

23    are not *implied* common law or statutory obligations related to any warranty, they
are *express* obligations that transcend the law of warranty.  Moreover, the MPA

24    also clarifies impermissible claim that can arise after the Closing Date. (*See id.* §

25    2.3(a)(ix) ("[F]or avoidance of doubt, Purchaser shall not assume, or become liable
to pay, perform or discharge, any Liability arising or contended to arise by reason

26    of exposure to materials utilized in the assembly or fabrication of motor vehicles
manufactured by Sellers and delivered prior to the Closing Date, including

27    asbestos, silicates or fluids, regardless of when such alleged exposure occurs.); *see*
*also* Sale Approval Order ¶¶ 8 & 62.)

28

1    Finally, Plaintiff's allegations also cover "distinct and discreet [sic]

2    occurrences." (MPA § 2.3(a)(ix).)  Indeed, Defendant can hardly contend that

3    Plaintiff's allegations of the water leak defect that manifested after the Closing Date

4    and resulted in damage to the interior of a vehicle's cabin or damage to a vehicle's

5    tail lights due to flooding, does not reflect "distinct and discrete occurrences."

6       **b)    Non-Disclosure and active concealment of material**

7          **information resulting in economic loss are actionable**

8    Defendant's argument that the occurrences disclosed in Plaintiff's allegations,

9    and by consequence Plaintiff's CLRA and UCL claims, cannot be covered under the

10   terms of the Closing Documents because these are claims for "*non-disclosure* of an

11   alleged defect causing *economic loss*," (MTD at 12:10-11 (emphasis in original)),

12   lacks merit on at least two counts.

13   First, even though non-disclosure of a material defect at the time of purchase

14   and lease may not be actionable under the terms of the Closing Documents if these

15   occurred prior to the Closing Date,[7] active concealment by New GM of these same

16   defects or the existence of a Secret Warranty program after the Closing date gives

17   rise to liability for New GM.  New GM cannot avoid liability, as it hopes to do, if it

18   perpetuates the same or similar wrongs as Old GM by actively concealing a defect

19   that should have been disclosed at the time of repair, or a Secret Warranty Program

20   that should have been disclosed when it was adopted.  *See Ehrlich et al. v. BMW of*

21   *North America, LLC*, No. 2:10-cv-01151, slip op. at 16:11-17:8 (C.D. Cal. Aug.

22   11, 2010) (failure to disclose the existence of a secret warranty program is active

23   concealment in violation of plaintiff's fraud-based CLRA and UCL claims)

24   (Tabesh Decl. Ex. 4).   For example, here, New GM's failure to disclose the secret

25   warranty program with the available fixes which it adopted in July 2009 to Plaintiff

26

27          [7] With respect to Defendant's failure to disclose the water leak defect at the
       time of purchase, Plaintiff's allegations are directed only at those consumers who
28     purchased the Class Vehicles (most likely as used vehicles) after the Closing Date.

1  violated the CLRA.  (FAC ¶¶ 24-25.)  Indeed, Plaintiff has alleged that her vehicle

2  continues to smell of mildew, a problem that apparently Defendant has attempted

3  to secretly remedy in a revised TSB, but has so far failed to inform or make

4  available to Plaintiff and class members. (*See infra* fn. 10.)

5      Second, Defendant provides no support for its counterintuitive assertion that

6  "injury to Persons or damage to property"[8] is not compensable as an "economic

7  loss."  (MTD at 12:8-13:11.)  Even if Plaintiff is making allegations of "economic

8  loss," this loss flows directly from the injury to the Class Members and damage to

9  the Class Vehicles. *Cf. Ryan v. Foster & Marshall, Inc.*, 556 F.2d 460, 464 (9th Cir.

10  1977) (distinguishing actual damages from mental suffering and punitive damages

11  and noting that "[a]ctual damages mean some form of economic loss"); *Rich Prods.*

12  *Corp. v. Kemutec, Inc.*, 241 F.3d 915, 918 (7th Cir. 2000) ("Recovery of economic

13  loss is intended solely to protect purchasers from losses suffered because a product

14  failed in its intended use.").  The fact that Plaintiff and Class Members have been

15  forced to pay out of pocket for repairs that should have been performed under

16  Defendant's Secret Warranty Program reflects an "economic loss" under any

17  plausible definition of the term.

18      2.    **New GM must comply with the reporting requirements of**

19            **the California Secret Warranty Law**

20      a)    **Plaintiff has adequately alleged the existence of a**

21            **secret warranty adjustment program.**

22      As discussed extensively in the FAC, GM's secret warranty adjustment

23  program qualifies as an unlawful "adjustment program" as that phrase is defined by

24  _____

25  [8] Presumably, GM recognizes it would be responsible for personal injury

26  claims that arose after the Closing Date due to a defect in its vehicles that existed at
   the time of purchase.  Yet, based on positions taken in its MTD, GM believes it

27  would have no responsibility to repair or compensate for repair to property damage
   caused by such a defect; nor would it have responsibility to repair or compensate

28  for repair of the defect that caused such personal injury.

1    the clear and straightforward language of California's Motor Vehicle Warranty

2    Adjustment Programs Act ("MVWAPA," also known as the "Secret Warranty

3    Law"), Cal. Civ. Code § 1795.90 *et seq.*  (FAC ¶¶ 10-12 and 48-66.)

4    The Secret Warranty Law imposes certain duties on vehicle manufacturers.

5    Among these is to notify consumers about the covered "condition" and the "terms

6    and conditions of the program."  Cal. Civ. Code § 1795.92.  Plaintiff has alleged

7    that while GM does not normally cover damage caused by water leaks under its

8    warranty, in July 2009, it formally adopted an internal bulletin that was distributed

9    to only its dealers in which it acknowledged the existence of the water leak defect,

10    identified multiple causes, and provided various fixes for each of these causes.

11    (FAC ¶ 54.)  Typically, Defendant does not cover fixes or repairs related to the

12    water leak defect because Defendant or its authorized dealers for vehicle repairs

13    generally tell consumers that the water leak defect occurs as a result of outside

14    influences.  (*Id.* ¶ 57.)  Nevertheless, in certain instances, Defendant has offered,

15    pursuant to the TSB, to extend its warranties to cover repairs related to the water

16    leak defect.  (*Id.*)

17    GM does not dispute the fact that it never gave notice to Plaintiff or the

18    prospective Class Members of its secret TSB program.[9]  Indeed, under California's

19    Secret Warranty Law, GM should have notified all Class Members of the

20    conditions that give rise to repairs related to the water leak defect, including those

21    Class Members who incurred out-of-pocket costs for water leak defect repairs prior

22    to acquiring knowledge of the program.  *See* Cal. Civ. Code §1795.92 ("A

23    manufacturer who establishes an adjustment program shall implement procedures

24    to assure reimbursement of each consumer . . . who incurs expenses for repair of a

25    condition prior to acquiring knowledge of the program.").  Here, GM failed to

26    _____

27    [9] *See Morris v. BMW*, 2007 U.S. Dist. Lexis 85513, at *18 (N.D. Cal. 2009)
("Defendants do not deny that they failed to inform the public of the of the
adjustment program stemming from the TSB.  Thus, Plaintiffs have successfully

28    alleged violations of the Secret Warranty Act.").

1    notify Plaintiff (or any other Class Members) of the TSB program or to "implement

2    procedures" that would have reimbursed Plaintiff or other prospective Class

3    Members for their repairs related to the water leak defect.

4        Furthermore, in addition to the TSB program that GM adopted in July

5    2009,[10] Plaintiff has alleged that after July 2009, to mollify those consumers who

6    complained loudly enough, GM adopted another secret program where it

7    reimbursed or paid for the costs of repairing the water leak defect and the related

8    damage that it causes, regardless of whether these problems arose within the

9    vehicle's warranty period.  (FAC ¶¶ 15, 18, 25 & 76.)  Again, GM did not notify

10   Plaintiff or any other Class Member of these programs.  (*Id.* ¶¶ 62-63.)  Thus, by

11   extending its warranty to cover the costs related to the water leak defect and the

12   property damage caused by it (and by doing so even if that warranty had expired),

13   GM has expanded or extended the consumer's warranty beyond its stated limits in

14   violation of the Secret Warranty law.  (*Id.* ¶¶ 57-60.)

15       Moreover, GM's decision to offer free repair[11] outside the vehicle's New Car

16   Warranty is not done on an *ad hoc* basis.  (*Id.* ¶ 59.)  Rather, it is made pursuant to

17   a systematic policy—communicated to, *inter alia*, regional offices, dealers, and

18   GM customer care personnel—designed to pacify the most vocal consumers.  (*Id.*)

19

20       [10] Plaintiff relies on TSB No. 08-08-57-001A to show the details of GM's
     secret warranty program adopted in July 2009.  (*See* FAC ¶ 54.)  A more recent
21   version of this, TSB No. 08-08-57-001B, dated January 13, 2009," expands the
     secret TSB program to include "a mildew odor condition repair."  (Tomasek Decl.
22   Ex. 2 (filed concurrently with GM's MTD) at 1.)

23       [11] GM suggests that "none of these TSBs provides for 'free' repairs or,
     indeed, says anything at all about payment for the repairs or whether or not they
24   are covered under Old GM's standard repair warranty."  (MTD at 6:4-6 (emphasis
     removed).)  Plaintiff, however, has alleged that these repairs are covered under
25   warranty and/or provided outside the warranty for those customers who complain
     loudly enough.  (FAC ¶ 14.)  Moreover, it is interesting to note that neither
26   Defendant's litigation counsel nor corporate counsel's declarations states under
     oath that these repairs were not covered under warranty.  Nevertheless, this is a
27   question of fact inappropriate for determination at the pleadings stage.
28

1    Plaintiff has offered examples of consumers suffering damage related to the water

2    leak defect but nevertheless being denied this coverage. (*See, e.g.*, FAC ¶¶ 25-26,

3    41; *see also id.* fn. 5.)

4         Further, GM's contention that its water leak defect repair program is not

5    "secret" because these TSBs can be found by a simple Google search is to no avail.

6    (MTD at 6:11-15.)  Even if true, a reasonable consumer cannot be charged with

7    such knowledge.  As the *Falk* court explained, "It is true that the prospective

8    purchasers, with access to the internet, could have read the many complaints . . .

9    [However,] many consumers would not have performed an internet search before

10   beginning a car search.  Nor were they required to do so."  *Falk v. General Motors

11   Corp.,* 496 F. Supp. 2d 1088, 1097 (N.D. Cal. 2007); *see also In re Tobacco II

12   Cases*, 46 Cal. 4th 298, 328 (2009) ("[A]llegation of reliance is not defeated

13   merely because there was alternative information available to the consumer-

14   plaintiff, even regarding an issue as prominent as whether cigarette smoking causes

15   cancer.").  Here, as explained below, GM was under a duty to disclose and actively

16   concealed the existence of its Secret Warranty program.  Plaintiff and Class

17   Members cannot be charged with knowledge of the TSBs—let alone a Secret

18   Warranty program—merely because GM's TSBs can be found on the Internet.[12]

19        In *Marsikian v. Mercedes Benz USA, LLC*, 2009 U.S. Dist. LEXIS 117012,

20   No. 2:08-04876 (C.D. Cal. May 4, 2009)  (Hon. Judge A. Howard Matz presiding)

21   (Tabesh Decl. Ex. 5), the court addressed the pleading of a UCL unlawful claim

22   based on a violation of the Secret Warranty Law, denied Mercedes' motion to

---

23        [12] Indeed, the legislative history to the Secret Warranty Law emphasizes this

24   point: "According to supporters of the bill, manufacturers to avoid recalls—either
     because the defect is minor or to avoid publicity and higher costs—often issue

25   *"technical service bulletins"* to their dealers.  Copies of these service bulletins are
     sent to NHTSA; whether or not they are safety related, but not directly to the

26   owners of the cars.  Consumers in the market for a new car are in the dark . . . ."

27   (Senate Committee on Judiciary, 1993-94 Session (SB 486) at 3-4 (emphasis
     added) (Tabesh Decl. Ex. 6).)  Thus, it is clear that the Secret Warranty Law is

28   designed to prevent the exact conduct Plaintiff alleges regarding GM.

---

1  dismiss for failure to state a claim.  The class action plaintiffs in *Marsikian* alleged

2  that the defendant had issued two TSBs and devised a policy of providing

3  "temporary fixes" for an alleged defect, which constituted a warranty adjustment

4  program under the MVWAPA because maintenance of the defect part was not

5  covered under the original warranty; that defendant extended the warranty even

6  further by repairing and reimbursing defect related damages for the most vocal

7  complaining customers as "good will adjustments" or "policy adjustments;" that

8  plaintiffs were not informed of the adjustment program; and that when plaintiffs

9  requested a free repair or replacement they were refused.  *Marsikian*, slip op. at 9-

10  10.  The district court found these allegations to be adequate to state a UCL claim

11  based on a violation of the Secret Warranty Law.  *Id.*  Plaintiff's allegations in the

12  instant case are substantially similar to the allegations that the *Marsikian* court

13  found to be sufficient, and GM's Motion to Dismiss should similarly be denied.[13]

14          b)      **Under the Closing Documents, GM's Secret Warranty**
15                  **program must be reported to the Class Members**

16          Despite Defendant's contention that it is not bound by California's Secret

17  Warranty Law, the MPA compels otherwise:

18          From and after the Closing, Purchaser shall comply with

19          the certification, reporting and recall requirements of the

20          National Traffic and Motor Vehicle Safety Act, the

21          Transportation Recall Enhancement, Accountability and

---

23  [13] With respect to GM's argument that Plaintiff's claims for injunctive relief
are preempted by the NHTSA (*see* MTD at 4 fn. 3), *Marsikian* also finds under
24  factually similar circumstances that conflict preemption does not bar a recall
remedy under state law.  *Marsikian*, slip op. at 11-12 (citing *Chamberlan* v. *Ford*
25  *Motor Co.,* 314 F. Supp. 2d 952 (N.D. Cal. 2004) ("Defendant has not shown that
preemption doctrine would bar a recall remedy.").  Moreover, regardless of the
26  Court's power to order a recall, Plaintiff has requested a range of remedies that
does not necessarily include a recall.  In addition to seeking damages, Plaintiff has
27  requested injunctive relief available under the UCL and CLRA, including an order
requiring GM to comply with California's Secret Warranty Law.  *See id.*

1    Documentation Act, the Clean Air Act, the California

2    Health and Safety Code and similar Laws, in each case,

3    to the extent applicable in respect of vehicles and vehicle

4    parts manufactured or distributed by Seller.

5    (MPA § 6.15 (a)).  Here, the MPA clearly invokes a series of laws designed to

6    promote public interest and safety, including "the certification, reporting and recall

7    requirements of the National Traffic and Motor Vehicle Safety Act . . . ." (*Id.*)  This

8    clause then goes on to capture "similar Laws."[14]  By any reasonable interpretation,

9    given the similarity of the California Secret Warranty Law to the acts and

10   requirements cited in § 6.15(a) and ¶ 17 of the Sales Approval Order, the broad and

11   expansive definition of Law in § 1.1, and California law's requirement that a Secret

12   Warranty must be reported within 90 days of adoption, California Secret Warranty

13   Law § 1795.90(a), taken with Plaintiff's allegation that GM's secret TSB program

14   was adopted in July 2009 (FAC ¶ 54 & fn. 4), the only reasonable conclusion is that

15   the after the Closing, New GM violated California's Secret Warranty Law when it

16   failed to disclose its adopted Secret Warranty program to prospective Class

17   Members.  Indeed, by making the argument that Plaintiff's Secret Warranty Claim

18   may amount to a recall, New GM has admitted that California's Secret Warranty

19   Law is covered by this provision because it is similar to the certification, reporting

20   and recall requirements of NHTSA.

21   **B.    Plaintiff Does Not "Saddle" New GM With Old GM's Liabilities**

22   Defendant repeatedly complains that Plaintiff's claims "represent an improper

23   attempt to fasten successor, transferee, derivative or vicarious liabilities on New

24   GM.  (MTD at 8:24-25 (citations and quotations omitted).)  As explained above,

25

26   [14] The MPA defines "Law" as "any and all applicable United States or non-
United States federal, national, provincial, state or local laws, rules, regulations,
27   directives, decrees, treaties, statutes, provisions of any constitution and principles
(including principles of common law) of any Governmental Authority, as well as
28   any applicable Final Order."  (MPA § 1.1 (Defined Terms).)

1    however, Plaintiff's claims are proper because they represent Assumed Liabilities of

2    New GM, *i.e.*, they are not brought under any theory of successor, transferee,

3    derivative, or vicarious liability, because New GM agreed to assume them.

4    Plaintiff's claims are valid because Plaintiff has alleged active concealment of the

5    water leak defect and the Secret Warranty Program from Plaintiff and Class

6    Members *after the Closing Date*, and these allegations satisfy the pleading

7    requirements for claims brought under the CLRA and the UCL.

8        Under California law, a duty to disclose material facts may arise when the

9    defendant actively conceals a material fact from the plaintiff.[15]  *See Falk*, 496 F.

10   Supp. 2d at 1094-96 (citation omitted).[16]  While GM declines to address in its

11   papers the notion that active concealment creates a duty to disclose, Plaintiff has

12   alleged sufficient facts here creating an independent basis for GM's duty to

13   disclose.  Plaintiff alleges that GM actively concealed the water leak defect by

14   withholding information about the systematic nature of the problem from

15   consumers, and where GM has attempted to repair the water leak defect, that GM

16   did so in a manner that would temporarily repair the problem, leaving consumers

17   with defective vehicles that are likely again to experience the water leak defect

18   _____

19       [15] Under California law, a duty to disclose material facts may also arise in
     the following circumstances: (1) when the defendant is in a fiduciary relationship
20   with the plaintiff; (2) when the defendant had exclusive knowledge of material
     facts not known to the plaintiff; or (3) when the defendant makes partial
21   representations but also suppresses some material fact.  *Falk*, 496 F. Supp. 2d at
     1094-96 (citation omitted).
22

23       [16] Material facts may include, but are not limited to, unreasonable safety
     defects, *see, e.g.*, *id.* at 1096 (explaining that defect to speedometer causing drivers
24   to travel at unsafe speeds is material), and monetary costs associated with such
     defects (including the inconvenience of repeated repairs and replacement costs),
25   *Marsikian*, slip op. at 9; *see also Ehrlich*, slip op. at 16:11-18 (same).  Here,
     Plaintiff has satisfied the pleading requirements for materiality.  The FAC alleges
26   the materiality of the water leak defect, including the costs for repairs related to the
     water leak defect, (FAC ¶¶ 9, 28, 42 & 43), the need for repeated repairs or
27   replacements, (*id.* ¶¶ 16, 17, & 21), and the significant safety dangers posed by the
28   water leak defect, (*see, e.g.*, *id.* ¶¶ 4-8).

1    outside the warranty period, the consequent damage caused by water leaks, and the

2    associated safety hazards.  (FAC ¶¶ 16-17.)  *See Falk*, 496 F. Supp. 2d at 1097

3    (explaining that an automaker's replacement of defective parts with the same

4    defective model constitutes concealment of a systematic problem).   Additionally,

5    GM actively concealed the water leak defect by providing free repairs to

6    consumers who complained loudly without disclosing the full nature of the

7    program to general public.  (*Id.* ¶¶ 48, 56, 58-59 & 62-63.)  *See Marsikian*, slip op.

8    at 8 (allegations that automaker extended secret "good will adjustments" to

9    consumers who complained loudly enough, without disclosing the full nature of the

10    problem to the general public, indicated active concealment in violation of the

11    CLRA); *see also Ehrlich*, slip op. at 16:11-17:8 (same.)

12        Defendant cannot contend that it has no liability because the water leak

13    defect arose from a design defect that was present before the closing date.  (*See*

14    MTD at 3:1-8.)  All Assumed Liabilities invoked in Plaintiff's claims relate to

15    harms that arose after the Closing Date.  New GM is liable for such harms.

### C.    This Federal Bankruptcy Court Does Not Have Jurisdiction Over This Case

18        Like other federal courts, bankruptcy courts are courts of limited

19    jurisdiction.  *In re Johnson*, 960 F.2d 396, 399 (4th Cir. 1992).  As such, "[i]t is to

20    be presumed that a cause lies outside this limited jurisdiction, and the burden of

21    establishing the contrary rests upon the party asserting jurisdiction."  *Kokkonen v.*

22    *Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994) (citations omitted).

23        Only the Constitution and federal statutes can confer subject matter

24    jurisdiction on federal courts.  *Id.*  28 U.S.C. § 1334 confers bankruptcy

25    jurisdiction and provides that "the district courts shall have original and exclusive

26    jurisdiction of all cases under title 11."  *Id.* § 1334(a).  "Cases under title 11" refers

27    merely to bankruptcy petitions themselves.  *In re Marcus Hook Dev't Park, Inc.*,

28    943 F.2d 261, 264 (3d Cir. 1991).  Because this case does not involve a bankruptcy

1   petition, but rather a consumer class action alleging state law causes of action, the

2   Court must examine subsection (b), which provides that "the district courts shall

3   have original but not exclusive jurisdiction of all civil proceedings arising under

4   title 11, or arising in or related to a case under title 11." 28 U.S.C. § 1334(b).

5   In addition to "cases under title 11," the district courts may refer to the

6   bankruptcy court proceedings that (1) "arise under" the Bankruptcy Code, (2)

7   "arise in" a case under the Bankruptcy Code, or (3) "relate to" a case under the

8   Bankruptcy Code. *Id.* § 157(a). Such delegation to non-Article III tribunals,

9   however, has its limitations. *See Northern Pipeline Constr. Co. v. Marathon Pipe*

10  *Line Co.*, 458 U.S. 50 (1982). As non-Article III tribunals, bankruptcy courts may

11  "hear and determine," and thus issue dispositive orders in "all core proceedings

12  arising under title 11, or arising in a case under title 11 . . . ." 28 U.S.C. §

13  157(b)(1).[17] A bankruptcy court, however, may not issue dispositive orders in non-

14  core proceedings that are otherwise related to a case under title 11 unless the

15  parties involved in the proceeding consent. *Id*. § 157(c).[18]

16  To determine whether a proceeding "arises under" title 11, courts apply the

17  same test used for deciding whether a civil action presents a federal question under

18  28 U.S.C. § 1331. *See In re Wood*, 825 F.2d 90, 96-97 (5th Cir. 1987). Thus,

19  "arising under" jurisdiction in bankruptcy matters extends to "only those cases in

20  which a well-pleaded complaint establishes either that federal [bankruptcy] law

21  creates the cause of action or that the plaintiff's right to relief necessarily depends

22  ─────────────

23  [17] While the Bankruptcy Code is not clear, commentators believe that the
    term "core" refers to "arising in" or "arising under" proceedings collectively. *See*

24  3 David G. Epstein et al., Bankruptcy § 12-2 at 203 (1992).

25  [18] Here, while Defendant does not contend that this is a related non-core
    proceeding—because it is not—Plaintiff nevertheless advises the Court that he will

26  not consent to the Bankruptcy Court's jurisdiction in this matter, nor will he waive
    his right to a jury trial. *See In re Cinematronics*, 916 F.2d 1444, 1451 (9th Cir.

27  1990) ("[W]here a jury trial is required and the parties refuse to consent to
    bankruptcy jurisdiction, withdrawal of the case to the district court is

28  appropriate.").

─────────────────────────────────────────────

**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION TO DISMISS OR TRANSFER**

1    on resolution of a substantial question of federal [bankruptcy] law." *Franchise Tax*

2    *Bd. v. Construction Laborers Vacation Trust*, 463 U.S. 1, 27-28 (1983).

3    Unquestionably, Plaintiff's state law claims against Defendant do not arise

4    under federal law.  While at best Defendant may assert a defense arising from the

5    scope of an order issued by the bankruptcy court, a case cannot be transferred "to

6    federal court on the basis of a federal defense, including the defense of preemption,

7    even if the defense is anticipated in plaintiff's complaint, and even if both parties

8    concede that the federal defense is the only question truly at issue." *Caterpillar v.*

9    *Williams*, 482 U.S. 386, 393 (1987).[19]  Therefore, this consumer class action case

10    does not present a question of federal law that would support "arising under"

11    jurisdiction.

### 1.    Plaintiff's state law claims are not core proceedings because they do not arise under title 11 or in a case under title 11

14    Generally, "a core proceeding is a legal dispute between parties in interest to

15    a bankruptcy case, one of whom is almost always the debtor.  As fixed by the very

16    nature of the parties' relationships to the debtor and the relief requested, core

17    proceedings are those intrinsic to the adjustment of debtor-creditor relationships

18    involved in bankruptcy relief." *Marine Iron Co. et al. v. City of Duluth*, 104 B.R.

19    976, 980 (Bankr. Minn. 1989); *see also, e.g.*, *In re Int'l Nutronics*, 28 F.3d 965,

---

[19] While the Supreme Court has concluded that the preemptive force of some federal statues is so strong that they completely preempt an area of state law, *Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58, 63-64 (1987), no court has ever held that 11 U.S.C. § 363 grants exclusive jurisdiction to the federal bankruptcy court to interpret its provisions. Indeed, the Supreme Court has construed only three federal statues to preempt their respective fields so as to authorize removal and transfer of actions seeking relief exclusively under state law. *Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 6-11 (2003) (Section 301 of the Labor Management Relations Act; Section 502 of ERISA; and Sections 85 and 86 of the National Bank Act); *see also Winn v Chrysler Group, LLC*, 2009 WL 5206647 (E.D. Cal. 2009) (Tabesh Decl. Ex. 7) (denying Chrysler's motion to remove and transfer plaintiffs' California state law claims to the federal bankruptcy court in New York because the interpretation of the bankruptcy court's free and clear sale order was at best an affirmative defense that did not provide the bankruptcy court with jurisdiction).

1   969 (9th Cir. 1994) ("Core proceedings are matters concerning the administration

2   of the estate and rights created by title 11."); *In re Harris Pine Mills,* 44 F. 3d

3   1431, 1435 (9th Cir. 1995) ("If the proceeding does not invoke a substantive right

4   created by the federal bankruptcy law and is one that could exist outside of

5   bankruptcy it is not a core proceeding.").

6       Here, none of Plaintiff's state law claims can be classified as core

7   proceedings.  Plaintiff's case is a consumer action between two parties, neither of

8   which was a debtor or a petitioner for bankruptcy relief in Old GM's Bankruptcy

9   case, and neither of which was a scheduled creditor or claimant against Old GM's

10   bankruptcy estate.  Further, Old GM is not a party to this action.  And finally, none

11   of Plaintiff's claims fall within any of the more specific examples of core

12   proceedings set forth in 28 U.S.C. §§ 157(b)(2)(A)-(P).

13       Nonetheless, Defendant incorrectly argues that "plaintiff's entire pleading is

14   nothing more than an attempt to fasten successor liability on New GM in violation

15   of the Sale Approval Order" (MTD at 10:12-13), and because Judge Gerber had

16   jurisdiction to enter the Sale Approval Order pursuant to section 363 and to enforce

17   its provisions, "the prosecution of this action in violation of the Sale Approval

18   Order is also a core proceeding" (MTD at 14:20-24.)

19       Defendant's reliance on *In re Eveleth Mines, LLC*, 312 B.R. 634, 644-45

20   (Bankr. D. Minn. 2007), to support this point is misplaced.  There, the parties had

21   each consented to the bankruptcy court's jurisdiction from the initiation of

22   proceedings through the time of the purchaser's motion on the merits.  *Id.* at 643.

23   Weeks later, however, defendant challenged the court's jurisdiction.  *Id.*  The

24   Bankruptcy Court, in finding that the case should continue under its jurisdiction,

25   noted that prior to this, defendant "gave every indication of being content with

26   having the Bankruptcy Court pass on the substantive issue."  *Id.*

27       Here, however, Plaintiff never availed himself of or consented to the

28   bankruptcy court's jurisdiction.  More significantly, prior to the defendant

**Case No.** CV 10-2683 AHM (VBK)          Page 23

**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION TO DISMISS OR TRANSFER**

1  challenging jurisdiction, the purchaser in *In re Eveleth Mine* filed an adversary

2  proceeding asking the Bankruptcy Court to interpret the "free and clear" language

3  of its sale order to determine whether or not the purchaser, as a successor in

4  interest, could be liable for certain taxes relating to the debtor's pre-sale

5  production. *Id.* at 640-42. Plaintiff here, however, has not filed an adversary

6  proceeding and is not seeking to challenge or interpret the bankruptcy court's "free

7  and clear" sales order (11 U.S.C. § 1363) under a successor liability or any other

8  theory.[20] Rather, Plaintiff is only attempting to enforce state law consumer

9  protection claims that New GM expressly assumed through contract. *See id.* at 638

10  fn. 3 (noting that the "identity of the 'assumed liabilities' [was] not relevant to the

11  matter at bar").

12      *Winn*, 2009 WL 5206647, is instructive. In *Winn*, after plaintiff dismissed

13  his successor liability claims, defendant Chrysler argued that the sale of old

14  Chrysler's assets, as approved by the bankruptcy court, was a core proceeding and

15  that plaintiff's complaint, which challenged the bankruptcy court's order with state

16  common law claims, amounted to "disguised bankruptcy claims" that should be

17  transferred to the New York bankruptcy court. *Id.* at *3. In denying Chrysler's

18  motion to transfer and remanding the matter to state court, the court reasoned that

19  plaintiff's claims were for indemnity arising from new Chrysler's obligations to its

20  dealers for certain assumed agreements—obligations New Chrysler expressly

21  assumed when it purchased Old Chrysler's assets" (*i.e.*, "assumed liabilities"). *See*

22  *id.* at **3-4.[21] Consequently, the court held that plaintiff's state law claims were

23  ───────────────────

24      [20] *But see Zerand-Bernal Group, Inc. v. Cox*, 23 F.3d 159, 163 (7th Cir.
25  1994) (suggesting that section 363(f) applies only to secured creditors—"liens
    and other encumbrances;" and further suggesting that section 363(f) cannot be
26  employed to grant federal courts jurisdiction under 28 U.SC. § 1334 and
    extinguish a successor liability claim).

27      [21] *See* Chrysler LLC et al. Sale Approval Order: *Old Carco LLC f/k/a
28  Chrysler LLC*, No. 09-5002 (Bankr. S.D.N.Y. May 20, 2009) (Docket No. 3232)
    ("[T]he purchaser shall not have any successor liability (*other than with respect*

1    not "core bankruptcy claims" because they were not unique to or uniquely affected

2    by the bankruptcy proceedings and did not directly affect "core bankruptcy

3    functions." *Id.*

4       Despite this adverse ruling, defendant Chrysler brought a motion for

5    reconsideration, arguing that the federal court had jurisdiction under 28 U.S.C. §

6    1334(b), because Chrysler did not "expressly assume liabilities" arising from a

7    dealership agreement reached with one of the dealership defendants. *Winn v.*

8    *Chrysler Group,* LLC, 2010 WL 1416749, at **1-2 (E.D. Cal. 2010) (Tabesh Decl.

9    Ex. 9). Again, in rejecting Chrysler's motion to transfer and remanding the matter

10   to state court, the court held that "Plaintiffs' lawsuit asserts claims sounding

11   exclusively in state law [and] to the extent that a that a bankruptcy defense is

12   appropriate, there is no reason why the defense cannot be asserted in state court."

13   *Id.* at *3. The court also stated that the bankruptcy debtor, Old Chrysler, was not

14   even a party to the lawsuit, and in the absence of the successor claims, New

15   Chrysler had not demonstrated how the indemnity claims would impact the

16   handling of the Bankruptcy state. *Id.* at *4. Significantly, the court, noting that

17   plaintiffs' indemnity claims against Chrysler were based on liabilities that

18   "Chrysler already assumed," distinguished the case from other district court

19   decisions arriving at a contrary result because in those cases, there was no

20   indication that a purchaser of assets had assumed any liabilities. Instead, those

21   cases were grounded in successor liability theories, a factor not at issue in the

22   *Chrysler* case. *Id.* at *3 fn. 4.

23      Similarly, here, to the extent New GM contends that Old GM's bankruptcy is

24   implicated by Plaintiff's claims, there is no reason why it cannot assert its

25   bankruptcy defense in this Court.[22] And because Plaintiff expressly excluded all

26

27   *to any obligations arising under the Assumed Agreements from and after the
     Closing.*") (emphasis added) (Tabesh Decl. Ex. 8).

28      [22] Moreover, here, unlike *Winn*, there is not even an express provision that
     New GM can point to as a defense that can demonstrate that it did not agree to

1    claims that arose prior to the Closing Date, there is little doubt that New GM's

2    alleged bankruptcy defense reflects nothing more than improper forum shopping,

3    which, if taken to its logical end, would result in all state law claims brought

4    against New GM being dismissed or transferred to the Bankruptcy Court of New

5    York, no matter where they are filed, so long as New GM contends it has a

6    different interpretation of the claims it assumed or did not assume by contract.

**2.    <u>Plaintiff's claims are not grounded in theories of successor</u>**
7
**<u>liability because they implicate GM's "assumed liabilities"</u>**
8

9         Defendant's claim that "plaintiff's entire pleading is nothing more than an

10   attempt to fasten successor liability on New GM in violation of the Sale Approval

11   Order" (MTD at 10:10-13), is a gross mischaracterization devised to confer

12   jurisdiction on the Bankruptcy Court of New York where none exists.  New GM is

13   completely aware that the bankruptcy court in New York has no jurisdiction over

14   Plaintiff in this matter unless it can convince this Court that Plaintiff is in violation

15   of the Sale Approval Order, a contention New GM makes by asserting that Plaintiff

16   is attempting to "[f]asten successor liability on New GM in violation of the Sale

17   Approval Order."  However, Plaintiff's state law claims relate only to those claims

18   New GM expressly assumed under the MPA, not any claim that the bankruptcy

19   court expressly discharged as part of the Sale Approval Order.  Manufacturing

20   ambiguity in an otherwise clear agreement should not be a basis for a defendant to

21   seek dismissal of a case on jurisdictional grounds.  GM's attempt to do so here to

22   avoid liability for claims it expressly assumed is disingenuous and improper.  *See*

23   *also Winn*, 2009 WL 5206647, at *3 (rejecting defendant's argument that plaintiffs'

24   claims against New Chrysler were a "'direct challenge' to the bankruptcy court's

25   Sale Order, with Plaintiff's state common law claims essentially amounting to

26   'disguised' bankruptcy claims.").

27
28   assume the liabilities at issue here.  *See also supra* fn. 8 (listing certain future
     liabilities, such as asbestos, a expressly excluded from the assumed liabilities).

**D.    Transfer to the New York Bankruptcy Court Would Serve Neither the Interests of Justice nor the Convenience of the Parties**

"A district court may transfer a case or proceeding under title 11 to a district court for another district, in the interest of justice or for the convenience of the parties." 28 U.S.C. § 1412.  Transfers of core bankruptcy proceedings are analyzed under 28 U.S.C. § 1412, but still apply analytical factors considered under § 1404(a), the general transfer provision, which include: (1) plaintiff's choice of forum, (2) convenience of parties and witnesses, (3) location of relevant documents and ease of access to sources of proof, (4) locus of operative facts, (5) availability of process to compel attendance of unwilling witnesses, and (6) relative means of the parties. *D.H. Blair & Co., Inc. v. Gottdiener*, 462 F.3d 95, 106-07 (2d Cir. 2006).  Judicial efficiency, the ability to receive a fair trial, the state's interest in having local controversies decided within its borders, and the economic administration of the bankruptcy estate are also considered. *See Blanton v. IMN Financial Corp.*, 260 B.R. 257, 266 (M.D.N.C. 2001).

Here, these factors weigh in favor of Plaintiff's original choice of forum. Transfer of this action to New York will have no impact on the administration of Old GM's bankruptcy estate because Plaintiff is asserting claims against New GM it expressly assumed under contract.[23]  Judicial economy is served if another court will not be required to familiarize itself with this case, as well as California consumer protection laws.  There is also no reason to believe that GM would not receive a fair trial in this Court.  Further, California has a strong interest in having this case tried here because the Class includes only California residents.

Convenience of the parties also weighs in favor of this Court.  Both parties and the percipient witnesses, including Class Members, are located in either

---

[23] Although the MTD stresses the importance of the "home court presumption," the location of the debtor's bankruptcy is not a legitimate factor to be considered when ruling on this motion because the debtor is not a party to this action and the outcome of this case will have no impact on the debtor's estate.

1    California or Michigan, where New GM is incorporated.  Were this matter to be

2    litigated in New York, the parties would be required to incur significant travel

3    expenses for themselves, their attorneys, and their witnesses.  Although this

4    additional expense might be trivial for an entity as large as New GM—which

5    recently received billions of taxpayer dollars—Plaintiff would rather direct his

6    limited resources to the case at hand and avoid unnecessary expenses.  Further,

7    Class Members and the Class Vehicles are all located in California.  All of the

8    records maintained by New GM dealers concerning vehicle defects and repairs at

9    issue are located in California.  It would serve neither the interests of judicial

10    economy nor convenience of the parties to have to transport them to New York.

11    Accordingly, New GM's venue motion must be denied.[24]

## IV.   CONCLUSION

     For the foregoing reasons, Plaintiff respectfully asks this Court to deny

GM's Motion to dismiss.

Dated: September 27, 2010        STRATEGIC LEGAL PRACTICES, APC

     By: /s/ _____

           Payam Shahian
           Attorneys for Plaintiff

---

[24] Finally, New GM is contending that federal bankruptcy jurisdiction exists under §1334(b) because this case is "related to cases under Title 11," and for good reason.  The Ninth Circuit holds that the test for determining whether a civil proceeding is "related to" bankruptcy is "whether the outcome of the proceeding could conceivably have any effect on the estate being administered in bankruptcy." *In re Fietz*, 852 F.2d 455, 457 (9th Cir. 1988) (emphasis in original); *In re Dumont*, 383 B.R. 481, 490 (9th Cir. BAP 2007).  An action is "related to" bankruptcy if the outcome could alter "the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate." *In re Fietz*, 852 F.2d at 457.  Here, any recovery against New GM will have no impact on Old GM's bankruptcy estate. And any contention that permitting this proceeding to continue against New GM in this Court may affect the bankruptcy estate on the ground that one might seek recovery with respect to claims that New GM expressly assumed is without merit.