BREDHOFF & KAISER P.L.L.C.
805 Fifteenth Street, N.W. Suite 1000
Washington, D.C. 20005
Telephone: (202) 842-2600
Facsimile: (202) 842-1888
Andrew D. Roth (admitted *pro hac vice*)
Ramya Ravindran (admitted *pro hac vice*)

CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
Telephone:  (212) 225-2000
Facsimile:  (212) 225-3999
Deborah M. Buell
James L. Bromley

*Counsel for International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------- X
                                                                    :
*In re*                                                             :   Chapter 11
                                                                    :
MOTORS LIQUIDATION COMPANY, *et. al.*,                              :   Case No. 09-50026 (REG)
         f/k/a General Motors Corp., *et. al.*,                     :
                                                                    :
                Debtors.                                            :   (Jointly Administered)
                                                                    :
-------------------------------------------------------------------- X

**MEMORANDUM OF LAW CONCERNING JURISDICTION OVER
MOTION OF GENERAL MOTORS LLC TO ENFORCE THE SALE ORDER**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................... ii

PRELIMINARY STATEMENT .............................................................................. 1

COUNTERSTATEMENT OF THE CASE .............................................................. 2

    The *"Henry I" Settlement Agreement, and the "DC VEBA" Established
under that Agreement* ............................................................................................. 2

    The *2007 Delphi Restructuring MOU, and Old GM's Conditional
$450 Million Payment Obligation Under that MOU* ............................................. 3

    The ***2008*** *UAW Retiree Settlement Agreement* ........................................ 5

    The *2008 Implementation Agreement* .............................................................. 8

    The ***2009*** *UAW Retiree Settlement Agreement* ........................................ 9

    *Delphi's Emergence from Bankruptcy, and the
UAW's Subsequent Payment Demand* ................................................................... 11

    *The UAW Lawsuit That New GM Seeks to Enjoin* ............................................ 12

    *Present Procedural Posture of the Michigan District Court Litigation
and the Motion* ....................................................................................................... 16

ARGUMENT ......................................................................................................... 17

I.   *This Court Lacks Jurisdiction Over **Any** Aspect of the
Underlying Controversy Between the Parties* ....................................................... 17

    A.    *This Court Lacks Jurisdiction to Rule on the Issue of
Contract Interpretation Arising Under the 2007 Delphi
Restructuring MOU* .................................................................... 18

    B.    *This Court Lacks Jurisdiction to Rule on the Issue of
Contract Interpretation Arising Under the **2009** UAW Retiree
Settlement Agreement* ................................................................. 21

II.  *Even If the Court Has Jurisdiction Over One or More Aspects
of the Underlying Controversy, It Should Abstain from Exercising
that Jurisdiction* ................................................................................................... 31

CONCLUSION ....................................................................................................... 36

# TABLE OF AUTHORITIES

Page(s)

RULES AND STATUTES

11 U.S.C. § 365(k) ................................................................................................ 20

28 U.S.C. § 157(e) ............................................................................................... 34

29 U.S.C. §§ 107-109 .......................................................................................... 35

29 U.S.C. § 185(a) ............................................................................................... 23


CASES

*Amperion, Inc. v. Current Group, LLC*,
No. 10-5362, 2010 WL 3469307 (S.D.N.Y. Aug. 23, 2010).............................. 34

*Arris Int'l, Inc. v. Hybrid Patents, Inc. (In re Com21, Inc.)*,
357 B.R. 802 (Bankr. N.D.Cal. 2006) ............................................................... 34-35

*Barbara v. New York Stock Exch., Inc.*,
99 F.3d 49 (2d Cir. 1996)................................................................................... 24

*Buchwald v. Renco Group (In re Magnesium Corp.)*,
No. 04-Civ.-1357, 2004 U.S. Dist. LEXIS 9389 (S.D.N.Y. May 20, 2004) ...... 34

*Channel Bell Assocs. v. W.R. Grace & Co.*,
No. 91 Civ. 5485, 1992 U.S. Dist. LEXIS 13014 (S.D.N.Y. Aug. 31, 1992) .... 32

*Dairy Queen, Inc. v. Wood*,
369 U.S. 469 (1962)........................................................................................... 33

*DeSilvio v. Prudential Lines, Inc.*,
701 F.2d 13 (2d Cir. 1983).................................................................................. 26

*Hartigan v. Blaeser Development Corp. (In re Chase Manhattan Mortgage & Realty Trust)*,
11 B.R. 982 (Bankr. S.D.N.Y. 1981).................................................................. 20

*In re Bradlees*,
No. 04-5500, 2005 WL 106794 (S.D.N.Y. Jan. 19, 2005) ................................. 19

*In re Kassover*,
336 B.R. 74 (Bankr. S.D.N.Y. 2006).................................................................. 19

**Page(s)**

*In re Petrie Retail, Inc.*,
304 F.3d 223 (2d Cir. 2002)......................................................................    20

*In re Portrait Corp. of Am.*,
406 B.R. 637 (Bankr. S.D.N.Y. 2009) .....................................................    32

*In re Stein & Day, Inc.*,
113 B.R. 157 (Bankr. S.D.N.Y. 1990) ......................................................    21

*In re Xonics*,
813 F.2d 127 (7th Cir. 1987) ....................................................................    19-20

*Int'l Union, UAW v. General Motors Corp.*,
No. 07-CV-14074-DT, 2008 WL 2968408 (E.D. Mich. July 31, 2008) ...........    8

*JMB Capital Partners L.P. v. CRT Capital Group. LLC (In re NTL Inc.)*,
295 B.R. 706 (Bankr. S.D.N.Y. 2003).....................................................    33

*Longacre Master Fund v. Telecheck Servs. Inc. (In re Casual Male Corp.)*,
317 B.R. 472 (Bankr. S.D.N.Y. 2004) ......................................................    33

*Marine Midland Bank v. Zurich Ins. Co. (In re Olympia & York Maiden Lane Co. LLC)*,
Case No. 98-B-46167, 1999 Bankr. LEXIS 91 (Bankr. S.D.N.Y. Jan. 25, 1999).............    32

*Massachusetts Mut. Life Ins. Co. v. Millstein*,
129 F.3d 688 (2d Cir. 1997).....................................................................    27

*Mkt. St. Assocs. v. Frey*,
941 F.2d 588 (7th Cir. 1991) (Posner, J.) ...............................................    26

*New York State Ass'n of Trial Lawyers v. Rockefeller*,
267 F. Supp. 148 (S.D.N.Y. 1967) ..........................................................    24

*NWL Holdings, Inc. v. Eden Center, Inc. (In re Ames Department Stores, Inc.)*,
317 B.R. 260 (Bankr. S.D.N.Y. 2004) (Gerber, J.).............................    20

*Penthouse Media Grp. v. Guccione (In re Gen. Media Inc.)*,
335 B.R. 66 (Bankr. S.D.N.Y. 2005).......................................................    21

*Perpetual Sec., Inc. v. Tang*,
290 F.3d 132 (2d Cir. 2002)......................................................................    24

*Petrusch v. Teamsters Local 317 (In re Petrusch)*,
667 F.2d 297 (2d Cir. 1981).....................................................................    35

*Reliance Ins. Co. v. Six Star, Inc.*,
155 F. Supp. 2d 49 (S.D.N.Y. 2001)........................................................    34

**Page(s)**

*Schnabel v. Ramsey Quantitative Sys., Inc.*,
322 F. Supp. 2d 505 (S.D.N.Y. 2004)................................................................................. 34

*Steel Co. v. Citizens for a Better Env't*,
523 U.S. 83 (1998)............................................................................................................. 21

*Textile Workers Union v. Lincoln Mills*,
353 U.S. 448 (1957)........................................................................................................... 32

*Tower Auto. Mexico S. de R.L. de C.V. v. Grupo Proeza, S.a. (In re Tower Auto., Inc.)*,
356 B.R. 598 (Bankr. S.D.N.Y. 2006)............................................................................... 21

*UAW v. General Motors Corp.*,
497 F.3d 615 (6th Cir. 2007) ............................................................................................. 2, 3


OTHER AUTHORITIES

2 James Wm. Moore et al., *Moore's Federal Practice*, § 8.08[1] (3d ed. 2010)............... 27

Black's Law Dictionary 55 (5th ed. 1979).......................................................................... 27

In accordance with the Stipulation and Agreed Order Regarding Scheduling Issues approved by this Court and entered on the docket on November 9, 2010 (D.I. 7689), the International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America ("**UAW**") hereby submits this Opening Brief on the following "Jurisdictional Issue" presented by the Motion of General Motors LLC (f/k/a General Motors Company) ("**New GM**") to Enforce the Sale Order, dated October 22, 2010 (D.I. 7527, the "**Motion**" or "**Mot.**"):

> Whether this Court has exclusive jurisdiction over the underlying controversy between the UAW and New GM and, if so, whether the Court should exercise it.

## PRELIMINARY STATEMENT

1.    By its Motion, New GM asks this Court "to enjoin the prosecution of a lawsuit" filed by the UAW in the United States District Court for the Eastern District of Michigan.  *See* Mot. at 1.  And, in its Motion, New GM makes certain factual "represent[ations]" to the Court, *id.*, in support of that requested injunctive relief, while at the same time omitting certain other facts that bear directly on the Jurisdictional Issue presented.

2.    New GM's factual "represent[ations]" to the Court are inaccurate or misleading in certain material respects and, coupled with New GM's omissions, they paint a highly distorted picture of the relevant factual landscape.  This is so, most importantly, with respect to:  (a) the true nature and substance of the UAW lawsuit that New GM would have this Court enjoin; and (b) the language of not only the 2009 UAW Retiree Settlement Agreement approved by this Court in the **Sale Order**[1] and invoked by New GM as the basis for that requested injunctive relief, but the agreements that preceded it.

---

[1]    *See* Order (I) Authorizing Sale of Assets Pursuant to Amended and Restated Master Purchase Agreement with NGMCO, Inc., a U.S. Treasury-Sponsored Purchaser; (II) Authorizing Assumption & Assignment of Certain

3.      Accordingly, the UAW submits this Opening Brief with a comprehensive

"Counterstatement of the Case" that sets the relevant factual record straight.  The UAW then

goes on to show, in Part I of the Argument section of the Brief, that on a fair and accurate

recitation of the relevant facts, it is abundantly clear that this Court does **not** have jurisdiction

over **any** aspect of the underlying controversy between the UAW and New GM.  Finally, Part II

of the Argument section addresses, out of an abundance of caution, why the Court should abstain

in the event it concludes, contrary to the showing in Part I, that it does have jurisdiction over one

or more aspects of the underlying controversy between the parties.

## COUNTERSTATEMENT OF THE CASE

### *The "Henry I" Settlement Agreement, and the "DC VEBA" Established under that Agreement*

4.      In 2006, the UAW, General Motors Corporation ("**Old GM**")[2] and the

Representatives of a Class consisting of GM retirees entered into a settlement agreement

resolving a class action lawsuit titled *Int'l Union, UAW v. General Motors Corp.*, Civil Action

No. 05-73991 (E.D. Mich.), and commonly referred to by the parties as the "***Henry I***" lawsuit.

The Michigan district court presiding over the *Henry I* lawsuit approved that settlement

agreement over the objection of a small percentage of GM retirees, and that district court

decision was affirmed by the Sixth Circuit in *UAW v. General Motors Corp.*, 497 F.3d 615 (6th

Cir. 2007).

5.      Under the *Henry I* Settlement Agreement, Old GM remained obligated to provide

medical insurance benefits to its retirees, but Old GM's retiree medical insurance plan was

---

Executory Contracts and Unexpired Leases in Connection with the Sale; (III) Granting Related Relief, entered on
July 5, 2009 (D.I. 2968, the "**Sale Order**").

[2]      As reflected in the caption above, General Motors Corporation is now known as Motors Liquidation Corp.,
and is referred to herein together with its jointly administered debtors and debtors-in-possession as the "**Debtors**."

modified to impose several specific new costs on retirees. *See* 497 F.3d at 624. At the same

time, however, the *Henry I* Settlement Agreement established a new trust fund called the Defined

Contribution Voluntary Employees' Beneficiary Association—or "**DC VEBA**" for short—to

mitigate these new costs on retirees, and also to pay for retiree dental coverage. *See id.*;

Declaration of Daniel Sherrick dated December 21, 2010 (the "**Sherrick Decl.**"), at ¶ 5 (filed

concurrently herewith).

*The 2007 Delphi Restructuring MOU, and Old GM's Conditional $450 Million Payment
Obligation Under that MOU*

6.       On June 22, 2007, the UAW, Old GM and Delphi Corporation ("**Delphi**") entered

into a tripartite Memorandum of Understanding ("**MOU**") to resolve a number of labor issues

that had arisen during Delphi's then-ongoing bankruptcy proceedings, a true and correct copy

(without exhibits) of which is appended to New GM's Motion as Exhibit C. New GM refers to

that MOU as "**the 2007 Delphi Restructuring MOU**" in its Motion, and for clarity's sake that

convention is adopted and followed here.

7.       In addition to establishing lower wage and benefit rates for UAW-represented

Delphi employees and granting Delphi additional flexibility to close or sell many UAW-

represented facilities, the 2007 Delphi Restructuring MOU allowed Delphi, upon the satisfaction

of certain specified conditions, to terminate its obligation to provide retiree medical insurance

benefits to its retirees—the vast majority of whom were former GM employees by virtue of their

employment at Delphi prior to the 1999 spin-off of Delphi from GM. *See* Sherrick Decl. at ¶¶ 7,

19. Such an action by Delphi would trigger the "**GM-UAW Benefit Guarantee**"—under which

Old GM had agreed to guarantee Delphi's obligations regarding the provision of retiree medical

insurance benefits to former UAW-represented GM employees who continued to work at Delphi

facilities following the spin-off, in the event that Delphi no longer could provide those benefits.

*See id.* at ¶ 4.   In the context of Delphi's bankruptcy and the negotiations for the 2007 Delphi Restructuring MOU, the parties recognized that Delphi's termination of retiree medical benefits (as permitted by the 2007 Delphi Restructuring MOU) would result in many new participants in the DC VEBA that had been established by the parties in 2006 under the *Henry I* Settlement Agreement.   *See id.* at ¶ 7.   To address those new participants—and new liabilities—for the DC VEBA, the parties also provided in the 2007 Delphi Restructuring MOU that GM would make a one-time contribution of $450 million to the DC VEBA.   *See id.*   As originally set out in the 2007 Delphi Restructuring MOU, this one-time contribution would occur at the same time as Delphi's termination of the retiree medical benefits—and concomitant increase in liabilities for the DC VEBA—*i.e.*, on "substantial consummation" of a plan of reorganization in Delphi's bankruptcy. *See id.*

8.      Thus, in Section J. of the 2007 Delphi Restructuring MOU, the parties agreed to several provisions "in partial consideration for the UAW entering into this Agreement and in consideration for the releases to be provided" in that Agreement, including a provision (Section J.2) under which Old GM would make a payment of $450 million "to be paid directly to the DC VEBA established pursuant to the [*Henry I*] settlement agreement."   *See* Mot., Ex. C, at §§ J. and J.2 (p. 20).   This payment to the DC VEBA was specifically for the purpose of settling a claim by the UAW "in the amount of $450 million as a result of the modifications encompassed by this Agreement and various other UAW agreements during the course of Delphi's bankruptcy."   *Id.*

9.      Under Section K.2e of the 2007 Delphi Restructuring MOU, this $450 million payment obligation to the DC VEBA arising under Section J.2 of the MOU was a conditional obligation that would be triggered by:

(a) execution by Delphi and GM of a comprehensive settlement agreement resolving the financial, commercial, and other matters between them; and

(b) the substantial consummation of a plan of reorganization proposed by Delphi in its Chapter 11 cases and confirmed by the Bankruptcy Court which incorporates, approves and is consistent with all of the terms of this Agreement and the comprehensive settlement agreement between Delphi and GM.

*See id.* at § K.2e (p. 22).

10.     The 2007 Delphi Restructuring MOU was approved by the bankruptcy court presiding over the Delphi bankruptcy on July 19, 2007.  *See* Order Under 11 U.S.C. §§ 363, 1113, and 1114 and Fed. R. Bankr. P. 6004 and 9019 Approving Memorandum of Understanding Among UAW, Delphi, and General Motors Corp. Including Modification Of UAW Collective Bargaining Agreements and Retiree Welfare Benefits For Certain UAW-Represented Retirees (Case No. 05-44481 (RDD), Docket No. 8693).

## *The **2008** UAW Retiree Settlement Agreement*

11.     On February 21, 2008, the UAW, Old GM and the Representatives of a Class consisting of both GM and Delphi retirees entered into a settlement agreement to resolve a subsequent class action lawsuit involving the provision of retiree medical benefits by Old GM titled *Int'l Union, UAW, et. al. v. General Motors Corp.*, Civil Action No. 07-14074 (E.D. Mich.), and commonly referred to by the parties as the "***Henry II***" lawsuit.  Henceforth in this Brief, this *Henry II* settlement agreement will be referred to as "the **2008** UAW Retiree Settlement Agreement," with the emphasis placed on **2008** so as clearly to distinguish that **2008** Agreement from "the **2009** UAW Retiree Settlement Agreement" approved by this Court in the Sale Order and invoked by New GM as the basis for the injunctive relief requested in its Motion. A true and correct copy of the **2008** UAW Retiree Settlement Agreement (without exhibits)— which is conspicuously omitted from the otherwise voluminous set of Exhibits accompanying

- 5 -

New GM's Motion—is attached as Exhibit 1 to the Declaration of Ramya Ravindran (the "**Ravindran Decl.**") filed concurrently herewith.

12.    Contrary to New GM's representation to this Court at the very outset of its Motion, *see* Mot. at ¶ 1, it was **not** the **2009** UAW Retiree Settlement Agreement approved by this Court in the Sale Order that provided for the "establish[ment]" of a new trust fund known as "the '**New VEBA**'" to "satisfy [Old GM's] obligations regarding the provision of post-employment medical benefits to UAW retirees." (Emphasis in original). Rather, in point of fact, it was the **2008** UAW Retiree Settlement Agreement that provided for the "establish[ment]" of that new trust fund known as "the 'New VEBA.'" *See* Ravindran Decl., Ex. 1 at § 1 (p. 8) ("The term "New VEBA" shall mean a new trust fund to be established as described in Section 4 of this [**2008**] Settlement Agreement.").

13.    The establishment of a new trust fund known as the New VEBA under the **2008** UAW Retiree Settlement Agreement was for the express "[p]urpose" of transferring "exclusive[] responsib[ility]" for the provision of retiree medical insurance benefits to GM and Delphi retirees from Old GM to the New VEBA. *See id.* at § 2 (pp. 9-10). Specifically in this regard, the **2008** UAW Retiree Settlement Agreement eliminated GM's obligation to provide retiree medical insurance benefits with respect to claims incurred on or after January 1, 2010, when the New VEBA would go into effect and begin providing those benefits. *See id.*; Sherrick Decl. at ¶ 10.

14.    The representations in New GM's Motion respecting the establishment of the New VEBA are inaccurate and misleading in yet another important respect. Although New GM stops short of saying so explicitly, its Motion plainly leaves the impression—through the various representations quoted in the margin—that the contract language in the **2009** UAW Retiree

- 6 -

Settlement Agreement "fixing and capping" New GM's payment obligations to the New VEBA

had no antecedent in a prior agreement between Old GM and the UAW, and was proposed and

insisted upon by New GM and the federal government in the negotiations over the section 363

sale approved by this Court as an indispensable condition for consummating that sale.[3]  But that

impression is a false one, inasmuch as that very same contract language "fixing and capping" the

payment obligations to the New VEBA was included *in haec verba* in the **2008** UAW Retiree

Settlement Agreement between Old GM and the UAW that established the New VEBA in the

first place.  *Compare* Ravindran Decl., Ex. 1 at ¶¶ 2, 5.B, 8, 14 ("fixing and capping" language

of **2008** Agreement) *with* Mot., Ex. A at ¶¶ 2, 5.B, 8, 14 ("fixing and capping" language of **2009**

Agreement).

15.    In addition to "fixing and capping" Old GM's payment obligations to the New

VEBA, the **2008** UAW Retiree Settlement Agreement provided that fifteen days after the New

VEBA became operational (*i.e.*, on January 16, 2010), the DC VEBA—referred to as the

"Existing External VEBA" in the Agreement—would transfer all of its assets and liabilities into

the New VEBA, and would then be terminated.  *See* Ravindran Decl., Ex. 1 at § 12.C (p. 23).

But although the **2008** Settlement Agreement took cognizance of the DC VEBA in this respect

(and other respects not relevant here), it did **not** address, and thus was **completely silent** with

---

[3]       *See* Mot. at ¶ 24 ("Ultimately, New GM and the UAW reached an agreement regarding the funding of a
new VEBA for UAW retiree medical benefits:  the [**2009**] UAW Retiree Settlement Agreement.  This agreement
was crucial in allowing New GM to 'fix and cap' its contributions to the New VEBA so that New GM could
successfully complete the purchase of the Debtors' assets."); *id.* at ¶ 26 ("As described, New GM entered into the
[**2009**] Retiree Settlement to fix and cap its contributions to the New VEBA so that it could satisfy the federal
government's mandate to reduce expenses and create a viable cost structure in connection with the purchase of the
Debtors' assets."); *id.* at ¶ 51 ("The UAW was an active participant in the Sale of the Debtors' assets to New GM
and specifically negotiated the cap on New GM's payment obligations to the New VEBA contained in the [**2009**]
UAW Retiree Settlement Agreement so that the Sale could be consummated."); *id.* at ¶ 58 ("These limitations [in
the **2009** UAW Retiree Settlement Agreement] on New GM's obligations to the New VEBA were a prerequisite to
the federal government's financial assistance to the Debtors and were necessary to consummate the Sale of the
Debtors' assets to New GM.").

respect to, the issue of the $450 million payment obligation to the DC VEBA arising under the 2007 Delphi Restructuring MOU:  it did **not** purport to modify or "extinguish" that payment obligation to the DC VEBA, or otherwise deal with that payment obligation to the DC VEBA in **any** way.

16.    The **2008** UAW Retiree Settlement Agreement was approved by the district court presiding over the *Henry II* lawsuit on July 31, 2008.  *See Int'l Union, UAW v. General Motors Corp.*, No. 07-CV-14074-DT, 2008 WL 2968408 (E.D. Mich. July 31, 2008).  No appeal from that district court order was taken.

*The 2008 Implementation Agreement*

17.    On September 26, 2008, several months **after** Old GM and the UAW had entered into the **2008** UAW Retiree Settlement Agreement establishing the New VEBA and "fixing and capping" Old GM's payment obligations to the New VEBA, Old GM, the UAW and Delphi entered into a tripartite agreement (while Delphi was still in bankruptcy) referred to by the parties as "**the 2008 Implementation Agreement**."  *See* Mot. at ¶ 14; *id.* at ¶ 35.  A true and correct copy of that 2008 Implementation Agreement is appended to New GM's Motion as Exhibit F.

18.    The 2008 Implementation Agreement served to modify certain obligations arising under the 2007 Delphi Restructuring MOU, such that those obligations would become effective immediately.  *See* Sherrick Decl. at ¶ 11.  The $450 million obligation to the DC VEBA set forth in the 2007 Delphi Restructuring MOU, however, was **not** among the terms of the MOU that the 2008 Implementation Agreement modified.  Rather, the 2008 Implementation Agreement expressly states that the $450 million payment obligation is ongoing, notwithstanding modifications to other terms in the MOU:  "[t]he payment required by sections J(2) and K(2)(e)

**shall remain payable** as set forth in the Restructuring MOU." *See* Mot., Ex. F, at ¶ 6 (emphasis added); Sherrick Decl. at ¶ 12.

19.    On its face, this stipulation by Old GM and the UAW in the 2008 Implementation Agreement that Old GM's $450 million payment to the DC VEBA "**shall remain payable** as set forth in the Restructuring MOU" evinces a clear, mutual understanding between those two parties to the Implementation Agreement that the contract language in their prior, **2008** UAW Retiree Settlement Agreement "fixing and capping" Old GM's payment obligations to the New VEBA did **not** have the effect of "extinguishing" that $450 million payment obligation to the DC VEBA.

*The **2009** UAW Retiree Settlement Agreement*

20.    In July 2009, New GM and the UAW entered into the **2009** UAW Retiree Settlement Agreement, which superseded and replaced the **2008** UAW Retiree Settlement Agreement, and which was approved by this Court as part of the Sale Order on July 5, 2009.  A true and correct copy of that **2009** UAW Retiree Settlement Agreement (without exhibits) is appended to New GM's Motion as Exhibit A.

21.    In its Motion, New GM accurately sets out the contract language in the **2009** UAW Retiree Settlement Agreement "fixing and capping" New GM's payment obligations to the New VEBA.  *See* Mot. at ¶ 2; *id.* at ¶¶ 38-42.  In particular, the Motion accurately states, and the UAW **does not dispute**, that a component of the **2009** UAW Retiree Settlement Agreement was that "New GM's obligations to make contributions to the New VEBA were 'fixed and capped' at the amount and structure of the specific payments denominated in the agreement—and no more." *See id.* at ¶ 2.  But as previously shown, the Motion leaves the impression that this component of the **2009** UAW Retiree Settlement Agreement was a brand new one negotiated by the parties to

- 9 -

make consummation of the section 363 sale possible, when in truth, it was a previously-

negotiated component of the **2008** UAW Retiree Settlement Agreement carried over without

substantive change into the **2009** Agreement.

22.    Other components of the **2008** UAW Retiree Settlement Agreement that were

carried over without substantive change into the **2009** UAW Retiree Settlement Agreement were

that the New VEBA would become operational on January 1, 2010, and that fifteen days later

(*i.e.*, on January 16, 2010), the DC VEBA—again referred to as the "Existing External

VEBA"—would transfer all of its assets and liabilities into the New VEBA, and would then be

terminated.  *See* Mot., Ex. A, at §§ 1 (defining "Implementation Date"), 2 and 12.C (pp. 6, 8-9,

15).  Moreover, like the **2008** UAW Retiree Settlement Agreement, the **2009** UAW Retiree

Settlement Agreement does **not** address, and thus is **completely silent** with respect to, the issue

of the $450 million payment obligation to the DC VEBA arising under the 2007 Delphi

Restructuring MOU:  it does **not** purport to modify or "extinguish" that payment obligation to

the DC VEBA, or otherwise deal with that payment obligation to the DC VEBA in **any** way.

23.    Indeed, when drafting the **2009** UAW Retiree Settlement Agreement, the parties

used the **2008** UAW Retiree Settlement Agreement as their starting point and only modified

those terms in the **2008** Agreement that needed to be changed as a result of the issues that had

arisen during this bankruptcy proceeding.  *See* Sherrick Decl. at ¶ 14.  In order to keep the

agreements as identical as possible, the parties decided that if an entire section of the **2008**

Agreement had become moot or was no longer applicable, they would list that section as

"reserved" in the **2009** Agreement rather than deleting the section so that even the paragraph

numbering could remain the same.  *See id.*

- 10 -

24.     The most significant substantive change between the two Agreements was that a substantial portion of the $20 billion contribution to the New VEBA provided for in the **2008** Agreement was, pursuant to the **2009** Agreement, converted from a cash payment to common and preferred stock in New GM.  *See id.* at ¶ 13.  And, contrary to the intimations in New GM's Motion, it was this major restructuring of GM's contribution obligations to the New VEBA— together with various other financial austerity measures designed to reduce GM's debt and ongoing cash outlays—that made the section 363 sale approved by this Court possible.  *See* Affidavit of Frederick A. Henderson Pursuant to Local Bankruptcy Rule 1007-2 (D.I. 21) at ¶¶ 57, 74-75 (explaining that the federal government's provision of debtor-in-possession financing to Old GM pending consummation of the sale to New GM "required, among other things, that GM . . . convert at least one-half of the value of the required $20 billion UAW VEBA Contribution to common stock rather than a cash payment"); Sherrick Decl. at ¶ 13.

25.     Moreover, while § 26 of the **2008** UAW Retiree Settlement Agreement gave the federal district court that had approved that **2008** Agreement "exclusive jurisdiction to resolve disputes arising out of or relating to the enforcement, implementation, application or interpretation of this Settlement Agreement," the corresponding § 26 of the **2009** UAW Retiree Settlement Agreement gives this Court "exclusive jurisdiction to resolve" such "disputes" arising out of or relating to that **2009** Agreement.  *Compare* Ravindran Decl., Ex. 1 at § 26B (p. 36) *with* Mot., Ex. A at § 26B (p. 25).

*Delphi's Emergence from Bankruptcy, and the UAW's Subsequent Payment Demand*

26.     The asset sale contemplated by the Sale Order closed on July 10, 2009.  *See* Mot. at ¶ 25.  Thereafter, on July 30, 2009, the Delphi bankruptcy court entered its Order Approving Modifications Under 11 U.S.C. § 1127(b) to (I) First Amended Joint Plan of Reorganization of

Delphi Corp. and Certain Affiliates, Debtors and Debtors-in-Possession, as Modified and (II)

Confirmation Order (D.I.18707 in Case No. 05-44481 (RDD), the "**Delphi Confirmation**

**Order**").  The Plan of Reorganization that the Delphi Confirmation Order confirmed became

effective on October 6, 2009.  On October 29, 2009, the UAW sent a demand letter to New GM

for payment of the $450 million due and owing to the DC VEBA under the 2007 Delphi

Restructuring MOU.  *See* Ravindran Decl., Ex. 2.  New GM refused that UAW payment demand

by letter dated November 11, 2009.  *Id.* at Ex. 3.  At the time of this exchange of letters, the DC

VEBA was still in existence and was fully operational, providing retiree medical benefits to

thousands of GM/Delphi retirees whose rights to those benefits was a function of the 1999 GM-

UAW Benefit Guarantee and the 2007 Delphi Restructuring MOU.  *See* Sherrick Decl. at ¶ 21.

While the UAW continued discussions with New GM regarding its obligations under the 2007

Delphi Restructuring MOU, the New VEBA became operational on January 1, 2010, and the DC

VEBA transferred its assets into that New VEBA on January 16, 2010 and was then terminated.

*See id.* at ¶ 22; Mot., Ex. A at ¶ 1 (defining "Implementation Date").  By virtue of New GM's

November 11, 2009 refusal of the UAW's October 29, 2009 payment demand, that subsequent

transfer of assets from the DC VEBA to the New VEBA included the still-outstanding and

unsatisfied claim against New GM for breach of its $450 million payment obligation to the DC

VEBA under the 2007 Delphi Restructuring MOU.

*The UAW Lawsuit That New GM Seeks to Enjoin*

       27.     Although New GM's Motion spans some 40 pages, and includes 77 separately-

numbered paragraphs, New GM purports to describe the UAW lawsuit against which injunctive

relief is sought from this Court (the "**Michigan District Court Litigation**") in cursory fashion at

the end of a long, argumentative sentence buried in paragraph 29 of its Motion.  That sentence

reads, in full:

> Despite entering into the [**2009**] UAW Retirement Settlement Agreement that expressly "fixed and capped" all of New GM's obligations to the New VEBA, and contrary to its own express commitment to refrain from seeking to obligate New GM to contribute more than what is specified in that agreement, on April 6, 2010, the UAW filed a complaint in the Michigan District Court (the **"VEBA Complaint"**), claiming that New GM's refusal to pay $450 million to the New VEBA constitutes a breach of the 2007 Delphi Restructuring MOU.

28.     With all due respect to New GM, the cursory description of the UAW's Michigan

District Court Litigation contained in the foregoing sentence is a patently inaccurate description.[4]

The UAW most certainly has **not** asserted any claim in the Michigan District Court Litigation

that New GM's refusal to pay $450 million to **the New VEBA** constitutes a breach of the 2007

Delphi Restructuring MOU.  Rather, as an appropriately-detailed description of the UAW's

factual allegations in that lawsuit attests, the UAW's sole claim therein is that New GM's refusal

to pay $450 million to **the DC VEBA** established in 2006 by the *Henry I* Settlement Agreement,

*see supra* ¶¶ 4-5, constitutes a breach of the 2007 Delphi Restructuring MOU:

    a.      Paragraph 6 of the UAW's Complaint in the Michigan District Court

Litigation begins by alleging that "[o]n June 22, 2007—during the course of bankruptcy

proceedings involving Delphi Corporation ('Delphi')—the UAW, the Company's predecessor

corporation (General Motors Corporation or 'GM') and Delphi entered into a tripartite

Memorandum of Understanding ('[2007 Delphi Restructuring] MOU')" that "was approved by

the Bankruptcy Court presiding over the Delphi bankruptcy proceedings." *See* Mot., Ex. I, at ¶ 6.

---

[4]      The UAW's Complaint in the Michigan District Court Litigation speaks for itself, of course, and in that regard the UAW would point this Court to the copy of that Complaint appended as Exhibit I to New GM's Motion.

b.    Paragraph 7 of the Complaint then goes on to allege that "GM itself went through bankruptcy proceedings in 2009 from which there emerged a new operating company— the defendant herein—called 'General Motors LLC' ('the Company')," and that "[t]he [new] Company has assumed all of GM's labor contracts with the UAW, including, without limitation, the [2007 Delphi Restructuring] MOU."[5]  *See id.* at ¶ 7.

c.    Paragraph 8 of the Complaint then states that under Section J.2 of the 2007 Delphi Restructuring MOU, GM agreed to "mak[e] a payment in the amount of $450 million"— **not** to **the New VEBA**, which had not even been established as of the date of the 2007 Delphi Restructuring MOU—but rather "to **the DC VEBA** established pursuant to the settlement agreement approved by the court in the case of *Int'l Union, UAW et al v. General Motors Corp.*, Civil Action No. 05-73991."  *See* Mot., Ex. I, at  ¶ 8 (emphasis added).

d.    Paragraphs 9 and 10 of the Complaint then allege that under Section K.2 of the 2007 Delphi Restructuring MOU, GM's $450 million payment obligation under Section J.2 is conditional on the occurrence of certain specified events; that these contractual conditions were fully satisfied as of October 6, 2009; and that, "[a]ccordingly, pursuant to Section K.2 of

---

[5]    Notably, New GM's Motion does **not** seek to contravene this allegation in the UAW's Complaint that New GM assumed the 2007 Delphi Restructuring MOU.  Rather, to the extent that New GM's Motion addresses this issue at all, it states that this allegation in the UAW's Complaint "**arguably**" is correct.  *See* Mot. at ¶ 28 (emphasis added).  In point of fact, this allegation **inarguably** is correct.  As New GM itself points out in its Motion:  (i) "Pursuant to the MPA [*i.e.*, the Master Purchase Agreement], New GM assumed the 'UAW Collective Bargaining'"; (ii) "The definition of 'UAW Collective Bargaining Agreement' under the MPA includes **any** agreement between Old GM and the UAW relating to 'Employees'"; and (iii) "In turn, the term 'Employees' means any current, **former** or retired employee of Old GM or its affiliates."  *See* Mot. at ¶¶ 45-46 (emphasis added).  Virtually all of the Delphi retirees covered by the 2007 Delphi Restructuring MOU are **former** GM employees.  *See* Sherrick Decl. at ¶ 19.  Accordingly, the 2007 Delphi Restructuring MOU unquestionably qualifies as an "agreement between Old GM and the UAW relating to 'Employees'" that was assumed by New GM under the plain terms of the MPA.  Indeed, New GM's own actions are consistent with this conclusion that it assumed the 2007 Delphi Restructuring MOU:  aside from its failure to make the $450 million payment to the DC VEBA required by the 2007 Delphi Restructuring MOU, New GM has complied scrupulously with that MOU, including by providing required pension benefits to thousands of Delphi retirees at a very significant cost to New GM.  *See id.* at ¶ 20.  Moreover, even Old GM agrees that New GM assumed all UAW-related obligations, including specifically all benefit-related obligations.  *See* Debtors' 113th Omnibus Objection to Claims (D.I. 8192), at ¶ 12 (pointing out, in support of its objection to expunge certain claims filed by UAW-represented employees, that under the terms of the MPA "New GM assumed all employment- and employee benefit-related obligations with respect to the UAW Employees").

- 14 -

the [2007 Delphi Restructuring] MOU, the Company's contractual obligation to make the payment to **the DC VEBA** specified in Section J.2 of the [2007 Delphi Restructuring] MOU became 'effective' on" that October 6, 2009 date. *See id.* at ¶¶ 9-10 (emphasis added).

      e.      Paragraph 11 of the Complaint then goes on to allege that "[b]y letter dated October 29, 2009, the UAW made a written demand that the Company honor its contractual obligation to make the foregoing payment to **the DC VEBA** as required by the terms of the [2007 Delphi Restructuring] MOU," and that the Company "rejected" this UAW demand "[b]y letter dated November 11, 2009." *See id.* at ¶ 11 (emphasis added).

      f.      After setting out these core factual allegations, the Complaint goes on to state, under the subheading "CLAIM FOR RELIEF," that "[t]he Company's failure and refusal to make the payment to **the DC VEBA** specified in Section J.2 of the [2007 Delphi Restructuring] MOU—as demanded by the UAW in its October 29, 2009 letter—constitutes a breach of the [2007 Delphi Restructuring] MOU that is remediable in this action brought under LMRA § 301, 29 U.S.C. § 185." *See id.* at ¶ 14 (emphasis added).

      g.      And, in the "PRAYER FOR RELIEF" section of the Complaint, the UAW respectfully requests that the Michigan District Court "[f]ind and declare that the Company is in breach of its contractual obligation under the [2007 Delphi Restructuring] MOU to make the payment to **the DC VEBA** specified in Section J.2 of the [2007 Delphi Restructuring] MOU," and "[o]rder the Company to make **that** contractually-required payment forthwith." *See id.* at p. 5 (emphasis added).

      29.      In sum, there is no truth to the assertion in New GM's Motion that the UAW's "claim[ ]" in the Michigan District Court Litigation is "that New GM's refusal to pay $450 million to **the New VEBA** constitutes a breach of the 2007 Delphi Restructuring MOU." *See*

- 15 -

Mot. at ¶ 29 (emphasis added).  Rather, on the face of its Complaint, the UAW's sole claim in

the Michigan District Court Litigation is that New GM's "failure and refusal to make the

payment to the **DC VEBA** specified in Section J.2 of the [2007 Delphi Restructuring] MOU—as

demanded by the UAW in its October 29, 2009 letter—constitutes a breach of [that] MOU."  *See*

Mot., Ex. I, at ¶ 14.

30.    Indeed, New GM further distorts the true nature and substance of the Michigan

District Court Litigation by adopting and continuously utilizing in its Motion the highly-

misleading shorthand "**VEBA Complaint**" to characterize the UAW's Complaint therein.  *See*

*e.g.* Mot. at ¶ 29.  As the detailed description of the UAW's Complaint set out in paragraph 28

above shows, a more apt shorthand characterization of the UAW's Complaint is "**the DC VEBA**

**Complaint**."  Accordingly, from this point forward, that shorthand characterization of the

UAW's Complaint will be utilized.

*Present Procedural Posture of the Michigan District Court Litigation and the Motion*

31.    Following service of the UAW's DC VEBA Complaint, New GM filed an

Answer in which it asserted, *inter alia*, an affirmative defense that this Court has exclusive

jurisdiction over the dispute between the parties.  *See* Ravindran Decl. Ex. 4, at 1-2.  The UAW

then filed a motion to strike that asserted defense, and New GM filed the present Motion the next

day.  After a status conference with the parties, this Court determined that it would resolve the

question of whether it has jurisdiction over the underlying controversy between the parties.  *See*

Memorandum and Order re: UAW-New GM Dispute (D.I. 7607), Oct. 29, 2010.  Accordingly,

on November 3, 2010, Judge Cohn entered an order staying proceedings in the Michigan District

Court Litigation, pending this Court's ruling on the jurisdictional question.  *See* Ravindran Decl.,

Ex. 5.  To expedite a resolution of this preliminary matter, the parties entered into a stipulation

- 16 -

establishing discovery and briefing schedules as to the jurisdictional question alone, which was

entered by this Court on November 9, 2010.  *See* Stipulation and Agreed Order Regarding

Scheduling Issues Related to Motion of General Motors LLC (f/k/a Gen. Motors Co.) to Enforce

Sale Order (D.I. 7704).

## **ARGUMENT**

I.    *This Court Lacks Jurisdiction Over **Any** Aspect of the Underlying Controversy Between the Parties*

32.    In its Motion, New GM advances two separate merits arguments for this Court's

consideration:

a.    New GM's first merits argument is that the contract language in the **2009**

UAW Retiree Settlement Agreement "fixing and capping" New GM's payment obligations to the

New VEBA had the effect of "extinguish[ing]" its $450 million payment obligation to the DC

VEBA arising under the 2007 Delphi Restructuring MOU, thereby "preclud[ing]" the UAW's

action in the Michigan District Court to enforce that $450 million payment obligation to the DC

VEBA.  *See* Mot. at ¶¶ 4-5; *id.* at ¶¶ 27-28; *id.* at ¶¶ 58-59; *id.* at ¶¶ 69-70.

b.    New GM's second merits argument, stated in the alternative, is that the

conditions precedent to the $450 million payment obligation to the DC VEBA expressly stated in

Section K.2 of the 2007 Delphi Restructuring MOU "have never been satisfied," thus dooming

the UAW's action in the Michigan District Court to enforce that $450 million payment

obligation to the DC VEBA "[f]or this independent reason."  *See* Mot. at ¶ 5; *id.* at ¶¶ 60-68.

33.    On its face, New GM's first merits argument presents an issue of contract

interpretation arising under the **2009** UAW Retiree Settlement Agreement.  Conversely, on its

face, New GM's second merits argument presents an issue of contract interpretation arising

under the 2007 Delphi Restructuring MOU.

34.    New GM explicitly asserts in its Motion that this Court has jurisdiction to rule on
the issue of contract interpretation arising under the **2009** UAW Retiree Settlement Agreement,
*see infra* ¶ 40, whereas New GM's assertion that this Court also has jurisdiction to rule on the
issue of contract interpretation arising under the 2007 Delphi Restructuring MOU is merely
implicit.  Be that as it may, it is abundantly clear that New GM is wrong with respect to **both** of
its jurisdictional assertions—as the UAW demonstrates below.  The UAW will begin by
addressing New GM's implicit jurisdictional assertion respecting the issue of contract
interpretation arising under the 2007 Delphi Restructuring MOU, because it readily can be
shown without extended analysis that New GM's implicit jurisdictional assertion is untenable
under Section 1334.  The UAW will then move on to address New GM's explicit jurisdictional
assertion respecting the issue of contract interpretation arising under the **2009** UAW Retiree
Settlement Agreement, which requires a more detailed analysis of the relevant agreements, but
which plainly fails as well.

A.    *This Court Lacks Jurisdiction to Rule on the Issue of Contract Interpretation*
*Arising Under the 2007 Delphi Restructuring MOU*

35.    In its Motion, New GM sets forth no affirmative basis for this Court's exercise of
jurisdiction over the UAW's claim for breach of the 2007 Delphi Restructuring MOU.  The
Motion focuses solely on the jurisdictional provisions of the **2009** UAW Retiree Settlement
Agreement and the Sale Order as related to New GM's first merits defense to that claim ("fixed
and capped" obligations to New VEBA).  *See* Mot. at ¶¶ 51-57.  These jurisdictional provisions
in the **2009** Agreement, however, can provide no basis for the exercise of jurisdiction over the
UAW's claim that the 2007 Delphi Restructuring MOU has been breached or New GM's second
merits defense that the conditions precedent set forth in the MOU have not been satisfied.  The

only connection between the claim and that second defense and this Court is the assumption and

assignment of the 2007 Delphi Restructuring MOU pursuant to the Sale Order.

      36.     Bankruptcy court jurisdiction over a contract dispute between non-debtors cannot

rest on so slim a reed.  Under the well-settled case law discussed below, the only circumstance

under which bankruptcy courts have found subject matter jurisdiction over a post-assignment

breach claim between non-debtors is when the claim (i) turns on the bankruptcy court's own

orders, thus invoking the court's "arising in" or ancillary jurisdiction, or (ii) has a sufficient

effect on the estate to justify the exercise of "related to" jurisdiction.

      37.     Neither of these circumstances is present here:  the UAW's breach-of-contract

claim against New GM neither turns on this Court's prior orders, nor raises any prospect of a

cognizable effect on Old GM's estate.  Instead, the UAW's claim turns on the terms of the 2007

Delphi Restructuring MOU—in particular, on whether the conditions precedent to New GM's

$450 million payment obligation to the DC VEBA have been satisfied.  The UAW contends that

these conditions were satisfied as of October 6, 2009, at which time New GM's $450 million

payment obligation to the DC VEBA became due and owing.  While New GM now disputes this,

*see* Mot. at ¶¶ 60-68, the relevant issues were never raised before this Court, or decided in the

course of the section 363 sale.  The nexus between the breach claim and Old GM's bankruptcy

proceeding is thus so attenuated as to be virtually nonexistent, such that there can be neither

"arising in" nor ancillary jurisdiction over the UAW's breach claim.  *See In re Kassover*, 336

B.R. 74, 80 (Bankr. S.D.N.Y. 2006) (Where an action is only "tangentially related to events that

occurred during the Debtor's bankruptcy proceeding . . . it clearly does not 'arise in' or 'arise

under' the Bankruptcy Code and is not core."); *In re Bradlees*, No. 04-5500, 2005 WL 106794,

at *3 (S.D.N.Y. Jan. 19, 2005); *see also In re Xonics*, 813 F.2d 127, 130 (7th Cir. 1987) (holding

that a dispute based on conflicting readings of contractual language "is the sort ordinarily resolved by state courts under the common law of contract and the Uniform Commercial Code. It should be resolved in the usual forum and under the usual rules . . . .").

38.    These facts distinguish the UAW's breach claim from the claim at issue in *NWL Holdings, Inc. v. Eden Center, Inc. (In re Ames Department Stores, Inc.)*, 317 B.R. 260, 262 (Bankr. S.D.N.Y. 2004) (Gerber, J.), where this Court found "arising in" jurisdiction over a post-assignment breach claim because it turned on a right expressly created by the bankruptcy court's sale order.[6]  Rather, as in *Hartigan v. Blaeser Development Corp. (In re Chase Manhattan Mortgage & Realty Trust)*, "[e]xtensive discussion is not needed" as to the bankruptcy court's jurisdiction, where the "dispute is within the general rule that a bankruptcy court lacks subject matter jurisdiction over a controversy solely and exclusively between third parties not involving, directly or indirectly, the debtor or its property."  11 B.R. 982, 984 (Bankr. S.D.N.Y. 1981) (dismissing the suit for lack of subject matter jurisdiction).

39.    Nor can New GM assert that the UAW's breach claim has an effect on the Debtors' estates sufficient to vest this Court with "related to" jurisdiction.  By virtue of the assignment of the 2007 Delphi Restructuring MOU to New GM, the Debtors have been relieved of all obligations under that agreement.  11 U.S.C. § 365(k).  The UAW has no claims against the Debtors,[7] and New GM has not suggested that the UAW's breach claim will give rise to any

---

[6]        In so holding, this Court analyzed *In re Petrie Retail, Inc.*, 304 F.3d 223 (2d Cir. 2002), which found the existence of core subject matter jurisdiction over a contract dispute between non-debtors for three reasons:  1) the dispute was based on rights established in the sale order; 2) the motion sought enforcement of a pre-existing injunction that was issued as part of the bankruptcy court's sale order; and 3) the dispute involved an issue already before the bankruptcy court, because the petitioner had previously filed a claim against the bankrupt estate with the bankruptcy court.  None of these factors apply to the UAW's breach claim (or New GM's second defense to that claim) under the 2007 Delphi Restructuring MOU.

[7]        Indeed, the UAW has agreed not to assert such claims.  *See* Ravindran Decl., Ex. 6.

liabilities for the estates. The only effect on the estate that New GM has identified is a potential fluctuation in the value of Old GM's fractional equity stake in New GM.[8] But even where a debtor owns *one hundred percent* of a non-debtor corporation, claims against that wholly-owned subsidiary cannot give rise to "related to" jurisdiction. *See Tower Auto. Mexico S. de R.L. de C.V. v. Grupo Proeza, S.a. (In re Tower Auto., Inc.),* 356 B.R. 598, 600 (Bankr. S.D.N.Y. 2006); *In re Stein & Day, Inc.,* 113 B.R. 157, 162 (Bankr. S.D.N.Y. 1990). Under this precedent, Old GM's mere ten percent holdings in New GM cannot begin to have a sufficient effect on its estate to establish "related to" jurisdiction.[9]

B.    *This Court Lacks Jurisdiction to Rule on the Issue of Contract Interpretation Arising Under the 2009 UAW Retiree Settlement Agreement*

40.    In support of its assertion that this Court has exclusive jurisdiction to rule on its first merits argument raising an issue of contract interpretation under the **2009** UAW Retiree

---

[8]    Old GM received approximately ten percent of New GM's equity pursuant to the Amended Master Sale and Purchase Agreement. *See* Mot., Ex. B (at Ex. A), at §§ 3.2(a)(iii)(A)-(B).

[9]    Even DPH Holdings Corp. ("**Reorganized Delphi**") agrees that this Court does not have jurisdiction over the UAW's claim under the 2007 Delphi Restructuring MOU. *See* DPH Holdings Corp. and its Affiliated Reorganized Debtors' Limited Objection in Response to Motion of General Motors LLC to Enforce Sale Order (D.I. 7626). Though Reorganized Delphi goes on to argue that the Delphi bankruptcy court has such jurisdiction in lieu of the Michigan District Court in which the UAW filed its DC VEBA Complaint, once this Court resolves the question of its own jurisdiction, it need not and should not reach that separate jurisdictional issue as between the Delphi bankruptcy court and the Michigan District Court. *See e.g. Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 94 (1998) ("Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause.") (quoting *Ex parte McCardle,* 7 Wall. 506, 514, 19 L.Ed. 264 (1868)). In any event, Reorganized Delphi's argument fails on the merits. Because the Delphi plan of reorganization has been consummated, the scope of the Delphi bankruptcy court's jurisdiction has further diminished, leaving jurisdiction only over matters having a close nexus to the bankruptcy plan over which jurisdiction has expressly been retained. *See Penthouse Media Grp. v. Guccione (In re Gen. Media Inc.),* 335 B.R. 66, 73 (Bankr. S.D.N.Y. 2005). The UAW's breach-of-contract claim is asserted solely against New GM and has no bearing on the implementation or administration of the Delphi plan. Moreover, while the Delphi Confirmation Order retained jurisdiction over "matters arising out of, and related to, the Chapter 11 Cases and this Plan," that retention of jurisdiction did not extend to jurisdiction over agreements executed during the Delphi bankruptcy, such as the 2007 Delphi Restructuring MOU. Finally, while Reorganized Delphi suggests that the UAW's pursuit of its breach-of-contract claim against New GM could violate the Delphi plan's injunction, this ignores the express plan provisions clarifying that obligations under the 2007 Delphi Restructuring MOU were never exculpated or released. Ravindran Decl., Ex. 7, at §§ 1.233, 1.235, 11.14, 11.15.

Settlement Agreement, New GM invokes this Court's retained jurisdiction under Section 26 of

that **2009** Agreement, as well as Paragraph 71 of the Sale Order.  As New GM observes, Section

26 of the **2009** Agreement confers exclusive jurisdiction on this Court to resolve "dispute[s]

arising out of or relating to, or involving, the enforcement, implementation, application or

interpretation of this Settlement Agreement," *see* Mot. at ¶ 43; *id.* at ¶ 52, and Paragraph 71 of

the Sale Order is to the same effect, in that it confers exclusive jurisdiction on this Court to

enforce "'each of the agreements executed in connection therewith,'" which would include the

**2009** Agreement, *see id.* at ¶ 50; *id.* at ¶ 55.

  41. In a nutshell, New GM's jurisdictional argument based on Section 26 of the **2009**

Agreement and Paragraph 71 of the Sale Order is as follows:  "A singular component of [the

**2009** Agreement] . . . was its express and repeated admonition that New GM's obligations to

make contributions to **the New VEBA** were 'fixed and capped' at the amount and structure of

the specific payments denominated in the agreement – and no more."  Mot. at ¶ 2 (emphasis

added).  That being so, says New GM, "the UAW's demand" in its DC VEBA Complaint for

what New GM characterizes as an "Additional VEBA Payment" presents a "dispute[ ] arising

out of or relating to the enforcement, implementation, application or interpretation of the [**2009**

Agreement]" that "fall[s] within" this Court's exclusive jurisdiction under Section 26 of that

**2009** Agreement to resolve such "disputes."  *See id.* at ¶ 52.  And, according to New GM, the

same is true with respect to its stated "position" in this Court that the UAW's demand "is

precluded by" the various provisions in the **2009** Agreement "fixing and capping" New GM's

payment obligations to **the New VEBA**.  *See id.*

  42. Again with all due respect to New GM, this line of argument is wholly fallacious,

inasmuch as it rests squarely and entirely on the patently inaccurate cursory description of the

UAW's DC VEBA Complaint exposed *supra* at ¶ 28.  Contrary to New GM's repeated

representations to this Court, the UAW's DC VEBA Complaint does **not** seek to enforce and

collect upon an "[a]dditional" payment obligation to **the New VEBA** of the kind that the UAW

readily acknowledges would be "precluded by" the terms of the **2009** UAW Retiree Settlement

Agreement "fixing and capping" New GM's payment obligations to **the New VEBA**.  Rather, as

shown, the UAW's DC VEBA Complaint seeks to enforce and collect upon a $450 million

payment obligation to **the DC VEBA** that arises under the 2007 Delphi Restructuring MOU and

that is **not** addressed in **any** way by the terms of the **2009** Agreement.

43.    Accordingly, on a fair and proper reading of the UAW's DC VEBA Complaint—

rather than the distorted reading put forward by New GM—it is plain that the UAW's Complaint

presents a "dispute arising out of or relating to the enforcement, implementation, application or

interpretation of" the terms of **the 2007 Delphi Restructuring MOU** respecting New GM's

$450 million payment obligation to **the DC VEBA** that falls within the Michigan District

Court's jurisdiction under § 301 of the Labor Management Relations Act ("**LMRA**"),[10] and does

**not** present **any** "dispute arising out of or relating to the enforcement, implementation,

application or interpretation of" the terms of the **2009** UAW Retiree Settlement Agreement

"fixing and capping" New GM's payment obligations to **the New VEBA** that falls within this

Court's exclusive jurisdiction under Section 26 of that **2009** Agreement.

44.    Nor is it relevant (much less dispositive) in this regard that New GM has taken the

self-serving "position" in this Court that the UAW's Michigan District Court action to enforce

---

[10]    Section 301(a) of the LMRA expressly provides that "[s]uits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce . . . may be brought in any district court of the United States having [personal] jurisdiction of the parties."  29 U.S.C. § 185(a).  On its face, the 2007 Delphi Restructuring MOU is a "contract[ ] between an employer and a labor organization representing employees in an industry affecting commerce," and there can be no dispute that the Michigan District Court has personal jurisdiction over New GM and the UAW.

and collect upon New GM's $450 million payment obligation to **the DC VEBA** under the 2007

Delphi Restructuring MOU "is precluded by" the terms of the **2009** Agreement "fixing and

capping" New GM's payment obligations to **the New VEBA**.  It is well-settled law that the mere

fact that a party has asserted a claim purportedly falling within a federal court's subject matter

jurisdiction is **not** sufficient in and of itself to invoke that jurisdiction; rather, if it is apparent that

the claim at issue is an insubstantial one that has no colorable merit, the proper course for the

court to follow is to dismiss that claim for want of jurisdiction.  *See e.g. New York State Ass'n of*

*Trial Lawyers v. Rockefeller*, 267 F. Supp. 148, 151 (S.D.N.Y. 1967) ("It is further 'settled that

jurisdiction does not arise simply because an averment is made as to the existence of a

constitutional question, if it plainly appears that such averment is not real and substantial, but is

without color of merit.'") (quoting *Newburyport Water Co. v. Newburyport*, 193 U.S. 561, 576

(1904)); *Barbara v. New York Stock Exch., Inc.*, 99 F.3d 49, 54 (2d Cir. 1996) ("The mere

presence of a federal issue in a state cause of action does not automatically confer federal-

question jurisdiction.  Rather, in determining federal question jurisdiction, courts must make

principled, pragmatic distinctions, engaging in a selective process which picks the substantial

causes out of the web and lays the other ones aside.") (internal citation and quotation marks

omitted); *Perpetual Sec., Inc. v. Tang*, 290 F.3d 132, 137 (2d Cir. 2002) ("Simply raising a

federal issue in a complaint will not automatically confer federal question jurisdiction.  Rather,

we ask 'whether the cause of action alleged is *so patently without merit* as to justify . . . the

court's dismissal for want of jurisdiction.'") (quoting *Duke Power Co. v. Carolina Envtl. Study*

*Group, Inc.*, 438 U.S. 59, 70 (1978)) (emphasis and ellipsis in original).

      45.      Here, it cannot be gainsaid that New GM's claim or "position" that the UAW's

Michigan District Court action to enforce and collect upon New GM's $450 million payment

obligation to **the DC VEBA** under the 2007 Delphi Restructuring MOU "is precluded by" the terms of the **2009** Agreement "fixing and capping" New GM's payment obligations to **the New VEBA**, is, on its face, an insubstantial "position" that has no colorable merit. For New GM does not even begin to explain in its Motion, and cannot possibly explain, how it is that an action to enforce and collect upon a payment obligation to one retiree health benefit fund (here, **the DC VEBA**) arising under one labor contract can be deemed "precluded by" the terms of a subsequent labor contract "fixing and capping" the employer's payment obligations to a separate and distinct retiree health benefit fund (here, **the New VEBA**).

46.     To be sure, on January 16, 2010, several months **after** New GM's $450 million payment obligation to the DC VEBA at issue in the Michigan District Court Litigation was triggered as alleged in the UAW's DC VEBA Complaint, the assets and liabilities of the DC VEBA were transferred to the New VEBA in accordance with section 12.C of the **2009** UAW Retiree Settlement Agreement, and the DC VEBA was then terminated. *See* Sherrick Decl. at ¶ 22. Thus, as a practical matter, should the UAW prevail on the merits of its breach-of-contract claim in the Michigan District Court Litigation, the $450 million payment that New GM will be required to make in satisfaction of its payment obligation to the DC VEBA under the 2007 Delphi Restructuring MOU will flow into the coffers of the New VEBA. But that fact cannot somehow transform the UAW's perfectly-proper LMRA § 301 action in the Michigan District Court to enforce New GM's $450 million payment obligation to the DC VEBA under the 2007 Delphi Restructuring MOU into an improper action to enforce a payment obligation to the New VEBA that is "precluded by" the terms of the **2009** Agreement "fixing and capping" New GM's payment obligations to the New VEBA. To the contrary, that fact simply reflects the reality that one of the assets transferred from the DC VEBA to the New VEBA on January 16, 2010 was the

still-outstanding, unsatisfied claim against New GM for breach of its $450 million payment

obligation to the DC VEBA under the 2007 Delphi Restructuring MOU—a payment obligation

to the DC VEBA that, as previously emphasized, the **2009** Agreement does **not** purport to

modify or "extinguish."

47.     In any event, as alleged by the UAW in its DC VEBA Complaint, New GM's

$450 million payment obligation to the DC VEBA ripened on October 6, 2009, and the UAW

made a timely, written demand that New GM make that contractually-required payment to the

DC VEBA on October 29, 2009—a UAW payment demand which New GM promptly rejected

in breach of its contractual payment obligation to the DC VEBA.  Had New GM honored its

contractual payment obligation to the DC VEBA upon the UAW's timely payment demand, then

the $450 million payment at issue **would have gone into the DC VEBA, which still existed as**

**of that date**.  *See* Sherrick Decl. at ¶ 21.  New GM cannot profit by its own contractual breach

by now attempting to recast its $450 million payment obligation to the DC VEBA under the

2007 Delphi Restructuring MOU as a payment obligation to the New VEBA that was

"extinguished" somehow by the contract language in the **2009** Agreement "fixing and capping"

New GM's payment obligations to the New VEBA.  *See, e.g., Mkt. St. Assocs. v. Frey*, 941 F.2d

588, 592 (7th Cir. 1991) (Posner, J.) ("[A] contracting party cannot be allowed to use his own

breach to gain an advantage by impairing the rights that the contract confers on the other

party."); *DeSilvio v. Prudential Lines, Inc.* 701 F.2d 13, 16 (2d Cir. 1983) ("th[e] principle" that

"no man may take advantage of his own wrong" is "[d]eeply rooted in our jurisprudence" and

"has been applied in many diverse classes of cases by both law and equity courts");

*Massachusetts Mut. Life Ins. Co. v. Millstein*, 129 F.3d 688, 692 (2d Cir. 1997) (same).[11]

48.     It is thus abundantly clear **on the face of** the **2009** Agreement that there is no

colorable merit in New GM's stated "position" herein that the contract language in that

Agreement "fixing and capping" New GM's payment obligations to the New VEBA had the

effect of "extinguishing" the $450 million payment obligation to the DC VEBA arising under the

2007 Delphi Restructuring MOU. Nevertheless, the UAW would be derelict if it failed to show

that this conclusion is confirmed by the history preceding, and informing a proper understanding

of, the **2009** Agreement. That is especially so given the distorted picture of the relevant factual

landscape painted by New GM in its Motion.

49.     To reiterate, the New VEBA was "established" by the **2008** UAW Retiree

Settlement Agreement—and **not** by the **2009** UAW Retiree Settlement Agreement as stated by

New GM, *see* Mot. at ¶ 1—and the contract language in the **2009** Agreement "fixing and

capping" New GM's payment obligations to the New VEBA was carried over *in haec verba*

from that prior, **2008** Agreement. That being so, the following argument is implicit in New

GM's stated "position" herein that this contract language can be read to have "extinguished" the

$450 million payment obligation to the DC VEBA arising under the 2007 Delphi Restructuring

MOU: that payment obligation was "extinguished" **in 2008** by operation of the **2008** UAW

---

[11]     New GM's "position" that the **2009** Agreement "extinguished" its $450 million payment obligation to the DC VEBA is in the nature of an affirmative defense to the breach-of-contract claim asserted by the UAW in its DC VEBA Complaint; and, indeed, was so characterized by New GM in its Answer to the UAW's Complaint. *See* Answer, "**AFFIRMATIVE DEFENSES**" (attached hereto as Exhibit 4 to the Ravindran Decl.). Accordingly, it is appropriate for this Court, in determining whether New GM's defense has colorable merit, to assume the validity of the UAW breach-of-contract claim to which that defense has been interposed. *See generally* Black's Law Dictionary 55 (5th ed. 1979) (an "affirmative defense" is "new matter which, assuming the complaint to be true, constitutes a defense to it"); 2 James Wm. Moore et al., *Moore's Federal Practice*, § 8.08[1] (3d ed. 2010) ("affirmative defenses, if accepted by the court, will defeat an otherwise legitimate claim for relief").

Retiree Settlement Agreement.  (For reasons that are obvious from the discussion that

immediately follows, New GM does not even mention the **2008** UAW Retiree Settlement

Agreement in its Motion, much less make an explicit argument along these lines based on the

**2008** Agreement.)

50.    The fatal problem for New GM is that its implicit argument along these lines is

belied by the 2008 Implementation Agreement discussed *supra* at ¶¶ 17-19, as to which both Old

GM and the UAW (along with Delphi) were parties.  That 2008 Implementation Agreement

expressly modified the 2007 Delphi Restructuring MOU, and in so doing expressly corroborated

the fact that the $450 million payment obligation to the DC VEBA arising under the 2007 Delphi

Restructuring MOU "**remain[ed] payable** as set forth in the Restructuring MOU."  *See* Mot.,

Ex. F, at ¶ 6 (emphasis added).  On its face, this stipulation by Old GM and the UAW in the

2008 Implementation Agreement that Old GM's $450 million payment to the DC VEBA "**shall**

**remain payable** as set forth in the Restructuring MOU" evinces a clear, mutual understanding

between those two parties to the Implementation Agreement that the contract language in their

prior, **2008** UAW Retiree Settlement Agreement "fixing and capping" Old GM's payment

obligations to the New VEBA did **not** have the effect of "extinguishing" that $450 million

payment obligation to the DC VEBA.  *A fortiori,* there is no colorable merit in New GM's stated

"position" herein that **the identically-worded contract language** in the **2009** UAW Retiree

Settlement Agreement "fixing and capping" New GM's payment obligations to the New VEBA

had such an "extinguishing" effect on the $450 million payment obligation to the DC VEBA.  If

the contracting parties' intentions had shifted so dramatically from one agreement to the next, it

stands to reason that the parties would have modified the relevant contract language accordingly.

51.     In this instance as well, the clear and unambiguous language of the parties'
agreement (here, the 2008 Implementation Agreement) is sufficient standing alone to make the
UAW's point.  But for the sake of completeness, the UAW adverts to the following additional
facts corroborating the point that the contract language in the **2008** UAW Retiree Settlement
Agreement "fixing and capping" Old GM's payment obligations to the New VEBA—and, *a
fortiori*, **the identically-worded contract language** in the **2009** UAW Retiree Settlement
Agreement—cannot possibly be read to have "extinguished" the $450 million payment
obligation to the DC VEBA arising under the 2007 Delphi Restructuring MOU:

a.     In the negotiations between Old GM and the UAW leading up to the **2008**
UAW Retiree Settlement Agreement establishing the New VEBA, the funding for the New
VEBA was calculated and re-calculated literally dozens of times, with Old GM's and the UAW's
actuaries and other experts sharing these calculations in order to ensure that the parties had a
common understanding of the funding.  *See* Sherrick Decl. at ¶ 16.  In all of these calculations,
the $450 million payment obligation to the DC VEBA arising under the 2007 Delphi
Restructuring MOU was included as a funding source.  *Id.*  In other words, for purposes of
determining funding levels for the New VEBA, the parties had a clear, mutual expectation that
this $450 million would in fact be paid to the DC VEBA when the conditions stated in the 2007
Delphi Restructuring MOU were satisfied, and would then be part of the transfer of assets to the
New VEBA provided for by Section 12.C of the **2008** Agreement.  *Id.*

b.     After the parties' execution of the 2008 Implementation Agreement in
September of 2008, but before Old GM's bankruptcy filing in this Court in June of 2009, Old
GM's deteriorating financial condition led Old GM to propose to the UAW a comprehensive
package for reducing Old GM's cash outlays associated with the ongoing provision of retiree

health benefits to former GM employees. *See id.* at ¶ 17. As an element of that comprehensive package (which was not ultimately agreed to by the UAW), Old GM proposed that the contingency on its $450 million payment obligation to the DC VEBA from the 2007 Delphi Restructuring MOU be removed, thereby obligating Old GM to make that $450 million payment without regard to the outcome of the still-pending Delphi bankruptcy proceeding. *Id.* By making that proposal, Old GM confirmed its own, keen understanding—reflected in the earlier, 2008 Implementation Agreement between Old GM, the UAW and Delphi—that its $450 million payment obligation to the DC VEBA had **not** been "extinguished" by the **2008** UAW Retiree Settlement Agreement and the contract language therein "fixing and capping" its payment obligations to the New VEBA.

      c.     Most recently, on April 7, 2010, New GM filed a 10-Q with the Securities and Exchange Commission in which it acknowledged that the $450 million payment obligation to the DC VEBA arising under the 2007 Delphi Restructuring MOU survived the **2008** UAW Retiree Settlement Agreement. Specifically, New GM stated in its filing that "[a]s a result of the 2008 UAW Settlement Agreement becoming effective in September 2008, Old GM remeasured the obligations and plan assets of its UAW hourly retiree medical plan and Mitigation Plan using updated assumptions in September 2008,"[12] and that those remeasured obligations and plan assets "included," among other things, "a $450 million payment to the New VEBA which was contingent upon substantial consummation of a plan of reorganization (POR) by Delphi

---

[12]    Because a purpose of the DC VEBA was to mitigate the new costs imposed on GM retirees by the *Henry I* settlement, *supra* ¶ 5, it sometimes was referred to by the parties as the "Mitigation" VEBA, *see* Sherrick Decl. at ¶ 5. Hence the reference in the 10-Q to the "Mitigation Plan" under which the DC or "Mitigation" VEBA operated.

Corporation (Delphi)."[13]  *See* General Motors Company Form 10-Q, at 52 (available at

http://www.gm.com/corporate/investor_information/sec/).

52.    The short of the matter is this:  New GM has asserted a putative defense under the

**2009** UAW Retiree Settlement Agreement to the UAW's DC VEBA Complaint that is so plainly

lacking in color of merit as to be insufficient to trigger this Court's retained jurisdiction under

Section 26 of the **2009** Agreement.  That being so, this Court should hold that it lacks

jurisdiction to entertain New GM's putative defense based on the well-established line of judicial

authority set out *supra* at ¶ 44, thereby allowing the UAW to proceed with the prosecution of its

Michigan District Court lawsuit without further, unnecessary delay and expense of the kind

already occasioned by New GM's Motion.

II.    *Even If the Court Has Jurisdiction Over One or More Aspects of the Underlying*
       *Controversy, It Should Abstain from Exercising that Jurisdiction*

53.    Even if the Court decides that it has jurisdiction—either solely as to New GM's

asserted defense under the **2009** UAW Retiree Settlement Agreement, or over the UAW's

breach-of-contract claim under the 2007 Delphi Restructuring MOU as well—the Court should

abstain in favor of the existing litigation in the Eastern District of Michigan.

54.    Each of the relevant factors that courts in the Second Circuit consider in

determining whether to abstain under Section 1334(c)(1) points in favor of abstention.  These

include:  (a) the effect the dispute will have on efficient administration of the estate, (b) the

---

[13]    While New GM's 10-Q filing speaks in terms of a "$450 million payment to the New VEBA," New GM's
use of that terminology is unsurprising given that by the filing date the transfer of assets from the DC VEBA to the
New VEBA had been accomplished and the DC VEBA had been terminated, such that as a practical matter the $450
million payment would indeed flow into the coffers of the New VEBA rather than the DC VEBA.  *See supra* ¶ 46.

extent to which state law[14] issues predominate, (c) the existence of a related proceeding

commenced in another non-bankruptcy court, (d) the degree of remoteness of the dispute to the

main bankruptcy case, (e) the existence of a right to a jury trial, and (f) the presence in the

proceedings of non-debtor parties. *See, e.g., Marine Midland Bank v. Zurich Ins. Co. (In re*

*Olympia & York Maiden Lane Co. LLC),* Case No. 98-B-46167, 1999 Bankr. LEXIS 91, at *23

(Bankr. S.D.N.Y. Jan. 25, 1999); *Channel Bell Assocs. v. W.R. Grace & Co.,* No. 91 Civ. 5485,

1992 U.S. Dist. LEXIS 13014, at **25-26 (S.D.N.Y. Aug. 31, 1992).[15]  As set forth above,

regardless of its outcome, the Motion will have no effect on the administration of the Debtors'

estates.  The underlying contract at issue has been assumed and assigned to New GM, and the

Debtors have no further obligations or liability thereunder.  The UAW also has no pending

claims against the Debtors, and New GM has identified no claims it would have against the

estate as a result of this dispute.  The Motion instead represents a contract dispute between two

non-debtor parties that is governed entirely by non-bankruptcy law.

55.    New GM's argument that its asserted defense under the **2009** UAW Retiree

Settlement Agreement implicates this Court's Sale Order, even if accepted, in no way changes

this analysis.  As this Court has itself recognized, where a contract dispute between two non-

debtor parties would have no effect on the debtor, the fact that "adjudication of this dispute will

require interpretation of the Court's Sale Order, or conclusions as to customary and standard

---

[14]      Or, in this case, the federal common law of contracts developed under § 301 of the LMRA, *see generally
Textile Workers Union v. Lincoln Mills,* 353 U.S. 448, 456-57 (1957).

[15]      Section 1334(c)(1) speaks both to abstention in the interests of comity with state courts, and to abstention
in the interest of justice, such that it applies with equal force to abstention in favor of another federal court.  *See,
e.g., In re Portrait Corp. of Am.,* 406 B.R. 637, 643 (Bankr. S.D.N.Y. 2009) (abstaining under Section 1334(c)(1) in
favor of action pending in federal district court); *see also In re Motors Liquidation Co.,* Case No. 09-50026, Tr. of
Oct. 4, 2010 Hr'g (Bankr. S.D.N.Y.) (Gerber, J.), at 48 ("[W]hile [1334(c)(1)] speaks principally of state courts and
state law, I accept for the purposes of this analysis that we, bankruptcy courts have the power to abstain in favor of
other federal courts when circumstances so warrant.") (appended to Mot. as Exhibit L).

provisions for the purchase and sale of claims in bankruptcy proceedings," does not provide a

compelling justification for the Court's exercise of its jurisdiction. *See Longacre Master Fund v.*

*Telecheck Servs. Inc. (In re Casual Male Corp.)*, 317 B.R. 472, 481 (Bankr. S.D.N.Y. 2004)

(internal quotations omitted); *see also JMB Capital Partners L.P. v. CRT Capital Group LLC (In*

*re NTL Inc.),* 295 B.R. 706, 717 (Bankr. S.D.N.Y. 2003) (abstaining from exercising jurisdiction

over dispute between non-debtors, as although "[t]his court's order . . . is one event that gave rise

to the litigation, . . . the real issues today do not involve the interpretation of the order, but rather

its effect on the parties to private contracts. Those issues are sufficiently distinct from the

bankruptcy case that they can and should be decided in the State court under applicable State

law.").[16]

56.    Moreover, as demonstrated above, there is no tenable basis on which New GM

can demonstrate that this Court has jurisdiction over the UAW's breach-of-contract claim under

the 2007 Delphi Restructuring MOU.  As such, even if the Court finds that it has jurisdiction as

to New GM's asserted defense under the **2009** UAW Retiree Settlement Agreement, the Court

cannot fully resolve the merits of the UAW's breach claim, forcing the UAW to return to the

Michigan District Court in which the UAW asserted that claim in the first place.  Second, given

that the UAW's breach claim is for recovery of "a debt allegedly due under a contract," *Dairy*

*Queen, Inc. v. Wood*, 369 U.S. 469, 477 (1962), and thus could not be "of a more traditionally

legal character," *id.*, the parties unquestionably are entitled to a jury trial on that claim under

*Dairy Queen*, which the UAW has in fact demanded in the Michigan District Court Litigation.[17]

---

[16]    Though *Casual Male* was decided on equitable remand grounds, the court's decision recognized that "[i]t is well established that the analysis that applies to discretionary abstention is very similar to that considered in connection with equitable remand."  *Casual Male*, 317 B.R. at 479, n.26.

[17]    *See* Ravindran Decl., Ex. 8.

Accordingly, even indulging New GM's untenable, implicit argument that the Court has

jurisdiction over **both** elements of its Motion, this Court would still be unable to enter a

judgment on the UAW's breach claim absent the express consent of all parties to waive their

right to a jury trial on that claim.  *See* 28 U.S.C. § 157(e); *Buchwald v. Renco Group (In re*

*Magnesium Corp.),* No. 04-Civ.-1357, 2004 U.S. Dist. LEXIS 9389, at *5 (S.D.N.Y. May 20,

2004).  By contrast, the Michigan District Court in which the UAW filed its DC VEBA

Complaint has jurisdiction to fully resolve the underlying controversy between the parties,

including through conduct of a jury trial.[18]  In either event, unless this Court abstains, it will of

necessity spawn piecemeal litigation over the disputes in the Motion, undermining the interests

in judicial economy that would be served through a single litigation before Judge Cohn in the

Eastern District of Michigan.

57.     The fact that the Complaint in the Michigan District Court Litigation was first-

filed only strengthens the case for abstention.  *See Reliance Ins. Co. v. Six Star, Inc.*, 155 F.

Supp. 2d 49, 54 (S.D.N.Y. 2001) ("When two actions involving the same parties and issues are

pending concurrently, courts in the Second Circuit follow the 'first-filed' rule whereby the court

which first has possession of the action decides it.") (quotations omitted).[19]  In *Arris Int'l, Inc. v.*

*Hybrid Patents, Inc. (In re Com21, Inc.),* a bankruptcy proceeding in the Northern District of

California was ongoing when a third party sued the purchaser of the debtor's assets in the

---

[18]     The balance of conveniences also favors the Eastern District of Michigan, as both parties' principal offices
are located in Detroit, and many of the witnesses and relevant documents are located there.  Indeed, Detroit is a
virtual metonym for General Motors.

[19]     For purposes of the first-to-file rule, the chronology of cases is generally determined by the date on which
the original complaint is filed.  *Amperion, Inc. v. Current Group, LLC*, No. 10-5362, 2010 WL 3469307, at *1
(S.D.N.Y. Aug. 23, 2010); *Schnabel v. Ramsey Quantitative Sys., Inc.,* 322 F. Supp. 2d 505, 511 n.4 (S.D.N.Y.
2004).  The UAW's Complaint was filed on April 6, 2010, while Purchaser's Motion was not filed until October 22,
2010.  *See* Motion at ¶¶ 29-30.  Even if the date of service governed, the UAW's Complaint was served on
September 17, 2010, more than a month before service of the Motion.  *See* Ravindran Decl., Ex. 9.

Eastern District of Texas.  357 B.R. 802, 807 (Bankr. N.D.Cal. 2006).  In response, the purchaser

initiated an adversary proceeding in the bankruptcy court asserting defenses based on the

bankruptcy court's sale order.  The defendant then moved to stay, transfer or dismiss the

purchaser's action to enforce the sale order on the basis of the first to file rule, since the Texas

action was chronologically first-filed.  The bankruptcy court agreed, staying the bankruptcy case

in favor of the Texas action, despite the fact that the bankruptcy court had retained exclusive

jurisdiction over disputes arising out of or related to the sale order.  In light of the importance of

the first-to-file rule, "[t]he [bankruptcy] court [wa]s not persuaded that [its retention of

jurisdiction] amount[ed] to a compelling reason to disregard the first-to-file rule."  357 B.R. at

809.  Here, as in *Com21*, the Court should exercise its discretion and abstain in favor of the

Eastern District of Michigan, the first-filed court, to the extent the Court finds that it has

jurisdiction over any aspect of New GM's Motion.[20]

---

[20]     Should the Court find, and decide to exercise, jurisdiction over one or both of the contract interpretation issues raised by the Motion, the parties will proceed to merits discovery on that issue or issues—including as to parol evidence—in preparation for the full evidentiary hearing that the Norris-LaGuardia Act would require as a precondition for issuance of the injunctive relief sought by New GM.  *See* 29 U.S.C. §§ 107-109; *Petrusch v. Teamsters Local 317 (In re Petrusch)*, 667 F.2d 297, 300 (2d Cir. 1981).

## CONCLUSION

WHEREFORE, for the reasons set forth herein, the UAW respectfully requests that the

Court dismiss New GM's Motion to Enforce the Sale Order for lack of subject matter

jurisdiction.

Dated:  December 22, 2010          Respectfully submitted,

                                   BREDHOFF & KAISER P.L.L.C.

                                   By:    /s/ ANDREW D. ROTH
                                          Andrew D. Roth (admitted *pro hac vice*)
                                          Ramya Ravindran (admitted *pro hac vice*)

                                   805 Fifteenth Street, N.W. Suite 1000
                                   Washington, D.C. 20005
                                   Telephone: (202) 842-2600
                                   Facsimile: (202) 842-1888


                                   CLEARY GOTTLIEB STEEN & HAMILTON LLP

                                          Deborah M. Buell
                                          James L. Bromley

                                   One Liberty Plaza
                                   New York, New York 10006
                                   Telephone:  (212) 225-2000
                                   Facsimile:  (212) 225-3999

                                   *Counsel for UAW*