UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------- X
                                                                    :
*In re*                                                             : Chapter 11
                                                                    :
MOTORS LIQUIDATION COMPANY, *et. al.,*                              : Case No. 09-50026 (REG)
    f/k/a General Motors Corp., *et. al.,*
                                                                    :
        Debtors.                                   : (Jointly Administered)
                                                                    :
------------------------------------------------------------------- X

**DECLARATION OF DANIEL SHERRICK IN SUPPORT OF
THE UAW's MEMORANDUM OF LAW CONCERNING JURISDICTION OVER
MOTION OF GENERAL MOTORS LLC TO ENFORCE THE SALE ORDER**

1

I, Daniel Sherrick, hereby declare:

1.    I am over twenty-one years of age and have personal knowledge of the facts set forth herein and, if called to testify as a witness thereto, could do so competently under oath.

2.    I served as the General Counsel for the UAW from 1998 to 2010.

3.    The UAW has been the collective bargaining representative of GM employees for more than 50 years. In my capacity as General Counsel for the UAW, I personally participated in numerous discussions with GM and its predecessor corporations regarding various labor issues, including each of the discussions referenced in this Declaration.

4.    In 1999, when Old GM sought to spin off its parts operations into a new company called Delphi, the UAW and Old GM negotiated the "GM-UAW Benefit Guarantee." Under the terms of the GM-UAW Benefit Guarantee, Old GM agreed, among other things, to guarantee Delphi's obligations to provide retiree medical insurance benefits to former UAW-represented GM employees who continued to work at Delphi facilities following the spin-off in the event that Delphi, after the spin-off, stopped providing those benefits. The GM-UAW Benefit Guarantee would therefore be triggered if and when Delphi ceased providing or otherwise reduced these benefits during the course of Delphi's bankruptcy.

5.    In 2006, the "DC VEBA" – Defined Contribution Voluntary Employees' Beneficiary Association – was created as a result of a settlement agreement to resolve the class action lawsuit *Int'l Union, UAW v. General Motors Corp.*, Civil Action No. 05-73991 (E.D. Mich.) ("*Henry I*"). The DC VEBA was funded by certain specified contributions to be made by GM. The purpose of the DC VEBA was to help fund retiree health benefits by providing dental coverage and mitigating the costs that GM retirees would have to bear going forward for retiree

medical coverage. For this reason, the DC VEBA is sometimes referred to by the parties as the "Mitigation VEBA."

6. On June 22, 2007, the UAW, Delphi, and Old GM entered into a tripartite Memorandum of Understanding ("2007 Delphi Restructuring MOU") to resolve a number of outstanding labor issues that had arisen during Delphi's bankruptcy proceedings.

7. In addition to establishing lower wage and benefit rates for UAW-represented Delphi employees and granting Delphi additional flexibility to close or sell many UAW-represented facilities, the 2007 Delphi Restructuring MOU allowed Delphi, upon the satisfaction of certain specified conditions, to terminate its obligation to provide retiree medical benefits to its retirees. That action would have the effect of triggering the 1999 GM-UAW Benefit Guarantee. In the context of Delphi's bankruptcy and the negotiations for the 2007 Delphi Restructuring MOU, the parties recognized that Delphi's termination of retiree medical benefits would result in many new participants into the DC VEBA. To address those new participants – and new liabilities – for the DC VEBA, the parties also provided in the 2007 Delphi Restructuring MOU that GM would make a one-time contribution of $450 million to the DC VEBA. As originally set out in the 2007 Delphi Restructuring MOU, this one-time contribution would occur at the same time as Delphi's termination of the retiree medical benefits – and concomitant increase in liabilities for the DC VEBA – i.e. on "substantial consummation" of a Plan of Reorganization in Delphi's bankruptcy.

8. The 2007 Delphi Restructuring MOU was approved by the bankruptcy court presiding over the Delphi bankruptcy on July 19, 2007.

9. In 2008, a new VEBA – called "New VEBA" – was created as part of a settlement agreement to resolve the class action lawsuit *Int'l Union, UAW, et. al. v. General*

3

*Motors Corp.*, Civil Action No. 07-14074 (E.D. Mich.) ("*Henry II*"). The 2008 UAW Retiree Settlement Agreement was approved by the *Henry II* court on July 31, 2008.

10.     The 2008 UAW Retiree Settlement Agreement eliminated Old GM's obligation to provide retiree medical insurance benefits with respect to claims incurred on or after January 1, 2010, when the New VEBA would go into effect and begin providing those benefits. The 2008 UAW Retiree Settlement Agreement also set forth Old GM's payment obligations to the New VEBA and provided that those payment obligations to the New VEBA were "fixed and capped" by the terms of that agreement.

11.     On September 26, 2008, the UAW, Delphi, and Old GM entered into the UAW-Delphi-GM Implementation Agreement Regarding 414(l) Transfers, Implementation of Term Sheet, Delphi Pension Freeze and Cessation of OPEB, and Application of Releases ("2008 Implementation Agreement"). The 2008 Implementation Agreement "pulled forward" some of the provisions in the 2007 Delphi Restructuring MOU that had been contingent on Delphi's substantial consummation of a plan of reorganization, which had not yet occurred at that time. The 2008 Implementation Agreement removed this contingency with respect to certain terms of the 2007 Delphi Restructuring MOU, including Delphi's cessation of retiree medical benefits and the triggering of the GM-UAW Benefit Guarantee, which resulted in Old GM taking over from Delphi the obligation to provide retiree medical benefits to those former UAW-represented GM employees who continued to work at Delphi facilities after the 1999 Delphi spin-off from Old GM.

12.     The 2008 Implementation Agreement did not remove the contingency with respect to Old GM's $450 million payment obligation to the DC VEBA, but rather expressly

4

provided that this $450 million payment to the DC VEBA "shall remain payable" in accordance with the terms set forth in the 2007 Delphi Restructuring MOU.

13. In 2009, during the course of this bankruptcy proceeding, the UAW and New GM entered into another settlement agreement in order to modify certain provisions of the 2008 UAW Retiree Settlement Agreement. The primary purpose of the 2009 UAW Retiree Settlement Agreement was to alter the nature and the timing of New GM's payment contributions to the New VEBA that were established in the 2008 UAW Retiree Settlement Agreement. The most significant substantive change in the 2009 UAW Retiree Settlement Agreement was that a substantial portion of the approximately $20 billion that New GM was to contribute to the New VEBA under the terms of the 2008 UAW Retiree Settlement Agreement was converted from a cash payment to common and preferred stock in New GM. It was this major restructuring of GM's contribution obligations to the New VEBA—together with various other financial austerity measures designed to reduce GM's debt and ongoing cash outlays—that made the section 363 sales transaction subsequently approved by this Court possible.

14. Because the purpose of the 2009 UAW Retiree Settlement Agreement was only to modify certain provisions in the 2008 UAW Retiree Settlement Agreement, the two agreements are intentionally identical in many respects. When drafting the 2009 UAW Retiree Settlement Agreement, the parties used the 2008 UAW Retiree Settlement Agreement as their starting point and only modified those terms in the 2008 UAW Retiree Settlement Agreement that needed to be changed as a result of the issues that had arisen during this bankruptcy proceeding. In order to keep the agreements as identical as possible, the parties decided that if an entire section of the 2008 UAW Retiree Settlement Agreement had become moot or was no longer applicable, we

would list that section as "reserved" in the 2009 UAW Retiree Settlement Agreement rather than deleting the section so that even the paragraph numbering could remain the same.

15. I participated in several discussions with representatives of Old GM in 2008 and 2009 in which the $450 million payment obligation to the DC VEBA came up.

16. In the negotiations between the UAW and Old GM leading up to the 2008 UAW Retiree Settlement Agreement establishing the New VEBA, the funding for the New VEBA was repeatedly calculated and re-calculated, with Old GM's and the UAW's actuaries and other experts sharing these calculations in order to make sure that the parties had a common understanding of the funding. In all of these calculations, Old GM's $450 million payment obligation to the DC VEBA under the 2007 Delphi Restructuring MOU was included as a funding source. In other words, for purposes of determining funding levels for the New VEBA, the parties had a clear mutual expectation that this $450 million would in fact be paid to the DC VEBA when the conditions stated in the 2007 Delphi Restructuring MOU were satisfied, and would then be part of the transfer of assets to the New VEBA provided for by Section 12.C of the 2008 UAW Retiree Settlement Agreement.

17. After the execution of the 2008 Implementation Agreement but before Old GM's bankruptcy filing in June of 2009, Old GM's deteriorating financial condition led Old GM to propose to the UAW a comprehensive package for reducing Old GM's cash outlays associated with the ongoing provision of retiree health benefits to former GM employees. As an element of that comprehensive package, Old GM proposed that the contingency on its $450 million payment obligation to the DC VEBA from the 2007 Delphi Restructuring MOU be removed, thereby obligating Old GM to make that $450 million payment without regard to the outcome of the still-pending Delphi bankruptcy proceeding. Old GM's position in these discussions was that if an

overall agreement could be reached on several other issues, then Old GM would agree to remove the contingency on the $450 million payment to the DC VEBA. While the UAW ultimately did not agree to the comprehensive package proposed by Old GM, at no time during these discussions did Old GM take the position that the $450 million payment obligation to the DC VEBA had been extinguished or was barred by subsequent events or agreements between the parties.

18. In the spring of 2009, the UAW was involved in discussions with Old GM regarding its bankruptcy filing, including discussions regarding the restructuring of GM's obligations relating to retiree health benefits. The UAW sought to include the $450 million payment obligation to the DC VEBA in those discussions in an attempt to remove the condition that the payment would not come due until Delphi's emergence from bankruptcy. At this time, there was considerable uncertainty as to whether Delphi would in fact be able to assemble a plan of reorganization that would be approved by the bankruptcy court. Old GM, however, took the position that the $450 million payment obligation should remain contingent on Delphi's emergence from bankruptcy, and therefore the parties did not reach an agreement to remove this condition. But at no time during these discussions did Old GM take the position that the $450 million payment obligation to the DC VEBA had been extinguished or was barred by subsequent events or agreements between the parties. Rather, Old GM expressed its desire that the obligation remain contingent on Delphi's emergence from bankruptcy.

19. Virtually all of the Delphi retirees covered by the 2007 Delphi Restructuring MOU are former employees of Old GM by virtue of their employment at Delphi prior to Delphi's 1999 spin-off from Old GM. Before Delphi was incorporated as a wholly-owned subsidiary of Old GM, the Delphi plants were owned by Old GM and they operated as a single

7

company covered by a single collective bargaining agreement with the UAW. The collective bargaining structure continued unchanged after Delphi's incorporation as a wholly-owned subsidiary of Old GM, and the employees working at the Delphi plants continued to be Old GM employees until the Delphi spin-off. Thus, the Delphi retirees eligible for protection under the GM-UAW Benefit Guarantee, and covered by the 2007 Delphi Restructuring MOU, are former employees of Old GM because they were employed at Old GM on the day of the Delphi spin-off.

20. With the exception of the $450 million payment obligation that is the subject of the UAW's lawsuit in the Michigan federal court, New GM has been performing its obligations under the 2007 Delphi Restructuring MOU, including "topping up" significant pension benefits for thousands of retirees, at a very significant cost to GM.

21. On October 6, 2009, the Bankruptcy Court in the Delphi bankruptcy proceedings entered an order finding that the Plan of Reorganization in Delphi's bankruptcy proceeding had been "substantially consummated" on that day, thus triggering GM's obligation under the 2007 Delphi Restructuring MOU. On October 29, 2009, the UAW made a written demand that New GM comply with this contractual obligation to make the $450 million payment to the DC VEBA. That demand was rejected by New GM by letter dated November 11, 2009. At the time of this exchange of letters, the DC VEBA was still in existence and was fully operational, providing retiree medical benefits to thousands of GM/Delphi retirees whose rights to those benefits was a function of the 1999 GM-UAW Benefit Guarantee and the 2007 Delphi Restructuring MOU. Had New GM paid the required amount at that time, the money would have gone to the DC VEBA.

22.    On January 16, 2010, while the UAW continued its discussions with New GM regarding its obligations under the 2007 Delphi Restructuring MOU, all of the assets and liabilities of the DC VEBA were transferred to the New VEBA and the DC VEBA was terminated under the terms of Section 12.C of the 2009 UAW Retiree Settlement Agreement.

I declare under penalty of perjury that the foregoing is true and correct. Executed in Detroit, Michigan on December 21, 2010.

_____
Daniel Sherrick