**Hearing Date and Time: January 11, 2011 at 2:00 p.m.**

TOGUT SEGAL & SEGAL LLP
One Penn Plaza, Suite 3335
New York, New York 10119
Telephone: (212) 594-5000
Facsimile: (212) 967-4258
Albert Togut
Scott E. Ratner
Richard K. Milin

Conflicts Counsel to the Debtors
and Debtors in Possession

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| MOTORS LIQUIDATION COMPANY, *et al.*, | ) | Case No. 09-50026 (REG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**DEBTORS' REPLY MEMORANDUM
(I) IN OPPOSITION TO DEUTSCHE BANK AG'S MOTION FOR RELIEF
FROM AUTOMATIC STAY TO EFFECT SETOFF AND (II) IN FURTHER
SUPPORT OF DEBTORS' CROSS-MOTION FOR IMMEDIATE PAYMENT**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...................................................................................... 1

ARGUMENT:    The Debtors Are Entitled to Immediate Payment of All Sums
DB Owes ........................................................................................... 5

POINT I:    DB Has No Right To Effectuate Its Proposed Setoff
Because the GM-DB Swap Agreements Prohibit It
from Doing So ................................................................................... 5

POINT II:    DB Should Pay the Debtors All Sums That It Seeks
To Set Off Against U.S.-Issued Bonds Because the GM
Indenture Prohibits DB's Proposed Setoff ......................................... 8

    A.    Because DB seeks to enforce rights under the GM Indenture,
the "no action" clause applies to DB's Motion to
effectuate a setoff .......................................................................... 10

    B.    The "no action" clause has not "expired" ........................................ 12

    C.    No purported "policy in favor of setoff" justifies DB's
setoff here ...................................................................................... 15

    D.    DB has no rights as a "secured creditor" ......................................... 15

POINT III:    DB Should Pay The Debtors All Sums That It Seeks
To Set Off Against Euro Bonds......................................................... 16

POINT IV:    DB Should Be Denied Permission To Set Off Its
Post-Petition Swap Debt to GM Against the Debtors' Pre-Petition
Obligations on GM Bonds ................................................................. 17

    A.    The "Transaction Test" .................................................................. 18

    B.    The "Acts Test".............................................................................. 23

    C.    The "Discretion Test" .................................................................... 25

    D.    DB's Swap Debt Was Unenforceable Prior to the Petition Date .... 30

CONCLUSION  ........................................................................................................ 34

i

## TABLE OF AUTHORITIES

Page

**Cases**

*Collins v. Harrison-Bode*, 303 F.3d 429 (2d Cir. 2002) ............................................................ 6

*Concord West v. J.A. Jones*, No. 3:09-cv-00182-GCM,
2010 WL 148432 (W.D.N.C. January 12, 2010).................................................................. 24

*Gore v. United States* (*In re Gore*), 124 B.R. 75
(Bankr. E.D. Ark. 1990)........................................................................................ 26-27, 30

*In re BOUSA Inc.*, No. 89-B-13380, 2006 WL 2864964
(Bankr. S.D.N.Y. Sept. 29, 2006) ....................................................................... 19-24, 28-29

*In re Cairns & Assocs.*, 372 B.R. 637 (Bankr. S.D.N.Y. 2007)......................................................... 5

*In re Chateaugay Corp.*, 154 B.R. 843 (Bankr. S.D.N.Y. 1993) ....................................................... 7

*In re Delta Airlines*, 341 B.R. 439 (Bankr. S.D.N.Y. 2006) ................................... 5, 10, 32-34

*In re Genuity, Inc.*, 323 B.R. 79 (Bankr. S.D.N.Y. 2005)........................................................ 32

*In re Lehman Brothers Holdings, Inc.*, 404 B.R. 752
(Bankr. S.D.N.Y. 2009)................................................................. 18-21, 23-24, 26-30

*In re Moore*, 350 B.R. 650 (Bankr. W.D. Va. 2006) ......................................................... 24-25

*In re Quigley Co.*, 383 B.R. 19 (Bankr. S.D.N.Y. 2008)................................................... 25 n.2

*In re Sauer*, 223 B.R. 715 (Bankr. D. N.D. 1998).............................................. 19-22, 28-29

*Seiden Assocs., Inc. v. ANC Holdings, Inc.*, 959 F.2d 425 (2d Cir. 1992) ......................... 7

*Wastemasters, Inc. v. Diversified Investors Services*, 159 F.3d 76 (2d Cir. 1998) ........... 6

*Waterman S.S. Corp. v. Aguilar* (*In re Waterman S.S. Corp.*), 141 B.R. 552 (Bankr.
S.D.N.Y. 1992), *vacated on other grounds*, 157 B.R. 220 (S.D.N.Y. 1993) .......... 25 n.2

**Statutes**

11 U.S.C. § 553.......................................................................................................... 31

15 U.S.C. § 77 ppp(b)................................................................................................ 12

**Page**

**Other Authorities**

5 Collier on Bankruptcy ¶ 553.03 (16th ed. 2009).................................................. 25, 25 n.2

Black's Law Dictionary (9th ed. 2009)......................................................................... 20

Merriam-Webster's Ninth Collegiate Dictionary (1983)................................................... 20

## DEBTORS' REPLY MEMORANDUM
## (I) IN OPPOSITION TO DEUTSCHE BANK AG'S MOTION FOR RELIEF FROM AUTOMATIC STAY TO EFFECT SETOFF AND (II) IN FURTHER SUPPORT OF DEBTORS' CROSS-MOTION FOR IMMEDIATE PAYMENT

Debtor Motors Liquidation Company (f/k/a General Motors Corporation) and its affiliated debtors, as debtors in possession in the above-referenced chapter 11 cases (the "**Debtors**"), respectfully submit this Reply Memorandum (a) in opposition to the motion (the "**Motion**") of Deutsche Bank AG ("**DB**") for relief from the automatic stay seeking to permit DB to execute a setoff of amounts it claims to be owed under bonds issued by General Motors Corporation ("**GM**") against amounts it owes GM as a result of two interest rate swaps, and (b) in further support of the Debtors' cross-motion for immediate payment of the full amount DB owes under the swaps.[1]

## PRELIMINARY STATEMENT

1.      DB admits that it owes the Debtors $24 million and, for the reasons stated in Debtors' Objection to DB's Motion (the "**Objection**"), DB should pay the Debtors forthwith.  The GM-DB swap agreements – the ISDA Master Agreement, Schedule and swap confirmations (together, the "**GM-DB Swap Agreements**") – require payment in full unless DB can demonstrate a valid right of setoff.  As the Debtors' Objection shows, however, DB has no such right.  DB's Reply in support of its Motion does nothing to alter this conclusion.

2.      The Debtors' Objection demonstrated that DB lacks the right to set off its swap obligations against GM bonds for at least three reasons.  First, DB's proposed setoff would not satisfy the "mutuality" requirement for a valid setoff – DB improperly

---

[1] Debtor Motors Liquidation Company and New General Motors Corporation have reached an agreement concerning their respective rights to DB's payment.

seeks to set off its *post-petition* obligation to GM against the Debtors' *pre-petition*

obligations under GM bonds.  (*See* Objection ¶¶ 9-18.)

3.      Second, DB lacks a valid right of setoff because the GM-DB Swap

Agreements only allow DB to set off "amounts [] to the Non-Defaulting Party."  (Empty

brackets added.)  The quoted provision is ambiguous and incomplete, and DB therefore

cannot show that its proposed setoff would satisfy the contractual requirements for a

valid setoff or justify DB's failure to pay the Debtors the sums it owes.  (*See* Objection

¶¶ 18-20.)

4.      Third, DB cannot set off against the GM bonds it says it owns:  it has failed

to provide facts establishing a contractual right to set off against euro bonds, and its

proposed setoff against U.S.-issued bonds is prohibited by the bonds' governing inden-

ture (the "**GM Indenture**").  As the Debtors' Objection showed, the GM Indenture's "no

action" clause prohibits DB from claiming the face amount of its unmatured bonds by

setoff or otherwise.  Only the Indenture Trustee has the right to make such a claim, and,

even then, the Trustee must act for the "equal, ratable and common benefit" of the

bondholders as a whole.  (*See* Objection ¶¶ 21-25.)

5.      The Debtors' argument based on the GM Indenture is confirmed by

Wilmington Trust, as Indenture Trustee, which has stated in its joinder that the GM

Indenture prohibits DB's proposed setoff.  (*See* Limited Joinder of Wilmington Trust as

Indenture Trustee dated June 25, 2010 (Docket No. 6129).)  As the Indenture Trustee

explains, "DB does not possess a state law right to setoff because the 1990 Indenture

2

does not permit an individual bondholder to set off its claims, a remedy that could have a potentially harmful impact on the recoveries of other bondholders."  (*Id.* ¶ 7.)

6.      DB's reply (DB's "Reply") offers no genuine basis for permitting DB's proposed setoff.  First, despite DB's representation that "black-letter law" supports its argument that swap obligations are pre-petition, DB cannot cite a single case in which *discretionary* post-petition termination of a contract was held to yield a pre-petition obligation.  The only authorities DB can offer are inapposite cases concerning *non-discretionary* contingent claims.  (*See, e.g.*, Reply ¶¶ 3, 10.)  Because DB's arguments fail to address the issue actually before the Court, those arguments are irrelevant and provide no support to DB.

7.      Next, DB argues that the Court should permit DB's setoff – despite the incompleteness and ambiguity of the setoff provision in the GM-DB Swap Agreements (the "**Setoff Provision**") – because the Court should adopt DB's interpretation of the provision as its "most logical" reading.  (*See* Reply ¶ 5.)  But in doing so, DB asks the Court to rewrite the parties' Setoff Provision in DB's favor without any evidentiary basis.  (*See* Reply ¶¶ 5, 30-33.)

8.      DB's argument is contrary to law and, indeed, DB cites no case that supports it.  All that DB can cite are cases to show that "under New York law, contracts are interpreted so that they make sense."  (Reply ¶ 32.)  It would have "made sense," however, for GM and DB to agree to limit setoffs to "amounts owing in connection with derivative contracts to the Non-Defaulting Party," particularly given that they entered

3

into more than one ISDA Master Agreement. If that is what the parties to the GM-DB

Swap Agreements intended, DB's proposed setoff should not be allowed.

     9.     DB's final argument is that the "no action" clause governing DB's bonds is

an inapplicable "red herring" because DB seeks to enforce "rights under the Swap

Agreements" and not "rights under the GM Indenture." (Reply ¶ 6.) DB's argument is

simply untrue – DB can only exercise a setoff against the full face amount of unmatured

GM bonds if it has a state law right to do so under the governing GM Indenture, and

the GM Indenture denies it that right. As Indenture Trustee Wilmington Trust explains

in its Joinder, "by attempting to recover 100% of its bond claim through implementation

of a setoff, DB is 'availing' itself of a remedy under the 1990 Indenture that is rightly

vested with the Trustee." (Joinder ¶ 9.) Consequently, because the indenture that DB

must rely on bars the setoff it seeks to effectuate, DB's setoff against U.S.-issued bonds

cannot be allowed.

     10.     For all of the foregoing reasons, the Debtors' cross-motion should be

granted. DB concedes that it is contractually required to pay GM $24 million under the

GM-DB Swap Agreements, yet it has failed to show that it has a right of setoff under

those agreements, has failed to show its entitlement to set off against euro bonds, and

cannot show either that it has a right to set off against U.S. bonds despite their

governing indenture, or that DB is entitled to consummate any setoff at all given that its

swap obligations arose post-petition. Consequently, the Court should deny DB's

Motion for permission to effectuate a setoff and should grant the Debtors' cross-motion for immediate payment of the $24 million that DB owes.

## ARGUMENT

### The Debtors Are Entitled to Immediate Payment of All Sums DB Owes

11.     As Debtors' Objection shows, the party seeking to effectuate a setoff "'bears the burden of proving a right of setoff.'"  *In re Cairns & Assocs.*, 372 B.R. 637, 660 (Bankr. S.D.N.Y. 2007) (quoting *In re Bennett Funding Group*, 212 B.R. 206, 212 (2d Cir. BAP 1997)).  Further, "if no right of setoff under state law existed before commencement of the case, none exists under Section 553."  *In re Delta Airlines*, 341 B.R. 439, 443-45 (Bankr. S.D.N.Y. 2006).   DB can neither sustain its burden of proving a right of setoff under the Bankruptcy Code nor establish a right of setoff under state law.

## POINT I

### DB Has No Right To Effectuate Its Proposed Setoff
### Because the GM-DB Swap Agreements Prohibit It from Doing So

12.     The GM-DB Swap Agreements' Setoff Provision requires the parties to pay all sums due "without setoff or counterclaim" unless the non-defaulting party can reduce the sums it owes by setting off "any or all amounts [] to the Non-Defaulting Party … (whether or not then due)."  (Schedule to ISDA Master, Part 5, ¶ 1 (empty brackets inserted).)  As Debtors' Objection shows, this Setoff Provision is ambiguous because it is materially incomplete – unless words are inserted in the brackets or the

5

provision is completed in some other way, it is impossible to be certain which

"amounts" the parties can set off.

13.     Further, although the parties may have intended to allow setoffs of all

amounts "owed to" the Non-Defaulting Party as DB contends (*see* Reply ¶ 35), they may

equally have intended to allow setoffs of only ***some*** amounts owed, such as amounts

"owing under this or any other ISDA Master Agreement" or amounts "owing in

connection with derivative transactions," but not amounts owed on GM bonds.  There

is no evidence whatsoever before the Court to show what the parties actually intended.

Accordingly, given the ambiguity of the Setoff Provision, DB must be denied the right

to effectuate its proposed setoff:  It has failed to sustain its burden of proof.

14.     In response, DB's Reply offers nothing more than an *ipse dixit*:

> Deutsche Bank submits that the Schedule means that any amounts
> owed by the non-defaulting party under the swaps can be offset
> against any and all amounts owed by the defaulting party, without
> limitation. This makes sense.  And under New York law, contracts are
> interpreted so that they make sense.

(Reply ¶ 32.)

15.     Under well-established law, this Court must decline DB's invitation to

rewrite the parties' contract.  The Setoff Provision fails to identify exactly which

amounts can be set off and yields no clear, single meaning.  Consequently, the Provision

is ambiguous.  *See, e.g., Wastemasters, Inc. v. Diversified Investors Services*, 159 F.3d 76, 78

(2d Cir. 1998).  *See also Collins v. Harrison-Bode*, 303 F.3d 429, 433 (2d Cir. 2002)

("Contract language is ambiguous if it is 'capable of more than one meaning when

viewed objectively by a reasonably intelligent person who has examined the context of

the entire integrated agreement.'") (quoting *Compagnie Financiere de CIC v. Merrill Lynch,*

232 F.3d 153, 158 (2d Cir. 2000)) (quoting *Sayers v. Rochester Tel. Corp.,* 7 F.3d 1091, 1095

(2d Cir. 1993)).

16.    Further, when a contract is ambiguous, the Court has two choices, both of

which require consideration of extrinsic evidence:

> If we determine that a contract is ambiguous, two courses are open
> to us depending on the circumstances. We "may resolve [an]
> ambiguity in ... contractual language as a matter of law if there is
> no extrinsic evidence to support one party's interpretation of the
> ambiguous language or if the extrinsic evidence is so one-sided that
> no reasonable factfinder could decide contrary to one party's
> interpretation." *Compagnie Financiere,* 232 F.3d at 159.  Or, we may
> remand for the trial court to consider and weigh extrinsic evidence
> to determine what the parties intended.  *See, e.g., Seiden Assocs., Inc.
> v. ANC Holdings, Inc.,* 959 F.2d 425, 430 (2d Cir.1992).

*Collins v. Harrison-Bode,* 303 F.3d 429, 433 (2d Cir. 2002).  *See also, e.g., Seiden Associates,*

*Inc. v. ANC Holding, Inc.,* 959 F.2d 425, 426 (2d Cir. 1992) ("Where the language used

creates an ambiguity, a reviewing court must permit the receipt of evidence in order to

see what was in the drafters' minds.");  *In re Chateaugay Corp.,* 154 B.R. 843, 848 (Bankr.

S.D.N.Y. 1993) ("If contract terms are ambiguous, evidence of the parties' intent at the

time of contracting must be received.").

17.    Here, DB has proffered no extrinsic evidence, and no discovery has been

conducted concerning the parties' intent.  Consequently, DB can neither prove that its

interpretation of the Setoff Provision is what the parties intended nor, indeed, that its

interpretation and no other "makes sense."  DB has thus failed to sustain its burden of

7

demonstrating a pre-petition state law right of setoff, and the Debtors are entitled to

payment of the sums they are owed.

## POINT II

### DB Should Pay the Debtors All Sums That It Seeks To Set Off Against
### U.S.-Issued Bonds Because the GM Indenture Prohibits DB's Proposed Setoff

18.     DB should pay GM the $12.75 million that DB's Motion seeks to set off

against U.S.-issued bonds (*see* Motion ¶¶ 7-8) forthwith because the GM Indenture

prohibits the proposed setoff.

19.     The Debtors' Objection showed that DB cannot properly set off against

U.S.-issued GM bonds because the "no action" clause in the GM Indenture provides

that, except in circumstances not present here, only the Indenture Trustee can pursue

remedies such as collecting accelerated amounts.  The Indenture also bars bondholders

from taking individual actions that "affect, disturb or prejudice the rights of any other

Holder of Securities or coupons."  (GM Indenture, § 6.04.)  Attempts to "enforce any

right … except … for the equal, ratable and common benefit of all Holders of Securities

and coupons" are similarly prohibited.  (*Id.*)  Consequently, DB cannot set off the full,

accelerated, "total face amount" (Motion at ¶¶ 7-8) of GM bonds.  Those bonds will not

reach their stated maturity dates until late 2011 and 2021 respectively.

20.     After the Debtors' Objection was filed, Indenture Trustee Wilmington

Trust joined in the Debtors' arguments based on the GM Indenture and added further

supporting arguments of its own.  The Trustee explained, based on its analysis of the

terms of the GM Indenture, that it alone has the right to collect the accelerated amount

8

of the GM bonds: "by attempting to recover 100% of its bond claim through implemen-

tation of a setoff, DB is 'availing' itself of a remedy under the 1990 Indenture that is

rightly vested with the Trustee … As such, the proposed setoff is an attempted exercise

of a right … which is properly subject to the "no action" clause and its Direction

Procedures."  (Joinder ¶ 9.)

21.    The Indenture Trustee also rejected any argument that DB could fit within

the limited exception in the GM Indenture for individual actions to collect overdue

principal or interest "on or after the respective due dates" expressed in securities or

coupons:

> DB … is not seeking to pursue payment of overdue principal and
> interest following the *stated due dates of such payments in its under-*
> *lying bonds*;  instead, DB is seeking payment on the principal and
> interest due on the bonds as a result of acceleration under the
> Indenture. Applicable case law is clear that the limited exception to
> the "no action" clause does not apply to bondholder actions to
> pursue payment of accelerated principal.  *See Jackson Nat'l Life Ins.*
> *Co. v. Ladish Co.*, No. 92 Civ. 9358, 1993 WL 43373 at *6-*7 (S.D.N.Y.
> Feb. 18, 1993).

(Joinder ¶ 11 (original emphasis).)

22.    The Indenture Trustee further explained that DB's setoff is prohibited

because DB's actions would favor its own interest to the potential detriment of other

bondholders.  The Trustee stated that "a rationale behind the 'no action' clause is 'the

expression of the principle of law that would otherwise be implied that all rights and

remedies of the indenture are for the equal and ratable benefit of all the holders.'"

(Joinder ¶ 13 (quoting American Bar Foundation, *Commentaries on Model Debenture*

9

*Indenture Provisions*, § 5-7 at 232 (1971)).  Permitting an individual bondholder such as

DB to set off "its personal obligation to the issuer with its bond claims, to the detriment

of all other bondholders," the Trustee continued, "would fly in the face of this purpose"

of ensuring equality.  Thus:

> If permitted to exercise a setoff of its bond claims against its swap
> obligations, DB will receive a 100% return on its claims, potentially
> to the detriment of other bondholders. Not only will DB's return on
> its bonds greatly exceed the bankruptcy distribution that other
> bondholders will receive, it could reduce the property of the estate
> to be distributed to bondholders. Such a result is simply not per-
> mitted under the Indenture governing DB's bond claims.

(Joinder ¶ 14.)

### A.  Because DB seeks to enforce rights under the GM Indenture, the "no action" clause applies to DB's Motion to effectuate a setoff

23.    DB offers six responses, all without merit, to the foregoing arguments.

First, DB asserts that it "does not seek to avail itself of any rights under the GM

Indenture – the setoff rights arise under the Swap Agreements, and under statutory and

common law."  (Reply ¶ 35.)  This assertion, as noted above is factually incorrect:  DB

cannot avail itself of any setoff rights unless it has something to set off its swap obliga-

tions *against*.  Further, as case law makes clear, DB cannot exercise a setoff in bankrupt-

cy unless it had a pre-petition right to set off under state law.  *See, e.g., In re Delta

Airlines*, 341 B.R. 439, 443-46 (Bankr. S.D.N.Y 2006).  Because of the "no action" clause in

the GM Indenture, DB had no such state law right – the right to claim the full face value

of unmatured bonds vests exclusively in the Indenture Trustee.  (*See* GM Indenture, §

6.04.)

10

24.     DB's second response is that "acceleration is not necessary to Deutsche Bank's setoff right, because the Swap Agreements provide that the non-defaulting party can setoff its debts against obligations owed … 'whether or not then due.'" (Reply ¶ 35.) This argument is similarly without merit:  the face amount of the bonds is not due to DB now *or* in the future.  Once the Debtors filed their bankruptcy petition, the only means for collection on the GM bonds became claims in bankruptcy.  No bondholder will collect or have a right to collect bond payments in the future – instead, a ratable distribution will be paid from the Debtors' estate, and any sums that would have been due in excess of that amount will be discharged.  Further, under the GM Indenture, any accelerated sums due on the bonds are payable to the Indenture Trustee, not to individual bondholders such as DB.  (GM Indenture ¶ 6.02.)  DB cannot escape this fundamental contractual restriction on its right to collect.

25.     DB's third response is to assert that it must be allowed to exercise setoff rights because an Indenture Trustee cannot do so and the Court should not "strip all bondholders of setoff rights."  (Reply ¶ 36.)  This argument fails for two reasons.  First, DB has provided no evidence that bondholders actually have rights that should not be "stripped" from them: *DB cites no case in which a setoff against publicly issued bonds has been permitted.*  Second, there are sound policy reasons for bond indentures to eliminate setoff rights, because, as the Indenture Trustee pointed out, indentures are intended to ensure that all bondholders receive an equal and ratable distribution.  That is why DB is prohibited from exercising setoff rights that could reduce distributions to

11

other bondholders.  It is also the most likely explanation why research has disclosed no case allowing a setoff against publicly issued bonds.

**B.    The "no action" clause has not "expired"**

26.    For its fourth response, DB argues that the GM Indenture's "no action" clause has "expired" because "the bonds … have already been accelerated by the indenture trustee."  (Reply ¶ 38.)  DB cites no cases in support of this argument, however, and DB's attempts to distinguish the cases the Debtors cite are ineffective.  Nevertheless, there is no need for an elaborate analysis of those cases – which Debtors' Objection described correctly– because each of the following reasons, among others, suffices on its own to refute DB's argument:

a.    DB improperly seeks to erase several key words from the "no action" clause – it argues that the "no action" clause has expired because "the bonds are now due."  (Reply ¶ 38.)  However, the "no action" clause actually bars individual collection actions until "the respective due dates *expressed in such Security or coupon*" (GM Indenture, § 6.04 (emphasis added); *see also* Trust Indenture Act of 1939, 15 U.S.C. § 77 ppp(b).).  The due dates expressed in the GM bonds – November 1, 2011 and July 15, 2021 (*See* Objection ¶ 10) – have not yet arrived.

b.    The GM Indenture's payment procedures require the "no action" clause to remain in force even when full payment on the bonds is due.  The Indenture provides that, after a default, "the *whole amount* that then shall have

12

become due and payable" must be paid to the Indenture Trustee, not to indivi-

dual bondholders.  (GM Indenture ¶ 6.02 (emphasis added).)  The Indenture also

provides that, upon a bankruptcy filing, the Indenture Trustee "shall be entitled

and empowered … to file and prove a claim or claims for the **whole amount** of

principal ... and premium, if any, interest, if any, and Additional Amounts …."

(*ld.* (emphasis added).)  Indeed, the Indenture authorizes the Trustee "to collect

and receive any moneys or other property payable … on any … claims" asserted

by "Holders of the Securities," and "any receiver, assignee or trustee in bank-

ruptcy or reorganization is hereby authorized by each of the Holders of the

Securities … to make payments to the Trustee." (*Id.*)

The GM Indenture even makes the Indenture Trustee the trustee of an

express trust to which individual bondholders' claims have been automatically

transferred:  "All rights of action and of asserting claims under this Indenture, or

under any of the Securities, may be enforced by the Trustee … and any such

action or proceedings instituted by the Trustee shall be brought in its own name

and as trustee of an express trust, and any recovery of judgment shall be for the

ratable benefit of the Holders of the Securities or coupons appertaining thereto."

(*Id.*)

Based on the foregoing provisions of the GM Indenture, it is clear that the

"no action" clause must remain in effect even after default and acceleration to

prevent duplicative recoveries.  Further, DB has expressly authorized the

13

Debtors to pay the Indenture Trustee (instead of DB) and has forfeited any right to setoff by agreeing to place its rights to payment in trust "for the ratable benefit of the Holders…." DB cannot, therefore, be permitted to effectuate a setoff for its individual benefit.

c.    The principle of equal treatment of bondholders, which the Indenture Trustee's Joinder showed to be fundamental – and which is consistent with the bankruptcy principle mandating the equal treatment of creditors – precludes a finding that the "no action" clause has expired. If DB were correct, then all individual bondholders would be free to act immediately upon acceleration in ways that would reduce other bondholders' recovery, as DB seeks to do by effectuating a setoff. That result would be fundamentally unfair and contrary to bondholders' legitimate expectations.

d.    Holding that the "no action" clause "expired" upon acceleration would also result in an administrative nightmare. Each individual bondholder would have an incentive to file its own claim and to attempt to recover on that claim as soon as possible. Unable to speak for all bondholders, the Indenture Trustee's role in bankruptcy cases would be severely diminished, and small bondholders could no longer assume that the Trustee would be able to protect their rights. The resulting waste and duplication of effort could work a fundamental, costly and unfair change in the procedures for collecting on defaulted bonds in Bankruptcy Court.

14

27.     Thus, DB's argument that "no action" clauses "expire" upon acceleration must be rejected as inconsistent with the express words of those clauses, contrary to the expectations of ordinary bondholders and potentially disastrous as a matter of bankruptcy policy.

### C.     No purported "policy in favor of setoff" justifies DB's setoff here

28.     DB's fifth response is that it should be permitted to set off its swap obliga-tions against its bonds because there is a "strong policy in favor of enforcing rights of setoff" and financial institutions should be allowed to pursue their rights even if they harm "other equally innocent creditors."  (Reply ¶¶ 39-41) (quoting *In re Bennett Fund-ing Group, Inc.*, 212 B.R. 206, 216 (2d Cir. BAP 1997), *aff'd*, 146 F.3d 136 (2d Cir. 1998)).

29.     DB has invented its asserted "policies" to suit the occasion – the phrase "strong policy" is not quoted from case law, but rather was made up by DB.  Also, even if there were social policies favoring setoff and the self-interest of financial institutions, DB fails to show that those policies outweigh the countervailing policies of fairness, equality and good order that mandate denial of DB's Motion.

30.     Above all, DB's policy argument is misplaced:  the question here is not whether setoff rights should be enforced, but whether DB has setoff rights at all. Because it does not, DB's policy argument has no application whatsoever.

### D.     DB has no rights as a "secured creditor"

31.     DB's final argument concerning the GM Indenture is its complaint that the Debtors are denying DB's rights as a secured creditor.  (*See* Reply ¶¶ 42-43.)  This argument, like DB's "strong policy" argument, merely begs the question.  The issue is

15

not whether DB is being "denied" rights as a secured creditor, but whether it has rights as a secured creditor in the first place.  Because DB has no right to effectuate a setoff, it has no such rights as a secured creditor.  Yet again, DB merely assumes that it has rights that it has not proved.

32.    For the foregoing reasons, the GM Indenture prohibits DB from effectuating a setoff against U.S.-issued bonds.  No precedent permits such a setoff, and the Indenture's terms preclude it.  DB therefore should pay the $12.75 million swap payment it proposes to set off against U.S.-issued bonds, and has refused to pay, forthwith.

## POINT III

### DB Should Pay The Debtors All
### <u>Sums That It Seeks To Set Off Against Euro Bonds</u>

33.    DB should pay the Debtors all of the sums it has been withholding based on its purported right to set off against euro bonds.  DB bears the burden of demonstrating its right to effectuate a setoff, yet it has not proffered sufficient information to establish whether the DB entity that owes the Debtors a swap payment also owns euro bonds, whether that entity owns its euro bonds as a beneficial owner, or whether that entity has the right to collect accelerated amounts under the contracts governing those bonds.  Consequently, DB has not sustained – and given its lack of proffer evidently cannot sustain – its burden of establishing a right of setoff.

16

34.     Further, for the reasons stated in the Debtors' Objection and in Points I

and IV of this Reply, DB cannot set off any of GM's pre-petition bond debts against

DB's obligations under the GM-DB Swap Agreements because the parties' Setoff

Provision is materially incomplete and DB's swap obligations arose post-petition.

Consequently, DB should be found liable to the Debtors for the full $24 million it owes.

35.     DB's response, in essence, is to request a discovery conference.  (*See* Reply

¶¶ 46-47.)  If the Court rules in the Debtors' favor on the ambiguity or mutuality issues,

however – and it should – no discovery will be required.  Further, even if the Court

were to leave open the possibility that DB could be entitled to set off against euro

bonds, a discovery conference is unnecessary because it is not clear at this point that

Court intervention in discovery will be required.  Indeed, given DB's lack of proffer,

there is no reason to believe that DB's claimed right of setoff against euro bonds has any

factual support at all.

## POINT IV

### DB Should Be Denied Permission To Set Off Its Post-Petition Swap Debt to GM Against the Debtors' Pre-Petition Obligations on GM Bonds

36.     Debtors' Objection showed that DB should be denied permission to

effectuate a setoff because DB's debt to GM arose from DB's post-petition discretionary

termination of swap agreements that, until they were terminated, might have yielded

no debt to GM at all.  (*See* Objection ¶¶ 9-18.)  The Debtors pointed out that relevant

case law uses four slightly different tests to determine whether a debt arose pre- or

post-petition, but that this Court need not choose among them:  all four establish that

17

DB's swap debt to GM is a post-petition obligation because it resulted from DB's post-petition discretionary acts.

37.     In response, DB seeks to convince the Court that there is no genuine issue at all:  DB twice declares that "black-letter law" supports its position, adds that "the weight of authority" does so as well, and further asserts that "the claim and obligations at issue are both pre-petition" under "well-settled law."  (Reply ¶¶ 2, 3, 10, 13.)  These are brave words, but they are unfounded:  DB has mischaracterized the issues before the Court.

38.     The question is not, as DB presents it, whether contingent claims can sometimes be considered pre-petition.  (*See* Reply ¶¶ 3, 10-12, 17-18.)  The Debtors agree that they can.  (*See* Objection ¶¶ 2, 32 (recognizing that swap debts have been treated as pre-petition if the swap terminated automatically).)

39.     Rather, the question is whether ***a debt that arose from discretionary, post-petition actions*** should be classified as pre-petition.  As shown in Debtors' Objection, and as discussed below, the law on ***this*** question all comes out one way:  the debt must be classified as post-petition.  DB – despite its purported reliance on "black-letter law" – cites not even a single case to the contrary.

### A.     The "Transaction Test"

40.     As discussed in Debtors' Objection, this Court most recently addressed the question whether discretionary, post-petition actions created a pre-petition debt in *In re Lehman Brothers Holdings, Inc.*, 404 B.R. 752 (Bankr. S.D.N.Y. 2009) [hereinafter

18

"**LBHI**"].  *LBHI*, like the *In re BOUSA* case it quotes, employed what can be called the

"**Transaction Test**":  it held that whether a debt should be classified as pre-petition

depends on whether "'all transactions necessary for liability have occurred' … when the

petition was filed."  *LBHI*, 404 B.R. at 759 (quoting *In re BOUSA Inc.*, No. 89-B-13380,

2006 WL 2864964 at *3 (Bankr. S.D.N.Y. Sept. 29, 2006) [hereinafter "**BOUSA**"]).  *See also*

*BOUSA* at *3 (holding that, "[f]or purposes of setoff, a debt arises when all transactions

necessary for liability have occurred");  *In re Sauer*, 223 B.R. 715, 725 (Bankr. D. N.D.

1998) [hereinafter "**Sauer**"] ("the crucial factor, then, is simply 'whether the genesis of

each debt was prepetition, that is, whether the events giving rise to the debt occurred

before bankruptcy.'") (quoting l David G. Epstein *et al.*, *Bankruptcy* § 6- 40 at 671 (1992)).

41.     Under the Transaction Test, it makes no difference whether a debt arose in

part from a pre-petition contract or whether the debt was contingent as of the Petition

Date – the test specifies that "*all* transactions necessary for liability" must have

occurred pre-petition if a debt is to be classified as pre-petition.  *LBHI*, 404 B.R. at 759

(emphasis added);  *BOUSA* at *3 (emphasis added).

42.     DB's debt to GM is clearly post-petition under the Transaction Test, as

Debtors' Objection showed.  The uncontroverted facts establish that, until DB calculated

the final sums due based on market conditions as of DB's designated Early Termination

Date, it was unclear whether GM or DB – or neither – would owe a payment to the

other.  (*See* Objection ¶ 32.)  DB's discretionary, post-petition decision to send a notice of

19

termination was thus "necessary for liability" to arise, and the resulting debt was post-petition.

43.    DB presents three arguments in response, but each lacks merit.  First, DB asserts that its "election to terminate" is "not a 'transaction' – the swaps are transactions."  (Reply ¶ 15.)  Second, DB asserts that *LBHI* is "totally distinguishable." (*Id.*)  Third, DB claims that *BOUSA* and *Sauer* "support DB's position, not GM's." (Reply ¶ 16.)  Each of these arguments fails for the reasons discussed below.

44.    First, DB cites no support for its assertion that its election to terminate was not a "transaction," and that argument is incorrect.  *Black's Law Dictionary* (9th ed. 2009) provides an extremely broad definition of "transaction":  "transaction" means "[a]ny activity involving two or more persons" and may be merely "[s]omething performed or carried out."  *Webster's Ninth Collegiate Dictionary* (1983) is equally broad:  a "transaction" is "something transacted," and to "transact" is to "carry out" or "perform." Accordingly, both dictionaries make clear that terminating the GM-DB swaps qualified as a "transaction" simply because the termination was an "activity involving two or more persons" that was "performed or carried out."

45.    Further, courts applying the Transaction Test have not required post-petition actions to meet some abstract definition of "transaction."  *Sauer*, for example, states that the "crucial factor" is "'whether the ***events*** giving rise to the debt occurred before bankruptcy" and does not use the word "transaction."  *Id.* at 725 (emphasis added).  *LBHI* and *BOUSA* similarly place no weight on the word "transaction" and

20

examine instead whether "all **acts** giving rise to liability arose before the petition date."
*LBHI*, 404 B.R. at 759 (emphasis added).  *See also BOUSA* at *3.  Thus DB's termination of
the parties' swap agreements, because it was at the very least a post-petition "act" or
"event" that gave rise to liability, created a post-petition debt under the Transaction
Test.

46.    DB's second argument, that *LBHI* is "totally distinguishable" (Reply ¶ 15),
is equally flawed.  DB merely recounts some of the facts of *LBHI*, which the Debtors'
Objection had discussed in detail (*see* Objection ¶¶ 41-42), and then asserts, without
explanation, that the circumstances of LBHI "bear no resemblance to those present
here."  (Reply ¶ 16.)

47.    DB is wrong.  The circumstances of *LBHI* "resemble" those at issue here
because both cases concern whether a party's post-petition discretion to terminate a
financial transaction makes the resulting debt post-petition.  (*See* Objection ¶¶ 41-42
(citing *LBHI*, 404 B.R. at 759-62).)  *LBHI* held that the mere fact that the parties had post-
petition discretion rendered the resulting debt post-petition, *see id.*, and this Court
should hold the same.  The details concerning the nature and extent of the post-petition
discretion are irrelevant – except that the discretion was actually exercised here.

48.    Third, DB tries to reclaim *Sauer* and *BOUSA* as support for its own posi-
tion.  (*See* Reply ¶¶ 15-18.)  DB cannot deny that these cases use the Transaction Test,
however, and that is the sole proposition for which the Debtors cite them.  DB's attempt
to reclaim *Sauer* and *BOUSA* is based solely on those cases' recognition of propositions

21

that are not relevant here and that the Debtors do not dispute:  that contingent claims

"can be" pre-petition and that "[e]quity favors set–off" when a valid setoff right exists.

(*See* Reply ¶ 17.)  Because *Sauer* and *BOUSA* use the Transaction Test to analyze

whether post-petition actions create a post-petition debt – and not the propositions for

which DB cites them – these case provide no support to DB.

49.    DB also complains that the Debtors omitted the end of a sentence when

quoting from *BOUSA*:

> GM cites *BOUSA* for the proposition that, "[f]or purposes of setoff, a debt
> arises when all transactions necessary for liability have occurred."  Objec-
> tion ¶ 35.  GM, however, omits the full quote in *BOUSA*, which reads
> '[f]or purposes of setoff, a debt arises when all transactions necessary for
> liability have occurred, **regardless of whether the claim was contingent
> when the petition was filed**.'"

(Reply ¶ 17 (quoting *BOUSA* at *3) (original emphasis).)

50.    This argument does not help DB, however, because completing the quoted

language merely reinforces the Debtors' argument:  "regardless of whether the claim

was contingent when the petition was filed," *id.*, DB's debt is post-petition because key

"transactions necessary for liability" did not occur until after GM's bankruptcy.  *Cf.*

*BOUSA* at *3.  In other words, the contingency of DB's swap debt is no reason to classify

it as pre-petition.  (*Cf.* Reply ¶ 3.)

51.    Thus *Sauer* and *BOUSA* do not "strongly support Deutsche Bank's posi-

tion"; their significance, as the Debtors showed, is that they both endorse the

Transaction Test.  Under that Test, as discussed above and in Debtors' Objection, DB's

swap debt must be classified as post-petition.

22

### B.    The "Acts Test"

52.    As discussed above, *LBHI* and *BOUSA* interpret the Transaction Test as equivalent to what can be called the Acts Test, which examines whether "all acts giving rise to liability arose before the petition date" to determine whether a debt is pre-petition.  (*See* Objection ¶¶ 38-39 (quoting *LBHI*, 404 B.R. at 759).)  The Acts Test classifies DB's debt as post-petition for a simple reason:  DB did not perform all acts giving rise to its liability for a termination payment until it terminated the GM-DB swaps after the Petition Date.

53.    Although *LBHI* and *BOUSA* provide precedents for application of the Acts Test, and although DB's swap debt is undeniably post-petition under that Test, DB's discussion of it is perfunctory at best.  In essence, DB constructs a straw man by misrepresenting the Debtors' argument:  "GM … contends that … Deutsche Bank's debt to GM and the amount of that debt both resulted **exclusively** from the termination."  (Reply ¶ 19 (original emphasis) (citing Objection ¶¶ 38, 39).)  DB then attacks its straw man, asserting that, "Deutsche Bank's liability in fact arose from the swap transactions as a whole, not solely from the termination." (Reply ¶ 19.)

54.    In fact, as Debtors' Objection showed, the Acts Test examines whether "***all*** acts giving rise to liability arose before the petition date."  (Objection ¶ 38 (quoting *LBHI*, 404 B.R. at 759) (emphasis added).)  The Acts Test therefore classifies a liability as post-petition whenever ***any*** of the acts giving rise to liability was post-petition – there is no need, as DB claims, to show that ***all*** of the acts were post-petition.  Consequently, it

23

makes no difference whether DB's liability arose from "the swap transactions as a whole" rather than "solely from the termination." (Reply ¶ 19)  DB's liability arose **at least in part** from DB's post-petition acts, and is therefore post-petition under the Acts Test.

55.     DB's only other response to the Debtors' discussion of the Acts Test is to refer back to DB's discussion of *LBHI* and *BOUSA* – which was inaccurate as discussed above – and to supplement it with a discussion of *In re Moore*, 350 B.R. 650 (Bankr. W.D. Va. 2006) [hereinafter **"Moore"**].  The Debtors' Objection cited *Moore* merely as a "see also" referencing the Fourth Circuit's "conduct test" (*see* Objection ¶ 38), but DB suggests that *Moore* and the "conduct test" it employs would classify DB's liability as pre-petition.

56.     DB's argument fails, not only because Fourth Circuit law does not control here, but also because DB materially misstates the "conduct test." According to DB, the Fourth Circuit's conduct test examines whether a claim arose from conduct that "occurred **primarily** before the commencement of the debtor's bankruptcy case." (Reply ¶ 21 (emphasis added).)  Actually, the conduct test is substantially equivalent to the Acts Test:  "The conduct test provides that a right to payment - or a claim - arises "when **the conduct giving rise to the alleged liability occurred**." *Concord West v. J.A. Jones*, No. 3:09-cv-00182-GCM, 2010 WL 148432 *1 (W.D.N.C. January 12, 2010) (emphasis added) (citing *In re Piper*, 58 F.3d 1573, 1577 (11th Cir. 1995) (citing *Grady v. A.H. Robins Co., Inc.*, 839 F.2d 198, 199 (4th Cir. 1988)))).  *See also Moore*, 350 B.R. at 653

24

("in the Fourth Circuit, courts are to apply the so-called 'conduct test' to determine *if*

*the acts committed giving rise to the claim occurred pre-petition*") (emphasis added).

The word "primarily" appears to have been interpolated into the statement of the test in

the *Collier* treatise, but the word does not appear in *Moore*, governing Fourth Circuit

cases, or even the authorities *Collier* itself cites.  *See* 5 *Collier on Bankruptcy* ¶ 553.03 (16th

ed. 2009).  Consequently, not even Fourth Circuit law supports DB's characterization of

its swap debt as pre-petition.[2]

### C.    The "Discretion Test"

57.    Debtors' Objection showed that, if a liability results in part from a party's

discretionary post-petition actions, that liability should be classified as post-petition for

setoff purposes.  (*See* Objection ¶¶ 40-42.)  This "Discretion Test" is merely a narrower

version of the Acts and Transaction Tests – discretionary acts are "acts" by definition

and, because "acts" and "transactions" are equivalent for purposes of evaluating setoffs

as discussed above, they are "transactions" as well.

58.    The Discretion Test differs from the broader Acts and Transaction Tests in

that it provides a clear line of demarcation.  Liabilities based on pre-petition contracts

that are triggered by post-petition contingencies *outside* the parties' control can

---

[2] It is arguable that this Court's decision in *Waterman S.S. Corp. v. Aguilar* (*In re Waterman S.S. Corp.*), 141 B.R. 552, 556 (Bankr. S.D.N.Y. 1992), *vacated on other grounds*, 157 B.R. 220 (S.D.N.Y. 1993), employs the conduct test.  *See* 5 *Collier on Bankruptcy* ¶ 553.03 at n.13.  *Waterman* holds – outside the setoff context – that asbestos claims arise "when acts giving rise to the alleged liability are performed."  *Waterman*, 141 B.R. at 556.  This Court's decision in *In re Quigley Co.*, 383 B.R. 19, 25-27 (Bankr. S.D.N.Y. 2008), is in accord.  However, these cases consider only whether pre-petition asbestos exposure gave rise to a claim in bankruptcy, not whether the claim should be characterized as pre- or post-petition for setoff purposes.  If asbestos claims resulted solely from pre-petition actions as in *Waterman* and *Quigley*, then the Acts and Transaction Tests, like the decisions in those cases, would characterize the claims as pre-petition.

properly be classified as pre-petition.  Liabilities based on pre-petition contracts that are

triggered by post-petition actions *within* a party's control, in contrast, are properly

classified as post-petition.  This case concerns only discretionary post-petition actions or

transactions, and therefore can be decided by applying the narrower Discretion Test, for

which both *LBHI* and *Gore v. United States (In re Gore)*, 124 B.R. 75, (Bankr. E.D. Ark.

1990) [hereinafter ***"Gore"***], are precedents.

59.    DB responds with three arguments, but none provide any reason why the

Discretion Test should not apply.  First, DB again mischaracterizes the Debtors'

position:  it says that "GM argues that if a debtor's counterparty retains discretion after

the petition date to decide whether to terminate a contract, the contract is classified as

post-petition if the counterparty terminates post-petition **and** the counterparty happens

to owe the debtor money."  (Reply ¶ 22; *see id.* ¶ 12 (citing Objection ¶¶ 40, 49).)

60.    Once more, DB has constructed a straw man instead of addressing the

Debtors' actual arguments:  the Discretion Test does ***not*** apply only when a counter-

party owes the debtor money.  DB cites two paragraphs of the Debtors' Objection to

support its mischaracterization, but the first states unambiguously that the Discretion

Test considers whether any "party" – not a "counter-party" – "retains discretion after

the petition date," and it of course says nothing about owing the debtor money.

(Objection ¶ 40.)  The second paragraph discusses only the ***priority*** afforded to post-

petition claims against debtors, and points out that a debtor's post-petition debts are not

entitled to administrative priority if, as likely will always be the case with voluntarily

26

terminated swaps, there was no post-petition benefit to the debtor's estate.  (Objection ¶ 49.)  DB's mischaracterization of the Debtors' position, therefore, is as substantively irrelevant as it is inappropriate.

61.     Second, DB attempts to distinguish *LBHI* and *Gore*.  Although DB's argument is far from clear, DB appears to distinguish *Gore* on the ground that "GM did not assume the Swap Agreements."  (Reply ¶ 24.)  DB's own description of *Gore*, however, shows that this distinction misses the point.  DB describes *Gore* as follows:  "Because the debtor's right to receive future payments under the contract was contingent on the debtor's continued post-petition performance under the contract, the payments were not owed pre-petition, as they had yet to be earned, and therefore could not be set off against a pre-petition claim of the creditors."  (Reply ¶ 23 (citing *Gore* 124 B.R. at 78).)

62.     In these circumstances, *Gore* held that the debtors' right to payment, though based on pre-petition contracts, was nonetheless post-petition because it depended on the debtors' discretionary future performance.  For this reason, the court held that the debtors' contract could be assumed and that their future earnings were not available for setoff.  In other words, *Gore* did not merely hold that the payments at issue were post-petition because the contract was assumed;  it held that the contract could be assumed because the payments at issue – even though they arose from a pre-petition contract – resulted from post-petition exercises of discretion.  Consequently, Gore's application of the Discretion Test is relevant here even though the Debtors did not assume obligations under GM-DB swaps.

27

63.    DB's attempt to distinguish *LBHI* is equally unavailing.  According to DB, *LBHI* "concerned whether a transfer was received post-petition, regardless of any exercise of discretion."  (Reply ¶ 24.)  *LBHI* says otherwise.  It applied the Transaction Test to determine whether the transfer at issue was received post-petition and held that the Test "require[d] a review of the contingencies applicable to the transfer of funds." *LBHI* 404 B.R. at 759.  As part of its review, the Court rejected the creditor's argument that the transfer of funds was completed pre-petition because, the "transfer involved more than the passage of time or a mere ministerial act" – it required the creditor "to take action and formally accept the Transfer Instructions."  *Id.*  Further, *LBHI* expressly distinguished a case in which agreements "provided no discretion to the bank" from *LBHI*, where "the Transfer Instructions were revocable."  *Id.* at 760 n.4.  Thus the Court considered the parties' post-petition discretion to be crucial to its decision in *LBHI*; DB's account of the case is incorrect.

64.    DB's third argument is equally troubling, because it too is based on statements that are demonstrably untrue.  DB asserts that, "the *BOUSA* and *Sauer* decisions relied upon by GM both allowed setoff despite the fact that the post-petition contingent event involved discretionary acts:  in *BOUSA* the discretionary post-petition act was prosecution of litigation and in *Sauer* the discretionary act was compliance with the terms of certain pre-petition farming contracts."  (Reply ¶ 24.)  If DB's assertion were correct, *BOUSA* and *Sauer* would be the only cases that DB cites which hold that

28

post-petition discretionary acts can yield pre-petition obligations.  DB's assertion,
however, is incorrect.

65.    DB mischaracterizes both *BOUSA* and *Sauer*.  The liability at issue in
*BOUSA* did not, as DB contends, arise from a "post-petition contingent event [that]
involved discretionary acts." (Reply ¶ 24.)  Indeed, Judge Peck of this Court, when
discussing his earlier *BOUSA* decision, expressly rejected DB's contention: "[In *BOUSA*,
t]his Court held that the postpetition litigation determined the amounts due, but the
fixing of the claim did not impact mutuality, because ***all acts giving rise to liability
arose before the petition date***." *LBHI*, 404 B.R. at 759 (emphasis added).  Thus, the
liability at issue in *BOUSA* did not arise from discretionary post-petition acts:  although
post-petition legal proceedings were necessary in *BOUSA* to ***enforce*** pre-petition debts,
those debts ***arose*** pre-petition.

66.    DB's description of *Sauer* is equally incorrect, because in that case, "all
parties agree[d] that the events giving rise to the debtors' claim for CRP and PFC
payments … arose prepetition."  *See Sauer* 223 B.R. at 725 n.4.  DB has no basis for
asserting, contrary to the litigating parties' agreement, that the events giving rise to the
claim should instead be classified as post-petition, and this Court certainly cannot so
hold.

67.    DB's reliance on mischaracterizations of *BOUSA* and *Sauer* is telling:
despite its repeated references to "black-letter law," ***DB cites no case holding that
discretionary post-petition acts can create pre-petition debts***.  The only cases research

29

has disclosed that consider post-petition discretionary acts – *LBHI* and *Gore* – both classify the resulting liabilities as post-petition.  The swap debt at issue here should be classified as post-petition as well.

68.     Thus, for all of the foregoing reasons, the liabilities created by DB's discretionary swap termination should be classified as post-petition.  The Transaction Test, Acts Test and Discretion Test employed by the courts in this Circuit all mandate this conclusion.  Accordingly, DB should pay the Debtors forthwith.

### D.    DB's Swap Debt Was Unenforceable Prior to the Petition Date

69.     DB's final attempt to show that its swap debt was pre-petition amounts to sleight of hand.  Debtors' Objection showed that DB's swap debt can be classified as post-petition because, "[n]umerous courts in this District and elsewhere have held that a debt must be considered post-petition if it is not 'absolutely owed' or a 'valid and enforceable' 'debt owing' until after the petition date."  (Objection ¶ 43; *see id.* at ¶¶ 45-48.)  The Debtors also showed that, until the GM-DB swaps were terminated, DB's swap debt did not exist.  (*See id.* ¶¶ 13-14, 44.)

70.     DB responds by asserting that the Debtors are "wrong" in contending "that Deutsche Bank's swap obligations were not valid and enforceable debts owing as of the petition date."  (Reply ¶ 25.)  Yet if "as of the petition date" means "prior to the commencement of the Debtors' bankruptcy case," DB's claim that the Debtors are "wrong" is insupportable.  The undisputed facts show that DB's swap debt did not arise until it terminated the parties' swaps *because of the Debtors' bankruptcy filing*, and that

30

debt was not a regular swap payment, but rather a termination payment that became due only because of the Debtors' default. (*See* Objection ¶¶ 13, 44.)

71.     On the other hand, if "as of the petition date" means "as of the close of business on the petition date," DB's assertion, even if true, is legally irrelevant: the Bankruptcy Code only permits setoff of "a mutual debt …that arose before *commencement of the case*." 11 U.S.C. § 553 (emphasis added).

72.     DB also employs a second trick: It presents the question before the Court as if it were whether the parties' *swap agreements* were enforceable pre-petition rather than whether DB's *swap debt* was enforceable pre-petition. DB's argument heading is, "The *Swap Transactions* Were Valid and Enforceable Debts" (emphasis added), and DB even asserts that, "GM has gone so far as to argue that valid, binding pre-petition swap contracts somehow are not valid and enforceable obligations as of the petition date." (Reply ¶ 29.)

73.     DB has constructed a straw man yet again; the Debtors make no such argument. The GM-DB swap agreements were valid pre-petition contracts, but those contracts allowed uncertain future events to determine which party owed the other money. Indeed, that was the whole point of the swap transactions. It does not follow, however, that DB owed an enforceable *debt* to GM before DB terminated the swap. The parties' contracts provided otherwise, and if the swap agreements had terminated at a different time, GM could have owed money to DB rather than the other way around.

31

74.    In sum, DB owed *contractual performance* to the Debtors as of the commencement of the Debtors' bankruptcy case, but that contractual performance did not yet result in, and in other circumstances might never have resulted in, a *debt*.  Thus, this Court cannot find that DB's swap debt – which arose *because of* the Debtors' bankruptcy – was nonetheless valid and enforceable before that bankruptcy took place. Even DB's sleight of hand provides no justification for doing so.

75.    DB concludes by attempting to distinguish *In re Delta Airlines*, 341 B.R. 439 (Bankr. S.D.N.Y 2006) [hereinafter *"Delta"*], and other cases holding that, "a debt must be considered post-petition if it is not 'absolutely owed' or a 'valid and enforceable' 'debt owing' until after the petition date." (Objection ¶ 43.)

76.    Apart from *Delta*, which is discussed below, the only case that DB discusses at length or in text is *In re Genuity, Inc.*, 323 B.R. 79 (Bankr. S.D.N.Y. 2005) [hereinafter *"Genuity"*], which DB attempts to distinguish on the ground that it barred a setoff of cure payments against pre-petition debts.  (*See* Reply ¶ 26.)  DB is confused about *Genuity*, however.  The Debtors' parenthetical for *Genuity* says only that it "den[ied] a request to set off deposits that were not 'debts' 'due and owing' before the petition date" (Objection ¶ 43),  and the deposits at issue were *not* cure payments – they were the other, offsetting debts.  *See Genuity* 323 B.R. at 84 n.9.  DB's purported distinction of *Genuity* is thus irrelevant to the point for which the Debtors cited it.  This is equally true of DB's attempts to distinguish the Debtors' other cases in a footnote, but

32

review of the parties' competing parentheticals for these cases sufficiently establishes

that fact.  (*Compare* Objection ¶ 43 *with* Reply p. 12 n.5.)

77.    Finally, DB attempts, but fails, to distinguish *Delta*.  The Debtors'

Objection discussed *Delta* at length, because it adopts an approach different from that of

the Acts, Transaction and Discretion Tests discussed above.  Under *Delta*, a debt is post-

petition for setoff purposes if it was not absolutely owing as a valid and enforceable

debt prior to the debtor's bankruptcy filing.  Thus, in *Delta*, the credits the debtor airline

was owed were classified as post-petition and unavailable for setoff because their

amount was "a function of a calculation that cannot be made before the [post-

bankruptcy] close of the Fiscal Year and therefore cannot exist or 'arise' before the [post-

bankruptcy] close of the Fiscal Year."  *Delta* 341 B.R. at 450.  Here too, the sums the

Debtors are owed could not be calculated until after the Debtors' bankruptcy, and those

sums should therefore be classified as post-petition under *Delta*.

78.    DB admits that *Delta* "found that even assuming the 'credits' to which the

debtor-airline was entitled could be regarded as debt owing from the airport authority

to the debtor-airline, it was a debt which arose only post-petition, at the conclusion of

the airport's business year, when determination could be made as to whether the

airport had operated at a profit."  (Reply ¶ 27.)  DB seeks to distinguish *Delta*, however,

on the ground that "Deutsche Bank's obligation is not in 'credits,' but in monetary

funds, as is GM's pre-petition claim."  (*Id.* ¶ 28.)  This is a mere distinction without a

difference:  in both cases, a debtor was entitled to a financial benefit that could only be

calculated post-petition, and here, as in *Delta*, the sums due should be classified as post-

petition.  DB therefore has no valid right of setoff, and it should pay the Debtors the

sums it owes.

## **CONCLUSION**

79.     For the foregoing reasons, the Debtors' Cross-Motion should be granted,

and DB's Motion should be denied in all respects.

Dated:  New York, New York
         December 28, 2010

TOGUT, SEGAL & SEGAL LLP
*Conflicts Counsel for the Debtors and*
*Debtors in Possession*

By:

   s/Richard K. Milin
ALBERT TOGUT
SCOTT E. RATNER
RICHARD K. MILIN
One Penn Plaza, Suite 3335
New York, New York 10019
(212) 594-5000