GREENBERG TRAURIG, LLP
Bruce R. Zirinsky, Esq.
Nancy A. Mitchell, Esq.
John H. Bae, Esq.
Gary D. Ticoll, Esq.
MetLife Building
200 Park Avenue
New York, New York 10166
Telephone: (212) 801-9200
Facsimile: (212) 801-6400
Email: zirinskyb@gtlaw.com
       mitchelln@gtlaw.com
       baej@gtlaw.com
       ticollg@gtlaw.com

*Counsel for Appaloosa Management L.P., Aurelius Capital Management, LP,
Elliott Management Corporation, and Fortress Investment Group LLC*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------x

| | |
|---|---|
| In re | : Chapter 11 |
| MOTORS LIQUIDATION COMPANY, et al., f/k/a General Motors Corp., et al., | : Case No. 09-50026 (REG) |
| Debtors. | : (Jointly Administered) |

---------------------------------------------------------x

**MOTION OF CERTAIN NOTEHOLDERS PURSUANT TO RULE
3018(a) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE
FOR TEMPORARY ALLOWANCE OF THE NOVA SCOTIA GUARANTY
<u>CLAIMS FOR THE PURPOSE OF VOTING TO ACCEPT OR REJECT THE PLAN</u>**

Appaloosa Management L.P. ("**Appaloosa**"), Aurelius Capital Management, LP ("**Aurelius**"), Elliott Management Corporation ("**Elliott**"), and Fortress Investment Group LLC ("**Fortress**") (collectively, the "**Moving Parties**"), each on behalf of their managed entities which hold Notes (as defined below) issued by General Motors Nova Scotia Finance Company

("**GM Nova Scotia**") and guaranteed by Motors Liquidation Company f/k/a General Motors Corporation ("**MLC**"), submit this motion (the "**Motion**") for entry of an Order pursuant to Rule 3018 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") temporarily allowing the Nova Scotia Guaranty Claims (as defined below) in the amount of $1,072,557,531.72 as claims under title 11 of the United States Code (the "**Bankruptcy Code**") against the estate of MLC, one of the above-captioned debtors, for the purpose of voting to accept or reject the Plan (as defined below).

## PRELIMINARY STATEMENT[1]

The Moving Parties are filing this Motion out of an abundance of caution to ensure that they are not deprived of their right to vote on the Debtors' Plan. The Nova Scotia Guaranty Claims are valid and enforceable claims. The filing of the proofs of claim based upon the Nova Scotia Guaranty Claims is prima facie evidence of their validity. Moreover, under the terms of the Lock-Up Agreement (which was assumed and assigned to General Motors Company pursuant to the terms of the Sale Order approved by the Court), MLC acknowledged the validity of the Nova Scotia Guaranty Claims. Although the Committee has filed an objection to the Nova Scotia Guaranty Claims, the Committee has not challenged the validity of the Nova Scotia Guaranty Claims, but has merely asked the Court to reduce distributions on account of such claims as a matter of "equity," based on unsubstantiated and baseless allegations.

The Solicitation Order appears to provide for the Nova Scotia Guaranty Claims to vote and the holders of Nova Scotia Guaranty Claims did receive ballots in accordance with the Solicitation Order. However, given the Committee's objection, the terms of the Solicitation Order are not completely clear that the votes of holders of the Nova Scotia Guaranty Claims will be counted for purposes of voting on the Plan. As a result of this ambiguity, counsel for the

---

[1] Capitalized terms not otherwise defined in the Preliminary Statement shall have the meanings ascribed to them below.

Moving Parties reached out to Debtors' counsel who confirmed to the Moving Parties, by a December 22, 2010 e-mail, that the Nova Scotia Guaranty Claims are allowed for purposes of voting on the Plan. On December 29, 2010, Debtors' counsel, despite the distribution of the ballots and the previous confirmation by Debtors' counsel of the Noteholders' right to vote, reversed itself and took the position that the Nova Scotia Guaranty Claims are not entitled to vote to accept or reject the Plan. In light of the conflicting positions taken by the Debtors' counsel, the Moving Parties were left with no choice but to file this Motion to preserve their rights to vote on the Debtors' Plan.

Accordingly, the Moving Parties request that the Court issue an order pursuant to Bankruptcy Rule 3018 temporarily allowing the Nova Scotia Guaranty Claims in the amount of $1,072,557,531.72 for the purpose of voting to accept or reject the Plan.

## JURISDICTION AND VENUE

1. The Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334.

2. This is a core proceeding under 28 U.S.C. § 157(b) and venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

3. The legal predicates for the relief sought herein are sections 502 and 1126 of the Bankruptcy Code and Rules 3001 and 3018 of the Bankruptcy Rules.

## FACTUAL BACKGROUND

### A. Procedural Background

4. On July 2, 2010, the Official Committee of Unsecured Creditors of MLC (the "**Committee**") filed the *Official Committee of Unsecured Creditors' Objection to Claims Filed by Green Hunt Wedlake, Inc. and Noteholders of General Motors Nova Scotia Finance Company and Motion for Other Relief* [Docket Nos. 6248 and 7859] (as amended on November 19, 2010,

3

the "**Committee Objection**"). On December 13, 2010, the Moving Parties filed the *Response of Certain Noteholders in Opposition to Official Committee of Unsecured Creditors' First Amended Objection to Claims Filed by Green Hunt Wedlake, Inc., and Noteholders of General Motors Nova Scotia Finance Company and Motion for Other Relief* [Docket No. 8084] (the "**Reply**").

5.  On August 31, 2010, MLC and certain of its subsidiaries (collectively, the "**Debtors**") filed the *Debtors' Joint Chapter 11 Plan* [Docket Nos. 6829 and 8015] (as amended on December 7, 2010, the "**Plan**") and related *Disclosure Statement for Debtors' Joint Chapter 11 Plan* [Docket Nos. 6830 and 8014] (amended on December 7, 2010).

6.  On December 8, 2010, the Bankruptcy Court for the Southern District of New York (the "**Court**") entered the *Order (I) Approving Notice of Disclosure Statement Hearing; (II) Approving Disclosure Statement; (III) Establishing a Record Date; (IV) Establishing Notice and Objection Procedures for Confirmation of the Plan; (V) Approving Notice Packages and Procedures for Distribution Thereof; (VI) Approving the Forms of Ballots and Establishing Procedures for Voting on the Plan; and (VII) Approving the Forms and Notices to Non-Voting Classes under the Plan* [Docket No. 8043] (the "**Solicitation Order**"). Pursuant to the Solicitation Order, a claim holder seeking to challenge the disallowance of its claim for voting purposes may file a motion for an order pursuant to Bankruptcy Rule 3018 temporarily allowing such claim for purposes of voting to accept or reject the Plan. *See* Solicitation Order, ¶ 17.

7.  The Voting Deadline (as defined in the Solicitation Order) is February 11, 2011.

8.  The confirmation hearing for the Plan is scheduled for March 3, 2011.

**B.    The Nova Scotia Guaranty Claims**

9.  GM Nova Scotia is a Nova Scotia unlimited company and a wholly-owned direct subsidiary of MLC. On July 10, 2003, GM Nova Scotia issued (a) £350,000,000 principal

4

amount of 8.375% Guaranteed Notes due December 7, 2015 (the "**2015 Notes**") and (b) £250,000,000 principal amount of 8.875% Guaranteed Notes due July 10, 2023 (the "**2023 Notes**" and together with the 2015 Notes, the "**Notes**"), pursuant to the terms and conditions of that certain Fiscal and Paying Agency Agreement, dated as of July 10, 2003, between and among GM Nova Scotia, MLC, Deutsche Bank Luxembourg S.A., as fiscal agent, and Banque Général du Luxembourg S.A., as paying agent (the "**Fiscal and Paying Agency Agreement**"). *See* Fiscal Paying and Agency Agreement, which is attached as Exhibit "A" at 4.

10.  MLC guaranteed GM Nova Scotia's obligations under the Notes. Pursuant to Section 5 of Schedule 1 to the Fiscal Paying and Agency Agreement (the "**Guaranty**"), MLC, defined as the "Guarantor" under the Fiscal Paying and Agency Agreement, guarantees the "due and punctual payment" of all amounts due on account of the Notes. The Fiscal Paying and Agency Agreement further provides that "the Guarantee is absolute and unconditional, irrespective of any circumstance that might otherwise constitute a legal or equitable discharge of a surety or guarantor." *Id.* By the plain terms of the Fiscal Paying and Agency Agreement, MLC guaranteed, and is liable for, all of GM Nova Scotia's obligations on account of the Notes. Proofs of claim have been filed against MLC on behalf of the Moving Parties and the other holders of the Notes (collectively, the "**Noteholders**") aggregating unique claims of $1,072,557,531.72 based upon the Guaranty (the "**Nova Scotia Guaranty Claims**").[2] *See* Noteholders' Proofs of Claim and Nova Scotia Guaranty Claims, attached as Exhibit "B."

---

[2] On November 9, 2009, Greenberg Traurig, LLP ("**GT**") filed a motion in connection with the bar date order on behalf of Aurelius, Drawbridge Special Opportunities Advisors, LLC, Fortress, Appaloosa, Elliott, Perry Partners, L.P. and Perry Partners International, Inc. (the "**GT-Represented Noteholders**"). At a hearing held on November 20, 2009, the Court ruled that the GT-Represented Noteholders and any other Noteholders that had communicated with GT (the "**Contacting Noteholders**") were required to file individual proofs of claim. The Court also authorized GT to file a group proof of claim for Noteholders other than the GT-Represented Noteholders and the Contacting Noteholders (the "**Other Noteholders**"). An order consistent with the Court's bench ruling was entered on December 23, 2009. Consistent with Court's ruling, (i) the GT-Represented Noteholders and the Contacting Noteholders filed the following claims: Nos. 67498, 66265, 67428, 67500, 66266, 67499, 67429, 66217, 69347, 69346, 67430, 66267, 66216, and 67501 (collectively, the "**Individual Noteholder Claims**") and (ii) GT filed a

5

### C.    The Wind-Up Claim

11.    Under Section 135 of the *Companies Act* (Nova Scotia), MLC, as the direct parent of GM Nova Scotia, is statutorily liable to GM Nova Scotia for the debts and liabilities of GM Nova Scotia in the event of its winding-up (the "**Wind-Up Obligations**"). *See* Section 135 of the *Companies Act* (Nova Scotia), attached as Exhibit "C." On October 9, 2009, the Supreme Court of Nova Scotia adjudged GM Nova Scotia bankrupt and issued an order on that date pursuant to the *Bankruptcy and Insolvency Act* (Canada) appointing Green Hunt Wedlake Inc. as trustee of the estate of GM Nova Scotia (the "**Nova Scotia Trustee**"). *See* Bankruptcy Order, which is attached as Exhibit "D." On November 30, 2009, the Nova Scotia Trustee filed its claims based on the Wind-Up Obligations bearing Claim No. 66319 in the amount of $1,607,647,592.49 (the "**Wind-Up Claim**").

### D.    Debtors' Acknowledgement of the Allowance of the Nova Scotia Guaranty Claims for Purposes of Voting

12.    Under the terms of the Lock-Up Agreement,[3] MLC formally acknowledged the validity and enforceability of the Nova Scotia Guaranty Claims. On December 22, 2010, counsel for the Moving Parties sent an e-mail to counsel for the Debtors seeking confirmation that the Debtors agreed that the Solicitation Order provides for the allowance of the Nova Scotia Guaranty Claims for purposes of voting to accept or reject the Plan. Counsel for the Debtors

---

global proof of claim (claim no. 69551) on behalf of the Other Noteholders in the amount of $1,072,557,531.72 less the aggregate amount of the Individual Noteholder Claims (the "**Global Noteholder Claim**"). In addition, certain other claims have been filed by other Noteholders which may be duplicative in part of the claims covered by the Global Noteholder Claim (the "**Other Individual Claims**"). It is undisputed that the aggregate amount owed under the Notes as of the commencement of the Debtors' cases is $1,072,557,531.72.

[3] On June 1, 2009, the Moving Parties, MLC, General Motors of Canada Limited ("**GM Canada**") and GM Nova Scotia entered into an agreement (the "**Lock-Up Agreement**") that resolved, among other things, litigation related to the Notes and certain intercompany loans, thus enabling MLC to proceed with its consensual restructuring, which involved selling substantially all of its assets to General Motors Company ("**GMC**"). The settlement embodied in the Lock-Up Agreement (attached as Exhibit "E") enabled MLC to effect a prompt sale under section 363 of the Bankruptcy Code (the "**363 Sale**"). Section 6(a) of the Lock-Up Agreement provides: "Each of the Company and the Guarantor hereby expressly acknowledges, agrees and confirms that . . . (iii) the Guarantee Claim is a valid and enforceable claim of the Holders and shall be enforceable against the Guarantor in the Chapter 11 Cases as Allowed Claims to the fullest extent permitted under applicable laws."

6

responded via e-mail on December 22, 2010 and confirmed that the Nova Scotia Guaranty Claims were entitled to vote on the Plan. A copy of the e-mail chain is attached hereto as Exhibit "F."

13. The Debtors also provided ballots and solicitation materials to the Noteholders in accordance with the Solicitation Order, which ballots were received on January 7, 2010.

14. Notwithstanding the foregoing, without explanation, on December 29, 2010, counsel for the Debtors advised that they did not believe that the Solicitation Order allowed the Nova Scotia Guaranty Claims for purposes of voting to reject or accept the Plan.

## RELIEF REQUESTED

15. The Moving Parties seek entry of an order temporarily allowing the Nova Scotia Guaranty Claims against MLC's estate in the amount of $1,072,557,531.72, for the purpose of voting to accept or reject the Plan.

## REASONS FOR GRANTING RELIEF

16. Bankruptcy Rule 3018 provides that "the court after notice and hearing may temporarily allow the claim or interest in an amount which the court deems proper for the purpose of accepting or rejecting a plan." Fed. R. Bankr. P. 3018. Pursuant to Bankruptcy Rule 3018(a), "the determination of whether and how to determine the temporary allowance of a claim is left to the sound discretion" of the Bankruptcy Court.[4] *In re Frascella Enterprises, Inc.*, 360 B.R. 435, 458 (Bankr. E.D. Pa. 2007). Notwithstanding an objection to the claim, the Bankruptcy Court may consider evidence it finds appropriate to determine the amount of the claim that should be temporarily allowed for voting purposes only. *See In re Ralph Lauren Womenswear, Inc.*, 197 B.R. 771, 775 (Bankr. S.D.N.Y. 1996) ("Neither the Code nor the Rules

---

[4] "Notwithstanding objection to a claim or interest, the court after notice and hearing may temporarily allow the claim or interest in an amount in which the court deems proper for the purpose of accepting or rejecting the plan." Fed. R. Bankr. P. 3018(a).

7

prescribe any method for estimating a claim, and it is therefore committed to the reasonable discretion of the court, which should employ whatever method is best suited to the circumstances of the case."); *In re First Republicbank Corp.*, No. 388-34546-SAF-11, 1990 Bankr. LEXIS 2840, at *25 (Bankr. N.D. Tex. June 19, 1990). Claims litigation can be lengthy; therefore, a court may temporarily allow a claim. *See Kane v. Johns-Manville Corp.*, 843 F.2d 636, 646 (2d Cir. 1988) (holding that pursuant to Bankruptcy Rule 3018(a), "objections to claims need not be finally resolved before voting on a plan may occur"); *In re Stone Hedge Props.*, 191 B.R. 59, 63 (Bankr. M.D. Pa. 1995) ("Since claims litigation is often drawn out, thereby defeating one of the essential purposes of the Code . . . for voting purposes only, the court can temporarily allow a claim in such an amount" it deems proper).

17.     In determining whether to temporarily allow a claim for voting purposes, courts may look to (1) the debtor's scheduling of the claim, (2) the proof of claim filed and (3) the objection to determine parties' expectations regarding the amount and nature of the claim to be voted. *In re Stone Hedge Props.*, 191 B.R. at 65. In addition, consistent with the policy underpinnings of the Bankruptcy Code, courts favor temporary allowance of disputed claims. *In re Amarex Inc.,* 61 B.R. 301, 303 (Bankr. W.D. Okla. 1985) ("[T]o allow [the disputed claims] to vote on the plans, even though some may be eventually disallowed for purposes of distribution, is more in keeping with the spirit of chapter 11 which encourages creditor vote and participation in the reorganization process."). The claimant has the burden of proof when seeking temporary allowance of a claim for voting purposes pursuant to Bankruptcy Rule 3018. *See In re DBSD N. Am. Inc.*, No. 09-13061, slip op. app. at *5 (Bankr. S.D.N.Y. Sept. 11, 2009). However, the court does not need to conduct a mini-trial over the Nova Scotia Guaranty Claims, but only need weigh "the probabilities of the various contentions made by the parties." *Ralph Lauren*, 197

B.R. at 775. As demonstrated in the Reply and below, the Moving Parties have shown that the Nova Scotia Guaranty Claims are valid and enforceable.

18. Pursuant to Bankruptcy Rule 3001(f), "[a] proof of claim executed and filed in accordance with these rules shall constitute prima facie evidence of the validity and amount of the claim." Fed. R. Bankr. P. 3001(f); *see also Sherman v. Novak (In re Reilly)*, 245 B.R. 768, 773 (2d Cir. B.A.P. 2000) ("A properly executed and filed proof of claim constitutes prima facie evidence of the validity of the claim. To overcome this prima facie evidence, the objecting party must come forth with evidence which, if believed, would refute at least one of the allegations essential to the claim.") (citing Fed. R. Bankr. P. 3001(f)). Section 502(a) of the Bankruptcy Code provides, "[a] claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest . . . objects." 11 U.S.C. § 502(a); *see Keating v. U.S. Lines, Inc. (In re U.S. Lines, Inc.)*, No. 04 Civ. 6614(LTS)(FM), 2006 WL 1559237, at *5 (S.D.N.Y. June 7, 2006) (recognizing that "under section 502(a) of the Bankruptcy Code, unless a party objects to a proof of claim, it is deemed allowed").

19. The Nova Scotia Guaranty Claims are valid and enforceable claims and are entitled to at least temporary allowance for purposes of voting on the Plan, because (i) the filing of proofs of claim in connection with the Nova Scotia Guaranty Claims constitutes prima facie evidence of the validity of the Nova Scotia Guaranty Claims; (ii) the Debtors have acknowledged the validity of the Nova Scotia Guaranty Claims; and (iii) the Committee Objection does not address the validity of the Nova Scotia Guaranty Claims, but rather raises equitable arguments that distributions should be reduced on the Nova Scotia Guaranty Claims.

20. Although the Committee has filed an objection to the Nova Scotia Guaranty Claims, the objection is not sufficient to disenfranchise the holders of the Nova Scotia Guaranty Claims, as the objection does not challenge the validity of the Nova Scotia Guaranty Claims.

9

The Committee's objection boils down to the following: (i) the Nova Scotia Guaranty Claims are duplicative of the Wind-Up Claim; and (ii) distributions on the Nova Scotia Guaranty Claims should be reduced or eliminated based on unsubstantiated claims of fraudulent transfer and preference. There is no merit to any of the Committee's objections to the allowance of the Nova Scotia Guaranty Claims or the Wind-Up Claim.

21.     With respect to the assertion that the Nova Scotia Guaranty Claims are duplicative of the Wind-Up Claim, both the law and the facts undermine the Committee's position. It is settled law that two creditors may assert separate claims arising from the same set of facts. As long as the Noteholders do not receive more than payment in full on account of the Notes, both the Nova Scotia Guaranty Claims and the Wind-Up Claim should be allowed in full. *See Northwestern Mut. Life Ins. Co. v. Delta Air Lines, Inc. (In re Delta Air Lines, Inc.)*, 608 F.3d 139 (2d Cir. 2010) (holding that the claims of two creditors related to the same underlying facts were not duplicative because the claims arose pursuant to separate legal obligations and total recovery would not exceed 100%); *In re Owens Corning,* 419 F.3d 195, 216 (3d Cir. 2005) (recognizing the rights of "creditors who have lawfully bargained prepetition for unequal treatment by obtaining guarantees of separate entities" and noting that "[e]quality among creditors who have lawfully bargained for different treatment is not equity but its opposite") (citation and quotation marks omitted). Thus, a creditor (such as the Noteholders) is entitled to assert its claims in full against both a guarantor debtor (such as MLC) and a principal debtor obligor (such as GM Nova Scotia) for the same debt until the creditor receives payment in full. The Nova Scotia Guaranty Claims arise from MLC's guaranty of GM Nova Scotia's obligations under the Notes. That guaranty obligation runs to the holders of the Nova Scotia Notes and has never been challenged by any party. The Wind-Up Claim arises from Section 135 of the Companies Act under Nova Scotia law that requires members of an unlimited company to satisfy

10

all debts of the unlimited company that is being wound up. Here, because GM Nova Scotia is an unlimited company that is being wound up and MLC is the sole member of GM Nova Scotia, MLC is legally required to satisfy all debts of GM Nova Scotia.[5] The Wind-Up Claim is an asset of GM Nova Scotia and is comprised of all of its debts and liabilities, not only its obligations to the holders of the Nova Scotia Notes. The Nova Scotia Guaranty Claims and the Wind-Up Claims are separate and distinct claims of different parties in differing amounts arising on account of different legal bases. There is no merit to the contention that the two claims are duplicative.

22. The Committee has also objected to the Nova Scotia Guaranty Claims by arguing that distributions on the Nova Scotia Guaranty Claims should be reduced or eliminated based on baseless claims of fraudulent transfer and preference. The Committee's avoidance claims are based on the loan of $450 million by MLC to GM Canada on May 29, 2010 (the "GM Canada Loan"), prior to the Petition Date. This objection is totally without merit because, among other things, the Debtors' estates do not own the purported avoidance claims to serve as a basis to object to the Nova Scotia Guaranty Claims.[6] All such avoidance claims were sold to New GM pursuant to the 363 Sale. *See Order (I) Authorizing Sale of Assets Pursuant to Amended and Restated Master Sale and Purchase Agreement with NGMCO, Inc., a U.S. Treasury-Sponsored Purchaser (II) Authorizing Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection with the Sale; and (III) Granting Related Relief* [Docket No. 2968]. Insofar as the MLC estate no longer owns any avoidance claims against the Noteholders,

---

[5] The establishment of GM Nova Scotia by MLC as an unlimited company ("**ULC**") under the *Companies Act* (Nova Scotia) provided MLC with potential tax benefits. Correspondingly, by structuring GM Nova Scotia as a ULC and acquiring the potential tax benefits, MLC is required under Nova Scotia law to satisfy the liabilities of the ULC. Having reaped the potential benefits of the ULC structure, MLC should not be permitted now to renounce that structure and the obligations it acquired in connection therewith.

[6] In the Reply, the Moving Parties demonstrate in detail the absence of any legal or factual basis for the Committee's conclusory contentions. The entirety of the Reply is incorporated by reference herein.

the Committee has no standing to object to the Nova Scotia Guaranty Claims based on claims of fraudulent transfer or preference. *See Bankr. Servs., Inc. v. Ernst & Young LLP* (*In re CBI Holding Co., Inc.*), 529 F.3d 432, 459 (2d Cir. 2008) (noting that bankruptcy trustee cannot assert claims that have not been assigned to it because "such claims are not part of the bankrupt's estate").

23.    Moreover, even if MLC's estate owned the avoidance claims that were sold to New GM, under section 502(d) of the Bankruptcy Code, the Committee cannot object to the Claims on the contention that the Lock-Up Agreement was a fraudulent conveyance or that payment of the Consent Fee was a preferential transfer unless and until the Court has entered a judgment that the Lock-Up Agreement constituted a fraudulent conveyance and payment of the Consent Fee was a preferential transfer. *See, e.g. United States Lines (S.A.), Inc. v. U.S. (In re McLean Indus., Inc.)*, 30 F.3d 385, 388 (2d Cir. 1994); see, also, *Holloway v IRS (In re Odom Antennas Inc.)*, 340 F.3d 705, 708 (8th Cir. 2003) (holding that a claim can be disallowed under section 502(d) only after claimant is first adjudged liable and fails to pay). Here, neither the Moving Parties, the Nova Scotia Trustee, nor any of the Noteholders have been adjudged liable under sections 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code and accordingly, as a matter of law, the Claims cannot be disallowed under section 502(d).

24.    In addition, because the Consent Fee was funded by GM Canada and paid by GM Nova Scotia, both non-Debtor entities, the Consent Fee cannot be avoided as a fraudulent transfer. A trustee's avoiding powers under the Bankruptcy Code only extend to transfers that are property of the estate; the transfer of non-debtor property is outside the scope of section 548 of the Bankruptcy Code. *See, e.g., In re Dreier* LLP, 429 B.R. 112, 125 (Bankr. S.D.N.Y. 2010) ("If the transfer did not involve property of the debtor under on-bankruptcy law, the trustee

12

cannot avoid and recover the transfer or its value"). Here, GM Nova Scotia paid the Consent Fee. The Consent Fee was not MLC's property, so it cannot be avoided as a fraudulent transfer

25. According to the Committee, the Consent Fee is avoidable as a preferential transfer under section 547 of the Bankruptcy Code because MLC made the GM Canada Loan prior to the Petition Date. To establish that the Consent Fee was a preferential transfer, the Committee must demonstrate, among other things, that the transfer was (i) for the benefit of the Noteholders; and (ii) for or on account of an antecedent debt owed by MLC before such transfer was made. 11 U.S.C. § 547. The Committee, however, has failed to satisfy its burden. The Committee's conclusory contention that the Consent Fee is avoidable based solely on the allegation that MLC made the GM Canada Loan to GM Canada, which provided funding for the Consent Fee, three days before the Petition Date fails to establish that the payment was a preferential transfer.

26. In fact, prior to the Petition Date, MLC made the GM Canada Loan to GM Canada and received a promissory note in the amount of $450 million (the "**GM Canada Promissory Note**") as consideration for the funds it transferred to GM Canada. Neither the Noteholders nor GM Nova Scotia was a party to that transaction, which occurred prior to an agreement on the terms of the Lock-Up Agreement, and which is not provided for in the Lock-Up Agreement. Thus, the Committee is wrong to argue that the GM Canada Loan was made for the benefit of the Noteholders. The Committee also fails to satisfy its burden because the transfer was not made on account of antecedent debt. It is indisputable that MLC made the GM Canada Loan in exchange for the GM Canada Promissory Note. There is no basis for the Committee to contend that MLC made the GM Canada Loan to GM Canada to satisfy the Noteholders' Claims against MLC.

13

27. The burden is on the Committee to raise an objection to the validity of the Nova Scotia Guaranty Claims, that if accurate, would refute at least one of the allegations essential to the Nova Scotia Guaranty Claims. *See Reilly*, 245 B.R. at 773 (holding that a "filed proof of claim constitutes prima facie evidence of the validity of the claim[,]" and that "[t]o overcome this prima facie evidence, the objecting party must come forth with evidence which, if believed, would refute at least one of the allegations essential to the claim"); *Riverbank, Inc. v. Make Meat Corp. (In re Make Meat Corp.)*, No. 98 CIV. 4990(HB), 1999 WL 178788, at *4 (S.D.N.Y. Mar. 31, 1999) ("The case law is clear. To prevail, the objector must affirmatively *produce* evidence to counter the creditor's claim.") (original emphasis); *In re Allegheny Intern., Inc.*, 954 F.2d 167, 173 (3d Cir. 1992) ("It is often said that the objector must produce evidence equal in force to the prima facie case."); *Juniper Development Transport, Inc. v. Kahn (In re Hemingway Transport, Inc.)*, 993 F.2d 915, 925 (1st Cir. 1993) ("The interposition of an objection does not deprive the proof of claim of presumptive validity unless the objection is supported by *substantial evidence*.") (original emphasis). The Committee has failed to meet that burden. The Committee has done nothing to refute the underlying validity of the Nova Scotia Guaranty Claims.

28. Regardless of whether the Committee is able to meet its burden, the very purpose of a motion made pursuant to Bankruptcy Rule 3018 is to allow a claim that is in dispute to be allowed for voting purposes. *See Kane*, 843 F.2d at 646 (holding that pursuant to Bankruptcy Rule 3018(a), "objections to claims need not be finally resolved before voting on a plan may occur"). Here, the Debtors have formally acknowledged the validity of the Nova Scotia Guaranty Claims. The Nova Scotia Guaranty Claims should be allowed for purposes of voting on the Plan.

29. Moreover, the Nova Scotia Guaranty Claims, which are classified in Class 3, aggregate approximately $1.072 billion. As provided in the Disclosure Statement, the Debtors

expect the total amount of allowed claims in Class 3 to be between $34.4 and $39 billion. Based on that estimate, the Nova Scotia Guaranty Claims represent, at most, 3.12% of the allowed claims in Class 3. Thus, the Court should temporarily allow the Nova Scotia Guaranty Claims for voting purposes because such allowance will not overwhelm the claims of other creditors or provide the Noteholders with improper influence over Class 3 inconsistent with the size of the Nova Scotia Guaranty Claims. *See DSBD*, No. 09-13061, slip op. app. at 5; *see also Enron*, 2004 WL 2434928, at *5 ("When circumstances warrant the estimation of claims for voting purposes, the bankruptcy court [should] utilize[] its claim estimation authority to ensure voting power [is] commensurate with economic interest.").

30.     In addition, while the Solicitation Order may be ambiguous as to whether the Nova Scotia Guaranty Claims are allowed for voting purposes, permitting the Nova Scotia Guaranty Claims to vote is the only rational reading of the order insofar as there is no credible basis to object to the Nova Scotia Guaranty Claims, and any other interpretation would be inconsistent with the Debtors' words and deeds. Having acknowledged that the Guaranty Claims are permitted to vote, and having solicited the Noteholders in accordance with the Solicitation Order, the Debtors should be estopped from now asserting the contrary.

## **CONCLUSION**

WHEREFORE the Moving Parties respectfully request entry of an order substantially in the form attached hereto (i) temporarily allowing the Nova Scotia Guaranty Claims against MLC's estate in the amount of $1,072,557,531.72, for the purpose of voting to accept or reject the Plan; and (ii) granting such other and further relief as is just and appropriate.

Dated: New York, New York
January 10, 2011

          GREENBERG TRAURIG, LLP

          By: */s/ John H. Bae*
              Bruce R. Zirinsky, Esq.
              Nancy A. Mitchell, Esq.
              John H. Bae, Esq.
              Gary D. Ticoll, Esq.
              200 Park Avenue
              New York, New York 10166
              Telephone: (212) 801-9200
              Facsimile: (212) 801-6400
              Email:   zirinskyb@gtlaw.com
                          mitchelln@gtlaw.com
                          baej@gtlaw.com
                          ticollg@gtlaw.com

          Counsel for Appaloosa Management L.P., Aurelius
          Capital Management, LP, Elliott Management
          Corporation, and Fortress Investment Group LLC