Page 1

1

2    UNITED STATES BANKRUPTCY COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    Case No. 09-50026(REG)

5    - - - - - - - - - - - - - - - - - - - -x

6    In the Matter of:

7

8    MOTORS LIQUIDATION COMPANY, et al.

9         f/k/a General Motors Corporation, et al.,

10

11            Debtors.

12

13   - - - - - - - - - - - - - - - - - - - -x

14

15            United States Bankruptcy Court

16            One Bowling Green

17            New York, New York

18

19            December 15, 2010

20            2:10 PM

21

22

23   B E F O R E:

24   HON. ROBERT E. GERBER

25   U.S. BANKRUPTCY JUDGE

Page 2

1

2    HEARING re IUE-CWA's Motion Pursuant to 11 U.S.C. §§ 105 and

3    363(b) to Approve Assignment of Claim of IUE-CWA to a VEBA

4    Trust

5

6    HEARING re Fourth Application of Weil, Gotshal & Manges LLP as

7    Attorneys for the Debtors, for Interim Allowance of

8    Compensation for Professional Services Rendered and

9    Reimbursement of Actual and Necessary Expenses Incurred from

10   June 1, 2010 through September 30, 2010

11

12   HEARING re Second Interim Application of Stutzman, Bromberg,

13   Esserman & Plifka, A Professional Corporation, for Allowance of

14   Interim Compensation and Reimbursement of Expenses Incurred as

15   Counsel for Dean M. Trafelet in his Capacity as Legal

16   Representative for Future Asbestos Personal Injury Claimants

17   for the Period from June 1, 2010 through September 30, 2010

18

19   HEARING re Second Interim Application of Dean M. Trafelet in

20   His Capacity as Legal Representative for Future Asbestos

21   Personal Injury Claimants, for Allowance of Interim

22   Compensation and Reimbursement of Expenses Incurred for the

23   Period from June 1, 2010 through September 30, 2010

24

25

Page 3

1

2    HEARING re Second Interim Application of Analysis Research

3    Planning Corporation as Asbestos Claims Valuation Consultant to

4    Dean M. Trafelet in his Capacity as Legal Representative for

5    Future Asbestos Personal Injury Claimants for Allowance of

6    Interim Compensation and Reimbursement of Expenses Incurred for

7    the Period from June 1, 2010 through September 30, 2010

8

9    HEARING re Second Interim Application of Bates White, LLC, as

10   Asbestos Liability Consultant to the Official Committee of

11   Unsecured Creditors, for Allowance of Compensation for

12   Professional Services Rendered and for Reimbursement of Actual

13   and Necessary Expenses Incurred for the Period from June 1,

14   2010 through September 30, 2010

15

16   HEARING re Fourth Application of Butzel Long, a Professional

17   Corporation, as Special Counsel to the Official Committee of

18   Unsecured Creditors of Motors Liquidation Company, f/k/a

19   General Motors Corporation, for Interim Allowance of

20   Compensation for Professional Services Rendered and

21   Reimbursement of Actual and Necessary Expenses Incurred from

22   June 1, 2010 through September 30, 2010

23

24

25

Page 4

1

2    HEARING re Second Interim Fee Application of Deloitte Tax LLP

3    as Tax Services Providers for the Period from June 1, 2010

4    through September 30, 2010

5

6    HEARING re Fourth Interim Application of FTI Consulting, Inc.

7    for Allowance of Compensation and for Reimbursement of Expenses

8    Rendered in the Case for the Period June 1, 2010 through

9    September 30, 2010

10

11   HEARING re Second Application of Hamilton, Rabinovitz, &

12   Associates, Inc. as Consultants for the Debtors with Respect to

13   Present and Future Asbestos Claims, for Interim Allowance of

14   Compensation for Professional Services Rendered and

15   Reimbursement of Actual and Necessary Expenses Incurred from

16   June 1, 2010 through September 30, 2010

17

18   HEARING re Fourth Interim Fee Application of Jenner & Block LLP

19   for Allowance of Compensation for Services Rendered and

20   Reimbursement of Expenses

21

22

23

24

25

Page 5

 1

 2    HEARING re Interim Compensation and Reimbursement of Expenses

 3    with Respect to Services Rendered as Consultant on the

 4    Valuation of Asbestos Liabilities to the Official Committee of

 5    Unsecured Creditors Holdings Asbestos-Related Claims for the

 6    Period June 1, 2010 through September 30, 2010

 7

 8    HEARING re Third Application of Plante & Moran, PLLC, as

 9    Accountants for the Debtors, for Interim Allowance of

10    Compensation for Professional Services Rendered and

11    Reimbursement of Actual and Necessary Expenses Incurred from

12    June 1, 2010 through September 30, 2010

13

14    HEARING re Fourth Interim Application of The Claro Group, LLC

15    for Allowance of Compensation and Reimbursement of Expenses for

16    the Period June 1, 2010 - September 30, 2010

17

18    HEARING re Second Application of Togut, Segal & Segal LLP as

19    Conflicts Counsel for the Debtors for Allowance of Interim

20    Compensation for Services Rendered for the Period June 1, 2010

21    through September 30, 2010, and for Reimbursement of Expenses

22

23

24

25

Page 6

1

2    HEARING re Second Consolidated Application of Brady C.

3    Williamson, Fee Examiner, and Godfrey & Kahn, S.C., Counsel to

4    the Fee Examiner, for Interim Allowance of Compensation for

5    Professional Services Rendered from June 1, 2010 through

6    September 30, 2010 and Reimbursement of Actual and Necessary

7    Expenses Incurred from September 1, 2010 through October 31,

8    2010

9

10   HEARING re Second Application of Stuart Maue for Allowance of

11   Compensation and Reimbursement of Expenses for the Analysis of

12   Interim Fee Applications of Selected Case Professionals

13

14   HEARING re Pre-Trial Conference Regarding Official Committee of

15   Unsecured Creditors' Objection to Claims filed by Green Hunt

16   Wedlake, Inc. and Noteholders of General Motors Nova Scotia

17   Finance Company and Motion for Other Relief

18

19   HEARING re Second Interim Quarterly Application of Caplin &

20   Drysdale, Chartered for Interim Compensation and Reimbursement

21   of Expenses with Respect to Services Rendered as Counsel to the

22   Official Committee of Unsecured Creditors Holdings

23   Asbestos-Related Claims for the Period June 1, 2010 through

24   September 30, 2010

25

Page 7

1

2   HEARING re Third Interim Application of LFR Inc. for Allowance

3   of Compensation and for Reimbursement of Expenses for Services

4   Rendered in the Case for the Period February 1, 2010 through

5   May 30, 2010

6

7   HEARING re Fourth Interim Application of LFR Inc. for Allowance

8   of Compensation and for Reimbursement of Expenses for Services

9   Rendered in the Case for the Period June 1, 2010 through

10   September 30, 2010

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Lisa Bar-Leib

Page 8

1

2    A P P E A R A N C E S :

3    WEIL GOTSHAL & MANGES LLP

4         Attorneys for the Debtors and Debtors-in-Possession

5         767 Fifth Avenue

6         New York, NY 10153

7

8    BY:  STEPHEN KAROTKIN, ESQ.

9

10   KING & SPALDING LLP

11        Attorneys for New GM

12        1185 Avenue of the Americas

13        New York, NY 10036

14

15   BY:  ARTHUR J. STEINBERG, ESQ.

16        SCOTT DAVIDSON, ESQ.

17

18   U.S. DEPARTMENT OF JUSTICE

19        Office of the United States Trustee

20        33 Whitehall Street

21        21st Floor

22        New York, NY 10004

23

24   BY:  BRIAN MASUMOTO, ESQ.

25

Page 9

1

2    AKIN GUMP STRAUSS HAUER & FELD LLP

3         Attorneys for Claimant Green Hunt Wedlake, Inc. as

4          Trustee of General Motors Nova Scotia Finance Company

5         One Bryant Park

6         New York, NY 10036

7

8    BY:  SEAN E. O'DONNELL, ESQ.

9         DEAN CHAPMAN, ESQ. (TELEPHONICALLY)

10

11   BROWN RUDNICK LLP

12        Attorneys for Certain Noteholders of General Motors Nova

13         Scotia Finance Company

14        Seven Times Square

15        New York, NY 10036

16

17   BY:  DANIEL J. SAVAL, ESQ.

18

19

20

21

22

23

24

25

Page 10

1

2    BROWN RUDNICK LLP

3        Attorneys for Certain Noteholders of General Motors Nova

4        Scotia Finance Company

5        One Financial Center

6        Boston, MA 02111

7

8    BY:  CALEB B. PIRON, ESQ.

9        (TELEPHONICALLY)

10

11    BUTZEL LONG P.C.

12        Attorneys for the Official Committee of Unsecured

13        Creditors

14        380 Madison Avenue

15        22nd Floor

16        New York, NY 10017

17

18    BY:  ERIC B. FISHER, ESQ.

19

20

21

22

23

24

25

Page 11

1

2    CAPLIN & DRYSDALE, CHARTERED

3        Attorneys for Official Committee of Unsecured Creditors

4         Holding Asbestos-Related Claims

5        One Thomas Circle, NW

6        Suite 1100

7        Washington, DC 20005

8

9    BY:  RONALD E. REINSEL, ESQ.

10

11   DICONZA LAW, P.C.

12       Attorneys for LFR, Inc.

13       880 Third Avenue

14       New York, NY 10017

15

16   BY:  GERARD DICONZA, ESQ.

17

18

19

20

21

22

23

24

25

Page 12

1

2    GODFREY & KAHN S.C.

3         Attorneys for the Fee Examiner, Brady C. Williamson

4         One East Main Street

5         Suite 500

6         Madison, WI 53701

7

8    BY:  KATHERINE STADLER, ESQ.

9         BRADY C. WILLIAMSON, ESQ. (TELEPHONICALLY)

10        MONICA SANTA MARIA, ESQ. (TELEPHONICALLY)

11        ERIC J. WILSON, ESQ. (TELEPHONICALLY)

12

13   GODFREY & KAHN S.C.

14        Attorneys for the Fee Examiner, Brady C. Williamson

15        333 Main Street

16        Suite 600

17        Green Bay, WI 54307

18

19   BY:  CARLA O. ANDRES, ESQ.

20        (TELEPHONICALLY)

21

22

23

24

25

Page 13

```
 1

 2   GREENBERG TRAURIG, LLP

 3         Attorneys for Certain Noteholders of General Motors Nova

 4          Scotia Finance Company

 5         MetLife Building

 6         200 Park Avenue

 7         New York, NY 10166

 8

 9   BY:  BRUCE R. ZIRINSKY

10         JOHN H. BAE, ESQ.

11

12   KENNEDY, JENNIK & MURRAY, P.C.

13         Attorneys for IUE-CWA

14         113 University Place

15         New York, NY 10003

16

17   BY:  SUSAN M. JENNIK, ESQ.

18

19   LOEB & LOEB LLP

20         Attorneys for Deloitte Tax LLP

21         345 Park Avenue

22         New York, NY 10154

23

24   BY:  DANIEL B. BESHKOF, ESQ.

25
```

Page 14

1

2    MORRISON & FOERSTER LLP

3         Attorneys for Citigroup Global Markets, Inc.

4         1290 Avenue of the Americas

5         New York, NY 10104

6

7    BY:  JORDAN WISHNEW, ESQ.

8

9    RICHARDS KIBBE & ORBE LLP

10        Attorneys for Morgan Stanley International plc

11        One World Financial Center

12        New York, NY 10281

13

14   BY:  NEIL S. BINDER, ESQ.

15

16   STUTZMAN, BROMBERG, ESSERMAN & PLIFKA, P.C.

17        Attorneys for Dean M. Trafelet

18        2323 Bryan Street

19        Suite 2200

20        Dallas, TX 75201

21

22   BY:  HEATHER PANKO, ESQ.

23

24

25

Page 15

1              P R O C E E D I N G S

2              THE CLERK:  All rise.

3              THE COURT:  Have seats, please.  All right.  General

4     Motors -- Motors Liquidation.  Mr. Karotkin, I'll hear your

5     recommendations as to the order in which we should proceed.  I

6     gather that the IUE's motion is wholly unopposed.  Should we

7     get that out of the way?

8              MR. KAROTKIN:  I was going to suggest that first.

9     Sure.

10             THE COURT:  All right.

11         (Pause)

12             MS. JENNIK:  Thank you, Your Honor.  Susan Jennik for

13     IUE-CWA.  As you know, the IUE-CWA has a claim in this matter

14     because of the settlement agreement with General Motors.  The

15     settlement agreement requires any assignment of the claim be

16     approved by the Court.

17             THE COURT:  Can I interrupt you, Ms. Jennik?  Because

18     I saw the motions, I saw the papers.  And most importantly, I

19     saw that it was wholly unopposed and was wholly innocuous.  Any

20     reason why I shouldn't grant it without any further comment?

21             MS. JENNIK:  I have an amended version of the order,

22     Your Honor, which makes some corrections.  And I'd like to

23     offer that up.  I've given it to the committee counsel and also

24     the U.S. trustee and the counsel for the debtors.

25             THE COURT:  Okay.

1        MS. JENNIK:  And there's been no objection from them.

2    If I may approach?

3        THE COURT:  Yes.

4        MS. JENNIK:  What you have there is a redline version

5    and also the amended order in a clean copy.

6        THE COURT:  Sure.  It's granted.  It'll be entered as

7    soon as I get this --

8        MS. JENNIK:  Thank you, Your Honor.

9        THE COURT:  -- courtroom support to get it typed.

10       (Pause)

11       MR. KAROTKIN:  Your Honor, the other -- I think the

12   only other -- there are two subject matters on the calendar.

13   One is fee applications and the other is the dispute related to

14   the Nova Scotia claims.  I think -- and counsel for the fee

15   examiner is here.  I think that all but two of the fee

16   applications have been resolved.

17       THE COURT:  Those being Caplin & Drysdale and LFR?

18       MR. KAROTKIN:  Yes, sir.  So my suggestion, again,

19   subject to whatever you'd like to do, is that you address those

20   first.

21       THE COURT:  All right.  We'll do that but everybody

22   stay seated.  Folks, I'm concerned that the costs of the fee

23   examiner process are excessively cutting into the very savings

24   that the fee examiner process is supposed to accomplish.  And I

25   don't want to make that situation which, frankly, is getting me

MOTORS LIQUIDATION COMPANY, et al.

 1    increasingly annoyed, even worse by lengthy argument today.

 2          I'm also concerned that the factor that most affects

 3    the legal fees and other professional expenses in this case

 4    isn't the vague time descriptions or even contentions that two

 5    senior lawyers are doing things, but the intercreditor

 6    disputes, most significantly, the battling between the

 7    creditors' committee and the asbestos claims creditors'

 8    committee.  And I think that those who've spoken in writing and

 9    in panels about their efforts to keep these down in large 11s

10    are kidding themselves and the public when they don't realize

11    that the thing that most affects the cost of running a large 11

12    isn't the things that the examiner and the professionals on

13    this motion and in the last three applications we've had have

14    been fighting about but this intercreditor jousting.

15          Now, I can and will do the bandaid types of measures

16    that the Code requires me to do as part of my responsibility.

17    But I need to tell you all that I want to keep our eye on the

18    ball in this case.  And I want to bring this case to an end.

19    And I don't think we should be self-congratulatory, on the one

20    hand, or spending all of this time, on the other, vis-à-vis the

21    issues that we have on this fee application dispute today

22    because until and unless we stop the intercreditor bickering,

23    we're never going to get this case done and we're never going

24    to keep the case expenses reasonably under control.

25          Now, with that said, I have a number of tentative

Page 18

1    rulings based upon my review of the papers, all of which I have

2    read, and I will hear very brief legal argument directed at

3    telling me why, after reading the briefs I am wrong.

4          One, the Caplin & Drysdale younger partners, for the

5    most part, the same price as the Weil and Kramer Levin

6    associates.  I find nothing troublesome about people who are

7    called young partners or partners doing work when the

8    associates who would be posted at other firms for doing that

9    same work are charging what is, in substance, the same amount.

10   The showing -- except for Inselbuch and Lockwood -- the Caplin

11   & Drysdale lawyers are at the cheap end of what I've seen.  And

12   the showing that other firms' associates are billed at rates

13   comparable to the young partners or the younger partners at

14   Caplin & Drysdale makes me unpersuaded that I'm going to make a

15   big deal of that issue.

16         Next.  There are enough deficiencies in each of the

17   positions of Caplin & Drysdale and the fee examiner's so that

18   neither side substantially prevailed in the back and forth and

19   the disputes.  I don't need a conference call.  The cost of

20   Caplin & Drysdale's responding to a fee examiner criticism will

21   not be compensable.  Obviously, many of the fee examiner

22   positions were likewise not accepted by me but that isn't the

23   test.

24         The objections based on vague descriptions even if

25   made vague for tactical reasons or for confidentiality reasons

09-50026-mg    Doc 8626    Filed 12/16/10    Entered 01/18/11 14:54:22    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 19 of 62

Page 19

1    are sustained.  You'll have to figure out what the dollar

2    consequence of that is.  There are ways to skin the cat by

3    means of description more specific than saying "Reading a

4    pleading to determine whether our committee's interests are

5    affected".

6             And when a task that's in the middle of a list of

7    many tasks separately stated to avoid the anti-bunching rules

8    is a tact as being beneath the level of sophistication of the

9    remainder of the lawyer, I think that's so de minimis and so

10   inefficient to critique and punish the lawyer for doing

11   something when it's a flow of work matter that I'm not going to

12   penalize the lawyer for being so accurate in his or her

13   description or for allowing a seemingly menial task to be mixed

14   as part of a larger flow.

15            With that said, what else do we have on Caplin &

16   Drysdale?

17            MS. STADLER:  Good afternoon, Judge.  Katherine --

18            THE COURT:  Ms. Stadler?

19            MS. STADLER:  Katherine Stadler, yes, for the fee

20   examiner of Godfrey & Kahn.  Nothing really left on Caplin &

21   Drysdale, Judge.  I don't quarrel at all with any of your

22   conclusions.  I did want to just clarify one thing for the

23   record.  The issue with the task allocation wasn't whether it

24   should be done by partners or associates.  The issue was

25   whether they were more in the nature of clerical tasks that

09-50026-mg   Doc 8626   Filed 12/16/10   Entered 01/18/11 14:54:22   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 20 of 62

Page 20

1    were inappropriate to bill attorneys for at all, such as docket

2    monitoring, et cetera.

3              THE COURT:  Well, were there ever any instances of an

4    attorney charging for using the xerox machine or something of

5    that sort?

6              MS. STADLER:  Not indicated on the time detail, no.

7    It would be check PACER, create to do lists, that sort of

8    thing.

9              THE COURT:  I'm not persuaded by that distinction,

10   Ms. Stadler.

11             MS. STADLER:  That's the only point on Caplin that I

12   have remaining after your tentatives, Judge.

13             THE COURT:  All right.  Anybody from Caplin &

14   Drysdale want to be heard given what I already said?  Mr.

15   Reinsel?

16             MR. REINSEL:  Thank you, Your Honor.  Robert Reinsel

17   for Caplin & Drysdale.  Just want to briefly respond to two

18   points you raised, Judge.  With respect to the -- I want to

19   come back to your fee order and whether or not fees would be

20   compensable for responding to the fee examiner based upon your

21   earlier ruling that the parties substantially prevailing ought

22   to be able to be compensated for that.

23             The first objection that we responded to, Your Honor,

24   that's involved here, although the fee examiner didn't quantify

25   a number or quantify their objection, they do acknowledge that

Page 21

1   that went to significantly all of our fees or a significant

2   portion of all of the fees in our first fee application which

3   were in excess of 400,000 dollars.  What we did was work with

4   the examiner, spent a great deal of time responding and,

5   ultimately, ended up compromising without admitting that

6   anything was wrong only about 13,000 dollars out of a 400,000

7   fee application with Your Honor.  Respectfully, Your Honor, I

8   would say that we did substantially prevail on that.

9            THE COURT:  Respectfully, Mr. Reinsel, aside from the

10  fact that I thought I made my thinking clear, I don't think

11  that pleading nolo contendere is a satisfactory way to get a

12  "Get out of jail free" card on this issue.  The fact is that I

13  got problems with both sides' positions and I don't find that

14  the Caplin & Drysdale side of the feuding was sufficiently

15  persuasive that I can find that you substantially prevailed.

16  Under those circumstances, as I stated in my last opinion, the

17  one that I had to publish, we go by the American rule and you

18  got to eat it.

19           MR. REINSEL:  I understand your ruling, Your Honor.

20           THE COURT:  Okay.

21           MR. REINSEL:  The second part, Your Honor, dealing

22  with the fee examiner's assertion of vagueness in certain

23  billing entries, as you say, there are a number of ways to

24  slice that cat up when we come down to it.  One of our problems

25  in responding both to the fee examiner's present objection and

MOTORS LIQUIDATION COMPANY, et al.

Page 22

1    to others is the lack of specificity in what they were

2    asserting was wrong with the particular billing entries.  What

3    they did was simply attach all of the billing run for one of

4    our attorneys and say take ten percent off of his entire cut

5    when the objection that they specifically framed, our vague

6    reference to review, analyze pleadings for impact on the

7    committee, really only accounted for six hours out of over 200

8    hours of his effort.  Now, if what the Court is saying is work

9    with the fee examiner to see if we can't refine that number,

10   our problem is with their just overall reach and making a

11   generalized take ten percent off the top.

12            THE COURT:  My ruling is that you identify the issues

13   that were subject to the -- or the time entries that were

14   subject to that affliction and those are disallowed.  And if

15   that's less than the ten percent then you win.  And if that's

16   more than ten percent then Mr. Williamson wins.

17            MR. REINSEL:  Understand, Your Honor.  Thank you very

18   much.

19            THE COURT:  Okay.  LFR.  Now, is Mr. DiConza here?

20   Come on up, please.

21            Folks, it's been the law in this district since long

22   before I was a judge, much more than ten years ago, probably

23   twenty or twenty-five, that the test for determining whether or

24   not a person or entity is a professional is governed by two

25   things.  One, the degree of control over the Chapter 11 case;

MOTORS LIQUIDATION COMPANY, et al.

Page 23

1    and, two, the extent to which those services would be provided

2    in the absence of bankruptcy.  If anybody believes that I'm

3    applying the wrong standard, he or she can correct me.

4          Under that standard, it seems to me that I don't have

5    a need for a retention of an environmental consultant who would

6    have to clean up the mess whether or not GM -- or Motors

7    Liquidation was in Chapter 11.  And Mr. DiConza has pointed out

8    that I already ruled on this issue in one of our earlier

9    sessions on fees.  Ms. Stadler, to what extent am I mistaken in

10   either of those understandings?  Mr. DiConza, make room for

11   her, please.

12         MS. STADLER:  Thank you, Judge.  I don't think you're

13   mistaken in either of those.  I would note that there are

14   numerous environmental consultants in the case that are

15   retained subject to Section 327 of the Bankruptcy Code.

16   Arguably, your analysis would apply to any of them.  With

17   respect to the first part of your inquiry, I wouldn't have any

18   corrections to make.

19         THE COURT:  All right.  Mr. DiConza, do you want to

20   be heard?

21         MR. DICONZA:  Well, Your Honor, we did file

22   responsive papers several days ago and basically we argued that

23   under the Seatrain decisions and cases that have followed it

24   that TEA is not a professional within the meaning of the

25   Bankruptcy Code.  What was troubling is that the fee examiner

MOTORS LIQUIDATION COMPANY, et al.

1    sought disallowance of a hundred percent of my client's

2    requested reimbursements with -- in connection with TEA under

3    the third and then an arbitrary fifty percent under the fourth

4    interim application.  We believe that the invoices submitted in

5    connection with the TEA expenses do contain sufficient detail.

6    And obviously -- we were on a conference earlier today with the

7    fee examiner and were able to resolve all the other issues with

8    the third and fourth interim fee applications.  If the fee

9    examiner has any particular issue with any of the time entries

10   submitted by TEA, my client would be more than happy to work

11   with the fee examiner and obtain additional information.  The

12   problem we had with TEA was that the fee examiner took a

13   hardline position and said, look, they are a professional, they

14   should have been retained and, therefore, we're going to seek

15   disallowance of all of their expenses under the third and fifty

16   percent under the fourth.

17          THE COURT:  All right.  Well, my ruling on the

18   TEA/LFR issue is as follows:

19          I am adhering to my stated articulation of what the

20   law is and when a party is a professional and when it isn't.

21   However, when an entity is used as a subcontractor for a

22   professional, retained professional, having opened the door by

23   getting oneself retained, the LFR estate -- or entity, excuse

24   me, as you properly anticipated, Mr. DiConza, must take the

25   heat or make any adjustments if any of the underlying time

MOTORS LIQUIDATION COMPANY, et al.

Page 25

1    turns out to have been unreasonable.  So the overall objection

2    that TEA was not retained is overruled.  However, the -- to the

3    extent that there were any instances of inappropriate billing

4    by TEA, TEA and/or LFR is going to have to eat those.  And you

5    can work out your specifics with the fee examiner staff to make

6    that happen.  Your deals with the fee examiner staff, I don't

7    need to hear in detail.  If they're consensual between the two

8    of you, they'll be ratified and confirmed.

9              MR. DICONZA:  Yes, Your Honor.  Thank you.

10             THE COURT:  All right.  Am I correct that we have no

11   further fee issues?  All right.  I'm just going to say one

12   other thing.

13             As I indicated at the outset of my remarks, in my

14   view, the kinds of things that we dealt with today and the

15   kinds of things that were consensually resolved before I had to

16   deal with them today are miniscule in importance compared to

17   the major, major costs that the estate is incurring both in

18   terms of running meters and delay in getting distributions to

19   creditors occasioned by the intercreditor disputes.  I want you

20   to redouble your efforts to resolve those issues and/or if you

21   have to agree to disagree, to minimize the number of people and

22   meters running to address those concerns.

23             All right.  Now, we'll turn to the one issue which

24   also has, of course, intercreditor dispute trappings but which

25   raises very serious issues which is the Nova Scotia matter.  As

09-50026-mg    Doc 8626    Filed 12/16/10    Entered 01/18/11 14:54:22    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 26 of 62

Page 26

1    I understand it, we have just a status conference today.  Mr.

2    Fisher?

3              MR. FISHER:  That's correct, Your Honor.

4              THE COURT:  Come on up, please.

5              MR. FISHER:  Good afternoon, Your Honor.  Eric Fisher

6    from Butzel Long for the creditors' committee.  I think, Your

7    Honor, that the only issue for the Court's consideration today

8    is the question of how the creditors' committee's objection

9    that's at issue which is an objection that arises out of Old

10   GM's guaranty of approximately a billion dollars face amount of

11   bonds issued by a subsidiary, GM Nova Scotia Finance.  The only

12   question is how that objection ought to be litigated.  And just

13   to cut right to the chase to the area of disagreement that we

14   have with noteholders' counsel, with trustee's counsel and, I

15   think, with New GM's counsel as well, it's the creditors'

16   committee's position that this objection raises complicated

17   factual issues.  Discovery is necessary.  And discovery will

18   ultimately contribute to the most efficient resolution of the

19   case even if that means that it needs to go the distance and be

20   heard at an evidentiary hearing before your Court -- before

21   Your Honor.

22             And it's the position of the claimants here that

23   early summary judgment is called for.  No discovery is

24   necessary.  And our view is that this early summary judgment

25   type approach will actually impede, as opposed to expedite, the

09-50026-mg    Doc 8626    Filed 12/16/10    Entered 01/18/11 14:54:22    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 27 of 62

                                                              Page 27

 1    progress of the case because given how complicated it is

 2    factually, I think, Your Honor, that it's a virtual certainty

 3    that if there's no discovery that's permitted and then we're

 4    faced with early summary judgment motions, we will be opposing

 5    the summary judgment motions at least in part on Rule 56(f)

 6    grounds and tell Your Honor that we need discovery.

 7          And so, we think it's important for the Court to put

 8    in place a reasonable discovery schedule, to schedule an

 9    evidentiary hearing down the road.  And certainly, we're open

10    to dispositive briefing in advance of that evidentiary hearing

11    as long as there is a reasonable period of discovery that

12    precedes that dispositive briefing.

13          If Your Honor will permit, I wanted to take just a

14    few minutes, since this is our first appearance before Your

15    Honor with respect to this objection, to just sketch out the

16    procedural history behind the objection, give Your Honor in

17    very broad brushstrokes just a sense of what our objection is

18    all about, and then describe what we think the proposed scope

19    of discovery and what a reasonable discovery schedule would

20    look like.

21          THE COURT:  Yes, but in a nonargumentative way

22    because I don't want an argument, mini or otherwise, on the

23    merits of this controversy today.

24          MR. FISHER:  I will try to give Your Honor just the

25    facts.  We first filed the objection on July 2010.  And when we

MOTORS LIQUIDATION COMPANY, et al.

1  filed the objection, we secured from chambers an evidentiary

2  hearing date in November.  And soon after --

3          THE COURT:  My chambers gave you an evidentiary

4  hearing date for -- on the filing of an objection?

5          MR. FISHER:  Yes, Your Honor.  We called chambers and

6  reque -- we indicated that we thought the objection was

7  appropriate for an evidentiary hearing --

8          THE COURT:  Well, it isn't that it's not appropriate

9  for an evidentiary hearing.  The problem is that an evidentiary

10  hearing on a matter of this character is one that isn't like a

11  new value preference hearing that you resolve in an hour and a

12  half.

13          MR. FISHER:  Right.  Your Honor, as a practical

14  matter, I think that date served as nothing more than a

15  placeholder at this point.  But what we did was within a few

16  weeks of serving -- of filing and serving our objection, we

17  served discovery requests on the GM Nova Scotia Finance

18  bondholders' counsel at Greenberg Traurig and we also served

19  interrogatories.  The response that we got was we don't think

20  discovery is appropriate here.  We don't think any discovery

21  should go forward.  Let's have a meeting.  We had a meeting

22  with bondholders' counsel at Greenberg in September 2010.  At

23  the time, Greenberg Traurig was representing the bondholders

24  and, I believe, also representing the GM Nova Scotia Finance

25  trustee.

MOTORS LIQUIDATION COMPANY, et al.

1         For the time being, at that meeting, we agreed to

2    disagree about whether or not there would be discovery or what

3    the scope would be or whether we would agree to litigate

4    threshold issues before proceeding with discovery.  We

5    continued to talk.  And then in November 2010, still no

6    response to our discovery because we had a disagreement with

7    them about whether there would be any discovery.  We had

8    another meeting.  That meeting was attended by Akin Gump who

9    had now come on as counsel for the GM Nova Scotia Finance

10   trustee.  And it was attended by the New GM.  And following

11   that meeting, the creditors' committee filed an amended

12   objection which is the operative objection before Your Honor.

13   That was filed on November 19, 2010.  And then pursuant to an

14   agreed schedule, because the noteholders and the other

15   claimants here wanted to be able to put in a response before

16   Your Honor had an initial pretrial conference in the case, they

17   did so just this past Monday, December 13th.

18         There were three substantive responses filed.  It's

19   more than 110 pages of response.  And there were a number of

20   joinders that were filed as well.

21         Procedurally, that's where we are.  A brief overview

22   of the objection.  The claims that we're challenging arise out

23   of something called a lockup agreement.  The lockup agreement

24   was entered into hours and maybe minutes before GM filed its

25   bankruptcy petition on June 1, 2009.  And the consequences of

MOTORS LIQUIDATION COMPANY, et al.

Page 30

1     the lockup agreement are that the GM Nova Scotia Finance

2     bondholders received a consent fee, a cash consent fee, of 369

3     million dollars which is thirty-six percent of the face amount

4     of their bonds.  They have asserted 2.67 billion dollars worth

5     of claims in the Old GM bankruptcy proceedings.  And you get to

6     that number by adding the GM Nova Scotia Finance trustee's

7     claim and the guaranty claim that's been asserted by the

8     bondholders.  600 million dollars of that 2.6 billion dollars

9     worth of claims relates to a swap that, in the first instance,

10    was an obligation that GM Nova Scotia Finance owed to Old GM.

11    And through a series of provisions in the lockup agreement that

12    I know Your Honor doesn't want to hear about now, that became a

13    claim against the Old GM estate.

14          And so, it's this whole ball of wax that we are

15    taking aim at with our objection.  And all of these claims, at

16    the end of the day, are based upon 1.07 billion dollars worth

17    of notes that were guaranties by Old GM and that we argue in

18    our objection ought to, in the first instance, be reduced by

19    the 369 million dollar consent fee that was paid because we say

20    it wasn't really a consent fee.  It was a payment against the

21    principal amount of the notes.

22          I won't take Your Honor through the various legal

23    theories that we have in our objection.  But --

24          THE COURT:  I've read the objection.

25          MR. FISHER:  -- those are the facts that are

Page 31

1    essential to our objection.

2          As I said at the outset, we need discovery.  It's

3    been our position from the very beginning that we need

4    discovery.  That's why we served discovery requests in August.

5          I think that part of the arrangements behind the

6    lockup agreement and the choreography that followed the lockup

7    agreement was to try to have the agreement escape this Court's

8    scrutiny.  And we want to make sure that we have a full and

9    fair opportunity to kick the tires and to test the legitimacy

10   of these claims.  And so, I think what we envision is document

11   discovery from the parties to the lockup agreement.  We

12   envision taking between ten and fifteen depositions.  And then

13   it's possible that this objection would require expert

14   testimony on the question of whether this consent fee, the 369

15   million dollar fee was reasonable.

16          What we've proposed to the other side was that we

17   ought to devote five months to all of that discovery, that's

18   the paper discovery, the deposition discovery and, potentially,

19   the expert discovery.  Based on the Court's calendar, it should

20   be scheduled for an evidentiary hearing for sometime

21   thereafter.  And we would be happy to work with all the other

22   parties to come up with an agreed to pre-hearing briefing

23   schedule so that as many issues that can be vetted as a matter

24   of law in advance of the hearing are vetted.

25          In a nutshell, that's our position, Your Honor.

09-50026-mg    Doc 8626    Filed 12/16/10    Entered 01/18/11 14:54:22    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 32 of 62

Page 32

1          THE COURT:  All right.  Mr. Zirinsky, are you

2    speaking for some of the noteholders or all of them?

3          MR. ZIRINSKY:  I'm speaking for four noteholders that

4    I represent, Your Honor.

5          THE COURT:  All right.  Come on up.

6          MR. ZIRINSKY:  For the record, Bruce Zirinsky,

7    Greenberg Traurig on behalf of Appaloosa, Aurelius, Fortress

8    and Elliott.  Your Honor, mindful of your point that we're not

9    here today to argue the merits, I'm not going to argue the

10   merits.

11         THE COURT:  All right.  I'll tell you the same thing

12   that I told Mr. Fisher.  I read your response and Philip

13   Dublin's response and the New GM response although somebody can

14   help me understand its standing a little bit better along with

15   the creditors' committee's response.

16         MR. ZIRINSKY:  Thank you, Your Honor.  Just to put

17   things into context, Your Honor.  The objection obviously seeks

18   to disallow and/or reduce or and/or equitably subordinate the

19   claims filed by the noteholders on their guaranty against GM.

20   GM is the guarantor of the bonds.  It also seeks similar relief

21   with respect to a claim filed by the bankruptcy trustee of GM

22   Nova Scotia which is a claim based upon the Companies Act of

23   Nova Scotia.  Nova Scotia is what's called an unlimited

24   liability company.  GM -- Old GM is the sole member and, under

25   Canadian law, Old GM is responsible for payment of any

MOTORS LIQUIDATION COMPANY, et al.

Page 33

1    deficiency claim upon the winding up of the unlimited liability

2    company.  So those are the two claims.

3         I'm not going to go into all of the background and

4    transactions.  Suffice it to say that there were arm's length

5    negotiations held between the bondholders, represented by me,

6    and GM shortly before GM filed for bankruptcy.  The terms of

7    that agreement were set forth in what's described as a lockup

8    agreement.  There was a public disclosure through an SEC filing

9    by GM on June 1st through an 8(k) in which the entire

10   transaction or the agreement was disclosed.  It was the subject

11   of a consent solicitation process which occurred, I believe,

12   sometime in either late June or early July of 2009.  The --

13   part of the arrangement was a release of intercompany claims

14   held by GM Nova Scotia of about a billion three hundred million

15   or a billion four hundred million dollars depending upon the

16   exchange rate of Canadian versus U.S. dollar.  So GM Canada

17   received a release of that intercompany claim in exchange for

18   the payment of the consent fee.

19        As a consequence of that, GM Canada was able to avoid

20   the necessity for seeking bankruptcy or similar relief under

21   Canadian law.  And as the Court is well aware, GM Canada, a

22   wholly owned subsidiary of Old GM was part of the assets

23   acquired by New GM under the purchase agreement which Your

24   Honor approved back in July of 2009 as part of the overall GM

25   restructuring sale transaction.

09-50026-mg   Doc 8626   Filed 12/16/10   Entered 01/18/11 14:54:22   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 34 of 62

Page 34

1          The objection ignores or tends to overlook or try to

2     overlook two or three very important elements.  First of all,

3     these transactions were fully known and were public and were

4     disclosed at the time of the sale held before Your Honor.  At

5     the time of the sale and included in the sale of assets to New

6     GM were any claims against GM Canada, including any avoidance

7     actions which were acquired by New GM under the sale order.

8          In addition, under the sale order, as I mentioned,

9     the stock of GM Canada was sold to New GM.  And in addition,

10    New GM assumed -- the lockup agreement was assumed and assigned

11    by Old GM to New GM under Section 365.  It was an assumed

12    agreement.

13         Now, without getting into an argument today as to

14    what all of that means, as we set forth in our papers, we

15    believe that even if you accept the factual allegations of the

16    committee on their face, which obviously we don't, and their

17    attempt to characterize the transactions as something

18    inappropriate, which again they weren't, the fact is that we

19    believe, as a matter of law, all of these claims can be

20    disposed of by the Court by way of summary judgment.  At the

21    very least, we believe that a motion for summary judgment would

22    enable the Court to determine to what extent, if any, there

23    were any genuine tryable issues of fact which might be the

24    basis for discovery.

25         The committee has suggested and they've given us a

MOTORS LIQUIDATION COMPANY, et al.

Page 35

1    working list of fifteen potential deponents, including the U.S.

2    Treasury Department and the Export Development Canada, two

3    governmental agencies which were, if not involved, were aware

4    of these transactions at the time they were being negotiated.

5    My point -- and they're proposing a five month discovery

6    schedule at which time will then first determine how to proceed

7    before Your Honor with a hearing.

8              Our clients are owed substantial amounts of money.

9    The debtors' plan, which is -- Your Honor just recently, I

10   believe, approved the disclosure statement -- treats these

11   claims as disputed claims.  And as a consequence, no

12   distributions can be made on these claims if that's the way the

13   plan ultimately gets confirmed.  No distributions can be made

14   on these claims unless and until Your Honor has resolved the

15   objections.  We believe that's, obviously, unfavorable to all

16   of the bondholders who will not receive any distributions if

17   that remains the state of play.  Moreover, the type of schedule

18   that the committee is proposing, five months of discovery and

19   then we'll decide how to try the case, means, for all intents

20   and purposes -- and I'm mindful of one of Your Honor's remarks

21   earlier in connection with the fee hearing or the fee

22   applications -- that this will delay distributions to

23   creditors.  We don't think that's fair.  We think this matter

24   should be adjudicated as promptly as possible and --

25             THE COURT:  Well, you're not suggesting it's going to

MOTORS LIQUIDATION COMPANY, et al.

Page 36

1   delay distributions to all creditors.  It's just going to delay

2   distributions to those creditors who are parties to this

3   transaction.

4          MR. ZIRINSKY:  It will delay distributions to all

5   bondholders of these -- all holders of these notes.  And there

6   are many holders of these notes beyond the four entities that I

7   represent.  So none of those parties will receive a

8   distribution on these notes or on the guaranty claim under

9   these notes as long as the objection is outstanding unless the

10  Court were to make some ruling to the contrary allowing some

11  form of distribution.

12         So we believe it's important that these matters get

13  resolved expeditiously.  We are mindful that Your Honor has a

14  rule that you must, in effect, approve any motion for summary

15  judgment --

16         THE COURT:  Not just me.  The entire Southern

17  District of New York.

18         MR. ZIRINSKY:  Well, which also applies to Your

19  Honor.  We are mindful of the rule.  And we obviously were

20  tempted to ask Your Honor to permit us to file summary judgment

21  some time ago.  But we also determined that given the efforts

22  to try to work this out with the committee's counsel to see if

23  there was a way to avoid a dispute about this and to see if we

24  could proceed on some form of summary judgment basis, on an

25  expedited basis, which unfortunately did not work out.  We were

MOTORS LIQUIDATION COMPANY, et al.

Page 37

1    unable to reach agreement on that, we decided to file our

2    responses.

3            New GM is represented here by Mr. Steinberg.  He can

4    speak to any questions you have for them.  But in terms of

5    their standing, I think that -- remember that the committee is

6    not only objecting to the claims, but the committee has filed a

7    motion or has included within their objection, a request for

8    relief under Federal Rule 60(b) to set aside the sale order or

9    to modify the sale order.  Obviously that would have rather

10   substantial consequences to New GM as well as potentially to

11   the entire Chapter 11 case, but I'll let Mr. Steinberg speak as

12   to the potential consequences for New GM.  So there, I think

13   they are potentially affected by what happens here.

14           And we also believe that the committee has failed

15   utterly to set forth any basis -- legitimate basis -- for that

16   kind of relief.  And given the fact that the entire predicate

17   of their claim is that somehow or another the consent fee was

18   somehow a fraudulent transfer or otherwise an avoidable

19   transfer, and that claim has been assigned -- any avoidance

20   claim has been assigned to New GM, it doesn't belong to the

21   estate.  The claim was given up.

22           So just as a matter of law, we don't see how that can

23   be pursued, unless the committee is serious about trying to ask

24   Your Honor to, in effect, set aside Your Honor's order of 2009,

25   which approved the sale to GM -- to New GM, and modify the sale

MOTORS LIQUIDATION COMPANY, et al.

Page 38

1    order, which we don't think is warranted.  We don't think

2    there's any basis for it.  And again, we think that's something

3    that should be disposed of by the Court up front.  In

4    connection with a motion for summary judgment, we would also

5    seek a ruling from Your Honor as to the 60(b) relief requested

6    by the committee.

7            So just to sum it all up, Your Honor.  We would

8    propose to file a motion for summary judgment in early January.

9    We could agree to a schedule.  Obviously before argument is

10   made, Your Honor will have an opportunity, together with the

11   parties, to determine, based on the papers filed, whether or

12   not there are any legitimate, genuine issues of fact that need

13   to be pursued or tried for which discovery may possibly be

14   warranted.  And so even if we don't eliminate all claims and

15   all discovery, I think we will certainly narrow the field

16   substantially.  It will also reduce the time necessary for

17   discovery, if that's the way it goes.  And it will also

18   substantially reduce the cost and expense of litigating and

19   potentially resolving this matter.  Thank you.

20           THE COURT:  All right.  I don't see Mr. Golden or Mr.

21   Dublin.

22           MR. O'DONNELL:  Your Honor, may it please the Court.

23   Sean O'Donnell.

24           THE COURT:  McDonald?

25           MR. O'DONNELL:  O'Donnell.

MOTORS LIQUIDATION COMPANY, et al.

1          THE COURT:  O'Donnell.

2          MR. O'DONNELL:  Mr. Golden and Mr. Dublin are in

3    Delaware on another matter and apologize for not being here

4    today.

5          THE COURT:  I see your name on the submission.

6          MR. O'DONNELL:  Yes, Your Honor.

7          THE COURT:  All right, Mr. O'Donnell.

8          MR. O'DONNELL:  Your Honor, for the record, Sean

9    O'Donnell with Akin Gump on behalf of Green Hunt Wedlake

10   Incorporated, Trustee of General Motors Nova Scotia Finance

11   Company.  We join in the suggestion by the noteholders that, in

12   fact, most if not all of the claims could be disposed of by

13   summary judgment.

14          If you were to look at essentially the five claims

15   for relief that the committee's seeking, they all can either be

16   dealt with as a matter of law or by certain undisputed facts

17   that are either in public filings or in their very own papers.

18   The duplicative claim, for example, is an issue of law that can

19   be dealt with by summary judgment, and the remainder of the

20   claims, the avoidance claims, go towards -- the lynchpin of the

21   claim is an objection to the lockup agreement and the consent

22   fee.  And as mentioned a moment ago by counsel for the

23   noteholders, on June 1, 2009 there was an 8-K that was filed by

24   the debtors.  That 8-K expressly, not only identifies the

25   lockup agreement but goes through and describes the very terms

MOTORS LIQUIDATION COMPANY, et al.

Page 40

1    that the committee is objecting to now.

2            THE COURT:  Mr. O'Donnell, as I understand the

3    exchange of papers, or at least the committee's position,

4    they're not saying that this was done in the dead of night;

5    they're saying that this was a bad transaction that would be no

6    less bad if it were done in Macy's window, which it seemingly

7    was.  Both you and Mr. Zirinsky had talked about the disclosure

8    of it.  But as I understand the gist of the creditors'

9    committee's position, as to which I express no substantive

10   view, but I hear when people talk to me, they're saying that in

11   substance it was an avoidable transaction and/or one that

12   justifies equitable subordination.

13           MR. O'DONNELL:  The problem with that position, Your

14   Honor, is they didn't say that at the sale hearing.  They

15   didn't say it -- in fact not only did they not object, they

16   consented and supported the transfer of any claim relating to

17   the consent fee by GM Canada to New GM.  It's no longer an

18   asset of the estate.  It's not something that the committee can

19   complain of after approving the sale.  So there's no dispute as

20   to the disclosure and a month later they say this is fine, you

21   can sell these claims to New GM.  It's part of what New GM

22   bought.  It's why, if you were to grant the relief that they're

23   seeking, you'd have to essentially unwind that 363 sale, which

24   I don't think anybody wants.

25           Now, Your Honor, at a minimum, what I would suggest

Page 41

1    is allow the parties to move on an expedited basis, summary

2    judgment briefing.  We can -- in the meantime, document

3    requests can go out the door, but we're prepared to move for

4    summary judgment within another week or two.  The other side is

5    free to argue that it's premature or that there are facts that

6    will raise tryable issues.  We don't think that's the case,

7    Your Honor.  And we're pretty sure that we can convince you of

8    that with our papers.  Thank you.

9            THE COURT:  I'll hear from New GM, at least until I

10   can ascertain its standing.

11           MR. STEINBERG:  Good afternoon, Your Honor.  Arthur

12   Steinberg from King & Spalding on behalf of New GM.  There's a

13   part of me that wants to agree with you and then sit down.  And

14   I would, because this is really an objection to claims filed by

15   an estate representative against claimants who have filed large

16   claims in the case.  So under normal circumstances, what would

17   a purchaser of the assets have to weigh in on the subject, and

18   why would, in effect, New GM want to weigh in something where

19   the plaintiff is the creditors' committee?  And so, to that

20   extent, Your Honor, I was almost happy to sit maybe even

21   further --

22           THE COURT:  Yes, I kind of thought that New GM had an

23   interest in the welfare of the creditors of Old GM.

24           MR. STEINBERG:  That's correct, Your Honor.  And on

25   the same token, the creditors of Old GM have an interest in the

Page 42

1    welfare of New GM.  And it is because of that reason that I

2    stand here today, why we filed a fairly substantial response,

3    and why I believe there are five separate reasons why we have

4    to weigh in on this matter and why I actually support the

5    suggestions made by that side of the table that so much of this

6    can be resolved without five months of discovery with lots of

7    depositions, because some of the issues are very specific, very

8    concrete, and can be decided on the papers.  But I'd like to go

9    through what Your Honor's threshold issue is, which is why New

10   GM is weighing in on this controversy, and go through the five

11   factors.

12           The first, as articulated by Mr. Zirinsky, was that

13   there's a Rule 60(b) request to vacate the sale order.  We're

14   the purchaser under the sale order.  We had a final and

15   nonappealable order.  The ramifications of any kind of Rule

16   60(b) relief, given to the committee or anyone else, has major

17   ramifications to New GM.  So on that basis alone, New GM would

18   be appearing.

19           And by the way, if I can just digress off the five

20   points?  Because I think that whole 60(b) relief is a tempest

21   in a teapot.  And the fact that no one really wants to say what

22   it is, except for what I'm about to say now, I think it's

23   important for Your Honor to hear.  They filed a 60(b) relief.

24   The other side files fifteen pages of briefing in response to

25   it.  The committee doesn't really articulate what their 60(b)

09-50026-mg    Doc 8626    Filed 12/16/10    Entered 01/18/11 14:54:22    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 43 of 62

Page 43

1    request is, other than to say it's protective, which is a very

2    unusual way of articulating what it is.

3          What I think that's really behind here, just so that

4    Your Honor has the issue on the table, without trying to

5    articulate it, is that when New GM designated the lockup

6    agreement as an executory contract to be assigned to it, it did

7    so because it believed that there was a cooperation covenant in

8    the agreement that if either Old GM hadn't complied with, it

9    could potentially unravel the lockup agreement and particularly

10   have an impact on GM Canada.  So they asked for the assignment

11   in order to make sure that that cooperation covenant was going

12   to be complied with.

13          The noteholders have articulated that the assumption

14   and the assignment of that lockup agreement constituted the

15   allowance of the noteholders' claims and the Nova Scotia

16   trustee claim, for all purposes.  We've stated in our papers

17   that that was not our belief that that was the intent or what

18   actually happened by virtue of the assignment, because the

19   actual lockup agreement says that Old GM would acknowledge the

20   claims and agree to support the claims to the fullest extent

21   permitted by law.  And that when that document -- when that

22   lockup then gets assigned to New GM, that's all that happened,

23   is that New GM will advocate and support their position to the

24   fullest extent permitted by law.  We believe that preserved the

25   right for the committee to raise the objection and do what they

Page 44

1    are trying to do now.

2           We also believe that the noteholders' position is the

3    correct position, but the issue was still for Your Honor to

4    determine, and no one was trying to, in effect, have claims

5    allowed of a billion dollars, by virtue of designating it in a

6    long list of executory contracts after the sale order.

7           I think all of the Rule 60(b) issue is whether there

8    was a greater ramification for the assumption and assignment

9    order other than what I've just said, which is that we wanted

10   to take on the cooperation covenant, but it wasn't a deemed

11   allowance for purposes of the bankruptcy case.

12          If that is litigated, because the noteholders will

13   want to articulate their position, the committee will take

14   whatever their position is, I've already articulated what New

15   GM's position is -- and Mr. Karotkin is in court, I bet you he

16   will agree with me on what Old GM's position is, because we've

17   talked about it before -- then Your Honor could have that issue

18   teed up without discovery.  Because there's nothing, really, I

19   think, more behind the Rule 60(b) relief.  And then one

20   material issue that's involved in this case from New GM's

21   perspective, would go away.  And a very big issue from a public

22   perception, that the committee is trying to undo a portion of

23   the sale order for protective basis.

24          And you couldn't -- if Your Honor didn't see the

25   issue without me articulating it, it's because the committee

MOTORS LIQUIDATION COMPANY, et al.

Page 45

1    never articulated what their real reason was.  And they framed

2    -- they didn't say what part of Rule 60(b) that they were

3    moving under.  And they came up with the notion, which I've

4    never heard of before, is I'm moving on a protective basis.

5              THE COURT:  Pause, please, Mr. Steinberg.  If you

6    could agree in paper by a stip or consent order or something

7    like that with the creditors' committee in this case and with

8    debtors' counsel, Mr. Karotkin or his designee, to confirm and

9    memorialize your understanding of the limited significance of

10   the assignment, then I need your help on a related standing

11   issue.  What standing do other individual parties in the case,

12   most obviously bondholders, have to quarrel with the

13   confirmatory understanding between the two sides of the assume

14   and assign relationship?

15             MR. STEINBERG:  Your Honor, if they wanted to argue

16   that it had a greater ramification, I think they should be free

17   to argue that, if they seriously want to argue that.  All I can

18   articulate was why New GM designated the assignment as part of

19   the list of executory contracts and what it was trying to

20   accomplish and what it was not trying to accomplish.  And I

21   think it's that concern of the deemed allowance of these claims

22   which underlies the Rule 60, and I think you don't need

23   discovery on that issue.

24             You can easily have the parties -- or Your Honor

25   could decide that issue.  We can stipulate as to what New GM's

MOTORS LIQUIDATION COMPANY, et al.

Page 46

1    intention was.  Old GM could stipulate what its intention was.

2    And then the issue is teed up.  And if I'm correct, the Rule

3    60(b) relief of this entire motion goes away.

4            Now, I'll go through my entire presentation, but the

5    committee counsel can say whether I'm correct as to what that

6    basis of the 60(b) relief --

7            THE COURT:  Well, it wouldn't be fair to any lawyer

8    in the country to make him respond on his feet to that.  But

9    obviously some of the questions that I ask are intended to

10   provide food for thought for lawyers in the days that follow a

11   hearing.

12           MR. STEINBERG:  Okay.  The second reason why, Your

13   Honor, as to why we have -- why we are trying to weigh in on

14   this matter, is that we -- our reading of the lockup agreement

15   is that if there is a disgorgement, if there's a requirement to

16   repay the consent fee, that that would have ramifications to

17   the intercompany claims that have been released, and would have

18   real ramifications to GM Canada.  And therefore, in order to

19   protect an asset that we purchased, we believe we have to weigh

20   in.

21           And that dovetails to the third point, which is that

22   in the sale order itself, we protected ourselves so that the

23   committee couldn't do what they're trying to do, because we

24   bought the avoidance power claims between the estates.  That

25   was part of the list of assets that went over.  It was not

Page 47

1   based on the lockup agreement, it was based on the sale order.

2   And therefore, the ability to get a disgorgement of the consent

3   fee, which has ramifications on GM Canada, is something that we

4   made sure would not happen by virtue of the terms of the sale

5   agreement.

6          And so the third point is that they are looking to

7   build a case based on assets which are not part of this estate.

8   Voiding power claims were sold.  Accounts receivable -- so the

9   intercompany claim between GM and GM Canada -- were sold to New

10  GM.  In fact, cash above 950 million dollars was all swept by

11  New GM.  So if there was more cash in this estate, that would

12  have been swept to New GM as well too.  They are trying to, in

13  effect, to pick a provision of the sale order -- forget the

14  lockup agreement -- that they say, you know what, that's a

15  benefit that was there that I'd like to have back.

16         The fourth element, Your Honor --

17         THE COURT:  Well, is the creditors' committee's

18  position -- and maybe Mr. Fisher is the better guy to ask than

19  you -- but is the creditors' committee's position that they

20  want to recover 360,000 dollars worth of -- 360 million dollars

21  worth of cash, or rather simply that they want to get -- have

22  the estate get credit for the 360 million dollars that was laid

23  out as part of that consent fee?

24         MR. FISHER:  It's the latter, Your Honor.

25         THE COURT:  Yeah.

MOTORS LIQUIDATION COMPANY, et al.

Page 48

1          MR. STEINBERG:  It may be the latter, but I think

2     they wrote --

3          THE COURT:  Go on, Mr. Steinberg.

4          MR. STEINBERG:  -- okay.  It may be the latter now,

5     but I think their papers actually have the former.

6          Your Honor, the next thing -- and by the way, that's

7     why I think a motion practice would narrow the gap here.  But

8     if their ability is based on avoiding power claims, then we

9     weighed in because we wanted to make sure that everybody

10    understood that we bought avoiding power claims which dealt

11    with transfers from Old GM to its subsidiaries.

12         The fourth thing, Your Honor, is that they have

13    talked about the swap liability claim, which is a claim that is

14    asserted by New GM against the Nova Scotia trustee, which is

15    part of their claim.  And in the context of objecting to their

16    claim, they have used language like "nefarious conduct" and

17    stuff like that.  So to the extent that the conduct of New GM

18    was being weighed in on, we thought we needed to respond.  To

19    the extent that they're talking about --

20         THE COURT:  Well, wait, Mr. Steinberg.  At the time

21    that all of this went on, I didn't think there was a New GM.

22         MR. STEINBERG:  There wasn't.  But they just picked

23    us because --

24         THE COURT:  Well, I --

25         MR. STEINBERG:  -- but they wrote it --

MOTORS LIQUIDATION COMPANY, et al.

Page 49

1          THE COURT:  -- does protecting you against

2   accusations of nefarious conduct require any more than me

3   saying, I understand that there wasn't a New GM when this went

4   on?

5          MR. STEINBERG:  Well, that's fair, Your Honor, and I

6   appreciate that.  It's just that until you said it, all I had

7   was a naked allegation by a committee that didn't want to

8   attack its own estate, because they were the representative of

9   the estate.  So I figured I had to say something.  And I

10  appreciate Your Honor's remark.

11         But counsel misstated that the lockup agreement is

12  where the swap liability claim was transferred.  The swap

13  liability claim was transferred as part of the sale order.  It

14  is another asset that is embedded in the sale order.  So a good

15  portion of the underpinnings of the committee's objection is

16  based on assets that were sold pursuant to the sale order,

17  totally without regard to the lockup agreement.

18         And therefore, I believe that since I'm firmly

19  convinced that I'm right on these issues, that we might as well

20  have motion practice to confirm that I'm right and see what's

21  left of their complaint, and how they want to articulate their

22  complaint, based on what the provisions of the sale order are.

23         And, Your Honor, just two -- one other thing.  Your

24  Honor had said that they're not articulating that in the dead

25  of the night the lockup agreement was; that it was open and

09-50026-mg    Doc 8626    Filed 12/16/10    Entered 01/18/11 14:54:22    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 50 of 62

Page 50

1   notorious and you should be able to evaluate the claim.   In

2   counsel's opening presentation to Your Honor he said that we

3   tried to -- someone, I don't know who -- tried to keep the

4   lockup agreement away from the Court's scrutiny.   So there was

5   the element, in even the presentation heard this morning, that

6   there was an element that this was hidden from somebody.

7           And that's why you've got me saying what I did in our

8   papers, and why the noteholders went through a long list of

9   disclosures that were made with regard to this lockup

10  agreement.   And these disclosures were things that the

11  committee knew.   At the bottom line, at the end of the day,

12  from New GM's perspective, we would love to exit the case, love

13  this to be a strip-down objection between the committee and the

14  noteholders and the Nova Scotia trustee as to whether these

15  claims should be allowed or not allowed.   If we are a fact

16  witness in connection with the lockup agreement, then we will

17  have to bear the consequences.   It's probably the Old GM people

18  who would be the fact witnesses.   But we stand and rise

19  because, A) --

20          THE COURT:   Well, the Old GM people are for the most

21  part New GM people, aren't they?

22          MR. STEINBERG:   That's correct, Your Honor.   And

23  that's why I'm able to make the statements I made as to what

24  was intended, is because I spoke to the people who are in New

25  GM who were involved in the transaction for Old GM.

09-50026-mg   Doc 8626   Filed 12/16/10   Entered 01/18/11 14:54:22   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 51 of 62

Page 51

1          But until Rule 60(b) relief goes away, until I'm sure

2     that GM Canada is not going to be impacted by this proceeding

3     by virtue of anybody arguing that there's a damage to the

4     lockup agreement, until I can confirm that no one is trying to

5     use assets that we purchased as part of the sale agreement as a

6     basis for any type of claims, then I feel I was compelled, at

7     least in the first instance, to raise those issues and point

8     them out to Your Honor.  Thank you.

9          THE COURT:  All right.  Mr. Fisher, would you like to

10     reply?  Well, before you do, Mr. Fisher, Mr. Karotkin, I assume

11     you have no dog in this fight right now?

12          MR. KAROTKIN:  That's correct, Your Honor.  We view

13     this as an intercreditor dispute.  And consistent with what you

14     said earlier, our interest is in getting this resolved

15     expeditiously and economically.

16          THE COURT:  All right.  Mr. Fisher?

17          MR. FISHER:  Your Honor, I certainly won't address

18     all the arguments on the merits.  But I did not mean to leave

19     out from my opening remarks a discussion of 60(b).  Because I

20     recognize that that request for relief has been something of a

21     lightning rod, and we certainly did not intend it to be that.

22     And in fact, that's why we used this peculiar word

23     "protective".  So I want to explain what it is that we mean

24     with respect to our 60(b) relief and how I think the best way

25     to approach that particular request is.

09-50026-mg   Doc 8626   Filed 12/16/10   Entered 01/18/11 14:54:22   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 52 of 62

Page 52

1      We've learned that the lockup agreement was assumed

2   by Old GM and assigned to New GM.  And we see now from the

3   papers that were filed on Monday what we expected to see, which

4   is that at least some of the parties are arguing that the

5   assumption of the lockup agreement by Old GM means that there

6   was a judicial finding that the lockup agreement was a

7   reasonable exercise of the debtors' business judgment.

8      They're trying to use the assumption itself to

9   bootstrap arguments on the merits and to argue that the lockup

10   agreement in its entirety is insulated from review.  And so to

11   the extent that the sale order and the assumption order can be

12   construed to be a judicial finding to that effect, we might

13   need relief from such an order.  I don't think we will, because

14   I'm hopeful that Your Honor will -- again, I think that this is

15   factual as well -- but I think that once it's established that

16   despite what the 8-K said, because the disclosure actually was

17   not as complete as counsel would suggest, the creditors'

18   committee did not know when and whether this contract was being

19   assumed and assigned, and it could not have appreciated what

20   the full consequences of that assumption and assignment were.

21      And so it's possible -- one way to have gone would

22   have been to seek 60(b) relief from every aspect of the sale

23   order that we thought we needed to in order to preserve maximum

24   flexibility to challenge the lockup agreement and then press

25   forward with that motion.  But I think that that would have

MOTORS LIQUIDATION COMPANY, et al.

Page 53

1   been a very aggressive and unsettling approach.  And I think

2   that as discovery progresses it's quite possible that we can

3   narrow the extent to which we need 60(b) relief, if at all;

4   which is yet another reason why, as opposed to the suggestion

5   of New GM, I think the better approach is to let everyone learn

6   what the real facts are here before we come to this Court and

7   ask for rulings.  Because if our hand is forced, we end up

8   having to ask for rulings that are more definitive and perhaps

9   broader than would be necessary if discovery were permitted.

10          And when I say that the 8-K -- first, I think Your

11   Honor is correct that even if -- that it's our position that

12   even if this agreement had happened in the Macy's department

13   store window, it would still be inequitable.  But it's also the

14   case that we are complaining about the lack of sunshine and

15   that there was not sufficient disclosure about what the true

16   implications of this agreement were and who it benefited and

17   why it benefitted them.

18          So we need discovery with respect to all of that.

19   You heard New GM's counsel say that the only reason that the

20   lockup agreement was assumed was because they wanted to make

21   sure that Old GM couldn't take pot shots at the lockup

22   agreement.  That's the -- the euphemism is the cooperation

23   covenant.  But in substance, that's what it means.  And I guess

24   it means that that was the only remaining portion of this

25   contract that required performance on the part of Old GM.  And

09-50026-mg    Doc 8626    Filed 12/16/10    Entered 01/18/11 14:54:22    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 54 of 62

Page 54

1    it's Old GM's requirement to keep its sock in its mouth that

2    makes this contract executory and even capable of being

3    assumed.

4          But if that's the meaning of assumption, if the only

5    meaning is that Mr. Karotkin and Weil Gotshal is not allowed to

6    say anything bad about the lockup agreement, I think we can

7    live with that.  But that's not what they're going to argue the

8    only meaning is.  They're going to argue that the meaning of

9    the assumption is that this was a reasonable exercise of Old

10   GM's business judgment.  And we certainly can't accept that

11   there's already been a judicial finding as to that, since the

12   creditors' committee and Your Honor was never apprised of what

13   the consequences of this assumption and assignment were.

14          On the topic of delay, I'll simply point out again,

15   we served discovery requests in August.  If we had just been

16   engaged in discovery during this period of time, I think we

17   would be quite far along.  And we're only now hearing that in

18   two weeks, claimants are prepared to make summary judgment

19   motions.  And as I pointed out at the outset, I think that the

20   proposal by claimant's counsel is actually not going to achieve

21   the objective that they seem to want, which is the more

22   expeditious resolution of this case.

23          Your Honor is also correct that the distributions

24   that are being held up are not distributions to all creditors,

25   it's only distributions to GM Nova Scotia Finance bondholders.

MOTORS LIQUIDATION COMPANY, et al.

Page 55

1   And there's a reserve that's been established to ensure that if

2   we're wrong, no one is prejudiced by whatever delay is

3   occasioned by the full and fair litigation of this objection.

4            THE COURT:  All right.  Everybody sit in place.

5        (Pause)

6            THE COURT:  All right, ladies and gentlemen.  The

7   notion that I would allow summary judgment motions before

8   giving the creditors' committee a fair opportunity for

9   discovery is unthinkable.  And I'm not going to permit summary

10  judgment motions under those circumstances without determining

11  the extent, if any, to which I would permit them thereafter.

12           It's unthinkable under Rule 56(f) of the Federal

13  Rules.  It's unthinkable as a matter of basic fairness to the

14  creditors in this case -- the nonbondholder creditors in this

15  case.  I wouldn't do it in a baby 11 and I'm sure not going to

16  do it in an 11 of this size, where there are thousands of

17  nonbondholder creditors who have a legitimate interest in the

18  fair prosecution of this litigation.

19           At the risk of stating the obvious, I express no view

20  as to the ultimate merits of the creditors' committee's

21  position on these issues.  But these are, as the exchange of

22  briefs on both sides makes clear, serious claims, factually

23  complicated claims, which deserve and indeed require judicial

24  scrutiny, as to the facts as well as the law underlying the

25  claims that the creditors' committee wishes to pursue, and not

MOTORS LIQUIDATION COMPANY, et al.

Page 56

1    in a factual vacuum, or under which I or any higher court would

2    be required to analyze them with knowledge of less than all of

3    their relevant facts.

4            I am painfully aware, as my earlier remarks

5    telegraphed pretty clearly, of the reality that intercreditor

6    disputes are very expensive.  Nevertheless, there are some

7    intercreditor issues that can't be swept under the rug and

8    ignored or be given expedited shorthand attention.  As much as

9    I have probably articulated by words or body language my

10   frustration with the disputes between the asbestos claims

11   creditors' committee and the general creditors' committee, I

12   would not have suggested and I don't suggest to this day that

13   those parties are entitled to a judicial determination of their

14   respective rights.  And I feel no differently with respect to

15   this issue.

16           So we're going to do it by the book, folks.  We're

17   going to do it by the way that this court -- and by this court,

18   I mean not me alone but the judges in the United States

19   Bankruptcy Court for the Southern District of New York -- have

20   done by our local court rules which is summary judgment motions

21   may be made after a pre-motion conference under which the Court

22   can consider whether or not the green light for filing such a

23   motion should be given.  But that pre-motion conference will be

24   taken after most or all of the discovery has been taken, not

25   now, and certainly not today.

MOTORS LIQUIDATION COMPANY, et al.

Page 57

1    I express no view as to whether or not I would later

2    grant or deny or, as I so often do, grant but with a message "I

3    think you're wasting your time", if such a request were made

4    down the road.  Just as it would be irresponsible for me to do

5    anything else at this point in time, it would be irresponsible

6    for me to make a prediction with respect to that issue at this

7    point in time.  So I'm not going to do it.

8    Now, with that said, I do believe that the discovery

9    has to be handled in a sensible way.  First, I don't remember

10   how often I've had to address this since the request is made

11   increasingly rarely, but I hate interrogatories, except on the

12   most basic statistical and numeric information.  Or, like we

13   used to do under the old MDL rules, before Rule 26 was amended,

14   interrogatories can be used to identify the names and locations

15   of witnesses.  But I don't want them used for anything other

16   than that.

17   Document production is authorized.  And lay witness

18   deposition testimony will be authorized.  But you've got to

19   come back to me for permission to use interrogatories.  And the

20   presumption is going to be that there are other and better ways

21   of getting information of that character.

22   Whenever you're talking about discovery of

23   governmental witnesses -- and I assume for the purposes of this

24   discussion that I should treat the Canadian government with the

25   same respect that I would treat our own -- you tend to involve

MOTORS LIQUIDATION COMPANY, et al.

Page 58

1   more complicated issues of internal deliberations, deliberative

2   privilege.  I haven't dealt with these issues in years.  I'm

3   not sure if I have my arms around them other than recognizing

4   that they exist.  But that's going to have to be done with the

5   consent of the government; or if there is an agreement to

6   disagree, you're going to have to give me an opportunity to

7   understand what kinds of discovery of the government are

8   appropriate and what are not.

9            At least seemingly, if the government discusses

10  things with outsiders, like bondholders or their lawyers, that

11  well might not be privileged or subject to the protections

12  which we, as citizens and judges, accord to the federal

13  government and its personnel.  But you've got to be careful in

14  that area.  And I'll be available if you have to agree to

15  disagree.

16           You are to do your discovery quickly, cleanly; and

17  I'll be available, as I always am, in the event of discovery

18  disputes, after the usual meet-and-confers.  But I need you to

19  redouble your efforts to make sure that the discovery is

20  efficiently handled, cooperative and clean.

21           You are to prepare a stip or consent order embodying

22  the request for discovery.  As is apparent, discovery is

23  presumptively a two-way street.  I recognize that the

24  creditors' committee is likely to have less in the way of

25  information that's relevant than maybe other parties, but it is

Page 59

1    not, just because it's the creditors' committee, exempt from

2    discovery.  And after you have some kind of stipulation or

3    consent order with as much as you can paper, you're to submit

4    it to me for judicial approval.  If it's reasonable, that

5    judicial approval will be granted.

6           All right.  Not by way of reargument, do we have open

7    issues?  All right.  Hearing none -- am I correct, Mr.

8    Karotkin, we have no further business as well?

9           MR. KAROTKIN:  That's correct, Your Honor.  Thank

10   you.

11          THE COURT:  All right.  We're adjourned.

12       (Whereupon these proceedings were concluded at 3:26 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 60

```
 1

 2                        I N D E X

 3

 4                      R U L I N G S

 5    DESCRIPTION                              PAGE    LINE

 6    Motion of IUE-CWA to approve assignment of    16      6

 7    claim of IUE-CWA to a VEBA trust granted

 8    Caplin & Drysdale's fee application generally

 9    approved based on specific rulings made on the

10    record re:

11    objection of fee examiner re billing rates and    18      6

12    task allocation sustained;

13    cost of Caplin & Drysdale's responding to fee    18     19

14    examiner's criticism will not be compensable;

15    objection of fee examiner re vague              19      1

16    communications and repetitive tasks sustained;

17    Overall objection of fee examiner in LFR fee    25      2

18    application that TEA, Inc. was not retained

19    overruled

20    Summary judgment motions will only be made    56     20

21    after a pre-motion hearing and after

22    substantially all discovery, as outlined

23    on the record

24

25
```

Page 61

1

2                          I N D E X, cont'd

3

4                          R U L I N G S

5    DESCRIPTION                              PAGE      LINE

6    Parties directed to prepare stipulation or    58       21

7    consent order re discovery requests for

8    judicial approval

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 62

1

2                        C E R T I F I C A T I O N

3

4    I, Lisa Bar-Leib, certify that the foregoing transcript is a

5    true and accurate record of the proceedings.

6              Lisa Bar-Leib    Digitally signed by Lisa Bar-Leib
                                DN: cn=Lisa Bar-Leib, o, ou,
                                email=digital1@veritext.com,
7    _____ c=US
                                Date: 2010.12.16 12:08:47 -05'00'

8    LISA BAR-LEIB

9    AAERT Certified Electronic Transcriber (CET**D-486)

10

11   Veritext

12   200 Old Country Road

13   Suite 580

14   Mineola, NY 11501

15

16   Date:  December 16, 2010

17

18

19

20

21

22

23

24

25