# EXHIBIT A

**To the**

**DECLARATION OF MICHAEL A. SCHWARTZ IN SUPPORT OF THE
SATURN PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITON TO
DEBTORS' OBJECTION TO PROOFS OF CLAIM NOS. 16440 and 16441**

7000730

| UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK | PROOF OF CLAIM |
|---|---|

Name of Debtor (Check Only One):
☒ Motors Liquidation Company (f/k/a General Motors Corporation)
☐ MLCS, LLC (f/k/a Saturn, LLC)
☐ MLCS Distribution Corporation (f/k/a Saturn Distribution Corporation)
☐ MLC of Harlem, Inc. (f/k/a Chevrolet-Saturn of Harlem, Inc.)

Case No.
09-50026 (REG)
09-50027 (REG)
09-50028 (REG)
09-13558 (REG)

Your Claim is Scheduled As Follows:

NOTE: *This form should not be used to make a claim for an administrative expense arising after the commencement of the case, but may be used for purposes of asserting a claim under 11 U.S.C. § 503(b)(9) (see Item # 5). All other requests for payment of an administrative expense should be filed pursuant to 11 U.S.C. § 503.*

Name of Creditor (the person or other entity to whom the debtor owes money or property): IN RE SATURN L-SERIES TIMING CHAIN LITIGATION MDL NO. 1920

Name and address where notices should be sent:
IN RE SATURN L-SERIES TIMING CHAIN LITIGATION MDL NO.
C/O MICHAEL A SCHWARTZ, ESQ
HORWITZ, HORWITZ & PARADIS, ATTORNEYS AT LAW
405 LEXINGTON AVE, 61ST FLOOR
NEW YORK NY 10174

Telephone number: **212-986-4500**
Email Address: **mschwartz@hhplawny.com**

☐ Check this box to indicate that this 1920 claim amends a previously filed claim.

Court Claim Number:
*(If known)*

Filed on:

Name and address where payment should be sent (if different from above):

Telephone number:

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check this box if you are the debtor or trustee in this case.

If an amount is identified above, you have a claim scheduled by one of the Debtors as shown. (This scheduled amount of your claim may be an amendment to a previously scheduled amount.) If you agree with the amount and priority of your claim as scheduled by the Debtor and you have no other claim against the Debtor, you do not need to file this proof of claim form, EXCEPT AS FOLLOWS: If the amount shown is listed as DISPUTED, UNLIQUIDATED, or CONTINGENT, a proof of claim MUST be filed in order to receive any distribution in respect of your claim. If you have already filed a proof of claim in accordance with the attached instructions, you need not file again.

1. **Amount of Claim as of Date Case Filed, June 1, 2009:** **$334,847,925**

If all or part of your claim is secured, complete item 4 below; however, if all of your claim is unsecured, do not complete item 4. If all or part of your claim is entitled to priority, complete item 5. If all or part of your claim is asserted pursuant to 11 U.S.C. § 503(b)(9), complete item 5.

☐ Check this box if claim includes interest or other charges in addition to the principal amount of claim. Attach itemized statement of interest or charges.

2. **Basis for Claim:** **See Attachment hereto**
*(See instruction #2 on reverse side.)*

3. **Last four digits of any number by which creditor identifies debtor:** _____

  **3a. Debtor may have scheduled account as:** _____
  *(See instruction #3a on reverse side.)*

4. **Secured Claim** *(See instruction #4 on reverse side.)*
Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.

Nature of property or right of setoff: ☐ Real Estate ☐ Motor Vehicle ☐ Equipment ☐ Other
Describe:

Value of Property: $_____ Annual Interest Rate____%

Amount of arrearage and other charges as of time case filed included in secured claim, if any: $_____

Basis for perfection: _____

Amount of Secured Claim: $_____ Amount Unsecured: $_____

6. **Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim.

7. **Documents:** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. You may also attach a summary. Attach redacted copies of documents providing evidence of perfection of a security interest. You may also attach a summary. *(See instruction 7 and definition of "redacted" on reverse side.)*

DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

If the documents are not available, please explain in an attachment.

5. **Amount of Claim Entitled to Priority under 11 U.S.C. § 507(a).** If any portion of your claim falls in one of the following categories, check the box and state the amount.

Specify the priority of the claim.

☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries, or commissions (up to $10,950*) earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier – 11 U.S.C. § 507(a)(4).

☐ Contributions to an employee benefit plan – 11 U.S.C. § 507(a)(5).

☐ Up to $2,425* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. § 507(a)(7).

☐ Taxes or penalties owed to governmental units – 11 U.S.C. § 507(a)(8).

☐ Value of goods received by the Debtor within 20 days before the date of commencement of the case – 11 U.S.C. § 503(b)(9) (§ 507(a)(2)).

☐ Other – Specify applicable paragraph of 11 U.S.C. § 507(a)(___).

**Amount entitled to priority:**

$_____

*Amounts are subject to adjustment on 4/1/10 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.*

**Signature:** The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any.

Date: 10-31-09

*Co-lead Counsel for Class*

FOR COURT USE ONLY

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

Modified B10 (GCG) (12/08)

7043271046

## INSTRUCTIONS FOR PROOF OF CLAIM FORM

*The instructions and definitions below are general explanations of the law. In certain circumstances, such as bankruptcy cases not filed voluntarily by the debtor, there may be exceptions to these general rules. The attorneys for the Debtors and their court-appointed claims agent, The Garden City Group, Inc., are not authorized and are not providing you with any legal advice.*

### A SEPARATE PROOF OF CLAIM FORM MUST BE FILED AGAINST EACH DEBTOR

PLEASE SEND YOUR ORIGINAL, COMPLETED CLAIM FORM AS FOLLOWS: **IF BY MAIL**: THE GARDEN CITY GROUP, INC., ATTN: MOTORS LIQUIDATION COMPANY CLAIMS PROCESSING, P.O. BOX 9386, DUBLIN, OH 43017-4286. **IF BY HAND OR OVERNIGHT COURIER**: THE GARDEN CITY GROUP, INC., ATTN: MOTORS LIQUIDATION COMPANY CLAIMS PROCESSING, 5151 BLAZER PARKWAY, SUITE A, DUBLIN, OH 43017. PROOFS OF CLAIM MAY ALSO BE HAND DELIVERED TO: THE UNITED STATES BANKRUPTCY COURT, SDNY, ONE BOWLING GREEN, ROOM 534, NEW YORK, NEW YORK 10004. ANY PROOF OF CLAIM SUBMITTED BY FACSIMILE OR E-MAIL WILL NOT BE ACCEPTED.

**THE GENERAL AND GOVERNMENTAL BAR DATE IS NOVEMBER 30, 2009 AT 5:00 P.M. (PREVAILING EASTERN TIME)**

**Court, Name of Debtor, and Case Number:**
These chapter 11 cases were commenced in the United States Bankruptcy Court for the Southern District of New York on June 1, 2009. You should select the debtor against which you are asserting your claim.
**A SEPARATE PROOF OF CLAIM FORM MUST BE FILED AGAINST EACH DEBTOR.**

**Creditor's Name and Address:**
Fill in the name of the person or entity asserting a claim and the name and address of the person who should receive notices issued during the bankruptcy case. Please provide us with a valid email address. A separate space is provided for the payment address if it differs from the notice address. The creditor has a continuing obligation to keep the court informed of its current address. See Federal Rule of Bankruptcy Procedure (FRBP) 2002(g).

**1. Amount of Claim as of Date Case Filed:**
State the total amount owed to the creditor on the date of the bankruptcy filing. Follow the instructions concerning whether to complete items 4 and 5. Check the box if interest or other charges are included in this claim.

**2. Basis for Claim:**
State the type of debt or how it was incurred. Examples include goods sold, money loaned, services performed, personal injury/wrongful death, car loan, mortgage note, and credit card. If the claim is based on the delivery of health care goods or services, limit the disclosure of the goods or services so as to avoid embarrassment or the disclosure of confidential health care information. You may be required to provide additional disclosure if the debtor, trustee or another party in interest files an objection to your claim.

**3. Last Four Digits of Any Number by Which Creditor Identifies Debtor:**
State only the last four digits of the debtor's account or other number used by the creditor to identify the debtor, if any.

**3a. Debtor May Have Scheduled Account As:**
Use this space to report a change in the creditor's name, a transferred claim, or any other information that clarifies a difference between this proof of claim and the claim as scheduled by the debtor.

**4. Secured Claim:**
Check the appropriate box and provide the requested information if the claim is fully or partially secured. Skip this section if the claim is entirely unsecured. (See DEFINITIONS, below.) State the type and the value of property that secures the claim, attach copies of lien documentation, and state annual interest rate and the amount past due on the claim as of the date of the bankruptcy filing.

**5. Amount of Claim Entitled to Priority Under 11 U.S.C. § 507(a):**
If any portion of your claim falls in one or more of the listed categories, check the appropriate box(es) and state the amount entitled to priority. (See DEFINITIONS, below.) A claim may be partly priority and partly non-priority. For example, in some of the categories, the law limits the amount entitled to priority.

For claims pursuant to 11 U.S.C. § 503(b)(9), indicate the amount of your claim arising from the value of any goods received by the debtor within 20 days before June 1, 2009, the date of commencement of these cases (See DEFINITIONS, below). Attach documentation supporting such claim.

**6. Credits:**
An authorized signature on this proof of claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the Debtor credit for any payments received toward the debt.

**7. Documents:**
Attach to this proof of claim form redacted copies documenting the existence of the debt and of any lien securing the debt. You may also attach a summary. You must also attach copies of documents that evidence perfection of any security interest. You may also attach a summary. FRBP 3001(c) and (d). If the claim is based on the delivery of health care goods or services, see instruction 2. Do not send original documents, as attachments may be destroyed after scanning.

**Date and Signature:**
The person filing this proof of claim must sign and date it. FRBP 9011. If the claim is filed electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what constitutes a signature. Print the name and title, if any, of the creditor or other person authorized to file this claim. State the filer's address and telephone number if it differs from the address given on the top of the form for purposes of receiving notices. Attach a complete copy of any power of attorney. Criminal penalties apply for making a false statement on a proof of claim.

### DEFINITIONS

**Debtor**
A debtor is the person, corporation, or other entity that has filed a bankruptcy case.
The Debtors in these Chapter 11 cases are:

| | |
|---|---|
| Motors Liquidation Company | |
| (f/k/a General Motors Corporation) | 09-50026 (REG) |
| MLCS, LLC | |
| (f/k/a Saturn, LLC) | 09-50027 (REG) |
| MLCS Distribution Corporation | |
| (f/k/a Saturn Distribution Corporation) | 09-50028 (REG) |
| MLC of Harlem, Inc. | |
| (f/k/a Chevrolet-Saturn of Harlem, Inc.) | 09-13558 (REG) |

**Creditor**
A creditor is the person, corporation, or other entity owed a debt by the debtor on the date of the bankruptcy filing.

**Claim**
A claim is the creditor's right to receive payment on a debt that was owed by the Debtor on the date of the bankruptcy filing. See 11 U.S.C. § 101(5). A claim may be secured or unsecured.

**Proof of Claim**
A proof of claim is a form used by the creditor to indicate the amount of the debt owed by the debtor on the date of the bankruptcy filing. The creditor must file the form with The Garden City Group, Inc. as described in the instructions above and in the Bar Date Notice.

**Secured Claim Under 11 U.S.C. § 506(a)**
A secured claim is one backed by a lien on property of the debtor. The claim is secured so long as the creditor has the right to be

paid from the property prior to other creditors. The amount of the secured claim cannot exceed the value of the property. Any amount owed to the creditor in excess of the value of the property is an unsecured claim. Examples of liens on property include a mortgage on real estate or a security interest in a car. A lien may be voluntarily granted by a debtor or may be obtained through a court proceeding. In some states, a court judgment is a lien. A claim also may be secured if the creditor owes the debtor money (has a right to setoff).

**Section 503(b)(9) Claim**
A Section 503(b)(9) claim is a claim for the value of any goods received by the debtor within 20 days before the date of commencement of a bankruptcy case in which the goods have been sold to the debtor in the ordinary course of such debtor's business.

**Unsecured Claim**
An unsecured claim is one that does not meet the requirements of a secured claim. A claim may be partly unsecured if the amount of the claim exceeds the value of the property on which the creditor has a lien.

**Claim Entitled to Priority Under 11 U.S.C. § 507(a)**
Priority claims are certain categories of unsecured claims that are paid from the available money or property in a bankruptcy case before other unsecured claims.

**Redacted**
A document has been redacted when the person filing it has masked, edited out, or otherwise deleted, certain information. A creditor should redact and use only the last four digits of any social-security, individual's

### INFORMATION

tax-identification, or financial-account number, all but the initials of a minor's name and only the year of any person's date of birth.

**Evidence of Perfection**
Evidence of perfection may include a mortgage, lien, certificate of title, financing statement, or other document showing that the lien has been filed or recorded.

**Acknowledgment of Filing of Claim**
To receive acknowledgment of your filing from The Garden City Group, Inc., please provide a self-addressed, stamped envelope and a copy of this proof of claim when you submit the original claim to The Garden City Group, Inc.

**Offers to Purchase a Claim**
Certain entities are in the business of purchasing claims for an amount less than the face value of the claims. One or more of these entities may contact the creditor and offer to purchase the claim. Some of the written communications from these entities may easily be confused with official court documentation or communications from the debtor. These entities do not represent the bankruptcy court or the debtor. The creditor has no obligation to sell its claim. However, if the creditor decides to sell its claim, any transfer of such claim is subject to FRBP 3001(e), any applicable provisions of the Bankruptcy Code (11 U.S.C. § 101 et seq.), and any applicable orders of the bankruptcy court.

**Additional Information**
If you have any questions with respect to this claim form, please contact Alix Partners at 1 (800) 414-9607 or by e-mail at claims@motorsliquidation.com.

7000730

| UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK | PROOF OF CLAIM |

**UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

**PROOF OF CLAIM**

Name of Debtor (Check Only One):

| | Case No. | Your Claim is Scheduled As Follows: |
|---|---|---|
| ☐ Motors Liquidation Company (f/k/a General Motors Corporation) | 09-50026 (REG) | |
| ☒ MLCS, LLC (f/k/a Saturn, LLC) | 09-50027 (REG) | |
| ☐ MLCS Distribution Corporation (f/k/a Saturn Distribution Corporation) | 09-50028 (REG) | |
| ☐ MLC of Harlem, Inc. (f/k/a Chevrolet-Saturn of Harlem, Inc.) | 09-13558 (REG) | |

NOTE: *This form should not be used to make a claim for an administrative expense arising after the commencement of the case, but may be used for purposes of asserting a claim under 11 U.S.C. § 503(b)(9) (see Item # 5). All other requests for payment of an administrative expense should be filed pursuant to 11 U.S.C. § 503.*

Name of Creditor (the person or other entity to whom the debtor owes money or property): IN RE SATURN L-SERIES TIMING CHAIN LITIGATION MDL NO. 1920

Name and address where notices should be sent:

IN RE SATURN L-SERIES TIMING CHAIN LITIGATION MDL NO.

C/O MICHAEL A SCHWARTZ, ESQ
HORWITZ, HORWITZ & PARADIS, ATTORNEYS AT LAW

405 LEXINGTON AVE, 61ST FLOOR

NEW YORK NY 10174

Telephone number:  212-986-4500

Email Address:  mschwartz@hhplawny.com

☐ Check this box to indicate that this claim amends a previously filed claim.

Court Claim Number: _____
*(If known)*

Filed on: _____

Name and address where payment should be sent (if different from above):

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check this box if you are the debtor or trustee in this case.

Telephone number: _____

If an amount is identified above, you have a claim scheduled by one of the Debtors as shown. (This scheduled amount of your claim may be an amendment to a previously scheduled amount.) If you agree with the amount and priority of your claim as scheduled by the Debtor and you have no other claim against the Debtor, you do not need to file this proof of claim form, EXCEPT AS FOLLOWS: If the amount shown is listed as DISPUTED, UNLIQUIDATED, or CONTINGENT, a proof of claim MUST be filed in order to receive any distribution in respect of your claim. If you have already filed a proof of claim in accordance with the attached instructions, you need not file again.

**1. Amount of Claim as of Date Case Filed, June 1, 2009:**    $334,847,925

If all or part of your claim is secured, complete item 4 below; however, if all of your claim is unsecured, do not complete item 4. If all or part of your claim is entitled to priority, complete item 5. If all or part of your claim is asserted pursuant to 11 U.S.C. § 503(b)(9), complete item 5.

☐ Check this box if claim includes interest or other charges in addition to the principal amount of claim. Attach itemized statement of interest or charges.

**2. Basis for Claim:** ____See Attachment hereto____
(See instruction #2 on reverse side.)

**3. Last four digits of any number by which creditor identifies debtor:** _____

**3a. Debtor may have scheduled account as:** _____
(See instruction #3a on reverse side.)

**4. Secured Claim** (See instruction #4 on reverse side.)
Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.

Nature of property or right of setoff:  ☐ Real Estate   ☐ Motor Vehicle   ☐ Equipment   ☐ Other

Describe: _____

Value of Property: $ _____   Annual Interest Rate ____ %

Amount of arrearage and other charges as of time case filed included in secured claim, if any: $ _____

Basis for perfection: _____

Amount of Secured Claim: $ _____    Amount Unsecured: $ _____

**6. Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim.

**7. Documents:** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements or running accounts, contracts, judgments, mortgages, and security agreements. You may also attach a summary. Attach redacted copies of documents providing evidence of perfection of a security interest. You may also attach a summary. *(See instruction 7 and definition of "redacted" on reverse side.)*

DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

If the documents are not available, please explain in an attachment.

**5.**   Amount of Claim Entitled to Priority under 11 U.S.C. § 507(a). If any portion of your claim falls in one of the following categories, check the box and state the amount.

Specify the priority of the claim.

☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries, or commissions (up to $10,950*) earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier – 11 U.S.C. § 507(a)(4).

☐ Contributions to an employee benefit plan – 11 U.S.C. § 507(a)(5).

☐ Up to $2,425* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. § 507(a)(7).

☐ Taxes or penalties owed to governmental units – 11 U.S.C. § 507(a)(8).

☐ Value of goods received by the Debtor within 20 days before the date of commencement of the case – 11 U.S.C. § 503(b)(9) (§ 507(a)(2)).

☐ Other – Specify applicable paragraph of 11 U.S.C. § 507(a)(___).

Amount entitled to priority:

$ _____

*Amounts are subject to adjustment on 4/1/10 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.*

**Signature:** The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any.

Date: 10-31-09

Co-lead Counsel for Class

**FOR COURT USE ONLY**

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.
Modified B10 (GCG) (12/08)

7043271046

## INSTRUCTIONS FOR PROOF OF CLAIM FORM

*The instructions and definitions below are general explanations of the law. In certain circumstances, such as bankruptcy cases not filed voluntarily by the debtor, there may be exceptions to these general rules. The attorneys for the Debtors and their court-appointed claims agent, The Garden City Group, Inc., are not authorized and are not providing you with any legal advice.*

### A SEPARATE PROOF OF CLAIM FORM MUST BE FILED AGAINST EACH DEBTOR

PLEASE SEND YOUR ORIGINAL, COMPLETED CLAIM FORM AS FOLLOWS: IF BY MAIL: THE GARDEN CITY GROUP, INC., ATTN: MOTORS LIQUIDATION COMPANY CLAIMS PROCESSING, P.O. BOX 9386, DUBLIN, OH 43017-4286. IF BY HAND OR OVERNIGHT COURIER: THE GARDEN CITY GROUP, INC., ATTN: MOTORS LIQUIDATION COMPANY CLAIMS PROCESSING, 5151 BLAZER PARKWAY, SUITE A, DUBLIN, OH 43017. PROOFS OF CLAIM MAY ALSO BE HAND DELIVERED TO: THE UNITED STATES BANKRUPTCY COURT, SDNY, ONE BOWLING GREEN, ROOM 534, NEW YORK, NEW YORK 10004. ANY PROOF OF CLAIM SUBMITTED BY FACSIMILE OR E-MAIL WILL NOT BE ACCEPTED.

**THE GENERAL AND GOVERNMENTAL BAR DATE IS NOVEMBER 30, 2009 AT 5:00 P.M. (PREVAILING EASTERN TIME)**

**Court, Name of Debtor, and Case Number:**
These chapter 11 cases were commenced in the United States Bankruptcy Court for the Southern District of New York on June 1, 2009. You should select the debtor against which you are asserting your claim.
**A SEPARATE PROOF OF CLAIM FORM MUST BE FILED AGAINST EACH DEBTOR.**

**Creditor's Name and Address:**
Fill in the name of the person or entity asserting a claim and the name and address of the person who should receive notices issued during the bankruptcy case. Please provide us with a valid email address. A separate space is provided for the payment address if it differs from the notice address. The creditor has a continuing obligation to keep the court informed of its current address. See Federal Rule of Bankruptcy Procedure (FRBP) 2002(g).

**1. Amount of Claim as of Date Case Filed:**
State the total amount owed to the creditor on the date of the bankruptcy filing. Follow the instructions concerning whether to complete items 4 and 5. Check the box if interest or other charges are included in the claim.

**2. Basis for Claim:**
State the type of debt or how it was incurred. Examples include goods sold, money loaned, services performed, personal injury/wrongful death, car loan, mortgage note, and credit card. If the claim is based on the delivery of health care goods or services, limit the disclosure of the goods or services so as to avoid embarrassment or the disclosure of confidential health care information. You may be required to provide additional disclosure if the debtor, trustee or another party in interest files an objection to your claim.

**3. Last Four Digits of Any Number by Which Creditor Identifies Debtor:**
State only the last four digits of the debtor's account or other number used by the creditor to identify the debtor, if any.

**3a. Debtor May Have Scheduled Account As:**
Use this space to report a change in the creditor's name, a transferred claim, or any other information that clarifies a difference between this proof of claim and the claim as scheduled by the debtor.

**4. Secured Claim:**
Check the appropriate box and provide the requested information if the claim is fully or partially secured. Skip this section if the claim is entirely unsecured. (See DEFINITIONS, below.) State the type and value of property that secures the claim, attach copies of lien documentation, and state annual interest rate and the amount past due on the claim as of the date of the bankruptcy filing.

**5. Amount of Claim Entitled to Priority Under 11 U.S.C. § 507(a):**
If any portion of your claim falls in one or more of the listed categories, check the appropriate box(es) and state the amount entitled to priority. (See DEFINITIONS, below.) A claim may be partly priority and partly non-priority. For example, in some of the categories, the law limits the amount entitled to priority.

For claims pursuant to 11 U.S.C. § 503(b)(9), indicate the amount of your claim arising from the value of any goods received by the debtor within 20 days before June 1, 2009, the date of commencement of these cases (See DEFINITIONS, below). Attach documentation supporting such claim.

**6. Credits:**
An authorized signature on this proof of claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the Debtor credit for any payments received toward the debt.

**7. Documents:**
Attach to this proof of claim form redacted copies documenting the existence of the debt and of any lien securing the debt. You may also attach a summary. You must also attach copies of documents that evidence perfection of any security interest. You may also attach a summary. FRBP 3001(c) and (d). If the claim is based on the delivery of health care goods or services, see instruction 2. Do not send original documents, as attachments may be destroyed after scanning.

**Date and Signature:**
The person filing this proof of claim must sign and date it. FRBP 9011. If the claim is filed electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what constitutes a signature. Print the name and title, if any, of the creditor or other person authorized to file this claim. State the filer's address and telephone number if it differs from the address given on the top of the form for purposes of receiving notices. Attach a complete copy of any power of attorney. Criminal penalties apply for making a false statement on a proof of claim.

---

### DEFINITIONS

**Debtor**
A debtor is the person, corporation, or other entity that has filed a bankruptcy case.
The Debtors in these Chapter 11 cases are:

| | |
|---|---|
| Motors Liquidation Company (f/k/a General Motors Corporation) | 09-50026 (REG) |
| MLCS, LLC (f/k/a Saturn, LLC) | 09-50027 (REG) |
| MLCS Distribution Corporation (f/k/a Saturn Distribution Corporation) | 09-50028 (REG) |
| MLC of Harlem, Inc. (f/k/a Chevrolet-Saturn of Harlem, Inc.) | 09-13558 (REG) |

**Creditor**
A creditor is the person, corporation, or other entity owed a debt by the Debtor on the date of the bankruptcy filing.

**Claim**
A claim is the creditor's right to receive payment on a debt that was owed by the Debtor on the date of the bankruptcy filing. See 11 U.S.C. § 101(5). A claim may be secured or unsecured.

**Proof of Claim**
A proof of claim is a form used by the creditor to indicate the amount of the debt owed by the debtor on the date of the bankruptcy filing. The creditor must file the form with The Garden City Group, Inc. as described in the instructions above and in the Bar Date Notice.

**Secured Claim Under 11 U.S.C. § 506(a)**
A secured claim is one backed by a lien on property of the debtor. The claim is secured so long as the creditor has the right to be

paid from the property prior to other creditors. The amount of the secured claim cannot exceed the value of the property. Any amount owed to the creditor in excess of the value of the property is an unsecured claim. Examples of liens on property include a mortgage on real estate or a security interest in a car. A lien may be voluntarily granted by a debtor or may be obtained through a court proceeding. In some states, a court judgment is a lien. A claim also may be secured if the creditor owes the debtor money (has a right to setoff).

**Section 503(b)(9) Claim**
A Section 503(b)(9) claim is a claim for the value of any goods received by the debtor within 20 days before the date of commencement of a bankruptcy case in which the goods have been sold to the debtor in the ordinary course of such debtor's business.

**Unsecured Claim**
An unsecured claim is one that does not meet the requirements of a secured claim. A claim may be partly unsecured if the amount of the claim exceeds the value of the property on which the creditor has a lien.

**Claim Entitled to Priority Under 11 U.S.C. § 507(a)**
Priority claims are certain categories of unsecured claims that are paid from the available money or property in a bankruptcy case before other unsecured claims.

**Redacted**
A document has been redacted when the person filing it has masked, edited out, or otherwise deleted, certain information. A creditor should redact and use only the last four digits of any social-security, individual's

### INFORMATION

tax-identification, or financial-account number, all but the initials of a minor's name and only the year of any person's date of birth.

**Evidence of Perfection**
Evidence of perfection may include a mortgage, lien, certificate of title, financing statement, or other document showing that the lien has been filed or recorded.

**Acknowledgment of Filing of Claim**
To receive acknowledgment of your filing from The Garden City Group, Inc., please provide a self-addressed, stamped envelope and a copy of this proof of claim when you submit the original claim to The Garden City Group, Inc.

**Offers to Purchase a Claim**
Certain entities are in the business of purchasing claims for an amount less than the face value of the claims. One or more of these entities may contact the creditor and offer to purchase the claim. Some of the written communications from these entities may easily be confused with official court documentation or communications from the debtor. These entities do not represent the bankruptcy court or the debtor. The creditor has no obligation to sell its claim. However, if the creditor decides to sell its claim, any transfer of such claim is subject to FRBP 3001(e), any applicable provisions of the Bankruptcy Code (11 U.S.C. § 101 et seq.), and any applicable orders of the bankruptcy court.

**Additional Information**
If you have any questions with respect to this claim form, please contact Alix Partners at 1 (800) 414-9607 or by e-mail at claims@motorsliquidation.com.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re ) | Chapter 11 Case No. |
| ) | |
| MOTORS LIQUIDATION COMPANY ) | |
| f/k/a GENERAL MOTORS CORPORATION, ) | 09-50026 (REG) |
| *et al.*, ) | |
| ) | |
| Debtors. ) | |

## PROOF OF CLAIM ATTACHMENT –
## IN RE SATURN L-SERIES TIMING CHAIN LITIGATION- MDL NO. 1920

2.    **Basis for Claim:**

    A.    **Background**

On August 6, 2007, plaintiff Amy Faust filed a Class Action Complaint in the United States District Court for the District of Nebraska, *Amy Faust v. General Motors Corp., et al.*, C.A. No. 8:07-298, naming as defendants General Motors Corporation and Saturn Corporation and alleging that Defendants manufactured and sold or leased certain defectively designed Saturn L-Series vehicles (the "*Faust* Action").

Pursuant to Transfer Order dated February 19, 2008, the Judicial Panel on Multidistrict Litigation, pursuant to 28 U.S.C. § 1407, transferred to the District of Nebraska *Linda S. Marchetta v. General Motors Corp., et al.*, C.A. No. 1:07-5362 (the "*Marchetta* Action") and *William P. Anderson v. Saturn Corp.*, C.A. No. 1:07-6213 (the "*Anderson* Action"), to be assigned to the Honorable Laurie Smith Camp for coordinated or consolidated pretrial proceedings with the *Faust* Action. *See In Re: Saturn L-Series*

*Timing Chain Products Liability Litigation,* 536 F. Supp. 2d 1367 (MDL 2008). (Exh. A hereto.)

Pursuant to Orders dated March 28, 2008, the United States District Court for the District of Nebraska, *inter alia,* consolidated the *Faust, Marchetta and Anderson* Actions under the caption *In re Saturn L-Series Timing Chain Products Liability Litigation,* MDL No. 1920, 8:07 CV 298, and appointed Horwitz, Horwitz & Paradis and Shepherd Finkelman Miller & Shah, LLC as co-lead counsel. (Exhs. B and C hereto.)

On June 11, 2008, Plaintiffs filed their Consolidated Amended Complaint alleging that Defendants General Motors Corporation and Saturn Corporation defectively designed and sold or leased to the Class the following "Class Vehicles": (i) model year 2000 - 2003 Saturn L-Series; (ii) model year 2002 - 2003 Saturn Vue; or (iii) model year 2003 Saturn Ion, each equipped with a 2.2 Liter, 4-cylinder, 137-horsepower dual-overhead-cam, Ecotec L61 Engine (the "2.2L Ecotec L61 Engine") and a GM production part number 90537338 steel timing chain (the "Timing Chain") and a GM production part number 90537476 Timing Chain oiling nozzle (the "Oiling Nozzle") (collectively, the "Class Vehicles") in the states of Alaska, Arkansas, California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Mexico, New Jersey, New York, North Carolina, North Dakota, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Texas, Utah, Vermont, Virginia, Washington, West Virginia, Wisconsin, Wyoming, and the District of Columbia (collectively, the "Class

States"), and whose Timing Chain has failed (the "Class").    (Consolidated Amended Complaint annexed hereto as Exh. D.)

On July 14, 2008, Defendants General Motors Corporation and Saturn Corporation moved to dismiss the Plaintiffs' Consolidated Amended Complaint.

On November 7, 2008, the United States District Court for the District of Nebraska issued a Memorandum and Order upholding the vast majority of the claims assert in the Consolidated Amended Complaint. *See In Re: Saturn L-Series Timing Chain Products Liability Litigation,* 2008 U.S. Dist. LEXIS 109978 (D. Neb. November 7, 2008) (Exh. E).

### B.    Basis for the Claim

Plaintiffs allege that the Class Vehicles are equipped with a 2.2L Ecotec L61 Engine, and each of these engines included two important smaller parts: a steel Timing Chain classified as GM production part number 90537338, and a Timing Chain Oiling Nozzle classified as GM production part 90537476.  (*See* Exhs. D and E.)

The Plaintiffs claim that the engines in their Saturn Class Vehicles were defectively de-signed in two ways. The first alleged defect was in the design of the Timing Chain. A timing chain synchronizes the motion of an engine's pistons with the motion of the engine's valves. For a car engine to run efficiently, valves regulating the intake of fuel and expulsion of exhaust at one end of an engine's cylinders must open and close at precise intervals in relation to the pistons' movement up and down from the opposite end of the cylinders. The timing chain connects a gear at the piston end of the cylinders to another gear at the valve end of the cylinders so that the movements of the pistons and valves are linked. A malfunctioning timing chain can cause an engine to run

inefficiently or stop running altogether. A timing chain that breaks completely can cause extensive damage to the engine. (*Id.*)

Saturn changed the design of the timing chain used in its automobiles beginning in model year 1999, one year prior to the manufacture of the earliest Class Vehicles. In an effort to reduce engine noise in comparison with earlier Saturn models, Saturn switched to a finer timing chain composed of smaller links and smaller pins connecting those links. The finer timing chain was weaker than the one Saturn previously designed because the smaller pins on the new timing chain were not coated with enough chrome to withstand normal wear and tear, *i.e.*, they were insufficiently "chromized." This redesigned finer timing chain was substantially the same as the chain used in Class Vehicles engines.

The second defect in the Class Vehicle engines was in the design of the Timing Chain's Oiling Nozzle. An oiling nozzle distributes engine oil from a car's oil pump onto the timing chain while the engine is running. Lubrication of the timing chain reduces friction, and reduced friction means increased engine efficiency. Keeping friction low also keeps the temperature of the steel in the timing chain low. This is important because an overheated timing chain is more likely to bend, stretch, or become brittle, which can cause the chain to malfunction or break.

The Oiling Nozzles in the Saturn Class Vehicles were designed with a feature known as a pintle valve. A pintle valve prevents oil from flowing from the oiling nozzle to the timing chain when a car runs at low or idle speeds. A consequence of the pintle valve design in the Saturn Class Vehicles was that an insufficient amount of oil lubricated the timing chain, causing the Timing Chains in the Class Vehicles to become brittle and snap. (*Id.*)

These two design defects -- a weak and insufficiently chromized Timing Chain, plus an insufficiently lubricating Oiling Nozzle -- caused the Timing Chains in the Plaintiffs' Class Vehicles to overheat, bend, stretch, and/or become brittle, and eventually break and damage Class members' Class Vehicles. Plaintiffs incurred repair costs ranging from $900 to $3,700 each. One Plaintiff's engine was damaged beyond repair. No Plaintiff brought a claim for personal injury. (*Id.*)

Defendants knew at the outset of production of the Class Vehicles that both the Timing Chain and Oiling Nozzle in the 2.2L Ecotec L61 Engine installed in the Saturn Class Vehicles were defectively designed and knowingly sacrificed strength in the Timing Chain design in their Class Vehicles. (*Id.*)

During the mid-1990s, the National Highway Traffic Safety Administration ("NHTSA") fielded a number of complaints about timing chain failures in Saturn vehicles. In June of 1997, in response to these complaints, the Defendants issued a Technical Service Bulletin to Saturn dealerships that included instructions to Saturn mechanics for repairing broken timing chains. Whenever they replaced a timing chain on a model year 1991-1996 Saturn car, the mechanics were instructed to make an alteration to the engine's oil pump in order to lubricate the newly installed timing chain with a constant flow of oil. This Technical Service Bulletin demonstrates Defendants' knowledge, at least as early as June 1997, that an engine must be designed to provide a constant flow of oil to its timing chain. In addition, Defendants had actual knowledge of the alleged design defects in the Class Vehicle engines once they were released into the stream of commerce, and the Defendants deceptively concealed this information. (*Id.*)

The existence of this defect has been confirmed by the investigation of the Office of Defects Investigation ("ODI") of the United States' Department of Transportation's National Highway Traffic Safety Administration ("NHTSA"). Cplt. at ¶ 88. Beginning in the year 2000, NHTSA and various consumer groups began to field complaints about Timing Chain failures in Class Vehicles. In late 2001 or early 2002, the Defendants redesigned Saturn's timing chain for a second time and also made a change to the Oiling Nozzle design. A year later, in June 2003, the Defendants issued a Technical Service Bulletin instructing Saturn mechanics who encountered broken Timing Chains on Class Vehicles to replace both the old Timing Chain and Oiling Nozzle with newer versions. No public recall was issued. (*Id.*)

In February 2006, in response to the complaint of a consumer advocacy group, NHTSA initiated an investigation into Timing Chain failures in model year 2000-2003 Saturn L-Series and 2003 Saturn Ion vehicles. In correspondence with NHTSA in April 2006, GM acknowledged that it received more than one thousand consumer or field reports of broken or replaced Timing Chains and over 2,200 warranty claims involving broken Timing Chains in model year 2000-2003 Saturn L-Series cars. GM also admitted that the Defendants had been aware of potential problems in the engines of L-Series Class Vehicles shortly after the first model year 2000 cars were assembled in 1999. GM stated that in 2001 it began a specific investigation of broken Timing Chains, and, in August 2002, it released new versions of the timing chain and oiling nozzle. The newer timing chain featured higher-chromized pins -- approximately 35 perecent more chrome was used -- and the new oiling nozzle design eliminated the pintle valve.

GM, however, wrongfully asserted to NHTSA that Timing Chain failures in Saturn L-Series Class Vehicles was most frequent in cars manufactured during a four-month window between November 2000 and February 2001. (NHTSA later pointed out that over one-third of Timing Chain failure claims arose from this group of cars, which constituted only 5 percent of the vehicles under investigation.) GM further wrongfully asserted that its analysis showed the majority of Timing Chain failures occurred during high chain load situations like engine startup rather than times when the vehicles were moving at higher speeds. (*Id.*)

NHTSA disagreed with GM's second conclusion. GM's own data showed a higher percentage of Timing Chain failures while Saturn cars were driven at higher speeds. So, in June 2006, NHTSA upgraded its investigation of the Saturn Timing Chain failures to its highest level of scrutiny, an Engineering Analysis, but only for those L-Series vehicles produced within the four-month window. (*Id.*)

GM issued a voluntary Safety Recall in December 2007 for all Saturn L-Series cars manufactured during the four-month window from November 2000 to February 2001. GM offered to replace all Timing Chains and Oiling Nozzles in these vehicles and also to reimburse costs of prior repairs to owners whose Timing Chains had mal-functioned. In anticipation of this recall, NHTSA discontinued its investigation.

GM's Safety Recall, however, was woefully insufficient, since it included only 20,514 of an estimated 412,149 Saturn vehicles featuring the 2.2L Ecotec L61 Engine and including GM production part number 90537338 (the weaker and insufficiently chromized Timing Chain) and GM production part 90537476 (the Oiling Nozzle designed with the pintle valve). Indeed, while vehicles manufactured within this four-

month window suffered Timing Chain failures at high rates, the warranty data demonstrates that thousands of other L-Series, Vue, and ION Class Vehicles not covered by GM's recall saw their Timing Chains fail.  (*Id.*)

### C.    Damages

GM's Safety Recall included only 20,514 of an estimated 412,149 defectively designed Class Vehicles sold or leased to Class members.  This limited recall has left, by GM's own estimate, the owners of 391,635 Class Vehicles to: (a) bear the cost of replacing the Timing Chain before it breaks, at a cost of anywhere from $600 to $900; or (b) bear the expense of the repairs to their Class Vehicles when the Timing Chains break, more often than not, causing thousands of dollars in damages to the Class Vehicles.  (*See* Complaint, ¶¶ 116-120.)

Class members have been damaged in the amount of **$334,847,925** based on the following analysis: (a) the cost of replacing the Timing Chains in the Class Vehicles is **$293,726,250** (using an average repair cost of $750 multiplied by 391,635 Class Vehicles not covered by GM's limited recall); and (b) 27,414 Class members have incurred **$41,121,675** in damages to their engines (applying NHTSA's failure rates of 7% (Complaint, ¶¶ 113-114) multiplied by 391,635 Class Vehicles multiplied by an average estimated repair cost of $1,500 per Class Vehicle).  (Complaint, ¶¶ 113-114.)

Defendants have admitted that GM produced the following number of Class Vehicles:

| Make/Model | Model Year | 2000 | 2001 | 2002 | 2003 | Total |
|---|---|---|---|---|---|---|
| Saturn L-Series | | 53,255 | 60,892 | 70,984 | 58,393 | 243,504 |
| Saturn Vue | | N/A | N/A | 13,083 | 59,250 | 72,333 |
| Saturn ION | | N/A | N/A | N/A | 96,312 | 96,312 |

TOTALS                53,255  60,892  84,067  213,955        412,149

(Complaint, ¶¶ 125-130.)

Defendants have further admitted that, according to their own warranty records, they received warranty (three years or 36,000 miles, whichever comes first) and extended warranty claims (optional coverage available at time of purchase) relating to broken Timing Chains on 2,203 of the Class Vehicles, as follows:

| Make/Model/Model Year | 2000 | 2001 | 2002 | 2003 | Total |
|---|---|---|---|---|---|
| Saturn L-Series | 392 | 926 | 315 | 17 | 1650 |
| Saturn Vue | N/A | N/A | 97 | 334 | 431 |
| Saturn ION | N/A | N/A | N/A | 122 | 122 |
| TOTALS | 392 | 926 | 412 | 473 | 2,203 |

The foregoing 2,203 Class Vehicles which suffered broken Timing Chains do not include Class Vehicles in which Timing Chains broke either after the warranty expired and/or the repair work was done at a dealership or facility other than a Saturn dealership.

Moreover, since many Timing Chains have broken after 36,000 miles, there are thousands more Class Vehicles which experienced broken Timing Chains that are not included in GM's warranty data. Indeed, according to NHTSA:

> GM's statistical modeling of the failure data initially concluded that the failure rates were declining with age and mileage for any set of Warranty Data analyze (e.g. stall while driving, other or combined). **However, subsequent analysis showed that the timing failure rates are increasing.** Based on the high complaint and warranty rates for timing chain failure in the 4-month production period for the Model Year 2001 L-Series Vehicles, an Engineering Analysis has been opened to further assess the frequency of stall incidents due to timing chain failures in those Vehicles

Complaint, ¶ 114.

Finally, since the limited recall applies to only 20,514 model year 2001 L-Series Class Vehicles manufactured between November 2000 and February 2001, according to GM's own production numbers, there are an additional 391,635 Class Vehicles with defective Timing Chains and Oiling Nozzles that are not covered by the recall.

This is further borne out by the thousands of consumer complaints received by NHTSA and other consumer websites which demonstrate broken Timing Chains across all of the Class Vehicle models and model years. This also demonstrates that defective Class Vehicles were manufactured by Defendants outside the four month period identified subject to the recall.

# EXHIBIT A TO PROOF OF CLAIM



3 of 3 DOCUMENTS

## IN RE: SATURN L-SERIES TIMING CHAIN PRODUCTS LIABILITY LITIGATION

### MDL No. 1920

### JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

*536 F. Supp. 2d 1367; 2008 U.S. Dist. LEXIS 15362*

### February 19, 2008, Filed

**COUNSEL:** For Amy Faust, Plaintiff: Pamela A. Car, William L. Reinbrecht, CAR, REINBRECHT LAW FIRM, Omaha, NE; Richard J. Doherty, James M. Smith, PRO HAC VICE, HORWITZ, HORWITZ LAW FIRM - CHICAGO, Chicago, IL; Joel G. MacMull, PRO HAC VICE, Paul O. Paradis, PRO HAC VICE, Michael A. Schwartz, PRO HAC VICE, Gina M. Tufaro, PRO HAC VICE, HORWITZ, HORWITZ LAW FIRM - NEW YORK, New York, NY; Brant C. Martin, WICK, PHILLIPS LAW FIRM, Dallas, TX; James E. Miller, PRO HAC VICE, SHEPHERD FINKELMAN LAW FIRM, Chester, CT.

For General Motors, Saturn, Defendants: Rodney M. Confer, Jocelyn W. Golden, KNUDSEN, BERKHEIMER LAW FIRM, Lincoln, NE; Timothy A. Daniels, PRO HAC VICE, A. Erin Dwyer, PRO HAC VICE, Amanda Sotak, PRO HAC VICE, FIGARI, DAVENPORT LAW FIRM, Dallas, TX.

**JUDGES:** [**1] John G. Heyburn II, Chairman.

**OPINION BY:** John G. Heyburn II

**OPINION**

## [*1367] TRANSFER ORDER

**Before the entire Panel:** Plaintiff in an action pending in the District of Nebraska has moved, pursuant to *28 U.S.C. § 1407*, to centralize this litigation in that district. No responding party opposes centralization, although defendants General Motors Corp. and Saturn Corp. are neutral as to a transferee district.

This litigation currently consists of three actions, two actions in the Northern District of Illinois and the action in the District of Nebraska, as listed on Schedule A.

[*1368] After considering the argument of counsel, we find that these three actions involve common questions of fact, and that centralization under *Section 1407* in the District of Nebraska will serve the convenience of the parties and witnesses and promote the just and efficient conduct of the litigation. All of these actions arise from allegations that certain Saturn vehicles have defective metal timing chains and oiler nozzles (a mechanism that is supposed to lubricate the timing chain). Centraliza-

536 F. Supp. 2d 1367, *; 2008 U.S. Dist. LEXIS 15362, **

tion under *Section 1407* will eliminate duplicative discovery, prevent inconsistent pretrial rulings, and conserve the resources of the parties, their counsel **[**2]** and the judiciary.

We are persuaded that the District of Nebraska is an appropriate transferee district for pretrial proceedings in this litigation, because the first-filed action was brought there and it is movant's unopposed choice.

IT IS THEREFORE ORDERED that, pursuant to *28 U.S.C. § 1407*, the two actions listed on Schedule A and pending outside the District of Nebraska are transferred to the District of Nebraska and, with the consent of that court, assigned to the Honorable Laurie Smith Camp for coordinated or consolidated pretrial proceedings with the action pending in that district and listed on Schedule A.

PANEL         ON         MULTIDISTRICT
LITIGATION

/s/ John G. Heyburn II

John G. Heyburn II

Chairman

## SCHEDULE A

*Northern District of Illinois*

Linda S. Marchetta v. General Motors Corp., et al., C.A. No. 1:07-5362

William P. Anderson v. Saturn Corp., C.A. No. 1:07-6213

*District of Nebraska*

Amy Faust v. General Motors Corp., et al., C.A. No. 8:07-298

# EXHIBIT B TO PROOF OF CLAIM

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| AMY FAUST, on behalf of herself and all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | 8:07CV298 |
| vs. | ) ) | CONSOLIDATION ORDER |
| GENERAL MOTORS CORPORATION and SATURN CORPORATION, | ) ) ) | |
| Defendants. | ) | |
| LINDA S. MARCHETTA, on behalf of herself and all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | 8:08CV78 |
| vs. | ) ) | CONSOLIDATION ORDER |
| GENERAL MOTORS CORPORATION and SATURN CORPORATION, | ) ) ) | |
| Defendants. | ) | |
| AMY FAUST, on behalf of herself and all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | 8:08CV79 |
| vs. | ) ) | CONSOLIDATION ORDER |
| GENERAL MOTORS CORPORATION and SATURN CORPORATION, | ) ) ) | |
| Defendants. | ) | |

Upon review of the parties' Joint Status Conference Hearing Report [53], and following a telephone conference with counsel on March 28, 2008,

**IT IS ORDERED:**

1.    The stay ordered on November 30, 2007 in Case No. 8:07CV298 is hereby vacated.

2.    Cases Nos. 8:07CV298, 8:08CV78 and 8:08CV79 are hereby consolidated for discovery, trial, and all other purposes. The cases will be tried to a jury in Omaha, Nebraska.

3.    Case No. 8:07CV298 is hereby designated as the "Lead Case." Cases Nos. 8:08CV78 and 8:08CV79 are hereby designated as the "Member Cases." All future papers filed in this action shall bear the following caption:

| | | |
|---|---|---|
| **In Re Saturn L-Series Timing Chain Products** | ) | **MDL No. 1920** |
| **Liability Litigation** | ) | **8:07CV298** |

The Clerk shall so amend the caption in Case No. 8:07CV298.

3.    The court's CM/ECF System now has the capacity for "spreading" text among the consolidated cases. If properly docketed, the documents filed in the Lead Case will automatically be filed in all Member Cases. To this end, the parties are instructed to file all further documents (except those described in paragraph 4) in the Lead Case, No. 8:07CV298, and to select the option "yes" in response to the System's question whether to spread the text.

4.    Counsel are advised that the spread text feature **may not** be used to file complaints, amended complaints, and answers; to pay filing fees electronically using pay.gov; or to file items related to service of process.

5.    If a party believes that an item in addition to those described in paragraph 4 should not be filed in all the consolidated cases, the party must move for permission to file the item in one or more member cases. The motion must be filed in all the consolidated cases using the spread text feature.

**DATED March 28, 2008.**

                              **BY THE COURT:**

                              s/ **F.A. Gossett**
                              **United States Magistrate Judge**

# EXHIBIT C TO PROOF OF CLAIM

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| IN RE SATURN L-SERIES TIMING CHAIN | ) | MDL No. 1920 |
| | ) | |
| PRODUCTS LIABILITY LITIGATION | ) | 8:07CV298 |

### SCHEDULING ORDER

Upon the consolidation of Cases Nos. 8:07CV298, 8:08CV78 and 8:08CV79,

**IT IS ORDERED:**

    1.  By agreement of the parties, the firm of **Car & Reinbrecht, PC** is hereby appointed as Liaison Counsel for plaintiffs and the Class. The firms of **Horwitz, Horwitz & Paradis**, Attorneys at Law, and **Shepherd Finkelman Miller & Shah, LLC** are hereby appointed Co-Lead Counsel for plaintiffs and the Class.

    2.  Pursuant to the parties' agreement, plaintiffs Marchetta and Anderson shall voluntarily dismiss their actions pending in the Northern District of Illinois without prejudice.

    3.  Plaintiffs and other individuals shall file their Consolidated Amended Complaint no later than **May 12, 2008**.

        a.  Defendants shall respond to the Consolidated Amended Complaint no later than **June 11, 2008**.

        b.  Any opposition to any Motion to Dismiss shall be filed no later than **July 11, 2008**.

        c.  Defendants' reply brief in further support of any Motion to Dismiss shall be filed no later than **July 28, 2008**.

    4.  The parties shall exchange initial disclosures pursuant to Fed. R. Civ. P. 26(a)(1) within fourteen (14) days of the filing of plaintiffs' Consolidated Amended Complaint, but must receive permission from the court before conducting any other discovery.

5.    A telephonic status conference will be held on **Thursday, June 26, 2008 at 11:00 a.m.** (Central Daylight Time).  The court will make the arrangements for the conference call. Counsel who intend to participate shall so notify chambers at (402) 661-7340 by the close of business on Monday, June 23, 2008.

**DATED March 28, 2008.**

> **BY THE COURT:**
>
> **s/ F.A. Gossett**
> **United States Magistrate Judge**

-2-

# EXHIBIT D TO PROOF OF CLAIM

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| IN RE SATURN L-SERIES TIMING | ) | MDL No. 1920 |
| CHAIN PRODUCTS LIABILITY | ) | |
| LITIGATION | ) | |
| | ) | 8:07CV298 |
| This document relates to: | ) | |
| ALL ACTIONS | ) | Jury Trial Demanded |
| (8:07cv298, 8:08cv78, 8:08cv79) | ) | |
| | ) | |

## PLAINTIFFS' CONSOLIDATED AMENDED COMPLAINT

## TABLE OF CONTENTS

NATURE OF THE ACTION...................................................................  1

THE PARTIES.................................................................................  2

JURISDICTION AND VENUE..............................................................  8

SUBTANTIVE ALLEGATIONS.............................................................  9

I.    THE 2.2 LITER ECOTEC L61 ENGINE.............................  9

    A.    Engine Operation................................................  9

    B.    The Need for a Properly Operating Engine
         Timing System.................................................  11

    C.    The Timing Chain...............................................  15

    D.    The Timing Chain Oiling Nozzle............................  19

II.    DEFENDANTS DESIGN SATURN VEHICLES WITH
    A STEEL TIMING CHAIN IN ORDER TO MARKET
    THE TIMING CHAIN AS A SELLING FEATURE..........................20

III.    DEFENDANTS HAD ACTUAL KNOWLEDGE THAT
    STEEL TIMING CHAINS ON SATURN VEHICLES
    WOULD BREAK IF NOT SUBJECT TO A CONSTANT
    FLOW OF OIL AT LEAST AS EARLY AS JUNE 1997....................23

        Despite Knowledge of this Design Defect in All 1991-1996
        Saturn Vehicles Defendants Failed to Recall these Vehicles
        or Accept Financial Responsibility ................................  25

IV.    IN ORDER TO ELIMINATE ENGINE NOISE SATURN
    RE-DESIGNED THE TIMING CHAIN USED IN ITS VEHICLES
    FOR MODEL YEAR 1999 AND SACRIFICED THE STRENGTH
    OF THE TIMING CHAIN.................................................  28

V.    THE 2.2L ECOTEC L61 ENGINES IN THE CLASS VEHICLES
    WERE DEFECTIVELY DESIGNED.........................................  29

    The Timing Chain..........................................................  29

    The Oiling Nozzle.........................................................  30

VI.     DEFENDANTS HAVE ADMITTED THAT THE TIMING
        CHAINS AND OILING NOZZLES WERE DEFECTIVELY
        DESIGNED...................................................................................30

VII.    DEFENDANTS HAD ACTUAL KNOWLEDGE OF THE FACT
        THAT THE TIMING CHAINS AND OILING NOZZLES
        WERE DEFECTIVELY DESIGNED BECAUSE OF THE DELUGE
        OF COMPLAINTS CONCERNING BROKEN TIMING CHAINS.......  33

                Consumers Post Scores of Complaints of Broken
                Timing Chains in Class Vehicles on NHTSA's
                and Various Consumer Websites.......................................  33

VIII.   DEFENDANTS SECRETLY RE-DESIGN THE DEFECTIVE
        TIMING CHAINS AND OILING NOZZLES BUT CONTINUE
        TO DENY THE EXISTENCE OF A DEFECT OR LIABILITY
        TO CLASS VEHICLE OWNERS................................................  48

                Defendants Advise Saturn Dealers in June 2003
                of "Design Changes" to the Timing Chains
                and Oiling Nozzles...........................................................48

IX.     CLASS VEHICLE OWNERS' COMPLAINTS MOUNT
        AS DEFENDANTS CONTINUE TO PUBLICLY DENY
        LIABILITY FOR REPAIRING CLASS VEHICLES
        WHILE SECRETLY ADMITTING A DEFECT.............................  50

        A.      NHTSA Begins an Investigation of Timing Chain
                Breakages in 2000 - 2003  Saturn L- Series
                and 2003 Saturn Ion Vehicles.........................................  50

        B.      NHTSA Grants the Petition and Opens
                Preliminary Evaluation to Assess the Defect.........................  51

        C.      GM's Response to NHTSA's Information Request
                Admits that Defendants had Actual Knowledge
                of the Design Defect in the Class Vehicles as Early as 1999........  51

        D.      NHTSA Upgrades the Investigation Based
                on the High Rate of Consumer Complaints............................  56

X.      IN ORDER TO AVOID THE EXPENSE OF A NHTSA
        MANDATED RECALL OF ALL CLASS VEHICLES
        DEFENDANTS INSTITUTE A LIMITED RECALL.............    57

XI.     DEFENDANTS LIMITED RECALL OF THE DEFECTIVE
        CLASS VEHICLES IS UNTIMELY AND IGNORES
        HUNDREDS OF THOUSANDS OF DEFECTIVE
        CLASS VEHICLES..................................    58

        A.    The Limited Recall is Contrary to TSB 03-06-01-017
              and Clearly Evidences Defendants' Wrongful Conduct
              by Their Refusal to Accept Financial Responsibility
              for the Defective Timing Chains and Oiling Nozzles.........    59

        B.    All of the Class Vehicles Are Defectively Designed..........    59

TOLLING OF THE STATUTE OF LIMITATIONS.......................    62

CLASS ACTION ALLEGATIONS.............................................    63

COUNTS..................................................................    65

PRAYER FOR RELIEF...................................................    106

CERTIFICATE OF SERVICE

EXHIBIT

Plaintiffs William Anderson, Jeremy Bauer, Antonio Burgos, Jennifer Cardwell, Amy Faust, Blain Fowler, Jesus Leal, Jeanne Menzer, Charles Reid, Debra Stoffer and Cynthia Scott ("Plaintiffs"), individually, and on behalf of all other persons similarly situated, by their undersigned counsel, allege the following, upon personal knowledge as to each of their own acts, and upon information and belief as to all other matters. Plaintiffs' information and belief is based on the investigation conducted by their counsel.

## NATURE OF THE ACTION

1.      Plaintiffs bring this action both individually and as a class action against defendants General Motors Corporation ("GM") and Saturn Corporation ("Saturn") (collectively, "Defendants") on behalf of themselves and similarly situated persons and entities who purchased or leased a (i) model year 2000 - 2003 Saturn L-Series; (ii) model year 2002 - 2003 Saturn Vue; or (iii) model year 2003 Saturn Ion, each equipped with a 2.2 Liter, 4-cylinder, 137-horsepower dual-overhead-cam, Ecotec L61 Engine (the "2.2L Ecotec L61 Engine") and a GM production part number 90537338 steel timing chain (the "Timing Chain") and a GM production part number 90537476 timing chain oiling nozzle (the "Oiling Nozzle") (collectively, the "Class Vehicles") in the states of Alaska, Arkansas, California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Mexico, New Jersey, New York, North Carolina, North Dakota, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Texas, Utah, Vermont, Virginia, Washington, West Virginia, Wisconsin, Wyoming, and the

District of Columbia (collectively, the "Class States"), and whose Timing Chain has failed (the "Class"). Excluded from the Class Vehicles and the Class are certain 2001 Saturn L-Series vehicles within the following VIN breakpoints: 1Y504884 through 1Y559453 (the "Recalled Vehicles").

2.      As demonstrated herein, the Class Vehicles are defectively designed because they were equipped with Timing Chains and Oiling Nozzles that were not capable of withstanding normal operation.

3.      As a result of this defect, the Timing Chains on the Class Vehicles have failed, causing damages to Plaintiffs and the Class.

4.      Despite Defendants' actual knowledge of the design defect, since as early as 1999, Defendants have failed to, *inter alia*, recall the Class Vehicles in order to retrofit them with non-defective parts and reimburse Class members for the costs incurred in repairing the damage to their Class Vehicles caused by the Timing Chains breaking.

5.      As a result of the acts alleged herein, Defendants have violated the laws governing implied warranties, unjust enrichment and consumer protection, as set forth herein.

## THE PARTIES

6.      Plaintiff William Anderson is a resident of Waukegan, Illinois. Plaintiff Anderson is a consumer who purchased a Saturn L-Series Class Vehicle, model year 2002 L200, VIN 1G8JT54F32Y522109, equipped with a 2.2L Ecotec L61 Engine, Timing Chain and Oiling Nozzle, from Saturn of Gurnee, IL, on or about October 12, 2001. Plaintiff was operating his Class Vehicle on or about June 17, 2007, when the Timing Chain broke, damaging the engine and causing the Class Vehicle to stop

operating, necessitating repairs costing over $3,700. According to the "2002 L-Series Maintenance Schedule," which accompanied the "2002 L-Series Owner's Handbook," the Timing Chain on this Class Vehicle required neither inspection nor replacement during the life of the Class Vehicle.

      7.    Plaintiff Jeremy Bauer is a resident of Independence, Missouri. Plaintiff Bauer is a consumer who purchased a Saturn L-Series Class Vehicle, model year 2002 L200, VIN 1G8JU54F42Y515038, equipped with a 2.2L Ecotec L61 Engine, Timing Chain and Oiling Nozzle, from Saturn of Blue Springs, MO, on or about September 8, 2005. Plaintiff Bauer was operating his Class Vehicle on or about July 17, 2007, when the Timing Chain broke, damaging an engine valve and causing the Class Vehicle to stop operating, necessitating repairs costing over $2,600. According to the "2002 L-Series Maintenance Schedule," which accompanied the "2002 L-Series Owner's Handbook," the Timing Chain on this Class Vehicle required neither inspection nor replacement during the life of the Class Vehicle.

      8.    Plaintiff Antonio Burgos is a resident of Houston, Texas. Plaintiff Burgos is a consumer who purchased a Saturn L-Series Class Vehicle, model year 2002 L200, VIN 1G8JU54F42Y530989, equipped with a 2.2L Ecotec L61 Engine, Timing Chain and Oiling Nozzle, from Saturn of Monroeville, Monroeville, PA, on February 14, 2002. Plaintiff Burgos was operating his Class Vehicle on or about January 24, 2008, when the Timing Chain broke, damaging engine valves and causing the Class Vehicle to stop operating, necessitating repairs costing over $900.00. According to the "2002 L-Series Maintenance Schedule," which accompanied the "2002 L-Series Owner's Handbook,"

the Timing Chain on this Class Vehicle required neither inspection nor replacement during the life of the Class Vehicle.

9.    Plaintiff Jennifer Cardwell is a resident of Lincoln, Nebraska. Plaintiff Cardwell is a consumer who purchased a Saturn L-Series Class Vehicle, model year 2000 LS1, VIN 1G8JU52F2YY668378, equipped with a 2.2L Ecotec L61 Engine, Timing Chain and Oiling Nozzle, from Saturn of Lincoln, NE, on November 27, 2000. Plaintiff Cardwell was operating her Class Vehicle on or about January 4, 2008, when the Timing Chain broke, damaging engine valves and causing the Class Vehicle to stop operating, necessitating repairs costing over $2,700. According to the "2000 L-Series Maintenance Schedule," which accompanied the "2000 L-Series Owner's Handbook," the Timing Chain on this Class Vehicle required neither inspection nor replacement during the life of the Class Vehicle.

10.    Plaintiff Amy Faust is a resident of Omaha, Nebraska. Plaintiff Faust is a consumer who purchased a Saturn L-Series Class Vehicle, model year 2000 LS1, VIN 1G8JU52F4YY671508, equipped with a 2.2L Ecotec L61 Engine, Timing Chain and Oiling Nozzle, from Rhoden Auto in Council Bluffs, Iowa, a GM certified used car dealer, on August 6, 2003. Plaintiff Faust was driving her Class Vehicle on November 16, 2006, when the Timing Chain broke, damaging the engine beyond repair and causing the Class Vehicle to stop operating. According to the "2000 L-Series Maintenance Schedule," which accompanied the "2000 L-Series Owner's Handbook," the Timing Chain on this Class Vehicle required neither inspection nor replacement during the life of the Class Vehicle.

11.    Plaintiff Blain Fowler is a resident of Milwaukee, Wisconsin.  Plaintiff
Fowler is a consumer who purchased a Saturn Vue Class Vehicle, model year 2002, VIN
5GZCZ23D72S824547, equipped with a 2.2L Ecotec L61 Engine, Timing Chain and
Oiling Nozzle, from GM dealer Meyer Motors in Plymouth, WI, on June 9, 2003.
Plaintiff Fowler was driving his Class Vehicle on March 23, 2008, when the Timing
Chain broke, causing extensive damage to the engine and causing the Class Vehicle to
stop operating, necessitating repairs costing over $2,700.  According to the "2002 Saturn
Vue Maintenance Schedule," which accompanied the "2002 Saturn Vue Owner's
Handbook," the Timing Chain on this Class Vehicle required neither inspection nor
replacement during the life of the Class Vehicle.

12.    Plaintiff Jesus Leal is a resident of Land O'Lakes, Florida.  Plaintiff Leal
is a consumer who purchased a Saturn L-Series Class Vehicle, model year 2001 L200,
VIN 1G8JU54F41Y583982, equipped with a 2.2L Ecotec L61 Engine, Timing Chain and
Oiling Nozzle, from Saturn of Doral, in Miami, FL, on June 1, 2001.  Plaintiff Leal was
driving his Class Vehicle on June 11, 2007, when the Timing Chain broke, causing
extensive damage to the engine and causing the Class Vehicle to stop operating,
necessitating repairs costing over $2,400.  According to the "2001 L-Series Maintenance
Schedule," which accompanied the "2001 L-Series Owner's Handbook," the Timing
Chain on this Class Vehicle required neither inspection nor replacement during the life of
the Class Vehicle.

13.    Plaintiff Jeanne Menzer is a resident of El Cajon, California. Plaintiff
Menzer is a consumer who purchased a Saturn L-Series Class Vehicle, model year 2002
L100, VIN 1G8JS54F82Y517099, equipped with a 2.2L Ecotec L61 Engine, Timing

Chain and Oiling Nozzle, from Saturn of El Cajon, in El Cajon, CA, on September 3, 2005. Plaintiff Menzer was driving her Class Vehicle on April 17, 2008, when the Timing Chain broke, damaging the engine and causing the Class Vehicle to stop operating, necessitating repairs costing over $1,900. According to the "2002 L-Series Maintenance Schedule," which accompanied the "2002 L-Series Owner's Handbook," the Timing Chain on this Class Vehicle required neither inspection nor replacement during the life of the Class Vehicle. Pursuant to the requirements of the Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750 *et seq.*, Plaintiff Menzer provided Defendants with statutory notice of her claims individually and on behalf of California consumers, as well as the opportunity to cure, but, to date, Defendants have failed or refused to take any effective remedial action. Plaintiff Menzer's jurisdictional declaration under the requirements of the CLRA is attached hereto as an Exhibit.

14.    Plaintiff Charles Reid is a resident of Southern Pines, North Carolina. Plaintiff Reid is a consumer who purchased a Saturn L-Series Class Vehicle, model year 2001 L200, VIN 1G8JU52F61Y583548, equipped with a 2.2L Ecotec L61 Engine, Timing Chain and Oiling Nozzle, from Saturn of Fayetteville, in Fayetteville, NC, on May 26, 2001. Plaintiff Reid was driving his Class Vehicle on October 20, 2006, when the Timing Chain broke, damaging the engine and causing the Vehicle to stop operating, necessitating repairs costing over $1,800. According to the "2001 L-Series Maintenance Schedule," which accompanied the "2001 L-Series Owner's Handbook," the Timing Chain on this Class Vehicle required neither inspection nor replacement during the life of the Class Vehicle.

15.    Plaintiff Cynthia Scott is a resident of Waterford, Michigan. Plaintiff Scott is a consumer who purchased a Saturn L-Series Class Vehicle, model year 2002 L200, VIN 1G8JU54FX2Y533749, equipped with a 2.2L Ecotec L61 Engine, Timing Chain and Oiling Nozzle, from Saturn of Farmington Hills, in Farmington Hills, MI, on November 9, 2001. Plaintiff Scott was driving her Class Vehicle on September 25, 2007, when the Timing Chain broke, damaging an engine valve and causing the Class Vehicle to stop operating, necessitating repairs costing over $2,200. According to the "2002 L-Series Maintenance Schedule," which accompanied the "2002 L-Series Owner's Handbook," the Timing Chain on this Class Vehicle required neither inspection nor replacement during the life of the Class Vehicle.

16.    Plaintiff Debra Stoffer is a resident of Elkhart, Indiana. Plaintiff Stoffer is a consumer who purchased a Saturn L-Series Class Vehicle, model year 2002 L200, VIN 1G8JU54F12y539875, equipped with a 2.2L Ecotec L61 Engine, Timing Chain and Oiling Nozzle, from Battjes Pontiac, in Elkhart, IN, on February 17, 2005. On March 18, 2008, Plaintiff Stoffer's parked Class Vehicle would not start. The Class Vehicle was towed to Saturn of Michiana, which informed Plaintiff Stoffer that the Timing Chain had broken, damaging the engine and causing the Vehicle to stop operating, and necessitating repairs costing over $1,200. According to the "2002 L-Series Maintenance Schedule," which accompanied the "2002 L-Series Owner's Handbook," the Timing Chain on this Class Vehicle required neither inspection nor replacement during the life of the Class Vehicle.

17.    Defendant GM is a company that maintains its corporate headquarters at 300 Renaissance Center, Detroit, Michigan, 48265, and is incorporated in Delaware. GM

is primarily engaged in the worldwide development, manufacturing and marketing of vehicles. GM sells vehicles in North America under the following brands: Chevrolet, Pontiac, GMC, Buick, Cadillac, Saturn, Saab, and Hummer. GM sells vehicles globally under the following brands: Opel, Vauxhall, Holden, Saab, Buick, Chevrolet, GMC, Cadillac and Daewoo.

18.    Defendant Saturn is a wholly owned subsidiary of GM that maintains its corporate headquarters at Spring Hill, Tennessee, 37174. Saturn is primarily engaged in the development, manufacturing and marketing of vehicles throughout North America, including the Class Vehicles.

## JURISDICTION AND VENUE

19.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because, *inter alia*, certain of the Plaintiffs and Defendants are citizens of different states and the amount in controversy is in excess of $5,000,000.

20.    Venue is properly laid in this district pursuant to 28 U.S.C. 1407 and the Judicial Panel on Multidistrict Litigation Transfer Order dated February 19, 2008, and because Defendants do business, including advertising, marketing, distribution and sales of the Class Vehicles in this judicial district, are subject to personal jurisdiction in this judicial district and/or maintain contacts in this judicial district sufficient to subject Defendants to personal jurisdiction.

## SUBSTANTIVE ALLEGATIONS

21.    In order to gain an understanding of the design defect alleged herein, it is helpful to first examine the integral automotive parts and processes involved in the Class

Vehicles, including: (i) the 2.2L Ecotec L61 Engine and the combustion process; (ii) the

engine timing system; (iii) the timing chain; and (iv) the timing chain oiling nozzle.

## I.    THE 2.2 LITER ECOTEC L61 ENGINE

22.    The Class Vehicles are equipped with GM manufactured 2.2L Ecotec L61

Engines.

### A.    Engine Operation

23.    The 2.2L Ecotec L61 Engine is an internal combustion engine, which

internally combines fuel and oxygen to create a combustion process (or cycle) that

generates the power necessary to move the Class Vehicles.  Figure 1 below illustrates a

generic internal combustion engine.

**Figure 1**



24.    The first step in the combustion cycle is called the *intake stroke*.  The

piston, a solid cylindrical piece of metal that moves up and down inside the cylinder,

starts at the top of the cylinder and moves downward to allow the engine to take in a cylinder full of fuel and air. The second step is called the *compression stroke*. The piston travels up the cylinder to compress the fuel and air mixture produced during step one. This motion is made possible by the crankshaft, a steel rod connected to the piston *via* the connecting rod. Figures 2 and 3 below depict the intake stroke and the compression stroke, respectively.

**Figure 2**                    **Figure 3**



25.    The third step in the combustion cycle transpires the moment the piston reaches the top of its compression stroke. The gasoline and air mixture gets ignited at this point by means of the spark plug. It is crucial that the ignition occurs at the correct moment in order to create the force needed to fully push the piston back down the cylinder. Once the piston hits the bottom of the cylinder, the fourth and final stroke, called the *exhaust stroke*, enables the release of the exhaust *via* an exhaust valve that shifts open, creating an aperture in the cylinder upon the conclusion of step three. The release of the exhaust is illustrated below in Figure 4.

**Figure 4**



26.    The foregoing cycles ensure the constant production of energy that is required to power the Class Vehicles.

B.    **The Need for a Properly Operating Engine Timing System**

27.    Opening and closing the intake and exhaust valves in precise synchronization with the up and down strokes of the pistons requires very accurate timing.

28.    Automobile engines can be classified as either free-running (non-interference) or interference, depending on what occurs if piston/valve synchronization is lost due to failed timing. As illustrated below in Figures 5 and 6, an interference engine, like the 2.2L Ecotec L61 Engine, usually sustains damage to the valves, pistons and/or cylinders if synchronization is lost due to timing chain failure, which likely results in very expensive engine repairs.

**Figure 5:  No Valve/Piston Inference**



**Figure 6:  Valve/Piston Interference**



29.    At idle, the time interval between valve openings for each cylinder is typically about a fifth of a second.  At 5,000 rpm, it is about two hundredths of a second.

30.    The instant at which the valves open and close affects engine performance, fuel economy, emissions, and, in interference engines, whether the valves and pistons will sustain damage from contact.  Accordingly, accurate timing is essential.

31.    On the intake side, valve timing not only determines how much air/fuel mixture is drawn into each cylinder, but also how efficiently the mixture is used.  When the piston starts down on its intake stroke, the intake valve must open quickly so that a full cylinder worth of air/fuel mixture will be drawn in, a necessity that becomes more acute as engine speed increases.  If the valve does not open soon enough, there may not

12

be enough time to fill the cylinder completely before the piston starts back up and the valve closes, reducing compression and power. If the valve opens too soon, the piston may still be completing its exhaust stroke, which would push exhaust back into the intake manifold, thereby interfering with efficient engine breathing.

32.    On the exhaust side, timing is equally important. If an exhaust valve opens too soon, the still expanding gases can escape from the cylinder prematurely, wasting power. If the exhaust valve opens too late, the engine will also have to work that much harder to pump the remaining exhaust gases from the cylinder. And, if the exhaust valve remains open too long, there will be excessive "overlap" with the opening of the intake valve, excessively allowing unburned fuel to be drawn right through the engine.

33.    The ignition system (the third cycle) has to work in perfect concert with the rest of the engine. The goal is to ignite the fuel at exactly the right time so that the expanding gases can do the maximum amount of work. If the ignition system fires at the wrong time, power will fall and gas consumption and emissions can increase.

34.    There is a small delay from the time of the spark to the time when the fuel/air mixture is all burning and the pressure in the cylinder reaches its maximum. If the spark occurs right when the piston reaches the top of the compression stroke, the piston will have already moved down part of the way into its power stroke before the gases in the cylinder have reached their highest pressures.

35.    To make the best use of the fuel, the spark should occur before the piston reaches the top of the compression stroke, so that by the time the piston starts down into its power stroke, the pressures are high enough to start producing useful work.

13

36.    The timing system of the engine, therefore, ensures that the various operations of the combustion cycle, which are described above, occur at the correct time, and in the correct sequence. Since the operations of the combustion cycle are interdependent, the timing system ensures that the operations are properly timed during engine performance. Figure 7 below illustrates the components of an engine's timing system.

**Figure 7: View of Timing System (without Timing Chain/Belt)**



37.    The major components of the timing system are as follows: the camshaft (or, in the case of the 2.2l Ecotec L61 Engine, an intake camshaft and an exhaust camshaft), the crankshaft, the main drive sprocket, the camshaft sprocket(s), the timing chain (or belt), and the tensioner.

38.    The camshaft is manufactured as a long steel rod and it is the part of the engine that rotates to push against the exhaust and intake valves in order to fully open them and allow the excess exhaust to be exhaled from the cylinder. The camshaft has protruding lobes that spin together with the rotation of the camshaft. These lobes are

responsible for opening and closing the exhaust and intake valves by pushing against the valves in time with the piston's motion.

39.     The piston's motion is made possible by the crankshaft. Attached to the crankshaft is the main drive sprocket. The sprocket has small protruding metal spikes, called teeth, that turn the crankshaft in tandem with the camshaft.

40.     Attached to the camshaft(s) is the camshaft sprocket(s). This sprocket has teeth similar to the main drive sprocket. The sprocket on the camshaft is larger than the main drive sprocket. This larger sprocket has exactly double the amount of teeth than the main drive sprocket. Two full revolutions of the main drive sprocket will equal one full revolution of the larger camshaft sprocket.

C.      **The Timing Chain**

41.     A timing chain is a series of traveling journal bearings with a means to engage the teeth of a sprocket and transmit force and motion. Because each chain joint is a bearing, proper lubrication is essential to obtain the maximum service life from a chain drive.

42.     In the internal combustion engine, the timing chain (or belt) connects the crankshaft to the camshaft(s) which, in turn, controls the opening and closing of the engine's valves. A four-stroke engine requires that the valves open and close once every other turn of the crankshaft. The timing chain accomplishes this task. It has custom teeth to turn the camshaft(s) synchronized with the crankshaft and is specifically designed for a particular engine. *See* Figure 8 for a view of the timing system with the timing chain/belt attached.

**Figure 8:  Timing System Showing the Timing Chain/Belt**



43.    The timing chain, which rotates the camshaft(s) and crankshaft, is fastened to the main drive sprocket on one end and to the crankshaft sprocket(s) on the other. Figure 9(a) is a picture of a 2.2L Ecotec L61 Engine showing how the Timing Chain attaches to the intake (top right) and exhaust (top left) camshaft sprockets and thereby turns the camshafts.

**Figure 9(a)**



44.    The timing chain has evenly situated holes that engage the teeth on the two sprockets.  A timing chain connected to the camshaft sprocket and the main drive (crankshaft) sprocket is illustrated below as Figure 9(b).

**Figure 9(b)**



45.    Figure 9(c) is a picture of a 2.2L Ecotec L61 Engine with the Timing Chain attached to the intake camshaft sprocket (top right), exhaust camshaft sprocket (top left) and crankshaft sprocket (bottom center).

**Figure 9(c)**



46.    The timing chain should allow for proper timing between the camshaft(s) and the crankshaft, which, in turn, controls the opening and closing of the engine valves. The valves must open and close once for every two turns of the crankshaft so that the pistons controlled by the crankshaft can make two full strokes through the cylinder during each cycle.

47.    The timing chain tensioner guide (visible in the center of 9(c) pushing against the Timing Chain), which is pushed forward by the timing chain tensioner, ensures the proper amount of timing chain tension.

48.    The 2.2L Ecotec L61 Engine uses a hydraulic tensioner and a tension lever to keep the timing chain taut.  Tension is critical and must be properly maintained in order to ensure that all the teeth on the sprockets are engaged and not skipped over by the timing chain.  Any slippage (due to lack of proper tension) can result in: (a) the chain

falling off the sprockets; (b) the timing chain breaking; and (c) potentially disastrous timing problems, including the opening of the exhaust valve during compression, or the closing of the exhaust valve after the exhaust stroke. If the timing chain is excessively loosened or stretched, the chain can slap into the chain guides. This can cause the engine to run with excessive noise or, in many situations, can completely stall the engine.

### D.    The Timing Chain Oiling Nozzle

49.    Oil is the life-blood of the engine. An engine running without oil will last about as long as a human without blood. Oil is pumped under pressure to all the moving parts of the engine by an oil pump. The oil pump is mounted at the bottom of the engine in the oil pan and is connected by a gear to either the crankshaft or the camshaft. This way, when the engine is turning, the oil pump is pumping.

50.    The timing chain must stay well lubricated. Proper lubrication is essential to obtain the maximum service life from a timing chain. The majority of chain drives (including timing chains) will perform better and last longer when properly lubricated. Chain lubrication is needed primarily to slow the wear between the pins and bushings in the chain joints. Lack of proper lubrication can cause increased friction and power consumption and cause a harmful temperature rise in the steel of the timing chain.

51.    Excessive heat causes the metal on the timing chain to bend, stretch and/or become brittle, thereby causing the timing chain to slip off the teeth of the sprockets, or to break completely. An oiling nozzle is placed above the chain, for the primary purpose of ensuring that the chain receives proper lubrication. Engine oil is fed to the oiling nozzle by the oil pump. *See* Figure 10 for a picture of the Oiling Nozzle (in black bolted to the 2.2L Ecotec L61 Engine over the crankshaft sprocket).

**Figure 10**



## II.    DEFENDANTS DESIGN SATURN VEHICLES WITH A STEEL TIMING CHAIN IN ORDER TO MARKET THE TIMING CHAIN AS A SELLING FEATURE

52.    GM, which marketed the Saturn brand as the "Best Overall Value" in its class, highlighted the inclusion of a steel timing chain, as opposed to a rubber timing belt, in Saturn vehicles as a selling point in the marketing materials used to advertise its model year 1998 and 1999 Saturn vehicles.

53.    The advantage of a timing chain over a timing belt is clear.  Normally, a timing chain does not require replacement, whereas a timing belt requires scheduled replacement at 60,000 to 90,000 miles.  If a timing chain requires replacement, it is usually a complicated and costly procedure.  Moreover, if the engine is an "interference engine," like the 2.2L Ecotec L61 Engines in the Class Vehicles, the failure of the timing

chain or belt will likely cause parts such as pistons and valves to collide with costly consequences.

54.    Saturn marketing materials repeatedly highlighted the fact that Saturn vehicles were equipped with steel timing chains. For example, Saturn's Brochure for model year 1998 vehicles dubbed, "A Moment in Time, Saturn MY1998," prominently (at p. 8) extolled the virtues of a steel timing chain:

> **Every Saturn has a tough, <u>long-lasting</u> steel timing chain. Why steel? One reason is that <u>rubber timing belts break more easily</u>. And when they break, they <u>can cause bent valves and costly engine work</u> (never mind the belt's replacement cost).**

(Emphasis added.)

55.    In the Brochure for Saturn's 1999 model year cars, entitled, "How a Different Kind of Car Company Makes a Different Kind of Car," Saturn again highlighted the virtues of a steel timing chain:

> **Our steel timing chain is <u>more durable</u> than the rubber timing belt you'll find in other cars . . ..**

(Emphasis added.)

56.    The Brochure went on to proclaim:

> **Steel Timing Chain.** Instead of a rubber timing belt, we use a durable steel timing chain (it operates camshafts and controls valve operation), **<u>which requires virtually no maintenance</u>.**

(Emphasis added.)

57.    Saturn dealers routinely proclaimed the virtues of a steel timing chain in the Class Vehicles. For example, one owner of a Class Vehicle reported that, "I can still hear my Saturn Salesperson singing the advantage of having a 'maintenance free' chain that will 'never break'. Thank God mine broke while still under warranty (just barely)."

*See* www.Saturnfans.com/forums. Another owner of a Class Vehicle stated, "I have to admit that I felt that Saturn betrayed us; when two of my kids bought Saturns the dealership was bragging about the timing chain . . .." (*Id.*)

58.    Moreover, the Brochures for each of the Class Vehicles, on the "Specifications" page, prominently stated that the 2.2L Ecotec L61 Engines contained a "steel timing chain."

59.    There can be no doubt that that the steel Timing Chains in the Class Vehicles were proclaimed (and intended) by Defendants to last the life of the Class Vehicles. According to the "Maintenance Schedules," which accompanied each of the Class Vehicles' "Owner's Handbooks," the Timing Chains on the Class Vehicles required neither inspection nor replacement, regardless of how many miles the Class Vehicles were driven.

60.    The Maintenance Schedules accompanying each of the Class Vehicles instructs the owners of the Class Vehicles on what maintenance needs to be done on the Class Vehicles at specified mileage throughout the life of the Class Vehicle:

> This Maintenance Schedule card tells you the maintenance services you should have done and when you should schedule them.
>
> . . . .
>
> The services shown in this schedule up to 150,000 miles (250,000 km) should be performed after 150,000 miles (250,000 km) at the same intervals.

61.    The Maintenance Schedule instructs owners of the Class Vehicles that, for example, they need to "Lubricate door hinges, check links, hood and sunroof" at 6,000 miles; "Rotate tires" at 18,000 miles; "Inspect brake system" at 90,000 miles; "Inspect vacuum lines/hoses every 24 months or 30,000 miles."

62.    With respect to the "3.0L V6 Engine Only" (optional equipment on the Class Vehicles), which came equipped with a timing belt instead of a Timing Chain, the Maintenance Schedule directs, "Replace timing Belt" at 100,000 miles.

63.    The Timing Chains, however, are not mentioned anywhere in the Maintenance Schedules. There is no indication that the Timing Chains need inspection or replacement – ever – leading to only one intended conclusion, that the Timing Chains were to last the life of the Class Vehicles.

64.    Moreover, the Saturn Brochure announcing the introduction of the L-Series vehicles assured consumers:

> In the end, L-Series test-drivers had logged more than one million miles on the odometer in the blazing hot Australian Outback and frosty Kapuskasing, Canada. If there's a better way of putting all of cars' components and systems to the test, we have yet to find it.

III.    **DEFENDANTS HAD ACTUAL KNOWLEDGE THAT STEEL TIMING CHAINS ON SATURN VEHICLES WOULD BREAK IF NOT SUBJECT TO A CONSTANT FLOW OF OIL AT LEAST AS EARLY AS JUNE 1997**

65.    Beginning in the early 1990s, Defendants began receiving complaints from consumers concerning the failures of timing chains in Saturn vehicles.

66.    The following are a sampling of consumer complaints available on the National Highway Traffic Safety Administration's ("NHTSA") website from owners of Saturn model years 1991 – 1995 vehicles, whose timing chains broke during the mid-1990s (emphasis added):

23

| | |
|---|---|
| **Make:** | SATURN |
| **Mode :** | SL2 |
| **Year:** | 1993 |
| **VIN:** | 1G8ZJ5572PZ... |
| **Manufacturer :** | GENERAL MOTORS CORP |
| **ODI ID Number :** | 602879 |
| **Date of Failure:** | February 8, 1995 |
| **Component:** | ENGINE AND ENGINE COOLING |
| **Summary:** | **TIMING CHAIN REPLACED**. |

| | |
|---|---|
| **Make:** | SATURN |
| **Model:** | SC2 |
| **Year:** | 1994 |
| **VIN:** | 1G8ZH1571RZ. |
| **Manufacturer:** | GENERAL MOTORS CORP |
| **ODI ID Number:** | 532271 |
| **Date of Failure:** | February 27, 1995 |
| **Component:** | ENGINE AND ENGINE COOLING |
| **Summary:** | **TIMING CHAIN FAILED.** |

| | |
|---|---|
| **Make :** | SATURN |
| **Model :** | SL1 |
| **Year :** | 1995 |
| **VIN:** | 1G8ZH5283SZ... |
| **Manufacturer :** | GENERAL MOTORS CORP |
| **ODI ID Number :** | 741803 |
| **Date of Failure :** | September 19, 1995 |
| **Component:** | ENGINE AND ENGINE COOLING |
| **Summary:** | THIS CAR HAS CONSTANTLY HAD PROBLEMS SINCE THE **TIMING CHAIN WENT AT 15,000 MILES**. I'D LIKE MORE INFORMATION CONCERNING ENGINE FAILURES ON 1995 SATURNS. THAT IS THE ONLY YEAR THEY MANUFACTURED THIS PARTICULAR ENGINE AND AM INTERESTED TO KNOW WHY, SINCE I COMING ACROSS LARGE AMOUNTS OF ENGINE COMPLAINTS FOR THIS YEAR.*AK |

| | |
|---|---|
| Make : | SATURN |
| Model : | SC2 |
| Year : | 1994 |
| VIN: | n/a. |
| Manufacturer : | GENERAL MOTORS CORP |
| ODI ID Number : | 815019 |
| Date of Failure: | July 27, 1997 |
| Component: | ENGINE AND ENGINE COOLING |
| Summary: | THE **TIMING CHAIN WENT OUT** AND CAUSED THE ENGINE TO FAIL. *AK. |

| | |
|---|---|
| Make : | SATURN |
| Model : | SL1 |
| Year : | 1994 |
| VIN: | 1G8ZG5599RZ. |
| Manufacturer : | GENERAL MOTORS CORP |
| ODI ID Number : | 549313 |
| Date of Failure: | n/a |
| Component: | ENGINE AND ENGINE COOLING |
| Summary: | **TIMING CHAIN FAILED**. NLM |

| | |
|---|---|
| Make : | SATURN |
| Model : | SL |
| Year : | 1995 |
| VIN: | 1C8ZH1576RZ. |
| Manufacturer : | GENERAL MOTORS CORP |
| ODI ID Number : | 540907 |
| Date of Failure: | November 6, 1997 |
| Component: | ENGINE AND ENGINE COOLING |
| Summary: | **TIMING CHAIN WORE PREMATURELY**. |

**Despite Knowledge of this Design Defect in All 1991-1996
Saturn Vehicles Defendants Failed to Recall these Vehicles
or Accept Financial Responsibility**

67.    In June 1997, in response to these and other consumer complaints, and
instead of issuing a recall, GM and Saturn issued Technical Service Bulletin ("TSB") No.
97-T-15A, directed to Saturn dealerships.  This TSB instructed Saturn mechanics how to
fix the problem, **at the vehicle owner's expense**, once a Saturn owner brought in a
Saturn with a broken timing chain.  TSB 97-T-15A informed automotive service
technicians that for all "1991 – 1996 Saturns":

A design change to the oil pump cover was made during the 1996 model year to **help lubricate the timing chain system by directing a constant flow of oil onto the timing chain**.

(Emphasis added.)

68.    TSB 97-T-15A went on to instruct automotive technicians that when servicing a timing chain on all Saturn vehicles built from 1991 through 1996, a new timing chain kit, including the new oil pump cover, should be used.

69.    Since TSB 97-T-15A was not a recall, but only a notice to Saturn mechanics of what should be done when repairing a timing chain on Saturn vehicles manufactured from 1991 through 1996, owners of these Saturn vehicles continued to experience timing chain failures after issuance of the Technical Service Bulletin, which had to be repaired at the owner's expense (since Saturn refused to accept responsibility or acknowledge a defect), as demonstrated by this sample of consumer complaints on the NHTSA website **after** the fix was implemented (emphasis added):

| | |
|---|---|
| **Make :** | SATURN |
| **Model :** | SL1 |
| **Year :** | 1994 |
| **VIN:** | 1G8ZH5595RZ. |
| **Manufacturer :** | GENERAL MOTORS CORP |
| **ODI ID Number :** | 720617 |
| **Date of Failure:** | **February 22, 2000** |
| **Component:** | ENGINE AND ENGINE COOLING |
| **Summary:** | MY CAR'S **TIMING CHAIN AND ASSEMBLY EXPLODED KILLING THE ENGINE** OF THE SATURN SL1 I HAVE OWNED FOR LESS THAN ONE YEAR. THE EXTENDED SERVICE PLAN WAS 12 MONTHS OR 12,000 MILES AND I HAVE DRIVEN ABOUT 15,000 MILES. THE CAR HAD ABOUT 65,000 MILES WHEN I BOUGHT IT FROM SATURN OF LEWISVILLE. THE CAR IS CURRENTLY AT A SATURN DEALER CALLED SATURN OF IRVING IN TEXAS. I FEEL THAT SATURN HAS A MEASURE OF RESPONSIBILITY FOR THIS. I CAN NOT FIND ALL MY RECEIPTS BUT DO HAVE SOME SHOWING MAINTENANCE I HAVE DONE AND THE EMMISSIONS TEST |

RESULTS FROM 12/29/99. I HAVE BEEN TALKING WITH SATURN SINCE 2/24/00. SATURN SENT A SAMPLE OF THE OIL FOR TESTING ON 2/25/00 WITH A PROMISE OF RESULTS WITHIN A WEEK. I AM STILL WAITING! I HAVE A WRITTEN STATEMENT FROM A FIRESTONE ON THE INITIAL CONDITION OF THE CAR AFTER THE FAILURE AS THEY WERE THE FIRST TO SEE THE CAR. *AK.

| | |
|---|---|
| Make : | SATURN |
| Model : | SL1 |
| Year : | 1994 |
| VIN: | 1G8ZH5595RZ. |
| Manufacturer : | GENERAL MOTORS CORP |
| ODI ID Number : | 838618 |
| Date of Failure : | **May 12, 1999** |
| Component: | ENGINE AND ENGINE COOLING |
| Summary: | **TIMING CHAIN BROKE,** CAUSING LOUD NOISE. ALSO, THERE IS SOME PROBLEM WITH THE ENGINE AS A WHOLE DUE TO THE TIMING CHAIN BELT BREAKING. *AK |

| | |
|---|---|
| Make : | SATURN |
| Model : | SL2 |
| Year : | 1994 |
| VIN: | 1G8ZK557XRZ. |
| Manufacturer : | GENERAL MOTORS CORP |
| ODI ID Number : | 10112407 |
| Date of Failure : | **January 1, 1998** |
| Component: | ENGINE AND ENGINE COOLING |
| Summary: | IN JAN. 1998 **MY TIMING CHAIN BROKE AND CRACKED MY ENGINE AND VALVE COVER.** PRIOR TO THIS I DID TAKE MY CAR TO THE DEALER WHO STATES TIMING CHAIN REPLACEMENT OR NEW ENGINE IF TIMING CHAIN BREAKS. BEING THAT MY SATURN SL2 WAS A 1994 IT WAS FUNNY THAT SO SOON TIMING CHAIN PROBLEMS OCCURRED. MY TIMING CHAIN DID BREAK, AND I WAS UNABLE TO GET IT REPAIRED INTIL 2001 BY THE LOCAL DEALER WITH A USED ENGINE THAT LEAKED OIL EVERY WHERE I PARKED, MY COMPLAINTS YIELDED NO RESULTS. NEEDLESS TO SAY I WAS ABLE TO CONTINUE DRIVING THE CAR WHICH BEGAN TO OVERHEAT, COOLING FAN FAILED AND IN AUGUST 2004, THE TIMING CHAIN ON THE OTHER USED ENGINE STARTED TO RATTLE AND ALSO BROKE, SO TODAY I AM |

27

CARLESS AND DON'T KNOW WHERE TO BEGIN. OBVIOUSLY THERE IS A PROBLEM WITH THESE SATURN TIMING CHAINS. IS THERE AN INVESTIGATION ONGOING?*AK

## IV.    IN ORDER TO ELIMINATE ENGINE NOISE SATURN RE-DESIGNED THE TIMING CHAIN USED IN ITS VEHICLES FOR MODEL YEAR 1999 AND SACRIFICED THE STRENGTH OF THE TIMING CHAIN

70.    Prior to model year 1999, critics and owners of Saturn vehicles often complained of the engine noise of Saturn vehicles.  For model year 1999, Saturn's Brochure acknowledged this fact and heralded its new quieter engine:

**How we found a quieter engine inside a soundproof room.**

Engineers Bob Downs and Dean Hauersperger didn't like what they heard. Noise, more of it than they wanted, coming from the Saturn powertrain... .

Examining the engine part by part, they were able to identify the culprits: the crankshaft, connecting rods and pistons. . . .

. . . . .

Our steel timing chain is more durable than the rubber timing belt you'll find in other cars, but it was a bit too noisy for our taste. This year, we redesigned it with smaller, finer links for a smaller, finer sound.

(Emphasis added.)

71.    This re-designed steel timing chain, with "smaller, finer link[s]," was materially weaker than the prior timing chains found in Saturn vehicles.

72.    The "smaller, finer link[s]," was accomplished by reducing the chain's "pitch" to 8 mm (pitch is the nominal distance between the centers of consecutive chain joints, *i.e.,* the distance between consecutive pins).  Prior to 1999, the pitch in the steel timing chains used by Saturn was approximately 9.5 mm.  In addition, with decreased pitch came a smaller diameter "pin" (the pin is the innermost member of a chain joint,

which articulates inside the bushing), which was approximately 10% smaller than the pin found in the timing chains with the 9.5mm pitch.

73.    As a result of the design change, the new steel timing chain with less pitch and approximately 10% smaller pins was not as strong as the prior steel timing chain with greater pitch and larger pins.

74.    This re-designed timing chain is substantially the same as the Timing Chain that Saturn incorporated into all of the Class Vehicles beginning in model year 1999.

## V.    THE 2.2L ECOTEC L61 ENGINES IN THE CLASS VEHICLES WERE DEFECTIVELY DESIGNED

### The Timing Chain

75.    The Class Vehicles were assembled in 1999 through 2002 (and sold as model year 2000 through 2003) and equipped with the Timing Chain and the Oiling Nozzle.

76.    The Timing Chain in the Class Vehicles was defectively designed because (i) in order to design a quieter timing chain, Defendants sacrificed strength of the Timing Chain for a quieter Timing Chain; and (2) the pins holding the many links on the Timing Chain together were too small and not covered with a sufficient amount of chrome coating to withstand normal operating wear and tear.  More specifically, the pins on the Timing Chain were not properly "chromised," thereby resulting in the inability of the Timing Chain to withstand normal wear and tear.

77.    As a result of the Timing Chains in the Class Vehicles being substantially identical to the weaker timing chains instituted by Saturn in its other vehicles in 1999,

with an 8 mm "pitch" and a 10% smaller diameter "pin," Saturn sacrificed the strength of

the Timing Chains in order to reduce engine noise in its vehicles.

### The Oiling Nozzle

78.    Despite having actual knowledge, since at least as early as in June 1997,

of the need to provide a constant flow of oil to the Timing Chain in order to prevent the

Timing Chains from becoming brittle and breaking, Defendants defectively designed the

Oiling Nozzle in such a manner so as to specifically prevent oil from flowing to the

Timing Chain at low and idle speeds.  This lack of oil caused excessive heat in the

Timing Chains, which caused the metal on the timing chain to bend, stretch and/or

become brittle, thereby causing the Timing Chains to break.

## VI.    DEFENDANTS HAVE ADMITTED THAT THE TIMING CHAINS AND OILING NOZZLES WERE DEFECTIVELY DESIGNED

79.    Defendants have admitted to NHTSA that the defective Oiling Nozzle was

designed with a "pintle valve" and "regulator spring design." A pintle valve is simply a

plug with a spring behind it; when sufficient oil pressure is exerted on the spring, the plug

is pushed forward, allowing oil to flow around the plug.

80.    The purpose of the pintle valve in the Oiling Nozzle is to prevent the flow

of oil to the Timing Chain at low and idle speeds.

81.    A side effect of the inclusion of the pintle valve is that the orifice through

which oil flowed into the pintle valve was so small as to further restrict the flow of oil

through the Oiling Nozzle.

82.    Because of these defects in the Oiling Nozzle, up to ten (10) times less oil

flowed to the Timing Chain at low and idle speeds than was necessary to keep the Timing

Chains properly lubricated.  Figure 10(a) shows the brass washer on the opening of the

Oiling Nozzle, which was defectively designed to restrict the flow of oil into the Oiling

Nozzle. The pintle valve is located on the inside of the Oiling Nozzle behind the brass

washer.

### Figure 10(a): Oiling Nozzle



83.    Figure 10(b) shows the concave opening of the Oiling Nozzle out of which

oil flows to the Timing Chain once enough oil pressure is exerted to pass the oil through

the brass washer and open the pintle valve.

### Figure 10(b)



84.    Figure 10(c) shows the Oiling Nozzle bolted to the engine block above the crankshaft sprocket, poised to oil the Timing Chain.

**Figure 10(c)**



85.    As admitted by Defendants on April 12, 2006 (¶¶ 106-108 below), this design defect, which restricted the flow of oil to the Timing Chain at low and idle speeds, led to "insufficient lubrication" of the Timing Chain at low and idle speeds, which caused excess friction and heat buildup, thereby causing the Timing Chains to become brittle and break.

86.    As discussed above, Defendants knowingly designed a less robust Timing Chain in order to reduce engine noise in Saturn vehicles.

87.    As a result of the foregoing, Defendants unquestionably knew at the start of production of the Class Vehicles that the Class Vehicles were defectively designed, because Defendants knew: (i) as of June 1997 that, in order to properly lubricate the timing chains, a constant flow of oil onto the Timing Chain was necessary; and (ii) that

they were using an even less robust Timing Chain than was in production prior to 1999,

the result of which was to make it far more likely that these less robust Timing Chains

would break when not properly lubricated.

VII.   **DEFENDANTS HAD ACTUAL KNOWLEDGE OF THE FACT THAT
THE TIMING CHAINS AND OILING NOZZLES WERE DEFECTIVELY
DESIGNED BECAUSE OF THE DELUGE OF COMPLAINTS
CONCERNING BROKEN TIMING CHAINS**

**Consumers Post Scores of Complaints of Broken Timing Chains
in Class Vehicles on NHTSA's and Various Consumer Websites**

88.    The Office of Defects Investigation ("ODI") of NHTSA has been

collecting complaints from owners of Saturn vehicles regarding their defective Timing

Chains from 2000 to the present.   Excerpts of some of these complaints are set forth

below.

| ODI ID # | Comments |
|---|---|
| 10196053 | *THE CONTACT OWNS A 2002 SATURN L200. WHILE PROCEEDING THROUGH A GREEN LIGHT AT 5 MPH, <u>THE VEHICLE SHUT OFF IN THE MIDDLE OF THE INTERSECTION</u>.   THE FAILURE OCCURRED WITHOUT WARNING. WHILE THE VEHICLE COASTED, THE CONTACT WAS ABLE TO TURN THE STEERING WHEEL TO THE RIGHT AND PULL OVER.  **THE VEHICLE WAS TOWED TO THE DEALER WHO DIAGNOSED THE CAUSE OF FAILURE AS THE TIMING CHAIN. THE DEALER FOUND OTHER RELATED FAILURES AS WELL.   THE CONTACT PAID $3,000 FOR THE REPAIR.   THE POWERTRAIN WAS UNKNOWN.  THE CURRENT MILEAGE IS 38,850 AND FAILURE MILEAGE WAS 38,800.** (Emphasis Added) |
| 10115682 | <u>'WHILE DRIVING AT 65 MPH</u> ENGINE FAILED DUE TO TIMING CHAIN WHICH CAUSED THE VALVES IN THE ENGINE TO BEND.  HAD A LOCAL MECHANIC CHECK ENGINE AND WAS TOLD <u>CONSUMER NEEDED A NEW ENGINE.</u> (Emphasis Added) Customer had only 36,000 Miles when the Vehicle failed. |
| 10125864 | STARTED VEHICLE AND LEFT GAS STATION WHEN THE ENGINE QUIT. THE CAR WOULD NOT START AND <u>DID NOT GIVE ANY DIAGNOSTIC INFORMATION ON THE DASH DISPLAY. EVERYTHING LOOKED NORMAL.</u> AFTER SEEING A MECHANIC FOUND OUT THAT THE TIMING CHAIN IS BROKE AND <u>WILL COST ME $3600 TO REPLACE</u> ACCORDING TO THE SATURN DEALER.  AFTER LOOKING AROUND ON THE INTERNET THIS IS A VERY BIG PROBLEM AND IS OCCURING VERY OFTEN.   THERE IS A TECHNICAL SERVICE BULLETIN TO THE SATURN DEALERS, ACCORDING TO A ARTICLE I READ, THAT STATES THAT THERE IS A KNOWN PROBLEM WITH THE OIL SENDING UNIT THAT LUBRICATES THE TIMING CHAIN.  THE OIL SENDING UNIT DOES NOT SUPPLY ENOUGH OIL TO THE TIMING CHAIN CAUSING THE FAILURE.  <u>SATURN NEEDS TO RECALL THIS ENGINE SO PEOPLE LIKE ME WITH A DAUGHTER IN COLLEGE DOES NOT HAVE TO</u> |

| | |
|---|---|
| | OCCUR THIS KIND OF EXPENSE WITH A CAR THAT ONLY HAS 52,000 MILES ON IT. (Emphasis Added) |
| 10126994 | DRIVING DOWN A 4-LANE HIGHWAY AT 60 MPH THE ENGINE JUST QUIT RUNNING.   THERE WERE NO UNUSUAL SOUNDS OR WARNING LIGHTS. LUCKILY, WE WERE ABLE TO COAST OVER TO THE BERM OF THE ROAD OUT OF THE PATH OF TRAFFIC WITHOUT BEING HIT.  THE CAR WAS TOWED TO THE DEALERSHIP. WITHIN APPROXIMATELY 1-2 HOURS OF RECEIVING THE CAR, THE DEALERSHIP INFORMED ME THAT THE TIMING CHAIN HAD BROKE AND DAMAGED SOME VALVES IN THE PROCESS.  THE CAR HAS 53,000 AND IS OUT OF WARRANTY AND THE TOTAL COST FOR REPAIRS WAS $2,300.00.  I INFORMED SATURN THAT I HAVE FOLLOWED BASIC MAINTENANCE ACTIVITIES AND THE CAR IS PRIMARILY DRIVEN TO AND FROM HOME AND THE OFFICE.  IN ADDITION, I INFORMED THEM THAT THERE ARE OTHER DOCUMENTED CASES OF THE TIMING CHAIN FAILURE ON THE INTERNET RANGING FROM 30,000-65,000 MILES.  SATURN SAID THERE IS NOT A PROBLEM WITH THE TIMING CHAIN IN THESE VEHICLES AND "THINGS JUST BREAK".  THEY DID, HOWEVER, WITHIN 24 HRS. OF RECEIVING MY CAR AT THE DEALERSHIP OFFER TO REIMBURSE ME 50% OF THE REPAIR COST.  HOWEVER, WHEN A VEHICLE SUDDENLY LOSES POWER ON A HIGHWAY IT BECOMES A ROLLING DEATH TRAP AND THE PROBLEM WITH THE TIMING CHAINS NEEDS TO BE RECTIFIED BEFORE THE PROBLEMS RESULTS IN A FATALITY. (Emphasis Added) |
| 10112117 | TIMING CHAIN WENT ON MY 2000 SATURN LS JUST AT FIVE YEARS WITH 53,700 MILES SATURN IS TRYING TO SAY ITS MY FAULT FROM 11 MONTHS AGO I DID NOT HAVE THE OIL FLUSHED OUT. BUT IN SEARCHING TO SEE IF I WAS THE ONLY ONE I'M NOT AND THERE HAS BEEN OTHER PROBLEMS THAT WERE COVERED ON AND OFF WARRANTY. I HAVE BROUGHT THIS TO THE ATTENTION OF BBB AND TO MY LOCAL DMV I HOPE THAT YOU CAN DO SOME THING ABOUT THIS BECAUSE WERE GETTING RIPPED OFF. (Emphasis Added) |
| 10047912 | 'WHILE DRIVING AT 65 MPH AND   WITHOUT ANY WARNING, THE VEHICLE   STOPPED STALLED   THERE WAS NO INDICATION THAT ANYTHING WAS WRONG WITH THE VEHICLE. THE VEHICLE WAS TAKEN TO THE DEALER WHO INFORMED THE CONSUMER THAT THE TIMING CHAIN SNAPPED AND A NEW ENGINE WAS NEEDED, (Emphasis Added) |
| 10128706 | 'THE TIMING CHAIN ON MY 2001 SATURN L200 SNAPPED AT 45,000 MILES. I HAD TO HAVE IT TOWED, FIRST TO MY MECHANIC AND THEN TO A SATURN DEALER. THE TIMING CHAIN DAMAGED PARTS OF MY ENGINE AND IT COST ME $2200 TO REPAIR. THERE HAD BEEN A TSB TO UPGRADE THE TIMING CHAIN FOR THIS VEHICLE, BUT OWNERS WERE NOT MADE AWARE OF IT. I WAS TOLD THAT THEY WILL NOT USE THE OLD TIMING CHAIN KIT AS REPLACEMENTS BECAUSE OF THE UPGRADE. SATURN HAS REFUSED ANY MONETARY HELP WITH THIS ISSUE. (Emphasis Added) |
| 10192850 | MY FAMILY AND I WERE TRAVELING ON U.S. 301 AT 9:00 A.M. ON OUR WAY HOME IN OUR 2001 SATURN (L100) COUPE. THERE WAS A CLICKING SOUND COMING FROM THE ENGINE THAT HAD STARTED WHILE DRIVING HOME. WHILE GOING 65 MPH, THERE WAS A POPPING SOUND AND THE OIL LIGHT CAME ON. THE CAR QUICKLY LOST POWER AND FORCED US TO THE SIDE OF THE ROAD. WE WERE SHAKEN BY THE THOUGHT WHAT COULD HAVE HAPPEN IF WE WERE IN AN AREA WITH HEAVY TRAFFIC. I WAS ABLE TO FLAG DOWN A PASSING TOW TRUCK TO HELP US OUT. THE ROAD SERVICE UNIT DROPPED THE CAR OFF AT A LOCAL MECHANIC AND THE FAMILY AT HOME. □THE LOCAL CAR MECHANIC COULD NOT DETERMINE WHAT WAS WRONG WITH THE CAR UNTIL IT WAS TAKEN APART AND EXAMINED. THE FIRST EXAMINATION DETERMINED THAT THE TIMING CHAIN AND HAD FAILED AND WOULD HAVE TO BE REPLACED. THE |

| | |
|---|---|
| | MECHANIC ALSO EXPLAIN THAT THE ENGINE WOULD HAVE TO BE TAKEN APART TO DETERMINE THE EXTENT OF THE DAMAGE. I SAID YES, ALTHOUGH I KNOW IT WOULD BE AN EXPENSIVE REPAIR. **I THOUGHT WITH THE LOW MILES (58,767) ON THE CAR**, THE WORK WOULD BE WORTH WHILE. THE EXAMINATION OF THE ENGINE REVEALED A DAMAGED HEAD AND BENT VALVES. **WHAT LOOKED LIKE A $1000.00 TIMING CHANGE REPLACEMENT QUICKLY WENT TO SEVERAL THOUSAND DOLLARS WORTH OF DAMAGE!** I CALLED THE SATURN DEALER TO SEE ABOUT WARRANTIES THAT WENT WITH THE CAR AND WHAT HELP THEY COULD PROVIDE. THEY EXPLAIN THAT THEY COULDN'T CONSIDER A WARRANTY WITHOUT FIRST EXAMING THE CAR IN THEIR OWN SHOP AND HAVING ALL THE MAINTENANCE RECORDS PROVIDED TO THEM. WITH THE ADDITIONAL TOWING FEES, EXAMINATION FEES FROM THE LOCAL MECHANIC, AND NO GURANTEES FROM THE SATURN DEALER; I DECIDE TO ALLOW THE LOCAL MECHANIC TO DO THE WORK. **THE FOLLOWING PARTS HAD TO BE REPLACE DUE TO THE 'PREMATURE" FAILURE OF THE TIMING CHAIN: HEAD, HEAD GASKET, VALVE GASKET, FRONT COVER GASKET, TIMING CHAIN KIT, VALVES, BELT, SPARK PLUGS, WIRE SET, FILTER, OIL, AND ANTIFREEZE. THE TOTAL BILL CAME TO $ 2,480.80.** THE CAR IS RUNNING FINE NOW. (Emphasis Added) |
| 10179145 | I HAVE A 2001 SATURN L SERIES. A FEW MONTHS AGO I STARTED HEARING LITTLE NOISES IN THE ENGINE WHEN IT WAS COLD, AND AS THE ENGINE WARMED UP THE NOISE WOULD STOP. I HAVE THE CAR SERVICED PRETTY REGULARLY, AND HAVE NOT HAD ANY BAD EXPERIENCES WITH THE CAR. 2 DAYS AGO, **I DROVE ONE MILE FROM MY WORK, AND WITH NO WARNING AT ALL I HEARD A LOUD POP IN THE ENGINE AND EVERYTHING STOPPED. I WAS SURPRISED TO KNOW THAT THE TIMING CHAIN HAD BROKE** AND THE REAR CAM WAS COMPLETELY FROZEN. I HAD THE CAR TOWED TO MY HOUSE AND THERE IT WILL SIT FOR AWHILE. **I CANNOT AFFORD TO FIX IT AS THE ESTIMATED COST TO JUST GET INTO IT IS $400, AND THEN MOST LIKELY WILL NEED A NEW ENGINE. I AM ON A MODEST INCOME, AND I AM STILL MAKING PAYMENTS ON THIS VEHICLE AND HAVE TO CONTINUE TO MAKE PAYMENTS ON A CAR I CAN'T DRIVE. THIS IS MY PRIMARY TRANSPORTATION TO AND FROM WORK, SO IT WILL MOST LIKELY AFFECT MY LIVELIHOOD.** I CONTACTED SATURN AND THEY TOLD ME THEY HAD NOT SERVICED THE CAR SINCE 2001 AND PRETTY MUCH I WAS ON MY OWN. I HAD SERVICED THE CAR REGULARLY, BUT NOT AT THE DEALERSHIP. **THIS HAPPENED AT 89000 MILES.** I THINK THAT SATURN SHOULD STAND BEHIND THIS PROBLEM AS IT IS A SAFETY ISSUE. APPARENTLY BY THE RESEARCH I HAVE DONE, THIS IS A COMMON PROBLEM WITH SATURNS AND I WANT THEM TO REPLACE MY ENGINE, PARTS AND LABOR AND STAND BEHIND THEIR WORK AS WELL, **I FEEL LIKE WITH ALL THE COMPLAINTS THAT THERE SHOULD BE A RECALL, AS WELL AS A CLASS-ACTION SUIT AGAINST SATURN.** (Emphasis Added) |

89.    A sampling of complaints NHTSA received from owners of Saturn Vue

Class Vehicles similarly report the following information:

| | |
|---|---|
| **Make :** | SATURN |
| **Model :** | Vue |
| **Year :** | 2002 |
| **VIN :** | 5GZCZ33D82S. |
| **Manufacturer :** | GENERAL MOTORS CORP |
| **ODI ID Number :** | 0162604 |
| **Date of Failure:** | December 1, 2002 |
| **Component:** | ENGINE AND ENGINE COOLING |
| **Summary:** | THE CONTACT STATED THE VEHICLE HAS IMING CHAIN FAILURE WHICH CAUSES VEHICLE TO STALL. THE CHECK ENGINE LIGHT ILLUMINATED AND THE DEALER CANNOT FIND THE CAUSE OF THE ILLUMINATION. THE TRANSMISSION ALSO HAS PROBLEMS AS WELL AS THE BRAKES |

| | |
|---|---|
| **Make :** | SATURN |
| **Model :** | Vue |
| **Year :** | 2003 |
| **VIN :** | n/a. |
| **Manufacturer :** | GENERAL MOTORS CORP |
| **ODI ID Number :** | 10166400 |
| **Date of Failure:** | December 4, 2004 |
| **Component:** | ENGINE AND ENGINE COOLING |
| **Summary:** | I WENT OUT TO START MY CAR. IT MADE A SOUND LIKE IT WAS A DIESEL TRUCK ENGINE. I HAD IT TOWED TO SATURN IN NORWOOD MA ON RT 1. IT WAS MY TIMING CHAIN. IT WAS COVERED UNDER WARRANTY. I AM JUST REPORTING THIS NOW BECAUSE I SAW YOU WERE INVESTIGATING THE BELTS ON OTHER SATURN'S. I READ THAT IT HADN'T EFFECTED THE VUE BUT I WANTED YOU TO KNOW IT DOES. I AM LOOKING UP PROBLEMS WITH THIS CAR BECAUSE I HAVE HAD SO MANY. THE INCIDENT DATE IS ESTIMATED. I PICK MY VUE UP(AGAIN) TODAY FROM THE DEALER I WILL GET A PRINT OUT OF THE EXACT DATE THIS OCCURRED. *JB |

| | |
|---|---|
| Make : | SATURN |
| Model : | Vue |
| Year : | 2002 |
| VIN : | 5GZCZ23D72S. |
| Manufacturer : | GENERAL MOTORS CORP |
| ODI ID Number : | 10223559 |
| Date of Failure: | April 6, 2008 |
| Component: | ENGINE AND ENGINE COOLING: ENGINE:GASOLINE:BELTS AND ASSOCIATED PULLEYS |
| Summary: | THE CONTACT OWNS A 2002 SATURN VUE. WHILE DRIVING APPROXIMATELY 40 MPH, THE CHECK ENGINE LIGHT AND THE LOW POWER LIGHT ILLUMINATED ON THE INSTRUMENT PANEL. THE VEHICLE SHUT OFF COMPLETELY AND WOULD NOT RESTART AFTER SEVERAL ATTEMPTS. THE VEHICLE WAS DIAGNOSED AS HAVING TIMING CHAIN FAILURE. THE VIN WAS NOT INCLUDED IN NHTSA CAMPAIGN ID NUMBER 07V519000 (ENGINE AND ENGINE COOLING). THE CURRENT AND FAILURE MILEAGES WERE 125,000. |

| | |
|---|---|
| Make : | SATURN |
| Model : | Vue |
| Year : | 2002 |
| VIN : | n/a. |
| Manufacturer : | GENERAL MOTORS CORP |
| ODI ID Number : | 10212646 |
| Date of Failure: | November 6, 2007 |
| Component: | ENGINE AND ENGINE COOLING: ENGINE:GASOLINE:BELTS AND ASSOCIATED PULLEYS |
| Summary: | THE ONLY "EVENT" WHICH LED TO THE FAILURE WAS ACCELERATING TO THEN MERGE INTO ONCOMING TRAFFIC. THE TIMING CHAIN FAILED/BROKE DURING ACCELERATION WHILE MERGING WITH ONCOMING TRAFFIC. POWER WAS THEN LOST,THE VEHICLE DIED WHILE GOING DOWNHILL. THIS CAUSED LOSS OF FULL BRAKES AND STEERING WHILE THE VEHICLE ROLLED TO A STOP. THE CHAIN THEN DAMAGED MULTIPLE VALVES LEADING TO A POTENTIAL MINIMUM $2000 REPAIR. *TR |

| | |
|---|---|
| Make : | SATURN |
| Model : | Vue |
| Year : | 2002 |
| VIN : | n/a. |
| Manufacturer : | GENERAL MOTORS CORP |
| ODI ID Number : | 10183344 |
| Date of Failure: | February 18, 2007 |
| Component: | ENGINE AND ENGINE COOLING: ENGINE: |
| Summary: | DRIVING AT @ 35 MILES PER HOUR IN OUR 2002 SATURN VUE WHEN IT STOPPED. JUST STOPPED. WAITED 2 HOURS IN FRIGID CONDITIONS FOR A TOW. FOUND OUT THE FOLLOWING DAY THAT THE TIMING CHAIN HAD SNAPPED. THIS IN TURN DAMAGED TWO OF THE ENGINE VALVES CAUSING 1400 DOLLARS IN DAMAGE. VEHICLE HAS ONLY 65,000 MILES. *NM |

| | |
|---|---|
| Make : | SATURN |
| Model : | Vue |
| Year : | 2002 |
| VIN : | 5GZCZ23D62S |
| Manufacturer : | GENERAL MOTORS CORP |
| ODI ID Number : | 10177030 |
| Date of Failure: | December 18, 2006 |
| Component: | ENGINE AND ENGINE COOLING:ENGINE: |
| Summary: | INCIDENT = SECOND INSTANCE IN 54,438 MILES OF: TIMING CHAIN 'SLIPPED' DUE TO LACK OF LUBRICATION. THIS IS ON MY 2002 SATURN VUE, 4 CYL. ENGINE - FRONT WHEEL DRIVE. SATURN BLAMES ME FOR NOT KEEPING UP WITH THE EVERY 3000 MILE OIL CHANGE REQUIREMENT. (AND IS SATISFIED TO LOOK NO FURTHER FOR OTHER CAUSES.) I HAVE SEEN A REPORT, ON THIS SITE, OF AN INVESTIGATION INTO FREQUENT TIMING CHAIN FAILURES IN L-SERIES MODELS (HAVING THE SAME ENGINE). THE REPORT REFERENCES LACK OF OIL FLOW TO THE TIMING CHAIN WHEN OPERATING AT LOW RPM. (THIS IS THE TYPE OF DRIVING I DO.) THE REPORT ALSO REFERENCES "ALL TIMING CHAIN SERVICE KITS NOW AVAILABLE WILL INCLUDE AN OILING NOZZEL, A NEW DESIGN THAT WILL INCREASE OIL FLOW TO THE TIMING CHAIN UNDER LOW RPM OPERATING CONDITIONS". THE FIRST INSTANCE WAS COVERED UNDER WARRANTEE AT 24,663 MILES. THE CURRENT INSTANCE OCCURRED AT 54,438 MI. , AND IS NOW OUT OF WARRANTEE. |

DAMAGE RESULTING = ENGINE DAMAGE FOR
THE SECOND INSTANCE IS "BEYOND REPAIR",
AND I AM TOLD THE ENGINE MUST BE
REPLACED. EVEN THOUGH THE VEHICLE IS
OUT OF WARANTEE, SATURN OFFERS TO PAY
50% OF THE COST OF A REBUILT ENGINE
REPLACEMENT. BUT, I CANNOT AFFORD EVEN
50% AT THIS TIME. I HAVE OPENNED A CASE
WITH SATURN TO GET MORE SUPPORT. THE
CASE IS CURRENTLY AWAITING ACTION BY
THE DISTRICT MANAGER WHO IS ON
VACATION UNTIL THE FIRTST OF THE YEAR.
*NM

Make :            SATURN
Model :           Vue
Year :            2002
VIN :             5GZCZ23D72S
Manufacturer :    GENERAL MOTORS CORP
ODI ID Number :   10223553
Date of Failure:  April 6, 2008
Component:        ENGINE AND ENGINE COOLING:
Summary:          I BEGAN TO HEAR A LITTLE BIT MORE ENGINE
NOISE THAN NORMAL, LIKE A TAPPING NOISE. I
HAD THE OIL CHANGED AS I DID REGULARLY
AND WITHIN MANUFACTURERS
RECOMMENDATION. LOCAL MECHANIC SAID IT
WAS THE TIMING CHAIN AND TO CONTINUE
WITH FREQUENT OIL CHANGES. CAR DIED
WHILE TRAVELING AT 40 MPH LOCALLY ON
THE WEEKEND, BUT COULD HAVE HAPPENED
WHILE TRAVELING 65MPH ON MY WAY TO
WORK IF IT WAS A WEEKDAY. LUCKILY, I WAS
ABLE TO PULL IMMEDIATELY INTO A SIDE
STREET AND HAVE THE CAR TOWED TO LOCAL
GOODYEAR SERVICE CENTER. I'VE SEEN
INTERNET POSTINGS CITING THE SAME
PROBLEMS ON SATURN MODELS WITH THE
SAME ENGINE. THERE MAY EVEN BE A RECALL
FOR THE L-CLASS SATURN CARS WITH THE
SAME ENGINE AND NOT THE VUE? *TR

| | |
|---|---|
| Make : | SATURN |
| Model : | Vue |
| Year : | 2002 |
| VIN : | 5GZCZ23D72S |
| Manufacturer : | GENERAL MOTORS CORP |
| ODI ID Number : | 10215980 |
| Date of Failure: | January 18, 2008 |
| Component: | ENGINE AND ENGINE COOLING:ENGINE: |
| Summary: | THE CONTACT OWNS A 2002 SATURN VUE. WHILE DRIVING APPROXIMATELY 60 MPH, THE CONTACT NOTICED THAT THE ENGINE AND REDUCED POWER LIGHTS ILLUMINATED ON THE INSTRUMENT CONTROL PANEL. THE VEHICLE COMPLETELY LOST POWER. THE CONTACT HAD TO SHIFT INTO NEUTRAL IN ORDER TO PULL OFF THE ROAD. THE VEHICLE WAS TOWED TO A LOCAL DEALER AND THEY STATED THAT THE TIMING CHAIN FAILED. SHE HAS PICTURES OF THE FAILED COMPONENT. THE CONTACT FILED A FORMAL COMPLAINT WITH THE MANUFACTURER. THE FAILURE AND CURRENT MILEAGES WERE 117,000. UPDATED 02/15/08. *LJ |

| | |
|---|---|
| Make : | SATURN |
| Model : | Vue |
| Year : | 2002 |
| VIN : | 5GZCZ23D52S |
| Manufacturer : | GENERAL MOTORS CORP |
| ODI ID Number : | 10198171 |
| Date of Failure: | July 27, 2007 |
| Component: | ENGINE AND ENGINE COOLING |
| Summary: | THE CONTACT OWNS 2002 SATURN VUE. WHILE DRIVING 70 MPH, HE HEARD A NOISE IN THE ENGINE. THE CHECK ENGINE AND REDUCE POWER LIGHT WERE ALSO ILLUMINATED. THE VEHICLE DRIFTED INTO THE SLOW LANE ALLOWING HIM TO STOP. THE VEHICLE WOULD NOT RESTART. THE VEHICLE WAS TOWED AND THE MECHANIC STATED THAT FAULTY WIRING CAUSED THE FAILURE. THE MECHANIC REPAIRED THE WIRING; HOWEVER, THE TIMING CHAIN FELL OFF. VEHICLE MAINTENANCE HAS BEEN UP TO DATE SINCE HE PURCHASED THE VEHICLE. THE TIMING CHAIN SHOULD NOT HAVE FAILED DUE TO THE MILEAGE. THE CURRENT AND FAILURE MILEAGES WERE 88,165. |

| | |
|---|---|
| Make : | SATURN |
| Model : | Vue |
| Year : | 2002 |
| VIN : | 5GZCZ23D92S. |
| Manufacturer : | GENERAL MOTORS CORP |
| ODI ID Number : | 10192916 |
| Date of Failure: | June 4, 2007 |
| Component: | ENGINE AND ENGINE COOLING |
| Summary: | THE TIMING CHAIN ON MY 2002 SATURN VUE, THAT HAS ONLY 55,000 MILES ON IT, BROKE, CAUSING THE ENGINE TO BE DESTROYED. (ENGINE DESTROYED WAS VERIFIED BY THE DEALERSHIP I TOOK IT TO, THEY SAID IT WAS SOMETHING THEY HAD NEVER SEEN HAPPEN, YET I SEE MANY COMPLAINTS ABOUT THEIR L SERIES HERE. MY CAR HAS THE SAME ENGINE AS IT WAS THE FIRST YEAR THE VUE WAS MADE AND THE ENGINE WAS THE SAME AS THE L SERIES THAT YEAR). *TR |

| | |
|---|---|
| Make : | SATURN |
| Model : | Vue |
| Year : | 2002 |
| VIN : | JT4RN81A1N0. |
| Manufacturer : | GENERAL MOTORS CORP |
| ODI ID Number : | 10169554 |
| Date of Failure: | September 26, 2006 |
| Component: | ENGINE AND ENGINE COOLING |
| Summary: | 2002 SATURN VUE (65,000 MILES) MAKING NOISE. WOULD NOT START, TOWED TO MECHANIC. TIMING CHAIN FAILURE CAUSING ENGINE DAMAGE. ESTIMATED COST IS $3000; LOSS OF VEHICLE FOR AT LEAST A WEEK WHILE BEING REPAIRED. CURRENTLY AT THE MECHANICS AWAITING REPAIR. *JB |

| | |
|---|---|
| Make : | SATURN |
| Model : | Vue |
| Year : | 2002 |
| VIN : | 5GZCZ63B92S. |
| Manufacturer : | GENERAL MOTORS CORP |
| ODI ID Number : | 10168290 |
| Date of Failure: | August 25, 2006 |
| Component: | ENGINE AND ENGINE COOLING |
| Summary: | WHILE DRIVING ON THE HIGHWAY, OUR 2002 VUE MADE A GRINDING NOISE AND THEN BEGAN TO LOSE POWER. AS WE WERE PULLING OFF TO THE SIDE, THE VEHICLE STALLED AND THEN WOULD NOT RE-START. THE SATURN |

41

DEALERSHIP TOWED THE VUE TO THEIR LOT AND INFORMED US , THAT THE TIMING CHAIN HAD SKIPPED AND BLEW THE MOTOR. THE TIMING CHAIN WAS SUPPOSED TO BE NO MAINTENANCE AND DIDN'T EVEN NEED TO BE CHECKED UNTIL 100,000 MILES. MY VUE HAD 65,000 MILES. AFTER 3 WEEKS WE WERE TOLD THAT THEY WOULD REBUILD THE ENGINE AT A COST OF $3500- $3800 AND SATURN WOULD PAY HALF OF THAT COST. SEVERAL WEEKS PRIOR, THE VEHICLE WAS STALLING WHILE DRIVING AND WOULD NOT RESTART UNTIL IT COOLED OFF. WE TOOK IT TO THE DEALERSHIP AND THEY REPLACED A SENSOR FOR THE CAM SHAFT. THE SWITCH FOR THE BACK WIPER HAS BEEN REPLACED AND WE WERE TOLD BY SATURN TECH'S THAT THE MOTOR FOR THE BACK WIPER ALSO NEEDS TO BE REPLACED, AGAIN AT OUR COST. *JB

90.    Consumer websites are inundated with consumer complaints of Saturn Class Vehicles with broken Timing Chains. The following are a sampling from http://www.topix.com/forum/state/nc/T7FEOD6MENJBK4OGA/p4:

| | |
|---|---|
| | Reply » |
| | *Mar 4, 2007* |
| Walt<br>*Birmingham,<br>MI* | I want to encourage everyone that had a timing chain issue with his or her Saturn L200 or LW200 to write to the NHTSA. When my chain broke last December (on a 50 MPH 2-lane highway), I wrote to the NHTSA to complain. Just this week (March 2 2007), the NHTSA responded for a request for additional information. They stated that the case has been re-opened do to the growing number of reported chain failures. They are especially interested in chains that broke while the car was on the road.(GM maintains it is not a safety issue as the chain usually breaks at start up.) While it cost ~$2500 to fix our car, I am more concern with the safety aspect. We came close on being hit when our chain broke. We need to give the NHTSA enough information to force GM to fix this problem before someone gets hurt or worse. The NHTSA web site is http://www.nhtsa.dot.gov . |
| Dennis P<br>*Brigham City,<br>UT* | *Mar 13, 2007*<br>I have a 2001 LS200, it has 155,000 miles and at 75,000 the timing chain had to be replaced, just like clockwork at 150,000 it had to be replaced again. Each time cost me about $600. |
| James<br>Lanning<br>*Greenville, SC* | *Mar 15, 2007*<br>I had a Saturn 2002 LS200, it hit 75000 miles and the timing chain broke. The dealer give me a price of $2941.40 for a rebuild motor with a one year warranty. They told me the chain broke because I went over the 3000 mile oil change to many times. That was bull and they knew it when they told me. Thats why I said I had a Saturn, I now have another Hyundai. |
| Wesley<br>DeVries<br>*Waterford,<br>Canada* | *Mar 29, 2007*<br>2002 Saturn. Just broke the timing chain at 160,000 KM. I've had a lemon Windstar & Caravan! You'd think i would have learned.<br><br>I bought a Honda. Life is better now! |
| J Tohlen<br>*Langhorne,<br>PA* | *Mar 31, 2007*<br>Mine 2002 Saturn L200, timing chain broke, absolutely no warning whatsoever, 51000 Miles while doing about 65 miles an |

hour. Never forget the Saturn service manager saying well you should have heard or noticed something wrong, not to mention her refusal to acknowledge the TSB that I found on the oil nozzle. After screaming at Saturn customer service and the regional Saturn representative they did it as if I had the worst possible extended warranty, so my rebuilt engine only cost me 2000 bucks. I loved my Saturn up to that very minute the chain broke, but considering one of the major reasons I picked it over the Accord was the fact it had a chain the Accord still had a belt, after that I could care less about the car and will never buy another Saturn.

**A Props**
*Mulberry, IN*
Apr 9  2007
Has anyone found out if the timing chain has been recalled? I have a 2000 LS1 and it just stopped and won't start. We checked the starter and battery. Both are fine. My husband thinks it is the timing chain.

**brazzle**
*Tors Cove,*
*Canada*
Apr 23, 2007
I have a 2001 l2oo, my timming chain broke last week and desroyed the heads .... it is 499.99+tax for the chain kit but i got lucky with an engine with only 15,000kms for 640.00+tax...the car only had 120,000kms...there is definitly a problem with these cars and satum refuses to do anything about it....needless to say SATURN SUCKS!!!!!!

**Wayne**
*Schaumburg,*
*IL*
Apr 25, 2007
Timing chain broke on my 2001 LS200 with 78,000 well maintained miles. Problem was defective oil nozzle which is a well documented problem. Saturn never issued a recall and is soaking all us poor slobs, even going so far as to blame US for not changing oil properly (apparently, this is the Corporate response to all their loyal customers!) Needlee to say, I will NEVER purchase another GM or Saturn vehicle and am in the process of taking them to small claims court (had to pay $3,100 for a USED engine!) I suggest everyone write to the NHTSA and the Attorney General's office regarding this scam.

**John**
*AOL*
My timing chain broke driving down a two lane highway yesterday, May 11, 2007. There was no warning, the dealership has told me it will be $2300.00 to fix. Out of warranty. I definitely feel it is a safety issue. GM needs to warn and recall. My 2002 L series has less than 40, 000 miles.

**Harold**
*Billerica, MA*
May 15, 2007
I have a 2000 LS with a timing chain which was just told may have jumped and caused the values to bend $$$$ I called Saturn of Medford MA and they said they can do nothing for me.

**tasher**
*Moline, MI*
May 19, 2007
I took my 2003 Saturn Ion in because of engine noise. I have always changed my oil regulary and only have 20,600 miles on the car, have never had any warning lights come on and it has always shown that it is operating at proper operating temperatures.

I first took it to a local mechanic and they said they thought the timing chain was going and suggested I take it to Saturn and that I shouldn't drive it to prevent further damage.

I contacted Saturn and was told by Customer Satisfaction and by the Service Manager that they would help me. They agreed that the mileage was awfully low to be having this kind of problem.

Now I am being blamed for the problem "oil deprevation". The entire engine needs to be replaced. I don't think I should be responsible for the defects the car obviously has. If I were to get the car fixed, I don't think I could trust to drive it again. In another 20,000 miles is it going to happen again?

I'm not getting anywhere with Saturn. If anyone has any suggestions, any advise would be greatly appreciated.

91.    The following is a sampling of the 122 consumer complaints of broken Timing Chains on Vue, Ion and L-Series Class Vehicles, which caused thousands of dollars of damages to Class Vehicles, as well as complaints of GM's refusal to take responsibility for repairing the damaged vehicles.

*See* http://www.carsurvey.org/viewmorecomments_review_56674_5.html:

**31st Mar 2007, 14:31**
On March 29, I was sitting in my 2001 Saturn L-100 waiting for traffic to clear. I stepped on the gas and the engine revved up as usual, and the car accelerated almost to highway speed. At about 45 mph, the car completely lost power and I coasted it to the side of the road. The problem? You guessed it, timing chain failure. I will be going to the local dealership on Monday, but I have very little hope that the problem will be solved to my satisfaction. I will be keeping you all posted on the results of the visit.

**1st Apr 2007, 01:46**
OK. Yet another one. Friday morning my L200 wouldn't start - made a whirring sound and the engine didn't turn over. Had it towed to the dealer and same story.

1400 to take apart the motor and see what the damage is. JUST TO SEE WHAT IT IS. 4k to fix it probably.

They also said that it would be worth something as a trade in if I want a new car.

Fine. My car is paid for- I'm going to go there this week and sell it to them for whatever they want it as a trade.

I'm probably never going to buy a Saturn again

**14th Apr 2007, 12:11**
April 14, 2007

This will be short. Read any of the aforementioned horror stories and it would be the same as mine. My 2001 L200 Saturn with 54,000 miles had its timing chain go yesterday and I have no idea of the cost of repairs as of yet. It went out at 40 MPH while driving in heavy traffic on Hwy 101 in Washington State. So far $116.00 tow bill. I will get on the phone on Monday April 16,2007 to start my round of complaints.

**27th Apr 2007, 11:18**
Ditto on another timing chain problem: 2000 Saturn LS1 @ 80,000 miles. In the shop with $1400 repair estimate and no help from Saturn.

**13th May 2007, 14:49**
My timing chain broke driving down a two lane highway May 11, 2007. There was no warning. The dealership has told me it will be $2300.00 to fix. Out of warranty. I definitely feel it is a safety issue. GM needs to warn and recall. My 2002 L series has less than 40, 000 miles. It looks like I am the latest in a long

line of owners who have had this problem I will be contacting NHTSA this week

**13th Jun 2007, 16:07**

I am yet another Saturn 2000 L Series owner with a failed timing chain at 46322 miles. It is very sad to see how GM's Saturn Division has turned their backs on an obvious design flaw that they created. We all bought their products based upon their track record of being honest and responsible. This is why my company car is a Nissan. GM, wake up, do the right thing and compete rather then complain. I don't have much faith that they will, but I wonder if they care?

**22nd Jun 2007, 09:06**

What august company I find myself in - we had a failure while in operation at 84,700 while in Richmond on April 17, 2007 on our 2001 L200, bought new from Saturn of Fairfax in June 2001. It was the 2nd of what would become four Saturn purchases between 1999 and 2004. I was pulling out of a stop sign, when poof! Was told on April 19, 2007 by Saturn of Manassas that the chain is to be replaced at the 90,000 mile scheduled service, an interval not yet reached. The vehicle had a 60000 mile car-care/extended warranty plan on it - and it seems certain that Saturn knew of the problem well before that period expired.

Saturn, aside from being inept in the customer assistance center in Tennessee, has taken to offering a pittance of 15% off of a warranty price, still totalling some $3000. Their "area managers" won't give a last name and claim they have no supervisor. When pressed, they give up the name of the General Manager of Saturn Corporation. I had 9 pages of email thread on my case with them - they pretend to be a liaison between customer and local facility, yet they did a very poor job at that.

Their General Manager (Jill Lajdziak) will not answer letters, nor will the higher-ups at GM whom it was copied to - G. Richard Wagoner, Jr., Troy A. Clarke and Mark R. LaNeve. It has been four weeks since my four-page letter to Ms. Lajdziak was received by Fedex - nothing. I was so annoyed at the lack of response that I sent a fresh letter just to Mr. LaNeve yesterday by FedEx, and then heard him on the Sean Hannity show yesterday afternoon. (My only contact since then? A postcard from Saturn of Manassas on June 12, 2007 advertising new car lease rates!)

I have taken to blogging about my poor experience at http://dontbuysaturn.blogspot.com/, as I feel it is important that the story be told of how GM will not stand behind their product. I filed my own NHTSA complaint on May 18, 2007 after Saturn made its insulting offer.

I fear for the safety of my family in our remaining Saturn, a 2004 VUE AWD V6, for I have lost faith in Saturn and GM. I suppose the only upside is the 2004 year had a Honda engine and transmission. The whole situation, now 66 days and running, has put additional miles on the VUE, as well as the inconvenience of being down to one vehicle.

Rob McKeever, Manassas VA. robmckii@aol.com.

**30th Jun 2007, 19:50**

I've joined the club, and you all have my empathy. Timing chain failed at 80k two days ago. 2001 L200, which I bought used from Saturn almost three years ago with 39k on it. I tried to start it the other day and the chain beat the heck out of the top of the engine. Total repair cost: $2,900. Because it's a holiday week/weekend, I'm waiting for my return call. PLEASE--EVERYONE--make a complaint with NHTSA. I just got back last week from a trip to KY for a funeral and thank God this didn't happen on I-75 in the hills! After reading all these experiences, it is a miracle that no one has died.

**4th Jul 2007, 19:49**

Here we go again... I will not burden everyone with a long story... just read the past entries...It's the same story over and over again... This is almost criminal...2002 Saturn L200 broken timing chain while my 18 Year old daughter was driving through an interstate interchange. Same story as many others... Saturn and dealer denying any responsibility... are you kidding me... we all need to contact our State Attorney Generals and have something done about this... In the meantime NEVER buy a Saturn... especially from Saturn of Medford Massachusetts...

**6th Jul 2007, 15:39**

Just want to add to all the other posts. Saturn 2001 L200 Wagon 88k miles. Timing chain broke while I was traveling around 30 MPH. Lost power steering and brakes, but got it safely parked. Had chain replaced, but now told I have engine damage... extent being determined. Already posted an incident report on the NHTSA site. Never had a single problem other than battery replacement until today.

**11th Jul 2007, 11:28**

May 14, 2007: I am the next victim of the failed timing chain. At 75,000 miles, the engine had only ever had Synthetic Oil and the Saturn Technician commented on how clean the inside was. Given my automotive engineering background, I (like many of you) also know how most of the NHTSA and OEM Technical Service Bulletin processes work.

I learned of the NHTSA investigations, the TSB and gained access to all the data GM had to supply the NHTSA as part of the investigation. The facts are that GM is aware of a 4 month build window of the Ecotec 2.2L engine in which the timing chain failure rate was 10 times greater than normal, affecting over 25,000 cars. In addition, the Saturn sales force marketed the high durability of the 2.2l metal timing chain as a strength over the 6 cylinder with a Kevlar belt that must

be changed at 100k. Most of this was known all the way back in 2002 and the preventive measure of performing the work in the TSB would have been cheaper as compared to a new engine. I would have gladly paid to prevent the cost of a new or rebuilt engine.

The result: I had a great perception of Saturn til now. Saturn made no attempt to inform me and therefore denied me the ability to prevent damage to my property. In addition, I was offended by the treatment toward me, especially as I approached the issue with facts, logic and the openness to resolution. Saturn has lost this customer and GM appears to be sticking to the "trick your customer" approach as opposed to the "keep your customer" approach. Pretty short-sighted.

Saturn offered to pay for half a new engine... still over $3k out of my pocket.


**27th Aug 2007, 19:23**
Saturday our dealer maintained and cared for 2000 L300m (54,000 miles) suffered a sudden and completely unexpected timing chain break that will cost hundreds to fix, only to get it to where the dealer (or another reputable shop we also had look at it) will be able to determine if valves and pistons are also damaged. According to both, this is highly likely. In searching tonight, I was shocked to see both the sheer number of similar problems, as well as the fact that Saturn has apparently known of this and offered an upgrade Oiling kit (also expensive) as a means of attempting to prevent this serious defect from destroying other motors. The Saturn maintenance schedule clearly states the timing chain should be replaced at 100,000 miles. I, too, would like to know about these 412,000 alleged complaints and how to verify that number. As an attorney, I intend to explore this vigorously.


**30th Aug 2007, 10:49**
Before I spent $813 dollars on a timing chain replacement - I wanted to know how many L200's were built (Saturn would not tell me) and I wanted to know how many had broken chains (again - according to Saturn, no one knows - and they say they have no way of finding out).

Their responses to the two NHSTA investigations, their redesign of the components, and their inability to discuss this subject in an honest way... scared me.

I spent the money to fix the car. GM may be willing to play the odds with my family's safety - but I'm not.


**5th Oct 2007, 20:43**
I have a 2001 Saturn L200 (seems to be quite the popular car... on here at least!). I took my car in to get a new ignition cylinder/housing . Went to pick up my car (hours after it was originally supposed to be done), and the mechanic started the

car... it started up fine. He turned it off to do some paperwork. He got in the car to pull it out of the garage and, low and behold, they come back to tell us that my timing chain has just broken!! First, I'm thinking... you broke it, you fix it. Now, as I'm sitting here thinking about Monday, when I get the nice call from the Area Manager, who knows I'm seeking financial assistance (I didn't know this was a problem with my series of car before speaking to them), I can pretty much predict what he'll have to say to me.

I just wish GM would realize there is a mistake with the car, take the losses, and move on. "Wish" being the key word there.

**16th Dec 2007, 20:34**
Just want to add my experience in with all these others. 64,000 miles, highway speed, chain broke. Towed in, extended warranty covered $100 of the $130 tow. The windshield that was bashed in during it's 16 hour sit on the highway was out of my pocket. ($208). the dealer demanded maintainence records which I produced. If I had not been able to produce these records, I'm sure they would have denied the claim on the extended used car warranty plan. As it is, it is being repaired and should be fixed tomorrow or tuesday. I think it's BS that the dealers are leaning on this "oil hasn't been changed" story to try and deny any known problems. I'm in on a class action if it gets started. Contact me at midnitemaster@hotmail.com.

Steve.

## VIII.  DEFENDANTS SECRETLY RE-DESIGN THE DEFECTIVE TIMING CHAINS AND OILING NOZZLES BUT CONTINUE TO DENY THE EXISTENCE OF A DEFECT OR LIABILITY TO CLASS VEHICLE OWNERS

### Defendants Advise Saturn Dealers in June 2003 of "Design Changes" to the Timing Chains and Oiling Nozzles

92.    In late 2001 or early 2002, Defendants re-designed both the Timing Chain and Oiling Nozzle. According to statements made by Defendants to NHTSA in 2006, Defendants no longer incorporated the original Timing Chain and Oiling Nozzle in the vehicles after: (i) April 22, 2002 in Saturn vehicles assembled at the Tonawanda vehicle plant, and (ii) May 1, 2002 in Saturn vehicles assembled at the Springhill vehicle plant.

93.    Defendants, however, then waited more than a year before they issued

Technical Service Bulletin (TSB) No. 03-06-01-017 on June 9, 2003. This TSB notified

the Service Departments at Saturn Dealerships that, when they encountered a Class

Vehicle that required a Timing Chain repair, the Service Technician should replace the

Timing Chain and Oiling Nozzle with a re-designed Timing Chain and Oiling Nozzle.

94.    More specifically, TSB  03-06-01-017 stated in relevant part:

> Service Information – Timing Chain Design Change and Revised Service
> Procedures
> 2000-2003 Saturn L-Series with 2.2L Engine (VIN F—RPO L61)
> 2002-2003 Saturn VUE with 2.2L Engine (VIN D – RPO L61)
> 2003 Saturn ION Vehicles
>
> General Manager, Fixed Operations Manager, Technician
>
> Purpose
>
> The purpose of this bulletin is to communicate updated service procedures
> to the timing chain and timing chain oiling nozzle due to design changes
> that have been made to both components.  All timing chain kits now
> available in service will include the Oiling nozzle. **This newer nozzle has
> higher flow rate characteristics that will increase oil flow to the timing
> chain under low RPM conditions.** Whenever replacing a timing chain, it
> is important to replace the Oiling nozzle.

(Emphasis added.)

95.    Thus, while publicly denying the existence of any defect associated with

the Timing Chain in the Class Vehicles and refusing to cover any non-warranty repairs

necessitated by broken Timing Chains in the Class Vehicles, Defendants were secretly

informing Saturn Dealers' Service Departments that they should make repairs using the

redesigned Timing Chain and Oiling Nozzle – at Class Vehicle owners' expense.

96.    Remarkably, as discussed below, it was not until December 2007 -- after

this lawsuit was commenced -- that Defendants notified a fraction of purchasers and

49

lessees of the Class Vehicles about the Class Vehicles' defective design, and undertook to
retrofit a very limited number of the Class Vehicles with the re-designed Timing Chains
and Oiling Nozzles, at Defendants' expense.

IX.    **CLASS VEHICLE OWNERS' COMPLAINTS MOUNT
AS DEFENDANTS CONTINUE TO PUBLICLY DENY
LIABILITY FOR REPAIRING CLASS VEHICLES
WHILE SECRETLY ADMITTING A DEFECT**

A.    **NHTSA Begins an Investigation of Timing Chain Breakages
in 2000 - 2003 Saturn L- Series and 2003 Saturn Ion Vehicles**

97.    The North Carolina Consumers Council, Inc. ("NCCC"), a non-profit
consumer advocacy group with a large membership base spanning the United States,
petitioned NHTSA to open an investigation into Timing Chain failures in Saturn vehicles.
On December 12, 2005, NCCC's Executive Director, Brad Lamb, issued a "Defect
Petition" to NHTSA requesting that NHTSA perform a defect investigation into Saturn
L-Series vehicles for Timing Chain failures, in response to the twenty-six consumer
complaints it received from drivers alleging Timing Chain failures.

98.    On the NCCC website, Brad Lamb stated that the Defendants had actual
knowledge of the problem, as evidenced through their actions of producing and releasing
the modified timing chain and modified timing chain oiling nozzle (as discussed above).
Mr. Lamb is quoted as saying: "The manufacturer knew there was a problem, and knew
the problem could happen as early as 25,000 miles. **They would rather the consumer
incur the expense of a new engine rather than make the up to $900 upgrade.**"
(Emphasis    added.)    *See    Saturn    Defect    Petition,    available    at*
http://www.ncconsumer.org/story22.html. The website continues to report that "since the
filing of our petition, consumer complaints continue to grow at an astonishing rate." (*Id.*)

**B.      NHTSA Grants the Petition and Opens**
**a Preliminary Evaluation to Assess the Defect**

99.      On February 6, 2006, NHTSA announced that it had granted the NCCC's

petition and reported its commencement of Preliminary Evaluation 06-006 ("PE06-006")

"to assess the frequency, trend, scope and safety consequences associated with the

alleged defect in the subject vehicles."

100.      By letter dated February 16, 2006, Jeffrey L. Quandt, NHTSA's Chief,

Vehicle Control Division, Office of Defects Investigation (ODI), notified GM's Director

of Product Investigations, Gay P. Kent, that ODI had opened PE06-006 and was

investigating Timing Chain failures in 2000 – 2003 Saturn L- Series and 2003 Saturn Ion

vehicles.  Pursuant to PE06-006, the ODI requested that GM produce information relating

to the defective Timing Chain and the defective Oiling Nozzle by March 29, 2006:

> This letter is to inform you that the Office of Defects Investigation of the
> National Highway Traffic Safety Administration has opened a Preliminary
> Evaluation (PE06-006) to investigate allegations of timing chain breakage
> resulting in engine stall in certain model year (MY) 2000 to 2003 Saturn
> L-Series and MY Saturn Ion vehicles manufactured by General Motors,
> and to request certain information.
>
> . . . .
>
> ODI has received 31 complaints alleging timing chain failures in MY
> 2000-2003 Saturn L-Series vehicles equipped with the 2.2L L4 engine. In
> most of the complaints the timing chain failure allegedly resulted in a
> sudden loss of power and engine stall.

**C.      GM's Response to NHTSA's Information Request**
**Admits that Defendants had Actual Knowledge**
**of the Design Defect in the Class Vehicles as Early as 1999**

101.      In a letter dated April 12, 2006, GM responded to the ODI's February 16th

information request (the "April 12, 2006 GM Letter").