102.   The April 12, 2006 GM Letter disclosed that GM had: (i) received over 1,020 consumer reports or field reports that indicated that the Timing Chains were broken or replaced; and (ii) 2,203 Warranty Claims involving broken Timing Chains in the 2000 – 2003 Saturn L-Series vehicles.  The sheer number of complaints and Warranty Claims once again proves, beyond all doubt, that Defendants had knowledge of the existence of the defect in the Class Vehicles.

103.   The April 12, 2006 GM Letter further admits that Defendants were on notice of the defective condition of the Timing Chains and Oiling Nozzles in the Class Vehicles shortly after the first of the L-Series Class Vehicles rolled off the assembly lines in 1999.  (Tellingly, Defendants never acknowledge to NHTSA the contents of the June 1997 TSB 03-06-01-017, wherein Defendants secretly admitted the need for a continuous flow of oil to the timing chains.)

104.   Table B of the April 12, 2006 GM Letter "summarizes the actions performed by GM that relates to the subject condition," *i.e.,* the broken Timing Chains in the Class Vehicles.  According to the first entry in Table B, GM began investigating Timing Chain failures in 1999, at the beginning of the introduction of the L-Series Class Vehicles.  Specifically, Table B states that, beginning with "Start of Production 1999" the GM Powertrain engineering group,

> **Perform[ed] engine teardowns on certain returned engines to determine root cause of failures**.  Not all returned engines are analyzed.  This process is typically utilized as an **early feedback tool at production launches or requested for specific issues**.

> Summary of Action:  **Generate engine teardown detail report and communicate findings** to GM Powertrain engineering, Vehicle Engineering, Engine Assembly Plant personnel, and part suppliers as deemed necessary.

(Emphasis added.)

105.    Table B of the April 12, 2006 GM Letter further states that, even though GM engineers were seeing broken Timing Chains as early as 1999, GM did not begin investigating the issue until August 2001, when GM began "investigat[ing] 2000-2001 MY Saturn L-series with broken timing chains where the vehicle suddenly stops running or stalls." Under "Summary of Action," GM stated:

> Reviewed warranty claims.    **Considering the S-pin timing chain released for the higher performance applications to improve robustness.**    Start development and validation testing of the S-pin timing chain.

(Emphasis added.)

106.    It was not until August 2002, however, that GM implemented a "fix" to the Timing Chain problem.  Moreover, GM admitted that its only motivation to come up with a "fix" was to reduce its cost of warranty repairs, and not to remove unsafe vehicles from the roads or spare its customers from expensive repairs.  According to the April 12, 2006 GM Letter, Table B:

> Start Date:  August 2002
>
> . . . .
>
> Description: **Eliminate occurrences where engines are returned with broken timing chains, cylinder head damage, and head gasket failures.**
>
> Summary of Action:    **Warranty cost reduction was achieved** by increasing component robustness.    A **full time flow oil nozzle** with torque limiting sleeve and the **S-pin timing chain** (double chromised pins) was released to **address lubrication and wear conditions.**

(Emphasis added.)

107.    Thus, acknowledging what it knew in June 1997, GM replaced the Oiling Nozzle, which restricted the flow of oil to the Timing Chain at low and idle speeds, with a "full time flow oil nozzle," which "enhance[d] timing chain lubrication at low speeds."

108.    According to the April 12, 2006 GM Letter, the original Oiling Nozzle:

> [W]as originally a pintle valve and regulator spring design. In this design, the nozzle flow rate was 700ccm at an oil pressure of 100kPa, **with reduced oil flow at lower pressures**. In 2002, it was speculated that **excessive idling in traffic could possibly contribute to conditions leading to insufficient lubrication of the timing chain components** on some engines. As such, enhancements were made in May 2002 to the oiling system to insure lubrication under all idling conditions . . .. **The design change included increasing the size of the nozzle orifice and elimination of the pintle valve.**

(Emphasis added.)

109.    In addition to being aware that the Timing Chain was less robust (*e.g.*, had smaller pitch and smaller pins) than the steel timing chains used prior to 1999, Defendants also switched to an "S-pin timing chain (double chromised pins)." One material difference between the new timing chain and the defective Timing Chain was that there was approximately 35% more chrome on the pins of the new timing chain, which was done in order to increase the strength of the timing chain.

110.    Seeking to limit its cost of addressing the Timing Chain issue, Defendants, however, proclaimed to NHTSA that the Timing Chain problem was isolated within certain L-Series Class Vehicles manufactured during a 4 month period and, therefore, deceptively indicated that the failures were a localized problem. In support of this position, Defendants pointed to what they claimed to be a statistically higher incidence of broken Timing Chains in L-Series Class Vehicles built from November 2000 through February 2001:

> Review of the warranty IPTV [Incidents Per Thousand Vehicles] by build of month suggests there was a **quality issue on some vehicles built from November 2000 through February 2001 (2001 Model Year L-Series)**.

(Emphasis added.)

111.   As demonstrated below, GM's own analysis showed that Timing Chains were breaking in <u>all</u> of the Class Vehicles manufactured between 1999 and 2002.

112.   Moreover, in an effort to downplay the safety risk of the defect, GM asserted that it believed that a "majority of warranty incidents [*i.e.,* broken Timing Chains] occurred while the vehicle was parked since the timing chain is more likely to break during high chain load situations, such as engine startup." This assertion ignored the hundreds, if not thousands, of complaints from Saturn owners whose Timing Chains broke while the vehicles were moving (many at high speeds on highways), thereby causing a serious safety issue.

113.   This false assertion regarding safety was later contradicted by NHTSA. In ODI's closing resume issued on November 9, 2007, in which both ODI and GM data concerning the defect was reported, ODI stated in relevant part:

> During this engineering analysis GM and ODI contacted Saturn owners that had warranty work performed related to timing chain replacements or repairs in order to determine certain safety consequences associated with timing chain failure. **Based on analysis of warranty claim verbatim text for indications of stall while driving (SWD) and the results from a survey of warranty claims with ambiguous text, <u>GM estimated that 55% of all timing chain warranty repairs involved SWD incidents. ODI's analysis estimated approximately 76% of warranty repairs may have involved a SWD.</u>** The surveys were also used to assess the safety consequences of the SWD incidents. The calls found that none of the vehicles that experiencing [sic] stalls due to timing chain failure could be restarted. <u>In addition, approximately one-third of the stalls occurred at speeds greater than 40 mph and about 20% indicated that they were not able to get the vehicle out of traffic after the engine died.</u> GM's statistical analyses of failure data estimated stall while driving rates of

1.7% and 5.2% at 3 and 6 years in service. ODI's analyses estimated slightly higher rates of 2.3% and 7.0% at 3 and 6 years in service.

(Emphasis added.)

### D.    NHTSA Upgrades the Investigation
#### Based on the High Rate of Consumer Complaints

114.    Dissatisfied with GM's responses to the information requests and in recognition of: (a) the safety hazards implicated by the defect; (b) the high volume of consumer complaints; and (c) the large numbers of warranty repairs for broken Timing Chains, on June 6, 2006, NHTSA's ODI upgraded its investigation to an "Engineering Analysis," the highest level within NHTSA's investigatory structure. The ODI Resume status update stated:

> On April 12, 2006, ODI received information from GM concerning timing chain failures in approximately 412,000 Model Year 2000 through 2003 Saturn L-Series and ION Vehicles with 2.2L engines. GM's response included 1,020 owner complaints and field reports concerning timing chain failure, including 228 that alleged the failure caused the vehicle to stall while driving. GM also provided Warranty Claim data that showed 1,902 subject Vehicles receiving timing chain repairs, including 261 which indicated that a stall while driving resulted from the failure.... GM's data showed elevated failure rates in approximately 20,500 Model Year 2001 L-Series Vehicles produced during a four month period from November 2000 through February 2001. Over one-third of GM's total complaints and field reports (34.3%) and Warranty Claims (38.2%) involved L-Series vehicles built during the 4-month period, which are only 5% of subject vehicle production. The timing chain failure rate in the vehicles built during this range is over 10 times greater than the remaining subject vehicle population.... **GM's statistical modeling of the failure data initially concluded that the failure rates were declining with age and mileage for any set of Warranty Data analyze (e.g. stall while driving, other or combined). <u>However, subsequent analysis showed that the timing failure rates are increasing.</u>** Based on the high complaint and warranty rates for timing chain failure in the 4-month production period for the Model Year 2001 L-Series Vehicles, an Engineering Analysis has been opened to further assess the frequency of stall incidents due to timing chain failures in those Vehicles."

(Emphasis added.)

115.    Due to the overwhelming number of failures and subsequent complaints about the Class Vehicles, NHTSA Engineering Analysis remained ongoing until November 9, 2007, two days after Defendants had announced they were recalling certain 2001 Saturn L-Series Class Vehicles.

## X.    IN ORDER TO AVOID THE EXPENSE OF A NHTSA MANDATED RECALL OF ALL CLASS VEHICLES DEFENDANTS INSTITUTE A LIMITED RECALL

116.    Concerned that NHTSA could require GM to recall all of the Class Vehicles in order to replace the Timing Chains and Oiling Nozzles (and reimburse owners for the cost of prior repairs related to Timing Chain failure), GM "voluntarily" instituted a limited recall of Saturn L-Series Class Vehicles manufactured during a four (4) month period (the Recalled Vehicles).

117.    On November 7, 2007 GM notified NHTSA that Defendants had:

[D]ecided that a defect, which relates to motor vehicle safety, exists in certain 2001 model year Saturn L-Series vehicles equipped with a 2.2L 4-cylinder (RPO L61 – VIN F) engine.  An elevated rate of engine timing chain link separation has occurred.

118.    In an attachment to GM's November 7, 2007 letter to NHTSA, Defendants identified a mere 20,514 Class Vehicles subject to the recall, out of the total universe of approximately 412,419 Class Vehicles produced with the defective Timing Chains and Oiling Nozzles. According to Defendants, all of the Recalled Vehicles are confined to Saturn 2001 L-Series Class Vehicles manufactured between November 2000 and February 2001 (VIN 1Y504884 through 1Y559453).

119.    In December 2007, GM issued Recall Bulletin No. 06074, publicly announcing a "Product Safety Recall," stating, in relevant part:

Subject:        Timing Chain Engine Stall

Models:        Certain 2001 Saturn L-Series
               Equipped with 2.2L 4-Cylinder (RPO L61 – VIN F)

CONDITION

General Motors had decided that a defect, which relates to motor vehicle safety, exists in **certain** model year Saturn L-Series model vehicles, equipped with a 2.2L 4-cylinder (RPO L61 – VIN F) engine. If the timing chain fails while the engine is running, the engine will stall and will not restart.

VEHICLES INVOLVED

Involved are **certain** 2001 model year Saturn L-Series model vehicles, equipped with a 2.2L 4-cylinder (RPO L61 – VIN F) engine built within these VIN breakpoints:

| Year | Division | Model | From | Through |
|------|----------|-------|------|---------|
| 2001 | Saturn | L-Series | 1Y504884 | 1Y559453 |

(Emphasis in original.)

120.    As set forth below, this limited recall has left, by GM's own estimate, the owners of 391,635 Class Vehicles to: (a) bear the cost of replacing the Timing Chain before it breaks, at a cost of anywhere from $600 to $900; or (b) bear the expense of the repairs to their Class Vehicles when the Timing Chains break, more often than not, causing thousands of dollars in damages to the Class Vehicles.

## XI.    DEFENDANTS' LIMITED RECALL OF THE DEFECTIVE CLASS VEHICLES IS UNTIMELY AND IGNORES HUNDREDS OF THOUSANDS OF DEFECTIVE CLASS VEHICLES

121.    Defendants "voluntarily" issued a limited recall of certain 2001 model year Saturn L-Series Class Vehicles (the Recalled Vehicles) almost nine (9) years after it first learned of the defect and only after Plaintiffs in this action acted to protect their

interests, and the personal safety and financial interests of others who purchased the defective Class Vehicles, by filing class action lawsuits.

122.    As set forth above, as a result of the design defect, thousands of owners of the Class Vehicles have experienced Timing Chain failures since 2000, as evidenced by Defendants' own admissions and by the hundreds (if not thousands) of complaints on the Internet.

A.    **The Limited Recall is Contrary to TSB 03-06-01-017 and Clearly Evidences Defendants' Wrongful Conduct by Their Refusal to Accept Financial Responsibility for the Defective Timing Chains and Oiling Nozzles**

123.    As discussed above, when Defendants issued TSB 03-06-01-017 on June 9, 2003, Defendants silently directed its Saturn dealers that, when they encountered any Class Vehicle that required a Timing Chain repair, the Service Technician should repair the Class Vehicle using the redesigned timing chain and oiling nozzle – at the Class Vehicle owner's expense.

124.    Ignoring the admission made by way of this TSB, and seeking to avoid the cost of recalling all of the defective Class Vehicles, Defendants decided to recall and repair **only** Saturn model year 2001 L-Series Class Vehicles manufactured between November 2000 and February 2001 (the Recalled Vehicles).

B.    **All of the Class Vehicles Are Defectively Designed**

125.    In an attachment to its November 7, 2007 letter, GM claims that the defective Timing Chains and Oiling Nozzles are only found in L-Series Class Vehicles that were manufactured from November 2000 through February 2001. Such a claim is patently false, as Defendants' own data demonstrates that Timing Chains have broken in

model year 2000 - 2003 Saturn L-Series vehicles; model year 2002 – 2003 Saturn Vue

vehicles; and model year 2003 Saturn Ion vehicles.

126.    Defendants have admitted that GM produced the following number of

Class Vehicles:

| Make/Model | Model Year | 2000 | 2001 | 2002 | 2003 | Total |
|---|---|---|---|---|---|---|
| Saturn L-Series | | 53,255 | 60,892 | 70,984 | 58,393 | 243,504 |
| Saturn Vue | | N/A | N/A | 13,083 | 59,250 | 72,333 |
| Saturn ION | | N/A | N/A | N/A | 96,312 | 96,312 |
| | TOTALS | 53,255 | 60,892 | 84,067 | 213,955 | 412,149 |

127.    Defendants have further admitted that, according to their own warranty

records, they received warranty (three years or 36,000 miles, whichever comes first) and

extended warranty claims (optional coverage available at time of purchase) relating to

broken Timing Chains on 2,203 of the Class Vehicles, as follows:

| Make/Model/Model Year | 2000 | 2001 | 2002 | 2003 | Total |
|---|---|---|---|---|---|
| Saturn L-Series | 392 | 926 | 315 | 17 | 1650 |
| Saturn Vue | N/A | N/A | 97 | 334 | 431 |
| Saturn ION | N/A | N/A | N/A | 122 | 122 |
| TOTALS | 392 | 926 | 412 | 473 | 2,203 |

128.    The foregoing 2,203 Class Vehicles which suffered broken Timing Chains

do not include Class Vehicles in which Timing Chains broke either after the warranty

expired and/or the repair work was done at a dealership or facility other than a Saturn

dealership.

129.    Moreover, since many Timing Chains have broken after 36,000 miles, there are thousands more Class Vehicles which experienced broken Timing Chains that are not included in GM's warranty data.

130.    Finally, since the limited recall applies to only 20,514 model year 2001 L-Series Class Vehicles manufactured between November 2000 and February 2001, according to GM's own production numbers, there are an additional 391,635 Class Vehicles with defective Timing Chains and Oiling Nozzles that are not covered by the recall.

131.    This is further borne out by the hundreds of consumer complaints received by NHTSA and other consumer websites which demonstrate broken Timing Chains across all of the Class Vehicle models and model years. This also demonstrates that defective Class Vehicles were manufactured by Defendants outside the four month period identified subject to the recall.

132.    The North Carolina Consumers Council (NCCC) has criticized the inadequacy of Defendants' limited recall. In a statement posted to its website, the NCCC wrote:

> The complaint data listed on the NHTSA website indicates that the timing chain problem is **not isolated to vehicles produced during this four-month period**. In fact, a 2001 Saturn L-Series vehicle with a 2.2L engine owned by a former NCCC Board Member experienced a timing chain failure. His vehicle was built in September 2000, two months BEFORE the vehicles affected by recall 07V519000.

*See New Saturn Recall*, available at http://www.ncconsumer.org/story49.html> (last visited Mar. 6, 2008) (emphasis added).

## TOLLING OF THE STATUTE OF LIMITATIONS

133.    The causes of action alleged herein accrued upon discovery of the latently defective nature of the Class Vehicles.  Because the defect and limitations alleged herein are latent and because Defendants took steps to conceal the true character, nature and quality of the Class Vehicles, among other reasons, Plaintiffs and the other members of the Class did not discover and could not have discovered the problems and defects alleged herein through the exercise of reasonable diligence.

134.    Any applicable statutes of limitations have been tolled by Defendants' knowing and active concealment and denial of the facts as alleged herein.  Plaintiffs and the other members of the Class have been kept ignorant of vital information essential to the pursuit of these claims, without any fault or lack of diligence on their part.  Plaintiffs and the other members of the Class could not reasonably have discovered the defects and problems alleged herein because of Defendants' fraudulent concealment.

135.    Defendants were and are under a continuous duty to disclose to Plaintiffs and the other members of the Class the true character, quality, and nature of the Class Vehicles.  Defendants knowingly, affirmatively, and/or actively concealed, and continue to conceal, the true character, quality and nature of the Class Vehicles.

136.    Defendants knew or should have known that Plaintiffs and the other members of the Class would reasonably rely upon Defendants' knowing, affirmative, and/or active concealment.  Based on the foregoing, Defendants are estopped from relying on any statutes of limitation in defense of this action.

## CLASS ACTION ALLEGATIONS

137.    Plaintiffs bring this class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and all persons who purchased the Class Vehicles in the Class States whose Timing Chain has failed (the Class). Excluded from the Class are the Recalled Vehicles, Defendants, any entity that has a controlling interest in Defendants and Defendants' current or former directors or officers. Any claims for personal injury or consequential damages are expressly excluded from this class action.

138.    Plaintiffs meet the prerequisites to bring this action on behalf of the Class because:

(a)    Numerosity: The Class consists of thousands of individuals and is so numerous that joinder of all members as individual plaintiffs is impracticable. While the exact number of Class members is unknown and can only be ascertained via discovery, Plaintiffs believe that there are thousands of Class members.

(b)    Commonality: There are questions of law and fact common to the Class, including:

(i)    Whether Defendants were unjustly enriched by ascertaining benefits conferred by Plaintiffs and the other members of the Class;

(ii)    Whether the Class Vehicles are defective because they were equipped with the defective Timing Chains and the defective Oiling Nozzles;

63

(iii)    Whether Defendants knew or should have known about the defects;

(iv)    Whether Defendants concealed from Plaintiffs and the other members of the Class the material fact that the Class Vehicles were defective;

(v)    Whether Defendants violated the Uniform Deceptive Trade Practices Act codified under Neb. Rev. Stat. §87-302 (a)(5) and §87-302 (a)(7);

(vi)    Whether Defendants violated the Implied Warranty of Merchantability Pursuant To Iowa Code § 554.2314;

(vii)    Whether GM breached its implied warranty to the Class;

(viii)    Whether the Class Vehicles are merchantable as a result of the design defect; and

(ix)    Whether, as a result of Defendants' misconduct, Plaintiffs and the Class are entitled to damages, restitution, equitable relief or other relief, and the amount and nature of such relief.

(c)    Typicality: Plaintiffs' claims are typical of the claims of the Class because Plaintiffs and members of the Class each sustained damages arising out of Defendants' wrongful conduct as complained of herein; and

(d)    Adequacy: Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs have no interests that are antagonistic to, or in conflict

with, the interests of the Class as a whole, and have engaged competent

counsel, highly experienced in class actions and complex litigation.

139.   A class action is superior to all other available methods for this

controversy because: (i) the prosecution of separate actions by the members of the Class

would create a risk of adjudications with respect to individual members of the Class that

would, as a practical matter, be dispositive of the interests of the other members not

parties to the adjudications, or substantially impair or impede their ability to protect their

interests; (ii) the prosecution of separate actions by the members of the Class would

create a risk of inconsistent or varying adjudications with respect to the individual

members of the Class, which would establish incompatible standards of conduct for

Defendants; (iii) Defendants acted or refused to act on grounds generally applicable to

the Class; and (iv) questions of law and fact common to members of the Class

predominate over any questions affecting only individual members, and a class action is

superior to other available methods for the fair and efficient adjudication of the

controversy.

## COUNT I

**(By Plaintiff Faust, Individually, And On Behalf Of All Members Of The
Class Who Purchased Or Leased Their Class Vehicles In The State Of Iowa, For
Unjust Enrichment Under Iowa Common Law)**

140.   The allegations of paragraphs 1 through 135 are re-alleged and

incorporated herein by reference.

141.   This Count is brought against Defendants pursuant to the common law

doctrine of Unjust Enrichment.

65

142.    At all times mentioned herein, Defendants developed, manufactured, marketed and sold the Class Vehicles. The Class Vehicles are defective because they were equipped with: (i) Oiling Nozzles that failed to properly lubricate the Timing Chains, causing the Timing Chains to break and fail to function properly; and (ii) Timing Chains that are less robust than was in production prior to 1999, the result of which was that these less robust Timing Chains would break when not properly lubricated.

143.    Defendants had knowledge of the design defects in as early as 1999 as a result of Defendants' internal investigation of Timing Chain failures. Defendants also had knowledge of the design defect as reflected in the June 1997 TSB 97-T-15A.

144.    Furthermore, Defendants had actual knowledge of the design defect because of complaints received from owners and lessees of Class Vehicles whose Timing Chains failed, and NHTSA's investigation of the design defect and the continuous contact and updates provided to Defendants in connection therewith.

145.    Defendants failed to disclose to Plaintiff Faust and the other members of the Class the material fact that the Class Vehicles contained defective Timing Chains and defective Oiling Nozzles.

146.    Plaintiff Faust and the other members of the Class did not have knowledge of the defect at the time of purchase or lease and therefore, conferred non-gratuitous benefits, either directly or indirectly, upon Defendants by paying monies to retailers in exchange for their Class Vehicles. A portion of such monies was paid to and received by Defendants.

147.    Defendants retained these non-gratuitous benefits from Plaintiff Faust and the other members of the Class, regardless of the fact that Defendants failed to

disclose the design defect of which Defendants had actual knowledge. The retention of these benefits by Defendants under these circumstances was unjust and inequitable.

148.    The unjust and inequitable retention of these benefits by Defendants derived from the purchases or leases of the defective Class Vehicles by Plaintiff Faust and the other members of the Class violates the principles of justice and equity. Therefore, Defendants must provide restitution to Plaintiff Faust and the other members of the Class in a manner established by the Court.

149.    Defendants' express warranty is limited to defects in material and workmanship and, accordingly, does not govern the subject matter of this design defect litigation or preclude this cause of action.

## COUNT II

**(By Plaintiff Faust, Individually, And On Behalf Of All Members Of The Class Who Purchased Or Leased Their Class Vehicles In The State Of Iowa For Violations Of the Implied Warranty Of Merchantability, Pursuant To Iowa Code § 554.2314 *et seq.*)**

150.    The allegations of paragraph 1 through 135, except those that are particular to Count I, are re-alleged and incorporated herein by reference.

151.    The Class Vehicles are "goods" within the meaning of the Iowa Code governing the Implied Warranty of Merchantability.

152.    Defendants are "merchants" within the meaning of the Iowa Code governing the Implied Warranty of Merchantability because they are sellers and manufacturers of Class Vehicles.

153.    The Implied Warranty of Merchantability is implied in the sale of the Class Vehicles and requires, among other things, that the Class Vehicles pass without

objection in the trade and are fit for the ordinary purposes for which the Class Vehicles are used.

154.    The Class Vehicles do not function in their ordinary capacity and were not merchantable at the time of sale because they were defectively designed.

155.    The defect in the Class Vehicles rendered the Class Vehicles non-merchantable because they could not be used for their ordinary purposes and thereby proximately caused the economic damages suffered by Plaintiff Faust and the other members of the Class.

156.    Plaintiff Faust provided Defendants with notice of the defect via email correspondence on or about December 5, 2006.

157.    Any purported disclaimer or limitation of the Implied Warranty of Merchantability on the part of Defendants is unconscionable and unenforceable because, *inter alia*, Defendants had knowledge of the defect.

## COUNT III

**(By Plaintiffs Faust and Cardwell, Individually, And On Behalf Of All Members Of The Class Who Either: i) Resided In Nebraska At The Time Of Purchase Or Lease Of The Class Vehicles Or ii) Purchased Or Leased Their Class Vehicles In Nebraska For Violations Of The Neb. Uniform Deceptive Trade Practices Act, R.R.S. NEB. §87-302(a)(5) and §87-302 (a)(7) (2008))**

158.    The allegations of paragraphs 1 through 135, except those that are particular to Counts I and II, are re-alleged and incorporated herein by reference.

159.    At all relevant times herein, Nebraska's Uniform Deceptive Trade Practices Act codified under R.R.S. NEB. § 87-302 (2008) was in effect. The Nebraska Uniform Deceptive Trade Practices Act prohibits any "deceptive trade practices."

160.    Plaintiffs Faust and Cardwell and the other members of the Class are "consumers."

161.    During the Class Period, Defendants manufactured the Class Vehicles, the design of which was defective.

162.    The Class Vehicles are defective because they were equipped with defective Timing Chains and defective Oiling Nozzles.

163.    Defendants had knowledge of the design defect in as early as 1999 as a result of Defendants' internal investigation of Timing Chain failures.  Defendants also had knowledge of the design defect as reflected in the June 1997 TSB 97-T-15A.

164.    Furthermore, Defendants had actual knowledge of the design defect because of complaints received from owners and lessees of Class Vehicles whose Timing Chains failed, and NHTSA's investigation of the design defect and the continuous contact and updates provided to Defendants in connection therewith.

165.    Defendants failed to disclose to Plaintiffs Faust and Cardwell and the other members of the Class the material fact that the Class Vehicles contained defective Timing Chains and defective Oiling Nozzles.

166.    The omission of this material fact by the Defendants resulted in the purchase or lease of the Class Vehicles by Plaintiffs Faust and Cardwell and the members of the Class, thereby unfairly benefiting Defendants.

167.    In order to prevent the unfair and deceptive trade practices from continuing, as alleged herein, Defendants must be enjoined from manufacturing and selling the defective Class Vehicles without disclosure of the defect, as permitted by Neb. Rev. Stat. § 87-303(a).

## COUNT IV

**(By Plaintiffs Faust and Cardwell, Individually, And On Behalf Of All Members Of The Class Who Either: i) Resided In Nebraska at The Time of Purchase Or Lease Of The Class Vehicles Or ii) Purchased Or Leased Their Class Vehicles In Nebraska For Violations Of The Nebraska Consumer Protection Act, R.R.S. NEB. §59-1601, *et seq.* (2008))**

168.    The allegations of paragraphs 1 through 135, except those that are particular to Counts I through III, are re-alleged and incorporated herein by reference.

169.    At all relevant times herein, Nebraska's Consumer Protection Act codified under R.R.S. NEB. § 59-1601 *et seq.* (2008), was in effect. The Nebraska Consumer Protection Act prohibits any "deceptive acts or practices in the conduct of any trade or commerce."

170.    Defendants are "persons" engaged in "trade or commerce" as those terms are contemplated in the Consumer Protection Act, Neb. Rev. Stat. § 59-1601.

171.    During the Class Period, Defendants manufactured the Class Vehicles, the design of which was defective.

172.    The Class Vehicles are defective because they were equipped with defective Timing Chains and defective Oiling Nozzles.

173.    Defendants had knowledge of the design defect in as early as 1999 as a result of Defendants' internal investigation of Timing Chain failures. Defendants also had knowledge of the design defect as reflected in the June 1997 TSB 97-T-15A.

174.    Furthermore, Defendants had actual knowledge of the design defect because of complaints received from owners and lessees of Class Vehicles whose Timing Chains failed, and NHTSA's investigation of the design defect and the continuous contact and updates provided to Defendants in connection therewith.

175.    Defendants failed to disclose to Plaintiffs Faust and Cardwell and the other members of the Class the material fact that the Class Vehicles contained defective Timing Chains and defective Oiling Nozzles.

176.    The omission of this material fact by the Defendants resulted in the purchase or lease of these defective Class Vehicles by Plaintiffs Faust and Cardwell and the other members of the Class, thereby unfairly benefiting Defendants.

177.    This omission constitutes a violation of the Neb. Consumer Protection Act, Neb. Rev. Stat. § 59-1601 and entitles Plaintiffs Faust and Cardwell and the other members of the Class to statutory and actual damages, injunctive relief and attorney fees and costs.

### COUNT V

**(By Plaintiff Cardwell, Individually, And On Behalf Of All Members Of The Class Who Purchased Or Leased Their Class Vehicles In The State Of Nebraska For Unjust Enrichment Under Nebraska Common Law)**

178.    The allegations of paragraphs 1 through 135 are re-alleged and incorporated herein by reference, except those particular to Counts I through IV.

179.    This Count is brought against Defendants pursuant to the common law doctrine of Unjust Enrichment.

180.    At all times mentioned herein, Defendants developed, manufactured, marketed and sold the Class Vehicles. The Class Vehicles are defective because they were equipped with: (i) Oiling Nozzles that failed to properly lubricate the Timing Chains, causing the Timing Chains to break and fail to function properly; and (ii) Timing Chains that are less robust than was in production prior to 1999, the result of which was that these less robust Timing Chains would break when not properly lubricated.

71

181.    Defendants had knowledge of the design defect in as early as 1999 as a result of Defendants' internal investigation of timing chain failures. Defendants also had knowledge of the design defect as reflected in the June 1997 TSB 97-T-15A.

182.    Furthermore, Defendants had actual knowledge of the design defect because of complaints received from owners and lessees of Class Vehicles whose Timing Chains failed, and NHTSA's investigation of the design defect and the continuous contact and updates provided to Defendants in connection therewith.

183.    Plaintiff Cardwell and the other members of the Class did not have knowledge of the defect at the time of purchase or lease and therefore, conferred non-gratuitous benefits, either directly or indirectly, upon Defendants by paying monies to retailers in exchange for their Class Vehicles. A portion of such monies was paid to and was received by Defendants.

184.    Defendants retained these non-gratuitous benefits from Plaintiff Cardwell and the other members of the Class, regardless of the fact that Defendants failed to disclose the design defect of which Defendants had actual knowledge. The retention of these benefits by Defendants under these circumstances was unjust and inequitable.

185.    The unjust and inequitable retention of these benefits by Defendants derived from the purchases or leases of the defective Class Vehicles by Plaintiff Cardwell and the other members of the Class violates the principles of justice and equity. Therefore, Defendants must provide restitution to Plaintiff Cardwell and the other members of the Class in a manner established by the Court.

186.    Defendants' express warranty is limited to defects in material and workmanship and, accordingly, does not govern the subject matter of this design defect litigation or preclude this cause of action.

## COUNT VI

**(By Plaintiff Cardwell, Individually, And On Behalf Of All Members Of The Class Who Purchased Or Leased Their Class Vehicles In The State Of Nebraska For Violations Of The Implied Warranty Of Merchantability Pursuant To R.R.S. Neb. (U.C.C.) § 2-314 *et seq.* (2008))**

187.    The allegations of paragraph 1 through 135, except those that are particular to Counts I through V, are re-alleged and incorporated herein by reference.

188.    The Class Vehicles are "goods" within the meaning of the Nebraska Code governing the Implied Warranty of Merchantability.

189.    Defendants are "merchants" within the meaning of the Nebraska Code governing the Implied Warranty of Merchantability because they are sellers and manufacturers of Class Vehicles.

190.    The Implied Warranty of Merchantability is implied in the sale of the Class Vehicles and requires, among other things, that the Class Vehicles pass without objection in the trade and are fit for the ordinary purposes for which the Class Vehicles are used.

191.    The Class Vehicles do not function in their ordinary capacity and were not merchantable at the time of sale because they were defectively designed.

192.    The defect in the Class Vehicles rendered the Class Vehicles non-merchantable because they could not be used for their ordinary purposes and thereby proximately caused the economic damages suffered by Plaintiff Cardwell and the other members of the Class.

193.    Plaintiff Cardwell provided Defendants with notice of the defect on or about January 4, 2008.

194.    Any purported disclaimer or limitation of the Implied Warranty of Merchantability on the part of Defendants is unconscionable and unenforceable because, *inter alia*, Defendants had knowledge of the defect.

### COUNT VII

**(By Plaintiff Burgos Individually, And On Behalf Of All Members Of The Class Who Purchased Or Leased Their Class Vehicles In The State Of Pennsylvania For Violations Of The Implied Warranty Of Merchantability Pursuant To 13 PA. CONS. STAT. § 2314 *et seq.* (2007))**

195.    The allegations of paragraph 1 through 135, except those that are particular to Counts I through VI, are re-alleged and incorporated herein by reference.

196.    The Class Vehicles are "goods" within the meaning of the Pennsylvania statute governing the Implied Warranty of Merchantability.

197.    Defendants are "merchants" within the meaning of the Pennsylvania statute governing the Implied Warranty of Merchantability because they are sellers and manufacturers of Class Vehicles.

198.    The Implied Warranty of Merchantability is implied in the sale of the Class Vehicles and requires, among other things, that the Class Vehicles pass without objection in the trade and are fit for the ordinary purposes for which the Class Vehicles are used.

199.    The Class Vehicles do not function in their ordinary capacity and were not merchantable at the time of sale because they were defectively designed.

200.    The defect in the Class Vehicles rendered the Class Vehicles non-merchantable because they could not be used for their ordinary purposes and thereby

proximately caused the economic damages suffered by Plaintiff Burgos and the other members of the Class.

201. Plaintiff Burgos provided Defendants with notice of the defect on or about January 28, 2007.

202. Any purported disclaimer or limitation of the Implied Warranty of Merchantability on the part of Defendants is unconscionable and unenforceable because, *inter alia*, Defendants had knowledge of the defect.

## COUNT VIII

**(By Plaintiff Scott, Individually, And On Behalf Of All Members Of The Class Who Purchased Or Leased A Class Vehicle In The State Of Michigan For Unjust Enrichment Under Michigan Common Law)**

203. The allegations of paragraph 1 through 135, except those that are particular to Counts I through VII, are re-alleged and incorporated herein by reference.

204. This Count is brought against Defendants pursuant to the common law doctrine of Unjust Enrichment.

205. At all times mentioned herein, Defendants developed, manufactured, marketed and sold the Class Vehicles. The Class Vehicles are defective because they were equipped with: (i) Oiling Nozzles that failed to properly lubricate the Timing Chains, causing the Timing Chains to break and fail to function properly; and (ii) Timing Chains that are less robust than was in production prior to 1999, the result of which was that these less robust Timing Chains would break when not properly lubricated.

206. Defendants had knowledge of the design defect in as early as 1999 as a result of Defendants' internal investigation of timing chain failures. Defendants also had knowledge of the design defect as reflected in the June 1997 TSB 97-T-15A.

207.    Furthermore, Defendants had actual knowledge of the design defect because of complaints received from owners and lessees of Class Vehicles whose Timing Chains failed, and NHTSA's investigation of the design defect and the continuous contact and updates provided to Defendants in connection therewith.

208.    Defendants failed to disclose to Plaintiff Scott and the other members of the Class the material fact that the Class Vehicles contained defective Timing Chains and defective Oiling Nozzles.

209.    Plaintiff Scott and the other members of the Class did not have knowledge of the defect at the time of purchase or lease and therefore, conferred non-gratuitous benefits, either directly or indirectly, upon Defendants by paying monies to retailers in exchange for their Class Vehicles. A portion of such monies was paid to and was received by Defendants.

210.    Defendants retained these non-gratuitous benefits from Plaintiff Scott and the other members of the Class, regardless of the fact that Defendants failed to disclose the design defect of which Defendants had actual knowledge. The retention of these benefits by Defendants under these circumstances was unjust and inequitable.

211.    The unjust and inequitable retention of these benefits by Defendants derived from the purchases or leases of the defective Class Vehicles by Plaintiff Scott and the other members of the Class violates the principles of justice and equity. Therefore, Defendants must provide restitution to Plaintiff Scott and the other members of the Class in a manner established by the Court.

212.    Defendants' express warranty is limited to defects in material and workmanship and, accordingly, does not govern the subject matter of this design defect litigation or preclude this cause of action.

## COUNT IX

**(By Plaintiff Scott Individually, And On Behalf
Of All Members Of The Class Who Purchased Or Leased Their Class Vehicles
In The State Of Michigan For Violations of the Implied Warranty Of
Merchantability Pursuant To MCLS § 440.2314)**

213.    The allegations of paragraph 1 through 135, except those that are particular to Counts I through VIII, are re-alleged and incorporated herein by reference.

214.    The Class Vehicles are "goods" within the meaning of the Michigan statute governing the Implied Warranty of Merchantability.

215.    Defendants are "merchants" within the meaning of the Michigan statute governing the Implied Warranty of Merchantability because they are sellers and manufacturers of Class Vehicles.

216.    The Implied Warranty of Merchantability is implied in the sale of the Class Vehicles and requires, among other things, that the Class Vehicles pass without objection in the trade and are fit for the ordinary purposes for which the Class Vehicles are used.

217.    The Class Vehicles do not function in their ordinary capacity and were not merchantable at the time of sale because they were defectively designed.

218.    The defect in the Class Vehicles rendered the Class Vehicles non-merchantable because they could not be used for their ordinary purposes and thereby proximately caused the economic damages suffered by Plaintiff Scott and the other members of the Class.

219.    Plaintiff Scott provided Defendants with notice of the defect via email correspondence on or about September 25, 2007.

220.    Any purported disclaimer or limitation of the Implied Warranty of Merchantability on the part of Defendants is unconscionable and unenforceable because, *inter alia*, Defendants had knowledge of the defect.

## COUNT X

**(By Plaintiff Bauer, Individually, And On Behalf Of All Members Of The Class Who Purchased Or Leased A Class Vehicle In The State Of Missouri For Unjust Enrichment Under Missouri Common Law)**

221.    The allegations of paragraph 1 through 135, except those that are particular to Counts I through IX, are re-alleged and incorporated herein by reference.

222.    This Count is brought against Defendants pursuant to the common law doctrine of Unjust Enrichment.

223.    At all times mentioned herein, Defendants developed, manufactured, marketed and sold the Class Vehicles. The Class Vehicles are defective because they were equipped with: (i) Oiling Nozzles that failed to properly lubricate the Timing Chains, causing the Timing Chains to break and fail to function properly; and (ii) Timing Chains that are less robust than was in production prior to 1999, the result of which was that these less robust Timing Chains would break when not properly lubricated.

224.    Defendants had knowledge of the design defect in as early as 1999 as a result of Defendants' internal investigation of timing chain failures. Defendants also had knowledge of the design defect as reflected in the June 1997 TSB 97-T-15A.

225.    Furthermore, Defendants had actual knowledge of the design defect because of complaints received from owners and lessees of Class Vehicles whose Timing

Chains failed, and NHTSA's investigation of the design defect and the continuous contact and updates provided to Defendants in connection therewith.

226.    Defendants failed to disclose to Plaintiff Bauer and the other members of the Class the material fact that the Class Vehicles contained defective Timing Chains and defective Oiling Nozzles.

227.    Plaintiff Bauer and the other members of the Class did not have knowledge of the defect at the time of purchase or lease and, therefore, conferred non-gratuitous benefits, either directly or indirectly, upon Defendants by paying monies to retailers in exchange for their Class Vehicles. A portion of such monies was paid to and was received by Defendants.

228.    Defendants retained these non-gratuitous benefits from Plaintiff Bauer and the other members of the Class, regardless of the fact that Defendants failed to disclose the design defect of which Defendants had actual knowledge. The retention of these benefits by Defendants under these circumstances was unjust and inequitable.

229.    The unjust and inequitable retention of these benefits by Defendants derived from the purchases or leases of the defective Class Vehicles by Plaintiff Bauer and the other members of the Class violates the principles of justice and equity. Therefore, Defendants must provide restitution to Plaintiff Bauer and the other members of the Class in a manner established by the Court.

230.    Defendants' express warranty is limited to defects in material and workmanship and, accordingly, does not govern the subject matter of this design defect litigation or preclude this cause of action.

## COUNT XI

**(By Plaintiff Bauer, Individually, And On Behalf Of All Members Of The Class Who Purchased Or Leased Their Class Vehicles In The State Of Missouri For Violations Of The Implied Warranty Of Merchantability Pursuant To Mo. Rev. Stat. § 400.2-314 *et seq.*)**

231.    The allegations of paragraph 1 through 135, except those that are particular to Counts I through X, are re-alleged and incorporated herein by reference.

232.    The Class Vehicles are "goods" within the meaning of the Missouri Statute governing the Implied Warranty of Merchantability.

233.    Defendants are "merchants" within the meaning of the Missouri Statute governing the Implied Warranty of Merchantability because they are sellers and manufacturers of Class Vehicles.

234.    The Implied Warranty of Merchantability is implied in the sale of the Class Vehicles and requires, among other things, that the Class Vehicles pass without objection in the trade and are fit for the ordinary purposes for which the Class Vehicles are used.

235.    The Class Vehicles do not function in their ordinary capacity and were not merchantable at the time of sale because they were defectively designed.

236.    The defect in the Class Vehicles rendered the Class Vehicles non-merchantable because they could not be used for their ordinary purposes and thereby proximately caused the economic damages suffered by Plaintiff Bauer and the other members of the Class.

237.    Any purported disclaimer or limitation of the Implied Warranty of Merchantability on the part of Defendants is unconscionable and unenforceable because, *inter alia*, Defendants had knowledge of the defect.

## COUNT XII

**(By Plaintiff Bauer, Individually, And On Behalf Of All Members Of The
Class Who Purchased Or Leased A Class Vehicle In The State Of Missouri
For Violations Of Mo. Rev. Stat. §§ 407.010 through 407.307)**

238.    The allegations of paragraphs 1 through 135 except those that are
particular to Counts I through XI, are re-alleged and incorporated herein by reference.

239.    This Count is brought against Defendants pursuant to the Missouri
Merchandising Practices Act (the "MMPA").

240.    The MMPA prohibits the use or employment of an omission of a material
fact in connection with the sale or advertisement of any merchandise in trade or
commerce.

241.    At all times mentioned herein, Defendants developed, manufactured,
marketed and sold the Class Vehicles. The Class Vehicles are defective because they
were equipped with: (i) Oiling Nozzles that failed to properly lubricate the Timing
Chains, causing the Timing Chains to break and fail to function properly; and (ii) Timing
Chains that are less robust than was in production prior to 1999, the result of which was
that these less robust Timing Chains would break when not properly lubricated.

242.    Defendants had knowledge of the design defects as early as 1999 as a
result of Defendants' internal investigation of Timing Chain failures.  Defendants also
had knowledge of the design defect as reflected in the June 1997 TSB 97-T-15A.

243.    Furthermore, Defendants had actual knowledge of the design defect
because of complaints received from owners and lessees of Class Vehicles whose Timing
Chains failed, and NHTSA's investigation of the design defect and the continuous
contact and updates provided to Defendants in connection therewith.

244.    Defendants failed to disclose to Plaintiff Bauer and the other members of the Class the material fact that the Class Vehicles contained defective Timing Chains and defective Oiling Nozzles at the time Plaintiff Bauer and the other members of the Class purchased or leased their Class Vehicles.

245.    Plaintiff Bauer and members of the Class purchased their Class Vehicles for personal, family, or household use.

246.    As a result of Defendants' violations of the MMPA, Plaintiff Bauer and the other members of the Class have thereby suffered ascertainable losses in an amount to be determined at trial.

247.    As a result of Defendants' violations of the MMPA, Defendants are liable to Plaintiff Bauer and the other members of the Class for the fees paid for services not performed, interest on those fees, costs of suit, including attorneys' and experts' fees, punitive damages, and such other costs which the Court determines.

## COUNT XIII

**(By Plaintiff Leal, Individually, And On Behalf Of All Members Of The Class Who Purchased Or Leased A Class Vehicle In The State Of Florida For Violation Of The Florida Deceptive And Unfair Trade Practices Act, FLA. STAT. § 501.201 *et seq.*, Florida Statutes ("FDUTPA"))**

248.    The allegations of paragraph 1 through 135, except those that are particular to Counts I through XII, are re-alleged and incorporated herein by reference.

249.    Plaintiff Leal and the other members of the Class are "consumers" as that term is defined in FLA. STAT. § 501.203(7).

250.    Plaintiff Leal and the other members of the Class are "persons" as that term is used in FLA. STAT. § 501.211, and as that term is defined in FLA. STAT. § 1.01(3).

251.    FDUTPA makes unlawful any unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce.

252.    At all times mentioned herein, Defendants developed, manufactured, marketed and sold the Class Vehicles. The Class Vehicles are defective because they were equipped with: (i) Oiling Nozzles that failed to properly lubricate the Timing Chains, causing the Timing Chains to break and fail to function properly; and (ii) Timing Chains that are less robust than was in production prior to 1999, the result of which was that these less robust Timing Chains would break when not properly lubricated.

253.    Defendants had knowledge of the design defect in as early as 1999 as a result of Defendants' internal investigation of timing chain failures. Defendants also had knowledge of the design defect as reflected in the June 1997 TSB 97-T-15A.

254.    Furthermore, Defendants had actual knowledge of the design defect because of complaints received from owners and lessees of Class Vehicles whose Timing Chains failed, and NHTSA's investigation of the design defect and the continuous contact and updates provided to Defendants in connection therewith.

255.    Defendants failed to disclose to Plaintiff Leal and the other members of the Class the material fact that the Class Vehicles contained defective Timing Chains and defective Oiling Nozzles. Defendants' failure to disclose this information constituted a violation of FDUTPA.

256.    Had Defendants informed Plaintiff Leal and the other members of the Class about the defect, Plaintiff Leal and the other members of the Class would not have purchased the defective Class Vehicles.

257.   By paying monies for these defective Class Vehicles, Plaintiff Leal and the other members of the Class have been damaged.

## COUNT XIV

**(By Plaintiff Reid, Individually, And On Behalf Of All Members Of The Class Who Purchased Or Leased A Class Vehicle In The State Of North Carolina For Violations of N. C. GEN. STAT. §§ 75-1.1 et seq. ("NCUDTPA")**

258.   The allegations of paragraph 1 through 135, except those that are particular to Counts I through XIII, are re-alleged and incorporated herein by reference.

259.   At all times mentioned herein, Defendants developed, manufactured, marketed and sold the Class Vehicles. The Class Vehicles are defective because they were equipped with: (i) Oiling Nozzles that failed to properly lubricate the Timing Chains, causing the Timing Chains to break and fail to function properly; and (ii) Timing Chains that are less robust than was in production prior to 1999, the result of which was that these less robust Timing Chains would break when not properly lubricated.

260.   Defendants had knowledge of the design defect in as early as 1999 as a result of Defendants' internal investigation of timing chain failures. Defendants also had knowledge of the design defect as reflected in the June 1997 TSB 97-T-15A.

261.   Furthermore, Defendants had actual knowledge of the design defect because of complaints received from owners and lessees of Class Vehicles whose Timing Chains failed, and NHTSA's investigation of the design defect and the continuous contact and updates provided to Defendants in connection therewith.

262.   Defendants failed to disclose to Plaintiff Reid and the other members of the Class the material fact that the Class Vehicles contained defective Timing Chains and

defective Oiling Nozzles. Defendants' failure to disclose this information constituted a deceptive act or practice that violated NCUDTPA.

263.    Defendants' sales of the Class Vehicles without disclosure of the defect were acts that occurred in or affected commerce.

264.    Had Defendants informed Plaintiff Reid and the other members of the Class about the defect, Plaintiff Reid and the other members of the Class would not have purchased the defective Class Vehicles.

265.    By paying monies for these defective Class Vehicles, Plaintiff Reid and the other members of the Class have been damaged.

## COUNT XV

**(By Plaintiff Menzer, Individually, And On Behalf Of All Members Of The Class Who Purchased Or Leased A Class Vehicle In The State Of California  For Unjust Enrichment/Quasi Contract Under California Common Law)**

266.    The allegations of paragraph 1 through 135, except those that are particular to Counts I through XIV, are re-alleged and incorporated herein by reference.

267.    This Count is brought against Defendants pursuant to the common law doctrine of Unjust Enrichment.

268.    At all times mentioned herein, Defendants developed, manufactured, marketed and sold the Class Vehicles.  The Class Vehicles are defective because they were equipped with: (i) Oiling Nozzles that failed to properly lubricate the Timing Chains, causing the Timing Chains to break and fail to function properly; and (ii) Timing Chains that are less robust than was in production prior to 1999, the result of which was that these less robust Timing Chains would break when not properly lubricated.

269.    Defendants had knowledge of the design defect in as early as 1999 as a result of Defendants' internal investigation of timing chain failures. Defendants also had knowledge of the design defect as reflected in the June 1997 TSB 97-T-15A.

270.    Furthermore, Defendants had actual knowledge of the design defect because of complaints received from owners and lessees of Class Vehicles whose Timing Chains failed, and NHTSA's investigation of the design defect and the continuous contact and updates provided to Defendants in connection therewith.

271.    Defendants failed to disclose to Plaintiff Menzer and the other members of the Class the material fact that the Class Vehicles contained defective Timing Chains and defective Oiling Nozzles.

272.    Plaintiff Menzer and the other members of the Class did not have knowledge of the defect at the time of purchase or lease and therefore, conferred non-gratuitous benefits, either directly or indirectly, upon Defendants by paying monies to retailers in exchange for their Class Vehicles. A portion of such monies was paid to and was received by Defendants.

273.    Defendants retained these non-gratuitous benefits from Plaintiff Menzer and the other members of the Class, regardless of the fact that Defendants failed to disclose the design defect of which Defendants had actual knowledge. The retention of these benefits by Defendants under these circumstances was unjust and inequitable.

274.    The unjust and inequitable retention of these benefits by Defendants derived from the purchases or leases of the defective Class Vehicles by Plaintiff Menzer and the other members of the Class violates the principles of justice and equity.

86

Therefore, Defendants must provide restitution to Plaintiff Menzer and the other members of the Class in a manner established by the Court.

275.    Defendants' express warranty is limited to defects in material and workmanship and accordingly does not govern the subject matter of this design defect litigation or preclude this cause of action.

## COUNT XVI

**(By Plaintiff Menzer, Individually, And On Behalf Of All Members Of The Class Who Purchased Or Leased A Class Vehicle In The State Of California For Violations Of The California Consumer Legal Remedies Act, CAL. CIV. CODE § 1750, *et seq.*)**

276.    The allegations of paragraph 1 through 135, except those that are particular to Counts I through XV, are re-alleged and incorporated herein by reference.

277.    At all times relevant herein, the Consumer Legal Remedies Act ("CLRA") was in effect. CLRA prohibits "unfair or deceptive acts or practices."

278.    At all times mentioned herein, Defendants developed, manufactured, marketed and sold the Class Vehicles. The Class Vehicles are defective because they were equipped with: (i) Oiling Nozzles that failed to properly lubricate the Timing Chains, causing the Timing Chains to break and fail to function properly; and (ii) Timing Chains that are less robust than was in production prior to 1999, the result of which was that these less robust Timing Chains would break when not properly lubricated.

279.    Defendants had knowledge of the design defect in as early as 1999 as a result of Defendants' internal investigation of timing chain failures. Defendants also had knowledge of the design defect as reflected in the June 1997 TSB 97-T-15A.

280.    Furthermore, Defendants had actual knowledge of the design defect because of complaints received from owners and lessees of Class Vehicles whose Timing Chains failed, and NHTSA's investigation of the design defect and the continuous contact and updates provided to Defendants in connection therewith.

281.    Defendants failed to disclose to Plaintiff Menzer and the other members of the Class the material fact that the Class Vehicles contained defective Timing Chains and defective Oiling Nozzles.  The failure to disclose this defect constituted a violation of CAL. CIV. CODE §§ 1750(a)(5) and 1750(a)(7).

282.    The defect described herein was a material fact related to the safety of the Class Vehicles known only to Defendants.  Accordingly, Defendants were under a duty to disclose the existence of the defect in the Class Vehicles to Plaintiff Menzer and the other members of the Class.

283.    Furthermore, had Plaintiff Menzer and the other members of the Class known about the design defect, they would not have purchased their Class Vehicles. Defendants, at all relevant times, knew that Plaintiff Menzer and the other members of the Class did not know or could not have reasonably discovered the defect prior to their purchases.

284.    On or about April 17, 2008, Plaintiff Menzer first discovered that her Class Vehicle contained a defect regarding the Timing Chain and Oiling Nozzle.  Prior to this date Plaintiff Menzer had no reasonable means to learn of this defect.

285.    On May 9, 2008, Plaintiff Menzer sent Defendants a demand letter, as required by CAL. CIV. CODE § 1782.

286. Defendants have failed to comply with the demands set forth in the Demand Letter.

287. By purchasing the defective Class Vehicles, Plaintiff Menzer and the other members of the Class have been damaged.

## COUNT XVII

**(On Behalf Of Plaintiff Menzer, Individually, And On Behalf Of All Members Of The Class Who Purchased Or Leased A Class Vehicle In The State Of California For Violations Of California Business & Professions Code §17200 *et seq.* )**

288. The allegations of paragraphs 1 through 135, except those that are particular to Counts I through XVI, are re-alleged and incorporated herein by reference.

289. This Count is brought against Defendants pursuant to CAL. BUS. & PROF. CODE §17200 *et seq.* (the "UCL").

290. At all times mentioned herein, Defendants developed, manufactured, marketed and sold the Class Vehicles. The Class Vehicles are defective because they were equipped with: (i) Oiling Nozzles that failed to properly lubricate the Timing Chains, causing the Timing Chains to break and fail to function properly; and (ii) Timing Chains that are less robust than was in production prior to 1999, the result of which was that these less robust Timing Chains would break when not properly lubricated.

291. Defendants had knowledge of the design defects in as early as 1999 as a result of Defendants' internal investigation of Timing Chain failures. Defendants also had knowledge of the design defect as reflected in the June 1997 TSB 97-T-15A.

292. Furthermore, Defendants had actual knowledge of the design defect because of complaints received from owners and lessees of Class Vehicles whose Timing

Chains failed, and NHTSA's investigation of the design defect and the continuous contact and updates provided to Defendants in connection therewith.

293.    Defendants failed to disclose to Plaintiff Menzer and the other members of the Class the material fact that the Class Vehicles contained defective Timing Chains and defective Oiling Nozzles.

294.    Plaintiff Menzer and the other members of the Class did not have knowledge of the defect at the time of purchase or lease of their Class Vehicles.

295.    Defendants' business acts and practices alleged herein are unlawful within the meaning of CAL. BUS. & PROF. CODE §17200 *et seq.* Specifically, Defendants' acts and practices are unlawful because they violate Civil Code § 1790 and because they rise to the level of a breach of the implied warranty of merchantability.

296.    Defendants' business acts and practices alleged herein are fraudulent within the meaning of CAL. BUS. & PROF. CODE §17200 *et seq.* Specifically, as an entity with exclusive knowledge regarding the defect in the Class Vehicles, Defendants had a duty to disclose the defect to Plaintiff Menzer and the other members of the Class. Plaintiff Menzer and the other members of the Class reasonably expected that Defendants would disclose the existence of any defect in the Class Vehicles to them, information which is and was material to Plaintiff Menzer and the other members of the Class.

297.    By failing and refusing to disclose the existence of a defect in the Class Vehicles, Defendants have engaged in actionable, fraudulent conduct within the meaning of the UCL. Had Plaintiff Menzer and the other members of the Class known about the defect in the Class Vehicles, they would not have purchased or leased the Class Vehicles

or, in the alternative, they would have paid substantially less to purchase or lease the Class Vehicles.

298.    Defendants' business acts and practices alleged herein are unfair within the meaning of CAL. BUS. & PROF. CODE §17200 *et seq.* Specifically, by failing to disclose and concealing the existence of the defect in the Vehicles, Defendants have engaged in unfair conduct within the meaning of the UCL.

299.    The benefit of any actions undertaken by Defendants in connection with the defect in the Class Vehicles is grossly outweighed by the harm caused to Plaintiff Menzer and the other members of the Class as a result of Defendants' misconduct. Moreover, the nature of Defendants' misconduct has been consistently recognized as unfair conduct within the meaning of the UCL as it offends established public policy and/or is immoral, unethical, oppressive, unscrupulous and substantially injurious to consumers.

300.    Plaintiff Menzer and the other members of the Class have suffered actual injuries because, *inter alia*, they have been required to make out-of-pocket payments for repairs arising out of the defect in the Class Vehicles. Furthermore, Plaintiff Menzer and the other members of the Class have suffered actual injuries because they paid more to purchase or lease the Class Vehicles than they would have if all material information, including information regarding the defect in the Class Vehicles, had been disclosed to them.

301.    Defendants' unlawful, unfair and fraudulent business acts and practices continue through the date of this Complaint's filing and, absent a Court order, Defendants will not comply with their obligations under CAL. BUS. & PROF. CODE § 17200.

302.    Under Business & Professions Code §17203, Plaintiff Menzer, on her own behalf, and on behalf of all members of the Class, seeks a court order requiring Defendants to immediately cease the above described acts of unfair competition and for all further relief which is available, as well as appropriate and just to grant, under the UCL.

## COUNT XVIII

**(By Plaintiff Fowler, Individually, And On Behalf Of All Members Of The Class Who Purchased Or Leased A Class Vehicle In The State Of Wisconsin For Unjust Enrichment Under Wisconsin Common Law)**

303.    The allegations of paragraph 1 through 135, except those that are particular to Counts I through XVII, are re-alleged and incorporated herein by reference.

304.    This Count is brought against Defendants pursuant to the common law doctrine of Unjust Enrichment.

305.    At all times mentioned herein, Defendants developed, manufactured, marketed and sold the Class Vehicles. The Class Vehicles are defective because they were equipped with: (i) Oiling Nozzles that failed to properly lubricate the Timing Chains, causing the Timing Chains to break and fail to function properly; and (ii) Timing Chains that are less robust than was in production prior to 1999, the result of which was that these less robust Timing Chains would break when not properly lubricated.

306.    Defendants had knowledge of the design defect in as early as 1999 as a result of Defendants' internal investigation of timing chain failures. Defendants also had knowledge of the design defect as reflected in the June 1997 TSB 97-T-15A.

307.    Furthermore, Defendants had actual knowledge of the design defect because of complaints received from owners and lessees of Class Vehicles whose Timing

Chains failed, and NHTSA's investigation of the design defect and the continuous contact and updates provided to Defendants in connection therewith.

308.    Defendants failed to disclose to Plaintiff Fowler and the other members of the Class the material fact that the Class Vehicles contained defective Timing Chains and defective Oiling Nozzles.

309.    Plaintiff Fowler and the other members of the Class did not have knowledge of the defect at the time of purchase or lease and therefore, conferred non-gratuitous benefits, either directly or indirectly, upon Defendants by paying monies to retailers in exchange for their Class Vehicles. A portion of such monies was paid to and was received by Defendants.

310.    Defendants retained these non-gratuitous benefits from Plaintiff Fowler and the other members of the Class, regardless of the fact that Defendants failed to disclose the design defect of which Defendants had actual knowledge. The retention of these benefits by Defendants under these circumstances was unjust and inequitable.

311.    Defendants had knowledge of and appreciated these non-gratuitous benefits.

312.    The unjust and inequitable retention of these benefits by Defendants derived from the purchases or leases of the defective Class Vehicles by Plaintiff Fowler and the other members of the Class violates the principles of justice and equity. Therefore, Defendants must provide restitution to Plaintiff Fowler and the other members of the Class in a manner established by the Court.

313.    Defendants' express warranty is limited to defects in material and workmanship and, accordingly, does not govern the subject matter of this design defect litigation or preclude this cause of action.

## COUNT XIX

**(By Plaintiff Stoffer, Individually, And On Behalf Of All Members Of The Class Who Purchased Or Leased Their Class Vehicles In The State Of Indiana For Unjust Enrichment Under Indiana Common Law)**

314.    The allegations of paragraph 1 through 135, except those that are particular to Counts 1 through XVIII are re-alleged and incorporated herein by reference.

315.    This Count is brought against Defendants pursuant to the common law doctrine of Unjust Enrichment.

316.    At all times mentioned herein, Defendants developed, manufactured, marketed and sold the Class Vehicles. The Class Vehicles are defective because they were equipped with: (i) Oiling Nozzles that failed to properly lubricate the Timing Chains, causing the Timing Chains to break and fail to function properly; and (ii) Timing Chains that are less robust than was in production prior to 1999, the result of which was that these less robust Timing Chains would break when not properly lubricated.

317.    Defendants had knowledge of the design defect in as early as 1999 as a result of Defendants' internal investigation of timing chain failures. Defendants also had knowledge of the design defect as reflected in the June 1997 TSB 97-T-15A.

318.    Furthermore, Defendants had actual knowledge of the design defect because of complaints received from owners and lessees of Class Vehicles whose Timing Chains failed, and NHTSA's investigation of the design defect and the continuous contact and updates provided to Defendants in connection therewith.

319.    Defendants failed to disclose to Plaintiff Stoffer and the other members of the Class the material fact that the Class Vehicles contained defective Timing Chains and defective Oiling Nozzles.

320.    Plaintiff Stoffer and the other members of the Class did not have knowledge of the defect at the time of purchase or lease and therefore, conferred non-gratuitous benefits, either directly or indirectly, upon Defendants by paying monies to retailers in exchange for their Class Vehicles. A portion of such monies was paid to and was received by Defendants.

321.    Defendants retained these non-gratuitous benefits from Plaintiff Stoffer and the other members of the Class, regardless of the fact that Defendants failed to disclose the design defect of which Defendants had actual knowledge. The retention of these benefits by Defendants under these circumstances is unjust and inequitable.

322.    The unjust and inequitable retention of these benefits by Defendants derived from the purchases or leases of the defective Class Vehicles by Plaintiff Stoffer and the other members of the Class violates the principles of justice and equity. Therefore, Defendants must provide restitution to Plaintiff Stoffer and the other members of the Class in a manner established by the Court.

323.    Defendants' express warranty is limited to defects in material and workmanship and accordingly does not govern the subject matter of this design defect litigation or preclude this cause of action.

## COUNT XX

**(By Plaintiff Stoffer, Individually, And On Behalf Of All Members Of The Class Who Purchased Or Leased Their Class Vehicles In The State Of Indiana For Violations Of The Implied Warranty of Merchantability Pursuant To IND. CODE ANN. § 26-2-314 *et seq.*)**

324.    The allegations of paragraph 1 through 135, except those that are particular to Counts I through XIX, are re-alleged and incorporated herein by reference.

325.    The Class Vehicles are "goods" within the meaning of the Indiana Code governing the Implied Warranty of Merchantability.

326.    Defendants are "merchants" within the meaning of the Indiana Code governing the Implied Warranty of Merchantability because they are sellers and manufacturers of Class Vehicles.

327.    The Implied Warranty of Merchantability is implied in the sale of the Class Vehicles and requires, among other things, that the Class Vehicles pass without objection in the trade and are fit for the ordinary purposes for which the Class Vehicles are used.

328.    The Class Vehicles do not function in their ordinary capacity and were not merchantable at the time of sale because they were defectively designed.

329.    The defect in the Class Vehicles rendered the Class Vehicles non-merchantable because they could not be used for their ordinary purposes and thereby proximately caused the economic damages suffered by Plaintiff Stoffer and the other members of the Class.

330.    Plaintiff Stoffer provided Defendants with notice of the defect via letter on April 10, 2008.

331.    Any purported disclaimer or limitation of the Implied Warranty of Merchantability on the part of Defendants is unconscionable and unenforceable because, *inter alia*, Defendants had knowledge of the defect.

### COUNT XXI

**(By Plaintiff Anderson, Individually, And On Behalf Of All Members Of The Class Who Purchased Or Leased Their Class Vehicles In The State Of Illinois For Unjust Enrichment Under Illinois Common Law)**

332.    The allegations of paragraph 1 through 135, except those that are particular to Counts I through XX, are re-alleged and incorporated herein by reference.

333.    This Count is brought against Defendants pursuant to the common law doctrine of Unjust Enrichment.

334.    At all times mentioned herein, Defendants developed, manufactured, marketed and sold the Class Vehicles. The Class Vehicles are defective because they were equipped with: (i) Oiling Nozzles that failed to properly lubricate the Timing Chains, causing the Timing Chains to break and fail to function properly; and (ii) Timing Chains that are less robust than was in production prior to 1999, the result of which was that these less robust Timing Chains would break when not properly lubricated.

335.    Defendants had knowledge of the design defect as early as 1999 as a result of Defendants' internal investigation of timing chain failures.  Defendants also had knowledge of the design defect as reflected in the June 1997 TSB 97-T-15A.

336.    Furthermore, Defendants had actual knowledge of the design defect because of complaints received from owners and lessees of Class Vehicles whose Timing Chains failed, and NHTSA's investigation of the design defect and the continuous contact and updates provided to Defendants in connection therewith.

337.    Defendants failed to disclose to Plaintiff Anderson and the other members of the Class the material fact that the Class Vehicles contained defective Timing Chains and defective Oiling Nozzles.

338.    Plaintiff Anderson and the other members of the Class did not have knowledge of the defect at the time of purchase or lease and therefore, conferred non-gratuitous benefits, either directly or indirectly, upon Defendants by paying monies to retailers in exchange for their Class Vehicles.  A portion of such monies was paid to and was received by Defendants.

339.    Defendants retained these non-gratuitous benefits from Plaintiff Anderson and the other members of the Class, regardless of the fact that Defendants failed to disclose the design defect of which Defendants had actual knowledge.  The retention of these benefits by Defendants under these circumstances was unjust and inequitable.

340.    The unjust and inequitable retention of these benefits by Defendants derived from the purchases or leases of the defective Class Vehicles by Plaintiff Anderson and the other members of the Class violates the principles of justice and equity. Therefore, Defendants must provide restitution to Plaintiff Anderson and the other members of the Class in a manner established by the Court.

341.    Defendants' express warranty is limited to defects in material and workmanship and accordingly does not govern the subject matter of this design defect litigation or preclude this cause of action. Accordingly, Plaintiff Anderson does not have an adequate remedy at law.

## COUNT XXII

**(By Plaintiff Anderson, Individually, And On Behalf Of All Class Members Who Purchased Or Leased A Class Vehicle In The State Of Illinois For Violations Of Illinois Consumer Fraud And Deceptive Business Practices Act, 815 ILCS 505/1 *et seq.*)**

342.    The allegations of paragraph 1 through 135, except those that are particular to Counts I through XXI, are re-alleged and incorporated herein by reference.

343.    At all times relevant herein Illinois' Consumer Fraud and Deceptive Business Practices Act ("ICFA") was in effect. ICFA prohibits "unfair or deceptive practices."

344.    Plaintiff Anderson and the other members of the Class are "consumers."

345.    At all times mentioned herein, Defendants developed, manufactured, marketed and sold the Class Vehicles. The Class Vehicles are defective because they were equipped with: (i) Oiling Nozzles that failed to properly lubricate the Timing Chains, causing the Timing Chains to break and fail to function properly; and (ii) Timing Chains that are less robust than was in production prior to 1999, the result of which was that these less robust Timing Chains would break when not properly lubricated.

346.    Defendants had knowledge of the design defect in as early as 1999 as a result of Defendants' internal investigation of timing chain failures. Defendants also had knowledge of the design defect as reflected in the June 1997 TSB 97-T-15A.

347.    Furthermore, Defendants had actual knowledge of the design defect because of complaints received from owners and lessees of Class Vehicles whose Timing Chains failed, and NHTSA's investigation of the design defect and the continuous contact and updates provided to Defendants in connection therewith.

348. Defendants failed to disclose to Plaintiff Anderson and the other members of the Class the material fact that the Class Vehicles contained defective Timing Chains and defective Oiling Nozzles.

349. Defendants' failure to disclose the existence of the defect constitutes an unfair and deceptive act under ICFA.

350. Defendants intended, and continue to intend, that Plaintiff Anderson and the other members of the Class rely on the omission of the defect.

351. If not for Defendants' deceptive and unfair act of concealing from Plaintiff and the Class the existence of the design defect in the Class Vehicles, Plaintiff Anderson and the other members of the Class would not have purchased the Class Vehicles.

## COUNT XXIII

**(By Plaintiffs Bauer, Cardwell, Faust, Menzer, Scott And Stoffer, Individually, And On Behalf Of All Those That Purchased Or Leased A Class Vehicle In Arkansas, California, Colorado, Connecticut, Hawaii, Indiana, Iowa, Michigan, Mississippi, Missouri, Nebraska, New Hampshire, New Jersey, New York, Oklahoma, Vermont Or West Virginia For Unjust Enrichment)**

352. The allegations of paragraph 1 through 135, except those that are particular to Counts I through XXII, are re-alleged and incorporated herein by reference.

353. This Count is brought against Defendants pursuant to the common law doctrine of Unjust Enrichment.

354. At all times mentioned herein, Defendants developed, manufactured, marketed and sold the Class Vehicles. The Class Vehicles are defective because they were equipped with: (i) Oiling Nozzles that failed to properly lubricate the Timing Chains, causing the Timing Chains to break and fail to function properly; and (ii) Timing

Chains that are less robust than was in production prior to 1999, the result of which was that these less robust Timing Chains would break when not properly lubricated.

355.    Defendants had knowledge of the design defect as early as 1999 as a result of Defendants' internal investigation of timing chain failures. Defendants also had knowledge of the design defect as reflected in the June 1997 TSB 97-T-15A.

356.    Furthermore, Defendants had actual knowledge of the design defect because of complaints received from owners and lessees of Class Vehicles whose Timing Chains failed, and NHTSA's investigation of the design defect and the continuous contact and updates provided to Defendants in connection therewith.

357.    Defendants failed to disclose to Plaintiffs Bauer, Cardwell, Faust, Menzer, Scott and Stoffer and the other members of the Class the material fact that the Class Vehicles contained defective Timing Chains and defective Oiling Nozzles.

358.    Plaintiffs Bauer, Cardwell, Faust, Menzer, Scott and Stoffer and the other members of the Class did not have knowledge of the defect at the time of purchase or lease and therefore, conferred non-gratuitous benefits, either directly or indirectly, upon Defendants by paying monies to retailers in exchange for their Class Vehicles. A portion of such monies was paid to and was received by Defendants.

359.    Defendants retained these non-gratuitous benefits from Plaintiffs Bauer, Cardwell, Faust, Menzer, Scott and Stoffer and the other members of the Class, regardless of the fact that Defendants failed to disclose the design defect of which Defendants had actual knowledge. The retention of these benefits by Defendants under these circumstances was unjust and inequitable.

360.    The unjust and inequitable retention of these benefits by Defendants derived from the purchases or leases of the defective Class Vehicles by Plaintiffs Bauer, Cardwell, Faust, Menzer, Scott and Stoffer and the other members of the Class violates the principles of justice and equity. Therefore, Defendants must provide restitution to Plaintiffs Bauer, Cardwell, Faust, Menzer, Scott and Stoffer and the other members of the Class in a manner established by the Court.

361.    Defendants' express warranty is limited to defects in material and workmanship and accordingly does not govern the subject matter of this design defect litigation or preclude this cause of action.

## COUNT XXIV

**(By Plaintiff Fowler, Individually, And On Behalf Of All Those That Purchased Or Leased A Class Vehicle In Alaska, District Of Columbia, Georgia; Kansas, Kentucky Maine, Minnesota, Nevada, New Mexico, Oregon, Rhode Island, South Carolina, South Dakota, Utah, Virginia, Washington Or Wisconsin For Unjust Enrichment)**

362.    The allegations of paragraph 1 through 135, except those that are particular to Counts I through XXIII, are re-alleged and incorporated herein by reference.

363.    This Count is brought against Defendants pursuant to the common law doctrine of Unjust Enrichment.

364.    At all times mentioned herein, Defendants developed, manufactured, marketed and sold the Class Vehicles. The Class Vehicles are defective because they were equipped with: (i) Oiling Nozzles that failed to properly lubricate the Timing Chains, causing the Timing Chains to break and fail to function properly; and (ii) Timing Chains that are less robust than was in production prior to 1999, the result of which was that these less robust Timing Chains would break when not properly lubricated.

365.    Defendants had knowledge of the design defect in as early as 1999 as a result of Defendants' internal investigation of timing chain failures. Defendants also had knowledge of the design defect as reflected in the June 1997 TSB 97-T-15A.

366.    Furthermore, Defendants had actual knowledge of the design defect because of complaints received from owners and lessees of Class Vehicles whose Timing Chains failed, and NHTSA's investigation of the design defect and the continuous contact and updates provided to Defendants in connection therewith.

367.    Defendants failed to disclose to Plaintiff Fowler and the other members of the Class the material fact that the Class Vehicles contained defective Timing Chains and defective Oiling Nozzles.

368.    Plaintiff Fowler and the other members of the Class did not have knowledge of the defect at the time of purchase or lease and therefore, conferred non-gratuitous benefits, either directly or indirectly, upon Defendants by paying monies to retailers in exchange for their Class Vehicles. A portion of such monies was paid to and was received by Defendants.

369.    Defendants retained these non-gratuitous benefits from Plaintiff Fowler and the other members of the Class, regardless of the fact that Defendants failed to disclose the design defect of which Defendants had actual knowledge. The retention of these benefits by Defendants under these circumstances was unjust and inequitable.

370.    Defendants had knowledge of and appreciated these non-gratuitous benefits.

371.    The unjust and inequitable retention of these benefits by Defendants derived from the purchases or leases of the defective Class Vehicles by Plaintiff Fowler

and the other members of the Class violates the principles of justice and equity. Therefore, Defendants must provide restitution to Plaintiff Fowler and the other members of the Class in a manner established by the Court.

372.    Defendants' express warranty is limited to defects in material and workmanship and accordingly does not govern the subject matter of this design defect litigation or preclude this cause of action.

## COUNT XXV

**(By Plaintiffs Burgos, Cardwell, Faust, Scott And Stoffer, Individually, And On Behalf Of All Those That Purchased Or Leased A Class Vehicle In Alaska, Arkansas, Colorado, Delaware, Hawaii, Indiana, Iowa, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Montana, Nebraska, Nevada, New Hampshire, New Jersey, North Dakota, Oklahoma, Pennsylvania, South Carolina, South Dakota, Virginia, West Virginia Or Wyoming And Purchasers Of New Class Vehicles In Texas For Breach Of Implied Warranty Of Merchantability)**

373.    The allegations of paragraph 1 through 135, except those that are particular to Counts I through XXIV, are re-alleged and incorporated herein by reference.

374.    The Class Vehicles are "goods" within the meaning of that term under the Implied Warranty of Merchantability statutes of the States listed herein.

375.    Defendants are "merchants" within the meaning of that term under the Implied Warranty of Merchantability statutes listed herein because they are sellers and manufacturers of Class Vehicles.

376.    The Implied Warranty of Merchantability is implied in the sale of the Class Vehicles and requires, among other things, that the Class Vehicles pass without objection in the trade and are fit for the ordinary purposes for which the Class Vehicles are used.

377.    The Class Vehicles do not function in their ordinary capacity and were not merchantable at the time of sale because they were defectively designed.

378.    The defect in the Class Vehicles rendered the Class Vehicles non-merchantable because they could not be used for their ordinary purposes and thereby proximately caused the economic damages suffered by Plaintiffs Burgos, Cardwell, Faust, Scott and Stoffer and the other members of the Class.

379.    Plaintiffs Burgos, Cardwell, Faust, Scott and Stoffer provided Defendants with notice of the defect.

380.    Any purported disclaimer or limitation of the Implied Warranty of Merchantability on the part of Defendants is unconscionable and unenforceable because, *inter alia*, Defendants had knowledge of the defect.

## COUNT XXVI

**(By Plaintiffs Burgos, Cardwell, Faust, Scott And Stoffer, Individually, And On Behalf Of All Those That Purchased Or Leased A Class Vehicle In Alaska, Arkansas, Colorado, Delaware, Hawaii, Indiana, Iowa, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Montana, Nebraska, Nevada, New Hampshire, New Jersey, North Dakota, Oklahoma, Pennsylvania, South Carolina, South Dakota, Virginia, West Virginia Or Wyoming, And Purchasers Of New Class Vehicles In Texas, For Breach Of Implied Warranty Of Merchantability Pursuant To 15 U.S.C. § 2301 *et seq.*)**

381.    The allegations of paragraph 1 through 135, except those that are particular to Counts I through XXV, are re-alleged and incorporated herein by reference.

382.    This Count is brought against Defendants for breach of Implied Warranty of Merchantability pursuant 15 U.S.C. § 2301 *et seq.*

383.    The Class Vehicles are "goods."

384.    Plaintiffs Burgos, Cardwell, Faust, Scott and Stoffer and the other members of the Class are "consumers."

385.    Defendants are "merchants" because they are sellers and manufacturers of Class Vehicles.

386.    The Implied Warranty of Merchantability is implied in the sale of the Class Vehicles and requires, among other things, that the Class Vehicles pass without objection in the trade and are fit for the ordinary purposes for which the Class Vehicles are used.

387.    The Class Vehicles do not function in their ordinary capacity and were not merchantable at the time of sale because they were defectively designed.

388.    The defect in the Class Vehicles rendered the Class Vehicles non-merchantable because they could not be used for their ordinary purposes and thereby proximately caused the economic damages suffered by Plaintiffs Burgos, Cardwell, Faust, Scott and Stoffer and the other members of the Class.

389.    Plaintiffs Burgos, Cardwell, Faust, Scott and Stoffer provided Defendants with notice of the defect.

390.    Any purported disclaimer or limitation of the Implied Warranty of Merchantability on the part of Defendants is unconscionable and unenforceable because, inter alia, Defendants had knowledge of the defect.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray that this Court:

a.    Certify this action as a class action under Rule 23;

b.    Order Defendants to pay Plaintiffs and members of the Class an amount of

actual damages to be determined at trial;

c.   Issue an injunction preventing Defendants from manufacturing and selling

the defective Class Vehicles;

d.   Issue an order granting Plaintiffs reasonable costs and attorneys' fees; and

e.   Grant such other relief as may be just and proper.

Dated: June 11, 2008

By:   /s/ Michael A. Schwartz
      PAUL O. PARADIS
      MICHAEL A. SCHWARTZ
      GINA M. TUFARO
      EDWARD Y. KROUB
      **HORWITZ, HORWITZ &**
      **PARADIS,**
      **Attorneys at Law**
      28 West 44th Street
      New York, NY 10036
      Tel: 212-404-2200
      Fax: 212-404-2226
      mschwartz@hhplawny.com

      JAMES E. MILLER
      LAURIE RUBINOW
      **SHEPHERD FINKELMAN**
      **MILLER & SHAH, LLP**
      65 Main Street
      Chester, CT 06412
      (Tel) (860) 526-1100
      (Fax)(860) 526-1120
      jmiller@sfmslaw.com

      *Co-Lead Counsel for Plaintiffs*
      *and the Class*

WILLIAM L. REINBRECHT
PAMELA A. CAR
**CAR & REINBRECHT, PC**
8720 Fredrick Street
Suite 105
Omaha, NE 68124
Telephone: (402) 391-8484
Facsimile: (402) 391-1103

*Liaison Counsel for Plaintiffs and
the Class*

## CERTIFICATE OF SERVICE

I, Michael A. Schwartz, hereby certify that on June 11, 2008, I caused a true and correct copy of Plaintiffs' Consolidated Amended Complaint to be served upon the following counsel of record for Defendants via electronic court filing and overnight mail (as indicated):

Timothy A. Daniels
FIGARI & DAVENPORT, LLP
901 Main Street
3400 Bank of America Plaza
Dallas, Texas 75202
Telephone: (214) 939-2005
Facsimile: (214) 939-2090
(*via* FedEx and ECF)

Rodney M. Confer
**KNUDSEN, BERKHEIMER,**
RICHARDSON & ENDACOTT, LLP
3800 VerMaas Place
Suite 200
Lincoln, NE 68502
Telephone: (402) 475-7011
Facsimile: (402) 475-8912
(*via* ECF only)

*Counsel for Defendants*

Dated: June 11, 2008

/s/ Michael A. Schwartz

# EXHIBIT E TO PROOF OF CLAIM



**IN RE SATURN L-SERIES TIMING CHAIN PRODUCTS
LIABILITY LITIGATION; This document relates to: ALL
ACTIONS (8:07cv298 & 8:08cv79)**

**MDL NO. 1920,8:07cv298&8:08cv79**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF
NEBRASKA**

*2008 U.S. Dist. LEXIS 109978*

**November 7, 2008, Decided
November 7, 2008, Filed**

**COUNSEL:** [*1] For Amy Faust, individually, and on behalf of all others similarly situated, Plaintiff: Brant C. Martin, WICK, PHILLIPS LAW FIRM, Dallas, TX; Douglas P. Dehler, SHEPHED, FINKELMAN LAW FIRM -WISCONSIN, Milwaukee, WI; Gina M. Tufaro, Michael A. Schwartz, Paul O. Paradis, PRO HAC VICE, HORWITZ, HORWITZ LAW FIRM - NEW YORK, New York, NY; James E. Miller, Laurie Rubinow, PRO HAC VICE, SHEPHERD FINKELMAN LAW FIRM, Chester, CT; William L. Reinbrecht, Pamela A. Car, CAR, REINBRECHT LAW FIRM, Omaha, NE.

For Amy Faust, Brian Fowler, Jesus Leal, Jeanne Menzer, Charles Reid, Cynthia Scott, Debra Stoffer, William Anderson, Jeremy Bauer, Antonio Burgos, Jennifer Cardwell, Plaintiffs: Michael A. Schwartz, Paul O. Paradis, PRO HAC VICE, HORWITZ, HORWITZ LAW FIRM - NEW YORK, New York, NY; Pamela A. Car, William L. Reinbrecht, CAR, REINBRECHT LAW FIRM, Omaha, NE.

For Saturn, Corporation, General Motors, Corporation, Defendants: A. Erin Dwyer, Amanda Sotak, Timothy A. Daniels, PRO HAC VICE, FIGARI, DAVENPORT LAW FIRM, Dallas, TX; Rodney M. Confer, KNUDSEN, BERKHEIMER LAW FIRM, Lincoln, NE.

For U.S. Bankruptcy Court, Interested Party: U.S. Bankruptcy Clerk, U.S. BANKRUPTCY COURT - OMAHA, Roman L. Hruska [*2] Courthouse, Omaha, NE.

**JUDGES:** Laurie Smith Camp, United States District Judge.

**OPINION BY:** Laurie Smith Camp

**OPINION**

**MEMORANDUM AND ORDER**

This matter is before the Court on the Motion to Dismiss ("Motion") (Filing No. 70 in Lead Case No. 8:07cv298; and Filing No. 68 in Member Case No. 8:08cv79). [1] The Defendants, General Motors Corporation ("GM") and Sat-

urn Corporation ("Saturn") have moved to dismiss the Plaintiffs' Consolidated Amended Complaint ("Complaint") (Filing No. 59) under *Fed. R. Civ. P. 12(b)(6)*. For the reasons stated below, the Motion will be granted in part and denied in part.

> 1   Further references to Filing Numbers herein will be to the "Lead" Case 8:07cv298, so designated by Magistrate Judge Gossett in his March 28, 2008, Consolidation Order (Filing No. 55).

## STANDARD OF REVIEW

Pursuant to the Federal Rules of Civil Procedure, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." *Fed. R. Civ. P. 8(a)(2).* "While a complaint attacked by a *Rule 12 (b)(6)* motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic [*3] recitation of the elements of a cause of action will not do." *Bell Atlantic Corp v. Twombly, 550 U.S. 544, 127 S.Ct. 1955, 1964-65, 167 L. Ed. 2d 929 (2007)*(quotations omitted). "The complaint must allege facts, which, when taken as true, raise more than a speculative right to relief." *Benton v. Merrill Lynch & Co., Inc., 524 F.3d 866, 870 (8th Cir. 2008)*, (citing *Twombly, 127 S.Ct. at 1965).*

When ruling on a Defendant's motion to dismiss, a judge must rule "on the assumption that all the allegations in the complaint are true." *Twombly, 127 S.Ct. at 1965.* The complaint must contain "enough fact to raise a reasonable expectation that discovery will reveal evidence "to substantiate the necessary elements of the plaintiff's claim. *Id.* The Court will grant a *Rule 12(b)(6)* motion "only in the unusual case in which a plaintiff includes allegations that show on the face of the complaint that there is some insuperable bar to relief."

*Parnes v. Gateway 2000, Inc., 122 F.3d 539, 546 (8th Cir. 1997).*

## FACTS

The factual allegations in the Complaint are accepted as true for purposes of the pending motion. In summary, the Plaintiffs allege that they suffered damage as a result of purchasing or leasing certain Saturn vehicles [*4] with defective timing chains and timing-chain oiling nozzles.

The cars in question were manufactured by the Defendants in 1999 through 2002 and sold as model year 2000 -2003 vehicles. To produce quiet vehicles, the Defendants allegedly used fragile timing chains with under-sized pins lacking adequate chrome coating. The timing chains were oiled by means of oiling nozzles that prevented oil from flowing to the timing chains at low and idle speeds. Plaintiffs contend that the lack of oil caused excessive heat in the timing chains, causing the metal to bend, stretch, and/or become brittle, and ultimately break.

The Plaintiffs seek class certification and present twenty-six claims for relief, in the general categories of unjust enrichment, breach of implied warranty of merchantability, state Uniform Deceptive and Unfair Trade Practices Act violations, and state consumer protection law violations.

The following factual allegations presented in the Consolidated Amended Complaint are material to the Defendants' pending motion to dismiss.

The Plaintiffs in this case are eleven individuals residing in various states, all of whom purchased or leased one of three kinds of Saturn automobiles: a model [*5] year 2000-2003 Saturn L-Series, a model year 2002-2003 Saturn Vue, or a model year 2003 Saturn Ion (collectively, "Class Vehicles"). [2] Each of these three kinds of car was equipped with a 2.2L Ecotec L61 Engine, and each of these engines

2008 U.S. Dist. LEXIS 109978, *

included two important smaller parts: a steel timing chain classified as GM production part number 90537338, and a timing chain oiling nozzle classified as GM production part 90537476. Some of the Plaintiffs purchased their cars new, and others used.

2   The Plaintiffs have excluded certain model year 2001 Saturn L-Series cars, falling between VIN breakpoints 1Y504884 - 1Y559453, from the category of Class Vehicles. These excluded L-Series cars have already been subject to a recall by GM for timing chain and oiling nozzle repairs.

The Plaintiffs claim that the engines in their Saturn Class Vehicles were defectively designed in two ways. The first alleged defect was in the design of the timing chain. A timing chain synchronizes the motion of an engine's pistons with the motion of the engine's valves. For a car engine to run efficiently, valves regulating the intake of fuel and expulsion of exhaust at one end of an engine's cylinders must open and close at [*6] precise intervals in relation to the pistons' movement up and down from the opposite end of the cylinders. The timing chain connects a gear at the piston end of the cylinders to another gear at the valve end of the cylinders, so that the movements of the pistons and valves are linked. A malfunctioning timing chain can cause an engine to run inefficiently or stop running altogether. A timing chain that breaks completely can cause extensive damage to the engine.

Saturn changed the design of the timing chain used in its automobiles beginning in model year 1999, one year prior to the manufacture of the earliest Class Vehicles. In an effort to reduce engine noise in comparison with earlier Saturn models, the company switched to a finer timing chain composed of smaller links and smaller pins connecting those links. The Plaintiffs claim that this finer chain was weaker than the one Saturn previously designed. Ac-

cording to the Plaintiffs, the smaller pins on the new timing chain were not coated with enough chrome to withstand normal wear and tear -- that is, they were insufficiently "chromized." This redesigned finer timing chain was substantially the same as the chain used in Class Vehicle [*7] engines.

The second defect in the Class Vehicle engines, according to the Plaintiffs, was in the design of the timing chain's oiling nozzle. An oiling nozzle distributes engine oil from a car's oil pump onto the timing chain while the engine is running. Lubrication of the timing chain reduces friction. Reduced friction means increased engine efficiency. Keeping friction low also keeps the temperature of the steel in the timing chain low. This is important because an overheated timing chain is more likely to bend, stretch, or become brittle, which can cause the chain to malfunction or break.

The oiling nozzles in the Plaintiffs' Saturn Class Vehicles were designed with a feature known as a pintle valve. A pintle valve prevents oil from flowing from the oiling nozzle to the timing chain when a car runs at low or idle speeds. The Plaintiffs claim that an unintended consequence of the pintle valve design in their Saturn Class Vehicles was that an insufficient amount of oil lubricated the timing chain.

These two alleged design defects--a weak and insufficiently chromized timing chain, plus an insufficiently lubricating oiling nozzle-- caused the timing chains in the Plaintiffs' Class Vehicles [*8] to overheat, bend, stretch, and/or become brittle, and eventually break and damage Plaintiffs' cars. Plaintiffs incurred repair costs ranging from $ 900 to $ 3,700 each. One Plaintiff's engine was damaged beyond repair. No Plaintiff brings a claim for personal injury.

The Plaintiffs claim that the Defendants knew at the outset of production that both the timing chain and oiling nozzle in the 2.2L Ecotec L61 Engine installed in the Saturn Class Vehicles were defectively designed. As de-

2008 U.S. Dist. LEXIS 109978, *

scribed above, the Defendants redesigned the timing chain used in model year 1999 and successive Saturn automobiles, switching to a finer chain with smaller pins, in an effort to reduce engine noise. Plaintiffs claim this proves the Defendants knowingly sacrificed strength in the timing chain design in their Class Vehicles.

The Plaintiffs allege similar foreknowledge with respect to oiling nozzles. During the mid-1990s, the National Highway Traffic Safety Administration ("NHTSA") fielded an unspecified number of complaints about timing chain failures in Saturn vehicles. In June of 1997, in response to these complaints, the Defendants issued a Technical Service Bulletin to Saturn dealerships that included [*9] instructions to Saturn mechanics for repairing broken timing chains. Whenever they replaced a timing chain on a model year 1991-1996 Saturn car, the mechanics were instructed to make an alteration to the engine's oil pump -- but not the oiling nozzle -- in order to lubricate the newly installed timing chain with a constant flow of oil. The Plaintiffs believe that this Technical Service Bulletin is conclusive evidence that the Defendants knew, at least as early as June 1997, that an engine must be designed to provide a constant flow of oil to its timing chain. But the Plaintiffs do not present any claim that the Defendants were aware in 1997 that a pintle valve oiling nozzle could prevent sufficient oil flow.

In addition to foreknowledge, the Plaintiffs claim the Defendants had actual knowledge of the alleged design defects in the Class Vehicle engines once they were released into the stream of commerce, and that the Defendants deceptively concealed this information.

Beginning in the year 2000, NHTSA and various consumer groups began to field complaints about timing chain failures in Class Vehicles. In late 2001 or early 2002, the Defendants redesigned Saturn's timing chain for a second [*10] time and also made a change to the oiling nozzle design. A year later, in June 2003, the Defendants issued a Technical Ser-

vice Bulletin instructing Saturn mechanics who encountered broken timing chains on Class Vehicles to replace both the old timing chain and oiling nozzle with newer versions. No public recall was issued.

In February 2006, in response to the complaint of a consumer advocacy group, NHTSA initiated an investigation into timing chain failures in model year 2000-2003 Saturn L-Series and 2003 Saturn Ion vehicles. [3]

> 3    NHTSA's investigation did not encompass the model year 2002-2003 Saturn Vue automobiles that are also included in the Class Vehicles category.

In correspondence with NHTSA in April 2006, GM acknowledged that it received more than one thousand consumer or field reports of broken or replaced timing chains and over 2,200 warranty claims involving broken timing chains in model year 2000-2003 Saturn L-Series cars. GM also admitted that the Defendants had been aware of potential problems in the engines of L-Series Class Vehicles shortly after the first model year 2000 cars were assembled in 1999. GM stated that, in 2001, it began a specific investigation of broken timing [*11] chains, and, in August 2002, it released new versions of the timing chain and oiling nozzle. The newer timing chain featured higher-chromized pins -- approximately 35% more chrome was used -- and the new oiling nozzle design eliminated the pintle valve.

In this correspondence with NHTSA, GM reached two conclusions that the Plaintiffs now contest. First, GM concluded that timing chain failure in Saturn L-Series Class Vehicles was most frequent in cars manufactured during a four-month window between November 2000 and February 2001. (NHTSA later pointed out that over one-third of timing chain failure claims arose from this group of cars, which constituted only 5% of the vehicles under investigation.) Second, GM concluded that its analysis showed the majority of timing chain

failures occurred during high chain load situations like engine startup rather than times when the vehicles were moving at higher speeds.

NHTSA disagreed with GM's second conclusion. Its own data showed a higher percentage of timing chain failures while Saturn cars were driven at higher speeds than GM's. So, in June 2006, NHTSA upgraded its investigation of the Saturn timing chain failures to its highest level of scrutiny, [*12] an Engineering Analysis, but only for those L-Series vehicles produced within the four-month window.

GM issued a voluntary recall in December 2007 for all Saturn L-Series cars manufactured during the four-month window from November 2000 to February 2001. GM offered to replace all timing chains and oiling nozzles in these vehicles and also to reimburse costs of prior repairs to owners whose timing chains had malfunctioned. In anticipation of this recall, NHTSA discontinued its investigation.

The Plaintiffs allege that GM's recall was insufficient, since it included only 20,514 of an estimated 412,149 Saturn vehicles featuring the 2.2L Ecotec L61 Engine and including GM production part number 90537338 (the allegedly weaker and insufficiently chromized timing chain) and GM production part 90537476 (the oiling nozzle designed with the pintle valve). The Plaintiffs dispute GM's conclusion -- first articulated in GM's April 2006 correspondence with NHTSA -- that timing chains failed at an unacceptable rate only in Saturn L-Series Class Vehicles manufactured within GM's designated four-month window. While vehicles manufactured within this four-month window suffered timing chain failures at [*13] disproportionately high rates, the Plaintiffs also present warranty data showing that hundreds of other L-Series, Vue, and ION Class Vehicles not covered by GM's recall saw their timing chains fail. Plaintiffs estimate that there are thousands of other Saturn Class Vehicles not included in GM's warranty data, whose timing chains also failed. Additional timing chain fail-

ures, Plaintiffs believe, are likely to have occurred in vehicles not covered by the recall.

Plaintiffs contend that in addition to Defendants' foreknowledge and actual knowledge of timing chain-related design defects in the Class Vehicles, the Defendants misleadingly represented the strength of steel timing chains as a desirable feature of their automobiles. The timing chain is not mentioned in the Maintenance Schedules printed in the Owner's Handbooks for Class Vehicles, which schedules recommended periodic inspection or replacement of parts. Plaintiffs also point to promotional materials for model years 1998 and 1999 Saturn vehicles -- but not Class Vehicles -- claiming that the steel timing chains in Saturn cars are more durable than the rubber timing belts used in other kinds of vehicles.

In their Motion, Defendants [*14] move to dismiss the majority of Plaintiffs' Implied Warranty claims, Unjust Enrichment claims, Consumer Protection Law claims, and Class Action claims. This Court will address each claim individually.

## ANALYSIS

### I. *Implied Warranty Claims*

The Defendants argue that the implied warranty claims presented by Plaintiffs Burgos, Cardwell, Scott, Bauer, Faust and Stoffer should be dismissed because (1) the claims are barred by the applicable state statute of limitations and/or (2) Plaintiffs failed to assert that the vehicles were unmerchantable.

### A. *Statutes of Limitations*

Upon review of the record and applicable law, this Court finds that Plaintiffs have pled facts sufficient to show that their implied warranty claims are not barred by Nebraska's statute of limitations. In their Complaint, Plaintiffs alleged facts to support the claim that Defendants committed acts of fraudulent concealment which, if accepted as true, would result in an

2008 U.S. Dist. LEXIS 109978, *

equitable tolling of the applicable statute of limitations. The facts that Plaintiffs have alleged, "when taken as true, raise more than a speculative right to relief." *Benton v. Merrill Lynch & Co., Inc., 524 F.3d 866, 870 (8th Cir. 2008)*(citing *Twombly, 127 S.Ct. at 1965*).

Plaintiffs [*15] Burgos, Cardwell, Scott, Bauer, Faust and Stoffer's implied warranty claims all arose in different states, and consequently, this Court must follow Nebraska's conflict of law rules in deciding which statute of limitations to apply to each Plaintiff's claim. *In re Derailment Cases, 416 F.3d 787, 794 (8th Cir. 2005)*("A federal district court sitting in Nebraska must follow Nebraska's conflict of law rules."). Nebraska's conflict of law rules distinguish substantive rights from procedural matters; if the question of law is a procedural matter, then the federal district court must follow the law of the forum. *Whitten v. Whitten, 250 Neb. 210, 548 N.W.2d 338, 340 (Neb.1996)*(internal citations omitted)("Although substantive rights of parties to an action are governed by the state where the cause of action arose, procedural matters are dictated by the law of the forum."). In Nebraska, a statute of limitations is considered to be a procedural matter, *not* substantive. *Id.* ("Generally, laws prescribing the time within which particular rights may be enforced relate to remedies only and not substantive rights. A statute of limitations does not create or extinguish a right, but only places a limitation on a [*16] remedy which may be tolled or waived.")(internal citations omitted). This Court must apply Nebraska's statute of limitations to each Plaintiff's implied warranty claim.

Defendants argue, however, that the recent passage of a Nebraska Statute (*Neb. Rev. Stat. § 25-3206*(2006)) changes the *Whitten* Court's distinction between substantive and procedural matters and instead requires that "'Nebraska courts generally apply the limitations period contained in the law of the state upon which a claim is substantively based.'" Def. Brief at 9

(quoting *Eggleton v. Plasser & Theurer Exp. Von Bahnbaumaschinen Gesellschaft, 495 F.3d 582, 585 n.1 (8th Cir. 2007)).* The Defendants' suggestion is misplaced. As the *Eggleton* Court noted, the "statute applies only to claims accruing 'after July 14, 2006.'" *Eggleton, 495 F.3d at 585, n.1*(quoting *Neb. Rev. Stat. § 25-3206*(2006)). [4]

> [4]    *See also, Ndunguru v. Kone, Inc., No. 8:07CV286, 2008 U.S. Dist. LEXIS 3428, *4, 2008 WL 53603 (D.Neb. Jan. 02, 2008)*(holding that *Neb. Rev. Stat. § 25-3206* did not apply to the case because the "cause accrued in June, 2003, well before the repeal" the legislature issued in *Neb. Rev. Stat. § 25-3206*(2006)).

Because none of the Plaintiffs' claims [*17] accrued after July 14, 2006, [5] the applicable statute of limitations governing all the Plaintiffs' implied warranty claims in this action is the law of the forum, Nebraska, and not the "law of the state upon which [the] claim is substantially based." *See id.*

> [5]    While the Nebraska Supreme Court has yet to rule on whether *Neb. UCC § 2-725(1)*'s four year statute of limitations on a vehicle starts over at zero every time the used vehicle is sold to a new consumer, a reasonable interpretation of the Supreme Court's decision in *Witherspoon v. Sides Const. Co., Inc.,* leads this Court to conclude that *Neb. UCC § 2-725(1)*'s four year statutory period does not start afresh when the initial consumer sells his/her vehicle used to a new consumer. *See Witherspoon v. Sides Constr. Co., Inc., 219 Neb. 117, 362 N.W.2d 35, 40 (Neb. 1985); see also,* Note, John G. Westrick, *Statutes of Limitations and Repose--The Decline and Rise of Statutes of Repose--Witherspoon v. Sides Construction Co. Annual Survey of Nebraska Law,* 19 CREIGHTON L. REV. 509, 539 (1985-86)("Products liability actions un-

der *section 25-224* will accrue when the ultimate consumer purchases the product. The legislative history indicates that re-sale from an **[*18]** ultimate consumer to another will not restart the statutory period."). By analogy, this Court finds that the "resale from an ultimate consumer" does "not restart the statutory period" in regards to *Neb. UCC § 2-725(1)*.

In Nebraska, "[a]n action for breach of any contract for sale must be commenced within four years after the cause of action has ac-crued." *Neb. UCC § 2-725(1)*. Defendants have argued, and Plaintiffs have not disputed, that all of the Plaintiffs' claims accrued well over four years ago. 6 Consequently, all of the Plaintiffs' claims ordinarily would be time-barred by Ne-braska's applicable statute of limitations. Plain-tiffs argue, however, that the applicable statute of limitations has been waived as a conse-quence of Defendants' fraudulent acts of con-cealment. In reviewing the question of whether equitable tolling applies to the Plaintiffs' claims in this case, this Court looks to Nebraska law.

6    To determine the date of accrual for each of the Plaintiffs' implied warranty claims, this Court looked to *Neb. UCC § 2-725(2)* which states that "[a] cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach. A breach of warranty **[*19]** occurs when tender of delivery is made." For purposes of de-termining whether the Plaintiffs' claims accrued before or after July 14, 2006, *Neb. UCC § 2-725(2)* dictates that all the Plaintiffs' claims accrued prior to that date, as none of the Plaintiffs contends that he or she purchased a vehicle after July 14, 2006. While Plaintiffs argue that *Neb. UCC § 2-725(1)*'s statute of limita-tions should not bar Plaintiffs' claims be-cause Defendants fraudulently concealed the automobiles' defects, the alleged acts of fraudulent concealment do not affect

the date of accrual under *Neb. UCC § 2-725(2)*; instead, if accepted as true by the trier of fact, the alleged fraudulent con-cealment would only act to equitably toll the applicable statute of limitations. De-fendants have conceded, and Plaintiffs have not contested, the conclusion that all Plaintiffs' claims accrued at the time they purchased their vehicles.

Under Nebraska law, "if a petition, chal-lenged under the statute of limitations, facially shows that a cause of action is barred by the statute of limitations, a plaintiff must allege facts sufficient to avoid the bar of a statute of limitations and, at trial, must prove facts avoid-ing the **[*20]** statute of limitations." *Broeke-meier Ford, Inc. v. Clatanoff, 240 Neb. 265, 481 N.W.2d 416, 421 (Neb.1992)*(citing *DeSci-ose v. Chiles, Heider & Co., 239 Neb. 195, 476 N.W.2d 200 (Neb. 1991))*. Because the petition facially shows that all Plaintiffs' implied war-ranty claims are barred by Nebraska's applica-ble statute of limitations, the burden is on the Plaintiffs to allege facts that support an equita-ble tolling of the statute. At trial, the Plaintiffs will bear the burden of persuading the trier of fact that such allegations of fraudulent con-cealment are true. *Id.*

In Nebraska, "the doctrine of fraudulent concealment estops a defendant from asserting a statute of limitations defense when the defen-dant has, either by deception or by a violation of a duty, concealed from the plaintiff material facts which prevent the plaintiff from discover-ing the malpractice. In addition, equitable es-toppel arises from active or affirmative efforts to conceal the malpractice." *Schendt v. Dewey, 252 Neb. 979, 568 N.W.2d 210, 213 (Neb. 1997)*. "One who wrongfully conceals a mate-rial fact necessary to the accrual of a cause of action against him, and such concealment causes the opposite party to delay the filing of suit cannot avail himself of the **[*21]** statutes of limitation as a defense. Estoppel may be ap-plied to prevent a fraudulent or inequitable re-

2008 U.S. Dist. LEXIS 109978, *

sort to a statute of limitations." *MacMillen v. A.H. Robins Co., Inc., 217 Neb. 338, 348 N.W.2d 869, 871 (Neb. 1984)* (internal citations omitted). Thus the *MacMillen* Court reasoned that "[t]he issue to be determined is whether the defendant is estopped from raising the statute of limitations as a defense because defendant fraudulently concealed its knowledge of the dangerousness of [defendant's product]." *Id.* (internal citations omitted).

In this case, Plaintiffs have alleged facts to support their contention that Defendants fraudulently concealed their knowledge that the steel timing chains and oiling nozzles were defective. First, Plaintiffs claim that the Defendants knew at the outset of production that both the timing chain and oiling nozzle in the 2.2L Ecotec L61 Engine installed in the Saturn Class Vehicles were defectively designed. In June 1997, in response to complaints received by NHTSA, the Defendants issued a Technical Service Bulletin to Saturn dealerships that included instructions to Saturn mechanics for repairing broken timing chains. The Plaintiffs assert that this Technical Service **[*22]** Bulletin shows that the Defendants knew, at least as early as June 1997, that an engine must be designed to provide a constant flow of oil to its timing chain.

In addition to foreknowledge, the Plaintiffs claim that the Defendants had actual knowledge of the alleged design defects in the Class Vehicle engines once they had been released into the stream of commerce, and that the Defendants deceptively concealed this information. Beginning in 2000, NHTSA and various consumer groups began to field complaints of timing chain failures in Class Vehicles. Plaintiffs have alleged that in late 2001 or early 2002, the Defendants redesigned Saturn's timing chain for a second time and changed the oiling nozzle design. According to Plaintiffs, in June 2003, the Defendants issued a Technical Service Bulletin instructing Saturn mechanics who encountered broken timing chains on

Class Vehicles to replace both the old timing chain and oiling nozzle with the newer versions.

Plaintiffs claim that in correspondence with NHTSA in April 2006, GM acknowledged that it had received more than one thousand consumer or field reports of broken or replaced timing chains and over 2,200 warranty claims involving broken **[*23]** timing chains in model year 2000-2003 Saturn L-Series cars. In this correspondence, GM allegedly admitted that the Defendants had been aware of potential problems in the engines of L-Series Class Vehicles shortly after the first model year 2000 cars were assembled in 1999. GM stated that in 2001 it began a specific investigation of broken timing chains, and in August 2002 it released new versions of the timing chain and oiling nozzle. The newer timing chain featured higher-chromized pins -- approximately 35% more chrome was used -- and the new oiling nozzle design eliminated the pintle valve.

Finally, the Plaintiffs contend that the Defendants misleadingly represented the strength of steel timing chains as a desirable feature of their automobiles. The timing chain is not mentioned in the Maintenance Schedule printed in the Owner's Handbooks for Class Vehicles, which lists recommended intervals for the inspection or replacement of parts. The Plaintiffs point to promotional materials for model year 1998 and 1999 Saturn vehicles -- but not Class Vehicles -- that promoted steel timing chains in Saturn cars as more durable than the rubber timing belts used in other kinds of vehicles.

This **[*24]** Court finds that Plaintiffs have alleged sufficient facts to support their contention that Defendants knew there were defects in the design of their steel timing chains and oiling nozzles and that Defendants deceptively concealed that information from Plaintiffs. Because the question of whether Plaintiffs were fraudulently deceived by Defendants' actions "presents a mixed question of law and fact . . . [the] complaint *should not be dismissed on mo-*

tion" and instead the issues of fact concerning Defendants' alleged fraudulent actions should be presented to the trier of fact. *MacMillen, 348 N.W.2d at 872* (internal quotations omitted).

Because it is clear from the Complaint that Plaintiffs' claims ordinarily would be time-barred by the statute of limitations, at trial Plaintiffs will bear the burden of demonstrating to the trier of fact the Defendants' alleged fraudulent acts of concealment. *See Broeke-meier Ford, Inc. v. Clatanoff, 240 Neb. 265, 481 N.W.2d 416, 421 (Neb.1992).* If Plaintiffs fail to persuade the trier of fact that Defendants fraudulently concealed their products' defects, Plaintiffs' implied warranty claims will be barred by the statute of limitations as a matter of law. To dismiss these **[*25]** claims at this stage in the proceedings would be improper, because where a plaintiff has sufficiently al-leged facts to support an inference of fraud, the "motion to dismiss should be denied and [the] plaintiff [should be] permitted to litigate [the] estoppel issue." *MacMillen, 348 N.W.2d at 872* (citing *Erbe v. Lincoln Rochester Trust Co., 13 A.D.2d 211, 214 N.Y.S.2d 849 (N.Y. App. Div. 1961), appeal dismissed, 11 N.Y.2d 754, 181 N.E.2d 629, 226 N.Y.S.2d 692 (N.Y. 1962)).*

Accordingly, Defendants' Motion to dis-miss Plaintiffs' implied warranty claims based on the applicable statute of limitations will be denied.

### B. *Unmerchantability*

This Court will also deny Defendants' Mo-tion to dismiss Burgos, Cardwell, Scott, Bauer, and Faust's implied warranty of merchantability claims based on Defendants' assertion that these Plaintiffs failed to plead that their vehicles were unmerchantable. The Court, however, will grant Defendants' Motion to dismiss Stoffer's implied warranty of merchantability claim, for the reasons described below.

In their Motion, Defendants argue that this Court should dismiss Plaintiffs' implied war-ranty claims because Plaintiffs have failed to plead that their vehicles were not merchantable, or that they were not "fit for their **[*26]** ordi-nary purpose." Defendants argue that the "ordi-nary purpose of an automobile is to provide transportation," and because the automobiles did provide the Plaintiffs with transportation for thousands of miles, Plaintiffs have failed to show their "vehicles were not merchantable at the time of original sale or delivery." Def. Brief at 13.

The applicable law in each Plaintiff's state differs, however, and the common language of "ordinary purpose" in *UCC Article 2-314* has been interpreted to have slightly different meanings than merely to "provide transporta-tion." These interpretations vary from state to state and require this Court to review each claim with a degree of scrutiny that will ensure that the Court does not improperly extinguish an individual Plaintiff's claim by applying the wrong state law.

In Nebraska, "[a] federal district court . . . must follow Nebraska's conflict of law rules." *In re Derailment Cases, 416 F.3d 787, 794 (8th Cir. 2005).* Because the language of *UCC Arti-cle 2-314* contains the statutory language that gives rise to the Plaintiffs' claims, the interpre-tation of the phrase "ordinary purpose" deter-mines the substantive rights of the parties in the action. Consequently, **[*27]** the Court must apply the law "governed by the state where the cause of action arose." *Whitten v. Whitten, 250 Neb. 210, 548 N.W.2d 338, 340 (Neb.1996)*(internal citations omitted). In evaluating Defendants' Motion to dismiss all six claims, the Court must apply the applicable law defining "ordinary purpose" in the six dif-ferent states from which each of the six differ-ent Plaintiffs' bring their claims.

All six of the Plaintiffs' respective states have adopted the same UCC language estab-lishing the implied warranty of merchantability. To state a claim for breach of that implied war-ranty, all Plaintiffs must allege facts showing their vehicles were not "fit for the ordinary

purposes for which such goods are used." *See 13 Pa.C.S.A. § 2314; Neb. U.C.C. 2-314; Mich. Comp. Laws § 440.2314; Mo. Ann. Stat. § 400.2-314; Iowa Code § 554.2314; Ind. Code Ann. § 26-1-2-314.* Because state courts in these six states have interpreted the words "ordinary purpose" to have different meanings, this Court will evaluate each Plaintiff's individual claim under the law of the state in which the Plaintiff's claim arose.

### 1. Plaintiff Burgos in Pennsylvania

In Pennsylvania, the implied warranty of merchantability is "a warranty **[*28]** that the goods will pass without objection in the trade and are fit for the ordinary purposes for which such goods are used." *Moscatiello v. Pittsburgh Contractors Equip. Co., 407 Pa. Super. 363, 595 A.2d 1190, 1193 (Pa. Super. Ct. 1991), citing 13 Pa.C.S.A. § 2314, appeal denied, 529 Pa. 650, 602 A.2d 860 (Pa. 1992).* The Pennsylvania Superior Court has interpreted this provision of the UCC to mean that the "warranty serves to protect buyers from loss where the goods purchased are below commercial standards." *Borden, Inc. v. Advent Ink Co., 701 A.2d 255, 258 (Pa. Super. Ct. 1997)*(internal quotations omitted). "Since cars are designed to provide transportation, the implied warranty of merchantability is simply a guarantee that they will operate in a 'safe condition' and 'substantially free of defects.' Thus, 'where a car can provide safe, reliable transportation[,] it is generally considered merchantable.'" *Hornberger v. General Motors Corp., 929 F.Supp. 884, 888 (E.D.Pa. 1996)*(quoting *Carlson v. General Motors Corp., 883 F.2d 287, 297 (4th Cir.1989), cert. denied, 495 U.S. 904, 110 S. Ct. 1923, 109 L. Ed. 2d 287, 910, (1990)*).

Consequently, the standard for "ordinary purpose" in Pennsylvania is not merely a car that provides transportation, but a car **[*29]** that provides "safe, reliable transportation" in a "safe condition" that is "substantially free of defects." In the Complaint, Plaintiff Burgos al-

leges he "was operating his Class Vehicle on or about January 24, 2008, when the Timing Chain broke, damaging engine valves and causing the Class Vehicle to stop operating, necessitating repairs costing over $ 900.00. According to the '2002 L-Series Maintenance Schedule,' which accompanied the '2002 L-Series Owner's Handbook,' the Timing Chain on this Class Vehicle required neither inspection nor replacement during the life of the Class Vehicle." Complaint at 3-4. Arguably a car that ceases to operate, especially when due to a mechanical failure not listed in the routine maintenance schedule, is *not* a car that provides "safe, reliable transportation." Nor is a car with a faulty timing chain a car that is "substantially free of defects."

Given the facts Burgos has alleged, there is more than a speculative chance that he will succeed in establishing that his automobile did not provide "safe, reliable transportation" in a "safe condition" that was "substantially free of defects." Accordingly, this Court will deny Defendants' Motion to Dismiss **[*30]** Plaintiff Burgos's implied warranty of merchantability claim.

### 2. Plaintiff Cardwell in Nebraska

In Nebraska, "to establish a breach of the implied warranty of merchantability, there must be proof that there was a deviation from the standard of merchantability at the time of sale and that such deviation caused the plaintiff's injury both proximately and in fact. A breach of warranty has been found to exist where the item sold failed to perform adequately because of a lack of quality inherent within the item itself." *O'Keefe Elevator Co., Inc. v. Second Ave. Props., Ltd., 216 Neb. 170, 343 N.W.2d 54, 56 - 57 (Neb. 1984).* Therefore, to establish that her car did not serve its "ordinary purpose," Caldwell cannot simply plead that her car failed to "provide transportation." She must allege facts sufficient to establish that the car she purchased deviated from "the standard of merchantability

at the time of sale" and that the car "failed to perform adequately because of a lack of quality inherent within the item itself." *Id.*

Caldwell's factual allegations fit well within the realm of Nebraska courts' interpretation of *Neb. U.C.C. 2-314*'s "ordinary purpose" test. In the Complaint, Cardwell alleges she "was [*31] operating her Class Vehicle on or about January 4, 2008, when the Timing Chain broke, damaging engine valves and causing the Class Vehicle to stop operating, necessitating repairs costing over $ 2,700. According to the '2000 L-Series Maintenance Schedule,' which accompanied the '2000 L-Series Owner's Handbook,' the Timing Chain on this Class Vehicle required neither inspection nor replacement during the life of the Class Vehicle." Complaint at 4.

These allegations create a "reasonable expectation . . . that discovery will reveal evidence" to substantiate the necessary elements of the plaintiff's claim. *Twombly, 127 S.Ct. at 1965.* Cardwell has alleged facts creating a reasonable expectation that she will be able to produce evidence to demonstrate that 1) her vehicle with a defective timing chain and oiling nozzle deviated from the standard of merchantability in Nebraska; 2) the defect existed at the time she purchased the vehicle; and 3) her vehicle "failed to perform adequately because of a lack of quality inherent within the item itself." *O'Keefe, 216 Neb. 170, 343 N.W.2d 54, 56 - 57.* Consequently, Cardwell's implied warranty of merchantability claim survives Defendants' Motion to Dismiss, and is [*32] left as "a factual question for jury determination." *Adams v. Am. Cyanamid Co., 1 Neb. Ct. App. 337, 498 N.W.2d 577, 584 (Neb. Ct. App. 1992)*("Whether there was a breach of implied warranty of merchantability is a factual question for jury determination.").

### 3. Plaintiff Scott in Michigan

In Michigan, "[t]o establish a prima facie case of breach of implied warranty, a plaintiff must show that goods were defective when they left the possession of the manufacturer or seller." *Guaranteed Const. Co. v. Gold Bond Prods., 153 Mich. App. 385, 395 N.W.2d 332, 336 (Mich. Ct. App. 1986)*(citing *Kupkowski v. Avis Ford, Inc., 395 Mich. 155, 235 N.W.2d 324 (Mich. 1975)).* To establish the requisite defect, the plaintiff must show that the "product is not reasonably fit for its intended, anticipated or reasonably foreseeable use." *Id.* (citations omitted). "Merchantable is not a synonym for perfect." *Id.* Instead, the question is whether the "the goods are of average quality within the industry." *Bosway Tube & Steel Corp. v. McKay Mach. Co., 65 Mich. App. 426, 237 N.W.2d 488, 490 - 491 (Mich. Ct. App. 1975).* "As to goods accepted, the burden is on the buyer to establish any claimed breach of warranty." *Guaranteed Const. Co., 395 N.W.2d at 336.*

The Michigan Circuit Court has held [*33] that the "ordinary purpose" of a car is to "provide safe, reliable transportation." *Koscielny v. Ford Motor Co., No. 05-527127-NZ, 2006 WL 1726486 at *5 (Mich. Cir. Ct., Jun. 21, 2006)*(citing *Carlson, 883 F.2d at 297.* The *Koscielny* Court reasoned that "[a] car not only has to provide transportation, but to do so with a certain level of ease and comfort. . . a vehicle that stalls may be dangerous." *Id.*

Scott's factual allegations serve to "raise more than a speculative right to relief." *Benton, 524 F.3d at 870* (citing *Twombly, 127 S.Ct. at 1965).* Notably, Scott alleges that she "was driving her Class Vehicle on September 25, 2007, when the Timing Chain broke, damaging an engine valve and causing the Class Vehicle to stop operating, necessitating repairs costing over $ 2,200. According to the '2002 Lseries Maintenance Schedule,' which accompanied the '2002 L-Series Owner's Handbook,' the Timing Chain on this Class Vehicle required neither inspection nor replacement during the life of the Class Vehicle." Complaint at 7. Scott alleges that her vehicle stopped operating while

2008 U.S. Dist. LEXIS 109978, *

she was driving as a result of the broken timing chain, which the car's manual did not indicate would need to be **[*34]** replaced during the life of car.

Scott has alleged sufficient facts to support her contention that the car she purchased did not satisfy the "ordinary purpose" of a car purchased in Michigan; the facts that she has alleged support the argument that her car was "defective when [it] left the possession of the manufacturer or seller," was not of "average quality within the industry," and did not "provide safe, reliable transportation." *Guaranteed Const. Co., 395 N.W.2d at 336*; *Bosway, 237 N.W.2d at 490 - 491*; *Koscielny, 2006 WL 1726486 at *5* (internal quotations omitted). Scott's implied warranty of merchantability claim, therefore, survives Defendant's Motion to Dismiss.

**4. Plaintiff Bauer in Missouri**

In Missouri, to establish a breach of an implied warranty of merchantability, "a plaintiff must prove (1) that a merchant sold goods, (2) which were not 'merchantable' at the time of the sale, (3) injury and damages to the plaintiff or his property (4) which were caused proximately or in fact by the defective nature of the goods, and (5) notice to the seller of the injury." *Ragland Mills, Inc. v. General Motors Corp., 763 S.W.2d 357, 360 (Mo. App. 1989)*(internal citations omitted). "There **[*35]** is no doubt that an implied warranty of merchantability extends to automobiles in this jurisdiction." *Id.* "Lack of merchantability may be proven either by showing a specific defect in goods or by circumstantial evidence." *Plunk v. Hedrick Concrete Prods. Corp., 870 S.W.2d 942, 947 (Mo. App. 1994)*(citation omitted). In *Ragland Mills,* the Missouri Court of Appeals for the Southern District held that Plaintiff's statements that the "automobile went out of control during normal use and struck a concrete wall . . . [and] was extensively damaged . . . constitute[d] substantial evidence that the Cadillac was not fit for

the ordinary purpose for which it was intended." *Ragland Mills, 763 S.W.2d at 360 (Mo. App. 1989).*

Bauer's factual allegations support a claim that his vehicle did not serve its "ordinary purpose" in accordance with Missouri law. Bauer alleges that he "was operating his Class Vehicle on or about July 17, 2007, when the Timing Chain broke, damaging an engine valve and causing the Class Vehicle to stop operating, necessitating repairs costing over $ 2,600. According to the '2002 L-Series Maintenance Schedule,' which accompanied the '2002 L-Series Owner's Handbook,' the Timing **[*36]** Chain on this Class Vehicle required neither inspection nor replacement during the life of the Class Vehicle." Complaint at 3.

"Lack of merchantability may be proven . . . by showing a specific defect," and Bauer's allegations point to Defendants' faulty timing chains and oiling nozzles as the specific defect that caused his vehicle to malfunction. *Plunk, 870 S.W.2d at 947* (citation omitted). Like the car at issue in *Ragland Mills,* Bauer's vehicle, through no fault of his own, ceased to operate "during normal use" and "was extensively damaged." Bauer has pled the necessary elements to establish that his car did not serve its "ordinary purpose." He has, therefore, met his burden of sufficiently pleading facts that "raise more than a speculative right to relief." *Benton, 524 F.3d at 870* (citing *Twombly, 127 S.Ct. at 1965*).

**5. Plaintiff Faust in Iowa**

In Iowa, "the implied warranty of merchantability involves the fitness of goods for their ordinary purpose. . . [T]his theory requires the plaintiff to prove (1) a merchant sold the goods, (2) the goods were not 'merchantable' at the time of sale, (3) injury or damage occurred to the plaintiff's property, (4) the defective nature of the goods **[*37]** caused the damage "proximately and in fact," and (5) notice was given to the seller of the damage. *Renze Hy-*

2008 U.S. Dist. LEXIS 109978, *

*brids, Inc. v. Shell Oil Co., 418 N.W.2d 634, 638 (Iowa 1988)*. The Iowa Supreme Court has held that "a warranty of merchantability is based on a purchaser's reasonable expectation that goods ... will be free of significant defects and will perform in the way goods of that kind should perform." *Wright v. Brooke Group Ltd., 652 N.W.2d 159, 180-81 (Iowa 2002)*(internal quotations omitted). "More recently, [the Iowa Supreme Court] has held that proof of a 'serious product defect' was sufficient to support submission of strict liability and breach of warranty theories." *Id. at 181*. Consequently, Iowa courts examine "whether the product in question was 'defective as manufactured' and whether it was 'manufactured in conformance with applicable industrial standards.'" *The Conveyor Co. v. Sunsource Tech. Servs., Inc., 398 F.Supp.2d 992, 1000-01 (N.D. Iowa 2005)*(citing *Randa v. U.S. Homes, Inc., 325 N.W.2d 905, 910 (Iowa Ct. App. 1982))*.

Faust's factual allegations suffice to substantiate her implied warranty of merchantability claim under Iowa law. In the Complaint, Faust alleges that she "was [*38] driving her Class Vehicle on November 16, 2006, when the Timing Chain broke, damaging the engine beyond repair and causing the Class Vehicle to stop operating. According to the '2000 L-Series Maintenance Schedule,' which accompanied the '2000 L-Series Owner's Handbook,' the Timing Chain on this Class Vehicle required neither inspection nor replacement during the life of the Class Vehicle." Complaint at 4. Faust has pointed to a "serious product defect" in the vehicle. She has alleged that her vehicle was "defective as manufactured," and has pled that the vehicle was not "free of significant defects" and did not perform "in the way goods of that kind should perform."

Faust has, therefore, succeeded in alleging facts sufficient to substantiate her claim of a breach of an implied warranty of merchantability under Iowa law. Defendants' Motion to

Dismiss Faust's implied warranty claim will be denied.

## 6. Plaintiff Stoffer in Indiana

Indiana law offers a narrower interpretation of "ordinary purpose," and consequently, what might be "unmerchantable" in Pennsylvania, Nebraska, Michigan, Missouri, and Iowa is not necessarily "unmerchantable" in Indiana. In Indiana, "[t]he term 'merchantable' implies [*39] that the goods sold conform to ordinary standards of care and that they are of average grade, quality and value of similar goods sold under similar conditions." *Woodruff v. Clark County Farm Bureau Co-op. Ass'n, 153 Ind. App. 31, 286 N.E.2d 188, 194 (Ind. Ct. App. 1972)*(citations omitted). Implied warranties of merchantability "are imposed by operation of law for the protection of the buyer, and they must be liberally construed in favor of the buyer." *Id. at 195*. The Indiana Court of Appeals, however, has limited "[t]he ordinary purpose of a privately owned vehicle . . . to provid[ing] transportation." *Sharp v. Tom Wood East, Inc., 822 N.E.2d 173, 175 (Ind. Ct. App. 2004)*.

In concluding that the defects in a plaintiff's used car did not constitute a breach of the implied warranty of merchantability, the *Sharp* Court reasoned that:

> Sharp purchased a vehicle that had already been driven 64,669 miles, and it provided her with transportation for the more than 22,000 miles that she drove over a span of thirteen months. While repairs to the vehicle were necessary, there is no indication in the record that the vehicle did not fulfill its ordinary purpose of providing transportation. Thus . . there [is] no genuine [*40] issue of material fact as to whether the vehicle

Sharp purchased from Tom Wood
was merchantable.

*Id.* (internal citations omitted). While it is true
that Indiana law requires a warranted vehicle to
be "of average grade, quality and value," it is
equally true that when a used car requires some
repairs the owner does not automatically have a
valid claim for breach of implied warranty. *See
id.* In fact, the *Sharp* Court concluded that de-
spite the fact that the plaintiff had to replace the
car's engine, "there [was] no indication in the
record that the vehicle did not fulfill its ordi-
nary purpose of providing transportation." *Id.*

Stoffer's factual allegations are hardly dis-
tinguishable from the plaintiff's in *Sharp.* No-
tably, Stoffer alleges that she "purchased a Sat-
urn L-Series Class Vehicle, model year 2002
L200, VIN 1G8JU54F12y539875, equipped
with a 2.2L Ecotec L61 Engine, Timing Chain
and Oiling Nozzle, from Battjes Pontiac, in
Elkhart, IN, on February 17, 2005. On March
18, 2008, Plaintiff Stoffer's parked Class Vehi-
cle would not start. The Class Vehicle was
towed to Saturn of Indiana, which informed
Plaintiff Stoffer that the Timing Chain had bro-
ken, damaging the engine and causing the
[*41] Vehicle to stop operating, and necessitat-
ing repairs costing over $ 1,200. According to
the '2002 L-Series Maintenance Schedule,'
which accompanied the '2002 L-Series Owner's
Handbook,' the Timing Chain on this Class Ve-
hicle required neither inspection nor replace-
ment during the life of the Class Vehicle."
Complaint at 7. Like the plaintiff in *Sharp,*
Stoffer purchased her car used and continued to
drive it for thousands of miles before the car
broke down necessitating repairs. Like the
plaintiff in *Sharp,* Stoffer's car provided trans-
portation for some time before the failure of the
timing chain and the replacement of the engine.

Stoffer, therefore, has not met her burden of
pleading factual allegations that "raise more
than a speculative right to relief." *Benton, 524*

*F.3d at 870* (citing *Twombly, 127 S.Ct. at
1965*). Because Indiana law states that the "or-
dinary purpose" of a car is simply to "provide
transportation," and because the *Sharp* Court
held that even a car that required an engine re-
placement still fulfilled its purpose of providing
transportation, Stoffer has not successfully pled
facts that would support a breach of the implied
warranty of merchantability under Indiana law.
[*42] Consequently, this Court will dismiss
Stoffer's implied warranty claim.

## II. *Unjust Enrichment Claims*

The Defendants contend that the unjust en-
richment claims of Plaintiffs Anderson, Card-
well, Faust, Fowler, Menzer, Scott, and Stoffer
should be dismissed because (1) the Saturn
written warranty governs the dispute and pre-
cludes quasi-contract claims under applicable
state law; and (2) these Plaintiffs, as well as
Plaintiff Bauer, did not plead facts showing that
the Defendants received benefits from the
Plaintiffs, or that any benefits the Defendants
did receive were unjust or inequitable.

### A. *Express Agreement Barring Quasi-
Contract Claims*

Plaintiffs    Anderson,    Cardwell,    Faust,
Fowler, Menzer, Scott, and Stoffer's individual
claims for unjust enrichment are barred by the
law of their respective states. A claim for unjust
enrichment is a quasi-contract claim, and if
"there is a specific contract which governs the
relationship of the parties, the doctrine of un-
just enrichment has no application." *People ex
rel. Hartigan v. E & E Hauling, Inc., 153 Ill. 2d
473, 607 N.E.2d 165, 177, 180 Ill. Dec. 271
(Ill. 1992)*(quotations omitted). [7] In this case,
the rights and obligations of the parties are
governed by Saturn's written, express    [*43]
warranty that covers "any vehicle defect related
to materials or workmanship." Because a bind-
ing, express agreement defines the parties'
rights and obligations, this Court will not de-
vise a quasi-contract remedy based on a claim
of unjust enrichment.

7    *Accord Wrede v. Exchange Bank of Gibbon, 247 Neb. 907, 531 N.W.2d 523, 530 (Neb.1995)*("[T]here cannot be an express and an implied contract for the same thing existing at the same time . . ."); *Frontier Props. Corp. v. Swanberg, 488 N.W.2d 146, 149 -150 (Iowa 1992)*("[An] express and implied contract cannot coexist on same subject matter, and the former supersedes the latter.")(citations omitted); *Greenlee v. Rainbow Auction/Realty Co., 202 Wis. 2d 653, 553 N.W.2d 257 (Wis. Ct. App.1996)*(holding that doctrine of unjust enrichment does not apply where parties have entered into a contract); *California Med. Ass'n, Inc. v. Aetna U.S. Healthcare of California, Inc., 94 Cal. App. 4th 151, 114 Cal. Rptr. 2d 109, 125 (Cal. Ct. App. 2001)*("[A]s a matter of law, a quasi-contract action for unjust enrichment does not lie where, as here, express binding agreements exist and define the parties' rights."); *Fodale v. Waste Mgmt. of Michigan, Inc., 271 Mich. App. 11, 718 N.W.2d 827, 841 (Mich. Ct. App. 2006)*("a contract will [\*44] be implied only if there is no express contract covering the same subject matter.")(quotations omitted); *Keystone Carbon Co. v. Black, 599 N.E.2d 213, 216 (Ind. Ct. 1992)*("When the rights of parties are controlled by an express contract, recovery cannot be based on a theory implied in law.")(citations omitted).

Plaintiffs argue that an express agreement should only preclude a quasi-contract claim when the agreement covers the same "specific subject matter" as presented in the plaintiff's quasi-contract action for recovery. [8] Plaintiffs' Brief at 21. Plaintiffs suggest that their claim for unjust enrichment is based on a "design defect" in their vehicles, as opposed to "a defect related to materials and workmanship." Consequently, Plaintiffs argue that they are not pre-

cluded from proceeding with their claims of unjust enrichment. Plaintiffs' Brief at 21. Plaintiffs go to great lengths to explain the distinction between a "defect related to materials and workmanship" and a "design defect." *See* Plaintiffs' Brief at 21-24. This Court finds that "a defect related to materials and workmanship" and a "design defect" are substantially the same in the context of this action.

8    To support their [\*45] argument, Plaintiffs cite two cases: *QuikPak, Inc. v. Reynolds-Freeborn Co., 2005 U.S. Dist. LEXIS 17064, at \* 15 n.8 (S.D. Ind., June 18, 2005)*; *Vanderford Co., Inc. v. Knudson, 144 Idaho 547, 165 P. 3d 261, 272 (Idaho 2007)*.

First, design is integrated into each step of the manufacturing process and affects both materials and workmanship. The U.S. District Court for the Southern District of New York considered a similar distinction when presented with two types of defects in a bicycle. In declining to recognize such a distinction, the *Koulajian* Court held that "the warranty's reference to 'workmanship' could refer to bicycle designs as well as to implementation of those designs in the manufacturing process." *Koulajian v. Trek Bicycle Corp., 1992 U.S. Dist. LEXIS 1490, 1992 WL 28884, at \*2 (S.D.N.Y., Feb. 11, 1992)*. The *Koulajian* Court reasoned that any other interpretation of the warranty would defy logic. *Id.* Conversely, it would be absurd to interpret a car company's written warranty as *not* covering any defect in "materials and workmanship" if the defect could simultaneously be attributable to a design implemented by the company in the manufacturing of the car. If this Court accepted this logic, it would have to conclude [\*46] that Saturn's written warranty would not cover Plaintiffs' defective timing chains and oil nozzles because one could argue Saturn "defectively designed" them.

Second, the cases on which Plaintiffs rely were based on tort law, not contract. [9] *See*

2008 U.S. Dist. LEXIS 109978, *

Plaintiffs' Brief at 21-24. In tort law, a court is concerned with the allocation of liability among negligent parties or parties who are subject to strict liability. Instead, this Court must be concerned with whether a quasi-contract claim undermines the validity of the parties' original agreement by creating "a means for shifting a risk one has assumed under contract." *F.H. Prince & Co., Inc. v. Towers Fin. Corp., 275 Ill. App. 3d 792, 656 N.E.2d 142, 151, 211 Ill. Dec. 950 (Ill. App. Ct. 1995)*(quotations omitted). "It would certainly be contrary to every correct notion of the law to permit a party to resort to an implied contract, when the parties have entered into an express agreement which remains in force." *Maynard v. Tidball, 2 Wis. 34, 1853 WL 1746 at *4 (Wis. 1853)*. Because this Court cannnot "substitute [its] own concepts of fairness . . . in place of the parties' own contract," this Court is required to consider the purported distinction between these two types of defects [*47] from a different perspective than that of court evaluating a question of tort law. *See California Med. Ass'n, 94 Cal. App. 4th 151, 114 Cal. Rptr. 2d 109, 125-26* (citations omitted).

> 9   Plaintiffs cite to several cases where courts have delineated a distinction between a "manufacturing defect" and a "design defect." Plaintiffs' Brief at 22-24. Many of these distinctions, however, were made in the context of determining liability in tort law, *not* in the context of interpreting whether or not an express agreement precludes an action for unjust enrichment under contract law. *E.g., ACE Fire Underwriters Ins. Co. v. ALC Controls, Inc., 2008 U.S. Dist. LEXIS 41672, 2008 WL 2229121 at *1 (N.D. Ga., May 28, 2008)*; *Nuzum v. Chlorella, 2006 U.S. Dist. LEXIS 93486, 2006 WL 3825111, at *5-6 (D. Neb., Dec. 27, 2006)*.

Plaintiffs' claims for unjust enrichment are barred by the express, written warranty agreement and this Court concludes that Anderson, Cardwell, Faust, Fowler, Menzer, Scott, and Stoffer's claims for unjust enrichment must be dismissed.

### B. *Necessity of Pleading Defendants' Receipt of Unjust Benefits*

In their Motion, Defendants argue that Plaintiffs failed to plead facts sufficient to establish that the Defendants received an unjust benefit. Because the Court will dismiss [*48] Anderson, Cardwell, Faust, Fowler, Menzer, Scott, and Stoffer's claims on other grounds, the Court need not address the question of whether these Plaintiffs adequately pled the Defendants' receipt of unjust benefits. Instead, the Court considers only whether Bauer sufficiently alleged facts to show that Defendants received benefits from him that were unjust or inequitable. Because he has failed to adequately allege that he conferred an unjust benefit upon Defendants, this Court will grant Defendants' Motion to Dismiss Bauer's claim for unjust enrichment.

In order to plead a cause of action for unjust enrichment in Missouri, a plaintiff must allege facts showing "(1) a benefit conferred upon the defendant by the plaintiff; (2) appreciation by the defendant of the fact of such benefit; and (3) acceptance and retention by the defendant of that benefit under circumstances in which retention without payment would be inequitable." *Green Quarries, Inc. v. Raasch, 676 S.W.2d 261, 264 (Mo. Ct. App. 1984)*. "The most important requirement is that the enrichment be unjust." *JB Contracting, Inc. v. Bierman, 147 S.W.3d 814, 819 (Mo. Ct. App. 2004)*(citations omitted). "Mere receipt of benefits is [*49] not enough when there is no showing that it would be unjust for the defendant to retain the benefit received." *Graves v. Berkowitz, 15 S.W.3d 59, 61 (Mo. Ct. App. 2000)*(quotations omitted).

In this case, Bauer has failed to plead facts showing that the benefit he conferred upon the Defendants constituted more than a "[m]ere

2008 U.S. Dist. LEXIS 109978, *

receipt of benefits." *Id.* The Complaint states that Bauer "purchased a Saturn L-Series Class Vehicle, model year 2002 L200, VIN 1G8JU54F42Y515038, equipped with a 2.2L Ecotec L61 Engine, Timing Chain and Oiling Nozzle, from Saturn of Blue Springs, MO, on or about September 8, 2005." Complaint at 3. The fact that Bauer states he paid Saturn money for his vehicle, however, is not enough to show that his payment to Defendants for his vehicle was unjust. While Bauer did allege that the steel timing chain did eventually break, "necessitating repairs costing over $ 2,600" (Complaint at 3), that does not constitute evidence that the initial sales transaction conferred an unjust benefit upon the Defendants.

Instead, "[t]here must be some something more than passive acquiescence, such as fault or undue advantage on the part of the defendant, for defendant's retention of the benefit [*50] to be unjust." *S & J, Inc. v. McLoud & Co., L.L.C., 108 S.W.3d 765, 768 (Mo. Ct. App. 2003).* Bauer has failed to plead how Saturn's receipt of payment for his car rose above the level of "passive acquiescence" to become a transaction by which Saturn's receipt of payment was unjust. Notably, Bauer has pled nothing that distinguishes his sales transaction from thousands of vehicle purchases that occur annually. If this Court were to accept Bauer's facts as sufficient to establish a cause of action for unjust enrichment, this Court would be interpreting Missouri's equitable remedy of quasi-contract to operate in protection of a consumer any time a purchased product breaks following a typical business transaction. Such an interpretation of the equitable remedy of unjust enrichment is contrary to the law of quasi-contract, and its purpose of protecting a plaintiff who has conferred a benefit on a defendant in circumstances that fail to demonstrate a "meeting of the minds." *Weinsberg v. St. Louis Cordage Co., 135 Mo. App. 553, 116 S.W. 461, 466 (Mo. Ct. App. 1909).* The quasi-contract remedy of unjust enrichment is not meant to

serve as a substitute for product liability or breach-of-warranty litigation.

Bauer [*51] has failed to meet his burden of demonstrating that Defendants' retention of his payment for the car would be inequitable, and his claim for unjust enrichment will be dismissed.

### III. *Consumer Protection Act Claims*

The Defendants contend that many of the Plaintiffs' claims under various state consumer protection laws fail to state a claim upon which relief can be granted. The Court will address each individual claim in turn.

### A. *Reid's Claim and North Carolina's Economic Loss Rule*

In their Motion, Defendants argue that Reid's claim under the North Carolina Unfair or Deceptive Trade Practices Act ("NCUDTPA") is barred by North Carolina's common law economic loss doctrine. Because neither the North Carolina Supreme Court or the Appellate Court has yet to consider the application of this common law doctrine to statutory NCUDTPA claims, this Court is left to determine how the North Carolina Supreme Court would rule if it were presented with the question. [10] *See Lincoln Benefit Life Co. v. Edwards, 243 F.3d 457, 465 (8th Cir. 2001)*("When presented with a question of state law, upon which the state's highest court has not yet ruled, the onus falls to this court to determine what that court would [*52] do, were it presented with the question."). After a careful review of North Carolina law, this Court concludes that the application of North Carolina's economic loss doctrine to a NCUDTPA-based claim would be contrary to the statutory purposes of the NCUDTPA and the common law purpose behind the economic loss doctrine itself. This Court finds that Reid's claim under NCUDTPA is not barred by the economic loss doctrine and Defendants' Motion to dismiss his claim will be denied

2008 U.S. Dist. LEXIS 109978, *

10   This Court did certify this question of law to the North Carolina Supreme Court on September 10, 2008. *See* Filing No. 79. To date, the North Carolina Supreme Court has offered no response. Consequently, the Court is left to apply its own interpretation of North Carolina's law to this legal question.

Because the economic loss doctrine's purpose is to preserve the common law distinction between tort and contract law, not tort law and claims created entirely by the Legislature, the doctrine has no application to the present case-- where Reid's cause of action is created wholly by statute and does not rely on common law. *See Coker v. DaimlerChrysler Corp, No. 01CVS1264, 2004 NCBC LEXIS 2, 2004 WL 32676, at * 3 (N.C. Super. Ct., Jan. 5, 2004)*(quoting [*53] *Werwinski v. Ford Motor Co., 286 F.3d 661, 679 (3rd Cir. 2002)*("[t]he economic loss doctrine is designed to place a check on limitless liability for manufacturers and establish clear boundaries between *tort* and *contract* law.")(emphasis added)); *see also Coker v. DaimlerChrysler Corp., 172 N.C. App. 386, 617 S.E.2d 306, 319 (N.C. Ct. App. 2005)*(Hudson, J., dissenting)("[NCUDTPA] claims are exempt from the economic loss rule because the rule is judicial, not legislative, and must give way to specific legislative policy pronouncement allowing damages for economic loss. . . *To apply the economic loss rule to [NCUDTPA] claims would effectively eviscerate the statute. The legislature could hardly have intended that the rule would bar the very claims the [NCUDTPA] statute created.*")(emphasis in original).

While North Carolina has adopted an economic loss rule that prohibits recovery under tort law for pure economic loss, the rule's purpose is strictly to "prohibit[] the purchaser of a defective product from bringing a negligence action against the manufacturer or seller of that product to recover purely economic losses sustained as a result of that product's failure to per-

form as expected." *Wilson v. Dryvit Systems, Inc., 206 F.Supp.2d 749, 753 (E.D.N.C. 2002)*(citing [*54] *Moore v. Coachmen Indus., Inc., 129 N.C. App. 389, 499 S.E.2d 772, 780 (N.C. 1998)*). "The rationale for the economic loss rule is that the sale of goods is accomplished by contract and the parties are free to include, or exclude, provisions as to the parties' respective rights and remedies, should the product prove to be defective." *Moore, 499 S.E.2d at 780.* Thus, North Carolina's economic loss doctrine serves to bar plaintiffs from using North Carolina's common tort law when the plaintiff has suffered an economic loss only -- as North Carolina law dictates such disputes are more properly addressed through contract law. *Id.* This Court finds that because the economic loss doctrine serves to preserve the distinction between North Carolina's common *tort* law and *contract* law, the doctrine has no application to the present case, where the distinction is between tort law and *statutory* law.

The potential application of the doctrine to Reid's NCDUTPA claim can be further distinguished from the doctrine's ordinary application to common law based claims since, as "the [*55] Supreme Court of North Carolina has observed, the obligations imposed by the DTPA 'create a cause of action broader than traditional common law actions.'" *South Atlantic Ltd. P'ship of Tenn., L.P. v. Riese, 284 F.3d 518, 537 (4th Cir. 2002)*(quoting *Marshall v. Miller, 302 N.C. 539, 276 S.E.2d 397, 402 (N.C. 1981)*). The North Carolina Court of Appeals has distinguished NCUDTPA claims from common law claims, holding that "traditional common law defenses such as contributory negligence or good faith are not relevant to" NCUDTPA claims. *Concrete Serv. Corp. v. Investors Group, Inc., 79 N.C. App. 678, 340 S.E.2d 755, 760 (N.C. Ct. App. 1986)*.

In fact, the North Carolina legislature created NCUDTPA "to provide relief in situations where 'common law remedies had proved often ineffective.'" *Dealers Supply Co., Inc. v. Cheil*

*Indus., Inc., 348 F.Supp.2d 579, 591-92 n.2 (M.D.N.C. 2004)*(quoting *Marshall, 276 S.E.2d at 400*). The *Dealers* Court rejected "the notion that recovery under [NCUDTPA] is limited 'to cases where some recovery at common law would probably also lie.'" *Id.* (quoting *Marshall, 276 S.E.2d at 400*). Accordingly, this Court will not apply a common law doctrine to terminate a cause of action specifically created [*56] by North Carolina's legislature unless clearly directed to do so by North Carolina's courts.

A review of the applicable North Carolina law does not warrant the application of the economic loss doctrine to extinguish Reid's NCUDTPA claim, and Defendants' Motion to Dismiss Reid's NCUDTPA claim will be denied.

### B. Menzer's Claim under California Consumer Legal Remedies Act ("CLRA")

Upon reviewing the pleadings, briefs, and applicable California law, the Court concludes that Menzer has made sufficient factual allegations in her pleadings to state a cause of action under CLRA. Defendants aver that Menzer's claim under CLRA is not actionable because it fails to allege that Defendants made any actual misrepresentations to her regarding the steel timing chains in their cars. Def. Brief at 25-27. While it is true that Menzer makes no such allegations, she has pled sufficient facts to substantiate a claim under CLRA because she has alleged facts to establish that Defendants were "bound to disclose" the alleged defect in the steel timing chain at the time she made her purchase. *See Bardin v. Daimlerchrysler Corp., 136 Cal. App. 4th 1255, 39 Cal.Rptr.3d 634, 648 - 649 (Cal. Ct. App. 2006)*. Consequently, Defendant's Motion [*57] to Dismiss Menzer's claim will be denied. In the Complaint, Menzer has pled facts sufficient to show that her case is well within the class of plaintiffs the California legislature intended to protect when it enacted CLRA. *See Broughton v. Cigna Healthplans of Cal., 21 Cal. 4th 1066, 90 Cal. Rptr. 2d 334,* 988 P.2d 67, 74 (Cal.1999)("This title shall be liberally construed and applied to promote its underlying purposes, which are to protect consumers against unfair and deceptive business practices and to provide efficient and economical procedures to secure such protection.")(quoting *Cal. Civ. Code § 1760*). While CLRA bans several "deceptive" trade practices, of particular import to this case is *Section 1750(a)(7)*'s language that prohibits any "[r]epresenting that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another." *Cal. Civ.Code § 1770(a)(7)*.

California courts have interpreted this statute to preclude any action where a plaintiff cannot show that a defendant made an actual misrepresentation, or more precisely, when the complaint "fails to identify any representation by [the Defendant] that its automobiles had any characteristic they do [*58] not have, or are of a standard or quality they are not." *Daugherty v. American Honda Motor Co., Inc., 144 Cal. App. 4th 824, 51 Cal.Rptr.3d 118, 126 (Cal. Ct. App. 2006)*. Thus, Defendants argue that Menzer's claim fails to allege any actual misrepresentation made on behalf of the Defendant at the time of sale. The *Daugherty* Court, however, also carved out an exception to this rule, and Menzer's claim fits squarely within that exception. The *Daugherty* Court held that in place of pleading an act of misrepresentation, the plaintiff could state a claim "under the CLRA in terms [consisting of] fraudulent omissions[;] to be actionable the omission must be contrary to a representation actually made by the defendant, or an *omission of a fact the defendant was obliged to disclose*." *Id.* at 835 (emphasis added). In the present case, Menzer has pled facts to establish that Defendants were "obliged to disclose" the defects in their steel timing chains and oiling nozzles to her at the time she purchased her vehicle from them.

Menzer has successfully asserted that Defendants were "obliged to disclose" the defects

2008 U.S. Dist. LEXIS 109978, *

in their vehicles because she has alleged that the defects in the steel timing chains and oiling nozzles posed [*59] a safety risk to her and other consumers. *See* Complaint at P 282; *Falk v. General Motors Corp., 496 F. Supp. 2d 1088, 1096 n.* (N.D. Cal. 2007)*(holding that Defendants were obliged to disclose the defect in their vehicles because "plaintiffs successfully allege that the potential for failed speedometers constitutes a safety hazard."); *cf Oestreicher v. Alienware Corp., 544 F.Supp.2d 964, 972-73 (N.D. Cal. 2008)*(concluding the Court would not impose a "duty to disclose . . . on a manufacturer for a latent *non-safety related* defect in its product.")(emphasis added). In contrast to the pleadings at issue in *Oestreicher,* Menzer has adequately pled facts to establish that the latent defect in the car is in fact related to safety and that Defendants knew of the defect at the time they sold her car. *See* Complaint PP 70-96, 282.

Defendants' contention that the *Daugherty* Court's decision supports the dismissal of Menzer's CLRA claim is misplaced. In *Daugherty,* the California Court of Appeals for the Fourth District dismissed plaintiffs' claim that defendants were "obliged to disclose" the defect in the vehicles because "[t]he sole allegation mentioning "safety" [came in] the paragraph claiming [*60] punitive damages. . . ." *Daugherty, 51 Cal.Rptr.3d at 127.* In dispensing with the plaintiffs' cause of action, the *Daugherty* Court concluded that "[t]he complaint is devoid of factual allegations showing any instance of physical injury or any safety concerns posed by the defect." *Id.* The Complaint in the present case, however, is not "devoid of factual allegations showing any instance of physical injury or safety concerns." *See* Complaint at P 88. While none of the individual Plaintiffs has personally suffered physical injury as a result of the latent defect in the vehicles, all have alleged sufficient facts to show that an unreasonable risk of physical injury existed. Plaintiffs have alleged that a number of other individuals experienced engine failures while driving at high speeds,

often times on interstates or in the middle of an intersection. *See id.* While the *Daugherty* Court may have concluded that a mere oil leak does not constitute enough of a safety risk to impose a "duty to disclose" upon defendants, this Court finds that the potential for an engine to stop operating in the middle of an intersection, or on an interstate at speeds upwards of 65 miles per hour, constitutes enough [*61] of a safety risk that the Defendants in this case had a duty to disclose the safety defect to any potential consumer. "

11    Defendants also rely on *Bardin v. Daimlerchrysler Corp., 136 Cal. App. 4th 1255, 39 Cal.Rptr.3d 634 (Cal. Ct. App. 2006),* to argue that Menzer's claim does not establish that Defendants were under an obligation to disclose the defect in their steel timing chains and oiling nozzles. Def. Brief at 25. Their reliance is misplaced, however, since the *Bardin* Court dismissed the plaintiffs' claim because they simply did not plead that the defendant was "bound to disclose" the defect in dispute. *Id. at 648-49* ("Plaintiffs' claim for violation of the CLRA fails because the second amended complaint [neglected to] alleg[e] facts showing [Defendant] was 'bound to disclose' its use of tubular steel exhaust manifolds. . . ."). Menzer has made the requisite allegations in this case and has alleged that the defect posed an unreasonable safety risk.

Like the Court in *Falk,* this Court finds that the alleged safety risk posed by a defective steel timing chain is "far more 'unreasonable' than the monetary consequences in *Daugherty." Falk, 496 F.Supp.2d at 1096.* Consequently, Menzer has met her burden of pleading [*62] facts sufficient to establish that Defendants were "obliged to disclose" the defects in their timing chains and oiling nozzles. Defendants' Motion to Dismiss Menzer's CLRA claim, therefore, will be denied.

## C. Menzer's Claim for Injunctive Relief and Monetary Damages Under California's Unfair Competition Law ("UCL")

The Court grants Defendants' Motion to Dismiss Menzer's UCL claim. In their Motion, Defendants aver that Menzer has not properly pled that Defendants' actions were unlawful, fraudulent, or unfair within the meaning of the UCL. Additionally, Defendants contend that the Court should dismiss Plaintiff Menzer's claim because the remedies she seeks, injunctive relief and monetary damages, are not available. Defendants argue, therefore, that Menzer has failed to state a claim upon which the Court could grant relief. Upon reviewing the parties' briefs and applicable law, this Court finds that there is no injunctive relief to be awarded and monetary damages are not available under the UCL as a matter of law. Consequently, Menzer's UCL claim will be dismissed. [12]

12 Because the Court can grant no relief based on the claim that Menzer has stated, the Court need not address the Defendants' [*63] alternative argument that Menzer did not allege sufficient facts to establish that Defendants' conduct was either unlawful, unfair, or fraudulent under the UCL.

First, this Court cannot grant Menzer the injunctive relief she requests in the Complaint because Defendants no longer engage in the behavior that Menzer would have this Court enjoin. See Def. Brief at 31. In response to Menzer's request for injunctive relief, Defendants state that "Saturn ceased making and marketing the vehicles years ago." [13] Id. In Plaintiffs' Response to Defendants' Motion, Menzer did not address Defendants' contention that there is no conduct or behavior for the Court to enjoin. See Response at 35-37. This Court cannot award injunctive relief for conduct that no longer exists. To the extent that

Menzer requests injunctive relief, she has failed to state a claim upon which can be granted.

13 Notably, in their Complaint, Plaintiffs acknowledge that Defendants no longer manufacture and sell cars with defective timing chains and oiling nozzles. See Complaint at P 92 ("According to statements made by Defendants to NHTSA in 2006, Defendants no longer incorporated the original Timing Chain and Oiling Nozzle in the [*64] vehicles after: (i) April 22, 2002, in Saturn vehicles assembled at the Tonawanda vehicle plant, and (ii) May 1, 2002, in Saturn vehicles assembled at the Springhill vehicle plant.").

Neither can this Court award Menzer monetary relief because a claim for monetary damages "is not permitted under the UCL." Korea Supply Co. v. Lockheed Martin Corp., 29 Cal. 4th 1134, 131 Cal. Rptr. 2d 29, 63 P.3d 937, 948 (Cal. 2003). In the Complaint Menzer requests, in addition to injunctive relief, "all further relief which is available, as well as appropriate and just to grant, under the UCL." Complaint at P 302. However, "it is well established that individuals may not recover damages" under the UCL, and, consequently, Menzer has failed to request any relief this Court is capable of granting. [14] Korea Supply, 63 P.3d at 948. "A court cannot, under the equitable powers of section 17203, award whatever form of monetary relief it believes might deter unfair practices." Id. at 946. If this Court were to award Menzer monetary damages for what amounts to a breach of the express warranty between her and Defendants, "[t]he result could be that the UCL would be used as an all-purpose substitute for a tort or contract action, something the Legislature [*65] never intended." Id. at 948-49.

14 This Court notes that there are some circumstances under which a plaintiff can recover; however, that recovery is limited to restitution. Korea Supply at 947

("Under the UCL, an individual may recover profits unfairly obtained to the extent that these profits represent monies given to the defendant or benefits in which the plaintiff has an ownership interest."); *Cel-Tech Commc'ns, 973 P.2d at 539* ("Prevailing plaintiffs are generally limited to injunctive relief and restitution."); *Kraus v. Trinity Mgmt. Servs., Inc., 23 Cal. 4th 116, 96 Cal. Rptr. 2d 485, 999 P.2d 718, 726 (Cal. 2000)*("[R]estitution to a person in interest is the only monetary remedy for violation of the UCL described in *section 17203*."). In the present case, because Menzer has not alleged sufficient facts to demonstrate how her purchase of a used vehicle resulted in "profits" or "monies given to the defendant[s,]" to the extent that the vague language in Paragraph 302 of her Complaint requests restitution, this Court cannot award her relief.

Menzer's request for injunctive and monetary relief is simply inapposite to the legislative purpose behind the enactment of the UCL. *See id.* The California Supreme Court has concluded **[*66]** that "the Legislature ... intended [the language in the UCL] to permit tribunals to enjoin on-going wrongful business conduct. . . ." *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Telephone Co., 20 Cal. 4th 163, 83 Cal. Rptr. 2d 548, 973 P.2d 527, 540 (Cal.1999)*(citations omitted)(emphasis added). Thus, the "overarching legislative concern [was] to provide a streamlined procedure for the prevention of ongoing or threatened acts of unfair competition." *Korea Supply, 63 P.3d at 948* (quotations omitted).

Further, the California Supreme Court has held the Legislature never intended for the UCL to be used as "an all-purpose substitute for a tort or contract action." *Id. at 948-49.* Instead, the *Korea Supply* Court warned against permitting a plaintiff to "recover . . . without having to meet the more rigorous pleading requirements of a . . . breach of contract suit." [15] *Id.* This Court, consequently, declines to interpret the UCL to award relief for the damages an individual suffered as a result of a breach of an express warranty between two parties.

> 15    This Court recognizes that in this context the *Korea Supply* Court was speaking directly to claims filed by one competitor against another competitor under the UCL. This Court finds, **[*67]** however, that the goal of preventing the UCL from becoming a substitute for tort and contract law applies with equal force when the UCL claim is filed by a consumer against a manufacturer.

Because Menzer has not stated a claim upon which the Court can grant relief, the Court will grant Defendants' Motion to Dismiss Menzer's UCL claim.

### D. Faust's and Cardwell's Claims for Injunctive Relief under the Nebraska Uniform Deceptive Trade Practices Act ("NDTPA")

The Court will dismiss Faust's and Cardwell's claims for injunctive relief under the NDTPA. In their Motion to Dismiss, Defendants contend that this Court should dismiss Plaintiffs' claims for injunctive relief as moot. Def. Brief at 32 n.22. Plaintiffs, in their Response, neglect to address this issue. As explained above, Defendants no longer manufacture or sell vehicles with the defective timing chains and oiling nozzles. *See* Complaint at P 92; Def. Brief at 32 n.22. There is no current, deceptive behavior this Court could possibly enjoin. Consequently, the Court concludes that Faust and Cardwell have not stated a claim upon which this Court could grant relief. Defendants' Motion to Dismiss the Plaintiffs' claims for injunctive relief **[*68]** under the NDTPA will be granted.

### E. Cardwell's and Faust's Claims under the Nebraska Consumer Protection Act ("NCPA")

This Court has reviewed the parties' briefs and the applicable law and concludes that Defendants' Motion to Dismiss Cardwell and Faust's NCPA claims will be denied. Through a misapplication of California law and Nebraska common law tort standards, [16] Defendants argue that Plaintiffs' claims must be dismissed because Plaintiffs failed to allege facts to support an inference that Defendants were under a duty to disclose the defects in their vehicles. Defendants cite two cases where California Courts required plaintiffs to plead facts establishing that defendants were under a "duty to disclose" under CLRA. [17] The California Courts' interpretation of the "duty to disclose" under CLRA, however, has no bearing on this Court's interpretation of what is a cognizable claim under Nebraska's Consumer Protection Act. *See Nelson v. Lusterstone Surfacing Co., 258 Neb. 678, 605 N.W.2d 136, 141 (Neb. 2000)*(noting that while "several other states have similar consumer protection acts that have been interpreted in various ways[, t]he determination of the issue here, however, depends on how we interpret **[\*69]** the language of *this* state's CPA.")(emphasis added).

16  In their Brief, Defendants argue that this Court should apply the Nebraska Supreme Court's recitation of the elements necessary to establish the "duty to speak"in the *Restatement (Second) of Torts § 551. See* Def. Brief at 34 (citing *Streeks, Inc. V. Diamond Hill Farms, Inc., 258 Neb. 581, 605 N.W.2d 110, 118-19 (Neb. 2000)*). Plaintiffs' claims under the NCPA, however, are statutorily constructed, and consequently, this Court declines to apply common law standards concerning duties under tort law to a cause of action the Nebraska Legislature has specifically created.

17  *See* Def. Brief at 33 (citing *Daugherty, 144 Cal. App. 4th 824, 51 Cal.Rptr.3d 118, 128-29; Bardin, 39 Cal.Rptr.3d at 634, 644-48.*

Not a single Nebraska Court has interpreted NCPA to require plaintiffs to plead a "duty to disclose" in order to establish a fraudulent omission claim under the Act. Consequently, although it is true that California Courts require plaintiffs to plead a "duty to disclose" in order to state an actionable claim under CLRA, this Court will refrain from extinguishing a Nebraska plaintiff's claim unless so directed by Nebraska law.

Interpreting NCPA, the Nebraska Supreme Court has held **[\*70]** that for a claim to be actionable "under the Act, the unfair or deceptive act or practice must have an impact upon the public interest. . . ." *Arthur v. Microsoft Corp., 267 Neb. 586, 676 N.W.2d 29, 36 (Neb. 2004).* NCPA provides: 'It shall be unlawful for any person to monopolize, or attempt to monopolize or combine or conspire with any other person or persons to monopolize any part of trade or commerce." NCPA § 59-1604. "Any person who is injured in his business or property by a violation of sections 59-1602 to 59-1606 ... may bring a civil action in the district court to enjoin further violations, to recover the actual damages sustained by him, or both, together with the costs of the suit ...." *Id.* at § 59-1609. The Nebraska Supreme Court has interpreted the statutory language "trade and commerce' as inclusive of any "sale of assets or services and any commerce directly or indirectly affecting the people of the State of Nebraska. [The Supreme Court] read[s] this definition to limit the disputes that fall within the ambit of § 59-1602 to unfair or deceptive acts or practices that affect the public interest." *Nelson, 605 N.W.2d at 141 (Neb. 2000)*(citations omitted). "[T]he Act is not available to redress **[\*71]** a private wrong where the public interest is unaffected." *Arthur, 676 N.W.2d at 36.*

In this case, Plaintiffs have alleged enough facts to establish their claim that the Defendants' unfair or deceptive acts have had an impact on the public interest. While the Nebraska Supreme Court has "refused to apply the Act to

isolated transactions between individuals that did not have an impact on consumers at large," Plaintiffs have pled facts that demonstrate that the defects in the steel timing chains and oiling nozzles were not limited to their individual cars, but affected thousands of cars that consumers purchased, thereby constituting "an impact on consumers at large." *Id.; cf. Nelson, 605 N.W.2d at 142* (noting that where a used car salesman lied about the certificate of title for one particular car, "the transfer of the Jeep from appellants to appellee affected no one other than the parties to the transaction, and appellee has not shown a sufficient impact indirectly or directly on the public to qualify the transaction as an act or practice which is prohibited under § 59-1602;" and dispensing with the plaintiffs' claim as non-cognizable under the Act). Plaintiffs in this case, however, have [*72] alleged that Defendants' deceptive acts in fraudulently concealing their defective steel timing chains and oiling nozzles damaged an entire class of cars, and thus, had numerous adverse impacts on the public at large.

Faust's and Cardwell's actions under NCPA will survive the Defendants' Motion to Dismiss.

### IV. *Class Action Allegations*

The Defendants contend that Plaintiffs' allegations in the Consolidated Amended Complaint seeking certification of a class should be dismissed because (1) the proposed class definition is overbroad in that it includes people with no valid claim, (2) it is not feasible to identify proposed class members, and (3) the proposed class members' individual issues outweigh any issues they may have in common. The Court has reviewed the record and applicable law, and the Court finds that the challenges Defendants raise are not sufficient to warrant a premature dismissal of all class action allegations prior to the certification stage. Accordingly, Defendants' Motion to Dismiss Plaintiffs' class allegations will be denied at this time and may be renewed at the class certification stage.[18]

18    While the Court is postponing the certification of Plaintiffs' state law class [*73] action claims until the class certification stage, the Court recognizes that should it decline to certify the class actions, the Court's subject matter jurisdiction over all of Plaintiffs' claims would be in question. In this case, Plaintiffs have presented no federal question pursuant to *28 U.S.C. § 1331*, and they have not met the statutory requirements for diversity under *28 U.S.C. § 1332(a)*. Plaintiffs' class allegations only meet the requirements for federal subject matter jurisdiction under *§ 1332(d)*. See Class Action Fairness Act (CAFA), Pub.L. 109-2, 119 Stat. 4 (2005); *Exxon Mobil Corp. v. Allapattah Servs., Inc., 545 U.S. 546, 125 S. Ct. 2611, 162 L. Ed. 2d 502 (2005)*("Subject to certain limitations, the CAFA confers federal diversity jurisdiction over [state law based] class actions where the aggregate amount in controversy exceeds $ 5 million."). Whether federal district courts lose subject matter jurisdiction over Plaintiffs' individual state law claims as a result of a decision to *not* certify the state law class actions is a question that has not yet been answered. *Compare McGaughey v. Treistman, 2007 U.S. Dist. LEXIS 126, 2007 WL 24935 at *1 (S.D.N.Y., Jan. 04, 2007)*("[D]enial of class certification leaves this Court without subject [*74] matter jurisdiction."); *Genenbacher v. CenturyTel Fiber Co. II, LLC, 500 F.Supp.2d 1014, 1015 (C.D.Ill. 2007)*("[T]his court retains jurisdiction . . . At the time of the filing, the Complaint alleged facts that invoked this Court's removal jurisdiction based on diversity of citizenship under CAFA. The subsequent reduction in the amount in controversy and elimination of the class claims does not remove that diversity jurisdiction.").

2008 U.S. Dist. LEXIS 109978, *

As one transferee federal judge in the Louisiana Eastern District has noted, "[i]t would be unfortunate if CAFA result[ed] in prolonging MDL proceedings with protracted jurisdictional questions about cases lying at the margins of the transferee court's jurisdiction." Sarah Vance, *A Primer On the Class Action Fairness Act of 2005, 80 TUL. L. REV. 1617, 1643 (2006)*. This Court agrees, and therefore, declines to prolong this case's progress any further at this stage in the proceedings with "protracted jurisdictional questions." The Court reserves its judgment concerning jurisdiction, however, in the event the Court does not certify the Plaintiffs' state law class allegations.

Striking a Plaintiff's class action allegations prior to discovery and the class certification [*75] stage is a rare remedy. *See Walker v. World Tire Corp., Inc., 563 F.2d 918, 921 (8th Cir. 1977)*("The propriety of class action status can seldom be determined on the basis of the pleadings alone."); *Weathers v. Peters Realty Corp., 499 F.2d 1197, 1200 (6th Cir. 1974)*(holding that "ordinarily the [class certification] determination should be predicated on more information than the pleadings will provide."); *Rios v. State Farm Fire and Cas. Co., 469 F.Supp.2d 727, 740 (S.D. Iowa, 2007)* ("Prior to the class certification stage, a defendant may move to strike class allegations prior to discovery in rare cases where the complaint itself demonstrates that the requirements for maintaining a class action cannot be met.") (internal citations omitted)). This case, however, is not one of those "rare cases where the complaint itself demonstrates that the requirements for maintaining a class action cannot be met." *Id.*

Instead, this Court finds that before dismissing or certifying Plaintiffs' state law class action claims, the Court will need to conduct a more rigorous analysis of the applicable facts and law. The Court does not yet "have before it

sufficient material . . . to determine the nature [*76] of the allegations, and rule on compliance with the Rule's requirements," and therefore, the Court declines to dismiss the class action allegations at this stage in the proceedings. *Walker, 563 F.2d at 921.* (internal quotations omitted). Consequently, "this court will proceed with discovery and postpone the certification or dismissal of plaintiffs' class action claims until the class certification stage." *Weathers, 499 F.2d at 1200 (6th Cir. 1974)*. "[T]here can be no doubt that it is proper for a district court, prior to certification of a class, to allow discovery and to conduct hearings to determine whether the prerequisites of *Rule 23* are satisfied." *Sirota v. Solitron Devices, Inc., 673 F.2d 566, 570-72 (2d Cir. 1982)*.

Defendants aver that this Court should dismiss Plaintiffs' class actions prematurely because the class is not ascertainable and is over-inclusive, and additionally because it is not feasible to identify class members. While Defendants note potential difficulties this Court may face in defining the class, these concerns do not justify a premature dismissal of all class allegations prior to the class certification stage. Defendants' arguments in support of premature [*77] dismissal are not persuasive since the cases they cite warranted premature dismissal on grounds that do not exist in this case. [19] Even where "plaintiffs' class definitions are suspicious and may in fact be improper, plaintiffs should at least be given the opportunity to make the case for certification based on appropriate discovery of, for example, the . . . lists that they claim will identify the class members." *In re Wal-Mart Stores, Inc., Wage and Hour Litigation, 505 F.Supp.2d 609, 615 (N.D. Cal. 2007)*. Accordingly, the Court finds that it is improper to dismiss Plaintiffs' class allegations at this stage in the proceedings.

19    *See e.g., John v. National Sec. Fire and Cas. Co., 501 F.3d 443, 445 (5th Cir. 2007)*(concluding that the plaintiffs' class was not ascertainable because the

2008 U.S. Dist. LEXIS 109978, *

plaintiffs "do not contend that the class they propose is ascertainable, but instead propose two newly defined classes"); *Van West v. Midland Nat. Life Ins. Co., 199 F.R.D. 448, 451 (D.R.I. 2001)*("The ascertainability requirement is not satisfied when the class is defined simply as consisting of all persons who may have been injured by some generically described wrongful conduct allegedly engaged in by [*78] a defendant. . . For example, there would be no practical way to determine, in advance of trial, who belongs to a class consisting of all persons allegedly injured by a hospital's failure to properly train its nurses."). In this case, however, Plaintiffs are contending that there class is ascertainable, and Plaintiffs are not claiming injury by "some generically described wrongful conduct allegedly engaged in by a defendant." Instead, Plaintiffs have *specifically* described the wrongful conduct attributed to Defendants as manufacturing and fraudulently concealing defective steel timing chains and oiling nozzles. The cases that Defendants cite do not support the conclusion that Plaintiffs' class allegations create a class that is not "ascertainable" or "over-inclusive."

Likewise, Defendants' claims that common issues do not predominate in the Plaintiffs' class allegations are without merit. Simply because Plaintiffs' claims involve several different state laws does not conclusively mean that common issues do not predominate. [20] *See Rios, 469 F.Supp.2d at 740* ("Clearly, multi-state, and even nationwide class actions can be, and are, maintained in many instances.")(citing *Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 105 S. Ct. 2965, 86 L. Ed. 2d 628 (1985))*. [*79] The question of whether common questions predominate over individual questions "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor, 521*

*U.S. 591, 623, 117 S. Ct. 2231, 138 L. Ed. 2d 689 (1997)*. "The nature of the evidence that will suffice to resolve a question determines whether the question is common or individual. If, to make a prima facie showing on a given question, the members of a proposed class will need to present evidence that varies from member to member, then it is an individual question. If the same evidence will suffice for each member to make a prima facie showing, then it becomes a common question." *Blades v. Monsanto Co., 400 F.3d 562, 566 (8th Cir. 2005)*. Upon reviewing the Complaint, it is clear that all Plaintiffs will need to rely on the same evidence for the majority of their case. All Plaintiffs will need to present the same evidence regarding the Defendants' knowledge and fraudulent concealment of the defective design of the steel timing chains and oiling nozzles in the Class vehicles.

20   This Court however, reserves its final judgment on this issue until the class certification stage.

It is not clear from the pleadings [*80] that individualized issues predominate common issues of fact, and consequently, this Court declines to dismiss Plaintiffs' class allegations before the certification stage. [21] Defendants may renew their Motion to Dismiss the class allegations during the class certification stage.

21   This Court further notes that the MDL Panel's determination that these cases met the "common questions of fact" standard required by *28 U.S.C. § 1407* is not determinative of whether these cases meet the requirement of *Fed. R. Civ. Pro. 23* that common issues of fact "predominate" over individualized issues of fact. The two are entirely separate standards. "[H]istory reveals that the 'common questions of fact' standard and the ends to which it is directed were conceived of before the 1966 amendments to *Rule 23 of the Federal Rules of Civil*

*Procedure* that created the modern class action. . . . There are, of course, many cases that would benefit from coordinated or consolidated pretrial treatment as part of an MDL proceeding but that should not be certified as class actions." *An Uncommon Focus on "Common Questions": Two Problems with the Judicial Panel on Multidistrict Litigation's Treatment of the "One or More* [*81] *Common of Fact" Requirement for Centralization,* Pearson Bownas & Mark Herrmann, *82 TUL. L. REV. 2297, 2299, 2310 (2008).* Accordingly, the Court will not consider the MDL Panel's conclusion that "common questions of fact" exist within Plaintiffs' claims as determinative of whether common issues of fact "predominate" in the class action allegations.

## CONCLUSION

For all the aforementioned reasons, the Court grants in part and denies in part Defendants' Motion to Dismiss.

ACCORDINGLY,

IT IS ORDERED:

1. The Defendants' Motion to Dismiss (Filing No. 70 in "Lead" Case No. 8:07cv298 and Filing No. 68 in "Member" Case No. 8:08cv79), seeking to dismiss the Plaintiffs' Consolidated Amended Complaint, is granted in part as follows:

 a. The implied warranty of merchantabil-

ity claim of Plaintiff Stoffer is dismissed;

 b. The unjust enrichment claims of Plaintiffs Anderson, Bauer, Cardwell, Faust, Fowler, Menzer, Scott, and Stoffer are dismissed;

 c. The claim brought by Plaintiff Menzer under the California Unfair Competition Law is dismissed; and

 d. The claims brought by Plaintiffs Faust and Caldwell for injunctive relief under the Nebraska Deceptive Trade Practices Act are dismissed.

2. Defendants' Motion to [*82] Dismiss is otherwise denied, and the Defendants shall respond to the Plaintiffs' Consolidated Amended Complaint on or before November 21, 2008.

DATED this 7th day of November, 2008.

BY THE COURT:

/s/ Laurie Smith Camp

United States District Judge