UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| Motors Liquidation Company., *et al.*, | ) | Case No. 09-50026(REG) |
| f/k/a General Motors Corp., *et al.* | ) | |
| | ) | |
| Debtors. | ) | Jointly Administered |

———————————————————————

BENCH DECISION[1] ON APARTHEID
CLAIMANTS' MOTION FOR CLASS
CERTIFICATION, AND ON DEBTORS'
OBJECTION TO APARTHEID CLAIMANTS'
UNDERLYING CLAIMS

APPEARANCES:

WEIL, GOTSHAL & MANGES LLP
Attorney for Debtors
767 Fifth Avenue
New York, New York 10153
By:    Harvey R. Miller, Esq.
       Stephen Karotkin, Esq.
       Joseph H. Smolinsky, Esq.
       Angela C. Zambrano, Esq. (argued)

HAUSFELD LLP
Attorney for Sakwe Balintulo, *et al.*, and
  on behalf of all those similarly situated
11 Broadway, Suite 615
New York, NY 10004
By:    Steig Olson, Esq. (argued)
       Michael Hausfeld, Esq.

---

[1] I use bench decisions to lay out in writing decisions that are too long, or too important, to dictate in open court, but where the circumstances do not permit more leisurely drafting or more extensive or polished discussion. Because they often start as scripts for decisions to be dictated in open court, they typically have a more conversational tone

NAGEL RICE LLP
Attorney for Lungisile Ntsebeza *et al*., and
  on behalf of all those similarly situated
103 Eisenhower Parkway
Roseland, NJ 07068
By:    Diane Sammons, Esq. (argued)

ROBERT E. GERBER
UNITED STATES BANKRUPTCY JUDGE:

In the jointly administered chapter 11 cases of Debtor Motors Liquidation
Company, formerly General Motors Corporation ("**Old GM**," and with its debtor
affiliates, the "**Debtors**"), I have two contested matters evolving from lawsuits brought
against Old GM, prepetition, which, after the filing of proofs of claim by the plaintiffs,
now are before me in the form of claims against the Old GM estate.

The lawsuits were brought by residents of South Africa under the Alien Tort
Statute,[2] which allows foreign nationals to bring actions in the federal courts of the
United States against those alleged to have committed torts in violation of the "law of
nations"—*i.e.*, international law.  As described more fully below, the former plaintiffs
(now claimants) (the "**Apartheid Claimants**") allege, in general terms, that they were
victims of the infamous system of apartheid in South Africa, and that Old GM aided and
abetted the perpetrators of the apartheid system, to the Apartheid Claimants' injury.

In the first of the two contested matters now before me, the Apartheid Claimants
move for certification of their claims as class proofs of claim, on behalf of themselves
and other victims of apartheid.  In the second of two contested matters before me, the
Debtors seek to disallow the claims, on a class basis or otherwise.

For the reasons that follow, I conclude, notwithstanding my abhorrence of
apartheid, that:

---

[2]    28 U.S.C. § 1350.  It provides, in full:

    The district courts shall have original jurisdiction of any civil
    action by an alien for a tort only, committed in violation of the
    law of nations or a treaty of the United States.

(1) class certification, which is discretionary in bankruptcy cases

and appropriate less frequently than in plenary litigation, must be denied

under the facts presented here; and that

(2) under controlling Second Circuit authority,[3] binding on me and

every other lower court in the Second Circuit, the underlying claims must

now be disallowed.

My Findings of Fact, Conclusions of Law, and bases for the exercise of my

discretion in connection with these determinations follow.

<u>Findings of Fact</u>

*1. Procedural History*

The claims pending before this Court were first raised in plenary non-bankruptcy

litigation—in two related lawsuits brought by 26 named plaintiffs in two separate groups

(the "**Botha Plaintiffs**" and the "**Balintulo Plaintiffs**"),[4] alleging that Old GM and other

multinational corporations aided and abetted South Africa's apartheid regime. The

lawsuits were initially filed in 2002 and 2003. In their current form, the two claimant

groups seek allowed claims on the part of Old GM for damages of the type originally

sought in the earlier lawsuits.

The earlier lawsuits had a lengthy and somewhat convoluted history, the specifics

of which need not be laid out at length in this Decision. It is sufficient for present

purposes to say that until recently, it was held in the course of that litigation and related

litigation that claims under the Alien Tort Statute for corporate aiding and abetting

---

[3]     *See Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111 (2d Cir. 2010) ("*Kiobel*").

[4]     Or the "**Botha Claimants**" and "**Balintulo Claimants**," when dealing with their claims as they
       were thereafter asserted in this Court.

violations of international law were legally cognizable, and could be heard in the U.S.

federal courts. That changed, at least in the Second Circuit, after the Circuit's *Kiobel*

decision, discussed above and below.

On June 1, 2009, when those lawsuits were ongoing, the Debtors filed their

chapter 11 cases. On September 16, 2009, I signed an order establishing November 30,

2009 as the "Bar Date"—the deadline for filing claims—in these chapter 11 cases, and

setting forth procedures for filing proofs of claim against the Debtors.

On August 29, 2009, the Botha Plaintiffs filed a proof of claim against Old GM,

and on October 9, 2009, the Botha Plaintiffs filed a second, largely similar, proof of

claim. The Botha Plaintiffs' action had not been certified as a class action as of the time

that the Debtors filed their chapter 11 cases. They first moved for class treatment of their

claims in these chapter 11 cases on June 22, 2010, about a year after Old GM's chapter

11 filing, and about 10 months after the filing of their proofs of claim.

Similarly, the Balintulo Plaintiffs' action had not been certified as a class action

as of the time that these chapter 11 cases were commenced. The Balintulo Plaintiffs filed

their proof of claim on October 14, 2009, and first moved for class treatment on the same

day that the Botha Claimants did, June 22, 2010.

*2. Botha Claimants' Claims*

The Botha Plaintiffs' claims in this Court, as in their complaint in the district

court, allege causes of action for (i) "apartheid as a crime against humanity";

(ii) "extrajudicial killing"; (iii) "torture"; and (iv) "cruel, inhuman or degrading

treatment."

As set forth in greater detail in their earlier complaint and proof of claim, the Botha Claimants seek recovery from Old GM based on Old GM's participation in South African apartheid, and/or aiding and abetting South Africa's apartheid system.   It is alleged, for example, that Old GM produced military vehicles that were used by South African security forces in their efforts to maintain the apartheid regime,[5] and that Old GM engaged in workplace segregation and retaliation against Old GM employees who engaged in union and/or anti-apartheid activity.[6]

The Botha Claimants seek compensatory damages, "including general and special damages"; punitive damages; disgorgement of profits, and costs of suit, including attorneys' fees.  The Botha claim describes the amount of the claim as "TBD," since "[t]he amount of this claim is contingent based upon pending litigation."[7]

The Botha Claimants seek that relief on their own behalf and on behalf of a putative class of:

> [A]ll black South African citizens (and their heirs and beneficiaries) who during the period from 1973 to 1994 suffered injuries as a result of Defendants' violations of the law of nations by their complicity in such violations caused by South African state officials, employees or agents or by their actions in replicating the apartheid system in their own internal operations.[8]

### 3.  Balintulo Plaintiffs' Claim

The Balintulo Claimants' claim alleges two "counts" against the Debtors.  The first, on behalf of four putative classes, described momentarily, is "for the crime of

---

[5]        Botha Putative Class Claim, Botha Cmplt., ¶¶ 85-88.

[6]        *Id.* at ¶¶ 89-94.

[7]        Botha Putative Class Claim.

[8]        Botha Putative Class Claim, Botha Cmplt., ¶ 149.

apartheid." It alleges that Old GM provided substantial assistance to the South African security forces knowing that the security forces were violating international law;[9] that this assistance had a substantial effect on the perpetration of its criminal and tortious activities against the purported classes; and that Old GM "aided and abetted" and/or ratified the actions of the apartheid regime.[10]

The second, on behalf of one of those four classes only, is for "the crime of extrajudicial killing," and makes aiding and abetting allegations substantially similar to those in the first count.[11]

The Balintulo Claimants seek, among other things, a declaration that "Defendants knowingly and intentionally aided and abetted the commission of a tort in violation of international law enforceable in this court as federal common law and the law of nations," compensatory damages, punitive damages, and costs.[12] Like the Botha Claimants' claim, the amount of the Balintulo Claimants' claim is "TBD," as "[t]he amount of this claim is contingent based upon pending litigation as outlined in the attached Complaint."[13]

The Balintulo Claimants' claim proposes four distinct classes:

> The "Extrajudicial Killing Class," defined as "[a]ll persons who are the surviving personal representatives—including parents, spouses, children, siblings, and dependents—of persons who were subject to *extrajudicial killing* by South African security forces during the period from 1960 to 1994."

---

[9]     Balintulo Putative Class Claim, Balintulo Cmplt., ¶ 316.

[10]    *Id.* ¶¶ 317, 320.

[11]    *Id.* ¶¶ 331-39.

[12]    *Id.* at 87-88.

[13]    Balintulo Putative Class Claim, Rider.

> The "Torture Class," defined as "[a]ll persons who
> were themselves subject to *torture and rape* by
> South African security forces during the period
> from 1960 to 1994."

> The "Detention Class," defined as "[a]ll persons
> who were themselves subject to *prolonged unlawful
> detention* by South African security forces during
> the period from 1960 to 1994."

> The "Cruel Treatment Class," defined as "[a]ll
> persons who were themselves subject to *cruel,
> inhuman, and degrading treatment* by South
> African security forces during the period from 1960
> to 1994." [14]

Discussion

I consider the two separate contested matters in turn.

I.

Class Certification

A.  *Class Certification of Claims in Bankruptcy Cases*

While I normally start with textual analysis in any dispute where such is relevant,

textual analysis is of only limited utility here.  The Bankruptcy Code is silent on the

extent to which a claim may be filed on behalf of persons other than the claimant, or the

standards under which a court might find that to be appropriate.[15]  And as relevant here,[16]

---

[14]    Balintulo Putative Class Claim, Balintulo Cmplt. ¶ 36 (emphasis added in each case).

[15]    The closest potentially applicable section, Bankruptcy Code section 501, provides, in relevant part:

> (a) A creditor or an indenture trustee may file a proof of claim . . .

> (b) If a creditor does not timely file a proof of such creditor's claim, an entity that is liable to such creditor with the debtor, or that has secured such creditor, may file a proof of such claim.

> (c) If a creditor does not timely file a proof of such creditor's claim, the debtor or the trustee may file a proof of such claim.

the Bankruptcy Rules are as well.  Class certification in cases under the Bankruptcy Code

is expressly addressed in Fed. R. Bankr. P. 7023, which provides that "Rule 23

F.R.Civ.P. applies in adversary proceedings."  But claims allowance matters, when

objected to, are contested matters, not adversary proceedings, and instead are governed

by Bankruptcy Rule 9014, which is silent as to class action treatment, or incorporation of

Civil Rule 23.

        Bankruptcy Rule 9014(c), captioned "Application of Part VII rules," provides that

"[e]xcept as otherwise provided in this rule, and unless the court directs otherwise, the

following rules shall apply. . . ."  Rules 9014(c) continues with a fairly long listing of Part

VII Rules that (unless the court directs otherwise) apply to contested matters, but Rule

7023 is not one of them.  Thus Rule 7023 doesn't apply in contested matters, "unless the

court directs otherwise."  But while at least implying that a bankruptcy court has the

power to "direct[] otherwise," and thus to apply Rule 7023 (and hence Fed.R.Civ.P. 23)

in claims allowance contested matters, Rule 9014 is silent as to standards under which

courts should do so.

        Thus, as in so many areas where the Code and Rules are silent, bankruptcy courts

look to caselaw to fill the gaps.  That caselaw is extensive, with much of it from

---

Prior to 1988, many courts had held that section 501 of the Code provides an exclusive list of
those who may file a representative claim and that class proofs of claims are invalid as a matter of
law because class representatives are not listed in section 501.  However, in *In re American
Reserve Corp.,* 840 F.2d 487 (7th Cir.1988) ("***American Reserve***"), the Seventh Circuit held that
class proofs of claim are not barred by section 501, but may be allowed in the discretion of the
bankruptcy court.  *See In re Ephedra Prods. Liab. Litig.*, 329 B.R. 1, 4 (S.D.N.Y. 2005) (Rakoff,
D.J., sitting as bankruptcy court after withdrawal of reference) ("***Ephedra***") (explaining the
history and so holding).  Though the Second Circuit hasn't addressed the issue, *id.*, lower court
decisions in this district since that time have held similarly.

[16]    Fed. R. Bankr. P. 3001(b) provides that except where proofs of claim may be filed by debtors or
co-obligors, *see* Fed. R. Bankr. P. 3004 and 3005, "[a] proof of claim shall be executed by the
creditor or the creditor's authorized agent."  But Bankruptcy Rule 3001 does not speak to the
permissibility of class action treatment for claims either.

bankruptcy courts in this district—which, while not, strictly speaking, binding upon me, I am on record as following in the absence of clear error.[17]

In this district, it has been held that while class proofs of claim in bankruptcy are not prohibited, the right to file one is not absolute.[18]  The decision to extend Civil Rule 23's application is committed to the Court's discretion.[19]  The exercise of that discretion is informed by special considerations applicable in bankruptcy cases that are superimposed on those that apply in any determination under Civil Rule 23.  "Although the Bankruptcy Code and Rules give no express guidance for the court's exercise of this discretion, a pervasive theme is avoiding undue delay in the administration of the case."[20]  And Judge Gropper of this Court has observed, "[t]he effect of a class claim on other creditors is an important factor in a court's decision whether to exercise its discretion and grant Rule 23 certification."[21]

Accordingly, the proponent of a class claim must (1) make a motion to extend the application of Rule 23 to some contested matter; (2) satisfy the requirements of Rule 23; and (3) show that the benefits derived from the use of the class claim device are

---

[17]     *See, e.g., In re Adelphia Communications Corp.,* 359 B.R. 65, 72 n.13 (Bankr.S.D.N.Y. 2007) ("This Court has been on record for many years as having held that the interests of predictability in this District are of great importance, and that where there is no controlling Second Circuit authority, it follows the decisions of other bankruptcy judges in this district in the absence of clear error.").

[18]     *In re Musicland Holding Corp.,* 362 B.R. 644, 650 (Bankr.S.D.N.Y. 2007) (Bernstein, C.J.) ("***Musicland***"); *In re Bally Total Fitness of Greater New York, Inc.,* 402 B.R. 616, 619 (Bankr.S.D.N.Y. 2009) (Lifland, C.J.) ("***Bally***"); *Ephedra,* 329 B.R. at 5.  *See also In re Sacred Heart Hospital of Norristown,* 177 B.R. 16, 22 (Bankr. E.D. Pa. 1995) (noting that the class action device may be utilized in appropriate contexts, but should be used sparingly).

[19]     *Musicland,* 362 B.R. at 650; *Bally,* 402 B.R. at 619 (same, citing *Musicland*); *accord Ephedra,* 329 B.R. at 4-5; *In re* Blockbuster, Inc., --- B.R. ---, 2011 Bankr. LEXIS 143, *4, 2011 WL 180035, *1 (Bankr.S.D.N.Y. Jan 20, 2011) (Lifland, C.J.) ("***Blockbuster***").

[20]     *Ephedra,* 329 B.R. at 5.

[21]     *In re Northwest Airlines Corp.,* 2007 WL 2815917, *3 (Bankr.S.D.N.Y. Sept. 26, 2007) (Gropper, J.) ("***Northwest Airlines***") (denying class certification, for that reason and others) (not available on Lexis).

consistent with the goals of bankruptcy.[22]  Thus where, as here, a motion has been duly

made, the claim can be asserted as a class claim if, but only if, (1) the class claim

proponent has shown compliance with the requirements of Civil Rule 23, and (2) after

consideration of consistency with bankruptcy needs and concerns, the bankruptcy court

directs that Rule 23 should apply.

### B.  Class Certification Here

#### 1.  Traditional Fed. R. Civ. P. 23 Considerations

Here I assume, without deciding, that the requested class certification satisfies the

requirements of Fed.R.Civ.P. 23(a), which requires that the class be so numerous that

joinder of all members is impracticable, that at least some questions of law or fact exist

that are common to the class; that claims of the representative parties be typical of claims

of members of the class, and that the representative parties will fairly and adequately

protect the interests of the class.  But more difficult issues exist with respect to

requirements of Rule 23(b)—and in particular, Rule 23(b)(3), which in this case, where

species of torts are alleged, would provide the basis, if any, for asserting claims of this

character as a class action in the Bankruptcy Court.[23]

Rule 23(b)(3) provides:

> (b) Types of Class Actions. A class action may be
> maintained if Rule 23(a) is satisfied and if:
>
> . . .
>
> (3) the court finds that the questions of law
> or fact common to class members
> predominate over any questions affecting

---

[22]    *Musicland*, 362 B.R. at 651; *In re Woodward & Lothrop Holdings, Inc.,* 205 B.R. 365, 369
(Bankr.S.D.N.Y. 1997) (Bernstein, C.J.) ("***Woodward***"); *Blockbuster*, 2011 Bankr. LEXIS 143 at
*4, 2011 WL 180035 at *1.

[23]    *See* n.53 below.

only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;

> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

> (D) the likely difficulties in managing a class action.

Courts considering whether Civil Rule 23(b) has been satisfied thus consider two separate requirements: (1) predominance of common issues, and (2) superiority of class action treatment in considering the underlying issues.[24] Here I necessarily must find that common issues, while some plainly exist, don't predominate over individual issues, and that class action treatment isn't the superior mechanism for dealing with the underlying claims.

*(a) Predominance of Common Issues*

As the Supreme Court observed in *Amchem*, Fed.R.Civ.P. 23(b)(3)'s predominance requirement is "far more demanding" than the commonality requirement

---

[24]    *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 615 (1997) (**"Amchem"**) ("a class must meet two requirements beyond the Rule 23(a) prerequisites: Common questions must 'predominate over any questions affecting only individual members'; and class resolution must be 'superior to other available methods for the fair and efficient adjudication of the controversy'").

of Rule 23(a)(2).[25]  For example, the *Amchem* court observed, in the context of an

asbestos class certification, that:

> Given the greater number of questions peculiar to
> the several categories of class members, and to
> individuals within each category, and the
> significance of those uncommon questions, any
> overarching dispute about the health consequences
> of asbestos exposure cannot satisfy the Rule
> 23(b)(3) predominance standard.[26]

The *Amchem* court went on to highlight the many differences between the

members of the proposed class:

> Class members were exposed to different asbestos-
> containing products, for different amounts of time,
> in different ways, and over different periods.  Some
> class members suffer no physical injury or have
> only asymptomatic pleural changes, while others
> suffer from lung cancer, disabling asbestosis, or
> from mesothelioma . . . Each has a different history
> of cigarette smoking, a factor that complicates the
> causation inquiry.[27]

These numerous individual issues ultimately defeated class certification.[28]

When resolution of class questions will still require case-by-case analysis of facts

with respect to each member of the class, class certification may not be appropriate.[29]

The Eleventh Circuit has stated that if "plaintiffs must still introduce a great deal of

---

[25]    *Id.* at 623-24.

[26]    *Id*. at 624.

[27]    *Id*. (citations omitted).

[28]    *Id*. at 624-25.

[29]    *See Klay v. Humana, Inc.*, 382 F.3d 1241, 1255 (11th Cir. 2004) ("***Klay***"); *Rutstein v. Avis Rent-A-Car Sys., Inc.*, 211 F.3d 1228, 1235 (11th Cir. 2000), ("Whether Avis maintains a policy or practice of discrimination may be relevant in a given case, but it certainly cannot establish that the company intentionally discriminated against every member of the putative class"); *Jackson v. Motel 6 Multipurpose, Inc.*, 130 F.3d 999, 1006 (11th Cir. 1997) (holding that plaintiffs alleging racial discrimination had failed to show "predominance" because proof concerning existence of a general policy of racial discrimination could not establish discrimination as to any individual plaintiff).

individualized proof or argue a number of individualized legal points to establish most or all of the elements of their individual claims, such claims are not suitable for class certification." [30]

Here I think that while some common issues would plainly exist, individual issues would predominate.  As the claims before me make clear, what people refer to under the general umbrella of "apartheid" hurt people in many different ways.  While one of the two claimant groups here (the Balintulo Claimants) tried to address that by identifying subclasses of types of claims—extrajudicial killing,  torture and rape, detention, and cruel, inhuman and degrading treatment—the most actionable wrongful acts were in substance wrongful acts by themselves—apart from being concrete examples of ways by which apartheid was a "crime against humanity."  And the latter, while I can see it as being actionable in many individual cases, would raise many individual issues when coming up with "injury-action-purpose" combinations.  For both the more general claim of "crime against humanity," on the one hand, and the more specific ways by which people were injured, on the other, I just see too many individual issues.

The complication (and in my view it's a major one) is the difficulty in establishing, for so many people's unique injuries, causation and the requisite purpose on the part of Old GM personnel with respect to whatever was being done to cause or facilitate the particular injury alleged by the claimant (or class member) involved—which in my view is not just a matter of damages but a matter necessary to fix liability in the first place.[31]  Taking allegations as true, for example, that Old GM made motor vehicles

---

[30]      *Klay*, 382 F.3d at 1255.

[31]      Reflecting somewhat similar concerns, even though Judge Leval, in *Kiobel*, disagreed with the majority of the *Kiobel* panel as to whether corporations are subject to claims in U.S. federal courts

-12-

that were used by South African security forces, I think many individual issues would

arise concerning how those vehicles were used, and what people at Old GM intended as

to how they'd be used.  Similarly, taking allegations as true, for purposes of this analysis,

that Old GM personnel retaliated against Old GM employees who engaged in union

and/or anti-apartheid activity, I think there are simply too many different ways by which

any wrongful conduct might have been conducted and caused a resulting injury or effect

on the employee involved, and what its purpose was.[32]

Civil actions involving mass torts are often not certified for class action treatment,

even in non-bankruptcy plenary litigation, because so many individualized legal and

individualized damages inquires are ultimately required.[33]  In *Talisman Energy*, Judge

Cote noted the similarities between Alien Tort Statute litigation and mass tort litigation,

and observed that the two are analogous for class certification purposes.[34]  In *Talisman

Energy*, current and former residents of southern Sudan brought suit under the Alien Tort

_____

under the Alien Tort Statute, he concurred with the Circuit's judgment dismissing the claims because of failures to make satisfactory allegations as to Shell's *"purpose to advance or facilitate the Nigerian government's violations of the human rights of the Ogoni people."* 621 F.3d at 192 (emphasis in original).  I make no determination here as to whether the allegations in this case would satisfy the analogous knowledge requirement, but note that, assuming they did, I would have to determine issues of a similar nature with respect to the various class members' claims.

[32]    For instance, while I hardly condone anti-union activity, it's not clear to me that it's a violation of international law.  It would take individualized analysis to ascertain the purpose of any action taken against Old GM employees.

[33]    *See In re Fibreboard Corp.*, 893 F.2d 706, 712 (5th Cir.1990) ("Commonality among class members on issues of causation and damages can be achieved only by lifting the description of the claims to a level of generality that tears them from their substantively required moorings to actual causation and discrete injury"); *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1084 (6th Cir. 1996) (Explaining that since there was "[n]o single happening or accident . . . [n]o one set of operative facts establishes liability"); *In re MTBE Prods. Liab. Litig.*, 209 F.R.D. 323, 348-49 (S.D.N.Y. 2002) (denying certification of a class of residential well owners whose wells were contaminated by MTBE); *In re Three Mile Island Litig.*, 87 F.R.D. 433, 441-42 (M.D.Pa.1980) ("the causation element of plaintiffs' physical injury/emotional distress claims will require individual proof. In effect, the class action would break up into separate suits").

[34]    *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 226 F.R.D. 456, 474 (S.D.N.Y. 2005) ("**Talisman Energy**").

-13-

Statute against a Canadian energy company and the government of Sudan, alleging that

they were victims of extrajudicial killing, genocide, and other violations of international

law.[35]  The plaintiffs sought certification of a putative class of:

> All non-Muslim, African Sudanese inhabitants of
> blocks 1, 2 or 4 or Unity State as far south as Leer
> and areas within ten miles thereof at any time
> during the period January 1, 1997 to June 15, 2003,
> who were injured during that period by acts of the
> Sudanese military or allied militia constituting
> genocide, extra-judicial killing, enslavement, forced
> displacement, attacks on civilians constituting war
> crimes, confiscation and destruction of property,
> torture or rape.[36]

In *Talisman Energy*, Judge Cote denied class certification because the plaintiffs

would have to show with respect to each individual class member that the injuries for

which they were claiming damages were actually caused by the campaign of genocide

and crimes against humanity targeting non-Muslim African Sudanese.  To conduct this

inquiry, factual questions that were individual to each attack would have to be

determined.[37]  Given the need for evidence of causation, and the allegations involving

hundreds of thousands of class members, hundreds of individual attacks, the massive

geographic area involved, and the six-and-a-half year time period, she found that "[t]he

challenge of presenting that individualized proof on behalf of thousands of class

members, even if it were logically feasible, will quickly dominate the proof regarding the

common issues."[38]

---

[35]    *Id*. at 457.

[36]    *Id*. at 458.

[37]    *Id*.

[38]    *Id*. at 482-83.

Here analogous factors cause me to conclude that with respect to individuals'
claims against Old GM, individual issues would predominate. While I assume, without
finding, that hundreds of thousands or millions of individuals were injured, in many cases
grievously, by the apartheid system as a whole, or by specific means by which it was
implemented, their rights to recover against *Old GM* for such injuries would depend not
just on their individual damages (which, if that were all, would likely not defeat class
certification),[39] but also on the numerous combinations of injury involved, action causing
it, assistance of that action, and purpose on the part of Old GM personnel to facilitate the
commission of the primary violations of international law and resulting injury on which
the aiding and abetting claims would be based.[40]

The Botha Claimants and Balintulo Claimants cite authority going the other way
or implying a contrary conclusion, *Does I v. The Gap, Inc.*,[41] *Does I v. Karadzic*,[42] and
*Hilao v. Estate of Ferdinand Marcos*.[43] But in *Talisman Energy* Judge Cote considered
and rejected the application of each of those cases, and I think she was right to do so.

First, Judge Cote found *Gap* distinguishable, and I think she was plainly right in
that respect. In *Gap*, the court granted a motion for class certification under Rule
23(b)(3) for approximately 30,000 factory garment workers in Saipan, Northern Mariana
Islands, who alleged that they were held in a system of peonage and involuntary servitude

---

[39]    *See, e.g., Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 456 (3d Cir. 1977) (although calculation of
damages in an antitrust action would involve some individualized issues, "it has been commonly
recognized that the necessity for calculation of damages on an individual basis should not preclude
class determination when the common issues which determine liability predominate").

[40]    *See Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 253, 258, 259 (2d Cir.
2009) (defining elements of cause of action for aiding and abetting violation of international law).

[41]    *Does I v. The Gap, Inc.*, 2002 WL 1000073 (D. N. Mariana Islands May 10, 2002) ("**Gap**") (not
available on Lexis).

[42]    176 F.R.D. 458 (S.D.N.Y. 1997) (Leisure, J.) ("**Karadzic**").

[43]    103 F.3d 767 (9th Cir. 1996) ("**Hilao**").

created through a conspiracy among garment manufacturers in the district.[44]  The *Gap*

court rejected the defendants' argument that "at least one element of each of the

plaintiffs' claims requires individualized proof and inquiry into the plaintiffs' mental

states, alleged injuries, and causes of the alleged injuries."[45]  Rather, the *Gap* court held

that "this is a lawsuit challenging the garment production system on Saipan based upon

allegations of peonage, not a case involving 30,000 individual tort actions."[46]

Consequently, the *Gap* court found that common issues would predominate over

individual issues because it would be unnecessary to engage in "the separate adjudication

of each class members' individual claim or defense."[47]

    But *Gap* was distinguished by Judge Cote in *Talisman Energy*, since "the class [in

*Gap*] suffered an identical injury—peonage—from a common source, the garment

production system on one island . . . . If the plaintiffs succeeded . . . all that remained to

be shown would be the amount of an individual's damages."[48]  That was very different

than the situation with which she was presented there.  And it is likewise very different,

in my view, from the situation here.  As relevant here, apartheid was implemented in

many different ways, injuring people in many different ways, and Old GM's alleged

wrongful acts and purpose, if any, would have a nexus to the affected people in too many

different ways.

    In *Hilao*, in which claims were brought for torture, extrajudicial killing and

disappearance against the Estate of Philippine strongman Ferdinand Marcos, the Ninth

---

[44]     *Gap*, 2002 WL 1000073, at *2.

[45]     *Id*. at *7.

[46]     *Id*.

[47]     *Id*.

[48]     *See Talisman Energy, Inc.*, 226 F.R.D. at 483.

Circuit reviewed a lower court order which had certified claims under Rule 23(b)(3) and

established phased proceedings and sampling methods to quantify the damages the

Marcos Estate owed to the almost 10,000 Filipinos he had injured.  The panel, by a 2-1

vote as to this issue, affirmed a class judgment premised on statistical analysis as a kind

of proxy for individualized proof of injury and causation—rejecting arguments, among

others, that the typicality requirement wasn't satisfied.  But Judge Cote observed in

Talisman Energy that *Hilao* "preceded *Amchem,* and would be unlikely to survive

today."[49]  And she regarded the dissent in *Hilao* as "the better reasoned decision," which

identified the very problems that "infected" the application for class certification before

her:[50]

> To paraphrase that dissent, there may be little
> question that the Government of Sudan caused
> tremendous harm to the people of southern Sudan,
> but the question is which people and how much.[51]

Also, of course, the *Hilao* claims were brought against the Estate of Ferdinand Marcos

himself, who was charged with authorizing the killing, torture and disappearances

*personally*, and the *Hilao* action did not involve the additional issues incident to claims of

secondary liability for aiding and abetting, which at least normally requires showings not

just of the primary violation, but of additional matters applicable to the alleged aider-and-

abettor, such as substantial assistance, and a purpose or intent to advance the primary

violation.

---

[49]      *Id.*

[50]      *Id.* (citing *Hilao*, 103 F.3d at 787).

[51]      *Id.*

Similarly here, there is little question that that apartheid caused tremendous harm to people in
South Africa, but the question —even apart from "how much," which might be regarded as more
relevant to damages, which by itself might not defeat class certification—is which people, in what
way, by what Old GM acts, and with what purpose on the part of any Old GM personnel involved.

-17-

Finally, *Karadzic* involved a failure to defend and a limited fund that made it an unusual case under the Alien Tort Statute. The claims were brought by victims (and/or survivors of victims) of genocide against Radovan Karadzic, who had declared himself president of a self-proclaimed republic within Bosnia-Herzegovina, and allegedly directed a campaign of ethnic cleansing against Bosnian Croats and Muslims. But Karadzic did not defend, on either class action treatment or the merits. He wrote a letter to the court informing it of his intention not to contest the action,[52] describing his limited financial resources. Thus, while the plaintiffs had originally moved for class certification under Rule 23(b)(3), "limited fund" class action treatment was certified instead, under Rule 23(b)(1), for the class members to allocate amongst themselves whatever Karadzic had.[53] Significantly, though he did not decide the issues, Judge Leisure observed in *Karadzic* that "[t]he Court has grave doubts about plaintiffs' ability to satisfy their burden under Rule 23(b)(3) of demonstrating that common questions of law and fact will predominate and that the proposed class action will be manageable."[54]

### (b) Class Action Superiority

Additionally, Civil Rule 23(b)(3)(D) requires me to consider the superiority of the class action mechanism when determining whether or not to certify a class.[55] Here—

---

[52]    *Karadzic*, 176 F.R.D. at 463.

[53]    I don't think that a limited fund rationale would justify certification under Rule 23(b)(1) here. Old GM's available value is, of course, limited, but the claim to that "limited fund" isn't limited to the putative class action claimants. Old GM has a large number of other creditors who likewise have claims against Old GM's assets. The "limited fund" thus isn't to be shared solely amongst class action claimants, but instead must be shared by all of Old GM's creditors. And of course the issues here don't involve prospective relief or standards of conduct for Old GM going forward, under which Rules 23(b)(1)(A) or (b)(2) might otherwise be applicable.

[54]    *Id.*

[55]    Fed.R.Civ.P. 23(b)(3)(D) provides:

once again before considering matters unique to bankruptcy—I don't think I can make such a finding.

For *individual claimants* who were victims of acts in furtherance of apartheid, it wouldn't be that hard, if Old GM objected to their individual claims, for each individual claimant to tell his or her story, and to then ascertain whatever Old GM did and intended as relevant to that claim. But to proceed on a class action basis, I'd have to choose between holding one or more trials of extraordinary complexity, on the one hand, or taking inappropriate shortcuts as to individual issues of wrongful conduct, causation and requisite purpose and assistance, on the other. Like Judge Cote, I think the dissent in *Hilao* was better reasoned, and I think any shortcuts that would have to be taken to make class action treatment superior as an administrative matter would have to come at the expense of due process concerns.

Also, the inherent simplicity of the bankruptcy process tends to make class action treatment *not* superior, as a general matter and in this case, because an individual claimant would need only to fill out and return a proof of claim form. And the deterrence class actions often provide would be of little utility in a case like this one, where Old GM is liquidating, and any punishment for any wrongful Old GM conduct would be borne by Old GM's innocent creditors.[56]

---

. . . (3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that *a class action is superior to other available methods* for fairly and efficiently adjudicating the controversy.

(emphasis added).

[56]     *See Musicland*, 362 B.R. at 650-51. As Judge Bernstein there observed:

Thus I cannot find that the requirements of 23(b)(3) have been satisfied here.

   *2.  Consistency With Bankruptcy Needs and Concerns*

Even more clearly, I here must find that entertaining these claims on a class action basis would significantly complicate the Debtors' chapter 11 case, making this huge case even more difficult to manage—with the likelihood, if not certainty, that consideration of these claims on a class basis would materially delay the distributions to the Debtors' thousands of other creditors.  Thus, on a matter where bankruptcy judges have unquestioned discretion to determine whether class certification would inappropriately clash with bankruptcy needs and concerns, I can't authorize class action treatment here.

As Judge Rakoff observed in *Ephedra*, "bankruptcy significantly changes the balance of factors to be considered in determining whether to allow a class action and . . . class certification may be 'less desirable in bankruptcy than in ordinary civil litigation.'"[57]  He further observed, quoting earlier analysis by Judge Bernstein:

> It follows that a court sitting in bankruptcy may decline to apply Rule 23 if doing so would in Judge Bernstein's words, "gum up the works" of distributing the estate.[58]

---

> Bankruptcy provides the same procedural advantages as a class action.  In fact, it provides more advantages.  Creditors, even corporate creditors, don't have to hire a lawyer, and can participate in the distribution for the price of a stamp.  They need only fill out and return the proof of claim sent with the Bar Date Notice.  Furthermore, claims are "deemed allowed" under § 502(a) in the absence of an objection, in which case discovery and fact-finding are avoided altogether.  Finally, where the debtor is liquidating and its managers have moved on to other jobs, the class action does not serve a deterrent effect.

   *Id.* at n.8 (citations omitted).

[57]   329 B.R. at 5 (quoting *American Reserve,* 840 F.2d at 493).

[58]   329 B.R. at 5 (citing *Woodward*, 205 B.R. at 376 (in turning, citing the Seventh Circuit, speaking through Judge Easterbrook, in *American Reserve*, 840 F.2d at 491)).

Similarly, as Judge Lifland very recently explained, in *Blockbuster*:

> "[C]lass certification is often less desirable in bankruptcy than in ordinary civil litigation,' as class-based claims have the potential to adversely affect the administration of a case by "adding layers of procedural and factual complexity . . . siphoning the Debtors' resources and interfering with the orderly progression of the reorganization."[59]

Here I have material concerns as to the adverse effect that consideration of these claims would have on the Debtors' other creditors, by reason of the delay in seeking class certification and the further delay (even if the Apartheid Claimants were blameless) and the burdens on the bankruptcy system that would be occasioned by the need to consider and/or estimate their claims.

First, the Apartheid Claimants failed to file a motion for class treatment until 12 months after the Commencement Date and 8 months after the Bar Date. Given the substantial impact that these claims could have on the Old GM estate, the Apartheid Claimants should have sought class certification far sooner than they did. Since *Ephedra*, five years ago, the importance of filing a prompt motion for class certification (and without waiting for an objection to the claim) has been clear, and the cases requiring prompt filing have been uniform. And while there is law outside this district, somewhat dated, holding otherwise,[60] and upon which the Apartheid Claimants rely, the *Charter* view was rejected in *Ephedra*,[61] and as Judge Gropper stated in his later decision in

---

[59]      *Blockbuster*, 2011 Bankr. LEXIS at *3, 2011 WL 180035 at *1 (quoting *Bally*, 402 B.R. at 621).

[60]      *See In re Charter Co.*, 876 F.2d 866 (11th Cir. 1989) ("*Charter*").

[61]      *See* 329 B.R. at 6-7 ("The Court disagrees with *Charter*'s view that an objection was necessary in order to have a "contested matter" triggering the court's discretion under Rule 9014. . . . Objection to the class proofs of claim was not a necessary prerequisite to a motion for class certification.").

-21-

*Northwest Airlines*, "the reasoning of *Charter* with respect to the procedural issues has been rejected in this district."[62]

It is true, as observed by Judge Rakoff in *Ephedra*, that the "Code and Rules are so opaque as to the procedure governing class claims" that expungement may not be appropriate if it were based solely on procedural default.[63]  And the argument on the Apartheid Claimants' class certification motion was deferred for a time (in part to address even more urgent matters, in this case and others), and the importance of this matter made it inappropriate to decide with an immediate dictated decision from the bench. Thus, I don't see the late filing of the Apartheid Claimants' request for class certification as dispositive in and of itself.  But as Judge Rakoff observed in *Ephedra*, after noting that bankruptcy courts have the power to decide whether Rule 23 should apply when doing so could "gum up the works,"[64]

> For example, since class litigation is inherently more time-consuming than the expedited bankruptcy procedure for resolving contested matters, class litigation would have to be commenced at the earliest possible time to have a chance of being completed in the same time frame as the other matters that must be resolved before distributing the estate.[65]

Here the class certification motion was most decidedly not filed "at the earliest possible time."  And a class claim allowance determination, or even estimation, could not be achieved without materially delaying distributions to creditors, and materially increasing the administrative costs of this already very expensive case.

---

[62]    *Northwest Airlines*, 2007 WL 2815917 at *4.

[63]    *Ephedra*, 329 B.R. at 6.

[64]    *See* page 20 and n.58 *supra*.

[65]    *Ephedra*, 329 B.R. at 5.

Here the Debtors' plan, which has now been filed with acceptances being solicited, will be a liquidating plan, with the Debtors distributing to the value they have available (principally in the form of New GM stock), *pari passu* to their creditors. While in a fair number of liquidating plan cases, we can deal with contested claims requiring substantial litigation by establishing plan reserves (holding back distributions to creditors of the sum put in reserve to await liquidation of the disputed claim), here we'd have to estimate the claim, under section 502(c) of the Code,[66] for either allowance or, more likely, creation of reserves. A full claims allowance process would hugely "delay the administration of the case." And here, even a claims estimation procedure would do likewise.

The Apartheid Claimants' claims in this case can be contrasted to the asbestos injury claims in it, which, until a recent settlement, were to be estimated under section 502(c). There the estimation hearing was to be conducted with the testimony of three or four experts, basing their opinions as to the Debtors' likely liability for asbestos injuries based in material part on statistical analysis of the costs of settling earlier asbestos claims. The asbestos claims exposure was well suited to a kind of "macroeconomic" analysis that could estimate overall asbestos claim exposure without considering, in any material way, the strengths and weaknesses of any individual asbestos claimant's claims. But here, by contrast, there is no prior history to work from, and an estimation of the Debtors' liability, if any, for aiding and abetting apartheid couldn't be considered without

---

[66]    That section provides, in relevant part:

> (c) There shall be estimated for purpose of allowance under this section—

>> (1) any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case . . .

-23-

extensive consideration of the diverse injuries to apartheid claimants, and whatever Old GM personnel did and intended to cause them.

It is conceivable, I suppose, that if Old GM had *primary* liability for apartheid (as Ferdinand Marcos did for the injuries he caused in *Hilao*), a section 502(c) estimation procedure might be simpler, as then potentially subject to some kind of statistical analysis. But fairness to Old GM's other creditors prohibits disregard of what Old GM personnel actually did, and intended, with respect to apartheid, and this would make any estimation process a very lengthy and complex one, if not also wholly unwieldy. And the management difficulties would be particularly severe since so much of the evidence would be coming from a foreign country.

Three factors have traditionally been most influential in determining whether or not Civil Rule 23 should be applied in bankruptcy cases: (1) whether the class was certified pre-petition; (2) whether the members of the putative class received notice of the bar date; and (3) whether class certification will adversely affect the administration of the case.[67] I've already discussed the third factor, finding that class certification would materially and adversely affect the administration of the case—materially complicating it, and materially delaying distributions to other Old GM creditors. I now turn to the others.

The first of the other two factors also weighs against the Apartheid Claimants. There was no prepetition class certification here.[68]

---

[67] *See Musicland*, 362 B.R. at 654-55.

[68] From time to time, as in a recent episode in the *Chemtura* case before me, debtors recognize the propriety of class claims, and find it to be in the interests of their stakeholders to stipulate to class action treatment, even though no prepetition class was certified. I recently approved such a stipulation, but situations of that character present facts very different from those here.

The last of the remaining matters presents closer issues.  The Apartheid Claimants argue that the notice of the Bar Date to their class members was deficient, denying them due process, and that as a result, members of the putative class largely didn't get notice of the Bar Date.  Implicit in that argument, of course, is that putative class members, while residents of South Africa, were entitled to the protections of the United States Constitution, from which the due process requirement emanates.  The Debtors dispute both matters.

To put those issues in context, I note that the Debtors published extensive notice of the Bar Date internationally—in The Financial Times (Worldwide Edition), The Wall Street Journal (Global Edition), USA Today (Monday through Thursday), The New York Times (National), Detroit Free Press, Detroit News, Le Journal de Montreal (French), Montreal Gazette (English), The Globe and Mail, (National), and The National Post.  It is undisputed that the first three of these, at least, were distributed in South Africa.

The publication was by the traditional means, and was well suited to providing notice to creditors of all of the usual types throughout the world, including in South Africa.  But the Apartheid Claimants argue, with some force, that if one were more conscientiously trying to get notice to the victims of apartheid (most or at least many of whom, one would suppose, would be poor and uneducated), one would not choose these publications.  And the Apartheid Claimants suggested two publications that would have been significantly more effective in targeting additional apartheid claimants without tremendous burden on the estate.  I think it's true that for the purpose of reaching apartheid victims, a more targeted notice would have been preferable, as potentially being

more effective in reaching the poor, and largely uneducated, putative class members living in South Africa.

Yet the people as to whom notice was arguably deficient were resident in a foreign country, and were not U.S. citizens or residents; did not have property in the U.S.; were not holders of Old GM funded debt; and with limited exceptions (such as any who might have worked in a GM plant), had no contractual dealings or direct contact with GM.

Thus, dealing first with the assumption upon which the notice arguments were made—the existence of constitutional due process rights—the Debtors dispute the underlying premise.  Citing one of the decisions in the *A.H. Robins* bankruptcy case,[69] they observe that, when speaking of the foreign notice program set up for victims of allegedly dangerous Dalkon Shields in foreign countries, the Fourth Circuit flatly stated:

> Appellant argues that the foreign notice program was unconstitutional.  The Constitution does not extend its guarantees to nonresident aliens living outside the United States.  Because foreign claimants are not protected by the Constitution, there is no merit to the constitutional claim.[70]

The *A.H. Robins* court relied on four Supreme Court decisions to come to that conclusion,[71] though none voiced the rule as expressly as the *A.H. Robins* court did.

The Apartheid Claimants respond by saying that since that *A.H. Robins* decision came down, "no . . .  court has ever relied on that statement,"[72] but they cite no authority

---

[69]    *Vancouver Women's Health Collective Society v. A.H. Robins Co. (In re A.H. Robins Co.)*, 820 F.2d 1360 (4th Cir. 1987) ("***A.H. Robins***").

[70]    *Id.* at 1363.

[71]    *See id.*

[72]    *See* Apartheid Claimants' Supp. Reply at 5.  They also say, correctly, that the *A.H. Robins* court nevertheless thereafter examined the quality of the notice.  *Id.*

to the contrary, nor any argument, even without support, as to why that ruling, or some variant of it,[73] wouldn't be correct.  I have no reason to doubt the correctness of the *A.H. Robins* court's ruling; even without other cases on point, it would seem obvious that the reach of the United States Constitution to people throughout the world is not limitless, and that if and when the U.S. Constitution is to apply, the person so affected must have some kind of nexus to the United States—such as U.S. citizen status, residence in the United States, or property here.[74]  Thus I think the Debtors' quarrel with the Apartheid Claimants' premise is well taken.

The Debtors argue further that even if constitutional due process obligations were owed to the South African putative class members here, they were satisfied.  Though this aspect of the matter is closer than the remainder of the issues, I agree.

When constitutional rights to due process are applicable, due process requires that notice must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."[75]  And notice must be more than a "mere gesture" and the debtor must use "means . . . such as one desirous of actually informing the absentee might reasonably adopt to accomplish it."[76]

---

[73]     Though I don't have to decide what all of them might be, there might be some qualifications or exceptions to the broad rule as stated.  For example, if a nonresident alien had property in the United States, I would think that he or she would be entitled to U.S. constitutional protections, including due process, before that property could be taken away.

[74]     With that said, I don't think that it would necessarily follow that because the U.S. Constitution is inapplicable and all of the requirements of constitutional due process don't apply, other fairness obligations wouldn't remain.  After all, we still have an *in rem* proceeding within the United States, and bankruptcy judges still strive for fairness.  Where a creditor, wherever located, is known, for example, we still expect actual notice of the Bar Date to that creditor, with steps (like first class mail) reasonably calculated to give that creditor actual notice.

[75]     *Mullane v. Cen. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950) ("***Mullane***").

[76]     *Id*. at 315.

But notice here was provided in the fashion that is customarily provided in large chapter 11 cases, and in plenary litigation generally. The notice here likely did not reach many potential claimants, but that does not make it deficient. For persons who are missing or unknown, "employment of an indirect and *even a probably futile* means of notification is all that the situation permits and creates no constitutional bar to a final decree foreclosing their rights."[77]

Here the GM bankruptcy was an event that got worldwide attention. Actual notice was given to the Apartheid Claimants. While a more targeted publication notice for other potential claimants would have been better, I can't find that notice wasn't given, or that the notice that was provided failed constitutional muster, even assuming that U.S. constitutional requirements would apply.[78]

While the notice in this situation was less than ideal, it was not wholly unsatisfactory. As the Debtors properly observe, no class has ever been certified in a bankruptcy court by reason of deficiencies in notice to prospective members of the putative class. And the factors as a whole—particularly the burdens on this estate and the delay that would result from a class certification here—weigh heavily in favor of denying the request to make Civil Rule 23 applicable. In an exercise of discretion, I cannot, consistent with the needs and concerns of the bankruptcy system and Old GM's creditors, make Civil Rule 23 applicable to apartheid claims in these chapter 11 cases.

---

[77]    *Id.* at 317 (emphasis added).

[78]    Obviously, it is only because of the unique nature of apartheid claims and the potential claimants that the quality of notice as these claims is debatable. I have great difficulty seeing how the notice provided here could be criticized in any way in an ordinary commercial bankruptcy situation.

II.

Claims Disallowance

Apart from the matter of class certification, the Debtors ask me to disallow the

Apartheid Claims, whether on a class basis or insofar as Apartheid Claims might still be

asserted by individual claimants.  Under controlling Second Circuit authority, I must do

so, and the claims must be disallowed.

On September 17, 2010, the Second Circuit held in *Kiobel* that U.S. courts do not

have subject matter jurisdiction to adjudicate cases brought under the Alien Tort Statute

when the allegations are against a corporation.  The Circuit, speaking through Judge

Cabranes, concluded that:

> No corporation has ever been subject to any form of
> liability (whether civil, criminal, or otherwise)
> under the customary international law of human
> rights.  Rather, sources of customary international
> law have, on several occasions, explicitly rejected
> the idea of corporate liability.  Thus, corporate
> liability has not attained a discernable, much less
> universal, acceptance among nations of the world in
> their relations *inter se*, and it cannot not, as a result,
> form the basis of a suit under the Alien Tort
> Statute.[79]

As discussed earlier, the claims of the Apartheid Claimants are based on the

premise that Old GM, a corporation charged with aiding and abetting the violations of

international law, may be found to be liable in the United States courts under the Alien

Tort Statute.  But *Kiobel,* binding authority from the Circuit, holds otherwise.

In oral argument here, the Apartheid Claimants pointed to the vigorous dissent by

Judge Leval in *Kiobel* on the issue of amenability of a corporation to suit.  They also

---

[79]        *Kiobel*, 621 F.3d at 148-49 (emphasis in original).

-29-

stated that the issue was raised *sua sponte* by the *Kiobel* panel, not having been briefed

by any party; that a petition for rehearing *en banc* in *Kiobel* had been filed, which is now

pending before the Second Circuit; and that another Second Circuit panel—the one

hearing the appeal involving the non-GM corporate defendants in the original apartheid

lawsuits—had failed to issue the very quick similar decision that adherence to *Kiobel*

might otherwise warrant.[80]  Nevertheless, those are points for the Circuit to consider, not

me; I'm bound as a lower court in the Second Circuit to abide by any Second Circuit

holding.  As "corporate liability . . . cannot . . . form the basis of a suit under the ATS,"[81]

and each of the claims submitted by the Apartheid Claimants is alleged against a

corporation, I must disallow the remaining claims.[82]

---

[80]    *See*, Arg. Tr. 81-82, 87-88.

[81]    *Id.*

[82]    Section 502(j) of the Code provides:

> A claim that has been allowed or disallowed may be
> reconsidered for cause.  A reconsidered claim may be allowed
> or disallowed according to the equities of the case.
> Reconsideration of a claim under this subsection does not
> affect the validity of any payment or transfer from the estate
> made to a holder of an allowed claim on account of such
> allowed claim that is not reconsidered, but if a reconsidered
> claim is allowed and is of the same class as such holder's
> claim, such holder may not receive any additional payment or
> transfer from the estate on account of such holder's allowed
> claim until the holder of such reconsidered and allowed claim
> receives payment on account of such claim proportionate in
> value to that already received by such other holder.  This
> subsection does not alter or modify the trustee's right to
> recover from a creditor any excess payment or transfer made
> to such creditor.

Thus, section 502(j) permits bankruptcy courts to reconsider the disallowance of claims.  If, after
consideration of the pending motion for reconsideration *en banc*, the Circuit rules in a fashion that
would change the rule of law now binding on me, the Apartheid Claimants may have rights to
seek reconsideration of this aspect of my ruling, under section 502(j) and Bankruptcy Rule 3008,
or, perhaps, other applicable law or rules.  In that event, all parties' rights as to any such request
are reserved.  Of course, by reason of my earlier rulings in Part I of this Decision, any such
opportunity would necessarily apply only to the named claimants here.

Finally, in oral argument here the Apartheid Claimants recognized my inability, as a lower court judge, to hold inconsistently with binding Circuit authority, but urged that I defer deciding the Debtors' *Kiobel*-based objection to their claims, pending a decision by the Circuit on the *Kiobel* plaintiffs' motion for rehearing *en banc*.[83] But with these claims having been asserted on a class action basis, I don't have the luxury of doing so. As the Debtors fairly observed, the Apartheid Claimants' class claims have a huge overhang in these chapter 11 cases.[84] I must agree with the Debtors' contention that it wouldn't be prudent for me to delay deciding the claims allowance issue,[85] in light of the uncertainties as to whether reconsideration *en banc* would be granted—and, if so, when any *en banc* decision might be forthcoming—and in light of these claims' major effect on the ability to bring these chapter 11 cases to a conclusion.[86]

## Conclusion

While I share the abhorrence by most of the civilized world of apartheid, this decision cannot, of course, be premised on my personal feelings about that practice. It must instead be pegged to the principles of plenary and bankruptcy litigation jurisprudence that govern issues as to whether class certification should be granted, and substantive rules of law articulated for the lower courts to follow by the Second Circuit.

---

[83]    *See, e.g.*, Arg. Tr. 85, 88.

[84]    *See*, Arg. Tr. 143-44.

[85]    *Id.* at 143.

[86]    I think it's possible, though the Debtors would be entitled to be heard on the matter, that if there were no longer an effort to proceed with the Apartheid Claimants' claims here on a class action basis, the requested deferral of a decision on my part to await any *en banc* determination in *Kiobel* wouldn't present the same practical problems, since the remaining individual apartheid claims might not have the same effect on other Old GM creditor recoveries. But such a scenario isn't now before me.

For the reasons set forth above, class certification must be denied, and the claims

remaining before me must be disallowed.

Dated: New York, New York     __*s/Robert E. Gerber*__
   January __28__, 2011      United States Bankruptcy Judge