Peter S. Partee, Sr.  
Scott H. Bernstein  
Robert A. Rich  
HUNTON & WILLIAMS LLP  
200 Park Avenue, 53rd Floor  
New York, New York 10166-0136  
(212) 309-1000  

**Hearing Date and Time: February 3, 2011 at 9:45 a.m. (Eastern Time)**

*Attorneys for DTE Pontiac North, LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------- x
: 
*In re*                                    :    Chapter 11
                                           :
MOTORS LIQUIDATION COMPANY                 :    Case No. 09-50026 (REG)
f/k/a GENERAL MOTORS CORPORATION,          :
*et al.*,                                  :    Jointly Administered
                                           :
               Debtors.                    :
---------------------------------------------------------------- x

**OBJECTION OF DTE PONTIAC NORTH, LLC TO DEBTORS' MOTION PURSUANT TO 11 U.S.C. § 365(a) TO REJECT UTILITY SERVICES AGREEMENT**

TO THE HONORABLE ROBERT E. GERBER  
UNITED STATES BANKRUPTCY JUDGE:

DTE Pontiac North, LLC ("DTE"), by and through its undersigned counsel, hereby submits this Objection (the "Objection") to the *Debtors' Motion Pursuant to 11 U.S.C. § 365(a) to Reject Utility Services Agreement* [Docket No. 8492] (the "Motion") filed by Motors Liquidation Company (f/k/a General Motors Corporation) ("MLC") and its affiliated debtors (collectively, the "Debtors"), and respectfully states as follows:

### I. BACKGROUND

1.   On June 1, 2009 (the "Petition Date"), four of the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code") with the United States Bankruptcy Court for the Southern

District of New York (the "Court"), and on October 9, 2009, two additional Debtors commenced voluntary cases with this Court under chapter 11 of the Bankruptcy Code. All of the Debtors' cases are jointly administered under Case Number 09-50026 (REG).

2. Debtor MLC owned a manufacturing plant located in Pontiac, Michigan (the "Plant").

3. Prior to the Petition Date, on January 10, 2007, DTE and MLC entered into that certain *Asset Purchase and Sale Agreement* by and between DTE and MLC, dated as of January 10, 2007 (the "Asset Purchase Agreement"). Through the Asset Purchase Agreement, DTE purchased certain utility assets related to the Plant generally referred to as the "Pontiac North Powerhouse" and more particularly described in the Asset Purchase Agreement (the "Facility"), in exchange for $2,000,000 to be paid by DTE in monthly installments to MLC (collectively, the "Deferred Payments").

4. Pursuant to the Asset Purchase Agreement, DTE and MLC also entered into (i) that certain *Utility Services Agreement* by and between DTE and MLC, dated as of January 10, 2007 (the "Utility Services Agreement"); (ii) that certain *Lease Agreement* by and between DTE and MLC, dated as of January 10, 2007 (the "Lease Agreement"); (iii) that certain *Security Agreement* by and between DTE and MLC, dated as of January 10, 2007 (the "Security Agreement"; and (iv) that certain *Project License Agreement* by and between DTE and MLC, dated as of August 3, 2007 (the "License Agreement;" together with the Asset Purchase Agreement, the Utility Services Agreement, the Lease Agreement, and the Security Agreement the "Project Contracts")[1]. True and complete copies of the Project Contracts are annexed hereto as **Exhibits A** through **E**.

---

[1] MLC entered into the Asset Purchase Agreement, the Utility Services Agreement, the Lease, and the License Agreement through its division General Motors Corporation World Wide Facilities Group.

2

5. Pursuant to the Security Agreement, MLC is granted a security interest in the Facility as collateral security for the Deferred Payments and other of DTE's obligations under the Asset Purchase Agreement. Through the Lease Agreement, DTE leases the parcel of real property on which the Facility is located, and is granted certain easement rights with respect to certain portions of the Plant in connection with the maintenance and operation of the Facility and the provision of utility services to the Plant. Through the License Agreement, MLC provides DTE with a project license related to the provision of utility services to the Plant. The term of the License Agreement coincides with the term of the lease contemplated by the Lease Agreement. *See* License Agreement, § (2).

6. Pursuant to the Utility Services Agreement, DTE maintains the Facility and provides utility services to MLC's Plant in exchange for certain fees more particularly described in the Utility Services Agreement (the "<u>Utility Service Fees</u>"). The Project Contracts contemplate that the Utility Service Fees are offset against the Deferred Payments and that, "in the event that [MLC] fails to make a payment to [DTE] in accordance with the terms of the Utility Services Agreement, [DTE] shall be relieved of its obligation to make a full Deferred Payment by the amount corresponding to the amount that [MLC] failed to pay [DTE]…" Asset Purchase Agreement, § 2.5.

7. The Project Contracts constitute a single agreement and collectively memorialize a single integrated transaction as evidenced by the following integration provisions:

> This Agreement and the other Project Contracts constitute the entire agreement and understanding between the Parties with respect to the subject matter of and the transaction contemplated by this Agreement and the other Project Contracts . . . This Agreement and the other Project Contracts collectively memorialize one integrated transaction that has been set forth in multiple agreements for organizational convenience only.

Asset Purchase Agreement, § 11.2; Utility Services Agreement, § 35.01.

3

> This Agreement and the other Project Contracts constitute the entire agreement and understanding between the Parties with respect to the subject matter of and the transaction contemplated by this Lease and the other Project Contracts…

Lease Agreement, § 17.1.

> This Lease and the other Project Contracts collectively memorialize one integrated transaction that has been set forth in multiple agreements for organizational convenience only.  Each Party acknowledges and agrees that each Project Contract is vital to the operation of such transaction and it would not have entered into any of the Project Contracts if each of the other Project Contracts had not been entered into as well.

Lease Agreement, § 17.20.

8. Further, the Project Contracts contain the following cross-default and termination provisions:

> A Project Contract Default by one Party or its Affiliate shall constitute a breach of this Agreement by such Party.

Asset Purchase Agreement, § 11.3; Utility Services Agreement, § 40.01.

> Subject to the provisions set forth in Articles IX, X and XI, in the event that the Utility Services Agreement is terminated, this Agreement shall terminate, and [DTE] shall be relieved of its obligations to make any Deferred Payments hereunder . . . .

Asset Purchase Agreement, § 10.1.

> [T]his Lease may be terminated . . . upon a termination of the Utility Services Agreement.

Lease Agreement, § 6.2.

> Each of the following shall constitute an event of default . . . if [DTE] shall fail to make any payment of any of the [Deferred Payment] Obligations . . . .

Security Agreement, § 3(a).

4

9. On January 7, 2011, the Debtors filed the Motion. Through the Motion, the Debtors' seek to reject only the Utility Services Agreement, and not the other Project Contacts, which the Debtors hope will result in DTE's continued obligation to make Deferred Payments without any offsetting Utility Service Fees, in direct contradiction to section 2.5 of the Asset Purchase Agreement. As explained below, the Project Contracts may not be separately assumed or rejected pursuant to section 365 of the Bankruptcy Code and, even if the Utility Services Agreement could be separately rejected, such rejection would not produce the result desired by the Debtors.

## II    OBJECTION

10. Section 365 of the Bankruptcy Code provides that trustee or debtor-in-possession may assume or reject an executory contract or unexpired lease. *See* 11 U.S.C. § 365(a). When assuming contacts or leases, debtors often wish to "cherry pick" desirable contractual provisions while discarding those that are more burdensome. Generally, in order for a contract to be assumed or rejected, the contract must be assumed or rejected "in its entirety." *In re Adelphia Bus. Solutions, Inc.*, 322 B.R. 51, 54 (Bankr. S.D.N.Y. 2005); *see also NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 531 (1984) ("Should the debtor-in-possession elect to assume the executory contract . . . it assumes the contract *cum onere*"). However, many courts, including courts in the Southern District of New York, allow a single contract to be "separately assumed and rejected if the contract is 'divisible' or 'severable' under state law." *In re Adelphia Bus, Solutions, Inc.*, 322 B.R. at 54.

11. Whether the Project Contracts are "divisible" or "severable" must be determined under the laws of the State of Michigan. *See* Asset Purchase Agreement, §11.14; Lease

5

Agreement, §17.10; Utility Services Agreement, § 34.01; Security Agreement, § 9.[2] Michigan law places primary importance on ascertaining and giving effect to the intent of the contracting parties. *See Network Communications v. Michigan Bell Telephone Co.*, 703 F. Supp. 1267, 1273 (E.D. Mich. 1989). In determining the intent of the parties as to whether several documents constitute a single contract, courts may rely on extrinsic evidence of the parties' intent. *See NAG Enterprises, Inc. v. All State Industries*, 285 N.W.2d 770, 771 (Mich. 1979) (extrinsic evidence of prior or contemporaneous agreements or negotiations is admissible as it bears on the threshold question of whether a written instrument represents the entire agreement of the parties).

12. Courts applying Michigan law follow the general rule that "in the absence of anything to indicate a contrary interpretation, instruments executed at the same time, by the same parties, for the same purpose and in the course of the same transaction will be read and interpreted together, it being said that they are, in the eyes of the law, one instrument." *Beacon Plaza Shopping Center, Inc. v. Tricities Construction and Supply Co.*, 140 N.W.2d 531, 535 (Mich. App. 1966) (citation omitted). One district court has refined the analysis by suggesting three principal factors that courts consider in assessing the divisibility and validity of multiple agreements: (i) whether the terms of each agreement modify or alter the terms of the others; (ii) whether the terms of each agreement are definite and certain; and (iii) whether each agreement is supported by independent consideration. *See Network Communications*, 703 F. Supp. at 1272.

---

[2] In determining which state's law to apply, the Court must rely on New York's choice of law rules. *See In re Thomson McKinnon Securities Inc.,* 141 B.R. 559, 567 (Bankr. S.D.N.Y. 1992) ("[b]ecause New York is the forum state, this court must rely on New York's choice of law rules to determine which state's substantive law applies"), *aff'd*, 151 B.R. 324 (S.D.N.Y. 1993). Pursuant to New York law, "it is the well-settled policy of the courts . . . to enforce contractual provisions for choice of law and selection of a forum for litigation." *Boss v. American Exp. Financial Advisors, Inc.*, 15 A.D. 3d 306, 307, 791 N.Y.S. 2d 12, 14 (1st Dept. 2005), *aff'd* 844 N.E. 2d 1142 (2006). Accordingly, the choice of law provisions of the Project Contracts are enforceable in determining which state law to apply in the divisibility analysis.

6

13. It is clear that the Project Contracts are a single, integrated transaction which may not be separately assumed or rejected. As set forth by the test in *Beacon Plaza*, the Project Contracts constitute one instrument because each was executed by the same parties (DTE and MLC), for the same purpose and, with the sole exception of the License Agreement, were entered on January 10, 2007. *See Beacon Plaza*, 140 N.W.2d at 535. Indeed, several of the Project Contracts explicitly state that the Project Contracts "collectively memorialize one integrated transaction that has been set forth in multiple agreements for organizational convenience only." Utility Services Agreement, §35.01; Asset Purchase Agreement, § 11.2; *see also* Lease Agreement, §§ 17.1, 17.20.

14. Moreover, the first and third factors set forth in *Network Communications* strongly indicate that the Project Contracts constitute a single agreement. First, the Project Contracts reference and are integrated with the other Project Contracts. *See*, *e.g.*, Utility Services Agreement, § 35.01 ("This Agreement and the other Project Contracts constitute the entire agreement and understanding between the parties…"). Second, each of the Project Contracts is supported by consideration provided by the parties through the other Project Contracts. *See* Lease Agreement, § 17.1 ("Each Party acknowledges and agrees that each Project Contract is vital to the operation of [one integrated transaction] and it would not have entered into any of the Project Contracts if each of the other Project Contracts had not been entered into as well"). Accordingly, DTE submits that the Debtors may not reject the Utility Services Agreement without also rejecting the other Project Contracts that comprise the single transaction.

15. Furthermore, even if the Debtors' could "cherry pick" and reject the Utility Services Agreement, its rejection would not produce the result desired by the Debtors. First, MLC's failure to pay the Utility Service Fees under the Utility Services Agreement relieves DTE

7

of its obligation to make the Deferred Payments by the amount corresponding to the amount that MLC fails to pay DTE.  *See* Asset Purchase Agreement, § 2.5 ("[I]n the event that [MLC] fails to make a payment to [DTE] in accordance with the terms of the Utility Services Agreement, [DTE] shall be relieved of its obligation to make a full Deferred Payment by the amount corresponding to the amount that [MLC] failed to pay [DTE]…").  Second, a rejection of the Utility Services Agreement constitutes an incurable default under and a deemed rejection of the other Project Contracts that excuses further performance thereunder.  *See* Asset Purchase Agreement, § 11.3; Lease Agreement, § 6.2.[3]  Accordingly, the anticipated benefit to MLC's estate though rejection of the Utility Services Agreement would not be realized.

16.     In sum, because the Project Contracts constitute a single agreement, the Bankruptcy Code does not permit the Debtors to assume or reject only the Utility Services Agreement.  Rather, the treatment of all of the Project Contracts must be resolved in an integrated manner.  Accordingly, DTE desires to negotiate a comprehensive resolution with the Debtors for the treatment of all of the Project Contracts.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

---

[3]     Rejection of the Utility Services Agreement, causing a rejection of the other Project Contracts, will vest in DTE all rights under section 365(h) of the Bankruptcy Code, including without limitation the right to remain in possession for the remaining term of the Lease Agreement and any extensions thereof, and to offset against the rent reserved under the Lease Agreement the value of any damages caused by the Debtors' rejection of the Lease Agreement.  *See* 11 U.S.C. §365(h).

### III.    CONCLUSION

WHEREFORE, DTE respectfully requests that the Court (i) grant either of the following forms of relief:

(a) deny the Debtors' Motion to reject the Utility Services Agreement;

(b) grant the Debtors' Motion to reject the Utility Services Agreement subject to rejection of the other Project Contracts; or

(c)  adjourn the hearing on the Debtors' Motion to reject the Utility Services Agreement so as to allow the parties sufficient time to negotiate a comprehensive resolution for the treatment of all of the Project Contracts;

 and (ii) grant such other and further relief in favor of DTE as the Court may deem just and proper.

Dated: January 28, 2011
       New York, New York

**HUNTON & WILLIAMS LLP**

*/s/ Peter S. Partee, Sr.*
Peter S. Partee, Sr.
Scott H. Bernstein
Robert A. Rich
200 Park Avenue, 53rd Floor
New York, New York 10166-0136
(212) 309-1000

*Attorneys for DTE Pontiac North, LLC*

**EXHIBITS A THROUGH E**

**THE PROJECT CONTRACTS ARE NOT BEING ELECTRONICALLY FILED.**

**THE PROJECT CONTRACTS HAVE BEEN PROVIDED
TO THE APPLICABLE SERVICE PARTIES AND WILL BE
PROVIDED TO PARTIES IN INTEREST UPON REASONABLE WRITTEN
<u>REQUEST TO ROBERT A. RICH, ESQ. AT RRICH2@HUNTON.COM</u>**

99900.12587 EMF_US 34236993v3