# EXHIBIT B
# PART 1

16

*Receipt # 015038*

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

**STANLEY R STASKO**
**27653 Lexington Pkwy Southfield, Michigan 48076**
**#313-670-6917**
**Plaintiff**
**Pro Se Litigant**

**V**                      ]

                           ]

                           ]

| |
|---|
| Case:2:09-cv-14827 |
| Judge: Cook, Julian Abele |
| MJ: Morgan, Virginia M |
| Filed: 12-11-2009 At 04:18 PM |
| STANLEY STASKO V. GENERAL MOTORS CO RP (KB) |

**GENERAL MOTORS CORPORATION**
**GENERAL MOTORS – GLOBAL HEADQUARTERS**
**300 RENAISSANCE CENTER**
**P.O. BOX 300**
**DETROIT, MICHIGAN 48265**
**#313-556-5000**
**Defendant**

## COMPLAINT:

Stanley R. Stasko respectfully states:

1)   that I am the Plaintiff in Stasko vs General Motors Corporation.

2)   that there is no other pending or resolved civil action arising out of this complaint at the

signing date of this complaint.

### JURISDICTION

3)   that the events giving rise to this complaint occurred at what is commonly known as the

General Motors Technical Center (Warren, Michigan) Macomb County from

approximately September 7, 1978 to approximately August 14, 1979, and from

approximately July 18, 1983 to approximately August 25, 1995

Document prepared by Stanley R. Stasko 27653 Lexington Pkwy
Southfield, Michigan 48076 Telephone # 313-670-6917

4) that the plaintiff resided at what is commonly known as 4450 52nd Street (Detroit, Michigan) Wayne County while employed at the General Motors Technical Center from approximately September 7, 1978, to approximately August 14, 1979.

5) that the plaintiff resided at what is commonly known as 4450 52nd Street (Detroit, Michigan) Wayne County while employed at the General Motors Technical Center from July 18, 1983, to approximately May, 1985

6) that the plaintiff resided in Oakland County (Southfield, Michigan) while employed at the General Motors Technical Center from approximately May, 1985 to approximately August 25, 1995

## CIVIL ACTION FOR DEPRIVATION OF RIGHTS

7) Title 42 USC Section 1983 states "every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory degree was violated or declaratory relief was unavailable." (See Exhibit 1)

Document prepared by Stanley R. Stasko 27653 Lexington Pkwy
Southfield, Michigan 48076 Telephone # 313-670-6917

## STATATUE OF LIMITATIONS

8) Title 42 USC Section 1983 does not specify a statute of limitations for recovery of

damages by an employee from an employer. M.C.L.A. 600.5807 (8) states that "the

period of limitations is 6 years for all other actions to recover damages or sums due for

breach of contract." (See Exhibit 2)

9) Defendant may argue that the statute of limitations has expired for the plaintiff to recover

damages from an employer since the plaintiff resigned from General Motors Corporation

on August 25, 1995. (See Exhibit 3) August 25, 1995 plus six years equals August 25,

2001.

### **TOLLING OF LIMITATIONS – METHOD #1 – DISCOVERY DELAYS**

10) According to Campau v Orchard Hills Psychiatric Center 946 F.Supp. 507, 19A.D.D.

1056, E.D. Mich., November 19, 1996 (No. Civ. A.96-40310) the discovery rule

postpones beginnings of limitations period from date when plaintiff is wronged to date

when he discovers he has been injured (See Exhibit 4)

11) Other State of Michigan court rulings include Stephens v. Dixon, 536 N.W.2d 755

Mich.,1995 (See Exhibit 5) "in deciding whether to strictly enforce period of limitation or

impose discovery rule, court must carefully balance when plaintiff learned of her injuries,

whether she was given fair opportunity to bring her suit, and whether defendant's

equitable interests would be unfairly prejudiced by tolling statute of limitations.

M.C.L.A. § 600.5827."

Document prepared by Stanley R. Stasko 27653 Lexington Pkwy
Southfield, Michigan 48076 Telephone # 313-670-6917

12) Also <u>Moll v. Abbott Laboratories, 506 N.W.2d 816</u> Mich.,1993 (See Exhibit 5) "…once

plaintiff is aware of injury and its possible cause, plaintiff is aware of possible cause of

action for purposes of commencement of statute of limitations."

13) Further, <u>City of Huntington Woods v. Wines, 332 N.W.2d 557</u> Mich.App.,1983 (See

Exhibit 5) "…limitation period commences when the person knows of the act which

caused his injury and has good reason to believe that the act was improper or was done in

an improper manner."

14) Still further, <u>Jackson County Hog Producers v. Consumers Power Co., 592 N.W.2d 112</u>

Mich.App.,1999 (See Exhibit 5) "…if the discovery rule applies, a claim does not accrue

for the purpose of the running of the limitation period until a plaintiff discovers, or

through the exercise of reasonable diligence should have discovered (1) an injury and (2)

the causal connection between the injury and a defendant's breach of duty."

15) <u>Rose v Saginaw County, 232 F.R.D. 267, E.D. Mich.</u>, November 21, 2005 (No. 01-

10337-BC). "…if the plaintiff has delayed beyond the limitations period, he must fully

plead the facts and circumstances surrounding his belated discovery and the delay" (See

Exhibit 6)

16) The plaintiff submits an essay fully describing the facts and circumstances surrounding

the belated discovery and the delay. (See Exhibit 7)

17) The plaintiff first began to discover the injury and loss he incurred by the defendant when

the plaintiff for the first time requested a complete copy of all employment records

Document prepared by Stanley R. Stasko 27653 Lexington Pkwy
Southfield, Michigan 48076 Telephone # 313-670-6917

pertaining to his work for General Motors Corporation on July 20, 2005. (See Exhibit

10).

18) The defendant did not respond to the letter dated July 20, 2005.

19) The plaintiff made a second request for a complete copy of all employment records

pertaining to his work for General Motors Corporation on August 8, 2005. (See Exhibit

11).

20) The defendant did not respond to the second request letter dated August 8, 2005.

21) The plaintiff made a third request for a complete copy of all employment records

pertaining to his work for General Motors Corporation on August 24, 2005. (See Exhibit

12).

22) The defendant responded by mailing a package of information to the plaintiff FedEx Trk

# 8464-9619-6310. (See Exhibit 13) The plaintiff includes the evaluation and salary

compensation information in Exhibit 13.

23) The plaintiff's employment record from General Motors Corporation is the first and only

time the plaintiff received employment records from the defendant.

24) The discovery rule postpones beginnings of limitations period from date when plaintiff is

wronged to date when he discovers he has been injured; therefore, since the plaintiff first

began to discover the injury and loss he incurred by the defendant on September 1, 2005;

therefore, the statue of limitations does not expire until September 1, 2011. (September 1,

2005 plus six years equals September 1, 2011.)

Page 5 of 14
Document prepared by Stanley R. Stasko 27653 Lexington Pkwy
Southfield, Michigan 48076 Telephone # 313-670-6917

## TOLLING OF LIMITATIONS – METHOD #2 – MENTAL DISABILITY

25) M.C.L.A. 600.5851 (1) states ... "if the person first entitled to make an entry or bring an action under this act is under 18 years of age or insane at the time the claim accrues, the person or those claiming under the person shall have 1 year after the disability is removed through death or otherwise, to make the entry or bring the action although the period of limitations has run." (See Exhibit 17)

26) Also M.C.L.A. 600.5851 (2) states "the term insane as employed in this chapter means a condition of mental derangement such as to prevent the sufferer from comprehending rights he or she is otherwise bound to know and is not dependent on whether or not the person has been judicially declared to be insane." (See Exhibit 17)

27) The plaintiff submits an essay fully describing the facts and circumstances surrounding his **loss of memory**. See Essay, Exhibit 7, p. 33-37.

28) The plaintiff's loss of memory continued for years including other people trying to convince the plaintiff he needs to be on medication.

    a) See Essay, Exhibit 7, p. 48-63

    b) See North Oakland Medical Center report in Exhibit 8.

    c) See Essay, Exhibit 7, p. 64-65

29) Further M.C.L.A. 600.5851 (3) states "to be considered a disability, the infancy or insanity must exist at the time the claim accrues. If the disability comes into existence after the claim has accrued, a court shall not recognize the disability under this section for the purpose of modifying the period of limitations." (See Exhibit 17)

Document prepared by Stanley R. Stasko 27653 Lexington Pkwy
Southfield, Michigan 48076 Telephone # 313-670-6917

30) Still further M.C.L.A. 600.5851 (5) states "... a court shall count the year of grace

provided in this section from the termination of the last disability to the person to whom

the claim originally accrued that has continued from the time the claim accrued, whether

this disability terminates because of the death of the person disabled or for some other

reason." (See Exhibit 17)

31) The plaintiff's memory only starts to clear up in July 2005. (See Essay, Exhibit 7, p. 65-

67) In order for the court to understand how much the plaintiff's memory will clear up

several years later, Exhibit 15 represents the plaintiff's resume for General Motors

accomplishments in CY2005 and Exhibit 16 represents the plaintiff's resume for General

Motors accomplishments written approximately October CY2009.

32) If the defendant argues that the plaintiff resigned from General Motors Corporation on

August 25, 1995; therefore, the plaintiff's mental disability (loss of memory) is over

fourteen years old. The court should note that Calladine v Dana Corp. 679 F.Supp. 700,

E.D. Mich., February 29, 1988 (No. Civ. A. 87-CV-1739DT) states "... that an individual

mentally incompetent at the time a cause of action accrues may file the claim before the

applicable limitations period runs *after* the disability is removed. Since William remains

mentally incompetent, the statute has not begun to run even though the injury occurred

almost nine years prior to the filing of this suit" (See Exhibit 18 for Calladine v Dana

Corp.)

Document prepared by Stanley R. Stasko 27653 Lexington Pkwy
Southfield, Michigan 48076 Telephone # 313-670-6917

33) Also *Paavola v. St. Joseph Hosp. Corp., 119 Mich.App. 10, 14-15, 325 N.W.2d 609*

(1982) states that the "...statute permits tolling for a "period potentially many decades

long." (See Exhibit 19 for Paavola v St. Joseph Hosp. Corp.)

34) Further if the defendant argues that the plaintiff should have appointed a guardian or

obtained an attorney to capably handle the plaintiff's rights when the plaintiff first began

to discovery the injury or loss approximately September 2005 similar to the argument

made in Calladine v Dana Corp. ( "... In other words, asserts Dana, William has been in a

far better position legally than the average individual who must attend to his or her legal

rights without such assistance."; See Exhibit 18 for Calladine v Dana Corp.) The plaintiff

states that he is a single man with no spouse. The plaintiff has no legal children. The

plaintiff did try to obtain an attorney when he first began to discover the injury or loss

approximately September 2005 but the attorney showed no interest in the case, nor did

the attorney return the plaintiff's phone calls, once the attorney learned that the plaintiff

resigned from General Motors Corporation on August 25, 1995 (ten years ago).

35) Still further, Calladine v Dana Corp. states that "...Michigan courts have consistently

held otherwise. In a string of decisions, the Michigan Court of Appeals has found that the

statute does not begin to run even with the appointment of a guardian, *see, e.g., Wallisch*

*v. Fosnaugh, 126 Mich.App. 418, 426, 336 N.W.2d 923 leave to appeal denied,* 418

Mich. 871 (1983); *Paavola, 119 Mich.App. at 14, 325 N.W.2d 609,* or next friend,

*Rittenhouse v. Erhart, 126 Mich.App. 674, 679, 337 N.W.2d 626 (1983), modified on*

Document prepared by Stanley R. Stasko 27653 Lexington Pkwy
Southfield, Michigan 48076 Telephone # 313-670-6917

*other grounds,* 424 Mich. 166, 380 N.W.2d 440 (1986), on behalf of a mentally

incompetent person. (Exhibit 18 for Calladine v Dana Corp.)

36) If the defendant argues that the plaintiff's did not have a mental disability because he was

able to work for DSP Technology in Ann Arbor, Michigan and MSX International in

Auburn Hills, Michigan covering a period a time from approximately January 1997 to

February 2001. The court should note that Asher v. Exxon Co., U.S.A., 504 N.W.2d 728

Mich.App.,1993 states "… the circuit court erred in finding that plaintiff was not

mentally deranged because he was able to work, see *Davidson v. Baker-Vander Veen*

*Construction Co.,* 35 Mich.App. 293, 302-303, 192 N.W.2d 312 (1971)." (See Exhibit 20

for Asher v Exxon Co.)

37) M.C.L.A. 600.5851 (5)  shall count the year of grace from the termination of the last

disability and since the plaintiff's loss of memory will clear up enough for the plaintiff to

represent himself in court approximately October CY2009; therefore, the statue of

limitations does not expire until October 2010. (October 2009 plus one year equals

October 2010.)

## TOLLING OF LIMITATIONS – METHOD #3 – FRAUDULENT CONCEALMENT

38) M.C.L.A. 600.5855 "… if a person who is or may be liable for any claim fraudulently

conceals the existence of the claim or the identity of any person who is liable for the

claim from the knowledge of the person entitled to sue on the claim, the action may be

commenced at any time within 2 years after the person who is entitled to bring the action

discovers, or should have discovered, the existence of the claim or the identity of the

Document prepared by Stanley R. Stasko 27653 Lexington Pkwy
Southfield, Michigan 48076 Telephone # 313-670-6917

person who is liable for the claim, although the action would otherwise be barred by the

period of limitation." (See Exhibit 21 for M.C.L.A. 600.5855)

39) McCray v Moore (Not reported in F.Supp. 2d, 2008 WL 4225762), U.S. District Court,

E.D. Mich., No. 07-13297, September 9, 2008 states "... Michigan law provides that the

statute of limitations may be tolled where a defendant has concealed the facts giving rise

to the cause of action." (See Exhibit 22 for McCray v Moore)

40) Further McCray v Moore states "... *Mich. Comp. Laws § 600.5855*. The acts constituting

fraudulent concealment are "(1) wrongful concealment of their actions by the defendants;

(2) failure of the plaintiff to discover the operative facts that are the basis of his cause of

action within the limitations period; and (3) plaintiff's due diligence until discovery of the

facts." *Evans v. Pearson Enterprises, Inc., 434 F.3d 839, 851 (6th Cir. 2006)*, quoting,

*Dayco Corp. v. Goodyear Tire & Rubber Co., 523 F.2d 389, 394 (6th Cir. 1975)*." (See

Exhibit 22 for McCray v Moore)

41) Lumber Village v Siegler, 355 N.W.2d 654 states "... as a general rule, for fraudulent

concealment to postpone the running of the period of limitation, the fraud must be

manifested by an affirmative act or misrepresentation. Draws v. Levin, 332 Mich. 447,

452, 52 N.W.2d 180 (1952)" (See Exhibit 23 for Lumber Village v Siegler)

42) The plaintiff for the first time requested a complete copy of all employment records

pertaining to his work for General Motors Corporation on July 20, 2005. (See Exhibit

10).

43) The defendant did not respond to the letter dated July 20, 2005.

Document prepared by Stanley R. Stasko 27653 Lexington Pkwy
Southfield, Michigan 48076 Telephone # 313-670-6917

44) The plaintiff made a second request for a complete copy of all employment records pertaining to his work for General Motors Corporation on August 8, 2005. (See Exhibit 11).

45) The defendant did not respond to the second request letter dated August 8, 2005.

46) The plaintiff made a third request for a complete copy of all employment records pertaining to his work for General Motors Corporation on August 24, 2005. (See Exhibit 12).

47) The court should note that in the third request the plaintiff states "Stanley R. Stasko requests this information to: ... (3) look for possible discrimination by General Motors against Stanley R. Stasko (it is Stanley R. Stasko opinion that he can compile a reasonable argument that he should have been one or more levels higher than he was at the time of his departure)."

48) The court should also note that in the third request the plaintiff states "... please note that a copy of this letter is being sent to: Dan Galnat, Attorney, General Motors – Global Headquarters..."

49) Now that the plaintiff has implied a possible lawsuit, the defendant responded by mailing a package of information to the plaintiff FedEx Trk # 8464-9619-6310. (See Exhibit 13) The plaintiff includes the evaluation and salary compensation information in Exhibit 13.

50) Since the plaintiff was hired by General Motors on July 18, 1983 and resigned on August 25, 1995, it is reasonable to expect performance evaluation forms for CY1983, CY1984,

Document prepared by Stanley R. Stasko 27653 Lexington Pkwy
Southfield, Michigan 48076 Telephone # 313-670-6917

CY1985, CY1986, CY1987, CY1988, CY1989, CY1990, CY1991, CY1992, CY1993, CY1994, and CY1995

51) The information from the defendant (FedEx Trk # 8464-9619-6310) contained only three Advanced Engineering Staff Performance planning and Development Process information forms.

    a)  One Advanced Engineering Staff Performance Planning Development Process information dated December 22, 1989, by Stanley R. Stasko

    b)  One Advanced Engineering Staff Performance Planning Development Process information dated December 19, 1990, by Stanley R. Stasko

    c)  One Advanced Engineering Staff Performance Planning Development Process information dated January 22, 1992 by Stanley R. Stasko

52) The plaintiff did try to obtain an attorney when he discovered so little of his accomplishments from CY1983, CY1984, CY1985, CY1986, CY1987, CY1988, CY1989, CY1990, CY1991, CY1992, CY1993, CY1994, and CY1995 were documented by the defendant.

53) The attorney showed no interest in the case, nor did the attorney return the plaintiff's phone calls, once the attorney learned that the plaintiff resigned from General Motors Corporation on August 25, 1995 (ten years ago).

54) The plaintiff's memory only starts to clear up in July 2005. (See Essay, Exhibit 7, p. 65-67) In order for the court to understand how much the plaintiff's memory will clear up several years later, Exhibit 15 represents the plaintiff's resume for General Motors

Document prepared by Stanley R. Stasko 27653 Lexington Pkwy
Southfield, Michigan 48076 Telephone # 313-670-6917

accomplishments in CY2005 and Exhibit 16 represents the plaintiff's resume for General

Motors accomplishments written approximately October CY2009.

55) M.C.L.A. 600.5855 states "... if a person who is or may be liable for any claim

fraudulently conceals the existence of the claim or the identity of any person who is liable

for the claim from the knowledge of the person entitled to sue on the claim, the action

may be commenced at any time within 2 years after the person who is entitled to bring

the action discovers, or should have discovered, the existence of the claim or the identity

of the person who is liable for the claim, although the action would otherwise be barred

by the period of limitation."; therefore, since the plaintiff was able to first represent

himself in court approximately October CY2009; therefore, the statue of limitations does

not expire until October 2011. (October 2009 plus two years equals October 2011.)

## PLAINTIFF'S REQUESTS

56) The plaintiff requests a three-judge court decide Stasko v General Motors Corporation.

57) The plaintiff requests the court to award the plaintiff approximately $2.7 million dollars

for the estimated loss by the plaintiff for actual work performed at General Motors

Corporation from approximately July 1983 to August 1995. (Final amount to be

determined by court.) See Exhibit 24, Exhibit 25, Exhibit 26, and Exhibit 27 for

calculations and estimates associated with plaintiff's $2.7 million dollar estimated loss.

58) The plaintiff requests the court to award the plaintiff an unspecified amount for unique

solution accomplished by the plaintiff while working at General Motors Corporation

from approximately July 1983 to August 1995. (Final amount to be determined by court.) (See Exhibit 28)

59) The plaintiff requests the court to award the plaintiff an unspecified amount for major accomplishments by the plaintiff while working at General Motors Corporation from approximately July 1983 to August 1995. (See Exhibit 29) (Final amount to be determined by court.) (Also see Exhibit 30 for news articles announcing General Motors Powertrain facility projects and the costs associated with major Powertrain facility projects.)

60) The plaintiff requests the court to award the plaintiff an unspecified amount in punitive damages for hostile work environment by defendant against the plaintiff from approximately July 1983 to August 1995. (See Exhibit 31) (Final amount to be determined by court.)

Date: December  / / , 2009          _____

Stanley R. Stasko #313-670-6917

Document prepared by Stanley R. Stasko 27653 Lexington Pkwy
Southfield, Michigan 48076 Telephone # 313-670-6917

JS 44 (Rev. 12/07)

## CIVIL COVER SHEET

County in which action arose: Oakland

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

### I. (a) PLAINTIFFS
Stanley R. Stasko
27653 Lexington Pkwy Southfield, Michigan 48076
#313-670-6917

### DEFENDANTS
General Motors Corporation
General Motors - Global Headquarters 300 Renaissance Center
P.O. Box 300 Detroit, Michigan 48265

(b) County of Residence of First Listed Plaintiff: Oakland
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant: Wayne
(IN U.S. PLAINTIFF CASES ONLY)

(c) Attorney's (Firm Name, Address, and Telephone Number)
Pro Se Litigant

Case:2:09-cv-14827
Judge: Cook, Julian Abele
MJ: Morgan, Virginia M
Filed: 12-11-2009 At 04:18 PM
STANLEY STASKO V. GENERAL MOTORS CO
RP (KB)

### II. BASIS OF JURISDICTION (Place an "X" in One Box Only)
☐ 1 U.S. Government Plaintiff
☒ 3 Federal Question (U.S. Government Not a Party)
☐ 2 U.S. Government Defendant
☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

### V. ORIGIN (Place an "X" in One Box Only)
☒ 1 Original Proceeding

### VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
Title 42 USC Section 1983
Brief description of cause:
I am suing General Motors under Title 42 USC Section 1983

### VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $ APPROX. $2.7 MILLION
JURY DEMAND: ☐ Yes ☒ No

### VIII. RELATED CASE(S) IF ANY

DATE 12/11/2009   SIGNATURE OF ATTORNEY OF RECORD

FOR OFFICE USE ONLY

## PURSUANT TO LOCAL RULE 83.11

1.          Is this a case that has been previously dismissed?          ☐ Yes
                                                                        ☒ No

If yes, give the following information:

Court: _____

Case No.: _____

Judge: _____


2.          Other than stated above, are there any pending or previously
            discontinued or dismissed companion cases in this or any other          ☐ Yes
            court, including state court? (Companion cases are matters in which      ☒ No
            it appears substantially similar evidence will be offered or the same
            or related parties are present and the cases arise out of the same
            transaction or occurrence.)

If yes, give the following information:

Court: _____

Case No.: _____

Judge: _____


Notes :

Case:2:09-cv-14827
Judge: Cook, Julian Abele
MJ: Morgan, Virginia M
Filed: 12-11-2009 At 04:18 PM
STANLEY STASKO V. GENERAL MOTORS CORP (KB)

# Exhibit - 1

**42 § 1982**            PUBLIC HEALTH AND WELFARE    Ch. 21

Note 249

**249. Statistical evidence, leasing and renting real property**

Resident manager's statement to black rental applicant that corporate landlord did not rent to blacks together with evidence that corporate landlord refused to rent black applicant any of ten available apartments together with statistical evidence indicating that corporate landlord had never rented to a black until December 1975 and had rented very few of the 159 apartments to blacks since then was sufficient to establish that black rental applicant was denied an apartment by landlord because of her race. Young v. Parkland Village, Inc., D.C.Md.1978, 460 F.Supp. 67.

Uncontradicted evidence that landlords rented apartment to black tenant who charged racial discrimination and that 87% of landlords' apartment units were occupied by black persons established no violation of this section. Lee v. Minnock, W.D.Pa.1976, 417 F.Supp. 436, affirmed 556 F.2d 567.

## § 1983.    Civil action for deprivation of rights

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.  For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

(R.S. § 1979; Pub.L. 96–170, § 1, Dec. 29, 1979, 93 Stat. 1284; Pub.L. 104–317, Title III, § 309(c), Oct. 19, 1996, 110 Stat. 3853.)

### HISTORICAL AND STATUTORY NOTES

**Revision Notes and Legislative Reports**

**1979 Acts.** House Report No. 96–548, see 1979 U.S. Code Cong. and Adm. News, p. 2609.

**1996 Acts.** Senate Report No. 104–366, see 1996 U.S. Code Cong. and Adm. News, p. 4202.

**Codifications**

R.S. § 1979 is from Act Apr. 20, 1871, c. 22, § 1, 17 Stat. 13.

Section was formerly classified to section 43 of Title 8, Aliens and Nationality.

**Amendments**

**1996 Amendments.** Pub.L. 104–317, § 309(c), inserted provisions relating to immunity of judicial officers from injunc-

tive relief unless declaratory decree was violated or declaratory relief is unavailable.

**1979 Amendments.** Pub.L. 96–170 added "or the District of Columbia" following "Territory," and provisions relating to Acts of Congress applicable solely to the District of Columbia.

**Effective and Applicability Provisions**

**1979 Acts.** Amendment by Pub.L. 96–170 applicable with respect to any deprivation of rights, privileges, or immunities secured by the Constitution and laws occurring after Dec. 29, 1979, see section 3 of Pub.L. 96–170, set out as a note under section 1343 of Title 28, Judiciary and Judicial Procedure.

---

**Ch. 21    CIVIL RIGHTS**

### CROSS REFEREN[CES]

Attorney's fees to prevailing party other than U[...]
Citizenship clause, see USCA Const. Amend. XIV
Conspiracy to interfere with civil rights, damage[...]
Institutionalized persons required to exhaust r[...]
    this section, see 42 USCA § 1997e.
Jurisdiction of district courts of civil rights actio[...]
Privileges and immunities clauses, see USCA C[...]
    XIV, § 1.

### AMERICAN LAW RE[...]

Assignability and survivability of cause of actio[...]
    ALR2d 1153.
Civil Rights: racial or religious discriminatio[...]
    services or facilities. 53 ALR3d 1027.
Discrimination in provision of municipal se[...]
    violation. 51 ALR3d 950.
Exclusion of, or discrimination against, phys[...]
    ALR5th 107.
Exclusion or expulsion from association or cl[...]
    act. 38 ALR4th 628.
Liability of municipal corporation or other gov[...]
    caused by action or inaction of off-d[...]
Prohibition, under state civil rights          of
    privately owned residential pro.        . 96[...]
Requiring apology as 'affirmative action or ot[...]
    rights Act. 85 ALR3d 402.
Search conducted by school official or teacher[...]
    or equivalent state constitutional provisi[...]
Action of private hospital as state action und[...]
    Amendment. 42 ALR Fed 463.
Action of private institution of higher educat[...]
    action under color of law, for purposes[...]
    USCA § 1983. 37 ALR Fed 601.
Action of private organization providing legal[...]
    within 42 USCA § 1983. 49 ALR Fed 95[...]
Action under 42 USCA § 1983 against mental[...]
    institutionalized person. 118 ALR Fed 5[...]
Action under Title VII of 1964 Civil Rights[...]
    precluding action under 42 USCA § 19[...]
    state or local government. 78 ALR Fed[...]
Actionability of malicious prosecution under 4[...]
Actionability under Federal Civil Rights Acts[...]
    plaining party's association with perso[...]
    6 ALR Fed 973.
Actionability under Federal Civil Rights A[...]
    discipline attorney, to regulate admiss[...]
    unauthorized practice of law. 9 ALR Fe[...]
Actionability, under 42 USCA § 1983, of clai[...]
    election. 66 ALR Fed 750.
Actionability, under 42 USCA § 1983, of clai[...]
    officers for unlawful arrest or imprison[...]
Actions brought under 42 U.S.C.A. § 19[...]
    Supreme Court cases. 164 ALR Fed 4[...]
Actions brought under 42 U.S.C.A. §§ 198[...]
    Supreme Court cases. 169 ALR Fed 1[...]
Actions of off-duty policeman acting as pri[...]
    color of state law' actionable under[...]
    § 1983). 56 ALR Fed 895.

Exhibit - 2

M.C.L.A. 600.5807

Michigan Compiled Laws Annotated Currentness
Chapter 600. Revised Judicature Act of 1961 (Refs & Annos)
🢂Revised Judicature Act of 1961 (Refs & Annos)
🢂Chapter 58. Limitation of Actions (Refs & Annos)
➡**600.5807. Damages for breaches of contract; specific performance; fiduciary bonds; deeds; mortgages; surety bonds; appeal bonds; public obligations**

Sec. 5807. No person may bring or maintain any action to recover damages or sums due for breach of contract, or to enforce the specific performance of any contract unless, after the claim first accrued to himself or to someone through whom he claims, he commences the action within the periods of time prescribed by this section.

(1) The period of limitations on actions charging any surety on any bond of any executor, administrator, guardian is 4 years after the discharge of the executor, administrator, or guardian.

(2) The period of limitations is 10 years for actions founded upon bonds of public officers.

(3) The period of limitations on actions founded upon bonds executed under sections 41.80 and 41.81 of the Compiled Laws of 1948, is 2 years after the expiration of the year for which the constable was elected.

(4) The period of limitations is 10 years for actions founded upon covenants in deeds and mortgages of real estate.

(5) The period of limitations is 2 years for actions charging any surety for costs.

(6) The period of limitations is 2 years for actions brought on bonds or recognizances given on appeal from any court in this state.

(7) The period of limitations is 10 years for actions on bonds, notes, or other like instruments which are the direct or indirect obligation of, or were issued by although not the obligation of, the state of Michigan or any county, city, village, township, school district, special assessment district, or other public or quasi-public corporation in the state of Michigan.

(8) The period of limitations is 6 years for all other actions to recover damages or sums due for breach of contract.

Exhibit - 3

ISSUED: 07-27-95                                                    SM-215/TAD

SALARIED PERSONNEL TRANSACTION

NAME-------: STANLEY R STASKO                          SSN: 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
ADDRESS--: 27653 LEXINGTON PKWY
           SOUTHFIELD, MI  48076
BIRTHDATE: 06-06-61                      SEX/MINORITY----: M  NON-MINORITY
PERF/DATE: S  01-22-92                   CREDITED SERVICE: 11 YRS  06 MOS
EDUCATION: 16  B  LAWRENCE TECH U  ENGRG - ELECTRICAL - GENERAL
*********** CURRENT ***********  S T A T U S  ***********  RECOMMENDED  *******
             07-18-83                                        08-25-95
HN    HIRE-REGULAR              ACTION CODE     1J    QUIT-CAREER CHANGE
RA    REGULAR ACTIVE            EMP CATEGORY    SE    SEPARATED
07-18-83  09-07-78             SERV DT/ORIG HIRE  _____ _____
                               LDW/RTW/REC DLA    08-25-95 _____    __
                               SEP ALLOW/VAC HRS  _____ _____
******************************  P O S I T I O N  ******************************
             01-01-95
D8    CHG-REORGANIZATION         ACTION CODE
7E06  SR PROJECT ENGINEER        POSITION CODE
                                 LOCAL NUMBER
                                 LOCAL TITLE
10020  GM POWERTRAIN-WRN ENG     PERSONNEL UNIT
WH213  LAB SUPERVISOR/ENGINE     DEPARTMENT
2130   WARREN      MI            LOCATION CODE
03     2        F      N         AOW/EEO/EXPT/SUPV
5110000 GM POWERTRAIN-WARREN     AAP FACILITY
******************************  C O M P E N S A T I O N  ***********************
             06-01-95
M     MERIT INCREASE             ACTION CODE
  5299.00    186.00    3.6       BASE SAL/CHG/%
  3325.00   5160.00  6325.00     MIN/MID/MAX
102.7   M   40.00                % MID/FREQ/HOURS
12-01-91    910.00    1.7        LST AWD DT/AMT/%
******************************************************************************
MR. STASKO IS RESIGNING FROM GENERAL MOTORS CORPORATION EFFECTIVE 8/25/95 TO GO
INTO THE MINISTRY.  HE IS ENTITLED TO 50% OF HIS 17.5 DAYS OF VACATION PLUS THE
FOUR (4) ADDITIONAL DAYS HE PURCHASED.  HE HAS TAKEN ALL OF HIS VACATION DAYS.

PREDECESSOR(NAME/TITLE):
REQ #:                                         WILL BE REPLACED(Y/N):
**********  S I G N A T U R E S  O F  A U T H O R I Z A T I O N  **********
APPROVAL/DATE: _____ 8-1-95  _____ 8-1-95
APPROVAL/DATE: _____/_____  _____/_____
APPROVAL/DATE: _____/_____  _____/_____

/Prism  Approved on lta on 8/1/95 -dr

Exhibit - 4

United States District Court,
E.D. Michigan,
Southern Division.

# Thomas A. CAMPAU, Plaintiff,
## v.
# ORCHARD HILLS PSYCHIATRIC CENTER, a Michigan Professional Corporation, Kenneth E. Pitts and Hiten C. Patel, Jointly and Severally, Defendants.

Civil Action No. 96-40310.
Nov. 19, 1996.

Employee brought Americans with Disabilities Act (ADA) claim against his former employer. Employer moved to dismiss. The District Court, Gadola, J., held that: (1) employee's claim accrued on date he discovered he was going to be terminated, and (2) limitations period for filing claim with Equal Employment Opportunity Commission (EEOC) was not tolled until date employee "confirmed" that his alcoholism was cause for termination.

Dismissed.

## West Headnotes

[1] ☑ KeyCite Citing References for this Headnote

⤶ 78 Civil Rights
  ⤶ 78IV Remedies Under Federal Employment Discrimination Statutes
   ⤶ 78k1503 Administrative Agencies and Proceedings
    ⤶ 78k1505 Time for Proceedings; Limitations
     ⤶ 78k1505(3) k. Operation; Accrual and Computation. Most Cited Cases
     (Formerly 78k342)

Statutory period for filing discrimination charge with Equal Employment Opportunity Commission (EEOC) begins to run on date that the employee receives notice of termination, not when his employment actually ceases. Civil Rights Act of 1964, § 706(d), as amended, 42 U.S.C.A. § 2000e-5(e).

[2] ☑ KeyCite Citing References for this Headnote

⤶ 241 Limitation of Actions
  ⤶ 241II Computation of Period of Limitation
   ⤶ 241II(F) Ignorance, Mistake, Trust, Fraud, and Concealment or Discovery of Cause of Action
    ⤶ 241k95 Ignorance of Cause of Action
     ⤶ 241k95(1) k. In General; What Constitutes Discovery. Most Cited Cases

Discovery rule postpones beginning of limitations period from date when plaintiff is wronged to date when he discovers he has been injured.

[3] ☑ KeyCite Citing References for this Headnote

↪78 Civil Rights
  ↪78IV Remedies Under Federal Employment Discrimination Statutes
    ↪78k1503 Administrative Agencies and Proceedings
      ↪78k1505 Time for Proceedings; Limitations
        ↪78k1505(3) k. Operation; Accrual and Computation. Most Cited Cases
        (Formerly 78k342)

If employer decides to terminate employee for allegedly discriminatory reason but does not convey to employee decision to terminate him until later date, limitations period begins to run on date that employee is notified of his termination and not on date that decision to terminate is made.

[4] ☑ KeyCite Citing References for this Headnote

↪78 Civil Rights
  ↪78IV Remedies Under Federal Employment Discrimination Statutes
    ↪78k1503 Administrative Agencies and Proceedings
      ↪78k1505 Time for Proceedings; Limitations
        ↪78k1505(3) k. Operation; Accrual and Computation. Most Cited Cases
        (Formerly 78k182)

It is employee's awareness of actual injury, as opposed to legal injury, that suffices to trigger running of limitations period for bringing ADA claim. Americans with Disabilities Act of 1990, § 2 et seq., 42 U.S.C.A. § 12101 et seq.

[5] ☑ KeyCite Citing References for this Headnote

↪78 Civil Rights
  ↪78IV Remedies Under Federal Employment Discrimination Statutes
    ↪78k1503 Administrative Agencies and Proceedings
      ↪78k1505 Time for Proceedings; Limitations
        ↪78k1505(3) k. Operation; Accrual and Computation. Most Cited Cases
        (Formerly 78k182)

Employee's ADA claim accrued on date he was notified he was being terminated. Americans with Disabilities Act of 1990, § 2 et seq., 42 U.S.C.A. § 12101 et seq.

[6] ☑ KeyCite Citing References for this Headnote

↪241 Limitation of Actions
  ↪241II Computation of Period of Limitation
    ↪241II(G) Pendency of Legal Proceedings, Injunction, Stay, or War
      ↪241k104.5 k. Suspension or Stay in General; Equitable Tolling. Most Cited Cases

Equitable tolling permits plaintiff to avoid bar of statute of limitation if, despite all due diligence, he is unable to obtain vital information bearing on existence of claim.

[7] ☑ KeyCite Citing References for this Headnote

↪241 Limitation of Actions
  ↪241II Computation of Period of Limitation
    ↪241II(G) Pendency of Legal Proceedings, Injunction, Stay, or War
      ↪241k104.5 k. Suspension or Stay in General; Equitable Tolling. Most Cited Cases

Equitable tolling is inappropriate if plaintiff has either actual or constructive knowledge of his rights.

[8] ☑ KeyCite Citing References for this Headnote

↪78 Civil Rights
  ↪78IV Remedies Under Federal Employment Discrimination Statutes
    ↪78k1503 Administrative Agencies and Proceedings
     ↪78k1505 Time for Proceedings; Limitations
      ↪78k1505(6) k. Tolling. Most Cited Cases
      (Formerly 78k182)

Limitations period for employee to file ADA claim with Equal Employment Opportunity Commission (EEOC) was not tolled for seven-month period between time employee allegedly learned he was discharged due to perceived handicap of alcoholism and date when he confirmed that alcoholism was the reason. Americans with Disabilities Act of 1990, § 2 et seq., 42 U.S.C.A. § 12101 et seq.

[9] ☑ KeyCite Citing References for this Headnote

↪241 Limitation of Actions
  ↪241I Statutes of Limitation
    ↪241I(A) Nature, Validity, and Construction in General
     ↪241k13 k. Estoppel to Rely on Limitation. Most Cited Cases

Equitable estoppel arises when defendant takes active steps, above and beyond wrongdoing upon which plaintiff's claim is founded, to prevent claimant from suing in time.

*508 Thomas R. Paxton, Eggenberger, Eggenberger, McKinney, Weber and Hofmeister, Detroit, MI, for Plaintiff.

Sheldon A. Fealk, Couzens, Lansky, Ellis, Roeder and Lazar, Farmington Hills, MI, for Defendants.

## MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS' MOTION TO DISMISS

## GADOLA, District Judge.

Before this court is the defendants', Orchard Hills Psychiatric Center, Kenneth E. Pitts and Hiten C. Patel, motion to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) filed on September 16, 1996. For the reasons set forth below, this court will grant the defendants' motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).

## I. Background

Plaintiff, Thomas Campau ("Campau"), was employed by defendant Orchard Hills Psychiatric Center ("OHPC") and defendants Kenneth E. Pitts ("Pitts") and Hiten C. Patel ("Patel") who were officers and managers at OHPC and were the employers of Campau. (collectively "Defendants") Campau was employed by OHPC as an independent contractor [FN1] in the position of Clinical Social Worker. On April 4, 1995, the defendants sent a letter to Campau which stated that they "[would] not require [his] services as an independent contractor after Friday, August 4, 1995." Accordingly, Campau's last day of work was August 4, 1995.[FN2] On or about September 4, 1995, Campau filed a lawsuit in Oakland County Circuit court against the defendants in this proceeding alleging wrongful discharge and retaliatory discharge.[FN3] During discovery in the state court action, Campau took the deposition testimony of Drs. Patel and Pitts on November 14, 1995 and February 2, 1996, respectively. Campau claims that their testimony revealed that he was dismissed, at least in part, based on the doctors' perception that Campau was an alcoholic. On or about February 23, 1996, Campau filed a motion for leave to amend the Circuit court complaint to allege violations of Michigan Handicappers Civil Rights Act ("MHCRA"). In the amended complaint, Campau sought to allege that he was fired because of the defendants' perception of his mental or physical condition, i.e. that Campau was an alcoholic. The motion to amend was denied on March 13, 1996 by the Honorable Robert C. Anderson, Circuit Judge, who stated that "my reading of the file does not indicate to me-and of your briefs and what's been submitted to me that there's enough merit to warrant going any further on that amended Complaint." On April 29, 1996, the entire Circuit court matter was dismissed, with prejudice, as plaintiff conceded that discovery had revealed that there was no basis for his wrongful discharge or breach of contract claims. Campau has appealed that dismissal but not the state court's denial of his motion to amend the complaint. Thereafter, on June 11, 1996, the plaintiff filed a charge with the Equal Employment Opportunity Commission ("EEOC").

FN1. The issue of whether Campau was an independent contractor and if so, whether he was protected under the Americans with Disabilities Act ("ADA"), *infra,* was not raised by the parties in their briefs. Although the parties, at oral argument on November 6, 1996, stated that that issue is in dispute, this court need not reach that issue, since it will grant the defendants' motion to dismiss for failure to exhaust administrative remedies.

FN2. Despite the fact that Campau's last day of actual work was Friday August 4, 1995, Campau, in his EEOC Notice of Charge of Discrimination, claims Sunday August 6, 1995 as his last day. As more fully discussed below, Campau's last day of work, for purposes of this motion to dismiss, is irrelevant. The relevant date is April 4, 1995, the day Campau was notified of his termination. As such, any dispute as to Campau's last day of work is moot.

FN3. The basis of plaintiff's wrongful discharge and retaliatory discharge claims was that Campau was allegedly terminated in retaliation for the defendants having to defend Campau in a malpractice suit by his former patient. That action against Campau was ultimately dismissed with prejudice.

On August 27, 1996, Campau filed suit in this court alleging a violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq. Campau claims that he was fired due to a perceived handicap, to wit: *509 alcoholism. On September 16, 1996, the defendants brought the instant motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6). The defendants argue that Campau has failed to exhaust his administrative remedies by failing to timely file a claim with the EEOC and that dismissal is, therefore, appropriate pursuant to Federal Rule of Civil Procedure ("FRCP") 12(b)(1) as this court lacks subject matter jurisdiction. Alternatively, the defendants argue that the instant complaint should be dismissed pursuant to 12(b)(6) based on the doctrines of res judicata and collateral estoppel. The defendants contend that the instant ADA claims are the same allegations as the MHCRA claims which were asserted in plaintiff's state court motion to amend the complaint and which were subsequently denied by the Circuit court on the "merits." This court heard oral argument on November 6, 1996.

## II. Legal Standard

Federal Rule of Civil Procedure 12(b)(6) authorizes the district courts to dismiss any complaint which fails "to state a claim upon which relief can be granted." Rule 12(b)(6) affords a defendant an opportunity to test whether, as a matter of law, the plaintiff is entitled to legal relief even if everything alleged in the complaint is true. In applying the standards under Rule 12(b)(6), the court must presume all well-pleaded factual allegations in the complaint to be true and draw all reasonable inferences from those allegations in favor of the non-moving party. _Mayer v. Mylod_, 988 F.2d 635, 638 (6th Cir.1993); _Miller v. Currie_, 50 F.3d 373, 377 (6th Cir.1995). The court need not, however, accord the presumption of truthfulness to any legal conclusion, opinions or deductions, even if they are couched as factual allegations. _Western Mining Council v. Watt_, 643 F.2d 618, 629 (9th Cir.1981); _Mitchell v. Archibald & Kendall, Inc._, 573 F.2d 429, 432 (7th Cir.1978); _Sexton v. Barry_, 233 F.2d 220, 223 (6th Cir.1956). Dismissal for failure to state a claim is disfavored:

> [A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.

_Conley v. Gibson_, 355 U.S. 41, 45-46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). _See also Cameron v. Seitz_, 38 F.3d 264, 270 (6th Cir.1994) (stating that a motion to dismiss should be denied unless "it is clear that the plaintiff can prove no set of facts in support of [its] claim that would entitle [it] to relief.").

## III. Analysis

## 1. Failure to Exhaust Administrative Remedies

At the outset, it should be noted that while the defendants correctly argue that Campau's failure to exhaust his administrative remedies, by failing to timely file a charge of discrimination with the EEOC, is a proper ground for dismissal, they incorrectly argue that such a dismissal should be made pursuant to FRCP 12(b)(1) based on this court's lack of subject matter jurisdiction. The United States Supreme Court, in _Zipes v. Trans World Airlines, Inc._, 455 U.S. 385, 393, 102 S.Ct. 1127, 1132, 71 L.Ed.2d 234, 243 (1982), held that "filing a timely charge of discrimination with the EEOC is not a jurisdictional prerequisite to suit in federal court, but a requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling." _See also Wright v. Tennessee_, 628 F.2d 949, 953 (6th Cir.1980). Accordingly, this court will find that Campau's complaint should be dismissed for failure to exhaust administrative remedies pursuant to FRCP 12(b)(6).

The ADA allows a plaintiff to bring suit within 180 days after the alleged act of discrimination. However, if the plaintiff initially filed a complaint with a state or local Fair Employment Practice agency ("FEP Agency") with authority to adjudicate the claim, he or she is allotted 300 days from the date of the alleged discrimination within which to file a charge of employment discrimination with the EEOC. 42 U.S.C. § 2000e-5(e).[FN4] *510 Moreover, in a deferral state, such as Michigan, where there is an agreement between the EEOC and the FEP agency to permit a claimant to file a charge with the EEOC in lieu of first filing with the FEP agency, a filing with the EEOC is timely if it is done within 300 days of the alleged violation even if the claimant does not first file with a state or local agency. _See_ 29 C.F.R. § 1601.13.[FN5]

FN4. 42 U.S.C. § 2000e-5(e) states, in pertinent part:A charge under this section shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred ... except that in a case of unlawful employment practice with respect to which the person aggrieved has initially instituted proceedings with a State or local agency with authority to grant or seek relief from such practice or to institute criminal proceedings with respect thereto upon receiving notice thereof, such charge shall be filed by or on behalf of the person aggrieved within three hundred days after the alleged unlawful employment practice occurred....

FN5. 29 C.F.R. § 1601.13 provides, in pertinent part, that:(c) *Agreements with Fair Employment Practice agencies.* Pursuant to section 705(g)(1) and section 706(b) of title VII, the Commission shall endeavor to enter into agreements with FEP agencies to establish effective and integrated resolution procedures. Such agreements may include, but need not be limited to, cooperative arrangements to provide for processing of certain charges by the Commission, rather than by the FEP agency during the period specified in section 706(c) and section 706(d) of title VII.

[1] It is well-settled that the statutory period for filing an EEOC charge begins to run on the date that a plaintiff receives notice of termination, not when his employment actually ceases. *See Janikowski v. Bendix Corp.,* 823 F.2d 945, 947 (6th Cir.1987) (citing cases). In the instant case, notwithstanding Campau's "discovery rule" and equitable tolling arguments to the contrary, *see* discussion *infra,* the statutory period began to run on April 4, 1995, the day that Campau was notified that he would be terminated effective August 4, 1995.[FN6] As such, an EEOC charge was required to be filed by January 29, 1996 which is 300 days from April 4, 1995, the day Campau was notified of his termination. Since plaintiff only filed his EEOC charge on June 11, 1996, that filing was untimely and the instant complaint should be dismissed, pursuant to 12(b)(6) for failure to exhaust administrative remedies.

FN6. Although counsel for the defendants argued at oral argument that Sixth Circuit caselaw prescribes that the statutory period begins to run upon notice of termination, not when employment ceased, counsel has nevertheless acquiesced to use August 6, 1996, the date that Campau wrote on his EEOC complaint as his last day of work, as the beginning of the statutory period. Irrespective of what counsel is willing to concede, this court is not prepared to do the same and finds that the statutory period started to run on April 4, 1995.

Campau, however, contends that the statutory 300-day limit should be "equitably tolled" because he was unable to "discover" facts sufficient to allege a claim under the ADA until the depositions of Drs. Patel and Pitts. Specifically, Campau argues that because he did not know that the defendants allegedly perceived that Campau was an alcoholic until February 23, 1996, the date of Dr. Pitts' deposition, the statutory time limit should be tolled and should not begin to run until that date. In that deposition, Campau argues, Dr. Pitts " *confirmed* [that] ... Mr. Campau's alcoholism was a substantial factor in the decision to terminate the plaintiff." (emphasis added). Alternatively, Campau argues that the statutory time limit should be tolled until November 14, 1995, the date of Dr. Patel's deposition, when Campau claims he became aware that "a reason for [Dr. Patel's] decision to terminate [Campau] was his perception of [Campau's] alcoholism." (emphasis supplied by Campau). Campau concludes that by applying "equitable tolling" to either date, Campau falls within the 300 day filing deadline because he filed on June 11, 1996 which is still less than 300 days after either the November 14, 1995 deposition or the February 2, 1996 deposition.

It is apparent, however, that Campau has confused two closely related doctrines, namely, the discovery rule and equitable tolling. In addition, Campau misapprehends how the equitable remedy of tolling, even if it is applicable in this instance, would operate.

## a. The Discovery Rule

[2] ☑ [3] ☑ [4] ☑ The essence of Campau's argument is that he did not "discover," until the depositions of Drs. Patel and Pitts, that he had been discriminately discharged and therefore *511 the 300 day filing deadline should be tolled up to that time. To the extent that Campau is making a "Discovery Rule" type argument, that argument must fail. The discovery rule "postpones the beginning of the limitations period from the date when the plaintiff is wronged to the date when he discovers he has been injured...." *Cada v. Baxter Healthcare Corp., 920 F.2d 446, 450 (7th Cir.1990)* (Posner, J.), *cert. denied, 501 U.S. 1261, 111 S.Ct. 2916, 115 L.Ed.2d 1079 (1991).* "It is not the date on which the wrong that injures the plaintiff occurs, but the date-often the same, but sometimes later-on which the plaintiff discovers that he has been injured." *Id.* For instance, where an employer decides to terminate an employee for an allegedly discriminatory reason but does not convey to the employee the decision to terminate him until a later date, the limitations period would begin to run on the date that the employee is notified of his termination and not on the date that the decision to terminate was made. Furthermore, it is the plaintiff's awareness of *actual* injury, as opposed to *legal* injury, that suffices to trigger the running of the statutory period. *See Oshiver v. Levin, Fishbein, Sedran & Berman, 38 F.3d 1380, 1386 (3rd Cir.1994)* (citing *Cada, 920 F.2d at 450).*

[5] ☑ The discovery rule is not applicable in this instance. The discovery rule is only concerned with the date of actual injury since the purpose of the rule is to determine the accrual date of the claim for purposes of when the statute of limitations begins to run. *See Merrill v. Southern Methodist University, 806 F.2d 600, 604-05 (5th Cir.1986).* Simply put, the accrual date in the instant case is the date of firing, April 4, 1995, since it was on that date that Campau became aware (1) that he had *actually* been injured, i.e., discharged, and (2) that this injury had been caused by another party's conduct. *Oshiver, 38 F.3d at 1391.* The accrual date is not the date that the termination took effect, i.e. August 4, 1996, and it most certainly is not the date Campau claims he became aware of an alleged legal wrong against him, i.e. either November 14, 1995 or February 2, 1996. As such, Campau's discovery rule argument must fail.

## b. Equitable tolling

[6] ☑ [7] ☑ Equitable tolling "permits a plaintiff to avoid the bar of the statute of limitation if despite all due diligence he is unable to obtain vital information bearing on the existence of his claim." *Cada, 920 F.2d at 451.* Equitable tolling is inappropriate where a plaintiff has either actual or constructive notice of his rights. *Jackson v. Richards Medical Co., 961 F.2d 575 (6th Cir.1992).*

[8] ☑ Campau's equitable tolling argument is that he was unable to ascertain the facts necessary to file an EEOC complaint until February 2, 1996 when he "confirmed" that he was allegedly discharged due to a perceived handicap of alcoholism. Campau contends that while he learned, on November 14, 1995, that " *a* " reason for his termination was the defendants' alleged perception of his alcoholism, he was not able to "confirm" that fact until the February 2, 1996 deposition of Dr. Pitts.

Assuming, *arguendo*, that Campau exercised reasonable diligence, an assumption that is, nonetheless, unsupported by the submissions to this court,[FN7] his argument that he was not able to "confirm" the alleged discriminatory reason for discharge is, nevertheless, unavailing. As Judge Posner

stated in *Cada*: "If a plaintiff were entitled to have all the time he needed to be *certain* his rights had been violated, the statute of limitations would never run-for even after judgment, there is no certainty." *Cada,* 920 F.2d at 451 (emphasis in the original). Judge Posner continued: "And remember that we are speaking not of a judicial complaint, but of an administrative complaint. There is no duty of precomplaint inquiry in EEOC proceedings as distinct from federal court actions ( Fed.R.Civ.P. 11)." *Id.* at 452. Here, *512 there is no reason why Campau could not have prepared an adequate administrative complaint within days of the November 14, 1995 deposition once he learned that " *a* " reason for the defendants decision to terminate him was, allegedly, their perception that Campau was an alcoholic.

FN7. Campau does not suggest, either in his complaint or in the instant pleadings, that he even inquired as to the reason for his termination. However, at oral argument, Campau's counsel represented to the court that Campau had inquired as to the reason for his termination and was told that it was due to the fact that OHPC could not obtain liability insurance as long as Campau was in their employ.

[9]   ☑ As such, even if this court assumes that equitable tolling is warranted until the November 14, 1995 deposition, Campau, nevertheless, misstates his rights under that doctrine. Unlike the situation of equitable estoppel,<sup>FN8</sup> where a fraudulent concealment by the employer is shown, thereby entitling the court to subtract from the period of limitation the entire period in which the tolling condition is in effect, it is not at all clear that equitable tolling-a doctrine that adjusts the rights of two innocent parties-is as generous. *Cada,* 920 F.2d at 452. In such circumstances, the negligence of the party invoking the doctrine of equitable tolling, i.e. Campau's neglect in failing to file within a reasonable time after learning of the allegedly discriminatory reason for discharge, can tip the balance against the application of the doctrine. *Id.* at 453. As Judge Posner stated:

FN8. Equitable estoppel, also known as fraudulent concealment, is not limited to the limitations context and is frequently mislabelled "equitable tolling." *Allen v. Diebold, Inc.,* 807 F.Supp. 1308, 1314 (N.D.Ohio 1992) *aff'd* 33 F.3d 674 (6th Cir.1994). Equitable estoppel arises when "the defendant takes active steps ... above and beyond the wrongdoing upon which plaintiff's claim is founded to prevent the plaintiff from suing in time." *Cada,* 920 F.2d at 451. *See also Pinney Dock and Transport Co. v. Penn Central Corp.,* 838 F.2d 1445, 1471-72 (6th Cir.1988). Equitable estoppel presupposes that the plaintiff has discovered or should have discovered that the defendant has injured him, and focusses on the efforts-beyond the wrongdoing which plaintiff's claim is founded on-to prevent the plaintiff from suing in time. *See Cada,* 920 F.2d at 450-51. For example, the accrual of Campau's cause of action would be postponed if his employers had told him that they would not plead a limitations defense or provided Campau with forged documents which negated any basis for supposing that Campau's termination was related to his perceived alcoholism. *See id.* These efforts by the defendants must be viewed separately from the decision to terminate a plaintiff, even if the termination is a pretext for discrimination. *Id.* As such, any attempt by Campau to bring himself within the equitable estoppel doctrine by contending that the circumstances of his termination was a ruse to conceal the intent to fire him because of his perceived alcoholism improperly merges the substantive wrong with the tolling doctrine and must, accordingly, fail. *See id.* at 451. As Judge Posner stated: "It implies that a defendant is guilty of fraudulent concealment unless it tells the plaintiff, 'We're firing you because of your age.' It would eliminate the statute of limitation in age discrimination cases." *Id.* Clearly, Campau cannot advance an equitable estoppel argument on the instant facts. Instead, Campau's contentions are more properly put forth under the doctrine of equitable tolling where there is no allegation of impropriety on the defendant's part. *Hill v. U.S. Dept. of Labor,* 65 F.3d 1331, 1335 n. 2 (6th Cir.1995) (citing *Cada,* 920 F.2d at 451).

We do not think equitable tolling should bring about an automatic extension of the statute of limitations by the length of the tolling period or any other definite term. (citation omitted). It is, after all, an equitable doctrine. It gives the plaintiff extra time if he needs it. If he doesn't need it there is no basis for depriving the defendant of the protection of the statute of limitations. Statutes of limitations are not arbitrary

obstacles to the vindication of just claims, and therefore they should not be given a grudging application. They protect important social interests in certainty, accuracy, and repose. The statute of limitations is short in [handicapper] discrimination cases as in most employment cases because delay in the bringing of suit runs up the employer's potential liability; every day is one more day of backpay entitlements. We should not trivialize the statute of limitations by promiscuous application of tolling doctrines.

* * * * * *

Since it is rare that by the end of the day of the adverse action the plaintiff will have all the requisite information, the automatic-extension rule would extend the statute of limitations in virtually all cases, making the ostensibly fixed deadline illusory.

* * * * * *

When as here the necessary information is gathered after the claim arose but before the statute of limitations has run, the presumption should be that the plaintiff could bring suit within the statutory period and should have done so.

Cada, 920 F.2d at 452-53.

Judge Posner concluded, and at least one district court in the Eastern District of Michigan*513 has agreed, that "a plaintiff who invokes equitable tolling to suspend the statute of limitation must bring suit within a reasonable time after he has obtained ... the necessary information." Cada, 920 F.2d at 453. See also Sherman v. Optical Imaging Systems, Inc., 843 F.Supp. 1168, 1180 (E.D.Mich.1994) (agreeing with Judge Posner's analysis).

In this case the time between Campau's obtaining the "necessary information," i.e. November 14, 1995 (more than two months before the statutory period which ran on January 29, 1996) and the time he filed his EEOC complaint, June 11, 1996, was almost seven months. Such delay evidences "a remarkable degree of lethargy in pursuing claims which should, by the righteous indignation such claims oft-times evoke, cry out for immediate protest." Allen, 807 F.Supp. at 1319. As such, this court finds that even if Campau was unable, despite all due diligence, to obtain vital information on the existence of his claim until November 15, 1995, this seven-month delay thereafter in filing charges with the EEOC is not, under any set of facts, reasonable and therefore a dismissal with prejudice is mandated.[FN9] See Id. See also Sherman, 843 F.Supp. at 1180.

FN9. Even if this court were to assume that Campau did not obtain the necessary information to file an EEOC charge until after the February 2, 1996 deposition, a finding that this court is not prepared to make, this court would still conclude that dismissal is warranted. In that case plaintiff's delay in filing an EEOC charge would have been more than four months, a delay which this court would still find to be unreasonable.

Moreover, any argument by Campau that he was not "sitting on his hands" during this seven month period, as evidenced by his pursuit of the state court action, is unavailing. Even if this court assumed that Campau sufficiently preserved his right to equitable tolling while he pursued his state court action, a finding that this court is not inclined to make in light of the dearth of caselaw supporting that argument,[FN10] Campau, nevertheless, cannot satisfactorily explain why he waited for another one and half months after

the entire state action was dismissed, on April 29, 1996, to file his complaint with the EEOC on June 11, 1996. Such a delay is likewise unreasonable under the circumstances of this case and therefore dismissal is appropriate.

FN10. Plaintiff directs this court to *Irwin v. Dept. of Veterans Affairs*, 498 U.S. 89, 111 S.Ct. 453, 112 L.Ed.2d 435 (1990). However, the Court in *Irwin* actually held that: "We have generally been much less forgiving in receiving late filings where the claimant failed to exercise due diligence in preserving his legal rights." *Id.* at 96, 111 S.Ct. at 458. Clearly, plaintiff, in order to preserve his legal rights under the ADA, was required to file an EEOC complaint within a reasonable time after obtaining the necessary information which would bear on an ADA claim. Maintaining a state court action is not a sufficient exercise of due diligence to preserve Campau's legal rights under an ADA claim.

## 2. Res Judicata and Collateral Estoppel

Because this court finds that plaintiff has failed to exhaust his administrative remedies, it need not address the defendants' res judicata and collateral estoppel arguments.

## Conclusion

In sum, because plaintiff failed to timely file charges of discrimination with the EEOC and because he is not entitled to the application of any equitable principles which would excuse his tardiness, the defendants' motion to dismiss will be granted pursuant to FRCP 12(b)(6) for plaintiff's failure to exhaust administrative remedies.

## *ORDER*

**IT IS HEREBY ORDERED** that the defendants', ORCHARD HILLS PSYCHIATRIC CENTER, KENNETH E. PITTS and HITEN C. PATEL, motion to dismiss is **GRANTED** and plaintiff, THOMAS A. CAMPAU's claims remaining before this court are **DISMISSED.**

**SO ORDERED.**

E.D.Mich.,1996.
Campau v. Orchard Hills Psychiatric Center
946 F.Supp. 507, 19 A.D.D. 1056

Motions, Pleadings and Filings (Back to top)

• 4:96cv40310 (Docket) (Aug. 27, 1996)
END OF DOCUMENT

Exhibit - 5

Discovery Delays – State of Michigan

[Cited 21 times for this legal issue]

Stephens v. Dixon, 536 N.W.2d 755 Mich.,1995

In deciding whether to strictly enforce period of limitation or impose discovery rule, court must

carefully balance when plaintiff learned of her injuries, whether she was given fair opportunity to

bring her suit, and whether defendant's equitable interests would be unfairly prejudiced by tolling

statute of limitations. M.C.L.A. § 600.5827.

[Cited 18 times for this legal issue]

Moll v. Abbott Laboratories, 506 N.W.2d 816 Mich.,1993

Once plaintiff is aware of injury and its possible cause, plaintiff is aware of possible cause of

action for purposes of commencement of statute of limitations.

[Cited 12 times for this legal issue]

City of Huntington Woods v. Wines, 332 N.W.2d 557 Mich.App.,1983

Limitation period commences when the person knows of the act which caused his injury and has

good reason to believe that the act was improper or was done in an improper manner.

[Cited 10 times for this legal issue]

Jackson County Hog Producers v. Consumers Power Co., 592 N.W.2d 112 Mich.App.,1999

If the discovery rule applies, a claim does not accrue for the purpose of the running of the

limitation period until a plaintiff discovers, or through the exercise of reasonable diligence

should have discovered (1) an injury and (2) the causal connection between the injury and a

defendant's breach of duty.

Exhibit - 6

United States District Court,
E.D. Michigan,
Northern Division.

# Linda ROSE, Jennifer Cradit, Sylvia Denise Braddock, Lisa Renee Brandimore, Dwayne Butterfield, Bobbie Wayne Carter, Daniel Wray Clayton, Joshua Fuller, Nicholas Anthony Giles, Willie Louis Hendricks, Tanisha Ramon Johnson, Robert Allen Kelsey, Sue Ann Letterman, Donna Lynn Quarles, Gregory Louis Schultz, Amanda Rae Shinaver, Dwayne Alann Simmons, Robin Renee Thomas, Joshua Allen Weigant, Justin Anderson, Craig Mason, and Matthew Starkweather, Plaintiffs,

## v.

# SAGINAW COUNTY, Saginaw County Sheriff's Department, Municipal Governmental Entities, Charles Brown, and Officers John Doe, and Jane Doe, (in their individual capacity), jointly and severally, Defendants.

No. 01-10337-BC.
Nov. 21, 2005.

**Background:** Former jail detainees brought suit against county, claiming that practice of forcing detainees in administrative segregation to be naked violated their constitutional rights. Following determination that practice was unconstitutional, 353 F.Supp.2d 900, detainees moved for class certification or joinder, and officials moved to amend affirmative defenses.

**Holdings:** The District Court, Lawson, J., held that:
(1) class would not be certified;
(2) equitable **tolling** of statute of limitations would not be permitted, to allow for joinder of additional plaintiffs;
(3) former inmates were not subject to exhaustion of administrative remedies requirements of Prison Litigation Reform Act (PLRA);
(4) damages limitation provisions of PLRA were not applicable to former inmates; and
(5) in any event, failure to exhaust defense had been waived by delay in assertion.

Motions denied.

# West Headnotes

[1] ☑ KeyCite Citing References for this Headnote

⟲~**170A** Federal Civil Procedure
  ⟲~**170AII** Parties
    ⟲~**170AII(D)** Class Actions
      ⟲~**170AII(D)2** Proceedings
        ⟲~**170Ak176** k. Identification of Class; Subclasses. <u>Most Cited Cases</u>

Definition of class is a prerequisite to certification of class action. <u>Fed.Rules Civ.Proc.Rule 23, 28 U.S.C.A.</u>

[2] ☑ KeyCite Citing References for this Headnote

⟲~**170A** Federal Civil Procedure
  ⟲~**170AII** Parties
    ⟲~**170AII(D)** Class Actions
      ⟲~**170AII(D)3** Particular Classes Represented
        ⟲~**170Ak186.10** k. Prisoners and Inmates. <u>Most Cited Cases</u>

Lack of precise definition of proposed class precluded class action certification of suit by female former county jail inmates, seeking damages after being left naked in administrative segregation portion of jail; proposed class would arguably include post-conviction detainees and those allowed paper gowns, requiring court to revisit decision already made that practice was unconstitutional as applied to pre-conviction detainees and those left completely naked. <u>Fed.Rules Civ.Proc.Rule 23, 28 U.S.C.A.</u>

[3] ☑ KeyCite Citing References for this Headnote

⟲~**170A** Federal Civil Procedure
  ⟲~**170AII** Parties
    ⟲~**170AII(D)** Class Actions
      ⟲~**170AII(D)3** Particular Classes Represented
        ⟲~**170Ak186.10** k. Prisoners and Inmates. <u>Most Cited Cases</u>

Prerequisites for class action, set forth in federal procedure rule, were not satisfied in suit by former county jail detainees, seeking damages after they were left naked in administrative segregation section of jail; numbers were not sufficiently high to render separate suits impractical, and commonality and typicality requirements were not satisfied due to differences in claims by pre and post-conviction detainees, and those left totally naked versus those allowed paper gown. <u>Fed.Rules Civ.Proc.Rule 23(a)(1-4), 28 U.S.C.A.</u>

[4] ☑ KeyCite Citing References for this Headnote

⟲~**241** Limitation of Actions
  ⟲~**241II** Computation of **Period of Limitation**

⌐~241II(G) Pendency of Legal Proceedings, Injunction, Stay, or War
&~241k104.5 k. Suspension or Stay in General; Equitable **Tolling**. Most Cited Cases

Equitable **tolling** of statute of limitations would not be applied, to allow for joinder of post-conviction detainees to group of female pretrial detainees seeking damages after being forced to remain naked in administrative segregation area of county jail.

[5] ☑ KeyCite Citing References for this Headnote

⌐~78 Civil Rights
&~78III Federal Remedies in General
&~78k1314 Adequacy, Availability, and Exhaustion of State or Local Remedies
&~78k1319 k. Criminal Law Enforcement; Prisons. Most Cited Cases

⌐~310 Prisons ☑ KeyCite Citing References for this Headnote
&~310III Pretrial Detention
&~310k369 k. Access to Courts and Public Officials. Most Cited Cases
(Formerly 98k6)

Former inmates of county jail were not required to exhaust administrative remedies pursuant to Prison Litigation Reform Act (PLRA) before being allowed to sue under § 1983 and state law for damages arising from practice of requiring detainees in administrative segregation to be naked. 42 U.S.C.A. § 1983; Civil Rights of Institutionalized Persons Act, § 7(a), 42 U.S.C.A. § 1997e(a).

[6] ☑ KeyCite Citing References for this Headnote

⌐~78 Civil Rights
&~78III Federal Remedies in General
&~78k1458 Monetary Relief in General
&~78k1463 k. Mental Suffering, Emotional Distress, Humiliation, or Embarrassment. Most Cited Cases

⌐~115 Damages ☑ KeyCite Citing References for this Headnote
&~115III Grounds and Subjects of Compensatory Damages
&~115III(A) Direct or Remote, Contingent, or Prospective Consequences or Losses
&~115III(A)2 Mental Suffering and Emotional Distress
&~115k57.12 k. Particular Cases in General. Most Cited Cases

Limitations of damages provision of Prison Litigation Reform Act (PLRA), limiting recoveries for mental or emotional injury to cases where prior physical injury could be shown, applied only to claimants who were actually incarcerated, and did not apply to former inmates, in action under § 1983 and state law. 42 U.S.C.A. § 1983; Civil Rights of Institutionalized Persons Act, § 7(e), 42 U.S.C.A. § 1997e(e).

[7] ☑ KeyCite Citing References for this Headnote

⌐~78 Civil Rights
&~78III Federal Remedies in General
&~78k1392 Pleading
&~78k1398 k. Defenses; Immunity and Good Faith. Most Cited Cases

⌐~310 Prisons ☑ KeyCite Citing References for this Headnote

   ☞**310II** Prisoners and Inmates
     ☞**310II(H)** Proceedings
      ☞**310k316** Exhaustion of Other Remedies
       ☞**310k318** k. Particular Cases. <u>Most Cited Cases</u>
       (Formerly 98k6)

Prison officials waived Prison Litigation Reform Act (PLRA) failure to exhaust administrative remedies affirmative defense, sought to be applied against inmates challenging requirement that they remain naked while in administrative segregation, when defense was not asserted until three years after filing of amended complaint, in action under <u>§ 1983</u> and state law. <u>42 U.S.C.A. § 1983</u>; Civil Rights of Institutionalized Persons Act, § 7(e), <u>42 U.S.C.A. § 1997e(e)</u>.

**\*269** Christopher J. Pianto, Fletcher, Wolf, Flint, MI, <u>Michael L. Pitt</u>, <u>Peggy G. Pitt</u>, Pitt, Dowty, <u>Stephen Wasinger</u>, Wasinger, Kickham, Royal Oak, MI, for Plaintiffs.

<u>James E. Tamm</u>, <u>Richard V. Stokan, Jr.</u>, O'Connor, Degrazia, Bloomfield Hills, MI, <u>Peter C. Jensen</u>, Currie, Kendall, Saginaw, MI, for Defendants.

## *OPINION AND ORDER DENYING PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND DENYING DEFENDANTS' MOTION TO AMEND AFFIRMATIVE DEFENSES*

## <u>LAWSON</u>, District Judge.


This matter is before the Court on various procedural motions filed by the parties. Although the Court previously bifurcated the case and determined the liability question upon adjudication of the parties' cross motions for summary judgment, through the present motions-the plaintiffs' motion for class certification and the defendants' motion for leave to file new affirmative defenses-the parties seek to unwind the litigation as it has proceeded thus far and litigate different theories involving additional claimants. The Court heard the parties arguments in open court on November 9, 2005 and now finds that the plaintiffs have not demonstrated the propriety of certifying the matter as a class action, the plaintiffs' motion is filed too late, equitable estoppel or tolling does not save it because they have submitted no evidence of wrongful behavior by the defendant, the defendants' proposed amended affirmative defenses would be futile because (with one exception) they would not bar the plaintiffs' claims, and the request to amend is untimely. The Court, therefore, will deny the parties motions.


### I.

The plaintiffs initial complaint was filed on October 9, 2001. It named as plaintiffs Linda Rose, Jennifer Cradit, and Jane Doe Detainees of the Saginaw County Jail. The complaint sought class action certification. According to the case management and scheduling order, as amended by this Court's July 23, 2002 order, the plaintiffs were required to file any motion for class certification by September 13, 2002.


The present plaintiffs, twenty-two individuals, claim they were subjected to an unconstitutional policy by officials at the Saginaw County jail when they were held as pretrial detainees at various times between May 1999 and December 2001. They contend that the Saginaw County sheriff instituted a policy and practice of housing uncooperative and disruptive detainees in administrative <u>segregation cells</u>; and jail

personnel would take all of the clothing from such detainees so that they were naked for the time that they spent in administrative segregation. The complaint and its several amendments assert claims under 42 U.S.C. § 1983 and state law.

At a scheduling conference on May 14, 2002, the defendants stated that only thirty prisoners housed as pretrial detainees had been put in a cell naked over the prior three years. The defendants claimed to have eliminated the practice after the suit was filed. The plaintiffs failed to file a motion for class *270 certification prior to September 13, 2002, apparently based on the defendants' representation that only thirty people were affected by the policy.

The plaintiffs amended their complaint from time to time with leave of court in order to add additional plaintiffs who emerged during the pendency of the case and alleged that they also were subjected to the naked detention policy. On December 9, 2002, the plaintiffs filed their sixth amended complaint. The amended complaint added more named plaintiffs and repeated the allegations that the plaintiffs, when detained while awaiting arraignment or trial, were forced to disrobe in the presence of corrections officers even though there was no reason to believe the plaintiffs were dangerous or possessed weapons. The amended complaint focused on the viewing of the plaintiffs' naked bodies by jail personnel and alleged constitutional violations, gross negligence, invasion of privacy, assault and battery, intentional infliction of emotional distress, and violation of the Michigan Elliott Larson Civil Rights Act, Mich. Comp. Laws. § 37.2101 et seq. This version of the complaint omitted reference to class action certification, but it did request injunctive relief to prevent the defendants from engaging in the alleged illegal behavior.

In February 2003, a local television station showed a story about the naked segregation policy. The plaintiffs' lawyers apparently received a number of phone calls after the story aired, leading them to dozens of potential plaintiffs. The plaintiffs have collected data from these potential plaintiffs, which they have presented to the court in a chart attached to the motion.

On December 22, 2004, the plaintiffs filed a motion to join even more parties as plaintiffs. They argued that the defendant had misrepresented the extent to which the naked segregation policy had been applied. The plaintiffs stated this misrepresentation prevented them from discovering 100 additional potential grievants in a timely manner and caused them to withdraw their class action claims. The plaintiffs' motion requested permission to add additional plaintiffs discovered some time after the filing of the lawsuit. The defendants opposed the motion stating the plaintiffs had not shown good cause, and the defendants would be prejudiced if the motion were granted. The defendant also claimed many of the new plaintiffs' claims would be barred by the statute of limitations.

On January 26, 2005, the Court filed an opinion adjudicating the parties' cross motions for summary judgment. The Court addressed and resolved all of the liability issues in the case, holding that the naked detention policy was unconstitutional as applied to pretrial detainees. The Court dismissed the other counts. Rose v. Saginaw County, 353 F.Supp.2d 900 (E.D.Mich.2005). The Court also denied the plaintiffs' motion to add additional parties plaintiff and stated that "[a]dding new parties as plaintiffs would serve to further complicate the litigation" because extensive discovery had already taken place and the defendants' assertion that the statute of limitations barred many of the new plaintiffs' claims. Id. at 926. The Court suggested that any new claimants not barred by the statute could file their own lawsuits.

On April 29, 2005, the plaintiffs filed a motion for class certification or, in the alternative, for joinder. The plaintiffs submitted an affidavit of Peggy Goldberg Pitt, a lawyer working on the case. Attached to the affidavit is a chart listing plaintiffs and potential plaintiffs, a summary of what happened to them, the date of their detention, and other information. The list indicates that sixty-four people were subject to the naked detention policy. Twenty of these people are original plaintiffs in the case, leaving forty-four new possible

plaintiffs. The affidavit states that twenty-three people were segregated while naked from 2002 through the date of the motion, despite the defendants claims that they have ended the naked detention policy.

The defendants dispute much of the data included in the chart and point out that the chart contains either unsworn averments or statements not based on firsthand knowledge of any of these incidents actually happening. The defendants state they ended the unconstitutional policy in November 2001 when this lawsuit was filed. They also contend that only seven of the new potential plaintiffs on the chart were actually pretrial detainees **\*271** when they were placed in administrative segregation cell. The other thirty-seven had been convicted of a criminal offense. Moreover, the defendants state, eleven of the potential plaintiffs were not even in the jail on the dates alleged according to jail records, and eight were never in administrative segregation.

In the mean time, on July 25, 2005 the defendants filed a motion to amend their affirmative defenses to claim that the Prisoner Litigation Reform Act (PLRA), 42 U.S.C. § 1997e(a), requires the plaintiffs to exhaust their remedies prior to filing suit in court and limits damages where no physical injury has been sustained. The plaintiffs contest this motion on the ground that it is untimely and the PLRA does not apply to them.

## II.

[1] ☑ In order to be certified as a class action under Federal Rule of Civil Procedure 23, the moving party must establish that the class meets the numerosity, commonality, typicality, and adequacy of representation requirements of Rule 23(a) and falls into one of the subcategories found in Rule 23(b). *Sprague v. General Motors Corp.*, 133 F.3d 388, 397 (6th Cir.1998). However, before the Court can assess the application of Rule 23' s elements, the moving party must offer a definition of the class itself. Without such a definition, a proper analysis of the utility and propriety of proceeding as a class action cannot be made. As explained by other district courts:

Rule 23(a) also contains an implicit requirement that the class be adequately defined and clearly ascertainable.... While the precise numbers of proposed class members need not be established, ... the class description must be sufficiently definite for the court to ascertain member status.

*Rink v. Cheminova, Inc.*, 203 F.R.D. 648, 659 (M.D.Fla.2001) (internal quotes and citations omitted).

Before the Court may certify a class pursuant to Rule 23, "the class definition must be sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member of the proposed class." 5 James W. Moore et al., Moore's Federal Practice et al. ¶ 23.21[1] (3d ed.1998). The identity of class members, moreover, must be ascertainable by reference to objective criteria.... A precise definition allows the Court to determine who would be entitled to relief, who would be bound by a judgment, and who is entitled to notice of the action. *See* 5 Moore's Federal Practice ¶ 23.21[3].

*Garrish v. United Auto., Aerospace, and Agric. Implement Workers of Am.*, 149 F.Supp.2d 326, 330-31 (E.D.Mich.2001) (citations omitted).

[2] ☑ The lack of a precise definition compounds the problem in a case in the procedural posture of this one because the previous liability determination necessarily turned on the status and circumstances surrounding the detention of the named plaintiffs. Where the implied definition of the class advanced by the plaintiffs would allow others who do not share all of the features of those named plaintiffs to benefit from that ruling, the Court's liability holding could be distorted.

At oral argument, the plaintiffs conceded that they had not offered a specific class definition in their motion papers. The Court directed them to submit a definition, and the one furnished after the argument reads as follows:

All detainees who were placed in administrative segregation in the Saginaw County Jail from October 19, 1998 and were stripped of their clothing before being placed in administrative segregation pursuant to Defendants' policy.

Pls.' Supplemental Br. at 1. As discussed at oral argument, that definition certainly includes the named plaintiffs-and more. Despite the arguments of the plaintiffs to the contrary, the definition expands the class to deal with a broader group of persons that includes those who are materially different than the named plaintiffs in at least two respects: inmates who are not pretrial detainees; and persons placed in administrative segregation who were given "suicide gowns," that is, paper gowns that covered their private parts.

**\*272** The core holding of the liability opinion in this case was that the County's policy of removing all clothing from pretrial detainees housed in administrative segregation violated the detainees' due process rights, inasmuch as policy was an exaggerated response to the County's articulated concerns about suicide, the guards' safety, and administrative costs, and given the magnitude of the right to privacy in one's own body and availability of alternatives to the policy (such as suicide gowns); and the policy was unreasonable under the Fourth Amendment because the scope of the intrusion was substantial, and the detainees had a legitimate expectation that they would not be required to forfeit all clothing and covering, even for a brief time, when they had been detained for relatively minor violations, there was no individualized suspicion of drug, weapon, contraband possession, and there was no indication that they were suicidal. _Rose_, 353 F.Supp.2d at 922-23. The plaintiffs argue that in reaching that result, the Court cited cases that dealt with convicted inmates, such as _Cornwell v. Dahlberg_, 963 F.2d 912 (6th Cir.1992), _Kent v. Johnson_, 821 F.2d 1220 (6th Cir.1987), _Wilson v. City of Kalamazoo_, 127 F.Supp.2d 855 (W.D.Mich.2000), and _Everson v. Michigan Dept. of Corrections_, 391 F.3d 737 (6th Cir.2004). But those cases were cited for the sole proposition that "prisoners have a liberty and privacy interest in shielding their naked bodies from view by others, especially members of the opposite gender." _Rose_, 353 F.Supp.2d at 919. In order to determine whether a particular practice is unconstitutional, the Court must balance that interest against the competing consideration whether "the regulation is ... reasonably related to legitimate penological interests." _Turner v. Safley_, 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). In this case, the Court relied heavily on _Bell v. Wolfish_, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), in striking that balance, which discusses the rules applicable to pretrial detainees.

The difference between pretrial detainees-that is, those who are presumed innocent of crime-and convicted inmates who are sentenced to a punishment, might call upon the Court to weigh that balance on different scales. On the other hand, the interests might be identical. However, injecting the extra factor into this case by expanding the universe of possible plaintiffs makes this a different case than the one the Court decided in its summary judgment motion. It is that primary reason that impels the Court to view the plaintiffs' proposed class definition as problematical at this stage of the proceedings. In order to accommodate the definition, the Court must plow old ground and reassess the issues already decided in the summary judgment motions in a new light. Of course, the defendants quite properly could demand their right to be heard again since the case becomes a new and different lawsuit.

The court is simply unable to grant certification without a class definition "sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member of the proposed class." _Garrish_, 149 F.Supp.2d at 330-31. From the list of potential claimants submitted by the plaintiffs, it appears that the class they seek to have certified includes all detainees from 1998 to present who were sent to administrative segregation, either naked or with a paper gown, whether they were

pretrial or postconviction detainees, and whether or not they were exposed to members of the opposite sex.

The plaintiffs state in their reply brief that they "have not limited their claim to pretrial detainees." Pl.'s Reply at 4. However, all the named plaintiffs in the several amended complaints were pretrial detainees. In their motion for summary judgment, which resulted in a ruling that the policy was unconstitutional as applied to pretrial detainees, the plaintiffs stated, "Plaintiffs are pretrial detainees accused of misdemeanors, not felonies." Pl.'s Mot. Summ. J. at 9. The plaintiffs describe the policy as one that requires officers "to strip naked pretrial detainees for insubordination." Id. at 1. The argument section of their brief stated that the officers must have probable cause for "any significant pretrial restraint of liberty." Id. at 10. The brief contains an entire section about the punishment of people not convicted of any crime. Id. at 15-17. It plainly appears that the plaintiffs were arguing on behalf of a *273 group of plaintiffs defined as pretrial detainees who were stripped naked.

Certifying the plaintiffs' proposed class is not the superior method of addressing the issue of other individuals who claim a violation of their constitutional rights. Accepting the plaintiff's proposed class definition would require the Court to scuttle its previous decision and rebalance the factors it assessed when determining the constitutional issues under the Fourth Amendment and the Due Process Clause. The Court is not willing to pursue that course.

Attempting to define the class after the liability determination has been made creates additional problems with respect to the other requirements of Rule 23(a). In determining whether "the class is so numerous that joinder of all members is impracticable," the Court must consider the plaintiffs' submissions in light of the opinion deciding the cross motions for summary judgment. Although a strict numerical test does not exist to determine when the class is too numerous to join, BreMiller v. Cleveland Psychiatric Inst., 195 F.R.D. 1, 19 (N.D.Ohio 2000), there must be some evidence to establish generally that "the number of potential class members is large, even if plaintiffs do not know the exact figure." In re Consumers Power Co. Sec. Litig., 105 F.R.D. 583, 601 (E.D.Mich.1985). Even "[w]here the exact size of the class is unknown but general knowledge and common sense indicate that it is large, the numerosity requirement is satisfied." Orantes-Hernandez v. Smith, 541 F.Supp. 351, 370 (C.D.Cal.1982).

The plaintiffs argue that they have identified forty-four new possible plaintiffs. However, as the defendants point out, only seven of the new potential plaintiffs on the chart were actually pretrial detainees when they were placed in administrative segregation cell. It is not clear how many of those were given paper gowns when their clothing was taken. However, the Court is not satisfied that the number of potential new plaintiffs is so large that class certification is a preferred or joinder of all plaintiffs is impractical.

[3] ☑ The commonality requirement, that is, establishing that "there are questions of law or fact common to the class," Fed.R.Civ.P. 23(a), is also problematic, given the plaintiffs' proposed class definition. The Sixth Circuit has held that the commonality and typicality requirements tend to merge because "[b]oth serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." Rutherford v. City of Cleveland, 137 F.3d 905, 909 (6th Cir.1998) (quoting Gen. Tel. Co. of the Southwest v. Falcon, 457 U.S. 147, 157 n. 13, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982)). The Court does not believe it allowable to confound pretrial detainees and convicted inmates, as the plaintiffs propose to do, because each group presents different questions as to the application of custodial policies. The groups do not present common questions of law; different considerations may apply when balancing constitutional rights against legitimate penological interests.

As to the third element, a claim is typical if "it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory." *In re Am. Med. Sys., Inc.,* 75 F.3d 1069, 1082 (6th Cir.1996). Although the named plaintiffs' claims must fairly encompass the class members' claims, they need not always involve the same facts or law provided there is a common element of fact or law. *Senter v. General Motors Corp.* 532 F.2d 511, 525 n. 31 (6th Cir.1976). However, the potential difference between pretrial and post-conviction inmates, and those who were confined completely naked and those given paper gowns, presents distinguishing legal issues that upset the claim of typicality.

The fourth prerequisite for class certification is the adequate representation of the class by the class representatives. Adequate representation includes two inquiries: (1) whether the class counsel are "qualified, experienced and generally able to conduct the litigation" and (2) whether the class members have interests that are antagonistic to the other class members. **\*274** *Stout v. J.D. Byrider,* 228 F.3d 709, 717 (6th Cir.2000). "The bedrock requirement of adequacy is that the named representatives be a member of the class." *Rockey v. Courtesy Motors, Inc.,* 199 F.R.D. 578, 585 (W.D.Mich.2001). This factor likely is satisfied because the named plaintiffs occupy a smaller universe within the broader definition of class proposed.

The plaintiffs cite *Tardiff v. Knox County,* 365 F.3d 1 (1st Cir.2004), in support of their position that class certification is appropriate, but the Court reads that case as an illustration of the difficulty that can result from an attempt to broaden the class definition, as the plaintiffs here propose, after a decision on the merits that accounts for characteristics of the named plaintiffs not shared by the broader proposed class. In that case, the court of appeals affirmed district court orders certifying classes of pretrial detainees who were subjected to a strip search policy as part of a county jail's intake process. The district court had addressed the "complications" arising from the fact that the policy "might be lawful as to some groups of arrestees ... and not others ... by narrowing the class." *Id.* at 5. The court of appeals discussed the potential difficulties in class administration that might arise when individual class members present issues as to liability that are not common to the other members of the class. That possibility, the court believed, did not present an obstacle to class certification in the *beginning* of the case because the district court retained the option "to consider [further] narrowing or de-certifying the class." *Id.* at 6. Those options no longer exist in this case because the Court's opinion, discussed above, likely applies to a narrower range of detainees than the group proposed by the plaintiffs.

For these reasons, the Court will deny the motion to certify the action as a class action.

## III.

[4] ☑ The plaintiffs request in the alternative that they be allowed to amend their complaint to join additional plaintiffs and that the statute of limitations be **tolled** for the new claimants. That request was made earlier and denied as part of the Court's January 26, 2005 opinion. *See Rose,* 353 F.Supp.2d at 926. No reason has been presented to change that ruling now.

The plaintiffs claim they are not barred by the statute of limitations because the defendants' misbehavior prevented them from discovering these new potential plaintiffs in a timely fashion, making equitable **tolling** applicable. Equitable **tolling** requires proof that the defendants took affirmative steps to conceal the plaintiffs' cause of action and that the plaintiffs could not have discovered the cause of action despite exercising due diligence. *Jarrett v. Kassel,* 972 F.2d 1415, 1423-24 (6th Cir.1992).

The plaintiffs claim that they were misled by the defendants' assertion that only thirty people were affected by the policy. However, the defendants were working on the assumption, reasonably based on the plaintiffs' prior assertions and motions, that the class was limited to pretrial detainees. The plaintiffs have submitted no evidence that the group of pretrial detainees who were stripped naked and not given a paper gown is significantly larger than thirty people. Moreover, the comment allegedly was made by the defendants in May 2002. Many of the new people the plaintiffs want to add were incarcerated after that date and could not have been considered by the defendants at the time the comment was made.

The defendants state that the plaintiffs did not use due diligence and therefore do not qualify for equitable tolling. "If the plaintiff has delayed beyond the limitations period, he must fully plead the facts and circumstances surrounding his belated discovery 'and the delay which has occurred must be shown to be consistent with the requisite diligence.' " Campbell v. Upjohn Co., 676 F.2d 1122, 1127 (6th Cir.1982). The plaintiffs have not provided any information about steps it took to verify that the comment made by the defendant was correct or not.

Finally, if defenses against the statute of limitations could be brought in this case, they also could be advanced in a separate action by individual plaintiffs who claim that they were aggrieved by the County's detention policy. The Court will not permit a further amendment of the complaint.

## *275 IV.

The defendants likewise seek to amend their pleadings. They contend that the plaintiffs were required to exhaust their administrative remedies under the Prisoner Litigation Reform Act prior to filing suit, see 42 U.S.C. § 1997e(a), and because the defendants failed to raise that defense earlier in the litigation, they seek leave to amend their answer so they can raise it now. They also wish to plead the PLRA's limitation on damages, see 42 U.S.C. § 1997e(e), as an affirmative defense.

Under Federal Rule of Civil Procedure 15(a), a party may amend its pleadings at this stage of the proceedings only after obtaining leave of court. Although the Rule provides that "leave of court shall be freely granted when justice so requires," leave may be denied on the basis of undue delay, bad faith by the moving party, repeated failure to cure defects by previously-allowed amendments, futility of the proposed new claim, or undue prejudice to the opposite party. Foman v. Davis, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962); Duggins v. Steak & Shake, Inc., 195 F.3d 828, 834 (6th Cir.1999); Fisher v. Roberts, 125 F.3d 974, 977 (6th Cir.1997). "Notice and substantial prejudice to the opposing party are critical factors in determining whether an amendment should be granted." Wade v. Knoxville Util. Bd., 259 F.3d 452, 458-59 (6th Cir.2001). The Rule does not establish a deadline within which a party must file a motion to amend. See Lloyd v. United Liquors Corp., 203 F.2d 789, 793 (6th Cir.1953) (reviewing a district court's denial of a motion to amend after the entry of summary judgment). However, the party seeking to amend should "act with due diligence if it wants to take advantage of the Rule's liberality." Parry v. Mohawk Motors of Michigan, Inc., 236 F.3d 299, 306 (6th Cir.2000). Thus, where "amendment is sought at a late stage in the litigation, there is an increased burden to show justification for failing to move earlier." Wade, 259 F.3d at 459. Courts are especially inclined to deny a motion brought under Rule 15 "if the moving party knew the facts on which the claim or defense sought to be added were based at the time the original pleading was filed and there is no excuse for his failure to plead them." 6 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane , Federal Practice and Procedure § 1487 (2d ed.1990); see Wade, 259 F.3d at 459 (finding undue delay where the plaintiff knew the facts forming the basis of the amended claims but failed to plead the claims in the original complaint).

The plaintiffs argue that the defendants should not be allowed to amend their affirmative defenses because the request comes too late, that is, six months after the liability opinion was filed, and the amendment would be futile because the PLRA does not apply to them. The Court agrees.

[5] ☑ The PLRA's exhaustion requirement reads as follows:

No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a). The plaintiffs argue that the statute does not apply to former prisoners, and the defendants contend that it does. The Sixth Circuit has not ruled on this issue.

By its terms, the statute applies to lawsuits brought by "a prisoner confined in any jail, prison, or other correctional facility." None of the named plaintiffs, save one, was an inmate at the time suit was filed; they all had been released. The statute has a temporal element in its language: it is directed to lawsuits by prisoners who are presently confined, not those who were confined at the time the cause of action arose or any other time.

That construction is consistent with the purpose of the PLRA, which, according to its sponsors, was enacted to curb abuses by prisoners filing frivolous lawsuits in the federal courts. For example, Senator Dole commented that "[t]his legislation is a new and improved version of S. 866, which I introduced earlier this year to address the alarming explosion in the number of frivolous lawsuits filed by State and Federal prisoners." *276 141 Cong Rec S14413 (daily ed. Sept. 27, 1995). Senator Kyl, a sponsor of an earlier version of the Bill, decried the proliferation of frivolous lawsuits by prison inmates, noting that "[f]iling frivolous civil rights lawsuits has become a recreational activity for long-term residents of our prisons." 141 Cong Rec S7526 (daily ed. May 25, 1995). The reforms introduced included the exhaustion requirement. Senator Kyl explained, "Section 7 will make the exhaustion of administrative remedies mandatory. Many prisoner cases seek relief for matters that are relatively minor and for which the prison grievance system would provide an adequate remedy." Id. at S7527. He based the need for such reform in part on the comment by Justice Rehnquist in his dissent in Cleavinger v. Saxner, where he observed, "With less to profitably occupy their time than potential litigants on the outside, and with a justified feeling that they have much to gain and virtually nothing to lose, prisoners appear to be far more prolific litigants than other groups in the population." Cleavinger, 474 U.S. 193, 211, 106 S.Ct. 496, 88 L.Ed.2d 507 (1985) (Rehnquist, J., dissenting) (emphasis added). It plainly appears that the purpose of the PLRA reforms was to curb the litigiousness of prisoners presently in custody.

The Sixth Circuit has observed that another purpose of the PLRA's exhaustion requirement was "to give increased powers to prisons so that they could solve their problems according to their own internal dispute resolution systems." Jones Bey v. Johnson, 407 F.3d 801, 807 (6th Cir.2005); see also Porter v. Nussle, 534 U.S. 516, 525, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002) (observing that by enacting the PLRA, "Congress afforded corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case. In some instances, corrective action taken in response to an inmate's grievance might improve prison administration and satisfy the inmate, thereby obviating the need for litigation"). That goal would not be achieved by requiring a plaintiff who no longer is part of the prison population to return to the institution to partake of an internal administrative dispute mechanism.

Other courts have reached the opposite view. *See, e.g., Morgan v. Maricopa County,* 259 F.Supp.2d 985, 991-92 (D.Ariz.2003); *Zehner v. Trigg,* 952 F.Supp. 1318, 1327 (S.D.Ind.1997), *aff'd,* 133 F.3d 459 (7th Cir.1997); *Kerr v. Puckett,* 967 F.Supp. 354, 361-62 (E.D.Wis.1997). However, those decisions appear to constitute a minority position, as several other courts have held that the PLRA applies only to inmates confined at the time the lawsuit is commenced. *See Page v. Torrey,* 201 F.3d 1136, 1140 (9th Cir.2000) (holding that the exhaustion requirement applies only to "individuals who, at the time they seek to file their civil actions, are detained as a result of being accused of, convicted of, or sentenced for criminal offenses"); *Greig v. Goord,* 169 F.3d 165, 167 (2d Cir.1999) (former prisoner not required to comply with PLRA); *Kerr v. Puckett,* 138 F.3d 321, 323 (7th Cir.1998) (same); *Doe v. Washington County,* 150 F.3d 920, 924 (8th Cir.1998) (same); *Kritenbrink v. Crawford,* 313 F.Supp.2d 1043, 1047-48 (D.Nev.2004) (stating that the "plain language of the statute" compels the "holding that the exhaustion requirement does not apply to former prisoners").

A district court in this circuit also has held that the PLRA does not apply to former inmates. *See Smith v. Franklin County,* 227 F.Supp.2d 667 (E.D.Ky.2002). In that case, the court observed that the reforms of the PLRA "will not be subverted by holding that the PLRA does not apply to former prisoners," and rejected the defendant's contention that the PLRA should be "stretched to include former prisoners." *Id.* at 675-76. The court reasoned:

[T]his Court finds Defendants' proposed interpretation to be nonsensical. To require former prisoners to initiate or pursue those internal, administrative remedies once they have left the confines of a facility is a strained application of § 1997e at best. Former prisoners are no longer members of the community that such administrative processes and limitations are meant to serve. This is particularly so with those prisoners who are incarcerated for short periods of time as their opportunity to initiate and pursue administrative remedies *277 while incarcerated is temporally limited at best.

*Ibid.*

This Court is convinced that the plain language of section 1997e(a) compels the conclusion that its requirements apply to prisoners who are confined when they file their lawsuits, and not to former inmates who bring actions after their release from custody. That construction of the statute is consistent with the purposes and goals of the Act and tracks the legislative history. Consequently, allowing the defendants to amend their affirmative defenses to plead the failure to exhaust remedies as required by 42 U.S.C. § 1997e(a) would be futile because that statute does not apply to all the named plaintiffs.

[6] ☑ The defendants contend that even if the exhaustion requirement is inapplicable, the damage limitation should apply. That section of the statute states:

No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury.

42 U.S.C. § 1997e(e).

In *Cox v. Malone,* 199 F.Supp.2d 135, 139-40 (S.D.N.Y.2002), the district court attempted to distinguish circuit precedent that the exhaustion requirement did not apply to former prisoners as a "procedural requirement" and held that the damage limitation did apply to former prisoners because it is a "substantive limitation." This Court cannot accept that distinction, however, because it ignores the plain language of the statute. Subsections (a) and (e) both refer only to "a prisoner confined in a jail, prison, or other correctional facility." The court in *Smith v. Franklin County* stated:

The Sixth Circuit has yet to address this issue, but it is widely held that "prisoner" means someone confined, incarcerated, or detained, not a former prisoner. *See Abdul-Akbar v. McKelvie*, 239 F.3d 307, 314 (3rd Cir.2001); *Janes v. Hernandez*, 215 F.3d 541, 543 (5th Cir.2000); *Page v. Torrey*, 201 F.3d 1136, 1140 (9th Cir.2000); *Harris v. Garner*, 216 F.3d 970, 981 (11th Cir.2000); *Greig v. Goord*, 169 F.3d 165, 167 (2nd Cir.1999); *Kerr v. Puckett*, 138 F.3d 321, 323 (7th Cir.1998); *Doe v. McKee*, 150 F.3d 920, 924 (8th Cir.1998).

*Smith*, 227 F.Supp.2d at 675. This Court agrees with that observation and further holds that there is no principled way to construe one section to include only current prisoners and expand the other to apply to former prisoners. This Court has held in the past that the PLRA prohibits inmates from suing to recover mental anguish damages absent physical injury, although nominal, compensatory, and punitive damages are available upon appropriate proof. *See Meade v. Plummer*, 344 F.Supp.2d 569, 572-74 (E.D.Mich.2004). That limitation, however, does not apply to individuals who bring actions against their former custodians after release from custody, as in this case.

[7] ☑ The defendants' proposed amendment also fails because it comes too late. The Sixth Circuit has not addressed in a published opinion whether the exhaustion requirement is an affirmative defense that can be waived. In fact, the court expressly declined to do so in *Curry v. Scott*, 249 F.3d 493, 501 (6th Cir.2001) (stating "Plaintiffs point out that most courts to consider the issue *have* characterized the PLRA's exhaustion requirements as affirmative defenses.... We need not *answer* this argument here"). Courts in other circuits have treated the PLRA's requirements as affirmative defenses that must be pleaded lest they be waived. *See, e.g., Anderson v. XYZ Correctional Health Serv., Inc.*, 407 F.3d 674, 681 (4th Cir.2005) (stating that "an inmate's failure to exhaust his administrative remedies must be viewed as an affirmative defense that should be pleaded or otherwise properly raised by the defendant"); *Johnson v. Testman*, 380 F.3d 691, 695 (2d Cir.2004) (observing that "[t]he failure to exhaust available administrative remedies is an affirmative defense" and holding that "that this defense is waivable"); *Foulk v. Charrier*, 262 F.3d 687, 697 (8th Cir.2001) (holding that "the assertion that a plaintiff prisoner failed to exhaust all available administrative remedies as required under the PLRA is an affirmative defense under Fed.R.Civ.P. 8(c). It is the burden of the defendant asserting this affirmative defense *278 to plead and prove it"); *Massey v. Helman*, 196 F.3d 727, 735 (7th Cir.1999) (holding exhaustion requirements are waivable if not asserted); *Perez v. Wisconsin Department of Corrections*, 182 F.3d 532, 536 (7th Cir.1999) (holding that PLRA's exhaustion requirement is an affirmative defense that can be waived or forfeited by defendants); *Jenkins v. Haubert*, 179 F.3d 19, 29 (2d Cir.1999) (ruling that section 1997e sets forth affirmative defenses under Fed.R.Civ.P. 8(e)); *Jackson v. District of Columbia*, 89 F.Supp.2d 48, 57 (D.D.C.2000) (same).

If, as the majority of courts hold, the defenses are waiveable, surely the defendants have waived them here. Almost three years have past since the plaintiffs filed their sixth amended complaint. The defendants have filed motions and made appearances before this court arguing the merits of the case. The court has adjudicated the cross motions for summary judgment and held that the defendants' practice and policy is unconstitutional. The request to amend the affirmative defenses is untimely.

## V.

The Court finds that the plaintiffs have not established the required elements to permit certification of their proposed class. The defendants' request to amend their affirmative defenses must fail because of futility and untimeliness.

Accordingly, it is **ORDERED** that the plaintiffs' motion for class certification or joinder and continued tolling [dkt. # 172] is **DENIED.**

It is further **ORDERED** that the defendants' motion to amend affirmative defenses [dkt. # 194] is **DENIED.**

It is further **ORDERED** that the attorneys for the parties shall appear for a status conference on **December 15, 2005 at 2 p.m.** to discuss a schedule for resolution of the claims that remain.

E.D.Mich.,2005.
Rose v. Saginaw County
232 F.R.D. 267

Motions, Pleadings and Filings (Back to top)

• 2008 WL 3412011 (Trial Motion, Memorandum and Affidavit) Defendant's Motion In Limine to Preclude Reference At Trial to the Practices or Policies of Other Jails or Correctional Facilities (Mar. 10, 2008) Original Image of this Document (PDF)
• 2008 WL 3412012 (Trial Motion, Memorandum and Affidavit) Defendants Motion In Limine to Preclude Reference At Trial to Subsequent Remedial Measures (Mar. 10, 2008) Original Image of this Document (PDF)
• 2008 WL 3412013 (Trial Motion, Memorandum and Affidavit) Defendant's Motion In Limine to Preclude Plaintiffs from Referring to the Discovery Depositions of Saginaw County Jail Personnel At Trial (Mar. 10, 2008) Original Image of this Document (PDF)
• 2008 WL 3412014 (Trial Motion, Memorandum and Affidavit) Defendant's Motion In Limine to Preclude Reference At Trial to Any Physical Injury Allegedly Suffered By Any Plaintiff (Mar. 10, 2008) Original Image of this Document (PDF)
• 2008 WL 3412015 (Trial Motion, Memorandum and Affidavit) Defendant's Motion In Limine to Preclude Reference At Trial to Alleged Damage or Injury Caused By the Use of Chemical Spray (Mar. 10, 2008) Original Image of this Document (PDF)
• 2008 WL 3412016 (Trial Motion, Memorandum and Affidavit) Defendant's Motion In Limine to Preclude Reference At Trial to Allegations of Assault and Battery (Mar. 10, 2008) Original Image of this Document (PDF)
• 2008 WL 3412017 (Trial Motion, Memorandum and Affidavit) Defendant's Motion In Limine to Preclude Reference At Trial to Any Claims Not Set Forth In Plaintiffs' Complaints (Mar. 10, 2008) Original Image of this Document (PDF)
• 2006 WL 5986674 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Response to Defendants' Motion to Dismiss And/or for Sanctions for Failure to Comply With Court Order (Jun. 29, 2006) Original Image of this Document (PDF)
• 2006 WL 1355638 (Trial Motion, Memorandum and Affidavit) Defendants' Response to Plaintiffs' Motion for Substitution of Party (Apr. 11, 2006) Original Image of this Document (PDF)
• 2006 WL 5986673 (Trial Motion, Memorandum and Affidavit) Plaintiffs'emergency Discovery Motion to Compel Videotaping of Jail Facilities (Jan. 26, 2006) Original Image of this Document (PDF)
• 2005 WL 6181376 (Trial Motion, Memorandum and Affidavit) Trial Motion (Nov. 17, 2005) Original Image of this Document (PDF)
• 2005 WL 6181377 (Trial Motion, Memorandum and Affidavit) Defendants' Response to Plaintiffs' Supplemental Brief Addressing Plra ""physical Injury" Issue (Nov. 17, 2005) Original Image of this Document (PDF)
• 2005 WL 3721866 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Supplemental Brief Addressing Class Definition (Nov. 14, 2005) Original Image of this Document (PDF)
• 2005 WL 3721323 (Trial Motion, Memorandum and Affidavit) Plaintiff's Supplemental Brief Addressing Plra:physical Injury Issue (Nov. 10, 2005) Original Image of this Document (PDF)

• <u>2003 WL 24271722</u> (Expert Report and Affidavit) Plaintiff's Frcp 26(a)2 Expert Disclosures (Jan. 27, 2003)

• <u>2003 WL 24271723</u> (Expert Report and Affidavit) Plaintiff's Frcp 26(a)2 Expert Disclosures (Jan. 27, 2003)

• <u>1:01cv10337</u> (Docket) (Oct. 9, 2001)

END OF DOCUMENT

Exhibit - 7

This essay is written by the plaintiff (Stanley R. Stasko) in the civil case of Stasko v General Motors Corporation filed in the United States District Court – Eastern District of Michigan. This essay is written in fulfillment of the requirement of Rose v Saginaw County (See Exhibit 6) whereby "… if the plaintiff has delayed beyond the limitation period, he must fully plead the facts and circumstances surrounding his belated discovery and the delay."

This essay will focus on the plaintiff's spiritual experiences, the plaintiff's spiritual growth, the plaintiff's experience working at General Motors Corporation, the plaintiff's experience at Sacred Heart Major Seminary, and the plaintiff's experience after Sacred Heart Major Seminary until the present. The plaintiff intention is to:

- give a reasonable chronology of events in the plaintiff's life in preface to a civil lawsuit against General Motors Corporation

- increase the reader understanding of what it is like for a ordinary person to have spiritual experiences

- help the United States District Court understand the hostile work environment by General Motors Corporation against the plaintiff

- help the reader understand why the plaintiff's spiritual experiences may challenge conventional Western Christian doctrine / theology

The spiritual experiences are not necessarily listed in chronological order.

The spiritual experiences are not necessarily listed in order of importance.

The spiritual experiences are not necessarily detailed in there entirety.

1 of 73

The spiritual experiences can even challenge conventional Western Christian doctrine / theology.

The plaintiff will begin with his own introduction to spiritual experiences.

The plaintiff was born June 6, 1961 in Southwest Detroit, Michigan, USA to the parents of Stanley Walter Stasko and Sophie Stasko. The plaintiff's parents owned a modest home at 4450 52nd Street and like most other homes on 52nd Street the plaintiff's home main level was elevated three to four feet above the street level. The house had two rear exits. One exit exited out of the house from the main level down a set of steps, and the second exit required a person to go down a set of steps inside the house prior to exiting out a street level door. When he was a toddler, the plaintiff was standing near the interior steps when he got to close to the edge and fell down the steps. The plaintiff never hit the steps; nor, did he hit the landing, instead he started to levitate.

**Question:** Did the plaintiff share this spiritual experience with anyone?

**Answer:** The plaintiff does not remember sharing this spiritual experience with anyone. The only feelings associated with this spiritual experience were - that was neat.

**Question:** Was this the only spiritual experience involving levitating that the plaintiff ever experienced?

**Answer:** No

The plaintiff's home had a backyard that was enclosed by a fence on four sides. In Southwest Detroit it was not unusual for a child or children to play in their backyard unsupervised by a parent or adult. When the plaintiff was a child he started to levitate in his backyard. His body rose higher and higher above the ground. His body levitated above the garage; then above the low voltage electrical power wires; then above the high voltage electrical power wires at the top of the wooden power poles.

**Question:** What feelings did the plaintiff have as a child with this spiritual experience?

**Answer:** When my body levitated above the high voltage electrical power wires - that was scary.

**Question:** Has the plaintiff had many spiritual experiences in his life?

**Answer:** Yes. In organizing the plaintiff's spiritual experiences the plaintiff will refer to the spiritual experiences by name.

What is the next spiritual experience remembered by the plaintiff?

Spiritual experience – Train

In the summer the plaintiff would periodically walk to Patton Park with other kids from the neighborhood, or by himself, to swim in the indoor public swimming pool. The walk to Patton Park from 4450 52nd Street began South on Central to John Kronk; at John Kronk there was multiple set of train tracks (Norfolk Southern); and a train car switching station on top of the hill. (A train would push a

set of train cars up the hill; at the top of the hill a man would disengage the cars as specified according to his work sheet; gravity would pull the train cars down the opposite side of the hill; and a switching tower would re-direct the disengaged train cars to their lineup.)

It was not uncommon for the plaintiff to walk South on Central to John Kronk, walk West on John Kronk to Lonyo; walk South on Lonyo to Dix, then walk across Patton Park to the indoor swimming pool. Periodically the plaintiff would hop a slow moving train for a free ride. One day the plaintiff tried to hop a train a fast moving train while walking along the train tracks from Lonyo to Central. The plaintiff could not hop the fast moving train. The plaintiff continued trying to hop the train when his feet hit a set of switch gear and his legs landed on the train tracks. Before the plaintiff's legs were cut off by the train, the plaintiff could feel his body be lifted off the train tracks and set down on the ground along side the train tracks. The plaintiff did not move himself off the train tracks; the plaintiff did not roll himself off the train tracks; the plaintiff did not see any human person in front of him, along side of him, or in back of him. The plaintiff only saw a person looking out of the train at the plaintiff as the plaintiff was lying safely on the ground.

**Question:** Did the plaintiff ever tell his parents about spiritual experience – train.
**Answer:** No.
The reader needs to understand what it was like growing up in Southwest Detroit in the 1970's. If a boy did something wrong and was caught by a neighbor, the neighbor would punish the boy. The boy would rather be punished by a neighbor

since his parent's punishment would be twice as bad. The plaintiff did not tell his parents because he did not want to be punished for horseplay on the train tracks.

**Question:** Did the plaintiff ever tell anybody about spiritual experience – train.

**Answer:** Yes. When the plaintiff was leaving General Motors in August 1995 to enter Sacred Heart Major Seminary in priestly formation he shared this spiritual experience with a group of people in the General Motors Technical Center, Engineering Building, E2 conference room.

**Question:** Does the plaintiff remember when his spiritual experiences started to influence the decisions he made in his life?

**Answer:** Spiritual experience – Read me

and

Spiritual experience – There are better answers

In the introduction the plaintiff stated his intention is to share his spiritual experiences to increase the reader's understanding of what it is like to have spiritual experiences; therefore, from this point forward the spiritual experiences are not necessarily listed in chronological order, nor are the spiritual experiences listed in order of importance.

The plaintiff was born to Stanley Walter Stasko and Sophie Stasko on June 6, 1961, and is the third of four children. Stanley Walter Stasko and Sophie Stasko are both Catholic Christian who regularly attended Mass and who sent all four of their children to St. Stephen Catholic Grade School.

In grade school the plaintiff was basically a B student - an A in math; a C in English; and basically B's in the other subjects. In grade school the plaintiff was a poor reader. The plaintiff would have found it difficult to read a sentence like "**let us pray for those who have died**" without making several mistakes. St. Stephen grade school sent the plaintiff off-campus via a bus ride to a building near old Tiger Stadium to help the plaintiff improve his reading. After awhile St. Stephen grade school and others gave up on plaintiff's reading ability.

The plaintiff's parents had only enough money for normal living expenses; therefore, they allowed each child to select the high school they wanted to attend. Marie and Gerri attended St. Andrew Catholic High School. David attended Chadsey High School - a Detroit Public High School, and the plaintiff attended Cass Technical High School – also a Detroit Public High School.

While at Cass Technical High School the plaintiff started to accelerate academically and obtained approximately a 3.7 grade point average. The reason for the significant improvement in academic performance was because St. Stephen Catholic grade school was academically more demanding than the Detroit public high school system.

Spiritual experience – Read me

When the plaintiff was in high school or in his early years of college he tied to read the Sacred Scripture beginning at Genesis 1:1. Since the plaintiff was a poor reader

he could not handle the details of the first five books of Sacred Scripture so he stopped reading Sacred Scripture.

Some time passed!

The plaintiff converted an old coal storage room in the basement of his house into a personal study room. When the plaintiff attended Lawrence Technological University (1979 to 1983) he did his studying in the basement at 4450 52nd Street in his personal study room. One day while the plaintiff was in his personal study room he looked at a Bible (which had a picture of Our Lord and Savior Jesus Christ on the front) and a voice spoke to him saying **"Read me."**

Since the plaintiff remembered what happen the last time he tried reading Sacred Scripture his intension was to randomly open the Bible and start reading. Prior to opening Sacred Scripture the plaintiff prayed a short prayer. As the plaintiff opened Sacred Scripture his right thumb slipped and the Bible opened to Acts 1:1.

After spiritual experience – read me the plaintiff's life began to change: the plaintiff's reading improved, the plaintiff's public speaking skills improved; and the plaintiff read the entire Bible for the first time.

Spiritual experience – There are better answers

In the same time frame (1979 to 1983) his brother David would bring his friends over to 4450 52nd Street. David and his friends would talk, lift weights, and

sometimes talk about religion. David is Roman Catholic, his friends included
cradle Catholics that practiced Protestantism, and a Muslim.

After one session of listening to my brother David and his friends argue about
religion, a spiritual voice spoke to the plaintiff saying **there are better answers**

**Question:** Did the spiritual voice specify where the plaintiff could find these better
answers?

**Answer:** No. The spiritual voice did not say the Roman Catholic Church had the
final answers. The spiritual voice did not say Protestants had the final answers. The
spiritual voice said – **there are better answers.**

**Question:** How did the plaintiff begin looking for those better answers?

**Answer:** During his college years the plaintiff developed a personal relationship
with God and took the initiative to read Sacred Scripture on a regular basis. As
Sacred Scripture came alive inside the plaintiff he found it enjoyable to read the
entire Bible. Further the plaintiff began to seriously reflect on the meaning behind
God's word in Sacred Scripture and what God was saying to him.

When a person questioned the plaintiff about his faith (like General Motors did)
the plaintiff could now take the initiative to search Sacred Scripture for a deeper
understanding into the answer to the question. It was also during this period of time
that the plaintiff became an active usher and lector at St. Stephen Catholic Church
parish.

When the plaintiff was twenty-three to twenty-eight years old he entered into a
marital relationship. Despite the unconsummated marriage and the other marital

problems the plaintiff's relationship with God began to grow more intense. It was also during these years that the plaintiff enrolled at Sacred Heart Major Seminary and obtained Certification as a Worship Coordinator for the Archdiocese of Detroit. Studying Vatican II documents, and learning about the history of the Roman Catholic Church added fuel to the fire that was already inside of the plaintiff.

During this period in time the plaintiff became President of the Parish Council, President of the Southwest Vicariate, and took on leadership responsibilities in running the parish festival.

**Question:** Did the plaintiff ever tell a priest that he was hearing spiritual voices?
**Answer:** No. To help the reader understand why the plaintiff did not tell a priest that he was hearing spiritual voices the reader needs some background information about what it is like growing up Roman Catholic in the 1960's – 1980's.

Vatican II came to close in the 1960's. Prior to Vatican II there was a very clear distinction in the Roman Catholic Church between priests / religious and laity. If you wanted to live a holy life and obtain a high place in heaven you became a priest and / or religious. If you wanted to live a normal martial life and hope one day to squeak into heaven (if you were lucky) you lived the life of a laity. Hearing spiritual voices or having spiritual experiences was for priests and / or religious and not for the laity.

**Question:** Does this attitude still exist in the Roman Catholic Church where holiness of life and high places in heaven are associated priests and / or religious, and the normal martial life is associated with the laity?

**Answer:** Unfortunately yes. In 1995 the plaintiff entered Sacred Heart Major Seminary in priestly formation for the Archdiocese of Detroit. In 1996 the plaintiff left Sacred Heart Major Seminar on his own accord. The Archdiocese of Detroit started to become more aware of the plaintiff's spiritual experiences (see Spiritual experience – Stanley can hear me) and a priest of the Archdiocese of Detroit ask the plaintiff **why you**???

This **why you** by the priest expresses the same attitude --- don't you know that spiritual experiences are for priests, bishops, and religious; you are nothing but a lowly laity.

The plaintiff responded to the priest's **why you** by telling him that with your attitude Our Lord and Savior Jesus Christ should not have selected any of the apostles.

The plaintiff was hired by General Motors approximately July 18, 1983, to work at the General Motors Technical Center, Engineering Building, Emissions Wing starting as a 5th level Associate Engineer. In retrospect the hostile work environment and discrimination by General Motors against the plaintiff began almost immediately.

The plaintiff should have been hired in as a 6th level Project Engineer.

10 of 73

- The reader needs to understand that four to five times General Motors specifically requested the plaintiff to work for General Motors.
- General Motors had first hand experience of the plaintiff's skills.

The first time General Motors requested the plaintiff to work for General Motors was when the plaintiff attended Cass Technical High School (Cass Tech). The plaintiff was asked to interview for a co-op position with General Motors (the plaintiff did not request to be interviewed; he was asked to interview for a co-op position) and General Motors offered the plaintiff the co-op position. The plaintiff said no.

This did a stop General Motors. General Motors made a second attempt to hire the plaintiff this time through Cass Tech. Cass Tech told the plaintiff to see his school counselor and the counselor pressured the plaintiff into accepting the General Motors co-op position. Finally the plaintiff accepted the position.

On the first day of work, General Motors tried verbally assaulting the plaintiff. (Makes you wonder why General Motors can't handle being told No by a 17 year old student.)

The plaintiff did so much good work for General Motors:

- wiring electrical controls for Emissions Analysis Systems zero / span control boxes
- wiring Emissions Analysis Systems analog signal amplification boxes

11 of 73

General Motors makes a third attempt to hire the plaintiff by extending his high
school co-op beyond the school year and into the summer of 1979.

- see General Motors Employment History Record – employment code
  changed from 2E00 to 2E30 on June 16, 1979 (See Exhibit 14); SRS now
  works eight hours a day and a slight increase in pay

The plaintiff continues to do so much good work for General Motors that General
Motors is running out of work for the plaintiff.

- On one occasion the plaintiff started and completed one Emissions Analysis
  Systems zero / span control box in one eight hour work day

General Motors has to think of new work for the plaintiff - rewiring Dynamometer
Test Cell cylinder distribution solenoids.

General Motors makes a fourth attempt to hire the plaintiff by offering him a full
time job as a salaried technician. Plaintiff says NO to General Motors offer.

- In the General Motors Summer Temporary Student Appraisal of the plaintiff
  General Motors gives the plaintiff an overall job rating of "Outstanding
  performance; far exceeds standard for this job; achievable but seldom
  attained performance" - signed by Ron Meegan; dated August 10, 1979.
- In the General Motors Evaluation on Separation or Transfer of the plaintiff –
  "Would you recommend for re-employment? Yes" – signed by Paul E.
  Rishel

In CY1983 when the plaintiff was nearly completed with the BSEE from Lawrence
Technological University, General Motors tries to hire plaintiff through Ron Buch-
holz (in CY1983, Ron lived on Central just North of McGraw in the Detroit,
Michigan); Ron is a person plaintiff knows from Lawrence Technological
University who worked for General Motors in CY1983. Plaintiff does not express
any interest to work for General Motors; Ron Buch-holz asks plaintiff for a resume
to give to General Motors; plaintiff tells Ron Buch-holz that he is not interested in
working for General Motors; eventually, plaintiff gives Ron Buch-holz a resume;
General Motors interviews plaintiff; General Motors offers plaintiff a job as a
5E35 Associate approximately July 18, 1983.

The hostile work environment by General Motors does not stop with General
Motors hiring the plaintiff as a 5th level Associate Engineer. Practically from the
first week of work, General Motors begins to challenge the plaintiff's religious
faith. The plaintiff is a Roman Catholic Christian who believes in Creation. The
reader must remember **Spiritual experience – Read me and Spiritual experience
– There are better answers** described above and how the plaintiff is beginning to
become more confident in defending his religious faith.

Terri Hostetter and Ward Wiers are the first to harass plaintiff about his religious
beliefs. Terri Hostetter purposefully starts a verbal argument with the plaintiff to
attack the plaintiff's belief in creation by asking - what came first the chicken or
the egg? The purpose of this question is to trap a Creationist into a circular
argument. The plaintiff diffuses the question basically by stating the chicken since
God can create without an egg.

13 of 73

Ward Wiers tries to convert plaintiff by asking him if he is a Christian. The reader must understand that when a Protestant asks a Roman Catholic if he is a Christian this is the first step in trying to convert the Roman Catholic Christian into a Protestant. The plaintiff diffuses the question basically by stating that he is a Christian. The plaintiff asks Ward Wiers if he is a Christian. When Ward Wiers states that he is plaintiff asks him what Catholic Church he goes to. Now Ward Wiers is at a loss for words.

General Motors is starting not to like plaintiff and increases the harassment against plaintiff. One day late in the afternoon the Engineering Building, Emissions Wing is mysteriously cleared out when plaintiff enters Chris Killen / Bob Zuzga office. Almost immediately after plaintiff enters the office Paul Durrenberg comes charging in after plaintiff and tries to hypnotize plaintiff. When Paul Durrenberg is unsuccessful at hypnotizing plaintiff, Paul Durrenberg starts verbally assaulting plaintiff. Plaintiff leaves the office

**Question:** Does plaintiff think General Motors management was aware that Paul Durrenberg was going to try to hypnotize plaintiff?
**Answer:** Yes, as soon as plaintiff left the office, Denise Wiese was conveniently standing outside the office door by a few paces.

General Motors does not stop. Approximately the next work day plaintiff enters his office to begin his work day. Almost immediately after plaintiff enters the office an unknown man comes charging in after plaintiff and tries verbally assaulting

14 of 73

plaintiff. Plaintiff grips his pen in his hand like he did when racist black students at Cass Tech High School tried to physically assault plaintiff. The unknown man yells Black Muslim and leaves.

**Question:** Why didn't the plaintiff complain to General Motors personnel about the harassment?

**Answer #1:** The reader must understand this unknown person is from General Motors personnel or is a General Motors security specialist.

**Answer #2:** General Motors purposefully abused the plaintiff. If the plaintiff filed a legal suit against General Motors, General Motors will play the plaintiff for a fool by offering him a promotion (a promotion he already earned) in compensation for the abuse.

Now General Motors turns up the harassment level. One day plaintiff is leaving work for home and a group of cars blocks in plaintiff car on South bound Mound Road just North of 12 Mile Road. Shaaa-zam!!! - Ron Buch-holz just happens to show up when plaintiff starts to look into the reason for the hold up.
General Motors now wants plaintiff gone and uses Ron Buch-holz to suggest to plaintiff that plaintiff should leave General Motors. Shaaa-zam!!!, Ron just happens to show up in General Motors parking lot by plaintiff car and Ron specifically asks plaintiff to leave General Motors and come with him to Motorola.

Since none of the above harassment worked, General Motors begins to attack plaintiff career.

15 of 73

- Plaintiff catches Paul Durrenberg (technician supervisor) tampering with the plaintiff's forty-seven mm diesel particulate filter sampling system project (see resume for project details)
- Jerry Sidlar (instrumentation technician) purposefully gives plaintiff bad information in the Sample Condition Unit project by telling plaintiff to design the Sample Conditioning Unit so big that you can remove any component without having to remove another component (see resume for project details)
- Paul Durrenberg purposefully tries to steal plaintiff idea of using a Programmable Logic Controller in the Sample Conditioning Unit project
- Chris Killen (a woman) falsely accuse plaintiff of looking down her blouse and Bob Zuzga (Chris' office partner) is willing to commit perjury to protect Chris from her false accusation

**Question:** Why does General Motors use some many different people in trying to harass plaintiff?

**Answer:** To diminish the possibility of detecting statistical significance in General Motors pattern of behavior against plaintiff.

General Motors now attacks the plaintiff's compensation.

Plaintiff does not receive his first promotion from 5th to 6th level until approximately September 1, 1985, almost two years after plaintiff was hired by General Motors. Further the plaintiff received a small 10 percent pay raise with the promotion.

- Even with the 10 percent pay raise plaintiff salary is approximately 15 percent below salary midpoint for a 6E11 project engineer approximately January 1, 1986.

- Midpoint salary is for an average 6E11 project engineer.

- Plaintiff was an above average 6E11 project engineer.

General Motors does not record plaintiff CY1983, CY1984, CY1985, CY1986, CY1987, and CY1988 accomplishments. These include:

- Humidity Monitoring to help diagnose problem with large printer (see resume for details)

- Forty-Seven mm diesel particulate filter sampling system (see resume for details)

- Sartorius Microbalance (see resume for details)

- Tylan Mass Flow Controllers (see resume for details)

- Sample Conditioning Unit (see resume for details)

- Horiba Chassis Dynamometer Controller (see resume for details)

- Overhead Track System (see resume for details)

- Emission Wing Renovation – Design Coordination (see resume for details)

- Programmable Logic Controllers -- integrated into Emissions Analysis Systems (see resume for details)

- Instrumentation Console and Custom Enclosure (see resume for details)

- Emission Test Site Instrumentation Patch Panel (see resume for details)

- 12-Channel Strip Chart Recorder and Custom Enclosure (see resume for details)

- Dew Point Meter and Ambient Temperature Sensor and Custom Enclosure (see resume for details)
- Instrumentation Interfacing (see resume for details)
- Large Temperature and Humidity Display (see resume for details)
- Honeywell HVAC Central Control Station (see resume for details)
- Smoke Detector Graphics Display Panel (see resume for details)
- Overhead Door Logic Controls (see resume for details)
- Emissions Wing Renovation – Project Management (see resume for details)
- Software Programming Skills and Software Program Management (see resume for details)
- Fuel Meter Calibration Cart (see resume for details)

So much is missing from plaintiff CY1983 to CY1988 personal records that a reader of plaintiff personnel records would get the impression plaintiff had nothing to do with the Emissions Wing renovation; even though, plaintiff had more to do with the success of the Emission Wing renovation than Denise Wiese, Ward Wiers, Paul Durrenberg, Don Nagy, or any other person.

With the completion of the Emission Wing renovation:
- Plaintiff is still a 6E11 Project Engineer
- Plaintiff does not receive a promotion to 8th level with the completion of the Emissions Wing renovation
- Plaintiff does not receive any form of bonus for Emissions Wing renovation
- Plaintiff personnel records does not show plaintiff had any involvement in the Emissions Wing Renovation

18 of 73

There were two other General Motors renovation projects taking place at the General Motors Technical Center simultaneously with the Emissions Wing renovation; in which, Utley – James acted as the general contractor for all three renovations.

- the Emission Wing renovation
- the Engineering Building, Dynamometer Wing, Underground Tank Farm renovation (the plaintiff suggests reviewing Clark Bell's personnel records)
  - when plaintiff transferred from the Engineering Building, Emissions Wing to the Engineering Building, Dynamometer Wing the only documentation Clark Bell gave plaintiff associated with the Underground Tank Farm renovation was one crude drawing on 8 ½ by 11 sheet of paper (which was almost useless), and one Programmable Logic Controller Software tape
- the new paint lab near Manufacturing A or Manufacturing B building
  - when plaintiff visited the new paint lab, plaintiff asked the project engineer what reward he expected from General Motors engineers for his involvement in this project – his response – 8th level

General Motors for a sixth time requested plaintiff to work for General Motors by specifically requesting plaintiff to transfer from the Engineering Building Emissions Wing to the Engineering Building Dynamometer Wing.

- Plaintiff does not receive a promotion to 8th level with General Motors request for plaintiff to transfer from the Engineering Building Emissions

Wing to the Engineering Building Dynamometer Wing - plaintiff is still a
6E11 Project Engineer

- Plaintiff does not receive any form of bonus from General Motors; even
  though, General Motors requested plaintiff to transfer from the Engineering
  Building Emissions Wing to the Engineering Building Dynamometer Wing

- Plaintiff personnel records does not show that General Motors requested
  plaintiff transfer from the Engineering Building Emissions Wing to the
  Engineering Building Dynamometer Wing

The hostile work environment by General Motors against plaintiff continued in the
Dynamometer Wing even though General Motors specifically requested plaintiff to
transfer from the Engineering Building Emissions Wing to the Engineering
Building Dynamometer Wing.

**Question:** Is the hostile work environment by General Motors Corporation
against the plaintiff the worst situation known by the plaintiff?

**Answer:** Unfortunately no!

One day the plaintiff was having lunch by himself when Apa Gomez joined the
plaintiff for lunch. Apa Gomez explained that his sister was raped by three
company employees on company property. Apa Gomez told the plaintiff that
personnel had done nothing regarding the rape.

The plaintiff expressed his sorrow to Apa Gomez for what happened to his sister.
The plaintiff told Apa Gomez that General Motors will probably do nothing
regarding the rape. The plaintiff told Apa Gomez that if he wanted to bring the
three men to justice he would have to do it himself. The plaintiff warned Apa
Gomez that if he tried to bring the three men to justice to stand trial for the rape of
his sister General Motors would have him killed. The plaintiff advised Apa Gomez
not to threaten anybody but to give advance notice he was coming to bring the
three men to justice to stand trial for the rape of his sister.

Some time passed.

One day the plaintiff was paged by General Motors to go to Dynamometer Wing
Maintenance and Calibration lab, and Paul Durrenberg, a General Motors salaried
employee, told the plaintiff that Apa Gomez was dead.

**Question:** Does the plaintiff have any evidence that Apa Gomez death was no accident.

**Answer:** The plaintiff left General Motors in 1995 to enter Sacred Heart Major Seminary for priestly formation. In 1996 the plaintiff left Sacred Heart Major Seminary and started looking for employment. The plaintiff had two less significant jobs and had interviews with several other companies.

During one interview the plaintiff had with Pico - located on the West side of Telegraph Road just North of Eight Mile in the City of Southfield, Michigan; now Comau North American (Pico) 21000 Telegraph - the interviewer said to the plaintiff **you have five minutes to leave company property or you will be shot.**

Shortly after plaintiff transferred into the Dynamometer Wing, Paul Durrenberg
and Allen Boogaard comes charging into plaintiff office one afternoon and begin
to verbally soliciting plaintiff for oral sex. (This 2 against 1 format General Motors
will continue using against the plaintiff even until the end of his career when M.J.
Spi-naz-zi and Bill Whitley try harassing plaintiff near the Engineering Building,
Dynamometer Wing, Chassis Dynamometer Test cell.

General Motors organized hostility against plaintiff religious beliefs does not stop
when the plaintiff transfers from the Engineering Building Emissions Wing to the
Engineering Building Dynamometer Wing

- General Motors now using GM suppliers to harass plaintiff belief that
  abortion is wrong in all situations; Phil and Jim Davies (MTS-PowerTek
  Farmington Hills, Michigan 48335) – ask plaintiff to name one thing that is
  always wrong; plaintiff response => Ted; with an aluminum baseball bat
  looking for Jim
- General Motors uses outside supplier DSP Technology to attack plaintiff
  silent praying before meal at lunch; contact Gil Troutman
- Jim Thorsen tries to convert plaintiff away from Roman Catholic Church;
  (similar pattern used by Ward Wiers)
- General Motors asks plaintiff to prove the existence of God (unknown man);
  near the end of plaintiff career at General Motors

Since General Motors has been unsuccessful in their hostility towards the plaintiff,
General Motors starts race baiting the plaintiff and falsely accusing the plaintiff of
being racist.

Plaintiff is paged to Technicians Lab, Paul Durrenberg and Aaron Trammel (black male) asks plaintiff if he is racist. This is race baiting. The false assumption American society makes is that white people are racist and that a white person is guilty until proven innocent. If plaintiff says he is not racist, then the black person purposefully tries to place the white person in a racial compromising situation. Plaintiff defuses the situation and leaves the room.

As the plaintiff is leaving the room, Roy Harvey (a black male) challenges plaintiff to hit him; plaintiff obliges Roy Harvey with his request and slaps Roy Harvey in his face.

As the plaintiff is leaving Roy Harvey, Roy Harvey says *Robert Bu-tha-ah*.

A few days later.

Robert Bu-tha-ah (a large black male with the UAW) comes into plaintiff office; stands behind plaintiff; and places a knife to his throat. The plaintiff pulls out an object from his desk drawer and Robert Bu-tha-ah leaves the room.

General Motors racial harassment of plaintiff continues when plaintiff is paged to the Dynamometer Wing Fuel Blend House. Plaintiff goes to the Dynamometer Wing Fuel Blend House and finds Steve Fry (a white male technician) and unknown black male in the Dynamometer Wing Fuel Blend House. As soon as plaintiff arrives, the unknown black man tries to act like a supervisor to Steve Fry.

Plaintiff is not impressed; a conversation starts between plaintiff and the unknown black male; plaintiff learns that the unknown black male is a 7th level supervisor who has a non-engineering Masters Degree and the only work the unknown black male does all day long is baby sits one technician (Steve Fry). The unknown black male thinks he is ready to be 8th level. Plaintiff did more for General Motors when plaintiff was a 5th level associate engineer. Since plaintiff does not support the black male for an 8th level, the unknown black male falsely accuses plaintiff of being racist by asking plaintiff if he is racist.

General Motors race baiting of plaintiff continues when plaintiff is sitting alone in the cafeteria building. Janet Austin (a black woman) comes uninvited to the table and starts kicking plaintiff in the leg. Plaintiff responds by kicking her back.

After all this racial harassment General Motors now attacks plaintiff family.

During this is the period of time, plaintiff owned a piece of rental property at 7320 Stout in Detroit, Michigan. Plaintiff rented the property to his sister Gerri. It was during this time period when plaintiff's sister Gerri is chased by an unknown black man and is almost physically assaulted. Fortunately a driver just by change happened to be in the area and help Gerri.

When General Motors race baited the plaintiff, the plaintiff would sometimes say *this is just like high school.*

Racist black students – Cass Tech – purposefully starting fights

The plaintiff attended Munger Junior High for 9th grade and Cass Tech for 10th, 11th, and 12th grade. Cass Tech is a Detroit Public High School with demographics of approximately 80 percent black students and approximately 20 percent non-black students.

On more than one occasion the plaintiff witnessed black students purposefully physically assault a non-black students. On more than one occasion black students purposefully tried to physically assault the plaintiff, but in self defense the plaintiff use to defend himself with a **Bic** pen against the assaults of the black students. The plaintiff's reputation for defending himself with a Bic pen grew among the black students to the point the black students would try to disarm the plaintiff by asking him if he had a pen that they could borrow prior to before trying to physically assault the plaintiff.

Physical assaults attempted by black students against the plaintiff was so flagrant that on one occasion prior to instigating a fight with the plaintiff, the black students in the electronics class room signaled the black instructor and the black instructor conveniently walked out of the classroom; thereupon, the black students then tried to physically assault the plaintiff.

**Question:** Are you saying the black instructor knew or was part of a premeditated fight plan by the black students?
**Answer:** Yes

Racist Black People – Black Students – Sabotage electrical panel

While attending Cass Tech the plaintiff was enrolled in the Electronics program. One of the required electronics classes was an electrical controls and motors class taught by Mr. Miller (a white male instructor). In the electrical controls class the students learned conventional relay logic wiring and controls; furthermore, the class required the students to build and wire an electrical control panel. The plaintiff was so good and fast at electrical control wiring that he finished ahead of the other groups.

One day the plaintiff saw some black students purposefully sabotage another electrical control panel. (Normally the white wire in electrical controls is associated with electrical neutral. The black students made the white wire hot while leaving the wire color white; therefore, an unsuspecting student could touch the white wire thinking it was neutral and get electrocuted.) A black female student (who nickname was Queen) was about to touch the sabotaged electrical control panel when the plaintiff warned her. The instructor came over to investigate the commotion. The plaintiff indicated to the instructor that black students sabotaged the electrical control panel. The instructor did not want to believe the plaintiff since black students were involved and he feared losing his job. Finally the instructor took the chance and tested the sabotaged electrical control panel - prior to testing the sabotaged electrical control panel the instructor put on safety gloves to protect himself. When the instructor tested the sabotaged electrical control panel not only did an electrical spark occur but the electrical fault was so severe that electrical power to part of the building was knock out.

Some time passed.

Cass Tech offered students extracurricular activities in the morning prior to the start of classes. The plaintiff enrolled in an extracurricular course on law which was taught by a black lawyer. One day the plaintiff began tell the lawyer about the sabotaged electrical control panel while purposefully not telling the black lawyer that the woman that was nearly killed (Queen) was sitting in the same extracurricular course on law. The lawyer did not want to take the case, nor could Queen's parents find a lawyer to take the case, to prosecute the students who sabotaged the electrical control panel because the lawyers lost interest in the case once they found out that black students who lived in the City of Detroit were responsible for sabotaging the electrical control panel.

### Racist Black Students – High School - Purposefully harassment

The reader should not be fooled into thinking that these incidents were isolated cases. As mentioned above, on more than one occasion the plaintiff witnessed black students purposefully physically assault non-black students. The difference between plaintiff and the other non-black students at Cass Tech was that the plaintiff used to defend himself with a **Bic** pen against the assaults of the black students.

As mentioned above, in the 1970's Cass Tech did not offer a 9th grade class; therefore, Cass Tech offered 10th, 11th, and 12th grades. Cass Tech was not the typically neighborhood Detroit Public High School, Cass Tech could pick-and-choose their students. If a black student and non-black student got into a fight both

students could be thrown out of Cass Tech and sent to their neighborhood Detroit
Public High School. If a student could not keep up their grades, Cass Tech could
send the student back to their neighborhood Detroit Public High School.

One day when the plaintiff was attending one of his electronics classes at Cass
Tech, a black student started to physically assault a non-black student by the name
of Bay-toe Ah-go-pian. (Bay-toe Ah-go-pian was one of the best students in the
electronics program at Cass Tech) Since the black student was going to be sent
back to his neighborhood Detroit Public High School anyway, he took the
opportunity to physically assault Bay-toe Ah-go-pian. Bay-toe was defenseless,
since to defend himself would have been expulsion from Cass Tech.

The above actions by racist black people does not compare to the tragedy a white
woman experienced at Munger Junior High. While at Munger Junior High the
plaintiff meet a white woman who lived or hung out at the Northeast corner of
Freer and St. John in Detroit, Michigan.

The plaintiff met the white woman years later and a child was with her. She told
the plaintiff that while at Munger Junior High she was given two options:

- let black men rape you until she got pregnant with a black baby
- or face repeated beatings (physical assaulted) until she submitted to be raped
  by black men until she got pregnant

Racist Black People – Black Students – Tenth Year Class Reunion

29 of 73

Unfortunately actions of some racist black students at Cass Tech did not end upon graduation. When plaintiff was working for General Motors, he received an invitation to the Cass Tech, Class of 1979, Tenth Year Reunion held at the Renaissance Center in Downtown Detroit, Michigan.

General Motors personnel asked the plaintiff if he was going to his 10th year class reunion, and plaintiff told them yes. General Motors personnel asked the plaintiff if Pamela was also going to his 10th year class reunion, and plaintiff told them Yes (this was a lie).

The reader needs to remember that on more than one occasion black students at Cass tech purposefully tried to physically assault the plaintiff; therefore, the plaintiff anticipated that some of these students would try to physically assault the plaintiff, physically assault his wife, and possibly rape his wife at the 10th year class reunion.

The plaintiff told Paul Durrenberg that if the plaintiff did not show up for work at General Motors on Monday following the 10th year class reunion, then he should check the hospitals because he anticipated that black students from Cass Tech might try to physically assault the plaintiff at the 10th year class reunion.

Pamela asked the plaintiff if she had to go to the 10th year class reunion, the plaintiff told her No. The plaintiff explained to her that he told other people that she was going to the 10th year class reunion; because, if the black students physically assaulted the plaintiff and criminal charges were filed by the plaintiff

against the black students the plaintiff wanted two sets of charges filed against the black students.

- one set of criminal charges for physically assaulting the plaintiff
- a second set of criminal charges for conspiring to physically assault Pamela

The plaintiff explained to Pamela that he would know quickly if the black students intended to physically assault him if the black students asked the plaintiff if they could borrow a pen. Remember the plaintiff had a reputation for defending himself with a Bic pen and that the black students would try to disarm the plaintiff by asking him if he had a pen that they could borrow prior to trying to physically assault the plaintiff.

Pamela advised the plaintiff to come straight home from the 10th year class reunion. If the plaintiff did not come home by a certain time Pamela would know something was wrong. The plaintiff prepared for the physical assault by the black students by taking with him a long screw drive that he could use as a knife to defend himself.

The plaintiff went to the 10th year class reunion and as expected a group of black male students and one female black student (Queen) were waiting for the plaintiff. One of the first things that the black students did was to ask the plaintiff if they could borrow a pen. The plaintiff knew the fight was on. When the black students seen that the plaintiff came prepared with a screw driver, the black students back off.

**Question:** Are you saying the black students from Cass Tech premeditated a physical assault on the plaintiff after ten years?

**Answer:** Yes

General Motors and American society assumes white people are racist until proven innocent. American society needs to wake up to the fact that some black people are so racist that they:

1. purposefully provoke racial tension; or
2. they falsely claim a white person is racist then let the white person prove they are innocent

General Motors knew they could race bait the plaintiff because American society assumes white people are racist until proven innocent.

General Motors harassment of the plaintiff did not stop with race baiting the plaintiff.

- On one occasion General Motors stole plaintiff Handbook of Chemistry and Physics that he won in Chemistry Class at Lawrence Technological University.
- One day plaintiff finds a rat in his house - the workers in the Dynamometer Wing nickname was Dyno Rats.

**Question:** Did your spiritual experiences significantly effect your work at General Motors?

**Answer:** Spiritual experience – The fall

Approximately CY1990 / CY1991, after the plaintiff completed Dynamometer Test Cell #13 renovation, General Motors asked the plaintiff to go to personnel and began to ask the plaintiff a series of questions. One of the questions General Motors asked the plaintiff was if he thought he was ready for 8th level. The plaintiff responded by asking for one more year.

In retrospect it is easy to see the discrimination by General Motors against the plaintiff. When General Motors asked the plaintiff if he thought he was ready for 8th level this implies that General Motors management still thought the plaintiff did not earn an 8th level position.

In retrospect the plaintiff did the correct thing by not accepting an 8th level position because the plaintiff earned his 9th level with the completion of Dynamometer Test Cell #13 renovation.

One evening in this same CY1990 / CY1991 timeframe the plaintiff was at home and woke up from sleep to get out of bed and to go to the bathroom. As the plaintiff was washing his hands something happened. The next thing the plaintiff remembers he was picking himself off the floor and there was blood on his body from an apparent fall. The plaintiff finished washing his hands and then went to sleep without giving any consideration to passing out in the bathroom.

The fall by the plaintiff erased from the plaintiff's memory the interview by
General Motors after the plaintiff completed Dynamometer Test Cell #13
renovation. Plaintiff never went back to General Motors personnel to claim his 9th
level.

General Motors did not award the plaintiff a 9th level in CY1990.
General Motors did not award the plaintiff a 9th level in CY1991.
General Motors did not award the plaintiff a 9th level in CY1992.
General Motors did not award the plaintiff a 9th level in CY1993.
General Motors did not award the plaintiff a 9th level in CY1994.
General Motors did not award the plaintiff a 9th level in CY1995.

**Question:** Should General Motors known something was wrong when the
plaintiff did not show up one year later for a 9th level?
**Answer:** The plaintiff on at least one occasion started to go unconscious at work
during a presentation in the General Motors Technical Center, Engineering
Building, Emissions Wing, E2-Conference Room. (Paul Durrenberg witnessed the
plaintiff nearly going unconscious at work.)

**Question:** How did General Motors respond once they learned that plaintiff memory was effect by a fall?

**Answer:** General Motors repeated race baiting the plaintiff even until the plaintiff's last days in August 1995 when General Motors tried to pin a racist label on the plaintiff in a meeting in the General Motors Technical Center, Engineering Building, Emissions Wing E2 – Conference Room,.

**Question:** Did any other spiritual experiences effect the plaintiff's work at General Motors?

**Answer:** Spiritual experience – The force

Plaintiff divorced Pamela approximately CY1990 and the plaintiff started dating many women. One woman the plaintiff dated was Maribeth. Plaintiff and Maribeth did a lot of pre-marital foreplay (but no sexual intercourse). The plaintiff and Maribeth were engaged to be married, but the plaintiff started becoming uncomfortable about engagement to Maribeth.

Plaintiff prayed that if he would lose his soul over this relationship …. **give me a sign**

Not long after praying this prayer plaintiff felt a weight upon his shoulder as if a man was sitting upon his shoulder. The force of the weight could not be relieved by lying down nor relieved in any other position.

The force physical effects on plaintiff started to be noticed by the plaintiff's family and the people at General Motors. The plaintiff started to wear a rosary (under his shirt).

- Maribeth noticed plaintiff wearing the rosary and commented that she would be embarrassed to be seen in public with plaintiff wearing a rosary
- Plaintiff started getting flash backs of his previous marriage to Pamela
- Plaintiff broke off the engagement with Maribeth
- Plaintiff started to receive counseling
- In retrospect **spiritual experience – the force** did the plaintiff a huge favor because when plaintiff's memory started to clear up he realized that marriage to Maribeth would have been worse that the marriage to Pamela.

The reader can verify the physical effects on plaintiff by contacting:

- Maribeth, the woman plaintiff was engaged to
- Plaintiff family
- The people at General Motors Technical Center, Engineering Building, Emissions Wing E2 – Conference Room, approximately August 1995. (Present at the meeting were Bill Whitley, M.J. Spi-nah-zee, Gerry Fairbanks, Paul Durrenberg, and an unknown man.)

General Motors would harass the plaintiff regarding this spiritual experiences years later:

- In May 2003 when plaintiff was imprisoned against his will at North Oakland Medical Center for over one week the mental hospital would

simulate General Motors paging system and feed the sounds into plaintiff room.

- In CY2001 after the plaintiff's position at MSX International was eliminated the plaintiff had an interview at PICO (an automotive supplier located on Telegraph Road just North of Eight Mile Road; now Comau North America (Pico) located at 21000 Telegraph Road)
    - o During the interview the PICO interviewer said to plaintiff - the force be with you

**Question:** In the beginning of this essay, the plaintiff stated that one of the intensions of this essay was to share these spiritual experiences with the reader as a primer for challenging conventional Western Christian doctrine / theology in future writings. Please specify one spiritual insight the plaintiff gain from his spiritual experiences?

**Answer:** Spiritual experience – woman in Ottawa

East and West are equal

In the July 1994 the plaintiff took a personal and business trip - General Motors was purchasing some Conditioned Air Units from Environmental Tectonics Corp. in the Southampton, Pennsylvania area.

The plaintiff did some cave crawling in the Mammoth caves in Kentucky; went on a coal mine tour in West Virginia; did some white water rafting in West Virginia; a air plane ride with five-dollar Charlie in West Virginia; visited Judie Brown at American Life League in Virginia; did some work for General Motors at

Environmental Tectonics Corp. in Southampton, Pennsylvania; visited the capital
of New York in Albany; and visited the church of St. Anne De Beaupre' in
Quebec, Canada.

While in Quebec, Canada the plaintiff exceeded his credit card limit trying to rent a
room and had to call for increase in his credit card limit.

On approximately July 23, 1994, the plaintiff visited Ottawa, Canada. After touring
the parliament building and spending some time by a small boat lock system, the
plaintiff started looking for a place to eat and found an open outside restaurant.
Almost immediately the plaintiff catches in the corner of his eye an attractive
young woman (angel) running to join the plaintiff. The plaintiff has a long
conversation with the woman (angel).

The restaurant should not be hard to find since the plaintiff purchased lunch for the
woman (angel) and dinner for the woman (angel) and her husband using his credit
card.

Please specify one spiritual insight the plaintiff gain from his conversation with
woman in Ottawa (angel).

East and West are equal

To understand the significance of **East and West are equal** the reader needs to
understand the Roman Catholic Church perspective on the relationship between
Roman Catholics, Orthodox Catholics, Protestants, Jews, Muslims, and other

peoples of good will. In overview the Roman Catholic Church views itself as the true deposit of the apostolic faith. All other people of faith are ordered by their relative agreement with the teachings of the Roman Catholic Church.

The woman in Ottawa (angel) makes the Roman Catholic Church and the Orthodox equal. Roman Catholics and Orthodox Catholics are equal as the true deposit of the apostolic faith.

This experience in Ottawa makes plaintiff more confident about defending his Catholic Christian faith at General Motors when Protestants, lukewarm Catholics, and secular people question and harass the plaintiff about the Roman Catholic teaching about praying the rosary, creation versus evolution, Sacred Scripture being myth, abortion, artificial birth control, all male priesthood, and capital punishment.

The plaintiff also begins to share his **spiritual experiences** more openly at General Motors.

The plaintiff completed the Conditioned Air System project (see resume for details) and continued to work for General Motors Corporation until the plaintiff resigned in August 1995 to enter Sacred Heart Major Seminary for the Archdiocese of Detroit in priestly formation.

The hostile work environment by General Motors against the plaintiff started in July 1983 and continued until August 1995. The compensation discrimination by

39 of 73

General Motors against the plaintiff started in July 1983 and continued until August 1995. General Motors hostile work environment and compensation discrimination against the plaintiff can be summarized as:

The plaintiff should have been hired in as a 6th level Project Engineer instead of a 5th level Associate Engineer.

General Motors hostile work environment against plaintiff religious beliefs:

- Terri Hostetter attacks plaintiff belief in Creation
- Ward Wiers tries to convert plaintiff away from Roman Catholic Church
- General Motors using suppliers to harass plaintiff's belief that abortion is wrong in all situations
- General Motors uses outside supplier DSP Technology to attack plaintiff silent praying before meal at lunch
- Jim Thorsen tries to convert plaintiff away from Roman Catholic Church
- General Motors asks plaintiff to prove the existence of God

General Motors hostile work environment continues against plaintiff in a variety of forms:

- Paul Durrenberg trying to hypnotize the plaintiff.
- Unknown people trying to verbally assaulting the plaintiff.
- General Motors blocks in the plaintiff's car with a group of cars on South bound Mound Road just North of 12 Mile Road.
- Paul Durrenberg (technician supervisor) tampering with the plaintiff's forty-seven mm diesel particulate filter sampling system project

- Jerry Sidlar (instrumentation technician) purposefully gives plaintiff bad information in the Sample Condition Unit project
- Paul Durrenberg purposefully tries to steal plaintiff idea of using a Programmable Logic Controller in the Sample Conditioning Unit project
- Chris Killen (a woman) falsely accuse plaintiff of looking down her blouse and Bob Zuzga (Chris' office partner) is willing to commit perjury to protect Chris from her false accusation

General Motors delays plaintiff's first promotion until approximately September 1, 1985 and awards plaintiff a small 10 percent pay raise with the promotion.

General Motors purposefully fails to record the plaintiff's CY1983, CY1984, CY1985, CY1986, CY1987, and CY1988 accomplishments. These include:
- Humidity Monitoring to help diagnose problem with large printer
- Forty-Seven mm diesel particulate filter sampling system
- Sartorius Microbalance
- Tylan Mass Flow Controllers
- Sample Conditioning Unit
- Horiba Chassis Dynamometer Controller
- Overhead Track System
- Emission Wing Renovation – Design Coordination
- Programmable Logic Controllers – integrated into Emissions Analysis Systems
- Instrumentation Console and Custom Enclosure
- Emission Test Site Instrumentation Patch Panel

- 12-Channel Strip Chart Recorder and Custom Enclosure
- Dew Point Meter and Ambient Temperature Sensor and Custom Enclosure
- Instrumentation Interfacing
- Large Temperature and Humidity Display
- Honeywell HVAC Central Control Station
- Smoke Detector Graphics Display Panel
- Overhead Door Logic Controls
- Emissions Wing Renovation – Project Management
- Software Programming Skills and Software Program Management
- Fuel Meter Calibration Cart

General Motors hostile work environment continues against plaintiff in a variety of forms in the Dynamometer Wing:

- Paul Durrenberg and Allen Boogaard verbally soliciting plaintiff for oral sex.
- General Motors race baiting the plaintiff and falsely accusing the plaintiff of being racist.
- Paul Durrenberg and Aaron Trammel (black male) asks plaintiff if he is racist.
- Roy Harvey (a black male) challenges plaintiff to hit him.
- Robert Bu-tha-ah (a large black male with the UAW) comes into plaintiff office; stands behind plaintiff; and places a knife to his throat.
- Janet Austin (a black woman) comes uninvited to the plaintiff's table during lunch and starts to kick plaintiff in the leg.

- General Motors attacks plaintiff family. Plaintiff owned a piece of rental property at 7320 Stout in Detroit, Michigan. Plaintiff rented the property to his sister Gerri. His sister Gerri is cased by an unknown black man and is almost physically assaulted by the black man.
- General Motors steals plaintiff's Handbook of Chemistry and Physics that he won in Chemistry Class at Lawrence Technological University.
- The plaintiff finds a rat in his house - the workers in the Dynamometer Wing nickname was Dyno Rats.

General Motors compensation discrimination against the plaintiff can be easily be seen when the plaintiff did not receive a promotion and / or bonus for a variety of major accomplishments:

Unique solutions by plaintiff with no promotion and / or bonus from General Motors

    1.1. Programmable Logic Controllers – integrated into Emissions Analysis Systems

        1.1.1. Don Nagy of General Motors Milford Proving Grounds specifically stated that Programmable Logic Controllers has been tried by General Motors before and cannot be made to work for Emission Analysis Systems applications

        1.1.2. Don Nagy of General Motors Milford Proving Grounds recommended using Milford Vehicle Emissions Lab Bench Controller

    1.2. DSP Combustion Analysis System – Several years later

1.2.1. General Motors Corporation and DSP Technology had a problem with the DSP Combustion Analysis Systems that General Motors Corporation and DSP Technology could not solve

1.3. Dynamometer Test Cell #13 Renovation

1.3.1. the first modern, integrated Dynamometer Test Cell renovation at the General Motors Technical Center completed in CY1990

1.4. Dynamometer Test Cell #06 Legal Issue

1.4.1. General Motors has a $20 Million dollar legal issue and nobody in General Motors can figure out the problem

1.4.2. eventually General Motors asks plaintiff to try to solve the problem

1.4.3. there is a General Motors Guidelines that specifies Dynamometer Test Cell Ventilation depression setting of 1.0 inch water

1.4.4. many years ago plaintiff told General Motors that the specification was wrong; the Dynamometer Test Cell Ventilation depression setting should be 0.1 inches of water not 1.0 inches of water

1.4.5. General Motors basically tells plaintiff to shut-up (plaintiff was only a 5th or 6th level Project Engineer when plaintiff told General Motors that the specification was wrong)

1.5. New Dynamometer Wing Ground Wire

1.5.1. the Engineering Building Dynamometer Wing electrical grounding was a crows nest of electrical grounding schemes

Major accomplishments by plaintiff for which plaintiff did not receive a promotion and / or bonus from General Motors

1.6. Emission Wing Renovation – Design Coordination; (see resume for details)

1.7. Emissions Wing Renovation – Project Management; (see resume for details)

1.8. Dynamometer Test Cell #13 Renovation; (see resume for details)

1.9. Dynamometer Test Cell #07 Renovation with New Hemi-anechoic Chamber; (see resume for details)

1.10.    Dynamometer Test Cell #11 Renovation; (see resume for details)

1.11.    Dynamometer Test Cell #15 Renovation; (see resume for details)

1.12.    Dynamometer Test Cell #08 Renovation; (see resume for details)

1.13.    Integration of New Programmable Logic Controller (PLC) and Modicon Panelmate 2000 Video Based Man-Machine Interface

    1.13.1.    Plaintiff took the first modern, integrated Dynamometer Test Cell renovation at the General Motors Technical Center and advanced it to the next higher level

9th Level Project Management by plaintiff– for all practical purpose the plaintiff ran the Emissions Wing Renovation and Dynamometer Wing Renovation

1.14.    Plaintiff did not revive or ask approval from Ward Wiers on a daily basis, weekly basis, or monthly basis

    1.14.1.    if Ward Wiers had been in a hospital, plaintiff would not have noticed a significant absence during the day-to-day Project Management of the Emissions Wing Renovation

1.15.    Plaintiff did not revive or ask approval from Dennis Wiese on a daily basis, weekly basis, or monthly basis

    1.15.1.      if Dennis Wiese had been in a hospital, plaintiff would not have noticed a significant absence during the day-to-day Project Management of the Emissions Wing Renovation

1.16.     Plaintiff did not revive or ask approval from Jerry Fairbanks on a daily basis, weekly basis, or monthly basis

    1.16.1.      if Jerry Fairbanks had been in a hospital, plaintiff would not have noticed a significant absence during the day-to-day Project Management of the Dynamometer Wing Renovation

1.17.     Plaintiff did not revive or ask approval from Jim Thorsen on a daily basis, weekly basis, or monthly basis

    1.17.1.      if Jim Thorsen had been in a hospital, plaintiff would not have noticed a significant absence during the day-to-day Project Management of the Dynamometer Wing Renovation

Evidence of General Motors pattern of compensation discrimination against plaintiff:

| Date | SRS Salary | 7E06 Mid-point | 7E06 Maximum | 9th Level > Mid-point |
|------|-----------|----------------|--------------|----------------------|
| May 01, 1989 | $44,916 | Not shown | $60,840 | ??? |

Plaintiff earns his 9th level with Dynamometer Wing Test Cell #13 renovation

| Date | SRS Salary | 7E06 Mid-point | 7E06 Maximum | 9th Level > Mid-point |
|------|-----------|----------------|--------------|----------------------|
| Sept. 01, 1990 | $47,976 | $52,800 | $63,276 | ??? |

Fairbanks / Thorsen recommend plaintiff for 7th level; Evaluation Dec. 12, 1990

| Date | SRS Salary | 7E06 Mid-point | 7E06 Maximum | 9th Level > Mid-point |
|------|-----------|----------------|--------------|----------------------|
| Sept. 01, 1991 | $52,800 | $55,368 | $66,276 | ??? |

Fairbanks / Thorsen recommend plaintiff for 7th level; Evaluation Jan. 22, 1992

Plaintiff compensation statement for CY1992 not in personnel records

| Date | SRS Salary | 7E06 Mid-point | 7E06 Maximum | 9th Level > Mid-point |
|------|-----------|----------------|--------------|----------------------|
| Oct. 01, 1993 | $57,432 | $58,200 | $70,500 | ??? |
| June. 01, 1994 | $61,356 | $59,940 | $73,680 | ??? |
| June. 01, 1995 | $63,588 | $61,920 | $75,900 | ??? |