# EXHIBIT B
# PART 3

| DATE/TIME | |
|---|---|
| 5/16/03 1400 | (S) "I want a razor and to see a chaplin... I'm catholic." (O) Pt. speaks clear and softly. Dressed appropriately. No blsr. No auditory or visual hallucinations. Carries a pad and pencil for note taking. Use pay phone. In room writing. Minimal peer interaxn. (A) Flat affect. Withdrawn and isolative. No internal stimuli response. (P) Encourage group meeting and social interaxn. Cont— to monitor and maintain level III. — P.Tulligan (E) Pt. isolative and quiet. In room sleeping. Ask staff for help to see chaplin. Pt out on unit lunch. B.Tulligan |
| 5/16/03 2152 | (S) I feel fine. pt makes his needs known. Asked for a shaver. was monitored (O) Pt sleeps most of shift when alert, he is polite upon approach. no social interaction c peers. Pt's appetite's 100% Quiet no inappropriate behavior. (A) isolative, auditory hallucinations, depressed mood, affect is flat. level II (P) Monitored pt, encouraged unit participation. Patricia McQueen MHT |
| 5/17/03 0600-sleep | D-pt appeared asleep throughout the night. level II maintained _____ S.Steiner RN |
| 5/17/03 | Pt reports persisting auditory hallucinations, said the voices are typically worse in Am, comments on his behaviour or tells him what to do next like brush his teeth, etc. No problems from meds other than some day time sedation. Shall continue meds as is. Pleasant, cooperative. Snalind Sanjay |

**NORTH OAKLAND MEDICAL CENTERS**

PONTIAC, MICHIGAN

PROGRESS RECORD

STASHO, STANLEY

JAMIL, SHAHID

JAMIL, SHAHID

| DATE/TIME | |
|---|---|
| 5/17/03 ~~1050~~ 0950 | S+O: pt up most of the morning in his room, reading scriptures. pt denies suicidal ideation and depression. pt stated he "never was really depressed," "I feel the incident was isolated," admitted to hearing voices in the AM. Refuses to say what the voices are saying stating "it's different every time, I just want to leave it at that." A:) isolative, hearing auditory hallucinations. P:) encourage pt to attend groups, encouraged pt to talk about auditory hallucinations. _____ VGMHS |
| 1050 | S+O:) pt attended session ē private priest. pt appeared to have more affect and was smiling after session. pt stated he "felt better." pt returned to room shortly after session. pt inquiring about mass on Sunday. A:) isolative, P:) continue to encourage pt to attend groups. _____ VGMHS |
| 5/17/03 1950 | (S+O) Pt was visible on unit with visitors ate dinner, played Yatzie game by himself, went to bed. ⑰ depressed isolative, guarded, withdrawn. ⑭ continue to monitor safety + any change in behavior, assist when needed. _____ Fontroe mHT |
| 2245 | ⑰ pt continue to sleep did not get up for group or snack time, no interaction with anyone, remain guarded + guarded slept during shift, remains to be level II _____ Fenroy MHT |
| 5/18/03 0600 Sleep | ⑰ pt appeared to sleep throughout the night. Sleep level II maintained. _____ |
| 5/18/03 | Talked at length he lies fear that someone was ⓞ trying to harm him on Monday. that his car was "booby-trapped" + he only had so much time to get to the church. He fears he might have hurt someone's career at 6dt by "speaking truthfully." Subsequent (more) |

| DATE/TIME | |
|---|---|
| 5/18/03 Cont'd | to leaving CM he had 2 other jobs but was unable to function. Has significant obsessional patterns that interfere c̄ his functioning, + between his thought disorder + OCD his ability to think/concentrate has been affected considerably. So present ~ 9 yrs ? untreated. |
| 5-18-03 1310 | S-"I didn't Request breakfast", "except for that one isolated incident that will never happen again, I don't belong here", "If I'm depressed it's only because of being here + not at home." O-refused breakfast Remained in Room Reading. Was ↑ playing yahtzee alone for awhile. Seen playing ping pong c̄ a peer before lunch. denies any psych problems. "Even if you asked me a few hours before the isolated incident, I would've told you I didn't want to hurt myself". ⊽ finishing lunch, Prayed 4 or 5 times (the same prayer) + went back to Room. except for ping-pong almost ∅ interaction seen. A-Relig. Pre-oc, lacks insight + denies mental illness. P-cont. to monitor mood + behavior, encourage to spend ↑ time out of room, support + ENCOURAGE o level II —T. Gregory MHT |
| 5-18-03 2040 | S "Right now I don't have any problems with voices, But I did earlier. I feel what happened to me was an isolated incident. I don't need to be here. I could have stayed at home, and went to counseling for treatment, there's NO need for me to be here. The voices I heard earlier had No indication for me to hurt my self. I would rather be at home dealing with what happened. O Visible on unit, pacing, ate dinner, did not attend group. A lack insight or psy- problem, Denial evasive. P encourage pt. to attend groups, assist, support, mon; for — J. Fantroy MHT |
| 5/19/23 0600 Sleep | O Pt has appeared to sleep throughout the night. Will ⊽ maintained —S. Schmuck? |

# NORTH OAKLAND MEDICAL CENTERS
## PONTIAC, MICHIGAN
### PROGRESS RECORD

STASKO, STANLEY
JAMIL, SHAHID        M F
JAMIL, SHAHID

| DATE/TIME | |
|---|---|
| 5/19/03 | Pt reports noticing "some" ↓ in the voices today Am. Odd re persist. Detailed discussion re Rx options, pros & cons, meds, side effects. Decided to:<br>→ ↓ Risperdal to 3mg Hs to ↓ daytime sedation<br>→ Add Zoloft for OCD (Sister on Zoloft c good results, per sister)<br>pt agrees.<br><br>Surendra Deshpe MD |
| 5/19/03 1/10 | (S) "Who decides when you should be discharged? I was led to believe it would be early this week. That means Mon or Tues to me. But I didn't get that impression when I talked to the Dr. The voices are less & I don't have urges to hurt myself. That was an isolated incident, I don't need to be here."<br>(O) Pt resting on bed upon approach, good eye contact spontaneous conversation, good ADLs. c/o roommate taking his things, requesting Room change. Flat affect, attending unit activities & peers, polite & cooperative. Focused on discharge.<br>(A) ↑ insight, denial of need of tx unit, auditory hallucinations less.<br>(P) Continue to observe & monitor mood & behavior, supportive approach, maintain safety, encourage verbalization of concerns. Level II maintained.  LJffitt |
| 5/19/03 2000 | "S – "I feel much better today, I have more energy, I feel good, I'm not hearing voices"<br>"O" – pt denies hearing voices, pt is smiling, good eye contact & has written in journal for 5/19. Did not attend 8:00pm meeting, was going to sleep for the night.<br>"A" – pt denies hearing voices, happy mood,<br>"P" – cont. to monitor pt behavior & mood, encouraged meeting, journal writing, and verbalization of feelings or concerns ——— Laura Rubbera |

4100028                          CONTINUED – OVER                          PROGRESS RECORD

CONTINUATION OF PROGRESS RECORD

| DATE/TIME | |
|---|---|
| 5-20-03 | Ⓓ Noted pt. ℞ Bed ē eyes closed all shift as Rounds were made. Noted no movement from pt.— Ⓡ Continues to rest in Bed @ med ℞. [signature] |
| 5/20/03 | Review of sx status & ℞ plan: Pt reports feeling less drowsy during the day. Sleeping well at night. Voices have decreased (but not gone). Conversations are a little more goal directed, though his concreteness & obsessional thinking still gets in the way. Tolerating meds well, shall ↑ Tolect. Again discussed need for caution ē anti-depressants given his family hx of Bipolarill. [signature] |
| 5/20/03 | Ⓢ "Doing good. Not napping much. I have more energy." Ⓞ Pt. appears calm & not depressed. Ⓐ Pt. denies hearing voices. Pt. is restless & ready to go home. Ⓡ monitor Pt. & continues to enc. group therapy. [signature] UONE |
| 5/20/03 1825 | Ⓢ "I don't believe that I ever needed to come here. I could have gone to a priest, had my sins absolved, and gone home to live my life." Ⓞ Pt. visible on unit, pacing. Minimal interaction ē peers. Cooperative ē 1:1 ē staff when approached. Reports a ↓ in hallucinations but fails to acknowledge benefit of medication. Unshaven. Minimal insight into illness. Ⓐ Hallucinations decreasing. Ⓟ Offered 1:1 interactions & pt. education re: medications & illness. Ⓔ Responsive to 1:1 interactions but remains in denial regarding his illness.— [signature] CCSN [signature] MSN occ faculty |

**NORTH OAKLAND MEDICAL CENTERS**
PONTIAC, MICHIGAN
PROGRESS RECORD

634084      PSY  51403
688916    50669    33Y
STASKO, STANLEY
JAMIL, SHAHID      M F
JAMIL, SHAHID

| DATE/TIME | |
|---|---|
| 5/21/03 0600-Sleep | D- Pt appeared to sleep throughout the night. Pt Checked q 15 mins. Level II maintained. [signature] RN |
| 5/21/03 | Pt appears to slowly doing better. He is somewhat more spontaneous, affect slightly more animated. Said voices persist but mostly limited to AM. Less depressed & anxious, denies any intent to harm self. Denies any problems from meds. Shall continue meds as is. Pt still shows poor insight into the nature of his P illness. Again discussed his dx, Px, Rx. Also d/w his sister Geraldine by phone yesterday re his Px status & Rx plan at his request (he will be staying c her p disch). Discharge Friday AM. Pt agrees.  Shahid Jamil M.D. |
| 5/21/03 SW NOTE | Patient has an appointment scheduled for 6-3-03 @ 8:30 AM c Easterseal 372-6800 FAX # 248 355-1402. Per Barbara Z. if Easterseal have cancelation will call patient early to schedule an appointment @ pt's sister's home.  Maxine Burgess MSW CSW CACE |
| 5-21-03 1400 | (S) "I was an engineer at GM... got laid off... I want to Seminar School to be a Catholic Priest." (O) Pt makes eye contact. Visible on unit. Minimal interax'n c peers. Attended group. Ate 100% meals. (A) Denies any hallucinations, isolative at times. Denies any thoughts of self harm. (P) Encouraged to interact c peers and express feelings. Monitor & maintain at level II.  B. Tullogue |
| 5/21/03 1845 | (S) "I would rather not answer that question because I might not be telling you the exact correct truth and my conscience tells me that I'm lying to you and I don't want to lie." |

4100028                CONTINUED — OVER                PROGRESS RECORD

| DATE/TIME | |
|---|---|
| | (O) Pt. guarded. Focuses on intellectual concepts and accomplishments & is resistive to exploring feelings. Minimal interaction c̄ peers. Playing Yahtzee c̄ Staff. Minimal insight re: illness. (A) ↓ hallucinations. In denial of illness. (P) Offered 1:1 interactions and Recreation. Encouraged group attendance. (E) Responsive to staff, but not interested in relating to peers. _____ M. Ostin CC SN _____ 6. Eves RN MON, OCC Fac. |
| 5/21/03 2020 | I'm having a great day, thats four in a row. My energy level is good I'm staying out of bed. The only voices I here are in the mornings theyre gone by the afternoon (O) Pt shared ADLs appropriate appearance neat. Received visitors. (A) Brighter affect, less isolative. Auditory hallucinations are less, less guarded. No interaction c̄ peers. level II (P) 1:1 interactions assistance as needed = encouragement. Patricia McQueen MHT |
| 5/23/03 Poor Sleep | O – pt appeared & slept throughout the night. Level I maintained _____ S. Hower jr |
| 5/22/03 | Pt continues to show slow but steady improvement. Feels he is thinking more clearly, more spontaneous. Voices are now confined to late Am's. said he feels in good control of himself. Again discussed his dx. the importance of his family hx of Bipolar disorder. Shall ↓ Level to I & if he continues to do better, discharge tomorrow Am. Pt agrees. _____ Shahid Tanipir |
| 5/22/03 1140 | (S): "I really feel better. I feel I have been improving over the last several days...... I don't have any thoughts to hurt myself. If that ever happens again I will call a counselor." (O): Visible on unit. Good ADLs. Cooperative on approach. Denies suicidal thoughts. Denies homicidal thoughts. |

**NORTH OAKLAND MEDICAL CENTERS**
PONTIAC, MICHIGAN
**PROGRESS RECORD**

STASKO, STANLEY
JAMIL, SHAHID    M F
JAMIL, SHAHID

| DATE/TIME | (note cont.) |
|---|---|
| 5/22/03 1140 | O: minimal interaction c̄ peers, Good w/ ē staff. Somewhat preoccupied c̄ cleanliness. pt ashed in Am to have soap for evening shower. A: Thought processes improving. ↓ potential for harm. ↓'d altered sensory perception. P: Continue to monitor safety, mood, and behavior. Enc. ventilation of thoughts and feelings. — Solar |
| 5/22/03 2250 | S) Pt stated his concentration is good, average energy. He didn't rest good last night O) Pt attend group ē participation, minimal interaction, appetite 100%. Pt spent most of shift out of his room, cooperative & quiet. A) less isolative, denies auditory hallucination, brighter affect, less paranoid, initiates conversation, makes his needs known, good eye contact level I (P) Supportive approach 1:1 interactions. — Patricia McQueen M H |
| 5/23/03 0600 Sleep | O – pt has appeared to sleep throughout the night. Level I maintained — Shonnja |
| 5/23/03 | Review of sp Status & Rx plan: pt is doing much better c̄ PTA. He is more spontaneous, smiles more, & his hygiene/grooming is better. Auditory hallucinations have ↓ but not gone, & are benign, eg. tells him to brush his teeth, "close the door" if he is changing clothes, etc. Denies any thoughts of hurting self/others. Tolerating meds well. Shall discharge, Flu c̄ Easter Seals. Again discussed dx, d/d, Rx, relapse prevention. — Shahid Jamil |

09-50026-mg    Doc 9093-4    Filed 02/04/11    Entered 02/04/11 17:42:53    Exhibit B
CONTINUATION OF MEDICAL RECORD
Case 2:09-cv-14827-JAC-VMM    Document 2-4    Filed 12/11/09    Page 41 of 43
Part 3 of 3 Pg 10 of 120

| DATE/TIME | |
|---|---|
| 5-23-03 1045 | Pt. discharged from unit appeared in good spirits, denied ideations given filled prescriptions & discharge instructions to f/u ā Easter Seals |
| Discharge 1045 | Pt. Vhelayd understanding of instructions. Pt. left the unit ā his sister.                                              W. Villaggio RN |
| 5/24/03 | Dictated |
| | James |

**North Oakland**
MEDICAL CENTERS

**PATIENT CLOTHING SHEET**

```
1 634684. : PSY  51403
  688918  80669  33Y
STRASKOIASTANLEY/
JAMIL, SHAHID      M F
JAMIL, SHAHID
```

**Female**

_____ Bra
_____ Panties
_____ Slip
___/___ Stocking/Socks    X Apr 5/17
_____ Blouse
_____ Belt
_____ Sweater
_____ Skirt
_____ Slacks
_____ Jogging Suit
_____ Shorts
_____ Other (see below)

_____ Hearing Aid
_____ Dentures/Partials*

*Dentures and/or partials must be kept
in hospital denture cup and placed in
nightstand drawer when not in use.

**Male**

2 + 1 +1  Undershirt  7 5/17
2 + 2   Briefs/Shorts  7 5/17
_____ Shorts
1 + 2   Shirt  4 5/17
1 + 1   Slacks/Jeans
___/___ Belt
_____ Suit
___/___ Tie
_____ Jogging Suit
3 Socks  Other (see below)

**Other**

_____ Contacts/Glasses
___/___ Wallet/Purse
_____ Jewelry, other valuables (list)
Pt has $184.00 in wallet —
1 Tie Clasp

**Miscellaneous**

_____ Robe
_____ Pajamas
_____ Nightgown
_____ Sleeper
_____ Slippers
_____ Cap/Hat/Scarf
___/___ Coat/Jacket/Snowsuit
_____ Gloves/Mittens
_____ Shoes/Boots
_____ Suitcase
_____ Other (see below)

_____ Cash Amount
_____ Valuables Envelope #
In his
Med Cabinet in Med Rm

**I release the hospital of any and all claims
for damage or loss of articles.**

_____
Patient Signature/or Responsible Adult

_____
Date

**Upon Transfer:**

| Released To: | Released By: | Date |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

**TO BE COMPLETED BY HOSPITAL PERSONNEL:**

☐ This sheet has not been reviewed with the patient due to his/her current condition.

☐ I certify that the patient has identified all clothing to remain in his/her room.

☐ All clothing & valuables sent home with patient's family or other responsible adult.

☐ Copy given to patient.

**DISCHARGE**  X _Stanly Elliott_    5/23/2003          _S. Lorene Lynn_  5/14/03
            Patient's Signature      Date              Employee Signature

**North Oakland**
MEDICAL CENTERS
461 West Huron
Pontiac, MI 48341

1 634668          PSY  51403
638985   60669    33Y
STASKO, STANLEY
JAMIL, SHAHID          M F
JAMIL, SHAHID

## DISCHARGE SUMMARY

| | |
|---|---|
| DISCHARGE: Date & Time  5-23-03 | Mode of Discharge: _Ambulatory_ |
| Accompanied By: _Sister_ | Valuables Received: _Yes_ |

| CONDITION OF PATIENT | POST-OP MANAGEMENT |
|---|---|
| Performance Of ADL: ☑ self ☐ assistance ☐ total care | Wound: _____ |
| Ambulation: ☑ self ☐ assistance ☐ strict bed rest ☑ walker ☐ cane ☐ crutches ☐ other: _____ | Dressing: _____ |
| | Ostomy: _____ |
| | Other: _____ |
| Transferred To: ☑ home ☐ other: _____ | Temperature: _____ |

**PERSONALIZED TEACHING:**

**MEDICATIONS:**

| Medication Name | Dosage | Route | Time(s) | Special Instructions |
|---|---|---|---|---|
| ① Risperdal | 3 mgm | ORAL | ŧ TABLET AT BEDTIME | 10pm |
| ② Zoloft | 50 mgm | ORAL | ŧ TABLET AFTER DINNER | 6pm |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

Has been cautioned that alcohol may interact with prescribed medication: ☑ yes   ☐ no   ☐ not applicable

**DIET**
Type: _Regular_ _____   ☐ has a copy   ☐ received instruction from Dietitian
Special instructions (other): _____

NEXT APPOINTMENT WITH:          date: _6/3/03_   time: _8:30 AM_   phone number _248 372-6800_
Doctor: _____

CONTACT YOUR DOCTOR: ☐ Elevated Temperature   ☐ Increased Pain   ☐ Nausea / Vomiting   ☑ If any unusual symptoms develop
In case of emergency go to the nearest Emergency Room.          _FAX # 248 355-1402_
SERVICE REFERRAL: Agency _Easterseal CMH_

_E. Vultaggio RN_          RN

I, _STANLEY STASKO_ _____ have been instructed, understand and can use above instructions.

SIGNED X _____          5/23/2003

Form No. 4100316 Rev. (01/97)          DISTRIBUTION:   WHITE PLY - CHART          CANARY PLY - PATIENT          DISCHARGE SUMMARY

Case:2:09-cv-14827
Judge: Cook, Julian Abele
MJ: Morgan, Virginia M
Filed: 12-11-2009 At 04:18 PM
STANLEY STASKO V. GENERAL MOTORS CORP (KB)

Exhibit - 9

STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF TUSCOLA

STANLEY R. STASKO,

    Plaintiff,

            Case No. 03-22044-CH

-vs-

            Hon. Patrick Joslyn

DAVID STASKO, MARIE A. BELCZAK,
GERALDINE T. HARRISON, WANDA LEE
TAYLOR, KEN KIMES, LORETTA LOVELAND,
LOZETTA LOVELAND, RICHARD WOLANSKI,
GERALDINE CROSWELL, EILEEN COUCHMAN,
and KATHLEEN FINEGOLD, and their spouses
and any other unknown heirs of Walter
and Anna Stasko, and their successors,

    Defendants.
_____/

DEPOSITION OF STANLEY R. STASKO,

  the plaintiff herein, on Thursday, September 9, 2004,

  at 475 North State Street, Caro, Michigan, at or

  about 9:30 a.m.

APPEARANCES:

For the Plaintiff:    DUANE E. BURGESS (P30248)
          475 North State Street
          Caro, Michigan 48723
          (989) 673-1990

For the Defendants   PHOEBE J. MOORE (P56064)
Couchman, Croswell,  Stephens & Moore, P.L.L.C.
Finegold, Taylor and  121 West Grant Street., Suite 2
Kimes         Caro, Michigan 48723
          (989) 672-4255

For the Defendants   S. PERRY THOMAS, JR. (P61163)
Loretta Loveland    Abbey, Abbey, & Thomas
and Lozetta Loveland  121 West Grant Street, Suite
          Caro, Michigan 48723
          (989) 673-7761

**COPY**

ALSO PRESENT:                    KENNETH KIMES
                                WANDA TAYLOR
                                EILEEN COUCHMAN

REPORTED BY:                    Lori L. Brady, CER-6925
                                Certified Electronic Recorder
                                Bay Area Reporting, Inc.
                                (800) 919-4441


                        TABLE OF CONTENTS

WITNESS:                                            PAGE:

Stanley Stasko

        Examination by Ms. Moore                    3

        Examination by Mr. Thomas                   38

        Re-Examination by Ms. Moore                 46



EXHIBITS:

        Exhibit 1 - Handwritten Document                45

        (Original retained by Plaintiff's counsel).

1                                    Caro, Michigan  9:30 a.m.

2                               Thursday, September 9, 2004

3                          STANLEY R. STASKO,

4        having been first duly sworn, testified under oath as

5        follows

6                               EXAMINATION

7    BY MS. MOORE:

8    Q    Sir, your full name for the record?

9    A    My signature is Stanley R. Stasko.

10                   MS. MOORE:  May the record reflect this is

11        the discovery deposition of Stanley R. Stasko being

12        taken pursuant to notice and to be used for all

13        purposes under the Michigan Court Rules and Michigan

14        Rules of Evidence.

15   Q    Mr. Stasko, my name is Phoebe Moore.  I'm an attorney

16        here in Caro.  I represent some defendants in this

17        lawsuit that you have filed in the Tuscola County

18        Circuit Court.  Mr. Stasko, have you ever had your

19        deposition taken before?

20   A    Can you explain to me what a deposition is?

21   Q    This is a deposition where we sit at a table in some

22        room and we have a court reporter taking down what

23        we're saying.

24   A    (No response).

25   Q    Have you ever been in this type of situation before?

1   A   I don't think so.

2   Q   Well, there's a couple rules we just need to follow.

3       One is that you use words and you're doing fine with

4       that so far.  Shrugs of the shoulder, nods of the head

5       can't work.  She can't take that down.  She can only

6       take down the words that we say.

7               Secondly, it's hard for her to take down what

8       we're saying if two people are speaking at one time, so

9       just wait until I'm finished with the question.

10              Finally, if you don't understand my question,

11      will you ask me to rephrase it or simply tell me that

12      you don't understand it?  Otherwise the record is going

13      to reflect that you understood the question and

14      answered it fully and accurately under oath.  Okay?

15  A   Fully and accurately?

16  Q   Right.  Do you understand that if you answer the

17      question the record's going to reflect that you

18      understood the question?

19  A   Would you please repeat?

20  Q   Sure.  Let me say it in a different way.  And that's

21      exactly what I want you to do; if you don't understand

22      a question, just tell me you don't understand.

23      Otherwise, if you answer it, the record's going to

24      reflect that you understood the question and you

25      answered it.  Okay?  That's all I'm saying.

Bay Area Reporting, Inc. - (800) 919-4441

1  A   Understood it and answered it?

2  Q   Right.  Unless you tell me I didn't understand or

3       please repeat.

4  A   Okay.

5  Q   Okay.  Mr. Stasko, where do you live?

6  A   I live in Southfield, Michigan.

7  Q   How long have you lived there?

8  A   In Southfield?  Since approximately 1985.

9  Q   Who do you live there with?

10  A   By myself.

11  Q   I guess right off the top, I just want to get a

12       clarification on your family history.  Your mother is

13       Sophie, right?

14  A   Sophie.

15  Q   Okay.  And your father was Stanley as well, right?

16  A   Yes.

17  Q   Your father's initial, was that the same?

18  A   Initial like in --

19  Q   Your middle initial is R, right?  Was Stanley's middle

20       initial R?

21  A   My father's middle initial was W.

22  Q   And Stanley W. Stasko's parents were Walter and Anna

23       Stasko, is that right?

24  A   I think that's correct.

25  Q   Okay.  Now Walter and Anna have several children,

1       correct?

2  A   Um, are you looking for like a quantity?

3  Q   Just asking you, they had several children, isn't that

4      right?

5  A   I think -- I think it would be my dad, my Uncle Joe --

6  Q   Mr. Stasko, let me just clear one thing up.  I'm trying

7      to make it easy on you, okay?  I just want to make

8      sure, the answer would be yes.  Then if I say how many,

9      then you could say a number.  Then if I say who, then

10     you would say who those people are, okay?  So if you

11     know, go ahead and say them, I don't want to interrupt

12     you, but just, you know, try to make it easy on

13     yourself.  You don't have to jump to the next question,

14     okay?

15          So who were Walter and Anna's children, if

16     you know?

17  A   I think Stanley, Joseph, Clara, Anna, and I'd really

18     rather try not to go beyond that.

19  Q   What's that?

20  A   I'd really rather not try to go beyond that.

21  Q   Did they have more than the four?

22  A   Um --

23          THE WITNESS:  Wayne, did I give you any

24     information on uh --

25          MR. BURGESS:  I'm looking right now, Stanley.

1   You can testify as to how many you can remember.  If

2   you can't remember any more, just let her know and I'll

3   see what I can find.

4       THE WITNESS:  I'd rather not push it after

5   what I've told.

6   Q   Okay.  So, Mr. Stasko, we're not going to look up every

7   answer to the question.  I'm asking you today about

8   what you know, so if you don't want to push it, a fair

9   answer would be I don't know.

10  A   I know that they had Stanley, Joseph, Clara, and uh --

11  Q   Anna.

12  A   Anna.

13  Q   Mr. Stasko, what do you do for employment?

14  A   I'm not employed.

15  Q   Do you receive any income from any entity or

16      institution?

17  A   Income?  No.

18  Q   Well, who pays for your house, for example?

19  A   I'm living off of savings.

20  Q   So were you employed at one time?

21  A   Yes.

22  Q   When did you stop work?

23  A   I think it was approximately 2001.

24  Q   Why did you stop working?

25  A   My position was eliminated.

1    Q    Where was that at?

2    A    I used to work for MSX International doing contract

3         work for Daimler Chrysler.

4    Q    So you're just living off of the savings that you

5         earned from there, right?

6    A    I'm living off of savings.

7    Q    Have you been diagnosed with any medical condition in

8         the last couple of years?

9    A    I was on medication, approximately starting say about

10        middle of last year.

11   Q    Are you off it now, or are you still on?

12   A    Off.

13   Q    What medication was that?

14   A    The last two was Zyprexa and Zoloft.

15   Q    What were those medications prescribed for?  What were

16        you diagnosed that you were treating?

17   A    I think the Zyprexa was for voices and I think the

18        Zoloft was for depression.

19   Q    So are you still treating with some type of therapist

20        or psychiatrist for those things?

21   A    No.

22   Q    No?  When did you stop treating?

23   A    Say approximately two, three months ago.

24   Q    Do you have any work restrictions or anything like that

25        as we sit here today?

1   A   Could you give me an example of --

2   Q   Your doctor saying, you know, because of your mental

3       condition it would be unsafe for you to work and we

4       only suggest that you work a 20-hour week, something

5       like that?

MEMORY  6   A   I don't know of any like weight restrictions at this

7       time, but in terms of like reading documents, my

8       retention is not as good as it used to be.

9   Q   So were you diagnosed with depression then at some

10      point?

11  A   Could you please repeat?

12  Q   Yes.  Did a doctor say you're suffering from depression

13      at some point?

14  A   I'd just like to say that the medicine I was taking,

15      the Zoloft, was for depression.

16  Q   In any event, were you treating at some type of clinic

17      for these things or some doctor's office, and what was

18      the name of that?

19  A   For a while I was seeing, uh, Dr. Lopa Rana.

20  Q   Can you spell that for me?

21  A   Last name is R-a-n-a.

22  Q   Can I just see that card that you have?  Thanks.

23              Are you still seeing her today?

24  A   No.

25  Q   As we sit here today have you been diagnosed with any

MEMORY

1     mental condition?

2  A  Um, she was the last -- she was the last person I saw.

3  Q  Okay. And when did you last see her?

4  A  I think it was about two, three months ago.

5  Q  So do you believe sitting here today that you suffer

6     from any type of mental condition, be it depression,

7     schizophrenia, I could go on and on, but do you think

8     you're suffering from any mental condition today?

9  A  My memory retention is not as good as it used to be.

10  Q  How do you know that, Mr. Stasko?

11  A  Yesterday I was reading a book and as in reading if I

12     had to try to repeat it I couldn't repeat it.

13  Q  Okay. Are you able to remember things about, for

14     example, your family history and the real property that

15     we're here to talk about today on Deford?

16  A  I could take it like question by question itself.

17  Q  Okay. Let's do that. So we were talking about your

18     family. You remembered at least four of the children

19     of Walter and Anna. Of course one of those children

20     was Stanley W. Stanley married your mother, Sophie,

21     right?

22  A  My mom's name was Sophie.

23  Q  As far as you know, with respect to the real property,

24     you understand the real property that you've identified

25     in your complaint, right?

1    A    Uh, I know it's like approximately 80 acres of land.

2    Q    Out in Ellington Township.

3    A    It's nearby here.

4    Q    Have you been there before?

5    A    Yes, I have.

6    Q    How many times have you been there?

7    A    Probably I think at least twice.

8    Q    More than five or between two and five total?

9    A    Um, I know it would be less than ten and more than two.

10    Q    So at some point in time your parents or at least your

11    mother deeded you the property, is that right?

12    THE WITNESS:  Do you have that --

13    MR. BURGESS:  Can you just answer the

14    question without looking at it?  Do you remember

15    getting a deed to it?

16    A    (Reviewing file).  (Handing document to Ms. Moore).

17    Q    Is that a yes, Mr. Stasko?  Do you recall getting a

18    deed to the property?

19    A    Yes.

20    Q    And you've now handed me what's entitled a quit claim

21    deed that was recorded in the Tuscola County Register

22    of Deeds on February 8th of 2001.

23    What happened, Mr. Stasko, before this deed?

24    For example, I see from this deed that your mother quit

25    claimed the property to you.  Did you have any

1       ownership in the property before this time?

2  A   My ownership was when my mom gave it to me.

3  Q   So your ownership began in 2001 -- well, let's see.  In

4       2001, is that correct?

5  A   May I take a look at that?

6  Q   Sure.

7  A   (Reviewing document).  Looks like 2001.

8  Q   Okay.  Who owned it before you?

9  A   My understanding would be my mom and my dad.

10  Q   Do you know when they took ownership of it?

11  A   (Reviewing file).  I don't have an exact date.  My

12       understanding would be, you know, when I was growing up

13       I would have understood that they were the owners of

14       the property itself.

15  Q   That who was the owners?

16  A   My mom and my dad.

17  Q   So when you were growing up you understood that your

18       parents owned the property, is that right?

19  A   Right.

20  Q   Has anybody ever lived on this property?

21  A   Not that I'm aware of.

22  Q   So it's always been vacant land?

23  A   Yeah.

24  Q   In sitting here today, you don't know if Walter and

25       Anna Stasko ever gave the property to your parents?

| | | |
|---|---|---|
| 1 | A | My understanding would be that my mom and my dad got |
| 2 | | the land from Walter, Walter Stasko. |
| 3 | Q | Okay.  How do you know that? |
| 4 | A | That would just be my understanding from growing up. |
| 5 | Q | But you don't have any specific facts or remember |
| 6 | | anything or someone didn't tell you something about, |
| 7 | | you know, Walter signing a paper or Walter saying |
| 8 | | Stanley, it's yours, you just assume that because it |
| 9 | | was your parents' growing up; is that fair to say? |
| 10 | A | Well, when I -- my dad had a probably around a 6th |
| 11 | | grade education and my mom probably had about an 8th |
| 12 | | grade education.  And um (reviewing file) -- there was |
| 13 | | at one time a, I think, I think this is like an |
| 14 | | easement to the property itself and I think the |
| 15 | | neighbor wanted to get like to get a -- like to use the |
| 16 | | uh -- |
| 17 | Q | Mrs. Moore? |
| 18 | A | Uh -- |
| 19 | Q | Let me see what you have, Mr. Stasko.  Okay. |
| 20 | | So your parents granted someone, I think it's |
| 21 | | Florence Moore, an easement.  Is that your response to |
| 22 | | my question is that you think they owned it because |
| 23 | | they granted someone an easement? |
| 24 | A | My answer is that uh, I don't know of anybody that -- |
| 25 | | my understanding is that they owned the land and I |

1    don't know of anybody that ever made a claim to the

2    land -- claim to the land itself.

3  Q  But you're not aware of any document from Walter and

4    Anna to your parents, true?

5  A  Um --

6         THE WITNESS:  Wayne, do you know of any?

7         MR. BURGESS:  I'm not aware of any.  You can

8    show her that one, too, Stanley.

9  Q  I've now been shown a quit claim deed.  It states that

10   Stanley Stasko and Sophie Stasko quit claim to Stanley

11   Stasko and Sophie Stasko (sic) dated November 15th,

12   1969.

13        Well, my next question is, Mr. Stasko, do you

14   know if -- did you know Walter and Anna Stasko?

15 A  No.

16 Q  How old are you today?

17 A  Forty-three.

18 Q  And do you know when Walter and Anna died?

19 A  No, I do not.

20 Q  Were they dead before you were born?

21 A  I don't have any conscious recollection of them.

22 Q  Do you know your aunts and uncles, Joseph, Clara, and

23   Anna?

24 A  I knew Uncle Joe and Auntie Clara and Auntie Anna.

25 Q  Okay.

1    A    A little bit.  We -- probably Uncle Joe and Aunt --

2         Uncle Joe and Auntie Clara better than Auntie Anna.

3    Q    Okay.  Did they all live in this area in the Thumb when

4         you were growing up?

5    A    Uh, my dad, Clara, Joseph, and Anna I would say lived

6         in the southeast part of Michigan.

7    Q    As far as you know, did Walter and Anna live in this

8         area, or did they live south of here, as well?

9    A    I never met them.  Well, at least I don't have any

10        conscious, um --

11   Q    Even if you don't remember meeting them or don't even

12        remember seeing them, do you know if they lived up here

13        and farmed this property, or did everybody basically

14        live in the Detroit area and this is just vacant land

15        that the family owned.

16   A    I don't know of any time my dad worked the land.

17   Q    Do you even know if your dad came to the property?

18   A    I'm -- I don't want to say yes or no to that.

19   Q    Did you ever come with him as a kid?

20   A    No.

21   Q    So what was the property for in terms of your parents'

22        eyes?  Was it just an investment property up in the

23        Thumb kind of thing?

24   A    They pretty much just paid the taxes and just let it

25        sit there.

1   Q   Was there ever any discussion like maybe we'll put a

2       farm up there or, I don't know, maybe we'll retire up

3       there?  Do you recall any of that, or it was just an

4       investment property?

5   A   Well, my parents didn't have a high degree of

6       education, so I don't recall any, you know, like plans

7       or anything like that to, you know, develop the land or

8       anything like that.

9   Q   Did they own any other, you know, plots of real

10      property around the state or any other state for that

11      matter?

12  A   In Detroit, they have a house in Detroit.

13  Q   And you, Mr. Stasko, do you -- you believe that you own

14      this property, correct?

15  A   Right.

16  Q   Do you own any other real property?

17  A   My house in Southfield.

18  Q   Okay.  With respect to Walter and Anna, do you have any

19      indication that they had any type of estate planning

20      documents, or if their estate was probated and, you

21      know, that kind of thing?

22  A   I didn't know, you know, I didn't know the people.

23  Q   But you know, your father never said, well, your

24      grandpa willed this to me or anything like that?

25  A   From my understanding when I was growing up, my

```
 1           understanding was that my dad and my mom owned the

 2           land.  I never heard anything from Joseph, Clara, or

 3           Anna that there was any dispute or anything about who

 4           owned the land.

 5    Q      I understand you didn't hear anything to the negative,

 6           anything contrary to your belief that they owned it,

 7           but you just don't know how they obtained ownership,

 8           true?  Be it by will, deed, what have you?

 9    A      My understanding is that they just received it from um

10           --

11    Q      Okay.  But you don't know how they received it, right?

12    A      My understanding was that they would have received it

13           from, you know, Walter.

14    Q      We talked about the fact that you've been there between

15           two and ten times, Mr. Stasko.  Is that since 2001?

16    A      Since 2001?

17    Q      When were you were quit claimed the property, or is

18           that over your lifetime, the two to ten times?

19    A      That would be over my lifetime.

20    Q      Okay.  And during those visits, are you basically just

21           driving by to see what is actually there, or are you

22           doing anything on the property?

23    A      Real short visit.  Parked along the side of the road,

24           walked on the land a little bit.  That's about it.

25    Q      Is there some type of cabin on the property?
```

1  A    I think if you were to go onto the property itself I

2       don't think there's anything on the land itself, but I

3       think there's a neighbor there that has like a cabin or

4       something nearby.

5  Q    Are there any structures on this 80 acres then?

6  A    Just trees.

7  Q    Do you know if any other individual does anything on

8       this property?  Does anyone else farm it or hunt on it

9       or anything like that?

10 A    No.

11 Q    Have you ever done anything to maintain the property?

12 A    Maintain the property?

13 Q    Yeah, like plant something or maybe fertilize,

14      something, maybe treat some trees, anything like that?

15 A    No.

16 Q    Have you ever put a sign out there, you know, to say

17      this is the property of Stanley Stasko or like a no

18      trespassing sign, anything like that?

19 A    Um, no.

20 Q    Have you ever done anything, Mr. Stasko, to demonstrate

21      to the public that you're the owner?

22 A    I'm in the process of trying to sell the land.

23 Q    But in terms of like putting anything out there, like a

24      sign or, I don't know, even putting a car out there or

25      something like that, have you done anything like that?

1   A   When I was younger I think a friend of mine, I think he

2       and I went out to the land with what would have been at

3       that time would have been my parents' land itself, so

4       just basically visit the land itself.

5   Q   And pretty much the same story for your parents?

6   A   Yeah, I think my -- I don't know of any time my parents

7       put like a sign up on the land or --

8   Q   Or maintained it?

9   A   -- or cut down a tree or anything like that.

10  Q   I mean did you even use it once a year like for camping

11      or anything like that?

12  A   No.

13  Q   Okay.

14  A   There might have been at some time like somebody might

15      have asked like permission to go out to the land for

16      like hunting or something like that.

17  Q   Okay.   A relative or another individual?

18  A   It might be a relative itself.

19  Q   Do you know which relative?

20  A   Um (reviewing file) -- I don't know if this was to a

21      particular relative, but this would have been like the

22      directions I would have given the person.

23  Q   Okay.   I've now been handed a document that has six

24      numbers on it and it's entitled, "Directions to Mama's

25      property"?

1  A    That would be Sophie.

2  Q    Okay.  And you give the directions, and then finally no

3       hunting on Sundays.  Where did you obtain this document

4       from, Mr. Stasko?

5  A    May I see?  It looks like something that I generated.

6  Q    Looks like a fairly new document.  Is that something

7       you printed off your computer?

8  A    It looks like it's a 1999 document.

9  Q    And you don't know who that person is though that

10      contacted you?

11  A    Besides being a family member, I'd really rather not

12      try to specify a name.

13  Q    Do you know if they go there every year or was this

14      just kind of a one-time thing?

15  A    I wouldn't describe it as an every year event.

16  Q    Now, you do pay some taxes on the property, is that

17      right, Mr. Stasko?

18  A    Yes, I do.

19  Q    And other than paying the taxes, is there anything, you

20      know, positive or I should say consciously do with this

21      property.  You've mentioned a couple times you've

22      driven by and the fact that you're trying to sell it.

23      Now we're going to talk about paying the taxes.  That's

24      really all you do with respect to this property is pay

25      the taxes and visit it?

| | | |
|---|---|---|
| 1 | A | Pay the taxes and visit it. |
| 2 | Q | When did you start paying the taxes? |
| 3 | A | When I took ownership of it. |
| 4 | Q | And that's in 2001, right? |
| 5 | A | May I look at this? |
| 6 | Q | Sure. |
| 7 | A | That would be about January of 2001 when I took |
| 8 | | ownership. |
| 9 | Q | Have you paid all the taxes? |
| 10 | A | Um -- |
| 11 | Q | For example, county taxes, township taxes, all seasons, |
| 12 | | that kind of thing? |
| 13 | A | I think there's a bill that I have that's coming up |
| 14 | | that's due and there's probably another bill, I think |
| 15 | | it would probably be late this year or early next year. |
| 16 | Q | But otherwise you're current on all the payments you |
| 17 | | believe? |
| 18 | A | Um, yes. |
| 19 | Q | Have you paid them all on time? |
| 20 | A | I wouldn't want to try to answer that question. |
| 21 | Q | Okay.  Safe to say you've never been foreclosed on or |
| 22 | | had some type of deficiency notice from Tuscola County? |
| 23 | A | Um, I don't know of any outstanding debts on the |
| 24 | | property itself. |
| 25 | Q | And prior to 2001 do you know who paid the taxes? |

1    A    Prior to me owning the land, my understanding would be

2        my parents Stanley Stasko and Sophie Stasko.

3    Q    Now, I've received a bunch of records from your

4        attorney and they seem to be tax records that he's

5        requested from several -- from the Treasurer's office

6        and from the township up here.  Do you keep records of

7        your tax payments?

8    A    At home I probably have folders like this for different

9        calendar years and I would probably put the information

10       in a folder itself.

11    Q    Do you have any records from when Stanley -- when your

12       parents paid the taxes?

13    A    Um --

14             THE WITNESS:  Wayne, did my mom give you some

15       tax information?

16             MR. BURGESS:  I think your mother might, but

17       do you have any of your mom's records?  That was the

18       question.

19    A    I think my mom gave -- looked for like tax records and

20       like originals were given to my lawyer.

21    Q    Okay.  Where does your mom live today?

22    A    Detroit, Michigan.

23    Q    Does she live by herself?

24    A    I'd rather not answer that question.  My sister, Marie,

25       I think is like a part owner of a -- it might be like a

①      condo, but I think she might live with my mom.

2   Q   How is your mother's health?

3   A   I haven't asked her recently.

4   Q   Okay.  Have you seen her recently?

5   A   Today being Thursday, uh, it's not unusual for me to

6      visit her on Thursday and take her shopping.

7   Q   Did you see her last Thursday?

8   A   (Reviewing calendar) I see now what I have written down

9      in my planner for September the 2nd, I have a note

10      written down, "Do not visit mama", so my understanding

11      would be probably not.

12   Q   Have you seen her in the last month, Mr. Stasko?

13   A   Um, yes.

14   Q   Is she -- does she have any mental -- does she suffer

15      from any medical condition or, you know, physical or

16      mental?

17   A   She can't hear.  She doesn't sign language.

18   Q   She does do sign?

19   A   No.

20   Q   So she wouldn't be able to testify at this type of

21      deposition?

22   A   If she was to come here the best thing to do would

23      probably be have somebody write out the questions and

24      hand it to her and have her take a look at it.

25   Q   Does she understand things in writing that you show to

1   her?

2 A When growing up --(reviewing file) -- if there was like

3   a question regarding the property itself, it would not

4   have been uncommon for my parents to actually like ask

5   me to like read the document and explain to them what

6   it means.

7 Q Okay.

8 A They weren't highly educated people.

9 Q Okay.  Now, your attorney, Mr. Stasko, has given me an

10   offer to purchase or a copy of it.  It looks like it's

11   an offer from Mr. William Zemke.  Do you recall

12   receiving that offer?

13 A May I take a look at that?

14 Q Sure.

15 A (Reviewing document).

16 Q And I think he might be the broker, Zemke, and the

17   purchasers were actually Benjamin and Gale --

18 A Talfarerro?

19 Q Yes.  Do you recall receiving that?

20 A Yes.

21 Q Do you recall when you received that?

22 A I'd have to take a look at the document itself.

23 Q Okay.  Well, was it in the last couple years?

24 A Over six months ago.

25 Q The closing date on the offer is noted to be August

1    5th, 2003.  Do you remember how soon before that date

2    you might have received this?

3  A  Please repeat.

4  Q  The closing date on the document is listed as August

5    5th, 2003.  There's actually no other date on it.  And

6    typically that's a closing that you plan out, okay, and

7    so you would get the offer to purchase a little bit

8    sooner than that, right?  So I was just asking if you

9    knew how much, how many months or how many days prior

10    to August 5th, 2003 that you would have received this

11    offer.

12  A  My memory's not that good.

13  Q  Fair to say you received it sometime in 2003?

14  A  I would want to take a look at the document itself.

15  Q  (Handing document).

16  A  (Reviewing document).  Probably 2003.

17  Q  How did this come about, Mr. Stasko?  Can you just

18    explain to me kind of what happened?  Did you receive

19    in the mail?  Did somebody call you up?  Did you get it

20    from your attorney?  How did you get ahold of this

21    offer?

22  A  I think what happened is they were people that lived,

23    like neighbors to the land itself.

24  Q  Okay.

25  A  And, uh, my understanding is they had an interest in

1      buying the land itself, and uh, somehow I obtained

2      their number.  It might have been like I got some

3      information on like from them about like from a real

4      estate person that would generate that document.  So it

5      just started with I knew that they had an interest in

6      buying the land itself, or part of the land itself.

7   Q   And you're not exactly sure how you got that initial

8      information?

9   A   Well -- (reviewing file).

10  Q   Do you want to show me that?

11  A   It's a document regarding --

12  Q   You're showing me a document that's entitled Benjamin

13     Talfarerro and looks like directions off the internet

14     on how to get to his place, yes?

15  A   I think that would be the internet.

16  Q   And at the bottom it says, "Ben interested in buying 40

17     acres or 80 acres.  Check title and then talk to David

18     Stasko on 7-12-2003".  Then you note underneath that,

19     "David will pay off an existing loan on approximately

20     October 20, 2003, and David will apply for an

21     approximate $70,000 loan.  If he qualifies, David will

22     buy 40 acres.  If he does not qualify then he'll sell

23     the second 40 acres to probably his parents, Mr. and

24     Mrs. Talfarerro".  Okay.

25            Who is David Stasko?

| | | |
|---|---|---|
| 1 | A | My brother. |
| 2 | Q | So was he offering to buy the property at the same |
| 3 | | time? |
| 4 | A | I think it would be fair to say that he has or had an |
| 5 | | interest in buying some of the land. |
| 6 | Q | Did you have the property listed at the time in 2003? |
| 7 | A | Um, my understanding would be that I didn't need to get |
| 8 | | it listed because like during one of my previous visits |
| 9 | | to the land itself, this person probably lives nearby |
| 10 | | the land and I probably visited them and in the course |
| 11 | | of the visit itself I would have found out that they |
| 12 | | had an interest in buying the land. |
| 13 | Q | So since 2001 you're kind of been outwardly approaching |
| 14 | | people saying do you have any interest in this |
| 15 | | property? |
| 16 | A | Oh, probably the people that I approached was |
| 17 | | Talfarerro and my brother. |
| 18 | Q | Okay.  So it wasn't exactly an aggressive marketing |
| 19 | | campaign, but you approached a couple people and said |
| 20 | | you might be interested in selling, that kind of thing? |
| 21 | A | I knew somebody that was interested in buying.  I think |
| 22 | | this person, since I knew that they were interested in |
| 23 | | buying the land itself, they probably would have bought |
| 24 | | like all the land if I wanted to sell all of it to |
| 25 | | them.  So it wasn't something like I needed to look for |

1      a potential buyer.  I knew of somebody that already had

2      interest in buying the land itself.

3   Q   Okay.  So, in any event, you get this written offer

4      from them finally after some discussions, is that fair

5      to say?

6   A   It probably -- it was probably a combination of working

7      with Benjamin Talfarerro and myself, Benjamin

8      Talfarerro and William Zemke that -- I don't know how

9      to say -- that that document was generated itself.

10  Q   And you're referring to the offer to purchase.  The

11     offer to purchase is for 40 acres of the land and did

12     you discuss the terms of it before it was drafted?  For

13     example, did you come up with a price and the fact that

14     it would be half of the acreage prior to Mr. Zemke

15     drafting this?

16  A   Yeah, I knew it was going to be 40 acres, and I knew

17     the price itself.

18  Q   So what happens after you receive the offer to

19     purchase, Mr. Stasko?

20  A   My understanding is that in the course of -- is that

21     called a title search?  There was found to be like a

22     break in the chain of ownership itself of how the land

23     transitioned from Walter to Stanley and Sophie.

24  Q   Okay.  And who obtained that title search?  Did you, or

25     Mr. Zemke, or the Talfarerro?

1   A   I think that would be either -- I think that might -- I

2       think that might have been, might have been Zemke.

3   Q   And that's when you found the break in the chain,

4       right?

5   A   Was at the time of trying to sell the land itself.

6   Q   When you got the title work?

7   A   In the process of trying to sell the land.

8   Q   And is that what caused the filing of this lawsuit?

9   A   Prior to the selling of this land I know of nobody

10      making a claim on the land itself.

11   Q   But after you found out about the break in the chain,

12      is that when you went to see your lawyer?

13   A   That's when the process --

14   Q   Okay.  Whatever came of this offer to purchase?

15   A   It's just been sitting pending.

16   Q   Okay.  Did they give you the $1,000 earnest money

17      deposit?

18   A   I've already received the money.

19   Q   Have you given it back?

20   A   No.

21   Q   So in your mind this is still pending?

22   A   Still pending.

23   Q   And if you were to obtain title through the Circuit

24      Court action you would follow through with this

25      contract, is that right?

Bay Area Reporting, Inc. - (800) 919-4441

| | | |
|---|---|---|
| 1 | A | That's correct. |
| 2 | Q | Have you ever had the property appraised, Mr. Stasko? |
| 3 | A | It would just be based on the, you know, yearly |
| 4 | | assessment itself. |
| 5 | Q | So you haven't had it appraised? |
| 6 | A | I don't know of it being appraised. |
| 7 | Q | Can I see that document again?  At this point, Mr. |
| 8 | | Stasko, I'm going to ask you to review all the |
| 9 | | documents that you brought with you today.  I've |
| 10 | | noticed this deposition to be a duces tecum basis which |
| 11 | | means that I've asked you to bring several documents. |
| 12 | | Can I see what you have?  You can just leave it right |
| 13 | | there. |
| 14 | | MR. BURGESS:  You may have to explain what |
| 15 | | these two are.  She can ask you about those in a |
| 16 | | minute. |
| 17 | | MS. MOORE:  As opposed to marking this, I'm |
| 18 | | just going to ask for a copy. |
| 19 | | MR. BURGESS:  You should have seen these |
| 20 | | already? |
| 21 | | MS. MOORE:  Yes. |
| 22 | | (Off the record at 10:57 a.m.) |
| 23 | | (On the record at 11:00 a.m.) |
| 24 | BY MS. MOORE:  (Continuing): |
| 25 | Q | Mr. Stasko, thank you for showing me those documents. |

Bay Area Reporting, Inc. - (800) 919-4441

1    I've reviewed them now and I'm going to make a couple

2    copies.   There's a couple documents I have questions

3    about.

4              Here's a handwritten document that lists the

5    address, it lists the legal description, the Ellington

6    Township Treasurer, as well as the Assessor.   What did

7    you write those down for?

8              First of all, is that your handwriting?

9  A    Looks like my handwriting.

10 Q    Did you write those down to contact them about the

11     value, is that it?

12 A    At this time I don't know.   This is information over

13     here.   I don't have a good understanding at this time

14     why I specifically wrote down this information.

15 Q    And then on this document it says at the top, Susan

16     Jensen, Treasurer, and it seems to be directions to her

17     home or somebody's home in Millington.   Did you

18     actually meet with Susan Jensen?

19 A    Physically meet her, I don't recall.

20 Q    Mr. Stasko, I'm now showing you something that's

21     entitled, "Land, home, and room and board".   Looks like

22     it's a computer-generated document.   Do you know what

23     that is for?

24 A    Um, when selling the land itself I think this is in

25     preparation for like a possible tax payment itself.   I

1       see a person's name here, Lynn Eickbrecht (ph), she

2       prepares my taxes for me.

3  Q   So that was a personal assessment of sorts?

4  A   It was like -- when like when selling the land itself,

5       how did they determine like in the beginning the

6       process how much taxes that you're going to have to pay

7       on the sale of the land itself.

8  Q   Okay.  Then I see a handwritten letter.  It came out of

9       an envelope dated January of 1989.  It seems to be a

10      letter from Stanley Stasko and Sophie Stasko.  I'm

11      going to show that to you, Mr. Stasko.  Do you

12      recognize that document?

13  A   (Reviewing document).

14  Q   Are you familiar with that document, Mr. Stasko?

15  A   Uh, readily familiar with it, no.  I would say no.

16  Q   Is it fair to say that your mom didn't know either

17      that, you know, how she got the property?

18  A   I think she would have had an understanding that it

19      came from Walter.

20  Q   But not knowing how it came, correct?

21  A   Um, not knowing how.  I think she would have had an

22      understanding that Walter Stasko gave the land to my

23      dad and my mom.  She would have that understanding.

24  Q   What are these folders, three-ring binders, there's two

25      white ones?

```
 1  A    One is the last will and testament of Joseph Stasko and

 2       the last will and testament of Clara Stasko, itself.

 3  Q    How do you believe those are relevant to this lawsuit?

 4  A    To this particular lawsuit itself, may I take a look at

 5       that, please?

 6  Q    Sure.

 7  A    My understanding is that I was the actual personal

 8       representative for both of these last will and

 9       testaments itself.

10  Q    So for your aunt and your uncle you were the personal

11       representative?

12  A    Yes.  And in the course of being the personal

13       representative for their last will and testament, I did

14       not find any information indicating that they had an

15       ownership in the land itself.

16  Q    Did you actually probate both estates?

17  A    Um --

18  Q    Do you know what that means?

19  A    Could you explain it to me?

20  Q    Did you file paperwork in the probate court where they

21       died and, you know, adjusted their estate, collected

22       the debts, disbursed any of the assets to the

23       beneficiaries, their kids, that kind of thing?

24  A    I would -- yes, I would have been involved in like if

25       there was more than one account of gathering the monies
```

1   that were from accounts themselves and putting it into

2   like a common account, paying any last bills on the

3   estate itself.

4 Q Did you actually commence any probate proceedings in

5   this matter, do you recall doing that?

6 A What do you mean by that?

7 Q Filing a document in court that says, you know, I'd

8   like to probate the estate of Joseph Stasko and I'd

9   like the court to authorize me, as the personal

10   representative, to do that.

11 A Probably hired a lawyer.

12 Q Did you hire the same lawyer for both your aunt and

13   your uncle?

14 A I think the answer to that is no, I don't think they

15   were the same.

16 Q And then the lawyer did whatever was appropriate, is

17   that your position?

18 A They took the appropriate action.  I would say that I

19   took care of the items like filing any like final taxes

20   or stuff like that.

21 Q And the real property that we're talking about today

22   never came up in either one of those estates?

23 A In those two estates, I don't know of any claim on the

24   property that we're uh . . .

25 Q So have you given -- you mentioned that your mother

|   |   |   |
|---|---|---|
| 1 |   | gave your attorney some documents about paying taxes. |
| 2 |   | Have you given your attorney all the documents you have |
| 3 |   | relevant to paying the taxes? |
| 4 | A | I don't have a good memory.   I would say that I would |
| 5 |   | have probably made a fair effort to give him the |
| 6 |   | documents themselves. |
| 7 | Q | Okay.   Who is Lottie Zwaleski (ph)? |
| 8 | A | That sounds like my Aunt Lottie.   That would be my |
| 9 |   | mother's sister. |
| 10 | Q | So that's from your mother's side? |
| 11 | A | Yes. |
| 12 | Q | You have listed her as a witness on your witness list. |
| 13 |   | What information would she give to this lawsuit, if |
| 14 |   | any? |
| 15 | A | I would suggest like asking her if there was ever a |
| 16 |   | time like when the land was up for sale or there was |
| 17 |   | some interest on Walter's part to sell the land.   And |
| 18 |   | that prior to selling the land like there was some sort |
| 19 |   | of transition to the land going over to my dad itself, |
| 20 |   | so she might have some sort of understanding of that |
| 21 |   | nature. |
| 22 | Q | So information pertaining to the transfer from Walter |
| 23 |   | and Anna to your parents? |
| 24 | A | Yeah.   She just might have like a general |
| 25 |   | understanding.   She might not have seen any legal |

1       documents.

2    Q    What's her address?

3    A    I'd have to see if I had it at home.

4    Q    Well, can you come up with it from either you or your

5         mom?

6    A    I should be able to come up with it.

7    Q    Where does she live without saying her address?  Is she

8         downstate, as well?

9    A    Like the, like the -- I think it's like Dearborn,

10        Dearborn Heights area.

11   Q    Okay.

12             MS. MOORE:  That's all the questions I have.

13        Actually I'm just going to ask for a short break,

14        Duane.

15             MR. THOMAS:  I have a few questions, but I

16        won't take too long.

17             (Off the record at 11:15 a.m.)

18             (On the record at 11:18 a.m.)

19   BY MS. MOORE (Continuing):

20   Q    Just a couple more, Mr. Stasko.  What is your -- did

21        you obtain a college degree then?

22   A    I have three degrees.

23   Q    What are those?

24   A    Electrical engineering degree from Lawrence

25        Technological University.  A bachelor's of philosophy

|    |   |                                                              |
|----|---|--------------------------------------------------------------|
| 1  |   | degree from Sacred Heart Seminary.  And a master's           |
| 2  |   | degree in information management and communications          |
| 3  |   | from Walsh College in Troy, Michigan.                        |
| 4  | Q | You're just simply not working at this time, you're not      |
| 5  |   | off on disability or anything of that nature?                |
| 6  | A | Not collecting any unemployment at this time.                |
| 7  | Q | Collecting any disability?                                   |
| 8  | A | No.                                                          |
| 9  | Q | Your parents, they didn't have driver's licenses, is         |
| 10 |   | that right?                                                  |
| 11 | A | All the years that I knew my dad and my mom, I never         |
| 12 |   | known them of driving.  I'm not saying that my dad           |
| 13 |   | never drove, but at least my recollection he never           |
| 14 |   | drove.                                                       |
| 15 | Q | Who drove them around?                                       |
| 16 | A | Well, when the kids were younger, if we didn't get a         |
| 17 |   | ride from like a relative or a friend, we had to walk.       |
| 18 |   | It wasn't until my brother David actually got a car          |
| 19 |   | when the family actually drove.                              |
| 20 | Q | Do you remember your Aunt Anna driving them around?          |
| 21 | A | I remember my Aunt Anna, but in terms specifically of        |
| 22 |   | taking them anywhere, um, I know that I've been by my        |
| 23 |   | Aunt Anna's house, I know that I was there at least on       |
| 24 |   | one occasion.  But as to how they specifically got           |
| 25 |   | there, I'd rather not say one way or the other.              |

1    Q    And are you on any medication today, Mr. Stasko?

2    A    No.

3    Q    Didn't take anything when you got up this morning?

4    A    No medication.

5              MS. MOORE:   Nothing further.

6                    EXAMINATION

7    BY MR. THOMAS

8    Q    Mr. Stasko, my name is Perry Thomas.   I'm the attorney

9         for Loretta and Lozetta Loveland in this matter.   I

10        just have a very few short questions for you.

11              Earlier, when Ms. Moore asked you some

12        questions about your father's brothers and sisters, do

13        you remember that?

14   A    If I had to repeat this conversation, I --

15   Q    Do you recall that your father had a sister named Mary

16        Kimes?   Does that name ring a bell to you?

17   A    Yes, the name -- I've heard of the name itself.   When I

18        was growing up it would not have been a name I would

19        have been familiar with.

20   Q    Have you ever met Mary Kimes to your recollection?

21   A    I don't think so.

22   Q    Let's talk about the land for a minute.   You said the

23        land is vacant land, is that correct?

24   A    Trees on it.

25   Q    Is it all trees?   Or is part of it open land?

1    A    I've only walked a narrow portion of the land itself.

2    Q    Can you tell me how much of the land is wooded and how

3         much is not wooded on a percentage basis, or do you

4         know?

5    A    From general looks itself, it looks like it's a wooded

6         land itself.

7    Q    To your knowledge has the land ever been farmed?

8    A    Not that I'm aware of.

9    Q    And since you got it by that quit claim deed it hasn't

10        been farmed to your knowledge, is that right?

11   A    I have not worked the land.

12   Q    To your knowledge has anybody ever paid any rent to use

13        the land?

14   A    I think there might have been at one time an interest

15        in the land itself for like it might have been mineral

16        rights or something like that.

17   Q    How long ago was that, if you remember?

18   A    That might -- I would rather not give a specific date,

19        but it would have been probably at least -- probably at

20        least ten years ago.

21   Q    Do you recall any money ever being paid pursuant to

22        that mineral lease or anything like that?

23   A    I know money's being paid for the land for the --

24        (reviewing file)  it was for this for the easement

25        itself.

1   Q   Is that the easement that you showed to Ms. Moore

2       earlier today?

3   A   It would be this document.

4   Q   Can I see that, please?  This was the easement in 1985

5       that your mother and father gave to Florence Moore, is

6       that correct?

7   A   I'd have to look at that to be sure.  Yeah, that would

8       be '85.

9   Q   And you recall your parents receiving some money for

10      that easement?

11  A   Well, the monies for this itself would have been like

12      when they hired the lawyer itself who represented them.

13      That money probably helped pay some or all of the

14      lawyer fee itself.

15  Q   Do you recall other than this easement document that

16      you're looking at right now, do you recall any other

17      monies that your parents may have received in

18      connection with the property, like for instance, such

19      things as maybe rent for farming it or mineral rights

20      or some kind of rent for that?  Anything else other

21      than what you're talking about here?

22  A   I personally don't know of any monies that my parents

23      receiving regarding the land, like somebody paying

24      somebody some monies for part of the land.

25  Q   And I believe your earlier testimony was that you

1    reviewed a lot of documents for your parents and

2    explained things to them, is that correct?  Because of

3    their limited education.

4  A  Based on their limited education.  If they received

5    something in the mail that needed explanation, it would

6    not have been uncommon like for them to ask me to

7    explain it to them.  But at that time I probably would

8    have had a better memory.

9  Q  When did you -- at what age did you begin to start

10    explaining documents that your parents received in the

11    mail to them?  Before you got out of college; or after

12    you got out of college?

13  A  That's hard to answer, because it could have been

14    almost anything.  It could have been a simple thing

15    like an insurance statement or something like that.  So

16    that's really a hard question.

17  Q  Fair enough.  You testified earlier about the fact that

18    your parents never, to your recollection, did anything

19    to the property.  And I want to ask you some specific

20    questions about that.  Did they ever post a sign on the

21    property to your knowledge?

22  A  Not that I'm aware of.

23  Q  Did they ever cut any trees off the property to your

24    knowledge?

25  A  Not that I'm aware of.

1    Q    To your knowledge has anyone ever cut trees off the

2         property, either for personal use or for commercial use

3         to cut timber off the property?

4    A    Not that I'm aware of.

5    Q    Did they ever dump garbage on the property?

6    A    Not that I'm aware of.

7    Q    Ever clear a road out on the property?

8    A    There is a road on the property, but ever since like

9         the first time I was there the road was already in

10        existence itself.

11   Q    Have you ever done any maintenance to that road,

12        cleared it off, cut the brush, anything like that?

13   A    No.

14   Q    To your knowledge did your parents ever do anything to

15        the road, clear the brush?

16   A    No.

17   Q    So the road has just always been there as long as you

18        remember?

19   A    As long as my memory serves me.  That land just pretty

20        much sits there, except for like directions like for

21        wanting to like hunt on the land itself.

22   Q    I wanted to ask you about that.  You said you recall

23        one of your relatives getting permission to hunt on it.

24        Did they pay any money for the right to hunt?

25   A    No.

| | | |
|---|---|---|
| 1 | Q | This was just allowing them to hunt on the property? |
| 2 | A | Just permission. |
| 3 | Q | I want you to look at a document that you produced to |
| 4 | | Ms. Moore.  The front page of the document appears to |
| 5 | | be handwritten by either your mother or your father. |
| 6 | | The question I want to ask you is do you recognize that |
| 7 | | handwriting? |
| 8 | A | (Reviewing document).  It looks like it's signed by two |
| 9 | | people.  Looks like it's signed by my dad and my mom. |
| 10 | | If I would have had to guess I would guess my mom's |
| 11 | | signature.  My dad probably had a lower education level |
| 12 | | than my mom and, therefore, I don't think that he would |
| 13 | | have written a document like this. |
| 14 | Q | Well, first of all, do you recognize the signatures? |
| 15 | A | It's my dad and my mom. |
| 16 | Q | Is that, in fact, your mother's signature to the best |
| 17 | | of your knowledge?  Is it like her handwriting? |
| 18 | A | Yes. |
| 19 | Q | Is that, in fact, your dad's signature to the best of |
| 20 | | your knowledge? |
| 21 | A | (Reviewing document).  I'm trying to recall how clean |
| 22 | | of a signature my dad had. |
| 23 | Q | You're just not sure? |
| 24 | A | Um (long pause), I think um, (long pause), I would say |
| 25 | | that there's some uncertainty, but I can't say -- I |

1    can't say it's not his signature itself.

2  Q    But the main body of the note, you think that's your

3    mother's writing?

4  A    Yes.

5  Q    If you'll flip that page over, please.  There

6    apparently is a response from somebody at some county

7    office.  Do you see that in the middle of the page?

8  A    In the black ink itself?

9  Q    Yes, sir.

10  A    Okay.

11  Q    And then there's some writing below the black ink in a

12    different kind of color ink in a different handwriting.

13    Do you see that, just a few words?

14  A    I see like, "Walter Stasko 1967 died, land inherited".

15  Q    Yes.  Do you see that writing down there?

16  A    Yes, I do.

17  Q    Do you know whose writing that is?

18  A    That looks like my writing.

19  Q    So that's your -- you think that's your writing?

20  A    Yes.

21  Q    Do you recall anything about this document as we sit

22    here today?

23  A    (Long pause; reviewing document).  No, I can't recall.

24  Q    You don't recall, for instance, why you would have

25    written that at the bottom of that piece of paper?

1   A   At this time I don't -- it's not clear to me.

2   Q   You don't recall if anybody would have told you that?

3   A   What?  This information over here (indicating)?

4   Q   Yes, sir.  Just the information at the bottom of the

5       page that's in your handwriting.

6   A   No.  Why I specifically wrote that information, I just

7       can't recall at this time.

8           MR. THOMAS:  Let's mark this as an exhibit.

9           (Exhibit 1 marked for identification).

10  Q   Just for the record, sir, we've marked this as Exhibit

11      1 and the writing on the front of Exhibit 1 in the blue

12      ink, you believe is your mother's writing, is that

13      correct?

14  A   Yes.

15  Q   And you believe that's your mother's signature at the

16      bottom, is that correct?

17  A   Yes, correct.

18  Q   And you're not quite sure whether that's your father's

19      signature or not.

20  A   Correct.

21  Q   But it appears to be.

22  A   Right.

23  Q   And on the back of that page there's a note in black

24      ink back from somebody at apparently some kind of

25      county office, is that correct?

1  A    Yeah, I don't know who would have wrote that.

2  Q    I understand that.  Then there's just two lines of

3       printed information at the very bottom of the page and

4       you believe that's your handwriting?

5  A    That's correct.

6  Q    And, in fact, you're certain that's in your

7       handwriting?

8  A    That's my handwriting.

9            MR. THOMAS:  I don't have any further

10      questions.

11           MR. BURGESS:  I don't have any questions.

12           (Off the record at 11:35 a.m.)

13           (On the record at 11:38 a.m.)

14                    RE-EXAMINATION

15  BY MS. MOORE:

16  Q    Mr. Stasko, I just have one more question for you.

17           Do you know if Walter and Anna owned any

18      other real property?

19  A    At one time there was a house on Edward and

20      approximately the time of the estate of Joseph Stasko I

21      would have had that house demolished.

22  Q    Okay.

23  A    So, in the City of Detroit on Edward.

24  Q    Did they own real property anywhere else, any other

25      vacant land in the State of Michigan or any other

| | | |
|---|---|---|
| 1 | | state? |
| 2 | A | (Long pause; reviewing white folder).  There might have |
| 3 | | been some land that my Aunt Clara and/or Uncle Joe |
| 4 | | might have received from Walter. |
| 5 | Q | What property was that? |
| 6 | A | (Reviewing white folder). |
| 7 | | MR. BURGESS:  Just leave it in there.  That's |
| 8 | | fine. |
| 9 | Q | (Reviewing white folder).  Looks like there was some |
| 10 | | property in 19 -- well, that Clara sold in 1994 on Wolf |
| 11 | | -- in Wolf Lake, is that right?  Okay. |
| 12 | | COURT REPORTER:  I'm sorry, did you have an |
| 13 | | answer.  I didn't hear a response. |
| 14 | | MR. BURGESS:  (Shakes head). |
| 15 | A | There might be some property that Clara and/or Joseph |
| 16 | | Stasko received from Walter. |
| 17 | Q | Other than the property that Joseph or Clara may have |
| 18 | | received that you're recalling from probating -- or |
| 19 | | from being involved in their estates, do you recall any |
| 20 | | other real property that they may have owned? |
| 21 | A | Walter and Aunt Anna? |
| 22 | Q | Yes. |
| 23 | A | I wasn't as close to Anna, Anna being my dad's sister, |
| 24 | | just because they -- our family didn't have a car, so |
| 25 | | they weren't as close in physical proximity; therefore, |

1    if they had received -- if Anna received some property

2    somewhere along the line I just can't recall at this

3    time.

4            MS. MOORE:  Thanks.  That's all I have.

5            MR. THOMAS:  I don't have any further

6    questions.

7            MR. BURGESS:  I don't have any questions.

8            (Deposition concluded at 11:46 a.m.)

9                         -o0o-

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
STATE OF MICHIGAN     )
                      )  SS
COUNTY OF SAGINAW     )
```

  I, Lori L. Brady, CER-6925, and Notary

Public, Saginaw County, acting in Tuscola County, State

of Michigan, hereby certify that I recorded the

examination of **STANLEY R. STASKO**.  Before taking of

said deposition, the said deponent was duly sworn to

tell the truth, the whole truth, and nothing but the

truth; and that the foregoing deposition is a true and

correct transcript of said deponent.

  I further certify that I am not a relative,

employee, attorney, or counsel of any of the parties; a

relative or employee of such attorney or counsel; and

am not financially interested in the transaction.

  I further certify that no request was made

that the foregoing **48-page** deposition be submitted to

the said deponent for examination and correction by

deponent or that deponent sign the same.

_9.22.04_
Date

_Lori Brady_
Lori L. Brady, CER-6925
Certified Electronic Recorder
My Commission Expires:  11-18-05
Bay Area Reporting, Inc.
*The Gold Building*
4855 State Street, Suite 6A
P.O. Box 6069
Saginaw, Michigan 48608-6069
(989) 791-4441   FAX (989) 791-3960
(800) 919-4441

Exhibit - 10

# STANLEY R. STASKO
27653 Lexington Parkway
Southfield, Michigan, 48076
Tel. 248-552-0476
stasko@worldnet.att.net

July 20, 2005

Leyone Jackson
General Motors Powertrain Product Engineering
823 Joslyn
Pontiac, Michigan 48340

Re:  Staley R. Stasko Employment Records

Dear Sir or Madam:

Stanley R. Stasko (Social Security #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) requires a complete copy of all employment records pertaining to his work for General Motors Corporation from approximately CY1978 to approximately CY1979 and from approximately CY1983 to CY1995.  Please inform me of any necessary release forms.  I may be reached at the above address if I can be of any assistance.  Thank you for your attention to this important matter.

Yours truly,

Stanley R. Stasko

SRS/ss



**SENDER: COMPLETE THIS SECTION**

■ Complete items 1, 2, and 3. Also complete
  item 4 if Restricted Delivery is desired.
■ Print your name and address on the reverse
  so that we can return the card to you.
■ Attach this card to the back of the mailpiece,
  or on the front if space permits.

1. Article Addressed to:

LEYONE JACKSON
GM POWERTRAIN
PROD. ENGR
823 JOSLYN
PONTIAC, MICH.
48340

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X                                    □ Agent
                                     □ Addressee

B. Received by ( Printed Name)    C. Date of Delivery

D. Is delivery address different from item 1?  □ Yes
   If YES, enter delivery address below:        □ No

3. Service Type
   ☒ Certified Mail      □ Express Mail
   □ Registered          ☒ Return Receipt for Merchandise
   □ Insured Mail        □ C.O.D.

4. Restricted Delivery? (Extra Fee)              □ Yes

2. Article Number
   (Transfer from service label)

7004 1350 0001 5312 5647

PS Form 3811, February 2004    Domestic Return Receipt    102595-02-M-1540

---

**U.S. Postal Service**
**CERTIFIED MAIL RECEIPT**
(Domestic Mail Only; No Insurance Coverage Provided)

For delivery information visit our website at www.usps.com®

**OFFICIAL USE**

PONTIAC MI 48340

| | |
|---|---|
| Postage | $  0.37 |
| Certified Fee | 2.30 |
| Return Receipt Fee (Endorsement Required) | 1.75 |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $  4.42 |

UNIT ID: 0908

Sent To
LEYONE JACKSON
Street, Apt. No.
GM POWERTRAIN PROD. ENGR
or PO Box No.  823 JOSLYN
City, State, ZIP+4
PONTIAC, MICH. 48340

PS Form 3800, June 2002    See Reverse for Instructions

7004 1350 0001 5312 5647



Exhibit - 11



# STANLEY R. STASKO

27653 Lexington Parkway
Southfield, Michigan, 48076
Tel. 248-552-0476
stasko@worldnet.att.net

August 8, 2005

Leyone Jackson
General Motors Powertrain Product Engineering
823 Joslyn
Pontiac, Michigan 48340

Re:  Staley R. Stasko Employment Records

Dear Sir or Madam:

On July 20, 2005, Stanley R. Stasko (Social Security #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) requested a
complete copy of all employment records pertaining to his work for General Motors
Corporation from approximately CY1978 to approximately CY1979 and from
approximately CY1983 to CY1995.  The request was made by U.S.A. Certified Mail with
Return Receipt. Please fulfill this request promptly. Please inform me of any necessary
release forms.  I may be reached at the above address if I can be of any assistance.  Thank
you for your attention to this important matter.

Yours truly,

Stanley R. Stasko

SRS/ss

Acknowledged by Stanley R Stasko before me on the
8th day of August, 2005

Audrey Lee

Notary public, State of Michigan, County of Oakland
My commission expires Dec 1, 2011
Acting in the County of Oakland





Exhibit - 12

# STANLEY R. STASKO
27653 Lexington Parkway
Southfield, Michigan, 48076
Tel. 248-552-0476
stasko@worldnet.att.net

August 24, 2005

Leyone Jackson
General Motors Powertrain Product Engineering
823 Joslyn
Pontiac, Michigan 48340

Re:  Staley R. Stasko Employment Records

Dear Sir or Madam:

On July 20, 2005, Stanley R. Stasko (Social Security #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) requested a
complete copy of all employment records pertaining to his work for General Motors
Corporation from approximately CY1978 to approximately CY1979 and from
approximately CY1983 to CY1995.  The request was made by U.S.A. Certified Mail with
Return Receipt.

On August 8, 2005, Stanley R. Stasko (Social Security #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) requested a
complete copy of all employment records pertaining to his work for General Motors
Corporation from approximately CY1978 to approximately CY1979 and from
approximately CY1983 to CY1995.  The request was made by U.S.A. Certified Mail with
Return Receipt.

Stanley R. Stasko is requesting this information per the Bullard Plawecki Employee
Right to Know Act.

Stanley R. Stasko requests this information to:

1.  determine his employment status at time of departure
2.  determine the maximum position Stanley R. Stasko legally qualified for as a
    General Motors employee
3.  look for possible discrimination by General Motors against Stanley R. Stasko (it
    is Stanley R. Stasko opinion that he can compile a reasonable argument that he
    should have been one or more levels higher than he was at the time of his
    departure)
4.  look to see if Stanley R. Stasko legally qualifies to return to General Motors

Please note that a copy of this letter is being sent to:

Dan Galnat
**Attorney**
General Motors – Global Headquarters
300 General Motors Renaissance Center
P.O. Box 300
Detroit, Michigan
48265-3000

Please fulfill this request promptly. Please inform me of any necessary release forms. I may be reached at the above address if I can be of any assistance. Thank you for your attention to this important matter.

Yours truly,

Stanley R. Stasko

SRS/ss

STATE OF MICHIGAN
COUNTY OF OAKLAND

ON AUGUST 29, 2005, STANLEY R. STASKO PERSONALLY APPEARED BEFORE ME. AND ENDORSED THE FOREGOING INSTRUMENT

Kim Young
NOTARY PUBLIC

KIM YOUNG
Notary Public, Oakland County, Michigan
Acting in ___OAKLAND___ County
My Commission Expires October 19, 2007



**U.S. Postal Service**

**CERTIFIED MAIL  RECEIPT**
(Domestic Mail Only; No Insurance Coverage Provided)

For delivery information visit our website at www.usps.com

**OFFICIAL USE**

DETROIT, MI 48265

| | | |
|---|---|---|
| Postage | $ | 0.60 |
| Certified Fee | | 2.30 |
| Return Receipt Fee (Endorsement Required) | | 1.75 |
| Restricted Delivery Fee (Endorsement Required) | | |
| Total Postage & Fees | $ | 4.65 |

UNIT ID: 0908

Postmark Here

Clerk: KRBVG7

08/24/05

Sent To    *DAN GALANT*

Street, Apt No.; or PO Box No.    *GM - GLOBAL HEADQUARTER.*
*300 GM RENAISSANCE CTR*
*P.O. BOX 300*

City, State, ZIP+4    *DETROIT, MICH. 48265-3000*

PS Form 3800, June 2002    See Reverse for Instructions

7004 1350 0001 5313 1389

---

**SENDER: COMPLETE THIS SECTION**

■ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
■ Print your name and address on the reverse so that we can return the card to you.
■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

*DAN GALNAT*
*GM - GLOBAL HQ.*
*300 GM RENAISSANCE CTR*
*P.O. BOX 300*
*DETROIT, MICH.*
*48,265-3000*

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
x _____    ☐ Agent
                 ☐ Addressee

B. Received by ( Printed Name)    C. Date of Delivery
                                   AUG 26 2005

D. Is delivery address different from item 1?    ☐ Yes
   If YES, enter delivery address below:    ☐ No

3. Service Type
☒ Certified Mail    ☐ Express Mail
☐ Registered    ☐ Return Receipt for Merchandise
☐ Insured Mail    ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)    ☐ Yes

2. Article Number
(Transfer from service label)    7004 1350 0001 5313 1389

PS Form 3811, February 2004    Domestic Return Receipt    102595-02-M-1540



Exhibit - 13



**GM Powertrain**
823 Joslyn Avenue
Pontiac, MI  48340

September 1, 2005

Mr. Stanley R. Stasko
27653 Lexington  Parkway
Southfield, MI   48076

Dear Mr. Stasko:

Per your request, the attached  file is being provided.

If I can be of further assistance, please let me know.

Sincerely,

Levone Jackson
Human Resources Representative
GM Powertrain Product Engineering
(248) 857-6449

ISSUANCE DATE 03-28-88

215 CHANGE OF STATUS OF SALARIED EMPLOYEE
AES                                    WARREN

NAME: GLASKO, STANLEY
ADDRESS: 27653 LEXINGTON PKWY   SOUTHFIELD   MI 48076
BIRTHDATE: 06-06-61      SERVICE DATE: 07-18-83    SEX/MINORITY: M/CAUCASIAN
EDUCATION: 16 COLLEGE GRADUATE       BACHELOR   ENGINEERING - ELECTRICAL
ORG TITLE: PROJECT ENGINEER          REPORTS TO: EXEC DIR APE

* DATA AS OF: 07-18-83 ******** S T A T U S ****** RECOMMENDED AS OF: _____

| HN | NEW HIRE REG | ACTION | ___ |
| RA | REGULAR ACTIVE (INCL P | EMPLOY CAT. | ___ |

* DATA AS OF: 01-16-86 ******* P O S I T I O N *** RECOMMENDED AS OF: 05-01-88

| D1 | POSITION BUILD | ACTION | J | PROFICIENCY PROMOTION |
| 6E11 | PROJECT ENGINEER | GM POS CODE | 7E05 | SR PROJECT ENGINEER |
| 00100 | AES | PER UNIT | 00100 | AES |
| F161 | APE ENGRG | DEPARTMENT | F161 | APE ENGRG |
| 1 | | SHIFT/BLDG | ___ | |
| 0001094 | | ORG#/REPLACE | 0001884 | |
| | | LOCAL CODE | ___ | |

* DATA AS OF: 10-01-87 * C O M P E N S A T I O N * RECOMMENDED AS OF: 05-01-88

| W | MERIT AWARD | ACTION | PROFICIENCY PROMOTION | |
| $ 3118.00 | $ 1947.00   5.2% | RATE/INCR. | $3925.00   CHG $ 374.00   11. |
| $ 1679.00 | TO: $ 3935.00  M | RANGE/FREQ | $ 2110.00   TO: $ 4836.00  M |

***************** R E A S O N   F O R   C H A N G E *************************
PROFICIENCY PROMOTION

********** L E A V E   O F   A B S E N C E / S E P A R A T I O N ***********:

| L.O.W. | LEAVE | FULL PAY DAYS | PART. PAY DAYS | WITHOUT PAY DAYS |
| ___ | / | ___ | ___ | ___ |

SEPARATION ALLOWANCE: _____   VACATION DAYS REMAINING: _____

************* H I S T O R I C A L   I N F O R M A T I O N ****************:

| EFF DATE | COMP. ACT | BASE RATE | AMOUNT CHANGE | % INC | POS ACT | EFF DATE | GM CD | STA ACT | EFF DATE | APPRA DATE/ |
|---|---|---|---|---|---|---|---|---|---|---|
| 03-01-86 | M | 3118.00 | 245.40 | 8.5 | | 09-01-85 | 6E11 | 5N | 08-14-79 | 12-87/ |
| 01-01-86 | T | 2872.60 | 93.60 | 3.4 | | 07-18-83 | 5E35 | HT | 06-16-79 | 12-86/ |
| 09-01-85 | J | 2779.00 | 252.72 | 10.0 | | 06-16-79 | 2E30 | HC | 09-07-78 | 11-85/ |
| 10-16-84 | T | 2526.28 | 518.28 | 25.8 | | 09-07-78 | 2E00 | | | 01-85/ |
| 09-01-84 | M | 2008.00 | 58.00 | 3.0 | | | | | | 01-84/ |

************** O R G A N I Z A T I O N A L   C H A N G E S ***************

ORGANIZATION TITLE: _____          EFFECTIVE DATE: _____

DIRECT: _____   PROJECT: _____   INDIRECT: _____

*** RECOMMENDED BY ********************** APPROVED BY ************:

| (signature) | DATE: 4/13/88 | (signature) | DATE: 4/19/88 |
| (signature) | DATE: 4/21/88 | (signature) | DATE: 4/2 8 |

ISSUED: 07-27-95                                                                GM-215/TAD

## SALARIED PERSONNEL TRANSACTION

NAME-------: STANLEY R STASKO                          SSN: 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

  RESS--: 27653 LEXINGTON PKWY
          SOUTHFIELD, MI 48076

BIRTHDATE: 06-06-61                    SEX/MINORITY----: M  NON-MINORITY
PERF/DATE S  01-22-92                  CREDITED SERVICE: 11 YRS  06 MOS.

EDUCATION: 16  B  LAWRENCE TECH U  ENGRG - ELECTRICAL - GENERAL

********** CURRENT *********** S T A T U S *********** RECOMMENDED *******
            07-18-83                                        08-25-95

HN     HIRE-REGULAR             ACTION CODE        1J     QUIT-CAREER CHANGE

RA     REGULAR ACTIVE           EMP CATEGORY       SE     SEPARATED

07-18-83  09-07-78             SERV DT/ORIG HIRE   _____  _____

                               LDW/RTW/REC DLA     08-25-95  _____  __

                               SEP ALLOW/VAC HRS   _____  _____

****************************** P O S I T I O N ******************************
            01-01-95

D8     CHG-REORGANIZATION       ACTION CODE

7E06   SR PROJECT ENGINEER      POSITION CODE

                                LOCAL NUMBER

                                LOCAL TITLE

10020  GM POWERTRAIN-WRN ENG    PERSONNEL UNIT

4H213  LAB SUPERVISOR/ENGINE    DEPARTMENT

 .30    WARREN        MI        LOCATION CODE

03      2        F      N       AOW/EEO/EXPT/SUPV

5110000  GM POWERTRAIN-WARREN   AAP FACILITY

****************************** C O M P E N S A T I O N **********************
            06-01-95

M      MERIT INCREASE           ACTION CODE

  5299.00     186.00      3.6   BASE SAL/CHG/%

  3325.00    5160.00   6325.00  MIN/MID/MAX

 192.7   M     40.00            % MID/FREQ/HOURS

12-01-91     910.00      1.7    LST AWD DT/AMT/%

****************************************************************************
MR. STASKO IS RESIGNING FROM GENERAL MOTORS CORPORATION EFFECTIVE 8/25/95 TO GO
INTO THE MINISTRY.  HE IS ENTITLED TO 50% OF HIS 17.5 DAYS OF VACATION PLUS THE
FOUR (4) ADDITIONAL DAYS HE PURCHASED.  HE HAS TAKEN ALL OF HIS VACATION DAYS.


PREDECESSOR(NAME/TITLE):

REQ #:                                           WILL BE REPLACED(Y/N):

*********** S I G N A T U R E S  O F  A U T H O R I Z A T I O N ***********
APPROVAL/DATE: _Gerald a Faul_____ / 8-1-95  _Bruce E Jones_ 8-1-95

APPROVAL/DATE: _____ / _____  _____ / _____

APPROVAL/DATE: _____ / _____  _____ / _____

  PRism  Approved on lita on 8/1/95 JRS

General Motors Corporation

10001   GMC CENTRAL OFFICE                                                        0024

STANLEY R STASKO                  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   DEPT   F161   NON-EXEMPT SEMI-MO

POSITION CODE AND TITLE: 5E35   ASSOC ENGINEER
POSITION SALARY RANGE: $1,306.00 TO  $2,310.96

EFFECT OF MERIT INCREASE                      08-31-84      CHANGE    09-01-84
MONTHLY BASE SALARY                         $ 1,950.00   $   58.00  $ 2,008.00

SAVINGS-STOCK OPTION 3     1%   MID MONTH       12.00         .00       12.00
                          1%   MONTH END       12.00        1.00       13.00
RETIREMENT DEDUCTION                             .00         .00         .00
OPTIONAL LIFE INSURANCE                          .00         .00         .00
BASIC LIFE INSURANCE (PAID FOR BY GM)       56,800.00   1,400.00   58,200.00

QUARTERLY COST OF LIVING ALLOWANCE:  $1560.80

---

General Motors Corporation

10001   GMC CENTRAL OFFICE                                                      02598

STANLEY R STASKO                  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   DEPT   F161   NON-EXEMPT SEM.

POSITION CODE AND TITLE: 5E35   ASSOC ENGINEER
POSITION SALARY RANGE: $1,306.00 TO  $2,829.24

EFFECT OF COLA TRANSFER TO BASE INCREASE      10-15-84      CHANGE    10-16-84
MONTHLY BASE SALARY                         $ 2,008.00   $  518.28  $ 2,526.28

SAVINGS-STOCK OPTION 3     1%   MID MONTH       12.00         .00       12.00
                          1%   MONTH END       13.00         .00       13.00
RETIREMENT DEDUCTION                             .00         .00         .00
OPTIONAL LIFE INSURANCE                          .00         .00         .00
BASIC LIFE INSURANCE (PAID FOR BY GM)       58,200.00   2,500.00   60,700.00

QUARTERLY COST OF LIVING ALLOWANCE:     $26.00

10001   GMC CENTRAL OFFICE    General Motors Corporation                    01695

STANLEY R STASKO              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   DEPT   F161        EXEMPT SEMI-M

POSITION CODE AND TITLE: 6E11   PROJECT ENGINEER
MONTHLY SALARY RANGE:        $1,679.00 TO    $3,934.84      MIDPOINT:      $3,322.
ANNUAL   SALARY RANGE:      $20,148.00 TO   $47,218.08      MIDPOINT:     $39,870.

EFFECT OF COLA TRANSFER TO BASE INCREASE        12-31-85       CHANGE      01-01-86
MONTHLY BASE SALARY                          $  2,779.00 $     93.60 $   2,872.60
ANNUAL  BASE SALARY                          $ 33,348.00 $  1,123.20 $ 34,471.20
SAVINGS-STOCK                   15%  MID MONTH       214.00        8.00      222.00
                                15%  MONTH END       216.00        8.00      222.00
RETIREMENT DEDUCTION                                 12.86        1.17       14.03
OPTIONAL LIFE INSURANCE DED (INC DGLI)                7.84         .18        8.02
OPTIONAL LIFE INS RETRO ONE TIME ADJ                   .18         .00         .00
OPTIONAL LIFE INSURANCE PRINCIPAL SUM           133,400.00    4,500.00  137,900.00
BASIC LIFE INSURANCE (PAID FOR BY GM)            66,700.00    2,300.00   69,000.00

---

10001   GMC CENTRAL OFFICE    General Motors Corporation                    00189

STANLEY R STASKO              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   DEP.   F161        EXEMPT SEMI-M

POSITION CODE AND TITLE: 6E11   PROJECT ENGINEER
POSITION SALARY RANGE: $1,679.00 TO   $3,425.88

EFFECT OF PROMOTIONAL INCREASE                  08-31-85       CHANGE      09-01-85
MONTHLY BASE SALARY                          $  2,526.28 $    252.72 $   2,779.00

SAVINGS-STOCK                   15%  MID MONTH       193.00       21.00      214.00
                                15%  MONTH END       194.00       21.00      215.00
RETIREMENT DEDUCTION                                   .00         .00         .00
OPTIONAL LIFE INSURANCE DED (INC DGLI)                7.35         .49        7.84
OPTIONAL LIFE INS RETRO ONE TIME ADJ                   .49         .00         .00
OPTIONAL LIFE INSURANCE PRINCIPAL SUM           121,300.00   12,100.00  133,400.00
BASIC LIFE INSURANCE (PAID FOR BY GM)            60,700.00    6,000.00   66,700.00

QUARTERLY COST OF LIVING ALLOWANCE:   $244.40

**General Motors Corporation**

10001  GMC CENTRAL OFFICE                                                003??

STANLEY R STASKO          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  DEPT  F161        EXEMPT SEM1-M

POSITION CODE AND TITLE: 6E11  PROJECT ENGINEER
MONTHLY SALARY RANGE:     $1,679.00 TO    $3,934.84   MIDPOINT:    $3,322.58
ANNUAL   SALARY RANGE:   $20,148.00 TO   $47,218.08   MIDPOINT:   $39,870.96

EFFECT OF MERIT INCREASE                    02-23-86      CHANGE     03-01-86
MONTHLY BASE SALARY                    $  2,872.60 $    245.40 $  3,118.00
ANNUAL  BASE SALARY                    $ 34,471.20 $  2,944.80 $ 37,416.00
SAVINGS-STOCK                15%  MID MONTH      214.00       18.00     232.00
                             15%  MONTH END      216.00       18.00     234.00
RETIREMENT DEDUCTION                             14.03        3.07      17.10
OPTIONAL LIFE INSURANCE DED (INC DGLI)            8.02         .47       8.49
OPTIONAL LIFE INS RETRO ONE TIME ADJ              .47         .00        .00
OPTIONAL LIFE INSURANCE PRINCIPAL SUM       137,900.00   11,800.00  149,700.00
BASIC LIFE INSURANCE (PAID FOR BY GM)        69,000.00    5,900.00   74,900.00

**General Motors Corporation**

10001  GMC CENTRAL OFFICE                                            00.36
10001-F   -9198
STANLEY R STASKO          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  DEPT  F161        EXEMPT SEMI-M

POSITION CODE AND TITLE: 7E06  SR PROJECT ENGINEER
MONTHLY SALARY RANGE:     $2,110.50 TO    $4,835.42   MIDPOINT:    $3,775.00
ANNUAL  SALARY RANGE:    $25,326.00 TO   $58,025.04   MIDPOINT:   $45,300.00

EFFECT OF PROMOTIONAL INCREASE              04-30-88      CHANGE     05-01-88
MONTHLY BASE SALARY                    $  3,118.00 $    374.00 $  3,492.00
ANNUAL  BASE SALARY                    $ 37,416.00 $  4,488.00 $ 41,904.00
SAVINGS-STOCK                10%  MID MONTH      155.00       19.00     174.00
                             10%  MONTH END      156.00       19.00     175.00
RETIREMENT DEDUCTION                             13.98        4.67      18.65
OPT LIFE INS DEDUCTION                            .00         .00        .00
OPT LIFE INS PRINCIPAL SUM                  149,700.00   18,000.00  167,700.00
BASIC LIFE INS (PD BY GM)                    74,900.00    9,000.00   83,900.00

**General Motors Corporation**

10001    GMC CENTRAL OFFICE                                          00329
10001-F    -9L98
STANLEY R STASKO                    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    DEPT    F161    EXEMPT SEMI-M

POSITION CODE AND TITLE: 7E06    SR PROJECT ENGINEER
MONTHLY SALARY RANGE:        $2,110.50 TO        $5,070.00
ANNUAL   SALARY RANGE:      $25,326.00 TO      $60,840.00

| | | | | |
|---|---|---|---|---|
| EFFECT OF MERIT INCREASE | | 04-30-89 | CHANGE | 05-01-89 |
| MONTHLY BASE SALARY | $ | 3,492.00 $ | 251.00 $ | 3,743.00 |
| ANNUAL  BASE SALARY | $ | 41,904.00 $ | 3,012.00 $ | 44,916.00 |
| SAVINGS-STOCK | 10% MID MONTH | 174.00 | 13.00 | 187.00 |
| | 10% MONTH END | 175.00 | 12.00 | 187.00 |
| RETIREMENT DEDUCTION | | 18.65 | 3.14 | 21.79 |
| OPT LIFE INS DED (INC DGLI) | | 9.21 | .48 | 9.69 |
| OPT LIFE INS RETRO ONE TIME ADJ | | .48 | .00 | .00 |
| OPT LIFE INS PRINCIPAL SUM | | 167,700.00 | 12,000.00 | 179,700.00 |
| BASIC LIFE INS (PD BY GM) | | 83,900.00 | 6,000.00 | 89,900.00 |

BASE SALARY CHANGE / RECOGNITION AWARD NOTICE - COMPENSATION STATEMENT

NAME    : STASKO,STANLEY R,                          SSN : 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
TITLE   : SR PROJECT ENGINEER                  POS CODE : 7E06
PERUNIT : 00100 AES              DEPT : F161      EXEMPT : P

PREVIOUS ANNUAL BASE: 44,916.00          EFFECTIVE DATE       : 09/01/90
AMOUNT OF INCREASE  : 3,060.00 $255 mo   M  MERIT INCREASE
NEW ANNUAL BASE     : 47,976.00
                                         ANNUAL RANGE MIDPOINT: 52,800.00
RECOGNITION AWARD   : 1,120.00 (09/01/90) ANNUAL RANGE MAXIMUM : 63,276.00

| BENEFITS IMPACT | PREV AMOUNT | NEW AMOUNT |
|---|---|---|
| BASIC LIFE INSURANCE (PAID FOR BY GM): | 89,900.00 | 96,000.00 |
| RETIREMENT DEDUCTION (MONTHLY): | 21.79 | 24.98 |
| OPTIONAL LIFE INS AMOUNT (MONTHLY): | 7.19 | 7.68 |
| SAVINGS STOCK DEDUCTION (MID_MONTH): | 187.00 | 199.00 |
| (END_MONTH): | 187.00 | 200.00 |

INSTRUCTIONS FOR THE SUPERVISOR (CONFIDENTIAL INFORMATION):
PLEASE PROVIDE YOUR EMPLOYE WITH THIS INFORMATION: IT CONFIRMS A CHANGE IN
COMPENSATION.  BOTH YOU AND THE EMPLOYE SHOULD SIGN EACH COPY, PROVIDING
ONE TO THE EMPLOYE AND FORWARDING THE OTHER TO SALARIED PERSONNEL.

COMPENSATION STATEMENT
COMMENCING: SEP 01, 1990  MY COMPENSATION IS $  3,998.00 PER MONTH

I AM CLASSIFIED AS AN EXEMPT EMPLOYE UNDER THE PROVISIONS OF THE FAIR
LABOR STANDARDS ACT.  THIS STATEMENT, WHICH IS A PART OF MY 'EMPLOYMENT
AGREEMENT,' RECOGNIZES THAT THE RATE CITED ABOVE WILL BE MY COMPENSATION
FOR ALL HOURS WORKED, INCLUDING OVERTIME, DURING EACH MONTHLY PERIOD.
HOWEVER, A NIGHT SHIFT PREMIUM, AN EXTENDED WORKWEEK SALARY PREMIUM OR
AN OVERTIME PREMIUM FOR SCHEDULED OVERTIME HOURS MAY BE PAID ME, IF
APPROVED, IN ACCORDANCE WITH THE POLICY OR PRACTICE IN EFFECT.  ACCEPTANCE
BY ME OF MY PAY, WITHOUT PROTEST IN WRITING, SHALL ACKNOWLEDGE THAT I HAVE
BEEN PAID IN FULL FOR THE PERIOD.
WHEN SIGNED AND ACCEPTED, THIS STATEMENT BECOMES A PART OF MY BASIC
'EMPLOYMENT AGREEMENT' AND REAFFIRMS THAT MY EMPLOYMENT IS FROM
MONTH-TO-MONTH ON A CALENDAR MONTH BASIS.
THIS STATEMENT REPLACES ANY PREVIOUS 'COMPENSATION STATEMENTS' AND
SHALL CONTINUE IN EFFECT UNTIL THE BASIC 'EMPLOYMENT AGREEMENT', OR MY
EMPLOYMENT, IS TERMINATED, OR UNTIL REPLACED BY A NEW 'COMPENSATION
STATEMENT.'
IN CONSIDERATION OF MY CONTINUED EMPLOYMENT, I ACKNOWLEDGE THAT I HAVE
RECEIVED ALL COMPENSATION DUE ME FOR ALL SERVICES I RENDERED PRIOR TO
THE SIGNING OF THIS STATEMENT.
THERE ARE NO OTHER ARRANGEMENTS, AGREEMENTS, UNDERSTANDINGS, OR
STATEMENTS, VERBAL OR IN WRITING, EXCEPT AS STATED ABOVE.  NO MODIFICATION
OR AMENDMENT, OTHER THAN A CANCELLATION AND REPLACEMENT BY ANOTHER WRITTEN
'COMPENSATION STATEMENT', WILL BE EFFECTIVE, UNLESS SIGNED BY ME AND MY
EMPLOYER.

_Stanly R. Stasko_      9/5/90    _Gerald A Fail_    9-5-90
EMPLOYE            DATE         SUPERVISOR         DATE

## BASE SALARY CHANGE NOTICE — COMPENSATION STATEMENT

NAME    : STASKO,STANLEY R,                              SSN : 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
TITLE   : SR PROJECT ENGINEER                            POS CODE : 7E06
PERUNIT: 00100 AES                     DEPT : F161       EXEMPT : P

PREVIOUS ANNUAL BASE: 47,976.00        EFFECTIVE DATE        : 09/01/91
AMOUNT OF INCREASE   : 4,824.00 (402 mth)  M  MERIT INCREASE
NEW ANNUAL BASE      : 52,800.00        ANNUAL RANGE MIDPOINT: 55,368.00
                                        ANNUAL RANGE MAXIMUM : 66,276.00

|     BENEFITS IMPACT                        | PREV AMOUNT | NEW AMOUNT |
|--------------------------------------------|-------------|------------|
| BASIC LIFE INSURANCE (PAID FOR BY GM):     | 96,000.00   | 105,600.00 |
| RETIREMENT DEDUCTION (MONTHLY):            | 24.98       | 30.00      |
| OPTIONAL LIFE INS AMOUNT (MONTHLY):        | 7.68        | 8.45       |
| SAVINGS STOCK DEDUCTION (MID_MONTH):       | 119.00      | 132.00     |
|                    (END_MONTH):            | 120.00      | 132.00     |

INSTRUCTIONS FOR THE SUPERVISOR (CONFIDENTIAL INFORMATION):
PLEASE PROVIDE YOUR EMPLOYE WITH THIS INFORMATION: IT CONFIRMS A CHANGE IN
COMPENSATION.  BOTH YOU AND THE EMPLOYE SHOULD SIGN EACH COPY, PROVIDING
ONE TO THE EMPLOYE AND FORWARDING THE OTHER TO SALARIED PERSONNEL.

### COMPENSATION STATEMENT
COMMENCING: SEP 01, 1991  MY COMPENSATION IS $  4,400.00 PER MONTH

    I AM CLASSIFIED AS AN EXEMPT EMPLOYE UNDER THE PROVISIONS OF THE FAIR
LABOR STANDARDS ACT.  THIS STATEMENT, WHICH IS A PART OF MY 'EMPLOYMENT
AGREEMENT,' RECOGNIZES THAT THE RATE CITED ABOVE WILL BE MY COMPENSATION
FOR ALL HOURS WORKED, INCLUDING OVERTIME, DURING EACH MONTHLY PERIOD.
HOWEVER, A NIGHT SHIFT PREMIUM, AN EXTENDED WORKWEEK SALARY PREMIUM OR
AN OVERTIME PREMIUM FOR SCHEDULED OVERTIME HOURS MAY BE PAID ME, IF
APPROVED, IN ACCORDANCE WITH THE POLICY OR PRACTICE IN EFFECT.  ACCEPTANCE
BY ME OF MY PAY, WITHOUT PROTEST IN WRITING, SHALL ACKNOWLEDGE THAT I HAVE
BEEN PAID IN FULL FOR THE PERIOD.
    WHEN SIGNED AND ACCEPTED, THIS STATEMENT BECOMES A PART OF MY BASIC
'EMPLOYMENT AGREEMENT' AND REAFFIRMS THAT MY EMPLOYMENT IS FROM
MONTH-TO-MONTH ON A CALENDAR MONTH BASIS.
    THIS STATEMENT REPLACES ANY PREVIOUS 'COMPENSATION STATEMENTS' AND
SHALL CONTINUE IN EFFECT UNTIL THE BASIC 'EMPLOYMENT AGREEMENT', OR MY
EMPLOYMENT, IS TERMINATED, OR UNTIL REPLACED BY A NEW 'COMPENSATION
STATEMENT.'
    IN CONSIDERATION OF MY CONTINUED EMPLOYMENT, I ACKNOWLEDGE THAT I HAVE
RECEIVED ALL COMPENSATION DUE ME FOR ALL SERVICES I RENDERED PRIOR TO
THE SIGNING OF THIS STATEMENT.
    THERE ARE NO OTHER ARRANGEMENTS, AGREEMENTS, UNDERSTANDINGS, OR
STATEMENTS, VERBAL OR IN WRITING, EXCEPT AS STATED ABOVE.  NO MODIFICATION
OR AMENDMENT, OTHER THAN A CANCELLATION AND REPLACEMENT BY ANOTHER WRITTEN
'COMPENSATION STATEMENT', WILL BE EFFECTIVE, UNLESS SIGNED BY ME AND MY
EMPLOYER.

_Stanley R. Stasko_        9/3/91      _General Motors_      9-3-91
EMPLOYE                    DATE        SUPERVISOR            DATE

BASE SALARY CHANGE NOTICE - COMPENSATION STATEMENT

```
NAME   : STASKO,STANLEY,R                      SSN : 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
TITLE  : SR PROJECT ENGINEER               POS CODE : 7E06
PERUNIT: 10020 GM POWERTRAIN-WRN ENG  DEPT : 53200    EXEMPT : P
```

```
PREVIOUS ANNUAL BASE:      52,800.00       EFFECTIVE DATE      : 10/01/93
AMOUNT OF INCREASE  :       4,632.00       M  MERIT INCREASE
NEW ANNUAL BASE     :      57,432.00       ANNUAL RANGE MIDPOINT:    58,200.00
                                           ANNUAL RANGE MAXIMUM :    70,500.00
```

========================================================================

INSTRUCTIONS FOR THE SUPERVISOR (CONFIDENTIAL INFORMATION):

PLEASE PROVIDE YOUR EMPLOYE WITH THIS INFORMATION: IT CONFIRMS A CHANGE IN
COMPENSATION.  BOTH YOU AND THE EMPLOYE SHOULD SIGN EACH COPY, PROVIDING
ONE TO THE EMPLOYE AND FORWARD THE OTHER TO SALARIED PERSONNEL.

------------------------------------------------------------------------
COMPENSATION STATEMENT

NAME: STASKO,STANLEY,R                UNIT: 10020 GM POWERTRAIN-WRN ENG
COMMENCING: OCT 01, 1993  MY COMPENSATION IS $    4,786.00 PER MONTH.

I AM CLASSIFIED AS AN EXEMPT EMPLOYE UNDER THE PROVISIONS OF THE FAIR
LABOR STANDARDS ACT.  THIS STATEMENT, WHICH IS A PART OF MY 'EMPLOYMENT
AGREEMENT,' RECOGNIZES THAT THE RATE CITED ABOVE WILL BE MY COMPENSATION
FOR ALL HOURS WORKED, INCLUDING OVERTIME, DURING EACH MONTHLY PERIOD.
HOWEVER, A NIGHT SHIFT PREMIUM, AN EXTENDED WORKWEEK SALARY PREMIUM OR
AN OVERTIME PREMIUM FOR SCHEDULED OVERTIME HOURS MAY BE PAID ME, IF
APPROVED, IN ACCORDANCE WITH THE POLICY OR PRACTICE IN EFFECT.  ACCEPTANCE
BY ME OF MY PAY, WITHOUT PROTEST IN WRITING, SHALL ACKNOWLEDGE THAT I HAVE
BEEN PAID IN FULL FOR THE PERIOD.
    WHEN SIGNED AND ACCEPTED, THIS STATEMENT BECOMES A PART OF MY BASIC
'EMPLOYMENT AGREEMENT' AND REAFFIRMS THAT MY EMPLOYMENT IS FROM
MONTH-TO-MONTH ON A CALENDAR MONTH BASIS.
    THIS STATEMENT REPLACES ANY PREVIOUS 'COMPENSATION STATEMENTS' AND
SHALL CONTINUE IN EFFECT UNTIL THE BASIC 'EMPLOYMENT AGREEMENT', OR MY
EMPLOYMENT, IS TERMINATED, OR UNTIL REPLACED BY A NEW 'COMPENSATION
STATEMENT.'
    IN CONSIDERATION OF MY CONTINUED EMPLOYMENT, I ACKNOWLEDGE THAT I HAVE
RECEIVED ALL COMPENSATION DUE ME FOR ALL SERVICES I RENDERED PRIOR TO
THE SIGNING OF THIS STATEMENT.
    THERE ARE NO OTHER ARRANGEMENTS, AGREEMENTS, UNDERSTANDINGS, OR
STATEMENTS, VERBAL OR IN WRITING, EXCEPT AS STATED ABOVE.  NO MODIFICATION
OR AMENDMENT, OTHER THAN A CANCELLATION AND REPLACEMENT BY ANOTHER WRITTEN
'COMPENSATION STATEMENT', WILL BE EFFECTIVE, UNLESS SIGNED BY ME AND MY
EMPLOYER.

_____    9/28/93    _____   9-28-93
EMPLOYE                    DATE              SUPERVISOR           DATE

BASE SALARY CHANGE NOTICE - COMPENSATION STATEMENT

NAME    : STASKO,STANLEY,R                                    SSN : 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
TITLE   : SR PROJECT ENGINEER                                 POS CODE : 7E06
PERUNIT : 10020 GM POWERTRAIN-WRN ENG    DEPT : 53150         EXEMPT : P

PREVIOUS ANNUAL BASE :  57,432.00        EFFECTIVE DATE      : 06/01/94
AMOUNT OF INCREASE   :   3,924.00        MERIT INCREASE
NEW ANNUAL BASE      :  61,356.00        ANNUAL RANGE MIDPOINT :  59,940.00
                                         ANNUAL RANGE MAXIMUM  :  73,680.00

=================================================================================

INSTRUCTIONS FOR THE SUPERVISOR (CONFIDENTIAL INFORMATION):

PLEASE PROVIDE YOUR EMPLOYE WITH THIS INFORMATION. IT CONFIRMS A CHANGE IN
COMPENSATION. BOTH YOU AND THE EMPLOYE SHOULD SIGN EACH COPY, PROVIDING
ONE TO THE EMPLOYE AND FORWARD THE OTHER TO SALARIED PERSONNEL.

=================================================================================

NAME, STASKO,STANLEY,R          COMPENSATION STATEMENT
COMMENCING: JUN 01, 1994    MY COMPENSATION IS $   5,113.00 PER MONTH.
                                UNIT : 10020 GM POWERTRAIN-WRN ENG

    I AM CLASSIFIED AS AN EXEMPT EMPLOYE UNDER THE PROVISIONS OF THE FAIR
LABOR STANDARDS ACT. THIS STATEMENT, WHICH IS A PART OF MY 'EMPLOYMENT
AGREEMENT,' RECOGNIZES THAT THE RATE CITED ABOVE WILL BE MY COMPENSATION
FOR ALL HOURS WORKED, INCLUDING OVERTIME, DURING EACH MONTHLY PERIOD.
HOWEVER, A NIGHT SHIFT PREMIUM, AN EXTENDED WORKWEEK SALARY PREMIUM OR
AN OVERTIME PREMIUM FOR SCHEDULED OVERTIME HOURS MAY BE PAID ME, IF
APPROVED, MY PAY, WITHOUT PROTEST IN WRITING, SHALL ACKNOWLEDGE THAT I HAVE
BY ME OF MY PAY, IN ACCORDANCE WITH THE POLICY OR PRACTICE IN EFFECT. ACCEPTANCE
BEEN PAID IN FULL FOR THE PERIOD.
    I HAVE SIGNED AND ACCEPTED THIS STATEMENT. STATEMENT BECOMES A PART OF MY BASIC
'EMPLOYMENT AGREEMENT' AND REAFFIRMS THAT MY EMPLOYMENT IS FROM
MONTH-TO-MONTH ON A CALENDAR MONTH BASIS.
    THIS STATEMENT REPLACES ANY PREVIOUS 'COMPENSATION STATEMENTS' AND
'EMPLOYMENT AGREEMENT' AND WILL BE THE BASIC 'EMPLOYMENT AGREEMENT,' OR MY
EMPLOYMENT, IS EFFECT UNTIL THE
SHALL CONTINUE IN EFFECT UNTIL THE
EMPLOYMENT, IS TERMINATED, OR UNTIL REPLACED BY A NEW 'COMPENSATION
STATEMENT.'

    IN CONSIDERATION OF MY CONTINUED EMPLOYMENT, I ACKNOWLEDGE THAT I HAVE
RECEIVED ALL COMPENSATION DUE ME FOR ALL SERVICES I RENDERED PRIOR TO
THE SIGNING OF THIS STATEMENT.
    THERE ARE NO OTHER ARRANGEMENTS, AGREEMENTS, UNDERSTANDINGS, OR
STATEMENTS, VERBAL OR IN WRITING, EXCEPT AS STATED ABOVE. NO MODIFICATION
OR CHANGE IN OTHER THAN A CANCELLATION AND REPLACEMENT BY ANOTHER WRITTEN
'COMPENSATION STATEMENT,' WILL BE EFFECTIVE, UNLESS SIGNED BY ME AND MY
EMPLOYER.

_____  5/23/94        _____  5/23/94
EMPLOYE           DATE           SUPERVISOR         DATE



BASE SALARY CHANGE NOTICE - COMPENSATION STATEMENT

NAME   : STASKO,STANLEY,R                                    SSN  : 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
TITLE  : SR PROJECT ENGINEER                             POS CODE : 7E06
PERUNIT: 10020 GM POWERTRAIN-WRN ENG   DEPT : WH213       EXEMPT : P

PREVIOUS ANNUAL BASE:   61,356.00          EFFECTIVE DATE      : 06/01/95
AMOUNT OF INCREASE  :    2,232.00          M MERIT INCREASE
NEW ANNUAL BASE     :   63,588.00          ANNUAL RANGE MARKET RATE:   61,920.00
                                           ANNUAL RANGE MAXIMUM    :   75,900.00
================================================================================

INSTRUCTIONS FOR THE SUPERVISOR (CONFIDENTIAL INFORMATION).

PLEASE PROVIDE YOUR EMPLOYEE WITH THIS INFORMATION. IT CONFIRMS A CHANGE IN
COMPENSATION AND/OR EXEMPT STATUS. BOTH YOU AND THE EMPLOYEE SHOULD SIGN
EACH COPY, PROVIDING ONE TO THE EMPLOYEE AND FORWARD THE OTHER TO SALARIED
PERSONNEL.

NAME: STASKO,STANLEY,R       COMPENSATION STATEMENT UNIT: 10020 GM POWERTRAIN-WRN ENG
COMMENCING: JUN 01, 1995   MY COMPENSATION IS $   5,299.00 PER MONTH.

I AM CLASSIFIED AS AN EXEMPT EMPLOYEE UNDER THE PROVISIONS OF THE FAIR
LABOR STANDARDS ACT. THIS STATEMENT, WHICH IS A PART OF MY 'EMPLOYMENT
AGREEMENT,' RECOGNIZES THAT THE RATE CITED ABOVE WILL BE MY COMPENSATION
FOR ALL HOURS WORKED, INCLUDING OVERTIME, DURING EACH MONTHLY PERIOD.
HOWEVER, A NIGHT SHIFT PREMIUM, AN EXTENDED WORKWEEK SALARY PREMIUM OR
AN OVERTIME PREMIUM FOR SCHEDULED OVERTIME HOURS MAY BE PAID ME, IF
APPROVED, IN ACCORDANCE WITH THE POLICY OR PRACTICE IN EFFECT. ACCEPTANCE
BY ME OF MY PAY, WITHOUT PROTEST IN WRITING, SHALL ACKNOWLEDGE THAT I HAVE
BEEN PAID IN FULL FOR THE PERIOD.
'WHEN SIGNED AND ACCEPTED, THIS STATEMENT BECOMES A PART OF MY BASIC
'EMPLOYMENT AGREEMENT' AND REAFFIRMS THAT MY EMPLOYMENT IS FROM
MONTH-TO-MONTH ON A CALENDAR MONTH BASIS.
THIS STATEMENT REPLACES ANY PREVIOUS 'COMPENSATION STATEMENTS' AND
SHALL CONTINUE IN EFFECT UNTIL THE BASIC 'EMPLOYMENT AGREEMENT', OR MY
EMPLOYMENT, IS TERMINATED, OR UNTIL REPLACED BY A NEW 'COMPENSATION
STATEMENT'.
IN CONSIDERATION OF MY CONTINUED EMPLOYMENT, I ACKNOWLEDGE THAT I HAVE
RECEIVED ALL COMPENSATION DUE ME FOR ALL SERVICES I RENDERED PRIOR TO
THE SIGNING OF THIS STATEMENT.
THERE ARE NO OTHER ARRANGEMENTS, AGREEMENTS, UNDERSTANDINGS, OR
STATEMENTS, VERBAL OR OTHER THAN AS STATED ABOVE. NO MODIFICATION
OR AMENDMENT OF THIS AGREEMENT, EXCEPT A CANCELLATION BY ANOTHER WRITTEN
'COMPENSATION STATEMENT', WILL BE EFFECTIVE, UNLESS SIGNED BY ME AND MY
EMPLOYER.

_____  _____     _____  6-15-95
EMPLOYEE                   DATE        SUPERVISOR                   DATE

PRISM INPUT
PSG

# ADVANCED ENGINEERING STAFF

## PERFORMANCE PLANNING AND DEVELOPMENT PROCESS
## EMPLOYE FEEDBACK REPORT

NAME: __ 1W ____ F164 STASKO, STANLEY R, _____

SSN: ____ 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   SR PROJECT ENGINEE _____
       7E06

NEXT SESSION SCHEDULED FOR: _____

DATE OF LAST FEEDBACK SESSION: _10.22.89_

POSITION JOB CODE/TITLE: _____

OBJECTIVE SETTING DATE: _02.23.89_

## INSTRUCTIONS / COMMENTS

The Performance Development Program (PDP) is a formal means of reviewing and evaluating employe performance. This program is intended to inspire and develop employes by:

- helping define goals and objectives
- encouraging performance that reflects the mission and philosophy of AES
- identifying specific areas where performance may be enhanced
- recognizing achievement

The following pages represent a valuable tool that we, as AES employes, have to strengthen the organization. Therefore, careful and serious thought should be given to each step of the review process. The following instructions and suggestions are provided to assist the employe and supervisor in utilizing this tool.

**Objectives** – The first and most critical step to an effective performance development program is establishing, jointly with the employe, clear and concise performance objectives with specific measurements. The goal is to make what can often be a subjective process as objective as possible. By establishing goals and expectations, we can ensure a more objective process, and clearly identify areas where improvement is desired and/or required. After objectives are developed, periodic performance review meeting/meetings should be scheduled. Employe and supervisor are to sign and date, thus confirming that the Performance Development Plan was reviewed.

**Employe Input** – This section is to be filled out at employe option, and given to the supervisor at least one week prior to the review meeting.

**Supporting Skills** – If appropriate, performance expectations should be reviewed with the employe at the objective setting meeting. The supervisor

may review progress on any of the skills listed during progress review meetings.

**Progress Feedback** – Supervisor uses this section to review the employe's progress relative to the objectives and goals previously established. Feedback should be a thorough evaluation of the employe's progress, highlighting achievements made in addition to what is needed to enhance performance, plus any comments by either the employe or supervisor.

**Employe Feedback Comments** – This section to be completed if appropriate to document progress feedback discussion.

**Training** – Work experiences, assignments, educational activities that would be helpful to employe.

**Year End Review PDP Closing Comments:**

    **Employe Comments** – Available for employe's use.

    **Supervisor Comments** – Supervisor should complete this section.

**Readiness for other Assignments** – Supervisor indicates levels and fields of work codes and employes indicate career interest.

**Signatures** – Supervisor and second-level supervisor are to sign before year end review meeting. Employe to sign after completion of meeting.

**Objectives Setting** – Objectives and goals for the following year should be established at the year end review meeting using a new form to begin the next year PDP cycle.

1989 OBJECTIVES
S. STASKO
14-Feb-89

* 1  Provide general engineering information and expertise to
     Dyno Wing personnel to provide test capabilities and solve
     problems.

* 2  Install engine coolant and oil temperature control systems
     in 8 test cells.

* 3  Finalize PLC design; install prototype system in Cell 7;
     provide information for appropriation request and install at
     least 3 systems in cells.

* 4  Finalize data acquisition system front end equipment design;
     install prototype in Cell 7; provide information for
     appropriation request for the balance of systems.

* 5  Install the high speed data acquisition equipment in Cell 11
     for cylinder pressure studies.

* 6  Lead a joint effort between GM and EDS to enhance C.A.T.S.
     system by adding a calibration and curve fit routine.

_Stanley R. Stasko_ 2/23/89          _Gerald A. Fairbanks_   2-23-8
Stanley R. Stasko                    Gerald A. Fairbanks

OBJECTIV.TXT

1989 OBJECTIVES REVIEW
S. STASKO
14-Feb-89


ADDITIONS

7.    Provide engineering support for the chassis dynamometer
      update.

8.    Design and install a fuel blending system in the Blendhouse.

COMMENT

      The second through fifth objectives are in work and are at
various stages of completion.  These projects are on schedule for
the items where Stan has control:

2.    Eight cell should have engine coolant and oil temperature
      control systems installed by the end of the year.

3.    PLC design is complete and the cost information is in Andy
      Virostek's area for writing the appropriation request.

4.    The data acquisition design is complete and the cost
      information is nearly ready to go to Andy Virostek for
      writing the appropriation request.  Equipment is available
      for the Cell 7 installation.

5.    DSP is putting together a high speed data acquisition system
      for Cell 11.

_____ 8/30/89          _____ 8/30/89
Stanley R. Stasko                      Gerald A. Fairbanks


A:STASKO.TXT

YEAR END REVIEW AND CLOSING COMMENTS

STANLEY R. STASKO
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
7E06          SR PEOJECT ENNGINEER
13-DEC-89

SUPERVISOR'S COMMENTS:

    Stan has completed most of the work outlined in his
1989 Objectives and Objectives Review.  The items that have
not been completed are ones awaiting Appropriation Request
approval which Stan does not have control.  The design and
installation of the fuel blending system has been reassigned
to Chuck Crowl.

    This past year Stan has done an outstanding job of
working with Dynamometer Wing personnel to design,
coordinate, document and monitor installation of equipment
for the update.  He has learned a lot about how to work with
different personalities and problems and he has done an
exceptional job.

Stan R. Stasko          date    Gerald A. Fairbanks        date

A:STASKO.TXT

1M        F161 STASKO, STANLE

## OBJECTIVES

Objectives should include specific job responsibilities and may include specific goals for the job responsibilities to be accomplished during the next year. These could be individual, departmental and/or business-plan related objectives and may include items from the supporting skills section (next page).

SEE ATTACHED SHEET

_____    _____    _____    _____
Employe                              2/23/89          Supervisor                         2-23-89
                                     Date                                                Date

Employe signature signifies the PDP objectives have been discussed with you.

## EMPLOYE INPUT

Discuss special accomplishments and/or barriers with respect to the objectives stated above. Attach a separate sheet if necessary.

Supervisory – Communicates work-related information to subordinates; delegates challenging assignments and follows-up; provides training opportunities to develop subordinates; defines work goals and objectives clearly; completes subordinate's performance feedback reports on at least an annual basis; and meets EEO responsibilities.

Career goals: Describe your short and long range career goals.

# SUPPORTING SKILLS

## Comment on supporting skills as appropriate:

**FUNCTIONAL KNOWLEDGE AND ABILITY**
- Applies knowledge & skills effectively.
- Teaches skills to others.
- Maintains awareness of developments in functional area of work.

**COMMUNICATIONS**
- Makes communications work.
- Speaks and writes clearly and accurately.
- Listens carefully.
- Keeps supervisor informed of progress.

**PROBLEM SOLVING**
- Uses technology as a problem solving tool.
- Identifies solutions to problem situations.
- Executes solutions on timely basis.
- Uses resources responsibly.

**POSITIVE LEADERSHIP**
- Maintains open and honest relations. (Trust)
- Encourages initiative and risk-taking. (Empowerment)
- Acts as an owner of the business. (Competitiveness)
- Takes initiative to do the right thing. (Personal responsibility)

**QUALITY NETWORK/CUSTOMER SATISFACTION**
- Eliminates every form of waste.
- Makes continuous incremental improvements.
- Focuses on needs and total satisfaction of the customer.
- Does not compromise integrity.

**PLANNING AND DECISION-MAKING**
- Accepts change as an opportunity.
- Plans & prioritizes work; assesses work requirements.
- Uses good judgement; makes timely & effective decisions.
- Accepts and uses advice or directions.

**GROUP INTERACTION AND TEAMWORK**
- Trusts others and is trustworthy.
- Works cooperatively with work group.
- Works effectively with other groups & departments to build teamwork & joint action.
- Treats people with respect.

# PROGRESS FEEDBACK

Discuss progress toward objectives. (supervisor comments)

# EMPLOYE FEEDBACK COMMENTS

## TRAINING

Recommended training (either through Tuition Assistance, Corporate, or AES Training Programs) that would assist in maximizing performance.

_____

_____

_____

### YEAR END REVIEW PDP CLOSING COMMENTS

Employe's Comments:

_____

_____

_____

Supervisor's Comments: _see attached sheet_

_____

_____

_____

### SUPERVISOR

List up to 3 entries identifying GM level and field of work codes that represent logical next assignments in the employe's career.

| Level | Field of work | Level | Field of work | Level | Field of work |
|-------|---------------|-------|---------------|-------|---------------|
| 7 | 8 6 8 | 7 | 0 3 0 | 7 | 0 5 3 |

Supervisor _Grace A Faith_    Date _12-13-89_

Second Level Supervisor _[signature]_    Date _12/18/89_

### EMPLOYE

Select up to three fields of work codes that represent fields which you are most interested in.

| Field of work | Field of work | Field of work |
|---------------|---------------|---------------|
| 8 6 8 | 0 8 1 | 0 2 2 |

Employe _[signature]_    Date _12/22/89_

Received by Personnel _[signature]_    Date _1/23/90_

PPDP-AES

# ADVANCED ENGINEERING STAFF
## PERFORMANCE PLANNING AND DEVELOPMENT PROCESS
### EMPLOYE FEEDBACK REPORT

NAME:    STASKO, STANLEY R,
7E06   SR  PROJECT  ENGINEE
381681710  1W

SSN:

NEXT SESSION SCHEDULED FOR:

DATE OF LAST FEEDBACK SESSION: 10.19.90

POSITION JOB CODE/TITLE:

OBJECTIVE SETTING DATE: 10.22.89

## INSTRUCTIONS / COMMENTS

The Performance Development Program (PDP) is a formal means of reviewing and evaluating employe performance. This program is intended to inspire and develop employes by:

- helping define goals and objectives
- encouraging performance that reflects the mission and philosophy of AES
- identifying specific areas where performance may be enhanced
- recognizing achievement

The following pages represent a valuable tool that we, as AES employes, have to strengthen the organization. Therefore, careful and serious thought should be given to each step of the review process. The following instructions and suggestions are provided to assist the employe and supervisor in utilizing this tool.

**Objectives** – The first and most critical step to an effective performance development program is establishing, jointly with the employe, clear and concise performance objectives with specific measurements. The goal is to make what can often be a subjective process as objective as possible. By establishing goals and expectations, we can ensure a more objective process, and clearly identify areas where improvement is desired and/or required. After objectives are developed, periodic performance review meeting/meetings should be scheduled. Employe and supervisor are to sign and date, thus confirming that the Performance Development Plan was reviewed.

**Employe Input** – This section is to be filled out at employe option, and given to the supervisor at least one week prior to the review meeting.

**Supporting Skills** – If appropriate, performance expectations should be r    ved with the employe at the objective setting meeting. The supervisor

may review progress on any of the skills listed during progress review meetings.

**Progress Feedback** – Supervisor uses this section to review the employe's progress relative to the objectives and goals previously established. Feedback should be a thorough evaluation of the employe's progress, highlighting achievements made in addition to what is needed to enhance performance, plus any comments by either the employe or supervisor.

**Employe Feedback Comments** – This section is to be completed if appropriate to document progress feedback discussion.

**Training** – Work experiences, assignments, educational activities that would be helpful to employe.

**Year End Review PDP Closing Comments:**

    **Employe Comments** – Available for employe's use.

    **Supervisor Comments** – Supervisor should complete this section.

**Readiness for other Assignments** – Supervisor indicates levels and field of work codes and employes indicate career interest.

**Signatures** – Supervisor and second-level supervisor are to sign before the year end review meeting. Employe to sign after completion of meeting.

**Objectives Setting** – Objectives and goals for the following year should be established at the year end review meeting using a new form to begin the next year PDP cycle.

7

## SUPPORTING SKILLS

Comment on supporting skills as appropriate:

**FUNCTIONAL KNOWLEDGE AND ABILITY**
- Applies knowledge & skills effectively.
- Teaches skills to others.
- Maintains awareness of developments in functional area of work.

**COMMUNICATIONS**
- Makes communications work.
- Speaks and writes clearly and accurately
- Listens carefully.
- Keeps supervisor informed of progress.

**PROBLEM SOLVING**
- Uses technology as a problem solving tool.
- Identifies solutions to problem situations.
- Executes solutions on timely basis.
- Uses resources responsibly.

**POSITIVE LEADERSHIP**
- Maintains open and honest relations. (Trust)
- Encourages initiative and risk-taking. (Empowerment)
- Acts as an owner of the business. (Competitiveness)
- Takes initiative to do the right thing. (Personal responsibility)

**QUALITY NETWORK/CUSTOMER SATISFACTION**
- Eliminates every form of waste.
- Makes continuous incremental improvements.
- Focuses on needs and total satisfaction of the customer.
- Does not compromise integrity.

**PLANNING AND DECISION-MAKING**
- Accepts change as an opportunity.
- Plans & prioritizes work; assesses work requirements.
- Uses good judgement; makes timely & effective decisions.
- Accepts and uses advice or directions.

**GROUP INTERACTION AND TEAMWORK**
- Trusts others and is trustworthy.
- Works cooperatively with work group.
- Works effectively with other groups & departments to build teamwork & joint action.
- Treats people with respect.

## PROGRESS FEEDBACK

**Discuss progress toward objectives. (supervisor comments)**

Stan has done an excellent job of providing engineering support for the Dynamometer Laboratory for the past six months. The engine coolant and oil temperature control system installations are on or ahead of schedule and Stan is working with maintenance and project personnel to complete this work. The PLC installation in Cell 3 is completed and Cell 13 is being installed. Also, the electronics update in Cell 13 is in work and this will be the prototype system. Stan has worked particularly hard in coordinating with maintenance, TSGF and Project personnel to insure that there is consensus on the updates, that they are completed correctly and in a timely manner.

*[signature]*
7/31/90

**EMPLOYE FEEDBACK COMMENTS**

## OBJECTIVES

Objectives should include specific job responsibilities and may include specific goals for the job responsibilities to be accomplished during the next year. These could be individual, departmental and/or business-plan related objectives and may include items from the supporting skills section (next page).

Supervisory – Communicates work-related information to subordinates; delegates challenging assignments and follows-up; provides training opportunities to develop subordinates; defines work goals and objectives clearly; completes subordinate's performance feedback reports on at least an annual basis; and meets EEO responsibilities.

_____    7/31/90          _____    12-22-89
Employe                          Date              Supervisor                       Date

Employe signature signifies the PDP objectives have been discussed with you.

## EMPLOYE INPUT

Discuss special accomplishments and/or barriers with respect to the objectives stated above. Attach a separate sheet if necessary.

_____

_____

_____

Career goals: Describe your short and long range career goals.

_____

_____

_____

## OBJECTIVES

Objectives should include specific job responsibilities and may include specific goals for the job responsibilities to be accomplished during the next year. These could be individual, departmental and/or business-plan related objectives and may include items from the supporting skills section (next page).

1. Provide engineering support and expertise to Dynamometer Laboratory maintenance personnel and operators.
2. Engine coolant and oil temperature control systems   A. Install (6) to (8) systems
   B. Provide training for Operators and Maintenance Technicians   C. Finalize documentation
3. PLC renovation
   A. Install (2) systems; Cell 3 and 13 (Additional systems depend on appropriation status)
   B. Finalize software programming   C. Finalize documentation   D. Provide training as required
4. Test cell electronics update
   A. Install (1) system in Cell 13   B. Finalize documentation
   C. Coordinate CATS Software enhancements
      1. An enhanced analog calibration / curve-fit routine
      2. Automatic range sense / selection for emissions analyzers
      3. Virtual zero and span for analog signals
   D. Additional systems depend on appropriation status
5. Coordinate implementation of (2) high speed data acquisition systems for combustion analysis.
7. Chassis dynamometer renovation
   A. Provide design engineering   B. Coordinate update activity   C. Finalize documentation
8. Coordinate implementation of (2) high speed pressure measuring systems
9. Implement dew point / RH humidity measuring and monitoring equipment for each test cell.
10. Design and start installation of the air supply and exhaust fan process control systems in each test cell in the Laboratory.
11. Elimination of full-time vault water spray (added July 31, 1990)

Discuss special accomplishments and/or barriers with respect to the objectives stated above. Attach a separate sheet if necessary.

_____

_____

**Career goals:** Describe your short and long range career goals.

_____

_____

## TRAINING

Recommended training (either through Tuition Assistance, Corporate, or AES Training Programs) that would assist in maximizing performance.

_____

_____

### YEAR END REVIEW PDP CLOSING COMMENTS

Employe's Comments:

_____

_____

_____

_____

Supervisor's Comments:

Stan has done an excellent job of providing engineering support for the Dynamometer Laboratory for the past year. The engine coolant and oil temperature control system installations are on or ahead of schedule and Stan is working with maintenance and project personnel to complete this work. The Cell 13 Update has been completed and the Cell turned over to the Diesel Project. Cell 13 is now our Prototype Cell and work can begin to Update all of the remaining Cells to this configuration. Stan has worked particularly hard in coordinating with maintenance, TSGF and Project personnel to insure that there is consensus on the updates, that they are completed correctly and in a timely manner. THE DSP CYLINDER PRESSURE EQUIPMENT AND PSI PRESSURE MEASUREMENT SYSTEM ARE BOTH COMPLETE. ALSO, THE ANALOG CALIBRATION CURVE FIT ROUTINE HAS BEEN COMPLETED. FINAL DOCUMENTATION FOR THE TLC, ELECTRONICS UPDATE AND ENGINE COOLANT AND OIL TEMP SUPERVISOR CONTROL HAS BEEN COMPLETED. THE DEW POINT AND VENTURI DESIGNS HAVE ALSO BEEN COMPLETED.

List up to 3 entries identifying GM level and field of work codes that represent logical next assignments in the employe's career.

| Level | Field of work | Level | Field of work | Level | Field of work |
|---|---|---|---|---|---|
| 7 | 8 6 3 | 7 | 0 5 3 | 2 | 8 6 8 |

Select up to three fields of work codes that represent which you are most interested in.

| Field of work | Field of work | Field of work |
|---|---|---|
| ___ | ___ | ___ |

EMPLOYE

Supervisor _____  Date 12-11-90

2nd Level Supervisor _____ Date 12/12/90

Employe _____ Date 02/12/90

Received by Personnel _____ Date 2/4/9

# ADVANCED ENGINEERING STAFF

## PERFORMANCE PLANNING AND DEVELOPMENT PROCESS
## EMPLOYE FEEDBACK REPORT

PPDFALS

NAME: _  STASKO,STANLEY R,
7E06   SR PROJECT ENGINEE
381681710 1W

SSN: ___

NEXT SESSION SCHEDULED FOR: ___

DATE OF LAST FEEDBACK SESSION: _1.22.92_

POSITION JOB CODE/TITLE: ___

OBJECTIVE SETTING DATE: _1.31.91_

## INSTRUCTIONS / COMMENTS

The Performance Development Program (PDP) is a formal means of reviewing and evaluating employe performance. This program is intended to inspire and develop employes by:

• helping define goals and objectives
• encouraging performance that reflects the mission and philosophy of AES
• identifying specific areas where performance may be enhanced
• recognizing achievement

The following pages represent a valuable tool that we, as AES employes, have to strengthen the organization. Therefore, careful and serious thought should be given to each step of the review process. The following instructions and suggestions are provided to assist the employe and supervisor in utilizing this tool.

**Objectives** – The first and most critical step to an effective performance development program is establishing, **jointly** with the employe, clear and concise performance objectives with specific measurements. The goal is to make what can often be a subjective process as objective as possible. By establishing goals and expectations, we can ensure a more objective process, and clearly identify areas where improvement is desired and/or required. After objectives are developed, periodic performance review meeting/meetings should be scheduled. Employe and supervisor are to sign and date, thus confirming that the Performance Development Plan was reviewed.

**Employe Input** – This section is to be filled out at employe option, and given to the supervisor at least one week prior to the review meeting.

**Supporting Skills** – If appropriate, performance expectations should be reviewed with the employe at the objective setting meeting. The supervisor

may review progress on any of the skills listed during progress review meetings.

**Progress Feedback** – Supervisor uses this section to review the employe's progress relative to the objectives and goals previously established. Feedback should be a **thorough** evaluation of the employe's progress, highlighting achievements made in addition to what is needed to enhance performance, plus any comments by either the employe or supervisor.

**Employe Feedback Comments** – This section to be completed if appropriate, to document progress feedback discussion.

**Training** – Work experiences, assignments, educational activities that would be helpful to employe.

**Year End Review PDP Closing Comments:**

   **Employe Comments** – Available for employe's use.

   **Supervisor Comments** – Supervisor should complete this section.

**Readiness for other Assignments** – Supervisor indicates levels and field of work codes and employes indicate career interest..

**Signatures** – Supervisor and second-level supervisor are to sign before year end review meeting. Employe to sign after completion of meeting.

**Objectives Setting** – Objectives and goals for the following year should be established at the year end review meeting using a new form to begin the next year PDP cycle.

## OBJECTIVES

Objectives should include specific job responsibilities and may include specific goals for the job responsibilities to be accomplished during the next year. These could be individual, departmental and/or business-plan related objectives and may include items from the supporting skills section (next page).

1. Provide engineering support and expertise to Dynamometer Laboratory maintenance personnel and operators.
2. Engine coolant and oil temperature control systems.
   A. Install (6) to (8) systems this calendar year.
   B. Provide training for Operators and Maintenance Technicians
3. Electronics Update (combined PLC renovation and Test Cell Electronics Data Acquisition Update)
   A. Install at least (4) systems this calendar year
   B. Provide training as required
   C. Coordinate CADTS Software enhancements
      1. Automatic range sense / selection for emissions analyzers
      2. Virtual zero and span for analog signals
4. Chassis Dynamometer renovation
   A. Provide design engineering    B. Coordinate update activity    C. Finalize documentation
5. Eliminate full time use of water in the vaults
6. Coordinate the installation of Cell 7 Hemi-Anechoic Chamber installation and Control Room walls and cabinets for Cells 6 and 7

Supervisory — Communicates work-related information to subordinates; delegates challenging assignments and follows-up; provides training opportunities to develop subordinates; defines work goals and objectives clearly; completes subordinate's performance feedback reports on at least an annual basis; and meets EEO responsibilities.

_____    1/31/91          _____    1-31-91
Employe                      Date               Supervisor                   Date

Employe signature signifies the PDP objectives have been discussed with you.

## EMPLOYE INPUT

Discuss special accomplishments and/or barriers with respect to the objectives stated above. Attach a separate sheet if necessary.

Career goals: Describe your short and long range career goals.

## TRAINING

Recommended training (either through Tuition Assistance, Corporate, or AES Training Programs) that would assist in maximizing performance.

## YEAR END REVIEW PDP CLOSING COMMENTS

Employee's Comments:

Supervisor's Comments:

Stan has done an excellent job of providing engineering support for the Dynamometer Laboratory for the past year. Four engine coolant and oil temperature control system installations have been completed this year. Design, renovation and documentation have been completed for the PLC, CPI instrumentation interfacing and Operator's Consoles in Cells 6 and 7. The Hemi-Anechoic Chamber installation in Cell 7 has been completed and the first transmission to be tested is being installed. Chassis Dynamometer renovation is continuing with coordination with TSGF, emissions equipment installation and system checkout. The design scope of the Chassis Dynamometer has changed and it is being designated Emissions Site No 6. Design requirements, specifications, project coordination and procurement has been completed for a natural gas compressor for the CNG Project in Cell 1. Stan has done an excellent job filling in for me on planning and administrative activities for the Dynamometer Laboratory this past year during my temporary assignment on the MORE 91 Project.

### SUPERVISOR

List up to 3 entries identifying GM level and field of work codes that represent logical next assignments in the employe's career.

| Level | Field of work |
|---|---|
| 7 | 8 5 7 |
| 7 | 0 2 8 |
| 7 | 0 3 0 |

Level 7   Field of work 0 2 8

Signature _____   Date 1-22-92
Supervisor

Signature _____   Date 1/22/92

Signature _____   Date 1/24/92
Second Level Supervisor

### EMPLOYE

Select up to three fields of work codes that represent fields which you are most interested in.

Field of work _____

Field of work _____

Field of work _____

Signature _____   Date 1/22/92
Employe

Received by Personnel _____   Date

# SUPPORTING SKILLS

## Comment on supporting skills as appropriate:

**FUNCTIONAL KNOWLEDGE AND ABILITY**
- Applies knowledge & skills effectively.
- Teaches skills to others.
- Maintains awareness of developments in functional area of work.

**COMMUNICATIONS**
- Makes communications work.
- Speaks and writes clearly and accurately
- Listens carefully.
- Keeps supervisor informed of progress.

**PROBLEM SOLVING**
- Uses technology as a problem solving tool.
- Identifies solutions to problem situations.
- Executes solutions on timely basis.
- Uses resources responsibly.

**QUALITY NETWORK/CUSTOMER SATISFACTION**
- Eliminates every form of waste.
- Makes continuous incremental improvements.
- Focuses on needs and total satisfaction of the customer.
- Does not compromise integrity.

**PLANNING AND DECISION-MAKING**
- Accepts change as an opportunity.
- Plans & prioritizes work; assesses work requirements.
- Uses good judgement; makes timely & effective decisions.
- Accepts and uses advice or directions.

**GROUP INTERACTION AND TEAMWORK**
- Trusts others and is trustworthy.
- Works cooperatively with work group.
- Works effectively with other groups & departments to build teamwork & joint action.
- Treats people with respect.

**POSITIVE LEADERSHIP**
- Maintains open and honest relations. (Trust)
- Encourages initiative and risk-taking. (Empowerment)
- Acts as an owner of the business. (Competitiveness)
- Takes initiative to do the right thing. (Personal responsibility)

## PROGRESS FEEDBACK

Discuss progress toward objectives. (supervisor comments)

The following objectives have been completed or modified:
1. 4 Engine Coolant and Oil Temperature Control Systems have been completed this year and an additional 6 to 8 will be completed by year end. Operator training will continue as installations are completed.
2. Modification of the Electronics Update schedule was required due to economic conditions and poor vehicle sales. 2 Test Cells will be updated by year end.
3. Chassis Dyno renovation work coordination with TSGF and system check is near completion. Test Cell calibration and system documentation remain.
4. Cell 13 renovation: PLC and instrumentation interfacing documentation have been completed.
5. Cell 3 renovation: PLC documentation has been completed.
6. Cell 6 renovation: Operator console revisions, new instrumentation interfacing(design and documentation), new PLC (design and documentation) has been completed.
7. Cell 7 renovation: Hemi-Anechoic chamber (specification and construction coordination); new instrumentation interfacing (design and documentation), new PLC (design and documentation) has been completed.
8. EDS/AES CATS initial software priority and coordination with Mike Taljonick and Dave Kotzan have been completed and monthly coordination meetings continue with Dave Kotzan.
9. Test Cell 3 grounding design, work coordination and installation has been completed. Evaluation and installation in additional cells will be done as required and appropriate.

### EMPLOYEE FEEDBACK COMMENTS

8-7-91

## EXHIBIT A

### EXIT INTERVIEW

Employe Name _STANLEY R. STASKO_
Position Code _7E06_
Service Date _7/18/83_
Social Security Number _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_
PER Unit _____
Department _WH213_
Supervisor _JERRY FAIRBANKS_

1. To what degree was your decision to leave this organization influenced by any of the following?  Please check all that apply.

| | | |
|---|---|---|
| _____ geographic relocation | | Use the following scale: |
| _____ returning to school | | |
| _____ family circumstances | | 1 — No Influence |
| _____ retirement | | 2 — Minor Influence |
| _____ health reasons | | 3 — Major Influence |
| _____ dissatisfaction with: | | 4 — Primary Influence |
| | _____ working conditions (elaborate) | |
| | _____ salary | |
| | _____ quality of management | |
| | _____ career advancement | |
| | _____ under-utilized in area of expertise | |
| | _4_ other (please specify) | _I AM ENTERING THE SEMINARY FOR THE ARCH. OF DETROIT TO DISCERN THE CALL TO BE A PRIEST._ |

2. Please indicate your (dis/)agreement with the following, using the following scale:
   1 — Strongly Agree
   2 — Agree
   3 — Neither Agree or Disagree
   4 — Disagree
   5 — Strongly Disagree

   _2_ There is a high degree of cooperation within my department.
   _2_ There is a high degree of cooperation between my department and other departments.
   _2_ The training I received from the Corporation adequately prepared me for my job.
   _2_ Communication within my department was <u>not</u> a barrier to my work.

3. What is your level of satisfaction with the following?
   1 — Greatly Satisfied
   2 — Satisfied
   3 — Neither Satisfied or Dissatisfied
   4 — Dissatisfied
   5 — Greatly Dissatisfied

| | | | |
|---|---|---|---|
| _2_ | Salary | _1_ | Benefits |
| _2_ | Opportunity for Advancement | _1_ | Job Security |
| _2_ | Equipment Provided | _2_ | Mentoring/Supervision |
| _2_ | Career Development | _2_ | General Management |

## EXHIBIT A

### EXIT INTERVIEW - PG. 2

**4(a)** If you are taking another job, what does that job offer you that your job at GM did not?

_NOT APPLICABLE - I AM ENTERING THE SEMINARY FOR THE ARCH. OF DETROIT; THEREFORE, I DON'T BELIEVE THIS QUESTION APPLIES TO ME._

**(b)** Did GM meet your expectations? If not, please provide specific areas in which your expectations were not met.

_YES, I VERY MUCH ENJOYED MY CAREER AT GENERAL MOTORS. OVERALL, IT WAS A VERY GOOD CAREER._

**(c)** What constructive comments do you have for management in regard to continuously improving the workplace?

**(d)** What are some factors which made your employment at GM a positive experience?

_DURING MY CAREER AT GM, MY (2) MANAGERS (WARD WIERS AND JERRY FAIRBANKS) HAVE GAVE ME MANY OPPORTUNITIES TO EXPRESS MY ENGINEERING TALENTS._

**(e)** Additional comments:

_THANK-YOU FOR THE ENJOYABLE CAREER._

**5.** Please describe your future career plans/goals.

_AT THIS TIME I AM DISCERNING THE CALL TO BE A PRIEST; THEREFORE, MY FUTURE PLANS/GOALS WILL BE DETERMINED AS THAT DISCERNMENT PROCESS UNFOLDS._

Interviewed by: _Gerald A Fairbel_

Date: _8-25-95_

Employe signature: _Charly N White_

Willing to participate in a follow-up survey? _YES_ (Y/N)

Address: _27653 LEXINGTON PKWY_
_SOUTHFIELD, MICH. 48076_

EXHIBIT B

## SECURITY TERMINATION STATEMENT

At the request of GM Powertrain, General Motors Corporation, I have returned all secret or confidential information in documentary or other tangible form, including copies or reproductions, in my possession or under my control and I agree that the obligation not to disclose secret or confidential information continues after the termination of my employment and that I shall not make any disclosure at any time thereafter without prior written permission of GM Powertrain, General Motors Corporation, except as I may be required to make such disclosure by judicial process or operation of law.

8-25-95
DATE

_Gerald A Fairbanks_
SIGNATURE OF WITNESS

GERALD A. FAIRBANKS
TYPED NAME OF WITNESS

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
SOCIAL SECURITY NUMBER

_Stanley R Stasko_
SIGNATURE OF EMPLOYE

STANLEY R. STASKO
TYPED NAME OF EMPLOYE

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
SOCIAL SECURITY NUMBER

EXHIBIT A

## SALARIED PERSONNEL EXIT INTERVIEW

SS# _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_

NAME _STANLEY R. STASKO_    DATE _8/25/95_

ADDRESS _27653 LEXINGTON PKWY_    ZIP CODE _48076_

HOME TELEPHONE NO. _(810) 552-0476_    SERVICE DATE _7/18/83_

CLASSIFICATION _7E∅6_    DEPARTMENT _WH 213_

EFFECTIVE DATE _8/25/95_    LAST DAY WORKED _8/25/95_

REASON FOR LEAVING _I AM ENTERING THE SEMINARY FOR THE ARCH. OF DETROIT_

| ITEMS TO BE COLLECTED | | AMOUNTS OWED | |
|---|---|---|---|
| GMAC CARD _N/A_ | | AMEX NOTE RECEIVABLE/ DELINQUENT ACCOUNT | $ _0_ |
| KEYS/TOOLS _____ | | GM FELLOWSHIP EXPENSE | $ _0_ |
| GM PASS _____ | | GM FELLOWSHIP LOAN | $ _0_ |
| EDS RELATED ITEMS: | | GM HOUSE LOAN | $ _0_ |
| – TRAVELCALL SERVICE CARD ____ – SYSTEM USER ID'S (LIST ALL) | | GM TUITION ASSISTANCE (BEFORE COURSE COMPLETION) | $ _0_ |
| _____ | | CASH ADVANCE | $ _0_ |
| – PC SOFTWARE/PC KEYS – LAPTOP (PORTABLE COMPUTER)____ – CELLULAR TELEPHONE | | LUMP SUM RELOCATION ALLOW. | $ _0_ |
| | | SALARY/VACATION OVERPAYMENT | $ _____ |

PERTINENT COMMENTS BY EMPLOYE AND/OR INTERVIEWER:

_____

_____

_____

_____

_____

_____

_____

SIGNATURE OF INTERVIEWER: _Gerald A Fairbanks_

```
GIIl        SALARY PRISM          ** RANS RA *        Pg 108 of 120
SSN-----------> 381681710
NAME----------: STASKO,STANLEY,R                      HIRED--------: 09/07/78
EFFECTIVE DATE-: 08/25/95              LENGTH OF SERVICE DATE-: 07/18/83
************************** STATUS AS OF: 08/25/95 **************************

STATUS ACTION--: 1J                QUIT-CAREER CHANGE
EMP CATEGORY---: SE                SEPARATED
*********************** POSITION AS OF: 01/01/95 **************************
POSITION ACTION: D8                CHG-REORG/ORG NAME
GROUP----------: GPT               GM POWERTRAIN GRP
DIV/STAFF------: 4700              POWERTRAIN
PERUNIT--------: 10020             GM POWERTRAIN-WRN ENG
DEPT-----------: WH213             *
LOCATION-------: 2130              WARREN      MI
POS CODE-------: 7E06              SR PROJECT ENGINEER
LOCAL TITLE----:
FUNCT ASSIGN---:                    *   *
******************************************************************************
CONTACT NAME---: CHRISTINE WESTERN
CONTACT NUMBER-: 8-227-8762
******************************************************************************


TS0010-ENTER NUMBER(S)
```

CRITICAL INFORMATION

_Stanley Staska_     _Electronics_

_4354 E. 31st_   _48210_   _849-5420_

_C. Weiser_    _447_   _Villa_   _CU-61_

_June 1978_   _16_

| | SUBJECT | RM | TEACHER |
|---|---|---|---|
| 1. | Physics 1 | 231 | Mr. Enciso |
| 2. | Electronics 5 | 433 | Mr. Downs |
| 3. | Electronics 5 | 433 | Mr. Downs |
| 4. | Algebra 4A | 505 | Mrs. Ward |
| 5. | Chemistry 2 | 523 | Mrs. Ooghir |
| 6. | Great Mysteries | 207 | Mr. Choske |
| 7. | American History 1 | 541 | Mrs. Hutson |
| 8. | | | |

INFORMATION RELEASE STATEMENT

I agree to the release of my scholastic record or any information it contains
for the purpose of seeking employment through Case Technical High School.

Signed _Stanley Staska_

Date _5-8-78_

REMARKS:

List any work experience on other side.

(Over)



Personnel Administration
General Motors Corporation
General Motors Technical Center
Warren. Michigan 48090

June 9, 1978

Mr. Stanley Stasko
4450 52nd Street
Detroit, Michigan 48270

Dear Stanley:

As a followup to our recent conversation, I would like to formally extend to you
an invitation to participate in our Cooperative Education Program for Fall, 1978.

As I mentioned, your assignment at Engineering Staff will utilize your electronics
knowledge and skills; we'll elaborate on your specific duties later.  In the meantime,
please contact Mr. Henry Simons at Cass Tech as soon as possible to let him know
of your decision, and he will arrange for any necessary adjustments in your course
schedule next year so that you will be available for work in the afternoons.

Thank you again for taking the time to talk with me.  Have a good summer and I'll
be looking forward to seeing you in the fall.

Eileen M. Poppleton
Student Coordinator

cc:  D. Kollar
     H. Simons

INTERNAL USE ONLY - DO NOT COMP        215 BOOK        O/R

| GM | GENERAL MOTORS TECHNICAL CENTER | EFFECTIVE STARTING DATE _____ |
| | PERSONNEL PLACEMENT | WILL SIGN PAPERS _____ |
| | ON ROLL NOTICE | Date        Time |

NAME _**Stanley**_____ _**R.**_____ _**Stasko**_____        STARTING TIME (H&S) _____
    First        Middle Initial        Last        CLOCK NO. (H) _____

STAFF _**Engineering Staff**_        DEPT. NO. _**11**_        REQ. NO. _**12895**_        INC. ☒
                                                    REPL. ☐
CODE _**2EO(30)**_        CLASSIFICATION _**Cooperative Student**_ RATE **$31.60**✱        MO. ☐
                                           C/L ☐ YES ☒ NO        DIEM ☒
                                                          HR. ☐

MINORITY CODE: ☒ C    ☐ N    ☐ O    ☐ S    ☐ A    EEOC ____        AREA OF WORK _**58**_
                                       (1-9)        PHYSICAL REQUIRED

| | INDICATORS | | |
| --- | --- | --- | --- |
| ☐ Permanent | VETERAN | ☐ Professional | ☒ YES    ☐ NO |
| ☐ Temporary (Approx. Duration)____ | DIS. VET. | ☒ Technical | SCHEDULED _8/28/78_    _10:00_ |
| | VIET. VET. | |    Date        Time |
| | DIS. VIET. VET. | ☐ Other (R&D) | |
| ☐ Contingent | DISAD. | ☒ X - All Others | SUPV. NAME _E. Poppleton_ |
| | DISAD. YTH | | |
| ☐ Summer | MESC. REF. | | RETURN FROM: |
| ☒ Other | NAB REP. | ☒ New Hire | ☐ Layoff: Inactive ☐ |
| | HANDICPD. | ☐ Re-Hire |          Separated ☐ |
| ☐ Exempt | GMI STUD. YR. | ☐ Transfer | Date _____ |
| ☒ Non-Exempt | SUPERVISOR | ☐ Other | ☐ Lv. of Absence-Type ____ |
| | | | Date _____ |

FILL OUT THE FOLLOWING FOR: Re-Hires: Layoffs, ELA/over 12 months, MLA/over 6 months, SLA/over 3 months, all Pregnancy Leaves.        DATE & NAME        GM SERVICE
TRANSFER OR LAYOFF FROM: _____        215 REQ. FR. _____        DATE _____

FILL OUT THE FOLLOWING FOR: Lateral Transfers (Last Discr. Inc./Dec.) & Promotional Transfers (Indicated This Promotion or Merit Incr./Dec.) & Re-hires not incl. above, i.e. ELA/under 12 mo.
TRANSFER        RATE AT        DATE & NAME
FROM: _____        LAST UNIT _____        215 REQ. FR. _____
DATE OF LAST        SALARY CHANGE        TYPE OF        GM SERVICE
DISCRETIONARY INC./DEC.        AMOUNT _____        CHANGE _____        DATE _____
POSITION & CODE        EFFECTIVE DATE
AT LAST UNIT (Lateral Only) _____        OF POSITION _____

PREVIOUS GM EMPLOYMENT RECORD - MUST BE COMPLETE

| FROM MO/DAY/YR | TO MO/DAY/YR | DIVISION AND LOCATION | POSITION | REASON FOR LEAVING * |
| --- | --- | --- | --- | --- |
| | | | | |
| | | | | |
| | | | | |

*Reason for leaving classifications: Quit, Discharge, Final Release, Mut. Sat. Release, Layoff-Inactive or Separated, Special Separation.

REFERENCE CHECKS COMPLETED ☐        ORIGINAL TRANSCRIPTS REQUESTED ✓
SPA NOTIFIED OF REPORTING DATE ✓        RECRUITING SOURCE _Cass Tech_
DEPT. NOTIFIED OF REPORTING DATE ✓

REMARKS/SPECIAL INSTRUCTIONS ✱_Not to exceed 3.8 hours/day_

RECRUITER _E. Poppleton_        DATE _6/30/78_        PERMANENT RECORD-RETAIN IN EMPLOYE FILE
                                                                  PE003   Rev. 6/77

   Personnel Administration
General Motors Corporation
General Motors Technical Center
Warren, Michigan 48090

August 3, 1978

Mr. Stanley Stasko
4450  52nd Street
Detroit, Michigan  48270

Dear Stanley:

Since you are required to pass a physical examination prior to the beginning of
your co-op assignment, we would like you to call and schedule an appointment
with our medical staff during the last two weeks in August.

Please contact Mrs. Sue Beals in our Placement Office by August 15; she can be
reached at 575-8000.  She will arrange a convenient time for you to come in for
the physical and to sign additional paperwork to confirm your status as a cooperative
student with Engineering Staff.

I hope your summer has been going well for you.  I'll be looking forward to seeing
you in the fall.

Sincerely,

Eileen M. Poppleton
Personnel Department

/lbj

## PERSONAL INFORMATION SHEET

PE002
5-76

(Pls. Print)

Name _Stanley R. Staske_  Soc. Security No. _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_  SINGLE ___✓___
(First/Middle Initial/Last)

Address _4450    52ND_  City, State, Zip _Detroit, Mich 48210_  MARRIED _____

Phone No. _849-5420_  Date and Place of Birth _6-6-61    Detroit_  SEPARATED _____
(Must furnish a copy of birth certificate)

If not a citizen of the United States:                                    DIVORCED _____
Alien Reg. No. _____  Date and Place Issued: _____

Name, relationship and phone number of person to notify in case of emergency:

_Sophie Staske, mother, 849-5420_

### (PLEASE FURNISH A COPY OF COLLEGE TRANSCRIPT)

| Education: (List all educational training) Name and Location of School | Course Program | Date Graduated | Degree Obtained | No. Years Attended |
|---|---|---|---|---|
| St. Stephens Grade | | 6-6-75 | | 9 |
| Munger Jr. High | | 6-15-76 | | 1 |
| Cass Tech High | Electronic | | | 2 |

Are you a Registered Engineer?  Yes ☐  No ☑  Year _____  State _____

List eligible dependents for health insurance coverage:  (If additional space required use reverse side)

| Name | Soc. Security No. | Birth Date | Relationship |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

** If covered under spouse's insurance, list place of employment of spouse _____

and name of Insurance Company _____

Please designate beneficiary for Metropolitan Group Life Insurance.

Name _Sophie Staske_  Age _57_ Relationship _Mother_  Address _4450 52ND_

### TRANSFERS FROM OTHER GM DIVISIONS PLEASE ANSWER THE FOLLOWING QUESTIONS:
(also includes employes who have had former employment with a GM division)

Were you actively participating in the following programs at the time of transfer or layoff?

Blue Cross/Blue Shield _____  Comprehensive Medical _____  Metropolitan Optional Life _____  Dependent Group Life _____
Stock Purchase Program _____  Retirement Program _____  Series "E" Savings Bonds _____  Dental _____

### LIST ALL PREVIOUS EMPLOYMENT WITH GENERAL MOTORS (If additional space required use reverse side)

| From Mo/Day/Yr | To Mo/Day/Yr | Division & Location | Position | Reason for Leaving |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

Vacation days used this calendar year _25_  Vacation days left _10_

Date _8-28-78_  Signed _Stanley Staske_



BOARD OF EDUCATION — CITY OF DETROIT
Department of Attendance — 5057 Woodward (48202)

**LIMITED EMPLOYMENT PERMIT**

Dept. of Labor
Occupational Approval
Number 7820353-6

For work during periods or days during which the school of which such minor is a pupil is not in session, or for hours outside of school hours.

| | | | |
|---|---|---|---|
| Name | Stanley Stasko | Address | 4450 52nd |
| Date of birth | 6-6-61 | Age 17 Place of birth | Detroit |
| Evidence of age accepted | Census | | Grade completed 11th |

DESCRIPTION: Sex M  Color hair Brn. Color eyes Hazel
Height 5 ft. 11 in.  Weight 150

Parent or guardian Stanley/Sophie  Signature of minor

Business or Industry Automotive Manufacturing  Employer General Motors Corporation
Address 12 Mile & Mound Road
Position Co-Operative Student  City, State, Zip Code Warren, MI 48050

TO EMPLOYER. After five (5) days return this permit to issuing officer if minor leaves your employ before his eighteenth (18) birthday.

This is to certify that the minor whose description appears hereon, signed this permit in my presence.

Harry Speelman

Date 9/5/78  By F. T. Bauer/db

ES-387

## EMPLOYMENT HISTORY RECORD

| DATE | CLOCK NO. | ACCOUNT NO. | DEPARTMENT | CODE | CLASSIFICATION | E/N | RATE | REASON |
|------|-----------|-------------|------------|------|----------------|-----|------|--------|
| 9-7-78 | | 1-11 Coop Students – HS | | 2E00(30) | Coop Student | N | 15.01/diem | Temp * |
| 6-16-79 | 25 | | | 2E30 | Learner-Lab Aide | | 32.80/diem | cc |

H—HIRE    R—REHIRE    C—CHANGE CLASS    RC—RATE CHANGE    T—TRANSFER    Q—QUIT    LO—LAYOFF    D—DISCHARGE

FR—FINAL RELEASE    MS—MUTUALLY SATISFACTORY SEPARATION    S—SPECIAL SEPARATION    DS—DECEASED



T E M P O R A R Y    STAFF—GENERAL MOTORS CORP.
STASKO, Stanley R.
NAME
* 3.8 hour day

SIGNATURE

8-28-78    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
DATE ISSUED    SOC SEC NO

...HE COST OF BADGE, TOOLS, OR OTHER PROPERTY OF SAID COMPANY OBTAINED AND NOT ...IATION OF SERVICE.

DATED THIS_____DAY OF_____19___

EMPLOYEE'S SIGNATURE

GM    Engineering Staff

| CLOCK NO. | | FIRST | R MIDDLE | | YEAR LEFT | SEX | REGION | SOC SEC NO | OUT |
|-----------|--------|--------|----------|--|-----------|-----|--------|------------|-----|
| | STASKO | Stanley | R | | 1981 | M | ES | 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 | |

Name: _____ STASKO, Stanley R. _____        Job Code: _____ 2E30 _____

Department: High School Coops    1-11        Job Title: _____ Learner--Lab Aide _____

Date: 8/10/79

**ATTENDANCE**

Tardiness:    [ ] Frequently    [ ] Occasionally    [✓] No Problem

Absenteeism: _____ Hours

JOB DUTIES: FABRICATION OF A WIDE ASSORTMENT OF ELECTRONIC DEVICES.

AREAS OF JOB STRENGTH: MAKES GOOD USE OF TIME. PERFORMS EACH TASK IN A HIGHLY PROFESSIONAL MANNER. VERY CONCIENTIOUS INDIVIDUAL.

AREAS NEEDING JOB IMPROVEMENT: ELECTRONIC TROUBLE-SHOOTING — HOWEVER THIS WAS NOT A REQUIREMENT OF THIS POSITION.

**OVERALL JOB RATING**

[✓]                [ ]                [ ]                [ ]                [ ]

Outstanding performance; far exceeds standard for this job; achievable but seldom attained performance.

Highly effective performance exceeds standard for this job.

Good competent performance; meets standard for this job; the level of performance most often achieved.

Needs slight improvement to meet standard for this job.

Needs much improvement to meet standard for this job.

_Stanley Stasko_        8-10-79        _R. A. Meager_        Paul Durrenberg        8-10-79

Employe Signature        Date        Appraised By        Date

EMPLOYE JOB APPRAISAL

Stasko, Stanley R.

1-11

JOB DUTIES: _Fabrication and calibration of test equipment for emission tests were my main job duties._

WAS JOB CHALLENGING? _Each job had its own challenges but I feel my full potential was not reached on any one project._

WERE RESOURCES AVAILABLE TO ACCOMPLISH JOB ASSIGNMENTS? _I was supplied with good and quality material to complete each job._

WHAT, IF ANY, OBSTACLES HINDERED GOAL ACHIEVEMENT?

_No obstacles of any significance._

GENERAL COMMENTS: _Cooperation and assistance by fellow employees excellent. Cooperative program has been a rewarding experience._

_Stanley Stasko_          8-13-79
Employe Signature          Date

EVALUATION REPLY CARD

Engineering Staff – Environmental Activities Staff – Transportation Systems Division

Name of Employe _____ Stanley R. Stasko _____

Department _____ I-11 _____

Date and Separation Classification ___ 8-14-79  Special separation ___

+ + + +

## DEPARTMENTAL COMMENTS

Please furnish a brief description of the employe's performance and reason for leaving. If any problem areas – such as attendance, work attitude, cooperation with other employes, etc., apply – give specific details. Return this form to ___ Bettie Bennett ___ of Personnel before the date of exit interview.

_Stanley did a superb job on electronic devices, he is leaving to go to school. His productivity was good, attitude exceptional, and gets along fine with everyone. No problem with attendance._

Would you recommend for re-employment? _Yes_

The above information furnished by: _Paul E. Pishel_
(signed)

## PERSONNEL DEPARTMENT COMMENTS

Exit Interview conducted by: _____



# PROPERTY CLEARANCE

### ENGINEERING STAFF / ENVIRONMENTAL ACTIVITIES STAFF

### GENERAL MOTORS CORPORATION

**EMPLOYE** _Stanley R. Stasko_    **LAST DAY OF WORK** _8-14-79_

**DEPARTMENT** _I-11_

SIGNATURES, WHERE APPLICABLE, MUST BE OBTAINED BEFORE FINAL CHECK IS ISSUED:

| DEPARTMENT | | AUTHORIZED SIGNATURE |
|---|---|---|
| **EMPLOYE'S DEPARTMENT** Equipment, Locker & Desk Keys Computer Validation Car Rental Card | | _Paul E. Pishil_ |
| **MACHINE SHOP · CRIB** | | |
| **A.P.E. · CRIBS** | Electronic | |
| | North | |
| | South | |
| **ENG. STAFF LIBRARY** | | _Becky Ohsniuk_ |
| **GENERAL STORES** Uniforms, Key, Other Equipment | | |
| **BUDGET & COST CONTROL** Travel Account, Air Travel Card Traveletter Authorization Personal Loans & Accounts | | _Dolores Schulte_ |
| **PERSONNEL** I.D., Door Keys Government Security | | Eng. Staff I.D. Parking Tag _Bennett_ |

Forwarding Address _4450 52ND Detroit, Michigan_

_48210_

ES-302
Rev. 10-77

EMPLOYE __Stasko, Stanley R__                     EFFECTIVE DATE __8.14.79__
DEPARTMENT/STAFF __I 11__                          LAST WORK DAY _____
LOCATION: _____                                          Advise ES Acctg., 5-1222
   Eligible for _____                        Quit _____
   Has taken _____                           Transferred to: _____
SUPPLEMENTAL DAYS:                                    Send 215 to: _____
   Eligible for _____                        Leave of Absence _____
   Has taken _____                              Type _____
EXIT INTERVIEW ON __8/14__                         * Retirement/Type _____
   Time __3:30__                                    Special Separation __SN__

+ + + + +

(1) GME-215 – Original and 2 copies
_____ Original for signature & to Comp. Section
_____ Copy (Xerox) for File
_____ Advance copy to Comp. Section

(1a) Transfer, Only – GME-215 – Original and 4 copies
_____ Original & one copy to gaining facility
_____ Copy (Xerox) to Comp. Section & File
_____ Advance Copy to Comp. Section & Kardex

(2) FILE CARDS – Alphabetical Index, Continuous Service & Birthdate
_____ Remove Alpha, record date & reason and file in Inactive File.
_____ Destroy Continuous Service & Birthdate cards
_____ If on LOA, record info but do not remove from Active File

(3) KARDEX CARD
_____ Remove, record information and file in inactive personnel jacket
_____ If LOA, record information and file in LOA Kardex drawer (lower right)

PERSONNEL JACKET
_____ Remove from Active File, place in Inactive jacket, noting effective date and reason (NOT LOA's)
_____ Note Exit Interview date/time on jacket and place in "Exit Interview" file (RH cabinet; top drawer)
_____ After Exit Interview, place in 'Current' drawer for future filing in Inactive File
_____ NOTE: Before filing, be sure Exit Interview is recorded on Evaluation

(5) SECURITY
_____ Staff I.D. and _____ Parking tag(s) # __41028__ to be returned
_____ Key(s) # _____ to be returned (Check Bldg. Services, 5-1339)
_____ U.S. Government Clearance – Check Bettie Bennett,

(6) PROPERTY CLEARANCE:
_____ Complete & send to Support Manager
_____ File in Jacket

(7) EVALUATION:
_____ Complete & send to Support Manager
_____ File in Jacket

(8) INSURANCE INFORMATION
_____ Group Insurance _____ Form G.525 (quit, etc.) _____ Form G.453 (LOA, layoff)- give pertinent form to
       (cancelled date quit)                                                            employe
_____ Blue Cross/Blue Shield – Cancelled at end of month in which quit
_____ Dental – Cancelled date quit

(9) RETIREMENT PROGRAM – Quits
_____ If in Contributory part, prepare SRP-4 or 4A
_____ If 5 years in Plan, prepare SRP-117W

(10) STOCK PURCHASE PROGRAM – Quits
_____ Prepare SSPP-9A

*(11) RETIREES: _____ I.D. Card                    _____ Advise Adm. Services
_____ Retiree file card

(12) MESC FORMS _____ (ALL Terminations)
(13) EDUCATIONAL LOA _____ GME221