# EXHIBIT B
# PART 5

Stasko v General Motors Corporation – Stanley R. Stasko Resume

64.7.2. new Programmable Logic Controller hardware documentation

64.7.3. new Programmable Logic Controller software documentation

64.7.4. new Modicon Panelmate 2000 Video Based Man-Machine Interface

64.7.5. new Engine Coolant and Engine Oil Process Control equipment

64.7.6. new Honeywell UDC3000 Process Controllers configuration

    64.7.6.1.   one configuration for Engine Coolant Process Control

    64.7.6.2.   one configuration for Engine Oil Process Control

    64.7.6.3.   one configuration for Test Cell Ventilation and pressure control

64.7.7. Supply Fan Variable Frequency Drive configuration

64.7.8. Exhaust Fan Variable Frequency Drive configuration

64.7.9. Allen – Bradley Motor Control Center

64.7.10.   the reader has to remember that in the late-1980's the modern Microsoft multi-application software was not deployed in Engineering Building Dynamometer Wing (Microsoft Windows 95 equals CY1995); therefore, converting 50 plus pages of CPI Front-end Equipment spreadsheet documentation from Portrait printout to Landscape printout was a major task in late-1980's

64.8.   one to two technicians for start-up of the equipment

64.8.1. new CPI Front-end equipment

64.8.2. new Programmable Logic Controller hardware

64.8.3. new Programmable Logic Controller software programming

64.8.4. new Modicon Panelmate 2000 Video Based Man-Machine Interface

64.8.5. new Engine Coolant and Engine Oil Process Control equipment

64.8.6. new Honeywell UDC3000 Process Controllers

    64.8.6.1.   one Engine Coolant Process Control

    64.8.6.2.   one Engine Oil Process Control

    64.8.6.3.   one Test Cell Ventilation and pressure control

64.8.7. Supply Fan Variable Frequency Drive configuration

64.8.8. Exhaust Fan Variable Frequency Drive configuration

64.8.9. Allen – Bradley Motor Control Center

Stasko v General Motors Corporation – Stanley R. Stasko Resume

**65. If General Motors tries to argue that they would not give plaintiff a monetary compensation of 3X, 4X, 5X, 6X, 7X, 8X, or 9X his salary compensation**

65.1.    after the plaintiff completed the Emissions Wing renovation, a team of managers, engineers, and /or technical personnel (Jim Thorsen, Terri Hostetter, Craig Hetzel, Paul Durrenberg, and Tom Wolff) could not keep the Engineering Building  Emissions Wing Test Sites in correlation

65.2.    prior to plaintiff renovating Dynamometer Test Cells, General Motors tried various Dynamometer Test Cell engineering and management **teams** - Phil Mohan, Aaron Shin, Jim K-hill, Dave Thacher, Clark Bell, Steve Kaatz

65.3.    prior to Dynamometer Test Cell #13 renovation by plaintiff, General Motors considered a Dynamometer Test Cell renovation basically the updating of one piece of equipment (like a new exhaust fan), cleaning, and maybe a fresh coat of paint.

65.4.    the Dynamometer Test Cells were becoming a crows nest of one-of-a-kind pieces of equipment; for example Dynamometer Test Cell #13 renovation Motor Control Center was a piece of extra equipment from the Dynamometer Blend-house renovation

Stasko v General Motors Corporation – Stanley R. Stasko Resume

66. **If General Motors tries to argue that they would not give plaintiff a monetary compensation of 3X, 4X, 5X, 6X, 7X, 8X, or 9X his salary compensation, then the Dynamometer Test Cell renovation would not been accomplished**

66.1.    the plaintiff was the first General Motors person to complete a modern, integrated Dynamometer Test Cell renovation at the General Motors Technical Center using in-house designs

66.2.    General Motors would have been forced to outsource the Dynamometer Test Cell renovations to a company like Sverdrup (now Jacobs Engineering)

66.3.    prior to renovating Dynamometer Test Cell #13, General Motors did have a meeting with Sverdrup to possibly outsource the Dynamometer Wing Renovation to Sverdrup (now Jacobs Engineering); ask Jerry Fairbanks how large a team of engineers and managers Sverdrup invited to the meeting

66.4.    outsourcing the Dynamometer Wing Renovation would have cost General Motors hundreds of thousands of dollars more per Dynamometer Test Cell renovation (See **Exhibit XX** for examples); plaintiff did a Dynamometer Test Cell Renovation for a fraction of the cost

Stasko v General Motors Corporation – Stanley R. Stasko Resume

67. **Plaintiff's – Project Management / Leadership – willing to take on management's bad decisions – Example #1**

   67.1.    plaintiff attended a meeting to discuss disciplinary action against Mel (a UAW painter) who stole a small ball of string

   67.2.    plaintiff can not believe that Mel might get fired for stealing a small ball of string that has a street value of less that one dollar

   67.3.    plaintiff states that if General Motors fires Mel for stealing a small ball of string, plaintiff will testify in court that during a recent power outage a General Motors manager took home a portable generator owned by General Motors and had General Motors salary personal install the portable generator; (General Motors property was never returned and General Motors looked a blind eye to the misappropriated property until plaintiff mentioned it)

   67.4.    What did General Motors award plaintiff for protecting Mel the UAW painter from a frivolous disciplinary action – basically nothing

   67.5.    What did General Motors award plaintiff for blowing the whistle on the misappropriated portable generator by the General Motors manager – basically nothing

68. **Plaintiff's – Project Management / Leadership – willing to take on management's bad decisions -- Example #2**

   68.1.    at the same meet as item 67 above

   68.2.    plaintiff also pointed out that Paul Durrenberg caused a major gasoline spill; instead of punishing Paul Durrenberg, General Motors awarded Paul Durrenberg $20,000 (it was not until plaintiff challenged the $20,000 award to Paul Durrenberg that General Motors retracted the award)

   68.3.    What did General Motors award plaintiff for challenging the $20,000 award to Paul Durrenberg that General Motors eventually recovered – basically nothing

Stasko v General Motors Corporation – Stanley R. Stasko Resume

**69. Evidence of General Motors continuous pattern compensation discrimination against plaintiff:**

|  |  | 7E06 | 7E06 | 9th Level |
| --- | --- | --- | --- | --- |
| Date | SRS Salary | Mid-point | Maximum | > Mid-point |
| May 01, 1989 | $44,916 | Not shown | $60,840 | ??? |

Plaintiff earns his 9th level with Dynamometer Wing Test Cell #13 renovation

| Sept. 01, 1990 | $47,976 | $52,800 | $63,276 | ??? |
| --- | --- | --- | --- | --- |

**Fairbanks / Thorsen recommend plaintiff for 7th level; Evaluation Dec. 12, 1990**

| Sept. 01, 1991 | $52,800 | $55,368 | $66,276 | ??? |
| --- | --- | --- | --- | --- |

**Fairbanks / Thorsen recommend plaintiff for 7th level; Evaluation Jan. 22, 1992**

Plaintiff compensation statement for CY1992 not in personnel records

| Oct. 01, 1993 | $57,432 | $58,200 | $70,500 | ??? |
| --- | --- | --- | --- | --- |
| June. 01, 1994 | $61,356 | $59,940 | $73,680 | ??? |
| June. 01, 1995 | $63,588 | $61,920 | $75,900 | ??? |

Stasko v General Motors Corporation – Stanley R. Stasko Resume

70. **Plaintiff's – Project Management / Leadership – willing to take on General Motors discrimination against Mike Byrd**

    70.1.    Mike Byrd is a white male with a Masters Degree (Economics or Statistics ???) for over eight years by CY1990 / CY1991

    70.2.    Mike Byrd did Emission Test Site correlation data analysis for General Motors, Engineering Building, Emissions Wing Test Sites

        70.2.1. Correlation testing and correlation data analysis is how General Motors ensures that the Emissions Test Sites are generating reliable EPA-type test data results

    70.3.    To begin understanding how much and how long General Motors discriminated against Mike Byrd the reader has to understand what was normal General Motors salary personnel progression in the CY1990 / CY1991 timeframe

        70.3.1. a person with a Bachelor Degree with zero experience equals 5th level

        70.3.2. a person with a Bachelor Degree with minimum experience equals 6th level

        70.3.3. a person with a Bachelor Degree with moderate experience equals 7th level

        70.3.4. a person with a Masters Degree with zero to minimum experience equals 7th level

            70.3.4.1.    plaintiff meet a black male with a Masters Degree who was a 7th supervisor of one technician (Steve Fry) who was expecting to be 8th level

        70.3.5. a person with a Masters Degree with moderate experience equals 8th level

        70.3.6. Mike Byrd had a Masters Degree and over eight years of proven experience, and was one of the top three Emission Test Site correlation data analysis experts in General Motors in all of the United States of America (the only two people who might have been better that Mike Byrd were Don Nagy and Ward Wiers)

    70.4.    Nevertheless, General Motors consistently keep Mike Byrd at 6th level for over eight years and rank him in the same range as salaried technicians with High School degrees

    70.5.    One day in CY1990 / CY1991, plaintiff gets a request to attend a meeting (plaintiff was not informed in advance that the meeting was for ranking General Motors salaried technicians)

    70.6.    Some of the people ranking the General Motors salaried technicians were:

Stasko v General Motors Corporation – Stanley R. Stasko Resume

70.6.1. Jim Thorsen – probably a 9th level manager

70.6.2. Terri Hostetter – probably a 8th level manager with a High School degree

70.6.3. Craig Hetzel – probably an 8th level manager with a bachelor degree

70.6.4. Paul Durrenberg – probably a 7th level technician with a High School degree in CY1990 / CY1991

70.6.5. Tom Wolff – probably a 7th level technician with a High School degree

70.6.6. Stanley R. Stasko – who should have been 9th level manager

70.7.    The ranking begins and people start giving their input; Jim Thorsen tries to pretend to be plaintiff boss and asks for his input; plaintiff tells Jim Thorsen that plaintiff will listen and after all the others have given their input plaintiff will correct the list

70.8.    Jim Thorsen, Terri Hostetter, Craig Hetzel, Paul Durrenberg, Tom Wolff, and all the other people at the meeting (except plaintiff) rank Mike Byrd in the middle of the salaried technicians who have High School degrees

70.9.    It is the plaintiff who corrects General Motors discrimination against Mike Byrd by placing Mike Byrd at the very top of the list

70.10.    Now General Motors is caught with its pants down

70.11.    A few days later plaintiff is called to Mike Byrd's office;

70.12.    General Motors now begins to try to cover up their discrimination against Mike Byrd by giving Mike Byrd a promotion to 7th level

70.13.    plaintiff asks Mike Byrd who supported him for his promotion; Mike Byrd tells plaintiff that he was told everybody at the meeting; plaintiff tells Mike Byrd that is a lie because nobody supported him for a promotion except the plaintiff; it is plaintiff who supported Mike Byrd for immediate promotion to 7th level; it is plaintiff who supported Mike Byrd for a future promotion to 8th level

70.14.    plaintiff asks Mike Byrd how much of a pay raise did General Motors offer him; Mike Byrd tells plaintiff ten percent; plaintiff tells Mike Byrd that he should have received significantly larger pay raise

70.15.    It is plaintiff who told Mike Byrd he should expect large pay increases from General Motors every year; remember General Motors in CY1990 / CY1991 used a

Stasko v General Motors Corporation – Stanley R. Stasko Resume

ranking scale for determining pay increase; people with a low ranking (technicians with a High School degree received small pay increases; professionals with a Masters Degree received large pay increases)

70.16.    It is plaintiff who advised Mike Byrd to seek a lawyer and sue General Motors for all the back monies General Motors cheated Mike Byrd out of since he hired into General Motors

70.17.    What reward did plaintiff receive for catching General Motors in their discrimination against Mike Byrd – basically nothing

**71. General Motors discriminated against Mike Byrd story does not end here**

71.1.    Remember correlation testing and correlation data analysis is how General Motors ensures that the Emissions Test Sites are generating reliable EPA-type test data results

71.2.    Once Mike Byrd was promoted, Mike Byrd was transferred out of the General Motors, Engineering Building, Emissions Wing

71.3.    Jim Thorsen, Terri Hostetter, Craig Hetzel, Paul Durrenberg, and Tom Wolff could not keep the Engineering Building Emissions Wing Test Sites in correlation without Mike Byrd; eventually Terry Hostetter was retired

71.4.    Denise Bam-mel (probably an 8th level engineer with a Masters Degree) to replaced Terry Hostetter

71.5.    Jim Thorsen, Denise Bammel, Craig Hetzel, Paul Durrenberg, and Tom Wolff could not keep the Engineering Building Emissions Wing Test Sites in correlation without Mike Byrd

71.6.    eventually Jim Thorsen was retired and Denise Bammel was transfer out

71.7.    All the people combined who did not support Mike Byrd for 7th level could not do Mike Byrd's job

Stasko v General Motors Corporation – Stanley R. Stasko Resume

**72. General Motors organized hostile work environment against plaintiff through compensation discrimination (See Exhibit 7)**

72.1.    the plaintiff should have been hired in as a 6th level Project Engineer

72.2.    plaintiff does not receive his first promotion to 6th level until approximately September 1, 1985, almost two years after plaintiff was hired by General Motors as a professional and received a small 10 percent pay raise

72.2.1. even with the 10 percent pay raise plaintiff salary is approximately 15 percent below salary midpoint for a 6E11 project engineer approximately January 1, 1986; even though the plaintiff is an above average 6E11 project engineer

72.3.    General Motors does not record plaintiff CY1983, CY1984, CY1985, CY1986, CY1987, and CY1988 accomplishments; See Items #6 thru #26 in above resume for details)

72.3.1. Humidity Monitoring to help diagnose problem with large printer

72.3.2. Forty-Seven mm diesel particulate filter sampling system

72.3.3. Sartorius Microbalance

72.3.4. Tylan Mass Flow Controllers

72.3.5. Sample Conditioning Unit

72.3.6. Horiba Chassis Dynamometer Controller

72.3.7. Overhead Track System

72.3.8. Emission Wing Renovation – Design Coordination

72.3.9. Programmable Logic Controllers – integrated into Emissions Analysis Systems

72.3.10.    Instrumentation Console and Custom Enclosure

72.3.11.    Emission Test Site Instrumentation Patch Panel

72.3.12.    12-Channel Strip Chart Recorder and Custom Enclosure

72.3.13.    Dew Point Meter and Ambient Temperature Sensor and Custom Enclosure

72.3.14.    Instrumentation Interfacing

72.3.15.    Large Temperature and Humidity Display

72.3.16.    Honeywell HVAC Central Control Station

72.3.17.    Smoke Detector Graphics Display Panel

Stasko v General Motors Corporation – Stanley R. Stasko Resume

72.3.18.    Overhead Door Logic Controls

72.3.19.    Emissions Wing Renovation – Project Management

72.3.20.    Software Programming Skills and Software Program Management

72.3.21.    Fuel Meter Calibration Cart

72.4.    So much is missing from plaintiff CY1983 to CY1988 personal records that a reader of plaintiff personnel records would get the impression plaintiff had nothing to do with the Emissions Wing renovation; even though, plaintiff had more to do with the success of the Emission Wing renovation than Denise Wiese, Ward Wiers, Paul Durrenberg, Don Nagy, or any other person.

72.5.    the plaintiff is still a 6E11 Project Engineer and did not receive a promotion to 8th level with the Emissions Wing Renovation

72.5.1. plaintiff does not receive any form of bonus for Emissions Wing renovation

72.5.2. There were two other General Motors renovation projects taking place at the General Motors Technical Center simultaneously with the Emissions Wing renovation; in which, Utley – James acted as the general contractor for all three renovations

72.5.2.1.    the Emission Wing renovation

72.5.2.2.    the Engineering Building, Dynamometer Wing, Underground Tank Farm renovation

72.5.2.3.    the new paint lab near Manufacturing A or Manufacturing B building

72.5.3. General Motors specifically requested plaintiff to transfer from the Engineering Building Emissions Wing to the Engineering Building Dynamometer Wing and the plaintiff does not receive a promotion to 8th level (plaintiff is still a 6th level Project Engineer)

72.5.4. plaintiff does not receive any form of bonus from General Motors when General Motors requests plaintiff to transfer from the Engineering Building Emissions Wing to the Engineering Building Dynamometer Wing

72.6.    plaintiff does not receive 9th level for Dynamometer Wing Test Cell #13 renovation

Stasko v General Motors Corporation -- Stanley R. Stasko Resume

**73. General Motors never awards plaintiff headcount he earned from CY1983 to CY1995;**
**See partial list of head count replacements that should been awarded to the plaintiff**

    73.1.1. Jim Daughtery, Doug Newmann, Lee (Denise Wiese's office helper)

    73.1.2. Ward Wiers, Ken Welbaum, Leslie Brown

    73.1.3. Andy McKenzie, Clark Bell, Jim Ka-hill

    73.1.4. David Thatcher, Bob Zuzga, Jim (Dynamometer Wing fuel man)

    73.1.5. Karl Klida, Terry Hostetter, Dennis Bammel

    73.1.6. Denise Wiese, Jim Thorsen, Chris Killeen

    73.1.7. Chris (Denise Wiese's office helper), Tony Schmid-hub-ber

**74. General Motors organized hostile environment against plaintiff career (See Exhibit 7)**

    74.1.    Paul Durrenberg tries to hypnotize plaintiff

    74.2.    an unknown man comes charging in plaintiff office and tries verbally assaulting plaintiff

    74.3.    General Motors has a group of cars blocks in plaintiff car on South bound Mound Road just North of 12 Mile

    74.4.    General Motors uses Ron Buch-holz to suggest to plaintiff that plaintiff should leave General Motors

    74.5.    Paul Durrenberg (technician supervisor) tampers with plaintiff forty-seven mm diesel particulate filter sampling system project

    74.6.    Jerry Sidlar (instrumentation technician) purposefully gives plaintiff bad information in the Sample Condition Unit project

    74.7.    Paul Durrenberg purposefully tries to steal plaintiff idea of using a Programmable Logic Controller in the Sample Conditioning Unit project

    74.8.    Chris Killen (a woman) falsely accuse plaintiff of looking down her blouse; Bob Zuzga (Chris' office partner) is willing to commit perjury to protect Chris from her false accusation

    74.9.    Paul Durrenberg and Allen Boogaard verbally soliciting plaintiff for oral sex

Stasko v General Motors Corporation – Stanley R. Stasko Resume

74.10. mysteriously one day one Druck pressure transducer is found damaged; even though, it would take a pressure six times the rated full scale to damage the pressure transducer

74.11. General Motors race bait plaintiff multiple ways

74.12. After the above racial harassment by General Motors now General Motors attacks plaintiff family. The plaintiff owned a piece of rental property at 7320 Stout in Detroit, Michigan. Plaintiff rented the property to his sister Gerri. It was during this time period when plaintiff's sister Gerri is chased by an unknown black man and is almost physically assaulted. Fortunately a driver just by change happened to be in the area and help Gerri.

74.13. General Motors steals plaintiff personal property; Handbook of Chemistry and Physics; plaintiff won Handbook of Chemistry and Physics at Lawrence Technological University in General Chemistry class (contact Dr. Chris)

74.14. One day plaintiff finds a rat in his house - the workers in the Dynamometer Wing nickname was Dyno Rats

74.15. M.J. Spi-naz-zi and Bill Whitley try 2 against 1 harassing plaintiff near the Engineering Building, Dynamometer Wing, Chassis Dynamometer Test cell

Stasko v General Motors Corporation – Stanley R. Stasko Resume

**75. General Motors organized hostile work environment against plaintiff religious beliefs (See Exhibit**

    75.1.      Terri Hostetter attacks plaintiff belief in Creation

    75.2.      Ward Wiers tries to convert plaintiff away from Roman Catholic Church

    75.3.      General Motors uses suppliers to harass plaintiff belief that abortion is wrong in all situations; Phil and Jim Davies (MTS-PowerTek Farmington Hills, Michigan 48335) – ask plaintiff to name one thing that is always wrong; plaintiff response => Ted; with an aluminum baseball bat looking for Jim

    75.4.      General Motors uses Gil Troutman of DSP Technology to attack plaintiff's silent praying before meal at lunch

    75.5.      Jim Thorsen tries to convert plaintiff away from Roman Catholic Church

    75.6.      General Motors uses an unknown man to ask the plaintiff to prove the existence of God near the end of plaintiff career at General Motors

**76. Certified Liturgy Coordinator Department of Christian Worship, Archdiocese of Detroit, Detroit, Michigan**

**77. Contributed to a book – Prayer Service Composer**

    77.1.      Come Holy Spirit: Practical Prayer Services for Parish Meetings

        77.1.1. Archdiocese of Detroit; Ave Maria Press, Notre Dame, Indiana 46556

        77.1.2. ISBN # 0-87793-592-0

**78. Resigned from General Motors Corporation General Motors Powertrain Warren West approximately August 1995**

    78.1.      plaintiff was a 7E06 Sr. Project Engineer in August 1995

Stasko v General Motors Corporation – Stanley R. Stasko Resume

**79. Hired by DSP Technology in Ann Arbor, Michigan (January 1997 to CY1998)**

**80. Masters of Science in Information Management and Communication**

    80.1.    Walsh College (Troy, Michigan); Graduated Summa Cum Laude in August 1999

**81. MSX International Auburn Hills, Michigan; (CY1997 to February 2001)**

    81.1.    contractor for Daimler-Chrysler

    81.2.    MSX International represented the position as a Project Management position; in reality, the position was a secretary position

    81.3.    most people did not show much interest in the plaintiff's work, and the project eventually failed for reasons not associated with the plaintiff's work

    81.4.    The plaintiff's position was eliminated.

    81.5.    The plaintiff's conscious was still sensitive during this period of time and the plaintiff would say - like *retract thought* - at work.

Exhibit - 17

M.C.L.A. 600.5851

Michigan Compiled Laws Annotated Currentness
Chapter 600. Revised Judicature Act of 1961 (Refs & Annos)
`■Revised Judicature Act of 1961 (Refs & Annos)
`■Chapter 58. Limitation of Actions (Refs & Annos)
➡600.5851. Disabilities of infancy or insanity at accrual of claim; year of grace; tacking; removal
of infancy disability; medical malpractice exception; application to imprisonment disability

Sec. 5851. (1) Except as otherwise provided in subsections (7) and (8), if the person first entitled to make
an entry or bring an action under this act is under 18 years of age or insane at the time the claim accrues,
the person or those claiming under the person shall have 1 year after the disability is removed through
death or otherwise, to make the entry or bring the action although the period of limitations has run. This
section does not lessen the time provided for in section 5852. [FN1]

(2) The term insane as employed in this chapter means a condition of mental derangement such as to
prevent the sufferer from comprehending rights he or she is otherwise bound to know and is not
dependent on whether or not the person has been judicially declared to be insane.

(3) To be considered a disability, the infancy or insanity must exist at the time the claim accrues. If the
disability comes into existence after the claim has accrued, a court shall not recognize the disability under
this section for the purpose of modifying the period of limitations.

(4) A person shall not tack successive disabilities. A court shall recognize only those disabilities that exist
at the time the claim first accrues and that disable the person to whom the claim first accrues for the
purpose of modifying the period of limitations.

(5) A court shall recognize both of the disabilities of infancy or insanity that disable the person to whom
the claim first accrues at the time the claim first accrues. A court shall count the year of grace provided in
this section from the termination of the last disability to the person to whom the claim originally accrued
that has continued from the time the claim accrued, whether this disability terminates because of the
death of the person disabled or for some other reason.

(6) With respect to a claim accruing before the effective date of the age of majority act of 1971, Act No. 79
of the Public Acts of 1971, being sections 722.51 to 722.55 of the Michigan Compiled Laws, the disability
of infancy is removed as of the effective date of Act No. 79 of the Public Acts of 1971, as to persons who
were at least 18 years of age but less than 21 years of age on January 1, 1972, and is removed as of the
eighteenth birthday of a person who was under 18 years of age on January 1, 1972.

(7) Except as otherwise provided in subsection (8), if, at the time a claim alleging medical malpractice
accrues to a person under section 5838a [FN2] the person has not reached his or her eighth birthday, a
person shall not bring an action based on the claim unless the action is commenced on or before the
person's tenth birthday or within the period of limitations set forth in section 5838a, whichever is later. If,
at the time a claim alleging medical malpractice accrues to a person under section 5838a, the person has
reached his or her eighth birthday, he or she is subject to the period of limitations set forth in section
5838a.

(8) If, at the time a claim alleging medical malpractice accrues to a person under section 5838a, the person has not reached his or her thirteenth birthday and if the claim involves an injury to the person's reproductive system, a person shall not bring an action based on the claim unless the action is commenced on or before the person's fifteenth birthday or within the period of limitations set forth in section 5838a, whichever is later. If, at the time a claim alleging medical malpractice accrues to a person under section 5838a, the person has reached his or her thirteenth birthday and the claim involves an injury to the person's reproductive system, he or she is subject to the period of limitations set forth in section 5838a.

(9) If a person was serving a term of imprisonment on the effective date of the 1993 amendatory act that added this subsection, and that person has a cause of action to which the disability of imprisonment would have been applicable under the former provisions of this section, an entry may be made or an action may be brought under this act for that cause of action within 1 year after the effective date of the 1993 amendatory act that added this subsection, or within any other applicable period of limitation provided by law.

(10) If a person died or was released from imprisonment at any time within the period of 1 year preceding the effective date of the 1993 amendatory act that added this subsection, and that person had a cause of action to which the disability of imprisonment would have been applicable under the former provisions of this section on the date of his or her death or release from imprisonment, an entry may be made or an action may be brought under this act for that cause of action within 1 year after the date of his or her death or release from imprisonment, or within any other applicable period of limitation provided by law.

(11) As used in this section, "release from imprisonment" means either of the following:

(a) A final release or discharge from imprisonment in a county jail.

(b) Release on parole or a final release or discharge from imprisonment in a state or federal correctional facility.

CREDIT(S)

Exhibit - 18

United States District Court, E.D. Michigan, Southern Division.

# Panzy CALLADINE, individually and as Guardian of William Calladine, Plaintiff,

## v.

# DANA CORPORATION, a Virginia corporation, Defendant.

Civ. A. No. 87-CV-1739-DT.
Feb. 29, 1988.

Wife brought action, individually and as guardian of her husband, against her husband's employer for injuries suffered by husband employee at work. On employer's motions for summary judgment, the District Court, Woods, J., held that: (1) under Michigan law, limitations period applicable to actions charging assault was tolled with respect to husband employee, who had been mentally impaired since time of the accident which was basis for action, but relevant limitations period was not tolled for wife's loss of consortium claim; (2) the 1987 amendment to the Michigan Workers' Disability Compensation Act would be given retroactive application; and (3) the exclusive remedy provision barred husband employee's intentional tort claim against employer, as there was no factual basis for concluding employer had actual knowledge that its plant design and layout were certain to cause employee's injury and willfully disregarded that knowledge.

Judgment for employer.

## West Headnotes

[1] ☑ KeyCite Citing References for this Headnote

241 Limitation of Actions
   241II Computation of Period of Limitation
      241II(C) Personal Disabilities and Privileges
         241k74 Insanity or Other Incompetency
         241k74(1) k. In General. Most Cited Cases

Under Michigan law, limitations period applicable to actions charging assault had not begun to run, although injury occurred almost nine years ago, where injured individual had been mentally impaired since time of accident which was basis of action, although defendant claimed limitations period should have begun running as injured individual's rights had been capably handled at least since time guardian and attorney began caring for his rights. M.C.L.A. §§ 600.5805(2), 600.5851.

[2] ☑ KeyCite Citing References for this Headnote

241 Limitation of Actions
   241II Computation of Period of Limitation

241II(C) Personal Disabilities and Privileges
   241k74 Insanity or Other Incompetency
      241k74(1) k. In General. Most Cited Cases

Under Michigan law, disability savings provision did not apply to loss of consortium claim of wife of injured individual, although injured individual had been mentally impaired since time of accident which was basis for action. M.C.L.A. § 600.5851(1).

[3] ☑ KeyCite Citing References for this Headnote

413 Workers' Compensation
   413I Nature and Grounds of Employer's Liability
      413k54 Retroactive Operation of Statutes
         413k58 k. Effect of Acts on Other Statutory or Common Law Rights of Action and Defenses. Most Cited Cases

The 1987 amendment to the exclusive remedy provision of the Michigan Workers' Disability Compensation Act would be given retroactive application, and accordingly, the amendment to the statute, rather than a prior judicial decision, provides the appropriate threshold for determining whether an employee may bring an intentional tort action against an employer, regardless of whether the intentional tort occurred prior or subsequent to the judicial decision. M.C.L.A. § 418.131.

[4] ☑ KeyCite Citing References for this Headnote

413 Workers' Compensation
   413XX Effect of Act on Other Statutory or Common-Law Rights of Action and Defenses
      413XX(A) Between Employer and Employee
         413XX(A)1 Exclusiveness of Remedies Afforded by Acts
            413k2084 k. In General. Most Cited Cases

Exclusive remedy provision of the Michigan Workers' Disability Compensation Act barred employee's intentional tort claim against employer that was based on design and layout of employer's plant, although employer placed drinking fountain, employees' time clock, and restroom in aisleway used by fork lift trucks; there was high volume of pedestrian traffic in the aisleway and only one prior accident, so there was no factual basis for concluding that employer had actual knowledge that its plant design and layout were certain to cause employee's injury and willfully disregarded that knowledge. M.C.L.A. § 418.131.

*701 Barry P. Waldman, Detroit, Mich., for plaintiff.

Edward D. Plato, Farmington, Hills, Mich., for defendant.

## MEMORANDUM OPINION AND ORDER

## WOODS, District Judge.

Plaintiff Panzy Calladine brings this action individually and as guardian of her husband William Calladine. On May 30, 1978, William was working for defendant Dana Corporation (Dana) at its plant in Ecorse, Michigan. After drinking at a water fountain, William was struck and seriously injured by a fork lift truck. He has been mentally impaired since the time of the accident. He seeks damages resulting from Dana's allegedly intentional assault, i.e., knowingly exposing him to a hazardous working condition without providing any warnings. Panzy Calladine seeks damages for loss of consortium.

Dana files two motions for summary judgment, claiming that plaintiff's claims are barred under (1) applicable statute of *702 limitations periods and (2) the Michigan Workers' Disability Compensation Act's exclusive remedy provision.

# 1. STATUTE OF LIMITATIONS

## A. *William Calladine's Claim*

[1] The statute of limitations for actions charging assault is two years. Mich.Comp.Laws § 600.5805(2). Unless tolled, the statute began to run at the time of the accident on May 30, 1978, and expired two years later. In this case the statute has been tolled. Michigan's disability savings provision applicable to William's assault claim, *id.* § 600.5851, provides that an individual mentally incompetent at the time a cause of action accrues may file the claim before the applicable limitations period runs *after the disability is removed*. Since William remains mentally incompetent, the statute has not begun to run even though the injury occurred almost nine years prior to the filing of this suit. *See Paavola v. St. Joseph Hosp. Corp.,* 119 Mich.App. 10, 14-15, 325 N.W.2d 609 (1982) (statute permits tolling for a "period potentially many decades long").

Dana nonetheless argues that the circumstances of this case are unique and dictate that the statute of limitations be deemed to have begun running when the first suit was filed. According to Dana, William's rights have been capably handled since at least 1981, when a guardian and an attorney began caring for his rights. In other words, asserts Dana, William has been in a far better position legally than the average individual who must attend to his or her legal rights without such assistance. Regardless of the persuasiveness of Dana's arguments, Michigan courts have consistently held otherwise. In a string of decisions, the Michigan Court of Appeals has found that the statute does not begin to run even with the appointment of a guardian, *see, e.g., Wellisch v. Fosnaugh,* 126 Mich.App. 418, 426, 336 N.W.2d 923 *leave to appeal denied,* 418 Mich. 871 (1983); *Paavola,* 119 Mich.App. at 14, 325 N.W.2d 609, or next friend, *Rittenhouse v. Erhart,* 126 Mich.App. 674, 679, 337 N.W.2d 626 (1983), *modified on other grounds,* 424 Mich. 166, 380 N.W.2d 440 (1986), on behalf of a mentally incompetent person.[FN1]

FN1. The fact that an individual has retained an attorney offers some evidence that the individual is mentally competent, but not conclusive evidence. *Davidson v. Baker-Vander Veen Construction Co.,* 35 Mich.App. 293, 192 N.W.2d 312, *leave to appeal denied,* 386 Mich. 756 (1971). Dana offers the fact that William has been represented by an attorney to show that William's legal rights have been capably handled. Dana does not argue that William is mentally competent.

## B. *Panzy Calladine's Claim*

[2] Unlike William's assault claim, Panzy's loss of consortium claim does not fall within the disability savings provision. Mich. Comp. Laws § 600.5851(1) extends the period of limitations for mentally incompetent individuals or those "claiming under" such individuals. Michigan courts nevertheless hold that a person bringing a loss of consortium claim maintains a separate and independent cause of action and does not claim under an injured mentally incompetent person-even if the claims arise from the same set of circumstances. *Wold v. Jeep Corp.,* 141 Mich.App. 476, 367 N.W.2d 421, *leave to appeal denied,* 423 Mich. 859 (1985); *Walter v. City of Flint,* 40 Mich.App. 613, 199 N.W.2d 264 (1972).

## 2. INTENTIONAL TORT EXCEPTION TO THE MICHIGAN WORKERS' COMPENSATION ACT'S EXCLUSIVE REMEDY PROVISION

[3] ☑ Dana contends that William's intentional assault claim is barred by the exclusive remedy provision of the Michigan Workers' Disability Compensation Act (Act), Mich.Comp.Laws § 418.131, amended by 1987 Mich.Pub. Act No. 28. The provision states that an employee's recovery of workers' compensation benefits shall be the employee's exclusive remedy against the employer. Various panels of the Michigan Court of Appeals have disagreed as to whether the Michigan legislature intended an exception for intentional torts. E.g., Eide v. Kelsey-Hayes Co., 154 Mich.App. 142, 163-64, 397 N.W.2d 532 (1986), leave *703 to appeal granted on other grounds, 428 Mich. 873, 402 N.W.2d 468 (1987); Leonard v. All-Pro Equities, Inc., 149 Mich.App. 1, 5-6, 386 N.W.2d 159 (1986). The Michigan Supreme Court in Beauchamp v. Dow Chemical Co., 427 Mich. 1, 398 N.W.2d 882 (1986), resolved the dispute by recognizing the following intentional tort exception to the exclusive remedy provision:

An intentional tort "is not ... limited to consequences which are desired. If the actor knows that the consequences are certain, or substantially certain, to result from his act, and still goes ahead, he is treated by the law as if he had in fact desired to produce the result." It does not matter whether the employer wishes the injury would not occur or does not care whether it occurs. If the injury is substantailly certain to occur as a consequence of actions the employer intended, the employer is deemed to have intended the injuries as well.

Id. at 21-22, 398 N.W.2d 882 (footnotes omitted).

Less than two months later, a bill was introduced in the Michigan senate in part to clarify the exclusive remedy provision in light of the Beauchamp decision. As introduced, the bill required an employee to show that an employer intended both the acts giving rise to the injury and the resulting injury. Senate Bill 67, § 132(1); Summary of Michigan Senate Bill 67, Senate Analysis Section (Feb. 2, 1987) (unofficial legislative history). Proponents of the bill characterized situations permitting employees to pursue such claims against employers as "extreme cases." Opponents argued that the bill would do away with the Beauchamp exception to the exclusive remedy provision, unduly restricting the rights of injured employees to seek redress against employers and drastically skewing the workers' compensation system in favor of employers. See First, Second & Third Analyses to Senate Bill 67, Senate Fiscal Agency (Mar. 23, Apr. 16 & May 26, 1987) (unofficial statements of legislative intent).

In reaching what appears to be a compromise between the two positions, the Michigan legislature amended the exclusive remedy provision to permit intentional tort claims against an employer, but requiring an employee to meet a higher threshold than set forth in Beauchamp:

Sec. 131(1) The right to the recovery of benefits as provided in this act shall be the employee's exclusive remedy against the employer for a personal injury or occupational disease. The only exception to this exclusive remedy is an intentional tort. An intentional tort shall exist only when an employee is injured as a result of a deliberate act of the employer and the employer specifically intended an injury. An employer shall be deemed to have intended to injure if the employer had actual knowledge that an injury was certain to occur and willfully disregarded that knowledge. The issue of whether an act was an intentional tort shall be a question of law for the court. This subsection shall not enlarge or reduce rights under law.

1987 Michigan Pub. Act No. 28 (effective May 14, 1987). As enacted, the amendment permits an employee to sue an employer for an on-the-job injury if, and only if, there is a deliberate act by the

employer, committed with the specific intent to injure an employee. Specific intent is shown where an employer had actual knowledge that its act was certain to injure an employee and willfully disregarded that knowledge.

The last sentence of the amendment to § 418.131, which states that "[t]his subsection shall not enlarge or reduce rights under law," is particularly important since it indicates the legislature's intent as to whether the amendment shall be given retroactive application. Although statutes generally are presumed to operate prospectively, they shall be held to operate retrospectively in Michigan if they "operate in furtherance of a remedy already existing and ... neither create new rights nor destroy existing rights." *Selk v. Detroit Plastic Products*, 419 Mich. 1, 9-10, 345 N.W.2d 184 (1985); *see also McGillis v. Aida Engineering, Inc.*, 161 Mich.App. 370, 373-75, 410 N.W.2d 817 (1987) (applying *Selk* guideline to the Michigan Workers' Disability Compensation Act and concluding that an amendment to § 418.641 *704 should be given retroactive application); *Spencer v. Clark Township*, 142 Mich.App. 63, 66-69, 368 N.W.2d 897 (1985) (retroactive application of an amendment to § 418.161 of the Act). This Court has found no reported decisions considering whether the amendment should be given retroactive application. Nevertheless, the amendment as well as Public Act 28 as a whole contains no language indicating, even indirectly, that the amendment is not intended to operate retroactively. To the contrary, the amendment contains the specific language outlined in *Selk* as a basis for giving a statute retroactive application. Furthermore, the only reasonable explanation for the inclusion of the *Selk* language in the statute is the legislature's intent that the amendment receive such application.

Because of its retroactive application, the amendment to § 418.131, not *Beauchamp*, gives the appropriate threshold for determining whether an employee may bring an intentional tort against an employer.[FN2] The higher standard necessarily applies regardless of whether the intentional tort occurred prior or subsequent to the *Beauchamp* decision. Finally, as stated in the amendment, the issue of whether an intentional tort occurred is a question of law for the court.

FN2. This Court disagrees with courts that have continued to apply the less strict *Beauchamp* standard following the amendment to the Act, *see Morgan v. Church's Fried Chicken*, 829 F.2d 10 (6th Cir.1987); *Eads v. Simon Container Machinery, Inc.*, 676 F.Supp. 786 (E.D.Mich.1987), although it fully agrees with the results reached in those cases.

[4] ☑ William bases his intentional tort claim on the design and layout of Dana's Ecorse plant.[FN3] He offers evidence showing that Dana placed the drinking fountain, as well as the employees' time clock and restroom, in an aisleway used by fork lift trucks. The parties agree that each workday at least 200 individuals walked across the aisleway during the three eight-hour shifts at the plant.

FN3. Plaintiff's counsel offered no evidence in support of William's claim until the filing of a rebuttal to Dana's reply brief. Local Court Rule 17 permits parties to file a brief in support of a motion, a brief in opposition, and a reply brief. Reply briefs are limited to 5 pages and shall be filed not less than 3 court days before oral argument. *Id.* 17(i). Additional briefs and supporting documents may be filed only if a party brings an *ex parte* motion or written request and obtains an *ex parte* order permitting such filing. *Id.* 17(j). Plaintiff's counsel filed the 7-page rebuttal the day before oral argument without first obtaining an order permitting the filing.

The driver of the fork lift truck involved in William's injury, however, knew of only one other accident occurring in the aisleway.[FN4] Although not mentioned in a written statement he prepared immediately following the accident, he asserted in a subsequent deposition that the aisleway was poorly lit and too narrow to accommodate both pedestrian and industrial equipment traffic. He further asserts that he notified Dana officers of the hazardous condition in the aisleway.

FN4. Dana's safety engineer disputes the fork lift driver's assertion. He claims that no pedestrian accidents occurred in the aisleway from 1972 to the date of William's injury. William, on the other hand, refers to "other accidents" at the plant involving fork lift trucks. Plaintiff's Rebuttal to Defendant's Reply Brief 4. He offers no evidence to support that contention, however.

Construing the evidence in favor of William's claim shows that William can establish, at best, gross negligence by Dana in failing to modify the layout of its plant. Given the high volume of pedestrian traffic in the aisleway and the single prior accident in the aisleway,[FN5] this Court has no difficulty concluding as a matter of law that William cannot maintain his intentional tort claim against Dana. There is no factual basis for concluding that Dana had actual knowledge that its plant design and layout were certain to cause an employee's injury and willfully disregarded that knowledge.

FN5. See Morgan, 829 F.2d at 12 ("The allegation that plaintiff's place of employment had been robbed on six previous occasions might be sufficient to support a finding that plaintiff's injury was likely to occur absent additional safety precautions, but [is insufficient] to support a finding that plaintiff's injury was certain or substantially certain to occur.")

# *705 ORDER

For the above reasons, IT IS HEREBY ORDERED that summary judgment be GRANTED in favor of defendant.

SO ORDERED.

E.D.Mich.,1988.
Calladine v. Dana Corp.
679 F.Supp. 700

Motions, Pleadings and Filings (Back to top)

• 2:87CV71739 (Docket) (May 23, 1989)
END OF DOCUMENT

Exhibit - 19

Court of Appeals of Michigan.

# Martha PAAVOLA, Guardian of the Estate of Karen Rae Paavola, a mentally incompetent person, Plaintiff-Appellant,
## v.
# SAINT JOSEPH HOSPITAL CORPORATION, Defendant-Appellee.

Docket No. 60406.
Submitted June 29, 1982.
Decided Aug. 25, 1982.
Released for Publication Nov. 9, 1982.

Guardian of estate of mentally incompetent person appealed order of the Genesee Circuit Court, Harry B. McAra, J., granting accelerated judgment for defendant in negligence action. The Court of Appeals, Walsh, J., held that period of limitation did not begin to run against insane person upon appointment of guardian, and thus, filing of negligence complaint on behalf of mentally incompetent daughter was timely although brought approximately 20 months after appointment of guardian.

Reversed.

## West Headnotes

[1] ☑ KeyCite Citing References for this Headnote

241 Limitation of Actions
    241II Computation of Period of Limitation
        241II(C) Personal Disabilities and Privileges
            241k74 Insanity or Other Incompetency
                241k74(2) k. Removal of Disability. Most Cited Cases

Appointment of a guardian for insane person does not constitute removal of insane person's disability for purposes of saving provision for statute of limitations. M.C.L.A. § 600.5851(1, 2).

[2] ☑ KeyCite Citing References for this Headnote

241 Limitation of Actions
    241II Computation of Period of Limitation
        241II(C) Personal Disabilities and Privileges
            241k74 Insanity or Other Incompetency
                241k74(2) k. Removal of Disability. Most Cited Cases

Period of limitations did not begin to run against insane person upon appointment of guardian, and thus, filing of guardian's complaint on behalf of her mentally incompetent daughter alleging negligence was timely although brought approximately 20 months after appointment of guardian. M.C.L.A. § 600.5851(1, 2).

**609 *10** Sommers, Schwartz, Silver & Schwartz, P.C. by *11 Stanley S. Schwartz, Norman D. Tucker and Richard D. Fox, Southfield, for plaintiff-appellant.

Neal & Lengauer by Stephen Zahs, Flint, for defendant-appellee.

# Before R.B. BURNS, P.J., and WALSH and MARUTIAK, FN* JJ.

FN* Peter J. Marutiak, 35th Judicial Circuit Judge, sitting on Court of Appeals by assignment pursuant to Const. 1963, Art. 6, Sec. 23, as amended 1968.

## WALSH, Judge.

Plaintiff, Martha Paavola, guardian of the estate of Karen Rae Paavola, a mentally incompetent person, appeals entry of accelerated judgment for defendant Saint Joseph**610 Hospital Corporation. The trial court ruled that plaintiff's suit was barred by the statute of limitations. GCR 1963, 116.1(5).

Plaintiff's daughter and ward, Karen Rae Paavola, was given medical treatment at defendant hospital in 1973. During a September 15, 1973, operation, plaintiff's daughter went into cardiac arrest, was deprived of oxygen for a matter of minutes, and apparently suffered permanent brain damage which rendered her mentally incompetent.

Plaintiff was appointed her daughter's guardian on June 19, 1979. In that capacity she filed suit against defendant hospital on February 25, 1981, alleging that her daughter's mental incompetence was caused in 1973 by defendant's negligence. Defendant filed a motion for accelerated judgment on the ground that the suit was barred by the running of the period of limitation. The trial court agreed, ruling that suit could have been brought by plaintiff only within one year of her appointment as guardian of her daughter. Because suit was brought approximately 20 months after the *12 appointment, accelerated judgment was entered for defendant. We reverse.

At issue is interpretation of the following statutory saving provision:

"If the person first entitled to make an entry or bring an action is under 18 years of age, insane or imprisoned at the time his claim accrues, he or those claiming under him shall have one year after his disability is removed through death or otherwise, to make the entry or bring the action although the period of limitations has run * * *." M.C.L. § 600.5851(1); M.S.A. § 27A.5851(1). FN1

FN1. The statute further provides:"The term insane as employed in this chapter means a condition of mental derangement such as to prevent the sufferer from comprehending rights he is otherwise bound to know and is not dependent on whether or not the person has been judicially declared to be insane."

M.C.L. § 600.5851(2); M.S.A. § 27A.5851(2).

That Karen Rae Paavola is insane for purposes of this statute is not disputed.

The question presented is whether Karen Rae Paavola's disability was removed by the appointment of her mother as her guardian. The trial court ruled that it was and that the one year statutory grace period began to run at the time of that appointment. We disagree.

In *Keating v. Michigan Central R. Co.*, 94 Mich. 219, 53 N.W. 1053 (1892), the Supreme Court held that, for purposes of the statutory saving provision, the disability of a minor is not removed until he or she attains the age of majority. The Court rejected the defendant's claim that the term "disability" means disability to bring suit, and ruled that the appointment of a guardian for a minor does not start the running of the period of limitation against the minor. This ruling was reaffirmed in *Klosky v. Dick*, 359 Mich. 615, 103 N.W.2d 618 (1960). Cf. *Smith v. Bordelove*, 63 Mich.App. 384, 234 N.W.2d 535 (1975), lv. den. 395 Mich. 772 (1975).

*13 Defendant argues that the disabilities of infancy and insanity should be treated differently for purposes of resolution of the issue presented in this case. The statute, however, makes no pertinent distinction between these two disabilities and we are not persuaded that such distinction is warranted. See *Whalen v. Certain-Teed Products Corp.*, 108 Ga.App. 686, 134 S.E.2d 528 (1963).

In jurisdictions where this issue has been addressed, it has generally been held that, absent contrary statutory authority, the appointment of a guardian for a mentally incompetent person does not have the effect of starting the running of a period of limitation tolled by virtue of the disability of mental incompetence. *Emerson v. Southern R. Co.*, 404 So.2d 576 (Ala.1981), *Zini v. First National Bank in Little Rock*, 228 Ark. 325, 307 S.W.2d 874 (1957), *Shambegian v. United States*, 14 F.Supp. 93 (D.R.I., 1936), *Johnson v. United States*, 87 F.2d 940, 942 (CA 8, 1937) (" * * * it has been generally held under such statutes that the insane person may maintain an action by his guardian at any time during the continuance of his disability"), *Wolf v. United States*, 10 F.Supp. 899, 900 (S.D.N.Y., 1935):

**611 "Where there is a statute to the effect that a suit on a cause of action accruing to an infant or insane person may be brought within a specified time after removal of the disability, it is generally held that the appointment of a guardian or committee is not a removal of the disability in the sense that it starts the running of the time limitation. The saving clause is held to cover the time of continuance of infancy or insanity. *Funk v. Wingert*, 134 Md. 523, 107 A. 345, 6 A.L.R. 1986; *Monroe v. Simmons*, 86 Ga. 344, 12 S.E. 643; *Hervey v. Rawson*, 164 Mass. 501, 41 N.E. 682; *Keating v. Michigan Central R. Co.*, 94 Mich. 219, 53 N.W. 1053; *Finney v. Speed*, 71 Miss. 32, 14 So. 465; *14 Bourne v. Hall*, 10 R.I. 139. The view is taken that the Legislature had in mind, not merely the inability to sue, but also the difficulties of the incompetent in giving information and in testifying. *Funk v. Wingert, supra* ."

See Anno: *Appointment of Guardian for Incompetent or for Infant as Affecting Running of Statute of Limitations Against Ward*, 86 A.L.R.2d 965. [FN2]

FN2. *Emery v. Chesapeake & O.R. Co.*, 372 Mich. 663, 127 N.W.2d 826 (1964), and *Geisland v. Csutoras*, 78 Mich.App. 624, 261 N.W.2d 537 (1977), involved suits brought by guardians on behalf of mentally incompetent plaintiffs. In discussing whether the period of limitation had run against the plaintiffs, the appellate courts focused solely on the issue of the mental condition of the plaintiffs. While the issue of the effect of the appointment of guardians was not presented, it is clear that the appointments played no

part in the courts' resolution of the statute of limitations questions.

[1] ☑ [2] ☑ Nothing in Michigan's statute suggests legislative intent that an insane person's exemption from the running of periods of limitation is to end upon appointment of a guardian for him or her. We adopt the view generally held in other jurisdictions and hold that the appointment of a guardian for an insane person does not constitute removal of the insane person's disability for purposes of M.C.L. § 600.5851(1). Periods of limitations, therefore, do not begin to run against insane persons upon such appointment. The filing of plaintiff's complaint on behalf of her mentally incompetent daughter was, therefore, timely.

Defendant urges that our holding effects the "impalatable result" that the guardian of a mentally incompetent person may bring suit on the ward's behalf during the entire period of mental incompetency-a period potentially many decades long. In our judgment, however, a contrary holding would constitute unjustifiable tampering with the significant public policy clearly reflected in M.C.L. § *15 600.5851(1) the protection and preservation of the substantive rights of mentally incompetent persons.

Reversed. Costs to plaintiff.

Mich.App.,1982.
Paavola v. Saint Joseph Hosp. Corp.
119 Mich.App. 10, 325 N.W.2d 609

END OF DOCUMENT

Exhibit - 20

Court of Appeals of Michigan.

# Farmer ASHER and Lucy Marie Asher, his wife, Plaintiffs-Appellants,

## v.

# EXXON COMPANY, U.S.A., a Division of Exxon Corporation, a Foreign Corporation, Defendant-Appellee,

## and

# Product-Sol, Inc., a Michigan Corporation, U.S. Industrial Lubricants, Inc., a Foreign Corporation, Chemical Solvents Inc., a Foreign Corporation, 3M Company, a Foreign Corporation, Techno Adhesives Company, a Foreign Corporation, and Dubois Chemicals, Inc., Jointly and Severally, Defendants.

Docket No. 140366.
Submitted March 10, 1993, at Detroit.
Decided July 19, 1993, at 9:25 a.m.
Released for Publication Sept. 23, 1993.

Employee who was allegedly injured as result of his exposure to toxic chemical manufactured by defendant sued to recover on products liability theory, and the Circuit Court, Wayne County, John H. Gillis, Jr., J., granted manufacturer's motion for summary disposition on statute of limitations grounds. Employee appealed. The Court of Appeals, Holbrook, J., held that: (1) continuing-wrongful-acts doctrine did not toll period of limitations on employee's products liability action until date of employee's most recent exposure to chemical manufactured by defendant, and (2) employee failed to establish that he was suffering from any "mental derangement" such as would prevent limitations from running.

Affirmed.

## West Headnotes

[1] ☑ KeyCite Citing References for this Headnote

〰️241 Limitation of Actions
〰️241II Computation of Period of Limitation
〰️241II(A) Accrual of Right of Action or Defense

⌐241k55 Torts
⌐241k55(4) k. Injuries to Person. Most Cited Cases

Cause of action for damages arising out of tortious injury to person accrues, for limitations purposes, when all of the elements of cause of action have occurred and can be alleged in proper complaint.

[2] ☑ KeyCite Citing References for this Headnote

⌐241 Limitation of Actions
   ⌐241II Computation of Period of Limitation
     ⌐241II(F) Ignorance, Mistake, Trust, Fraud, and Concealment or Discovery of Cause of Action
       ⌐241k95 Ignorance of Cause of Action
         ⌐241k95(4) Injuries to the Person
           ⌐241k95(4.1) k. In General. Most Cited Cases

Products liability cause of action accrues when plaintiff knows or should have known of injury, and not at time of exposure to product or at time of diagnosable injury.

[3] ☑ KeyCite Citing References for this Headnote

⌐241 Limitation of Actions
   ⌐241II Computation of Period of Limitation
     ⌐241II(A) Accrual of Right of Action or Defense
       ⌐241k55 Torts
         ⌐241k55(6) k. Continuing Injury in General. Most Cited Cases

Continuing-wrongful-acts doctrine did not toll statute of limitations on products liability action arising out of employee's exposure to toxic chemicals in workplace until employee's most recent exposure to product manufactured by defendant, given employee's admission, at time he first developed symptoms of illness, that he believed his symptoms were caused by chemicals he used at work.

[4] ☑ KeyCite Citing References for this Headnote

⌐241 Limitation of Actions
   ⌐241II Computation of Period of Limitation
     ⌐241II(C) Personal Disabilities and Privileges
       ⌐241k74 Insanity or Other Incompetency
         ⌐241k74(1) k. In General. Most Cited Cases

Employee who allegedly experienced some memory loss and difficulty in finding his way around employer's plant as result of his exposure to chemical manufactured by defendant failed to establish that he was suffering from "mental derangement" such as would toll statute of limitations on his products liability action. M.C.L.A. § 600.5851.

[5] ☑ KeyCite Citing References for this Headnote

⌐241 Limitation of Actions
   ⌐241II Computation of Period of Limitation
     ⌐241II(C) Personal Disabilities and Privileges
       ⌐241k74 Insanity or Other Incompetency
         ⌐241k74(1) k. In General. Most Cited Cases

Mere fact that employee was able to work was not dispositive of whether he was suffering from any "mental derangement" such as would toll statute of limitations on his products liability action against chemical manufacturer. M.C.L.A. § 600.5851.

*636 **728 Mark Granzotto, Detroit and Jerome G. Quinn, Bloomfield Hills, for plaintiffs-appellants.

Dykema Gossett by Joseph C. Basta, Kathleen McCree Lewis, and Darleen Damall, Detroit, for defendant-appellee.

## **729 Before GRIBBS, P.J., and HOLBROOK, and NEFF, JJ.

### *637 HOLBROOK, Judge.

In this products liability case, the circuit court granted defendant Exxon Company, U.S.A., summary disposition under MCR 2.116(C)(7). Plaintiffs appeal as of right. We affirm.

Farmer Asher (plaintiff) worked for General Motors Corporation from February 10, 1966, to May 15, 1987. Plaintiff's work involved cleaning glue residue from the walls and floors of spray booths. During the course of plaintiff's employment at General Motors, he was exposed to various industrial adhesives and cleaning solvents manufactured and sold by Exxon Company, U.S.A. (defendant) and other defendants. Plaintiff used one of these products, "Fab cleaner," throughout his tenure at General Motors. Defendant's product, 587 Naphtha, was first sold to General Motors in July of 1985 for use as a component of Fab cleaner.

Plaintiff initially avoided going to a doctor because he did not want to be placed on sick leave and suffer reduced income. Dr. Jerry Walker first treated plaintiff in December of 1979 for chronic rhinitis, anxiety, boils, and breathing difficulty. Walker diagnosed that these conditions were caused by plaintiff's exposure to chemicals at his workplace.

During the 1980s, plaintiff began to experience memory loss, difficulty finding his way around the General Motors plant, and chronic lethargy. Plaintiff failed to heed Walker's advice to find a different job. In May of 1987, Walker declared plaintiff permanently disabled. Plaintiff and his wife filed their complaint on April 18, 1989.

Defendant moved for summary disposition under MCR 2.116(C)(7), arguing that plaintiffs' complaint was not filed within the period of limitation. The other defendants joined in defendant's motion. After plaintiffs had settled with all six other defendants, *638 the circuit court heard oral arguments regarding the motion. Defendant argued that plaintiff knew of his claim for several years by the time he began using Fab cleaner containing 587 Naphtha in July of 1985 because he knew from the onset of his first symptoms that the chemicals were a possible cause of his illness. Defendant argued that plaintiff had three years from the date of his first exposure to its product in July of 1985 to file timely his cause of action. Plaintiff responded that the complaint was filed timely because he was continuously subjected to defendant's tortious conduct through plaintiff's last day of employment with General Motors on May 15, 1987. Alternatively, plaintiff argued that the period of limitation had been tolled because he had been

suffering from mental derangement. The circuit court found that plaintiff was not mentally deranged because he was able to work and function. The circuit court then granted defendant summary disposition.

When reviewing a motion for summary disposition under MCR 2.116(C)(7), this Court accepts all well-pleaded allegations as true and construes them most favorably to the plaintiff. *Bonner v. Chicago Title Ins. Co.*, 194 Mich.App. 462, 469, 487 N.W.2d 807 (1992). If the pleadings show that a party is entitled to judgment as a matter of law, or if affidavits or other documentary evidence show that there is no genuine issue of material fact, the trial court must render judgment without delay. MCR 2.116(I)(1); *Nationwide Mutual Ins. Co. v. Quality Builders, Inc.*, 192 Mich.App. 643, 648, 482 N.W.2d 474 (1992). If no facts are in dispute, the court must decide as a matter of law whether the claim is statutorily barred. *Harris v. Allen Park*, 193 Mich.App. 103, 106, 483 N.W.2d 434 (1992).

It is undisputed that the period of limitation for **\*639** a products liability action is three years. M.C.L. § 600.5805(9); M.S.A. § 27A.5805(9). The issue ^FN1 presented in **\*\*730** this case is whether the continuing-wrongful-acts doctrine tolls the period of limitation in a products liability action until the time of the most recent exposure to the product.

FN1. In *Scott v. Monroe Co. Bd. of Road Comm'rs*, unpublished opinion per curiam of the Court of Appeals, decided November 8, 1989 (Docket Nos. 108566, 108567), lv. vacated 438 Mich. 869, 474 N.W.2d 592 (1991), this Court rejected the argument that the products liability statute of limitations began to run on the date of the plaintiff's last exposure to toxic substances in the workplace.

M.C.L. § 600.5827; M.S.A. § 27A.5827 provides:

Except as otherwise expressly provided, the period of limitations runs from the time the claim accrues....

[T]he claim accrues at the time the wrong upon which the claim is based was done regardless of the time when damage results.

[1] ☑A cause of action for damages arising out of tortious injury to a person accrues when all the elements of the cause of action have occurred and can be alleged in a proper complaint. *Connelly v. Paul Ruddy's Equipment Repair & Service Co.*, 388 Mich. 146, 150, 200 N.W.2d 70 (1972). Under the discovery rule, an action for products liability accrues when the plaintiff discovers or should have discovered a possible cause of action. *Bonney v. Upjohn Co.*, 129 Mich.App. 18, 35, 342 N.W.2d 551 (1983).

In *Defnet v. Detroit*, 327 Mich. 254, 258, 41 N.W.2d 539 (1950), our Supreme Court held that continuing wrongful acts occurring within the period of limitation prevent the accrual of an action in trespass. Since then, the continuing-wrongful-acts doctrine has been applied to other claims. See, e.g., *Moore v. Pontiac*, 143 Mich.App. 610, 614, 372 N.W.2d 627 (1985) (nuisance); **\*640** *Sumner v. Goodyear Tire & Rubber Co.*, 427 Mich. 505, 510, 398 N.W.2d 368 (1986) (civil rights). Plaintiffs argue that the continuing-wrongful-acts doctrine should apply to products liability actions for personal injury damages.

[2] ☑[3] ☑In *Larson v. Johns-Manville Sales Corp.*, 427 Mich. 301, 304-305, 399 N.W.2d 1 (1986), our Supreme Court held in part that a cause of action for asbestosis accrues in accordance with the

discovery rule rather than at the time of the exposure to asbestos or at the time of diagnosable injury. A products liability cause of action accrues at the time a person knows or should have known of the injury and not at the time of exposure to the product or at the time of diagnosable injury. *Stinnett v. Tool Chemical Co., Inc.*, 161 Mich.App. 467, 472-473, 411 N.W.2d 740 (1987), citing *Larson*. The Court in *Stinnett, supra* at 473, 411 N.W.2d 740, further held that the plaintiff's claim was barred by the statute of limitations because he failed to file his complaint within three years after he knew or should have known of the injury. Consequently, a cause of action for products liability accrues when the plaintiff discovers, or through the exercise of reasonable diligence should discover, an injury and its likely cause. *Mascarenas v. Union Carbide Corp.*, 196 Mich.App. 240, 244, 492 N.W.2d 512 (1992), citing *Moll v. Abbott Laboratories*, 192 Mich.App. 724, 731, 482 N.W.2d 197 (1992). Accordingly, we conclude that the accrual of a products liability action is determined by reference to the discovery rule. Thus, the continuing-wrongful-acts-doctrine does not toll the period of limitation in a products liability action until the most recent exposure to the product. Rather, the period of limitation in a products liability case begins to run when the plaintiff discovers, or through the exercise of reasonable **641* diligence should discover, an injury and its likely cause. At that time, all the elements of the cause of action have occurred and can be alleged in a proper complaint. *Connelly, supra.*

In this case, plaintiff admitted that at the time he first developed symptoms of illness in the late 1970s, he believed that his symptoms were caused by the chemicals he used at work. Plaintiff's first exposure to defendant's product occurred in July of 1985. Like in *Stinnett, supra*, and *Mascarenas, supra* at 246, 492 N.W.2d 512, the circuit court in this case could have relied on plaintiff's own statements to find his cause of action barred. We agree with defendant that plaintiff had three years from July of 1985 to file a claim. Because plaintiffs' complaint was filed after July of 1988, it was barred by the statute of limitations.

**731 [4] ☑ [5] ☑** We reject plaintiff's argument that the period of limitation had been tolled under M.C.L. § 600.5851; M.S.A. § 27A.5851 because he had been suffering from mental derangement. None of the documentary evidence submitted by plaintiffs to the circuit court show any controversy with respect to whether plaintiff was deranged at the time his claim accrued. *Makarow v. Volkswagen of America, Inc.*, 157 Mich.App. 401, 407, 403 N.W.2d 563 (1987). Although the circuit court erred in finding that plaintiff was not mentally deranged because he was able to work, see *Davidson v. Baker-Vander Veen Construction Co.*, 35 Mich.App. 293, 302-303, 192 N.W.2d 312 (1971), the evidence presents no genuine issue of material fact regarding plaintiff's sanity at the time his claim accrued. See also *Hooper v. Hill Lewis*, 191 Mich.App. 312, 316, 477 N.W.2d 114 (1991). Thus, the circuit court did not err in granting defendant summary disposition.

Affirmed.

Mich.App.,1993.
Asher v. Exxon Co., U.S.A.
200 Mich.App. 635, 504 N.W.2d 728, Prod.Liab.Rep. (CCH) P 13,710

END OF DOCUMENT

Exhibit - 21

.

M.C.L.A. 600.5855

Michigan Compiled Laws Annotated <u>Currentness</u>
Chapter 600. Revised Judicature Act of 1961 <u>(Refs & Annos)</u>
`▪Revised Judicature Act of 1961 <u>(Refs & Annos)</u>
`▪<u>Chapter 58</u>. Limitation of Actions <u>(Refs & Annos)</u>
➡**600.5855. Fraudulent concealment of claim or identity of person liable, discovery**


Sec. 5855. If a person who is or may be liable for any claim fraudulently conceals the existence of the claim or the identity of any person who is liable for the claim from the knowledge of the person entitled to sue on the claim, the action may be commenced at any time within 2 years after the person who is entitled to bring the action discovers, or should have discovered, the existence of the claim or the identity of the person who is liable for the claim, although the action would otherwise be barred by the period of limitations.

Exhibit - 22

United States District Court,
E.D. Michigan,
Southern Division.

# Michael D. McCRAY, Plaintiff,
## v.
# Marc MOORE, et al., Defendants.

No. 07-13297.
Sept. 9, 2008.

Michael McCray, Kincheloe, MI, pro se.

Steven M. Cabadas, MI Dept of Attorney General, Lansing, MI, George M. Degrood, III, Thomas, Degrood, Southfield, MI, for Defendants.

## *ORDER ACCEPTING REPORT AND RECOMMENDATION*

## DENISE PAGE HOOD, District Judge.

## I. INTRODUCTION

*1 This matter is before the Court on Magistrate Michael Hluchaniuk's Report and Recommendation **[Docket No. 49, filed August 6, 2008]** recommending that Defendant's Motions for Judgment on the Pleadings **[Docket No. 19, filed September 28, 2008]** and Summary Judgment **[Docket No. 23, filed October 26, 2008]** be granted, and Plaintiff's Motion to Voluntarily Dismiss Certain Defendants **[Docket No. 29, filed March 20, 2008]** be denied as moot, and that this matter be dismissed in its entirety with prejudice. Plaintiff filed an objection to the Report and Recommendation **[Docket. No. 52, filed August 18, 2008]**, to which Defendants filed a Response **[Docket No. 53, filed August 21, 2008]**.

The only objection raised to the Magistrate Judge's Report and Recommendation is that Plaintiff alleges that the applicable statute of limitations should have been tolled due to fraudulent concealment of his cause of action by the Defendants. This Court has reviewed the remainder of the Magistrate Judge's Report and Recommendation, and ACCEPTS and ADOPTS all portions not relating to the issue of tolling the statute of limitations, and will discuss Plaintiff's objections below.

## II. STANDARD OF REVIEW

The standard of review to be employed by the Court when examining a Report and Recommendation is set forth in 28 U.S.C. § 636. This Court "shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1)(C). This Court "may accept, reject or modify, in whole or in part, the findings or recommendations made by the magistrate." *Id.*

## III. ANALYSIS

Plaintiff asserts that the Magistrate Judge committed error by failing to find that the applicable statute of limitations should be **tolled** because of the alleged fraudulent **concealment** of his cause of action by the Defendants. To successfully advance a claim of fraudulent **concealment** as a basis for avoiding the limitations bar, Plaintiff must demonstrate that:

1) defendants wrongfully **concealed** the existence of the cause of action;

2) plaintiff failed to discover operative **facts**, within the **limitation period**, that are the basis of the cause of action; and

3) plaintiff exercised due diligence to discover those **facts**.

_Hill v. United States Dept. Of Labor_, 65 F.3d 1331, 1335 (6th Cir.1995).

Plaintiff has not produced new evidence substantiating his contention, nor does he satisfy the three elements needed to advance a theory of fraudulent concealment. Nowhere within his objections does Plaintiff explain how or when he actually discovered his claim, nor what new operative facts or information were obtained after the limitation period expired. In fact, as the Magistrate Judge notes on page 22 of his Report and Recommendation, the information that Plaintiff contends was concealed from him was used by him and his lawyer in reaching the plea agreement for his underlying criminal proceedings on June 11, 2003. Plaintiff has failed to show that he has exercised due diligence in discovering the facts.

## IV. CONCLUSION

*2 The Court fully adopts Magistrate Judge Michael Hluchaniuk's Report and Recommendation.

Accordingly,

IT IS ORDERED that the Report and Recommendation of Magistrate Judge Michael Hluchaniuk **[Docket No. 49, filed August 6, 2008]** is ACCEPTED and ADOPTED as this Court's finding and conclusions of law.

IT IS FURTHER ORDERED that Defendant's Motion for Judgment on the Pleadings **[Docket No. 19, filed September 28, 2008]** is GRANTED

IT IS FURTHER ORDERED that Defendant's Motion for Summary Judgment **[Docket No. 23, filed October 26, 2008]** is GRANTED.

IT IS FURTHER ORDERED that Plaintiff's Motion to Voluntarily Dismiss Certain Defendants **[Docket No. 29, filed March 20, 2008]** is MOOT.

IT IS FURTHER ORDERED that this case is DISMISSED with prejudice.

## *REPORT AND RECOMMENDATION ON DEFENDANTS' MOTION FOR JUDGMENT ON PLEADINGS, DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, AND PLAINTIFF'S MOTION FOR VOLUNTARY DISMISSAL*

## MICHAEL HLUCHANIUK, United States Magistrate Judge.

## I. PROCEDURAL HISTORY

Plaintiff, Michael McCray is a prisoner in the custody of the State of Michigan. (Dkt.1). Pursuant to *42 U.S.C. § 1983*, plaintiff filed a complaint against defendants on August 8, 2007, alleging that they violated his constitutional rights. *Id.* Plaintiff sought to proceed under the provisions of 28 U.S.C. § 1915(a), which allows a party to file a complaint without payment of customary court fees. (Dkt.2). On August 8, 2007, plaintiff's application to proceed in *forma pauperis* was granted. (Dkt.5). District Judge Denise Page Hood referred this matter to Magistrate Judge Mona K. Majzoub for all pre-trial matters on August 21, 2007. (Dkt.7). On January 14, 2008, this matter was reassigned to the undersigned. (Dkt.26).

Defendant Moore (a Michigan State Trooper) filed an answer to the complaint on September 17, 2007. (Dkt.12). Defendants Birdwell, Adams, and the City of Adrian (Adrian defendants) filed a motion for judgment on the pleadings on September 28, 2007. (Dkt.18). The remaining defendants [FN1] filed an answer on September 25, 2007 and a motion for summary judgment on October 26, 2007. (Dkt.16,23). Plaintiff moved for additional time to respond to the motion for judgment on the pleadings, which was denied by Magistrate Judge Majzoub on November 7, 2007. (Dkt.21, 25). Instead of responding to the motion for judgment on the pleadings or the motion for summary judgment, plaintiff filed a motion to amend the complaint and a motion to "voluntarily" dismiss certain defendants. (Dkt.29, 30). Plaintiff did not file a response to the motion for judgment on the pleadings so, on April 16, 2008, the Court directed plaintiff to file a response by May 12, 2008. (Dkt.43). Plaintiff has not filed a response. The Court also directed plaintiff to respond to the motion for summary judgment by March 28, 2008. (Dkt.27). Plaintiff has not responded to this motion either.

FN1. These defendants are Magistrate Tina Todd, Circuit Court Judge William Lavoy, an unidentified "District Judge," the County of Monroe, the County of Lenawee, the Monroe County Prosecutor's Office, prosecuting attorney Weipert, prosecuting attorney Swinkey (County defendants), the Monroe County Sheriff's Department, Detective Corie, Deputy Gore, and Chief Tilman Crutchfield (Sheriff's Department defendants). In his motion to voluntarily dismiss certain defendants, plaintiff expresses his willingness to dismiss all of the County defendants, but not the Sheriff's Department defendants. (Dkt.29).

On March 25, 2008, the Court directed defendants to respond to plaintiff's motions. (Dkt.32). The Adrian defendants filed responses on April 8, 2008. (Dkt.40, 41). Defendant Moore filed a response to the motion to amend on April 9, 2008. (Dkt.42). The County defendants and the Sheriff's Department

defendants filed a response to the motion to amend on May 6, 2008. (Dkt.44). Plaintiff filed replies on May 12, 2008. (Dkt.46, 47). Plaintiff also filed an affidavit on May 27, 2008. (Dkt.48).

*3 For the reasons for forth below, the undersigned **RECOMMENDS** that defendants' motions for judgment on the pleadings and for summary judgment be **GRANTED,**[FN2] that plaintiff's motion to voluntarily dismiss certain defendants be **DENIED** as **MOOT,** and that plaintiff's complaint be **DISMISSED** in their entirety **WITH PREJUDICE.**

FN2. While defendant Moore has not filed a dispositive motion, plaintiff's claims against him should be dismissed with prejudice for the same reasons as the remaining defendants and as he describes in his response to plaintiff's motion for leave to amend the complaint, discussed herein.

## II. STATEMENT OF FACTS

### A. *Plaintiff's Complaint and Proposed Amended Complaint*

Plaintiff's claims arise from an incident that occurred on April 10, 2003. (Dkt.1, p. 3). Plaintiff alleges that he was pulled over on M-50 in Dundee, Michigan while "out on a bond stipulation." *Id.* Plaintiff claims that he was not permitted to leave Lenawee County unless his girlfriend was with him. *Id.* While he was driving to Detroit with his girlfriend in the vehicle, he was pulled over by defendant Moore (a Michigan State Trooper). *Id.* at 4. He claims that defendant Moore did not have probable cause to pull him over and that, when he stopped, "more unknown Officer's [sic] came to the scene with guns out screaming to get out of the car...." *Id.* Plaintiff claims that defendant Moore assaulted him and searched his car without his consent. *Id.* at 4-5. After he was handcuffed, plaintiff claims that defendant Moore sexually assaulted him while the other officers watched. *Id.* at 5. Plaintiff also claims that the Sheriff's Department defendants falsely arrested him, unlawfully imprisoned him, and that the County defendants prosecuted him maliciously. *Id.* at 11. Finally, plaintiff claims that his prosecution and imprisonment were a "fraud upon the court." *Id.* at 12-13.

While his complaint is not a model of clarity, plaintiff appears to assert the following claims: (1) that one or more "police officers" arrested him without a warrant, probable cause or exigent circumstances; (2) that one or more "police officers" assaulted him; (3) and one or more "police officers" stood idly while plaintiff was assaulted; (4) that one or more of the defendants falsely arrested plaintiff; (5) plaintiff claims that the Adrian defendants and the County defendants failed to adequately train, supervise, or discipline the officers and that, pursuant to a policy, practice or custom, they were deliberately indifferent to or encouraged the harm caused by the officers; (6) that the County of Monroe, the City of Monroe, the County of Lenawee, and the City of Adrian are vicariously liable for acts of the officers, prosecutors, and judges; (7) the defendant officers falsely arrested and falsely imprisoned him; (8) that two or more County and City defendants allowed a "fraud in the court" and "schemed to retaliate"; (9) that two or more defendants allowed a malicious prosecution against him; (10) all defendants conspired to deprive him of his constitutional rights; and (11) all defendants caused him to be falsely arrested and imprisoned. While their alleged levels of participation vary, as does whether the claims are based on vicarious liability, a fair reading of plaintiff s complaint places his claims against defendants into the following categories: (1) excessive force and assault and battery (and a pattern or practice of same); (2) false imprisonment; (3) false arrest; and (4) malicious prosecution, which appears to encompass the allegations of a "fraud on the court." (Dkt.1). Plaintiff's complaint, in an effort to be as broad as possible, appears to allege, at one point or another, all categories of claims against all defendants. However, a review plaintiff's proposed amended complaint seems to clarify which claims he is pursuing against which defendants.

**\*4** In his proposed amended complaint, plaintiff only makes claims against the various police officers and police agencies. Plaintiff's complaint also includes only those claims arising from the alleged use of excessive force, including an alleged failure to train officers to use force properly, an alleged failure to assist plaintiff during the arrest, and an alleged failure to notify supervisory personnel that plaintiff was assaulted. (Dkt.1, 28). Reading the initial complaint in conjunction with the proposed amended complaint, plaintiff appears to assert the excessive force claims against the Sheriff's Department defendants and the Adrian defendants only, as these are the only defendants and the only claims that remain in the proposed amended complaint. Thus, it also appears that plaintiff's claims for false arrest, false imprisonment, and malicious prosecution were brought against some or all of the County defendants as he omits these claims from his proposed amended complaint and seeks to voluntarily dismiss these defendants. (Dkt.28, 29). Given the undersigned's conclusion that it would be futile for plaintiff to amend his complaint, all claims contained in the initial complaint are addressed.

## B. *Motion for Judgment on the Pleadings*

The Adrian defendants move for judgment on the pleadings, asserting that the statute of limitations governing plaintiff's claims expired before he filed suit in federal court. (Dkt.19). The Adrian defendants assert that there can be no dispute that plaintiff's causes of action arose on April 10, 2003, when he was arrested. *Id.* at 2. Under *42 U.S.C. § 1983* and applicable Michigan law, the three-year limitations period began running on that date. Thus, the statute of limitations expired on April 10, 2006. *Id.* Given that plaintiff did not file this action until August 10, 2007, more than one year after the expiration of the statute of limitations, according to the Adrian defendants, his claims are time-barred. *Id.*

## C. *Motion for Summary Judgment*

The County defendants and the Sheriff's Department defendants filed a motion for summary judgment on all of plaintiff s claims, also based on the statute of limitations. (Dkt.23). They point out that plaintiff's complaint falsely states that the underlying criminal prosecution ended in his favor. Indeed, plaintiff is serving a sentence on charges to which he pleaded guilty, arising from the events of April 10, 2003. *Id.* at 1. The County defendants and Sheriff's Department defendants also give a detailed statement of facts regarding the events of April 10, 2003. On April 10, 2003, the state police "OMNI team" [FN3] received information that plaintiff would be traveling from Adrian to Monroe, Michigan with a quantity of powder cocaine. *Id.* A separate OMNI team advised that plaintiff "was under house arrest and was not to leave Lenawee County due to a court-ordered bond condition, pursuant to a pending sentence for narcotics." *Id.* The state police then surveilled plaintiff's home and observed him leaving his residence and traveling into Monroe County. *Id.* A traffic stop was then effectuated and, according to the officers, plaintiff admitted to transporting the cocaine with intent to sell and giving it to his girlfriend. *Id.*; Ex. A. The County defendants and the Sheriff's Department defendants submitted the register of actions from the state court criminal proceeding, which reflects that, during his pretrial hearing held on July 2, 2004, plaintiff pleaded guilty of possession with intent to deliver a controlled substance, as well as to habitual offender, fourth. *Id.*; Ex. B.

FN3. Community leaders and law enforcement agencies in Hillsdale and Lenawee Counties partnered with the Michigan State Police and federal agencies to establish the Office of Monroe Narcotics Investigation (OMNI). OMNI is a multijurisdictional team with the common goal of removing drug dealers from the streets. *See,* http://www.michigan.gov/documents/OMNI-III_131198_7.pdf.

**\*5** The County defendants and Sheriff's Department defendants, like the Adrian defendants, argue that plaintiff's § 1983 claims are governed by the three-year Michigan personal injury statute of limitations.

*Id.* at 3, citing, *Banks v. City of Whitehall, 344 F.3d 550, 553 (6th Cir.2003); Wolfe v. Perry, 412 F.3d 707 (6th Cir.2005).* They also point out that, under Michigan law, claims of malicious prosecution, assault, battery, and false imprisonment are subject to a two-year statute of limitations. *Id.* at 2. Defendants argue that, even under the three-year limitations period, plaintiff's claims for malicious prosecution and false imprisonment are time-barred. They would have accrued, at the latest, on July 2, 2004 when he pleaded guilty and thus, the limitations expired, at the latest, on July 2, 2007. *Id.* at 2-3. Given that plaintiff filed this action on August 10, 2007, his claims are time-barred. *Id.* at 3.

# D. *Motion for Leave to File Amended Complaint*[FN4]

FN4. Plaintiff's motion for leave to amend will be denied via separate order, given that it is a non-dispositive motion and a report and recommendation is unnecessary. For all the same reasons that the undersigned recommends dismissing plaintiff's claims with prejudice, the motion to amend so too will be denied. This motion is discussed at length herein, given that it is essentially plaintiff's response to defendants' dispositive motions.

Rather than responding to defendants' dispositive motions, plaintiff filed a motion to amend his complaint and a proposed amended complaint. (Dkt.30, 28). Plaintiff argues that, as a pro se litigant, he was unaware that he had to state in his complaint why he could not have brought his claims within the applicable statute of limitations and sets forth those reasons in his proposed amended complaint. (Dkt.30, pp. 1-2). In his proposed amended complaint, plaintiff claims that, while he spent 10 months in jail awaiting disposition of the criminal charges against him, he made several attempts to obtain the names of the unknown officers who were at the scene of his arrest. (Dkt.28, p. 6, ¶ 39). He states that these requests were made to the various police agencies involved and he received no response to his requests. *Id.* Plaintiff also alleges in his proposed amended complaint that, after he was transported to the prison, he again attempted to obtain the names of the unknown officers, but no one responded to his requests. *Id.* at ¶ 40.

The Adrian defendants oppose plaintiff's motion to amend, arguing that plaintiff has not shown any basis for tolling the limitations period. (Dkt.41). Defendants argue that, while the applicable statute of limitations is determined under state law, when the limitation period begins to run is governed by federal law. *Id.* at 2, citing, *Ruff v. Runyon, 258 F.3d 498 (6th Cir.2001); Wilson v. Garcia, 471 U.S. 261, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985).* And, according to defendants, under federal law, the statute of limitations begins to run when plaintiff knew or should have known about the injury that forms the basis of the claims. *Id.,* citing, *Friedman v. Estate of Presser, 929 F.2d 1151, 1159 (6th Cir.1991).* The focus of this inquiry is whether a "plaintiff has reason to know of his injury when he should have discovered it through the exercise of reasonable diligence." *Sevier v. Turner, 742 F.2d 262, 273 (6th Cir.1984).* The Adrian defendants argue that plaintiff fails to allege or show that he did not know (and should have known) of his alleged injuries at the time they occurred or that he did know (and should have known) the identity of the officers involved in his arrest. (Dkt.41, p. 3).

*6 Defendants suggest that plaintiff's claim is really an attempt to establish "fraudulent **concealment**," which, under limited circumstances, can operate to **toll the limitations period** where (1) a defendant wrongfully **conceals** their actions, (2) a plaintiff fails to discover the operative **facts** that are the basis of his cause of action within the **limitations period**, and (3) the plaintiff exercised due diligence until he discovered the **facts**. *Id.* at 3, citing, *Friedman, supra.* The Adrian defendants argue that plaintiff fails to even identify any act or wrong that was **concealed** by them. Further, plaintiff does not even state that he failed to discover his cause of action within the **limitations period** (or state when he actually discovered his claims) and fails to offer any evidence of due diligence. (Dkt.41, p. 4). The Adrian defendants assert that, clearly, plaintiff had actual knowledge of the **facts** underpinning his claims on the day he was

arrested; or, at the very latest, when the information and witness list were filed in the underlying criminal proceeding on June 11, 2003. *Id.* at 4, 8; Ex. B. The Adrian defendants point out that the information plaintiff now claims was "concealed" was obviously used by him and his lawyer in reach the plea agreement. *Id.* at 9.

Defendant Moore filed a response to plaintiff's motion for leave to amend on April 9, 2008. (Dkt.42). Defendant Moore's argument is twofold. First, he too suggests that plaintiff's motion for leave to amend would be futile because his claims are barred by the statute of limitations. *Id.* at 5. Defendant Moore's argument is substantially similar to the Adrian defendants' position on this issue and need not be repeated here.[FN5] Second, defendant Moore suggests that leave to amend is futile because, pursuant to *Heck v. Humphrey, 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994)*, plaintiff's claims are barred by *res judicata* where he pleaded guilty to the underlying criminal charges from which his civil claims arose. *Id.* Defendant Moore explains that, throughout the complaint, plaintiff makes assertions that "call into question the validity of his plea based conviction." *Id.* at 8. For example, plaintiff challenges whether the police had probable cause to stop his car and he questions the validity of the seizure of cocaine. *Id.* According to defendant Moore, this is "precisely the type of challenge that is prohibited" under *Heck v. Humphrey. Id.* Plaintiff pleaded guilty to possession with intent to deliver; because he had no criminal appeal, "he is now attempting to use this § 1983 claim to collaterally attack the factual circumstances of his conviction for money damages." *Id.* According to defendant Moore, since plaintiff's claims "factually relate to the validity of plaintiff s conviction and confinement, his claim is legally barred." *Id.* Stated differently, where success in a civil suit "would implicitly question the validity of conviction or duration of sentence, a litigant must first achieve favorable termination of his available state or federal habeas opportunities to challenge the underlying conviction or sentence." *Id.* at 8-9, quoting, *Muhammad v. Close, 540 U.S. 749, 750, 124 S.Ct. 1303, 158 L.Ed.2d 32 (2004)*.

FN5. The County defendants and the Sheriff's Department defendants joined in their co-defendants' responses to plaintiff's motion to amend on May 6, 2008, but do not offer any additional substantive argument. (Dkt.44).

*7 Defendant Moore also argues that plaintiff's state law tort claims are barred for the same reasons. In *Moore v. Michigan Nat. Bank, 368 Mich. 71, 73-74, 117 N.W.2d (1962)*, the Michigan Supreme Court held that a conviction, unless procured by fraud or unfair means, is conclusive evidence of probable cause. (Dkt.42, p. 9). In *Moore*, the court dismissed the plaintiff's malicious prosecution claim because the plaintiff's guilty plea rendered it factually impossible for him to demonstrate that probable cause was lacking. (Dkt.42, p. 9). Thus, defendant Moore suggests that plaintiff's proposed amendment is entirely futile and should be denied.

Plaintiff filed reply briefs in support of his motion for leave to amend on May 12, 2008. (Dkt.46, 47). In his first reply, he argues that his proposed amended complaint sets forth sufficient facts to establish that the statute of limitations should be tolled given that he was "prevented from discovery the merits of his claim or the identity of those officers involved, in order to bring his claim before now." (Dkt.46, p. 2). Further, plaintiff claims that he still does "not know the identities of all the police officers who were involved in ... his April 10, 2003 arrest." *Id.* at 3, 117 N.W.2d 105. Plaintiff also suggests that he exercised due diligence by sending letters to the various police departments. *Id.*

In his second reply, plaintiff addresses defendant Moore's argument that his claims are barred by *Heck v. Humphrey*. (Dkt.47). He argues that the grant of relief in his proposed amended complaint will not invalidate his conviction and argues that the success of an excessive force claim does not rest on the overturning of a conviction. *Id.* at 2-3, citing, *Fox v. DeSoto, 489 F.3d 227 (6th Cir.2007)*.

In response to the Adrian defendants' challenge to provide documentation or testimonial evidence to support his claims that he exercised due diligence (Dkt.45), plaintiff also submitted an affidavit purporting to detail his efforts to obtain information regarding his causes of action. (Dkt.48). He claims to have sent two letters to the Adrian police department and two letters to the Monroe County Sheriff's Department and also claims that he did not receive any responses. *Id.* Plaintiff further explains that he did not know who the "Chief of the City of Adrian" was until reviewing the affidavit of Chief Collins. *Id.* Thus, according to plaintiff, he could not have brought suit any earlier and exercised due diligence in trying to learn the names of the defendants before the statute of limitations expired. (Dkt.46, 48).

## E. *Motion to Voluntarily Dismiss Certain Defendants*

As noted above, plaintiff filed a motion to "voluntarily" dismiss certain defendants. (Dkt.29). Plaintiff states no basis for his motion, but he purports to "hereby voluntarily dismiss," "without prejudice," Prosecutor Weipert, Prosecutor Unknown, Magistrate Tina Todd, Circuit Judge William L. Lavoy, Unknown Chief of City of Adrian, Prosecutor Swinkey, the Monroe County Prosecutor's office, District Judge Unknown, the County of Monroe, and the County of Lenawee. *Id.* The Adrian defendants responded to plaintiff's motion, indicating that they will stipulate to the dismissal of the "Chief of the City of Adrian" only if that stipulation is with prejudice. (Dkt.40). The remaining defendants have not filed a response to this motion. The undersigned notes that, pursuant to *Fed.R.Civ.P. 41(a)(2)*, after responsive pleadings are filed, voluntary dismissals must be obtained by leave of the Court unless all the parties who have appeared agree to the dismissal.

# III. DISCUSSION

## A. *Standard of Review*

*8 A defendant raising the statute of limitations as an affirmative defense has the burden of proving that the action is time-barred. *Campbell v. Grand Trunk W. R.R. Co., 238 F.3d 772, 775 (6th Cir.2001)*. To prevail on this affirmative defense, defendants must prove both that: (1) the statute of limitations has run; and (2) that no genuine issue of material fact exists as to when plaintiff's cause of action accrued. *Id.* If defendants meet this burden, the burden then shifts to plaintiff to establish an exception to the statute of limitations. *Id.* The nonmoving party may not rest on the mere allegations in the pleadings. *Id.* However, if defendants fail to meet their burden of proof, plaintiff has no obligation to proffer any additional evidence to rebut the statute of limitations defense. *Fonseca v. CONRAIL, 246 F.3d 585, 590-91 (6th Cir.2001)*.

The nature of plaintiff s burden with respect to establishing an exception depends on the exception at issue. This Court recently agreed with the Tenth Circuit that "for equitable tolling of the statute of limitations, the burden lies with the plaintiff; for [tolling based on] administrative exhaustion under *42 U.S.C. § 1997e*, the burden lies with the defendants." *Jones v. Richardson, 2008 WL 907383, *11 (E.D.Mich.2008)*, quoting, *Roberts v. Barreras, 484 F.3d 1236 (10th Cir.2007)*.

## B. *Statute of Limitations*

Statutes of limitation are established to extinguish rights, justifiable or not, that might otherwise be asserted. *Kavanagh v. Noble, 332 U.S. 535, 539, 68 S.Ct. 235, 92 L.Ed. 150 (1947)*. They are designed, among other things, to compel plaintiffs to exercise their rights of action within a reasonable time; to

protect potential defendants from the protracted fear of litigation; and to promote judicial efficiency by preventing defendants and courts from having to litigate stale claims. *Moll v. Abbott Labs., 444 Mich. 1, 14, 506 N.W.2d 816 (1993); see also, U.S. v. $515,060.42 in U.S. Currency, 152 F.3d 491, 503 (6th Cir.1998)*. As such, these statutory restrictions are not simply technicalities; rather, they are fundamental to a well-ordered judicial system. *Bd. of Regents of the Univ. of the State of N.Y. v. Tomanio, 446 U.S. 478, 487, 100 S.Ct. 1790, 64 L.Ed.2d 440 (1980)*.

Because Congress did not specifically adopt a statute of limitations governing § 1983 actions, "federal courts must borrow the statute of limitations governing personal injury actions in the state in which the section 1983 action was brought." *Banks v. City of Whitehall, 344 F.3d 550, 553 (6th Cir.2003)*, citing *Wilson v. Garcia, 471 U.S. 261, 275-276, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985)*. The Sixth Circuit has held that the "appropriate statute of limitations to be borrowed for § 1983 actions arising in Michigan is the state's three-year limitations period for personal injury claims." *Drake v. City of Detroit, Michigan, 266 Fed.Appx. 444, 448 (6th Cir.2008)*, citing, *Mich. Comp. Laws § 600.5805(10); Chippewa Trading Co. v. Cox, 365 F.3d 538, 543 (6th Cir.2004); see also, Owens v. Okure, 488 U.S. 235, 249-250, 109 S.Ct. 573, 102 L.Ed.2d 594 (1989)* (Where "state law provides multiple statutes of limitation for personal injury actions, courts considering § 1983 claims should borrow the general or residual statute for personal injury actions.").

*9 The characterization of a claim, including the determination of when the cause of action accrued, is determined by federal law. *Wallace v. Kato, —U.S. —, 127 S.Ct. 1091, 1095, 166 L.Ed.2d 973 (2007)*. The statute of limitations begins to run under federal law "when plaintiffs knew or should have known of the injury which forms the basis of their claims." *Ruff v. Runyon, 258 F.3d 498, 500 (6th Cir.2001)*. "In determining when the cause of action accrues in section 1983 actions, [courts] have looked to what event should have alerted the typical lay persons to protect his or her rights." *Kuhnle Bros., Inc. v. County of Geauga, 103 F.3d 516, 520 (6th Cir.1997)*.

# 1. Defendants have met their burden of proving that plaintiff's excessive force claim is barred by the statute of limitations.

"A § 1983 claim for excessive force in effectuating an arrest accrues at the time of arrest." *Fox, 489 F.3d at 233*, citing, *Wallace v. Kato, 127 S.Ct. at 1095*. When there are no disputed facts on this question, it is for the Court to decide. *See, Moll, 444 Mich., at 26, 506 N.W.2d 816* (Where the facts are undisputed, whether a cause of action is barred by the statute of limitations is a question of law to be determined by the trial judge.). There is no dispute that plaintiff's arrest occurred on April 10, 2003. April 10, 2003, therefore, sets the date from which any § 1983 excessive force claim accrued. There is also no dispute that plaintiff's complaint was not filed until August 8, 2007, well in excess of the three years prescribed by Michigan's statute of limitations. Thus, the undersigned concludes that plaintiff's excessive force claim is presumptively time-barred.

# 2. Plaintiff has failed to establish that tolling of his excessive force claim under the Michigan fraudulent concealment statute is appropriate.[FN6]

FN6. Plaintiff neither asserts that the statute of limitations should be tolled as to any of his other claims, including those based on any purported policy, pattern, or practice of any of defendants, nor does he claim that any policy, pattern, or practice based causes of actions accrued such that the statute of limitations had not already run when he filed his complaint.

Acknowledging that the **limitations period** expired before he filed suit, plaintiff argues, however, that the statute of limitations with respect to this excessive force claim should be **tolled** under Michigan's fraudulent **concealment** statute. For **1983** claims, the federal courts generally rely on state law for **tolling** rule, just as with the length of the appropriate **limitations period**. *Wallace, 127 S.Ct. at 1098*. Michigan law provides that the statute of limitations may be **tolled** where a defendant has **concealed** the **facts** giving rise to the cause of action:

If a person who is or may be liable for any claim fraudulently **conceals** the existence of the claim or the identity of any person who is liable for the claim from the knowledge of the person entitled to sue on the claim, the action may be commenced at any time within 2 years after the person who is entitled to bring the action discovers, or should have discovered, the existence of the claim or the identity of the person who is liable for the claim, although the action would otherwise be barred.

*Mich. Comp. Laws § 600.5855.* The acts constituting fraudulent **concealment** are "(1) wrongful **concealment** of their actions by the defendants; (2) failure of the plaintiff to discover the operative **facts** that are the basis of his cause of action within the **limitations period**; and (3) plaintiff's due diligence until discovery of the **facts**." *Evans v. Pearson Enterprises, Inc., 434 F.3d 839, 851 (6th Cir.2006)*, quoting, *Dayco Corp. v. Goodyear Tire & Rubber Co., 523 F.2d 389, 394 (6th Cir.1975)*.

*10 Plaintiff has neither alleged nor proven that equitable **tolling** is applicable with respect to his excessive force claim against defendant Moore. Thus, this claim remains time-barred as set forth above. With respect to his excessive force claims against the Adrian police department and the Monroe County Sheriff's Department, plaintiff asserts that he failed to discover the operative facts of his claim (i.e., the identity of all the alleged wrongdoers) based on the failure of these entities to respond to his inquiries. Even if true, plaintiff's claim for equitable tolling must fail for several reasons. As the Adrian defendants correctly point out, plaintiff fails to explain how or when he actually discovered his claim. That is, he offers no explanation or evidence regarding any newly discovered evidence or information obtained *after* the limitations period expired, which is required by § 600.5855. Indeed, it appears that plaintiff had exactly the same information in his possession on the day he was arrested as the day he filed suit. Additionally, plaintiff had access to the information and witness list that were filed in the underlying proceeding on June 11, 2003. (Dkt. 41, p. 8; Ex. B). The Court agrees with the Adrian defendants that the information plaintiff now claims was somehow "**concealed**" from him, was apparently used by him and his lawyer in reaching the plea agreement. *Id.* at 9. Further, failing to answer letters is not fraudulent **concealment**. Thus, plaintiff cannot establish either that defendants "wrongfully **concealed**" anything or that he "failed to discover his cause of action" before the expiration of the **limitations period**. With Michigan's equitable **tolling** provision unavailable, plaintiff's excessive force claim, as to all remaining defendants against whom this claim is asserted, is time-barred by the statute of limitations. *See, Hedges v. U.S., 404 F.3d 744, 751 (3d Cir 2005)* (equitable **tolling** is "an extraordinary remedy which should be extended only sparingly," and is unavailable unless the plaintiff exercised due diligence in pursuing his claims).

## 3. *Heck v. Humphrey* neither applies to, nor affects, the accrual of plaintiff's excessive force claim.

Plaintiff disputes defendant Moore's argument that *Heck* bars his claim for excessive force. Plaintiff is correct, however, this does not change the result reached above because the statute of limitations for the excessive force claim accrued on the date of plaintiff' s arrest and nothing has deferred that accrual. In *Wallace v. Kato*, the Supreme Court clarified that "the *Heck* rule for deferred accrual is called into play only when there exists 'a conviction or sentence that has not been ... invalidated,' that is to say, an 'outstanding criminal judgment.' " *Warner v. McMinn Co., 2007 WL 3020510 (E.D.Tenn.2007)*, quoting, *Wallace v. Kato, 127 S.Ct. at 1097-1098*. Thus, plaintiff is correct that *Heck* is not generally a bar to a § 1983 claim of excessive force, however, *Heck* also does not operate to toll the limitations period for such a claim because, as set forth above, a " § 1983 claim for excessive force in effectuating an arrest accrues

at the time of arrest." *Fox, 489 F.3d at 233*. Again, plaintiff's excessive force claim accrued on April 10, 2003 and expired on April 10, 2006, well before plaintiff filed this suit.

## 4. Plaintiff's false imprisonment and false arrest claims are barred by the statute of limitations and *Heck v. Humphrey* does not defer accrual of the applicable statute of limitations.

**\*11** In *Wallace v. Kato,* the Supreme Court analyzed when claims of false imprisonment and false arrest (which overlap) begin to accrue. The Court observed that, "[r]eflective of the fact that false imprisonment <sup>FN7</sup> consists of detention without legal process, a false imprisonment ends once the victim becomes held pursuant to such process-when, for example, he is bound over by a magistrate or arraigned on charges." *Wallace v. Kato, 127 S.Ct. at 1096*. After such legal process begins, "unlawful detention forms part of the damages for the 'entirely distinct' tort of malicious prosecution, which remedies detention accompanied, not by absence of legal process, but by wrongful institution of legal process." *Id.* The Court held that, for a claim for false arrest, "where the arrest is followed by criminal proceedings, [the statute of limitations] begins to run at the time the claimant becomes detained pursuant to legal process." *Id.* at 1100.

FN7. After noting the overlap between the two claims, the Court referred to them collectively as "false imprisonment" throughout much of its opinion. *Wallace, 127 S.Ct. at 1095.*

Based on this analysis, the Court rejected the petitioner's contention that his false imprisonment ended when he was released from custody. Rather, the Court concluded, his false imprisonment "ended much earlier, when legal process was initiated against him, and the statute [of limitations] would have begun to run from that date...." *Id; see also, Jones v. Whittaker, 2008 WL 2397716, \*3 (W.D.Ky.2008)* (The plaintiff's " § 1983 claim arises from his alleged false arrest and false imprisonment, both of which would have ended when the Plaintiff became held pursuant to legal process on ... the date of his arraignment.").

Here, plaintiff was arraigned on June 13, 2003. (Dkt.23, Ex. 2). Under *Wallace,* the statute of limitations for plaintiff's false imprisonment and false arrest claims began to accrue on that date. Thus, the limitations period expired on June 13, 2006, long before plaintiff filed this lawsuit on August 8, 2007. Plaintiff's claims for false imprisonment and false arrest are therefore time-barred.

Moreover, the delayed accrual rule for malicious prosecution set forth in *Heck v. Humphrey* does not apply to plaintiff's false arrest and false imprisonment claims. As the Sixth Circuit recently noted in *Fox,* the *Wallace* Court "rejected both the argument that the statute of limitations on a false arrest claim should begin only after 'an anticipated future conviction ... occurs and is set aside,' and that the statute of limitations on such a claim should be tolled until an anticipated future conviction is set aside." *Fox, 489 F.3d at 235,* quoting, *Wallace, 127 S.Ct. at 1098-1099* (internal citations omitted). Thus, "the possibility that the plaintiff's already-accrued § 1983 [false imprisonment] claims might impugn an anticipated future conviction did not trigger the *Heck* rule for deferred accrual." *Fox, 489 F.3d at 235.* Thus, there is no basis under *Heck v. Humphrey* for deferring the accrual of the three-year statute of limitations applicable to these claims.

## C. Plaintiff Fails to State a Claim for Malicious Prosecution Under § 1983 and Any State Law Claims Must Fail Because His Conviction Was Not Set Aside.

*12 Plaintiff's malicious prosecution claim is barred by *Heck v. Humphrey*. In *Heck*, the Supreme Court held that the plaintiff's post-conviction action under § 1983 for claims analogous to the tort of malicious prosecution (brought during the pendency of his state-court criminal appeal) would not accrue until a final adjudication in *Heck's* favor in state court, since the tort of malicious prosecution requires final adjudication in favor of the accused and any determination by the federal court regarding the legality of the prosecution would necessarily affect the validity of the state court proceedings. *Heck v. Humphrey, 512 U.S. at 480-487.* The Court held that a "claim for damages bearing that relationship to a conviction or sentence that has not been so invalidated is not cognizable under § 1983." *Id.* at 486-487. *Heck* stands for the "proposition that in order to bring a section 1983 suit challenging the constitutionality of a conviction, a plaintiff must prove that the conviction has been reversed on direct appeal or otherwise declared invalid." *Moore v. Hayes, 1998 WL 432474, *6 (6th Cir.1998).* In this case, therefore, plaintiff has simply failed to state a claim for malicious prosecution because he has not established that his conviction was set aside. To the extent that plaintiff asserts that his purported malicious prosecution resulted from some policy, pattern, or practice, that claim too must fail for the same reason. *See, e.g., Crespo v. New York City Police Comm'r, 930 F.Supp. 109, 117 (S.D.N.Y.1996)* (Claim that prosecution resulted from policy of perjury and falsification of documents did not accrue for limitations purposes until such time as the underlying criminal action against plaintiff was terminated in plaintiff's favor.).

Moreover, if plaintiff intended to assert state-law claims of false arrest, false imprisonment, or malicious prosecution, in addition to pursuing these theories as federal constitutional claims under § 1983, his conviction requires the dismissal of these state-law claims, for the same reasons set forth above. As defendant Moore pointed out, "[u]nder Michigan law, a plaintiff must demonstrate the absence of probable cause [to arrest] to prevail in claims of malicious prosecution, false arrest, or false imprisonment." *Bell v. Raby, 2000 WL 356354, *8, n. 13 (E.D.Mich.2000),* citing, *Moore v. Michigan Nat'l Bank, supra; Blase v. Appicelli, 195 Mich.App. 174, 489 N.W.2d 129, 131 (1992); Tope v. Howe, 179 Mich.App. 91, 445 N.W.2d 452, 459 (1989).* This is so because a criminal conviction is "conclusive proof of probable cause," which defeats these claims. *Bell,* at *8 n. 13, quoting, *Moore v. Michigan Nat'l Bank, 368 Mich. at 72, 117 N.W.2d 105.* Under Michigan law, this general rule also applies to convictions resulting from a guilty plea. *Blase, 195 Mich.App. at 178, 489 N.W.2d 129.* Thus, to the extent plaintiff asserts any such state law claims, they too should be dismissed.

## IV. RECOMMENDATION

*13 Based on the foregoing, the undersigned **RECOMMENDS** that defendants' motions for judgment on the pleadings and for summary judgment be **GRANTED**, that plaintiff's motion to voluntarily dismiss certain defendants be **DENIED** as **MOOT**, and that this matter be **DISMISSED** in its entirety **WITH PREJUDICE.**

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within 10 days of service of a copy hereof, as provided for in *28 U.S.C. § 636(b)(1)* and Local Rule 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); Howard v. Sec'y of Health and Human Servs., 932 F.2d 505 (6th Cir.1981).* Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Sec V. of Health and Human Servs., 931 F.2d 390, 401 (6th Cir.1991); Smith*

*v. Detroit Fed'n of Teachers Local 231, 829 F.2d 1370, 1373 (6th Cir. 1987).* Under Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Within 10 days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall not exceed 20 pages in length unless such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections by motion order. If the Court determines objections are without merit, it may rule without awaiting the response to the objections.

E.D.Mich.,2008.
McCray v. Moore
Not Reported in F.Supp.2d, 2008 WL 4225762 (E.D.Mich.)

Motions, Pleadings and Filings (Back to top)

• 2:07cv13297 (Docket) (Aug. 8, 2007)
END OF DOCUMENT

Exhibit - 23

Court of Appeals of Michigan.

# LUMBER VILLAGE, INC., a Michigan corporation, Plaintiff-Appellant,

## v.

# Thomas S. SIEGLER and Priscilla J. Siegler, Defendants, Third-Party Plaintiffs.

## and

# L.M. BEAMAN CORPORATION, a Michigan corporation, and Larry M. Beaman and Dorothy E. Beaman, jointly and severally, Defendants,

## v.

# BYRON CENTER STATE BANK, a Michigan corporation, Third-Party Defendant-Appellee.

## and

# ATLAS FARM & INDUSTRIAL BUILDING COMPANY, INC., a Michigan corporation, Plaintiff,

## v.

# Thomas and Priscilla SIEGLER, Defendants.

Docket No. 67887.
Submitted May 3, 1984.
Decided June 28, 1984.
Released for Publication Oct. 19, 1984.

Payee, who supplied materials for construction of pole barn, brought contract action against builder and sought to foreclose mechanic's lien on the property after drawee bank paid proceeds of checks from owner to builder which, as copayee, forged payee supplier's endorsements. Owners and payee filed third-party complaints against drawee bank. The Circuit Court, Kent County, Stuart Hoffius, J., granted bank's motion for accelerated judgment, and payee appealed. The Court of Appeals, Allen, J., held that: (1) due process clauses in State and Federal Constitutions did not mandate that statutory limitation period commence to run upon discovery of existence of the cause of action rather than at time the cause of action accrued; (2) there was no fraudulent concealment within meaning of limitations statute because there was no affirmative act or misrepresentation; (3) bank's mere silence was not sufficient to warrant invoking of equitable estoppel so as to preclude bank's pleading of statute of limitations; and (4) payee failed to plead a cause of action in fraud which was separate and apart from its untimely claim based on the forged instrument.

Affirmed.

# West Headnotes

**[1]** ☑ KeyCite Citing References for this Headnote

🗝 **30** Appeal and Error
  🗝 **30V** Presentation and Reservation in Lower Court of Grounds of Review
    🗝 **30V(A)** Issues and Questions in Lower Court
      🗝 **30k170** Nature or Subject-Matter of Issues or Questions
        🗝 **30k170(2)** k. Constitutional Questions. Most Cited Cases

General rule of law is that constitutional challenges to a statute may not be raised for first time on appeal.

**[2]** ☑ KeyCite Citing References for this Headnote

🗝 **92** Constitutional Law
  🗝 **92XXVII** Due Process
    🗝 **92XXVII(E)** Civil Actions and Proceedings
      🗝 **92k3971** k. Time for Proceedings; Limitation or Suspension of Remedy. Most Cited Cases
      (Formerly 92k308)

State and federal due process clauses did not mandate that statutory limitation period commenced to run upon discovery of existence of a cause of action rather than at time the cause of action accrued even where statutory period may have expired by time of discovery. U.S.C.A. Const.Amends. 5, 14.

**[3]** ☑ KeyCite Citing References for this Headnote

🗝 **241** Limitation of Actions
  🗝 **241II** Computation of Period of Limitation
    🗝 **241II(F)** Ignorance, Mistake, Trust, Fraud, and Concealment or Discovery of Cause of Action
      🗝 **241k104** Concealment of Cause of Action
        🗝 **241k104(1)** k. In General. Most Cited Cases

As a general rule, for fraudulent concealment to postpone running of period of limitation, the fraud must be manifested by an affirmative act or misrepresentation.

**[4]** ☑ KeyCite Citing References for this Headnote

🗝 **241** Limitation of Actions
  🗝 **241II** Computation of Period of Limitation
    🗝 **241II(F)** Ignorance, Mistake, Trust, Fraud, and Concealment or Discovery of Cause of Action
      🗝 **241k104** Concealment of Cause of Action
        🗝 **241k104(2)** k. What Constitutes Concealment. Most Cited Cases

Mere fact that payee was named as a payee on checks on which its endorsements were forged by copayee did not create fiduciary relationship between payee and drawee bank such as would require bank to disclose to payee existence of causes of action for the forged endorsements and, thus, there was

no fraudulent concealment which would postpone running of applicable period of limitation. M.C.L.A. § 600.5805.

[5] ☑ KeyCite Citing References for this Headnote

⤳241 Limitation of Actions
   ⇐241II Computation of Period of Limitation
      ⇐241II(F) Ignorance, Mistake, Trust, Fraud, and Concealment or Discovery of Cause of Action
         ⇐241k104 Concealment of Cause of Action
            ⤳241k104(2) k. What Constitutes Concealment. Most Cited Cases

As relating to fraudulent concealment for purposes of tolling running of statutory period of limitation, drawee bank had no duty to disclose to payee that checks made payable to payee and copayee were paid over forged endorsements. M.C.L.A. § 600.5805.

[6] ☑ KeyCite Citing References for this Headnote

⤳156 Estoppel
   ⤳156III Equitable Estoppel
      ⤳156III(A) Nature and Essentials in General
         ⤳156k54 k. Knowledge of Facts. Most Cited Cases

Special knowledge of the defendant may be a consideration in applying estoppel.

[7] ☑ KeyCite Citing References for this Headnote

⤳156 Estoppel
   ⤳156III Equitable Estoppel
      ⤳156III(B) Grounds of Estoppel
         ⤳156k95 k. Silence. Most Cited Cases

While silence or inaction, in certain situations, may invoke doctrine of estoppel, silence does not invoke the doctrine unless the party remaining silent has a duty or obligation to disclose.

[8] ☑ KeyCite Citing References for this Headnote

⤳241 Limitation of Actions
   ⤳241I Statutes of Limitation
      ⤳241I(A) Nature, Validity, and Construction in General
         ⤳241k13 k. Estoppel to Rely on Limitation. Most Cited Cases

Where drawee bank had no obligation to disclose to payee fact that payee's endorsements of two checks had been forged by copayee, bank's mere silence was not sufficient to warrant invoking of equitable estoppel so as to preclude bank's pleading of statute of limitations. M.C.L.A. § 600.5805.

[9] ☑ KeyCite Citing References for this Headnote

⤳52 Banks and Banking
   ⤳52III Functions and Dealings
      ⤳52III(C) Deposits
         ⤳52k147 Payment of Forged or Altered Paper
            ⤳52k148 Liabilities of Bank to Depositor, Payee, or Owner

⟜52k148(2) k. Liability of Bank Paying Check on Forged or Fraudulent Indorsement. <u>Most Cited Cases</u>

Drawee bank had no duty to disclose to payee fact that checks issued to it and copayee had been paid over forged endorsements and, consequently, payee would not be able to prevail upon silent fraud claim.

[10] ☑ <u>KeyCite Citing References for this Headnote</u>

⟜<u>184</u> Fraud
  ⟜<u>184I</u> Deception Constituting Fraud, and Liability Therefor
    ⟜<u>184k19</u> Reliance on Representations and Inducement to Act
      ⟜<u>184k20</u> k. In General. <u>Most Cited Cases</u>

In addition to duty to disclose, silent fraud requires a plaintiff to establish reliance.

[11] ☑ <u>KeyCite Citing References for this Headnote</u>

⟜<u>52</u> Banks and Banking
  ⟜<u>52III</u> Functions and Dealings
    ⟜<u>52III(C)</u> Deposits
      ⟜<u>52k147</u> Payment of Forged or Altered Paper
        ⟜<u>52k148</u> Liabilities of Bank to Depositor, Payee, or Owner
          ⟜<u>52k148(2)</u> k. Liability of Bank Paying Check on Forged or Fraudulent Indorsement. <u>Most Cited Cases</u>

Payee did not realistically rely on drawee bank's failure to disclose fact that checks had been paid over payee's endorsements which were forged by copayee and, thus, payee would not be able to prevail upon a silent fraud claim against bank.

**\*\*655 \*688** Carruthers & Halverson Associates by James G. Halverson, East Lansing, for plaintiff-appellant.

Freihofer, Oosterhouse & DeBoer, P.C. by Robert A. Buchanan and Clifford H. Bloom, Grand Rapids, for Byron Center State Bank.

## Before BEASLEY, P.J., and ALLEN and BREIGHNER,[FN*] JJ.

[FN*] Martin B. Breighner, 33rd Judicial Circuit Judge, sitting on Court of Appeals by assignment pursuant to <u>Const. 1963, Art. 6, Sec. 23</u>, as amended 1968.

## ALLEN, Judge.

Plaintiff, Lumber Village, Inc., appeals as of right from a September 22, 1982, order of accelerated judgment in favor of third-party defendant, Byron Center State Bank, pursuant to GCR **\*689** 1963, 116.1(5). Issue III raised on appeal is of first impression in Michigan.

In 1977, Thomas S. Siegler and his wife, Priscilla, undertook to have built for them a pole barn building for use in their horse stable operation business. For this purpose they employed Larry M. Beaman and L.M. Beaman Construction Corporation as the builder and secured financing for construction of the barn by a mortgage for $68,000 from the Byron Center State Bank. Plaintiff furnished building materials for the barn project, the bulk being delivered between September 27, 1977, and October 26, 1977, with smaller deliveries as late as January, 1978. Two money order checks totaling $30,250 were issued by the Byron Center State Bank to L.M. Beaman and Lumber Village, Inc. in September, 1977. The purpose of making the money orders payable to both parties was to avoid creation of a mechanics lien in favor of plaintiff.

The first check for $15,250 was dated September 22, 1977, and was picked up by Mr. Siegler, who gave the check to Beaman. Unbeknownst to either the bank or the Sieglers, and without the authorization of plaintiff, Beaman endorsed the name of plaintiff and deposited the check in his account at the Bank of Lansing on September 26, 1977. The second check, dated September 30, 1977, and in the amount of $15,000 was similarly endorsed by Beaman and deposited in his account on October 3, **656 1977. The first check was paid by Byron Center State Bank on September 27, 1977, and the second check was paid by the bank on October 5, 1977.

Plaintiff did not receive payment from Beaman and, in April, 1978, recorded a mechanic's lien on the Siegler property. Mr. Siegler first became aware that the checks had not been properly *690 negotiated when he was served with notice of the lien on April 12, 1978. Mr. Siegler immediately notified bank, and this appears to be the first time that the bank or Siegler became aware that the instruments had been paid over forged endorsements. In March, 1979, Lumber Village filed a contract action against Beaman and sought to foreclose the mechanic's lien on the Siegler property. After considerable difficulty, service was finally obtained on Beaman, and a default judgment against him was entered in May, 1980.

In February, 1981, an order was entered permitting the Sieglers to file a third-party complaint adding the Byron Center State Bank as an additional party-defendant. Though the bank and the Sieglers knew of the forgery and that Lumber Village was named as a payee on the money orders, this information had never been communicated to Lumber Village. The bank's failure to inform plaintiff of the forgery is the subject of the instant appeal. In March, 1981, the Sieglers filed a third-party complaint against the bank. This was the first time Lumber Village learned of the forgery. In April, 1981, the Sieglers filed bankruptcy, and the cause was removed to the United States Bankruptcy Court but was remanded July 28, 1981. In August, 1981, Lumber Village, Inc. moved for leave to file a third-party complaint against Byron Center State Bank, and, by stipulation and order, a third-party complaint against the bank was filed in December, 1981.

Third-party defendant bank pled the three-year statute of limitations for forged instruments, M.C.L. § 600.5805; M.S.A. § 27A.5805, as an affirmative defense and, on June 28, 1982, moved for accelerated judgment. In a written opinion dated September 22, 1982, the trial court made the following findings:

*691 1. For purposes of the motion, it was conceded that Lumber Village, Inc. did not become aware of the checks or the forgery until after the Sieglers filed their cross-complaint against the bank around April of 1981.

2. Based on *Continental Casualty Co. v. Huron Valley National Bank*, 85 Mich.App. 319, 271 N.W.2d 218 (1978), the three year statute of limitations applies to the alleged conversion and such statute began

to run in September-October 1977, when the checks were paid on a forged endorsement and not in March 1981 when the plaintiff discovered the conversion or forgery.

3. Estoppel from asserting the defense of the running of the statute of limitations is unavailable in Michigan.

4. Estoppel and/or fraudulent concealment sufficient to toll the running of the statute of limitations requires active misconduct or affirmative acts or misrepresentations and mere silence is inadequate.

5. A separate or independent cause of action for silent fraud or fraudulent concealment requires detrimental reliance and, since Lumber Village, Inc. was unaware of the instruments, it could not have relied thereon to its detriment in any way.

The parties frame the issues differently both in content and number. As is our practice in such instances, we have rearranged and reworded the issues as follows:

I. WHETHER CONSTITUTIONAL DUE PROCESS REQUIRES THAT A STATUTORY PERIOD OF LIMITATIONS BEGIN TO RUN ON THE DATE A CAUSE OF ACTION IS DISCOVERED RATHER THAN THE DATE THE WRONG OCCURRED.

II. WHETHER DEFENDANT FRAUDULENTLY CONCEALED THE EXISTENCE OF A CAUSE OF ACTION SO AS TO PREVENT *692 THE STATUTE OF LIMITATIONS FROM RUNNING **657 UNTIL TWO YEARS AFTER DISCOVERING THE ACTION.

III. WHETHER DEFENDANT SHOULD BE ESTOPPED FROM ASSERTING THE STATUTE OF LIMITATIONS AS A DEFENSE TO PLAINTIFF'S CAUSE OF ACTION.

IV. WHETHER PLAINTIFF SUFFICIENTLY STATED A CAUSE OF ACTION FOR SILENT FRAUD TO ALLOW THE CASE TO GO TO THE TRIER OF FACT ON THE MERITS.

### I.

[1] Initially, plaintiff presents the constitutional argument that due process requires that the statutory period of limitation starts running from the day of discovery by plaintiff of the cause of action, rather than from the date that the cause of action accrued. To hold otherwise, argues plaintiff, would result in the extinguishing of a payee's right to bring suit before the payee discovered that a cause of action existed. The trial court's opinion did not address the constitutional challenge, and nothing in the file suggests that the constitutional issue was raised at the trial level. The general rule of law is that constitutional challenges to a statute may not be raised for the first time on appeal. *Brookdale Cemetery Ass'n v. Lewis*, 342 Mich. 14, 18, 69 N.W.2d 176 (1955); *Petterman v. Haverhill Farms, Inc.*, 125 Mich.App. 30, 33, 335 N.W.2d 710 (1983), *Michigan Carousel, Inc. v. Cecil*, 66 Mich.App. 248, 251, 238 N.W.2d 825 (1975).

[2] ☑ Moreover, federal decisions find no violation of due process under the federal constitution even if the statute in question extinguishes a cause of action before it is discovered to exist. *Adair v. Koppers Co., Inc.*, 541 F.Supp. 1120, 1128 (N.D.Ohio, 1982) (Ohio's ten year statute of limitations for *693 actions against architects and engineers); *Jewson v. Mayo Clinic*, 691 F.2d 405, 411-412 (CA 8, 1982) (two-year limitation statute starts to run when treatment ceases rather than when injury is discovered); *Mathis v. Eli Lilly & Co.*, 719 F.2d 134, 141 (CA 6, 1983); (Tennessee's ten-year limitation period for filing tort claim where injury was not discovered until 25 years after exposure); *Duke Power Co. v. Environmental Study Group, Inc.*, 438 U.S. 59, 82-93, 98 S.Ct. 2620, 2635-2640, 57 L.Ed.2d 595 (1978), (Price-Anderson Act limiting liability of operator of nuclear plant arising from nuclear accident).

Citing *Dyke v. Richard*, 390 Mich. 739, 213 N.W.2d 185 (1973), plaintiff argues that, if not under the federal constitution, at least under the Michigan constitution, a statute of limitations is unreasonable and therefore constitutionally flawed where it extinguishes a cause of action before the injured party knew or could have known of the cause of action.[FN1] However, this Court ruled in *Szlinis v. Moulded Fiber Glass Cos., Inc.*, 80 Mich.App. 55, 66, 263 N.W.2d 282 (1977), that Dyke "restricted this approach to malpractice cases". More on point, for purposes of the instant case, is the Michigan Supreme Court's ruling seven years after *Dyke* in *O'Brien v. Hazelet & Erdal*, 410 Mich. 1, 299 N.W.2d 336 (1980). That case involved suits by various plaintiffs against state licensed architects or contractors for injuries arising out of defective or unsafe improvements to buildings. Citing *Dyke*, the injured parties claimed that the six-year period of limitation violated due process because it barred a cause of action before the injured parties *694 could reasonably know that a defect existed.[FN2] In a unanimous opinion, the six-year period of limitation was upheld. Since a review of relevant federal and state law discloses that neither the federal nor state constitution mandates that a "discovery" rule be utilized when applying a statutory **658 period of limitation, we find Issue I to be without merit.

FN1. For an excellent review of the growing reliance upon state constitutions, rather than the federal constitution, as the primary guarantor of fundamental rights, see Utter *Freedom & Diversity In a Federal System: Perspectives on State Constitutions and the Washington Declaration of Rights*, 7 Puget Sound L.Rev. 491 (1984).

FN2. See *O'Brien, supra*, 410 Mich. p. 15, fn. 15, 299 N.W.2d 336.

## II.

Did the defendant bank fraudulently conceal from plaintiff supplier of lumber and materials the existence of a cause of action? If the existence of a cause of action is concealed by the party who would be liable, the person entitled to sue may bring the action within two years after the date of discovery or after the date the existence of the cause should have been discovered, despite any applicable statute of limitations. M.C.L. § 600.5855; M.S.A. § 27A.5855. That statute provides:

"If a person who is or may be liable for any claim fraudulently conceals the existence of the claim or the identity of any person who is liable for the claim from the knowledge of the person entitled to sue on the claim, the action may be commenced at any time within 2 years after the person who is entitled to bring the action discovers, or should have discovered, the existence of the claim or the identity of the person who is liable for the claim, although the action would otherwise be barred by the period of limitations."

[3] ☑ As a general rule, for fraudulent concealment to postpone the running of the period of limitation, the fraud must be manifested by an affirmative act or misrepresentation. *Draws v. Levin*, 332 Mich. 447,