# EXHIBIT B
# PART 6

452, 52 N.W.2d 180 (1952); *695 _Dowse v. Gaynor_, 155 Mich. 38, 118 N.W. 615 (1908); _Grebner v. Runyon_, 132 Mich.App. 327, 347 N.W.2d 741 (1984); _Buszek v. Harper Hospital_, 116 Mich.App. 650, 323 N.W.2d 330 (1982). An exception to this rule is that there is an affirmative duty to disclose where the parties are in a fiduciary relationship. _Barrett v. Breault_, 275 Mich. 482, 267 N.W. 544 (1936); _Tompkins v. Hollister_, 60 Mich. 470, 27 N.W. 651 (1886). See also, _Stetson v. French_, 321 Mass. 195, 72 N.E.2d 410 (1947), cited with approval in _International Union United Automobile Workers of America, AFL v. Wood_, 337 Mich. 8, 59 N.W.2d 60 (1953).

[4] ☑ However, there does not appear to be a fiduciary relationship between plaintiff and defendant bank. The record indicates that the only transactions between plaintiff and the bank were the two bank money orders. The bank issued these money orders payable to both Beaman and plaintiff, not so much to look out for plaintiff's interest, but rather to look out for the bank's own interest in preventing the attachment of a mechanics lien to property over which the bank held the mortgage. Therefore, we conclude that the fiduciary relationship exception to the affirmative act requirement of fraudulent concealment does not apply to the instant case.

[5] ☑ Plaintiff cites _Groening v. Opsata_, 323 Mich. 73, 34 N.W.2d 560 (1948), for the proposition that there exists a duty to disclose when one party has superior knowledge. Plaintiff's reliance on _Groening_ is misplaced. _Groening_ involved a direct action based upon fraud in which the plaintiffs, purchasers of a parcel of land, made specific inquiries of one of the defendants, Mrs. Opsata, and one of the owners of the property being sold. In answering those questions, Mrs. Opsata either misrepresented the facts or was silent to material facts. _Groening_ differs from the *696 case at bar in that a distinction is drawn between what will establish a direct action for fraud and what constitutes fraudulent concealment for the purposes of tolling the running of a statutory period of limitation. _Dowse v. Gaynor, supra_, 155 Mich. pp. 42-43, 118 N.W. 615; _Draws v. Levin, supra_, 332 Mich., pp. 452-453, 52 N.W.2d 180; _McNaughton v. Rockford State Bank_, 261 Mich. 265, 268, 246 N.W. 84 (1933).

A second distinction between _Groening_ and the case at bar is that in _Groening_ the plaintiffs had made specific inquiries of Mrs. Opsata and the defendants were advised that the plaintiffs were relying on the "superior knowledge, experience as a builder, and information of" Mr. Opsata. _Groening, supra_, 323 Mich. p. 82, 34 N.W.2d 560. In the instant case, plaintiff never made any inquiries of the bank, and **659 therefore did not rely upon the bank's superior knowledge. A third distinction is that in _Groening_ there was a buyer-seller relationship between the parties, whereas in the instant case, the bank had no relationship at all with plaintiff. Furthermore, plaintiff fails to cite any authority for the proposition that a drawee bank has a duty to disclose to a payee that a negotiable instrument made payable to payee was paid over a forged endorsement.

III

It is plaintiff's claim that it would have brought its action within the three-year period of limitation had the bank disclosed to plaintiff the existence of the forged instrument, that the bank was in a uniquely superior position to know that the instrument had been forged, that special knowledge is a factor favoring the application of the doctrine of estoppel, and that, accordingly, the bank should be estopped from asserting the defense of the statute of limitations. The question of *697 whether a bank which has no direct dealings with a payee of a bank money order issued by the bank pursuant to a mortgage loan agreement with the bank's customer should be estopped from asserting the defense that the statutory limitation period has run in an action by the payee based upon the bank's payment of the money order over the payee's forged endorsement in Michigan.

[6] ☑ The criteria for application of the doctrine of estoppel are set forth in _Cook v. Grand River Hydro Electric Power Co.,_ 131 Mich.App. 821, 828, 346 N.W.2d 881 (1984).

"An estoppel arises where: (1) a party by representation, admissions or silence, intentionally or negligently induces another party to believe facts; (2) the other party justifiably relies and acts on this belief; and (3) the other party will be prejudiced if the first party is permitted to deny the existence of the facts * * *."

Special knowledge of a defendant may be a consideration in applying estoppel. _Bohlinger v, DAIIE,_ 120 Mich.App. 269, 327 N.W.2d 466 (1982). However, special knowledge is just one of many other factors enumerated by the _Bohlinger_ Court, viz: concealment of a cause of action, misrepresentation as to the statutory time in which an action may be brought, inducement not to bring the action, a promise to pay or settle the claim, and a fiduciary relationship. None of these other factors are present in the instant case.

Also missing in the instant case is the element of false representation. In _Lothian v. Detroit,_ 414 Mich. 160, 176-177, 324 N.W.2d 9 (1982), Chief Justice Coleman, writing for a unanimous Court which held that a party seeking to invoke the doctrine of estoppel must establish a false representation**698** or a concealment of a material fact, stated:

"The doctrine of equitable estoppel, a judicially fashioned exception to the general rule which provides that statutes of limitation run without interruption, see _Klass [ v Detroit,_ 129 Mich 35, 39; 88 NW 204 (1901) ], 'is essentially a doctrine of waiver' which 'serves to extend the applicable statute of limitations-by precluding the defendant from raising the bar of the statute', _Huhtala v Travelers Ins Co,_ 401 Mich 118, 132-133; 257 NW2d 640 (1977). Equitable estoppel may be introduced to counter a statute of limitations defense so as 'to accomplish the prevention of results contrary to good conscience and fair dealing', _McLearn v Hill,_ 276 Mass 519, 524; 177 NE 617 (1931). Generally, to justify the application of estoppel, one must establish that there has been a false representation or concealment of material fact, coupled with an expectation that the other party will rely upon this conduct, and knowledge of the actual facts on the part of the representing or concealing party. See _28 Am Jur 2d, Estoppel and Waiver, § 35, p 640._" 414 Mich, 176-177, 324 N.W.2d 9.

In the instant case, the bank made no representations to plaintiff. Nothing in the record suggests that the bank induced plaintiff to believe certain facts. Indeed, **660** the bank had no dealings at all with plaintiff.

[7] ☑ [8] ☑ Except for silence, there is nothing in the record showing the bank concealed any material fact from plaintiff. While silence or inaction, _in certain situations,_ may invoke the doctrine of estoppel, silence does not invoke the doctrine unless the party remaining silent has a duty or obligation to disclose.

"That concealment of material facts _that one under the circumstances is bound to disclose_ may constitute actionable fraud is not open to question. *699 _Busch v Wilcox,_ 82 Mich 315; 46 NW 940 (1890); _Prudential Insurance Company of America v Ashe,_ 266 Mich 667; 254 NW 243 (1934); _Wolfe v A E Kusterer & Co,_ 269 Mich 424; 257 NW 729 (1934)." _Groening, supra,_ 323 Mich. p. 83, 34 N.W.2d 560.

Unless there has been some fiduciary relationship or other direct dealings between the parties, mere silence is not enough to overcome the applicable period of limitation.

"Fraudulent concealment is more than mere silence. _McNaughton v Rockford State Bank,_ 261 Mich 265, 268; 246 NW 84 (1933). See, also, _Schram v Burt,_ 111 F2d 557 (CA 6, 1940). No fiduciary relationship existed between the Union and Wood, as was alleged and denied in _Dowse v Gaynor,_ 155 Mich 38, 42; 118 NW 615 (1908). See also, _Stetson v French,_ 321 Mass 195; 72 NE2d 410; 173 ALR 569

(1947), and authorities annotated beginning on page 578." *International Union United Automobile Works of America, AFL v. Wood*, 337 Mich. 8, 13-14, 59 N.W.2d 60 (1953).

Finally, we note that plaintiff cites *Nowicki v. Podgorski*, 359 Mich. 18, 32, 101 N.W.2d 371 (1960), for the proposition that silence should toll the statute of limitations in the instant case. However, that case involved direct dealings between the plaintiff, as purchaser, and defendants, as sellers of a grocery store. In *Nowicki*, defendant wife remained silent when her husband made false statements as to the volume of sales per week and as to the fact that the fixtures were in good shape. Obviously, there was a duty to speak up in that case.

## IV

Lastly, plaintiff argues that an action for silent fraud is recognized in Michigan, *\*700 United States Fidelity & Guaranty Co. v. Black*, 412 Mich. 99, 313 N.W.2d 77 (1981), and that its complaint states a claim for silent fraud. In so doing, plaintiff concedes that for suppression of information to constitute silent fraud there must be a legal or equitable duty to disclose. The bank argues that plaintiff's complaint fails to state a claim for silent fraud, and even if it does, the bank owed no duty, either legal or equitable, to disclose the existence of the instruments to the plaintiff. We agree with the bank.

[9] ☑ The complaint does not specifically plead a cause of action in fraud. Assuming, *arguendo*, that an action in fraud has been sufficiently pled, for the reasons set forth in issues II and III of this opinion, we find that the bank had no duty to disclose to plaintiff the fact that the money orders had been paid over a forged endorsement. Consequently, plaintiff would not be able to prevail upon a silent fraud claim.

[10] ☑ [11] ☑ In addition to the duty to disclose, silent fraud requires a plaintiff to establish reliance. *Emerick v. Saginaw Twp.*, 104 Mich.App. 243, 247, 304 N.W.2d 536 (1981). Despite plaintiff's allegations to the contrary, we fail to see how plaintiff realistically relied on the bank's silence in the instant case. As was so aptly stated in the trial court's opinion:

"If, as alleged in this case, the plaintiff was not aware of the checks until four years after their issuance, there is no way that plaintiff could have relied upon the issuance of the check to its detriment in any way."

For these reasons, we affirm the trial court's dismissal of plaintiff's complaint against defendant bank with respect to silent fraud.

**\*\*661** In conclusion, having found that none of the *\*701* issues raised by plaintiff establish error on the part of the trial court, the trial court's order for accelerated judgment in favor of the bank is affirmed. Costs to the bank.

Mich.App.,1984.
Lumber Village, Inc. v. Siegler
135 Mich.App. 685, 355 N.W.2d 654

END OF DOCUMENT

Exhibit - 24

**Stasko v General Motors Corporation: Estimated Loss by Plaintiff**

| Year | | |
|---|---|---|
| Estimated Loss by Plaintiff for actual work performed...July 1983 - July 1984 | $ | 7,560.00 |
| Estimated Loss by Plaintiff for actual work performed...July 1984 - July 1985 | $ | 50,085.63 |
| Estimated Loss by Plaintiff for actual work performed...July 1985 - July 1986 | $ | 79,219.84 |
| Estimated Loss by Plaintiff for actual work performed...July 1986 - July 1987 | $ | 103,245.62 |
| Estimated Loss by Plaintiff for actual work performed...July 1987 - July 1988 | $ | 141,964.45 |
| Estimated Loss by Plaintiff for actual work performed...July 1988 - July 1989 | $ | 273,865.26 |
| Estimated Loss by Plaintiff for actual work performed...July 1989 - July 1990 | $ | 315,634.02 |
| Estimated Loss by Plaintiff for actual work performed...July 1990 - July 1991 | $ | 327,010.25 |
| Estimated Loss by Plaintiff for actual work performed...July 1991 - July 1992 | $ | 339,964.83 |
| Estimated Loss by Plaintiff for actual work performed...July 1992 - July 1993 | $ | 359,206.21 |
| Estimated Loss by Plaintiff for actual work performed...July 1993 - July 1994 | $ | 380,832.81 |
| Estimated Loss by Plaintiff for actual work performed...July 1994 - July 1995 | $ | 396,677.34 |
| **Total Estimated Loss by Plaintiff** | **$** | **2,775,266.26** |

Case 2:09-cv-14827-JAC-VMM    Document 4-3    Filed 12/11/09    Page 41 of 50

**Stasko v General Motors Corporation: Estimated Loss by Plaintiff**

| Year | | | |
|---|---|---|---|
| July 1983 - July 1984 | | | |
| | | | |
| Accomplishments | Four to five times General Motors specifically requested the plaintiff to work for General Motors. | | |
| | - General Motors had first hand experience of the plaintiff's skills. | | |
| | - General Motors Summer Temporary Student Appraisal - overall job rating of "Outstanding performance" | | |
| | - See Exhibit 14 | | |
| | Humidity Monitoring to help diagnose problem with large printer - See Exhibit 16, Item 6 | | |
| | Forty-Seven mm diesel particulate filter sampling system - See Exhibit 16, Item 7 | | |
| | Sartorius Microbalance - See Exhibit 16, Item 8 | | |
| | Tylan Mass Flow Controllers - See Exhibit 16, Item 9 | | |
| | | | |
| Plaintiff Viewpoint | 6E11 Project Engineer | $ | 35,560.00 |
| | - Average promotion increase (from 5E35 * 1.27) | | |
| | | | |
| General Motors Position | 5E35 Associate Engineer | $ | 28,000.00 |
| | - Plaintiff starting yearly compensation (salary + COLA) | | |
| | **Estimated Loss by Plaintiff** | **$** | **7,560.00** |

**Stasko v General Motors Corporation: Estimated Loss by Plaintiff**

| Year | | | |
|---|---|---|---|
| July 1984 - July 1985 | | | |
| Accomplishments | Sample Conditioning Unit - See Exhibit 16, Item 10 | | |
| | Horiba Chassis Dynamometer Controller - See Exhibit 16, Item 11 | | |
| | Overhead Track System - See Exhibit 16, Item 12 | | |
| | Emission Wing Renovation – Design Coordination - See Exhibit 16, Item 13 | | |
| | | | |
| Plaintiff Viewpoint | 7th Level Project Manager | $ | 45,040.24 |
| | 6E11 Electrical Engineer | $ | 35,464.75 |
| | | | |
| General Motors Position | 5E35 Associate Engineer | $ | 30,419.36 |
| | - Plaintiff's yearly compensation 10/16/1984 (salary + COLA) | | |
| | **Estimated Loss by Plaintiff** | **$** | **50,085.63** |

Case 2:09-cv-14827-JAC-VMM   Document 4-3   Filed 12/11/09   Page 43 of 50

**Stasko v General Motors Corporation: Estimated Loss by Plaintiff**

| Year | | | |
|---|---|---|---|
| July 1985 - July 1986 | | | |

**Accomplishments**
Instrumentation Console and Custom Enclosure - See Exhibit 16, Item 15
Emission Test Site Instrumentation Patch Panel- See Exhibit 16, Item 16
12-Channel Strip Chart Recorder and Custom Enclosure - See Exhibit 16, Item 17
Dew Point Meter and Ambient Temperature Sensor and Custom Enclosure - See Exhibit 16, Item 18
Instrumentation Interfacing - See Exhibit 16, Item 19

| | | | |
|---|---|---|---|
| Plaintiff Viewpoint | 7th Level Project Manager | $ | 43,830.61 |
| | 7E06 Sr. Electrical Engineer | $ | 43,830.61 |
| | 6th Level Technical Designer | $ | 25,884.22 |
| General Motors Position | 6E11 Project Engineer on Sept. 01, 1985 | $ | 34,325.60 |
| | Estimated Loss by Plaintiff | $ | 79,219.84 |

3 of 12

**Stasko v General Motors Corporation: Estimated Loss by Plaintiff**

| Year | | | |
|---|---|---|---|
| July 1986 - July 1987 | | | |
| | | | |
| Accomplishments | Emissions Wing Renovation – Project Management - See Exhibit 16, Item 14 | | |
| | Programmable Logic Controllers – integrated into Emissions Analysis Systems - See Exhibit 16, Item 20 | | |
| | Large Temperature and Humidity Display - See Exhibit 16, Item 21 | | |
| | Honeywell HVAC Central Control Station - See Exhibit 16, Item 22 | | |
| | Smoke Detector Graphics Display Panel - See Exhibit 16, Item 23 | | |
| | Overhead Door Logic Controls - See Exhibit 16, Item 24 | | |
| | Software Programming Skills and Software Program Management - See Exhibit 16, Item 25 | | |
| | | | |
| Plaintiff Viewpoint | 8th Level Project Manager | $ | 62,449.59 |
| | 7E06 Sr. Electrical Engineer | $ | 49,172.91 |
| | 6th Level Technical Designer | $ | 29,039.12 |
| | | | |
| General Motors Position | 6E11 Project Engineer | $ | 37,416.00 |
| | Estimated Loss by Plaintiff | $ | 103,245.62 |

Case 2:09-cv-14827-JAC-VMM   Document 4-3   Filed 12/11/09   Page 44 of 50

Case 2:09-cv-14827-JAC-VMM    Document 4-3    Filed 12/11/09    Page 45 of 50

**Stasko v General Motors Corporation: Estimated Loss by Plaintiff**

| Year | | | |
|---|---|---|---|
| July 1987 - July 1988 | | | |
| | | | |
| Accomplishments | Fuel Meter Calibration Cart - See Exhibit 16, Item 26 | | |
| | Fuel Injector Test Stand Renovation - See Exhibit 16, Item 27 | | |
| | Elimination of Dynamometer Shimming - See Exhibit 16, Item 28 | | |
| | | | |
| Plaintiff Viewpoint | 8th Level Project Manager | $ | 62,449.59 |
| | 7E06 Sr. Electrical Engineer | $ | 49,172.91 |
| | 6E11 Mechanical Engineer | $ | 38,718.83 |
| | 6th Level Technical Designer | $ | 29,039.12 |
| | | | |
| General Motors Position | 6E11 Project Engineer | $ | 37,416.00 |
| | Estimated Loss by Plaintiff | $ | 141,964.45 |

Case 2:09-cv-14827-JAC-VMM     Document 4-3     Filed 12/11/09     Page 46 of 50

**Stasko v General Motors Corporation: Estimated Loss by Plaintiff**

| Year | | | |
|------|---|---|---|
| July 1988 - July 1989 | | | |

| | | | |
|---|---|---|---|
| Accomplishments | Engine Coolant and Engine Oil Process Control - See Exhibit 16, Item 29 | | |
| | DSP Combustion Analysis System - See Exhibit 16, Item 30 | | |
| | Druck Pressure Transducers - See Exhibit 16, Item 32 | | |
| | New Programmable Logic Controller (PLC) - See Exhibit 16, Item 33 | | |
| | New CPI Front-end Equipment - See Exhibit 16, Item 34 | | |
| | AutoCAD Drawings - See Exhibit 16, Item 35 | | |
| | New Instrumentation Booms - See Exhibit 16, Item 36 | | |
| | Humidity and Ambient Temperature Sensor per Test Cell - See Exhibit 16, Item 37 | | |
| | | | |
| Plaintiff Viewpoint | 9th Level Project Manager | $ | 76,742.64 |
| | 7E06 Sr. Electrical Engineer | $ | 47,580.53 |
| | 6E11 Instrumentation Engineer | $ | 37,464.99 |
| | 6E11 Mechanical Engineer | $ | 37,464.99 |
| | 6E11 Process Controls Engineer | $ | 37,464.99 |
| | 6th Level AutoCAD Designer | $ | 25,850.84 |
| | 6th Level Technical Designer | $ | 28,098.74 |
| | 6th Level Technical Secretary | $ | 25,101.54 |
| | | | |
| General Motors Position | 7E06 Sr. Project Engineer | $ | 41,904.00 |
| | on May 1, 1988 | | |
| | Estimated Loss by Plaintiff | $ | 273,865.26 |

**Stasko v General Motors Corporation: Estimated Loss by Plaintiff**

| Year | | | |
|---|---|---|---|
| July 1989 - July 1990 | | | |
| | | | |
| Accomplishments | Dynamometer Test Cell #13 Renovation - See Exhibit 16, Item 38 | | |
| | Dynamometer Test Cell #03 Renovation - See Exhibit 16, Item 39 | | |
| | | | |
| Plaintiff Viewpoint | 9th Level Project Manager | $ | 80,465.65 |
| | 7E06 Sr. Electrical Engineer | $ | 49,888.80 |
| | 6E11 Instrumentation Engineer | $ | 39,282.52 |
| | 6E11 Mechanical Engineer | $ | 39,282.52 |
| | 6E11 Process Controls Engineer | $ | 39,282.52 |
| | 6th Level AutoCAD Designer | $ | 27,104.94 |
| | 6th Level Technical Designer | $ | 29,461.89 |
| | 6th Level Technical Secretary | $ | 26,319.29 |
| | 6th Level Technician for Test Cell Start-up | $ | 29,461.89 |
| | | | |
| General Motors Position | 7E06 Sr. Project Engineer | $ | 44,916.00 |
| | **Estimated Loss by Plaintiff** | **$** | **315,634.02** |

Case 2:09-cv-14827-JAC-VMM    Document 4-3    Filed 12/11/09    Page 48 of 50

## Stasko v General Motors Corporation: Estimated Loss by Plaintiff

**Year**

July 1990 - July 1991

| | | | |
|---|---|---|---|
| Accomplishments | Natural Gas Compressor - See Exhibit 16, Item 40 | | |
| | Dynamometer Vault Spray Renovation - See Exhibit 16, Item 41 | | |
| | Designed a Custom Pulse Circuit Board - See Exhibit 16, Item 42 | | |
| | PSI High Speed and High Channel Count Pressure Measurement System - See Exhibit 16, Item 43 | | |
| | Chassis Dyno Renovation - See Exhibit 16, Item 44 | | |
| | | | |
| Plaintiff Viewpoint | 9th Level Project Manager | $ | 83,687.45 |
| | 7E06 Sr. Electrical Engineer | $ | 51,886.32 |
| | 6E11 Instrumentation Engineer | $ | 40,855.37 |
| | 6E11 Mechanical Engineer | $ | 40,855.37 |
| | 6E11 Process Controls Engineer | $ | 40,855.37 |
| | 6th Level AutoCAD Designer | $ | 28,190.21 |
| | 6th Level Technical Designer | $ | 30,641.53 |
| | 6th Level Technical Secretary | $ | 27,373.10 |
| | 6th Level Technician for Test Cell Start-up | $ | 30,641.53 |
| | | | |
| General Motors Position | 7E06 Sr. Project Engineer | $ | 47,976.00 |
| | **Estimated Loss by Plaintiff** | **$** | **327,010.25** |

Case 2:09-cv-14827-JAC-VMM    Document 4-3    Filed 12/11/09    Page 49 of 50

**Stasko v General Motors Corporation: Estimated Loss by Plaintiff**

| Year | | | |
|---|---|---|---|
| July 1991 - July 1992 | | | |

| | | | |
|---|---|---|---|
| Accomplishments | Dynamometer Test Cell #07 Renovation - New Hemi-anechoic Chamber - See Exhibit 16, Item 45 | | |
| | Dynamometer Test Cell #06 Renovation - See Exhibit 16, Item 46 | | |
| | New Exhaust Fans - See Exhibit 16, Item 47 | | |
| | New Dynamometer Wing Ground Wire - See Exhibit 16, Item 49 | | |
| | | | |
| Plaintiff Viewpoint | 9th Level Project Manager | $ | 87,655.18 |
| | 7E06 Sr. Electrical Engineer | $ | 54,346.32 |
| | 6E11 Instrumentation Engineer | $ | 42,792.38 |
| | 6E11 Mechanical Engineer | $ | 42,792.38 |
| | 6E11 Process Controls Engineer | $ | 42,792.38 |
| | 6th Level AutoCAD Designer | $ | 29,526.74 |
| | 6th Level Technical Designer | $ | 32,094.28 |
| | 6th Level Technical Secretary | $ | 28,670.89 |
| | 6th Level Technician for Test Cell Start-up | $ | 32,094.28 |
| | | | |
| General Motors Position | 7E06 Sr. Project Engineer | $ | 52,800.00 |
| | **Estimated Loss by Plaintiff** | **$** | **339,964.83** |

00-50026-mg    Doc 9093-7    Filed 02/04/11    Entered 02/04/11 17:42:53    Exhibit B

Case 2:09-cv-14827-JAC-VMM    Document 4-3    Filed 12/11/09    Page 50 of 50

### Stasko v General Motors Corporation: Estimated Loss by Plaintiff

| Year | | | |
|---|---|---|---|
| July 1992 - July 1993 | At this time the plaintiff is General Motors best Powertrain Test Cell renovation person | | |
| | | | |
| Accomplishments | Dynamometer Test Cell #11 Renovation - See Exhibit 16, Item 50 | | |
| | Modicon Panelmate 2000 Video Based Man-Machine Interface - See Exhibit 16, Item 51 | | |
| | Dynamometer Test Cell #21 Outside Anechoic Chamber - See Exhibit 16, Item 53 | | |
| | Dynamometer Test Cell #15 Renovation - See Exhibit 16, Item 54 | | |
| | New Motor Control Centers - See Exhibit 16, Item 55 | | |
| | | | |
| Plaintiff Viewpoint | 9th Level Project Manager - Maximum Salary | $ | 106,896.56 |
| | 7E06 Sr. Electrical Engineer | $ | 54,346.32 |
| | 6E11 Instrumentation Engineer | $ | 42,792.38 |
| | 6E11 Mechanical Engineer | $ | 42,792.38 |
| | 6E11 Process Controls Engineer | $ | 42,792.38 |
| | 6th Level AutoCAD Designer | $ | 29,526.74 |
| | 6th Level Technical Designer | $ | 32,094.28 |
| | 6th Level Technical Secretary | $ | 28,670.89 |
| | 6th Level Technician for Test Cell Start-up | $ | 32,094.28 |
| | | | |
| General Motors Position | 7E06 Sr. Project Engineer | $ | 52,800.00 |
| | Estimated Loss by Plaintiff | $ | 359,206.21 |

**Stasko v General Motors Corporation: Estimated Loss by Plaintiff**

| Year | | | |
|------|---|---|---|
| July 1993 - July 1994 | | | |
| | | | |
| Accomplishments | Dynamometer Test Cell #08 Renovation - See Exhibit 16, Item 56 | | |
| | Dynamometer Test Cell Ventilation System converted to 24/7 operation - See Exhibit 16, Item 57 | | |
| | | | |
| Plaintiff Viewpoint | 9th Level Project Manager - Maximum Salary | $ | 113,709.45 |
| | 7E06 Sr. Electrical Engineer | $ | 57,810.00 |
| | 6E11 Instrumentation Engineer | $ | 45,519.69 |
| | 6E11 Mechanical Engineer | $ | 45,519.69 |
| | 6E11 Process Controls Engineer | $ | 45,519.69 |
| | 6th Level AutoCAD Designer | $ | 31,408.58 |
| | 6th Level Technical Designer | $ | 34,139.76 |
| | 6th Level Technical Secretary | $ | 30,498.19 |
| | 6th Level Technician for Test Cell Start-up | $ | 34,139.76 |
| | | | |
| General Motors Position | 7E06 Sr. Project Engineer | $ | 57,432.00 |
| | **Estimated Loss by Plaintiff** | **$** | **380,832.81** |

Case 2:09-cv-14827-JAC-VMM    Document 4-4    Filed 12/11/09    Page 2 of 50

**Stasko v General Motors Corporation: Estimated Loss by Plaintiff**

| Year | | | |
|---|---|---|---|
| July 1994 - July 1995 | | | |
| | | | |
| Accomplishments | Replacement of (4) Aux Temperature Safety Meters with Modicon Analog Input - See Exhibit 16, Item 58 | | |
| | Conditioned Air Systems - See Exhibit 16, Item 59 | | |
| | | | |
| Plaintiff Viewpoint | 9th Level Project Manager - Maximum Salary | $ | 118,838.47 |
| | 7E06 Sr. Electrical Engineer | $ | 60,417.60 |
| | 6E11 Instrumentation Engineer | $ | 47,572.91 |
| | 6E11 Mechanical Engineer | $ | 47,572.91 |
| | 6E11 Process Controls Engineer | $ | 47,572.91 |
| | 6th Level AutoCAD Designer | $ | 32,825.31 |
| | 6th Level Technical Designer | $ | 35,679.69 |
| | 6th Level Technical Secretary | $ | 31,873.85 |
| | 6th Level Technician for Test Cell Start-up | $ | 35,679.69 |
| | | | |
| General Motors Position | 7E06 Sr. Project Engineer | $ | 61,356.00 |
| | Estimated Loss by Plaintiff | $ | 396,677.34 |

Exhibit - 25

Estimating CY1983 to CY1995 Salary Compensation of other Occupations from General Motors' Salary Data

| CY Estimates (Date) | 5E35 Engineer Salary Maximum | 6E11 Engineer Salary Maximum | 6E11 Engineer Salary Midpoint | 7E06 Engineer Salary Maximum | 7E06 Engineer Salary Midpoint | 7th Level Proj. Mgr Salary Maximum | 7th Level Proj. Mgr Salary Midpoint | 6th Level Tech Salary Midpoint |
|---|---|---|---|---|---|---|---|---|
| 07/1984 to 07/1985 - October 16, 1984 | $ 34,054.88 | $ 43,249.70 | $ 35,464.75 | | | $ 54,927.12 | $ 45,040.24 | |
| 07/1985 to 07/1986 - September 1, 1985 | | $ 42,088.16 | $ 34,512.29 | $ 53,451.96 | $ 43,830.61 | $ 53,451.96 | $ 43,830.61 | $ 25,884.22 |

| CY Estimates (Date) | 6E11 Engineer Salary Maximum | 6E11 Engineer Salary Midpoint | 7E06 Engineer Salary Maximum | 7E06 Engineer Salary Midpoint | 8th Level Proj. Mgr Salary Maximum | 8th Level Proj. Mgr Salary Midpoint | 6th Level Tech Salary Midpoint |
|---|---|---|---|---|---|---|---|
| 07/1986 to 07/1987 - March 1, 1986 | $ 47,218.08 | $ 38,718.83 | $ 59,966.96 | $ 49,172.91 | $ 76,158.04 | $ 62,449.59 | $ 29,039.12 |
| 07/1987 to 07/1988 - March 1, 1986 | $ 47,218.08 | $ 38,718.83 | $ 59,966.96 | $ 49,172.91 | $ 76,158.04 | $ 62,449.59 | $ 29,039.12 |

| CY Estimates (Date) | 7E06 Engineer Salary Maximum | 6E11 Engineer Salary Maximum | 6E11 Engineer Salary Midpoint | 7E06 Engineer Salary Maximum | 7E06 Engineer Salary Midpoint | 9th Level Proj. Mgr Salary Maximum | 9th Level Proj. Mgr Salary Midpoint | 6th Level Tech Salary Midpoint | 6th Level CAD Salary Midpoint | 6th Level Secretary Salary Midpoint |
|---|---|---|---|---|---|---|---|---|---|---|
| 07/1988 to 07/1989 - May 1, 1988 | $ 58,025.04 | $ 45,689.01 | $ 37,464.99 | $ 58,025.04 | $ 47,580.53 | $ 93,568.59 | $ 76,742.64 | $ 28,098.74 | $ 25,850.84 | $ 25,101.54 |
| 07/1989 to 07/1990 - May 1, 1989 | $ 60,840.00 | $ 47,905.51 | $ 39,282.52 | $ 60,840.00 | $ 49,888.80 | $ 98,128.84 | $ 80,485.65 | $ 29,461.89 | $ 27,104.94 | $ 26,319.29 |
| 07/1990 to 07/1991 - September 1, 1990 | $ 63,276.00 | $ 49,823.62 | $ 40,855.37 | $ 63,276.00 | $ 51,886.32 | $ 102,057.86 | $ 83,687.45 | $ 30,641.53 | $ 28,190.21 | $ 27,373.10 |
| 07/1991 to 07/1992 - September 1, 1991 | $ 66,276.00 | $ 52,185.83 | $ 42,792.38 | $ 66,276.00 | $ 54,346.32 | $ 106,896.56 | $ 87,655.18 | $ 32,094.28 | $ 29,526.74 | $ 28,670.89 |
| 07/1992 to 07/1993 - September 1, 1991 | $ 66,276.00 | $ 52,185.83 | $ 42,792.38 | $ 66,276.00 | $ 54,346.32 | $ 106,896.56 | $ 87,655.18 | $ 32,094.28 | $ 29,526.74 | $ 28,670.89 |
| 07/1993 to 07/1994 - October 1, 1993 | $ 70,500.00 | $ 55,511.81 | $ 45,519.69 | $ 70,500.00 | $ 57,810.00 | $ 113,709.45 | $ 93,241.75 | $ 34,139.76 | $ 31,408.58 | $ 30,498.19 |
| 07/1994 to 07/1995 - June 1, 1994 | $ 73,680.00 | $ 58,015.75 | $ 47,572.91 | $ 73,680.00 | $ 60,417.60 | $ 118,838.47 | $ 97,447.55 | $ 35,679.69 | $ 32,825.31 | $ 31,973.85 |

Case 2:09-cv-14827-JAC-VMM    Document 4-4    Filed 12/11/09    Page 5 of 50

### Estimating Promotion Level Pay Increases

| Date | Position Code | Monthly Salary | Yearly Salary | Quarterly COLA | Yearly COLA | Total Yearly Compensation | Promotion Increase |
|---|---|---|---|---|---|---|---|
| October 16, 1984 | 5E35 - Minimum Salary | $ 1,306.00 | $ 15,672.00 | $ 26.00 | $ 104.00 | $ 15,776.00 | |
| September 1, 1985 | 6E11 - Minimum Salary | $ 1,679.00 | $ 20,148.00 | $ 244.40 | $ 977.60 | $ 21,125.60 | 34% |
| | | | | | | | |
| October 16, 1984 | 5E35 - Maximum Salary | $ 2,829.24 | $ 33,950.88 | $ 26.00 | $ 104.00 | $ 34,054.88 | |
| September 1, 1985 | 6E11 - Maximum Salary | $ 3,425.88 | $ 41,110.56 | $ 244.40 | $ 977.60 | $ 42,088.16 | 24% |
| | | | | | | | |
| March 1, 1986 | 6E11 - Minimum Salary | $ 1,679.00 | $ 20,148.00 | $ - | $ - | $ 20,148.00 | |
| May 1, 1988 | 7E06 - Minimum Salary | $ 2,110.50 | $ 25,326.00 | $ - | $ - | $ 25,326.00 | 26% |
| | | | | | | | |
| March 1, 1986 | 6E11 - Maximum Salary | $ 3,934.84 | $ 47,218.08 | $ - | $ - | $ 47,218.08 | |
| May 1, 1988 | 7E06 - Maximum Salary | $ 4,835.42 | $ 58,025.04 | $ - | $ - | $ 58,025.04 | 23% |
| | | | | | | Average Promotion Increase | 27% |

Case 2:09-cv-14827-JAC-VMM    Document 4-4    Filed 12/11/09    Page 6 of 50

**Estimating Midpoint Salary Compensation from Maximun Salary Data**

| Date | Position Code | Yearly Salary | Midpoint Percentage of Maximun |
|------|--------------|--------------|-------------------------------|
| March 1, 1986 | 6E11 - Midpoint Salary | $ 39,870.96 | 84% |
| March 1, 1986 | 6E11 - Maximum Salary | $ 47,218.08 | |
| | | | |
| May 1, 1988 | 7E06 - Midpoint Salary | $ 45,300.00 | 78% |
| May 1, 1988 | 7E06 - Maximum Salary | $ 58,025.04 | |
| | | | |
| September 1, 1990 | 7E06 - Midpoint Salary | $ 52,800.00 | 83% |
| September 1, 1990 | 7E06 - Maximum Salary | $ 63,276.00 | |
| | | | |
| September 1, 1991 | 7E06 - Midpoint Salary | $ 55,368.00 | 84% |
| September 1, 1991 | 7E06 - Maximum Salary | $ 66,276.00 | |
| | | | |
| October 1, 1993 | 7E06 - Midpoint Salary | $ 58,200.00 | 83% |
| October 1, 1993 | 7E06 - Maximum Salary | $ 70,500.00 | |
| | | | |
| June 1, 1994 | 7E06 - Midpoint Salary | $ 59,940.00 | 81% |
| June 1, 1994 | 7E06 - Maximum Salary | $ 73,680.00 | |

Midpoint Salary as a Percentage of Maximum Salary - Average    82%

Estimating Midpoint Salary Compensation of other Occupations from Midpoit Engineering Salary Data

| Position Code | Monthly Salary Beginner - Min | Monthly Salary Beginner - Max | Monthly Salary Intermediate - Min | Monthly Salary Intermediate - Max | Monthly Salary Senior - Min | Monthly Salary Senior - Max | Avg Monthly Salary | Promotion Increase |
|---|---|---|---|---|---|---|---|---|
| Electrical Engineer | $ 2,130.00 | $ 3,066.00 | $ 2,910.00 | $ 3,897.00 | $ 3,533.00 | $ 5,179.00 | $ 3,452.50 | |
| Electrical Laboratory Tech | $ 1,871.00 | $ 2,468.00 | $ 2,143.00 | $ 3,031.00 | $ 2,591.00 | $ 3,365.00 | $ 2,578.17 | 75% |
| Electrical Engineer | $ 2,130.00 | $ 3,066.00 | $ 2,910.00 | $ 3,897.00 | $ 3,533.00 | $ 5,179.00 | $ 3,452.50 | |
| CAD Drafter | $ 1,282.00 | $ 2,295.00 | $ 1,948.00 | $ 2,875.00 | $ 2,442.00 | $ 3,455.00 | $ 2,382.83 | 69% |
| Electrical Engineer | $ 2,130.00 | $ 3,066.00 | $ 2,910.00 | $ 3,897.00 | $ 3,533.00 | $ 5,179.00 | $ 3,452.50 | |
| Secretaries | $ 1,186.00 | $ 2,104.00 | $ 1,749.00 | $ 2,944.00 | $ 2,226.00 | $ 3,722.00 | $ 2,321.83 | 67% |

Occupational Wage Information - Michigan - June 1996
Michigan Employment Security Commission

Exhibit - 26



3  0000 005 328 954
LIBRARY OF MICHIGAN

# Occupational Wage Information

# MICHIGAN

### June 1996

Michigan Employment
Security Commission

For Further Information Contact:
Occupational Employment Statistics
7310 Woodward Avenue
Detroit, Michigan 48202
(313) 876-5372

STATE OF MICHIGAN
DEPARTMENT OF LABOR
MICHIGAN EMPLOYMENT
SECURITY COMMISSION

Acquired by JTPA
5 edition 1 25 .A 42
Copied 2 CO
Cost $5 .R 1 6 3 65 / copy
Paid for with Federal funds

## MONTHLY RATES
## FOR
## SELECTED OCCUPATIONS
## MICHIGAN

| OCCUPATION TITLE | BEGINNING MIN | MAX | INTERMEDIATE MIN | MAX | SENIOR MIN | MAX | DATA SOURCE |
|---|---|---|---|---|---|---|---|
| BOOK COVER DESIGNER | $1510 | $2324 | $2241 | $3166 | $2868 | $4219 | PU |
| SUPERVISORY | | | | | 4003 | 5348 | PU |
| ADMINISTRATIVE | | | | | 4760 | 6008 | PU |
| BOTANIST | 2165 | 3022 | 2304 | 3577 | 3118 | 4252 | CS |
| SUPERVISORY | | | | | 3343 | 4598 | CS |
| ADMINISTRATIVE | | | | | 3888 | 6538 | CS |
| BUDGET ANALYSTS | -- | -- | 2312 | 3403 | 2825 | 3880 | CFP |
| SUPERVISORY | | | | | 3403 | 4313 | CFP |
| ADMINISTRATIVE | | | | | 3880 | 5614 | CFP |
| BUILDING INSPECTOR | 1808 | 2806 | 2529 | 3360 | 3118 | 4780 | CS |
| BUILDING-ILLUMINATING ENGINEER | 2130 | 3066 | 2910 | 3897 | 3533 | 5179 | CPS |
| SUPERVISORY | | | | | 4088 | 5515 | C |
| BURSAR | 1888 | 2892 | 2511 | 3392 | 2840 | 3888 | CFPSU |
| SUPERVISORY | | | | | 3222 | 4605 | CFPSU |
| ADMINISTRATIVE | | | | | 3620 | 6417 | CFPSU |
| BUSINESS AND FINANCIAL COUNSEL | 2042 | 3629 | 3447 | 5212 | 4486 | 6276 | CFS |
| SUPERVISORY | | | | | 5502 | 7805 | CFS |
| ADMINISTRATIVE | | | | | 6212 | 8747 | CFS |
| BUSINESS PROGRAMMER | 1871 | 2806 | 2425 | 3637 | 2910 | 3888 | CFPS |
| SUPERVISORY | | | | | 3525 | 5412 | CFPS |
| BUSINESS REPRESENTATIVE | 1879 | 2832 | 2624 | 3334 | 2866 | 3854 | CFPS |
| SUPERVISORY | | | | | 3429 | 4760 | CFPS |
| ADMINISTRATIVE | | | | | 3819 | 6885 | CFPS |
| BUYER, X FARM PRODUCTS | 1871 | 2866 | 2412 | 3429 | 2866 | 3758 | CFPS |
| SUPERVISORY | | | | | 3343 | 4373 | CFPS |
| ADMINISTRATIVE | | | | | 3992 | 5594 | CFPS |
| CABLE ENGINEER | 2130 | 3066 | 2910 | 3897 | 3533 | 5179 | CPS |
| SUPERVISORY | | | | | 4088 | 5515 | CPS |
| CAD DRAFTER | 1282 | 2295 | 1948 | 2875 | 2442 | 3455 | CFPSU |
| SUPERVISORY | | | | | 2814 | 4122 | CFPSU |
| CALIBRATION LABORATORY TECH | 1871 | 2468 | 2143 | 3031 | 2591 | 3365 | CPS |
| SUPERVISORY | | | | | 3144 | 3464 | CPS |

MONTHLY RATES
FOR
SELECTED OCCUPATIONS
MICHIGAN

| OCCUPATION TITLE | BEGINNING MIN | BEGINNING MAX | INTERMEDIATE MIN | INTERMEDIATE MAX | SENIOR MIN | SENIOR MAX | DATA SOURCE |
|---|---|---|---|---|---|---|---|
| DIETICIAN | $2087 | $2848 | $2381 | $3083 | $2882 | $3914 | CS |
| SUPERVISORY | | | | | 3343 | 4304 | CS |
| DIETICIAN, TEACHING | 2087 | 2848 | 2381 | 3083 | 2882 | 3914 | CS |
| SUPERVISORY | | | | | 3343 | 4304 | CS |
| DIETICIAN, THERAPIUTIC | 2087 | 2848 | 2381 | 3083 | 2882 | 3914 | CS |
| SUPERVISORY | | | | | 3343 | 4304 | CS |
| DIETICIAN/NUTRITIONIST | 2087 | 2848 | 2381 | 3083 | 2882 | 3914 | CS |
| SUPERVISORY | | | | | 3343 | 4304 | CS |
| DISTRIBUTION FIELD ENGINEER | 2130 | 3066 | 2910 | 3897 | 3533 | 5179 | CPS |
| SUPERVISORY | | | | | 4088 | 5515 | CPS |
| DOCTOR OF NUCLEAR MEDICINE | 2693 | 7663 | 5860 | 9223 | 7762 | 9999+ | CS |
| DRAFTER, ELECTRICAL | 1282 | 2295 | 1948 | 2875 | 2442 | 3455 | CFPSU |
| SUPERVISORY | | | | | 2814 | 4122 | CFPSU |
| DRAFTER, ELECTRONIC | 1282 | 2295 | 1948 | 2875 | 2442 | 3455 | CFPSU |
| SUPERVISORY | | | | | 2814 | 4122 | CFPSU |
| DRAFTERS | 1282 | 2295 | 1948 | 2875 | 2442 | 3455 | CFPSU |
| SUPERVISORY | | | | | 2814 | 4122 | CFPSU |
| DRUG ADDICTION COUNSELOR | 2217 | 2489 | 2356 | 3335 | 2463 | 3706 | CS |
| DRUGGIST | 2304 | 3057 | 2728 | 3646 | 2910 | 3975 | CS |
| SUPERVISORY | | | | | 3646 | 4607 | CS |
| ECONOMISTS | 2200 | 2866 | 2477 | 3706 | 3178 | 4053 | S |
| SUPERVISORY | | | | | 3568 | 4949 | S |
| EDUCATION COUNSELOR | -- | -- | 1897 | 2693 | 2634 | 4088 | CS |
| SUPERVISORY | | | | | 3178 | 4521 | CS |
| EEG TECHNICIAN | -- | -- | 1951 | 2451 | -- | -- | S |
| ELECTRICAL DESIGN ENGINEER | 2130 | 3066 | 2910 | 3897 | 3533 | 5179 | CPS |
| SUPERVISORY | | | | | 4088 | 5515 | CPS |
| ELECTRICAL ENG TECHNOLOGIST | 1871 | 2468 | 2143 | 3031 | 2591 | 3365 | CPS |
| SUPERVISORY | | | | | 3144 | 3464 | CPS |
| ELECTRICAL ENGINEER | 2130 | 3066 | 2910 | 3897 | 3533 | 5179 | CPS |
| SUPERVISORY | | | | | 4088 | 5515 | CPS |
| ELECTRICAL LABORATORY TECH | 1871 | 2468 | 2143 | 3031 | 2591 | 3365 | CPS |
| SUPERVISORY | | | | | 3144 | 3464 | CPS |

14

**MONTHLY RATES
FOR
SELECTED OCCUPATIONS
MICHIGAN**

| OCCUPATION TITLE | BEGINNING | | INTERMEDIATE | | SENIOR | | DATA |
| | MIN | MAX | MIN | MAX | MIN | MAX | SOURCE |
| --- | --- | --- | --- | --- | --- | --- | --- |
| SALES RECORD CLERK | $1749 | $2200 | $1992 | $2546 | $2122 | $2988 | CS |
| SALES REP-EXCEPT SCI & RETAIL | -- | -- | 2009 | 2970 | 2363 | 3328 | CP |
| SUPERVISORY | | | | | 3040 | 5135 | CP |
| SALES REPRESENTATIVE SUPV | 1871 | 2455 | 2364 | 3438 | 3230 | 3992 | CP |
| SCHEDULE MAKER | 1687 | 2246 | 2055 | 2652 | 2404 | 3386 | CPU |
| SCHEDULER AND PLANNER | 1230 | 1733 | 1434 | 2321 | 2130 | 2712 | C |
| SUPERVISORY | | | | | 2342 | 3532 | C |
| SECRETARIES | 1186 | 2104 | 1749 | 2944 | 2226 | 3722 | CFPSU |
| SUPERVISORY | | | | | 2719 | 4486 | CFPSU |
| SHIPPING CLERK | 1282 | 1905 | 1819 | 2412 | 2122 | 3187 | CFPU |
| SUPERVISORY | | | | | 2607 | 3473 | CFPU |
| SHIPPING/RECEIVING CLERK | 1282 | 1905 | 1819 | 2412 | 2122 | 3187 | CFI |
| SUPERVISORY | | | | | 2607 | 3473 | CFPu |
| STACK CLERK | -- | -- | 1360 | 2191 | 1974 | 2650 | C |
| STATION HOUSE CLERK | 1351 | 1871 | 1645 | 2165 | 2085 | 2884 | CP |
| SUPERVISORY | | | | | 2840 | 3750 | CP |
| STATISTICAL CLERKS | 1749 | 2200 | 1992 | 2546 | 2122 | 2988 | CS |
| STENOGRAPHER | 1332 | 2210 | 1708 | 2736 | 2252 | 3176 | CS |
| STENOTYPE OPERATOR | 1332 | 2210 | 1708 | 2736 | 2252 | 3176 | CS |
| STOCK CLERK, STOCKROOM, WAREHOUS | 1126 | 1950 | 1686 | 2347 | 2088 | 3144 | CPSU |
| SUPERVISORY | | | | | 2892 | 3473 | CPSU |
| STOCKROOM CLERK | 1126 | 1950 | 1686 | 2347 | 2088 | 3144 | CPSU |
| SUPERVISORY | | | | | 2892 | 3473 | CPSU |
| STOCKROOM INVENTORY CLERK | 1126 | 1950 | 1686 | 2347 | 2088 | 3144 | CPSU |
| SUPERVISORY | | | | | 2892 | 3473 | CPSU |
| STORE CASHIER | 736 | 1862 | 1690 | 2451 | 2113 | 3100 | CPU |
| STOREKEEPER | 1126 | 1950 | 1686 | 2347 | 2088 | 3144 | CPSU |
| SUPERVISORY | | | | | 2892 | 3473 | CPSU |
| SUBSCRIPTION ORDER CLERK | 1212 | 1741 | 1567 | 2390 | -- | -- | C |
| SUPPLY CLERK | 1126 | 1950 | 1686 | 2347 | 2088 | 3144 | CPSU |
| SUPERVISORY | | | | | 2892 | 3473 | CPSU |

Exhibit - 27

ISSUANCE DATE 03-28-88       215 CHANGE OF STATUS OF SALARIED EMPLOYEE

AES        / WARREN    DI

ANASTASIO STANLEY
ADDRESS: 27653 LEXINGTON PKWY   SOUTHFIELD  MI 48076
BIRTHDATE: 06-06-61      SERVICE DATE: 07-18-83    SEX/MINORITY: M/CAUCASIAN
EDUCATION: 16 COLLEGE GRADUATE         BACHELOR  ENGINEERING - ELECTRICAL - G
ORG TITLE: PROJECT ENGINEER            REPORTS TO:  EXEC DIR APE

★ DATA AS OF: 07-18-83 ******** S T A T U S ***** RECOMMENDED AS OF: _____

| HN | NEW HIRE REG | ACTION | __ | _____ |
| RA | REGULAR ACTIVE (INCL P | EMPLOY CAT. | __ | _____ |

★ DATA AS OF: 01-16-86 ******* P O S I T I O N ***** RECOMMENDED AS OF 05-01-88

| D1 | POSITION BUILD | ACTION | J | PROFICIENCY PROMOTION |
| 6E11 | PROJECT ENGINEER | GM POS CODE | 7E | SR PROJECT ENGINEER |
| 00100 | AES | PER UNIT | 00100 | AES |
| F161 | APE ENGRG | DEPARTMENT | F161 | APE ENGRG |
| 1 | | SHIFT/BLDG | | |
| 0001094 | | ORG#/REPLACE | 0001884 | _____ |
| | | LOCAL CODE | | _____ |

★ DATA AS OF: 10-01-87 ★ C O M P E N S A T I O N ★ RECOMMENDED AS OF 05-01-88

| W | MERIT AWARD | | ACTION | | PROFICIENCY PROMOTION |
| $ 3118.00 | $ 1947.00 | 5.2% | RATE/INCR. | $ 4462.00   CHG $ 374.00 | 11.9 |
| $ 1679.00 | TO: $ 3935.00 | M | RANGE/FREQ | $ 2110.00    TO: $ 4836.00 | M |

********************* R E A S O N   F O R   C H A N G E *******************
PROFICIENCY PROMOTION

********** L E A V E  O F  A B S E N C E  / S E P A R A T I O N ***********

| L.O.W. | : | LEAVE | : | FULL PAY : | PART. PAY : | WITHOUT PAY |
| | | | | DAYS ___ | DAYS ___ | DAYS ___ |

SEPARATION ALLOWANCE: _____  VACATION DAYS REMAINING: _____

************* H I S T O R I C A L   I N F O R M A T I O N ***************

| EFF DATE | COMP. ACT | BASE RATE | AMOUNT CHANGE | % INC | POS ACT | EFF DATE | GM ACT | STA ACT | EFF DATE | APPRAI DATE/1 |
|---|---|---|---|---|---|---|---|---|---|---|
| 03-01-86 | M | 3118.00 | 245.40 | 8.5 | | 09-01-85 | 6E11 | 5N | 08-14-79 | 12-87/1 |
| 01-01-86 | T | 2872.60 | 93.60 | 3.4 | | 07-18-83 | 5E35 | HT | 06-16-79 | 12-86/1 |
| 09-01-85 | J | 2779.00 | 252.72 | 10.0 | | 06-16-79 | 2E30 | HC | 09-07-78 | 11-85/1 |
| 10-16-84 | T | 2526.28 | 518.28 | 25.8 | | 09-07-78 | 2E00 | | | 01-85/1 |
| 09-01-84 | M | 2008.00 | 58.00 | 3.0 | | | | | | 01-84/2 |

************* O R G A N I Z A T I O N A L   C H A N G E S ***************

ORGANIZATION TITLE: _____        EFFECTIVE DATE: _____

DIRECT: _____   PROJECT: _____   INDIRECT: _____

★★★ RECOMMENDED BY ********************** APPROVED BY *************

DATE: 4/13/88        DATE: 4/21/08
DATE: 4/21/88        DATE: 4/2/08

Case 2:09-cv-14827-JAC-VMM   Document 4-4   Filed 12/11/09   Page 15 of 50

ISSUED: 07-27-95    SALARIED PERSONNEL TRANSACTION    SM-215/TAD

NAME----: STANLEY R STASKO    SSN: 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
ADDRESS--: 27653 LEXINGTON PKWY
           SOUTHFIELD, MI 48076

BIRTHDATE: 06-06-61    SEX/MINORITY----: M NON-MINORITY
PERF/DATE S 01-22-92    CREDITED SERVICE: 11 YRS 06 MOS
EDUCATION: 16  B  LAWRENCE TECH U  ENGRG - ELECTRICAL - GENERAL

*********** CURRENT *********** S T A T U S *********** RECOMMENDED *******
        07-18-83                                        08-25-95
HN    HIRE-REGULAR          ACTION CODE        1J    QUIT-CAREER CHANGE
RA    REGULAR ACTIVE        EMP CATEGORY       SE    SEPARATED
07-18-83  09-07-78          SERV DT/ORIG HIRE  _____  _____
                            LDW/RTW/REC DLA    08-25-95   _____    __
                            SEP ALLOW/VAC HRS  _____     _____

************************ P O S I T I O N *********************************
        01-01-95
D8    CHG-REORGANIZATION     ACTION CODE
7E06  SR PROJECT ENGINEER    POSITION CODE
                            LOCAL NUMBER
                            LOCAL TITLE
10020 GM POWERTRAIN-WRN ENG  PERSONNEL UNIT
4213  LAB SUPERVISOR/ENGINE  DEPARTMENT
2130  WARREN        MI       LOCATION CODE
03       2        P     N   AOW/EEO/EXPT/SUPV
5110000 GM POWERTRAIN-WARREN AAP FACILITY

********************** C O M P E N S A T I O N ***************************
        06-01-95
M     MERIT INCREASE         ACTION CODE
  5299.00    186.00      3.6  BASE SAL/CHG/%
  3325.00   5160.00   6325.00 MIN/MID/MAX
102.7   M    40.00            % MID/FREQ/HOURS
12-01-91    910.00      1.7  LST AWD DT/AMT/%

**************************************************************************
MR. STASKO IS RESIGNING FROM GENERAL MOTORS CORPORATION EFFECTIVE 8/25/95 TO GO
INTO THE MINISTRY.  HE IS ENTITLED TO 50% OF HIS 17.5 DAYS OF VACATION PLUS THE
FOUR (4) ADDITIONAL DAYS HE PURCHASED.  HE HAS TAKEN ALL OF HIS VACATION DAYS.


PREDECESSOR(NAME/TITLE):

REQ #:                                        WILL BE REPLACED(Y/N):

*********** S I G N A T U R E S   O F   A U T H O R I Z A T I O N ***********
APPROVAL/DATE: _Gerald A Faul_____  8-1-95  _Bruce E Holmes_  8-1-95

APPROVAL/DATE: _____/_____  _____/_____

APPROVAL/DATE: _____/_____  _____/_____

Prism  Approved on LHA on 8/1/95  dAS

**General Motors Corporation**

10001  GMC CENTRAL OFFICE                                                    00240

STANLEY R STASKO            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  DEPT   F161   NON-EXEMPT SEMI-MO

POSITION CODE AND TITLE: 5E35  ASSOC ENGINEER
POSITION SALARY RANGE: $1,306.00 TO  $2,310.96

| | | | EFFECT | CHANGE | |
|---|---|---|---|---|---|
| EFFECT OF MERIT INCREASE | | | 08-31-84 | CHANGE | 09-01-84 |
| MONTHLY BASE SALARY | | | $ 1,950.00 | $ 58.00 | $ 2,008.00 |
| SAVINGS-STOCK OPTION 3 | 1% | MID MONTH | 12.00 | .00 | 12.00 |
| | 1% | MONTH END | 12.00 | 1.00 | 13.00 |
| RETIREMENT DEDUCTION | | | .00 | .00 | .00 |
| OPTIONAL LIFE INSURANCE | | | .00 | .00 | .00 |
| BASIC LIFE INSURANCE (PAID FOR BY GM) | | | 56,800.00 | 1,400.00 | 58,200.00 |

QUARTERLY COST OF LIVING ALLOWANCE:  $1580.80

---

**General Motors Corporation**

10001  GMC CENTRAL OFFICE                                                    02598

STANLEY R STASKO            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  DEPT   F161   NON-EXEMPT SEMI

POSITION CODE AND TITLE: 5E35  ASSOC ENGINEER
POSITION SALARY RANGE: $1,306.00 TO  $2,829.24

| | | | | CHANGE | |
|---|---|---|---|---|---|
| EFFECT OF COLA TRANSFER TO BASE INCREASE | | | 10-15-84 | CHANGE | 10-16-84 |
| MONTHLY BASE SALARY | | | $ 2,008.00 | $ 518.28 | $ 2,526.28 |
| SAVINGS-STOCK OPTION 3 | 1% | MID MONTH | 12.00 | .00 | 12.00 |
| | 1% | MONTH END | 13.00 | .00 | 13.00 |
| RETIREMENT DEDUCTION | | | .00 | .00 | .00 |
| OPTIONAL LIFE INSURANCE | | | .00 | .00 | .00 |
| BASIC LIFE INSURANCE (PAID FOR BY GM) | | | 58,200.00 | 2,500.00 | 60,700.00 |

QUARTERLY COST OF LIVING ALLOWANCE:   $26.00

```
10001   GMC CENTRAL OFFICE      General Motors Corporation                      01699

STANLEY R STASKO                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   DEPT   F161          EXEMPT SEMI-M

POSITION CODE AND TITLE: 6E11   PROJECT ENGINEER
MONTHLY SALARY RANGE:    $1,679.00 TO   $3,934.84          MIDPOINT:  $3,322.
ANNUAL   SALARY RANGE:   $20,148.00 TO  $47,218.08          MIDPOINT:  $39,470.

EFFECT OF COLA TRANSFER TO BASE INCREASE      12-31-85      CHANGE    01-01-86
MONTHLY BASE SALARY                       $   2,779.00 $       93.60 $  2,872.60
ANNUAL  BASE SALARY                       $  33,348.00 $    1,123.20 $ 34,471.20
SAVINGS-STOCK                 15%  MID MONTH        214.00         6.00        220.00
                              15%  MONTH END        216.00         6.00        222.00
RETIREMENT DEDUCTION                               12.46          1.37         14.03
OPTIONAL LIFE INSURANCE DED (INC DGLI)              7.84           .18          8.02
OPTIONAL LIFE INS RETRO ONE TIME ADJ                .18           .00
OPTIONAL LIFE INSURANCE PRINCIPAL SUM          133,400.00     4,500.00    137,900.00
BASIC LIFE INSURANCE (PAID FOR BY GM)           66,700.00     2,300.00     69,000.00
```

```
10001   GMC CENTRAL OFFICE      General Motors Corporation                      00189

STANLEY R STASKO                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   DEP.   F161          EXEMPT SEMI-M

POSITION CODE AND TITLE: 6E11   PROJECT ENGINEER
POSITION SALARY RANGE: $1,679.00 TO  $3,425.88

EFFECT OF PROMOTIONAL INCREASE                08-31-85      CHANGE    09-01-85
MONTHLY BASE SALARY                       $   2,526.28 $      252.72 $  2,779.00

SAVINGS-STOCK                 15%  MID MONTH        193.00        21.00        214.00
                              15%  MONTH END        194.00        21.00        215.00
RETIREMENT DEDUCTION                                .00           .00          .00
OPTIONAL LIFE INSURANCE DED (INC DGLI)             7.35           .49          7.84
OPTIONAL LIFE INS RETRO ONE TIME ADJ               .49           .00
OPTIONAL LIFE INSURANCE PRINCIPAL SUM          121,300.00    12,100.00    133,400.00
BASIC LIFE INSURANCE (PAID FOR BY GM)           60,700.00     6,000.00     66,700.00

QUARTERLY COST OF LIVING ALLOWANCE:   $244.40
```

## General Motors Corporation

10001   GMC CENTRAL OFFICE                                              0036!

STANLEY R STASKO                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  DEPT   F161        EXEMPT SEMI-M

POSITION CODE AND TITLE: 6E11  PROJECT ENGINEER
MONTHLY SALARY RANGE:    $1,679.00 TO     $3,934.84   MIDPOINT:      $3,322.58
ANNUAL   SALARY RANGE:  $20,148.00 TO    $47,218.08   MIDPOINT:     $39,870.96

EFFECT OF MERIT INCREASE                 02-28-86      CHANGE      03-01-86
MONTHLY BASE SALARY              $   2,872.60 $    245.40 $   3,118.00
ANNUAL   BASE SALARY             $  34,471.20 $  2,944.80 $  37,416.00
SAVINGS-STOCK            15%  MID MONTH      214.00        18.00       232.00
                        15%  MONTH END      216.00        18.00       234.00
RETIREMENT DEDUCTION                         14.03         3.07        17.10
OPTIONAL LIFE INSURANCE DED (INC DGLI)        8.02          .47         8.49
OPTIONAL LIFE INS RETRO ONE TIME ADJ           .47          .00          .00
OPTIONAL LIFE INSURANCE PRINCIPAL SUM   137,900.00    11,800.00   149,700.00
BASIC LIFE INSURANCE (PAID FOR BY GM)    69,000.00     5,900.00    74,900.00

## General Motors Corporation

10001   GMC CENTRAL OFFICE                                              00136
10001-F    -9L98
STANLEY R STASKO                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  DEPT   F161        EXEMPT SEMI-M

POSITION CODE AND TITLE: 7E06   SR PROJECT ENGINEER
MONTHLY SALARY RANGE:    $2,110.50 TO    $4,835.42   MIDPOINT:     $3,775.00
ANNUAL   SALARY RANGE:  $25,326.00 TO   $58,025.04   MIDPOINT:    $45,300.00

EFFECT OF PROMOTIONAL INCREASE           04-30-88      CHANGE      05-01-88
MONTHLY BASE SALARY              $   3,118.00 $    374.00 $   3,492.00
ANNUAL   BASE SALARY             $  37,416.00 $  4,488.00 $  41,904.00
SAVINGS-STOCK            10%  MID MONTH      155.00        19.00       174.00
                        10%  MONTH END      156.00        19.00       175.00
RETIREMENT DEDUCTION                         13.98         4.67        18.65
OPT LIFE INS DEDUCTION                         .00          .00          .00
OPT LIFE INS PRINCIPAL SUM              149,700.00    18,000.00   167,700.00
BASIC LIFE INS (PD BY GM)                74,900.00     9,000.00    83,900.00

General Motors Corporation

10001   GMC CENTRAL OFFICE                                              00329
10001-F   -9L98
STANLEY R STASKO              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   DEPT   F161      EXEMPT SEMI-M

POSITION CODE AND TITLE: 7E06   SR PROJECT ENGINEER
MONTHLY SALARY RANGE:      $2,210.50 TO      $5,070.00
ANNUAL   SALARY RANGE:    $25,326.00 TO     $60,840.00

EFFECT OF MERIT INCREASE                    04-30-89        CHANGE        05-01-89
MONTHLY BASE SALARY                 $    3,492.00 $     251.00 $    3,743.00
ANNUAL   BASE SALARY                $   41,904.00 $   3,012.00 $   44,916.00
SAVINGS-STOCK          10%  MID MONTH       174.00         13.00        187.00
                       10%  MONTH END       175.00         12.00        187.00
RETIREMENT DEDUCTION                         18.65          3.14         21.75
OPT LIFE INS DED (INC DGLI)                   9.21           .48          9.65
OPT LIFE INS RETRO ONE TIME ADJ                .48           .00           .00
OPT LIFE INS PRINCIPAL SUM              167,700.00     12,000.00    179,700.00
BASIC LIFE INS (PD BY GM)                83,900.00      6,000.00     89,900.00

BASE SALARY CHANGE / RECOGNITION AWARD NOTICE — COMPENSATION STATEMENT

NAME    : STASKO,STANLEY R,                           SSN : 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
TITLE   : SR PROJECT ENGINEER                    POS CODE : 7E06
PERUNIT : 00100 AES              DEPT : F161     EXEMPT : P

PREVIOUS ANNUAL BASE: 44,916.00        EFFECTIVE DATE         : 09/01/90
AMOUNT OF INCREASE  : 3,060.00  $255 mo    M  MERIT INCREASE
NEW ANNUAL BASE     : 47,976.00

                                       ANNUAL RANGE MIDPOINT: 52,800.00
RECOGNITION AWARD   : 1,120.00 (09/01/90) ANNUAL RANGE MAXIMUM : 63,276.00
------------------------------------------------------------------
          BENEFITS IMPACT              PREV AMOUNT       NEW AMOUNT
BASIC LIFE INSURANCE (PAID FOR BY GM):   89,900.00       96,000.00
RETIREMENT DEDUCTION (MONTHLY):              21.79           24.98
OPTIONAL LIFE INS AMOUNT (MONTHLY):           7.19            7.68
SAVINGS STOCK DEDUCTION (MID_MONTH):        187.00          199.00
                        (END_MONTH):        187.00          200.00
==================================================================
      INSTRUCTIONS FOR THE SUPERVISOR (CONFIDENTIAL INFORMATION):
PLEASE PROVIDE YOUR EMPLOYE WITH THIS INFORMATION: IT CONFIRMS A CHANGE IN
COMPENSATION.  BOTH YOU AND THE EMPLOYE SHOULD SIGN EACH COPY, PROVIDING
ONE TO THE EMPLOYE AND FORWARDING THE OTHER TO SALARIED PERSONNEL.
------------------------------------------------------------------
             COMPENSATION STATEMENT
COMMENCING: SEP 01, 1990  MY COMPENSATION IS $   3,998.00 PER MONTH

    I AM CLASSIFIED AS AN EXEMPT EMPLOYE UNDER THE PROVISIONS OF THE FAIR
LABOR STANDARDS ACT.  THIS STATEMENT, WHICH IS A PART OF MY 'EMPLOYMENT
AGREEMENT,' RECOGNIZES THAT THE RATE CITED ABOVE WILL BE MY COMPENSATION
FOR ALL HOURS WORKED, INCLUDING OVERTIME, DURING EACH MONTHLY PERIOD.
HOWEVER, A NIGHT SHIFT PREMIUM, AN EXTENDED WORKWEEK SALARY PREMIUM OR
AN OVERTIME PREMIUM FOR SCHEDULED OVERTIME HOURS MAY BE PAID ME, IF
APPROVED, IN ACCORDANCE WITH THE POLICY OR PRACTICE IN EFFECT.  ACCEPTANCE
BY ME OF MY PAY, WITHOUT PROTEST IN WRITING, SHALL ACKNOWLEDGE THAT I HAVE
BEEN PAID IN FULL FOR THE PERIOD.
    WHEN SIGNED AND ACCEPTED, THIS STATEMENT BECOMES A PART OF MY BASIC
'EMPLOYMENT AGREEMENT' AND REAFFIRMS THAT MY EMPLOYMENT IS FROM
MONTH-TO-MONTH ON A CALENDAR MONTH BASIS.
    THIS STATEMENT REPLACES ANY PREVIOUS 'COMPENSATION STATEMENTS' AND
SHALL CONTINUE IN EFFECT UNTIL THE BASIC 'EMPLOYMENT AGREEMENT', OR MY
EMPLOYMENT, IS TERMINATED, OR UNTIL REPLACED BY A NEW 'COMPENSATION
STATEMENT.'
    IN CONSIDERATION OF MY CONTINUED EMPLOYMENT, I ACKNOWLEDGE THAT I HAVE
RECEIVED ALL COMPENSATION DUE ME FOR ALL SERVICES I RENDERED PRIOR TO
THE SIGNING OF THIS STATEMENT.
    THERE ARE NO OTHER ARRANGEMENTS, AGREEMENTS, UNDERSTANDINGS, OR
STATEMENTS, VERBAL OR IN WRITING, EXCEPT AS STATED ABOVE.  NO MODIFICATION
OR AMENDMENT, OTHER THAN A CANCELLATION AND REPLACEMENT BY ANOTHER WRITTEN
'COMPENSATION STATEMENT', WILL BE EFFECTIVE, UNLESS SIGNED BY ME AND MY
EMPLOYER.

_____    9/5/90    _____    9-5-90
EMPLOYE                    DATE       SUPERVISOR                  DATE

## BASE SALARY CHANGE NOTICE — COMPENSATION STATEMENT

```
NAME    : STASKO,STANLEY R,                        SSN : 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
TITLE   : SR PROJECT ENGINEER                      POS CODE : 7E06
PERUNIT : 00100 AES              DEPT : F161        EXEMPT : P
```

```
PREVIOUS ANNUAL BASE: 47,976.00        EFFECTIVE DATE       : 09/01/91
AMOUNT OF INCREASE  : 4,824.00  (402 mth)  M  MERIT INCREASE
NEW ANNUAL BASE     : 52,800.00        ANNUAL RANGE MIDPOINT: 55,368.00
                                       ANNUAL RANGE MAXIMUM : 66,276.00
```

```
                BENEFITS IMPACT              PREV AMOUNT     NEW AMOUNT
BASIC LIFE INSURANCE (PAID FOR BY GM):       96,000.00      105,600.00
RETIREMENT DEDUCTION (MONTHLY):                  24.98          30.00
OPTIONAL LIFE INS AMOUNT (MONTHLY):               7.68           8.45
SAVINGS STOCK DEDUCTION (MID MONTH):            119.00         132.00
                        (END MONTH):           120.00         132.00
```

INSTRUCTIONS FOR THE SUPERVISOR (CONFIDENTIAL INFORMATION):
PLEASE PROVIDE YOUR EMPLOYE WITH THIS INFORMATION: IT CONFIRMS A CHANGE IN
COMPENSATION.  BOTH YOU AND THE EMPLOYE SHOULD SIGN EACH COPY, PROVIDING
ONE TO THE EMPLOYE AND FORWARDING THE OTHER TO SALARIED PERSONNEL.

### COMPENSATION STATEMENT

COMMENCING: SEP 01, 1991  MY COMPENSATION IS $   4,400.00 PER MONTH

I AM CLASSIFIED AS AN EXEMPT EMPLOYE UNDER THE PROVISIONS OF THE FAIR
LABOR STANDARDS ACT.  THIS STATEMENT, WHICH IS A PART OF MY 'EMPLOYMENT
AGREEMENT,' RECOGNIZES THAT THE RATE CITED ABOVE WILL BE MY COMPENSATION
FOR ALL HOURS WORKED, INCLUDING OVERTIME, DURING EACH MONTHLY PERIOD.
HOWEVER, A NIGHT SHIFT PREMIUM, AN EXTENDED WORKWEEK SALARY PREMIUM OR
AN OVERTIME PREMIUM FOR SCHEDULED OVERTIME HOURS MAY BE PAID ME, IF
APPROVED, IN ACCORDANCE WITH THE POLICY OR PRACTICE IN EFFECT.  ACCEPTANCE
BY ME OF MY PAY, WITHOUT PROTEST IN WRITING, SHALL ACKNOWLEDGE THAT I HAVE
BEEN PAID IN FULL FOR THE PERIOD.

WHEN SIGNED AND ACCEPTED, THIS STATEMENT BECOMES A PART OF MY BASIC
'EMPLOYMENT AGREEMENT' AND REAFFIRMS THAT MY EMPLOYMENT IS FROM
MONTH-TO-MONTH ON A CALENDAR MONTH BASIS.

THIS STATEMENT REPLACES ANY PREVIOUS 'COMPENSATION STATEMENTS' AND
SHALL CONTINUE IN EFFECT UNTIL THE BASIC 'EMPLOYMENT AGREEMENT', OR MY
EMPLOYMENT, IS TERMINATED, OR UNTIL REPLACED BY A NEW 'COMPENSATION
STATEMENT.'

IN CONSIDERATION OF MY CONTINUED EMPLOYMENT, I ACKNOWLEDGE THAT I HAVE
RECEIVED ALL COMPENSATION DUE ME FOR ALL SERVICES I RENDERED PRIOR TO
THE SIGNING OF THIS STATEMENT.

THERE ARE NO OTHER ARRANGEMENTS, AGREEMENTS, UNDERSTANDINGS, OR
STATEMENTS, VERBAL OR IN WRITING, EXCEPT AS STATED ABOVE.  NO MODIFICATION
OR AMENDMENT, OTHER THAN A CANCELLATION AND REPLACEMENT BY ANOTHER WRITTEN
'COMPENSATION STATEMENT', WILL BE EFFECTIVE, UNLESS SIGNED BY ME AND MY
EMPLOYER.

```
_____   9/3/91   _____   9-3-91
EMPLOYE                    DATE     SUPERVISOR                 DATE
```

BASE SALARY CHANGE NOTICE - COMPENSATION STATEMENT

```
NAME   : STASKO,STANLEY,R                        SSN : 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
TITLE  : SR PROJECT ENGINEER              POS CODE : 7E06
PERUNIT: 10020 GM POWERTRAIN-WRN ENG  DEPT : 53200     EXEMPT : P

PREVIOUS ANNUAL BASE:     52,800.00     EFFECTIVE DATE        : 10/01/93
AMOUNT OF INCREASE  :      4,632.00     M  MERIT INCREASE
NEW ANNUAL BASE     :     57,432.00     ANNUAL RANGE MIDPOINT:   58,200.00
                                        ANNUAL RANGE MAXIMUM :   70,500.00
```
=============================================================================

INSTRUCTIONS FOR THE SUPERVISOR (CONFIDENTIAL INFORMATION):

PLEASE PROVIDE YOUR EMPLOYE WITH THIS INFORMATION: IT CONFIRMS A CHANGE IN
COMPENSATION.  BOTH YOU AND THE EMPLOYE SHOULD SIGN EACH COPY, PROVIDING
ONE TO THE EMPLOYE AND FORWARD THE OTHER TO SALARIED PERSONNEL.

-----------------------------------------------------------------------------
COMPENSATION STATEMENT
NAME: STASKO,STANLEY,R                UNIT: 10020 GM POWERTRAIN-WRN ENG
COMMENCING: OCT 01, 1993  MY COMPENSATION IS $     4,786.00 PER MONTH.

    I AM CLASSIFIED AS AN EXEMPT EMPLOYE UNDER THE PROVISIONS OF THE FAIR
LABOR STANDARDS ACT.  THIS STATEMENT, WHICH IS A PART OF MY 'EMPLOYMENT
AGREEMENT,' RECOGNIZES THAT THE RATE CITED ABOVE WILL BE MY COMPENSATION
FOR ALL HOURS WORKED, INCLUDING OVERTIME, DURING EACH MONTHLY PERIOD.
HOWEVER, A NIGHT SHIFT PREMIUM, AN EXTENDED WORKWEEK SALARY PREMIUM OR
AN OVERTIME PREMIUM FOR SCHEDULED OVERTIME HOURS MAY BE PAID ME, IF
APPROVED, IN ACCORDANCE WITH THE POLICY OR PRACTICE IN EFFECT.  ACCEPTANCE
BY ME OF MY PAY, WITHOUT PROTEST IN WRITING, SHALL ACKNOWLEDGE THAT I HAVE
BEEN PAID IN FULL FOR THE PERIOD.
    WHEN SIGNED AND ACCEPTED, THIS STATEMENT BECOMES A PART OF MY BASIC
'EMPLOYMENT AGREEMENT' AND REAFFIRMS THAT MY EMPLOYMENT IS FROM
MONTH-TO-MONTH ON A CALENDAR MONTH BASIS.
    THIS STATEMENT REPLACES ANY PREVIOUS 'COMPENSATION STATEMENTS' AND
SHALL CONTINUE IN EFFECT UNTIL THE BASIC 'EMPLOYMENT AGREEMENT', OR MY
EMPLOYMENT, IS TERMINATED, OR UNTIL REPLACED BY A NEW 'COMPENSATION
STATEMENT.'
    IN CONSIDERATION OF MY CONTINUED EMPLOYMENT, I ACKNOWLEDGE THAT I HAVE
RECEIVED ALL COMPENSATION DUE ME FOR ALL SERVICES I RENDERED PRIOR TO
THE SIGNING OF THIS STATEMENT.
    THERE ARE NO OTHER ARRANGEMENTS, AGREEMENTS, UNDERSTANDINGS, OR
STATEMENTS, VERBAL OR IN WRITING, EXCEPT AS STATED ABOVE.  NO MODIFICATION
OR AMENDMENT, OTHER THAN A CANCELLATION AND REPLACEMENT BY ANOTHER WRITTEN
'COMPENSATION STATEMENT', WILL BE EFFECTIVE, UNLESS SIGNED BY ME AND MY
EMPLOYER.

_____  9/28/93      _____  9-28-93
EMPLOYE                  DATE          SUPERVISOR                DATE

Case 2:09-cv-14827-JAC-VMM    Document 4-4    Filed 12/11/09    Page 23 of 50

BASE SALARY CHANGE NOTICE - COMPENSATION STATEMENT

```
NAME  : STASKO,STANLEY,R                          SSN : 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
TITLE : SR PROJECT ENGINEER              POS CODE : 7E06
PERUNIT: 10020 GM POWERTRAIN-WRN ENG DEPT : 53150    EXEMPT : P

PREVIOUS ANNUAL BASE  :     57,432.00    EFFECTIVE DATE      : 06/01/94
AMOUNT OF INCREASE    :      3,924.00    M  MERIT INCREASE
NEW ANNUAL BASE       :     61,356.00    ANNUAL RANGE MIDPOINT:   59,940.00
                                         ANNUAL RANGE MAXIMUM :   73,680.00
```

=========================================================================

INSTRUCTIONS FOR THE SUPERVISOR (CONFIDENTIAL INFORMATION):

PLEASE PROVIDE YOUR EMPLOYE WITH THIS INFORMATION: IT CONFIRMS A CHANGE IN
COMPENSATION.  BOTH YOU AND THE EMPLOYE SHOULD SIGN EACH COPY, PROVIDING
ONE TO THE EMPLOYE AND FORWARD THE OTHER TO SALARIED PERSONNEL.

-------------------------------------------------------------------------
COMPENSATION STATEMENT

NAME: STASKO,STANLEY,R                 UNIT: 10020 GM POWERTRAIN-WRN ENG
COMMENCING: JUN 01, 1994  MY COMPENSATION IS $     5,113.00 PER MONTH.

    I AM CLASSIFIED AS AN EXEMPT EMPLOYE UNDER THE PROVISIONS OF THE FAIR
LABOR STANDARDS ACT.  THIS STATEMENT, WHICH IS A PART OF MY 'EMPLOYMENT
AGREEMENT,' RECOGNIZES THAT THE RATE CITED ABOVE WILL BE MY COMPENSATION
FOR ALL HOURS WORKED, INCLUDING OVERTIME, DURING EACH MONTHLY PERIOD.
HOWEVER, A NIGHT SHIFT PREMIUM, AN EXTENDED WORKWEEK SALARY PREMIUM OR
AN OVERTIME PREMIUM FOR SCHEDULED OVERTIME HOURS MAY BE PAID ME, IF
APPROVED, IN ACCORDANCE WITH THE POLICY OR PRACTICE IN EFFECT.  ACCEPTANCE
BY ME OF MY PAY, WITHOUT PROTEST IN WRITING, SHALL ACKNOWLEDGE THAT I HAVE
BEEN PAID IN FULL FOR THE PERIOD.
    WHEN SIGNED AND ACCEPTED, THIS STATEMENT BECOMES A PART OF MY BASIC
'EMPLOYMENT AGREEMENT' AND REAFFIRMS THAT MY EMPLOYMENT IS FROM
MONTH-TO-MONTH ON A CALENDAR MONTH BASIS.
    THIS STATEMENT REPLACES ANY PREVIOUS 'COMPENSATION STATEMENTS' AND
SHALL CONTINUE IN EFFECT UNTIL THE BASIC 'EMPLOYMENT AGREEMENT', OR MY
EMPLOYMENT, IS TERMINATED, OR UNTIL REPLACED BY A NEW 'COMPENSATION
STATEMENT.'
    IN CONSIDERATION OF MY CONTINUED EMPLOYMENT, I ACKNOWLEDGE THAT I HAVE
RECEIVED ALL COMPENSATION DUE ME FOR ALL SERVICES I RENDERED PRIOR TO
THE SIGNING OF THIS STATEMENT.
    THERE ARE NO OTHER ARRANGEMENTS, AGREEMENTS, UNDERSTANDINGS, OR
STATEMENTS, VERBAL OR IN WRITING, EXCEPT AS STATED ABOVE.  NO MODIFICATION
OR AMENDMENT, OTHER THAN A CANCELLATION AND REPLACEMENT BY ANOTHER WRITTEN
'COMPENSATION STATEMENT', WILL BE EFFECTIVE, UNLESS SIGNED BY ME AND MY
EMPLOYER.

_____    5/23/94    _____    5/23/94
     EMPLOYE              DATE              SUPERVISOR            DATE

### BASE SALARY CHANGE NOTICE - COMPENSATION STATEMENT

```
NAME    : STASKO,STANLEY,R                          SSN : 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
TITLE   : SR PROJECT ENGINEER                  POS CODE : 7E06
PERUNIT: 10020 GM POWERTRAIN-WRN ENG  DEPT : WH213   EXEMPT : P

PREVIOUS ANNUAL BASE:    61,356.00      EFFECTIVE DATE    : 06/01/95
AMOUNT OF INCREASE  :     2,232.00      M  MERIT INCREASE
NEW ANNUAL BASE     :    63,588.00      ANNUAL RANGE MARKET RATE:   61,920.00
                                        ANNUAL RANGE MAXIMUM    :   75,900.00
```
==========================================================================

### INSTRUCTIONS FOR THE SUPERVISOR (CONFIDENTIAL INFORMATION):

PLEASE PROVIDE YOUR EMPLOYEE WITH THIS INFORMATION. IT CONFIRMS A CHANGE IN
COMPENSATION AND/OR EXEMPT STATUS.  BOTH YOU AND THE EMPLOYEE SHOULD SIGN
EACH COPY, PROVIDING ONE TO THE EMPLOYEE AND FORWARD THE OTHER TO SALARIED
PERSONNEL.

--------------------------------------------------------------------------
### COMPENSATION STATEMENT
NAME: STASKO,STANLEY,R          UNIT: 10020 GM POWERTRAIN-WRN ENG
COMMENCING: JUN 01, 1995  MY COMPENSATION IS $   5,299.00 PER MONTH.

   I AM CLASSIFIED AS AN EXEMPT EMPLOYEE UNDER THE PROVISIONS OF THE FAIR
LABOR STANDARDS ACT.  THIS STATEMENT, WHICH IS A PART OF MY 'EMPLOYMENT
AGREEMENT,' RECOGNIZES THAT THE RATE CITED ABOVE WILL BE MY COMPENSATION
FOR ALL HOURS WORKED, INCLUDING OVERTIME, DURING EACH MONTHLY PERIOD.
HOWEVER, A NIGHT SHIFT PREMIUM, AN EXTENDED WORKWEEK SALARY PREMIUM OR
AN OVERTIME PREMIUM FOR SCHEDULED OVERTIME HOURS MAY BE PAID ME, IF
APPROVED, IN ACCORDANCE WITH THE POLICY OR PRACTICE IN EFFECT.  ACCEPTANCE
BY ME OF MY PAY, WITHOUT PROTEST IN WRITING, SHALL ACKNOWLEDGE THAT I HAVE
BEEN PAID IN FULL FOR THE PERIOD.
   WHEN SIGNED AND ACCEPTED, THIS STATEMENT BECOMES A PART OF MY BASIC
'EMPLOYMENT AGREEMENT' AND REAFFIRMS THAT MY EMPLOYMENT IS FROM
MONTH-TO-MONTH ON A CALENDAR MONTH BASIS.
   THIS STATEMENT REPLACES ANY PREVIOUS 'COMPENSATION STATEMENTS' AND
SHALL CONTINUE IN EFFECT UNTIL THE BASIC 'EMPLOYMENT AGREEMENT', OR MY
EMPLOYMENT, IS TERMINATED, OR UNTIL REPLACED BY A NEW 'COMPENSATION
STATEMENT.'
   IN CONSIDERATION OF MY CONTINUED EMPLOYMENT, I ACKNOWLEDGE THAT I HAVE
RECEIVED ALL COMPENSATION DUE ME FOR ALL SERVICES I RENDERED PRIOR TO
THE SIGNING OF THIS STATEMENT.
   THERE ARE NO OTHER ARRANGEMENTS, AGREEMENTS, UNDERSTANDINGS, OR
STATEMENTS, VERBAL OR IN WRITING, EXCEPT AS STATED ABOVE.  NO MODIFICATION
OR AMENDMENT, OTHER THAN A CANCELLATION AND REPLACEMENT BY ANOTHER WRITTEN
'COMPENSATION STATEMENT', WILL BE EFFECTIVE, UNLESS SIGNED BY ME AND MY
EMPLOYER.

_____  6/19/95     _____  6-19-95
     EMPLOYEE           DATE              SUPERVISOR       DATE

Exhibit - 28

Stasko v General Motors Corporation – Unique Solutions by Plaintiff

When the plaintiff work for General Motors Corporation from July 1983 to August 1995 it was **common knowledge** and **common practice** whereby an employee could **make a suggestion improvement** and **receive a suggestion award** of 10% of the first year cost savings associated with the suggestion.

- The suggestion could be for items as simple as replacing lighting bulbs with new higher efficiency lighting bulbs.
- The monetary award was calculated by:
  - First year costs savings
  - Minus implementation costs of the suggestion
  - 10% award of net savings awarded to suggestion person (up to a maximum of $20,000)

The plaintiff would argue that the unique solutions below qualify for a momentary award because of the plaintiff's solution to unique problems encountered by General Motors Corporation.

1. **Plaintiff's Management / Leadership – Unique solutions**
   1.1. Programmable Logic Controllers – integrated into Emissions Analysis Systems; (see below for details); Don Nagy of General Motors Milford Proving Grounds specifically stated that Programmable Logic Controllers has been tried by General Motors before and cannot be made to work for Emission Analysis Systems applications
   1.2. DSP Combustion Analysis System – Several years later; (see below for details); General Motors Corporation and DSP Technology had a problem with the DSP Combustion Analysis Systems that General Motors Corporation could not solve nor could DSP Technology solve
   1.3. Dynamometer Test Cell #13 Renovation; (see below for details); the first modern, integrated Dynamometer Test Cell renovation at the General Motors Technical Center; completed in CY1990

Stasko v General Motors Corporation – Unique Solutions by Plaintiff

1.4. Dynamometer Test Cell #06 Legal Issue; (see below for details); General Motors has a
$20 Million dollar legal issue and nobody in General Motors can figure out the problem;
eventually, General Motors asks plaintiff to try to solve the problem

1.5. New Dynamometer Wing Ground Wire; (see below for details); the Engineering
Building Dynamometer Wing electrical grounding was a crows nest of electrical
grounding schemes

Stasko v General Motors Corporation – Unique Solutions by Plaintiff

2. **Programmable Logic Controllers – integrated into Emissions Analysis Systems**

   2.1. Don Nagy of General Motors Milford Proving Grounds specifically stated that Programmable Logic Controllers have been tried by General Motors before and cannot be made to work for Emissions Analysis Systems application; Don Nagy recommended using Milford Vehicle Emissions Lab Bench Controller

   2.2. When General Motors was starting up the first Programmable Logic Controller and a minor problem appeared between the Emissions Test Site Computer and the Programmable Logic Controller; you should have seen Jo-han-na You-house (Don Nagy's representative from General Motors Milford Proving Grounds responsible for the Emissions Test Site Computer) **run** to the telephone and start complaining that it does not work

   2.3. plaintiff rewrote practically all of the Modicon 884 PLC software provided by Richmond Instruments

      2.3.1. Richmond Instruments software exhausted PLC memory

      2.3.2. Richmond Instruments software incomplete and non-functioning

   2.4. plaintiff version of Modicon 884 PLC software uses unique programming logic

   2.5. plaintiff proved Don Nagy and General Motors wrong by proving Programmable Logic Controllers can be used in Emission Analysis System applications

   2.6. plaintiff implementation of Modicon 884 Programmable Logic Controllers is another example of plaintiff expanding General Motors vendor base because General Motors strongly uses Allen Bradley Programmable Logic Controllers

Stasko v General Motors Corporation – Unique Solutions by Plaintiff

3. **DSP Combustion Analysis System – Several years later**

   3.1. Several years later General Motors Corporation and DSP Technology had a problem with the DSP Combustion Analysis Systems that General Motors Corporation could not solve nor could DSP Technology solve

      3.1.1. This can be verified by talking to General Motors engineer Tony Sperling or with DSP Technology (try DSP Technology sales representative Tim Sante)

   3.2. General Motors Corporation got so desperate that they accused DSP Technology of having a software virus in their equipment

   3.3. General Motors Corporation asked plaintiff to try to solve the problem

   3.4. The basic problem – DSP Technology Combustion Analysis System RPM signal unstable

   3.5. Example: 2400 RPM + / - a lot of fluctuation

   3.6. plaintiff within minutes breaks solves the problem

   3.7. RPM signal from one pulse per revolution signal

   3.8. 2400 RPM equals 40 pulses per second

   3.9. Display updates approximately one update per second

   3.10.   Therefore RPM signal accuracy at 2400 RPM equals 40 pulses + / - 1 pulse equals 2.5 percent accuracy

   3.11.   2400 RPM * 2.5 percent equals 60 RPM

   3.12.   2400 RPM + / - 60 RPM; Problem solved!

   3.13.   Remember nobody in General Motors Corporation nor in DSP Technology could figure out the problem

   3.14.   plaintiff reward for solving this problem – basically nothing

Stasko v General Motors Corporation – Unique Solutions by Plaintiff

4. **Dynamometer Test Cell #13 Renovation**

    4.1. The first modern, integrated Dynamometer Test Cell renovation at the General Motors Technical Center; completed in CY1990

    4.2. plaintiff designed, engineered, and incorporated new CPI front-end equipment into Dynamometer Test Cell #13 renovation; see above in resume for details

    4.3. plaintiff designed, engineered, and incorporated new Programmable Logic Controller and PLC Enclosure into Dynamometer Test Cell #13 renovation; see above in resume for details

        4.3.1.  Including interfacing to Dynamometer Hard Stop safety circuit

        4.3.2.  Auxiliary temperature safety meters

        4.3.3.  Engine and Dynamometer RPM safety meters

        4.3.4.  Manual push button Test Cell interface panel

        4.3.5.  General Electric Solid State Dynamometer Controller

        4.3.6.  Engine Coolant and Engine Oil Temperature Control System

        4.3.7.  Supply and Exhaust Fan for Dynamometer Test Cell ventilation and pressure control

        4.3.8.  Existing Motor Control Center

    4.4. Aaron Trammel fabricated the Fuel System control enclosure that housed the Fuel System control solenoids

    4.5. plaintiff incorporated new Instrumentation Booms into Dynamometer Test Cell #13 renovation; see above in resume for details

    4.6. plaintiff incorporated new Engine Coolant and Engine Oil Process Control into Dynamometer Test Cell #13 renovation; see above in resume for details

    4.7. plaintiff designed, engineered, and incorporated the first Dynamometer Test Cell ventilation and pressure control system into Dynamometer Test Cell #13

    4.8. plaintiff new Druck Pressure Transducers into Dynamometer Test Cell #13 renovation; see above in resume for details

        4.8.1.  after over one year the Druck Pressure Transducers remained within calibration specifications; a significant maintenance time and cost savings

Stasko v General Motors Corporation – Unique Solutions by Plaintiff

4.9. plaintiff takes no credit for Cell #13 Motor Control Center; this was a piece of extra equipment from the Dynamometer Wing blend-house renovation project

4.10.    Specified, ordered, and procured major components associated with:

    4.10.1. new CPI Front-end equipment

    4.10.2. new Programmable Logic Controller hardware

    4.10.3. new Engine Coolant and Engine Oil Process Control equipment

    4.10.4. new Honeywell UDC3000 Process Controllers

4.11.    Generated the required documentation for the design of:

    4.11.1. new CPI Front-end equipment

    4.11.2. new Programmable Logic Controller hardware

    4.11.3. new Programmable Logic Controller software programming

    4.11.4. new Engine Coolant and Engine Oil Process Control equipment

    4.11.5. new Honeywell UDC3000 Process Controllers configuration

        4.11.5.1.    one configuration for Engine Coolant Process Control

        4.11.5.2.    one configuration for Engine Oil Process Control

        4.11.5.3.    one configuration for Test Cell Ventilation and pressure control

    4.11.6. Supply Fan Variable Frequency Drive configuration

    4.11.7. Exhaust Fan Variable Frequency Drive configuration

    4.11.8. existing Motor Control Center

4.12.    Project management and project coordination of work activity between General Motors Dynamometer Wing salaried personnel, General Motors Emission Wing salaried personnel, software personnel and UAW personnel by writing project activity timeline utilizing Timeline project management software

    4.12.1. verify by contacting Bob Welsh; plaintiff knew Bob Welsh as the highest ranking UAW representative in GM Technical Center, Engineering Building, Warren, Michigan from approximately CY1989 to CY1995)

4.13.    Provided detailed startup assisted for:

    4.13.1. new CPI Front-end equipment (can be verified with Karl Klida)

    4.13.2. new Programmable Logic Controller hardware

Stasko v General Motors Corporation – Unique Solutions by Plaintiff

4.13.3. new Programmable Logic Controller software programming

4.13.4. new Engine Coolant and Engine Oil Process Control equipment (can be verified with John Carver or Dave Van-poel-e-vor-de) new Engine Coolant and Engine Oil Process Control equipment

4.13.5. new Honeywell UDC3000 Process Controllers configuration

    4.13.5.1.    one configuration for Engine Coolant Process Control

    4.13.5.2.    one configuration for Engine Oil Process Control

    4.13.5.3.    one configuration for Test Cell Ventilation and pressure control

4.13.6. Supply Fan Variable Frequency Drive configuration

4.13.7. Exhaust Fan Variable Frequency Drive configuration

4.13.8. existing Motor Control Center

4.14.    first modern and integrated Dynamometer Test Cell renovation

4.14.1. Prior to plaintiff renovating Dynamometer Test Cells, Dynamometer Test Cell engineers and managers would come-and-go readily

    4.14.1.1.    Phil Mo-han, Aaron Shin, Jim K-hill, Dave Thacher, Clark Bell, Steve Kaatz

4.14.2. Prior to plaintiff renovating a Dynamometer Test Cell basically consisted of updating a piece of equipment (like a new exhaust fan) and maybe a fresh coat of paint.

4.14.3. over time Dynamometer Test Cells were becoming a crows nest of one-of-a-kind equipment

4.14.4. Dynamometer Test Cell #13 honestly looked like a new Dynamometer Test Cell looks new!

4.15.    Prior to plaintiff renovating Dynamometer Test Cell #13, plaintiff knows of nobody in General Motors Corporation designing, engineering, and project managing an entire Dynamometer Test Cell renovation in-house; a major project like this would have been outsourced to a company like Sverdrup (now Jacobs Engineering) and would have cost General Motors hundreds of thousands of dollars; plaintiff did the complete job for a fraction of the cost

Stasko v General Motors Corporation – Unique Solutions by Plaintiff

5. **Dynamometer Test Cell #06 Legal Issue**

   5.1. General Motors has a $20 Million dollar legal issue

   5.2. nobody in General Motors can figure out the problem

   5.3. eventually General Motors asks plaintiff to try to solve the problem

      5.3.1. there is a General Motors Guidelines that specifies Dynamometer Test Cell Ventilation depression setting of 1.0 inch water

      5.3.2. many years ago plaintiff told General Motors that the specification was wrong; the Dynamometer Test Cell Ventilation depression setting should be 0.1 inches of water not 1.0 inches of water

      5.3.3. General Motors basically tells plaintiff to shut-up (plaintiff was only a 5th or 6th level Project Engineer when plaintiff told General Motors that the specification was wrong)

   5.4. when General Motors changes the Dynamometer Test Cell Ventilation depression setting to plaintiff recommendation of 0.1 inch water the problem is solved

   5.5. what reward did General Motors give plaintiff for resolving General Motors $20 Million Dollar Dynamometer Test Cell #06 Legal Issue => basically nothing, not even a thank-you plaintiff

   5.6. this can be verified by contacting Steve Kaatz or Don Du-zon-berry (General Motors Salaried engineers associated with Dynamometer Test Cell #06 Testing)

   5.7. some time passes

   5.8. near the end of plaintiff career with General Motors, plaintiff mentions that plaintiff resolved a $20 Million Dollar Dynamometer Test Cell #06 Legal Issue for General Motors and that General Motors did not even say thank-you

      5.8.1. General Motors now tells plaintiff that the Dynamometer Test Cell #06 Legal Issue was worth $2 Million dollars not $20 Million dollars

      5.8.2. what financial reward did General Motors give plaintiff for resolving General Motors Dynamometer Test Cell #06 Legal Issue => basically nothing

      5.8.3. General Motors tells plaintiff thank-you

Stasko v General Motors Corporation – Unique Solutions by Plaintiff

6. **New Dynamometer Wing Ground Wire**

  6.1. the Engineering Building Dynamometer Wing electrical grounding was a crows nest of electrical grounding schemes

    6.1.1. Dynamometer Basement 480 VAC bus grounding

    6.1.2. Dynamometer grounding

    6.1.3. Mech Box grounding

    6.1.4. General 120 VAC power outlets and lighting grounding

    6.1.5. Instrumentation grounding

    6.1.6. Dynamometer Bedplate grounding

    6.1.7. Engine-under-test grounding

  6.2. plaintiff designed a custom Dynamometer Wing Ground Wire scheme to begin the process of elimination the crows nest of electrical grounding schemes as each Dynamometer Test Cell was renovated

  6.3. plaintiff would consider his Dynamometer Wing Ground Wire scheme his own unique / priority design

Exhibit - 29

Stasko v General Motors Corporation – Major Accomplishments by Plaintiff

When the plaintiff work for General Motors Corporation from July 1983 to August 1995 it was **common knowledge** and **common practice** whereby an employee could **make a suggestion improvement** and **receive a suggestion award** of 10% of the first year cost savings associated with the suggestion.

- The suggestion could be for items as simple as replacing lighting bulbs with new higher efficiency lighting bulbs.
- The monetary award was calculated by:
  - First year costs savings
  - Minus implementation costs of the suggestion
  - 10% award of net savings awarded to suggestion person (up to a maximum of $20,000)

The plaintiff would argue that the accomplishments below qualify for a momentary award because they are major accomplishments normally associated with a promotion within General Motors Corporation.

**Plaintiff's Management / Leadership – Major Accomplishments for which plaintiff did not receive a bonus**

1.1. Emission Wing Renovation – Design Coordination; (see Exhibit 16 for details)

1.2. Emissions Wing Renovation – Project Management; (see Exhibit 16 for details)

1.3. Dynamometer Wing Renovation – Project Management; (see Exhibit 16 for details)

1.4. Dynamometer Test Cell #13 Renovation; (see Exhibit 16 for details)

1.5. Dynamometer Test Cell #03 Renovation; (see Exhibit 16 for details)

1.6. Dynamometer Test Cell #07 Renovation with New Hemi-anechoic Chamber; (see Exhibit 16 for details)

1.7. Dynamometer Test Cell #11 Renovation; (see Exhibit 16 for details)

1.8. Dynamometer Test Cell #15 Renovation; (see Exhibit 16 for details)

1.9. Dynamometer Test Cell #08 Renovation; (see Exhibit 16 for details) - integration of New Programmable Logic Controller (PLC) and Modicon Panelmate 2000 Video Based

Stasko v General Motors Corporation – Major Accomplishments by Plaintiff

Man-Machine Interface advanced Dynamometer Test Cell Renovations to the next higher level

Exhibit - 30

**General Motors Powertrain Lab One (Pontiac, MI)** - EMCOR subsidiary Shambaugh & Son designed, fabricated, and installed the fire protection systems for this new automotive research and development facility, which consists of 85 fuel test cells and 35 non-fuel test cells supported by its own tank farm and central energy plant. The new facility consolidates four engineering and five test lab facilities under one roof, making it the headquarters for the Powertrain Group on GM's Pontiac campus. Shambaugh's scope of work for the project consisted of designing, fabricating, and installing 10 wet automatic sprinkler systems, two dry automatic sprinkler systems, two high pressure water mist systems, 5,500 sprinkler heads, 11 miles of sprinkler pipe, and a 2,500 gpm diesel fire pump house.

In addition, EMCOR PACE Mechanical is performing the Mechanical Process Piping work at GM's new Dynamometer engine test facility. This large test facility of 85 test cells includes cells that simulate extreme outdoor conditions as low as -55 degrees F. The facility is intended to keep GM current with engine technology well into the future.

- WWW.GM.COM HAD AN ANNOUNCEMENT ABOUT A NEW 500 MILLION DOLLAR TEST FACILITY IN PONTIAC, MICHIGAN

- RECENTLY THE PLAINTIFF TRIED TO RECOVER A COPY OF THE ANNOUNCEMENT

- PLAINTIFF COULD NOT FIND THE ANNOUNCEMENT AT WWW.GM.COM

- PLAINTIFF DID FIND THIS ANNOUNCEMENT BY A SUPPLIER THAT MAY BE RELATED TO THE NEW TEST FACILITY

# GM bringing 1,200 jobs to Pontiac

**Oakland Press, The (Pontiac, MI)** - Tuesday, June 26, 2007
A new 450,000-square-foot test center for engines and transmissions, which will bring 1,200 high-tech jobs to Pontiac, is rising quickly behind the General Motors Powertrain Group headquarters on the north side of Pontiac.

**GM** , which plans to ask the city of Pontiac soon for a tax abatement for the major project, plans to start moving some of its engineers and technicians into the new center later this year, said Susan Garavaglia, a company spokeswoman.

"Employees will begin their transition to the new **facility** later this year and through 2008," Garavaglia said. Almost all of the 1,200 employees who will be relocating are from Wixom, Ypsilanti, Romulus and Warren, she added.

The site of the new construction, which faces Joslyn Road, was once the home of the Pontiac Motor Division and is one of the most company's most storied properties, having been used by the giant automaker continuously since the early 1920s.

**GM** continues to operate a metal fabricating plant on the site, and one of the automaker's largest parts warehouses is on the north side of Columbia Avenue.

During the 1990s, however, **GM** shut down and dismantled a foundry, an engine plant and an assembly plant at the center of the site. Since then, **GM** has spent several million dollars on an environmental cleanup of the site. Part of the site was sold to the U.S. Postal Service for a sorting center, which is also nearly complete.

The shift is part of the company's continuing effort to concentrate its engineers and technicians with responsibility for developing the company's engines and transmissions in one place, **GM** officials have said.

The company now has about 3,000 engineers, technicians and support staff on the Pontiac campus, which was extensively remodeled earlier in the decade.

"What we're trying to do is develop the world's best powertrains," said Tom Stephens, the group executive in charge of **GM** powertrain operations. "We're going to try and continue to obsolete our products. In my opinion, the most important thing is that I am willing to learn faster than the next guy."

The **GM** Powertrain campus now stretches from the 1960sstyle administration building commissioned by John DeLorean, when he was general manager of the Pontiac Motor Division. It also includes an addition, which opened after the organization of the Powertrain Group in the late 1990s, and an engineering building put up in the 1940s and 1950s.

The construction of the new wing was spurred by the fact that much of the equipment at the other **GM** sites in Ypsilanti and Warren was 30 and 40 years old and at the end of

useful life, and needed to be replaced.

In addition, automakers are under considerable pressure from both consumers and regulators to improve the fuel economy of their vehicles. Only last week, the U.S. Senate voted to raise corporate average fuel economy standards for the first time since 1975.

Consumers also have become increasingly sensitive to rising gasoline prices, the top GM marketing executive in North America said last week.

Mark LaNeve, **GM** vice president of sales, service and marketing, said **GM** actually has emerged as the leader in fuel economy in many segments and expects to continue to post improvements in the years to come.

Garavaglia said **GM** studied refurbishing the other laboratories, but ultimately decided the best solution was to concentrate its resources in Pontiac.

The moves from Warren, Romulus and Ypsilanti will concentrate all of **GM** 's engine, transmission and hybrid-vehicle development in Oakland County.

Engine-development work also will be done at the Milford Proving Ground and at the joint hybrid development center in Troy, which also houses engineers and technicians from DaimlerChrysler and BMW.

*Section: Local News*
*Record Number: 364114d3cf3d80f7f66348dbc4ad69fd1ce68c4*
*Copyright (c) 2007 The Oakland Press*

# GM plan is $193 million for Pontiac - Carmaker's engine design complex project to give city much-needed economic boost

**Detroit News, The (MI)** - Sunday, April 23, 2000
*Author: The Detroit News ; R.J. King*
PONTIAC -- General Motors Corp. is giving Pontiac a badly needed tuneup.

**GM** this week is to announce a $193 million investment in its Pontiac North engine design complex, preparing the **facility** to be its global **powertrain** engineering center.

That, together with previous spending here by the No. 1 automaker, promises to have a profound impact on what for years was a downtrodden, tired old industrial city.

Pontiac is emerging as a big winner in **GM** 's $2 billion strategy to streamline its Michigan operations. Under that plan, 37,500 salaried workers, once scattered as far north as Saginaw and west to Lansing, are being relocated into six major campuses.

Two are here. The result: new homes and stores and municipal development. In sum, the city has attracted close to $700 million in new investment since 1993, both by the automaker and private developers.

"I've seen a lot more houses going up, something that didn't happen for years," said Fred Soldiers, a life-long Pontiac resident and retired auto worker. "Downtown Pontiac is a lot more active. It used to be a ghost town."

**GM** 's Pontiac North project calls for a new 400,000-square-foot engineering building adjacent to what served for decades as the headquarters of Pontiac Motor Division. The site along Joslyn, north of Montcalm, is home to 5,400 workers. Another 1,200 engineers will be added by 2005, **GM** says.

Also included is a massive landscaping effort, global reception and visitors center, museum and new roads. **GM** says its goal is to transform a stark industrial center into a setting resembling a college campus. Portions of the 500-acre site might also be sold for use by private developers or key suppliers.

The template for Pontiac North is **GM** 's Centerpoint Business Campus in the city near Interstate 75 and Opdyke. Since 1993, the company and its partner, Etkin Equities Inc. in Southfield, have demolished close to three million square feet of obsolete plants and renovated another 1.4 million square feet of space.

Today Centerpoint houses **GM** 's truck product group, auto suppliers, stores, restaurants and two hotels. A $44-million Marriott Hotel is scheduled to open in the coming months, along with a private health club and a new $80-million engineering complex for **GM** .

"Pontiac North won't have all the commercial amenities that Centerpoint has, but it will be a more active and energetic site," said Larry Pitcole, **facility** manager for **GM** 's Southeast Michigan Project Team in Pontiac. "We've also done a complete renovation of the administration and engineering buildings."

**GM** 's capital infusion in Pontiac sits squarely in the center of Oakland County, and borders such communities as Auburn Hills, Bloomfield Township and Waterford Township.

"If you look at an eight-mile radius around downtown Pontiac, the spending capacity is just tremendous," said Gregg McDuffee, director of real estate for SmithGroup Consulting in Detroit, which is overseeing a downtown revitalization study.

"When you add in new high-paying jobs at **GM** and other companies, the upside is tremendous. You have new stores, restaurants and galleries coming downtown, and there's new housing going up in the neighborhoods. That development will accelerate in the future."

The investment has not been lost on Pontiac officials, who are taking measured steps to sell off underutilized property like the former Clinton Valley Center, originally designed as a government services **facility** . They are also examining ways to make the downtown more inviting by redesigning Wide Track Drive, an eight-lane road that encircles the central business district.

Among the prospects:

* The west portion of Wide Track will be renamed Woodward with traffic likely to travel two ways instead of one. The east section of Wide Track could be converted to two lanes, with the remaining portion removed to expose the Clinton River, which runs below the road.

* Proposals are expected to be sent out shortly to redevelop or tear down the Pontiac Silverdome, which will lose the Detroit Lions following the 2001 season. The site could become home to another sports team or be demolished to accommodate a corporate or light-industrial campus.

* The city has received three proposals to redevelop the former Clinton Valley Center, a 228-acre site on the west side, into new and renovated homes, stores and restaurants. A similar process is under way for the so-called southwest quadrant, near Crystal Lake.

A decade ago, new housing construction was largely non-existent in Pontiac, but developers recorded 185 residential permits in each of the last two years. The builders include Crosswinds Communities Inc. in Novi, Pulte Homes of Michigan in Royal Oak and Talon Development Group in Bloomfield Hills.

The 34-block downtown district was built up in the 1920s as the auto industry expanded,

but fell on hard times from 1960 to 1990 because of changing corporate needs and the advent of shopping malls. Now, developers are returning with new stores, restaurants and galleries.

Walter Cohen, principal partner of ARCO Construction Co. in Southfield which purchased the former Pontiac State Bank building in 1998, credits Pontiac's rebirth to steady corporate investment, the strong national economy and a proactive city administration.

Cohen is negotiating to buy the former Sears department store in Pontiac, and plans to convert the five-story, 110,000-square-foot structure on Saginaw into a high-tech building geared to Internet-related firms. The building's location near an Ameritech switching station will offer low-cost connections to fiber-optic lines.

"The business climate is improving and the night life is getting better," Cohen said. "There are new firms coming in every month and we've increased the occupancy of the Oakland Center (People State Bank) building by 25 percent."

# Simulating snow, heat and slick, hairpin curves - New Milford test lab puts vehicles through climate, terrain extremes, without shipping them at an expense.

**Detroit News, The (MI)** - Tuesday, May 23, 2006
*Author: The Detroit News ; Josee Valcourt*

MILFORD -- It may be months before Metro Detroiters experience subzero temperatures again, but inside a new $50 million lab at General Motors Corp.'s Milford proving grounds, engineers can now switch from sweat to chills in mere hours.

The automaker on Monday dedicated a new state-of-the-art vehicle testing **facility** that can create the severest of weather conditions -- from arctic blasts with temperatures at 40 degrees below zero, to stifling desert heat with temperatures as high as 130 degrees.

It is one of the most sophisticated development **facilities** for testing engines and transmissions for cars and trucks in the world, **GM** says.

With the 40,000-square-foot **facility** , the automaker hopes to take some much-needed giant steps and bring new engines and transmissions to market sooner, while spending considerably less on product development.

For example, engineers can now see how driving conditions such as icy roads or extreme humidity affect engine performance, and view the results immediately, without having to ship vehicles to testing destinations such as Canada or Arizona.

"It reduces cost," said Dan Hancock, vice president of engineering operations for **GM Powertrain** .

**GM** lost $10.6 billion last year and is in the midst of a major restructuring of its struggling North American operations.

One major focus is to develop lighter, more fuel-efficient powertrains across a smaller family of engines and transmissions. For one, **GM** has been slower than some rivals in introducing six-speed automatic transmissions that can boost fuel efficiency, as well as more powerful four-cylinder and V-6 engines that don't sacrifice fuel economy.

For the 2007 model year, **GM** is introducing 19 new or significantly redesigned engines and transmissions, including a new hybrid system and a fuel-saving V-6 engine

Using computers and customized software at the new test site, **GM** has created one of the most advanced dynamic road simulators used in the auto industry. **GM** engineers have mapped nearly two dozen mountain and desert roads where customer vehicles are test driven. Climate conditions along with road grades and other conditions have been programmed into computers.

The computer-simulated roads can be "played back" as test vehicles are driven on them. And any of the road conditions can be digitally modified to simulate each of the four seasons, on a single day, if needed.

"As a consumer, you want to hear the transmission shift smoothly whether its 20 degrees or 105 degrees temperature," said Karla Berger, a technical assistant at **GM** .

The **facility** will help **GM** engineers develop and validate future **powertrain** products by allowing testing currently completed on the road to be executed in a controlled, repeatable and climatically robust laboratory environment.

Behind the sliding steel door of dynamic chamber room 35S, 48-inch rollers in the floor can move back and forth and simulate a highway drive, for example.

Adjustable floor tracks can fit different size vehicles, from tiny compacts to hulking Hummer SUVs. A wind tunnel can blast air up to 100 mph. And special ceiling lights can intensely beam to simulate the hottest desert sun.

In addition, engineers will be able to test any type of emissions levels in gasoline, ethanol or diesel fuel, allowing the automaker to better respond to government regulations that vary by country and state, such as environmentally conscious California.

"We have the ability to provide year-round climatic and altitude testing, which greatly improves our vehicle development time," said Hancock, adding the new lab could help cut development time by 4 to 5 months.

In the lab: 4 seasons at a click

**GM** 's new state-of-the-art engine and transmission test **facility** in Milford is designed to simulate any type of road surface or climate found in the world, year-round. Key features:

Y Capable of achieving temperatures between 40 degrees below zero to 130 degrees

Y Allows humidity and altitude tests from 700 feet below sea level to 12,500 feet

Y Air speeds up to 100 mph

Y Test **facilities** can switch from various climates -- arctic to desert heat -- within several hours.

Y Four static chambers allow stationary vehicles to climatically tested
**Caption:** A Hummer H3 sits in the test **facility** , which can test the SUV on a variety of simulated terrains. Danny Johnston, **GM** senior lab technician, staffs the control panel at

the automaker's new testing **facility** in Milford, which can simulate climate extremes in which vehicles can be performance-tested.

Exhibit - 31

Stasko v General Motors Corporation – Hostile Work Environment

Summary of General Motors hostile work environment against plaintiff.

General Motors hostile work environment against plaintiff religious beliefs:

- Terri Hostetter attacks plaintiff belief in Creation
- Ward Wiers tries to convert plaintiff away from Roman Catholic Church
- General Motors uses GM suppliers to harass plaintiff belief that abortion is wrong in all situations; Phil and Jim Davies (MTS-PowerTek Farmington Hills, Michigan 48335) – ask plaintiff to name one thing that is always wrong; plaintiff response => Ted; with an aluminum baseball bat looking for Jim
- General Motors uses outside supplier DSP Technology to attack plaintiff silent praying before meal at lunch; contact Gil Troutman
- Jim Thorsen tries to convert plaintiff away from Roman Catholic Church
- General Motors asks plaintiff to prove the existence of God (unknown man); near the end of plaintiff career at General Motors

Stasko v General Motors Corporation – Hostile Work Environment

General Motors hostile work environment against plaintiff career.

- Paul Durrenberg trying to hypnotize the plaintiff.

- Unknown people trying to verbally assaulting the plaintiff.

- General Motors blocks in the plaintiff's car with a group of cars on South bound Mound Road just North of 12 Mile Road.

- Paul Durrenberg (technician supervisor) tampering with the plaintiff's forty-seven mm diesel particulate filter sampling system project

- Jerry Sidlar (instrumentation technician) purposefully gives plaintiff bad information in the Sample Condition Unit project

- Paul Durrenberg purposefully tries to steal plaintiff idea of using a Programmable Logic Controller in the Sample Conditioning Unit project

- Chris Killen (a woman) falsely accuse plaintiff of looking down her blouse and Bob Zuzga (Chris' office partner) is willing to commit perjury to protect Chris from her false accusation

- Paul Durrenberg and Allen Boogaard verbally soliciting plaintiff for oral sex.

- mysteriously one day one Druck pressure transducer is found damaged; even though, it would take a pressure six times the rated full scale to damage the pressure transducer

- M.J. Spi-naz-zi and Bill Whitley try 2 against 1 harassing plaintiff near the Engineering Building, Dynamometer Wing, Chassis Dynamometer Test Cell

Stasko v General Motors Corporation – Hostile Work Environment

- General Motors race baiting the plaintiff and falsely accusing the plaintiff of being racist.
    - o Paul Durrenberg and Aaron Trammel (black male) asks plaintiff if he is racist.
    - o Roy Harvey (a black male) challenges plaintiff to hit him.
    - o Robert Bu-tha-ah (a large black male with the UAW) comes into plaintiff office; stands behind plaintiff; and places a knife to his throat.
    - o Janet Austin (a black woman) comes uninvited to the plaintiff's table during lunch and starts to kick plaintiff in the leg.
- General Motors attacks plaintiff family. Plaintiff owned a piece of rental property at 7320 Stout in Detroit, Michigan. Plaintiff rented the property to his sister Gerri. His sister Gerri is cased by an unknown black man and is almost physically assaulted by the black man.
- General Motors steals plaintiff's Handbook of Chemistry and Physics that he won in Chemistry Class at Lawrence Technological University.
- The plaintiff finds a rat in his house - the workers in the Dynamometer Wing nickname was Dyno Rats.

Stasko v General Motors Corporation – Hostile Work Environment

General Motors hostile work environment against plaintiff career - General Motors never awards plaintiff headcount he earned from CY1983 to CY1995; See partial list of head count replacements that should been awarded to the plaintiff

- Jim Daughtery, Doug Newmann, Lee (Denise Wiese's office helper)
- Ward Wiers, Ken Welbaum, Leslie Brown
- Andy McKenzie, Clark Bell, Jim Ka-hill
- David Thatcher, Bob Zuzga, Jim (Dynamometer Wing fuel man)
- Karl Klida, Terry Hostetter, Dennis Bammel
- Denise Wiese, Jim Thorsen, Chris Killeen
- Chris (Denise Wiese's office helper), Tony Schmid-hub-ber

Stasko v General Motors Corporation – Hostile Work Environment

General Motors hostile work environment against plaintiff monetary
compensation.

- General Motors delaying the plaintiff's first promotion until approximately
  September 1, 1985 and awarding the plaintiff a small 10 percent pay raise
  with the promotion.
- General Motors purposefully not recording the plaintiff's CY1983, CY1984,
  CY1985, CY1986, CY1987, and CY1988 accomplishments. These include:
  - Humidity Monitoring to help diagnose problem with large printer
  - Forty-Seven mm diesel particulate filter sampling system
  - Sartorius Microbalance
  - Tylan Mass Flow Controllers
  - Sample Conditioning Unit
  - Horiba Chassis Dynamometer Controller
  - Overhead Track System
  - Emission Wing Renovation – Design Coordination
  - Programmable Logic Controllers – integrated into Emissions Analysis
    Systems
  - Instrumentation Console and Custom Enclosure
  - Emission Test Site Instrumentation Patch Panel
  - 12-Channel Strip Chart Recorder and Custom Enclosure
  - Dew Point Meter and Ambient Temperature Sensor and Custom
    Enclosure
  - Instrumentation Interfacing
  - Large Temperature and Humidity Display
  - Honeywell HVAC Central Control Station

Stasko v General Motors Corporation – Hostile Work Environment

- o  Smoke Detector Graphics Display Panel
- o  Overhead Door Logic Controls
- o  Emissions Wing Renovation – Project Management
- o  Software Programming Skills and Software Program Management
- o  Fuel Meter Calibration Cart
- So much is missing from plaintiff CY1983 to CY1995 personal records that a reader of plaintiff personnel records would get the impression plaintiff had nothing to do with the Emissions Wing renovation and little to do with the Dynamometer Test Cell Renovations.
- The plaintiff did not receive a promotion to 8th level with the Emissions Wing Renovation
- The plaintiff did not receive a promotion to 9th level for Dynamometer Wing Test Cell #13 renovation

Stasko v General Motors Corporation -- Hostile Work Environment

Evidence of General Motors continuous pattern compensation discrimination against plaintiff:

| Date | SRS Salary | 7E06 Mid-point | 7E06 Maximum | 9th Level > Mid-point |
|---|---|---|---|---|
| May 01, 1989 | $44,916 | Not shown | $60,840 | ??? |

Plaintiff earns his 9th level with Dynamometer Wing Test Cell #13 renovation

| Date | SRS Salary | 7E06 Mid-point | 7E06 Maximum | 9th Level > Mid-point |
|---|---|---|---|---|
| Sept. 01, 1990 | $47,976 | $52,800 | $63,276 | ??? |

Fairbanks / Thorsen recommend plaintiff for 7th level; Evaluation Dec. 12, 1990

| Date | SRS Salary | 7E06 Mid-point | 7E06 Maximum | 9th Level > Mid-point |
|---|---|---|---|---|
| Sept. 01, 1991 | $52,800 | $55,368 | $66,276 | ??? |

Fairbanks / Thorsen recommend plaintiff for 7th level; Evaluation Jan. 22, 1992.

Plaintiff compensation statement for CY1992 not in personnel records

| Date | SRS Salary | 7E06 Mid-point | 7E06 Maximum | 9th Level > Mid-point |
|---|---|---|---|---|
| Oct. 01, 1993 | $57,432 | $58,200 | $70,500 | ??? |
| June. 01, 1994 | $61,356 | $59,940 | $73,680 | ??? |
| June. 01, 1995 | $63,588 | $61,920 | $75,900 | ??? |