UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------X

DAVE SHOSTACK, PLAINTIFF,

-AGAINST-

GENERAL MOTORS CORPORATION,
GERNAL MOTORS HOLDING CORPORATION,
AC DELCO, MOTORS LIQUIDATION ET AL.
DEFENDANTS.

---------------------------------------------------------------------X

CHAPTER 11 CASE NO.:
09-50026 (REG)

AFFFIDAVIT OF
SERVICE

RECEIVED
FEB - 3 2011
U.S. BANKRUPTCY COURT, SDNY

DAVE SHOSTACK sworn and deposes and says:

That I reside at 4 Suttonwood Dr. Commack, NY and am over 18 years of age.

That on the 1ST day of FEBRUARY 2011 I mailed a copy of an AFFIDAVIT IN OPPOSITION TO DEBTORS OPPOSITION TO THE MOTION OF DAVE SHOSTACK FOR RELIEF FROM THE AUTOMATIC STAY TO HARVEY MILLER ESQESQ. at the law firm of WEIL, GOTSHAL & MANGES ESQS located at 767 FIFTH AV., NEW YORK, NY by certified mail

Sworn to:

---------------------------
DAVE SHOSTACK

On this 1ST day of FEBRUARY 2011

FLOYD SARISOHN
Notary Public, State of New York
No. 02SA3455550
Qualified in Suffolk County
Commission Expires Sept. 30, 2013

FEB - 3 2011
SDNY

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------X

DAVE SHOSTACK PLAINTIFF,

VS.

GENERAL MOTORS CORPORATION,
GENERAL MOTORS HOLDING CORPORATION,
AC DELCO, MOTORS LIQUIDATION ET AL
DEFENDANTS.

---------------------------------------------------X

CHAPTER 11 CASE NO.:

09-50026 (REG)

Affidavit in opposition to Debtors opposition to Dave Shostack Motion for Relief from Automatic Stay

DAVE SHOSTACK sworn and deposes and says:

1. Plaintiff fees he has a meritorious cause of action.

2. That the reason why Plaintiff feels he has a meritorious cause of action is because Defendant knew that the transmissions on the 2004 Chevy Malibu were defective as per their Service Bulletin. Exhibit 2 DS

3. That the Warrantee of Durability and the Implied Warrantee Act apply during and after the expiration of the manufacturer or dealers expressed or written warranty and requires that a part or repair will last a reasonable period of time. (SEE THRESHOLD OF DURABILITY IN EXHIBIT 5) DS

4. That the expiration of GM warrantee does not nullify the legal warrantee set out in articles 38 and 39 of the Consumer Protection Act. The legal warrantee requires that all products be reasonably durable.

5. That both Defendants expressedly or impliedly state in their ads on radio, tv and print ads that their parts and vehicles made with AC Delco parts are superior to other parts manufactured by other companies.

6. That Plaintiff relied on these statements when he purchased his 2004 Chevy Malibu Classic.

7. That when Defendants vehicles and parts that they manufactured fail to live up to these claims they commit fraud by misrepresentation and omission of the truth.

8. That had Plaintiff known about the untruthfulness of these claims he would have never purchased his 2004 Chevy Malibu Classic.

9. Congress enacted the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 *et seq.*(the "Act") in 1975 in response to widespread complaints from consumers that many warranties were misleading and deceptive, and were not being honored. To remedy this problem of deception and failure to honor warranties, the Act imposes civil liability on any "warrantor" for, *inter alia,* failing to comply with any obligation under a written warranty and/or implied warranty. *See* 15 U.S.C. § 2310(d)(1). The Act authorizes a "suit for damages and other legal and equitable relief." *Id.* The Act authorizes the award of attorneys' fees *(id.)*, and expressly authorizes class actions. 15 U.S.C. § 2310(e)

10. That as a result of both Defendants failure to comply with their obligations under the applicable express and implied warranties. Plaintiff suffered approx 3000 worth of damages in potential labor and repair Including potential rental car expenses

11. Plaintiff was never in violation of the automatic stay based on the following reasons:

12. Defendant never served Plaintiff with Notice of the GM Bankruptcy.

13. Plaintiff claims are post petition claims meaning they took place months after the bankruptcy and are new claims.

14. Plaintiff never properly served Defendant with the Summons and Complaint from the State court which was commenced in 2nd District Court in Lindenhurst, NY

15. That in December 10, 2010 Plaintiff Summons and Complaint (from Dec 31, 2009) that was commenced in Lindenhurst, NY was dismissed without prejudice for failure to properly serve defendant. (Defendant was served by fax) (Service by Fax is improper service) Exhibit 1

16. Plaintiff did not have the time to amend the Motion for the Automatic Stay in Southern District Bankruptcy Court since Defendant already responded to Plaintiff Motion and Plaintiff thought he still had time to amend the motion.

17. That as per Neil Flaum ESQ. (bankruptcy attorney) he felt that Plaintiff's having to move the court in order to lift the automatic stay was unnecessary since Plaintiff claim was a post petition claim and that it was ok for Plaintiff to proceed in State Court without first lifting the stay.

18. That if Plaintiff's claims took place months after the bankruptcy and they are considered new claims how would Plaintiff be expected to file a proof of claim?

19. Therefore Plaintiff by filing a Motion to lift the Automatic Stay has acted in good faith.

20. That in addition as per Neil Flaum ESQ. Plaintiff was told that since Plaintiff claims are post petition claims and are new claims Plaintiff would be entitled to 100% of the damages that Plaintiff claims against Defendant.

21. That on Jan 4, 2011 at 11:18 AM and on January 13, 2011 at 4:05 PM Plaintiff received a call from Defendant's Attorney Weil, Gotschal ESQS. trying to coerce and intimidate Plaintiff into accepting an offer to settle this matter for a prorata claim meaning Plaintiff would only get a small percentage of what his claim was worth as a condition of defendant agreeing to left the automatic stay.

22. That on said date and time Plaintiff explained to Defendant attorney that since Plaintiff claim was a post petition claim meaning it is a new claim Plaintiff would be entitled to 100% of his claim and that Plaintiff would not accept their settlement offer.

23. That upon information and belief Defendant is fully aware that Plaintiff claim is a new claim and that Plaintiff is entitled to 100% of his claim and that there is a good chance that Plaintiff will succeed in lifting the automatic stay since his claim is a new claim which is why Defendant called Plaintiff.

24. That just because Plaintiff rejected Defendant offer to settle is not enough of a reason for this court to deny Plaintiff motion for relief from the automatic stay

25. Defendant was fully aware of the calls Plaintiff made complaining of problems with his car and Plaintiff kept a log which is detailed as to the dates and persons Plaintiff spoke with.

26. That upon information and belief if Defendant does not have a record of the calls they most likely destroyed the records for the sole purpose of defending this lawsuit against Plaintiff.

27. That the court should note that the problem with the transmission did not take place until months after defendant filed bankruptcy and would be considered a new claim.

28. That since Plaintiff claim is a new claim (post petition claim) none of the cases of laws that Defendant states in his Opposition to Plaintiff Motion are relevant or applicable.

29. That most of the cases or laws that Defendant states are not relevant to Plaintiff case because they do not discuss anything that relates to cases where it involved a new claim or post petition claim.

Wherefore Plaintiff seeks an order lifting Defendant bankruptcy Stay together with any other relief that this court feels is just and proper.

Sworn to:

On this day of 2/1/ 2011

FLOYD SARISOHN
Notary Public, State of New York
No. 02SA3455550
Qualified in Suffolk County
Commission Expires Sept. 30, 2013

DAVE SHOSTACK
4 SUTTONWOOD DR.
COMMACK, NY 11725
(631) 864-2656

Exhibit 1

2nd DISTRICT HELD AT Lindenhurst

ORIGINAL COURT District

INDEX NO. DHC 13096-09

CAL. NO.

JURY DEMAND
DEFT

SHOSTACK, DAVE BAC 09 0013096( )

GENERAL MOTORS HOLDING,
GENERAL MOTORS CORPORATION,
AC DELCO INC.

| | Judge's # |
|---|---|
| DATE 12-10-10 | |
| ADJ DATE SCC | |
| π app'd - NO SVC DISM w/o/p | 67 |

| J DATE | Judge's # |
|---|---|
| JUDGMENT | |
| TRANSCRIPT | |

| Return Date | MOTION |
|---|---|
| | |



# Service Bulletin

File In Section: 07 - Transmission/Transa
Bulletin No.: 08-07-30-009
Date: March, 2008

## TECHNICAL

**Subject:** **HYDRA-MATIC® Front Wheel Drive 4T80-E (MH1) Right Front Axle Seal Leak, Transmission Slips in Gear (Replace Third Clutch Housing with Revised Service Part)**

**Models:** **2001-2008 GM Passenger Cars with HYDRA-MATIC® Front Wheel Drive 4T80-E Automatic Transmission (RPO – MH1)**

### Condition

Some customers may comment on a transmission oil leak and/or that the transmission slips in gear.

### Cause

An oil leak may be caused by bushing wear in the third clutch housing, causing excessive fluid build-up at axle seal.

### Correction

**Important:** DO NOT replace the transmission for above concerns.

Replace the third clutch housing with service P/N 8682114, which has revised bushing material to extend life and reduce right front axle seal leaks. Refer to Automatic/Transaxle – 4T80-E Transmission Off-Vehicle Repair Instructions for the replacement of the third clutch housing in SI.

### Parts Information

| Part Number | Description | Qty |
|---|---|---|
| 8682114 | Housing, Third Clutch | 1 |

### Warranty Information

For vehicles repaired under warranty, use:

| Labor Operation | Description | Labor Time |
|---|---|---|
| K7532 | Clutch, Third – R&R or Replace | Use Published Labor Operation Time |

Exhibit 1

Exhibit 2

GM bulletins are intended for use by professional technicians, NOT a "do-it-yourselfer". They are written to inform these technicians of conditions that may occur on some vehicles, or to provide information that could assist in the proper service of a vehicle. Properly trained technicians have the equipment, tools, safety instructions, and know-how to do a job properly and safely. If a condition is described, DO NOT assume that the bulletin applies to your vehicle, or that your vehicle will have that condition. See your GM dealer for information on whether your vehicle may benefit from the information.

WE SUPPORT VOLUNTARY TECHNICIAN CERTIFICATION

Copyright 2008 General Motors Corporation. All Rights Reserved.

083626

**Dave Shostack**
4 Suttonwood Dr.
Commack, N.Y. 11725
(631) 864-2656

October 19, 2009

Edward Whitacare CEO
General Motors
Chevy Motors Division
300 Rennaisance Center
Detroit, MI 48265

Dear Mr. Whitacare:

In May 7, 2009 I purchased a 2004 Chevy Malibu Classic with 15,000 miles on it from the US Federal Gov't through the General Services Administration. It is my understanding that GM had and still has a contract with the US government to manufacture and distribute 2004, 2005 and newer Chevy Malibu Classics for the US GOV'T fleet of employee cars.

Since that time I have noticed several problems with my 2004 Malibu Classic: Defective sticking calipers and brake pads, uncutable rotors, water leak in the trunk, exhaust fumes through the A/C vents, a bell ringing noise when the key is not in the ignition. Most recently at approximately 25,000 miles the transmission is leaking from the right front axle seal which I am told that even if the axle seal is repaired I may need a transmission a month from now due to excessive fluid build up as a result of defective clutch bushings.

That GM is fully aware of all these problems mentioned as per several Technical Service Bulletins that I have obtained and by refusing to repair these items GM perpetrates a fraud upon me as a tax payer as well as a consumer as well as all the other tax payers whose money bought these cars from GM with US Tax payer money. Every one of these cars will eventually need a transmission which GM is fully aware of.

In addition it is my understanding that GM got tax payer bailout money from the US Gov't and that as part of the agreement GM had agreed to stand behind the garbage that they manufactured. That by refusing to agree to repair the problems with my car GM commits fraud a third time in light of the fact that they took tax payer money as part of a bailout and agreed to stand behind the product that they manufactured yet they still refuse to cover the items in need of repair on my car.

That unless I hear from GM immediately that they intend to repair all the above mentioned problems at their expense rest assured I will immediately commence a class action lawsuit for fraud against GM immediately. PLEASE NOTE FRAUD is not dischargeable in a bankruptcy proceeding.

Please further note a copy of this letter is being sent to the US Congress, US Attorney General as well as the Inspector General and the Federal Trade Commission.

Very truly yours,

Dave Shostack

Exhibit 3

To: Fax#18152826156
GM OPERATOR SERVICES Date: 2/5/2010 Time: 11:56:10 AM
021/025

**Dave Shostack**
4 Suttonwood Dr.
Commack, N.Y. 11725
(631) 864-2656

October 27, 2009

Edward Whitacare CEO
General Motors
Chevy Motors Division
300 Rennaisance Center
Detroit, MI 48265

Dear Mr. Whitacare:

In May 7, 2009 I purchased a 2004 Chevy Malibu Classic with 15,000 miles on it from the US Federal Gov't through the General Services Administration. It is my understanding that GM had and still has a contract with the US government to manufacture and distribute 2004, 2005 and newer Chevy Malibu Classics for the US GOV'T fleet of employee cars.

Since that time I have noticed several problems with my 2004 Malibu Classic: Defective sticking calipers and brake pads, uncutable rotors, water leak in the trunk, exhaust fumes through the A/C vents, a bell ringing noise when the key is not in the ignition, an overheating problem when local driving or sitting in traffic (temperature gage needle goes 2 lines past half way mark) and creaking noises in the front end suspension (defective stabilizer bar bushings, struts and or lower control arms) Most recently at approximately 25,000 miles the transmission is leaking from the right front axle seal which I am told that even if the axle seal is repaired I may need a transmission a month from now due to excessive fluid build up as a result of defective clutch bushings.

That GM is fully aware of all these problems mentioned as per several Technical Service Bulletins that I have obtained and by refusing to repair these items GM perpetrates a fraud upon me as a tax payer as well as a consumer as well as all the other tax payers whose money bought these cars from GM with US Tax payer money. Every one of these cars will eventually need a transmission which GM is fully aware of.

In addition it is my understanding that GM got tax payer bailout money from the US Gov't and that as part of the agreement GM had agreed to stand behind the garbage that they manufactured. That by refusing to agree to repair the problems with my car GM commits fraud a third time in light of the fact that they took tax payer money as part of a bailout and agreed to stand behind the product that they manufactured yet they still refuse to cover the items in need of repair on my car.

That unless I hear from GM immediately that they intend to repair all the above mentioned problems at their expense rest assured I will immediately commence a class action lawsuit for fraud against GM immediately. PLEASE NOTE FRAUD is not dischargeable in a bankruptcy proceeding.

Please further note a copy of this letter is being sent to the US Congress, US Attorney General as well as the Inspector General and the Federal Trade Commission.

On Oct 10, 2009 I took my Malibu to Atlantic Chevrolet for a multi-point inspection and an alignment. A copy of which was previously faxed to you. In our conversation that followed you insisted on my bringing the car back to Atlantic a 2nd time and pay them $100 to look at the car a second time. At that time I asked that you guarantee in writing that if I did that that you would cover the repairs of the above mentioned items at your expense and you refused to guarantee in writing that you would cover the reapirs or soffer any cost assistance regardless of whether I took the car back to Atlantic Chevrolet. I explained to you that I am still making payments on this car and that $100 would pose a hardship to me and you still refused to waive the fee or guarantee in writing that you would cover any of the above repairs. Why would I waste what little money I have to take the car back to your dealer a second time if you will not guarantee that you

Exhibit 4

are going to cover the cost of these repairs and or perform the repairs. I do not know of anyone that would be stupid enough to do that without anything in writing. Then you refused to give me the name of the Zone Manager or District Manager for GM for Long Island. In light of the fact that your show rooms are empty you would think GM would have the common courtesy of helping a loyal GM customer at their expense with regard to the many repairs needed on this car. Especially in light of the fact that GM told Congress they would stand behind the junk that they manufactured. No wonder nobody is buying your cars anymore.

Please be advised in my case and in many other cases GM can't deny making these repairs because of something called Implied Warrantee Rulings :It applies during and after the expiration of the manufacturer or dealers expressed or written warranty and requires that a part or repair will last a reasonable period of time. **Chevrier vs. General Motors Du Canada (Oct 18, 2006) Quebec Small Claims Court, Joliette District (Repentigny) No 730-32-004876-046; Justice Georges Massol)**

In the above mentioned case the Plaintiff had a 2000 Montana minivan that at **71,000 km the transmission failed.** Gm at that time refused warranty coverage because they claim the warrantee expired after the 3rd yr of use or **60,000 km of use.**
**"The judge ruled that the expiration of GM warrantee does not nullify the legal warrantee set out in articles 38 and 39 of Consumer Protection Act. The legal warrantee requires that all products be reasonably durable."**

GM was required to pay the entire repair costs plus interest, and filing fee.

In **Kravitz vs. GM**, The Supreme Court of Canada affirmed that automakers and dealers are jointly liable for replacement and repair of a vehicle if independent testimony shows that it is afflicted with factory related defects that compromise its safety or performance. The existence of a secret warrantee extension or technical service bulletin also helps prove that the vehicle problems are the automakers responsibility. For example in **Lowe vs. Fairview Chrysler** technical service bulletins were instrumental in showing in Ontario Small Claims Court that Chrysler's history of automatic transmission failures went back to 1989.

I am asking that one of your GM dealers either perform the repairs or that your company reimburse me for the cost of repairing each and every item listed in the letter. The estimate of the cost of repairs is approximately $5000. In the alternative of the above I would ask that you replace this vehicle with another 4 Cyl Malibu of equal or greater value with similar or lower mileage that is free of defects. I am putting you on notice under the Federal and provincial Consumer Protection Statutes and that your refusal to apply this extended warrantee coverage in my case would be an unfair warranty practice within the puview of the above cited laws.

Your actions also violate the Implied Warrantee set down by the Supreme Court of Canada **(Donaghue vs. Stevenson and Longpre vs. St Jacques Automobile)** and repeatedly reaffirmed by provincial consumer protection **laws (Lowe v. Chrsyler, Dubor v. Ford du Canada and Frank v. GM).**

I also reserve the right to claim up to $1,000,000 for punitive damages pursuant to the Supreme Court of Canada Feb 22, 2002 ruling in Whiten v. Pilot.

Very truly yours,

Dave Shostack

Exhibit 4



### Product Liability

Almost three decades ago, in *Kravitz v. GM* (the first case where I was called as a pro bono expert witness), the Supreme Court of Canada clearly affirmed that automakers and their dealers are jointly liable for the replacement or repair of a vehicle if independent testimony shows that it is afflicted with factory-related defects that compromise its safety or performance. The existence of a secret warranty extension or technical service bulletin also helps prove that the vehicle's problems are the automaker's responsibility. For example, in *Lowe v. Fairview Chrysler* (see page 92), technical service bulletins were instrumental in showing an Ontario small claims court judge that Chrysler's history of automatic transmission failures went back to 1989.

In addition to replacing or repairing the vehicle, an automaker can also be held responsible for any damages arising from the defect. This means that loss of wages, supplementary transportation costs, and damages for personal inconvenience can be awarded. However, in the States, product liability damage awards often exceed millions of dollars, while Canadian courts are far less generous.

### Implied Warranty Rulings

*Reasonable durability*

As outlined near the beginning of the chapter, this is that powerful "other" warranty that they never tell you about. It applies during and after the expiration of the manufacturer's or dealer's expressed or written warranty and requires that a part or repair will last a reasonable period of time. What is reasonable depends in a large part on benchmarks used in the industry, the price of the vehicle, and how it was driven and maintained. Look at the "Reasonable Part Durability" table on page 48 for some guidelines as to what you should expect. Judges usually apply the implied or legal warranty when the manufacturer's expressed warranty has expired and the vehicle's manufacturing defects remain uncorrected.

*Chevrier v. General Motors Du Canada* (October 18, 2006; Quebec Small Claims Court, Joliette District (Repentigny) No. 730-32-004876-046; Justice Georges Massol). You can get the judgment at *www.canlii.org/fr/qc/qccq/doc/2006/2006qccq5312/2006qccq5312.pdf.*

The plaintiff leased and then bought a 2000 Montana minivan. At 72,000 km, the automatic transmission failed and two GM dealers estimated the repairs to be between $2,200 and $2,500. They refused warranty coverage because the warranty had expired after the third year of ownership or 60,000 km of use. The owner repaired the transmission at an independent garage for $1,869 and kept the old parts, which GM refused to examine.

A small claims court lawsuit was filed, and Judge Massol gave the following reasons for ruling against GM's two arguments that (1) there was no warning that a claim would be filed and (2) all warranties had expired:

- GM filed a voluminous record of jurisprudence in its favour, relative to other lawsuits that were rejected because they were filed without prior notice. But the judge reasoned that GM could not plead a "failure to notify," because the owner went to several dealers who were essentially agents of the manufacturer.
- The judge also reasoned that the expiration of GM's written warranty does not nullify the legal warranty set out in articles 38 and 39 of the *Consumer Protection Act*. The legal warranty requires that all products be "reasonably durable," which did not appear to be the case with the plaintiff's vehicle, given its low mileage and number of years of use.

GM was ordered to pay the entire repair costs, *plus* interest, and the $90 filing fee.

*Dufour v. Ford Canada Ltd.* (April 10, 2001; Quebec Small Claims Court, Hull; No. 550-32-008335-009; Justice P. Chevalier). Ford was forced to reimburse the cost of engine head gasket repairs carried out on a 1996 Windstar 3.8L engine—a vehicle not covered by the automaker's Owner Notification Program, which cut off assistance after the '95 model year.

*Schaffler v. Ford Motor Company Limited and Embrun Ford Sales Ltd.* (Ontario Superior Court of Justice; L'Orignal Small Claims Court; Court File No. 59-2003; July 22, 2003; Justice Gerald Langlois). The plaintiff bought a used 1995 Windstar in 1998. Its engine head gasket was repaired for free three years later, under Ford's seven-year extended warranty. In 2002, at 109,600 km, the head gasket failed again, seriously damaging the engine. Ford refused a second repair. Justice Langlois ruled that Ford's warranty extension bulletin listed signs and symptoms of the covered defect that were identical to the problems written on the second work order ("persistent and/or chronic engine overheating; heavy white smoke evident from the exhaust tailpipe; flashing 'low coolant' instrument panel light even after coolant refill; and constant loss of engine coolant"). Judge Langlois concluded that "the problem was brought to the attention of the dealer well within the warranty period; the dealer was negligent." The plaintiff was awarded $4,941 plus 5 percent interest. This judgment included $1,070 for two months' car rental.

*John R. Reid and Laurie M. McCall v. Ford Motor Company of Canada* (Superior Court of Justice; Ottawa Small Claims Court; Claim No: #02-SC-077344; July 11, 2003; Justice Tierney). A 1996 Windstar, bought used in 1997, experienced engine head gasket failure in October 2001 at 159,000 km. Judge Tierney awarded the plaintiffs $4,145 for the following reason:

> A Technical Service Bulletin dated June 28, 1999, was circulated to Ford dealers. It dealt specifically with "undetermined loss of coolant" and "engine oil contaminated with coolant" in the 1996–98 Windstar and five other models of Ford vehicles. I conclude that Ford owed a duty of care to the Plaintiff to equip this vehicle with a cylinder head gasket of sufficient sturdiness and durability that would function trouble-free for

Exhibit 6



*at least seven years, given normal driving and proper maintenance conditions. I find that Ford is answerable in damages for the consequences of its negligence.*

*Dove v. Courtesy Chrysler* (Dartmouth Nova Scotia Small Claims Court; SCCH #206825; July 30, 2004; Judge Patrick L. Casey, Q.C.). "Small claims" doesn't necessarily mean small judgments. This 21-page, unreported Nova Scotia small claims court decision is impressive in its clarity and thoroughness. It applies *Donoghue, Kravitz, Davis, et al.* In awarding a 2001 Dodge Ram owner over $5,000 in damages. Anyone with engine, transmission, and suspension problems or water leaking into the interior will find this judgment particularly useful.

*Fissel v. Ideal Auto Sales Ltd.* (1991) (91 Sask. R. 266). Shortly after the vehicle was purchased, its motor seized and the dealer refused to replace it, even though the car was returned on several occasions. The court ruled that the dealer had breached the statutory warranties in sections 11 (4) and (7) of the *Consumer Products Warranties Act.* The purchasers were entitled to cancel the sale and recover the full purchase price.

*Friskin v. Chevrolet Oldsmobile* (72 D.L.R. (3d), 289). A Manitoba used-car buyer asked that his contract be cancelled because of his car's chronic stalling problem. The garage owner did his best to correct it. Despite the seller's good intentions, the *Manitoba Consumer Protection Act* allowed for cancellation.

*Graves v. C&R Motors Ltd.* (April 8, 1980; British Columbia County Court; Judge Skipp). The plaintiff bought a used car on the condition that certain deficiencies be remedied. They never were, and he was promised a refund, but it never arrived. The plaintiff brought suit, claiming that the dealer's deceptive activities violated the provincial *Trade Practices Act.* The court agreed, concluding that a deceptive act that occurs before, during, or after the transaction can lead to the cancellation of the contract.

*Hachey v. Galbraith Equipment Company* (1991) (33 M.V.R. (2d) 242). The plaintiff bought a used truck from the dealer to haul gravel. Shortly thereafter, the steering failed. The plaintiff's suit was successful because expert testimony showed that the truck wasn't roadworthy. The dealer was found liable for damages for being in breach of the implied condition of fitness for the purpose for which the truck was purchased, as set out in section 15 (a) of the New Brunswick *Sale of Goods Act.*

*Henzel v. Brussels Motors* (1973) (1 O.R., 339 (C.C.)). The dealer sold a used car, brandishing a copy of the mechanical fitness certificate as proof that the car was in good shape. The plaintiff was awarded his money back because the court held the certificate to be a warranty that was breached by the car's subsequent defects.

*Johnston v. Bodasing Corporation Limited* (February 23, 1983; Ontario County Court, Bruce; No. 15/11/83; Judge McKay). The plaintiff bought a used 1979 Buick Riviera that was represented as being "reliable" for $8,500. Two weeks after purchase, the motor self-destructed. Judge McKay awarded the plaintiff $2,318 as compensation to fix the Riviera's defects. One feature of this particular decision is that the trial judge found that the *Sale of Goods Act* applied, notwithstanding the fact that the vendor used a standard contract that said there were no warranties or representations. The judge also accepted the decision in *Kendal v. Lillico (1969)* (2 Appeal Cases, 31), which indicates that the *Sale of Goods Act* covers not only defects that the seller ought to have detected but also latent defects that even his or her utmost skill and judgment could not have detected. This places a very heavy onus on the vendor, and it should prove useful in actions of this type in other common-law provinces with laws similar to Ontario's *Sale of Goods Act.*

*General Motors Products of Canada Ltd. v. Kravitz,* (1979) (1 S.C.R. 790). The court said the seller's warranty of quality was an accessory to the property and was transferred with it on successive sales. Accordingly, subsequent buyers could invoke the contractual warranty of quality against the manufacturer, even though they did not contract directly with it. This precedent was then codified in articles 1434, 1442, and 1730 of Quebec's *Civil Code.*

*Morrison v. Hillside Motors (1973) Ltd.* (1981; 35 Nfld. & P.E.I.R. 361). A used car advertised to be in A-1 condition and carrying a 50/50 warranty developed a number of problems. The court decided that the purchaser should be partially compensated because of the ad's claim. In deciding how much compensation to award, the presiding judge considered the warranty's wording, the amount paid for the vehicle, the model year of the vehicle, the vehicle's average life, the type of defect that occurred, and the length of time the purchaser had use of the vehicle before its defects became evident. Although this judgment was rendered in Newfoundland, judges throughout Canada have used a similar approach for more than a decade.

*Neilson v. Medin Motors* (71 D.L.R. (3d), 744). The plaintiff bought a used truck on the strength of the seller's allegations that the motor had been rebuilt and that it had 210 hp. The engine failed. The judge awarded damages and cancelled the contract because the motor had not been rebuilt and did not have 210 hp, and the transmission was defective.

*Parent v. Le Grand Trianon and Ford Credit* (1981) (C.P., 194; Judge Bertrand Gagnon). Nineteen months after paying $3,300 for a used 1974 LTD, the plaintiff sued the Ford dealer for his money back because the car was prematurely rusted out. The dealer replied that rust was normal, there was no warranty, and the claim was too late. The court held that the garage was still responsible. The plaintiff was awarded $1,500 for the cost of rust repairs.

*Narbonne v. Glendale Recreational Vehicles* (Quebec Small Claims Court; June 2, 2008; Reference: 2008 QCCQ 5325; Judge Richard Landry). Three years after the plaintiff purchased a travel trailer, the manufacturer sent a recall notice to the wrong address. Seven years after that, the vehicle broke down when the recalled

Exhibit 7

### Acura

*2001–03 3.2 CL; 1999–2003 TL; 2004–05 TSX*

**Problem:** Breakage of the rear stabilizer bar link. **Warranty coverage:** Honda will replace both stabilizer bar links under a "goodwill" warranty extension that was confirmed in TSB #05-015, issued June 24, 2005.

### Acura/Honda

*1999–2003 Acura CL and TL; Honda Accord, Prelude, and Odyssey models*

**Problem:** Defective automatic transmission and torque converter. **Warranty coverage:** This "goodwill" warranty extension was confirmed in the August 4, 2003, edition of *Automotive News*. Honda will fix or replace the transmission free of charge up to 7 years/160,000 km (100,000 mi.), whether owners bought their vehicle new or used. The company will also reimburse owners who already paid for the repair.

### Audi

*2002–06 S4 and A6 equipped with 2.7L turbocharged V6 engines*

**Problem:** Defective auxiliary coolant pump leaks coolant from the pump body. When the pump fails, the coolant light will come on, warning that continued driving could cause serious engine damage. **Warranty coverage:** VW will install a Repair Kit free of charge up to 7 years/160,000 km. See TSB #05-05, published October 28, 2005.

### Audi, Chrysler, Mercedes-Benz, Saab, Toyota, and VW

*1997–2004 Audi A4; 1999–2002 Chrysler models equipped with a 2.7L V6; 1998–2002 Mercedes-Benz vehicles; 1998–2003 Saab 9-3 and 9-5 models; 1997–2002 Toyota and Lexus vehicles with 2.2L 4-cylinder or 3.0L V6 engines; and 1997–2004 VW Passat*

**Problem:** Engine sludge. **Warranty coverage:** Varies; usually 7–10 years/160,000 km. Automakers can't automatically deny this free repair because you don't have proof of all of your oil changes, unless they can show that the sludge was caused by a missed oil change (which, according to independent mechanics, is impossible to do). Remember, the warranty has been extended to fix a factory-related problem that occurs despite regular oil changes. That's why it's the automaker's responsibility.

Service bulletins, press releases, and dealer memos are all admissions of responsibility. From there, the legal doctrine of "the balance of probabilities" applies. To wit, a defect *definitely* causes engine sludge, while a missed oil change *may* cause engine sludge. Therefore, it is more probable that the defect caused the sludge.

Once the sludge condition is diagnosed, the dealer and automobile manufacturer are jointly liable for all corrective repairs plus additional damages for your inconvenience, your loss of use or the cost of a loaner vehicle, and the cost to replace the oil. The automaker's owner notification letter may not have gone out to Canadian owners, since it is not required by any Canadian recall or by statute. If a letter goes out, it is usually sent only to first owners of record. And in the case of Chrysler's engine, no customer notification letters have been sent to anyone.

Some automakers say owners must use a special, more-expensive oil to prevent sludge. This after-sale stipulation is illegal and can also provide owners with a reason to ask for damages, or even a refund, since it wasn't disclosed at the time of sale. All of the letter restrictions and decisions made by the dealer and the manufacturer can easily be appealed to the small claims court, where the sludge letter is powerful proof of the automaker's negligence.

### Chrysler, Ford, General Motors, and Asian Automakers

*All years, all models*

**Problem:** Faulty automatic transmissions that self-destruct, shift erratically, gear down to "limp mode," are slow to shift in or out of Reverse, or are noisy. **Warranty coverage:** If you have the assistance of your dealer's service manager, or some internal service bulletin that confirms the automatic transmission may be defective (such as the bulletin below), expect an offer of 50–75 percent (about $2,500) if you threaten to sue in small claims court. Acura, Honda, Hyundai, Lexus, and Toyota coverage varies between seven and eight years.

> I've just been told that I need my fourth transmission on my '96 Town & Country minivan with 132,000 miles (212,000 km) on it. I've driven many cars well past that mileage with only one transmission. The dealer asked Chrysler, who said they

**CHRYSLER TRANSMISSION DELAYED ENGAGEMENT**

BULLETINNO.: [illegible] DATE: [illegible]

**OVERVIEW:** This bulletin involves replacing the front pump assembly in the transmission and checking the Transmission Control Module (TCM) for the latest software revision level.

2004 (CS) Pacifica
**2002**–2004 (JR) Sebring Convertible/Sebring Sedan/Stratus Sedan
2003 (KJ) Liberty
2003 (KJ) Cherokee (International Markets)
**2002** 2004 (LH) 300M/Concorde/Intrepid
**2002** 2003 (PL) Neon
**2002** 2003 (PT) PT Cruiser
**2002** 2003 (RG) Chrysler Voyager (International Markets)
**2002** 2003 (RS) Town & Country/Caravan/Voyager
2003 (TJ) Wrangler

Exhibit 8

*Reasonable diligence*

When asking for a refund, keep in mind the "reasonable diligence" rule that requires that a suit be filed within a reasonable amount of time after the purchase, which usually means less than a year. Because many factory-related deficiencies take years to appear, the courts have ruled that the reasonable diligence clock starts clicking only after the *defect* is confirmed to be manufacturer- or dealer-related (powertrain, paint, etc.). For powertrain components like engines and transmissions, this allows you to make a claim for up to seven years after the vehicle was originally put into service, regardless of whether it was bought new or used. Body failures like paint delamination (see *Frank v. GM*) are reimbursable for up to 11 years. If there have been negotiations with the dealer or the automaker, or if either the dealer or the automaker has been promising to correct the defects for some time or has carried out repeated unsuccessful repairs, the deadline for filing the lawsuit can be extended.

*Extra, punitive damages*

Yes, you can claim for hotel and travel costs or compensation for general inconvenience. Fortunately, when legal action is threatened—usually through small claims court—automakers quickly up their out-of-court offer to include most of the owner's expenses because they know the courts will be far more generous. For example, a British Columbia court's decision gave $2,257 for hotel and travel costs, and then capped it off with a $5,000 award for "inconvenience and loss of enjoyment of their luxury vehicle," to a motorist who was fed up with his lemon Cadillac (see *Wharton v. Tom Harris Chevrolet Oldsmobile Cadillac Ltd. and General Motors of Canada Limited*; B.C. Supreme Court, Vancouver; 1999/12/02; Docket C982104). In the *Sharman v. Ford* case (see page 95), the judge gave the plaintiff $7,500 for "mental distress" caused by the fear that his children would fall out of his 2000 Windstar equipped with a faulty sliding door.

As of March 19, 2005, the Supreme Court of Canada confirmed that car owners can ask for punitive, or exemplary, damages when they feel the seller's or the automaker's conduct has been so outrageously bad that the court should protect society by awarding a sum of money large enough to dissuade others from engaging in similar immoral, unethical conduct. I call this the "weasel-whacker" law. In *Prebushewski v. Dodge City Auto (1985) Ltd. and Chrysler Canada Ltd.* (2001 SKQB 537; QB1215/99JCS), the plaintiff got $25,000 in a judgment handed down December 6, 2001, in Saskatoon. The award followed testimony from Chrysler's expert witness that the company was aware of many cases where daytime running lights shorted and caused 1996 Ram pickups to catch fire. The plaintiff's truck had burned to the ground, and Chrysler refused the owner's claim, saying it had fulfilled its expressed warranty obligations, in spite of its knowledge that fires were commonplace. The plaintiff sued on the grounds that there was an implied warranty that the vehicle would be safe. Justice Rothery gave this stinging rebuke to his judgment against Chrysler and its dealer:

Not only did Chrysler know about the problems of the defective daytime running light modules, it did not advise the plaintiff of this. It simply chose to ignore the plaintiff's requests for compensation and told her to seek recovery from her insurance company. Chrysler had replaced thousands of these modules since 1988. But it had also made a business decision to neither advise its customers of the problem nor to recall the vehicles to replace the modules. While the cost would have been about $250 to replace each module, there were at least one million customers. Chrysler was not prepared to spend $250 million, even though it knew what the defective module might do.

Counsel for the defendants argues that this matter had to be resolved by litigation because the plaintiff and the defendants simply had a difference of opinion on whether the plaintiff should be compensated by the defendants. Had the defendants some dispute as to the cause of the fire, that may have been sufficient to prove that they had not wilfully violated this part of the Act. They did not. They knew about the defective daytime running light module. They did nothing to replace the burned truck for the plaintiff. They offered the plaintiff no compensation for her loss. Counsel's position that the definition of the return of the purchase price is an arguable point is not sufficient to negate the defendants' violation of this part of the Act. I find the violation of the defendants to be wilful. Thus, I find that exemplary damages are appropriate on the facts of this case.

In this case, the quantum ought to be sufficiently high as to correct the defendants' behaviour. In particular, Chrysler's corporate policy to place profits ahead of the potential danger to its customers' safety and personal property must be punished. And when such corporate policy includes a refusal to comply with the provisions of the Act and a refusal to provide any relief to the plaintiff, I find an award of $25,000 for exemplary damages to be appropriate. I therefore order Chrysler and Dodge City to pay: Damages in the sum of $41,969.83; Exemplary damages in the sum of $25,000; Party and party costs.

## Warranty Rights

The manufacturer's or dealer's warranty is a written legal promise that a vehicle will be reasonably reliable, subject to certain conditions. Regardless of the number of subsequent owners, this promise remains in force as long as the warranty's original time/kilometre limits haven't expired. Tires aren't usually covered by car manufacturers' warranties; they're warranted instead by the tiremaker on a pro-rated basis. This isn't such a good deal, because the manufacturer is making a profit by charging you the full list price. If you were to buy the same replacement tire from a discount store, you'd likely pay less, without the prorated rebate.

But consumers have gained additional rights following Bridgestone/Firestone's massive recall in 2001 of its defective ATX II and Wilderness tires. Because of the confusion and chaos surrounding Firestone's handling of the recall, Ford's 575 Canadian dealers stepped into the breach and replaced the tires with any equivalent tires they had in stock, no questions asked. This is an important precedent that tears down the traditional wall separating tire manufacturers from

Exhibit 9

**02/01/2011** **FULLSIZE**

**Reservation:** 8YRXYN **Date Taken:** **By:** **Origin:** BRANCH

**Vehicle**

**Car Class:** FULLSIZE
**Rate Quoted:** $38.99/DAY
$193.99/WEEK
$752.99/MONTH
**Specials:**
**Mileage Charge:** NO CHARGE
**Preferences:**

**Authorization**

**Status:**
**Car Class:**
**Auth Amount:**
**# of Days:**
**Max Per Day:**
**Total Max Amount:**
**% Auth:**

**Product/Services**

| | |
|---|---|
| DAMAGE WAIVER | $8.99/DAY |
| PAI | $2.50/DAY |
| SUPPLEMENTAL LIABILITY PROTECTION 2 | $13.80/DAY |

**Authorization**

**Pick Up/Return**

**Pick Up Date:** 02/01/2011
**Pick Up Time:**
**Pick Up Group:** A0024_ELRAC_ LLC
**Pick Up Branch:** COMMACK 24A3
189 COMMACK RD
COMMACK,NY 117253443
**Pick Up Method:**
**Pick Up Location:**
**Directions:**

**Return Date:** 02/03/2011
**Return Time:**
**Return Group:** A0024_ELRAC_ LLC
**Return Branch:** COMMACK 24A3
189 COMMACK RD
COMMACK,NY 117253443
**Return Method:**
**Return Location:**

**Renter Information**

NY

**Home:**
**Work:**
**Other:**

**Bill-to**

**Rental Type:**
**Claim Type:**
**Claim/Pol/PO/RO:**
**Insured Name:**

**Shop**

**Renters Vehicle:**

**Flight Information**

**Airline:** **Flight:** **Terminal:**
**Arrival Date:** **Arrival Time:**

Exhibit 10

U.S. Postal Service™
CERTIFIED MAIL™ RECEIPT
(Domestic Mail Only; No Insurance Coverage Provided)

For delivery information visit our website at www.usps.com®

OFFICIAL USE

| | |
|---|---|
| Postage | $ $0.78 |
| Certified Fee | $2.80 |
| Return Receipt Fee (Endorsement Required) | $0.00 |
| Restricted Delivery Fee (Endorsement Required) | $0.00 |
| Total Postage & Fees | $ $3.58 |

0802

HICKSVILLE, NY 11801
FEB 1 2010
USPS
Postmark Here
02/01/2011

Sent To Harvey Miller Esq. Weil, Gotshal & Manges ESQ's
Street, Apt. No.; or PO Box No. 767 5th AV.
City, State, ZIP+4 New York, NY 10153

7007 0710 0003 4650 4035

PS Form 3800, August 2006 See Reverse for Instructions