**Hearing Date and Time: March 3, 2011 at 9:45 a.m., ET**
**Objection Deadline: February 11, 2011 at 4:00 p.m., ET**

**HARRIS BEACH PLLC**
100 Wall Street
New York, New York 10005
Telephone: (212) 687-0100
Facsimile: (212) 687-0659

-and-

**HARRIS BEACH PLLC**
One Park Place, 4th Floor
300 South State Street
Syracuse, New York 13202
Telephone: (315) 423-7100
Facsimile: (315) 422-9331
Lee Woodard, Esq.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re | Chapter 11 |
| MOTORS LIQUIDATION COMPANY, *et al.*, f/k/a General Motors Corp., *et al.*, | Case No. 09-50026 (REG) |
| Debtors. | (Jointly Administered) |

## OBJECTION OF TOWN OF SALINA TO AMENDED JOINT CHAPTER 11 PLAN PROPOSED BY MOTORS LIQUIDATION COMPANY, f/k/a/ GENERAL MOTORS CORPORATION

The Town of Salina of the State of New York (the "Town"), by and through its undersigned counsel, hereby submits this Objection to the Amended Joint Chapter 11 Plan Proposed by Motors Liquidation Company, f/k/a General Motors Corporation, and respectfully states as follows:

### I. BACKGROUND

1.     By Order dated December 8, 2010, the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") approved the revised Disclosure Statement for the Debtors' Amended Joint Chapter 11 Plan, dated December 7, 2010 (the "Disclosure Statement").

2.     A hearing on the confirmation of the Debtors' Amended Joint Chapter 11 Plan (the "Plan") is scheduled for March 3, 2011 at 9:45 a.m. Objections to the Plan are to be filed with Bankruptcy Court no later than February 11, 2011 at 4:00 p.m.

3.     The Town of Salina has filed three claims in the Debtors' cases, resulting from the cleanup of various sites contaminated by the Debtors within the Town of Salina and the County of Onondaga in the State of New York.

4.     These claims filed assert the following claims against the Debtors: (i) approximately $12,498,818.63 in cost reimbursement for environmental contamination at the Onondaga Lake Superfund Site (the "Onondaga Lake Claim"); (ii) approximately $18,577,319.00 in cost reimbursement for environmental contamination at the former-Town of Salina Landfill (the "Landfill Claim"); and (iii) an amount to be determined, but estimated to be in excess of $10,000,000.00 in cost reimbursement for environmental contamination at the Lower Ley Creek sub-site (the "Lower Ley Creek Claim") (collectively, the "Town of Salina Claims").

5.     On or about January 11, 2010, the Debtors filed a Motion for an Order for authorization to implement alternative dispute resolution procedures, including mandatory mediation, to establish a procedure for resolving Unliquidated/Litigation claims in order to quantify the amounts of general unsecured claims (the "ADR Procedures Motion").

6.     On or about February 2, 2010, the Town filed opposition to the ADR Procedures Motion (the "ADR Objection"). As a result of the ADR Objection, the Town's claims were excluded from the ADR procedures pursuant to Court Order dated February 23, 2010 (the "ADR Procedures Order").

7.     On October 20, 2010 the United States of America filed a Notice of Lodging of Proposed Settlement Decree of the Environmental Response Trust Consent Decree and Settlement

2

229314 1531117.1

Agreement (the "ERT Notice"). The Town filed an Objection to that proposed Settlement Decree and appeared at the public meeting held on December 15, 2010 in Syracuse, New York in opposition to its approval.

8.      On or about February 11, 2011, the Town filed an Administrative Proof of Claim in the approximate amount of $3.8 million based on the continuing environmental contamination emanating from the Debtors' real property located in the Town of Salina and the associated remediation expenses that have been incurred during the pendency of the bankruptcy cases.

## II.  OBJECTIONS TO THE PLAN

A.      All General Unsecured Creditors Will Not Be Treated Equally

9.      The Town has reviewed the Plan and objects to Confirmation on the basis that it is inequitable and fails to comply with the requirements of Section 1129, which are more fully set out below.

10.      At the outset, it is impossible for the Town to determine if there will be sufficient funds set aside to distribute the same dividend to unsecured creditors whose claims are allowed after Confirmation as those creditors who are allowed and paid upon Confirmation. The Debtors' Disclosure Statement estimated the total liability for unsecured claims to be approximately $34.4 to $39 Billion. However, there have been rumors about estimation hearings that may radically reduce the estimated amount of those claims to be provided for in the Plan. Without this Court issuing orders that actually disallow many of those claims, however, the estimate of the total liabilities of the general unsecured class should not be reduced. A premature reduction in those claims will result in a shortfall in funds set aside to pay general unsecured claimants like the Town who are deemed allowed after the confirmation process. As a result, all of the unsecured creditors in Class 3 would

3

not be treated equitably and equally under the Plan and the GUC Trust, in violation of 11 U.S.C. §1129(b).

11.    The Town further objects to the Debtors' Plan and submits that it should not be confirmed because it fails to meet all of the other requirements of 11 U.S.C. §1129, as more fully outlined below.

12.    In late 2010, the Town was contacted by Alix Partners, with a representation that an analysis of the Town's claims would be undertaken, and, hopefully, they would be resolved. In conjunction with those discussions, the Town complied with various requests for detailed technical information in order to establish its claims, particularly with respect to the Town of Salina Landfill Site.

13.    In spite of the Town's efforts to have its claims resolved well prior to the confirmation hearing, Alix Partners unilaterally suspended its discussions with the Town pending unknown negotiations with the United States Environmental Protection Agency ("USEPA") and the United States Department of Justice ("USDOJ"). The Town was informed that Alix Partners was "negotiating the site (Onondaga Lake and all of the derivative sites) with the USEPA and the USDOJ and do not currently have plans to discuss this claim with the Town of Salina until those talks have concluded." Despite further requests for clarification, there was no additional information or explanation regarding why the Town was not a part of those discussions, which is especially troublesome given the Town's continuing obligations and the tremendous expenses incurred in the remediation of the Landfill Site.

14.    It would appear that, in spite of the original stated "good intentions" expressed by Alix Partners on behalf of the Debtors, the Debtors have determined they will not undertake further efforts to resolve the Town's claims by the confirmation date.

4

15.    Without a resolution of the Town's Claims, they will not be "allowed" under the terms of the Proposed Plan upon Confirmation. Pursuant to paragraph 1.54 of the Plan, the Town's claims are considered "disputed" because its claims were filed by the applicable deadline, but vary from the nature and amount of such claim as listed on the Schedules. (The Town was not listed on the Schedules, although the New York State Department of Environmental Conservation ("NYSDEC") and EPA were listed as contingent and disputed). Having its claims unresolved and treated as disputed will likely result in the Town being treated differently than other general unsecured creditors who are paid upon confirmation of the Plan, in violation of 11 U.S.C. §1129(b).

16.    The Plan provides for the establishment of the GUC Trust for the benefit of general unsecured creditors. The GUC Trust Administrator is responsible for determining claim amounts and making distributions to unsecured claimants that are to be paid after confirmation, such as the Town.

17.    It is respectfully submitted that the Plan should not be confirmed in its current form, until there are detailed protections included that ensure equitable treatment among: (i) those general unsecured claims that are deemed allowed upon confirmation; and (ii) those claims, such as the Town's claims, which may be established and paid after confirmation.

18.    One alternative is for the Debtors to set aside funds for the unresolved claims in an amount that would be sufficient to pay those claims as if allowed in full on their face value, pending a further Court Order reducing or expunging those claims. Another alternative is for the Confirmation Order to contain a provision that limits the amount of distributions to Class 3 Claimants to payment of only 50% of amounts owed to them, and only upon a final allowance or disallowance of all general unsecured claims shall the remainder be paid. In either event, there should not be any distribution until after the Effective Date of the Plan.

5

19.    This proposed holdback procedure would allow an initial distribution on those claims that are deemed allowed as of the Confirmation Date, but would provide for a subsequent distribution to the entire general unsecured creditor body once all of the unsecured claims are resolved. It would ensure that the ultimate distribution to general unsecured claims not allowed on the date of confirmation is equivalent to the distribution to the allowed unsecured creditors, preventing discrimination among unsecured creditors and ensuring compliance with § 1129(b).

20.    If the Plan is confirmed in its current form, it is highly likely that the payments made to allowed "pre-confirmation" claims would be higher than the payments made to allowed "post-confirmation" claims. However, the Plan does not provide any mechanism to require those "pre-confirmation" allowed claims to disgorge any distribution that proves to be inequitable. More importantly, to seek disgorgement from those parties that were paid on their allowed claims immediately after confirmation would be virtually impossible and create unnecessary chaos in this case. To avoid that result, the Plan should be modified to ensure that the holdbacks are truly sufficient to meet the Debtors' required payments to all Class 3 Claimants.

**B.    The Plan Improperly Discriminates Among General Unsecured Environmental Claimants**

21.    As fully detailed below, the Town has vehemently objected to the Environmental Response Trust Agreement and Environmental Response Trust Consent Decree and Settlement Agreement (the "ERT"). The Town believes its environmental claims should be included in the ERT, and therefore, it objects to the classification of its claims as part of Class 3 and maintains that its claims should be properly classified as Class 4 Claims. The Plan provides that Class 4 Environmental Claimants will receive either 100% of their allowed claims under the terms of the ERT, or they will receive immediate cash payments pursuant to the Priority Order Sites Consent Decrees and Settlement Agreements. The Debtors' Plan does not explain or justify the different

6

treatment between ERT Environmental Claimants, the Priority Order Site Claimants, and those Class 3 Claimants, like the Town, whose claims are also the result of the Debtors' environmental contamination.    There is no rationale for the Debtors' proposed payment of 100% on its environmental liabilities for some sites but not others.  While the Debtors attempt to distinguish the sites by "owned" sites that are the subject of ERT and "non-owned" sites, these arbitrary, artificial lines do not recognize the nature of the existing, continuing and/or migrating contamination that resulted directly from the GM's operations in the Town.  Consequently, the Debtors' distinction and proposed classification and treatment of the environmental claims under the Plan should not be permitted.

22.    The Debtors' stated rationale for differentiating between "owned" and "non-owned" sites becomes even more incredible when reviewing the provisions in the Plan that address those "Priority Order Sites" that are the subject of an order requiring performance of environmental action. The Plan identifies, on Exhibit "E," six certain "Priority Sites" that are the subject of separate settlement agreements, all of which involve environmental claims on non-owned sites.

23.    The "Priority Site" Claimants are to receive specific cash payments on their claims upon approval of their settlement agreements, and some of the parties to the settlement agreement then also share in the Plan's distribution to general unsecured creditors as Class 3 Claimants.  There is no justification or explanation for that cash payout and superior treatment for those environmental claimants, whose claims appear to be virtually identical to the Town's claims, or for not including the Town as a Priority Site.

24.    For example, the Priority Site Consent Decree and Settlement Agreement for the Wheeler Pit Site in Wisconsin is based on the Debtors' liability to conduct remedial actions pursuant to a Unilateral Administrative Order issued by the EPA in 1991.  The EPA and the State of

229314 1531117.1

Wisconsin filed proofs of claim for both past and/or future response costs incurred or to be incurred under CERCLA. Under the Wheeler Pit Settlement, the Wisconsin Department of Natural Resources will receive $385,991 on the Effective Date of the Plan, and the United States, on behalf of the EPA, shall have an allowed General Unsecured Claim in the amounts of $95,045 for response costs incurred through May 31, 2006.

25.    The Consent Decree and Settlement Agreement for the Sioux City Site in the State of Iowa is similar. The agreement provides for payment of $6,476,634 to the EPA which shall be "in settlement and satisfaction of any claim for past and future response costs alleged in the (Iowa) State Proof of Claim."

26.    The Town's largest claim, the Landfill Claim, also includes both past and future response costs incurred or to be incurred by the Town under CERCLA, pursuant to both an October 29, 1997 Consent Order entered into between the Town and NYSDEC, as well as a Record of Decision which outlines the required investigatory and remedial actions as issued by USEPA and NYSDEC in March 2007. To date, the Town has incurred $5,485,160.06 in investigation, remedial and other costs pursuant to the Record of Decision.

27.    The Record of Decision outlines specific response actions that are necessary to protect the public health or welfare and the environment from actual or threatened releases of hazardous substances. As detailed below, the technical data and evidence demonstrates that the Debtors' operations at the IFG Site, as well as its disposal of PCB related wastes at the Landfill Site, resulted in the Landfill Site being classified as an Inactive Hazardous Waste Site by NYSDEC. Given these facts, there can be no rational explanation why the Landfill Site should not be included as a Priority Site since it is similar in nature to the type of Priority Sites that are already being paid out by the Debtors.

28.    Consequently, regardless of the Classification scheme set forth in the Plan, it cannot be confirmed because it unfairly discriminates amount similarly situated creditors (see 11 U.S.C. 1129(b)). In In re 222 Liberty Associates, 108 B.R. 971 (Bankr. E.D. Pa 1990), the Court denied confirmation of a plan because it unfairly discriminated between similarly situated creditors. The 222 Liberty Court noted that a plan proponent may classify claims separately, but it may not deny equal treatment to similarly situated creditors absent a valid basis for the discrimination. Id. at 991. In its analysis, the Court applied the following test for determining whether a plan unfairly discriminates:   different treatment is permissible if and only if the debtor is able to prove a reasonable basis for the degree of discrimination contemplated by the plan. Id. at 991 (quoting In re Furlow, 70 B.R. 973, 978 (Bankr. E.D. Pa 1987)).

29.    In the case at hand, the Plan's treatment between similarly situated environmental claimants is unfair discrimination at its worst. There can be no rational explanation that can justify the disparate treatment between: (i) the Class 4 Environmental Claimants that are stated to receive 100% repayment under the ERT; (ii) the Priority Order Site Claimants that are to receive cash plus an immediate allowed distribution as a Class 3 claimant; and (iii) the Class 3 Environmental Claimants, such as the Town, that may receive some unknown non-cash amount at some point in the future. The Debtors simply cannot provide any reasonable basis for that degree of discrimination among the environmental claimants. In the absence of such an explanation, the Plan should not be confirmed.

**C.    Objection To The Proposed Environmental Response Trust Consent Decree And Settlement Agreement And Classification Of The Town's Claims As Class 3 Claims**

30.    The Plan and the Notice of Lodging of Proposed Settlement Agreement with respect to approval of the ERT are not consistent. It is unclear if the proposed ERT will be approved upon confirmation of the Plan or if the United States will follow the procedure in its ERT Notice and

9

separately request that the Court approve the ERT. Pursuant to paragraph 6.4(a) of the Plan, "Entry of the confirmation order shall constitute approval of the Environmental Response Trust Consent Decree and Settlement Agreement pursuant to section 1123(b) of the Bankruptcy Code and Bankruptcy Rule 9019." However, the ERT Notice requires the United States to solicit public comments and to report those comments to the Court, along with its responses to those comments. At that time, if appropriate, the USA would request that the Court approve the ERT. This process is also reiterated in the Disclosure Statement (Section II (F)(13)).

31.     The Town, among others, provided extensive written and verbal comments and objections to the ERT during the public comment period and at the public meeting held on December 15, 2010, as more fully detailed in the Town's correspondence to the USDOJ dated December 15, 2010 (the "ERT Objection"). A copy of the ERT Objection without exhibits is attached hereto as Exhibit "A" and fully incorporated herein.

32.     To date, no responses from the United States have been filed.

33.     Because of these inconsistencies in the Plan and the ERT Notice, it is unclear if the Debtors are attempting to obtain court approval of the ERT at the Confirmation Hearing, even though the public's comments and the United States' responses thereto have not been submitted to the Court. In the event that the Debtors are seeking approval of the ERT in conjunction with the Confirmation Hearing, the Town incorporates its ERT Objection herein, and reserves all rights to further object to the approval of the ERT at the appropriate time.

34.     The Town objects to and requests that specific revisions be made to the ERT which seeks to create the Environmental Trust Fund. The Town objects to the arbitrary limitations the United States has placed on the proposed distribution of the approximately $641 million comprising the Environmental Trust Fund. In particular, the Town opposes the ERT's ban on the use of trust

monies to address the "downstream" liabilities associated with Old GM's Inland Fisher Guide facility (the "IFG Site") and, in particular, the disposal, discharge and/or release of hazardous wastes generated by Old GM within the lower portions of Ley Creek, Onondaga Lake, and the former Town of Salina Landfill Site (the "Landfill Site").

35.     In support of its trust fund scheme, the ERT artificially and arbitrarily divides the lower portion of Ley Creek from that portion of Ley Creek located upstream of the Route 11 Bridge, irrespective of the voluminous technical data collected by the USEPA and the NYSDEC proving that Old GM's operations at the IFG Site have resulted in decades of PCB releases into the entirety of Ley Creek and the remaining Onondaga Lake system. The Town further objects to the arbitrary and capricious decision made by the United States to exclude from compensation under the ERT Old GM's liability to the Landfill Site, notwithstanding that such liability is a direct result of Old GM's historical operations at the IFG Site. The hazardous waste disposal practices conducted at the IFG Site resulted in the disposal of hundreds of tons of PCBs and PCB-related waste at the Landfill Site, which is currently being remediated by the Town pursuant to a Record of Decision issued by USEPA and NYSDEC in March 2007.

36.     The ERT is clearly in violation of CERCLA's mandate that a consent decree be fair, reasonable, and consistent with its statutory goals. If left unmodified, the ERT will result in the taxpayers of the Town, County and State of New York solely bearing the financial burden of addressing the decades of contamination Old GM and its IFG Site have caused. Moreover, there is no justification for the exclusion of Lower Ley Creek sub-site and/or the Landfill Site from compensation under the ERT, since these liabilities are inextricably linked to the IFG Site. What is particularly offensive and arbitrary is how the United States on one hand has purposefully excluded these IFG Site-related liabilities from compensation, while at the same time pursuing enforcement

11

actions against the Town and other non-GM parties for the cleanup (and cost recovery) associated with these same liabilities.

37.     The Town therefore requests that the proposed ERT be modified to include not only funding for the cleanup of the entirety of Ley Creek, but also for the liability Old GM faces as a generator and arranger for disposal of IFG Site-related hazardous waste at the Landfill Site pursuant to the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9601 *et seq.* A decision by the United States to deny the modifications requested by both the Town and Onondaga County will result in the Town's taxpayers solely bearing the cost of these Old GM liabilities, with the United States (through its debtor-in-possession financing of Old GM) benefitting from the expenditure of trust monies and the concomitant redevelopment of these now, federally-controlled assets.

38.     Additionally, the County of Onondaga in its November 24th, 2010 letter to DOJ has provided numerous comments on the proposed ERT in light of Old GM's liability to the Lower Ley Creek sub-site and the Onondaga Lake NPL Site (the "Onondaga County ERT Objection"). A copy of the Onondaga County ERT Objection is attached hereto as Exhibit "B" and incorporated herein in its entirety. The Town submits the following supplemental comments with respect to the Lower Ley Creek sub-site, as well as Old GM's liability as a potentially responsible party ("PRP") pursuant to CERCLA for the Landfill Site.

### 1.     Lower Ley Creek

39.     A voluminous amount of technical data has been collected by NYSDEC and USEPA which demonstrates that the discharge of PCBs and PCB-related wastes from the IFG Site has impacted the entirety of Ley Creek.

229314 1531117.1

40.    The sediment samples collected upstream of the Landfill Site contained higher concentrations of PCBs than downstream samples, indicating that the upper portions of Ley Creek (above the Route 11 bridge) were the source of PCB contamination in Lower Ley Creek. A Remedial Investigation/Feasibility Study was further performed by Old GM wherein PCBs were detected in the dredge spoils at concentrations up to 466 mg/kg. The results of this study linked the presence of PCBs along the entire length of Ley Creek to the historical discharges of PCBs from the IFG Site.

41.    In June, 1996 NYSDEC prepared a Site Summary Report for the IFG Site as part of its sub-site status determination. After completing its investigation, NYSDEC and USEPA concluded that the IFG Site contributed to the presence of PCBs within the entirety of Ley Creek. Soils, groundwater, industrial wastewater, and stormwater were all confirmed as containing PCBs and other hazardous substances. The report further states that "[f]rom 1954 until 1963, process wastewater [from the IFG Site] discharged directly to Ley Creek presumably with little or no treatment." NYSDEC thus concluded that, due to the presence of PCBs and other hazardous substances at the IFG Site, it represented "a release and a continued threat of release [of hazardous substances] to the Onondaga Lake System."

42.    In July, 2010 USEPA further acknowledged that "the majority of the contamination in Lower Ley Creek sediment has come from various sources and/or facilities upstream and on Ley Creek, including the former General Motors Corporation – Inland Fisher Guide Facility." USEPA's evaluation does not identify any other alleged sources of PCB contamination besides the IFG Site in the Lower Ley Creek.

43.    The technical analyses clearly demonstrate that there is no legitimate basis to divide the upper portion of Ley Creek from its lower portion when determining Old GM's environmental

13

liability. To the contrary, the division set forth in the ERT is a merely fictional; one created to arbitrarily cut off Old GM's liability, while ensuring both an overwhelming "orphan share" of liability and protracted future litigation between DOJ and the remaining PRPs.

### 2.    The Former Town of Salina Landfill Site

44.    In addition to its liabilities to the Lower Ley Creek sub-site and Onondaga Lake NPL Site, Old GM's historical operations at the IFG Site resulted in Old GM becoming a PRP for the cleanup of the Landfill Site. Old GM conducted various manufacturing processes at the IFG Site including plating; buffing; forming and finishing metal automobile parts; junction moldings; painting; and assembling plastic body and trim components for automobiles. The evidence collected by NYSDEC shows that Old GM's disposal practices at the IFG Site resulted in the presence of PCBs and other hazardous substances and wastes at the Landfill Site.

45.    According to USEPA and NYSDEC, between 1962 and 1973, Old GM disposed PCBs and PCB-related hazardous wastes at the Landfill Site. PCBs (including Aroclor 1248) known to be present at the IFG Site, have also been detected in various media associated with the Landfill Site. This undeniable connection between the Aroclor 1248 PCBs generated at the IFG Site, and those present in the soils and groundwater at the Landfill Site, confirms that Old GM's historical waste practices at the IFG Site directly resulted in the disposal of PCBs and PCB wastes at the Landfill Site, thus supporting a finding that Old GM is a PRP with respect to the Landfill Site pursuant to Section 107(a)(3), 42 U.S.C. § 9607(a)(3) of CERCLA.

46.    The main consideration for Old GM's PRP liability is the acknowledgement that, but for the presence of PCBs and other hazardous substances generated and disposed of by Old GM, the cleanup of the Landfill Site would have been completed as a 6 N.Y.C.R.R. Part 360 municipal solid waste closure, as opposed to a Class 2 Inactive Hazardous Waste Site pursuant to 6 N.Y.C.R.R. Part

14

375. Because Old GM's disposal of PCBs and PCB-related waste resulted in a Class 2 listing of the Landfill Site, the associated cleanup costs are significantly higher, requiring that Old GM's allocated share of cleanup costs reflect this outcome. The Town therefore projects that Old GM's disposal of PCB-related wastes resulted in a 56% incremental increase in the total cost to be incurred in remediating the Landfill Site.

47.    Based on its recent bid award for phase one of the cleanup, the Town has calculated that the total present worth cost of remediating the Landfill Site is $29,592,701. Old GM's estimated allocated share of these costs is, at a minimum, $19,201,701, representing the incremental costs associated with remediating the Landfill Site as a Class 2 Inactive Hazardous Waste Site due to GM's disposal of PCBs and other hazardous substances.

48.    The ERT, in its current form, however, bars the Town from recovering any portion of this cost from Old GM despite the source of its liability being directly (and unequivocally) linked to the IFG Site. The ERT thus fails to satisfy the applicable standard for judicial approval of CERCLA settlements, and violates that statute's objective that consent decrees, wherein the United States provides covenants not to sue, be fair, reasonable and consistent with CERCLA's goals of cleaning up contaminated sites.

### 3.    Miscellaneous Comments on Environmental Response Trust

49.    In addition to the comments provided in the Onondaga County ERT Objection on pages 10-12, the Town requests that the following revisions be made to the proposed ERT.

50.    The GM-IFG Site as described in ¶ 63 of the ERT includes both the area "within the IFG Syracuse facility property boundaries" and "the property extending from the facility property boundaries to the Route 11 Bridge". The phrase "the property extending from the facility property boundaries to the Route 11 Bridge" is at best ambiguous. It must be defined more precisely and the

15

229314 1531117.1

scope of the work intended to be funded by the trust should be described. To the extent that work does not include both in and out of Ley Creek response actions, the scope should be amended to include all such required activities and if necessary, the cost estimate and Trust funding should be modified accordingly.

51.    Paragraph 94 of the ERT concerning Covenants Not to Sue proposes that the covenants relate to potential claims or causes of action against the Environmental Trust "under CERCLA, RCRA, and State environmental statutes, as well as any other environmental liabilities asserted in the Governmental Proofs of Claim." The phrasing of the covenant is at best ambiguous and suggests an agreement to pursue claims or causes of action that may arise after the Trust is funded (e.g., current or future on-going permit violations). The language should be amended to narrow the scope of the proposed covenants such that future enforcement of post-funding environmental violations is not precluded.

52.    Paragraph 99 of the ERT sets forth the Debtors' and the Trust's proposed covenant not to sue the United States or states for potential CERCLA or RCRA claims. Given that proposed covenant, what steps were taken and to what extent was any allocation of United States or state liabilities used to derive the funding proposed to be provided to the Trust for any individual site?

53.    Paragraph 100 (ii) of the ERT carves out an exception to the Covenants Not to Sue for Lower Ley Creek that is defined as "the entire portion of Ley Creek which is downstream from the Route 11 Bridge." That phrasing is much too ambiguous and uncertain. It should be modified to read as follows: "the existing channel from Route 11 to Onondaga Lake, Old Ley Creek and any PCB dredge disposal areas located west and downstream of the Route 11 Bridge and/or otherwise not the "Ley Creek PCB Dredging Site" located immediately downstream of GM-IFG Syracuse."

16

54.     Paragraph 100 (iv) of the ERT carves out an exception to the covenants Not to Sue for future acts that create liability but creates an exception to the carve-out for "continuing releases related to the Debtors' conduct prior to the Effective Date." The exception to the exception should not apply to on-going permit violations whether or not they can in any way be related back to pre-Effective Date conduct. In this case, the latest publicly available information indicates on-going PCB discharges in violation of applicable SPDES permit limits; that conduct should not be exempted.

55.     Paragraphs 100 and/or 105 of the ERT should confirm that "covered matters" does not include violations of the Clean Water Act or any state analogs to the Clean Water Act.

56.     The term "any general unsecured claim" in paragraph 100 (ii) of the ERT should be replaced with the term "any claims." This revision ensures the broadest reservation of rights by the United States since some of the environmental claims are still ongoing and not necessarily reflected in the proof of claims filed, to date, in the Old GM bankruptcy proceeding.

57.     The phrase "other than claims or causes of action for migration of Hazardous Substances emanating from a Property" in paragraph 100 (ii) must be deleted since it is inconsistent with the ERT's reservation of rights with respect to the Lower Ley Creek and Lake Bottom sub-sites. The basis of the claims preserved in paragraph 100(ii) is that PCBs and other hazardous substances have actually migrated from the IFG Site and contaminated those sub-sites.

58.     The second sentence on page 60 of the ERT (with paragraph 100) must be revised so that the ERT is also without prejudice as to any liability of Debtors' successors, assigns, officers, directors, employees, and trustees pursuant to Section 113(f) of CERCLA. The Town further objects to the ERT's ban on future acts creating liability under CERCLA, RCRA and/or state law if based on continuing releases related to conduct prior to the Effective Date of the ERT.

17

229314 1531117.1

59.    Consistent with comments above, paragraph 105 of the ERT must be revised by deleting the phrase "including releases of Hazardous Substances from any portion of the Properties, and all areas affected by migration of such substances emanating from the Properties...," since it undermines the reservation of rights preserved in Article VIII of the ERT as to the Lower Ley Creek, Lake Bottom and Salina Landfill Sub-sites.

60.    The arbitrary limitations that have been placed on the distribution of the ERT's trust monies will result in a significant financial burden being placed squarely on the Town, notwithstanding the fact that Old GM's IFG Site is solely or primarily responsible for the contamination existing at the Lower Ley Creek sub-site and the Landfill Site. The environmental data collected by USEPA and NYSDEC proves there is no legitimate basis to exclude these Old GM liabilities from compensation under the Environmental Trust Fund. To do so, will not only undermine the future efforts of the United States to address these environmental concerns, but unjustly place the burden of these liabilities solely on the shoulders of Town residents.

61.    Based on the foregoing, the ERT and the Priority Order Sites Consent Decrees in their current form should not be approved, whether in conjunction with the Confirmation Hearing or otherwise. The technical analysis above demonstrates that there is no rational basis for dividing the contaminated properties and the claims resulting therefrom. The exclusion of the Town as a party to the ERT and a Class 4 Claimant improperly and unfairly discriminates between similarly situated claimants without justification. 11 U.S.C. §1122(a). As a result, the Town should be included as a party to the ERT (or, in the alternative, treated as a Priority Site Claimant), and should be treated as a Class 4 Claimant under the Plan, being paid 100% of its environmental claims.

18

229314 1531117.1

**D.    Wilmington Trust Corporation And The GUC Trust Monitor**

62.    There are many potential conflicts of interest that Wilmington Trust Corporation ("WTC") may encounter in fulfilling its roles under the Plan. The Plan proposes that WTC act as the GUC Trust Administrator, as the Avoidance Action Trust Administrator, and as the entity that objects to disputed claims. Simply stated, WTC is wearing too many hats in this case.

63.    Given the potential conflicts, the GUC Trust Monitor should not be chosen by WTC. The United States Trustee should ensure that the Monitor is independent and can unbiasedly oversee WTC's administration of the Trust to confirm distributions and holdbacks are appropriate, claims are timely resolved and paid, and the overall administration and expenses of the GUC Trust are proper.

64.    In addition, the indemnification provisions for the GUC Trust Administrator should exclude any indemnification for a breach of fiduciary claims. The Town does not believe that WTC should not be indemnified from the Trust if it breaches its fiduciary duties, and that the Trust should bear that expense if WTC has acted inappropriately in carrying out its fiduciary obligations.

**E.    The Town Is Unable To Accept And Hold The New GM Stock**

65.    Assuming, arguendo, that the Town's claims are properly classified as Class 3 Claims, its claims will be paid through the GUC Trust. The GUC Trust contemplates the payment of the Class 3 Claimant's pro rata share of: (i) the new GM Securities, as defined therein (the "New GM Stock"); and (ii) the GUC Trust Units, in accordance with the terms of the GUC Trust and the GUC Trust Agreement.

66.    The New GM Stock will be an equity stake in a publicly traded corporation. Pursuant to Article VIII § 1 of the New York Constitution, the Town is precluded from accepting and owning the New GM Stock as that distribution is proposed under the Debtors' Plan.

19

67.    The plain language of the New York Constitution prohibits a municipality from directly or indirectly owning stock in any private corporation. The New York State Constitution provides:

> "No county, city, town, village or school district shall . . . become directly or indirectly the owner of stock in, or bonds of, any private corporation or association . . . ." New York Constitution Art. VIII §1.

In interpreting this constitutional provision, the New York State Comptroller has found that the ownership of stock in private corporations violates Article VIII § 1. See N.Y. Opns. St. Comp. 68-51(1968).

68.    Despite having been raised prior to approval of the Disclosure Statement, the Plan has not addressed or resolved the issue regarding the Constitutional restrictions and the impact those restrictions may have on the municipal Claimants and their proposed distributions under the Plan. The Disclosure Statement indicates that the Debtor is willing to work with the municipalities to identify and implement a solution to the extent practical and economically neutral to the Debtors, and presumably such a solution would provide the Town with the financial benefit that should be associated with the acquisition of the New GM Stock. However, no efforts have been made to resolve this issue. If not properly addressed in the Plan, it would result in a windfall for the other general unsecured claimants who would benefit from those restrictions at the expense of the Town. Clearly such a result would not be equitable, especially since under the terms of the Plan as currently proposed, the Town and its taxpayers will be forced to bear the burden of the additional environmental clean up that the Debtors are abandoning under the current Plan.

F.    **Bankruptcy Court Jurisdiction Over Certain Environmental Matters Should Be Limited**

69.    Paragraph 11.1 of the Plan provides the Bankruptcy Court with "exclusive" jurisdiction of all matters arising under, arising out of, or related to the Chapter 11 Cases and the

20

229314 1531117.1

Plan after confirmation. This language is simply too broad when dealing with environmental issues. While the Bankruptcy Court retains jurisdiction over various matters related to the estate administration and Plan consummation, its post-confirmation jurisdiction should not be "exclusive." As a result, "exclusive" should be deleted from Paragraph 11.1 of the Plan.

70.     The Plan also provides that the Debtors or the GUC Trust Administrator may at any time request that the Bankruptcy Court estimate any contingent, unliquidated or Disputed Claims pursuant to Section 502(c) of the Code, and the Bankruptcy Court shall retain jurisdiction to estimate at any time during litigation concerning any objection to Claim (Plan, Paragraph 7.3). It further states that: "In any event that the Bankruptcy Court estimated any contingent, unliquidated or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or the maximum limitation on such claim as determined by the Bankruptcy Court." These estimation provisions, however, do not apply to Property Environmental Claims that are resolved by the Environmental Response Trust or the Priority Order Sites (Plan Paragraph 1.114) and should similarly not apply to the state and local municipalities holding environmental claims. It should be clear that the Bankruptcy Court does not retain exclusive jurisdiction to determine the environmental claims of the state and tribal governments and municipalities and have that determination binding on those entities.    The Plan should therefore be amended to reflect: "The Bankruptcy Court's jurisdiction with respect to any environmental claims, including the estimation of any such claims of state and tribal governments and municipalities concerning environmental liabilities, should be concurrent with the jurisdiction of other courts of competent jurisdiction over such matters."·

## G.    Overbroad Releases

71.     In addition to the deficiencies discussed above, the Plan also provides overly broad releases and exculpation to numerous parties in Paragraphs 12.5 and 12.6 of the Plan.

72.    Specifically, the Plan proposes to release, *inter alia*, the Debtors' former directors, management, all post-Commencement date advisors, consultants and professionals to the Debtors and the DIP Lenders, the Creditor's Committee, the Indentured Trustees, etc. (the "Released Parties") from virtually any liability (except, *inter alia*, from gross negligence, etc.). The Exculpation clause in Paragraph 12.6 also provides that many of the same Released Parties shall not have or incur any liability in connection with, related to or arising out the Chapter 11 cases, etc., or related to the administration of the Plan or the property to be distributed under the Plan. These overly broad releases violate section 524(e) and therefore the Plan cannot be confirmed.

73.    As was recognized by the Bankruptcy Court for the Southern District of New York in In re XO Communications, Inc, 330 B.R. 394 (Bankr. S.D.N.Y. September 23, 2005), ". . . the Second Circuit in Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.), 416 F.3d 136 (2d Cir. 2005)  ("Metromedia"), clarified its previous holding in Drexel where it "held that in bankruptcy cases, a court may enjoin a creditor from suing a third party, provided the injunction plays an important part in the debtor's reorganization plan." XO Communications, 330 B.R. at 436 (quoting Metromedia, 416 F.3d at 141; SEC v Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc., 960 F.2d 285, 293 (2d Cir. 1992)). It is well established that such non-debtor releases are proper only in "rare cases". Id.; see also Class Five Nev. Claimants v. Dow Corning Corp. (In re Dow Corning Corp.), 280 F.3d 648, 658 (6th Cir. 2002) ("Such an injunction is a dramatic measure to be used cautiously. . . ."); Gillman v. Cont'l Airlines (In re Cont'l Airlines), 203 F.3d 203, 212-13 (3d Cir. 2000) (recognizing that nondebtor releases have been approved only in "extraordinary cases")).

74.    Courts should be wary to approve non-debtor releases because there is no explicit authority for such releases except at section 524(g) of the Bankruptcy Code which applies only in

22

asbestos cases, and only where specified conditions are satisfied, including the creation of a trust for future claimants. Metromedia, 416 F.3d at 142.

75.     Likewise, it has been recognized that "a nondebtor release is a device that lends itself to abuse. By it, a nondebtor can shield itself from liability to third parties. In form, it is a release, in effect, that may operate as a bankruptcy discharge arranged without a filing and without the safeguards of the [Bankruptcy] Code." Id.

76.     "A nondebtor release in a plan of reorganization should not be approved absent the finding that truly unusual circumstances render the release terms important to success of the plan." Id. at 143 (comparing its conclusion to the holding in Dow Corning, 280 F.3d at 658, which requires a bankruptcy court to make "specific factual findings that support its conclusions" before approving nondebtor releases).

77.     As to such considerations, the Second Circuit noted that "courts have approved nondebtor releases when:" (1) "the estate received substantial consideration," citing Drexel, 960 F.2d at 293, (2) "the enjoined claims were channeled to a settlement fund rather than extinguished," citing MacArthur Co. v. Johns-Manville Corp. (In re Johns-Manville Corp.), 837 F.2d 89, 93-94 (2d Cir.1988), and Menard-Sanford v. Mabey (In re A.H. Robins Co.), 880 F.2d 694, 701 (4th Cir.1989), (3) "the enjoined claims would indirectly impact the debtor's reorganization by way of indemnity or contribution," A.H. Robins, 880 F.2d at 701, and (4) "the plan otherwise provided for the full payment of the enjoined claims," Id.; see also Metromedia, 416 F.3d at 142.

78.     However, the Second Circuit cautioned in Metromedia that "this is not a matter of factors and prongs. No case has tolerated nondebtor releases absent the finding of circumstances that may be characterized as unique." XO Communications, 330 B.R. at 437 (quoting Id. at 142-43

23

229314 1531117.1

(citing <u>Dow Corning</u>, 280 F.3d at 658; <u>Cont'l Airlines</u>, 203 F.3d at 212-13; <u>Drexel Burnham</u>, 960 F.2d at 288-93)).

79.     It has not been demonstrated, nor is it likely that any of the Releases or related Exculpations in Paragraphs 12.5 and 12.6 are "essential" or "important" to the success of the Plan, or that unique circumstances exist to grant the releases requested.

## H.     The ADR Procedures Should Not Be Imposed On The Town

80.     The Plan provides that the GUC Trust Administrator will be responsible for the prosecution of objections to General Unsecured Claims. It is unclear if the Debtors are attempting to have the ADR procedures imposed upon the Town for the establishment of the amount of its claims. As outlined above, the Town previously objected to the ADR Procedures Motion and was specifically excluded from the ADR Procedures Order when it was entered. Therefore any Confirmation Order should adopt this ruling and preclude ADR Procedures from being utilized by the GUC Trust Administrator when seeking to establish or object to the Town of Salina Claims.

## I.     Additional Objections To The Plan

81.     Pursuant to Section 5.2 of the Plan, any remaining cash after funding of the various trusts and reserves, including the GUC Trust, should be paid to the DIP Lenders. In the absence of a 100% payment on the Town's claims, those funds should not be returned to the DIP Lenders but should instead be used to increase the dividend to general unsecured creditors.

## III.    <u>CONCLUSION</u>

82.     The Plan does not comply the statutory requirements of 11 U.S.C. §1129 and improperly discriminates against creditors with similar claims in violation of §1122 so that the Plan should not be confirmed without significant amendments that address the Town's objections. In addition, to the extent that it is properly before the Court, the ERT also should not be approved.

229314 1531117.1

83.    Nothing contained herein shall be deemed to be a waiver by the Town of Salina of any rights it may have under applicable law and the Town of Salina reserves the right to amend and supplement this Objection, and to object or otherwise respond to the approval, confirmation and implementation of the Debtors' Plan on any grounds outlined herein and any other grounds available.

WHEREFORE, the Town of Salina respectfully requests that the Court deny confirmation of the Plan, and request such other and further relief as this Court deems just and proper.

Dated: February /0 , 2011

HARRIS BEACH PLLC

_Lee E. Woodard, Esq._
HARRIS BEACH PLLC
One Park Place, 4th Floor
300 South State Street
Syracuse, New York 13202
Telephone: (315) 423-7100
Facsimile: (315) 422-9331

-and-

100 Wall Street
New York, New York 10005
Telephone: (212) 687-0100
Facsimile: (212) 687-0659

*Attorneys for Town of Salina*

25

229314 1531117.1