# EXHIBIT "B"

COUNTY OF ONONDAGA



| JOANNE M. MAHONEY<br>*County Executive* | DEPARTMENT OF LAW<br>*John H. Mulroy Civic Center, 10th Floor*<br>*421 Montgomery Street*<br>*Syracuse, New York 13202*<br>*(315) 435-2170 • Fax (315) 435-5729*<br>*www.ongov.net* | GORDON J. CUFFY<br>*County Attorney* |

November 24, 2010

<u>Via E-Mail and U.S. Mail</u>

Ignacia S. Moreno, Assistant Attorney General
Environment and Natural Resources Division
P.O. Box 7611
U. S. Department of Justice
Washington, D.C. 20044-7611

  Re: *In re Motors Liquidation Corp., et al.*, D.J. Ref. 90-11-3-09754

    Onondaga County, New York Comments on Proposed Consent
    Decree and Settlement Agreement

Dear Assistant Attorney General Moreno:

  Onondaga County submits these comments to request specific changes to the proposed Consent Decree and Settlement Agreement (the "Settlement Agreement") that will result in the creation of the General Motors Bankruptcy Environmental Trust Fund.

  As more fully set forth below, the proposed settlement arbitrarily prescribes that Trust monies shall be used for the remediation of Ley Creek in Onondaga County, NY only so far as the "Route 11 Bridge". If uncorrected, this arbitrary funding decision will result in both a gross inequity and a significant funding shortfall of the monies necessary to respond to decades of PCB releases by General Motors that contaminated the entirety of Ley Creek[1].

  The decision to underfund the Debtors' liability for the remediation of Ley Creek is inconsistent with the underlying purposes of the Trust Fund: "to conduct, manage and/or fund Environmental Actions with respect to the Properties or migration of Hazardous Substances emanating from certain of

---

[1] A map of the Ley Creek Watershed, Ley Creek, the location of the GM-IFG Syracuse facility, the Route 11 Bridge and Onondaga Lake is attached.

-1-

the Properties in accordance with the provisions of this Agreement."
(Proposed Environmental Response Trust Agreement, Article 2.3).

Moreover, as to Ley Creek, the proposed Settlement Agreement is in direct contravention of Congressional mandates and the underlying purposes of both the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), 42 U.S.C. § 9601 *et seq.*, and the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 *et seq.*

Onondaga County requests that the proposed Settlement Agreement be modified to include funding for the cleanup of the entirety of Ley Creek, Old Ley Creek and any and all GM-related Ley Creek PCB dredge spoil locations.

## I. **Background**

Onondaga County, New York, is a claimant in the *Motors Liquidation Corp., et al., f/k/a General Motors Corp., et al.*, Jointly Administered Case No. 09-50026 (REG) bankruptcy. The County's proof of claim concerns General Motors' liability under the Nation's environmental laws for PCB contamination detected in the Onondaga Lake, Onondaga County, New York National Priorities List, including Ley Creek and the Ley Creek PCB Dredging Site.

For approximately 40 years -- from the 1950s through 1993 -- General Motors Corporation (GM) discharged polychlorinated biphenyls (PCBs) from its Inland Fisher Guide facility ("IFG" or "GM-IFG Syracuse") into Ley Creek. Ley Creek flows generally east to west adjacent to and past the IFG site before discharging into Onondaga Lake approximately four miles downstream.

On August 12, 1985 GM entered into a consent order with NYSDEC (Case #7-0383) to (a) address the on-going discharge to Ley Creek of GM-IFG Syracuse wastewaters contaminated with, among other pollutants, two PCB cogeners, Aroclor 1242 and Aroclor 1248; and (b) limit any such future discharges.

Following additional investigation the NYSDEC concluded: "The confirmed presence of these hazardous substances at GM's facility and the proximity of such substances and discharge of PCBs to Ley Creek establishes that the hazardous substance contamination at the GM facility represents a release or threat of release of hazardous substances to the Onondaga Lake NPL Site pursuant to 104 and 107 of CERCLA. GM's facility is a sub-site of the Onondaga Lake NPL site." See "Exhibit A" (NYSDEC Order on Consent, Index # D-7-0001-97-06, September 17, 1997) at paragraph 33A.

Pursuant to a series of subsequent orders entered into with NYSDEC from 1985 through 2001, GM investigated the extent of PCB contamination in what has become known as the "Ley Creek PCB Dredging Site" and executed an interim remedial measure to remove PCB-contaminated soils in the area of a County sewer line. The "Ley Creek PCB Dredging Site" is located on the south side of Ley Creek starting at the approximate eastern boundary of the IFG facility (i.e., Town Line Road) and extending west and downstream for a distance of approximately 4,300 feet or 0.814 miles. The investigation and remediation work was all conducted outside the Creek.

The 1997 NYSDEC Consent Order, which was voluntarily executed by GM, created an obligation on GM to sample Ley Creek surface water and sediment, but only downstream as far as the Route 11 Bridge. While the required scope of GM's initial 1999 Work Plan was limited to that reach of the Creek, the Consent Order established the potential that GM would be required to investigate and respond to conditions beyond the Route 11 Bridge. Specifically, Paragraph 27 of the 1997 NYSDEC Order ("Exhibit A" hereto) stated "any additional investigation found to be necessary . . . should be addressed under this Consent Order in conjunction with the Department's evaluation of the need for potential response action with respect to environmental contamination at the facility." Indeed, it was understood that the investigation would ultimately proceed beyond the Route 11 Bridge.

In December, 2000 the Town of Salina, New York submitted a Remedial Investigation report to NYSDEC for the former Town of Salina Landfill, which is located adjacent to Ley Creek downstream from GM-IFG Syracuse, the "Ley Creek PCB Dredging Site" and the Route 11 Bridge that crosses Ley Creek. The Town Landfill RI Report confirmed the presence of PCB contamination in Ley Creek sediment (Aroclor 1248 and 1260) and PCB contamination in Ley Creek surface waters (Aroclor 1248) downstream of the IFG Facility, the "Ley Creek PCB Dredging Site" and the Route 11 Bridge.

Recent sampling by the United States Environmental Protection Agency of the so-called Lower Ley Creek site (i.e., Ley Creek downstream of the Route 11 Bridge) confirmed the presence of PCBs in Lower Ley Creek and EPA's July 22, 2010 Onondaga Lake NPL Sub-site Evaluation for Lower Ley Creek states: "[T]he majority of the contamination in Lower Ley Creek sediment has come from various sources and/or facilities upstream and on Ley Creek, including the former General Motors Corporation – Inland Fisher Guide Facility." A copy is attached hereto as "Exhibit B". The evaluation does not identify any other alleged source.

Contemporaneous with the above events, the New York State Department of Environmental Conservation listed Old Ley Creek[2], which is also located downstream of the Route 11 Bridge in the State Registry of Inactive Hazardous Waste Disposal Sites, due to the presence of GM-IFG Syracuse PCB Contamination. GM's refusal to commence an investigation of Old Ley Creek was largely driven by its concern for the magnitude of the site, as defined by NYSDEC, and the detrimental impact on other pending claims. See "Exhibit C" (March 10, 2009 letter from counsel for GM to NYSDEC)

Notwithstanding New York State issued Orders enjoining GM from continuing unpermitted discharges of hazardous substances to Ley Creek and its environs and the 1997 finding that GM-IFG Syracuse was an actual or potential source of PCB contamination detected in Onondaga Lake, GM-IFG Syracuse continues to discharge PCBs to Ley Creek. GM reported that it exceeded its SPDES permit discharge limits for PCB Aroclor 1248 in March, 2007 and December, 2008. See "Exhibit D" (02/07/08 GM letter to NYSDEC). GM also reported that its discharges to Ley Creek exceeded 0.065 ug./l for PCB in February and March, 2008. See "Exhibit D" (04/10/09 GM ltr to NYSDEC). It is worth noting that these exceedances occurred from a location that is no longer operating and has not operated for years, and they strongly suggest GM-IFG Syracuse remains a pervasive source of PCBs to Ley Creek and its environs.

Recognizing the limited data currently available and the absence of a completed feasibility study, conservative preliminary estimates of the potential response cost for the Lower Ley Creek[3] site could approximate or exceed fifty million of dollars ($50,000,000).

By letter dated October 30, 2009, Onondaga County and seven other entities, including GM, were identified as potentially responsible parties with respect to what has been identified as the "Lower Ley Creek" site and asked to fund a Remedial Investigation/Feasibility Study for Lower Ley Creek. Such a request is historically a precursor to a section 106 cleanup order, pursuant to 42 U.S.C. § 9606, to respond to the release or threat of a release that is

---

[2] Until the 1970s, "Old Ley Creek" was the original Ley Creek channel immediately downstream of Route 11. It was cut off from the original channel as a result of flood control dredging.

[3] While EPA appears to define Lower Ley Creek as the existing main channel of Ley Creek west and downstream of the Route 11 Bridge to the point of discharge into Onondaga Lake, for the purposes of these comments Onondaga County submits Lower Ley Creek should include the existing channel from Route 11 to Onondaga Lake, Old Ley Creek (an historic artifact that documents the historic levels of GM-IFG Syracuse PCB contamination in Ley Creek prior to historic flood control dredging), and any PCB dredge disposal areas located west and downstream of the Route 11 Bridge and/or otherwise not the "Ley Creek PCB Dredging Site" located immediately downstream of GM-IFG Syracuse.

impacting Lower Ley Creek and/or a subsequent government cost recovery action should the government fund a response.

## II. The Proposed Consent Decree and Settlement Agreement

The proposed Consent Decree and Settlement Agreement are intended to address and resolve the Debtors' liabilities and obligations for environmental matters under CERCLA, RCRA and analogous state statutes. *See generally*, Notice of Lodging of Proposed Settlement Agreement, October 20, 2010, Exhibit 1 (Environmental Response Trust Consent Decree and Settlement Agreement Among Debtors, The Environmental Response Trust Administrative Trustee, The United States *et al)* ("Settlement Agreement").

Specifically, with respect to the County's objections and comments, the proposed Settlement Agreement would allocate a total of $33,004,154 to the proposed G.M. Bankruptcy Environmental Trust Fund to address CERCLA and RCRA liability for "GM-IFG Syracuse" and the "Ley Creek PCB Dredging Site", assigned respectively MLC Site ID 1010 and 1110. (*See* Settlement Agreement, Attachment A). That sum is further allocated between Minimum Response Cost, Reserve Response Costs and Post Cleanup Operations and Maintenance Costs, as such terms are defined in the draft agreements. (*See generally* Settlement Agreement).

The GM-IFG Syracuse site is allocated $31,121,812 of the combined $33 million. Of that, $22,573,341 is allocated "for remediation within the IFG Syracuse facility property boundaries and $8,548,471 [is allocated for] the property extending from the facility property boundaries to the Route 11 Bridge." (*See* Settlement Agreement, ¶63).

While the Settlement Document defines the term "Environmental Action" to encompass remediation, the term "Remediation" is not a defined term; nor is there a breakdown provided for Minimum Response Cost, Reserve Response Costs and Post Cleanup Operations and Maintenance Costs as such terms might apply to that portion of the GM-IFG Site described as "within the IFG Syracuse facility property boundaries" or that portion described as "the property extending from the facility property boundaries to the Route 11 Bridge".

The remaining $1,882,342 is designated for the Ley Creek PCB Dredging Site, which, as noted earlier, is located upstream of Route 11. Of that, 74% or $1,393,361 is allocated for Post Cleanup Operations and Maintenance Costs. As the County reads the proposed Settlement Agreement and Trust document, none of those monies would be available for use with respect to any "off-site" contamination (i.e., Lower Ley Creek).

As detailed below the proposed settlement in its current form fails to satisfy the applicable standard for judicial approval of CERCLA settlements.

III. **With Respect to GM-IFG Syracuse and Ley Creek and Its Environs, The Proposed Settlement Agreement is Not Fair, It is Not Reasonable and It is Not Faithful to the Objectives of CERCLA and RCRA**

Pursuant to 42 U.S.C. § 6973,

> "Whenever the United States or the Administrator proposes to covenant not to sue or to forbear from suit or to settle any claim arising under this section, notice, and opportunity for a public meeting in the affected area, and a reasonable opportunity to comment on the proposed settlement prior to its final entry shall be afforded to the public."

A review of this proposed Consent Decree and Settlement Agreement must determine "if it is fair, reasonable, and faithful to the objectives of CERCLA" and RCRA. See *United States v. General Electric Company*, 460 F. Supp.2d 395, 401 (N.D.N.Y. 2006)(quotations and citations omitted).

A prime objective of CERCLA is "to impose liability on responsible parties." *Id.* The fairness inquiry concerns both procedural and substantive fairness; the reasonableness inquiry addresses both technical considerations and such matters as "whether a settlement that does not fully compensate for costs is nonetheless a cost-effective alternative to litigation that will conserve public and private resources." *Id.*

Onondaga County submits that with respect to GM-IFG Syracuse and Ley Creek[4] and its environs the proposed Consent Decree and Settlement Agreement is neither fair - procedurally or substantively, reasonable or supportive of one of the prime objectives of RCRA of CERCLA, namely, assuring that the settlement will in fact further an appropriate remediation of the impacted site.

A. The Artificial and Arbitrary Site Boundary

In relevant part, CERCLA defines the term "facility" to mean "any site or area where a hazardous substance has been deposited, stored, disposed of, or

---

[4] See footnote 2.

placed or otherwise come to be located". 42 U.S.C. § 9601(9). The evidence here is undisputed that PCBs were released (and continue to be released) into Ley Creek from GM-IFG Syracuse and they are transported the length of Ley Creek to its point of discharge into Onondaga Lake. Thus, by definition, the Site is the entirety of Ley Creek including the current and historic portions located downstream of Route 11.

Despite that undisputed and irrefutable reality, the proposed Settlement Agreement allocates monies to remediate only "the property extending from the facility property boundaries to the Route 11 Bridge."[5] No monies have been made available to address Lower Ley Creek, which given the response to date at the Ley Creek PCB Dredging Site is today likely the more critical environmental concern. To the contrary, the proposed Settlement Agreement arguably precludes the use of federal settlement funds for Lower Ley Creek while threatening to leave impecunious PRPs liable to fund GM's cleanup.

Ley Creek flows an additional two (plus or minus) miles from the Route 11 Bridge to its point of discharge into Onondaga Lake. Just as the Creek does not stop at the Route 11 Bridge neither did the PCB contamination from GM-IFG Syracuse stop at the Route 11 Bridge. As noted above, sampling results confirm the presence of PCB contamination downstream of the Route 11 Bridge in Ley Creek, Old Ley Creek and in the Ley Creek PCB dredging sites located downstream of the Route 11 Bridge. There is no rational basis to limit the cleanup to that portion of Ley Creek upstream of the Route 11 Bridge.

The decision to fund only a portion of the Ley Creek discharge is in conflict with both (1) the Government's public statements lauding the settlement (i.e., "This settlement holds accountable those responsible for contaminating certain properties and ensures they help transform those communities by supporting the necessary cleanup." Statement of Acting Deputy Attorney General Grindler; Department of Justice Press Release, October 20, 2010) and (2) the stated objective found in the text of the proposed Trust Agreement (i.e., "to conduct, manage and/or fund Environmental Actions with respect to the Properties or migration of Hazardous Substances emanating from certain of the Properties in accordance with the provisions of this Agreement"). (*See* Proposed Environmental Response Trust Agreement, Article 2.3).

It simply cannot be said that a decision to fund half a cleanup of the off-site GM-IFG Syracuse facility PCB contamination "holds accountable those

---

[5] To be frank, Onondaga County cannot decipher from the draft Settlement Agreement what precisely is meant by the ambiguous phrase "the property extending from the facility property boundaries to the Route 11 Bridge." It is not known if monies are, in fact, proposed to be available to address in-Creek PCB contamination upstream of the Route 11 Bridge. That contamination has recently been confirmed and must be included among any Environmental Actions intended for this site.

responsible for contaminat[ion] by ensuring they engage in" the necessary cleanup. The proposed settlement does not even offer to conduct the necessary cleanup of property located downstream of the arbitrary Route 11 cutoff point.

This circumstance is best explained by the Conference Report on the Hazardous and Solid Waste Amendments of 1984, 98 STAT. 3221:

> SECTION 207-- CORRECTIVE ACTION BEYOND FACILITY BOUNDARIES; UNDERGROUND TANKS
>
> *14 HOUSE BILL.-- THE HOUSE BILL DIRECTS THE ADMINISTRATOR TO AMEND THE STANDARDS UNDER SECTION 3004 TO REQUIRE THAT CORRECTIVE ACTION BE TAKEN BEYOND THE FACILITY BOUNDARY WHERE NECESSARY TO PROTECT HUMAN HEALTH AND THE ENVIRONMENT. SUCH REQUIREMENT WOULD NOT BE APPLICABLE WHERE THE OWNER OR OPERATOR OF THE FACILITY CONCERNED DEMONSTRATES TO THE SATISFACTION OF THE ADMINISTRATOR THAT, DESPITE THE BEST EFFORTS OF THE OWNER OR OPERATOR, PERMISSION TO UNDERTAKE SUCH ACTIONS COULD NOT BE OBTAINED.
> SENATE AMENDMENT. -- THE SENATE AMENDMENT DOES NOT CONTAIN A SIMILAR PROVISION.
> CONFERENCE SUBSTITUTE. -- THE CONFERENCE SUBSTITUTE ADOPTS THE HOUSE PROVISION. THIS PROVISION OVERTURNS A POLICY OF THE ENVIRONMENTAL PROTECTION AGENCY WHICH LIMITED THE SCOPE OF CORRECTIVE ACTION TO THE PROPERTY OF THE POLLUTING FACILITY. SINCE MOST FORMS OF POLLUTION, PARTICULARLY GROUNDWATER CONTAMINATION, DO NOT OBSERVE TERRITORIAL OR PROPERTY BOUNDARIES, *SUCH A RESTRICTION HAS NO BASIS IN LOGIC.* THE PROVISION THEREFORE REQUIRES EPA TO AMEND THE APPLICATION REGULATION TO ASSURE THAT CORRECTIVE ACTION BEYOND A FACILITY BOUNDARY WILL BE REQUIRED WHERE APPROPRIATE.

H.R. CONF. REP. 98-1133, H.R. Conf. Rep. No. 1133, 98TH Cong., 2nd Sess. 1984, 1984 U.S.C.C.A.N. 5649, 1984 WL 37531 (Leg. Hist.)(emphasis added).

Indeed, the artificial site boundary found in the proposed Settlement Agreement *has no basis in logic* and no support under the law. Thus, the

settlement approach proposed here is the very approach that was explicitly identified and rejected by Congress in its repudiation of a prior Government policy and its 1984 direction to EPA on how it must proceed in the future.

### B. The Arbitrary Use of Federal Monies

More troubling to Onondaga County is the reality that while the vast majority of the $600,000,000 in funding for the Environmental Trust is recycled federal dollars, and the sole beneficiary of the Trust will be the United States, (See Settlement Agreement, ¶38), EPA is concurrently pursuing Onondaga County (and 6 others) as potentially responsible for addressing the Lower Ley Creek GM-IFG PCB contamination in furtherance of a concerted strategy to protect the considerable federal holdings in the Debtors. Insofar as the available information and data identifies the Debtors as the parties that are overwhelmingly, if not 100%, responsible for the PCB related contamination driving the need for a response, the proposed Settlement Agreement leaves significant environmental contamination potentially unaddressed.

When GM and its subsidiaries filed for bankruptcy protection in June of 2009, the federal government provided debtor-in-possession funding to Motors Liquidation Corp (i.e., Old GM), ultimately as much as $1.75 billion, plus an additional $19.4 billion to preserve GM's viability as a going concern pending conclusion of this bankruptcy proceeding[6].

At the same time that one hand of the Government was funding GM, the other hand of the Government, in the name of the United States Environmental Protection Agency, is seeking to hold non-GM parties liable for GM-IFG Syracuse PCB releases.

The EPA has requested that Onondaga County (and the other named PRPs) conduct a more detailed study of the Lower Ley Creek GM-IFG PCB contamination as a precursor to the selection of a Lower Ley Creek remedy. The County fully anticipates that in the future EPA will potentially issue a 106 order to the County (and other PRPs) or ultimately, seek cost recovery for any past or future EPA response costs from the County (and other PRPs).[7]

---

[6] The scale of the United States' involvement in managing GM through the bankruptcy proceeding is detailed at Sections II (B) and II(C) of Debtors' proposed Disclosure Statement filed with this Court on or about August 31, 2010.

[7] Neither Onondaga County nor any of the other PRPs have been found liable for any response costs and the submission of these comments in no way acts as a waiver of any defenses - factual or legal - that the County may have in the face of EPA's allegation that the County is a PRP for this site. It is possible that the County and/or others may be found liable, and it is possible that given the GM bankruptcy and the terms of this proposed Settlement Agreement, the Lower Ley Creek Site will be a true orphan site with no other existing or viable PRPs other than the federal or state governments.

Meanwhile, the proposed Settlement Agreement allocates what is likely only a fraction of the monies that actually will be required to remediate Debtors' legacy of contamination throughout Ley Creek and its environs.

To the extent the proposed Settlement Agreement is intended to promote community economic revitalization and growth and the return of properties to the tax rolls, the result in Onondaga County will be the complete opposite. If the Settlement Agreement is approved in its current form, local citizens and taxpayers may be forced to fund the response costs for years of GM contamination and/or may be compelled to devote significant resources to achieve vindication and/or a fair and equitable apportionment.

Moreover, structuring a settlement that arbitrarily cuts off the sole or primary polluter's liability at an artificial site boundary and thereby creates a likely 95% or more orphan share with respect to Lower Ley Creek is a virtual guarantee of protracted future litigation resulting in the expenditure of limited financial and judicial resources in contravention of the goals of CERCLA. *See e.g. United States v. Grand Rapids*, 166 F. Supp.2d 1213, 1218 (W.D. MI 2000). The County submits that, with respect to GM-IFG Syracuse, this proposed settlement is not a cost-effective alternative to the likely litigation between and among primarily units of government regarding the allocation of the Government-induced GM orphan share of response cost likely totaling tens of millions of dollars.

In *United States v. SEPTA,* 235 F.3d 817 (3d Cir. 2000) the Third Circuit noted that: "A court should approve a consent decree if it is fair, reasonable, and consistent with CERCLA's goals." SEPTA, 235 F.3d at 823. The element of: "fairness requires that settlement negotiations take place at arm's length. A court should 'look to the negotiation process and attempt to gauge its candor, openness and bargaining balance.'" *Accord In re: Tutu Water Wells CERCLA Litigation,* 326 F.3d 201, 207 (3d Cir. 2003). A proposed settlement negotiated by a lender controlled Debtor that by its expressed terms is intended to solely benefit the lender, that has as a potential purpose and/or impact of shifting remedial costs to entities such as the County who have been named as potentially responsible parties without fully assessing the adequacy of the settlement in achieving CERCLA's remedial objectives, fails to meet the well recognized fairness standard for judicial approval. *United States v. Cannons Eng'g Corp.*, 899 F.2d. 79, 84 (1st Cir.1990).

## IV. Additional Comments

- The GM-IFG Site as described in ¶63 of the Settlement Agreement includes both the area "within the IFG Syracuse facility property boundaries" and "the property extending from the facility property boundaries to the Route 11 Bridge". The phrase "the property extending

from the facility property boundaries to the Route 11 Bridge" is at best ambiguous. It must be defined more precisely and the scope of the work intended to be funded by the Trust should be described. To the extent that work does not include both in and out of Creek response actions, the scope should be amended to include all such required activities and if necessary, the cost estimate and Trust funding should be modified accordingly.

- Paragraph 94 of the Settlement Agreement concerning Covenants Not to Sue proposes that the covenants relate to potential claims or causes of action against the Environmental Trust "under CERCLA, RCRA, and State environmental statutes, as well as any other environmental liabilities asserted in the Government Proofs of Claim." The phrasing of the covenant is at best ambiguous and suggests an agreement not to pursue claims or causes of action that may arise after the Trust is funded (e.g., current or future on-going permit violations). The language should be amended to narrow the scope of the proposed covenants such that future enforcement of post-funding environmental violations is not precluded.

- Paragraph 99 of the Settlement Agreement sets forth the Debtors and the Trusts' proposed covenant not to sue the United States or states for potential CERCLA or RCRA claims. Given that proposed covenant, what steps were taken and to what extent was any allocation of United States or state liabilities used to derive the funding proposed to be provided to the Trust for any individual site?

- Paragraph 100 (ii) of the Settlement Agreement carves out an exception to the Covenants Not to Sue for Lower Ley Creek that is defined as "the entire portion of Ley Creek which is downstream from the Route 11 Bridge." That phrasing is much too ambiguous and uncertain. It should be modified to read as follows: "the existing channel from Route 11 to Onondaga Lake, Old Ley Creek and any PCB dredge disposal areas located west and downstream of the Route 11 Bridge and/or otherwise not the "Ley Creek PCB Dredging Site" located immediately downstream of GM-IFG Syracuse.

- Paragraph 100 (iv) of the Settlement Agreement carves out an exception to the Covenants Not to Sue for future acts that create liability buts creates an exception to the carve out for "continuing releases related to the Debtor's conduct prior to the Effective Date." The exception to the exception should not apply to on-going permit violations whether or not they can in any way be related back to pre-Effective Date conduct. In this case, the latest publicly available information indicates on-going PCB

discharges in violation of applicable SPDES permit limits; that conduct should not be exempted.

- Paragraphs 100 and/or 105 of the settlement Agreement should confirm that "covered matters" does not include violations of the Clean Water Act or any state analogs to the Clean Water Act.

### IV. Request for a Public Hearing

Given the decision to artificially limit funding to areas at or upstream of the Route 11 Bridge, pursuant to section 7003 of RCRA, 42 U.S. C. 6973(d), Onondaga County requests that the Department of Justice hold a public meeting and receive public comments in Onondaga County, New York prior to any decision to finalize the proposed Consent Decree and Settlement Agreement.

Respectfully submitted,

GORDON J. CUFFY
County Attorney

GJC/nlm
Enclosures

cc:  Joanne M. Mahoney, Onondaga County Executive
Matthew J. Millea, Deputy Onondaga County Executive
Patricia M. Pastella, P.E., Commissioner Onondaga County
   Dept. of Water Environment Protection
Luis A. Mendez, Senior Deputy County Attorney
David Coburn, Director, Onondaga County Office of the Environment
Kevin C. Murphy, Esq.