UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------x
|   |   : | Chapter 11 |
|---|---|---|
| *In re* | : |   |
|   | : | Case No. 09-50026 (REG) |
| **MOTORS LIQUIDATION COMPANY,** |   |   |
| f/k/a General Motors Corp., et al., | : |   |
|   | : | (Jointly Administered) |
| Debtors | : |   |
|   | : | Objection Deadline: February 11, 2011 4:00 p.m. |
|   | : | Hearing Date: March 3, 2011 at 9:45 a.m. |

----------------------------------------------------------x

**LIMITED OBJECTIONS OF THE CALIFORNIA DEPARTMENT OF TOXIC SUBSTANCES CONTROL TO DEBTORS' JOINT PLAN**

The California Department of Toxic Substances Control ("DTSC") objects to confirmation of the Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code for Motors Liquidation Company ("MLC") dated December 8, 2010 ("Plan") on the following limited grounds:

1.      The Plan does not comply with the requirements of the United States Bankruptcy Code, including section 1129(a). Further, the Plan is unfair and inequitable as it applies to DTSC. DTSC respectfully requests that the Court not approve the Plan in its present form. In support of its objections, DTSC states as follows:

**I.      STANDARDS FOR PLAN CONFIRMATION**

2.      A bankruptcy court may confirm a plan of reorganization only if the plan meets all of the requirements of section 1129. *See,* 11 U.S.C. 1129(a). Debtors seeking confirmation of a bankruptcy plan bear the burden of establishing by a preponderance of the evidence that the plan complies with each of the confirmation requirements of section 1129(a). *In re Exide Techs*, 303 B.R. 48, 58 (Bankr. D. Del. 2003). The bankruptcy court has an independent duty to

1

determine whether a plan proponent has met its evidentiary burden under section 1129(a) prior to entering an order confirming a Chapter 11 plan. *In re Lermout & Houspie Speech Prods, N.V.*, 301 B.R. 651, 656 (Bankr. D. Del. 2003).

## II. DTSC'S PROOF OF CLAIM FOR CALIFORNIA SITES FOR WHICH DEBTOR IS LIABLE FOR ENVIRONMENTAL CONTAMINATION

3.  DTSC is a California state government agency mandated to enforce laws related to hazardous wastes and the cleanup of hazardous substances in California. *Cal. Health & Safety Code* § 25100 *et seq*. (the Hazardous Waste Control Law (HWCL), § 25300 *et. seq*. (the Hazardous Substances Account Act (HSAA)); *Cal. Health & Safety Cod*e § 58000 *et seq*. The HWCL is a state statute which, like its federal counterpart the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §6901 *et seq*, regulates the cradle-to-grave handling of hazardous wastes. The HSAA, like its federal counterpart, the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. § 9601 establishes a comprehensive program for the cleanup of hazardous substances that have been released, or are threatened to be released, into the environment.

DTSC filed a timely proof of claim in the bankruptcy proceeding of MLC.[1] DTSC's proof of claim, numbered 50606, concerns several sites in California for which Debtors are liable to DTSC under federal and state environmental laws. These sites are: (1) the "BKK Site," which includes a Class I (hazardous waste) landfill; (2) the Casmalia Resources Superfund Site ("Casmalia Site") and (3) the former General Motors facility in Fremont, California (the "Fremont Facility").[2]

---

[1] Documents supporting the facts presented in this discussion are attached to the Supplemental Statement DTSC submitted with its Proof of Claim, number 50606.

[2] DTSC's Proof of Claim also included a claim against Debtor for the former General Motors facility in Van Nuys, California (the "Van Nuys Facility"). DTSC no longer seeks a claim against MLC for the Van Nuys Facility.

2

4.      The BKK Site is a large municipal and hazardous waste landfill complex in West Covina, California, where releases or threatened releases of hazardous substances have occurred and will continue to occur.  The BKK Site contains a closed hazardous waste, or "Class I," landfill, a closed municipal solid waste, or "Class III," landfill, and related facilities including a leachate treatment plant and gas and leachate collection systems.  The Class I landfill is approximately 190 acres in size and accepted waste from roughly 1962 to 1987.  The BKK Site is named after the BKK Corporation, which is the current owner and operator of the landfills complex.  More than four million tons of liquid and solid hazardous wastes, and a much larger volume of nonhazardous solid waste (trash) were disposed of at the Class I landfill.  In October 2004, the BKK Corporation stated that it could not continue to conduct post-closure care as required by law for the BKK Class I landfill after November 17, 2004.  Thereafter, because of the imminent threats to the environment, DTSC engaged a contractor to conduct emergency response activities and to operate and maintain the critical equipment and systems on a daily basis.  In December 2004, DTSC issued an "Imminent and Substantial Endangerment Determination and Order and Remedial Action Order" ("BKK Site ISE Order") to the BKK Corp. and 50 other respondents who were alleged to be potentially responsible for conditions at the BKK Site.  Debtor was one of the respondents named in the BKK Site ISE Order.  The BKK Site ISE Order required the respondents to conduct operation and maintenance activities at the BKK Class I Landfill and the leachate treatment plant.

5.      In 2006, DTSC entered a federal consent decree with Debtor General Motors Corp. ("General Motors") and twenty-five other parties requiring the Settling Defendants to take further response actions at the BKK Landfill.  That case, is entitled *California Department of Toxic Substances Control., et al. v. American Honda Motor Co., et al.*, Central District of California, Case No. CV05-7746 CAS.  The Consent Decree required Debtor General Motors,

and other named parties, to perform certain operating, maintenance and monitoring activities at the BKK Facility and to pay response costs. Further, DTSC contends that under CERCLA, Debtor General Motors is jointly and severally liable for environmental responses costs in connection with the environmental cleanup of the BKK Class I Landfill. 42 U.S.C. §§ 9601(25), 9607; Cal. Health and Safety Code § 25323.3.

6. The Casmalia Site includes the former Casmalia Resources Hazardous Waste Management Facility, ("Facility") an inactive commercial hazardous waste treatment, storage, and disposal facility, which accepted large volumes of hazardous substances from 1973 to 1989, and all areas where hazardous substances from the facility have migrated, including soil and groundwater. Located on a 252-acre parcel in Santa Barbara County, California, the "Facility" consisted of six landfills, numerous surface impoundments, disposal trenches, injection wells, waste spreading areas and tank treatment systems. During its sixteen (16) years of operation, approximately 5.6 billion pounds of documented liquid and solid wastes from generators were disposed at the Facility. Information currently known to DTSC indicates that Debtor General Motors contributed at least 4,411,324 pounds of materials containing hazardous substances to the Casmalia Site.

7. Debtor General Motors owned and operated a car manufacturing plant in Fremont, California from approximately 1963 to 1982 (the "Fremont Facility"). DTSC is informed and believes and thereon alleges that Debtor used solvents, paints and other chemicals in manufacturing process and stored those chemicals on site and that during its operations at the Fremont Facility, Debtor General Motors discharged paint sludge, cyanide plating bath solutions, cyanide bath sludges into one or more site surface impoundments. In the mid-1980s, Debtor General Motors created a joint venture with Toyota Motor Corporation, named "New United Motor Manufacturing, Inc." and commonly known as "NUMMI" to restart manufacturing operations at the Fremont Facility. In 1985, NUMMI undertook an environmental assessment of two areas of the manufacturing facility. The environmental assessment revealed that General

4

Motor's manufacturing operations caused or contributed to the contamination of soil and groundwater at the Fremont Facility. Hazardous substances were detected in the soil and groundwater at the Fremont Facility. Based on information currently known to DTSC, remediation is needed to cleanup the full extent of the contamination at the Fremont Facility resulting from General Motor's operations at the Fremont Facility.

8. Debtor General Motors is liable to DTSC as an arranger of hazardous substances at the BKK and Casmalia Sites, where releases or threatened releases of hazardous substances have occurred and continue to occur. Debtor General Motors is liable to DTSC with respect to environmental contamination at and/or from the Fremont Facility as the former owner and operator of a facility when releases of hazardous wastes and/or hazardous substances occurred and continue to impact the environment.

### III.    DTSC'S OBJECTION TO PROPOSED PLAN

9. The Plan should not be confirmed because it fails to meet the requirements of 1129(a)(1) and (3) for the following reasons[3]:

**A.    The Plan provides for administrative expense payment to unsecured creditors and their professionals for pre-petition claims without bankruptcy court review.**

10. Section 2.5 of the Plan is entitled "Special Provisions Regarding Fees and Expenses of Indenture Trustees and Fiscal Paying Agents." The Indenture Trustee is Wilmington Trust Company ("WTC"), a member of the Official Committee of Unsecured Creditors in its capacity as Indenture Trustee for certain bondholders holding billions of dollars of allowed unsecured claims. Under the proposed Plan, WTC is also designated to serve post-confirmation as, *inter alia*, the Administrator of both the General Unsecured Creditors Trust and

---

[3] DTSC reserves the right to join in objections filed by other interested parties.

5

the Avoidance Action Trust. In prior submittals to this Court, Debtors and WTC both acknowledge that WTC is an unsecured creditor. *See,* Docket No. 6595 [So Ordered Stipulation signed on 8/9/10 Between Debtors, Wilmington Trust Co., and Citibank Solely in its Capacity as Paying Agent].

11. However, Section 2.5 of the proposed Plan provides:

"the reasonable **prepetition** and post petition fees and expenses of each of the Indenture Trustees and the Fiscal Paying Agents solely in connection with their performance of their duties (which **includes the reasonable fees and expenses of any counsel or any other professionals retained by the Indenture Trustees and the Fiscal Paying Agents in connection with such duties**) **shall be deemed Allowed Administrative Expenses** and shall be paid in Cash on the Effective Date, or as soon thereafter as practicable, upon submission of documented invoices (in customary form) to the Debtors, the DIP Lenders, the Creditors' Committee, subject to a review of reasonableness by the Debtors, the DIP Lenders, and representatives of the member of the Creditors' Committee who are not Indenture Trustees or Fiscal and Paying Agents, **without the necessity of making application to the Bankruptcy Court.** (emphasis added)

12. Section 2.5 is contrary to the Bankruptcy Code because it affords certain named unsecured creditors-- the Indenture Trustees and Fiscal Paying Agents-- and their professionals, administrative expense priority payment for pre-petition claims, and purports to pay administrative expenses without notice and hearing and bankruptcy court review. These provisions are contrary to the Bankruptcy Code. *See*, 11 U.S.C. §§ 726 (distribution priority); 11 U.S.C. § 503 (b) (requiring application, notice, hearing and bankruptcy court review for allowance of administrative expense priority). There is no basis to afford administrative expense priority to the prepetition claims of the Indenture Trustees, the Fiscal Paying Agents and their professionals. Further, notice to parties in interest and bankruptcy court review are required under the court to accord administrative expense priority.

6

Section 2.5 violates the provisions of the Bankruptcy Code and is neither fair nor equitable to other unsecured creditors.

### B. DTSC objects to the Proposed Plan because it allows multiple roles for Wilmington Trust Corporation, creating the potential for a conflict of interest.

13.    DTSC objects to the Plan because it allows WTC to serve in many roles, which create the appearance of and a potential for a conflict of interest, if not an actual conflict. As such, the Plan fails to satisfy section 1129(a)(3).

14.    As noted above, WTC is an Indenture Trustee and a member of the Official Committee of Unsecured Creditors. The Plan further designates WTC as the GUC Trust Administrator and the Avoidance Action Trust Administrator post confirmation, in addition to several other pre- and post-confirmation roles to be executed by WTC. *See,* Plan, Sections 1.83, 6.2(e) [WTC as GUC Trust Administrator]; Sections 1.21, 6.5(e) [WTC as Avoidance Action Trust Administrator]; Section 1.89 [WTC as successor-in-interest Indenture Trustee to Citibank, N.A.]; Section 2.5 [WTC's post and pre-petition roles as Indenture Trustee]; Section 6.2(n)(iii) [WTC's responsibility to file Debtor's statements, returns or disclosures relating to the GUC required by any governmental unit]. In its capacities as Administrator of both the GUC Trust and the Avoidance Action Trust, WTC has obligations to the Debtors, unsecured creditors, and the Debtor in Possession ("DIP") Lender. *See,* Plan, Sections 6.2 and 6.5. Serving in multiple roles in this instance creates the potential for a conflict of interest. *See, In re Taub,* 427 B.R. 208, 227-28 (Bankr. E.D.N.Y. 2010) (discussing the potential for a conflict of interest where multiple roles give rise to conflicting duties and obligations); *In re Metropolitan Environmental, Inc.*, 293 B.R. 871, 885 (Bankr. N.D. Ohio 2003) (noting multiple roles make it "seem all but impossible" to reconcile roles as fiduciaries). The possible prejudice to creditors from any

7

conflict of interest is heightened because liability for a "breach of fiduciary duty" is excluded from the carve out in the indemnifications provisions of the GUC Trust. *See,* Plan, Section 6.2(p), p. 42. To protect unsecured creditors, breach of fiduciary duties should be included in the carve out for indemnification.

15. The GUC Trust governs the recovery by unsecured creditors, including those holding claims not yet deemed allowed as of the date of confirmation. The Plan currently provides that WTC will act as the GUC Trust Administrator, despite its status as an unsecured creditor and Indenture Trustee for GM bondholders during this case. The Avoidance Action Trust was established for the purpose of liquidating and distributing assets from the Avoidance Action litigation, and is for the beneficiaries of the Avoidance Action Trust. The beneficiaries include the DIP Lenders and unsecured creditors. The Plan provides that WTC will act as the Avoidance Action Trust Administrator. Plan, Section 6.5(e).

16. The interests of these different constituencies of these Trusts vary and have the potential for an actual conflict. Further, WTC's role as Indenture Trustee does not end upon confirmation. WTC will continue to have obligations to the bondholders post confirmation. *See e.g,* Plan, Section 5.10 (Surrender of Existing Publicly Traded Securities). Further, the GUC Trust Administrator is required to pay the Indenture Trustee. *See e,g.,* Plan, Section 6.2(k), p. 40. As such, WTC will be paying itself.

17. As noted above, WTC's post confirmation fiduciary obligations under the Plan as Administrator of the GUC Trust and Avoidance Action Trust are not limited to those owed to the bondholders or unsecured creditors. Under the Plan, WTC will also owe fiduciary obligations to

8

the DIP Lenders as potential beneficiaries of the Avoidance Action Trust.  *See*, Plan, Section 6.5(n), p. 52-53.

18. Also, as noted above, the indemnification provisions for the GUC Trust Administrator do not exclude breach of fiduciary claims.  Thus, it appears that WTC can be indemnified from the Trust even if it breaches its fiduciary duties to unsecured creditors.

19. Furthermore, as GUC Trust Administrator, WTC will have the power to prosecute and resolve objections to unresolved claims.  Plan, Section 6.2(f), p. 39. The language of Section 6.2(f) purports to require that WTC "act in the best interest of all beneficiaries of the GUC Trust and in furtherance of the purpose of the GUC Trust, and in accordance with the GUC Trust Agreement, <u>and not in its own best interest as a creditor</u>." This language is insufficient to protect unsecured creditors whose claims WTC must resolve after confirmation.

20. The Plan is also deficient because it does not provide that the trust monitor be independently appointed by the Court.  Under the Plan, the GUC Trust provides for WTC to choose a Trust Monitor whose role is to oversee WTC's administration of the Trust and distribution of the Trust assets to unsecured creditors.  The ability for WTC to choose the Trust Monitor eliminates the Monitor's independence and does not provide for an independent monitor to protect the Trust assets for distribution to unsecured creditors.  To ensure the independence of the Trust Monitor, the Bankruptcy Court, with the assistance of the U.S. Trustee, should appoint the Trust Monitor.

21. Accordingly, DTSC objects to Debtors' Plan because of the various potentially conflicting roles that WTC is charged with undertaking and the absence of an independent Trust Monitor.

9

**C.    DTSC objects to the Plan because it unfairly delays distribution of allowed claims in certain situations.**

22.    Section 7.2 of the Plan is entitled "No Distribution Pending Allowance" and provides that "if any portion of a Claim is a Disputed Claim, no payment or distribution provided hereunder to the holder thereof shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim." Plan, Section 7.2, p. 63. DTSC objects to this provision because it unfairly withholds distribution to unsecured creditors. DTSC's Proof of Claim includes separate claims for three sites in California for which Debtors are liable to DTSC under federal and state environmental laws. The claims for the three sites are entirely separate – indeed, the sites are hundreds of miles apart from each other, and each site has a different factual background, costs, and DTSC staff involved. An allowed claim for one site simply does not affect the other. Moreover, DTSC will place the funds received relating to each of the sites into a separate site-specific account, as provided by law, to have the money available for response costs incurred in connection with the respective site. *See,* Health and Safety Code § 25330.4. Delaying distribution of an allowed claim for a specific site because a claim for different site made by the same claimant has not been allowed would needlessly delay payment for environmental remediation, is unreasonable, and is unfair in this instance. Accordingly, DTSC objects to section 7.2 of the Plan because it appears to hold back distribution of allowed claims pending resolution of all sites listed in a claim.

**D.    The Plan improperly allows injunctions under section 105 or 362 of the Bankruptcy Code to continue past the effective date**

23.    Section 10.4 of the Plan is entitled "Terms of Injunctions or Stays," and states: "Unless otherwise expressly provided herein, all injunctions or stays arising under or entered during the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, otherwise, and in

10

existence on the Confirmation Date, shall remain in full force and effect until the closing of the Chapter 11 Cases." Plan, Section 10.4 p. 67. DTSC objects to this provision. Given that the Plan provides at Section 12.2, "Substantial Consummation," that the Plan shall be deemed substantially consummated under Bankruptcy Code sections 1101 and 1127(b) as of the "Effective Date," there is no basis to continue the stays entered during the case past that date. Accordingly, DTSC objects to Section 10.4 of the Plan as written. At a minimum, this provision should expressly state that the exceptions under section 362(b) will apply through the closing of these Chapter 11 cases.

   **E.**  **Section 10.7 of the Plan is vague and overly broad.**

   24.  Section 10.7 of the Plan states: "Upon entry of the Confirmation Order, all holders of Claims and Equity Interests and other parties in interest, along with their respective present or former employees, agents, officers, directors, or principals, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan." Plan, Section 10.7, p. 68. Because this is a liquidating Chapter 11, the discharge injunction does not apply. *See*, 11 U.S.C. section 1141(d)(3). However, section 10.7 appears to craft such a discharge injunction into the Plan in contravention of the provisions of the Bankruptcy Code. Further, the broad language in Section 10.7, may impair unsecured creditors' rights against the GUC Trust Administrator under the carve out provisions in Section 6.2(p) of the Plan, which should be amended to include breach of fiduciary duties. Accordingly, DTSC objects to the Plan because Section 10.7 of the Plan is vague and overly broad.

   **F.**  **The Release provision is improperly vague.**

   25.  Section 12.5 of the Plan is entitled "Release" and provides that Debtors release non-debtor third parties, among others, "any other Persons who serve or served as members of

11

management of the Debtors on or after the Commencement Date . . . ." Plan, Section 12.5, p. 72.

DTSC objects to this provision because it fails to provide notice of the identity of the non-debtors who will be protected by the Release and the basis for their release.

    **G.    The Plan wrongly provides that the bankruptcy court has exclusive jurisdiction post confirmation.**

26.    Section 11.1 of the Plan states that the "Bankruptcy Court shall retain exclusive jurisdiction of all matters under, arising out of, or related to the Chapter 11 cases and the Plan pursuant to, and for purposes of, sections 105(a) and 1152 of the Bankruptcy Code and for, among other purposes, the following purposes . . . ." The Plan then provides a laundry list of matters over which the bankruptcy court would "retain exclusive" jurisdiction.[4]

---

[4] They are:
a. To hear and determine motions for the assumption, assumption and assignment, or rejection of executory contracts or unexpired leases and the allowance of Claims resulting therefrom;
b. To determine any motion, adversary proceeding, application, contested matter, and other litigated matter pending on or commenced before or after the Confirmation Date, including, without limitation, any proceeding with respect to a Cause of Action or Avoidance Action (including the Term Loan Avoidance Action);
c. To ensure that distributions to holders of Allowed Claims are accomplished as provided in the Plan;
d. To consider Claims or the allowance, classification, priority, compromise, estimation, or payment of any Claim;
e. To enter, implement, or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;
f. To issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any 108 person with the consummation, implementation, or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court;
g. To hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in the Plan, the Disclosure Statement, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;
h. To hear and determine all applications under sections 330, 331,

12

and 503(b) of the Bankruptcy Code for awards of compensation for services rendered and reimbursement of expenses incurred prior to the Confirmation Date;

i. To hear and determine disputes arising in connection with or related to the interpretation, implementation, or enforcement of the Plan, the Confirmation Order, the GUC Trust, the Asbestos Trust, the Environmental Response Trust, the Avoidance Action Trust, the GUC Trust Agreement, the Asbestos Trust Agreement, the Environmental Response Trust Agreement, the Environmental Response Trust Consent Decree and Settlement Agreement, and the Avoidance Action Trust Agreement, any transactions or payments contemplated hereby, or any agreement, instrument, or other document governing or relating to any of the foregoing, including to formulate and enforce alternative dispute resolution procedures with respect to the Environmental Response Trust Agreement or the Environmental Response Trust Consent Decree and Settlement Agreement; provided, however, that the Bankruptcy Court's jurisdiction with respect to the Environmental Response Trust Agreement and the Environmental Response Trust Consent Decree and Settlement Agreement shall be concurrent with the jurisdiction of other courts of competent jurisdiction over such matters to the extent such agreements provide for concurrent jurisdiction;

j. To take any action and issue such orders as may be necessary to construe, enforce, implement, execute, and consummate the Plan or to maintain the integrity of the Plan following consummation;

k. To recover all assets of the Debtors, property of the Debtors' estates, the GUC Trust Assets, the Asbestos Trust Assets, and the Avoidance Action Trust Assets, wherever located;

l. To hear and determine all objections to the termination of the Asbestos Trust;

m. To determine such other matters and for such other purposes as may be provided in the Confirmation Order;

n. To hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including, without limitation, matters with respect to any taxes payable by a trust or reserve established in furtherance of the Plan and the expedited determination of tax under 109 section 505(b) of the Bankruptcy Code with respect to the Debtors or any trust or reserve established in furtherance of the Plan);

o. To resolve all matters related to the 363 Sale Transaction;

p. To enforce all orders previously entered by the Bankruptcy Court;

q. To hear and determine any other matters related hereto and not inconsistent with the Bankruptcy Code and title 28 of the United States Code; and

r. To enter a final decree closing the Chapter 11 Cases.

To the extent that the Bankruptcy Court is not permitted under applicable law to preside over any of the forgoing matters, the reference to the "Bankruptcy Court" in Article XI of the Plan shall be deemed to be replaced by the "District Court." Notwithstanding anything in Article XI of the Plan to the contrary, (i) the allowance of Asbestos Personal Injury Claims and the forum in which such allowance will be determined shall be governed by and in accordance with the Asbestos Trust Distribution Procedures and the Asbestos Trust Agreement and (ii) the Bankruptcy Court and/or the

27. As described below, the Plan's provision that the bankruptcy court retain exclusive jurisdiction post-confirmation over the enumerated areas in section 11.1 conflicts with Second Circuit law and the Bankruptcy Code.

28. Title 28 U.S.C. § 1334(a) grants the district court exclusive jurisdiction over bankruptcy cases. Subsection (b) grants the district court "original but not exclusive jurisdiction of all civil proceedings arising under title 11 or arising in or related to cases under title 11." The district court may refer its bankruptcy jurisdiction to the bankruptcy court. 28 U.S.C. § 157(a).

29. Although section 1334 does not expressly limit the bankruptcy court's jurisdiction following plan confirmation, [*In re U.S. Brass Corp.*, 301 F.3d 296, 304 (5th Cir. 2002)], once confirmation occurs, the bankruptcy court's jurisdiction "shrinks." *In re Kassover*, 336 B.R. 74, 78-79 (Bankr. S.D.N.Y. 2006) (jurisdiction of bankruptcy court shrinks once Chapter 11 plan is confirmed).

30. The federal courts are courts of limited jurisdiction, and "neither the bankruptcy court nor the parties can write their own jurisdictional ticket." *In re General Media,* 335 B.R. at 73 (quoting *In re Poplar Run Five Ltd. P'ship*, 192 B.R. 848, 859 (Bankr. E.D.Va. 1995) [a plan provision cannot grant jurisdiction over a proceeding beyond the jurisdiction granted by statute]).

31. Accordingly, DTSC objects to the Plan provision that the bankruptcy court retains <u>exclusive</u> jurisdiction post-confirmation.

---

District Court shall have concurrent, rather than exclusive, jurisdiction with respect to disputes relating to (a) rights under insurance policies issued to the Debtors that are included in the Asbestos Insurance Assets, and (b) the Debtors' rights to insurance with respect to workers' compensation claims.

32. DTSC reserves the right to amend this objection and to join in objections to the Plan filed by other parties in interest.

## CONCLUSION

For the reasons stated above, DTSC respectfully objects to confirmation of the Plan in its present form.

Dated: February 11, 2011

Respectfully Submitted,

*Olivia W. Karlin*
KAMALA HARRIS
Attorney General of California
MARGARITA PADILLA
Supervising Deputy Attorney General
OLIVIA W. KARLIN
Deputy Attorney General
State Bar No. 150432
300 South Spring Street, Suite 1702
Los Angeles, CA 90013
Telephone: (213) 897-0473
Fax: (213) 897-2802
E-mail: Olivia.Karlin@doj.ca.gov
Attorneys for Claimant California Department of Toxics Substances Control