GREENBERG TRAURIG, LLP
Bruce R. Zirinsky, Esq.
Nancy A. Mitchell, Esq.
John H. Bae, Esq.
Gary D. Ticoll, Esq.
MetLife Building
200 Park Avenue
New York, New York 10166
Telephone: (212) 801-9200
Facsimile: (212) 801-6400
Email: zirinskyb@gtlaw.com
        mitchelln@gtlaw.com
        baej@gtlaw.com
        ticollg@gtlaw.com

*Counsel for Appaloosa Management L.P., Aurelius Capital Management, LP,*
*Elliott Management Corporation, and Fortress Investment Group LLC*


UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------------------------------x
                                         :
In re                                    :   Chapter 11
                                         :
MOTORS LIQUIDATION COMPANY, et al.,      :   Case No. 09-50026 (REG)
f/k/a General Motors Corp., et al.,      :
                                         :
                                         :
Debtors.                                 :   (Jointly Administered)
                                         :
------------------------------------------------------------x
```

### OBJECTION OF APPALOOSA MANAGEMENT L.P., AURELIUS CAPITAL MANAGEMENT, LP, ELLIOTT MANAGEMENT CORPORATION, AND FORTRESS INVESTMENT GROUP LLC <u>TO DEBTORS' AMENDED JOINT CHAPTER 11 PLAN</u>

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................... ii

I.     PRELIMINARY STATEMENT ................................................................................ 1

II.    FACTUAL BACKGROUND ..................................................................................... 6

      A.     The Nova Scotia Notes ................................................................................ 6

      B.     The Intercompany Loans ............................................................................. 7

      C.     The Wind-Up Obligations............................................................................ 8

      D.     The Lock-Up Agreement ............................................................................. 8

      E.     The Claims ................................................................................................. 11

      F.     The Committee's Claims Objection............................................................ 12

III.   PLAN OBJECTIONS .............................................................................................. 12

      A.     The Nova Scotia Noteholders and Nova Scotia Trustee Should Receive
            Initial Distributions ................................................................................... 12

      B.     The Plan Should Provide for a Segregated Reserve ................................... 18

      C.     The Claims Should Not be Subject to the Plan's Estimation Provisions.............. 21

      D.     Distributions on the Claims Should Not be Withheld Pending Surrender of
            the Nova Scotia Notes................................................................................ 23

      E.     The Nova Scotia Fiscal Paying and Agency Agreement Should not be
            Cancelled.................................................................................................... 24

      F.     The General Unsecured Creditor Trust May Not be Substantively Altered
            Following Confirmation of the Plan ........................................................... 24

      G.     The Unit Issuance Ratio Should be Provided Prior to Confirmation of the
            Plan ............................................................................................................ 26

      H.     The GUC Trust Administrator Must Act in Accordance With the Terms of
            the GUC Trust Agreement ......................................................................... 27

IV.    CONCLUSION........................................................................................................ 28

## <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

### <u>Federal Cases</u>

*Adelphia Commc'ns Corp. v. Bank of America (In re Adelphia Commc'ns)*,
  365 B.R. 24 (Bankr. S.D.N.Y. 2007) ..................................................................................... 15

*Aetna Casualty & Surety Co. v. LTV Steel Co., Inc. (In re Chateaugay Corp.)*,
  94 F.3d 772 (2d Cir. 1996) ................................................................................................... 25

*Ashcroft v. Iqbal*,
  129 S. Ct. 1937 (2009) .......................................................................................................... 13

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007) .............................................................................................................. 13

*Computer Task Group, Inc. v. Brotby (In re Brotby)*,
  303 B.R. 177 (B.A.P. 9th Cir. 2003) ..................................................................................... 20

*Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.)*,
  416 F.3d 136 (2d Cir. 2005) ................................................................................................. 25

*In re Adelphia Bus. Solutions, Inc.*,
  341 B.R. 415 (Bankr. S.D.N.Y. 2003) .................................................................................. 22

*In re ASARCO L.L.C.*,
  420 B.R. 314 (S.D. Tex. 2009) ............................................................................................. 20

*In re Best Prods. Co.*,
  177 B.R. 791 (S.D.N.Y. 1995) .............................................................................................. 26

*In re Charis Hosp., L.L.C.*,
  360 B.R. 190 (Bankr. M.D. La. 2007) ................................................................................... 20

*In re Dreier LLP*,
  429 B.R. 112 (Bankr. S.D.N.Y. 2010) .................................................................................. 14

*In re Granite Partners, LP*,
  210 B.R. 508 (Bankr. S.D.N.Y. 1997) .................................................................................. 14

*In re Ionosphere Clubs, Inc.*,
  208 B.R. 812 (S.D.N.Y. 1997) .............................................................................................. 26

*In re Journal Register Co.*,
  407 B.R. 520 (Bankr. S.D.N.Y. 2009) .................................................................................. 20

*In re Linens Holding Co.*,
  No. 08-10832, 2009 WL 2163235 (Bankr. D. Del. June 12, 2009) ....................................... 20

*In re Machne Menachem Inc.*,
  233 Fed. Appx. 119 (3d Cir. 2007) ....................................................................................... 20

*In re Mazzeo*,
  131 F.3d 295 (2d Cir. 1997) ................................................................................................. 22

*In re Northeast Dairy Cooperative Federation, Inc.*,
    73 B.R. 239 (Bankr. N.D.N.Y. 1987) ................................................................... 21

*In re Rickel & Assocs., Inc.*,
    260 B.R. 673 (Bankr. S.D.N.Y. 2001) ................................................................. 25

*In re Weiss-Wolf, Inc.*,
    59 B.R. 653 (Bankr. S.D.N.Y. 1986) ............................................................. 20, 21

*Lawrence v. Revere Copper & Brass Inc. (In re Revere Copper & Brass Inc.)*,
    78 B.R. 17 (S.D.N.Y. 1987) ............................................................................... 25

*Magnolia Gas Co.v. Compression Solutions, Co. (In re Magnolia Gas Co.)*,
    255 B.R. 900 (Bankr. W.D. Okla. 2000) ........................................................... 13

*Northwestern Mut. Life Ins. Co. v. Delta Air Lines, Inc. (In re Delta Air Lines, Inc.)*,
    608 F.3d 139 (2d Cir. 2010) ............................................................................. 15

*Plan Comm. of Northwestern Corp. v. Northwestern Corp. (In re Northwestern Corp.)*,
    362 B.R. 131 (D. Del. 2007) ............................................................................. 20

*U.S. v. Verdunn*,
    89 F.3d 799 (9th Cir. 1987) ............................................................................. 22

*United Jersey Bank v. Morgan Guaranty Trust Co. of N.Y. (In re Prime Motor Inns, Inc.)*,
    135 B.R. 917 (Bankr. S.D. Fla. 1992) ............................................................... 13

*United States Lines (S.A.), Inc. v. U.S. (In re McLean Indus., Inc.)*,
    30 F.3d 385 (2d Cir. 1994) ............................................................................... 14

**Federal Statutes**

11 U.S.C. § 1127(b) ........................................................................................... 25

Appaloosa Management L.P., Aurelius Capital Management, LP, Elliott Management Corporation, and Fortress Investment Group LLC (collectively, the "**Objecting Parties**"), each on behalf of their managed entities which hold certain Notes issued by General Motors Nova Scotia Finance Company ("**GM Nova Scotia**"), submit this objection to the *Debtors' Amended Joint Chapter 11 Plan* (Docket No. 8015) (the "**Plan**").

## I.    <u>PRELIMINARY STATEMENT</u>[1]

1.      The Objecting Parties object to confirmation of the Plan for the following reasons:

- Section 7.3 of the Plan provides for withholding all distributions on account of the Nova Scotia Guaranty Claims and the Wind-Up Claim, including on account of undisputed portions of those Claims, until such time as the Claims are allowed.

- The Plan does not provide for a segregated reserve for distributions withheld pending resolution of disputed general unsecured claims; instead the Plan provides that remaining disputed general unsecured claims shall be discharged if trust distributable assets are exhausted.

- Section 6.2(f) of the Plan authorizes the GUC Trust Administrator to sell trust assets, including securities withheld from distribution and allocable to holders of disputed general unsecured claims, without the consent of such holders.

- Section 7.3 of the Plan improperly provides that the GUC Trust Administrator may at any time request that the Bankruptcy Court estimate a disputed claim (including the Nova Scotia Guaranty Claims and the Wind-Up Claim), regardless of whether the Bankruptcy Court has ruled on such claim, including during the pendency of any appeal.

- Section 5.10 of the Plan permits the Nova Scotia Noteholders to retain their debt securities for the purpose of asserting their direct claims against GM Nova Scotia, but is ambiguous as to whether distributions to the Nova Scotia Noteholders will be made during the period that they retain their securities. The Plan should be clarified to state distributions to the Nova Scotia Noteholders will be made during the period they retain their securities.

- Section 6.7 of the Plan improperly provides for the cancellation of the Nova Scotia Fiscal and Paying Agency Agreement notwithstanding that GM Nova Scotia is the subject of a Canadian BIA proceeding and is not a Debtor.

---

[1] Capitalized terms not otherwise defined in the Preliminary Statement shall have the meanings ascribed to them below.

- Section 6.10 of the Plan improperly provides for the dissolution of GM Nova Scotia notwithstanding that GM Nova Scotia is the subject of a Canadian BIA proceeding and is not a Debtor.

- Section 6.2(a) of the Plan is ambiguous as to whether the Debtors may modify the substance of the GUC Trust Agreement post-confirmation. The Plan should be clarified to state that the Debtors may not modify the agreement post-confirmation.

- The Plan does not provide the value of the Unit Issuance Ratio used to determine distributions under Section 3.3(a) of the GUC Trust Agreement.

- Section 5.9 of the GUC Trust Agreement authorizes the GUC Trust Administrator to make distributions that are "not in technical compliance" with the distribution provisions of the GUC Trust Agreement.

2.     The Noteholders object to the confirmation of the Plan because it fails to provide fair treatment to Nova Scotia Guaranty Claims and the Wind-Up Claim, which the Debtors expressly acknowledged should be allowed as part of a global agreement that enabled the Debtors to move forward with their restructuring plan that formed the foundation of this Plan. In the spring of 2009, General Motors[2] teetered on the brink of liquidation. However, with the financial backing of the U.S. and Canadian governments, General Motors was able to consummate a 363 sale that resulted in what has been described as one of the most successful restructurings in history. After one of the biggest corporate collapses in history, New GM, which acquired virtually all of the assets of the Debtors, made one of the biggest rebounds ever. In November 2010, New GM completed the largest public stock offering in history, raising $23.1 billion.

3.     When the General Motors filed for bankruptcy, it was losing money and bleeding cash at an unsustainable rate. A quick sale was the only way to avert liquidation of the company and avoid, as President Obama said, an economic calamity. To assure an expedited sale, it was

---

[2] "**General Motors**" means Motors Liquidation Company f/k/a General Motors Corp. ("**MLC**") together with its prepetition direct and indirect subsidiaries. "**Debtors**" means MLC and its affiliated debtors.

critically important that GM Canada be kept out of a CCAA proceeding, which would likely have resulted in significant delays and deterioration in GM's value, and possibly liquidation.

4.      In late May 2009, to prevent GM Canada from filing a CCAA proceeding and to preserve and enhance its value, GM initiated negotiations with the Nova Scotia Noteholders to resolve their claims.  The negotiations were conducted by GM in consultation with the U.S. Treasury Department, the Canadian and Ontario governments, and the UAW.  The settlement, embodied in the Lock-Up Agreement, enabled the Debtors to avoid a GM Canada CCAA filing and effect a prompt 363 sale.  The Debtors derived substantial benefits under the Lock-Up Agreement including the following:

> (i)      With the consent of the Nova Scotia Noteholders, GM Canada was relieved of its liability of CDN$1.3 billion Intercompany Loans owed to GM Nova Scotia;

> (ii)      MLC was able to sell its assets including the stock of GM Canada to New GM without the disruption, cost, risk and delay of a GM Canada CCAA proceeding;

> (iii)      As the sole owner of GM Canada, MLC garnered the benefit of the increased value of GM Canada that resulted from the elimination of GM Canada's CDN$1.3 billion liability under the Intercompany Loans; and

> (iv)      The Nova Scotia Noteholders agreed to vote in favor of an Extraordinary Resolution, providing for the release by the Nova Scotia Noteholders of all claims and demands raised against the Debtors in the Nova Scotia Proceeding.

5.      The Lock-Up Agreement also provided consideration to the Nova Scotia Noteholders including the following:

> (i)      The Nova Scotia Noteholders received a Consent Fee from GM Nova Scotia in the amount of approximately $369,000,000 which was funded by GM Canada into an escrow account;

> (ii)      MLC confirmed, acknowledged and agreed that the Nova Scotia Guaranty Claims would be allowed general unsecured

claims in MLC's bankruptcy for the full amount due under the Guaranty; and

(iii)    MLC confirmed, acknowledged and agreed that the Nova Scotia Trustee would be entitled to an allowed general unsecured claim in MLC's bankruptcy on account of its Wind-Up Obligations arising under Nova Scotia law.  The allowance of both the Nova Scotia Guaranty Claims and the Wind-Up Claim was a critical element of the agreement among the parties.

6.    The execution of the Lock-Up Agreement was the final critical component that permitted the Debtors to satisfy the conditions imposed by the governments of the U.S. and Canada, to effect an expedited 363 sale that could only occur without a GM Canada CCAA filing, and preserve the going-concern value of the Debtors' business.  Indeed, the Debtors' chapter 11 filing occurred within minutes of the execution of the Lock-Up Agreement.  Absent the Lock-Up Agreement, the restructuring of the Debtors' business could not have proceeded in the form it did.  At the very least, the 363 sale would have been significantly delayed resulting in greatly diminished value to the Debtors' estates.  Possibly, the delay and the Debtors' rapid depletion of cash would have resulted in a piecemeal, fire sale liquidation of the Debtors' assets, with no return for the Debtors' unsecured creditors.

7.    Now the Debtors, the counterparties to the Lock-Up Agreement, and represented by the same attorneys who negotiated the Lock-Up Agreement on their behalf, are seeking, through the Plan, to deprive the Nova Scotia Noteholders and the Nova Scotia Trustee of entitlement to any initial distributions under the Plan.  The position of the Debtors is not only inconsistent with the terms of the Lock-Up Agreement that MLC assumed and pursuant to which it covenanted "not [to] take any action inconsistent with" these terms."  It is also inconsistent with the Debtors' prior representations to the Court.  Under the terms of the Master Purchase Agreement, New GM determined that the Lock-Up Agreement would be assumed and assigned – the Lock-Up Agreement did not require its assumption or assignment.  In connection with the

4

363 sale, the Debtors represented that assumption of certain executory contracts – including the Lock-Up Agreement – was in the best interests of the Debtors' estates.

8.        The Debtors refusal to permit distributions to the Nova Scotia Noteholders and the Nova Scotia Trustee is based solely on the objection of the Committee to the claims of the Nova Scotia Noteholders and the Nova Scotia Trustee.  However, the Committee's objection can only be described as flimsy, at best.  Although the Committee makes some facially serious allegations, the allegations are simply conclusory in nature and the Committee's objection is notable for the complete absence of any specific facts to support its allegations.

9.        The Committee's objection boils down to two assertions:  (i) payment of the Consent Fee was a fraudulent transfer or preference; and (ii) the Nova Scotia Guaranty Claims are duplicative of the Wind-Up Claim.  There is no merit to either assertion.  First, the Consent Fee was funded by GM Canada – a non-Debtor – and there was no transfer of estate property; and second, the Debtors' estates do not own the purported avoidance claims which were sold to New GM pursuant to the 363 Sale.  Neither the Committee nor the Debtors have standing to assert avoidance claims that belong to New GM and are not part of the Debtors' estates.

10.        With respect to the assertion that the Nova Scotia Guaranty Claims are duplicative of the Wind-Up Claim, the law is clear in the Second Circuit that as long as the Nova Scotia Noteholders do not receive more than payment in full on account of the Nova Scotia Notes, both the Nova Scotia Guaranty Claims and the Wind-Up Claim should be allowed in full.  The Nova Scotia Guaranty Claims arise from MLC's guaranty of GM Nova Scotia's obligations under the Nova Scotia Notes.  That undisputed guaranty obligation runs to the holders of the Nova Scotia Notes.  The Wind-Up Claim is an asset of GM Nova Scotia that arises from Section 135 of the Companies Act of Nova Scotia law that requires members of an unlimited company to satisfy all

debts of the unlimited company that is being wound up.  There is no merit to the contention that the two claims are duplicative.

11.    In its objection, the Committee also asks the Court to equitably subordinate the Nova Scotia Guaranty Claims and the Wind-Up Claim to the extent they are allowed.  However, the Committee notably fails to cite any law or fact to support the relief it requests; rather, it simply makes the conclusory allegation that the Nova Scotia Noteholders "engaged in, and benefited from, inequitable conduct that resulted in injury to [MLC's] creditors and conferred an unfair advantage upon the Noteholders."  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not satisfy the pleading requirements set forth by the Supreme Court and should not provide a basis to withhold plan distributions to legitimate unsecured creditors.

12.    It would be patently unfair for the Court to confirm a plan of reorganization that deprives the Nova Scotia Noteholders and the Nova Scotia Trustee of initial distributions, solely based on the meritless claims objection filed by the Committee.  This is particularly true here where the Debtors themselves agreed to the validity of the claims in the Lock-Up Agreement and represented to the Court that assumption of the Lock-Up Agreement was in the best interests of the Debtors' estates.  The Debtors' representations and the assumption of the Lock-Up Agreement should at the very least provide a presumption of the validity of the Nova Scotia Guaranty Claims and the Wind-Up Claim, requiring a particularly heavy burden for the Debtors and the Committee to overcome.

## II.    FACTUAL BACKGROUND

A.    The Nova Scotia Notes

13.    GM Nova Scotia is a Nova Scotia unlimited company and a wholly-owned direct subsidiary of MLC.  On July 10, 2003, GM Nova Scotia issued (a) £350,000,000 principal

6

amount of 8.375% Guaranteed Notes due December 7, 2015 (the "**2015 Notes**"), and (b) £250,000,000 principal amount of 8.875% Guaranteed Notes due July 10, 2023 (the "**2023 Notes**" and together with the 2015 Notes, the "**Nova Scotia Notes**"), pursuant to the terms and conditions of that certain Fiscal and Paying Agency Agreement, dated as of July 10, 2003, between and among GM Nova Scotia, MLC, Deutsche Bank Luxembourg S.A., as fiscal agent, and Banque Général du Luxembourg S.A., as paying agent (the "**Nova Scotia Fiscal and Paying Agency Agreement**").  *See* Fiscal Paying and Agency Agreement, attached as **Exhibit "A."**

14.     MLC guaranteed GM Nova Scotia's obligations under the Nova Scotia Notes. Pursuant to Section 5 of Schedule 1 to the Nova Scotia Fiscal Paying and Agency Agreement (the "**Guaranty**"), MLC, defined as the "Guarantor" under the Nova Scotia Fiscal Paying and Agency Agreement, guarantees the "due and punctual payment" of all amounts due on account of the Nova Scotia Notes.  The Nova Scotia Fiscal Paying and Agency Agreement further provides that "the Guarantee is absolute and unconditional, irrespective of any circumstance that might otherwise constitute a legal or equitable discharge of a surety or guarantor." *Id.*  By the plain terms of the Nova Scotia Fiscal Paying and Agency Agreement, MLC guaranteed, and is liable for, all of GM Nova Scotia's obligations on account of the Nova Scotia Notes.

B.     The Intercompany Loans

15.     Immediately after the issuance of the Nova Scotia Notes by GM Nova Scotia, GM Nova Scotia loaned the proceeds of the Nova Scotia Notes to General Motors of Canada Limited ("**GM Canada**"), pursuant to separate loan agreements, resulting in Intercompany Loans payable by GM Canada to GM Nova Scotia in the aggregate principal amount of approximately CDN$1.3 billion.

C.      The Wind-Up Obligations

16.      Under Section 135 of the Companies Act (Nova Scotia), MLC, as the direct parent of GM Nova Scotia, is statutorily liable to GM Nova Scotia for the debts and liabilities of GM Nova Scotia in the event of its winding-up (the "**Wind-Up Obligations**").  *See* Section 135 of the Companies Act (Nova Scotia), attached as **Exhibit "B."**  The liabilities of GM Nova Scotia include its direct obligations to the Nova Scotia Noteholders under the Nova Scotia Notes. The Wind-Up Obligations are an asset of GM Nova Scotia which, together with the Intercompany Loans, comprise substantially all of the assets of GM Nova Scotia available to repay its liabilities including the Nova Scotia Notes.

D.      The Lock-Up Agreement

17.      Because GM Nova Scotia had few other material assets prior to the Petition Date, the ability of GM Nova Scotia to satisfy its obligations under the Nova Scotia Notes was dependent upon the ability of GM Canada and GM Investments Ltd. ("**GM Investments**") (which owed significant amounts of money to GM Nova Scotia) to satisfy their financial obligations owed to GM Nova Scotia.  Nonetheless, in or about May 2008, at a time when MLC was insolvent or on the brink of insolvency, MLC (as sole shareholder) caused GM Investments to reduce its paid up capital by CDN$576,672,670 thereby effectively stripping it of its assets and impairing its ability to satisfy its obligations owing to GM Nova Scotia.  In the same time period, MLC also caused GM Nova Scotia to reduce its paid up capital by more than CDN$16,000,000.  In addition, on February 11, 2009, MLC and GM Canada amended their credit agreement in a manner that potentially impaired GM Canada's ability to repay its obligations to GM Nova Scotia, including the Intercompany Loans.  Under section 241 of the Canada Business Corporations Act, the foregoing actions gave rise to, among other things,

8

oppression claims by the Nova Scotia Noteholders against various parties, including MLC, GM Canada, GM Investments, and GM Nova Scotia.

18.     On March 2, 2009, in connection with the oppression claims, the Nova Scotia Notes, the Guaranty, and the Intercompany Loans, certain of the Nova Scotia Noteholders commenced the Nova Scotia Proceeding in the Supreme Court of Nova Scotia (Aurelius Capital Partners, LP, et al. v. General Motors Corp., et al., Court File No. HFX No. 308066), naming as defendants, among others, MLC, GM Canada, GM Investments, and GM Nova Scotia (the "**Nova Scotia Proceeding**").  *See* Notice of Action entitled Aurelius Capital Partners, LP, et al. v. General Motors Corp., et al., Court File No. HFX No. 308066, attached as **Exhibit "C."**

19.     In spring of 2009, to prevent its liquidation and produce a viable restructuring plan supported by its stakeholders, MLC entered into negotiations with numerous constituencies, seeking their support and cooperation.  MLC's restructuring plan was based on completing an expedited sale to New GM, an entity sponsored and funded by the governments of the U.S. and Canada.  Completion of the expedited sale required GM Canada to avoid filing a Canadian proceeding.  Because MLC was bleeding cash at an unsustainable rate, any delay would have caused a serious deterioration in value, if not a piecemeal liquidation providing no recovery to unsecured creditors.

20.     To avert a CCAA filing by GM Canada, in late May 2009, MLC initiated negotiations with certain of the Nova Scotia Noteholders.  The negotiations between the GM Parties and the Nova Scotia Noteholders concerned, among other things, the Nova Scotia Notes, the Guaranty, the Intercompany Loans, the Wind-Up Obligations, and the Nova Scotia Proceeding.  The GM Parties were represented in these negotiations by Weil, Gotshal & Manges, LLP as attorneys and Morgan Stanley as financial advisors.  The negotiations were conducted by

the GM Parties with the knowledge and in consultation with the U.S. Treasury Department, the Canadian and Ontario governments and the UAW.

21.    Upon completion of the negotiations, on June 1, 2009, the Lock-Up Agreement was executed by the participating Nova Scotia Noteholders and the GM Parties.  Moments after the execution of the Lock-up Agreement, the Debtors filed their chapter 11 cases.  The settlement embodied in the Lock-Up Agreement (attached as **Exhibit "D"**) enabled MLC to effect a prompt sale under section 363 of title 11 of the United States Code (the "**Bankruptcy Code**").

22.    As set forth in detail above, MLC and the other GM Parties derived substantial benefits under the Lock-Up Agreement including relief for GM Canada from its CDN$1.3 billion liability under the Intercompany Loans, which enabled MLC was to sell its assets including the stock of GM Canada to New GM without the disruption, cost, risk and delay of a GM Canada CCAA proceeding.  In return, GM Canada agreed to fund a Consent Fee payable by GM Nova Scotia to the Nova Scotia Noteholders in the amount of approximately $369,000,000.[3]  In addition, MLC confirmed, acknowledged and agreed that (i) the Nova Scotia Guaranty Claims would be allowed general unsecured claims in MLC's bankruptcy for the full amount due under the Guaranty; and (ii) the Nova Scotia Trustee would be entitled to an allowed general unsecured claim in MLC's bankruptcy on account of its Wind-Up Obligations arising under Nova Scotia law, including, without limitation, amounts due under the Nova Scotia Notes and the Swap Liability.  The allowance of both the Nova Scotia Guaranty Claims and the Wind-Up Claim was

---

[3] On or about May 29, 2009, MLC loaned to GM Canada $450,000,000, a portion of which GM Canada used to fund the Consent Fee.  The loan was evidenced by a promissory note executed by GM Canada in favor of MLC (the "**GM Canada Promissory Note**").  Pursuant to the Master Purchase Agreement approved by the Court (the "**MPA**"), MLC sold the GM Canada Promissory Note to New GM.  *See* MPA § 2.2(a)(iii).  This loan was made before the agreement between the GM Parties and the Nova Scotia Noteholders, and was not a component of the Lock-Up Agreement.

a critical element of the agreement among the parties.  In addition, MLC agreed and covenanted "that it will not take any action or assert any position inconsistent" with the foregoing.  *See* Lock-Up Agreement at Section 6.

23.    The Lock-Up Agreement was well publicized.  MLC filed a Form 8-K, dated June 1, 2009, disclosing the Lock-Up Agreement and its terms.  *See* **Exhibit "E."**  In addition, there were press reports describing the Lock-Up Agreement.  *See* Brian Kalish, GM Nova Scotia Unit In Pact To Settle Canada Bondholder Suit, Dow Jones Factiva, June 1, 2009, attached as **Exhibit "F"** ("If the [extraordinary] resolution is successfully passed, GM Nova Scotia will make a cash payment of £ 366.46 per £ 1,000 par value of outstanding Nova Scotia notes due 2015 and £ 380.17 per £ 1,000 par value of outstanding Nova Scotia notes due 2023.").

E.    The Claims

24.    On December 10, 2009, pursuant to order of the Court, a proof of claim bearing Claim No. 69551 in the aggregate amount of $1,072,557,531.72 as well as other claims on behalf of certain individual holders of the Nova Scotia Notes (collectively, the "**Nova Scotia Noteholders**") were filed with the Court (collectively, the "**Nova Scotia Guaranty Claims**").  The Nova Scotia Guaranty Claims arise from MLC's contractual Guaranty.  *See* Noteholders' Proofs of Claim and Guaranty Claims, in relevant part, attached as **Exhibit "G."**

25.    On October 9, 2009, the Supreme Court of Nova Scotia adjudged GM Nova Scotia bankrupt and issued an order pursuant to the Bankruptcy and Insolvency Act (Canada) appointing Green Hunt Wedlake Inc., as trustee of the estate of GM Nova Scotia (the "**Nova Scotia Trustee**").  On November 30, 2009, the Nova Scotia Trustee filed its Wind-Up Claim against MLC bearing Claim No. 66319 in the amount of $1,607,647,592 (the "**Wind-Up Claim**" and together with the Nova Scotia Guaranty Claims, the "**Claims**").  The Wind-Up Claim is separate and apart from the Nova Scotia Guaranty Claims as it arises from MLC's Wind-Up

Obligations that include the amounts due on account of GM Nova Scotia's liabilities including under the Nova Scotia Notes.[4]  *See* Wind-Up Claim, in pertinent part, attached as **Exhibit "H."**

F.    The Committee's Claims Objection

26.    On July 2, 2010, the Official Committee of Unsecured Creditors (the "**Committee**") filed its Official Committee of Unsecured Creditors' Objection to Claims Filed by Green Hunt Wedlake, Inc. and Noteholders of General Motors Nova Scotia Finance Company and Motion for Other Relief [Docket No. 6248], (as amended on November 19, 2010 [Docket No. 7859], the "**Claims Objection**").  In the Claims Objection the Committee argues that (i) the Claims should be reduced by the amount of the Consent Fee because payment of the Consent Fee is avoidable as a preference or fraudulent conveyance; (ii) to the extent the Claims are allowed, they should be equitably subordinated, and (iii) the Wind-Up Claim is duplicative of the Nova Scotia Guaranty Claims.  However, the Claims Objection is merely a compilation of conclusory assertions that fails to allege relevant facts to support the relief the Committee seeks.

## III.    PLAN OBJECTIONS

A.    The Nova Scotia Noteholders and Nova Scotia Trustee Should Receive Initial Distributions

27.    Section 7.2 of the Plan and Section 5.1(b) of the GUC Trust Agreement[5] provide that no recovery or distribution shall be made with respect to any portion of a disputed general unsecured claim unless and until such disputed claim has become an allowed general unsecured claim.  Under the Plan, the Claims are deemed disputed based on the Committee's Claims Objection.

---

[4] The components of the Wind-up Claim include the following debts and liabilities of GM Nova Scotia: CDN$1,088,542,512 related to the Nova Scotia Notes; CDN$589,292,176 related to certain currency swap transactions with MLC (the "**Swap Liability**"); and CDN$436,222 in other obligations, aggregating CDN$1,678,270,910 which, when converted to US Dollars at the date of the bankruptcy of GM Nova Scotia at the exchange rate of 0.957919, equals US$1,607,647,592.

[5] The Plan provides for the establishment of a trust in accordance with that certain GUC Trust Agreement, substantially in the form annexed to the Plan as Plan Exhibit D (the "**GUC Trust Agreement**").

28.     It is grossly unfair to deprive the Nova Scotia Noteholders and the Nova Scotia Trustee of distributions on their Claims based on a flimsy objection filed by the Committee that fails to satisfy the pleading requirements adopted by the Supreme Court in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 55 (2007) (holding that a complaint must plead facts to support the asserted claims and the "recitation of the elements of a cause of action will not do."). *See, also, Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009) (reaffirming *Twombly*, stating "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").

29.     None of the arguments advanced in the Claims Objection withstands even cursory scrutiny. The Committee's avoidance claims are totally without merit. The Consent Fee was funded by GM Canada – a non-Debtor – and thus there was no transfer of estate property. More importantly, the Debtors' estates do not own the purported avoidance claims which were sold to New GM pursuant to the 363 Sale. Neither the Committee nor the Debtors have standing to assert avoidance claims that belong to New GM and are not part of the Debtors' estate. *See Magnolia Gas Co. v. Compression solutions, Co. (In re Magnolia Gas Co.)*, 255 B.R. 900, 913 (Bankr. W.D. Okla. 2000) (holding that party that lacks standing to pursue avoidance action does not have standing to raise section 502(d) objection based on the same avoidance action); *United Jersey Bank v. Morgan Guaranty Trust Co. of N.Y. (In re Prime Motor Inns, Inc.)*, 135 B.R. 917, 920 (Bankr. S.D. Fla. 1992) (same).

30.     Moreover, even if MLC's estate owned the avoidance claims that were sold to New GM, under section 502(d) of the Bankruptcy Code, the Committee cannot object to the Claims on the basis that the there was an avoidable transfer unless and until the Court has

entered a judgment against the Nova Scotia Noteholders and the Nova Scotia Trustee. *See, e.g.*
*United States Lines (S.A.), Inc. v. U.S. (In re McLean Indus., Inc.)*, 30 F.3d 385, 388 (2d Cir.
1994). No such judgment has been entered and the Claims cannot be disallowed under section
502(d).

31.     Also, because the Consent Fee was funded by GM Canada and paid by GM Nova
Scotia, both non-Debtor entities, the Consent Fee cannot be avoided as a fraudulent transfer. A
trustee's avoiding powers under the Bankruptcy Code only extend to transfers that are property
of the estate; the transfer of non-debtor property is outside the scope of section 548 of the
Bankruptcy Code. *See In re Dreier LLP*, 429 B.R. 112, 125 (Bankr. S.D.N.Y. 2010) ("If the
transfer did not involve property of the debtor under non-bankruptcy law, the trustee cannot
avoid and recover the transfer or its value"). The Consent Fee was not MLC's property, so it
cannot be avoided as a fraudulent transfer.

32.     The Committee also asks the Court, pursuant to section 510(c) of the bankruptcy
Code, to equitably subordinate the Nova Scotia Guaranty Claims and the Wind-Up Claim to the
extent they are allowed. However, the Committee notably fails to cite any law or fact to support
the relief it requests; rather, it simply makes the conclusory allegation that the Nova Scotia
Noteholders "engaged in, and benefited from, inequitable conduct that resulted in injury to
[MLC's] creditors and conferred an unfair advantage upon the Noteholders." The Committee's
allegations are not even close to satisfying the heightened pleading requirements set forth by the
Supreme Court in *Twombly* and *Ashcroft*.

33.     To satisfy section 510(c), the Committee is required to allege that the Nova Scotia
Noteholders engaged in inequitable conduct, causing injury to the creditors of MLC or
conferring an unfair advantage on the Nova Scotia Noteholders. *See In re Granite Partners, LP*,

210 B.R. 508, 514 (Bankr. S.D.N.Y. 1997) (quoting *Mobile Steel*, 563 F.2d at 700 (5th Cir. 1977)).  The *Mobile Steel* factors are consistently applied in other Circuits.  *Adelphia Commc'ns Corp. v. Bank of America (In re Adelphia Commc'ns)*, 365 B.R. 24, 68 (Bankr. S.D.N.Y. 2007) ("Courts in this district, and elsewhere, regularly apply the standards set forth in the Fifth Circuit's decision in Mobile Steel.").

34.    The Committee fails to satisfy this requirement.  Conclusory allegations that the Nova Scotia Noteholders engaged in certain "inequitable, unconscionable and outrageous" conduct without more are not sufficient to satisfy the heightened pleading requirements.  The only specific allegation of inequitable conduct alleged in the Committee's Objection is based on the alleged undisclosed transfer of the Swap Liability claim by MLC to New GM.  However, the transfer of the Swap Liability claim from MLC to New GM was made pursuant to the MPA, an agreement to which the Nova Scotia Noteholders are not a party (and approved by the Court at the request of the Debtors with the support of the Committee).  Moreover, the Committee fails to allege any facts to support the contention that the entry into the Lock-Up Agreement caused injury to MLC or to other creditors.

35.    With respect to the Committee's assertion that the Nova Scotia Guaranty Claims are duplicative of the Wind-Up Claim, it is settled law that two creditors may assert separate claims arising from the same set of facts.  As long as the Nova Scotia Noteholders do not receive more than payment in full on account of the Nova Scotia Notes, both the Nova Scotia Guaranty Claims and the Wind-Up Claim should be allowed in full.  *See Northwestern Mut. Life Ins. Co. v. Delta Air Lines, Inc. (In re Delta Air Lines, Inc.)*, 608 F.3d 139 (2d Cir. 2010) (holding that the claims of two creditors related to the same underlying facts were not duplicative because the claims arose pursuant to separate legal obligations and total recovery would not exceed 100%).

The Nova Scotia Guaranty Claims arise from MLC's guaranty of GM Nova Scotia's obligations under the Nova Scotia Notes. That guaranty obligation runs to the holders of the Nova Scotia Notes and has never been challenged by any party. The Wind-Up Claim arises from Section 135 of the Companies Act under Nova Scotia law that requires members of an unlimited company to satisfy all debts of the unlimited company that is being wound up. Here, because GM Nova Scotia is an unlimited company that is being wound up and MLC is the sole member of GM Nova Scotia, MLC is legally required to satisfy all debts of GM Nova Scotia. The Wind-Up Claim is an asset of GM Nova Scotia and is comprised of all of its debts and liabilities, not only its obligations to the holders of the Nova Scotia Notes. The Nova Scotia Guaranty Claims and the Wind-Up Claims are separate and distinct claims of different parties in differing amounts arising on account of different legal bases. There is no merit to the contention that the two Claims are duplicative.

36.    It is egregious that the Debtors, counterparties to the Lock-Up Agreement, and represented by the same attorneys who negotiated the Lock-Up Agreement on their behalf, are seeking to deprive the Nova Scotia Noteholders and the Nova Scotia Trustee of their entitlement to initial distributions under the Plan. After their estates reaped the considerable benefits of the Lock-Up Agreement, the Debtors are proposing a Plan diametrically inconsistent with the terms of the Lock-Up Agreement that MLC assumed and pursuant to which it covenanted "not [to] take any action inconsistent with" these terms. The Debtors' position is also inconsistent with the Debtors' prior representations to the Court that assumption of certain executory contracts – including the Lock-Up Agreement – was in the best interests of the Debtors' estates. (Notably, under the terms of the Master Purchase Agreement, New GM determined that the Lock-Up

Agreement would be assumed and assigned; the Lock-Up Agreement did not require its assumption or assignment.).

37.    Accordingly, the Court should order that the Plan be revised to provide that distributions shall be made with respect to the Nova Scotia Guaranty Claims and the Wind-Up Claim unless and until the Claims are disallowed.  Alternatively, the Court should order that the Plan be revised so that distributions are made on account of the undisputed portion of the Nova Scotia Guaranty Claims and the Wind-Up Claim.  Assuming, arguendo, that the Committee's arguments all have merit so that the Wind-Up Claim should be disallowed as duplicative and the Nova Scotia Guaranty Claims should be reduced by the Consent Fee, the Nova Scotia Noteholders would still be entitled to an allowed general unsecured claim in the aggregate amount equal to the aggregate Nova Scotia Guaranty Claims less the Consent Fee,[6] and the Nova Scotia Trustee would still be entitled to an allowed general unsecured claim in the amount of the Wind-Up Claim less the portion of the Wind-Up Claim related to the Nova Scotia Notes.  Other than providing leverage to the Committee, there is no rational basis to withhold distributions on the undisputed portion of the Claims.  Providing in the Plan for distributions on account of the undisputed portions of the Claims is particularly appropriate in this case, where the distributions are in the form of marketable securities that holders of disputed claims cannot trade, potentially resulting in significant loss of value depending on the vagaries of the market and the performance of New GM.

---

[6] At the pre-trial conference on December 15, 2010, counsel for the Committee represented that the Committee is *not* seeking to recover the Consent Fee, but simply to reduce the Claims by the amount of the Consent Fee.  *See* Hr'g Tr., 47:17-24, Dec. 15, 2010 (relevant portion attached as **Exhibit "I"**) (THE COURT:  is the creditors' committee's position that they want to recover 360,000 dollars worth of – 360 million dollars worth of cash, or rather simply that they want to get – have the estate get credit for the 360 million dollars that was laid out as part of that consent fee?
MR. FISHER:  It's the latter, Your Honor.)

38.    Providing for distributions on account of undisputed portions of disputed claims is consistent with many chapter 11 plans confirmed by this Court and others.  *See e.g., In re Dana Corp.*, 06-10354 (BRL) Docket No. 6671 (Bankr. S.D.N.Y. October 23, 2007);  *In re Silicon Graphics, Inc.*, 06-10977 (BRL) Docket No. 409 (Bankr. S.D.N.Y. September 15, 2006); *In re Loral Space & Comms.*, 03-41710 (RDD) Docket No. 2075 (Bankr. S.D.N.Y. June 3, 2005).  In addition, in cases involving objections alleging that Section 135 claims are duplicative of guaranty claims, Delaware bankruptcy courts confirmed chapter 11 plans that provided for full distributions to the holders of the guaranty claims, pending adjudication of the objections.  *See, In re Smurfit-Stone Container Corp.*, Case No. 09-10235 (BLS), Docket No. 8107 (Bankr. D. Del. June 21, 2010); *In re AbitibiBowater Inc.*, Case No. 09-11296 (KJC), Docket No. 3940 (Bankr. D. Del. November 23, 2010).[7]  The Plan here should provide no less.

B.    The Plan Should Provide for a Segregated Reserve

39.    Sections 4.3(g) and 7.2 of the Plan and Section 1.1(jj)(A) of the GUC Trust Agreement provide for a maximum claims amount of $2.69 billion (the "**Nova Scotia Maximum Claims Amount**") in the aggregate for the Nova Scotia Guaranty Claims and the Wind-Up Claim.  Pursuant to Section 7.2(g) of the Plan, when a distribution is made, the GUC Trust Administrator[8] shall withhold from the property to be distributed the portion of such property allocable to Disputed General Unsecured Claims including the Nova Scotia Maximum Claims Amount (the "**Withheld Distributions**").  However, the Plan fails to provide for a segregated reserve to hold the Withheld Distributions; rather it provides that the Withheld Distributions remain in the GUC Trust.  In addition, Section 6.2(f) of the Plan and Section 8.1 of the GUC

---

[7] The provisions of the confirmation orders relating to partial distributions cited in this paragraph were not disputed.

[8] Capitalized terms used herein that are not otherwise defined shall have the meanings ascribed to them in the Plan and the GUC Trust Agreement.

Trust Agreement authorize the GUC Trust Administrator to sell GUC Trust Assets, which would include Withheld Distributions.

40.    The absence of a segregated reserve presents a risk that when a disputed general unsecured claim becomes an allowed general unsecured claim, there will be insufficient property in the GUC Trust to provide for the distribution to which such allowed claim is entitled under the Plan.  Indeed, the Debtors recognize the possibility that distributable assets will be exhausted before disputed claims are resolved.  However, rather than fixing the problem by providing for a segregated reserve, Section 5.3(b) of the GUC Trust Agreement provides that if, on a Distribution Date, there are insufficient distributable assets to satisfy disputed claims that have been resolved, then after distributing pro rata all remaining distributable assets to satisfy resolved disputed claims, any remaining portion of the resolved disputed claims, together with all remaining disputed claims shall be discharged.  This is clearly impermissible disparate treatment.  Holders of disputed general unsecured claims are entitled to certainty that their claims, if and when allowed, will receive the distributions promised under the Plan, just like holders of general unsecured claims that are undisputed on the effective date of the Plan.

41.    Section 1123(a)(4) of the Bankruptcy Code provides that "a plan shall . . . provide the same treatment for each claim or interest of a particular class . . . ."  Section 1123(a)(4) is in furtherance of the important policy of equality of distribution of similarly situated claims.  *See In re Combustion Eng'g, Inc.*, 391 F.3d 190, 239 (3rd Cir. 2004) ("The Bankruptcy Code furthers the policy of equality of distribution among creditors by requiring that a plan of reorganization provide similar treatment to similarly situated claims.") (internal quotations omitted).

42.    If a plan fails to provide equal treatment to all claims in a class, the plan violates section 1123(a)(4) and cannot be confirmed.  *See, e.g., In re Weiss-Wolf, Inc.*, 59 B.R. 653, 655

(Bankr. S.D.N.Y. 1986) (holding that disparate treatment is not justified on the grounds that a claimant's claim is disputed by the debtor); *In re Machne Menachem Inc.*, 233 Fed. Appx. 119, 122 (3d Cir. 2007) (upholding district court finding that debtors violated section 1123(a)(4) where plan provided for full payment to all creditors in a given class but two of the four claims in such class were paid in less than full); *Computer Task Group, Inc. v. Brotby (In re Brotby)*, 303 B.R. 177, 186 (B.A.P. 9th Cir. 2003) (plan violated section 1123(a)(4) because of deferred payment to one creditor in class); *In re Weiss-Wolf, Inc.*, 59 B.R. 653, 655 (Bankr. S.D.N.Y. 1986) ("The plan must treat claims in the same class alike, just as like claims must be classified together"); *In re Journal Register Co.*, 407 B.R. 520, 532 (Bankr. S.D.N.Y. 2009) (stating that section 1123(a)(4) "advances the policy of equality of distribution of estate property in bankruptcy law").

43.    Courts in this and other jurisdictions have required debtors to establish sufficient reserves to allow creditors full pro-rata recovery on their claims in order for a plan to be confirmable. *See, e.g., Plan Comm. of Northwestern Corp. v. Northwestern Corp. (In re Northwestern Corp.)*, 362 B.R. 131, 134-35 (D. Del. 2007) (remanding matter to bankruptcy court to determine whether claims reserve contained sufficient assets to allow creditors to recover fully on their claims and ensure equal treatment for similarly situated creditors); *In re Linens Holding Co.*, No. 08-10832, 2009 WL 2163235, at *9 (Bankr. D. Del. June 12, 2009) (confirming plan requiring establishment of disputed claims reserve that contained sufficient assets to pay the full asserted amount of each disputed claim, should such claim eventually become allowed); *In re ASARCO L.L.C.*, 420 B.R. 314, 391 (S.D. Tex. 2009) (approving plan that required debtor to establish disputed claims reserve with assets sufficient to pay disputed claims in full as if they had been allowed as of the effective date of the plan); *In re Charis Hosp.,*

20

*L.L.C.*, 360 B.R. 190, 200-01 (Bankr. M.D. La. 2007) (forcing chapter 11 liquidator to disgorge fees and refusing to approve attorneys' fees where, inter alia, the liquidator failed to establish a disputed claims reserve for administrative priority claims such that similarly situated creditors would not receive payment should such claims eventually become allowed); *In re Weiss-Wolf, Inc.*, 59 B.R. 653, 655 (Bankr. S.D.N.Y. 1986) (holding that "a debtor must make provision for payment of disputed claims so that if and when allowed the claims have reasonable assurance that they will receive identical treatment"); *In re Northeast Dairy Cooperative Federation, Inc.*, 73 B.R. 239, 244 (Bankr. N.D.N.Y. 1987) (confirming plan based in part on reserves for disputed claims in the amounts that would be paid if such claims were allowed).

44.    Accordingly, the Plan should be modified to (i) provide for a segregated reserve on account of the Nova Scotia Maximum Claims Amount and (ii) prohibit the GUC Trust Administrator from selling assets in the segregated reserve without the consent of the holders of the Claims.  Absent these modifications, the Plan cannot be confirmed because it violates section 1123(a)(4) of the Bankruptcy Code.

C.    The Claims Should Not be Subject to the Plan's Estimation Provisions

45.    Section 7.3 of the Plan and Section 5.1(e) of the GUC Trust Agreement provide that MLC or the GUC Trust Administrator may at any time request that the Bankruptcy Court estimate, for purpose of distribution (or as a cap), a Disputed Claim, including those claims where there is a prior objection, irrespective of whether the Bankruptcy Court has ruled on such objection, including during the pendency of an appeal.  Section 4.3(g) provides that the Maximum Nova Scotia Claims Amount of $2.69 billion may be reduced by order of the Bankruptcy Court.

46.    Section 502(c) of the Bankruptcy Code provides a mechanism for estimating the amount of a contingent or unliquidated claim for the purpose of allowance when the fixing or

liquidation of such a claim would cause an undue delay in the administration of the bankruptcy estate.

47.     As a threshold matter, a claim must be contingent or unliquidated to be the subject of estimation under section 502(c) of the Bankruptcy Code.   Generally, a claim is considered liquidated if the claim is capable of being determined by reference to an agreement or simple computation.   *In re Mazzeo*, 131 F.3d 295, 304 (2d Cir. 1997).   Moreover, "[a] claim plainly is liquidated if its amount is made certain 'by operation of law.'"   *Id.* (quoting U.S. v. Verdunn, 89 F.3d 799, 802 (9th Cir. 1987)).   While courts have disagreed on the issue, the *Mazzeo* court plainly stated that an otherwise liquidated claim does not become unliquidated merely because it is disputed.   *Id.* ("The Code uses both 'unliquidated' and 'disputed' in its definition of 'claim'; to rule that a claim (and thence the debt with which it is coextensive) is unliquidated whenever it is disputed would render the term 'unliquidated' mere surplusage").   Here, the Claims are liquidated; accordingly, they are not subject to estimation under section 502(c).

48.     Moreover, estimation is not appropriate here because litigation of the Claims Objection will not unduly delay the administration of the Debtors' chapter 11 cases.   As this Court observed, "[e]stimation, authorized under section 502(c) of the Bankruptcy Code, provides a means for a bankruptcy court to achieve reorganization, and/or distributions on claims, without awaiting the results of legal proceedings that could take a very long time to determine."   *In re Adelphia Bus. Solutions, Inc.*, 341 B.R. 415, 422 (Bankr. S.D.N.Y. 2003).   Estimation enables chapter 11 cases to move forward and proceed with distributions where otherwise there would be undue delays as a consequence of litigating claims.   *Id.* at 423.   However, even where section 502(c) estimation is permissible, "it raises risks of the denial of due process, and Bankruptcy Courts need to be sensitive to this concern."   *Id.*   Here, confirmation of the Plan is not dependent

on the resolution of the Claims and distributions to unsecured creditors would not be altered by the allowance or disallowance of the Claims. The Debtors are able to fully reserve for the Claims which, when combined, account for less than 7.8% of the claims in Class 3 as estimated by the Debtors. *See* Disclosure Statement for the Debtors' Amended Joint Chapter 11 Plan [Docket No. 8023] at pp. 6, 57, and 65. The Claims Objection is being adjudicated by this Court. The Debtors cannot satisfy the requirements of section 502(c) and the Debtors and the Committee are not entitled to deny the Nova Scotia Noteholders due process simply because they are dissatisfied with adjudication of the Claims Objection or the progress of any appeal. Accordingly, the Plan should not be confirmed unless its provisions (including Plan Sections 4.3(g) and 7.3, and Section 5.1(e) of the GUC Trust Agreement) to provide that the Debtors may not seek to estimate the Claims or reduce the Maximum Nova Scotia Claims Amount.

D.    Distributions on the Claims Should Not be Withheld Pending Surrender of the Nova Scotia Notes

49.    Section 5.10 of the Plan provides that, (i) on the Effective Date of the Plan, holders of bond claims, except for holders of Guarantee Claims, shall surrender their debt instruments to the applicable Indenture Trustee or Fiscal and Paying Agent and (ii) no distributions under the Plan shall be for or on behalf of such holder until the securities are received by the applicable Indenture Trustee or Fiscal and Paying Agent. In response to concerns raised by the Objecting Parties that Nova Scotia Noteholders need to retain their debt securities to assert their direct claims against GM Nova Scotia under the Nova Scotia Notes, the Debtors included the following carve-out un Section 5.10:

> Notwithstanding the foregoing, holders of Nova Scotia Guarantee Claims shall not be required to surrender their debt securities to the applicable Fiscal and Paying Agent or provide instructions to the Depository and shall be entitled to retain their debt securities solely for the purpose of asserting their

direct claims, if any, against GM Nova Scotia under the applicable Fiscal and Paying Agency Agreement.

50.    Although the carve-out permits the Nova Scotia Noteholders to retain their debt securities for the purpose of asserting their direct claims against GM Nova Scotia, Section 5.10 is unclear as to whether distributions will be made to the Nova Scotia Noteholders pending their surrender of their debt securities.  The carve-out should be modified to clarify that distributions on the Claims under the Plan shall be made notwithstanding the retention by the Nova Scotia Noteholders of the Nova Scotia debt securities for the purpose of asserting their direct claims against GM Nova Scotia.

E.    The Nova Scotia Fiscal Paying and Agency Agreement Should not be Cancelled

51.    Section 6.7 of the Plan provides that on the Effective Date (except for purposes of evidencing claims) all Indentures and Fiscal and Paying Agency Agreements are cancelled and discharged.  GM Nova Scotia is in a Canadian BIA proceeding and is not a Debtor in these chapter 11 cases.  Accordingly, this Court does not have jurisdiction to cancel the Nova Scotia Fiscal and Paying Agreement.  Moreover, the discharge of the Nova Scotia Guarantee Claims provided in the Plan is sufficient for the Debtors' purposes.

52.    In addition, Section 6.10 of the Plan provides for the dissolution of the Debtors' subsidiaries, including GM Nova Scotia.  As GM Nova Scotia is in a Canadian BIA proceeding and is not a Debtor in these chapter 11 cases, the Court does not have jurisdiction to order the dissolution of GM Nova Scotia.

F.    The General Unsecured Creditor Trust May Not be Substantively Altered Following Confirmation of the Plan

53.    The GUC Trust Agreement is defined in Section 1.84 to the Plan as "that certain GUC Trust Agreement executed by the Debtors and the GUC Trust Administrator, *substantially in the form* annexed hereto as Exhibit 'D'." (emphasis added).  However, Section 6.2(a) of the

24

Plan provides that, on or before the Effective Date of the Plan, the GUC Trust Agreement shall be executed, "*in a form acceptable* to the Debtors, the Creditors' Committee, the U.S. Treasury, as a DIP Lender, and the GUC Trust Administrator." (emphasis added).

54.    Section 6.2(a) of the Plan should be revised in a manner consistent with Section 1.84 to clarify that no substantive changes will be made to Plan Exhibit D.  A chapter 11 plan may not be substantively altered following confirmation and substantial consummation. *See Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.)*, 416 F.3d 136, 144 (2d Cir. 2005) (when a plan of reorganization has been substantially consummated, an appeal of the Confirmation Order is presumed moot); *Aetna Casualty & Surety Co. v. LTV Steel Co., Inc. (In re Chateaugay Corp.)*, 94 F.3d 772, 776 (2d Cir. 1996) ("Reviewing courts presume that it will be inequitable or impractical to grant relief after substantial consummation of a plan of reorganization."). This doctrine "advances the policy of affording finality to the orders and judgments of the bankruptcy court." *Lawrence v. Revere Copper & Brass Inc. (In re Revere Copper & Brass Inc.)*, 78 B.R. 17, 21 (S.D.N.Y. 1987).

55.    "Section 1127(b) [of the Bankruptcy Code] provides the sole means for modifying a confirmed plan."  *In re Rickel & Assocs., Inc.*, 260 B.R. 673, 677 (Bankr. S.D.N.Y. 2001) (citation omitted).  Section 1127(b) provides in relevant part:

> (b) The proponent of a plan or the reorganized debtor may modify such plan at any time after confirmation of such plan and before substantial consummation of such plan, but may not modify such plan so that such plan as modified fails to meet the requirements of sections 1122 and 1123 of this title.  Such plan as modified . . . becomes the plan only if circumstances warrant such modification and the court, after notice and a hearing, confirms such plan as modified, under section 1129 of this title.

11 U.S.C. § 1127(b).

56.     In order to modify a confirmed plan under section 1127(b), the proponent of the plan must be able to demonstrate, among other things, that circumstances warrant such modification. *In re Best Prods. Co.*, 177 B.R. 791, 802 (S.D.N.Y. 1995).  In addition, in order for the post-confirmation modified plan to become the plan, such modified plan must be confirmed by the court under section 1129 of the Bankruptcy Code after notice and a hearing.  11 U.S.C. § 1127(b).  "Only after notice and an opportunity to be heard may the Bankruptcy Court alter the legal relationships among the debtor and its creditors and other parties in interest."  *In re Ionosphere Clubs, Inc.*, 208 B.R. 812, 816 (S.D.N.Y. 1997) ("Permitting [the movant] to modify a provision that explicitly was incorporated into a reorganization plan . . . would permit circumvention of the bankruptcy process.").

57.     To allow the Debtors and other parties listed above carte blanche to modify the GUC Trust Agreement following confirmation of the Plan is impermissible and internally inconsistent within the Plan.  Accordingly, the Court should order that the Debtors modify Section 6.2(a) of the Plan to clarify that the executed version of the GUC Trust Agreement shall not vary materially from of Plan Exhibit D.

G.     The Unit Issuance Ratio Should be Provided Prior to Confirmation of the Plan

58.     Under Section 3.3(a) of the GUC Trust Agreement, holders of Allowed General Unsecured Claims receive a distribution consisting of (i) GUC Trust Distributable Assets in proportion to the amount of Allowed General Unsecured Claim; and (ii) Units of beneficial interest in the GUC Trust equal to the product of (x) the amount of the Allowed General Unsecured Claim multiplied by (y) the Unit Issuance Ratio of one Unit for each undisclosed dollar amount of Allowed General Unsecured Claims.  However, the Debtors do not specify the value of the Unit Issuance Ratio in the GUC Trust Agreement, the Plan, or the Disclosure Statement.

26

59.     Until such time as the Debtors provide the value of the Unit Issuance ratio and parties in interest are given a reasonable period of time to object, the Plan should not be confirmed.

H.     **The GUC Trust Administrator Must Act in Accordance With the Terms of the GUC Trust Agreement**

60.     Section 5.9 of the GUC Trust Agreement permits the GUC Trust Administrator to make a distribution in a manner that is not in technical compliance with the distribution provisions of the GUC Trust Agreement where such variance is necessary to carry out the intent of the Plan.    Neither the Disclosure Statement nor the GUC Trust Agreement provides an explanation for this provision or what it is intended to accomplish.    Accordingly, absent the deletion of Section 5.9 of the GUC Trust Agreement, the Court should not confirm the Plan.

## IV.    **CONCLUSION**

61.    For the foregoing reasons, the Objecting Parties respectfully request the Court

deny confirmation of the Plan unless amended as requested herein, and grant the Objecting

Parties such further relief as is just and proper.

Dated: New York, New York
February 11, 2011

GREENBERG TRAURIG, LLP

By: /s/ Gary D. Ticoll_____
    Bruce R. Zirinsky, Esq.
    Nancy A. Mitchell, Esq.
    John H. Bae, Esq.
    Gary D. Ticoll, Esq.
    200 Park Avenue
    New York, New York 10166
    Telephone: (212) 801-9200
    Facsimile: (212) 801-6400
    Email:    zirinskyb@gtlaw.com
          mitchelln@gtlaw.com
          baej@gtlaw.com
          ticollg@gtlaw.com

    Counsel for Appaloosa Management L.P., Aurelius
    Capital Management, LP, Elliott Management
    Corporation, and Fortress Investment Group LLC