Hearing Date and Time: March 3, 2011 at 9:45 a.m. (ET)
Response Deadline: February 11, 2011 at 4:00 p.m. (ET)

Kevin C. Murphy
The Wladis Law Firm, P.C.
P.O. Box 245
Syracuse, NY 13214
Telephone: (315) 445-1700

-and-

Luis A. Mendez
Senior Assistant County Attorney
Department of Law
Onondaga County, New York
John H. Mulroy Civic Center, 19th Floor
421 Montgomery Street
Syracuse, New York 13202
Telephone: (315)435-2170

Attorneys for Onondaga County, New York

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

| | |
|---|---|
| **In re** | |
| | **Chapter 11** |
| **MOTORS LIQUIDATION COMPANY, *et al.*,** | |
| **f/k/a General Motors Corp., *et al.*,** | **Case No. 09-50026 (REG)** |
| **Debtors.** | **Jointly Administered** |

---

## OBJECTION OF ONONDAGA COUNTY, NEW YORK
## TO THE DEBTORS' AMENDED CHAPTER 11 PLAN

# TABLE OF CONTENTS

I.    BACKGROUND........................................................................1

II.   OBJECTIONS TO THE PLAN..................................................3

      A. The Proposed Plan is not Feasible.......................................3

           1. The Plan is Dependent on Conditional Settlement....................3

           2. The Environmental Property Claims.........................................4

                i.  Environmental Trust Properties......................................5

                ii. Priority Order Sites.........................................................7

           3. Status of the Environmental Property Claims Settlements........8

           4. The Plan is both Conditional and Internally Inconsistent........10

      B. The Plan is Affected by Legal Error.....................................12

           1. As a Non-Settling  Party the Environmental Response Trust is
              Not Entitled to CERCLA Contribution Protection.....................12

           2. The Term "Covered Matters" is too broadly Defined................15

                i.  The County's Objection to the Proposed Environmental
                    Response Trust Settlement...........................................15

                ii. Miscellaneous Paragraph Issues Related to Contribution
                    Protection and "Covered
                    Matters"....................................................................17

                iii. Additional Concerns....................................................18

           3. Paragraph 90 of the Proposed Settlement Agreement is of no
              Legal Affect..........................................................................19

      C. The Proposed Environmental Property Claims Settlements and thus
         the Plan are Discriminatory, Unfair and Inequitable........................20

           1. The Plan Discriminate Against Similar Claim Types................21

i

2. Environmental Claimants were Discriminated Against and
Treated Unfairly in the Settlement Negotiation Process ...........25

D. Bankruptcy Court Jurisdiction Over Certain Environmental Matters
Should Be Limited ..........................................................................27

E. The ADR Procedures Should Not Be Imposed on the County ............29

III.   CONCLUSION ......................................................................................29

The County of Onondaga, State of New York (the "County" or "Onondaga County"), by and through its undersigned counsel, submits this Objection to the Amended Chapter 11 Plan proposed by Motors Liquidation Company, f/k/a General Motors Corp. (the "Plan"), and respectfully states as follows:

1.      As set forth in more detail below, the Plan is conditioned on events that have yet to occur and may never occur. As such, the Plan is not feasible and cannot be approved.

2.      In addition, the Plan should be rejected as it is neither fair nor equitable and it is affected by legal error in that it attempts to improperly resolve the liability and future obligations of a non-debtor while at the same time improperly and without legal authority divesting creditors and future creditors of potential post-petition claims.

## I. **BACKGROUND**

3.      On or about June 1, 2009 the Debtors filed Voluntary Petitions for Relief under Chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").

4.      Onondaga County timely filed a three-pronged proof of claim for reimbursement and/or the payment of funds resulting from environmental contamination of various Debtor-owned or Debtor-contaminated sites located in Onondaga County, New York premised on the Debtors' liability under federal

and state statutory law and/or purchase/sale and indemnification agreements entered into by the County and the Debtors.

5.      Specifically, the County claims concern (a) the so-called PCB Dredge Spoil Site that is owned by the Debtor and contaminated with PCBs discharged from the Debtor's environmentally impacted Inland Fisher Guide (IFG) facility located in the Town of Salina and adjacent to Ley Creek; (b) IFG PCB contamination in Ley Creek, adjacent to or downstream of the former IFG facility and extending to the mouth of the Creek where it discharges into Onondaga Lake, and (c) the contamination of Onondaga Lake, including the PCB contamination of Onondaga Lake sediments.

6.      In February, 2009 the County (and others) objected to the inclusion of environmental claims as part of the ADR Procedures proposed by the Debtors and the subsequent ADR Order excluded environmental claims from the ADR process.

7.      By Order dated December 8, 2010, the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") approved the revised Disclosure Statement for the Debtors' Amended Joint Chapter 11 Plan (the "Plan"), directed that objections to the Plan be filed with the Bankruptcy Court no later than 4:00 p.m. on Friday, February 11, 2011 and scheduled a confirmation hearing on the Plan for 9:45 a.m. on March 3, 2011.

## II. OBJECTIONS TO THE PLAN

### A.  The Proposed Plan is not Feasible

#### 1.  The Plan is Dependent on Conditional Settlements

8.     At the time of Plan confirmation, the Plan's execution must be feasible. *See,* 11 U.S.C. § 1129(a)(11); *see, Tennessee Publishing Co. v. American National Bank,* 299 U.S. 18, 22, 57 S.Ct. 85, 87, 81 L.Ed. 13 (1936).

9.     "Feasibility, addressed under 1129(a)(11), is mandatory and must be determined at the confirmation hearing. A plan submitted on a conditional basis thwarts this legislative intent and therefore renders a plan infeasible. Where this occurs, plan confirmation must be denied". *In re Sis Corp.,* 120 B.R. 93, __ (N.D. Ohio 1990).

10.    Where a Plan is dependent on conditions being satisfied and whether those conditions will be met is entirely uncertain and the plan is open-ended and without a deadline for the requisite action to take place, such a plan does not satisfy the feasibility requirement. *See, In re Arn Ltd. Ltd. Partnership,* 140 B.R. 5 (D. D.C. 1992).

11.    The Plan proposes to satisfy all of the so-called Property Environmental Claims on the Plan Effective Date but, as detailed below, all of the Property Environmental Claims are intended to be resolved in the context of six separate settlement agreements and a separate consent decree and settlement agreement all between the Debtors and the United States (and/or various states and/or one tribe). Each of the proposed Settlement Agreements states that it is a condition precedent to the confirmation of the Plan.

12.    While executed, these agreements remain subject to public comment, the United States' review and response to those public comments, and a potential decision by the United States to withdraw from or withhold its consent to any of the various settlements. Only if the United States should decide it is appropriate to do so will it ask the Bankruptcy Court to approve any of those proposed settlement agreements.

13.    As of the date of this filing, the United States has not made any motion seeking the Court's approval of any of the proposed settlements and the United States may never do so.

14.    Given the obviously conditional nature of the Plan and the other inconsistencies and ambiguities detailed below with respect to the proposed settlement agreements the proposed Plan is not approvable.

## 2. **The Environmental Property Claims**

15.    "Environmental Property Claims" are identified under the Plan as Class 4 claims. The characterization is misleading, however, as the Class is comprised of two categories of environmentally impacted real property, namely: Environmental Trust Properties, defined as properties owned by the Debtor, and Priority Order Sites, of which there are six, none of which are owned by the Debtor.

16.    Regardless of the ownership status, the Plan provides for all such claims to be satisfied on the Plan Effective Date.

### i. **Environmental Trust Properties**

17.    Pursuant to the Plan, "Entry of the Confirmation Order shall constitute approval of the Environmental Response Trust Consent Decree and Settlement Agreement" and "on the Effective Date, the Environmental Response Trust (ERT) Agreement and the Environmental Response Trust Consent Decree and Settlement Agreement shall become effective and the Environmental Response Trust shall be established and funded." Plan at ¶6.4(a).

18.    Pursuant to the terms of the proposed ERT Settlement Agreement (Exhibit C to the Plan), "[t]he settlement reflected in this Settlement Agreement shall be subject to approval by the Bankruptcy Court pursuant to Bankruptcy Rule 9019" and "Debtors shall move promptly for court approval of this Settlement Agreement and shall exercise commercially reasonable efforts to obtain such approval."

19.    At odds with the Plan, the United States' October 20, 2010 Notice of Lodging of Proposed Environmental Response Trust Consent Decree and Settlement Agreement states "the United States Department of Justice will accept public comments on the proposed Settlement Agreement for a 30-day period. In addition, the United States understands that one or more of the states that are party to the proposed Settlement Agreement may accept public comments on the proposed Settlement Agreement. After the conclusion of the public comment period, the United States and the States will file with the Court any comments received, as well as responses to the comments, and at

that time, *if appropriate*, will request that the Court approve the proposed

Settlement Agreement" (emphasis added).

20.   The proposed ERT Settlement Agreement provides further detail

and explanation as follows:

### X. PUBLIC COMMENT

107. This Settlement Agreement will be subject to a public comment period following notice published in the Federal Register and notice under any applicable state law providing for public comment, which may take place concurrent with the judicial approval process under Paragraph 108 hereof. The *United States* and any State or Tribe receiving public comment *reserve the right to withdraw or withhold their consent* if the public comments regarding the Settlement Agreement disclose facts or considerations that indicate that this Settlement Agreement is inappropriate, improper, or inadequate. The Governments will promptly provide Debtors copies of any public comments received during the public comment period. At the conclusion of the public comment period, the United States and any State or Tribe taking public comment will provide the Bankruptcy Court with copies of any public comments and their response thereto. *If the United States or any State or Tribe taking public comment withdraws or withholds its consent to the Settlement Agreement prior to the Effective Date, this Settlement Agreement shall be void and have no further force and effect.* Any changes, revisions or amendments to the Settlement Agreement in response to public comment are subject to the approval of all Parties.

### XII. PLAN

109. The Debtors shall incorporate this Settlement Agreement into the Plan by reference and *approval of this Settlement Agreement shall be a condition precedent to confirmation of the Plan.* The Debtors shall not file a Plan or amend the Plan in a manner

inconsistent with the terms and provisions of this Settlement Agreement, take any other action in the Bankruptcy Cases that is inconsistent with the terms and provisions of this Settlement Agreement, or propose terms for any order confirming the Plan that are inconsistent with this Settlement Agreement. The Governments shall not oppose any term or provision of the Plan or an order confirming the Plan that is addressed by and is consistent with this Settlement Agreement. The Parties reserve all other rights or defenses that they may have with respect to the Plan. In the event of any inconsistency between the Plan, any order confirming the Plan, and this Settlement Agreement, the terms of this Settlement Agreement shall control.

(emphasis added).

### ii. **Priority Order Sites**

21.     The Plan defines "Priority Order Sites" as "the non-owned sites, as set forth on Exhibit "E" hereto, that are subject to an order requiring performance of an Environmental Action", which is defined as "any response, removal, investigation, sampling, remediation, reclamation, closure, post-closure, corrective action, engineering controls, institutional controls, deed restrictions, oversight costs and operation, monitoring and maintenance activities authorized or required under law with respect to a Property." Plan at ¶¶ 1.109 and 1.62.

22.     As with the proposed ERT Settlement Agreement, each of the proposed Priority Order Site Consent Decree and Settlement Agreements is defined as a "condition precedent to the confirmation of the Plan". The Priority Order Agreements are designated as Exhibit E to the Plan, but werer not distributed with the Plan. They are collectively attached hereto as "Exhibit A".

23.    Each of the proposed Priority Site Consent Decree and Settlement Agreements also provides for public comment, allows the United States to withdraw or withhold consent to any of the Agreements. *Id*.

24.    Similar to the proposed ERT Settlement Agreement, the Priority Sites Agreements require the Debtor to "move promptly for court approval" of the Agreements, but the United States Notice of Lodging and Federal Register Notices all indicate it is the obligation of the United States to request court approval, if appropriate. *Id*.

### 3. Status of the Environmental Property Claims Settlements

25.    The United States published notice of the proposed Environmental Trust Settlement Agreement in the Federal Register on October 25, 2010.

26.    Pursuant to the terms of the Federal Register Notice the public comment period expired on November 24, 2010.

27.    Onondaga County filed comments on the proposed settlement on November 24, 2010 and pursuant to section 7003 of RCRA, 42 U.S.C. § 6973, requested that a public hearing be held. A copy of the County's Comment is attached as "Exhibit B".

28.    The public comment period was, at least in part, subsequently extended through and a public hearing was held in Syracuse, New York on December 15, 2010.

29.    Onondaga County and multiple others, including other claimants, made and/or submitted comments at the public hearing. A copy of Onondaga County's Supplemental Comments is attached as "Exhibit C".

30.    Upon information and belief there were no further extensions of the public comment period and it closed on December 15, 2010.

31.    On December 14, 2010 the United States filed a separate and distinct Notice of Lodging of Proposed Settlement Agreement for each of the six Priority Order Sites.

32.    A Federal Register Notice for each proposed Priority Order Site settlement was published on December 20, 2010.

33.    The public comment period on each of the Priority Order Sites settlement agreements closed on January 19, 2011.

34.    On or about January, 19, 2011 Onondaga County submitted combined comments on the proposed Priority Order Sites settlements. A copy of the County's comments is attached as "Exhibit D".

35.    Upon information and belief, there were no extensions of the Priority Order Sites public comment period.

36.    To date, the United States has not filed with the Bankruptcy Court copies of the public comments concerning the proposed Environmental Response Trust or Priority Order Sites Settlement Agreements or the United States' responses to those comments.

37.    To date, the United States has not requested that the Bankruptcy Court approve either Environmental Response Trust or Priority Order Sites Settlement Agreements.

38.    To date, the Debtor has not requested that the Bankruptcy Court approve any of Environmental Response Trust or Priority Sites Settlement Agreements.

### 4. **The Plan is both Conditional and Internally Inconsistent**

39.    The United States is free to withdraw or withhold its consent from any of the proposed Environmental Property Trust settlements; it is under no obligation to request that the Bankruptcy Court approve any of the Environmental Trust or Priority Order Site settlements and there is no deadline by which the United States is required to make any such decision.

40.    The absence of any requirement to seek the Court's approval is plainly absent from each of the proposed settlement documents.

41.    Representatives of Onondaga County inquired of representatives of the United States on January 18, 2011 and February 4, 2011 if the United States intended to ask the court to approve the Environmental Trust settlement.

42.    On both occasions, representatives of the United States indicated (a) the United States is not subject to any filing deadline or date by which it must make a decision on how to proceed *vis-à-vis* the Environmental Trust settlement agreement; (b) the United States has not made a decision as to how it may proceed; and/or (c) the United States is engaged in on-going negotiations regarding at least one site/location. *See* "Exhibit E" attached hereto.

43.    "The above conditions precedent remove the certainty of plan

implementation required to be in place as of the time of a confirmation hearing

. . . in total disregard of the confirmation process. Such an approach renders

the Plan infeasible." *In re Sis Corp.*, 120 B.R. at 95.

44.    Given the above uncertainty, unless and until Court actually

approves the Environmental Trust and Priority Sites settlements, pursuant to

11 U.S.C. § 1129(a)(11) the Plan must be rejected as infeasible.[2]

45.    In addition to the infeasibility of the proposed Plan it is internally

inconsistent in that the Plan and the various proposed settlement documents

require both the Debtor and the United States to request the Bankruptcy

Court's approval of the various proposed environmental settlements.

46.    Onondaga County submits that given the requirements imposed on

the United States by section 122 of CERCLA, 42 U.S.C. 9622(d)(1)(A), it is the

United States, acting through the Attorney General, that must request that the

Court approve each of the settlements. *See, City of Bangor v. Citizens*

*Communications Company*, 532 F.3d 70, 90 (1st Cir. 2008).

47.    Lastly in this regard, the Plan proposes that if the Priority Order

Settlement Agreements are not approved that nothing in the Plan would not

preclude additional payments to the Environmental Response Trust and the

proposed Settlement Agreements indicate an ability to request Bankruptcy

---

[2] Onondaga County recognizes that at some point in time the United States may
move to have one or all of the subject settlement agreements approved by the
Court and may do so before the Confirmation Hearing Date. Onondaga County
reserves its right to object to any such motion(s) dependent, of course, on
exactly what motion(s) the United States files and the relief sought by such,
what public comments were made, what responses to those comments are
provided by the United States and what if any modifications are made to the
proposed settlement agreements, all issues that highlight the uncertainty and
conditional nature of the proposed Plan.

Court approval to deposit the proposed Priority Site Agreement monies to the ERT Cushion Account. That, however, is at odds with the language of each such proposed settlement, which states that each proposed settlement is, itself, a condition precedent to confirmation of the Plan. In addition, the rationale or bases for any such payment is never explained.

48.    The indentified ¶43 conflict further highlights both the ambiguity and inconsistency in the proposed settlement documents and the conditional nature of the settlements and distribution of the Debtors' assets to the benefit of one class of claims and the detriment of other classes.

**B. The Plan is Affected by Legal Error**

49.    The Environmental Property Claims settlements include among their provisions covenants not to sue; liability releases and the provision of contribution protection under the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), but the use of those provisions are affected by legal error.

**1. As a Non-Settling Party the Environmental Response Trust is Not Entitled to CERCLA Contribution Protection**

50.    Paragraph 105 of the proposed ERT Settlement Agreement states:

> The parties hereto agree, and by entering this Settlement Agreement the Bankruptcy Court finds, that this Settlement Agreement constitutes a judicially-approved settlement for purposes of Section 113(f)(2) of CERCLA, 42 U.S.C. § 9613(f)(2), and that the Debtors and the Environmental Response Trust and the Environmental Response Trust Protected Parties, as of the Effective Date, are entitled to protection from contribution actions or claims as

provided by Section 113(f)(2) of CERCLA, 42 U.S.C. §
9613(f)(2) or as may be otherwise provided by law, for
"matters addressed" in this Settlement Agreement. The
"matters addressed" in this Settlement Agreement are
<u>all costs of Environmental Actions incurred</u> or to be
incurred by the U.S. EPA, the States, or the Tribe or
<u>any other person or entity relating to or in connection
with the Properties,</u> including releases of Hazardous
Substances from any portion of the Properties, and all
areas affected by migration of such substances
emanating from the Properties; provided, however, that
the "matters addressed" in this Settlement Agreement
do not include (i) any matters reserved in Paragraph
100 of this Settlement Agreement; or (ii) any claims for
past costs asserted by potentially responsible parties
who are not parties to this Settlement Agreement.

(emphasis added).

51.    Paragraph 105 is problematic for two reasons: first is the proposed

inclusion of the Environmental Response Trust and the Environmental

Response Trust Parties (hereinafter collectively, the "Trust") as protected

parties and second, is the overly broad, overly inclusive and inaccurate

description of "matters addressed."

52.    In relevant part, section 113(f)(2) of CERCLA, 42 U.S.C. § 9613(f)(2)

states:

"A person who has resolved its liability to the United
States or a State in a . . . judicially approved
settlement shall not be liable for claims for
contribution regarding matters addressed in the
settlement."

53.    The proposed ERT Settlement Agreement properly proposes to

resolve the settling parties claims against the Debtors, but it does *not* and

*cannot* settle claims against the Trust because there are no such claims to be

settled.

54.    "The Environmental Response Trust is separate and distinct from the Debtors" (see, proposed ERT Settlement Agreement at ¶29), and as detailed in the Plan, the Trust does not exist and will not exist prior to the Plan Effective Date.

55.    At the same time, as discussed above, the Bankruptcy Court's approval of the proposed ERT Settlement Agreement and the liability at issue is, itself, a precondition to Plan confirmation. Thus, whatever liability is to be resolved by the proposed ERT Settlement Agreement will have been resolved prior to the establishment of the Environmental Response Trust or the appointment or designation of the Environmental Response Trust Parties.

56.    Even as of the Effective Date there will, however, be no basis for environmental liability or more correctly, the potential environmental liability of the Trust until such time that the Debtor's owned properties are, in fact, transferred to the Trust.

57.    Not yet in existence and thus, it being impossible to have any liability, it is not possible for the Trust to have resolved its liability to the United States or a State.

58.    Not having resolved their liability, there is no basis under the statute by which the proposed ERT Settlement Agreement can confer contribution protection to the Trust.

## 2. The Term "Covered Matters" is too Broadly Defined

59.    The second error issue with the proposed release is its scope. It proposes to release the Trust from any contribution liability for any future environmental harm caused or contributed to by the Trust or trustee.

60.    Specifically, the Trust is being insulated from having to contribute its equitable share of any post-Effective Date response, removal, investigation, sampling, remediation, reclamation, closure, post-closure, corrective action, engineering controls, institutional controls, deed restrictions, oversight costs and operation, monitoring and maintenance activities" "relating to or in connection with the Properties, including releases of Hazardous Substances from any portion of the Properties, and all areas affected by migration of such substances emanating from the Properties" even if the third-party costs are incurred as a result of the Trust and/or trustee being in violation of the law or a permit or is maintaining or causing a nuisance or environmental harm.

### i. The County's Objection to the Proposed Environmental Response Trust Settlement

61.    The suggestion is not hypothetical and in fact, is inextricably bound up in the terms and conditions of the proposed Environmental Response Trust settlement and the objections of Onondaga County to that settlement.

62.    To summarize the County's comments (Exhibits H and I) to the Department of Justice:

- For approximately 60 years General Motors has discharged PCBs to Ley Creek. As a result, the entire

four mile length of Ley Creek, and its environs, from the GM facility to Onondaga Lake is contaminated with PCBs.

- GM has been found responsible for the subject PCB contamination and for years has been recognized as the primary, if not sole, contributor of PCBs to Ley Creek by the United States Environmental Protection Agency and the New York State Department of Environmental Conservation.

- The available data indicates PCBs continue to be discharged from the subject property, including piped discharges in violation of existing permit limits. As with past discharges, the current discharges continue to flow downstream and contaminate the length of the Creek.

- In relevant part, CERCLA defines the term "facility" to mean "any site or area where a hazardous substance has been deposited, stored, disposed of, or placed or otherwise come to be located". 42 U.S.C. § 9601(9). Here the evidence is undisputed that PCBs were released (and continue to be released) into Ley Creek from the GM facility and those PCBs are thereafter transported the length of Ley Creek to its point of discharge into Onondaga Lake. Thus, by statutory definition, the Site is the entirety of Ley Creek including the current and historic portions located downstream of Route 11.

- Despite the above and in contravention of explicit Congressional directives to the contrary, the United States has proposed a settlement with the Debtor that requires the Debtor to provide funding for Environmental Actions that will address the first two miles of the contaminated Creek and its environs, but not the last two miles.

- Congress explicitly stated there would be no logic for any such decision and indeed, there is no factual, scientific or legal basis for arbitrarily drawing the "funding line" proposed by the United States.

- Contemporaneous with the pending bankruptcy the United States has requested that Onondaga County (and others) investigate and address the PCBs in the last two miles of the Creek so as to complete any required environmental action by 2014, when PCB and other contamination in Onondaga Lake is to be addressed.

16

- The potential cost based on the currently available data has been preliminarily estimated in the potential range of $50 million, plus or minus.

63.    Thus, as drafted, the Trust would be protected from contributing to the County's cost to address new or on-going post Effective Date releases of hazardous substances by the Trust via a spill or piped discharges, even if such conduct is a violation of the law or a permit or not the "actual" subject of the proposed ERT Settlement Agreement.

64.    There is simply no legal basis or authority for granting such a release to the Trust and trustee. In fact, the proposed ERT Settlement Agreement provides for the ability to remove the trustee if, for example, the proposed or required Environmental Action is not carried out. That is the very conduct the County is concerned with and which could harm the County's interests, yet as drafted, the Trust and trustee would have no obligation to contribute to the resulting cost.

65.    At a minimum, the phrase "including releases of Hazardous Substances from any portion of the Properties, and all areas affected by migration of such substances emanating from the Properties" should be stricken.

### ii. Miscellaneous Paragraph Issues Related to Contribution Protection and "Covered Matters"

66.    The definition of covered matters contains an exception that partially resolves the otherwise overbroad definition of covered matters, but also clearly defines the problem. Specifically, there is an exception for matters

reserved in Paragraph 100 of the proposed ERT Settlement Agreement, which

states in relevant part:

> The United States, the States, and the Tribe also specifically reserve all rights against Debtors with respect to: (ii) any general unsecured claim with respect to the release of Hazardous Substances into Lower Ley Creek, the Lake Bottom Subsite, or the Salina Landfill Subsite, which are part of the Onondaga Lake Superfund Site in Onondaga County, New York or the Old Ley Creek Channel in Onondaga County, New York. "Lower Ley Creek" for purposes of this Settlement Agreement shall mean the entire portion of Ley Creek which is downstream from the Route 11 Bridge.

67.    The reservation appears to solve one-quarter of the problem. It suggests the Trust and trustee would not have contribution protection with respect to existing claims for Lower Ley Creek, but by their absence it leaves in place the Trust's contribution protection for existing claims related to Upper Ley Creek and all future claims concerning Upper or Lower Ley Creek. All such claims should be excluded from the proposed contribution protection clause. Thus, the phrase "any general unsecured claim" should read "any claims"

### iii. **Additional Concerns**

68.    Paragraph 100 also states: "Debtors' future acts creating liability under CERCLA, RCRA or state law do not include continuing releases related to Debtors' conduct prior to the Effective Date." To be frank, it is not known what that sentence means or what it is intended to achieve. To the extent it is intended to affect the scope or magnitude of the contribution protection afforded any party its purpose should be explained.

69.    In addition to the above, the definition of Covered Matters is so broad that, to the extent the release is intended to address the potential liability of the Trust or trustee under, for example, the Resource Conservation and Recovery Act or the Clean Water Act or state environmental or common law, the County submits there is no basis in law for any such release from liability and any such interpretation must be rejected.

### 3. **Paragraph 90 of the Proposed Settlement Agreement is of no Legal Affect**

70.    Paragraph 90 of the Settlement Agreement appears to be an attempt to preempt potential claims by creditors, claimants and other third-parties against the United States, the States, the Tribe and the Debtors by stating as follows:

> Neither the United States, the States, the Tribe, nor any of the Debtors shall be deemed to be an owner, operator, trustee, partner, agent, shareholder, officer, or director of the Environmental Response Trust or the Environmental Response Trust Protected Parties, or to be an owner or operator of any of the Properties on account of this Settlement Agreement, the Trust Agreement, or actions contemplated by the Settlement Agreement and/or Trust Agreement.

71.    The Debtors are identified as owners of at least the owned properties. To suggest otherwise calls in to question the bases of the claims that are proposed to be settled by the Environmental Property Claims settlements and the very bases for the proposed transfer of the Debtors' monies and assets. If the Debtors are not liable under CERCLA as owners of the owned properties why are any assets being transferred to the Environmental Response

19

Trust? Absent liability, the monies should be available for transfer to the general unsecured creditors trust proposed by the Plan.

72.     As important, to the extent Paragraph 90 is an effort by the United States (or the other signatories) to preclude evidence of, for example, the funding provided to the Debtor by the United States pre- and post-petition; the acts and omissions by the United States both pre- and post-petition that evidence potential liability as an owner and/or an operator under CERCLA; the nature and content of the subsequent environmental negotiations and the selected use of monies provided by the United States that evidence potential liability as an owner and/or an operator under CERCLA; and the selection of sites or portions of sites to receive such funding and thereby forestall or preclude potential CERCLA (or any other) liability by the United States or any other signatory or to maximize the recovery of the United States and the several states it must be rejected as nothing more than a self serving statement otherwise having no factual or legal basis.

### C. The Proposed Environmental Property Claims Settlements and thus the Plan are Discriminatory, Unfair and Inequitable

73.     Although settlements are favored, the unique nature of the bankruptcy process means that courts must carefully examine settlements and determine that they are fair and equitable before approving them. *In re Nutritional Sourcing Corporation*, 398 B.R. 816, 832, 835 (D. Del. 2008) (Plan rejected where the claim definitions adversely impacted a class of creditors who were not at the negotiating table and were not adequately represented in their absence).

74.    "Under the 'fair and equitable' standard [the court must] look to the fairness of the settlement to other persons, i.e., the parties who did not settle." *In re Nutraquest*, 434 F.3d 639, 645 (3rd Cir. 2006).

75.    As summarized above at ¶62, and set forth in detail in attached "Exhibit B", "Exhibit C" and "Exhibit D", the proposed Environmental Property Claims settlements are rife with a series of interrelated deficiencies that result in proposed settlements that are is neither fair nor equitable.

76.    Accordingly, as currently constituted and without further explanation from the settling parties, if requested, the Bankruptcy Court should not approve any of the proposed Environmental Property Claims settlements.

77.    If the pending motion to confirm the Plan is treated by the Bankruptcy Court as a motion to approve the proposed Environmental Property Claims settlements, they should not be approved.

78.    The Plan For the reasons set for the in the attached public and otherwise preclude confirmation of the Plan.

### 1. **The Plan Discriminates Against Similar Claim Types**

79.    Despite the undisputed and irrefutable reality that GM contaminated the length of Ley Creek, the proposed ERT Settlement Agreement allocates monies to remediate only "the property extending from the facility property boundaries to the Route 11 Bridge."[3] No monies have been made

---

[3] To be frank, Onondaga County cannot decipher from the draft Settlement Agreement what precisely is meant by the ambiguous phrase "the property extending from the facility property boundaries to the Route 11 Bridge." It is not known if monies are, in fact, proposed to be

available to address Lower Ley Creek, which today is likely the more critical environmental concern.

80.    The decision to fund only a portion of the Ley Creek discharge is in conflict with both (1) the Government's public statements lauding the settlement (i.e., "This settlement holds accountable those responsible for contaminating certain properties and ensures they help transform those communities by supporting the necessary cleanup," Statement of Acting Deputy Attorney General Grindler; Department of Justice Press Release, October 20, 2010), and (2) the stated objective found in the text of the proposed Trust Agreement (i.e., "to conduct, manage and/or fund Environmental Actions with respect to the Properties or migration of Hazardous Substances emanating from certain of the Properties in accordance with the provisions of this Agreement"). (*See* proposed ERT Settlement Agreement, Article 2.3).

81.    It simply cannot be said that a decision to fund half a cleanup of the off-site GM-IFG Syracuse facility PCB contamination "holds accountable those responsible for contaminat[ion] by ensuring they engage in" the necessary cleanup and the proposed settlement will not address the necessary cleanup of property located downstream of the arbitrary Route 11 cutoff point.

82.    This circumstance is best explained by the Conference Report on the Hazardous and Solid Waste Amendments of 1984, 98 STAT. 3221 that was referenced above :

---

available to address in-Creek PCB contamination upstream of the Route 11 Bridge. That contamination has recently been confirmed and must be included among any Environmental Actions intended for this site.

SECTION 207-- CORRECTIVE ACTION BEYOND FACILITY BOUNDARIES; UNDERGROUND TANKS

**\*14** HOUSE BILL.-- THE HOUSE BILL DIRECTS THE ADMINISTRATOR TO AMEND THE STANDARDS UNDER SECTION 3004 TO REQUIRE THAT CORRECTIVE ACTION BE TAKEN BEYOND THE FACILITY BOUNDARY WHERE NECESSARY TO PROTECT HUMAN HEALTH AND THE ENVIRONMENT. SUCH REQUIREMENT WOULD NOT BE APPLICABLE WHERE THE OWNER OR OPERATOR OF THE FACILITY CONCERNED DEMONSTRATES TO THE SATISFACTION OF THE ADMINISTRATOR THAT, DESPITE THE BEST EFFORTS OF THE OWNER OR OPERATOR, PERMISSION TO UNDERTAKE SUCH ACTIONS COULD NOT BE OBTAINED.
SENATE AMENDMENT. -- THE SENATE AMENDMENT DOES NOT CONTAIN A SIMILAR PROVISION.
CONFERENCE SUBSTITUTE. -- THE CONFERENCE SUBSTITUTE ADOPTS THE HOUSE PROVISION. THIS PROVISION OVERTURNS A POLICY OF THE ENVIRONMENTAL PROTECTION AGENCY WHICH LIMITED THE SCOPE OF CORRECTIVE ACTION TO THE PROPERTY OF THE POLLUTING FACILITY. SINCE MOST FORMS OF POLLUTION, PARTICULARLY GROUNDWATER CONTAMINATION, DO NOT OBSERVE TERRITORIAL OR PROPERTY BOUNDARIES, _SUCH A RESTRICTION HAS NO BASIS IN LOGIC._ THE PROVISION THEREFORE REQUIRES EPA TO AMEND THE APPLICATION REGULATION TO ASSURE THAT CORRECTIVE ACTION BEYOND A FACILITY BOUNDARY WILL BE REQUIRED WHERE APPROPRIATE.

H.R. CONF. REP. 98-1133, H.R. Conf. Rep. No. 1133, 98TH Cong., 2nd Sess. 1984, 1984 U.S.C.C.A.N. 5649, 1984 WL 37531 (Leg. Hist.)(emphasis added).

83.    The result is that the Plan misclassifies claims, treats them in a disparate manner and discriminates against similar claims, as follows: it treats a portion of the EPA and State of New York claims related to Ley Creek (i.e., from the IFG facility to the Route 11 bridge) as a Class 4 Environmental

Property Claim that will be satisfied on the Effective Date, but treats the remainder of that claim (i.e., from the Route 11 bridge down to and including the Onondaga Lake Bottom subsite) as a Class 3 General Unsecured Claim.

84.    It does so without any stated basis in law or fact and in fact, contrary to both the law and facts.

85.    That disparity is further highlighted and repeated by the treatment afforded the Priority Order Sites, which as a group are no different than the EPA and State of New York claims for Ley Creek, Lower Ley Creek and Onondaga Lake.

86.    The Priority Order Sites are afforded Class 4 status and the EPA and State of New York claims for Ley Creek, Lower Ley Creek and Onondaga Lake are, as noted, afforded Class 3 unsecured status.

87.    The Plan (and the related settlement documents) provides no basis for the disparate treatment and classification of such claims.

88.    Absent an adequate explanation of that disparity, the Plan cannot be confirmed. *See e.g., In re Baseline-Dobson Center Real Estate Limited Partnership*, 193 B.R. 284 (D. Ariz. 1994); *In re ACandS, Inc.*, 33 B.R. 36 (D. Del. 2004)(Rejected plan with proposed asbestos trust where the court found similar claimants would not be compensated based on the nature of their injury, but on the cunning and influence of their lawyers).

89.    Moreover that dual disparity affects both all creditors and the ultimate distribution of the Debtors' assets.

## 2. **Environmental Claimants were Discriminated Against and Treated Unfairly in the Settlement Negotiation Process**

90.    The disparity of claim treatment described above was due in large part to those with environmental claims not being included in the environmental claims negotiations and not being adequately represented in those negotiations.

91.    The disparity and inequity is highlighted by the nature of the "Lower Ley Creek" claim, which, based on the data available, the County's consultant estimates could cost plus or minus $50,000,000, a sum equal to 10% of the Environmental Trust monies earmarked for the cleanup of all other 89 owned properties.

92.    Concurrent with this bankruptcy proceeding and refusing to acknowledge the impact of the GM bankruptcy at this site, EPA requested that Onondaga County (and others) undertake a remedial investigation and feasibility study of Lower Ley Creek.

93.    Despite the need for an expedited response after years of government inaction and multiple requests to participate in meaningful discussions with the Debtor and/or the United States, Onondaga County was never allowed to participate in any settlement discussions concerning Ley Creek, including discussions that are reportedly on-going.

94.    While cognizant of the on-going negotiations and despite having requested an opportunity to participate in such proceedings, Onondaga County and others were frozen out of all negotiations of environmental claims issues

between the Debtors and federal and state authorities, and specifically those related to Ley Creek and Onondaga Lake.

95.    In addition to being frozen out, the interests of Onondaga County and others similarly situated were not represented in those negotiations.

96.    Clearly, Onondaga County would not have agreed to the United States funding the Debtor and then agreed to the Debtor being allowed to use the same monies received from the United States to fund the United States' claims, but for only half of Ley Creek, while at the same time the United States pursues Onondaga County, apparently because of historic flood control actions necessary to protect taxpayer lives and property, for the full cost of correcting the Debtors' PCB contamination in Lower Ley Creek.

97.    The environmental settlements are all reported to represent a compromise of the amount claimed by EPA and in this case, the State of New York. Thus, Onondaga County does not understand that the funds from the Environmental Trust will fully pay for the required remedy at any of the covered sites, but the County understands and its complaint here is that whatever percentage of the compromised claims were agreed to for such sites, including the top portion of Ley Creek, the percentage for Lower Ley Creek is zero. Thus, the County is confronted with the specter of being required to fund a portion of "Upper Ley Creek" but all of Lower Ley Creek when the source of PCB contamination to both was the Debtor.

98.    The resulting layers of uncertainty and absent explanations also relates to the funding afforded the 89 ERT Properties and the Priority Order

Sites. The Plan and Disclosure Statement describe what appears to have been a detailed process to determine the potential costs of environmental remediation at the 89 ERT Properties, but there is no way of confirming or understanding if the process resulted in accurate cost estimates, to what extent those estimates were compromised as part of the settlement and whether each site was subject to the same compromise. The same information is totally lacking with respect to the Priority Order Sites.

99.    Thus, it is not possible to determine if the remediation cost estimates were reasonable, to what extent they were compromised, whether the claim at each site was compromised to the same degree, whether the ERT Properties and Priority Order Sites were all compromised to the same degree (i.e., treated the same way) and there is no explanation as to why those sites were treated one way and other similar sites (i.e., Lower Ley Creek) are classified as an unsecured claim.

## D. Bankruptcy Court Jurisdiction Over Certain Environmental Matters Should Be Limited

100.    Paragraph 11.1 of the Plan provides the Bankruptcy Court with "exclusive" jurisdiction of all matters arising under, arising out of, or related to the Chapter 11 Cases and the Plan after confirmation.  This language is simply too broad when dealing with environmental issues.  While the Bankruptcy Court retains jurisdiction over various matters related to the estate administration and Plan consummation, its post-confirmation jurisdiction should not be "exclusive."  As a result, "exclusive" should be deleted from Paragraph 11.1 of the Plan.

98.    The Plan also provides that the Debtors or the GUC Trust Administrator may at any time request that the Bankruptcy Court estimate any contingent, unliquidated or Disputed Claims pursuant to Section 502(c) of the Code, and the Bankruptcy Court shall retain  jurisdiction to estimate at any time during litigation  concerning any objection to Claim (Plan, Paragraph 7.3). It further states that:  "In any event that the Bankruptcy Court estimated any contingent, unliquidated or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or the maximum limitation on such claim as determined by the Bankruptcy Court."  These estimation provisions, however, do not apply to Property Environmental Claims that are resolved by the Environmental Response Trust or the Priority Order Sites (Plan Paragraph 1.114) and should similarly not apply to the state and local municipalities holding environmental claims. It should be clear that the Bankruptcy Court does not retain exclusive jurisdiction to determine the environmental claims of the state and tribal governments and municipalities and have that determination binding on those entities.  The Plan should therefore be amended to reflect: "The Bankruptcy Court's jurisdiction with respect to any environmental claims, including the estimation of any such claims of state and tribal governments and municipalities concerning environmental liabilities, should be concurrent with the jurisdiction of other courts of competent jurisdiction over such matters."

### E.    The ADR Procedures Should Not Be Imposed on the County

99.    The Plan provides that the GUC Trust Administrator will be responsible for the prosecution of objections to General Unsecured Claims.  It is unclear if the Debtors are attempting to have the ADR procedures imposed upon the County for the establishment of the amount of its claims.  The County previously objected to the ADR Procedures Motion and was specifically excluded from the ADR Procedures Order when it was entered. Therefore any Confirmation Order should adopt this ruling and preclude ADR Procedures from being utilized by the GUC Trust Administrator when seeking to establish or object to the claims of Onondaga County, New York.

### III. CONCLUSION

100.    The Plan does not comply with the statutory requirements of 11 U.S.C. § 1129 and should not be confirmed.

101.    To the extent any of the proposed Environmental Property Claims settlements are before the Court, for the reasons set forth above and in the attached comments that were previously provided to the United States, they should not be approved.

102.    Nothing contained herein should be considered a waiver by Onondaga County, which reserves its rights, to amend or supplement this Objection or otherwise object to any separate motion to approve any of the Environmental Property Claims settlements.

WHEREFORE, the County of Onondaga respectfully requests the Court

(i) denying confirmation of the Debtors' Amended Plan; and (ii) for such other

and further relief as this Court deems just and proper.


Dated: February 11, 2011
      Syracuse, New York

                    Attorneys for Claimant
                    Onondaga County, New York

                By: /s/Luis A. Mendez, Esq.
                    Luis A. Mendez
                    Senior Deputy County Attorney
                    John H. Mulroy Civic Center, 19th Floor
                    421 Montgomery Street
                    Syracuse, New York 13202
                    Telephone: (315)435-2170


                By: /s/Kevin C. Murphy, Esq.
                    Kevin C. Murphy
                    The Wladis Law Firm, P.C.
                    PO Box 245
                    Syracuse, NY 13214
                    Telephone: (315) 445-1700