# **EXHIBIT A**

**New York State Department of Environmental Conservation**
**Division of Environmental Enforcement**
**Onondaga Lake Unit**
**50 Wolf Road, Room 410A**
**Albany, New York 12233-5550**



John P. Cahill
Commissioner

**Telephone: (518) 457-7821**
**Fax: (518) 457-7819**

September 25, 1997

**VIA OVERNIGHT MAIL**

Barry R. Kogut, Esq.
Bond, Schoeneck & King, LLP
One Lincoln Center
Syracuse, New York 13202-1355

      Re:    General Motors Corporation
             Former IFG Facility (Site No. 7-34-057)
             RI/FS Order On Consent

Dear Mr. Kogut:

    For your files please find the enclosed executed Order on Consent regarding the Remedial Investigation/Feasibility Study ("RI/FS") for the above referenced site. Michael J. O'Toole, Jr., Director of the Division of Environmental Remediation, signed the Order for Commissioner Cahill on September 25, 1997.

    As we discussed, the final SPDES Permit for the GM facility was simultaneously executed on September 25, 1997 and has an expiration date of August 31, 2002. The SPDES Permit will be sent via regular mail to GM tomorrow, September 26, 1997.

    Please contact me if you have any questions regarding the implementation of this Order. Thank you for your cooperation in addressing this matter.

                  Sincerely,

                  Robert K. Davies
                  Enforcement Counsel

Enclosure

cc:    S. Benjamin (w/ encl.)



RECEIVED

SEP 26 1997

BUREAU OF CENTRAL
REMEDIAL ACTION

STATE OF NEW YORK:  DEPARTMENT OF ENVIRONMENTAL CONSERVATION

----------------------------------------------------------------------------

In the Matter of the
Development and Implementation
of a Remedial Investigation/Feasibility                    ORDER
Study for an Inactive Hazardous Waste                      ON
Disposal Site Under Article 27, Title 13,                  CONSENT
and Article 71, Title 27 of the                            INDEX # D-7-0001-97-06
Environmental Conservation Law
of the State of New York and
the Development of a State Pollutant
Discharge Elimination System Program
under Article 17 of the Environmental
Conservation Law of the State of
New York by

                    General Motors Corporation,
                         Respondent.

                                        Site Code # 734057

----------------------------------------------------------------------------

The New York State Department of Environmental Conservation (the "Department") and

the General Motors Corporation ("Respondent") hereby agree to the making and entry of this

Administrative Order on Consent ("Consent Order").


WHEREAS,

     1.     The Department is responsible for enforcement of Article 27, Title 13 of the

Environmental Conservation Law of the State of New York ("ECL"), entitled "Inactive Hazardous

Waste Disposal Sites," and is authorized to abate and prevent the pollution of New York State

waters caused by discharges pursuant to Article 17 of the ECL and Parts 702 and 703 of Title 6 of

the Official Compilation of Codes, Rules and Regulations of the State of New York.

                                        September 17, 1997

                                        MAINRIFS.ORD 9/17/97

2.    A. Pursuant to ECL 27-1313.3.a, whenever the Commissioner of Environmental Conservation (the "Commissioner") "finds that hazardous wastes at an inactive hazardous waste disposal site constitute a significant threat to the environment, he may order the owner of such site and/or any person responsible for the disposal of hazardous wastes at such site (i) to develop an inactive hazardous waste disposal site remedial program, subject to the approval of the department, at such site, and (ii) to implement such program within reasonable time limits specified in the order."

B. Any person under order pursuant to ECL § 27-1313.3.a. has a duty imposed by ECL Article 27, Title 13 to carry out the remedial program committed to under such order. ECL § 71-2705 provides that any person who fails to perform any duty imposed by ECL Article 27, Title 13 shall be liable for civil, administrative and/or criminal sanctions.

C. The Department also has the power, inter alia, to provide for the prevention and abatement of all water, land, and air pollution. ECL § 3-0301.1.i.

3.    General Motors Corporation ("GM") is a corporation organized and existing under the laws of the State of Delaware and is doing business in the State of New York. Respondent owns a facility, formerly operated by its Inland Fisher Guide division, in the Town of Salina, County of Onondaga, State of New York, which was used for manufacturing automobile parts until December of 1993 (the "facility"; formerly known as GM: Fisher Guide). The location of the facility is indicated on the map attached and hereby incorporated into this Consent Order as Exhibit A.

September 17, 1997

2

## SPDES Permitting Issues

4.    The Respondent's facility began operation in the 1950s and ceased manufacturing operations in December of 1993. During that time, Respondent's facility discharged process wastewater and storm water into Ley Creek. Testing of these waters on and around the facility has shown and storm water continues to show contamination by polychlorinated biphenyls ("PCBs") (Aroclors 1242 and 1248) and other hazardous substances. Testing of soils in and around the facility has shown contamination by PCBs (Aroclors 1242, 1248, 1254 and 1260).

5.    On August 12, 1985, Respondent executed a consent order (Case # 7-0383)(the "SPDES Consent Order") to address the discharge of many parameters from the facility, including two types of PCBs, Aroclor 1242 and Aroclor 1248. Pursuant to Exhibit B of the SPDES Consent Order, Respondent was to comply with set interim daily average discharge limitations. For PCBs, the limits were 2 micrograms per liter ("ug/1") for Aroclor 1242 and 4 ug/1 for Aroclor 1248. These discharge limitations continue to be the effective limits for Respondent.

6.    At the time the SPDES Consent Order was executed, Respondent's Outfall 001 (storm water runoff) and Outfall 002 (effluent from coal pile runoff, cooling water, storm water and process wastewater) had been combined at a point designated as Outfall 003 prior to discharge to Ley Creek.

7.    During implementation of the SPDES Consent Order, Respondent decided to discharge process wastewater to the Onondaga County (the "County") Metropolitan Treatment Plant ("POTW").

September 17, 1997

3

8.    Respondent obtained an Industrial Waste Discharge Permit from the County and the connection to the POTW occurred on December 1, 1986.

9.    Two outfalls (Outfalls 003 and 004) currently direct the discharge of storm water from the facility into Ley Creek. These outfalls are shown on the map attached as Exhibit A to this Consent Order.

10.    Outfall 003 was previously permitted for both process wastewater and storm water flow, but has subsequently been repiped to receive storm water flow only. Outfall 004 is an existing storm water outfall that was not previously permitted. It is the end point of a storm water pipeline owned and installed by the County within a County drainage easement running north across the facility. This outfall collects and discharges storm water from upgradient industrial and commercial areas as well as from Respondent's facility.

11.    On March 22, 1996, the Department issued a draft SPDES permit which would supersede the terms and conditions of the SPDES Consent Order. Respondent submitted comments on the draft permit under cover of its letter, dated June 28, 1996, and conducted additional wastewater sampling in August of 1996 with the intent to support its position that there is no technical justification for the proposed weekly monitoring for PCBs from outfalls 003 and 004.

12.    Under cover of its letter of October 29, 1996 to Brian Baker of the Department's Bureau of Water Permits, Respondent submitted the analytical results from the August 1996 round of sampling of Outfalls 003, 004, and 04I and the coal pile runoff. In addition to the foregoing, Respondent submitted copies of the quarterly monitoring reports for 1995 and 1996 that it

September 17, 1997

4

previously provided to the County under its POTW sewer use permit to show the quality of waters that would be discharged from Outfall 03B.

## RCRA Requirements

13.     There were two surface impoundments in use at the facility and they were located to the north of the manufacturing building as shown on the map attached as Exhibit A. Impoundment No. 1 was constructed in 1963 and received treated effluent from an onsite wastewater treatment system and storm water runoff from paved areas.  Impoundment No. 2, which was constructed in 1979, was designed to collect storm water runoff and capture free oil from the storm water runoff.

14.     In 1988, characterization of the sediment in the two surface impoundments indicated the presence of sludge deposits and oil containing greater than 50 parts per million (ppm) of PCBs.

15.     In July 1989, Respondent submitted a RCRA post-closure permit application to the Department under Article 27, Title 9 of the ECL and 6 NYCRR Part 373 for interim status facilities (the "RCRA Program").  As required by the RCRA program, the post-closure permit application contained a post-closure ground water monitoring plan to be implemented following the closure of the surface impoundments.

16.     In the summer of 1989, Respondent completed the construction required for closure of the two surface impoundments in accordance with a Department-approved work plan.  As part of the closure work, Respondent, at the request of the County, incorporated approximately 972 cubic yards of Ley Creek dredgings containing less than 50 ppm of PCBs from the

September 17, 1997

5

Meadowbrook/Hookway Basin in impoundment No. 1. This Meadowbrook soil transfer work was done in accordance with a Department order on consent, dated June 15, 1989 (Index # A7-0193-89-03).

17.    Following the closure of the surface impoundments, Respondent undertook the required post-closure ground water monitoring program in the area of the surface impoundments. On September 19, 1991, Respondent received a draft post-closure permit and submitted comments on the draft permit under cover of its letter, dated December 20, 1991, to Robert Torba of the Department's Region 7 Office. Although the Department has not issued a final post-closure permit, the Respondent has continued to conduct the Department-approved ground water monitoring program, which was designed to evaluate the ground water quality in the vicinity of the closed surface impoundments.

18.    Prior to the discovery of PCBs in the surface impoundments, the Respondent had submitted a RCRA Part A "interim status" application in connection with a drum storage area, which was an asphalt storage pad used for storage of waste paints, thinners and degreasers in 55 gallon drums. The "interim status" of the facility was not formally terminated as of the date the facility ceased manufacturing operations in December of 1993.

## Xylene Spill

19.    On March 11, 1985, excavation near underground paint thinner lines revealed paint thinner (xylene) in the soil surrounding the lines and this was determined to be the result of a rupture of a line from tank # 1.

September 17, 1997

20.    In response to this spill, Respondent installed a recovery well, which utilized a water table depression pump to enhance solvent recovery, and ten monitoring wells in the vicinity of the underground tank storage area. A map, showing the estimated area of the xylene spill and the location of the monitoring wells, is attached and hereby incorporated into this Consent Order as Exhibit B.

21.    Respondent entered into a consent order, dated February 18, 1986 [Case # R7-0002-85-05], wherein it agreed to pay a $1,900 fine for SPDES permit violations and undertake a ground water investigation of the paint thinner contamination (the "Xylene Spill Consent Order"). Ten additional monitoring wells were installed as part of this investigation and these wells are shown on Exhibit B to this Consent Order. Two ground water recovery trenches were installed subsequent to this investigation. Ground water has been pumped from the recovery trenches since 1986 and treated and discharged to the County POTW on a batch basis. Ground water monitoring has been performed since 1986 on a bi-weekly basis.

### Ley Creek PCB Dredgings Site

22.    The Department maintains a Registry of Inactive Hazardous Waste Disposal Sites and one of the sites on the Registry is known as the Ley Creek PCB Dredgings Site, #7-34-044 (the "Dredgings Site"). The location of the Dredgings Site, which is bounded by Factory Avenue to the south and Ley Creek to the north, is indicated on the map attached and hereby incorporated into this Consent Order as Exhibit C.

23.    The dredgings were generated during channel improvements for Ley Creek conducted by the County Department of Drainage and Sanitation and for the most part are located

September 17, 1997

7

on the south side of Ley Creek. The Department believes PCB contamination, which has been

detected in the dredgings, is the result of discharges of contaminated wastewater primarily from

the operations of the facility, which is located south of Ley Creek.

24.    Respondent investigated the extent of contamination at the Dredgings Site in

accordance with Department orders on consent, dated August 12, 1985 (Case # 7-0383),

November 19, 1987 (Index # A7-0129-87-09) and May 23, 1991 (Index # A7-0239-90-07). In

addition, Respondent undertook an interim remedial measure, involving removal of PCB-

contaminated soils in the area of the County's sewer pipeline during construction of the Ley Creek

Service Area Improvement Project under a Department order on consent, dated June 10, 1991

(Index # A7-0263-91-05).

25.    The Department, in consultation with the New York State Department of Health,

has proposed a remedial action at the Dredgings Site, which consists of the excavation and off-site

disposal of dredge materials/soils with PCB concentrations greater than or equal to 50 ppm and the

consolidation and covering of the remaining volume of materials with PCB concentrations

exceeding 1 ppm at the surface and 10 ppm subsurface. The remedial action is set forth in a

Record of Decision ("ROD") issued by the Department pursuant to the ECL, dated March 28,

1997.

26.    As part of the remedial investigation of the Dredgings Site, Respondent

investigated the PCB contamination in ground water underlying the dredgings, as well as

contamination in sediments and surface water in Ley Creek. Pursuant to the ROD, dated March

28, 1997, the Department deferred to this Consent Order the evaluation of ground water

September 17, 1997

underlying the dredgings, and the surface water and sediments in Ley Creek (the "Deferred Media").

27.    The Department has concluded that there may be a need to undertake additional investigation in Ley Creek sediments and surface water in the area from Townline Road to the Route 11 bridge as part of the evaluation of the Deferred Media to determine if there is PCB, heavy metal or volatile organic compound ("VOC") contamination ("environmental contamination") which needs to be addressed. Any additional investigation found to be necessary, and an evaluation of the need for response action to address any environmental contamination found in the Deferred Media, should be addressed under this Consent Order in conjunction with the Department's evaluation of the need for potential response action with respect to the environmental contamination at the facility. The area of concern that is the subject of this Consent Order, comprised of the facility and the Deferred Media, is hereby referred to as the "Site" and the Site is shown on the map attached as Exhibit D.

### Environmental Conditions at the Facility

28.    Ley Creek is a tributary of Onondaga Lake and ultimately flows into Onondaga Lake. The Onondaga Lake Site was added to the National Priorities List ("NPL") on December 16, 1994. The Onondaga Lake NPL Site is composed of the Lake itself, its tributaries and the upland hazardous waste sites which have contributed or are contributing contamination to the Lake (subsites).

29.    DEC has been designated the lead agency for hazardous substance remedial enforcement activities concerning the Onondaga Lake NPL Site. EPA and DEC have entered into

September 17, 1997

9

a cooperative agreement under § 104(d)(1)(a) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended ("CERCLA"), recognizing DEC's role as lead agency for this NPL site.

30.    In response to requests for information under §104(e) of CERCLA 42 USC §9604(e), the Respondent submitted to the Department on September 29, 1994 and February 2, 1995 extensive information about hazardous substances used in the past at the facility.

31.    In accordance with discussions at an August 27, 1996 meeting with the Department, Respondent, in November of 1996, submitted copies of the data collected in the course of the internal environmental site assessment conducted by Respondent at the facility.

32.    Based upon the CERCLA §104 (e) submissions and other information available on the effective date of this Consent Order, the Department makes the following findings:

A.    The facility's plant was constructed in 1952. The plant was used for plating, buffing, forming and finishing metal automotive parts. These operations were discontinued in the early 1970s. The facility commenced the manufacture and painting of plastic (injection molded) body trim components in the late 1960s and this work continued until the facility ceased manufacturing operations in 1993. RCRA inspection reports confirmed that hazardous substances/wastes, which were generated at the facility by the former hydraulic compressors used in stamping and die casting (and later injection molding) and painting operations, included PCB-contaminated hydraulic oils, waste solvents, PCB paint sludge, and sludges containing heavy metals, cyanides and chemical degreasers.

September 17, 1997

B.      Respondent's report entitled, "Evaluation of Plant Capabilities to Achieve Wastewater Compliance" by EDI Engineering & Science, 1985, confirmed that oil from "interior storm sewers" contained PCBs (Aroclor 1242) and stated "[t]his is strong evidence that oil which was used has leaked into the ground and is now finding its way back into the storm sewers through leaking pipe joints." Such oil entered the ground from the facility via floor drains and concrete trenches and sumps prior to the implementation of corrective measures in 1984 and 1985.

C.      An early 1980s investigative engineering study determined that an underground oil reclamation system was contributing PCB-contaminated oil to Ley Creek and to the facility surface and subsurface soils. Elevated levels of PCBs have been detected in water and soil at the Site. PCB contamination appears to be greatest surrounding and under the facility's manufacturing building.

D.      VOCs (e.g., trichloroethene, xylene, ethyl benzene and tetrachloroethene), which were used in painting and other operations, have been detected in soil and ground water at a number of locations around the facility.

E.      In 1985, excavation next to an abandoned oil sump showed oily soil and free oil. In 1985 and 1986, a hydrogeologic assessment was conducted by EDI Engineering and Science. This study revealed contamination of ground water at the facility by solvents, as well as by nickel, chromium, and PCBs. PCB contamination at levels of up to 8,000 ppm was found approximately four feet below the surface in soils along the northern portion of the facility in the area of a former drainage swale.

September 17, 1997

11

F.    Suspected disposal of solid and hazardous wastes or substances at the

facility's "Past Landfill" may have resulted in the release of such wastes or substances into the

environment. Constituents detected in monitoring wells installed at the boundaries of and down

gradient from the landfill include trans-1,2-dichloroethene, vinyl chloride, toluene, chloroform,

nickel, zinc, chromium, arsenic and PCBs. See Exhibit A.

33.    The Department has determined that:

A.    The PCBs, VOCs , and heavy metals are hazardous wastes under ECL

Article 27, Title 9 and/or hazardous substances under CERCLA.   The confirmed presence of these

hazardous substances at Respondent's facility and the proximity of such substances and discharge

of PCBs to Ley Creek establishes that the hazardous substance contamination at the facility

represents a release or threat of release of hazardous substances to the Onondaga Lake NPL Site

pursuant to §§101 and 104 of CERCLA. Respondent's facility is a subsite of the Onondaga Lake

NPL Site. By letter dated June 23, 1997, the Department and the United States Environmental

Protection Agency notified the Respondent of their determination that Respondent's facility is a

subsite.

B.    Respondent's facility is an inactive hazardous waste disposal site, as that

term is defined at ECL Section 27-1301(2) and has been listed in the Registry of Inactive

Hazardous Waste Disposal Sites in New York State as Site Number 7-34-057. The Department

has classified Respondent's facility as a Classification "2" pursuant to ECL Section 27-1305(4)(b),

which means the facility presents a "significant threat to the public health or environment - action

required."

September 17, 1997

12

C.    Contamination of ground water, soil and surface water (including storm water discharged from the facility) at the Site has been documented. Coordination of the data gathering, investigatory and remedial approaches is necessary to effectuate the most efficient remedial program for these media.

D.    Respondent is responsible for developing and implementing a Remedial Investigation/Feasibility Study ("RI/FS") for the Site that is consistent with CERCLA, the National Oil and Hazardous Substances Pollution Contingency Plan, 40 C.F.R. Part 300, as amended (the "NCP"), and all other applicable State and Federal laws.

E.    Respondent is responsible for investigating the nature and extent of, and evaluating the feasibility of remediating contamination of ground water, soil, surface water (including storm water discharged from the facility) at the Site as set forth in this Consent Order. The RI/FS must include a complete and coordinated engineering evaluation of Respondent's storm water system and management that indicates how storm water is impacted by contaminants at the facility, how storm water entering the facility affects the distribution of contaminants and how these effects will be remedied in order to achieve compliance with the effluent limits established under the final SPDES permit. Interim SPDES permit limits for certain parameters, including PCBs, will be incorporated into this Consent Order pursuant to Paragraph XIV of this Order.

F.    Pursuant to ECL § 17-0813, SPDES permits may contain compliance schedules which require the permittee, within the shortest reasonable time, to conform to and meet applicable effluent limitations.

September 17, 1997

13

G.    The actions approved by the Department pursuant to this Consent Order are in the public interest and are consistent with CERCLA, the NCP and all other applicable State and Federal laws.

34.    The Department and Respondent agree that the goals of this Consent Order are for Respondent to (i) coordinate and address all the pending regulatory and remedial matters described in the Recitals to this Consent Order; (ii) develop and implement a comprehensive RI/FS for the Site in accordance with Paragraphs I through V of this Consent Order;  (iii) develop and implement appropriate interim remedial measures, *inter alia*, for bringing its surface water discharges into outfalls 003 and 004 into compliance with the final SPDES permit conditions referenced in this Consent Order; and (iv) reimburse the Department's administrative and oversight costs as set forth in paragraph XIII of this Consent Order.

35.    Respondent waives its right to any hearing as provided by law, and consents to the issuance and entry of this Consent Order and agrees to be bound by its terms.  Respondent's consent to and compliance with this Consent Order does not constitute, and shall not be construed as, an admission of liability or an admission by Respondent of law or fact or the applicability of any law to the conditions at the Site,  the Dredgings Site or the Onondaga Lake NPL Site. Respondent consents to and agrees not to contest the authority or jurisdiction of the Department to issue or enforce this Consent Order, and agrees not to contest the validity of this Consent Order or its terms.

NOW, having considered this matter and being duly advised, IT IS ORDERED THAT:

September 17, 1997

14

I.    Submittal of Preliminary RI/FS Report

A.    Within 30 days after the effective date of the Consent Order, Respondent shall submit to the Department a Preliminary RI/FS Report which satisfactorily:

(1)    describes in the RI section of the report the nature and extent of contamination at the Site (which has been defined in Paragraph 26 of thisConsent Order to include the facility and Deferred Media), as determined by preliminary investigations done by Respondent or others prior to the execution of this Consent Order: and

(2)    provides in the FS section of the report a preliminary evaluation that identifies remedial action objectives and provides a detailed analysis of remedial alternatives designed to address all health and environmental hazards and potential hazards at the Site attributable to the release or threat of release of hazardous substances/wastes.

B.    The Preliminary RI/FS Report shall be reviewed by the Department under this Consent Order. Upon completion of its review, the Department shall provide Respondent with notice and comments regarding any additional RI and FS work that may need to be done in order to satisfy the requirements of CERCLA, the NCP, the EPA guidance document entitled "Guidance for Conducting Remedial Investigations and Feasibility Studies under CERCLA," dated October 1988, and any subsequent revisions to that guidance document in effect at the time the Preliminary RI/FS Report is submitted, appropriate EPA and Department technical and administrative guidance, which are in final form and publicly available (the "applicable RI/FS guidance"), and any RCRA post-closure permit requirements which may otherwise apply in addressing contamination at the Site.

September 17, 1997

15

C.    Subject to Paragraph XVII of this Consent Order, the investigation of Ley
Creek sediments and surface water under this Consent Order shall be limited to the area of Ley
Creek between Townline Road and the Route 11 bridge and the scope of work shall be that set
forth in the attached Exhibit E.

D.    If the Department determines that the Preliminary RI/FS Report does satisfy
applicable RI/FS guidance, the Department shall approve such report and develop a Proposed
Remedial Action Plan ("PRAP") or Proposed Plan for the selection of a remedy for the Site.

II.    Supplemental Remedial Investigation Work Plan

A.    Within 60 days after receiving the Department's written notice that
supplemental RI work must be performed, Respondent shall submit to the Department a detailed
Supplemental RI Work Plan for the Site that addresses the Department's comments regarding the
Preliminary RI/FS Report. The Supplemental RI Work Plan shall be developed in conformance
with the law, regulations and guidance referenced in Paragraph I.B. above.

B.    (1)    The Supplemental RI Work Plan shall include, but is not limited to,
the following:

a.    A schedule for implementation of Supplemental RI tasks and
submission of Supplemental RI deliverables. The schedule shall provide, at a minimum, for the
submittal of a Supplemental RI Report.

b.    A Sampling and Analysis Plan that shall include:

(i) A quality assurance project plan ("QAPP") that describes
the quality assurance and quality control protocols necessary to achieve the initial data quality

September 17, 1997

16

objectives. This plan shall designate a project QA officer and data validation expert and must

describe such individual's qualifications and experience. The QAPP shall be subject to review,

modification, and approval by the Department. The Respondent shall ensure that any laboratories

utilized for analysis participate in a documented EPA Quality Assurance/Quality Control

("QA/QC") program equivalent to that followed by EPA and consistent with EPA guidance

(including EPA QA/R-5, EPA Requirement for Quality Assurance Project Plans for

Environmental Data Operations, August 1994, Draft Interim Final). As part of such program, and

upon request by the Department, such laboratories shall perform analysis of samples provided by

the Department to demonstrate the quality of analytical data for each laboratory. The analytical

laboratory must obtain and maintain proper New York State Department of Health certification for

the duration of the project.

(ii) A field sampling plan that defines sampling and data

gathering methods in a manner consistent with the "Compendium of Superfund Field Operations

Method"(EPA/540/P-87/001, OSWER Directive 9355.0-14, December 1987), or subsequent EPA

guidance in effect at the time the Supplemental RI Work Plan is submitted for approval.

c. A health and safety plan to protect persons at and in the vicinity

of the Site during the performance of the Supplemental RI which shall be prepared by a certified

health and safety professional in accordance with 29 CFR Part 1910 and all other applicable

standards.

(2)    The Department will either approve the Supplemental RI Work Plan

or shall require modification of it, in accordance with the procedures set forth in Paragraph IX.

September 17, 1997

17

After approval by the Department, the final Department-approved Supplemental RI Work Plan shall be incorporated into and made an enforceable part of this Consent Order. All work shall be conducted in a manner consistent with CERCLA, the NCP, applicable RI/FS guidance, and the requirements of this Consent Order and the approved Supplemental RI Work Plan.

      III.    Performance and Reporting of Supplemental Remedial Investigation

      A.    Respondent shall perform the Supplemental RI in accordance with the provisions and schedule set out in the approved Supplemental RI Work Plan.

      B.    During the performance of the Supplemental RI, Respondent shall have on-Site a full-time representative who is qualified to supervise the work done.

      C.    Within 90 days of the date of the last sample collection associated with a discrete sampling event, Respondent shall submit to the Department an analytical summary report. The summary report shall describe the scope of the sampling addressed in the report, reference any sampling or testing issues associated with the sampling event and attach the relevant lab data sheets. Interpretation of the sampling data shall be reserved for the Supplemental RI Report. The Department reserves the right to receive copies of the QA/QC data packages within 45 days of the date of the Respondent's receipt of a written request from the Department.

      In addition to the hard copy analytical summary report(s), the Respondent shall submit all analytical data in an electronic format (e.g., 3.5 inch IBM-compatible computer disks). Two (2) copies of each data file shall be submitted in either a PC-based IBM-compatible spreadsheet format, (e.g.,*.wk 1 files) or a database format (e.g.,* dbf or *.db files). The

September 17, 1997

18

Department will provide Respondent with a preferred format for the tables and any associated

graphical representations of sampling results.

        D.       Within the time frame set forth in the Supplemental RI Work Plan,

Respondent shall prepare and submit a Supplemental RI Report that shall:

        (1) include a summary of all data generated and all other information

obtained during the Supplemental RI;

        (2) provide all of the assessments and evaluations needed to complete an RI

as set forth in CERCLA, the NCP, and the guidance documents identified in Paragraph I.B;

        (3) identify any additional data that must be collected; and

        (4) include a certification by the individual or firm with primary

responsibility for the day-to-day performance of the Supplemental RI that all activities that

comprised the Supplemental RI were performed in full accordance with the Department approved

Supplemental RI Work Plan.

    IV.    Performance of Supplemental Risk Assessment

        A.       Within 30 days after receipt of the Department's written approval of the

Supplemental RI Report, Respondent shall submit a memorandum identifying the contaminants of

concern and the potential exposure pathways, assumptions, and exposure point concentrations to

be used in the baseline risk assessment (the "Risk Assessment Memorandum"), consistent with

EPA OSWER Directive No. 9835.15a, dated July 2, 1991, and EPA's "Risk Assessment Guidance

for Superfund, Vol. 1: Human Health Evaluation Manual (Part A)," dated December 1989 and

"Risk Assessment Guidance for Superfund Volume II: Environmental Evaluation Manual," dated

September 17, 1997

19

March 1989, as may be revised at the time of the Department's approval of the Supplemental RI Report.

B.    The Department will either approve the Risk Assessment Memorandum or will require modification of it, in accordance with the procedures set forth in Paragraph IX . The final Department-approved Risk Assessment Memorandum shall be incorporated into and made an enforceable part of this Consent Order.

C.    Respondent shall perform the Risk Assessment in accordance with the guidance documents identified in Subparagraph I.B. and in a manner consistent with CERCLA and the NCP.

D.    Within 30 days after receipt of the Department's written approval of the Risk Assessment Memorandum, Respondent shall submit a Supplemental Risk Assessment Report.

E.    The Department will either approve the Risk Assessment Report or will require modification of it, in accordance with the procedures set forth in Paragraph IX. The final Department-approved Risk Assessment Report shall be incorporated into and made an enforceable part of this Consent Order.

V.    Performance of Supplemental Feasibility Study

A.    Within 45 days after receipt of the Department's written approval of the Risk Assessment Report, Respondent shall prepare and submit a Supplemental FS Screening Memorandum that provides Respondent's methods, rationale, and results of its development and screening of remedial action alternatives for the Site, consistent with EPA's "Guidance for

September 17, 1997

Conducting Remedial Investigation and Feasibility Studies Under CERCLA," dated October 1988 (see Section 4.5 of this Guidance).

B.    The Department will either approve the Supplemental FS Screening Memorandum or will require modification of it, in accordance with the procedures set forth in Paragraph IX. The final Department-approved Supplemental FS Screening Memorandum shall be incorporated into and made an enforceable part of this Consent Order.

C.    Respondent shall perform and prepare the Supplemental FS in a manner consistent with CERCLA, the NCP, and the guidance documents identified in Subparagraph I.B.

D.    Within 45 days of the Department's written approval of the FS Screening Memorandum, Respondent shall submit the Supplemental FS Report. The Supplemental FS Report shall be prepared by and have the signature and seal of a professional engineer, who shall certify that the Supplemental FS was prepared in accordance with this Consent Order.

E.    Upon the Department's written approval of the Supplemental FS Report, the Department will develop a PRAP or Proposed Plan for the Site and will solicit public comment upon it. After the close of the public comment period, the Department will select a final remedial alternative for the Site in a ROD.

VI.    Interim Remedial Measure

A.    Before the effective date of the ROD, Respondent may propose interim remedial measures ("IRMs") for purposes of, but not limited to, bringing its surface water discharges to Outfalls 003 and 004 into compliance with the final SPDES permit conditions referenced in this Consent Order. Within 45 days of receiving the Department's written

September 17, 1997

21

determination that a proposal is an appropriate IRM, Respondent shall submit an IRM Work Plan. Each proposed IRM Work Plan shall include a chronological description of the anticipated IRM activities, together with a schedule for the performance of those activities. Upon the Department's written approval of the IRM Work Plan, the IRM Work Plan shall be incorporated into and become an enforceable part of this Consent Order.

B.    Respondent shall submit to the Department for review, and as appropriate, approval, in accordance with the schedule contained in the approved IRM work plan, detailed documents and specifications prepared, signed and sealed by a professional engineer, to implement the approved IRM. Such documents shall include a health and safety plan, contingency plan, and, if the Department requires such, a citizen participation plan that incorporates appropriate activities outlined in the Department's publication : "New York State Inactive Hazardous Waste Citizen Participation Plan," dated August 30, 1988, the draft revision to that document dated May 1994, and any subsequent revisions thereto that are in final form and publicly available. Respondent shall then carry out such an IRM in accordance with the requirements of an approved IRM Work Plan, detailed documents and specifications, and this Consent Order.

C.    Within the schedule contained in the approved IRM Work Plan, Respondent shall submit to the Department a final engineering report, prepared by a professional engineer, that includes a certification that all activities that comprised the IRM were performed in full accordance with the approved IRM Work Plan, detailed documents and specifications, and this Consent Order. Within the schedule contained in the approved IRM Work Plan, Respondent shall submit to the Department a report or reports periodically documenting the performance of the IRM

September 17, 1997

22

and any significant difficulties encountered or anticipated in implementing the approved IRM Work Plan. All IRM work plan activities associated with the development, construction and operation of wastewater treatment facilities, or other activities covered by the Department's jurisdiction under Article 17 of the ECL, shall also be subject to review and approval by the Department's Division of Water ("DOW") and the DOW shall conduct its review under this Consent Order. Respondent shall not modify any obligation in the approved IRM Work Plan unless first approved by the Department in writing.

D.    (1) In implementing any IRM approved by the Department under this Consent Order, Respondent shall be exempt from the requirement to obtain any permit issuable by the Department for an activity satisfying the criteria set out below in Subparagraph VI.D(2) of this Consent Order.

(2) The activity must be conducted "on-Site". For purposes of this Consent Order, an activity is "on-Site" if:

(a) it is conducted on the same premises as the Site, or

(b) it is conducted on different premises that are under common control or are contiguous to or physically connected with the Site and the activity manages exclusively hazardous substances from the Site (except in situations where off-Site hazardous substance deposits derived from, or otherwise related to materials deposited on-Site exist, in which case such deposits shall be deemed subject to this Consent Order to the extent Respondent is able to obtain access for purposes of investigation and/or remediation); and

(c) the activity is conducted in a manner which satisfies all

September 17, 1997

23

substantive technical requirements applicable if the activity were conducted pursuant to a permit issued by the Department.

      VII.    Community Relations

           Respondent shall cooperate and assist the Department in providing information relating to the work required hereunder to the public. As requested by the Department, Respondent shall participate in the preparation of all appropriate information disseminated to the public and in public meetings that may be held or sponsored by the Department to explain activities at or concerning the Site.

      VIII.    Progress Reports

           Respondent shall submit to the parties set forth in Subparagraph XX.B in the numbers specified therein copies of written monthly progress reports that describe the actions that have been taken toward achieving compliance with this Consent Order during the previous month, including (i) a brief description of all results of sampling and tests and all other data received or generated by Respondent or Respondent's contractors or agents in the previous month, whether conducted pursuant to this Consent Order or conducted independently by Respondent; (ii) all actions, including, but not limited to, data collection and implementation of work plans, that were performed during the month and other information relating to the progress of work being performed pursuant to this Consent Order; (iii) information regarding percentage of completion, unresolved delays encountered or anticipated that may affect the future schedule for implementation of the Respondent's obligations under the Order, and efforts made to mitigate those delays or anticipated delays; (iv) any modifications to any work plans that Respondent has

September 17, 1997

24

proposed to the Department or that the Department has approved; (v) all activities to be

undertaken in the next month; (vi) difficulties encountered during the reporting period and the

actions taken to rectify the problems; and (vii) any changes in key personnel. Respondent shall

submit these progress reports to the Department by the tenth day of every month following the

effective date of this Consent Order. The obligation to submit progress reports shall cease after

the Respondent's receipt of the Department's written approval of the Preliminary RI/FS Report or

the Supplemental FS Report, whichever applies under the terms of this Consent Order.

IX.   Review of Submittals

A.   The Department shall review each of the submittals Respondent makes

pursuant to this Consent Order to determine whether the submittal was prepared, and whether the

work done to generate the data and other information in the submittal was done, in accordance

with this Consent Order and generally accepted technical and scientific principles. The

Department shall notify Respondent in writing of its approval or disapproval of the submittal,

except for any health and safety plans submitted by Respondent pursuant to this Consent Order.

All Department-approved submittals shall be incorporated into and become an enforceable part of

this Consent Order.

B.   If the Department disapproves a submittal, it shall so notify Respondent in

writing, specify the reasons for its disapproval, and offer Respondent a timely opportunity to meet

with the Department's staff to discuss the measures necessary to obtain the Department's approval.

Within 30 days after the date of its receipt of the Department's written disapproval of the

submittal, or the date of the Respondent-Department meeting to review the basis for the

September 17, 1997

25

Department's disapproval, whichever is later (or within such other period of time otherwise agreed upon by the parties), Respondent shall make a revised submittal to the Department that addresses all of the Department's stated reasons for disapproving the first submittal.

    C.  After receipt of the revised submittal, the Department shall notify Respondent in writing of its approval or disapproval. If the Department disapproves the revised submittal, Respondent shall be in violation of this Consent Order and the Department may take any action or pursue whatever rights it has pursuant to any provision of statutory or common law unless, within 30 days of its receipt of the Department's written notice of disapproval, Respondent invokes the Dispute Resolution procedure set forth in Paragraph X. If the Department approves the revised submittal, it shall be incorporated into and become an enforceable part of this Consent Order.

    D.  (1)  Respondent shall modify and/or amplify and expand a submittal upon the Department's written direction to do so if the Department determines, as a result of reviewing data generated by an activity required under this Consent Order or as a result of reviewing any other data or facts, that the further work is necessary to attain the remedial goals specified at paragraph 34 of this Consent Order, provided the Department's written direction is received prior to the Department's issuance of the ROD for the Site (or an applicable operable unit of the Site, whichever applies).

      (2)  The Respondent may challenge the Department's determination that further work is necessary under the Dispute Resolution provisions of Paragraph X of this Consent Order by requesting the required meeting with the Director of the Department's Division of

September 17, 1997

26

Environmental Remediation within 30 days after receipt of the Department's written direction to undertake the further work.

X.    Dispute Resolution

A.    If the Department disapproves a revised submittal (Paragraph IX.C) or demands additional work (Paragraph IX.D), Respondent shall be in violation of this Order unless, within 30 days of receipt of the Department's written notice of disapproval of a revised submittal, or within 30 days of its receipt of the Department's written demand for additional work, Respondent serves on the Department's Director of the Division of Environmental Remediation ("the Director") a written request to meet with the Director to discuss the Department's objections to the revised submittal and/or the Department's demands for additional work and a written statement of the issues in dispute, the relevant facts upon which the dispute is based, and factual data, analysis or opinion supporting its position, and all supporting documentation on which the Respondent relies (the "Statement of Position").

B.    The Department shall provide the Respondent with an opportunity to meet with the Director to discuss the Department's objections to the revised submittal and/or the Department's demands for additional work. Respondent and the Department shall meet at a mutually agreed upon time (the "meeting").

C.    An administrative record of any dispute under this Paragraph X shall be maintained by the Department. The record shall include the Statement of Position of the Respondent and any other relevant information, including any information submitted by either

September 17, 1997

party up to and including the time of the meeting. The record shall be available for review by all parties and the public.

D.    Upon review of the administrative record as developed pursuant to this Paragraph X and taking into consideration the discussion of the parties at the meeting with the Director, the Director shall issue a final written decision, resolving the dispute (the "Director's Decision"). The period of time for revision of a submittal or commencement of additional work shall be set forth in the Director's Decision.

E.    The invocation of formal dispute resolution procedures under Subparagraphs A - D above, shall excuse, toll and/or suspend ("tolling") during the pendency of the dispute resolution process the compliance obligation or deadline which is in dispute, and any other obligation or deadline which is dependent upon the matters in dispute, but shall not toll or suspend any other of Respondent's obligations under this Consent Order.

F.    In the event of the Respondent's preparation of a required modified submittal, the Department shall notify Respondent in writing of its approval or disapproval thereof. If the modified submittal fails to adequately address the Department's comments contained in the Director's Decision, as modified, and the Department disapproves the modified submittal for this reason, Respondent shall be in violation of this Consent Order and ECL Article 71, Title 27.

G.    Respondent may also dispute invoices for State costs issued by the State pursuant to Paragraph XIII of this Consent Order. If Respondent disputes a State invoice issued pursuant to Paragraph XIII of this Consent Order, Respondent shall invoke dispute resolution by

September 17, 1997

28

requesting, within 30 days of its receipt of the Department's invoice, a meeting with the Director
to discuss Respondent's objections to the invoice, and the Director shall decide whether to modify
the invoice. The Director's written decision issued after the meeting shall be a final agency
determination for purposes of seeking review under Article 78 of the CPLR. If the Director
revises the invoice, Respondent shall pay the revised invoice within 30 days of its receipt of the
Director's written decision.

    H.  Respondent's failure to pay the revised invoice within 30 days of receipt
thereof or, if the Director determines that the invoice need not be revised, Respondent's failure to
pay the original invoice within 30 days of receipt of the Director's written decision, shall be a
violation of this Consent Order and subject to whatever enforcement action is within the
Department's jurisdiction, unless, within 30 days after receipt of the Director's written decision,
Respondent commences an action for review of the Director's written decision pursuant to Article
78 of the CPLR.

  XI.  Force Majeure:

    A.  Respondent's failure to comply with any term of this Consent Order
constitutes a violation of this Consent Order and ECL Article 71, Title 27.

    B.  Respondent shall not suffer any penalty under this Consent Order or be
subject to any proceeding or action if it cannot comply with any requirement hereof because of
war, riot, adverse weather conditions, or any fact or circumstance beyond the Respondent's
reasonable control ("force majeure event"). Respondent shall, within five days of when it obtains
knowledge of any such condition, notify the Department in writing. Respondent shall include in

September 17, 1997

such notice the measures taken and to be taken by Respondent to prevent or minimize any delays and shall request an appropriate extension or modification of this Consent Order. Failure to give such notice within such five-day period constitutes a waiver of any claim that a delay is excusable under this subparagraph and not subject to penalties. Respondent shall have the burden of proving that an event is a defense to compliance with this Consent Order pursuant to this subparagraph.

XII.    Entry upon Site

Respondent hereby consents to the entry upon the Site or areas in the vicinity of the Site, which may be under the control of the Respondent, by any duly designated employee, consultant, contractor, agent of EPA, the Department or any New York State agency, at reasonable times, for purposes of inspection, sampling, and testing and to ensure Respondent's compliance with this Consent Order. Any such individual authorized to enter the Site pursuant to this paragraph shall comply with any applicable health and safety plan for the Site.

XIII.    Payment of State Costs

A.    Within 30 days after receipt of an itemized invoice from the Department, which the Department will use its best efforts to submit on an annual basis, beginning with the calendar quarter ending December 31, 1997, Respondent shall pay to the Department a sum of money which shall represent reimbursement for the State's expenses at the Site including, but not limited to, direct labor, fringe benefits, indirect costs, travel, analytical costs, and contractor costs incurred by the State of New York for work performed under the terms of this Consent Order, as well as for negotiating this Consent Order (including the review of background information in connection therewith), reviewing and revising submittals made pursuant to this Consent Order,

September 17, 1997

30

overseeing activities conducted pursuant to this Consent Order, and collecting and analyzing

samples. The foregoing shall not include services relating strictly to SPDES permitting issues

performed by representatives of the Department's Division of Water, or activities relating to the

Onondaga Lake NPL Site that are unrelated to the implementation of this Consent Order which

may overlap with the oversight being conducted by the Department's Division of Environmental

Remediation under this Order. Such payment shall be made by check payable to the Department

of Environmental Conservation. Payment shall be sent to the Director, Bureau of Program

Management, Division of Environmental Remediation, N.Y.S.D.E.C., 50 Wolf Road, Albany, NY

12233-7010.

        B.     Itemization of the costs shall include an accounting of personal services

indicating the employee name, title, biweekly salary, and time spent (in hours) on the project

during the billing period, as identified by an assigned time and activity code. This information

shall be documented by reports of Direct Personal Service. The Department's approved fringe

benefit and indirect cost rates shall be applied. Non-personal service costs shall be summarized by

category of expense (e.g., supplies, materials, travel, contractual) and shall be documented by the

New York State Office of the State Comptroller's quarterly expenditure reports.

        C.     The accrual of State costs for reimbursement shall cease after the issuance

of the ROD made pursuant to this Consent Order.

    XIV.   SPDES Permit Requirements

        A.     Upon the effective date of this Consent Order, Respondent shall comply

with the interim effluent limitations established in the discharge authorization for Outfalls 003 and

September 17, 1997

31

004 contained in Exhibit F, which is incorporated into and made part of this Consent Order. The
SPDES Consent Order, discussed in paragraph 5 of this Consent Order, shall terminate on the
effective date of this Consent Order.

        B.     The interim effluent limitations contained in Exhibit F shall become
effective on the date of execution of this Consent Order and shall continue for three (3) years. At
the end of such time period, Respondent shall be required to comply with all effluent limits
identified in the final SPDES permit issued by the Department in September of 1997("1997
SPDES permit" - the final effluent limits are attached as Exhibit G) for all point source discharges
into Ley Creek. Respondent shall undertake the interim remedial actions necessary to come into
compliance with the effluent limits specified in the final SPDES permit within the shortest
reasonable time period, which period shall not exceed 3 years.

        C.     During the compliance period specified in paragraph XIV.B of this Consent
Order, Respondent shall discharge into Ley Creek in accordance with the discharge authorization
contained in Exhibit F and the 1997 SPDES permit or to the County POTW in accordance with the
terms and conditions of any approval granted by the County Department of Drainage and
Sanitation.

        D.     Unless otherwise agreed upon in writing by the Respondent and the
Department, the terms and provisions of Paragraph XIV of this Consent Order shall terminate
upon the expiration of the compliance period specified in Paragraph XIV.B of this Consent Order.
Following the termination of paragraph XIV, Respondent shall discharge into Ley Creek from
point sources at the facility in accordance with the terms and conditions of the 1997 SPDES permit

September 17, 1997

32

and future modifications and renewals of the 1997 SPDES permit shall be in accordance with applicable law.

    XV.   RCRA Closure Requirements

    A.   Upon the effective date of this Order, Respondent shall comply with the Surface Impoundment Closure Ground Water Monitoring Program, dated March 1989, as modified by Exhibit H of this Consent Order. This modified program shall supersede the Respondent's existing obligations for ground water monitoring for the impoundments under the Department's RCRA program. The ground water monitoring program set forth in this Order shall continue until modified by the ROD issued under this Consent Order, or prior to the ROD, by agreement between the Respondent and the Department consistent with applicable and appropriate Federal and State regulations and guidance upon request by the Respondent under this Order.

    B.   The RCRA "interim status" of any portion of the facility shall terminate upon the implementation and completion by Respondent of the construction phase of a Remedial Design/Remedial Action Order on Consent, which covers the facility. The Respondent's fulfillment of and compliance with the terms and conditions of this Consent Order shall satisfy any RCRA post-closure permit requirements which may otherwise apply for the two closed surface impoundments at the facility and any "interim status" requirements under the Department's RCRA program to investigate the scope of any contamination from a "solid waste management unit" or an "area of concern" as those terms are defined under the Department's RCRA program.

September 17, 1997

33

XVI.  Xylene Spill Consent Order

A.    Upon the effective date of this Order, Respondent shall comply with the Department approved ground water monitoring program for the area of the xylene spill, which is set forth in Exhibit I of this Order.  This ground water monitoring program shall continue until modified by the ROD issued under this Consent Order, or prior to the issuance of the ROD, by agreement between the Respondent and the Department consistent with applicable and appropriate Federal and State regulations and guidance upon request by the Respondent under this Order.

B.    The existing ground water pumping program described at paragraphs 20 and 21 of this Order shall continue until modified by the ROD issued under this Consent Order, or prior to the issuance of the ROD, by agreement between the Respondent and the Department consistent with applicable and appropriate Federal and State regulations and guidance upon request by the Respondent under this Order.

C.    The Xylene Spill Consent Order shall terminate as of the effective date of this Consent Order.

XVII.  Reservation of Rights

A.    Nothing contained in this Consent Order shall be construed as barring, diminishing, adjudicating, or in any way affecting any of the Department's rights, except as specified within this Consent Order.

B.    Nothing contained in this Consent Order shall be construed to prohibit the Commissioner or his or her duly authorized representative from exercising any summary abatement powers.

September 17, 1997

34

C.      Nothing herein is intended to be a release or settlement of any claim for
personal injury or property damage by any person not a party to this Consent Order against
Respondent.

D.      For violations of this Consent Order and ECL Article 71, Title 27, the
Department may elect to pursue any remedy, penalty, and/or sanction, including enforcement of
this Consent Order.

E.      Nothing herein represents a satisfaction, waiver, release, or covenant not to
sue, of any claim of the State of New York against Respondent relating to the Site, including, but
not limited to, claims to require Respondent to undertake further response actions, and claims to
seek reimbursement of response costs and/or natural resource damages pursuant to Section 107 of
CERCLA.

XVIII. Indemnification

Respondent shall indemnify and hold the Department, the State of New York, and
their representatives and employees harmless for all claims, suits, actions, damages, and costs of
every name and description arising out of or resulting from the fulfillment or attempted fulfillment
of this Consent Order by Respondent, and/or Respondent's directors, officers, employees,
servants, agents, successors, and assigns. Said indemnification shall not include indemnification
in any form for unlawful, willful or malicious acts or omissions on the part of the Department, the
State of New York or their representatives and employees.

XIX.   Public Notice

A.      Within 30 days after the effective date of this Consent Order, Respondent

September 17, 1997

35

shall file a Declaration of Covenants and Restrictions with the County Clerk to give all parties

who may acquire any interest in the facility notice of this Consent Order.

        B.     If Respondent proposes to convey the whole or any part of Respondent's

ownership interest in the facility, Respondent shall, not fewer than 60 days before the date of

conveyance, notify the Department in writing of the identity of the transferee and of the nature and

proposed date of the conveyance and notify the transferee in writing, with a copy to the

Department, of the applicability of this Consent Order.

      XX.   Communications

       A.     All written communications required by this Consent Order shall be
transmitted by United States Postal Service, by private courier service, or hand delivered as
follows:

          Communication from Respondent shall be sent to:

                 1.      William L. Daigle, Remedial B, Section Chief
                          Division of Environmental Remediation
                          NYSDEC
                          50 Wolf Road, Room 222
                          Albany, New York  12233-7010

                 2.      Robert Montione
                          Bureau of Environmental
                          Exposure Investigation
                          New York State Department of Health
                          2 University Place
                          Albany, New York  12203

                 3.      Regional Director
                          Region 7, NYSDEC
                          615 Erie Blvd. West
                        Syracuse, N.Y. 13204-2400

September 17, 1997

36

4.  George A. Shanahan, Esq.
    Assistant Regional Counsel
    EPA Region 2
    290 Broadway
    New York, N.Y. 10007-1866

5.  Alison A. Hess, C.P.G.
    Onondaga Lake Project Manager
    EPA Region 2
    290 Broadway, 20th Floor
    New York, N.Y. 10007-1866

6.  Robert K. Davies, Esq.
    Onondaga Lake Unit, NYSDEC
    50 Wolf Road, Room 400
    Albany N.Y. 12233-5550

B.  Copies of work plans and reports shall be submitted as follows:

1.  Five copies (one unbound hard copy with associated figures and one
    on 3½" computer disk(s) in Word Perfect version
    6.0 or compatible word processing format and
    any associated figures in Auto Cad or compatible format) to:
    William L. Daigle, DER.

2.  Two copies to:
    Robert Montione, NYSDOH
    Bureau of Environmental Exposure Investigation

3.  Two copies to:
    Region 7 Director

4.  One copy to:
    Alison A. Hess, C.P.G.
    EPA Region 2

5.  One copy of the transmittal letter only to:
    Robert K. Davies, Esq.
    Onondaga Lake Unit, NYSDEC

September 17, 1997

6. Upon receiving formal approval of a submittal by the Department, Respondent shall submit three copies of such submittal to the Department for placement in the designated Document Repository(s) and one copy to EPA.

C. Communication to be made from the Department to the Respondent shall be sent to:

(1)  William E. Kochem, Jr.
GM-North American Operations
1 General Motors Drive
Syracuse, New York 13206

(2)  James Hartnett
GM Remediation Project Office
Route 37 East,  PO Box 460
Massena, New York 13662-0460

(3)  General Motors Corporation Legal Staff
Attn: Michelle Fisher, Esq.
3044 West Grand Blvd.,  MC 482-112-149
Detroit, Michigan 48202

(4)  Bond, Schoeneck & King, LLP
Attn: Barry R. Kogut, Esq.
One Lincoln Center
Syracuse, New York 13202

D. The Department and Respondent reserve the right to designate additional or different addressees for communication or written notice to the other.

E. The Department's Project Manager for the work to be done under this Consent Order shall be Susan Benjamin, P.E. of the Department's Division of Environmental Remediation ("DER") and DER shall coordinate the technical review and involvement of the EPA and any Division of the Department, which is involved with regulatory or remedial decision

September 17, 1997

making at the Site. The Department reserves the right to designate a different Project Manager upon written notice to the Respondent.

### XXI.   Record Keeping

Respondent shall preserve, during the pendency of this Consent Order, and for a minimum of five (5) years after the Department has officially concluded that the construction phase of the selected remedial alternative for this Site has been fully performed, all records and documents in the possession of the Respondent, or in the possession of any division, employees, agents, accountants, contractors, or attorneys of the Respondent, which are subject to disclosure under applicable law, because they relate to the selection of remedial action at the Site, whether or not prepared pursuant to this Consent Order and despite any document retention policy to the contrary. After this five (5) year period, the Respondents shall notify the Department in writing within 60 (sixty) days prior to destruction or disposal of any such documents. Upon the request of the Department, Respondent shall make available to the requestor all or any such records, or copies of all or any such records, unless the records may be withheld from disclosure as confidential and privileged under applicable law.

### XXII.   Miscellaneous

A.;     Respondent shall retain professional consultants, contractors, laboratories, quality assurance/quality control personnel and data validators acceptable to the Department to perform the technical, engineering and analytical obligations ("technical work") required by this Order. The Respondent has retained O'Brien & Gere Engineers, Inc. and O'Brien & Gere Laboratories to perform the technical work required by this Order and they are acceptable to the

September 17, 1997

39

Department. If the Respondent chooses to substitute another firm to perform any of the technical

work under this Order, it shall submit its respective experience, capabilities and qualifications to

the Department for prior approval, which approval shall not be unreasonably withheld or delayed.

        B.     With respect to the RI activities which are described in Paragraphs II - VI of

this Order ("RI/FS/IRM Work"), the Department shall have the right to obtain split samples,

duplicate samples, or both, of all substances and materials sampled by Respondent, and shall also

have the right to take its own samples. Respondent shall notify the Department at least 7 business

days in advance of any sample collection activity.  Respondent and the Department shall make

available to each other the results of all sampling and/or tests or other data generated by the

Respondent or the Department (the "information") with respect to implementation of the

RI/FS/IRM Work.  Respondent shall submit the information in accordance with Paragraph III.C of

this Order and the Department shall use its best efforts to submit any information to the

Respondent in a manner which allows for timely consideration by the Respondent in its

preparation of submittals required under this Consent Order.

        C.     Respondent shall notify the Department at least 7 business days in advance

of any RI/FS/IRM field activities to be conducted pursuant to this Consent Order.

        D.     Respondent shall use its best efforts to obtain whatever permits, easements,

rights-of-way, rights-of-entry, approvals, or authorizations that are necessary to perform

Respondent's obligations under this Order (the "authorizations").  Respondent shall promptly

notify the Department in the event of Respondent's inability to obtain such authorizations on a

timely basis. In the event Respondent is unable to obtain the necessary authorizations, the

September 17, 1997

40

Department may, consistent with its legal authority, assist in obtaining all such authorizations which Respondent was unable to obtain despite its best efforts, or which Respondent could not obtain without unreasonable terms or conditions. "Best efforts" shall not include (i) the payment of money in consideration for the authorization or (ii) the purchase of any property. If Respondent cannot obtain such authorization on a timely basis, the time for performance of any obligation dependent upon such authorization shall be appropriately extended and the Order appropriately modified.

E.    All references to "professional engineer" in this Consent Order are to an individual certified and registered as a professional engineer in accordance with Article 145 of the New York State Education Law.

F.    All references to "days" in this Consent Order are to calendar days unless otherwise specified.

G.    The section headings set forth in this Consent Order are included for convenience of reference only and shall be disregarded in the construction and interpretation of any of the provisions of this Consent Order.

H.    All work undertaken by the Respondent pursuant to this Consent Order shall be performed in compliance with all applicable Federal, State and local laws, ordinances and regulations, including all Occupational Health and Safety Administration and Department of Transportation regulations. In the event of a conflict in the application of Federal, State, or local laws, ordinances and regulations, Respondent shall comply with the most stringent such law, ordinance or regulation.

September 17, 1997

I.    (1)    The terms of this Consent Order shall constitute the complete and

entire Consent Order between Respondent and the Department concerning the Site. No term,

condition, understanding, or agreement purporting to modify or vary any term of this Consent

Order shall be binding unless made in writing and subscribed by the party to be bound.   No

informal advice, guidance, suggestion, or comment by the Department regarding any report,

proposal, plan, specification, schedule, or any other submittal shall be construed as relieving

Respondent of Respondent's obligation to obtain such formal approvals as may be required by this

Consent Order.

(2)    If Respondent desires that any provision of this Consent Order be

changed, Respondent shall make timely written application, signed by the Respondent, to the

Department setting forth reasonable grounds for the relief sought.  Copies of such written

application shall be delivered or mailed to:

> Robert K. Davies, Senior Attorney
> Onondaga Lake Unit, NYSDEC

J.    (1)    In the event that a conflict arises among the terms and conditions of

this Consent Order and those of any Department approved submittal, this Consent Order shall

govern and the terms and conditions hereunder shall determine the parties' rights and

responsibilities.

(2)    Notwithstanding any provision in this Consent Order to the contrary,

any remedial alternative selected for the Site (including, where applicable, any operable unit of the

September 17, 1997

42

Site) shall be consistent with the remedial alternative selected by the Department in its March 28, 1997 ROD for the Dredgings Site.

      K.     In the event that a conflict arises among the terms and conditions of this Consent Order and those of any other existing consent order between the Department and Respondent, (see orders identified in paragraphs 4 - 24 of this Consent Order), this Consent Order shall govern and the terms and conditions hereunder shall determine the parties' rights and responsibilities.

      L.    (1)    The undersigned representatives of the Department and Respondent each certify that he or she is fully authorized to enter into the terms and conditions of this Consent Order and to execute and legally bind the party he or she represents to this document.

           (2)    Respondent and Respondent's officers, directors, agents, servants, employees, successors, and assigns shall be bound by this Consent Order.  Any change in ownership or corporate status of Respondent including, but not limited to, any transfer of assets or real or personal property shall in no way alter Respondent's responsibilities under this Consent Order.

           (3)    Respondent shall provide written notice and a copy of this Consent Order to each contractor hired to perform work required by this Consent Order and to each person representing Respondent with respect to the Site, and shall condition all contracts entered into hereunder upon performance in conformity with the terms of this Consent Order.  Respondent shall nonetheless be responsible for ensuring that Respondent's contractors and/or subcontractors perform the work to be done under this Consent Order in accordance with this Consent Order.

September 17, 1997

43

(4)    Respondent shall provide to each contractor hired a copy of the comprehensive reference list (attached as Exhibit J to this Consent Order) of the reports of previous investigations at the Site and access to copies of such reports as well as all available topographic and property surveys, engineering studies and aerial photographs.

M.    The effective date of this Consent Order shall be the date it is signed by the Commissioner of the Department or his authorized representative.


DATED: Albany, New York
        25 September    , 1997


                        John P. Cahill
                        Commissioner
                        New York State Department
                            of Environmental Conservation


                        BY: _____
                            Michael J. O'Toole, Jr.
                            Division Director


                                        September 17, 1997

44

CONSENT BY RESPONDENT

Respondent hereby consents to the issuing and entering of this Consent Order, waives Respondent's right to a hearing herein as provided by law, and agrees to be bound by this Consent Order.

By: _W. J. McFarland_

Name: _W. J. McFARLAND_

Title: _MANAGER, REMEDIATION_

Dated: September     ,1997

STATE OF MICHIGAN    )
                     ) s.s.:
COUNTY OF _WAYNE_     )

On this _22_ day of September,    1997, before me personally came _William J. McFarland_, to me known, who being duly sworn, did depose and say that he/she resides in _Michigan_                                    ; that he/she is the _MANAGER, Rx Media_ of the GENERAL MOTORS CORPORATION, the corporation described in and which executed the above instrument; and that he/she signed his name thereto by authority of the board of directors of said corporation.

_Alice Louise Parker_
Notary Public

rkd:c:\
alldocs\gm\mainrifs.ord

ALICE LOUISE PARKER
NOTARY PUBLIC - WAYNE COUNTY, MI
MY COMMISSION EXPIRES 05/40/00

September 17, 1997

45

## LIST OF EXHIBITS

**General Motors Corporation**
**Former IFG Facility (Site No. 7-34-057)**
**RI/FS Order on Consent**

**Exhibit A**   Map of the GM Facility.

**Exhibit B**   Map of the Xylene Spill Site.

**Exhibit C**   Map of the Dredgings Site.

**Exhibit D**   Map of the Site (includes the facility and the Deferred Media).

**Exhibit E**   Conceptual Scope of Work pertaining to Ley Creek Surface
Water and Sediments.

**Exhibit F**   SPDES Interim Effluent Limits.

**Exhibit G**   Final SPDES Permit Limits.

**Exhibit H**   RCRA Post-Closure Monitoring Requirements.

**Exhibit I**   Xylene Spill Monitoring.

**Exhibit J**   List of Site Investigation Reports.

0311147.01 9/18/97



EXHIBIT A

FACILITY MAP

GENERAL MOTORS CORP.
FORMER INLAND FISHER
GUIDE FACILITY
SYRACUSE, NEW YORK

FILE NO. 5858.024-090



EXHIBIT B

LEGEND

MONITORING WELL (VERIFIED 9/96)

MONITORING WELL (NOT LOCATED 9/96)

STORM SEWER

FIRE PROTECTION PIPING

SOIL BORING

MANHOLE

GENERAL MOTORS CORP.
SYRACUSE, NEW YORK

SAMPLING LOCATIONS
FORMER THINNER
TANKS AREA

NOT TO SCALE

FILE NO. 5858.024-XXX

BUILDING ADDITION

MANUFACTURING BUILDING

FORMER PAINT AND THINNER STORAGE AND DISPENSING

STORM SEWER

ABANDONED THINNER LINES

PIPING TO IWT

FIRE PROTECTION PIPING

SOLVENT RECOVERY TRENCHES

ESTIMATED PLUME LOCATION

8,000 GAL. UNDERGROUND THINNER TANKS (REMOVED IN 1986), 18"φ PURGE WELL WITH MECHANICAL SKIMMER

SWITCH HOUSE

MW2D
MW2S

HP-5
HP-4
HA-1

T-30
T-33E
T-29
T-21
T-18
T-10
T-9
T-26
T-13
T-4
T-8
T-5
T-1
T-6
T-7
T-34
T-25
T-16
T-15
T-24
P-9
P-2
T-11
T-2

W-4D



LEY CREEK PCB DREDGINGS SITE
Town of Salina, Onondaga County, New York
Site No. 7-34-044

New York State Department of Environmental Conservation

SITE MAP

FIGURE 1

DATE: 03/28/97

EXHIBIT    D



SITE MAP

QUADRANGLE LOCATION

0        2000        4000

SCALE IN FEET

SOURCE: SYRACUSE, EAST & WEST U.S.G.S. QUADRANGLE MAPS, DATE 1989.


O'BRIEN & GERE
ENGINEERS INC.

# EXHIBIT E

Conceptual
SCOPE of WORK
pertaining to
Ley Creek Surface Water and Sediments


The following provides a general scope of Site Remedial Investigation field work activities related to Ley Creek.   Additional sampling of media may be warranted.

## Geographic Limits

The portion of Ley Creek to be addressed under the RI/FS for the referenced site begins at Townline Road and extends downstream to the Route 11 bridge.  In addition, upstream sample locations will need to be collected in order to assist in evaluating impacts from the GM site relative to other potential contaminant sources upstream.

## Media of Concern

Sampling shall be performed in order to adequately characterize the nature and extent of contamination in the sediments, surface water and biota of Ley Creek.  At a minimum, the investigation shall include the following:

A.    Sediment

1.    Conduct a sediment probing program for Ley Creek.  The purpose will be to locate depositional areas and determine the number of samples which will be required.

2.    Based upon the sediment profile, conduct a sediment coring program.  The majority of sediment cores will be taken in depositional areas, but not less than once every 500 feet.  If no specific depositional area is found within a 500 foot stretch, the appropriate core location(s) will be selected in the field.

3.    Upstream core(s) shall be taken to determine levels of contaminants in upstream sediments.

4.    Sediment cores will be collected to depth of refusal.  Discrete surface and subsurface samples will be submitted for analysis.  The maximum core length per sample will be 6 inches.

5.    The surface sediment sample at each core location will be analyzed for PCBs
(USEPA Method 8080), VOCs (USEPA Method 8010/8020) heavy metals
(antimony, arsenic, chromium, copper, lead, mercury, nickel, selenium, and
zinc; USEPA methods 6010 and 7000 series), and total organic carbon ("TOC")
(Lloyd Kahn Method).

6.    A representative number of subsurface sediment samples will also be analyzed
for PCBs (USEPA Method 8080), VOCs (USEPA Method 8010/8020), heavy
metals (antimony, arsenic, chromium, copper, lead, mercury, nickel, selenium,
and zinc; USEPA methods 6010 and 7000 series), and TOC (Lloyd Kahn
Method).

7.    In addition, a representative number of the samples taken in items # A (5) and
(6) will also be tested for the presence of the additional parameters found in the
TCL (Target Compound List) and TAL (Target Analyte List).

B.    Surface Water

1.    A minimum of 4 surface water sampling locations will be utilized.  One will be
located upstream of the GM facility outfalls.  The second will be located
immediately downstream of the existing outfall 004 and the third immediately
downstream of outfall 003.  The fourth station will be at the Route 11 bridge.
Additional surface water locations may be necessary, depending on the results
of the initial sampling.

2.    A number of samples at each location, 4 or more, will need to be collected in
order to adequately characterize the nature and extent of contamination in the
surface water of Ley Creek.  Each sample will be analyzed for PCBs (USEPA
Method 8080), VOCs (USEPA Method 8010/8020) and heavy metals
(antimony, arsenic, chromium, copper, lead, mercury, nickel, selenium, and
zinc; USEPA methods 6010 and 7000 series).  Samples will be collected during
both high and low water flows.  In addition, flow rates, temperature, pH, and
conductivity will be measured.

3.    In addition, a representative number of the samples taken in item # B (2) will
also be tested for the presence of the additional parameters found in the TCL
(Target Compound List) and TAL (Target Analyte List).

C.    Biota

Depending upon what the initial RI data show, biota sampling and analyses may
be needed.  Generally, such data is needed for the ecological and human health risk
assessments.

0290113 02  9/18/97

## EXHIBIT F - SPDES INTERIM EFFLUENT LIMITS

SPDES No.: NY 000 0566

Page 1 of 3

EFFLUENT LIMITATIONS AND MONITORING REQUIREMENTS

During the period beginning _____ EDCO _____

and lasting until _____ EDCO + 3 YEARS _____

the discharges from the permitted facility shall be limited and monitored by the permittee as specified below:

| Outfall Number & Effluent Parameter | Discharge Limitations Daily Avg. | Daily Max. | Units | Minimum Monitoring Requirements Measurement Frequency | Sample Type |
|---|---|---|---|---|---|
| **Outfall 003 - Storm water, Treated Wastewaters, and Remediation Wastewaters:** | | | | | |
| Aroclor 1242 | NA | 2.0[1] | µg/l | Weekly | Grab |
| Aroclor 1242 | NA | Monitor[1] | g/d | Weekly | Grab |
| Aroclor 1248 | NA | 2.0[1] | µg/l | Weekly | Grab |
| Aroclor 1248 | NA | Monitor[1] | g/d | Weekly | Grab |
| Aroclor 1254 | NA | 2.0[1] | µg/l | Weekly | Grab |
| Aroclor 1254 | NA | Monitor[1] | g/d | Weekly | Grab |
| Aroclor 1260 | NA | 2.0[1] | µg/l | Weekly | Grab |
| Aroclor 1260 | NA | Monitor[1] | g/d | Weekly | Grab |
| Aluminum, Total | Monitor | Monitor | mg/l | Monthly | 24-hr. comp. |
| Cyanide, Total | Monitor | Monitor | mg/l | Monthly | 24-hr. comp. |
| Lead, Total | Monitor | Monitor | mg/l | Monthly | 24-hr. comp. |
| Trichloroethene | Monitor | 0.16 | mg/l | Monthly | Grab |
| 1,1,1-Trichloroethane | Monitor | 0.23 | mg/l | Monthly | Grab |
| Toluene | Monitor | 0.05 | mg/l | Monthly | Grab |
| 1,2-(trans)-Dichloroethene | Monitor | Monitor | mg/l | Monthly | Grab |
| 1,2-(cis)-Dichloroethene | Monitor | Monitor | mg/l | Monthly | Grab |
| **Outfall 004 - Storm water:** | | | | | |
| Trichloroethene | Monitor | Monitor | mg/l | 2/Month | Grab |
| 1,1,1-Trichloroethane | Monitor | Monitor | mg/l | 2/Month | Grab |
| Toluene | Monitor | Monitor | mg/l | 2/Month | Grab |
| Phenolics, Total | Monitor | Monitor | mg/l | 2/Month | Grab |
| Aroclor 1242 | NA | Monitor[1] | µg/l | Weekly | Grab |
| Aroclor 1242 | NA | Monitor[1] | g/d | Weekly | Grab |
| Aroclor 1248 | NA | Monitor[1] | µg/l | Weekly | Grab |
| Aroclor 1248 | NA | Monitor[1] | g/d | Weekly | Grab |
| Aroclor 1254 | NA | Monitor[1] | µg/l | Weekly | Grab |
| Aroclor 1254 | NA | Monitor[1] | g/d | Weekly | Grab |
| Aroclor 1260 | NA | Monitor[1] | µg/l | Weekly | Grab |
| Aroclor 1260 | NA | Monitor[1] | g/d | Weekly | Grab |

SPDES No.:  NY 000 0566

Page  2  of  3

## ACTION LEVEL REQUIREMENTS  (TYPE I)

The parameters listed below have been reported present in the discharge but at levels that currently do not require water quality or technology based limits.  Action levels have been established which, if exceeded, will result in reconsideration or water quality or technology based limits.

Routine action level monitoring results, if not provided for on the Discharge Monitoring Report (DMR) form, shall be appended to the DMR for the period during which the sampling was conducted.  If submission of DMR's is not required by this permit, the results shall be maintained in accordance with instructions on the RECORDING, REPORTING AND MONITORING page of this permit.

If any of the action levels is exceeded, the permittee shall undertake a short-term, high-intensity monitoring program for this parameter.  Samples identical to those required for routine monitoring purposes shall be taken on each of at least three operating days and analyzed.  Results shall be expressed in terms of both concentration and mass, and shall be submitted no later than the end of the third month following the month when the action level was first exceeded. Results may be appended to the DMR or transmitted under separate cover to the addresses listed on the RECORDING, REPORTING AND MONITORING page of this permit.  If levels higher than the actions levels are confirmed the permit may be reopened by the Department for consideration of revised action levels or effluent limits.

The permittee is not authorized to discharge any of listed parameters at levels which may cause or contribute to a violation of water quality standards.

Effective Dates:  ___EDCO to EDCO + 3 YEARS_____

| Outfall Number & Effluent Parameter | Action Level | Units | Minimum Monitoring Requirements | |
|---|---|---|---|---|
| | | | Measurement Frequency | Sample Type |
| Outfall 003: | | | | |
| Xylenes, Total | 0.1 | mg/l | Monthly | Grab |

SPDES No.: NY __000  0566__

Page __3__ of __3__

Effective Dates:    __EDCO to EDCO + 3 YEARS__ _____

SPECIAL CONDITIONS and FOOTNOTES

1.    a.    The permittee must monitor this discharge for PCBs using USEPA laboratory method 608. The permittee shall use 0.065 µg/l as the Minimum Detection Limit (MDL) for each Aroclor in the absence of a site specific MDL, which has been approved for use by the Department on the basis of an effluent specific MDL study performed in accordance with Appendix B of 40CFR 136.  The MDL which is achieved (the site specific MDL) must be repeatable, technically sound, and consider the effects of site specific matrix interference and intra-laboratory variability.  Requirements for use of analytical procedures to determine compliance with Aroclor limits and requirements may be modified in the future if the Department approves a method different from 608 which has received prior approval of the USEPA Regional Administrator in accordance with 40 CFR 136.3(a).

      b.    Non-detect at the higher of 0.065 µg/l or the site specific MDL is the discharge goal.  The permittee shall report all values above the higher of 0.065 µg/l or the site specific MDL.

91-20-2a (1/89)

SPDES No.: NY 000  0566

Part 1, Page _1_ of _6_

EFFLUENT LIMITATIONS AND MONITORING REQUIREMENTS

During the period beginning _____ EDP

and lasting until _____ EDP + 5 YEARS

the discharges from the permitted facility shall be limited and monitored by the permittee as specified below:

| Outfall Number & Effluent Parameter | Discharge Limitations | | | Minimum Monitoring Requirements | |
| | Daily Avg. | Daily Max. | Units | Measurement Frequency | Sample Type |
|---|---|---|---|---|---|
| **Outfall 003 - Storm water, Treated Wastewater, and Remediation Wastewaters[6]:** | | | | | |
| Flow | Monitor | Monitor | gpd | Weekly | Recorder |
| pH (Range) | 6.0 - 9.0 | SU | | Monthly | Grab |
| Oil & Grease | Monitor | 15 | mg/l | 2/Month | Grab |
| Solids, Total Suspended | 30 | 50 | mg/l | 2/Month | 24-hr. comp. |
| BOD, 5-day | Monitor | 30 | mg/l | Quarterly | Grab |
| Aroclor 1242 | NA | 0.30[1,3,5] | µg/l | Weekly | Grab |
| Aroclor 1242 | NA | Monitor[1,3,5] | g/d | Weekly | Grab |
| Aroclor 1248 | NA | 0.30[1,3,5] | µg/l | Weekly | Grab |
| Aroclor 1248 | NA | Monitor[1,3,5] | g/d | Weekly | Grab |
| Aroclor 1254 | NA | 0.30[1,3,5] | µg/l | Weekly | Grab |
| Aroclor 1254 | NA | Monitor[1,3,5] | g/d | Weekly | Grab |
| Aroclor 1260 | NA | 0.30[1,3,5] | µg/l | Weekly | Grab |
| Aroclor 1260 | NA | Monitor[1,3,5] | g/d | Weekly | Grab |
| Aluminum, Total | Monitor | 0.8[5] | mg/l | Monthly | 24-hr. comp. |
| Cyanide, Total | Monitor | 0.06[5] | mg/l | Monthly | 24-hr. comp. |
| Lead, Total | Monitor | 0.01[5] | mg/l | Monthly | 24-hr. comp. |
| Iron, Total | Monitor | 2.0 | mg/l | Monthly | 24-hr. comp. |
| Phenolics, Total | Monitor | 0.03 | mg/l | Monthly | Grab |
| **Outfall 03B - Industrial Waste Treatment Plant (IWTP) and Remediation Wastewater Discharge[4,6]:** | | | | | |
| Flow | Monitor | Monitor | gpd | Continuous | Recorder |
| pH(Range) | 6.0 - 9.0 | SU | | Monthly | Grab |
| Solids, Total Suspended | Monitor | Monitor | mg/l | 2/Month | Grab |
| Oil & Grease | Monitor | 15 | mg/l | 2/Month | Grab |
| Aroclor 1242 | NA | 0.30[1] | µg/l | Weekly | Grab |
| Aroclor 1242 | NA | Monitor[1] | g/d | Weekly | Grab |
| Aroclor 1248 | NA | 0.30[1] | µg/l | Weekly | Grab |
| Aroclor 1248 | NA | Monitor[1] | g/d | Weekly | Grab |
| Aroclor 1254 | NA | 0.30[1] | µg/l | Weekly | Grab |
| Aroclor 1254 | NA | Monitor[1] | g/d | Weekly | Grab |
| Aroclor 1260 | NA | 0.30[1] | µg/l | Weekly | Grab |
| Aroclor 1260 | NA | Monitor[1] | g/d | Weekly | Grab |
| Methylene Chloride | Monitor | 0.03 | mg/l | Monthly | Grab |
| 1,1-Dichloroethane | Monitor | 0.01 | mg/l | Monthly | Grab |
| Ethylbenzene | Monitor | 0.01 | mg/l | Monthly | Grab |
| Chloroform | Monitor | 0.03 | mg/l | Monthly | Grab |
| 1,1,1-Trichloroethane | Monitor | 0.01 | mg/l | Weekly | Grab |
| Carbon Tetrachloride | Monitor | 0.01 | mg/l | Monthly | Grab |
| Trichloroethene | Monitor | 0.01 | mg/l | Weekly | Grab |

Notes: See pages 5 and 6 of this exhibit.

EXHIBIT G - FINAL SPDES PERMIT LIMITS

91-20-2a (1/89)

SPDES No.: NY 000 0566

Part 1, Page 2 of 6

### EFFLUENT LIMITATIONS AND MONITORING REQUIREMENTS

During the period beginning _____ EDP _____

and lasting until _____ EDP + 5 YEARS _____

the discharges from the permitted facility shall be limited and monitored by the permittee as specified below:

| Outfall Number & Effluent Parameter | Discharge Limitations Daily Avg. | Daily Max. | Units | Minimum Monitoring Requirements Measurement Frequency | Sample Type |
|---|---|---|---|---|---|
| **Outfall 03B - IWTP Discharge (continued)[4,6]:** | | | | | |
| 1,1,2-Trichloroethane | Monitor | 0.01 | mg/l | Monthly | Grab |
| Benzene | Monitor | 0.01 | mg/l | Monthly | Grab |
| 1,2-(cis)-Dichloroethene | Monitor | 0.01 | mg/l | Monthly | Grab |
| 1,2-(trans)-Dichloroethene | Monitor | 0.01 | mg/l | Monthly | Grab |
| Tetrachloroethene | Monitor | 0.01 | mg/l | Monthly | Grab |
| Xylenes, Total | Monitor | 0.01 | mg/l | Weekly | Grab |
| Toluene | Monitor | 0.01 | mg/l | Weekly | Grab |
| **Outfall 004 - Storm water[6]:** | | | | | |
| Flow | Monitor | Monitor | gpd | Weekly | Recorder |
| Trichloroethylene | Monitor | 0.01[2,5] | mg/l | Monthly | Grab |
| 1,1,1-Trichloroethane | Monitor | 0.01[2,5] | mg/l | Monthly | Grab |
| Toluene | Monitor | 0.01[2,5] | mg/l | Monthly | Grab |
| Phenolics, Total | Monitor | 0.03[2,5] | mg/l | Monthly | Grab |
| Aroclor 1242 | NA | 0.30[1,3,5] | µg/l | Weekly | Grab |
| Aroclor 1242 | NA | Monitor[1,3,5] | g/d | Weekly | Grab |
| Aroclor 1248 | NA | 0.30[1,3,5] | µg/l | Weekly | Grab |
| Aroclor 1248 | NA | Monitor[1,3,5] | g/d | Weekly | Grab |
| Aroclor 1254 | NA | 0.30[1,3,5] | µg/l | Weekly | Grab |
| Aroclor 1254 | NA | Monitor[1,3,5] | g/d | Weekly | Grab |
| Aroclor 1260 | NA | 0.30[1,3,5] | µg/l | Weekly | Grab |
| Aroclor 1260 | NA | Monitor[1,3,5] | g/d | Weekly | Grab |
| Antimony, Total | NA | Monitor | mg/l | Quarterly | 24-hr. Comp. |
| Arsenic, Total | NA | Monitor | mg/l | Semiannual | 24-hr. Comp. |
| Copper, Total | NA | Monitor | mg/l | Quarterly | 24-hr. Comp. |
| Mercury, Total | NA | Monitor | mg/l | Semiannual | 24-hr. Comp. |
| Nickel, Total | NA | Monitor | mg/l | Quarterly | 24-hr. Comp. |
| Bis(2-ethylhexyl)Phthalate | NA | Monitor | mg/l | Quarterly | 24-hr. Comp. |
| Di-n-octylphthalate | NA | Monitor | mg/l | Quarterly | 24-hr. Comp. |
| Naphthalene | NA | Monitor | mg/l | Quarterly | 24-hr. Comp. |

Notes: See pages 5 and 6 of this exhibit.

91-20-2a (1/89)

SPDES No.: NY 000 0566

Part 1, Page __3__ of __6__

EFFLUENT LIMITATIONS AND MONITORING REQUIREMENTS

During the period beginning _____ EDP _____

and lasting until _____ EDP + 5 YEARS _____

the discharges from the permitted facility shall be limited and monitored by the permittee as specified below:

| Outfall Number & Effluent Parameter | Discharge Limitations Daily Avg. | Daily Max. | Units | Minimum Monitoring Requirements Measurement Frequency | Sample Type |
|---|---|---|---|---|---|
| **Outfall 041 - Storm water Intake:** | | | | | |
| Flow | Monitor | Monitor | gpd | Weekly | Recorder |
| Trichloroethylene | Monitor | Monitor | mg/l | Monthly | Grab |
| 1,1,1-Trichloroethane | Monitor | Monitor | mg/l | Monthly | Grab |
| Toluene | Monitor | Monitor | mg/l | Monthly | Grab |
| Phenolics, Total | Monitor | Monitor | mg/l | Monthly | Grab |
| Aroclor 1242 | NA | Monitor[1,3] | µg/l | Weekly | Grab |
| Aroclor 1242 | NA | Monitor[1,3] | g/d | Weekly | Grab |
| Aroclor 1248 | NA | Monitor[1,3] | µg/l | Weekly | Grab |
| Aroclor 1248 | NA | Monitor[1,3] | g/d | Weekly | Grab |
| Aroclor 1254 | NA | Monitor[1,3] | µg/l | Weekly | Grab |
| Aroclor 1254 | NA | Monitor[1,3] | g/d | Weekly | Grab |
| Aroclor 1260 | NA | Monitor[1,3] | µg/l | Weekly | Grab |
| Aroclor 1260 | NA | Monitor[1,3] | g/d | Weekly | Grab |
| Antimony, Total | NA | Monitor | mg/l | Quarterly | 24-hr. Comp. |
| Arsenic, Total | NA | Monitor | mg/l | Semiannual | 24-hr. Comp. |
| Copper, Total | NA | Monitor | mg/l | Quarterly | 24-hr. Comp. |
| Mercury, Total | NA | Monitor | mg/l | Semiannual | 24-hr. Comp. |
| Nickel, Total | NA | Monitor | mg/l | Quarterly | 24-hr. Comp. |
| Bis(2-ethylhexyl)Phthalate | NA | Monitor | mg/l | Quarterly | 24-hr. Comp. |
| Di-n-octylphthalate | NA | Monitor | mg/l | Quarterly | 24-hr. Comp. |
| Naphthalene | NA | Monitor | mg/l | Quarterly | 24-hr. Comp. |

Notes:   See pages 5 and 6 of this exhibit.

91-20-2g (2/89)                                                                SPDES No.:    NY 000 0566

                                                                               Part 1, Page ____4____ of __6__

## ACTION LEVEL REQUIREMENTS  (TYPE I)

The parameters listed below have been reported present in the discharge but at levels that currently do not require water quality or technology based limits.  Action levels have been established which, if exceeded, will result in reconsideration or water quality or technology based limits.

Routine action level monitoring results, if not provided for on the Discharge Monitoring Report (DMR) form, shall be appended to the DMR for the period during which the sampling was conducted.  If submission of DMR's is not required by this permit, the results shall be maintained in accordance with instructions on the RECORDING, REPORTING AND MONITORING page of this permit.

If any of the action levels is exceeded, the permittee shall undertake a short-term, high-intensity monitoring program for this parameter.  Samples identical to those required for routine monitoring purposes shall be taken on each of at least three operating days and analyzed.  Results shall be expressed in terms of both concentration and mass, and shall be submitted no later than the end of the third month following the month when the action level was first exceeded.  Results may be appended to the DMR or transmitted under separate cover to the addresses listed on the RECORDING, REPORTING AND MONITORING page of this permit.  If levels higher than the actions levels are confirmed the permit may be reopened by the Department for consideration of revised action levels or effluent limits.

The permittee is not authorized to discharge any of listed parameters at levels which may cause or contribute to a violation of water quality standards.

|                                        |                    |        | Minimum Monitoring Requirements |              |
| Outfall Number & Effluent Parameter    | Action Level       | Units  | Measurement Frequency           | Sample Type  |
| -------------------------------------- | ------------------ | ------ | ------------------------------- | ------------ |
| Outfall 003[6]:                        |                    |        |                                 |              |
| Trichloroethylene                      | 0.005[5]           | mg/l   | Monthly                         | Grab         |
| 1,1,1-Trichloroethane                  | 0.005[5]           | mg/l   | Monthly                         | Grab         |
| Toluene                                | 0.005[5]           | mg/l   | Monthly                         | Grab         |
| 1,2-(trans)-Dichloroethene             | 0.005[5]           | mg/l   | Monthly                         | Grab         |
| 1,2-(cis)-Dichloroethene               | 0.005[5]           | mg/l   | Monthly                         | Grab         |
| Xylenes, Total                         | 0.005[5]           | mg/l   | Monthly                         | Grab         |
| Antimony, Total                        | 0.1                | mg/l   | Quarterly                       | 24-hr. Comp. |
| Arsenic, Total                         | 0.01               | mg/l   | Semi-annual                     | 24-hr. Comp. |
| Copper, Total                          | 0.1                | mg/l   | Quarterly                       | 24-hr. Comp. |
| Mercury, Total                         | 0.001              | mg/l   | Semi-annual                     | 24-hr. Comp. |
| Nickel, Total                          | 0.1                | mg/l   | Quarterly                       | 24-hr. Comp. |
| Zinc, Total                            | 0.16               | mg/l   | Semi-annual                     | 24-hr. Comp. |
| Bis(2-ethylhexyl)Phthalate             | 0.1                | mg/l   | Quarterly                       | 24-hr. Comp. |
| Di-n-octylphthalate                    | 0.1                | mg/l   | Quarterly                       | 24-hr. Comp. |
| Naphthalene                            | 0.1                | mg/l   | Quarterly                       | 24-hr. Comp. |
| Outfall 004[6]:                        |                    |        |                                 |              |
| Antimony, Total                        | 0.1[2]             | mg/l   | Quarterly                       | 24-hr. Comp. |
| Arsenic, Total                         | 0.01[2]            | mg/l   | Semi-annual                     | 24-hr. Comp. |
| Copper, Total                          | 0.1[2]             | mg/l   | Quarterly                       | 24-hr. Comp. |
| Mercury, Total                         | 0.001[2]           | mg/l   | Semi-annual                     | 24-hr. Comp. |
| Nickel, Total                          | 0.1[2]             | mg/l   | Quarterly                       | 24-hr. Comp. |
| Bis(2-ethylhexyl)Phthalate             | 0.1[2]             | mg/l   | Quarterly                       | 24-hr. Comp. |
| Di-n-octylphthalate                    | 0.1[2]             | mg/l   | Quarterly                       | 24-hr. Comp. |
| Naphthalene                            | 0.1[2]             | mg/l   | Quarterly                       | 24-hr. Comp. |

Notes: See pages 5 and 6 of this exhibit.

SPDES No.: NY 000 0566

Part 1, Page __5__ of __6__

## SPECIAL CONDITIONS and FOOTNOTES

1.  a.  The permittee must monitor this discharge for PCBs using USEPA laboratory method 608. The permittee shall use 0.065 μg/l as the Minimum Detection Limit (MDL) for each Aroclor in the absence of a site specific MDL, which has been approved for use by the Department on the basis of an effluent specific MDL study performed in accordance with Appendix B of 40 CFR 136. The MDL which is achieved (the site specific MDL) must be repeatable, technically sound, and consider the effects of site specific matrix interference and intra-laboratory variability. Requirements for use of analytical procedures to determine compliance with Aroclor limits and requirements may be modified in the future if the Department approves a method different from 608 which has received prior approval of the USEPA Regional Administrator in accordance with 40 CFR 136.3(a).

    b.  The permittee shall provide a written detection report within the corresponding Discharge Monitoring Report. The report shall contain a description of any PCB detection, the exact date(s) of PCB detection(s) and whether there is a known or probable cause. If there is a known or probable cause, the report shall include the short term steps taken or planned to reduce, eliminate, and prevent the detection and its reoccurrence.

    c.  Non-detect at the higher of 0.065 μg/l or the site specific MDL is the discharge goal. As outlined in 1.b., the permittee shall report all values above the higher of 0.065 μg/l or the site specific MDL. Following three consecutive months that include analytical results above the higher of 0.065 μg/l or the site specific MDL, the permittee shall (i) evaluate the treatment system and/or the wastewater source to determine if there is an identifiable and/or controllable cause of the detectable level of PCBs in the discharge, and (ii) prepare an approvable report identifying any long-term measures that could be undertaken, if necessary and feasible (both technically and economically), to reduce, eliminate, and prevent the recurrence of such detections. This report shall be submitted to the Department within 60 days following the receipt of sampling results from the third detection monitoring period and, where appropriate, shall include a proposed schedule for implementing the identified long-term measures. When the Department has approved a report required under this paragraph and the Department so states in the approval, the permittee shall not be required to submit any further reports under this paragraph unless the reason for the detection of PCBs varies from that set forth in the approved report..

    d.  If the Department determines that the level of PCBs detected above the higher of 0.065 μg/l or the site specific MDL can be reduced, eliminated, or prevented by the implementation of the technically and economically feasible measures proposed by the permittee in 1.c., the permittee shall implement such additional measures in accordance with the schedule that has been proposed by the permittee and approved by the Department.

    e.  As treatment technology improvements become available, the permittee shall, at the Department's written request, review the available technology and evaluate whether the technology would be both feasible (both technically and economically) and provide a tangible environmental benefit at this site. The evaluation report shall be submitted by the permittee within one year of the permittee's receipt of written notification by the Department.

    f.  This limit is a phased Total Maximum Daily Loading limit, prepared in accordance with 6 NYCRR 702.16(b).

    g.  Modification of requirements for use of analytical procedures (note 1.a.) and requirements for use of improved treatment technologies as such technologies become available (note 1.e.) will be implemented as a permit modification in accordance with 6 NYCRR Part 621.

    h.  To the extent practicable, the permittee shall not be required to implement any additional remedial measures under this Special Condition and Footnote #1 other than in a manner which is consistent with the overall remediation strategy at the site.

2.  Net limitations shall apply to the indicated parameters. Net limitations shall be calculated by subtracting the mass measured at outfall 04I from that measured at outfall 004 divided by GM's contributing flow (flow @ 004 - flow @ 04I) for the indicated parameters.

EXHIBIT G - FINAL SPDES PERMIT LIMITS

SPDES No.: NY 000 0566

Part 1, Page 6 of 6

### SPECIAL CONDITIONS and FOOTNOTES(continued)

3.   The minimum measurement frequency for PCBs shall be 2/month following a period of twenty eight (28) consecutive sampling events showing no discharges above 0.065 µg/l or the site specific MDL, whichever is higher. If a discharge limitation (0.30 µg/l) for any Aroclor is exceeded the measurement frequency for all Aroclors shall again be weekly, until a period of eight (8) consecutive weekly sampling events shows no discharges above 0.065 µg/l or the site specific MDL, whichever is higher, at which point 2/month monitoring may resume.

4.   The discharge from Outfall 03B shall be treated by the industrial waste treatment plant prior to discharge to the industrial storm sewer.

5.   During the interim period identified in Order on Consent D7-0001-97-06, General Motors shall comply with the limitations and action levels set forth in that Order for the specified parameters. The Order on Consent is appended to this permit as Appendix A. All other parameters are subject to the effluent limitations and monitoring requirements as described on pages 1 through 4 of this exhibit.

6.   Storm water is defined as including dry weather flows such as groundwater infiltration and springs. Remediation wastewaters are defined as treated wastewater flow from interim remedial measures or other remedial actions which are undertaken in accordance with the terms and conditions of the above referenced Order on Consent.

## EXHIBIT H - RCRA POST-CLOSURE MONITORING REQUIREMENTS

By letter dated June 5, 1989, the New York State Department of Environmental Conservation
(the "Department") approved a Closure Plan for the two surface impoundments at the GM
facility. Part of that plan included a Compliance Groundwater Monitoring Program, which
was entitled Post-Closure Groundwater Monitoring Plan (PCGWMP) (initially dated April
1988, and subsequently revised in November 1992). The PCGWMP was implemented
following closure of the surface impoundments in 1989.

The PCGWMP consisted of monthly monitoring of ten wells for six months to determine
baseline groundwater quality, annual Appendix IX of 40 CFR Part 261 analysis of samples
from two designated compliance wells (MW-2S and MW-4D), and a quarterly groundwater
monitoring program of ten wells. Quarterly groundwater samples were analyzed for site-
specific indicator parameters, including volatile organic compounds (VOCs), polychlorinated
biphenyls (PCBs), carbon disulfide, and metals (arsenic, lead, mercury, nickel, chromium, and
zinc). The annual Appendix IX analysis served to identify additional hazardous constituents to
be monitored during the PCGWMP for the following year.

In accordance with the approved PCGWMP, laboratory analyses for mercury, cyanide, lead,
and carbon disulfide were discontinued once concentrations for these compounds remained
non-detect in the ten monitoring wells for three consecutive sampling events, as summarized
below:

| | |
|---|---|
| Lead | Quarterly analysis discontinued, because constituent not detected in three consecutive monitoring events. |
| Carbon Disulfide | Quarterly analysis discontinued, because constituent not detected in the 1995 monitoring events. |
| Cyanide | Constituent detected in Appendix IX analysis in December 1989, but not listed as a site-indicator parameter. Analysis discontinued in March 1993 after no additional detections. |
| Mercury | Analysis discontinued in March 1993 after three years of non-detects. |

In addition, by letter dated February 24, 1993, the Department approved GM's request to
discontinue statistical analysis of the groundwater monitoring data because of the presence of
historical contamination unrelated to the surface impoundments.

Based on review of existing data collected from the ten wells which monitor groundwater
quality in the vicinity of the closed surface impoundments, the following modification to the
sampling schedule will be in effect, beginning on the effective date of the attached RI/FS
Consent Order. The monitoring well locations are shown on the attached figure.

| Parameter | Method | Number of Samples | Frequency | Schedule |
|-----------|--------|-------------------|-----------|----------|
| VOCs | 8010/8020 | MW-1S, MW-1D, MW-2S, MW-2D, MW-3S, MW-3D, MW-4S, MW-4D, MW-5S, MW-5D, 1 trip blank, 1 equipment blank | Semi-annual | April October |
| PCBs | 8080 | MW-1S, MW-1D, MW-2S, MW-2D, MW-3S, MW-3D, MW-4S, MW-4D, MW-5S, MW-5D, 1 equipment blank | Semi-annual | April October |

Historically, the results of the PCGWMP were reported to the Department in an annual report. This requirement will be discontinued and GM will report the results of the modified groundwater monitoring program to the Department at the addresses listed in the RI/FS Consent Order within thirty (30) days after it receives copies of the written analytical reports.

FIGURE 1

INLAND
FISHER
GUIDE
PLANT

MW2D
MW2S

CLOSED
SURFACE
IMPOUNDMENT #1

MW1S
MW1D

MW5D
MW5S

MW3D
MW3S

CLOSED
SURFACE
IMPOUNDMENT #2

MW4S
MW4D

FACTORY AVE.

LEY CREEK

LEGEND:

⊕   MONITORING WELL

◇   CLOSED SURFACE
    IMPOUNDMENT

===⊃  OUTFALL

GENERAL MOTORS CORPORATION
SYRACUSE, NEW YORK

## SITE MAP



0        200        400

APPROX. SCALE IN FEET

3247.089-09F


O'BRIEN & GERE
ENGINEERS, INC.

## EXHIBIT I - XYLENE SPILL MONITORING

Pursuant to the 1986 Consent Order between GM and the New York State Department of Environmental Conservation (the "Department") #R-0002-85-05, GM currently conducts a ground water monitoring program in the vicinity of the xylene spill and ground water recovery system. Monitoring wells T-1 through T-10 are sampled bi-weekly for analysis for toluene, ethyl benzene and, xylene. The referenced Consent Order provides that when bi-weekly sampling indicates the presence of less than 100 parts per billion (ppb) of toluene, ethyl benzene and xylene combined and less than 50 ppb of each constituent, for five consecutive quarters ("the criteria"), then the monitoring frequency can be reduced to once/year for five years.

The sampling schedule being followed pursuant to the "Xylene Order" will be modified as set forth below beginning upon the effective date of the attached RI/FS Consent Order.

| Parameter | Sampling Well Locations* | Frequency | Schedule |
|-----------|--------------------------|-----------|----------|
| Toluene, ethyl benzene, xylene | T-1, T-2, T-3, T-4, T-5, T-10, T-13, T-15, T-18, T-21, T-24, T-26, T-29, T-33B, P-9 | Quarterly** | January April July October |
| Toluene, ethyl benzene, xylene | T-6, T-7, T-8, T-9 | Annually | April |

*The monitoring well locations are identified in Exhibit B of the RI/FS Consent Order.
**Monitoring of a specific well would be decreased to once/year (April) if concentrations are below the criteria for five consecutive sampling periods.

Historically, the results of the sampling were reported to the Department and the Onondaga County Department of Health on a quarterly basis. This requirement will be discontinued and GM will report the results of the modified groundwater monitoring program to the Department at the addresses listed in the RI/FS Consent Order within thirty (30) days after it receives copies of the written analytical reports.

# EXHIBIT J

There follows the list of site investigation reports, which is to be provided to remediation contractors in accordance with paragraph XXII.L (4) of the attached RI/FS Order on Consent.

EDI Engineering & Science. *Hydrogeological Investigation.* 1985a.

EDI Engineering & Science. *Oil and PCB Sampling and Analyses of Portions of Ley Creek, Onondaga County, New York.* 1985b.

EDI Engineering & Science. *Phase II Hydrogeological Investigation.* February 1986a.

EDI Engineering & Science. *Solvent Spill Hydrogeological Investigation and Remedial Action Plan.* April 1986b.

GMC (James Hartnett) letter of November 6, 1996 to Sue Benjamin of the DEC, forwarding analytical summaries of the Conestoga Rovers & Associates environmental site assessment data collected in 1995 and 1996.

Niagara Mohawk Power Corporation. *Factory Avenue Electric Projects; PCB Sampling and Analysis Report.* May 1996.

O'Brien & Gere Engineers, Inc. *Hydrogeologic Investigation of Fill Area Along Ley Creek.* April 1987a.

O'Brien & Gere Engineers, Inc. *Storm Outfall Assessment.* August 1987b.

O'Brien & Gere Engineers, Inc. *Surface Impoundment Closure Ground Water Monitoring Program Report.* March 1989a.

O'Brien & Gere Engineers, Inc. *Field Investigation; Ley Creek Dredged Material Area.* July 1989b.

O'Brien & Gere Engineers, Inc. *Storm Sewer Sampling Summary.* October 1989c.

O'Brien & Gere Engineers, Inc. *Work Plan; Remedial Investigation/Feasibility Study; Ley Creek Dredged Material Area.* February 1992a.

O'Brien & Gere Engineers, Inc. *Interim Remedial Measure; Ley Creek Relief Interceptor Area.* March 1992b.

O'Brien & Gere Engineers, Inc. *Surface Impoundment Post Closure
Ground Water Monitoring Plan.* April 1988; updated March 1992c.

O'Brien & Gere Engineers, Inc. *Remedial Investigation; Ley Creek
Dredged Material Area.* September 1993.

O'Brien & Gere Engineers, Inc. *Interim Remedial Measure; Ley Creek Relief
Interceptor Area.* Addendum Report. June 1994.

O'Brien & Gere Technical Services, Inc. *Interim Remedial Measures; Ley
Creek Relief Interceptor Area Work Plan.* March 1991.

Thomsen Associates and Empire Soils Investigations, Inc. *Hydrogeologic
Investigation, Fisher Body Plant, Syracuse, New York.* December 1983.

Weston Services, Inc. *Closure Plan for Drum Storage Area.* November 21, 1988.

Weston Services, Inc. *Surface Impoundments Closure Documentation Report and
Engineer's Certification Statement.* December 1989.

# EXHIBIT B

## ONONDAGA LAKE NPL SUBSITE EVALUATION

**1. SITE NAME**

Lower Ley Creek Site

**2. RECOMMENDATION**                                                                  **Date** July 22, 2010

Subsite ___X_____        Not Subsite _____        Potential Subsite _____

**3. LOCATION OF SITE (Site location map attached)**
Ley Creek from Onondaga Lake to Route 11, Town of Salina

**4. BRIEFLY DESCRIBE THE SITE (Site Sketch and Data Attached)**

This site consists of a section of Ley Creek starting from the mouth of the Creek at Onondaga Lake up to and including the Route 11 bridge and is a tributary to Onondaga Lake. This two mile section of Ley Creek is bordered by industrial properties, a rail freight track, and landfill areas. An interstate highway, I-81, also crosses the Creek. In 1994, 1998 and 2009, sediment samples from the Creek were collected and analyzed. The sample analyses performed prior to 2009 indicated the presence of PCBs at levels which constitute hazardous waste. In addition, significantly elevated concentrations of chromium, copper, lead, zinc, cadmium and mercury were found in sediment. A half mile or so portion of the Lower Ley Creek site is located adjacent to the Salina Town Landfill Inactive Hazardous Waste Site (NYS Registry #734036). A Remedial Investigation was completed in December 2000. Although there are slightly contaminated levels of PCBs and metals in the groundwater at the western end of the Salina Landfill South parcel, and the report indicates that groundwater flow and surface water runoff is toward the Ley Creek channel, it is believed that the majority of the contamination in the Lower Ley Creek sediment has come from various sources and/or facilities upstream and on Ley Creek, including the former General Motors Corporation- Inland Fisher Guide facility. The implementation of the remedies for the Salina Town Landfill and the upper Ley Creek portion of the Inland Fisher Guide Deferred Media site are expected to mitigate any ongoing or potential site-related sources of PCBs and metals to Ley Creek.

Lower Ley Creek was dredged in 1970/71 and again in 1975. Some of this material may have been placed on the banks of the Creek.

Site Work Completed to Date: () Phase I  () Phase II  () PSA  () RI/FS  () PA/SI    (X) Other : RI/FS underway

**5. IS THERE A KNOWN RELEASE OF HAZARDOUS SUBSTANCES TO THE ENVIRONMENT?** Yes __X___  No _____  Potential _____

Is the release historic or ongoing? The release is both historic and ongoing. Sediment sampling indicates the presence of PCBs, SVOCs, and metals at significantly elevated concentrations.

**6. IS THE RELEASE INTO THE LAKE OR A TRIBUTARY?** Yes ___X -tributary___  No _____  Potential ___X -Lake_____

What is the location and nature of the release? Ley Creek is a tributary of Onondaga Lake. PCBs and metals have been found in the channel sediment. There is a direct pathway for potential release of contaminants (e.g., PCBs and metals) to the Lake.

**7. IS THERE A THREAT OF RELEASE INTO THE LAKE OR A TRIBUTARY?** · Yes __X___  No _____  Potential _____

What is the location and nature of the threat? The presence of PCBs and metals in the channel presents a threat of release to the lake.

**8. HAZARDOUS SUBSTANCES/WASTES ASSOCIATED WITH THE SITE**

PCBs, chromium, copper, lead, zinc, nickel, cadmium, and mercury.

**9.     ANALYTICAL DATA AVAILABLE**

() Air   () Groundwater    (X) Surface Water   (X) Sediment    () Soil   () Waste  () Leachate·   (X) Fish Tissue

In 2009, sediment sampling in the lower portion of Ley Creek detected the presence of PCBs (total) at concentrations up to 43 ppm and metals at levels exceeding DEC Fish & Wildlife Severe Effect Level (SEL) and Lowest Effect Level (LEL);
Chromium to 1,090 ppm (SEL 110)        copper to 525 ppm (SEL 110)            Nickel to 447 ppm (SEL 50)
Lead to 856 ppm (SEL 110)                  zinc to 4430 ppm (SEL 270)            cadmium to 462 ppm (LEL 0.6)
Mercury to 2.1 ppm (LEL 0.15) .
In addition, pyrene and fluoranthene (100,000 ppb and 130,000 ppb, respectively) were detected in the sediments.
Surface water samples taken during 2009 also revealed levels of PCBs to 0.11 µg/L.
Fish tissue analyses performed in 2009 detected levels of Total PCBs as high as 2,800 µg/kg.

**10.  EXPLANATION OF RECOMMENDATION**

A release of PCBs and metals to the lower Ley Creek channel has been documented. Ley Creek is a tributary to Onondaga Lake. PCBs and metals are contaminants of concern in Onondaga Lake. This site is considered a subsite of the Onondaga Lake NPL site.

**11.   RECOMMENDATIONS FOR FURTHER ACTION**

Proceed with a Remedial Investigation/Feasibility Study as part of the Onondaga Lake NPL Site Remedial Program.

| **12. SITE OWNER'S NAME** | **13. ADDRESS** | **14. TELEPHONE NUMBER** |
|---|---|---|
| County of Onondaga | 650 W Hiawatha Blvd, Syracuse, NY 13204 | Telephone unknown |
| National Grid | 300 Erie Blvd W, Syracuse, NY 13202 | Telephone unknown |

There are various other PRPs at the Site
See attached map



Figure X

Total PCBs used in Sediment
Lower Ley Creek Superfund
Syracuse, New York

U.S EPA Environmental Response Team
Scientific Engineering Response and Analytical Services
EP-W-09-031
W.A.# 0-007

# **EXHIBIT C**

# BOND, SCHOENECK & KING, PLLC

ATTORNEYS AT LAW ■ NEW YORK  FLORIDA  KANSAS

BARRY R. KOGUT
Direct: 315-218-8181
Fax: 315-218-8481
bkogut@bsk.com

March 9, 2009

MAR 1 0 2009

**BY FIRST CLASS MAIL AND E-MAIL**

Margaret A. Sheen, Esq.
Assistant Regional Attorney
New York State Department of Environmental Conservation
Office of General Counsel, Region 7
615 Erie Boulevard West
Syracuse, NY 13204-2400

*Re:*    *Old Ley Creek Channel – Index # D7-0002-00-05*

Dear Margaret:

We are in receipt of your letter of February 23, 2009 under cover of which you provided a copy
of a updated version of an Order on Consent (the "Order") between General Motors Corporation
(GM) and the New York State Department of Environmental Conservation (the "Department")
that you asked be signed by GM in connection with the referenced matter. You advised that if
the Department does not receive a copy of this Order signed by GM by March 9, it will seek
authorization to use the Remedial Fund to undertake the remedial program at the referenced site.

This is to advise that GM will not be signing the Order because:

(1)    the proposed scope of the investigation in the Study Area is too broad. In your
February 23 letter, you indicated that the Department is not willing to limit the scope of the
investigation of the "Study Area" downstream from the "Site" (as those terms are defined under
the proposed Order) to the main channel of Ley Creek. The Department is insisting that the
Study Area include the "flood plain of the main channel of Ley Creek running underneath and
downstream of the Route 11 bridge," which you advised in your February 23 letter is interpreted
by the Department as the "FEMA 100 year flood plain."

This defined flood plain area is very extensive with potentially many owners, and if GM were
required to contact all of these owners, it would highlight GM's position as a potentially
responsible party for not only any contamination detected throughout this industrial/commercial
corridor area, but with historical discharges from Ley Creek into Onondaga Lake. The latter is
of particular concern in view of the decision made late last year by the federal and state

One Lincoln Center, Syracuse, NY 13202-1355 ■ Phone: 315-218-8000 ■ Fax: 315-218-8100 ■ www.bsk.com

1539446.2 3/9/2009

Margaret A. Sheen, Esq.
March 9, 2009
Page 2

governments to actively pursue a cost recovery action against GM and a number of other entities related to the Onondaga Lake NPL Site;

(2)    the performance of the investigation and remedial work at the Site cannot be effectively done without assistance by the Department and it is clear from your February 23 letter that this assistance will not be forthcoming.

The Site at issue was understood to be the portion of the parcel owned by Plaza East LLC (a copy of the relevant deed was forwarded to you under cover of my e-mail to you of August 20, 2008). The northern portion of the Plaza East LLC parcel is proposed to be addressed as part of the remedial program for the Salina Town Landfill site, which is to be undertaken under an order on consent between the Department and the Town of Salina.

The Department will be involved with the details of the Town's design and implementation of the remedial program; GM will not. However, in your February 23 letter, the Department advises, "Any coordination of the remedial program with other parties must be coordinated by GM and can be part of the RI work plan." This simply will not work.

GM has no right to make the Town cooperate with GM in the Town's implementation of its obligations under its order on consent with the Department. Furthermore, the Department knows, and has recited in its Registry narrative for the Salina Town Landfill site that GM is alleged to have disposed of hazardous waste, including PCB-containing wastes, at the Salina Town Landfill site. Given this, GM will be considered by the Town as a potentially adverse party in the Town's future efforts to be reimbursed for its portion of costs associated with investigation and remediation of the Salina Town Landfill site. In view of this adversarial situation, it is not realistic to believe that GM can develop the close working relationship with the Town that would be required in this case.

GM needs to have access to the Site and had successfully reached consensus with the Department for two other sites on its request to have the site owner included on the Order for purposes of securing access. (See my letter to you of August 20, 2008.) However, in this case, you advised in your February 23 letter that the Department "will not be adding on the property owner" to the Order, and that the Department "considers this aspect closed from further negotiation" without further explanation.[1]

In sum, without the Department's assistance, GM cannot effectively do the required work at the Site. We also note that in your February 23 letter, you now are requiring that the Site be extended to "go down to the boundary of Route 11" and "the eastern edge must abut Brewerton

---

[1]    Apparently, the Department has never sought information from Plaza East LLC to determine the scope of its activities on the property or that of any of its predecessors that could be of interest in the development of the required investigation. GM has no right to this information from Plaza East LLC outside of litigation

Margaret A. Sheen, Esq.
March 9, 2009
Page 3

Road." We do not believe that Plaza East LLC owns any portion of that property and so there is now another potential owner involved for which GM has no information; and

(3)    Based on the positions taken by the Department in your February 23 letter, it is the Department, rather than GM, that is in the far better position to perform the work required under the Order. We note that it is the Department, and not GM, that:

(a)    Has the regulatory authority to access the various parcels within the FEMA 100 year flood plain of Ley Creek to take samples as part of an investigation and it can exercise that right in a timely manner. GM has no comparable right of access and the effort to secure the needed access would be time-consuming and require needless expenditure of monies (not even counting the costs that would need to be incurred if landowners demanded compensation for access);

(b)    Has access to information on downstream sites that are now, or might in the future be, the subject of administrative orders associated with environmental conditions. The Department is in the best position to know the extent of contamination from these sites, or how these sites might expand or contract over time based upon the results of ongoing investigation or remedial efforts;

(c)    Has access to the work being done by the Town of Salina in connection with the implementation of the remedial program at the Salina Town Landfill that will overlap on the Site as defined under the Order. The Town will be working with the Department on this project under a separate order on consent, and therefore, the site information generated by the Town will be readily available to the Department; and

(d)    Can demand that the Site owner, Plaza East LLC, provide information on its past historical activities, and to the extent it knows, that of its predecessors. That information is important in developing the scope of the required investigation.

Given its access to the information referenced under items (a)-(d), it is the Department who can then assess the strength of its argument that upstream contamination from the former GM-IFG manufacturing facility is the source, in whole or in part, to any environmental contamination observed within the Ley Creek corridor that may require a remedial response. The Department will also be able to obtain the required information much more quickly than GM due to its involvement with the other entities doing environmental work within the Ley Creek corridor either now or in the future.

Given GM's economic challenges that have only intensified over the past several months, GM cannot agree to take on expenditures of any significance unless it concludes that it can do the work in the most efficient and productive manner consistent with its position on responsibility for environmental conditions in the areas at issue. This review is an obligation that GM owes not

Margaret A. Sheen, Esq.
March 9, 2009
Page 4

only to its immediate stakeholders (that is, its employees, shareholders, etc.), but to the federal government with whom it is engaged in ongoing discussions on needed financial assistance. As noted, for the reasons stated, GM has concluded after thoughtful analysis that it cannot go forward with the proposed Order.

We do not agree with a number of the other comments that you made in your February 23 letter, but given the outcome of the foregoing analysis, it would not be productive to set forth for the record our position on a number of other items that you discuss in your letter. The exchange may also detract from the basis for GM's decision not to go forward, which can be summarized as follows:

- the restrictions under which GM is being asked to perform the work under the Order will not yield a timely, thorough or cost-effective investigation and remedial result; and

- the Order represents a burden that is not appropriate for GM to assume under the facts as known and given the pending economic challenges facing GM.

Sincerely,

BOND, SCHOENECK & KING, PLLC

*Barry R Kogut*

Barry R. Kogut

cc:    Susan Edwards, NYSDEC (By e-mail)
       James Hartnett, GM (By e-mail)