**Hearing Date and Time:  March 3, 2011 at 9:45 a.m. (ET)**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| MOTORS LIQUIDATION COMPANY, | Case No. 09-50026 (REG) |
| f/k/a/ GENERAL MOTORS CORP., | Jointly Administered |
| Debtor. | |

**UNITED STATES' STATEMENT IN SUPPORT OF ENVIRONMENTAL PROVISIONS OF DEBTORS' PLAN OF LIQUIDATION, RESPONSE TO PUBLIC COMMENT AND JOINDER IN DEBTORS' REQUEST FOR APPROVAL OF THE ENVIRONMENTAL RESPONSE TRUST CONSENT DECREE AND SETTLEMENT AGREEMENT AMONG DEBTORS, THE ENVIRONMENTAL RESPONSE TRUST ADMINISTRATIVE TRUSTEE, THE UNITED STATES, CERTAIN STATES AND STATE ENVIRONMENTAL AGENCIES, AND THE ST. REGIS MOHAWK TRIBE INCORPORATED IN DEBTORS' PLAN**

PREET BHARARA
United States Attorney for the
Southern District of New York
NATALIE N. KUEHLER
DAVID S. JONES
Assistant United States Attorneys
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel. No.:  (212) 637-2741
Fax No.:  (212) 637-2750

*Counsel for the United States*

## TABLE OF CONTENTS

I.  PRELIMINARY STATEMENT .................................................................................1

II.  GENERAL STATUTORY/FACTUAL BACKGROUND .................................................3

    A.  Statutory Background ..........................................................................................4

        1.  CERCLA.....................................................................................................4

        2.  RCRA........................................................................................................6

    B.  Procedural Background.......................................................................................7

        1.  Old GM's Chapter 11 Petition and U.S. Treasury's Debtor
            in Possession Loan...................................................................................7

        2.  Proofs of Claims of the Governmental Environmental
            Entities ....................................................................................................8

        3.  Settlement Negotiations...........................................................................9

    C.  The ERT Settlement Agreement.........................................................................9

        1.  Cash Payments to the Trust......................................................................9

        2.  Environmental Response Trust ...............................................................11

        3.  Properties Addressed by the ERT Settlement Agreement .......................12

        4.  Other Environmental Claims Not Resolved by the
            ERT Settlement Agreement ....................................................................14

        5.  Covenants Not to Sue and Contribution Protection..................................15

    D.  Public Comments and Objections......................................................................15

        1.  Written Comments..................................................................................16

            a.  Onondaga County .......................................................................16

            b.  Craig Arquette, Environment Division of the St. Regis
               Mohawk Tribe18

c.   Matthew J. Millea, Deputy Onondaga County Executive
for Physical Services ....................................................................18

d.   Karen Kucharski ...........................................................................19

e.   William B. Magnarelli, New York Assembly Member.................19

f.   Town of Salina...............................................................................19

g.   David J. Valesky, New York Senator ............................................21

h.   Jean Public ....................................................................................22

2.   Oral Comments .........................................................................................22

a.   Ms. Kakwerais ..............................................................................22

b.   Town of Salina, New York ............................................................23

c.   Matthew J. Millea, Deputy County Executive for
Physical Services ..........................................................................23

d.   Jim Corbett, Chairman of the Environment Protection
Committee and Member of the Onondaga County
Legislature.....................................................................................24

e.   Dereth Glance, Executive Program Director of the Citizens
Campaign for the Environment and Chair of the Onondaga
Lake Bottom Community Participation Working Group ..............24

f.   Robert Gilka, on behalf of William B. Magnarelli,
New York State Assembly Member ...............................................25

g.   Lindsay Speer..............................................................................  25

h.   Les Monostory, Vice-President of the Central New York
Chapter of the Izaak Walton League of Amerca ..........................26

i.   Jeff Davis, attorney at Hiscock & Barclay, LLP, on behalf
Carrier Corporation, Oberdorfer Aluminum Foundry,
Syracuse China Corporation, Cooper Hinds, and
National Grid ................................................................................26

j.   Mr. Kaniatakeron ..........................................................................27

k.   Karen Kucharski ...........................................................................27

3.   Objections ..........................................................................28
    a.   Onondaga County .......................................................28

    b.   Town of Salina...........................................................28

III.   ARGUMENT ..................................................................................28

A.   The Court Should Approve the Proposed ERT Settlement
     Agreement Because It is Fair, Reasonable, and Consistent
     With Environmental Law...................................................................28

    1.   The Settlement Is Fair..............................................................30

    2.   The Settlement Is Reasonable.................................................31

    3.   The Settlement Is Consistent With the Goals of CERCLA ......................32

B.   The Public Comments and Objections Do Not Indicate That the
     ERT Settlement Agreement Is Inappropriate, Inadequate,
     or Improper ......................................................................................32

    1.   The Agreement Appropriately Prioritizes Owned Properties
         and Adjacent Sites With Cleanup Orders ..................................33

    2.   The Other Comments Regarding the Onondaga Site's
         Treatment Under the ERT Settlement Agreement Fail to
          Establish that the Agreement is Unfair, Unreasonable or
         Inconsistent With CERCLA .....................................................37

    3.   The ERT Settlement Agreement is Not Designed to Protect
         Federal Lender Interests..........................................................42

    4.   The Length of the Public Comment Period and Notice of
         Public Meeting Were Sufficient and Appropriate and
         no Additional Public Meeting Was Necessary ..........................43

    5.   The ERT Settlement Agreement Appropriately Does Not
         Address Criminal Issues Alleged by Commenters ....................45

    6.   The ERT Settlement Agreement Appropriately Does Not
         Address Damages for Health Effects Caused by Debtors'
         Releases of Hazardous Substances ..........................................45

    7.   The ERT Settlement Agreement's Covenants Not to Sue

        Are Appropriate ........................................................................................47

    8.    The Remaining Questions Similarly Do Not Indicate That
          the ERT Settlement Agreement Is Unreasonable, Unfair or
          Contrary to CERCLA ...............................................................................47

CONCLUSION....................................................................................................................49

## TABLE OF AUTHORITIES

**CASES**

*B.F. Goodrich Co. v. Murtha*,
   958 F.2d 1192 (2d Cir. 1992)......................................................................5

*In re Chateaugay Corp.*,
   944 F.2d 997 (2nd Cir. 1991)....................................................................35

*City of New York v. Exxon Corp.*,
   697 F. Supp. 677 (S.D.N.Y. 1988) .............................................................6

*In re Cuyahoga Equip. Corp.*,
   980 F.2d 110 (2d Cir. 1992).........................................................6, 29, 32

*Dedham Water Co. v. Cumberland Farms Dairy, Inc.*,
   805 F.2d 1074 (1st Cir. 1986) ....................................................................4

*In re Eagle-Picher Holdings, Inc.*,
   345 B.R. 860 (Bankr. S.D. Ohio 2006).............................................11, 35

*In re H.L.S. Energy Co.*,
   151 F.3d 434 (5th Cir. 1998) ....................................................................35

*In re Mark IV Indus., Inc.*,
   438 B.R. 460 (Bankr. S.D.N.Y. 2010)......................................................35

*New York v. Shore Realty Corp.*,
   759 F.2d 1032 (2d Cir. 1985).....................................................................4

*New York v. Solvent Chem. Corp.*,
   984 F. Supp. 160 (W.D.N.Y. 1997) ...........................................29, 32, 35

*O'Neil v. Picillo*,
   682 F. Supp. 706 (D.R.I. 1988),
   aff'd 883 F.2d 176 (1st Cir. 1989)..........................................................4, 5

*Pennsylvania v. Conroy*,
   24 F.3d 568 (3d Cir. 1994)........................................................................35

*In re Tilston Roberts Corp.*,
   75 B.R. 76 (S.D.N.Y. 1987).......................................................................34

*In re Torwico Elecs, Inc.*,
    8 F.3d 146 (3d Cir. 1993)..................................................................................35

*United States v. Akzo Coatings of Am., Inc.*,
    949 F.2d 1409 (6th Cir. 1991) ....................................................................3, 6

*United States v. Alcan Aluminum Corp.*,
    990 F.2d 711 (2d Cir. 1993)..............................................................................5

*United States v. Alcan Aluminum, Inc.*,
    25 F.3d 1174 (3d Cir. 1994)..............................................................................6

*United States v. Apex Oil Co., Inc.*,
    579 F.3d 734 (7th Cir. 2009) ..........................................................................35

*United States v. Cannons Eng'g Corp.*
    720 F. Supp. 1027 (D. Mass 1989),
    aff'd 899 F.2d 79 (1st Cir. 1990)....................................................................29

*United States v. Cannons Engineering Corp.*,
    899 F.2d 79 (1st Cir. 1990),  .......................................................6, 29, 30, 31

*United States v. Charles George Trucking Inc.*,
    34 F.3d 1081 (1st Cir. 1994)...........................................................29, 30, 31

*United States v. Davis*,
    261 F.3d 1 (1st Cir. 2001)...............................................................................30

*United States v. DiBiase*,
    45 F.3d 541 (1st Cir. 1995)........................................................................6, 30

*United States v. Hooker Chem. & Plastics Corp.*,
    540 F. Supp. 1067 (W.D.N.Y. 1982),
    aff'd, 749 F.2d 968 (2d Cir. 1984) ..............................................3, 29, 32

*United States v. Monsanto*,
    858 F.2d 160 (4th Cir. 1988) ...........................................................................5

*United Techs. Corp. v. Browning-Ferris Indus., Inc.*,
    33 F.3d 96 (1st Cir. 1994),
    cert. denied, 115 S. Ct. 1176 (1995) ..............................................................6

*Voluntary Purchasing Grps, Inc. v. Reilly*,
    889 F.2d 1380 (5th Cir. 1989) .........................................................................4

*In re Wall Tube & Metal Prod. Co.*,
    831 F.2d 118 (6th Cir. 1987) ....................................................................................35

*In re Westchester Structures, Inc.*,
    181 B.R. 730 (Bankr. S.D.N.Y. 1995) .......................................................................33

**STATUTES**

28 C.F.R. § 50.7 ..............................................................................................................43

40 C.F.R. §§ 300.430 .................................................................................................38, 39

75 Fed. Reg. 66  ................................................................................................................2

75 Fed. Reg. 68,001 ..........................................................................................................2

11 U.S.C. § 363 .................................................................................................................7

28 U.S.C. § 959(b) ......................................................................................................11, 35

42 U.S.C. §§ 6901-6992 .................................................................................................1, 6

42 U.S.C. §§ 6924(u) .........................................................................................................7

42 U.S.C. § 6925 ...............................................................................................................6

42 U.S.C. § 6926(b) ...........................................................................................................6

42 U.S.C. § 6928 ...............................................................................................................6

42 U.S.C. § 6973............................................................................................................ passim

42 U.S.C. § 6973(a) ...........................................................................................................7

42 U.S.C. § 9601(24) .........................................................................................................4

42 U.S.C. §§ 9604..............................................................................................................5

42 U.S.C. § 9604(a) ...........................................................................................................4

42 U.S.C. § 9604(a)-(b) ......................................................................................................5

42 U.S.C. §§ 9606..............................................................................................................5

42 U.S.C. § 9607................................................................................................................4

42 U.S.C. § 9607(a) ...................................................................................................5

42 U.S.C. § 9613(f)(2) ...........................................................................................6, 15

42 U.S.C. § 9622(a) ...................................................................................................6

42 U.S.C. § 9622(d)(2)(g)...........................................................................................43

1986 U.S.C.C.A.N. 2862 .............................................................................................6

## I.    PRELIMINARY STATEMENT

The United States, on behalf of the United States Environmental Protection Agency ("**U.S. EPA**") and the United States Department of the Treasury ("**U.S. Treasury**") (collectively, the "**United States**"), hereby submits this statement in support of the environmental provisions of the Proposed Plan of Liquidation ("**Plan**"), responds to public comments received in connection with the proposed Environmental Response Trust Consent Decree and Settlement Agreement (the "**ERT Settlement Agreement**" or "**Agreement**")[1]  lodged with the United States Bankruptcy Court for the Southern District of New York (the "**Court**") on October 20, 2010, and respectfully joins Motors Liquidation Company ("**MLC**"), formerly known as General Motors Corp. ("**Old GM**"), Remediation and Liability Management Company, Inc. ("**REALM**"), and Environmental Corporate Remediation Company, Inc. ("**ENCORE**") (collectively, "**Debtors**") in their request for the Court's approval of the ERT Settlement Agreement, which is incorporated into Debtors' Plan.  The proposed ERT Settlement Agreement resolves environmental liabilities of the Debtors asserted by the United States on behalf of U.S. EPA, as well as certain environmental liabilities asserted by 14 states or state agencies and the Tribe (collectively, the "**Governmental Environmental Claimants**") under, *inter alia*, the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended ("**CERCLA**"), 42 U.S.C. §§ 9601–9675, and the Resource Conservation and Recovery Act ("**RCRA**"), 42 U.S.C. §§ 6901–6992, in connection with 89 real properties located in 14 states.

Under the ERT Settlement Agreement, Debtors will transfer title of Debtor-owned real properties (the "**Owned Properties**") to an Environmental Response Trust (the "**Trust**"), which

---

[1]    A copy of the ERT Settlement Agreement containing the signatures of all parties except the Saint Regis Mohawk Tribe (the "Tribe"), was attached to the Notice of Lodging filed with the Court on October 20, 2010.  Docket No. 7452 (hereinafter cited to as "**SA**").  The Tribe submitted its signature to the ERT Settlement Agreement to the Court on October 21, 2010.

will fund cleanup of those properties, certain adjacent real properties, and one recently sold real property, and help to return the properties to beneficial use.  On the effective date of the Plan, which will also be the effective date of the ERT Settlement Agreement (the "**Effective Date**"), Debtors will provide approximately $509 million in cash to the Trust to fund cleanup activities, subject to certain funding adjustments provided for under the Agreement.[2]  Debtors will also transfer additional non-cash assets to the Trust together with at least $142 million in cash, subject to certain funding adjustments provided for under the Agreement, to fund the administrative costs of the Trust.

In order to become effective, the proposed ERT Settlement Agreement must be approved by the Court based on the fairness and reasonableness of the proposed Agreement and its consistency with environmental law.[3]  Notice of the settlement was published in the Federal Register on October 28, 2010, 75 Fed. Reg. 66,390 (the "**Federal Register Notice**").  A corrected Federal Register Notice was published on November 4, 2010, 75 Fed. Reg. 68,001, clarifying that two of the real properties to be transferred to the Trust previously identified as located in Michigan are, in fact, located in Missouri.  The United States received four public comments on the proposed ERT Settlement Agreement during the comment period that expired on November 27, 2010.  In response to a request received from Onondaga County, New York, the United States also agreed to accept additional public comments on the proposed ERT Settlement Agreement at a public meeting held in Syracuse, New York, on December 15, 2010.

---

[2]       Under the terms of the ERT Settlement Agreement, certain expenditures by the Debtors prior to the Effective Date to clean up the real properties covered by the Trust will be credited to the remedial funding accounts for the respective properties and, therefore, result in Trust funding adjustments.  *See* SA ¶¶ 36-37.

[3]       Debtors' will seek approval of the ERT Settlement Agreement under bankruptcy law in connection with the proceedings relating to Debtors' request for the Court's approval of their proposed Amended Joint Chapter 11 Plan.

After reviewing all comments received, the United States has determined that the proposed ERT Settlement Agreement is fair, reasonable, and consistent with environmental law. The settlement memorialized in the proposed ERT Settlement Agreement was reached after lengthy negotiations of its terms among sophisticated counsel. In addition, the parties weighed the merits, costs, risks and delays that litigation would entail against the value of settlement.

The function of the Court in reviewing such motions is not to substitute its judgment for that of the parties to the proposed ERT Settlement Agreement, but to confirm that the terms of the proposed ERT Settlement Agreement are "fair and adequate and are not unlawful, unreasonable, or against public policy." *United States v. Hooker Chem. & Plastics Corp.*, 540 F. Supp. 1067, 1072 (W.D.N.Y. 1982), *aff'd*, 749 F.2d 968 (2d Cir. 1984). The Court should also confirm that the ERT Settlement Agreement is consistent with CERCLA's goals. *United States v. Akzo Coatings of Am., Inc.*, 949 F.2d 1409, 1426 (6th Cir. 1991). In conducting its review, the Court should be deferential to the United States' determination that the settlement is in the public's interest. *Id.* Accordingly, for the reasons set forth herein, the United States respectfully requests that this Court approve and enter as a final judgment the proposed ERT Settlement Agreement lodged with this Court on October 20, 2010.[4]

## II.    GENERAL STATUTORY/FACTUAL BACKGROUND

The environmental liabilities that are resolved by the ERT Settlement Agreement derive primarily from two federal statutes and their state counterparts. The first of these, CERCLA, is generally directed at cleaning up sites contaminated with hazardous substances as a result of releases of such substances into the environment. The second, RCRA, in part addresses cleanup of hazardous constituents and hazardous wastes at operating facilities, as well as any migration

---

[4]    Approval of the ERT Settlement Agreement under environmental law is a condition precedent to the effective date of the Plan. *See* Debtors' Amended Joint Chapter 11 Plan of Liquidation, (Dec. 7, 2010), at §§ 6.4(a), 9.2 [Docket No. 8015].

of hazardous constituents from such facilities, resulting from the generation, treatment, storage, disposal, or transport of hazardous wastes.

A.    **Statutory Background**

1.    <u>CERCLA</u>

CERCLA was enacted to provide a framework for cleanup of the nation's worst hazardous waste sites.  The primary goal of CERCLA is to protect and preserve public health and the environment from the effects of releases or threatened releases of hazardous substances to the environment.  *See* 42 U.S.C. § 9601(24); *Voluntary Purchasing Grps, Inc. v. Reilly*, 889 F.2d 1380, 1386-87 (5th Cir. 1989); *O'Neil v. Picillo*, 682 F. Supp. 706, 726 (D.R.I. 1988), *aff'd*, 883 F.2d 176 (1st Cir. 1989); *Dedham Water Co. v. Cumberland Farms Dairy, Inc.*, 805 F.2d 1074, 1081 (1st Cir. 1986); *New York v. Shore Realty Corp.*, 759 F.2d 1032, 1040, n.7 (2d Cir. 1985).

CERCLA also created a Hazardous Substance Superfund, 42 U.S.C. § 9607, commonly known as the Superfund, to finance federal response actions undertaken pursuant to section 104(a) of CERCLA, 42 U.S.C. § 9604(a).  Although CERCLA authorizes cleanup of sites contaminated with hazardous substances using money provided by the Superfund, the Superfund is a limited source of funding intended for use only when responsible parties are not available to conduct or finance a site's cleanup.  *See* S. Rep. No. 96-848, 96th Cong., 2d Sess. at 17-18 (1980), *reprinted in* 1 Sen. Comm. on Env't & Pub. Works, Legislative History of CERCLA 305, 324-25 (1983).  The Superfund cannot finance cleanup of all of the many contaminated sites nationwide, so replenishment of expended Superfund monies is crucial to the continuing availability of funds for future cleanups.  Thus, the United States is tasked with seeking to ensure that potentially responsible parties ("**PRPs**") perform site cleanups or, when Superfund monies

are expended by the federal government in response to a release or threatened release of

hazardous substances, that those monies are recovered from PRPs through the liability scheme

set forth in section 107 of CERCLA.  *See B.F. Goodrich Co. v. Murtha*, 958 F.2d 1192, 1197-98

(2d Cir. 1992) (explaining that one statutory purpose of CERCLA is to hold responsible parties

liable for the costs of the cleanup).

Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), permits the United States to recover its

costs of responding to releases of hazardous substances from PRPs.  Pursuant to section 107(a),

PRPs include the owners and operators of Superfund sites at the time of the disposal of

hazardous substances at the sites, the current owners and operators of Superfund sites, as well as

the generators and transporters of hazardous substances sent to Superfund sites.  *See United

States v. Alcan Aluminum Corp.*, 990 F.2d 711, 722 (2d Cir. 1993) (describing potential liability

for generating hazardous wastes found at a Superfund site); *O'Neil*, 883 F.2d at 178

(distinguishing waste generators from waste transporters); *United States v. Monsanto*, 858 F.2d

160, 168-171 (4th Cir. 1988) (laying out the distinction between owner liability and generator

liability).

Section 104(a) and (b) of CERCLA, 42 U.S.C. § 9604(a)-(b), authorizes the U.S. EPA to

use Superfund monies to investigate the nature and extent of hazardous substance releases from

contaminated sites and to clean up those sites.  Moreover, pursuant to section 104,106, and 122

of CERCLA, the U.S. EPA may also issue administrative orders to PRPs that require them to

clean up sites, may seek injunctive relief through a civil action to secure such relief, or may seek

to reach agreements with PRPs through which one or more PRPs agree to perform the necessary

cleanup of sites.  *See* 42 U.S.C. §§ 9604, 9606, and 9622.

Having created the liability system and enforcement tools to allow the U.S. EPA to

5

pursue responsible parties for Superfund cleanups, Congress expressed a strong preference that

the United States settle with responsible parties in order to avoid spending resources on litigation

rather than on cleanup.  42 U.S.C. § 9622(a).[5]  CERCLA encourages settlements, *inter alia*, by

providing parties who settle with the United States protection from contribution claims for

matters addressed in the settlement.  42 U.S.C. § 9613(f)(2).  This provision was designed to

provide settling parties "with a measure of finality in return for their willingness to settle".[6]

## 2.    RCRA

RCRA regulates generators and transporters of hazardous wastes and owners and

operators of facilities that manage, treat, store, or dispose of hazardous wastes.  Pursuant to 42

U.S.C. § 6926(b), EPA has authorized certain states to administer portions of the RCRA

hazardous waste management programs.  The United States retains the authority to enforce an

authorized State's regulations as well as the federal portion of the program still being

administered by the United States.  42 U.S.C. § 6928.

RCRA regulations impose obligations on the owners and operators of hazardous waste

generation, treatment, storage, disposal, and/or transportation facilities regarding the manner in

which solid and hazardous wastes are dealt with.  *See* 42 U.S.C. §§ 6921-6925; 40 C.F.R. Parts

260-279.  In addition, owners and operators of hazardous waste treatment, storage, or disposal

facilities must obtain either a permit or "interim status" in order to operate legally.  42 U.S.C. §

---

[5]    *See also United States v. DiBiase*, 45 F.3d 541, 545-46 (1st Cir. 1995); *United States v. Alcan Aluminum, Inc.*, 25 F.3d 1174, 1184 (3d Cir. 1994); *In re Cuyahoga Equip. Corp.*, 980 F.2d 110 (2d Cir. 1992) (citing *City of New York v. Exxon Corp.*, 697 F. Supp. 677, 693 (S.D.N.Y. 1988)); *Akzo Coatings*, 949 F.2d at 1436; *United States v. Cannons Engineering Corp.*, 899 F.2d 79, 92 (1st Cir. 1990); H.R. Rep. No. 99-253, pt. 1, at 80 (1985), *reprinted in* 1986 U.S.C.C.A.N. 2862.

[6]    *Cannons Eng'g*, 899 F.2d at 92; *see also United Techs. Corp. v. Browning-Ferris Indus., Inc.*, 33 F.3d 96, 103 (1st Cir. 1994), *cert. denied*, 115 S. Ct. 1176 (1995); *O'Neil*, 883 F.2d at 178-79); H.R. Rep. No. 99-253, pt. 1, at 80 (1985), *reprinted in* 1986 U.S. C.C.A.N. 2862.

6925.  Under RCRA, the United States and authorized states have the authority to order the owner or operator of a permitted or interim status facility to conduct closure, corrective action, or other response measures as necessary to protect human health and the environment.  *See* 42 U.S.C. §§ 6924(u) and (v), 6928(h).  Where the U.S. EPA determines that handling, storage, treatment, transportation, or disposal of solid or hazardous waste may present an imminent and substantial endangerment to health or the environment, it can also issue a cleanup order or seek injunctive relief against any person who has contributed or is contributing to the handling, storage, treatment, transportation, or disposal of solid or hazardous waste anywhere that such solid or hazardous waste is located.  42 U.S.C. § 6973(a).

**B.**    **Procedural Background**

  1.    <u>Old GM's Chapter 11 Petition and U.S. Treasury's Debtor in Possession Loan</u>

On June 1, 2009, Old GM and three wholly-owned direct or indirect subsidiaries filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code, and on October 9, 2009, REALM and ENCORE each also filed voluntary chapter 11 petitions.  The Debtors' cases are being jointly administered in this Court.  On June 1, 2009, Old GM also filed a motion to approve the sale of substantially all of its assets pursuant to 11 U.S.C. § 363.  As part of the sale of assets, Old GM excluded from the sale certain real property and personalty it owned, including the Owned Properties and the other non-cash assets to be transferred to the Trust under the Agreement.  On July 5, 2009, the Bankruptcy Court approved the sale of assets to NGMCO, Inc. (a/k/a Newco), now known as General Motors Company ("**New GM**").  Following the sale of assets, Old GM was renamed MLC, and it has continued to own and manage the real property assets excluded from the sale to New GM.

In order to allow, among other things, the orderly winding down of MLC's affairs, U.S.

7

Treasury and Export Development Canada ("**EDC**") granted MLC a loan in the amount of

$950 million under a debtor-in-possession agreement, which became effective on June 25, 2009,

when the Bankruptcy Court entered a "Final Order Pursuant to Bankruptcy Code Sections

105(a), 361, 362, 364 and 507 and Bankruptcy Rules 2002, 4001 and 6004 (a) Approving a DIP

Credit Facility and Authorizing the Debtors to Obtain Post-Petition Financing Pursuant Thereto,

(b) Granting related Liens and Super-Priority Status, (c) Authorizing the Use of Cash Collateral

and (d) Granting Adequate Protection to Certain Pre-Petition Secured Parties" (the "**DIP**

**Order**").  On July 5, 2009, U.S. Treasury and EDC increased their loan to MLC from $950

million to $1.175 billion (the "**DIP Loan**"), and the Bankruptcy Court amended its June 25, 2009

Order accordingly by entering an "Order Pursuant to Bankruptcy Code Sections 105(a), 361,

362, 363, 364 and 507 and Bankruptcy Rules 2002, 4001 and 6004 (a) Approving Amendment to

DIP Credit Facility to Provide for Debtors' Post-Petition Wind-Down Financing" (the

"**Amended DIP Order**").  Under the terms of the DIP Loan, the DIP Order, and the Amended

DIP Order, U.S Treasury retained liens on Debtors' assets, including the cash provided to

Debtors under the DIP Loan and all real properties and personalty owned by Debtors.  Of the

$1.175 billion, a maximum of $536 million was allocated for administrative environmental

expenses.  *See* Transcript of June 30, 2009 Sale Hearing, Testimony of Albert Koch, at 297-98.

    2.    <u>Proofs of Claims of the Governmental Environmental Entities</u>

On November 28, 2009, the United States timely filed duplicate copies of a proof of

claim against MLC both in the Bankruptcy Court and directly with Debtors' claims agent, and

the two copies of the identical proof of claim were assigned Nos. 67362 and 64064.  On April 16,

2010, the United States also filed proofs of claim against REALM and ENCORE, which were

assigned Nos. 70254 and 70255.  The U.S. environmental proofs of claim protectively set forth,

*inter alia*, claims or causes of action for future work as well as past and/or future costs with

respect to certain properties addressed by the ERT Settlement Agreement.  In addition, the States

that are parties to the ERT Settlement Agreement filed environmental proofs of claim setting

forth similar claims with respect to properties addressed by the Agreement.[7]  The U.S. proof of

claim alone referred to over one hundred sites.

3.    Settlement Negotiations

Recognizing that the United States and the States were some of the largest creditors in the

bankruptcy, and that it would be difficult for Debtors to achieve a plan of liquidation without

reaching some settlements with the United States and the States with respect to the Owned

Properties, certain adjacent real properties, and the one recently sold real property (collectively,

the "**Properties**"), the United States, States and Debtors negotiated extensively for over one year

to achieve this consensual Agreement and Plan.

C.    **The ERT Settlement Agreement**[8]

1.    Cash Payments to the Trust

Pursuant to the ERT Settlement Agreement and subject to the adjustments as provided in

Paragraph 36 and 37 of the Agreement, the Debtors will make a payment to fund the Trust in the

---

[7]    The Saint Regis Mohawk Tribe (the "**Tribe**"), which is a party to the ERT Settlement Agreement, filed protective Proof of Claim No. 59086.  The states that are parties to the ERT Settlement Agreement timely filed protective Proofs of Claim in the Bankruptcy Cases as follows:  Nos. 48416 (Delaware); 44875 and 70228 (Illinois); 59181 (Indiana); 45638 (Kansas); 65349 (Massachusetts Department of Environmental Protection); 60528 and 70233 (Michigan Department of Natural Resources and Environment); 60897 and 70235 (Missouri); 44869 and 48352 (New Jersey); 50587 (New York); 50676 and 70234 (Ohio); and 44759 (Wisconsin) (collectively with the Tribe the "**States**").  These proofs of claim, *inter alia,* set forth claims and causes of action under environmental laws in connection with the Properties.

[8]    This memorandum of law contains an abbreviated summary of the terms and provisions of the ERT Settlement Agreement.  If there is any conflict between the description of the settlement contained in this memorandum and the terms and provisions of the ERT Settlement Agreement, the terms and provisions of the ERT Settlement Agreement are controlling.

9

amount of no less than $641,434,945, and separate payments will be made by sureties of Debtors to a Massachusetts expendable trust in the amount of $786,944, and to an Illinois 807 trust fund in the amount of $102,390. The cash paid to the Trust will be allocated as follows: (i) $295,036,131 will be placed in a Minimum Estimated Property Funding Account that provides specific funding amounts for the environmental cleanup of each of the properties addressed in the ERT Settlement Agreement, if any, as set forth on Attachment A, Column 2 of the Agreement; (ii) $52,065,197 will be placed in a Reserve Property Funding Account that provides specific funding amounts for each of the Properties in the event that the Minimum Estimate Property Funding is insufficient to complete the Property's cleanup, if any, as set forth on Attachment A, Column 3 of the Agreement; (iii) $84,099,794 will be placed in a Long Term Operation, Monitoring and Maintenance Property Funding Account that provides specific funding amounts for each Property to pay for long-term operation, monitoring and maintenance activities, if any, as set forth in Attachment A, Column 4 of the Agreement; (iv) $68,233,823 will be placed in a Cushion Funding Account and will be available to fund cleanup cost overruns at each of the Properties, if any, provided that certain criteria are met; (v) no less than $102 million, subject to certain adjustments, will be placed in the Administrative Funding Account to pay for costs necessary for the administration of the ERT and the orderly wind-down of the Properties, including, but not limited to, administrative and personnel costs, including professional and legal fees, Property holding costs (security, utilities, maintenance, property taxes), Property marketing costs, and demolition costs unrelated to environmental actions; and (vi) $40 million will be placed in the Administrative Funding Reserve Account to fund actual or projected shortfalls in the Administrative Funding Account that are identified prior to the third anniversary of the ERT Settlement Agreement's Effective Date. *See* SA ¶¶ 32-37.

2.    <u>Environmental Response Trust</u>

The ERT Settlement Agreement provides a mechanism by which Debtors can fulfill their responsibility to comply with applicable non-bankruptcy law, s*ee* 28 U.S.C. § 959(b), to clean up the Properties and resolve Debtors' liability to the Governmental Environmental Claimants for administrative expense claims or injunctive relief. *See In re Asarco*, *Findings of Fact and Conclusions of Law on Debtors' Motion for Order Approving Settlement of Environmental Claims* ¶ 265, No. 05-21207 (Bankr. S.D. Tex. June 5, 2009) (approving environmental settlements providing for environmental response trusts because they "pave the way for confirmation of a plan that is not 'forbidden by law' and therefore unconfirmable"); *In re Eagle-Picher Holdings, Inc.*, 345 B.R. 860, 861 (Bankr. S.D. Ohio 2006) (finding that a real property trust must be funded to comply with environmental law in order to meet requirement that plan not be forbidden by law).

As noted, under the ERT Settlement Agreement, an environmental response trust will be created into which the Owned Properties will be transferred.  The Trust will clean up hazardous substances or hazardous waste at (i) the Owned Properties; (ii) any properties formerly owned by the Debtor but sold to private parties during the course of the ERT Settlement Agreement negotiations; and (iii) certain properties adjacent to Owned Properties, and will return the Properties to beneficial use.  The Trust will be governed by the terms and conditions of the ERT Settlement Agreement and of the environmental response trust agreement that was annexed in substantially final form as Exhibit D to the ERT Settlement Agreement (the "**Trust Agreement**").  The Trust Agreement is expected to be executed and separately filed for the Court's approval prior to the approval hearing currently scheduled as part of the Plan confirmation proceedings on March 3, 2011.  The ERT Settlement Agreement and ERT Trust

Agreement contemplate the Court's appointment of EPLET, LLC as the Trust's administrative trustee (the "**ERT Trustee**").

      3.      <u>Properties Addressed by the ERT Settlement Agreement</u>

The ERT Settlement Agreement acknowledges the Debtors' responsibility to meet their environmental obligations at the Owned Properties and, through the Trust, provides funding for the Owned Properties' environmental cleanup, if any, and their administration and anticipated return to beneficial use. In addition to the Owned Properties, the ERT Settlement Agreement also provides for the resolution of Debtors' liability at certain contaminated property parcels that are immediately adjacent to Owned Properties. These properties include a brook and lagoon adjacent to the Debtor-owned Framingham Landfill in Massachusetts (the "**Framingham Brook and Lagoon**"), and the Upper Ley Creek site, in Syracuse, New York, which includes the surface water, sediments, and groundwater as defined in the September 17, 1997 State of New York Order on Consent, Index # D-7-0001-97-06 and is bounded at its south side by the Debtor-owned GM-IFG Syracuse Facility (the "**IFG Facility**") and as far downstream as the Route 11 Bridge ("**Upper Ley Creek**"). The Framingham Brook and Lagoon and Upper Ley Creek are two sites adjacent to Owned Properties which the parties believe are entitled to priority treatment in this bankruptcy based on their unique circumstances, including strong arguments for prioritization under bankruptcy law.[9]

Specifically, at the Framingham Brook and Lagoon and Upper Ley Creek sites (collectively, the "**Adjacent Properties**"): (i) the properties are immediately adjacent to properties that are owned by the Debtors; (ii) the contamination at these sites stems from the adjacent currently or formerly Debtor-owned properties; (iii) administrative or court orders compel Debtors at each of these sites to conduct environmental cleanup; and (iv) Debtors are

---

[9]      In addition, the Massena Property includes certain adjacent tribal lands.

essentially the sole PRPs in connection with the hazardous substances at issue. Accordingly, absent provision for the Adjacent Properties, they will either remain contaminated or the task of cleanup of the contaminated sites would likely fall to the state or federal governments. Moreover, to ensure the efficient cleanup of adjacent parcels, adjacent properties were included in the ERT Settlement Agreement to require the Trust to complete their cleanup alongside the cleanup of the abutting Owned Properties.

Ley Creek is the focus of most of the public comments that the United States received regarding the ERT Settlement Agreement. Upper Ley Creek is part of the Onondaga Lake Superfund Site (the "**Onondaga Site**"), as are, among other areas, the IFG Facility and the PCB Dredging Site, the Town of Salina municipal landfill (the "**Salina Landfill**"), Lower Ley Creek, and the Onondaga Lake Bottom itself. Old Ley Creek Channel, a portion of former creek bed that became intermittent when the Creek was redirected upstream for flood control purposes, is another area of concern associated with the Site. Ley Creek, after passing the IFG Facility, eventually flows beneath the Route 11 Bridge into the portion of Ley Creek which is referred to by U.S. EPA for administrative purposes as Lower Ley Creek. The Lower Ley Creek portion of Ley Creek flows west (and downstream) through the Salina Landfill, past the mouth of Old Ley Creek Channel and ultimately discharges into Onondaga Lake. The ERT Settlement Agreement does not resolve MLC's environmental liabilities at any of the many other portions of the Onondaga Site other than the IFG Facility, the PCB Dredging Site and Upper Ley Creek. A detailed map showing all relevant portions of the Onondaga Site is attached hereto as Exhibit 1. Under the ERT Settlement Agreement, the PCB Dredging Site will receive $488,981 in site-specific minimum and reserve property funding for environmental cleanup and $1,393,361 in funding for long term operation and maintenance activities; the IFG Facility will receive

$12,299,701 in site-specific minimum and reserve property funding for environmental cleanup;

Upper Ley Creek will receive $8,548,471 in site-specific minimum and reserve property for

environmental cleanup; and the IFG Facility will receive an additional $10,273,640 for

operation, monitoring, and maintenance activities.  No commenter has disputed the adequacy of

the funding provided under the ERT Settlement Agreement for the cleanup of the sites being

resolved by the Agreement.

Finally, the ERT Settlement Agreement also covers Debtors' environmental liabilities at

the GMNA Car property in Wilmington, Delaware (the "**Wilmington Property**"), which was

owned by Debtors but sold to a private party while settlement negotiations between the Debtors,

the United States and the remaining parties to the ERT Settlement Agreement were ongoing.

The purchaser of the Wilmington Property chose to have the Trust undertake certain cleanup

activities.[10]

      4.      Other Environmental Claims Not Resolved by the ERT Settlement Agreement

Certain environmental liabilities of the Debtors relating to the non-owned and Owned

Properties are not resolved by the ERT Settlement Agreement, including (i) any general

unsecured claim with respect to Lower Ley Creek, the Salina Landfill, the Old Ley Creek

Channel and the Lake Bottom, which, as mentioned above, are non-owned areas affiliated with

the Onondaga Site in the vicinity of the IFG Facility; (ii) any general unsecured claim for pre-

petition response costs with respect to any of the Owned Properties; and (iii) any general

unsecured claim for damages or injury to, or destruction or loss of natural resources, and for the

costs of any natural resource damage assessments.  The ERT Settlement Agreement expressly

---

[10]      Another Debtor-owned facility, the Metal Fab property in West Mifflin, Pennsylvania,
may also be purchased by a private party prior to the Effective Date.  As of the date of this filing,
however, the sale has not been completed and the Metal Fab property remains an Owned
Property.

14

reserves these liabilities for separate resolution, and discussions with the Debtors regarding those liabilities are ongoing.

      5.    <u>Covenants Not to Sue and Contribution Protection</u>

Under Section VII of the ERT Settlement Agreement, the Debtors will receive covenants not to sue from the Governmental Environmental Claimants with respect to the Owned Properties as well as the Framingham Brook and Lagoon, Upper Ley Creek, and the Wilmington Property. Section VII of the ERT Settlement Agreement also provides reciprocal covenants not to sue from Debtors to the Governmental Environmental Claimants and the environmental response trust parties, the latter of which are defined to include the Trust, its administrative trustee, and the trustee's shareholders, officers, directors, consultants, agents, and other professionals or representatives engaged or employed by the Trust or trustee (collectively, the "**Trust Protected Parties**"). *See* SA ¶ 99. Under Section IX of the ERT Settlement Agreement, the Debtors and the Trust Protected Parties will also receive contribution protection for matters addressed by section 113(f)(2) of CERCLA, 42 U.S.C. § 9613(f)(2). *Id.* ¶ 105.[11]

**D.**    **Public Comments and Objections**

As set forth below, the United States received eleven oral comments and eight written comments, some of which were submitted at the December 15, 2010, public meeting held in Syracuse, New York. Most of the comments pertained to Ley Creek, which is a portion of the Onondaga Site and only partially included in the ERT Settlement Agreement. Generally speaking, the commenters felt that the Agreement should be expanded to also provide funding for other non-owned areas affiliated with the Onondaga Site, specifically Lower Ley Creek, the

---

[11]    In addition, the ERT Settlement Agreement reserves all rights of the United States with respect to any site that is not included among the sites addressed by the ERT Settlement Agreement other than claims or causes of action for migration of hazardous substances emanating from a site to the extent not reserved by the ERT Settlement Agreement.

Salina Landfill, the Old Ley Creek Channel and the Lake Bottom.  Some of these commenters,

including Onondaga County and the Town of Salina, which also objected to the ERT Settlement

Agreement in their respective objections to the Debtors' Amended Chapter 11 Plan, are

themselves PRPs at these other portions of the Onondaga Site.

      1.     <u>Written Comments</u>

      *a.*     *Onondaga County*

On November 24, 2010, Gordon J. Cuffy, County Attorney, submitted a written comment

on behalf of Onondaga County, New York, attached hereto as Ex. 2 at US0004-18, requesting

specific changes to the ERT Settlement Agreement because it "arbitrarily prescribes that Trust

monies shall be used for the cleanup of Ley Creek in Onondaga County, NY only so far as the

'Route 11 Bridge'." *Id.* at US0005.  Onondaga County, itself a PRP at Ley Creek below the

Route 11 Bridge, comments that the ERT Settlement Agreement's "arbitrary funding decision

will result in both a gross inequity and a significant funding shortfall of the monies necessary to

respond to decades of polychlorinated biphenyl ("**PCB**") releases by General Motors that

contaminated the entirety of Ley Creek." *Id.*  Onondaga County further states that "the proposed

Settlement Agreement is in direct contravention of Congressional mandates and the underlying

purposes of both [CERCLA] and [RCRA]," and "requests that the proposed Settlement

Agreement be modified to include funding for the cleanup of the entirety of Ley Creek, Old Ley

Creek [Channel], and any and all GM-related Ley Creek PCB dredge spoil locations." *Id.* at

US0006.

Onondaga County acknowledges that the State of New York Order on Consent, Index #

D-7-0001-97-06 (Sept. 17, 1997) ("**1997 CONSENT ORDER**"), entered into between Old GM

and the State of New York requires MLC to "sample Ley Creek surface water and sediment, but

only downstream as far as the Route 11 Bridge." *Id.* at US0007.  Onondaga County also

acknowledges that in addition to Old GM, the County itself and six other entities "were

identified as potentially responsible parties with respect to [Lower Ley Creek]…" by the U.S.

EPA. *Id.* at US0008.  Nonetheless, Onondaga County asserts that "[t]here is no rational basis to

limit the cleanup to that portion of Ley Creek upstream of the Route 11 Bridge," *Id.* at US0011,

and that "the artificial site boundary found in the proposed Settlement Agreement *has no basis in

logic* and no support under the law." *Id.* at US0012.

      Onondaga County also alleges that the ERT Settlement Agreement is part of a "concerted

strategy to protect the considerable federal holdings in the Debtors," that under the Agreement

"local citizens and taxpayers may be forced to fund the response costs for years of GM

contamination and/or may be compelled to devote significant resources to achieve vindication

and/or a fair and equitable apportionment," and that it "is a virtual guarantee of protracted future

litigation resulting in the expenditure of limited financial and judicial resources in contravention

of the goals of CERCLA." *Id.* at US0014.  Onondaga County concludes that "[a] proposed

settlement negotiated by a lender controlled Debtor that by its expressed terms is intended to

solely benefit the lender, that has as a potential purpose and/or impact of shifting remedial costs

to entities such as the County … fails to meet the well recognized fairness standard for judicial

approval." *Id.*

      Finally, Onondaga County asserts that the Settlement Agreement is vague in its

description of Upper Ley Creek and the covenants not to sue provided under the Agreement,

questions whether the United States' or any State's liabilities at any of the sites addressed by the

Agreement was "used to derive the funding proposed to be provided to the Trust for any

individual site," and requests confirmation that "violations of the Clean Water Act or any state

analogs to the Clean Water Act" are not addressed by the Agreement.  *Id.* at US0014-15.

        b.      *Craig Arquette, Environment Division of the St. Regis Mohawk Tribe*

On December 8, 2010, Craig Arquette ("**Arquette**"), an employee of the Environment

Division of the Tribe, submitted a written comment, *see id.* at US0019, requesting information

on "[w]hat happens if the Tribe does not sign," whether "[i]f the Tribe signs [the ERT Settlement

Agreement], is the Tribe or community members prevented from suing," and "[w]ho do we sue

down the road for health impacts".  *Id.*

        c.      *Matthew J. Millea, Deputy Onondaga County Executive for Physical Services*

On December 15, 2010, at the public meeting in Syracuse, Matthew J. Millea, the Deputy

County Executive for Physical Services of the County of Onondaga, submitted written comments

in opposition to the ERT Settlement Agreement, *see id.* at US0020-24, "supplement[ing] and

expand[ing] upon the County's written submissions."  *Id.* at US0020.  Onondaga County notes

that its "distress grew when we understood that no monies would be available for Old Ley Creek

or PCB-contaminated dredge spoils removed from the Creek and located downstream of Route

11" and again alleges that "there is no discernable legal or factual basis for the arbitrary Route 11

boundary."  *Id.* at US0021.  Onondaga County's supplemental written submission noted that the

County was "forced to ask: 'Exactly what was done to review this site and GM's contamination

of Ley Creek' and 'What about that review caused the seemingly arbitrary cutoff at the Route 11

Bridge?'"  *Id.* at US0022.  Onondaga County further requests assurance that, although U.S. EPA

identified it as a PRP at Lower Ley Creek, "Onondaga County and its taxpayers … will not be

forced to pay for the cleanup of GM's environmental legacy."  *Id.*

        d.      *Karen Kucharski*

On December 15, 2010, at the public meeting in Syracuse, Karen Kucharski

("**Kucharski**") submitted written comments in opposition to the ERT Settlement Agreement, *see id.* at US0025, stating that "GM needs to clean up ALL of Ley Creek, and whatever damage has arisen from it. The watershed depends on every part being clean, healthy, and properly maintained, just as a car cannot have just its outer frame to run as a cohesive entity." *Id.*

> e.    *William B. Magnarelli, New York State Assembly Member*

On December 15, 2010, at the public meeting in Syracuse, William B. Magnarelli ("**Magnarelli**"), a member of the New York State Assembly, 120th district, submitted written comments to the ERT Settlement Agreement¸ *see id.* at US0026-27, stating that he is "in substantial agreement with the comments submitted by the County of Onondaga on November 24, 2010." *Id.* at US0026. Magnarelli further asserts that GM should not be "allowed, under cover of bankruptcy and enabled by immense taxpayer support, to abrogate its clear responsibilities under CERCLA and RCRA," and that the United States should "not lose sight of the *local* interests which in this instance are represented not only by several valued local employers, but especially by the County of Onondaga and the Town of Salina." *Id.* at US0027. Magnarelli goes on to argue that the ERT Settlement Agreement "leaves such entities in fiscal jeopardy, and at a time of economic crisis" and "creates the specter of an everlasting open-ended project, wherein government may always feel free to require 'just one more thing'." *Id.*

> f.    *Town of Salina*

On December 15, 2010, at the public meeting in Syracuse, Mark A. Nicotra, Supervisor of the Town of Salina, submitted written comments in opposition to the ERT Settlement Agreement on behalf of the Town of Salina, *see id.* at US0028-34, stating that it "supports and incorporates those comments submitted to the U.S. Department of Justice by the County of Onondaga … in its November 24, 2010 correspondence." *Id.* at US0028. The Town of Salina

objects to the notice given by the United States regarding both the ERT Settlement Agreement and the public meeting, arguing that "the notice given for the Settlement Agreement violates both applicable U.S. Bankruptcy Court procedures and 42 U.S.C. § 6973," and that the notice given for the public meeting was "apparently designed to avoid meaningful public input." *Id*. at US0028 n.1.

The Town of Salina argues that the ERT Settlement Agreement improperly restricts the use of cash funds to Upper Ley Creek, and "[i]n support of its trust fund scheme … artificially and arbitrarily divides the lower portion of Ley Creek from [Upper Ley Creek]." *Id.* at US0028. The Town of Salina, which is itself a PRP at the Salina Landfill and Lower Ley Creek, asserts that by not addressing MLC's environmental liability at that landfill, the ERT Settlement Agreement represents an "arbitrary and capricious decision" by the United States. *Id.* at US0029. The Town of Salina further argues that the ERT Settlement Agreement "is clearly in violation of CERCLA's mandate that a consent decree be fair, reasonable, and consistent with its statutory goals" because "it will result in the taxpayers of the Town, County and State of New York solely bearing the financial burden of addressing the decades of contamination Old GM and its IFG Site have caused." *Id.*

The Town of Salina finds it "particularly offensive and arbitrary" that the United States provided no funding under the ERT Settlement Agreement for the municipal landfill "while at the same time pursuing enforcement actions against the Town and other non-GM parties for the cleanup (and cost recovery) associated with these same liabilities." *Id.*  At the same time, the Town of Salina recognizes that U.S. EPA determined that "the majority of the contamination in Lower Ley Creek sediment has come from various sources and/or facilities upstream . . . " *Id.* at US0030.  The Town of Salina specifically requests that MLC be required to pay $19,201,701

towards the cleanup of the municipal landfill, and alleges that the ERT Settlement Agreement

"bars the Town from recovering any portion of this cost from Old GM" and, therefore, "fails to

satisfy the applicable standard for judicial approval of CERCLA settlements, and violates that

statute's objective that consent decrees … be fair, reasonable, and consistent with CERCLA's

goals of cleaning up contaminated sites." *Id.* at US0032.  Finally, the Town of Salina requests

that Paragraph 100(ii) of the ERT Settlement Agreement be amended to (i) reserve U.S. EPA's

rights with respect to Debtors' successors as well as "any claims," rather than merely "any

general unsecured claims" at the Lower Ley Creek and Salina Landfill sub-sites; and (ii) allow

additional claims other than those specifically reserved that result from the migration of

hazardous substances from an Owned Property to be asserted so as not to undermine U.S. EPA's

reservation of rights with respect to the Lower Ley Creek and Salina Landfill sub-sites. *Id.* at

US0033.

> g.     *David J. Valesky, New York State Senator*

On December 29, 2010, after the public comment period for written comments had

expired, David J. Valesky ("**Valesky**"), a member of the New York State Senate from the 49th

Senate District, submitted written comments to the ERT Settlement Agreement, *see id.*, at

US0035-36, stating that "[i]f this trust is approved without alteration, Onondaga County, the

Town of Salina and the hundreds of thousands of taxpayers who live therein will be forced to

pay for actions that occurred without their knowledge by a private company and beyond their

control." *Id.*

> h.     *Jean Public*

On October 30, 2010, Jean Public ("**Public**") submitted a written comment, *see id.* at

US0001-03, stating that "the penalty should be increased by 4 times and the amounts below

21

should be 4 times that." *Id.* at US0001. Public added that "this massive pollution of earth is unforgivable. [A]ll corp execs that allowed this pollution should be in jail. … [W]hy is our govt just sitting by and allowing this massive corporate pollution to have happened without criminal proceedings?" *Id.*

      2.    Oral Comments

On December 15, 2010, in response to a request received by Onondaga County, U.S. EPA Region 2 and the United States Department of Justice held a public meeting in Syracuse, New York, to discuss the ERT Settlement Agreement with the local community and solicit oral public comments. The following oral comments were received during that public meeting.

      a.    *Ms. Kakwerais*

Ms. Kakwerais ("**Kakwerais**") stated that Old GM had committed "genocide," that she "feel[s] and believe[s] that the public meeting should be held up north where the people … have that poison in their body." *See* Transcript of Public Meeting in Syracuse, New York, December 15, 2010, attached hereto as Ex. 3, at US0078. Kakwerais further stated that members of the Akwesasne Tribe had suffered severe adverse health effects from Old GM's release of hazardous substances, and that the proposed environmental cleanup at the Massena Superfund Site in New York is "not a cleanup, it's a cover up." *Id.* at US0081. Kakwerais suggested that the United States "give the people that General Motors did this genocide to … a $45 billion credit" and stated that "General Motors should be held responsible 100 percent for what they've done. And not get away with it and set the standards for the future." *Id.* at US0081-82.

Kakwerais further argued that "General Motors shouldn't be afforded the right to declare bankruptcy and use the laws of the United States to get away with what they've done." *Id.* at US0127. Kakwerais stated that "all the toxic things that they've done they're allowed to get

22

away with it.  And that is not right.  Because the PCBs last thousands of years. … It is an injustice with what has happened.  It's an injustice." *Id.* at US0129.  Kakwerais argued that the ERT Settlement Agreement "is all about" allowing Old GM to "take laws and stuff and ... twist it and turn it to suit [it], to get away with something….  It is about being irresponsible for the damage that they've done right across this country" *Id.* at US0130.  Kakwerwais stated that "$783 million isn't going to do it."  *Id.* at US0132.

### b.    *Town of Salina, New York*

Mr. Nicotra read a statement on behalf of the Town of Salina noting that "General Motors abandoned our Town in the late '80s" and "left behind a huge environmental liability that has already cost our Town taxpayers thousands of dollars, and potentially millions of dollars into the future."  *Id.* at US0084.  Nicotra repeated the Town of Salina's written comments that "[t]he [A]greement sets an arbitrary line at the bridge at New York State Route 11" and "bars the Town and the State of New York from receiving millions of dollars in compensation to address the cleanup of GM's hazardous waste generated at the Inland Fisher Guide facility, which are now located at the former Salina Landfill site."  *Id.* at US0086.  Nicotra also argued that the IFG Facility and Upper Ley Creek had already been cleaned up, and the funding allocated to those properties in the ERT Settlement Agreement should be re-allocated to clean up Lower Ley Creek and the Town of Salina municipal landfill.  *Id.* at US0088-89.

### c.    *Matthew J. Millea, Deputy County Executive for Physical Services*

Mr. Millea stated that he did not "want to see a mistake being made where a demarcation is being made arbitrarily simply because the Consent Order was placed in one section of the Creek and not another."  *Id.* at US0092.  Millea argued that "Onondaga County cannot survive a $50 million liability to clean up Lower Ley Creek … nor can the Town of Salina," and that "GM

23

should take prime liability for all of Ley Creek not just to the Route 11 [B]ridge … and for their

share of the liability of the Lake Bottom." *Id.* at US0092-93.

> d.    *Jim Corbett, Chairman of the Environment Protection Committee and
> Member of the Onondaga County Legislature*

Jim Corbett ("**Corbett**"), Chairman of the Environment Protection Committee and a

member of the Onondaga County Legislature, commented that "[t]he current plan for the [$]8.5

million to clean up only Upper Ley Creek to [the Route 11 Bridge] is not acceptable.  More

dedicated clean up monies should be available for … Lower Ley Creek." *Id.* at US0094.

Corbett requested that the "clean up plan … be redefined to include Ley Creek from the Inland

Fisher Guide all the way down into Onondaga Lake." *Id.*  Corbett argued that "Lower Ley Creek

should not become a liability for the citizens of Onondaga County. … What happened along Ley

Creek was not our responsibility, and the citizens of Onondaga County should not be held

responsible and have to pay for this." *Id.* at US0094-95.

> e.    *Dereth Glance, Executive Program Director of the Citizens Campaign for
> the Environment and Chair of the Onondaga Lake Bottom Community
> Participation Working Group*

Dereth Glance ("**Glance**"), Executive Program Director of the Citizens Campaign for the

Environment and Chair of the Onondaga Lake Bottom Community Participation Working

Group, commented that "the arbitrary line at the [Route 11] [B]ridge … is asinine.  This is

flowing into the lake." *Id.* at US0096.  Glance further argued that the entire Ley Creek needs to

be cleaned up before the cleanup of Onondaga Lake – which Ley Creek discharges into – begins,

as otherwise "[w]e're just going to be removing materials and then there is going to be more

pollution that's coming in.  It makes no sense." *Id.* at US0096-97.  Accordingly, Glance

requested that the ERT Settlement Agreement be amended to permit the use of funding allocated

to the IFG Facility and Upper Ley Creek on areas below the Route 11 Bridge. *Id.* at US0098.

Glance argued that "the most important thing … is that we're able to use these dollars wisely and we're able to clean up the entirety of Ley Creek, the key tributary to Onondaga Lake and help support the overall remediation and clean up of Onondaga Lake." *Id.* at US0099.  Glance also noted that "it's very important that the public is going to be engaged in what the future use of the[] [Owned] [P]roperties will be." *Id.*

           f.      *Robert Gilka, on behalf of William B. Magnarelli, New York State Assembly Member*

Robert Gilka, on behalf of Magnarelli, read into the record Magnarelli's written statement, which is summarized *supra* p. 19.  *See* Ex. 3 at US0099-103.

           g.      *Lindsay Speer*

Lindsay Speer ("**Speer**") commented that "[t]o limit GM's liability only to the upstream areas means that the other identified potentially responsible parties, unfortunately including the Town of Salina and Onondaga County[,] will be left to deal with the pollution.  This is my community, and that's not fair." *Id.* at US0104.  Speer argued that "GM continues to exist, free of the shackles of its environmental liabilities at [the] cost of the people[s'] and the communities it has affected financially and medically.  GM reported $2 billion profit in the third quarter of this year.  There is something profoundly wrong with our legal and economic system when a corporation can come into a community, pollute it badly over a number of years, earn a significant profit off that pollution, and then disappear and leave the people with the bill for cleaning it up, not to mention the health effects on the community." *Id.* at US0105.  Speer also stated that "[u]nder Superfund the federal government is required to consider the health and environmental concerns unique to the Native American populations and resource[s] both on and off their territory.  It does not seem like this has been adequately done." *Id.* at US0107.  Speer, moreover, requested that "the amount of money allocated" be increased. *Id.* at US0104-105.

h.    *Les Monostory, Vice-President of the Central New York Chapter of the
Izaak Walton League of America*

Les Monostory ("**Monostory**"), Vice-President of the Central New York Chapter of the

Izaak Walton League of America, commented on the ERT Settlement Agreement that "the public

notice about the GM liability was pretty sketchy." *Id.* at US0110. Monostory further stated that

his community group monitored streams across Onondaga County, including the "chemical

parameters" other than PCBs in Lower Ley Creek, which showed "polluted conditions or at least

moderately polluted conditions in Ley Creek." *Id.* at US0110-12. Monostory questioned

whether, prior to making the decision "about cutting off the liability at this Route 11 [B]ridge, …

anyone ever stud[ied] the impacts of the PCBs in the entire Ley Creek system." *Id.* at US0112.

i.    *Jeff Davis, attorney at Hiscock & Barclay, LLP, on behalf of Carrier
Corporation, Oberdorfer Aluminum Foundry, Syracuse China
Corporation, Cooper Crouse Hinds, and National Grid*

Jeff Davis ("**Davis**"), an attorney at the law firm of Hiscock & Barclay, LLP, commented

on the ERT Settlement Agreement on behalf of Carrier Corporation ("**Carrier**"), Oberdorfer

Aluminum Foundry ("**Oberdorfer**"), Syracuse China Corporation ("**Syracuse China**"), Cooper

Crouse-Hinds ("**Crouse-Hinds**") and National Grid (collectively, the "**Other PRPs**"). Davis

noted that all of the Other PRPs, "along with Onondaga County and the Town of Salina received

notice letters from the EPA relating to Lower Ley Creek." *Id.* at US0113. Davis argued that the

"arbitrary line" being drawn at the Route 11 Bridge was "troubling" because Old GM, which had

also received a notice letter from EPA relating to Lower Ley Creek, would not "be participating

in the clean up" although "EPA has acknowledged in the sub-site designation form that

predominant contamination in lower Ley Creek is caused by GM." *Id.* at US0114. Davis

concluded that the "contamination that is flowing downstream [from Upper Ley Creek] … is GM

related [and] needs to be cleaned up. And GM and the [Trust] should provide a source to do

26

that." *Id.* at US0115.

### j.    *Mr. Kaniatakeron*

Mr. Kaniatakeron ("**Kaniatakeron**") stated that the "Bear Clan mother … has commanded me to inform you that this document that is being presented to all the parties involved is not acceptable." *Id.* at US0115-16.  Kaniatakeron explained that he is Akwesasne, and therefore neither part of the Onkwehonwe tribe nor the St. Regis Indian Tribal Council, but rather "international," "the first law of the land," and "over the United States." *Id.* at US0116-17.  Kaniatakeron stated that "the Bear Clan mother … has instructed me to inform you that General Motors has done a great injustice to the human kind.  Total disregard for human life.  They need to be held responsible.  Obama needs to discipline them.  New York needs to discipline them.  Letting them off the hook by way of this Chapter 11 is unacceptable." *Id.* at US0119.  Kaniatakeron further explained that he lives adjacent to the Owned Property in Massena, New York, and disagrees with the capping remedy U.S. EPA chose to address Old GM's releases of hazardous substances at the Massena property.  *Id.* at US0120.

### k.    *Karen Kucharski*

Karen Kucharski ("**Kucharski**") stated that "GM needs to clean up all of Ley Creek, and whatever damage has arisen from it.  The watershed depends on every part being clean, healthy, and properly maintained. … Please see the bigger picture, GM." *Id.* at US0140-41.

### 3.    Objections

### a.    *Onondaga County*

Onondaga County filed an Objection to the Debtors' Amended Chapter 11 Plan on February 11, 2011, [Docket No. 9203], in which the County also objects to the ERT Settlement Agreement as "neither fair nor equitable" for the reasons set forth in their written comments

submitted to the U.S. Department of Justice, which have been summarized above.

    *b.*    *Town of Salina*

The Town of Salina also filed an Objection to Debtors' Amended Joint Chapter 11 Plan Proposed by Motors Liquidation Company, f/k/a General Motors Corporation on February 11, 2011, [Docket No. 9197], in which it, too, objected to the ERT Settlement Agreement. The Town of Salina's objections are based on the Agreement's "ban on the use of [T]rust monies to address the 'downstream' liabilities associated with [the IFG Facility], and, in particular, the disposal, discharge and/or release of hazardous wastes generated by Old GM within the lower portions of Ley Creek, Onondaga Lake, and the [Salina Landfill]." *Id.* at ¶ 34. The Town of Salina further reasserted its comments on the ERT Settlement Agreement previously submitted to the U.S. Department of Justice, including that the Agreement constitutes an "arbitrary and capricious" decision by the United States and "is clearly in violation of CERCLA's mandate that a consent decree be fair, reasonable, and consistent with its statutory goals." *Id.* at ¶¶ 35-36. The Town of Salina also requests information regarding "what steps were taken and to what extent … any allocation of United States or state liabilities [was] used to derive the funding proposed to be provided to the Trust for any individual site." *Id.* at ¶ 52.

## III.    ARGUMENT

**A.    The Court Should Approve the Proposed ERT Settlement Agreement Because It is Fair, Reasonable, and Consistent With Environmental Law**

Approval of a settlement agreement is a judicial act committed to the informed discretion of the court. *In re Cuyahoga*, 980 F.2d at 118; *Hooker Chem.*, 540 F. Supp. at 1072; *United States v. Cannons Eng'g Corp.*, 720 F. Supp. 1027, 1035 (D. Mass 1989), *aff'd* 899 F.2d 79 (1st Cir. 1990). Judicial review of a settlement negotiated by the United States to protect the public interest is subject to special deference; the Court should not engage in "second-guessing the

28

Executive Branch." *Cannons Eng'g*, 899 F.2d at 84; *see also In re Cuyahoga*, 980 F.2d at 118

(noting the "usual deference given the EPA"); *New York v. Solvent Chem. Corp.*, 984 F. Supp.

160, 165 (W.D.N.Y. 1997) ("This court recognizes that its function in reviewing consent decrees

apportioning CERCLA liability is not to substitute its judgment for that of the parties to the

decree but to assure itself that the terms of the decree are fair and adequate and are not unlawful,

unreasonable, or against public policy.") (internal quotation marks omitted).  An evidentiary

hearing is not required in order to evaluate a proposed CERCLA consent decree because such

hearings would frustrate the statutory goal of expeditious settlement, and as such, hearing

requests are routinely and properly denied.  *United States v. Charles George Trucking Inc.*, 34

F.3d 1081, 1085 (1st Cir. 1994); *Cannons Eng'g*, 899 F.2d at 94.  This "limited standard of

review reflects a clear policy in favor of settlements."  *Solvent Chem. Corp.*, 984 F. Supp. at 165.

For the reasons discussed below, the Court should approve the ERT Settlement

Agreement because it is fair, reasonable, in the public interest, and furthers the goals of both

RCRA and CERCLA.  *See Charles George Trucking*, 34 F.3d at 1084; *Cannons Eng'g*, 899 F.2d

at 85; *Hooker Chem.* 540 F. Supp. at 1073 ("the task has been to examine the proposal and

determine whether it is a fair and adequate settlement and whether its implementation will reflect

concern for the problems for which Congress has enacted the various environmental statutes.");

*Solvent Chem. Corp.*, 984 F. Supp. at 166.

1.    The Settlement Is Fair

The fairness criterion of a CERCLA settlement integrates both procedural fairness and

substantive fairness.  *Cannons Eng'g*, 899 F.2d at 86-88.  To measure procedural fairness, the

court "should ordinarily look to the negotiation process and gauge its candor, openness, and

bargaining balance."  *Id.* at 86.  The negotiation of the ERT Settlement Agreement was

procedurally fair because it was negotiated at arm's length over nearly one and a half years, with

good faith participation by governmental actors, and parties that were represented by

experienced counsel and aided, on both sides, by technical experts who assisted on matters such

as estimating the cost of future response actions.  During these many months of negotiations, the

United States, the Debtors, and their respective environmental experts were also aided by the

environmental expertise of the States' regulatory agencies.  *See id.* at 87 (finding a CERCLA

settlement procedurally fair based on criteria including an arms-length negotiation, experienced

counsel, and good faith participation by EPA).

To measure substantive fairness, the court should consider whether the settlement is

"based upon, and roughly correlated with, some acceptable measure of comparative fault,

apportioning liability . . . according to rational (if necessarily imprecise) estimates of how much

harm each PRP has done."  *Id.* at 87; *see also United States v. Davis*, 261 F.3d 1, 24 (1st Cir.

2001); *Charles George Trucking*, 34 F.3d at 1087; *DiBiase*, 45 F.3d at 544-45.  Here, the

proposed ERT Settlement Agreement is substantively fair.  The Debtors are essentially the sole

viable responsible party identified by U.S. EPA or the States at all of the properties addressed by

the ERT Settlement Agreement.  Debtors' liability at the Properties formed the backdrop for

lengthy negotiations between the parties regarding the nature, extent and cost of the cleanup that

will be required at the Properties.  The resulting terms of the ERT Settlement Agreement provide

approximately $509 million in funding for the Owned Properties and the Wilmington Site, the

Framingham Brook and Lagoon and Upper Ley Creek sites (part of which has been and will

continue to be spent by Debtors prior to the Effective Date).  *See* SA Ex. A.  These amounts were

determined after extensive discussions that included environmental experts, and represent a

substantively fair resolution of the liabilities taking into account the uncertainties and litigation

risks involved.

2.      The Settlement Is Reasonable

Courts evaluating the reasonableness of CERCLA settlements have considered three

factors: technical adequacy of the cleanup work to be performed; satisfactory compensation to

the public for response costs; and the risks, costs, and delays inherent in litigation.  *See Charles*

*George Trucking*, 34 F.3d at 1085; *Cannons Eng'g*, 899 F.2d at 89-90.  Although the first prong

of the reasonableness inquiry is not at issue in this settlement, as the Debtors are not performing

any cleanup, the ERT Settlement Agreement satisfies the other, necessarily intertwined,

considerations relevant to reasonableness.  As discussed above, the ERT Settlement Agreement

will result in at least $509 million in funding for the cleanup of the Properties.  In addition,

certain cash and other non-cash assets will be provided to the Trust to fund its administration.

These settlement terms provide for a reasonable likelihood of sufficient funding for the future

cleanup of the Properties, and reasonably balance the litigation risks for the estimated future

cleanup costs at the covered sites, including the strength of the United States' and the other

Governmental Environmental Claimants' case against the Debtors; the Debtors' bankruptcy, and

the need to recover funds for cleanup and minimize the expense and potential delay of protracted

litigation.  Accordingly, the ERT Settlement Agreement is reasonable.

3.      The Settlement Is Consistent With the Goals of CERCLA

The primary goals of CERCLA are to "encourage prompt and effective responses to

hazardous waste releases and to impose liability on responsible parties," and to "encourage

settlements that would reduce the inefficient expenditure of public funds on lengthy litigation."

*In re Cuyahoga*, 980 F.2d at 119.  This settlement furthers these statutory goals.  As discussed

above, the proposed ERT Settlement Agreement obtains significant recoveries for future

31

response costs at the Owned Properties and the Wilmington Site and a substantial portion of the

estimated future cleanup at the Framingham Landfill Site and Upper Ley Creek Site, and

reserves the rights of governmental environmental claimants, such as the United States

Department of the Interior ("**DOI**"), and the United States Department of Commerce, acting

through the National Oceanic and Atmospheric Administration ("**NOAA**"), to seek allowed

general unsecured claims for natural resource damages with respect to the Properties, as well as

the rights of the U.S. EPA to seek allowed general unsecured claims for past unreimbursed costs

incurred in connection with the Properties.  Moreover, the ERT Settlement Agreement serves

CERCLA's goal of reducing, where possible, the litigation and transaction costs associated with

response actions, as well as the public policy favoring settlement to reduce costs to litigants and

burdens on the courts.  *See Solvent Chem. Corp.*, 984 F. Supp. at 165; *Hooker Chem.*, 540 F.

Supp. at 1072.

**B.**     **The Public Comments and Objections Do Not Indicate That the ERT Settlement
          Agreement Is Inappropriate, Inadequate, or Improper**

The United States has carefully considered all public comments received and, as set forth

below, has determined that none of them indicate that the ERT Settlement Agreement is

inappropriate, inadequate, or improper.  The public comments received concerning the ERT

Settlement Agreement raise many of the same issues and can be generally grouped into the

following categories: (1) the Agreement should be expanded to provide funding for the Lower

Ley Creek, Salina Landfill, Old Ley Creek Channel and Lake Bottom areas affiliated with the

Onondaga Site, and/or the reservations relating to these other areas affiliated with the Onondaga

Site should be expanded or clarified; (2) Onondaga County, the Town of Salina, and their

Taxpayers should not be required to pay for the cleanup of Lower Ley Creek, Old Ley Creek

Channel or the Salina Landfill; (3) various other concerns relating to the Onondaga Site; (4) the

32

Agreement is designed to protect federal interests, especially those of U.S. Treasury; (5) the

notice provided for submitting public comments and attending the public meeting in Syracuse,

New York, was insufficient, and an additional public meeting should have been held in Massena,

New York; (6) MLC and its former executives should be fined and held criminally liable for Old

GM's releases of hazardous substances; (7) the Agreement should include damages for the

adverse health effects suffered by the people living in the vicinity of the Superfund site in

Massena, New York; (8) the covenants not to sue and contribution protection provisions of the

Agreement should be amended; and (9) other comments and questions.

      1.     The Agreement Appropriately Prioritizes Owned Properties and Adjacent
             Properties With Cleanup Orders

Many commenters object to the Agreement because it obtains cash funding for cleanups

of the Properties, while not providing cash funding and reserving only general unsecured claim

treatment for other areas affiliated with the Onondaga Site, specifically Lower Ley Creek, the

Salina Landfill, Old Ley Creek Channel, and the Lake Bottom.[12]  *See* Ex. 2 at US0004-18,

US0020-36; Ex. 3.  However, given the limited funding available in these bankruptcies, the ERT

Settlement Agreement appropriately prioritizes cleanups by taking into account principles of

bankruptcy law and environmental law, including whether properties are owned by the Debtors,

whether cleanup orders have been issued, and whether there are other significant viable PRPs.

Unfortunately, because of the limited funding and the need to prioritize, the Agreement cannot

---

[12]      To the extent that any commenters believe that the Agreement resolves Debtors' liability for these other parts of the Onondaga Site, they are mistaken.  The United States timely filed a proof of claim for these areas among many other sites, and the Settlement Agreement expressly reserves rights associated with those environmental liabilities.  *See* SA ¶ 100(ii).  General unsecured claims in this bankruptcy are expected to have significant value, and the United States intends to pursue these claims, potentially including the right of setoff.  *See* Plan Sections 5.7, 6.1(b), 10.8; *see also In re Tilston Roberts Corp.*, 75 B.R. 76, 79 (S.D.N.Y. 1987); *In re Westchester Structures, Inc.,* 181 B.R. 730, 740 (Bankr. S.D.N.Y. 1995).  Although the Agreement includes certain waivers relating to the non-covered portions of the Onondaga Site, those provisions are appropriate for the reasons stated below.

be expanded to include cleanup funding for other areas affiliated with the Onondaga Site, just as it cannot be expanded to include cleanup funding for the scores of other non-owned sites for which Debtors have liability but where no cleanup orders have been issued and U.S. EPA or the states have identified other viable PRPs.

The comments do not warrant rejection of the ERT Settlement Agreement. The sites that are funded by the Agreement were selected based on two criteria. First, given the limited funding available in this bankruptcy, applicable bankruptcy law must provide the strongest basis for obtaining funding for cleanup from Debtors for the covered properties. Second, again because of the limited available cash funding, the U.S. EPA had to further prioritize Debtors' environmental liabilities by limiting funding under the ERT Settlement Agreement to sites at which there are essentially no other significant viable PRPs identified by U.S. EPA or the States. Moreover, the Framingham Brook and Lagoon and Upper Ley Creek, unlike the non-covered portions of the Onondaga Site, are both immediately adjacent to Owned Properties.

Under these criteria, the strongest right of recovery under bankruptcy law for environmental cleanup is for owned sites. With respect to owned sites, the U.S. EPA is entitled to require debtors to perform cleanup obligations because debtors have an obligation to manage their property in accordance with applicable non-bankruptcy law, including environmental statutes and regulations. *See* 28 U.S.C. § 959(b); *see also In re H.L.S. Energy Co.*, 151 F.3d 434, 438 (5th Cir. 1998); *Pennsylvania v. Conroy*, 24 F.3d 568, 569-70 (3d Cir. 1994); *In re Chateaugay Corp.,* 944 F.2d 997, 1009-10 (2nd Cir. 1991); *In re Wall Tube & Metal Prod. Co.*, 831 F.2d 118, 123-24 (6th Cir. 1987). And Debtors cannot obtain confirmation of a plan of liquidation without appropriate provision for property of the estate that complies with applicable law. *In re Asarco*, *Findings of Fact and Conclusions* ¶ 265 (approving environmental

34

settlements providing for environmental response trusts because they "pave the way for confirmation of a plan that is not 'forbidden by law' and therefore unconfirmable"); *In re Eagle-Picher*, 345 B.R. 860 (finding that real property trust must be funded to comply with environmental law in order to meet requirement that plan not be forbidden by law).

Similarly, a strong case for priority under bankruptcy law can be made for non-owned sites at which cleanup orders have been issued. *See United States v. Apex Oil Co., Inc.*, 579 F.3d 734, 736-37 (7th Cir. 2009); *In re Chateaugay,* 944 F.2d at 1007-09 (noting that debtors cannot discharge their injunctive obligations under CERCLA cleanup orders because they are not "claims"); *In re Torwico Elecs, Inc.*, 8 F.3d 146, 151 (3d Cir. 1993) (explaining that debtors injunctive obligations under RCRA cleanup orders are not impaired or otherwise affected by debtors' bankruptcy); *In re Mark IV Indus., Inc.,* 438 B.R. 460, 469 (Bankr. S.D.N.Y. 2010) (holding that environmental obligations to New Mexico Environment Department are not "claims" and are not dischargeable).

Finally, among the non-owned sites with orders, the decision to prioritize sites without other significant viable PRPs is consistent with environmental law. Environmental law is premised upon the goal of maximizing the cleanup of contaminated sites. *See* discussion *supra* at pp. 4-7. It makes sense, therefore, to prioritize limited funds to sites with the highest likelihood of not being cleaned up in the absence of a settlement.

The non-covered areas affiliated with the Onondaga Site do not satisfy the above criteria. The non-covered Onondaga sites are not owned by Debtors, Debtors were not issued injunctive cleanup orders at these sites, and Debtors are not the sole viable PRPs identified by U.S. EPA or the States. In fact, many of the commenters who criticize the ERT Settlement Agreement for failing to include the other portions of the Onondaga Site are in fact all PRPs who have already

received notice letters from EPA or the New York State Department of Environmental

Conservation ("**NYS DEC**") advising them of their environmental liabilities at these sites.[13]

The criteria applied by the United States in entering into the Agreement were eminently

reasonable.  Indeed, departing from these criteria would have made the settlement vulnerable to

objection under bankruptcy law, would have delayed presentation of a confirmable Plan, and

would have delayed or prevented the cleanups that the Agreement makes possible – none of

which are in the public interest.  Moreover, if the non-covered areas affiliated with the Onondaga

Site were to be added to the ERT Settlement Agreement, PRPs or claimants at numerous other

non-owed sites could request that their sites receive cash funding as well.  Many of these sites

involve unfortunate facts of contamination and an impact on public and environment that are

arguably as compelling as those put forward by the commenters.  Indeed, it may well be the case

that the Onondaga Site, parts of which are, under the circumstances, treated generously in the

Agreement, would end up getting less overall funding than the ERT Settlement Agreement

provides.  The Agreement, therefore, may well be in the commenters' own best interest, even if

they do not realize it.

The U.S. EPA and other environmental regulators (i.e., the States) should be permitted to

take into account how priorities for environmental cleanup may be affected by the existence of a

bankruptcy proceeding, and the requirements of allocating scarce resources.  Nothing herein,

therefore, should in any way be construed to indicate that the cleanup of the non-covered

portions of the Onondaga Site is not of high priority to the U.S. EPA.  The U.S. EPA remains

committed to the cleanup of all contaminated sites and is hopeful that significant funding can

---

[13]    Other PRPs at the non-covered portions of Ley Creek include not only Onondaga County and the Town of Salina, but also Carrier, Oberdorfer, Syracuse China, Crouse-Hinds and National Grid.

still be obtained for their cleanup.  Thus, although the United States appreciates the commenters'

apparent concerns regarding the tension between environmental law and bankruptcy law, given

the constraints created under the Bankruptcy Code, the applicable case law, and the limited

funding available in this case, the United States contends that the ERT Settlement Agreement is

fair and reasonable.

> 2.    The Other Comments Regarding the Onondaga Site's Treatment Under the ERT
> Settlement Agreement Fail to Establish that the Agreement is Unfair,
> Unreasonable or Inconsistent With CERCLA

Certain comments also expressed concern that the lack of funding provided for the

cleanup of Lower Ley Creek through the ERT Settlement Agreement will negatively impact the

dredging of the Onondaga Lake Bottom, as Ley Creek will continue to deposit PCBs into

Onondaga Lake even after the dredging has commenced, and that the public should be consulted

by the U.S. EPA in determining appropriate response actions at the Onondaga Site.  *See* Ex. 2 at

US0005 (Onondaga County); US0033 (Town of Salina); Ex. 3 at US0097-99 (Glance).

Kaniatakeron and Kakwerais, in turn, oppose the ERT Settlement Agreement because they

disagree with the remedy selected by the U.S. EPA at the Massena Superfund Site in New York.

*See id.* at US0081; US0120.  The terms, and cost, of the remedy selected for the Lower Ley

Creek area of the Onondaga Site, the Massena Superfund Site, and any other Property for which

the ERT Settlement Agreement provides cleanup funding, however, will be or have been

determined by the U.S. EPA or the States pursuant to an administrative process independent of

the ERT Settlement Agreement.  According to applicable federal regulations, CERCLA remedies

are determined pursuant to a three-step administrative process in which members of the public

have an opportunity to participate.  *See* 40 C.F.R. §§ 300.430.[14]  To determine a remedy for a

---

[14]      The three steps are as follows.  First, either the PRP(s) or the U.S. EPA conducts a study
and prepares a report called a remedial investigation and feasibility study ("RI/FS"), which

site, the U.S. EPA considers a set of nine criteria set forth in 40 C.F.R. § 300.430(e)(9)(iii).[15]

None of these criteria concerns the terms of any settlement reached with a PRP.

The proposed ERT Settlement Agreement is a significant step forward in the cleanup of

the Massena Superfund Site and the Onondaga Site.  The Agreement provides over $120 million

in cleanup funding for the Massena Superfund Site, and substantial funding for response actions

required at Upper Ley Creek, the IFG Facility and the PCB Dredging Site.  The U.S. EPA,

moreover, can be expected to attempt to obtain cleanup funding for the non-covered parts of the

Onondaga Site either from the Superfund or from one or more viable PRPs, irrespective of the

net cash recovery for specific areas of the Onondaga Site in the ERT Settlement Agreement, and

any additional funds that may be recovered for the remaining areas of the Onondaga Lake Site in

the future.  To the extent that members of the public are dissatisfied with any proposed remedy

ultimately selected by the U.S. EPA for any non-covered area affiliated with the Onondaga Site,

these concerns could have been or can be raised during the related administrative processes after

---

determines the extent of contamination at a particular site or operable unit and the alternatives available to clean up the site.  40 C.F.R. § 300.430(a), (d), (e) (detailing the purpose and content of a RI/FS).  Second, the U.S. EPA uses the findings from the RI/FS to evaluate nine criteria relied upon to develop a proposed remedy for any site where hazardous substances pose and unacceptable risk.  *See* 40 C.F.R. §§ 300.430(a)(2), (e)(9)(iii), (f)(1)(i).  The proposed remedy will be made available to the public in a proposed plan, for review and comment.  40 C.F.R. § 300.430(f)(1)(ii).  In the third and final step, the U.S. EPA reviews and responds to comments received from the public concerning the proposed remedy, and consults with the affected state and other agencies where appropriate, before making a final decision.  *Id.*  The remedy selected by the U.S. EPA is documented in a Record of Decision ("ROD"), which is also made available to the public before the commencement of any remedial action.  *See* 40 C.F.R. § 300.430(f)(5), (6).

[15]     The nine criteria considered when evaluating a proposed remedy are (a) overall protection of human health and the environment; (b) compliance with applicable or relevant and appropriate requirements under federal and state environmental laws; (c) long-term effectiveness and permanence; (d) reduction of toxicity, mobility, or volume through recycling or treatment; (e) short-term effectiveness; (f) ease or difficulty of implementing the remedy; (g) the costs associated with the remedy, including capital costs, annual operation and maintenance costs, and net present value of capital and operation and maintenance costs; (h) state acceptance; and (i) community acceptance.  *See* 40 C.F.R. § 300.430(e)(9)(iii).

the proposed remedy is presented to the public in a proposed plan.  In addition to soliciting

public input into site decisions, the U.S. EPA and NYS DEC are required to provide a written

response to comments received from the public.  The U.S. EPA has and will continue to keep the

public informed of the progress at the Onondaga Site, including Lower Ley Creek, and the

Massena site.  In short, the ERT Settlement Agreement does not impact the selection or timing of

a remedy for any portion of Ley Creek or for the Massena site, other than obtaining funding for

the cleanup of the IFG Facility, PCB Dredging Site, Upper Ley Creek, and the Massena site.

Several of the comments received suggest that the ERT Settlement Agreement's coverage

of Debtors' environmental liabilities at Upper Ley Creek, but not their environmental liabilities

at Lower Ley Creek, Old Ley Creek Channel, the Salina Landfill or the Lake Bottom areas

affiliated with the Onondaga Site, was arbitrary and capricious, artificial, and without basis.  *See*

Ex. 2 at US0005-06 (Onondaga County); Ex. 3 at US0021-22 and US0092 (Onondaga County);

US0086 (Town of Salina); US0096 (Glance); US0114 (Other PRPs).  Onondaga County further

asked "what was done to review this site and GM's contamination of Ley Creek?"  Ex. at

US0022.  Other commenters stated that "GM needs to clean up ALL of Ley Creek," *id.* at

US0025 (Kucharski); and that the inclusion of Upper Ley Creek but not the remaining portions

of the Onondaga Site is "asinine," *id.* at US0096 (Glance); and "troubling," Ex. 3 at US0114

(Davis).

For the reasons stated above, the "cut-off" for purposes of the ERT Settlement

Agreement of Ley Creek at the Route 11 Bridge is in no way "arbitrary," "artificial," or

"capricious."  As previously described, the various areas affiliated with the Onondaga Site – the

IFG Facility, PCB Dredging Site, Upper Ley Creek, Lower Ley Creek, Old Ley Creek Channel,

Salina Landfill, and the Lake Bottom sites – have long been separated out and treated

39

individually, with differences in PRPs, lead agencies, and remedies.  Indeed, while at Upper Ley

Creek the lead regulatory agency is NYS DEC, the lead regulatory agency for Lower Ley Creek

is the U.S. EPA.  Moreover, the administrative order issued by NYS DEC to the Debtors that

requires Debtors to conduct certain cleanup actions is limited to Upper Ley Creek, which

includes the surface water, sediments, and groundwater as defined in the 1997 Consent Order.

Moreover, it is the United States' view that Debtors are essentially the only PRP connected to the

hazardous substances at issue in Upper Ley Creek, and additional remedial actions have been

ordered for Upper Ley Creek, unrelated to the cleanup efforts at Lower Ley Creek and other

portions of the Onondaga Site below the Route 11 Bridge.  Accordingly, the ERT Settlement

Agreement properly distinguishes between Debtors' liabilities north of the Route 11 Bridge and

their liabilities south of the Route 11 Bridge at the Onondaga Site.

Some commenters further express concern that under the ERT Settlement Agreement

local communities and taxpayers will bear the brunt of the remedial costs at the non-covered

areas affiliated with the Onondaga Site.  *See* Ex. 2 at US0014, US0020 (Onondaga County);

US0029 (Town of Salina); US0035-36 (Valesky); Ex. 3 at US0094 (Corbett); US0105 (Speer).

Similarly, the Town of Salina commented that it was "particularly offensive and arbitrary" for

the ERT Settlement Agreement not to provide funding for the Salina Landfill while pursuing the

Town and Other PRPs at the same site.  Ex 2. at US0029; s*ee also* US0026 (Magnarelli) (the

United States should "not lose sight of the *local* interests … especially [of] the County of

Onondaga and the Town of Salina" or "leave such entities in fiscal jeopardy").

These comments seem to be based on the fact that both Onondaga County and the Town

of Salina have been identified by the U.S. EPA as PRPs at Lower Ley Creek, and that the Town

of Salina, as owner and operator of the municipal landfill, is also a PRP at the Salina Landfill

40

Site.  While the United States sympathizes with the concerns of these other PRPs, their potential

liability is not being resolved by the ERT Settlement Agreement.  The U.S. EPA, moreover,

retains the ability in its discretion to provide appropriate orphan share forgiveness in accordance

with its policies to these PRPs in the future.  Moreover, as mentioned above, it may well be that

the Agreement in its current form provides more funding for cleanup in the State of New York

and Onondaga County than would be available had different criteria been applied to select sites

for inclusion in the settlements that would have included dozens of properties such as the non-

covered portions of the Onondaga Site.  Accordingly, these comments provide no basis for the

United States to withdraw its consent to the ERT Settlement Agreement.

Onondaga County also asserts that the ERT Settlement Agreement's definition of the IFG

Facility Site "is at best ambiguous," and that the scope of the intended work should be described

and the funding increased "to the extent that work does not include both in and out of Creek

response actions."  *See id.* at US0014-15.  As noted in the ERT Settlement Agreement, the IFG

Facility Site comprises both the IFG Facility, which is owned by Debtors, and the portion of Ley

Creek extending from the IFG Facility to the Route 11 Bridge.  *See* SA ¶ 63.  Separately, the

ERT Settlement Agreement also provides funding for the PCB Dredging Site, which is also

owned by Debtors and is immediately adjacent to Upper Ley Creek adjacent to the IFG Facility.

*See* SA Ex. A.  For the avoidance of doubt, the Owned Properties' full legal description will be

included as Exhibit A to the proposed Trust Agreement.  *See* Ex. A of SA Ex. C.  To the extent

that Onondaga County is concerned about the remedies selected for the cleanup of Ley Creek,

the U.S. EPA and NYS DEC will determine, as described above, what the appropriate remedies

are for Ley Creek through an administrative process that is separate from the ERT Settlement

Agreement, in which members of the public, including Onondaga County, will have an

opportunity to participate and voice any concerns regarding the scope of the selected remedies.

Finally, to the extent commenters argue that no further cleanup is required at Upper Ley Creek because that area has already been cleaned up in the past, they are incorrect. While Upper Ley Creek was dredged in the past, it was not dredged to address environmental conditions but flood control issues. An RI/FS study is currently nearing completion for what is referred to as the IFG Facility and Deferred Media portion of the Onondaga Site. The Deferred Media refers to upper Ley Creek itself and ground water in the vicinity of the IFG Facility and Upper Ley Creek.

3.      The ERT Settlement Agreement is Not Designed to Protect Federal Lender Interests

Onondaga County also opposes the ERT Settlement Agreement because it believes the Agreement is part of a "concerted strategy to protect the considerable federal holdings in the Debtors." Ex. 2 at US0013. To support its position, Onondaga County alleges that the ERT Settlement Agreement was "negotiated by a lender controlled Debtor [and] by its expressed terms is intended to solely benefit the lender," and as such "fails to meet the well recognized fairness standard for judicial approval." *Id*. at US0014.

Onondaga County's comment that the United States has "considerable … holdings in the Debtors" appears to incorrectly equate the Government's stake in New GM with any interest in Old GM. The Government does not have any "holdings in the Debtors." Moreover, although U.S. Treasury did act as Old GM's DIP lender in this bankruptcy, Onondaga County's allegations that the Government controlled the Debtors or that the ERT Settlement Agreement is intended to solely benefit the United States lack any factual basis. As discussed above, Debtors here have been represented by highly experienced and sophisticated counsel and outside experts, and negotiations were conducted with the United States and other parties at arms-length. The

$536 million from the DIP Loan Proceeds provided by Treasury are the sole source of cash

funding available to cover Debtors' environmental liabilities, and there is no expectation that

Treasury will recoup such funds. Moreover, the assertion that the ERT Settlement Agreement,

particularly with regard to Debtors' environmental liabilities at the Onondaga Site, in any way

favors the United States is simply unfounded. Indeed, the State of New York is the lead for

those areas of the Onondaga Site that are receiving funding under the Agreement. The funding

provided through the Trust to clean up the IFG Facility, the PCB Dredging Site, and Upper Ley

Creek, therefore, do not "solely benefit" the United States. It benefits the State of New York and

other States and their local communities, who will be receiving substantial cash funding –

originally provided to the Debtors though U.S. Treasury's DIP Loan – to clean up those areas of

the Onondaga Lake Site and return the IFG Facility and PCB Dredging Site and other Owned

Properties to beneficial use. Far from shifting a cleanup burden to the local communities, the

ERT Settlement Agreement significantly eases the cleanup burden these communities would

otherwise be under by providing cash funding to clean up areas at the Onondaga Site, as well as

many other sites across the county at which U.S. EPA is not the lead agency.

     4.     <u>The Length of the Public Comment Period and Notice of Public Meeting Were</u>
               <u>Sufficient and Appropriate and no Additional Public Meeting Was Necessary</u>

       The Town of Salina's contention that the public comment period and the notice of the

Syracuse public meeting were inadequate is erroneous and does not warrant rejection of the

settlement. A thirty-day comment period is plainly sufficient for environmental settlements. *Cf.*

28 C.F.R. § 50.7 and 42 U.S.C. § 9622(d)(2)(g) and (i). The United States' thirty-day public

comment period was also properly noticed in the October 28, 2010, Federal Register Notice.

Above and beyond the public comment period, which solicits written comments, Onondaga

County requested that a public meeting be held pursuant to RCRA requirements. Under 42

43

U.S.C. § 6973, the United States is required to afford the public "notice, and opportunity for a public meeting in the affected area, and a reasonable opportunity to comment on the proposed settlement prior to its final entry."  The United States held such a meeting on December 15, 2010, after notice by telephone to Onondaga County, which had requesting the meeting, and notice by publication on December 13, 2010 in the Syracuse Post Standard, as well as distribution via the Onondaga Site email list, which has over 800 interested parties who have registered as subscribers.

The commenters present no facts to support their assertion that the public comment period and notice of the Syracuse public meeting were insufficient.  Indeed, nobody has submitted any comments since December 29, 2010, and no one has asked for an extension.  The United States is responding in this memorandum to all written and oral comments provided at the public meeting, and to all written comments received, including one that was received thirty-one days after the public comment period had expired.  Similarly, nobody requested that the public meeting in Syracuse be postponed, and as shown by the comments received the meeting itself was well-attended.  The commenters raising this concern were clearly able to submit carefully considered and detailed comments to which the United States has responded.

Kakwerais also requested that the Syracuse public meeting should have been held "up north where the people … have that poison in their body," which the United States believes is a reference to Massena, New York, where the largest Superfund site addressed by the ERT Settlement Agreement is located and where Kakwerais lives.  *See* Ex. 3 at US0078.  The United States, however, received no requests to move the Syracuse public meeting to Massena before the meeting took place, and the only person requesting that a public meeting be held in Massena was Kakwerais, who was able to attend the meeting in Syracuse and submitted detailed oral

44

comments on the ERT Settlement Agreement at the time.

Accordingly, the arguments that an additional public meeting should have been held in Massena, New York, and that the ERT Settlement Agreement should not be entered because of the length of the public comment period and the fact that the public meeting was held in Syracuse, New York, do not warrant rejection of the ERT Settlement Agreement.

5.     <u>The ERT Settlement Agreement Appropriately Does Not Address Criminal Issues Alleged by Commenters</u>

Comments by Public, Kakwerais and Speer complain that the United States should hold MLC and its former executives liable for having released hazardous substances by imposing fines and initiating criminal prosecutions. *See* Ex. 2 at US0001; Ex. 3 at US0081; US0105. These comments do not warrant rejection or modification of the ERT Settlement Agreement. This is a bankruptcy proceeding, and the ERT Settlement Agreement is aimed at securing reasonable funding to put in place remedies at the Properties that protect public health and the environment. Remedies available in civil actions such as this one do not include criminal prosecution or incarceration. Moreover, the ERT Settlement Agreement expressly reserves the United States' rights against Debtors with respect to criminal liabilities, and the United States therefore does not express any view with respect to, or in any way address any issue under, criminal laws. Regarding civil fines or penalties, none of the commenters has provided any facts whatsoever that indicate that the United States has improperly compromised any claim for civil fines or penalties in the Agreement.

6.     <u>The ERT Settlement Agreement Appropriately Does Not Address Damages for Health Effects Caused by Debtors' Releases of Hazardous Substances</u>

Kakwerais and Speers comments that the ERT Settlement Agreement should include damages for the effects of Debtors' releases of hazardous substances on public health and other

"environmental concerns unique to the Native American populations and resource[s]." *Id.* at

US0107 (Speer); US0078, US0081, US0129 (Kakwerais). These comments ignore that the

Agreement expressly reserves the United States' natural resource damages claims against the

Debtors. Indeed, the United States, the State of New York, the Tribe, and Onondaga Nation,

respectively, are currently engaged in ongoing settlement discussions with the Debtors regarding

their liability for natural resource damages at both the Massena and the Onondaga Superfund

Sites in New York. The United States, moreover, does not have claims against Debtors for

adverse health effects suffered by the public as a result of Debtors' releases of hazardous

substances, and any such claims asserted by the affected individuals are neither addressed nor

otherwise impacted by the ERT Settlement Agreement. These comments, therefore, are not

grounds for rejecting the Agreement.

       7.    <u>The ERT Settlement Agreement's Covenants Not to Sue Are Appropriate</u>

       Onondaga County has also submitted comments requesting that Paragraph 94 of the ERT

Settlement Agreement be amended to permit future actions against the Trust "to pursue claims or

causes of action that may arise after the Trust is funded (e.g., current or future on-going permit

violations)," regardless of whether or not they relate back to pre-Effective Date conduct by the

Debtors. Ex. 2 at US0015. Onondaga County further requests that Paragraph 100(ii) of the ERT

Settlement Agreement be revised to include a different definition for those areas of the

Onondaga Site that are exempted from the covenant not to sue provided by the United States and

States. *Id.* As Onondaga County itself recognizes, one of CERCLA's aims is to encourage

settlements with the U.S. EPA by providing the settling parties finality. Finality is precisely

what the proposed ERT Settlement Agreement seeks to provide by limiting future lawsuits

against the Trust so that the Trust will be able to fund and undertake the contemplated cleanups.

Moreover, to the extent that unexpected cost overruns are incurred, the Trust's cushion funding account further provides an additional potential source of funding for the Properties. The ERT Settlement Agreement's description of the areas of the Onondaga Site that are excluded from the United States' covenant not to sue, moreover, track the definitions used in the United States' proof of claim, and are well known to, and recognized by, the regulatory agencies. To the extent Onondaga County remains uncertain as to what areas of the Onondaga Site are included in Paragraph 100(ii) of the ERT Settlement Agreement, the United States refers Onondaga County to the map of the Onondaga Site attached hereto as Exhibit 1. The United States therefore contends that these comments do not warrant disapproval of the ERT Settlement Agreement.

       8.      <u>The Remaining Questions Similarly Do Not Indicate That the ERT Settlement Agreement Is Unreasonable, Unfair or Contrary to CERCLA</u>

In addition to the comments addressed above, the United States also received several questions regarding the terms of the ERT Settlement Agreement. Arquette asked: (i) "[w]hat happens if the Tribe does not sign"; (ii) "[i]f the Tribe signs…, is the Tribe or community members prevented from suing"; and (iii) "[w]ho do we sue down the road for health impacts." Ex. 2 at US0019. Arquette's first question is hypothetical, since the Tribe did sign the ERT Settlement Agreement on October 21, 2010. In response to Arquette's second and third questions, by signing the Agreement the Tribe gave up its rights to sue Debtors, their successors or assigns, or the Trust in connection with environmental liabilities covered by the ERT Settlement Agreement. The Tribe did not, however, waive or impair its rights to sue Debtors or their successors or assigns for natural resource damages, and the settlement does not abrogate any claims for personal injury or health effects.

Onondaga County has asked whether, in determining which sites to fund through the ERT Settlement Agreement, the United States' or any State's liabilities at the sites were

considered. *Id.* at US0015. The United States is not aware of any liabilities by the United States

or any of the States in connection with the Properties. Onondaga County also requests

confirmation that "violations of the Clean Water Act or any state analogs to the Clean Water

Act" are not addressed by the Agreement. *Id.* at US0016. The United States notes that it has not

asserted any claims against Debtors under the Clean Water Act in this bankruptcy. The United

States also refers Onondaga County to Paragraph 94 of the ERT Settlement Agreement, under

which the United States and the States have agreed not to assert any claims against Debtors, any

successor entity or the Trust relating to the Properties "under CERCLA, RCRA, and State

environmental statutes, as well as any other environmental liabilities asserted in the Government

Proofs of Claim" in return for Debtors' transfer of the Owned Properties and other assets to, and

their full funding of, the Trust.[16]

Finally, Monostory asked whether, in deciding whether to include Lower Ley Creek in

the ERT Settlement Agreement, "anyone ever stud[ied] the impacts of the PCBs in the entire Ley

Creek System." Ex. 3 at US0112. U.S. EPA and the State of New York are overseeing and/or

performing, or have overseen, three RI/FS studies of the impacts to Ley Creek. The RI/FS of

Upper Ley Creek is near completion, the RI/FS of Lower Ley Creek is in progress, and the RI/FS

of the Lake Bottom, including near the mouth of Ley Creek, has been completed. Nonetheless,

for the reasons discussed above, the United States determined that the only non-owned portion of

the Onondaga Site that should be included in the ERT Settlement Agreement is Upper Ley

Creek. These questions, therefore, do not warrant rejection of the Agreement.

---

[16]    The Trust can only spend its cleanup funding in accordance with annual remedial budgets
approved by the regulatory agencies and annual administrative budgets approved by U.S.
Treasury. *See* SA ¶¶ 49-54.

## CONCLUSION

For the reasons stated above, the Court should approve and enter the proposed ERT

Settlement Agreement.


Dated:        New York, New York
              February 18, 2011

                                   PREET BHARARA
                                   United States Attorney for the
                                   Southern District of New York
                                   Attorney for the United States of America


                          By:        _____/s/ Natalie N. Kuehler _____
                                   NATALIE N. KUEHLER
                                   DAVID S. JONES
                                   Assistant United States Attorneys
                                   86 Chambers Street, 3rd Floor
                                   New York, New York  10007
                                   Telephone:  (212) 637-2741
                                   Facsimile:  (212) 637-2750
                                   Email: natalie.kuehler@usdoj.gov


                                   ALAN S. TENENBAUM
                                   National Bankruptcy Coordinator
                                   PATRICK CASEY
                                   Senior Counsel
                                   Environment and Natural Resources Division
                                   Environmental Enforcement Section
                                   U.S. Department of Justice