# EXHIBIT 2

**From:**     bk1492@aol.com
**Sent:**     Saturday, October 30, 2010 12:25 PM
**To:**       Fleetwood, Tonia (ENRD); pubcomment-ees-enrd@usdoj.gov; Katz, Maureen (ENRD);
              americanvoices@mail.house.gov; comments@whitehouse.gov; sf.nancy@mail.house.gov;
              rush.holt@mail.house.gov; foe@foe.org; information@sierraclub.org;
              broads@greatoldbroads.org; center@biologicaldiversity.org; info@earthjustice.org
**Cc:**       letters@time.com; today@nbc.com; info@emagazine.com
**Subject:**  public comment on federal register Fwd: why was this company allowed to pollute like this
              over the years - feds allowed it

how did this cmpany get away with polluting so many sites over the years. where was the federal govt - epa to check on this?
i think the penalty should be increased by 4 times and the amounts below should be 4 times that.

this massive pollution of earth is unforgivable. all corp execs that allowed this pollution should be in jail. it is their job to prevent
destruction of the usa. they didnt do it. why are the corp execs not hunted down and put in jail, and lose their house and savings
and pensions? why is our govt just sitting by and allowing this massive corporate pollution to have happened without criminal
proceedings?
jean public l5 elm s tlforham park nj07932


```
[Federal Register: October 28, 2010 (Volume 75, Number 208)]
[Notices]
[Page 66390-66391]
From the Federal Register Online via GPO Access [wais.access.gpo.gov]
[DOCID:fr28oc10-58]
===============================================================
---------------------------------------------------------------

DEPARTMENT OF JUSTICE

Notice of Lodging of Settlement Agreement Under the Comprehensive
Environmental Response, Compensation, and Liability Act and the
Resource Conservation and Recovery Act

    Notice is hereby given that on October 20, 2010, a proposed Consent
Decree and Settlement Agreement in the bankruptcy matter, Motors
Liquidation Corp, et al., f/k/a General Motors Corp., et al., Jointly
Administered Case No. 09-50026 (REG), was lodged with the United States
Bankruptcy Court for the Southern District of New York. The Parties to
the Settlement Agreement are debtors Motors Liquidation Corporation,
formerly known as General Motors Corporation, Remediation and Liability
Management Company, Inc., and Environmental Corporate Remediation
Company, Inc. (collectively, ``Old GM''); the United States of America;
the States of Delaware, Illinois, Indiana, Kansas, Michigan, Missouri,
New Jersey, New York, Ohio, Virginia and Wisconsin; the Louisiana
Department of Environmental Quality; the Massachusetts Department of
Environmental Protection; the Department of Environmental Protection of
the Commonwealth of Pennsylvania; the Saint Regis Mohawk Tribe; and
EPLET, LLC, not individually but solely in its representative capacity
as Administrative Trustee of the Environmental Response Trust. The
Settlement Agreement resolves claims and causes of action of the
Environmental Protection Agency (``EPA'') against Old GM under the
Comprehensive Environmental Response, Compensation, and Liability Act
(``CERCLA''), 42 U.S.C. 9601-9675 and the Resource Conservation and
Recovery Act (``RCRA''), 42 U.S.C. 6901-6992k, with respect to the
following sites:
    1. The GMNA Car--Wilmington Site in Delaware;
    2. The GMPT--Danville Landfill Site in Illinois;
    3. The Former GM Delco Plant Site in Indiana;
    4. Various Bedford Town Sites (60 Properties) Indiana;
    5. The Manual Transmission of Muncie Site in Indiana;
    6. The Metal Fab--Indianapolis in Indiana;
    7. The Delphi I--Anderson/Monroe Site in Indiana;
```

US0001

8. The Allison Gas Turbines Site in Indiana;
9. The Venture 2000 Property Site in Indiana;
10. The 1-Acre Fire Suppression Lot Site in Indiana;
11. The Fairfax I Plant Site in Kansas;
12. The Fairfax Parking Lot Site in Kansas;
13. The GMVM--Shreveport Assembly (exclude Stamping) Site in Louisiana;
14. The MCD--Framingham Landfill Site in Massachusetts;
15. The GMPT--Willow Run Site in Michigan;
16. The GMNA--Buick City Site in Michigan;
17. The Pontiac North Site in Michigan;
18. The GMPT Saginaw Malleable Site in Michigan;
19. The Saginaw Nodular Iron (PIMS297) Site in Michigan;
20. The GMNA Car (Fisher Body)--Lansing Site in Michigan;
21. The Midsize & Luxury Car--Willow Run Site in Michigan;
22. The Delphi C--Livonia Groundwater Site in Michigan;
23. The GMNA Car--Lansing Site in Michigan;
24. The GMNA Car--Lansing Site in Michigan;
25. The Delphi I--Coldwater Rd. (Landfill) Site in Michigan;
26. The Stamping--Grand Rapids Site in Michigan;
27. The GMPT Bay City Site in Michigan;
28. The Flint West--Flint River Site in Michigan;
29. The Vacant Land South of Van Born (68 acres) Site in Michigan;
30. The GMPT--Livonia Site in Michigan;
31. The Greenpoint Landfill Site in Michigan;
32. The Hemphill Lot Site in Michigan;
33. The Peregrine--Coldwater Rd. (Plant) Site in Michigan;
34. The Employee Development Center Site in Michigan;
35. The Chevrolet-Pontiac-Canada Pontiac Fiero Assembly Plant Site in Michigan;
36. The Davison Road Land Site in Michigan;
37. The Dort Highway Land Site in Michigan;
38. The -1 PCC--Validation Site in Michigan;
39. The Saginaw PLt 2 Landfill Site in Michigan;
40. The Pontiac Centerpoint Campus--West Site in Michigan;
41. The Powertrain--Romulus Engineering Center Site in Michigan;
42. The Former Howard W/H--Vacant Land Site in Michigan;
43. The Textile Road Land Site in Michigan;
44. The ACC--Penske Site in Michigan;
45. The Linden Road Landfill Site in Michigan;
46. The Windiate Park Lots Site in Michigan;
47. The Lot 8--6241 Cass Avenue at Amsterdam Ave. Site in Michigan;
48. The 6560 Cass Ave/GMNA New Center Complex Site in Michigan;
49. The GLTC land (Atherton Landfill/Die Lot Parking) Site in Michigan;
50. The Vacant Land (76 acres) Site in Michigan;
51. The Delphia C Livonia Coil & Bumper Site in Michigan;
52. The Land along Stanley Road Site in Michigan;

[[Page 66391]]

53. The Fiero Site (Powerhouse) Site in Michigan;
54. The Flint Flow-through Warehouse Site in Michigan;
55. The GMPT--Flint North 5/10/81 Site in Michigan;
56. The GMVM--Pontiac Assembly Site in Michigan;
57. The Midsize & Luxury Car Clark Street Site in Michigan;
58. The Delta Engine Plant Site in Michigan;
59. The 1831 Grondinwood (residence) Site in Michigan;
60. The 1394 Oak Hollow (residence) Site in Michigan;
61. The Pontiac Centerpoint Campus--Central Site in Michigan;
62. The Pontiac Centerpoint Campus--East Site in Michigan;
63. The Centerpoint Land (no Etkin ground lease) Site in Michigan;
64. The Centerpoint Land (Etkin ground lease) Site in Michigan;
65. The 652 Meadow Drive Site in Michigan;
66. The 642 Meadow Drive Site in Michigan;
67. The 631 Meadow Drive Site in Michigan;
68. The 607 Meadow Drive Site in Michigan;
69. The Willow Run Engineering Center Site in Michigan;
70. The PCC Validation Southern Parking Lot Site in Michigan;
71. The Former Leed's Assembly Plant--Northern Parcel Site in Michigan;
72. The Former Leed's Assembly Plant--Southern Parcel Site in Michigan;
73. The Hyatt Clark Industries Site in Michigan;
74. The Delphi Interior & Lighting Systems--Trenton Site in Michigan;
75. The General Motors (Central Foundry Division) Superfund Site, a/k/a the Massena Site, in New York;
76. The GM-IFG Syracuse Site in New York;
77. The Ley Creek PCB Dredging Site in New York;

US0002

78. The Tonawanda Engine Landfill Site in New York;
79. The Delphi Harrison--Moraine Site in Ohio;
80. The Delphi Interior--Elyria Site in Ohio;
81. The Stamping--Mansfield Site in Ohio;
82. The GMPT--Toledo 103C Landfill Site in Ohio;
83. The GMPT--Parma Complex Site in Ohio;
84. The Lordstown Excess Land Site in Ohio;
85. The Moraine Lagoon Site in Ohio;
86. The Moraine Assembly Site in Ohio;
87. The Metal Fab--Pittsburgh Site in Pennsylvania;
88. The GMPT--Fredericksburg Site in Virginia; and
89. The Janesville Training Center Site in Wisconsin.

Under the Settlement Agreement, Old GM will make a cash payment of $499,434,945 to an Environmental Response Trust established pursuant to an Environmental Response Trust Agreement to clean up these 89 sites. Old GM will also make an additional payment of $142,000,000 and transfer certain personalty and title to 88 real properties owned by Old GM to the environmental response trust to fund administrative expenses.

The Department of Justice will receive, for a period of thirty days from the date of this publication, comments relating to the Consent Decree and Settlement Agreement. Comments should be addressed to the Assistant Attorney General, Environment and Natural Resources Division, and either emailed to pubcomment-ees.enrd@usdoj.gov or mailed to P.O. Box 7611, U.S. Department of Justice, Washington, DC 20044-7611, and should refer to In re Motors Liquidation Corp., et al., D.J. Ref. 90-11-3-09754. Commenters may request an opportunity for a public meeting in the affected area, in accordance with Section 7003(d) of RCRA, 42 U.S.C. 6973(d).

The Consent Decree and Settlement Agreement and the Environmental Response Trust Agreement may be examined at the Office of the United States Attorney, 86 Chambers Street, 3rd Floor, New York, New York 10007, and at the U.S. Environmental Protection Agency, Ariel Rios Building, 1200 Pennsylvania Avenue, NW., Washington, DC 20460. During the public comment period, the Settlement Agreement and the Custodial Trust Agreement may also be examined on the following Department of Justice Web site, http://www.usdoj.gov/enrd/Consent_Decrees.html. Copies of the Consent Decree and Settlement Agreement and the Environmental Response Trust Agreement may also be obtained by mail from the Consent Decree Library, P.O. Box 7611, U.S. Department of Justice, Washington, DC 20044-7611 or by faxing or e-mailing a request to Tonia Fleetwood (tonia.fleetwood@usdoj.gov), fax no. (202) 514-0097, phone confirmation number (202) 514-1547. In requesting a copy from the Consent Decree Library, please enclose a check in the amount of $42.75 (with exhibits) or $22.75 (without exhibits) (25 cents per page reproduction cost) payable to the U.S. Treasury or, if by e-mail or fax, please forward a check in that amount to the Consent Decree Library at the stated address.

Maureen Katz,
Assistant Section Chief, Environmental Enforcement Section, Environment and Natural Resources Division.
[FR Doc. 2010-27265 Filed 10-27-10; 8:45 am]
BILLING CODE 4410-15-P

US0003

| | |
|---|---|
| **From:** | Kevin C. Murphy |
| **To:** | ENRD, PUBCOMMENT-EES (ENRD) |
| **Cc:** | GordonCuffy@ongov.net; MatthewMillea@ongov.net; DavidCoburn@ongov.net; LuisMendez@ongov.net |
| **Subject:** | In re Motors Liquidation Corp., et al., D.J. Ref. 90-11-3-09754 - - Comments of Onondaga County, New York |
| **Date:** | Wednesday, November 24, 2010 12:14:39 PM |
| **Attachments:** | 2010-11-24 Ltr to AAG Moreno ocr.pdf |
| | Attachment Ley Creek Watershed.pdf |
| | Exhibit A Cover.pdf |
| | Exhibit A consent HW734057 1997-09-25 RIFSconsentorder-ocrreadable.pdf |
| | Exhibit B.pdf |
| | Exhibit C2.pdf |
| | Exhibit D2.pdf |

Please find attached the comments of Onondaga County, New York concerning the proposed Environmental Response Trust Consent Decree and Settlement Agreement Among Debtors, The Environmental Response Trust Administrative Trustee, The United States *et al.*

Kevin C. Murphy
**The Wladis Law Firm, P.C.**
P.O. Box 245, Syracuse, NY 13214
6312 Fly Road, East Syracuse, NY 13057

P  315/445-1700
F  315/251-1073
kmurphy@wladislawfirm.com

Circular 230 Notice: To insure compliance with requirements imposed by the Internal Revenue Service under Circular 230, we inform you that any United States tax advice included in this communication is not intended or written to be used, and cannot be used, for the purpose of: (1) avoiding federal tax-related penalties, or (2) promoting, marketing or recommending to another party any transaction or matter addressed herein.

CONFIDENTIALITY NOTICE: This e-mail transmission (including any attachment) is intended only for the use of the individual or entity to which it is addressed, and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or the taking of any action in reliance on the contents of this e-mail or any attachment is strictly prohibited. If you have received this transmission in error, please immediately notify the sender by return e-mail and delete all copies of this e-mail and any attachment.

COUNTY OF ONONDAGA



JOANNE M. MAHONEY
*County Executive*

**DEPARTMENT OF LAW**
*John H. Mulroy Civic Center, 10th Floor*
*421 Montgomery Street*
*Syracuse, New York 13202*
*(315) 435-2170 • Fax (315) 435-5729*
*www.ongov.net*

GORDON J. CUFFY
*County Attorney*

November 24, 2010

<u>Via E-Mail and U.S. Mail</u>

Ignacia S. Moreno, Assistant Attorney General
Environment and Natural Resources Division
P.O. Box 7611
U. S. Department of Justice
Washington, D.C. 20044-7611

Re: *In re Motors Liquidation Corp., et al.,* D.J. Ref. 90-11-3-09754

Onondaga County, New York Comments on Proposed Consent
Decree and Settlement Agreement

Dear Assistant Attorney General Moreno:

Onondaga County submits these comments to request specific changes to the proposed Consent Decree and Settlement Agreement (the "Settlement Agreement") that will result in the creation of the General Motors Bankruptcy Environmental Trust Fund.

As more fully set forth below, the proposed settlement arbitrarily prescribes that Trust monies shall be used for the remediation of Ley Creek in Onondaga County, NY only so far as the "Route 11 Bridge". If uncorrected, this arbitrary funding decision will result in both a gross inequity and a significant funding shortfall of the monies necessary to respond to decades of PCB releases by General Motors that contaminated the entirety of Ley Creek[1].

The decision to underfund the Debtors' liability for the remediation of Ley Creek is inconsistent with the underlying purposes of the Trust Fund: "to conduct, manage and/or fund Environmental Actions with respect to the Properties or migration of Hazardous Substances emanating from certain of

---

[1] A map of the Ley Creek Watershed, Ley Creek, the location of the GM-IFG Syracuse facility, the Route 11 Bridge and Onondaga Lake is attached.

- 1 -

US0005

the Properties in accordance with the provisions of this Agreement."
(Proposed Environmental Response Trust Agreement, Article 2.3).

Moreover, as to Ley Creek, the proposed Settlement Agreement is in
direct contravention of Congressional mandates and the underlying purposes
of both the Comprehensive Environmental Response, Compensation and
Liability Act (CERCLA), 42 U.S.C. § 9601 *et seq.*, and the Resource
Conservation and Recovery Act, 42 U.S.C. § 6901 *et seq.*

Onondaga County requests that the proposed Settlement Agreement be
modified to include funding for the cleanup of the entirety of Ley Creek, Old Ley
Creek and any and all GM-related Ley Creek PCB dredge spoil locations.

## I. Background

Onondaga County, New York, is a claimant in the *Motors Liquidation
Corp., et al., f/k/a General Motors Corp., et al.*, Jointly Administered Case No.
09-50026 (REG) bankruptcy. The County's proof of claim concerns General
Motors' liability under the Nation's environmental laws for PCB contamination
detected in the Onondaga Lake, Onondaga County, New York National
Priorities List, including Ley Creek and the Ley Creek PCB Dredging Site.

For approximately 40 years -- from the 1950s through 1993 -- General
Motors Corporation (GM) discharged polychlorinated biphenyls (PCBs) from its
Inland Fisher Guide facility ("IFG" or "GM-IFG Syracuse") into Ley Creek. Ley
Creek flows generally east to west adjacent to and past the IFG site before
discharging into Onondaga Lake approximately four miles downstream.

On August 12, 1985 GM entered into a consent order with NYSDEC
(Case #7-0383) to (a) address the on-going discharge to Ley Creek of GM-IFG
Syracuse wastewaters contaminated with, among other pollutants, two PCB
cogeners, Aroclor 1242 and Aroclor 1248; and (b) limit any such future
discharges.

Following additional investigation the NYSDEC concluded: "The
confirmed presence of these hazardous substances at GM's facility and the
proximity of such substances and discharge of PCBs to Ley Creek establishes
that the hazardous substance contamination at the GM facility represents a
release or threat of release of hazardous substances to the Onondaga Lake NPL
Site pursuant to 104 and 107 of CERCLA. GM's facility is a sub-site of the
Onondaga Lake NPL site." *See* "Exhibit A" (NYSDEC Order on Consent, Index #
D-7-0001-97-06, September 17, 1997) at paragraph 33A.

US0006

Pursuant to a series of subsequent orders entered into with NYSDEC from 1985 through 2001, GM investigated the extent of PCB contamination in what has become known as the "Ley Creek PCB Dredging Site" and executed an interim remedial measure to remove PCB-contaminated soils in the area of a County sewer line. The "Ley Creek PCB Dredging Site" is located on the south side of Ley Creek starting at the approximate eastern boundary of the IFG facility (i.e., Town Line Road) and extending west and downstream for a distance of approximately 4,300 feet or 0.814 miles. The investigation and remediation work was all conducted outside the Creek.

The 1997 NYSDEC Consent Order, which was voluntarily executed by GM, created an obligation on GM to sample Ley Creek surface water and sediment, but only downstream as far as the Route 11 Bridge. While the required scope of GM's initial 1999 Work Plan was limited to that reach of the Creek, the Consent Order established the potential that GM would be required to investigate and respond to conditions beyond the Route 11 Bridge. Specifically, Paragraph 27 of the 1997 NYSDEC Order ("Exhibit A" hereto) stated "any additional investigation found to be necessary . . . should be addressed under this Consent Order in conjunction with the Department's evaluation of the need for potential response action with respect to environmental contamination at the facility." Indeed, it was understood that the investigation would ultimately proceed beyond the Route 11 Bridge.

In December, 2000 the Town of Salina, New York submitted a Remedial Investigation report to NYSDEC for the former Town of Salina Landfill, which is located adjacent to Ley Creek downstream from GM-IFG Syracuse, the "Ley Creek PCB Dredging Site" and the Route 11 Bridge that crosses Ley Creek. The Town Landfill RI Report confirmed the presence of PCB contamination in Ley Creek sediment (Aroclor 1248 and 1260) and PCB contamination in Ley Creek surface waters (Aroclor 1248) downstream of the IFG Facility, the "Ley Creek PCB Dredging Site" and the Route 11 Bridge.

Recent sampling by the United States Environmental Protection Agency of the so-called Lower Ley Creek site (i.e., Ley Creek downstream of the Route 11 Bridge) confirmed the presence of PCBs in Lower Ley Creek and EPA's July 22, 2010 Onondaga Lake NPL Sub-site Evaluation for Lower Ley Creek states: "[T]he majority of the contamination in Lower Ley Creek sediment has come from various sources and/or facilities upstream and on Ley Creek, including the former General Motors Corporation – Inland Fisher Guide Facility." A copy is attached hereto as "Exhibit B". The evaluation does not identify any other alleged source.

- 3 -

US0007

Contemporaneous with the above events, the New York State Department of Environmental Conservation listed Old Ley Creek[2], which is also located downstream of the Route 11 Bridge in the State Registry of Inactive Hazardous Waste Disposal Sites, due to the presence of GM-IFG Syracuse PCB Contamination. GM's refusal to commence an investigation of Old Ley Creek was largely driven by its concern for the magnitude of the site, as defined by NYSDEC, and the detrimental impact on other pending claims. See "Exhibit C" (March 10, 2009 letter from counsel for GM to NYSDEC)

Notwithstanding New York State issued Orders enjoining GM from continuing unpermitted discharges of hazardous substances to Ley Creek and its environs and the 1997 finding that GM-IFG Syracuse was an actual or potential source of PCB contamination detected in Onondaga Lake, GM-IFG Syracuse continues to discharge PCBs to Ley Creek. GM reported that it exceeded its SPDES permit discharge limits for PCB Aroclor 1248 in March, 2007 and December, 2008. *See* "Exhibit D" (02/07/08 GM letter to NYSDEC). GM also reported that its discharges to Ley Creek exceeded 0.065 ug./l for PCB in February and March, 2008. *See* "Exhibit D" (04/10/09 GM ltr to NYSDEC). It is worth noting that these exceedances occurred from a location that is no longer operating and has not operated for years, and they strongly suggest GM-IFG Syracuse remains a pervasive source of PCBs to Ley Creek and its environs.

Recognizing the limited data currently available and the absence of a completed feasibility study, conservative preliminary estimates of the potential response cost for the Lower Ley Creek[3] site could approximate or exceed fifty million of dollars ($50,000,000).

By letter dated October 30, 2009, Onondaga County and seven other entities, including GM, were identified as potentially responsible parties with respect to what has been identified as the "Lower Ley Creek" site and asked to fund a Remedial Investigation/Feasibility Study for Lower Ley Creek. Such a request is historically a precursor to a section 106 cleanup order, pursuant to 42 U.S.C. § 9606, to respond to the release or threat of a release that is

---

[2] Until the 1970s, "Old Ley Creek" was the original Ley Creek channel immediately downstream of Route 11. It was cut off from the original channel as a result of flood control dredging.

[3] While EPA appears to define Lower Ley Creek as the existing main channel of Ley Creek west and downstream of the Route 11 Bridge to the point of discharge into Onondaga Lake, for the purposes of these comments Onondaga County submits Lower Ley Creek should include the existing channel from Route 11 to Onondaga Lake, Old Ley Creek (an historic artifact that documents the historic levels of GM-IFG Syracuse PCB contamination in Ley Creek prior to historic flood control dredging), and any PCB dredge disposal areas located west and downstream of the Route 11 Bridge and/or otherwise not the "Ley Creek PCB Dredging Site" located immediately downstream of GM-IFG Syracuse.

- 4 -

US0008

impacting Lower Ley Creek and/or a subsequent government cost recovery action should the government fund a response.

## II. **The Proposed Consent Decree and Settlement Agreement**

The proposed Consent Decree and Settlement Agreement are intended to address and resolve the Debtors' liabilities and obligations for environmental matters under CERCLA, RCRA and analogous state statutes. *See generally,* Notice of Lodging of Proposed Settlement Agreement, October 20, 2010, Exhibit 1 (Environmental Response Trust Consent Decree and Settlement Agreement Among Debtors, The Environmental Response Trust Administrative Trustee, The United States *et al)* ("Settlement Agreement").

Specifically, with respect to the County's objections and comments, the proposed Settlement Agreement would allocate a total of $33,004,154 to the proposed G.M. Bankruptcy Environmental Trust Fund to address CERCLA and RCRA liability for "GM-IFG Syracuse" and the "Ley Creek PCB Dredging Site", assigned respectively MLC Site ID 1010 and 1110. (*See* Settlement Agreement, Attachment A). That sum is further allocated between Minimum Response Cost, Reserve Response Costs and Post Cleanup Operations and Maintenance Costs, as such terms are defined in the draft agreements. (*See generally* Settlement Agreement).

The GM-IFG Syracuse site is allocated $31,121,812 of the combined $33 million. Of that, $22,573,341 is allocated "for remediation within the IFG Syracuse facility property boundaries and $8,548,471 [is allocated for] the property extending from the facility property boundaries to the Route 11 Bridge." (*See* Settlement Agreement, ¶63).

While the Settlement Document defines the term "Environmental Action" to encompass remediation, the term "Remediation" is not a defined term; nor is there a breakdown provided for Minimum Response Cost, Reserve Response Costs and Post Cleanup Operations and Maintenance Costs as such terms might apply to that portion of the GM-IFG Site described as "within the IFG Syracuse facility property boundaries" or that portion described as "the property extending from the facility property boundaries to the Route 11 Bridge".

The remaining $1,882,342 is designated for the Ley Creek PCB Dredging Site, which, as noted earlier, is located upstream of Route 11. Of that, 74% or $1,393,361 is allocated for Post Cleanup Operations and Maintenance Costs. As the County reads the proposed Settlement Agreement and Trust document, none of those monies would be available for use with respect to any "off-site" contamination (i.e., Lower Ley Creek).

- 5 -

US0009

As detailed below the proposed settlement in its current form fails to satisfy the applicable standard for judicial approval of CERCLA settlements.

**III.    With Respect to GM-IFG Syracuse and Ley Creek and Its Environs, The Proposed Settlement Agreement is Not Fair, It is Not Reasonable and It is Not Faithful to the Objectives of CERCLA and RCRA**

Pursuant to 42 U.S.C. § 6973,

> "Whenever the United States or the Administrator proposes to covenant not to sue or to forbear from suit or to settle any claim arising under this section, notice, and opportunity for a public meeting in the affected area, and a reasonable opportunity to comment on the proposed settlement prior to its final entry shall be afforded to the public."

A review of this proposed Consent Decree and Settlement Agreement must determine "if it is fair, reasonable, and faithful to the objectives of CERCLA" and RCRA. *See United States v. General Electric Company,* 460 F. Supp.2d 395, 401 (N.D.N.Y. 2006)(quotations and citations omitted).

A prime objective of CERCLA is "to impose liability on responsible parties." *Id.* The fairness inquiry concerns both procedural and substantive fairness; the reasonableness inquiry addresses both technical considerations and such matters as "whether a settlement that does not fully compensate for costs is nonetheless a cost-effective alternative to litigation that will conserve public and private resources." *Id.*

Onondaga County submits that with respect to GM-IFG Syracuse and Ley Creek[4] and its environs the proposed Consent Decree and Settlement Agreement is neither fair - procedurally or substantively, reasonable or supportive of one of the prime objectives of RCRA of CERCLA, namely, assuring that the settlement will in fact further an appropriate remediation of the impacted site.

A. The Artificial and Arbitrary Site Boundary

In relevant part, CERCLA defines the term "facility" to mean "any site or area where a hazardous substance has been deposited, stored, disposed of, or

---

[4] See footnote 2.

US0010

placed or otherwise come to be located". 42 U.S.C. § 9601(9). The evidence here is undisputed that PCBs were released (and continue to be released) into Ley Creek from GM-IFG Syracuse and they are transported the length of Ley Creek to its point of discharge into Onondaga Lake. Thus, by definition, the Site is the entirety of Ley Creek including the current and historic portions located downstream of Route 11.

Despite that undisputed and irrefutable reality, the proposed Settlement Agreement allocates monies to remediate only "the property extending from the facility property boundaries to the Route 11 Bridge."[5] No monies have been made available to address Lower Ley Creek, which given the response to date at the Ley Creek PCB Dredging Site is today likely the more critical environmental concern. To the contrary, the proposed Settlement Agreement arguably precludes the use of federal settlement funds for Lower Ley Creek while threatening to leave impecunious PRPs liable to fund GM's cleanup.

Ley Creek flows an additional two (plus or minus) miles from the Route 11 Bridge to its point of discharge into Onondaga Lake. Just as the Creek does not stop at the Route 11 Bridge neither did the PCB contamination from GM-IFG Syracuse stop at the Route 11 Bridge. As noted above, sampling results confirm the presence of PCB contamination downstream of the Route 11 Bridge in Ley Creek, Old Ley Creek and in the Ley Creek PCB dredging sites located downstream of the Route 11 Bridge. There is no rational basis to limit the cleanup to that portion of Ley Creek upstream of the Route 11 Bridge.

The decision to fund only a portion of the Ley Creek discharge is in conflict with both (1) the Government's public statements lauding the settlement (i.e., "This settlement holds accountable those responsible for contaminating certain properties and ensures they help transform those communities by supporting the necessary cleanup." Statement of Acting Deputy Attorney General Grindler; Department of Justice Press Release, October 20, 2010) and (2) the stated objective found in the text of the proposed Trust Agreement (i.e., "to conduct, manage and/or fund Environmental Actions with respect to the Properties or migration of Hazardous Substances emanating from certain of the Properties in accordance with the provisions of this Agreement"). (*See* Proposed Environmental Response Trust Agreement, Article 2.3).

It simply cannot be said that a decision to fund half a cleanup of the off-site GM-IFG Syracuse facility PCB contamination "holds accountable those

---

[5] To be frank, Onondaga County cannot decipher from the draft Settlement Agreement what precisely is meant by the ambiguous phrase "the property extending from the facility property boundaries to the Route 11 Bridge." It is not known if monies are, in fact, proposed to be available to address in-Creek PCB contamination upstream of the Route 11 Bridge. That contamination has recently been confirmed and must be included among any Environmental Actions intended for this site.

US0011

responsible for contaminat[ion] by ensuring they engage in" the necessary cleanup. The proposed settlement does not even offer to conduct the necessary cleanup of property located downstream of the arbitrary Route 11 cutoff point.

This circumstance is best explained by the Conference Report on the Hazardous and Solid Waste Amendments of 1984, 98 STAT. 3221:

> SECTION 207-- CORRECTIVE ACTION BEYOND
> FACILITY BOUNDARIES; UNDERGROUND TANKS

> **\*14** HOUSE BILL.-- THE HOUSE BILL DIRECTS THE ADMINISTRATOR TO AMEND THE STANDARDS UNDER SECTION 3004 TO REQUIRE THAT CORRECTIVE ACTION BE TAKEN BEYOND THE FACILITY BOUNDARY WHERE NECESSARY TO PROTECT HUMAN HEALTH AND THE ENVIRONMENT. SUCH REQUIREMENT WOULD NOT BE APPLICABLE WHERE THE OWNER OR OPERATOR OF THE FACILITY CONCERNED DEMONSTRATES TO THE SATISFACTION OF THE ADMINISTRATOR THAT, DESPITE THE BEST EFFORTS OF THE OWNER OR OPERATOR, PERMISSION TO UNDERTAKE SUCH ACTIONS COULD NOT BE OBTAINED.
> SENATE AMENDMENT. -- THE SENATE AMENDMENT DOES NOT CONTAIN A SIMILAR PROVISION.
> CONFERENCE SUBSTITUTE. -- THE CONFERENCE SUBSTITUTE ADOPTS THE HOUSE PROVISION. THIS PROVISION OVERTURNS A POLICY OF THE ENVIRONMENTAL PROTECTION AGENCY WHICH LIMITED THE SCOPE OF CORRECTIVE ACTION TO THE PROPERTY OF THE POLLUTING FACILITY. SINCE MOST FORMS OF POLLUTION, PARTICULARLY GROUNDWATER CONTAMINATION, DO NOT OBSERVE TERRITORIAL OR PROPERTY BOUNDARIES, *SUCH A RESTRICTION HAS NO BASIS IN LOGIC.* THE PROVISION THEREFORE REQUIRES EPA TO AMEND THE APPLICATION REGULATION TO ASSURE THAT CORRECTIVE ACTION BEYOND A FACILITY BOUNDARY WILL BE REQUIRED WHERE APPROPRIATE.

H.R. CONF. REP. 98-1133, H.R. Conf. Rep. No. 1133, 98TH Cong., 2nd Sess. 1984, 1984 U.S.C.C.A.N. 5649, 1984 WL 37531 (Leg. Hist.)(emphasis added).

Indeed, the artificial site boundary found in the proposed Settlement Agreement *has no basis in logic* and no support under the law. Thus, the

- 8 -

US0012

settlement approach proposed here is the very approach that was explicitly identified and rejected by Congress in its repudiation of a prior Government policy and its 1984 direction to EPA on how it must proceed in the future.

## B. The Arbitrary Use of Federal Monies

More troubling to Onondaga County is the reality that while the vast majority of the $600,000,000 in funding for the Environmental Trust is recycled federal dollars, and the sole beneficiary of the Trust will be the United States, (*See* Settlement Agreement, ¶38), EPA is concurrently pursuing Onondaga County (and 6 others) as potentially responsible for addressing the Lower Ley Creek GM-IFG PCB contamination in furtherance of a concerted strategy to protect the considerable federal holdings in the Debtors. Insofar as the available information and data identifies the Debtors as the parties that are overwhelmingly, if not 100%, responsible for the PCB related contamination driving the need for a response, the proposed Settlement Agreement leaves significant environmental contamination potentially unaddressed.

When GM and its subsidiaries filed for bankruptcy protection in June of 2009, the federal government provided debtor-in-possession funding to Motors Liquidation Corp (i.e., Old GM), ultimately as much as $1.75 billion, plus an additional $19.4 billion to preserve GM's viability as a going concern pending conclusion of this bankruptcy proceeding[6].

At the same time that one hand of the Government was funding GM, the other hand of the Government, in the name of the United States Environmental Protection Agency, is seeking to hold non-GM parties liable for GM-IFG Syracuse PCB releases.

The EPA has requested that Onondaga County (and the other named PRPs) conduct a more detailed study of the Lower Ley Creek GM-IFG PCB contamination as a precursor to the selection of a Lower Ley Creek remedy. The County fully anticipates that in the future EPA will potentially issue a 106 order to the County (and other PRPs) or ultimately, seek cost recovery for any past or future EPA response costs from the County (and other PRPs).[7]

---

[6] The scale of the United States' involvement in managing GM through the bankruptcy proceeding is detailed at Sections II (B) and II(C) of Debtors' proposed Disclosure Statement filed with this Court on or about August 31, 2010.

[7] Neither Onondaga County nor any of the other PRPs have been found liable for any response costs and the submission of these comments in no way acts as a waiver of any defenses - factual or legal - that the County may have in the face of EPA's allegation that the County is a PRP for this site. It is possible that the County and/or others may be found liable, and it is possible that given the GM bankruptcy and the terms of this proposed Settlement Agreement, the Lower Ley Creek Site will be a true orphan site with no other existing or viable PRPs other than the federal or state governments.

-9-

US0013

Meanwhile, the proposed Settlement Agreement allocates what is likely only a fraction of the monies that actually will be required to remediate Debtors' legacy of contamination throughout Ley Creek and its environs.

To the extent the proposed Settlement Agreement is intended to promote community economic revitalization and growth and the return of properties to the tax rolls, the result in Onondaga County will be the complete opposite. If the Settlement Agreement is approved in its current form, local citizens and taxpayers may be forced to fund the response costs for years of GM contamination and/or may be compelled to devote significant resources to achieve vindication and/or a fair and equitable apportionment.

Moreover, structuring a settlement that arbitrarily cuts off the sole or primary polluter's liability at an artificial site boundary and thereby creates a likely 95% or more orphan share with respect to Lower Ley Creek is a virtual guarantee of protracted future litigation resulting in the expenditure of limited financial and judicial resources in contravention of the goals of CERCLA. *See e.g. United States v. Grand Rapids*, 166 F. Supp.2d 1213, 1218 (W.D. MI 2000). The County submits that, with respect to GM-IFG Syracuse, this proposed settlement is not a cost-effective alternative to the likely litigation between and among primarily units of government regarding the allocation of the Government-induced GM orphan share of response cost likely totaling tens of millions of dollars.

In *United States v. SEPTA*, 235 F.3d 817 (3d Cir. 2000) the Third Circuit noted that: "A court should approve a consent decree if it is fair, reasonable, and consistent with CERCLA's goals." SEPTA, 235 F.3d at 823. The element of: "fairness requires that settlement negotiations take place at arm's length. A court should 'look to the negotiation process and attempt to gauge its candor, openness and bargaining balance.'" *Accord In re: Tutu Water Wells CERCLA Litigation,* 326 F.3d 201, 207 (3d Cir. 2003). A proposed settlement negotiated by a lender controlled Debtor that by its expressed terms is intended to solely benefit the lender, that has as a potential purpose and/or impact of shifting remedial costs to entities such as the County who have been named as potentially responsible parties without fully assessing the adequacy of the settlement in achieving CERCLA's remedial objectives, fails to meet the well recognized fairness standard for judicial approval. *United States v. Cannons Eng'g Corp.*, 899 F.2d. 79, 84 (1st Cir.1990).

## IV. Additional Comments

- The GM-IFG Site as described in ¶63 of the Settlement Agreement includes both the area "within the IFG Syracuse facility property boundaries" and "the property extending from the facility property boundaries to the Route 11 Bridge". The phrase "the property extending

US0014

from the facility property boundaries to the Route 11 Bridge" is at best ambiguous. It must be defined more precisely and the scope of the work intended to be funded by the Trust should be described. To the extent that work does not include both in and out of Creek response actions, the scope should be amended to include all such required activities and if necessary, the cost estimate and Trust funding should be modified accordingly.

- Paragraph 94 of the Settlement Agreement concerning Covenants Not to Sue proposes that the covenants relate to potential claims or causes of action against the Environmental Trust "under CERCLA, RCRA, and State environmental statutes, as well as any other environmental liabilities asserted in the Government Proofs of Claim." The phrasing of the covenant is at best ambiguous and suggests an agreement not to pursue claims or causes of action that may arise after the Trust is funded (e.g., current or future on-going permit violations). The language should be amended to narrow the scope of the proposed covenants such that future enforcement of post-funding environmental violations is not precluded.

- Paragraph 99 of the Settlement Agreement sets forth the Debtors and the Trusts' proposed covenant not to sue the United States or states for potential CERCLA or RCRA claims. Given that proposed covenant, what steps were taken and to what extent was any allocation of United States or state liabilities used to derive the funding proposed to be provided to the Trust for any individual site?

- Paragraph 100 (ii) of the Settlement Agreement carves out an exception to the Covenants Not to Sue for Lower Ley Creek that is defined as "the entire portion of Ley Creek which is downstream from the Route 11 Bridge." That phrasing is much too ambiguous and uncertain. It should be modified to read as follows: "the existing channel from Route 11 to Onondaga Lake, Old Ley Creek and any PCB dredge disposal areas located west and downstream of the Route 11 Bridge and/or otherwise not the "Ley Creek PCB Dredging Site" located immediately downstream of GM-IFG Syracuse.

- Paragraph 100 (iv) of the Settlement Agreement carves out an exception to the Covenants Not to Sue for future acts that create liability buts creates an exception to the carve out for "continuing releases related to the Debtor's conduct prior to the Effective Date." The exception to the exception should not apply to on-going permit violations whether or not they can in any way be related back to pre-Effective Date conduct. In this case, the latest publicly available information indicates on-going PCB

US0015

discharges in violation of applicable SPDES permit limits; that conduct should not be exempted.

- Paragraphs 100 and/or 105 of the settlement Agreement should confirm that "covered matters" does not include violations of the Clean Water Act or any state analogs to the Clean Water Act.

### IV. **Request for a Public Hearing**

Given the decision to artificially limit funding to areas at or upstream of the Route 11 Bridge, pursuant to section 7003 of RCRA, 42 U.S. C. 6973(d), Onondaga County requests that the Department of Justice hold a public meeting and receive public comments in Onondaga County, New York prior to any decision to finalize the proposed Consent Decree and Settlement Agreement.

Respectfully submitted,

GORDON J. CUFFY
County Attorney

GJC/nlm
Enclosures

cc:    Joanne M. Mahoney, Onondaga County Executive
Matthew J. Millea, Deputy Onondaga County Executive
Patricia M. Pastella, P.E., Commissioner Onondaga County
    Dept. of Water Environment Protection
Luis A. Mendez, Senior Deputy County Attorney
David Coburn, Director, Onondaga County Office of the Environment
Kevin C. Murphy, Esq.

- 12 -

US0016

## **EXHIBIT A**

**US0017**



The Ley Creek Watershed in Onondaga County

US0018

| | |
|---|---|
| **From:** | Craig Arquette |
| **To:** | ENRD, PUBCOMMENT-EES (ENRD) |
| **Subject:** | motors liquidation corp.,et al.,d.j. ref. 90-11-3-09754 |
| **Date:** | Wednesday, December 08, 2010 3:16:26 PM |

We understand that the public comment period has been extended to December 15th, 2010. Below are the comments submitted to the St. Regis Mohawk Tribe during the public meeting regarding the above referenced subject.

1. What happens if the Tribe does not sign?
2. If the Tribe signs it, is the Tribe or community members prevented from suing?
3. Who do we sue down the road for heath impacts?

If you need to contact me I can be reached at:

Craig Arquette
St. Regis Mohawk Tribe
Environment Division
412 State Route 37
Akwesasne, NY 13655
Phone: 518-358-5937 ext. 120
Fax: 518-358-6252
e-mail: craig.arquette@srmt-nsn.gov

US0019



County of Onondaga

# Office of the County Executive

John H. Mulroy Civic Center, 14th Floor
421 Montgomery Street, Syracuse, New York 13202
Phone: 315.435.3516  Fax: 315.435.8582

ongov.net

Joanne M. Mahoney
*County Executive*

William P. Fisher
*Deputy County Executive*

## TESTIMONY OF
## MATTHEW J. MILLEA
### DEPUTY COUNTY EXECUTIVE FOR PHYSICAL SERVICES
### ON THE PROPOSED ENVIRONMENTAL RESPONSE TRUST SETTLEMENT
### IN THE MOTORS LIQUIDATION COMPANY (AKA OLD GM)
### BANKRUPTCY PROCEEDING

# December 15, 2010

Good evening.   My name is Matthew Millea, Deputy Onondaga County Executive for Physical Services.

Please allow me first to welcome you to Syracuse and Onondaga County and thank you for agreeing to hold this public hearing.

On November 23, 2010 Onondaga County submitted 12 pages of comments plus exhibits to the United States Department of Justice concerning the proposed Environmental Response Trust Consent Decree and Settlement Agreement in the General Motors Corp Bankruptcy Matter.

My comments this evening are intended to supplement and expand upon the County's written submissions.

Onondaga County requested this hearing so the County, local elected officials, the local community and Central New York taxpayers might better understand what the proposed Environmental Trust will and will not accomplish and the resulting impact on Ley Creek, Onondaga Lake, Onondaga County and the taxpayers of Onondaga County.

Simply stated, for 40 years – from the 1950s through 1993 – General Motors discharged polychlorinated biphenyls (PCBs) from its Inland Fisher Guide facility (IFG) into Ley Creek.  In fact, the latest publicly available records indicate IFG continues to discharge PCBs to Ley Creek. The Creek flows past the IFG site before discharging into Onondaga Lake approximately 4 miles downstream.

US0020

PCBs have been detected the length of Ley Creek and in Onondaga Lake. PCBs also have been detected in Old Ley Creek and in dredge spoils from Ley Creek.

It is generally known by all in Central New York, and by the EPA and the State of New York, that GM was the primary, if not sole, contributor of PCBs to Ley Creek and that GM PCBs were ultimately transported to Onondaga Lake. The State of New York stated as much as early as 1989. With the knowledge of the Department of Justice, in 2008, EPA demanded GM reimburse the federal government and the State of New York for Onondaga Lake response costs and in 2009, requested that GM undertake a remedial investigation and feasibility study of Lower Ley Creek.

Given the magnitude of GM's role in contaminating Ley Creek and its environs the County has constantly been concerned about the potential impact of the GM bankruptcy on Onondaga County. The County was pleased to learn of the plan to set aside funds from the bankruptcy proceedings to address GM's environmental legacy.

The County was confident that its concerns would be addressed when it was learned that a proposed Consent Decree would provide funds for the GM/IFG facility in New York and that funds would be available to address "the migration of Hazardous Substances emanating from certain of the Properties".

When the details of the trust were made public in late October, we were disappointed to learn that any monies that might be made available for Ley Creek would only address contamination downstream to the Route 11 Bridge or approximately half the distance the Creek flows from the GM/IFG facility to Onondaga Lake.

Our distress grew when we understood that no monies would be available for Old Ley Creek or PCB-contaminated dredge spoils removed from the Creek and located downstream of Route 11.

In our view, there is no discernable legal or factual basis for the arbitrary Route 11 boundary. Thus, we are forced to ask: "How is it that this proposed settlement is fair and reasonable to Onondaga County?"

And, moreover, "How is it that the proposed settlement is faithful to the objectives of the Superfund law, the federal hazardous waste law and the Government's public statements that this Agreement holds accountable those responsible for pollution?"

Furthermore, the EPA website that summarizes the proposed settlement explains that 29 of the 89 designated sites are not scheduled to receive funds but if conditions change, they will be eligible to receive monies from the Cushion Funding Account. Thus, Lower Ley Creek, which is known to require some form of response action, has been afforded less priority and lower consideration than 29 sites at which no current remediation is planned.

US0021

The County recognizes that the settlement agreement excludes Lower Ley Creek and the bed of Onondaga Lake from the Government's covenant not to sue. While on its face this does provide a venue for the United States to pursue a claim for contribution, we understand that claim would be pursued against the Debtor and not the Trust. If the County is correct in its understanding does the United States intend to pursue such claims against the debtor? And if so, what meaningful resources would there be to satisfy any such claim, either by the United States or Onondaga County?

Adding to our concerns over this matter are USEPA's repeated statements that the cleanup of Lower Ley Creek must be addressed within the next year so as not to delay the cleanup of Onondaga Lake. The County and others have repeatedly questioned EPA on this issue and implored officials from DOJ and EPA that Lower Ley Creek be addressed in the GM bankruptcy.

Again, documents released with the announcement of the proposed Consent Decree state that an extensive and exhaustive review of environmental conditions was done before the terms of the proposed Consent Decree were agreed to and announced publicly. Onondaga County is forced to ask:

"Exactly what was done to review this site and GM's contamination of Ley Creek?" and

"What about that review caused the seemingly arbitrary cutoff at the Route 11 Bridge?"

Given that EPA requested that GM, Onondaga County and the Town of Salina and five industrial PRPs conduct a Remedial Investigation and Feasibility Study of Lower Ley Creek, and EPA's proposed expedited work schedule, it is only reasonable for Onondaga County to assume that EPA also will ask or direct Onondaga County to conduct any cleanup of Lower Ley Creek and its environs or that EPA will seek reimbursement from the County for any monies EPA itself might spend.

Is that the Government's plan of action here? Or can you assure Onondaga County and its taxpayers that it will not be forced to pay for the cleanup of GM's environmental legacy?

While the County and Town struggle to balance budgets and provide necessary services, any unfunded mandate is a significant burden on tax payers. Onondaga County was further disheartened to learn that GM declined to execute a proposed State of New York Order on Consent intended to address the PCB contamination of Old Ley Creek.

External experts have informed the County the potential cost for the remediation of Lower Ley Creek and its environs could approach or exceed $50 million. While any dollars that must be used to address Ley Creek would be a burden on the County, even a fraction of that estimated cost would be staggering on the County and its taxpayers.

US0022

In the press release announcing the Consent Decree, the Department of Justice proclaimed the proposed Agreement was evidence that the federal government could work with states and tribes to address the environmental legacy of Old GM. While the County believes that statement is generally true, unfortunately it is not true with respect to Lower Ley Creek or Onondaga Lake, a site of historic spiritual significance to the Haudenosaunee peoples.

Given the above, Onondaga County requests that the proposed Consent Decree be modified and that it provide funds for the entirety of GM's PCB legacy including the cleanup of Lower Ley Creek, Old Ley Creek and any PCB-contaminated dredge spoils located downstream of Route 11.

Thank you.

US0023



US0024

December 15, 2010

United States Environmental Protection Agency
Region 2
290 Broadway
New York, NY 10007-1866

**RE:  Comments on Proposed Settlement with GM regarding the Ley Creek Superfund Site**

To Whom It May Concern:

GM needs to clean up ALL of Ley Creek, and whatever damage has arisen from it.
The watershed depends on every part being clean, healthy, and properly maintained, just
as a car cannot have just its outer frame to run as a cohesive entity.  Please see the bigger
picture, GM.

Thank you

Sincerely yours,

Karen Kucharski

16 Standish Drive
Apalachin, New York  13732
MFA, Syracuse University

US0025



WILLIAM B. MAGNARELLI
Assemblyman 120th District

THE ASSEMBLY

STATE OF NEW YORK

ALBANY

CHAIR
Veterans' Affairs
COMMITTEES
Economic Development, Job Creation,
Commerce and Industry
Education
Health
Oversight, Analysis and Investigation
Steering

December 15, 2010

Ignacia S. Moreno, Assistant Attorney General
Environmental and Natural Resources Division
P. O. 7611
U. S. Department of Justice
Washington, D. C. 20044-7611

Re: *In re Motors Liquidation Corp., et al.*, D. J. Ref. 90-11-3-09754

Dear Assistant Attorney General Moreno:

In accordance with the Department of Justice' recent Public Meeting announcement, this letter is hereby submitted for inclusion as a public comment on the above referenced matter. As your announcement notes, while the public comment period closed on November 27, 2010, the "Department will accept public comments on the proposed Settlement at the public meeting." The letter also has been mailed to you and those copied below.

I have read and am in substantial agreement with the comments submitted by the County of Onondaga on November 24, 2010. Writing as an Assemblymember who has legal training, I commend the County for its well argued plea on the merits and facts, and a compelling call for "justice as fairness". There can be little doubt that the proposed settlement favors the party with superior advantage (GM), and tacitly marks those of lesser advantage (the taxpayers of my Assembly District and Onondaga County) with the responsibility for remedying, if you will, a mess not of their making.

I understand and am somewhat sympathetic to the vagaries of the manufacturing market place, and even of the shortsighted decision making of GM's management and R&D principals. Many Onondaga County residents will recall their shock at the closure of GM Inland Fisher Guide, and their Massena facility. In my opinion, that is enough of a legacy without GM being allowed, under cover of bankruptcy and enabled by immense taxpayer support, to abrogate its clear responsibilities under CERCLA and RCRA. This region has supported GM quite enough as former GM workers, and as taxpayers underwriting the automotive 'bailout', and CERCLA and RCRA were never intended as shields.

(Continued)

DISTRICT OFFICE: State Office Building, 333 East Washington Street, Room 840, Syracuse, New York 13202 • 315-428-9651 • FAX: 315-428-1279
ALBANY OFFICE: Room 841, Legislative Office Building, Albany, New York 12248 • 518-455-4826 • FAX: 518-455-5498
magnarw@assembly.state.ny.us
 Printed on recycled paper.

US0026

Page Two

I would hope that the Department, and the Environmental Protection Agency, in the context of a negotiated *national* settlement, will not lose sight of the *local* interests which in this instance are represented not only by several valued local employers, but especially by the County of Onondaga and the Town of Salina. The settlement, as proposed leaves such entities in fiscal jeopardy, and at a time of economic crisis. In particular, to link Salina and this county to the known purveyor of PCB contamination relies on linkages that, however legitimized under a broad reading of CERCLA and RCRA, are at best tenuous when they are not entirely absurd.

As is well known to the Department of Justice and the EPA, Onondaga County has made great and even heroic strides towards Onondaga Lake wastewater treatment remediation, and in partnership with Honeywell and others, is addressing many of the issues created by industrial residuals. These efforts have been made possible by Federal, State, and local resources, and of course commitments from various successor companies. All of these resources are precious, and all of these sources are stressed. The current proposed settlement, at least in my opinion, creates the specter of an everlasting open-ended project, wherein government may always feel free to require 'just one more thing'.

I respectfully request favorable consideration of an amended settlement agreement that does not leave Onondaga County taxpayers liable for what is clearly and completely a corporate environmental responsibility.

Very truly yours,

*William H. Magnarelli*

William B. Magnarelli
Member, NYS Assembly
120th District

CC:    Honorable Charles Schumer
       Honorable Kirsten Gillibrand
       Joanne M. Mahoney, Onondaga County Executive
       Lisa Jackson, Administrator, USEPA
       Kenneth P. Lynch, Regional Director, NYSDEC Region 7

US0027



**Town of Salina**
## OFFICE OF THE TOWN SUPERVISOR
Salina Town Hall
201 School Road – Room 112
Liverpool, NY 13088
(315) 457-6661
Fax: (315) 457-4476
www.salina.ny.us
supervisor@salina.ny.us

**Mark A. Nicotra**
Town Supervisor
**Lesley Dublin**
Secretary to the Supervisor

**Colleen Gunnip**
Deputy Town Supervisor

December 15, 2010

*Via U.S. Mail and Hand Submission at 12/15/10 Public Meeting*

United States Department of Justice
c/o Ignacia S. Moreno, Assistant Attorney General
Environmental and Natural Resources Division
P.O. Box 7611
U.S. Department of Justice
Washington, DC 20044-7611

      *Re:*   *In re: Motors Liquidation Corp., et al. D.J. Ref. 90-11-3-09754*
           *Town of Salina, New York Comments on Proposed Environmental*
           *Response Trust Consent Decree and Settlement Agreement*

To the U.S. Department of Justice:

     The Town of Salina (the "Town") requests that specific revisions be made to the proposed Environmental Response Trust Consent Decree and Settlement Agreement (the "Settlement Agreement") which seeks to create the Motors Liquidated Company ("Old GM") Bankruptcy Environmental Trust Fund. In addition to the comments provided herein, the Town supports and incorporates those comments submitted to the U. S. Department of Justice by the County of Onondaga (the "County") in its November 24, 2010 correspondence.

     The Town objects to the arbitrary limitations the United States has placed on the proposed distribution of the approximately $641 million comprising the Environmental Trust Fund.[1] In particular, the Town opposes the Settlement Agreement's ban on the use of trust monies to address the "downstream" liabilities associated with Old GM's Inland Fisher Guide facility (the "IFG Site") and, in particular, the disposal and discharge of hazardous wastes generated by Old GM within the lower portions of Ley Creek; Onondaga Lake; and the former Town of Salina Landfill Site (the "Landfill Site").

In support of its trust fund scheme, the Settlement Agreement artificially and arbitrarily divides the lower portion of Ley Creek from that portion of Ley Creek located

---

[1]   The Town further objects to the nature of the notice the U.S. Department of Justice ("DOJ") has given with respect to both the Settlement Agreement and the December 15th public hearing. We submit that the notice given for the Settlement Agreement violates both applicable U.S. Bankruptcy Court procedures and 42 U.S.C. § 6973. The Town further finds the one-week notice of the public hearing unacceptable, and apparently designed to avoid meaningful public input.

US0028

United States Department of Justice
December 15, 2010
Page 2

upstream of the Route 11 Bridge, irrespective of the voluminous technical data collected by the U.S. Environmental Protection Agency ("USEPA") and the New York State Department of Environmental Conservation ("NYSDEC") proving that Old GM's operations at the IFG Site have resulted in decades of PCB releases into the entirety of Ley Creek and the remaining Onondaga Lake system. The Town further objects to the arbitrary and capricious decision made by the United States to exclude from compensation under the Settlement Agreement Old GM's liability to the Landfill Site, notwithstanding that such liability is a direct cause of Old GM's historical operations at the IFG Site. The hazardous waste disposal practices conducted at the IFG Site resulted in the disposal of hundreds of tons of PCBs and PCB-related waste at the Landfill Site, which is currently being remediated by the Town pursuant to a Record of Decision issued by USEPA and NYSDEC in March 2007.

The Settlement Agreement is clearly in violation of CERCLA's mandate that a consent decree be fair, reasonable, and consistent with its statutory goals. If left unmodified, the Settlement Agreement will result in the taxpayers of the Town, County and State of New York solely bearing the financial burden of addressing the decades of contamination Old GM and its IFG Site have caused. There is no justification for the exclusion of Lower Ley Creek sub-site and/or the Landfill Site from compensation under the Settlement Agreement, since these liabilities are inextricably linked to the IFG Site. What is particularly offensive and arbitrary is how the United States on one hand has purposefully excluded these IFG Site-related liabilities from compensation, while at the same time pursuing enforcement actions against the Town and other non-GM parties for the cleanup (and cost recovery) associated with these same liabilities.

The Town therefore requests that the proposed Settlement Agreement be modified to include not only funding for the cleanup of the entirety of Ley Creek, but also for the liability Old GM faces as a generator and arranger for disposal of IFG Site-related hazardous waste at the Landfill Site pursuant to the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9601 et seq. A decision by the United States to deny the modifications requested by both the Town and the County will result in our taxpayers solely bearing the cost of these Old GM liabilities, with the United States (through its debtor-in-possession financing of Old GM) benefitting from the expenditure of trust monies and the concomitant redevelopment of these now, federally-controlled assets.

The County of Onondaga in its November 24th, 2010 letter to DOJ has provided numerous comments on the proposed Settlement Agreement in light of Old GM's liability to the Lower Ley Creek sub-site and the Onondaga Lake NPL Site. The Town submits the following supplemental comments with respect to the Lower Ley Creek sub-site, as well as Old GM's liability as a potentially responsible party ("PRP") pursuant to CERCLA for the Landfill Site.

US0029

United States Department of Justice
December 15, 2010
Page 3


### Lower Ley Creek

A voluminous amount of technical data has been collected by NYSDEC and USEPA which demonstrates that the discharge of PCBs and PCB-related wastes from the IFG Site has impacted the entirety of Ley Creek. A number of the reports containing this technical data were already provided to your office by the County.

As part of its remedial investigation of the Landfill Site, the Town, at the request of NYSDEC, also collected surface water samples along Ley Creek. Samples were collected just east of the Route 11 Bridge and at various locations extending downstream to the confluence of Beartrap Creek and Ley Creek. Shallow (0 to 6 inches below the sediment/water interface) and deeper (6 to 12 inches below the interface) sediment samples were also collected at the same surface water sample locations.

The results showed that both water and sediment samples contained PCBs (Aroclor 1248) above the applicable sediment screening criteria. More importantly, the sediment samples collected upstream of the Landfill Site contained higher concentrations of PCBs than downstream samples, indicating that the upper portions of Ley Creek (above the Route 11 bridge) were the source of PCB contamination in Lower Ley Creek. A Remedial Investigation/Feasibility Study was further performed by Old GM wherein PCBs were detected in the dredge spoils at concentrations up to 466 mg/kg. The results of this study linked the presence of PCBs along the entire length of Ley Creek to the historical discharges of PCBs from the IFG Site.

Pursuant to Section 104(e) of CERCLA, NYSDEC prepared in June, 1996 a Site Summary Report for the IFG Site as part of its sub-site status determination. A copy of that report is attached hereto as Exhibit "A." After completing its investigation, NYSDEC and USEPA concluded that the IFG Site contributed to the presence of PCBs within the entirety of Ley Creek due to dredging activities conducted along certain creek bed areas. Soils, groundwater, industrial wastewater, and stormwater were all confirmed as containing PCBs and other hazardous substances. The report further states that "[f]rom 1954 until 1963, process wastewater [from the IFG Site] discharged directly to Ley Creek presumably with little or no treatment." NYSDEC thus concluded that, due to the presence of PCBs and other hazardous substances at the IFG Site, it represented "a release and a continued threat of release [of hazardous substances] to the Onondaga Lake System."

These PCB findings were further supported by recent sampling collected by USEPA in 2010 along the lower portions of Ley Creek. As stated in the July 22, 2010 Onondaga Lake NPL Sub-site Evaluation for Lower Ley Creek, USEPA acknowledges that "the majority of the contamination in Lower Ley Creek sediment has come from various sources and/or facilities upstream and on Ley Creek, including the former General Motors Corporation – Inland Fisher Guide Facility." As also noted by the

US0030

United States Department of Justice
December 15, 2010
Page 4

County in its November 24th comment letter, USEPA's evaluation does not identify any other alleged sources of PCB contamination in the Lower Ley Creek. This is further acknowledged by USEPA in its October 30, 2009 correspondence notifying Old GM that it is a PRP to the Lower Ley Creek sub-site pursuant to CERCLA.

The technical analyses discussed above, as well as the data noted in the County's November 24th letter, clearly demonstrate that there is no legitimate basis to divide the upper portion of Ley Creek from its lower portion when determining Old GM's environmental liability. To the contrary, the division set forth in the Settlement Agreement is a merely fictional; one created to arbitrarily cut off Old GM's liability, while ensuring both an overwhelming "orphan share" of liability and protracted future litigation between DOJ and the remaining PRPs.

**The Former Town of Salina Landfill Site**

In addition to its liabilities to the Lower Ley Creek sub-site and Onondaga Lake NPL Site, historical operations at the IFG Site have resulted in Old GM becoming a PRP for the cleanup of the Landfill Site. The Landfill Site, approximately 55 acres in size, has been designated a Class 2 Inactive Hazardous Waste Disposal Site by NYSDEC. The Landfill Site primarily accepted municipal waste, but also accepted commercial and industrial wastes from the IFG Site. Following 1994, when USEPA listed the Onondaga Lake Site on the National Priorities List, USEPA and NYSDEC also notified the Town that the Landfill Site was being listed as a sub-site. An extensive investigation was subsequently completed at the Landfill Site, which culminated in USEPA and NYSDEC issuing a Record of Decision in March, 2007 wherein a remedial remedy was selected.

Old GM conducted various manufacturing processes at the IFG Site including plating; buffing; forming and finishing metal automobile parts; junction moldings; painting; and assembling plastic body and trim components for automobiles. The evidence collected by NYSDEC shows that Old GM's disposal practices at the IFG Site resulted in the presence of PCBs and other hazardous substances and wastes at the Landfill Site. Attached hereto as Exhibit "B" is a copy of the Preliminary Site Assessment Report prepared for the Landfill Site by NYSDEC, dated July, 1992, which includes a portion of a July, 1985 Industrial Chemical Survey and Hazardous Waste Generator questionnaire prepared by Old GM confirming the hazardous waste disposal practices at the IFG Site which resulted in the presence of hazardous wastes at the Landfill Site.

According to USEPA and NYSDEC, between 1962 and 1973, Old GM disposed PCBs and PCB-related hazardous wastes at the Landfill Site. Documented releases included approximately 640 tons of paint sludge; 22 tons of waste paint thinner and paint reducer; unknown quantities of boiler ash and buffing sludge; and approximately 30 pounds of unadulterated PCBs. Old GM further acknowledged that Leaseway Haulers,

US0031

United States Department of Justice
December 15, 2010
Page 5

Inc., AT&T Haulers, and Mattheison Trash Service regularly hauled waste from the IFG Site to the Landfill Site. PCBs (including Aroclor 1248) known to be present at the IFG Site, have also been detected in various media associated with the Landfill Site. This undeniable connection between the Aroclor 1248 PCBs generated at the IFG Site, and those present in the soils and groundwater at the Landfill Site, confirms that Old GM's historical waste practices at the IFG Site directly resulted in the disposal of PCBs and PCB wastes at the Landfill Site, thus supporting a finding that Old GM is a PRP with respect to the Landfill Site pursuant to Section 107(a)(3), 42 U.S.C. § 9607(a)(3) of CERCLA. There is no dispute that Old GM is a party, who by contract, agreement or otherwise, arranged for the disposal of hazardous substances at the Landfill Site. A party qualifies as a PRP on an arranger basis under CERCLA when it "takes intentional steps to dispose of a hazardous substance." *See Burlington Northern and Santa Fe Railroad Company v. United States*, 129 Sup.Ct. 1870, 1879 (2009).

The main consideration for Old GM's PRP liability is the acknowledgement that, but for the presence of PCBs and other hazardous substances generated and disposed of by Old GM, the cleanup of the Landfill Site would have been completed as a 6 N.Y.C.R.R. Part 360 municipal solid waste closure, as opposed to a Class 2 Inactive Hazardous Waste Site pursuant to 6 N.Y.C.R.R. Part 375. Because Old GM's disposal of PCBs and PCB-related waste resulted in a Class 2 listing of the Landfill Site, the associated cleanup costs are significantly higher, requiring that Old GM's allocated share of cleanup costs reflect this outcome. The Town therefore projects that Old GM's disposal of PCB-related wastes resulted in a 56% incremental increase in the total cost to be incurred in remediating the Landfill Site.

Based on its recent bid award for phase one of the cleanup, the Town has calculated that the total present worth cost of remediating the Landfill Site is $29,592,701. Old GM's estimated allocated share of these costs is, at a minimum, $19,201,701, representing the incremental costs associated with remediating the Landfill Site as a Class 2 Inactive Hazardous Waste Site due to GM's disposal of PCBs and other hazardous substances. The Settlement Agreement, in its current form, however, bars the Town from recovering any portion of this cost from Old GM despite the source of its liability being directly (and unequivocally) linked to the IFG Site. The Settlement Agreement thus fails to satisfy the applicable standard for judicial approval of CERCLA settlements, and violates that statute's objective that consent decrees, wherein the United States provides covenants not to sue, be fair, reasonable and consistent with CERCLA's goals of cleaning up contaminated sites.

What is particularly troubling about the United States' decision to bar the Lower Ley Creek sub-site and Landfill Site from compensation is its self-creation of "orphan shares," which will ultimately jeopardize the future cost recovery efforts by USEPA, NYSDEC and the Town relating to these sub-sites, as well as the Onondaga Lake NPL

United States Department of Justice
December 15, 2010
Page 6

Site. By agreeing to the Settlement Agreement, the United States has essentially
undermined its ability to seek the recovery of millions of dollars from non-Old GM
parties who also bear liabilities to these contaminated sites.

**Miscellaneous Comments**

In addition to the comments provided by the County on pages 10-12 of its
November 24th correspondence, the Town requests that DOJ further consider the
following revisions to the proposed Settlement Agreement:

1. The term "any general unsecured claim" in paragraph 100 (ii) of the
   Settlement Agreement should be replaced with the term "any claims." This
   revision ensures the broadest reservation of rights by the United States since
   some of the environmental claims are still ongoing and not necessarily
   reflected in the proof of claims filed, to date, in the Old GM bankruptcy
   proceeding.

2. The phrase "other than claims or causes of action for migration of Hazardous
   Substances emanating from a Property" in paragraph 100 (ii) must be deleted
   since it is inconsistent with the Settlement Agreement's reservation of rights
   with respect to the Lower Ley Creek and Lake Bottom sub-sites. The basis
   of the claims preserved in paragraph 100(ii) is that PCBs and other hazardous
   substances have actually migrated from the IFG Site and contaminated those
   sub-sites.

3. The second sentence on page 60 of the Settlement Agreement (with paragraph
   100) must be revised so that the Settlement Agreement is also without
   prejudice as to any liability of Debtor's successors, assigns, officers,
   directors, employees, and trustees pursuant to Section 113(f) of CERCLA.
   The Town further objects to the Settlement Agreement's ban on future acts
   creating liability under CERCLA, RCRA and/or state law if based on
   continuing releases related to conduct prior to the Effective Date of the
   Settlement Agreement.

4. Consistent with comment 2 above, paragraph 105 of the Settlement
   Agreement must be revised by deleting the phrase "including releases of
   Hazardous Substances from any portion of the Properties, and all areas
   affected by migration of such substances emanating from the Properties...,"
   since it undermines the reservation of rights preserved in Article VIII of the
   Settlement Agreement as to the Lower Ley Creek, Lake Bottom and Salina
   Landfill Sub-sites.

US0033

United States Department of Justice
December 15, 2010
Page 7


**Conclusion**

The arbitrary limitations that have been placed on the distribution of the Settlement Agreement's trust monies will result in a significant financial burden being placed squarely on the Town, notwithstanding the fact that Old GM's IFG Site is solely or primarily responsible for the contamination existing at the Lower Ley Creek sub-site and the Landfill Site. The environmental data collected by USEPA and NYSDEC proves there is no legitimate basis to exclude these Old GM liabilities from compensation under the Environmental Trust Fund. To do so, will not only undermine the future efforts of the United States to address these environmental concerns, but unjustly place the burden of these liabilities solely on the shoulders of Town and County residents.


Sincerely,


Mark A. Nicotra
Supervisor
Town of Salina


Attachments
cc:     Town of Salina Town Board Members
        Natalie N. Kuehler, Assistant U.S. Attorney
        Maureen Leary, NYS Assistant Attorney General
        Joanne M. Mahoney, Onondaga County Executive
        Frank C. Pavia, Esq.
        Robert D. Ventre, Esq.
        Christopher A. Burns, P.G.

229314 1500959.1

US0034

**DAVID J. VALESKY**
SENATOR, 49TH DISTRICT

**ALBANY OFFICE**
ROOM 416, STATE CAPITOL
ALBANY, NEW YORK 12247
518-455-2838
FAX 518-426-6885

**DISTRICT OFFICE**
805 STATE OFFICE BUILDING
333 EAST WASHINGTON STREET
SYRACUSE, NEW YORK 13202
315-478-8745
FAX 315-474-3804

E-MAIL
valesky@senate.state.ny.us

WEBSITE
www.valesky.nysenate.gov

# NEW YORK STATE SENATE
ALBANY, NEW YORK 12247

VICE PRESIDENT PRO TEMPORE

**COMMITTEES:**

AGRICULTURE

CULTURAL AFFAIRS, TOURISM,
PARKS & RECREATION

ENERGY & TELECOMMUNICATIONS

FINANCE

HEALTH

LOCAL GOVERNMENT

RULES

TRANSPORTATION

December 14, 2010

Ignacia S. Moreno, Assistant Attorney General
Environment and Natural Resources Division
P.O. Box 7611
U. S. Department of Justice
Washington, D.C. 20044-7611

Re: Public Comment for hearing regarding the proposed General Motors Environmental Trust

Dear Ms. Moreno,

I am writing to urge the Department of Justice to amend the proposed settlement between General Motors and several sites across the nation, including the former GM Inland Fisher Guide plant and Ley Creek.

If the settlement is accepted in its current form, Onondaga County and the Town of Salina, and the taxpayers who live there, could be held financially liable for parts of the environmental cleanup, potentially totaling more than $20 million, causing a devastating effect on the local tax burden.

This is an unacceptable assessment, the basis for which is the County's participation in a dredging project in Ley Creek in 1970—before it had any knowledge of the pollution caused by General Motors.

If this trust is approved without alteration, Onondaga County, the Town of Salina and the hundreds of thousands of taxpayers who live therein will be forced to pay for actions that occurred without their knowledge by a private company and beyond their control.

Therefore, I urge you to amend the settlement to expand General Motors fiscal responsibility for environmental cleanup of the entire affected area, including lower Ley Creek.

Sincerely,

David J. Valesky
State Senator
49th Senate District

DJV/jad

Cc: Joanne M. Mahoney, Onondaga County Executive

corr
90-11-3-09754

US0035



US POSTAGE

HASLER

017H15551515

$0.440

12/15/2010

Mailed From 13202



Ignacia S. Moreno, Assistant Attorney General
Environment and Natural Resources Division
P.O. Box 7611
U.S. Department of Justice
Washington, D.C. 20044-7611

DEC 22 2010

DOJ MAILROOM

20044$7611



THE SENATE
STATE OF NEW YORK
805 STATE OFFICE BLDG.
333 EAST WASHINGTON ST.
SYRACUSE, NY 13202

DAVID J. VALESKY
SENATOR, 49TH DISTRICT

US0036