**Hearing Date and Time: March 3, 2011 at 9:45 a.m. (ET)**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| MOTORS LIQUIDATION COMPANY, | ) Case No. 09-50026 (REG) |
| | ) |
| f/k/a/ GENERAL MOTORS CORP., | ) Jointly Administered |
| | ) |
| Debtor. | ) |
| | ) |

**UNITED STATES' STATEMENT IN SUPPORT OF ENVIRONMENTAL PROVISIONS
OF DEBTORS' PLAN OF LIQUIDATION, RESPONSE TO PUBLIC COMMENT AND
JOINDER IN DEBTORS' REQUEST FOR APPROVAL OF THE PRIORITY ORDER
SITE SETTLEMENT AGREEMENTS AMONG DEBTORS, THE UNITED STATES,
AND CERTAIN STATES INCORPORATED IN DEBTORS' PLAN**

PREET BHARARA
United States Attorney for the
Southern District of New York
DAVID S. JONES
NATALIE N. KUEHLER
JAIMIE L. NAWADAY
Assistant United States Attorneys
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel. No.:  (212) 637-2741
Fax No.:  (212) 637-2750

*Counsel for the United States*

## TABLE OF CONTENTS

I.    PRELIMINARY STATEMENT ..................................................................3

II.    GENERAL STATUTORY/FACTUAL BACKGROUND ...............................5

    A.    Statutory Background ................................................................5

        1.    CERCLA........................................................................5

        2.    RCRA ...........................................................................8

    B.    Procedural Background................................................................9

        1.    Old GM's Chapter 11 Petition and U.S. Treasury's Debtor in Possession Loan ...........................................................9

        2.    Proofs of Claims of the Governmental Environmental Entities ...............10

        3.    Settlement Negotiations ..............................................11

    C.    The Priority Order Settlement Agreements ........................................11

        1.    Cash Payments to Fund Clean-Up at the Priority Order Sites .................11

        2.    Allowed, General Unsecured Claims........................................13

        3.    Environmental Claims Not Resolved by the Agreements ........................13

        4.    Covenants Not to Sue and Contribution Protection..................................14

    D.    Public Comments ................................................................14

        1.    Onondaga County ................................................................14

        2.    The City of Dayton ................................................................15

III.    ARGUMENT................................................................15

    A.    The Court Should Approve the Proposed Priority Order Site Settlements Because They Are Fair, Reasonable, and Consistent With Environmental Law ................................................................16

        1.    The Settlements Are Fair ........................................................17

        2.    The Settlements Are Reasonable ..............................................18

3.      The Settlements Are Consistent With the Goals of CERCLA ..................18

B.    The Public Comments Do Not Indicate That the Priority Order Site Settlement
       Agreements Are Inappropriate, Inadequate, or Improper......................................19

       1.      The Agreements Appropriately Prioritize Cleanup Order Sites with No
               Other Significant Viable PRPs.................................................................19

       2.      The Agreements Provide Significant and Reasonable Funding For
               Cleanup ....................................................................................................23

       3.      The Agreements Reasonably Provide for a Transfer of Any Excess
               Funding to the Superfund or the Cushion Funding Account ...................23

       4.      The City of Dayton Supports the Delphi Harrison Settlement
               Agreement.................................................................................................25

CONCLUSION...........................................................................................................25

# TABLE OF AUTHORITIES

**FEDERAL CASES**

*B.F. Goodrich Co. v. Murtha*,
     958 F.2d 1192 (2d Cir. 1992)..................................................................5

*Cannons Engineering Corp.*,
     720 F. Supp. at 1035............................................................................15

*In re Chateaugay*,
     944 F.2d 997 ........................................................................................19

*City of New York v. Exxon Corp.*,
     697 F. Supp. 677 (S.D.N.Y. 1988) .......................................................6

*In re Cuyahoga Equipment Corp.*,
     980 F.2d 110 (2d Cir. 1992).......................................................6, 15, 18

*Dedham Water Co. v. Cumberland Farms Dairy, Inc.*,
     805 F.2d 1074 (1st Cir. 1986) ...............................................................5

*In re Mark IV Industrial, Inc.*,
     438 B.R. 460 (Bankr. S.D.N.Y. 2010)..................................................20

*New York v. Shore Realty Corp.*,
     759 F.2d 1032 (2d Cir. 1985)..................................................................5

*New York v. Solvent Chemical Corp.*,
     984 F. Supp. 160 (W.D.N.Y. 1997) ................................................15, 18

*O'Neil v. Picillo*,
     682 F. Supp. 706 (D.R.I. 1988), *aff'd*, 883 F.2d 176 (1st Cir. 1989) ................5, 6

*In re Torwico Electrics, Inc.*,
     8 F.3d 146 (3d Cir. 1993)......................................................................20

*United States v. Akzo Coatings of America, Inc.*,
     949 F.2d 1409 (6th Cir. 1991) ...........................................................4, 6

*United States v. Alcan Aluminum Corp.*,
     990 F.2d 711 (2d Cir. 1993)  .................................................................6

*United States v. Alcan Aluminum, Inc.*,
     25 F.3d 1174 (3d Cir. 1994)...................................................................6

*United States v. Apex Oil Co., Inc.*,
   579 F.3d 734 (7th Cir. 2009) ...............................................................................19

*United States v. Cannons Engineering Corp.*,
   899 F.2d 79 (1st Cir. 1990) ...........................................................4,6, 7, 15, 16, 17

*United States v. Charles George Trucking Inc.*,
   34 F.3d 1081 (1st Cir. 1994) ................................................................15, 16, 17

*United States v. Davis*,
   261 F.3d 1 (1st Cir. 2001) ....................................................................................16

*United States v. DiBiase*,
   45 F.3d 541 (1st Cir. 1995) ..............................................................................6, 16

*United States v. Hooker Chemical & Plastics Corp.*,
   540 F. Supp. 1067 (W.D.N.Y. 1982),
   *aff'd*, 749 F.2d 968 (2d Cir. 1984) .......................................................4, 15, 18, 19

*United States v. Monsanto*,
   858 F.2d 160 (4th Cir. 1988) .................................................................................6

*United Technologies Corp. v. Browning-Ferris Industrial, Inc.*,
   33 F.3d 96 (1st Cir. 1994), *cert. denied*, 115 S. Ct. 1176 (1995) ...........................7

*Voluntary Purchasing Groups, Inc. v. Reilly*,
   889 F.2d 1380 (5th Cir. 1989) ...............................................................................5

FEDERAL STATUTES

40 C.F.R. § 264.151(a)(1) ..........................................................................................7, 11

11 U.S.C. § 363 ..............................................................................................................8

26 U.S.C. § 9507 ............................................................................................................5

42 .S.C. §§ 6921—6925 .................................................................................................7

42 U.S.C. §§ 6924(u) .....................................................................................................7

42 U.S.C. § 6925 ............................................................................................................7

42 U.S.C. § 6926(b) .......................................................................................................7

42 U.S.C. § 6928 ............................................................................................................7

42 U.S.C. § 6973(a) .......................................................................................................8

42 U.S.C. § 9601(24) .....................................................................................................5

42 U.S.C. §§ 9604 ..........................................................................................................6

42 U.S.C. § 9604(a) .......................................................................................................5

42 U.S.C. § 9607(a) .......................................................................................................5

42 U.S.C. § 9613(f)(2) ...................................................................................................7

42 U.S.C. § 9622(a) .......................................................................................................6

## I.    PRELIMINARY STATEMENT

The United States, on behalf of the United States Environmental Protection Agency ("**U.S. EPA**") and the United States Department of the Treasury ("**U.S. Treasury**") (collectively, the "**United States**") hereby submits this statement in support of the environmental provisions of the Proposed Plan of Liquidation ("**Plan**"), responds to public comments received in connection with the Wheeler Pit Settlement Agreement; the Garland Road Settlement Agreement; the Sioux City Site Settlement Agreement; the Delphi Harrison Settlement Agreement; the Scatterfield Site Settlement Agreement; and the Harvey & Knott Settlement Agreement (collectively, the "**Priority Order Site Settlement Agreements**" or "**Agreements**") lodged with the United States Bankruptcy Court for the Southern District of New York (the "**Court**") on December 14, 2010, and respectfully joins Motors Liquidation Company ("**MLC**"), formerly known as General Motors Corp. ("**Old GM**"), Remediation and Liability Management Company, Inc. ("**REALM**"), and Environmental Corporate Remediation Company, Inc. ("**ENCORE**") (collectively, "**Debtors**") in their request for the Court's approval of the Priority Order Site Settlement Agreements, which are incorporated into Debtors' Plan.

The proposed Agreements resolve environmental liabilities of the Debtors asserted by the United States on behalf of U.S. EPA, as well as environmental liabilities asserted by Iowa, Indiana, Ohio, and Wisconsin (collectively, the "**Governmental Environmental Claimants**") under, *inter alia*, the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended ("**CERCLA**"), 42 U.S.C. §§ 9601 – 9675, and the Resource Conservation and Recovery Act ("**RCRA**"), 42 U.S.C. §§ 6901 – 6992, in connection with six properties (the "**Priority Order Sites**") at which MLC is under a judicial or administrative order to perform cleanup and is the sole viable potentially responsible party ("**PRP**") to carry out that cleanup.

Under the Agreements, on the effective date of the Plan, which will also be the effective date of the Agreements (the "**Effective Date**"), Debtors will pay approximately $25 million in cash to resolve their liability under cleanup orders at the Priority Order Sites.   In addition, the United States will receive allowed, general unsecured claims in the amount of $3,046,868 for its unreimbursed past costs and future oversight costs, and the State of Ohio will receive an allowed, general unsecured claim in the amount of $134,326 for its unreimbursed past costs at the Garland Road Site.

The proposed Agreements require the Court to approve their fairness, reasonableness, and consistency with environmental law.[1]  A public notice of each settlement was published in the Federal Register, 75 Fed. Reg. 79,391-93, (Dec. 20, 2010), (the "**Federal Register Notice**"), and the thirty-day public comment period expired on January 19, 2011.  The United States received only two public comments, one in support of the Delphi Harrison Settlement Agreement, and one that contained three criticisms of the six proposed Agreements.

After reviewing the comments received, the United States has determined that the proposed Priority Order Site Settlement Agreements are fair, reasonable and consistent with environmental law.  The settlements memorialized in the Agreements were reached after lengthy negotiation of their terms among sophisticated counsel.  In addition, the parties weighed the merits, costs, risks and delays that litigation would entail against the value of settlement.

The function of the Court in reviewing such motions is not to substitute its judgment for that of the parties to the proposed Agreements, but to confirm that the terms of the proposed Agreements are "fair and adequate and are not unlawful, unreasonable, or against public policy."

---

[1]    Debtors will seek approval of the Priority Order Site Settlement Agreements under bankruptcy law in connection with the proceedings relating to Debtors' request for the Court's approval of their proposed Amended Joint Chapter 11 Plan.

*United States v. Hooker Chem. & Plastics Corp.*, 540 F. Supp. 1067, 1072 (W.D.N.Y. 1982), *aff'd*, 749 F.2d 968 (2d Cir. 1984). The Court should also confirm that the Agreements are consistent with CERCLA's goals. *United States v. Akzo Coatings of Am., Inc.*, 949 F.2d 1409, 1426 (6th Cir. 1991). In conducting its review, the Court should be deferential to the United States' determination that the settlements are in the public's interest. *United States v. Cannons Eng'g Corp.*, 899 F.2d 79, 84 (1st Cir. 1990). Accordingly, for the reasons set forth herein, the United States respectfully requests that this Court approve and enter the proposed Priority Order Site Settlement Agreements lodged with this Court on December 14, 2010.[2]

## II.    GENERAL STATUTORY/FACTUAL BACKGROUND

The environmental liabilities that are resolved by the Agreements derive primarily from two federal statutes and their state counterparts. The first of these, CERCLA, is generally directed at cleaning up sites contaminated with hazardous substances as a result of releases of such substances into the environment. The second, RCRA, in part, addresses cleanup of hazardous constituents and hazardous wastes at operating facilities, as well as any migration of hazardous constituents from such facilities, resulting from the generation, treatment, storage, disposal, or transport of hazardous wastes.

### A.    Statutory Background

1.    <u>CERCLA</u>

CERCLA was enacted to provide a framework for cleanup of the nation's worst hazardous waste sites. The primary goal of CERCLA is to protect and preserve public health and the environment from the effects of releases or threatened releases of hazardous substances

---

[2]    Approval of the Agreements under environmental law is a condition precedent to the effective date of the Plan of Liquidation. *See* Debtors' Amended Joint Chapter 11 Plan of Liquidation, (Dec. 7, 2010) (cited hereinafter as "**Amended Plan**"), at §§ 6.4(a), 9.2 [Docket No. 8015].

to the environment.  *See* 42 U.S.C. § 9601(24); *Voluntary Purchasing Groups, Inc. v. Reilly*, 889

F.2d 1380, 1386-87 (5th Cir. 1989); *O'Neil v. Picillo*, 682 F. Supp. 706, 726 (D.R.I. 1988), *aff'd*,

883 F.2d 176 (1st Cir. 1989); *Dedham Water Co. v. Cumberland Farms Dairy, Inc.*, 805 F.2d

1074, 1081 (1st Cir. 1986); *New York v. Shore Realty Corp.*, 759 F.2d 1032, 1040 n.7 (2d Cir.

1985).

The Hazardous Substance Superfund, commonly known as the Superfund, was

established pursuant to 26 U.S.C. § 9507 to finance federal response actions undertaken pursuant

to section 104(a) of CERCLA, 42 U.S.C. § 9604(a).  Although CERCLA authorizes cleanup of

sites contaminated with hazardous substances using money provided by the Superfund, the

Superfund is a limited source of funding intended for use only when responsible parties are not

available to conduct or finance a site's cleanup.  *See* S. Rep. No. 96-848, 96th Cong., 2d Sess. at

17-18 (1980), *reprinted in* 1 Sen. Comm. on Env't & Pub. Works, Legislative History of

CERCLA 305, 324-25 (1983).  The Superfund cannot finance cleanup of all of the many

contaminated sites nationwide, so replenishment of expended Superfund monies is crucial to the

continuing availability of funds for future cleanups.  Thus, the United States is tasked with

seeking to ensure that PRPs perform site cleanups, or, when Superfund monies are expended by

the federal government in response to a release or threatened release of hazardous substances,

that those monies are recovered from PRPs through the liability scheme set forth in section 107

of CERCLA.  *See B.F. Goodrich Co. v. Murtha*, 958 F.2d 1192, 1197-98 (2d Cir. 1992) (one

statutory purpose of CERCLA is to hold responsible parties liable for the costs of the cleanup).

Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), permits the United States to recover its

costs of responding to releases of hazardous substances from PRPs.  Pursuant to section 107(a),

PRPs include the owners and operators of Superfund sites at the time of the disposal of

hazardous substances at the sites, the current owners and operators of Superfund sites, as well as the generators and transporters of hazardous substances sent to Superfund sites. *See United States v. Alcan Aluminum Corp.*, 990 F.2d 711, 722 (2d Cir. 1993) (describing potential liability for generating hazardous wastes found at a Superfund site); *O'Neil*, 883 F.2d at 178 (distinguishing waste generators from waste transporters); *United States v. Monsanto*, 858 F.2d 160, 168-171 (4th Cir. 1988) (laying out the distinction between owner liability and generator liability).

Section 104(a) and (b) of CERCLA, 42 U.S.C. § 9604(a)-(b), authorizes the U.S. EPA to use Superfund monies to investigate the nature and extent of hazardous substance releases from contaminated sites and to clean up those sites. Moreover, the U.S. EPA may also issue unilateral administrative orders to PRPs that require them to clean up sites, may seek injunctive relief through a civil action to secure such relief, or may seek to reach agreements with PRPs through which one or more PRPs agree to perform the necessary cleanup of sites. *See* 42 U.S.C. §§ 9604, 9606, 9622.

Having created the liability system and enforcement tools to allow U.S. EPA to pursue responsible parties for Superfund cleanups, Congress expressed a strong preference that the United States settle with responsible parties in order to avoid spending resources on litigation rather than on cleanup. 42 U.S.C. § 9622(a).[3] CERCLA encourages settlements, *inter alia*, by providing parties who settle with the United States protection from contribution claims for matters addressed in the settlement. 42 U.S.C. § 9613(f)(2). This provision was designed to

---

[3]      *See also United States v. DiBiase*, 45 F.3d 541, 545-46 (1st Cir. 1995); *United States v. Alcan Aluminum, Inc.*, 25 F.3d 1174, 1184 (3d Cir. 1994); *Akzo Coatings*, 949 F.2d at 1436; *In re Cuyahoga Equip.Corp.*, 980 F.2d 110 (2d Cir. 1992) (citing *City of New York v. Exxon Corp.*, 697 F. Supp. 677, 693 (S.D.N.Y. 1988)); *Cannons Eng'g*, 899 F.2d at 92; H.R. Rep. No. 99-253, pt. 1, at 80 (1985), *reprinted in* 1986 U.S.C.C.A.N. 2862.

provide settling parties "with a measure of finality in return for their willingness to settle."[4]

    2.    <u>RCRA</u>

RCRA regulates generators and transporters of hazardous waste and owners and operators of facilities that treat, store, or dispose of hazardous wastes.  Pursuant to 42 U.S.C. § 6926(b), EPA has authorized certain states to administer portions of the RCRA hazardous waste management programs.  The United States retains the authority to enforce an authorized State's regulations as well as the federal portion of the program still being administered by the United States.  42 U.S.C. § 6928.

RCRA regulations impose obligations on the owners and operators of hazardous waste generation, treatment, storage, disposal, and/or transportation facilities regarding the manner in which such owners and operators deal with solid and hazardous wastes.  *See* 42 U.S.C. §§ 6921—6925; 40 C.F.R. Parts 260-279.  In addition, owners and operators of hazardous waste treatment, storage, or disposal facilities must obtain either a permit or "interim status" in order to operate legally.  42 U.S.C. § 6925.  Under RCRA, the United States and authorized states have the authority to order the owner or operator of a permitted or interim status facility to conduct closure, corrective action, or other response measures as necessary to protect human health and the environment.  *See* 42 U.S.C. §§ 6924(u) and (v); 6928(h).  Where the U.S. EPA determines that handling, storage, treatment, transportation, or disposal of solid or hazardous waste may present an imminent and substantial endangerment to health or the environment, it can also issue a cleanup order or seek injunctive relief against any person who has contributed or is contributing to the handling, storage, treatment, transportation, or disposal of solid or hazardous waste anywhere that such solid or hazardous waste is located.  42 U.S.C. § 6973(a).

---

[4]    *Cannons Eng'g*, 899 F.2d at 92; *United Techs Corp. v. Browning-Ferris Indus., Inc.*, 33 F.3d 96, 103 (1st Cir. 1994), *cert. denied*, 115 S. Ct. 1176 (1995); H.R. Rep. No. 99-253, pt. 1, at 80 (1985), *reprinted in* 1986 U.S. C.C.A.N. 2862.

**B.**     **Procedural Background**

1.     Old GM's Chapter 11 Petition and U.S. Treasury's Debtor in Possession Loan

On June 1, 2009, Old GM and three wholly-owned direct or indirect subsidiaries filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code, and on October 9, 2009, REALM and ENCORE each also filed voluntary chapter 11 petitions.  The Debtors' cases are being jointly administered in this Court.  On June 1, 2009, Old GM also filed a motion to approve the sale of substantially all of its assets pursuant to 11 U.S.C. § 363.  As part of the sale of assets, Old GM excluded from the sale certain real property and personalty it owned, including the 89 properties specified in the Environmental Response Trust Consent Decree and Settlement Agreement lodged with this Court on October 20, 2010 (the "**ERT Settlement Agreement**"), and the other non-cash assets to be transferred to the Trust under the Agreement. On July 5, 2009, the Bankruptcy Court approved the sale of assets to NGMCO, Inc. (a/k/a Newco), now known as General Motors Company ("**New GM**").  Following the sale of assets, Old GM was renamed MLC, and it has continued to own and manage the real property assets excluded from the sale to New GM.

In order to allow, among other things, the orderly winding down of MLC's affairs, U.S. Treasury and Export Development Canada ("**EDC**") granted MLC a loan in the amount of $950 million under a debtor-in-possession agreement, which became effective on June 25, 2009, when the Bankruptcy Court entered a "Final Order Pursuant to Bankruptcy Code Sections 105(a), 361, 362, 364 and 507 and Bankruptcy Rules 2002, 4001 and 6004 (a) Approving a DIP Credit Facility and Authorizing the Debtors to Obtain Post-Petition Financing Pursuant Thereto, (b) Granting related Liens and Super-Priority Status, (c) Authorizing the Use of Cash Collateral and (d) Granting Adequate Protection to Certain Pre-Petition Secured Parties" (the "**DIP**

Order"). On July 5, 2009, U.S. Treasury and EDC increased their loan to MLC from $950 million to $1.175 billion (the "**DIP Loan**"), and the Bankruptcy Court amended its June 25, 2009 Order accordingly by entering an "Order Pursuant to Bankruptcy Code Sections 105(a), 361, 362, 363, 364 and 507 and Bankruptcy Rules 2002, 4001 and 6004 (a) Approving Amendment to DIP Credit Facility to Provide for Debtors' Post-Petition Wind-Down Financing" (the "**Amended DIP Order**"). Under the terms of the DIP Loan, the DIP Order, and the Amended DIP Order, U.S Treasury retained liens on Debtors' assets, including the cash provided to Debtors under the DIP Loan and all real properties and personalty owned by Debtors. Of the $1.175 billion, a maximum of $536 million was allocated for administrative environmental expenses. *See* Transcript of June 30, 2009 Sale Hearing, Testimony of Albert Koch, at 297-98. Pursuant to the ERT Settlement Agreement, the parties agreed that of the $536 million, $511 million should be used for cleanup of the Debtor-owned sites and the remaining $25 million should be used for cleanup at the Priority Order Sites.

      2.    <u>Proofs of Claims of the Governmental Environmental Entities</u>

On November 28, 2009, the United States timely filed duplicate copies of a proof of claim against MLC both in the Bankruptcy Court and directly with Debtors' claims agent, and the two copies of the identical proof of claim were assigned Nos. 67362 and 64064. On April 16, 2010, the United States also filed proofs of claim against REALM and ENCORE which were assigned Nos. 70254 and 70255. The U.S. environmental proofs of claim protectively set forth, *inter alia*, claims or causes of action for future work as well as past and/or future costs with respect to the properties addressed by the Priority Order Site Settlement Agreements. In addition, Wisconsin, Indiana, Iowa, and Ohio protectively filed environmental proofs of claim setting forth similar claims or causes of action concerning the Wheeler Pit Site, Scatterfield Site,

Sioux City Site, and Garland Road Site, respectively.  The U.S. proof of claim alone referred to over one hundred sites.

    3.    <u>Settlement Negotiations</u>

Recognizing that the United States and the states were some of the largest creditors in the bankruptcy, and that it would be difficult for Debtors to achieve a Plan of Liquidation ("**Plan**") without reaching some settlements with the United States and the States with respect to Debtors' environmental obligations, the United States, States and Debtors negotiated extensively for over one year to reach a number of significant settlements.  First, the parties reached consensus on the ERT Settlement Agreement, which primarily addressed environmental liabilities at Debtor-owned sites.[5]  Second, the parties reached consensus on the Priority Order Site Settlement Agreements.  The Priority Order Sites, while not Debtor-owned sites, are all sites at which (i) MLC is under a judicial or administrative order compelling it to conduct environmental cleanup; and (ii) MLC is the sole viable, responsible party to perform the cleanup.   Accordingly, absent Debtors' cash payment toward the cleanup costs at the Priority Order Sites, the sites would either not be cleaned up or the task of cleanup of the contaminated sites, or paying for the sites' cleanup, would fall entirely on the state or federal governments.

---

[5]    A complete discussion of the ERT Settlement Agreement and the properties addressed therein can be found in the United States' Response to Public Comment and Joinder in Debtors' Motion to Approve the ERT Settlement, ("**Memo to Approve the ERT Settlement**"), filed contemporaneously with this Response.

C.    **The Priority Order Settlement Agreements**[6]

1.    Cash Payments to Fund Clean-Up at the Priority Order Sites

Pursuant to the Priority Order Site Settlement Agreements, on the Effective Date, Debtors will make a cash payment of approximately $25 million in resolution of their obligations under the cleanup orders at these sites.  The $25 million in funding is to be distributed among the six Priority Order Sites as follows:  (i) for cleanup work at the Delphi Harrison Site in Dayton, Ohio, Debtors will make a cash payment to Ohio EPA in the amount of $5,329,343; (ii) for cleanup work at the Garland Road Site in West Milton, Ohio, Debtors will make a cash payment to EPA in the amount of $6,732,895; (iii) for cleanup work at the Sioux City Site in Sioux City, Iowa, Debtors will make a cash payment to EPA in the amount of $6,476,634; (iv) for cleanup work at the Scatterfield Road Site in Anderson, Indiana, Debtors will make a cash payment in the amount of $3,599,039 to a trust established pursuant to 40 C.F.R. § 264.151(a)(1) and in accordance with a trust agreement approved by the United States; (v) for cleanup work at the Harvey & Knott Drum Site in Kirkwood, Delaware, Debtors will make a cash payment to EPA in the amount of $2,484,816; and (vi) for cleanup work at the Wheeler Pit Site near Janesville, Wisconsin, Debtors will make a cash payment to the Wisconsin Department of Natural Resources ("**WDNR**") in the amount of $385,991.

Each of the six Agreements requires that the payment for the Priority Order Site be deposited in a special account or trust and "used to conduct or finance response actions at or in connection with the Priority Order Site," and not for any other purpose.  *See* Harvey & Knott Settlement Agreement, [Docket No. 8107] at ¶ 9; Sioux City Site Settlement Agreement, [Docket

---

[6]    This memorandum of law contains an abbreviated summary of the terms and provisions of the Priority Order Site Settlement Agreements.  If there is any conflict between the description of the settlements contained in this memorandum and the terms and provisions of the Agreements, the terms and provisions of the Agreements are controlling.

No. 8109] at ¶ 6; Scatterfield Settlement Agreement, [Docket No. 8109] at ¶ 6; Delphi Harrison

Settlement Agreement, [Docket No. 8110] at ¶ 6; Garland Road Settlement Agreement, [Docket

No. 8111] at ¶ 10; Wheeler Pit Settlement Agreement, [Docket No. 8112] at ¶ 9.  The payments

to EPA for the Garland Road, Sioux City, and Harvey & Knott Drum Sites will be deposited into

special accounts within the Superfund.  The payment for the Scatterfield Road Site will be

deposited into a trust established pursuant to the requirements and in the format set forth at 40

C.F.R. § 264.151(a)(1) and in accordance with a trust agreement approved by the United States.

The payments for the Wheeler Pit and Delphi Harrison Sites will be deposited in special

accounts administered by Wisconsin and Ohio, respectively.

After completion of the cleanup work, any remaining cash balance will be transferred

either to the Superfund or to the Cushion Funding Account as defined by the ERT Settlement

Agreement.  Specifically, for those sites at which Debtors will deposit the proposed amount into

an EPA special account, (the Garland Road, Harvey & Knott Drum, and Sioux City Sites), any

remaining balance will be transferred to the Superfund, in accordance with EPA guidelines.  For

the other sites (the Delphi Harrison, Scatterfield, and Wheeler Pit Sites), any remaining balance

will be transferred to the Cushion Funding Account and made available to fund remediation at

the properties addressed by the ERT Settlement Agreement.

2.    Allowed, General Unsecured Claims

The United States and the State of Ohio will receive Allowed General Unsecured Claims

at certain sites for their unreimbursed past response costs.  In addition, at sites where EPA is the

lead agency, it will receive an Allowed General Unsecured Claim for non-work site costs (*e.g.*,

future oversight costs).  Accordingly, the United States will receive Allowed General Unsecured

Claims (i) in the amount of $2,574,760 for past costs and future oversight costs at the Garland

11

Road Site; (ii) in the amount of $95,045 for past costs at the Wheeler Pit Site; and (iii) in the

amount of $377,063 for future oversight costs at the Harvey & Knott Drum Site.  The State of

Ohio will receive an Allowed General Unsecured Claim in the amount of $134,326 for its past

costs at the Garland Road Site.

> 3.    Environmental Claims Not Resolved by the Agreements

The Governmental Environmental Claimants reserve all rights against Debtors with

respect to all matters not specifically settled by the Priority Order Site Settlement Agreements,

including (i) all rights with respect to any site that is not a Priority Order Site; (ii) any claims for

response costs and injunctive relief under applicable environmental law for future acts taken by

the Debtors after the Effective Date; (iii) any criminal liability; and (iv) any action to enforce the

agreement.

> 4.    Covenants Not to Sue and Contribution Protection

Each of the Priority Order Site Settlement Agreements provides Debtors with covenants

not to sue from the Governmental Environmental Claimants with respect to the Priority Order

Site.   Each Agreement also provides reciprocal covenants not to sue from Debtors for the

Governmental Environmental Claimants.  Finally, each Agreement provides the Debtors with

contribution protection for matters addressed as provided for by section 113(f)(2) of CERCLA,

42 U.S.C. § 9613(f)(2).

## D.    Public Comments

The United States received two comments, which are described below and filed herewith.

> 1.    Onondaga County

On January 19, 2011, Gordon J. Cuffy, County Attorney, submitted comments on behalf

of Onondaga County, New York, attached hereto as Exhibit ("**Ex**.") A at US00350-54.  First,

Onondaga County states that the Priority Order Sites are "non-owned" sites and that no explanation is provided in the Agreements as to "why these sites are or should be treated differently than other similarly situated sites or why they should be considered a 'priority'." *Id.* at US00351. Onondaga County acknowledges that it and six other parties have been identified as PRPs at the Lower Ley Creek site in Onondaga County (*id.* at US00352), but nevertheless argues that failing to accord the same priority status to the Lower Ley Creek site is "arbitrary and capricious and akin to an artificial and thus improper preference," (*id.* at US00351). In particular, Onondaga County maintains that it is "similarly situated to the Sioux City, Iowa Site" and should therefore be afforded priority status. *Id.* at US00353.

Second, Onondaga County argues that there is "no explanation provided as to the bases of the monies proposed to be transferred for use at any of the Priority Order Sites." *Id.* at US00351.

Finally, Onondaga County asserts that there is no explanation "as to why any funds dedicated for use at a Priority Order Site, but ultimately determined to be excess, should be transferred to the Superfund [or] the Cushion Fund Account of the MLC Environmental Trust," (*id.*) and requests that such funds instead be transferred to the General Unsecured Creditors Trust ("**GUC Trust**"), or "otherwise allocated to address G.M. related environmental contamination at sites in Onondaga County, New York or elsewhere," (*id.*).

2.    The City of Dayton

Also on January 19, 2011, the City of Dayton submitted a comment stating that it "strongly supports and requests approval of" the proposed Delphi Harrison Settlement Agreement. Ex. A at US000355. The City of Dayton stated that the taxpayers of the State of Ohio and the City of Dayton have "assumed more than their fair share of the burden placed on

13

the community" by the contamination at the Delphi Harrison Site and that the proposed cash

payment of $5,329,343 "for remediation will go a long way to alleviating that burden and

moving the site to productive reuse." *Id.*

## III.    ARGUMENT

### A.    The Court Should Approve the Proposed Priority Order Site Settlements Because They Are Fair, Reasonable, and Consistent With Environmental Law

Approval of a settlement agreement is a judicial act committed to the informed discretion

of the Court. *In re Cuyahoga.*, 908 F.2d at 118; *Cannons Eng'g Corp.*, 720 F. Supp. at 1035.

Judicial review of a settlement negotiated by the United States to protect the public interest is

subject to special deference; the Court should not engage in "second-guessing the Executive

Branch." *Cannons Eng'g Corp.*, 899 F.2d at 84; *In re Cuyahoga*, 980 F.2d at 118 (noting the

"usual deference given the EPA"); *New York v. Solvent Chem. Corp.*, 984 F. Supp. 160, 165

(W.D.N.Y. 1997) ("This Court recognizes that its function in reviewing consent decrees

apportioning CERCLA liability is not to substitute its judgment for that of the parties to the

decree but to assure itself that the terms of the decree are fair and adequate and are not unlawful,

unreasonable, or against public policy.") (internal quotation marks omitted).  An evidentiary

hearing is not required in order to evaluate a proposed CERCLA consent decree because such

hearings would frustrate the statutory goal of expeditious settlement; hearing requests are

therefore routinely and properly denied.  *United States v. Charles George Trucking Inc.*, 34 F.3d

1081, 1085 (1st Cir. 1994); *Cannons Eng'g*, 899 F.2d at 94.  This "limited standard of review

reflects a clear policy in favor of settlements." *Solvent Chem. Corp.*, 984 F. Supp. at 165.

For the reasons discussed below, the Court should approve the Priority Order Site

Settlement Agreements because they are fair, reasonable, in the public interest, and further the

goals of both RCRA and CERCLA. *See Charles George Trucking*, 34 F.3d at 1084; *Cannons*

*Eng'g*, 899 F.2d at 85; *Hooker Chem.* 540 F. Supp. at 1073 ("the task has been to examine the

proposal and determine whether it is a fair and adequate settlement and whether its

implementation will reflect concern for the problems for which Congress has enacted the various

environmental statutes."); *Solvent Chem. Corp.*, 984 F. Supp. at 166.

1.    The Settlements Are Fair

The fairness criterion of a CERCLA settlement integrates both procedural fairness and

substantive fairness.  *Cannons Eng'g*, 899 F.2d at 86-88.  To measure procedural fairness, the

Court "should ordinarily look to the negotiation process and gauge its candor, openness, and

bargaining balance."  *Id.* at 86.  The proposed Agreements are procedurally fair because they

were negotiated at arm's length over many months, with good faith participation by

governmental actors and parties who were represented by experienced counsel, and involved

assistance by technical experts on matters such as estimating the cost of future response actions.

During these many months of negotiations, the United States, the Debtors, and their respective

environmental experts were also aided by the environmental expertise of the States' regulatory

agencies.  *See id.* at 87 (finding a CERCLA settlement procedurally fair based on criteria

including an arms-length negotiation, experienced counsel, and good faith participation by EPA).

To measure "substantive" fairness, the Court considers whether the settlement is "based

upon, and roughly correlated with, some acceptable measure of comparative fault, apportioning

liability . . . according to rational (if necessarily imprecise) estimates of how much harm each

PRP has done."  *Id.* at 87; s*ee also United States v. Davis*, 261 F.3d 1, 24 (1st Cir. 2001);

*Charles George Trucking*, 34 F.3d at 1087; *DiBiase*, 45 F.3d 541, 544-45 (1st Cir. 1995).  The

proposed Agreements are substantively fair because the Priority Order Sites are all properties at

which Debtors are under a judicial or administrative order compelling them to conduct

15

environmental cleanup and Debtors are the only significant viable responsible parties identified by U.S. EPA or the states.  Debtors' liability at the Priority Order Sites formed the backdrop for lengthy negotiations between the parties regarding the nature, extent and cost of the cleanup that will be required at the six sites.  The resulting terms of the Agreements provide approximately $25 million in funding for the six Priority Order Sites.  The site-specific payments were determined after extensive discussions with environmental experts, and represent a substantively fair resolution of the liabilities taking into account the uncertainties and litigation risks involved.

>    2.    The Settlements Are Reasonable

Courts evaluating the reasonableness of CERCLA settlements have considered three factors: technical adequacy of the cleanup work to be performed; satisfactory compensation to the public for response costs; and the risks, costs, and delays inherent in litigation.  *See Charles George Trucking*, 34 F.3d at 1085; *Cannons*, 899 F.2d at 89-90.

Although the first prong of the reasonableness inquiry is not at issue in this settlement, as the Debtors are not performing any cleanup, the Agreements satisfy the other, necessarily intertwined, considerations relevant to reasonableness.  As discussed above, Debtors will pay approximately $25 million to resolve their liability under cleanup orders for the Priority Order Sites.  These settlement terms provide for a reasonable likelihood of sufficient funding for the future cleanup of the Priority Order Sites and reasonably balance the litigation risks of obtaining cleanup.  The terms also reasonably balance the strength of the United States' and the other Governmental Environmental Claimants' case against the Debtors, the Debtors' bankruptcy, and the need for cleanup and to minimize the expense and potential delay of protracted litigation.  As the City of Dayton pointed out with respect to the Delphi Harrison Site, the proposed funding will "go a long way to alleviating" the burden of cleanup that would otherwise not be undertaken

or would be assumed by taxpayers.  Ex. A at US00355.   Accordingly, the Priority Order Site

Settlement Agreements are reasonable.

>    3.    <u>The Settlements Are Consistent With the Goals of CERCLA</u>

The primary goals of CERCLA are to "encourage prompt and effective responses to

hazardous waste releases and to impose liability on responsible parties," and to "encourage

settlements that would reduce the inefficient expenditure of public funds on lengthy litigation."

*In re Cuyahoga*, 980 F.2d at 119.  The Priority Order Site Settlement Agreements further these

statutory goals.  As discussed above, the proposed Agreements obtain significant funding for

cleanup at the Priority Order Sites.  Moreover, the Agreements serve CERCLA's goal of

reducing, where possible, the litigation and transaction costs associated with response actions, as

well as the public policy favoring settlement to reduce costs to litigants and burdens on the

courts.  *See Solvent Chem. Corp.*, 984 F. Supp. at 165; *Hooker Chem.*, 540 F. Supp. at 1072.

**B.    The Public Comments Do Not Indicate That the Priority Order Site Settlement
Agreements Are Inappropriate, Inadequate, or Improper**

The only negative comment the United States received was from Onondaga County, and

the comment does not indicate that the Agreements are inappropriate, inadequate or improper.

>    1.    <u>The Agreements Appropriately Prioritize Cleanup Order Sites with No Other
Significant Viable PRPs</u>

Onondaga County objects to the Agreements because they provide no explanation for

prioritizing the Six Priority Order Sites over a non-owned site in Onondaga County, the Lower

Ley Creek site.  *See* Ex. A at US00350-54.  Specifically, Onondaga County contends that "[i]n

the absence of any compelling or unique characteristic of the Priority Order Sites . . . that

distinguish such locations from the Lower Ley Creek site, the Government's approach to

resolving MLC's CERCLA liability is marred by unreasonableness, arbitrariness and

17

capriciousness." *Id.* Given the limited funding available in this bankruptcy, the Agreements

appropriately prioritize cleanups by taking into account principles of bankruptcy law and

environmental law, including whether cleanup orders have been issued, and whether there are

other significant viable PRPs. Unfortunately, because of the limited funding and the need to

prioritize, the Agreements cannot be expanded to include cleanup funding for the Lower Ley

Creek site just as they cannot be expanded to include cleanup funding for the numerous other

sites for which MLC has liability.

Onondaga County's comment does not warrant rejection of the Priority Order Site

Settlement Agreements. The sites funded by the ERT and the Priority Order Site Settlement

Agreements were selected based on two criteria. First, given the limited funding available in this

bankruptcy, applicable bankruptcy law must provide the strongest basis for obtaining funding for

cleanup from Debtors for the funded properties. Second, again because of the $536 million limit

in cash funding for environmental cleanup, U.S. EPA had to further prioritize Debtors'

environmental liabilities by limiting the $25 million available for the Priority Order Site

Settlement Agreements to sites where there were no other significant, viable PRPs identified by

U.S. EPA or the states who could perform the cleanup.

Under these criteria, the strongest right of recovery under bankruptcy law for

environmental cleanup is for owned sites. With respect to owned sites, the U.S. EPA is entitled

to require debtors to perform cleanup obligations because debtors have an obligation to manage

their property in accordance with applicable non-bankruptcy law, including environmental

statutes and regulations. *See* Memo to Approve ERT Settlement at 34-35. And Debtors cannot

obtain confirmation of a Plan without appropriate provision for property of the estate that

complies with applicable law. *Id.* The United States therefore gave the highest settlement

18

priority to the Debtor-owned sites addressed by the ERT Settlement Agreement.

Similarly, a strong case for priority under bankruptcy law can be made for non-owned sites at which cleanup orders have been issued. *See United States v. Apex Oil Co., Inc.*, 579 F.3d 734, 736-37 (7th Cir. 2009); *In re Chateaugay,* 944 F.2d 997, 1007-09 (debtors cannot discharge their injunctive obligations under CERCLA cleanup orders because they are not "claims"); *In re Torwico Elecs., Inc.*, 8 F.3d 146, 151 (3d Cir. 1993) (debtors' injunctive obligations under RCRA remediation orders are not impaired or otherwise affected by debtors' bankruptcy); *In re Mark IV Indus., Inc.,* 438 B.R. 460, 469 (Bankr. S.D.N.Y. 2010) (holding that environmental obligations to New Mexico Environment Department are not "claims" and are not dischargeable). Accordingly, the United States also gave priority treatment to the six Priority Order Sites.[7]

Finally, among the non-owned sites with orders, the decision to prioritize sites without other significant viable PRPs is consistent with environmental law. Environmental law is premised upon the goal of maximizing the cleanup of contaminated sites. *See* discussion *supra* at pp. 4-7. It makes sense, therefore, to prioritize limited funds to sites with the highest likelihood of not being cleaned up in the absence of a settlement.

---

[7] At the Harvey & Knott Drum Site, GM was required to conduct remedial action pursuant to a Consent Decree entered on October 19, 1987, by the United States District Court for the District of Delaware. At the Garland Road Site, GM was required to conduct a removal action pursuant to a Unilateral Administrative Order under CERCLA, U.S. EPA Docket No. V-W-09-C-922, dated May 14, 2009. At the Delphi Harrison Site, Old GM was required to conduct remedial action pursuant to a Voluntary Corrective Action Agreement under RCRA, dated May 22, 2001. At the Scatterfield Site, Old GM was required to conduct remedial action pursuant to an Administrative Consent Agreement and Final Order under RCRA, dated May 8, 2002. At the Wheeler Pit Site, Old GM was required to conduct remedial action pursuant to a Unilateral Administrative Order under CERCLA, dated May 6, 1991. At the Sioux City Site, Old GM was required to conduct remedial action pursuant to Iowa Consent Order for RD/RA No. 2004-HC-06, dated September 29, 2004, and Iowa Consent Order, Judgment and Decree, Law No. CVCV136444, dated August 29, 2007.

The Lower Ley Creek site does not satisfy the applicable criteria.  Debtors are not subject to an injunctive cleanup order at the Lower Ley Creek site, and Debtors are not the only significant viable PRPs.[8]  In fact, Onondaga County acknowledges that it, along with six other parties, is being pursued by U.S. EPA as potentially responsible for the contamination at the site.  *See* Ex. A at US00351-53.

The criteria applied by the United States in entering into the Agreements were eminently reasonable.  Indeed, departing from these criteria would have made the settlements vulnerable to objection under bankruptcy law, would have delayed presentation of a confirmable Plan, and would have delayed or prevented the cleanups that the Agreements make possible – none of which are in the public interest.  Moreover, if the Lower Ley Creek site were added to the Priority Order Sites, PRPs or claimants at numerous other non-owed sites might request that their sites receive cash funding as well.  Many of these sites involve unfortunate facts of contamination and an impact on public health and the environment that are arguably as compelling as those put forward by Onondaga County.   The United States should therefore be permitted to prioritize those sites with orders where there are no other significant viable responsible parties.[9]

---

[8]      Notwithstanding the significant differences between Lower Ley Creek and the Priority Order Sites, Onondaga County contends that it "knows for certain that the Lower Ley Creek Site . . . is similarly situated to the Sioux City, Iowa Site."  Ex. A at US000353.  Meanwhile, Onondaga County identifies no common characteristic with the Sioux City Site or any other Priority Order Site.  At the Sioux City Site, Old GM is required by an Iowa consent decree to perform remedial work and is the only viable PRP.  As the Iowa Department of Natural Resources Consent Order for RD/RA provides, "[e]arly in 1995, GMC expressed a desire to proceed with a full investigation of the Site and corrective actions, as necessary," and assumed full responsibility for the remedial work at the site.  *See* IDNR Consent Order RD/RA, No. 2004-HC-06 at ¶ 6.

[9]      In fact, if the Court were to disagree with and not defer to the United States' position prioritizing cleanup order sites without other viable PRPs, the United States has reserved the right to propose that the funding for these sites be added to the Cushion Funding Account, (a reserve account for the Debtor-owned properties defined in the ERT Settlement Agreement),

The U.S. EPA and other environmental regulators (i.e., the states) should be permitted to take into account how priorities for environmental cleanup may be affected by the existence of a bankruptcy proceeding, and the requirements of allocating scarce resources. Nothing herein, therefore, should in any way be construed to indicate that the cleanup of the Lower Ley Creek site is not of high priority to the U.S. EPA.  The U.S. EPA remains committed to the cleanup of all contaminated sites and is hopeful that significant funding can still be obtained for their cleanup.  Thus, given the constraints created under the Bankruptcy Code, the applicable case law, and the limited funding available in this case, the United States contends that the Priority Order Site Settlement Agreements are fair and reasonable.

2.    The Agreements Provide Significant and Reasonable Funding For Cleanup

Onondaga County also comments that the Agreements fail to provide an explanation for the funding amounts for use at the Priority Order Sites.  *See* Ex. A at US00351.  Although it is unclear from the comment itself what Onondaga County regards as unreasonable about the funding amounts, the site-specific funding determinations were made after months of negotiation that involved environmental experts who analyzed each component of the cleanup, including such things as capping, groundwater extraction and treatment, soil treatment, soil vapor intrusion management, sediment removal, well and soil removal, offsite disposal of drums and sludges, operation and maintenance, and monitoring.  The resulting funding amounts provide significant recoveries for future cleanup and, as the City of Dayton observed, are expected to "go a long way toward alleviating" the risk that cleanup would not be performed or would become a burden assumed by taxpayers.  *See* Ex. A. at US00355.  Even if funding amounts fail to cover the full

---

because these sites would have the highest priority under bankruptcy law.  *See* Harvey & Knott Drum Settlement Agreement at 4; Sioux City Site Settlement Agreement at 4; Scatterfield Settlement Agreement at 4; Delphi Harrison Settlement Agreement at 4; Garland Road Settlement Agreement at 4; Wheeler Pit Settlement Agreement at 4.

21

cost of cleanup at the Priority Order Sites, the amounts negotiated would not therefore be unreasonable. To the contrary, as discussed above, the settlement terms provide for significant funding while balancing the litigation risks of obtaining cleanup, the Debtors' bankruptcy, and the need to minimize the expense and potential delay of protracted litigation. Accordingly, the funding for the Priority Order Sites is reasonable.

3.    <u>The Agreements Reasonably Provide for a Transfer of Any Excess Funding to the Superfund or the Cushion Funding Account</u>

Finally, Onondaga County requests that any excess funding for the Priority Order Sites be directed to the GUC Trust or address environmental contamination at sites within Onondaga County rather than to either the Cushion Funding Account or the Superfund. However, as an initial matter, because the funding for the Priority Order Sites is from administrative expense wind down funding, it cannot be directed to general unsecured claimants.

In any event, the determinations as to the transfer of any excess funding were reasonable. For those sites at which the cash payment will be made to EPA and deposited in a special account (the Sioux City, Garland Road, and Harvey& Knott Drum Sites), the Agreements provide that excess funding will be transferred to the Superfund. The determination that EPA should transfer any excess funds to the Superfund was made in accordance with a U.S. EPA Memorandum entitled "Guidance on the Planning and Use of Special Account Funds," dated September 28, 2010, which provides that "[s]pecial account balances that exceed the estimated known and potential future response costs should be transferred to the general portion of the [Superfund] . . ." U.S. EPA Memorandum at 6 (Sep. 28, 2010), *available at* http://www.epa.gov/compliance./resources/policies/cleanup/superfund. *See also* U.S. EPA Memorandum at 2 (Jan. 23, 2009), *available at* http://www.epa.gov/compliance /resources/policies/cleanup/superfund (providing that "EPA's general hierarchy for use of special

account funds" is to (a) retain the funds as a future settlement incentive with [PRPs]; (b) fund any response actions; (c) estimate and retain funds to address future site costs/risks, then apply the balance to previous site expenditures; and (d) "transfer any remaining balances to the general part of the [Superfund].")   U.S. EPA is therefore acting pursuant to its guidelines concerning the disposition of special account balances.

For those sites at which the cash payment will be made to a state agency or trust (the Wheeler Pit, Delphi Harrison, and Scatterfield Sites), the Agreements provide that excess funding will be transferred to the Cushion Funding Account and will be available to fund remediation at the properties addressed by the ERT Settlement Agreement.  Applying any excess funding from the Priority Order Sites to cover any shortfall in funding the remediation of the Debtor-owned properties accords with the United States' guiding principle that remediation of the Debtor-owned sites (those addressed by the ERT Settlement Agreement) should be given the highest priority in this bankruptcy. *See* discussion *supra* p. 19.  Additionally, any excess transferred to the Cushion Funding Account could be available to fund remediation at the GM-IFG Syracuse Site and the Ley Creek PCB Dredging Site, both of which are properties addressed by the ERT Settlement Agreement and in Onondaga County.   In short, the United States reasonably determined that any excess in Priority Order Site funding be directed to the Superfund or the Cushion Funding Account.

4.    The City of Dayton Supports the Delphi Harrison Settlement Agreement

The City of Dayton commented that it strongly supported the Delphi Harrison Site Settlement Agreement, noting that the local taxpayers have "assumed more than their fair share of the burden placed on the community" by the contamination at the Delphi Harrison Site and that the proposed cash payment of $5,329,343 "for remediation will go a long way to alleviating

23

that burden and moving the site to productive reuse." *See* Ex. A. at US00355.  Although the City

of Dayton's approving comment requires no formal response, it reinforces the United States'

determination that the Priority Order Site Settlement Agreements are fair and reasonable.

## CONCLUSION

For the reasons stated above, the Court should approve and enter the proposed Priority

Order Site Settlement Agreements.


Dated:      New York, New York
            February 18, 2011
                                        PREET BHARARA
                                        United States Attorney for the
                                        Southern District of New York
                                        Attorney for the United States of America

                              By:       ___/s/   Jaimie L. Nawaday_____
                                        DAVID S. JONES
                                        NATALIE N. KUEHLER
                                        JAIMIE L. NAWADAY
                                        Assistant United States Attorneys
                                        86 Chambers Street, 3rd Floor
                                        New York, New York 10007
                                        Telephone:  (212) 637-2741
                                        Facsimile:  (212) 637-2750
                                        Email: jaimie.nawaday@usdoj.gov


                                        ALAN S. TENENBAUM
                                        National Bankruptcy Coordinator
                                        PATRICK CASEY
                                        Senior Counsel
                                        Environment and Natural Resources Division
                                        Environmental Enforcement Section
                                        U.S. Department of Justice