HEARING DATE: **March 1, 2010 at 9:45 a.m.** (prevailing Eastern Time)
OBJECTION DEADLINE: **February 22, 2010 at 4:00 p.m.** (prevailing Eastern Time)

**POLSINELLI SHUGHART PC**
Jason A. Nagi
7 Penn Plaza, Suite 600
New York, New York 10001
Tel: (212) 644-2092
Fax: (212) 684-0197
jnagi@polsinelli.com

**DINSMORE & SHOHL LLP**
Vincent B. Stamp (*pro hac vice* to be submitted)
Tim J. Robinson (*pro hac vice* to be submitted)
255 East 5th St., Ste. 1900
Cincinnati, OH  45202
Tel: (513) 977-8200
Fax: (513) 977-8141
vince.stamp@dinslaw.com
tim.robinson@dinslaw.com

Attorneys for Kelsey-Hayes Company

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | Chapter 11 Case No. |
| **MOTORS LIQUIDATION COMPANY,** *et al.*, f/k/a General Motors Corp., *et al.* | 09-50026 (REG) |
| Debtors. | (Jointly Administered) |

### RESPONSE OF KELSEY-HAYES COMPANY TO DEBTORS' 208TH OMNIBUS OBJECTION TO CLAIMS

Kelsey-Hayes Company[1] (the "Company"), by its attorneys, hereby submits this response to Debtors' 208th Omnibus Objection to Claims (Contingent Co-Liability Claims) (the "Objection") filed by Motors Liquidation Company (f/k/a General Motors Corporation) and its affiliated debtors, as debtors in possession (collectively, the "Debtors"). In support of this Response, the Company respectfully represents as follows:

### BACKGROUND

1. The Company is a member of a group of potentially responsible parties who are potentially responsible under the Comprehensive Environmental Response Compensation and

---

[1] The Response is filed by Kelsey-Hayes Company, as successor to Dayton Walther.
1884461v2

1924997.1

Liability Act of 1980, as amended ("CERCLA") for the conditions of the North Sanitary Landfill Superfund Site ("Valleycrest" or, the "Site") in Dayton, Ohio (the "VLSG"). The members of the VLSG are: (i) The Standard Register Company, (ii) Cargill, Inc., (iii) NCR Corporation, (iv) the Company, (v) Flowserve Corporation, successor-in-interest to The Duriron Company, (vi) Waste Management of Ohio, Inc., and (vii) Northrop Grumman Corporation, successor-in-interest to Globe Motors, Inc. (collectively, the "Members").

2.  On January 21, 1995, the Ohio Environmental Protection Agency (the "Ohio EPA") issued a Director's Final Findings and Orders with respect to the Site (the "FFO"). The FFO provides for the evaluation and development of a Remedial Investigation and Feasibility Study (the "RIFS") for the Site. A copy of the FFO is attached to the proof of claim filed by the VLSG ("Claim 50586") as Exhibit A-2.

3.  In order to carry out the terms and conditions of the FFO and perform the RIFS, the Members entered into the (i) Valleycrest Landfill Site Participation Agreement, dated January 12, 1995, as amended by that certain First Amended Valleycrest Landfill Site Participation Agreement, dated May 22, 1998 (the "Original Agreement"), and (ii) the Valleycrest Landfill Site Governmental Entity Participation Agreement, dated on or about January 5, 1999 (the "Second Agreement"), and (iii) the Amendment to Valleycrest Landfill Site Governmental Entity Participation Agreement and the First Amended Valleycrest Landfill Site Participation Agreement, dated on or about May 2000 (the "Master Amendment") (the Original Agreement, the Second Agreement, and the Master Amendment herein are referred to collectively as the "Participation Agreements"). The Participation Agreements are attached to Claim 50586 as Exhibit A-1.

4. The Debtor is a former member of the VLSG and a party to the Participation Agreements. In addition, the Debtor entered into a separate settlement agreements, with certain Members, including the Company, whereby the Debtor agreed to indemnify the parties for any future costs to be incurred at the Site, including, but not limited to, costs to be incurred in completing the work required under the FFOs and future costs incurred to remediate the Site.

5. On November 4, 2002, the Debtor, Kelsey-Hayes Company and TRW Inc. entered into the Settlement Agreement whereby the Debtor is liable to the Company for all past and future response costs incurred by the Company in relation to the Site (the "Settlement Agreement"); a copy of the Settlement Agreement is attached hereto as Exhibit 3.[2]

6. The Participation Agreements allocated a percentage share of the costs and expenses in performing the RIFS to each member of the VLSG. The Company's allocation percentage is 6.75%.[3] During the term of the Participation Agreement, each of the parties were issued periodic assessments by de maximis, the VLSG coordinator of the Site work ("de maximis"), to cover the costs and expenses (as set forth in the Participation Agreements) incurred in connection with complying with the FFO, RIFS and the Participation Agreements. Pursuant to the Settlement Agreement between the Debtor and the Company, the Debtor was to pay the Company's assessments for any costs incurred in connection with the RIFS and FFOs. Certain of these assessments against the Company have not been paid by the Debtor. The Company has contributed additional amounts to cover the unpaid prepetition and postpetition assessments of the Company for the Site.

---

[2] At the time the Settlement Agreement was executed, the Company was a wholly-owned subsidiary of TRW Inc. Since then, Kelsey-Hayes (and the other automotive-related businesses and assets of TRW Inc.) were sold to the entity now known as TRW Automotive Inc.

[3] See Exhibit D to the Master Amendment.

1924997.1

7. On November 27, 2009, the Company filed its proof of claim for unreimbursed FFO and RIFS costs incurred by the Company which costs were to have been paid by the Debtor (the "RIFS Claim"), and for future remediation costs at the Site (the "RDRA Claim"); the claims were assigned the number 60991 (collectively, the "Company Claim").

8. On January 28, 2011, the Debtors filed the Objection and listed the Company's RDRA Claim as a contingent co-liability claim and assigned a value of $0.00 and listed the RIFS Claim as a general unsecured claim in the amount of $12,864. However, as shown in the Report from de maximis, attached hereto as Exhibit 1, the Company has incurred $129,519 in RIFS costs which should have been paid by the Debtor. Accordingly, the RIFS Claim should be classified as a general unsecured claim in the amount of $129,519.

9. As to the portion of the Company's claim for indemnification against the Debtor for the Company's potential share of RDRA costs (i.e., the RDRA Claim), the Remediation Report and cost estimate issued by de maximis, attached hereto as Exhibit 2, estimates that the cost of implementing a remedy at the Site will be $75.6 million (the "Remediation Cost Estimate"). Based on the Company's allocation set forth in the Participation Agreements (6.75%), the Debtor's indemnification of the Company's RDRA share would be $5,103,000 which amount should be classified as a general unsecured claim.

## THE DEBTORS' OBJECTION

10. The Debtors' Objection asserts that the RDRA Claim is a contribution claim pursuant to section 502(e)(1)(B) of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). See paragraph 1 of the Objection. To establish the co-liability status, the Debtors note that the "Surviving Creditor [is the] United States Environmental Protection Agency"; see Exhibit A to the Objection.

11.     On November 28, 2009, the Environmental Protection Agency (the "EPA") filed a proof of claim in the Debtors' bankruptcy case (Claim Number 64064) (the "EPA Claim"). The EPA Claim sets forth over forty-five sites where the Debtors are liable to the EPA for various penalties, costs, and remedies. The Valleycrest Site is not included in the EPA Claim.

## ARGUMENT

### A.     The Debtors Have a Recognized Pre-Petition Liability

12.     The RDRA Claim should be allowed against the Debtors under section 1123(a)(4) of the Bankruptcy Code. To disallow the RDRA Claim while concurrently allowing the EPA Claim for similarly situated sites, but not including the Site, would be in direct contravention of the Bankruptcy Code's requirement that claimants within the same class be treated equally.

13.     Section 1123(a)(4) of the Bankruptcy Code states that a plan must "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest." Thus, under its plain language, "the text of § 1123(a)(4) mandates that a confirmable plan provide the "same treatment" for class members." *In re Sentinel Mgmt. Group*, 398 B.R. 281, 304 (Bankr. N.D. Ill. 2008).

14.     The Company and the EPA are similarly situated in that both are asserting general unsecured claims for environmental liabilities. The Debtors are attempting to prevent the allowance of the RDRA Claim while allowing the EPA Claim for similarly situated sites which do not include Valleycrest. Therefore, the RDRA Claim should be allowed in the same manner as the EPA Claim for similarly situated sites in order to satisfy section 1123(a)(4).

15.     This Court has stated that "the key inquiry under § 1123(a)(4) is not whether all of the claimants in a class obtain the same thing, but whether they have the same opportunity." *In re Dana Corp.*, 412 B.R. 53, 62 (S.D.N.Y. 2008). Courts have found this to mean that while

5

some claimants in the same class may settle and therefore receive a different dollar amount allowance than other claimants in that class, the process and opportunity for satisfying and allowing similar claims must remain equal. *See In re Central Medical Center, Inc.*, 122 B.R. 568, 575 (Bankr. E.D. Mo. 1990) ("The parties have presented the issue of whether Section 1123(a)(4) requires a plan to subject class members to the same process for claim satisfaction, or whether that process must yield the same pecuniary result for each class member. This Court chooses the former interpretation."). Under this standard, by attempting to object to the RDRA Claim while allowing the EPA Claim for similarly situated sites, but not including the Site, the Company is denied the same opportunity and process as the EPA to have its claim satisfied, and therefore its treatment is inequitable and in violation of section 1123(a)(4).

16.    Thus, the Company requests that this Court accord the RDRA Claim the same treatment and process for satisfaction as the EPA Claim in accordance with section 1123(a)(4) of the Bankruptcy Code.

B.    **Section 502 is not Applicable to the Company's RDRA Claim.**

17.    Section 502(e)(1)(B) of the Bankruptcy Code provides, in relevant part:

> [T]he court shall disallow any claim for reimbursement or contribution of an entity that is liable with the debtor on or has secured the claim of a creditor to the extent that …such claim for reimbursement or contribution is contingent as of the time of allowance or disallowance of such claim for reimbursement or contribution . . . .

11 U.S.C. § 502(e)(1)(B). All three elements must be met in order for a claim to be subject to disallowance pursuant to § 502(e)(1)(B): "First, the claim must be for reimbursement or contribution. Second, the party asserting the claim must be liable with the debtor on the claim. Third, the claim must be contingent at the time of its allowance or disallowance." *In re Drexel Burnham Lambert Group Inc. ("Drexel I"),* 148 B.R. 982, 985 (Bankr. S.D.N.Y. 1992).

6

18.  The well-recognized public policy motivations behind § 502(e)(1)(B) are two-fold.  First, Congress sought to prevent competition between a primary and secondary creditor for the "limited proceeds in the estate."  *In re Wedtech Corp.*, 85 B.R. 285, 289 n.4 (Bankr. S.D.N.Y. 1988) (*"Wedtech I"*) (quoting HR Rep. No. 95-595, 95th Cong., 1st Sess. 354 (1977)).  Second, Congress enacted § 502(e)(1)(B) to protect debtors from having to make duplicative distributions of estate assets on the basis of contingent claims.

**(1)    Section 502 is not Applicable to the RDRA Claim for Costs to be Incurred at the Valleycrest Site**

19.  The second prong of 502(e)(1)(B) asks whether a debtor is "liable with" the claimant.  *In re GCO Services, LLC*, 324 B.R. 459, 465 (Bankr. S.D.N.Y. 2005).  This prong requires "a finding that the causes of action in the underlying lawsuit assert claims upon which, if proven, the debtor could be liable but for the automatic stay."  *Id.*, *citing Wedtech I*, 85 B.R. at 290.  Courts have held that claims for contribution under CERCLA 113(f) satisfy the co-liability requirement where the underlying cleanup liability of the claimant is legally compelled in some fashion such as a lawsuit or the issuance of a so-called "PRP notice" from an agency such as the EPA.  In other words, co-liability requires some compulsion by a government agency to clean-up.  *See In re Hemingway Transp. Inc.,* 126 B.R. 656, 662 (D. Mass. 1991) (PRP letter to claimant and debtor suffices to establish co-liability).  In this case no such governmental compulsion has been instituted against the Company on the RDRA costs.

20.  The public policy rationale for disallowing a claim that is subject to joint liability is to prevent double payment by the debtors on account of the same liability.  *See, e.g., In re Lyondell Chemical Company*, 2011 Bankr. LEXIS 10, at *45 (Bankr. S.D.N.Y., January 4, 2011).  This rationale was at the heart of the decisions to disallow the claims that are the subject of the Objection.  *See, e.g., In re Chemtura Corporation*, 2011 Bankr. LEXIS 88, at *49-64

7

(Bankr. S.D.N.Y., January 13, 2011). In *Chemtura*, the Private Party Claims were premised on joint liability under the cost recovery aspect of CERCLA section 107(a), as opposed to the requirements of contribution under section 113(f) of CERCLA. *Id*. at \*49. As the Debtors had agreements with the EPA and state authorities in which there existed allowed claims for environmental liabilities, and the Private Parties sought contribution on the full amount of their claims, the claims of the Private Parties would subject the Debtors to the type of double payment that section 502(e)(1)(B) was created to prevent. *Id*. at \*54.

21. On November 28, 2009, the EPA filed a proof of claim, which set forth over forty-five sites where the Debtors are liable to the EPA for various penalties, costs, and remedies. The Valleycrest Site is not included in the EPA Claim.

22. There is no EPA Claim against the Debtors for the Valleycrest Site, and as a result, the EPA cannot recover any portion of the cleanup costs incurred by the Company at the Valleycrest Site. Logically, the Debtors cannot be liable then to the EPA for any amount with respect to the Company's cleanup of the Valleycrest Site. The RDRA Claim against the Debtors is a direct claim for established costs representing the Debtors' proportionate share for the remediation costs at the Valleycrest Site.

23. Therefore, there is no risk of double payment from the Debtor (to the EPA and the Company), and the RDRA Claim should not be disallowed under § 502(e)(1)(B).

C. **The Indemnification Claims are Contract Claims Not Subject to 502(e)(1)(B)**

24. Unlike the other recent cases addressing section 502(e)(1)(B) in the context of environmental claims, the Company and the Debtors entered into the Settlement Agreement expressly for the purpose of transferring the liability risk from the Company to the Debtors. As a result of the terms of the Settlement Agreement, the Debtors assumed all of the Company's

8

rights related to the defense of the environmental claims and accepted all responsibility for paying the environmental claims.

25. The Settlement Agreement was executed in order to relinquish the Company's right to participate in any defense of the environmental claims, in exchange for a blanket indemnification against "all liabilities, remedies, claims, duties, obligations, costs (including any claim for past costs), or penalties that the Company and/or the Debtors may or could have with respect to environmental conditions at, emanating from, or related to the Valleycrest Site and/or any agreement(s) other than this Settlement Agreement entered into by the Company and the Debtors relating to the Valleycrest Site and which liabilities, remedies, claims, duties, obligations, costs (including claims for past costs), or penalties are created under or by CERCLA, Ohio Superfund, the Resource Conservation and Recovery Act; 42 USC. §§6901, et seq. ("RCRA"), or common law." See Settlement Agreement at ¶1 and ¶4. The Settlement Agreement also authorizes the Debtors to "notify EPA and OEPA of the existence and effect of this [Settlement] Agreement, and that Kelsey-Hayes has paid for and extinguished its potential liabilities associated with the Valleycrest Site." See Settlement Agreement at ¶6.

26. The Debtors rely on section 502(e)(1)(B) of the Bankruptcy Code for the proposition that, seven years after entry of the Settlement Agreement, this bargained for exchange should be terminated, all rights received by the Company unenforceable and all claims of the Company disallowed. Such a result would violate the principles and spirit of section 502(e)(1)(B), would alter the incentives to negotiate settlements among parties at risk of environmental liabilities, and would result in a windfall for the Debtors as they have received payment in full without providing any consideration in return.

9

1924997.1

27. As discussed in Section B, *supra*, in order to establish disallowance of a claim under section 502(e)(1)(B), the Debtor must show: 1) that the claim is for reimbursement or contribution, 2) that the party asserting the claim must be liable with the debtor on the claim, and 3) that the claim is contingent as of the time of allowance or disallowance. *See, e.g.*, *Drexel I*, 148 B.R. at 985. While the Company acknowledges that its claim is contingent, and therefore satisfies the third part of the three part test, given the nature of the Settlement Agreement, the first two requirements demand additional discussion.

**(1)    Pursuant to the Settlement Agreement, All Potential Liabilities of the Company Associated with the Valleycrest Site Were Transferred to the Debtors and Therefore, the Claims Are Not for Reimbursement or Contribution.**

28. The first prong of the 502(e)(1)(B) test requires the Debtors to show that the claim is for reimbursement or contribution. "Contribution 'refers to the ability of one joint tort feasor against whom a judgment is rendered to recover a proportional share of the judgment from another joint tort feasor also liable to the plaintiff." *In re GCO Services, LLC*, 324 at 465 (*citing Wedtech I*, 85 B.R. at 289. Reimbursement "is a broad word which encompasses whatever claims a co-debtor has which entitle him to be made whole for monies he has expended on account of a debt for which he and the debtor are both liable." *In re Wedtech*, 87 B.R. 279, 287 (Bankr. S.D.N.Y. 1988) ("*Wedtech II*"). Generally, the concept of reimbursement includes indemnity. *In re GCO Services, LLC*, 324 B.R. at 465. The requirement that the claim be for contribution or reimbursement addresses the Congressional intent to prevent competition between a primary and secondary creditor.

29. The Company recognizes that any claim for liability under CERCLA or other applicable law related to the Site, to the extent both the Company and the Debtors, as PRPs, are found liable, would satisfy the requirement that a claim brought by the Company, against the

10

1924997.1

Debtors, would be for contribution and/or reimbursement. However, that is not the case in the present circumstances. The Debtors accepted a monetary settlement from the Company in exchange for accepting all responsibility for the Company related to the environmental liabilities incurred at the Valleycrest Site. The Settlement Agreement goes beyond the concept of indemnity on joint liabilities, to provide that the Debtors may inform the governmental authorities "that Kelsey-Hayes has paid for and extinguished its potential liabilities associated with the Valleycrest Site." See Settlement Agreement at ¶6.

30. Through its proof of claim, the Company is not seeking contribution from the Debtors for that portion of the underlying environmental claims that would otherwise be the responsibility of the Debtors. Nor is the Company seeking reimbursement for funds it is required to pay. The Debtors have contractually agreed to be fully responsible for all obligations that may otherwise be the liability of the Company at the Valleycrest Site. They accepted consideration in order to have control of the process and the terms of any settlement related to the environmental claims under CERCLA or other applicable law, including those associated with the FFO and RIFS. Therefore, the Company would contractually not be responsible for paying the underlying claims, would not pay the underlying claims in the first instance, and would not be entitled to reimbursement under the terms of the Settlement Agreement. As a result, the claim of the Company is not a claim for contribution or reimbursement, and the Debtors are unable to satisfy the first requirement of section 502(e)(1)(B).

**(2)** **Under the Terms of the Settlement Agreement, the Sole Liability for the Environmental Claims are Borne by the Debtors and therefore, the Debtors Contractually Eliminated Joint Liability.**

31. The second public policy rationale for disallowing a claim that is subject to joint liability is to prevent double payment by the debtors on account of the same liability. *See, e.g. In*

11

1924997.1

*re Lyondell Chemical Company*, 2011 Bankr. LEXIS 10 at *45.  Under the present facts, the EPA does not have an allowed claim, and, in the event they seek to amend their claim to include the Site, it is unclear what the value of that claim would be or how, precisely, it would be calculated.  The Company expects that such an amended claim would identify the percentage of expenses owed by the Debtors under the terms of the Participation Agreements, and an estimate of the expenses related to the remediation.  Even if both that claim filed by the EPA and the Company's RDRA Claim were allowed, the Debtors would not face the potential for redundant payments by the Debtors.  The Company's RDRA Claim is for that portion of the remediation that is deemed the responsibility of the Company under the terms of the Participation Agreements, and is based on the contractual relationship between the Debtors and the Company, not on the statutory co-liability created by CERCLA, or any other statutory obligations.

       32.     The Company acknowledges and agrees that there is co-liability among the PRPs at the Valleycrest Site.  The rights and responsibilities of the various PRPs were first articulated in the Participation Agreements, and later, with respect to the Debtors and the Company, within the Settlement Agreement.  Therefore, by contract, the liabilities and requirements of the parties have been modified.  The Company is only seeking an allowed claim for that portion of the clean-up that, but for the existence of the Settlement Agreement, would otherwise be deemed the liability of the Company under the terms of the Participation Agreement.  This unique portion is not the liability of the Debtors in the first instance, and therefore the claim cannot be based on a co-liability argument.  Taking it a step further, the Company Claim is not based on the environmental claim under CERCLA, but based solely on the contractual relationship wherein the Debtors agreed to indemnify and hold the Company harmless as part of a Settlement Agreement.  As such, the Company believes the Company's RDRA Claim is not subject to

disallowance under section 502(e)(1)(B) and should be allowed based on the estimated value of the underlying environmental claims and the terms of the Participation Agreements.

### (3) The Company Is Entitled to a Claim Under the Terms of the Settlement Agreement.

33.   Pursuant to the Settlement Agreement, the Company and the Debtors agreed to a settlement with respect to the Company's environmental claims at the Valleycrest Site. The terms provided that the Company would pay an agreed-upon consideration, which amount was paid, in full, in 2003, and in return, the Debtors agreed to control the environmental issues at the Site as well as hold harmless and indemnify the Company for any potential obligations that may arise. As of the bankruptcy filing, the only remaining obligation with respect to the Settlement Agreement was for the Debtors to honor their commitment to hold the Company harmless and to indemnify the Company for the obligations, to the extent they arise under applicable law. There are no further obligations on behalf of the Company.

34.   "Courts have consistently held that contracts that only require payment by the debtor are not executory." In re Farmland Industries, Inc., 318 B.R. 159, 163 (Bankr. W.D. Mo. 2004) (citing In re Spectrum Information Technologies, Inc., 190 B.R. 741, 748 (Bankr. E.D.N.Y. 1996 (holding that debtor's indemnification obligation was insufficient to deem employment agreement an executory contract); In re Van Dyk Research Corp., 13 B.R. 487, 503-06 (Bankr. D. N.J. (holding that debtor's indemnification obligation in purchase agreement was not an executory contract). As such, the Settlement Agreement is not subject to rejection and the outstanding obligations remain with the estate.

35.   If the Court finds that the claim is subject to disallowance under 502(e)(1)(B), the Company will have paid a substantial sum without receiving their bargained for consideration in return. At the time the Settlement Agreement was negotiated, the parties acknowledged they

13

1924997.1

were potentially responsible parties and had entered into the Participation Agreements to set forth their rights and obligations for environmental claims at the Valleycrest Site. It was based on their mutual interests in how to effectively limit their liability and/or control the process, that the parties negotiated and agreed to the terms of the Settlement Agreement. The Company was looking for cost certainty and to eliminate the long-term risks such environmental claims present. As a result, the Company paid a substantial sum as part of the Settlement Agreement.

36.    Disallowance of the contractual claims could lead to the perverse result of a PRP negotiating and paying substantial sums to eliminate the uncertainty and risks that are inherent in being a PRP, only to have the potential liabilities reinstated, in full, as a result of a bankruptcy of the counter-party to the negotiated settlement. Such a result would be unjust. As a result, and as set forth herein, the Company believes the Company Claim is appropriate and should be allowed in full.

## CONCLUSION

WHEREFORE, for all the foregoing reasons, the Company respectfully request that the Court (i) overrule the Objection, (ii) allow the Company a general unsecured claim in the amount of $5,103,000 for remediation costs pursuant to the Settlement Agreement, (iii) allow the Company a general unsecured claim in the amount of $129,519 for the RIFS costs, and (iv) grant the Company such other and further relief as this Court deems just, proper and equitable.

Dated: New York, New York　　　　　　　POLSINELLI SHUGHART PC
　　　　February 22, 2011

　　　　　　　　　　　　　　　　　　　　　　　　/s/ Jason A. Nagi
　　　　　　　　　　　　　　　　　　　　Jason A. Nagi
　　　　　　　　　　　　　　　　　　　　7 Penn Plaza, Suite 600
　　　　　　　　　　　　　　　　　　　　New York, New York 10001
　　　　　　　　　　　　　　　　　　　　Tel: (212) 644-2092
　　　　　　　　　　　　　　　　　　　　Fax: (212) 684-0197
　　　　　　　　　　　　　　　　　　　　jnagi@polsinelli.com

14

1924997.1

-and-

DINSMORE & SHOHL LLP

Vincent B. Stamp (*pro hac vice* to be submitted)
Tim J. Robinson (*pro hac vice* to be submitted)
255 East Fifth Street, Suite 1900
Cincinnati, Ohio 45202
Tel: (513) 977-8200
Fax: (513) 977-8141
vince.stamp@dinslaw.com
tim.robinson@dinslaw.com

Attorneys for Kelsey-Hayes Company

1924997.1