Hearing Date and Time: March 1, 2011 at 9:45 a.m. (ET)
Response Deadline: February 22, 2011 at 4:00 p.m. (ET)

Kevin C. Murphy
The Wladis Law Firm, P.C.
P.O. Box 245
Syracuse, NY 13214
Telephone: (315) 445-1700

-and-

Luis A. Mendez
Senior Assistant County Attorney
Department of Law
Onondaga County, New York
John H. Mulroy Civic Center, 19th Floor
421 Montgomery Street
Syracuse, New York 13202
Telephone: (315)435-2170

Attorneys for Onondaga County, New York

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

**In re**

**MOTORS LIQUIDATION COMPANY, *et al.*,**
        **f/k/a General Motors Corp., *et al.*,**

                                **Debtors.**

---

**Chapter 11**

**Case No. 09-50026 (REG)**

**Jointly Administered**

**OBJECTION OF ONONDAGA COUNTY, NEW YORK TO
DEBTORS' MOTION TO ESTIMATE MAXIMUM AMOUNT OF
CERTAIN CLAIMS FOR PURPOSES OF ESTABLISHING CLAIMS RESERVES**

# TABLE OF CONTENTS

I.      BACKGROUND..................................................................................1

II.     THE PENDING MOTION ..........................................................................3

      A. The Motion Fails to Identify the Methodology or Substantiate the
          Basis for the Proposed Estimates ......................................................3

      B. The Proposed Zero Allocation Substantiates and Corroborates the
          Discriminatory, Unfair and Inequitable Treatment of Similar Claims
          by the Debtors and the Debtors' Proposed Plan................................10

III.    CONCLUSION ...................................................................................11

The County of Onondaga, State of New York (the "County" or "Onondaga County"), by and through its undersigned counsel, submits this Limited Objection to the Debtors' Motion for Entry of an Order Establishing Maximum Amount of Certain Claims for Purposes of Establishing Claims Reserves Under the Debtors' Amended Joint Chapter 11 Plan (the "Plan"), Document No. 9213[2], and respectfully states as follows:

1.    As set forth in more detail below, the Motion for an Order must be denied until such time that the Debtors' can substantiate a bases and the data that substantiates the proposed estimates, particularly the bases for a zero allocation for the multiple unliquidated government claims concerning the on-going Lower Ley Creek investigation and remediation.

## I. **BACKGROUND**

2.    On or about June 1, 2009 the Debtors filed Voluntary Petitions for Relief under Chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").

3.    Onondaga County timely filed a three-pronged proof of claim for reimbursement and/or the payment of funds resulting from environmental contamination of various Debtor-owned or Debtor-contaminated sites located in Onondaga County, New York premised on the Debtors' liability under federal

---

[2] The Debtors simultaneously filed two separate but similar motions respectively assigned Document No. 9212 and 9213.

and state statutory law and/or purchase/sale and indemnification agreements entered into by the County and the Debtors.

4.      Specifically, the County claims concern (a) the so-called PCB Dredge Spoil Site that is owned by the Debtor and contaminated with PCBs discharged from the Debtor's environmentally impacted Inland Fisher Guide (IFG) facility located in the Town of Salina and adjacent to Ley Creek; (b) IFG PCB contamination in Ley Creek, adjacent to or downstream of the former IFG facility and extending to the mouth of the Creek where it discharges into Onondaga Lake, and (c) the contamination of Onondaga Lake, including the PCB contamination of Onondaga Lake sediments.

5.      In February 2009, the County (and others) objected to the inclusion of environmental claims as part of the ADR Procedures proposed by the Debtors and the subsequent ADR Order excluded environmental claims from the ADR process.

6.      By Order dated December 8, 2010, the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") approved the revised Disclosure Statement for the Debtors' Amended Joint Chapter 11 Plan (the "Plan"), directed that objections to the Plan be filed with the Bankruptcy Court no later than 4:00 p.m. on Friday, February 11, 2011 and scheduled a confirmation hearing on the Plan for 9:45 a.m. on March 3, 2011.

7.      On February 11, 2011 Onondaga County filed an Objection to the Plan.

8.      Also, but later, on February 11, 2011 the Debtors filed a motion for Entry of an Order Establishing Maximum Amount of Certain Claims for Purposes of Establishing Claims Reserves Under the Debtors Amended Joint Chapter 11 Plan.

## II.  **The Pending Motion**

9.      The motion seeks entry of an Order, pursuant to sections 105(a), 502(c) and 1142(b) of Title 11 of the United States Code (the "Bankruptcy Code") and Rule 3021 of the Federal Rules of Bankruptcy estimating the maximum amount of the partially unliquidated Claims identified and scheduled in the motion.

10.     The motion is premised on the need to establish proper reserves, allow timely distributions under the Plan and to generally effectuate the administration of the Plan.

11.     Onondaga County has no objection to the motion as a whole and in fact, concurs with the need for and is not opposed to a process that properly estimates the necessary reserves.

### A.  **The Motion Fails to Identify the Methodology or Substantiate the Basis for the Proposed Estimates**

12.     Onondaga County objects, however, to the manner by which the Debtors have apparently contrived their proposed estimate or said another way, the failure of the Motion to substantiate in any meaningful way the proposed estimates.

13.    In sum, at ¶¶19 and 20 of their motion the Debtors allege a number of sweeping generalizations (e.g. "many of these claims" include a reservation of rights that "is not an indicator of actual amounts owed"; "other estimated claims . . . reserve for . . . amounts that are inappropriate, such as [prohibited] interest"), as the basis for estimating the maximum amount of the Unliquidated Amounts of each of the individual 530 Claims that are the subject of the Motion at zero.

14.    While the Debtors' objections may be applicable to certain of the subject 530 Claims and may properly serve as a basis for estimating the maximum reserve amount for certain specifically identified Claims at zero, that general assertion, even if 100% accurate, does not provide a basis for identifying the reserve for each of the subject 530 Claims at zero.

15.    To the extent the issues raised by the Debtors in ¶¶19 and 20 of their motion apply to certain claims, those claims must be specifically and individually identified and scheduled and those Claims that do not suffer from those deficiencies should stand on their own merits and reserves should be estimated on their individual or if appropriate, collective merits.

16.    The Debtors contend that the reserves need to be estimated because the statute refers to and courts have allowed estimation in the past (Motion at ¶¶ 22 and 23); so as to avoid undue delay (Motion at ¶24); it would take too long to prosecute objections to each of the Estimated Claims or otherwise wait for their liquidation (Motion at ¶25); litigating each claim would cause undue delay in the administration of the estates (Motion at ¶26); it is not

possible for courts to estimate the value of claims with certainty (Motion at ¶27); section 502(c) does not prescribe the method for estimating a claim (Motion at ¶28); and by observing that the bankruptcy court has broad authority over the property of the estate (Motion at ¶29).

17.    Even if unsubstantiated by the Debtors, those contentions are generally correct observations of the law and the apparent facts underlying these matters and Onondaga County does not dispute them as a proper basis for an order allowing for the estimation of claims, but they do not support the proffered zero allocation for the Unliquidated Amounts of each of the 530 subject Claims.  Moreover, Onondaga County submits they do not provide the Bankruptcy Court with the bases for accepting the proffered allocation.

18.    In ¶30 of the Motion the Debtors submit in conclusory fashion that the proposed zero allocation was arrived at "in good faith, conservatively and upon review and analysis" of, among other things, "such other factors as the Debtors deemed relevant." Without further description or explanation it is difficult, at best, to substantiate those claims or those generic statements to serve as a basis for the proffered allocations.

19.    The Debtors go on in ¶31 of the Motion to suggest their ability to expunge or reduce more than 23,721 Claims "demonstrates the Debtors' ability to properly and accurately estimate the Estimated Claims" and thus, the Bankruptcy "Court can and should rely upon the Debtors' estimate."

20.    Onondaga County submits the facts cited to in ¶31 of the Motion equally support a contrary conclusion from the one offered by the Debtors.

Without further explanation, it appears safe to conclude the successes noted by the Debtors included the identification and elimination of duplicate or clearly baseless claims. While that is laudatory, it does not demonstrate or support a conclusion that the Debtors have an equal aptitude or ability to resolve "more difficult" claims, some of which are likely addressed by this motion. Simply stated, the ability to resolve numerous other claims does not, without more, lead to the conclusion that the Bankruptcy Court need not look closely and scrutinize the outcome proposed by this motion.

21.    As noted above at ¶14, the Debtors suggest many of the subject 530 Claims have obvious deficiencies that support a zero allocation. Those should be separately scheduled and addressed accordingly. Purportedly that would, if the Debtors are correct, significantly reduce the number of Claims that would require some effort to reach a meaningful allocation. If other claims are proposed to receive a zero allocation due to legal hurdles or pitfalls those too should be specifically identified such that the Bankruptcy Court and the Claimants can understand the actual basis for the proposed zero allocation.

22.    An entire category of the claims proposed for a zero allocation are environmental claims where the investigation, remediation and post-remediation operation and maintenance are either on-going or scheduled to occur. By its very nature, the costs associated with such claims require the iterative investigation/remediation process to run its course.

23.    The Debtors are cognizant of that process and while they elected not to inform or remind the Bankruptcy Court, they are experienced in conducting actual estimations of future environmental costs.

24.    As explained commencing on page 43 of the approved Disclosure Statement, the Debtors engaged in a three-step -- initial review, thorough review with guidance from regulators and negotiation -- process that allowed "[t]he Debtors and their environmental consultants [] to achieve consensus among various governmental parties regarding the cost to remediate the Environmental Response Trust Properties in an unprecedented time span. Similar negotiations in other bankruptcies have taken much longer. The swift resolution of the environmental cost projection efforts in these Chapter 11 Cases saved the Debtors' estates millions of dollars by avoiding costly litigation and estimation hearings." Disclosure Statement at 47.

25.    Notwithstanding the Debtors' assertion in the approved Disclosure Statement, the Debtors' motion makes no effort to describe the process used to estimate environmental claims or explain how that process yielded a zero dollar value for each such claim. That every such Claim was assigned a zero allocation suggests not a thoughtful or reasoned process but a predetermined outcome.

26.    As explained by the United States in its Statement in Support of the Environmental Response Trust and its Statement in Support of Priority Order Sites the sums determined to be set aside for future costs at the Environmental Response Trust Properties was the result of "lengthy

negotiations between the parties regarding the nature, extent and cost of the cleanup that will be required at the Properties. *** These amounts were determined after extensive discussions that included environmental experts, and represent a substantively fair resolution of the liabilities taking into account the uncertainties and litigation". Statement at 30 -31.

27.    With respect to the Priority Order Sites, "the site-specific funding determinations were made after months of negotiation that involved environmental experts who analyzed each component of the cleanup, including such things as capping, groundwater extraction and treatment, soil treatment, soil vapor intrusion management, sediment removal, well and soil removal, offsite disposal of drums and sludges, operation and maintenance, and monitoring." Statement at 21.

28.    With respect to the claim proposed to be estimated by this motion, a review process was either simply not undertaken or for some reason not disclosed. Indeed among the claims for which the Debtors contend there should be a zero allocation is a claim by the United States of America and 13 separate, individual claims by either a state or state environmental regulator.

29.    The United States at page 46 of its Statement in Support of the Environmental Response Trust states "the United States, the State of New York, the Tribe and Onondaga Nation, respectively, are currently engaged in ongoing settlement talks with the Debtors regarding their liability for natural resource damages at both the Massena and Onondaga Superfund Sites in New York" and at page 48 states "the RI/FS of Lower Ley Creek is in progress".

30.    If the RI/FS of Lower Ley Creek is in progress, then costs are being and will be incurred in the future. If that is the case, and the United States has stated that is the case, how is it that the estimated future cost is zero?

31.    Confirmation that the RI/FS process is on-going is corroborated by the attached "Exhibit A", a letter from the United States Environmental Protection Agency requesting that certain alleged potentially responsible parties undertake a remedial investigation, which request was declined by all invitees, and "Exhibit B", a February, 2011 e-mail from EPA counsel confirming that the EPA conducted RI is not complete and may require additional sampling.

32.    That the Debtors are the major source of contamination was confirmed by EPA in the attached "Exhibit C" 2010 Onondaga Lake Subsite Evaluation and was admitted by the Debtors in 1997 when it executed an NYSDEC Order on Consent that concluded: "The confirmed presence of these hazardous substances at GM's facility and the proximity of such substances and discharge of PCBs to Ley Creek establishes that the hazardous substance contamination at the GM facility represents a release or threat of release of hazardous substances to the Onondaga Lake NPL Site pursuant to 104 and 107 of CERCLA. GM's facility is a subsite of the Onondaga Lake NPL site." *See* "Exhibit D" (In relevant part, NYSDEC Order on Consent, Index # D-7-0001-97-06, September 17, 1997) at paragraph 33A.

33.    Given the nature of the Lower Ley Creek Site, experts retained by the County have estimated the potential cost at potentially $50 million plus or minus.

**B. The Proposed Zero Allocation Substantiates and Corroborates the Discriminatory, Unfair and Inequitable Treatment of Similar Claims by the Debtors and the Debtors' Proposed Plan**

34.     As discussed at length in the Objection to the Plan filed by Onondaga County (as well as the Objection filed by the Town of Salina, New York), the Plan misclassifies environmental claims, treats them in a disparate manner and discriminates against similar claims, as follows: despite the undisputed and irrefutable reality that the Debtors contaminated the length of Ley Creek, it treats a portion of the EPA and State of New York claims related to the Debtors' former Inland Fisher Guide (IFG) facility (i.e., from the IFG facility to the Route 11 Ley Creek bridge) as a Class 4 Environmental Property Claim that will be satisfied on the Effective Date, but treats the remainder of that claim (i.e., from the Route 11 Ley Creek bridge down to and including the Onondaga Lake Bottom Superfund subsite) as a Class 3 General Unsecured Claim.

35.     It does so without any stated basis in law or fact and in fact, contrary to the applicable law, facts and science.

36.     The instant motion exacerbates the disparate treatment by suggesting that the maximum allocation for future costs at the Lower Ley Creek and Onondaga Lake sites are zero without even pretending to suggest why that is the case when at the same time the United States has informed the Court that the RI/FS for lower Ley Creek is ongoing.

37.     Thus, claims based on the Debtors 60 years of past and on-going discharges to Ley Creek are treated, in part, as a Class 4 Claim that will be

satisfied on the Effective Date based upon an extensive three-part investigation and estimation process intended to determine future costs and the remaining portion of the same Claim is proposed to be classified as a General Unsecured Claim for which the Debtors made no meaningful disclosure as to how they may have estimated future costs.

38.     Although settlements are favored and properly derived estimates are favored, the unique nature of the bankruptcy process means that courts must carefully examine settlements and determine that they are fair and equitable before approving them. *In re Nutritional Sourcing Corporation*, 398 B.R. 816, 832, 835 (D. Del. 2008) (Plan rejected where the claim definitions adversely impacted a class of creditors who were not at the negotiating table and were not adequately represented in their absence).

39.     "Under the 'fair and equitable' standard [the court must] look to the fairness of the settlement to other persons, i.e., the parties who did not settle." *In re Nutraquest*, 434 F.3d 639, 645 (3rd Cir. 2006).

### III. CONCLUSION

40.     Nothing contained herein should be considered a waiver by Onondaga County, which reserves its rights, to amend or supplement this Objection.

WHEREFORE, the County of Onondaga respectfully requests the Court (i) deny the Motion for an Order Estimating Maximum Claims reserves unless and until the Debtors can substantiate the bases for the proposed estimates and specifically the bases for a zero estimate with respect to the multiple

government claims related to the on-going Lower Ley Creek investigation and

remediation; and (ii) for such other and further relief as this Court deems just

and proper.


Dated: February 22, 2011
    Syracuse, New York

                          Attorneys for Claimant
                          Onondaga County, New York

                          By: /s/Luis A. Mendez, Esq.
                              Luis A. Mendez
                              Senior Deputy County Attorney
                              John H. Mulroy Civic Center, 19th Floor
                              421 Montgomery Street
                              Syracuse, New York 13202
                              Telephone: (315)435-2170


                          By: /s/Kevin C. Murphy, Esq.
                              Kevin C. Murphy
                              The Wladis Law Firm, P.C.
                              PO Box 245
                              Syracuse, NY 13214
                              Telephone: (315) 445-1700

# EXHIBIT A



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
REGION 2
290 BROADWAY
NEW YORK, NY 10007-1866

OCT 3 0 2009

**BY OVERNIGHT MAIL CARRIER**

(See attached list of addresses)

Re:   <u>Lower Ley Creek Subsite, Onondaga Lake Superfund Site, Onondaga County, New York
Notice of Potential Liability and Request to Perform Remedial Investigation and
Feasibility Study Activities Pursuant to the Comprehensive Environmental Response,
Compensation, and Liability Act, 42 U.S.C. § 9601, <i>et seq</i>.</u>

Dear Sir/Madam:

The U.S. Environmental Protection Agency ("EPA") is charged with responding to the release or
threatened release of hazardous substances, pollutants, and contaminants into the environment
and with enforcement responsibilities under the Comprehensive Environmental Response,
Compensation, and Liability Act, as amended ("CERCLA"), 42 U.S.C. §§ 9601-9675.

EPA has documented the release and threatened release of hazardous substances into the
environment at the Lower Ley Creek Subsite ("Subsite") of the Onondaga Lake Site ("Site"),
located in Onondaga County, New York. At the request of the New York State Department of
Environmental Conservation ("NYSDEC"), EPA assumed responsibility for the Subsite in July
2009. EPA has spent and anticipates spending additional public funds to investigate and control
releases or potential releases of hazardous substances at the Subsite.

### NOTICE OF POTENTIAL LIABILITY

Through prior correspondence, including a letter dated October 15, 2008, EPA and NYSDEC
have notified your client of the claims against it for the recovery of response costs pursuant to
Section 107 of CERCLA, 42 U.S.C. § 9607, and state statutory and common law. As part of cost
recovery negotiations, on April 23, 2009, EPA provided a chart to all PRPs involved in the cost
recovery claim which summarized the nexus of each PRP to the Site. In that chart, EPA
identified the following PRPs as having a nexus to the Site by way of this Subsite:

1.   Carrier Corporation
2.   General Motors Corporation
3.   Oberdorfer LLC
4.   Syracuse China Company
5.   Crouse Hinds/Division of Cooper Industries

Internet Address (URL) • http://www.epa.gov
Recycled/Recyclable • Printed with Vegetable Oil Based Inks on Recycled Paper (Minimum 50% Postconsumer content)

6. Town of Salina
7. Onondaga County
8. Niagara Mohawk Power Corporation, d/b/a National Grid

Under CERCLA and other laws, responsible parties may be held liable for monies expended by, *inter alia*, the federal government in taking response actions at and around sites where hazardous substances have been released, including investigative, planning, removal, remedial, and enforcement actions. Responsible parties also may be subject to orders requiring them to take response actions themselves. Responsible parties under CERCLA include, among others, the current owner of property upon which there is a release or threatened release of hazardous substances.

By this letter, we notify your client that because of its actions as a person who arranged for the disposal of hazardous substances at the Subsite, your client is considered to be PRP with respect to the Subsite, pursuant to Section 107(a) of CERCLA, 42 U.S.C. Section 9607(a).

This notice letter is not being provided pursuant to the special notice procedures outlined in Section 122(e) of CERCLA, 42 U.S.C. § 9622 (e), because EPA does not believe that those procedures would expedite remedial action at the Subsite. As discussed below, EPA is providing your client with the opportunity to volunteer to perform necessary response actions, and any such agreement would have to be memorialized in an Administrative Consent Order within 60 days of receipt of this letter.

### REQUEST TO COMPLETE ACTION

A remedial investigation and feasibility study ("RI/FS") for the Subsite under the Superfund Program is necessary to determine the nature and extent of the contamination at the Subsite, evaluate the risks to human health and the environment posed by releases or threatened releases from the Subsite, and identify and evaluate remedial alternatives. In order to proceed with the Onondaga Lake Bottom remedy in the vicinity of the mouth of Ley Creek, remediation of the Subsite must first be completed. It is anticipated that remediation in Onondaga Lake in the vicinity of the mouth of Ley Creek will commence in 2013. To complete the remedy for the Subsite in advance of this timeframe, EPA believes that a remedy decision for the Subsite needs to be made in 2010. To meet this schedule, EPA anticipates commencing RI-related sampling in November 2009.

EPA wishes to determine whether your client is willing to commence negotiations related to the performance or funding of the above-referenced RI/FS. Accordingly, please advise EPA within 14 days of receipt of this letter whether your client would be willing to enter into negotiations with EPA concerning performing the RI/FS at the Subsite under EPA oversight or funding the RI/FS. As mentioned above, any agreement by your client to perform or fund the RI/FS would need to be memorialized in an administrative consent order issued by EPA under CERCLA. Your response may be by telephone, e-mail, or letter and should be directed to:

2

Lauren Charney
Assistant Regional Counsel
New York/Caribbean Superfund Branch
Office of Regional Counsel
U.S. Environmental Protection Agency, Region II
290 Broadway, 17th Floor
New York, NY 10007-1866
charney.lauren@epa.gov
212-637-3181

with a copy to:

Pamela Tames, P.E.
Central New York Remediation Section
Emergency and Remedial Response Division
U.S. Environmental Protection Agency, Region II
290 Broadway, 20th Floor
New York, NY 10007-1866
Tames.pam@epa.gov
212-637-4255

If your client declines and EPA performs the work itself, your client may be liable under Section 107(a) of CERCLA for EPA's costs incurred in connection with that work. Should your client not volunteer to perform or fund the work, EPA also may unilaterally require your client to perform the work pursuant to Section 106(a) of CERCLA.

Please give the matter addressed in this letter your immediate attention. If you have any legal questions or would like to discuss this matter with EPA, please contact Ms. Charney. Should you have any technical questions regarding the Subsite, please direct them Ms. Tames.

Sincerely yours,

Raymond Basso, Strategic Integration Manager
Emergency and Remedial Response Division

3

## Addressee List

1. Crouse Hinds

Keith H. Odenweller, Esq.
Associate General Counsel
Cooper Industries
600 Travis Street, Suite 5600
Houston, TX 77002
Keith.Odenweller@CooperIndustries.com

2. National Grid

Richard R. Capozza, Esq.
Hiscock & Barclay, LLP
1 Park Place
300 South State Street
Syracuse, NY 13202-2078
rcapozza@hblaw.com

3. Onondaga County

Kevin C. Murphy, Esq.
Wladis Law Firm, P.C.
5795 Widewaters Pkwy
Syracuse, N.Y. 13214
kmurphy@wladislawfirm.com

4. Town of Salina

Frank C. Pavis, Esq.
Harris Beach PLLC
99 Garnsey Road
Pittsford, NY 14534
fpavia@harrisbeach.com

5

# EXHIBIT  B

**Kevin C. Murphy**

| | |
|---|---|
| **From:** | Charney.Lauren@epamail.epa.gov |
| **Sent:** | Thursday, February 03, 2011 3:33 PM |
| **To:** | Kevin C. Murphy |
| **Cc:** | Luis.Mendez@ongov.net |
| **Subject:** | Re: Lower Ley Creek update |

Kevin and Luis,

The RI has not been completed yet.  EPA is evaluating whether more samples will need to be
taken once the weather warms up in the spring because the latest sampling results showed hits
of contaminants in the swale area which had not been sampled before.  I will let the group
know if/when EPA decides more sampling is necessary.  Once this determination is made, we
will have a better estimate as to when the RI will be complete.

Regards,

Lauren


From: "Kevin C. Murphy" <KMurphy@WladisLawFirm.com>
To:    Lauren Charney/R2/USEPA/US@EPA
Cc:    <Luis.Mendez@ongov.net>
Date: 02/03/2011 03:24 PM
Subject:    Lower Ley Creek update


Dear Lauren:

I do not believe Onondaga County has received any type of an update on Lower Ley Creek since
your e-mail of September 8, 2010. Has an RI been completed? Is it available? If not what is
the anticipated schedule of events?

Any information you can provide would be helpful and much appreciated.

Thank you.


Kevin C. Murphy
The Wladis Law Firm, P.C.
P.O. Box 245, Syracuse, NY 13214
6312 Fly Road, East Syracuse, NY 13057

P   315/445-1700
F   315/251-1073
kmurphy@wladislawfirm.com <mailto:kmurphy@wladislawfirm.com>

Circular 230 Notice:  To insure compliance with requirements imposed by the Internal Revenue
Service under Circular 230, we inform you that any United States tax advice included in this
communication is not intended or written to be used, and cannot be used, for the purpose of:
(1) avoiding federal tax-related penalties, or (2) promoting, marketing or recommending to
another party any transaction or matter addressed herein.

CONFIDENTIALITY NOTICE:  This e-mail transmission (including any
attachment) is intended only for the use of the individual or entity to which it is
addressed, and may contain information that is privileged, confidential and exempt from
disclosure under applicable law.  If you are not the intended recipient, you are hereby
notified that any disclosure, copying, distribution, or the taking of any action in reliance
on the contents of this e-mail or any attachment is strictly prohibited.  If you have
received this transmission in error, please immediately notify the sender by return e-mail
and delete all copies of this e-mail and any attachment.
-----Original Message-----
From: Charney.Lauren@epamail.epa.gov
[mailto:Charney.Lauren@epamail.epa.gov]
Sent: Thursday, September 02, 2010 12:12 PM
To: Cirillo.Argie@epamail.epa.gov; fpavia@HarrisBeach.com; Gary.Gengel@lw.com;
haustin@hancocklaw.com; JMcCreary@nixonpeabody.com; Singerman.Joel@epamail.epa.gov;
jredwine@alixpartners.com; Kathleen.McFadden@UTC.COM; Keith.Odenweller@CooperIndustries.com;
Kevin C. Murphy; kovacsa@libbey.com; LuisMendez@ongov.net; mkerwin@hblaw.com;
Tames.Pam@epamail.epa.gov; RCapozza@hblaw.com; Nunes.Robert@epamail.epa.gov;
thomas.goslin@weil.com
Subject: Lower Ley Creek update


Hello All,

I've gotten several inquiries about the status of our investigation of Lower Ley Creek.  The
May sampling indicated high levels of PCBs and some metals in an area called the "swale
area."  See the attached map.
The entire universe of data from the May sampling has not yet been mapped out.  The swale
area data was mapped out because EPA had to go back in August and take more and deeper
samples of this area.  This sampling was necessary to understand the extent of the
contamination and to calculate volume for the FS.  The results of the deeper samples of the
swale area are not yet available.  We now estimate that the RI may be complete by December.

Regards,

(See attached file: LLC Swale Sample Results.pdf) Lauren P. Charney Assistant Regional
Counsel New York/Caribbean Superfund Branch Office of Regional Counsel, EPA Region 2 290
Broadway, 17th Floor New York, NY
10007
Tel: 212-637-3181
Fax: 212-637-3104

# EXHIBIT  C

## ONONDAGA LAKE NPL SUBSITE EVALUATION

**1. SITE NAME**

Lower Ley Creek Site

**2. RECOMMENDATION**                                                  Date  July 22, 2010

Subsite ___X___          Not Subsite _____          Potential Subsite _____

**3. LOCATION OF SITE  (Site location map attached)**
Ley Creek from Onondaga Lake to Route 11, Town of Salina

**4. BRIEFLY DESCRIBE THE SITE (Site Sketch and Data Attached)**

This site consists of a section of Ley Creek starting from the mouth of the Creek at Onondaga Lake up to and including the Route 11 bridge and is a tributary to Onondaga Lake. This two mile section of Ley Creek is bordered by industrial properties, a rail freight track, and landfill areas. An interstate highway, I-81, also crosses the Creek. In 1994, 1998 and 2009, sediment samples from the Creek were collected and analyzed. The sample analyses performed prior to 2009 indicated the presence of PCBs at levels which constitute hazardous waste. In addition, significantly elevated concentrations of chromium, copper, lead, zinc, cadmium and mercury were found in sediment.
A half mile or so portion of the Lower Ley Creek site is located adjacent to the Salina Town Landfill Inactive Hazardous Waste Site (NYS Registry #734036). A Remedial Investigation of the Salina Landfill was completed in December 2000. Although there are slightly contaminated levels of PCBs and metals in the groundwater at the western end of the Salina Landfill South parcel, and the report indicates that groundwater flow and surface water runoff is toward the Ley Creek channel, it is believed that the majority of the contamination in the Lower Ley Creek sediment has come from various sources and/or facilities upstream and on Ley Creek, including the former General Motors Corporation- Inland Fisher Guide facility. The implementation of the remedies for the Salina Town Landfill and the upper Ley Creek portion of the Inland Fisher Guide Deferred Media site are expected to mitigate any ongoing or potential site-related sources of PCBs and metals to Ley Creek.

Lower Ley Creek was dredged in 1970/71 and again in 1975. Some of this material may have been placed on the banks of the Creek.

Site Work Completed to Date:  () Phase I () Phase II () PSA () RI/FS () PA/SI   (X) Other : RI/FS underway

**5. IS THERE A KNOWN RELEASE OF HAZARDOUS SUBSTANCES TO THE ENVIRONMENT? Yes__X__   No_____ Potential _____**

Is the release historic or ongoing?  The release is both historic and ongoing. Sediment sampling indicates the presence of PCBs, SVOCs, and metals at significantly elevated concentrations.

**6. IS THE RELEASE INTO THE LAKE OR A TRIBUTARY?  Yes____X_-tributary_____   No_____  Potential ___X_-Lake_____**

What is the location and nature of the release?  Ley Creek is a tributary of Onondaga Lake. PCBs and metals have been found in the channel sediment. There is a direct pathway for potential release of contaminants (e.g., PCBs and metals) to the Lake.

**7. IS THERE A THREAT OF RELEASE INTO THE LAKE OR A TRIBUTARY?  Yes__X___  No_____  Potential _____**

What is the location and nature of the threat?  The presence of PCBs and metals in the channel presents a threat of release to the lake.

**8. HAZARDOUS SUBSTANCES/WASTES ASSOCIATED WITH THE SITE**

PCBs, chromium, copper, lead, zinc, nickel, cadmium, and mercury.

**9.    ANALYTICAL DATA AVAILABLE**

() Air    () Groundwater    (X) Surface Water    (X) Sediment    () Soil    () Waste () Leachate    (X) Fish Tissue

In 2009, sediment sampling in the lower portion of Ley Creek detected the presence of PCBs (total) at concentrations up to 43 ppm and metals at levels exceeding DEC Fish & Wildlife Severe Effect Level (SEL) and Lowest Effect Level (LEL);

| | | |
|---|---|---|
| Chromium to 1,090 ppm (SEL 110) | copper to 525 ppm (SEL 110) | Nickel to 447 ppm (SEL 50) |
| Lead to 856 ppm (SEL 110) | zinc to 4430 ppm (SEL 270) | cadmium to 462 ppm (LEL 0.6) |
| Mercury to 2.1 ppm (LEL 0.15) | | |

In addition, pyrene and fluoranthene (100,000 ppb and 130,000 ppb, respectively) were detected in the sediments.
Surface water samples taken during 2009 also revealed levels of PCBs to 0.11 µg/L.
Fish tissue analyses performed in 2009 detected levels of Total PCBs as high as 2,800 µg/kg.

**10.  EXPLANATION OF RECOMMENDATION**

A release of PCBs and metals to the lower Ley Creek channel has been documented. Ley Creek is a tributary to Onondaga Lake. PCBs and metals are contaminants of concern in Onondaga Lake. This site is considered a subsite of the Onondaga Lake NPL site.

**11.  RECOMMENDATIONS FOR FURTHER ACTION**

Proceed with a Remedial Investigation/Feasibility Study as part of the Onondaga Lake NPL Site Remedial Program.

| **12. SITE OWNER'S NAME** | **13. ADDRESS** | **14. TELEPHONE NUMBER** |
|---|---|---|
| County of Onondaga | 650 W Hiawatha Blvd, Syracuse, NY 13204 | Telephone unknown |
| National Grid | 300 Erie Blvd W, Syracuse, NY 13202 | Telephone unknown |

There are various other PRPs at the Site
See attached map



# EXHIBIT D

*final – seyney 4/27/77*

STATE OF NEW YORK: DEPARTMENT OF ENVIRONMENTAL CONSERVATION
--------------------------------------------------------------------------------

In the Matter of the
Development and Implementation
of a Remedial Investigation/Feasibility
Study for an Inactive Hazardous Waste
Disposal Site Under Article 27, Title 13,
and Article 71, Title 27 of the
Environmental Conservation Law
of the State of New York and
the Development of a State Pollutant
Discharge Elimination System Program
under Article 17 of the Environmental
Conservation Law of the State of
New York by

ORDER
ON
CONSENT
INDEX # D-7-0001-97-06

General Motors Corporation,
Respondent.

Site Code # 734057
--------------------------------------------------------------------------------

The New York State Department of Environmental Conservation (the "Department") and the General Motors Corporation ("Respondent") hereby agree to the making and entry of this Administrative Order on Consent ("Consent Order").

WHEREAS,

1.    The Department is responsible for enforcement of Article 27, Title 13 of the Environmental Conservation Law of the State of New York ("ECL"), entitled "Inactive Hazardous Waste Disposal Sites," and is authorized to abate and prevent the pollution of New York State waters caused by discharges pursuant to Article 17 of the ECL and Parts 702 and 703 of Title 6 of the Official Compilation of Codes, Rules and Regulations of the State of New York.

September 17, 1997

MAINRIFS.ORD 9/17/97

F.    Suspected disposal of solid and hazardous wastes or substances at the facility's "Past Landfill" may have resulted in the release of such wastes or substances into the environment. Constituents detected in monitoring wells installed at the boundaries of and down gradient from the landfill include trans-1,2-dichloroethene, vinyl chloride, toluene, chloroform, nickel, zinc, chromium, arsenic and PCBs. See Exhibit A.

33.    The Department has determined that:

A.    The PCBs, VOCs , and heavy metals are hazardous wastes under ECL Article 27, Title 9 and/or hazardous substances under CERCLA. The confirmed presence of these hazardous substances at Respondent's facility and the proximity of such substances and discharge of PCBs to Ley Creek establishes that the hazardous substance contamination at the facility represents a release or threat of release of hazardous substances to the Onondaga Lake NPL Site pursuant to §§101 and 104 of CERCLA. Respondent's facility is a subsite of the Onondaga Lake NPL Site. By letter dated June 23, 1997, the Department and the United States Environmental Protection Agency notified the Respondent of their determination that Respondent's facility is a subsite.

B.    Respondent's facility is an inactive hazardous waste disposal site, as that term is defined at ECL Section 27-1301(2) and has been listed in the Registry of Inactive Hazardous Waste Disposal Sites in New York State as Site Number 7-34-057. The Department has classified Respondent's facility as a Classification "2" pursuant to ECL Section 27-1305(4)(b), which means the facility presents a "significant threat to the public health or environment - action required."

September 17, 1997

12

C.    Contamination of ground water, soil and surface water (including storm water discharged from the facility) at the Site has been documented. Coordination of the data gathering, investigatory and remedial approaches is necessary to effectuate the most efficient remedial program for these media.

D.    Respondent is responsible for developing and implementing a Remedial Investigation/Feasibility Study ("RI/FS") for the Site that is consistent with CERCLA, the National Oil and Hazardous Substances Pollution Contingency Plan, 40 C.F.R. Part 300, as amended (the "NCP"), and all other applicable State and Federal laws.

E.    Respondent is responsible for investigating the nature and extent of, and evaluating the feasibility of remediating contamination of ground water, soil, surface water (including storm water discharged from the facility) at the Site as set forth in this Consent Order. The RI/FS must include a complete and coordinated engineering evaluation of Respondent's storm water system and management that indicates how storm water is impacted by contaminants at the facility, how storm water entering the facility affects the distribution of contaminants and how these effects will be remedied in order to achieve compliance with the effluent limits established under the final SPDES permit. Interim SPDES permit limits for certain parameters, including PCBs, will be incorporated into this Consent Order pursuant to Paragraph XIV of this Order.

F.    Pursuant to ECL § 17-0813, SPDES permits may contain compliance schedules which require the permittee, within the shortest reasonable time, to conform to and meet applicable effluent limitations.

September 17, 1997

13

(4)    Respondent shall provide to each contractor hired a copy of the comprehensive reference list (attached as Exhibit J to this Consent Order) of the reports of previous investigations at the Site and access to copies of such reports as well as all available topographic and property surveys, engineering studies and aerial photographs.

M.    The effective date of this Consent Order shall be the date it is signed by the Commissioner of the Department or his authorized representative.

DATED: Albany, New York
    25 September    , 1997

John P. Cahill
Commissioner
New York State Department
    of Environmental Conservation

BY: _____
Michael J. O'Toole, Jr.
Division Director

September 17, 1997

44

## CONSENT BY RESPONDENT

Respondent hereby consents to the issuing and entering of this Consent Order, waives Respondent's right to a hearing herein as provided by law, and agrees to be bound by this Consent Order.

By: _W.J. McFarland_____

Name: _W. J. MCFARLAND_____

Title: _MANAGER, REMEDIATION_

Dated: September ,1997

STATE OF MICHIGAN )
                  ) s.s.:
COUNTY OF _Wayne_ )

On this 22 day of September, 1997, before me personally came _William J. McFarland_, to me known, who being duly sworn, did depose and say that he/she resides in _Michigan_ ; that he/she is the _Manager, Remediation_ of the GENERAL MOTORS CORPORATION, the corporation described in and which executed the above instrument; and that he/she signed his name thereto by authority of the board of directors of said corporation.

_Alice Louise Parker_
Notary Public

ALICE LOUISE PARKER
NOTARY PUBLIC · WAYNE COUNTY, MI
MY COMMISSION EXPIRES 08/06/00

rkd:c:\
alldocs\gm\mainrifs.ord

September 17, 1997

45

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

In Re:                                        Chapter 11 Case No.

MOTORS LIQUIDATION COMPANY, *et al.,*          09-50026 (REG)
    f/k/a General Motors Corp., *et al.*

              Debtors.             (Jointly Administered)

CERTIFICATE OF SERVICE

I, Kevin C. Murphy, of The Wladis Law Firm, P.C. hereby certify that on the 22nd day of February, 2011, this office electronically filed the Objection of Environmental Claimant Onondaga County, New York to the Debtor's Motion to Estimate Maximum Amount of Certain Claims for Purposes of Establishing Claims Reserves, in the above-referenced matter, with the Clerk of the Bankruptcy Court using the CM/ECF system, which sent notification to the CM/ECF participants.

February 22, 2011                          /s/ Kevin C. Murphy, Esq