PMB 311
484 East Carmel Drive
Carmel, Indiana  46032-2812
February 19, 2011

The Honorable Robert E. Gerber
U.S. Bankruptcy Court
Southern District of New York
One Bowling Green
New York, New York  10004

Subject:  Chapter 11 Case Number 09-50026 - Motors Liquidation Company

Dear Judge Gerber:

I am in receipt of (1) Notices of Debtors' 168th, 181st, 182nd, and 185th Omnibus Objections to Claims and (2) Notice on Hearing on Motion of Debtors for Entry of an Order Estimating Maximum Amount of Certain Claims for Purposes of Establishing Claims Reserves Under the Debtors' Amended Joint Chapter 11 Plan in the subject bankruptcy case.  I am writing this letter to object to what is proposed in these notices and to request that the Court retain my claims in valid and undiminished form for consideration in the future course of the case.

My rationale in making this request is that the debtors have misclassified my claims as claims arising out of normal employment and retirement status whereas these claims are actually based upon a contractual termination agreement that was freely negotiated and consummated between General Motors (G.M.) and me.  Although the agreement contains several negotiated provisions that are consistent with normal retirement provisions, e.g. pension eligibility; retention of stock option grants; retention of previous restricted stock unit grants; etc., this was not a normal retirement, but a termination contract based upon negotiated good and adequate consideration between the parties.  The fact that this agreement is not a normal retirement document, but a contractual termination agreement is evidenced by the inclusion of several additional provisions not found in normal retirement agreements that represent value to both parties, e.g. the special incremental payments ($29,980 times 5) referred to in paragraphs 3 and 7 of the agreement; the provision of

1

outplacement services; the agreement to pay the 2006 bonus (AIP) at par value; the non-compete provisions; the confidentiality provisions; the agreement not to pursue legal action in paragraph 12; etc. As explained in the "Background" section at the end of this letter, this termination agreement was the result of my refusal, as CFO of Allison Transmission at the end of 2006, to falsely inflate the financial projections provided to potential purchasers in connection with the sale of the Allison Transmission Division of G.M. and G.M.'s desire that I agree to terminate my employment in order to avoid any public discussion or legal action associated with this issue. I have enclosed a copy of the agreement for your reference.

**My contentions are the following:**

(1) The benefits and compensation granted to me in the referenced termination agreement are substantively different from the "Welfare Benefits Claims of Retired and Former Salaried and Executive Employees" and "Supplemental Executive Retirement Benefits Claims of Former Executive Employees" described by the debtors in their notices. Because these benefits and compensation were contractually negotiated between G. M. and me they are not subject to the normal prerogatives that G.M. contends it has with regard to modifying or eliminating employee benefits.

(2) If, however, it is determined that G.M. did have the right to modify or eliminate such benefits as are referred to as "welfare benefits," e.g. health care, then the other still unpaid "compensation" benefits that are included in the termination agreement, i.e. life insurance, supplemental retirement payments, the special incremental payment, should be allowed to stand as legitimate claims because they were contractually negotiated in return for consideration that was seen as important and valuable to G.M.

(3) If it is determined that G.M. did have the right to modify or eliminate the still unpaid supplemental executive retirement payments and life insurance "compensation" benefits described in the termination agreement, then my claim for the special incremental payment referred to in paragraphs 3 and 7 of the termination agreement should be allowed

2

to stand and ultimately be honored.  This special incremental payment is not covered under any of G.M.'s benefit or other plans and is, therefore, not subject to G.M.'s modification or elimination prerogatives.  Three of the five annual payments were made before the bankruptcy filing, but the remaining two totaling $59,960 (which were not taken over by the New G.M.) are still unpaid.

The detailed background of the circumstances of the termination agreement execution is described below.  Thank you for your consideration of this request.

                                  Sincerely,

                                  Robert J. Sheipe
                                  (317) 414-7777
                                  Robert@Sheipe.com

## Termination Agreement Background

Allison Transmission was a unit of General Motors Corporation that produced automatic transmissions for commercial, industrial, and military use. I joined Allison in April of 2000 as Chief Financial Officer after 27 years in a variety of executive positions with G.M in North America, Europe, and Asia.

In 2000, Allison was underperforming, incurring a net loss of ($12 million) on sales of approximately $1.2 billion. Through a variety of aggressive initiatives, the Allison management team was able to increase sales and net income in every year after 2000, culminating in sales of approximately $2.4 billion and net income (assuming a 38% corporate tax rate) of $450 million in 2006.

In early 2006, seeing that Allison had squeezed out just about all possible financial performance improvements without the prospect of significant additional expenditures for new product development and capacity increases, and increasingly aware of its own deteriorating performance, G.M. management decided to sell or "monetize" Allison in order to apply the proceeds to other more "core" G.M. automotive priorities. As CFO, I was the internal "point person" to prepare Allison for sale as a stand-alone entity.

The Allison team, along with outside accountants, investment bankers, and other consultants, worked through most of 2006 to recreate five years of stand-alone financial statements, develop operating and financial projections for the next five years, and otherwise determine what would be necessary to separate Allison from G.M. and operate effectively as a stand-alone entity. At the same time, discussions were being held with several potential purchasers.

In the last quarter of 2006, final preparations were being made to have management presentations to a narrowed list of potential purchasers. While the full breadth of the business would be reviewed, the emphasis in these presentations was to be on the financial projections for the next five years because these projections would form the basis for the eventual price that would be agreed upon for the sale. Allison management felt that, in view of the current strength of the market, drastic cost cutting over the previous five years, full capacity utilization, and several recent one-time financial improvements, it would little short of miraculous to be able to maintain the current 2006 volume

4

and financial performance over the next five years.  Therefore, the maintenance of 2006 performance was the basis of the projections to be shared with potential purchasers.

However, when G.M. management became aware of these projections, they were not satisfied.  Over the November, 2006 to early December, 2006 timeframe, I spent a considerable amount of time and effort explaining to G.M. financial management in great detail all the reasons why the projections were the best (and probably better) that Allison would be able to achieve.  Finally, in early December, I was told by Joe DaMour, the CFO  of GM Powertrain to whom I directly reported, that the Allison financial projections would have to be "substantially improved."  I told him that if we did so, we would be materially deceiving the potential purchasers, and in the unlikely event that we were successful, the people of Allison would suffer because they would not be able to achieve the performance assumptions on which we had sold the company.  He told me that it didn't matter because Walter (Borst), the Treasurer of G.M. and Fritz (Henderson), the CFO of G.M., wanted "higher numbers."  After more discussion, I told him that I just could not, in good conscience, falsely inflate the financial projections.

I didn't hear any more on the subject until during the Christmas break, I was informed by the President of Allison that the G.M. financial leadership had decided to relieve me of my position as Allison CFO.  He also told me that there was no other position for me and that my option was to move to Pontiac, Michigan (the G.M. Powertrain headquarters) and "sit it out" without any job responsibilities.  He also said that because G.M. financial management had no legitimate reason to involuntarily terminate me, they were hoping that I would be open to a negotiated termination agreement.  I said that I would be willing to discuss termination under certain conditions including maintaining my salary and benefits until an agreement could be reached and receiving my full earned 2006 bonus.  The G.M. Powertrain Human Resources Vice President started discussions with me on a termination agreement in early January, 2007 and,  a negotiating considerable number of proposals and counter proposals, the agreement (copy attached) was ultimately signed on March 15, 2007.

5