# Exhibit A

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

|  |  |  |
|---|---|---|
| In re | : | Chapter 11 Case No. |
|  | : |  |
| MOTORS LIQUIDATION COMPANY | : | 09-50026 (REG) |
| f/k/a GENERAL MOTORS CORPORATION, | : |  |
| *et al.*, | : |  |
|  | : |  |
| Debtors. | : | (Jointly Administered) |
|  | : |  |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

## <u>AFFIDAVIT</u>

I, John N. Hanson, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury under the laws of the United States of America that the following is true and correct:

1. I am Common Counsel for a group of companies that banded together to respond to the United States Environmental Protection Agency (EPA) and the Indiana Department of Environmental Management (IDEM) concerning environmental conditions at a landfill in Grant County, Indiana, known as the Marion Bragg Site ("the Site"). The group of companies is known as the Marion Bragg Group ("the Group").

2. The Group entered into the Marion-Bragg Participation Agreement in 1988 ("Participation Agreement"). Attachment 1. General Motors Corporation signed the Participation Agreement on March 28, 1988. <u>Id</u>. at 10. Among other things, under the Participation Agreement, each member of the Group committed to respond to the environmental conditions at the Site, to pay the costs of that response, and to allocate the costs of that response among themselves.

3. Later in 1988, the Group entered into a Consent Decree with the United States of America, on behalf of EPA, and with IDEM ("Federal Consent Decree"), in which the Group committed to implement and pay for the response to the environmental conditions at the Site.

Attachment 2 (relevant portions only). General Motors Corporation signed the Federal Consent

Decree on September 29, 1988. Id. at 67. The United States District Court for the Southern

District of Indiana entered the Federal Consent Decree on April 24, 1991. Id. at 63.

4. Under the Federal Consent Decree, each member of the Group is bound, among other

things, to finance and perform the work called for by the Decree. Id. at 12, ¶ VI.A.1. That work

includes:

- monitoring the Site for at least 30 years after construction work at the Site is complete (Id. at 19-20);

- conducting additional studies at the Site (Id. at 24-25);

- funding EPA's five-year periodic reviews of the Site (Id. at 26-27);

- performing any additional work deemed necessary at the Site (Id. at 28-29);

- submitting annual reports to EPA concerning the Site (Id. at 34); and

- reimbursing government oversight costs (Id. at 43-44).

5. In 1994, the members of the Group entered into a Final Judgment By Consent in the

Huntington Circuit Court for the State of Indiana ("State Consent Decree") that re-adjusted the

percentages that each company must pay for the costs incurred by the Group under the Federal

Consent Decree and the Participation Agreement. Attachment 3. Under the State Consent

Decree, General Motors Corporation's percentage of those costs was 11.27%. Id. at 2.

6. Because of the subsequent bankruptcy of Dana Corporation, a Group member, its

3.44% percent cost sharing percentage had to be assumed pro rata by the remaining members of

the Group. Therefore, General Motors Corporation's share became and is now 11.67%.

7. The Group's consultants have estimated the costs for which each member of the

Group will be responsible under the Federal Consent Decree and the Participation Agreement

until those obligations are expected to end in 2026. Those cost estimates are presented in

Attachment 4.

8. General Motors Corporation's share of those costs is 11.67% of $1,130,000.00, or $131,871.00.

9. From November 2009 to January 2011, our records reflect that the Marion Bragg Group incurred costs of $102,996.23, broken down into the following categories:

    a. Technical consultants: $44,575.30

    b. Legal fees: $41,308.64

    c. Fees paid to the U.S. Environmental Protection Agency: $9,738.36

    d. Fees paid to the Indiana Hazardous Substance Response Trust Fund: $7,373.93

10. General Motors Corporation's 11.67% share of the total fees incurred from November 2009 to January 2011 is $12,019.66.

Executed on February 16, 2011 at Washington, D.C.

John N. Hanson, Esquire
Common Counsel for the Marion Bragg Group
Beveridge & Diamond, P.C.
1350 I Street, N.W., Suite 700
Washington, D.C. 20005
202-789-6015

# Attachment 1

## MARION—BRAGG PRP PARTICIPATION AGREEMENT

WHEREAS, many companies, governmental entities and individuals have received a letter from the United States Environmental Protection Agency indicating that they are Potentially Responsible Parties ("PRPs") pursuant to the Comprehensive Environmental Response Compensation and Liability Act of 1980, and its amendments, ("CERCLA") for conditions at the Marion—Bragg site in Grant County, Indiana; and

WHEREAS, many other companies, governmental entities and individuals have utilized, directly or indirectly, the site for waste disposal; and

WHEREAS, the PRPs recognize that there are substantial efficiencies in responding to the site on a cooperative basis; and

WHEREAS, the PRPs desire to establish a Steering Committee to coordinate their joint efforts; and

WHEREAS, the Steering Committee will incur certain expenses on behalf of all PRPs; and

WHEREAS, the PRPs are presently conducting negotiations with the State of Indiana and the United States Environmental Protection Agency for a proposed Remedial Action Plan (RAP); and

WHEREAS, the PRPs are desirous of performing the RAP and having a determination of a final allocation performed pursuant to the terms of this Agreement;

WHEREAS, the PRPs must allocate such expenses without establishing any precedent as to final allocation; and

[ 1 ]

WHEREAS, the PRPs recognize that they desire to avoid litigation amongst themselves and arrive at a final allocation within the context of this Agreement.

NOW, THEREFORE, in consideration of the promises and mutual covenants contained herein, the participating PRPs hereby contractually agree as follows:

1.   It is understood and agreed that participation in any joint effort is in no way to be construed to be as admission with respect to liability. No party hereto admits any liability, past or present, by virtue of execution or performance of this Agreement.

2.   The parties hereto hereby empower John Hanson, common counsel, to employ through his law firm, Beveridge and Diamond, both the investigator and the third-party neutral. It is the intent of the parties that the work product of the investigator and the third-party neutral be work product prepared at the request of common counsel in anticipation of litigation, and, therefore, incapable of discovery.

3.   If the parties successfully enter into a Consent Decree to perform the RAP then all monies raised pursuant to this Agreement will be used only for the costs of implementation of the RAP, and final allocation work performed by the investigator and the neutral defined herein.

4.   The PRPs who execute this Agreement (Participating PRPs) shall voluntarily serve on a Steering Committee. The Steering Committee is responsible for directing the joint efforts

[ 2 ]

and expending jointly collected funds, and for public and governmental relations with regard to the activities of the Steering Committee as a whole. The Steering Committee is not empowered to speak on behalf of any individual PRP without express approval.

5. It is the objective of the Steering Committee to make decisions based on the unanimous consent of the participating PRPs. When this is not possible, the Steering Committee shall decide such matter by majority vote. Each committee member's vote shall be weighted in accordance with the member relative contribution to the joint expense fund as set forth in paragraph (11) below.

6. The Steering Committee shall be empowered to define the scope of work for, retain the services of, and contract with competent and qualified technical, legal and/or investigative consultants to assist the Steering Committee in its endeavors.

7. Each participating PRP agrees that all information, documentation, records and communications involving the site or the participants' activities shall be held in strict confidence and not divulged outside of the context of the Steering Committee.

8. Each participating PRP waives all claims that it might have as to each other participating PRP arising out of the Marion-Bragg site except those claims and rights contained in this Agreement.

[ 3 ]

9. Each participating PRP agrees to be contractually bound by the terms of this Agreement and agrees any breach of this Agreement may be enforced by litigation. Any party found to be in breach shall be responsible for court costs, expenses and attorney fees with respect to that enforcement proceeding.

10. The Steering Committee shall establish a trust and/or escrow fund to be maintained by a treasurer appointed by the Steering Committee. The Steering Committee shall adopt procedures for the authorized payment of invoices. The treasurer shall provide an accounting of the funds to the Steering Committee as requested to do so by the Steering Committee.

11. Until such time as final allocation is determined, the participating PRPs agree that all expenses shall be allocated in the following manner:

    a. Initial Funding
        1. RCA — $400,000.00
        2. DiversiTech — $400,000.00
        3. General Motors — $143,000.00
        4. Dana Corp. — $143,000.00
        5. Owens-Illinois — $143,000.00
        6. United Technologies — $143,000.00

[ 4 ]

b. In the event that all funds raised above are expended prior to the final allocation and additional funds are necessary, then all participating parties shall meet, in person or telephonically, for a single session in order to consentually arrive at a further interim funding mechanism. In the event that the parties fail to agree, then the neutral shall immediately determine the necessary final interim allocation so that the parties may fund ongoing responsibilities and activities.

c. The investigator and neutral shall not know or be informed of the initial funding mechanism under this Agreement, the interim funding mechanism hereunder or the final interim funding mechanism agreed upon by the parties to this Agreement.

12. Additional PRPs upon becoming signatories to this Agreement will be assigned by the Steering Committee to an appropriate financial participation level. The Steering Committee may require a late membership fee as a condition to becoming a participating PRP after the effective date. Additional parties shall be bound to all of the terms and conditions of this Agreement.

13. Each participating party agrees that the reasonable costs of RCA's Independent investigation shall be reimbursed to each of these companies in accordance with the final allocation. This amount of money shall not apply towards the $400,000.00 figure referred to in paragraph 14(b) below.

[ 5 ]

The reimbursement referred to within this paragraph shall only apply if such investigation is provided to all participating parties within 14 days of the effective date of this Agreement. The participating parties shall determine the reasonableness of the costs of these independent investigations by majority vote as defined within this Agreement. All signatory parties agree not to take any punitive action against any employee who has aided in the above-mentioned investigations.

14. The determination of final allocation shall be as follows:

   a. The Steering Committee shall hire Technical Environmental Consultants, Inc. to conduct a factual investigation with respect to final allocation, and either David Van Epps through The Center for Public Resources or Gene Berman of Clean Sites, Inc. as a third party neutral who will decide any dispute among the participating PRPs with respect to final allocation.

   b. The cost of the factual investigation shall not exceed $300,000.00. The cost of the third party neutral shall not exceed $100,000.00

   c. The questionnaire identified as Exhibit "A" and attached to this Agreement shall be completed and verified by an officer of each participating PRP, and submitted to the investigator within 45 days of the effective date of this Agreement.

[ 6 ]

The completed additional questions shall be submitted to the investigator within 15 days of the receipt of the additional questions.

d. Within 30 days of the effective date of this Agreement, each participating PRP may submit one or more allocation proposals. The elements of a proposal shall include the methodology for achieving a final allocation. The investigator shall use these submissions to narrow the scope of his investigation.

e. A factual investigation will take place and be developed with respect to all Potentially Responsible Parties; however, primary emphasis shall be placed on the participating PRPs and certain non-participating PRPs identified by the Steering Committee. The participating PRPs agree to cooperate in this investigation.

f. The factual investigation shall be completed within 90 days after submission to the investigator of the questionnaires referred to in paragraph 14(c) above.

g. Upon completion of the investigation, the investigator shall submit all certified questionnaires and a report of the results of his investigation to the neutral. The participating PRPs shall have access to all completed

[ 7 ]

questionnaires and the investigator's report. The participating PRPs may submit comments on the investigator's report to the third party neutral within 21 days of the investigator's submission of the report to the neutral.

h. Any report that the investigator and/or the neutral shall render, if expressed in percentages, shall state a percentage for each participating party vis-a-vis the total costs necessary to be expended with respect to the site.

i. The parties then will be given up to 3 allocation sessions over a 21 day period to decide final allocation amongst themselves. This time period may be extended for 2 additional allocation sessions over the next 14 day period by vote of the Steering Committee. However, at all subsequent allocation sessions, an officer of each participating company must be in attendance. The neutral shall be a moderator during all allocation sessions but shall not express a position on allocation during those sessions.

j. The parties agree that should they not be able to agree to allocation amongst themselves, then the neutral shall render an allocation decision within 21 days. The neutral shall decide all issues using common sense and good judgment

[ 8 ]

consistent with CERCLA principles of decision making. The participating parties shall vote to accept or reject the decision of the neutral. Majority vote shall rule. Should the decision of the neutral be rejected, then the neutral shall reconsider its' decision with the costs of reconsideration being borne by those parties who voted to reject the neutral's initial decision. The neutral shall render its' reconsidered decision within 15 days. The participating parties shall vote to accept either:

1. The neutral's initial decision, or
2. The neutral's reconsidered decision.

Should the parties be unable to reach a majority vote with respect to the neutral's initial decision or the neutral's reconsidered decision, then the neutral's two decision shall be averaged together. The decision shall be binding upon the parties. The decisions of the third party neutral shall be admissible as evidence in a court of law, in camera, should any action be necessary to enforce the terms of this contract.

15. It is the intent of PRPs participating in this Agreement that non-participating PRPs of the Marion-Bragg site be sued by EPA and/or the Steering Committee, if necessary, for

[ 9 ]

their respective liabilities of this site.

16.    The parties to this Agreement agree that this Agreement shall be capable of modification.    Such modification shall only be effective upon unanimous vote of all the parties.

17.    This participation Agreement shall terminate upon final allocation being reached pursuant to this Agreement. However, the parties specifically agree that the following provisions shall survive termination of the Agreement:

   a.  waiver of claims

   b.  binding nature of the allocation

   c.  confidentiality and non-discoverability of the investigation.

This Agreement has been executed by a duly authorized an empowered agent of the PRP.

_____

SIGNATURE

_____

SIGNATURE DATE

_____

EFFECTIVE DATE

[ 10 ]



PARTICIPATION AGREEMENT TIME LINE

their respective liabilities of this site.

16.    The parties to this Agreement agree that this Agreement shall be capable of modification.    Such modification shall only be effective upon unanimous vote of all the parties.

17.    This participation Agreement shall terminate upon final allocation being reached pursuant to this Agreement. However, the parties specifically agree that the following provisions shall survive termination of the Agreement:

a.    Waiver of claims

b.    binding nature of the allocation

c.    confidentiality and non-discoverability of the investigation.

This Agreement has been executed by a duly authorized an empowered agent of the PRP.

_Clement Revetti, Legal Counsel_
SIGNATURE
_Dana Corporation_

_3/28/88_
SIGNATURE DATE

EFFECTIVE DATE

[ 19 ]

their respective liabilities of this site.

16.    The parties to this Agreement agree that this Agreement shall be capable of modification.    Such modification shall only be effective upon unanimous vote of all the parties.

17.    This participation Agreement shall terminate upon final allocation being reached pursuant to this Agreement. However, the parties specifically agree that the following provisions shall survive termination of the Agreement:

a.    waiver of claims

b.    binding nature of the allocation

c.    confidentiality and non-discoverability of the investigation.

This Agreement has been executed by a duly authorized an empowered agent of the PRP.

R. Jeffrey Biller

SIGNATURE

ASST. SEC'Y - OWENS-ILLINOIS, INC.

3/29/88

SIGNATURE DATE

EFFECTIVE DATE

[ 18 ]

their respective liabililties of this site.

16.  The parties to this Agreement agree that this
Agreement shall be capable of modification.  Such modification
shall only be effective upon unanimous vote of all the parties.

17.  This participation Agreement shall terminate upon
final allocation being reached pursuant to this Agreement.
However, the parties specifically agree that the following
provisions shall survive termination of the Agreement:

a.  waiver of claims

b.  binding nature of the allocation

c.  confidentiality and non-discoverability of the
investigation.

This agreement has been executed by a duly authorized and
empowered agent of the PRP.


William H. Trachsel
Vice President and
Deputy General Counsel
United Technologies Corporation


April 7, 1988
DATE


EFFECTIVE DATE


( 10 )

MAR 28 '88 15:51 CORPORATE ENVIROMENTAL PROGRAMS                    P.2/2

their respective liabilities of this site.

16. The parties to this Agreement agree that this Agreement shall be capable of modification. Such modification shall only be effective upon unanimous vote of all the parties.

17. This participation Agreement shall terminate upon final allocation being reached pursuant to this Agreement. However, the parties specifically agree that the following provisions shall survive termination of the Agreement:

a. waiver of claims

b. binding nature of the allocation

c. confidentiality and non-discoverability of the investigation.

This Agreement has been executed by a duly authorized an empowered agent of the PRP.

FOR RCA/GE

_____
SIGNATURE


3/28/88
_____
SIGNATURE DATE


EFFECTIVE DATE


[ 10 ]

their respective liabilities of this site.

16.   The parties to this Agreement agree that this Agreement shall be capable of modification.   Such modification shall only be effective upon unanimous vote of all the parties.

17.   This participation Agreement shall terminate upon final allocation being reached pursuant to this Agreement. However, the parties specifically agree that the following provisions shall survive termination of the Agreement:

a.   waiver of claims

b.   binding nature of the allocation

c.   confidentiality and non-discoverability of the investigation.

This Agreement has been executed by a duly authorized an empowered agent of the PRP.

SIGNATURE _____

*Approve Signature B HB*

SIGNATURE DATE _____

EFFECTIVE DATE _____

*Based on conversation with Brubaker and Jack Heckel, the decision is to proceed and sign —  CRSmith*

[ 16 ]   5/20/88

their respective liabilities of this site.

16.    The parties to this Agreement agree that this Agreement shall be capable of modification.    Such modification shall only be effective upon unanimous vote of all the parties.

17.    This participation Agreement shall terminate upon final allocation being reached pursuant to this Agreement. However, the parties specifically agree that the following provisions shall survive termination of the Agreement:

a.    waiver of claims

b.    binding nature of the allocation

c.    confidentiality and non-discoverability of the investigation.

This Agreement has been executed by a duly authorized an empowered agent of the PRP.

_____
SIGNATURE

_____
SIGNATURE DATE

EFFECTIVE DATE

[ 10 ]

# Attachment 2

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

UNITED STATES OF AMERICA,    )
)
        Plaintiff    )
)
    v.    )
)    CIVIL ACTION NO.
RICHARD YOUNT, <u>et al.</u>,    )
)
        Defendants    )
)
STATE OF INDIANA,    )
)
        Plaintiff    )
)
    v.    )
)
RICHARD YOUNT, <u>et al.</u>,    )
)
        Defendants    )
)
)

<u>CONSENT DECREE</u>

TABLE OF CONTENTS

I.        BACKGROUND                                                          1

II.       JURISDICTION                                                        8

III.      PURPOSE OF THIS DECREE                                              8

IV.       PARTIES BOUND                                                       9

V.        DEFINITIONS                                                         9

VI.       GENERAL PROVISIONS                                                 12

VII.      PERFORMANCE OF THE WORK BY SETTLING DEFENDANTS                     15

VIII.     U.S. EPA PERIODIC REVIEW TO ASSURE PROTECTION
          OF HUMAN HEALTH AND ENVIRONMENT                                   26

IX.       ADDITIONAL WORK                                                    27

X.        QUALITY ASSURANCE                                                  28

XI.       ACCESS, SAMPLING, DOCUMENT AVAILABILITY                           30

XII.      REPORTING REQUIREMENTS                                            33

XIII.     REMEDIAL PROJECT MANAGER/PROJECT COORDINATORS                     35

XIV.      FORCE MAJEURE                                                     36

XV.       DISPUTE RESOLUTION                                                38

XVI.      RETENTION AND AVAILABILITY OF INFORMATION                         41

XVII.     REIMBURSEMENT                                                     43

XVIII.    STIPULATED PENALTIES                                              45

XIX.      COVENANT NOT TO SUE                                               50

XX.       OTHER CLAIMS                                                      53

XXI.      CLAIMS AGAINST THE FUND                                           54

XXII.     INSURANCE/FINANCIAL RESPONSIBILITY                                57

XXIII.    NOTICES                                                           58

XXIV.     CONSISTENCY WITH NATIONAL CONTINGENCY PLAN                        59

-i-

XXV.      RESPONSE AUTHORITY                                          60

XXVI.     MODIFICATION                                                60

XXVII.    PUBLIC PARTICIPATION                                        60

XXVIII.   COMMUNITY RELATIONS                                         61

XXIX.     EFFECTIVE AND TERMINATION DATES                             61

## I.

### BACKGROUND

This Consent Decree is made and entered into by and between the United States of America ("United States") on behalf of the United States Environmental Protection Agency ("U.S. EPA"); the State of Indiana ("State"); Dana Corporation, DiversiTech General, Inc., General Motors Corporation, Owens-Illinois, Inc., RCA Corporation, and Essex Group, Inc., collectively hereinafter the "Generator Defendants;" Richard Yount, hereinafter the "Owner Defendant;" and the City of Marion, Indiana, hereinafter the "City Defendant." These Defendants are collectively referred to as "Settling Defendants."

WHEREAS, the United States Environmental Protection Agency ("U.S. EPA"), pursuant to § 105 of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), 42 U.S.C. § 9605, placed the Marion/Bragg Dump in Grant County, Indiana (the "Facility" as specifically defined in Paragraph V of this Consent Decree) on the National Priorities List, which is set forth at 40 C.F.R. Part 300, Appendix B, by publication in the Federal Register on September 8, 1983, 48 Fed. Reg. 40658 (1983);

WHEREAS, in response to an alleged release or a substantial threat of a release of a hazardous substance at or from the Facility, the U.S. EPA in May, 1985, authorized a Remedial

WHEREAS, in consideration of, and in exchange for, the promises and the mutual undertakings and covenants herein, and intending to be bound legally hereby, the Plaintiffs and the Settling Defendants, by their authorized representatives, have agreed to the entry of this Consent Decree as a final and enforceable Order of this Court.

NOW, THEREFORE, before the taking of any testimony and upon the consent of the parties hereto, it is hereby Ordered, Adjudged and Decreed:

## II.

### JURISDICTION

This Court has jurisdiction over the subject matter herein, and over the parties consenting hereto, pursuant to 42 U.S.C. § 9601 et seq., and 28 U.S.C. §§ 1331 and 1345.  Settling Defendants shall not challenge this Court's jurisdiction to enter and enforce this Consent Decree.

## III.

### PURPOSE OF THIS DECREE

The parties agree that the purpose of this Consent Decree is to insure performance by the Settling Defendants of all work necessary to effectuate the interim remedial actions at the Marion/Bragg facility identified as appropriate in the Record of Decision and in the Remedial Action Plan attached hereto.

-8-

## IV.

### PARTIES BOUND

A.    This Consent Decree applies to and is binding upon the undersigned parties and their successors and assigns.  The undersigned representative of each Settling Defendant, the Attorney General of Indiana, and the Assistant Attorney General of the United States certify that he or she is fully authorized by the party or parties whom she or he represents to enter into the terms and conditions of the Consent Decree and to execute and legally bind that party to it.  Settling Defendants shall provide a copy of this Consent Decree to the principal contractor or contractors hired to perform the work required by this Consent Decree and shall require that contractor to provide a copy thereof to any subcontractor retained to perform any part of the work required by this Consent Decree.

B.    The Settlement Agreements between the Generator Defendants and the City of Marion and Richard Yount, which are attached to this Consent Decree as Appendices H and I, respectively, as between the parties thereto, are enforceable as a part of this Consent Decree.

## V.

### DEFINITIONS

Whenever the following terms are used in this Consent Decree and the Appendices attached hereto, the following definitions apply:

-9-

A.    "Architect" or "Engineer" means the company or companies retained by the Settling Defendants to prepare the construction plans and specifications necessary to accomplish the remedial action described in the ROD and the RAP, which are attached to this Consent Decree as Appendices A and B, respectively.

B.    "City Defendant" means the City of Marion, Indiana.

C.    "Contractor" means the company or companies retained by the Settling Defendants to undertake the Work required by this Consent Decree.  Each contractor and subcontractor shall be qualified to do those portions of the Work for which it is retained.

D.    "Facility" means the "facility" as that term is defined at § 101(9) of CERCLA, 42 U.S.C. § 9601(9), which consists of a site located within the limits of Grant County, Indiana and as shown on the map attached as Appendix C.

E.    "Future liability" refers to liability arising after U.S. EPA's Certification of Completion is issued pursuant to Paragraph XXIX.

F.    "Generator Defendants" means Dana Corporation, General Motors Corporation, DiversiTech General Corporation, Owens-Illinois, Inc., RCA Corporation, and Essex Group, Inc.

G.    "Hazardous substance" shall have the meaning provided in § 101(14) of CERCLA, 42 U.S.C. § 9601(14).

H.    "IDEM" means the Indiana Department of Environmental Management.

-10-

I.   "National Contingency Plan" shall be used as that term is used in § 105 of CERCLA, 42 U.S.C. § 9605.

J.   "Owner Defendant" means Richard Yount.

K.   "Parties" means the United States of America, the State of Indiana and the Settling Defendants.

L.   "Plaintiffs" means the United States of America and the State of Indiana, and their agencies and departments.

M.   "Remedial Action Plan" or "RAP" shall mean the plan for implementation of the interim remedial action determined by the U.S. EPA to be necessary and appropriate through its Record of Decision, including remedial design, remedial action and operation and maintenance of the remedial action at the Facility, which is attached hereto as Appendix B and incorporated herein by reference.

N.   "Response Costs" mean any costs incurred by the United States, the State of Indiana and Generator Defendants pursuant to 42 U.S.C. § 9601 et seq. in connection with the Facility.

O.   "Settling Defendants" shall mean the City Defendant, the Owner Defendant, and the Generator Defendants.

P.   "State" means the State of Indiana.

Q.   "United States" means the United States of America.

R.   "U.S. EPA" means the United States Environmental Protection Agency.

S.   "U.S. DOJ" means the United States Department of Justice.

T.    "Waste Material" means any hazardous substance, as defined by 42 U.S.C. § 9601(14) and any associated contaminated material, or pollutant or contaminant as defined by 42 U.S.C. § 9601(33).

U.    "Work" means the design, construction and implementation, in accordance with Paragraphs VII and VIII hereof, of the tasks described in the Remedial Action Plan, and any schedules or plans required to be submitted pursuant thereto; however, "Work" shall not include operation and maintenance activities at the facility which extend beyond termination of this Consent Decree pursuant to Paragraph XXIX below.

## VI.

### GENERAL PROVISIONS

A.    Commitment of Plaintiffs and Settling Defendants:

1.    Settling Defendants agree to finance and perform the Work as defined in Paragraph V.U., at their expense except for claims made and paid pursuant to Paragraph XXI.

2.    The Work as defined in Paragraph V.U. shall be completed in accordance with the standards and specifications and within the time periods and in accordance with schedules established in Paragraph VII and in the RAP.

B.    Permits and Approvals:

1.    Except as exempted by § 121(e)(1) of CERCLA, 42 U.S.C. § 9621(e)(1), all activities undertaken by the Settling Defendants pursuant to this Consent Decree shall be undertaken in accordance with the requirements of all applicable local,

-12-

in the RD/RA Work Plan and performance standards set forth in the ROD and RAP.

7.    The following tasks shall be performed subject to the conditions set forth in this Paragraph and the requirements of the ROD and the RAP and the purposes and goals of this Decree:

a.    <u>Monitoring</u>

(i)    <u>Description</u>:  The Generator Defendants shall construct, maintain, and periodically sample, in accordance with this Decree including the ROD, at least ten (10) monitoring wells and shall periodically sample the surface waters adjacent to the Facility from at least ten (10) locations to determine any final remedial work that may be required at the Facility and to determine the effectiveness and protectiveness of the interim remedy.  Sampling at each of the locations and wells shall be conducted at least semiannually, and confirmatory samples shall be taken during the quarter following the sampling event that revealed the presence of a parameter requiring such confirmatory sampling.

(ii)    <u>Performance Standard</u>:  Installation, development and sampling of the monitoring wells shall be consistent with and subject to the requirements of "A Compendium of Superfund Field Operations Methods," EPA/540/P-87/001, dated December 1987.  The monitoring points in the adjacent surface waters shall be selected as set forth in the RAP, and sampled in accordance with U.S. EPA guidance

provided to the Generator Defendants or their contractor or contractors.  Analysis of samples collected shall include analysis of priority pollutants, except PCBs and pesticides on such list, and Indiana Department of Environmental Management conventional landfill parameters, including ammonia, and shall be conducted in accordance with the Quality Assurance Project Plan prepared in accordance with the U.S. EPA's 1980 "Interim Guidelines and Specifications for Preparing Quality Assurance Project Plans" and with other applicable guidance provided by the U.S. EPA to the Generator Defendants or their contractor or contractors.  Monitoring shall continue for a period of at least 30 years after the construction of the cap is complete, unless it can be demonstrated to the U.S. EPA's satisfaction that further monitoring is not necessary.

      b.   <u>Fencing</u>

      (i)  <u>Description</u>:  The Generator Defendants shall design and construct, and the City Defendant shall maintain, in accordance with the requirements of this Decree including the ROD, a fence to prevent access to the site.  The fence shall at a minimum be six feet in height, constructed of durable chain link galvanized material, supported at appropriate intervals by steel pipe and shall enclose the area of the Facility as indicated in Appendix C.  Gates shall be provided at appropriate locations, and shall be of like height with the fence and provided with secure means of locking. Generator Defendants shall post, and City Defendant shall

    e.    <u>Flood Protection</u>

        (i)  <u>Description</u>: The Generator Defendants shall, in accordance with this Decree including the ROD, design and construct, and the City Defendant shall maintain, flood protection measures to protect the cap and cover in all areas of the Facility that lie within the 100 year floodplain.

        (ii)  <u>Performance Standard</u>: The flood protection measures are intended to protect the elements constructed in the floodplain, to prevent any washout, erosion or other damage to the cover and cap er to the monitoring wells, during a flood event up to and including a 100 year flood event. These measures may incorporate riprap, additional cover thickness, or other means in accordance with the requirements of Executive Order 11988 and the Indiana Flood Control Act, I.C. 13-2-22.

    f.    <u>Additional Studies</u>

        (i)  <u>Description</u>: The Generator Defendants shall conduct additional studies of the adjacent surface waters (the river, the on-site pond and the large off-site pond near the south boundary of the Facility) to determine that no unacceptable threat to human health or the environment results from release(s) of hazardous substances, pollutants or contaminants from the wastes on the Facility into the environment. These tests shall be performed in accordance with the requirements of the ROD and the RAP.

(ii) <u>Performance Standard</u>:  The performance of the additional studies shall be consistent with and subject to the requirements of "A Compendium of Superfund Field Operations Methods," EPA/540/P-87/001, dated December 1987. The sampling and analysis shall be done in accordance with U.S. EPA guidance provided to the Generator Defendants or their contractors(s) and the site specific Quality Assurance Project Plan ("QAPP"), which will be subject to approval by U.S. EPA in accordance with Paragraph X of this Consent Decree.

g.    <u>Operation and Maintenance</u>

(i)  <u>Description</u>:  The City Defendant shall have primary responsibility and liability for inspection and maintenance of any fence, including signs, the cap, and the flood protection measures that are constructed in accordance with this Decree, including the ROD.  In the event that the City Defendant fails to discharge its obligation hereunder, the Generator Defendants shall be secondarily responsible and liable for such inspection and maintenance, notwithstanding any other provision of this Consent Decree, and the City Defendants shall reimburse the Generator Defendants for all costs incurred by the Generator Defendants in performance of this portion of the Work.

(ii)  <u>Performance Standard</u>:  The fence, including the signs, the cap, and the flood protection measures shall be maintained so that they continue to meet the performance standards for which they were designed and

-25-

constructed, which are set further in subparagraphs (b)(ii),
(c)(ii) and (d)(ii) of this Paragraph, and other applicable
requirements of this Consent Decree, including the ROD and the
RAP.  The fence, including the signs, the cap and the flood
protection measures shall be maintained until it is
demonstrated to U.S. EPA's satisfaction that further
maintenance is not necessary to protect human health or the
environment.

E.   The Parties acknowledge and agree that they believe
that the proper performance of the RAP and the RD/RA Work Plan
will achieve the performance goals and standards set forth in
the ROD and in the Consent Decree.  However, nothing herein
shall foreclose the Plaintiffs, prior to certification of
completion, from seeking performance by the Settling Defendants
of all terms and conditions including the performance goals and
standards of this Consent Decree.

VIII.

## U.S. EPA PERIODIC REVIEW TO ASSURE
## PROTECTION OF HUMAN HEALTH AND ENVIRONMENT

A.   Pursuant to § 121(c) of CERCLA, 42 U.S.C. § 9621(c),
and any applicable regulations, U.S. EPA shall review the
remedial action at the Facility at least every five (5) years
after the entry of this Consent Decree to assure that human
health and the environment are being protected by the remedial
action being implemented.  If upon such review or issuance of
subsequent Records of Decision, U.S. EPA determines that
further response action in accordance with §§ 104 or 106 of

CERCLA, 42 U.S.C. §§ 9604 and 9606, is appropriate at the Facility, the U.S. EPA may take or require such action in a subsequent administrative or judicial action. Generator Defendants reserve any rights they may have to contest or defend against any such action.

B.    Nothing in this Consent Decree shall be construed to require the Generator Defendants to implement additional remedial action beyond that which is necessary to fulfill the requirements of the ROD.

## IX.

### ADDITIONAL WORK

A.    In the event that the U.S. EPA in consultation with the State, or the Generator or City Defendants, determine that additional work, including but not limited to further investigatory work or additional removal or disposal of materials or further protective measures, is necessary to fulfill the requirements of the ROD and the performance standards and requirements of Paragraph VII above, the party or parties making such determination shall promptly notify the other parties in writing. Said written notification shall specify why such additional work is necessary and provide a schedule for completion. Any additional work shall be consistent with the requirements of the NCP. If the Generator or City Defendants do not agree that such additional work is necessary, they shall promptly provide notice pursuant to the

dispute resolution process set forth in Paragraph XV of this
Consent Decree.

B.    Any additional work determined to be necessary by the
Generator or City Defendants shall be subject to the review and
approval of the U.S. EPA in consultation with the State.  Any
disapproval by the U.S. EPA of additional work shall be
accompanied by a statement of basis therefor.

C.    Any additional work determined to be necessary by the
Generator or City Defendants and approved by the U.S. EPA in
consultation with the State, or determined to be necessary by
the U.S. EPA in consultation with the State, shall be completed
by the Generator or City Defendants in accordance with the
standards, specifications and schedules provided by the U.S.
EPA and the State.

## X.

## QUALITY ASSURANCE

Generator Defendants shall follow and apply, in all
monitoring, sampling, and analysis procedures required under
this Consent Decree, quality assurance, quality control, and
chain of custody procedures in accordance with U.S. EPA's
"Interim Guidelines and Specifications For Preparing Quality
Assurance Project Plans," (QAM-005/80) and subsequent
amendments to such guidelines upon notification to Generator
Defendants of such amendments by U.S. EPA.  Generator
Defendants shall only be required to comply with such
amendments for sampling or analyses conducted subsequent to

-28-

or notification is extended to the next working day following the weekend or holiday.

C.    Upon the occurrence of any event during performance of the Work which, pursuant to § 103 of CERCLA, 42 U.S.C. § 9603, requires reporting to the National Response Center, the Settling Defendant responsible for that portion of the Work shall promptly orally notify the U.S. EPA Project Manager ("RPM") and IDEM Project Manager, or in the event of the unavailability of the U.S. EPA RPM, the Emergency Response Section, Region V, United States Environmental Protection Agency, in addition to the reporting required by § 103.  Within 20 days of the onset of such an event, such Defendant shall furnish to plaintiffs a written report setting forth the events which occurred and the measures taken, and to be taken, in response thereto.  Within 30 days of the conclusion of such an event, such Defendant shall submit a report setting forth all actions taken to respond thereto.

D.    Generator Defendants shall report verbally within 5 business days of becoming aware of any event or occurrence which is likely to cause delay in performance of the work.

E.    During the post-termination monitoring period, after the additional studies have been completed, reports must be submitted on an annual basis promptly following the annual monitoring.

-34-

burden of proving that a document is subject to a claim of
privilege shall lie with the party asserting the claim.

XVII.

REIMBURSEMENT

A.    Generator Defendants shall pay all oversight costs of
the United States and the State, not inconsistent with the NCP,
incurred after the entry of this Consent Decree in overseeing
implementation of the Work. Payments shall be made on an
annual basis. The State agrees that it will not engage an
independent contractor to oversee implementation of this Decree.

B.    Payments shall be made as specified in this
subparagraph B. In consideration of and upon payment of all
oversight costs as required by this subparagraph the United
States and the State covenant not to sue any Generator
Defendant for oversight costs incurred in overseeing the Work.
The United States and the State shall submit their oversight
cost claims in January of each year until the Certification of
Completion is signed. The U.S. EPA and the State shall submit
an accounting to the Generator Defendants of all oversight
costs incurred by the U.S. EPA and the State with respect to
this Consent Decree during the previous year. Within ninety
(90) calendar days of receipt of such accounting, the Generator
Defendants shall remit a certified check to the U.S. EPA,
payable to "EPA Hazardous Substances Superfund," and delivered
to the U.S. EPA, Superfund, P.O. Box 371003M, Pittsburgh,
Pennsylvania 15251, and a copy of such check shall be sent to

the Director, Waste Management Division, U.S. EPA Region V, and
to the Assistant Attorney General, Land and Natural Resources
Division, U.S. Department of Justice. The Generator Defendants
shall, within a like period, submit a certified check in the
full amount claimed by the State, to the "Indiana Department of
Environmental Management," which shall be delivered to the
Office of the Attorney General of the State of Indiana. With
respect to oversight costs incurred after January 1 in the
final year of performance under this Consent Decree, at the
time the United States and the State plan to terminate this
Consent Decree, Generator Defendants shall, within thirty (30)
days of the submission of an itemized cost statement and
supporting documentation by the United States and the State,
before termination of this Consent Decree, pay such oversight
costs that are not inconsistent with the NCP. Generator
Defendants reserve the right to contest, through the dispute
resolution process provided in this Consent Decree, whether
such costs were actually and appropriately incurred in
accordance with law in connection with oversight of the work
performed by Settling Defendants under this Consent Decree. On
a quarterly basis, the U.S. EPA shall provide the Generator
Defendants with a computer generated report, currently known as
the SPUR report, listing costs attributable to the Facility.
The State will provide similar accounting information,
documenting its oversight costs, on a quarterly basis.

Defendant's obligations to perform post-termination maintenance
of the fence and signs, cap and flood protection measures,
shall survive the termination of this Consent Decree, and shall
be enforceable by the United States by reinstitution of this
action or by institution of a new action.

IT IS SO ORDERED.

Date: 4, 24-91

_____
United States District Judge

The undersigned Settling Defendant hereby consents to the foregoing Consent Decree in <u>U.S. and State of Indiana v. Richard Yount, et al.</u>

GENERAL MOTORS CORPORATION

By: _____

Date: 9/29/89

# Attachment 3

RECEIVED

MAR 21 1994

LAW DEPT.

IN THE HUNTINGTON CIRCUIT COURT
STATE OF INDIANA
1994 TERM

GENCORP INC.,                          )
GENERAL MOTORS CORP.,                  )
DANA CORPORATION,                      )
OWENS-ILLINOIS, INC., and              )
GENERAL ELECTRIC COMPANY               )
(AS SUCCESSOR TO RCA                   )
CORPORATION),                          )
              Plaintiffs,              )    CAUSE NO. 35C01-9109-CP-00446
                                       )
       v.                              )
                                       )
UNITED TECHNOLOGIES CORP.              )
  (ESSEX GROUP),                       )
              Defendant.               )

## FINAL JUDGMENT BY CONSENT OF ALL PARTIES

All parties having consented hereto, and the Court having determined that entry of this Final Judgment is appropriate based on the facts and applicable law;

It is, therefore, ORDERED, ADJUDGED AND DECREED as follows:

1. Judgment is entered as follows on all of Plaintiffs' claims against Defendant:

a. In satisfaction of Plaintiffs' claims against Defendant for Defendant's alleged breach of the Marion-Bragg PRP Participation Agreement by the underpayment of past assessments by the Marion-Bragg PRP Group ("PRP Group"), within ten (10) days after entry by the Court of this Final Judgment, Defendant shall pay to Plaintiffs the respective amounts as indicated:

To Plaintiff GenCorp, Inc.        $370,591.43
To Plaintiff General Motors Corp. $114,423.86
To Plaintiff Dana Corporation     $ 34,988.11
To Plaintiff Owens-Illinois, Inc. $ 32,782.60
To Plaintiff General Electric Company
 (as successor to RCA Corporation) $164,244.18

After these payments have been completed, all parties including
Defendant will be deemed to have paid in full all assessments
issued by the PRP Group prior to the "1994 Call for Funds," dated
January 13, 1994.

     b.   Defendant shall pay, when due, 27.50% of all
future assessments by the PRP Group; and the balance of such
future assessments shall be paid by Plaintiffs, according to the
respective percentages as indicated:

By Plaintiff GenCorp, Inc.        36.50%
By Plaintiff General Motors Corp. 11.27%
By Plaintiff Dana Corporation      3.44%
By Plaintiff Owens-Illinois, Inc.  3.23%
By Plaintiff General Electric Company
 (as successor to RCA Corporation) 18.06%

     c.   Respecting any amounts obtained by the PRP Group
on account of the PRP Group's pending claim against the Hazardous
Substances Superfund, as authorized by Sections 111(a)(2) and 112
of the Comprehensive Environmental Response, Compensation and
Liability Act, 42 U.S.C. §§ 9601, et seq. ("CERCLA") ("Mixed
Funding Claim"), Defendant shall be entitled to receive from the
PRP Group 27.50%, and Plaintiffs each shall be entitled to
receive their respective percentages as indicated above in
paragraph 1(b); provided, however, that (i) Defendant shall
immediately pay over to Plaintiffs, in the respective amounts as
indicated, the first $200,000.00 which Defendant shall be

-2-

entitled to receive on account of said Mixed Funding Claim

("Supplemental Mixed Funding Shares"):

| | |
|---|---|
| To Plaintiff GenCorp, Inc. | $ 65,000.00 |
| To Plaintiff General Motors Corp. | $ 20,200.00 |
| To Plaintiff Dana Corporation | $  6,200.00 |
| To Plaintiff Owens-Illinois, Inc. | $  5,800.00 |
| To Plaintiff General Electric Company | |
| (as successor to RCA Corporation) | $102,800.00 |
| Total: | $200,000.00 |

and provided further that (ii) if Plaintiffs have not received

their full Supplemental Mixed Funding Shares by December 31,

1994, then Defendant shall pay to each Plaintiff, on or before

January 31, 1995, an amount sufficient to guarantee that each

Plaintiff shall receive its full Supplemental Mixed Funding Share

as provided above in paragraph 1(c)(i), in addition to the

respective amount each Plaintiff shall receive from Defendant

pursuant to paragraph 1(a), above.  After Plaintiffs have

received their full Supplemental Mixed Funding Shares, Defendant

shall be entitled to receive from the PRP Group 27.50% of any and

all amounts obtained by the PRP Group on account of the Mixed

Funding Claim.

    d.    Except as otherwise provided above in paragraph

1(c), respecting any and all amounts obtained by the PRP Group

from parties who are not members of the PRP Group and not parties

to this Final Judgment (including but not limited to non-parties

who are alleged to be liable pursuant to CERCLA Sections 107(a)

or 113(f), 42 U.S.C. §§ 9607(a), 9613(f), for a portion or all of

the costs of the response action performed by the PRP Group at

the Marion-Bragg Superfund Site in Grant County, Indiana),

-3-

Plaintiffs and Defendant each shall be entitled to receive their respective percentages as indicated above in paragraph 1(c).

2.    Defendant shall recover nothing on its claims against Plaintiffs in this action, and all of Defendant's claims, including its Counterclaims and Amended Counterclaims, are dismissed with prejudice.

3.    Plaintiffs' claims against Defendant in this action, including their Complaint, are completely satisfied by and merged into this Final Judgment.

4.    No prejudgment interest is awarded.

5.    No costs or attorneys' fees are awarded.

6.    The parties shall keep confidential the terms of this Final Judgment, except as may be necessary to obtain its enforcement or as may otherwise be required by law.

7.    This Court will retain jurisdiction over this matter to ensure compliance by all parties with this Final Judgment.

Entered this 16th day of March, 1994.

_____

Mark A. McIntosh

The Honorable Mark A. McIntosh, Judge of the Huntington Circuit Court

-4-

CONSENTED TO
AND AGREED:

BY PLAINTIFFS

GENCORP, INC.


BY DEFENDANT

UNITED TECHNOLOGIES CORP.
  (ESSEX GROUP)


/s/  Thomas M. Skove

/a/ William F. Leikin


BOWERS BREWER GARRETT & WILEY
By _____
James W. Bowers, Attorney #286935
301 Warren Street
P.O. Box 269
Huntington, IN  46750


WOODEN MCLAUGHLIN & STERNER
By _____
Douglas B. King, Attorney #519949
1600 Capital Center South
201 North Illinois Street
Indianapolis, IN  46204

Attorneys for Defendant
United Technologies
Corporation


GENERAL MOTORS CORPORATION

/s/ Don A. Schiemann


DANA CORPORATION

/s/ Lisa A. Wurster

-5-

OWENS-ILLINOIS, INC.

/s/ Robert Towles

GENERAL ELECTRIC COMPANY
(as successor to RCA
Corporation)

/s/ Teri R. Simon

BARRETT & MCNAGNY

By _____

Ted S. Miller, Attorney #937235
429 Jefferson Park Mall
P.O. Box 5156
Huntington, IN 46750
(219) 356-7766

Attorneys for all Plaintiffs

SIDLEY & AUSTIN

By _____

Langley R. Shook
1722 Eye Street, N.W.
Washington, D.C. 20006
(202) 736-8197

Attorneys for Plaintiff
General Electric Company

-6-

CONSENTED TO
AND AGREED:

BY PLAINTIFFS

GENCORP, INC.

_Thomas A. Sloan_

BY DEFENDANT

UNITED TECHNOLOGIES CORP.
   (ESSEX GROUP)

_____

BOWERS BREWER GARRETT & WILEY

By _____
James W. Bowers, Attorney #286935
301 Warren Street
P.O. Box 269
Huntington, IN  46750

WOODEN MCLAUGHLIN & STERNER

By _____
Douglas B. King, Attorney #519949
1600 Capital Center South
201 North Illinois Street
Indianapolis, IN  46204

Attorneys for Defendant
United Technologies
Corporation

GENERAL MOTORS CORPORATION

_____

DANA CORPORATION

_____

-5-

MAR 34 09:13 WOODEN MCLAUGHLIN TION                TO 83176396444        PP.2/002/002

CONSENTED TO
AND AGREED:

BY PLAINTIFFS

GENCORP, INC.

_____

BY DEFENDANT

UNITED TECHNOLOGIES CORP.
(ESSEX GROUP)

_____

BOWERS, BREWER GARRETT & WILEY
By James W. Bowers
James W. Bowers, Attorney #286935
301 Warren Street
P.O. Box 269
Huntington, IN 46750

WOODEN MCLAUGHLIN & STERNER

By Douglas B. King /sw
Douglas B. King, Attorney #519949
1600 Capital Center South
201 North Illinois Street
Indianapolis, IN 46204

Attorneys for Defendant
United Technologies
Corporation

GENERAL MOTORS CORPORATION

_____

DANA CORPORATION

_____

-5-

CONSENTED TO
AND AGREED:

BY PLAINTIFFS                    BY DEFENDANT

GENCORP, INC.                    UNITED TECHNOLOGIES CORP.
                                 (ESSEX GROUP)

_____          _____

                                 BOWERS BREWER GARRETT & WILEY

                                 By _____
                                 James W. Bowers, Attorney #286935
                                 301 Warren Street
                                 P.O. Box 269
                                 Huntington, IN  46750

                                 WOODEN MCLAUGHLIN & STERNER

                                 By _____
                                 Douglas B. King, Attorney #519949
                                 1600 Capital Center South
                                 201 North Illinois Street
                                 Indianapolis, IN  46204

                                 Attorneys for Defendant
                                 United Technologies
                                 Corporation

GENERAL MOTORS CORPORATION

_Don A. Schiemann_

DANA CORPORATION

_____

-5-

OWENS-ILLINOIS, INC.

*Robert Towler*

GENERAL ELECTRIC COMPANY
(as successor to RCA
corporation)

_____

BARRETT & McNAGNY

By _____
Tad S. Miller, Attorney #937235
429 Jefferson Park Mall
P.O. Box 5155
Huntington, IN  46750
(219) 356-7766

Attorneys for all Plaintiffs

SIDLEY & AUSTIN

By _____
Langley R. Shook
1722 Eye Street, N.W.
Washington, D.C.  20006
(202) 736-8197

Attorneys for Plaintiff
General Electric Company

-6-

OWENS-ILLINOIS, INC.

---

GENERAL ELECTRIC COMPANY
(as successor to RCA
Corporation)

*Tim R. Simm*

*Counsel, Environmental Matters*

BARRETT & MCNAGNY

By _____
    Ted S. Miller, Attorney #837235
    429 Jefferson Park Mall
    P.O. Box 5156
    Huntington, IN  46750
    (219) 356-7766

    Attorneys for all Plaintiffs

SIDLEY & AUSTIN

By _____
    Langley R. Shook
    1722 Eye Street, N.W.
    Washington, D.C.  20006
    (202) 736-8197

    Attorneys for Plaintiff
    General Electric Company

-6-

# Attachment 4

**MARION BRAGG**
**ESTIMATE OF COSTS**
**TECHNICAL SUPPORT**

| Activities | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | Total (Rounded) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Groundwater and Surface Water Monitoring | | | | | | | | | | | | | | | | | | |
| 5th Quarter Sampling and Reporting | | $25,000 | | | | | | | | | | | | | | | | |
| 5-Year Review Report Sampling and Reporting | $5,000 | | $25,000 | | $45,000 | $5,000 | | $25,000 | | $45,000 | $5,000 | | $25,000 | | $45,000 | $5,000 | | |
| Monitoring Well Abandonment | | | | | | | | | | | | | | | | | | |
| Off-Site Monitoring Wells (3) | $15,000 | | | | | | | | | | | | | | | | | |
| Monitoring Well Maintenance and Replacement | | | | | $30,000 | | | | | | | | | | | | | |
| On-Site Monitoring Wells (All) | | | | | | | | | | | | | | | | | $45,000 | |
| Technical Support/Consulting | $5,000 | $3,750 | $3,750 | $3,750 | $11,250 | $750 | $3,750 | $3,750 | $3,750 | $6,750 | $750 | $3,750 | $3,750 | $3,750 | $6,750 | $1,000 | $6,750 | |
| **Subtotal** | $25,000 | $28,750 | $28,750 | $28,750 | $88,250 | $5,750 | $28,750 | $28,750 | $28,750 | $51,750 | $5,750 | $28,750 | $28,750 | $51,750 | $6,000 | $51,750 | | |
| Escalation (Annual Rate) | 0% | 3% | 3% | 3% | 3% | 3% | 3% | 3% | 3% | 3% | 3% | 3% | 3% | 3% | 3% | 3% | 3% | |
| **Subtotal** | $25,000 | $29,613 | $30,501 | $31,416 | $97,075 | $6,698 | $34,328 | $35,359 | $36,420 | $67,522 | $7,728 | $39,797 | $40,991 | $42,220 | $75,277 | $9,348 | $83,044 | |
| **Subtotal (Annual Rate)** | 0% | 3% | 3% | 3% | 3% | 3% | 3% | 3% | 3% | 3% | 3% | 3% | 3% | 3% | 3% | 3% | 3% | |
| **Subtotal** | $25,000 | $28,750 | $28,750 | $28,750 | $88,250 | $5,750 | $28,750 | $28,750 | $28,750 | $51,750 | $5,750 | $28,750 | $28,750 | $51,750 | $6,000 | $51,750 | | |
| Contingency (10%) | $2,500 | $2,875 | $2,875 | $2,875 | $8,625 | $575 | $2,875 | $2,875 | $2,875 | $5,175 | $575 | $2,875 | $2,875 | $5,175 | $600 | $5,176 | | |
| **Total** | $27,500 | $31,625 | $31,625 | $31,625 | $94,875 | $6,325 | $31,625 | $31,625 | $31,625 | $56,925 | $6,325 | $31,625 | $31,625 | $56,925 | $6,600 | $56,825 | | $500,000 |

**MARION BRAGG**
**ESTIMATE OF COSTS**
**ADMINISTRATIVE SUPPORT**

| Year | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Etheridge & Diamond, PC | $ 16,000 | $ 16,000 | $ 16,000 | $ 16,000 | $ 16,000 | $ 16,000 | $ 16,000 | $ 16,000 | $ 16,000 | $ 16,000 | $ 16,000 | $ 16,000 | $ 16,000 | $ 16,000 | $ 16,000 | $ 16,000 | $ 16,000 |
| Indiana Department of Environmental Management | | | | | | | | | | | | | | | | | |
| Hazardous Substances Response Trust Fund | | | | | | | | | | | | | | | | | |
| EPA | $ 6,500 | $ 6,500 | $ 6,500 | $ 6,500 | $ 6,500 | $ 6,500 | $ 6,500 | $ 6,500 | $ 6,500 | $ 6,500 | $ 6,500 | $ 6,500 | $ 6,500 | $ 6,500 | $ 6,500 | $ 6,500 | $ 6,500 |
| Subtotal | $ 6,000 | $ 6,000 | $ 6,000 | $ 6,000 | $ 6,000 | $ 6,000 | $ 6,000 | $ 6,000 | $ 6,000 | $ 6,000 | $ 6,000 | $ 6,000 | $ 6,000 | $ 6,000 | $ 6,000 | $ 6,000 | $ 6,000 |
| Subtotal | $ 28,500 | $ 28,500 | $ 28,500 | $ 28,500 | $ 28,500 | $ 28,500 | $ 28,500 | $ 28,500 | $ 28,500 | $ 28,500 | $ 28,500 | $ 28,500 | $ 28,500 | $ 28,500 | $ 28,500 | $ 28,500 | $ 28,500 |
| Escalation (Annual Rate) | 0% | 3% | 3% | 3% | 3% | 3% | 3% | 3% | 3% | 3% | 3% | 3% | 3% | 3% | 3% | 3% | 3% |
| Escalation (Annual Rate) | 0% | 3% | 3% | 3% | 3% | 3% | 3% | 3% | 3% | 3% | 3% | 3% | 3% | 3% | 3% | 3% | 3% |
| Deposit (Annual Rate) | 0% | 3% | 3% | 3% | 3% | 3% | 3% | 3% | 3% | 3% | 3% | 3% | 3% | 3% | 3% | 3% | 3% |
| Modified Subtotal | $ 28,500 | $ 29,355 | $ 30,238 | $ 31,143 | $ 32,077 | $ 33,039 | $ 34,030 | $ 35,051 | $ 36,103 | $ 37,186 | $ 38,302 | $ 39,451 | $ 40,634 | $ 41,853 | $ 43,109 | $ 44,402 | $ 45,734 |
| Contingency | $ 2,850 | $ 2,850 | $ 2,850 | $ 2,850 | $ 2,850 | $ 2,850 | $ 2,850 | $ 2,850 | $ 2,850 | $ 2,850 | $ 2,850 | $ 2,850 | $ 2,850 | $ 2,850 | $ 2,850 | $ 2,850 | $ 2,850 |
| Total | $ 31,350 | $ 31,350 | $ 31,350 | $ 31,350 | $ 31,350 | $ 31,350 | $ 31,350 | $ 31,350 | $ 31,350 | $ 31,350 | $ 31,350 | $ 31,350 | $ 31,350 | $ 31,350 | $ 31,350 | $ 31,350 | $ 31,350 |

Subtotal (Rounded)        $ 530,000
Total from previous page    $ 600,000
Grand Total (Rounded)      $1,130,000