# UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

| PROOF OF CLAIM |
| --- |

**Name of Debtor** (Check Only One):

| | Case No. | Your Claim is Scheduled As Follows: |
| --- | --- | --- |
| ☒ Motors Liquidation Company (f/k/a General Motors Corporation) | 09-50026 (REG) | |
| ☐ MLCS, LLC (f/k/a Saturn, LLC) | 09-50027 (REG) | |
| ☐ MLCS Distribution Corporation (f/k/a Saturn Distribution Corporation) | 09-50028 (REG) | **EXHIBIT A** |
| ☐ MLC of Harlem, Inc. (f/k/a Chevrolet-Saturn of Harlem, Inc.) | 09-13558 (REG) | |

NOTE: *This form should not be used to make a claim for an administrative expense arising after the commencement of the case, but may be used for purposes of asserting a claim under 11 U.S.C. § 503(b)(9) (see Item # 5). All other requests for payment of an administrative expense should be filed pursuant to 11 U.S.C. § 503.*

Name of Creditor (the person or entity to whom the debtor owes money or property): DANIELS MOTORS, INC.

Name and address where notices should be sent:

DANIELS MOTORS, INC.
ELIZABETH WINSTON
670 AUTOMOTIVE DR
COLORADO SPRINGS, CO 80905-7347

Telephone number: (719) 632-5591
Email Address: thanken@phillong.com

☒ Check this box to indicate that this claim amends a previously filed claim.

Court Claim Number: 50160
(*If known*)

Filed on: 11/25/09

If an amount is identified above, you have a claim scheduled by one of the Debtors as shown. (This scheduled amount of your claim may be an amendment to a previously scheduled amount. If you agree with the amount and priority of your claim as scheduled by the Debtor and you have no other claim against the Debtor, you do not need to file this proof of claim form, EXCEPT AS FOLLOWS: If the amount shown is listed as DISPUTED, UNLIQUIDATED, or CONTINGENT, a proof of claim MUST be filed in order to receive any distribution in respect of your claim. If you have already filed a proof of claim in accordance with the attached instructions, you need not file again.

Name and address where payment should be sent (if different from above):

Telephone number:

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check this box if you are the debtor or trustee in this case.

**1. Amount of Claim as of Date Case Filed, June 1, 2009:** $ 2,500,000

If all or part of your claim is secured, complete item 4 below; however, if all of your claim is unsecured, do not complete item 4. If all or part of your claim is entitled to priority, complete item 5. If all or part of your claim qualifies as an Administrative Expense under 11 U.S.C. § 503(b)(9), complete item 5.

☐ Check this box if claim includes interest or other charges in addition to the principal amount of claim. Attach itemized statement of interest or charges.

**2. Basis for Claim:** Breach of contract (Dealer Sales and Service Agreement)
(See instruction #2 on reverse side.)

**3. Last four digits of any number by which creditor identifies debtor:** _____

**3a. Debtor may have scheduled account as:** _____
(See instruction #3a on reverse side.)

**4. Secured Claim** (See instruction #4 on reverse side.)
Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.

Nature of property or right of setoff: ☐ Real Estate ☐ Motor Vehicle ☐ Equipment ☐ Other
Describe:

Value of Property: $_____ Annual Interest Rate ____%

Amount of arrearage and other charges as of time case filed included in secured claim, if any: $_____

Basis for perfection: _____

Amount of Secured Claim: $_____ Amount Unsecured: $_____

**6. Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim.

**7. Documents:** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements or running accounts, contracts, judgments, mortgages, and security agreements. You may also attach a summary. Attach redacted copies of documents providing evidence of perfection of a security interest. You may also attach a summary. (*See instruction 7 and definition of "redacted" on reverse side.*)

DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING. (See attached Addendum and documents)

If the documents are not available, please explain in an attachment.

**5. Amount of Claim Entitled to Priority under 11 U.S.C. § 507(a).** If any portion of your claim falls in one of the following categories, check the box and state the amount.

Specify the priority of the claim.

☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries, or commissions (up to $10,950*) earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier – 11 U.S.C. § 507(a)(4).

☐ Contributions to an employee benefit plan – 11 U.S.C. § 507(a)(5).

☐ Up to $2,425* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. § 507(a)(7).

☐ Taxes or penalties owed to governmental units – 11 U.S.C. § 507(a)(8).

☐ Value of goods received by the Debtor within 20 days before the date of commencement of the case - 11 U.S.C. § 503(b)(9) (§ 507(a)(2))

☐ Other – Specify applicable paragraph of 11 U.S.C. § 507(a)(___).

**Amount entitled to priority:**

$_____

*Amounts are subject to adjustment on 4/1/10 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.*

**Signature:** The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any.

Date: 2/14/2011

James T. Flynn, attorney and agent

111 South Tejon, #202
Colorado Springs, CO 80903
(719) 578-8444

| FOR COURT USE ONLY |
| --- |

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.
Modified B10 (GCG) (12/08)

AMENDED

Addendum to Amended Proof of Claim—Daniels Motors, Inc. (Claim No. 50160)

Daniels Motors, Inc. is an eighty year old family business. The current owner of all of the stock of the corporation is Elizabeth Winston Daniels. Daniels Motors, Inc. was an authorized Chevrolet dealer until it was notified in May of 2009 that General Motors was terminating its dealership status. This action on the part of General Motors (now Motors Liquidation Company) constituted a breach of contract in that Daniels Motors, Inc. was a party to a Sales and Service Agreement which did not expire until October of 2010. Furthermore, General Motors had contractually committed to Daniels Motors, Inc. that the Sales and Service Agreement would be renewed at its expiration.

This breach of contract on the part of General Motors, which prohibited Daniels Motors, Inc. from continuing to sell new Chevrolet products, caused Daniels Motors, Inc. to experience devastating operating losses over the next thirteen months. These losses consumed all of the operating capital of the corporation and destroyed its going concern and good will value. The consequence was that Daniels Motors, Inc. was forced to sell its remaining assets to another Colorado car dealership business in July of 2010 for book value.

The operating losses and destruction of going concern/good will value of the business caused by General Motors' breach of contract constitute direct and foreseeable damages to Daniels Motors, Inc. in the amount of not less than $2,500,000.

Attached hereto are copies of the Sales and Service Agreement between General Motors and Daniels Motors, Inc. dated September 28, 2005, wherein a renewal at expiration is "assured"; a copy of the Asset Purchase Agreement and Bill of Sale pursuant to which Daniels Motors, Inc. sold its remaining assets at book value to an affiliate of the Phil Long dealership organization; and a statement from the sole shareholder and president of Daniels Motors, Inc., Elizabeth Daniels Winston, confirming the operating losses of the corporation from June of 2009 through June of 2010. This statement also confirms the loss of the corporation's going concern/good will value as a consequence of General Motors' breach of contract.

Statement of Elizabeth Daniels Winston in support of amended proof of claim of Daniels Motors, Inc. (Claim No. 50160)

I am the sole shareholder of Daniels Motors, Inc., a Chevrolet dealership business that has been in my family for more than 80 years. I am also the sole member of Rival, LLC, which owns the land and building out of which Daniels Motors, Inc. operated its Chevrolet dealership business from 1999 until the sale of the assets of Daniels Motors, Inc. to an affiliate of the Phil Long dealership organization in July of 2010 for book value.

In May of 2009, General Motors breached the Sales and Service Agreement between it and Daniels Motors, Inc. by giving notice that it was terminating the Agreement. During the period from June of 2009 through June of 2010, after which the assets of Daniels Motors, Inc. were sold to a Phil Long affiliate, Daniels Motors, Inc. experienced operating losses totaling $ 1,151,010 . Furthermore, because of General Motors' breach of its contract with Daniels Motors, Inc., the going concern/good will value of this 80 year old business was destroyed, resulting in an asset sale at book value. As between the operating losses incurred by Daniels Motors, Inc. and the destruction of the corporation's going concern/good will value, General Motors' breach of contract has resulted in damages to Daniels Motors, Inc. in the amount of not less than $2,500,000.

Dated: February 8 , 2011

Elizabeth Daniels Winston

# June 2009 thru June 2010
## Profit/Loss Summary

| Year | Month | Profit/Loss | |
|------|-------|-------------|---|
| 2009 | June | ($38,754) | |
| | July | ($4,759) | |
| | August | ($588) | |
| | September | ($76,376) | |
| | October | ($66,528) | |
| | November | ($139,197) | |
| | December (w/LIFO) | ($46,163) | LIFO Reserve adjustment to Profit ($10,119) |
| | | | |
| 2010 | January | ($172,230) | |
| | February | ($128,761) | |
| | March | ($91,956) | |
| | April | ($123,485) | |
| | May | ($108,653) | |
| | June | ($153,560) | |
| | Total Loss | ($1,151,010) | |

GMMS 1012
USA 11/2004

# GENERAL MOTORS CORPORATION
## Dealer Sales And Service Agreement(s)

Effective <u>November 1, 2005</u>, General Motors Corporation, a Delaware Corporation, separately on behalf of its Division(s) identified in the specific Motor Vehicle Addendum(s) for ☒ Chevrolet Passenger Vehicles and Light Duty Trucks, ☐ Chevrolet Medium Duty Trucks, ☐ Pontiac Motor Vehicles, ☐ GMC Light Duty Trucks, ☐ GMC Medium Duty Trucks, ☐ Buick Motor Vehicles, ☐ Cadillac Motor Vehicles, and ☐ HUMMER Motor Vehicles, ("General Motors") and <u>DANIELS MOTORS, INC.</u>, ☐ a proprietorship, ☐ a partnership, or ☒ a <u>COLORADO</u> corporation, ☐ a limited liability company, or ☐ other business entity, doing business as <u>Not Applicable</u> and located at <u>670 AUTOMOTIVE DR, COLORADO SPRINGS, COLORADO, 80906</u>, ("Dealer"), hereby enter into separate Agreement(s) for each Motor Vehicle Line-Make(s) included in the Motor Vehicle Addendum(s) incorporated into this Agreement, and only for the Line-Make(s) included in the Motor Vehicle Addendum(s). The Agreement for each Line-Make is independent and separately enforceable by each party, and the use of this common form is intended solely to simplify execution of the Agreement(s). The parties agree as follows:

## FIRST: TERM OF AGREEMENT(S)

This Agreement(s) shall expire on <u>October 31, 2010</u> unless earlier terminated. Dealer is assured of an opportunity to enter into a new Agreement(s) at the expiration date if General Motors determines that Dealer has fulfilled its obligations under this Agreement(s).

✳

## SECOND: STANDARD PROVISIONS AND RELATED ADDENDA

The Standard Provisions and all of the related Addenda are hereby incorporated as part of this Agreement. The Dealer acknowledges that these documents have been brought to its attention, and Dealer accepts their form, content and amendments thereto, in the prescribed manner, from time to time.

## THIRD: DEALER OPERATOR AND DEALER OWNER

Dealer agrees that the following Dealer Operator will provide personal services in accordance with Article 2 of the Standard Provisions:
<u>ELIZABETH A. WINSTON</u>
_
_

The following Dealer Owner(s) agree that they will comply in all respects with Article 3 of the Standard Provisions:
<u>N/A</u>
_
_

## FOURTH: EXECUTION OF AGREEMENT(S) AND RELATED DOCUMENT(S)

This Agreement(s) and related agreement(s) are valid only if signed:
  (a) on behalf of Dealer by its duly authorized representative, and in the case of this Agreement(s), by its Dealer Operator; and
  (b) this Agreement(s) as set forth below on behalf of General Motors by the Regional General Manager and his authorized representative. All related agreements will be signed by the Regional General Manager or his authorized representative.

## FIFTH: ADDITIONAL AGREEMENTS AND UNDERSTANDINGS
The following agreement(s) are hereby incorporated by reference into this Agreement(s):

<u>DANIELS MOTORS, INC.</u>

Dealer Firm Name

By _____ 9-28-05
Dealer Operator and Date

**GENERAL MOTORS CORPORATION**

By: _____
Regional General Manager

By: _____ 9-28-05
Authorized Representative and Date

# ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement ("Agreement") made this _1ˢᵗ_ day of _June_, 2010 is between Phil Long Dealerships, Inc., a Colorado corporation, organized to do business in the State of Colorado, with its principal place of business located at P. O. Box 85, Colorado Springs, CO 80901 ("PLD"), and/or assigns ("Buyer") and Daniels Motors, Inc., a Colorado corporation, organized to do business in the State of Colorado, with its principal place of business located at 670 and 610 Automotive Drive, Colorado Springs, CO 80905 ("Seller"). This Agreement is binding upon the respective parties, subject to and in conjunction with other documents and agreements between any or all of the parties.

**WHEREAS,** Seller owns and operates an automobile dealership located in Colorado Springs, Colorado, under certain franchises, specifically those granted by General Motors, LLC ("GM"), for the automotive sales, parts sales, and service of Chevrolet products, and further owns and operates a collision repair facility located at 425 E. Fillmore Street, Colorado Springs, CO (collectively referred to as the "Business"); and

WHEREAS, Seller desires to sell to Buyer, and Buyer desires to purchase from Seller certain assets of the Business, as further described in this Agreement.

**NOW, THEREFORE,** in consideration of the promises and mutual covenants herein contained, the parties, intending to be legally bound, do hereby agree that PLD and Seller will form a new Colorado limited liability company, to be known as Daniels Long Chevrolet, LLC ("DLC") on terms to which they mutually agree and that this Agreement will be assigned by PLD to DLC, as Buyer, on or before the date of closing, after which assignment DLC will be the beneficiary of, and be bound by, any and all representations, warranties and covenants of Seller and Buyer under the terms of this Agreement.

## ARTICLE I

### Sale and Purchase of the Assets

<u>Section 1.01</u>: Upon the terms and conditions set forth in this Agreement, Seller agrees to sell,

transfer, convey and assign to Buyer, and Buyer agrees to purchase from Seller, at Closing, certain of
Seller's assets inclusive of those held by Seller at 670 and 610 Automotive Drive, and at Seller's
collision repair facility at 425 E. Fillmore Street (the "Assets"). The Assets will be transferred to
Buyer free of any and all claims, liens and encumbrances of any kind or nature whatsoever except as
otherwise set forth in this Agreement. The assets consist of:

A. Any and all of Seller's fixed operational non-vehicle assets which relate solely to the
Business, including, but not limited to, serviceable tools, special tools, parts (as defined in 1.01 (B)
below) and parts bins relating to the assets being sold to Buyer, and all other fixed assets that are a
part of the existing Business including furniture, fixtures, office equipment, computers, software, and
equipment systems (collectively, the "Operational Non-Vehicle Assets"). The purchase price for the
Operational Non-Vehicle Assets shall be as agreed by the parties, taking into account initial cost,
physical depreciation, and current market value if purchased from another source. If the parties are
unable to agree on a price, the price shall be determined by an independent appraiser acceptable to all
parties.

B. All of Seller's inventory of parts and accessories on hand as of Closing, except that Buyer
shall not be obligated to purchase parts that are unsalable due to damage. Seller agrees to maintain
the parts and accessories inventory at normal operating levels through the Closing. If an inventory
service is used to conduct the final physical inventory for Closing, the cost of the inventory service
shall be paid equally by Buyer and Seller. The purchase price for Seller's inventory of parts and
accessories will be Seller's cost as shown on Seller's most recent balance sheet as of the date of
Closing.

C. All costs and sales records and data, customer lists, vehicle dealer records, service records,
mailing lists, invoices, correspondence, advertising materials and methods, warranty records, and all
other operating data and records of Seller with respect to new and used vehicles sold or serviced or
leased by Seller, including, without limitation, the corresponding customer lists and records, credit
records, lease portfolio lists, whether generated by Seller or any financial institutions or manufacturer
(sales records, customer service files and other similar documents and records) and files concerning
the Seller required to be retained after the Closing by any applicable law or government regulation,
which relate to the Seller subject to any confidentiality or disclosure requirements under federal or
state law (collectively, the "Customer Data"). As to the records of Seller that Buyer is receiving at

Closing, Buyer shall retain such records and lists (collectively, the "Records and Lists") and the Customer Data, and will provide Seller access thereto due to litigation, audits or other such reasonable needs on Seller's part for a period of five (5) years after Closing. Unless required by applicable law, regulation or contractual commitment, Buyer shall not be obligated to maintain any such Records or Lists that are more than five (5) years old. Upon the expiration of the five year period, Buyer shall be entitled to destroy such records without further obligation of any nature to Seller unless such records are necessary for a pending legal or regulatory action. Buyer shall notify Seller of an intent to destroy records and Seller may thereupon elect, at Seller's expense, to take custody of such records.

D. All "New Vehicles," meaning 2009 and later models, including corporate vehicles, which have less than one thousand five hundred (1,500) miles. As used throughout this Agreement, "New Vehicles" will only be new, unregistered, untitled vehicles with less than 1,500 miles, except that Buyer agrees to buy Seller's inventory of demonstrator vehicles pursuant to Paragraph 1.01(G). Any motor vehicle that is not considered a "New Vehicle" as defined in this paragraph shall be considered a used motor vehicle subject to the provisions of Paragraph 1.01(G). The price to be paid for New Vehicles is described in Article II of this Agreement.

E. Orders and contracts for new vehicle sales and service, and parts sales, which are pending and existing at the date of Closing ("Vehicle Contracts"). Vehicle Contracts will be transferred from Seller to Buyer without further consideration.

F. All dealer-installed parts or accessories on New Vehicles being transferred to Buyer. The price for such parts and accessories shall be Seller's net cost, with no mark up for parts and/or labor.

G. All used vehicles. The price for demonstrators and other vehicles that are categorized as used vehicles due to mileage will be Seller's cost, including refurbishing cost, as carried on Seller's most recent balance sheet available at the time of Closing. An inventory of all such used motor vehicles shall be provided to Buyer in advance of Closing.

H. All useable oil and grease at the Business on the Closing Date. The purchase price for oil and grease shall be Seller's actual cost as determined by vendor invoices for such products to Seller. Seller agrees that if any such items not purchased by Buyer hereunder are not removed from the

Business within five (5) days after Buyer takes possession of the premises, those items shall become the property of Buyer without charge and included in the other consideration provided in this Agreement.

I. Current work in process and sublet repair work at time of Closing. The price will be Seller's cost of the labor and parts performed for any uncompleted customer service repair orders in process at the Business on the Closing Date, provided that such work in process and sublet repairs are current and collectible. In regard to such orders, Buyer shall complete such repair work and shall be entitled to collect the entire proceeds covering such repairs from the customers of Seller. "Current" shall be defined as any work, repairs or parts on or to a motor vehicle, which motor vehicle has not been delivered to the customer and which was performed within 30 days of Closing.

J. All of Seller's leasehold improvements at 670 and 610 Automotive Drive, and 425 E. Fillmore. The purchase price for such leasehold improvements shall be as agreed by the parties, taking into account initial cost, physical depreciation, and current market value if purchased from another source. If the parties are unable to agree on a price, the price shall be determined by an independent appraiser acceptable to all parties.

K. All of Seller's goodwill and going concern value, including tradenames, trademarks, web page resources, telephone numbers, prepaid advertising and the like. The parties may allocate a portion of the overall purchase price to these assets if they mutually agree. It is the intention of the parties that a transfer of these assets will not increase the overall purchase price of the assets being purchased and sold hereunder.

**Section 1.02**: There shall not be included in the sale, and Seller will retain, all assets not otherwise specified as being transferred to Buyer in Section 1.01 above. Cash, accounts receivable, Seller's claim in the bankruptcy of the former General Motors corporation, and the like shall not be included in the sale.

**Section 1.03**: Except as specifically stated elsewhere in this Agreement, all liabilities of the Seller are to be retained by the Seller. Seller shall remain responsible for all warranties issued by Seller prior to Closing, with the sole exception of factory warranty work for which Buyer will be reimbursed directly by GM.

## ARTICLE II

### Purchase Price, Consideration and Payment

**Section 2.01:** Other than the purchase price to be paid by Buyer to Seller for New Vehicles, as set forth in Section 2.02 of this Article II, Buyer will purchase such assets of the Seller at the prices or valuation methods set forth in Article I above.

**Section 2.02:** The price for New Vehicles, including demonstrators with less than 1,500 miles, is to be the factory invoice price, less: (1) any holdbacks or allowances of any nature that the manufacturer may have paid to or be holding on behalf of Seller; (2) any applicable demonstrator allowances; (3) any model change allowances, incentives, or holdbacks, whether already paid to Seller or being held for Seller; (4) any advertising fees applicable to such vehicles (rebates from any advertising association on vehicles sold by Seller shall belong to Seller); and (5) preparation fees as to any vehicles being transferred to Buyer where Buyer will have to prepare such vehicles for sale and will not be entitled to receive such preparation fees from GM. Such price will be further increased or decreased by any dealer-added or dealer-deleted accessories at Seller's net cost with no markup for parts and/or labor. Upon Closing, any shortfall between the purchase price and the amount financed on such vehicles will be paid in full by Seller. The above price for such vehicles will also be less any physical damages identified and agreed upon by both Buyer and Seller sustained prior to Closing by the vehicles being purchased,  provided that, if such damage will cost in excess of $1,000 per vehicle to repair, then such vehicle shall be considered a used vehicle pursuant to Section 1.01 G.  In the event Buyer and Seller do not agree on the decrease in price for such physical damage, the Buyer and Seller shall mutually agree on an independent third party who will determine the cost of such physical damage to be deducted from the purchase price. Such determination shall be binding on all parties. Seller will retain all rights to insurance coverage for damaged vehicles, unless the parties otherwise agree.  Seller will reimburse Buyer for any holdbacks received by Seller on any vehicles being purchased which holdbacks arise from delivery of those vehicles by GM after Closing and where such holdbacks on such vehicles have not already been deducted from the purchase price as set forth above in this Section 2.02.

**Section 2.03.** At Closing, Buyer will pay all sums due and owing under the terms of this

Agreement in cash or certified funds or by electronic transfer of immediately available funds through the Federal Reserve System. Buyer understands that Seller will be using proceeds from the Closing to satisfy outstanding liabilities of Seller that are secured by assets being transferred to Buyer hereunder.

**Section 2.04**: Except as otherwise may be set forth in this Agreement, Seller agrees to hold Buyer harmless and provide a full and complete indemnification to Buyer against claims directly arising out of this Agreement which are brought against the Buyer respecting any of the assets being transferred to the Buyer or respecting any other claims of any nature whatsoever against the Buyer resulting from or occurring as a result of this transfer of assets, provided such claim against Buyer has resulted from acts or omissions of Seller. Such indemnification and holding harmless of the Buyer by the Seller are to cover any and all costs, expenses, fees or monies of any kind and nature, including attorney's fees. In the event of any indemnification claim by Buyer, with respect to any indemnifications, warranties or representations made by Seller under this Agreement, Buyer shall, within a reasonable period of time of being apprised of any such claim, advise Seller, in writing, of any such claim. Seller shall have the right to undertake the defense of any such claim, at the sole expense of Seller. In the event that Buyer is called upon to make payment of any such claim or incur any expenses in defending any such claim, Seller shall be responsible for paying such amounts, in full, to Buyer within thirty (30) days of written notification of same by Buyer to Seller.

Except as otherwise set forth in this Agreement, Buyer agrees to indemnify Seller for any and all claims which arise as a result of the breach of any warranty or representation by Buyer in connection with this transaction. Such indemnification and holding harmless of the Seller by the Buyer are to cover any and all costs, expenses, fees or monies of any kind and nature, including reasonable attorney's fees. In the event of any indemnification claim by Seller, with respect to any indemnifications, warranties or representations made by Buyer under this Agreement, Seller shall, within a reasonable period of time of being apprised of any such claim, advise Buyer, in writing, of any such claim. Buyer shall have the right to undertake the defense of any such claim, at Buyer's sole expense. In the event that Seller is called upon to make payment of any such claim or incur any expenses in defending any such claim, Buyer shall be responsible for paying such amounts, in full, to Seller within thirty (30) days of written notification of same by Seller to Buyer.

**Section 2.05**: Seller shall pay all taxes and assessments against the Business and its personal

property being transferred to Buyer applicable to the period prior to Closing, whether or not the same shall have been formally assessed or recorded as a lien as of the time of Closing; provided, however, that Seller shall have the right to pay taxes and assessments after Closing if the amounts are not readily ascertainable or payable prior to Closing.  Buyer shall be responsible for the payment of any sales, use or other taxes assessed in connection with the transfer of assets under this Agreement and in connection with the operation of the Business after Closing.

**Section 2.06**: Seller has agreed to transfer to Buyer customer orders and, in connection with any such transfer, the Seller will transfer to Buyer, the customer cash deposits made in connection therewith at no cost to Buyer.

**Section 2.07**: Seller hereby acknowledges that the Customer Data constitutes a material portion of the purchased assets. Accordingly, the Seller hereby agrees that all rights and interest in and to the Customer Data shall be exclusively vested in Buyer following the Closing, and Seller shall not use such Customer Data following the Closing to target (or directly solicit) any customer of the Business for the purpose of selling or leasing to any such customer a new or used vehicle (even though such solicitation would be for non-GM or used vehicles) or providing vehicle service to any such customer.  Additionally, the Seller shall not retain copies of the Customer Data, and all such information shall become the property of Buyer.

## ARTICLE III

### Seller's Liabilities

**Section 3.01**: Except as otherwise provided in this Agreement, Buyer does not agree to assume any past, current or future responsibility for any of Seller's unpaid taxes, installment sales contracts, leases, labor agreements, payroll and payroll items, vacation pay, sick pay, disability pay, retirement benefits, medical benefits, any and all other fringe benefits and the like, or for any other matters, liabilities, obligations or plans of the Seller; provided, however, that Buyer shall be responsible for any factory authorized warranty work on GM's motor vehicles after the date of Closing. Buyer agrees to consider in good faith the continued employment of Seller's current employees.  Buyer is not, however, obligated to employ any of Seller's current employees other than Elizabeth Daniels Winston, who will be employed in the position of operations manager for DLC, which employment will be for compensation, and pursuant to terms and conditions, customary within

PLD's family of dealerships. At all times during the week immediately prior to Closing, Buyer shall have reasonable access to the managers and key employees of the Seller for the purpose of interviewing them prior to Closing. Employees of Seller who are hired by Buyer will have their years of service honored by Buyer and Buyer will honor accrued vacation and sick leave entitlement for such employees pursuant to Buyer's policies.

Section 3.02: Buyer agrees to assume only the lease of the body shop facility at 425 E. Fillmore, certain Chevrolet sign leases associated with the Business, and other contracts which may be identified prior to Closing and which Buyer agrees to assume. Buyer does not otherwise assume, nor shall Buyer be liable for, any liabilities or contracts of the Seller, nor take title to any of the assets subject to any liens or encumbrances of any kind or nature whatsoever. Seller understands that Buyer does not intend to continue, as a long term activity, operation of Seller's body shop and, both prior to and subsequent to Closing, Seller will cooperate with Buyer in an effort to wind up this aspect of the Business, dispose of its assets and terminate its liabilities, including the lease of the property at 425 E. Fillmore. As to any contracts or leases being assumed by Buyer and as to any claims, charges or obligations made under such contracts or leases prior to Closing which were not known by or disclosed to Buyer prior to Closing, Seller represents, warrants and indemnifies Buyer that Seller has not violated any of the material terms or conditions of any such contract or lease being conveyed, all of the covenants to be performed by the Seller, up to the date of Closing, under such contracts or leases have been fully performed, and no claims have been made or issued for breach of indemnification or notice of default or termination under any such contract or lease. As to any contracts or leases being assumed by Buyer, Buyer shall indemnify and hold Seller harmless from any claims or obligations made under such contracts or leases applicable to the period after Closing. Any refundable deposits made by Seller under any of the contracts and leases assumed by Buyer and which are transferred to Buyer shall be credited to Seller at Closing. The term "Contract" shall include, as applicable, the franchise agreement between Seller and GM.

## ARTICLE IV

### Closing

**Section 4.01**: The Closing shall occur promptly after GM has given its approval for DLC to operate under a GM Sales and Service Agreement as a Chevrolet dealership. The party will cooperate in an effort to obtain such approval on an expedited basis. If such approval has not been received by July 31, 2010, then either party may terminate this Agreement upon ten (10) days prior written notice to the other party. The Closing shall be held at such location and time as may be mutually acceptable to Seller and Buyer. Conditions precedent to Closing are: formation of DLC on terms satisfactory to Seller and Buyer; GM's approval of Buyer as a franchised dealer with a Sales and Service Agreement to be an authorized Chevrolet dealer; approval by the Colorado Department of Revenue and Dealer Licensing Board of the Buyer as a licensed motor vehicle dealer in the State of Colorado; Buyer's ability to obtain satisfactory inventory floor plan financing; the execution of an employment agreement (satisfactory to both parties) with Elizabeth Daniels Winston; the mutually satisfactory assignment of Seller's current lease of, or a mutually satisfactory new lease for, 425 E. Fillmore; and the execution of a sixty (60) month lease (satisfactory to both parties) for 670 and 610 Automotive Drive. Said lease will be on a triple-net basis, and the monthly base rental payments shall not be more than an amount sufficient to service the mortgage loan against 670 and 610 Automotive Drive and provide funds sufficient to cover any income tax liability passing through to Elizabeth Daniels Winston as the sole member of Rival, LLC, the property owner of 670 and 610 Automotive Drive, and will in no event exceed the amount of Fifty-four thousand dollars ($54,000.00) per month. The lease will provide Buyer with an option to renew the lease for an additional five year term, with the base rent adjusted to be an amount sufficient to service the mortgage loan against the property and provide funds sufficient to cover any income tax liability passing through to Elizabeth Daniels Winston as the sole member of Rival, LLC, plus an amount determined by multiplying the percentage increase in the Consumer Price Index (All Items) during the initial five years of the lease by the amount of the base rent at the commencement of the lease. As further conditions precedent, at the Closing, Seller will cause all of the following to be delivered to the Buyer:

A. A resolution adopted by the duly authorized President of Seller approving and authorizing the Seller and its specifically designated officers to enter into this Agreement and consummate the transactions contemplated hereby, accompanied by a Certificate of the Secretary of the Seller, dated

as of the Closing Date, certifying: (i) the date and manner of the adoption of each such resolution; and (ii) that each such resolution is true, complete and in full force and effect, without amendment, as of the date of Closing.

B. Executed copies of all documents required from Seller pursuant to the provisions of this Agreement in order to consummate the transactions to be in effect at the Closing.

C. Such instruments of conveyance, negotiation, assignment and/or transfer as Buyer may reasonably request to accomplish the transfer of the ownership of the assets to the Buyer, including, but not limited to, a Bill of Sale and appropriate Assignments for all unfulfilled retail orders, necessary resolutions of the Seller, and such other Assignments, Bills of Sale and/or documents as Buyer may reasonably request to fully and completely transfer to the Buyer those assets, rights, deposits and claims to which the Buyer is entitled under the terms of this Agreement.

D. If requested by Buyer, Seller will cooperate with Buyer in filing a request for a tax status with the Colorado Department of Revenue.

**Section 4.02:** At the Closing, Buyer will cause all of the following to be delivered to Seller:

A. A resolution adopted by the duly authorized President of PLD to enter into this Agreement and consummate the transactions contemplated hereby, accompanied by a Certificate of the Secretary of PLD, dated as of the Closing Date, certifying: (i) the date and manner of the adoption of each such resolution; and (ii) that each such resolution is true, complete and in full force and effect, without amendment, as of the date of Closing.

B. Executed copies of all documents required from Buyer pursuant to the provisions of this Agreement in order to consummate the transactions to be in effect at the Closing, together with payment of the purchase price for the assets being purchased and sold hereunder.

**Section 4.03:** The day of Closing will be for the account of Buyer. The day immediately preceding Closing will be for the account of Seller.

## ARTICLE V

### Representations and Warranties

**Section 5.01**: The Seller represents, warrants and agrees to and with the Buyer as follows:

A. Seller is and will be through the date of Closing a Colorado corporation duly organized, validly existing and in good standing under the laws of the State of Colorado.

B. Seller has the full and unrestricted right and power: (i) to make and give, and to bind itself by, these representations, warranties and agreements, and (ii) to sell, transfer, convey and assign the assets and contracts to the Buyer subject to the approval and right of first refusal of GM, if any.

C. At Closing, the President of Seller shall have authorized such sale.

D. Seller has or will have at the date of Closing good and merchantable title (and complete right of possession) to all of the assets to be transferred hereunder, and will transfer and convey the assets to the Buyer, free and clear of all liens, claims, encumbrances and charges whatsoever; provided that GM, GMAC and any other financing entity has released any and all security interests they may have in the Seller's assets, which are the subject of this Agreement. The instruments of assignment and transfer delivered by Seller on the date of Closing will be adequate to convey all rights of the Seller in the assets and contracts purchased hereunder.

E. Seller has filed or will duly file all federal, state, and local tax returns, including but not limited to sale and use tax, income tax, unemployment taxes, and FICA, required to be filed by it and has paid or will pay all federal, state, local and withholding taxes required to be paid with respect to the prior tax periods and all periods through the Closing. In the case of any such assessment against Buyer following Closing for periods preceding Closing, Seller shall indemnify and hold Buyer harmless respecting same and pay all expenses incurred as a result thereof.

F. As of the date of Closing, Seller will not have obligations or liabilities which could become a lien or charge against or otherwise affect any of the assets, whether absolute, accrued, contingent or

otherwise, due or to become due, known or unknown.

G. There is not an agreement presently in effect between the Seller and any person, organization, corporation or other entity (except with the Buyer pursuant hereto) pursuant to which the Seller will, upon the occurrence of certain conditions, sell, transfer, convey, assign or in any way encumber the assets, which are being purchased by Buyer under this Agreement, including the request for approval of Buyer to be an authorized Chevrolet dealer with a Sales and Service Agreement granted by GM.

H. The execution, delivery and performance of this Agreement by the Seller has been duly authorized by all necessary corporate action, and neither the execution nor the delivery nor the performance of this Agreement will violate any provisions of federal, state or local law, any order of any court or other governmental agency or authority, whether federal, state or local, the Articles of Incorporation or By-Laws of Seller, or any agreement or other instrument to which the Seller is a party or by which the Seller is bound. This Agreement constitutes the legal, valid and binding obligation of the Seller, enforceable in accordance with the terms hereof.

I. All information and other documents delivered by the Seller to Buyer prior to the date hereof and prior to, and including, the date of Closing are and will be true, complete and accurate, to the best of Seller's knowledge and belief, after diligent inquiry.

J. Seller has, and will, up to and through the date of Closing, maintain, in full force, fire and extended perils insurance covering the assets and general public liability insurance, all of which insurance is in adequate amounts in view of the replacement value of the assets and the risks to which the Seller is subject.

K. To Seller's knowledge, no consent or approval by any governmental agency or authority or any non-governmental person or entity, except for GM, the Colorado Motor Vehicle Dealer Board, and Buyer's inventory floor plan lender is required in connection with the execution, performance and delivery by Seller of this Agreement or the consummation by Seller of the transactions contemplated herein.

L. To Seller's knowledge, Seller is not in violation of any federal, state or local law or

regulatory requirement applicable to the Business. Seller has not received any notice or complaint from any governmental agency or authority in respect of any claim or violation of any law, regulation, order, license, permit, or standard related to any such legal requirement.

M. At the Closing, all assets being purchased by Buyer or covered by any leases as to which Buyer is assuming will be in good working order and state of repair, reasonable wear and tear excepted. If such assets are not in good working order and state of repair, Seller shall have the option to make such repairs as are necessary or to adjust the Purchase Price accordingly.

N. Seller represents that to its knowledge, after due inquiry of its employees, none of the vehicles to be transferred to Buyer have had their odometer tampered with, changed or adjusted in any manner whatsoever and that all such vehicle odometers reflect the actual mileage of said vehicles unless otherwise disclosed on the odometer disclosure form and no vehicles being transferred are "salvage" or "rebuilt from salvage" as that term is defined by Colorado statute or regulation.

O. Seller warrants that on and after the Closing Date, Seller shall execute and deliver such other and further instruments and perform such other acts as may be reasonably requested by Buyer or its counsel to fully effect the clear intent of this Agreement.

P. Seller's representations and warranties shall be deemed to have been made again and as of the Closing Date and shall then be true in all material respects and shall survive Closing.

**Section 5.02:**      Buyer represents, warrants and agrees to and with Seller as follows:

A. Buyer, or Buyer's assignee, will be a Colorado corporation or a Colorado limited liability company and will be duly organized, validly existing and in good standing under the laws of the State of Colorado at the date of Closing;

B. Buyer will, at the date of Closing, be duly authorized to do business in the State of Colorado;

C. Buyer has the full and unrestricted right and power: (i) to make and give, and to bind itself by, these representations, warranties and agreements; and (ii) to purchase and receive the assets and

contracts from the Seller.

D. At Closing, the President, or members and managers, as the case may be, of Buyer shall have authorized such purchase and will have specified the officers or members or managers, as the case may be, of Buyer with the authority to consummate such purchase.

E. The execution, delivery and performance of this Agreement by the Buyer has been duly authorized by all necessary corporate or limited liability company action, as the case may be, and neither the execution nor the delivery, nor the performance of this Agreement will violate any provisions of federal, state or local law, any order of any court or other governmental agency or authority, whether federal, state or local, the Articles of Incorporation or Bylaws or Articles of Organization or Operating Agreement, as the case may be, of Buyer, or any agreement or other instrument to which Buyer is a party or by which Buyer is bound. This Agreement constitutes the legal, valid and binding obligations of Buyer enforceable in accordance with the terms hereof.

F. All information and other documents delivered by Buyer to Seller prior to the date hereof and prior to, and including, the date of Closing are and will be true, complete and accurate, to the best of Buyer's knowledge and belief, after diligent inquiry.

G. To Buyer's knowledge, no consent or approval by any governmental agency or authority or any non-governmental person or entity, except for GM and the Colorado Motor Vehicle Dealer Board, and Buyer's inventory floor plan lender is required in connection with the execution, performance and delivery by Buyer of this Agreement or the consummation by Buyer of the transactions contemplated herein.

H. Buyer warrants that on and after the Closing Date, Buyer shall execute and deliver such other and further instruments and perform such other acts as may be reasonably requested by Seller to fully affect the clear intent of this Agreement.

I. Buyer's representations and warranties shall be deemed to have been made again and as of the Closing Date and shall then be true in all material respects and shall survive Closing.

## ARTICLE VI

### Covenants

**Section 6.01**: Seller covenants and agrees that, from the date of this Agreement until Closing, Seller:

A. Will conduct its Business only in the ordinary course, using all reasonable efforts to retain the goodwill of its suppliers, customers and others having business relations with it;

B. Will not sell or otherwise dispose of any of the assets to be transferred to Buyer under the terms of this Agreement except in the ordinary course of business. Seller shall maintain inventories of new and used motor vehicles as well as parts and accessories in a manner and number which are similar to Seller's past practices in connection with the operation of the Business. As to motor vehicle inventories as well as parts and accessories inventories, Seller shall use commercially reasonable efforts to maintain such inventories with similar vehicles with similar options and similar parts and accessories to achieve a target of a sixty (60) day supply of new vehicles and thirty (30) day supply of used vehicles. (Buyer acknowledges its understanding that Seller's ability to acquire vehicle and parts inventory has been impaired by the suspension of Seller's rights as a Chevrolet dealership arising out of the General Motors bankruptcy.) Seller will not engage in any extraordinary purchases or sales which are not in the ordinary course of business which would significantly increase or decrease such inventories.

C. Will continue to perform all of its material obligations under any and all agreements, contracts or courses of dealing pertaining to its Business.

D. Will maintain fire and extended perils insurance covering the assets and general public liability insurance in reasonable amounts in view of: (i) the replacement value of the assets, and (ii) the risks to which the Seller is subject;

E. Will use its best efforts to obtain consents, authorizations or approvals of any governmental or non-governmental entity necessary for the consummation of the transactions contemplated by this Agreement;

F. Will terminate its Sales and Service Agreement with GM by delivering to GM appropriate letters of termination, conditioned upon the approval of Buyer as a successor Chevrolet dealer by GM upon the Closing as provided in this Agreement.

**Section 6.02**: Buyer covenants and agrees that, from the date of this Agreement through Closing, it:

A. Will use its best efforts to obtain consents, authorizations or approvals of any governmental or non-governmental entity necessary for the consummation of the transactions contemplated by this Agreement;

B. Will promptly do all such reasonable acts and take all such reasonable measures as may be appropriate to enable it to perform as early as possible the agreements, obligations and covenants herein provided to be performed by Buyer, and to enable the conditions precedent to the Closing to be fully satisfied: and,

C. Will keep confidential the Records and Lists, the Customer Data and all books and records provided to it by Seller pursuant to this Agreement, in the event the Closing does not occur for any reason, except to the extent that disclosure is reasonable and appropriate in seeking to enforce any rights of Buyer under this Agreement or to obtain necessary consents.

## ARTICLE VII

### Conditions Precedent To Obligation of Parties

**Section 7.01**: All obligations of the parties under this Agreement are subject to the fulfillment, on or before the Closing, of each of the following conditions:

A. PLD and Seller have formed DLC on terms satisfactory to both parties.

B. The Buyer shall have received from the Seller all documents, opinions, representations and warranties and approvals as required in this Agreement.

C. Buyer shall have received at or prior to Closing, and it is specifically understood and agreed by Seller and Buyer that the sale and purchase herein is subject to: 1) approval by GM of this Agreement and the issuance of a new Dealer Sales and Service Agreement by GM to Buyer; and the approval by GM of the full assignment from Seller to Buyer of any franchise cancellation rights, pursuant to Section 10.08 of this Agreement; and mutual agreement between GM and Buyer as to all requirements and standards required as to issuance of a new Dealer Sales and Service Agreement to Buyer. All such approvals shall be subject only to such terms and conditions as are acceptable to Buyer. 2) Buyer shall have obtained any applicable licenses, permits and governmental or third-party approvals required to be obtained, including those required under state law or the applicable state motor vehicle authorities, and all other governmental authorities with respect to the transactions contemplated in this Agreement in order to commence operation as a dealership. 3) Buyer shall have obtained sufficient inventory floor plan financing satisfactory to Buyer from a lender of Buyer's choice at such interest rate and terms that are acceptable to Buyer in Buyer's sole discretion. 4) The execution of a mutually agreeable employment agreement with Elizabeth Daniels Winston. 5) The execution of a mutually agreeable lease agreement for 670 and 610 Automotive Drive with monthly base rent in an amount no more than sufficient to service the mortgage loan against that property and provide funds sufficient to cover any income tax liability passing through to Elizabeth Daniels Winston as the sole member of Rival, LLC (which is the owner of the property). In no event will said monthly base rent exceed the amount of Fifty-four thousand dollars ($54,000.00). The lease will additionally contain a five year option to renew, as described in Paragraph 4.01. 6) The mutually satisfactory assignment of Seller's current lease of, or a mutually satisfactory new lease for, 425 E. Fillmore.

D. All of the conditions required in this Article VII may be waived in whole or in part by either Buyer or Seller, provided the same is waived in writing prior to or on the date of Closing.

## ARTICLE VIII

### Assignment

**Section 8.01**: PLD shall have the right to, and will prior to Closing, assign this entire Agreement to DLC. The term "Buyer", as used in this Agreement, shall refer to PLD and DLC as

their interests may appear.

## ARTICLE IX

### Attorneys. Brokers and Consultants

Section 9.01: The parties hereto warrant that no person or entity can properly claim a right to a commission, finder's fee, or other compensation based upon the acts of that party with respect to the purchase and sale contemplated herein and each party hereby agrees to mutually indemnify and hold the other harmless from any and all claims. liabilities. costs, including attorney fees, expenses and commissions, resulting from any claim for a commission. fee or other compensation by any party or entity based upon those acts.

## ARTICLE X

### Miscellaneous

Section 10.01: Any notices. requests. demands or other communications hereunder shall be in writing and shall be deemed to have been duly given when mailed by United States registered or certified mail. postage prepaid, or sent by overnight mail delivery, to the following address:

If to the Buyer:        Phil Long Dealerships. Inc
                        1212 Motor City Drive
                        Colorado Springs. CO 80905
                        Attn: Greg Nelson

If to Seller:           Daniels Motors, Inc.
                        670 Automotive Drive
                        Colorado Springs, CO 80905
                        Attn: Elizabeth Daniels Winston

                        With a copy to:
                        Jim Flynn
                        Flynn Wright & Fredman, LLC
                        111 S. Tejon St., Suite 202
                        Colorado Springs, CO 80903

Either party hereto may change its address for notification purposes by giving notice thereof in writing, as aforesaid.

**Section 10.02**: All representations, warranties, covenants and agreements, included or provided in this Agreement or in any Exhibit hereto or instrument of transfer or other certificate or document delivered pursuant hereto, shall survive the Closing.

**Section 10.03**: Each party hereto shall from time to time after Closing, at the reasonable request of the other party and without further consideration, execute and deliver such further instruments of conveyance, assignment, and transfer and take such other action as the other may reasonably request in order to more effectively convey and transfer the assets conveyed hereunder and otherwise to effect the objectives hereof.

**Section 10.04**: This Agreement constitutes the entire agreement between the parties and there are no representations, warranties or covenants except as provided herein. Except as specifically provided herein, this Agreement supersedes all prior agreements, understandings, negotiations and discussions, whether written or oral. This Agreement shall not be modified or amended except by an instrument in writing signed by or on behalf of the parties. This Agreement shall be binding upon and shall inure to the benefit of the parties and their respective successors, assigns and heirs. Nothing in this Agreement is intended or shall be construed to confer upon or to give any person other than the parties, and their personal representatives, successors, assigns and heirs, any rights or remedies under or by reason of this Agreement.

**Section 10.05**: This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Colorado.

**Section 10.06**: Any waiver by any party of any violation of, breach of, or default under any provision of this Agreement shall not be construed as or constitute a waiver of any subsequent violation, breach of, or default under such provision or a waiver of such party's rights under any other provision.

**Section 10.07**: This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Facsimile or scanned signatures shall have the same force and effect as original signatures.

**Section 10.08:** Seller agrees to assign to Buyer its termination rights, if any, for parts returned under the Dealer Sales and Service Agreement with GM, provided that such assignment is permitted by GM.

**Section 10.09:** Upon approval of GM in accordance with the requirements of this Agreement and conditioned upon such approval and the consummation of the transactions contemplated by this Agreement, Seller will submit to the appropriate office of GM such letters of resignation and termination as may be required by GM in order for the Buyer to be approved under the new Dealer Sales and Service Agreement by GM.. No additional consideration will be paid by Buyer to Seller with respect to the Dealer Sales and Service Agreement with GM.

**Section 10.10:** The Seller does assert, warrant and guarantee to the Buyer that it will not have any further claim against the assets being transferred to the Buyer at the time of Closing for any compensation such as employee pay, reimbursement, bonus, or with respect to any of the assets being sold to Buyer, except as to the payment of purchase monies called for under this Agreement and that the same will be true whether their status is as creditor, officer, shareholder, director or employee.

## ARTICLE XI

### Construction

**Section 11.01:** This Agreement constitutes the jointly bargained agreement of the parties and the construction of this Agreement shall not be altered or influenced by the fact or presumption that one party had a greater or lesser hand in drafting this Agreement.

## ARTICLE XII

### Additional Provisions

**Section 12.01:** Except as required by law or as otherwise permitted or contemplated herein in order to consummate the transactions under this Agreement (including, but not limited to, disclosure to lenders, accountants, financial advisors, GM and government authorities), no party shall disclose to any third party this Agreement or its terms or the transactions contemplated herein prior to Closing. The parties agree that they cannot be responsible for the actions of former employees, lenders, financial advisors, governmental authorities, or GM, in connection with this nondisclosure. No party

shall issue any press release or announcement or make any other public disclosure relating to the subject matter of this Agreement prior to the Closing without the prior written approval of the other party, which consent shall not be unreasonably withheld. If a party is required by law to make any such disclosure, it must first promptly notify the other party of such requirement and provide to the other party the content of the proposed disclosure.

**Section 12.02:** Any controversy or claim arising out of or relating to the interpretation, enforcement or breach of this Agreement or relating to the transactions contemplated hereby (other than actions for equitable relief including request for specific performance) shall be resolved by arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association. Arbitration shall be by one arbitrator experienced in the matters at issue and selected by the parties in accordance with the Commercial Arbitration Rules of the American Arbitration Association. The arbitration shall be held in such location in Denver, Colorado as may be specified by the arbitrator (or any place agreed to by the parties and the arbitrator). The parties shall request an arbiter who, if possible, is an attorney with experience in the purchase and sale of automobile dealerships. The decision of the arbitrator shall be final and binding as to any matters submitted to such arbitration; provided, however, if necessary, such decision may be enforced in any court having jurisdiction over the subject matter or over any of the parties to this Agreement. Each party shall pay its own costs and expenses incurred in connection with any such arbitration proceeding (including reasonable attorney's fees) and the filing fees and arbitrator's fees shall be paid one-half by Seller and one-half by the Buyer.

**Section 12.03:** Time is of the essence in this Agreement.

**Section 12.04:** In the event that any term, covenant, condition, agreement, section or provision hereof shall be deemed invalid or unenforceable by an arbitrator or a court of competent jurisdiction, this Agreement shall not terminate or be deemed void or voidable, but shall continue in full force and effect and there shall be substituted for such stricken provision a like but legal and enforceable provision which most nearly accomplishes the intention of the parties hereto.

**Section 12.05:** Seller represents to the Buyer that Seller meets the requirements established by all regulatory agencies governing the operation of the Business, including but not limited to the department of motor vehicles, city and/or county permits and license departments, environmental

protection agency, and other governmental agencies. Seller represents that Seller is not aware of any toxic waste or hazardous waste material on or under any property at which the Business is operated. On request, Seller shall promptly furnish Buyer with a copy of any and all environmental reports and any certificates of compliance regarding the above items. A Phase I study of any of the property where the Business is operated may be ordered for the purpose of assuring the Buyer that no soil contamination exists, the cost of which will be divided equally between the Buyer and the Seller. In the event that a Phase II study is necessary, the cost shall be shared equally by Buyer and Seller. Seller agrees to hold Buyer harmless from any environmental and toxic waste issues based on acts or omissions of Seller occurring prior to Closing.

**Section 12.06:** Seller agrees that Seller will not negotiate with any other party for purchase of the Business once this Agreement is executed, as long as Buyer is not in default and is proceeding in good faith to purchase the assets.

**Section 12.07:** Those continuing expenses which shall become Buyer's obligation after Closing, including but not limited to rent, utilities, and insurance, shall be prorated as of the Closing Date to the extent applicable.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed on the day and year first above written.

SELLER:
Daniels Motors, Inc

Elizabeth Daniels Winston
President

President

**BUYER:**

Phil Long Dealerships, Inc.

Gerald D. Cimino
President

# BILL OF SALE

On this 1st day of July, 2010, for the sum of Two Million, one hundred and sixty-eight thousand and four hundred and ninety-five dollars and ninety-four cents ($2,168,495.94) hereby receipted for and acknowledged, Daniels Motors, Inc., a Colorado corporation ("Seller") sells to Daniels Long Automotive, LLC, a Colorado limited liability company("Buyer") all title and interest in the items listed in the attached Exhibit A, which consists of seven pages..

Seller makes no representation as to the condition of any of these items, but warrants that it has good title to all items and has lawful authority to convey title to such to Buyer. In the event that such title is drawn into question, Seller agrees to defend against any such claim on Buyer's behalf, and Buyer agrees to cooperate fully in such process.

Phil Long Automotive, LLC
Buyer
By:  Gerald D. Cimino, President
Phil Long Dealerships, Inc., Manager

Daniels Motors, Inc.
Seller
Elizabeth Daniels Winston
President

Daniels Pontiac Chevrolet
07/01/10
Exhibit " A "

| | | | | |
|---|---|---|---|---|
| New Vehicle Inventories | $ | 567,862.99 | per worksheets | 30300 |
| Used Vehicle Inventories | $ | 745,892.37 | per worksheets | 30300 |
| Parts Inventory | | $847,076.82 | per physical | 24200, 24400 |
| Fixed assets | $ | 496,408.55 | per 6/30/2010 as agreed* | |
| NV Notes payable | $ | (488,744.79) | | |
| | | $ 2,168,495.94 | Due for buy-sell | |

*includes equip lease $62K-adj: already
included in fixed assets



Company: 125  DANIEL-LONG CHEVROLET LLC                    NV

Accounting Schedule Report: 307 - VEHICLE PURCHASE CLEARING - SUMMARY

Account: 30300 USED VEHICLE PURCHASE CLEARING

| Vehicle | Days | Vehid | Amount $ | Per 31400 | Per Arkona-July | Per Arkona-June | | |
|---|---|---|---|---|---|---|---|---|
| J3195 | 43 | 8F410562 | (42,085.66) | | 41,004.42 | 41,004.42 | (1,081.24) | |
| K4046 | 43 | 9R104070 | (51,973.22) | | 49,592.55 | 49,592.55 | (2,377.65) | |
| K4047 | 43 | 91184200 | (26,387.85) | | 25,041.65 | 25,041.65 | (1,346.20) | |
| K4062 | 43 | 9B387768 | 0.00 | 1,398.47 | | 11,650.48 | 0.00 | |
| K4115 | 43 | 9B619911 | (12,131.28) | | 11,537.41 | 11,537.41 | (593.87) | |
| K4116 | 43 | 9B619517 | (12,131.28) | | 11,537.41 | 11,537.41 | (593.87) | |
| K4121 | 43 | 9R135889 | (53,259.10) | | 51,181.22 | 51,181.22 | (2,071.88) | |
| K4122 | 43 | 94187159 | (28,642.00) | | 27,203.18 | 27,203.18 | (1,438.82) | |
| K17209 | 43 | 98154604 | (22,022.50) | | 22,022.50 | 22,022.50 | 0.00 | |
| L5014 | 43 | AS133756 | (37,506.19) | | 36,154.04 | 36,154.04 | (1,752.15) | |
| L5015 | 43 | A4138194 | 22,959.26 | | 22,268.88 | 22,268.88 | 773.03 | |
| L5016 | 43 | AG212150 | 36,209.74 | | 35,074.69 | 35,074.69 | 1,136.05 | |
| L5017 | 43 | AF133172 | 0.00 | 5,445.07 | | 22,268.88 | 0.00 | |
| L5018 | 43 | A7143495 | (15,995.13) | | 15,517.98 | 15,517.98 | 477.15 | |
| L5023 | 43 | AJ232396 | 0.00 | | 38,778.96 | 38,778.96 | 38,778.96 | Dealer traded |
| | | | | | | | 40,301.78 | |
| L5025 | 43 | A1210299 | 23,295.38 | | 25,901.28 | 25,901.28 | 754.10 | |
| L5026 | 43 | AG212657 | 37,623.74 | | 36,442.69 | 36,442.69 | 1,183.05 | |
| L5027 | 43 | AG245901 | 40,857.34 | | 39,673.49 | 39,673.49 | 1,183.35 | |
| L5030 | 43 | A7124022 | 17,990.35 | | 17,354.93 | 17,354.93 | 637.42 | |
| L5031 | 43 | AR208827 | 50,793.33 | | 49,150.98 | 49,150.98 | 1,512.25 | |
| L5032 | 43 | AZ121609 | 32,725.00 | | 31,719.57 | 31,719.57 | 1,005.55 | |
| L5035 | 28 | AR257313 | 0.00 | 8,527.40 | 7,300.00 | | 1,227.40 | Fleet deal |
| Hold L5023 | | | | | | | 1,222.80 | |
| Hold L5035 | | | | | | | 1,227.40 | |
| | | | | | | | 19,884.14 | |
| | | | 567,362.99 | 15,370.94 | 594,057.81 | 520,877.17 | | |

|  | per ADP | Per Arona |
|---|---|---|
| per gl | 567,862.99 | 594,057.81 |
| L5023 | | (33,778.96) |
| L5035 | | (7,300.00) |
| Holdback | | 19,884.14 |

| 567,862.99 | 567,862.99 |
|---|---|



Company: 125  DANIEL-LONG CHEVROLET LLC                    UV

Accounting Schedule Report: 307 - VEHICLE PURCHASE CLEARING - SUMMARY

Account: 35300 USED VEHICLE PURCHASE CLEARING

| Vehicle | Days | Verxd | Amount $ | Per 31400 | Per Arkona-July | Per Arkona-June | |
|---------|------|-------|----------|-----------|-----------------|-----------------|---|
| 33208 | 43 | 1FV01794 | 0.00 | 2,090.67 | | 5,520.98 | 0.00 |
| 3389 | 43 | 82004588 | (24,838.14) | | 24,838.14 | 24,838.14 | 0.00 |
| 3424A | 43 | 8W296743 | 0.00 | 2,364.70 | | 10,301.25 | 0.00 |
| 3424B | 27 | R7537103 | (1,000.00) | | 1,000.00 | | 0.00 |
| 3481 | 43 | 7J339678 | (30,635.18) | | 30,635.18 | 30,635.18 | 0.00 |
| 3495A | 43 | WJ317444 | (2,500.00) | | | 2,500.00 | (2,500.00) |
| 3497 | 43 | 8A021838 | (18,925.25) | | 18,925.25 | 18,925.25 | 0.00 |
| 3501 | 43 | 62246371 | (21,809.33) | | 21,809.33 | 21,809.33 | 0.00 |
| 3504 | 43 | 91272450 | (14,246.35) | | 14,246.35 | 14,246.35 | 0.00 |
| 3507 | 43 | 67836292 | 0.00 | 4,346.58 | | 11,530.39 | 0.00 |
| 3525 | 43 | 7R333911 | 0.00 | 4,780.50 | | 30,378.45 | 0.00 |
| 3544 | 43 | 6KV60804 | (21,962.95) | | 21,962.95 | 21,962.95 | 0.00 |
| 3545 | 43 | 6S277173 | (24,747.25) | | 24,747.25 | 24,747.25 | 0.00 |
| 3548 | 43 | 82802197 | (22,786.81) | | 22,786.81 | 22,786.81 | 0.00 |
| 3549 | 43 | 7G285209 | 0.00 | 4,115.80 | 0.10 | 28,022.15 | 0.10 |
| 3550 | 43 | 71530970 | (22,394.40) | | 22,394.40 | 22,394.40 | 0.00 |
| 3551 | 43 | A1171557 | (18,197.35) | | 18,197.35 | 18,197.35 | 0.00 |
| 3553 | 43 | YE101650 | (5,656.31) | | 5,656.31 | 5,656.31 | 0.00 |
| 3555 | 43 | 97270306 | (12,469.05) | | 12,469.05 | 12,469.05 | 0.00 |
| 3556 | 43 | 5A025327 | 0.00 | | 15,335.85 | 15,335.85 | 0.00 |
| 3557 | 43 | 6U152734 | (15,302.55) | | 15,802.55 | 15,802.55 | 0.00 |
| 3558 | 43 | 8L612826 | 0.00 | 6,233.65 | | 21,569.26 | 0.00 |
| 3559 | 43 | 56126527 | 0.00 | 7,150.27 | | 11,203.58 | 0.00 |
| 3559A | 41 | 34197123 | 0.00 | 6,663.18 | | | 0.00 |
| 3560 | 43 | 91196782 | 0.00 | 2,433.37 | | 17,543.00 | 0.00 |
| 3562 | 43 | 5C781025 | (15,754.42) | | 15,754.42 | 15,754.42 | 0.00 |
| 3563 | 43 | 4PP52315 | (11,161.00) | | 11,161.00 | 11,161.00 | 0.00 |
| 3564A | 43 | 68207341 | (17,176.75) | | 17,176.75 | 17,176.75 | 0.00 |
| 3565 | 43 | 75012950 | (22,213.32) | | 22,213.32 | 22,213.32 | 0.00 |
| 3566 | 43 | AS553963 | (14,755.60) | | 14,755.60 | 14,755.60 | 0.00 |
| 3567A | 43 | 8M006726 | (23,228.95) | | 23,228.95 | 23,228.95 | 0.00 |
| 3569 | 43 | 74138077 | (13,772.81) | | 13,772.81 | 13,772.81 | 0.00 |
| 3570 | 43 | 64249892 | (10,183.41) | | 10,183.41 | 10,183.41 | 0.00 |
| 3571 | 43 | 6EB61809 | (11,299.25) | | 11,299.25 | 11,299.25 | 0.00 |
| 3572 | 43 | 7F270951 | 0.00 | 3,394.31 | | 12,374.84 | 0.00 |
| 3572A | 20 | YH415746 | (2,000.00) | | 2,000.00 | | 0.00 |
| 3573 | 43 | 9LA08098 | 0.00 | 4,699.96 | | 25,412.00 | 0.00 |
| 3574 | 43 | 8C810961A | (18,732.76) | | 18,732.76 | 18,732.76 | 0.00 |
| 3575 | 43 | 90193758 | (20,459.07) | | 20,459.07 | 20,459.07 | 0.00 |
| 3577 | 43 | 98130410 | (20,560.19) | | 20,560.19 | 20,560.19 | 0.00 |
| 3578 | 43 | 82198548 | (13,825.81) | | 13,825.81 | 13,568.31 | 0.00 |
| 3579 | 43 | 5R192004 | 0.00 | | 19,853.18 | 19,853.18 | 0.00 |
| 3580 | 43 | 79304348 | (15,253.28) | | 15,253.25 | 15,100.00 | (0.03) |
| 3581 | 43 | 7U200755 | (17,231.90) | | 17,231.90 | 16,896.90 | 0.00 |
| 3582 | 43 | 60062979 | (22,325.00) | | 22,325.00 | 21,925.00 | 0.00 |
| 3584 | 43 | 8C101042 | (32,215.02) | | 32,215.02 | 215.02 | 0.00 |



| | | | | | |
|---|---|---|---|---|---|
| 3585 | 43 7S000910 | (20,966.44) | | 966.44 | (20,000.00) |
| 3586 | 43 97265589 | (8,900.00) | | 8,900.00 | 8,525.00 | 0.00 |
| 3587 | 41 78341080 | 0.00 | 5,533.19 | 0.00 | 0.00 | 0.00 |
| 3587A | 41 XC576983 | (500.00) | | 500.00 | | 0.00 |
| 3588 | 43 87168630 | (7,725.00) | | 7,725.00 | 7,725.00 | 0.00 |
| 3589 | 36 71112772 | (24,715.00) | | 24,715.00 | | 0.00 |
| 3590 | 36 A1174854 | 0.00 | | 13,900.00 | | 13,900.00 PD |
| 3591 | 35 5F895585 | 0.00 | 8,213.96 | | 18,750.00 | 0.00 |
| 3592 | 35 55112545 | 0.00 | 3,966.59 | | | 0.00 |
| 3595 | 31 A9165939 | 0.00 | | 32,290.00 | | 32,290.00 PD |
| 3596 | 30 5G199335 | 0.00 | | 15,705.00 | | 15,705.00 PD |
| 3597 | 30 AS140007 | 0.00 | | 24,765.00 | | 24,765.00 PD |
| 3598 | 29 AE013283 | (12,500.00) | | 12,500.00 | | 0.00 |
| 3602 | 23 6FA00398 | (24,000.00) | | 24,000.00 | | 0.00 |
| 3604 | 20 9H507529 | 0.00 | 2,070.95 | | | 0.00 |
| 3604A | 17 74185480 | (7,500.00) | | 7,500.00 | | 0.00 |
| 3605 | 18 51228242 | (8,000.00) | | 8,000.00 | | 0.00 |
| 3606 | 18 A6275715 | (24,000.00) | | 23,850.00 | | (150.00) |
| K4062A | 16 82195040 | (14,900.00) | | 14,900.00 | | 0.00 |
| K4144A | 43 80123001 | 0.00 | 2,371.75 | (23,685.75) | 23,954.25 | 23,585.75 |
| K4144B | 17 2S808979 | (5,000.00) | | 5,000.00 | | 0.00 |
| L5017A | 24 5Z156583 | (5,500.00) | | 5,500.00 | | 0.00 |
| L5024A | 43 49223561 | (5,316.50) | | 5,316.50 | 5,316.50 | 0.00 |
| L5029A | 43 9H703501 | 0.00 | 2,685.81 | | 17,500.00 | 0.00 |
| L5029B | 20 4P703767A | (11,500.00) | | 11,500.00 | | 0.00 |
| L5033A | | | | | 18,598.00 | 0.00 |
| L5034B | 43 6C256294 | (10,000.00) | | 10,000.00 | 10,000.00 | 0.00 |
| | | | | | | 40,324.32 |
| | | 748,542.40 | 73,135.18 | 788,866.72 | 843,887.36 | |

| | PER ADP | PER ARKONA |
|---|---|---|
| per gl | 748,542.40 | 788,866.72 |
| PL Check 1013 | | 13,900.00 |
| PL Check 1017 | | 32,290.00 |
| PL Check 1040 | | 15,705.00 |
| PL Check 1040 | | 24,765.00 |
| Stock 3585 | | 20,000.00 |
| Stock K4144A | | 23,685.75 |
| Stock 3495A | 2,500.00 | |
| Stock 3606 | (150.00) | |
| Stocks 3580, 3549 | 0.03 | 0.10 |
| | 745,892.37 | 745,892.37 |



Parts Inventory

| | | | | | |
|---|---|---|---|---|---|
| Arcona Inventory per gl | $ | 815,540.94 | ADP inventory per gl | $ | (57,711.76) |
| Arcona Inventory per gl | $ | - | ADP inventory per gl | $ | (3,840.95) |
| | | | | | |
| WIP | $ | (1,490.98) | WIP | $ | (18,570.54) |
| Pending Credits-post Phil Long | | | Pending Credits | $ | (12,463.06) |
| Unposted Invoices-Phil Long | | | Unposted Invoices | $ | 30,903.30 |
| Parts sale to Phil Long | | ($847,076.82) | Parts purchase from Daniels | | $847,076.82 |
| | $ | (33,026.86) | | $ | 785,393.81 |
| | | | | | |
| Adjustment to (COS)* | $ | (33,026.86) | Adjustment to (COS) | $ | - |

*Preliminary physical on June 30 2010 showed
excess of $30K on parts pad per the Arkona
system.



Daniels Long Chevrolet
07/01/10
Fixed Assets

## Fixed Assets

| | Original Value | PER CPA | Less Depr. | PER CPA | Total |
|---|---|---|---|---|---|
| Equipment | 1,205,768.16 | 1,205,769.00 | (1,130,690.18) | 75,078.82 | 75,077.98 |
| Leaseholds | 797,527.65 | 665,618.00 | (313,459.00) | 352,059.00 | 484,068.65 |
| Company Vehicles | 191,369.42 | 191,369.00 | (179,107.50) | 12,261.50 | 12,261.92 |
| | | | | | 571,408.55 |
| ( agrees to Daniel's gl ) | | | | | |
| Leaseholds-other property | | elimination of Body Shop | | | (75,000.00) |
| | | ($192,010) | | | 496,408.55 |



New Vehicle Floor Plan

Balance per
Arkona

| | |
|---|---|
| J3195 | (21,042.83) |
| K4046 | (31,183.60) |
| K4047 | (16,133.85) |
| K4062 | (12,131.08) |
| K4115 | (12,131.08) |
| K4116 | (12,131.08) |
| K4121 | (31,963.63) |
| K4122 | (28,642.00) |
| K17209 | (17,696.78) |
| L5014 | (37,306.19) |
| L5015 | (22,969.08) |
| L5016 | 0.00 |
| L5017 | (22,969.08) |
| L5018 | (15,995.13) |
| L5023 | (40,001.76) |
| L5024 | 0.00 |
| L5025 | (26,295.36) |
| L5026 | (37,323.74) |
| L5027 | (40,957.34) |
| L5030 | (17,892.36) |
| L5031 | (50,763.33) |
| L5032 | (32,725.23) |
| L5035 | 0.00 |

| | | |
|---|---|---|
| | (528,746.55) | |
| L5023 | 40,001.76 | Hold per worksheet |
| NV | (488,744.79) | |