**HEARING DATE AND TIME:  March 3, 2011 at 9:45 a.m. (Eastern Time)**

Harvey R. Miller
Stephen Karotkin
Joseph H. Smolinsky
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
                                           :
In re                                      :        **Chapter 11 Case No.**
                                           :
**MOTORS LIQUIDATION COMPANY, *et al.*,**  :        **09-50026 (REG)**
    **f/k/a General Motors Corp., *et al.***  :
                                           :
           **Debtors.**  :        **(Jointly Administered)**
                                           :
------------------------------------------------------------x

## DEBTORS' MEMORANDUM OF LAW IN SUPPORT OF
## CONFIRMATION OF AMENDED JOINT CHAPTER 11 PLAN
## <u>AND RESPONSE TO OBJECTIONS TO PLAN</u>

*Harvey R. Miller*          WEIL, GOTSHAL & MANGES LLP
*Stephen Karotkin*          767 Fifth Avenue
*Joseph H. Smolinsky*       New York, New York 10153
*Michele J. Meises*         212-310-8000 (T)
*Pablo Falabella*           212-310-8007 (F)
    *Of Counsel*

*Attorneys for Debtors*
*and Debtors in Possesion*

PRELIMINARY STATEMENT ................................................................................................ 1

FACTS ...................................................................................................................................... 3

ARGUMENT ............................................................................................................................ 3

I.  THE PLAN SATISFIES  SECTION 1129 OF THE BANKRUPTCY CODE ................. 3

    A.  The Plan Satisfies the Requirements under Section 1129(a) of the
        Bankruptcy Code ................................................................................................... 4

        1.  The Plan Complies with All Applicable Provisions of the
            Bankruptcy Code .................................................................................... 4

        2.  The Debtors Have Complied with the Provisions of the Bankruptcy
            Code ...................................................................................................... 21

        3.  The Plan Has Been Proposed in Good Faith and Not by Any
            Means Forbidden by Law ...................................................................... 23

        4.  The Plan Provides that Payments Made by the Debtors for Services
            or Costs and Expenses Are Subject to Court Approval ......................... 24

        5.  The Debtors Have Satisfied the Requirement to Disclose All
            Necessary Information Regarding Directors, Officers, and Insiders ...... 25

        6.  The Plan Is in the Best Interests of All Creditors .................................. 26

        7.  The Plan Has Been Accepted by Impaired Classes 3 and 5, and as
            to Such Classes, the Requirements of Section 1129(a)(8) Have
            Been Satisfied ........................................................................................ 28

        8.  The Plan Provides for Payment in Full of All Allowed Priority
            Claims ................................................................................................... 29

        9.  At Least One Class of Impaired Claims Has Accepted the Plan ............. 30

        10.  The Plan Is Feasible .............................................................................. 30

        11.  All Statutory Fees Have Been or Will Be Paid ....................................... 32

        12.  The Plan Complies with Section 1129(a)(13) ......................................... 32

    B.  The Plan Satisfies the "Cram Down" Requirements under Section 1129(b)
        of the Bankruptcy Code with Respect to Class 6 (Equity Interests in MLC) ...... 35

        1.  The Plan Does Not Discriminate Unfairly .............................................. 35

        2.  The Plan Is Fair and Equitable ............................................................... 36

II.  THE SETTLEMENTS, RELEASES, EXCULPATIONS, AND INJUNCTIONS
    IN THE PLAN ARE PROPER .......................................................................... 37

    A.  The Settlements, the Releases, the Exculpation, and the Injunction ................... 37

        1.  The Settlements ..................................................................................... 37

        2.  Releases ................................................................................................ 41

        3.  Exculpation ........................................................................................... 43

        4.       Injunctions.............................................................................................. 45

III.    RESPONSE TO OBJECTIONS TO CONFIRMATION ................................................ 46

CONCLUSION.................................................................................................................... 47

## TABLE OF AUTHORITIES

**Page(s)**

### FEDERAL CASES

*In re Adelphia Commc'ns Corp.*,368 B.R. 140 (Bankr. S.D.N.Y. 2007)
    2007), stay temporarily granted, 361 B.R. 337 (S.D.N.Y. 2007), *appeal dismissed*,
    371 B.R. 660 (S.D.N.Y. 2007), *aff'd*, 544 F.3d 420 (2d Cir. 2008)....................................4, 26

*Aetna Cas. & Sur. Co. v. Chateaugay Corp. (In re Chateaugay Corp.)*,
    89 F.3d. 942 (2d. Cir. 1996)...........................................................................................................4, 35

*Airlines Pilot Assoc. Inc. v. Am Nat'l Bank & Trust Co. of Chicago (In re Ionosphere
    Clubs, Inc.)*, 156 B.R. 414 (S.D.N.Y. 1993), *aff'd sub nom. Sobchack v. Am. Nat'l
    Bank & Trust Co. of Chicago (In re Ionosphere Clubs, Inc.)*,
    17 F.3d 600 (2d Cir. 1994) ..............................................................................................................39

*Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*,
    526 U.S. 434 (1999)............................................................................................................................26

*In re Chemtura Corp*., 439 B.R. 561 (Bankr. S.D.N.Y. 2010) ................................3, 10, 23, 24 38

*In re Crowthers McCall Pattern, Inc.*, 120 B.R. 279 (Bankr. S.D.N.Y. 1990) ...........................21

*In re DBSD N. Am., Inc.*, 419 B.R. 179 (Bankr. S.D.N.Y. 2010),
    *aff'd in part and rev'd in part sub nom. DISH Network Corp. v. DBSD N. Am., Inc.
    (In re DBSD N. Am., Inc.)*, No. 10-1175, 2010 U.S. App. LEXIS 27007 (2d Cir. Feb.
    7, 2011) .................................................................................................................................................42

*In re Deltacorp, Inc.* 179 B.R. 773 (Bankr. S.D.N.Y. 1995)...........................................................9

*In re Dow Corning*, 198 B.R. 214 (Bankr. E.D. Mich. 1996) .......................................................38

*In re Drexel Burnham Lambert Group, Inc.*, 138 B.R. 714 (Bankr. SDNY 1992) ......................36

*In re Drexel Burnham Lambert Group Inc.*, 138 B.R. 723 (Bankr. S.D.N.Y. 1992) ...............4, 21

*Drexel  Burnham Lambert Trading Corp. v. Drexel Burnham Lambert Group, Inc. (In re
    Drexel Burnham Lambert Group, Inc.)*, 960 F.2d 285 (2d Cir. 1992) ...................................38

*In re Eagle-Picher Holdings, Inc.*, 345 B.R. 860 (Bankr. S.D. Ohio 2006)................................13

*F.D.I.C. v. Colonial Realty Co.*, 966 F.2d 57 (2d Cir. 1992)...........................................................8

*In re Friese*, 103 B.R. 90 (Bankr. S.D.N.Y. 1989) ........................................................................29

*In re Fur Creations by Varriale, Ltd.*, 188 B.R. 754 (Bankr. S.D.N.Y. 1995)..............................29

*In re H.L.S. Energy Co.*, 151 F.3d 434 (5th Cir. 1998) ................................................................12

*In re Johns-Manville Corp.*, 68 B.R. 618 (Bankr. S.D.N.Y. 1986), *aff'd in part, rev'd in
part on other grounds*, 78 B.R. 407 (S.D.N.Y. 1987), *aff'd sub nom. Kane v. Johns-
Manville Corp.*, 843 F.2d 636 (2d Cir. 1988) .........................................................................36

*In re Journal Register Co.*, 407 B.R. 520 (Bankr. S.D.N.Y. 2009)...............................................31

*JPMorgan Chase Bank v. Charter Commc'ns Operating, LLC (In re Charter Commc'ns)*,
419 B.R. 221 (Bankr. S.D.N.Y. 2009) .......................................................................3, 5, 36, 42

*Kane v. Johns-Manville Corp.*, 843 F.2d 636 (2d Cir. 1988) ....................................................4, 31

*In re Kent Terminal Corp.*, 166 B.R. 555 (Bankr. S.D.N.Y. 1994)................................................3

*In re Leslie Fay Cos. Inc.*, 207 B.R. 764 (Bankr. S.D.N.Y. 1997) ............................................9, 24

*Mac Arthur Co. v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 837 F.2d 89 (2d
Cir. 1988) ................................................................................................................................42

*Machinery Terminals, Inc. v. Woodward (In re Albert-Harris, Inc.)*,
313 F.2d 447 (6th Cir. 1963) ..................................................................................................38

*Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*,
478 F.2d 452 (2d Cir. 2007)..............................................................................................10, 38

*In re Okura & Co. (Am.), Inc.*, 249 B.R. 596 (Bankr. S.D.N.Y. 2000) ........................................21

*In re Oneida Ltd.*, 351 B.R. 79 (Bankr. S.D.N.Y. 2002) ..............................................................45

*In re Owens Corning*, 419 F.3d 195 (3d Cir. 2005)...................................................................8, 9

*Pennsylvania v. Conroy*, 24 F.3d 568 (3d Cir. 1994) ..................................................................12

*Pizza of Haw., Inc. v. Shakey's, Inc. (In re Pizza of Haw., Inc.)*,
761 F.2d 1374 (9th Cir. 1985) ................................................................................................31

*Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v.
Anderson*, 390 U.S. 414 (1968) .............................................................................................38

*In re Purofied Down Prods. Corp.*, 150 B.R. 519 (S.D.N.Y. 1993)..............................................39

*In re PWS Holding Corp.*, 228 F.3d 224 (3d Cir. 2000)...............................................................21

*In re Quigley Co.*, 346 B.R. 647 (Bankr. S.D.N.Y. 2006)...........................................................29

*In re Resorts Int'l, Inc.*, 145 B.R. 412 (Bankr. D.N.J. 1990).......................................................24

*In re Texaco Inc.*, 84 B.R. 893 (Bankr. S.D.N.Y.), *appeal dismissed*, 92 B.R. 38
(S.D.N.Y. 1988) ................................................................................................................25

*Union Savs. Bank v. Augie/Restivo Baking Co. (In re Augie/Restivo Baking Co.)*,
860 F.2d 515 (2d Cir. 1988)...........................................................................................9

*United Sav. Ass'n v. Timbers of Inwood Forest Assocs. (In re Timbers of Inwood Forest
Assocs.)*, 793 F.2d 1380 (5th Cir. 1986), *aff'd*, 808 F.2d 363 (5th Cir. 1987) (en banc),
*aff'd* , 484 U.S. 365 (1988) ............................................................................................37

*United States v. Energy Res. Co.*,495 U.S. 545 (1990)................................................31

*U.S.A. v. LTV Corp. (In re Chateaugay Corp.)*, 944 F.2d 997 (2d Cir. 1991) .......................12, 14

*In re U.S. Truck Co.*, 47 B.R. 932 (E.D. Mich. 1985), *aff'd*, 800 F.2d 581 (6th Cir. 1986) ........31

*In re Wall Tube & Metal Prods. Co.*, 831 F.2d 118 (6th Cir. 1987)............................................12

*WorldCom Inc.*, Ch. 11 Case No. 02-13533,
2003 Bankr. LEXIS 1401 (Bankr. S.D.N.Y. 2003) ...................................................35

*In re Young Broad. Inc.*, 430 B.R. 99 (Bankr. S.D.N.Y. 2010)........................................3

### FEDERAL STATUTES

11 U.S.C. § 105(a) ........................................................................................................9

11 U.S.C. § 327 ...........................................................................................................

11 U.S.C. § 328...........................................................................................................

11 U.S.C. § 330...........................................................................................................

11 U.S.C. § 331 ..........................................................................................................25

11 U.S.C. § 363 ............................................................................................................1

11 U.S.C. § 365 ............................................................................................................7

11 U.S.C. § 503(b) ..................................................................................................25, 30

11 U.S.C. § 507 ..........................................................................................................32

11 U.S.C. § 507(a) ..................................................................................................5, 29, 30

11 U.S.C. § 541(a)(1)..................................................................................................42

11 U.S.C. § 1114 ................................................................................................................33

11 U.S.C. § 1122 ..........................................................................................................4, 5

11 U.S.C. § 1122(a) ...............................................................................................................5

11 U.S.C. § 1123 ..........................................................................................................4, 8

11 U.S.C. § 1123(a) ...............................................................................................................6

11 U.S.C. § 1123(a)(3) ...........................................................................................................6

11 U.S.C. § 1123(a)(4) ...........................................................................................................6

11 U.S.C. § 1123(a)(5)(B) ....................................................................................................21

11 U.S.C. § 1123(a)(5)(C) ......................................................................................................9

11 U.S.C. § 1123(a)(6) ...........................................................................................................7

11 U.S.C. § 1123(a)(7) ...........................................................................................................7

11 U.S.C. § 1123(a)(8) ...........................................................................................................6

11 U.S.C. § 1123(b) .........................................................................................7, 13, 14, 18

11 U.S.C. § 1123(b)(3) ...........................................................................................................7

11 U.S.C. § 1123(b)(3)(A) ....................................................................................................43

11 U.S.C. § 1125 ........................................................................................................21, 22

11 U.S.C. § 1125(b) .............................................................................................................22

11 U.S.C. § 1126 ..................................................................................................................22

11 U.S.C. § 1126(c) .............................................................................................................29

11 U.S.C. § 1126(f) ..............................................................................................................29

11 U.S.C. § 1126(g) .............................................................................................................29

11 U.S.C. § 1129(a) ....................................................................................................3, 4, 21

11 U.S.C. § 1129(a)(1) ..................................................................................................4, 8

11 U.S.C. § 1129(a)(2) ..................................................................................................21, 23

11 U.S.C. § 1129(a)(3) ..................................................................................................23, 24

11 U.S.C. § 1129(a)(4)..................................................................................................24, 25

11 U.S.C. § 1129(a)(5) .................................................................................................25, 26

11 U.S.C. § 1129(a)(6)........................................................................................................4

11 U.S.C. § 1129(a)(7) ...........................................................................................26, 27, 28

11 U.S.C. § 1129(a)(8) ..................................................................................................28, 29

11 U.S.C. § 1129(a)(9) ..................................................................................................29, 30

11 U.S.C. § 1129(a)(9)(C) .................................................................................................30

11 U.S.C. § 1129(a)(10) ....................................................................................................30

11 U.S.C. § 1129(a)(11).........................................................................................30, 31, 32

11 U.S.C. § 1129(a)(13) ..............................................................................................33, 35

11 U.S.C. § 1129(a)(12)....................................................................................................32

11 U.S.C. § 1129(b) ......................................................................................29, 35, 37

11 U.S.C. § 1129(b)(2)(C) .................................................................................................37

11 U.S.C. § 1129(b)(2) ......................................................................................................37

28 U.S.C. § 959(b) .............................................................................................................12

### FEDERAL RULES

Fed. R. Bankr. P. 9019.......................................................................................................38

TO THE HONORABLE ROBERT E. GERBER,
UNITED STATES BANKRUPTCY JUDGE:

Motors Liquidation Company (f/k/a General Motors Corporation) ("**MLC**") and

its affiliated debtors, as debtors and debtors in possession (collectively, the "**Debtors**"),

respectfully represent:

## PRELIMINARY STATEMENT

This Memorandum of Law is submitted on behalf of the Debtors in support of

confirmation of the Debtors' Amended Joint Chapter 11 Plan, dated December 7, 2010 (as the

same has been or may be amended, modified, supplemented, or restated, the "**Plan**"), pursuant to

section 1129 of title 11, United States Code (the "**Bankruptcy Code**").

As a result of the global economic collapse and liquidity crisis that began to

surface during the second half of 2007 and into 2008, General Motors Corporation (now known

as Motors Liquidation Company) and its affiliated debtors commenced these Chapter 11 Cases

with the objective of implementing the only available means to preserve and maximize the value,

viability, and continuation of the Debtors' business and, by extension, preserve and provide jobs

for the Debtors' employees and others, thereby enhancing the interests of their economic

stakeholders – a sale of substantially all their assets pursuant to section 363 of the Bankruptcy

Code to NGMCO, Inc. (now known as General Motors LLC, "**New GM**"), a purchaser

sponsored primarily by the United States Department of the Treasury (the "**U.S. Treasury**," and

the transaction, the "**363 Transaction**").

The 363 Transaction closed on July 10, 2009, and, following the closing, the

Debtors have been winding down their estates, liquidating their remaining assets, and

formulating a plan of liquidation to conclude these Chapter 11 Cases.  The Plan represents the

culmination of efforts by the Debtors, the U.S. Treasury, the official committee of unsecured

creditors (the "**Creditors' Committee**"), the statutory committee of unsecured creditors holding

Asbestos Personal Injury Claims (the "**Asbestos Claimants' Committee**"), the legal

representative for future asbestos claimants (the "**Future Claimants' Representative**"), various

other parties in interest, and their respective advisors, to address the issues critical to developing

and implementing a chapter 11 plan.  As discussed in more detail below, the Plan provides for

the distribution of the Debtors' remaining assets to holders of all Allowed Claims[1] in accordance

with the priorities and provisions of the Bankruptcy Code and various settlements consistent

therewith.  The Plan has been accepted by the Classes of creditors entitled to vote thereon.

   As demonstrated in this Memorandum of Law, the Plan satisfies all applicable

requirements of the Bankruptcy Code for confirmation.  This Memorandum of Law also

responds to the objections to the Plan that have been filed, as set forth in **Exhibit "A"** annexed

hereto (the "**Objections**").

   Of the tens of thousands of creditors, shareholders, and parties in interest in these

cases, only a handful of substantive and/or technical Objections to confirmation of the Plan have

been filed, some of which have been consensually resolved.  As discussed below, and as will be

demonstrated at the hearing to be held regarding confirmation of the Plan (the "**Confirmation

Hearing**"), the unresolved Objections are devoid of merit, should be overruled, and the Plan

should be confirmed.

---

[1] Capitalized terms used herein but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan or the Disclosure Statement for Debtors' Amended Joint Chapter 11 Plan, dated December 8, 2010 (ECF No. 8023) (the "**Disclosure Statement**").

## FACTS

The pertinent facts are set forth in the Disclosure Statement, the Plan, and any testimony and declarations that may be adduced or submitted at the Confirmation Hearing.  Such facts are incorporated herein as if fully set forth herein.

## ARGUMENT

## I.

### THE PLAN SATISFIES
### SECTION 1129 OF THE BANKRUPTCY CODE

To achieve confirmation of the Plan, the Debtors must demonstrate that the Plan satisfies section 1129(a) of the Bankruptcy Code by a preponderance of the evidence.  As the United States Court of Appeals for the Fifth Circuit stated in *Heartland Federal Savings & Loan Ass'n v. Briscoe Enterprises, Ltd. II (In re Briscoe Enterprises, Ltd. II)*:  "The combination of legislative silence, Supreme Court holdings, and the structure of the [Bankruptcy] Code leads this Court to conclude that preponderance of the evidence is the debtor's appropriate standard of proof under both § 1129(a) and in a cramdown."  994 F.2d 1160, 1165 (5th Cir.), *cert. denied*, 510 U.S. 992 (1993); *see In re Chemtura Corp.*, 439 B.R. 561, 608 (Bankr. S.D.N.Y. 2010); *In re Young Broad. Inc.*, 430 B.R. 99, 128 (Bankr. S.D.N.Y. 2010); *JPMorgan Chase Bank v. Charter Commc'ns Operating, LLC (In re Charter Commc'ns)*, 419 B.R. 221 (Bankr. S.D.N.Y. 2009); *see also In re Kent Terminal Corp.*, 166 B.R. 555, 561 (Bankr. S.D.N.Y. 1994) (holding that "the final burden of proof at confirmation hearings remains a preponderance of the evidence").

Through evidence to be presented at the Confirmation Hearing, the Debtors will demonstrate, by a preponderance of the evidence, that all the subsections of section 1129 of the Bankruptcy Code have been satisfied with respect to the Plan.

A.    **The Plan Satisfies the Requirements
Under Section 1129(a) of the Bankruptcy Code**

1.    **The Plan Complies with All
Applicable Provisions of the Bankruptcy Code**

Under section 1129(a)(1) of the Bankruptcy Code, a plan must comply with the

applicable[2] provisions of the Bankruptcy Code.  11 U.S.C. § 1129(a)(l).  The legislative history

of section 1129(a)(1) explains that this provision encompasses the requirements of sections 1122

and 1123 of the Bankruptcy Code governing classification of claims and contents of the plan,

respectively.  *See* H.R. Rep. No. 95-595, at 412 (1977); S. Rep. No. 95-989, at 126 (1978); *see

also Kane v. Johns-Manville Corp.*, 843 F.2d 636, 648-49 (2d Cir. 1988); *In re Drexel Burnham

Lambert Group Inc.*, 138 B.R. 723, 757 (Bankr. S.D.N.Y. 1992).  As demonstrated below, the

Plan complies fully with the requirements of both sections as well as with all other provisions of

the Bankruptcy Code.  *Aetna Cas. & Sur. Co. v. Chateaugay Corp. (In re Chateaugay Corp.)*, 89

F.3d. 942, 949 (2d. Cir. 1996); *see also In re Adelphia Commc'ns Corp.*, 368 B.R. 246-47

(Bankr. S.D.N.Y. 2007) (explaining the law on classification of claims as interpreted within the

Second Circuit*), stay temporarily granted*, 361 B.R. 337 (S.D.N.Y. 2007)*, appeal dismissed*, 371

B.R. 660 (S.D.N.Y. 2007), *aff'd*, 544 F.3d 420 (2d Cir. 2008).

a.    **Classification of Claims and Interests**

Section 1122 of the Bankruptcy Code provides:

(a)    Except as provided in subsection (b) of this section,
a plan may place a claim or an interest in a particular class only if
such claim or interest is substantially similar to the other claims or
interests of such class.

---

[2] The confirmation requirements set forth in subsections (a)(6), (14), (15), and (16) of section 1129 are not
applicable to the Plan.  11 U.S.C. § 1129(a)(6) concerns the need for government approval of rate changes subject to
government regulatory jurisdiction; § 1129(a)(14) concerns debtors required by order or statute to pay domestic
support obligations; § 1129(a)(15) applies to individual debtors; and § 1129(a)(16) is only relevant to the
mechanism by which certain property is transferred.

11 U.S.C. § 1122(a).  Under this section, a plan may provide for multiple classes of claims or

interests as long as each claim or interest within a class is substantially similar to other claims or

interests in that class.

The Plan provides for separate classification of Claims and Equity Interests in six

Classes based upon differences in the legal nature and/or priority of such Claims and Equity

Interests.[3]

- Class 1 provides for the separate classification of Secured Claims, and each Secured Claim shall be deemed to be separately classified in a subclass of Class 1;

- Class 2 provides for the separate classification of all Claims identified in section 507(a) of the Bankruptcy Code that are entitled to priority in payment (other than Administrative Expenses and Priority Tax Claims);

- Class 3 provides for the separate classification of General Unsecured Claims;

- Class 4 provides for the separate classification of Property Environmental Claims;

- Class 5 provides for the separate classification of Asbestos Personal Injury Claims; and

- Class 6 provides for the separate classification of Equity Interests in MLC.

Each of the Claims or Equity Interests in each particular Class is substantially

similar to the other Claims or Equity Interests in such Class.  Accordingly, the classification of

Claims and Equity Interests in the Plan complies with section 1122 of the Bankruptcy Code.  *See*

*In re Charter Commc'ns*, 419 B.R. at 264 n.35 (explaining that debtors "enjoy considerable

discretion when classifying similar claims in different classes").

---

[3] Administrative Expenses (including Administrative Expenses for the total amount due under the DIP Credit Agreement) and Priority Tax Claims are not classified and are separately treated.

b.       **Contents of the Plan**

Section 1123(a) of the Bankruptcy Code sets forth seven requirements with which

the proponent of every chapter 11 plan -- other than individual debtors -- must comply.[4]  11

U.S.C. § 1123(a).  As demonstrated herein, the Plan fully complies with each such requirement.

Article III of the Plan designates Classes of Claims and Equity Interests as

required by section 1123(a)(1).  In addition to Administrative Expenses, Priority Tax Claims, and

DIP Credit Agreement Claims, which need not be designated, Article IV of the Plan designates

six Classes of Claims and Equity Interests. Valid business, factual, and legal reasons exist for

separately classifying the various Classes of Claims and Equity Interests created under the Plan,

and such Classes do not unfairly discriminate between holders of Claims and Equity Interests.

Article III of the Plan specifies that Class 1 (Secured Claims), Class 2 (Priority Non-Tax

Claims), and Class 4 (Property Environmental Claims) are unimpaired under the Plan, as

required by section 1123(a)(1) of the Bankruptcy Code.  Article III of the Plan also designates

Class 3 (General Unsecured Claims), Class 5 (Asbestos Personal Injury Claims), and Class 6

(Equity Interests in MLC) as impaired, and Article IV of the Plan specifies the treatment of

Claims and Equity Interests in such Classes, as required by section 1123(a)(3) of the Bankruptcy

Code.  The Plan provides for the same treatment by the Debtors for each Claim or Equity Interest

in each respective Class unless the holder of a particular Claim or Equity Interest has agreed to a

less favorable treatment of such Claim or Equity Interest, as required by section 1123(a)(4) of the

Bankruptcy Code.

Articles V, VI, VII, VIII, and X and various other provisions of the Plan, as well

as the various documents and agreements set forth in the Plan Supplement and the Exhibits to the

---

[4] An eighth requirement, set forth in 11 U.S.C. § 1123(a)(8), only applies in a case in which the debtor is an
individual.

Plan, set forth the means for implementation of the Plan as required by section 1123(a)(5),
including the deemed consolidation of the Debtors and the establishment of (i) the GUC Trust,
(ii) the Asbestos Trust, (iii) the Environmental Response Trust; and (iv) the Avoidance Action
Trust, as described more fully below.  Although the Plan is a liquidating plan that provides for
the dissolution of the Debtors, MLC will remain in existence until no later than December 15,
2011.  Accordingly, MLC's Restated Certificate of Incorporation will be amended on the
Effective Date to prohibit the issuance of nonvoting equity securities as required by section
1123(a)(6) of the Bankruptcy Code.  The officers and directors of Post-Effective Date MLC will
be a subset of MLC's current officers and directors, and such disclosure satisfies section
1123(a)(7) of the Bankruptcy Code.

Section 1123(b) of the Bankruptcy Code sets forth the permissive provisions that
may be incorporated into a chapter 11 plan.  Each provision of the Plan is consistent with section
1123(b).  Specifically, Article II of the Plan describes the treatment for the following unimpaired
Classes of Claims:  Class 1 (Secured Claims), Class 2 (Priority Non-Tax Claims), and Class 4
(Property Environmental Claims), and Article IV of the Plan describes the treatment for the
following impaired Classes of Claims:  Class 3 (General Unsecured Claims), Class 5 (Asbestos
Personal Injury Claims), and Class 6 (Equity Interests in MLC), as contemplated by section
1123(b)(1).  Article VIII of the Plan provides for the deemed rejection of the executory contracts
and unexpired leases of the Debtors not previously assumed or rejected (or for which a motion
for assumption or rejection is filed no later than thirty days after the Effective Date) under
section 365 of the Bankruptcy Code as contemplated by section 1123(b)(2).  As permitted by
section 1123(b)(3) of the Bankruptcy Code, the Plan provides for several settlements of claims as
described herein.

Based upon the foregoing, the Plan complies fully with the requirements of sections 1122 and 1123, as well as with all other provisions of the Bankruptcy Code, and thus satisfies the requirement of section 1129(a)(1) of the Bankruptcy Code.

### c.    Substantive Consolidation

Section 6.1 of the Plan provides for the deemed substantive consolidation of each of the Debtors and their respective estates into MLC solely for voting, confirmation, and distribution purposes under the Plan and that, solely for such purposes, on and after the Effective Date, (i) all assets and all liabilities of the Debtors shall be deemed merged into MLC, (ii) all guaranties of any Debtor of the payment, performance, or collection of obligations of another Debtor shall be eliminated and canceled, (iii) any obligation of any Debtor and all guaranties thereof executed by one or more of the other Debtors shall be treated as a single obligation, and such guaranties shall be deemed a single Claim against the consolidated Debtors, (iv) all joint obligations of two or more Debtors and all multiple Claims against such entities on account of such joint obligations shall be treated and allowed only as a single Claim against the consolidated Debtors, (v) all Claims between or among the Debtors shall be canceled, and (vi) each Claim filed in the Chapter 11 Case of any Debtor shall be deemed filed against the consolidated Debtors and a single obligation of the consolidated Debtors on and after the Effective Date.

Substantive consolidation of two or more debtors' estates generally results in the consolidation of the assets and liabilities of the debtors, the elimination of intercompany claims, subsidiary equity ownership interests, multiple and duplicative creditor claims, joint and several liability claims and guarantees, and the payment of allowed claims from a common fund. *See In re Owens Corning,* 419 F.3d 195, 205 (3d Cir. 2005); *F.D.I.C. v. Colonial Realty Co.*, 966 F.2d

57, 58-59 (2d Cir. 1992); *Union Savs. Bank v. Augie/Restivo Baking Co. (In re Augie/Restivo Baking Co.)*, 860 F.2d 515, 518 (2d Cir. 1988).

The plain text of the Bankruptcy Code contemplates that a consolidation may appropriately be used to effectuate a plan of liquidation. *See* 11 U.S.C. § 1123(a)(5)(C). However, numerous courts have also held that section 105(a) of the Bankruptcy Code, which provides, in pertinent part, that the "court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title," 11 U.S.C. § 105(a), empowers a bankruptcy court to authorize substantive consolidation. *See Owens Corning*, 419 F.3d at 210; *Augie/Restivo*, 860 F.2d at 518 n.1; *In re Leslie Fay Cos. Inc.*, 207 B.R. 764, 779 (Bankr. S.D.N.Y. 1997); *In re Deltacorp, Inc.*, 179 B.R. 773, 777 (Bankr. S.D.N.Y. 1995).

The substantive consolidation proposed in the Plan has three major effects. First, it eliminates any intercompany Claims from the treatment scheme. Second, it eliminates guaranties of the obligations of one Debtor by another Debtor. Thus, any joint and several liability of any of the Debtors shall be deemed to be one obligation of the consolidated Debtors. Finally, each Claim filed against any of the Debtors would be considered to be a single Claim against the consolidated Debtors. The substantive consolidation will eliminate multiple and duplicative Claims as well as joint and several liability claims, and will afford payment of Allowed Claims against each of the Debtors from a common fund.

Under the circumstances of these Chapter 11 Cases, it would be inefficient to propose, vote on, and make distributions in respect of entity-specific Claims. The substantive consolidation of the Debtors will not have a material impact on the holder of any Allowed Claim. Furthermore, no creditor will receive a recovery inferior, in any meaningful way, to that which it would receive if the Debtors proposed a plan that was completely separate as to each Debtor. If

substantive consolidation is not approved, certain creditors of the Debtors, other than MLC, representing a *de minimis* amount of Claims overall, may not receive any distribution under the Plan.

In view of the foregoing, the fact that the consideration components of the 363 Transaction were paid to all the Debtors unallocated, and the immense size of the MLC creditor pool compared to the other Debtors, the Debtors believe that creditors would not be prejudiced by the substantive consolidation proposed in the Plan.  Moreover, no creditor has objected to substantive consolidation as provided in the Plan.

### d.    <u>Settlements</u>

The Plan is the result of protracted negotiations with the Debtors' various creditors and parties in interest, including various state and federal governmental units and regulators, that has resulted in several consensual agreements.  The Debtors have entered into various settlements from the inception of these Chapter 11 Cases outside of the Plan, and in many instances, outside of this Courts' oversight as permitted by various procedural orders. These settlements have preserved the precious resources of the Debtors, minimized the use of the judicial process to resolve disputes, and cleared the path for the efficient administration of the Debtors' estates.  *See Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.2d 452, 455 (2d Cir. 2007); *In re Chemtura Corp.*, 439 B.R. at 595 ("As a general matter, settlements or compromises are favored in bankruptcy and, in fact, encouraged") (citation omitted).  Now, the Debtors seek approval of certain additional settlements that are the cornerstone of the Plan.

(1)    <u>Settlement of Property Environmental Claims</u>

From the time leading up to the commencement of the Chapter 11 Cases, the

Debtors have engaged in a rigorous assessment of the scope and potential costs associated with

the Debtors' environmental remediation obligations.  Settlement of the Debtors' administrative

expense liability to a variety of governmental agencies for cleanup of property was arguably the

largest issue facing the Debtors' estates.  The Debtors' review of their potential environmental

liability and their subsequent development of appropriate remediation plans necessitated an open

exchange of information with federal and state governmental authorities and was designed so

that the Debtors' environmental obligations could be discharged in a way that protects public

health and the environment while being consistent with the interests of creditors and the Debtors'

rights and obligations under the Bankruptcy Code.  The Debtors and the various federal and state

governmental parties ultimately reached a consensus on cost projections for conducting

environmental remediation and monitoring at the facilities.  It was agreed that a specialized trust

would be created and funded to own and remediate the Debtors' properties.  Throughout this

process, the Debtors also worked cooperatively with the Creditors' Committee and other parties

to evaluate and develop these work plans.

(a)    Environmental Response Trust
<u>Consent Decree and Settlement Agreement</u>

On October 20, 2010, the Debtors reached an agreement (the "**Environmental**

**Response Trust Consent Decree and Settlement Agreement**") with the U.S. Treasury, on

behalf of the United States Environmental Protection Agency (the "**U.S. EPA**"), certain States,

and the St. Regis Mohawk Tribe to establish an Environmental Response Trust for certain

Environmental Response Trust Properties in Delaware, Illinois, Indiana, Kansas, Louisiana,

Massachusetts, Michigan, Missouri, New Jersey, New York, Ohio, Pennsylvania, Virginia, and

Wisconsin (the "**Environmental Response Trust Properties**").  The United States lodged the Environmental Response Trust Consent Decree and Settlement Agreement (ECF No. 7452) on October 20, 2010, a copy of which is annexed to the Plan as Exhibit "C."

The Environmental Response Trust Consent Decree and Settlement Agreement dictates that MLC fund the Environmental Response Trust with approximately $511 million to cover remedial costs and Governmental Authority oversight costs for the Environmental Response Trust Properties  (subject to certain adjustments to reflect payments made prior to the Effective Date) and an additional $262 million in Cash and other assets that will be used to cover various administrative activities of the Environmental Response Trust.[5]  Once the Environmental Response Trust is funded according to the terms of the Environmental Response Trust Consent Decree and Settlement Agreement, the Property Environmental Claims relating to the Environmental Response Trust Properties will be deemed settled and fully satisfied.

The Environmental Response Trust Consent Decree and Settlement Agreement has been the foundation of, and a critical factor in, the formulation of the Debtors' Plan because it was the only way for the Debtors' owned sites to satisfy (a) the U.S. EPA's administrative expense claim for remediation of environmental liabilities, and (b) the Debtors' obligation to manage their property in accordance with applicable nonbankruptcy law, including environmental statutes and regulations.  *See* 28 U.S.C. § 959(b); *see also In re H.L.S. Energy Co.*, 151 F.3d 434, 438 (5th Cir. 1998); *Pennsylvania v. Conroy*, 24 F.3d 568, 569-70 (3d Cir. 1994); *In re Chateaugay Corp.*, 944 F.2d 997, 1009-10 (2d Cir. 1991); *In re Wall Tube & Metal*

---

[5] For a detailed description of the terms of the Environmental Response Trust Consent Decree and Settlement Agreement, *see* United States' Statement in Support of Environmental Provisions of Debtors' Plan of Liquidation, Response to Public Comment and Joinder in Debtors' Request for Approval of the Environmental Response Trust Consent Decree and Settlement Agreement among Debtors, the Environmental Response Trust Administrative Trustee, the United States, Certain States and State Environmental Agencies, and the St. Regis Mohawk Tribe Incorporated In Debtors' Plan (ECF No. 9311).

*Prods. Co.*, 831 F.2d 118, 123-24 (6th Cir. 1987).  Moreover, any Plan would have to provide

that property of the estate comply with applicable law.  *In re Eagle-Picher Holdings, Inc.*, 345

B.R. 860 (Bankr. S.D. Ohio 2006) (finding that real property trust must be funded to comply

with environmental law in order to meet requirement that plan not be forbidden by law).  As

demonstrated in Part II of this Memorandum of Law, the Environmental Response Trust Consent

Decree and Settlement Agreement should be approved pursuant to section 1123(b) and

Bankruptcy Rule 9019.

(b)      The Priority Order Sites Consent
Decrees and Settlement Agreements

On or about December 14, 2010, the Debtors reached six agreements

(collectively, the "**Priority Order Sites Consent Decrees and Settlement Agreements**") with

the U.S. Treasury, on behalf of the U.S. EPA, as well as the states of Iowa, Indiana, Ohio, and

Wisconsin asserting environmental liabilities under the Comprehensive Environmental Response

Compensation, and Liability Act of 1980, as amended ("**CERCLA**"), 42 U.S.C. §§ 6901-9675,

and the Resources Conservation and Recovery Act ("**RCRA**"), 42 U.S.C. §§ 6901-6992, and

analogous state laws in connection with six properties (the "**Priority Order Sites**") at which

MLC is both under a judicial or administrative order to perform cleanup[6] and is the sole viable

potentially responsible party to carry out that cleanup.[7]

       Under the Priority Order Sites Consent Decrees and Settlement Agreements, the

Debtors will pay approximately $25 million in cash on the Effective Date to resolve their

liability under cleanup orders at the Priority Order Sites.  In addition, the U.S. Government will

receive an Allowed General Unsecured Claim in the amount of $3,046,868 for its unreimbursed

past costs and future oversight costs, and the State of Ohio will receive an Allowed General

Unsecured Claim in the amount of $134,326 for its unreimbursed past costs at the Garland Road

Site.  It should be noted that the funds necessary to comply with the Priority Order Sites Consent

Decrees and Settlement Agreements were made available to the Debtors by the DIP Lenders and

these amounts will not be carved out of the assets available for General Unsecured Creditors.

       As demonstrated in Part II of this Memorandum of Law, the Priority Order Sites

Consent Decrees and Settlement Agreements should be approved pursuant to section 1123(b)

and Bankruptcy Rule 9019.

---

[6] At the Harvey & Knott Drum Site, MLC was required to conduct remedial action pursuant to a Consent Decree
entered on October 19, 1987, by the United States District Court for the District of Delaware.  At the Garland Road
Site, MLC was required to conduct a removal action pursuant to a Unilateral Administrative Order under CERCLA,
U.S. EPA Docket No. V-W-09-C-922, dated May 14, 2009.  At the Delphi Harrison Site, MLC was required to
conduct remedial action pursuant to a Voluntary Corrective Action Agreement under RCRA, dated May 22, 2001.
At the Scatterfield Site, MLC was required to conduct remedial action pursuant to an Administrative Consent
Agreement and Final Order under RCRA, dated May 8, 2002.  At the Wheeler Pit Site, MLC was required to
conduct remedial action pursuant to a Unilateral Administrative Order under CERCLA, dated May 6, 1991.  At the
Sioux City Site, MLC was required to conduct remedial action pursuant to Iowa Consent Order for RD/RA No.
2004-HC-06, dated September 29, 2004, and Iowa Consent Order, JudMLCent and Decree, Law No. CVCV136444,
dated August 29, 2007.

[7] For a detailed description of the terms of the Priority Order Sites Consent Decrees and Settlement Agreements, *see*
United States' Statement in Support of Environmental Provisions of Debtors' Plan of Liquidation, Response to
Public Comment and Joinder in Debtors' Request for Approval of the Priority Order Site Settlement Agreements
among Debtors, the United States, and Certain States Incorporated In Debtors' Plan (ECF No. 9312).

09-50026-mg    Doc 9389    Filed 02/22/11    Entered 02/22/11 22:44:27    Main Document
Pg 23 of 78

(2)    The Asbestos Settlements

Although the Chapter 11 Cases clearly are not asbestos-driven cases, the Debtors

historically have incurred some liability with respect to asbestos-related claims.  In that regard,

over 28,500 asbestos-related proofs of claim were filed, which claims do not account for

potential asbestos claims that may be asserted against the Debtors in the future.  In light of the

difficulty in assessing future asbestos personal injury claims and in order to make sure that all

asbestos-related claims receive the same recovery, the Debtors, the Asbestos Claimants'

Committee, the Future Claimants' Representative, and the Creditors' Committee engaged in

extensive discussions to find a means to provide for a fair and just resolution to these liabilities

for the Debtors' estates, creditors, and parties in interest.

(a)    The Asbestos Trust Claim Settlement

As this Court is aware, the Debtors, the Asbestos Claimants' Committee, the

Future Claimants' Representative, and the Creditors' Committee had resorted to litigation to

establish the appropriate portion of the 363 Transaction consideration to be distributed under the

Plan to the Asbestos Trust for the benefit of holders of Asbestos Personal Injury Claims.  After

intense negotiations, the parties were able to reach an agreement fixing the amount of the

Asbestos Trust Claim at $625,000,000.00.  This settlement was approved by the Court on

February 14, 2011 (ECF No. 9214) (the "**Asbestos Trust Claim Settlement**").

(b)    The Settlement with Remy International, Inc.

Delco Remy was a division of GM until 1994, when Delco Remy was merged

with AC Rochester (another division of GM) to form the division AC Delco Systems, and certain

assets of the Delco Remy division were sold by GM to DRA, Inc., a wholly-owned subsidiary of

DR International, Inc., which was a Delaware corporation incorporated on November 22, 1993

(f/k/a Transportation Systems, Inc.) by a group of private investors, pursuant to an Asset

Purchase Agreement by and among DR International, Inc., DRA, Inc., and GM, dated July 13,

1994 (the "**1994 Asset Purchase Agreement**").  On August 1, 1994, DR International, Inc.

changed its legal name to Delco Remy International, Inc. and DRA, Inc. changed its legal name

to Delco Remy America, Inc.  In conjunction with the 1994 Asset Purchase Agreement, DR

International, Inc. and DRA, Inc. were permitted use of the trade name Delco Remy for ten

years.  On July 31, 2004, Delco Remy International, Inc. changed its legal name to Remy

International, Inc. and Delco Remy America, Inc. changed its legal name to Remy Inc.

(collectively, "**Remy**").  Prior to this sale, which was completed on July 13, 1994, DRA, Inc. did

not manufacture, distribute, or sell any products, but was a shell corporation incorporated to

carry out the asset purchase.  Under the 1994 Asset Purchase Agreement, DRA, Inc. neither

assumed responsibility for GM products manufactured prior to the close of such agreement on

July 13, 1994 nor assumed responsibility for any real property or premises owned or occupied by

GM prior to that date.  Rather, under the 1994 Asset Purchase Agreement, GM agreed to defend

and indemnify DRA, Inc. and DR International, Inc. for Damages (as defined in the 1994 Asset

Purchase Agreement) arising out of or resulting from the Retained Liabilities (as defined in

Section 5.2(i) –(xiv) of the 1994 Asset Purchase Agreement) or otherwise to the extent arising

out of or relating to the ownership or use of the Purchased Assets (as defined in the 1994 Asset

Purchase Agreement) by GM or the operation of the Businesses (as defined in the 1994 Asset

Purchase Agreement) on or prior to the closing of the 1994 Asset Purchase Agreement.

       Since the execution of the 1994 Asset Purchase Agreement, Remy f/k/a Delco

Remy has been improperly named in lawsuits claiming injury from products GM manufactured

and premises GM owned prior to the closing of the 1994 Asset Purchase Agreement, specifically

alleging exposure to asbestos.  Remy has tendered such lawsuits to GM for defense and

indemnity pursuant to the 1994 Asset Purchase Agreement, and GM consistently has accepted

such tenders until the commencement of the Chapter 11 Cases.  Remy has asserted it has no

liability pursuant to the 1994 Asset Purchase Agreement and has been dismissed regularly from

such lawsuits.

During the Chapter 11 Cases, the Debtors filed a motion to reject the 1994 Asset

Purchase Agreement as an executory contract in an abundance of caution.  Remy filed an

objection to such motion, asserting that the 1994 Asset Purchase Agreement was not an

executory contract.  The Debtors and Remy have since agreed that the 1994 Asset Purchase

Agreement is no longer an executory contract.  As a result, Remy has asserted certain Claims,

including (i) a Claim against MLC in the amount of $16,354,200 comprised of (a) $13,954,200

of estimated costs associated with anticipated future asbestos litigation that Remy bases on the

number of cases projected by Remy to be filed per year through 2034 (the "**Remy Asbestos**

**Indemnification Claim**") and (b) $2,400,000 in respect of potential environmental remediation

claims relating to property leased to DRA, Inc. by the Debtors (Proof of Claim No. 43411)

(together with the Remy Asbestos Indemnification Claim, the "**Remy Claim Against MLC**"),

and (ii) a contingent Claim against ENCORE in the amount of $2,110,570 in respect of potential

environmental remediation claims relating to property leased to DRA, Inc. by the Debtors (Proof

of Claim No. 69951) (the "**Remy Claim Against ENCORE**").  Additionally, on August 12,

2009, Remy filed an application with the Bankruptcy Court for an order pursuant to Bankruptcy

Rule 2004 authorizing and directing the production of a substantial amount of documents

relating to the foregoing (the "**Remy 2004 Request**").  Remy has taken the position that the

Remy Asbestos Indemnification Claim may properly be asserted against and satisfied from both

the GUC Trust and the Asbestos Trust under the Plan.  Remy also has taken the position that any

environmental claims it has may properly be asserted against MLC and/or ENCORE and

satisfied and treated under the Plan in accordance with the Environmental Trust Agreement and

the Environmental Response Trust Consent Decree and Settlement Agreement.

MLC has reached a settlement with Remy (the "**Remy Settlement**") resolving

these issues, the terms of which are:  (i) the Plan shall make clear that with respect to the portion

of the Remy Claim Against MLC relating to asbestos liability arising on or prior to the closing of

the 1994 Asset Purchase Agreement, Remy shall be a Protected Party, (ii) the Remy Claim

Against MLC ($16,354,200) and the Remy Claim Against ENCORE ($2,110,570) shall be

reduced and Allowed in the amount of $484,978.33 as an Allowed General Unsecured Claim in

Class 3 representing amounts spent by Remy to date in defense costs, (iii) Remy shall withdraw

the Remy 2004 Request to the extent the Remy 2004 Request is still pending, and (iv) upon

request, the Debtors shall provide Remy with certain documents relating to remediation by the

Debtors or Post-Effective Date MLC, as applicable at sites adjacent to those leased by the

Debtors to Remy or leased by Remy.

As demonstrated in Part II of this Memorandum of Law, the Remy Settlement

should be approved pursuant to section 1123(b) and Bankruptcy Rule 9019.

### e.    The Trusts

The Plan provides for the establishment of the GUC Trust, the Asbestos Trust, the

Environmental Response Trust, and the Avoidance Action Trust.

### (1)    *The GUC Trust*

Section 6.2 of the Plan provides for the establishment of the GUC Trust and the

beneficial interests therein, which shall be for the benefit of the holders of Allowed General

Unsecured Claims, pursuant to the GUC Trust Agreement to be executed on or before the

Effective Date.  The GUC Trust, which shall be governed by the GUC Trust Administrator and

overseen by the GUC Trust Monitor, shall be established to administer certain post-Effective

Date activities under the Plan, including, but not limited to, distributing New GM Securities and

resolving certain outstanding Disputed General Unsecured Claims to determine the amount of

Allowed General Unsecured Claims that will be eligible for distribution of their Pro Rata Share

of New GM Securities under the Plan.  Upon the dissolution of MLC, all remaining assets of

MLC shall be transferred to the GUC Trust and shall constitute GUC Trust Assets.  The GUC

Trust has no objective to continue or engage in the conduct of a trade or business.

(2)    *The Asbestos Trust*

Section 6.3 of the Plan provides for the establishment of the Asbestos Trust and

the beneficial interests therein, which shall be for the benefit of the holders of Asbestos Personal

Injury Claims, pursuant to the Asbestos Trust Agreement to be executed on or before the

Effective Date.  The Asbestos Trust, which shall be governed by the Asbestos Trust

Administrator, shall be established to, among other things, (i) direct the processing, liquidation,

and payment of all Asbestos Personal Injury Claims in accordance with the Plan, the Asbestos

Trust Distribution Procedures, and the Confirmation Order and (ii) preserve, hold, manage, and

maximize the assets of the Asbestos Trust for use in paying and satisfying Asbestos Personal

Injury Claims.

(3)    *The Environmental Response Trust*

Section 6.4 of the Plan provides for the establishment of the Environmental

Response Trust to conduct, manage, and/or fund Environmental Actions with respect to certain

of the Environmental Response Trust Properties, including the migration of hazardous

substances emanating from certain of the Environmental Response Trust Properties, in

accordance with the Environmental Response Trust Agreement and the Environmental Response

Trust Consent Decree and Settlement Agreement; to reimburse the lead agency for

Environmental Actions it conducts or has agreed to pay for with respect to the Environmental

Response Trust Properties; to own certain of the Environmental Response Trust Properties, carry

out administrative and property management functions related to the Environmental Response

Trust Properties, and pay associated administrative costs; and to try to sell or transfer the

Environmental Response Trust Properties owned by the Environmental Response Trust with the

objective that the Environmental Response Trust Properties be put to productive or beneficial

use.  After the establishment and funding of, and the conveyance of the Environmental Response

Trust Properties owned by the Debtors to, the Environmental Response Trust as provided in the

Environmental Response Trust Consent Decree and Settlement Agreement, the Debtors shall

have no further liability, role, or residual interest with respect to the Environmental Response

Trust or the Environmental Response Trust Properties.  The Environmental Response Trust

Administrative Trustee shall be responsible for implementing the purpose of the Environmental

Response Trust.

(4)    *The Avoidance Action Trust*

Section 6.5 of the Plan provides for the establishment of the Avoidance Action

Trust and the beneficial interests therein, which shall be for the benefit of the beneficiaries of the

Avoidance Action Trust, pursuant to the Avoidance Action Trust Agreement to be executed on

or before the Effective Date.  The Avoidance Action Trust, which shall be governed by the

Avoidance Action Trust Administrator and overseen by the Avoidance Action Trust Monitor,

shall be established for the sole purpose of liquidating and distributing its assets, in accordance

with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business.

Section 1123(a)(5)(B) of the Bankruptcy Code "appears clearly to contemplate transfer to an entity such as a liquidating trust organized after confirmation to facilitate distribution to parties in interest in accordance with a plan." *In re Crowthers McCall Pattern, Inc.*, 120 B.R. 279, 285 n.6 (Bankr. S.D.N.Y. 1990). Courts have frequently confirmed chapter 11 plans which provided for liquidating trusts. *See, e.g., In re Okura & Co. (Am.), Inc.*, 249 B.R. 596, 599 n.1 (Bankr. S.D.N.Y. 2000) (on effective date of plan, all property of estate was transferred to liquidating trust and liquidating trustee was given right to file objections to claims); *In re Drexel Burnham Lambert Group Inc.*, 138 B.R. 723 (Bankr. S.D.N.Y. 1992); *In re Crowthers McCall Pattern, Inc.*, 120 B.R. 279 (Bankr. S.D.N.Y. 1990) (provision of chapter 11 plan indicating debtor was deemed to have assigned to indenture trustee of liquidating trust all right, title, and interest to litigation complied with section 1123(b)(3)(B)).

## 2.    The Debtors Have Complied with The Provisions of the Bankruptcy Code

Section 1129(a)(2) of the Bankruptcy Code requires that the plan proponents comply with the applicable provisions of the Bankruptcy Code. 11 U.S.C. § 1129(a)(2). The legislative history to section 1129(a)(2) reflects that this provision is intended to encompass the disclosure and solicitation requirements under sections 1125 and 1126 of the Bankruptcy Code. H.R. Rep. No. 95-595, at 412 (1977); S. Rep. No. 95-989, at 126 (1978) ("Paragraph (2) [of § 1129(a)] requires that the proponent of the plan comply with the applicable provisions of chapter 11, such as section 1125 regarding disclosure."); *see also In re PWS Holding Corp.*, 228 F.3d 224, 248 (3d Cir. 2000); *In re Drexel Burnham Lambert Group Inc.*, 138 B.R. 723, 759 (Bankr. S.D.N.Y. 1992).

The Debtors have complied with the applicable provisions of title 11, including the provisions of sections 1125 and 1126 regarding disclosure and plan solicitation.  By Order, dated December 8, 2010 (ECF No. 8043) (the "**Solicitation Order**"), after notice and a hearing, the Court approved the Disclosure Statement pursuant to section 1125(b) of the Bankruptcy Code as containing "adequate information" of a kind and in sufficient detail to enable hypothetical, reasonable investors typical of the Debtors' creditors and equity interest holders to make an informed judgment regarding whether to accept or reject the Plan.  As set forth in (i) the Affidavit of Patrick M. Leatham, sworn to on January 14, 2011 (the "**GCG Affidavit**") (ECF No. 8607); (ii) the Affidavit of Jane Sullivan, sworn to on January 6, 2011 (the "**Epiq Affidavit**") (ECF No. 8449); and (iii) the Affidavit of Jane Sullivan, sworn to on February 21, 2011 (the "**Epiq Supplemental Affidavit**" (ECF No. 9327).  and together with the GCG Affidavit and the Epiq Affidavit, the "**Affidavits of Service**"), each holder of a Claim or Equity Interest received the solicitation materials required by the Solicitation Order, including, for holders of Claims entitled to vote, the Disclosure Statement (which includes as an exhibit a copy of the Plan), and a ballot.  The solicitation package was transmitted in connection with the solicitation of votes to accept the Plan in compliance with section 1125 and the Solicitation Order.  11 U.S.C. §§ 1125(b), (c).  The Debtors did not solicit acceptances of the Plan from any creditor or equity interest holder prior to the transmission of the Disclosure Statement.

Section 1126 of the Bankruptcy Code specifies the requirements for acceptance of the Plan.  Under section 1126, only holders of Allowed Claims in impaired Classes of Claims that will receive or retain property under the Plan on account of such Claims may vote to accept or reject the Plan.  In accordance with section 1126 of the Bankruptcy Code, the Debtors solicited acceptances of the Plan from the holders of all Allowed Claims in each Class of

impaired Claims that are entitled to vote to accept or to reject the Plan. The impaired Classes

entitled to vote under the Plan are Class 3 (General Unsecured Claims) and Class 5 (Asbestos

Personal Injury Claims), with the exception of holders of Claims subject to an objection filed by

the Debtors at least 10 days before the voting deadline, February 11, 2011 at 5:00 p.m. (Eastern

Time) (the "**Holders of Claims Subject to an Objection**"), which Claims are temporarily

disallowed for voting purposes only pursuant to the Solicitation Order.  The Plan provides that

Class 6 (Equity Interests in MLC) will receive no property under the Plan and is conclusively

presumed to have rejected the Plan.  In accordance with Articles III and IV of the Plan and the

Solicitation Order, the Debtors did not solicit acceptances from the holders of Equity Interests in

MLC in Class 6 and the Holders of Claims Subject to an Objection.  Based upon the foregoing,

the requirements of section 1129(a)(2) have been satisfied.

### 3. The Plan Has Been Proposed in Good Faith And Not by Any Means Forbidden by Law

Section 1129(a)(3) of the Bankruptcy Code requires that a plan be "proposed in

good faith and not by any means forbidden by law."  11 U.S.C. § 1129(a)(3).  "Good faith is

generally interpreted to mean that there exists a reasonable likelihood that the plan will achieve a

result consistent with the objectives and purposes of the Bankruptcy Code."  *In re Chemtura

Corp.*, 439 B.R. at 608 (quoting *In re Madison Hotel Assocs.*, 749 F.2d 410, 425 (7th Cir. 1984)).

"Whether a [chapter 11] plan has been proposed in good faith must be viewed in the totality of

the circumstances, and the requirement of [s]ection 1129(a)(3) speaks more to the process of

plan development than to the content of the plan."  *Id.* (internal quotations and citations omitted).

In addition to achieving a result consistent with the objectives of the Bankruptcy

Code, the Plan also allows creditors to realize the highest possible recoveries under the

circumstances.  The Plan is the result of consensual resolutions and agreements between the

Debtors, the Creditors' Committee, the Asbestos Claimants' Committee, the Future Claimants'

Representative, the U.S. Treasury, and various other stakeholders and constituencies.  The

support of the Plan by the Creditors' Committee reflects its acknowledgment that the Plan

provides fundamental fairness to general unsecured creditors.  *See also Leslie Fay Cos.*, 20 B.R.

764, 781 (Bankr. S.D.N.Y. 1997) ("The fact that the plan is proposed by the committee as well

as the debtors is strong evidence that the plan is proposed in good faith.").  Moreover, the

Environmental Response Trust Consent Decree and Settlement Agreement, the Priority Order

Sites Consent Decrees and Settlement Agreements, and the Asbestos Trust Claim Settlement are

indicative of the Debtors' genuine efforts to reach consensual resolutions with other parties in

interest.  *See In re Chemtura Corp.*, 493 B.R. at 608-09 (finding good faith requirement met

because, among other things, the debtor negotiated and reached agreements with several parties

in interest to put forward a chapter 11 plan which "in the aggregate demonstrate a good faith

effort on the part of the debtor to consider the needs and concerns of all major constituencies in

this case").  Accordingly, the Plan has been filed in good faith and the requirements of section

1129(a)(3) are satisfied.

### 4.    The Plan Provides that Payments Made by the Debtors for Services or Costs and Expenses Are Subject to Court Approval

Section 1129(a)(4) requires that certain professional fees and expenses paid by the

plan proponent, the debtor, or a person receiving distributions of property under the plan, be

subject to approval by the Court as reasonable.  11 U.S.C. § 1129(a)(4).  Section 1129(a)(4) has

been construed to require that all payments of professional fees which are made from estate

assets be subject to review and approval as to their reasonableness by the court.  *See River

Village Assocs.*, 161 B.R. at 141; *In re Resorts Int'l, Inc.*, 145 B.R. 412, 475 (Bankr. D.N.J.

1990); *In re Texaco Inc.*, 84 B.R. 893, 908 (Bankr. S.D.N.Y.), *appeal dismissed*, 92 B.R. 38 (S.D.N.Y. 1988).

Pursuant to the interim application procedures established under section 331 of the Bankruptcy Code, the Court authorized and approved the payment of certain fees and expenses of professionals retained in the Chapter 11 Cases.  All such fees and expenses, as well as all other accrued fees and expenses of professionals through the Confirmation Date, remain subject to final review for reasonableness by the Court under sections 327, 328, 330, 331, and 503(b) of the Bankruptcy Code.

Based upon the foregoing, the Plan complies with the requirements of section 1129(a)(4) of the Bankruptcy Code.

**5.      The Debtors Have Satisfied the Requirement
To Disclose All Necessary Information
Regarding Directors, Officers, and Insiders**

Section 1129(a)(5) of the Bankruptcy Code requires that the plan proponent disclose the identity and affiliations of the proposed officers and directors of the reorganized debtors; that the appointment or continuance of such officers and directors be consistent with the interests of creditors and equity security holders and with public policy; and that there be disclosure of the identity and compensation of any insiders to be retained or employed by the reorganized debtors.  11 U.S.C. § 1129(a)(5).

As discussed above, the Plan is a liquidating plan that provides for the dissolution of each Debtor after the respective Debtor's completion of the acts required by the Plan, and therefore, there will be no "reorganized debtor" for any presently existing officer or director to serve.  Nonetheless, MLC will remain in existence through a date no later than December 15, 2011.  On and after the Effective Date, the officers and directors of MLC will be a subset of

MLC's current officers and directors.  Additionally, the Debtors have disclosed the identity of

the GUC Trust Administrator and the Avoidance Action Trust Administrator in the Plan.  The

Environmental Response Trust Administrative Trustee will be Elliott P. Laws, Esq.  Mr. Laws'

affiliations are disclosed in his curriculum vitae,[8] annexed hereto as **Exhibit "B."**  The identity

of the Asbestos Trust Administrator is Kirk P. Watson, Esq.  Mr. Watson's curriculum vitae is

annexed hereto as **Exhibit "C."**

### 6.    The Plan Is in the Best Interests of All Creditors

Section 1129(a)(7) of the Bankruptcy Code requires that a plan be in the best

interests of creditors and stockholders.  The best interests test focuses on individual dissenting

creditors rather than classes of claims.  *See Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N.*

*LaSalle St. P'ship*, 526 U.S. 434 (1999).  It requires that each holder of a claim or equity interest

either accepts the plan or will receive or retain under the plan property having a present value, as

of the effective date of the plan, not less than the amount such holder would receive or retain if

the debtor were liquidated under chapter 7 of the Bankruptcy Code.

Under the best interests test, "the court must measure what is to be received by

rejecting creditors in the impaired classes under the plan against what would be received by them

in the event of liquidation under chapter 7.  In doing so, the court must take into consideration

the applicable rules of distribution of the estate under chapter 7, as well as the probable costs

incident to such liquidation."  *In re Adelphia Commc'ns*, 368 B.R. 140, 252 (Bankr. S.D.N.Y.

2007); *see also 203 N. LaSalle*, 526 U.S. at 440 (explaining that the court "must find that each

[non-accepting] creditor will receive or retain value that is not less than the amount he would

---

[8] Mr. Law has recently informed the Debtors that aside from the affiliations described in his curriculum vitae, he is also a member of the Board of the National Association of Environmental Law Societies.

receive if the debtor were liquidated."); *United States v. Reorganized CF&I Fabricators, Inc.*, 518 U.S. 213, 228 (1996). As section 1129(a)(7) makes clear, the liquidation analysis applies only to nonaccepting holders of impaired claims or equity interests.

In the instant case the best interests test is satisfied as to each holder of an impaired Claim or Equity Interest.

Each member of an impaired Class will receive under the Plan a larger recovery than that member would otherwise receive in a chapter 7 liquidation because of the DIP Lenders' substantial contributions to fund the Plan, and the various settlements reached under the Plan. The DIP Lenders' contributions total hundreds of millions of dollars and will be used, in large part, to satisfy obligations that would otherwise have to be satisfied out of the 363 Transaction consideration before any distributions could be made to holders of General Unsecured Claims. Moreover, the Debtors' costs of liquidation under chapter 7 would include the fees payable to a trustee in bankruptcy, as well as those fees that might be payable to attorneys and other professionals that such a trustee might engage.

In addition, in the absence of the settlements under the Plan and the Trusts such as the Environmental Response Trust created as a consequence thereof, a chapter 7 trustee would likely breach certain postpetition contracts entered into by the Debtors and reject other executory contracts that would otherwise be assigned to the Trusts. These actions would generate additional administrative expense and rejection damage claims that would further dilute recoveries.

After consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors in the Chapter 11 Cases, including (i) the cessation of funding of the Chapter 11 Cases by the DIP Lenders (*see* Order Pursuant to

Bankruptcy Code Sections 105(a), 361, 362, 363, 364 and 507 and Bankruptcy Rules 2002, 4001

and 6004 (a) Approving Amendment to DIP Credit Facility to Provide for Debtors' Post-Petition

Wind-Down Financing (ECF No. 2969)); (ii) the increased costs and expenses of a liquidation

under chapter 7 arising from fees payable to a trustee in bankruptcy and its professional advisors

that would be unfamiliar with all of the work done to date; (iii) the substantial increases in claims

that would be satisfied on a priority basis, and (iv) the substantial delay in distributions

occasioned by a conversion of the Chapter 11 Cases to cases under chapter 7, it is clear that

confirmation of the Plan will provide each holder of an Allowed Claim with a recovery that is

not less than such holder would receive or retain if the Debtors were liquidated under chapter 7.

Based upon the foregoing, the Plan satisfies the requirements of section

1129(a)(7).

> **7.     The Plan Has Been Accepted by Impaired
> Classes 3 and 5, and as to Such Classes,
> The Requirements of Section 1129(a)(8) Have Been Satisfied**

Section 1129(a)(8) of the Bankruptcy Code requires that each class of impaired

claims or interests accept the plan, as follows: "With respect to each class of claims or interests -

(A) such class has accepted the plan; or (B) such class is not impaired under the plan."  11

U.S.C. § 1129(a)(8).

Although the Debtors' Voting Agent and Debt Instruments Voting Agent have not

yet filed the voting certification with the Court, the Debtors have been advised that the Plan has

been accepted by creditors holding well in excess of two-thirds in amount and one-half in

number in each of the Classes entitled to vote under the Plan.  Specifically, Class 3 (General

Unsecured Claims) and Class 5 (Asbestos Personal Injury Claims) are impaired and have voted

to accept the Plan in accordance with sections 1126(c) and (d) of the Bankruptcy Code.  Thus, as

to such impaired and accepting Classes, the requirements of section 1129(a)(8) have been

satisfied.

Class 1 (Secured Claims), Class 2 (Priority Non-Tax Claims), and Class 4

(Property Environmental Claims) are unimpaired, and, therefore, are deemed to have accepted

the Plan.  *See* 11 U.S.C. § 1126(f)

Class 6 (Equity Interests in MLC) is not entitled to receive or retain any property

under the Plan and, therefore, is deemed to have rejected the Plan pursuant to section 1126(g) of

the Bankruptcy Code.  *See In re Quigley Co.,* 346 B.R. 647, 653 n.14 (Bankr. S.D.N.Y. 2006)

("If a class receives nothing, it is deemed to reject the plan"); *In re Fur Creations by Varriale,*

*Ltd.*, 188 B.R. 754, 758 n.4 (Bankr. S.D.N.Y. 1995) ("a class is deemed to reject a plan if the

class does not receive a distribution under the plan"); *In re Friese*, 103 B.R. 90, 91 (Bankr.

S.D.N.Y. 1989) ("A class receiving no distribution is deemed not to have accepted the plan.").

Nonetheless, as to such Class, the Plan may be confirmed under the "cram down" provisions of

section 1129(b) of the Bankruptcy Code, as discussed below.

### 8.    The Plan Provides for Payment In Full of All Allowed Priority Claims

Section 1129(a)(9) of the Bankruptcy Code requires that persons holding allowed

claims entitled to priority under section 507(a) receive specified cash payments under the plan.

Unless the holder of a particular claim agrees to a different treatment with respect to such claim,

section 1129(a)(9) of the Bankruptcy Code sets forth the treatment the plan must provide.  11

U.S.C. § 1129(a)(9).

Pursuant to Articles II and IV of the Plan, and in accordance with sections

1129(a)(9)(A) and (B), the Plan provides that all Allowed Administrative Expenses under section

503(b) of the Bankruptcy Code and all Allowed Priority Non-Tax Claims under section 507(a)

(excluding Priority Tax Claims under section 507(a)(8) described below) will be paid in full, in

Cash, on the Effective Date or as soon thereafter as is reasonably practicable.

The Plan satisfies the requirements of section 1129(a)(9)(C) of the Bankruptcy

Code in respect of the treatment of Priority Tax Claims under section 507(a)(8).  Pursuant to

Section 2.3 of the Plan and except as otherwise may be agreed, holders of Allowed Priority Tax

Claims will be paid in full, in Cash, on the Effective Date or as soon thereafter as is reasonably

practicable.

Based upon the foregoing, the Plan satisfies the requirements of section

1129(a)(9) of the Bankruptcy Code.

### 9.        At Least One Class of Impaired Claims Has Accepted the Plan

Section 1129(a)(10) of the Bankruptcy Code requires the affirmative acceptance

of the Plan by at least one Class of impaired Claims, "determined without including any

acceptance of the plan by any insider."  11 U.S.C. § 1129(a)(10).  The Plan clearly satisfies this

requirement because two Classes of impaired Claims – Class 3 (General Unsecured Claims) and

Class 5 (Asbestos Personal Injury Claims) – have accepted the Plan, without including the

acceptance of the Plan by insiders in such Classes.

### 10.        The Plan Is Feasible

Section 1129(a)(11) of the Bankruptcy Code requires that the Court determine

that the Plan is feasible as a condition precedent to confirmation.  Specifically, it requires that

confirmation is not likely to be followed by liquidation of the debtor, unless such liquidation is

proposed in the plan. 11 U.S.C. § 1129(a)(11).  As described below, and as will be demonstrated

at the Confirmation Hearing, the Plan is feasible within the meaning of this provision.  The

feasibility test set forth in section 1129(a)(11) requires the Court to determine whether the Plan is

workable and has a reasonable likelihood of success.  *See United States v. Energy Res. Co.*, 495

U.S. 545, 549 (1990); *Kane v. Johns-Manville Corp.*, 843 F.2d at 649.

   The key element of feasibility is whether there is a reasonable probability that the

provisions of the plan can be performed.  The purpose of the feasibility test is to protect against

visionary or speculative plans.  As noted by the United States Court of Appeals for the Ninth

Circuit:  "The purpose of section 1129(a)(11) is to prevent confirmation of visionary schemes

which promise creditors and equity security holders more under a proposed plan than the debtor

can possibly attain after confirmation."  *Pizza of Haw., Inc. v. Shakey's, Inc. (In re Pizza of

Haw., Inc.)*, 761 F.2d 1374, 1382 (9th Cir. 1985).  However, just as speculative prospects of

success cannot sustain feasibility, speculative prospects of failure cannot defeat feasibility.  The

mere prospect of financial uncertainty cannot defeat confirmation on feasibility grounds.  *See In

re U.S. Truck Co.*, 47 B.R. 932, 944 (E.D. Mich. 1985), *aff'd*, 800 F.2d 581 (6th Cir. 1986).

   In the context of a liquidating debtor, the feasibility test generally seeks to

determine whether a debtor will be able to make the payments required under its chapter 11 plan.

*See, e.g., In re Journal Register Co.*, 407 B.R. 520, 539 (Bankr. S.D.N.Y. 2009) (explaining that

the feasibility test is "whether the things which are to be done after confirmation can be done as a

practical matter under the facts") (internal quotation omitted).

   For purposes of determining whether the Plan satisfies the above-described

feasibility standards, the Debtors have analyzed their ability to fulfill their obligations under the

Plan.  Since the Plan provides for the liquidation of the Debtors, the Plan is feasible if the Court

determines that the Debtors will be able to satisfy the conditions precedent to the Effective Date

and otherwise have sufficient funds to meet their post-Confirmation Date obligations to pay for

the costs of administering and fully consummating the Plan and closing the Chapter 11 Cases.

Although the Debtors received several Administrative Expense requests that are quite large in amount, the Debtors are confident that such requests will not affect the feasibility of the Plan. Accordingly, the Debtors believe that the Plan satisfies the feasibility requirement imposed by the Bankruptcy Code.

The Debtors reasonably project that Post-Effective Date MLC and the Trusts established under the Plan will have sufficient assets to satisfy all of their obligations through the complete implementation of the Plan, therefore satisfying the feasibility standard of section 1129(a)(11) of the Bankruptcy Code.

### 11.    All Statutory Fees Have Been or Will Be Paid

Section 1129(a)(12) requires the payment of "[a]ll fees payable under section 1930 of title 28, as determined by the court at the hearing on confirmation of the plan." 11 U.S.C. § 1129(a)(12). Section 507 of the Bankruptcy Code provides that "any fees and charges assessed against the estate under [section 1930] of title 28" are afforded priority as administrative expenses. *Id*. § 507(a)(2). In accordance with sections 507 and 1129(a)(12) of the Bankruptcy Code, Section 12.8 of the Plan provides that (i) on the Effective Date such fees shall be paid by each of the Debtors and (ii) after the Effective Date, such fees shall be paid by the GUC Trust Administrator, the Asbestos Trust Administrator, the Environmental Response Trust Administrative Trustee, and the Avoidance Action Trust Administrator solely out of the GUC Trust, the Asbestos Trust, the Environmental Response Trust, and the Avoidance Action Trust, respectively.

### 12.    The Plan Complies with Section 1129(a)(13)

Section 1129(a)(13) of the Bankruptcy Code requires a plan to provide for retiree benefits at levels established pursuant to section 1114 of the Bankruptcy Code. As part of the

363 Transaction, New GM and the International Union, United Automobile, Aerospace and

Agricultural Implement Workers of America (the "**UAW**") reached a resolution addressing the

final obligations of MLC with respect to the UAW-sponsored retiree benefits plan funded by a

UAW-sponsored VEBA (the "**UAW VEBA**") (the "**UAW Retiree Settlement Agreement**"),

pursuant to which New GM agreed to provide to the UAW VEBA, among other things, (i) shares

of common stock of New GM representing 17.5% of New GM's total outstanding common

stock, (ii) a note of New GM in the principal amount of $2.5 billion, (iii) shares of cumulative

perpetual preferred stock of New GM in the amount of $6.5 billion, (iv) warrants to acquire 2.5%

of New GM's equity, and (v) the assets held in MLC's VEBA to be transferred to New GM as

part of the 363 Transaction.

By order entered on November 12, 2009 (ECF No. 4433) (the "**Union Settlement**

**Order**"), this Court approved that certain settlement agreement, dated September 10, 2009, by

and among MLC, New GM, and certain "splinter unions" (the "**Union Settlement Agreement**").

Pursuant to the Union Settlement Agreement, New GM agreed to provide certain retiree medical

benefits at a reduced level to participating union retirees and surviving spouses who are not

eligible for Medicare benefits and to provide a reduced level of life insurance coverage to

participating retirees regardless of Medicare eligibility.  The Union Settlement Agreement

further provided that, with respect to those retirees who were eligible for Medicare as of

December 31, 2009, MLC shall grant to the Participating Splinter Unions (as defined in the

Union Settlement Order) that agree to the applicable terms of, and agree to participate in, the

Union Settlement Agreement, a General Unsecured Claim in an amount equal to such union's

respective "Percentage Share" of the aggregate amount of $1 billion (the "**Splinter Union**

**Allowed Claim**") in full settlement, satisfaction, and discharge of all claims that the

Participating Splinter Unions, as authorized under section 1114 and 1113 representatives, have or may have against the Debtors and their affiliates arising out of collective bargaining agreements relating to retiree healthcare benefits, life insurance benefits, and all other benefits and claims.

The Union Settlement Agreement and the Union Settlement Order contemplate that the unions listed on Exhibit "A" to the Union Settlement Order that were not parties to the Union Settlement Agreement may agree to participate in the Union Settlement Agreement and in their Percentage Share of the Splinter Union Allowed Claim at any point prior to the Debtors' making any distributions under the Plan.  By order entered on August 9, 2010, two additional unions joined in the Union Settlement Agreement (ECF No. 6594).

The sole remaining splinter union, the International Brotherhood of Boilermakers (the "**IBB**") declined to represent its retired past members (the "**IBB Retirees**") and did not agree to participate in the Union Settlement, nor has New GM assumed any liability for any claims attributable to the IBB Retirees.  Rather than terminate the health and life insurance benefits of these IBB Retirees, by motion dated February 8, 2011 (ECF No. 9121), the Debtors requested the Court (i) authorize the Debtors, in conjunction with New GM, to provide the IBB Retirees the health and life insurance benefits on essentially the same terms and conditions provided to the other retirees as provided for in the Union Settlement Agreement and (ii) order that the IBB Retirees shall be entitled to their Percentage Share of the Splinter Union Allowed Claim as set forth on Exhibit "A" to the Union Settlement Order, with the mechanism to make distributions to the IBB Retirees in respect thereof under the Plan to be determined at a later date.

With respect to non-union employees, New GM agreed in the MSPA to assume all retiree benefits under plans then in existence.

Based on the foregoing, the Debtors submit that the Plan satisfies the requirements of section 1129(a)(13) of the Bankruptcy Code.

**B.      The Plan Satisfies the "Cram Down" Requirements
Under Section 1129(b) of the Bankruptcy Code
With Respect to Class 6 (Equity Interests in MLC)**

Section 1129(b) of the Bankruptcy Code provides a mechanism (known colloquially as "cram down") for confirmation of a chapter 11 plan in circumstances where the plan is not accepted by all impaired classes of claims.  Under section 1129(b), the court may "cram down" a plan over the dissenting vote of an impaired class or classes of claims or interests as long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to such dissenting class or classes.  Class 6 (Equity Interests in MLC) is deemed to reject the Plan and is the only rejecting impaired Class.

**1.      The Plan Does Not Discriminate Unfairly**

Section 1129(b)(1) does not prohibit discrimination between classes.  Rather, it prohibits discrimination that is unfair.  *See Aetna Cas. & Sur. Co. v. Chateaugay Corp. (In re Chateaugay Corp.)*, 89 F.3d. 942, 949 (2d. Cir. 1996).  Under section 1129(b) of the Bankruptcy Code, a plan unfairly discriminates where similarly situated classes are treated differently without a reasonable basis for the disparate treatment.  *See WorldCom Inc.*, Ch. 11 Case No. 02-13533, 2003 Bankr. LEXIS 1401, *174 (Bankr. S.D.N.Y. 2003) (citing *In re Buttonwood Partners, Ltd.*, 111 B.R 57, 63 (Bankr. S.D.N.Y. 1990).  "[I]f under the facts and circumstances of a particular case, there is a reasonable basis for disparate treatment of two similarly situated classes of claims or two similarly situated classes of equity interests, there is no unfair discrimination."  *See WorldCom* at *174.  Accordingly, as between two classes of claims or two classes of equity interests, there is no unfair discrimination if (i) the classes are comprised of

dissimilar claims or interests, *see, e.g., In re Johns-Manville Corp.*, 68 B.R. 618, 636 (Bankr.

S.D.N.Y. 1986), *aff'd in part, rev'd in part on other grounds*, 78 B.R. 407 (S.D.N.Y. 1987), *aff'd*

*sub nom. Kane v. Johns-Manville Corp.*, 843 F.2d 636 (2d Cir. 1988), or (ii) taking into account

the particular facts and circumstances of the case, there is a reasonable basis for such disparate

treatment, *see, e.g., In re Drexel Burnham Lambert Group, Inc.*, 138 B.R. 714, 715 (Bankr.

SDNY 1992) (separate classification of similar classes was rational where members of each class

"possess[ed] different legal rights"); *see also Charter Commc'ns*, 419 B.R. at 264-265 (finding

separate classification justified because of the members' "disparate legal rights").

       In the perspective of the foregoing standards, the Plan does not "discriminate

unfairly" with respect to Class 6.

       The Plan provides that holders of Equity Interests in MLC in Class 6 will neither

receive nor retain any property and will be cancelled on the Effective Date.  Class 6 is the only

Class of Equity Interests in MLC, consisting of 610,562,173 shares of common stock issued by

MLC.  Inasmuch as Class 6 represents the only Equity Interests classified under the Plan, the

Plan, *a fortiori*, does not discriminate unfairly as between any holders of Equity Interests.

       Based upon the foregoing, the Plan does not "discriminate unfairly" with respect

to any impaired Classes of Claims or Equity Interests.

## 2.     The Plan Is Fair and Equitable

       Section 1129(b) of the Bankruptcy Code sets forth the definition of the phrase

"fair and equitable."  11 U.S.C. § 1129(b)(2).  With respect to a class of equity interests, a plan is

fair and equitable if:

     (C)     With respect to a class of interests—

       (i) the plan provides that each holder of an interest of such
class receive or retain on account of such interest property of a

value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest; or

(ii) the holder of any interest that is junior to the interests of such class will not receive or retain under the plan on account of such junior interest any property.

11 U.S.C. 1129(b)(2)(C).  This standard is clearly satisfied here in that no holder of an interest junior to Class 6 exists.

Finally, in determining whether a plan is "fair and equitable," courts consider additional factors to those set forth in section 1129(b).  For example, courts look to whether the holders of claims that are senior to the claims of a dissenting class are receiving more than 100% of their claims.  *See, e.g., United Sav. Ass'n v. Timbers of Inwood Forest Assocs. (In re Timbers of Inwood Forest Assocs.)*, 793 F.2d 1380, 1410 (5th Cir. 1986), *aff'd*, 808 F.2d 363 (5th Cir. 1987) (en banc), *aff'd* , 484 U.S. 365 (1988).  In the instant case, no senior Classes are being paid more than 100% of their Claims and, in fact, creditors in Classes 3 and 4 are receiving significantly less than 100% recovery of their Claims.  On this basis, the Plan is "fair and equitable" in all respects.

## II.

## THE SETTLEMENTS, RELEASES, EXCULPATIONS, AND INJUNCTIONS IN THE PLAN ARE PROPER

### A.    The Settlements, the Releases, the Exculpation, and the Injunction

### 1.    The Settlements

The Plan is premised, in part, on the approval of the Environmental Response Trust Consent Decree and Settlement Agreement and the Priority Order Sites Consent Decrees and Settlement Agreements, as well as the settlements reached with the Asbestos Claimants'

Committee, the Future Claimants' Representative, and the Creditors' Committee, including the

Remy Settlement (collectively, the "**Settlements**").

Bankruptcy Rule 9019 provides "after notice and a hearing, the court may

approve a compromise or settlement." Fed. R. Bankr. P. 9019. The legal standard for

determining the propriety of a bankruptcy settlement is whether the settlement is in the best

interest of the estate. *See In re Chemtura*, 439 B.R. at 593. Relying on the guiding language of

*Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson,* 390

U.S. 414, 424 (1968), courts in this Circuit have set forth the following factors regarding the

reasonableness of such settlements:

1. the probability of success in the litigation;
2. the difficulties associated with collection;
3. the complexity of the litigation, and the attendant expense, inconvenience, and delay; and
4. the paramount interests of the creditors.

*Drexel Burnham Lambert Trading Corp. v. Drexel Burnham Lambert Group, Inc. (In re Drexel*

*Burnham Lambert Group, Inc.)*, 960 F.2d 285, 292 (2d Cir. 1992); *In re Iridium Operating LLC*,

478 F.3d 452, 462 (2d Cir. 2007); *Airlines Pilot Assoc. Inc. v. Am Nat'l Bank & Trust Co. of*

*Chicago (In re Ionosphere Clubs, Inc.)*, 156 B.R. 414, 428 (S.D.N.Y. 1993), *aff'd sub nom.*

*Sobchack v. Am. Nat'l Bank & Trust Co. of Chicago (In re Ionosphere Clubs, Inc.)*,

17 F.3d 600 (2d Cir. 1994); *In re Purofied Down Prods. Corp.*, 150 B.R. 519, 522 (S.D.N.Y.

1993). The decision to approve a particular settlement lies within the sound discretion of the

Bankruptcy Court. *Machinery Terminals, Inc. v. Woodward (In re Albert-Harris, Inc.)*, 313 F.2d

447, 449 (6th Cir. 1963). It is the responsibility of the court to examine a settlement and

determine whether it "falls below the lowest point in the range of reasonableness." *In re Dow*

*Corning*, 198 B.R. 214, 222 (Bankr. E.D. Mich. 1996).

### a.    Settlement of Property Environmental Claims

The Environmental Response Trust Consent Decree and Settlement Agreement should be approved as it is fair, reasonable, and consistent with applicable Environmental Laws. The establishment and funding of the Environmental Response Trust and the transfer of Environmental Response Trust Assets to the Environmental Response Trust is in full settlement and satisfaction of all present and future civil environmental liabilities or obligations of the Debtors to the Governmental Authorities, other than the General Unsecured Claims reserved in Paragraph 100 of the Environmental Response Trust Consent Decree and Settlement Agreement, with respect to any of the Environmental Response Trust Properties listed on Attachment A to the Environmental Response Trust Consent Decree and Settlement Agreement, whether prepetition or postpetition, in accordance with Section 6.4 of the Plan and the Environmental Response Trust Consent Decree and Settlement Agreement.

By achieving consensus between the Debtors and the various Governmental Authorities regarding the projected costs to remediate and conduct monitoring at the Environmental Response Trust Properties, the Environmental Response Trust Consent Decree and Settlement Agreement saved the Debtors' estates millions of dollars by avoiding costly litigation and estimation hearings.  In addition, reaching amicable agreement among the Governmental Authorities regarding the Debtors' remediation obligations maintains positive regulatory relationships that will benefit the Debtors and the Environmental Response Trust as the remediation work moves forward.  The Environmental Response Trust will be positioned to undertake the environmental remediation of the Environmental Response Trust Properties with the cooperation of the federal and state governments and with a better understanding of the work required to achieve regulatory closure.  This benefits not only the Debtors' estates, which can fully resolve their obligations in this regard, but also the Governmental Authorities, which will

have a higher degree of certainty regarding future remediation activities and a willing and

cooperative partner in the Environmental Response Trust following the Effective Date.  The

municipalities and neighborhoods where the Environmental Response Trust Properties are

located should also benefit as the Environmental Response Trust Properties are cleaned up and

put back into productive use.

    The Priority Order Sites Consent Decrees and Settlement Agreements should be

approved as they are fair, reasonable, and consistent with applicable Environmental Laws The

Debtors' payments under the Priority Order Sites Consent Decrees and Settlement Agreements

shall be in full settlement and satisfaction of all present and future civil environmental liabilities

of the Debtors to the United States on behalf of the United States Environmental Protection

Agency, Iowa, Indiana, Ohio, and Wisconsin with respect to the Priority Order Sites, other than

claims or causes of action for response costs and injunctive relief under CERCLA, RCRA, or

state environmental laws for future acts taken by the Debtors with respect to the Priority Order

Sites after the Effective Date that create liability under CERCLA, RCRA, or state environmental

laws, whether prepetition or postpetition.

### b.   The Remy Settlement

    The Remy Settlement represents an arm's-length and fair settlement of the Remy

Claim and satisfies the requirements for approval under Bankruptcy Rule 9019.  Remy is

waiving more than $16 million in claims against the Debtors and in exchange, will be getting

Protected Party status under the Plan.  Protecting Remy from suits by holders of asbestos claims

is reasonable consideration for waiving these claims because Remy should not be liable to the

holders of asbestos claims, as evidenced by its 100% success rate in dismissing suits nevertheless

brought.  Remy's contributions to Class 5 by waiving its Indirect Asbestos Claims are tangible

and sufficient to warrant Protected Party status under the Plan.  Accordingly, the Remy

Settlement should be approved.

    **2.**     **Releases**

       Pursuant to Section 12.5 of the Plan (the "**Releases**"), effective as of the Effective

Date, the Debtors will release (i) all present and former directors and officers of the Debtors who

were directors and/or officers, respectively, on or after the Commencement Date, and any other

Persons who serve or served as members of management of the Debtors on or after the

Commencement Date, (ii) all post-Commencement Date advisors, consultants, agents, counsel,

or other professionals of or to the Debtors, the DIP Lenders, the Creditors' Committee, the

Asbestos Claimants' Committee, the Future Claimants' Representative, the Indenture Trustees,

and the Fiscal and Paying Agents, and (iii) all members (current and former) of the Creditors'

Committee and of the Asbestos Claimants' Committee, in their capacity as members of such

Committees, the Future Claimants' Representative, and the Indenture Trustees and the Fiscal and

Paying Agents and their respective officers, directors, and employees from any and all Causes of

Action held by, assertable on behalf of, or derivative from the Debtors, in any way relating to the

Debtors, the Chapter 11 Cases, the Plan, negotiations regarding or concerning the Plan, and the

ownership, management, and operation of the Debtors, except for actions found by Final Order

to be willful misconduct (including, but not limited to, conduct that results in a personal profit at

the expense of the Debtors' estates), gross negligence, fraud, malpractice, criminal conduct,

unauthorized use of confidential information that causes damages, breach of fiduciary duty (to

the extent applicable), and *ultra vires* acts; *provided, however,* that the foregoing (a) shall not

operate as a waiver of or release from any Causes of Action arising out of any express

contractual obligation owing by any former director, officer, or employee of the Debtors or any

reimbursement obligation of any former director, officer, or employee with respect to a loan or

advance made by the Debtors to such former director, officer, or employee, and (b) shall not

limit the liability of any counsel to their respective clients contrary to Rule 1.8(h)(1) of the New

York Rules of Professional Conduct.

Claims held by the debtor against third parties are property of the estate and may

be released in exchange for settlement. *Mac Arthur Co. v. Johns-Manville Corp.* (*In re Johns-

Manville Corp.*), 837 F.2d 89, 91-92 (2d Cir. 1988); *see also* 11 U.S.C. 541(a)(1). When

reviewing releases in a debtor's plan, courts consider whether such releases are in the best

interest of the estate. *In re Charter Commc'ns*, 419 B.R. at 257 (explaining that "[w]hen

reviewing releases in a debtor's plan, courts consider whether such releases are in the best

interest of the estate"); *see also In re DBSD N. Am., Inc.*, 419 B.R. 179, 217 (Bankr. S.D.N.Y.

2009) (explaining that releases and discharges of claims and causes of action pursuant to section

1123(b)(3)(A) of the Bankruptcy Code are only subject to the Debtors' business judgment) *rev'd

in part on other grounds sub nom. DISH Network Corp. v. DBSD N. Am., Inc. (In re DBSD N.

Am., Inc.)*, No. 10-1175 2010 U.S. App. LEXIS 27007 (2d Cir. Feb. 7, 2011).

The releases provided for in the Plan are releases by the Debtors of claims or

causes of actions owned by the Debtors. The Debtors submit that such releases are reasonable

and consistent with section 1123(b)(3)(A) of the Bankruptcy Code. Despite certain

characterizations in the Objections,[9] the Releases are not third-party releases as they are being

provided only by the Debtors and their estates. The Debtors are not aware of the existence of

---

[9] Specifically, the Objections filed by Town of Salina (ECF No. 9203), the State of New York (ECF No. 9208), California Department of Toxic Substances Control (ECF No. 9199), and Green Hunt Wedlake, Inc., Trustee of General Motors Nova Scotia Finance Company (ECF No. 9272).

any potential causes of action against the released parties.  Accordingly, the releases should be approved.

### 3.  <u>Exculpation</u>

Section 12.6 of the Plan (the "**Exculpation**") provides that, as of the Effective Date, neither the Debtors, the GUC Trust Administrator, the Asbestos Trust Administrator, the Environmental Response Trust Administrative Trustee, the Avoidance Action Trust Administrator, the DIP Lenders, the Creditors' Committee, the Asbestos Claimants' Committee, the Future Claimants' Representative, the Indenture Trustees, and the Fiscal and Paying Agents, nor any of their respective members (current and former), officers, directors, employees, counsel, advisors, professionals, or agents, shall have or incur any liability to any holder of a Claim or Equity Interest for any act or omission in connection with, related to, or arising out of the Chapter 11 Cases; negotiations regarding or concerning the Plan, the GUC Trust Agreement, the Environmental Response Trust Agreement, the Asbestos Trust Agreement, the Avoidance Action Trust Agreement, the Environmental Response Trust Consent Decree and Settlement Agreement, and the Priority Order Sites Consent Decrees and Settlement Agreements; the pursuit of confirmation of the Plan; the consummation of the Plan; or the administration of the Plan or the property to be distributed under the Plan, except for actions found by Final Order to be willful misconduct, gross negligence, fraud, malpractice, criminal conduct, unauthorized use of confidential information that causes damages, breach of fiduciary duty (to the extent applicable), and *ultra vires* acts, and, in all respects, the Debtors, the GUC Trust Administrator, the Asbestos Trust Administrator(s), the Environmental Response Trust Administrative Trustee, the Avoidance Action Trust Administrator, the Creditors' Committee, the Asbestos Claimants' Committee, the Future Claimants' Representative, the Indenture Trustees, the Fiscal and Paying

Agents, and each of their respective members (current or former), officers, directors, employees,

counsel, advisors, professionals, and agents shall be entitled to rely upon the advice of counsel

with respect to their duties and responsibilities under the Plan; *provided, however*, that the

foregoing shall not limit the liability of any counsel to their respective clients contrary to Rule

1.8(h)(1) of the New York Rules of Professional Conduct.

Further, Section 10.8 of the Plan ("**Special Provisions for Governmental Units**,"

and together with the Exculpation, the "**Exculpation Provisions**") provides that, except as

provided in the Environmental Response Trust Consent Decree and Settlement Agreement and

the Priority Order Sites Consent Decrees and Settlement Agreements, as to "governmental units"

(as defined in the Bankruptcy Code), nothing in the Plan, shall discharge, release, enjoin, or

otherwise bar (i) any liability of the Debtors, their Estates, any successors thereto, the GUC

Trust, the Asbestos Trust, the Environmental Response Trust, or the Avoidance Action Trust,

arising on or after the Confirmation Date, (ii) any liability that is not a "claim" within the

meaning of section 101(5) of the Bankruptcy Code, (iii) any valid right of setoff or recoupment,

(iv) any police or regulatory action, (v) any environmental liability that the Debtors, their

Estates, any successors thereto, the GUC Trust, the Asbestos Trust, the Environmental Response

Trust, the Avoidance Action Trust, or any other Person or Entity may have as an owner or

operator of real property after the Effective Date, and (vi) any liability to a "governmental unit"

(as defined in the Bankruptcy Code), on the part of any Persons or Entities other than the

Debtors, their Estates, the GUC Trust, the Asbestos Trust, the Environmental Response Trust,

the Avoidance Action Trust, the GUC Trust Administrator, the Asbestos Trust Administrator(s),

the Environmental Response Trust Administrative Trustee, or the Avoidance Action Trust

Administrator, except with respect to the parties as specifically provided for in Sections 12.5 and

12.6 of the Plan.

The Exculpation Provisions exculpate third parties solely in connection with

"act[s] or omission[s] in connection with, related to, or arising out of the Chapter 11 Cases" and

specifically carve out actions for "willful misconduct, gross negligence, fraud, malpractice,

criminal conduct, unauthorized use of confidential information that causes damages, breach of

fiduciary duty(to the extent applicable), and ultra vires acts"  (Plan § 12.6.).  These provisions

are customary and generally accepted in this District.  *See In re Oneida Ltd.*, 351 B.R. 79, 94

n.22 (Bankr. S.D.N.Y. 2002).  Accordingly, the Exculpation Provisions should be approved.

### 4.        Injunctions

Section 10.6 of the Plan (the "**Injunction**") provides that, on and after the

Confirmation Date, all persons are permanently enjoined from commencing or continuing in any

manner any action or proceeding (whether directly, indirectly, derivatively, or otherwise) on

account of or respecting any claim, debt, right, or cause of action of the Debtors for which the

Debtors, the GUC Trust Administrator, or the Avoidance Action Trust Administrator retains sole

and exclusive authority to pursue in accordance with the Plan.

Section 10.7 of the Plan (the "**Injunction Against Interference with Plan**", and

together with the Injunction, the "**Injunction Provisions**") provides that, upon the entry of the

Confirmation Order, all holders of Claims and Equity Interests and other parties in interest, along

with their respective present or former employees, agents, officers, directors, or principals, shall

be enjoined from taking any actions to interfere with the implementation or consummation of the

Plan.

The Injunction Provisions are customary in this District and merely seek to assure that parties do not interfere with the consummation and implementation of the Plan and all the transactions contemplated thereby.  Accordingly, the Injunction Provisions should be approved.

## III.

## RESPONSE TO OBJECTIONS TO CONFIRMATION

Approximately twelve objections to the confirmation of the Plan have been filed and served by various parties in interest (collectively, the "**Objections**," and the objecting parties, the "**Objectors**").  Additionally, the Debtors have received approximately fifty objections to the Debtors' Disclosure Statement and/or confirmation of the Plan that can best be described as general statements of dissatisfaction with the 363 Transaction or the inevitable effects of chapter 11 on creditors and equity holders.  For ease of reference, the Debtors' response or proposed resolution to each of the Objections is set forth in the table annexed hereto as **Exhibit "A."**  The Debtors intend to update the Court on remaining Objections and any resolutions reached by the parties prior to the Confirmation Hearing.

*[The Remainder of this Page Is Intentionally Left Blank]*

## <u>CONCLUSION</u>

The Plan complies with and satisfies all the requirements of section 1129 of the

Bankruptcy Code and, therefore, should be confirmed.

Dated: New York, New York
      February 22, 2011

                  WEIL, GOTSHAL & MANGES LLP
                  Attorneys for Debtors
                  and Debtors in Possession

                  By: /s/ Stephen Karotkin
                        Stephen Karotkin
                        A Member of the Firm
                  767 Fifth Avenue
                  New York, New York 10153
                  Telephone:  (212) 310-8000
                  Facsimile:  (212) 310-8007

*Harvey R. Miller*
*Stephen Karotkin*
*Joseph H. Smolinsky*
*Michele J. Meises*
*Pablo Falabella*
      *Of Counsel*

**Exhibit "A"**

**Response to Objections to Confirmation for Debtors' Amended Joint Chapter 11 Plan**
***In re Motors Liquidation Company, et al., f/k/a General Motors Corp., et al.,***

| Docket No. | Name of Objector | Summary of Objection | Debtors' Response |
|---|---|---|---|
| 9022 | M-Heat Investors, LLC and Chapter 7 Trustee of Micro-Heat, Inc. (collectively, the "**Microheat Claimants**") | 1.  Plan's injunction provisions are too broad.  Broadly construed, the injunction provisions could be interpreted to bar or affect claimants' alleged recoupment and offset rights against the Debtors. | 1. The Plan does not affect the Microheat Claimants' right of setoff or recoupment, if any.  The Microheat Claimants and the Debtors executed a stipulation and agreed order which provides that all matters shall be adjudicated by this Court to the extent the ADR Procedures fail.  Mediation is currently scheduled to take place on March 1, 2011. |
| 9110 | JPMorgan Chase Bank, N.A., as agent ("**JPMorgan**") | 1.  Plan fails to provide for payment in full of administrative expenses relating to litigation expenses for Term Loan Avoidance Action,  particularly, JPMorgan's legal fees, costs, and charges in defending the Term Loan Avoidance Action.<br><br>2.  Section 10.5 of the Plan regarding Debtors' right to offset in connection with the Term Loan Avoidance Action violates terms of this Court's order approving debtor in possession financing (ECF No. | 1. Administrative Expenses relating to litigation expenses for the Term Loan Avoidance Action are appropriately allocated in the GUC Trust's budget.  Specifically, a total of $1.5 million (the "**Allocated Amount**") has been allocated for reimbursement of potential legal fees incurred by the defendants in the Term Loan Avoidance Action.  The Allocated Amount is, of course, subject to the Debtors' rights to challenge reasonableness and to seek disgorgement of all amounts paid and/or to be paid in the event JPMorgan's liens are avoided.  The Debtors believe the Allocated Amount is more than enough to address this obligation.<br><br>2. For the avoidance of doubt and without waiving the Debtors' rights under section 502(d) of the Bankruptcy Code as to any claimant, the Debtor and the GUC Trust do not intend to withhold Class 3 distributions to financial institutions that are defendants in the Term Loan Avoidance Action unless and until such time as the Court determines that those financial |

| Docket No. | Name of Objector | Summary of Objection | Debtors' Response |
|---|---|---|---|
| | | 2529). | institutions are required to disgorge payments received. |
| | | | The Debtors also do not intend to offset or withhold distributions to defendants in the Term Loan Litigation with respect to unrelated claims they may have based on the pending Term Loan Litigation. |
| | | 3. The Plan should not provide that the lenders under the term loan are precluded from receiving other distribution pursuant to section 502(d) of the Bankruptcy Code. Nor should the Debtors be able to offset the Term Loan Avoidance Action against JPMorgan's litigation expenses. | 3. See above for extent of offset provision under the Plan. As to JPMorgan's assertion that the Debtors will attempt to offset the Term Loan Avoidance Action against JPMorgan's legal fees and expenses, that is not the intention of the Debtors. |
| 9197 | Town of Salina ("**Salina**") | 1. All General Unsecured Claims will not be treated equally because there is a possibility that Disputed Claims may receive less distribution than Claims which are Allowed at the time of the Effective Date. | 1. All Claims, Allowed or Disputed, are entitled to a pro rata distribution of the Debtors' assets, regardless of when they are Allowed. The Plan provides for appropriate reserves for all three of Salina's Claims. |
| | | 2. The Plan improperly discriminates among "general unsecured environmental claimants" because, no rationale has been provided for distinguishing between class 3 (General Unsecured Claims) and Class 4 (Property Environmental Claims). | 2. Under section 1129(b) of the Bankruptcy Code, a plan unfairly discriminates where similarly situated classes are treated differently without a reasonable basis for the disparate treatment. *See WorldCom Inc.*, Ch. 11 Case No. 02-13533, 2003 Bankr. LEXIS 1401, at *174 (Bankr. S.D.N.Y. 2003) (citing *In re Buttonwood Partners, Ltd.*, 111 B.R 57, 63 (Bankr. S.D.N.Y. 1990)). "[I]f under the facts and circumstances of a particular case, there is a reasonable basis for disparate treatment of two similarly situated classes of claims or two similarly situated classes of equity interests, there is no unfair discrimination." *Id.* |

| Docket No. | Name of Objector | Summary of Objection | Debtors' Response |
|---|---|---|---|
| | | | Holders of Claims in Class 4 are *all* parties to either the Priority Order Sites Consent Decrees and Settlement Agreements, or the Environmental Response Trust Consent Decree and Settlement Agreement, and will receive 100% recovery in light of applicable Environmental Laws. *See* 28 U.S.C. § 959(b); *see also In re H.L.S. Energy Co.*, 151 F.3d 434, 438 (5th Cir. 1998); *Pennsylvania v. Conroy*, 24 F.3d 568, 569-70 (3d Cir. 1994); *In re Chateaugay Corp.*, 944 F.2d 997, 1007-10 (2d Cir. 1991) (debtors cannot discharge their injunctive obligations under CERCLA cleanup orders because they are not "claims"); *In re Torwico Elecs., Inc.*, 8 F.3d 146, 151 (3d Cir. 1993) (debtors' injunctive obligations under RCRA remediation orders are not impaired or otherwise affected by debtors' bankruptcy); *In re Wall Tube & Metal Prod. Co.*, 831 F.2d 118, 123-24 (6th Cir. 1987); *In re Mark IV Indus., Inc.*, 438 B.R. 460, 469 (Bankr. S.D.N.Y. 2010) (holding that environmental obligations to New Mexico Environment Department are not "claims" and are not dischargeable); *In re Eagle-Picher Holdings, Inc.*, 345 B.R. 860 (Bankr. S.D. Ohio 2006) (finding that real property trust must be funded to comply with environmental law in order to meet requirement that plan not be forbidden by law).<br><br>The Priority Order Sites Consent Decrees and Settlement Agreements were entered into between the Debtors and the governmental parties charged with enforcing applicable Environmental Laws with respect to the Debtors' obligations under such Environmental Laws. Salina's Claims are entirely distinguishable: Salina and the Debtors are alleged to be co-liable parties with respect to certain environmental contamination in the area of Lower Ley Creek and the former Town of Salina Landfill, and Salina seeks costs that it may incur under applicable Environmental Laws as a result of Salina's own liability for such contamination. Whereas the |

| Docket No. | Name of Objector | Summary of Objection | Debtors' Response |
|---|---|---|---|
|  |  |  | Priority Order Sites Consent Decrees and Settlement Agreements seek to enforce applicable Environmental Laws, Salina seeks costs that it may incur by virtue of being prosecuted under such Environmental Laws. *See In re Drexel Burnham Lambert Group, Inc.*, 138 B.R. 714, 715 (Bankr. SDNY 1992) (separate classification of similar classes was rational where members of each class "possess[ed] different legal rights"); *see also JPMorgan Chase Bank v. Charter Commc'ns Operating, LLC (In re Charter Commc'ns)*, 419 B.R. 221, 264-265 (Bankr. S.D.N.Y. 2009) (finding separate classification justified because of the members' "disparate legal rights"). |
|  |  |  | Accordingly, the Plan does not discriminate against holders of General Unsecured Claims relating to environmental claims, who in fact, will receive enhanced recoveries as a result of the Priority Order Sites Consent Decrees and Settlement Agreements and the Environmental Response Trust Consent Decree and Settlement Agreement. |
|  |  | 3.  Objects to Environmental Response Trust Consent Decree and Settlement Agreement and the Priority Order Sites Consent Decrees Settlement Agreement. | 3.  The Debtors believe that Salina's issues with respect to the specifics of the Environmental Response Trust Consent Decree and Settlement Agreement and the Priority Order Sites Consent Decrees and Settlement Agreements have been properly addressed by the United States in its Statement in Support of Environmental Provisions of Debtors' Plan and Request for Approval of Environmental Response Trust Consent Decree and Settlement (ECF No. 9311) and its Statement in Support of the Priority Order Sites Consent Decrees and Settlement Agreements (ECF No. 9312). |
|  |  |  | 4.  Wilmington Trust Company was selected as the GUC Trust |

| Docket No. | Name of Objector | Summary of Objection | Debtors' Response |
|---|---|---|---|
| | | 4. Objects to Wilmington Trust Company's appointment as the Avoidance Action Trust Administrator and as the GUC Trust Administrator. | Administrator for, among other reasons, its familiarity with these Chapter 11 Cases having historically represented the interest of over $21 billion of unsecured claims and, as such, was selected by the Creditors' Committee as being the most likely candidate to efficiently oversee the administration of the GUC Trust.<br><br>The Debtors do not believe there is a conflict of interest in having Wilmington Trust Company serve as GUC Trust Administrator and Avoidance Action Trust Administrator. It would add unnecessary costs to have yet another trustee or administrator for the very limited purpose of serving as the Avoidance Action Trust Administrator. |
| | | 5. Requests that the appointment of the GUC Trust Monitor be independent from Wilmington Trust Company. | 5. FTI Consulting Inc. is independent of Wilmington Trust Company and was selected as the GUC Trust Monitor for the combination of expertise and efficiencies it provides as it has been involved in these Chapter 11 Cases since their inception and knows in great detail the plethora of unresolved Claims. The Debtors believe that the combination of Wilmington Trust Company and FTI Consulting Inc. will provide an appropriate level of checks and balances and provide for the efficient and economic administration of the GUC Trust. |
| | | 6. Requests that Wilmington Trust Company not be indemnified for breach of fiduciary claims. | 6. The Debtors believe that the indemnification provisions are standard and appropriate. |
| | | 7. Inability under state law to accept and own publicly-traded securities. | 7. The Disclosure Statement already clarifies that the Debtors are willing to work with any municipality that is unable to accept and own publicly-traded securities to identify and |

| Docket No. | Name of Objector | Summary of Objection | Debtors' Response |
|---|---|---|---|
| | | | implement a solution to the extent practical and economically neutral to the Debtors. The Debtors are currently working with Wilmington Trust Company to generate a proposal for liquidating any distribution to Salina and reducing it to cash. |
| | | 8. Bankruptcy Court's postconfirmation exclusive jurisdiction should be limited. | 8. "[N]either [28 U.S.C.] § 1334 nor any other statutory provision explicitly limits bankruptcy jurisdiction to pre-confirmation matters . . . '[B]ankruptcy jurisdiction is not cut off the moment a [chapter 11 plan] is confirmed, nor is the analysis under [28 U.S.C.] § 1334 of whether a case is 'related to' the bankruptcy proceedings otherwise modified.'" *In re DBSD N. Am., Inc.*, 419 B.R. 179, 220 (Bankr. S.D.N.Y. 2009 (quoting *Nachom v. Citigroup, Inc. (In re Global Crossing Ltd. Sec. Litig.)*, 2003 U.S. Dist. LEXIS 20563, at *4 (S.D.N.Y. 2003)), *rev'd in part on other grounds sub nom. DISH Network Corp. v. DBSD N. Am., Inc. (In re DBSD N. Am., Inc.)*, No. 10-1175, 2010 U.S. App. LEXIS 27007 (2d Cir. Feb. 7, 2011). There is no court that is more uniquely suited to oversee matters reserved in the Plan's retention of jurisdiction provision than this Court. |
| | | 9. Overbroad releases and exculpations. | 9. The releases provided for in the Plan are releases by the Debtors of Claims owned by the Debtors. Such releases are reasonable and consistent with section 1123(b)(3)(A) of the Bankruptcy Code. *See DBSD N. Am.*, 419 B.R. at 217 (explaining that releases and discharges of claims and causes of action pursuant to section 1123(b)(3)(A) of the Bankruptcy Code are only subject to the Debtors' business judgment), *rev'd in part on other grounds sub nom. DISH Network Corp. v. DBSD N. Am., Inc. (In re DBSD N. Am., Inc.)*, No. 10-1175, 2010 U.S. App. LEXIS 27007 (2d Cir. Feb. 7, 2011).<br><br>The exculpation provision exculpates third parties solely in connection with "act[s] or omission[s] in connection with, |

| Docket No. | Name of Objector | Summary of Objection | Debtors' Response |
|---|---|---|---|
| | | | related to, or arising out of the Chapter 11 Cases" and specifically carves out actions for "willful misconduct, gross negligence, fraud, malpractice, criminal conduct, unauthorized use of confidential information that causes damages, breach of fiduciary duty(to the extent applicable), and *ultra vires* acts." (Plan § 12.6)  The language of this clause follows the text that has become standard in this District.  *See In re Oneida Ltd.*, 351 B.R. 79, 94 n.22 (Bankr. S.D.N.Y. 2002). |
| | | 10. Salina should not be subject to ADR Procedures. | 10.    The Debtors have informed Salina on multiple occasions that its environmental claim is not subject to the ADR Procedures as environmental claims are expressly carved out of the ADR Procedures approved by this Court on February 23, 2010 (ECF No. 5037) and October 25, 2010 (ECF No. 7558). |
| | | 11. Excess cash should not be returned to DIP Lenders but rather to general unsecured creditors. | 11.    The terms of the DIP Credit Agreement provide exactly the contrary:  Excess cash is to be returned to the DIP Lenders.  *See* Order Pursuant to Bankruptcy Code Sections 105(a), 361, 362, 363, 364 and 507 and Bankruptcy Rules 2002, 4001 and 6004 (a) Approving Amendment to DIP Credit Facility to Provide for Debtors' Post-Petition Wind-Down Financing (ECF No. 2969).  (*See also* Plan § 5.2(b)).  There is absolutely no basis to strip the DIP Lenders of their rights to recoup funds advanced by them that the Debtors no longer need to administer the wind-down. |
| 9203 | Onondaga County, New York ("**Onondaga**") | 1.    The Plan is not feasible because the Priority Order Sites Consent Decrees and Settlement Agreements, and the Environmental Response Trust Consent Decree and Settlement Agreement will | 1. The Debtors disagree and believe that the Priority Order Sites Consent Decrees and Settlement Agreements and the Environmental Response Trust Consent Decree and Settlement Agreement will be approved at of the Confirmation Hearing.  *See* United States' Statement In Support of Environmental Provisions of Debtors' Plan and |

| Docket No. | Name of Objector | Summary of Objection | Debtors' Response |
|---|---|---|---|
| | | not be approved by confirmation. | Request for Approval of Environmental Response Trust Consent Decree and Settlement (ECF No. 9311); United States' Statement In Support of the Priority Order Sites Consent Decrees and Settlement Agreements (ECF No. 9312). |
| | | 2. The Environmental Response Trust Agreement contains several legal errors. | 2. Onondaga's objections to the Environmental Response Trust Agreement have been properly addressed by the United States in its (i) Statement In Support of Environmental Provisions of Debtors' Plan and Request for Approval of Environmental Response Trust Consent Decree and Settlement (ECF No. 9311) and (ii) Statement In Support of the Priority Order Sites Consent Decrees and Settlement Agreements (ECF No. 9312). |
| | | 3. The Plan improperly discriminates among "general unsecured environmental claimants" because, no rationale has been provided for distinguishing between class 3 (General Unsecured Claims) and Class 4 (Property Environmental Claims). | 3. See Response to Salina's Objection # 4 above. |
| | | 4. Bankruptcy Court jurisdiction over certain environmental matters should be limited. | 4. See Response to Salina's Objection # 8 above. |
| | | 5. Onondaga should not be subject to ADR Procedures. | 5. The Debtors have informed Onondaga on multiple occasions that its environmental claim is not subject to the ADR Procedures as environmental claims are expressly carved out of the ADR Procedures approved by this Court on February 23, 2010 (ECF No. 5037) and October 25, 2010 (ECF No. |

| Docket No. | Name of Objector | Summary of Objection | Debtors' Response |
|---|---|---|---|
| | | 7558). | |
| 9208 | State of New York ("**SNY**") | 1. The GUC Trust lacks sufficient controls and oversight. | 1. Wilmington Trust Company is a well-respected indenture trustee, and its role in the GUC Trust will be adequately overseen by the GUC Trust Monitor.  No fee examiner or other additional oversight is either warranted or appropriate. |
| | | 2. Wilmington Trust Company has conflicting roles in these Chapter 11 Cases. | 2. The Debtors do not believe there is a conflict of interest in having Wilmington Trust serve as GUC Trust Administrator and Avoidance Action Administrator.  If anything, it would add unnecessary costs to have yet another trustee or administrator for the very limited purpose of serving as the Avoidance Action Trust Administrator. |
| | | 3. Plan impermissibly provides for payment as administrative expenses of Wilmington Trust Company's counsel. | 3. Payment of an indenture trustee's professional fees is customary in chapter 11 cases of this nature where the indenture trustee has provided substantial assistance to the Debtors, and relying on the indenture trustee's charging lien would dilute the recoveries of its beneficial bondholders. |
| | | 4. There are conflicts of interest of professionals that may be retained by the GUC Trust Administrator. | 4. The Debtors do not believe that there is a conflict. |
| | | 5. Plan lacks mechanism to assure that Disputed Claims will receive same distribution as Allowed Claims. | 5. The Plan's reserve mechanism for Disputed Claims sufficiently assures that distributions shall be pro rata. |
| | | 6. Plan improperly stays actions past Effective Date. | 6. The Debtors believe that the injunction provision in section 10.6 of the Plan is customary in this District and properly |

| Docket No. | Name of Objector | Summary of Objection | Debtors' Response |
|---|---|---|---|
| | | | seeks to assure that parties do not interfere with the consummation and implementation of the Plan and all the transactions contemplated thereby, including the completion of the claims reconciliation process. |
| | | 7. Overbroad third-party releases and exculpation. | 7. See Response to Salina's Objection # 9 above. |
| | | 8. Bankruptcy Court's jurisdiction post confirmation should not be exclusive. | 8. See Response to Salina's Objection # 8 above. |
| | | 9. Plan does not provide for payment of all Administrative Expenses, including compliance with applicable Environmental Laws. | 9. SNY provides no basis for this assertion. The Debtors are complying with all applicable Environmental Laws and the Plan does provide for payment of all Administrative Expenses. |
| 9198 | NCR Corporation ("**NCR**") | Plan provision regarding repayment of excess cash should not include NCR's monies held in trust. | The Debtors dispute NCR's contention that they hold property in trust belonging to NCR. In any event, according to NCR's complaint (Adv. Proc. No. 11-09400 (REG) (ECF No. 1), NCR's claim would amount to approximately $2,265,858.12. The Debtors believe that they will hold as of and after the Effective Date sufficient reserves to satisfy this Claim in full should NCR be successful in its Adversary Proceeding. |
| 9199 | California Department of Toxic Substances Control ("**CDTSC**") | 1. Plan impermissibly provides for payment as Administrative Expenses of Wilmington Trust Company's attorney fees. | This Objection is being consensually resolved by the parties. To the extent that the Objection is not resolved by the time of the Confirmation Hearing, the Debtors reserve their right to respond to each of the Objections raised by CDTSC. |

| Docket No. | Name of Objector | Summary of Objection | Debtors' Response |
|---|---|---|---|
| 9201 | Centerpoint Associates, LLC | Environmental Response Trust Agreement may prejudice Centerpoint's rights under the ground lease by and between MLC and Centerpoint. | This Objection has been resolved. |
| 9202 | Appaloosa Management L.P., Aurelius Capital Management, LP, Elliot Management Corporation, and Fortress Investment Group LLC (collectively, the "**Nova Scotia Noteholders**") | 1. Plan provision regarding no distribution pending allowance of Disputed Claim is unfair.[1]<br><br>2. Plan does not provide for a segregated reserve.<br><br>3. The Nova Scotia Noteholders' Claims should not be subject to the Plan's estimation provisions. | 1. The Nova Scotia Noteholders' real issue is with the objection to their Claims rather than the reserve mechanism in connection with Disputed Claims. There is no requirement that a chapter 11 plan mandate that disputed claims receive a distribution prior to a complete resolution of the dispute. Moreover, the Nova Scotia Noteholders' Claims are being objected to in their entirety-by the Creditors' Committee, and litigation in that respect is ongoing.<br><br>2. Despite the Debtors' success in resolving thousands of Claims, thousands of Claims remain Disputed and establishing a specific reserve for each of them would be completely impracticable. The Plan's reserve mechanism provides adequate assurance that all holders of Claims that ultimately are Allowed will receive their pro rata distribution.<br><br>3. The particular procedures for liquidating the Nova Scotia Noteholders' Claims are not an objection to confirmation and will be resolved by the parties at the appropriate juncture. |

---

[1] The Nova Scotia Noteholders argue that providing for distribution as to portions of Disputed Claims is consistent with other chapter 11 cases and cite to orders entered in other chapter 11 cases. The Nova Scotia Noteholders, however, fail to comply with ¶ 32 of the Case Management Order (ECF No. 157) and not only do not provide copies of the cited orders but also do not include "a discussion of the procedural context in which [they were] entered, and, in particular, whether [they were] entered on notice; the extent to which [they were] opposed; whether [they were] entered on a preliminary or final hearing, where applicable; the extent to which the provision[s] relied on [were] focused on by the judge; and the extent to which the judge made findings of fact or conclusions of law in connection with the provision[s] relied on." (Case Management Order ¶ 32.)

| Docket No. | Name of Objector | Summary of Objection | Debtors' Response |
|---|---|---|---|
| | | 4. Distributions on the Nova Scotia Noteholders' Claims should not be withheld pending surrender of the Nova Scotia Notes. | 4. To the extent the Plan precludes a distribution solely based on other provisions of the Plan which permit the retention of the Nova Scotia Noteholders' Claim for limited purposes, such inconsistency will be remedied. |
| | | 5. The GUC Trust should not be substantively altered following confirmation of the Plan. | 5. It is the Debtors' understanding that no material modifications to the GUC Trust Agreement will be made between the Confirmation Date and the Effective Date. |
| | | 6. The unit issuance ratio should be provided prior to confirmation. | 6. The GUC Trust Agreement will provide that the unit issuance ratio is 1 unit for each $1,000 of Allowed Claims. |
| | | 7. The GUC Trust Administrator should not be allowed to make distributions inconsistent with provisions of the Plan. | 7. Section 5.9 of the GUC Trust Agreement merely provides for limited flexibility necessary for the efficient administration of the GUC Trust. It does not affect any substantive rights of the holders of Allowed Claims. |
| 9207 | Anchorage Capital Master Offshore Ltd, Canyon-GRF Master Fund, L.P., Canyon Value Realization Fund L.P., CSS, LLC, CQS Directional Master Fund Inc., KIVU Investment Fund | Joined objection filed by the Nova Scotia Noteholders. | See Debtors' response to the Nova Scotia Noteholders above. The Debtors note that, to date, a statement under Bankruptcy Rule 2019 has not been filed with respect to these entities. |

| Docket No. | Name of Objector | Summary of Objection | Debtors' Response |
|---|---|---|---|
| | Limited, Knighthead Master Fund, LP, LMA SPC for and on behalf of MAP 84, Lyxor/Canyon Realization Fund, Ltd., Onex Debt Opportunity Fund, Ltd., Redwood Master Fund Ltd, and The Canyon Value Realization Master Fund, L.P. | | |
| 9272 | Green Hunt Wedlake, Inc., Trustee of General Motors Nova Scotia Finance Company (the "**Nova Scotia Trustee**") | 1. The Plan has not been proposed in good faith because it prohibits distributions to holders of Disputed Claims and does not provide for segregated reserves. | 1. There is no basis for asserting a lack of good faith pursuant to section 1129(a)(3) of the Bankruptcy Code because the Plan provides that no distribution will be made with respect to Disputed Claims until the dispute is fully resolved. Moreover, the Nova Scotia Trustee's Claim has been objected to in its entirety by the Creditors' Committee and litigation in that respect is ongoing.<br><br>Despite the Debtors' success in resolving thousands of Claims, thousands of Claims remain Disputed and establishing a specific reserve for each of them would be completely impracticable. The Debtors' reserve mechanism provides adequate assurance that all holders of Claims that ultimately are Allowed will receive their pro rata distribution. |

| Docket No. | Name of Objector | Summary of Objection | Debtors' Response |
|---|---|---|---|
| | | 2. The Plan contains vague treatment of Class 3 General Unsecured Claims. | 2. The treatment provided for in the Plan and the GUC Trust Agreement is not vague. Section 5.8 of the GUC Trust Agreement is absolutely clear: The GUC Trust Administrator may, if it determines in good faith that it is necessary to carry out the intent of the Plan, the Confirmation Order, and the GUC Trust Agreement, make distributions not in technical compliance with Article V of the GUC Trust Agreement. This hardly is material. Moreover, Section 5.8 is not inconsistent with Section 5.9 because Section 5.9 expressly states that it is subject to Section. 5.8. |
| | | 3. The Plan requires the Court to act in excess of its jurisdiction because— <br><br> a. The Plan requires dissolution of the Debtors' subsidiaries, which would include, GM Nova Scotia, whose dissolution is governed under the laws of Nova Scotia. <br><br> b. The Plan provides for cancellation and discharge of the Fiscal and Paying Agency Agreement governing the Nova Scotia Notes, which would conflict with the Nova Scotia bankruptcy. | 3. <br><br> a. Appropriate actions will be undertaken to assure that whatever dissolution requirements are provided for under the Plan will not supersede applicable law of Nova Scotia with respect to the dissolution of GM Nova Scotia. <br><br> b. To the extent the Plan provides for a cancellation of the Fiscal and Paying Agency Agreement that improperly prejudices the Nova Scotia Noteholders' claims against GM Nova Scotia, such provision will be remedied. |
| | | 4. The setoff provision of the Plan may violate section 502(d) of the Bankruptcy Code. | 4. The provision in the Plan (Section 5.7) is a standard and customary provision. Any setoff effected by the Debtors or under the Plan will be in full compliance with applicable law. There is no requirement under the Bankruptcy Code or otherwise that the Debtors advise any creditor prior to |

| Docket No. | Name of Objector | Summary of Objection | Debtors' Response |
|---|---|---|---|
| | | | confirmation whether they intend to effectuate a setoff. |
| | | 5. The Plan includes inappropriate exculpation provisions. | 5. See Response to Salina's Objection # 9 above. |
| 9259 | New United Motor Manufacturing, Inc. ("**NUMMI**") | 1. Plan should establish a segregated reserve for NUMMI claim. | 1. Despite the Debtors' success in resolving thousands of Claims, thousands remain Disputed and establishing a segregated reserve account for each of them would be completely impracticable.  The Plan's reserve mechanism provides adequate assurance that all holders of Claims that ultimately are Allowed will receive their pro rata distribution. |
| | | 2. The release and injunctive language should not bar NUMMI from prosecuting its adversary proceeding. | 2. The Debtors have specifically provided, in their proposed Confirmation Order, that NUMMI not be barred from prosecuting its adversary proceeding against the Debtors. |
| | | 3. Plan provision regarding dissolving the Debtors' subsidiaries should be consistent with NUMMI's governing documents. | 3. The Debtors have specifically provided in their proposed Confirmation Order that NUMMI's dissolution be governed by its governing documents. |
| | | 4. Provision regarding setoff rights is overly broad. | 4. See Response to Nova Scotia Trustee Objection # 4 above. |
| | | 5. Plan should provide for oversight on GUC Trust Administrator's power to settle Disputed Claims. | 5. There is no requirement for this under applicable law.  The GUC Trust Administrator has fiduciary duties to the beneficiaries of the GUC Trust, and there is no basis to assume that such duties will not be appropriately discharged. |
| | | 6. Debtors have not assured that NUMMI's Administrative Expense will be satisfied with cash. | 6. The Debtors do not believe that NUMMI has a valid Administrative Expense and will be filing an objection to NUMMI's Administrative Expense request. |

| Docket No. | Name of Objector | Summary of Objection | Debtors' Response |
|---|---|---|---|
| 9206 | Allstate Insurance Company, solely as successor in interest to Northbrook Excess and Surplus Insurance Company ("**Northbrook**") | 1.  The Plan is not insurance neutral.<br><br>2.  The Plan improperly assigns insurance policies to the Asbestos Trust due to non-assignment clauses in the insurance policies.<br><br><br>3.  Bankruptcy Court's retention of jurisdiction provision cannot cover state law coverage disputes. | The Debtors are working with Northbrook to address their concerns and believe that this objection will be resolved.  To the extent it is not resolved, below are the Debtors' responses to each of the objections asserted by Northbrook.<br><br>1.  There is no requirement in section 1129 that a plan contain specific "insurance neutral language" in order to be confirmed.  However, the plan is "insurance neutral" in that the Debtors do not intend to give themselves or subsequent transferees of the policies any greater rights than they would otherwise have.<br><br>2.  Insurance policies in which the policy periods have expired and initial premiums have been paid are not executory contracts, despite continuing obligations by the insured.  *In re Grace Industries, Inc.*, 341 B.R. 399 (Bankr. E.D.N.Y. 2006); *In re Vanderveer Estates Holding, LLC*, 328 B.R. 18 (Bankr. E.D.N.Y. 2005); *In re Ames Dept. Stores, Inc.,* 1995 WL 311764 (S.D.N.Y. May 18, 1995).  Pursuant to sections 541(c)(1) and 1123(a)(5)(B), respectively, such policies are transferable to a debtor's estate, and from a debtor's estate to other entities, regardless despite any state law provisions prohibiting assignment.  *In re Combustion Engineering*, 391 F.2d 190, n.23 (3d Cir. 2004); *In re Federal-Mogul Global, Inc.*, 385 B.R. 560 (Bankr. D. Del. 2008); *In re Western Asbestos Co.*, 313 B.R. 832, 858 (Bankr. N.D. Cal. 2003).  The case cited by Northbrook does not address the transfer of insurance policies.<br><br>3.  The Plan is not drafted to extend the jurisdiction of the Bankruptcy Court beyond the limits proscribed in the U.S. Constitution and governing statutes, but rather to provide that the Bankruptcy Court's retention of jurisdiction is as broad as permissible under those authorities. |

**Exhibit "B"**

# biography

## Elliott Laws



**Elliott P. Laws**
Partner
elaws@crowell.com

**Washington**
1001 Pennsylvania Avenue, N.W.
Washington, DC 20004-2595
Phone: 202.624.2798
Fax: 202.628.5116

**Elliott Laws** is a partner in the Washington, DC office of Crowell & Moring and practices in the firm's Public Policy and Environment and Natural Resources Groups. He provides strategic counseling and legal, policy and crisis management advice on environmental and energy policy issues, regulation and litigation, addressing Superfund and Hazardous Wastes; Brownfields Redevelopment; Environmental Remediation; Chemical Regulation; Clean Air; and Clean Water. Mr. Laws is frequently sought for advice regarding site specific, as well as, general issues faced by major corporations in the environmental regulatory and policy areas. With his his deep environmental experience, he is able to help guide these clients through complex negotiations and development of innovative resolutions at the highest levels of the federal governments.

He was recently proposed to the U.S. Bankruptcy Court to serve as Administrative Trustee for the environmental response trust that will oversee the approximately $800 million trust established by the U.S. Government to clean up and repurpose for redevelopment the former properties of "Old" General Motors Corp.  He will manage this role through a separate entity, EPLET LLC, of which he will be the Managing Member.

Mr. Laws formerly served as President of Safety, Health and Environment for Texaco Inc. While at Texaco, Mr. Laws was responsible for the development and oversight of worldwide environmental and safety policies and positions, including climate change, sustainability, environmental management systems, and corporate audit and responsibility programs supporting the underlying strategic and business objectives of the corporation. Mr. Laws was also principal advisor to the CEO and other senior corporate officials on environmental policy matters. His work with

# biography

Texaco included, working with business unit leaders to integrate environmental goals of the corporation into the business unit plans. Finally, he supported business units on international project and policy development including interaction with international business partners, and coordinated with Legal Department and Government Affairs Office on major environmental claims.

As Assistant Administrator for Solid Waste and Emergency Response at the Environmental Protection Agency, he was responsible for regulatory and policy development and implementation for solid and hazardous waste management. This included the Superfund, RCRA, Brownfields and underground storage tank programs. Previously, he was a Justice Department and EPA attorney and a Manhattan Assistant District Attorney.

**Education**
St. John's University, B.A., 1977
Georgetown University Law Center, J.D., 1980

**Affiliations**
Admitted to practice: District of Columbia, New York

**Other Affiliations**

- Fellow: American College of Environmental Lawyers
- Council Member: American Bar Association's Section of Environment, Energy and Resources
- National Board Member: Trust for Public Land
- Board Member: Environment and Energy Study Institute
- Former Secretary/Treasurer and Board member: Environmental Law Institute, Elliott authors the "The Business of Environment," published in the Environmental Forum

**Publications**
"In the Gulf, BP Faces a Tragedy," *The Environmental Forum*, Environmental Law Institute, Washington, D.C., www.eli.org (July/August 2010). Author: Elliott P. Laws.

"EPA Releases Broad Chemical Reform Principles and Seeks Industry Data for Immediate Risk Management Plans," *Crowell & Moring Product Risk Management Law Alert* (October 2, 2009). Co-Authors: James C. Chen, Monica M. Welt and Elliott P. Laws.

**Exhibit "C"**

# KIRK WATSON

2301 Woodlawn Blvd Austin, TX 78703  512-478-6695

## BACKGROUND AND EDUCATION

Born in 1958 and grew up in Fort Worth area. Graduated from Boswell High School,  Eagle Mountain-Saginaw ISD, in 1976.

Graduated from Baylor University and Baylor Law School: Fall 1976-Spring 1981

> B.A., *magna cum laude*, Baylor University
> J.D., *cum laude*, Baylor University School of Law 1981
> *(Graduated from law school five years after graduating from high school.  Graduated first in law school class, serving as Editor-in-Chief of the Law Review, and competing on the national finals teams in both moot court and mock trial.)*

Married to Liz McDaniel Watson for 31 years; father to Preston (21; junior at University of Texas) and Cooper Watson (15; sophomore at Austin High School)

## PROFESSIONAL EXPERIENCE: LAWYER, ECONOMIC DEVELOPMENT CONSULTANT

| | | |
|---|---|---|
| Brown McCarroll | Partner | 2009 |
| K&L Gates (after merger with Hughes & Luce LLP) | Partner | 2008 - 2009 |
| Hughes & Luce, LLP | Partner | 2005 – 2008 |
| Watson Bishop London & Galow | Founding Partner | 1997 – 2005 |
| Whitehurst, Harkness & Watson | Associate and Partner | 1986 – 1997 |
| Scott, Douglass & Luton | Associate and Partner | 1982 – 1986 |
| Clerk, Judge Sam D. Johnson, U.S. Court of Appeals for the Fifth Circuit | | 1981 – 1982 |

### Recognitions

> Outstanding Young Lawyer of Texas
> Young Baylor Lawyer of the Year
> Texas Young Lawyers Association President
> State Bar of Texas Executive Committee Member
> American Bar Association Young Lawyers Division, Texas Representative
> State Bar Committee on Legal Services to the Poor in Civil Matters, Chair
> Two Presidential Citations for work on behalf of the State Bar
> Frequent lecturer at Continuing Legal Education Seminars
> Listed in "Best Lawyers in America"
> Named a Texas "Superlawyer" in Texas Monthly magazine

- Consulted with cities, counties and regional groups across the country on preparing for and prospering in the 21st Century economy
- Nationally and internationally recognized speaker on job creation and economic development issues
- Invited by the U.S. State Department in 2006 to tour Russia and speak on 21st Century economic development
- Referenced in *The Rise of Creative Class* and other works by Dr. Richard Florida, now Director of the Martin Prosperity Institute and Professor of Business and Creativity at the University of Toronto, who pioneered studies of creative economies.

### Other Business Activity

 Frontier Bank of Texas, Elgin, Texas - Founder, Organizer and Director

Federal Mogul U.S. Personal Injury Trust, Managing Trustee

**PUBLIC SERVICE**

**Texas State Senator** - District 14   2006 - present (reelected in 2010)
*Appointed to following Senate committees by Texas Lieutenant Governor:*
  Transportation & Homeland Security - Vice Chair
  Business & Commerce
  Select Committee on Economic Development
  Subcommittee on Emerging Technologies & Economic Development
  Higher Education
  Nominations
  Business Tax Advisory Committee

- Named "Rookie of the Year" by Texas Monthly Magazine, 2007
- Named a "Ten Best" Legislator by Texas Monthly Magazine, 2009
- Received the Price Daniel Award for Distinguished Public Service by Baylor Alumni Association
- Excellence in Leadership Award by Concordia University for the application of Christian values in service, among other recognitions
- Received the inaugural Pro Texana Medal of Service Award from Baylor University

**Chair, Capitol Area Metropolitan Planning Organization**   2007 - 2009
- Chair of a 20-member board of state, county, and local officials, which is designated by the federal government as the principal transportation planning agency for the Austin region
- Lead the board in considering policy decisions dictating the spending of federal transportation dollars in the region
- Work with the Texas Department of Transportation, the Capital Metro Transit Authority, and local governments on transportation needs and plans throughout the region
- Oversaw "peer review" process to reform CAMPO, making it more transparent, accountable, and effective
- Launched process to review and reform Capital Metro while reorganizing the agency's board
- Led effort to pass long-needed highway improvements in the Austin area

**Chair, Greater Austin Chamber of Commerce**   2005
- Monitored operations and policy development for the region's leading business organization
- Helped lead the effort to create the Opportunity Austin program, which sought to establish 70,000 net new jobs over five years in the five county region
- Worked to align economic development priorities with technological opportunities, such as clean energy development and activities at research universities
- Led efforts to bring to the Austin area the nation's largest capital investment expenditure - Samsung's next-generation chip factory
- Created the Small Business Health Coalition, a model program helping small businesses access health insurance for their employees through the Chamber

**Mayor, City of Austin**   1997-2001
- Elected in 1997, re-elected in 2000 with a record 84 percent of the vote
- Launched several initiatives that connected the city's economic health with its environmental well-being, ending decades-long battles between environmentalists and the business community
- Developed enduring, consensus-based growth policies that spurred transformative development in downtown Austin and fortified the city's technology-based economy
- Negotiated an agreement that secured the city's water supply for potentially 100 years
- Led the search for a new Austin Independent School District Superintendent
- Named "Best Mayor in Texas for Business" by Texas Monthly Biz Magazine
- *Forbes* and *Fortune Magazine* named Austin the best city or place in the U.S. to do business

- *Governing Magazine* recognized Austin as one of the top two cities in the country for the way in was governed
- Was personally recognized by numerous groups for service, including the Greater Austin Chamber of Commerce, Real Estate Council of Austin, Downtown Austin Alliance, Texas Nature Conservancy, Austin Family magazine, the International Downtown Association and the Austin Chronicle

**Chair, Texas Air Control Board** 1991-1993
- Appointed by Governor Ann Richards, confirmed by Texas Senate
- Vice-Chair of committee that merged the Air Control Board and the Texas Water Commission (now know as Texas Commission of Environmental Quality)
- Recognized by the Sierra Club and American Lung Association

**SELECTED PREVIOUS COMMUNITY INVOLVEMENT**
Juvenile Diabetes Research Foundation, Austin Chapter
  (*The annual award given by the organization is called "The Liz and Kirk Watson Founders Award."*)
Lance Armstrong Foundation, Board Member of the Original Board
Ballet Austin, Board Member
KLRU, Board Member
Community Partnership for the Homeless, Board Member
Texas Advisory Board for Environmental Defense, Chair
El Buen Samaritano, Board Member

**SELECTED RECENT AWARDS AND RECOGNITIONS**
Harvey Penick Award for Excellence in the Game of Life, given by Caritas of Austin
Distinguished Legislative Award, given by Texas Municipal League
Public Officials Award, given by Texas Public Power Association
Salute for outstanding leadership, given by Clean Air Force of Central Texas
Champion for Children Award, given by AMERIGROUP Foundation & the Austin Children's Shelter
Legislative Advocate of the Year, given by Texas PTA
Texas Technology Champion, given by American Electronics Association
Environmental Stewardship Award, given by Texas Association of Mexican American Chambers of Commerce
Best State Legislator, named in Austin Chronicle Reader's Poll
Heart of Honor Award, given by American Heart Association
Outstanding Alumnus Award, given by Austin Young Lawyers Association
Star for Austin's Children Award, given as part of the Dennis Quaid Charity Weekend in Austin
Environmental Stewardship Award, given by Texas Interfaith Power & Light
Austinite of Year, given by Greater Austin Chamber of Commerce