Hearing date and time: **March 1, 2011 at 9:45 a.m.**

Objection Deadline: **February 23, 2011**
**by consent of Debtors**

MORGAN, LEWIS & BOCKIUS LLP
101 Park Avenue
New York, NY 10178
(212) 309-6000
Richard S. Toder
Andrew D. Gottfried
Annie C. Wells

*Attorneys for JPMorgan Chase Bank, N.A., as Agent*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------------------------------x
In re                                  :
                                       :    Chapter 11
MOTORS LIQUIDATION COMPANY, et al.     :
        f/k/a General Motors Corp., et al.,   :    Case No. 09-50026 (REG)
                                       :
                Debtors.               :    (Jointly Administered)
------------------------------------------------------------x
```

OBJECTION OF JPMORGAN CHASE BANK, N.A., AS AGENT, TO MOTION OF DEBTORS
FOR ENTRY OF AN ORDER ESTABLISHING CLAIMS RESERVES IN CONNECTION WITH
DISTRIBUTIONS TO BE MADE UNDER THE DEBTORS' AMENDED JOINT CHAPTER 11
PLAN WITH RESPECT TO, AMONG OTHER THINGS, CERTAIN UNLIQUIDATED CLAIMS

JPMorgan Chase Bank, N.A. ("**JPMC**" or "**Term Loan Agent**"), through its

undersigned attorneys, hereby submits this Objection to the Debtors' Motion (the "**Motion**") for

an Order Establishing Claims Reserves (the "**Claims Reserve**") in Connection with Distributions

to be Made Under the Debtors' Amended Joint Chapter 11 Plan (the "**Plan**"),[1] and respectfully

states as follows:

## OBJECTION

1.      JPMC objects to the Motion for two reasons:  First, the Debtors have failed to

clearly reserve for the Term Loan Lenders' potential $1.6 billion general unsecured claim in

---

[1]    Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Motion or
the Plan, as applicable.

connection with the ongoing Term Loan Avoidance Action (the "**Term Loan Claim**")[2].  Second,

the Debtors improperly propose to reserve for and treat JPMC's filed administrative claims

(listed on Exhibit D as claims nos. 70708 and 70709, collectively, the "**Filed Administrative**

**Claims**") as unliquidated general unsecured claims.

I.    *Debtors Must Reserve For The Term Loan Lenders'*
      *Potential $1.6 Billion General Unsecured Claim*

2.    In their Motion, Debtors make clear that the amount of New GM Securities and

GUC Trust Units available for distributions to unsecured creditors is fixed and that "no

additional New GM Securities or GUC Trust Units will be issued . . . ."  See Motion ¶16.  As

such, Debtors recognize that "a reserve must be established to provide for potential Class 3

Claims that are not Allowed Unsecured Claims as of the applicable distribution date . . . ."  Ibid.

3.    The Motion seeks to establish, *inter alia*, initial distribution reserve amounts for

certain fully unliquidated General Unsecured Claims in the aggregate amount of $420 million,

which is based upon the Debtors' estimate of the valuation of such claims at approximately $370

million.   *See* Motion ¶ 22.   However, since the reserve does not take into account the

approximately *$1.6 billion* Term Loan Claim, the so-called $50 million "cushion" is grossly

inadequate, unless a separate reserve for the $1.6 billion[3] is created for the Term Loan Claim.

4.    As this Court is aware, the Creditors Committee commenced the Term Loan

Avoidance Action seeking to avoid as unperfected the security interest asserted by the Term

Loan Lenders and to recover approximately $1.6 billion in repayments made to the Term Loan

Lenders from the DIP Loan.  As of the date hereof, JPMC's motion for summary judgment and

---

[2]    While JPMC is confident that the Term Loan Avoidance Action will be resolved in favor of the Term Loan
       Lenders and that their security interest on Debtors' property was perfected, prudence and fairness require that
       the Term Loan Lenders be protected against an adverse outcome.

[3]    In the Motion, the only unliquidated claims which are excluded from the Claims Reserve are the environmental
       claims, subject to the Environmental Response Trust.  See Motion, ¶2, n. 2.  There is no reference in the
       Motion to the Term Loan Claim.

the Creditors Committee's cross motion for partial summary judgment in the Term Loan Avoidance Action are *sub judice* and, under the Plan, the Term Loan Avoidance Action will continue to be pursued by the Term Loan Avoidance Action Trust.[4]

5.    In the event that the Term Loan Lenders are judicially determined (on a final and non-appealable basis) to be liable for the repayment of the $1.6 billion, then the Term Loan Lenders are entitled to a general unsecured claim for such amount pursuant to Bankruptcy Rule 3002(c)(3).[5]  Yet, as discussed below, the only mention in the Motion of any claim of the Term Loan Lenders is the wrongful inclusion of JPMC's Filed Administrative Claims on <u>Exhibit D</u>. *See* <u>Exhibit D</u>, p. 18.  A lack of proper reserves for the Term Loan Claim means that in the event of a final judgment adverse to the Term Loan Lenders, there will undoubtedly be insufficient securities and units available for distribution to them, even assuming that Debtors' estimate of $370 million of disputed claims is accurate.[6]

---

[4]    The factual background relating to the Term Loan Avoidance Action, the relevant terms of this Court's Final DIP Order and the Plan, and JPMC's Filed Administrative Claims for administrative litigation expenses in defending the Term Loan Avoidance Action pursuant to the Final DIP Order are set forth in the *Objection of JPMorgan Chase Bank, N.A., as Agent, to Confirmation of Debtors' Amended Joint Chapter 11 Plan* filed on February 7, 2011 [Dkt. No. 9110] (the "<u>Plan Objection</u>"), and are incorporated in their entirety herein.

[5]    Rules 3002(c)(3) states:

An unsecured claim which arises in favor of an entity or becomes allowable as a result of a judgment may be filed within 30 days after the judgment becomes final if the judgment is for the recovery of money or property from that entity or denies or avoids the entity's interest in property.  If the judgment imposes a liability which is not satisfied, or a duty which is not performed within such period or such further time as the court may permit, the claim shall not be allowed.

[6]    The Debtors state that "[U]nlike other chapter 11 cases where a reserve and the estimation procedure to create a reserve may operate to limit the amount that any individualized creditor can recover, there is no such effect here.  Rather, the Debtors seek to reserve an amount that is determined in the aggregate, but which does not operate to limit the ability of any one creditor to prove the amount of its claim or to recover on the basis of that proven amount, *subject only to the aggregate cap of the Disputed Claims Reserve as set forth herein.*" (emphasis added).  See Motion ¶42.

.

6. The absence of adequate securities and units occurs because the stated intent of Debtors is to make distributions to holders of allowed unsecured claims "as soon as reasonably practical after the Effective Date." See Motion ¶19. While Debtors assert that the proposed $420 million reserve takes into account "the potential concerns of holders of Disputed Claims regarding the adequacy of the Fully Unliquidated Claims Reserve" (See Motion ¶24), this is patently not so.

7. The only fair and equitable means of protecting against such eventuality is to establish an Individual Claims Reserve of $1.6 billion for the Term Loan Claim.[7] If the Term Loan Avoidance Action is resolved in favor of the Term Loan Lenders, a second distribution to holders of Allowed Class 3 Claims can be promptly made and the only detriment to such holders will be a delay in receipt of some securities and units. On the other hand, if the pending litigation is determined adverse to the Term Loan Lenders and the securities and units have already been distributed to holders of Allowed Class 3 Claims, the Term Loan Lenders will have no recourse.

8. Indeed, the GUC Trust Agreement provides that the GUC Trust Administrator shall retain on account of the Term Loan Claim sufficient GUC Trust Distributable Assets of up to the Maximum Amount, defined as an amount equal to "$[1.5 billion]." See GUC Trust Agreement, p. 7 and ¶5.5(a). Similar language is contained in the Avoidance Action Trust (p. 19, ¶5.5(a)). Thus, the Debtors must make clear that the Motion does not apply to the Term Loan Claim and that an appropriate reserve for a $1.6 billion claim be created (both in the GUC

---

[7] Debtors recognize that it may be appropriate to "establish a maximum specific reserve" on account of particular disputed claims. See Motion, ¶27.

Trust and the Avoidance Action Trust).[8] Furthermore, both proposed Trust Agreements contain language that the reserve to be created shall hold sufficient assets "to the extent practicable." See Trust Agreements, ¶5.5. This language creates uncertainty and the possibility of a diminution of the protections said to be afforded.

## II.    *JPMC's Filed Administrative Claims Are Improperly Treated As General Unsecured Claims*

9.    JPMC could not have been clearer that the Filed Administrative Claims were in respect of JPMC's post-petition, administrative expenses for the reasonable fees, costs and charges in defending the Term Loan Avoidance Action, which expenses the Debtors are obligated to pay pursuant to the Final DIP Order.[9] However, the Debtors have identified JPMC's Filed Administrative Claims as general unsecured claims in the Motion on Exhibit D and, presumably, are seeking to include such claims in the reserve -- as distinguished from satisfying such administrative claims by continuing cash payments, as required by the Final DIP Order. In both Trusts, the only possible reference to payment of the Filed Administrative Claims is in §6.1(a)(ii) where, subject to the Budget, the Trust Administrator is to "satisfy other obligations or other liabilities incurred or assumed by the Trust...." Nothing in the Trust Agreements or the Plan, purports to have either Trust assume the liability for payment of the Filed Administrative Claims.

10.    On February 22, 2011, Debtors filed a Memorandum of Law in Support of Confirmation of the Plan which on Exhibit A, p. 1, states in response to JPMC's objection to the Plan:

---

[8]    Furthermore, since §6.2(f) of the Plan permits the GUC Trust Administrator to sell New GM Stock and §8.1(b) of the GUC Trust Agreement gives the Administrator powers granted under the Plan, New GM Stock in such Individual Claim Reserve should only be sold with the consent of the Term Loan Lenders.

[9]    Again, JPMC respectfully refers the Court to the Plan Objection, as well as JPMC's proofs of claim (nos. 70708 and 70709).

Administrative Expenses relating to litigation expenses for the Term Loan Avoidance Action are appropriately allocated in the GUC Trust's budget.  Specifically, a total of $1.5 million (the "Allocated Amount") has been allocated for reimbursement of potential legal fees incurred by the defendants in the Term Loan Avoidance Action.

11.    The Memorandum raises the following concerns.  First, while it is stated that litigation expenses are allocated in the GUC Trust budget, there is nothing in the Trust Agreements which obligates either of the Trusts to pay the Filed Administrative Claims.  In that regard, on February 22, 2011, Alix Partners sent an e-mail to Agent's counsel stating, in pertinent part, that "responsibility for processing and paying invoices . . . after the Effective Date will depend on whether your services fall under the operation and claims transferred to the GUC Trust. . . ."  Rather than clarify the issue, it demonstrates the necessity for a writing that acknowledges the Trust's undertaking to pay the Filed Administrative Claims.

12.    Second, while Debtors' state in the Memorandum that the Agent's litigation expenses are in the GUC Trust's budget, the only evidence that counsel has been able to discover is the unhelpful reference in Exhibit B to the Disclosure Statement, p. 8, where "Professional Fees" for 2011-2014 are projected to be a total of $39.7 million.  Third, while the Memorandum unilaterally states that a total of $1.5 million has been allocated for reimbursement of legal fees, that amount has never been discussed, much less agreed to by the Agent.  Fourth, Debtors' obligation under the Final DIP Order is not limited to counsel fees, rather it includes fees, costs and charges.

13.    Either the parties will agree to an Allocated Amount for the Filed Administrative Claims or the Court should set such amount.  Furthermore, that amount should be earmarked for this specific purpose and not subject to diminution on account of other Trust expenses.  This is

because as an administrative claim, Section 1129(a)(9) of the Bankruptcy Code mandates that it

be paid in cash in full or on such other terms as may be otherwise agreed.

## CONCLUSION

**WHEREFORE**, for the reasons set forth above, the Agent respectfully requests that the

Court (i) deny the Motion, and (ii) grant such other relief as this Court deems just and proper.

Dated: New York, New York
       February 23, 2011

                    Respectfully submitted,

                    **MORGAN, LEWIS & BOCKIUS LLP**

                    By: _____/s/ Richard S. Toder_____ _____
                              Richard S. Toder
                              Andrew D. Gottfried
                              Annie C. Wells
                              101 Park Avenue
                              New York, New York  10178
                              (212) 309-6000

                    *Attorneys for JPMorgan Chase Bank, N.A., as Agent*