**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------x
                                                                :
In re                                                           :          **Chapter 11 Case No.**
                                                                :
**MOTORS LIQUIDATION COMPANY,** *et al.,*                       :          **09-50026 (REG)**
      **f/k/a General Motors Corp.,** *et al.*   :
                                                                :
          **Debtors.**                    :          **(Jointly Administered)**
                                                                :
-----------------------------------------------------------------x

### DECLARATION OF THOMAS A. MORROW IN SUPPORT OF
### CONFIRMATION OF DEBTORS' AMENDED JOINT CHAPTER 11 PLAN

I, Thomas A. Morrow, hereby declare under penalty of perjury:

       1.       I am a Managing Director for AlixPartners, LLP and a Vice President of Motors

Liquidation Company ("**MLC,**" and together with its affiliated debtors and debtors in

possession, the "**Debtors**"). My responsibilities for the Debtors primarily consist of overseeing

the Debtors' risk management activities, managing the progress of the Chapter 11 Cases[1] and

negotiating the terms of the Debtors' Plan, including the establishment of the GUC Trust and the

mechanics of the Plan's distribution scheme. I have extensive experience providing financial

advisory and management services in chapter 11 cases and I have been personally involved in

other important chapter 11 cases in a variety of positions. For example, I acted as (i) financial

advisor to the debtor in a chapter 11 case involving an automotive parts manufacturer, *In re*

*BHM Techs. Holdings, Inc.*, Ch. 11 Case No. 08-04413 (Bankr. W.D. Mich. 2008); (ii) financial

advisor to the secured creditor in *In re Scotia Pacific Co. LLC, et al.*, Ch. 11 Case No. 07-20027

(Bankr. S.D. Tex. 2007); (iii) chief restructuring officer for Core-Mark International, Inc., a

---

[1] Capitalized terms used herein but not otherwise defined herein shall have the meanings ascribed to such terms in the Debtors' Amended Joint Chapter 11 Plan, dated December 7, 2010 (as the same has been or may be amended, modified, supplemented, or restated, the "**Plan**").

subsidiary of Fleming Companies, in connection with its chapter 11 cases (*In re Fleming Cos., Inc., et al.*, Ch. 11 Case No. 03-10945 (Bankr. D. Del. 2003)); (iv) assistant treasurer for K-Mart Corporation in its chapter 11 cases, having responsibility for, among other things, vendor management relating to the chapter 11 plan; and (v) financial advisor to the debtor in LTV's chapter 11 case in which I was integrally involved in developing and implementing LTV's plan of liquidation.

2.      Except as otherwise indicated, all facts set forth herein are based upon my personal knowledge or the personal knowledge of employees who report to me, my review of relevant documents, information provided to me by the Debtors' management or legal advisors, or my opinion based upon my familiarity with the Debtors' business, operations, and financial condition.  If I were called upon to testify, I could and would testify competently as to the facts set forth herein.

3.      I have reviewed and am generally familiar with the terms and provisions of the Plan and the requirements for confirmation of the Plan under section 1129 of the Bankruptcy Code.

### The 363 Transaction

4.      As a result of the economic collapse and liquidity crisis that began to surface during the end of 2007 and exploded in 2008, General Motors Corporation ("**GM**") (now known as Motors Liquidation Company) and its affiliated debtors commenced these Chapter 11 Cases with the objective of implementing the only available means to preserve and maximize the value, viability, and continuation of the Debtors' business and, by extension, preserve and provide jobs for the Debtors' employees and others, and enhance the interests of their economic stakeholders through a sale of substantially all their assets pursuant to section 363 of the Bankruptcy Code to

NGMCO, Inc. (the "**Purchaser**" or "**New GM**"), a U.S. Treasury-sponsored purchaser (the "**363 Transaction**").

5.      On June 1, 2009, immediately after commencing the Chapter 11 Cases, the Debtors filed a motion with the Bankruptcy Court to approve the 363 Transaction pursuant to sections 105(a), 363, and 365 of the Bankruptcy Code (the "**363 Motion**") in exchange for a purchase price of over $90 billion (the "**Sale**").  As discussed above, the Debtors filed the 363 Motion to preserve the going concern value of GM's assets and business.  Pursuant to the Sale, New GM acquired the operating assets of the Debtors, assumed certain specified liabilities, and created a New GM free of most of the Debtors' liabilities which were left behind.

6.      As set forth in the Bankruptcy Court's opinion authorizing and approving the Sale, the undisputed evidentiary record before the Bankruptcy Court demonstrated that the 363 Transaction was the only viable means of preserving and maximizing GM's value.  There was no other option, as the only alternative to an immediate Sale was liquidation.  Only the U.S. Treasury was prepared to finance the administration of the Debtors' Chapter 11 Cases.  The DIP Facility was expressly conditioned on GM's seeking and obtaining approval of the 363 Transaction and, even then, only if the Sale occurred on an expedited basis.  The 363 Transaction, as contemplated by the MSPA, was a material element of the United States Government's program to revitalize the domestic automotive industry.  The Bankruptcy Court found that the MSPA was the product of intense, good-faith negotiations between the Debtors and their key stakeholders, including the U.S. Treasury and the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (the "**UAW**").

7.      The 363 Transaction provided that substantially all of GM's core assets (i.e., those that the U.S. Treasury and the Purchaser considered essential for New GM to be a

competitive, economically viable operating entity) would be sold and transferred to the

Purchaser.  The consideration to GM for the purchase had a total value in excess of $90 billion,

as stated in connection with the hearing to approve the 363 Transaction, equal to the sum of:

- a section 363(k) credit bid in an amount (estimated to be $48.7 billion at July 31, 2009) equal to the amount of indebtedness owed to the Purchaser as of the closing pursuant to the UST Credit Facilities (as defined in the MSPA) and the DIP Facility, less approximately $7.7 billion of indebtedness under the DIP Facility;

- the cancellation of the Warrant Notes previously issued by GM to the U.S. Treasury;

- the issuance by the Purchaser to the Debtors of 10% of the common stock of the Purchaser as of the closing (estimated to be worth $3.8 to $4.8 billion at the closing);

- the issuance by the Purchaser to the Debtors of New GM Warrants (as described in the Disclosure Statement) to purchase up to an additional 15% of the shares of common stock of the Purchaser on a fully-diluted basis; and

- the assumption by the Purchaser of the Assumed Liabilities (as defined in the MSPA).

Additionally, if the Bankruptcy Court determines that the estimated amount of (i) Allowed

General Unsecured Claims against the Initial Debtors and (ii) Allowed Asbestos Personal Injury

Claims against the Initial Debtors collectively exceeds $35 billion, then the Purchaser will issue

up to an additional 2% of the Purchaser's outstanding stock as of the closing of the 363

Transaction.  Certain assets were excluded from the Sale and were retained by the Debtors.

These assets have been administered during the Chapter 11 Cases and will be dealt with under

the Plan.

### The Wind-Down Process

8.    After the commencement of the Debtors' Chapter 11 Cases and the

consummation of the 363 Transaction, the Debtors began the process of an orderly liquidation

and wind-down of the Debtors' remaining assets and properties.  In connection therewith, the

Debtors retained a number of professionals to assist in the administration of their estates,

including the professionals at AP Services (an affiliate of AlixPartners, LLP), who have taken

the lead in compiling information related to the Debtors' remaining assets and in administering

the Debtors' estates, local and foreign counsel, as well as accounting professionals and

environmental consultants.

9.      The wind-down activities have included, among other things, analyzing the

physical assets of the Debtors; addressing the Debtors' environmental remediation obligations in

respect of hundreds of properties remaining with the Debtors; analyzing the assets and

obligations of MLC's numerous remaining subsidiaries to determine the most appropriate means

of liquidating each subsidiary; filing motions to reject hundreds of executory contracts and

unexpired leases; establishing global procedures for demolition of obsolete buildings and

preparation and consummation of sales of real property and equipment assets; establishing bar

dates for the filing of claims; analyzing the over 70,000 proofs of claim that have been filed in an

aggregate amount of over $270 billion; estimating an appropriate aggregate liability for present

and future asbestos personal injury claims; and negotiating lease modifications with various

equipment lessors which permitted the assumption and assignment to New GM of such modified

leases, thus  reducing or eliminating hundreds of millions of dollars in rejection damage claims.

10.     As a result of these activities, the Debtors are now in a position to confirm their

Plan.

## General Overview of the Plan

11.     The Plan represents the culmination of efforts of the Debtors, the U.S. Treasury,

the official committee of unsecured creditors (the "**Creditors' Committee**"), the official

committee of unsecured creditors holding Asbestos Personal Injury Claims (the "**Asbestos**

**Claimants' Committee**"), the legal representative for future claimants (the "**Future Claimants'**

**Representative**"), various other parties in interest, and their respective advisors to address the

issues critical to developing and implementing a chapter 11 plan.  It provides for, inter alia, the

distribution of the Debtors' remaining assets to holders of Allowed Claims.

   12. It is my understanding that, by an order dated December 8, 2010 (ECF No. 8043)

(the "**Solicitation Order**"), the Bankruptcy Court approved the Disclosure Statement pursuant to

section 1125 of the Bankruptcy Code, as containing adequate information of a kind and in

sufficient detail to enable hypothetical, reasonable investors typical of the Debtors' creditors to

make an informed judgment whether to accept or reject the Plan.  The Solicitation Order also

fixed March 3, 2011 as the date of the hearing to consider confirmation of the Plan (the

"**Confirmation Hearing**") and established certain deadlines for voting and filing objections to

confirmation of the Plan (said deadlines, the "**Deadlines**").

   13. I am also advised that, in accordance with the Solicitation Order (i) the Affidavit

of Patrick M. Leatham, sworn to on January 14, 2011 (the "**GCG Affidavit**") (ECF No. 8607);

(ii) the Affidavit of Jane Sullivan, sworn to on January 6, 2011 (the "**Epiq Affidavit**") (ECF No.

8449); and (iii) the Affidavit of Jane Sullivan, sworn to on February 21, 2011 (the "**Epiq

Supplemental Affidavit**" (ECF No. 9237 and together with the GCG Affidavit and the Epiq

Affidavit, the "**Affidavits of Service**"), were filed with the Bankruptcy Court, evidencing the

timely service of the Disclosure Statement (with the Amended Plan annexed thereto), and related

solicitation materials.  I am also advised that in accordance with the Solicitation Order, the

Amended Affidavit of Publication of Debra Wolther, sworn to on February 16, 2011 (the

"**Affidavit of Publication**") (ECF No. 9277) was filed with the Bankruptcy Court, evidencing

that publication notice of the Confirmation Hearing Notice was made on January 13, 2011 in *The*

*Wall Street Journal, The New York Times, USA Today, The Globe and Mail*, and *The National Post*.

14. I understand that the Debtors solicited votes for acceptance or rejection of the Plan from holders of Claims entitled to vote in Class 3 (General Unsecured Claims) and Class 5 (Asbestos Personal Injury Claims).

15. It is my understanding that because of their deemed rejection of the Plan, the Debtors did not solicit votes of holders of Equity Interests in MLC in Class 6, although such holders nevertheless received notice of the Confirmation Hearing.

16. It is my further understanding that because of their deemed acceptance of the Plan, the Debtors did not solicit votes of holders of (i) Secured Claims in Class 1, (ii) Priority Non-Tax Claims in Class 2, and (iii) Property Environmental Claims in Class 4.

**<u>Classification of Claims</u>**

17. Article III of the Plan designates six Classes of Claims and Equity Interests:

Class 1 – Secured Claims

Class 2 – Priority Non-Tax Claims

Class 3 – General Unsecured Claims

Class 4 – Property Environmental Claims

Class 5 – Asbestos Personal Injury Claims

Class 6 – Equity Interests in MLC

18. I believe that the classification scheme was not proposed principally to create a consenting impaired Class and thereby manipulate voting.  All Claims and Equity Interests within each Class have the same or substantially similar rights as the other Claims and Equity Interests in that Class and will receive the same treatment under the Plan for their respective Claims and Equity Interests in the same Class.

### The Plan Satisfies Section 1129 of the Bankruptcy Code

A.    Section 1129(a)

19.    Section 1129(a)(1).  On the basis of my understanding and discussions with the

Debtors' retained legal advisors, the Plan complies with section 1129(a)(1) of the Bankruptcy

Code.  In that regard, I believe the Plan satisfies each requirement set forth in section 1123(a)

regarding the required contents of a chapter 11 plan.  In addition to Administrative Expenses,

Priority Tax Claims, and DIP Credit Agreement Claims, which I am advised need not be

designated, the Plan designates six Classes of Claims and Equity Interests, Article III of the Plan

sets forth the classification of Claims and Equity Interests as required under section 1123(a)(1).

It is my understanding that the Claims and Equity Interests placed in each Class are substantially

similar to other Claims and Equity Interests, as the case may be, in each such Class.  It is my

opinion that valid business, factual, and legal reasons exist for separately classifying the various

Classes of Claims and Equity Interests created under the Plan, and such Classes do not unfairly

discriminate between holders of Claims and Equity Interests.  Article IV of the Plan identifies

that there are Classes of Claims that are not impaired by the Plan, as required under section

1123(a)(2), and specifies the treatment of impaired Classes of Claims and Equity Interests as

required by section 1123(a)(3).  The Plan provides for the same treatment by the Debtors for

each Claim or Equity Interest in each respective Class unless the holder of a particular Claim or

Equity Interest has agreed to a less favorable treatment of such Claim or Equity Interest, thereby

satisfying section 1123(a)(4) of the Bankruptcy Code.

20.    It is my further understanding, based on my discussions with the Debtors'

retained legal advisors, that Articles V, VI, VII, VIII, and X and various other provisions of the

Plan satisfy the requirements of section 1123(a)(5) of the Bankruptcy Code by setting forth the

means for  implementation of the Plan.  One of the means of implementing the Plan is

substantive consolidation.  Section 6.1 of the Plan provides, solely for voting, confirmation, and

distribution purposes of the Plan, that each of the Debtors, and their respective estates, shall be

deemed merged into MLC, and (i) all assets and all liabilities of the Debtors shall be deemed

merged into MLC, (ii) all guaranties of any Debtor of the payment, performance, or collection of

obligations of another Debtor shall be eliminated and canceled, (iii) any obligations of any

Debtor and all guaranties thereof executed by one or more of the other Debtors shall be treated as

a single obligation, and such guaranties shall be deemed a single Claim against the consolidated

Debtors, (iv) all joint obligations of two or more Debtors and all multiple Claims against such

entities on account of such joint obligations shall be treated and allowed only as a single Claim

against the consolidated Debtors, (v) all Claims between or among the Debtors shall be canceled,

and (vi) each Claim filed in the Chapter 11 Case of any Debtor shall be deemed filed against the

consolidated Debtors and a single obligation of the consolidated Debtors on and after the

Effective Date.

      21.     Under the circumstances of these Chapter 11 Cases, I believe that it would be

inefficient to propose, vote on, and make distributions in respect of entity-specific Claims.

Moreover, considering the sheer size of MLC compared to the other Debtors, the fact that the

consideration received in connection with the 363 Transaction would have to be allocated to each

of the Debtors, the asset profile of all the Debtors other than MLC, and the immaterial impact

that substantive consolidation would have on holders of Allowed Claims, I believe that

substantive consolidation is fair and equitable to all parties in interest.  Furthermore, no creditor

will receive a recovery inferior, in any meaningful way, to that which it would receive if the

Debtors proposed a plan that was completely separate as to each Debtor.

22.     In view of the foregoing, I believe that creditors would not be prejudiced by the deemed substantive consolidation proposed in the Plan.  I further believe that if substantive consolidation were not approved, creditors of certain of the Debtors other than MLC, representing a *de minimis* amount of Claims overall, may not receive any distribution under the Plan.  Based on the foregoing, substantive consolidation under the Plan should be approved.

23.     <u>Section 1129(a)(2)</u>.  On the basis of my understanding and discussions that I have had with the Debtors' retained legal advisors, I believe that the Debtors have complied with the applicable provisions of the Bankruptcy Code, including the provisions of sections 1125 and 1126 regarding disclosure and plan solicitation.  To the best of my knowledge and belief, and as evidenced by the Solicitation Order and prior orders of the Bankruptcy Court and the filings submitted by the Debtors, the Debtors have complied with all of the provisions of the Bankruptcy Code and the Bankruptcy Rules governing notice, disclosure, and solicitation in connection with the Plan, the Disclosure Statement, and all other matters considered by the Bankruptcy Court in connection with these Chapter 11 Cases.  To the best of my knowledge and belief, the Debtors have timely filed with the Clerk of the Bankruptcy Court their schedules of assets and liabilities.  To the best of my knowledge and belief, good, sufficient, and timely notice of the Confirmation Hearing and all other hearings in these Chapter 11 Cases has been provided to all holders of Claims and Equity Interests and all other parties in interest to whom notice was required to have been provided.  Additionally, based on the Affidavits of Service, I believe the Debtors have properly solicited votes with respect to the Plan.

24.     <u>Section 1129(a)(3)</u>.  As described above and in the Disclosure Statement, the Plan is based upon good faith and arms-length discussions and negotiations with the Creditors' Committee, the Asbestos Claimants' Committee, the Future Claimants' Representative, the DIP

Lenders, various other parties in interest, including several state and federal regulators and

governmental units, and their respective advisors, to address the issues critical to developing and

implementing a chapter 11 plan.  The Plan and Disclosure Statement reflect the culmination of

those efforts.  The proposed Plan provides for the liquidation of the Debtors' estates and provides

for the establishment of four Trusts: (i) the GUC Trust (for the benefit of the holders of Allowed

General Unsecured Claims), (ii) the Asbestos Trust (for the benefit of the holders of Asbestos

Personal Injury Claims), (iii) the Environmental Response Trust (for the benefit of the holders of

Property Environmental Claims), and (iv) the Avoidance Action Trust (for the benefit of the

Avoidance Action Trust Beneficiaries).  The establishment of these Trusts is the result of the

various understandings reached among the Debtors and the different creditor constituencies

which have enabled the Debtors to propose a consensual and confirmable plan in an expeditious

manner for estates of this size and complexity.

　　　　25.　　　Further, I believe that the release, exculpation, and injunction provisions

embodied in the Plan are fair and equitable, given for valuable consideration, and in the best

interests of the Debtors and all parties in interest.  I further believe that the Debtors have

included in the Disclosure Statement all information material to the decision whether to accept

the Plan.  Accordingly, I believe the Debtors have complied with the requirements of good faith.

　　　　26.　　　Section 1129(a)(4).  It is my understanding that payments made or to be made by

the Debtors to their retained advisors for services or costs and expenses in or in connection with

the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases have

been approved by, or are subject to the approval of, the Bankruptcy Court.

　　　　27.　　　Section 1129(a)(5).  It is my understanding that the requirement of section

1129(a)(5) that the plan proponent disclose all necessary information regarding directors,

officers, and insiders is satisfied.  The Plan is a liquidating plan that provides for the dissolution

of each Debtor after the respective Debtor's completion of the acts required by the Plan, and

therefore, there will be no "reorganized debtor" for any presently existing officer or director to

serve.  Nonetheless, MLC will remain in existence through a date no later than December 15,

2011.  On and after the Effective Date, the officers and directors of MLC will be a subset of

MLC's current officers and directors.  Additionally, the Debtors have disclosed the identity of

the GUC Trust Administrator and the Avoidance Action Trust Administrator.  The

Environmental Response Trust Administrative Trustee will be Elliott P. Laws, Esq.  Mr. Laws'

affiliations are disclosed in his curriculum vitae,[2] annexed to the Debtors' Confirmation Brief as

Exhibit "B."  The identity of the Asbestos Trust Administrator is Kirk P. Watson, Esq.  Mr.

Watson's curriculum vitae is annexed to the Debtors' Confirmation Brief as Exhibit "C."

28.    Section 1129(a)(6).  I am advised that section 1129(a)(6) is inapplicable because

the Plan is a liquidating plan that provides for the dissolution of the Debtors.

29.    Section 1129(a)(7).  I have been informed that the Bankruptcy Code requires that,

with respect to each impaired Class of Claims and Equity Interests, each holder of a Claim or

interest therein must either (i) accept the Plan, or (ii) receive or retain under the Plan property of

a value, as of the Effective Date, that is not less than the value such holder would receive or

retain if the Debtors were to be liquidated under chapter 7 of the Bankruptcy Code.  As set forth

below, I believe that the Plan satisfies the requirements of section 1129(a)(7) of the Bankruptcy

Code.

30.    I believe each member of an impaired Class will receive under the Plan a larger

recovery than that member would otherwise receive in a chapter 7 liquidation because of the DIP

---

[2] Mr. Law has recently informed the Debtors that aside from the affiliations described in his curriculum vitae, he is
also a member of the board of the National Association of Environmental Law Societies.

Lenders' substantial contributions to fund the Plan and the various settlements reached under the

Plan.  The DIP Lenders' contributions total hundreds of millions of dollars and will be used, in

large part, to satisfy obligations that would otherwise have to be satisfied out of the 363

Transaction consideration before any distributions could be made to holders of General

Unsecured Claims.  Moreover, the Debtors' costs of liquidation under chapter 7 would include

the fees payable to a trustee in bankruptcy, as well as those fees that would be payable to

attorneys and other professionals that such a trustee might engage.

31.    In addition, in the absence of the settlements under the Plan and the Trusts, such

as the Environmental Response Trust created as a consequence thereof, a chapter 7 trustee would

likely breach certain postpetition contracts entered into by the Debtors and reject other executory

contracts that would otherwise be assigned to the Trusts.  These actions would generate

additional administrative expenses and rejection damage claims that would further dilute

recoveries.

32.    After consideration of the effects that a chapter 7 liquidation would have on the

ultimate proceeds available for distribution to creditors in the Chapter 11 Cases, including (i) the

cessation of funding of the Chapter 11 Cases by the DIP Lenders (*see* Order Pursuant to

Bankruptcy Code Sections 105(a), 361, 362, 363, 364 and 507 and Bankruptcy Rules 2002, 4001

and 6004 (a) Approving Amendment to DIP Credit Facility to Provide for Debtors' Post-Petition

Wind-Down Financing (ECF No. 2969)); (ii) the increased costs and expenses of a liquidation

under chapter 7 arising from fees payable to a trustee in bankruptcy and its professional advisors

that would be unfamiliar with all of the work done to date; (iii) the substantial increases in claims

that would be required to be satisfied on a priority basis, and (iv) the substantial delay in

distributions occasioned by a conversion of the Chapter 11 Cases to cases under chapter 7, I

conclude that confirmation of the Plan will provide each holder of an Allowed Claim with a recovery that is not less than such holder would receive pursuant to liquidation of the Debtors under chapter 7.

33.     As a result of the foregoing, I believe each holder of a Claim or Equity Interest either has (i) accepted the Plan, or (ii) will receive or retain under the Plan on account of such Claim or Equity Interest property of a value, as of the Effective Date, that is not less than the amount that such holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

34.     Section 1129(a)(8).  The Debtors' voting agents are still in the process of tabulating the Plan voting results with respect to Class 3 (General Unsecured Claims) and Class 5 (Asbestos Personal Injury Claims).  This vote will be certified prior to the Confirmation Hearing.

35.     I have been informed that Class 6 (Equity Interests in MLC) is deemed to have rejected the Plan, and therefore, the Plan will have to satisfy section 1129(b) of the Bankruptcy Code as to Class 6, which is addressed below.

36.     Section 1129(a)(9).  In accordance with sections 1129(a)(9)(A) and (B), Articles II and IV of the Plan provide that all Allowed Administrative Expenses under section 503(b) and all Allowed Priority Non-Tax Claims under section 507(a) (excluding Priority Tax Claims under section 507(a)(8)) will be paid in full, in Cash, on the Effective Date or as soon thereafter as is practicable.

37.     The Plan satisfies the requirements of section 1129(a)(9)(C) in respect of the treatment of Priority Tax Claims under section 507(a)(8).  Pursuant to Section 2.3 of the Plan and

except as otherwise may be agreed, holders of Allowed Priority Tax Claims will be paid in full,

in Cash, on the Effective Date or as soon thereafter as is reasonably practicable.

38.     Accordingly, it is my understanding that, based upon the foregoing, the Plan

satisfies the requirements of section 1129(a)(9) of the Bankruptcy Code.

39.     Section 1129(a)(10).  This requirement will be addressed when the final vote

tabulation is certified by the Debtors' voting agents.

40.     Section 1129(a)(11).  I have been informed that section 1129(a)(11) of the

Bankruptcy Code permits a plan to be confirmed only if it is feasible, i.e., it is not likely to be

followed by a need for further rehabilitation.  For purposes of determining whether the Plan

meets this requirement, the Debtors have analyzed their ability to meet their obligations under

the Plan.

41.     As part of the consideration from the 363 Transaction, the Debtors received -- and

will distribute to their creditors -- the New GM Securities.  Because not all Claims will be

Allowed Claims at the time of the Effective Date, the GUC Trust Administrator will set aside in

reserve sufficient New GM Securities and other assets from the GUC Trust to make ratable

distributions on Claims once they become Allowed.  Although individual accounts will not be

established for individual Disputed Claims (indeed, to do so would be overwhelmingly

burdensome and costly), the distribution mechanisms of the GUC Trust Agreement protect all

holders of Claims, whether Allowed, Disputed, or Unliquidated.  For liquidated Claims that have

not been disallowed, reserves will be established based on the liquidated amount of such Claims.

Even where a claimant asserts a Priority Tax Claim, Priority Non-Tax Claim, or Administrative

Expense that is subject to possible reclassification to a General Unsecured Claim, a reserve in

Class 3 is made.  With respect to unliquidated Claims, the Debtors have had to estimate

appropriate reserve amounts.  I have reviewed the Debtors' Motion for Entry of An Order

Establishing Claims Reserves with Respect to, Among Other Things, Certain Unliquidated

Claims In Connection with Distributions to Be Made Under the Debtors' Amended Joint Chapter

11 Plan (ECF No. 9212) (the "**Reserve Motion**"), along with the Basler Declaration annexed

thereto.  I concur with the Reserve Motion that the proposed reserves to be established for the

fully unliquidated Claims, inclusive of the projected cushion, should result in sufficient assets to

fully implement the Plan in accordance with its terms.

42.    With respect to administrative costs of the GUC Trust, I have reviewed the

postconfirmation budget for the GUC Trust and estimates of available cash that will reside in the

GUC Trust on and after the Effective Date.  I believe that the GUC Trust Administrator will have

sufficient available funds in cash to fund all of its obligations.  To the extent the cash reserves

prove insufficient, the GUC Trust Agreement contemplates that the GUC Trust Administrator

may establish holdbacks of New GM Securities that could be converted into cash in order to

satisfy any unexpected amounts incurred over the current budgets.

43.    After the Effective Date, MLC will continue in existence for a period of time not

beyond December 15, 2011 and will initially be responsible for reconciling and paying all

priority claims, secured claims, and administrative expenses.  It is my understanding that when

MLC dissolves, the GUC Trust will be responsible for any of such claims that have not been

satisfied.

44.    MLC will set aside $75 million in cash to satisfy Priority Tax Claims, Priority

Non-Tax Claims, Secured Claims, and Administrative Expenses other than professional fees.  I

have reviewed those Claims and believe that the set aside funds will be sufficient.

45.     Prior to the deadline for filing proofs of claim for administrative expenses

incurred prior to January 31, 2011, a number of claimants have asserted administrative expenses

that are either asserted in unliquidated amounts or are filed in amounts that are unreasonable.

Two of these Administrative Expense requests are described below:

**The Mealer Administrative Expense Request (Proof of Claim No. 70792)**

46.     On February 5, 2011 John Mealer ("**Mealer**") filed a request for Administrative

Expense (the "**Mealer Claim**") seeking $230 million for damages resulting from certain

comments posted by a General Motors employee, Mr. Kris Kordella, on Mealer's website on

June 9, 2009.

47.     Through various court proceedings, Mealer alleged that Mr. Kordella's comments

injured Mealer's automotive technology start-up business by deterring prospective investors and

customers.

48.     My claims team and I conclude after consultation with the Debtors' legal counsel

that there is absolutely no merit to the Mealer Claim because, among other reasons —

    i.   the Debtors cannot be held liable for Mr. Kordella's conduct because Mr. Kordella was not acting within the scope of his employment when he commented on Mealer's website, and, if he was, then such liabilities constitute liabilities assumed by General Motors LLC pursuant to the MSPA;

   ii.   Mr. Kordella's comments do not give rise to an actionable tort because the comments cannot (a) give rise to a plausible claim for defamation as they are mere hyperbolic opinions that do not imply the requisite factual assertion capable of being proven true or false, and (b) form the basis of a plausible claim for tortious interference with a business expectancy since Mealer fails to demonstrate any actual, specific business relationship with which Mr. Kordella intentionally interfered and damaged;

  iii.   Mealer's allegations of trade libel are similarly spurious.  In fact, Mealer has left Mr. Kordella's comments on his website for more than 18 months, thus contradicting any assertion that such comments are harmful to Mealer's business; and

       iv.  Mr. Kordella apologized to Mealer for his comments, and Mealer accepted the apology, thereby satisfying the doctrine of accord and satisfaction.

49.     It is my understanding that to escalate this dispute from one involving simple name calling to a $230 million administrative expense claim is not justified under what I am told are the relevant facts and law.  Accordingly, the Debtors will be filing an objection to the Mealer Claim requesting its disallowance and expungement in its entirety.

**The NUMMI Administrative Expense Request (Proof of Claim No. 70842)**

50.     On February 9, 2011, New United Motor Manufacturing, Inc. ("**NUMMI**") filed a request for Administrative Expense for "all liabilities of the Debtors to NUMMI relating to or arising from events occurring subsequent to the [Commencement] Date, whether asserted by NUMMI in the Complaint, arising or related to the Adversary Proceeding, or otherwise" (the "**NUMMI Administrative Claim**").  (NUMMI Administrative Claim ¶ 6).  NUMMI alleges that its administrative expense claim is in a contingent and unliquidated amount.

51.     It is hard to understand, from the face of the NUMMI Administrative Claim, what NUMMI is alleging as a basis for its Administrative Expense request because the claim fails to provide sufficient specificity.

52.     It is my understanding that following the commencement of these Chapter 11 Cases, MLC promptly took certain actions to cease postpetition business with NUMMI.

53.     It is further my understanding that MLC rejected all contracts with NUMMI that it believed may be characterized as executory, and under the Plan, will reject any remaining non-executory contracts between MLC and NUMMI.

54.     Thus, it is my understanding that MLC had no postpetition obligations to NUMMI and that the NUMMI Administrative Claim cannot arise from consideration provided in a postpetition transaction between NUMMI and MLC.

55.      I am advised that to the extent the NUMMI Administrative Claim attempts to

recover administrative expenses arising from obligations incurred prior to the commencement of

the Chapter 11 Cases, it must be disallowed for that reason.

56.      In addition, I believe that NUMMI did not even attempt an explanation in the

NUMMI Administrative Claim as to any benefit conferred on the Debtors by NUMMI's

postpetition actions.

57.      In my opinion, the NUMMI Administrative Claim appears to be an attempt to

extract leverage over the Debtors with respect to the underlying NUMMI claim which is the

subject of a motion to dismiss that is currently under advisement by this Court. (*New United

Motors Manufacturing, Inc. v. Motors Liquidation Company (In re Motors Liquidation

Company*, Adversary Case No. 10-05016 (Bankr. S.D.N.Y. 2010) (ECF No. 4)).  Accordingly,

the Debtors will be filing an objection to the NUMMI Administrative Claim requesting its

disallowance and expungement in its entirety.

58.      As previously stated, I believe that the amounts set aside by MLC are sufficient to

discharge its obligations under the Plan.

59.      Each of the four Trusts established under the Plan will have its own funding

which I believe should be sufficient for it to fully carry out its duties and obligations.

- The GUC Trust.  As stated above, this Trust is sufficiently funded.

- The Avoidance Action Trust.  This Trust will funded by the GUC Trust and there are
  sufficient funds budgeted.

- The Environmental Response Trust.  As part of the negotiations between the
  signatory parties to the Environmental Response Trust Consent Decree and
  Settlement Agreement, the parties spent considerable time developing an appropriate
  budget, and as a result, I believe the Environmental Response Trust should have
  adequate funds for remediation costs, maintenance, as well as marketing of the
  Environmental Response Trust Properties.

- The Asbestos Trust.  The administration of this Trust is funded initially with $2
  million, which I believe to be sufficient.  To the extent such amount proves

insufficient, the Asbestos Trust will liquidate the New GM Securities it receives under the Plan. (*See* Stipulation and Agreed Order Fixing Asbestos Trust Claim and Resolving Debtors' Estimation Motion (ECF No. 9214)).

60.    Thus, I believe that the Debtors will have more than sufficient funds to meet their post-Confirmation Date obligations to pay for the costs of administering and fully consummating the Plan and closing the Chapter 11 Cases, as well as establishing and fully implementing the purpose of each of the Trusts established under the Plan.

61.    Based upon the foregoing, I believe that the Debtors will be able to fulfill all of their obligations under the Plan, satisfying the feasibility standard of section 1129(a)(11) of the Bankruptcy Code.

62.    <u>Section 1129(a)(12)</u>.  It is my understanding that the Debtors have paid all chapter 11 statutory and operating fees required to be paid during these Chapter 11 Cases and filed all fee statements required to be filed.  Pursuant to Section 12.7 of the Plan, all fees payable pursuant to section 1930 of title 28 of the United States Code shall be paid on the Effective Date by the Debtors and thereafter by MLC and the various Trusts as may be required.

63.    <u>Section 1129(a)(13)</u>.  As part of the 363 Transaction, New GM and the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (the "**UAW**") reached a resolution addressing the final obligations of MLC with respect to the UAW-sponsored retiree benefits plan funded by a UAW-sponsored VEBA (the "**UAW VEBA**") (the "**UAW Retiree Settlement Agreement**"), pursuant to which New GM agreed to provide to the UAW VEBA, among other things, (i) shares of common stock of New GM representing 17.5% of New GM's total outstanding common stock, (ii) a note of New GM in the principal amount of $2.5 billion, (iii) shares of cumulative perpetual preferred stock of New GM

in the amount of $6.5 billion, (iv) warrants to acquire 2.5% of New GM's equity, and (v) the

assets held in MLC's VEBA to be transferred to New GM as part of the 363 Transaction.

64.    By order entered on November 12, 2009 (ECF No. 4433) (the "**Union Settlement**

**Order**"), this Court approved that certain settlement agreement, dated September 10, 2009, by

and among MLC, New GM, and certain "splinter unions" (the "**Union Settlement Agreement**").

Pursuant to the Union Settlement Agreement, New GM agreed to provide certain retiree medical

benefits at a reduced level to participating union retirees and surviving spouses who are not

eligible for Medicare benefits and to provide a reduced level of life insurance coverage to

participating retirees regardless of Medicare eligibility.  The Union Settlement Agreement

further provided that, with respect to those retirees who were eligible for Medicare as of

December 31, 2009, MLC shall grant to the Participating Splinter Unions (as defined in the

Union Settlement Order) that agree to the applicable terms of, and agree to participate in, the

Union Settlement Agreement, a General Unsecured Claim in an amount equal to such union's

respective "Percentage Share" of the aggregate amount of $1 billion (the "**Splinter Union**

**Allowed Claim**") in full settlement, satisfaction, and discharge of all claims that the

Participating Splinter Unions, as authorized under section 1114 and 1113 representatives, have or

may have against the Debtors and their affiliates arising out of collective bargaining agreements

relating to retiree healthcare benefits, life insurance benefits, and all other benefits and claims.

65.    The Union Settlement Agreement and the Union Settlement Order contemplate

that the unions listed on Exhibit "A" to the Union Settlement Order that were not parties to the

Union Settlement Agreement may agree to participate in the Union Settlement Agreement and in

their Percentage Share of the Splinter Union Allowed Claim at any point prior to the Debtors'

making any distributions under the Plan.  By order entered on August 9, 2010, two additional

unions joined in the Union Settlement Agreement (ECF No. 6594).

66.    The sole remaining splinter union, the International Brotherhood of Boilermakers

(the "**IBB**") declined to represent its retired past members (the "**IBB Retirees**") and did not

agree to participate in the Union Settlement, nor has New GM assumed any liability for any

claims attributable to the IBB Retirees.  Rather than terminate the health and life insurance

benefits of these IBB Retirees, by motion dated February 8, 2011 (ECF No. 9121), the Debtors

requested the Court (i) authorize the Debtors, in conjunction with New GM, to provide the IBB

Retirees the health and life insurance benefits on essentially the same terms and conditions

provided to the other retirees as provided for in the Union Settlement Agreement and (ii) order

that the IBB Retirees shall be entitled to their Percentage Share of the Splinter Union Allowed

Claim as set forth on Exhibit "A" to the Union Settlement Order, with the mechanism to make

distributions to the IBB Retirees in respect thereof under the Plan to be determined at a later date.

67.    With respect to non-union employees, New GM agreed under the MSPA to

assume all retiree benefits under the plans then in existence.

B.    Section 1129(b)

68.    It is my understanding, based on discussions with the Debtors' retained legal

advisors, that a plan may be confirmed notwithstanding the rejection or deemed rejection by a

class of claims or equity interests so long as the plan does not discriminate unfairly and is fair

and equitable.  It is my further understanding, based on such discussions, that (a) a plan does not

discriminate unfairly if the legal rights of a dissenting class are treated in a manner that is

consistent with the treatment of other classes whose legal rights are substantially similar to those

of the dissenting class, and (b) the "fair and equitable" requirement is met as set forth in section

1129(b)(2) of the Bankruptcy Code. For the reasons described below, I believe that the Plan does not "unfairly discriminate" and the "fair and equitable" requirement is satisfied as to Class 6 (Equity Interests in MLC), the only rejecting Class under the Plan.

69.    Class 6 (Equity Interests in MLC) is the only Class of Equity Interests, consisting of 610,562,173 shares of common stock issued by MLC as of May 1, 2009. Under the Plan, holders of Equity Interests in Class 6 will neither receive nor retain any property on account of their Equity Interests. Inasmuch as Class 6 represents the only Equity Interests classified under the Plan, the Plan, *a fortiori*, does not discriminate unfairly as between any holders of the Equity Interests. Moreover, the Plan is fair and equitable because holders of Claims that are senior to Class 6 are not receiving more than 100% of their Claims and there is no junior class of Equity Interests that could receive any distributions under the Plan. Accordingly, I believe that the requirements of section 1129(b) are satisfied with respect to Class 6.

70.    Section 1129(d). The Plan has not been filed for the purpose of the avoidance of taxes or the application of Section 5 of the Securities Act of 1933, as amended.

71.    In light of all of the forgoing, I believe that confirmation of the Plan is appropriate, is in the best interests of all parties in interest, and should, therefore, be granted.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed On: February 23, 2011

By: _____
            Thomas A. Morrow