HEARING DATE AND TIME: TO BE DETERMINED

BREDHOFF & KAISER P.L.L.C.
805 Fifteenth Street, N.W. Suite 1000
Washington, D.C. 20005
Telephone: (202) 842-2600
Facsimile: (202) 842-1888
Andrew D. Roth (admitted *pro hac vice*)
Ramya Ravindran (admitted *pro hac vice*)

CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
Telephone:  (212) 225-2000
Facsimile:  (212) 225-3999
Deborah M. Buell
James L. Bromley

*Counsel for International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------- X
                                                                    :
*In re*                                                             :    Chapter 11
                                                                    :
MOTORS LIQUIDATION COMPANY, *et. al.,*                              :    Case No. 09-50026 (REG)
         f/k/a General Motors Corp., *et. al.,*
                                                                    :
         Debtors.                                                   :    (Jointly Administered)
                                                                    :
-------------------------------------------------------------------- X

**REPLY MEMORANDUM OF LAW CONCERNING JURISDICTION**
**OVER MOTION OF GENERAL MOTORS LLC TO ENFORCE THE SALE ORDER**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................................................ ii

ARGUMENT .............................................................................................. 1

I.     *This Court Lacks Jurisdiction Over **Any** Aspect of the Underlying Controversy
       Between the Parties* .......................................................................... 1

       A.     *The Court's Lack of Jurisdiction to Rule on New GM's "Preclusion"
              Defense Based on the **2009** UAW Retiree Settlement Agreement (i.e., Lack
              of Jurisdiction Over What New GM Dubs the "**Preclusion Dispute**")* ...... 1

       B.     *The Court's Lack of Jurisdiction to Rule on Whether the Conditions
              Precedent to Payment Under the 2007 Delphi Restructuring MOU Have
              Been Satisfied (i.e., Lack of Jurisdiction Over What New GM Dubs the
              "**MOU Dispute**")* ...................................................................... 9

II.    *Even If the Court Has Jurisdiction Over Some Aspect of the Underlying
       Controversy Between the Parties, the Court Should Abstain from Exercising that
       Jurisdiction* .................................................................................... 14

CONCLUSION ........................................................................................... 18

# TABLE OF AUTHORITES

Page(s)

RULES AND STATUTES

28 U.S.C. § 1367.................................................................................................... 13, 14

CASES

*176-60 Union Tpk., Inc. v. Howard Beach Fitness Ctr., Inc.*,
209 B.R. 307 (S.D.N.Y. 1997)................................................................................ 11

*Abraham Zion Corp. v. Lebow*,
761 F.2d 93 (2d Cir. 1985)..................................................................................... 4

*Achtman v. Kirby, McInerney  & Squire, LLP*,
464 F.3d 328 (2d Cir. 2006)................................................................................... 14

*Ameritrust Co., N.A. v. Opti-Gage, Inc. (In re Opti-Gage, Inc.)*,
128 B.R. 189 (Bankr. S.D. Ohio 1991).................................................................. 13

*Arris Int'l v. Hybrid Patents, Inc. (In re Com21, Inc.)*,
357 B.R. 802 (Bankr. N.D. Cal. 2006) .................................................................. 15

*Back v. LTV Corp. (In re Chateaugay Corp.)*,
213 B.R. 633 (Bankr. S.D.N.Y. 1997).................................................................. 11, 12

*Bolt Electric, Inc. v. City of New York*,
223 F.3d 146 (2d Cir. 2000)................................................................................... 16

*Chamberlain Grp., Inc. v. Lear Corp. (In re Lear Corp.)*,
No 09-14326, 2009 WL 3191369 (Bankr. S.D.N.Y. Sept. 24, 2009)................................. 14

*Chiste v. Hotels.com L.P.*,
No. 08 Civ. 10744, 2010 WL 4630317 (S.D.N.Y. Nov. 15, 2010) ......................... 15

*Collins v. IBM Se. Emples. Fed. Credit Union (In re Alliance Leasing Corp.)*,
No. 07-0065A, 2007 Bankr. LEXIS 4637 (Bankr. M.D. Tenn. July 3, 2007)................... 15

*DeSilvio v. Prudential Lines, Inc.*,
701 F.2d 13 (2d Cir. 1983)..................................................................................... 5

*DVI Fin. Servs., Inc. v. Nat'l Med. Imaging, LLC (In re DVI, Inc.)*,
305 B.R. 414 (Bankr. D. Del. 2004) ..................................................................... 12

*Enron Corp. v. Citigroup, Inc. (In re Enron Corp.)*,
353 B.R. 51 (Bankr. S.D.N.Y. 2006)..................................................................... 13, 14

*Feldman v. Tr. of Beck Indus. (In re Beck Indus., Inc.),*
479 F.2d 410 (2d Cir.), *cert. denied,* 414 U.S. 858 (1973) .................................................. 12

*Fruit of the Loom, Inc. v. Magnetek, Inc. (In re Fruit of the Loom, Inc.),*
407 B.R. 593 (Bankr. D. Del. 2009) ..................................................... 15

*In re Ames Dep't Stores, Inc.,*
190 B.R. 157 (S.D.N.Y. 1995) ........................................................... 12

*In re Gen. Motors Corp.,*
407 B.R. 463 (Bankr. S.D.N.Y. 2009), *aff'd sub nom. In re Motors Liquidation Co.,* 428
B.R. 43 (S.D.N.Y. 2010), *aff'd sub nom. In re Motors Liquidation Co.,* 430 B.R. 65
(S.D.N.Y. 2010) ........................................................................... 13

*In re Kmart Corp.,*
359 B.R. 189 (Bankr. N.D. Ill. 2005) ................................................... 12

*In re Portrait Corp. of Am., Inc.,*
406 B.R. 637 (Bankr. S.D.N.Y. 2007) ................................................... 14

*JMB Capital Partners, L.P. v. CRT Capital Grp. LLC (In re NTL, Inc.),*
295 B.R. 706 (Bankr. S.D.N.Y. 2003) ................................................... 17

*LaRoche Indus., Inc. v. Orica Nitrogen LLC (In re LaRoche Indus., Inc.),*
312 B.R. 249 (Bankr. D. Del. 2004) ..................................................... 15

*Longacre Master Fund, Ltd. v. Telecheck Servs., Inc. (In re Casual Male Corp.),*
317 B.R. 472 (Bankr. S.D.N.Y. 2004) (Gerber, J.) ...................................... 17

*Lothian Cassidy LLC v. Ransom,*
428 B.R. 555 (E.D.N.Y. 2010) .......................................................... 10, 11

*Nemsa Establishment, S.A. v. Viral Testing Sys. Corp.,*
No. 95-Civ-0277, 1995 U.S. Dist. LEXIS 11650 (S.D.N.Y. Aug. 15, 1995) .................... 13

*Sterling Vision, Inc. v. Sterling Optical Corp. (In re Sterling Optical Corp.),*
302 B.R. 792 (Bankr. S.D.N.Y. 2003) (Gerber, J.) ...................................... 17

*Stoe v. Flaherty,*
436 F.3d 209 (3d Cir. 2006) ............................................................ 10

*Tower Auto. Mexico v. Grupo Proeza, S.A. De C.V. (In re Tower Auto., Inc.),*
356 B.R. 598 (Bankr. S.D.N.Y. 2006) ................................................... 12

*Winstar Holdings, LLC v. Blackstone Grp. L.P.,*
No. 07-cv-46324, 2007 WL 4323003 (S.D.N.Y. Dec. 10, 2007) ............................... 17

In accordance with the Stipulation and Agreed Order Regarding Scheduling Issues

approved by this Court and entered on the docket on November 9, 2010 (D.I. 7689), and the

Second Stipulation and Agreed Order approved by this Court and entered on the docket on

January 18, 2011 (D.I. 8619), the International Union, United Automobile, Aerospace, and

Agricultural Implement Workers of America ("**UAW**") hereby submits this Reply Brief in

response to the Brief Of General Motors LLC ("**New GM**") In Support Of The Court's Exercise

Of Jurisdiction Over The Motion Of New GM To Enforce Sale Order (D.I. 9107, the "**New GM**

**Br.**").

## ARGUMENT

I. _This Court Lacks Jurisdiction Over **Any** Aspect of the Underlying Controversy Between
the Parties_

    A. _The Court's Lack of Jurisdiction to Rule on New GM's "Preclusion" Defense Based
on the **2009** UAW Retiree Settlement Agreement (i.e., Lack of Jurisdiction Over What
New GM Dubs the "**Preclusion Dispute**")_

        1.      As the UAW showed in its Opening Brief, New GM cannot properly invoke this

Court's reserved jurisdiction under Section 26 of the **2009** UAW Retiree Settlement Agreement

and Paragraph 71 of the Sale Order merely by filing a Motion in this Court taking the self-

serving "position" that the UAW's Michigan District Court Litigation to enforce and collect

upon New GM's $450 million payment obligation to **the DC VEBA** under the 2007 Delphi

Restructuring MOU "is precluded by" the terms of that **2009** Agreement "fixing and capping"

New GM's payment obligations to **the New VEBA**.[1] _See_ UAW Br. ¶ 44. Rather, under well-

settled case law, jurisdiction under the **2009** Agreement and the Sale Order is lacking if this New

---

[1]      Initially capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the
UAW's Memorandum of Law Concerning Jurisdiction Over Motion of General Motors LLC to Enforce the Sale
Order ((D.I. 8624), the "**UAW Br.**", or "**Opening Brief**").

GM "position" is a wholly insubstantial one that has no colorable merit.  *See id.* (citing cases);

*see also* New GM Br. ¶ 15 (citing two additional cases standing for the same legal proposition).

2.      In its responsive brief, New GM does **not** contest the foregoing legal proposition.

Rather, New GM argues that the UAW's effort to defeat this Court's jurisdiction over the

"**Preclusion Dispute**" raised by New GM in its Motion fails because "the UAW has not made

and cannot make th[e] showing" required by the "relevant case law" that New GM's

"preclusion" defense is a wholly insubstantial defense that has no colorable merit.  *See* New GM

Br. ¶ 5; *see also id.* ¶ 6 ("New GM's position far surpasses the 'colorable' standard.  Thus, the

UAW's solitary basis for asserting this Court's lack of jurisdiction [over the Preclusion Dispute]

must fail"); *id.* ¶ 18 (the UAW's "attempt[ ] to defeat this Court's exclusive jurisdiction" over

the Preclusion Dispute fails because "certainly, at a minimum, New GM advances a position

having 'colorable merit'.").

3.      On this decisive issue that separates the parties, New GM could not be more

wrong.  As the UAW showed at paragraphs 44-52 of its Opening Brief, New GM's asserted

"preclusion" defense based on the **2009** Agreement **most certainly is** a wholly insubstantial

defense that has no colorable merit.  And, as the UAW now demonstrates in paragraphs 4-12

below, New GM has done **nothing whatsoever** in its responsive brief to rebut this prior UAW

showing.  Indeed, New GM's various arguments in support of its "preclusion" defense are so

patently baseless on their face—and so unresponsive to the key points made by the UAW in its

Opening Brief—that they serve only to buttress that prior UAW showing.

4.      At its most basic level, the UAW's prior showing rests on the plain language of

the "fixing and capping" provisions of the **2009** UAW Retiree Settlement Agreement relied on

by New GM in its Motion as the basis for its "preclusion" defense.  By their plain terms, those

"fixing and capping" provisions do nothing more than provide that New GM's contractual

obligations set forth in the **2009** Agreement to make certain payments to **the New VEBA** under

which health benefits would henceforth be provided to GM retirees are "fixed and capped" at the

level specified in that **2009** Agreement.[2]  That being so, those "fixing and capping" provisions of

the **2009** Agreement cannot even arguably be interpreted as having the effect of "extinguishing"

or "precluding the enforcement of" New GM's separate and distinct contractual obligation under

the 2007 Delphi Restructuring MOU—a pre-existing labor contract indisputably assumed by

New GM in this proceeding, *see* UAW Br. ¶ 28 n.5—to make a $450 million payment to another

retiree health benefit fund, **the DC VEBA**, upon the occurrence of the conditions specified in the

2007 Delphi Restructuring MOU.  *See id.* ¶ 45.

       5.      New GM's rejoinder to this UAW plain-language argument—repeated like a

mantra in New GM's brief—is that the "fixing and capping" provisions of the **2009** Agreement

**are** susceptible to the foregoing interpretation "because the [**2009** Agreement] by its terms was

expressly made applicable to the DC VEBA."  New GM Br. ¶ 6.[3]  But this mantra-like rejoinder

is a complete and utter *non sequitur*.  Obviously, whether the "fixing and capping" provisions of

the **2009** Agreement are susceptible to New GM's proffered interpretation of those provisions

depends upon **the manner in which** the 2009 Agreement "applies to the DC VEBA."  And, New

GM has not made and cannot make a colorable showing that the 2009 Agreement "applies to the

---

[2]      *See* **2009** Agreement, Preamble, p. 2 ("[New Co]'s obligation to pay into **the New VEBA** is fixed and capped as described herein") (emphasis added); *id.* § 8 ("[New Co]'s financial obligations and payments to **the New Plan** and **New VEBA** are fixed and capped by the terms of this Settlement Agreement. . . .  Pursuant to this Settlement Agreement, [New Co] shall have the following, and only the following, [payment] obligations to **the New VEBA** and **the New Plan** . . . .") (emphasis added).

[3]      *See also* New GM Br. ¶ 12 ("[C]ontrary to the UAW's protest that the 'DC VEBA' is immune to the 'fixed and capped' provisions, the 2009 UAW Retiree Settlement Agreement explicitly covered and applied to the 'Existing External VEBA' (*i.e.*, the DC VEBA).");  *id.* ¶ 14 (the **2009** Agreement is "made expressly applicable to the DC VEBA");  *id.* ¶ 18 ([B]y its terms, the 2009 UAW Retiree Settlement Agreement is expressly made applicable to the DC VEBA and, therefore, governs New GM's obligations to *both* the former DC VEBA *and* the New VEBA.") (emphasis in original).

DC VEBA" **in such a manner** as to lend even an iota of support to New GM's proffered

interpretation of that Agreement's "fixing and capping" provisions.

6.    Indeed, the **2009** Agreement provision relied on by New GM is a recital clause in

the preamble, which only provides in generic terms that the Agreement "has application to,"

among other things, the UAW, New GM, and "the Existing External VEBA [*i.e.*, the DC

VEBA]." *See* New GM Br. ¶ 18.  In this regard, New GM ignores not only black-letter law that

such precatory language does not create binding obligations,[4] but also the operative provisions of

the **2009** Agreement, which make clear that the Agreement has the following **specific**

"application" to the DC VEBA as stated in Section 12C:

> The Approval Order shall direct the committee and the trustees of
> the Existing External VEBA [*i.e.*, the DC VEBA] to transfer all
> assets and liabilities into the New VEBA and terminate the
> Existing External VEBA [*i.e.*, the DC VEBA] within 15 days after
> the [January 1, 2010] Implementation Date [of this Agreement].

On its face, this provision in the **2009** Agreement pertaining specifically to the DC VEBA does

not provide, or even remotely imply, that contractual payment obligations of New GM (or other

persons or entities) inuring to the benefit of the DC VEBA are "extinguished" or rendered

unenforceable by the **2009** Agreement.  Quite to the contrary, on its face, this provision takes it

as a given that any "assets" belonging to the DC VEBA as of January 1, 2010—including,

perforce, any contractual right of the DC VEBA to receive a payment of money from New GM

upon the occurrence of certain conditions—shall remain "assets" of the DC VEBA pending their

transfer into the New VEBA on January 16, 2010.  In short, Section 12C plainly has **no effect**

**whatsoever** on the DC VEBA's "assets," much less an "extinguishing" effect.

---

[4]    *See Abraham Zion Corp. v. Lebow*, 761 F.2d 93, 103 (2d Cir. 1985).

7.      As the UAW anticipated in its Opening Brief, New GM seeks to make much of the fact that, by operation of Section 12C, the DC VEBA is **now** "defunct," *see* New GM Br. ¶ 18, such that the $450 million payment to the DC VEBA that is the object of the UAW's breach-of-contract claim in the Michigan District Court Litigation will, as a practical matter, flow into the coffers of the New VEBA if the UAW succeeds on that claim.  Indeed, that fact serves as the predicate for New GM's stubborn insistence on repeatedly mischaracterizing the UAW's breach-of-contract claim as an effort to enforce an obligation to make an "**Additional VEBA Payment**" of the kind precluded by the "fixing and capping" provisions of the **2009** Agreement, rather than an effort to enforce an obligation to make a payment to **the DC VEBA** of the kind that stands wholly unaffected by those "fixing and capping" provisions.  *See id.* ¶¶ 4, 5, 10, 11 (n.12), 18, 19, 20, 23, 43.  But as the UAW showed in paragraph 47 of its Opening Brief, New GM's effort to take advantage of this fact suffers from the following fatal flaw (among others, *see also id.* ¶ 46):  (a) The DC VEBA most certainly was **not** "defunct" when the contract breach alleged by the UAW occurred; and (b) that being so, to allow New GM to take advantage of the fact that the DC VEBA is **now** "defunct" would be to allow New GM to profit by its own contractual breach, in violation of a legal "principle" that is "[d]eeply rooted in our jurisprudence."  *DeSilvio v. Prudential Lines, Inc.*, 701 F.2d 13, 16 (2d Cir. 1983).  New GM does not even acknowledge, much less try to rebut, this UAW showing, and New GM's silence in this regard speaks volumes.

8.      Indeed, in tacit recognition of the fact that the provisions in the **2009** Agreement "fixing and capping" New GM's payment obligations to **the New VEBA** cannot possibly be interpreted to "extinguish" or "preclude the enforcement of" New GM's $450 million payment obligation to **the DC VEBA** under the 2007 Delphi Restructuring MOU, New GM's brief places

heavy reliance on **an altogether different provision** of the **2009** Agreement—namely, Section

5D—that New GM contends has the very same "extinguishing"/"preclusive" effect.  *See* New

GM Br. ¶¶ 3, 6, 9, 14, 20.[5]  But that reliance is as badly misplaced—and as equally untenable—

as New GM's reliance on the provisions in the **2009** Agreement "fixing and capping" New GM's

payment obligations to the New VEBA.

9.        In this regard, it is essential to distinguish between:  (a) Section 8 of the **2009**

Agreement, which deals solely with the issue of New GM's contractual **payment** obligations to

the New VEBA, and thus aptly is titled "**[New Co] Payments to New Plan and New VEBA**,"

and (b) Section 5 of the **2009** Agreement, which deals solely with the issue of New GM's

contractual obligations respecting **the provision of** retiree health benefits to GM retirees, and

thus aptly is titled "**Provision and Scope of Retiree Medical Benefits**."  The **payment of**

**monies** by an employer to fund employee or retiree health benefits through an established

vehicle such as a VEBA, and the **provision of** those health benefits by that established vehicle in

accordance with the terms of the insurance plan specifying the type and level of health benefits

to which those employees or retirees are entitled, are two separate subject matters.  And, for all

of the reasons set out below, it is plain that Section 5D has nothing whatsoever to do with the

separate subject matter of New GM's contractual **payment** obligations to the New VEBA, much

---

[5]        In particular, New GM seizes upon, and repeatedly quotes out of context snippets of, the following
sentence in Section 5D:

> The Approval Order shall provide that all obligations of [New Co] and all
> provisions of the [New Co] Plan in any way related to Retiree Medical Benefits
> for the Class and/or the Covered Group, and all provisions of applicable
> collective bargaining agreements, contracts, letters and understandings in any
> way related to Retiree Medical Benefits for the Class and the Covered Group are
> terminated on the Implementation Date, or otherwise amended so as to be
> consistent with this Settlement Agreement and the fundamental understanding
> that all [New Co] obligations regarding Retiree Medical Benefits for the Class
> and the Covered Group are terminated, as set forth in this Settlement
> Agreement.

less the separate subject matter of New GM's contractual **payment** obligations to **the DC VEBA**.

10.    On its face**,** Section 5D, which references the contracting parties' "fundamental understanding that all [New Co] obligations regarding Retiree Medical Benefits for the Class and the Covered Group are terminated, as set forth in this Settlement Agreement," deals with the subject matter of "Retiree Medical Benefits" obligations—not funding obligations.  Specifically, the **2009** Agreement defines the term "Retiree Medical Benefits" as the medical benefits provided post-retirement, including "hospital surgical medical, prescription drug, vision, dental, hearing aid and the $76.20 Special Benefit related to Medicare."  *See* **2009** Agreement, p. 8. This definition makes plain that the "fundamental understanding" at issue does not concern New GM's obligation to make payments that would be used to fund the cost of providing health benefits, but rather concerns the provision of those health benefits themselves.[6]  And, it is equally plain when read in context that the Section 5D language stating that all prior "collective bargaining agreements, contracts, letters and understandings in any way related to Retiree Medical Benefits for the Class and the Covered Group are terminated on the Implementation Date, or otherwise amended so as to be consistent with" this "fundamental understanding," means that all prior agreements that could be read to impose an obligation on New GM, as the purchaser of Old GM's assets, **to provide** health benefits to GM retirees (and to do so on certain terms and at a certain level) are superseded by the **2009** Agreement.  At the same time, that Section 5D language cannot possibly be taken to mean that a prior agreement (the 2007 Delphi

---

[6]    This plain reading of Section 5D is confirmed by the sentence immediately following the sentence seized upon and quoted out of context by New GM:  "Summary Plan Descriptions of the [New Co] Plan shall reflect the termination of the responsibilities of [New Co] and the [New Co] Plan for Retiree Medical Benefits for the Class and the Covered Group for claims incurred after the Implementation Date, as set forth herein."

Restructuring MOU) related to a separate subject matter altogether—*i.e.*, New GM's $450

million **payment** obligation to **the DC VEBA**—is superseded as well.

      11.    Indeed, that the Section 5D language seized upon by New GM had the relatively

narrow and specific purpose of superseding **only** those prior agreements dealing with the subject

matter of New GM's obligations respecting **the provision of** health benefits to GM retirees—and

thus has nothing whatsoever to do with the separate subject matter of New GM's **payment**

obligations to the New VEBA (much less the DC VEBA)—is confirmed by paragraph 20 of the

Sale Order.[7]  In subparagraph (III) of paragraph 20, the Sale Order states that under the **2009**

**Agreement**, "all obligations of the Purchaser and the Sellers **to provide** Retiree Medical

Benefits" to GM retirees "shall be governed by" that Agreement, and then goes on to state that

"in accordance with Section 5.D," New GM "shall not [after the Agreement's January 1, 2010

Implementation Date] have any **such** obligations."  *See* Sale Order, at p. 28 (emphasis added).

Plainly then, the Sale Order makes clear that Section 5D has the limited and specific meaning set

out in paragraph 10 above—namely, that as of January 1, 2010, New GM would not have any

obligations respecting **the provision of** health benefits to GM retirees (as distinct from **payment**

obligations necessary to fund those health benefits).

      12.    While it is telling that New GM would rely so heavily in its brief on language in

Section 5D that, read in context, lends no support whatsoever to New GM's "preclusion" defense

based on the **2009** Agreement, it is even more telling that New GM does not rely at all on the

broader language in Section 32C providing that "[t]his Settlement Agreement supersedes any

prior understandings, agreements or representations by or between the parties, written or oral,

regarding **the matters set forth in** this Settlement Agreement."  *See* **2009** Agreement, p. 30

---

[7]    Notably, while asserting that the Sale Order "singled out" Section 5D, *see* New GM Br. ¶ 9(b), New GM omits any discussion of the substantive provisions of the Sale Order that implement that Section.

(emphasis added). This uncharacteristic reticence on New GM's part evinces its own, keen understanding of the fact that New GM's $450 million payment obligation to the DC VEBA under the 2007 Delphi Restructuring MOU is **not** a "matter" that is addressed in any way by the **2009** Agreement. And that fact, in turn, reveals a basic truth that renders New GM's asserted "preclusion" defense based on the **2009** Agreement "wholly insubstantial" to say the very least: Given that the **2009** Agreement does not address the "matter" of New GM's $450 million payment obligation to the DC VEBA at all, it cannot possibly be said that the **2009** Agreement nonetheless operates in some mysterious fashion to "extinguish" or "preclude the enforcement of" that $450 million payment obligation.[8]

B. *The Court's Lack of Jurisdiction to Rule on Whether the Conditions Precedent to Payment under the 2007 Delphi Restructuring MOU Have Been Satisfied (i.e., Lack of Jurisdiction Over What New GM Dubs the "MOU Dispute")*

13.    New GM grasps at each of "arising in," "related to," and "supplemental" jurisdiction in an effort to ground the MOU Dispute within this Court's jurisdiction over the Old GM bankruptcy case. But as ample case law makes clear, this contractual dispute between two non-debtors has no jurisdictional home in this proceeding.

14.    First, New GM argues that this Court has "arising in" jurisdiction over the MOU Dispute because the Preclusion Dispute involves a "gateway" interpretation of the **2009** UAW

---

[8]    Given this basic truth apparent **on the face of** the **2009** Agreement, we will not burden this Court by engaging in a tit-for-tat with New GM on various side issues, including whether the history preceding the **2009** Agreement confirms this basic truth. Suffice it to say that New GM's rejoinder to the UAW's showing on this point, *compare* New GM Br. ¶¶ 11 & 19 *with* UAW Br. ¶¶ 48-51, is so evasive, confusing and incomplete as effectively to constitute no response at all. To provide but one illustrative example, New GM twice makes the point in its rejoinder that it did not assume the **2008** Agreement as part of the sales transaction, *see* New GM Br. ¶¶ 11 & 19, but that point is yet another New GM *non sequitur*. The UAW does not argue that the **2008** Agreement is relevant here because New GM assumed it in the sales transaction. Rather, the UAW argues that the **2008** Agreement is relevant here because: (a) it contained **the very same contract language** relied upon by New GM as the basis of its "preclusion" defense, **including** the Section 5 language that New GM now relies on so heavily; and (b) by their repeated course of conduct **after** the consummation of the **2008** Agreement, the contracting parties manifested a clear, mutual understanding that this contract language appearing in both the **2008** and **2009** Agreements did **not** have the effect of "extinguishing" or "precluding the enforcement of" the $450 million payment obligation to the DC VEBA arising under the 2007 Delphi Restructuring MOU.

Retiree Settlement Agreement and the Sale Order.  New GM Br. ¶¶ 22-23.  But New GM's effort

to piggyback jurisdiction for the MOU Dispute onto its argument regarding the Preclusion

Dispute is contradicted by New GM's own papers—New GM readily acknowledges that the

MOU Dispute is "independent" of the Preclusion Dispute.  New GM Br. ¶ 33.  In this New GM

is entirely correct; no aspect of the MOU Dispute requires the Court to interpret or apply the

**2009** UAW Retiree Settlement Agreement or the Sale Order, or otherwise consider claims that

could only arise in bankruptcy.  *See Stoe v. Flaherty*, 436 F.3d 209, 218 (3d Cir. 2006) ("Claims

that 'arise in' a bankruptcy case are claims that by their nature, not their particular factual

circumstance, could arise only in the context of a bankruptcy case.").  The MOU Dispute is

governed by the federal common law of contracts developed under Section 301 of the Labor

Management Relations Act, *see* UAW Br. ¶¶ 43 & 54 n.14, and requires interpretation of the

2007 Delphi Restructuring MOU to determine whether conditions precedent to New GM's $450

million payment obligation to the DC VEBA have been satisfied.  That New GM seeks a

determination of both the Preclusion Dispute and the admittedly independent MOU Dispute does

not transform the MOU Dispute into a claim "arising in" Title 11.

      15.     The single case on which New GM relies to suggest that there is "arising in"

jurisdiction over the MOU Dispute—*Lothian Cassidy LLC v. Ransom*, 428 B.R. 555 (E.D.N.Y.

2010)—provides no support for New GM's novel argument of "gateway" jurisdiction.  The

*Lothian* plaintiffs brought numerous state law claims, which defendants removed to bankruptcy

court.  In upholding that removal, the *Lothian* Court found a separate statutory basis to exercise

jurisdiction over each dispute.  *Lothian*, 428 B.R. at 559-60 (finding "related to" jurisdiction over

all claims, with additional "arising in" jurisdiction over certain claims requiring interpretation of

chapter 11 plan and bankruptcy court orders).  *Lothian* provides no support for the remarkable

proposition that jurisdiction over one claim vests a bankruptcy court with jurisdiction to grant relief as to "independent" claims.[9]

16.     Nor can New GM assert a right to litigate the MOU Dispute in this Court based on "related to" jurisdiction.  New GM sets forth no cognizable effect the MOU Dispute could have on the Debtors' estates.  Instead, New GM speculates that a decision upholding the UAW's right to payment by New GM "could cause various parties in interest (including some of the more than 850 objectors to the Sale) to file pleadings with the Court questioning such consideration."  New GM Br. ¶ 25.  But the "any conceivable effect" standard is not satisfied by a showing of "any speculative effect."  New GM suggests no reasonable legal basis for such pleadings.  The Sale Order is a final order (as to which even the time to bring a motion under Rule 60 has expired), and the UAW's breach-of-contract claim under the 2007 Delphi Restructuring MOU is solely against New GM, not the Debtors.  While New GM attempts to analogize to pending Rule 60 motions in the *In re Lehman Brothers Holdings Inc.* proceedings (New GM Br. ¶ 44), those motions were timely filed and concern assets of the estate and recoveries for the benefit of creditors—not obligations between third party non-debtors.  New GM's failure to set forth any reasonable legal basis for any similar proceedings, should the UAW prevail on its breach-of-contract claim under the 2007 Delphi Restructuring MOU, is dispositive of New GM's argument.  *See 176-60 Union Tpk., Inc. v. Howard Beach Fitness Ctr., Inc.*, 209 B.R. 307, 313 (S.D.N.Y. 1997) ("any controversy having only a speculative, indirect or incidental effect on the estate is not 'related to' the bankruptcy action within the meaning of Sections 157(a) and (c)") (internal quotations omitted); *Back v. LTV Corp. (In re Chateaugay*

---

[9]     Ultimately, the only connection between the MOU Dispute and the Sale Order is that the Sale Order effectuated assignment of the 2007 Delphi Restructuring MOU to New GM.  New GM does not dispute this assignment, or suggest that it is sufficient standing alone to establish jurisdiction over the MOU Dispute.

*Corp.*), 213 B.R. 633 (Bankr. S.D.N.Y. 1997) (where movant failed to set forth any "reasonable

legal basis" for supposed claims against the estate as a result of an action, such claims could not

provide a basis for "related to" jurisdiction over that action).[10]

17.    New GM's remaining arguments are no more supported by either case law or

logic.  First, New GM's reliance on cases that suggest a basis for jurisdiction over a dispute that

is shown to affect the stock price of **the reorganized debtor itself** is badly misplaced.[11]  New

GM is not a reorganized debtor.  Instead, New GM is a purchaser of identified Debtor assets; the

Debtors only hold a small minority of the equity in New GM as a result of consideration received

in the Sale.  Under the clear precedent set forth in the UAW's Opening Brief[12]—to which New

GM fails even to respond—those equity holdings are insufficient as a matter of law to provide

"related to" jurisdiction, even if New GM could establish that the resolution of the MOU Dispute

in the UAW's favor would have an effect on New GM's stock price.[13]

---

[10]    *See also In re Kmart Corp.*, 359 B.R. 189, 197-98 (Bankr. N.D. Ill. 2005) (speculation that potential interpretation of a bankruptcy court order could lead to commencement of an action to rescind a sale was insufficient to confer "related to" jurisdiction).

[11]    *See* New GM Br. ¶ 25 & n.26 (citing *In re Chautegay Corp.*, 213 B.R. 633, 640 (S.D.N.Y. 1997) and *In re Ames Dep't Stores, Inc.*, 190 B.R. 157 (S.D.N.Y. 1995)).  Even if New GM's authorities were applicable to an asset purchaser—which they are not—they do not support its position.  Indeed, the district court in *Chautegay* expressly found that "a possible effect on stock price [of the reorganized debtor] is **not** enough to sustain jurisdiction." *Chautegay*, 213 B.R. at 640 (emphasis added).

[12]    *See* UAW Br. ¶ 39, citing *Tower Auto. Mexico v. Grupo Proeza, S.A. De C.V. (In re Tower Auto., Inc.)*, 356 B.R. 598 (Bankr. S.D.N.Y. 2006); *see also Feldman v. Tr. of Beck Indus. (In re Beck Indus., Inc.)*, 479 F.2d 410 (2d Cir.), *cert. denied*, 414 U.S. 858 (1973); *DVI Fin. Servs., Inc. v. Nat'l Med. Imaging, LLC (In re DVI, Inc.)*, 305 B.R. 414 (Bankr. D. Del. 2004) ("The mere fact that [the debtor] holds equity interests in the [defendant] is too tenuous and insufficient to confer jurisdiction on this Court.  If [the debtor] were correct, then the Court's jurisdiction would expand to include every claim by or against any entity in which the debtor owned stock.  That is simply not true.").

[13]    New GM fails to set forth any support for its assertions as to a stock price effect—a deficiency that standing alone is fatal to its claim to "related to" jurisdiction.  *Chautegay*, 213 B.R. at 640 ("a possible effect on stock price is not enough to sustain jurisdiction . . . [where] it appears that no evidence was presented to support any conclusion regarding stock price."); *In re Kmart*, 359 B.R. at 197 (in dispute between non-debtor parties, "potential indirect negative impact on the [reorganized debtors'] stock value" was insufficient to confer related-to jurisdiction, particularly without any "quantif[ication of] the decrease in stock value").  Nor is it clear that New GM could credibly make such a showing, where the $450 million payment obligation represents less than one percent of New

18.    Second, while New GM suggests that the MOU Dispute is "related to" the

Debtors' estates based on an "intimate intertwining" between the parties and the Debtors, this not

only misconstrues the applicable standard but flies in the face of this Court's conclusions

regarding New GM's relationship to the Debtors.  As the authorities New GM cites show, courts

have applied the "intertwining" standard to find "related to" jurisdiction only where the claim at

issue was either asserted against insiders of a debtor, or was in essence a claim against the debtor

itself due to issues of joint or overlapping liability.[14]  New GM ignores that here the UAW has

not asserted—and has affirmatively waived—any claim against the Debtors in relation to either

the Preclusion or MOU Disputes.  *See* UAW Br. ¶ 39.  The sole defendant in the Michigan

District Court Litigation is New GM, and there is no risk of any findings concerning the Debtors'

actions or liability.  Moreover, in now asserting that it is so "intimately intertwined" with the

Debtors as to establish "related to" jurisdiction, New GM contradicts this Court's findings that

New GM is not an insider of the Debtors, and instead is an arms-length third party that made

decisions independent of the Debtors.  *See* Sale Order, ¶¶ Q, R, S, U, and 55; *In re Gen. Motors

Corp.*, 407 B.R. 463, 494-495 (Bankr. S.D.N.Y. 2009), *aff'd sub nom. In re Motors Liquidation

Co.*, 428 B.R. 43 (S.D.N.Y. 2010), *aff'd sub nom. In re Motors Liquidation Co.*, 430 B.R. 65

(S.D.N.Y. 2010).[15]

---

GM's massive $50 billion market capitalization.  *See* Yahoo! Finance, http://finance.yahoo.com/q?s=GM (last visited Feb. 25, 2011).

[14]    *See, e.g., Nemsa Establishment, S.A. v. Viral Testing Sys. Corp.*, No. 95-Civ-0277, 1995 U.S. Dist. LEXIS 11650, at *20 (S.D.N.Y. Aug. 15, 1995) (finding "related to" jurisdiction over claims against officers and directors of a debtor, where claims concerned joint conduct of both the debtors and defendants); *Ameritrust Co., N.A. v. Opti-Gage, Inc. (In re Opti-Gage, Inc.)*, 128 B.R. 189, 195 (Bankr. S.D. Ohio 1991) (finding that officers of the debtor were sufficiently intertwined to place them only within the "outer boundaries of bankruptcy court jurisdiction," where the claim challenged the combined actions of the debtors and their officers).

[15]    While New GM also suggests in passing that even in the absence of "related to" jurisdiction over the MOU Dispute, the Court could exercise supplemental jurisdiction over that Dispute (New GM Br. ¶ 26 n. 27), this suggestion ignores the weight of authority that Section 1367 simply does not apply to bankruptcy courts.  *See Enron Corp. v. Citigroup, Inc. (In re Enron Corp.)*, 353 B.R. 51 (Bankr. S.D.N.Y. 2006) (citing *In re Walker*, 51 F.3d 562,

II.      *Even If the Court Has Jurisdiction Over Some Aspect of the Underlying Controversy Between the Parties, the Court Should Abstain from Exercising that Jurisdiction*

19.      Even if the Court were to decide that it has jurisdiction—either solely as to the Preclusion Dispute, or over the MOU Dispute as well—the Court should abstain in favor of the pre-existing Michigan District Court Litigation.  Nothing in New GM's brief contests that both aspects of its Motion are, at base, contract disputes between two non-debtors, the outcome of which—aside from past history or speculation as to the future—has no bearing whatsoever on the Debtors' estates.  The Court also lacks any expertise or familiarity with the MOU Dispute, which includes a right to a jury trial that this Court cannot conduct.  Where each of the contract Disputes raised by New GM's Motion can instead be competently and comprehensively handled in the Michigan District Court Litigation, this Court should exercise its discretion to abstain from hearing those contract Disputes.[16]

---

573 (5th Cir. 1995) (applying 28 U.S.C. § 1367 to bankruptcy courts would "gut [the] careful system [set out in the jurisdictional grants of 1334(b)] by allowing bankruptcy courts to exercise supplemental jurisdiction to pull into bankruptcy courts matters Congress excluded in its specific jurisdictional grants.")).  Even if Section 1367 did apply to bankruptcy courts, it would require that there be a common nucleus of operative facts between the MOU Dispute and other disputes over which the Court does have jurisdiction.  *Achtman v. Kirby, McInerney  & Squire, LLP,* 464 F.3d 328, 335 (2d Cir. 2006).  Not only does the Bankruptcy Court have no jurisdiction over the Preclusion Dispute (as set forth above), but in any event, as New GM concedes, that dispute is "independent" from the MOU Dispute. New GM Brief ¶ 33.  Indeed, New GM suggests that this Court defer ruling on whether it even has jurisdiction over the MOU Dispute until resolving the Preclusion Dispute.  *Id.*  This forecloses any suggestion that the MOU Dispute is "so related to [the Preclusion Dispute] that [the two disputes] form part of the same case," as Section 1367 would require.  *See* 28 U.S.C. § 1367.

[16]      As New GM itself acknowledges, the Court need not consider all of the abstention factors that have been cited in the parties' briefs.  New GM Br. ¶ 40.  Accordingly, the UAW will not discuss each factor raised by New GM, where many are inapplicable to New GM's Motion while only a few are ultimately determinative.  Indeed, contrary to New GM's assertion (New GM Br. ¶ 47), courts may consider the same factors when determining whether permissively to abstain in favor of state or federal court proceedings.  *See, e.g., In re Portrait Corp. of Am., Inc.,* 406 B.R. 637, 641-43 (Bankr. S.D.N.Y. 2007) (abstaining in favor of another federal court after citing a twelve-factor test analogous to the test cited by New GM and relying on the factor of judicial economy); *Chamberlain Grp., Inc. v. Lear Corp. (In re Lear Corp.),* No 09-14326, 2009 WL 3191369 (Bankr. S.D.N.Y. Sept. 24, 2009) (noting that section 1334(c)(1) provides "broadly" for abstention in favor of other federal courts in the interests of justice and abstaining in favor of another federal court based on factors including judicial economy and the convenience of the parties).

20.    The retention of jurisdiction provision in the Sale Order and the forum selection clause in the **2009** UAW Retiree Settlement Agreement do not restrict this Court's exercise of its discretion to abstain from hearing the Preclusion Dispute.  To the contrary, where circumstances warrant abstention, a bankruptcy court may abstain from exercising its retained jurisdiction notwithstanding such provisions.  *See, e.g., Collins v. IBM Se. Emples. Fed. Credit Union (In re Alliance Leasing Corp.)*, No. 07-0065A, 2007 Bankr. LEXIS 4637, *32-33 (Bankr. M.D. Tenn. July 3, 2007) (abstaining from hearing adversary proceeding over trustee's objection that defendant's participation and failure to object to retention of jurisdiction provision in a confirmed plan waived the defendant's right to seek abstention in favor of another forum); *Arris Int'l v. Hybrid Patents, Inc. (In re Com21, Inc.)*, 357 B.R. 802 (Bankr. N.D. Cal. 2006) (abstaining from hearing action under first-to-file rule despite retention of exclusive jurisdiction provision in bankruptcy court's sale order).[17]

21.    The circumstances presented here plainly warrant abstention.  In this regard, New GM's effort to "invest" this Court in the exercise of its retained jurisdiction—by invoking this Court's statement in the *Rally Decision* that "[a] purchaser that relies on the terms of a bankruptcy court's order and whose title and rights are given life by that order should have a forum in the issuing court," New GM Br. ¶ 38, and by repeatedly trumpeting how important this Court's blessing of the "fixing and capping" principle of the **2009** Agreement in the Sale Order was to New GM, *see id.* ¶¶ 41, 47, 54, 57—falls entirely flat.  To begin with, the "fixing and

---

[17]    Additionally, as the cases that New GM cites point out, courts can and have permissively abstained *sua sponte* after finding that a party has voluntarily agreed to the jurisdiction of the court.  *See, e.g., Fruit of the Loom, Inc. v. Magnetek, Inc. (In re Fruit of the Loom, Inc.)*, 407 B.R. 593 (Bankr. D. Del. 2009) (rejecting the argument that agreed retention of jurisdiction and forum selection language in a settlement agreement approved by the bankruptcy court precluded the court from reaching the abstention question and abstaining *sua sponte*); *LaRoche Indus., Inc. v. Orica Nitrogen LLC (In re LaRoche Indus., Inc.)*, 312 B.R. 249 (Bankr. D. Del. 2004) (same). Moreover, contrary to New GM's assertion (New GM Br. ¶ 55), this Court's retention of jurisdiction did not divest other courts of their concurrent, subject matter jurisdiction to hear the Disputes.  *See Chiste v. Hotels.com L.P.*, No. 08 Civ. 10744, 2010 WL 4630317, *5 (S.D.N.Y. Nov. 15, 2010) ("A forum-selection clause does not divest a federal court of subject matter jurisdiction . . . .").

capping" principle of the **2009** Agreement had already been established and settled by the prior, **2008** UAW Retiree Settlement Agreement, and such principle was not further elaborated on in the Sale Order.  See UAW Br. ¶¶ 12-14, 21.  Moreover, as the UAW has established, if this Court determines that it has jurisdiction over the Preclusion Dispute, that jurisdiction rests on the slenderest of reeds.  In any event, whatever relevance the retention of jurisdiction and forum selection provisions may have to the Preclusion Dispute, no such contractual provisions support this Court's exercise of jurisdiction over the MOU Dispute, as New GM implicitly concedes and cannot help but concede.

22.    New GM also does not and cannot refute the UAW's right to a jury trial on the MOU Dispute; nor does New GM address the risks and burdens of piecemeal litigation that can be avoided through a single proceeding in the Eastern District of Michigan.  In the former regard, New GM's position rests on the speculation that the merits of the underlying MOU Dispute are "unlikely to reach a jury" (New GM Br. ¶ 50), but nowhere does New GM suggest that the UAW lacks a jury trial right as to the MOU Dispute, or that the UAW failed validly to invoke that right in the Michigan District Court Litigation.  Indeed, the cases that New GM cites fail even to address the existence of a right to a jury trial, and instead concern only the need for a jury trial in light of the availability of dispositive relief on the pleadings or on summary judgment in appropriate cases.  *See, e.g., Bolt Electric, Inc. v. City of New York*, 223 F.3d 146, 149-150 (2d Cir. 2000) (reversing grant of summary judgment because reasonable minds could differ as to the interpretation of the contract at issue).

23.    Finally, New GM ignores the current status of the Debtors' bankruptcy proceedings.  As demonstrated in the UAW's Opening Brief, the MOU Dispute is tied to this Court only by virtue of the assumption and assignment of the 2007 Delphi Restructuring MOU

pursuant to the Sale Order, which connection alone, under well-settled authority, is not enough to

sustain this Court's jurisdiction over the MOU Dispute.  *See* UAW Br. ¶¶ 35-39.  Similarly, even

if the Court were to find that it has jurisdiction over the Preclusion Dispute, the attenuated nature

of such jurisdiction should weigh heavily in favor of abstention.[18]  The Sale—which closed 19

months ago—is at this point remote from the current stage of the Debtors' bankruptcy

proceedings.  *See, e.g., Longacre Master Fund, Ltd. v. Telecheck Servs., Inc. (In re Casual Male

Corp.)*, 317 B.R. 472 (Bankr. S.D.N.Y. 2004) (Gerber, J.) (remanding claims trading dispute,

which may have required interpretation of the Court's sale order, because plaintiff was "seeking

relief solely from…a non-debtor party, and the outcome will have no effect on the…estate or its

other creditors"); *JMB Capital Partners, L.P. v. CRT Capital Grp. LLC (In re NTL, Inc.)*,

295 B.R. 706 (Bankr. S.D.N.Y. 2003) (abstaining from hearing litigation spawned by

modification of the confirmation order for reasons including remoteness of the dispute to the

debtors' cases only six months after the debtors' plan went effective).[19]  Faced with a lack of any

tangible effect on the Debtors' proceedings, New GM is forced to reach not only into the history

of the Sale, but into a crystal ball.  Specifically, New GM imagines a parade of motions of an

unspecified nature, though as discussed above, the additional workload for this Court that New

GM conjures is entirely speculative.  Moreover, New GM's speculation as to the effects of the

---

[18]     Even if this Court finds that it has jurisdiction over the Disputes, the limited nature of the connection between such disputes and the Debtors' chapter 11 cases demonstrates that the underlying action is in substance a contract dispute between non-debtors—it is not in substance a "core" proceeding as New GM suggests.  New GM Br. ¶ 53.  Indeed, the provisions of the Sale Order—upon which New GM relies to assert "arising in" jurisdiction— only refer to provisions of the **2009** UAW Retiree Settlement Agreement, and do not create rights that are themselves the subject of either Dispute.

[19]     *Winstar Holdings, LLC v. Blackstone Grp. L.P.*, No. 07-cv-46324, 2007 WL 4323003 (S.D.N.Y. Dec. 10, 2007), cited by New GM (New GM Br. ¶ 41), is not to the contrary.  In *Winstar*, the purchaser of the debtor's assets sued one of the debtor's professionals for fraudulently inducing the purchaser into purchasing the assets.  *Id.* at *6.  *Winstar* thus directly implicated the very basis for the Debtors' sale, whereas the Michigan District Court Litigation concerns only contract rights between non-debtors.  *In re Sterling Optical Corp.*, 302 B.R. 792 (Bankr. S.D.N.Y. 2003) (Gerber, J.), cited by New GM (New GM Br. ¶ 38), is also not to the contrary.  In *Sterling*, this Court clearly had jurisdiction over the dispute because issue had been joined before the Court on the defendant's claim, which raised substantially the same issues as were raised by the adversary proceeding.  *Id.* at 803.

Disputes depends not on whether this Court exercises jurisdiction, but instead on the UAW's

ability to prevail on its breach-of-contract claim on the merits at some point in the future.

## <u>CONCLUSION</u>

For the foregoing reasons, and for those set out in the UAW's Opening Brief, the UAW

respectfully requests that this Court dismiss New GM's Motion to Enforce the Sale Order for

lack of subject matter jurisdiction, or in the alternative abstain from exercising any jurisdiction

that the Court concludes it has.

Dated:  February 28, 2011              Respectfully submitted,

                                       BREDHOFF & KAISER P.L.L.C.

                                       By:      /s/ ANDREW D. ROTH
                                                Andrew D. Roth (admitted *pro hac vice*)
                                                Ramya Ravindran (admitted *pro hac vice*)

                                       805 Fifteenth Street, N.W. Suite 1000
                                       Washington, D.C. 20005
                                       Telephone: (202) 842-2600
                                        Facsimile: (202) 842-1888

                                       CLEARY GOTTLIEB STEEN & HAMILTON LLP

                                            Deborah M. Buell
                                            James L. Bromley

                                       One Liberty Plaza
                                       New York, New York 10006
                                       Telephone:  (212) 225-2000
                                       Facsimile:  (212) 225-3999

                                       *Counsel for UAW*

18