**HEARING DATE AND TIME: April 12, 2011 at 9:45 a.m.**
**REPLY DEADLINE: March 14, 2011 at 4:00 p.m.**

Steven M. Bierman
Nicholas K. Lagemann
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 839-5300
Facsimile: (212) 839-5599

Kenneth P. Kansa (admitted *pro hac vice*)
Courtney A. Rosen (admitted *pro hac vice*)
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, Illinois 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036

Counsel for Wells Fargo Bank
Northwest, N.A., as Agent to the TPC Lenders

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- X
In re:                                           :         Chapter 11
                                                 :
MOTORS LIQUIDATION COMPANY., *et al.*,           :         Case No. 09-50026 (REG)
        f/k/a General Motors Corp., *et al.*     :
                                                 :
                Debtors.                         :         (Jointly Administered)
------------------------------------------------------------- X

# MEMORANDUM OF LAW OF THE TPC LENDERS CONCERNING THE PROPER VALUATION METHODOLOGY UNDER THE SALE ORDER AND SECTION 506 OF THE BANKRUPTCY CODE TO BE APPLIED TO THE TPC PROPERTY

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................................................... ii

PRELIMINARY STATEMENT ............................................................................................... 1

STATEMENT OF FACTS AND PROCEDURAL HISTORY .................................................. 6

    The Bankruptcy and Sale Order .................................................................................... 6

    The Facilities ............................................................................................................... 11

ARGUMENT ......................................................................................................................... 17

I.      THE BANKRUPTCY CODE AND THE SALE ORDER REQUIRE THAT THE TPC
       PROPERTY BE VALUED AT FAIR MARKET VALUE WITH REFERENCE TO THE
       PLAIN LANGUAGE OF SECTION 506 OF THE BANKRUPTCY CODE ................... 17

      A.     The Plain Language of Section 506(a) Requires that a Court Value a Secured
           Creditor's Collateral in Light of the Purpose of the Valuation and the Proposed
           Disposition or Use of the Property ....................................................................... 18

      B.     Replacement Value Is the Appropriate Valuation Method Given the Purpose of
           the Valuation and the Proposed Disposition or Use of the Property ..................... 20

      C.     The Replacement Value Standard of *Rash* Is the Fair Market Value Which Takes
           Into Account the Actual Use of the TPC Property ................................................ 24

      D.     Determining Fair Market Value Without Reference to the TPC Property's
           Proposed Disposition or Use Provides New GM with an Unjustified Windfall .. 277

CONCLUSION……………………………………………………………………………..29

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Associates Commercial Corp. v. Rash,*
   520 U.S. 953 (1997)...............................................................................3, 4, 5, 20, 21, 22, 25

*Butner v. United States,*
   440 U.S. 48 (1979)..................................................................................................................27

*Cathcart v. Wachovia Mortgage,*
   No. 1:04-CV-1236-JDT-TAB, 2005 WL 756208 (S.D. Ind. Feb. 22, 2005) ...........................1

*In re Bell,*
   304 B.R. 878 (Bankr. N.D. Ind. 2003).....................................................................................25

*In re Chateaugay Corp.,*
   154 B.R. 29 (Bankr. S.D.N.Y. 1993).............................................................................18, 22, 25

*In re Clarkeies Mkt., L.L.C.,*
   Nos. BK. NO. 01-10700-JMD, 69, 73, 79, 80, 81, 2002 WL 31317242 (Bankr.
   D.N.H. Sept. 26, 2002) ............................................................................................................13

*In re Coker,*
   973 F.2d 258 (4th Cir. 1992) ...................................................................................................28

*In re Colfor, Inc.,*
   No. 96-60306, 1996 WL 628057. (Bankr. N.D. Ohio Sept. 18, 1996).....................................23

*In re Donato,*
   253 B.R. 151 (M.D. Pa. 2000) ............................................................................................21, 22

*In re Fiberglass Indus., Inc.,*
   74 B.R. 738 (Bankr. N.D.N.Y. 1987) ...........................................................................22, 25, 28

*In re Fruedenheim,*
   189 B.R. 279 (Bankr. W.D.N.Y. 1995) ....................................................................................22

*In re LTV Steel Co.,*
   285 B.R. 259 (Bankr. N.D. Ohio 2002).....................................................................................23

*In re Olio Dental, Inc.,*
   No. 08-10305-BHC-11, 2009 WL 1475273 (Bankr. S.D. Ind. May 26, 2009)........................26

*In re Perez,*
   318 B.R. 742 (Bankr. M.D. Fla. 2005) ....................................................................................25

ii

*In re R&S Vinyl Prods. Group, L.L.C.*,
   291 B.R. 685 (Bankr. W.D. Pa. 2003) ..................................................................26

*In re TennOhio Transp. Co.*,
   247 B.R. 715 (Bankr. S.D. Ohio 2000) ................................................................26

*In re UAL Corp.*,
   351 B.R. 916 (Bankr. N.D. Ill. 2006), *mot. to amend denied*, 360 BR 780 (Bankr.
   N.D. Ill. 2007) .......................................................................................................22

*In re Urban Communicators PCS Ltd. P'ship*,
   379 B.R. 232 (Bankr. S.D.N.Y. 2007), *aff'd in part, rev'd in part on other grounds*,
   394 B.R. 325 (S.D.N.Y. 2008) .............................................................................18

*In re Winthrop Old Farm Nurseries, Inc.*,
   50 F.3d 72 (1st Cir. 1995) .....................................................................................22

*Matter of T-H New Orleans Ltd. P'ship*,
   116 F.3d 790 (5th Cir. 1997) ................................................................................20

*Union Bank of Switzerland v. Duetche Fin. Serv. Corp.*,
   No. 98 Civ. 3251 (HB), 2000 WL 178278 (S.D.N.Y. Feb. 16, 2000 ....................13

*United Air Lines, Inc. v. Reg'l Airports Improvement Corp.*,
   564 F.3d 873 (7th Cir. 2009) .........................................................................20, 25

## STATUTES & RULES

11 U.S.C. § 506 ...............................................................................................................3, 18

## OTHER AUTHORITIES

4 *Collier on Bankruptcy* ¶ 506.03 ..........................................................................20, 24, 27

iii

Wells Fargo Bank Northwest, N.A. ("**Wells Fargo**"), as Agent (the "**Agent**"), on behalf

of  Norddeutsche Landesbank Girozentrale (New York Branch), as Administrator (the

"**Administrator**"), and Deutsche Bank, AG, New York Branch, HSBC Bank USA, National

Association, ABN AMRO Bank N.V. n/k/a The Royal Bank of Scotland NV, Royal Bank of

Canada, Bank of America, N.A., Citicorp USA, Inc., Merrill Lynch Bank USA, and Morgan

Stanley Bank, as purchasers (collectively with the Administrator, the "**TPC Lenders**"),

respectfully submits this Memorandum of Law Concerning the Proper Valuation Methodology

under the Sale Order and Section 506 of the Bankruptcy Code to Be Applied to the TPC Property

("**Memorandum of Law in Support of Wells Fargo's Valuation Methodology**").

## PRELIMINARY STATEMENT

1.      In these unique and unprecedented bankruptcy cases, an American icon, the

business of the legendary General Motors automobile company has been restructured and

continued for the benefit of the business' economic stakeholders as a whole.  One of the keys to

this successful transformation was the ability of the General Motors business, through a Section

363 sale (the "**363 Sale**") consummated in the early phases of these cases, to retain and continue

to use a number of specifically selected assets and operations for its continued manufacture and

sale of automobiles.

2.      As part of that sale, "New GM" acquired from "Old GM" (as each term is defined

herein) two facilities that served as security for indisputably secured loans advanced by the TPC

Lenders to Old GM.  Since the Commencement Date those two facilities – a transmission

manufacturing plant in White Marsh, Maryland (the "**Maryland Facility**") and a distribution

center in Memphis, Tennessee (the "**Tennessee Facility**," and, together with the Maryland

Facility, the "**Facilities**" or the "**TPC Property**") – have continually been used in the General

1

Motors business as part of its revitalized operations.  The continued use and employment of these

two facilities in the General Motors business has conferred extraordinary benefits upon that

business and New GM, including, among other things, allowing it to obtain hundreds of millions

of dollars in government grants and tax benefits for the continued operation and dramatic

expansion of the Maryland Facility and continued operation of the Tennessee Facility.  These are

benefits that would not and could not have been obtained but for retention and use of the

Facilities in the ongoing General Motors business.

3.       As part of the Order (I) Authorizing Sale of Assets Pursuant to Amended and

Restated Master Sale and Purchase Agreement; (II) Authorizing Assumption and Assignment of

Certain Executory Contracts and Unexpired Leases in Connection with the Sale; and (III)

Granting Related Relief  entered by this Court on July 5, 2009[1] (the "**Sale Order**") [Docket No.

2968], it was agreed and ordered that the TPC Lenders would be entitled to an allowed secured

claim, to be paid from certain funds placed in escrow by New GM, in an amount "equal to the

fair market value of the TPC Property on the Commencement Date under section 506 of the

Bankruptcy Code (the "**TPC Value**")."  Sale Order ¶ 36.  The TPC Lenders appraisals were

undertaken to accomplish what the Sale Order provided for and what is required under Section

506 of the Bankruptcy Code.  But now, instead of providing the TPC Lenders with the "fair

market value" clearly defined as a matter of law, New GM claims that the TPC Value should

ignore the actual and continued use of the Facilities, ignore the fact that they continue to be

operated and occupied, and ignore the fact that to the Old GM and New GM intended on the

Commencement Date for the Facilities to be used, retained and operated in an uninterrupted

fashion for the benefit of General Motors' ongoing business.

---

[1] Attached as Exhibit A to the Declaration of Steven M. Bierman in Support of the Memorandum of Law in Support
of Wells Fargo's Valuation Methodology ("Bierman Decl.").

4.      Under New GM's theory, the TPC Value would be merely a purported fair market value that might have been obtained if, instead of being sold as a part of a going concern for continued use in the General Motors business, the TPC Property had been foreclosed upon and sold into the market to any party other than one engaged in the manufacture of automobiles. That, however, is not what was ordered in the Sale Order, is contrary to numerous representations made to the Court by Old GM and New GM in obtaining approval of the 363 Sale and wholly ignores reality.

5.      It is also wrong as a matter of law. Section 506(a) of the Bankruptcy Code provides that the value of a secured creditors claim "shall be determined" according to "the proposed disposition or use of such property." 11 U.S.C. § 506(a)(1). The United States Supreme Court has held that where, as here, the collateral for a secured loan is retained and continued to be used, valuation under Section 506 of the Bankruptcy Code is not simply the value that might have been obtained by the secured lender if it had foreclosed and sold the property, but instead what it would cost the party who continues to use the property to have purchased it for the same use (i.e., "replacement value"). *Associates Commercial Corp. v. Rash*, 520 U.S. 953, 965 (1997).[2] Thus, when valued under Section 506, as required by the Sale Order, the fair market value of the TPC Property is "the price a willing buyer *in the debtor's trade, business or situation* would pay a willing seller to obtain property of like age and condition;" in other words, the cost that General Motors "would incur to obtain a like asset for the same

---

[2] Although *Rash* arose in the context of a Chapter 13 cram down, its interpretation of section 506 applies universally to any bankruptcy case where, as here, the value of a secured claim is being established under section 506(a). *See infra* at [20, n.22].

3

'proposed . . . use.'" *Id.* at 959 n.2 & 965 (emphasis added). The TPC Lenders' appraisals have

followed the standard required by Section 506 and the Supreme Court's decision in *Rash*.[3]

6.        Not only does New GM ignore this clear and controlling law, it also ignores Old

GM's and New GM's statements in these proceedings, which are entirely inconsistent with this

new position. In seeking approval of the Sale Order, the Debtors repeatedly informed this Court

that allowing the sale would preserve and maximize the true value of the properties subject to the

Sale Order, including the TPC Property, as going concerns. *See* Debtor's Memorandum of Law

in Support of Debtors' Motion Pursuant to 11 U.S.C. §§ 105, 363(B), (F), (K), (M) And 365,

And Fed. R. Bankr. P. 2002, 6004 And 6006, To (I) Approve (A) the Sale Pursuant to the Master

Sale and Purchase Agreement with Vehicle Acquisition Holdings LLC, a U.S. Treasury-

Sponsored Purchaser, Free and Clear of Liens, Claims, Encumbrances and Other Interests; (B)

the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (C)

Other Relief; And (II) Schedule Sale Approval Hearing dated November 14, 2005[4]

("**Memorandum of Law in Support of Debtor's 363 Sale Motion**") at 3 [Docket No. 105] ("It

is axiomatic that going concern value exceeds liquidation value. Thus, it is in the best interests of

all stakeholders that, whenever possible, avoidance of liquidation and preservation of going

concern value, and the preservation of a business, jobs and correlated interests, should be the

objectives of any bankruptcy case."); *Id.* at 4-5 ("Against this backdrop, the authority for the 363

Transaction, which enables the Company to sell its major assets as a going concern, rather than

simply liquidating them, is clear in the Bankruptcy Code and under the cases.); *Id.* at 11 ("The

---

[3] As will be established at the required valuation hearing, the "use value" of the Facilities reflects the replacement value required by *Rash*. It values the property according to what it would cost General Motors to have purchased like and similar facilities as the transmission manufacturing plan in White Marsh, Maryland and the distribution center in Memphis, Tennessee. This is the fair market value under section 506 of the Bankruptcy Code and that is the appropriate methodology that should be utilized under the Sale Order.
[4] Attached as Exhibit B to the Bierman Decl.

363 Transaction … enabl[es] the business to be sold and continue operations without the current financial and operating distress and free of bankruptcy, as part of an immediately viable going concern.").

7.     Moreover, in responding to the TPC Lenders' limited objection to the 363 Sale, the Debtors expressly cited *Rash* for the proposition that "the 'proposed disposition or use' of the collateral is of paramount importance to the valuation question.'"  Omnibus Reply of the Debtors to Objections to Debtors' Motion Pursuant to 11 U.S.C. §§ 105, 363(B), (F), (K), and (M), and 365 and Fed. R. Bankr. P. 2002, 6004, And 6006, to Approve (A) the Sale Pursuant to the Master Sale and Purchase Agreement with Vehicle Acquisition Holdings LLC, a U.S. Treasury-Sponsored Purchaser, Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (B) The Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (C) Other Relief dated June 26, 2009[5] ¶ 89 n.19 [Docket No. 2645] (citing *Rash*, 520 U.S. at 963). This was the context in which the Sale Order was entered, and the Debtors then rightly noted the paramount and undeniable importance of the "proposed disposition or use" in determining valuation.

8.     The Debtors' repeated representations about the importance of the continued use of the properties that were part of the 363 Sale were not contradicted by what would become New GM, or the Treasury, or the Creditors Committee, or any party supporting the 363 Sale and were relied on by the Court in its decision to approve the 363 Sale.  Indeed, in approving the 363 Sale, this Court held it undisputable that allowing the assets to be sold through a liquidation would be a disastrous result to the Debtors' creditors.  *See* Decision on Debtors' Motion for Approval of (1) Sale of Assets to Vehicle Acquisition Holding LLC; (2) Assumption and Assignment of Related Executory Contracts; and (3) Entry into UAW Retiree Settlement

---

[5] Attached as Exhibit C to the Bierman Decl.

Agreement, dated July 5, 2009[6] ("**Findings**") at 3 [Docket No. 2967]. New GM, however, appears to assume exactly this disastrous result in its proposed valuation methodology for the Facilities, not the actual outcome the Court achieved.

9.     Finally, following the clear legal valuation methodology and valuing the properties according to their use and replacement value to the General Motors business, will benefit not only the TPC Lenders, but also the Debtors' estates and all other creditors as well. As the Court is aware, New GM has funded an escrow account in the amount of $90.7 million which would be used to satisfy the secured portion of the face amount of the TPC Lenders' claim. Subject to certain limitations, any unsecured portion would be repaid through an allowed unsecured claim which would necessarily lessen the amount of consideration available in the estate to repay other creditors. Thus, applying a proper valuation methodology that values the TPC Property according to its actual use and value to the General Motors business is in the best interests of all but one party to these bankruptcy cases.

10.     Accordingly, for these reasons and as further explained below, the Agent respectfully requests that the Court follow the requirements of Section 506(a) of the Bankruptcy Code and the Supreme Court's decision in *Rash* and value the TPC Property according to the price that General Motors would have had to pay to obtain similar properties for the same use as the Facilities.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

### The Bankruptcy and Sale Order

11.     General Motors Corporation ("**Old GM**"), and its affiliated Debtors filed these bankruptcy cases on June 1, 2009. On the same day, General Motors filed a Motion Pursuant to 11 U.S.C. §§ 105, 363(b), (f), (k), and (m), and 365 and Fed. R. Bankr. P. 2002, 6004, and 6006,

---

[6] Attached as Exhibit D to the Bierman Decl.

6

to (I) Approve (A) the Sale Pursuant to the Master Sale and Purchase Agreement With Vehicle

Acquisition Holdings LLC (the "**Purchaser**" or "**New GM**")[7], a U.S. Treasury-Sponsored

Purchaser, Free and Clear Of Liens, Claims, Encumbrances, and Other Interests; (B) the

Assumption and Assignment Of Certain Executory Contracts And Unexpired Leases; and (C)

Other Relief; and (II) Schedule Sale Approval Hearing[8] (the "**363 Sale Motion**") [Docket No.

92].  Among other things, the 363 Sale Motion requested that the Court approve the sale of the

majority of General Motors' assets, free and clear of any liens, encumbrances and other interests,

to New GM.  Included among the assets to be sold were the Maryland and Tennessee Facilities

which served as security for certain secured loans provided by the TPC Lenders to General

Motors.

12.     In support of the 363 Sale Motion, Old GM informed the Court that the

transaction was the only means available to prevent the General Motors business from being

forced into liquidation and to enable it to emerge from bankruptcy and avoid a complete

collapse.  *See e.g.*, 363 Sale Motion ¶ 33.  At the same time, both Old GM and New GM made

clear that the sale of the assets from Old GM to New GM would result in a seamless continuation

of the same business and same company.  For instance, in the 363 Sale Motion, General Motors

represented that "[t]he result of the sale will be the *continuation of the business* represented by

the assets to be sold that will make the Purchaser (sometimes referred to as "**New GM**") a

lynchpin of the domestic automotive industry so this nation once again can assume its place as

---

[7] At relevant points herein that go across the period in which the 363 Sale occurred, the Agent refers to "General Motors" herein for ease of reference.
[8] Attached as Exhibit E to the Bierman Decl.

NY1 7579047v.1

the domicile of one of the leading automotive manufacturers in the world."  *Id.* ¶ 2 (emphasis added).[9]

13.    In seeking approval for the sale, Old GM repeatedly emphasized how the assets held substantially more value as going concerns rather than simply being sold into the market in a liquidation.  According to Old GM, the sale would allow New GM to "acquire the purchased assets, create a New GM, and operate New GM free from any entanglement with the bankruptcy cases, and thereby preserve the going concern value . . . ."  Affidavit of Frederick A. Henderson Pursuant to Local Bankruptcy Rule 1007-2[10] ("**Henderson Aff.**") ¶ 74 [Docket No. 21].  Among other things, in the 363 Sale Motion, Old GM stated that the "[p]roposed sale is the only viable alternative that will permit realization of the going concern value of the assets to be sold and effect the transformation of the Purchased Assets to be the foundation for an efficient, productive, and economically viable business that will be competitive."  363 Sale Motion ¶ 2; *see also id.* ¶ 62 ("The 363 Transaction is the best and only way for the Company's assets to retain going concern value"); Henderson Aff. ¶ 16 (stating that the sale was "the only, viable means to save and carry forward GM's business in a new enterprise ("**New GM**") that will maximize and realize the going concern value of the Company's assets").

14.    In addition to emphasizing the going concern value of the assets, Old GM also repeatedly stated that the 363 Sale would result in greater recoveries for creditors than would have resulted from a sale to unknown parties on or around the Commencement Date.  For example, in the 363 Sale Motion, Old GM represented to the Court that the "[i]mplementation of

---

[9] After the entry of the Sale Order, General Motors made clear that its acquisition of the assets allowed it to continue in business as a reorganized entity, albeit one based upon the same assets and operations as before.  For instance, in a Form 8-K, General Motors Company, the parent entity of General Motors LLC, stated that New GM was simply a reorganized form of Old GM, one that operated the same business and assets as before.  *See* General Motors Company, Current Report (Form 8-K), at 1 (Aug. 7, 2009) ("Prior to July 10, 2009, the business of the Company was operated by Motors Liquidation"), attached as Exhibit F to the Bierman Decl.

[10] Attached as Exhibit G to the Bierman Decl.

the sale will best serve the interests of the Company's economic stakeholders, as the only other

alternative [to the sale would] result in little or no recoveries from the Company's assets as well

as severe economic consequence for the domestic automotive industry and the nation."  363 Sale

Motion ¶ 6; *see also* Henderson Aff. ¶ 82 ("[a]ny delay will result in irretrievable revenue

perishability and loss of market share to the detriment of all economic interests"); *id.* ¶ 98 ("The

only alternative to the 363 Transaction is a liquidation of the Debtors' assets -- a process that will

severely reduce the value of the Company's assets to the prejudice of its employees and all

economic stakeholders.").

15.    Similarly, Old GM informed the Court that "[a]bsent approval of [the sale], the

Company will be forced to liquidate, yielding only a fraction of the value of that the assets

subject to the sale would have as a going concern . . . [a] scenario [that would] . . . result in

significantly lesser recoveries by the Company's creditors . . . ."  Memorandum of Law in

Support of Debtor's 363 Sale Motion at 2.  Thus, according to Old GM, the allowance of a sale

would "maximize[] the value of the Company's business for the benefit of all of the Debtors'

economic stakeholders."  *Id.* at 12.

16.    On June 19, 2009, the TPC Lenders filed a Limited Objection Of White

Marsh/Memphis Secured Lender Group To Debtors' Motion Pursuant To 11 U.S.C. §§ 105,

363(b), (f), (k), And (m) And 365 And Fed. R. Bankr. P. 2002, 6004, And 6006, (I) To Approve

(A) The Sale Pursuant To The Master Sale And Purchase Agreement With Vehicle Acquisition

Holdings LLC, A U.S. Treasury-Sponsored Purchaser, Free And Clear Of Liens, Claims,

Encumbrances And Other Interests; (B) The Assumption And Assignment Of Certain Executory

Contracts And Unexpired Leases; And (C) Other Relief, And (II) Scheduling Sale Approval

Hearing And, In The Alternative, Request For Adequate Protection Pursuant To 11 U.S.C. §

9

363(E) (the "**Limited Objection**")[11] [Docket No. 2018], for the purpose of preserving the rights and interests of the TPC Lenders as holders of first-priority secured claims against the Facilities. While not objecting in principle to the 363 Sale, the TPC Lenders' Limited Objection sought that either their claims be satisfied in full, or alternatively, that the TPC Lenders' existing rights in the Facilities be unaffected by the sale and be provided adequate protection for the TPC Lenders' interests.  Limited Objection ¶ 1.

17.     Ultimately, the TPC Lenders agreed that the debtors' interests in the Facilities would be transferred under Section 363(e) of the Bankruptcy Code free and clear and in exchange, the Sale Order provided, among other things, that the TPC Lenders' secured claims would be valued by agreement of the parties at a later date, or failing agreement, by the Bankruptcy Court.  Sale Order ¶ 36.  In addition, the Sale Order provided for the establishment of a cash escrow account in the amount of $90.7 million, the full amount of the TPC Lenders' secured claims. *Id.* ¶ 37.  In the event the TPC Lenders' secured claims were valued at less than $90.7 million, the TPC Lenders would have an allowed general unsecured claim for the deficiency, up to the amount of $45 million.  *Id.* ¶ 38.

18.     On July 5, 2009, this Court approved Old GM's request to sell certain specifically selected properties, including the Facilities, to New GM and to allow General Motors to continue to utilize and operate the facilities on a going forward basis.  In approving the 363 Sale, the Court noted that Old GM contended that the sale was "appropriate and indeed essential" because "GM's business can be sold, and its value preserved, before the company dies."  Findings at 2. As a result, the Court found that "nobody can seriously dispute, the only alternative to an immediate sale is liquidation – *a disastrous result for GM's creditors* . . . . In the event of a liquidation, creditors now trying to increase their incremental recoveries would get nothing."  *Id.*

---

[11] Attached as Exhibit H to the Bierman Decl.

NY1 7579047v.1

at 3 (emphasis added).  The Court also noted that the 363 Sale would allow New GM to continue

to use the assets subject to the Sale Order, which would "bring[] in value.  Creditors will

thereafter share in that value pursuant to a chapter 11 plan subject to confirmation by the Court."

*Id.* at 42-43.

19.     Moreover, in its Findings, the Court expressly referenced the objection of the TPC

Lenders, noting that the TPC Lenders had "a lien on property to be transferred," and were

attempting to ensure "adequate protection as part of the sale."  *Id.* at 28 n.21.  As noted above, as

a result of negotiations between Old GM and New GM and the TPC Lenders, the Sale Order

adopted by the Court established that New GM would fund an escrow account in the amount of

$90.7 million, an amount reflecting the outstanding balance owed under the TPC Operative

Documents (as defined in the Sale Order) for the benefit of the TPC Lenders.  *See* Sale Order ¶

37.  The Court's Order further established that the TPC Lenders' secured claim was fixed at an

amount "equal to the fair market value of the of the TPC Property on the Commencement Date

under section 506 of the Bankruptcy Code (the "**TPC Value**"), as determined at a valuation

hearing conducted by this Court or by mutual agreement of the Debtors, the Purchaser, and the

TPC Lenders."  *See id.* ¶ 36.

## The Facilities

20.     Prior to and since the Commencement Date, the Facilities have continued to be

operated as vital parts of the ongoing business of General Motors.  As intended on the

Commencement Date, the Facilities have continued as valuable parts of the manufacturing and

distribution operations of the General Motors business and have contributed substantially

towards the economic recovery of the business.  Indeed, without the two Facilities, particularly

NY1 7579047v.1

the Maryland Facility, New GM could not have moved forward with its express plans to become

a revitalized and successful automobile manufacturer.

21.    The Maryland Facility manufactures transmissions for General Motors

automobiles, and, in particular, serves as the exclusive manufacturer of the drivetrain and

transmissions for General Motors' current and future green line of automobiles.  Based even

upon the limited evidence the TPC Lenders have obtained from publicly available sources to

date, it is clear that as of the Commencement Date, Old GM and New GM intended that the

continued use of the Maryland Facility as part of General Motors' manufacturing process was

crucial to the successful recapitalization of the business.  As detailed briefly below, and as will

be more fully established at the valuation hearing, Old GM and New GM indisputably intended

as of the Commencement Date that not only would the Maryland Facility continue to be used,

but hundreds of millions of dollars would be invested to expand and improve the Maryland

Facility, funds that were, in large part, ultimately provided by federal, state and local authorities.

The evidence strongly suggests that this substantial funding could not have been obtained absent

a clear intention by Old GM and New GM that the Maryland Facility would be retained and

operated as part of the General Motors business.

22.    In support of the 363 Sale Motion, Old GM informed the Court that one of the

key components for the recovery of the General Motors business was to set "the automotive

industry standard for 'green' manufacturing methods and products, flexible fuels, and multimode

hybrid systems."  *See* Henderson Aff. ¶ 20.  Accordingly, as part of its desire to produce cars for

the new economy, "GM is fully committed to improving vehicle fuel economy and lowering

greenhouse gas emissions consistent with the new Corporate Average Fleet Economy standards

announced by President Obama on May 19, 2009."  *Id.* ¶ 28.  As of the filing of the 363 Sale

NY1 7579047v.1

Motion, General Motors manufactured and sold "twenty hybrid models which achieve thirty

miles per gallon or more on the highway – more than any other manufacturer." *Id.*

23.    The Maryland Facility has been the "exclusive manufacturer" of the drivetrain for

General Motors' hybrid automobiles since 2006. *See Federal, State, and Local Governments*

*Partner to Expand Green Manufacturing in Maryland, Create Jobs*, January 26, 2010,

http://www.governor.maryland.gov/pressreleases/100126.asp[12] ("Opened in December 2000,

GM Powertrain Baltimore was selected to manufacture GM's two-mode hybrid transmission in

2006. The plant is still GM's exclusive manufacturer of the two-mode hybrid drivetrain."). Just

as the transmission and drivetrain are keys to the ability of a car to drive, the ability to

manufacture such parts is a key component of the ability of a car company to sell cars. After all,

if the car does not drive, it also does not sell. And, without the "exclusive manufacturer" of

these vital components – *i.e.*, the Maryland Facility – General Motors could never have fulfilled

its intention to become a leading green manufacturer, something which it represented was a key

component of its intended recovery.

24.    The unique value of the Maryland Facility has also been evidenced by a number

of other activities undertaken by Old GM and New GM since the Commencement Date.[13] In

addition to utilizing the Maryland Facility for its production of its hybrid line of automobiles,

General Motors also planned to operate the Maryland Facility in connection with its

development of fully electric vehicles. At the time of the Commencement Date, General Motors

had already announced that another key part of its green initiative was the production of an

---

[12] Attached as Exhibit I to the Bierman Decl.

[13] "[T]o ensure that a valuation is based in reality, the Court may consider information after the valuation date if that information will tend to shed light on a fair and accurate assessment of the collateral or liability as of the relevant date." *In re Clarkeies Mkt., L.L.C.*, Nos. BK. NO. 01-10700-JMD, 69, 73, 79, 80, 81, 2002 WL 31317242, at *3 (Bankr. D.N.H. Sept. 26, 2002) (citing *Union Bank of Switzerland v. Deutsche Fin. Serv. Corp.*, No. 98 Civ. 3251 (HB), 2000 WL 178278 (S.D.N.Y. Feb. 16, 2000)).

NY1 7579047v.1

electric car, known as the Volt,[14] which was recently released to the market, and has already

been named as the 2011 Motor Trend Car of the Year and the North American Car of the Year.

*See, e.g.* Chevrolet 2011 Volt, http://www.chevrolet.com/volt/ (last visited Feb. 22, 2011)[15] &

Chevrolet Stories and Events, *North American Car of the Year*, http://www.chevrolet.com/

experience/story/?story=Volt&evar3=voltmhp_coty_crdstory (last visited Feb. 22, 2011).[16]

25.    In January 2010, General Motors announced plans for an expansion of the

Maryland Facility which included an investment of $246 million, including state funds and

federal stimulus money, to construct a new 40,000-square-foot facility to build its own electric

motors. *See* Andrea K. Walker, *GM To Build Electric Motors In White Marsh*, The Baltimore

Sun, Jan. 27, 2010, *available at* http://articles.baltimoresun.com/2010-01-27/business/bal-

bz.gm27jan27_1_electric-motors-general-motors-corp-gm.[17]  General Motors simultaneously

announced its plans to be the first car company to produce its own electric motors, which it will

build at the Maryland Facility. *Id.*  According to General Motors' Vice Chairman, the Maryland

Facility was chosen because of its experience at building transmissions and electric drivers. *Id.*

26.    Expansion of the Maryland Facility has been made possible through the infusion

of hundreds of millions of dollars in government grants tied to the Maryland Facility.  Based on

its green initiative, General Motors has received over $105 million in federal stimulus funds

designed to encourage the production of green automobile technologies.  *See* Recovery Act

Grant - Award Summary for GM, *available at* http://www.recovery.gov/Transparency/

RecipientReportedData/pages/RecipientProjectSummary508.aspx?AwardIdSur=108755&Award

---

[14] General Motors first announced that it was intending to develop and sell the Volt at the 2007 Detroit Auto Show.
*See* Keith Naughton, *Bob Lutz: The Man Who Revived the Electric Car*, Newsweek, December 22, 2007, *available
at* http://www.newsweek.com/2007/12/22/bob-lutz-the-man-who-revived-the-electric-car.html, attached as Exhibit
J to the Bierman Decl.
[15] Attached as Exhibit K to the Bierman Decl.
[16] Attached as Exhibit L to the Bierman Decl.
[17] Attached as Exhibit M to the Bierman Decl.

Type=Grants.[18]  In addition to federal stimulus funds, General Motors has received at least $4.5

million in grants from the State of Maryland as well as over $6 million from Baltimore County

governmental authorities for the Maryland Facility expansion.  *Id.*  These funds would not have

been made available other than for the fact that the Maryland Facility has been and continues to

be what Old GM and New GM envisioned it would be all along – continuously operated as a

valuable part of the General Motors business.

27.    In September 2010, General Motors pledged to invest an additional $23.5 million

for additional production of vehicle electrification components at the Maryland Facility.  *See GM

Invests $23.5 Million for Electric Components in Baltimore: Builds on January Pledge of $246

Million for Electric Drive Production*, Sept. 29, 2010, *available at* http://media.gm.com/content/

media/us/en/news/news_detail.brand_gm.html/content/Pages/news/us/en/2010/Sept/0929_baltim

ore.[19]  These investments in the Maryland Facility will make it the "the first electric motor

manufacturing facility in the U.S. [to] be operated by a major automaker."  *Id.*

28.    The Tennessee Facility was at the Commencement Date and continues today in

operation as a parts distribution center for General Motors.  The Tennessee Facility is

particularly important for these purposes both because of its unique geographic location and the

economic benefits that General Motors continues to derive.  The Memphis area is particularly

important for distribution centers, like the Tennessee Facility, because it is within one day's

drive to areas throughout the Midwest, Southern and Southeastern United States.  Thus, the

Tennessee Facility enables General Motors to service and supply its dealership network

throughout the substantial portion of the Continental United States.

---

[18] Attached as Exhibit N to the Bierman Decl.
[19] Attached as Exhibit O to the Bierman Decl.

NY1 7579047v.1

29.     Additionally, through its continued operation of the Tennessee Facility, General Motors has continued to receive a multi-million dollar tax benefit through the Payment in Lieu of Taxes (PILOT) Program (the "**PILOT Program**") entered into with the Industrial Development Board (the "**IDB**") of the City of Memphis and County of Shelby, Tennessee.  The PILOT Program is a financial incentive program that is designed to encourage commercial real estate development in and around the Memphis Central Business Improvement District by "freezing" property taxes at the predevelopment level for a predetermined period of time (up to 15 years). *See* Downtown Memphis Payment-in-Lieu-of-Tax (PILOT) Program Packet, revised January 8, 2010, *available at* http://www.downtownmemphis.com/documents/PILOT_Application.pdf.[20]  In November 1999, pursuant to the PILOT Program, General Motors conveyed its title to the Tennessee Facility via quit claim deed to the IDB.  Simultaneously, General Motors and the IDB entered a lease agreement for the term of 14 years.  The base rent is $100 per year and General Motors occupies the property under an absolute net lease basis, and therefore pays the property taxes, which are heavily reduced pursuant to the PILOT Program.  Now, through the termination of the lease and re-conveyance of the property to General Motors, General Motors will receive over $500,000 a year in property tax savings for the Tennessee Facility.

30.     The extensive benefits that Old GM and New GM have received from the continued use and retention of the Facilities as part of the General Motors business is highly relevant to the determination of the TPC Value.  As discussed in detail below, all of these factors demonstrate that the Facilities were always intended by Old GM and New GM to remain part of the General Motors business.  Accordingly, they should be valued with that in mind as required by Section 506(a) of the Bankruptcy Code, and should not be valued in complete opposition to this reality, as New GM asserts.

---

[20] Attached as Exhibit P to the Bierman Decl.

## ARGUMENT

31.     Under the terms of the Sale Order and the governing law concerning the

application of section 506(a) of the Bankruptcy Code, the TPC Value must reflect the sale of the

TPC Property to New GM as part of the sale of Old GM's business and assets.  As a matter of

law (and logic), the TPC Value is not and cannot be simply the cost of the TPC Property to a

third party that is not in the business that both the purchaser and seller under the Sale Order are

involved in and would never use the TPC Property as it was being used as of the Commencement

Date and was contemplated to be used thereafter.  To the contrary, under section 506 and

applicable case law, the "fair market value" of the TPC Property "under section 506 of the

Bankruptcy Code" is properly set at the replacement value for the TPC Property – that is, at the

value that either the purchaser or the seller to this transaction would have had to spend to obtain

like facilities for the same proposed and intended use.

**I.      THE BANKRUPTCY CODE AND THE SALE ORDER REQUIRE THAT THE
        TPC PROPERTY BE VALUED AT FAIR MARKET VALUE WITH
        REFERENCE TO THE PLAIN LANGUAGE OF SECTION 506 OF THE
        BANKRUPTCY CODE**

32.     Determining the TPC Value necessarily begins with the Sale Order.  The Sale

Order provides that the value of the TPC Lenders' secured claim will be fixed at an amount

"equal to the fair market value of the TPC Property on the Commencement Date under section

506 of the Bankruptcy Code. . . ."  Sale Order ¶ 36.  The two key elements of this provision: "fair

market value of the TPC Property" and "under section 506 of the Bankruptcy Code" must be

read together, with each given force and effect in light of the relevant case law and statute.[21]  For

ease of presentation, the Agent first sets out the relevant standards for valuing a secured claim

---

[21] The Sale Order's inclusion of "on the Commencement Date" before "under Section 506 of the Bankruptcy Code"
reinforces the Agent's reading of the order, in that it makes clear that the valuation is to take account how the TPC
Property was being used on the Commencement Date.

17

under section 506(a) of the Bankruptcy Code, and then turns to the meaning of "fair market

value" in the context of a section 506(a) valuation.

> A.    **The Plain Language of Section 506(a) Requires that a Court Value a Secured Creditor's Collateral in Light of the Purpose of the Valuation and the Proposed Disposition or Use of the Property**

33.    Under Section 506 of the Bankruptcy Code, the value of collateral held by a

secured creditor "*shall* be determined in light of the purpose of the valuation and of the proposed

disposition or use of such property."  11 U.S.C. § 506(a) (emphasis added).  This Court has

previously observed that the plain language of section 506(a) speaks directly as to how the value

of a secured creditor's interest in property – *i.e.*, the collateral securing its claim – is to be

valued.  In *In re Urban Communicators PCS Ltd. P'ship*, 379 B.R. 232, 241 (Bankr. S.D.N.Y.

2007) (Gerber, J.), *aff'd in part, rev'd in part on other grounds*, 394 B.R. 325 (S.D.N.Y. 2008),

the Court stated that "[b]y section 506(a)'s express terms, the value of the collateral is to be

determined 'in light of' (i) the purpose of the valuation, and (ii) the proposed disposition or use

of the collateral."  *See also In re Chateaugay Corp.*, 154 B.R. 29, 33 (Bankr. S.D.N.Y. 1993)

(Section 506 "directs that the selection of a valuation methodology should be based upon the

proposed use of the property").  Accordingly, there can be no reasonable doubt that determining

the TPC Value must take these two factors into account.

34.    Assessing the purpose of the valuation and the proposed disposition or use of the

collateral is nearly as logical.  The purpose of the valuation here is straightforward: the

allowance of the TPC Lenders' secured claims and determination of the extent to which the TPC

Lenders are entitled to recover from the escrow account established under the Sale Order cash in

an amount equal to the value of the TPC Property.  *Cf. Urban Communicators PCS*, 379 B.R. at

241 (describing similar valuation purpose).

35.     The proposed disposition or use of the collateral – the TPC Property – is also well-known to the parties and the Court.  On the Commencement Date, which is specified in the Sale Order as the relevant date, there is no dispute that Old GM was operating both the Maryland Facility and the Tennessee Facility as integral parts of the General Motors business.  Also on the Commencement Date, Old GM announced its intention to sell the two facilities to New GM, on an arm's length basis and for fair consideration, as part of a going-concern sale of the overwhelming majority of Old GM's business and assets.  *See e.g.*, Henderson Aff. ¶ 5; 363 Sale Motion ¶ 87.  New GM, for its part, intended on the Commencement Date to acquire the Maryland Facility and the Tennessee Facility and continue operating them as part of the General Motors business.  *See e.g.*, Henderson Aff. ¶ 74; 363 Sale Motion ¶ 2.  While Old GM announced the long-anticipated closure of various facilities on the Commencement Date, neither the Maryland Facility nor the Tennessee Facility was among those facilities closed, which further reinforces the already-apparent conclusion that the two facilities were to be operated by Old GM through the sale, then sold to New GM as part of a going-concern and thereafter operated by New GM.  Henderson Aff. ¶¶ 5, 16 & 76; 363 Sale Motion ¶ 62.

36.     The last two years further evidence that this analysis is correct.  As discussed extensively above (see *supra* at ¶¶ 20-30), both the Maryland Facility and the Tennessee Facility are today essential elements of New GM's business and operations.  The Maryland Facility and the Tennessee Facility employ significant numbers of workers that are presumably valuable to the ongoing General Motors business, and the Maryland Facility in particular has been a driver of New GM's push into "green" vehicles.  *See supra* at ¶¶ 21-27.  In short, the two facilities were important elements of the value of the General Motors business at the Commencement Date,

from the Commencement Date through the 363 Sale, and after the 363 Sale, and they remain so today.

37.    The plain-language command of Section 506(a) is that all of these factors must be taken into account in establishing the TPC Value, because all of these factors describe the proposed disposition and use of the TPC Property in these cases.  In short, taking these factors into account reflects the reality of Old GM's initial retention and then sale of the two facilities, which was contemplated by both Old GM and New GM on the Commencement Date, as well as the continued operation of those facilities as part of the going concern General Motors business. To ignore all of these factors – as New GM apparently believes is appropriate – is to disregard the statute, the case law and the Sale Order in favor of an unsupported, out-of-thin-air valuation standard that, as discussed below (at ¶¶ 47-49), confers an inappropriate windfall upon New GM at the expense of the TPC Lenders and the prepetition creditors of Old GM.

B.    **Replacement Value Is the Appropriate Valuation Method Given the Purpose of the Valuation and the Proposed Disposition or Use of the Property**

38.    The purpose of the valuation and the proposed disposition/use of the TPC Property is plainly relevant to the valuation of the TPC Property, as shown above.  The Bankruptcy Court must also select a valuation method for the TPC Property in light of those factors.  *See* 4 *Collier on Bankruptcy* ¶ 506.03[7] (16th ed. 2010).  The Supreme Court illuminated the Section 506(a) standards for valuing collateral in light of property's proposed disposition or use in *Rash*, 520 U.S. at 962.[22]  In *Rash*, the Supreme Court held that where a

---

[22] Although *Rash* arose in the context of a Chapter 13 cram-down, its construction of valuation under Section 506 applies equally to Chapter 11 cases, a point made clear by the dissent in *Rash*.  *See* 520 U.S. at 987 (Stevens, J., dissenting) ("It is crucial to keep in mind that § 506(a) is a provision that applies *throughout* the various chapters of the Bankruptcy Code; it is, in other words, a 'utility' provision that operates in many different contexts.") (emphasis in original).  Accordingly, courts consistently have applied the analysis in *Rash* to value secured collateral in Chapter 11 proceedings.  *See, e.g., United Air Lines, Inc. v. Reg'l Airports Improvement Corp.*, 564 F.3d 873, 875 (7th Cir. 2009) (citing *Rash* valuing assets according to replacement value); *Matter of T-H New Orleans Ltd. P'ship*, 116 F.3d 790,799 (5th Cir. 1997) (citing *Rash*, the Court holds that for the Chapter 11 plan confirmation, value

debtor retains and operates a subject property, Section 506(a) imposes a "replacement-value

standard", which ascertains the value of the property to a debtor by measuring what it would cost

for the debtor to replace, or replicate, its ongoing use of the property at issue. *See id.* Under the

replacement-value standard, a court must value the property in which a secured creditor has an

interest according to "the price a willing buyer in the debtor's trade, business or situation would

pay to obtain like property from a willing seller." *Id.* at 960. Thus, under Section 506(a), a court

is required to value the relevant property according to "the cost the debtor would incur to obtain

a like asset for the same 'proposed … use.'" *Id.* at 965.

39.     In reaching its conclusions, the Supreme Court in *Rash* focused on the statutory

requirement that the secured creditor's interest should be measured by the "proposed disposition

or use" in determining the appropriate standard of value. *See id.* at 961. The Court found the

foreclosure value was inappropriate because it failed to value the property according to "the

debtor's choice to surrender the property or retain it." *Id* at 962. By contrast, "[a] replacement-

value standard, . . . distinguishes retention from surrender and renders meaningful the key words

'disposition or use.'" *Id.*; *see also id.* at 963 ("Of prime significance, the replacement-value

standard accurately gauges the debtor's 'use' of the property.") The Supreme Court further

explained:

> When a debtor surrenders the property, a creditor obtains it
> immediately, and is free to sell it and reinvest the proceeds. ... If a
> debtor keeps the property and continues to use it, the creditor
> obtains at once neither the property nor its value and is exposed to
> double risks: The debtor may again default and the property may
> deteriorate from extended use. … Of prime significance, *the*

---

under §506 is to be determined in light of the purpose of the valuation and of the proposed disposition or use of the
property); *Cathcart v. Wachovia Mortgage*, No. 1:04-CV-1236-JDT-TAB, 2005 WL 756208, at *3 (S.D. Ind. Feb.
22, 2005) (*Rash* is persuasive and §506 requires a replacement value standard for determining the amount of a
secured claim). It is also clear that although *Rash* involved the valuation of a truck, that its application applies to the
valuation of real property like the Facilities. *In re Donato*, 253 B.R. 151, 155 (M.D. Pa. 2000) ("The reasoning of
the [*Rash*] court – that one should examine the underlying proposed use of the collateral – is equally applicable to
real estate as to trucks.").

> *replacement-value standard accurately gauges the debtor's "use"
> of the property.* It values "the creditor's interest in the collateral in
> light of the proposed [repayment plan] reality: no foreclosure sale
> and economic benefit for the debtor derived from the collateral
> equal to ... its [replacement] value." *The debtor in this case elected
> to use the collateral to generate an income stream. That actual
> use, rather than a foreclosure sale that will not take place, is the
> proper guide under a prescription hinged to the property's
> "disposition or use."*

*Id*. at 962-63 (quoting *In re Winthrop Old Farm Nurseries, Inc.*, 50 F.3d 72, 75 (1st Cir. 1995))

(emphasis added).

40.     Since the Supreme Court's decision, courts have routinely noted that under *Rash*

"valuation under § 506(a) for retained collateral must be based on the price that the debtor would

have to pay to replace it."  *In re UAL Corp.*, 351 B.R. 916, 921 (Bankr. N.D. Ill. 2006), *mot. to

amend denied*, 360 BR 780 (Bankr. N.D. Ill. 2007); *see also In re Donato*, 253 B.R. at 155 ("The

Court held that when a debtor seeks to retain and use the creditor's collateral in a Chapter 13

bankruptcy, the collateral is to be valued at its replacement value, that is the amount the debtor

would have to pay for comparable property.").[23]

41.     Although *Rash* addressed a circumstance where a debtor retained the property in

question, its logic applies with no less force to a circumstance where a debtor sells property as

part of the sale of the debtor's business and substantially all of its assets pursuant to Section 363

of the Bankruptcy Code.  In the context of such a sale, both the debtor and the purchaser derive

value from the continued use or operation of the property.  Moreover, in such a context, as here,

both the debtor and the purchaser have made repeated representations to this Court and to all

---

[23] Indeed, even before the Supreme Court decided *Rash*, most courts, including Courts in this district, had made
clear that Section 506, "directs that the selection of a valuation methodology should be based upon the proposed use
of the property." *Chateaugay*, 154 B.R. at 33. Thus, "the proper measure of value is not what the creditor would
net in a hypothetical sale, but rather the value of the collateral 'in the hands of the Debtor.'  In the view of this
Court, the value of the collateral in the hands of the Debtor is what the Debtor would have to pay to replace this
collateral." *In re Fruedenheim*, 189 B.R. 279, 280 (Bankr. W.D.N.Y. 1995); *see also In re Fiberglass Indus., Inc.*,
74 B.R. 738, 742 (Bankr. N.D.N.Y. 1987) ("The essential inquiry is what 'value' does the collateral have to the
estate").

parties in interest that (i) the purchaser would continue the business of the debtor in substantially

the same manner as it was operated pre-bankruptcy, and (ii) the transaction was in good faith, at

arm's length, and for a fair consideration – in other words, the sale was not undertaken at an

artificially low valuation.[24]  *See e.g.*, Henderson Aff. ¶ 76; 363 Sale Motion ¶ 87.  Courts in

numerous other cases, both pre- and post-*Rash,* have recognized the logic of applying a

replacement value (or going concern value) methodology to collateral transferred as part of a 363

sale.  *See, e.g., In re LTV Steel Co.,* 285 B.R. 259 (Bankr. N.D. Ohio 2002) (citing *Rash* and

applying going concern value to assets transferred in bulk through 363 sale); *In re Colfor, Inc.*,

No. 96-60306, 1996 WL 628057, at *2 (Bankr. N.D. Ohio Sept. 18, 1996) (applying a going-

concern valuation and stating that "[i]mportant to the court, both in its approval of the sale and

this consideration of the disposition of the proceeds of that sale is the fact that the assets were

first preserved and then disposed of on a going concern basis.").[25]

42.    As discussed above, in seeking approval for the 363 Sale, the Debtors repeatedly

represented that the sale was necessary to preserve the value of the General Motors business and

prevent a collapse and ensuing fire-sale liquidation.  *See e.g.*, Henderson Aff. ¶ 97;

Memorandum of Law in Support of Debtor's 363 Sale Motion at 2.  The Court should now hold

New GM and the Debtors to those statements and value the TPC Property at its replacement

---

[24] The Debtors and New GM could have resolved this issue in connection with the 363 Sale by specifying a value to which the Agent and the TPC Lenders could have agreed to or objected to; indeed, the TPC Lenders noted this issue in their Objection to the 363 Sale.  Limited Objection ¶ 12.  Instead, the Debtors and New GM maintained that such an action was not necessary, and the issue was put off for the future.  That does not, however, afford New GM with the opportunity retroactively to impose an unrealistically low valuation on the TPC Property.

[25] To date, the TPC Lenders have not attempted to ascribe a going concern value to the Facilities, largely because General Motors has not provided documents or information that could provide the necessary information for such a valuation.  Even if General Motors had provided sufficient information during informal discovery, the TPC Lenders reasonably believe that a going concern valuation of the Facilities would be difficult, given that the Facilities are part of General Motors integrated supply chain.  Nevertheless, by reflecting the expected profits over a period of time to its owner, a going concern valuation necessarily measures the value of a property to its owner.  Thus, the fact that going concern valuations have been applied in the context of 363 sales lends further support to the TPC Lenders' standard of valuation and further demonstrates the impropriety of General Motors' reliance upon a hypothetical sale that ignores the actual retention and use of the Facilities by General Motors.

value, which best replicates the value that should be ascribed to the property in light of its

continued use and operation as part of the General Motors business, first under Old GM and then

under New GM.

C.      **The Replacement Value Standard of *Rash* Is the Fair Market Value Which Takes Into Account the Actual Use of the TPC Property**

43.      As discussed at the outset of this section, the Sale Order provides that the TPC

Lenders' secured claim will be valued at an amount equal to the "fair market value of the TPC

Property…under section 506 of the Bankruptcy Code" because that accords with the relevant

statute and the overwhelming weight of case law.  Sale Order ¶ 36.  Courts routinely use the term

"fair market value" in determining a valuation of collateral under Section 506(a).  Indeed,

*Collier's* expressly states that the "courts agree that the relevant quest under Section 506(a) is to

determine 'fair market value.'"  4 *Collier on Bankruptcy* ¶ 506.03[6][c][iii] (16th ed. 2010).

44.      Reciting the term "fair market value," however, is the beginning of the analysis,

not the end, and that analysis results in the conclusion that the replacement value standard yields

the "fair market value" in this matter.  *Collier's* and the applicable case law make absolutely

clear that "[b]y itself, [fair market value] reveals very little.  In virtually every case, the

determination of fair market value will depend on the particular market and means selected to

gauge the value of the item in question."  4 *Collier on Bankruptcy* ¶ 506.03[6].  Under Section

506, as construed by the Supreme Court in *Rash*, in determining fair market value

> the relevant choice in any given context is between one of (i) a
> hypothetical purchase standard, meaning the debtor's purchase of
> like property of the same age or condition using either wholesale,
> retail or some other value method depending on the circumstances,
> or (ii) a hypothetical sale standard, meaning the creditor's sale of
> the collateral through foreclosure, but not some combination of the
> two.  Hence, in searching for "fair market value," courts are guided
> to apply section 506(a) with these principles in mind.

24

*Id.* ¶ 506.03[6][c][iii].  Indeed, *Rash* itself made clear that the replacement value standard, which

values the subject property according to its use, was consistent with and equivalent to the term

"fair market value" in connection with a valuation under Section 506(a).  *See Rash*, 520 U.S. at

959 n.2 ("our use of the term replacement value is consistent with the Ninth Circuit's

understanding of the meaning of fair market value; by replacement value, we mean the price a

willing buyer in the debtor's trade, business, or situation would pay a willing seller to obtain

property of like age and condition."); *see also United*, 564 F.3d at 875 (under *Rash*, an asset's

value depends on the price that could be agreed by willing buyers and sellers negotiating for a

replacement); *In re Perez*, 318 B.R. 742, 743 n.1 (Bankr. M.D. Fla. 2005) (treating terms

"replacement value" and "fair market value" as synonymous and reflecting high end of

collateral's value); *In re Bell*, 304 B.R. 878, 880 (Bankr. N.D. Ind. 2003) (observing that Rash

requires use of a replacement value standard and stating that replacement value "is akin to fair

market value").

45.     As a result, in the present circumstance, the Bankruptcy Court must determine the

price a willing buyer in relevant trade, business or situation would pay a willing seller to obtain

property of like age and condition, whether such willing buyer or willing seller is Old GM or

New GM.  Under the facts of this case, that is the fair market value under Section 506(a).  *See*

*Chateaugay*, 154 B.R. at 34 (valuing mills in light of debtor's stated intention to continue

operating same); *Fiberglass*, 74 B.R. at 742 ("Where…the debtors propose retention and

continued use of the collateral, a forced-sale or liquidation value of the collateral is inappropriate

… . The essential inquiry is what 'value' does the collateral have to the estate."); *In re TennOhio*

*Transp. Co.*, 247 B.R. 715, 720 (Bankr. S.D. Ohio 2000) (stating that replacement value would be what the debtors or any other similar purchaser would have to pay for similar units).[26]

46.     This analysis necessarily needs to take into account the seller's and the buyer's proposed use of the property in question – as Section 506(a) requires – or else it will lead to an inaccurate and sometimes absurd result.  The "fair market value" of a property to a buyer that intends to use the property for its existing or intended purpose would be expected to be higher than the "fair market value" or a property to a buyer who has only other, lesser uses for the property.[27]  It is for precisely this reason that Section 506(a), *Rash*, and numerous other cases mandate the consideration of the intended disposition or use of the relevant property.  *See, e.g., In re R&S Vinyl Prods. Group, L.L.C.*, 291 B.R. 685, 687 (Bankr. W.D. Pa. 2003) ("[t]he Debtor's current and prospective use of the Collateral is the correct basis for use in determination of the amount of the lender's secured claim"); *In re Olio Dental, Inc.*, No. 08-10305-BHC-11, 2009 WL 1475273 at *2 (Bankr. S.D. Ind. May 26, 2009) (under section 506 and *Rash*, "where the debtor intends to retain and use the collateral to operate his business as a viable going concern, some courts have found the appropriate valuation to be a 'use value' or generalized 'fair market value' of the property").

---

[26] The decision in *In re TennOhio* provides an instructive example of the proper application of valuation under Section 506.  In that case, the Debtor initially continued to use the secured collateral but, subsequently, the collateral was sold.  *See* 247 B.R. at 719-720.  Accordingly, the Court applied a replacement value for the period when the property was retained by the Debtors and measured the remainder of the value according to the actual sale price for the collateral.  *See id.* at 720.  Here, of course, General Motors has continued to retain and use the Facilities and, as such, the value of the collateral should only measure the cost that General Motors would have had to expend to acquire like property for the same use.

[27] For example, in determining the "fair market value" in a transfer of Yankee Stadium, a court would almost certainly consider whether the buyer owned a Major League Baseball franchise and intended to continue to use the property as a baseball stadium as opposed to a parking lot.  Nothing in the term "fair market value" requires a Court to assume the answer is no, particularly if the relevant facts, well known to the Court, are to the contrary.  Such an assumption would invariably lead to an unrealistically low value.

NY1 7579047v.1

D.      **Determining Fair Market Value Without Reference to the TPC Property's Proposed Disposition or Use Provides New GM with an Unjustified Windfall**

47.      The "fair market value" of the TPC Property should be set at replacement value not only because that is what the statute, case law and facts require, but because it prevents New GM from receiving an unwarranted windfall and the expense of the TPC Lenders and the estates through an unrealistically low valuation.  It is axiomatic that bankruptcy law should "prevent a party from 'receiving a windfall merely by reason of the happenstance of bankruptcy.'"  *Butner v. United States*, 440 U.S. 48, 55 (1979).  Of particular relevance here, under *Rash*,

>the debtor should not necessarily be able to use bankruptcy to, in essence, acquire the property at *less* than its market cost, because doing so effectively permits a windfall in the form of a subsidized, below-market acquisition that may have the general effect of encouraging the use of bankruptcy proceedings in violation of the policy of bankruptcy avoidance.  The standard articulated in *Rash* may effectively police these objectives by requiring the debtor to pay more for the property than the creditor would generally recover if the property were sold at a foreclosure.

4 *Collier on Bankruptcy* ¶ 506.03[6][a][ii].  This logic could not apply more clearly in this circumstance, where the two Facilities have been retained as part of the General Motors business, yet New GM seeks to ascribe an artificially low valuation by contending – without any support in bankruptcy case law – that "fair market value" is synonymous with liquidation value.  Applying the replacement value standard as "fair market value" in this case reflects objective reality – the Maryland Facility and Tennessee Facility were operated by Old GM through the 363 Sale's closing, then sold to New GM, which continued to operate the two facilities seamlessly.  Any argument that the "fair market value" of the two facilities in that context is liquidation value is self-evidently wrong and should be rejected.

48.      Avoiding these types of absurd results is precisely why Section 506(a) requires a court to consider the proposed disposition or use of collateral in determining its value.  "If the

'proposed use or disposition' provision is to have any meaning, the debtor should not be permitted to 'eat with the hounds and run with the hares.'" *In re Coker*, 973 F.2d 258, 260 (4th Cir. 1992) (quoting *In re Crockett*, 3 B.R. 365, 367 (Bankr. N.D. Ill. 1980)); *see also Fiberglass Indus.*, 74 B.R. at 742 ("Therefore, the debtors cannot eat with the hounds and run with the hares. *Seeking retention of the property, they cannot insist on liquidation values be paid to the creditor.*") (quoting *Crockett*, 3 B.R. at 367) (emphasis added). Here, New GM got the benefit of acquiring the two facilities and their continued operation, and Old GM received its consideration through the 363 sale.

49.    The Court should not now permit New GM to realize an unjustified windfall by applying an unrealistic valuation that ignores the plain language of section 506(a), binding case law, and simple logic. The Court should accordingly apply a replacement value standard, which is reflected in the use value standard utilized by the TPC Lenders' appraisers, for valuing the Maryland Facility and the Tennessee Facility that takes into account the undisputed disposition and use of those facilities.

NY1 7579047v.1

## CONCLUSION

50.    For the foregoing reasons, Wells Fargo, as Agent to the TPC Lenders,

respectfully submits that the TPC Value must be established by the replacement value required

by the Supreme Court's decision in *Rash* and under Section 506 of the Bankruptcy Code.


Dated: New York, New York                         Respectfully submitted,
      February 28, 2011

                                              /s/ *Steven M. Bierman*
                                              SIDLEY AUSTIN LLP
                                              Steven M. Bierman
                                              Nicholas K. Lagemann
                                              787 Seventh Avenue
                                              New York, New York 10019
                                              Telephone: (212) 839-5300
                                              Facsimile: (212) 839-5599
                                              Email:    sbierman@sidley.com
                                                         nlagemann@sidley.com

                                         -    and    -

                                              SIDLEY AUSTIN LLP
                                              Kenneth P. Kansa (admitted *pro hac vice*)
                                              Courtney A. Rosen (admitted *pro hac vice*)
                                              One South Dearborn
                                              Chicago, Illinois 60603
                                              Telephone: (312) 853-7000
                                              Facsimile: (312) 853-7036
                                              Email:    kkansa@sidley.com
                                                          crosen@sidley.com

                                              *Counsel for Wells Fargo Bank Northwest, N.A.,*
                                              *as Agent to the TPC Lenders*

NY1 7579047v.1