HEARING DATE AND TIME: April 14, 2011 at 9:45 a.m.
OBJECTION DEADLINE: February 28, 2011 at 4:00 p.m.
REPLY DEADLINE: March 14, 2011 at 4:00 p.m.

KING & SPALDING LLP
1185 Avenue of the Americas
New York, New York 10036
Telephone:  (212) 556-2100
Facsimile:  (212) 556-2222
Arthur Steinberg
H. Slayton Dabney
Scott Davidson

*Counsel to General Motors LLC*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**
---------------------------------------------------------------x
| | |
|---|---|
| **In re:** : | **Chapter 11** |
| : | |
| **MOTORS LIQUIDATION COMPANY,** *et al.*, : | **Case No.: 09-50026 (REG)** |
|       f/k/a General Motors Corp., *et al*. : | |
| : | **(Jointly Administered)** |
| **Debtors.** : | |

---------------------------------------------------------------x

**BRIEF OF GENERAL MOTORS LLC IN SUPPORT OF
USING A "FAIR MARKET VALUE" VALUATION
STANDARD TO VALUE THE TPC PROPERTY**

NYC_IMANAGE-1240781v5

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

RELEVANT BACKGROUND ................................................................................................... 4

PROCEDURAL HISTORY......................................................................................................... 8

I. "FAIR MARKET VALUE" IS THE ONLY VALUATION STANDARD
THAT IS APPROPRIATE TO VALUE THE TPC PROPERTY ..................................... 9

    A. The Sale Order Mandates that the "Fair Market Value" Standard is the
Only Method to Use to Value the TPC Property ...................................................... 9

    B. Section 506(a) of the Bankruptcy Code Supports the Utilization of the
"Fair Market Value" Standard to Value the Disposition of the TPC
Property................................................................................................................... 12

    C. The Supreme Court's Decision in Rash Supports the Utilization of the
"Fair Market Value" Standard in this Situation ..................................................... 14

CONCLUSION.......................................................................................................................... 16

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Associated Commercial Corp. v. Rash*,
    520 U.S. 953 (1997) .................................................................................. 2, 3, 4, 14, 15, 16

*In re Taffi*,
    96 F.3d 1190 (9th Cir. 1996) ........................................................................................... 15

**STATUTES**

11 U.S.C. § 363 ............................................................................................................... 12, 13

11 U.S.C. § 506 ......................................................................................... 1, 2, 3, 6, 9, 12, 14, 15, 16

**OTHER AUTHORITIES**

12 C.F.R. Part 34.42(g) ......................................................................................................... 11

55 Federal Register 34696, August 24, 1990 ........................................................................ 11

57 Federal Register 12202, April 19, 1992 ........................................................................... 11

59 Federal Register 29499, June 7, 1994 .............................................................................. 11

*Dictionary of Real Estate Appraisal, Fourth Edition* ............................................................ 11

TO THE HONORABLE ROBERT E. GERBER,
UNITED STATES BANKRUPTCY JUDGE:

General Motors LLC (f/k/a General Motors Company) ("**New GM**"), by and through its undersigned counsel, hereby submits this brief ("**Brief**") in support of using a "fair market value" valuation standard to value the TPC Property.[1] In support of this Brief, New GM respectfully represents as follows:

## PRELIMINARY STATEMENT

1. The dispute between New GM and the TPC Lenders that is the subject of this Brief concerns the appropriate valuation standard to use when valuing the TPC Property in order to fix the secured and unsecured claims of the TPC Lenders in accordance with the parameters of the Sale Order (defined below). New GM asserts that the appropriate valuation standard is "fair market value." This valuation method is mandated by the clear language of this Court's Sale Order, which expressly provides that the "TPC Lenders shall have an allowed secured claim in a total amount equal to the ***fair market value*** of the TPC Property on the Commencement Date under section 506 of the Bankruptcy Code . . . ." Sale Order, ¶ 36 (emphasis added).

2. The language used in the Sale Order was negotiated by the TPC Lenders to resolve their objection to the sale of the TPC Property by Old GM (as defined below) to New GM. This Court approved the agreed-upon terms of the Sale Order in July, 2009. The TPC Lenders are now bound by the provisions in the Sale Order that unambiguously require the TPC Property to be valued using a "fair market value" standard.

---

[1] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the *Motion of the TPC Lenders for an Entry of an Order (I) Initiating Valuation Proceedings in Accordance with the Sale Order, and (II) Establishing a Schedule with Respect to the Valuation Proceeding* [Docket No. 8616] ("**TPC Lenders' Motion**") filed by Wells Fargo Bank Northwest, N.A. ("**Agent**"), as agent to the TPC Lenders.

1

3.      Despite this straight-forward, negotiated and Court-approved language, and notwithstanding that the TPC Lenders actually commissioned an appraisal applying the same "fair market value" standard as New GM utilized to value the TPC Property, the TPC Lenders now contend that "fair market value" is not the appropriate benchmark to use to value the TPC Property. The TPC Lenders contend that a different valuation standard should be used -- a so-called "Use Value" or "Value in Use" method. However, the Sale Order never mentions this other, very different valuation standard or authorizes its use in this situation.

4.      Moreover, as discussed more fully below, the TPC Lenders' attempt to use this different standard -- which purports to artificially increase the value of the TPC Property by approximately $24 million -- is based on (i) a distortion of the facts of this case; (ii) an incomplete reading of Section 506(a) of the Bankruptcy Code; and (iii) the misapplication of the Supreme Court's decision in *Associated Commercial Corp. v. Rash*, 520 U.S. 953 (1997).

5.      It is indisputable that Old GM disposed of its assets -- including the TPC Property -- by selling them to New GM. This is not a "fiction," but a fact borne out by the lengthy and detailed Sale Order. What is a fiction is the TPC Lenders' assertion that the **Debtors** somehow ***retained the use*** of the TPC Property after approval of the 363 Sale Transaction (as defined below). Once this faulty premise is discarded -- as it clearly must be -- both Section 506(a) of the Bankruptcy Code and *Rash* unquestionably support New GM's argument that "fair market value" is the appropriate metric to use in order to value the TPC Property.

6.      Section 506(a) of the Bankruptcy Code generally prescribes how property should be valued when fixing a secured claim in a bankruptcy case, although it does not specify which valuation method should be used in a given situation. The statute provides that value is to be determined "in light of the ***purpose of the valuation*** and the proposed ***disposition or use*** of such

2

property . . . ." 11 U.S.C. § 506(a) (emphasis added).  The purpose of the valuation here is to fix the TPC Lenders' secured claim in the context of a sale of the TPC Property.  It is not, as the TPC Lenders argument implies, to be considered in the context of the Debtors retaining the TPC Property for ongoing operations.

7. The TPC Lenders' focus on the phraseology "continued use" of the TPC Property by the "Debtors" is clearly misguided; it is undisputed that the Debtors previously sold the TPC Property to New GM.  Thus, given that the purpose of the valuation was to fix a secured claim in the context of a "disposition" of the TPC Property (and not in the context of the continued use of such property by the Debtors), the "fair market value' method -- the method previously agreed upon by the parties -- is the only appropriate method to use to value the TPC Property.

8. *Rash* does not suggest a different result.  *Rash* was decided in the context of a Chapter 13 cram-down dispute regarding the value of a truck that the debtor was retaining and continuing to use.  In such a context -- which is not analogous to the situation here -- the Supreme Court found that the appropriate valuation method to use when fixing a secured claim, the collateral for which was being retained by the debtor, is not liquidation value, but "replacement" value.  Here, the Debtors sold the TPC Property to New GM; they are not retaining the property or continuing to use it.  Moreover, the context in which the valuation arises is not a cram-down dispute in connection with confirmation, but is in the context of a sale of the TPC Property.  It is, therefore, questionable how *Rash* is relevant to the situation at hand.

9. However, assuming that *Rash* somehow applies to this case, it is noteworthy that the Supreme Court found in *Rash* that the meaning of "replacement value" is consistent with the meaning of "fair market value." *See* ¶ 40, *infra*.  Accordingly, *Rash* does not support the TPC Lenders' position that a "value in use" method is appropriate in this situation.  To the contrary,

3

*Rash* reinforces New GM's position that the "fair market value" method should be used to value the TPC Property.

10. In light of the foregoing, and as more specifically discussed below, the only appropriate valuation standard that should be used to value the TPC Property is the "fair market value" method.

## RELEVANT BACKGROUND

11. On June 1, 2009 ("**Petition Date**"), General Motors Corporation ("**Old GM**") and certain of its subsidiaries (collectively, the "**Debtors**") commenced voluntary bankruptcy cases under Chapter 11 of the Bankruptcy Code.

12. On the Petition Date, the Debtors filed a motion ("**Sale Motion**") requesting, *inter alia*, an order ("**Sale Order**"), pursuant to 11 U.S.C. §§ 105, 363(b), (f), and (m), and 365, authorizing and approving, among other things, the sale of substantially all of the Debtors' assets pursuant to the Amended and Restated Master Sale and Purchase Agreement, dated as of June 26, 2009, free and clear of liens, claims, encumbrances, and other interests ("**363 Sale Transaction**").[2]

13. In response to the Sale Motion, the TPC Lenders filed a limited objection ("**Limited Sale Objection**")[3] to the 363 Sale Transaction to preserve their rights and interests as holders of secured claims against the TPC Property. Among other things, the TPC Lenders asserted that (i) the Debtors could not sell the TPC Property free and clear of the TPC Lenders' liens and claims; (ii) the proposed 363 Sale Transaction frustrated the TPC Lenders' right to credit bid; and (iii) the adequate protection proposed by the Debtors was inadequate. In the

---

[2] A true and correct copy of the Sale Order is annexed hereto as Exhibit "A."

[3] A true and correct copy of the Limited Sale Objection is annexed hereto as Exhibit "B."

4

Debtors' omnibus reply to the numerous objections to the 363 Sale Transaction, the Debtors disagreed with the arguments made by the TPC Lenders in the Limited Sale Objection.

14. A hearing ("**Sale Hearing**") on the Sale Motion took place between June 30, 2009 and July 2, 2009. During the course of the Sale Hearing, the Debtors, the TPC Lenders and other parties in interest attempted to resolve the issues raised by the TPC Lenders in their Limited Sale Objection. These attempts were ultimately successful, and agreed-upon language was added to the Sale Order. *See* Transcript of Sale Hearing held on July 2, 2009 ("**July 2 Transcript**"), 220:5 - 220:9 ("MR. KANZA: Good afternoon, Your Honor. Ken Kansa of Sidley Austin on behalf of the TPC lender group. We have agreed language for the order with the debtors and the purchaser that resolves the TPC lenders' objections. And so on reliance on that language, we withdraw the objection.").[4] The language agreed upon to resolve the Limited Sale Objection was not an inconsequential addition to the Sale Order; it was 10 paragraphs long and spanned seven pages.

15. The Sale Order, with the language agreed to by the TPC Lenders, was entered by the Court on July 5, 2009.

16. Pursuant to the Sale Order, the TPC Property was transferred from Old GM to New GM free and clear of all liens, claims, interests and encumbrances, including the TPC Lenders' secured liens and claims. *See* Sale Order, ¶ 36. Under the Sale Order, as adequate protection for the TPC Lenders' secured claim, New GM placed $90.7 million in the TPC Escrow Account (as defined in the Sale Order). *See id*. at ¶ 37. If the fair market value of the TPC Property turns out to be less than $90.7 million, the Sale Order provides that the balance

---

[4] Page 220 of the July 2 Transcript is annexed hereto as Exhibit "C."

5

remaining in the TPC Escrow Account after satisfying the secured claim of the TPC Lenders is to be returned to New GM. *See id.* at ¶ 39.

17. Particularly relevant here, the Sale Order contained the following agreed-upon language:

> As a result of Debtors' interest in the TPC Property being transferred to the Purchaser free and clear of all liens, claims, interests and encumbrances (other than Permitted Encumbrances), including, without limitation, the TPC Lenders' Liens and Claims, pursuant to section 363(e) of the Bankruptcy Code, the TPC Lenders shall have an allowed secured claim in ***a total amount equal to the fair market value of the TPC Property on the Commencement Date*** under section 506 of the Bankruptcy Code . . ., as determined at a valuation hearing conducted by this Court or by mutual agreement of the Debtors, the Purchaser and the TPC Lenders . . . .

Sale Order, ¶ 36 (emphasis added).

18. After entry of the Sale Order, the TPC Lenders filed a proof of claim ("**TPC Lenders' Proof of Claim**") in Old GM's bankruptcy case.[5] In the TPC Lenders' Proof of Claim, the TPC Lenders reiterated that they have "an allowed secured claim equal to the *fair market value* of the Leased Property . . . as determined at a valuation hearing before the Court or any mutual agreement of the Debtors, the Purchaser and the [TPC] Lenders . . . ." Addendum to TPC Lenders' Proof of Claim, ¶ 9(a).

19. Thereafter, New GM and the TPC Lenders engaged in negotiations regarding the fair market value of the TPC Property as of the Commencement Date, seeking to reach a consensual arrangement for the disbursement of the TPC Escrow Account, which would also fix the secured and unsecured claims of the TPC Lenders in accordance with the parameters of the

---

[5] A copy of the TPC Lenders' Proof of Claim is annexed hereto as Exhibit "D."

6

Sale Order.[6] As part of these negotiations, both New GM and the TPC Lenders obtained appraisals for the TPC Property. Consistent with the Sale Order, New GM obtained an appraisal utilizing a "fair market value" standard. The TPC Lenders also obtained an appraisal utilizing the "fair market value" standard. However, in addition to a value based on "fair market value," the TPC Lenders' appraisals also contain a value for the TPC Property utilizing the so-called "value in use" or "use value" method.[7]

20.  The TPC Lenders have taken the position, to date, that the separate and distinct "value in use" standard should be considered to value the TPC Property. New GM disputes that this different valuation standard is relevant. If both parties' "fair market value" appraisals are used, the gap between the values is approximately $11 million. However, if the TPC Lenders' "value in use" method is used, the gap between New GM's value (utilizing the "fair market value" method) and the TPC Lenders' value (utilizing the "value in use" method) grows to approximately $34 million; a $23 million difference.

21.  Generally, the reason why the TPC Lenders "value in use" appraisal is greater than that generated by a "fair market value" standard is because under the "value in use" construct, the TPC Lenders are not deducting for items labeled as "additional functional obsolescence" and "external obsolescence." Notably, the TPC Lenders agree that such items (additional functional obsolescence and external obsolescence) are appropriate deductions when utilizing the "fair market value" standard in respect of the hypothetical generic buyer for the properties being appraised. The additional functional obsolescence and external obsolescence factors account for approximately $21 million of the $23 million difference between the "value in use" appraisal and the "fair market value" appraisal. The remaining $2 million difference

---

[6] Under the Sale Order, the TPC Lenders agreed to cap their deficiency claim at $45 million.

[7] Prior to the hearing on this matter, New GM will seek to file the appraisals under seal with the Court.

relates to a tax abatement that Old GM, as well as New GM, qualifies for in respect of the Tennessee property, subject to applicable conditions and obligations. The TPC Lenders and New GM both agree that under the "fair market value" standard, this tax benefit should not be included in such valuation.

## PROCEDURAL HISTORY

22. On January 14, 2011, the Agent filed the TPC Lenders' Motion with the Court to institute proceedings ("**Valuation Proceedings**") to value the TPC Property. On February 3, 2011, New GM filed its response ("**New GM Response**") to the TPC Lenders' Motion, requesting that prior to the Court establishing a schedule for the Valuation Proceedings, the Court establish a schedule to resolve the issue concerning the dispute regarding the appropriate valuation standard for the TPC Property (the "**Valuation Standard Issue**"). On February 8, 2011, the Agent filed a reply ("**TPC Lenders' Reply**") to the New GM Response, opposing the relief requested by New GM.

23. On February 9, 2011, a hearing was held before this Court regarding the TPC Lenders' Motion, at which time the Court directed the parties to establish a briefing schedule for the Valuation Standard Issue, and deferred consideration for setting any other schedule for the Valuation Proceedings. A Stipulation and Agreed Order was entered by the Court on February 17, 2011 establishing the briefing schedule for the Valuation Standard Issue.[8]

---

[8] Aside from the Valuation Standard Issue, there currently exists an unresolved issue between the parties regarding whether and/or to what extent certain equipment located at the Facilities constitutes the TPC Lenders' collateral. New GM believes that this is not a high dollar issue and will attempt to reach a consensual resolution with the TPC Lenders. Nonetheless, this may ultimately be an issue which will require judicial intervention.

# I.

# "FAIR MARKET VALUE" IS THE ONLY VALUATION STANDARD THAT IS APPROPRIATE TO VALUE THE TPC PROPERTY

### A. The Sale Order Mandates that the "Fair Market Value" Standard is the Only Method to Use to Value the TPC Property

24.     The resolution of the dispute concerning the Valuation Standard Issue should begin and end with the clear and unambiguous language of the Sale Order. It clearly provides that the "TPC Lenders shall have an allowed secured claim in a total amount equal to the *fair market value of the TPC Property* on the Commencement Date under section 506 of the Bankruptcy Code . . . ." Sale Order, ¶ 36 (emphasis added). No other valuation standard is mentioned in the Sale Order. It is, thus, crystal clear that the appropriate standard to use to value the TPC Property is the "fair market value" approach specifically approved by the Court.

25.     The language in the Sale Order was not drafted by the Court or, unilaterally, by New GM. It was language that was crafted by the TPC Lenders, the Debtors, New GM and other parties in interest at the Sale Hearing to resolve the TPC Lenders' Limited Sale Objection. As reflected by the statements made by counsel for the TPC Lenders at the Sale Hearing, the TPC Lenders agreed to the language that was included in the Sale Order. The TPC Lenders could have negotiated other language to include in the Sale Order, or they could have demanded that no valuation standard be included therein. They did neither.

26.     Thereafter, in the TPC Lenders' Proof of Claim, the TPC Lenders reiterated that the "fair market value" standard is the appropriate standard to apply when valuing the TPC Property. They did not assert in the TPC Lenders' Proof of Claim that some other valuation method was appropriate or justified. Accordingly, the TPC Lenders are now bound by the

agreed-upon provisions of the Sale Order and must apply the "fair market value" standard to value the TPC Property.

27. To be clear, "fair market value" and "value in use" are very different valuation standards and each has its own common meaning. The TPC Lenders' own appraisers recognized this, appraising the TPC Property using a "fair market value" method *and* a "value in use" method. In fact, in the TPC Lenders' appraisals, their appraisers "recognize[d] that real property may have a market value *and* a value in use . . . ." *See* TPC Lenders' Appraisal of Real Property (Tennessee) ("**TPC Lenders' Tennessee Appraisal**"), at p. 46 (emphases added); TPC Lenders' Appraisal of Real Property (Maryland) ("**TPC Lenders' Maryland Appraisal**"), at p. 37 (emphasis added).

28. "Fair market value," or "market value," is explicitly defined in the TPC Lenders' appraisals as follows:

> "The most probably price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeable, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specific date and the passing of title from seller to buyer under conditions whereby:
>
> - Buyer and seller are typically motivated;
>
> - Both parties are well informed or well advised, and acting in what they consider their best interest;
>
> - A reasonable time is allowed for exposure in the open market;
>
> - Payment is made in terms of cash in United States dollars or in terms of financial arrangements comparable thereto; and
>
> - The price represents the normal consideration for the property sold unaffected by special or creative

10

> financing or sales concessions granted by anyone associated with the sale."

TPC Lenders Tennessee Appraisal, at pp. 2-3; TPC Lenders Maryland Appraisal, at p. 3 (both appraisals quote from 12 C.F.R. Part 34.42(g); 55 Federal Register 34696, August 24, 1990, as amended at 57 Federal Register 12202, April 19, 1992; 59 Federal Register 29499, June 7, 1994). New GM's appraisals contain the same definition. *See* New GM's Appraisals, Addendum A - Glossary of Terms. It is, thus, clear that both the TPC Lenders and New GM knew what was meant by "fair market value" and had the TPC Property appraised using the same defined method.

29. Nonetheless, the TPC Lenders appraisals also contain the following definition for "value in use":

> The value a specific property has to a specific person or a specific firm as opposed to the value to persons or the market in general. Special purpose properties such as churches, schools and public buildings, which are seldom bought and sold in the open market, can be valued on the basis of value in use. The value to a specific person may include a sentimental value component. The value in use to a specific firm may be the value of a plant as a part of an integrated multiplant operation.

TPC Lenders Tennessee Appraisal, at pp. 2, 46; TPC Lenders Maryland Appraisal, at pp. 3, 37 (both appraisals quote from *The Dictionary of Real Estate Appraisal, Fourth Edition*, p. 306 published by The Appraisal Institute). The "value in use" standard is markedly different then the "fair market value" standard prescribed by the Sale Order. It is, thus, improper for the TPC Lenders to rely on this different valuation methodology when valuing the TPC Property.

30. Apparently recognizing that "fair market value" is different then "value in use," the TPC Lenders had the TPC Property appraised using the "fair market value" standard. If the TPC Lenders truly believed that the only appropriate valuation standard to use in this situation

11

was the "value in use" method, it would have appraised the TPC Property only under that method. It did not. The fact that the TPC Lenders' appraisals contain two different values -- one using "fair market value" and one using "value in use" -- highlights the fact that these are different valuation standards, and that "fair market value" has its own, identifiable meaning in this situation (as demonstrated by the TPC Lenders' appraisals containing the same definition as New GM's appraisals).

31. Accordingly, as the Sale Order states that the TPC Lenders' secured claim will "be equal to the fair market value of the TPC Property" and the fair market value of such property is capable of being determined, that is the only valuation standard that should be used to value the TPC Property.

**B.    Section 506(a) of the Bankruptcy Code Supports the Utilization of the
       "Fair Market Value" Standard to Value the Disposition of the TPC Property**

32. In the TPC Lenders' Reply to the New GM Response, the TPC Lenders rely on Section 506 of the Bankruptcy Code to somehow argue that their "value in use" standard is appropriate in this situation. Section 506(a) provides, in relevant part, that the value of property secured by a lien "shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest." 11 U.S.C. § 506(a).

33. Here, the purpose of the valuation of the TPC Property is *not* to fix the secured claim of the TPC Lenders in the context of the Debtors retaining the *use* of the TPC Property pursuant to a plan of reorganization. The purpose of the valuation is to fix the TPC Lenders' secured claim in the context of a Section 363 sale of the TPC Property or, more specifically, to fix the TPC Lenders' claim to escrow proceeds pursuant to the terms and procedures dictated by

the Sale Order. Putting the valuation in this proper context reveals that the only appropriate methodology to utilize to value the TPC Property is the "fair market value" method.

34. Ignoring both the purpose of the valuation and the express language of the Sale Order, the TPC Lenders inappropriately focus on only the "use" of the property, arguing that "GM" has "retained and continued to operate the [TPC Property] as vital parts of its reorganized business." TPC Lenders' Reply, p. 3. They further assert that New GM's appraisals are based on a "fiction that New GM did not retain and continue to operate the property, but instead abandoned the properties and attempted to sell empty properties to a third party." *Id.* at p. 5. The TPC Lenders then go so far as to say that New GM's appraisals value the TPC Property at a "foreclosure value." *Id.* at p. 5. The TPC Lenders are simply wrong on all accounts.[9]

35. The TPC Lenders' current statements are directly contradicted by their previous statements made in the Limited Sale Objection. For example, the TPC Lenders stated in their Limited Sale Objection that they do "not object to the ***sale of the Debtors' assets to the Purchaser*** pursuant to section 363 of the Bankruptcy Code, including the ***sale*** of" the TPC Property. Limited Sale Objection, ¶ 1 (emphasis added). They then stated that the "Debtors intend to transfer the Facilities to the Purchaser. Further, pursuant to the Sale Motion and [MSPA], the Debtors intend to sell the Facilities free and clear of all liens, claims, encumbrances and interests, including the [TPC Lenders'] mortgages and security interests." *Id.* at ¶ 9. It is, thus, clear from a review of the Limited Sale Objection that the TPC Lenders acknowledged that Old GM was selling the TPC Property to New GM.

36. Simply put, Old GM *sold* its assets to New GM pursuant to the 363 Sale Transaction, which was approved by the Bankruptcy Court pursuant to the Sale Order. This is

---

[9] Contrary to the TPC Lenders' argument in the TPC Lenders' Reply, New GM did not value the TPC Property using a "foreclosure sale" method. As clearly set forth in the appraisals, New GM used a "fair market value" method to appraise the TPC Property.

13

not fiction but an uncontestable fact. The 363 Sale Transaction was (i) the subject of numerous objections -- including the TPC Lenders' Limited Sale Objection; (ii) was the subject of a lengthy hearing before the Bankruptcy Court; and (iii) was the subject of the 50-page Sale Order. Moreover, Old GM -- now known as Motors Liquidation Company -- and New GM are clearly separate and distinct entities. For the TPC Lenders to now argue that Old GM and New GM are one and the same, that there was no sale and that the TPC Property was retained by the Debtors "as parts of its reorganized business" is belied by the uncontroverted facts of these cases. It also comes impermissibly late, since the TPC Lenders did not raise the issue in connection with their objection to the 363 Sale Transaction and agreed to the language in the Sale Order which is fatally inconsistent with their argument.

37. Accordingly, when deciding on the appropriate valuation methodology to utilize to value the TPC Property pursuant to Section 506(a) of the Bankruptcy Code, the "use" of such property is not important. What is important is the "disposition" of the TPC Property. The disposition here was that the TPC Property was sold by Old GM to New GM. In a sale context, such as here, it is clear that the well-established "fair market value" methodology must be utilized to value the TPC Property. This is what was contemplated by the Sale Order and this is what should be done now.

C.  **The Supreme Court's Decision in *Rash* Supports the Utilization of the "Fair Market Value" Standard in this Situation**

38. The TPC Lenders' heavy reliance on *Rash* is entirely misplaced. *Rash* concerned a Chapter 13 debtor who was attempting to cram-down his plan on a secured creditor by using the liquidation value of a truck, even though the debtor was retaining the truck and continuing to use it in his business. The Supreme Court found that "the 'proposed disposition or use' of the

14

collateral is of paramount importance to the valuation question." *Rash*, 520 U.S. at 962. The important fact in *Rash* was that the debtor was retaining the truck:

> Of prime significance, the replacement-value standard accurately gauges the debtor's "*use*" of the property. . . . The debtor in this case elected to *use* the collateral to generate an income stream. That actual *use*, rather than a foreclosure sale that will not take place, is the proper guide under a prescription hinged to the debtor's "disposition or use."

*Id*. at 963 (emphasis added). The holding of *Rash* was, thus, stated as follows: "In sum, under § 506(a), the value of property retained because the debtor has exercised the § 1325(a)(5)(B) 'cram down' option is the cost the debtor would incur to obtain a like asset for the same 'proposed . . . use.'" *Id.* at 965.

39. The situation here is not at all like that in *Rash*. Here, the Debtors were not retaining any property; the Debtors were not attempting to cram-down any plan on a secured creditor; and the Debtors were not continuing to use the property. The Debtors *sold* the TPC Property to New GM. Thus, they were not continuing to "use" the TPC Property, but were "disposing" of the property. The TPC Lenders' constant focus on the Debtors' continued "use" of the TPC Property is simply wrong.

40. Significantly, the Supreme Court did have occasion to compare the definition of "replacement value" and "fair market value" in *Rash*. Noting that the Ninth Circuit in *In re Taffi*, 96 F.3d 1190 (9th Cir. 1996) viewed these two standards as incompatible, the Supreme Court stated as follows:

> By using the term "replacement value," we do not suggest that a creditor is entitled to recover what it would cost the debtor to purchase the collateral brand new. Rather, our use of the term replacement value is consistent with the Ninth Circuit's understanding of the meaning of fair-market value; by replacement value, we mean the price a willing buyer in the debtor's trade,

15

>business, or situation would pay a willing seller to obtain property of like age and condition.

*Rash*, 520 U.S. at 959 n.2.  The Supreme Court, in its holding, reiterated this view: the "value of the property (and thus the amount of the secured claim under § 506(a)) is the price a willing buyer in the debtor's trade, business, or situation would pay to obtain like property from a willing seller." *Id.* at 960.  Thus, the so-called "replacement value" standard under *Rash* is thus akin to the "fair market value" standard used by New GM herein.

41. In contrast, the "value in use" standard that the TPC Lenders seek to use is not at all akin to the "replacement value" (or "fair market value") standard set forth in *Rash*.  As stated above, "value in use" is defined in the TPC Lenders' appraisals as the "value a ***specific*** property has to a ***specific*** person or a specific firm as opposed to the value to persons or the market in general." (Emphasis added)  The Supreme Court's valuation method never speaks in terms of "specific property" or "specific persons;" it merely speaks in terms of "willing buyers" and "willing sellers" generally in the debtor's trade or business.  In so doing, the Supreme Court alluded to a "fair market value" standard; the same standard that applies here.

42. Accordingly, based on the foregoing *Rash* does not support the TPC Lenders' position.

## CONCLUSION

43. Relying on the plain language of the Sale Order, New GM used the "fair market value" standard in its appraisals of the TPC Property.  Apparently recognizing that the Sale Order set forth the appropriate valuation methodology to use to value the TPC Property, the TPC Lenders also used the "fair market value" standard in their appraisals of the TPC Property.  The fact that the TPC Lenders also appraised the TPC Property under some other, different standard is irrelevant.  Accordingly, based on the explicit language of the Sale Order and Section 506(a)

of the Bankruptcy Code, the appropriate valuation standard to use in this situation is "fair market value."

WHEREFORE, New GM respectfully requests that the Court (i) reiterate the finding contained in the Sale Order that only the "fair market value" of the TPC Property can be used to fix the secured claim of the TPC Lenders; and (ii) grant to New GM such other and further relief as is just and proper.

Dated: New York, New York
February 28, 2011

                  KING & SPALDING LLP


                  By: /s/ Arthur Steinberg
                      Arthur Steinberg
                      H. Slayton Dabney
                      Scott Davidson
                  1185 Avenue of the Americas
                  New York, NY 10036
                  (212) 556-2100

                  *Counsel to General Motors LLC*