# EXHIBIT B

# Bierman Decl.

Harvey R. Miller
Stephen Karotkin
Joseph H. Smolinsky
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x
                                            :
**In re**                                   :    **Chapter 11 Case No.**
                                            :
**GENERAL MOTORS CORP.,** *et al.*,         :    **09-_____ (___)**
                                            :
            **Debtors.**                    :    **(Jointly Administered)**
                                            :
------------------------------------------------------------x

**MEMORANDUM OF LAW IN SUPPORT OF DEBTORS' MOTION PURSUANT TO 11 U.S.C. §§ 105, 363(b), (f), (k), (m) AND 365, AND FED. R. BANKR. P. 2002, 6004 AND 6006, TO (I) APPROVE (A) THE SALE PURSUANT TO THE MASTER SALE AND PURCHASE AGREEMENT WITH VEHICLE ACQUISITION HOLDINGS LLC, A U.S. TREASURY-SPONSORED PURCHASER, FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS; (B) THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (C) OTHER RELIEF; AND (II) SCHEDULE SALE APPROVAL HEARING**

General Motors Corporation ("GM") and certain of its subsidiaries, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors" or the "Company"), submit this Memorandum of Law in Support of Debtors' Motion Pursuant to 11 U.S.C. §§ 105, 363(b), (f), (k), (m) and 365, and Fed. R. Bankr. P. 2002, 6004 and 6006, to (i) Approve (a) the Sale Pursuant to the Master Sale and Purchase Agreement with Vehicle Acquisition Holdings LLC, a U.S. Treasury-Sponsored Purchaser, Free and Clear of Liens, Claims, Encumbrances and Other Interests; (b) the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (c) Other Relief; and (ii) Schedule Sale Approval Hearing (the "363 Motion").[1]

## PRELIMINARY STATEMENT

There can be no doubt that the Company's decision to enter into the 363 Transaction represents an exercise of sound and prudent business judgment -- the overriding consideration under section 363(b) -- for that transaction represents the *only* available option to preserve and maximize the value of the assets to be sold; to save GM, a lynchpin of the domestic automotive industry; and to ensure its continued existence and viability. The well-documented financial crisis that has befallen the Company since 2008, and that has threatened not only the Company and its nearly quarter of a million workers, but also the jobs of hundreds of thousands of other United States workers and the viability of thousands of businesses that supply or are otherwise dependent upon the Company, has already necessitated billions of dollars of assistance by the U.S. Government. That assistance, however, which to date has sustained the Company's

---

[1] Capitalized terms not otherwise defined herein have the meanings ascribed thereto in the 363 Motion; the Affidavit of Frederick A. Henderson Pursuant to Local Bankruptcy Rule 1007-2, sworn to on June 1, 2009 (the "First Day Affidavit" or "Henderson Affidavit"), filed contemporaneously with the 363 Motion; or the proposed Master Sale and Purchase Agreement among the Debtors (the "Sellers") and Vehicle Acquisition Holdings LLC (the "Purchaser"), a purchaser sponsored by the U.S. Treasury, dated June 1, 2009 (the "MPA").

operations (and, thus, avoided both the Company's and an industry-wide failure), is *not* committed going forward: that is, there will be no additional Government assistance (either inside or outside of chapter 11) *unless* the 363 Transaction is expeditiously approved. And, absent such Governmental assistance, there is no viable alternative at all to preserve the Company's business.

Absent approval of the 363 Transaction, the Company will be forced to liquidate, yielding only a fraction of the value that the assets subject to the sale have as a going concern. A liquidation will result in virtually all of the proceeds going to satisfy, in part or fully, the billions of dollars of secured loans to GM. That scenario will not only result in significantly lesser recoveries by the Company's creditors, but also drastic consequences for its customers, current, and even former, employees, suppliers and dealers -- and, in turn, the overall United States automotive industry and the Midwest and national economies. Chapter 11 -- including section 363(b) -- is designed, and repeatedly has been applied, precisely to avoid this result. As noted in *In re Drexel Burnham Lambert Group, Inc.*, 138 B.R. 723 (Bankr. S.D.N.Y. 1992), the "'fundamental purpose of reorganization is to prevent [the] debtor from going into liquidation, with an attendant loss of jobs and possible misuse of economic resources.'" *Id.* at 760 (quoting *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 528 (1984)).

In short, the 363 Transaction -- and *only* the 363 Transaction -- avoids systemic failure and provides a genuine opportunity for the business to survive and thrive in an economically viable entity, and, in the process, to maximize value for all of its stakeholders and stabilize and foster both consumer and market confidence. There simply is *no* other alternative: there is no other purchaser to buy the business; no investor to capitalize the business; no other financing source for the long term; not even another source to provide financing for a chapter 11

case. The Debtors therefore request that the Court approve the 363 Transaction expeditiously and ensure, in the words of President Obama, that "the cars of the future are built where they've always been built -- in Detroit and across the Midwest -- to make America's auto industry in the 21st century what it was in the 20th century -- unsurpassed around the world." Barack H. Obama, U.S. President, Remarks on the American Automotive Industry, at 7 (Mar. 30, 2009).

## STATEMENT OF FACTS

The Debtors refer the Court to, and expressly incorporate herein, the factual background set forth in the 363 Motion and the Henderson Affidavit, as well as the supporting declarations of J. Stephen Worth of Evercore Group LLC (the "Worth Declaration"), William C. Repko of Evercore Group LLC (the "Repko Declaration") and Albert A. Koch of AlixPartners, LLP (the "Koch Declaration"), each sworn to on May 31, 2009.

## ARGUMENT

**I.    THE 363 TRANSACTION IS AN EXERCISE OF SOUND BUSINESS JUDGMENT AND SHOULD BE APPROVED UNDER SECTION 363(b)**

It is axiomatic that going concern value exceeds liquidation value. Thus, it is in the best interests of all stakeholders that, whenever possible, avoidance of liquidation and preservation of going concern value, and the preservation of a business, jobs and correlated interests, should be the objectives of any bankruptcy case. *See In re Drexel Burnham Lambert Group, Inc.*, 138 B.R. 723, 759-60 (citing *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 528 (1984)). *See also Reading Co. v. Brown*, 391 U.S. 471, 475 (1968) ("[T]he words 'preserving the estate' include the larger objective . . . of operating the debtor's business with a view to rehabilitating it"); *In re Global Serv. Group, LLC*, 316 B.R. 451, 460 (Bankr. S.D.N.Y. 2004) ("[C]hapter 11 is based on the accepted notion that a business is worth more to everyone alive than dead") (citations omitted); *In re WorldCom, Inc.*, 2003 WL 23861928, at *51 (Bankr.

S.D.N.Y. Oct. 31, 2003) (same); *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 176 (Bankr. S.D.N.Y. 1989) ("[T]he paramount policy and goal of Chapter 11, to which all other bankruptcy policies are subordinated, is the rehabilitation of the debtor").

The 363 Transaction achieves the objectives of enhancing value and preserving a business that is a critically important part of the national economy, thereby avoiding liquidation and, thus, comporting with the essential purpose of chapter 11:

> The purpose of a business reorganization case, unlike a liquidation case, is to restructure a business's finances so that it may continue to operate, provide its employees with jobs, pay its creditors, and produce a return for its stockholders. *The premise of a business reorganization is that assets that are used for production in the industry for which they were designed are more valuable than those same assets sold for scrap*. Often, the return on assets that a business can produce is inadequate to compensate those who have invested in the business. Cash flow problems may develop, and require creditors of the business, both trade creditors and long-term lenders, to wait for payment of their claims. If the business can extend or reduce its debts, it often can be returned to a viable state. *It is more economically efficient to reorganize than to liquidate, because it preserves jobs and assets*.

H.R. Rep. No. 95-595, at 220, *reprinted in*, 1978 U.S.C.C.A.N. 5963, 6179 (emphasis added); *see also* 7 Collier on Bankruptcy ¶ 1100.01 (15th ed. rev. 2008) ("Chapter 11 embodies a policy that it is generally preferable to enable a debtor to continue to operate and to reorganize its business rather than simply to liquidate a troubled business. Continued operation may enable the debtor to preserve any positive difference between the going concern value of the business and the liquidation value. Moreover, continued operation can save the jobs of employees, the tax base of communities, and generally reduce the upheaval that can result from termination of a business").

Against this backdrop, the authority for the 363 Transaction, which enables the Company to sell its major assets as a going concern, rather than simply liquidating them, is clear

in the Bankruptcy Code and under the cases. *See*, *e.g.*, *Fla. Dep't of Revenue v. Piccadilly Cafeteria, Inc.*, 128 S. Ct. 2326, 2331 n.2 (2008) (recognizing that debtors often sell "substantially all of [their] assets as a going concern" and then "submit[] for confirmation a plan of liquidation . . . providing for the distribution of the proceeds resulting from the sale"). Specifically, section 363(b) authorizes a debtor to sell assets other than in the ordinary course of business by providing, in relevant part, that "[t]he trustee, after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1); *see also* 11 U.S.C. § 1107(a) (providing that debtors in possession have "all the rights . . . of a trustee"); Fed. R. Bankr. P. 6004(f)(1) (providing that "[a]ll sales not in the ordinary course of business may be by private sale or by public auction").

Although section 363(b) states the general principle that debtors in possession may sell property of the estate outside of the ordinary course of business, it does not set forth a standard for determining when it is appropriate for a court, in an exercise of its sound discretion, to authorize such a sale or other disposition of a debtor's assets. Courts in the Second Circuit (and elsewhere) have required that the decision to sell assets outside the ordinary course of business be based on the sound business judgment of the debtor. *See Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 466 (2d Cir. 2007) (holding that an asset sale under section 363(b) "is permissible if the 'judge determining the . . . application expressly find[s] from the evidence presented before [him or her] at the hearing [that there is] a good business reason to grant such an application'") (quoting *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983)); *Consumer News & Bus. Channel P'ship v. Fin. News Network Inc. (In re Fin. News Network Inc.)*, 980 F.2d 165, 169 (2d Cir. 1992) (same); *Official Comm. of Unsecured Creditors of LTV Aerospace &*

*Defense Co. v. LTV Corp. (In re Chateaugay Corp.)*, 973 F.2d 141, 143 (2d Cir. 1992) (same); *In re Global Crossing Ltd.*, 295 B.R. 726, 743 (Bankr. S.D.N.Y. 2003) (same); *In re Ionosphere Clubs, Inc.*, 100 B.R. 670, 675 (Bankr. S.D.N.Y. 1989) (same); *see also In re Lionel*, 722 F.2d at 1069, 1071 (holding that, in considering a section 363(b) motion, "a bankruptcy judge must not be shackled with unnecessarily rigid rules when exercising the undoubtedly broad administrative power granted him under the Code," but must simply find a "good business reason" supporting the proposed transaction).

Nor will courts second-guess a reasonably founded business judgment in the context of section 363(b).  As Judge Lifland stated in *Committee of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612 (Bankr. S.D.N.Y. 1986), "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *Id.* at 616.  When a valid business justification exists, the law vests the debtor's decision to sell or otherwise dispose of assets outside the ordinary course of business with a strong presumption that the debtor's management and directors, in approving the sale or other disposition, "'acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company.'"  *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkum*, 488 A.2d 858, 872 (Del. 1985)), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993); *see also In re Integrated Res.*, 147 B.R. at 656 (holding that the Delaware business judgment rule has "vitality by analogy" in chapter 11, especially where the debtor is a Delaware corporation) (quotations omitted).  The burden of rebutting this presumption falls to parties opposing the proposed exercise of a debtor's business judgment.  *See In re Integrated*

The 363 Transaction is the *only* alternative to a liquidation and, thus, is certainly a good alternative for the Company's stakeholders.  And, it simultaneously provides a genuine opportunity to let the Company's business survive and thrive as a viable entity:  it is designed to optimize New GM's ability to compete immediately and successfully on a global basis -- the prerequisite for additional billions of dollars of Government financing and related support, as well as the Government's forbearance with respect to the more than $19 billion already extended under (and secured by) the existing facilities.  *See* Henderson Aff. ¶¶ 14-15, 74-76 (explaining that the U.S. Government is *not* willing to provide financing in any other scenario but the 363 Transaction).  The 363 Transaction ensures continued financing (particularly given the Government's substantial interest in GM) and, thus, permits maximization of the value of the Debtors' assets, while, at the same time, enabling the business to be sold and continue operations without the current financial and operating distress and free of bankruptcy, as part of an immediately viable going concern.

      **B.**      **The 363 Transaction Is Also Justified Because It Avoids The Dire Consequences Of A Liquidation**

The 363 Transaction is critical to the Debtors' ability to curb the rapidly decreasing value of the Purchased Assets and maintain vital integrated relationships with existing and potential customers, current and former employees, suppliers, dealers and partners (the loss of any of which would significantly and likely permanently impair the Company's business and future prospects, even putting aside the impact of the rapid decline in global vehicle sales).  *See generally* Henderson Aff. ¶¶ 82-96.  For example, a protracted bankruptcy process, among other things, would:

- dramatically and irreversibly erode sales and GM's market share.  It will substantially erode customers' confidence in GM's ability to stay in business, provide parts and service over the long-term, ensure the availability of warranty coverage or maintain

> acceptable resale values, all of which will result in a significant, precipitous and irreversible decline in GM's sales, global revenues, profitability and cash flow;
>
> - endanger the viability of GM's dealers and suppliers that depend on volume sales to GM, causing systemic failures;
>
> - distract managerial and union employees from the performance of their duties or, worse yet, cause them to seek other job opportunities, while, at the same time, rendering it extremely difficult, if not impossible, to attract new employees;
>
> - lead many of GM's suppliers, dealers and partners (including certain joint-venture partners) to terminate their relationships with GM, require financial assurances or enhanced performance, or refuse to provide trade credit on the same terms as the bankruptcy cases; and
>
> - foreclose GM's ability to obtain debtor in possession financing sufficient to sustain operations during case administration, which likely would force the Debtors' liquidation.

*See generally* Henderson Aff. ¶¶ 82-96.  The 363 Transaction, pursuant to which New GM would continue to operate the Debtors' business freed of any taint of bankruptcy (in exchange for consideration to the Company), is intended to address the foregoing concerns and, among other things, stabilize and foster the dealer and supplier networks that are crucial to the success and restoration of consumer and market confidence.  At the same time, the 363 Transaction maximizes the value of the Company's business for the benefit of all of the Debtors' economic stakeholders.

The 363 Transaction makes not just good, but overwhelming business sense, as it: (i) saves one of the largest and most important global businesses from the almost certain risk of a near term liquidation, which would minimize (rather than maximize) the value of the assets -- and which would have extraordinary, if not incalculable, systemic economic and societal consequences not only to the Company's customers, employees, suppliers and dealers, but also to the entire automotive industry, the Midwest and the overall United States economy; (ii) saves countless smaller businesses and their tens (if not hundreds) of thousands of jobs in the process;

and (iii) creates a new entity with the operational and balance sheet flexibility to compete successfully (and, thus, generate substantial value) going forward (with the most fundamental benchmark, as indicated by the Government, being the near term generation of positive cash flow and an adequate return on capital).  As Judge Peck observed this past September in approving the sale of Lehman Brothers' North American business within a week of the filing of Lehman Brothers' chapter 11 case:

> I am completely satisfied that I am fulfilling my duty as a United States bankruptcy judge in approving this transaction and in finding that there is no better alternative transaction for these assets, that the consequences of not approving a transaction could prove to be truly disastrous, and those adverse consequences are meaningful to me as I exercise this discretion.  The harm to the debtor, its estates, the customers, creditors, generally, the national economy, and the global economy could prove incalculable.
>
> \*     \*     \*
>
> And so, as to those objectors who say it would be establishing bad precedent to approve this transaction, I say no.  This is not bad precedent.  To the contrary.  It's an extraordinary example of the flexibility that bankruptcy affords under circumstances such as this.  It's an example that creative minds working diligently day and night even under the worst of circumstances can create remarkably complicated transactions that preserve value.  I am proud to have been part of this process.

*In re Lehman Bros. Holdings Inc.*, Case No. 08-13555 (Bankr. S.D.N.Y. Sept. 19, 2008), Transcript of Sale Approval Hearing, at 250, 252 (excerpts attached hereto as Exhibit C).  The same can be said even more strongly here, which, like *Lehman Brothers*, is the extraordinary case where the outcome will have consequences extending far beyond the particular transaction at issue.

### C.    The Debtors Have Satisfied All Of The Other Section 363(b) Factors

Given the Debtors' sound business justification for the proposed sale, the inquiry turns to whether:  (i) adequate and reasonable notice of the sale has been provided to interested