# EXHIBIT D

# Bierman Decl.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x
                                                           :

In re                                                 :         Chapter 11 Case No.

GENERAL MOTORS CORP., *et al.*,                :         09- 50026 (REG)

                            Debtors.      :         (Jointly Administered)

-------------------------------------------------------------x


DECISION ON DEBTORS' MOTION FOR
APPROVAL OF (1) SALE OF ASSETS TO
VEHICLE ACQUISITION HOLDINGS LLC;
(2) ASSUMPTION AND ASSIGNMENT OF
RELATED EXECUTORY CONTRACTS; AND
(3) ENTRY INTO UAW RETIREE SETTLEMENT
AGREEMENT


APPEARANCES:[1]
WEIL, GOTSHAL & MANGES LLP
*Attorneys for Debtors and Debtors in Possession*
767 Fifth Avenue
New York, New York 10153
By:    Harvey R. Miller (argued)
        Stephen Karotkin (argued)
        Joseph H. Smolinsky (argued)

KRAMER LEVIN NAFTALIS & FRANKEL LLP
*Counsel for the Official Committee*
  *of Unsecured Creditors*
1177 Avenue of the Americas
New York, New York 10036
By:    Kenneth H. Eckstein (argued)
        Thomas Moers Mayer (argued)
        Robert Schmidt
        Jeffrey S. Trachtman

---

[1]    Principal participants are shown here.  A full listing will be posted when practicable.

i

ROBERT E. GERBER
UNITED STATES BANKRUPTCY JUDGE

In this contested matter in the jointly administered chapter 11 cases of Debtors General Motors Corporation and certain of its subsidiaries (together, "**GM**"), the Debtors move for an order, pursuant to section 363 of the Bankruptcy Code, approving GM's sale of the bulk of its assets (the "**363 Transaction**"), pursuant to a "Master Sale and Purchase Agreement" and related documents (the "**MPA**"), to Vehicle Acquisitions Holdings LLC (the "**Purchaser**")[2]—a purchaser sponsored by the U.S. Department of the Treasury (the "**U.S. Treasury**")—free and clear of liens, claims, encumbrances, and other interests. The Debtors also seek approval of the assumption and assignment of the executory contracts that would be needed by the Purchaser, and of a settlement with the United Auto Workers ("**UAW"**) pursuant to an agreement (the "**UAW Settlement Agreement**") under which GM would satisfy obligations to an estimated 500,000 retirees.

GM's motion is supported by the Creditors' Committee; the U.S. Government (which has advanced approximately $50 billion to GM, and is GM's largest pre- and post-petition creditor); the Governments of Canada and Ontario (which ultimately will have advanced about $9.1 billion); the UAW (an affiliate of which is GM's single largest unsecured creditor); the indenture trustees for GM's approximately $27 billion in unsecured bonds; and an ad hoc committee representing holders of a majority of those bonds.

---

[2] When discussing the mechanics of the 363 Transaction, the existing GM will be referred to as "**Old GM,**" and the Purchaser will be referred to as "**New GM**."

1

But the motion has engendered many objections and limited objections, by a variety of others. The objectors include, among others, a minority of the holders of GM's unsecured bonds (most significantly, an ad hoc committee of three of them (the "**F&D Bondholders Committee**"), holding approximately .01% of GM's bonds),[3] who contend, among other things, that GM's assets can be sold only under a chapter 11 plan, and that the proposed section 363 sale amounts to an impermissible "*sub rosa*" plan.

Objectors and limited objectors also include tort litigants who object to provisions in the approval order limiting successor liability claims against the Purchaser; asbestos litigants with similar concerns, along with concerns as to asbestos ailments that have not yet been discovered; and non-UAW unions ("**Splinter Unions**") speaking for their retirees, concerned that the Purchaser does not plan to treat their retirees as well as the UAW's retirees.

On the most basic issue, whether a 363 sale is proper, GM contends that this is exactly the kind of case where a section 363 sale is appropriate and indeed essential—and where under the several rulings of the Second Circuit and the Supreme Court in this area, GM's business can be sold, and its value preserved, before the company dies. The Court agrees. GM cannot survive with its continuing losses and associated loss of liquidity, and without the governmental funding that will expire in a matter of days. And there are no options to this sale—especially any premised on the notion that the company could

---

[3] When it filed its objection, the F&D Bondholders Committee, identifying itself as the "Family & Dissident" Bondholders Committee, said it was "representing the interests of" 1,500 bondholders, with bond holdings "believed to exceed $400 million." (F&D Bondholder Comm. Obj. at 1). But even after it filed the second of its Fed.R.Bankr.P. 2019 statements, it did not identify any other bondholders for whom it was speaking, or provide the holdings, purchases and sales information for any others that Rule 2019 requires. Under these circumstances, the Court must consider that the committee speaks for just those three bondholders.

2

survive the process of negotiations and litigation that characterizes the plan confirmation process.

As nobody can seriously dispute, the only alternative to an immediate sale is liquidation—a disastrous result for GM's creditors, its employees, the suppliers who depend on GM for their own existence, and the communities in which GM operates. In the event of a liquidation, creditors now trying to increase their incremental recoveries would get nothing.

Neither the Code, nor the caselaw—especially the caselaw in the Second Circuit—requires waiting for the plan confirmation process to take its course when the inevitable consequence would be liquidation. Bankruptcy courts have the power to authorize sales of assets at a time when there still is value to preserve—to prevent the death of the patient on the operating table.

Nor can the Court accept various objectors' contention that there here is a *sub rosa* plan. GM's assets simply are being sold, with the consideration to GM to be hereafter distributed to stakeholders, consistent with their statutory priorities, under a subsequent plan. Arrangements that will be made by the Purchaser do not affect the distribution of the *Debtor's* property, and will address wholly different needs and concerns—arrangements that the Purchaser needs to create a new GM that will be lean and healthy enough to survive.

Issues as to how any approval order should address *successor liability* are the only truly debatable issues in this case. And while textual analysis is ultimately inconclusive and caselaw on a nationwide basis is not uniform, the Court believes in *stare decisis*; it follows the caselaw in this Circuit and District in holding that to the extent the Purchaser

3

has not voluntarily agreed to accept successor liability, GM's property—like that of Chrysler, just a few weeks ago—may be sold free and clear of claims.

Those and other issues are addressed below. GM's motion is granted. The following are the Court's Findings of Fact, Conclusions of Law, and bases for the exercise of its discretion in connection with this determination.

### Findings of Fact[4]

After an evidentiary hearing,[5] the Court makes the following Findings of Fact.

*1. Background*

GM is primarily engaged in the worldwide production of cars, trucks, and parts. It is the largest Original Equipment Manufacturer ("**OEM**") in the U.S., and the second largest in the world.

GM has marketed cars and trucks under many brands—most of them household names in the U.S.—including Buick, Cadillac, Chevrolet, Pontiac, GMC, Saab, Saturn, HUMMER, and Opel. It operates in virtually every country in the world.

GM maintains its executive offices in Detroit, Michigan, and its major financial and treasury operations in New York, New York. As of March 31, 2009, GM employed approximately 235,000 employees worldwide, of whom 163,000 were hourly employees and 72,000 were salaried. Of GM's 235,000 employees, approximately 91,000 are employed in the U.S. Approximately 62,000 (or 68%) of those U.S. employees were represented by unions as of March 31, 2009. The UAW represents by far the largest

---

[4]    To avoid making this lengthy decision even longer, the Court has limited its citations in its Findings of Fact to those matters where they are most useful.

[5]    In accordance with the Court's Case Management Order #1, direct testimony was presented by affidavit and cross-examination and subsequent questioning proceeded live. After cross-examination, the Court found all witnesses credible, and takes their testimony as true.

4

bankruptcy judge in this District is not, strictly speaking, binding on another, it is the practice of this Court to grant great respect to the earlier bankruptcy court precedents in this District,[19] particularly since they frequently address issues that have not been addressed at the Circuit level.

Here this Court has the benefit of the decisions of Bankruptcy Judge Gonzalez in the *Chrysler* chapter 11 cases[20]—affirmed by the Second Circuit, for substantially the reasons Judge Gonzalez set forth in his opinion—on facts extraordinarily similar to those here.[21] Even more importantly, this Court also has the benefit of the Second Circuit's decisions in *Lionel*,[22] *LTV*,[23] *Financial News Network*,[24] *Gucci*,[25] and *Iridium*,[26] which

---

[19] *See*, *e.g.*, *In re Adelphia Communications Corp.*, 359 B.R. 65, 72 n.13 (Bankr. S.D.N.Y. 2007) ("This Court has been on record for many years as having held that the interests of predictability in this District are of great importance, and that where there is no controlling Second Circuit authority, it follows the decisions of other bankruptcy judges in this district in the absence of clear error.").

[20] *See In re Chrysler LLC*, 405 B.R. 84 (Bankr. S.D.N.Y. 2009) ("*Chrysler*"), and 405 B.R. 79 (Bankr. S.D.N.Y. 2009) ("*Chrysler-Standing*") (Gonzalez, J.), *aff'd for substantially the reasons stated in the opinions below*, No. 09-2311-bk (2d Cir. Jun. 5, 2009) ("*Chrysler-Circuit*"), *temporary stay vacated and further stay denied*, 129 S.Ct. 2275 (Jun. 9, 2009).

[21] Though the similarities between this case and *Chrysler* are many, there is a noteworthy difference, as that case had one issue not before the Court here. In *Chrysler*, Judge Gonzalez had to analyze rights of participants in a secured lending facility who quarreled with their administrative agent's decision to consent to a sale free and clear of secured creditor claims and interests. *See Chrysler*, 405 B.R. at 100-104. Here there was no objection by secured creditors, other than a single limited objection by a secured creditor with a lien on property to be transferred, looking for adequate protection as part of the sale. Here the objecting bondholders are holders of *unsecured* debt, and thus lack the greater rights that secured creditors have in bankruptcy cases. Of course, the *Chrysler* case never really concerned, as some asserted, an assault on secured creditors' rights; it merely involved dissident minority participants in a secured lending facility being bound by the actions of their agent, pursuant to contractual agreements with the agent that they or their predecessors had agreed to.

[22] *Comm. of Equity Sec. Holders v. Lionel Corp.(In re Lionel Corp.)*, 722 F.2d 1063, (2d Cir. 1983) ("*Lionel*").

[23] *Official Comm. of Unsecured Creditors of LTV Aerospace & Defense Co. v. LTV Corp.* (*In re Chateaugay Corp.*), 973 F.2d 141 (2d Cir. 1992) ("*LTV*").

[24] *Consumer News & Bus. Channel P'ship v. Fin. News Network Inc. (In re Fin. News Network Inc.)*, 980 F.2d 165 (2d Cir. 1992) ("*FNN*").

[25] *Licensing By Paolo, Inc. v. Sinatra* (*In re Gucci*), 126 F.3d 380 (2d Cir. 1997) ("*Gucci*").

28

confirm that section 363 sales of major assets may be effected before confirmation, and lay out the circumstances under which that is appropriate. And this Court also can draw upon the Supreme Court's decision in *Piccadilly Cafeterias*,[27] which, while principally addressing other issues, recognized the common practice in chapter 11 cases of selling the bulk of a debtor's assets in a section 363 sale, to be followed by confirmation of a liquidating plan.

In *Chrysler*, Judge Gonzalez discussed at great length the evolution of the law in this area and its present requirements,[28] and this Court need not do so in comparable length. Judge Gonzalez, and the Second Circuit affirming him, dealt with the exact issue presented here: whether under Bankruptcy Code section 363, the bulk of the assets of an estate can be sold before confirmation. As Judge Gonzalez noted, *Lionel*—upon whose standards all of the cases considering pre-confirmation section 363 sales have been based—speaks directly to whether assets of a bankruptcy estate can be sold "out of the ordinary course of business and prior to acceptance and outside of any plan of reorganization."[29]

The *Lionel* court expressly recognized that section 363(b) "seems on its face to confer upon the bankruptcy judge virtually unfettered discretion" to authorize sales out of the ordinary course.[30] And the *Lionel* court further declared that "a bankruptcy judge

---

[26]   *Motorola v. Comm. of Unsecured Creditors (In re Iridium Operating LLC),* 478 F.3d 452 (2d Cir. 2007) ("***Iridium***").

[27]   *Florida Dept. of Revenue v. Piccadilly Cafeterias, Inc.,* --- U.S. ----, ---- n.2, 128 S.Ct. 2326, 2331 n.2, 171 L.Ed.2d 203 (2008) ("***Piccadilly Cafeterias***").

[28]   *See Chrysler*, 405 B.R. at 94-96.

[29]   *Id.* at 94.

[30]   722 F.2d at 1069.

29

While neither section 363 nor any other provision of the Code defines or otherwise mentions "*sub rosa*" plans, or provides that they are impermissible, caselaw (including caselaw in this Circuit and District) recognizes the impropriety of *sub rosa* plans in instances in which they genuinely exist.[63] The idea underlying the prohibition against *sub rosa* plans appears in *Braniff*, the case from which the prohibition emerged. It is that "the debtor and the Bankruptcy Court should not be able to short circuit the requirements of Chapter 11 for confirmation of a reorganization plan by establishing the terms of the plan *sub rosa* in connection with a sale of assets."[64] A proposed 363 sale may be objectionable, for example, when aspects of the transaction dictate the terms of the ensuing plan or constrain parties in exercising their confirmation rights,[65] such as by placing restrictions on creditors' rights to vote on a plan.[66] A 363 sale may also may be objectionable as a *sub rosa* plan if the sale itself seeks to allocate or dictate the distribution of sale proceeds among different classes of creditors.[67]

But none of those factors is present here. The MPA does not dictate the terms of a plan of reorganization, as it does not attempt to dictate or restructure the rights of the creditors of this estate. It merely brings in value. Creditors will thereafter share in that

---

[63] *See Iridium*, 478 F.3d at 466 (citing *Pension Benefit Guar. Corp. v. Braniff Airways, Inc. (In re Braniff Airways, Inc)*, 700 F.2d 935, 940 (5th Cir. 1983); *Chrysler,* 405 B.R. at 95-96.

[64] 700 F.2d at 940.

[65] *See Abel v. Shugrue (In re Ionosphere Clubs, Inc.)*, 184 B.R. 648, 654 & n.6 (S.D.N.Y. 1995).

[66] *See Official Comm. of Unsecured Creditors v. Cajun Elec. Power Coop., Inc. (In re Cajun Elec. Power Coop, Inc.)*, 119 F.3d 349, 354 (5th Cir. 1997).

[67] *See Contrarian Funds, LLC v. Westpoint Stevens Inc. (In re Westpoint Stevens Inc.)*, 333 B.R. 30, 51 (S.D.N.Y. 2005) (Swain, J.).

42

value pursuant to a chapter 11 plan subject to confirmation by the Court. A transaction contemplating that does not amount to a *sub rosa* plan.[68]

In the *TWA* chapter 11 case,[69] substantially all of the airline's assets were sold to American Airlines, in a 363 sale. There too the contention was made that the 363 sale was a *sub rosa* plan. Judge Walsh rejected the contention. He explained:

> It is true, of course, that TWA is converting a group of volatile assets into cash. It may also be true that the value generated is not enough for a dividend to certain groups of unsecured creditors. *It does not follow, however, that the sale itself dictates the terms of TWA's future chapter 11 plan.* The value generated through the Court approved auction process reflects the market value of TWA's assets and the conversion of the assets into cash is the contemplated result under § 363(b).[70]

Here the objectors principally base their arguments on things the *Purchaser* intends to do. They complain of the Purchaser's intention, in connection with the 363 Transaction, to

    (i) be assigned substantially all executory contracts with direct suppliers,

    (ii) make offers of employment to all of the Debtors' nonunionized employees and employees represented by the UAW, and

---

[68] *See In re Naron & Wagner, Chartered*, 88 B.R. 85, 88 (Bankr. D. Md. 1988) (the "sale proposed here is not a *sub rosa* plan because it seeks only to liquidate assets, and the sale will not restructure [the] rights of creditors.").

[69] *See In re Trans World Airlines, Inc.*, 2001 WL 1820326, at *11 (Bankr. D. Del. Apr. 2, 2001) (Walsh, J.).

[70] 2001 WL 1820326, at *12 (emphasis added).

43

(iii) be assigned a modified collective bargaining agreement with the UAW, including an agreement to contribute to the New VEBA to fund retiree medical benefits for UAW members and their surviving spouses.

But these do not give rise to a *sub rosa* plan when the first is merely an example of an element of almost *every* 363 sale (where purchasers designate the contracts to be assumed and assigned), and the second and third are actions by the *Purchaser*.

The Court senses a disappointment on the part of dissenting bondholders that the Purchaser did not choose to deliver consideration to them in any manner other than by the Purchaser's delivery of consideration to GM as a whole, pursuant to which bondholders would share like other unsecured creditors—while many supplier creditors would have their agreements assumed and assigned, and new GM would enter into new agreements with the UAW and the majority of the dealers. But that does not rise to the level of establishing a *sub rosa* plan. The objectors' real problem is with the decisions of the Purchaser, not with the Debtor, nor with any violation of the Code or caselaw.

Caselaw also makes clear that a section 363(b) sale transaction is not objectionable as a *sub rosa* plan based on the fact that the purchaser is to assume *some*, but not all, of the debtor's liabilities, or because some contract counterparties' contracts would not be assumed. As Judge Walsh observed in *TWA*:

> [N]othing in § 363 suggests that disparate treatment of creditors, such as is likely to occur here, disqualifies a transaction from court approval. The purpose of a § 363(b) sale is to transform assets . . . into cash in an effort to maximize value. *Distribution of the value generated in accordance with § 1129 and other priority provisions occurs and is intended to occur subsequent to the sale*.

He further stated:

44