# EXHIBIT E
# Bierman Decl.

Harvey R. Miller
Stephen Karotkin
Joseph H. Smolinsky
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------x
:
**In re**                                 :          **Chapter 11 Case No.**
: 
**GENERAL MOTORS CORP.**, *et al.*,     :          **09-_____ (___)**
:
               **Debtors.**        :          **(Jointly Administered)**
:
-----------------------------------------------------------------x

**DEBTORS' MOTION PURSUANT TO 11 U.S.C. §§ 105, 363(b), (f), (k), AND (m),**
**AND 365 AND FED. R. BANKR. P. 2002, 6004, AND 6006, TO (I) APPROVE**
**(A) THE SALE PURSUANT TO THE MASTER SALE AND PURCHASE AGREEMENT**
**WITH VEHICLE ACQUISITION HOLDINGS LLC, A U.S. TREASURY-SPONSORED**
**PURCHASER, FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND OTHER**
**INTERESTS; (B) THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY**
**CONTRACTS AND UNEXPIRED LEASES; AND (C) OTHER RELIEF;**
**AND (II) SCHEDULE SALE APPROVAL HEARING**

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

General Motors Corporation ("GM") and certain of its subsidiaries, as

debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors"

or the "Company"), respectfully represent:

**Overview**

1.    By this Motion, the Company seeks entry of two orders.  First, the

Company requests entry of an order (the "Sale Procedures Order"), pursuant to 11 U.S.C.

§§ 105(a) and 363 and Fed. R. Bankr. P. 2002 and 6004, (i) authorizing and approving

certain proposed procedures to govern the sale process and provide for the submission of

any competing bids for substantially all the Debtors' assets and the form and manner of

notices of (a) the hearing to consider authorization and approval of the sale, (b) the

assumption and assignment of executory contracts and unexpired leases of personal

property and of nonresidential real property (collectively, the "Leases") pursuant to 11

U.S.C. § 365, and (c) the approval of the UAW Retiree Settlement Agreement,[1] and (ii)

setting a hearing to consider the sale on June 30, 2009.  Second, subject to the terms of

the Sale Procedures Order and the entry of an order (the "Sale Order"), pursuant to 11

U.S.C. §§ 105, 363(b), (f), and (m), and 365 and Fed. R. Bankr. P. 6004 and 6006,

authorizing and approving, among other things, (i) the sale of the Debtors' assets

pursuant to the proposed Master Sale and Purchase Agreement and related agreements

(the "MPA") among the Debtors (the "Sellers") and Vehicle Acquisition Holdings LLC

(the "Purchaser"), a purchaser sponsored by the United States Department of the

Treasury (the "U.S. Treasury"), free and clear of liens, claims, encumbrances, and other

interests (the "363 Transaction"), (ii) the assumption and assignment of certain executory

contracts and Leases, and (iii) the approval of UAW Retiree Settlement Agreement.

2.    The instant Motion requests approval of a sale transaction that

embodies the objective of the Debtors to implement the only available means to preserve

and maximize the value, viability, and continuation of the Company's business and, by

extension, preserve and provide jobs for the Company's employees and others and

---

[1] Capitalized terms not otherwise defined herein have the meanings ascribed thereto in the MPA and/or the Affidavit of Frederick A. Henderson Pursuant to Local Bankruptcy Rule 1007-2, filed contemporaneously herewith.

enhance the interests of its economic stakeholders through a sale that is made possible only because it also is a critical element of the program adopted by the United States Government to preserve the domestic automotive industry. The result of the sale will be the continuation of the business represented by the assets to be sold that will make the Purchaser (sometimes referred to as "New GM") a lynchpin of the domestic automotive industry so this nation once again can assume its place as the domicile of one of the leading automotive manufacturers in the world. The proposed sale is the only viable alternative that will permit the realization of the going concern value of the assets to be sold and effect the transformation of the Purchased Assets to be the foundation for an efficient, productive, and economically viable business that will be competitive and a source of pride and employment for hundreds of thousands of workers. At the same time, it will avoid systemic failure in the automotive industry and other sectors of the economy as well as offer hope for thousands of other businesses and their employees that supply or otherwise are dependent upon the Company, together with the countless communities in which those businesses and their employees are located.

3.    These chapter 11 cases are the result of the economic collapse and liquidity crisis that began to surface during the end of 2007 and exploded in 2008 that materially and adversely affected the Debtors' business. Prior to the commencement of these chapter 11 cases, the exigent economic circumstances compelled the Company to seek financial assistance from the federal government in order to sustain its operations and avoid a potentially fatal systemic failure, a failure that would have prejudiced not only the Company itself, but also other entities and hundreds of thousands of persons employed by them in the automotive industry.

4.      As GM's largest secured creditor, the United States Government has dedicated substantial time and effort negotiating with the Company to preserve the going concern value of the GM enterprise to achieve the objectives noted above in the national interest.  The transaction for which this Motion seeks approval is the result of those efforts.

5.      The success of an automotive manufacturing company depends on the ultimate retail sale of the vehicles it manufactures.  Consumers must have confidence in GM's products, i.e., that a new GM will exist in the future so that it can stand behind its products.  It is in this context that the timing of the transformation of the assets, in connection with the approval of the sale, becomes critical.

6.      To instill confidence on the part of consumers, employees, suppliers, and other stakeholders that a New GM – one that is viable and competitive – will quickly emerge from bankruptcy, the proposed sale of substantially all of the Company's assets to the Purchaser under 11 U.S.C. § 363 must be expeditiously pursued and approved.  Implementation of the sale will best serve the interests of the Company's economic stakeholders, as the only other alternative will result in little or no recoveries from the Company's assets as well as severe economic consequences for the domestic automotive industry and the nation.

7.      New GM, to be established under the 363 Transaction, will be a new, reshaped business that is not entangled by financial and operating distress or bankruptcy and that (a) will be competitive and profitable, both here and abroad, (b) will demonstrate to consumers the existence of a viable business that manufactures competitive and attractive products, (c) satisfies the goals of the U.S. Government, and

economic conditions and the credit crunch that has negatively affected the Company.  As described in the Henderson Affidavit, the Company has expended significant time and effort exploring numerous operational, financing, and other transactional options regarding how to best transform its obligations and, if necessary, its operations to create a more efficient, productive, and viable business that would be competitive in the industry.

32.    The financial and operational distress confronting the Company has been well publicized.  It has been, and continues to be, the subject of substantial media attention.  The decline in the value of GM's shares of common stock from $93.62 per share as of April 28, 2000 to $1.09 per share as of May 15, 2009, and the dramatic decrease in market capitalization of approximately $59.5 billion, is illustrative of the public market's appreciation of GM's distress.  The basic elements of the 363 Transaction likewise have been widely reported.  Notwithstanding, there have been no credible proposals to purchase or invest in any of the Company's assets or to purchase the Company's total business.

33.    The 363 Transaction is the only realistic alternative for the Company to avoid liquidation of its assets that would severely undermine the automotive industry.  The 363 Transaction preserves the value of the Purchased Assets and the benefits that result from the ongoing business operations.  The Purchaser is the only entity capable of purchasing the Purchased Assets and closing the 363 Transaction.

## Time Is of the Essence

34.    The Debtors, their employees and creditors, and others that rely upon the Company's continuing business will suffer immediate and irreparable harm if the 363 Transaction is not approved on an expedited basis.  The immediate

considering sale outside plan of reorganization, "'a bankruptcy judge must not be shackled with unnecessarily rigid rules when exercising the undoubtedly broad administrative power granted him under the [Bankruptcy] Code'") (quoting *Lionel* at 1069); *see also Licensing By Paolo, Inc. v. Sinatra* (*In re Gucci*), 126 F.3d 380, 387 (2d Cir. 1997) ("A sale of a substantial part of a Chapter 11 estate . . . may be conducted if a good business reason exists to support it."); *Official Comm. of Unsecured Creditors of LTV Aerospace & Defense Co. v. LTV Corp.* (*In re Chateaugay Corp.*), 973 F.2d 141, 144 (2d Cir. 1992) (approval of subsidiary's sale of its assets before confirmation of plan was not abuse of discretion).

62.     The 363 Transaction is the best and only way for the Company's assets to retain going concern value, provide employment opportunities, and create a viable domestic OEM in the interests of all stakeholders.  New GM, which will emerge from the 363 Transaction, will have the ability to successfully compete with other OEMs both in this nation and abroad.

63.     As the Company's largest secured creditor, the U.S. Treasury, and recently together with EDC, engaged in arm's-length negotiations with the Debtors in the formulation of the 363 Transaction and its financing.  As a secured creditor and a financer, the U.S. Treasury together with EDC have set out a series of actions and conditions that the Company had to undertake before they would provide further financing.  As set forth in the Henderson Affidavit, the Company explored various options in its attempt to achieve long-term viability.  The Company determined that it is in the best interests of all economic stakeholders to pursue the 363 Transaction  as the only viable means to accomplish the survival of an operating, economically sound

86.     Section 363(m) *of* the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

87.     The terms and provisions of the MPA were negotiated by the Sellers and the Purchaser at arm's length, without *collusion*, and in good faith.  The MPA represents substantial value to the Debtors and provides for fair consideration for the Purchased Assets.  Moreover, the Purchaser does not hold any interests in the Debtors. The Purchaser's sponsor is the holder of secured claims and will provide DIP financing for the Debtors' chapter 11 cases as well as financing of New GM.  In addition, it will be the majority holder of equity interests in New GM.  The Purchaser and its sponsor are not affiliated with the Debtors, their officers, or directors.

88.     Accordingly, the *Purchaser* should be found to be acting in good faith and entitled to the protections afforded under section 363(m).

**<u>The Appointment of a Consumer Privacy Ombudsman Is Necessary</u>**

89.     Section 363(b)(1) of the Bankruptcy Code provides that if the Debtors "in connection with offering a product or a service discloses to an individual a policy prohibiting the transfer of personally identifiable information about individuals [and] such policy is in effect on the date of the commencement of the case," then the Debtors "may not sell . . . personally identifiable information to any person unless" the sale is "consistent with such policy" or a "consumer privacy ombudsman" is appointed.