# EXHIBIT G

# Bierman Decl.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x
: 
**In re**                                                  :    **Chapter 11 Case No.**
                                                           :
**GENERAL MOTORS CORP.,** *et al.*,                        :    **09-_____ (    )**
                                                           :
**Debtors.**                                               :    **(Jointly Administered)**
                                                           :
------------------------------------------------------------x

### AFFIDAVIT OF FREDERICK A. HENDERSON
### PURSUANT TO LOCAL BANKRUPTCY RULE 1007-2

STATE OF NEW YORK          )
                           )    ss:
COUNTY OF NEW YORK         )

    Frederick A. Henderson, being duly sworn, hereby deposes and says:

    1.  I am the President, Chief Executive Officer, and a Director of General Motors Corporation, a Delaware corporation ("GM"), which together with its wholly-owned direct subsidiaries, Chevrolet-Saturn of Harlem, Inc. ("Chevrolet-Saturn") and Saturn, LLC ("Saturn"), and GM's wholly-owned indirect subsidiary Saturn Distribution Corporation ("Saturn Distribution"), are the debtors in the above-captioned chapter 11 cases (collectively, the "Debtors"). I submit this affidavit (the "Affidavit") pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York (the "Local Rules") to assist the Court and other parties in interest in understanding the circumstances that compelled the commencement of these chapter 11 cases and in support of (i) the Debtors' petitions for relief under chapter 11 of title 11, United States Code (the "Bankruptcy Code"), filed on the date hereof (the "Commencement Date"), (ii) the relief requested in the motions and applications that the Debtors have filed with the Court, including, but not limited to, the "first day motions," and

was appointed GM's President and Chief Operating Officer, which position I held until being appointed to my current position. I am familiar with and involved in the day-to-day operations, businesses, and financial affairs of the Debtors.

4. Except as otherwise indicated, all facts set forth in this Affidavit are based upon my personal knowledge, my discussions with other members of GM's senior management, my review of relevant documents, or my opinion based upon my extensive personal experience, knowledge, and information concerning GM's worldwide operations and financial affairs and the automotive industry. If called upon to testify, I would testify competently to the facts set forth in this Affidavit. I am authorized to submit this Affidavit on behalf of GM.

5. The Debtors have filed the 363 Motion because there simply is *no* viable alternative to the 363 Transaction to preserve the going concern value of the GM business and the employment opportunities and related benefits of that business. There is no other sale, or even other potential purchasers, present or on the horizon. There is no other source for debtor in possession ("DIP") financing even under the expedited process that is a condition to the instant proposal, let alone under a traditional chapter 11 process. In the face of the global meltdown of the financial markets, and a liquidity crisis unprecedented in GM's 100 year history, there is only one way to maximize the value and permit the survival of GM's business and save hundreds of thousands of jobs associated with not only GM, but also its vast supplier and dealer networks: these chapter 11 cases and the prompt approval of the 363 Transaction. The only other alternative is the liquidation of the Debtors' assets that would (i) substantially diminish the value of GM's business and assets, (ii) throw hundreds of thousands of persons out of work and cause the termination of health benefits and jeopardize retirement benefits for current and former employees and their families; (iii) benefit no interested economic stakeholder, and (iv) yield

noteholders and other unsecured creditors no recovery. Approval of the 363 Transaction must be prompt in order to accomplish its goals – to sell substantially all the assets of the Debtors as a going concern to a purchaser sponsored by the United States Department of the Treasury (the "U.S. Treasury") that will assure the ongoing operation of a competitive and profitable automotive company.

6.  Sections I through IV of this Affidavit describe the nature of GM's business; the events that led to the commencement of these chapter 11 cases; the rationale for and structure of the proposed 363 Transaction (including the urgent need for its expeditious consummation); and the capital structure of the Debtors. Section V identifies the attached schedules of information required by Local Bankruptcy Rule 1007-2.

## I.

## Overview

7.  For over one hundred years, GM and its approximately 463 direct and indirect wholly-owned subsidiaries (collectively, the "Company"), have been a major component of the United States manufacturing and industrial base, as well as the market leader in the United States automotive industry. GM has employed -- and provided health and retirement benefits to -- millions of dedicated workers over the years. Both directly and as a customer of literally thousands of businesses that supply GM, the Company played a significant role in the development of a strong middle class in the United States. The Company has been a source of pride for generations of American workers whose hard work and creativity helped fuel GM's global expansion as a full line manufacturer of cars, trucks, and related products. GM has also been instrumental in the United States becoming the world's major economic force.

15. Equally important, in the context of the 363 Transaction, the U.S. Treasury is willing to provide DIP financing. There are *no* other sources with either the financial wherewithal or willingness to provide such financing. The U.S. Government has stated it will not provide DIP financing absent the 363 Transaction. Without such financing, these cases quickly will plunge into a liquidation, with the concomitant loss of value, employment, and systemic failure necessarily attendant thereto.

16. For these reasons, the 363 Transaction, as embodied in the proposed Master Sale and Purchase Agreement among GM and its Debtor subsidiaries (the "Sellers") and Vehicle Acquisition Holdings LLC (the "Purchaser"), a purchaser sponsored by the U.S. Treasury, dated as of June 1, 2009 (the "MPA"), reflects the good faith business judgment of GM's Board that the 363 Transaction is the best, indeed, the only, viable means to save and carry forward GM's business in a new enterprise ("New GM") that will maximize and realize the going concern value of the Company's assets. The MPA is the product of intense negotiations among the Debtors, the U.S. Government, the Debtors' largest secured creditor, and the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (the "UAW") (on behalf of current and retired employees) -- each of which recognizes the need to maximize the value of the Debtors' operating assets and provide for the continuation of the business. Each of the U.S. Government and the UAW has made significant concessions to enable the sale and to support the viability of the Purchaser. The 363 Transaction: (i) accomplishes the goals of the Company; (ii) prevents the inevitable meltdown of the domestic automotive industry; and (iii) creates an enterprise that will be competitive and profitable. In addition, both the Government of Canada and the Government of Ontario, through Export Development Canada ("EDC"), Canada's export trading agency, have recognized the urgent

need to facilitate the 363 Transaction and have agreed to provide approximately $9 billion in financing to support the long-term viability of GM's North American operations.  The 363 Transaction will alleviate consumers' concerns about residual value, replacement parts, warranty obligations, and maintenance of GM products that are critical to the preservation of the value of the assets.  The task is a large one.  GM is committed to getting it done, but it must be *expeditiously* accomplished.

17. As part of the 363 Transaction, the Purchaser, and the UAW have reached a resolution addressing the ongoing provision of certain employee and retiree benefits.  Under the "UAW Retiree Settlement Agreement," the Purchaser has agreed to provide, among other things:  (i) shares of common stock of the Purchaser representing 17.5% of the Purchaser's total outstanding common stock, (ii) a note of the Purchaser in the principal amount of $2.5 billion, (iii) shares of cumulative perpetual preferred stock of the Purchaser in the amount of $6.5 billion, (iv) warrants to acquire 2.5% of the Purchaser's equity, and (v) the assets held in a voluntary employees' beneficiary association trust sponsored by the Sellers and to be transferred to the Purchaser as part of the 363 Transaction, in each case to a new voluntary employees' beneficiary association sponsored by an employees beneficiary association (the "New VEBA"), which will have the obligation to fund certain retiree medical benefits for the Debtors' retirees and surviving spouses represented by the UAW (the "UAW-Represented Retirees").

18. In connection with the foregoing, the UAW has agreed to be the authorized representative for UAW-Represented Retirees for purposes of section 1114 of the Bankruptcy Code and will enter into the UAW Retiree Settlement Agreement effective upon the closing of the 363 Transaction.  The class representatives on behalf of the class members, by and through class counsel in certain class actions previously filed against GM on behalf of UAW-

Represented Retirees regarding retiree health care benefits (the "Class Representatives") have acknowledged and confirmed the UAW Retiree Settlement Agreement. As part of the 363 Transaction, the Purchaser also will assume modified and duly ratified collective bargaining agreements entered into by and between the Debtors and the UAW (the "UAW CBA Assignment").

19. These chapter 11 cases were initiated to preserve the going concern value of the Company's assets and provide for the sale of such assets to the Purchaser to be the anchor for a new era of American automotive innovation and growth. The 363 Transaction will enable New GM to become an engine of opportunity and prosperity for countless Americans. The prompt approval and execution of the 363 Transaction is consistent with President Obama's observation that use of the bankruptcy laws may be the "best chance to make sure that the cars of the future are built where they've always been built -- in Detroit and across the Midwest -- to make America's auto industry in the 21st century what it was in the 20th century -- unsurpassed around the world." Barack H. Obama, U.S. President, Remarks on the American Automotive Industry at 7 (Mar. 30, 2009) [hereinafter *Presidential Remarks*].

## II.

## The Businesses of General Motors

A.   **Overview of GM's Business Operations**

20. The Company is primarily engaged in the worldwide development, production and marketing of cars, trucks, and parts through four automotive segments: GM North America, GM Europe, GM Latin America/Africa/Mid-East, and GM Asia Pacific. For many years, GM supplied at least one in five vehicles sold in the U.S. It is the largest OEM in the U.S. and the second largest in the world. With global revenues of approximately $181.1

billion in 2007, GM ranked ninth on the 2008 Fortune Global 500 list.[2]  In addition, GM's highly-skilled engineering and development personnel designed and manufactured some true automotive icons, including the Corvette, the Camaro, the NorthStar engine, and even the first lunar roving vehicle driven on the moon.  GM continues as a leading global technology innovator.  Currently, it is setting the automotive industry standard for "green" manufacturing methods and products, flexible fuels, and multimode hybrid systems.

21.     GM maintains its executive offices in Detroit, Michigan, and its major financial and treasury operations in New York, New York.

22.     Substantially all of GM's worldwide car and truck deliveries (totaling 8.4 million vehicles in 2008) are marketed through independent retail dealers or distributors.  In addition to the products sold to dealers for consumer retail sales, GM sells cars and trucks to fleet customers, including rental car companies, commercial fleet companies, leasing companies, and governmental units.

23.     As of March 31, 2009, GM employed approximately 235,000 employees worldwide, of whom 163,000 (69%) were hourly employees and 72,000 (31%) were salaried employees.  Approximately 62,000 (68%) of GM's total of approximately 91,000 U.S. employees were represented by unions as of March 31, 2009.  The UAW represents the largest portion of GM's U.S. unionized employees, totaling approximately 61,000 employees.

B.      **GM's Dealer Network**

24.     GM relies heavily on its relationships with dealers, as substantially all retail sales are through its unique network of independent retail dealers and distributors.  As of April 30, 2009, there were 6,099 GM vehicle dealers throughout the United States.  These

---

[2]     Global 500, Fortune, 2008, *available at* http://money.cnn.com/magazines/fortune/global500/2008/.

adversely affected and may be forced to shut down. Moreover, as explained below, there would be no way to obtain replacement parts within a reasonable time period.

27.     Specifically, most parts that a given supplier manufactures for GM are not readily available from alternate sources because of, among other things, (i) capacity constraints within the automotive parts supply industry (including the practice of "sole source suppliers" of many parts and components), (ii) the significant length of time (up to 36 months) it takes to validate safety and environmental regulatory compliance of a new supplier's parts, and (iii) the lead time required to develop and build tools for manufacture of particular parts. As an example, Delphi Corporation ("Delphi"), which is struggling as a debtor in possession in a chapter 11 case pending in this Court, currently provides over 60% of GM's North American steering columns -- almost three million per year. That volume simply cannot be replaced quickly as there is not currently enough excess capacity to accommodate GM's needs or time to validate the parts. The Delphi situation confirms the critical implications to the Debtors of a shutdown of a major supplier.

### D.     GM Is at the Forefront in Technology and Environmental Advances

28.     Energy diversity and fuel economy leadership are material elements of GM's overall business plan. The Company's historic success has been enhanced by its innovative approach to developing an alternative propulsion strategy. From developing plug-in hybrids, lithium-ion battery technology, and clean burning alternative diesel fuels to stability control and the OnStar in-vehicle safety, security, navigation, and communication system, GM has been, and continues to be, in the forefront of the technology revolution. It is one of the largest and most successful investors in automotive research and development in the United States. The Company has a variety of innovations on the path to commercialization that are directly relevant to national goals of energy efficiency, energy independence, and safety. GM is

NY2:\1998176\10\16TSW10!.DOC\72240.0635                13

a world leader in flex fuel technology, with more than 5 million biofuel capable vehicles on the road today.  It is working hard to develop next-generation biofuels, such as cellulosic ethanol and biodiesel, which can be sustainably produced.  GM has introduced a number of hybrid vehicles that meet a variety of consumer needs in terms of fuel efficiency and performance.  Indeed, GM offers twenty models which achieve thirty miles per gallon or more on the highway -- more than any other manufacturer.  In addition, GM is fully committed to improving vehicle fuel economy and lowering greenhouse gas emissions consistent with the new Corporate Average Fleet Economy standards announced by President Obama on May 19, 2009.

### E.    GM's Relationship with the UAW

29.    The Company has tried to reduce the costs of healthcare benefits for its employees, but these costs continue to substantially escalate.  The Company has used trusts qualified as voluntary employee beneficiary associations under section 501(c)(9) of the Internal Revenue Code of 1986, as amended, and sponsored by the Company or a union (each, a "VEBA"), as a funding vehicle to hold reserves to meet its future obligations to provide healthcare and life insurance benefits ("OPEB") under certain benefit plans to its salaried and hourly employees upon retirement.

30.    To restructure its retiree healthcare liability, in 2006 GM negotiated a settlement of a legal dispute regarding retiree medical benefits with the UAW and the Class Representatives  (the "2006 UAW Settlement Agreement"), under which the Company significantly  reduced its OPEB liabilities for healthcare benefits for existing UAW retirees but agreed to continue to provide benefits under an amended GM sponsored retiree health care benefit plan (the "2005 Benefit Plan").  Under the 2006 UAW Settlement Agreement, the Company also agreed to mitigate the cost to retirees of the 2005 Benefit Plan by funding  a new,

When the Exchange Offer was launched, GM understood that at least 90% of the aggregate principal amount of the outstanding bonds, including at least 90% of the aggregate principal amount of the outstanding Series D Notes, were required to be tendered in the Exchange Offer in order to achieve a sufficient level of debt reduction to meet the viability requirement. Consummation of the Exchange Offer was also conditioned on, among other things, the conversion to equity of (i) at least 50% of GM's outstanding U.S. Treasury debt at June 1, 2009 (approximately $10 billion) and (ii) at least 50% (or approximately $10 billion) of GM's future financial obligations to the New VEBA, for a total projected additional debt reduction of approximately $20 billion.

73.     The Exchange Offer expired on May 26, 2009 without achieving the threshold of required tendered acceptances.

I.     **The 363 Transaction and the MPA**

74.     In connection with providing financing, the U.S. Treasury advised the Company that, if an out-of-court restructuring was not possible, the Company should consider pursuing the bankruptcy process to implement a transaction under which substantially all the assets of the Company would be purchased by a U.S. Treasury-sponsored purchaser (subject to any higher or better offer) in an expedited process under section 363 of the Bankruptcy Code. Under this scenario, the Purchaser would acquire the purchased assets, create a New GM, and operate New GM free of any entanglement with the bankruptcy cases, and thereby preserve the going concern value, avoid systemic failure, provide employment, protect the many communities dependent upon the continuation of the business, and restore consumer confidence.

75.     To facilitate this process, the U.S. Treasury agreed that it would provide DIP financing for the Company through the chapter 11 process -- but *only* if the sale of the purchased assets occurred on an *expedited* basis. Notably, both the Government of Canada and

the Government of Ontario, through the EDC, have agreed to participate in the DIP financing to assure the long-term viability of GM's North American enterprise, to (i) preserve value of the business and restore consumer confidence, and mitigate the devastating damage that GM itself, and the industry, would suffer if GM's major business operations were to remain in bankruptcy; and (ii) avoid the enormous costs of financing a lengthy chapter 11 case.  The extent of the Canadian participation will be approximately $9.1 billion.  The U.S. Treasury also agreed that it would provide New GM with adequate post-acquisition financing that would further GM's long-term viability.  A fundamental premise of the U.S. Treasury program is to revive consumer confidence in GM products and services for the benefit of the Company's employees, its extended supplier and dealer network, and the families and communities that depend on GM operations.  In the end, a New GM will emerge that will be viable, competitive, reliable, and a standard bearer for a basic U.S. industry.  Importantly, the DIP financing to be furnished by the U.S. Treasury is the only financing that is available to the Company.  The U.S. Treasury is the *only* entity that is willing to extend DIP financing to the Company.  Other efforts to obtain such financing were unsuccessful.  Absent adequate DIP financing, the Company will have no choice but to liquidate.[7]

      76.     The purchase and transfer of the Purchased Assets under the MPA is a material element of the U.S. Treasury program to revitalize the domestic automotive industry and is the product of intense negotiations between the Debtors and their key stakeholders, including the U.S. Treasury and the UAW.  The 363 Transaction, as embodied in the MPA,

---

[7] The terms and conditions of the DIP financing are set forth in the Debtors' Motion for For Entry Of An Order Pursuant To 11 U.S.C. §§ 361, 362, 363, and 364 (A) Authorizing The Debtors To (I) Obtain Postpetition Financing, Including On An Immediate, Interim Basis Pursuant To Bankruptcy Rule 6003; (II) Grant Adequate Protection To The DIP Lenders; (III) Utilize Cash Collateral Of The U.S. Treasury; (IV) Use Estate Property To Repay Certain Secured Obligations In Full Within 45 Days Of The Commencement Date, And (V) Provide Adequate Protection To The U.S. Treasury, And (B) Scheduling a Final Hearing Pursuant To Bankruptcy Rule 4001, filed contemporaneously herewith and incorporated herein as if fully set forth herein.

contemplates that substantially all of GM's core operating assets -- assets that are essential for New GM to be a profitable and competitive operating entity (including the capital stock of the majority of its subsidiaries) -- will be sold and transferred to the Purchaser, which can immediately begin operations. Knowing that the Company's business will exist and be supported in the form of New GM, consumers can have confidence that if they buy a GM car, there will be a dealer network and U.S. Government support to assure parts, warranty service, and a market for future used GM vehicle trade-ins. Indeed, a viable company will help preserve and support jobs and benefits, not only for the Company's employees, but also for GM's supplier and dealer employees, all of which will help support the market for GM vehicles.

77. The purchase price for the Purchased Assets is equal to the sum of:

- a section 363(k) credit bid in an amount equal to the amount of indebtedness owed to the Purchaser as of the closing pursuant to the UST Credit Facilities (as defined in the MPA) and the DIP Facility, less approximately $7.7 billion of indebtedness under the DIP Facility (estimated to be $48.7 billion at July 31, 2009);

- the warrant previously issued by GM to the U.S. Treasury;

- the issuance by the Purchaser to the Debtors of 10% of the common stock of the Purchaser as of the closing;

- Warrants to purchase up to 15% of the shares of common stock of the Purchaser, with the initial exercise prices for equal amounts of the warrants based on $15 billion and $30 billion equity values of the Purchaser. The warrants will be exercisable through the seventh and tenth anniversaries of issuance, respectively, and GM can elect partial and cashless exercises; and

- the assumption by the Purchaser of the Assumed Liabilities.

In addition, in the event the Bankruptcy Court determines that the estimated amount of allowed prepetition general unsecured claims against the Debtors exceeds $35 billion, then the Purchaser will issue an additional 2% of the outstanding common stock of Purchaser as of the closing.

78. In negotiating the 363 Transaction, GM implemented a bottoms-up, "clean sheet" approach to determine the assets to be sold to New GM and the obligations that had to be

assumed as necessary to maximize the value and viability of New GM for the benefit of its economic stakeholders. For example, it is imperative to the success of New GM that consumers have confidence in its products. As such, liabilities such as warranties, customer incentive contracts, and necessary supplier contracts are being assumed by New GM as part of the 363 Transaction.

79.     Any payments that are made to the Debtors' creditors in connection with the 363 Transaction (other than payments of Cure Amounts in connection with the assumption and assignment of Purchased Contracts) will be voluntarily made by New GM.

80.     The assets excluded from the sale -- as well as the proceeds of the sale, such as 10% of the equity interests in New GM -- will be administered in the chapter 11 cases to support the liquidation of assets, wind-down, or other disposition of the Debtors' chapter 11 cases. After the closing, the Purchaser or one or more of its subsidiaries will provide the Debtors and any retained subsidiaries with transition services as described in the MPA to help liquidate and wind down or otherwise dispose of the assets that are not sold to the Purchaser.

81.     Finally, as part of the 363 Transaction, and as described below, the Purchaser will make contributions to the New VEBA that will provide retiree health and welfare benefits to former UAW employees and their spouses. Also, as part of the 363 Transaction, the Purchaser will be the assignee of revised collective bargaining agreements with the UAW, the terms of which were recently ratified.

### J.     Expedited Approval of the 363 Transaction Is Essential

82.     The need for speed in approving and consummating the 363 Transaction is critical for several reasons. Most obvious -- the U.S. Treasury has made very clear that it will sponsor New GM as the purchaser and fund the chapter 11 cases only if the 363 Transaction is approved by July 10, 2009. As explained below, the assets that will be sold -- that is, not merely

the physical assets, but the value of and consumer confidence in the GM brand and its products and support systems (including parts, warranty service, and a market for used vehicles) -- are fragile and will be subject to significant value erosion unless they are expeditiously transferred to New GM and its operations start free from the stigma of bankruptcy.  Any delay will result in irretrievable revenue perishability and loss of market share to the detriment of all economic interests.  It will exacerbate and entrench consumer resistance to General Motors' products.  *There is no other alternative.*  No other DIP financing source.  No other buyer for the business.

    *Consumers*

    83. New GM needs to sell cars and trucks.  Consumers must have confidence that, in buying a GM car or truck, they will receive not only value and reliability, but also warranty protection and future parts and servicing through an integrated dealer system.  The purchase or lease of a new car or truck represents the second largest expenditure (after a home purchase) of a typical American household.  Buying a car is a major, and often discretionary, economic and emotional event for a customer -- but once a consumer buys a vehicle and is satisfied, including if it involves a change in brand, the consumer's brand loyalty shifts as well, and can be expected to continue for years or even decades.  The significance of consumer perception cannot be overstated, particularly in light of the crisis of confidence that has permeated the economy, and with particular impact on GM and Chrysler, since September 2008.  Uncertainty about the future success of New GM, therefore, must be dissipated quickly.  But it will be aggravated, not dissipated, if GM's business and future must continue in the limbo of a prolonged chapter 11.

    84. The risks to GM of a prolonged chapter 11 process are patent.  Information compiled by, or at the direction of, the Company confirms that the mere threat of a

thousands of dealerships to survive, while providing for an orderly wind-down of those dealerships not being retained. The alternative to the exercise of sound business judgment is that the Company would liquidate – and *all* dealerships would cease to be GM dealerships, including the approximately 4,000 dealerships that otherwise are contemplated to continue to operate under New GM.

96.  The major predicate for the 363 Transaction, including, most importantly, the U.S. Treasury's willingness to continue financing the Company's operations during and after the sale and transfer of the Purchased Assets, is dependent upon the expeditious approval of the Sale Motion. It is the *sine qua non* of protecting the Company's market share brand credibility and to avoid further consumer support erosion. Delay will result in additional dealership closings well beyond those currently envisioned. More than half of the Company's entire dealership network may be undercapitalized because of the significant recent decline in sales and revenue as the shadow of bankruptcy loomed large over GM. The 363 Transaction will enable alleviation of that condition.

### K.     The 363 Transaction Is the Only Credible Alternative To a Liquidation of the Company

97.  The 363 Transaction is the only remaining alternative to save the Company's operations and prevent the immediate liquidation of GM and the catastrophic impact on the economy that will result from the loss of hundreds of thousands of jobs if the GM assets and business are not sold and transferred as proposed. No other potential buyer of GM's business has come forward. No entity other than the U.S. Government has the wherewithal to provide the billions of dollars needed for DIP financing and the financing of New GM.

98.  The only alternative to the 363 Transaction is a liquidation of the Debtors' assets -- a process that will severely reduce the value of the Company's assets to the prejudice of