UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------x
                                                      :
In re                                                 :        Chapter 11
                                                      :
MOTORS LIQUIDATION COMPANY, *et al.*,                 :        09-50026 (REG)
        f/k/a General Motors Corp., *et al.*          :
                                                      :
                                Debtors.              :        (Jointly Administered)
                                                      :
----------------------------------------------------------------x

BENCH DECISION[1] ON OBJECTIONS TO
CONFIRMATION

APPEARANCES:

WEIL, GOTSHAL & MANGES LLP
*Attorneys for Debtors and Debtors in Possession*
767 Fifth Avenue
New York, New York 10153
By:    Harvey R. Miller, Esq.
       Stephen Karotkin, Esq. (argued)
       Joseph H. Smolinsky, Esq. (argued)
       Michele J. Meises, Esq.
       Pablo Falabella, Esq.

1300 Eye Street NW, Suite 900
Washington, DC 20005-3314
By:    David R. Berz, Esq.

KRAMER LEVIN NAFTALIS & FRANKEL LLP
*Counsel for the Official Committee*
  *of Unsecured Creditors*
1177 Avenue of the Americas
New York, New York 10036
By:    Thomas Moers Mayer, Esq. (argued)
       Robert Schmidt, Esq.

---

[1]     I use bench decisions to lay out in writing decisions that are too long, or too important, to dictate
in open court, but where the circumstances do not permit more leisurely drafting or more extensive
or polished discussion. Because they often start as scripts for decisions to be dictated in open
court, they typically have a more conversational tone.

BUTZEL LONG, PC
*Special Counsel for Official Committee*
  *of Unsecured Creditors*
380 Madison Avenue, 22nd Floor
New York, New York  10017
By:    Barry N. Seidel, Esq. (argued)

CAPLIN & DRYSDALE, CHARTERED
*Counsel for the Official Committee*
  *of Asbestos Claimant Creditors*
One Thomas Circle, NW, Suite 1100
Washington, DC  20005
By:    Ronald E. Reinsel, Esq. (argued)

STUTZMAN, BROMBERG, ESSERMAN & PLIFKA, PC
*Counsel for Dean M. Trafelet in his*
  *Capacity as the Future Claimants' Representative*
2323 Bryan Street, Suite 2200
Dallas, Texas 75201
By:    Sander L. Esserman, Esq. (argued)
        Robert T. Brousseau, Esq.
        Peter C. D'Apice, Esq.
        Jo E. Hartwick, Esq.

PREET BHARARA
United States Attorney for the
  Southern District of New York
*Counsel for the United States of America*
86 Chambers Street, 3rd Floor
New York, New York  10007
By:    David S. Jones, Esq. (argued)
          Deputy Chief, Civil Division
        Natalie N. Kuehler, Esq. (argued)
          Assistant United States Attorney

UNITED STATES DEPARTMENT OF JUSTICE
*Counsel for the United States of America*
By:    Alan S. Tenenbaum, Esq.
          National Bankruptcy Coordinator
By:    Patrick Casey, Esq.
          Senior Counsel, Environmental Enforcement Section,
          Environment and Natural Resources Division

VEDDER PRICE
   *Counsel for Export Development Canada*
1633 Broadway, 47th Floor
New York, NY  10019
By:   Michael L. Schein, Esq. (argued)

GIBSON, DUNN & CRUTCHER LLP
*Counsel for Wilmington Trust Company,*
   *as Indenture Trustee*
200 Park Avenue, 47th Floor
New York, New York  10166
By:   Matt J. Williams, Esq.  (argued)
       Keith R. Martorana, Esq.

KELLEY DRYE & WARREN LLP
*Counsel for Law Debenture Trust Co. of New York*
   *as Indenture Trustee*
101 Park Avenue
New York, New York  10178
By:   David E. Retter, Esq. (argued)

MORGAN, LEWIS & BOCKIUS LLP
*Counsel for JPMorgan Chase Bank, N.A., as Agent*
101 Park Avenue
New York, NY 10178
By:   Richard S. Toder, Esq. (argued)
       Andrew D. Gottfried, Esq.
       Annie C. Wells, Esq.

ERIC T. SCHNEIDERMAN
   Attorney General of the State of New York
*Counsel for the State of New York and*
   *New York State Department of Environmental Conservation*
The Capitol
Albany, New York 12224-0341
By:   Maureen F. Leary, Esq. (argued)
       Assistant Attorney General

THE WLADIS LAW FIRM, PC
*Counsel for Onondaga County, New York*
P.O. Box 245
Syracuse, NewYork 13214
Telephone: (315) 445-1700
By:     Kevin C. Murphy, Esq.

DEPARTMENT OF LAW
*Counsel for Onondaga County, New York*
John H. Mulroy Civic Center, 19th Floor
421 Montgomery Street
Syracuse, New York 13202
By:     Luis A. Mendez, Esq. (argued)

HARRIS BEACH PLLC
*Counsel for Town of Salina*
100 Wall Street
New York, New York 10005
By:     Eric H. Lindenman, Esq. (argued)

One Park Place, 4th Floor
300 South State Street
Syracuse, New York 13202
By:     Lee Woodard, Esq.

KAMALA HARRIS
Attorney General of California
*Counsel for California Department of Toxic Substances Control*
By:     Margaret Padilla, Esq.
        Olivia W. Karlin, Esq. (argued)

GREENBERG TRAURIG, LLP
*Counsel for Nova Scotia Noteholders Appaloosa Management L.P.,*
  *Aurelius Capital Management, LP,   Elliott Management Corporation,*
  *and Fortress Investment Group LLC*
MetLife Building
200 Park Avenue
New York, New York 10166
By:     Bruce R. Zirinsky, Esq. (argued)
        Nancy A. Mitchell, Esq.
        John H. Bae, Esq.
        Gary D. Ticoll, Esq.

AKIN GUMP STRAUSS HAUER & FELD LLP
*Counsel for Green Hunt Wedlake, Inc., as*
   *Trustee of General Motors Nova Scotia Finance Company*
One Bryant Park
New York, New York 10036
By:     Daniel H. Golden, Esq.
          Philip C. Dublin, Esq. (argued)
          Natalie E. Levine, Esq.

KIRKLAND & ELLIS LLP
*Counsel to New United Motor Manufacturing, Inc.*
601 Lexington Avenue
New York, New York  10022
By:     Richard M. Cieri, Esq.
          Ray C. Schrock, Esq.

555 California Street, 27th Floor
San Francisco, California 94104
By:     Mark E. McKane, Esq. (argued)

ERMAN, TEICHER, MILLER,
ZUCKER & FREEDMAN, P.C.
*Counsel for Centerpoint Associates, LLC*
400 Galleria Officentre, Suite 444
Southfield, MichiganI 48034
By:     Dianne S. Ruhlandt, Esq.

WINDELS, MARX, LANE
& MITTENDORF, LLP
*Counsel for Allstate Insurance Company,*
  *as successor in interest to Northbrook Excess*
  *and Surplus Insurance Company, formerly*
  *Northbrook Insurance Company*
One Giralda Farms – Suite 380
Madison, New Jersey 07940
By:     Stefano V. Calogero, Esq.

BARNES & THORNBURG LLP
*Counsel for M-Heat Investors, LLC*
171 Monroe Avenue, NW, Suite 1000
Grand Rapids, Michigan 49503
By:     Patrick E. Mears, Esq.
          John T. Gregg, Esq.

HANGLEY ARONCHICK SEGAL & PUDLIN
*Counsel for NCR Corporation*
One Logan Square, 27th Floor
Philadelphia, Pennsylvania 19103
By:    Matthew A. Hamermesh, Esq.
         Jacqueline R. Dungee, Esq.

TRACY HOPE DAVIS
   United States Trustee, Region 2
33 Whitehall Street, 21st Floor
New York, NY  10004
By:    Brian S. Masumoto, Esq.

ROBERT E. GERBER
UNITED STATES BANKRUPTCY JUDGE:

 In this contested matter in the chapter 11 cases of debtor Motors Liquidation

Company, formerly known as General Motors Corp. ("**Old GM**") and its affiliates

(collectively, the "**Debtors**"), the Debtors seek confirmation of their chapter 11 plan (the

"**Plan**"). While necessarily complex in aspects of its implementation, the Plan at bottom

is a relatively simple, and classic, liquidating "Pot Plan." Under it, the securities of what

now is called General Motors LLC ("**New GM**") that were brought in under Old GM's

July 2009 sale of its assets (the "**363 Sale**"),[2] and any further value brought in hereafter,

will simply be distributed to Old GM creditors with allowed claims. Additionally

(though importantly from a public interest perspective), substantial cash payments will be

made to implement environmental settlements with the U.S. Government and state

environmental regulators.

 The Plan is very popular with Old GM's creditors, having secured the approval of

97% of them in number, and 85% in dollar amount.[3] Confirmation was affirmatively

supported, on the record, by the Official Committee of Unsecured Creditors (the

"**Creditors' Committee**"); the Official Committee of Holders of Asbestos Claims (the

"**Asbestos Claims Committee**"); the Asbestos Future Claims Representative (the

"**Asbestos Future Claims Rep.**"); the indenture trustees representing the $27 billion in

---

[2]  To avoid making this Decision unnecessarily long, I'm assuming familiarity with the history of
this case. The background appears in my decision on the 363 Sale. *See In re General Motors
Corp.*, 407 B.R. 463, 475-486 (Bankr. S.D.N.Y. 2009) (the "**363 Decision**"), *appeal dismissed and
aff'd*, 428 B.R. 43 (S.D.N.Y. 2010) (Buchwald, J.), and 430 B.R. 65 (S.D.N.Y. 2010) (Sweet, J.).

[3]  It also received 97.8% approval, in each of number and amount, of the class of asbestos injury
claimants, the Debtors' other major unsecured creditor class.

principal amount of Old GM bonds;[4] the governments of Canada and Ontario, through

their Export Development Canada, and the U.S. Government.  And the number of

objections to confirmation (originally 13, thereafter reduced to 5), was very small in the

context of a case that originally had over 37,000 claims, and which, even after claims

disallowances, still has almost $50 billion in claims in amount.

Nevertheless, I still have to rule on the remaining objections[5]—some contending

that further Plan modifications must be made in order to make it confirmable, and some

simply requesting changes in the Plan.[6]

As is increasingly common, the Plan has a feature (the "**Self-Correcting**

**Feature**"), which could be triggered at the Debtors' option, under which the Plan would

be amended to cure any minor impediments to confirmation that might otherwise exist.

That enabled me to orally rule, at the conclusion of the Confirmation Hearing, that the

Plan would be confirmed—though I'd take under advisement objections that might cause

me to require modifications to the Plan.

---

[4]     Wilmington Trust Company ("**Wilmington Trust**"), and Law Debenture Trust Company of New
York ("**Law Debenture Trust**").  Wilmington Trust is the indenture trustee with respect to
$23 billion of that unsecured bond debt.

[5]     The States of New York and California, while objecting to aspects of the Plan, denominated their
objections as "limited" ones, and expressed their support of the Plan (and its related environmental
settlements) as a general matter, with a desire only for certain modifications.

[6]     I also note, though I have no occasion to substantively address, about 50 more submissions that I
received that did not go to any matters legally cognizable on a motion for confirmation, and that
can best be described as statements of disappointment with the 363 Sale or the inevitable effect of
the chapter 11 process on creditors and stockholders—the latter of whom, unfortunately, will be
wholly wiped out.  I know how they feel.  But with Old GM's resources being as limited as they
are, bankruptcy law requires that Old GM creditors be paid much less than in full, and that
stockholders, who can't receive distributions until creditor claims have been satisfied, not receive
anything at all.

Upon consideration of the objections, I determine that some of the objections require (minor) modifications to the Plan. The remainder are lacking in merit. Thus the Plan will be confirmed as modified.

Plan supporters may, if they wish, give me more extensive Findings of Fact and Conclusions of Law that also cover matters that were not in controversy. My Findings of Fact and Conclusions of Law on essential background and disputed matters, including those where I've overruled remaining Plan objections, follow.

<u>Findings of Fact</u>[7]

*1. Overview of the Plan*

The Debtors have proposed a liquidating plan to distribute, most significantly, the securities of New GM—stock and warrants ("**New GM Securities**")—that Old GM acquired in the 363 Sale. The Plan has 6 Classes:

- Class 1, which, with appropriate subclasses, covers secured creditors;

- Class 2, for section 507(a) priority payments (aside from administrative expenses and priority tax claims);

- Class 3, for General Unsecured Claims (the "**Unsecured Class**");

- Class 4, for Property Environmental Claims (the "**Environmental Class**");

- Class 5, for Asbestos Personal Injury Claims (the "**Asbestos Class**"); and

- Class 6, for the equity holders of Old GM.

Of these classes, only the General Unsecured Class (Class 3) and the Asbestos Class (Class 5) were impaired and still receiving a distribution from the Estate, and thus only

---

[7]    To shorten this Decision, I've limited factual citations and detail to the most significant matters.

their members were entitled to vote.  The equity holders of Old GM (Class 6) received no distribution, and thus were deemed to reject.  The remaining classes will be paid in full, and thus were deemed to accept.

As noted above, each of the two voting classes voted overwhelming in favor of the Plan.

The strong support of the Plan was made possible, in part, by a number of settlements on which the Plan is premised.  One of Old GM's largest liabilities was its environmental obligations to the U.S. Government and various states and sovereigns, such as the States of New York and California, and the St. Regis Mohawk Tribe in upstate New York.  The most major environmental claims have been settled by two separate agreements:  an "Environmental Response Trust Agreement" and the "Priority Order Site Settlements."  In addition, though Old GM's chapter 11 case was of course not asbestos-driven, Old GM did have material asbestos liabilities—which the Debtors and Creditors' Committee settled by agreements with the Asbestos Claims Committee and the Asbestos Future Claims Rep. (fixing present and future asbestos claims at $625 million), and with a former GM division (Delco Remy, later, Remy International, Inc.).

To manage the liquidation of this very large and complex estate, the Plan creates four trusts:

- the General Unsecured Creditors Trust ("**GUC Trust**");

- the Avoidance Action Trust ("**Avoidance Trust**");

- the Environmental Response Trust ("**Environmental Trust**"); and

- the Asbestos Trust ("**Asbestos Trust**").

-4-

The GUC Trust is responsible for managing the New GM Securities, and distributing them to unsecured creditors with allowed claims.

The Avoidance Trust is responsible for prosecuting, collecting, and distributing proceeds from avoidance actions brought by the liquidating estate—including, most significantly, an avoidance action arising from the erroneous release of the security interest on a $1.5 billion term loan, discussed below, referred to as the "**Term Loan Litigation**."

The Environmental Trust will take possession of polluted property that will remain the responsibility of Old GM, and will be responsible for the cleanup and management of these sites.

Finally, the Asbestos Trust will manage distributions to current and future asbestos claimants.

*2. The GUC Trust*

The GUC Trust will hold and distribute the New GM Securities that were received under the 363 Sale. Obviously, the total amount of the New GM Securities in the GUC Trust is finite. Each creditor with an allowed claim will be entitled to its pro rata share of the New GM Securities, along with "units" of the GUC Trust, which under certain circumstances could permit supplemental distributions.

But while a very large number of claims were scheduled by the Debtors or otherwise were undisputed (and thus already are allowed), much less than all of the claims in this case (originally about 37,000 in number) are in that category. Many are in dispute. As in every one of the dozen largest chapter 11 cases on my watch,[8] the Plan

---

[8] *See* page 20 & nn. 34 and 35 below. My Chambers didn't check the smaller cases, though I have no reason to believe that they'd be materially different.

makes distributions only on allowed claims, and distributions on claims that are disputed, in whole or in part, must await their resolution. This is a major element in each of the 5 remaining objections that I have before me.

To address the fact that many claims aren't now allowed, but may be allowed in the future, the GUC Trust provides for reserves. In each case where a liquidated claim was asserted, the Debtors simply reserved for it in the full amount the creditor claimed, without regard to how potentially meritorious the claim might be. Previously unliquidated claims were reserved for as well, in earlier proceedings before me.

Perhaps oversimplifying things slightly (but not in material respects), creditors with allowed claims will get their distributions in doses, permitting appropriate measures as the pool of disputed claims decreases.[9] Pro rata distributions of those with allowed claims will be based on their shares of *the sum of allowed claims and disputed ones*— which in essence is on the assumption that all of the now disputed claims will be allowed. If presently disputed claims turn out ultimately to be disallowed, the amount remaining in the GUC Trust may permit more (or greater) supplemental distributions to those with allowed claims. But this mechanism protects those whose claims are now disputed, as it guards against premature and/or excessive distributions to those whose claims already are allowed.

Simultaneously, it protects the thousands of creditors whose claims already are allowed from the prejudice that might otherwise result if they have to await the end of a claims resolution process that could take many months or even years.

---

[9]     It's fair to assume that some of the disputed claims will turn out to be allowed; some will be allowed in some part; and some will be disallowed. But it's impossible to determine, at this point, what the dollar amount in each category will be.

I expressly find as a fact that this mechanism satisfactorily, and reasonably, addresses the needs and concerns of both holders of allowed claims and holders of disputed claims.[10]

*3. Role of Wilmington Trust*

Wilmington Trust (which as noted above was the indenture trustee with respect to $23 billion of Old GM's prepetition bond debt) will be the administrator to the GUC Trust and the Avoidance Trust. Wilmington Trust was the Chair of the Creditors' Committee. As a consequence of its role in acting on behalf of $23 billion in debt (both before and after the filing of Old GM's chapter 11 petition), and its role since June 2009 as a fiduciary for all unsecured creditors in this chapter 11 case, Wilmington Trust has considerable familiarity with the details of this case and Old GM's affairs. It is reasonable for me to conclude, and I further find, that such knowledge would take time, and be expensive, to replace.[11]

Wilmington Trust's role as Indenture Trustee to GM bondholders will become substantially limited after the Effective Date. Bond indentures will be cancelled for all

---

[10]    The principal corpus of the GUC Trust is New GM Securities—as compared and contrasted, *e.g.*, to ordinary cash. The Plan and its related documents provide for the GUC Trust Administrator to exercise controlled discretion to manage the GUC Trust corpus, including by selling GUC assets. *See* Plan Article 6.2(f) ("In furtherance of and consistent with the purposes of the GUC Trust and the Plan, the GUC Trust Administrator shall (i) have the power and authority to hold, manage, sell, invest, and distribute to the holders of Allowed General Unsecured Claims the GUC Trust Assets, (ii) hold the GUC Trust Assets for the benefit of the holders of Allowed General Unsecured Claims, (iii) have the power and authority to hold, manage, sell, invest, and distribute the GUC Trust Assets obtained through the exercise of its power and authority . . ."). I find this to be reasonable as well.

[11]    Creditors' Committee counsel states that "[a]ny suggestion that [Wilmington Trust] be replaced at this late stage is misguided because, among other things, creditors will lose the benefit of a trust administrator which has been intimately involved in these cases since their inception and which holds an almost unparalleled amount of institutional knowledge about this case, the important issues relevant to the unsecured creditors, and the intricate distribution mechanics outlined in the GUC Trust Agreement and laboriously negotiated by [Wilmington Trust] and the Committee with the Debtors, the Securities and Exchange Commission and the Depository Trust Company." (Creditors' Committee Statement in Support of Plan, ¶ 12). I additionally find these observations to be true.

-7-

purposes other than ministerial duties such as the disbursing of cash, stock, and

warrants.[12]  Though I'm unsure whether the Plan simply codifies something Wilmington

Trust would take as a given, the Plan provides, in its Article 6.2(f), that the Trust

Administrator Wilmington Trust must "act in the best interest of all beneficiaries of the

GUC Trust and in furtherance of the purpose of the GUC Trust, and in accordance with

the GUC Trust Agreement, and not in its own best interest as a creditor."

As noted above, the Avoidance Trust, of which Wilmington Trust will also serve

as the administrator, was established to continue the Term Loan Litigation, and to address

matters of collection and distribution of any award if the Term Loan Litigation (which

now is the subject of cross-motions for summary judgment, which are *sub judice*) is

successful.[13]  I've been advised that issues are also likely to exist (as to which I've heard

very little so far, and likewise express no view) as to whether, assuming the Term Loan

Litigation is successful, the Avoidance Trust or the U.S. Treasury will be entitled to any

proceeds.  I've been informed (or at least have assumed) that the Creditors' Committee

will argue that any proceeds should go to the unsecured creditors.  I've been informed

that the U.S. Treasury may argue that any proceeds should be applied toward the

---

[12]     *See* Plan Article 6.7 (". . . on the Effective Date all the agreements and other documents
evidencing the Claims or rights of any holder of a Claim against the Debtors . . . shall be cancelled
and discharged; *provided, however*, that the Indentures and Fiscal and Paying Agency Agreements
shall continue in effect solely for the purposes of (i) allowing the Indenture Trustees and the Fiscal
and Paying Agents to make any distributions on account of Allowed General Unsecured Claims in
Class 3 pursuant to the Plan and perform such other necessary administrative functions with
respect thereto, (ii) permitting the Indenture Trustees and the Fiscal and Paying Agents to receive
payment from the Indenture Trustee/Fiscal and Paying Agent Reserve Cash, (iii) permitting the
Indenture Trustees and the Fiscal and Paying Agents to maintain any rights or liens they may have
for fees, costs, expenses, and indemnities under the Indentures and the Fiscal and Paying Agency
Agreements, against or recoverable from distributions made under the Plan to the Registered
Holders and/or beneficial owners of debt securities with respect to the Note Claims, the Eurobond
Claims, and the Nova Scotia Guarantee Claims, and (iv) allowing holders of Nova Scotia
Guarantee Claims to assert direct claims, if any, against GM Nova Scotia . . ." (italics in original)).

[13]     Obviously, I here express no view on the likely outcome of the Term Loan Litigation, or the
pending motions.

Treasury sponsored DIP Loan.  Thus, the ultimate beneficiary of any successful litigation on behalf of the Avoidance Trust is yet to be determined.

But it's clear to me that at this point, the beneficiary of the Avoidance Trust is plainly unsecured creditors, of which Wilmington Trust's bondholders, a subset of the unsecured creditor community, are an important (if not also the largest) part.  There certainly is no conflict, insofar as either the GUC Trust or the Avoidance Trust is concerned, between Old GM bondholders and other members of the Unsecured Class.  And it's likewise clear to me that Wilmington Trust will be focused on prosecuting the Term Loan Litigation appropriately, and attempting to maximize value for unsecured creditors or whoever ultimately is entitled to any proceeds.

At this point, I don't know whether there will be any proceeds for unsecured creditors and the U.S. Treasury to fight over, and I don't know the extent, if any, to which Wilmington Trust would have conflicting duties to the U.S. Treasury (as contrasted to unsecured creditors)—especially since the U.S. Treasury, to my observation, has so far been well represented and capable of making decisions for itself.  I don't see this as a present or systemic conflict, if it ever will be one.

### 4.  Other GUC Trust Provisions

The Plan also provides for several layers of oversight for the GUC Trust Administrator.  In the first instance, the GUC Trust Monitor must review and approve all non-ministerial activities of the GUC Trust Administrator.[14]  The Creditors' Committee,

---

[14]    *See, e.g.*, GUC Trust Agreement Article 3.5(b) (approval of GUC Trust Monitor required to issue physical certificates as evidence for GUC units); Article 5.4(d) (approval necessary to withhold distributions of excess assets upon discovery of previously unknown general unsecured claims); Article 5.7(a) (approval necessary to sell expiring warrants in a privately negotiated sale); Article 6.2 (GUC Trust Monitor to review all reports prepared by the GUC Trust); Article 6.4(a)(i) (GUC Trust Monitor to review and approve all annual budgets and updates thereto); Article 11.3 (approval necessary to resolve disputed claims over $10 million, decisions to retain or terminate

in consultation with the Debtors, appointed FTI Consulting (a well known turnaround

firm, whose retention, as the Creditors' Committee's financial advisor, I approved early

in this case) as the GUC Trust Monitor.[15]

The GUC Trust Agreement further provides for me to review and approve actions

that may be thought of as outside of the ordinary course of business; for the GUC Trust to

file quarterly reports in this Court and on a website (and, after a forthcoming revision to

the GUC Trust Agreement, with the SEC), and for the GUC Trust's financial statements

to be audited.  The beneficiaries of the GUC Trust also have the authority to remove the

GUC Trust Administrator and/or the GUC Trust Monitor upon a showing of good cause.

The Plan allows the GUC Trust Administrator in consultation with the GUC Trust

Monitor to settle claims without Court approval.  Some claims can be settled by the GUC

Trust Administrator without the approval of the GUC Trust Monitor.  But the Plan

provides the GUC Trust Administrator must obtain the approval of the GUC Trust

Monitor with respect to settlements of Disputed General Unsecured Claims above a

certain threshold.

The GUC Trust Agreement also allows the GUC Trust Administrator to request

that the Bankruptcy Court estimate, under 502(c) of the Code, any disputed claim for

purposes of distribution or for creating a cap on a claim.

---

employment of trust professionals, incur costs over budget, and amend the GUC Trust
Agreement).

[15]    Other professionals who have worked extensively in connection with Old GM's chapter 11 case
will likewise continue to do so, taking on new roles in the administration of the trusts created by
the Plan.  AP Services (another well-known turnaround advisory firm, which managed Old GM
during this chapter 11 case) will be retained by the GUC Trust to manage "day to day operations."
Weil Gotshal, which has served as the Debtors' counsel throughout this case, may serve as counsel
to the GUC Trust and Wilmington Trust after confirmation.

5. *Claims by Nova Scotia Noteholders and Green Hunt Wedlake*[16]

Old GM has Canadian subsidiaries, including, at the least, GM Canada and GM Nova Scotia Finance Company ("**GM Nova Scotia**"), the latter of which issued about US $1.05 billion in unsecured notes (the "**Nova Scotia Notes**"), the proceeds of which went to GM Canada, at least in the first instance. Old GM guarantied the Nova Scotia Notes.

At some point in time, GM Nova Scotia became insolvent. In October 2009, it was adjudged bankrupt, and Green Hunt Wedlake was appointed as the Trustee of GM Nova Scotia by the Nova Scotia courts under Nova Scotia law.

At one or more points in time, Appaloosa Management, Aurelius Capital Management, Elliott Management, and Fortress Investment Group (the "**Nova Scotia Noteholders**"), and other hedge funds,[17] invested in the Nova Scotia Notes. The Nova Scotia Noteholders and Green Hunt Wedlake contend that Old GM is liable to the Nova Scotia Noteholders under its guaranty, and also, that under Nova Scotia law,[18] Old GM, as a direct corporate parent of GM Nova Scotia, is separately statutorily liable to Green

---

[16]    This discussion addresses only the most basic aspects of a complex series of facts, and related dispute, and is by way of background only. It undoubtedly leaves out facts upon which one side or the other will later rely when I rule on the merits. It's not intended to consist of Findings of Fact with respect to the underlying transaction; its legality; any rights of Old GM creditors, the Nova Scotia Noteholders or Green Hunt Wedlake with respect to it; or the merits of the Creditors' Committee's objection to the claims of the Nova Scotia Noteholders and Green Hunt Wedlake, discussed below. It's expressly without prejudice to whatever either side will show me in the ensuing litigation.

[17]    The others included Anchorage Capital Master Offshore Ltd., Canyon-GRF Master Fund, Canyon Value Realization Fund Limited, Knighthead Master Fund, LMA SPC for and on behalf of MAP 84, Lyxor/Canyon Realization Fund, Onex Debt Opportunity Fund, Redwood Master Fund, and The Canyon Value Realization Master Fund. They joined in the Nova Scotia Noteholders' objection, but failed to comply with Fed.R.Bankr.P. 2019, and then with an order I had entered after their failure to comply was noted. They've since requested extra time to bring themselves into compliance, which I've granted. Assuming that they comply within the requested additional time, I'll consider that their joinder was valid and should be considered.

[18]    They cite Section 135 of the Companies Act (Nova Scotia). I now make no finding as to whether their assertion is correct.

Hunt Wedlake (for the ultimate benefit of the Nova Scotia Noteholders) for the liabilities of GM Nova Scotia when GM Nova Scotia is wound up.

On the eve of Old GM's chapter 11 filing, the Nova Scotia Noteholders secured a $369 million "Consent Fee" as part of a "Lock-Up Agreement" in which they say they provided "substantial benefits"[19] in exchange, the value and *bona fides* of which are disputed by the Creditors' Committee. The "Consent Fee" represented about 37% of the total US $1.072 billion principal amount of the Nova Scotia Notes. Funds sufficient to cover the "Consent Fee," which GM Canada then used to fund it,[20] are said to have been loaned by Old GM to GM Canada on May 29, 2009, two days before the filing. The US $369 million thereafter found its way to the Nova Scotia Noteholders. The Nova Scotia Noteholders say that "[t]his loan was made before the agreement between the GM Parties and the Nova Scotia Noteholders, and was not a component of the Lock-Up Agreement."[21]

The Creditors' Committee in this case has objected to the Nova Scotia Noteholders' claim—arguing, among other things, that the "Consent Fee" can't be ignored when computing the Nova Scotia Noteholders' entitlement, and that the circumstances under which the Nova Scotia Noteholders extracted the "Consent Fee" are such that their claims should be equitably subordinated or disallowed.

Though the principal amount of the Nova Scotia Notes is US $1.072 billion, and I've been led to believe (though I do not now find) that they constitute the great bulk of GM Nova Scotia's debt, the collective claims of the Nova Scotia Noteholders and Green

---

[19]     Nova Scotia Noteholders Obj. at 10.

[20]     *Id.* n.3.

[21]     *Id.*

Hunt Wedlake (the full amount of which the Debtors have fully reserved for) total

US $2.6 billion.[22]  And that US $2.6 billion has not been reduced by the $369 million

"Consent Fee" that the Nova Scotia Noteholders received.  The Creditors' Committee

also contends that the claim of Green Hunt Wedlake, the trustee appointed under Nova

Scotia law to recover for the capital deficiencies of GM Nova Scotia, is inappropriately

duplicative of the Nova Scotia Noteholders' claims.

The Nova Scotia Noteholders and Green Hunt Wedlake dispute the Creditors'

Committee's contentions.  The former argue, among other things, that the transaction was

entirely proper, and that they acted neither unlawfully or inequitably.  They also contend

that the Creditors' Committee's concerns are, if anything, in the nature of an avoidance

action, which, they contend, the Creditors' Committee cannot bring.  Green Hunt

Wedlake additionally argues, among other things, that Nova Scotia law permits the

allegedly duplicative recovery.  Discovery is ongoing, and I haven't yet ruled on the

merits of the controversy.

## 6.  *Releases and Exculpations*

### *(a) By Debtors*

In Article 12.5 of the Plan,[23] the *Estate* releases present and former directors and

officers of the Debtors; all post-Commencement Date advisors and other professionals of

---

[22]    The Nova Scotia Noteholders' claim is for US $1.072 billion, and Green Hunt Wedlake's claim is
for approximately US $1.608 billion.

[23]    Plan Article 12.5 ("As of the Effective Date, the Debtors release (i) all present and former
directors and officers of the Debtors who were directors and/or officers, respectively, on or after
the Commencement Date, and any other Persons who serve or served as members of management
of the Debtors on or after the Commencement Date, (ii) all post-Commencement Date advisors,
consultants, agents, counsel, or other professionals of or to the Debtors, the DIP Lenders, the
Creditors' Committee, the Asbestos Claimants' Committee, the Future Claimants' Representative,
the Indenture Trustees, and the Fiscal and Paying Agents, and (iii) all members (current and
former) of the Creditors' Committee and of the Asbestos Claimants' Committee, in their capacity
as members of such Committees, the Future Claimants' Representative, and the Indenture Trustees

the Debtors; the DIP Lenders; each of the Creditors Committee, the Asbestos Committee,

and the Asbestos Future Asbestos Rep. (together, the "**Chapter 11 Fiduciaries**"); the

Indenture Trustees; the Fiscal and Paying Agents; all past and present members of the

Chapter 11 Fiduciaries; and the officers, directors, and employees of the Indenture

Trustees and the Fiscal and Paying Agents from specified types of claims.

The claims released by the Estate in Article 12.5 are those "in any way relating to

the Debtors, the Chapter 11 Cases, the Plan, negotiations regarding or concerning the

Plan, and the ownership, management, and operation of the Debtors."

Importantly, however, the claims released expressly carve out

> actions found by Final Order to be willful
> misconduct (including, but not limited to, conduct
> that results in a personal profit at the expense of the
> Debtors' estates), gross negligence, fraud,
> malpractice, criminal conduct, unauthorized use of
> confidential information that causes damages,
> breach of fiduciary duty (to the extent applicable),
> and *ultra vires* acts…

---

and the Fiscal and Paying Agents and their respective officers, directors, and employees from any
and all Causes of Action held by, assertable on behalf of, or derivative from the Debtors, in any
way relating to the Debtors, the Chapter 11 Cases, the Plan, negotiations regarding or concerning
the Plan, and the ownership, management, and operation of the Debtors, except for actions found
by Final Order to be willful misconduct (including, but not limited to, conduct that results in a
personal profit at the expense of the Debtors' estates), gross negligence, fraud, malpractice,
criminal conduct, unauthorized use of confidential information that causes damages, breach of
fiduciary duty (to the extent applicable), and *ultra vires* acts; *provided, however*, that the foregoing
(a) shall not operate as a waiver of or release from any Causes of Action arising out of any express
contractual obligation owing by any former director, officer, or employee of the Debtors or any
reimbursement obligation of any former director, officer, or employee with respect to a loan or
advance made by the Debtors to such former director, officer, or employee, and (b) shall not limit
the liability of any counsel to their respective clients contrary to Rule 1.8(h)(1) of the New York
Rules of Professional Conduct." (italics in original)).

Article 12.5 (as well as Article 12.6) sets forth these very important provisions in a single block of
single-spaced text, running half a page or more in length, without any formatting to make it
readable.  I wish the lawyers of the world would learn not to do this.

Article 12.5 also excepts from its waivers of claims and releases any causes of action

arising out of any Debtor officer, director, or employee's express contractual obligations

with respect to a loan or advance, and certain professional duties of counsel to its clients.

*(b) By Third Parties—Creditors and Equity Security Holders*

In a subsequent Article 12.6,[24] the Plan provides exculpation to various protected

persons and entities.  Importantly, Article 12.6 doesn't apply to litigation rights owned by

the Estate (which are covered under Article 12.5) but rather applies to litigation rights of

creditors and stockholders or any other equity security holders.  And in fact, it protects

the Debtors themselves.  With respect to the types of claims specified below, Article 12.6

provides that the Debtors, the Trust Administrators, the DIP Lenders, the Chapter 11

Fiduciaries, the Indenture Trustees, and the Fiscal and Paying Agents (and all related,

---

[24]    Plan Article 12.6 ("Neither the Debtors, the GUC Trust Administrator, the Asbestos Trust Administrator, the Environmental Response Trust Administrative Trustee, the Avoidance Action Trust Administrator, the DIP Lenders, the Creditors' Committee, the Asbestos Claimants' Committee, the Future Claimants' Representative, the Indenture Trustees, and the Fiscal and Paying Agents, nor any of their respective members (current and former), officers, directors, employees, counsel, advisors, professionals, or agents, shall have or incur any liability to any holder of a Claim or Equity Interest for any act or omission in connection with, related to, or arising out of the Chapter 11 Cases; negotiations regarding or concerning the Plan, the GUC Trust Agreement, the Environmental Response Trust Agreement, the Asbestos Trust Agreement, the Avoidance Action Trust Agreement, the Environmental Response Trust Consent Decree and Settlement Agreement, and the Priority Order Sites Consent Decrees and Settlement Agreements; the pursuit of confirmation of the Plan; the consummation of the Plan; or the administration of the Plan or the property to be distributed under the Plan, except for actions found by Final Order to be willful misconduct, gross negligence, fraud, malpractice, criminal conduct, unauthorized use of confidential information that causes damages, breach of fiduciary duty (to the extent applicable), and *ultra vires* acts, and, in all respects, the Debtors, the GUC Trust Administrator, the Asbestos Trust Administrator, the Environmental Response Trust Administrative Trustee, the Avoidance Action Trust Administrator, the Creditors' Committee, the Asbestos Claimants' Committee, the Future Claimants' Representative, the Indenture Trustees, the Fiscal and Paying Agents, and each of their respective members (current or former), officers, directors, employees, counsel, advisors, professionals, and agents shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan; *provided, however*, that the foregoing shall not limit the liability of any counsel to their respective clients contrary to Rule 1.8(h)(1) of the New York Rules of Professional Conduct.  In the event a holder of a Claim fails to satisfy a Medical Lien, the holder of such Medical Lien shall be barred and prohibited from seeking recourse directly against the Debtors, the GUC Trust, and any of their respective officers, directors, representatives, employees, counsel, and advisors." (italics in original)).

past and present, directors, employees, counsel, advisors, professionals, or agents of any

of them) will not incur any liability to *any creditor or equity security holder*.

The claims covered are those "for any act or omission in connection with, related

to, or arising out of":

- the Chapter 11 Cases;

- negotiations regarding or concerning the Plan, the GUC Trust Agreement,

  the Environmental Response Trust Agreement, the Asbestos Trust

  Agreement, the Avoidance Action Trust Agreement, the Environmental

  Response Trust Consent Decree and Settlement Agreement, and the

  Priority Order Sites Consent Decrees and Settlement Agreements;

- the pursuit of confirmation of the Plan;

- the consummation of the Plan; or

- the administration of the Plan or the property to be distributed under the

  Plan…

Article 12.6 also expressly provides that the protected parties may rely on the

advice of counsel with respect to their duties and responsibilities under the Plan.

Importantly, however, as in Article 12.5, the exculpation does not protect actions

that are particularly egregious:

> actions found by Final Order to be willful
> misconduct, gross negligence, fraud, malpractice,
> criminal conduct, unauthorized use of confidential
> information that causes damages, breach of
> fiduciary duty (to the extent applicable), and *ultra
> vires* acts…

Article 12.6 also carves out of from its exculpation provisions certain duties of counsel to

its clients.

<u>Discussion</u>

The objections overlap in many respects, and thus I'll group and address them by concept, rather than by objector.  I'll turn first to objections that are overruled, and then to objections that I believe require Plan modifications.

*1.  Lack of Good Faith*

As noted above,[25] the Nova Scotia Noteholders—holders of notes of nondebtor General Motors Nova Scotia, which were guarantied by Old GM—secured a $369 million "Consent Fee" as part of a "Lock-Up Agreement" on the eve of Old GM's chapter 11 filing.  The "Consent Fee" represented about 37% of the total $1.072 billion principal amount of the Nova Scotia Notes.  The Creditors' Committee in this case has objected to the Nova Scotia Noteholders' $1.07 billion claim—arguing, among other things, that the $369 million "Consent Fee" can't be ignored when computing the Nova Scotia Noteholders' entitlement, and that the circumstances under which the Nova Scotia Noteholders extracted the "Consent Fee" are such that their claims should be equitably subordinated or disallowed.  The Creditors' Committee also contends that the separate $1.6 billion claim of Green Hunt Wedlake, the trustee appointed under Nova Scotia law to recover for the capital deficiencies of GM Nova Scotia, is inappropriately duplicative of the Nova Scotia Holders' claims.  The Nova Scotia Noteholders and Green Hunt Wedlake dispute the Creditors' Committee's contentions.  Discovery is ongoing, and I haven't yet ruled on the merits of the controversy.

---

[25]    *See* pages 11 through 13 above.

Green Hunt Wedlake argues[26] that the Plan was not proposed in good faith (and

thus is unconfirmable for failure to meet the requirements of section 1129(a)(3) of the

Code),[27] because the Plan unfairly deals with its claims.  The Nova Scotia Noteholders,

while not invoking or otherwise mentioning section 1129(a)(3), simply say that the Plan

is "grossly unfair."[28]  Each argues that the Plan evidences a failure to act with fairness

towards holders of disputed claims, or at least disputed claims held by them, because the

Plan does not provide for partial distributions to holders of disputed claims.  They argue

that the Plan should provide for either payment of the undisputed portion of their claims,

or for the outstanding amount of the Nova Scotia Notes, less the "Consent Fee."

But I disagree with their contentions that the Plan must provide for any payment

to them at this time, and I especially disagree with the contention that the Plan wasn't put

forward in good faith.

The objections are both factually and legally deficient.  As factual matters, the

Nova Scotia Noteholders and Green Hunt Wedlake give insufficient attention to the fact

that the Plan provision denying immediate payment on account of disputed claims applies

not just to them, but to every other claimant with a disputed claim in the Old GM chapter

11 case.  This wasn't a bill of attainder.

---

[26]        *See* Green Hunt Wedlake Obj. at 2-3.

[27]        Section 1129 of the Code provides, in relevant part:

> (a) The court shall confirm a plan only if all of the following
> requirements are met:
>
> …
>
>  (3) The plan has been proposed in good faith and
> not by any means forbidden by law.…

[28]        Nova Scotia Noteholders Obj. at 13; *accord id.* at 6 and elsewhere in Nova Scotia Noteholders
Obj.

They also give insufficient attention to the fact that the Creditors' Committee,

with an objection that at the very least was colorable,[29] asked me to disallow, and

subordinate, the Nova Scotia Noteholders' and Green Hunt Wedlake's claims in their

entirety.  Delay in payment was a natural consequence of that objection.  There was no

undisputed portion of either claim that could or should otherwise be entitled to a

distribution under the Plan.[30]

Similarly, as a legal matter, the Nova Scotia Noteholders and Green Hunt

Wedlake must recognize that as a consequence of the Creditors' Committee's objection,

---

[29]    The Nova Scotia Noteholders told me at a previous conference on the Creditors' Committee's objection, and now say once again (Nova Scotia Noteholders Obj. at 13), that they want to contend that that the Creditors' Committee's objection fails to satisfy the pleading requirements of *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)  and *Ashcroft v. Iqbal*, 129 S.Ct. 1937 (2009), and is "implausible," within the meaning of *Iqbal*.  The contention surprised me then, and surprises me now.  The Nova Scotia Noteholders have a reservation of rights as to any issues that they may hereafter raise at trial, or on motion.  But if the Nova Scotia Noteholders press the point, I'll want both sides to address whether I'm mistaken in my understanding that each of *Twombly* and *Iqbal* was a decision dealing with the requirements for a complaint under Fed.R.Civ.P. 8, as tested under Civil Rule 12(b)(6), *see* 550 U.S. at 554-556 (*Twombly*), and 129 S.Ct. at 1949-1950 (*Iqbal*).  I'll want the two sides also to address how *Twombly* and *Iqbal* apply to objections to claims, when Fed.R.Bankr.P. 9014, which applies to contested matters (of which objections to claims are one type), does not make Bankruptcy Rules 7008 and 7012 applicable in contested matters (thereby incorporating Civil Rules 8 and 12) unless the court orders otherwise.

Of course, objections to claims *are* subject to Bankruptcy Rule 9011.  And it annoys me greatly, to use the most restrained words I can, when parties in interest assert frivolous objections to claims.  But based on the briefing and oral argument that I've had so far, I necessarily must regard the Creditors' Committee's objection as raising very serious issues, that are deserving, to say the least, of factual and legal scrutiny.  Assuming, without deciding, that to qualify as an objection for purposes of section 502(a) of the Code, the objection must at least be colorable, I rule that the Creditors' Committee's objection here easily passed that test.

[30]    *See* Creditors' Committee Obj. to Nova Scotia Noteholders' Claim (ECF #6248).  In their objection (*see* Nova Scotia Noteholders Obj. at 17 & n.6), the Nova Scotia Noteholders suggest that they are entitled to payment on account of most of their claims, because the Creditors' Committee "is *not* seeking to recover the Consent Fee, but simply to reduce the Claims by the amount of the Consent Fee" (*id.* at n.6 (emphasis in original)—as if those were the only two matters, or alternatives, on the table.  They materially mischaracterize the Creditors' Committee's position, and, as the Creditors' Committee fairly points out (Creditors' Committee Statement at 5 n.6), take words out of context.  It was and still is plain to me that when the Creditors' Committee's special counsel answered a question I asked in the December 2010 conference with respect to this controversy, the Creditors' Committee wasn't withdrawing its requests for disallowance and equitable subordination in connection with its objection, and was merely confirming that it wasn't asking for a clawback of the $369 million.  I'm surprised, and disappointed, that the Nova Scotia Noteholders would be making arguments in this fashion.

-19-

each of them lost the benefit of section 502(a) of the Code, which provides in substance

that a proof of claim is allowed if, but only if, a party in interest does not object.[31]

Similarly, Green Hunt Wedlake has given me no basis in fact, or in law, for its

contention that this Plan was put forward in anything but good faith.  Plans can, and

sometimes do, trump the normal statutory scheme and provide for at least some

distributions on claims that have been objected to—most commonly, where they have

been objected to only in part.  Each of the Nova Scotia Noteholders and Green Hunt

Wedlake was able to cite a few confirmation orders (though the same ones) wherein that

mechanism was part of the confirmed plan—though in each case under circumstances

that the Creditors' Committee notes are distinguishable, and in each case without a ruling

by the court as to whether that was required.[32]  But as at least the Nova Scotia

Noteholders (all of whom are distressed debt investors and regular participants in cases in

this Court) know, and both objectors' counsel know, provisions of the type they criticize,

and which Green Hunt Wedlake asserts to be "bad faith," have been a regular feature of

reorganization plans approved in this Court.

I haven't gone through the dockets of every case in this district, and thus can't

empirically confirm my suspicion, or make a factual finding, that the disputed claim

provisions in this Plan appear in the overwhelming majority of chapter 11 plans in this

---

[31]    Section 502(a) of the Code provides, in relevant part:

> A claim …, proof of which is filed under section 501 of this
> title, is deemed allowed, unless a party in interest … objects.

[32]    The Nova Scotia Noteholders and Green Hunt Wedlake initially failed to comply with the
requirements of my Case Management Order, ¶32, which provides that I won't take as authority
citations to orders (as contrasted to opinions) unless additional information is provided describing
the context in which the order was entered and the provision for which the order was cited
appeared—and in particular, the extent to which the propriety of the provision was opposed by any
party, and the court actually focused on it or ruled on it.  The Nova Scotia Noteholders and Green
Hunt Wedlake thereafter cured the deficiency, but when they did so, it appeared that in none of the
cases cited did the court actually rule on the matter.

district and elsewhere.  But I can say, and find (after a simple docket review),[33] that

substantively identical provisions have appeared in at least a *dozen* earlier confirmed

plans in cases on my watch over the last 10 years—in *every one* of my largest chapter 11

wherein a plan was confirmed at all[34]—including one filed by the Nova Scotia

Noteholders' own counsel.[35]  They are by no means atypical, and are hardly evidence of

bad faith.

---

[33]     *See* Fed. R. Evid. 201(b)(1) and (2), 201(c).

[34]     Only the earliest two will be quoted; it would unnecessarily lengthen this Decision to quote the
plan language in all of them.  *See* plans in *In re Indesco Int'l*, No. 00-15452 (REG) ("**Indesco**")
(ECF #381) Article VIII(D) ("except as otherwise agreed by the Reorganized Debtor and/or the
Committee in their sole discretion, no partial payments and no partial distributions will be made
with respect to a Disputed Claim until the resolution of such dispute by settlement or Final
Order"); *In re PSINet*, Inc., No. 01-13213 (REG) (ECF #1123) § 8.4(d)(i) ("No payments or
distributions will be made with respect to all or any portion of a Disputed Claim unless and until
all objections to such Disputed Claim have been settled or withdrawn or have been determined by
a Final Order, and the disputed Claim has become an Allowed Claim."); *In re Global Crossing
Ltd*., 02-40188 (REG) (ECF #2586) § 7.3; *In re Century/ML Cable Venture*, No. 02-14838 (REG)
(ECF #268) §§ 6.4 & 4.6; *In re Adelphia Business Solutions, Inc*., No. 02-11389 (REG) (ECF
#1607) § 6.1; *In re Adelphia Communications Corp.,* 02-41729 (REG) (ECF #12770) § 11.5; *In re
Our Lady of Mercy Medical Center*, No. 07-10609 (REG) (ECF #1027) § 5.03; *In re
BearingPoint, Inc.,* No. 09-10691 (REG) (ECF #1326) § 7.2; *In re Lyondell Chemical Co.,* 09-
10023 (REG) ("**Lyondell**") (ECF #4418) § 8.3; *In re T H Agriculture & Nutrition, L.L.C.,* No. 08-
14692 (REG) ("**THAN**") (ECF #532) § 8.3; *In re Chemtura Corp.*, No. 09-11233 (REG) (ECF
#4387) § 7.6(b).

The plan in still another case, that of *DBSD North America,* provided similarly.  *See In re DBSD
North America, Inc.* No. 09-13061 (ECF #506) Article IV(D).  The confirmation order with
respect to that plan was affirmed by the district court, but reversed in part on other grounds by the
Second Circuit.  *See In re DBSD North America*, 419 B.R. 179 (Bankr. S.D.N.Y. 2009)
("**DBSD**"), aff'd 2010 WL 1223109 (S.D.N.Y. 2010), *aff'd in part and reversed in part, in each
respect on other grounds*, 627 F.3d 496 (2d Cir. 2010) (Order) and 2011 WL 350480, --- F.3d ---
(2d Cir. 2011) (Opinion).

So as not to violate the rule with which the Nova Scotia Noteholders and Green Hunt Wedlake
initially failed to comply, I note that in none of those cases was the propriety of the provision
litigated, as best I recall, nor was the propriety of the provision ever challenged, on bad faith
grounds or otherwise.  In one case, *Indesco*, as the quoted language reflects, the debtors and
creditors' committee were given the power to waive the provision, and in another case, *Lyondell*,
the provision applied to unsecured claims, but did not apply to three other classes of funded
secured debt, where the latter's claims had been the subject of a settlement.

[35]     *See THAN* plan § 8.3, n.34 above.  *See also* the confirmation order in *THAN*, which was submitted
to me for approval and signature by the Nova Scotia Noteholders' counsel, and, after its entry,
picked up and electronically published by Westlaw.  *In re T H Agriculture and Nutrition, L.L.C.,*
2009 WL 7193573, *17 (Bankr. S.D.N.Y. 2009) ("Notwithstanding any other provision of the
Plan, if any portion of a Claim (other than an Asbestos PI Claim) is a Disputed Claim, no payment

In a recent decision in *Adelphia*,[36] I ruled on the propriety of a plan provision under which the estate paid the professional fees of a large number of *ad hoc* committees of distressed debt investor unsecured creditors, without a showing on their part of "substantial contribution."  I found such a provision lawful when it was included in a reorganization plan—noting that section 1123(b)(6) of the Code provides that a reorganization plan may "include any other appropriate provision not inconsistent with the applicable provisions of this title."

I commented in *Adelphia* that a bankruptcy court should "be wary of declaring a plan provision not 'appropriate,' and hence forbidden, in the absence of a violation of statutory or caselaw, a provision plainly contrary to public policy, or, perhaps, unusual circumstances or good reason that the Court cannot find here."  And I went on to say that:

> The various interests of maintaining the necessary
> flexibility for plan proponents and other parties in
> interest, maintaining predictability in the
> bankruptcy courts of this district and elsewhere, and
> avoiding judicial legislation all suggest a
> construction of section 1123(b)(6) under which
> judges act with restraint in declaring plan provisions
> not to be appropriate based on anything short of
> bankruptcy caselaw, nonbankruptcy statutory or
> case law, or clear public policy concerns.[37]

The provision challenged here is hardly contrary to the Code.  It is fully consistent with the Code, and, indeed, may fairly be said to implement it.  And as I've noted, it is a provision commonly, if not also typically, included in chapter 11 plans in this district and elsewhere—including the plan in *THAN* that the objecting Nova Scotia Noteholders'

---

or Distribution provided for under the Plan shall be made on account of such Claim, unless and until such Claim becomes an Allowed Claim.").

[36]    *In re Adelphia Communications Corp.*, 441 B.R. 6 (Bankr. S.D.N.Y. 2010) ("***Adelphia Non-Fiduciary Fees Decision***").

[37]    *Id.* at 19.

counsel filed.[38]  Particularly after *Adelphia*—wherein I emphasized the great flexibility

that plan proponents have in crafting reorganization plans, and approved a provision

whose propriety was much more debatable—there is no basis for a suggestion that

inclusion of this commonplace provision is indicative of "bad faith."

2.  *Unequal Treatment Within Unsecured Class*

A few creditors or creditor groups (the Nova Scotia Noteholders, Green Hunt

Wedlake, the States of New York and California, and the Town of Salina, each of which

are in Class 3, the Unsecured Class) make an argument that's a variant of the one I just

addressed.  All assert unfair discrimination between the members of the Unsecured Class

whose claims already are allowed, and those whose claims are not, and ask me to order

that the Plan be changed to provide for payment on disputed claims.  Two contend that if

the Plan isn't so modified, the Plan is unconfirmable.  I disagree that the argued

deficiency makes the Plan unconfirmable, and (whether or not the argued deficiency rises

to the level of a confirmation objection), decline to order the requested changes in the

Plan.

To the extent that the objectors rely on applicable Code provisions for their

objections, they argue that the Plan violates sections 1129(a)(1) and 1123(a)(4) of the

Code.[39]  They base those objections on the fact that, as noted above, the Plan provides

---

[38]        *See* n.35 above.

[39]        Section 1129(a)(1) of the Code provides that the court shall confirm a plan only if, among other
things, "[t]he plan complies with the applicable provisions of this title"—*i.e.*, the Bankruptcy
Code.  Section 1123 of the Code provides, in relevant part:

(a) Notwithstanding any otherwise applicable nonbankruptcy
law, a plan shall—

…

(4) provide the same treatment for each claim or
interest of a particular class, unless the holder of a

-23-

that until disputed claims are allowed, distributions on account of those claims won't be made.[40]  I've addressed this above, and just as such a mechanism isn't indicative of bad faith, it doesn't result in unequal treatment of creditors in the same class.

Section 1123(a)(4) requires a plan to provide the same treatment for each claim of a particular class.  That means, as practical matter, that all *allowed* claims within a particular class should get the same treatment, and that if claims are disputed and not yet allowed (but have the potential to be allowed), reasonable measures must be taken to ensure that the required same treatment is received if and when they're allowed.  In fact, *Weiss-Wolf*,[41] one of the cases upon which the Nova Scotia Noteholders rely, expressly states, after first noting that "[t]he plan must treat claims in the same class alike, just as like claims must be classified together,"[42] that "[a] debtor *need not, of course, pay disputed claims until the claims are fixed and the dispute resolved*."[43]

Of course it's true, as the Nova Scotia Noteholders observe,[44] that courts in this and other jurisdictions have required debtors to establish reserves with assets sufficient to pay disputed claims in full to allow creditors full pro rata recovery on their claims.[45]  But

---

particular claim or interest agrees to a less favorable
treatment of such particular claim or interest.…

[40]    California additionally expressed a concern that an objection to one of its several separate claims (relating to separate polluted properties) would result in the inability to receive distributions on any of them.  The Debtors clarified that this wasn't their intent, and that the Plan won't function in that manner. Thus this concern, which would otherwise be a matter of concern to me, has been satisfactorily resolved.

[41]    *In re Weiss-Wolf, Inc.*, 59 B.R. 653 (Bankr. S.D.N.Y. 1986) (Beatty, J.) ("**Weiss-Wolf**").

[42]    *Id.* at 655.

[43]    *Id.* (emphasis added).

[44]    *See* Nova Scotia Noteholders Obj. at 20.

[45]    *See, e.g., Weiss-Wolf*, 59 B.R. at 655 (after noting that a debtor needn't pay disputed claims until the claims are fixed and the dispute resolved, continuing "[h]owever, a debtor must make provision for payment of disputed claims so that if and when allowed the claims have reasonable assurance that they will receive identical treatment.").

-24-

that begs the question; the Plan supporters here did exactly that.[46]  They reserved for

whatever the claimants asked for.  But the duty *to reserve* for disputed claims that may

ultimately be allowed does not equate to the duty *to immediately pay* them.

The Plan's GUC Trust Agreement provides, in substance, that in the absence of

agreement on the amount to reserve (or a determination by the Court), the GUC Trust

will simply reserve the *full liquidated amount the claimant asked for.*  Here, for example,

though the Nova Scotia Noteholders' and Green Hunt Wedlake's claims are objected to,

and they will not get distributions unless and until their claims are allowed, reserves have

been set up to cover the full $2.6 billion aggregate amount of the Nova Scotia

Noteholders and Green Hunt Wedlake claims.  Thus the Plan supporters have already

given those claimants all that the latter reasonably could demand.

There also is no legal impediment to funding the reserves with New GM

Securities.  That is the only currency that Old GM received from New GM at the time of

the sale, and the only currency that Old GM has to provide to its creditors.  By its nature,

the value of Old GM stock can go down, or go up.  Equal treatment does not require

establishing additional mechanisms for holders of disputed claims to track the

movements of the stock market.  Plan proponents must take *reasonable* steps to fund

reserves for disputed claims.[47]  Everybody gets a pro rata share of the New GM

Securities, if and when claims are allowed.  That's equal treatment.

---

[46]   I read the Town of Salina's objection (which was filed well before the Confirmation Hearing, and also before the earlier hearing to finalize fund reserves) to be asking that sufficient reserves be established. (*See* Salina Obj. at 3).  At the earlier hearing on fund reserves, the amounts necessary to reserve for unliquidated claims were fixed, and as a consequence, I believe that this otherwise legitimate concern on Salina's part was satisfactorily resolved.  I didn't understand the Town of Salina to be demanding that its disputed claims be paid immediately.

[47]   *See Weiss-Wolf*, 59 B.R. at 655 ("a debtor must make provision for payment of disputed claims so that if and when allowed the claims have *reasonable* assurance that they will receive identical treatment." (emphasis added)).

There can be no doubt that the Debtors and Creditors' Committee have been

trying to do the right thing.  In fact, Creditors' Committee's counsel offered to put

additional language into the Plan to memorialize that intent;  It would say:

> For the avoidance of doubt, it is intended that the
> distributions to be made to holders of resolved,
> allowed, general unsecured claims, in accordance
> with this Section 5.3, shall provide such holders as
> nearly as possible with the exact same amount of
> distributions of each asset type, as if such holders
> had been holders of initial allowed general
> unsecured claims.

He added:

> I mean the English is not Shakespeare, but
> hopefully, it is clear enough that the purpose of this
> agreement is to make sure that if you're allowed
> early or you're allowed late, you're getting the same
> distributions.  That's the intent of the agreement.[48]

Thus there is no legally cognizable unequal treatment as between members of the

Unsecured Class.  Each will get its full entitlement if its claim is allowed.

### 3.  Segregated Reserves and Other Requested Special Treatment

The Nova Scotia Noteholders and Green Hunt Wedlake further contend that the

Plan must establish *segregated* reserves, for their benefit alone, from which their claims

will be satisfied if their claims are allowed.[49]  If the Plan doesn't  do so (and if the Plan

continues to provide, as it does now, that the reserves for their benefit will be part of the

---

Such reasonable steps do not require complex and potentially expensive means for hedging against what could happen in the future, such as by setting up mechanisms, as the one New York would like (New York Obj. at 12), that the Plan be rewritten to provide the same "value," rather than the same distribution, to each holder of a disputed claim that's ultimately allowed.  While consensual market movement true-ups are of course permissible (and I approved a plan with such in *Adelphia*), it is quite a different thing to say that they are required.  Reasonable steps likewise do not require, as New York also argues, *id.*, making all of the holders of already allowed claims take lesser distributions so as to accommodate those whose claims are now in dispute.

[48]    Confirmation Hrg. Tr. at 73.

[49]    *See* Nova Scotia Noteholders Obj. at 18-21; Green Hunt Wedlake Obj. at 5-6.

much larger reserve applying to all disputed claims), they argue that the Plan will be

unconfirmable.  Once more I cannot agree.

While, as noted above, caselaw requires that reserves be established for holders of

disputed claims, it does not impose any additional requirement that such reserves be

*segregated* for each holder of a disputed claim.[50]  The Nova Scotia Noteholders cite cases

establishing the need for reserves, but none of those cases further set forth a requirement

that the reserves be segregated for each claimant.  In a large chapter 11 case, like this one,

with thousands of disputed claims (or even a medium size case, with hundreds), the

burden of such a requirement, if there ever were one, would be obvious.

The Nova Scotia Noteholders cite no authority for the proposition that segregated

reserves must be established.  Nor does Green Hunt Wedlake—though it points to the

fact (which is true, but not to the point) that in *Chemtura,* I approved such reserves, when

the *Chemtura* debtors agreed to set them up, to consensually resolve objections.  But I did

not rule on the extent to which segregated reserves were necessary, and certainly did not

hold that they were necessary.  A single such request imposes burdens on an estate, and if

I were to go beyond existing caselaw and rule that segregated reserves are required,

hundreds or thousands of other creditors in this case and others would be clamoring for

like treatment—resulting in extraordinarily burdensome obligations on this and future

estates, borne by creditors whose claims *were* allowed.

---

[50]     The Code itself does not impose *either* requirement, though without creating reserves of some
kind, I have some difficulty seeing how one could provide the statutorily required equal treatment
when dealing with the need to make later distributions on disputed claims that ultimately turn out
to be allowed, especially in cases, like this one, with a liquidating plan.

-27-

Once more, the Debtors need only take reasonable steps.[51]  Requests for personal

segregated reserves go way beyond that requirement.[52]  Where, as here, the Debtors have

created a very large reserve corresponding in size to the sum of what each creditor with a

disputed liquidated claim asked for, that is eminently reasonable, and all that the law

requires.

### 4.  Wilmington Trust Conflicts

A few objectors—the States of New York and California, and the Town of

Salina—contend that the Plan is unconfirmable by reason of concerns as to future trust

administrator activities of Wilmington Trust—contending that Wilmington Trust's

current and future roles in these cases (as a present member of the Creditors' Committee

and future administrator of each of the GUC and Avoidance Trusts) poses a potential

conflict of interest, with a possibility of prejudice to general unsecured creditors.

Assuming, without deciding, that such conflicts would require revisions of the Plan or its

underlying documents in order to make the Plan confirmable, I find no deficiencies that

would necessitate any such plan revisions.

Upon the Effective Date of the Plan if it is confirmed, the Creditors' Committee

will dissolve for all but a few very limited purposes, and Wilmington Trust will be

resigning from its position as a member and the chair of the Creditors' Committee.  Thus,

as of the Effective Date, Wilmington Trust will be focused on serving trust beneficiaries

in its capacity as GUC and Avoidance Action Trust Administrators.  At least in the

---

[51]    *See Weiss-Wolf*, n.47, above.

[52]    Similarly, I also reject the Nova Scotia Noteholders' contention (Conf. Hrg. Tr. 117-118) that as
holders of disputed claims, they should be given investment control over reserves established to
cover their claims.  They cited no authority for such a proposition, and as Creditors' Committee
counsel understandably responded (*id.* at 125), investment control "is unheard of."

foreseeable future, the beneficiaries of the two trusts will be the same—the unsecured

creditors in this case.  And while the trust corpuses differ, the underlying objectives of

each trust are fully congruent—to advance the welfare of the Debtors' unsecured

creditors.  While I tend to be very sensitive to conflicts on the part of fiduciaries, I can

find no reason for any concern vis-à-vis any future Wilmington Trust activities here.[53]

*5.  Other GUC Issues*

The objectors further contend that the GUC Trust lacks sufficient oversight and

controls to protect general unsecured creditors.  Once more, while I very much care about

the welfare of Old GM's creditors, I can find no reason for concern here.  The GUC Trust

Agreement provides for various layers of review for all actions taken by the GUC Trust

Administrator, including by the GUC Trust Monitor[54]—which is charged with overseeing

the activities of the GUC Trust Administrator—and also the Bankruptcy Court.  In

addition, the GUC Trust Agreement provides that the GUC Trust Administrator can be

removed and replaced by a successor administrator upon the filing of a petition to the

Bankruptcy Court by the holders of a majority of the GUC Trust units.  I'm comfortable,

accordingly, that these mechanisms provide for sufficient oversight and control to protect

the interests of unsecured creditors.

Also, of course, Wilmington Trust, an indenture trustee for $23 billion in Old GM

bonds, has extensive experience in acting as a fiduciary and in coordinating distributions

---

[53]    Also, as I noted previously, *see* page 9 above, there is no conflict now between Wilmington
Trust's duties to unsecured creditors and any duties it might hereafter have to the U.S. Treasury, if
there ever will be.

[54]    The Plan provides that the GUC Trust Monitor, like the GUC Trust Administrator, is to be
appointed by the Creditors' Committee with the consent of the Debtors.  Following deliberations
and the consideration of other parties, the Creditors' Committee determined that its financial
advisor, FTI Consulting, Inc., a well-known turnaround firm, was best suited to serve in the role of
the GUC Trust Monitor.

to bondholders and other creditor constituencies.  The objectors have put forward no

evidence to suggest a conclusion that it would meet these largely similar fiduciary

obligations in a deficient way.  And since Wilmington Trust has been actively involved in

this case since its inception, and in the creation of mechanisms to serve general unsecured

creditors' interests, it would actually be contrary to the interests of Old GM's unsecured

creditors to replace Wilmington Trust with an alternative entity, and lose the benefit of its

institutional knowledge about Old GM's chapter 11 case and plan distribution mechanics.

The objectors may be concerned that Wilmington Trust, as the soon-to-be former

indenture trustee for bondholders with liquidated and Allowed Claims, is focused on

disallowing disputed claims, to their disadvantage, since their claims have not yet been

allowed.  But I think the premise underlying that concern is faulty, and that objections of

this character fail sufficiently to take into account the underlying law.  AP Services, the

entity that currently manages the Debtors, and has managed claims objections during Old

GM's chapter 11 case, will continue to assist the GUC Trust and continue to manage

claims allowance litigation after the Effective Date.  And as a matter of law, any estate

fiduciary—be it the debtor's management, board of directors, creditors' committee, post-

effective date trustee, or the professionals for any of them—has similar duties with

respect to claims:  to seek to reduce or disallow claims to the extent that such is

warranted (to ensure that such claims don't dilute creditor recoveries inappropriately),

and conversely to refrain from contesting claims except where such is warranted.[55]  In the

absence of a showing that the proposed fiduciary is unwilling or unable to meet those

---

[55]    *Cf. Asbestos Settlement Trust v. City of New York (In re Celotex Corp.)*, 487 F.3d 1320, 1325
(11th Cir. 2007) (The purposes of the Trust are essentially to receive and manage the Trust assets,
to assume the Debtors' current and future liabilities from asbestos claims, and "to address,
liquidate, resolve, and disallow or allow and pay Asbestos Claims," *quoting In re Celotex Corp.*,
204 B.R. 586, 602 (Bankr. M.D. Fla. 1996)).

-30-

obligations (of either type), I don't believe that I should prevent its appointment. Of course, no claimant may appropriately object to the appointment of any post-Effective Date administrator out of concern that such administrator will litigate hard against it. When the claim warrants an objection, that is precisely what any such administrator is supposed to do.

### 6. Exculpation Provisions

The State of New York, the Town of Salina, and Green Hunt Wedlake also object to the "exculpation" provisions under the Plan, under which specified major participants in the case, and their professionals,[56] obtain what's in substance a qualified immunity for acts undertaken in connection with the case. New York[57] and the Town of Salina[58] object to provisions under which the Old GM *estate* releases any claims it might have, while all three object to the provision insofar as it provides that *third parties* (creditors and equity security holders) would be bound by such a result.

I agree in part. The releases in Article 12.5 by the Old GM estate are unobjectionable, but the releases in Article 12.6 are third-party releases impermissible under applicable Second Circuit law, and earlier rulings on my part following the Second Circuit's rulings. But as I well understand the abuses that such exculpation provisions are intended to address, and since most of the claims that creditors and stockholders might assert would actually belong to the Estate, I'll approve gatekeeping provisions to protect the exculpated parties from claims asserted by creditors and stockholders that actually belong to the Estate, and provide (to the extent I have subject matter jurisdiction

---

[56]    *See* pages 13 and 15, respectively.

[57]    New York Obj. at 13.

[58]    Salina Obj. at 21-24.

and elect to exercise it) that I'll *personally* hear any such claims, to separate meritorious

claims from those that are merely harassment.

I've dealt with this issue five times before, in my earlier decisions in *Chemtura*,[59]

*DBSD*,[60] and three times in *Adelphia*,[61] and needn't discuss it at comparable length here.

Releases by estates, on the one hand, and by third parties on the other, are very different,

and are governed by different principles of law.  Releases by estates involve a give-up of

potential rights that are owned by the estate, and are perfectly permissible in a plan, either

as parts of plan settlements or otherwise,[62] though the court must satisfy itself (at least if

anyone raises the issue) that the give-up is an appropriate exercise of business judgment,

and, possibly, in the best interests of the estate.[63]

By contrast, claims owned by third parties, such as creditors and stockholders, are

subject to different law and considerations.  As I explained in the *Adelphia Confirmation

Decision*,[64] while the Code provides that the discharge of a debtor's liabilities to its

---

[59]    *In re Chemtura Corp.*, 439 B.R. 561, 609-614 (Bankr. S.D.N.Y. 2010).

[60]    *DBSD*, n.34 above, 419 B.R. at 217-220.

[61]    *See In re Adelphia Communications Corp.*, 368 B.R. 140, 263-270 (Bankr. S.D.N.Y. 2007) (the "**Adelphia Confirmation Decision**"); *In re Adelphia Communications Corp.*, 364 B.R. 518, 528-530 (Bankr. S.D.N.Y. 2007) (the "**Adelphia D&O Policies Settlement Decision**") and, to a lesser extent, the *Adelphia Non-Fiduciary Fees Decision*, 441 B.R. at 17 n.41.

[62]    Nothing in the Code prohibits them, and at least many will be affirmatively authorized under section 1123(b) of the Code, which covers matters that *may* be included in a plan.  Section 1123 provides, among other things, that a plan may provide for "the settlement or adjustment of any claim … belonging to the debtor or to the estate," or, alternatively, provide for "the retention and enforcement by the debtor, by the trustee, or by a representative of the estate appointed for such purpose, of any such claim…."  Section 1123(b)(3).

[63]    In *DBSD*, I found that the debtor releases were both an appropriate exercise of business judgment and in the best interests of the estate, *see* 419 B.R. at 217, and in *Chemtura*, I recognized the issue but didn't need to decide it.  *See* 439 B.R. at 612 n.224 ("Irrespective of whether the release of claims of that character [those "given by the Debtors of claims the Debtors themselves own"] is governed by a best interests of the estate or merely a business judgment standard, I see no basis for finding such releases to be inappropriate.").  Here I likewise don't need to decide the appropriate standard, since I expressly find, as a mixed question of fact and law, that the Old GM estate's release of claims it owns satisfies both requirements.

[64]    *See* 368 B.R. at 266.

creditors doesn't also result in a discharge of nondebtors' liabilities on those obligations to such creditors[65] (and, at least impliedly, any *other* nondebtor obligations to such creditors, or other third parties), the Code doesn't say that provisions in plans providing for such are impermissible. And it says, in section 1123(b)(6), that a plan may "include any other appropriate provision not inconsistent with the applicable provisions of this title." Although (since the Code is silent on the matter) third-party releases aren't "inconsistent with the applicable provisions of this title," the Second Circuit has ruled that they're permissible only in rare cases, with appropriate consent or under circumstances that can be regarded as unique, some of which the Circuit listed.[66] But where those circumstances haven't been shown, third-party releases can't be found to be "appropriate."[67]

---

[65]     *See* Bankruptcy Code section 524(e).

[66]     *See Deutche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.)*, 416 F.3d 136, 142 (2d Cir. 2005) ("***Metromedia***"); *Adelphia Confirmation Decision*, 368 B.R. at 266-270 (explaining and applying *Metromedia*).

[67]     *See Adelphia Non-Fiduciary Fees Decision*, 441 B.R. at 17 & n.41. As I noted in the *Adelphia Confirmation Decision*, *see* 368 B.R. at 267, the limitations on third-party releases apply to both pre- and post-petition events. Even though it's long been the custom in the bankruptcy community to make distinctions between releases involving pre- and postpetition conduct (and postpetition releases are less subject to abuse), "after *Metromedia*, limitation to postpetition events, by itself, is insufficient to justify a third-party release." *Id.* At least up to now, the Circuit hasn't distinguished between them.

As I observed in *Chemtura,* citing my earlier decision in *DBSD*, there are good reasons why plan proponents put in the provisions that I now feel bound to invalidate:

> Exculpation provisions are included so frequently in chapter 11 plans because stakeholders all too often blame others for failures to get the recoveries they desire; seek vengeance against other parties; or simply wish to second guess the decisionmakers in the chapter 11 case.

439 B.R. at 610. And that's so even though most of the claims that might be brought don't belong to individual stakeholders, but belong instead to the debtor estates—which quite properly can, and do, provide exculpation, carefully drafted (as in this case) to carve out from any protection matters unworthy of protection, such as intentional misconduct or gross negligence.

Strong arguments can be made that the bankruptcy system would be strengthened if plan fiduciaries were more broadly protected from claims by disgruntled or harassing stakeholders, such as by the provisions we now have for exculpation granted by estates, which the U.S. Trustee

As just noted, the Circuit listed certain circumstances that would justify third-party releases, one of which is applicable to *other* releases in the Plan—relating to asbestos-related claims, none of which were objected to here.  But none of the qualifying circumstances has been even argued to be applicable to the exculpation provisions here.

I well recognize how hard the Debtors, the Chapter 11 Fiduciaries, and their professionals worked on this case, and how, with thousands of disappointed creditors and stockholders out there to second guess their actions, they would like to be protected for their good faith actions in maximizing value and bringing this case to a successful conclusion.  But I'm constrained by existing law to place some limits on their protection.  I've spoken many times, including earlier in this very case,[68] of the importance of *stare decisis* and predictability in commercial cases in this district, and thus must remain consistent with my earlier decisions, not to mention the Circuit's.  Accordingly, the exculpation provisions of Article 12.6[69] must be fixed, consistent with *Chemtura*, *DBSD*, and the *Adelphia* decisions.

With that said, I recognize the legitimate concerns that prompted the exculpation provisions that I'm trimming.  And as in my earlier decisions,[70] I'll approve language that addresses those concerns, so long as it falls short of an impermissible third-party release.  Article 12.6 may include language, if Plan supporters wish, requiring third-party claims of the type now covered to be first brought before me, for a threshold inquiry to confirm that they actually belong to the third party, and don't belong, instead, to the Estate.  And

---

Program carefully monitors.  But until Congress or the Circuit gives me the authority to authorize exculpation from claims by third parties, I think I must rule in accordance with existing caselaw.

[68]   *See* the *363 Decision*, 407 B.R. at 486-487 & n.19, 504.

[69]   Article 12.5 is fine, and for the avoidance of doubt, objections to Article 12.5 are overruled.

[70]   *See*, *e.g.*, *Chemtura*, 439 B.R. at 612.

it may further provide, if Plan supporters wish, that, subject to any applicable subject matter jurisdiction limitations, I'll at least initially have exclusive jurisdiction to be the forum for any covered litigation brought by any creditor or equity security holder, so long as I'm free to abstain and consider whether that litigation would be better conducted elsewhere.

Since the Plan has the Self-Correcting Feature to which I previously referred, the Plan is confirmable notwithstanding the changes that I require here. And the Plan will be confirmed, so long as I receive revised Plan language substantially in conformity with this Decision.

### 7. *Miscellaneous Objections*

I don't think that I should lengthen this Decision further by specifically addressing any of the other objections that were filed, or other arguments or argument variants that were made in connection with the objections discussed above. I've canvassed them and satisfied myself that no material objections other than those I've specifically addressed were raised and have merit. To the extent those objections were not expressly addressed in this Decision, they're overruled.

Conclusion

For the foregoing reasons, the Plan will be confirmed, subject to inclusion of the Plan revisions announced on the record and as required under this Decision. The Debtors are to settle an order in accordance with this Decision. The time to appeal will run from the date of entry of the resulting order, and not from the date of this Decision.

Dated: New York, New York      _____*s/Robert E. Gerber*_____
         March _**7th**_, 2011        United States Bankruptcy Judge