Page 1

1

2  UNITED STATES BANKRUPTCY COURT

3  SOUTHERN DISTRICT OF NEW YORK

4  Case No. 09-50026-reg

5  - - - - - - - - - - - - - - - - - - - - - - -x

6  In the Matter of:

7

8  MOTORS LIQUIDATION COMPANY, ET AL.,

9      F/K/A GENERAL MOTORS CORP., ET AL.,

10

11        Debtors.

12

13  - - - - - - - - - - - - - - - - - - - - - - -x

14

15            U.S. Bankruptcy Court

16            One Bowling Green

17            New York, New York

18

19            February 9, 2011

20            9:51 AM

21

22  B E F O R E:

23  HON. ROBERT E. GERBER

24  U.S. BANKRUPTCY JUDGE

25

Page 2

1    Debtors' 110th Omnibus Objection to Claims (Contingent Co-

2    Liability Claims)

3

4    Debtors' 134th Omnibus Objection to Claims (Eurobond Deutsche

5    Debt Claims)

6

7    Debtors' 136th Omnibus Objection to Claims (Eurobond Deutsche

8    Debt Claims)

9

10    Debtors' 137th Omnibus Objection to Claims (Eurobond Deutsche

11    Debt Claims)

12

13    Debtors' 138th Omnibus Objection to Claims (Eurobond Deutsche

14    Debt Claims)

15

16    Debtors' 139th Omnibus Objection to Claims (Eurobond Deutsche

17    Debt Claims)

18

19    Debtors' 140th Omnibus Objection to Claims (Eurobond Deutsche

20    Debt Claims)

21

22    Debtors' 141st Omnibus Objection to Claims (Eurobond Deutsche

23    Debt Claims))

24

25

Page 3

1     Debtors' 142nd Omnibus Objection to Claims (Eurobond Deutsche

2     Debt Claims)

3

4     Debtors' 143rd Omnibus Objection to Claims (Eurobond Deutsche

5     Debt Claims)

6

7     Debtors' 144th Omnibus Objection to Claims (Eurobond Deutsche

8     Debt Claims))

9

10    Debtors' 145th Omnibus Objection to Claims (Eurobond Deutsche

11    Debt Claims)

12

13    TPC Lenders Motion for an Entry of an Order (I) Initiating

14    Valuation Proceedings in Accordance with the Sale Order, and

15    (II) Establishing a Schedule with Respect to the Valuation

16    Proceedings

17

18    (Adv. Proc. No. 1-10-05016) New United Motors Manufacturing,

19    Inc. v. Motors Liquidation Company {Pretrial Conference)

20

21    Motion to Dismiss Adv. Case 10-5015 & 10-5016

22

23    Hearing on Debtors' Objection to Proof of Claim #67357 of New

24    United Motor Manufacturing, Inc.

25    Transcribed By:  Ellen S. Kolman

Page 4

1    A P P E A R A N C E S :

2    WEIL, GOTSHAL & MANGES LLP

3            Attorneys for Debtors

4            767 Fifth Avenue

5            New York, NY 10153

6

7    BY:   ANTHONY ALBANESE, ESQ.

8            JOSEPH H. SMOLINSKY, ESQ.

9

10

11   KIRKLAND & ELLIS, LLP

12           Attorneys for NUMMI

13           555 California Street

14           San Francisco, CA 94104

15

16   BY:   MARK MCKANE, ESQ.

17

18

19   KIRKLAND & ELLIS, LLP

20           Attorneys for NUMMI

21           601 Lexington Avenue

22           New York, NY 10022

23

24   BY:   RAY C. SCHROCK, ESQ.

25

Page 5

1    FOLEY & LARDNER, LLP

2         Attorneys for Toyota Motors Corporation (TMC) and Cummins

3         321 North Clark Street

4         Suite 2800

5         Chicago, IL 60654-5313

6

7    BY:   JEFFREY A. SOBLE, ESQ. (TMC)

8         JILL MURCH NICHOLSON, ESQ. (CUMMINS) (TELEPHONICALLY)

9

10

11   ARNSTEIN & LEHR LLP

12        Attorneys for Sentry Insurance and Sentry Select

13          Insurance Company

14        120 South Riverside Plaza

15        Suite 1200

16        Chicago, IL 60606

17

18   BY:   DAVID GOLIN, ESQ. (TELEPHONICALLY)

19

20

21

22

23

24

25

Page 6

1   STUTZMAN, BROMBERG, ESSERMAN & PLIFKA, P.C.

2         Attorneys for the Future Asbestos Claimants

3         2323 Bryan Street

4         Suite 2200

5         Dallas, TX 75201

6

7   BY:   JACOB L. NEWTON, ESQ. (TELEPHONICALLY)

8

9

10  SIDLEY AUSTIN, LLP

11        Attorneys for the Lender Group

12        787 Seventh Avenue

13        New York, NY 10019

14

15  BY:   NICHOLAS K. LAGEMANN, ESQ.

16        STEVEN M. BIERMAN, ESQ.

17

18

19

20

21

22

23

24

25

Page 7

1

2    KING & SPALDING

3         Attorneys for New GM

4         1185 Avenue of the Americas

5         New York, NY 10036

6

7    BY:    ARTHUR J. STEINBERG, ESQ.

8           SCOTT DAVIDSON, ESQ.

9           H. SLAYTON DABNEY, ESQ.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 8

1             P R O C E E D I N G S

2             THE CLERK:  All rise.

3             THE COURT:  Good morning. Be seated, please.

4             All right.  We're here on GM Motors Liquidation.  I

5    want to start with the NUMMI matter. I want to get appearances

6    and then I want everybody to sit down because I have some

7    preliminary comments.

8             MR. SMOLINSKY:  Good morning, Your Honor.  Joe

9    Smolinsky of Weil Gotshal Manges for the debtors.  I just stood

10   to introduce my colleague, Anthony Albanese, who I think you've

11   met once before who will be handling this matter.

12            THE COURT:  Yes.  Was it Global Crossing?

13            MR. ALBANESE:  Yes.  That's right.  Global Crossing

14   years ago.

15            THE COURT:  Yes.  I remember, Mr. Albanese.

16            MR. MCKANE:  Good morning, Your Honor.  Mark McKane of

17   Kirkland & Ellis on behalf of NUMMI and with me is my partner

18   Ray Schrock.

19            THE COURT:  Right. I'm sorry, Mr. McKane, you

20   partner's name?

21            MR. MCKANE:  Mr. Schrock.  Ray Schrock, Your Honor.

22            THE COURT:  Oh, yes.  I see him as the other name on

23   the brief, right.

24            MR. SOBLE:  Your Honor, Jeff Soble on behalf of Toyota

25   Motor Corporation or TMC from Foley & Lardner and I'm the only

GENERAL MOTORS CORPORATION

Page 9

1    one alone today.

2         THE COURT:  All right.  You're going to have to do it

3    by yourself, huh, Mr. Soble?  All right. I see you on your

4    brief as well.

5         All right, gentlemen, make your presentations as you

6    see fit and since I'm not an appellate court you can address my

7    questions and concerns at any time as long as you've covered

8    them by the time you're done.  But I do have a number of

9    problems and concerns with both of your positions and I want

10   you to address them as we go along.

11        Starting with the 1983 Memorandum of Understanding,

12   and one thing I'm going to ask of you guys either as a point of

13   personal privilege so I can do my job or as a matter of just

14   basic communication, please don't use acronyms except on the

15   most obvious things.  If you're talking about the FCC, I

16   understand what that is.  But when people use acronyms for less

17   obvious things it makes a judge go blind.

18        Turning first to the 1983 Memorandum of Understanding,

19   as so many letters of intent and memoranda of understanding

20   are, it is a little squishy in terms of the degree of

21   specificity upon which emerges different things of intent,

22   precatory words, and actual contractual obligations.  And then

23   in a paragraph that none of you seem to rely upon, and perhaps

24   that's because you know more about the case than I do, toward

25   the end it seems to say that many of the things in it don't

GENERAL MOTORS CORPORATION

Page 10

1    become effective until some later time such as when governments

2    approve things and things like that.  And both sides seem to

3    assume that it was a full binding agreement and I would like

4    you to tell me, it doesn't appear in the pleadings unless I

5    missed it, as to whether there was a time at which what

6    seemingly or tentative and preliminary thoughts blossomed into

7    more concrete obligations.  But both sides seemed to my

8    understanding to assume that the 1983 Memorandum of

9    Understanding is a binding agreement vis-a-vis whatever it says

10   but I want you to help me if my understanding in that respect

11   isn't correct.

12        My principal interest is in the 1984 Vehicle Supply

13   Agreement and I want both sides to address what is my biggest

14   concern, probably the whole day, on the tension between three

15   sentences in 4.1 of that agreement because they head in

16   dramatically different directions and each of you, and I mean

17   no disrespect, I used to be a lawyer, I was an advocate for a

18   client, but each of you relies on a sentence or pairs of

19   sentence that you care about and you ignore the others.  And

20   somehow, I as a judge, have to read together seemingly

21   inconsistent language.

22        Now, one or both of you, I guess it was principally

23   NUMMI, perhaps Toyota made the same point, spoke about canons

24   against surplusage and giving every clause meaning.  I think

25   each of you violated that rule.  And my job is to give due

Page 11

1    respect to that principle and that cuts against each of you,

2    vis-a-vis the language in that 4.1(b) that's inconsistent.

3           I also am nervous about GM's position when taken to

4    its logical extreme because it would seemingly make all

5    obligations illusory and I think it was Toyota that made the

6    point in its brief.  It asked rhetorically could it be that GM

7    had made no promises whatever and didn't have to buy a single

8    vehicle.  That strikes me as counter intuitive.  Conversely, it

9    seems to me that this dispute may ultimately, perhaps not on a

10   12(b)(6), but ultimately turn on good faith and could cause me

11   to wonder whether while GM had some obligations, it wasn't

12   required to do anything that forces -- imposed upon it, such as

13   the discontinuation of the Pontiac line and the Pontiac Vibe

14   and the pressure from the U.S. Government wouldn't contemplate.

15          I do have material problems, Mr. Albanese, with the

16   heavy reliance you put in your motion to dismiss on stuff that

17   was outside the four corners of the complaint.  And while the

18   Federal Rules of Evidence to which you relied allows stuff to

19   go in at trial in some cases by reason of judicial notice, I

20   don't know if that's the same thing as turning a 12(b)(6) into

21   a please consider all the other facts.  Obviously, I'm allowed

22   to consider everything in the documents but when we go beyond

23   that, I have reservations.

24          I have major problems, much more major problems with

25   the Toyota claims in at least two respects.  One, on the major

1   contractual obligations, it appears to me, subject to your

2   rights to be heard, of course, that Toyota is a signatory to

3   most or all of the key documents.  But the obligations run to

4   NUMMI.  They don't run to Toyota.  Toyota is a co-shareholder.

5   And I have trouble seeing how Toyota in contrast to NUMMI can

6   complain of contractual obligations except insofar as there is

7   the stated violation of a contractual obligation that runs to

8   Toyota in contrast to NUMMI.

9           I also have problems of two types with respect to the

10  environmental and workers' comp indemnity claims.  The first is

11  the obvious one that the GM estate already articulated which is

12  the failure to allege amounts that we're expending or insofar

13  as I can tell assuming that it would be actionable even

14  though -- which have not been expended but which Toyota is on

15  the hook for.

16          The second and it puzzled me as to why GM didn't raise

17  this especially on the environmental side, the obligations seem

18  to walk and talk and quack a lot like the CERCLA obligations

19  with respect to which I dismissed claims for indemnification by

20  PRPs, potentially responsible parties, in two recent published

21  decisions in Lyondell Chemical and Chemtura on 502(e) grounds

22  and other than the fact that Toyota might not have spent

23  anything, which if it had spent it wouldn't be a subject to

24  attack under 502(e), I have trouble seeing why those claims

25  aren't also disallowed under 502(e) but I'm also puzzled as to

1    why GM, which has some pretty good lawyers on it, didn't raise

2    that point.  So, maybe I'm just missing something.  But when

3    multiple parties are jointly liable to the State of California

4    or to the U.S. government for cleaning up polluted property, I

5    have some trouble divorcing 502(e) from my analysis.  So, I

6    want both sides to help me on that issue.

7         Okay, with that said, I'll hear argument in the

8    traditional order.  First from you, Mr. Albanese, then I'll

9    hear from your two opponents, then I'll allow you to reply.

10   And so long as it's appropriately limited I'll permit surreply

11   as well.  Want to come on up to the main lectern please?

12        MR. ALBANESE:  Thank you, Your Honor.  I'm just

13   gathering some things.

14        Good morning again, Your Honor.

15        THE COURT:  Good morning.

16        MR. ALBANESE:  Well, in light of Your Honor's

17   comments, I'll keep my presentation very focused on the issues

18   that you've raised, Your Honor.  And -- but as you know, our

19   MLC's overall argument here is that -- and I'm going to start

20   primarily with NUMMI's claims and Toyota overlaps with some of

21   their arguments and then at the end I'll go to the separate

22   Toyota claims that you mentioned.  But with respect to NUMMI's

23   main arguments, we believe the contracts are very clear in and

24   of themselves that MLC did not have the contractual obligations

25   that NUMMI claims that we had and claims that we violated.  We

GENERAL MOTORS CORPORATION

Page 14

1    don't think you need to go beyond the four corners of a

2    contract so for purposes of this presentation, we will -- I

3    will focus on the contracts and I'd like to start with the VSA,

4    the Vehicle Supply Agreement, which Your Honor referenced and

5    in particular section 4.1.

6           Now, I understand what Your Honor is pointing out

7    that, you know, we each focus on three separate sentences

8    within the same provision and Your Honor's question is whether

9    or not they are, in fact, contradictory.  And we don't think

10   they are and we'd like to focus on this entire provision

11   4.1(b).

12          The first sentence reads, "The parties hereto are

13   establishing supply and purchase arrangements under which the

14   JB Company shall supply and GM shall purchase the products on a

15   continuous and stable basis."  And that's what NUMMI focuses on

16   for its argument that continuous and stable basis means it goes

17   on indefinitely and we have this obligation to continuously

18   purchase vehicles from them.  But the provision goes on and it

19   says, "It is acknowledged that the JB Company is making

20   substantial amounts of capital expenditures in its facilities

21   relying upon GM's present projection that market demand for the

22   vehicles will exceed 200,000 units per annum."  Now, just to

23   refresh Your Honor, this agreement was from February 1984.  So,

24   this paragraph is referencing GM's projections in '84; over

25   twenty years ago.

1    And then the last sentence says, "However, it is

2  further acknowledged that market demand for the products that

3  could be generated in the areas in which GM expects to sell

4  them will govern the purchase commitments of the parties as to

5  all products."  So, that makes very clear that market demand

6  will govern the purchase commitments.  And so the reason we

7  don't think it's inconsistent is the way it's drafted.  It says

8  that "GM will purchase on a continuous and stable basis,

9  however," it uses the language however, it's qualifying that

10  language, "however, it is further acknowledged", again, further

11  qualifiers, "that market demand will govern."  So, again, we

12  don't think the two sentences are inconsistent.  We're not

13  attempting to ignore the first one.  Yes, there was this --

14  this language, this effort that we would buy on a continuous

15  and stable basis but only to the extent that market demand

16  allow for it and would govern.

17        THE COURT:  Pause, please, Mr. Albanese.

18        MR. ALBANESE:  Sure.

19        THE COURT:  Is your point that the first sentence of

20  4.1 which precedes the continuous and stable basis business

21  with "The parties hereto are establishing supply and purchase

22  arrangements" is in substance describing something that is

23  being done elsewhere as contrasted to establishing covenants of

24  its own?

25        MR. ALBANESE:  Yes, Your Honor.  We -- first of all,

GENERAL MOTORS CORPORATION

Page 16

1    I'm saying it's qualified but a latter sense then yes because

2    the VSA makes clear that if you turn to Section 4.2, Your

3    Honor --

4            THE COURT:  Yes.  Which begins "Within the general

5    principal set forth in Section 4.1 hereof."

6            MR. ALBANESE:  Yes.  Correct.  "Within the general

7    principals set forth in Section 4.1 hereof, each purchase and

8    sale transaction between the JB Company and GM shall be

9    governed by an individual sales contract.  It being agreed that

10   within the context -- within that context that the JB Company

11   has no obligation to supply and GM has no obligation to

12   purchase any products until the parties enter into a contract."

13   So, we think the contract is very clear.  It's saying you'll

14   purchase on a continuous and stable basis, however, we're

15   acknowledging that market demand will govern and we're crystal

16   clear that any purchase will not be done pursuant to this VSA

17   but pursuant to a separate sales contract and that you have no

18   obligation to purchase if and until you enter into such a

19   contract, meaning a separate sales contract.

20           So, we think 4.1 and 4.2 read together in their

21   entirety are very clear as to MLC's obligations with respect to

22   purchasing vehicles, Your Honor.

23           THE COURT:  I didn't have so much of a problem with

24   the first sentence of 4.1 as I did with the second which is

25   acknowledging what could be regarded by your opponents as a

GENERAL MOTORS CORPORATION

Page 17

1    kind of a detrimental reliance upon a projection but which then

2    goes on in its third sentence to talk about the effect of

3    market demand and the fact that market demand will govern the

4    purchase commitments of the parties.

5            I can see why the third sentence could be argued by GM

6    to provide a material out when the market demand doesn't

7    warrant continuing doing things but it does -- the second

8    sentence does seem to acknowledge that NUMMI is in reliance on

9    some kind of commitments as making substantial amounts of

10   capexes relying on the projection and that would cause me to

11   believe that there might be some kind of implied duty of good

12   faith that if you have the ability to keep doing business with

13   NUMMI consistent with market demand that there would be some

14   obligation if Toyota does it; I don't think you could

15   contend -- I don't think you could just stop dealing with them

16   on a whim.

17           MR. ALBANESE:  I understand, Your Honor, but the

18   bottom line is that second sentence that you're referring to

19   again is referring to projections, it said "present

20   projections," in 1984 and the parties had a very good

21   relationship for twenty-some odd years.  But the sentence that

22   immediately follows it made it very clear that market demand

23   will govern and the parties acknowledge that -- this was a very

24   long relationship and the parties are acknowledging in this

25   provision that market demand could change drastically which it

GENERAL MOTORS CORPORATION

Page 18

1    did twenty-plus years later.  And the point is that the

2    contract was specifically drafted to allow for that.  To

3    provide that market demand would govern, to have market demand

4    control and impact purchasing obligations.  And again, this

5    document doesn't set forth any purchasing obligations.  It says

6    that this is the relationship, this is how we're going to work

7    together, this is what we're going to do, market demand will

8    govern your purchasing obligations and you will enter separate

9    sales contracts for the vehicles that you're going to purchase.

10   This document doesn't say you will purchase 100,000 vehicles

11   every year for the next 20 years.  It in no way says that or

12   sets up such a relationship.

13          THE COURT:  Keep going, please.

14          MR. ALBANESE:  So, that's our view on the VSA, Your

15   Honor.  And again, reading it in its entirety not ignoring any

16   sentences, we think it's crystal clear as to MLC's obligations.

17          The next document I'll turn to is the 1983 MOU that

18   Your Honor referenced.

19          THE COURT:  Memorandum of Understanding, please?

20          MR. ALBANESE:  Yes, Your Honor; I'm sorry.  The 1983

21   Memorandum of Understanding.  And again, this document, the VSA

22   and the shareholders' agreement were executed on the same day,

23   February 21st, 1984.  A year prior, the Memorandum of

24   Understanding, the 1983 Memorandum of Understanding, was

25   enacted.  And Your Honor referred to it as somewhat of a letter

GENERAL MOTORS CORPORATION

Page 19

```
 1    of intent as "squishy," I think it was the word you used, and

 2    we agree with that.  I mean this was the parties' intent, and

 3    when I say "the parties'", it's Toyota and ML's what's now MLC,

 4    getting together and deciding they're going to create this

 5    joint venture NUMMI.  NUMMI, obviously, wasn't a party to this

 6    contract and we say they have a standing issue because this was

 7    creating them.  They weren't a party to it.  But put that aside

 8    for now.  The point of this agreement, was essentially a letter

 9    of intent as to what NUMMI would be, what this joint venture

10    would be.  And what we do argue in our papers is that the

11    shareholder agreement a year later is the binding document that

12    creates the obligation that the two shareholders have with

13    respect to NUMMI.

14            THE COURT:  But -- pause, please, Mr. Albanese.

15            MR. ALBANESE:  Sure.

16            THE COURT:  Because the shareholder agreement says in

17    substance, I could probably find the exact words but in

18    substance it says leading into the trumps language you're

19    talking about, to the extent not inconsistent or to the extent

20    inconsistent it supersedes which seemingly says, now, you know

21    having litigated cases of this type back in my first life I

22    well understand that people for business reasons use squishy

23    language for business reasons which would otherwise be inept or

24    even incompetent lawyering otherwise, but in RepraSystem (ph.)

25    terms, RepraSystem, of course, being a Second Circuit decision
```

Page 20

1    under New York law but I don't know if California law would

2    differ in this, "parties can decided to bind themselves or not

3    bind themselves before they enter into the more definitive

4    documentation" and that's their decision and the job of a judge

5    is to determine their intent.

6         Good lawyers normally say this is a letter of intent

7    and won't be binding until more definitive documentation is

8    entered into.  Alternatively, they can say, as was said in the

9    Teachers' Insurance cases, "Upon you signing this, this shall

10   be a binding agreement."  This document did neither and it took

11   kind of a hybrid approach and it said this document won't be

12   binding, and this is a paraphrase, until various governmental

13   approvals have been obtained, yada, yada, but the implication

14   is that when they have come in that there is some duties that

15   remain and the fact that a) you didn't argue that there was no

16   agreement at all in your brief coupled with the fact that the

17   shareholders' agreement in 1984 doesn't say forget about the

18   letter of intent it simply says to the extent not inconsistent,

19   it seems to imply that the 1983 Memorandum of Understanding was

20   perceived by the parties as having some contractual

21   significance.  Do you think I'm wrong in that regard?

22        MR. ALBANESE:  Well, if I could just respond two ways,

23   Your Honor.  First of all, if our papers we argue that this is

24   not a contract with NUMMI.  NUMMI didn't exist yet.  So, we

25   don't believe that NUMMI can be suing us for a breach of a

GENERAL MOTORS CORPORATION

Page 21

1    Memorandum of Understanding between us and Toyota.  So, we do

2    not believe this is a contract with NUMMI.  And the

3    shareholders' agreement a year later, Your Honor is absolutely

4    right  It has language that says it supersedes this Memorandum

5    of Under -- '83 Memorandum of Understanding to the extent it's

6    inconsistent.  But the --

7              THE COURT:  I think I stuck a not in there when I

8    should have but you're correct.

9              MR. ALBANESE:  Right.

10             THE COURT:  It's roughly what it says.

11             MR. ALBANESE:  Correct.  And, Your Honor, what NUMMI

12   relies on it for is inconsistent.  So, our point is we don't

13   need to get to -- to defer their issues.  It's a) not a

14   contract with NUMMI, they can't sue us for breach of it; and b)

15   they're trying to use this -- this Memorandum of Understanding

16   to argue that we're liable -- MLC is liable for its expenses,

17   for its wind-down costs, for its debts at termination yet the

18   Shareholder Agreement, which supersedes it on this point,

19   states that the JV company shall be responsible for the payment

20   of all its own expenses; and it makes clear that the JV is now

21   a separate and distinct entity from its shareholders MLC and

22   Toyota.

23             So, it's not a contract with NUMMI, they can't sue us

24   for breach of it, and second of all, it's contradicted.  The

25   provision for which they rely on the Memorandum of

Page 22

1    Understanding is contradicted by the Shareholder Agreement and

2    makes very clear we are not liable for their expenses.

3            THE COURT:  Good time -- good segue for you to talk

4    about their third-party beneficiary point.

5            MR. ALBANESE:  Sure, Your Honor.

6            THE COURT:  Because NUMMI didn't exist, but it sure

7    seemed to me, at the time that the 1983 Memorandum of

8    Understanding was entered into, that people had a pretty good

9    idea that they were going to set up what they referred to as a

10   joint venture.

11           MR. ALBANESE:  Correct, Your Honor.

12           The parties could have explicitly made NUMMI a third-

13   party beneficiary of this contract, and they did not.  There --

14   the law on third-party beneficiary is clear that a party need

15   to be expressly named as a third-party beneficiary, or it must

16   be clear that the "third-party beneficiary" was intended to be

17   a third-party beneficiary.  And there's nothing in the language

18   of this agreement -- there's nothing express to say that

19   this -- that NUMMI would be a third-party beneficiary, and

20   there's nothing, in our view, even implied that says we

21   intended to create a third-party beneficiary status with

22   respect to NUMMI.

23           And while yes, it's creating NUMMI, the point is that

24   we knew -- the parties knew that they were going to enter into

25   a more definitive Shareholder Agreement, which they did within

GENERAL MOTORS CORPORATION

Page 23

1    a year.  And so our view is there was no intent and there's no

2    express language creating the third-party beneficiary status

3    that they're attempting to achieve.

4            THE COURT:  Continue, please.

5            MR. ALBANESE:  Your Honor, let me take the last two

6    agreements that they relied, and then we'll have gone through

7    all four; there are four in total.

8            We've talked about the Vehicle Supply Agreement, we've

9    discussed the 1983 MOU and we've discussed the Shareholders

10   Agreement, Your Honor, which talks about the separate existing

11   entities.

12           So, let me just touch on the fourth one then, which is

13   this 2006 MOU.  Now, this is created much later than the other

14   documents, because Memorandum of Understanding is '83,

15   Shareholders Agreement is --

16           THE COURT:  Twenty-two years later, I can do the math.

17           MR. ALBANESE:  Twenty-two years later, okay.  I won't

18   do the math for you.

19           So, twenty-two years later they enter into this

20   Memorandum of Understanding because they had updated the

21   vehicles and there were newer models with respect to the

22   Corolla, TMC -- the Toyota Corolla and the GMC Vibe.

23           Now again, here, Toyota -- rather NUMMI selectively

24   quotes from the agreement, and they argue that this agreement

25   says that both TMC and GMC will make "best efforts to maximize

GENERAL MOTORS CORPORATION

Page 24

1    the production volume during the life in consideration of

2    maintaining the stability and operations at NUMMI".  And they

3    use that language to argue that we had an obligation to sustain

4    the viability of NUMMI.  But again, they quote this paragraph

5    1, subparagraph 2, and they don't discuss the next paragraph,

6    paragraph 3, which says -- which reads that "the parties

7    understand that, assuming that 225,000 units of the products

8    are scheduled to be produced in a year, the products will be

9    allocated between TMC and GMC under the following formula" --

10   and below it lays out a split -- and this is the key language,

11   "where each of TMC and GMC will have a right to, but not an

12   obligation, to purchase the products from NUMMI".  And again,

13   while it says we'll use best efforts to maximize production

14   volume, it -- that's qualified and it goes on to state as

15   clearly as it did in the Vehicle Supply Agreement that we will

16   have a right to, but not an obligation to purchase these

17   vehicles.

18          And then if you go on to paragraph 7 of the 2006

19   Memorandum of Understanding, which says annual review.  That

20   paragraph says "the parties understand that changes in the

21   market condition for the products might make the contents

22   described in this Memorandum of Understanding inconsistent with

23   the continued viability of NUMMI and the profitability of sales

24   on the products; therefore the parties agree that they will

25   annually review all the contents described herein to ensure

1    that NUMMI will remain viable and that the results from NUMMI's

2    operations continue to be acceptable for TMC and GMC".

3         Now again, Your Honor, we think that paragraph makes

4    clear that the annual -- the point of the annual review is each

5    year to see where things stand, to see what the purchasing

6    obligations or needs will be going forward and it ends with

7    that the results will be acceptable for TMC and GMC.  Again,

8    it's clearly not acceptable for GMC to be purchasing vehicles

9    from NUMMI that have been discontinued at GMC, due to its

10   restructuring with the government.

11        THE COURT:  Well, it's subject to a double entendre,

12   isn't it, Mr. Albanese?  That is one interpretation.  But TMC,

13   using my parlance, Toyota, and GMC, using my parlance, GM, or

14   General Motors, are shareholders of NUMMI and the language that

15   precedes it to ensure that NUMMI will remain viable, it doesn't

16   say that this arrangement will make sense for either Toyota or

17   GM.  This is another example of where each of you guys is

18   relying upon shreds of a larger document, or a larger

19   paragraph, on a 12(b)(6); which I can see a dozen reasons why

20   you may win after trial and half a dozen why you may win on

21   summary judgment but I cannot, for the life of me -- that's

22   overstated, but I have difficulty seeing how you can win on

23   contentions of the character you're making on a 12(b)(6).

24        MR. ALBANESE:  Your Honor, NUMMI is arguing that we

25   were obligated to continue purchasing vehicles from them in

GENERAL MOTORS CORPORATION

Page 26

1   order to keep them viable.  This contract, the Vehicle Supply

2   Agreement, say crystal clear -- this is not a paraphrase --

3   that we do not have a purchasing obligation.  We have no

4   obligation -- we have a right to purchase, but not an

5   obligation.  That language couldn't be clearer.  This paragraph

6   is saying we'll do an annual review, we'll see where things

7   stand; we'll see what we can do to help it remain viable.

8   Earlier it says we'll use best efforts.

9          But none of that trumps -- none of that creates an

10  obligation to purchase vehicles.  And the language says we

11  don't have an obligation.  So, we don't think there's any need

12  for factual discovery, we think it'd be a waste of all the

13  parties' time and money, because the contract's clear in that

14  point.  I mean, they're saying you had to keep purchasing

15  vehicles from us to keep us viable.  But we put in the

16  contracts that we did not have any such purchasing obligations.

17  Trying to use best efforts, trying to do a review to see where

18  things stand and what the market demand was, that's all part of

19  the relationship, but that doesn't create -- I mean, that's all

20  part of the parties' relationship and intent, but that doesn't

21  create an obligation to purchase vehicles.

22          And the contracts are clear that market demand will

23  govern the ob -- purchasing obligations; and that we don't have

24  purchasing obligations.  We have a right, not an obligation, to

25  purchase.

Page 27

1          So for the Court to ultimately conclude that we did

2     have -- we had to keep purchasing vehicles from them would be

3     expressly -- would be an express contradiction, in our view, of

4     these plain agreements.  And we see no need for discovery we

5     have contracts that are that clear, Your Honor.

6          Your Honor, those are all -- if you have no more

7     further questions about the four contracts, I'll just turn

8     briefly to their noncontractual claims, the implied covenant of

9     good faith and fair dealing and promissory estoppel.

10          THE COURT:  Um-hum.

11          MR. ALBANESE:  The -- the implied -- and I could sort

12     of do them together -- well, take one at a time.  Implied

13     covenant of good faith and fair dealing -- and promissory

14     estoppel, both of these non-contractual claims, we have law

15     which is cited in our papers, and I won't make Your Honor go

16     through it again, but both of those claims, and the law in both

17     of those areas, make it very clear that you can't use those

18     types of claims to get around plain language of a contract.  I

19     mean, they're saying that you had an implied covenant of good

20     faith and fair dealing to continue purchasing vehicles from

21     NUMMI to keep it viable.  Well, the law is very clear that you

22     can't use the covenant of good faith and fair dealing to

23     rewrite or to contradict the plain terms of a contract.

24          And the law is clear with respect to promissory

25     estoppel as well, Your Honor, that, first of all, promissory

1    estoppel, you need a clear promise -- a clear and unambiguous

2    promise to have done something and we never made such a promise

3    to purchase X number of vehicles a year going forward.

4          THE COURT:  Well, that seems, as I understand it, to

5    be a disputed issue of fact.

6          MR. ALBANESE:  Well, Your Honor, sorry.

7          THE COURT:  Forgive me.  I do think it's important to

8    focus on whether any promises of the type that your opponents

9    say were made were made before or after the 2006 Memorandum of

10   Understanding was entered into, because if they preceded the

11   2006 Memorandum of Understanding, then I would have some

12   difficulty seeing how they could trump anything that the 2006

13   Memorandum of Understanding said.  But if they were made after

14   the 2006 Memorandum of Understanding was entered into, don't I

15   have to then consider what they're alleging to be true in terms

16   of what promises were made?

17         MR. ALBANESE:  I don't believe so, Your Honor, because

18   the law is very clear that when an enforceable contract exists,

19   the parties cannot assert a claim for promissory estoppel based

20   on alleged promises that contradict the written contract.  So,

21   if -- and that's why, again, we don't think you need to get

22   into the factual analysis.

23         THE COURT:  And the contract you're talking about

24   being the -- which contract?

25         MR. ALBANESE:  The contracts, in our view, Your Honor,

GENERAL MOTORS CORPORATION

Page 29

```
 1    are consistent, whether you're looking at the Vehicle Supply

 2    Agreement or the Memorandum of Understanding.  Both have the

 3    same language, that we have no purchasing obligations and that

 4    market demand would govern.  So to the extent they're alleging

 5    that we made a statement even after the 2006 MOU that we'll

 6    purchase vehicles from you -- or, they're saying that, you

 7    know, we promise we promise we'll purchase X number of vehicles

 8    a year, we dispute that any such promise was made; but even

 9    leaving that aside, such a promise would contradict the express

10    language of both contracts, Your Honor.  And therefore be

11    unenforceable.

12         THE COURT:  So, let me make sure I understand the

13    issue that's on the table.

14         You have written contracts with terms that say

15    whatever they say.  There is a -- an oral promise, inconsistent

16    with the written contracts, which would in substance be a

17    promise of an amendment, which has not been papered.  And your

18    contention is that an oral promise to modify -- or that has --

19    that is in substance a modification, is unenforceable under the

20    case law?

21         MR. ALBANESE:  Correct, Your Honor, but it's more than

22    a modification; it's contradicted by the plain language of the

23    contract.  Again, we don't believe any such promise exists, but

24    even accepting their allegations, the promise explicit -- it's

25    not just an amendment or a modification, it's explicitly
```

1    contradicted by the express language of the contract.

2         And that's what the law says, you can't allege a

3    promise that explicitly contradicts a contract to rewrite a

4    contract.

5         THE COURT:  Um-hum.  Okay.

6         MR. ALBANESE:  Your Honor, I'll turn briefly to the

7    few claims that Toyota -- the few claims that Toyota has

8    referenced.  And, you know, with respect to the environmental

9    damages claim and the Workers' Compensation claim, Your Honor,

10   again, we -- as we stated in our papers, they don't allege any

11   basis for these claims.  I mean, they have not alleged that

12   they have paid any money, that they should be entitled to

13   recover money from NUMMI on, they're completely speculative

14   claims, and they have not sufficiently alleged them to warrant

15   a payment by MLC.  I mean these -- on the environmental damages

16   claim, they don't allege any law or statute that would require

17   us -- require NUMMI or us to engage in environmental

18   remediation and a hypothetical, speculative claim that they

19   could be sued for environmental damage somewhere down the road

20   is not a sufficient basis to garner a judgment from MLC.

21        And the same is true for Workers' Compensation.  Now,

22   they said they made a guaranty, but again, they haven't been

23   called upon to pay any money on behalf of NUMMI and they've

24   shown no basis to hold MLC liable.

25        With respect to the 502 claim, Your Honor, we do think

1    it would be disallowed -- not 502 claim, with respect to the

2    502 point -- we do think that to the extent they were to make a

3    claim for contribution -- they have not yet, but we think if

4    they were to make a claim for contribution, we would argue that

5    502 would apply and that the claim would be disallowed until

6    there was an actual payment or an actual claim that had been

7    settled.

8            THE COURT:  Well, if it isn't a claim for

9    contribution, what they've already asserted, what is it?

10           MR. ALBANESE:  We don't know, Your Honor.  I mean, you

11   know, their environmental damages claim, as we said in our

12   papers, we thought was -- you know, they didn't set forth what

13   the law or statute was that it was pursuant to, they didn't set

14   forth what the payment would be made pursuant to, they didn't

15   set forth, you know, what the act was of dumping of hazardous

16   waste or whatever it might be, that created some environmental

17   obligation.  We thought their complaint was completely devoid

18   of allegations sufficient to understand the claim, and identify

19   it.  To the extent they're saying that they may be held liable

20   to some environmental body for some hazardous waste issue, and

21   that therefore they could seek contribution from us, to the

22   extent they're arguing that, then we do think 502 applies, Your

23   Honor.

24           THE COURT:  Um-hum.

25           MR. ALBANESE:  So if you have no further questions

GENERAL MOTORS CORPORATION

Page 32

1    Your Honor, I'll save any additional points for rebuttal.

2            THE COURT:  Okay.

3            MR. ALBANESE:  Thank you, Your Honor.

4            THE COURT:  Fair enough.  Mr. McKane?  Do you want to

5    step up?

6            MR. MCKANE:  Thank you, Your Honor.

7            Good morning again, Your Honor.  For the record, Mark

8    McKane, of Kirkland & Ellis, on behalf of NUMMI; and I'm -- I

9    am going to just refer to my client as NUMMI, and I'll try to

10   keep the acronyms at that level.

11           I understand why the Court is struggling, and I think

12   it is primarily based on the procedural posturing on which

13   you're being asked to address these issues.  And with that, it

14   is our position that there may be ambiguities in these

15   contracts, I think you've highlighted some of them, and as a

16   result of that, you cannot grant this motion to dismiss.  We

17   need to allow discovery so that we can present to you the

18   course of dealing between the parties, the interaction between

19   the parties, so that you can have a better understanding of how

20   these contracts -- which are interrelated and work together --

21   you know, are fleshed out -- were fleshed out in practice and

22   that will inform you as to how to address these issues to the

23   extent that MLC, or Motors Liquidation Corp., has gone beyond

24   the scope of what is in the four corners.  We think that they

25   cannot convert this into a summary judgment motion at this time

Page 33

1    because we haven't been allowed discovery.

2         And what we're really talking about is a extremely

3    harsh remedy, on a 12(b)(6), where you're being asked to

4    interpret inconsistent provisions of a contract when we are in

5    a situation where a plant is closed, 5,000 people are out of

6    work; indirectly believe the impact on the northern California

7    economy was the loss of 20,000 workers and we're looking at

8    claims for inability to recoup capital expenditures, just that

9    portion of the claim of 150 million dollars.

10        And so what we're asking for is allow us to go in

11   through the discovery process and prove up our case and then

12   come back to you on a motion for summary judgment or at trial

13   and address these issues again.

14        Going directly to -- I'll do my best to address the

15   contracts in the manner that Mr. Albanese did, 'cause -- I

16   think that it'll aid the Court.  But I think it's important to

17   note that you asked us to flesh out our claim and we did so; in

18   128 paragraphs and 8 counts, giving very precise details as to

19   which cause -- which contractual language we're relying on.

20   And nonetheless, we're back here today.  We think in many ways

21   it's informative to the Court so you see the issues and where

22   we're grappling, but that the end of the day, I think we need

23   to go forward and address this through discovery.

24        First -- let me start with the Vehicle Supply

25   Agreement, and I'll try to do my best to address our

1   understanding of how those provisions work in Section 4.1.

2       We emphasize the "shall purchase" language, the

3   shall -- that GM, General Motors, shall purchase the products

4   on a continuous and stable basis, and we kept repeating that as

5   our mantra; in part because we are facing this allegation that

6   they say they have no obligation to purchase, none whatsoever.

7   And so that's why, you know, we were so -- I apologize,

8   repetitive -- in doing so.  But let's walk through all three

9   sentences.

10      THE COURT:  I think you're going to need to, because I

11  had material problems reading your complaint, as to how you

12  took clauses out of context.

13      MR. MCKANE:  All right.

14      THE COURT:  And where when you read the whole sentence

15  from which you took a clause, it at least seemingly, if not

16  clearly, said something very much different.

17      MR. MCKANE:  Well --

18      THE COURT:  But -- all right, let's start with

19  sentence number 1 of 4.1(b), which has the "continuous and

20  stable basis" language in it.  It doesn't say, Mr. McKane, the

21  parties promise, or that GM promises, or Toyota promises, to

22  buy vehicles on a continuous and stable basis.  It says they're

23  establishing arrangements, which seemingly is not a covenant,

24  but which is describing something else that is going on.  So

25  you then, as a judge, got to look at whatever that else is to

Page 35

1    determine what the covenant is.  Do you think that's an

2    inappropriate way for me to --

3         MR. MCKANE:  I --

4         THE COURT:  -- analyze that language?

5         MR. MCKANE:  I do in part, because I think before you

6    even go to 4.1(b), you have to go up to 4.1(a), which says

7    "these are the principles contained in Section 1, which will

8    apply to the supply and purchase arrangements under this

9    agreement".  So I think it's not just that there are supply

10   agreements that are being reference elsewhere, but that this is

11   the -- this is the supply -- a Vehicle Supply Agreement which

12   will govern the production of all model years going forward.

13   And then what happens is as contract operated between the

14   parties and what the course of dealing was is the VSA stayed in

15   effect, and then there were separate Memorandums of

16   Understanding for each of the pro -- of the four-year models

17   that were going to be produced at NUMMI and purchased by GM.

18   And what you have here is, in a commitment that for that model

19   period, GM will purchase the products on a continuous and

20   stable basis and then there's an implementation of that through

21   a series of manuals and agreements.

22        And this is what we tried to spell out in our

23   complaint, which is how it operated is the three parties,

24   Toyota, General Motors and NUMMI, would get together in a

25   series of annual meeting called the three-party meetings; they

1    would then set forth for that year what they believed the

2    production level would be for the year.  Then, every three

3    months they would meet again and set a thirt -- an eleven-week

4    production schedule, which spelled out per week what they --

5    what each of the purchasers wanted from NUMMI for that week.

6    That schedule, for each week, would then carry forward.  And if

7    unamended by the -- per by the buyers, by GM and others, that

8    schedule -- that number -- would then convert into an

9    individual sale contract.

10          That's how these contra --this all works together.

11   And what we are saying is how -- and you can read 4.1 and 4.2

12   together in a way that fits.  And what we've alleged is the

13   continuous and stable basis language refers to the fact that

14   for a production year, GM will issue sales contracts under a

15   schedule driven by market demand but that they won't stop

16   issuing the contracts.

17          And so what we're trying to say to the Court is, they

18   come forward and saying hey, we -- there are no unfilled sales

19   contracts, we have no obligation; what we're saying is market

20   demand impacts the number for that week but for the period of

21   the model -- for that four-year period -- they have a

22   continuing obligation to issue the sales contracts.

23          THE COURT:  Suppose market demand week after week

24   after week was such that it would be idiotic to buy so many

25   vehicles.  Are you contending that GM was still obligated to

1    buy?

2         MR. MCKANE:  What we're saying is -- and we believe

3    the facts show on what we've alleged -- is that there was

4    continuing demand for the Vibe.  There was a decline in demand

5    from '07 to '08 and into '09, but that there was continuing

6    demand in excess of 40,000 vehicles.  And not only was that

7    important just generally -- that market demand didn't go to

8    zero -- but that, you know, against the allegations that the

9    government forced them to do this, the timing, as we allege in

10   the complaint, is General Motors announces that they're

11   discontinuing the Pontiac line and then thereafter, continues

12   to express interest in producing the Vibe, potentially as a

13   rebranded vehicle under another brand, the GMC brand, and then

14   continues to investigate that issue, and then stops and goes

15   forward.

16         So there is -- at least we believe the conduct of the

17   parties indicates some obligation, some continuing obligation

18   to produce the Vibe and some market interest to do so.

19         Now, as to the second point -- the second sentence of

20   4.1(b), we do believe it's important that there is an

21   acknowledgement that we are making capital expenditures and --

22   on reliance, on these estimates.  And those capital

23   expenditures weren't just in 1984.  For each of the production

24   years -- when we introduce a new model, NUMMI creates a new

25   line; makes additional capital expenditures.  And that's what

GENERAL MOTORS CORPORATION

Page 38

1    we did in 2006, when in the 2006 Memorandum of Understanding we

2    agreed to produce the Vibe for years 2008 through 2012.

3          And that's really how the Vehicle Supply Agreement

4    from 1984 interrelates with the Memorandum of Understanding

5    from 2006.  The 2006 Memorandum of Understanding spells out

6    what we're going to do specifically for the Vibe.  And we made

7    capital expenditures right there as well.

8          Now, is there detrimental reliance on that projection?

9    There absolutely was.  And we have alleged it.  We do believe

10   that, you know, in -- you know, the -- we have alleged a breach

11   of good faith and fair dealing.  And we believe that we have a

12   reason to say that we -- they breached that good faith and fair

13   dealing through their actions at the wind-down phases.  But

14   it's also tethered to express statements of our reliance on

15   their projections for giving capital expenditures.  So there is

16   express contractual language on which we are detrimentally

17   relying and on which we have a basis to assert our good faith

18   and fair dealing provisions.

19         THE COURT:  The problem I have, Mr. McKane, because I

20   certainly see the language upon which you can rely, is that

21   most detrimental reliance cases, and I'd have to go back to see

22   whether California tracks my experience with New York law in

23   this area, but most detrimental reliance cases require that you

24   reasonably rely, and you can reasonably rely in many instances

25   but you can't reasonably rely on something if it's contradicted

GENERAL MOTORS CORPORATION

Page 39

1    by something that is elsewhere in the contract.

2           So, that is one reason why, while I accept the notion

3    that you can rely, whether you could reasonably rely or not,

4    depends on whether some other provision in the contract says

5    you got no business relying on it.

6           MR. MCKANE:  Well, Your Honor, in addition, that I

7    think I -- my reasonable reliance is something I want to have

8    discovery on to be able to prove up what was exchanged between

9    the parties in terms of the development of the Vibe, the

10   commit -- the information that we told them, we are making

11   these capital expenditures and these commitments?  And based on

12   your production estimates and your projections going forward?

13   And that also will enable me to prove up the reasonableness of

14   my reliance.

15          I understand that you may say at the end of the day,

16   sir, you may -- I may question this.  But my problem is, not at

17   a motion to dismiss.  The reasonableness of my reliance is a

18   factually intensive inquiry here.  And I think when you look at

19   the fact that we expressly say we are relying, you may say the

20   amount of your reliance may be in question, but that's going to

21   be -- it might be -- maybe in a motion for summary just --

22   may -- motion for summary judgment, maybe at trial, but not

23   here.  And I think that's -- and our primary position is, you

24   know, given what's at stake, we'd like to live to fight for

25   another day.

Page 40

1          Your Honor, I think as to the VSA, it's that the

2    importance as we understand the interrelationship of the

3    agreements.  The Vehicle Supply Agreement, the Memorandum --

4    the, what's called a manual production that we attach, which

5    informs how it works; it's the refusal to issue any additional

6    supply agreement --

7          THE COURT:  Pause please, Mr. McKane.  The manual was

8    attached to the Vehicle Supply Agreement, or was incorporated

9    by reference to the Vehicle Supply Agreement?

10         MR. MCKANE:  It is referenced that a manual will be

11   prepared that will govern it.  And that is, there's no dispute

12   between the parties, I believe that what I've attached is the

13   manual that was used to apply the vehicle supply agreements.

14         THE COURT:  That was contemplated when the 1984

15   vehicle supply agreement was signed?

16         MR. MCKANE:  That's correct, Your Honor.  And I

17   believe it is -- it's Exhibit G to our complaint.  It was

18   effective as of 1986.  It's called the "Manual for Allocation

19   of NUMMI Production".  And then there was also a purchase

20   procedures manual that was also expressly referenced.  That's

21   Exhibit H to the complaint.  And that was effective as of

22   December of 1984.

23         THE COURT:  Um-hum.

24         MR. MCKANE:  Let me -- just turning to some of the

25   other issues that you raised.  As it relates to the 1983

Page 41

1   memorandum of understanding, you've asked some questions as to

2   was this just a letter of intent that wasn't enforced.  I think

3   we have to put ourselves back in time.  There is a reason why

4   this language was, we're not going to go effective until we're

5   allowed to do so.

6          THE COURT:  Antitrust?

7          MR. MCKANE:  Antitrust, absolutely.  And actually,

8   it's referenced in the Toyota papers.  There was a serious --

9   this was -- as revolutionary and important as this was so that

10  GM could get knowhow and understanding as to the Japanese way

11  of making automobiles, there are serious antitrust concerns

12  when the two largest automakers in the world get together and

13  share information.  And so there had to be an antitrust review

14  process.  There was an antitrust review process.  And then that

15  memorandum of understanding went into effect.

16         I think what gives us all assurances that that is true

17  isn't just the silence of the two parties on that issue.  But

18  when you also look to the shareholder agreement, on some of the

19  language that GM tries to rely on when they refer us to Section

20  10.7, referring to earlier agreements, they express or identify

21  the 1983 memorandum of understanding as one of those earlier

22  agreements.  So I mean, there was clearly a -- at least, as of

23  the approval -- the government approval -- the memorandum of

24  understanding was an enforceable agreement.

25         As to the issue that we assert -- one of our causes of

GENERAL MOTORS CORPORATION

Page 42

```
 1   action under the memorandum of understanding as it relates to

 2   the deficit and what will be treated and what will be done at

 3   the time of termination, I think what's very important there is

 4   that you look at not just the language in the memorandum of

 5   understanding that talks about what will happen specifically at

 6   the termination, but then, at the shareholder agreement when

 7   NUMMI is incorporated and created, it identifies what will

 8   happen generally, which is that NUMMI will bear its own

 9   expenses, but it also has that carve-out, so that we believe

10   that based on that carve-out of what happen -- not to be

11   inconsistent with earlier agreements, there is no express

12   statement in these shareholder agreements as to what will

13   happen at termination.

14          And so it's in that exact circumstance that we find

15   ourselves today.  And that's why we believe that it's not just

16   the fact that they used expenses as opposed to deficit; it's

17   also there is no express statement as to what will happen at

18   termination in the shareholder agreement.  And that's why we

19   look back to the earlier memorandum -- the enforceable

20   memorandum of understanding.

21          Regarding our third-party beneficiary status on that,

22   I think it's -- first of all, look at the preamble of the

23   memorandum of understanding.  The purpose of this agreement is

24   to create the joint venture.  The joint venture is NUMMI.

25   NUMMI is an incorporated joint venture.  I think that's
```

Page 43

1    important language.

2          But I also want to highlight for the Court that we

3    identify specific language where there are actions taken by the

4    shareholders for NUMMI's benefit.  And we do that -- I think

5    one of the best places where we highlight that language is page

6    11 of our opposition brief, where we spell out a number of

7    sections that in the memorandum of understanding from '83, that

8    emphasize obligations that General Motors takes on for the

9    benefit of NUMMI.  That's the expressed benefit that we believe

10   shows that we are a third-party beneficiary.

11         GM promises to increase its production -- NUMMI's

12   production, to the maximum extent possible.  That it agreed to

13   price the vehicles, "to provide a reasonable profit to NUMMI";

14   that it would take reasonable -- take necessary measures if

15   NUMMI were endangered; and it would provide guarantees to

16   NUMMI's lenders so that NUMMI could --

17         THE COURT:  I saw that language in your complaint, Mr.

18   McKane.  And then I want back and looked at the clauses to find

19   where they were from.

20         MR. MCKANE:  Sure.

21         THE COURT:  I think it was on pages 3, 4, 7 and 10 --

22         MR. MCKANE:  That's right.

23         THE COURT:  -- of the memorandum of understanding.

24   Were you relying upon those solely for the purpose of showing

25   that the joint venture, later NUMMI Corporation, was a third-

 1   party beneficiary, or were you trying to rely on those as

 2   establishing covenants to which GM had made a promise?  Because

 3   I understand how you might make the point on the former.  I

 4   have more problems when I read the whole language from which

 5   you took those snippets --

 6            MR. MCKANE:  It is --

 7            THE COURT:  -- as establishing covenants.

 8            MR. MCKANE:  -- it is the former more than the latter.

 9   The only one where we go forward on an affirmative covenant is

10   the one where the best efforts language to maximize production.

11   But that language is not just in the '83 memorandum of

12   understanding, it's also in the '84 shareholder agreement.  And

13   it's also in the 2006 memorandum of understanding.

14            So I have three separate contractual bases on which to

15   assert that same provision.  But really I highlighted the

16   provisions on pages 3, 4, 7 and 10 to show that we are a third-

17   party beneficiary.  And as to the issue of whether a

18   nonincorporated entity that had not yet been created can have

19   third-party beneficiary status in California, I do urge the

20   Court to look at the Gourmet Lane case that we cited.  It's 222

21   Cal. App. 2d 701.  That case spells out exactly that instance

22   where members of an unincorporated association entered into an

23   agreement that association was then incorporated.  One of the

24   members failed in its obligation under the agreement and they

25   had not yet been formed as a shareholder incorporated

Page 45

1    association, and had third-party beneficiary standing to suit

2    to enforce the member to comply with its obligations.  And

3    that's still good law in California.

4         Your Honor, as to the 2006 memorandum of

5    understanding, this -- the GM position simply falls down to

6    they don't have an obligations because the estimates that are

7    in there are just estimates.  They don't have an obligation

8    under those estimates.  The 2006 memorandum of understanding is

9    a requirements contract.  It's a classic requirements contract.

10   In it, GM acknowledges that NUMMI is the sole manufacturing

11   facility for the Vibe.  It states the estimate.  We have a -- I

12   think what we have here is a unique -- it's definitely a very

13   special relationship with our owners.  It is referenced as an

14   incorporated joint venture.  There is the undeniable sharing of

15   information that kind of sets us apart from and makes us

16   different from your standard first-tier supplier.

17        And what we believe, and under what California law

18   provides in a requirements contract, is that you cannot

19   substantially -- I'm not going to get the exact language

20   right -- but you cannot remove your -- you cannot vary from

21   that estimate down to zero.  You can't take it all the way down

22   to zero for a requirements contract when you have that special

23   relationship.  There actually is a Tenth Circuit decision on

24   that issue.

25        THE COURT:  Tenth Circuit under California law?

GENERAL MOTORS CORPORATION

Page 46

1          MR. MCKANE:  No, it's -- no it's not applying

2    California law.  But in that setting when you have a special

3    relationship between an incorporated entity and its member

4    associations in a requirements contract situation where there's

5    an output, the -- it's a case in which the Court found you

6    cannot reduce the requirements down to zero in that special

7    circumstance; especially when you know, not only is there a

8    special relationship, but the entity that's providing the

9    output is making substantial capital investments, based on the

10   estimates being provided at the time.  It's in the power

11   purchase agreement context.  But it's something I wanted to

12   highlight.

13          The California language that I was specifically

14   referring to -- I apologize for the confusion -- was the

15   California Commercial Code 23-06, and it's comment 3.  That's

16   where in the requirements contract you cannot -- you're bound

17   to purchase quantities "not unreasonably disproportionate to

18   the amount."  That's the point I was trying to make under

19   California law, is even if it is an estimate, we believe we

20   have an enforceable requirements contract for an estimate

21   that's not unreasonably disproportionate to the --

22          THE COURT:  I'm having some problems, Mr. McKane,

23   because the way you're articulating the premise, the underlying

24   existence of a requirements contract, is a little different

25   from the one that I had historically grown up with.  And I

GENERAL MOTORS CORPORATION

Page 47

1    don't know whether my understanding was too myopic or just

2    didn't capture the concept as it's now understood.

3            Going back forty years, to when -- or more, when I

4    went to law school, I thought a requirements contract was one

5    that required you to buy everything you needed.  Now, this is a

6    little different, at least if I understand your contention,

7    because you're saying that when parties estimate a contemplated

8    level of purchasing, that -- more or less, subject to the

9    nuances you articulated -- that becomes a contractual

10   obligation of some type.  Is this a -- this is also a

11   requirements contract under California law?

12           MR. MCKANE:  Yeah.  Let me try to bridge the gap,

13   because I don't think it's as large as you think.  What we're

14   really saying is, to the extent that they're arguing in any way

15   that the contract -- the 2006 memorandum of understanding -- is

16   unenforceable because there is no set quantity.  Part of GM's

17   argument is, we never agreed to buy a set amount.  We never

18   agreed to actually make any purchases whatsoever.  What we're

19   saying is, the require -- this is a requirements contract in

20   that to the extent that they're -- you need to determine what

21   the quantity was of the purchase to calculate the damages.

22           We believe we have an enforceable prov -- enforceable

23   agreement that they will purchase amounts.  If not 65,000 then

24   an amount that's not unreasonably -- I apologize for the double

25   negative -- not unreasonably disproportionate to that amount.

GENERAL MOTORS CORPORATION

Page 48

1   And so that's why it's really -- it's in a similar setting to

2   the classic requirements contract that you envision.

3           Our point is, they agreed to purchase four years worth

4   of the Vibe from us, exclusively for their needs.  They gave us

5   an estimate.  We made massive capital expenditures based on

6   that estimate.  And we're saying you can't take that number to

7   zero during those four years.  And if you do, and you reject

8   the contract and you breach the contract, then we're entitled

9   to recoup our -- as a reasonable recovery of damages, the

10  amount of the capital expenditures that we made, based on that

11  estimate.

12          As to our separate contractual assertions that there

13  is an enforceable commitment by General Motors to ensure that

14  NUMMI remained viable, we believe that that language -- it

15  flows through the agreements.  We do highlight the preamble

16  language in the 2006 memorandum of understanding.  We also

17  highlight section 7 and the language contained there.  But

18  again, we agree that it is ambiguous, when you look at section

19  7 as a whole, that we have a freestanding commitment to take

20  actions to ensure that NUMMI will remain viable; but then you

21  have later language as well.

22          That's what we think we need discovery to prove out,

23  which is that in addition to these contractual provisions,

24  there are also oral commitments, and of course the dealing

25  along the way, that will show that after the 2006 memorandum of

GENERAL MOTORS CORPORATION

Page 49

1    understanding was entered into, there are continual assurances

2    and commitments made by General Motors that they will purchase

3    at least as many Vibes as necessary to make sure that NUMMI

4    would have stable operations and would remain viable.

5            THE COURT:  Now, the remain viable language comes from

6    the 2006 memorandum of understanding, if I'm not mistaken.

7            MR. MCKANE:  Yes, sir.

8            THE COURT:  You have three causes of action under your

9    viability rubric or heading.  It's only your Count III that

10   relies on actual language that says "viability".  Am I correct?

11           MR. MCKANE:  It is.  We also believe we have

12   enforceable best efforts covenants, that in two other earlier

13   agreements that GM would take best efforts to maximize the

14   production from NUMMI, and that the purpose of that commitment

15   was to ensure that NUMMI would remain viable so that GM could

16   continue to get the knowhow of how to do things the Japanese

17   way.  Which, based on statements made by their own executives,

18   as recently as two years ago, generated a billion dollars'-

19   worth of knowhow for their company.

20           So in our viability rubric, we rely on two best

21   efforts covenants, and then the viability provisions in the

22   2006 memorandum of understanding.

23           THE COURT:  Um-hum.  And the sentence that refers to

24   viability is in section 7 of the 2006 memorandum of

25   understanding:  "Therefore the parties agree that they will

Page 50

1    annually review all the contents described herein to ensure

2    that NUMMI will remain viable"?

3             MR. MCKANE:  It's also --

4             THE COURT:  "And that the results from NUMMI's

5    operations continue to be acceptable for Toyota and GM"?

6             MR. MCKANE:  -- that is one of the provisions that we

7    rely on.  We also rely on the preamble language.

8             THE COURT:  To the 2006 memorandum?

9             MR. MCKANE:  To the 2006 memorandum, where it says,

10   "This memorandum of understanding," and I'll just, "sets forth

11   the basic understanding among," and I'll skip forward, because

12   it's just the three parties, "regarding the production and

13   pricing of new car models to be produced at NUMMI from January

14   of 2008 to December of 2012, collectively 'the products', to

15   help ensure that all parties remain viable."

16            THE COURT:  Um-hum.

17            MR. MCKANE:  And we believe that we have an

18   enforceable viability provision based on that commitment as

19   well.

20            We're not saying that they had to put our interests

21   ahead of their own.  We're not saying they had to help us out

22   and couldn't file for bankruptcy.  We're just saying we believe

23   we have an enforceable claim for damages, to the extent that

24   they elect to terminate the contracts.

25            Your Honor, as to the implied covenant issue, I think

GENERAL MOTORS CORPORATION

Page 51

1    I have emphasized where I believe that we have, based on

2    commitments for capital expenditures, an express provision on

3    which we can rely to assert the good faith and fair dealing.  I

4    also would emphasize that we have spelled out very precise

5    factual allegations about GM's conduct, both before and after

6    they announced that they were canceling the Pontiac brand as to

7    why we believe that their negotiations for and their evaluation

8    of continuing the Vibe as another branded GM vehicle and

9    pursuing a Toyota -- rebadged Toyota Tacoma truck, were not in

10   good faith.  And we believe that we need discovery to prove

11   those out.  We've spun out the allegations, but they are

12   factually intense.

13           THE COURT:  I'm a little confused.  It may be outside

14   the record, but I would imagine that there wouldn't be a

15   dispute between you and your opponents on this.  I thought I

16   saw a Vibe on the street once.  I thought the Vibe is like a

17   compact car.

18           MR. MCKANE:  A Vibe is a compact car.  If you've ever

19   seen the Toyota Matrix and the Pontiac Vibe, they're sister

20   vehicles.

21           THE COURT:  But then you made reference to a Toyota

22   truck.  I didn't follow that.

23           MR. MCKANE:  So in the negotiations --

24           THE COURT:  Tacoma, was it?

25           MR. MCKANE:  -- it was a Toyota Tacoma.  It is a mid-

GENERAL MOTORS CORPORATION

Page 52

1    sized truck.  And let me explain what happened.

2          THE COURT:  A pickup type truck?

3          MR. MCKANE:  It is a pickup type truck.

4          THE COURT:  Um-hum.

5          MR. MCKANE:  The Tacoma is another vehicle produced at

6    NUMMI.  After GM announced it was discontinuing the Pontiac

7    line, GM, we allege, reaffirmed its commitment to NUMMI and

8    defined alternative ways so that they could continue the NUMMI

9    venture in the NUMMI plant.  There were two separate

10   evaluations.  One was a rebranded Vibe as a GMC Vibe.

11         THE COURT:  Is it GMC?  I thought GMC mainly makes

12   trucks.

13         MR. MCKANE:  Well, I believe that they've made cars in

14   the past.  I have a vision --

15         THE COURT:  I see.

16         MR. MCKANE:  -- of a Gremlin in my mind.

17         THE COURT:  But their point is they could have put a

18   Chevy label on it too or some label within the GM family?

19         MR. MCKANE:  That's correct.  I mean --

20         THE COURT:  Okay.

21         MR. MCKANE:  -- it didn't -- we weren't specifying --

22   we, NUMMI, weren't saying to them under what brand they should

23   be offering this vehicle.  But they were evaluating a rebranded

24   Vibe.

25         THE COURT:  Um-hum.

1           MR. MCKANE:  In addition to that, they then said we

2     would also consider -- and the term is "rebadged" -- and I

3     apologize, I should have brought water --

4           THE COURT:  It's the one thing you're allowed to drink

5     in this courtroom.  If someone wants to give him one, he can.

6           MR. MCKANE:  No, it's all right.

7           THE COURT:  Actually.

8           MR. MCKANE:  Your Honor, may I approach?

9           THE COURT:  Audie, yeah, give it to him.  This isn't

10    going to take you very far, but it's better than nothing.

11          MR. MCKANE:  Thank you, sir, for the courtesy.  I do

12    appreciate it.

13          In addition to a rebadged Vibe, they also were

14    evaluating a rebadged Toyota -- a Toyota Tacoma truck that they

15    would offer as well.  And it's those negotiations and what was

16    said and the positions took in those negotiations where we

17    believe there was a breach of good faith and fair dealing as

18    well.

19          But what's important about the fact that there even

20    were these negotiations, after the announcement of the Vibe --

21    the cancelation of the Pontiac line, is there is either one of

22    two things were going on, as we've alleged.  Either there's an

23    independent market interest in the Vibe or there's some belief

24    on the GM side -- because we were within days of filing, and

25    then after filing that this conduct occurs -- that there is an

1   existing obligation to maintain NUMMI's viability through 2012,

2   and they need to evaluate alternatives other than the Vibe if

3   they're going to cancel out the Vibe.  And that's our theory

4   that we've alleged for that provision.

5           Finally, as it relates to our last count, the

6   promissory estoppel count, I cannot agree with Mr. Albanese's

7   characterization of the law.  First, as to our complaint, we

8   have alleged promises that occurred both before the 2006

9   memorandum of understand and after the 2006 memorandum of

10  understanding; specifically in the annual three-party meetings.

11  They occur generally in December:  in December of '05, December

12  of '06, December of '07, December of '08, there was a renewed

13  commitment by General Motors in those meetings, to purchase

14  enough vehicles from NUMMI to maintain its viability through

15  2012.

16          That is an express allegation that we've made.  And

17  that is the basis for our promissory estoppel.  And it is -- I

18  think Mr. Albanese's characterization of California law is

19  wrong.  That there can be promises made after a contract that

20  would amend or modify that contract, that are enforceable under

21  promissory estoppel, both before and after.  So -- not after.

22  And that's what we're relying on in the last count.

23          Your Honor, if I could just have a moment to go back

24  through the original questions you posed and the --

25          THE COURT:  Sure.

GENERAL MOTORS CORPORATION

Page 55

1          MR. MCKANE:  -- and the issues that you raised?

2          Your Honor, you at one point said that you had a

3     concern that GM's obligations, in and of itself, could be

4     illusory, that if you take their argument to the extreme that

5     they had no obligation to purchase, then is there an

6     enforceable agreement here at all.  I think that's the right

7     read.  We support that in terms of like taking it to its

8     logical extreme.

9          I would also note that GM, at least in the past, has

10    taken the position that these are enforceable agreements in

11    some way; that these are executory agreements.  Because at

12    least as it relates to the 1984 vehicle supply agreement, the

13    2006 memorandum of understanding and the 1984 shareholder

14    agreement as it relates to us, GM went so far as to reject the

15    contracts.  So we believe that there's at least some

16    acknowledgement that those are enforceable agreements.

17         THE COURT:  Well, they had a pretty good answer for

18    that in their reply, didn't they, Mr. McKane?  They said, in

19    substance, that a) there were obligations other than the

20    obligations upon which you're relying; and b) -- and this is

21    something the debtors of the world encounter all the time --

22    that they put in disclaimers that said, in substance, to the

23    extent there are any obligations or something, we've got to

24    reject it, that protects their creditor constituency against

25    the much larger burdens that would be associated with having to

GENERAL MOTORS CORPORATION

Page 56

1    assume obligations that could convert pre-petition obligations

2    into post-petition obligations.

3            MR. MCKANE:  Now, I --

4            THE COURT:  And you and your firm -- maybe not you,

5    but your firm has represented its share of debtors over the

6    years, and probably well understands the practical problems

7    that debtors face in this situation.

8            MR. MCKANE:  Your Honor, Mr. Schrock has advised me of

9    that.  And so I'm aware that that may be a general

10   protectionary language.  But I guess on the first concern, the

11   one that -- the way they responded in their reply wasn't just,

12   hey, we did it out of an abundance of caution; we don't think

13   we had any obligations, but we didn't want to put ourselves in

14   the position exactly you described.  They came forward and said

15   we had obligations other than the ones you identified.  But

16   they don't identify what those obligations are.  And if you

17   read the vehicle supply agreement, it's a vehicle supply

18   agreement.  And it's a memorandum of understanding to produce

19   vehicles.  If there's no commitment to purchase the vehicles,

20   one wonders what those other obligations are.

21           So I think our point really, less the abundance of

22   caution, it's -- I think the first half of their response is

23   more telling, because they admit there're some obligations.

24   But for a vehicle supply agreement to not purchase any

25   vehicles, what could there be another obligation to be?

Page 57

1          As to -- I'll allow Mr. Soble to address the Toyota

2     claims issue.  But coming back to kind of the fundamental

3     principles on which we started.  On a 12(b)(6) with much

4     conflicting language and this much need to go beyond the four

5     corners and the ambiguities identified both facial and latent,

6     we believe discovery's necessary, and we ask that we be -- at

7     the end of the hearing we set a schedule and move forward with

8     claims based on the contracts we've asserted, to develop those

9     claims, and if necessary, set a schedule for summary judgment,

10    briefing and trial.  Thank you, Your Honor.

11          THE COURT:  Okay, thanks.  Gentlemen, we've gone on

12    for almost an hour and a half.  Let's take ten minutes, and

13    then I'll hear from Soble and I'll take reply after that.

14          We're in recess -- actually, let's try to discipline

15    ourselves.  Can we try to be back here by 11:15 on that clock?

16    I mean, if you've got to go to the bathroom and there's a line,

17    obviously, I'll understand.  But let's try to.

18        (Recess from 11:08 a.m. until 11:16 a.m.)

19          THE COURT:  Okay.  Mr. Soble?

20          MR. SOBLE:  Your Honor, thank you.  Again, for the

21    record, Jeff Soble with Foley & Lardner on behalf of Toyota

22    Motor Corporation, which I'll refer to as Toyota, and try and

23    avoid the habits I've built up with our acronyms, as the

24    lawyers are used to using talking to each other.

25          Your Honor, I want to start by addressing one of the

1    questions you raised about how these obligations run to Toyota

2    and sort of Toyota's role in that.  And I think in doing so, I

3    want to use as a jumping-off point, something -- a factual

4    point that Mr. McKane stated, which is, when we talk about

5    these vehicles, a Pontiac Vibe and a Toyota Matrix are

6    essentially underneath the same vehicle.  And here's why.

7         The vehicles at NUMMI, and in particular the Vibe,

8    were designed by Toyota.  In this relationship between the

9    three entities, each entity had one general role -- I would

10   tend to say obligation; I'm sure MLC would disagree with

11   that -- but one major role.  NUMMI manufactured the vehicles

12   for GM; Toyota designed the vehicles for GM; and GM purchased

13   the vehicles.

14        The damages that Toyota is seeking in its adversary

15   proceeding is for research and development costs in designing

16   the Pontiac Vibe.  These are research and development costs

17   that were incurred, consistent with the obligations in the

18   vehicle supply agreement and the 2006 memorandum of

19   understanding.  And those agreements do refer at various times

20   to model changes and designs by Toyota.  In particular in the

21   2006 memorandum of understanding at paragraph 6, it talks about

22   mid model design changes.  Those are design changes that Toyota

23   will undertake, and for which Toyota did expend research and

24   development costs in support of the vehicles that NUMMI would

25   sell to GM.

Page 59

1          THE COURT:  So if you guys want to get paid for your

2    technology, why don't you have a contract that says that GM's

3    got to pay Toyota for the technology?

4          MR. SOBLE:  Well, we got paid out of the purchase

5    price when GM would buy the vehicles from NUMMI.  We recovered

6    our costs for research and development through that

7    transaction.

8          I wasn't involved -- the contracts go back, obviously,

9    the relationship -- twenty five years.  I think the fact, Your

10   Honor, that it took ninety minutes for me on behalf of Toyota

11   to get to speak, speaks to the fact that with 20/20 hindsight,

12   we all probably would have liked the contracts written

13   differently.  And I think that the length of this discussion

14   speaks to how difficult this is to do on a 12(b)(6).

15         But the language you referred to, it's not in there.

16   There are discussions throughout the vehicle supply agreement,

17   just as one example, in paragraph 3.3, that talks about design

18   changes by Toyota.  There was no secret that Toyota was

19   designing these vehicles.  And there was no secret that --

20         THE COURT:  Mr. Soble, am I mistaken that the deal was

21   structured that Toyota was a stockholder of NUMMI?

22         MR. SOBLE:  A fifty-percent shareholder, yes.

23         THE COURT:  How many other cases are you aware of

24   where stockholders have a right to recover for breaches of

25   contract or its hybrids, promissory estoppel and breaches of

1    the duty of good faith, for the corporations in which they

2    invest in?

3            MR. SOBLE:  We're not seeking that, Your Honor.  We're

4    seeking to recover pursuant to the contracts that we, as an

5    individual party, are parties to.  Toyota is a party to the

6    vehicle supply agreement and the 2006 MOU, as an independent

7    entity, as the designer of the vehicles.

8            Our research and development costs are not duplicative

9    of NUMMI's losses.  They are independent costs of Toyota Motor

10   Corporation, not as a shareholder of NUMMI or losses through

11   NUMMI.  It was compensation to Toyota for the research and

12   design work that it did for -- as said, all these -- every

13   vehicle that was manufactured by NUMMI was designed by Toyota.

14   And Toyota would obviously incur hundreds of millions of

15   dollars over the years, if not more, in doing that design and

16   development work.

17           And in this particular instance, the losses are

18   associated with the Pontiac Vibe itself and the research and

19   development of the Pontiac Vibe itself.  So as its role as

20   designer, as its own party in a corporation, and as a party to

21   these three contracts -- not through NUMMI, but as a party

22   itself to these three contracts -- as Toyota, that's how Toyota

23   gets here and suffered its losses, proximally caused by GM

24   deciding not to buy any more Vibes.

25           Your Honor, I want to move on and actually talk a

Page 61

1    little bit more about how things worked, because I think that

2    informs the interpretation applying California laws of contract

3    construction to the vehicle supply agreement.  And by what I

4    mean is, Your Honor is right.  Each side focuses, obviously, on

5    provisions that are most helpful to its own interpretation.

6    And I think we all knew coming here that on our side of the

7    table you'd hear "continuous and stable supply" over and over

8    again, and on GM's you'd hear "no obligation to purchase".

9            But I think what's important is something that is set

10   forth in paragraphs 30 through 35, including the subparts, of

11   our complaint.  And that's the idea that all of this was done

12   not just as a vehicle supply agreement, but with the companion

13   agreements, so that they could manage manufacturing, inventory,

14   production and sales.  And as talked about and has been

15   referenced a little bit, there's the manual of allocation,

16   which itself says it's of great importance to keep a smooth

17   production flow for the purpose of maintaining high quality

18   vehicles and facilitating high efficiency of NUMMI's production

19   and in GM's and Toyota's distribution and marketing of

20   vehicles.

21           The use of individual sales contracts on which GM

22   relies flows from that.  The individual sales contracts, as

23   pled in paragraph 34 of our complaint, are created out of a

24   final requirement schedule, a fixed requirement schedule, and

25   preliminary requirement schedules.  Pursuant to the purchase

1    procedures manual, which Mr. McKane referred to, all of this

2    production planning resulted in an individual sales contract.

3            So read together, consistently, we have three parties

4    agreeing that they will design, manufacture and buy vehicles.

5    GM is going to buy all of their Pontiac Vibes from NUMMI.  In

6    fact, in section 1(4) of the 2006 MOU, GM specifically

7    negotiated an acknowledgement by NUMMI and Toyota that all

8    Vibes would be produced at NUMMI, and that GM had no other

9    production capability for that vehicle.

10           But then the question becomes, how do we manage the

11   supply chain?  How do we manage the manufacturing chain?  We're

12   not just going to build 65,000 vehicles in a week.  So that is

13   where the individual sales contracts in.  Here they called them

14   individual sales contracts.  In other cases, they could be

15   purchase orders or material releases or electronic invoices.

16   It's a way of all three parties getting together and managing

17   production at NUMMI.  That is in context with the idea that

18   everyone would work together; all parties would meet annually;

19   all parties would agree to produce on a continuous and stable

20   basis, to keep NUMMI viable, to do all of those things so that

21   the enterprise could go forward.  That is how the individual

22   sales contracts work into the relationship.

23           This idea that GM only had to buy cars for which it

24   sent an individual sales contract, I think, is shown to be most

25   absurd, to use California law language, if you look at it the

GENERAL MOTORS CORPORATION

Page 63

1   opposite way.  Let's say we're at the beginning of 2008, which

2   is the first production year under the 2006 memorandum of

3   understanding, and GM sends an individual sales contract to

4   NUMMI.  Under GM's reading of the contract, NUMMI could say in

5   response, no, we're not going to sell you those cars.  We've

6   decided we have no obligation to sell you Vibes, so thanks for

7   the property that NUMMI sits on that you put into the deal

8   twenty-five years ago; thanks for the billions of dollars of

9   information and knowledge sharing.  We're just not going to

10  sell you those Vibes.  We might sell them to you next week or

11  the week after.  But we have no obligation to supply you Vibes

12  until we've accepted an individual sales contract.  And I

13  cannot believe that in that situation, GM's response would have

14  been, you're right, that's what the contract says.

15         As for the 2006 memorandum of understanding, one thing

16  we've talked quite a bit about there and with the vehicle

17  supply agreement is market demand.  Well, market demand was not

18  zero.  In fact, we plead in our complaint that in 2006, 60,000

19  Vibes were manufactured.  In 2007, it was 50,000; and in 2008

20  it was 70,000.  That's paragraph 18 of our complaint.

21         So in those three years, we have an average of 60,000

22  vehicles, which actually is materially in line with the 2006

23  MOU, which had an allocation of 65,000 vehicles for Vibes.  So

24  if market demand dictated things, which Mr. Albanese said in

25  his opening remarks today, market demand was not zero.  And the

1    idea that GM could unilaterally decide market demand was zero,

2    is inconsistent, in particular, with the 2006 MOU.  The 2006

3    MOU repeatedly discusses the fact that the parties would work

4    together.  Section 1(5), "The parties agree that each fall they

5    will decide the planned production volume of the products at

6    NUMMI for the subsequent three calendar years, and that each

7    spring they will review and modify such planned production

8    volume if appropriate."

9         So the parties will get together and have this

10   discussion.  It goes on, as we've talked about, last sentence,

11   "A final allocation plan will be established that is mutually

12   agreeable to the parties, consistent with the spirit of the

13   joint venture."  Well, this situation certainly, is nothing, as

14   we've seen, as mutual agreeable to the parties, nor is it

15   consistent with the spirit of the joint venture, which was to

16   be an ongoing operation to produce vehicles, in particular,

17   Vibes.  And that is an independent obligation.  It's an

18   obligation to meet and confer with all parties, including

19   Toyota, which we've alleged has been breached.

20        Paragraph 6, "The parties agree that the expected

21   model life of Vibe and Corolla shall run from January 2008

22   through December 2012."  So again, the parties have

23   memorialized that they expect at least six more years of

24   production.  This is entirely inconsistent with the idea that

25   there's no obligation to buy any vehicles at all, going

GENERAL MOTORS CORPORATION

Page 65

1   forward.

2        It goes on to say that, "Should the need arise to

3   lengthen or shorten the expected model life, the parties will

4   discuss and determine countermeasures," which was not done

5   here.

6        It goes on, "Expected mid minor model change of Vibe

7   will take place commencing with the 2011 model."  Many of the

8   research and development costs that Toyota is seeking to

9   recover in its breach of contract claim arise from research and

10   development related to those mid minor model changes, among

11   others and other research costs.

12        In the annual review, which is section 7, which we've

13   talked about, again, this is a paragraph that talks about the

14   parties agreeing to do an annual review, what they will agree

15   to coming out of that annual review, with -- going back to 1

16   section (5), consistent with the spirit of the joint venture,

17   which is ensuring that NUMMI will remain viable.

18        Those meetings didn't occur.  They didn't take place.

19   They did not result in what they were supposed to under the

20   agreements.  And these are independent breaches of contract

21   that we have alleged in our complaint.

22        Also the best-efforts clause in 1(2) of the 2006

23   memorandum of understanding.  We have alleged that GM did not

24   use its best efforts to work towards the continued viability of

25   NUMMI.  That's not addressed in any of GM's briefs.

GENERAL MOTORS CORPORATION

Page 66

1        The allegations that we've made concerning discussions

2   about rebranding the Vibe made by us and NUMMI, allegations

3   about discussions about GM trying to gain very favorable terms

4   on rebranding the Tacoma, actually lead me right into the

5   discussion of good faith and fair dealing, because these are

6   all discussion that occurred long after the 2006 memorandum of

7   understanding was signed.  And they all have to do with whether

8   GM acted in good faith and in fair dealing in working to

9   continue the viability of NUMMI in using its best efforts in

10  working to rebrand the Vibe, as Your Honor noted, whether it be

11  a GMC Vibe or a Chevy Vibe or a Buick Vibe.  Such cross-

12  platform work is certainly not unknown in the auto industry and

13  could have been done, for a vehicle which had been averaging

14  60,000 in sales the previous three years, which was consistent

15  with the 2006 memorandum of understanding.

16       Out allegations about the breach of good faith and

17  fair dealing have to do with much more than just GM not

18  purchasing Vibes.  They have to do with these misleading

19  statements; with GM's failure to seek alternatives to the Vibe;

20  and with their attempt to extort commercially unreasonable

21  terms to keep NUMMI viable, which refers to the Toyota Tacoma

22  discussions.

23       All of that -- all of those are allegations which

24  create issues of fact which get us past the 12(b)(6) state and

25  get us into discovery.

Page 67

```
 1              THE COURT:  What were -- Mr. Soble, what were the

 2     statements that you plead were misleading?  I mean, that walks

 3     and talks like a fraud claim.  But I couldn't see the specifics

 4     of what you say was said that was misleading.  Was it that we

 5     intend to keep selling Vibes or -- because -- and are you

 6     saying that that intention was false when made?  Or was it a

 7     promise that wasn't honored, which normally states a claim for

 8     either contract or promissory estoppel, depending on how it was

 9     articulated, but doesn't state a claim for fraud, or what?

10              MR. SOBLE:  Well, we think there are specific factual

11     examples where GM was not dealing in good faith, that they did

12     not --

13              THE COURT:  That's not the same thing as making a

14     misstatement.

15              MR. SOBLE:  Correct.  We don't believe they were

16     misstatements.  We have not pled a fraud action; we're not here

17     to argue fraud.  We plead in paragraph 45 of our complaint that

18     GM reaffirmed its ongoing obligations to NUMMI in various

19     letters; that on May 11, 2009, GM informed Toyota that it had

20     been working on a plan to repurpose the Pontiac Vibe to a GMC

21     Vibe and was also reviewing additional options to support

22     NUMMI, none of which came to fruition.  On May 14th of 2009, GM

23     again stated that it was currently working to develop a

24     replacement for the Vibe and was interested in seeing a new

25     product from NUMMI.  All things meant, ostensibly, to help keep
```

Page 68

1    NUMMI viable and going forward and best efforts.

2           But we don't think that these statements were made in

3    good faith.  We don't think we were dealt with fairly.  And

4    there are others.  I certainly am happy to read through more of

5    them in our complaint.  But they generally are in paragraphs

6    46, 51, 78, 47, in which we don't believe that GM -- we believe

7    that GM breached its obligations of good faith and fair

8    dealing, which are independent obligations under California

9    law.

10          And we need more details.  I have difficulty answering

11   some of these factual questions that you ask, Your Honor,

12   because we haven't had the discovery.  We don't have any --

13          THE COURT:  Well, if a statement was made to your

14   guys, you don't need discovery to tell me what they were told.

15          MR. SOBLE:  Correct.  And we've pled what we were

16   told.  What I can't tell you is what GM was saying internally.

17   I can't tell you what GM was saying to its lenders, what its

18   board was discussing, what its executives were discussing.  I

19   have no access to any of that.  All of that would be the

20   routine sort of discovery that would occur if this claim goes

21   forward.

22          THE COURT:  Um-hum.

23          MR. SOBLE:  On the promissory estoppel claim, I think

24   that GM in many ways is trying to have its cake and eat it too

25   here.  There's no dispute that Toyota expended hundreds of

GENERAL MOTORS CORPORATION

Page 69

1    millions if not billions of dollars in designing cars for two

2    and a half decades, for GM.  There's no dispute that Toyota

3    continued to design those cars, including the Vibe, all the way

4    up until the end, when GM pulled out of NUMMI.

5            Apparently, we were doing that with no promise of any

6    contractual kind, because there's no obligation to purchase

7    anything, and no other promises of any kind.  That Toyota was

8    doing that on the off chance that NUMMI might be able to sell

9    Vibes that Toyota had designed for which Toyota would be able

10   to recover its research and development costs.

11           I think that's just counterintuitive, that these two

12   organizations who sought the antitrust exemption, who formed

13   all of these contracts -- and there are more contracts and

14   agreements than most of us see in most cases -- that all of

15   that would be done with no obligation, contractual or an

16   implied contract.  That despite the fact that GM would consult

17   with Toyota on design changes and on design issues with the

18   cars, and that GM knew that Toyota was expending money to do

19   that design work, that there was no promise of any kind to buy

20   any vehicles, that is counterintuitive.

21           Your Honor, beyond that, on the contracts, I won't

22   talk about the specific provisions.  And unless Your Honor has

23   more questions, I think they've been covered very much by Mr.

24   McKane and Mr. Albanese.

25           THE COURT:  Go on to your CERCLA claims or whatever

1    your environmental claims are, and your Workers' Comp claims.

2            MR. SOBLE:  Your Honor, on the environmental claims, I

3    would note that the California Department of Toxic Substances

4    Control has a claim in this bankruptcy.  That Toyota is funding

5    some efforts at environmental remediation.  We certainly can

6    plead that more specifically and better in an amended

7    complaint, if allowed.  But these are not speculative.  There

8    are environmental issues at NUMMI, at least, that the

9    California Department of Toxic Substances Control --

10           THE COURT:  I'm very well familiar with that

11   department, because they were the principal claimant along with

12   the Federal EPA in my Lyondell and Chemtura cases when I

13   dismissed all of the claims by the PRPs in those cases against

14   those debtors.  You're not at Kirkland.  I somehow suspect Mr.

15   McKane's familiar with what his firm successfully did in that

16   case to make claims of exactly the type you're asserting go

17   away.

18           MR. SOBLE:  I understand, Your Honor.  And no, I'm not

19   at Kirkland.  And this wasn't briefed or argued by GM.  But

20   what I can say, Your Honor, is that there is money being

21   expended.  There are costs --

22           THE COURT:  That you've already expended or that you

23   think you're going to expend in the future?

24           MR. SOBLE:  My understanding is that have been

25   expended and that we could plead to add those.

Page 71

1          THE COURT:  For the limited extent of what your client

2     had expended as a PRP?

3          MR. SOBLE:  I believe so, sir.  Yes, Your Honor.

4          THE COURT:  Um-hum.  Go on.

5          MR. SOBLE:  As far as the Workers' Compensation, my

6     client has already given a guarantee to the State of

7     California.  The guarantee, I believe, exceeded 100 million

8     dollars.  And absent that guarantee, NUMMI would have been put

9     into involuntary dissolution.  That guarantee does not come

10    without costs.  It's not free.  There are costs with giving it,

11    associated with carrying it on the books.  It is a liability

12    for which Toyota incurs costs.

13          And as I said, without it, there would have been

14    immediate involuntary dissolution of NUMMI, which would have

15    been in no one's interests.  And we have pled that.  We think

16    we've pled it adequately for a 12(b)(6) standard.  If not,

17    we'll plead more facts related to it.

18          THE COURT:  Um-hum.  Go on.  Is that it?

19          MR. SOBLE:  That's all I have, Your Honor.

20          THE COURT:  Okay, Mr. Albanese, reply?

21          MR. ALBANESE:  Thank you, Your Honor.  Your Honor,

22    I'll be very brief.  Both NUMMI and Toyota are selectively

23    quoting from these contracts.  And read in their entirety, it

24    is clear that MLC had no obligation to purchase any set number

25    of vehicles.  There are two governing contracts on purchasing,

1   as we said.  The vehicle supply agreement and the 2006

2   memorandum of understanding both say that they have no

3   obligation to purchase any set number.  And the vehicle supply

4   agreement makes very clear that you need to enter into an

5   individual sales contract with respect to any actual vehicles

6   that you want to purchase.

7          And they've not alleging that we breached any sales

8   contract.  And they're arguing best efforts.  But best efforts

9   does not require MLC to order and purchase vehicles that have

10  been discontinued.  This market demand had plummeted.  As part

11  of our restructuring the vehicle was discontinued.   That's not

12  what best efforts means.

13         And the only way for this Court to grant them the

14  relief that they are seeking would be to rewrite these

15  contracts and omit the provisions that say there are no

16  purchasing obligations without an individual sales contract.

17  And there's no need for discovery, Your Honor, with contracts

18  that are clear, that don't set forth the obligations that are

19  alleged to have been violated or breached, and in fact,

20  explicitly contradict the obligations that they allege to

21  exist, when the contracts explicitly say they don't have such

22  obligations.  There's no need for factual discovery.  It would

23  be a waste of the parties' time and money, Your Honor.  Thank

24  you.

25         THE COURT:  Okay.  I assume that considering the

GENERAL MOTORS CORPORATION

Page 73

1    brevity of Mr. Albenese's comments, there's no need for

2    surreply?

3             MR. MCKANE:  That's correct, sir.

4             MR. SOBLE:  Correct, Your Honor.

5             THE COURT:  Okay.  All right.  Thank you very much,

6    gentlemen.  I'm going to have to take this under submission.

7             I do want supplemental memoranda on the significance

8    of 502(e) to the Toyota claims for especially environmental

9    remediation, and to the extent, if any, which 502(e) would also

10   apply to the Workers' Comp liability.  It's not clear to me

11   that Toyota is actually liable or that GM is liable on those

12   Workers' Comp claims, in which case 502(e) might not be

13   applicable there.  But of course, it is relevant on the

14   environmental.

15            They need not be elaborate.  And you're to agree upon

16   a satisfactory supplemental briefing schedule amongst

17   yourselves for how long it takes you to get me those.  But I

18   was scratching my head to see why 502(e) doesn't make the

19   environmental claims, to the extent that they're for future

20   expenses, disallowable.  And to get my arms around that, I'm

21   going to need it.

22            The matter is under submission.  And after you've

23   agreed upon a stip for a schedule, just paper your deal and

24   submit it to me.  If it's reasonable, it's going to be

25   approved.  I just want to know when I can expect it.

GENERAL MOTORS CORPORATION

Page 74

1        We're going to right into the appraisal matters now.

2   Thank you very much.  Anybody who was here solely on the first

3   matter is free to leave.

4        (Pause)

5        MR. LAGEMANN:  Good morning, Your Honor.  My name is

6   Nick Lagemann, and with me is my partner Steve Bierman --

7        THE COURT:  Just a minute.

8        MR. LAGEMANN:  Sorry.

9        THE COURT:  Over the noise, I couldn't hear you,

10  partly because of your distance from the microphone and partly

11  because of the surrounding noise.  Did you say your name was

12  Bierman?

13       MR. LAGEMANN:  No, Nick Lagemann, Your Honor.  My

14  partner Mr. Bierman, is on my right.

15       THE COURT:  Oh, you're Mr. Lagemann, the second name

16  on the papers.

17       MR. BIERMAN:  And I'm Mr. Bier -- I'm Steve Bierman,

18  Your Honor.

19       THE COURT:  Okay.  Very well, gentlemen.

20       MR. BIERMAN:  Thank you.

21       THE COURT:  And you're at Sidley New York?

22       MR. LAGEMANN:  Yes, sir.

23       THE COURT:  In its New York office?

24       MR. BIERMAN:  Yes.

25       THE COURT:  Okay.  And Mr. Steinberg, I know you,

GENERAL MOTORS CORPORATION

Page 75

1    having appeared on other New GM matters.

2           MR. STEINBERG:  I'm with my colleagues, Scott Davidson

3    and Slayton Dabney as well.

4           THE COURT:  Okay.  Yes, thank you.  All right.

5           Mr. Lagemann, are you going to be taking the lead on

6    behalf of your clients?

7           MR. LAGEMANN:  Yes, Your Honor.

8           THE COURT:  All right.  I thought I was prepared for

9    this matter when I left the courthouse last night, then I found

10   out about a very late reply that was submitted by you, I guess

11   yesterday, electronically, although no copy was sent to

12   chambers.

13          MR. LAGEMANN:  My apologies, Your Honor.

14          THE COURT:  Yeah.  My case management order talks

15   about giving me a reasonable time to read reply papers.  One of

16   the reasons for it, as the matter ahead of you indicated, is I

17   try to be prepared for these matters beforehand.  And when you

18   give me replies like that, it impairs my ability to do that.

19   But with that said, it looked to me, from reading your reply,

20   that you really didn't say much about the timing of the issue;

21   and what you were saying was to the merits of your underlying

22   position, that I should use the appraisal technique that you

23   advocate as contrasted to the one that New GM advocates.

24          It seems to me, gentlemen, that the real issue for me

25   to decide today isn't so much which of the two appraisal

GENERAL MOTORS CORPORATION

Page 76

1    techniques is most appropriate, but rather whether I should

2    accede to New GM's desire that before I get into the specifics

3    of an appraisal proceeding, I use the approach that New GM

4    recommends, which is deciding the threshold issue of the thing

5    that was addressed in the late reply, which is, does the

6    environment in which you guys are litigating the matter make it

7    more economical for me to decide the philosophical issue/legal

8    issue which you differ on, to facilitate a settlement or a

9    hearing going forward.

10           And considering a) the fact that this matter has gone

11   on for months; b) that I got a basket full of things on my

12   plate now, including the one that preceded this matter; and c)

13   the fact that it at least seemingly provides for a mechanism

14   for teeing the matter up for either a simpler determination in

15   case no agreement is forthcoming or a settlement otherwise, why

16   New GM's idea for deciding the legal and conceptual

17   underpinnings for the appraisal dispute isn't a good one; under

18   these circumstances, I think I should flip flop the normal

19   order for hearing it.

20           Well, actually, the motion initiating is the TPC

21   lenders' motion anyway.  So I think I should hear from you

22   first, Mr. Langemann, then I'll hear from Mr. Steinberg, and

23   then I'll have the usual opportunity for reply and opportunity

24   for surreply.  I also have to say, Mr. Lagemann, that I don't

25   know how significant a role Old GM is going to have in this.

Page 77

1   But somehow I suspect that between now and March 8th or

2   whatever the exact day is that Old GM has other matters on its

3   plate that it needs to focus on, like confirmation of its plan.

4          MR. LAGEMANN:  Understood.  And Your Honor, again, I

5   do apologize about the late reply.  It was my understanding

6   that there was going to be a copy delivered to chambers.  But I

7   apologize to the Court for that mistake.

8          With respect to the questions about scheduling, Your

9   Honor.  We believe that the most efficient way to handle this

10  process is to proceed under the schedule that we set forth in

11  our initial motion.  We do not believe that New GM has set

12  forth any particular reason why bifurcating or not proceeding

13  with discovery at this point, would expedite this matter to a

14  conclusion.  In particular, there is no particular rea -- there

15  is no reason why the parties cannot conduct discovery and brief

16  any particular legal issues heading into a valuation hearing.

17  Which is precisely the type of schedule that we set forth in

18  our initial motion.

19         The issues, such as they are, we believe, are clear,

20  as we've set forth in our reply brief.  But that said, to the

21  extent that the Court thinks that it needs additional briefing

22  on that legal issue or any particular factual issues heading

23  into the hearing, we believe there is more than enough

24  opportunity in the schedule to handle that, and at the same

25  time, move forward in discovery, the same way any other

Page 78

1    litigation would proceed.

2              Your Honor, we think that we can move forward with

3    discovery, which would be narrowly tailored to the specific

4    issues that relate to the appraisal.  We think that the

5    discovery can be handled in the short time frame that we've set

6    forth.  And then by contrast, Your Honor, we do believe that

7    New GM's proposal would extend and lengthen these proceedings

8    unjustifiably.

9              By asking this Court to set a separate schedule with

10   briefing first and then the parties proceeding to discovery and

11   to the hearing and proceedings, which they admit in their

12   opposition, are necessary to resolve this dispute, it would

13   merely be lengthening this matter and this dispute to a date

14   which is not set forth in their opposition or their response,

15   and to a point in time which will leave the TPC lenders without

16   resolution of their claim.

17             Finally, Your Honor, I would like to make clear,

18   obviously, the sale order provides that any party, including

19   the TPC lenders, can initiate these proceedings on twenty-days'

20   notice.  So it established a short time frame, a short

21   schedule, to more forward to a valuation proceeding under

22   section 506.  We think our motion or the proposed order we

23   submitted, clearly falls within the terms of the sale order and

24   is appropriate.  And by contrast, New GM's proposal of

25   separating these proceedings is not something that was

GENERAL MOTORS CORPORATION

Page 79

1    contemplated under the sale order.

2           THE COURT:  Um-hum.  All right.  Thank you.

3           MR. LAGEMANN:  Thank you.

4           THE COURT:  Mr. Steinberg?

5           MR. STEINBERG:  Your Honor, the reason why we

6    suggested that it made eminent sense to have the Court rule as

7    to what the appropriate standard would be is that when the

8    parties tried to resolve this matter on their own and they

9    exchanged appraisals, that the TPC lenders' appraisal put in

10   two numbers.  The fair market value number differed from the

11   New GM appraisal by eleven million dollars.  The value in use

12   number differed by thirty-four million dollars.

13          So we thought that a thirty-four million dollar gap

14   was very difficult to bridge.  But if the parties knew that

15   there was an eleven million dollar litigation that was going on

16   when there was an escrow for ninety-one million dollars, and

17   both sides had an incentive to get some of that money back,

18   that they would go back to the negotiating table, and we would

19   never have to come before Your Honor.  That was what the

20   parties contemplated doing before.

21          There was a lengthy preparation of and exchange of

22   appraisals that were done in the fall of last year.  There were

23   some settlement discussions.  But when you have a fundamental

24   difference as to what the valuation standard should be, then

25   that presented way too large of a gap.

1          The reason why I'm able to say that there is a

2    difference between fair market value and value in use, and the

3    reason why our papers had definitions, is that we basically

4    extracted them from the appraisal prepared by the TPC lenders.

5    The order that Your Honor signed did use the word "fair market

6    value".  What happened in this case was a sale from Old GM to

7    New GM.  Fair market value is the valuation standard when you

8    have a sale context.

9          In the reply, when they cite to the Rash case, they

10   totally miscite anything that's applicable.  And we would be

11   prepared to brief that in fairly short order to be able to

12   demonstrate to Your Honor.  But simply put, Rash was a Chapter

13   13 cramdown case where the debtor was retaining the property.

14   And the Supreme Court, when it ultimately got the case, had to

15   decide whether I'm dealing with liquidation value -- what the

16   creditor would get if it got back the equipment and then sold

17   it -- or something more akin to a fair market value.  The Rash

18   case uses fair market value concepts.  The footnote that

19   cited --

20          THE COURT:  Of course, what you're doing, Mr.

21   Steinberg, just like what Mr. Lagemann is doing, is giving me a

22   preview of what you guys would argue when the issue was teed up

23   for a legal determination.

24          MR. STEINBERG:  I agree with that, Your Honor.  And

25   I'm prepared to move on.  But what I would like to suggest is

1   that we could certainly do simultaneous briefing on this issue

2   in two weeks.  We each have our one shot to present what the

3   issue is here as to why the order provides what it does and

4   then to be able to present.  And if Your Honor decided that

5   issue in the way that we believe it should be decided, it will

6   necessarily narrow the discovery as well too.

7           There's a different type of discovery that you would

8   take if you had a valuation in use concept versus a fair market

9   value concept.  If you're dealing with fair market value,

10  you're dealing with what is the market conditions in June of

11  2009, which is essentially a battle of the experts as to what

12  the prevailing market conditions then.  And both of us have our

13  appraisals.  So there's not a long time to ratchet up on this.

14          But if you had value in use concept, it's a much more

15  fishing expedition, open-ended discovery.  And we're going to

16  end up having fights with -- when they serve discovery

17  requests, arguing that that's not the appropriate position

18  anyway.

19          So we believe that in a very short order, Your Honor

20  would have it in front of you.  You would have the benefits of

21  what I was going to say but Your Honor didn't want to address

22  the substance -- that's fine.  But we can easily do the

23  substance very, very quickly.  We think it's fairly clear cut.

24  And we actually believe that when you deal and narrow this down

25  to an eleven million dollar litigation, parties' attitudes

GENERAL MOTORS CORPORATION

Page 82

1    change in trying to bridge a gap between a bid-and-ask on a

2    valuation of real estate.

3         Now, there is an underlying issue that may or may not

4    exist in this case.  We believe it's less than a one million

5    dollar issue.  And we do think that we need to flesh this out

6    to make sure that we're correct on this.  You'll see, noted in

7    their papers that there was an allusion that in addition to the

8    real estate appraisals that they may claim to have a lien on

9    some portion of equipment.  I think if they would specify what

10   it is that they think that their lien position is, since they

11   never filed a proof of claim, we believe, for that, and what

12   their perfection is -- because we're not sure whether they ever

13   would have perfected it -- we would have the full ambit of what

14   Your Honor would ultimately have to value.

15        And that, we believe, probably warrants some

16   discovery, if they are alleging something that is way beyond

17   what we think is involved in equipment.  And there, I think,

18   the parties can engage in that type of discovery right away.

19   But it's silly to do discovery on the real estate until we know

20   what the valuation standard is.  And I think Your Honor,

21   depending on when you rule -- and I know Your Honor has a very

22   busy calendar -- that Your Honor could rule on the issue fairly

23   quickly, because I think it is a fairly clean issue to rule

24   upon.  And the legal principles and the order that you signed

25   are fairly explicit in these circumstances.

GENERAL MOTORS CORPORATION

Page 83

1          So, you know, our view is not to just open up the

2    spigot and everybody run around trying to do a whole bunch of

3    different things having discovery skirmishes here.  Ours is

4    more focused.  And I do think that we have every incentive to

5    try to resolve this matter sooner rather than later.  We have

6    just proposed something that we think is more efficient from a

7    litigation expense viewpoint and from a timing viewpoint.  And

8    that's why we think our proposal makes sense.  Thank you.

9          THE COURT:  Mr. Lagemann?

10         MR. LAGEMANN:  Yes, sir.  Your Honor, very briefly.

11   And unless Your Honor wants argument about the particular

12   merits, I think we have set forth --

13         THE COURT:  I assume that you and Mr. Steinberg are

14   going to have continuing disagreements -- difference in

15   perception on that.  And I'm just going to assume for the

16   purpose of this analysis that both of your positions are taken

17   in good faith, and it's a classic argument of what cases say.

18         MR. LAGEMANN:  Your Honor, I think that's exactly

19   right.

20         I would like to address, as far as procedure, though.

21   We do not think that setting forth the -- moving forward the

22   way Mr. Steinberg said will move this any more expeditiously.

23   In fact it's exactly the opposite.  As Mr. Steinberg noted, the

24   Court certainly has other things on its plate.  We think the

25   parties can move forward on their own, like any two parties in

Page 84

1     a litigation, and move forward through discovery to a valuation

2     hearing.  And the legal issues can be decided at that point

3     after the parties have gone through the necessary discovery.

4          In particular, I do note that Mr. Steinberg said that

5     he thought once the Court ruled, if Your Honor ruled in their

6     favor, things could be resolved in short order.  We obviously

7     disagree.  We think Your Honor would rule in our favor.  We

8     think proceeding in the manner in which he requested would then

9     require further delays.

10         There was an allusion in their response to, to the

11    extent that the Court follows the dictates of Rash and Section

12    506, as we believe that the Court should, that they will then

13    need more time to go out and commission a new appraisal, until

14    some point in the future which they do not inform us or the

15    Court how long that would take.  One thing I would note, Mr.

16    Steinberg has --

17         THE COURT:  Well, pause, Mr. Lagemann.  Am I right

18    that sooner or later, the threshold legal issue that separates

19    you and Mr. Steinberg is going to have to be decided by me,

20    unless you guys somehow otherwise make a deal?  Let me just ask

21    that first?

22         MR. LAGEMANN:  At some point, Your Honor, yes, there

23    will need to be a decision.

24         THE COURT:  And if it turns out that you're right, New

25    GM has to conduct or solicit or obtain an appraisal on the

Page 85

```
 1   legal premises upon which you think I should ultimately be

 2   deciding the issue, but that if -- and I express no view on the

 3   merits -- I were to favor New GM's view over yours, the need to

 4   do that would be obviated?

 5           MR. LAGEMANN:  I'm sorry, Your Honor.  The question

 6   being?

 7           THE COURT:  There are two kind of concepts for

 8   proceeding with the appraisal:  one being on a fair market

 9   value, which I gather each of the two sides has already done

10   its homework; the second where you have, but New GM hasn't.  If

11   I agree with your legal premise, then New GM has to make what

12   I'll call a category II type of appraisal on value in use as

13   contrasted to the fair market value, on the different

14   philosophy.  But if I ultimately agree with New GM, the need to

15   engage in that second kind of appraisal is obviated.

16           MR. LAGEMANN:  Well, Your Honor, I think the answer is

17   yes and no.  Yes, to the extent that New GM were correct about

18   the meaning of the sale order and Section 506.  Obviously we

19   dispute that.  You know, the appraisers have set forth

20   different numbers and there is the gap that Mr. Steinberg

21   talked about.  To the extent that the Court follows the

22   dictates as we believe they are, of Section 506 and Rash and

23   its progeny, New GM already has appraisals.  New GM already has

24   the ability to, I would expect in short order, starting from

25   today, to institute and get an appraised number under valuing
```

Page 86

1    it under the dictates of Rash.

2          There is no particular reason -- there is no reason

3    why that could not be done in connection with the proceedings

4    and the schedule as we've set forth in our motion.  It's just a

5    matter of New GM going forth and doing it.

6          We believe that that is -- that should have been done

7    before, as we've noted in our papers.  We do not see a reason

8    why the fact it wasn't done before serves as any good reason to

9    deny the TPC lenders moving forward to a claim which was

10   allowed, subject to setting the parameters of it, in the sale

11   order back in June of 2009.

12         Your Honor, I think that that does not set forward a

13   reason why the parties should not move forward with the

14   particular valuation hearing or the type of valuation hearing

15   that the Court allowed the parties to move forward on, on

16   twenty days' notice, as in the sale order.

17         Your Honor, just briefly, one other point I would like

18   to touch on.  We think that discovery from New GM will be the

19   same under either valuation proceeding.  First of all, there is

20   the issue of equipment which Mr. Steinberg noted, and I believe

21   has noted for the Court, should go forward anyway.  We

22   obviously disagree about the amount.  And in fact, we believe

23   that the equipment and the lien on the equipment can be

24   extremely, potentially, very valuable.

25         We also think, Your Honor, that discovery relating to

GENERAL MOTORS CORPORATION

Page 87

1    the use of the facilities by GM is precisely the type of

2    information that a potential buyer of the facilities would

3    want, particularly a buyer in the like trade or industry, as

4    required under Rash.  Your Honor, that discovery -- and

5    frankly, it is part of what we would be requesting.  There are

6    certain pieces of discovery that we received from -- through

7    informal means during the time leading up.  We do believe that

8    there is more.  But either way, the discovery would be the same

9    under either standard.

10            THE COURT:  Okay.  Mr. Steinberg, is there a need for

11    you to rise now?  What's the remaining issue that requires a

12    surreply on a matter of this simplicity?

13            MR. STEINBERG:  I always have more to say, Your Honor.

14    But I --

15            THE COURT:  Every litigant does.  Every lawyer does.

16            MR. STEINBERG:  But I'm prepared to sit at this point.

17            THE COURT:  Thank you.

18            MR. SMOLINSKY:  Your Honor, Joe Smolinsky for the

19    debtors.  I agree with Your Honor that we have very little dog

20    in this fight.  I just want to make sure that Your Honor has

21    received our papers and taken them under advisement.

22            THE COURT:  I did.  I read them.  They came in on

23    time.

24            MR. SMOLINSKY:  Thank you.

25            THE COURT:  Thank you.

GENERAL MOTORS CORPORATION

Page 88

1      (Pause)

2           THE COURT:  All right.  Gentlemen, in the contested

3      matter before me, which presents, not an issue on the

4      underlying merits of your positions on the appraisal, either

5      factually or as a matter of law, defining the standards under

6      which the appraisal is to be conducted or the value is to be

7      determined, but rather is a textbook example of how I should

8      apply my 105(d) authority, which gives judges the ability to

9      schedule the matters before them in a manner that puts the most

10     money into the pockets of creditors and is the most efficient,

11     I'm going with New GM's recommendation as to the timing for how

12     these issues should be teed up.  And the following are the

13     bases for the exercise of my discretion in this regard.

14          Obviously, the ultimate issues will require a

15     determination of value of the plant and the equipment, the real

16     and personal property, for the two plants in question.  But

17     it's apparent to me that the legal standards under which that

18     question, which is ultimately a mixed question of fact and law,

19     will be determined, raise an important and perhaps critical

20     threshold issue.  That threshold issue being whether I

21     determine fair market value with or without consideration of

22     its value for a particular purpose or its value in use is one

23     upon which the parties plainly have a disagreement, and which

24     will determine the ultimate issue.

25          I'm going to have to decide that issue sooner or later

Page 89

1    anyway.  I can and will read the various authorities that you

2    have and more likely will file with respect to that.  But that

3    is going to be roughly the same time, either way, unless the

4    matter is settled.  And that's been at least possible if not

5    clear that that is going to have a material effect on your

6    ability to settle it, if you ever can settle it.  And right now

7    it doesn't look like you can settle it.

8            Mr. Steinberg, on behalf of New GM, may or may not be

9    right in his view of the law.  But if he is right, then the

10   associated work on behalf of New GM and in discovery amongst

11   you has at least the probability if not the certainty of being

12   less than it would be if the TPC lenders are right.  And I

13   can't give you any prediction as to whether they're going to

14   turn out to be right, but since I'm going to have to spend the

15   time on deciding the legal issue anyway, even the possibility

16   of facilitating a settlement after I've decided that issue, or

17   narrowing the issues later to be determined, is tempting

18   enough, especially in light of the many burdens I have, both in

19   this case and in the other multibillion dollar cases on my

20   watch, it being remembered that Old GM isn't the only one of

21   them.  Any opportunity I have to conduct my docket more

22   efficiently and effectively is one that I can't turn down.

23           I heard Mr. Steinberg volunteer to submit a brief

24   within two weeks and to recommend simultaneous briefs.  It

25   seems to me that what you guys should do is not necessarily to

GENERAL MOTORS CORPORATION

Page 90

1    reject Mr. Steinberg's offer, but to agree amongst yourselves

2    as to the best way to time the submissions, and to agree among

3    yourselves as to whether his idea of simultaneous submissions

4    is better for your needs than the more common but not

5    necessarily better seriatim method of submitting briefs.

6         It also may be appropriate for you to consider -- and

7    I'm certainly not ordering it -- that you do a variant or a

8    hybrid, which is that you have simultaneous submissions, and

9    that you either provide for or reserve the right to submit very

10   short replies, covering anything that you guys didn't think of

11   the first time around.  But I think that any agreement of

12   whatever type you guys provide is likely to be approved by me

13   if it's consensual amongst you.  And what I want you to do is

14   to prepare a stip or consent order which tees it up for

15   determination on the threshold issue.

16        I sense that Old GM has no dog in this fight and that

17   at least the briefing of the legal issues will not place any

18   material burdens on Old GM between now and the time of its

19   March 8 confirmation hearing.  And Mr. Smolinsky, if I got the

20   date wrong, I apologize.  But if it does require anything

21   meaningful from Old GM, you've got to allow enough time for Old

22   GM to do what it needs to do to get its case ready for

23   confirmation.

24        So come up with a stip or consent order, gentlemen, in

25   accordance with the foregoing.  That's the bases for the

Page 91

1    exercise of my discretion on this scheduling issue.

2          Obviously, for the avoidance of doubt, I'm expressing

3    no view whatever on the merits of either the appraisal or the

4    legal premise upon which it's going to be premised.  And the

5    fact that I'm leaving out the possibility that New GM might be

6    right in further proceedings might be narrowed or obviated, is

7    premised only on possibility and not in any way, shape or form

8    upon my prediction of the likely outcome.

9          Not by way of reargument, are there any open issues?

10   Hearing none -- Mr. Lagemann?

11         MR. LAGEMANN:  No, Your Honor.

12         THE COURT:  All right.  Very well.  All right, we're

13   adjourned.  Thank you, very much, folks.

14         MR. SMOLINSKY:  Your Honor, we do have a few

15   uncontested matters.

16         THE COURT:  Oh, yes, I apologize, Mr. Smolinsky.

17         Anybody who was here on the TPC matter is free to

18   leave.  But I'll hear you for whatever it takes on the

19   remainder, Mr. Smolinsky.

20         MR. SMOLINSKY:  Thank you, Your Honor.  Joe Smolinsky

21   again.  I know it's been a long morning.  We can go through

22   this quick.  As we only have a handful of hearings between now

23   and confirmation, we're working hard on the claims, as every

24   dollar of claims that's resolved puts more of a distribution in

25   the hands of those holding allowed claims.

GENERAL MOTORS CORPORATION

Page 92

1          Your Honor, we have several omnibus claims motions on

2     the calendar today.  As we typically do, to the extent we can

3     resolve those matters, we submit orders indicating the

4     resolution or the defaults, and then adjourn with respect to

5     the continued contested matters.

6          It's no different today.  As normal, we would work

7     with Ms. Blum to make sure that the calendar adequately

8     reflects the adjournments of the matters that are continued,

9     and we can submit orders to Your Honor for consideration.

10         THE COURT:  Okay.  So to the extent they've been

11    resolved just submit the orders.  And to the extent they're

12    continued, just be sure they don't fall off the radar screen.

13         MR. SMOLINSKY:  We will, Your Honor.  Thank you.

14         THE COURT:  All right.  Thank you very much.  We're

15    adjourned.

16    (Whereupon these proceedings wee concluded at 12:14 p.m.)

17

18

19

20

21

22

23

24

25

Page 93

1                                  I N D E X

2

3                                    RULINGS

4                                                          Page        Line

5      Discovery schedule will proceed in the TPC          88          12

6      matter according to New GM's recommendation

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 94

1

2                    C E R T I F I C A T I O N

3

4      I, Ellen S. Kolman, certify that the foregoing transcript is a

5      true and accurate record of the proceedings.

6

7      Ellen S. Kolman    Digitally signed by Ellen S. Kolman
                          DN: cn=Ellen S. Kolman, c=US
                          Reason: I am the author of this document
8      _____    Date: 2011.02.10 14:45:41 -05'00'

9      ELLEN S. KOLMAN

10     CET**D-568

11

12     Veritext

13     200 Old Country Road

14     Suite 580

15     Mineola, NY 11501

16

17     Date:  February 10, 2011

18

19

20

21

22

23

24

25