Page 1

1

2    UNITED STATES BANKRUPTCY COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    Case No. 09-50026(REG)

5    - - - - - - - - - - - - - - - - - - - - - -x

6    In the Matter of:

7

8    MOTORS LIQUIDATION COMPANY, et al.

9    f/k/a General Motors Corporation, et al.,

10

11              Debtors.

12

13    - - - - - - - - - - - - - - - - - - - - - -x

14

15              United States Bankruptcy Court

16              One Bowling Green

17              New York, New York

18

19              March 3, 2011

20              9:51 AM

21

22

23    B E F O R E:

24    HON. ROBERT E. GERBER

25    U.S. BANKRUPTCY JUDGE

Page 2

1

2    HEARING re Confirmation

3

4    HEARING re Motion of Debtors for Entry of an Order Pursuant to

5    Bankruptcy Rules 9006(b) and 9027 Enlarging the Time Within

6    Which to File Notices of Removal of Related Proceedings

7

8    HEARING re Motion of Debtors for Entry of an Order Pursuant to

9    11 U.S.C. Section 365 Authorizing the Debtors to Assume and

10   Assign Certain Contracts to the Environmental Response Trust

11   Conditioned On and as of the Effective Date

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by: Aliza Chodoff

Page 3

1

2    A P P E A R A N C E S :

3    WEIL  GOTSHAL  &  MANGES  LLP

4           Attorneys  for  the  Debtors

5           767  Fifth  Avenue

6           New  York,  NY  10153

7

8    BY:   JOSEPH  H.  SMOLINSKY,  ESQ.

9           STEPHEN  KAROTKIN,  ESQ.

10

11

12   WEIL  GOTSHAL  &  MANGES  LLP

13           Attorneys  for  Debtors

14           1300  Eye  Street  NW

15           Suite  900

16           Washington,  DC  2005

17

18   BY:   DAVID  R.  BERZ,  ESQ.

19           THOMAS  GOSLIN,  ESQ.  (TELEPHONICALLY)

20

21

22

23

24

25

Page 4

1

2    KRAMER LEVIN NAFTALIS & FRANKEL LLP

3        Attorneys for Creditor's Committee

4        1177 Avenue of Americas

5        New York, NY  10036

6

7    BY:  THOMAS MOERS MAYER, ESQ.

8        ROBERT T. SCHMIDT, ESQ.

9

10

11   CAPLIN AND DRYSDALE

12       Attorneys for Official Committee of Unsecured

13        And Asbestos Creditors

14       One Thomas Circle NW

15       Suite 1100

16       Washington, DC  20005

17

18   BY:  RONALD E. REINSEL, ESQ.

19       TREVOR W. SWETT, ESQ.

20

21

22

23

24

25

Page 5

1

2    STUTZMAN BROMBERG ESSERMAN & PLIFKA PC

3         Attorneys for Future Representative

4         2323 Bryon Street

5         Suite 2200

6         Dallas, TX  75201

7

8    BY:  SANDER L. ESSERMAN, ESQ.

9         JACOB L. NEWTON, ESQ. (TELEPHONICALLY)

10

11

12   GIBSON, DUNN & CRUTCHER

13        Attorneys for Wilmington Trust as Indenture Trustee

14        200 Park Avenue

15        New York, NY  10166

16

17   BY:  MATT J. WILLIAMS, ESQ.

18   KELLEY, DRYE & WARREN LLP

19        Attorneys for Law Debenture Trust Company of New York

20        101 Park Avenue

21        New York, NY  10178

22

23   BY:  DAVID E. RETTER, ESQ.

24

25

1

2    VEDDER PRICE

3         Attorneys for Export Development Canada

4         1633 Broadway

5         47th Floor

6         New York, NY  10019

7

8    BY:  MICHAEL L. SCHEIN, ESQ.

9

10

11   U.S. DEPARTMENT OF JUSTICE

12        United States Attorney's Office

13        Southern District of New York

14        86 Chambers Street

15        New York, NY 10007

16

17   BY:  NATALIE N. KUEHLER, AUSA

18        DAVID S. JONES, DEPUTY CHIEF, CIVIL DIVISION

19

20

21

22

23

24

25

Page 7

1

2    HARRIS BEACH PLLC

3         Attorneys for ???

4         100 Wall Street

5         New York, NY 10005

6

7    BY:  ERIC H. LINDENMAN, ESQ.

8

9

10   NEW YORK STATE DEPARTMENT OF LAW

11        Office of the Attorney General, Eric T. Schneiderman

12        Environmental Protection Bureau

13        The Capitol

14        Albany, NY 12224

15

16   BY:  MAUREEN F. LEARY, AGAR

17

18

19

20

21

22

23

24

25

Page 8

```
 1

 2    DEPARTMENT OF LAW

 3          Attorneys for Onondaga County, New York

 4          John H. Mulroy Civic Center

 5          19th Floor

 6          421 Montgomery Street

 7          Syracuse, NY 13202

 8

 9    BY:  LUIS A. MENDEZ, SENIOR ASSISTANT COUNTY ATTORNEY

10

11

12    MORGAN LEWIS & BOCKIUS LLP

13          Attorneys for JPMorgan Chase Bank, N.A.

14          101 Park Avenue

15          New York, NY 10178

16

17    BY:  RICHARD S. TODER, ESQ.

18

19

20

21

22

23

24

25
```

Page 9

```
 1

 2    GREENBERG TRAURIG, LLP

 3         Attorneys for Certain Noteholders of General Motors Nova

 4          Scotia Finance Company

 5         MetLife Building

 6         200 Park Avenue

 7         New York, NY 10166

 8

 9    BY:  GARY D. TICOLL, ESQ.

10         BRUCE ZIRINSKY, ESQ.

11

12

13    CALIFORNIA DEPARTMENT OF JUSTICE

14         Attorney for California Department of Justice

15         300 S. Spring Street

16         Suite 1702

17         Los Angeles, CA

18

19    BY:  OLIVIA KARLIN, ESQ. (TELEPHONICALLY)

20

21

22

23

24

25
```

Page 10

1

2   KIRKLAND AND ELLIS, LLP

3        Attorneys for NUMMI

4        555 California Street

5        San Francisco, CA  94014

6

7   BY:  MARK E. MCKANE, ESQ.

8

9

10   MORRISON FOERSTER, LLP

11        Attorneys for Citigroup Global Markets, Inc.

12        1290 Avenue of the Americas

13        New York, NY  10104

14

15   BY:  JORDAN WISHNEW, ESQ.

16

17

18   AKIN GUMP STRAUSS HAUER & FELD, LLP

19        Attorneys for Green Hunt Wedlake

20        One Bryant Park

21        New York, NY  10036

22

23   BY:  PHILIP C. DUBLIN, ESQ.

24        NATALIE LEVINE, ESQ.

25

Page 11

U.S. DEPARTMENT OF JUSTICE

    Office of the United States Trustee

    33 Whitehall Street

    21st Floor

    New York, NY 10004


BY:  BRIAN S. MASUMOTO, ESQ.



BUTZEL LONG, PC

    Attorneys for GM Creditors' Committee

    380 Madison Avenue

    22nd Floor

    New York, NY  10017


BY:  BARRY SEIDEL, ESQ.



CADWALADER, WICKERSHAM & TAFT, LLP

    Attorneys for U.S. Treasury

    700 Sixth Street NW

    Washington, DC  20001


BY:  TIMOTHY T. BROWN, ESQ. (TELEPHONICALLY)

Page 12

1

2    HANGLEY ARONCHICK SEGAL & PUDIN

3         Attorneys for NCR

4         One Logan Square

5         18th & Cherry Streets

6         27th Floor

7         Philadelphia, PA  19103

8

9    BY:  MATTHEW A. HAMERMESH, ESQ. (TELEPHONICALLY)

10

11

12    ROPERS, MAJESKI, KOHN & BENTLEY

13         Attorneys for Remy International

14         20 Spear Street

15         Suite 1000

16         San Francisco, CA  94105

17

18    BY:  KATHLEEN STRICKLAND, ESQ. (TELEPHONICALLY)

19

20

21    PRESENT TELEPHONICALLY:

22         Matthew M. Barnett, In Pro Per/Pro Se

23         George Brickfield, The Seaport Group

24         Robert Chambers, Akanthos Capital Management

25         Timothy Chen, Puma Capital

Page 13

1          Leslee N. Cowan, In Pro Per/Pro Se

2          Ephraim Diamond, DK Partners

3          Michael Fabiano, GSO Capital Partners

4          Jordan Fisher, Pentwater Capital Management

5          Manish Garg, Halcyon Asset Management

6          Anthony Kim, DebtWire

7          Nate Oakes, Stone Lion Capital Partners

8          Dennis A. Prieto, Aurelius Capital Management, LP

9          Sarah Thompson, Barclays Capital, Inc.

10          Michael A. Trahan, Carlson Capital

11          Eric J. Werwie, EBF & Associates, LP

12          Michele Whalen, Morgens, Waterfall, Vintiadis & Co.

13          Patricia Wheeler, Godfrey & Kahn, S.C.

14          Shaun Wong, Credit Suisse

15

16

17

18

19

20

21

22

23

24

25

Page 14

1                         P R O C E E D I N G S

2                THE COURT:  Good morning.  Have seats, please.

3                Okay.  We're here on confirmation in Motors

4     Liquidation Company, General Motors.  Of course, as you know I

5     entered an administrative order to provide for orderly

6     proceedings today, which I assume will be followed through on.

7     I see Mr. Karotkin, Mr. Smolinsky, do you folks want to give me

8     a recommendation as to how you would like to proceed?

9                MR. KAROTKIN:  Good morning, Your Honor, Stephen

10    Karotkin, Weil Gotshal and Manges for the Debtors.  I think, as

11    you indicated, there's been the order to which you just

12    referred, Your Honor, that there would be three company's

13    statements by people in favor of the plan to the extent they

14    wanted to make them, and we would like to make a new statement.

15               And then I think that Mr. Jones and Ms. Kuehler from

16    the United States Government after they make a brief statement,

17    I'd like to address the environmental settlement trust and

18    issues related to the people of those agreements, and then I

19    think it would be appropriate again, subject to however you

20    would like to proceed to address any objections that still

21    remain.

22               THE COURT:  That's agreeable Mr. Karotkin so do you

23    want to start?

24               MR. KAROTKIN:  Yes, if I could.

25               As Your Honor knows, and as you just indicated right

09-50026-mg    Doc 9791    Filed 03/04/11    Entered 03/14/11 11:50:45    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 15 of 160

Page 15

1    here, we're here to consider confirmation of the plan which is

2    the culmination of the process, Your Honor, which as you well

3    know began on June 1st, 2009 an encompassed the expeditious

4    sale of the General Motors enterprise.  The creation of New GM

5    and its re-Establishment in the market as a competitive force,

6    both internationally as well as domestically, GM's rebirth,

7    Your Honor, its recent public offering, the growth of its

8    market share as indicated in yesterday's newspaper, the

9    revenues it's been generating and perhaps most importantly from

10   the perspective of the people involved in this case and I'm

11   sure, Your Honor, the continued employment of tens of thousands

12   of people worldwide, and we think that's a testament to the

13   value and flexibility of our bankruptcy system and the

14   dedication of this court to the implementation of that process.

15           The final winding up of Old GM, which is now called

16   Motors Liquidation Company, the hopeful confirmation and

17   implementation of the plan that is before Your Honor today, in

18   which, as I will detail shortly was overwhelmingly accepted by

19   the two classes of creditors voting on the plan, assures, among

20   other things Your Honor a fully funded remediation of GM's

21   former manufacturing properties and significant distributions

22   to general unsecured creditors, and brings to a close, we hope,

23   of a very successful administration of these Chapter 11 cases.

24           I would like to say that on behalf of our firm and on

25   behalf of the debtors, on behalf of AlixPartners we want to

1    thank Your Honor for all the time that you devoted to the 363

2    sale, the administration of these estates, particularly in view

3    of all of the challenges involved at the outset of these cases

4    and thereafter, and in view of your very busy schedule, and we

5    thank you for your dedication of time to this effort and we are

6    very grateful to the Court for that.

7            In connection with today's hearing Your Honor we have

8    submitted the affidavit of Thomas Morrow in support of

9    confirmation of the plan.  We have also filed a memorandum of

10   law which includes a response to the various objections that

11   were filed, including a chart that summarizes those objections

12   as well as our responses.

13           I would note Your Honor that solicitation of votes on

14   the plan and notice of this hearing, the deadline to file

15   objections to the plan, and notice of all of those matters were

16   provided in accordance with this Court's order dated December

17   8, 2010 which approved the debtor's disclosure statement, and

18   also approved solicitation and voting procedures as well as the

19   manner and form of notice.

20           There are various affidavits of service and

21   publication on file which demonstrate that the procedures for

22   giving notice and for the solicitation process were done fully

23   in compliance with your order and I believe the Court can take

24   judicial notice of those affidavits.

25           Also on file with the Court are four certifications

MOTORS LIQUIDATION COMPANY, et al.

Page 17

1    of the voting agents with respect to voting on the plan.  As

2    Your Honor knows there were two voting agents; the Garden City

3    Group which dealt with the Class V solicitation as well as the

4    Class III solicitation to the extend it did not involve public

5    debt securities, and by Epiq which was involved in the Class

6    III solicitation and certification process with respect to the

7    public debt.

8            As I'm sure Your Honor may recall only two classes of

9    creditors were solicited for voting, that's Class III which is

10   the class of general unsecured claims and Class V which is the

11   Class of asbestos personal injury claims.  All other classes

12   are either unimpaired or not entitled to vote.

13           The only class that is impaired and not entitled to

14   vote is the class of equity security holders which does not

15   receive any property or consideration under the plan.

16           THE COURT: And therefore is deemed to reject.

17           MR. KAROTKIN:  That is correct, sir.

18           I'm pleased to report that as set forth in the

19   supplemental declaration of James Sullivan of Epiq, filed last

20   night -- and I would point out Your Honor that that final

21   certification was delayed by virtue of extended solicitation in

22   Italy to make sure that sufficient time was granted to the

23   Italian bondholders to get their votes in, and I'm happy to

24   report your Honor that the plan, as I indicated earlier was

25   overwhelming accepted by both classes, III and Class V and I

Page 18

1  could just summarize the vote Your Honor from those

2  certifications.

3         With respect to Class III, which is the general

4  unsecured creditor class which consists of the bondholders as

5  well, in terms of dollar amount accepting the number is

6  $18,460,970,649.08 representing 85.6 percent of those voting.

7  The amount rejecting is $3,106,806,154.16 representing 14.4

8  percent.

9         In terms of number accepting Your Honor 91,470 votes

10 were cast in favor of the plan, and 3,042 votes were cast

11 rejecting the plan.  And in terms of percentages that is 96.78

12 percent accepting and 3.22 percent rejecting.

13        With respect to Class V Your Honor which is the

14 asbestos personal injury claims, as provided in your order

15 authorizing improving the solicitation procedures, because of

16 the nature of the asbestos plans and the fact that they are

17 essentially all unliquidated, the procedure was one dollar per

18 vote.  And the summary of the votes in that class are as

19 follows, the dollar -- and they will be the same since the

20 dollar and the number, since it's one dollar, are the same.

21        The dollar accepting are 17,027.  The dollar

22 rejecting is 386 dollars.  The percentages are 97.78 percent

23 accepting, 2.22 percent rejecting and those same numbers

24 without dollars attributed to them are the same for the numbers

25 voting.  So again number accepting is 97.89 percent and number

Page 19

1    rejecting is 2.22 percent.

2              So as I indicated you can see the plan was

3    overwhelmingly accepted and satisfies the requirements of the

4    statute and therefore the only class that is essentially being

5    crammed down on is the equity class.  And I think as we've

6    demonstrated in our pleadings, with respect to the equity class

7    we certainly satisfied the provisions of 1129(b).

8              Over the past several days Your Honor we have been

9    working to address a number of the objections to the plan, as

10   well as addressing certain modifications to the plan and

11   suggested modifications that have been made, which I would

12   characterize Your Honor as technical in nature in ways to

13   clarify various issues that have been raised or to make sure

14   the plan works in the way it is supposed to work.

15             This has included certain modifications to the

16   exhibits to the plan, most particularly what we call GUC Trust

17   Agreement.  On February 25th Your Honor a revised version of

18   the GUC Trust Agreement was filed with the Court, put on the

19   website as well as a blacklined version and distributed to

20   various parties for their review.

21             As to all, as to both the plan, the exhibits to the

22   plan, we have them in Court today a blacklined versions of

23   those documents from, in terms of the GUC Trust Agreement which

24   was filed on February 25th, in terms of the plan, what was

25   originally filed and went out in the solicitation package, and

Page 20

1    we have furnished copies to your chambers for your review as

2    well.  And they are available here as I indicated this morning

3    and people have had an opportunity to look at them.

4                I would submit to Your Honor and as indicated as well

5    in the pleading filed by the creditors' committee on February

6    25th to which the GUC Trust Agreement was attached that these

7    documents do not include any substantively economic changes to

8    distributions under the plan.  As I indicated they're basically

9    clarification making sure the reserves work properly, making

10   sure fractional shares work properly so that people are treated

11   fairly particularly with respect to that issue, and I would

12   submit Your Honor that the modifications to the plan and the

13   exhibits to the plan do not adversely affect the treatment of

14   the claim of any creditor who has not accepted the modification

15   in writing, and therefore in accordance with Section 1127(a) of

16   the Bankruptcy Code and Bankruptcy Rule 3019, we will be

17   seeking confirmation of the plan as modified, and we will be

18   filing Your Honor together with hopefully a proposed

19   confirmation order a second amended plan which will reflect

20   those modifications.  Again that document is in the courthouse

21   today.

22                I will point out that in connection with the

23   modifications that have been done to all of these documents

24   that has been a concerted effort engaged in, with the

25   creditors' committee, the debtors, of course, the United States

MOTORS LIQUIDATION COMPANY, et al.

Page 21

1   Treasury and the other committees have been involved as well

2   and it reflects a consensual presentation of where we are

3   today.

4          With respect to the objections, there were thirteen

5   objections filed to confirmation of the plan; six of these have

6   been fully resolved, leaving only the following seven.  The

7   Town of Salina, Onondaga County, the State of New York,

8   California Department of Toxic Substances, what are called the

9   Nova Scotia noteholders, the Nova Scotia Trustee, and NUMMI.

10         As I said we have addressed --

11         THE COURT:  And NUMMI is still on that list?

12         MR. KAROTKIN:  My colleague Mr. Smolinsky says it may

13  be off.

14         MR. SMOLINSKY:  May be.

15         MR. KAROTKIN:  He's responsible for NUMMI, Your

16  Honor.

17         As I said, we have addressed these in our brief.  We

18  will be prepared to address these at the appropriate time.  I

19  understand the creditors' committee has a position on certain

20  of these items as well, but before we get to that as I

21  indicated to the extent that other parties in support of the

22  plan who wish to make statements, I think that would be

23  appropriate at this time unless Your Honor has any questions.

24         I know that Mr. Jones on behalf of the United States

25  Government and Treasury would prefer to go last and then he can

Page 22

1    get into, at that point, the environmental trust agreements and

2    settlement agreements.

3              THE COURT:  Okay.  I'd like to hear next from the

4    estate fiduciaries, starting with the creditors' committee.

5    Mr. Mayer, good morning.

6              MR. MAYER:  Good morning, Your Honor.  I'd like to

7    take this time to address only a subcategory of the objections

8    because I think that's the most productive use of our time, and

9    I want to start with the Nova Scotia bondholder objections.

10   Probably the easiest way to track this is to turn to the

11   objection filed by Appaloosa Management because it has a sort

12   of checklist of objections and I would propose to briefly

13   address each one because some of them, I hope, are off the

14   table.

15             THE COURT:  Give me a second then, please, Mr. Mayer.

16             MR. MAYER:  Certainly.

17        (Pause)

18             MR. MAYER:  Mr. Karotkin reminds me I'm supposed to

19   make a general opening statement and it is not appropriate to

20   take Your Honor through the actual objections in advance.  I'm

21   sorry.  Some of these have been resolved Your Honor --

22             THE COURT:  I didn't want to be rude.  I think Mr.

23   Karotkin got it right.

24             MR. MAYER:  Yes, Your Honor, in that case I'll be --

25             THE COURT:  What I would like to know at this point

Page 23

```
 1    is any overall comments the creditors' committee has, the

 2    asbestos committee has, the future claims rep, Government -- I

 3    don't know if the UAW and the Canadian authorities and the U.S.

 4    -- well the U.S. Trustee wouldn't have a position -- want to be

 5    heard in general terms, but what I'm trying to do now is kind

 6    of get my arms around where we stand in terms of support for

 7    the plan and then I'll deal with the technical objections and

 8    other objections that have been raised by the remaining

 9    objectors.

10              MR. MAYER:  Thank you, Your Honor, I'll be very

11    brief.  The creditors' committee wholeheartedly supports the

12    plan by a unanimous vote of its diverse membership, and on a

13    general basis just as Mr. Karotkin paid tribute to certain

14    people whose work went into this plan, I would like to do so

15    too.

16              In particular the administration of this, this estate

17    going forward will be committed to a GUC Trust, there will be

18    GUC Trustee.  The GUC Trust Agreement is a detailed and complex

19    document that has been carefully shepherded, not just through

20    the bankruptcy process which we hope will be a successful

21    shepherding ending today, but also through the Securities and

22    Exchange Commission and the Internal Revenue Service with

23    respect to a no-action letter that we hope to receive from the

24    SEC momentarily with respect to private letter ruling that we

25    have asked for and expect to receive from the Internal Revenue
```

09-50026-mg    Doc 9791    Filed 03/04/11    Entered 03/14/11 11:50:45    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 24 of 160

Page 24

1    Service.

2            And in connection with those efforts Your Honor

3    should know that the involvement of the future GUC Trustee was

4    critical because that's the institution that's actually going

5    to be signing the statements that are filed with the SEC and is

6    going to be the institution is signing the tax returns, and you

7    can't do that in a vacuum.  And in that connection I would

8    therefore like to pay tribute to the business people at

9    Wilmington Trust and to their counsel who made a very material

10   contribution to getting this quite complex document done.

11           And finally going back a couple of years, we stand

12   here today as I said before as the custodian of the deal is cut

13   by Paul Weiss and Houlihan Lokey a month before this case

14   filed, and we view this plan as the successful preservation and

15   consummation of that deal.

16           THE COURT:  Pause just a minute, please, Mr. Mayer.

17       (Pause)

18           THE COURT:  Proceed, please.

19           MR. MAYER:  We view this plan as the consummation of

20   that deal and I wanted to pay tribute to those who negotiated

21   it and are not here in Court today, and we urge Your Honor to

22   confirm the plan.  Thank you.

23           THE COURT:  Thank you.  Mr. Reinsel and Mr. Swett.

24   Mr. Reinsel, good morning.

25           MR. REINSEL:  Good morning, Your Honor.  For the

09-50026-mg    Doc 9791    Filed 03/04/11    Entered 03/14/11 11:50:45    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 25 of 160

Page 25

1    record, Ron  Reinsel from Caplin and Drysdale on behalf of the

2    official committee of unsecured creditors holding asbestos

3    claims.

4          Your Honor, we will be as brief as possible.  We late

5    yesterday filed a statement in support of the plan.  The

6    asbestos committee does fully support the plan, it reflects

7    extensive negotiations by the committee, the unsecured

8    committee, the debtor assisted by the FCR.  It has been

9    overwhelmingly accepted by the present claimants and supported,

10    I'm sure Mr. Esserman will confirm by the future claimants'

11    representative.  So, Your Honor, we urge confirmation.

12          THE COURT:  Very well, thank you.

13          Mr. Esserman.

14          MR. ESSERMAN:  Good morning, Your Honor, Sandy

15    Esserman of Stutzman Bromberg Esserman & Plifka on behalf of

16    the future representative.  We do support the plan.  We filed a

17    brief in favor of the plan, it's obviously a product of arm's

18    length and extensive negotiation among a lot of people.

19          As Your Honor knows we brought many disputes to Your

20    Honor.  We appreciate Your Honor's patience in resolving those

21    disputes.  Many disputes were resolved outside Your Honor's

22    presence and outside the Court as Your Honor would expect the

23    attorneys to do of the caliber that we have here and in this

24    case.  We have done so, the future's representative has been a

25    participant extensively in the negotiations of the trust and

Page 26

1    applicable provisions of the plan.  We think it's a fair deal

2    and we urge approval.

3              This is not something that one might have thought we

4    would have said early on in the case or even middle or even

5    late in the case but the parties worked very, very hard and

6    that includes Mr. Karotkin and his crew, Mr. Mayer and his

7    crew, Mr. Reinsel and others that are unnamed.  So it really

8    was a group effort here with very competing interests.  I think

9    that's an important factor that needs to be stated.  Thank you.

10             THE COURT:  All right.  Thank you.

11             Anybody else want to be heard before I give the

12   Government an opportunity?

13             MR. WILLIAMS:  Just very quickly, Your Honor.

14   Matthew Williams of Gibson, Dunn & Crutcher for Wilmington

15   Trust as indenture trustee.  As Your Honor knows Wilmington

16   Trust is chair of the official committee of unsecured creditors

17   and also is the proposed Guk administrator.

18             In our capacity as indenture trustee we think this is

19   the best deal for our bondholders.  We think that this plan is

20   going to get out the largest distribution they can possibly get

21   in the most expeditious timeframe practical, and for that

22   reason we support confirmation of the plan.

23             THE COURT:  Mr. Williams did I have a second

24   indenture trustee?  My memory is that you had about twenty-two

25   or twenty-three million of the total of twenty-seven -- excuse

09-50026-mg   Doc 9791   Filed 03/04/11   Entered 03/14/11 11:50:45   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 27 of 160

Page 27

1    me, billion.

2            MR. WILLIAMS:  Twenty-three billion.  Yes, there are

3    other indenture trustees as well Your Honor, Law Debenture is

4    an indenture trustee.  There are also some fiscal paying

5    agents, I believe Law Debenture is in the courtroom as well.

6            THE COURT:  All right.  Does Law Debenture want to

7    comment in any way?

8            MR. WILLIAMS:  Thank you, Your Honor.

9            THE COURT:  Thank you.

10           MR. RITTER:  Good morning, Your Honor.  My name is

11   David Retter of Kelley, Drye & Warren.  We represent Law

12   Debenture Trust Company of New York as indenture trustee for

13   seven series of General Motors' bonds.  The total principal

14   amount is approximately 176 million.  Law Debenture has been an

15   active member of the creditors' committee ever since the

16   inception of this case and we are very much in favor of the

17   plan and we support the plan together with all of the other

18   members of creditors' committee.

19           We want to use this opportunity as well to thank

20   debtor's counsel, to thank Cream Eleven (ph) in particular, the

21   counsel to our committee, Tom Mayer and all of his crew, all of

22   whom did a wonderful job in shepherding this case through this

23   court.  Thank you very much.

24           THE COURT:  All right.  Thank you, Mr. Retter.

25           All right.  Anybody else?  Mr. Schein.

Page 28

1           MR. SCHEIN:  Good morning, Your Honor.  Michael

2    Schein, Vedder Price on behalf of Export Development Canada as

3    the DIP, as one of the DIP lenders.  We fully support the

4    confirmation plan and most importantly want to thank Your Honor

5    for all your efforts and time throughout this case.

6           THE COURT:  Thank you.

7           MR. SCHEIN:  Thank you.

8           THE COURT:  Okay.  Mr. Jones.

9           MR. JONES:  Thank you, Your Honor, and may it please

10   the court, David Jones from the U.S. Attorney's Office for the

11   Southern District of New York for the United States.  My

12   colleague Natalie Kuehler has headed our office's efforts on

13   environmental issues and as Mr. Karotkin explained she will

14   address those plan provisions and state our request that they

15   be approved under the environmental laws in a moment.

16           But first I wish briefly to state that the United

17   States strongly supports prompt confirmation of the proposed

18   plan of liquidation.  The plan is overwhelmingly beneficial to

19   the nation and to the creditor community.  It honors the

20   commitment that the United States made to fund the proper wind

21   down of the Old GM's nonviable assets following the hugely

22   successful launch of New GM through the 363 sale process.

23           It is also critical to the public interest that the

24   plan be confirmed and become effective promptly so that

25   creditors can be paid under the plan without further delay and

09-50026-mg   Doc 9791   Filed 03/04/11   Entered 03/14/11 11:50:45   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 29 of 160

Page 29

1    so that taxpayers of the United States can stop bearing the

2    extraordinary and ever growing expense of running a complex,

3    unresolved Chapter 11 proceeding.

4              In the United State's view the plan appropriately

5    provides for the full wind down of debtor's affairs.  I do wish

6    briefly to comment on the DIP lenders' role, commitments and

7    entitlements as this matter progresses through the rest of the

8    wind down process.  The DIP lenders and specifically U.S.

9    Treasury have agreed to let MLC and the trusts use the DIP

10   lender collateral to complete the work of the wind down of this

11   estate subject to a budget.  However, in exchange and as the

12   documents in the case provide, the DIP lenders are keeping

13   their liens on all of the collateral at the trust and at MLC.

14             And one thing I want to specifically note and is also

15   made clear in the plan documents nothing being done today

16   alters any parties' rights or contentions as specifically to

17   entitlements to any proceeds of the term loan avoidance action

18   which the court has heard about earlier in this case.

19             Finally to the extent assets remain following

20   completion of the wind down, those assets under the plan will

21   be returned to the DIP lenders.  What I've given is an overview

22   and a key component of the plan.  The plan documents, as I've

23   said make clear of what I've stated today and nothing I've said

24   today is intended to modify or supplement those provisions at

25   all, but we wanted to articulate at a general level on the

09-50026-mg   Doc 9791   Filed 03/04/11   Entered 03/14/11 11:50:45   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 30 of 160

Page 30

1    record today what the basis is of the DIP lenders' continuing

2    consent to fund the wind down of the estate.

3            I acknowledge and join in the thanks of all counsel

4    to the court and to all parties in interest and to the many

5    people who, on the governmental side, including the

6    Government's advisors who have helped to bring this case to

7    this point.  We are very satisfied and pleased to find

8    ourselves on the brink of confirmation we hope and are very

9    pleased we have achieved such a satisfactory resolution for all

10   parties in interest.

11           At this time if the court has no questions, I will

12   ask Ms. Kuehler to address the environmental issues that are so

13   central to the claim before the court.  Thank you.

14           THE COURT:  Okay.  Thank you.

15           Ms. Kuehler I'll hear from you, then I'll hear from

16   any objectors on your environmental settlement.

17           MS. KUEHLER:  Good morning, Your Honor, Natalie

18   Kuehler from the U.S. Attorney's Office for the Southern

19   District of New York on behalf of the United States.

20           As my colleague David Jones has stated, the United

21   States strongly supports confirmation of the proposed plan and

22   that plan is conditioned on and incorporates certain

23   environmental settlements.

24           The first environmental settlement is what we call

25   the Environmental Response Trust settlement.  This settlement

Page 31

1  covers eighty-nine sites in fourteen states.  The second set of

2  settlements are what we call the priority order site

3  settlements.  These are six separate settlements for non-owned

4  properties.

5          The debtors will be seeking the court's approval of

6  these settlements under bankruptcy law as part of their motion

7  to approve the plan as a whole, and the United States is now

8  also seeking the court's approval under the applicable

9  environmental laws.  Ultimately any ruling by the court

10 confirming the plan will constitute a ruling approving the

11 settlement agreements under both environmental and bankruptcy

12 law.

13         Both the Environmental Response Trust settlement

14 agreement and the priority order site settlement agreements

15 were lodged with the court last year and the United States has

16 taken public comments on those settlement agreements, and after

17 reviewing those public comments has determined that the

18 settlement agreements are fair, they are reasonable and they

19 are consistent with environmental law.

20         In ruling on the Government's motion to approve the

21 settlement agreements under environmental law the court

22 conducts its own review of the settlement agreement's fairness.

23 The court, however, should be deferential to the United States'

24 determination that the settlement agreements ware in the public

25 interest.

09-50026-mg    Doc 9791    Filed 03/04/11    Entered 03/14/11 11:50:45    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 32 of 160

Page 32

1          To reach the settlement agreements at issue here the

2    United States, the debtors, fifteen states and a tribe

3    conducted extensive negotiations over a period of over one year

4    in which the parties were not only represented by experienced

5    counsel but also by experts, and these experts were deeply

6    involved in technical discussions at the site determining

7    future remedial costs as well as the debtor's liability.

8          The settlement agreements that are now before the

9    court are the result of these intensive arm's length

10   negotiations and as mentioned just earlier and also in detail

11   in the brief we submitted in approval of the settlement

12   agreements, these agreements are fair, they're consistent with

13   environmental law and public policy and they are in the

14   public's interest.

15         I will just briefly summarize the essential terms of

16   both settlement agreements now, and it's important to note that

17   at the outset, at the very inception of this case as part of

18   the budgeting process up to 536 million of the DIP loan

19   proceeds were set aside and reserved specifically to address

20   the debtor's priority environmental obligations.

21         Under the settlement agreements now before the court

22   of those 536 million, 511 million will be placed in the

23   Environmental Response Trust to fund the clean-up of the

24   properties at issue in that settlement, and the remaining 25

25   million are allocated to the six separate priority order site

09-50026-mg    Doc 9791    Filed 03/04/11    Entered 03/14/11 11:50:45    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 33 of 160

Page 33

1    settlement agreements.

2            THE COURT:  Did you say Ms. Kuehler that eighty-nine

3    sites were covered under the ERT?

4            MS. KUEHLER:  That's correct, Your Honor.

5            THE COURT:  All right.  Go on.

6            MS. KUEHLER:  The Environmental Response Trust

7    settlement agreement, those eighty-nine properties are all

8    properties that are either currently owned by the debtors or

9    were owned by the debtors at the time of the petition date and

10   in some instances include adjacent properties that were

11   contaminated by the debtors.

12           The priority order site settlement agreements in turn

13   involve sites at which the debtors are essentially the sole

14   potentially responsible party, and the debtors are subject to

15   existent clean-up orders requiring them to remediate the sites.

16           As part of the United States' process for determining

17   that the settlement agreements are in the public interest, the

18   United States solicited public comments by lodging the

19   settlement agreements with the court, publishing them in the

20   Federal Register and in the case of the Environment Response

21   Trust settlement agreement we also held a public meeting in

22   Syracuse and in Onondaga County, New York where we solicited

23   additional written and oral comments.

24           All the comments that we received and the transcript

25   of that public meeting have been submitted to the court in our

1    papers and they have been addressed in those papers as well, so

2    I'm not going to go into each of those in detail.

3           But I would like to discuss the underlying reasons

4    for why the United States has determined that the settlement

5    agreements are in the public interest.

6           In determining which of the many sites at which

7    debtors have environmental obligations should receive funding

8    from the available 536 million in DIP loan proceeds, the United

9    States first identified those sites for which the strongest

10   basis for priority treatment exists under bankruptcy law.  And

11   what I mean by that is that the debtors at those sites have

12   direct fee enforceable injunctive obligations as opposed to the

13   United States having mere claims for clean-up obligations.

14          Under the existing case law which this court in

15   intimately familiar with --

16          THE COURT:  Painfully familiar.  I say that not

17   because of the burdens on a court but because it is

18   conceptually very difficult including some authority which we

19   try to follow from the second circuit.

20          MS. KUEHLER:  Yes, Your Honor.

21          THE COURT:  Go on, please.

22          MS. KUEHLER:  And under that authority the sites that

23   have the strongest basis for priority treatment are those sites

24   that are currently owned by the debtors or were owned by the

25   debtors as of the petition date.  And another very strong

09-50026-mg    Doc 9791    Filed 03/04/11    Entered 03/14/11 11:50:45    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 35 of 160

Page 35

1    similarly strong basis for priority treatment exists for those

2    sites which are not owned but where there is ongoing pollution

3    and the debtors are under an existing clean-up order requiring

4    them to remediate and there are essentially no other viable

5    peer piece that would conduct the clean-up in their place.

6         In addition to this the United States also looked to

7    the environmental laws mandate to maximize the overall clean-up

8    of contaminated sites and protect the public health and the

9    environment.  The sites that are addressed by the settlement

10   agreements here would have no clean-up funding available from

11   any source other than the debtors.  As such, without the

12   settlement agreements, the properties they address would either

13   not be cleaned up or the clean-up costs would fall to be borne

14   by the federal and state taxpayers with funds that then could

15   not be used to clean up other sites.

16        The United States understands that the County of

17   Onondaga which had filed an objection to the approval of the

18   settlement agreements has or will be withdrawing that objection

19   and the only remaining objection is that from the Town of

20   Salina.

21        The Town of Salina is a PRP, potentially responsible

22   party, at certain areas of the Onondaga Lake superfund site,

23   and it essentially contends that those areas of the site where

24   it has is a PRP should also be fully funded from the DIP loan

25   proceeds.

Page 36

1          It's important to note that the Town of Salina does

2     not object to the general idea that there are sites that

3     qualify for priority treatment.  Rather it simply wants those

4     sites where it is a PRP to be added to the group of sites that

5     are receiving priority treatment, and this Your Honor is both

6     self-serving and unjustified under the facts of this case.

7          Specifically the Town has requested that there be a

8     priority treatment for the Lower Ley Creek and the Town of

9     Salina landfill portions of the Onondaga Lake superfund site.

10    Like so many other non-owned sites at which debtors have

11    environmental liabilities both these portions, the Lower Ley

12    Creek and Town of Salina landfill of the Onondaga superfund

13    site involve numerous other PRPs, including the Town of Salina

14    itself, the County of Onondaga but also a corporation such as

15    Carrier, National Grid, Syracuse China, Cooper Crouse-Hinds and

16    others.

17          In addition --

18          THE COURT:  Pause, please, Ms. Kuehler.  Did I

19    understand you to say that the sites that Salina cares about

20    are neither now owned by GM nor were they owned at the time GM

21    filed this petition?

22          MS. KUEHLER:  That's correct, Your Honor.

23          THE COURT:  Continue, please.

24          MS. KUEHLER:  In addition and this is another

25    important point the debtors are not under any existing clean-up

09-50026-mg    Doc 9791    Filed 03/04/11    Entered 03/14/11 11:50:45    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 37 of 160

Page 37

1    orders requiring them to remediate at these sites.  The clean-

2    up order, there's one clean-up order the Town of Salina cited

3    to and Your Honor that clean-up order directs the Town of

4    Salina to conduct remedial actions, it does not involve Old GM

5    or Motors Liquidation Company.

6            THE COURT:  Have I been pronouncing the name of the

7    town wrong all of this time?

8            MS. KUEHLER:  We will have to ask the Town, I differ

9    between Selena and Salina.  I heard on Wednesday, I believe it

10   was or Tuesday Salina so I'm sticking to that, I'm trying to

11   stick to that.

12           THE COURT:  That's what you get for just getting

13   things by reading papers.  Continue, please.

14           MS. KUEHLER:  For these various reasons, including

15   that the sites were not and are not owned by the debtors there

16   are other viable PRPs at them and there are no current orders

17   requiring the debtors to comply with clean-up obligations.

18   There simply is no basis under the criteria set forth by the

19   bankruptcy law or the policy furthered by the environmental

20   laws of maximizing the protection of human health and the

21   environment and the overall clean up of sites to add these

22   sites into those sites receiving priority treatment from the

23   536 million in the DIP loan proceeds set aside to address

24   priority environmental obligations of the debtors.

25           Nor, Your Honor, is there a basis in any law or logic

Page 38

1    despite what the Town suggests in its reply that a Treasury's

2    role as a DIP lender in this case makes the settlement

3    agreements that were reached any less valid or the Town of

4    Salina's demands any more reasonable.  As mentioned before the

5    settlement negotiations were extensive, involved numerous

6    parties, including experts and conducted for a period of over

7    one and a half years.

8            The Town of Salina, and I just want to mention this

9    briefly, also mentions in its reply that it believes there are

10   certain of the six non-owned sites that are receiving funding

11   where there are PRPs other than MLC, and Your Honor the United

12   States has conducted a review of those sites in the process of

13   settlement negotiations and determined that there are in fact

14   no other viable PRPs at these sites.

15           One of the PRPs identified by the Town of Salina is

16   Chrysler which Your Honor knows has itself gone through

17   bankruptcy proceedings.  At other sites the PRPs that were

18   identified are either a 72-year old farmer who has no assets to

19   speak of or corporations, two of themselves in turn have also

20   gone through bankruptcy proceedings.

21           I want to be very clear that the fact that the areas

22   of the Onondaga Lake site, which the Town of Salina requests

23   priority treatment for, are not addressed in the settlements

24   currently before the court, does not mean that the United

25   States is not pursuing the debtors for their environmental

MOTORS LIQUIDATION COMPANY, et al.

Page 39

1    obligations at those sites.

2            The United States and the debtors are engaged in

3    intensive negotiations for the resolution of debtors'

4    environmental liabilities at all of the sites that are not

5    addressed by the settlement agreements currently before the

6    court and is pursuing recovery for those remaining liabilities

7    from other available assets of the estate including New GM

8    stock.

9            And this brings me to another important point which

10   is that the settlements at issue before the court do not only

11   benefit the environment and the public at large but also here

12   greatly benefit all of the parties in interest in this

13   bankruptcy.

14           The 536 million in DIP loan proceeds that were set

15   aside to cover the debtors' priority environmental obligations

16   are not available for distribution under the plan to other

17   creditors.  That's because the DIP loan proceeds are not pre-

18   existing or prepetition assets of the estate but rather funds

19   that were provided by the DIP lenders after the debtors had

20   already filed for bankruptcy to secure the orderly wind down of

21   the estate, including the proper clean up of priority

22   environmental obligations.

23           The settlement agreements therefore are in the

24   interest of the debtors' estate as a whole and in particular of

25   the general unsecured creditor community because they remove

09-50026-mg    Doc 9791    Filed 03/04/11    Entered 03/14/11 11:50:45    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 40 of 160

Page 40

1    536 million dollars worth of claims or obligations from the

2    general unsecured claims pool that would otherwise need to be

3    satisfied by New GM stock.  This in turn means that the pro

4    rata recovery of every general unsecured creditor is increased.

5            For these reasons and in light of the limited assets

6    available in this case, the Government's funding decisions in

7    the settlement agreement are reasonable, they are fair, and

8    they should be upheld and the United States therefore requests

9    that the court approve the settlement agreements under both

10    bankruptcy and environmental law.

11            THE COURT:  All right.  Thank you.

12            Does the Town wish to be heard?

13            MR. LINDENMAN:  Good morning, Your Honor.  Eric

14    Lindenman of Harris Beach for the Town of Salina, Selina (sic).

15    I prefer to pronounce it as the Town.  It's just a little

16    easier.  I think there's an upstate, downstate pronunciation

17    issue.

18            THE COURT:  But I thought you were upstate also.

19            MR. LINDENMAN:  Well, Your Honor, I try not to go

20    upstate all that often, I restrict it to New York, Long Island

21    and New Jersey.  Only when I have to visit the mother ship do I

22    proceed north.

23            Your Honor, I'm operating under both a response to

24    the United States as well as Your Honor's order limiting

25    discussion and the parties who will be speaking with regard to

MOTORS LIQUIDATION COMPANY, et al.

Page 41

1    objections.

2            THE COURT:  Can I assume Mr. Lindenman that you are

3    going to be taking the lead on the issues that were at one time

4    raised by Salina, Onondaga County and --

5            MR. LINDENMAN:  New York State, Your Honor.

6            THE COURT:  I don't know how many other environmental

7    objections -- well I did have one at one point, but I take it

8    you're principally the point guy at this point.

9            MR. LINDENMAN:  Your Honor, I'm speaking now only

10   because of the specific discussion of the Town's objection and

11   the United States' presentation.

12           Ms. Leary from the New York State Attorney General

13   will actually be handling the matter that Your Honor lists in

14   the order as 2(a)(b)(d)(e) and (f).  And if it's easier and I

15   would defer to Ms. Leary if she'd rather discuss all of those

16   issues and I'll come back after that, whatever either her or

17   Your Honor prefers.

18           THE COURT:  Well certainly on the wisdom of the

19   Government's settlements I understood that you were the

20   principal objector.

21           MR. LINDENMAN:  Well Your Honor with regard to the

22   ERT and the priority site agreements certainly we don't

23   advocate upending it and do not request that Your Honor reject

24   these deals if for no other reason than I would be stoned on my

25   way out of here, and all of the money that would otherwise be

MOTORS LIQUIDATION COMPANY, et al.

Page 42

1    available pursuant to the trust and the priority site agreement

2    would be gone and then the GUC holders would be dramatically

3    increased and the numbers to be received by the unsecured

4    creditors would be dramatically decreased.

5           So while I'm not advocating that it ultimately be

6    rejected by Your Honor, I think it also a very valid purpose

7    the concerns we have and I don't think the United States

8    completely addresses it because I'm hearing really for the

9    first time that in addition to what we have here in these two

10   agreements, the United States is separately seeking to obtain

11   additional recoveries from the debtor or other GM entities,

12   throughout the GM assets, to remediate these sites, and that's

13   news to us.

14          And perhaps if we had known about this, perhaps if we

15   had been party to these negotiations for whatever length of

16   time or if we had known about this when we had spoke with the

17   debtor at length last night, perhaps I would not be raising any

18   issue at this point, Your Honor.

19          We're sort of a little bit in the dark here with

20   regard to exactly how this all happened because we weren't part

21   of it.  I can't speak to, I can't respond to the comments about

22   the United States reviewing the other sites that we cite in our

23   reply as having additional PRPs but nonetheless are in the ERT

24   or on their priority site.  We reviewed the EPA's website, this

25   is what we found.  I can't dispute or otherwise challenge what

Page 43

1    the United States is saying so I will just leave it at that.

2           We're just hard pressed to understand why when the

3    Inland Fisher site is receiving remediation and the Inland

4    Fisher site is the site owned by GM that distributed the PCBs

5    all throughout this area, into the lake, into the landfill,

6    into the Lower Ley Creek, why there is an arbitrary cutoff

7    outside the four corners of the property owned by GM.  I don't

8    think that CERCLA provides for that.  I don't think that's what

9    the intention is.

10          Really Your Honor there's not much else to address

11   because we are not advocating that Your Honor reject these two

12   agreements.  We raised our concern, we don't think that we

13   should be outside of that.  We think we should be part of one

14   of the other, either the ERT or the priority site agreement and

15   the only other issue is that I would address is simply to

16   support what my understanding is of Ms. Leary's presentation

17   with regard to (f) on the order which deals with confirming

18   that the Town is not subject to ADR procedures, that's our

19   understanding from the debtor, so we no longer have that issue.

20          As well as (b) dealing with the concern that the Town

21   may receive less in distribution than others who are paid prior

22   or who have already been allowed as of the effective date.  Our

23   understanding from the debtor last night was that there will be

24   no diminution in the value of what is received whether we are,

25   since we are not currently allowed as of the effective date, if

Page 44

1    we are allowed down the road that there will be no diminution

2    of what our ultimate recovery is.

3                THE COURT:  Forgive me, Mr. Lindenman, that is a

4    general unsecured claim issue that was raised by a number of

5    people including, by way of example, the Nova Scotia

6    noteholders, if I'm not mistaken.

7                MR. LINDENMAN:  Again, Your Honor, we've been advised

8    by the debtor that it is not an issue.  That there will be no

9    diminution, so that's no longer an issue nor objection for us.

10               Really, Your Honor, that's the extent of it I don't

11   want to run into what Ms. Leary has discussing, I don't want to

12   be repetitive.  That's our concern that we are not part of

13   those two agreements and we still don't understand the

14   rationale for it.

15               THE COURT:  Okay.  Thank you.

16               Ms. Leary, would you like to be heard?

17               MS. LEARY:  Thank you.  Salina, Your Honor.

18               THE COURT:  Very well.

19               MS. LEARY:  Salina.  And I'm not even from upstate.

20   I'm from New Jersey.

21               THE COURT:  Well I'm from New Jersey as well but I

22   thought people are allowed to call their towns whatever they

23   want to call them.

24               MS. LEARY:  Good morning, Your Honor, Maureen Leary

25   on behalf the New York Attorney General's Office representing

09-50026-mg    Doc 9791    Filed 03/04/11    Entered 03/14/11 11:50:45    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 45 of 160

Page 45

1    the State of New York and the Department of Environmental

2    Conservation.

3              Thank you for your February 24th order it really

4    brought the parties, objecting parties together and we have

5    conferred at length.  I hope to be as comprehensive as

6    possible, and I welcome the other parties on the phone who I am

7    attempting to speak for, even though I cannot, to jump in

8    afterwards in the event that, as Your Honor states, there is a

9    unique issue or some material deficiency to my presentation

10   which is quite possible.

11             I want to say first thank you to the court but I want

12   to recognize the United States particularly because of the

13   eighteen months that I've been able to observe a group of

14   people under a huge amount of pressure representing the

15   interests of Treasury as well as EPA, the Department of

16   Interior and it's really just phenomenal what the Department of

17   Justice and the U.S. Attorney's office in the Southern District

18   has done.  And they've had to put up with all of us so I just

19   want to take this opportunity to tell you what an amazing job

20   they've done and how much of a pleasure it is to work with

21   them, and I think they serve their clients well, as well as the

22   public interest and this court.

23             We are signatory on the Environmental Response Trust

24   as this court may be aware and in that --

25             THE COURT:  I must confess that that had caused me

09-50026-mg   Doc 9791   Filed 03/04/11   Entered 03/14/11 11:50:45   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 46 of 160

Page 46

1    some confusion because I had thought you had signed up to it

2    and wouldn't have signed up unless you thought it was pretty

3    good from a regulatory prospective.

4         MS. LEARY:  Absolutely.  It deals with two of New

5    York's twenty-one sites, we fully support it and we fully

6    support the plan conditionally.  Our support of ERT is not

7    conditional, however, we think that the court could approve it,

8    you know, without further consideration.  And the reason that

9    we think it's an excellent result is because as Ms. Kuehler

10   indicated a number of sites will be remediated around the

11   country, two particular in New York that are highly

12   contaminated and were previously owned by General Motors.

13   I    do want to make clear that we have two hats here

14   because of our signature on the ERT and our support for that,

15   but we also stand in the Class III role as an unsecured

16   claimant for another nineteen sites around the state, and of

17   the two sites that are resolved in the ERT we are still an

18   unsecured claimant as to prepetition response costs incurred at

19   those sites.

20        Under the ERT we will be paid out post-petition costs

21   but our prepetition costs are still in the Class III category.

22   So we stand before you with sort of this double role here and

23   what I'm going to address today are issues that I think can, to

24   some degree, be resolved as part of the court's confirmation of

25   the plan.

09-50026-mg   Doc 9791   Filed 03/04/11   Entered 03/14/11 11:50:45   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 47 of 160

Page 47

1          I want to just lay out a roadmap so if you don't want

2    to go here Judge let me know now, we have raised issues with

3    the State of California, Salina, that are similar but to some

4    degree but slightly different so I can't pretend to speak for

5    them.  I can only speak for New York although we have

6    conferred.

7          THE COURT:  Let me help you with my confusion, Ms.

8    Leary, and then you can help me.

9          I had thought that I heard from Ms. Kuehler vis-a-vis

10   the two environmental trusts, the two settlements -- I suspect

11   there are sub-settlements within the larger settlements but let

12   me refer to it that way, and that I was called upon under

13   federal environmental law, kind of like I was asked to do in

14   Lyondell Chemical and Chemtura to make a finding not just that

15   the settlements were appropriate from the perspective of the

16   stakeholders in the Old GM estate, but also for the public

17   interest.  And that some of the concerns that have been voiced

18   by the Town of Salina by you, by Nova Scotia noteholders and

19   perhaps others dealt with concerns kind of that character in

20   terms of whether I was satisfactorily protecting environmental

21   Class III members, environmental unsecureds.

22          I thought our principal focus now is on what I might

23   call the public interest perspective in terms of whether the

24   federal government did a good enough job from its regulatory

25   perspective.  Do you -- you don't need to be diplomatic, do you

Page 48

1    think I was not understanding these issues appropriately.

2        MS. LEARY:  No, I'll be blatant they did a fantastic

3    job from New York's perspective on serving the public interest

4    here, and I attended the public meeting in Syracuse on a very

5    snowy night, but the outreach that the United States undertook

6    as well as the months and months and months of negotiation,

7    there's no question in my mind that this is the best possible

8    deal.

9        I mean the agony, I don't want to bore you with the

10   details, but there is no question that ERT is in the public

11   interest and while New York did not submit a brief as the

12   United States did, because we were worried about our unsecured

13   role, we could easily have supported the United States'

14   position on the ERT being in the public interest as well as

15   consistent.

16       I will say this, and this is really where the rubber

17   hits the road, Your Honor, and I'm not talking about this case

18   in particular, I'm talking about the issue that may have been

19   in Lyondell as well as Chemtura, about this owned

20   property/unowned property concept.  From New York's

21   perspective, and I'm not applying this to the ERT or otherwise,

22   I want to raise to the court as a matter of law, CERCLA defines

23   a facility for which a party has liability as wherever the

24   contamination is.  It doesn't stop at the property boundaries.

25       Having said that the issues in the bankruptcy context

MOTORS LIQUIDATION COMPANY, et al.

Page 49

1    are precisely as Ms. Kuehler represented, there is this -- I

2    don't even want to use the term priority because it is a term

3    of art in this court, but there is a overlay of how much the

4    regulator has required at that property.  What has, what is

5    enforceable before this court and that's where Ms. Kuehler made

6    clear, I think, that these sites being covered in the ERT were

7    on the regulator's radar screen, they were subject to orders,

8    they were owned by the debtor, there wasn't a big dispute about

9    there's contamination we have to address it.  Indeed General

10   Motors was addressing in New York the contamination of both of

11   those sites when they filed a petition in bankruptcy.

12       So there wasn't this sort of big dispute about, you know,

13   big landfill site where you have 150 potentially responsible

14   parties, GM being one of them.  This is a little bit different,

15   but this is sort of this --

16           THE COURT:  Forgive me.

17           MS. LEARY:  -- collision between the objectives of

18   CERCLA, you know, saying go get it all and the objectives of

19   the bankruptcy code pragmatic as they are and equitable as they

20   are, addressing issues that are of a more priority nature,

21   especially from the regulator's point of view.

22           So in short, just to answer your question, there's no

23   question in my mind the ERT is absolutely in the public

24   interest.  I don't know what else I can show you other than the

25   months and months of negotiation and the result of millions of

Page 50

1    dollars of Treasury money being put into the states that

2    otherwise would have to bear that burden.  And New York is

3    realizing 154 million dollars, that is a huge, huge benefit to

4    our state right now.

5         So I can just speak for New York in that regard but I

6    probably if they had the fiscal ability to be before this

7    court, every signatory in the ERT would come before this court

8    and say we are happy this is in the public interest.  We did

9    the best we could given the circumstances and complexity of

10   this case, and the fact that Treasury is funding it obviously

11   is an overlay.

12        So I don't think the court needs to look any further

13   than that context to make a finding that the ERT is in the

14   public interest.

15        THE COURT:  Fair enough.

16        MS. LEARY:  Thank you.

17        THE COURT:  Thank you.

18        MS. LEARY:  Can I move to the issues in your order or

19   do you want me to, these are the straight objections.

20        THE COURT:  My preference, Ms. Leary, not in the way

21   of non-negotiable demand, I think, but my preference would be

22   to get my arms around all of the public interest issues that

23   were associated with the Government's threshold matter, and

24   then to take a brief recess to be hopefully in a position where

25   I could rule on whether the settlements past muster for 9019

MOTORS LIQUIDATION COMPANY, et al.

Page 51

1    law and federal public interest law points of view, and then

2    have people deal with the more traditional 1129 issues

3    thereafter, which I sense is most of all of what you would

4    otherwise be talking out.

5            MS. LEARY:  In that event, Your Honor, we

6    respectfully request that the court approve the ERT as in the

7    public interest, as consistent with 9019 as well as CERCLA.

8            THE COURT:  Okay.

9            MS. LEARY:  Thank you.

10           THE COURT:  Does anybody else want to be heard a

11   first time on ERT issues before I give the Government a chance

12   to reply?

13           MR. MENDEZ:  Yes, Your Honor.

14           THE COURT:  Come on up, please.

15           Now forgive me, sir, because I think I have most of

16   the parties accounted for in my mind and I don't recognize you,

17   so I'm going to let you speak but I'm going to ask that you be

18   telling me who you're acting for and to be non-duplicative in

19   comments you wish to make.

20           MR. MENDEZ:  Okay.  Um --

21           THE COURT:  Could you come to a microphone, please.

22           MR. MENDEZ:  Thank you.  Is that better, Your Honor?

23           THE COURT:  Yes, thank you.

24           MR. MENDEZ:  It's senior deputy county attorney Luis

25   A. Mendez for Onondaga County.  And as I believe was indicated

09-50026-mg   Doc 9791   Filed 03/04/11   Entered 03/14/11 11:50:45   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 52 of 160

Page 52

1    earlier Onondaga County after Tuesday's appearance we entered

2    into discussions with counsel for the debtor, and based on

3    those discussions we have arrived at a resolution of our

4    objections.  If counsel for the debtor would advise me so that

5    I don't inadvertently misquote the full extent of what that

6    resolution is --

7              THE COURT:  Mr. Smolinsky.

8              MR. SMOLINSKY:  Your Honor, Joseph Smolinsky, Weil,

9    Gotshal, Manges for the debtors.  We've been in discussions

10   with the County and there is a general understanding.  We

11   informed Mr. Mendez that as part of the hundred million dollars

12   plus that we discussed two days ago that will be set aside

13   under the EPA's claim relating to the entire Onondaga, Onondaga

14   County site, that in excess of 70 million dollars of that money

15   is set aside for the lower lay portion of that site.  And I

16   think with that understanding, Onondaga County was comfortable.

17             THE COURT:  Mr. Mendez, you may comment, if you wish.

18             MR. MENDEZ:  Yes.  That was our understanding.  The

19   only other matter is a purely administrative matter and our

20   client, because of our official statement and other disclosure

21   obligations, we will need to document that somehow.  It's our

22   understanding that that money is going to go into a much larger

23   pot, that there is not going to be a specific entry made.

24   However, we would ask that as soon as the transcript is

25   available, that we could obtain this portion of the transcript

Page 53

1    to -- in order to satisfy our auditors of the basis upon which

2    this objection was resolved.

3              THE COURT:  Well, I think that as part of my powers

4    as a judge, I can order the debtors to give you the transcript.

5    And I just want to be sure that Mr. Smolinsky is on the same

6    page as you, vis-à-vis the substantive aspect.

7              MR. SMOLINSKY:  Yes, Your Honor.  I just want to make

8    clear that what we're talking about is claims that will be part

9    of the general reserve, and specifically tied to this site, and

10   that we'll get the treatment for those claims when they're

11   finally reconciled and allowed pursuant to the terms of the

12   plan of Class III.

13             MR. MENDEZ:  That is our understanding as well, Your

14   Honor.

15             THE COURT:  All right.  Very good, Mr. Mendez, thank

16   you.

17             MR. MENDEZ:  You're very welcome.

18             THE COURT:  Okay.  And I understand now, of course,

19   when I didn't recognize Mr. Mendez, because he'd appeared

20   previously by telephone.

21             Okay.  Anybody else want to be heard a first time

22   before I give Ms. Kuehler an opportunity to respond?

23   Mr. Karotkin?

24             MR. KAROTKIN:  Yes, Your Honor, just quickly.  As set

25   forth in our memorandum of law, we believe the standards under

09-50026-mg    Doc 9791    Filed 03/04/11    Entered 03/14/11 11:50:45    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 54 of 160

Page 54

1    9019 have been satisfied with respect to the settlements.

2           THE COURT:  Sure.  I never understood that anybody

3    understood that the debtor was giving away the store, as I read

4    the objections.  They were concerning as to whether or not the

5    federal government and/or state governments had done their

6    jobs.

7           Ms. Kuehler, do you want to reply in any way?

8           MS. KUEHLER:  Your Honor, only if you have any

9    questions for me.  Otherwise, I will rest.

10          THE COURT:  I have no questions.  We're going to take

11   a brief, hopefully brief recess, relatively brief.  I'd like

12   you back here, folks, at ten after 11:00, at which time I will

13   hopefully be able to rule on the threshold issues.

14          We're in recess until 11:10.

15   (Recessed at 10:54 a.m.; reconvened at 11:16 a.m.)

16          THE COURT:  Ladies and gentlemen, I'm approving the

17   motions for approval of the ERT and priority order site

18   settlement agreements from both 9019 and regulatory

19   perspectives.  And I'm making express findings as mixed

20   questions of fact and law that the settlements are in the best

21   interests of the Old GM estate and that they are fair,

22   reasonable, in the public interest and consistent with federal

23   law, from the perspective of the federal and state regulatory

24   interests that those agreements are also intended to advance.

25          I have a very full courtroom with I don't know how

Page 55

1    many meters running.  And I don't think it's appropriate to

2    make so many people listen to a very lengthy ruling,

3    establishing all of the case law underpinnings for this

4    determination.

5         If the Government wants to, it can give me more

6    extensive findings of fact and conclusions of law, although my

7    recommendation would be that a very simple order be prepared to

8    say that for the reasons set forth on the record, both the

9    settlements are approved from both perspectives.

10        If anybody wants to appeal, I will upon request,

11   flesh out my conclusions more.

12        The approval of the settlement from the estate's

13   perspective under traditional 9019 and Tmt Trailer criteria is

14   not in dispute.  There are no objections on that ground, and

15   it's plainly well within that range of reasonableness.

16        I did get, of course, the objection from the Town of

17   Salina, and originally before it was withdrawn, Onondaga

18   County, and I'll speak briefly to those.

19        The function of the Court in reviewing a motion like

20   this one is not to substitute its judgment for that of the

21   parties.  Rather, it's to confirm that the terms of the

22   proposed environmental settlement agreement are fair and

23   adequate and are not unlawful, unreasonable, or against public

24   policy.  See U.S. versus Hooker Chemical, 540 F.Supp. 1067 at

25   page 1072.

09-50026-mg    Doc 9791    Filed 03/04/11    Entered 03/14/11 11:50:45    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 56 of 160

Page 56

1        My job is to confirm that the settlement agreements

2    are consistent with CERCLA's goals.  And in conducting that

3    review, I should be deferential to the government's

4    determination that the settlement's in the public interest.

5    See U.S. versus Akzo Coatings, 949 F2d 1409 at page 1426.

6        As Mr. Mendez confirmed, Onondaga County's objections

7    have now been resolved.  I still have objections from the Town

8    of Salina, not so much because of any substantive objections it

9    has with respect to what was agreed upon, but rather by reason

10   of what wasn't included as part of that settlement.  By reason

11   of the agreement's failures to also include additional

12   favorable treatment for other areas, and dealing with those not

13   by giving up those claims, but by providing that they would get

14   unsecured claims treatment.

15       Salina objects to the agreements because some

16   remedial needs are addressed by cash funding for clean-up of

17   properties, while not providing cash funding, and reserving

18   only general unsecured treatment for other areas affiliated

19   with the Onondaga site, such as Lower Ley Creek, the Salina

20   landfill, Old Ley Creek Channel and the lake bottom.

21       As the Government properly observes, those claims are

22   getting meaningful distributions, but of course, it's obvious

23   that they're not getting cash, and they're not getting paid in

24   one hundred cent dollars.  And it's understandable that

25   anybody, especially a PRP, who might have to write out a larger

09-50026-mg    Doc 9791    Filed 03/04/11    Entered 03/14/11 11:50:45    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 57 of 160

Page 57

1    check because somebody else isn't picking up the tab would be

2    disappointed with that.  And I hardly fault the Town of Salina

3    for being disappointed, and indeed, for filing the objection,

4    but ultimately the issue is whether the government acted

5    reasonably and was acting in the public interest, which as I've

6    noted, I find that it did.

7            Given the limited funding available in this Chapter

8    11 case, the settlements appropriately prioritize clean-ups.

9    They take into account overlapping principles of federal

10   bankruptcy law and federal environmental law.  Factors that are

11   relevant to those determinations include whether properties are

12   owned by the debtors, whether clean-up orders had been issued,

13   and whether there are other PRPs who the government can

14   legitimately expect to be able to write out a check, all of

15   which inform the discretion of the government in getting the

16   best deal it can for the public and for the taxpayers.

17           Unfortunately, because of limited resources available

18   and the need to prioritize, the agreement can't be expanded to

19   include clean-up funding for other areas affiliated with the

20   Onondaga County sites, just as it can't be expanded to include

21   clean-up for other environmental matters of concern elsewhere

22   in the country for which the debtors have liability, but where

23   no clean-up orders have been issued, and the federal and state

24   governments with their regulatory needs and concerns can't look

25   to other PRPs.

MOTORS LIQUIDATION COMPANY, et al.

Page 58

1          The Government has explained that the sites that were

2     funded by these agreements were selected based on two criteria.

3     First, given the limited funding available in this Chapter 11

4     case, and the fact that when the government comes in looking to

5     get either future environmental compliance or the money for

6     meeting obligations of that character, applicable bankruptcy

7     law has to provide the strongest basis for obtaining funding

8     for the clean-up from the debtors for the covered properties.

9          Second, again because of the limited available cash

10    funding, the federal EPA had to further prioritize the debtor's

11    environmental liabilities by limiting funding to the sites

12    where there weren't other people to look to, or where there --

13    or where, excuse me, if there were other people to look to,

14    those people had resources by which they could meet those

15    obligations.

16          As many of you know, the interface between federal

17    bankruptcy law and federal environmental law is complex.  And

18    as I noted in colloquy by Ms. Kuehler, the law that we judges

19    follow in the bankruptcy courts and in the district courts is

20    not always as clear as it might be.

21          Under the law as it's developed, at least in the 2nd

22    Circuit, the strongest right of recovery under bankruptcy law

23    for environmental clean-up is for sites that are actually

24    owned.  With respect to those, the regulatory authorities, the

25    EPA in particular, can require debtors to perform clean-up

1   obligations, because debtors have to manage their property that

2   they still own in accordance with applicable non-bankruptcy

3   law, which of course, includes environmental regulations, and

4   environmental statutes.  See 28 USC Section 959.

5            And as you know, the debtors can't obtain

6   confirmation of their plan without appropriate provision for

7   property of the estate that complies with applicable law.

8            Similarly, a stronger case for priority can be made

9   for non-owned sites where, in addition, clean-up orders have

10  been issued.  But when the regulatory authorities can't do

11  that, that doesn't mean they don't have claims, but they have

12  unsecured claims, which is what the government entities

13  negotiated for themselves here.

14           It's hardly unreasonable for them to take

15  considerations of that character into account when structuring

16  a deal.  It also makes sense for them to structure their deals,

17  to prioritize limited funds to apply them to the sites with the

18  highest likelihood of not being cleaned up by some other means

19  or by other people.

20           It was at least reasonable for the U.S. government to

21  arrange settlements under which less than all of the sites that

22  might be relevant would be bankrolled with a hundred cent

23  dollars.

24           The non-covered areas in the Onondaga region can't be

25  said to satisfy the criteria that I just articulated.  They

09-50026-mg    Doc 9791    Filed 03/04/11    Entered 03/14/11 11:50:45    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 60 of 160

Page 60

1    weren't owned by the debtors, the debtors didn't have

2    injunctive clean-up orders that they had to comply with, and

3    the debtors weren't the sole viable PRPs.  That provides a very

4    sensible basis for the government's decision to structure the

5    deal as it did.

6            I find that the criteria applied by the U.S.

7    government in entering into the agreement were eminently

8    reasonable.  It was also reasonable for the government to take

9    into account the risks that departing from the criteria that I

10   articulated would've made the settlement vulnerable to

11   objection under bankruptcy law.  They would've delayed

12   presentation of a confirmable plan, they would've delayed

13   getting the money in to procure all of these needs, which we

14   all agree need to be addressed; and none of that is in the

15   public interest.

16           Thus, I find that the Government's regulatory efforts

17   were fully reasonable and in the public interest, and they're

18   approved.

19           Ms. Kuehler, you and your colleagues may if you wish

20   provide for more extensive papering of my decision, but that

21   summarizes the reasons for it.

22           Shall we go right now into the substantive objections

23   to confirmation, what I'll call the 1129 objections?  And I

24   think for this purpose that I need to hear from objectors

25   having hopefully complied with my order to coordinate.  Any

Page 61

1    preliminary observations, Mr. Karotkin or Mr. Smolinsky, before

2    we proceed?

3            MR. SMOLINSKY:  Your Honor, if you'd like, I could

4    walk through the withdrawn and resolved matters before we get

5    to the objections.

6            THE COURT:  I think that might be helpful, let's do

7    that.

8            MR. SMOLINSKY:  Joe Smolinsky, Your Honor.  I just

9    wanted to mention from the outset that in addition to the

10   thirteen objections that Mr. Karotkin referred to, as Your

11   Honor is aware, there have been numerous letters that have been

12   sent to the Court throughout these Chapter 11 cases by

13   individuals who have rightfully expressed the harm that's come

14   to them as a result of the GM bankruptcy, as is the case in all

15   bankruptcies.

16           We've reviewed all those letters.  We don't believe

17   that those letters give rise to substantive plan objections

18   within the confines of what's required to confirm the plan, but

19   we did want to raise that because we don't want to be

20   dismissive of those individuals' interests.

21           Your Honor, let me just first walk through the

22   withdrawn matters first.

23           The Microheat objection was withdrawn.  We had a

24   mediation a couple of days ago with Microheat.  And as a

25   result, our claims against Microheat and Microheat's claims

Page 62

1    against us were resolved, and that caused Microheat to withdraw

2    their objection.

3              NCR, as Your Honor may be aware, NCR has a pending

4    adversary proceeding raising constructive trust issues against

5    the debtor.  We've discussed the -- their issues with them, and

6    I think they're comfortable that they're not being prejudiced

7    as a result of confirmation in their adversary proceeding.

8              Center Point Associates, they have a ground lease

9    with the debtors.  We advised them after they filed their

10   objection that their ground lease is being assumed and assigned

11   over to the ERT, the Environmental Response Trust, pursuant to

12   confirmation and pursuant to the motion that's going to be

13   before Your Honor after confirmation.  And with that, they've

14   agreed to withdraw their objection.

15             Finally, Your Honor, Allstate Insurance Company or it

16   might be referred to as Northbrook, we have worked out some

17   insurance neutrality language with them that you'll see in the

18   confirmation order, and with the addition of that language,

19   they've withdrawn their objection.

20             Moving on, there have been a couple of resolutions,

21   or at least agreements that may, in some case will, resolve

22   objections.  The JPMorgan objection has been resolved;

23   Mr. Toder's two and a half issues.  Let me just give Your Honor

24   a brief summary of what those resolutions are.

25             We have added some language to the confirmation order

MOTORS LIQUIDATION COMPANY, et al.

Page 63

1    that makes clear that the pendency of the term loan avoidance

2    action won't affect individual term loan lenders' rights to

3    receive distributions on account of unrelated claims that they

4    might have against the debtors.  And that language has been

5    agreed to among all the parties.

6              THE COURT:  Was there, Mr. Smolinsky, because that

7    issue comes across in other places.  I thought what the plan

8    provides is that if your claim is objected to, you don't get

9    distribution on that claim, but if you happen to have claims

10   that are different or, in essence, you're coincidentally a

11   claimant in different capacities, it doesn't go to those other

12   capacities.  Did I misunderstand the plan?

13             MR. SMOLINSKY:  I think that's the standard, Your

14   Honor, and we added language that specifically addresses that

15   now.

16             THE COURT:  And that says that in baby talk?  That

17   clarifies?

18             MR. SMOLINSKY:  Yes.  We hope baby talk, Your Honor.

19             THE COURT:  Okay.  Go on.

20             MR. SMOLINSKY:  The second agreement is to make clear

21   that under the plan, Motors Liquidation Company will continue

22   in existence for a period of time, not later than the end of

23   December of 2011.  And under the plan, that will be the entity

24   that resolves and satisfies all secured priority and

25   administrative expense claims.

09-50026-mg    Doc 9791    Filed 03/04/11    Entered 03/14/11 11:50:45    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 64 of 160

Page 64

1          JPMorgan was looking for a clarification that after

2    MLC dissolves, that that role will be taken over by the GUC

3    Trust, and that, in fact, is the case, and we will confirm on

4    the record that that's the case, so that the GUC Trust will

5    effectively assume the obligation to satisfy any administrative

6    expense claims that JPMorgan as trustee may have in the case.

7          We have been paying JPMorgan's fees throughout this

8    case, and we will continue to do that, to the extent that the

9    debtors believe that those fees are reasonable, under the terms

10   of the DIP order.

11         The last clarification, I guess this is the half, is

12   that the million and a half dollars that's budgeted in the GUC

13   Trust for the payment of JPMorgan's defense fees, there's not a

14   cap on their administrative expense claims.  That's the amount

15   that was negotiated with the U.S. Treasury, but it's not a cap

16   on the allowed amount on the administrative expense claim.  The

17   plan does provide that all administrative expense claims, to

18   the extent they're allowed, are paid in full.

19         And with that clarification, I believe that we are

20   done addressing JPMorgan's issues.

21         THE COURT:  Mr. Toder, do you have any problems with

22   what he said?

23         MR. TODER:  Absolutely no problems with what was

24   said, Your Honor.  There is one other minor change we made to

25   paragraph 55 of the confirmation order, making clear that the

09-50026-mg   Doc 9791   Filed 03/04/11   Entered 03/14/11 11:50:45   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 65 of 160

Page 65

1    term loan agreement, as between the bank, the bank lenders, and

2    the lenders and the agent remains in effect, it's just can't be

3    reached with the debtors.

4           MR. SMOLINSKY:  That's a nit, Your Honor, 2.6 issues.

5           MR. TODER:  But I've fulfilled my commitment to the

6    Court.  I want that noted.  I did not speak for anywhere close

7    to five minutes.

8           THE COURT:  Okay.  Fair enough.

9           MR. JONES:  Your Honor, may I --

10          THE COURT:  Mr. Jones.

11          MR. JONES:  Thank you, Your Honor.

12          Your Honor, I just quickly want to note that I've

13   been advised the DIP lenders haven't fully signed off on the

14   wording included in the current evolved confirmation order

15   draft in one respect regarding the resolution with JPMorgan

16   just described.  We'll talk to them upon conclusion of the

17   hearing, and hopefully resolve it.  It's a narrow wording

18   issue, but I don't want to fail to say that there is one

19   concern that apparently has not been fully signed off on by the

20   DIP lenders on this one point.

21          MR. TODER:  Would it make sense for us to step

22   outside so that we don't slow things down and have the

23   discussion --

24          THE COURT:  Well, if you can button it up in the next

25   couple of hours, that would be helpful, but I'm not sure if I

MOTORS LIQUIDATION COMPANY, et al.

Page 66

1    want to ask Mr. Jones to leave a hearing of this importance, on

2    an issue of that character --

3              MR. JONES:  Your Honor --

4              THE COURT:  -- especially.

5              MR. JONES:  Your Honor, if I can suggest, I

6    appreciate that, I would like to stay here, but suggest that

7    Mr. Toder speak with separate counsel for Treasury who's

8    present.  They can go out and hope to reach resolution and then

9    we'll be set.

10             MR. TODER:  That's fine.

11             THE COURT:  That's fine with me.  I was surprised

12   that this much lawyering on an issue of this character was

13   required, but if you want to go out and go in the hall, go

14   ahead and do it.  I just don't want Mr. Jones pulled out of

15   this hearing.

16             MR. SMOLINSKY:  Thank you, Your Honor.

17             THE COURT:  Okay.

18             MR. SMOLINSKY:  I will not be stepping out, Your

19   Honor.

20             The next resolved matter is Onondaga, just so the

21   record is clear, Onondaga County, based on the representation

22   that I made earlier, has agreed to withdraw not only its

23   objection to the ERT settlement agreement, but also to the plan

24   of confirmation.

25             THE COURT:  Okay.

09-50026-mg    Doc 9791    Filed 03/04/11    Entered 03/14/11 11:50:45    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 67 of 160

Page 67

1          MR. SMOLINSKY:  The last issue that I'd like to

2    address of NUMMI, the NUMMI objection.  I don't know whether we

3    have fully resolved the objection, hopefully we have, but I did

4    want to put on the record certain agreements and understandings

5    that we've reached in discussion.

6          First of all, we've agreed that if there are any set-

7    off issues between NUMMI and the debtors, that that would be

8    addressed through the adversary proceeding through the

9    litigation that's separately pending before Your Honor, and I

10   so state on the record.

11         Second, with respect to the dissolution of NUMMI,

12   we've agreed, I think it's a reasonable agreement, that in

13   connection with the dissolution of NUMMI that we would comply

14   with all of the corporate governance necessities under that

15   vehicle, with a caveat that we, of course, as you know, need to

16   dissolve MLC prior to December of 2011.  So we'll work with

17   them to comply with their needs, and also to address ours.

18         The next issue is I think one that you may have heard

19   a couple of days ago.  The debtors have fully reserved for the

20   liquidated 500 million dollar NUMMI claim, and after

21   discussions with them, I think that resolves the reserve

22   portion of their objection.

23         And finally, with their objection that the -- they

24   were concerned that the confirmation order would somehow impact

25   their adversary proceeding, we've added specific language that,

09-50026-mg    Doc 9791    Filed 03/04/11    Entered 03/14/11 11:50:45    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 68 of 160

Page 68

1    in fact, it will not, and that would be paragraph 51 of the

2    order at page 49 of the one that was circulated last night.

3              With that, maybe I'll pause and see if there are any

4    comments on those specific objections.

5              THE COURT:  Sure.

6              MR. MCKANE:  Your Honor, for the record, Mark McKane

7    of Kirkland and Ellis on behalf of NUMMI.

8              Based on the representations that Mr. Smolinsky has

9    made today on the record, as well as the revised proposed

10   confirmation order, we no longer have an objection to the plan.

11   Thank you.

12             THE COURT:  Very good.  Okay.  Thank you.

13             MR. SMOLINSKY:  Your Honor, I think that that leaves,

14   as I've been educated, the Town of Salina, the State of New

15   York, and the various Green Wedlake Nova Scotia objections.

16             Mr. Karotkin will be handling the Nova Scotia

17   objections, so I think we can address the Town of Salina and

18   the State of New York now.

19             THE COURT:  Do I still have an objection from

20   California?

21             MR. SMOLINSKY:  Oh, I'm sorry, and California.

22   You're correct, Your Honor.

23             THE COURT:  All right.

24             MR. SMOLINSKY:  We've had numerous discussions with

25   these objectors over the last several days, and at this point

1    rather than doing the traditional, I'll respond to their

2    objections, I'm a little bit in the air in terms of what

3    objections still remain.  Certainly those objections may have

4    been modified by your earlier ruling, and perhaps the best way

5    to address it is to have those objectors speak on the various

6    issues that you raised in your order, and then I could respond.

7            THE COURT:  I think that'd be helpful, but there's

8    one thing that you can do for me, Mr. Smolinsky.  Forgive me

9    and anybody who's listening in other rooms for this, because

10   normally I keep this microphone close enough so people can hear

11   in this room, and I gather when I do that, it gets too loud for

12   people in the other room.

13           But it looked to me like Green Hunt Wedlake and the

14   Nova Scotia noteholders had made an addition of -- to their

15   more important points, a number of what I thought were requests

16   for clarifications.  Have those all been buttoned up or are

17   those issues still on the table, or is that best asked to Green

18   Hunt, Wedlake and to Nova Scotia noteholders?

19           MR. KAROTKIN:  Your Honor, I think a number of them

20   have been buttoned up, but there are two or three I think that

21   still remain, I think relating to reserves, specific reserves

22   that they're requesting for their claims, as well as --

23           THE COURT:  Well, I didn't think the specific reserve

24   contention was one that could be resolved by a clarification,

25   but I thought there were about three or four bullet points that

Page 70

1    I scratched my head, and wondered if they were really issues or

2    not.  I guess I can let them speak to it, unless, Mr. Mayer,

3    you can help me.

4              MR. MAYER:  Yes, Your Honor, both before the hearing,

5    and in fact, during the break, I was able to confer with the

6    gentleman from Greenberg, Traurig, and I believe we can go

7    through their particular objection, tick off those bullet

8    points that have been resolved, and focus the Court on the two

9    or three that still remain, and I'm happy to do that now or

10   later, as Your Honor wishes.

11             THE COURT:  If you're happy to do it now, I wonder if

12   that might be constructive, and then I'll give Mr. Zirinsky and

13   I don't see Mr. Golden, is he here, or somebody from his firm?

14   Oh, Mr. Dublin, all right.

15             Yeah, why don't you go ahead and do that, Mr. Mayer.

16             MR. MAYER:  And again, Your Honor, it would be useful

17   to have in front of you the objection of Appaloosa Management

18   filed by Greenberg Traurig.

19             THE COURT:  Okay.  Well, I found it before when you

20   originally spoke and then I got it mixed up with everything

21   else.  Give me a second.

22             MR. MAYER:  Your Honor, I have an extra copy as part

23   of a binder.  Would that expedite things, I can simply hand

24   that up?

25             THE COURT:  Well, give me a second, because I'd

Page 71

1   rather use my marked up one.  I've got it now.  Go ahead.  What

2   page did you have in mind?

3          MR. MAYER:  If you go to the first page after the

4   table of authorities --

5          THE COURT:  In the preliminary statement?

6          MR. MAYER:  That's correct.

7          THE COURT:  Yeah.  Go ahead.

8          MR. MAYER:  The first three bullet points remain

9   open, and will be the subject of argument.  The fourth bullet

10  point relating to Section 7.3 has been changed to eliminate the

11  concern expressed in that bullet point.  Their claims will not

12  be subject to estimation.  I stated that correctly?

13         The next bullet point relating to Section 510,

14  relating to their retaining debt securities, that problem has

15  also been fixed.  I believe that language has been accepted.

16  Yes?

17         All right.  The next bullet point on Section 6.7

18  relating to the cancellation of the Nova Scotia Fiscal and

19  Paying Agency Agreement, during the break I believe the debtors

20  and the Nova Scotia holders and the committee agreed on

21  language that will clarify that the Nova Scotia Fiscal and

22  Paying Agency Agreement is being canceled, solely with respect

23  to the debtors and their successors.  Have I stated that

24  correctly?

25         MR. UNIDENTIFIED:  That's in principle what we agreed

09-50026-mg    Doc 9791    Filed 03/04/11    Entered 03/14/11 11:50:45    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 72 of 160

Page 72

1    to.  We haven't actually seen the language, but subject to

2    that --

3             MR. MAYER:  All right.  And this is a cousin of the

4    issue raised by Mr. Toder, I believe.

5             The next issue on page two at the top, Section 610 of

6    the plan, this has been addressed in the change in the order,

7    so I believe that it is now clear that GM Nova Scotia is not

8    being dissolved.

9             Section -- the next bullet point relates to their

10   concerns that in between the -- the noteholder's concerns, that

11   in between the confirmation of the plan and the effective date

12   of the plan, it wasn't clear if the GUC Trust agreement could

13   be changed.  And we have agreed that Section 1127 will apply to

14   any changes in the GUC Trust agreement between confirmation and

15   the effective date, to the extent Section 1127 requires us to

16   obtain Court approval, we will obtain Court approval.

17            THE COURT:  Okay.

18            MR. MAYER:  The next bullet point relating to the

19   unit issuance ratio, we provided language acceptable to them.

20   That is no longer an issue.  Am I right about that?

21            MR. UNIDENTIFIED:  Yes.

22            MR. MAYER:  And finally, with respect to Section 5.9,

23   this last bullet, this is actually -- we've got language which

24   solves this.  It appears in two different places, if I can ask

25   the Court for one second.

Page 73

1      (Pause)

2              MR. MAYER:  Your Honor, it's the purpose of the GUC

3      Trust to make sure that people get the same treatment of their

4      claim, whether they're allowed early or late.  That's what

5      we've tried to draft.

6              The trust has lots of formulas that attempts to

7      achieve this, but we thought it would be useful in connection

8      with this objection, and it may end up being useful with

9      respect to some objections by New York State and others, to

10     insert in Section 5.3(b) of the trust agreement, and I believe

11     this is the changed pages that have been delivered to chambers,

12     but it's worth reading.  It's a short sentence, but it's

13     substantive.

14             "For the avoidance of doubt, it is intended that the

15     distributions to be made to holders of resolved, allowed,

16     general unsecured claims, in accordance with this Section 5.3,

17     shall provide such holders as nearly as possible with the exact

18     same amount of distributions of each asset type, as if such

19     holders had been holders of initial allowed general unsecured

20     claims."

21             I mean the English is not Shakespeare, but hopefully,

22     it is clear enough that the purpose of this agreement is to

23     make sure that if you're allowed early or you're allowed late,

24     you're getting the same distributions.  That's the intent of

25     the agreement.

09-50026-mg   Doc 9791   Filed 03/04/11   Entered 03/14/11 11:50:45   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 74 of 160

Page 74

1          And in connection with that, although we will still

2     have some arguments about issues they may want to raise in

3     connection with that intent, in connection with this particular

4     issue raised by the Nova Scotia noteholders, going back to

5     their objection on page two, Section 5.9 of the GUC Trust

6     agreement authorizes the GUC Trust to make distributions that

7     are quote, not in technical compliance with the distributions

8     of the GUC Trust agreement.  They objected to that, and we have

9     agreed to insert language that provides that any such

10    distributions must comply with Section 5.3(b).

11          The point of this 5.9 was to provide minor

12    flexibility to the GUC trustee to basically make everybody come

13    out equal, and the purpose of relating it back to 5.3(b) is to

14    limit the freedom of the GUC trustee to make those technical

15    changes to the explicit intent in 5.3(b) that everybody comes

16    out the same.

17          THE COURT:  So you're saying that the purpose was to

18    help people whose claims might later be resolved or allowed,

19    rather than to prejudice them?

20          MR. MAYER:  That is correct.  And we've tried to make

21    that clear through this language.

22          THE COURT:  Okay.

23          MR. MAYER:  That's what I have with respect to the

24    Nova Scotia holder issues that I think have been resolved.

25    Have I missed anything or misstated anything?

MOTORS LIQUIDATION COMPANY, et al.

Page 75

1    THE COURT:  Mr. Ticoll, come to a microphone, please,

2    if you want to be heard.

3    MR. TICOLL:  Good afternoon, Your Honor, Gary Ticoll

4    of Greenberg Traurig.  I think that accurately states it.  I

5    only have, I think, one thing that Mr. Mayer forgot to mention

6    with respect to the last point, the avoidance action trust

7    agreement has a provision which is basically verbatim or

8    similar to 5.9 and --

9    THE COURT:  You wanted the same thing in the

10    avoidance --

11    MR. TICOLL:  -- the committee agreed --

12    THE COURT:  -- trust that you do in the general --

13    the GUC trust?

14    MR. TICOLL:  Right.  That was part of what we agreed

15    upon.

16    THE COURT:  Do you have a problem with that,

17    Mr. Mayer?

18    MR. MAYER:  That is correct, Your Honor, that is our

19    agreement, and we will make the avoidance action trust language

20    mirror the language in the GUC trust agreement with respect to

21    this point.

22    THE COURT:  Okay.

23    MR. TICOLL:  Thank you, Your Honor.

24    THE COURT:  All right then.  I think we're now up to

25    the remaining objections, and there's been some coordination.

09-50026-mg    Doc 9791    Filed 03/04/11    Entered 03/14/11 11:50:45    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 76 of 160

Page 76

1    I'd like to show a little bit of flexibility in the order in

2    which I take them, as long as people are coordinated.  So I'll

3    hear from Ms. Leary, or Mr. Zirinsky, or Mr. Dublin, or

4    whomever.  Ms. Leary, come on up, please.

5            MS. LEARY:  I might take too long.  Thank you, Your

6    Honor.  I think the -- last week, as difficult as it probably

7    was for the debtors and the creditors' committee, I think both

8    the GUC trust and the plan got better.  There's still some

9    issues outstanding, and I want to go back to your order of

10   February 24th, which I discussed earlier in terms of

11   coordination.

12           We originally -- I think we're designated to speak as

13   sort of a representative for NUMMI.  Now it's just Salina and

14   California and New York.  I think there's some easy issues here

15   that I can very quickly dispose of, in terms of our position

16   being presented on the record.  I'm a little bit concerned

17   about the length of time I'm up here, when there's someone else

18   that may take a shorter period of time if --

19           THE COURT:  I didn't get the impression he was going

20   to take a shorter period of time.

21           MS. LEARY:  Say no more.  We did have lengthy

22   conversation with the debtors about some language on

23   jurisdiction.  I want to talk about that first.  It's 2(d) of

24   your order.  We went through the Chemtura case with Your Honor,

25   we went back to that confirmation order, and the single big

09-50026-mg   Doc 9791   Filed 03/04/11   Entered 03/14/11 11:50:45   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 77 of 160

Page 77

1     difference is the use of that word exclusive.  And I think the

2     Court's well aware of the law in the area.

3            Nobody in this room can change whatever your

4     jurisdiction is, and New York and none of the other objecting

5     parties that we're speaking for would pretend to do that.  It

6     is what it is, but the fact is, is that there lots of different

7     statutes under which governments and others operate that also

8     use those words.

9            So we have some real concerns, and what we cited to

10    Your Honor was the General Media case, 335 BR 66 at -- I'm

11    sorry, we did not cite this, but I want to raise it to the

12    Court.  Jurisdiction, even though California's papers state

13    that it essentially shrinks, I want to raise to your Court's

14    attention, Judge Bernstein's decision in General Media at page

15    74, note 7, in which he makes a differentiation between a

16    liquidating 11 and a reorganization, in terms of the shrinking.

17           So it doesn't shrink as much in a liquidating 11,

18    because the potential for the Court's jurisdiction to go on and

19    on and on and on for years is not evident.  There will be an

20    end date.

21           But the fact is, is that this Court is eminently able

22    to determine its jurisdiction and to state in a plan that it's

23    exclusive or not is inappropriate, and we would ask the Court

24    to stay in line with the Chemtura plan and your order

25    confirming that plan, in which the use of the word exclusive is

Page 78

1    not there.

2            Let me tell you why this makes a difference, and it's

3    fairly simple.  There are lots of environmental statutes that

4    give other courts exclusive jurisdiction.  That doesn't mean

5    that this Court doesn't have jurisdiction as well, it just

6    means that there's an issue.

7            There's no one, including New York, that is going to

8    go running into another court before we come here first.

9    That's -- and I can make that commitment to you on behalf of my

10   state.

11           We have been here since the 363 motion, and we may be

12   back, but the fact is, is that under 362(b)(4), we have the

13   ability to deal with public health issues and environmental

14   issues without the automatic stay.  As I mentioned in my

15   papers, New York and all the governmental entities in this case

16   have been enjoined since the beginning of that case.  We have

17   not had our 362(b)(4) ability to move our claims to judgment

18   and liquidate them or to otherwise act in a way without coming

19   to the Court.

20           That hasn't been prejudicial to date to any great

21   degree, but it could be in the future.  I can't predict.  But I

22   can make a commitment that we will be back to this Court if

23   there is any question.

24           THE COURT:  Let me tell you what's bothering me,

25   Ms. Leary, and the problem isn't you or the kinds of interest

09-50026-mg    Doc 9791    Filed 03/04/11    Entered 03/14/11 11:50:45    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 79 of 160

Page 79

1    that you and other environmental regulatory authorities

2    enforce.  I've been here for a while now, I've been here for

3    ten years, and the kinds of abuses I see by litigants and

4    claimants of different character has become quite a matter of

5    concern to me.  And even vis-à-vis the 363 order that I entered

6    in July of 2009 where dealers, in particular, tried to end run

7    the Court by suing elsewhere.  That was a matter of concern to

8    me.  So -- and if this creates a schism between you and other

9    objectors, then we'll just have to let them be heard.  I don't

10   have a problem with letting environmental authorities exercise

11   any concurrent jurisdiction they might have, but I have a

12   problem with people who are trying to get cute, who are trying

13   to get around orders that we have, to be terrorists, not in the

14   Osama bin Laden sense, but to make mischief.  And I think

15   provisions of that character have importance for that reason.

16   Help me on that.

17          MS. LEARY:  I will, and I definitely see the

18   interests that the Court, and I believe that that interest is

19   an important one to serve.  I have not been party to those

20   kinds of abuses or understood that they were happening,

21   although I hear Your Honor.

22          The fact is, is that there perhaps should be some

23   clarification in your confirmation order.  Without the use of

24   the word exclusive, that in the abundance of caution, any party

25   who seeks to bring an action elsewhere shall come to this Court

Page 80

1    and talk about it.  So that you can --

2            THE COURT:  Are you suggesting then I might be a

3    gatekeeper, and I might say, of course you should be allowed to

4    sue in the Northern District of New York or up at Foley Square,

5    but that you can't try to use a technique of that character to

6    get around what I've been trying to accomplish here?

7            MS. LEARY:  I think there's a tension here between a

8    bigger picture than just the dealers, or those parties that

9    abuse.  And on a case by case basis, I would have confidence

10   that the Court would be able to deal with dealers or other

11   abusing parties, but as we cite in our papers, Mystic Tank,

12   which is a 3rd Circuit case and NRG Energy which is, I believe,

13   an 8th Circuit case, the exclusive jurisdiction provisions

14   against the Government are invalid.

15           So if Your Honor could serve that interest --

16           THE COURT:  Against the federal government, state

17   governments, or both?

18           MS. LEARY:  Well, in the situation of both Mystic

19   Tank and NRG Energy, I believe they were both state government

20   cases.  Mystic Tank is 544 F3d.  I don't seem to have written

21   down in my notes the NRG Energy citation, but I will give that

22   to your law secretary at the break.

23           And I believe that this Court in DSBD said it clearly

24   enough, "although these provisions have the salutatory purpose

25   --" I'm sorry, I'm confusing two cases.  I believe in DSBD, you

Page 81

1    cited the Metromedia Fiber case.  And to me the law is clear

2    that this Court has extremely broad jurisdiction of all of the

3    matters that are listed in the plan.  No question about it.  We

4    don't refute that.  It's the use of the term exclusive, which

5    seems to say that there's no one -- there's no other court that

6    can do anything in this completely broad arena.

7            In fact, if we were to come to you as we likely

8    would, should we find ourselves in a position of having to go

9    to another court, we would be pretty confident that you would

10   agree with us that we could go, or we wouldn't appear before

11   you.

12           So I guess the question is what language could the

13   confirmation order contain that would serve the interests of

14   the Government, and this is a real interest to both California,

15   particularly California and New York.  California's interest

16   obviously because of their fiscal problem is they can't come

17   here, they don't have the money, they are under tremendous

18   travel restrictions, and I believe Ms. Karlin or Ms. Padeer

19   (ph) or both are on the phone to verify that.

20           Their big concern is that every time they have to

21   deal in a governmental sense with the protection of human

22   health and the environment, they've got to come here for the

23   next however many years.

24           So is there a middle ground?  I think so.  Can I say

25   that should just the Government have that?  That's the

Page 82

1   interests I represent, but to me, the use of the word

2   exclusive, the case law's clear, it's not exclusive.

3           THE COURT:  Would it meet your concerns if I inserted

4   a provision in the confirmation order in the nature of a

5   proviso that said, that nothing will prohibit any governmental

6   entity from enforcing its 959 rights, 28 USC 959 rights?

7           MS. LEARY:  I'm not sure that that's -- I don't think

8   that that's broad enough.  I don't think 959(b) rights are

9   broad enough.  Because it's all about property of the estate,

10  and there are a lot of things that debtors do that may not have

11  anything to do with property of the estate.  And so --

12          THE COURT:  You read 959 as not complying with law

13  generally, but rather using your property in compliance with

14  law?

15          MS. LEARY:  Yes.  And I think the language, the

16  express language of 959(b) is, shall manage and operate

17  property of the estate in compliance with the laws of the state

18  in which the property is located.  So there is a little bit of

19  a narrowness on this owned property, not owned property.

20  There's lots of things the debtors can do that may have nothing

21  to do with property of the estate per se.

22          So that, I think it's getting there, Your Honor, and

23  one of the things that may be helpful for us to do is for

24  California and New York to go back and have this discussion

25  with Mr. Smolinsky.  I know that California provided some

MOTORS LIQUIDATION COMPANY, et al.

Page 83

1    language that was not acceptable, and so that's where, you

2    know, we ran out of time, frankly.

3            THE COURT:  Okay.  Well, certainly I have to give

4    Mr. Smolinsky the opportunity to be heard, but it also occurs

5    to me and I'm going to invite you to comment on this, and also

6    Old GM, I would think that most of the stuff that's going to be

7    a matter of concern to you, if it's bad from a public

8    perspective, would be done by New GM, rather than Old GM.

9            MS. LEARY:  Well, that's a very interesting point,

10   Your Honor, and the one question --

11           THE COURT:  And forgive me for interrupting you, but

12   I assume you got pretty broad rights to make New GM comply with

13   the law?

14           MS. LEARY:  That depends on whether somebody can

15   trigger up the master sale and purchase agreement.  I mean, one

16   of the things that disturbed me in my discussions with the

17   debtor was, we said we are not attempting to constrict or

18   circumscribe the jurisdiction of the Court, it is what it is.

19   On the -- and the question to them was, are you attempting --

20   you're not attempting to expand the jurisdiction of the Court,

21   are you?  And the answer to that was, yes, we are.

22           And the example given to me was the master sale and

23   purchase agreement, and I'm not going to comment on whether

24   that's appropriate or not.  It's a, I see through the pendency

25   of the case that jurisdiction has been exercised repeatedly

09-50026-mg    Doc 9791    Filed 03/04/11    Entered 03/14/11 11:50:45    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 84 of 160

Page 84

 1    with respect to issues arising under that agreement.

 2            But it's a little bit muddy in my view to just say

 3    most of what we're going to do is as to New GM.  I don't know

 4    that.  The scenarios are difficult for me to recount to the

 5    Court.  I cannot predict to the Court in what context this

 6    might arise with MLC or the GUC Trust or whoever in the case

 7    and so forth.  But the fact is that I'm trying to protect the

 8    interests of the state in being able to exercise its

 9    governmental regulatory authority, without -- and California

10    similarly, without being concerned that every single issue must

11    be decided by this Court, which is how I read exclusive

12    jurisdiction.

13            I think that this Court is going to be the first one

14    to recognize, as I think it did in Chemtura, where that line

15    is, in terms of what should go to the district court and in

16    what context.  And as the Court may recall in that context, it

17    was an adversary proceeding, the challenged fundamental orders

18    issued by the Government on the basis of the question of

19    whether they were dischargeable claims, whether they were

20    actually claims within the meaning of the Code.

21            THE COURT:  Of course, I think the decision to yank

22    the reference was Richard Berman's, rather than mine.

23            MS. LEARY:  That is correct, Your Honor, but I recall

24    specifically having a conference or an appearance before you in

25    which you were quite clear about the basis for the Government's

MOTORS LIQUIDATION COMPANY, et al.

1    request to withdraw the reference.  And so I'm just suggesting

2    that this is not going to be a mystery later, but I think it's

3    important for the governments at least to know that this

4    exclusivity of the Court's jurisdiction doesn't really mean

5    what it says.

6              THE COURT:  Well, my practical problem, Ms. Leary, is

7    knowing when I should take exclusive jurisdiction or not.  It's

8    kind of like Potter Stewart and pornography.

9              MS. LEARY:  I -- that's my point exactly, Your Honor.

10   That I think you're going to know when you see it, and yet you

11   don't need that word in the confirmation order.  There's going

12   to be a big difference between when the United States or the

13   State of New York or California comes before you and a dealer

14   comes before you, you know, from an obvious perspective.

15             So somehow our interests to protect our authority has

16   to be served.  How that's done, you know, I don't mean to

17   abandon discussions with the debtors in this regard, but they

18   were pretty firm that they did not want that word to come out,

19   and that's really all we're asking.

20             We think that the dealers can clearly see from the

21   listing of matters that follow in Section 11.1, there's no

22   question they can't run somewhere else.  So you don't need to

23   use that word to make sure that the message is clear in the

24   plan, as well as the Court's confirmation order.

25             THE COURT:  Okay.  I'm with you and understand the

Page 86

1    issues.  Thank you.

2             MS. LEARY:  Do you want me to move to the next issue

3    or to give Mr. Smolinsky the opportunity to address the

4    jurisdiction issue?

5             THE COURT:  I think it would be conceptually easiest

6    for me if he responds now, if he doesn't mind.  Can you do

7    that, Mr. Smolinsky?

8             MR. SMOLINSKY:  Thank you, Your Honor.  I think

9    Ms. Leary aptly capsulated our position when she said that we

10   were not willing to budge on this issue.  I think because this

11   is a liquidating case, in particular, it is very important to

12   us that we have -- Your Honor have exclusive jurisdiction for

13   the matters that are set forth in the plan.  We don't want to

14   be chased to various courts all over the country, from

15   Mr. Karotkin and my perspective being the subject of a maritime

16   lien filed in Massachusetts by Mr. Spencer, one of our

17   creditors, I am --

18             THE COURT:  Say that again.

19             MR. SMOLINSKY:  One of our creditors, Barry Spencer

20   has --

21             THE COURT:  One of whose creditors?  Your creditor or

22   a creditor --

23             MR. SMOLINSKY:  No, I'm sorry.

24             THE COURT:  -- of Old GM?

25             MR. SMOLINSKY:  I'm sorry, I pay all my bills on

09-50026-mg   Doc 9791   Filed 03/04/11   Entered 03/14/11 11:50:45   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 87 of 160

Page 87

1      time.  The -- one of the debtor's creditors has been very

2      aggressive in his pursuit of the estate, and in that regard,

3      has filed actions in Massachusetts that we're going to have to

4      deal with, but has also filed maritime liens against the U.S.S.

5      Karotkin and the U.S.S. Smolinsky.  But we'll get to that.

6               Your Honor, in trying to assess the --

7               THE COURT:  Now you know why I said what I said about

8      Potter Stewart.  But you also understand that I am concerned

9      about governmental agencies being allowed to do their day-to-

10     day regulatory stuff.

11               MR. SMOLINSKY:  Well, Your Honor, when I spoke to

12     Ms. Leary and the State of California about their concerns and

13     asked them to articulate what they were concerned about,

14     Ms. Leary kept coming back to her concern that if the claims

15     that are -- need to be resolved, for instance, Onondaga County,

16     are not resolved consensually, that she wants to consider where

17     else she can seek to have those claims liquidated.

18               Now, from my perspective --

19               THE COURT:  Liquidating an unsecured claim in --

20               MR. SMOLINSKY:  That's correct, Your Honor.

21               THE COURT:  -- another court?

22               MR. SMOLINSKY:  That's correct, Your Honor.  So, you

23     know, from my perspective, from our perspective, that's --

24     there could be nothing clearer that that's something which is

25     governed under 157(b)(2)(b) as a core proceeding, 28 USC, of

09-50026-mg   Doc 9791   Filed 03/04/11   Entered 03/14/11 11:50:45   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 88 of 160

Page 88

1    course, that would be a core proceeding that would be

2    exclusively within the purview of Your Honor, nor do we want

3    to --

4             THE COURT:  Well, that would be exclusively within

5    the purview of the federal courts of the Southern District of

6    New York, but 157 says that as a core matter I can decide it,

7    but a district judge would still have 1334 jurisdiction, and

8    would have the ability to determine whether there's something

9    that makes it sufficiently oddball that he or she should hear

10   it up at Foley Square.

11            MR. SMOLINSKY:  And, Your Honor, there is language

12   following the listing of the exclusive jurisdiction, which says

13   to the extent the bankruptcy court is not permitted under any

14   applicable law to preside over any of the foregoing matters,

15   the reference to the bankruptcy court in this Article 11 shall

16   be deemed to be replaced with the district court.

17            So we have taken into account the fact that there may

18   be things that bring into the picture federal laws that can't

19   be presided over by you, in which the district court would be

20   an acceptable jurisdiction to hear that matter.

21            In discussing with the State of California what their

22   issues were, their issues were that if, for example, another

23   PRP at the Freemont, California site sued California over the

24   property, over the site, that they did not want to be dragged

25   to New York to have that matter heard in the bankruptcy court;

09-50026-mg   Doc 9791   Filed 03/04/11   Entered 03/14/11 11:50:45   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 89 of 160

Page 89

1    and I think that's a perfect example of a situation that

2    wouldn't be a matter that's arising of or related to the

3    Chapter 11, and would not be caught up under this section.

4            So because of the failure to articulate exactly what

5    we're talking about, it's hard to say that Your Honor will be

6    the gatekeeper, because I don't think we want to litigate on

7    these types of issues before Your Honor every time these issues

8    come up.

9            I think the State of California's issues are

10   addressed --

11           THE COURT:  Well, New GM made me do it six times.

12           MR. SMOLINSKY:  And that's one of the examples that I

13   gave them, that you retained jurisdiction under the APA, and to

14   enforce the order, and this is the appropriate place to do

15   that.

16           Just with respect to the Chemtura example, I don't

17   know that Chemtura is substantively different, because the

18   Chemtura order says that notwithstanding the entry of the

19   confirmation order and the occurrence of the effective date, on

20   and after the effective date, the bankruptcy court shall retain

21   such jurisdiction, that's all the jurisdiction that the

22   bankruptcy court had during the case; over the Chapter 11 cases

23   and all matters arising out of or related to the Chapter 11

24   cases and the plan, including, and then on and on.

25           We went back and looked at the Adelphia order, and we

09-50026-mg    Doc 9791    Filed 03/04/11    Entered 03/14/11 11:50:45    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 90 of 160

Page 90

1   have all these orders for Your Honor to look at if you desire.

2   The Adelphia order says the bankruptcy court shall have

3   exclusive jurisdiction.  The Lyondell order says that the

4   bankruptcy court shall have -- shall retain exclusive

5   jurisdiction.  The BearingPoint order says that the bankruptcy

6   court shall have exclusive jurisdiction.  So this is nothing

7   new.  This is nothing that we're adding that is unique in this

8   case, and that's not necessarily the, you know, the basis for

9   Your Honor to approve the language.

10          But I think it is very important that we have comfort

11  that Your Honor will retain the same level of jurisdiction that

12  it had during the case as we go forward through our

13  liquidation.

14          THE COURT:  Mr. Smolinksy, Chemtura and Adelphia, and

15  I don't remember whether you said Lyondell, but if you did, it

16  would be equally true, are poster children for why I have the

17  rule that say that we don't use prior orders as precedence

18  unless the Judge focused on the issue and was asked to rule on

19  it.

20          It seems to me that, and I may want to think about

21  this a little more, but I understand where you're coming from

22  and the abuses that I saw with New GM having to come in, and I

23  mean, it took a lot of my time, but I understood why New GM had

24  to come in to deal with those dealers, points out why you

25  should have the protection you're asking me to give here.

09-50026-mg    Doc 9791    Filed 03/04/11    Entered 03/14/11 11:50:45    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 91 of 160

Page 91

1          But I also understand Ms. Leary's desires, at least

2     some of them.  I'm not enamored of the idea of people trying to

3     dispute claims anywhere other than before me, unless I decide

4     that that's appropriate, which I'm not likely to do on garden

5     variety claims.

6          But the problem I have is that I think she made a

7     decent case that you've got to have some kind of escape valve

8     or some way to deal with the situation where having exclusive

9     jurisdiction is nutty.  And I guess the question I'm going to

10    ask you, and I'm going to ask Ms. Leary if she wants to reply

11    on this, is whether I should try to draw the line, or whether

12    I'm better served having you put your noodle together with her,

13    to try to negotiate out how you draft the language to draw the

14    line.

15         MR. SMOLINSKY:  Your Honor, I don't know that it

16    would be productive to try to reach an agreement about

17    language.  I think that there's a practical answer and a legal

18    answer.

19         The practical answer is that MLC will be around,

20    Motors Liquidation Company, for a very short period of time,

21    and then it will be gone.  The GUC Trust has very little role

22    that is crucially related to the core aspect of what it's in

23    business to do, to reconcile claims and make distributions.

24         The Environmental Response Trust, from the debtor's

25    perspective, I'm not sure that we're as concerned about that,

09-50026-mg   Doc 9791   Filed 03/04/11   Entered 03/14/11 11:50:45   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 92 of 160

Page 92

1   and we understand Ms. Leary's concern that if there is an

2   environmental spill at one of those properties, that she needs

3   to go elsewhere.  But I would suggest that the legal response

4   is that the language says retain jurisdiction, it doesn't say

5   create jurisdiction.

6          So to the extent that something is not subject to the

7   stay under 362, where a governmental agency can take steps to

8   protect, you know, the health and human welfare, and they can

9   go wherever they want, we're not trying to deal with that in

10  the section, because it's only retaining jurisdiction.

11         You never had exclusive jurisdiction in regard to

12  that in the first place.  And so I don't think we're expanding

13  what we already have, but what we have we want to retain.  And

14  I'll carve out the Environmental Response Trust for a minute,

15  because I don't know that the debtors are the ones to speak

16  about that in their activities going forward.  Other than to

17  say that certainly there are issues such as implementation and

18  interpretation of the consent decree and settlement agreement

19  that are probably before this Court if they arise in the

20  future.

21         THE COURT:  One last question, Mr. Smolinsky, unless

22  you want to continue.  You've got a pretty good firm and you've

23  got an army of associates who can find anything for you if it's

24  there.  I assume that if you had a case as contrasted to past

25  orders, you would've told me so, on point?

Page 93

1          MR. SMOLINSKY:  Your Honor, I focused on cases that

2     were before Your Honor, and we did not do a thorough search of

3     all orders --

4          THE COURT:  I mean, I haven't focused on this issue

5     before, personally.  I've been generally aware of these issues

6     when people come back to me to invoke these clauses.  I am not

7     aware of any case that has focused on this that's given me a

8     true precedent, in the sense of saying, for the following

9     reasons, I think it should be exclusive to this extent and not

10    another.  Are you aware of any?

11         MR. SMOLINSKY:  I'm not, Your Honor, and it's a very

12    difficult exercise to come up with a list of examples that

13    should be coextensive, as opposed to exclusive.

14         THE COURT:  Well, I think it's very easy for me to

15    decide when I shouldn't invoke the power.  I think it's just

16    hard for me to articulate a rule in advance.  I mean, that's

17    kind of like what I meant about Potter Stewart.  I know when

18    people are trying to circumvent my orders, and I know when

19    they're trying to be abusive, and I know when they're just

20    trying to do, you know, their regulatory jobs or whatever.

21         MR. SMOLINSKY:  Your Honor, I think that subject to

22    other people -- what other people might think that in the

23    language, to the extent of subject to further order of the

24    Court, where you have to come here first, I don't really want

25    that with respect to anybody, because I -- we may see a parade

09-50026-mg   Doc 9791   Filed 03/04/11   Entered 03/14/11 11:50:45   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 94 of 160

Page 94

1    of people thinking that they have the right to go elsewhere on

2    basic matters.

3            THE COURT:  Well, I can just tell them to pound sand

4    and you'll earn more fees when you do it.

5            MR. SMOLINSKY:  I'd like to think that I'm beyond the

6    priorities of just earning fees, and I do have an interest in

7    protecting the estate each time we have to do that, it does

8    cost the estate money.  And it does have -- the GUC Trust is

9    going to have a very limited budget.

10            So I think sending out the message very clearly that

11    if you have anything arising out of or related to the Chapter

12    11 case, you better come here, I think that's what this

13    language accomplishes.

14            And we're not asking Your Honor to in perpetuity,

15    necessarily be bound to hear every matter that we come before

16    you on, to the extent that you think that it should go

17    elsewhere, you, of course, have that right.  But I do not want

18    to put in if I could, if we can help it, actual of invite

19    people to come in and test the boundaries of the rules to --

20            THE COURT:  All right.

21            MR. SMOLINSKY:  -- take jurisdiction of --

22            THE COURT:  Fair enough.  Ms. Leary, I don't know if

23    you need to reply but if you have any ideas for drawing a line

24    or any final thoughts, I'll take them.  I do want to move on.

25    I think I've taken a lot of time on an issue which is, of

Page 95

1    course, important from a regulatory perspective, but which

2    doesn't affect a lot of creditors.

3            MS. LEARY:  Your Honor, it really is, and think of

4    the result.  The first thing that's going to happen is somebody

5    who steps out of this exclusive jurisdiction, is that the

6    debtors are going to come in and seek, I think, contempt or

7    some sanction with respect to a violation of the confirmation

8    order.

9            I want to clarify though a discussion that

10   Mr. Smolinsky referred to that we had yesterday, in which I

11   gave an example of a situation in which there would be an issue

12   between whether this court and another court hears it.  It was

13   not with respect to an allowance of a claim, which is covered

14   under 157(b)(2)(b), it was not about estimation, which is also

15   under that provision, and which we readily concede, absolutely,

16   this Court is it.

17           What we are permitted to do as the Government, what

18   362(b)(4) gives us the ability to do, is to commence or

19   continue an action if it's enforcement of our police regulatory

20   authority, period.

21           If we -- so during this case, what we would normally

22   do if there were a major issue of impairment of human health or

23   some threat, imminent threat, we would go to New York State

24   Court or to a federal court under state or federal

25   environmental law and seek that it be stopped.  We would not

09-50026-mg    Doc 9791    Filed 03/04/11    Entered 03/14/11 11:50:45    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 96 of 160

Page 96

1    look for money, we would not affect the estate, what we would

2    look for is to have our position crystallized by a judicial

3    forum of appropriate jurisdiction.

4            I don't think that this Court wants to hear all about

5    the technical environmental stuff.  And the reason I raised the

6    Chemtura matter was because in that case, as the Court may

7    recall, we were looking at the kind of injunctive orders that

8    deal with that protection of human health and the environment.

9            And under the City of New York versus Exxon, the 2nd

10   Circuit in this -- which is precedent in this district -- has

11   said, the Government can proceed all the way to judgment, it

12   can liquidate its claim in another forum.  Can it go beyond

13   that to levy on any assets of the estate, absolutely not.  But

14   we have the ability to move it to liquidation.

15           So for Mr. Smolinsky to mischaracterize our example,

16   which was --

17           MR. SMOLINSKY:  No.

18           MS. LEARY:  Yes, it was liquidation of a plan, but it

19   was essentially seeking relief under federal or state

20   environmental laws, and we're entitled to do that.

21           So the exclusive jurisdiction, and here's the

22   scenario I gave them, just before I forget, Your Honor.  What I

23   said was, we have a number of claims in this case that arise

24   under CERCLA and Requa (ph), federal hazardous waste or

25   Superfund law.  And let's assume we can't resolve one or more

MOTORS LIQUIDATION COMPANY, et al.

Page 97

1  of those claims.  Obviously, we're going to have to go to the

2  substance of those claims.  Resolving the amount of an allowed

3  claim is different than the question of whether the debtors in

4  disputing that claim have liability for it, whether our costs

5  are inconsistent with the national contingency plan, whether

6  they have available defenses under CERCLA and Requa, all the

7  kinds of federal questions that this Court may not want to

8  hear.

9         Now again, I think, as a practical matter, the

10  Government comes to you and says, this is what's going on, this

11  is what we think we need to do, and this is where I think we

12  need to go.  And not to have that ability because the

13  jurisdiction is framed as exclusive is a real problem.  There's

14  a sanction here that we don't want to live with.  We want to be

15  able to exercise our authority as the Code gives it, as the

16  Code recognizes it.

17         So basically, I hear Mr. Smolinsky not interested in

18  talking about this, we're going to agree to disagree about

19  whether exclusive should be in there or not.  I think Your

20  Honor has grasped a way to get around this.  Whether that

21  actually comes down to language that we can offer or that you

22  can come up with, I am at your service.  I am willing to sit

23  down with Mr. Smolinsky, but I think that the clarity in the

24  plan and the confirmation are critical here for the Government,

25  as to jurisdiction, as to where we go from here.

Page 98

1      And remember, we have been enjoined during the entire

2    case, 362(b)(4) went right out the window with that first day

3    order.  We asked the debtors to eliminate that provision, and

4    nothing really came of it.  Luckily, we didn't have a crisis

5    where we would have to exercise that authority.  But certainly

6    one of the positions that I'll offer later is that I was unable

7    to liquidate the amount of my claim in a court where my state

8    law or federal law gives me the ability to move under

9    362(b)(4).

10      I could've gone somewhere else but for this Court's

11    first day order, that circumscribed the Government's ability to

12    commence or continue.

13      THE COURT:  We're really spending a lot of time on

14    this, but I've got to ask you, Ms. Leary.  I had never

15    understood 36 -- I still talk in terms of (b)(3), was the

16    numbering changed?

17      MS. LEARY:  (b)(4).  Oh --

18      THE COURT:  Somebody stick something in there.  The

19    police and regulatory power --

20      MS. LEARY:  Yes.

21      THE COURT:  -- that you got as an exception to the

22    automatic stay.  I always thought that gave municipalities the

23    -- and others the power to, you know, get injunctive type of

24    relief, to get somebody to clean something up, to stop doing

25    something bad, to curb a nuisance, but I didn't understand it

09-50026-mg   Doc 9791   Filed 03/04/11   Entered 03/14/11 11:50:45   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 99 of 160

Page 99

1    to authorize, you know, getting claims for money.

2           MS. LEARY:  Oh, yeah, the City of New York versus

3    Exxon, the 2nd Circuit says it flat out, you know, CERCLA

4    context.  If the Government's looking for a response cost, go

5    ahead, move to judgment.  You cannot go beyond that point, and

6    that's State of New York versus Enstraronsky Cooper (ph) in the

7    Northern District, Judge McCurn, but that is the point at which

8    you can go.

9           And in this circuit, I believe it was Judge Cotrell

10   in the State of New York versus Mirant case that analyzed this

11   very clear and obvious power.  And in that case what happened

12   was, Mirant had entered into a consent decree with the State of

13   New York and went -- and two weeks later went bankrupt in

14   Texas.  And then when New York went to lodge the consent decree

15   and have it approved by the district court, Mirant went

16   screaming in the bankruptcy court, and came to Judge Cotell and

17   said, you can't -- you cannot enter this decree, this all has

18   to be before Judge Lynn in the district --

19          THE COURT:  Mike Lynn in Fort Worth?

20          MS. LEARY:  Yes.

21          THE COURT:  Uh-huh.

22          MS. LEARY:  And so thankfully Judge Lynn did not

23   agree, and neither did Judge Cotell.  But I think that

24   decision, it's a published one.  I don't have the -- I believe

25   the citation is in our papers.

MOTORS LIQUIDATION COMPANY, et al.

Page 100

1          The distinction between the position of the

2     Government enforcing its police and regulatory authority is

3     very clear.  And in City of New York versus Exxon, it can be

4     seeking money, you just can't affect property of the estate,

5     take it up to that point and no further.  But the federal

6     district court is entitled under CERCLA to set that amount, to

7     find liability, and set response costs that are due and owing.

8          THE COURT:  Okay.  Anything else?

9          MS. LEARY:  Thank you.

10          THE COURT:  Mr. Smolinsky, hopefully limited to what

11     Ms. Leary said the last round.

12          MR. SMOLINSKY:  Yes, Your Honor.  I think Ms. Leary's

13     statements highlight exactly why we don't think it would be

14     productive to sit down and have a discussion.

15          Your Honor, we're okay with concurrent jurisdiction

16     over 362(b)(4), of course we are.  We never said that police

17     and regulatory enforcement, the kind of things that you're

18     talking about, the injunctive relief, is going to be heard

19     before you as a court of first instance.

20          But you have to understand what post effective date,

21     you know, debtor look like.  There's no property, there's

22     nothing to administer, and therefore, we think that police and

23     regulatory power, while it's okay, that's not the situation in

24     Mirant.

25          THE COURT:  So we've been talking for the last half

Page 101

1    hour on angels on heads of pins?

2           MR. SMOLINSKY:  Well, no, because she's going

3    further, and Ms. Leary is saying, wait a minute, since CERCLA

4    in a non-bankruptcy context says that you can go and get a

5    judgment for money damages, that now she's excluded from having

6    to come before Your Honor to liquidate the claim, and we

7    vehemently disagree with that.

8           And so we would only ask Your Honor in considering

9    this matter, if Your Honor wants to talk about police and

10   regulatory power, which I'm fine with, it should not go beyond

11   that to put us in the position where they're going to be

12   arguing before some other court, some state court in New York,

13   or some federal court other than the Southern District of New

14   York, upon withdrawal of the reference that they have -- that

15   that court has the right to liquidate the claims, allowance and

16   disallowance of claims.

17          And that's exactly what I discussed with her.  So it

18   starts off as police and regulatory power and then all of a

19   sudden it shifts to the fixing and allowance of a claim.  And

20   so that's the only thing I would add, Your Honor, in response

21   to her statements.

22          THE COURT:  Okay.  Am I correct that we can now

23   consider that discussion shut down?  All right.

24          It's now 12:30.  We have a way to go.  I would love

25   to finish this afternoon or tonight.  I don't know if we can.

MOTORS LIQUIDATION COMPANY, et al.

Page 102

1    I can go tomorrow if we need to, but I would like to move as

2    efficiently as we can.  I think I'd like to, since we're at a

3    natural breaking point, take a break for an hour now.  Resume

4    at 1:30, and then we'll move on.

5            I'd like the people in their lunch hour just work out

6    amongst themselves what order the objectors are going to be

7    want to be heard.  Mr. Jones?

8            MR. JONES:  Your Honor, I apologize for standing

9    slightly late off cue, but I did want to observe, because the

10   treatment of the Environmental Response Trust came up in the

11   argument that you just --

12           THE COURT:  I'm interested in that.  Just come over

13   to a microphone, closer, please.

14           MR. JONES:  Your Honor, I just wanted to point out

15   something that was not stated, which is that although the

16   Environmental Response Trust was mentioned in the argument, it

17   was not mentioned that the current plan includes a provision

18   that -- under the exclusive jurisdiction provision, saying

19   provided however that the bankruptcy court's jurisdiction with

20   response to the Environmental Response Trust agreement and the

21   consent decree and settlement agreement shall be concurrent

22   with the jurisdiction of other courts of competent

23   jurisdiction, over such matters to the extent such agreements

24   provide for concurrent jurisdiction.

25           And in turn, the underlying agreements do preserve

Page 103

1    concurrent jurisdiction as to environmental matters.  So --

2         THE COURT:  Can you give me a cite to that either now

3    or with -- over the lunch break?

4         MR. JONES:  Yes, Your Honor.  It's in the proposed

5    plan, paragraph or section, I'm not sure which is the right

6    word, 11.1(i).  The United States hasn't taken a position on

7    this argument.  We sometimes have precedential interests in

8    whatever the order will end up saying.  I will note that any

9    ruling here can and should be confined to the unique

10   circumstances here, including that the remaining estate post

11   confirmation will hold no properties, because all real property

12   will be transferred to the ERT, the Environmental Response

13   Trust.

14        So given that what ordinarily might be environmental

15   regulator policy concerns about the exclusive jurisdiction

16   language, we think in the circumstances here, is solved by the

17   specific treatment of the ERT.

18        THE COURT:  All right.  Thank you.  Okay.  We'll

19   break until 1:45.  We're in recess.

20   (Recessed at 12:35 p.m.; reconvened at 1:43 p.m.)

21        THE COURT:  Have seats, everybody.  Okay.  Folks, do

22   we have an understanding as to who wants to be heard next,

23   who's going to be heard next?  Mr. Smolinsky?

24        MR. SMOLINSKY:  Your Honor, before we move forward,

25   despite my previous comments, I think we do have language on

MOTORS LIQUIDATION COMPANY, et al.

Page 104

1    the exclusive jurisdiction point that we'd like to run by Your

2    Honor, and see whether Your Honor finds it acceptable, because

3    it is acceptable with the State of New York and the debtors.

4              THE COURT:  You say it is acceptable to you --

5              MR. SMOLINSKY:  Yes.

6              THE COURT:  -- and the State of New York?  Go ahead.

7              MR. KAROTKIN:  And Treasury.

8              THE COURT:  I beg your pardon?

9              MR. KAROTKIN:  And Treasury.

10             THE COURT:  And Treasury, okay.

11             MR. SMOLINSKY:  We would add a sentence to the end of

12   11.1, which is the exclusive jurisdiction section that says,

13   nothing contained in Section 11.1 shall expand the exclusive

14   jurisdiction of the bankruptcy court beyond that permitted by

15   applicable law.

16             THE COURT:  Are you okay with that, Ms. Leary?

17             Very good.  Okay.  That'll be fine.

18             MR. SMOLINSKY:  Okay.

19             THE COURT:  And I assume it's okay with California as

20   well?  Did they have that same objection, or was this just a

21   New York State issue?

22             MR. UNIDENTIFIED:  Actually --

23             MS. KARLIN:  This is Olivia Karlin for the State of

24   California, we did have the same objection.  That's fine with

25   us.

MOTORS LIQUIDATION COMPANY, et al.

Page 105

1           THE COURT:  Okay.  Very good.  All right then.  That

2    issue is off the table.  Thank you.

3           MR. SMOLINSKY:  I think in terms of moving forward, I

4    know New York State is not done with their objections, but

5    there has been talk about letting the Nova Scotia objections go

6    forward at this point.

7           THE COURT:  Okay.  Is that Mr. Zirinsky?

8           MR. ZIRINSKY:  Good afternoon, Your Honor.  For the

9    record, Bruce Zirinsky, Greenberg Traurig for Aurelius Capital,

10   Appaloosa, Fortress, and Elliott Associates, holders of what's

11   been referred to in these proceedings as Nova Scotia bonds.

12          Your Honor, we -- as Your Honor heard earlier this

13   morning, a lot of the other technical objections have

14   apparently been resolved that we had to the plan and

15   confirmation order.  But what remains is certainly what I would

16   characterize as the most critical.  And that goes to whether or

17   not the plan, which includes the Nova Scotia bonds in Class III

18   as unsecured claims, is confirmable, on the basis that unlike

19   other claims, which are to receive distributions on the

20   effective date of the plan, this plan expressly provides with

21   respect to the Nova Scotia claims, as well as the Wedlake

22   claims which are held by the trustee of the Nova Scotia

23   bankruptcy estate in Canada, that no distributions on those

24   claims will be made, pending further proceedings on the

25   allowance of those claims.

Page 106

1              Now, to put this in context, we understand that it is

2      not all that uncommon for there to be holdbacks on

3      distributions to claims that are under objection, but when we

4      look at 1123, which talks about the requirement that each claim

5      within a class gets the same treatment unless a creditor within

6      the class has specified or agreed to something less.

7              And we look at the objections that -- the so-called

8      objections that are outstanding with respect to these claims,

9      we observe the following.  One is that unlike other types of

10     disputed claims, there is no dispute as between the debtors,

11     New GM and other GM entities, and the noteholders, that these

12     are valid, enforceable claims, and that they should be allowed

13     in these proceedings in the full amount.  I --

14             THE COURT:  What's the relevance of that?  Doesn't

15     Section 502 say object -- make reference to an objection by any

16     party of interest?

17             MR. ZIRINSKY:  Well, I'll get to that in a moment,

18     Your Honor, yes, it does.

19             THE COURT:  Well, don't we normally start with

20     textural analysis, Mr. Zirinsky?

21             MR. ZIRINSKY:  Yes, we can start with that analysis,

22     Your Honor, and I will go through that analysis in a moment.

23             502(d), if you want to get into 502, requires that a

24     claim, in order for there to be no distribution on a claim

25     where the basis for the objection to the claim is founded under

09-50026-mg    Doc 9791    Filed 03/04/11    Entered 03/14/11 11:50:45    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 107 of 160

                                                    Page 107

1    Section 502(d), which is what the objection is here, that

2    somehow or another the payment of a consent fee which was done

3    consensually, obviously, that the payment of a consent fee was

4    somehow an avoidable transfer.

5            And prior to there being any determination by any

6    court that, in fact, such a voidable transfer occurred, there

7    is no basis for a distribution on the claim to be withheld.

8    Not only has there been no determination that there's a

9    fraudulent transfer or other avoidable transfer, there's not

10   even litigation pending before the Court raising those claims.

11           Moreover, those claims, to the extent they had any

12   sustenance or vitality at all, which we don't believe they do,

13   were sold to New GM as part of the 363 sale.  The estate

14   doesn't even have any claims that could be brought, assuming a

15   claim could be brought.

16           So to disallow distributions or to delay

17   distributions on claims that are valid and enforceable based on

18   someone's theory that there may have been some sort of an

19   avoidable transfer is tantamount to saying that if a horse had

20   wings, it could fly.

21           And the point very simply is, that as a matter of

22   law, that is not a basis for an objection to claim.  And the

23   law and the case law is very clear to that.

24           Secondly, the committee's objection is premised upon

25   a claim of equitable subordination.  Well, again, there is no

Page 108

1    claim for equitable subordination.  Number one, the committee

2    has not received leave of the court, they've never applied to

3    the court for standing to bring a claim on equitable

4    subordination.  And secondly, again, there's no adversary

5    proceeding pending.  And again, the case law is clear, that

6    a -- and the rules are clear, that a basis or a claim for

7    equitable subordination shall not be contained in an objection

8    to a claim.

9            So I would submit to Your Honor, those are two

10   principle prongs of the committee's, quote, "objection,"

11   neither one of which go to the validity and enforceability of

12   the claim.  What they go to is a written statement, because

13   it's not even a pleading.  It goes to a written statement that

14   they believe there may be some grounds which they're going to

15   try to explore to bring a claim under one of the avoidance

16   sections or a claim for equitable subordination, without having

17   done so.

18           And again, what we're talking about is the rights of

19   creditors holding in excess of two billion dollars of claims

20   against this estate, creditors, who by the way, played an

21   extremely important and valuable role in assisting the debtors

22   through a smooth and orderly 363 sale of the business.

23           A sale of the Canadian business and assets could not

24   have occurred, but for an agreement that we reached with

25   General Motors, and GM Canada, and other affiliates just prior

Page 109

1    to the filing of the bankruptcy.  GM itself has filed a

2    pleading, has filed papers in connection with the objections to

3    the claims, stating affirmatively that this was a good faith

4    intense arm's length transaction which provided very

5    substantial benefits to GM U.S., GM Canada, and the other

6    related entities.

7            And but for having been able to reach an agreement

8    with my clients, there could not have been as smooth a

9    transition of the business and assets to New GM, there would've

10   been high uncertainty and risk that the transaction might not

11   have occurred.  The Canadian Government supported or provided

12   approximately seven billion dollars in financial support in

13   this endeavor, which was premised upon GM Canada being part of

14   the New GM, which it is today.

15           And I was somewhat interested, it was somewhat ironic

16   listening to at the outset of this hearing, you know, counsel

17   for the debtors, and the creditors' committees and other

18   parties, congratulating themselves on having negotiated

19   successfully agreements that have inured to the benefit of GM,

20   the New GM, the GM creditors, and I thought back to the time

21   when we negotiated a deal with GM, which we thought inured to

22   the benefit of GM, GM Canada, as well as to our clients as

23   well, given the circumstances.

24           And by the way, let's remember that as part of that

25   deal, GM Canada received a forgiveness of debt of in excess of

Page 110

1    one billion dollars on an inter-company loan, which absolutely

2    required the consent of the noteholders.  The noteholders gave

3    GM Canada over a billion dollar haircut on that liability, as

4    part of that agreement.

5            Now, getting back into focus in terms of the

6    objections to confirmation, I'm not here today to argue the

7    merits of the claims.  What I am here today, Your Honor, is to

8    suggest to Your Honor that particularly in a case like this,

9    where distributions are going to be made to creditors in the

10   form of stock and warrants, which are volatile, subject to

11   market vagaries, subject to events, the values fluctuate, to

12   defer distribution of that consideration to creditors who have,

13   on the face of it, and frankly, on the merits of it, a very

14   strong presumption that these claims should be allowed, you

15   have no -- you have before you no legitimate basis not to allow

16   the claims.

17           I'm not suggesting the committee can't pursue a

18   potential avoidance claim or if they wanted to seek some sort

19   of subordination relief, or at some other litigation, they want

20   to seek to recharacterize a consent fee as a payment of

21   principal, which is by the way, that's all that's really in

22   their objection, and complain about, you know, GM, New GM

23   having engaged in certain transactions as part of the sale

24   process, which they're now asking Your Honor to go back almost

25   two years ago and undo portions of the sale order, and I think

Page 111

1    a lesson can be learned from Judge Peck's recent decision in

2    Lehman, where the creditors' committee in that case also which

3    supported heartedly the sale to Barclay's, came back a year or

4    two later and tried to undo it.

5            This was a good deal for GM at the time.  It was a

6    great deal for the GM creditors at the time.  It avoided a

7    total liquidation, a disorganized liquidation or potential for

8    that.  You heard testimony at the sale hearing that unsecured

9    creditors in these cases would receive probably nothing if the

10   sale did not go forward.

11           There is substantial value today, thankfully as a

12   result of a lot of concessions made by a lot of people,

13   including labor unions, dealers, other creditors, as well as my

14   clients.  All of whom made concessions in order to allow a

15   successful sale of the assets of GM as a going concern to go to

16   New GM.

17           And so here it is almost two years later, and you

18   know, the crisis is over, and now people are saying, well, look

19   at these guys, these Nova Scotia bondholders, they really got

20   too good a deal, let's go to court and challenge their claims.

21   And that's just not fair.  And I don't think this Court should

22   just allow that to happen, taking into account that creditors,

23   my clients, as well as the trustee and counsel, Akin Gump, is

24   here for the trustee, they can speak on his behalf more

25   directly, but our clients are entitled to protection of their

MOTORS LIQUIDATION COMPANY, et al.

Page 112

1    interests.  And protection of those interests means they're

2    entitled to a distribution on those claims.

3              THE COURT:  Mr. Zirinsky, are you going to start

4    talking about Section 1129 any time soon?

5              MR. ZIRINSKY:  Well, I have, Your Honor, in the sense

6    that 1129 requires --

7              THE COURT:  Well, please tell me which sections of

8    1129 you contend are violated?

9              MR. ZIRINSKY:  The section in 1129 which provides

10   that a plan must comply with the statute, and 1123 is part of

11   the statute.

12             THE COURT:  Of course it is.  Now, what's your --

13   your 1123 contention is what, that the provision in the plan

14   that says that claims aren't entitled to distributions until

15   they're allowed is violative of 1123?

16             MR. ZIRINSKY:  I'm saying the provision in the plan

17   which speaks and addresses our claim specifically and says that

18   they are disputed claims and are not entitled to distributions,

19   yes, those violate 1123.

20             If the debtors intended to treat our claims

21   differently from other Class III claims, they should have put

22   them in another class, and we should've had the right to vote

23   separately as a class.

24             The debtors chose to classify those claims in Class

25   III, as a consequence of classifying us in Class III, we're

09-50026-mg    Doc 9791    Filed 03/04/11    Entered 03/14/11 11:50:45    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 113 of 160

Page 113

1    entitled to the identical treatment as other claims.

2             The fact that the creditors' committee has speculated

3    in writing that there may be avoidance claims, or that there

4    may be some -- you know, they might find some egregious grounds

5    for equitably supporting -- subordinating the claims of the

6    noteholders is not a basis for disallowance of the claims.

7    It's a basis for them seeking affirmative relief if they can

8    make the case.  And thus far, they haven't made the case.  They

9    haven't even presented the case.

10            And as a consequence, there is no basis to withhold

11   distributions on our claims, the effect of which is to

12   discriminate against our claims, as opposed to other Class III

13   claims.

14            THE COURT:  Go on.

15            MR. ZIRINSKY:  You know, I have represented holders

16   of other what we call ULC or unlimited liability claims in two

17   other cases, recent cases; one is Smurfit Stone, and one is

18   Abitibi Bowater, both in Delaware, one before Judge Shannon,

19   and the other before Judge Carey.

20            In both of those cases, where disputes were raised as

21   to whether or not the winding up claim under Nova Scotia law

22   and the guarantee claim, which was a direct claim of the

23   noteholders against the debtor, were duplicative.  In both of

24   those cases, although there were objections pending at the time

25   of confirmation, distributions were allowed on one of those two

Page 114

1    claims.

2             Here, the debtors propose to distribute nothing.  So

3    we have a situation where we have two billion -- creditors

4    holding over two billion dollars of claims, having to sit and

5    wait while the prices of those securities go up, down, who

6    knows, okay, over the next period of six months or a year,

7    however long it may take for this case to be resolved, or these

8    claims to be -- these claims by the committee to be resolved.

9    That's almost like a prejudgment garnishment or attachment.

10            You're basically saying, we're not going to give you

11   your property because somebody has a lawsuit.  And that's what

12   this is the equivalent of.

13            You know, there are provisions which permit this

14   Court to make distributions.  Our clients are prepared to make

15   appropriate agreements, if there ever is a successful outcome

16   from the committee's perspective, which we don't think there

17   ever will be on any claims they may have filed, they can --

18   they know where to find us.  These are not fly-by-night

19   operations.  These are large, responsible financial

20   institutions and hedge funds.

21            And secondly --

22            THE COURT:  Before you get to the secondly,

23   Mr. Zirinsky, your argument is premised in material part or

24   wholly on the contention that the plan inappropriately says

25   that disputed claims don't get distributions until they're

09-50026-mg    Doc 9791    Filed 03/04/11    Entered 03/14/11 11:50:45    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 115 of 160

Page 115

1  allowed.  And you cited a few cases, as did Green, Hunt,

2  Wedlake, in which plans had provided for, I think they were

3  partial distributions, I don't know if any of them provided for

4  total distributions.  How many cases did you and your guys go

5  through before you found those examples of provisions that --

6  or plans that had provisions of that character?

7          MR. ZIRINSKY:  I can't --

8          THE COURT:  You've been around the block a few times.

9  You know what has been the traditional way by which plans are

10  formulated in this district.  I can't tell you whether that's

11  ninety percent, eighty percent, or fifty-one percent, or even

12  thirty-five percent, but I take it you're aware of the many,

13  many cases that have made what the plan proponents in this case

14  put into their plan, what I think most objective observers

15  would call the typical provision.

16          MR. ZIRINSKY:  Typical where there's a defense to the

17  allowance of the claim.  And what I'm trying to explain, Your

18  Honor, is that there's a difference between having a defense to

19  an allowance of the claim, which has not been asserted.  No one

20  has disputed the enforceability of the guarantees under the

21  indenture or under the notes.

22          No one has disputed the validity of those agreements.

23  They're unconditional guarantees.  And that's different from

24  someone saying I'm not going to pay you because I think, you

25  know, you acted badly, you committed a tort, you did something

Page 116

1    so egregious that your claims should be equitably subordinated.

2          And to make it even worse, they haven't even brought

3    a claim.  All they've done is suggested in a piece of paper

4    that they might bring a claim, that they reserve their rights

5    to bring a claim.  That's not due process.  That's not the kind

6    of objection that normally withstands the light of day.

7          We told Your Honor back in December that we thought

8    these -- that we knew we were going to get to this point.  We

9    were going to be at a confirmation hearing, and we were going

10   to be stuck, and they were going to try to withhold

11   distributions on our claim.  We asked Your Honor for leave to

12   bring a motion for summary judgment.

13         Your Honor, as it is your right to do, said no, let's

14   have full discovery.  So we're engaged in discovery, but we

15   should not have to bear the risk of diminution of loss of value

16   of our distributions because the creditors' committee wants to

17   go on a frolic and a folly, and you know, do a fishing

18   expedition in the hope that they might actually find something.

19   They won't find anything, by the way.  But it's a hope and a

20   prayer, okay.

21         So they're free to do that.  But at the same time, we

22   shouldn't be penalized by having our distributions withheld.

23   Why should our distributions be withheld?  There's no basis for

24   that.  They haven't said your claim -- no one has said your

25   claim under the guarantee is invalid.  And I don't think

09-50026-mg    Doc 9791    Filed 03/04/11    Entered 03/14/11 11:50:45    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 117 of 160

Page 117

1    anybody would suggest that there is a basis for saying the

2    claim under the guarantee is invalid.

3           Sure, the committee might like to say that, well, you

4    got this consent fee, and you know, we think it -- you know, we

5    think it ought to be recharacterized.  The fact is that there's

6    a written agreement, that by the way was assumed and assigned

7    as part of the 363 sale, which says the consent fee shall not

8    be applied to reduce the claims.  That's an agreement, it's

9    been assumed and assigned.  That's the law.  That's the state

10   of the case.

11          If the committee wants to upset that agreement, they

12   have a very steep, long climb to make, and I'll be fighting

13   them every inch of the way.  But the fact of the matter is, as

14   it stands today, there is no dispute as to the validity of our

15   claims.  These are affirmative claims that the committee would

16   like to bring, or thinks they would like to bring.  It's not a

17   basis for holding up distributions to creditors who hold over

18   two billion dollars of claims.

19          Particularly where, you know, this isn't cash in a

20   lock box, where we can go invest it someplace and it'll be

21   absolutely safe.  We don't even have under the debtor's plan

22   the ability to direct the investment decisions with regard to

23   the securities that are being placed in this reserve.

24          So it's compounded not only by not receiving the

25   consideration, but also having absolutely no control over your

Page 118

1    own property while the committee spends the next two or three

2    years litigating to its heart's content on these affirmative

3    claims against the noteholders and the trustee.

4           And that's basically it in a nutshell, Your Honor.  I

5    don't want to, you know, take any more of the Court's time.  I

6    think these are very good arguments.  I think these are serious

7    arguments, and I think it does go -- it goes right to the core

8    of what's fair and equitable in a bankruptcy proceeding.  And

9    that is, that it's not only debtors have rights, creditors have

10   rights as well.

11          The Court should not be used, or a device of throwing

12   in what's called an objection to claim, should not be used as a

13   device to hold up distributions to large creditors,

14   particularly where the record shows, and it's not just us

15   saying it, it's GM saying it, where the record shows that this

16   was a fair, arm's length negotiation whereby the GM estate

17   derived very substantial benefits.  That's the record.

18          There are absolutely no facts -- there are no facts

19   in the record to contest that.  The only facts, so-called facts

20   alleged by the committee are totally conclusory allegations,

21   allegations which as a matter of Supreme Court law, two

22   decisions in the last several years, would not stand the light

23   of day on a motion to dismiss.

24          They have not alleged any facts to support any of

25   these claims.  Their allegations are bare bone conclusory legal

09-50026-mg    Doc 9791    Filed 03/04/11    Entered 03/14/11 11:50:45    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 119 of 160

Page 119

1    allegations, and are not entitled to any credence.  And if we

2    were permitted by Your Honor to move to dismiss, I believe Your

3    Honor, when evaluating our papers and evaluating the law, would

4    in fact, dismiss these claims.  They don't stand the light of

5    scrutiny, as enunciated twice now in three years by the Supreme

6    Court.

7              THE COURT:  All right.  Are you the designated

8    speaker for any of the other Appaloosa or Green Hunt Wedlake

9    issues?

10             MR. ZIRINSKY:  I believe so, I don't know if anyone

11   from Akin would like to speak or adds anything I've said on

12   behalf of Mr. Wedlake.

13             THE COURT:  Mr. Dublin.

14             MR. ZIRINSKY:  Thank you, Your Honor.  Yeah, let me

15   just add, Your Honor, one other point, and I don't want this to

16   be taken as a concession on our part, but at the very least,

17   even if the Court were not to permit distributions at this

18   time, at the very least, we do believe that the Court should

19   require the debtors to establish a segregated reserve for these

20   claims, and to give the holders of those claims appropriate

21   discretion and direction in terms of managing the shares and

22   warrants that would be contained in those reserves.

23             It's their money, subject to somebody being able to

24   take it away from them, it's their money, and they should have

25   the entitlement to direct how those funds or how those

09-50026-mg   Doc 9791   Filed 03/04/11   Entered 03/14/11 11:50:45   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 120 of 160

1    securities are treated.  Whether they're sold, warrants

2    exercised, and how the proceeds are dealt with during the

3    period that their money is being held hostage.  Thank you, Your

4    Honor.

5              THE COURT:  All right.  Mr. Dublin.

6              MR. DUBLIN:  I'll be very brief, Your Honor.  Phil

7    Dublin, Akin Gump on behalf of Green Hunt Wedlake.

8              Your Honor, I'd just like to note as we set forth in

9    our pleadings with respect to the primary issue that

10   Mr. Zirinsky was focusing on, that we did allege a violation of

11   1129(a)(3) and that the company, presumably in consultation

12   with the creditors' committee, were using the holdback of any

13   distributions as leverage in connection with the claim

14   objection.

15             The focus with respect to Green Hunt Wedlake is that

16   our claim, at least a portion of it, not even the entirety,

17   just a portion of it is duplicative of the guaranty claim.  We

18   understand the allegations.  That's a paragraph in their

19   twenty-odd so page claim objection, but we do note that we

20   think that 1129(a)(3), the use of not providing for the interim

21   distribution, at least in respect of one of the claims that are

22   largely duplicative, and to the extent the Court deemed

23   appropriate to reduce on account of the consent fee, but we

24   laid that out in our pleadings.  I'm not going to spend any

25   time repeating that in front of the Court.

Page 121

1            Your Honor, substantially all of our other issues

2    have been resolved through conversations with the committee and

3    the debtors.  One item which I think was not addressed earlier

4    was that with respect to our concern about setting off

5    potential distributions on account of any allowed claim we may

6    ultimately have.  I believe the debtors were amenable -- well,

7    their view is they don't think they have any claims to set off,

8    but if they do, they would give us at least ten days' notice

9    before they even sought to do any set-off, and then we could

10   come to Court or make some other type of agreement, before that

11   would be effectuated.

12           And then the last item was just on the exculpation,

13   and we just put forth our argument in the papers, and based on

14   the Chemtura holding, we have nothing else to add to that.

15           THE COURT:  All right.  Debtor's side, do you have

16   any problems with what Mr. Dublin said about your deal?

17           MR. KAROTKIN:  On the set-off, no, that's accurate.

18           THE COURT:  Okay.  All right.  Who's going to respond

19   to these, is it the debtors or the creditors' committee?

20   Mr. Mayer?

21           MR. MAYER:  I'm just the set-up man, Your Honor, as

22   you know, conflicts counsel has been taking the lead on this

23   matter, and I'd ask Mr. Seidel to come forward.  I'm just

24   briefly going to stay in line to set it up, but this is in the

25   nature of a motion to dismiss argument, there is a disputed

Page 122

1    claim, and it's absolutely consistent with practice that where

2    an objection has been filed to a claim, that distributions are

3    withheld.

4            I would also note, I was also involved with

5    Mr. Zirinsky in some of the cases that he cited.  They're not

6    on all fours.  Your Honor has already referred to the rule in

7    this court that you don't take an order that's not a published

8    decision and cite it.

9            This is a great example of that.  The facts of the

10   cases that are cited in their pleadings, including the Dana

11   case, where I was counsel to the creditors' committee, and the

12   Smurfit Stone case, where I was also counsel to the creditors'

13   committee are not on all fours at all with what is before Your

14   Honor, and it's difficult to respond to blank orders that don't

15   have decisions attached to them.

16           With respect to the status of the litigation itself,

17   I think it's appropriate for Mr. Seidel to --

18           THE COURT:  Well, I'll hear from Mr. Seidel.  Yeah,

19   why don't I hear from Mr. Seidel.  Remember that I'm not

20   looking for or intending to hold a mini trial or even a mini

21   summary judgment hearing or a mini 12(b)(6) hearing on the

22   issues today.

23           MR. SEIDEL:  Thank you, Your Honor.  Barry Seidel,

24   Butzel Long, special conflict counsel for the GM Creditors'

25   committee.

Page 123

1          I stand before Your Honor today not necessarily in a

2     position to respond on the merits.  I didn't come here to

3     address the merits.  Mr. Mayer had asked me to be prepared to

4     address the status of the litigation, and that's why I'm

5     standing.

6          We are in the midst of discovery.  The allegations

7     we've made in our claims objection relate to 502(d), as

8     Mr. Zirinsky referenced, as well as a claim for equitable

9     subordination.  The discovery we're seeking is related to

10    particularly the equitable subordination.

11         There was a lot that happened before the committee

12    was ever formed.  As Your Honor probably knows about from our

13    papers, this is a situation where I think that the claimants

14    have developed a cottage industry of purchasing these claims,

15    these bonds of unlimited liability companies for cents on the

16    dollar, and what they do is the sellers to them, sell them --

17    those claims fairly cheaply, not being aware of the 135 angle

18    that they have been playing in these other cases.

19         This particular case is one where these claims buyers

20    are getting the benefit for I think it's about 2.6 billion

21    dollars of claims against this estate, when in fact, the

22    aggregate principal amount of their bonds were only a billion

23    dollars to start, and they got a consent fee of 360 million

24    dollars to forebear from some litigation.

25         From the creditors' perspective, we think this

Page 124

1    stinks, and the discovery is necessary to elucidate the claims

2    objection we've made.  In my experience, as well as Your

3    Honor's, claims -- plans of reorganization withhold

4    distributions on disputed claims.  And the claims asserted by

5    the Nova Scotia trustee and the Nova Scotia bondholders are

6    disputed within the meaning of the statute.  These are disputed

7    claims, whether or not because they're objected to, whether or

8    not we've alleged the equitable subordination claim, we have

9    had preliminary discussions over a long period of time with the

10   debtor about getting the right to bring equitable subordination

11   in the way of a complaint, but that hasn't happened yet.

12           But these are all things that in the context of this

13   ongoing litigation would be addressed.  And if Your Honor has

14   any questions about the litigation, I'll try to answer them.

15           THE COURT:  No, not at this point.  Mr. Mayer, did

16   you want to consult with Mr. Seidel, or did you want to be

17   heard with me?

18           MR. MAYER:  I had one other plan point, Your Honor,

19   related to segregated accounts.  It might be useful to consider

20   the following facts.  I believe that there are, at the present

21   time, approximately 29.5 billion dollars of allowed claims

22   against this estate.  And the total reserves are 11.5 billion

23   dollars.

24           Given those two numbers, we see no need to create a

25   special segregated reserve just for this disputed unsecured

1  claim.  In my experience, that's highly unusual.  It would also

2  be unheard of to give a disputed creditor the right to direct

3  the investment or disposition of planned distributions that are

4  being held out in reserve not just for that claimant, but

5  potentially for all the other creditors, should that claimant's

6  claim be disallowed.  And I just wanted to address those two

7  late points.  We don't believe a segregated account is required

8  or warranted, and we think the assertion of investment control

9  over it is unheard of.

10              THE COURT:  All right.  Mr. Karotkin.

11              MR. KAROTKIN:  Just one statement, Your Honor, just

12  to make sure the record's very clear.  I think Mr. Zirinsky

13  eluded to the fact that his client's Class III claims are being

14  treated differently than other Class III claims.  That is not

15  the case.  All disputed claims are treated the same way in

16  Class III.

17              THE COURT:  All right.  What's our next issue, folks?

18  Do I still have arguments vis-à-vis -- okay.  Ms. Leary, are

19  you coming up?  That's fine.  If the argument's vis-à-vis the

20  role of Wilmington Trust, they're still being pressed by

21  someone or anyone, I'll take brief argument on those after Ms.

22  Leary's done.

23              MS. LEARY:  Thank you, Your Honor.  I thought

24  jurisdiction was the easy one.  And I will make a real effort

25  to be very, very brief.

Page 126

1            I think, going to 2(e) of your order, the release and

2    exculpation issue, I think that's low hanging fruit.  I think

3    this is a drafting issue.  If I can just take the Court through

4    a couple of provisions.

5            The release and exculpation are set forth in the

6    plan, Section 12.5 and 12.6.

7            THE COURT:  Yeah, hang on a minute.  I had pulled

8    that at one point.  Are you concerned about the part where the

9    estate gives away its claims or the language in the exculpation

10   which applies to third parties?

11           MS. LEARY:  I think there needs to be some clarity in

12   the plan, because there is no real identification of the

13   subject matter of the releases, nor is there identification of

14   the individuals being exculpated.  There's sort of this very

15   broad -- and I think what the Court did in Adelphia and DBSD

16   and in Chemtura, was simply add language that says to the

17   extent permitted by applicable law, to that provision.

18           In Chemtura, and I think the other cases, there was a

19   question in the Court's mind about the enforceability of those.

20   I don't know if that's a solution that the debtors can live

21   with, but there's another drafting problem, which has to do

22   with the plan very clearly setting forth the particular conduct

23   to which the exculpation applies, which is as follows:  Willful

24   misconduct, gross negligence, bad faith, self-dealing, ultra

25   vires act, fraud, malpractice, criminal conduct, unauthorized

MOTORS LIQUIDATION COMPANY, et al.

Page 127

1    use of confidential information, and breach of fiduciary duty.

2              Turning to the GUC Trust, however, there is not a

3    mirror of those particular carve-outs from the exculpation, and

4    I don't think that that was intentional, but I believe that the

5    GUC Trust needs to do what the plan does.  And that is, to --

6    what's missing is fraud, malpractice, criminal conduct,

7    unauthorized use of confidential information, and breach of

8    fiduciary duty.

9              Now, I'm referring specifically to that sort of

10   string of items in 9.4 --

11             THE COURT:  It runs on to page 73 of the plan?

12             MS. LEARY:  I'm sorry, no.  I'm moving to the GUC

13   Trust now.

14             THE COURT:  Oh, you're --

15             MS. LEARY:  So --

16             THE COURT:  But you're saying the GUC Trust needs

17   language similar to what's on page 73 of the plan?

18             MS. LEARY:  That is right.  That is right.  And, Your

19   Honor, the reason that this is of concern is because Section

20   13.8 of the GUC Trust says, that the GUC Trust governs to the

21   extent it is inconsistent with the plan on Section 6.2, which

22   does govern -- I just think it's a drafting issue, and I will

23   say no more.  If there's a response, I'm happy to reply to it.

24             The section of the plan 10.7 looks an awful lot like

25   a discharge injunction --

09-50026-mg   Doc 9791   Filed 03/04/11   Entered 03/14/11 11:50:45   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 128 of 160

Page 128

1          THE COURT:  A pause, please, Ms. Leary.

2          MS. LEARY:  Yeah.

3          THE COURT:  Would you be okay with the exculpation,

4    which as I read it, does enjoin third parties and not just the

5    estate, if it had the limitations on it that appear at the top

6    of 73 in terms of carving it back?  I don't think that's what I

7    ruled in Chemtura, but that's the question I'm asking you.

8          MS. LEARY:  73?

9          THE COURT:  Well, in 73, you pointed out that this

10   isn't a get out of jail free card for everything in the

11   world --

12         MS. LEARY:  Right.

13         THE COURT:  -- it's a fairly limited exculpation, or

14   at least it protects people unless they do stuff that's really

15   bad.  And my question is, are you asking me to strictly

16   implement my rulings in Chemtura and its predecessor cases, or

17   as long as it had that kind of really bad type of conduct

18   provision in it like 73 seemingly has, that you'd be okay with

19   it?

20         And if you're acting as a surrogate for others, I

21   understand you can only speak for yourself.

22         MS. LEARY:  That's right, Your Honor, and cognizant

23   of the fact, and I want to reiterate our objective to have the

24   plan confirmed, your proposal is fine to set forth, subject to

25   California and Salina being okay with that, so.

MOTORS LIQUIDATION COMPANY, et al.

Page 129

```
 1              THE COURT:  All right.  Can you pause for a second?

 2   Do I still have counsel for California on the line?

 3              MS. KARLIN:  Yes, you do.  This is Olivia Karlin.

 4              THE COURT:  Do you want to weigh in on this,

 5   Ms. Karlin?

 6              MS. KARLIN:  We would agree with New York.

 7              THE COURT:  Okay.  Salina I see out there in left

 8   field.

 9              MR. LINDENMAN:  Yes, we would agree.

10              THE COURT:  Okay.

11              MS. LEARY:  Your Honor, is that assuming that you

12   would add the language to the extent permitted by law,

13   applicable law?  As you did in --

14              THE COURT:  My tentative would be that way, but I

15   haven't heard from your opponents yet.

16              MS. LEARY:  Well, I would agree with your proposal if

17   that language is added, to the extent permitted by applicable

18   law, so that it's clear that parties can rely on this Court's

19   analysis in this and other cases with respect to the releases

20   and exculpations.  I don't want to make a big deal out of this

21   one at all, so.

22              THE COURT:  Are you okay with yielding to

23   Mr. Karotkin for a second?

24              MS. LEARY:  Yes, of course.

25              MR. KAROTKIN:  I'm not precisely sure what the
```

Page 130

1    suggestion is.  And I think that the language to the extent

2    permitted by applicable law, as I recall, Your Honor, in your

3    Chemtura decision, had to do with third party releases.  There

4    are no third party releases in this.  The only related third

5    party releases, as you mentioned in those decisions, is the

6    exculpation provision.  If you're -- if we're talking about

7    adding it to that language --

8            THE COURT:  Yeah.  I thought we were talking about

9    exculpation.

10            MR. KAROTKIN:  All right.  So we're not talking about

11   12.5, we're talking about 12.6?

12            THE COURT:  I read 12.5 and I look to both of you of

13   folks on this, and obviously you've had a very gentlemanly and

14   womanly back and forth.  I understood 12.5 to be releases by

15   the debtors --

16            MR. KAROTKIN:  Correct.

17            THE COURT:  -- which are subject only to a best

18   interest of the estate test, and which wouldn't particularly

19   trouble me.  And I'm not sure if anybody still has an objection

20   to 12.5, but I may be wrong, and if so, somebody can correct

21   me.

22            12.6 spills over to third party releases.  Now, the

23   way I read 12.6, the kinds of things that 12.6 protects the

24   exculpated folks against, as I mentioned in my Chemtura

25   decision, are almost entirely claims that are owned by the

09-50026-mg   Doc 9791   Filed 03/04/11   Entered 03/14/11 11:50:45   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 131 of 160

Page 131

1    estate and not by third parties.

2           But the language is broad enough to cover third

3    parties, which is why I asked Ms. Leary those questions, which

4    is in essence, her saying that even though what I said in

5    Chemtura, she doesn't regard it as a big deal.  And that's a

6    paraphrase, but I think that's where we are.

7           But I thought that 12.6, exculpation, does protect

8    creditors' committee, debtor, all the people who are listed,

9    from a claim by somebody out in the hallway.

10          MR. KAROTKIN:  Yes, it does.

11          THE COURT:  And that's the legal issue I dealt with

12   in Chemtura.

13          MR. KAROTKIN:  Correct.  And I'm not sure what the

14   suggested fix is, that's all.

15          THE COURT:  Well, I think what she was saying is, to

16   the maximum extent permitted by law or words to that effect,

17   and I've got to tell you that although I'm inclined to put in

18   all the safeguards people want, as I did in Chemtura, and I'd

19   hear creative suggestions for more protection, I've said a

20   zillion times, I believe in predictability.  I don't think I

21   should be retreating from three published decisions I have in

22   the area.

23          Now, as I understand it, and this is something I need

24   your help on, Mr. Karotkin, but I understand that there's a

25   self-correcting procedure, a mechanism at the end of the plan,

Page 132

1    that says the plan is still confirmable, it's just modified to

2    the extent I need -- I think it needs to be modified.  But I'd

3    like you to confirm that.

4             It's 12 -- no, excuse me.

5             MR. KAROTKIN:  12.12?

6             THE COURT:  No, I think it was way near the end.

7    Hang on a second.

8             MR. KAROTKIN:  I think 12.12.

9             THE COURT:  Yes, it is 12.12, I'm sorry.

10            MR. KAROTKIN:  Yeah.  That's fine.  I --

11            THE COURT:  Although you may have to ask.

12            MR. KAROTKIN:  Pardon me?

13            THE COURT:  At the request of the debtor's.

14            MR. KAROTKIN:  Yes, we --

15            THE COURT:  So if you're requesting me, when we're

16   all done, if I otherwise find the plan confirmable, but I need

17   to -- I think a term here or there needs to be tweaked, if

18   you're asking me to confirm it anyway, you can tell me that at

19   the end of the day.

20            MR. KAROTKIN:  Okay.  But I still have and maybe I'm

21   being thick.  I just don't understand the suggested fix to

22   12.6.

23            THE COURT:  Well, I think the suggested fix by

24   Ms. Leary, in practical effect, means you don't get those third

25   party releases as part of the exculpation under my rulings in

Page 133

1    Adelphia, DBSD and Chemtura.

2              MR. KAROTKIN:  Okay.  So is the fix just to add to

3    the extent permitted by applicable law?

4              THE COURT:  You can -- that's probably the easiest

5    thing.  Although I don't tell lawyers how to practice law, but

6    I would suggest that you put in one or more provisions that

7    say -- which I would be willing to approve, subject to others'

8    rights to be heard, that before anybody wants to sue any of the

9    protected parties on that, they've got to come to me to satisfy

10   me that it belongs to them, and it doesn't already belong to

11   the estate.

12             MR. KAROTKIN:  The same language.

13             THE COURT:  Because I think most of the kinds of

14   things that would bug somebody in this situation would belong

15   to the estate and not to an individual creditor.

16             MR. KAROTKIN:  That same language you had in the

17   Chemtura plan.

18             THE COURT:  You may remember it better than I, but I

19   think I did something like that there, yes.

20             MR. KAROTKIN:  Okay.  I understand.

21             THE COURT:  Okay.

22             MS. LEARY:  And we would find this Court's directive

23   on coming here for clarification on the last thing that you

24   said, whether the claim belongs to the third party or the

25   estate, we are fine with that as well, Your Honor.

MOTORS LIQUIDATION COMPANY, et al.

Page 134

1           THE COURT:  Okay.  Salina, are you okay with that as

2    well?

3           MR. LINDENMAN:  I'm sorry, Your Honor?

4           THE COURT:  Are you okay with what Ms. Leary just

5    said?

6           MR. LINDENMAN:  Yes.

7           THE COURT:  Okay.  California?

8           MS. KARLIN:  California did not object to paragraph

9    12.6.

10           THE COURT:  Oh, okay, fair enough.  Do you want to

11    continue then, Ms. Leary?

12           MS. LEARY:  I just have a couple of other issues.

13    That didn't take too much, but.

14           THE COURT:  It isn't like I'm watching the clock.  I

15    just --

16           MS. LEARY:  I am, Your Honor.

17           THE COURT:  All right.  Fair enough.

18           MS. LEARY:  I have to leave, so the -- I'm going to

19    go to 2(a), which is as the Court characterizes it, some GUC

20    Trust issues.

21           Again, I think there's some fixes here, and the over-

22    arching concern we had when we read the GUC Trust in the

23    February 25th iteration was -- through the lack of some

24    oversight and some protective measures, which I think in the

25    next iteration or it may have been the one on the 25th, I got

Page 135

1    more comfortable with that.  And yet, I still think that there

2    are issues, and they are as follows.

3            And I have to apologize, Your Honor, I was handed the

4    new GUC Trust this morning, and I have not had an opportunity

5    to review it.  I am told by Ms. Macksoud of the creditors'

6    committee that -- counsel, that the revisions to this version

7    are primarily for tax purposes.  They would not necessarily fix

8    what is here, so I apologize if it did fix.

9            Here's a couple of things that we see as problematic.

10   What the GUC Trust provides is for the retention of Wilmington

11   Trust, I'll refer to it as WTC, AP Services --

12           THE COURT:  No, refer -- indulge me.  Acronyms drive

13   me absolutely bananas.

14           MS. LEARY:  Okay.

15           THE COURT:  Unless you're talking about the UAW or

16   the FCC, call it Wilmington Trust.

17           MS. LEARY:  Okay.  And AP Services.

18           THE COURT:  All right.

19           MS. LEARY:  Which I believe is AlixPartners.

20           THE COURT:  Right.  But I think they had some

21   business reason for changing their name, so you can indulge

22   them on that one, I know who they are.

23           MS. LEARY:  Okay.  I don't know what FTI stands for,

24   I think it's Financial -- anybody know?

25           THE COURT:  FTI Consulting is also a name that's

Page 136

1   familiar enough to those in the bankruptcy community, so it's

2   okay.

3          MS. LEARY:  Okay.  So our concern is that AP

4   Services, I think has been operating the debtor for the last 18

5   months.  I think that's a classic insider within the definition

6   of insider.  And so what I think might be required is a little

7   bit more disclosure about the number of people within AP, the

8   terms of compensation, and benefits, the affiliations, and a

9   general statement of disinterestedness.

10         I don't see that.  All I see in the plan and in the

11   brief in support of the plan is a general statement that AP

12   Services will continue to be retained by the GUC Trust, and I

13   believe an abbreviated team or fewer people, there's an

14   implication that there'll be fewer people.

15         I think it needs a little bit more in terms of making

16   us feel comfortable that there's an entity here that can move

17   into the GUC Trust operating role, and which is different than

18   its role before this Court.

19         THE COURT:  Ms. Leary, is this something that's a

20   plan issue or is this something that anybody who cares, and I'm

21   not sure how many people, frankly, would care, could resolve by

22   picking up the phone?

23         MS. LEARY:  You'd think.  Perhaps.  I mean, I don't

24   know.  I don't know the answer to that, Your Honor.  I know

25   that this is an overwhelming case for --

Page 137

1          THE COURT:  Okay.  Well, your other points, as you

2     can tell from the back and forth and the amount of time I spent

3     on it, got my attention, but this one really doesn't.

4          MS. LEARY:  Okay.  Here's the bottom line for New

5     York, we want some comfort level that we will be treated in a

6     way that has some independence and some fairness to it.  I am

7     not suggesting that AP or any of the professionals that are

8     going to move into the GUC Trust roles lack that.

9          What I am suggesting is that the GUC Trust does not

10     necessarily provide a mechanism if that doesn't happen.  And

11     that's where I'm struggling with the GUC Trust.  I'm struggling

12     with it because there are things that will no longer be

13     undertaken with this Court's oversight, the U.S. Trustee's

14     oversight and so forth, the fee examiner's oversight.  Those

15     are the kinds of things that I feel, as a creditor, protected,

16     the estate protected, unsecured creditors.

17          So I'm not suggesting that these parties cannot act

18     in a way that is fully above board and so forth.  What I'm

19     suggesting is that the showing in 1129(a)(5) hasn't really been

20     made.  I don't think that that provision has been fulfilled.

21     That doesn't mean that it can't be fulfilled.  If this Court

22     entered an order conditionally approving the plan, but

23     requiring some additional showing, I think that would fully

24     satisfy the state.

25          THE COURT:  Uh-huh.  Okay.  Do you have other stuff?

Page 138

1          MS. LEARY:  One of the issues that New York and

2    California raised was some concern about Wilmington Trust's

3    roles pre and post petition, and Wilmington Trust has come in

4    and stated that its prepetition role as indentured trustee is

5    primarily ministerial.  We don't view it that way.  We think

6    that they have a bit of discretion, including the right to

7    assert claims against Delphi, discretionary issues with respect

8    to distribution and allowance of claims.

9          You know, I think our papers set forth a question

10   mark, rather than a line in the sand about Wilmington Trust,

11   and it is something that I hope the Court will look at in terms

12   of is there something more than can be provided to give a

13   comfort level to unsecured creditors, that there is some real

14   oversight here.  This is not just more professionals being paid

15   to dispute claims and so forth.

16         New York wants to be paid soon, and we are scrambling

17   to do that because we have no dollars to devote to remedial

18   obligations that involve this debtor.  And my entire focus for

19   the next several months is going to be to get us there.  To the

20   extent that I have a willing partner in AP Services, Wilmington

21   Trust and so forth, I'm happy.

22         To the extent that I don't, if there are issues that

23   I don't understand why we can't resolve them.

24         Here's an example.  When New York filed its proofs of

25   claim, there were essentially two aspects to the claim, many of

Page 139

1    them.  The first aspect was for past -- I'm sorry, prepetition

2    response costs.  These are quantifiable numbers, they were

3    supported by affidavit, as well as documentary evidence.  For

4    whatever reason, we were a disputed claim, even though we feel

5    that everything's there, tell us why this is not deemed allowed

6    on the effective date, and we don't really  have an answer to

7    that.

8              It is what it is.  The bottom line for New York,

9    though, is that we can't wait years to get into some, you know,

10   fourth, fifth, tenth distribution.  We would have loved to have

11   been in the first distribution, that looks like it's not

12   necessarily going to happen.

13             And if I can -- and sort of moving into another issue

14   we raised, another objection, it really does go to the question

15   of whether there will be equal treatment.  And here's the way I

16   look at it, because I don't think this Court or the debtors or

17   anybody in this room, or anybody in the world, can dictate what

18   the GM stock is going to be worth.

19             But I envision a scenario whereby the General Motors'

20   stock on the first distribution date is worth something, let's

21   call it 35 cents or 35 cents on the dollar.  And when that 23

22   billion -- 27 billion dollar stock distribution goes out into

23   the market, the law of supply and demand indicates that the

24   value attached to that stock is not the same after the first

25   distribution, and it might be.

09-50026-mg   Doc 9791   Filed 03/04/11   Entered 03/14/11 11:50:45   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 140 of 160

Page 140

1          Now, the difficulty I think for the debtors is to try

2     to assure and the committee, is how do you assure that

3     subsequent distributions get paid the same amount.  And I think

4     there's every intention to do that.  It's clear to me from the

5     plan.  The question is, is it really going to happen?  And if

6     it doesn't happen, will we know it, and if it doesn't happen,

7     is there some remedy that the state or other unsecured

8     creditors have to come back to the Court and say, we don't

9     understand what happened here.  They got 35 cents on the dollar

10    and we got 15.

11          So there's a difference between distribution and the

12    value of that distribution, and it's not that I want to assure

13    getting 35 cents on the dollar, but I don't have the choice

14    today that Wilmington Trust bondholders and others who are

15    allowed have, which is, do I hold or do I sell, that

16    discretion.  And that's where the discrimination, I think,

17    comes in.  I don't have that ability today.  And if you give it

18    to me tomorrow on let's say the tenth distribution and it's

19    worth ten cents of the dollar, does New York have to hold it at

20    that point to make it get to 33 cents, to feel -- are we

21    required to do that, or can we come back to the Court and say,

22    this didn't work.

23          I don't think the GUC Trust has a mechanism for us to

24    do that, and the reason it doesn't is because it doesn't

25    compare apples to apples.  It -- one share of stock today is

Page 141

1    not valued at the same price as the stock -- as a share of

2    stock tomorrow.

3              So what do you do about that?  I think what you do is

4    you require in a reporting context, the value that could have

5    been, not that is, but that could've been realized on the date

6    of distribution, the first day of distribution.

7              Go the second day.  What is the value of that

8    distribution to be realized, and do they match?  Not what did

9    you get, New York, or what did you get, Wilmington Trust

10   bondholders, but let's look at what opportunity exists on the

11   first distribution as compared with what exists on the second

12   and subsequent distributions in terms of value.

13             That is what New York would like to see.  We'd like

14   to feel comfortable to have the next few months and not worry

15   that the more the stock is traded and floods the market, and

16   the lower it goes or whatever economic, we want an incentive as

17   well to have our claim determined soon, early, not only to save

18   Treasury money, but also to have in hand dollars that we can

19   put into the ground for remedial purposes.

20             Because as I have said my theme today, New York has

21   zero dollars, and I think this Court can take judicial notice

22   of the fiscal constraints that the State of New York is under

23   today, and I don't think anybody can dispute that.

24             So that's it.  And if I can reserve some time for

25   reply to the extent that there may be issues raised by

Page 142

1     Mr. Karotkin or Mr. Smolinsky, I'd appreciate it, Your Honor.

2              THE COURT:  Okay.  Do I have somebody who wants to

3     respond?

4              MR. SMOLINSKY:  Your Honor, Joe Smolinsky.  Let me

5     see if I address all of the issues, if I can.

6              With respect to Wilmington Trust and the other

7     professionals, I think that -- we won't take insult to the

8     comments, but I think that Wilmington Trust is the party best

9     served to do this work.  They've been involved in the bonds,

10    which represent 23 billion dollars' worth of the debt, since

11    the inception.  They're familiar with the distribution

12    structure.

13             In terms of checks and balances, FTI will sit above

14    as a monitor, so there are built-in protections to make sure

15    that Wilmington Trust acts appropriately.

16             AlixPartners -- I mean, AlixPartners is in there,

17    another checks and balance.  They're very familiar with the

18    claims.  To bring in someone else now to do the claims

19    reconciliation work, would be tremendously expensive, if it

20    could be done at all.

21             With respect to the allowance of New York State's

22    claims, I think we've evidenced, and the debtors have evidenced

23    to the Court how much work we've put into the claims process.

24    We have over 220 omnibus objections either resolved or on file.

25    We've had numerous stipulations of large claims.  We've had

09-50026-mg    Doc 9791    Filed 03/04/11    Entered 03/14/11 11:50:45    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 143 of 160

Page 143

1    estimation hearings on asbestos.  We've -- if you look at

2    our -- at the time records of Weil Gotshal and of AlixPartners,

3    you'll see an incredible amount of time being spent on

4    environmental matters since the very beginning of this case.

5              We've spent a lot of time with New York State; and

6    what I find interesting is that there were -- if you remember,

7    when we set up the ADR process, which has been very successful

8    at resolving claims, all of the environmental claimants came in

9    and said, Your Honor, not me, we shouldn't be a part of the ADR

10   procedures, even though we were prepared to build in procedures

11   to allow those claims to be resolved through ADR, such as

12   bringing in special mediators that are knowledgeable on

13   environmental matters.

14             But the environmental claimants didn't want to be

15   part of that program, and you might have seen some objections

16   to confirmation based on that issue.  So without mediation ADR,

17   it is a tiresome process, but we are engaged, we are going to

18   continue to engage, and our efforts to resolve claims and the

19   debtor's -- and the GUC Trust's efforts to resolve claims are

20   not going to diminish.  If anything, they will accelerate.

21             THE COURT:  Before you move on, Mr. Smolinsky --

22             MR. SMOLINSKY:  The last issue --

23             THE COURT:  No, before you do.

24             MR. SMOLINSKY:  Oh, yes.

25             THE COURT:  On ADR, because at one time I had that.

09-50026-mg    Doc 9791    Filed 03/04/11    Entered 03/14/11 11:50:45    Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 144 of 160

Page 144

1    How was that resolved?  That you just shrugged your shoulders,

2    and said anybody who doesn't want to do ADR doesn't have to do

3    ADR?

4            MR. SMOLINSKY:  No, Your Honor.  We were requested at

5    the time to carve out and exclude any environmental claim from

6    the ADR procedures.

7            THE COURT:  And you said okay to that?

8            MR. SMOLINSKY:  Yes.

9            THE COURT:  Yeah, that's what I meant.

10           MR. SMOLINSKY:  The order exclusively carves out any

11   environmental claims from being subject to the ADR program,

12   although it does reserve the debtor's rights to seek to

13   establish a new ADR program for environmental claims.

14           THE COURT:  All right.  At which time they could be

15   heard in opposition, if they still don't want to do it.

16           MR. SMOLINSKY:  That's correct, Your Honor.

17           THE COURT:  Okay.

18           MR. SMOLINSKY:  The last issue, which if I understand

19   Ms. Leary correctly, she's suggesting that we don't do this

20   plan, but we do another plan, where we determine at the time of

21   any distribution what the value of the stock is, compare that

22   to the size of the claim and distribute based on value, rather

23   than number of shares.

24           Given the entire construct of this plan, that just

25   isn't possible.  That would mean that if in the unlikely event

Page 145

1    that the value of New GM stock plummeted, that the estate would

2    run -- would simply run out of shares in order to satisfy that

3    party's claim.

4            That actually would create a disincentive to settle

5    claims quickly, because a claimant, unless they were concerned

6    about running out of shares, would get the same distribution

7    whether claims are settled today, or tomorrow, or three years

8    from now.  We want people to settle claims, we want to settle

9    claims, and despite the fact that it wasn't established for

10   this purpose, the way that it's currently constructed, there is

11   an incentive to resolve claims quickly so that you can get

12   control as a claimant over your shares.

13           So the incentives are matched up, regardless of the

14   fact that that wasn't the reason why it was set up that way.

15           THE COURT:  Okay.  Ms. Leary, based on -- oh,

16   Mr. Mayer.

17           MS. LEARY:  Your Honor, may I be heard?

18           THE COURT:  Ms. Leary, I'll give you a chance to be

19   heard, but I wonder if Mr. Mayer should be heard first.

20           MR. MAYER:  Thank you, Your Honor.  Just a couple of

21   points.  New York State has a disputed unsecured claim, the

22   debtors have been dealing with it, the GUC Trust will continue

23   to deal with it.  And the personnel handling it, basically

24   aren't changing very much.  Wilmington Trust is coming in to be

25   the trustee who will hold the assets, but AP Services continues

MOTORS LIQUIDATION COMPANY, et al.

Page 146

1    to effectively direct the affairs of what will be the successor

2    to the estate.

3            There's no more conflict of interest here than there

4    is any other situation that this Court sees every day of the

5    week, where the same people stick around to do effectively the

6    same jobs.

7            With respect to oversight, we have oversight galore,

8    and as one of the few professionals that is not continuing on

9    in this case, with the exception with a couple of very narrow

10   exceptions, I was deeply involved in negotiated these.

11   Sometimes to generating a fair amount of heat, perhaps not

12   light, oversight.

13           FTI, which basically takes the place of the

14   committee, is going to have oversight over Wilmington Trust.  I

15   don't recall New York State claiming that the committee was not

16   representative, or not doing its job during this case.  They

17   have no basis for stating that the committee's financial

18   advisor, which replaces the committee at some considerable

19   savings to the estate, has any conflict of interest in its

20   role.

21           But there's more.  As Your Honor knows, every cash

22   dollar that goes out the door to pay professionals, New York

23   State talks about making sure professionals don't run wild.

24   Well, the dollars are Treasury's dollars, and you have seen how

25   tightly Treasury has negotiated the post effective date budget.

MOTORS LIQUIDATION COMPANY, et al.

Page 147

1    You know how hard it was to negotiate those numbers, and the

2    document is replete with Treasury's budgetary controls over the

3    expenditure of the cash.

4           So there is that control.  But there is more.  We

5    have in this document a holdback, any professional goes over

6    budget, there's a ten percent holdback, which can be liquidated

7    only with the consent of this Court, and if New York State

8    wants to come in and object, it has the ability to do so.

9           And finally, there is still more.  If it turns out,

10   and this is the only place where New York State could possibly

11   be prejudiced, assuming that its claims are allowed, which I

12   presume they will be to some extent, if you're in an allowance

13   fight, you have an adversary, you don't have a partner, and

14   every dollar that goes to New York State comes out of some

15   other creditor's pocket.

16          Finally, if the trustee, if Wilmington Trust ends up

17   having to sell stock to pay for professional expenses, it has

18   to come to this Court first, over and above a five million

19   dollar initial amount, the genesis of which is that the SEC has

20   required some reporting, and that wasn't in Treasury's budget.

21   So we needed to provide for five million dollars to cover that

22   and associated costs.

23          But other than that, and mechanical items, such as

24   selling warrants which are about to expire, Wilmington Trust

25   has to come back to court to sell the assets that New York

Page 148

1    State is concerned about before it can do so to pay expenses.

2           So there's tremendous amounts of oversight in this

3    trust, and I can't see the point of requiring even more.

4    Unless Your Honor has questions, I'll --

5           THE COURT:  No.  No, thank you.  All right.

6    Ms. Leary, do you have -- oh, forgive me.

7           MR. WILLIAMS:  Your Honor, Matthew Williams, Gibson

8    Dunn for Wilmington Trust.

9           Just a couple of things just to clear up the record.

10   With respect to the Delphi bonds, although I don't think it

11   would be a conflict, those are not Wilmington Trust's bonds.  I

12   just wanted to correct the record there.

13          And then with respect to anything else that's been

14   raised, I'm happy to answer any questions, but I think

15   everything is adequately dealt with.

16          THE COURT:  Yeah, I read your brief.  I'm okay.

17          MR. WILLIAMS:  Thank you, Your Honor.

18          THE COURT:  Thank you.  All right.  Ms. Leary.

19          MS. LEARY:  I have neglected to indicate to the Court

20   a portion of California and New York's objection that was

21   withdrawn.  And I apologize if I neglected to advise both the

22   committee and the debtors, and it deals with the assertion that

23   Wilmington Trust prepetition fees being paid administratively

24   are -- is inappropriate.

25          Given the representation to us that the fees total

Page 149

1   about 270,000 dollars, we are not going to continue to assert

2   that.  Having said that, Your Honor, the proffered reason that

3   it would be acceptable to pay those fees, we want to represent

4   clearly to the Court that we do not think that because it's

5   standard practice in this district unless there's a decision

6   that Your Honor has issued or another judge has issued in this

7   district, directly on this point, we don't think because it's

8   standard practice that it is a good enough reason.

9           THE COURT:  Well, if you'd pressed the objection, I

10   would've asked you whether my recent decision in Adelphia

11   changes the terrain in that, but if you're not pushing the

12   objection, I would just as soon not issue a precedent on

13   something where I don't have to.

14           MS. LEARY:  No.  And I want to indicate Mr. Smolinsky

15   represented yesterday a substantial contribution underlying

16   those fees, and California and New York felt that it was not

17   necessary to press.

18           Another issue that has -- it's in our brief, but it

19   didn't occur to me to press it until Mr. Mayer raised it,

20   really about the GUC Trust monitor, and whether it is, in fact,

21   a monitor.  And that's the issue I hope the Court looks at.

22           The bottom line is, Your Honor, whether I'm standing

23   here as an objecting party or not, this Court is going to give

24   a hard look particularly in the spirit of the Supreme Court's

25   Espinosa case, to everything in this plan to see whether it is

Page 150

1    consistent with the Code.

2              And sometimes things are --

3              THE COURT:  Do you read Espinosa as saying that a

4    bankruptcy judge has the duty to fly speck a 79-page single

5    spaced plan?  I mean, I'm properly respectful of the Supreme

6    Court, but -- and I will do whatever the Supreme Court tells me

7    that I have to do with sufficient clarity, of course, but how

8    could a bankruptcy judge, especially in this district, with the

9    paper that parties lay on him or her, ever live in an Espinosa

10   world?

11             MS. LEARY:  I knew I shouldn't have raised that case,

12   Your Honor.  I knew it the minute it came out of my mouth.  The

13   reason I raised it simply is because that's your -- whether

14   Espinosa is past or not, that is I, in my view, how this Court

15   has viewed plans in the past, particularly with respect to

16   Chemtura and others.  That's all I meant.  You don't need

17   Espinosa to do what you normally do.

18             THE COURT:  When it's in my face and I see it, I

19   don't close my eyes on it.

20             MS. LEARY:  Right.

21             THE COURT:  But I must confess to you that I focused

22   on -- to the world, to the newspapers, to DebtWire, I focused

23   on the objections to confirmation, and anything that is so

24   noteworthy that it catches my attention.  I can't rule out the

25   possibility that in 79 single spaced pages on the plan alone or

Page 151

1      any of its ancillary documents there's something in there that

2      got by me.

3              MS. LEARY:  Thank you, Your Honor.

4              THE COURT:  Okay.  Mr. Karotkin.

5              MR. KAROTKIN:  I believe that's it, Your Honor.  To

6      which Mr. Smolinsky has to clarify, I don't believe there are

7      any more objections.

8              THE COURT:  Okay.  Mr. Smolinsky, you can rise with

9      that, and then I'll give a chance to anybody who is on the

10     phone a chance to be heard, whose points raised pass muster

11     under the standard I articulated in my February 24th order.

12             MR. SMOLINSKY:  Your Honor, I just want to stand to

13     identify two issues that the parties continue to work on, just

14     so Your Honor could take them into consideration, in connection

15     with your order.  Both involve New GM.

16             The first is an amendment to the master sale and

17     purchase agreement.  You may recall that there's an additional

18     two percent of New GM shares that are available, to the extent

19     the claims exceed 35 billion dollars, but less than 42 billion.

20     That's the cap.  And the procedure that's in the master sale

21     and purchase agreement requires that the debtors come back to

22     court and have a hearing to estimate the amount of claims,

23     which would require Your Honor to sit and decide at some point

24     in time in the near future what the Nova Scotia claims are

25     worth, and what the NUMMI claims are worth, and it becomes very

Page 152

1    difficult and puts a tremendous burden on Your Honor.

2              So the parties are discussing a construct that would

3    no longer require that kind of a hearing, and would permit

4    distributions of additional shares to be based on true allowed

5    claims.

6              The accountants are still discussing it, but you

7    should expect, hopefully, to see something in the near future

8    to address that issue.

9              The second issue, which perhaps is more immediate,

10   because we'd like to get it inserted into the sale order,

11   involves the treatment of the master of sale --

12             MR. UNIDENTIFIED:  I think you mean confirmation.

13             MR. SMOLINSKY:  Oh, I'm sorry, confirmation.  What

14   I'd say?

15             MR. UNIDENTIFIED:  Been there/done that sale.

16             MR. SMOLINSKY:  The other issue which is more

17   immediate and will hopefully find its way in the confirmation

18   order involves the treatment of the master sale and purchase

19   agreement itself.

20             Because we're taking the debtor's ongoing activities

21   and moving them into two separate trusts, there are benefits

22   and obligations under the master sale and purchase agreement

23   that are important to both surviving entities, as well as the

24   post effective date debtor.

25             So we are trying to come up with language that would

09-50026-mg   Doc 9791   Filed 03/04/11   Entered 03/14/11 11:50:45   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 153 of 160

Page 153

1  allow the Environmental Response Trust to continue to have the

2  benefits of that agreement, and the obligations to continue,

3  for example, to lease property back to New GM, as the debtors

4  have been doing, and at the same time, allow the GUC Trust to

5  continue to utilize the benefits of the sale agreement in order

6  to do its duties.

7           So we expect over the next few hours to have further

8  conversations on that, but you won't see it, I don't think in

9  the current version of the order that you're looking at.

10           I think that's it, Your Honor.

11           THE COURT:  Okay.  I'll say -- ask first the people

12  in the courtroom.  Is there anybody who filed a written

13  objection who feels that he or she wants to be heard because

14  the designated presenter of any argument didn't do a

15  satisfactory job?

16           No response.  Same question to those on the phone.

17           MS. KARLIN:  This is California.  New York did

18  address the majority of our objections, but I would just add

19  with regard to Wilmington Trust multiple roles, the possible

20  prejudice to the creditors is heightened because the liability

21  for the breach of fiduciary duties excluded from the carve-out

22  in the indemnification privileges of the GUC Trust, I haven't

23  hear that there was a new or revised GUC Trust provided to

24  that, I haven't seen it.

25           If they're not excluded from the plan in Section

MOTORS LIQUIDATION COMPANY, et al.

Page 154

1    12.6, but the GUC Trust says that that governs in version 13.8

2    of the GUC Trust, so I would add that to Ms. Leary's objection.

3              THE COURT:  Thank you for raising that.  My memory is

4    that Ms. Leary raised that issue.  She said she thought it

5    might just be a drafting bug or drafting issue.  And can I ask

6    whether there is an intentional distinction or -- and I think

7    she asked whether the specification of the particular bad acts

8    that was in the plan might also be put into the GUC Trust

9    document, unless I misunderstood her point.

10             MR. WILLIAMS:  Your Honor, Matthew Williams, Gibson,

11   Dunn.  At least from that --

12             THE COURT:  Can you pull the mic closer to you,

13   please, Mr. Williams.

14             MR. WILLIAMS:  I'm sorry, Matthew Williams of Gibson,

15   Dunn.

16             At least from the proposed GUC Trust administrator's

17   point of view, we'd be happy to mirror the two provisions, so

18   the GUC Trust would have similar release and exculpation

19   language.

20             THE COURT:  Anybody have a different view than

21   Mr. Williams just articulated?

22             Okay.  Then I'm going to consider that issue

23   satisfactorily resolved.

24             Okay.  Anything else?  Anybody?  Mr. Karotkin?

25             MR. KAROTKIN:  I think, Your Honor, I think you said

09-50026-mg   Doc 9791   Filed 03/04/11   Entered 03/14/11 11:50:45   Main Document
MOTORS LIQUIDATION COMPANY, et al.
Pg 155 of 160

Page 155

1    at the end of the hearing whether we would have any objection

2    to you exercising the rights under Section 12.12 with respect

3    to exercising certain provisions of the plan, and we have no

4    objection to it.

5              THE COURT:  All right.  Ladies and gentlemen, give --

6    oh, Mr. Jones.

7              MR. JONES:  I'm sorry, Your Honor.  Excuse me.  I

8    just want to make one housekeeping or ministerial note.

9              Your Honor had regarding the approval of the

10   environmental settlements previously ruled on, Your Honor had

11   referenced possibly the submission of an independent order on

12   those.  I just wanted to let the Court know we anticipate if

13   the plan is confirmed, that the confirmation and order itself

14   will include the appropriate findings and holdings embodying

15   Your Honor's rulings.  Thank you.

16             THE COURT:  All right.  Under those circumstances,

17   and with Mr. Karotkin having confirmed that the plan is self-

18   correcting, I can tell you based upon my review of the papers

19   and the oral argument I've heard today, that this plan will be

20   confirmed.  The issue is the extent to which I might require

21   provisions to be modified in any way.

22             I will have a written decision on that, some of these

23   issues warranting written attention as soon as possible.  We're

24   adjourned.

25             MR. SMOLINSKY:  Thank you, Your Honor.  Your Honor,

MOTORS LIQUIDATION COMPANY, et al.

Page 156

1    we do have some other motions, two other motions on the

2    calendar.

3                 THE COURT:  All right.  Anybody who is here strictly

4    on what we've dealt with so far is free to leave, and then I'll

5    hear from Mr. Smolinsky.

6           (Pause)

7                 THE COURT:  Mr. Smolinsky, whenever you're ready.

8                 MR. SMOLINSKY:  Thank you, Your Honor.  Before we get

9    to the two motions, I just want to mention that we have two

10   stipulations with the United States Government.  One with

11   regard to the EPA claims that they've filed, and one with

12   respect to the U.S. Treasury DIP, Debtor-in-Possession

13   financing claims.

14                There are numerous claims.  We've consolidated them

15   down into one, and those stipulations are needed in order to go

16   effective on the plan.  So if it's okay with Your Honor, we'd

17   just like to submit those in connection with confirmation.

18                THE COURT:  Sure.  Provide them to Ms. Blum (ph), who

19   I imagine at this hour will still be here.

20                MR. SMOLINSKY:  We will, Your Honor.

21                The first motion on the calendar is a motion seeking

22   to enlarge the time within to remove actions, consistent with

23   Bankruptcy Rules 9006(b) and 9027.

24                Your Honor, part of the ADR procedure, this is an

25   unusual case, in that there are so many claims that are subject

Page 157

1    to potential removal.  But consistent with the ADR procedures,

2    as we go forward in the post confirmation world, hopefully we

3    need an extension of time in which to remove actions, so that

4    if the mediation is unsuccessful, we can then seek to remove

5    those actions to federal court.

6            THE COURT:  Which is to put these cases in the

7    Southern District of New York before a district judge, hearing

8    car wreck cases?

9            MR. SMOLINSKY:  Well, under the Code, it's either the

10   district court where the case is pending or the Southern

11   District of New York.

12           THE COURT:  Uh-huh.

13           MR. SMOLINSKY:  Whether or not we would come up with

14   some way of dealing with them in the Southern District of New

15   York on a consolidated basis, we haven't really thought about.

16   We've only removed one case recently and that's the Chun Lee

17   (ph), Chun Sang Lee (ph) case.  But as we go forward, so we're

18   seeking at this point, the one year extension, and if we need

19   to come back, we reserve the right to come back once again.

20           THE COURT:  I'm not aware of there being any

21   objection, are there?

22           MR. SMOLINSKY:  There are no objections, Your Honor.

23           THE COURT:  All right.  The cause has plainly been

24   shown for this request and it's granted.

25           MR. SMOLINSKY:  Thank you, Your Honor.  The last

Page 158

1    motion is a motion to assume or assign a contract subject to

2    the occurrence of the effective date to the Environmental

3    Response Trust.

4            We only have two changes to the schedule of contracts

5    to be assumed and assigned; one is an easement and access

6    agreement with Lear Case Simpson (ph), and an easement and

7    access agreement with Red Oak Holdings.  We will notify them by

8    writing that we have excised them from the schedule and

9    contracts to be assigned and assigned.  And other than that,

10   there are no objections to this motion.

11           THE COURT:  Very well.  It's approved.

12           MR. SMOLINSKY:  Thank you, Your Honor.

13           THE COURT:  Does that take care of all of our

14   business for today?

15           MR. SMOLINSKY:  That does, Your Honor.

16           THE COURT:  All right.  We're adjourned, thank you.

17           MR. SMOLINSKY:  Thank you.

18       (Whereupon these proceedings were concluded at 3:04 p.m.)

19

20

21

22

23

24

25

Page 159

1

2                              I N D E X

3                             R U L I N G S

4      DESCRIPTION                                    PAGE      LINE

5

6      Approval of ERT And Priority                   52        17

7      Order Site Settlement

8      Agreement from Both 9019

9      and Regulatory Perspective

10

11     Plan Confirmed                                 153       21

12

13     Motion of Debtors for Entry of an              155       25

14     Order Pursuant to Bankruptcy Rules

15     9006(b) and 9027 Enlarging the

16     Time Within Which to File Notices

17     Of Removal of Related Proceedings

18

19     Motion of Debtors for Entry of an              156       12

20     Order Pursuant to 11 U.S.C. Section

21     365 Authorizing the Debtors to Assume

22     And Assign Certain Contracts to the

23     Environmental Response Trust

24     Conditioned On and as of the

25     Effective Date

Page 160

1

2                     C E R T I F I C A T I O N

3

4    I, Aliza Chodoff, certify that the foregoing transcript is a

5    true and accurate record of the proceedings.

6    Aliza Chodoff    Digitally signed by Aliza Chodoff
                       DN: cn=Aliza Chodoff, c=US, o=Veritext
                       Reason: I am the author of this document
7    _____    Date: 2011.03.04 15:17:53 -05'00'

8    ALIZA CHODOFF

9

10

11   Veritext

12   200 Old Country Road

13   Suite 580

14   Mineola, NY 11501

15

16   Date:  March 4, 2011

17

18

19

20

21

22

23

24

25