HEARING DATE AND TIME: April 12, 2011 at 9:45 a.m.
REPLY DEADLINE: March 14, 2011 at 4:00 p.m.

Steven M. Bierman
Nicholas K. Lagemann
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 839-5300
Facsimile: (212) 839-5599

Kenneth P. Kansa (admitted *pro hac vice*)
Courtney A. Rosen (admitted *pro hac vice*)
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, Illinois 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036

Counsel for Wells Fargo Bank
Northwest, N.A., as Agent to the TPC Lenders

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| MOTORS LIQUIDATION COMPANY., *et al.*, | : | Case No. 09-50026 (REG) |
| f/k/a General Motors Corp., *et al.* | : | |
| | : | |
| Debtors. | : | (Jointly Administered) |

**RESPONSE OF THE TPC LENDERS TO THE BRIEF OF GENERAL MOTORS LLC
IN SUPPORT OF USING A "FAIR MARKET VALUE" VALUATION
<u>STANDARD TO VALUE THE TPC PROPERTY</u>**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ..................................................................................................1

ARGUMENT ...................................................................................................................................3

I.    NEW GM'S PROPOSED METHODOLOGY IGNORES THE ACTUAL
TERMS OF THE SALE ORDER...........................................................................................3

    A.    New GM's Proposed Valuation Standard Is Improper Because it Takes
Section 506 of the Bankruptcy Code Out of the Sale Order.....................................3

    B.    New GM's Reading of the Sale Order Also Ignores the Procedural History
of the 363 Sale ..........................................................................................................5

    C.    New GM's Reading of the Sale Order Also Ignores the Meaning of "Fair
Market Value" in the Bankruptcy Context ...............................................................7

II.    IN THE CONTEXT OF A 363 SALE, SECTION 506 VALUES SECURED
COLLATERAL UNDER A VALUATION STANDARD THAT REFLECTS
THE ACTUAL DISPOSITION OR USE OF SUCH PROPERTY.....................................9

III.    THE REPLACEMENT VALUE STANDARD ARTICULATED IN *RASH* IS
APPLICABLE TO THE SALE OF THE TPC PROPERTY FROM OLD GM TO
NEW GM ..............................................................................................................................11

IV.    THE TPC LENDERS' APPRAISALS APPLY THE STANDARDS OF
SECTION 506 AND *RASH* AND NEW GM'S ARGUMENTS TO THE
CONTRARY ARE, AT BEST, PREMATURE ................................................................13

CONCLUSION................................................................................................................................16

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Associates Commercial Corp. v. Rash*,
520 U.S. 953 (1997)..................................................................................1, 5, 8, 9, 11, 15

*Duncan v. Walker*,
533 U.S. 167 (2001)..........................................................................................................4

*In re Clarkeies Market, L.L.C.*,
Nos. BK. No. 01-10700-JMD, 69, 73, 78, 80, 81, 2002 WL 31317242 (Bankr. D.N.H.
Sept. 26, 2002) ................................................................................................................12

*In re Colfor, Inc.*,
No. 96-60306, 1996 WL 628057 (Bankr. N.D. Ohio Sept. 18, 1996).....................................12

*In re LTV Steel Co.*,
285 B.R. 259 (Bankr. N.D. Ohio 2002) .................................................................................12

*In re Urban Communicators PCS Ltd. P'ship*,
379 B.R. 232 (Bankr. S.D.N.Y. 2007) *aff'd in part, rev'd in part on other grounds*,
394 B.R. 325 (S.D.N.Y. 2008)..........................................................................................10, 13

*In re Winthrop Old Farm Nurseries, Inc.*,
50 F.3d 72 (1st Cir. 1995)...................................................................................................9

*Law Debenture Trust Co. of New York v. Maverick Tube Corp.*,
595 F.3d 458 (2d Cir. 2010)................................................................................................4

*TRW Inc. v. Andrews*, 534 U.S. 19 (2001)...............................................................................4

**OTHER AUTHORITIES**

4 *Collier on Bankruptcy* ¶ 506.03 ...............................................................................7, 13

*The Dictionary of Real Estate Appraisal,*
*Fourth Edition* (Mary E. Geraci ed., Appraisal Institute 2002) ...............................................8

Wells Fargo Bank Northwest, N.A. ("**Wells Fargo**"), as Agent (the "**Agent**"), on behalf of Norddeutsche Landesbank Girozentrale (New York Branch), as Administrator (the "**Administrator**"), and Deutsche Bank, AG, New York Branch, HSBC Bank USA, National Association, ABN AMRO Bank N.V. n/k/a The Royal Bank of Scotland NV, Royal Bank of Canada, Bank of America, N.A., Citicorp USA, Inc., Merrill Lynch Bank USA, and Morgan Stanley Bank, as purchasers (collectively with the Administrator, the "**TPC Lenders**"), respectfully submits this response to the Brief of General Motors LLC ("**New GM**") In Support Of Using A "Fair Market Value" Valuation Standard to Value the TPC Property ("**New GM Opening Brief**"), filed on February 28, 2011 [Docket No. 9494].

## PRELIMINARY STATEMENT

1.     The TPC Lenders demonstrated in their Memorandum of Law Concerning the Proper Valuation Methodology Under the Sale Order and Section 506 of the Bankruptcy Code to Be Applied to the TPC Property (the **"TPC Lenders Opening Brief"**)[1], filed on February 28, 2011 [Docket No. 9493], that the TPC Value must be determined en light of the "disposition or use" of the TPC Property on the Commencement Date. As established in the TPC Lenders Opening Brief, the plain language of the Sale Order, the plain text of Section 506, and case law, including the Supreme Court's decision in *Associates Commercial Corp. v. Rash*, 520 U.S. 953 (1997) and its progeny, compel this result.

2.     New GM, by contrast, argues that the Court should apply a definition based upon a dictionary, which is nowhere to be found in the Sale Order and not tied to Section 506, because (i) the Sale Order contains the term "fair market value," (ii) the Sale Order was negotiated among the parties, and (iii) the 363 Sale was in fact a sale. None of these points, however, are in

---

[1] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the TPC Lenders Opening Brief.

1

dispute and none of them bear upon the appropriate valuation standard under Section 506 of the Bankruptcy Code as required by the actual terms of the Sale Order. A proper analysis of the specific issue before the Court now – what valuation methodology should be applied by the Court to value the TPC Property in order to determine the amount of the TPC Lenders' secured claim – demonstrates that the Court must determine the value of the TPC Property by ascertaining the price that a willing buyer in Old GM's and New GM's trade, business or situation would pay to obtain like property from a willing seller for the same use as the Facilities have at all times been, and are being, used.

3.  In total, New GM's arguments in support of its newly minted valuation methodology are simply wrong. While New GM focuses on the Sale Order's use of the term "fair market value," it entirely ignores the case law interpreting that term in the context of a Section 506 valuation, which makes clear that "fair market value" is the beginning, not the end, of a valuation analysis. Indeed, New GM reads the Sale Order as if the reference therein to Section 506 either did not exist or is entirely superfluous, rather than giving it the meaning it unquestionably requires; namely, that the Court should value the TPC Property with reference to the mandatory factors set forth in Section 506, and the case law interpreting Section 506. New GM further errs in concluding, without support in the statute or case law, that even if the Court should look to Section 506, the term "fair market value" requires the Facilities to be valued as if they were sold to a "hypothetical generic buyer" rather than looking to the disposition that actually occurred. Finally, New GM contends briefly that *Rash* is *per se* inapplicable in the context of a 363 sale, an argument that runs counter to the case law that has considered the issue.

4.  In sum, the result that is required by the actual language of the Sale Order, the plain language of Section 506, and the relevant case law, is that the TPC Value must be

2

measured according to the value to New GM having used the Facilities as part of the General Motors business, and New GM's arguments to the contrary are simply wrong.

## ARGUMENT

**I.    NEW GM'S PROPOSED METHODOLOGY IGNORES THE ACTUAL TERMS OF THE SALE ORDER**

5.    There is no dispute that the Sale Order provides that the "TPC Lenders shall have an allowed secured claim in a total amount equal to the fair market value of the TPC Property on the Commencement Date under Section 506 of the Bankruptcy Code…." Sale Order ¶ 36; New GM Opening Brief ¶ 1.  It is also uncontested that "[t]he language used in the Sale Order was negotiated by the TPC Lenders to resolve their objection to the sale of the TPC Property by Old GM [] to New GM" and that the "Court approved the agreed-upon terms of the Sale Order in July, 2009."  New GM Opening Brief ¶ 2.  The TPC Lenders further agree that all parties are "bound by the provisions of the Sale Order."  New GM Opening Brief ¶¶ 2, 26.  These facts are self-evident and in any event, support the TPC Lenders' arguments and refute New GM's remaining erroneous contentions that Section 506(a) should either be disregarded, or its plain language ignored, in determining the "fair market value . . . under section 506" of the TPC Property.

**A.    New GM's Proposed Valuation Standard Is Improper Because it Takes Section 506 of the Bankruptcy Code Out of the Sale Order**

6.    In purporting to focus only on the term "fair market value," New GM actually ignores the "straight-forward, negotiated and Court-approved language" of the Sale Order (New GM Opening Brief at ¶ 3), which provides that the TPC Value shall be "equal to the fair market value of the TPC Property on the Commencement Date *under section 506 of the Bankruptcy Code.*"  Sale Order ¶ 36 (emphasis added).  Under the plain language of the provision, read in its entirety, the "fair market value" must be determined "under section 506 of the Bankruptcy

3

Code." New GM, however, asks the Court to define "fair market value" according to a dictionary definition having nothing to do with the Sale Order. *See* New GM Opening Brief ¶¶ 28-29. New GM goes on to contend that the Court should either expressly or impliedly ignore Section 506 in conducting this analysis, by arguing that the circumstances of the 363 Sale are irrelevant to the determination of the TPC Value. Nothing in the Sale Order supports any of these assertions.

7. Simply stated, the Court's Order must be applied as written. However, New GM's current approach willfully ignores the phrase "under section 506 of the Bankruptcy Code" and renders these words in the Sale Order superfluous. There is no support for such a reading of this Court's order, and, indeed, the law is clearly to the contrary. *See, e.g., TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) ("It is 'a cardinal principal of statutory construction' that 'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.'") (quoting *Duncan v. Walker*, 533 U.S. 167, 174 (2001)); *Law Debenture Trust Co. of New York v. Maverick Tube Corp.*, 595 F.3d 458, 468 (2d Cir. 2010) ("The court should read the integrated contract 'as a whole to ensure that undue emphasis is not placed on particular words and phrases,' . . . 'and to safeguard against adopting an interpretation that would render any individual provision superfluous.'") (citations omitted).

8. The TPC Lenders' agreement to the language of the Sale Order was not an agreement to New GM's strained, unsupported reading of that order, as New GM implies it was. *See* New GM Opening Brief ¶ 25 (TPC Lenders "agreed to the language that was included in the Sale Order."). The TPC Lenders, Old GM, New GM, and the Creditors' Committee negotiated language for the Sale Order providing that the TPC Value would be fixed according to the TPC Property's fair market value *under Section 506 of the Bankruptcy Code.* As a matter of law, and

4

the plain language of the Sale Order and the statute, that value must take the actual disposition or use of the Facilities into account. The TPC Lenders agreed to that in the Sale Order and apply that analysis in their valuation; New GM now seeks to change the rules of the game to its benefit nearly two years after the Sale Order was entered.

      **B.    New GM's Reading of the Sale Order Also Ignores the Procedural History of the 363 Sale**

      9.    Even if the actual language of the Sale Order were not clear, the procedural history of the Sale Order demonstrates that the parties always understood that fair market value under Section 506 required measuring the TPC Value according to its actual disposition or use. As noted in the TPC Lenders' opening brief, in the context of seeking approval for the 363 Sale, the Debtors expressly cited *Rash* and stated that "'the proposed disposition or use of the collateral is of paramount importance to the valuation question.'" Omnibus Reply of the Debtors to Objections to Debtors' Motion Pursuant to 11 U.S.C. §§ 105, 363(B), (F), (K), and (M), and 365 and Fed. R. Bankr. P. 2002, 6004, and 6006, to Approve (A) the Sale Pursuant to the Master Sale and Purchase Agreement with Vehicle Acquisition Holdings LLC, a U.S. Treasury-Sponsored Purchaser, Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (B) The Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (C) Other Relief ("**Omnibus Reply**"), filed on June 26, 2009 ¶ 89 n. 19 [Docket No. 2645] (*citing Rash*, 520 U.S. at 962) (internal quotations omitted). The United States joined in the Omnibus Reply – and its assertion above – completely. *See* The United States of America's Statement in Support of Debtors' Motion to Approve (A) the Sale Pursuant to the Master Sale and Purchase Agreement with Vehicle Acquisition Holdings, LLC, a U.S. Treasury-Sponsored Purchaser, Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (B) the Assumption and

5

Assignment of Certain Executory Contracts and Other Leases; and (C) Other Relief (the "**Treasury Statement**"), filed on June 26, 2009 [Docket No. 2646] ¶ 2.

10.  In addition to this clear statement that under Section 506, the disposition or use is "of paramount importance" to the valuation of the Facilities, the procedural history also demonstrates that all parties understood that the Facilities' value to creditors, such as the TPC Lenders, would be protected and enhanced by allowing their continued operation by New GM. As discussed in the TPC Lenders' opening brief, the Debtors, with the support of New GM, repeatedly represented to this Court that the 363 Sale was necessary to enable the Facilities to continue to be operated and preserve their going concern value. *See* TPC Lenders Opening Brief ¶¶ 12-13. Additionally, the Debtors also represented to the Court that permitting the 363 Sale to move forward would result in greater recoveries for creditors, like the TPC Lenders, than would have resulted from a sale to unknown parties as of the Commencement Date. *See id.* ¶¶ 14-15. The United States of America, as New GM's sponsor, also repeatedly represented that the 363 Sale would preserve the value of the General Motors business for the benefit of all parties. *See, e.g.*, Treasury Statement ¶¶ 25-29 (describing intense, arm's length negotiations concerning purchase and sale of Old GM's assets and stating that the 363 Sale would "avoid GM's liquidation").

11.  Under New GM's current approach, the value of Facilities would not be preserved based upon their continued use, but instead would be measured as if the 363 Sale to and continued use by New GM did not happen and as if the Facilities were sold onto the open market to parties who would not have continued to use them in the General Motors business. That is not what occurred, that is not what the Sale Order prescribes, and that is not what the law requires.

12. In sum, the record thus reflects that the Sale Order was approved based upon representations that it would ensure that the facilities that were being sold to New GM, including the TPC Property, would retain their value through their continued operation and use as part of the General Motors business. Moreover, the Sale Order was designed to ensure that the value of the Facilities, as going concerns through their continued operation in the General Motors business, would be preserved for all creditors, including the TPC Lenders. *See* TPC Lenders Opening Brief ¶ 18 (*citing* Findings at 2, 3, 42-43). Accordingly, even beyond the actual language of the Sale Order, the history of the Sale Order lends further support for the proposition that the value of the TPC Property must reflect its value to New GM based upon the continued use and operation of the Facilities.

**C.   New GM's Reading of the Sale Order Also Ignores the Meaning of "Fair Market Value" in the Bankruptcy Context**

13. Ignoring the full language and history of the Sale Order, New GM relies upon a definition of "fair market value" from *The Dictionary of Real Estate Appraisal*, and argues that by having the Facilities appraised under the definition, the TPC Lenders intended for that definition to apply to its secured claim. New GM Opening Brief ¶ 28. However, as discussed in the TPC Lenders' opening brief, in the bankruptcy context, invocation of the term "fair market value . . . reveals relatively little" because "[i]n virtually every case, the determination of fair market value will depend on the particular market and means selected to gauge the value of the item in question." 4 *Collier on Bankruptcy*, ¶ 506.03[6] (16th ed. 2010); TPC Lenders Opening Brief ¶ 44. In other words, *Collier's* makes clear that recitation of the term "fair market value" is not the valuation standard in and of itself, as New GM maintains. Instead, the Bankruptcy Court and the parties must determine the relevant market and means to gauge the value of the TPC Property. The TPC Lenders' analysis does this; New GM's does not.

7

14. Moreover, by its terms, the Sale Order does not provide that the TPC Value "shall be equal to the fair market value" according to a dictionary, but, instead, that the TPC Value "shall be equal to the fair market value of the TPC Property . . . *under section 506 of the Bankruptcy Code*." Sale Order ¶ 36. Simply stated, what the TPC Lenders bargained for, and what the Court approved, in the Sale Order was valuation under Section 506, not according to a dictionary.

15. New GM also claims the fact that the TPC Lenders' appraisals include both a real estate market value and a "use value" or "value in use" standard evidences that the TPC Lenders adopted the dictionary definition as opposed to the statutory standard. *See* New GM Opening Brief ¶ 29. To the contrary, this refutes New GM's argument as these value reflect the actual use of the Facilities as required by Section 506 and the Supreme Court's decision in *Rash*.

16. Consistent with the replacement value standard articulated in *Rash*, "value in use" and "use value" recognizes the value of a facility's continued use to its owner. For example, the "value in use" is "'[t]he value a specific property has to a specific person or specific firm as opposed to the value to persons or the market in general. . . . *The value in use to a specific firm may be the value of the plant as part of an integrated multiplant operation*." *The Dictionary of Real Estate Appraisal, Fourth Edition* 306 (Mary E. Geraci ed., Appraisal Institute 2002) (emphasis added). Similarly, "use value" is "*the value a specific property has for a specific use*; may be the highest and best use of the property or some other use specified as a condition of the appraisal." *Id.* at 303 (emphasis added). Thus, these standards establish a valuation methodology that recognizes the value of the particular property according to its use and, correspondingly, what that party would need to pay to acquire a similar asset of like condition. This is the standard articulated in and adopted by the replacement value standard of *Rash*. *See*

8

520 U.S. at 963 ("[T]he replacement-value standard accurately gauges the debtor's 'use' of the property. . . . Th[e] actual use, rather than a foreclose sale that will not take place, is the proper guide under a prescription hinged to the property's 'disposition or use.'") (quoting *In re Winthrop Old Farm Nurseries, Inc.*, 50 F.3d 72, 75 (1st Cir. 1995)).[2]

17.  In sum, the TPC Lenders' appraisals include an appraised value that measures the property according to its actual disposition or use. That is the standard prescribed by the Sale Order through its express reference to measuring the "fair market value . . . under section 506." Indeed, for the reasons previously explained in the TPC Lenders' opening brief, the replacement value standard of *Rash* is the fair market value under Section 506, *see* TPC Lenders Opening Brief ¶¶ 43-46, and that is the valuation methodology required by the express terms of the Sale Order.

II.  **IN THE CONTEXT OF A 363 SALE, SECTION 506 VALUES SECURED COLLATERAL UNDER A VALUATION STANDARD THAT REFLECTS THE ACTUAL DISPOSITION OR USE OF SUCH PROPERTY**

18.  New GM's opening brief appears to take the position that the TPC Lenders are not acknowledging there was a sale of the Facilities to New GM. *See* New GM Opening Brief ¶¶ 35-36. Again, New GM is wrong. *See, e.g.,* TPC Lenders Opening Brief ¶ 1. The fact that the Facilities were sold to New GM as part of the 363 Sale, however, does not alter the fact that under Section 506, the value of the Facilities must be measured according to their actual use and according to the replacement value standard of *Rash*.

19.  The parties agree that the "purpose of the valuation" is to determine the extent to which the TPC Lenders, in satisfaction of their secured claims, are entitled to recover from the

---

[2] Moreover, the Supreme Court in *Rash* made clear that the replacement value standard was "consistent with the Ninth Circuit's understanding of fair market value; by replacement value, we mean the price a willing buyer in the debtor's trade, business or situation would pay a willing seller to obtain property of like age and condition." *Rash*, 520 U.S. at 959 n.2 (citation omitted).

9

escrow account established under the Sale Order, cash in an amount equal to the value of the TPC Property. *See* TPC Lenders Opening Brief ¶ 34; New GM Opening Brief ¶ 33; *see also In re Urban Communicators PCS Ltd. P'ship*, 379 B.R. 232, 241 (Bankr. S.D.N.Y. 2007) (Gerber, J.), *aff'd in part, rev'd in part on other grounds*, 394 B.R. 325 (S.D.N.Y. 2008). However, contrary to the plain language of Section 506 and the Sale Order, New GM ignores the statutory requirement that valuation must measure the actual "disposition or use" under Section 506.

20. In particular, New GM argues that the "use" of the property is "not important" and claims "[w]hat is important is the 'disposition' of the TPC Property. … [and i]n a sale context, such as here, it is clear that the well-established 'fair market value' methodology must be utilized to value the TPC Property." New GM Opening Brief ¶ 37. New GM further contends that as a result of its purported application of this methodology, the value of the TPC Property must be determined not in light of the sale that actually occurred, but as if a hypothetical sale to a "hypothetical generic buyer" occurred. New GM Opening Brief ¶ 21. However, New GM cites no authority for these propositions and, as discussed below, the law is to the contrary.

21. As discussed in the TPC Lenders' opening brief, *see* TPC Lenders Opening Brief ¶¶ 35-36, on the Commencement Date, there is no dispute that Old GM was operating the Facilities as integral parts of the General Motors Business. Additionally, there is no dispute that on that date, Old GM announced its intention to sell the Facilities to New GM as part of a going-concern sale. *See, e.g.,* Henderson Aff. ¶ 5; 363 Sale Motion ¶ 87. At the same time, New GM, intended on the Commencement Date to acquire the Facilities and continue operating them as part of the General Motors Business. *See* Henderson Aff. ¶ 74; 363 Sale Motion ¶ 2.

22. As of the Commencement Date, the Facilities were being used as part of the General Motors business, and both Old GM and New GM intended for the Facilities to continue to be used in that business. Since the Commencement Date, the evidence clearly indicates that the Facilities have been used as integral parts of the General Motors business. The Facilities have continued to employ significant numbers of workers, the General Motors business has received significant benefits (including hundreds of millions of dollars in government support at the Maryland Facility and significant tax benefits at the Tennessee Facility) for their continued operation and expansion, and New GM has invested many millions of dollars into expanding the Maryland Facility to continue its push into "green" automobiles. *See* TPC Lenders Opening Brief ¶¶ 20-30. All relevant parties (*e.g.,* Old GM, New GM, the United States, and the Creditors' Committee) intended not only this result at all times, but also contended at all times that this result would preserve the value of General Motors and its assets.

23. Accordingly, there can be no legitimate dispute that, as of the Commencement Date, the proposed "disposition or use" of the Facilities under Section 506 was a sale of the Facilities to New GM, which would continue to use the Facilities in the continued operation of General Motors. This is the actual proposed disposition or use that existed on the Commencement Date, not some hypothetical sale to an unknown party that did not occur. *See Rash*, 520 U.S. at 963 ("That actual use, rather than a foreclosure sale that will not take place, is the proper guide under a prescription hinged to the property's 'disposition or use.'").

### III. THE REPLACEMENT VALUE STANDARD ARTICULATED IN *RASH* IS APPLICABLE TO THE SALE OF THE TPC PROPERTY FROM OLD GM TO NEW GM

24. In their opening brief, the TPC Lenders cited numerous cases making clear that a valuation under Section 506 requires the Court to measure the value of the collateral according to its actual disposition or use. *See* TPC Lenders Opening Brief ¶ 33. By contrast, in its opening

11

brief, New GM fails to cite even a single case for its argument that the TPC Property should be valued in accordance with *The Dictionary of Real Estate Appraisal's* definition of "fair market value." This is because the TPC Property should not be valued according to a dictionary definition. Instead, the Court should follow clear statutory and case law and value the TPC Property at its replacement value according to Section 506 and *Rash*.

25.     Unable to base its argument on the actual language of the Sale Order, the statute or case law, New GM is left to argue that because there was a "sale" of the Facilities, "[t]he TPC Lenders' heavy reliance on *Rash* is entirely misplaced."[3] *See* New GM Opening Brief ¶ 38. In short, New GM argues that *Rash* is *per se* inapplicable in the context of a 363 sale. *See id.* ¶ 39. New GM is wrong.

26.     As a matter of law, "nothing in the *Rash* [] decision[], or section 506(a), limits the application of the 'proposed disposition or use' of collateral to the debtor's proposed use or disposition." *In re Clarkeies Market, L.L.C.*, Nos. BK. No. 01-10700-JMD, 69, 73, 78, 80, 81, 2002 WL 31317242 (Bankr. D.N.H. Sept. 26, 2002) (measuring value of collateral transferred from a debtor to a creditor according to *Rash* and applying a going concern valuation). Indeed, as noted in the TPC Lenders' opening brief, *see* TPC Lenders Opening Brief ¶ 41, courts have repeatedly applied a value that recognizes the continued use of the facilities in the context of a 363 Sale. *See, e.g.*, *In re LTV Steel Co., Inc.*, 285 B.R. 259 (Bankr. N.D. Ohio 2002) (citing *Rash* and applying going concern value to assets transferred in bulk through 363 sale); *In re Colfor, Inc.*, No. 96-60306, 1996 WL 628057, at *2 (Bankr. N.D. Ohio Sept. 18, 1996) (applying a going-concern valuation and stating that "[i]mportant to the court, both in its approval of the

---

[3] Indeed, as noted above and discussed in the TPC Lenders' opening brief, in seeking approval for the 363 Sale, the Debtors expressly cited *Rash* for the proposition that "the 'proposed disposition or use' of the collateral is of paramount importance to the valuation question.'" TPC Lenders Opening Brief ¶ 7 (citing Omnibus Reply ¶ 89 n. 19).

12

sale and this consideration of the disposition of the proceeds of that sale is the fact that the assets were first preserved and then disposed of on a going concern basis."). These cases make clear that the logic of *Rash*, and its basis in the text of Section 506, applies equally to a situation where a debtor sells all of its assets as part of a going-concern sale of its business as to a retention by a debtor of collateral.

27. The only legitimate alternative to this valuation methodology would be to fix the value of the TPC Property at the actual consideration received by the estate in connection with the 363 Sale. *See* 4 *Collier on Bankruptcy* ¶ 506.03[6][b] (16th ed. 2010); *accord Urban Communicators*, 394 B.R. at 336 (Gerber, J.). However, both at the time of the 363 Sale through to today, neither the Debtors or New GM have disclosed what portion of the consideration paid as part of the 363 Sale is attributable to the Facilities.

28. In any event, New GM's opening brief fails to cite any authority for the proposition that the value of collateral that is sold as part of a 363 sale should be set according to a hypothetical sale to an unknown entity without regard to the collateral's actual disposition or use. And, as discussed above, the law is to the contrary.

### IV. THE TPC LENDERS' APPRAISALS APPLY THE STANDARDS OF SECTION 506 AND *RASH* AND NEW GM'S ARGUMENTS TO THE CONTRARY ARE, AT BEST, PREMATURE

29. Finally, New GM claims that the TPC Lenders' appraisals are "not at all akin to the 'replacement value' (or 'fair market value') standard set forth in *Rash*." New GM Opening Brief ¶ 41. Again, New GM is wrong and its argument disingenuous. The sole question before the Court is the valuation methodology prescribed by the terms of the Sale Order, not which parties' appraisals are better.

30. As an initial matter, for the reasons previously discussed in the TPC Lenders' opening brief, the TPC Lenders believe, and will establish at the valuation hearing, that their

13

appraisals are consistent with and clearly "akin" to the standards prescribed by Section 506 and *Rash*. *See* TPC Lenders Opening Brief ¶ 5 n. 3. However, that issue will be for the Court to decide at the valuation hearing, not here.

31. New GM requested that this Court defer proceeding towards the valuation hearing requested by the TPC Lenders in order for the Court to determine "[t]he threshold issue" of "the appropriate valuation methodology to use to determine the value of the TPC Property." Response by General Motors LLC to Motion of the TPC Lenders for an Entry of an Order (I) Initiating Valuation Proceedings in Accordance with the Sale Order, and (II) Establishing a Schedule with Respect to the Valuation Proceedings, dated February 3, 2011 ¶ 3 [Docket No. 9080]. As the Debtors noted, this request sought to "bifurcate this matter by first determining the threshold legal issue of which valuation methodology to employ." Debtors' Response to Motion of TPC Lenders for Entry of Order (I) Initiating Valuation Proceedings in Accordance with the Sale Order, and (II) Establishing a Schedule with Respect to the Valuation Proceedings, dated February 4, 2011 ¶ 5 [Docket No. 9091]. New GM cannot now unify the very hearing it sought – over the TPC Lenders' objection – to bifurcate in the first place.

32. Instead, while the TPC Lenders will prove at the valuation hearing that their appraisals accurately measure the value of the Facilities under Section 506, as required by the Sale Order, the issue of whose appraisals are better is an issue for the valuation hearing. The legal issue ripe for decision now is whether the provisions of the Sale Order should be read by their express terms which require that the TPC Value shall be fixed in an amount "equal to the fair market value of the TPC Property on the Commencement Date *under section 506 of the Bankruptcy Code* . . ." Sale Order ¶ 36. As explained in the TPC Lenders' opening brief and in this response to New GM's opening brief, under Section 506 of the Bankruptcy Code, the

14

appropriate valuation methodology must measure the actual disposition or use of the TPC Property and, under the Supreme Court's decision in *Rash*, must value the property according to "the price a willing buyer in the debtor's trade, business or situation would pay to obtain like property from a willing seller," and, accordingly, sets the value as "the cost the debtor would incur to obtain a like asset for the same 'proposed . . . use." *Rash*, 520 U.S. at 960 and 965.

## **CONCLUSION**

For the foregoing reasons, Wells Fargo, as Agent to the TPC Lenders, respectfully submits that the TPC Value must be established by the replacement value required by the Supreme Court's decision in *Rash* and Section 506 of the Bankruptcy Code.

Dated: New York, New York  
      March 14, 2011

Respectfully submitted,

/s/ *Steven M. Bierman*  
SIDLEY AUSTIN LLP  
Steven M. Bierman  
Nicholas K. Lagemann  
787 Seventh Avenue  
New York, New York 10019  
Telephone: (212) 839-5300  
Facsimile: (212) 839-5599  
Email:   sbierman@sidley.com  
             nlagemann@sidley.com

-     and    -

SIDLEY AUSTIN LLP  
Kenneth P. Kansa (admitted *pro hac vice*)  
Courtney A. Rosen (admitted *pro hac vice*)  
One South Dearborn  
Chicago, Illinois 60603  
Telephone: (312) 853-7000  
Facsimile: (312) 853-7036  
Email:   kkansa@sidley.com  
             crosen@sidley.com

*Counsel for Wells Fargo Bank Northwest, N.A., as Agent to the TPC Lenders*