HEARING DATE AND TIME: April 14, 2011 at 9:45 a.m.
OBJECTION DEADLINE: February 28, 2011 at 4:00 p.m.
REPLY DEADLINE: March 14, 2011 at 4:00 p.m.

KING & SPALDING LLP
1185 Avenue of the Americas
New York, New York 10036
Telephone: (212) 556-2100
Facsimile: (212) 556-2222
Arthur Steinberg
H. Slayton Dabney
Scott Davidson

*Counsel to General Motors LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| **MOTORS LIQUIDATION COMPANY,** *et al.,* | : | Case No.: 09-50026 (REG) |
| f/k/a General Motors Corp., *et al.* | : | |
| | : | (Jointly Administered) |
| Debtors. | : | |

------------------------------------------------------------x

**REPLY MEMORANDUM OF LAW OF GENERAL MOTORS LLC
(I) IN RESPONSE TO THE MEMORANDUM OF LAW OF THE TPC
LENDERS CONCERNING THE PROPER VALUATION METHODOLOGY
UNDER THE SALE ORDER AND SECTION 506 OF THE BANKRUPTCY
CODE TO BE APPLIED TO THE TPC PROPERTY, AND (II) IN FURTHER
SUPPORT OF USING A "FAIR MARKET VALUE" VALUATION
STANDARD TO VALUE THE TPC PROPERTY**

## <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ................................................................................................ 1

REPLY .................................................................................................................................. 5

A.   New GM Did Not Value the TPC Property Utilizing a "Liquidation
Value" Standard ................................................................................................. 5

B.   "Fair Market Value" has a Known and Identifiable Meaning ................................ 7

C.   The TPC Property was Sold by Old GM to New GM, a Separate and
Distinct Entity from Old GM ................................................................................ 10

D.   The TPC Lenders' Reliance on *Rash* is Misplaced ............................................. 13

E.   New GM Will Not Receive a Windfall if the "Fair Market Value"
Standard is Utilized to Value the TPC Property .................................................... 16

i

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Alberts v. HCA Inc. (In re Greater Southeast Community Hospital Corp. I)*,
   Adv. Proc. No. 04-10366, 2008 WL 2037592 (Bankr. D. D.C. May 12, 2008).....................10

*Associated Commercial Corp. v. Rash*,
   520 U.S. 953 (1997)..........................................................................................1, 3, 4, 13, 14, 15

*Butner v. United States*,
   440 U.S. 48 (1979)..........................................................................................................17

*Cathcart v. Wachovia Mortgage*,
   No. 1:04-CV-1236-JDT-TAB, 2005 WL 756208 (S.D. Ind. Feb. 22, 2005) .........................15

*In re Bell*,
   304 B.R. 878 (Bankr. N.D. Ind. 2003)...............................................................................14

*In re Chateaugay Corp.*,
   154 B.R. 29 (Bankr. S.D.N.Y. 1993) .................................................................................13

*In re Coker*,
   973 F.2d 258 (4th Cir. 1992) ..................................................................................13, 15, 17

*In re Colfor, Inc.*,
   No. 96-60306, 1996 WL 628057 (Bankr. N.D. Ohio Sept. 18, 1996)......................................9

*In re Fiberglass Industries, Inc.*,
   74 B.R. 738 (Bankr. N.D.N.Y. 1987) ............................................................................13, 17

*In re Freudenheim*,
   189 B.R. 279 (Bankr. W.D.N.Y. 1995) ..........................................................................13, 15

*In re Gallup*,
   194 B.R. 851 (Bankr. W.D. Mo. 1996)...............................................................................10

*In re LTV Steel Company, Inc.*,
   285 B.R. 259 (Bankr. N.D. Ohio) .......................................................................................9

*In re Olio Dental, Inc.*,
   No. 08-10305-BHL-11, 2009 WL 1475273 (Bankr. S.D. Ind. May 26, 2009) .........................8

*In re Perez*,
   318 B.R. 742 (Bankr. M.D. Fla. 2005) ...............................................................................15

ii

*In re R & S Vinyl Products Group, L.L.C.*,
    291 B.R. 685 (Bankr. W.D. Pa. 2003) ...................................................................9

*In re TennOhio Transportation Co.*,
    247 B.R. 715 (Bankr. S.D. Ohio 2000)..................................................................9

*In re Winthrop Old Farm Nurseries, Inc.*,
    50 F.3d 72 (1st Cir. 1995)....................................................................................15

*Lincoln National Life Insurance Co. v. Craddock-Terry Shoe Corp. (In re Craddock-Terry Shoe Corp.)*,
    98 B.R. 250 (Bankr. W.D. Va. 1988) ...................................................................10

## Statutes

11 U.S.C. § 101(31) ...................................................................................................11

11 U.S.C. § 363...............................................................................................4, 11, 16

11 U.S.C. § 506.................................................................................8, 9, 10, 14, 15

11 U.S.C. § 1325(a)(5)(B) ........................................................................................15

## Other Authorities

55 Federal Register 34696, August 24, 1990, as amended at 57 Federal Register 12202, April 19, 1992 ....................................................................................................6

59 Federal Register 29499, June 7, 1994 .....................................................................6

Appraisal Institute, *The Dictionary of Real Estate Appraisal*, 4th ed. (Chicago:  Appraisal Institute, 2002) .....................................................................................................6

Office of Comptroller of the Currency (OCC), 12 CFR Part 34, Subpart C - Appraisals, 34.42  (g)................................................................................................................6

Office of Thrift Supervision (OTS), 12 CFR 564.2 (g) ................................................6

*The Appraisal of Real Estate*, Thirteenth Edition, Appraisal Institute, 2008 .................5

iii

TO THE HONORABLE ROBERT E. GERBER,
UNITED STATES BANKRUPTCY JUDGE:

General Motors LLC (f/k/a General Motors Company) ("**New GM**"), by and through its undersigned counsel, hereby submits this reply memorandum of law (i) in response to the *Memorandum of Law of the TPC Lenders Concerning the Proper Valuation Methodology Under the Sale Order and Section 506 of the Bankruptcy Code to be Applied to the TPC Property*, dated February 28, 2011 [Docket No. 9493] ("**TPC Lenders Brief**") filed by the TPC Lenders;[1] and (ii) in further support of using a "fair market value" standard to value the TPC Property.

### PRELIMINARY STATEMENT

1.      The Sale Order unambiguously provides that "fair market value" is the standard by which the TPC Property is to be valued.  The arguments in the TPC Lenders Brief essentially disregard the Sale Order, and are also premised on the following three fundamental misconceptions: (i) the appraisals[2] prepared by New GM valued the TPC Property as if the properties were foreclosed upon or sold through a liquidation sale; (ii) there was no sale from Old GM to New GM, but a continuation of Old GM's business; and (iii) the United States Supreme Court's decision in *Associated Commercial Corp. v. Rash*, 520 U.S. 953 (1997) -- if it is applicable here -- somehow mandates that a valuation standard other than "fair market value" be used to value the TPC Property.  Each of these misconceptions is unquestionably wrong, and, as demonstrated below, they are the underpinnings of the TPC Lenders' meritless arguments.

2.      Once these misconceptions are properly discarded, it is clear that the only valuation standard that should be used to value the TPC Property is the "fair market value"

---

[1]   Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the *Brief of General Motors LLC in Support of Using a "Fair Market Value" Valuation Standard to Value the TPC Property*, dated February 28, 2011 [Docket No. 9494] ("**New GM's Brief**").

[2]   New GM, with the consent of the TPC Lenders and the Debtors, filed an application seeking to file New GM's appraisals and the TPC Lenders' appraisals under seal.  The Court entered an Order on March 14, 2011 [Docket No. 9792] granting New GM leave to file the appraisals under seal.

standard, which in any event is required by the express terms of the Sale Order negotiated and approved by the TPC Lenders.  The TPC Lenders have advanced no valid argument that would warrant the use of a different standard.   In fact, the TPC Lenders have already prepared appraisals of the TPC Property utilizing a "fair market value" standard; so too has New GM.  In short, the TPC Lenders' desire to "inflate" their secured claim is not a legitimate basis for using another valuation standard that is contrary to both the Sale Order and the Bankruptcy Code.

3.     The TPC Lenders' misconceptions should be rejected as contrary to the facts and/or the law of this case for the following reasons.  *First*, the TPC Lenders assert -- with no citation to anything -- that New GM used a "liquidation value" standard to value the TPC Property.  *See, e.g.,* TPC Lenders Brief ¶ 4 ("Under New GM's theory, the TPC Value would be merely a purported fair market value that might have been obtained if, instead of being sold as a part of a going concern for continued use in the General Motors business, the TPC Property had been *foreclosed upon* and sold into the market to any party other than one engaged in the manufacture of automobiles.")(emphasis added); ¶ 47 ("This logic could not apply more clearly in this circumstance, where the two Facilities have been retained as part of the General Motors business, yet New GM seeks to ascribe an artificially low valuation by contending – without any support in bankruptcy case law – *that "fair market value" is synonymous with liquidation value*.  . . .  Any argument that the "fair market value" of the two facilities *in that context is liquidation value* is self-evidently wrong and should be rejected." (emphasis added)).

4.     New GM agrees with the TPC Lenders that using a "liquidation value" standard in this context would be inappropriate.  What the TPC Lenders are simply wrong about, however, is that New GM never used a "liquidation value" standard to value the TPC Property, but used a "fair market value" standard -- a standard demonstrably different than "liquidation

2

value." Moreover, the standard used by New GM was the exact same standard -- with the same definition -- used by the TPC Lenders in their appraisals when they valued the TPC Property under a "fair market value" standard. For the TPC Lenders to contend that New GM used a "liquidation value" standard to value the TPC Property is simply wrong.

5. **Second**, the TPC Lenders continue to assert that the **Debtors** somehow **retained the use** of the TPC Property after approval of the 363 Sale Transaction, arguing essentially that Old GM and New GM are the same entity. This assertion is obviously wrong. It is clear that Old GM and New GM are completely separate entities and that they have been treated as completely separate entities since the formation of New GM in June, 2009. It is further indisputable that Old GM disposed of its assets -- including the TPC Property -- by **selling** them to New GM. Once the sale was complete, the Debtors no longer used any of the TPC Property. This conclusion is mandated by the Sale Order, which provides that the TPC Property is to be valued as of the Commencement Date of these bankruptcy cases, not thereafter. Once this misconception of the TPC Lenders is laid to rest, a substantial portion of the TPC Lenders Brief -- which focuses on the specific "use" of the TPC Property as always being "retained" by New GM -- becomes demonstrably irrelevant to the matter at hand.

6. **Third**, *Rash* is not relevant here. As explained in the New GM Brief, *Rash* was a Chapter 13 case that concerned a cram-down dispute regarding the value of a truck that the debtor was retaining and continuing to use. In that specific context -- where a debtor is retaining and continuing to use a secured creditor's collateral -- the Supreme Court found that the appropriate valuation method to use when fixing a secured claim is not liquidation value, but "replacement" value. Here, the Debtors sold the TPC Property to New GM; the Debtors did not retain the property or continue to use it after the sale. Moreover, there is no cram-down dispute

3

at issue here; this matter arises in the context of a sale of the TPC Property pursuant to Section 363 of the Bankruptcy Code. The holding of *Rash* is, therefore, irrelevant to this dispute.

7. Nonetheless, even if *Rash* is somehow relevant in this context, it supports New GM's position that "fair market value" is the appropriate standard to value the TPC Property because the Supreme Court equated "replacement value" standard with a "fair market value" standard; a finding the TPC Lenders now acknowledge. *See* TPC Lenders Brief, ¶ 44.

8. Once all of the TPC Lenders' misstatements are stripped away, and the facts of this case are accurately applied to the matter at hand, it is clear that the only appropriate valuation standard to use to value the TPC Property is the "fair market value" standard. This is what is mandated by the Sale Order and the Bankruptcy Code. Valuing the TPC Property in this manner will not -- as argued by the TPC Lenders -- provide New GM with a "windfall." Instead, it appropriately gives effect to the bargain struck by all of the parties (including the TPC Lenders) when negotiating and approving the terms of the Sale Order. The TPC Lenders are bound by their past actions and by the applicable provisions of the final, non-appealable Sale Order.

9. In light of the foregoing, the arguments made in the New GM Brief and the arguments made below, the only appropriate valuation standard that should be used to value the TPC Property is the "fair market value" standard.

## <u>REPLY</u>

A.    **New GM Did Not Value the TPC Property
      Utilizing a "Liquidation Value" Standard**

10.    Contrary to the TPC Lenders' assertions, New GM never valued the TPC

Property utilizing a "liquidation value" standard; it valued the TPC Property utilizing a "fair

market value" standard.  A review of New GM's appraisals confirms that "liquidation value" is

never used when discussing the value of the TPC Property.[3]

11.    "Liquidation value" and "fair market value" have completely different meanings.

As defined in the New GM Appraisals, "liquidation value" is defined as

> The most probable price which a specified interest in real property
> is likely to bring under all of the following conditions:
> 1) Consummation of a sale will occur within a severely limited
> future marketing period specified by the client; 2) The actual
> market conditions currently prevailing are those to which the
> appraised property interest is subject; 3) The buyer is acting
> prudently and knowledgeably; 4) The seller is under extreme
> compulsion to sell; 5) The buyer is typically motivated; 6) The
> buyer is acting in what he or she considers his or her best interests;
> 7) A limited marketing effort and time will be allowed for the
> completion of a sale; 8) Payment will be made in cash in U.S.
> dollars or in terms of financial arrangements comparable thereto;
> and 9) The price represents the normal consideration for the
> property sold, unaffected by special or creative financing or sales
> concessions granted by anyone associated with the sale.

New GM Appraisal Addendum (citing to *The Appraisal of Real Estate*, Thirteenth Edition,

Appraisal Institute, 2008).

12.    In contrast, the New GM Appraisals, themselves, specifically state that the

"purpose of this appraisal is to estimate the market value of the subject property."  *See* New GM

Appraisals, p. 1.  Both appraisals then state as follows:

---

[3]    The only reference to "liquidation value" in New GM's appraisals is in "Addendum A - Glossary of Terms"
("**New GM Appraisal Addendum**") which is a standard document containing boilerplate terms that may, or may
not be, found in the New GM Appraisals.

The current economic definition of market value agreed upon by agencies that regulate federal financial institutions in the U.S. (and used herein) is as follows:

The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

1.      buyer and seller are typically motivated;

2.      both parties are well informed or well advised, and acting in what they consider their own best interests;

3.      a reasonable time is allowed for exposure in the open market;

4.      payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and

5.      the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

New GM's Appraisals, at pp. 1-2.[4]

13.     Notably, the TPC Lenders' appraisals cite to the exact same definition. *See* TPC Lenders Tennessee Appraisal, at pp. 2-3; TPC Lenders Maryland Appraisal, at p. 3.[5]

---

[4]     The New GM Appraisals cite to the following authorities for the definition of  "market value": "Office of Comptroller of the Currency (OCC), 12 CFR Part 34, Subpart C – Appraisals, 34.42 (g); Office of Thrift Supervision (OTS), 12 CFR 564.2 (g); Appraisal Institute, *The Dictionary of Real Estate Appraisal*, 4th ed. (Chicago: Appraisal Institute, 2002), 177-178. This is also compatible with the RTC, FDIC, FRS and NCUA definitions of market value as well as the example referenced in the *Uniform Standards of Professional Appraisal Practice (USPAP)*."

[5]     Both of the TPC Lenders' appraisals quote from 12 C.F.R. Part 34.42(g); 55 Federal Register 34696, August 24, 1990, as amended at 57 Federal Register 12202, April 19, 1992; 59 Federal Register 29499, June 7, 1994.

14.    In analyzing the "fair market value" of the TPC Property, New GM's appraiser reviewed and analyzed the cost approach, the sales comparison approach and the income capitalization approach.    The TPC Lenders' appraiser reviewed and analyzed the same three approaches when it valued the TPC Property using a "fair market value" standard.    Since the TPC Lenders are not contending that they appraised the TPC Property utilizing a "liquidation" standard, *a fortiori*, New GM's appraisals also must not be using a "liquidation" standard.

15.    To the contrary, **both** the TPC Lenders and New GM knew what was meant by "fair market value" and **both** had the TPC Property appraised using the  same methodology and approach.    The fact that the TPC Lenders' appraisals also contain a value utilizing a so-called "value in use" standard -- as explained in the New GM Brief, a standard very different then the "fair market value" standard -- is simply irrelevant to the matter at hand.

16.    The Sale Order clearly states that the TPC Lenders' secured claim will "be equal to the fair market value of the TPC Property . . . ."    That is the valuation standard New GM employed, and that which the TPC Lenders' employed.    Since "fair market value" of the TPC Property is capable of being determined (and it was determined by both New GM and the TPC Lenders), that is the only valuation standard that should be used to value the TPC Property.

17.    Using a "fair market value" approach, New GM valued the TPC Property at $30,575,000.    In contrast, using a "fair market value" approach, the TPC Lenders valued the TPC Property at $42,000,000.    The difference between the parties to litigate or settle is $11,425,000.[6]

**B.    "Fair Market Value" has a Known and Identifiable Meaning**

18.    The TPC Lenders' argument that the term "fair market value" "reveals very little" and that the "actual use" of the TPC Property must be taken into account is not supported by the

---

[6]    Using the "value in use" standard, the TPC Lenders value the TPC Property at $64,900,000, which is $22,900,000 more than using the TPC Lenders' "fair market value" standard.

facts or the law of this case. *See* TPC Lenders Brief, § C. As explained in Section A, *supra*, and in the New GM Brief, "fair market value" has a specific and identifiable meaning; so too does the "value in use" standard. *See* New GM Brief, ¶¶ 28-29. This is aptly demonstrated by the TPC Lenders Appraisals, which contain (i) definitions for these two very different standards of valuation, and (ii) different appraised amounts utilizing these two standards. If "fair market value" truly meant "very little," there simply could never be any appraisals prepared using this valuation standard. This clearly is not the case, as the TPC Lenders' own appraisals demonstrate.

19.       In their brief, the TPC Lenders seem to agree that "fair market value" is the appropriate standard to use here. *See* TPC Lenders Brief, at ¶¶ 43-45. The TPC Lenders then make an unsupported leap, arguing that "[t]his analysis necessarily needs to take into account the seller's *and* the buyer's proposed use of the property in question." *Id.* at ¶ 46 (emphasis added). There simply is no support for this statement. Section 506(a) of the Bankruptcy Code provides that when valuing collateral, the court should look at the "proposed disposition *or* use of such property," not -- as the TPC Lenders content -- the "disposition *and* use" of such property. *See* TPC Lenders Brief, ¶ 37 ("The plan-language command of Section 506(a) is that all of these factors must be taken into account in establishing the TPC Value, because all of these factors describe the proposed disposition *and* use of the TPC Property in these cases." (emphasis added)). "Use" connotes continued retention by the Debtors. "Disposition" connotes a "sale" by the Debtors. They are two different disjunctive acts. What occurred in this case is a "disposition.".

20.       Moreover, the cases cited by the TPC Lenders for this proposition each concerned situations where the debtor was retaining and continuing to use the property. *See In re Olio*

*Dental, Inc.*, No. 08-10305-BHL-11, 2009 WL 1475273 (Bankr. S.D. Ind. May 26, 2009) (debtor

retaining and using secured party's collateral); *In re R & S Vinyl Products Group, L.L.C.*, 291

B.R. 685, 687 (Bankr. W.D. Pa. 2003)("The Debtor intends to retain and use the Collateral to

generate an income stream."); *In re TennOhio Transportation Co.*, 247 B.R. 715 (Bankr. S.D.

Ohio 2000)(while debtor was using tractors, the appropriate valuation standard was "replacement

value" but when the tractors were sold, the appropriate valuation standard was the sales price

received).

21.     Notably, the cases cited by the TPC Lenders that concern a sale of collateral do

not utilize the so-called "value in use" standard, or look at the unique value to the buyer or the

seller when valuing property pursuant to Section 506(a).  For example, in *In re LTV Steel

Company, Inc.*, 285 B.R. 259 (Bankr. N.D. Ohio), a steel producer's assets were sold as a going

concern and the court was tasked with allocating the sales proceeds among secured creditors.

When valuing individual assets, the court accepted the use of various valuation methods,

including: (i) prior bids; (ii) appraisals; (iii) sale offers; (iv) liquidation; (v) market value; and

(vi) market comparable sales.  At no time was a "value in use" standard employed.  It also

appears that the sale order in the *LTV* case -- unlike here -- did not contained a provision

directing the parties to value the collateral using a specified standard.  In *In re Colfor, Inc.*,

No. 96-60306, 1996 WL 628057 (Bankr. N.D. Ohio Sept. 18, 1996), the court merely found that

the appropriate valuation standard to use to value secured creditors' collateral that had been sold

was a "going concern" standard, not a forced liquidation method.  The court did not state that a

"going concern" standard was equivalent to the TPC Lenders' "value in use" standard.

22.     As explained in the next section, Old GM and New GM are separate and distinct

entities.  They are not one and the same.  Old GM is not retaining and using the TPC Property.

9

There simply is no basis to factor into any "fair market" valuation of the TPC Property, New GM's "continued use" thereof. The common and known definition of "fair market value" does not warrant consideration of this irrelevant information, and such information should not play a factor in the Court's determination regarding the value of the TPC Property.

## C.    The TPC Property was Sold by Old GM to New GM, a Separate and Distinct Entity from Old GM

23.    The TPC Lenders continue to use Old GM and New GM interchangeably, arguing that there was a continuation of the "General Motors" business and that, essentially, Old GM retained and continued to use the TPC Property after the closing of the 363 Sale Transaction. *See, e.g.*, TPC Lenders Brief, ¶ 2. This is inconsistent with the essence of a 363 sale, contrary to the terms of the Sale Order and simply wrong. Moreover, the fact that Old GM and New GM asserted previously that the sale of the Debtors' assets to New GM would preserve and maximize the value of those assets -- including the TPC Property -- as a going concern[7] is not at all at odds with New GM's assertions now that there was a "disposition of property" pursuant to Section 506 of the Bankruptcy Code (***not*** a continued "***use***" of the property). As the Sale Order recognizes and affirms, New GM and Old GM are separate and distinct entities.

---

[7]    The TPC Lenders assert that they have "not attempted to ascribe a going concern value to the Facilities" because New GM has not provided them with certain, unnamed documents. *See* TPC Lenders Brief, p. 23 n. 25. Yet, the TPC Lenders were able to commission appraisals and use those appraisals to negotiate with New GM regarding a potential resolution. When that resolution was not accomplished, the TPC Lenders attempted to schedule a valuation proceeding within a tight time frame. The TPC Lenders, thus, had all of the information they needed to either resolve this matter or litigate. It is, thus, disingenuous to imply that the TPC Lenders did not have all of the necessary information to value the TPC Property. In any event, "going concern" value is equivalent to "fair market" value. *See, e.g.*, *Alberts v. HCA Inc.* (*In re Greater Southeast Community Hospital Corp. I)*, Adv. Proc. No. 04-10366, 2008 WL 2037592, *12 (Bankr. D. D.C. May 12, 2008)("A company's net asset value under the going concern approach is the sum of the fair market values of each of its underlying assets."); *In re Gallup*, 194 B.R. 851, 852 n.1 (Bankr. W.D. Mo. 1996)("Use of the term 'fair market value' or 'retail value' or 'going concern value' is merely a matter of semantics."); *Lincoln National Life Insurance Co. v. Craddock-Terry Shoe Corp. (In re Craddock-Terry Shoe Corp.)*, 98 B.R. 250, 254 (Bankr. W.D. Va. 1988)(collecting cases finding that "going concern value" generally signifies "fair market value").

24.     As explained in the New GM Brief, the TPC Lenders have previously acknowledged that there was a "disposition" related to the TPC Property, namely the sale to New GM.  *See, e.g.*, TPC Lenders Limited Sale Objection, ¶ 1 (not objecting "to the **sale of the Debtors' assets to the Purchaser** pursuant to section 363 of the Bankruptcy Code, including the **sale** of" the TPC Property); ¶ 9 (the "Debtors intend to transfer the Facilities to the Purchaser. Further, pursuant to the Sale Motion and [MSPA], the Debtors intend to sell the Facilities free and clear of all liens, claims, encumbrances and interests, including the [TPC Lenders'] mortgages and security interests.").  It is, thus, clear from a review of the Limited Sale Objection that the TPC Lenders always understood that Old GM was **selling** the TPC Property to New GM. To now argue otherwise flies in the face of not only the TPC Lenders' previous acknowledgements, but the actual foundation of these Chapter 11 cases.

25.     Next, there can be no dispute that Old GM and New GM are separate and distinct entities.  One only needs to review the Sale Order to confirm the truth of this statement. Specifically, the Sale Order provides that the

> Purchaser [New GM] is a newly-formed Delaware corporation that, as of the date of the Sale Hearing, is wholly-owned by the U.S. Treasury.  The Purchaser is a good faith purchaser under section 363(m) of the Bankruptcy Code and, as such, is entitled to all of the protections afforded thereby.

Sale Order, ¶ R.  Moreover, the Sale Order provides that "[n]either the Purchaser, the U.S. Treasury, nor their respective agents, officials, personnel, representatives, or advisors is an "insider" of any of the Debtors, as that term is defined in section 101(31) of the Bankruptcy Code."  *Id.* at ¶ S.  The Sale Order also provides that the

> [t]he Purchaser, not the Debtors, has determined its ownership composition and capital structure. The Purchaser will assign ownership interests to certain parties based on the Purchaser's belief that the transfer is necessary to conduct its business going

11

forward, that the transfer is to attain goodwill and consumer confidence for the Purchaser and to increase the Purchaser's sales after completion of the 363 Transaction. The assignment by the Purchaser of ownership interests is neither a distribution of estate assets, discrimination by the Debtors on account of prepetition claims, nor the assignment of proceeds from the sale of the Debtors' assets.

*Id.* at ¶ U.

26.    In addition, there are numerous provisions in the Sale Order that detail the transfer of Old GM's assets to New GM free and clear of liens, claims and encumbrances, including successor liability claims.  For example, the Sale Order provides:

The transfer of the Purchased Assets to the Purchaser pursuant to the MPA constitutes a legal, valid, and effective transfer of the Purchased Assets and shall vest the Purchaser with all right, title, and interest of the Sellers in and to the Purchased Assets free and clear of all liens, claims, encumbrances, and other interests of any kind or nature whatsoever (other than Permitted Encumbrances), including rights or claims based on any successor or transferee liability, other than the Assumed Liabilities.

Sale Order, ¶ 10; *see also id.* at ¶¶ AA, BB, DD, 7, 8, 23, 46, 47.  Specifically relevant to the matter at hand, the Sale Order explicitly provides that

Under the MPA, GM is ***transferring*** all of its right, title, and interest in the Memphis, TN SPO Warehouse and the White Marsh, MD Allison Transmission Plant (the "**TPC Property**") ***to the Purchaser*** pursuant to section 363(f) of the Bankruptcy Code free and clear of all liens (including, without limitation, the TPC Liens (as hereinafter defined)), claims, interests, and encumbrances (other than Permitted Encumbrances).

Sale Order, ¶ CC (emphasis added).

27.    Based on the foregoing, the Sale Order could not be clearer that Old GM and New GM are separate and distinct entities, and that Old GM sold its assets -- include the TPC Property -- to New GM.  Once this basic understanding of this case is accepted, all of the TPC Lenders' arguments relating to "retention" and "continued use" of the TPC Property become irrelevant,

12

and all of the cases cited by the TPC Lenders that concern a debtor retaining and continuing to use property become inapposite.[8]

### D.    The TPC Lenders' Reliance on *Rash* is Misplaced

28.    The TPC Lenders continue to rely on *Rash* when arguing that a "replacement value" standard is somehow analogous to the "value in use" standard utilized by the TPC Lenders in their appraisals.  *Rash* in no way stands for this proposition.  And, in any event, the facts of *Rash* are not at all similar to the facts presented here.

29.    In general, *Rash* stands for the fairly uncontroversial proposition that "the 'proposed disposition or use' of the collateral is of paramount importance to the valuation question." *Rash*, 520 U.S. at 962.  The Supreme Court in *Rash* then went on to apply this finding to the facts of the case before it; facts that are not at all similar to the facts presented here.

30.    *Rash* concerned a debtor that was seeking to cram-down his Chapter 13 plan on a secured creditor by utilizing a liquidation value for a truck he was retaining and continuing to use in his business.  In looking at the "disposition" or "use" of the property, the Supreme Court found that the determination "turns on the alternative the debtor chooses - in one case the collateral will be surrendered to the creditor, and in the other, the collateral will be retained and used by the debtor." *Id.* at 962.[9]  Finding that the debtor was proposing to retain the property and to continue using it in his business, the Supreme Court found that the appropriate valuation

---

[8]    A few examples of the inapposite cases cited by the TPC Lenders that concern a debtor retaining and continuing to use collateral include the following: *In re Chateaugay Corp.*, 154 B.R. 29 (Bankr. S.D.N.Y. 1993)(debtor continued to retain and use property that was to be valued); *In re Freudenheim*, 189 B.R. 279 (Bankr. W.D.N.Y. 1995) (finding that debtor continued to retain and use property and accepting stipulated "fair market value" for property); *In re Coker*, 973 F.2d 258 (4th Cir. 1992)(finding that debtor continued to retain and use property and noting that valuation was done utilizing a "market value" standard); *In re Fiberglass Industries, Inc.*, 74 B.R. 738, 741-42 (Bankr. N.D.N.Y. 1987) (finding that debtor continued to retain and use property, but noted that "[w]ere the debtors contemplating an actual disposition of the collateral, valuation would be based upon the consideration that the estate would expect to receive therefore, assuming the consideration to be fair").  Many of the other cases cited in the TPC Lenders Brief are similar to those referenced in this footnote.

[9]    Here, in the Chapter 11 context, there is a third option -- a sale of the collateral.  This fact further demonstrates that *Rash* is distinguishable from the instant matter.

13

method to use to value the truck was not a "liquidation value" as if the secured creditor had foreclosed on its collateral. Rather, the appropriate standard was "replacement-value," since it "accurately gauges the debtor's 'use' of the property." *Id.* at 963.

31.      The "replacement-value" standard was defined by the Supreme Court as follows: "the value of the property (and thus the amount of the secured claim under § 506(a)) is the price a willing buyer in the debtor's trade, business, or situation would pay to obtain like property from a willing seller." *Id.* at 960. Thus, the so-called "replacement value" standard under *Rash* is akin to the "fair market value" standard used by New GM herein.[10]

32.      Notably, the Supreme Court did not find -- as the TPC Lenders ask this Court to do here -- that the "replacement-value" standard should be tied to any value that is personal or unique to the debtor. This aspect was recognized in *In re Bell*, 304 B.R. 878 (Bankr. N.D. Ind. 2003) -- a case cited by the TPC Lenders in their brief. In *Bell*, the court found that under *Rash*, "when a debtor proposes to retain a secured creditor's collateral, the court is to determine the replacement value of that property." *Bell*, 304 B.R. at 881. Replacement value was found to be "akin to fair market value, [that] being 'the price a willing buyer in the debtor's trade, business, or situation would pay to obtain like property from a willing seller.'" *Id.* at 880 (quoting *Rash*, 520 U.S. at 960). The court in *Bell* then specifically dismissed the argument advanced by the TPC Lenders here, finding that "*Rash* says **nothing about setting a value that is based upon a use which might be unique to a particular debtor**. Indeed, the Court specifically rejected what it called 'a ruleless approach' to value that would be 'based on the facts and circumstances of individual cases.'" *Id.* at 881 (quoting *Rash*, 520 U.S. at 965 n. 5) (emphasis added). Thus, even

---

[10]      As stated previously herein, the TPC Lenders now acknowledge that "replacement value" is equivalent to "fair market value." *See* TPC Lenders Brief, ¶ 44 ("Indeed, *Rash* itself made clear that the replacement value standard, which values the subject property according to its use, was consistent with and equivalent to the term 'fair market value' in connection with a valuation under Section 506(a).").

the cases cited by the TPC Lenders support New GM's argument that a "fair market value" standard, and not a so called "value in use" standard, is equivalent to the Supreme Court's "replacement value" standard that should be used to value property pursuant to Section 506(a) of the Bankruptcy Code, even where the debtor is retaining the property and continuing to use it (facts that simply do not exist here).[11]

33.    In any event, as stated by the court in *In re Perez*, 318 B.R. 742 (Bankr. M.D. Fla. 2005) -- another case cited by the TPC Lenders -- "[n]owhere in *Rash* does the Supreme Court hold that all valuations under section 506 must be based on a replacement value standard. Rather, *Rash* was decided entirely in the context of a debtor's exercise of the 'cram down' option available in a chapter 13 case under Bankruptcy Code section 1325(a)(5)(B)." *Id.* at 744. Accordingly, even if "replacement value" could somehow be construed as something other than "fair market value" -- which it cannot -- there is nothing stopping the parties from agreeing to use a specific valuation standard in any given context. That is exactly what happened here, with such agreement being memorialized in the Sale Order.

34.    The Sale Order clearly provides that the "TPC Lenders shall have an allowed secured claim in a total amount equal to the ***fair market value of the TPC Property*** on the Commencement Date under section 506 of the Bankruptcy Code . . . ." Sale Order, ¶ 36 (emphasis added). This language was drafted by the TPC Lenders, the Debtors, New GM and other parties in interest at the Sale Hearing to resolve the TPC Lenders' Limited Sale Objection.

---

[11]   Other cases cited by the TPC Lenders where a "fair market value" standard was used to value property include: *In re Freudenheim*, 189 B.R. 279 (Bankr. W.D.N.Y. 1995) (finding that debtor continued to retain and use property and accepting stipulated "fair market value" for property); *In re Coker*, 973 F.2d 258 (4th Cir. 1992)(finding that debtor continued to retain and use property and noting that valuation was done utilizing a "market value" standard); *In re Winthrop Old Farm Nurseries, Inc.*, 50 F.3d 72, 76 (1st Cir. 1995)("In light of the proposed use, the bankruptcy court committed no error in valuing the Property at its stipulated fair market value."); *Cathcart v. Wachovia Mortgage*, No. 1:04-CV-1236-JDT-TAB, 2005 WL 756208, *3 (S.D. Ind. Feb. 22, 2005)("The court finds *Rash* to be persuasive (if not controlling) in the context of the instant case, and concludes that the Bankruptcy Court was correct to use a fair market value standard rather than net liquidation value.").

If the TPC Lenders truly believed that the "fair market value" standard was not appropriate to value the TPC Property, they could have suggested a different standard, or negotiated to exclude any determination of the appropriate standard from the Sale Order.  They did neither and are, thus, now bound by the agreed-upon provisions of the Sale Order that provides for the use of a "fair market value" standard to value the TPC Property.

### E.    New GM Will Not Receive a Windfall if the "Fair Market Value" Standard is Utilized to Value the TPC Property

35.    In the usual situation, when valuing a secured creditor's collateral, the dispute is between the debtor and the secured creditor, not the entity that purchased the collateral pursuant to a Section 363 sale.  This is so because the secured claim of the creditor is deducted from the funds received by the debtor from the sale, the unsecured claim is a claim against the estate, and the collateral is transferred to the purchaser free and clear of liens, claims and encumbrances.

36.    The situation here is somewhat unique in that, in connection with the 363 Sale Transaction, and the resolution of the TPC Lenders' Limited Sale Objection, an agreement was reached between the parties whereby the TPC Escrow Account was established and the TPC Lenders' liens and claims were transferred to that account, making the TPC Property unencumbered.  Any excess funds remaining in the TPC Escrow Account after payment to the TPC Lenders on account of their secured claim will be returned to New GM.  The TPC Lenders bargained for this treatment, and in so doing conceded that a "fair market value" standard for valuing the TPC Property would be appropriate, and they capped any remaining unsecured claim they may have against the Debtors at $45 million.  This benefitted the TPC Lenders, who received recourse to segregated cash to the extent of their interest in the TPC Property.  It benefitted the Debtors' estate, because it resolved any claim by the TPC Lenders to the proceeds of the 363 sale and it capped their unsecured deficiency claim.  The benefit to New GM (which

16

deposited upwards of $90 million) was the relevant procedural provisions of the Sale Order, including confirmation that "fair market value" was the standard by which the TPC Property would be valued.

37.    For the TPC Lenders to now contend that New GM would somehow receive an "unjustified windfall" if the TPC Property is valued at "fair market value" is disingenuous. There is no "windfall merely by reason of the happenstance of bankruptcy." TPC Lenders Brief, p. 27 (quoting *Butner v. United States*, 440 U.S. 48, 55 (1979)). The agreement reached between Old GM, New GM and the TPC Lenders was a negotiated resolution that was incorporated into the Sale Order. The TPC Lenders are bound by that Court-approved resolution.

38.    In addition, as noted, the TPC Lenders' continued focus on New GM's use of the TPC Property is irrelevant to the issue currently before the Court. The Sale Order clearly provides that the TPC Property is to be valued "as of the Commencement Date" -- another point negotiated and accepted by the TPC Lenders. Moreover, unlike the situations in *In re Coker*, 973 F.2d 258 (4th Cir. 1992) and *In re Fiberglass Industr., Inc.*, 74 B.R. 738 (Bankr. N.D.N.Y. 1987), the Debtors are not retaining and continuing to use the TPC Property. There is, thus, no "eat[ing] with the hounds and run[ing] with the hares." *Coker*, 973 F.2d at 260 (quoting *In re Crockett*, 3 B.R. 365, 367 (Bankr. N.D. Ill. 1980)).[12]

39.    Accordingly, New GM is not receiving any type of "windfall" here. There merely is the application of the terms of the Sale Order to the valuing of the TPC Property, as agreed to by the parties. Nothing more, nothing less.

---

[12]    Although it might be suggested that this is exactly what the TPC Lenders are trying to do.

17

WHEREFORE, New GM respectfully requests that the Court (i) confirm the finding contained in the Sale Order that only the "fair market value" of the TPC Property can be used to fix the secured claim of the TPC Lenders; (ii) reject the TPC Lenders' argument that a different valuation standard should be used; and (iii) grant to New GM such other and further relief as is just and proper.

Dated: New York, New York
        March 14, 2011

                                    KING & SPALDING LLP


                                    By: /s/ Arthur Steinberg
                                        Arthur Steinberg
                                        H. Slayton Dabney
                                        Scott Davidson
                                    1185 Avenue of the Americas
                                    New York, NY  10036
                                    (212) 556-2100

                                    *Counsel to General Motors LLC*