John Lewis Mealer, Pro Per  (Pro Se)
6333 Gardenia Lane
Show Low, Arizona 85901
jlmealer@mealercompanies.com
jlmealer@yahoo.com

## IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

## IN AND FOR THE COUNTY OF NAVAJO

| | |
|---|---|
| JOHN LEWIS MEALER      ) | **CASE_NUMBER_CV201000316** |
|        ) | |
| PLAINTIFF      ) | |
| vs      ) | **CIVIL COMPLAINT FOR TORT, CRIMES** |
| GMAC MORTGAGE LLC and **CEO DAVID**   ) | |
| **APPLEGATE**, GMAC FINANCIAL    ) | **JURY TRIAL DEMANDED** |
| SERVICES, **GMAC LLC** and **CEO**     ) | |
| **MICHAEL CARPENTER,** GENERAL    ) | **FIRST AMENDED COMPLAINT** |
| MOTORS CORPORATION., GENERAL    ) | |
| MOTORS COMPANY and **CEO EDWARD**   ) | *AFFIDAVITS I, II, III* |
| **WHITACRE JR**, MOTORS LIQUIDATION ) | |
| COMPANY, RESIDENTIAL CAPITAL LLC ) | |
| and **CEO THOMAS MARANO**, UNITED   ) | |
| STATES TREASURY DEPARTMENT, GM   ) | |
| ENGINEER KRIS J KORDELLA, JANE    ) | |
| DOE, JOHN DOE,  et al.       | |
| DEFENDANTS | |

---

## VERIFIED COMPLAINT

**1.**    Plaintiff, John Lewis Mealer Pro Se, states, pleads with specificity per legal requirements

and case law noted on Pages 98, 99 herein, commences and prosecutes as follows:

### JURISDICTION AND VENUE

**2.**    This detailed case, filed, June 8th, 2010 involves intentional and ongoing tort violations

including injuries for malicious libel by the defendants against this plaintiff, which have created

a claim in excess of $50,000 and also affects title to real property within Navajo County, Arizona

and falls within the jurisdiction of the Superior Court of The State of Arizona in and for the County of Navajo where the damages to this State of Arizona, Navajo County resident John Lewis Mealer and his locally based Independent Alternative Fuel Powered Automaker business known as Mealer Companies LLC had occurred on June 9th, 2009 and continue to occur to date.

**3.**    This honorable court has local jurisdiction for local judicial action and trial court action in these matters under Article 6, Sections 5 and 14 of the Arizona Constitution, and ARS Title 44, Chapter 10, per ARS Title 12-541 and other laws pertaining to this instant case.

**4.**    This court may exercise supplemental jurisdiction over the state law and federal law asserted in this action pursuant to 28 USC § 1367.

**5.**    This court has personal jurisdiction over each of the defendants because they do business in this District and engaged in unlawful conduct and/or caused the harm at issue in this case in this District.

**6.**    Original subject matter jurisdiction is conferred upon this Court by the Federal Trade Commission Act (1914). Title 15 U.S.C. §§ 41-51 Lanham Act, 15 U.S.C. §1111 et seq, the United States antitrust laws, The Sherman Act 15 U.S.C. §§§ 1,2,4, and 28 U.S.C. §1331. Supplemental jurisdiction over claims arising under the law of the State of Arizona ARS Title 44 §1111 et seq., Arizona Revised Statutes Title 12 et seq.

**7.**    Venue is proper in this District under Title 28 USC § 1391 because a substantial portion of the events giving rise to the claims as issue in this Complaint occurred in this district.

**8.**    The true nature of culpability of these defendants, whether as sole individuals for their random, wholly unconnected yet contributory acts of tortious aggression and wrongful conduct which was guided by evil motives and willful and wanton disregard of the interests of this plaintiff  and/or an obscure series of acts which fell into place resulting in pure negligence

against this plaintiff, in what defendants may excuse in defense of these claims] as merely **(8a)** "Coincidentally-Occurring," "Individually-Tortious," "Unintentionally-Simultaneous" interruption of this plaintiff's prospective funding and private business growth from a secluded incident of GM engineering employee Mr. Kordella's fit of jealousy and passion as his private opinion [yet, while in his professional capacity, simply for "his own and fellow employee's and GM survival"] creating various injurious issues of significant importance in respect to both the initial and ongoing unrelenting injurious falsehoods and intentional tortious and quasi-criminal behavior and malicious attacks by defendants against this plaintiff.

      **(8b)** Which by Arizona legal determination prescribes *respondeat superior culpability*, resulting in and causing irreparable harm to this plaintiff, nonetheless, **OR**

      **(8c)** perhaps these defendants were actually, at least partially, acting in concert in an aggressive display of the GM Family's need to succeed as proclaimed by the GM Family in multiple documents, governmental, public and private testimony, which will be validated as additional inculpatory evidence upon Discovery-Disclosure prior to this honorable court hearing this instant case.

**9.**    This pro per, pro se plaintiff reserves the right to hire or acquire counsel during these proceedings. This pro per, pro se plaintiff reserves the right to settle out of court with individual defendants without causing this lawsuit and/or these claims to be diminished or detracted from.

## NATURE OF ACTION

**10.**    **This historical action comes forth June 8th, 2010,** and with good cause, plaintiff submitting this plausible, truthful complaint (sworn civil lawsuit) against defendants actual June 9th, 2009 (perpetuated to date), unwanted, unlawful, unethical, injurious trespass with intent to

cause serious injury through defamation of character, publication of injurious falsehoods and trade libel and by effect have caused irreparable harm to this plaintiff, and defendants' have;

**(10a)** intentionally destroyed this plaintiff's prospective advantages, personal and business reputation, trade viability and other pertinent attributes through unlawful means AND

**(10b)** have acted to destroy through unlawful activity this plaintiff's competitive business trade of alternative fuel powered automobile (and other product) manufacturing,

**(10c)** Which occurred on this plaintiff's professional privately-owned-business website "http://mealercompanies.com" which was;

**(10d)** created explicitly and clearly labeled to secure and provide an Internet presence for final due diligence for prospective advantageous methods, from foreign and/or domestic pending contractual relations and product orders and purchases from various; persons, groups, investors, banks, clients, customers, employees, government agencies, private businesses, et al. AND

**(10e)** to be used specifically for the benefit of this plaintiff, [who is the manager and founder of the private independent alternative fuel powered automaker "Mealer Companies LLC"] in order to gather,

**(10f)** specifically, $200,000,000. of prospective B-Round trade growth capital and to garner, specifically,

**(10g)** multiple private and public prospective agreements for 2000 Pre-MFG Mealer "BV" automobile sales worth $30,000,000. in sales profits (pending prospective funding contracts of which defendants interfered with) and additional future sales of other Mealer Companies LLC products, AND

**(10h)** Mr. Kordella, (who is a co-defendant and jointly and severely co-liable for these instances, privately and professionally) did effectively, intentionally publish on a global scale;

**(10h*1*)** multiple grossly disparaging, derogatory and injurious falsehoods, libel per quod, and per se by definition, AND

**(10h*2*)** gross trade libel per se, AND

**(10h*3*)** gross slander of title, intentional misrepresentation of the Mealer Automobile,

**(10i)** in order to intentionally interfere with prospective advantageous capital investors AND **(10j)** whereby defendant's have created these exact pecuniary and compounding daily damages AND

**(10k)** other irreparable harm[s] to this plaintiff through intentional personal defamation of character and plaintiff's professional reputation and **(9k*1-a)*** the Mealer Automobile

**(10k*1-b)*** and other Mealer products for domestic manufacturing trade as detailed herein.

**(10l)** Defendants did intentionally commit intentional misrepresentation, publishing untrue and unprivileged derogatory statements creating personal injury of plaintiff's personality, mental capacity, trustworthiness, engineering capability, product viability, authenticity, selflessness as gross slander of title and gross defamation of character and this plaintiff's expected fiscal, political and job creating contributions to these United States of America for which this proud American has long planned and has expected to execute.

**(10m)** Defendants' *(Specifically Mr. Kordella and GM whether acting severally or jointly as per and within the scope of ResCap and GMACm's strategic mortgage servicing program)* wrongful conduct was guided by intentional malicious and evil motives and willful and wanton disregard of the interests of this plaintiff.

**11.** <u>Defendants continue to brazenly and maliciously complete and perpetuate</u> their mission of tortious interference through globally published malicious libel, injurious falsehoods, defamation of character, trade libel, slander of title, etc

**(11a)** after invading the privacy of this plaintiff AND

**(11b)** defendants with unclean hands AND

**(11c)** which have intentionally intimidated AND,

**(11d)** destroyed and rendered bankrupt this plaintiff and have **(10e)** wholly restrained and derailed plaintiff's professional automotive trade by;

**(11f)** intervening in prospective investor growth (funding) and interfering with pre MFG sales of the Mealer Automobile and other Mealer Companies products AND

**(11g)** <u>without a response</u> from defendants when this plaintiff has requested and has repeatedly demanded a corporately written and Internet global publication of a formal corporate apology within the first 5 days of their grossly disparaging attack.. **(See Exh_____)**

12.     Worse yet, co-defendant (specifically GMACM, ResCap who own title to this plaintiff's home and competitive [to GM] automobile manufacturing business HQ address) have refused multiple phone calls and written requests and/or demands from this plaintiff to have removed the various grossly disparaging, derogatory and injurious falsehoods and gross trade libel, slander of title that were strategically placed upon this plaintiff's funding, business growth website through the use of a "protected computer," per 18 U.S.C. § 1030(e)(2), which designates the private and highly secured Internet Service Provider ("ISP") which is housed in GMAC LLC corporate headquarters at 200 Renaissance Center in Detroit, Michigan. **(See Exh_____)**

**(12a)** The defendants' malicious, strategic and cleverly worded disparaging remarks and financially destructive and globally published libel through invasion(s) "with intent to destroy" and defendants' highly improper actions have;

**(12b)** intentionally caused both this plaintiff's chapter 7 bankruptcy (after inducing breach of mortgage contract) **(12c)** and while continuing their attack from June 9th 2009 to date,

have, **(12d)** wholly violated the Automatic Stay of said bankruptcy and continue in order to **(12e)** prolong this plaintiff's inability to make to recover from the initial attack in order to resume this instant defaulted mortgage.

**(12f)** This plaintiff can not assume responsible for removing mealercompanies.com professional website postings made by another party without that corporation's or private party's explicit directions to do so, and in this case, a public corporate apology and full detailed public retraction which had been demanded by this plaintiff from the corporate defendants within five days of finding the grossly disparaging injurious falsehoods and utterly destructive trade libel. For this plaintiff to remove these attacks without the defendant's aforementioned publicly made request to do so, including their publicly made apologies would be dishonest to those parties who have been following this plaintiff's public Internet postings and business website logs (Blogs) of his search and subsequent acquisition of prospective and pending funding agreements from both of this plaintiff's professional websites related to the Mealer Automobile, products and funding.

**(12h)** To hide the defendant's publicly and globally posted and globally published via RSS feed, the various grossly disparaging trade libel and defamation of character "by removal from public view," would "reduce" this plaintiff to the *same moral turpitude of the defendants* and by this plaintiff's perspective would be dishonest concealment to prospective clients, investors and the general public.

**(12i)** Simple removal of said defendants' comments will do nothing to repair the damages that have been done. In fact, removal without defendant's public corporate apology would be useless as the MONEY01 blog was sent out worldwide via the RSS feed, email update for the http://mealercompanies.com website and the prospective parties who received have obviously lost interest due to personal disparagement and product trade libel and other untrue comments

and destructive actions of the world renowned GM Family published to the severe detriment and financial injury of this plaintiff.

**13.** Multiple inner-corporate employees and intra-corporate agents may be brought forth as co-defendants for aiding and abetting and contributory negligence involved in these gross tortious transgressions during discovery-disclosure. Including defendant's CEOs and upper management for refusing to take action since receiving notice of these claims, which have caused and continue to perpetuate ongoing damages.

**14.** Plaintiff expects to seek justice and rule of law in these matters and to be paid, reimbursed, made whole again for defendant's intentionally and/or negligently created and continued damages and suffering of this plaintiff, his company (trade loss), his company products loss of revenue including trade libel) and his family's suffering both financially and emotionally and physically.

### PARTIES and POSITIONS

### PLAINTIFF MEALER

**15.** **Plaintiff (Mealer)** is living at the home he built 90% single handedly creating a custom "Mealer-Built" home located at 6333 Gardenia Lane, Show Low, Arizona [which is currently mortgaged to GMAC] and is the **(15a)** founding member **(15b)** and patent holder to the "at-one-time" expanding to meet tremendously expansive future sales demands for, **(15c)** independently owned and operated alternative-fuel-powered automaker called Mealer Companies LLC which is state registered - headquarters and on adjoining property a private R&D - located at 6333 Gardenia Lane, Show Low, Arizona [also under the same GMAC mortgage], **(15d)** which is an Arizona LLC registered as of 9/19/08 with the Arizona Corporation Commission #L-1477212-5, to **(15e)** build alternative fuel powered automobiles and **(15f)** to eventually pay profit and other

employee related taxes through Internal Revenue Service ("IRS") Employer ID #26-3359384,

**(See Exh's _____, _____, _____, _____)**

**16.**     Although plaintiff lists defendants' as separate "parties" who are listed individually with a brief outline of their tortious and/or criminal and/or contributory involvement, plaintiff contends that defendants' are jointly and severally liable for 100 percent of this plaintiff's damages **(16a)** per **ARS 12-2506(D)**. **(16b)** Of an amount as this honorable court and the jury deem proper. **(16c)** _But For_ the illegal, injurious and improper methods of debt collection, defamation of character, trade libel et al, by the defendants this plaintiff would have been funded to expand Mealer Automobile manufacturing and to expand manufacturing of other Mealer Companies products and/or would have acquired interim high level employment in other company's alternative powered automobile manufacturing/development positions or other high level work outside and exclusive of Mealer Companies LLC.

### DEFENDANTS
### _GMAC LLC_, GMAC MORTGAGE LLC,

**17.**     Defendant, **GMAC LLC** _[Headquarters at 200 Renaissance Center, Detroit, Michigan who has the responsible  CEO of Mr. Michael Carpenter]_, 'et al' [including Ally bank and Ally Financial LLC., Inc. and/or any subsequent renamed entities of the same company and all subsidiaries who act under GMAC LLC fiducial capacity, please refer to  Points and Authorities herein], specifically GMACM as the main creditor and private home mortgage holder,  Cause of Action; _[By and through the cross-collateralization under the Omnibus Security Agreement and other documents and agreements whereby granted a security interest to the Omnibus Agent in any cash or other property posted or required to be posted as collateral (REFERENCE ALL OF "¶ #63" herein)]_

**(17a)** [Mortgage #0602003923 for this plaintiff's home and purchased by GMAC Mortgage (GMACM who has the responsible <u>CEO of Mr. David Applegate</u>) on April 1st, 2008 from the original mortgage holder known as Amerifirst Financial Inc., of Arizona, for this plaintiff]. GMACM have since made multiple;

**(17b)** efforts to foreclose upon this debtor's mortgage contract AND

**(17c)** coincidentally, "GMAC" was also the main creditor of General Motors (herein called "GM") on June 9th, 2009,

**(17d)** whereby GMAC LLC has maintained a publicly proclaimed interest in the survivability and viability of their preferred debtor/competitive automaker [to plaintiff] "GM",

**(17e)** maintains the registered "protected computer," per 18 U.S.C. § 1030(e)(2), which designates an Internet Service Provider ("ISP") used for access to and the perpetuation of the series of intentionally financially devastating torts/crimes against this plaintiff. **(See Exh's_____, _____, _____, _____)**

**18.**     This plaintiff further contends that "GMAC" et al whether as the corporate entity and/or as "Jane Doe and/or John Doe" employee and/or agents working within "GMAC," and/or subsidiary "GMACM,"

**(18a)** Cause of Action, did willfully, flagrantly and abusively misapply a substantial portion of this plaintiff's mortgage payments by converting said portion to a variety of tortious abuses and to benefit the GM Family (specifically GMACM, GMAC LLC, GMAC Financial Services, "GMAC et al," ResCap and all versions of a failing GM 'the automaker') when defendants have no right or authority to do so and against any implied or assumed position of applied pecuniary trust, did through intentional acts of willful and wanton misconduct, while;

**(18b)** in fact, GMAC LLC, direct subsidiary ResCap, SEC recorded contract connected subsidiary GMACM were acting as a bank, while also acting as a mortgage company (specifically regarding the inner-corporate distribution of this plaintiff's mortgage payments).

**(18c)** This contention includes the "GMAC LLC, GMAC Mortgage LLC, GMAC Financial Services, ResCap, et al" direct corporate civil liability due to the fact that the GMAC LLC  Detroit HQ "houses" their financial and insurance institution's regulated "protected computer," per 18 U.S.C. § 1030(e)(2), which designates the private and highly secured Internet Service Provider ("ISP") their private "ISP" which was used to attack this plaintiff.

**(18d)** That this "protected computer," per 18 U.S.C. § 1030(e)(2), which designates the private and highly secured Internet Service Provider ("ISP") is by agreement, contract, ISDA 2002 Master Agreement collectively and together with the schedules, annexes and swap transactions related thereto, foreign exchange and interest rate transactions and Master Securities Forward Transaction Agreement with the annexes and swap transactions relating thereto with GMAC LLC in such capacity as the Omnibus Agent. This entire agreement ultimately transferred 100% of the equity of GMACM servicing rights and related contractual rights whereby GMAC LLC (AKA Ally Bank and Ally Financial, who's HQ is located at 200 Renaissance Center, Detroit, MI) own, control and cross-collateralize and jointly administer under the agreement, a substantial share of said contracts and filings belonging to and serviced by defendants', per SEC filings prior to June 9th, 2009. **(See Exh's _____, _____, _____, _____)**

## DEFENDANTS GENERAL MOTORS "CORPORATION", GENERAL MOTORS "COMPANY", MOTORS LIQUIDATION COMPANY

**19.**   Defendant, by Respondeat Superior, **General Motors "*Corporation*"** f/k/a **General Motors "old GM", (19a)** *[For over 100 years has been Headquartered at 300 Renaissance*

*Center, Detroit, Michigan],* **(19b)** k/n/a **Motors Liquidation Company "MLC"** *[Headquartered at 500 Renaissance Center, Ste 1400, Detroit, MI.]* while in the Southern District of New York Bankruptcy court, AND

**(19c)** today officially and formally restructured as **General Motors "Company"** a/k/a **"new GM"** who has the responsible CEO of Edward Whitacre Jr, *[Currently Headquartered at 300 Renaissance Center, Detroit, MI]* f/k/a **General Motors Corporation ("Old")** which was the intra-company ("GM Family") which by Cause of Action;

**(19d)** directly employed GM engineer Kris J Kordella on June 9th, 2009 **(19e)** who did commit (and privately apologized/admitted) the aforementioned and detailed herein torts/crimes while at work **(19f)** using GM equipment, and via inner-corporate GM Family "GMAC" privately regulated, "protected computer," per 18 U.S.C. § 1030(e)(2), which designates the private and highly secured Internet Service Provider ("ISP" registered as GMC-20) as accessed from within most GM owned and/or operated engineering offices throughout the Greater Detroit, Michigan area.

**(19g)** "Old GM" k/n/a "MLC" and each successive version of "new GM" (herein called "GM") continue to receive monetary benefits after the initial and continued destruction of new American Automakers (specifically Mealer Companies LLC) AND

**(19h)** "GM" was considered financially distressed, bankrupted and frustrated and did require a large "financial loan" on or about June 9th, 2009, at a critical financial time for the GM automaker AND

**(19i)** when GM required on June 9th, 2009 any available or possible, whether lawful or unlawful competitive strategic advantage in the automobile trade, AND

**(19j)** while promoting, protecting, paying, aiding & abetting their employee-agent Mr. Kordella on June 9th, 2009 and to date.

**(19k)** "GM" engineers and manufactures some of the highest quality automobiles in existence. **(19l)** "GM" is a global leader in automobile sales.

**(19m)** Due to agency/employer ("GM") MLC's tortious behavior and ongoing quasi-criminal conduct and negligent entrustment of their employee(s)/agent(s) Mr. Kordella and others (specifically *[thus far determined to be]* Mr. Joseph Burgel and Ms. Christie Garwood who appear to be GM employees and GMAC agents) on June 9th, 2009, this plaintiff is currently considered by law, "a preferred creditor" to the MLC Southern District of New York bankruptcy No. **09-50026 (REG)** and has been accepted and entered as such by the presiding Honorable Robert E Gerber pending motion of protocol and the outcome of this instant case while under the bankruptcy code:

**(19n) 11 USC § 503(a)(1)(A),(3)(A)(3)** whereby (a) <u>An entity may timely file a request for payment of an administrative expense, or may tardily file such request if permitted by the court for cause.</u> (b) <u>After notice and a hearing,</u> there shall be allowed administrative expenses, other than claims allowed under Section 502(f) of this title including-- <u>(1)(A) the actual, necessary costs and expenses of preserving the estate including-- (3) the actual, necessary expenses, other than compensation and reimbursement specified in paragraph</u> (4) of this subsection, incurred by-- <u>(A) a creditor that files a petition under section 303 of this title;</u> (B) <u>a creditor that recovers, after the court's approval, for the benefit of the estate any property transferred or concealed by the debtor;</u> (C) <u>a creditor in connection with the prosecution of a criminal offense relating to the case or to the business or property of the debtor.</u>

**(19o) 11 USC § 101(10)(A)(B)**: whereby "(10)" The term "creditor" means-- (A) <u>entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor;</u> (B) entity that has a claim against the estate of a kind specified in section 348(d), 502(f), 502(g), 502(h) or 502(I) of this section.
**348 (d)** <u>A claim against the estate or the debtor that arises after the order for relief but before conversion in a case</u> **...**

**(19p)** In addition to this obvious legal standard (the law), plaintiff relies on exemption to "MLC"f/k/a GM (old) with EXEMPTION TO DISCHARGE 11 USC § 523(a)(6) "for

willful and malicious injury by the debtor to another entity or to the property of another entity."

**(19q)**  The intentionally destructive, malicious crippling attack and libelous assault by GM employee and GMACM agent (via GMAC "ISP"), Mr Kordella and his associates late morning on June 9th, 2009 against this plaintiff on his professional business growth oriented website certainly fit the category of "willful and malicious injury by the debtor (Old GM, k/n/a MLC and also as New GM) to another entity (this plaintiff) or to the property of another entity (this plaintiff's good business/trade reputation and the Mealer Automobile and other Mealer Companies products). Old GM cannot become MLC and New GM in order to escape their quasi-criminal activity against this plaintiff simply by changing their name or declaring bankruptcy.

**(19r)** It appears from the beginning (06/09/09) of this grossly disparaging attack upon this victimized plaintiff GM has constantly referred to their non-culpable status as "GUILTY but NOT RESPONSIBLE BY REASON OF BANKRUPTCY". This plaintiff believes the law clearly states the opposite view of what "Old GM" n/k/a MLC et al has claimed on prior occasions, by this line of GM Family reasoning any *other* common thief, unlawfully earned monopolistic entity, child rapist, mass murderer, or typical miscreant could simply claim bankruptcy and/or change their name to escape their criminal and/or tortious behavior and avoid their own responsibility.

### GM ENGINEER KRIS J KORDELLA
### UNDER PUBLIC AND PRIVATE CAPACITY

**20.**  Defendant, **GM Engineer Kris J Kordella**, Cause of Action **(20a)** who on June 9th, 2009 while at work at his GM office location, did enter and trespass **(20b)** with malicious intent to injure and destroy (against the will of, wishes and without permission from this plaintiff), plaintiff's privately held business, professional website [which was created, clearly and obviously

put in place for business growth investments between various qualified prospective investment parties, banks, and venture capitalists, customers, etc], and **(20c)** per Mr Kordella's self-described plan, to cause and create the most damage as possible to this injured, victimized plaintiff, *"...Anyway I wish you ALL the worst the the world can give to such a....* [this plaintiff]*..."* [Emphasis kept]  (See Exh _____)

**21.**    Mr Kordella did create through intentional acts of willful and wanton misconduct and **(21a)** did publish a series of ultra-inflammatory, injurious **(21b)** maliciously and strategically worded, **(20c)** untrue, unwanted, **(21d)** grossly defamatory of this plaintiff's character and trade, **(21e)** globally visible and **(20f)** RSS fed "blogs" **(21g)** under the clever moniker "MONEY01", on this plaintiff's prospective investor oriented website, whereby Mr. Kordella's untrue damaging libelous attack **(21h)** was followed up with private email messages to other prospective clients, engineers, potential investors and Pre-MFG Mealer BV buyers interested in all of Mealer Companies LLC with direct and blatantly derogatory emails berating and **(21i)** defaming the good character and honesty of this plaintiff and **(21j)** the over-all credibility of the pending mass manufacturing of the Mealer Automobile through intentional **s**lander of title.

    **(21k)** Mr. Kordella visited plaintiff's professional and funding growth oriented website using a GM computer and IP address 198.208.251.24 from his GM office in or near (yet with the IP registered to GM in) Bloomfield Hills, MI., concurrently and with what appears to be the assistance and "goading" of both Mr. Joseph Burgel "joe.burgel@gm.com" using IP address 198.208.251.22 out of his GM place of work located in or near (yet with the IP registered to GM in) Farmington, MI. and Ms. Christy Garwood "christy.garwood@gm.com" using IP address 198.208.251.23 out of her GM place of work located in or near (yet with the IP registered to GM in) West Bloomfield, MI . on June 9th, 2009. **(See Exh _____).**

22.    Mr. Kordella must answer this complaint honestly in both his private ("severely") capacity and public capacity ("jointly" as employee/agent GM Engineer, GMACM, ResCap) as he is being sequestered herein as both/all entities. **(22a)** Mr. Kordella has received employment and 'private agent' payroll from all versions of "GM" **(22b)** prior to AND **(22c)** following this intentional tortious event 6/9/09, creating multiple Respondeat Superior issues of employer/agented culpability. **(22d)** To this plaintiff's belief prior to Disclosure, Mr. Kordella may have been acting as agent for the entire GM Family in partial  joint capacity whether by direct or indirect agreement or on his own volition due to the GM Family financial woes on June 9th, 2009. (**See Appendix II**)

## DEFENDANT RESIDENTIAL CAPITAL LLC

23.    Defendant, **Residential Capital LLC ("ResCap")** who has the responsible CEO of Thomas Marano *[Headquarters at One Merdian Crossings, Minneapolis, MN],* Cause of Action **(23a)** is the parent company for GMAC Mortgage, **(23b)** was formed as direct subsidiary to GMAC LLC which is public record, **(23c)** did actually suggest, inspire and instigate these gross deviations of honest banking and mortgage procedures to create "aggressively strategic servicing" techniques [procedures which are unlawful to this plaintiff] for the GM Family as both negligent and intentional acts of willful misconduct in variate degrees against this plaintiff [Specifically, by ResCap's and GMACM's new loan servicing plan-- Any potential mortgage asset which may create intra-corporate "...business risk..." would then require "...reducing..." *Specifically,* this plaintiff's mortgage and this plaintiff's risky competitive business required direct and abrupt "reducing" in order to provide security for the GM Family of businesses. Whom, through a preponderance of inculpatory evidence, appear to have been acting as *GMACM servicing agent* while GM engineering was at a stand still, in an effort to maintain the

-16-

aggressive reduction of business risk as per ResCap (and GMAC Mortgage) inner-corporate agreements and publications. **(See Appendix III,** ~~Broad Allegations~~ **and Exh _____).**

**(23d)** Through a preponderance of evidence, this plaintiff expects to prove that by and through ResCap's inspired plan (used by subsidiary GMAC Mortgage) to cut costs and increase GM Family viability, certain aggressive asset management actions were instigated, determined and utilized to "_...respond aggressively by further reducing..._" "_...business risk..._" **(See Exh_____)**

To help explain the ResCap and GMACM (and other newly contracted inner-corporate businesses and banks) publicly stated and agreed methods of mortgage contract servicing and plans for GM  Family survivability, the following terms quoted from ResCap CEO public statements are below:

**(23e)**   _The definition of "Aggressive[ly]" according to Merriam-Webster dictionary means, "Tending toward or exhibiting aggression."_

**(23f)** _The definition of "Aggression" according to Merriam-Webster dictionary means, **1:** a forceful action or procedure (as an unprovoked attack) especially when intended to dominate or master **2:** the practice of making encroachments; especially: unprovoked violations by one country of the territorial integrity of another **3:** hostile, injurious, or destructive behavior or outlook especially when caused by frustration._

**(23g)**   _The definition of "Reduce" according to Merriam-Webster dictionary means, **1:** to draw together or cause to converge: CONSOLIDATE **b(1):** to diminish in size, amount, extent, or number  **b(2):** to decrease the volume and concentrate the flavor of by boiling **c:** to narrow down: RESTRICT **d:** to make shorter: ABRIDGE  **2:** to restore righteousness  **3:** to bring to a specified state or condition  **4a:** to force to capitulate  **b:** FORCE, COMPEL  **5a:** to bring to a systematic form or character  **b:** to put down in written or printed form  **7a:** to lower in grade or rank : DEMOTE  **b:** to lower in condition or status :DOWNGRADE  **8a:** to diminish in strength or density  **b:** to diminish in value_ ...

**(23h)**   _The definition of "Business" according to Merriam-Webster dictionary means, **1:** purposeful activity **2a:** role, function **b:** an immediate task or objective: MISSION **c:** a particular field of endeavor **3a:** a usually commercial or mercantile activity engaged in as a means of livelihood: TRADE, LINE **b:** a commercial or sometimes an industrial enterprise; also: such enterprises   **c:** dealings or transactions especially of an economic nature : PATRONAGE **4:** AFFAIR, MATTER **5:** CREATION, CONCOCTION **6:** movement or action by an actor_

*intended to establish atmosphere, reveal character, or explain a situation – stage business* **7a:** *a personal concern* **b:** *RIGHT* **8a:** *serious activity requiring time and effort and usually the avoidance of distractions* **b:** *maximum effort* **9a:** *damaging assault* **b:** *REBUKE, TONGUE-LASHING* **c:** *DOUBLE CROSS* **10:** *a bowel movement*

**(23i)** *The definition of "Risk" according to Merriam-Webster dictionary means,* **1:** *possibility of loss or injury: PERIL* **2:** *someone or something that creates or suggests a hazard* **3a:** *the chance of loss or the perils to the subject matter of an insurance contract; also: the degree of probability of such loss* **b:** *a person or thing that is a specified hazard to an insurer* **c:** *an insurance hazard from a specified cause or source, war risk. ...*

**(23j)** The obvious meaning of ResCap and GMACM publicly stated loan servicing program (definitions noted above) was created to utilize the over-all GM-GMAC (GM Family) political and financial strength to forcefully master by any means -including hostile, injurious destructive behavior (tort violations) - in fact, and done per the GM Family of businesses claims of "while frustrated" in order to systematically force, compel, restrict and demote competitive trades who may pose a a possibility of loss or injury to the GM Family.

**(23k)** This plaintiff and the Mealer Automobile and other Mealer products certainly fit the category of RISK for the GM Family that GMACM and ResCap has proclaimed they must reduce in order to stay viable as a bank and connected automaker. The defendant's self-proclaimed means, motive and intent to survive in the business sense while doing so with at this unlawfully in connection with this plaintiff and at this plaintiff's intentional gross injury and expense while this critical *"creditor to debtor competitive business relationship"* became the culminate factor which destroyed this plaintiff and his competitive trade.

**(23l)** The aforementioned seemingly 'broad allegations' involving ResCap's instigating efforts as both negligent and intentional acts of willful misconduct will be proven through a preponderance of evidence including ResCap, GMAC and other inner-corporate published documented inculpatory evidence, and other official press releases and/or documents *without altering or affecting the absolute fact that GM Employee, GMACM agent, Mr. Kordella did*

*already commit (and did previously admit to)* publishing the destructive injurious libel in a malicious manner noted herein while at work and while utilizing the GMAC LLC maintained private "ISP".

### UNITED STATES TREASURY (Department of)

**24.**    **Defendant, The Department of the US Treasury** ("UST") Cause of Action

**(23a)** through negligent, reckless misconduct [i.e lack of due care] is the main pecuniary source for co-defendant's AND who engaged in gross negligence during the various tortious acts against this plaintiff (ongoing) and allowed;

**(24b)** These co-defendants to begin and to maintain this crippling series of strategically worded injurious falsehoods which amount to both civil and criminal behavior and have been allowed since June 9th, 2009 to continue on this plaintiff's website to the severe business and personal reputation crippling, injurious detriment (herein noted) [via "UST" funding of plaintiff's general operating costs, specifically the GMAC HQ maintenance for the GMAC LLC located and "protected computer," per 18 U.S.C. § 1030(e)(2), which designates the private and highly secured Internet Service Provider ("ISP")] without a subsequent "GM Family" corporately stated apology (neither public nor private) for the damaging libelous tyrade nor any sort of "GM Family" corporately stated request (neither public nor private) to have this attack removed. [However, to be fair and clear, the lack of public apologies from GM-GMAC, prior to the date of service of this lawsuit or the preceding final notice certified letter to Secretary of the UST Geithner on 8/1/2010, is no fault of the UST],

**(24c)** *LET IT BE KNOWN:* The US Treasury is now, on this date of service, formally and officially fully aware of these criminal and tortious activities by both GM and GMAC and **(24d)** if they do not immediately halt all such funding and retract all monetary backing of said

companies whereby <u>any</u> UST funds are continued to be used, whether whole or in part, to perpetuate these crimes, AND

**(24e)** to force immediate legal and remedial actions upon GM, GMAC whereby the UST requires GM, GMAC to remove and issue a public corporate apology for said oppressive libelous tactics used against and to destroy this plaintiff and **(24f)** because, in fact, GM, GMAC via UST funding, have and continue to destroy this plaintiff and interfere with this plaintiff's business **in clear violation of federal and state laws,** (Specifically ARS Codes noted at ¶ **24l,** ¶ **24m)** .

**(24g)** The UST may from this day onward be held accountable as a knowing and willing (aiding and abetting) accomplice to the tortfeasors and crimes against this plaintiff noted herein.

**(24h)** <u>WHEREFORE the United States Treasury ("UST") BY LAW must from this point forward be held accountable as a full criminal partner (see complaint herein) and direct tort associate on these criminal activities.</u> **(23i)** Please be aware that plaintiff's next claims and allegations will be proven as **(24j) Willful and Wanton Misconduct** to replace this plaintiff's current claims for damages and allegations through what is currently,

**(24k) Reckless Misconduct**, by the UST against this plaintiff which is classic guilt by association amounting, <u>in either circumstance in regards to ¶ ¶ ¶ 24h,24i,24j herein,</u> to aiding and abetting the perpetuation of these seriously damaging tortious action[s] and crime[s] against this plaintiff by and through the agreed UST as lender status and delivery of GM, GMAC TARP and other funding on a "committed basis".

**(24L) Arizona Revised Statutes § 13-1003** and by law of conspiracy and pure unmitigated complicity, the UST can no longer continue to provide funding in a quasi-fiduciary, wholly pecuniary manner or in any other committed basis for co-defendants as they are acting unlawfully and with unclean hands to destroy this victimized plaintiff through the improper use

of lender UST funds in regards to the maintenance of and protection of the privately owned "protected computer," per 18 U.S.C. § 1030(e)(2), which designates Internet Service Provider "ISP" which is the basis of perpetuating the crimes and torts noted herein.

**(24m) Arizona Revised Statutes § 13-2303**. <u>**Financing extortionate extensions of credit**</u>, Refers to exactly what the UST is participating with from this point forward and this plaintiff expects to be compensated by the UST separately for damages incurred after this date. *"A person who knowingly advances money or property, whether as a gift, loan, investment, pursuant to a partnership or profit sharing agreement or otherwise, to any person, with reasonable grounds to believe that it is the intention of that person to use the money or property so advanced, directly or indirectly, for the purpose of making extortionate extensions of credit, is guilty of a class 2 felony."* The Honorable Secretary Geithner must regretfully be held personally liable for his own negligence from this day forward if GM-GMAC continue to receive funding or benefit from UST actions or in-actions to have this blackening,damaging injurious libel and falsehoods including but not limited to trade libel removed from this plaintiff business and funding related website. *Plaintiff does not make these claims against the UST or Secretary of Treasury Geithner with satisfaction, but with a heavy heart.*

**(24n)** Plaintiff is making it very clear to the UST, this honorable court and all parties, that for the UST and/or the US Government to go any further in working with GM, GMAC or any new corporate names this company may invent (herein called the "GM Family") while the "GM Family" continues to commit the crimes and torts noted herein against this plaintiff, THEN the UST and USG will be held fully culpable as willing accomplice.

**(24o)** Reserved.

**(24p)** Potential-additional culpable parties within the UST or elsewhere are not being served at this time, since they are unknown until this honorable court grants Discovery.

**(24q)** *A legal point that must be understood by the UST, is that now that you are aware of these issues, the UST will be held liable for protecting and not participating in the further destruction of this plaintiff's constitutional protected rights to be detailed as needed and in court,* **(24r)** specifically, the right to free agency, the right to NOT be deprived of life, liberty and pursuit of happiness, et al **(24s)** [which for this plaintiff is the goal of creating a business that expands the US workforce and creates jobs while promoting and selling the Mealer Automobile and other Mealer Companies LLC US made products]) from being further reduced and eroded by the companies you are funding (specifically GM and GMAC and whatever corporate name changes they invent.

**(24t)** The UST has no protection from any law to allow the funding of co-defendant's gross abrogations of rights and tortfeasors against this plaintiff.

**(24u) Wherefore,** United States Treasury, you are on notice, do what the law commands and stop funding this illegal activity. **(24v)** *And yes, I am ready for that series of audits, you will probably now throw at me and my now destroyed business(es).*

### FACTUAL ALLEGATIONS

**25.** Defendant, **Mr. Kris Kordella,** on information and belief, resides at 1575 Honert Rd., Ortonville, MI (48462) **(24a)** Mr. Kordella's current phone number is (248)-627-3631

**(25b)** Mr. Kordella was a seasoned and experienced loyal member of the GM Family from "May 1986 to September 2009" (23 yrs, 5 mos.)"

**(25c)** Mr. Kordella served for a time as Senior Engineer for GM and is

**(25d)** now "self-employed" **(24e)** with UAW and GM benefits as a

**(25d)** "Quality Engineering & Education and Training Development" [instructor] for

**(25g)** GM related 'classes'

**(25h)** at various GM  owned and/or leased locations **(25i)** since October 2009

**(25i)**  at least partially from within GM facilities and GM maintained classroom setting for the benefit of GM, **(25j)** and at least partially to benefit of "NEW GM".

**26.**    Mr. Kordella, while signing up and creating his simulated character "MONEY01" who, by the very moniker, while appearing to profess himself a highly rated investor "guru" or "know-it-all" (and engineer per "MONEY01" proclamations)

**(26a)** did publish untrue, derogatory injurious falsehoods about the Mealer Automobile and plaintiff, Mr. JL Mealer himself,

**(26b)** on June 9th, 2009 and also through direct email messages to "MONEY01" blog related parties.

**27.**    Mr. Kordella's return email address as entered into his MONEY01 blog on plaintiff's professional website in what he made appear to be a new financial, professional engineering opinion blog was/is "kris.j.kordella@gm.com" and originated from GM registered IP address 198.208.251.24 in or near Bloomfield Hills, MI., while at work on June 9th, 2009 by and through the GMAC LLC, HQ maintained, protected and privately owned "protected computer," per 18 U.S.C. § 1030(e)(2), which designates Internet Service Provider "ISP" "GMC-20" which is jointly owned by all corporate defendants through contracts as noted herein.

**28.**    Defendant's willful and malicious conduct and conscious disregard of this plaintiff's safety and business goals and personal reputation and through gross deviation of conduct creating irreparable injury to this plaintiff (specifically defendant, Mr. Kordella) who was on June 9th, 2009;

(28a) a GM employee AND (28b) a subsequent GMACM agent [which is subsidiary of ResCap, which is subsidiary of GMAC LLC and under contract for cross-collateralization of all negotiable instruments and mortgage interests with each other] while utilizing jointly owned GMAC LLC Corporate HQ maintained "ISP" while at his place of work for GM in a GM building on a GM Family network computer (specifically registered to GM the automaker),

(28c) did personally use his self-created "MONEY01 Blogging Account" on plaintiff's privately owned business growth website, in order to immediately globally publish maliciously planned denigrating attacks against this plaintiff and have viewed by prospective future customers and funding agents and to be implied with extreme significance, via; exclusive RSS fed and automatically emailed "news updates."

(28d) Phony news updates and untrue commentary which Mr. Kordella created through his MONEY01 blog were immediately published globally on this plaintiff's "private business funding and product growth website" known as "http://mealercompanies.com" whereby the actions and damages noted herein, did occur and continue to occur to the extreme detriment of this plaintiff and this plaintiff's automaker business;

(28e) While under Mr. Kordella's professional capacity, (27f) While at work for GM, (28g) While using the GMAC et al private "ISP," (27h) While trespassing with intent to destroy on this plaintiff's professional business website, which was;

(28h1) Created to influence multiple qualified prospective investors, clients, customers, employees, banking institutions, US Military and US Border Patrol prospective interests, governmental prospects, etc.,

(28h2) Created for privately owned independent automaker "Mealer Companies LLC,"

(28h3) In order to gather $200,000,000. of prospective B-Round trade growth investment

funds, and, **(28h4)** Created to gather $30,000,000. worth of prospective pre-MFG sales of the Mealer BV (slated for 2000 units) AND,

**(28i)** did effectively publish on a global scale;

**(28i1)** Multiple grossly disparaging, derogatory, injurious falsehoods, and

**(28i2)** Gross trade libel. **(28i3)** By and through a derisive AND effective tortious design to intentionally interfere with prospective advantageous fund investors and future product sales;

**(28j)** Which created these exact pecuniary and compounding daily damages AND

**(28k)** Other irreparable harm to this plaintiff's;

**(28k1)** through Personal defamation of good character AND **(28k2)** destruction of Professional reputation AND

**(28k3a)** unprofessional, aggravated willful and wanton misconduct (which is ongoing and intentional) resulting in improper influence and intentional tortious interference regarding the prospective investment viability and trade libel specifically regarding the Mealer Automobile,

**(28k3b)** and other Mealer products for domestic manufacturing trade and to be marketed for sale publicly and governmentally as detailed herein.) **(See Appendix II) (See Exh._____)**

**(28l)** Mr. Kordella did in fact visit this plaintiff's professional website and while and after and during signing up to blog and actually "blogging" with ill intent the injurious falsehoods and trade libel per se under moniker MONEY01, did also open an Internet "window" to view and read the actually defined and detailed webpage of mealercompanies.com entitled "WHAT WE ARE REALLY ABOUT" ["http://mealercompanies.com/?page_id=2"] and did personally review the actual reasons for the existence of this plaintiff's prospective funding website multiple times *prior to and during* his malicious and intentional acts of willful and wanton

misconduct whereby he did in fact publish a series of ultra-inflammatory, injurious, maliciously and strategically worded, injurious falsehoods about this plaintiff and his automotive manufacturing trade creating trade libel, intentionally and explicitly to destroy this plaintiff's notoriety, ability, plans, goals and desires to gather funding and expand manufacturing of the Mealer Automobile and other Mealer products and to destroy pre-MFG sales and the total destruction of the Mealer name. **(See Exh_____)**

**(28m)**  Defendant Mr. Kordella while at work for GM and while using the *private, jointly owned* and "protected computer," per 18 U.S.C. § 1030(e)(2), which designates Internet Service Provider "ISP" *[By and through the cross-collateralization under the Omnibus Security Agreement and other documents and agreements whereby granted a security interest to the Omnibus Agent in any cash or other property posted or required to be posted as collateral (REFER TO ALL OF " ¶ # 63 " herein)]* while on this plaintiff's professional business and funding website creating the injurious falsehoods and trade libel, did also participate with two other GM employees and did share interactions and communication with Mr. Joe Burgel and Ms Christie Garwood who were also at work for GM at separate locations and were simultaneously visiting the same website pages of this plaintiff from the defendants' *private, jointly owned* and "protected computer," per 18 U.S.C. § 1030(e)(2), which designates Internet Service Provider "ISP" *[By and through the cross-collateralization under the Omnibus Security Agreement and other documents and agreements whereby granted a security interest to the Omnibus Agent in any cash or other property posted or required to be posted as collateral (REFERENCE ALL OF "¶ #63" herein)]* and sharing suggestions on exactly what untrue and unwarranted methods and injurious falsehoods terminology to use to publish and permanently destroy this plaintiff.

**29.** General Motors Corporation ("GM" a/k/a "GMC") was founded on September 16, 1908, in Flint, MI., as a holding company for Buick. **(28a)** In the mid 1920's "GM" HQ was moved to Detroit, MI.

**30.** General Motors Acceptance Corporation ("GMAC") was a wholly owned subsidiary of General Motors Corporation"GM" when it was formed in 1919 as the "GM" financial arm mainly to provide funding for GM vehicles.

**(30a)** "GMAC" has multiple inner-corporate branches, such as;

**(30b)** GMAC Financial Service(s) ("GMACfs) created specifically for home loans), AND **(30c)** GMAC Commercial Finance ("GMAC CF") created specifically to maintain dealer vehicle supplies, credit and vehicle stock on GM Lots), **(30d)** In July 2006, General Motors Acceptance Corporation changed its name to GMAC, LLC

**31.** On May 15th, 2009, GMAC's banking unit enhanced/changed their corporate presence with a new name whereby they planned to become publicly recognized as the new Ally Bank (a/k/a Ally Financial),

**(31a)** and agreed to accept and offer loans for Chrysler vehicles specifically so that they could receive funds from GM after the  GM - "UST" - T.A.R.P. funding AND

**(31b)** as publicly stated, specifically so that the defamed "GM" title would not become a blemish to "GMAC" **(31c)** AND as GMAC's banking unit would thus become re-branded as the new "Ally" financial, a bank and lending unit.

**32.** On May 21st, 2009, the US Treasury announced it would invest an additional $7.5 Billion in GMAC LLC which gave the US Government the majority stake.

**33.** GMAC, LLC (GMAC), previously known as General Motors Acceptance Corporation, was incorporated in 1919 as a wholly owned subsidiary of General Motors Corporation (GM).

**34.**    GMAC Global Relocation Services LLC, a member of the GM Family, changed it's name to Brookfield Relocation Services LLCs, in 2009.

**35.**    Residential Capital LLC was formed as a subsidiary of GMAC LLC to provide Residential Funding Corporation ("RFC") and GMAC Mortgage with a revolving credit facility.

**36.**    The "credit facility" mentioned in  "¶ #35" is secured by "RFC's" and GMAC Mortgage's servicing rights and related contractual rights under certain pooling and servicing agreements and loan servicing agreements with respect to pools of mortgage loans and home equity lines of credit.

**37.**    Residential Funding Corporation "RFC" and GMAC Mortgage, LLC entered into a Loan and Security Agreement with GMAC LLC October 23rd, 2008

**38.**    Under the terms of the Loan and Security Agreement, RFC and GMAC Mortgage were permitted to request loans from the lender until October 17th, 2008, at which point the loans would mature, unless refinanced or repaid earlier.

**39.**    On June 1, 2008 " RFC", GMAC Mortgage ("GMACM") and GMAC LLC entered into an amendment to increase GMAC LLC maximum lending commitment under the Loan and Security Agreement from $750 million to $1.2 billion.

**40.**    Residential Funding Company, LLC ("RFC") and GMAC Mortgage, LLC announce extension of mortgage loans and home equity lines of credit facility to July 31st, 2009.

**41.**    Residential Capital LLC is the parent company for GMAC Mortgage.

**42.**    GMAC Mortgage is licensed to do business in Arizona under an Arizona Mortgage Banker License # BK-0908590 and is an indirect wholly owned subsidiary of Ally Financial Inc., one of the largest financial services companies in the world.

**43.**    GMAC Mortgage is a leader in customized subservicing programs, offering a full range of branding options to support the servicing of multiple products across multiple asset grades,

including first mortgages, home equity loans and lines, and unsecured consumer credit. Originators, servicers or investors can maximize profits with GMAC Mortgage by:

**(43a)** decreasing costs, **(43b)** moving into new markets quickly and efficiently,

**(43c)** mitigating operational risk,  **(43d)** increasing focus on core business, and

**(43e)** executing various secondary market options. **(43f)** GMAC Mortgage works with businesses to develop a cost-effective servicing solution tailored to individual business objectives.

**(43g)** With their state-of-the-art systems and operations, they assist companies in protecting assets and maximizing returns so they can focus on their core revenue producing activities.

**44.** On April 18th, 2008, Residential Funding Company, LLC and GMAC Mortgage, LLC (GMACM) (each of which are subsidiaries of ResCap), entered into a Loan and Security Agreement with GMAC Inc., as lender, to provide company and GMACM with a revolving secured credit facility, which is secured by RFC's and GMACM's servicing rights and related contractual rights under certain pooling and servicing agreements and loan servicing agreements with respect to pools of mortgage loans and home equity lines of credit. On June 30, 2009, the loan repayment dates for each of the MSR Facility, the November Facility and the June Facility were extended from June 30, 2009 to July 31, 2009.

**45.** GMAC Mortgage, LLC engages in originating and servicing residential mortgages.

**(45a)** The company operates three primary business units: **(45b)** GMAC Mortgage,

**(45c)** GMAC Home Services, and **(45d)** GMAC Bank. **(45e)** GMAC Mortgage business unit originates first and second lien residential mortgage loans through a network of retail offices; direct lending centers; and Internet sites, such as http://www.gmacmortgage.com and http://www.ditech.com. **(45f)** GMAC Home Services LLC business unit provides real estate services directly to customers. **(45g)** GMAC Global Relocation Services LLC is a subsidiary of

GMAC Home Services business unit and offers GM Family and associate members specialized, private member relocation services. **(45h)** GMAC Bank business unit provides online banking services, which include money market savings accounts and fixed-term certificates of deposit. **(45i)** GMAC Mortgage, LLC was formerly known as GMAC Mortgage Corporation. **(45j)** The company was founded in 1985 and is headquartered in Horsham, Pennsylvania. **(45k)** It has additional offices in the United States and Canada. GMAC Mortgage, LLC operates as a subsidiary of GMAC Mortgage Group, LLC.

**46.**     The "GMAC" umbrella group of mortgage and it's inner-related finance companies is one of the nations largest residential mortgage lenders. **(46a)** GMAC originates and services loans for customers nationwide and **(46b)** has earned a reputation for offering high-quality service to it's customers. **(46c)**  GMAC (et al) once strong reputation as a family-oriented lender is now of a lender who places more stringent, unyielding standards against its customers to benefit it's new shareholders and their "bottom dollar".

**(46d)** GMAC's family of lenders (specifically GMACM) is a member of the GM Family and provides GM Family benefits to other members of the GM Family and benefits from other members of the GM Family.

**47.**     GMAC Mortgage Corporation is a division of the General Motors Acceptance Corporation. **(47a)** GMAC Financial Services, which is the parent organization of GMAC Mortgage, encompasses **(47b)** insurance, **(47c)** real estate, **(47d)** auto loans, and

**(47e)** commercial finance. **(47f)** This international company has been part of the General Motors Family since the late 1910s.

**48.**     GM Family First is a program offered to GM employees and its related companies.

**(48a)** The program waives appraisal costs and guarantees that GMAC will hold mortgage for the life of the policy.

**49.**    GM Family First eligibility includes employees (active, retired and surviving spouses/domestic partners of retired employees) of the following companies: **(49a)** General Motors, EDS, Delphi, The Raytheon Company, Hughes Electronics. Eligible family members of employees include: Spouses, Children (including step), Grandchildren (including step), Parents (including step), Grandparents (including in-law and step), Siblings (including full, half and step), In-laws (including mother, father, son, daughter, brother and sister), Same-sex domestic partners (where applicable). **(49b)** GM Family First is also available to GM dealership employees and their eligible family members. This includes employees of non-GM dealers who are part of a multi-dealer group that includes a GM dealership.

**50.**    GMAC was renamed Ally Financial in 2010, and was founded in 1919 as the General Motors Acceptance Corporation (GMAC) to be a provider of financing to automotive customers. Since then, the business has expanded to include insurance, online banking, mortgage operations and commercial finance.

**51.    Reserved**

**52.**    Per GMACM  loan servicing agreements with ResCap and through various ResCap's publicly released statements, the GM Family cabal was, on June 9th, 2009, employing what the ResCap CEO consciously termed and expressed as an *"...aggressive..."* response for mortgage debt collection and as loan servicing guidelines, which did qualify and eliminate certain competitive businesses (specifically the Mealer Automobile) *"... by further reducing..."* the ResCap, GMACM, GMAC LLC, and GM Family, *"...business risk..."* standards in order to increase profits and decrease loss for the entire GM Family.

**53.**    GMAC purchased plaintiff's home mortgage loan from the Arizona based mortgage company "Amerifirst Financial Inc." This transaction was made without consultation or by choice of this plaintiff and became effective according to GMAC(M) on April 1st, 2008.

**54.**    On December 29th, 2009, the UST invested $5 Billion in GMAC from its Troubled Assets Relief Program (TARP).

**55.**    On July 15th, 2010 *[TG-777]* Treasury Secretary Timothy Geithner remarked on the passage of the "Wall Street Reform and Consumer Protection Act", in part:

"...**He [US President Obama] called for a restoration of responsibility**, for a more stable banking system **with stronger protections for American families and businesses**.  And last spring as President, he called for comprehensive reform – not changes at the margin – because failures of our financial system were so devastating to the lives and dreams of so many Americans...." "...They **will help restore the great strength of the American financial system** which – at its best – develops innovative ways to provide credit and capital, not just for our great global companies, but **for the individual with an idea and a plan**..."

**(55a)**    Although this currently pending law (as this first amended document is drafted) is supposed to prevent the too "big to fail" situations such as with GM and GMAC, it is apparent that banks such as GMAC et al will be required to act with prudence and care and follow the law of the land with and without contracts and not with the intentional recklessness, wanton malfeasance with criminal intent as GMAC Mortgage, GMAC et al has put upon this injured plaintiff, simply to self-serve and to support their own interests. Albeit, the laws protecting the new businessman from anti-competitive and direct creditor misconduct including banking fraud and a host of tortious offenses do actually already exist, Mr. Geithner has restated that Congress will further protect the "...individual with an idea and a plan..."

**56.**    Intentionally Interfering With [an individual's or a businesses'] Prospective Advantage is also referred to as tortious interference by legal standards in most American States, specifically in Arizona.

**57.    Reserved**

**58.**    "GM" has retained approximately $20 Billion in automobile financing through the new GMAC (aka Ally) in their dealing with Cerberus worth an estimated $4 Billion over three years.

**59.**    On December 29, 2008, the United States Department of the Treasury invested $5 billion in GMAC from its $700 billion Troubled Asset Relief Program (TARP).

**60.**    As of May 15, 2009, GMAC's banking unit officially changed its name to Ally Bank.

**61.**    On May 21, 2009, the U.S. Treasury announced it would invest an additional $7.5 billion in GMAC LLC which gave the U.S. government the majority stake in the new company.

**62.**    On May 10, 2010, GMAC Inc announced that it re-branded itself as Ally Financial Inc.

**63.**    <u>PER the SEC filing readable at ["http://www.secinfo.com/d12TC3.sFg8.htm"]</u>

    **(63a)**"On March 18, 2009, Residential Capital, LLC ("ResCap") and two indirect subsidiaries of ResCap, Residential Funding Company, LLC ("*RFC"*) and GMAC Mortgage, LLC ("*GMAC Mortgage"*), each entered into an ISDA 2002 Master Agreement (collectively and together with the schedules, annexes and swap transactions relating thereto, the "*ISDA Agreements"*) with GMAC Investment Management LLC ("*GMAC IM"*), a subsidiary of GMAC LLC ("*GMAC"*), whereby ResCap, RFC and GMAC Mortgage each agreed with GMAC IM to enter into foreign exchange and interest rate hedging transactions. On March 18, 2009, GMAC Mortgage entered into a Master Securities Forward Transaction Agreement (together with the annexes and swap transactions relating thereto, the "*Forward Agreement"* and together with the ISDA Agreements, the "*Derivative Agreements"*) with GMAC IM whereby GMAC Mortgage

agreed to sell certain mortgage backed securities to GMAC IM from time to time on a forward basis."

(63b). "On March 18, 2009, ResCap, RFC, GMAC Mortgage, and two indirect subsidiaries of ResCap, Passive Asset Transactions, LLC ("*PATI*") and RFC Asset Holdings II, LLC ("*RAHI*" and together with ResCap, RFC, GMAC Mortgage and PATI, the "*ResCap Entities*") entered into a Guarantee and Master Netting Agreement (the "*Master Netting Agreement*") with GMAC and GMAC IM whereby the parties agreed to aggregate, net and set off against GMAC IM across the following related agreements: (i) the Derivative Agreements, (ii) the Loan Agreement dated as of November 20, 2008 (the "*November Loan Agreement*") by and among the ResCap Entities, GMAC as lender agent (in such capacity, the "*November Lender Agent*"), and GMAC as initial lender, and (iii) the Loan and Security Agreement dated as of April 18, 2008 (the "*MSR Agreement*") by and among ResCap, RFC, GMAC Mortgage and GMAC as lender (in such capacity, the "*MSR Lender*")."

(63c). "In connection with the Derivative Agreements and Master Netting Agreement, on March 18, 2009, the ResCap Entities as grantors entered into an Omnibus Pledge and Security Agreement and Irrevocable Proxy (the "*Omnibus Security Agreement*") with GMAC as omnibus agent (in such capacity, the "*Omnibus Agent*"), the November Lender Agent, the MSR Lender, GMAC as a secured party and GMAC IM as a secured party, whereby the ResCap Entities agreed to cross-collateralize their respective obligations under (i) the Derivative Agreements, (ii) the November Loan Agreement and the Pledge and Security Agreement and Irrevocable Proxy dated as of November 20, 2008 (the "*November Security Agreement*") by and among the ResCap Entities and the November Lender Agent, and (iii) the MSR Agreement. To secure such obligations, the ResCap Entities granted a security interest to the Omnibus Agent in any cash or other property posted or required to be posted as collateral by ResCap, RFC and GMAC

Mortgage to GMAC IM pursuant to the terms of any Derivative Agreement and all right, title and interest of each of ResCap, RFC and GMAC Mortgage in, to and under any Derivative Agreement, and in the collateral previously pledged to the November Lender Agent and the MSR Lender, including (i) RFC's receivables under certain warehouse loans it has made to third-party lenders; (ii) a secured note issued to PATI by Flume (No. 8), (iii) 100% of the equity of PATI A, LLC and 100% of the equity of RAHI A, LLC, and (iv) RFC's and GMAC Mortgage's servicing rights and related contractual rights under certain pooling and servicing agreements and loan servicing agreements with respect to pools of first- and second-lien mortgage loans and home equity lines of credit."

**(63d).**    "In connection with this cross-collateralization under the Omnibus Security Agreement, on March 18, 2009, the ResCap Entities and GMAC entered into the Fourth Amendment to the November Loan Agreement and the First Amendment Agreement to the November Security Agreement; and ResCap, RFC, GMAC Mortgage and GMAC entered into Amendment No. 8 to the MSR Agreement."

**(63e).**    "The Omnibus Security Agreement and each of the Derivative Agreements contain representations, warranties and covenants customary for such agreements. Other provisions of the Omnibus Security Agreement include limitations on creating liens, incurring debt, transactions with affiliates, sale/leaseback transactions, engaging in new lines of business activity, paying dividends, and mergers and sale of substantially all assets. In addition, on March 18, 2009, the Loan Repayment Dates for the MSR Agreement and the November Loan Agreement were extended to June 30, 2009."

**64.    Reserved.**

**65.    Reserved.**

**66.    Reserved.**

**67.    Reserved.**

**68.**    GMACM, GMACLLC, RESCAP and defendant's GM have been aware of their willful and malicious misappropriation of funds used unlawfully against and to the detriment of this plaintiff within 15 days of the unlawful incident and have not yet responded or made an attempt to have removed the content of their destructive, aggressive behavior, which is a perpetuation and continuation of their destructive tortious and criminal and inner-corporate collusive activity.

## INITIAL OUTLINE OF ALLEGATIONS, VIOLATIONS, TORTS

**69.**    These instant "fully **plausible** allegations" detailed herein according to case law noted on Pgs 98, 99 are highly extraordinary, yet are in fact, true and provable albeit seemingly bizarre and rare. **(69a)** These fully plausible, factual and documented statements and the resulting claims caused by and intentionally perpetuated by defendants' actions against this victimized plaintiff include a letter of intent and admission by defendants' (specifically Mr. Kordella).

**(69b)** Plaintiff is well aware and expecting the defense counsel to claim these facts are merely broad allegations, wild accusations and baseless claims, but as is proven by the GM Family of defendants (as detailed herein) this improper means was/is standard operating procedure for defendant's as a bank, as an automaker, as a mortgage company and as a loan servicing company, and

**(69c)** this plaintiff looks forward to our day before a jury in this honorable court so that this may be proven through testimony, inculpatory evidence and direct government documents created by and filed by defendants..

**70.**    Plaintiff contends that even without full disclosure from plaintiff's this complaint may stand in court and **(70a)** by all legal ramifications the plaintiffs both individually and

**(70b)** collectively are culpable for the 100% of the damages, losses and irreparable harm including but not limited to defamation of character, trade libel and tortious interference, et al

made unconscionable and with malice against this plaintiff through **(70c)** respondeat superior "severely" (Master and Servant) and/or

**(70d)** "jointly" as working in concert. **(70e)** Through a preponderance of evidence and a prima facie  letter of confession by GM these claims have been proven and the all defendants' inner-corporate associates who may have participated with the injury of this plaintiff will be brought forth at trial during discovery.

**(70f)** With ample inculpatory evidence of defendants' "civil conspiracy" this plaintiff contends that this intentionally grossly destructive, malicious attack will unfold into a series of criminal activity that may shape future case law.

(70g)   As  an attorney for Wolfe & Wyman LLP who represent GMAC Mortgage LLC, stated on this matter while discussing this extraordinairy case over the phone on August 3rd, 2010; (somewhat paraphrased), *"...This case can be compared to a movie made by producers Michael Moore and Oliver Stone combined..."*  This plaintiff has to agree with Wolfe & Wyman's initial outlook on this complex yet very simple complaint and the absolutely incredible factors involved to create this entire scenario, but as is proven within this complaint, with the inculpatory evidence provided and GM employee Mr. Kordella's admission and reasoning of his injurious falsehoods and intent combined with the SEC filings made by GMACM, GMAC LLC, ResCap, et al themselves and the public announcements made by ResCap's CEO Thomas Marano, that this is not a bad "B" movie, but a fully plausible and real life intentionally arranged anticompetitive drama that has destroyed this plaintiff to the benefit of GM and the GM Family, specifically, the defendants.

**(70h)**   The New GM may not have succeeded to the financially respectable and generally recovered  manufacturing  position  as  "Old  GM"  today,  if  another  new  US  Automaker

(specifically Mealer Companies LLC) had come into the spotlight in the summer of 2009. This plaintiff believes that but for the trade libel and personal character assassination of this plaintiff including the improper and unlawful destruction of the reputation of the Mealer Automobile was a necessary, highly unlawful requirement for the General Motors Corp., k.n/a. New GM and GM Family (specifically the defendants) during their critical moment of abject failure in June 2009,

**(70i)**    AND the expanded Mealer Automobile and other Mealer Companies' products would have been funded for expansion <u>"but for"</u> the intentional interference by defendants of this plaintiff's prospective advantage and defendants' strategic sabotage which is their published trade libel through published injurious falsehoods which were strategically prepared to cause the most harm and did in fact, expose this plaintiff to public hatred, shame, obloquy, contumely, odium, contempt, ridicule, aversion, ostracism, degradation and disgrace, and did induce an evil, disgraced, uncertain opinion of this plaintiff and the Mealer Automobile in the minds of right-thinking persons, prospective customers and investors which did deprive this plaintiff of the confidence needed from prospective funding groups and family's and/or individuals who required trust in plaintiff and the safety of the Mealer Automobile prior to purchasing the automobile and other products whereby future customers required a high level of trust of engineering prior to Mealer Automobile purchases and the placing of loved ones in the Mealer Automobile.

**(70j)**  These ultra destructive for and committed by defendants' against this plaintiff on June 9th, 2009 and the subsequent , damaging and injurious falsehoods and irreparable trade libel including defendants' follow up emails to prospective clients and investors by defendants, (specifically Mr. Kordella) have utterly and permanently destroyed the Mealer Automobile name and the trustworthiness and honesty of this plaintiff.

## COUNT I
### GMACM, ResCap, GMAC LLC, MORTGAGE ASSETS MISHANDLING, MISAPPROPRIATION OF MORTGAGE FUNDS Title 18 USC 657, MISUSE OF MORTGAGE PAYMENTS (FRAUD, CONSTRUCTIVE FRAUD), WANTON AND RECKLESS MISCONDUCT, ADVANCEMENT OF ECONOMIC ESPIONAGE THROUGH ELECTRONIC AND PUBLISHED MEANS, WILLFUL MISAPPLICATION OF MONIES, ATTEMPTED THEFT BY CONVERSION,  IMPAIRED CONSENT, WICKED EXPLOITATION, UNDUE INFLUENCE, UNCONSCIONABLE DEALINGS, BREACH OF IMPLIED FIDUCIARY RESPONSIBILITY, et al

**71.    GMAC, ResCap, GMACM' (et al)** improper conduct, wanton and reckless misconduct and the various wicked exploitation circumstances described herein committed through **(71a)** perversions of prudence, care, misuse and illegal improper pecuniary misapplication of this plaintiff's mortgage payments did result in the commission of tortious behavior, gross negligence and defendants did willfully perpetuate against this plaintiff, and causing harm, creating hardship and bankruptcy and loss of prospective funding to the detriment of this plaintiff by;

**(71a_1_)** fraudulent mishandling of assets (specifically the perverted abuse of this plaintiff's mortgage payments to harm this plaintiff while benefiting themselves ), which encompass;

**(71a_2_)** illegal, unfair and unethical business practices, **(71a_3_)** contributory unlawful, unfair competition,  **(71a_4_)** attempt to unlawfully obtain through lawful foreclosure by improper means, this plaintiff's real estate, via false pretenses (theft by conversion), **(71a_5_)** illegal contract manipulation with intent to cause mortgage default (mortgage fraud), **(71a_6_)** wrongful appropriation through gross misconduct, resulting in extortion,

**(71a_7_)** abrogation of banking and creditor standards of fairness and procedure,

**(71a_8_)** impaired consent through breach of contractual assumption of trust through "equitable lien" and "security interest" (which is the mortgage contract between GMACM and plaintiff which creates a quasi-fiduciary relationship through the duty of trust and care between contractual parties) and

**(71a_9_)** unconscionable dealings causing breach of fiducial obligation to prohibit ("GM Family") intra-corporate self-dealings and **(71a_10_)** contract breach of implied covenant of good

faith and fair dealing which directly relates to creditors failure of duty of non-interference, inadequate protection for debtor in respect to this instant mortgage obligation.

(71a*11*) GMACM and ResCap did aid and abet and commit by direct participation a series of irreparably harmful acts tot his plaintiff of gross negligence and dereliction of duty to act fairly while under contract with this plaintiff

(71a*12*) which is but is not limited to; willful and malicious misappropriation of this plaintiff's mortgage funds that are ongoing after the lawful default caused by unlawful means upon this plaintiff by defendants who,

(71a*13*)  IN FACT, misapplied a portion of this plaintiff's mortgage funds to initiate and maintain defendants' GMAC LLC, GMACM, ResCap, et al *private, jointly owned* and "protected computer," per 18 U.S.C. § 1030(e)(2), which designates Internet Service Provider "ISP" *[By and through the cross-collateralization under the Omnibus Security Agreement and other documents and agreements whereby granted a security interest to the Omnibus Agent in any cash or other property posted or required to be posted as collateral **(REFER TO ALL OF " ¶ # 63 " herein)]** .

(71b) GMACM did intentionally participate, aid and abet in the commission and perpetuation of various acts of intentional misrepresentation of this plaintiff and injurious falsehoods to a variety of this plaintiff's pending customers, prospective investors and joint venture business associates and other critical parties at a critical juncture of business growth for their own gain and for the gain of inner and intra-corporate businesses resulting in actual theft by Conversion and Theft by Attempted Conversion by lawful means (foreclosure) through unlawful means (which is, but not limited to; defamation of character, intentional interference with prospective advantage and trade libel, et al) which was defendants' actual and effectual efforts to their intentional exercise of domination and control over a this plaintiff's real property at 6333 Gardenia Lane, Show Low, Arizona, which seriously interfered with the right of this plaintiff  to

control this property which is also the legal headquarters for the Arizona registered alternative automaker Mealer Companies LLC which is competitive to the defendants livelihood.

**(71c)** GMACM did intentionally participate in the activity that did, in fact, create an impossibility to perform under the mortgage contract and has intentionally participated in the perpetuation of said impossibility to perform under this mortgage contract which was legally acquired by GMACM possibly for evil intent against the wishes of this plaintiff on April 1st, 2008 to the extreme injurious harm to this plaintiff whereby damages and restitution is demanded due the irreperable harm that has been done to this plaintiff and his property and trade.

**(71d) GMACM does, to this very day** intentionally participate in the perpetuation of these crimes and tortious behavior and they have purposely failed to and now refuse to exercise their strong influence within the GM Family to have their contracted equivalent "GMAC LLC", (aka Ally Financial,  aka, Ally Bank) at 200 Renaissance Center, Detroit, Mi to utilize their protected and privately owned "protected computer," per 18 U.S.C. § 1030(e)(2), which designates Internet Service Provider "ISP" and which was the doorway and access point by which these improper transgressions were created and maintained against their contracted client who is this plaintiff.

**72.** In this particular instance, GMAC LLC, GMACM and ResCap have created a national fiducial duty to act in the best interest of all US Taxpayers when they accepted TARP funds and other UST funding, whereby their duty to regulate, service and otherwise protect their mortgage contracts (specifically Mortgage #0602003923),

**(72a)** Regardless of defendants' use of public funds, they are required to obey all US and state law including non interference with this plaintiff's legal right to compete with the GM Family (which they are part of) and to allow this plaintiff to provide alternative fuel powered automobiles and other legal products for public consumption and use.

**(72b)** Through banking and mortgage defendants' dereliction of their new duty of trust to protect the public's best interest and via any publicly proclaimed, self-prescribed quasi-fiduciary capacity to utilize US Taxpayer funds for good will rather than this deceitful purpose against the general public intended give advantage to themselves alone is gross breach of trust and constructive fraud, by giving their own inner-corporate GM Family (specifically GM the automaker) an advantage over Mealer Companies LLC who is also an Arizona registered and licensed alternative fuel powered automaker.

> **A fiduciary's duty must not conflict with another fiduciary duty.** Stewart v Layton (1992) 111 ALR 687 **Conduct by a fiduciary may be deemed constructive fraud when it is based on acts, omissions or concealments considered fraudulent and that gives one an advantage against the other because such conduct—though not actually fraudulent, dishonest or deceitful—demands redress for reasons of public policy. Breach of fiduciary duty... ...if intentional, it may be remedied in equity.** <u>Clark v Rowe</u>, 428 Mass. 339, 345 (1998) (dicta).

**73.** <u>This plaintiff does acknowledge that a typical relationship between creditor and debtor does not allow for a bona fide fiduciary relationship</u>, but this is an extra-ordinary matter and a highly unusual relationship where GMAC et al (the creditor) has an <u>imminent pecuniary dependency</u> on the viability and survival of their GM Family relationship with both Old and New GM, making their relationship *at-the-very-least* "quasi-fiduciary" as they share pecuniary risks, loans, accountability and mutual need for inner-business survival, including their fiducial pecuniary link with the US Treasury after the T.A.R.P. loans.

**74.** Fraudulent deceit of a third party in order to elevate one's own pecuniary status through false pretenses to instill a mortgage default is grossly negligent. The actions taken by GMAC LLC, GMACM, (ResCap) is a highly improper, blatantly "bad faith" violation in gross breach of implied good faith contract and the worst version of unfair dealing possible in a mortgage contract.

**75.**    Whereas, this plaintiff's business is in direct competition with the GM Family of which GMAC LLC, GMACM and ResCap are an integral part (See Exh _____ ), this plaintiff and his independent automaker business (specifically by the location of Mealer Companies LLC headquarters), which is this plaintiff's current home/office and this instant GMAC mortgage, there exists a pecuniary conflict of interest creating a quasi-fiducial conflict of interest.

**76.**    By "Fiducial Conflict," this plaintiff recognizes and is not inferring that GMAC owes any such fiduciary duty through mortgage contract as is done between a shareholder, corporation and accountant, (etc) but merely a strong duty of fair dealing and trust. GMAC breached this trust through gross unfair, bad faith dealings with this injured plaintiff.

**77.**    GMACM, GMAC LLC, ResCap misappropriation of this plaintiff/debtor's mortgage payments is a breach of duty and trust as it was used to sabotage this plaintiff's business trade and ability to maintain the mortgage contract between creditor & debtor (causing conversion).

**78.**    Whereby, the undisputed fact that this debtor's mortgage payments were lumped, combined and co-mingled into GMAC LLC, GMACM, -ResCap bank accounts, the funds were obviously used to pay for, in part, GMAC LL, GMACM and ResCap corporate expenses, including, but not limited to; maintenance of payroll, insurance, security, utilities, janitorial, clerical and specifically overhead to, maintain and secure the privately owned and regulated in GMAC headquarters "ISP" which was used to access this plaintiff's website.

**(78a)**    Discovery will provide the clear and convincing evidence needed by this plaintiff and this honorable court to  expose the co-mingling of this plaintiff's mortgage funds which were used to harm this plaintiff in the manners described herein.

<u>**COUNT II**</u>
**<u>ALL DEFENDANTS- TRESSPASS WITH INTENT TO DESTROY, DEFAULT CAUSED
THROUGH IMPROPER MEANS, INTENTIONAL INTERFERENCE WITH
PROSPECTIVE ADVANTAGE, UNFAIR DEALING, BREACH OF GOOD FAITH,
BREACH OF DUTY</u>**

**79.**    This intentional breach of contract, breach of duty through intentional sabotage by the GM Family specifically when used as mortgage debt collection procedures by GMACM is not a legal or viable portion of the Mortgage contract between GMACM and this plaintiff. There exists not a single agreement or application of any agreement between this plaintiff and GMACM or ResCap that allows either party to invade and trespass with intent to destroy, injure and abrogate the other party's ability for financial survival, or to injure the other party's reputation and expose the other party to public hatred, contempt, ridicule, and degradation.

**(79a)**    BUT FOR the defendants' invasion and trespass of this plaintiff's professional Internet website with intent to sabotage and destroy this plaintiff personally by intentionally publishing injurious falsehoods to blacken his name thus creating irreparable harm, trade libel of the Mealer Automobile, this plaintiff would have been funded by prospective funding groups, would have sold the Pre-MFG Mealer Automobiles and would never have defaulted on his mortgage with GMACM who is a co-defendant..

**(79b)** Intentional Interference With Plaintiff's Prospective Advantage, **(See Appendix II)**

**80.**    GMACM and co-defendant's did allow, instigate and participate with the June 9th, 2009 (and to date) invasion, trespass, destruction and injury, of this plaintiff's good reputation and that of his automotive trade viability and product credibility while exposing plaintiff to public hatred, contempt, ridicule and degradation which abrogated and destroyed plaintiff's ability to gather business expansion funds for the Mealer Automobile, to support my family and to fulfill the mortgage contract between GMACM and Plaintiff..

**81.**   Defendant GMACM "et al" has no authority, nor a vested right to take any legal foreclosure action after their gross contract violation which provided access for GM to destroy and defame the character and utterly devastate the trade reputation this plaintiff's professional competitive-business (GM) in order to elevate GM over Mealer Companies LLC.

**(81a)**   This plaintiff demands that GMACM produce any portion of a valid contract between GMACM and this plaintiff which allows for improper conduct such as detailed within this complaint. Without this document or contract, *GMACM has breached this instant mortgage contract without remedy on their part.*

**82.**   **THEREFORE,** this plaintiff demands and requests that if GMACM is to continue to attempt to proceed with foreclosure they <u>must</u> validate their contributory tortious interference and misuse of this plaintiff's mortgage funds (to procure the inner-office ISP) and <u>must</u> produce a legitimate authorized agreement made through Mortgage #0602003923 with this plaintiff, whereby; they were allowed on June 9th, 2009 (continued to date) or otherwise authorized to utilize *any* malicious tortfeasor (and/or) *any* gross criminal activity to their favor or for the benefit of GM Family inner-corporate entities, (including their shareholders and the US Government) that may give them *any* legal authority to participate in these crimes (herein) against this plaintiff.

**83.**   By and through what appears to be direct gross inequitable willful and wanton misconduct, and as intentionally staged and as executed gross tort violations per se (as gross creditor misconduct against their own client/debtor who is this plaintiff) the defendant GMACM *did also;*

   **(83a)** Misappropriate by unfair equitably perverse distribution of this plaintiff's mortgage payments *(including US Treasury T.A.R.P. funds)* to assist, benefit, provide, protect,

secure, instigate and negligently procure to date, their inner-corporate owned "protected computer," per 18 U.S.C. § 1030(e)(2), which designates the private and highly secured Internet Service Provider ("ISP") which was used to attack this plaintiff, per Omnibus and other agreements between defendants'. **(See Exh_____)** for grossly unfair, inequitable conduct, herein:

**(83b)** 1). Which, by vicarious liability specifically through respondeat superior culpability, was utilized as an access point and staging arena **(See ¶ # 83a)** for co-defendant's grossly disparaging defamation of character resulting in gross trade libel and intentional tortious interference of this plaintiff's private fiscal capacity and this plaintiffs' ability to maintain mortgage payments by utterly destroying this plaintiff's reputable name. **(see Damages)**

**(83c)** a). Furthermore, this plaintiff contends that GMAC committed an unethical breach of contract by violating their obligation and duty of good faith and fair dealing in respect to this plaintiff's trade, per,

> **(A.R.S. § 47-2306).**
> Section 1-203 sets forth the parties' general obligation of good faith. **For the purposes of § 1-203, good faith is defined as "honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade."** § 2-103(1)(b). 1 **Breach of this general obligation of good faith *is* a breach of the contract.**

**84.** GMACM, in order to comply with this Arizona mortgage contract under 47-2306, then, GMAC is required to; *(1)* be honest in fact, and *(2)* observe reasonable commercial standards of fair dealing. GMACM has violated both principles above in this instance and continue to disregard reasonable commercial standards of fair dealing by not having removed the MONEY01 postings which were allowed to be posted through the GMAC LLC-GMACM-RESCAP private, jointly owned and "protected computer," per 18 U.S.C. § 1030(e)(2), which designates Internet Service Provider "ISP" *[By and through the Omnibus agreement and other documents and agreements whereby granted a security interest to the Omnibus Agent in any*

*cash or other property posted or required to be posted as collateral **(REFER TO ALL OF " ¶ # 63 " herein)]** .*

**85.**    The very actions taken by these defendants appear to be the equivalent economic moral turpitude and subsequently, for anyone to offer legal defense for these defendants who have already admitted their acts and who have intentionally perpetuated their grossly unjust destruction of this plaintiff amounts to a continuation of their malicious, financial and physical devastation of another human being for the sake of a group of inner-corporate businesses which have proven inept and have failed because of their own greed.

**86.**    The very fact of GMAC derelict and intentional sabotage of one client and automaker (Mealer Companies LLC) for the financial survival and benefit of a second client and automaker (General Motors) is by all reasonable standards of commercial dealings "dishonest," "unreasonable," "unethical," and as viewed by this plaintiff/debtor (mortgagor) a blatant instance of evilly contrived gross creditor misconduct, inequitable conduct which amounts to fraud, fraudulent creditor dealings and intention to fraudulently transfer ownership of this plaintiff's mortgage by negligent and intentional destruction of this plaintiff's ability to maintain mortgage payments.

**87.**    GMACM, unfair business dealings connected in part, by fiducial payment accountability standards and creditor-debtor relationship by equitable lien under contract in Arizona, proves gross negligence, fraud and ill-intent which amounts to <u>inner-corporate self-dealing</u> against this competitive plaintiff. Whereby these instant tortfeasors and criminal activity was seemingly created in concert with GMAC LLC, GMACM , ResCap and non-engineering GM engineers and employees and allowed to continue by the GM family banking and finance sector (defendants noted herein) in favor of their preferred debtor and their inner-corporate dependency on the

survival of their competitive automaker, (codependent "GM") to the severe financial, trade and personal reputation detriment of plaintiff's "Mealer Companies LLC" (an alternative fuel powered automaker).

(87a)    Which is by and  in clear violation of the duty to protect their client even if to elevate their preferred client which is illegal misuse of mortgage assets (specifically debtors mortgage payments and TARP funds),  creating a clear conflict of interest.

(87b)    Although case law may allude where a mortgage lender and servicing agent does not have a specific legal bound "fiduciary duty" to protect their debtor/mortgagor, it is clear through even the most basic contract law that neither does any rule or the lack there of, allow for willful and negligent conflict of interest, trust or duty (inequitable conduct) when under even a basic fiducial capacity.

(87c)    Especially when an FDIC insured bank is involved such as GMAC LLC, GMACM *[By and through the Omnibus agreement and other documents and agreements whereby granted a security interest to the Omnibus Agent in any cash or other property posted or required to be posted as collateral (REFER TO ALL OF " ¶ # 63 " herein)]* with the use of GM engineers to subjugate the contract rights of plaintiff (Mealer) in order to elevate by preference, the contract rights for co-defendant (GM) is blatant omissions, concealment, dishonest, deceitful and entirely fraudulent. GMAC  et al acted intentional during the entire time they have known about the tortious interference and this claim must be remedied in equity.

(87d)    This plaintiff reasons that Breach of Trust and dereliction of duty (as inequitable conduct) cannot *legally* be used for the benefit of a preferred, intra-corporate debtor (GM) and to the detriment of another debtor (plaintiff) who may pose a *"...business risk..."* for inner-corporate GM Family.

**88.**    GMAC et al MUST BE held accountable for consequential and punitive damages and for the tortious interference among other tortious and criminal activity they induced and/or participated in upon this plaintiff which occurred and created the total and immediate pecuniary destruction of this movant. GMAC, ResCap by vicarious liability under Respondeat Superior have caused financial damages torts of gross negligence leading to intentional defamation of character, trade libel per quod (per se) etc, by and through the GM Family privately owned and accessed "protected computer," per 18 U.S.C. § 1030(e)(2), which designates Internet Service Provider "ISP" and which was the doorway and access point by which these improper transgressions were created and maintained against their contracted client who is this plaintiff. the "ISP" located from within and secured by GMAC headquarters and perpetrated by actual GM employee(s) under the GMAC LLC, GMACM, ResCap "agent" capacity while at work for GM.

**89.    GMACM does not deserve to be awarded default and foreclosure**, because this plaintiff's mortgage failure occurred through unconscionable actions instigated and originating from directly within GMAC headquarters and while defendant's have intentionally ignored this plaintiff's pleas and demands for GMAC to attempt to rectify the grossly disparaging publications which caused tortious interference and related illegal activity and subsequent mortgage default by this injured, victimized plaintiff.

**90.    Therefore,** GMACM, legal ability to foreclose on this plaintiff's real property located at 6333 Gardenia Lane, Show Low, Arizona is moot as the contract is void through fraudulent transgressions by GMACM, because this plaintiff's mortgage default was unlawfully induced and the GMAC right to foreclosure was unconscionably acquired.

1.    Regardless of these "plausible," yet barely believable claims made herein by this plaintiff, (yet in-line with various historic claims made against this global conglomerate known

as the "GM Family"), and any subsequent and potential excuses(s) the defendants give for these various torts they have admitted to have intentionally committed, *__the fact is,__* *__these torts/crimes__* *__have been committed__* and continue, unabated to-date against this injured, victimized plaintiff.

(¶ #'s **79,79, 84-89**)    Moreover, the purpose of the rule this movant proposes is consistent with § 195 of the Restatement (Second) of Contracts (1981), which prohibits contracts exempting parties from intentional or reckless tort liability, and A.R.S. § 47-2719(C) of Arizona's Uniform Commercial Code, which states:  **"Consequential damages may be limited or excluded unless the limitation or exclusion is unconscionable." And Arizona has long recognized parties to a contract have a duty to act in good faith.** See, e.g., <u>Beaugureau v. Beaugureau,</u> 11 Ariz.App. 234, 236, 463 P.2d 540, 542 (1970). **As a matter of public policy, a party should not benefit from a bargain it performed in bad faith. Accordingly, in the absence of any contrary argument or authority, Arizona courts have adopted this sensible rule.**

**(All Counts and ¶ # 89)      "Every contract implies good faith and fair dealing between the parties to it."** <u>Kerrigan v. Boston,</u> 361 Mass. 24, 33 (1972). See Eaton v. Eaton, 233 Mass. 351, 376 (1919). The covenant requires **"that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract . . . ."** <u>Drucker v. Roland Wm. Jutras Assocs.,</u> 370 Mass. 383, 385 (1976), quoting <u>Uproar Co. v. National Broadcasting Co.,</u> 81 F.2d 373, 377 (1st Cir.)

(¶ #'s **79-90**)    **It is well established in Arizona that a covenant of good faith and fair dealing is implied in every contract.** <u>Wagenseller v Scottsdale Memorial Hospital,</u> 147 Ariz. 370, 710 P.2d 1025 (1985); <u>Rawlings v Apodaca,</u> 151 Ariz. 149, 726 P.2d 565 (1986); see also Restatement (Second) of contracts § 205 (1981). **The covenant is applied to protect the rights of contracting parties to receive the benefits of their agreement. Hence, the Arizona Supreme Court has recognized that the inquiry necessarily must focus on the contract itself to determine the parties agreement.** <u>Wagensellar v Scottsdale Memorial Hospital,</u> 147 Ariz. At 386; <u>Rawlings v Apodaca,</u> 151 Ariz. At 154.

## <u>COUNT III</u>
### <u>OUTLINE OF DEFENDANT'S DEFAMATION OF CHARACTER; RESULTING IN, TORTIOUS INTERFERENCE, TRADE LIBEL per se,, CONTINUED AND PERPETUATED CRIMINAL ACTIVITY  INCLUDING AIDING AND ABETTING CREATING A COERCIVE MONOPOLY VIA US TREASURY FUNDS.</u>

**91.**    All Defendants as combined and as individually responsible for 100% of the damages and suffering of this plaintiff in all items in Count III as noted herein,,

**92.**     Per rules of Arizona law, this plaintiff had made immediate phone calls and have send a series of letters and emails to both GMACM, GMAC LLC and GM (both old and new) to have removed or to have them request that I remove their postings with a public apology following this injured plaintiff's demand for a public apology from Mr. Kordella. Defendants refused to respond until after contacting the GM Stockholders services via their GM website contact form did I get a reaction. (June 11th, 2009 emailed to GM Stockholders) GM sent out "special incident handler" from subcontracted firm "Convergys", Ms. Christine Stein **(See Exh. C).**

**93.     Reserved.**

**94.**     No excuse or public apology or public recanting of the injurious falsehoods were offered or have ever been offered as this plaintiff believes that the GM Family (specifically all defendants and employees, et al according to Mr. Kordella) would suffer tremendously if the world knew the truth of their despicable, malicious actions on June 9th, 2009 which have been intentionally perpetuated to date against this plaintiff and his competitive automaker business.

**95.**     However, Mr. Kordella did finally offer an insolent private apology on June 15th, 2009 for his strategic "MONEY 01" BLOG of injurious falsehoods on this injured plaintiff's privately owned professional business funding related website YET no comment private or public whatsoever for his injurious falsehood statements in his direct emails sent to multiple Mealer Companies LLC interest parties and prospective funding groups whereby Mr. Kordella referred to this plaintiff a fraud, (See Exh. B-1),

**(95a)**     and no public apology whatsoever has ever been published nor made globally visible until this plaintiff was forced to betray the confidence of his own forthrightness with prospective investors and did finally intervened on Mr. Kordella's "MONEY01" BLOG and

posted the insolent "pseudo-apology" in an effort to stem the damage that defendants had done to the Mealer Automobile and this plaintiff's good reputation on June 9th, 2009.

(95b) The intended strategically worded and executed damage was too deep to repair and this plaintiff has been intentionally financially destroyed, emotionally damaged and with an unrepairable detrimental appearance upon this plaintiff's good reputation especially and specifically to the multiple foreign investment groups who were reviewing the Mealer Automobile and Mealer Companies LLC funding documents. (See Exh_____).

(95c)   AND to the various domestic pre-MFG Mealer Automobile orders that were also pending these prospective investments to expand the Mealer Companies LLC manufacturing capabilities, output and global availability of the Mealer Automobile and other Mealer Companies products as detailed within the Mealer Companies Funding Documents noted above.

96.   By and through this plaintiff's mortgage holder *GMAC LLC Headquarters* private, jointly owned and "protected computer," per 18 U.S.C. § 1030(e)(2), which designates Internet Service Provider "ISP" "GMC-20" *[By and through the Omnibus agreement and other documents and agreements whereby granted a security interest to the Omnibus Agent in any cash or other property posted or required to be posted as collateral]* located at 200 Renaissance Center in Detroit, Michigan the following tortfeasor(s) did occur and continue to cause further damages and suffering as defendants have not made any effort to rectify their illegal transgressions which are expected to be commented on by defendants as per this complaint and respond therewith:

97.   GM engineers (GMAC agents), specifically Kris J Kordella using IP address 198.208.251.24 out of Bloomfield Hills, MI., while at work on June 9th, 2009, hunted down plaintiff and entered plaintiff's professional Mealer Automobile investment-oriented website "http://mealercompanies.com" with the admitted intentions to (and which he did, in fact) insert

fraudulent misrepresentations (injurious falsehoods) with specific intent to destroy, defame and blacken plaintiff's good name and to hinder plaintiff from gathering expansion B-Round growth funding and garner the Pre-Manufacturing ("Pre-MFG") sales for the Mealer Automobile upon the initial deposit of prospective growth funding for Mealer Companies LLC [an Arizona registered alternative fuel automobile manufacturing company as of Sept. 19th, 2008 **(See Exh**
**_____).**

**98.**    GM engineer, Mr. Kordella, **'*appears to'*** have acted in concert with at least two other "GM" employees (Joseph Burgel "joe.burgel@gm.com" using IP address 198.208.251.22 out of Farmington, MI. and Christy Garwood "christy.garwood@gm.com" IP address 198.208.251.23 out of West Bloomfield, MI.) who were both working to 'aid and abet' these torts in what appears to be a reassigned Public Relations department of GM, **'*who appear'*** prior to June 9th, 2009 to have been acting as either full time or part time "Professional Bloggers" for defendants. Discovery may add these two  well defined and documented participants aka "suspects of these alleged but provable and admitted offenses" to the list of defendants    **(See Exh _____).**

**99.**    **FURTHERMORE,** GM employee Mr. Kordella acted to intentionally <u>interfere with</u> <u>contractual relations</u> between GMAC and this plaintiff. This claims is backed by the very evidence used to base other claims on in this instant case. **(See Appendix II) (See Exh _____)**

    **(99a)**    GM engineer (specifically Mr. Kordella), while acting under GMACM capacity via the corporately owned private, jointly owned and "protected computer," per 18 U.S.C. § 1030(e)(2), which designates Internet Service Provider "ISP" "GMC-20" *[By and through the Omnibus agreement and other documents and agreements whereby granted a security interest to the Omnibus Agent in any cash or other property posted or required to be posted as collateral]* located at 200 Renaissance Center in Detroit, Michigan, signed into the

Internet and did intentionally enter http://mealercompanies.com and signed up as a Blogger to leave a series of professional Investor and engineer rated statements as "MONEY01". Mr. Kordella then followed up his grossly disparaging, strategically "Blogged" comments portrayed as  financial expert "MONEY01" a series of wholly untrue libelous attacks and injurious falsehoods and then, actually proceeded to send direct and separate emails to additional interested private individuals, government employees and other parties and Mealer Automobile Pre-MFG sales customers who had commented on Mr. Kordella's "MONEY01" blog which he created on plaintiff's professional funding expansion website and in his direct emails, disparagingly referred to this plaintiff as a fraud, etc.  **(See Exh _____ and Appendix II)**

**(99b)**  GMAC  LLC, GM and the GM Family (specifically the defendants) provided ("ISP") access to on June 9th, 2009 and "currently holds open the Internet doorway" for the tortious crimes noted herein to be first committed upon this plaintiff and also in order for these torts to continue and are fully culpable as respondeat superior of GM and GM's engineers and public relations (professional Bloggers for GM) who 'punched the keys' and spelled out the exact libel which created (and continue the damaging effects to this day, (as it has not yet been removed) the far reaching and irreversible financial loss and future business and emotional-related  damages to this plaintiff, his business and his family. **(_____)**

**(99c)**  The libel per quod as detailed to per se that was "Blogged" by GM and the GM Family (specifically the defendants) on mealercompanies.com website was done for the explicit and malicious purpose of causing as much damage as possible to plaintiff which acted as a deterrent for various interested parties who were investigating and compiling finalized "due diligence" on plaintiff and plaintiff's business prior to investing in, offering their services for, applying for employment within, planning a future purchase, offering equipment and buildings

for lease or sale to, or otherwise providing funding, backing and/or other support for plaintiff and plaintiff's business and family. The defendant's destructive attack also destroyed the "tentative-to-funding," prospective Pre-MFG purchases of the MEALER BV (first run of automobiles) of which 2000 units were slated as sales to private dealers, collectors, possibly the US Border Patrol (semi private contracted test bed for product durability) and various enthusiasts and multiple celebrities throughout the world.

(99d)  Worse yet co-defendant (specifically all versions of GM) have refused requests and demands to have removed the various grossly disparaging, derogatory and injurious falsehoods and gross trade libel, slander of title that were strategically placed upon this plaintiff's funding, business growth website by their employee agent Mr. Kordella from work on GM registered Internet Protocol "IP" locations (not to be confused with the private, jointly owned and "protected computer," per 18 U.S.C. § 1030(e)(2), which designates Internet Service Provider "ISP" "GMC-20" *[By and through the Omnibus agreement and other documents and agreements whereby granted a security interest to the Omnibus Agent in any cash or other property posted or required to be posted as collateral]* located at 200 Renaissance Center in Detroit, Michigan).

## COUNT IV

### ANTICOMPETITIVE BEHAVIOR, UNFAIR BUSINESS PRACTICES, COERCIVE MONOPLY CAUSED BY THE PERPETUATED TRADE LIBEL AND DEFAMATION.

**100.  GM AND THE GM FAMILY (SPECIFICALLY THE DEFENDANTS) VIOLATED SECTION 2 OF THE SHERMAN ACT BY UNLAWFULLY MAINTAINING ITS MONOPOLY IN AUTOMOTIVE PRODUCTION AND SALES**

**Section 2 of the Sherman Act prohibits a firm with monopoly power from maintaining that monopoly power through means that go beyond competition on the merits. "'The offense of monopoly under § 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful**

acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.'" Eastman Kodak Co. v. Image Technical Services, Inc., 504 U.S. 451, 480 (1992) (quoting United States v. Grinnell Corp., 384 U.S. 563, 570-71 (1966)); see Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585, 596 n.19 (1985); United States v. Griffith, 334 U.S. 100, 107 (1948) ("The anti-trust laws are as much violated by the prevention of competition as by its destruction.").

Under those settled principles of monopolization law, GM and the GM Family (specifically the defendants) used multiple unlawful actions to repel promising efforts to lower the critical barrier to entry into its monopoly market constitute unlawful maintenance of a monopoly. This is a classic example of a case

"in which a defendant's possession of substantial market power, combined with his exclusionary or anticompetitive behavior, threatens to defeat or forestall the corrective forces of competition and thereby sustain or extend the defendant's agglomeration of power." Eastman Kodak, 504 U.S. at 488 (Scalia, J., dissenting).

## 101.    GM AND THE GM FAMILY (SPECIFICALLY THE DEFENDANTS) ENGAGED IN A SERIES OF ANTICOMPETITIVE, EXCLUSIONARY, PREDATORY ACTS TO MAINTAIN ITS MONOPOLY

Although GM and the GM Family (specifically the defendants) has often seemingly welcomed new automakers and other automaker's products that would offer consumers a wider choice in the automotive market that GM has maintained the leader of in over-all global vehicle sales for decades, it recognized that the ecological global impact of burning fossil fuels and importing crude oil from countries that are set on destroying America and other developments causing what would eventually become known as the Crash of 2008 and the subsequent failure and bankruptcy of the entire General Motors Corporation including the GM financial arm GMAC LLC and subsidiary RESCAP and GMACM and their pecuniary suffering in 2007 to their reformation in June and July of 2009 which gave rise to the conglomerate's predatory loan servicing and anti-competitive, unfair competition attitude towards this plaintiff and his then

expanding Arizona based alternative fuel powered automaker company known as Mealer Companies LLC.

**(101a)** GM and the GM Family (specifically the defendants) reacted to the newer company who was actively seeking financial B-Round business and manufacturing growth funds from prospective investors which also would have provided a minimum of 2000 units of the Mealer Automobile Pre-MFG sales orders pending this prospective funding, with a consistent pattern of acts that can be understood only as a deliberate scheme to ensure that its own monopoly will persist.

**(101b)** Deploying a wide variety of libelous, defamatory, coercive, and other stratagems, and using its monopoly position and notoriety as a global engineering leader under the new revised Obama administration's plan to rebuild the dying company to exploit Mealer Companies LLC, GM and the GM Family (specifically the defendants) worked actively to prevent this new automaker from gathering the prospective funding and from the Mealer innovations from reaching consumers.

**(101c)**  It is neither possible nor necessary to tell definitively whether any or all of the automotive technologies retarded or destroyed by GM and the GM Family (specifically the defendants) would have led to the end of the General Motors Corporation (k/n/a "New GM") monopoly. They would, however, have lowered entry barriers, easing entry for new entrepreneurial competition, opening up new possibilities for automotive innovation and future alternative fuel powered automobile competition, and thus promoting consumer choice.

**(101d)** GM and the GM Family (specifically the defendants)'s numerous related actions to stifle such competitive developments and restrict consumer choice constituted unlawful monopolization.

**(101e)** A Monopolist May Not Deliberately Take Actions That Erect Obstacles To Consumer Choice On The Merits Or Otherwise Make No Business Sense Except For Their Monopoly-Maintaining Effects

> **"'Anticompetitive conduct' can come in too many different forms, and is too dependent upon context, for any court or commentator ever to have enumerated all the varieties."** Caribbean Broadcasting System, Ltd. v. Cable & Wireless PLC, 148 F.3d 1080, 1087 (D.C. Cir. 1998).

**(101f)** And the formulations used to identify unlawful anticompetitive conduct have varied in terminology if not in substance. The objects of inquiry, however, are clear. Equally clear is the illegality of GM and the GM Family (specifically the defendants)'s conduct under any available formulation of the standards for monopolizing conduct, (specifically the publications of injurious falsehoods and direct trade libel and tortious interference against competitive registered rival automaker Mealer Companies LLC who was expanding for global sales of the alternative fuel powered Mealer Automobile and other competitive products).

> **(101g)** Basic Standards. The second element of a Section 2 claim is the use of anticompetitive means **"to foreclose competition, to gain a competitive advantage, or to destroy a competitor."** Eastman Kodak, 504 U.S. at 482-83 (quoting United States v. Griffith, 334 U.S. 100, 107 (1948)). **The Supreme Court has described this conduct element as prohibiting a monopolist's "scheme of willful acquisition or maintenance of monopoly power."** Eastman Kodak at 483 (citing Grinnell, 384 U.S. at 570-71; Aspen, 472 U.S. at 600-05; United States v. Alcoa, 148 F.2d 416, 432 (2d Cir. 1945)). **The Court has used the language of "exclusionary" or "anticompetitive" or "predatory" to label the unlawful conduct** (Aspen, 472 U.S. at 602) **and to distinguish it from the competition on the merits reflected in Grinnell's reference to "superior product, business acumen, or historic accident."** 384 U.S. at 570-71 (quoted in Aspen, 472 U.S. at 596 n.19, and Eastman Kodak, 504 U.S. at 480); see also

Eastman Kodak, 504 U.S. at 488 (Scalia, J., dissenting) **(Section 2 condemns "exclusionary or anticompetitive" behavior)**.

**(101h)** The Court in Aspen stated that conduct is anticompetitive if the defendant **"has been 'attempting to exclude rivals on some basis other than efficiency.'"** 472 U.S. at 605 (quoting R. Bork, The Antitrust Paradox 138 (1978)). The Court directed its attention to the challenged conduct's **"impact on consumers and whether it has impaired competition in an <u>unnecessarily restrictive</u> way."** Id. at 605 (footnote omitted; emphasis added). The Court quoted with approval the definition from III P. Areeda & D. Turner, Antitrust Law 78 (1978):

**(101i)   Thus, 'exclusionary' comprehends at the most behavior that not only (1) tends to impair the opportunities of rivals, but also (2) either does not further competition on the merits or does so in an unnecessarily restrictive way.**

**(101j)** Aspen, 472 U.S. at 605 n.32; see also III P. Areeda & H. Hovencamp, Antitrust Law 78 (Rev'd Ed. 1996). **That standard properly asks whether the challenged conduct, first, tends to impair rivals' opportunities and, second, can be justified -- at all or in its full restrictive scope -- by "'valid business reasons.'"** Eastman Kodak, 504 U.S. at 483 (quoting Aspen, 472 U.S. at 605). **Such asserted justifications must be tested both for their "validity," assessed in light of (among other things) their consistency with the defendant's other conduct and assertions, and for their "sufficiency" to explain the full extent of the impact on rivals.** Id.; see id. at 483-85.

**(101k)** Most recently, the Court in Eastman Kodak applied this approach to hold that a triable issue of monopolization was presented where there were reasons to doubt the validity and sufficiency of the asserted business justifications. 504 U.S. at 482-86. Previously, in Aspen, the Court applied the approach to uphold a jury finding of monopolization. The Court looked to three key factors -- **"the effect of the challenged pattern of conduct on consumers;" its effect on the defendant's "smaller rival;" and its effect on "[the defendant] itself."** 472 U.S. at 605. **<u>First</u>, the conduct deprived consumers of arrangements they provably desired.** Id. at 605-07. **<u>Second</u>, the conduct inflicted "substantial" "pecuniary injury" on the smaller rival, which had to undertake "prohibitively expensive" efforts to try to meet consumer demand for the withdrawn arrangements.** Id. at 607-08. **<u>Third</u>, the conduct was costly to the defendant (the defendant "elected to forgo . . . short-run benefits")**; and, because none of the asserted efficiency justifications could explain the conduct (considering particularly the defendant's other conduct that was inconsistent with the asserted justifications), it was reasonable to infer that the defendant **"was not motivated by efficiency concerns and that it was willing to sacrifice short-run benefits and consumer good will in exchange for a perceived long-run impact on its smaller rival."** Id. at 610-11 (footnote omitted).

**(101L)** These decisions used in prior anticompetitive cases have thus focused on several

closely related inquiries: whether the conduct is an effort to exclude rivals on some basis

other than the defendant's own improved market performance, *(wherein the GM Family was suffering, failed and bankrupted in June 2009 when their anticompetitive behavior began against this plaintiff to exclude his rival automobile manufacturing business)*, thus impeding rather than enabling or enriching consumer choice; whether the full restrictive impact of the conduct on competition is justified as necessary to further legitimate goals of lowering prices, improving quality, or in other ways promoting or expanding consumer choice; and whether the conduct's costs to the defendant are ultimately inexplicable except on the basis of the monopoly returns expected as a result of the conduct's creation or maintenance of a monopoly. Court of appeals decisions reflect similar standards for distinguishing monopolizing conduct from competition on the merits. Unilateral conduct, such as that at issue in <u>Aspen</u>, as well as **exclusive,** preferential, **restrictive, or otherwise exclusionary** contracts, **especially when coercively imposed by use of monopoly power,** can constitute the requisite anticompetitive acts.

**102.**    **Intent and Effect.**  These basic monopolization standards embody three important principles about the roles of intent and effect in separating competition on the merits from unlawful monopolizing conduct. <u>First</u>, while an intent to secure a monopoly is not

> **"a separate and essential prerequisite to civil antitrust liability"** (<u>Ass'n for Intercollegiate Athletics for Women</u>, 735 F.2d at 583), **the intent with which a defendant undertook an action is relevant to understanding the nature and economic consequences of the action. In particular, an intent to frustrate customer choice by excluding competition is telling evidence, from a presumptively knowledgeable market participant, that the act was not competition on the merits and made sense for the defendant only because it facilitated realization of monopoly returns.** See <u>Aspen</u>, 472 U.S. at 602 **("the question of intent is relevant to both" actual and attempted monopolization; while a separate element of attempt, for monopolization "evidence of intent is merely relevant to the question whether the challenged conduct is fairly characterized as 'exclusionary' or 'anticompetitive' . . . or 'predatory'")**; <u>United States v. United States Gypsum Co.</u>, 438 U.S. 422, 436 n.13

(1978) **("consideration of intent may play an important role in divining the actual nature and effect of the alleged anticompetitive conduct")**; Chicago Board of Trade v. United States, 246 U.S. 231, 238 (1918) **("knowledge of intent may help the court to interpret facts and to predict consequences")**; Ass'n for Intercollegiate Athletics for Women, 735 F.2d at 583 **(relevant "insofar as it helps predict the probable competitive impact of a disputed practice")**; see U.S. Healthcare, Inc. v. Healthsource, Inc., 986 F.2d 589, 596 (1st Cir. 1993) (per Boudin, J.) **("Motive can, of course, be a guide to expected effects . . . .")**.

**103.**    The very fact that GM and the GM Family (specifically the defendants) have known about their acts of intentional interference through trade libel, personal defamation and other unlawful anticompetitive behavior through their perverted acts of intentional sabotage to exclude and disrupt the Mealer Automobile from competing in the GM and GM Family (specifically the defendants)'s monopoly by interfering with this plaintiff's prospective advantage of a rival automaker's B-Round growth, for well over a year without making any attempt to remove or have removed the perpetuated crimes and injurious falsehoods from this plaintiff's rival automaker's expansion and growth oriented website predicts the probable competitive impact of their unlawful practice. GM and the GM Family (specifically the defendants) have intentionally prevented and perpetuated this plaintiff from gathering funding for expansion of manufacturing and sales.

   **(103a)** This is not an accident on the part of the defendants, but a scheme of willful maintenance of their monopoly through acts that created an unlawful coercive monopoly.

**104.**    Second, no particular degree of already-suffered competitive harm is required to find unlawful monopolization where such harm can be predicted for the future. Indeed, the Supreme Court has repeatedly spoken of the monopolist's intent to monopolize, which can be readily inferred from exclusionary acts, as sufficient for an act to be a Section 2 violation.

**(104a)** See, e.g., Eastman Kodak, 504 U.S. at 483 (quoting Grinnell, 384 U.S. at 570-71) **("'scheme of willful . . . maintenance'" is illegal)**; Eastman Kodak Co. v. Southern Photo Materials Co., 273 U.S. 359, 375 (1927). **The Court's holdings are to the same effect. In Aspen, the Court upheld liability without saying anything about the degree of harm to the plaintiff except that it was substantial; it was enough that unjustified conduct contributed to the defendant's monopoly power. In** Eastman Kodak, **the Court held the Section 2 claim sufficient to go to trial without inquiry into the degree of harm suffered by the plaintiffs who threatened the defendant's monopoly power. Even in a case treated as one of mere attempted monopolization,** Lorain Journal Co. v. United States, 342 U.S. 143 (1951), **the Court readily found Section 2 to be violated by the defendant newspaper's deliberate actions to take advertising business from its principal, if not sole, rival (radio station), without any analysis of the particular degree of harm to the rival or to consumers in the market. Thus, the Court's articulated standards condemn a monopolist's action that lacks legitimate business justification and "**threatens **to defeat or forestall the corrective forces of competition and thereby sustain or extend the defendant's agglomeration of power."** Eastman Kodak, 504 U.S. at 488 (Scalia, J., dissenting) (emphasis added). United States vs Microsoft

**105.** Third, an action that might not be held to violate Section 1 (though it is concerted action) may nevertheless be held to violate Section 2 because of its threat to competition. Cf. Eastman Kodak, 504 U.S. at 488 (Scalia, J., dissenting) **("Behavior that might otherwise not be of concern to the antitrust laws -- or that might even be viewed as procompetitive -- can take on exclusionary connotations when practiced by a monopolist.")**; United States v. GM and the GM Family (specifically the defendants) Corp., 1998 WL 614485 (D.D.C. 1998), at *23 **("a monopolist's conduct that does not rise to the level of a § 1 violation may nevertheless violate § 2")**. The likelihood that a particular agreement with a harmful impact on rivals will contract consumer choice is greater with a firm that is already a monopolist. By definition, a monopolist has substantial ability to exploit consumers; a monopolist is thus more likely to undertake actions that serve no business purpose other than to protect its monopoly.

**106.** The Conduct At Issue In This Case. No matter what legally available formulation of a monopolization standard is invoked, and no matter what role is assigned to intent, already-suffered consumer harm, or independent illegality of the concerted aspects of GM and the GM Family (specifically the defendants)'s conduct under Section 1, previous court cases and Court's findings establish that GM and the GM Family (specifically the defendants) engaged in monopolizing acts in violation of Section 2. GM and the GM Family (specifically the defendants) clearly had a deliberate plan to use means beyond competition on the merits to

prevent erosion of the applications barrier to entry that protects its automobile manufacturing and sales monopoly.

(106a)    GM and the GM Family (specifically the defendants)'s several actions harmed consumers, harmed promising threats to its monopoly power, and were costly to GM and the GM Family (specifically the defendants) itself. No legitimate business justifications can account for these actions, leaving them inexplicable except on the basis of the willfully sought benefits of maintaining the automobile manufacturing and sales monopoly.

(106b)    This is not a case of a firm simply enjoying the fruits of economic forces that may produce a natural monopoly, with entry efforts failing on their own cost-and-quality merits. Nor is this a case where Congress or a State legislature has concluded that a particular market is better subjected to regulatory controls on entry than left to free-market competition. Rather, this is a case in which a monopolist in an unregulated market intentionally set out to squash promising marketplace efforts (specifically Mealer Companies LLC and the Mealer Automobile) to lower the critical barrier to entry and expansion in the monopolized market. Whatever GM and the GM Family (specifically the defendants) may think of the value of preserving its vehicle line-up without a rival, its calculated effort to prevent competition is fundamentally anathema to the commitment to competition embodied in the Sherman Act.

See National Soc'y of Prof. Eng'rs v. United States, 435 U.S. 679, 695 (1978); see FTC v. Procter & Gamble Co., 386 U.S. 568, 580 (1967); United States v. Philadelphia Nat'l Bk., 374 U.S. 321, 371 (1963); see also Otter Tail Power Co. v. United States, 410 U.S. 366, 380 (1973).

107.    GM and the GM Family (specifically the defendants)'s campaign included at least the following acts:

(107a)    sabotaging a rival automaker (specifically Mealer Companies LLC);

**(107b)**    committing gross acts of defamation of character in an effort to squash a competitive automaker from gaining the needed contracts to compete on a level playing field;

**(107c)**    committing gross acts of trade libel to demoralize a rival product (specifically the Mealer Automobile) and prevent this rival automaker (specifically Mealer Companies LLC) from competing with the GM and the GM Family (Specifically the defendant's);

**(107d)**    imposing restrictions on this plaintiff so as to prevent plaintiff from creating an alternative rival automobile under a different corporate name in competition with GM and the GM Family (Specifically the defendant's);

**(107e)**    coercing future prospective customers of the Mealer Automobile to support GM and reject products created by Mealer Companies LLC;

**(107f)**    conditioning and influencing through unlawful means and activity, prospective investors from placing trust and investment funds into businesses owned by this plaintiff;

**(107g)**    conditioning and influencing through unlawful means and activity, prospective clients from purchasing the Mealer Automobile in Pre-MFG vehicle sales pending the prospective funding noted above;

**(107h)**    conditioning and limiting access to crucial private party engineers and third party suppliers through unlawful means and activity;

**(107i)**    conditioning continued development Mealer Companies LLC products and research and development that could have and would have and should have transpired had the GM and the GM Family (Specifically the defendant's) not interfered;

**(107j)**    Accepting and misusing US Taxpayer funds to stifle competition and to extend the GM and the GM Family (Specifically the defendant's) monopoly

**(107k)**    hampering the development and distribution of Mealer Automobile and other Mealer Companies product technology by eliminating Mealer Companies LLC growth funding potential and perpetuating criminal behavior to the extreme injury of this plaintiff for well over 400 days without reprieve, and preventing Plaintiff's ability to serve as a distribution source for Mealer Companies products and vehicles, pressuring Mealer Companies LLC prospective and current employees, consumers and investors not to support or distribute Mealer Companies LLC technology and products and coercing this plaintiff from competing on a level playing field;

**108.**    Prior Court's findings establish the anticompetitive nature of these acts and of the

campaign as a whole. The findings compel the conclusion that GM and the GM Family

(specifically the defendants), a monopolist, unlawfully maintained its automotive manufacturing monopoly in violation of Section 2 of the Sherman Act.

**109.**    To date, the Mealer Automobile manufactured for public use and the public cannot make a choice to buy this rival vehicle BUT FOR the predatory, exclusionary conduct and unlawful restraint of trade whereby GM and the GM Family (Specifically the defendant's) have destroyed this plaintiff and his company as a potential competitor.

**110.**    But for GM and the GM Family (Specifically the defendant's) unjustified predatory anticompetitive grossly unfair behavior, this plaintiff would have been funded for expansion for both nationwide and global sales of the Mealer Automobile and other Mealer Companies products. Furthermore, but for the unlawful activities of GM and the GM Family (Specifically the defendant's), this plaintiff would not have had his good name blackened and denigrated before the world of entrepreneurs and businessmen/women whereby this plaintiff would be a viable candidate for multiple alternative fuel powered automotive and related high paying jobs.

**111.**    This plaintiff contends that GM and the GM Family (Specifically the defendant's) knew exactly what they were doing and whether through acting in concert of by Mr. Kordella's fit of rage while under the domain of GM and the GM Family (Specifically the defendant's), has destroyed this plaintiff and have created a situation of irreparable detrimental harm to all projects, goals and products that could have, should have and would have been created by and for this plaintiff and Mealer Companies LLC.

 **"'[N]o monopolist monopolizes unconscious of what he is doing,'"** and **"'[i]mproper exclusion (exclusion not the result of superior efficiency) is always deliberately intended.'"** <u>Aspen</u>, 472 U.S. at 602, 603 (quoting <u>United States v. Alcoa</u>, 148 F.2d 416, 432 (2d Cir. 1945), and R. Bork, <u>The Antitrust Paradox</u> 160 (1978)).

Some decisions, following the Areeda formulation, focus on whether the defendant's conduct served a legitimate purpose or impaired the opportunity of rivals more than necessary to serve such a purpose. See, e.g., Data General Corp. v. Grumman Syst. Support Corp., 36 F.3d 1147, 1182 (1st Cir. 1994) (Areeda standard: **"Exclusionary conduct is defined as conduct, other than competition on the merits or restraints reasonably necessary to competition on the merits, that reasonably appears capable of making a significant contribution to creating or maintaining monopoly power."**) **(internal quotation marks omitted)**; Barry Wright Corp. v. ITT Grinnell Corp., 724 F.2d 227, 230 (1st Cir.1983) (Breyer, J.) (same); Home Placement Service, 682 F.2d at 281 (irrespective of motive, **"defendant's use of monopoly power to destroy a potential competitor"** was illegal where **"not supported by a legitimate business reason")**; Multistate Legal Studies, Inc. v. Harcourt Brace Jovanovich Legal and Professional Publications, Inc., 63 F.3d 1540, 1550 (10th Cir. 1995), cert. denied, 516 S. Ct. 1044 (1996) (Areeda standard); id. at 1553 n.12 (triable issue whether defendant's action **"would disproportionately raise [competitor's] costs"** and, if so, had **"a legitimate business justification")**; Instructional Syst. Devel. Corp. v. Aetna Casualty & Surety Co., 817 F.2d 639, 649 (10th Cir. 1987) **("Predatory practices are illegal if they impair the opportunities of rivals and are not competition on the merits or are more restrictive than reasonably necessary for such competition. . . . [T]he exclusionary conduct must appear reasonably capable of contributing significantly to creating or maintaining monopoly power.")**; C.E. Serv's., Inc. v. Control Data Corp., 759 F.2d 1241 (5th Cir. 1985) (Areeda standard).

Other decisions articulate standards that focus on whether the defendant's conduct makes business sense other than as a means of securing monopoly power. See, e.g., Neumann v. Reinforced Earth Co., 786 F.2d 424, 427 (D.C. Cir. 1986), cert. denied, 479 U.S. 851 (1986) **("predation involves aggression against business rivals through the use of business practices that would not be considered profit maximizing except for the expectation that (1) actual rivals will be driven from the market, or the entry of potential rivals blocked or delayed, so that the predator will gain or retain a market share sufficient to command monopoly profits, or (2) rivals will be chastened sufficiently to abandon competitive behavior the predator finds threatening to its realization of monopoly profits.")**; Stearns Airport Equipment Co., Inc. v. FMC Corp., 170 F.3d 518, 524 (5th Cir. 1999) **("_Aspen_ involved a company willingly accepting a real loss because it represented a relative gain.")**; Great Western Directories v. Southwestern Bell Tel., 63 F.3d 1378, 1386 (5th Cir. 1995), modified, 74 F.3d 613, vacated pursuant to settlement agreement (Aug. 21, 1996), cert. dismissed, 518 U.S. 1048 (1996) (described in Stearns, 170 F.3d at 524 n.3, as imposing Section 2 liability based on **"conduct that harmed the monopolist and could only be understood when one recognized that competitors suffered more severe harm," i.e., "raising defendant's costs but inflicting more pain on its cash-starved competitor")**; Advanced Health-Care Serv's. v. Radford Community Hosp., 910 F.2d 139, 148 (4th Cir. 1990) **("if a plaintiff shows that a defendant has harmed consumers and competition by making a short-term sacrifice in order to further its exclusive, anti-competitive objectives, it has shown predation by that defendant")**; General Indus. Corp. v. Hartz Mountain

<u>Corp.</u>, 810 F.2d 795, 803 (8th Cir. 1987) (act is anticompetitive if **"anticipated benefits [are] dependent on its tendency to discipline or eliminate competition and thereby enhance the firms' long term ability to reap the benefits of monopoly power"**) (internal quotation marks omitted); <u>Berkey Photo, Inc. v. Eastman Kodak Co.</u>, 603 F.2d 263, 291 (2d Cir. 1979), <u>cert. denied</u>, 444 U.S. 1093 (1980) (action harming competition is unlawful **"use of monopoly power"** if it is **"an action that a firm would have found substantially less effective, or even counterproductive, if it lacked market control"**); <u>see also</u> <u>Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.</u>, 509 U.S. 209, 222 (1993) (even in an attempted-monopolization predatory-pricing case, **"the essence of the claim"** is that the defendant has priced its products **"with an object to eliminate or retard competition and thereby gain and exercise control over prices in the relevant market"**).

*[Much of Count IV due to applicable standards have been paraphrased from United States vs Microsoft, Dec 6, 1999 ]*

## COUNT V
### SPECIFICALLY REGARDING AIDING AND ABETTING WHILE KNOWINGLY PERPETUATING THESE CRIMES (HEREIN) WHILE UNDER THE CORPORATE LEADERSHIP POSITION AND LEGAL CAPACITY TO INFLUENCE THE OUTCOME OF AND TO CAUSE THE CEASE AND DESIST OF THESE ONGOING CRIMES AND TORTFEASORS, WHEREIN THE FOLLWING PARTIES INTENTIONALLY AIDED AND ABBETED THE PERPETUATION OF THE CRIMES AND INJURIOUS TORTS,  SPECIFICALLY, ALL ALLEGATION NOTED HEREIN

**112.**    This plaintiff reaffirms all subject matter and allegations in **(¶ #1) through (¶ #111) and (Appendix I and II and II)** and further alleges the following reasons and claims against **(112a)** GM CEO Edward Whitacre Jr. and by and through **(112b)** Respondeat Superior "Old GM",

**(112c)** "New GM"," **(112d)** "MLC",  **(120e)** GMACM CEO David Applegate and by and through **(112f)** Respondeat Superior GMACM, GMAC LLC, (aka ALLY BANK),

**(112g)** CEO, Michael Carpenter and by and through **(112h)** Respondeat Superior GMAC LLC, RESCAP CEO, **(112i)** Thomas Marano and by and through **(112j)** Respondeat Superior Residential Capital LLC are responsible for all crimes and torfeasors mentioned herein specifically for the reasons detailed under **ALL COUNTS** herein, specifically **COUNT V** herein of this document for the following qualifying Aiding and Abetting and otherwise instigating the perpetuation of these crimes while under the corporate and legal capacity to influence the

outcome of the cease and desist of these ongoing crimes and tortfeasors specifically, the

perpetuation of damages with this plaintiff's prospective advantage, trade libel against the Mealer

Automobile and other Mealer Companies products, defamation of plaintiff's good character,

unfair business practices, unfair competition and other related intentional injurious falsehoods as

posted by defendants (specifically Mr. Kordella) and remaining without any public and

published corporate apology on this plaintiff's business-growth-funding website, which has

utterly irreparably destroyed the financial future and public image of this plaintiff.

### APPENDIX I
### CLAIMS CONTINUED/ "COUNT VI" ACTIONS DEFINED

**113.    INTENTIONAL INTERFERENCE WITH PROSPECTIVE ADVANTAGE,** cause
of action, by the initial invasion of privacy, trespass with intent, trade libel,  and injurious
falsehoods intentionally placed upon this plaintiff's professional funding website by defendants
specifically to destroy and interfere with this plaintiff's prospective funding and subsequent
business expansion, in order to prevent a rival competitor from expanding.

GM and the GM Family (specifically and notably the defendants under Count V) have

created *[and have perpetuated, Please see ¶ #'s 11, 13, 17e, 24, 68, 71 b,c, d, 107k, 116, 141,*

*COUNT I, IV, V]* this tortious situation against this plaintiff whereby they have either been

totally negligent in monitoring their private "ISP" or their employees and agents WHEREBY

through vicarious liability, respondeat superior becomes the mitigating factor *OR* employee and

agents and employer(s) worked in concert to; intentionally interfere with this plaintiff's

prospective advantage in his automotive manufacturing business.

**The elements of this cause of action are:**
**(1) The existence of a valid** contractual relationship or **business expectancy**;
**(2) knowledge of the relationship or expectancy on the part of the interferor**;
**(3) intentional interference inducing or causing a breach or termination of the
relationship or expectancy**; and
**(4) resultant damage to the party whose relationship or expectancy has been
disrupted**.    Hirsch v. Cooper, 737 P.2d 1092, 1097 (Ariz.Ct.App.1986).

(113a)    "(1)"**The once existing business expectancy** between this plaintiff and the various parties and qualified prospective investors and a diverse group of credible brokers, banks, and other viable funding sources such as venture capitalists and private investment groups, including their own private brokers AND the independent dealers and entrepreneurs who were expecting (and expected) to purchase 2000 Pre-MFG Mealer BV as we gathered contracts from these prospective investors, who were using this plaintiff's professional business website as a final sounding board for their due diligence as well as future high level employees and customers.

(113b)  **"(2)"**  Defendants clearly in defiance of the Mealer Automobile and this plaintiff, (aka interferor(s)) Mr. Kordella signed onto this plaintiff's professional and investor based website at 10:55:18AM on June 9th, 2009 and signed up to "Blog" under the alias moniker "MONEY01" in order to portray himself as a leading money and investor source which is clear evidence that Mr. Kordella knew the reason for the existence of this plaintiff prospective investment website. Further evidence of "#2 knowledge of the existence of and expectancy", is the fact that Mr. Kordella visited the page #2 of this plaintiff's website which clearly details the reasons for the existence of the website at 10:59:23AM, where he signed on to and did create his "MONEY01" Blog at 11:29:31AM and viewed the "WHAT WE ARE REALLY ABOUT" page #2 of the *Mealer Companies professional and funding growth oriented website* again at 11:30:47AM after making and posting the globally RSS fed (immediately emailed to prospective parties) injurious falsehoods and critically destructive comments that destroyed this plaintiff's ability to sell Mealer products to prospective clients and gather prospective funding in the Summer of 2009. **(See APPENDIX II), (See "Exh E" pages 2 through 5)**

**(113b1)**        Furthermore, the fact that this grossly disparaging attack and posting of injurious falsehoods occurred on this plaintiff's professional investor oriented website where it is made quite clear the reason for this exact website currently listed on the page 2 entitled and linked from "WHAT WE ARE REALLY ABOUT", at http://mealercompanies.com/?page_id=2 which was visited multiple times by Mr. Kordella during his crippling tirade and business destructive libelous attack and clearly states the following reasons for this professional website's existence, (emphasis kept):

"

WHAT WE ARE REALLY ABOUT

**Mealer Companies LLC** is gathering funding to begin full scale production of our automobile and 220v full power source (combined as one). We have the vehicle, the patents, the key personnel and are now simply procuring the key ingredient...
*The remainder of our investment money.*        "

**(113b2)**        The complete destruction of this plaintiff's private and personal credibility and as an automaker and businessman, which created a destruction of earning capacity and business growth was and continues as the blatant intention(s) by the defendants in this matter. Defendants refuse to have removed or request to have removed their injurious falsehoods and attempt to mitigate the financial and repair their intentional damage to this plaintiff's reputation and try to lighten their damages due to their libelous attack(s) left on this plaintiff's business website or to attempt damage control for other injurious falsehoods which were later emailed to other interested parties.

**(113c) "(3)"** The tortious crime of defendant's intentionally publishing injurious falsehoods and trade libel per quod (per se as defined) while creating a path for a continued anti-competitive, unlawful monopoly against the MEALER AUTOMOBILE and the gross libel per se, (documented herein and admitted to by Mr. Kordella of GM-GMAC) against plaintiff John Lewis Mealer as grossly irreparable tortious actions taken by GM by and through the privately

owned "protected computer," per 18 U.S.C. § 1030(e)(2), which designates Internet Service Provider "ISP" as supplied by GM's own creditor (GMAC LLC) which is coincidentally this plaintiff's own creditor, *[By and through the cross-collateralization under the Omnibus Security Agreement and other documents and agreements whereby granted a security interest to the Omnibus Agent in any cash or other property posted or required to be posted as collateral (REFER TO ALL OF " ¶ # 63 " herein)]* have created the inability of this plaintiff to close the deal with his prospective investors simply because of defendant's strategic, malicious, defamatory business and trade sabotage resulting in Intentional Interference with this plaintiff's Prospective Advantage.

**(113d)**    Defendant (Specifically Mr. Kordella) made it very clear why he had entered plaintiff's professional website and he succeeded in his quest for total destruction of plaintiff's livelihood and prospective B-Round business growth. Plaintiff had prospects who were ready to provide growth funding and pre-purchase the Pre-MFG Mealer Automobiles, and very simply, the global leader and automotive giant GM, by and through the GMAC HQ housed/owned Internet doorway, did intentionally and maliciously destroyed plaintiff's credibility with their grossly derogatory, automotive business crippling comments. To this end, the actual interference by libel per se (or per quod upon defining in terms) is clearly and unequivocally tortious interference by the improper motive or means through the use of fraudulent misrepresentations and injurious falsehoods (libel and defamation) of plaintiff and trade libel and slander of title regarding the Mealer Automobile.

**The most important element in a claim for tortious business interference is the improper "motive or means" of the interference**, *Wagenseller v. Scottsdale Mem'l Hosp.*, 147 Ariz. 370, 388, 710 P.2d 1025, 1043 (1985). **and the use of fraudulent misrepresentations is one form of improper interference with another's business potential:**

> **Fraudulent misrepresentations are ... ordinarily a wrongful means of interference and make an interference improper. A representation is fraudulent when, to the knowledge or belief of its utterer, it is false in the sense in which it is intended to be understood by its recipient.**

**(113e)** **"(4)"** The irreparable damages and critical timing against this plaintiff by and through GM's employee, GM Family agent. Mr. Kordella, while at work and while utilizing the privately owned "protected computer," per 18 U.S.C. § 1030(e)(2), which designates Internet Service Provider "ISP" as supplied by GM's own creditor (GMAC LLC) which is coincidentally this plaintiff's own creditor, *[By and through the cross-collateralization under the Omnibus Security Agreement and other documents and agreements whereby granted a security interest to the Omnibus Agent in any cash or other property posted or required to be posted as collateral (REFER TO ALL OF "¶ # 63" herein)]* from work entered the site and signed on as a professional Blogger under the moniker of "MONEY01" to assert his clever masquerade as an elite investor status and as a professional and "real engineer" viewpoint over the viability of the MEALER AUTOMOBILE and this plaintiff from a personal perspective as detailed herein. Mr. Kordella obviously knew as his visits to the website prove he had open for examination while he created the injurious falsehoods "WHAT WE ARE ALL ABOUT" (http://mealercompanies.com/?page_id=2) which clearly details the reason for the Mealer Companies website (http://mealercompanies.com)'s existence and the effect his intentionally destructive and untrue comments about this plaintiff which destroyed this plaintiff's automobile manufacturing business and 25 years of research, design, planning, development and this most recent and critical prospective series of business growth round funds.

**(113f)** Mr. Kordella ("GM" and the GM family noted herein)'s attack utterly and immediately destroyed all Mealer Companies LLC viability and the personal and private work

related capabilities (viability) of this plaintiff and destroyed and ended the prospective investor

relations who have since lost all interest with plaintiff and his business, causing loss of funds.

Although there is no Arizona law directly on point (i.e., addressing the question whether a claim for tortious interference with prospective contractual relations is dependent upon compliance with the statute of frauds), it appears that under Arizona law, a tort **"may be committed even where the plaintiff has no contractual rights but simply the prospect of a contractual relationship."** Bar J Bar Cattle Co. v. Pace, 158 Ariz. 481, 486; 763 P.2d 545, 550 (Ariz.Ct.App.1988) (citing Restatement (Second) of Torts § 766B comment c (1979) (**"The relations protected against intentional interference by the rule ... include any prospective contractual relations ... if the potential contract would be of pecuniary value to the plaintiff."**)).

The California Supreme Court has held that a claim for intentional interference with prospective economic advantage is not dependent on compliance with the statute of frauds. See Buckaloo v. Johnson, 14 Cal.3d 815, 822; 537 P.2d 865, 868 (1975). It reasoned: **This is a tort theory of recovery rather than contract, and is based on interference with a "relationship" between parties irrespective of the enforceability of the underlying agreement.** As stated in the leading California case of Zimmerman v. Bank of America: **"The tort of interference with an advantageous relationship, or with a contract, does not ... disintegrate because it relates to a contract not written or an advantageous relation not articulated into a contract. The nature of the tort does not vary with the legal strength, or enforceability, of the relation disrupted. The actionable wrong lies in the inducement to break the contract or to sever the relationship, not in the kind of contract or relationship so disrupted, whether it is written or oral, enforceable or not enforceable."**

Id. (citation omitted) (emphasis in original). **Because we believe that the Arizona Supreme Court would find the California Supreme Court's reasoning to be persuasive, we hold that to prevail upon their claim for tortious interference with prospective contractual relations, the appellants need not show that they could have enforced the alleged oral agreement with the RTC. Accordingly, the Arizona statute of frauds is not dispositive of the 12(b)(6) motion as it relates to this claim.**

**The privilege we recognized in Bendix is indeed broad, but not so broad as to encompass, as a matter of law, the conduct alleged here. The question in this case is whether Smith and Hudesman acted acceptably, given the current community standards and the manner in which business persons are expected to conduct their affairs.** See Restatement (Second) of Torts 767 comment (1979). **This is not a theoretical problem to be resolved by this court according to abstract notions of how society should work. Rather, this is a genuine issue of material fact. As such, it should be determined by the trier of fact, after thorough review of the evidence produced at trial.** See C.N.C. Chemical Corp., 690 F. Supp. at 143; Powers v. Leno, 509 N.E.2d 46, 49 (Mass. App. 1987); see also Snow v. Western Savings & Loan Ass'n, 730 P.2d 204 (Ariz. 1986).10

FURTHERMORE:

**To prove the tort of intentional interference with contractual relations, a plaintiff must show: [1]the existence of a valid contractual relationship or business expectancy; [2]the interferer's knowledge of the relationship or expectancy; [3] intentional interference inducing or causing a breach or termination of the relationship or expectancy; [4]and resultant damage to the party whose relationship or expectancy has been disrupted. ... [5]In addition, the interference must be improper as to motive or means before liability will attach.** _Wallace v. Casa Grande Union High Sch. Dist. No. 82 Bd. of Gover-nors_, 184 Ariz. 419, 427, 909 P.2d 486, 494 (App. 1995) (citations omitted).

**(113g)** The obvious connection between the GM Family specifically all versions of GM as the globally renowned builder of fine automobiles _(excluding the 1973 to 1987 pressed fuel tank pick up trucks)_ and their anticompetitive outlook on a new automaker (specifically Mealer Companies LLC) and what they may claim as fair business dealings to advance their own competitive interests; We see below that this excuse does not cover the respondeat superior blame nor GM employee and GMAC agent Mr. Kordella's fraudulent and criminally induced tortious interference with plaintiff's prospective economic advantage(s) and unfair trade competition. Defendant's intentional publication of grossly disparaging falsehoods is by Arizona court standards, criminal and fraudulent conduct which may somehow be claimed by defendants as fair competition, but Arizona law proves otherwise.

**(113h)** GM and the GM Family (specifically the defendants) did commit through their actions of gross defamation of character while in connection to a debt collecting incident of published irreparable injurious falsehoods against this plaintiff and trade libel per se, did entertain and intentionally commit criminal and fraudulent conduct for the sole purpose of advancing the GM and the GM Family (specifically the defendants) image and to promote their own inner-corporate dealings to benefit themselves while using the _private, jointly owned_ and "protected computer," per 18 U.S.C. § 1030(e)(2), which designates Internet Service Provider

"ISP" *[By and through the cross-collateralization under the Omnibus Security Agreement and other documents and agreements whereby granted a security interest to the Omnibus Agent in any cash or other property posted or required to be posted as collateral (REFER TO ALL OF "¶ # 63 " herein)].*

> **If the defendant's interference is intended, at least in part, to advance its own competing interests, the claim will fail unless the means employed include criminal or fraudulent conduct.** Nifty Foods Corp. v. Great Atlantic & Pacific Tea Co., 614 F.2d 832, 838 (2d Cir.1980); Strapex Corp. v. Metaverpa N.V., 607 F.Supp. 1047, 1050 (S.D.N.Y.1985).

**114.**    This plaintiff further contends that through defendants' publication of their false comparative claims, deception, reliance and intentional confusion of the quality of the Mealer automobile and all products related to this plaintiff, the prospective buying public has relied on the false description of Mealer Companies products and the grossly disparaging and damaging injurious falsehoods and unconscionable representations of the mental state of this plaintiff to such a point as they would reject Mealer Companies products.

**(114a)**    This plaintiff expects to supply this honorable court with ample evidence of studies, testimony and actual reports that present clear and convincing evidence (although not strictly required) to prove this plaintiff's claims for injunctive relief and entitlement to damages beyond what was intentionally caused by GM and the GM Family (specifically the defendants) intentional Interference With This Plaintiff's Prospective Advantage and investment parties as noted herein.

> **"[p]ublication of deliberately false comparative claims gives rise to a presumption of actual deception and reliance...."** U-Haul International, Inc. v. Jartran, Inc., 601 F.Supp. 1140, 1149 (D.Ariz.1984).

> **In cases brought under 15 U.S.C. § 1125(a), courts traditionally have distinguished the standard that must be met to state a claim for injunctive relief from the standard necessary to establish entitlement to damages.** *See* 1 J. Gilson, Trademark Protection and Practice § 7.02[3], at 7-26.2 to -27 (1985 & Supp. 1986).

**In order to state a claim for injunctive relief, plaintiffs must demonstrate a likelihood of deception or confusion on the part of the buying public caused by the false description or representation.** E.g., <u>Burndy Corp. v. Teledyne Indus.</u>, 748 F.2d 767, 772 (2d Cir. 1984); <u>Coca-Cola Co. v. Tropicana Products, Inc.</u>, 690 F.2d 312, 316 (2d Cir. 1982).

**Actual consumer confusion often is demonstrated through the use of direct evidence, e.g., testimony from members of the buying public, as well as through circumstantial evidence, e.g., consumer surveys or consumer reaction tests.** See <u>U-Haul Int'l, Inc. v. Jartran, Inc.</u>, 601 F.Supp. 1140, 1149 (D. Ariz. 1984), **aff'd in part, modified in part and rev'd in part on other grounds,** 793 F.2d 1034 (9th Cir. 1986).

**courts may engage in "some degree of speculation in computing the *amount* of damages, particularly when the inability to compute them is attributable to the defendant's wrongdoing."** <u>Burndy</u>, 748 F.2d at 771 (citing <u>Stevens Linen Assocs. v. Mastercraft Corp.</u>, 656 F.2d 11, 14-15 (2d Cir. 1981)).

**115.** Mealer Companies funding documents had been distributed for consideration and investigative prospective consideration whether in whole or in part to multiple prospective and highly interested parties for their investment due diligence procedures (including letters from JL Mealer in order to garner qualified automaker interest from GM, Ford, Chrysler, Toyota, Nissan and Tata Motors), and which was under serious prospective investment consideration with several viable investment and brokerage parties.

**(115a)**        Due diligence for these parties included this plaintiff's professional global interface from the Mealer Companies professional and globally accessible website which was also being highly scrutinized and a major factor of face value for the Mealer Automobile and this plaintiff.

**(115b)**        GM and the GM Family (specifically the defendants) immediately (within 40 days) upon the release of this <u>Mealer Companies Funding Document Business Proforma</u> and the creation of the <u>mealercompanies.com</u> automotive MFG growth funding website did provide the pathway and possibly an incentive, as they certainly had multiple motives, for GM engineers

to post injurious falsehoods and blacken the good name of this plaintiff and Mealer Automobile

manufacturing goals. (See Exh Z, Pg 8):

**(115c)** This document titled "MEALER COMPANIES, FUNDING REQUEST

SUMMARY, CONFIDENTIAL DISCLOSURE, J.L. MEALER, Q2 JUNE 2009" states very

clearly the amount of funding that was prospective and under serious consideration and financial

advisory at the time of defendant's publication of their injurious falsehoods of plaintiff.

> "Mealer seeks to raise start-up $95,000,000 in VC capital and lease-back agreements over the
> first three years for Phase I, not taking into account pre-and post-production sales. After two
> years, Mealer will require another $105,000,000 of either private capital or loans for Phase II
> secondary manufacturing purposes. The company will have one major manufacturing facility in
> either VA or TN and electronics research and developmental center and manufacturing center
> either in the same state or elswhere. At least four other ideal manufacturing locations are under
> review and remain highly attractive. The cost of a fund-to-suit conversion of existing facilities
> proves to be a fast, viable and cost-effective alternative to new site construction. And, since
> there are a growing number of such facilities coming to market, Mealer is sure to find the right
> facilities to meet our requirements."

**116.** The aggravated and direct damages and loss of prospective funding which was caused by

GM through the private and bank secured ISP registered to GMAC headquarters is

$200,000,000. The actions of GMAC providing for and allowing and perpetuating this incident

with their debtor GM whereby entering this plaintiff's professional website with the intent to

injure and destroy.

**117.** Defendant GMAC intentionally participated and caused the immediate and future

abandonment and discontinuance of financial investment interest from prospective contracts and

agreements by this plaintiff's prospective investors, future customers, future employees and other

interested parties. The true and actual damages, financial and accrued, are ongoing and no

corporate version of GM (and all have benefited financially from these illegal transgressions),

nor of the (also benefiting) variations of GMAC has offered to remove their grossly damaging

libel, nor have they made any attempt to contact the once prospective investment parties or other

interested parties. The intentional grossly damaging remarks are still on plaintiff's professional website without any <u>public</u> <u>comment</u> or apology from defendants.

**118.**    Plaintiff claims that additional immediate $200,000,000. pecuniary value and loss of the potential growth funding contract was to be realized upon the prospective funding contracts being completed was immediately and permanently 'taken off the table' due to defendant's intentional and blatantly destructive, libelous falsehoods, blackening, grossly defamatory attack upon this plaintiff PLUS the loss of $30,000,000. Pre-Manufacturing ("Pre-Mfg") sales of the <u>MEALER Bridge Vehicle ("BV")</u> which were tentative on prospective funding to prospective private dealers, various celebrities and automobile collector enthusiasts throughout the world. As noted in the Mealer Companies Funding Document **(See Exh Z, pg 23):**

> " · **Pre Manufacturing Sales:**
> o The current trend with new automakers, especially those automakers that are being funded to manufacture Green Technology vehicles, is that Pre-Mfg Sales are in the thousands of customers. Aptera, the three-wheeled, 2-seater EV as well as Tesla Motors' compact sedan EV were both reported selling at least 2000 Pre-Mfg new models. This presents a terrific opportunity for additional funding and to service debt. In like manner, Mealer is forecasting 2,000 presales per BV model by Q4'2010, which equates to $30,000,000 gross margin. The Chevy Volt website has nearly 50,000 potential customer signed up and that vehicle will not launch until 2010."

### APPENDIX II
### CLAIMS CONTINUED/ GROSS DEFAMATORY INJURIOUS FALSEHOODS
### PRODUCT DISPARAGMENT, ACTIONS DEFINED, TRADE LIBEL DEFINED

**119.**    <u>Trespass with Intent to Destroy, Defamation of Character, False Light, Trade Libel</u>

**(119a)**    The defendants (specifically Mr. Kordella) invaded this plaintiff's privacy with intent to injure and did intentionally publish grossly derogatory remarks on this plaintiff's professional business website, "<u>mealercompanies.com</u>".

**(119b)**    Whereby these strategically worded postings acts did occur and were admitted to by Mr. Kordella, the intentions of derogatory remarks which were placed before this plaintiff's

prospective investors, lenders, business partners, interested parties and future clients were specifically meant to interfere with the Mealer Automobile and to destroy this plaintiff.

**(119c)** Defendants posting his various grossly derogatory, untrue, defamatory libel per se, and untruths this plaintiff which painted him in false light with Mr. Kordella's series of cleverly worded, wholly fraudulent, deceptive, disparaging, dishonest and effectually destructively defamation of character, fraudulent misrepresentations of business viability and mental capacity, which utterly destroyed Mr. Mealer's ability to maintain any high level future job. Defendants intentional destruction of plaintiff's moral character destroyed the public trust required by this plaintiff as a global automaker in what would have been a globally available Mealer Automobile.

**(119d)** Furthermore, this libelous attack was immediately updated as "Mealer Companies Investor News" when it was delivered through email, (<u>worldwide</u>), to the various interested investing parties who had signed up for automatic updates via the RSS feed ("<u>Really Simple Syndication</u>" also considered a "live news feed" or "real time update") which interfered with and destroyed the prospective investments and product credibility and over-all personal viability of this plaintiff and Mealer Companies and the Mealer Automobile.

> **ARS § 20-455 Defamation** No person shall make, publish, disseminate or circulate, directly or indirectly, or aid, abet or encourage the making, publishing, disseminating or circulating of any oral or written statement or any pamphlet, circular, article, sales material or literature which is false or maliciously critical of or derogatory to the financial condition of an insurer, and which is calculated to injure any person engaged in the business of insurance, or any domestic corporation or group being formed pursuant to this code for the purpose of becoming an insurer. This provision shall not be deemed to restrict the right, lawfully exercised, of newspapers, magazines, radio and television stations, and similar public media for news dissemination, objectively to publish and disseminate news.

**120.  Gross Libel per se, Defamation of Character per se, Trade Libel per se,  publication of injurious falsehood, slander of title** *("per quod" as "per se" when defined),*

**(120a)** While working in concert and in a combined effort utilizing the private, jointly owned and "protected computer," per 18 U.S.C. § 1030(e)(2), which designates Internet Service Provider "ISP" "GMC-20" *[By and through the Omnibus agreement and other documents and agreements whereby granted a security interest to the Omnibus Agent in any cash or other property posted or required to be posted as collateral]* and maintained with company profits and US Treasury Department (T.A.R.P. loans)], and housed Internet Service Provider ("ISP"), GM engineers did enter plaintiff's professional Mealer Automobile company funding website and intentionally, maliciously destroyed over 25 years of planning, research, development and this plaintiff's life's work by intentionally and critically blackening this plaintiff's name including the purposefully damaging injurious falsehoods relating to the Mealer Automobile disparagement under slander of title as to the viability as an automaker and global supplier of Mealer Companies products.

**TRADE LIBEL COMMERCIAL DISPARAGEMENT**
**trade libel and commercial, or product disparagement claims are also referred to as "injurious falsehood" claims** See Western Tech., Inc. v. Sverdop & Parcel, Inc., 154 Ariz. 1, 4, 739 P.2d 1318, 1321 (Ariz. Ct. App. 1987). **Trade libel and commercial disparagement claims arose from the general law of defamation, and are similar to slander of title claims; but whereas slander of title goes to the property, product, or service,** See City of Tempe v. Pilot Properties, Inc., 22 Ariz. App. 356, 363, 527 P.2d 515, 522 (Ariz. Ct. App. 1974) (Slander of Title); Gee v. Pima County, 126 Ariz. 116, 612 P.2d 1079 (Ariz. Ct. App. 1980) (trade libel).

**Trade libel** is the **"intentional publication of injurious falsehood disparaging the quality of another's property with the resulting pecuniary loss or the publications of matter derogatory to the plaintiff's business which is calculated to prevent others from dealing with him"** See Gee, 126 Ariz. At 116, 612 P.2d at 1079; Western Tech., 154 Ariz. At 4, 739 P2d at 1321. "**For such a claim one must affirmatively plead actual loss of business customers, that the defamatory statement was false, and special damages".** 83 See Aldabbagh v Dept of Liquor Licenses & Control. 163 Ariz.

**121.**    The following outline details the negligent, and intentionally, strategically, critically damaging and disparaging injurious falsehoods in willful and wanton disregard for this plaintiff in regards to this plaintiff's private and professional character and of the trade character and viability of the Mealer Automobile. Defendants' intentional disruption of what would have, could have and should have been the expected, prospective expansion of the Mealer Companies LLC international automotive manufacturing trade (and other Mealer Companies products) by the unprivileged, unprovoked  publication of intentionally false, misleading and defamatory statements made by the defendant's which was "Blogged" in content and placed on plaintiff's professional automotive and business expansion website with the intent to destroy the reputation and funding viability and expansion of manufacturing capabilities and viability of the Mealer Automobile.

**122.**    Defendants intentional sabotage of this plaintiff's character and business was a direct assault on a competitive trade, aggressive and unfair competition and the strategic unfair business practices to destroy this plaintiff and his trade. The defendants did, in fact, publish globally and correspond with prospective parties to plaintiff via RSS feed and email including direct intentional email communication after the initial attack)  the following series of unwanted, critically arranged per quod (per se which by definition is per se) statements which accomplished their goal which has caused harm and did in fact, expose this plaintiff to public hatred, shame, obloquy, contumely, odium, contempt, ridicule, aversion, ostracism, degradation and disgrace, and did induce an evil opinion of this plaintiff and the Mealer Automobile in the minds of right-thinking persons, prospective customers and investors and did deprive this plaintiff of the confidence needed for Mealer Companies product sales and for investor reasoning.

**123.**    When, on June 9th, 2009 GM Engineer Kris J Kordella who signed on as "MONEY01" in order to elevate himself in what he portrayed as an investor who appears to have superior knowledge in all matters of funding by the very term of moniker "MONEY01" (which by

terminology, precedes MONEY 101 as in college class English 101 and specifically with Mealer

Automobiles), <u>which in turn adds to the preponderance of evidence that Mr. Kordella and the</u>

<u>defendants did IN FACT know the exact purpose of this plaintiff's funding expansion website.</u>

**124.    Defamation:  A statement which causes  harm to reputation.**

> A statement is defamatory if it **"tends to injure the plaintiff's reputation and expose
> the plaintiff to public hatred, contempt, ridicule, or degradation."** <u>Phipps v. Clark</u>
> <u>Oil & Ref. Corp.</u>, 408 N.W.2d 569, 573 (Minn. 1987).
> **When the defamatory meaning is not apparent on its face, the plaintiff has the
> burden of pleading and proving such extrinsic facts.** <u>Anderson v. Kammeier</u>, 262
> N.W.2d 366, 371 (Minn. 1977).

**125.**    Below, this plaintiff will prove the extrinsic facts of this intentional blackening libelous

defamation, unrelenting character assassination and the defendant's complete destruction of this

plaintiff's business funding through their wholehearted destructive attack on this plaintiff's

professional  business  and  funding  growth  for  the  Mealer  Automobile  website,

**http://mealercompanies.com** on June 9th, 2009 by the defendants. The 'standard of conduct' for

defamation is met as is the 'standard of proof' including the defendant's insolent letter of apology

(which is an admission of their tortious interference).

> **Standard of Conduct. Punitive damages are appropriate only where the defendant's
> wrongful conduct was guided by evil motives or willful or wanton disregard of the
> interests of others. An "evil mind" may be shown by evidence that defendant
> pursued a course of conduct knowing that it created a substantial risk of significant
> harm to others.** *Rawlings v.Apodaca* 726 P.2d 565 (Ariz. 1986); *see also* <u>*Warner v.*</u>
> <u>*Southwest Defect Images, LLC*</u>, 2008 Ariz.App. LEXIS 47 (Ct.App.2008); <u>*Medasys*</u>
> <u>*Acquisition Corp. v. SDMS, PC*</u>, 203 Ariz. 420 (2002).

**126.**    The evil mind and willful intent of defendants (specifically Mr. Kordella) is outlined

clearly in the actual wording of the  disparaging attack as well as in the letter of apology where

he admitted why the injurious falsehood attacks were made. **(See Exh_____  P.____Line_____)**

> **Standard of Proof. The standard of proof is one of clear and convincing evidence.**
> *See* <u>*Hyatt Regency Phoenix Hotel Co. v. Winston and Strawn*</u>, 907 P.2d 506 (Ct. App.
> 1995), *cert. denied*, 517 U.S. 1234, 116 S. Ct. 1877, 135 L.Ed.2d 173; <u>*Linthicum v.*</u>

_Nationwide Life Insurance Co._, 723 P.2d 675 (Ariz. 1986). _See also_ _Thompson v. Better-Bilt Aluminum Prods. Co._, 171 Ariz. 550 (1992); _Saucedo v. Salvation Army_, 200 Ariz. 179 (Ct. App. 2001).

**127.**    This evidence and the GM engineer's (specifically Mr. Kordella) letter of admission cannot make this more clear for both the immediate attack, the prolonged negligence of the defendants as a whole and individually whereby, other than Mr. Kordella's private insolent apology, the defendants' have refused to remove or attempt to make amends and have thus gained immense monetary gains (enrichment and engorgement) from the never removed and unrelenting attack where they have totally ignored this fellow automaker and debtor for the sake of their financially connected and interdependent globally renowned automaker (GM) who is also their preferred debtor and also under the GM Family of businesses which are under agreement and witnessed by the SEC filings and other documentation referenced herein.

**128.**    The injurious falsehood comments below as **_highlighted, italicized in quotes_**, and "underlined meanings" of this portion of defendant's comments from modern everyday dictionary definitions are underlined in quotes. This baseless disparaging attack which destroyed this plaintiff were posted in their entirety _(yes, there's more, including emails sent directly to this plaintiff's future customers and prospective employees and investors)_, and immediately sent out to many highly interested qualified prospective investors, prospective future customers and future engineering and other employees who had signed up for RSS feed from the Mealer Companies LLC interim, qualified Investor based website known as mealercompanies.com;

> **1a.** (Meriam Webster Dictionary), ...**_"Mealer Automobiles? America's next        major automobile company??"_**
>    "Question Marks and multiple usage of Question marks meaning: **a:** Something unknown, unknowable, or uncertain **b:** someone (as an athlete or an automaker) whose condition, talent,or potential for success is in doubt."

(128a) The statement above "**1a.**" make it blatantly clear the evil intentions of defendant (GM) Mr. Kordella can only allude to and which were perceived by this now irreparably injured and grossly damaged, disgraced, shamed and disparaged victim and as obviously perceived by the prospective clients and investors, as signaling and making it clear to plaintiff's prospective investors, clients and engineers that the viability, condition and potential for success of Mealer Automobiles is in serious doubt and "MONEY01" makes it clear that all readers of his disparaging Blog should be wary of this unknown company (Mealer Companies LLC) with it's uncertain automobile product (Mealer Automobile), by casting and creating a feeling of highly disparaging doubt as a major investment while portraying oneself as a financial guru ("MONEY01") and a "real" engineer. This is clearly a proven issue of blatant intentional interference with a prospective advantage.

**1b.**  (Collins English Dictionary),  ***"...HAH!!!!!!!!!!!!!!!!!!!!!!!"...***
"HAH abbreviation of HA meaning an exclamation denoting surprise, joy or grief. Both uttered and as written, it expresses as great variety of emotions, determined by the tine or the context. When repeated,ha,ha, it is an expression of laughter, satisfaction, or triumph, sometimes derisive laughter; or sometimes it is equivalent to "Well, it is so." Ha-has, and articulate hootings of satirical rebuke. Carlysle

**1c**.  (Stuart Jeffries, "The Joy of Exclamation Marks!" The Guardian, Apr. 29, 2009)
"There is surely a point after which exclamation marks no longer express friendliness. In this post-literal time, exclamation marks become signs of sarcasm as witty correspondents rebel against their overuse. Hence: 'I loved your last email! OMG did I LOVE it!!!!!!' The point is they didn't. They were being IRONIC."

**1d. *Use of multiple Exclamation Points with exclamation point defined as:*** "as a symbol of factorial function, or (in logic) occurring with an existential quantifier"

(128b) The blatant statements and strategic use of punctuation at "**1b., 1c., 1d**" as Blogged by Mr. Kordella under the moniker "MONEY01" is clearly a successful attempt to create an expression of disparaging, derisive and comical rebuke through intentional injurious falsehoods which singles out the Mealer Automobile as a laughable joke, uncertain, aversion of a product so as to actually and effectively persuade prospective investors, employees, engineers

and other interested parties and Pre-MFG "Mealer BV" clients to steer clear of the company and the man (this plaintiff). Plaintiff believes the objective was to intentionally interfere with and destroy interest or otherwise ostracize the Mealer Automobile, Mealer products to those who may have had anything financially or productively to do with the Mealer Automobile as it would also reduce these interested parties to the same ridicule.

(128c)  Mr. Kordella portrayed and intentionally inflected disparaging shame and loss of face upon this plaintiff. In defendant's successful efforts to interfere with funding and business growth and the over-all competition that Mealer Automobiles would give to GM automobiles, the strategic damage must be far reaching and complete. The exclamation marks and over-use of this particular punctuation drives the point home to these same parties who are looking for the smallest weakness to put their hard earned investment money, time and efforts elsewhere.

**2.** (Cambridge Idiom Dictionary), ***"...You're a legend in your own head and notice I didn't say mind because it's obvious you don't have one..."***
[commonly referred to as *out of your mind]*:
"extremely stupid or mentally ill."

(128d)  This blatantly crippling, injurious falsehood and disparaging comment creating public disgrace and humiliation while making this plaintiff out to be evil and shameful, was another coupe de gras by adding to the doubt of this plaintiff's mental capacity, defendants' insinuated insanity and uncertainty of this plaintiff and his ability to function as any form of normal human being let alone as a businessman running a company that is requesting $200,000,000. of investment funds from prospective parties, and/or the same businessman running a company expecting to sell many viable products and hiring additional, multiple and highly competent engineers. This is clearly a gross and blatant attempt (that proved successful) to dissuade prospective investors and clients from putting efforts and funding into the growth of a competitive to GM automaker.

**(128e)** After-all, what serious engineer or other long term qualified employee would want to taint their resume by working with a man or company whom GM and "MONEY01" (engineer Mr. Kordella) claims (this plaintiff ) "*has no mind" ?* Everyday, commonplace market results and basic research and long time purchasing habits sheds light on the fact, that very few people would commit to buy a high dollar product (specifically a supposedly family-safe automobile) from a man who is mentally ill, thereby exposing this plaintiff to public hatred.

**3.** (A closing statement by Mr. Kordella, which indicates exactly the intentions of the destructive, strategically-worded tirade made by Defendant, ***"...Anyway I wish you ALL the worst the the world can give to such a*** [this plaintiff by gross injurious falsehood terms 3a,b,c].*"*

**(128f)** The meaning of the defendant's clear and concise statement above provides ample evidence, and which was globally published upon this professional business finding related website, to essentially provide proof of a "non-beneficial, anti-profitable curse towards Mealer products specifically the Mealer Automobile" [authored by an "executive money guru" under moniker "...MONEY01..." who is a self proclaimed "...real engineer of real automobiles..."] which is put upon all projects forever attempted or to be accomplished by this plaintiff and his business.

**(128g)** These evil words were placed in front of and sent via RSS fed email updates to the very prospective investors, future customers and employees and provides a factual basis for the pure contemptuous hatred for this injured, defamed and victimized plaintiff. These words alone acted a proverbial nail in the coffin to deter prospective interest in the Mealer Automobile and this plaintiff himself and clearly show defendant's evilly contrived, strategically planned and executed wrongful improper conduct was guided by malicious motives and willful, wanton disregard of the interests of plaintiff. This statement alone caused the entire $200,000,000. prospective funding investors and Pre-MFG sales $30,000,000. to lose complete interest because

no tentative investor or careful brand new product purchaser wants to deal with "outsider drama"

connected to what has now become a cursed and doomed new automaker.

**3a**. (Merriam-Webster Dictionary), ***"...self serving..."***
"Serving one's own interests often in disregard of the truth or the interests of others."

**(128h)** As defendants (specifically Mr. Kordella) noted above in "**3a.**" further

disparaging plaintiff with injurious falsehoods as "self-serving" and this blackening statement is

so far from the truth that it should fit in a category of lies and a crime all on it's own. This grossly

deviant behavior on the part of GM and the GM Family (specifically Mr. Kordella and all

defendants)'s use of this disparaging term is used to signal to the world of prospective clients,

investors, employees, suppliers, fellow business owners, future business partners, Pre-MFG

purchasing clients and others, that plaintiff cares for no one but his companies bottom dollar and

will do whatever it takes to make a profit including the very acts and mistakes that General

Motors has done to create their own self serving world of bankruptcy and failure. This is a

critically destructive and untrue portrayal of Mealer Companies LLC which is an Independent,

Alternative Fuel Powered Automaker which exposes this man and his automobile to public

hatred.

**3b.** (Merriam-Webster Dictionary), ***"...pathetic..."***
"Pitifully inferior or adequate"

**(128i)** As defendants clearly intentionally disparagingly misstate above in "**3b.**" an effort

to cleverly sabotage and seal the fate of this plaintiff's future by further dissuading his

prospective investors from finalizing and closing the funding agreements for Mealer Companies.

The term "...pathetic..." is used to portray this plaintiff as inferior and inadequate, exposing him

to public hatred and ridicule for the prospective parties time, efforts or prospective investment

funds, which is another blatant and successful injurious falsehood used to destroy the validity of

funding for the Mealer Automobile to prevent this plaintiff from competing in and rivaling in an open market with General Motors vehicles.

**3c.** (Merriam-Webster Dictionary), ***"...MORON..."***
"1. a person affected with mild retardation.    **2.** a very stupid person."

**(128j)** As defendants clearly and intentionally lied about in "**3c.**" in order to destroy, expose this plaintiff to odium, contempt, obloquy and to disparage the upstanding business reputation of this plaintiff by referring to him as someone with mild retardation, who is very stupid and have intentionally created a life-changing outlook on this plaintiff's credibility as a viable candidate for the workforce or as an investment opportunity with his own business. No reasonable person would buy or rely on the safety of an automobile supplied by an automaker who is mildly retarded or very stupid, nor would they hire a disgraced man, exposed to public hatred as defendants' have intentionally created as an abject, untrue and unwanted observation of this plaintiff.

*4.* (Merriam-Webster Dictionary), **"...good riddance CLOWN..."**
"2. rude ill-bred person.    **3.** A person who habitually jokes and plays the buffoon.

**(128k)** By using the phrase, "...good riddance..." Mr Kordella made it clear that this plaintiff is destined to fail and would not be a worthy investment, which in effect, interfered with the prospective clients and investors by negating this plaintiff's viability and longevity. As defendants clearly and intentionally deceive this plaintiff's prospective clients through published injurious falsehoods and thwarted investors in "**4**" and intentionally misguide and mislead this plaintiff's future employees, future domestic and international customers, prospective clients and business partners by intentionally and incorrectly referring to this plaintiff as a CLOWN which is by definition a "rude, ill-bred person" which ridiculed this plaintiff, and someone who by the defendant's untrue description of this plaintiff caused this plaintiff to "lose face" with his

prospective Japanese and Korean investment groups who now want nothing to do with this "CLOWN" per MONEY01 and real engineers from a real engineering firm noted below in "**5**".

**5.** (Merriam Webster Dictionary), **"...real..."** used twice to explain that Mealer was in fact, not "real".

"1. Not artificial, fraudulent, or illusionary. **2.** GENUINE.  **3.** Genuinely good or capable of success.

**(128L)** As defendants unequivocally intentionally misstate in order to dissuade plaintiff's prospective investors, et al. by inferring and disparaging that the Mealer Automobile and JL Mealer are not "real" and in fact by definition are no more than "a fraudulent and illusionary, non-genuine entity," "who is incapable of success". This alone is a major prospective deal breaker and as has been proven, Mr. Kordella and fellow defendant's have succeeded in their quest to utterly destroy, disparage, assassinate and crush this plaintiff's character and did commit gross trade libel upon this plaintiff's business (specifically the Mealer Automobile) and other injurious falsehoods upon this plaintiff's reputation creating obloquy, odium, ostracism and disgrace which is irreparable harm.

**129.**    **Intentional Infliction of Emotional Distress,** *(specified three elements noted below)*

Defendants' (specifically Mr. Kordella) did **(1)** and **(2)** trespass with intent to totally destroy this plaintiff personally and to crush over 25 years of the Mealer Automobile research, development and prototyping through **(3)** but not limited to, intentional infliction of emotional distress by the very actions of interference, trade libel and other grossly intentional torts and crimes noted herein.

**130.**    Defendant's (Specifically Mr. Michael Carpenter the CEO of GMAC LLC aka Ally Bank, Ally Financial AND

**(130a)** Mr. David Applegate, the CEO of GMAC Mortgage, AND

**(130b)** Thomas Marano CEO of ResCap, AND

**(130c)** Edward Whitacre, Jr., the CEO of the New GM

**(130d)** by and through the private, inner-corporate owned and governed per 18 U.S.C. § 1030(e)(2), which designates Internet Service Provider "ISP" *[By and through the Omnibus agreement and other documents and agreements whereby granted a security interest to the Omnibus Agent in any cash or other property posted or required to be posted as collateral (REFER TO ALL OF " ¶ # 63 " herein)]* have **(1)** outrageously refused to remove or have removed the injurious falsehoods and **(2)** have intentionally not made any attempt to ease the intentionally inflicted emotional distress by responding to the multiple phone calls, letters and emails sent to their respective companies and themselves personally **(3)** while the entire development goals and plans of this plaintiff's future and family have literally dissolved around him due to the defendants' conduct. These improper motives and means not only add to the perpetuation of all crimes and tortfeasors noted herein, but multiply the injurious falsehoods and compound the intentional infliction of emotional distress all the while GMACM and ResCap are lawfully foreclosing on this plaintiff's home through grossly unlawful means as detailed herein.

> In Arizona, *three elements* are necessary to establish a claim for the tort of intentional infliction of emotional distress: **(1) the conduct by the defendant must be extreme and outrageous; (2) the defendant must either intend to cause emotional distress or recklessly disregard the near certainty that such distress will result from her conduct; and (3) severe emotional distress must in fact occur as a result of the defendant's conduct.** Ford v. Revlon, Inc., 734 P.2d 580, 585 (Ariz. 1987).

**130.** All defendant's noted at **(¶ #129)** above have also caused aggravated damages where damages may be assumed including but not limited to severe emotional and other severe stress related physical suffering(s) of this plaintiff, his wife and two young sons, by and through the constant stress of being publicly assaulted and grossly defamed, crippled and placed in an economic choke-hold while the abusive tactics used against this plaintiff will not abate, and by having his family placed in harms way when this plaintiff and his family have clean hands in this

matter. Not only is this family being forced from our home, but the unlawful actions by defendants' have forced this plaintiff to loose escrow accounts and once in a life-time opportunities with funding as well as with properties and MFG site locations..

### APPENDIX III
### DEFENDANTS BANK / LENDER VIOLATION OF LAW AGAINST THIS PLAINTIFF CAUSE OF ACTION and MEMORANDUM EXCLUSIVE POINTS and AUTHORITIES

**131.**    Due to the interstate commerce application **specifically for GMAC LLC, GMACM and ResCap,** (et al) for banking, mortgage and lending practices and other fiduciary related and legally binding requirements, these federal housing and banking laws which are in effect as state laws and statutes must be taken into consideration. These blatantly illegal, tortious transgressions by the defendant (creditor and mortgage holder GMAC, ResCap, et al) did occur in clear violation of banking laws, creditor-debtor relationship standards, and blatant violations of housing laws;

**132.**    **RESPA (12 USC 2601, 2616 et al),** these laws simply state that State laws are in full effect for RESPA violations.

**FDIC Debt Collection Practices:**

**A.**    **§ 805 Communication in connection with debt collection [15USC 1692c(a)(1)]**

**(b)** COMMUNICATION WITH THIRD PARTIES. Except as provided in section 804, without the prior consent of the consumer given directly to the debt collector, or the express permission of a court of competent jurisdiction, or as reasonably necessary to effectuate a postjudgment judicial remedy, a debt collector may not communicate, in connection with the collection of any debt, with any person other than a consumer, his attorney, a consumer reporting agency if otherwise permitted by law, the creditor, the attorney of the creditor, or the attorney of the debt collector.

**B.**    **15 USC 1692e, <u>False and Misleading Representations</u>**, *[Specifically]:* (14) The use of any business, company, or organization name other than the true name of the debt collector's business, company, or organization.

**[This is not merely a "bold assertion" by this plaintiff, but a conceivable result of defendant's actions as per a M.O. stance made public by GMAC and ResCap and submitted as evidence].** When GMAC and ResCap utilized GM's engineers and employees as collections agents (specifically Mr. Kordella) who was an engineer, yet for an unknown reason was researching this plaintiff's mortgage and website to, in fact, disparage and destroy this plaintiff so as to create and absolve a situation as stated by ResCap chairman Tom Marano to *"...strategically..." "...respond aggressively..."* by *"...further reducing ... business risk..."* Certainly, this independent, competitive, alternative fuel powered automaker who was making mortgage payments and not yet in default to GMAC was a business risk to the GM Family. GM and GMAC knew full well who this plaintiff is and his business practices. **(See Exh_____, _____)**

**C.    15 USC § 806. *(1692d)*, Harassment or abuse**

   A debt collector may not engage in any conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of a debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section:  (1) The use or threat of use of violence or other criminal means to harm the physical person, reputation, or property of any person. (2) The use of obscene or profane language or language the natural consequence of which is to abuse the hearer or reader.

NOTE: The intentional damage to this plaintiff's reputation is obvious and has been explained in detail (See Section "APPENDIX II" of this document).

**D.    15 USC § 807. *(1692e)* False or misleading representations,** A debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt. *[Specifically]:* (7) The false representation or implication that the consumer committed any crime or other conduct in order to disgrace the consumer. *[Specifically]:* (9) The use or distribution of any written communication which simulates or is falsely represented to be a document authorized, issued, or approved by any court, official, or agency of the United States or any State, or which creates a false impression as to its source, authorization, or approval. *[Specifically]:* (14) The use of any business, company, or organization name other than the true name of the debt collector's business, company, or organization.

**133.**    NOTE: Defendant's written and globally distributed misleading representation and claims under moniker "MONEY01" comes to perspective as a false implication and impression as to MONEY01's fiduciary capacity as a related fiduciary source, who's very authorization, or approval was falsely represented and used to disgrace this consumer (plaintiff) in a clear blatant tortious action(s). *GM is not GMAC or ResCap by their own corporate paperwork, so they must be acting in concert against this plaintiff.*

> ***E.***    **15 USC § 808. *(1692f )* Unfair practices,** A debt collector may not use unfair or unconscionable means to collect or attempt to collect any debt.*[Specifically]:* (6) Taking or threatening to take any nonjudicial action to effect dispossession or disablement of property if—
>
> (A) there is no present right to possession of the property claimed as collateral through an enforceable security interest;
>
> (C) the property is exempt by law from such dispossession or disablement.

NOTE: This Plaintiff was not in mortgage default until after the tortious interference and crippling and untrue libelous inequitable activity was instigated and committed by the defendants and thus was created to destroy this plaintiff's ability to maintain mortgage payments.

**134.**    **F.**    **Fair Debt Collection Practices Act ("FDCPA") § 803. [15 USC 1692a]**

**Definitions:**

> (6)    The term "**debt collector**" means any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another. Notwithstanding the exclusion provided by clause (F) of the last sentence of this paragraph, the term includes any creditor who, in the process of collecting his own debts, uses any name other than his own which would indicate that a third person is collecting or attempting to collect such debts. *For the purpose of section 1692f (6) of this title*, **such term also includes** any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the enforcement of security interests.    (F) any person collecting or attempting to collect any debt owed or due or asserted to be owed or due another to the extent such activity
>
> > **(i) is incidental to a bona fide fiduciary obligation or a bona fide escrow arrangement;**

**(ii) concerns a debt which was originated by such person;**
**(iii) concerns a debt which was not in default at the time it was**
**obtained by such person;**

## COUNT VI
### Declaratory Relief

**135.**     Mealer repeats and realleges the allegations and continued in paragraphs 1 through 134.

**136.**     The mortgage agreements executed between "GMACM" and Mealer to be released free and clear of encumbrances to Mealer, which is for the real property between "GMAC" and Mealer detailed herein.

**137.**     Through their unlawful actions, or lawful actions for an unlawful purpose, GM and the GM Family (specifically the defendants), have caused losses, irreparable damages, missed opportunity and severe emotional distress to this plaintiff.

**138**     Accordingly, this plaintiff seeks a declaration pursuant to as described by this plaintiff at the time of trial, that permits and requests this plaintiff to remove all objectionable content that was placed through GM and the GM Family (specifically the defendants) onto this plaintiff's professional business website, including a much needed publicly known and globally published and verbal apology and retraction of all complaints, comments, derogatory remarks and defamation of this plaintiff's good character which may be distributed and rendered as this plaintiff deems fit.

**(138a)** Financial and emotional and punitive damages and other Loss incurred by this plaintiff is not limited to defamation of character, trade libel, prospective funding, Pre-MFG sales, but should include governmental contracts and vertical sales as outlined in the Mealer Companies LLC Funding Documents.

## DEMAND FOR RELIEF

**139.**    WHEREFORE, this plaintiff demands a judgement in its favor on all Counts of the

Complaint. In addition, this plaintiff demands:

    A.    Compensatory damages in an amount to be determined at trial, demanded jointly

and severally including but not limited to:

        (1)    The actual Mealer Family private residence, real property and all

encumbrances  thereto, located at 6333 Gardenia Lane Show Low, Arizona

released by GMAC Mortgage LLC to this plaintiff.

        (2)    The costs incurred by Mealer to Date,  due to the Defendants' wrongful

conduct,  recovery of  his property and rectify the damage to his goodwill, loss

of face, and prospective advantage for pending investors and customers of

the Mealer Automobile and other Mealer Companies products that the

Defendants have caused to be lost.

        (3)    Full and complete restitution for the irreparable damage done to this

plaintiff's good name through injurious falsehoods and defamation of character.

        (4)    Full restitution to the full extent of the law for all losses and future losses

due to defendants' improper conduct resulting in trade libel and anticompetitve

behavior which created serious detrimental harm through the publications of

injurious falsehoods.

        (5)    Full restitution to the full extent of the law for all losses and future losses

for the perpetuation of the injurious falsehoods by the applicable parties under

respndeat superior, jointly and severally.

(6)    Full restitution to the full extent of the law for all losses and projected future losses for the direct emails sent out after the initial injurious falsehoods which created a second act of injurious falsehoods, trade libel and intentional interference with this plaintiff's prospective advantage.

B.    Injunctive relief, including but not limited to an order requiring the Defendants ' official and main corporate authorizing parties:

(1)    To supply Mealer with written explanations of why they failed to properly maintain  this debtor's mortgage and at what point they were instructed to trespass upon this debtor's professional website to cause the impending default in this instant mortgage and a full list of all inner-corporate and associated employees and agents involved.

(2)    To permanently delete and to request in writing for Mealer to erase and remove all contact or references about Mealer from "GMAC" and their inner-corporate associates from Mealer's professional business website.

(3).    To cease and desist from any further use or attempts to cause damage, harm, ridicule or derogatory remarks or innuendos as disclosure of any of Mealer's business or the Mealer Automobile or other Mealer products or desires.

(4).    To cease and desist from contacting any Mealer or Mealer Companies LLC potential and pending and prospective investors, customers, engineers, employees or interested business partners, associates, suppliers, distributors or other interested parties.

C.    Pre-Judgement and post-judgement interest;

D.  Punitive damages;

E.  The equivalent of attorneys' fees for this pro se plaintiff/movant (debtor); and

F.  Such other relief as is just and appropriate.

## CONCLUSION

**140.** This debtor PRAYS that this Honorable Court through it's inherent powers grants entitlement to relief upon lack of response by defendants and that during this course of trial, to use it's inherent power to further forestall the GMACM illegal foreclosure on this plaintiff's real property (my family's home) and to allow this active civil case to decide pecuniary damages and other damages and awards for the creditor's misconduct against this debtor. Or for the civil case to be adjudicated as the jury deems proper. If Not, then the defendants *should be willing to play fair pool* until this case is absolved as they have nothing to lose by waiting for justice to be served. And, JUSTICE MUST BE SERVED.

**141.** This plaintiff wishes to make it clear that his recently diagnosed with colorectal cancer wife (I Swear) and sons are in a seriously hazardous situation caused by GM and the GM Family (specifically the defendants) has placed this injured family in mortal danger and without the means of survival *(exclusive to resorting to complete pauperism)*, when, in fact, GMACM has already shown it's unconscionable and unethical contract management methods to this court, the world and against this plaintiff that they are not willing to work out the real-life destructive, damaging, unlawful gross and egregious conduct that they have innately created and intentionally perpetuate against this plaintiff.

**142.** This honorable court must intervene to preserve justice and integrity, quality, and respect in our judicial system.

## AFFIDAVIT OF JOHN LEWIS MEALER

**143.**    I, John Lewis Mealer, do hereby swear that the testimony and content of this complaint are true and factual to the best of my knowledge and that I am personally responsible to the full extent of the law as a Pro Se litigant for the content herein. I do not lie and I will not deceive this court nor any other court nor human being regarding this case nor for any reasonable context regarding this case or the references and quotes and evidence used within these documents or other documents regarding this matter. So help me God.        Dated _____

_____
John Lewis Mealer, In Propria Persona, Pro Se

## POINTS AND AUTHORITES

**VERIFIED COMPLAINT specificity:**

**CASE LAW RELATING TO (¶ #1)**

A well-pleaded complaint must contain more than mere labels and conclusions.  *See Ashcroft v. Iqbal,129 S.Gt.* 1937 (2009); *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544 (2007). When determining whether dismissal is appropriate, the court conducts a two-part analysis. *Fowler V. UPMC Shadyside,* 578 F.3d 203, 210 (3d Gir. 2009). **First, the factual and legal elements of a claim are separated.** *Id.* **The court must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions.** *Id.* **at 210-11. Second, the court must determine whether the facts alleged in the complaint are sufficient to show that plaintiff has a "plausible claim for relief."** *Id.* **At 211;** *see also Iqbal,* 129 S.Ct. at 1949; *Twombly,* 550 U.S. at 570.
**In other words, the complaint must do more than allege plaintiffs entitlement to relief; rather it must "show" such an entitlement with its facts.** *Id.* **A claim is facially plausible when its factual content allows the court to draw a reasonable inference that the defendant is liable for the misconduct alleged.** *Iqbal,* 129 S.Ct. at 1949 (citing *Twombly,* 550 U.S. At 570). **The plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully."** *Id.* **"Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'"** *Id.*

**Arizona Supreme Court in** <u>Long v.Arizona Portland Cement Co</u>. *explicitly determined that the tests under Arizona Rule 8 and the Federal Rule 8 were the same.45 There, the court stated:* **"[t]his Court and the United States Supreme Court have recently held that the test as to whether a complaint is sufficient to withstand a motion to dismiss is whether enough is stated therein which, if true, would entitle plaintiff to some kind of relief on some theory, and the court should not grant a motion to dismiss unless it appears certain that plaintiff would be entitled to no relief under any state of facts which is susceptible of proof under the claim as stated."**

**In 2007, the U.S. Supreme Court in <u>Bell Atlantic Corp. v. Twombly</u>** markedly reinterpreted the pleading standard under Rule 8 of the federal rules, **atleast in the antitrust context**.  127 S. Ct. 1955 (2007). *Notably, the Court phrased the scope of its review as addressing* **"the proper standard for pleading an antitrust conspiracy through allegations of parallel conduct."** *Id.* at 1963. There, the Court explicitly rejected *Conley's* **"no set of facts language,"** reasoning that such language, when read literally or in  isolation, would permit a wholly conclusory statement revealing the theory of the claim to survive a motion to dismiss unless the statement itself was a factual impossibility. *Twombly*, 127 S. Ct. at 1968−69. Consequently, if there remained any possibility that undisclosed conjectural facts supporting the plaintiff's claim might later be unearthed, *Conley's* formulation of Rule 8 precluded dismissal. In relegating *Conley's* formulation to a **"phrase best forgotten as an incomplete, negative gloss on an accepted pleading standard,"** *the Court in <u>Twombly</u> held that a complaint must reveal sufficient facts to "plausibly suggest" the claims alleged*. *Id.* at 1965−66. **The Court's analysis of Federal Rule 8 seemed to be tailored to the antitrust context.** The Court noted, for example, that judicial supervision cannot adequately ferret out discovery abuse, and the cost of discovery in an antitrust action can be unusually high. *Id.* at 1966−67. The Court's criticism of <u>Conley</u>, however, was not limited to its application in an antitrust action. *See id.* at 1968−69 (observing that **"a good number of judges and commenters have balked at taking the literal terms of the *Conley* passage as a pleading standard" and citing cases arising out of many different causes of action"**). Consequently, whether *Twombly's* **"plausibility"** standard has application outside of the antitrust context, or whether *Conley* is authoritative in other causes of action, remains unclear. As a practical matter, however, federal courts are applying <u>Twombly</u> outside of the antitrust context. **The Court clarified that under this "plausibility standard," the plaintiff need not engage in heightened fact pleading of specifics, but it is necessary to plead enough facts such that the plaintiffs claim for relief "is plausible on its face."**

**The Arizona Rules of Civil Procedure 9(b) is identical with the federal rules and imposes a heightened pleading standard for fraud, specifically that the circumstances constituting the alleged fraud must be stated with particularity.** Ariz R. Civ. P. 9(b) **One reason for this requirement is that the fraud embraces "such a wide variety of potential conduct that a defendant needs a substantial amount of particularized information about plaintiffs claim in order to understand it and effectively prepare a defense."** See <u>Bakeway v Texas Bus. Invs. Co.</u>, 12 Ariz. App. 390, 393, 470 P .2d 710, 713 (Ariz. Ct. App. 1970) quoting 5 <u>Wright & Miller</u>, Federal

Practices and procedure, § 1296 at 400 (3d ed 1969). **Failure to plead fraud with particularity may be grounds for dismissal, but AZ courts generally are liberal in allowing amendments to pleadings when rule 9(b) is violated.** See Parks v Macro-Dynamics, Inc., 121 Ariz. 517, 520, 591 P.2d 1005, 1008 (Ariz Ct. App. 1979).

**In pleading the claim for fraud, no formal language is required, but all nine elements of fraud MUST be found in the complaint as a whole:** See Hall v Romero, 141 Ariz. 120, 124, 685 P2d 757, 761 (Ariz. Ct App, 1984); Parks 121 Ariz. At 520, 591, P.2d at 1008.

**1. A representation, 2. its falsity, 3 it's materiality, 4. the speaker's knowledge of its falsity or ignorance of its truth 5. his intent that is should be acted upon by the hearer, and in the manner reasonably contemplated, 6. the hearer's ignorance of its falsity, 7. the reliance on its truth, 8. his right to rely thereon, 9. his consequent and proximate injury.** See Services Holding Co, Inc v Transamerican Occidental Life Ins. Co., 180 Ariz. 198,208,883 P.2d 435,445 (Ariz. Ct. App. 1994)  **"To sustain a claim for fraud, there must be a concurrence of all nine elements."**

## ALL ALLEGATIONS *WHEN NOT WORKING IN CONCERT (per Defense claims):*

### MASTER SERVANT RELATIONSHIPS

**The four factors to be used in evaluating whether employee conduct is within the scope of the employee's employment are: 1) it is of the type and nature for which the employee was hired to perform; 2) it occurs substantially within the authorized time and space limits; 3) it is conducted to serve the employer; 4) where force is intentionally used by an employee against another, the use of force is not unexpected by the employer.** Restatement (Second) of Agency § 228; R.A. v. First Church of Christ, 748 A.2d 692 (Pa.Super. 2000). Johnson v. Dudenak & Geibig t/d/b/a Sassy's, 60 Som.L.J. 333 (2002) (Gibson, J.).Restatement (Second) of Torts § 317 states: **A master is under a duty to exercise reasonable care so to control his servant while acting outside the scope of his employment as to prevent him from intentionally harming others or from so conducting himself as to create an unreasonable risk of bodily harm to them if a) the servant i) is upon the premises in possession of the master or upon which the servant is privileged to enter only as his servant, or ii) is using a chattel of the master, and b) the master i) knows or has reason to know that he has the ability to control his servant, and ii) knows or should know of the necessity and opportunity for exercising such control.** Johnson v. Dudenak & Geibig t/d/b/a Sassy's, 60 Som.L.J. 333 (2002) (Gibson, J.).

Such language suggests that our legislature intended to limit an employer's dram shop liability to those circumstances in which the employer has the right and ability to control an employee's actions—during working hours and "in connection with . . . employment."10 The Restatement of Torts similarly anchors the scope of an employer's duty for the actions of an employee to the employer's right to control the employee. See, e.g.,Restatement (Second) of Torts § 317 (employer liable for actions of employee outside scope of employment when employer has (1) right to control employee's actions, (2) right to control instrumentality used by employee to commit tort, or (3) right to

control premisesupon which employee commits tort); § 414 (person employing independent contractor liable for tortious actions of contractor when employer retains control of any part of work and fails to exercise reasonable care in exerting that control).

**A claim of vicarious liability exists where the plaintiff shows an agency relationship or an employee-employer relationship between the actor and the defendant.** <u>Cugini v. Kearcher and Mardis Ford-Lincoln-Mercury, Inc.</u>, 60 Som.L.J. 402 (2002) (Cascio, J.).

## <u>ALL ALLEGATIONS</u> *WHEN NOT MASTER-SERVANT RELATIONSHIPS ALONE*

### <u>*ACTING IN CONCERT*</u>

"acting in concert" in the same vague open-ended way in which the court had used in White**: acting in concert meant "pursuing a common plan or design to commit a tortious act and actively taking part in it."** *Cf. Restatement (Second) of Torts* § 876 (1979) **Acting in concert means entering into a conscious agreement to pursue a common plan or design to commit an intentional tort and actively taking part in that intentional tort. Acting in concert does not apply to any person whose conduct was negligent in any of its degrees rather than intentional. A person's conduct which provides substantial assistance to one committing an intentional tort does not constitute acting in concert if the person has not consciously agreed with the other to commit the intentional tort.** <u>A.R.S. § 12-2506(F)(1)</u> **Given this definition, cases of joint and several liability for acting in concert will be rare. Except in criminal enterprises, people seldom enter into "a conscious agreement" to commit an "intentional tort."** See, e.g., <u>Bishop v. Pecanic,</u> 275 Ariz. Adv. Rep. 7 (App. 1998) (group of young men acted in concert in brutally beating the plaintiff). As a practical matter this exception to several-only liability has been all but repealed.

## <u>DEFENDANTS' CLAIMS OF RESPONSIBILITY OR NON RESPONSIBILITY</u>

### <u>Conjecture by this plaintiff relating to (¶ #8):</u>

\*C.O.I.T.U.S. Interruptus – *A legal maneuver and dodging attempt by the "GM Family";*potentially created in an attempt to effectively excuse inner-corporate, anti-competitive behavior whereby a competitive automaker to GM *(specifically Mealer Companies LLC)*, who is also a mortgagor to GMACM and was intentionally "interrupted" from securing various prospective funding agreements, prospective sales contracts and the pecuniary capacity (upon gathering growth-funds), to compete globally with GM in the sale of the Mealer Automobile and other Mealer Companies products, and subsequent "GM Family" blame being passed to a lone employee in order to further avoid GM corporate responsibility.*[In this Instant Case # CV201000316 Mealer v GMAC-GM, et al ]*

The respondeat superior theoretical basis for the doctrine is a fiction created in furtherance of the public policy of giving an injured party a cause of action against a financially responsible defendant. E.g. <u>Herman v Magnusan</u>, 277 N.W.2d 445, 455 (N.D.

1979). An employer may be liable for injuries caused by an employee under the doctrine of Respondeat Superior. <u>Santiago v. Phoenix Newspapers, Inc.,</u> 164 Ariz. 505, 794 P.2d 138. (1990); <u>Haralson v. Fisher Surveying, Inc.,</u> 201 Ariz. 1, 31 P.3d 114 (2001). The employer is liable for the foreseeable acts committed by an employee acting within the scope of the    employee's employment in furtherance of the employer's business. <u>Pruitt v. Pavelin,</u> 141 Ariz. 195, 685 P.2d 1347 (1984). An employer may also be liable for the employee's torts that   occur outside the scope of employment when the employer entrusts the custody and control of a dangerous instrumentality to the employee. <u>Macneil v. Perkins,</u> 84 Ariz. 74, 324 P.2d 211 (1958). Thus, an employer may be vicariously liable for torts committed by an employee  that cause injury to another's property or person even if the employer did not have any part in the commission of the tortious act. If an employer has the right to control or controls an      employee's    actions,    then    the employee is an "employee" and the employer is potentially subject  to  vicarious  liability for the employee's tortious acts. <u>McDaniel v. Troy Design  Services Company,</u> 186 Ariz. 552, 925 P.2d 693 (1996).

**(¶ #13 and #24) RELATING TO THE UST** if Secretary Geithner  insists on not appealing to their federal jurisdiction to prevent these crimes from perpetuating against this US Citizen.
**COUNT III** and **COUNT V**

**ARS § 13-301. <u>Definition of accomplice</u>**

In this title, unless the context otherwise requires, "accomplice" means a person, other than a peace officer acting in his official capacity within the scope of his authority and in the line of duty, who with the intent to promote or facilitate the commission of an offense:

1. Solicits or commands another person to commit the offense; or

2. Aids, counsels, agrees to aid or attempts to aid another person in planning or committing
an offense.

3. Provides means or opportunity to another person to commit the offense.

**<u>MISAPPLIED and MISAPPROPRIATED FUNDS, "Perpetuation of":</u>**

**Case Law relating to (¶ #17e, 24k, 68, 71b,c,d, Count V, ¶ #130d),**

**"Persons who, as officers of a corporation, received money and notes belonging to a third person, and knowingly misapplied and misappropriated the same, are liable to him. <u>Virginia-Carolina Chemical Co. v Floyd</u>. 158 N.C. 455. 72 SE465 (where the officers apparently did not convert the funds to their own use but used them for the benefit of the corporation).**

## ALL ALLEGATIONS RELATED TO MISUSE AND MISAPPROPRIATION OF FUNDS

### ARS § 44-403. Damages

A. Except to the extent that a material and prejudicial change of position before acquiring knowledge or reason to know of misappropriation renders a monetary recovery inequitable, a complainant is entitled to recover damages for misappropriation. Damages may include both the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss. In lieu of damages measured by any other methods, the damages caused by misappropriation may be measured by imposition of liability for a reasonable royalty for a misappropriator's unauthorized disclosure or use of a trade secret.

B. If willful and malicious misappropriation exists, the court may award exemplary damages in an amount not exceeding twice any award made under subsection A.

## ACTIONS BEING ATTEMPTED BY DEFENDANTS" AMONGST OTHER TORTS AND CRIMES

### (¶ #17, 18, 23, 24, 130,  Count V, et al)

### ARS § 44-1211. Fraudulent conveyance or other transaction with intent to defraud others or defeat creditors; classification

 A person is guilty of a class 2 misdemeanor who:

 1. Is a party to any fraudulent conveyance of any lands, tenements or hereditaments, goods
  or chattels or any right or interest issuing therefrom, had, made or contrived with intent to
  deceive and defraud others, or to defeat, hinder or delay creditors or others of their just
  debts, damages or demands.

 2. Is a party to any bond, action or judgment, or execution, contract or conveyance had,

  made or  contrived with intent to deceive and defraud others, or to defeat, hinder or delay
  creditors or others of their just debts, damages or demands.

 3. Is a party as provided in paragraph 1 or paragraph 2 of this section, and

 (a) At any time knowingly puts in, uses, avows, maintains, justifies or defends such
  transaction as true, and had or made in good faith, or

**(b) Upon good consideration aliens, assigns or sells any of such lands or goods or other things which have been so conveyed to him.**

## ARIZONA REVISED STATUTES EQUIVALENTS ON  ANTICOMPETITIVE LAWS

### COUNT SII, III, IV, V and other

### ARS § 44-1402. Contract, combination or conspiracy to restrain or monopolize trade

A contract, combination or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce, any part of which is within this state, is unlawful.

### ARS § 44-1403. Establishment, maintenance or use of monopoly

The establishment, maintenance or use of a monopoly or an attempt to establish a monopoly of trade or commerce, any part of which is within this state, by any person for the purpose of excluding competition or controlling, fixing or maintaining prices is unlawful.

### ARS § 44-141. Joint and several liability of parties to joint obligations

A. All parties to a joint obligation, including negotiable paper and partnership debts, shall be severally liable also for the full amount of such obligations. An action may be brought against such parties jointly or separately, joining one or more, and judgment may be given in each such action without barring an action against any party to the obligation not included in the judgment, and without releasing any party against whom the action was not brought.

B. The court may, upon its own motion or upon the application of any interested party, require that the plaintiff bring in as defendants all parties jointly liable on the obligation upon which the action is brought, in which event any subsequent judgment shall be for the amount unsatisfied.

## BREACH OF DUTY

### COUNT II, and other

**The three prong test of duty, breach of duty and damages proximately caused by that breach is uniformly applied in every state; however, a subrogation professional, depending on the jurisdiction where the claim arises may find that additional criteria should be considered in investigating proximate cause.  These criteria or tests may be defined as the "but for" rule, "the substantial factor rule" and/or "the foreseeability rule". The standard for negligence in each state is treated in the state-by-state reference section of this text.  States vary in the application of these rules in the standard for negligence. For example, the standard for negligence in Arizona includes a "but for" rule i.e. the damages would not have occurred "but for" the**

**defendant's conduct.**  Markowitz v. **Arizona** Parks Bd., 146 Ariz 352, 354-59, 706 P.2d 364, 366-71 (1985).

## BREACH OF DUTY

### COUNT II, and other

**The three prong test of duty, breach of duty and damages proximately caused by that breach is uniformly applied in every state; however, a subrogation professional, depending on the jurisdiction where the claim arises may find that additional criteria should be considered in investigating proximate cause.  These criteria or tests may be defined as the "but for" rule, "the substantial factor rule" and/or "the foreseeability rule". The standard for negligence in each state is treated in the state-by-state reference section of this text.  States vary in the application of these rules in the standard for negligence. For example, the standard for negligence in Arizona includes a "but for" rule i.e. the damages would not have occurred "but for" the defendant's conduct.**  Markowitz v. **Arizona** Parks Bd., 146 Ariz 352, 354-59, 706 P.2d 364, 366-71 (1985).

**Breach of Duty . . . . . .  best described as standard of care "proceed[ed] with such reasonable caution as a prudent man would have exercised under such circumstances."**  Vaughn v Menlove (1873)

## NEGLIGENCE DUTY OF CARE if not acting in concert

### ALL COUNTS

The 2006 Supreme Court case of *Farabaugh* is instructive in regards to the interpretation and application of Section 414 of the Restatement (Second) of Torts, **"Negligence in Exercising Control Retained by Employer."** Nielsen Sjolander, Administratrix of Estate of Niels Otto Andersen Sjolander v. Vestas Wind System A/S, 64 Som. L.J. 280 (2009) (Klementik, J.).

**The vicarious liability determination in this matter is governed by Arizona's "loaned servant" or "lent employee" doctrine.** Williams v. Wise, 106 Ariz. 335, 337, 476 P.2d 145, 147 (1970). **Under this doctrine, an employee of a "general" employer who is "loaned" to a "special" employer is treated as the employee of the special employer rather than the general employer for purposes of respondeat superior.** Id. at 337-38, 476 P.2d at 147-48. Thus, generally only the special employer would be held vicariously liable for the employee's torts. Id.

**However, the general employer may be held vicariously liable for a lent employee's tortious conduct if it had "control of or the right to control the performance of the lent employee's work."** McDaniel v. Troy Design Servs. Co., 186 Ariz. 552, 553, 925

P.2d 693, 694 (App. 1996). **The "right to control, rather than the actual exercise of control" is the key factor in determining whether the general employer may be held vicariously liable.** Williams, 106 Ariz. at 338, 476 P.2d at 148. **The focus is on whether the general employer had "control of the details of the particular work being done at the time of the injury causing incident" and "which employer had the right to control the specific injury-causing activity."** Ruelas, 199 Ariz. at 346, 347, ¶¶ 5, 11, 18 P.3d at 140, 141

14 Several of our cases addressing this doctrine have looked to the Restatement (Second) of Agency § 227 as an additional authority. E.g., Williams, 106 Ariz. at 337-38, 476 P.2d at 147-48; Larsen v. Ariz. Brewing Co., 84 Ariz. 191, 198- 99, 325 P.2d 829, 834 (1958); Ruelas, 199 Ariz. at 346, 347, ¶¶ 5, 11, 18 P.3d at 140, 141. The Restatement (Third) of Agency § 7.03 has since superseded § 227, which failed to provide **"a consistent answer to the question of allocation of liability between general and special employers."** Restatement (Third) of Agency § 7.03 (2006). Section 7.03 and Arizona law both recognize the **"right to control"** test. McDaniel, 186 Ariz. at 554, 925 P.2d at 695 **("Arizona follows the 'control or right to control' test to determine if a general employer is vicariously liable for the negligent acts of a lent employee.")**; Restatement (Third) of Agency § 7.03. The comment to § 7.03 propounds further on this test:

**Liability should be allocated to the employer in the better position to take measures to prevent the injury suffered by the third party. An employer is in that position if the employer has the right to control an employee's conduct. When both a general and special employer have the right to control an employee's conduct, the practical history of direction may establish that one employer in fact ceded its right of control to the other, whether through its failure to exercise the right or otherwise.**

The 2006 Supreme Court case of _Farabaugh_ is instructive in regards to the interpretation and application of Section 414 of the Restatement (Second) of Torts, "**Negligence in Exercising Control Retained by Employer."** Nielsen Sjolander, Administratrix of Estate of Niels Otto Andersen Sjolander v. Vestas Wind System A/S, 64 Som. L.J. 280 (2009) (Klementik, J.).

Restatement (Second) of Torts § 317 states: **A master is under a duty to exercise reasonable care so to control his servant while acting outside the scope of his employment as to prevent him from intentionally harming others or from so conducting himself as to create an unreasonable risk of bodily harm to them if a) the servant i) is upon the premises in possession of the master or upon which the servant is privileged to enter only as his servant, or ii) is using a chattel of the master, and b) the master i) knows or has reason to know that he has the ability to control his servant, and ii) knows or should know of the necessity and opportunity for exercising such control. Johnson v. Dudenak & Geibig t/d/b/a Sassy's, 60 Som.L.J. 333 (2002) (Gibson, J.).**

**Arizona Revised Statutes § 12-2506(D)** Master and Servant Relationship (Joint and several liability abolished; exception; apportionment of degrees of fault definition.

**1. Liability remains joint and several between a party and another person "if both the party and the other person were acting in concert." 2. Liability remains joint and several between a party and another person "if the other person was acting as agent or servant of the party."**

**The Arizona Constitution in Article 18, Section 3 provides as follows:**

It shall be unlawful for any person, company, association, or corporation to require of its servants or employees as a condition of their employment, or otherwise, any contract or agreement whereby such person, company, association, or corporation shall be released or discharged from liability of [sic, or] responsibility on account of personal injuries which may be received by such servants or employees which [sic, while] in the service or employment of such person, company, association, or corporation, by reason of the negligence of such person, company, association, corporation, or the agents or employees thereof; and any such contract or agreement if made, shall be null and void.

**TRESPASS WITH VIOLENT or MALICIOUS INTENTIONS**

**(¶ #'s 10, 20, 79, 80, 119, 129, 135) ALL COUNTS**

> Justice Holt stated for the court in regards to <u>Keeble v Hickeringill</u>, (1707) 103 Eng. Rep. 1127, styled as a **"trespass on the case" "where a violent or malicious act is done to a man's occupation, profession, or way of getting a livelihood, there an action lies in all cases."**

**UNLAWFUL CONVERSION of PLAINTIFF'S REAL PROPERTY**

**(COUNT I)**

> **CONVERSION** *(attempted conversions as applied herein prior to full judicial release of mortgage to GMACM-ResCap dominion which will initiate a complete and illegally induced foreclosure of this plaintiff's Real Property at 6333 Gardenia Lane Show Low, Arizona)* **is the "intentional exercise of domination or control over a chattel which is so seriously interferes with the right of another to control it that the actor may be required to pay the other the full value of the chattel].** <u>Miller v Hehlen,</u> 209 Ariz. 462, ¶ 34, 104 P 3d 193, 203 (Ariz. Ct. App. 2005). **The seriousness of the interference is determined by consideration of the following factors: (1) the extent and duration of the alleged exercise of domination and control, (2) the defendant's intent to assert a right inconsistent with the plaintiff's right of control, (3) the extent of the duration of the resulting interference with the plaintiff's right of control, (4) the damage done, and (5) inconvenience and expense.** <u>Focal Point, Inc. v U-Haul Co. of Ariz.</u> 318, 320, 746 P.2d 488, 490 (Ariz. Ct. App. 1986)   **These are the same factors set forth in the Restatement (Second) of Torts, § 222 (A)(2), except unlike   Restatement,**

**Arizona does not consider good faith belief or intention is not a defense to a conversion action under Arizona Law.** (50See Focal Point, 155 Ariz. At 320, 746 P.2d at 490; see also <u>Patton v First Federal Sav & Loan Ass'n of Phoenix</u>, 118  Ariz,473, 479, 578 P.2d 152, 158, (Ariz. 1976); <u>Jabczenski v S, Pacific Memorial Hosp.</u>, 119  Ariz.  15, 20, 579 P.2d 53, 58 (Ariz. Ct. App. 1978).

**To bring an action for conversion, the plaintiff must have "a right to immediate possession of the chattel at the time of the alleged conversion,"** Miller, 209 Ariz. At 472, **A conversion claim may only be brought to recover tangible personal property or "intangible property that is merged in, or identified with, some document."** <u>Miller</u>, 209 Ariz. At 472, ¶ 35, 104 P.3d at 203, quoting 18 Am.Jur. 2D, Conversion § 7 (2004)

**When a mortgage is procured by fraud, the instruments can be canceled and foreclosure denied.** <u>*Meyerson v. Boyce*</u>, 97 So.2d 488 (Fla. 3d DCA 1957). **Fraud only invalidates contracts of debtor.** In the absence of fraud, every contract of a debtor is valid against all his creditors, existing or subsequent, who have not acquired a lien on the property affected by such contract. R.L. 1910, § 2894. **Unless displaced by the provisions of the Uniform Fraudulent Transfer Act, the principles of law and equity, including the law merchant and the law relating to principal and agent, estoppel, laches, fraud, misrepresentation, duress, coercion, mistake, insolvency, or other validating or invalidating cause, supplement the provisions of the Uniform Fraudulent Transfer Act.** Added by Laws 1986, c. 100, § 11, eff. Nov. 1, 1986.

**In addition to Arizona's strong constitutional protections of the right to bring common-law tort claims and to receive full compensation for any damages**, *see* <u>*Cronin v. Sheldon*</u>, 195 Ariz. 531, 538-41 ¶¶33-51, 991 P.2d 231, 238-41 (1999)

I, John Lewis Mealer, hereby assign my signature and affirmation that these additional pages of pertinent case law and code were added by myself to the best of my Pro Se ability and do represent my views on the legal issues detailed herein this complaint.

Dated_____          _____

John Lewis Mealer, Pro Per  (Pro Se)
6333 Gardenia Lane
Show Low, Arizona 85901
jlmealer@mealercompanies.com
jlmealer@yahoo.com

**IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**
**IN AND FOR THE COUNTY OF NAVAJO**

| | | |
|---|---|---|
| JOHN LEWIS MEALER | ) | **CASE_NUMBER_CV201000316** |
| PLAINTIFF | ) | |
| vs | ) | |
| | ) | |
| GMAC MORTGAGE LLC and CEO DAVID | ) | **NOTICE AND** |
| APPLEGATE, GMAC FINANCIAL | ) | **CERTIFICATE OF SERVICE** |
| SERVICES, GMAC LLC and CEO | ) | |
| MICHAEL CARPENTER, GENERAL | ) | |
| MOTORS CORPORATION., GENERAL | ) | |
| MOTORS COMPANY and CEO EDWARD | ) | |
| WHITACRE JR, MOTORS LIQUIDATION | ) | |
| COMPANY, RESIDENTIAL CAPITAL LLC | ) | |
| and CEO THOMAS MARANO, UNITED | ) | |
| STATES TREASURY DEPARTMENT, GM | ) | |
| ENGINEER KRIS J KORDELLA, JANE | ) | |
| DOE, JOHN DOE,  et al. | | |
| DEFENDANTS | | |

**NOTICE AND**
**CERTIFICATE OF SERVICE**

I, John Lewis Mealer do hereby declare that: On August _____, 2010, I deposited the

original and copies of the following documents and otherwise served via the US Postal

Service, First Class Mail to be delivered to the following persons and addresses:

CASE_NUMBER_CV201000316,  CIVIL COMPLAINT FOR TORT , CRIMES

I declare under penalty of perjury that the foregoing is true and correct and that this declaration

on August _____, 2010 at Lakeside, Arizona.

_____

### SERVICE LIST

ORIGINAL:

State of Arizona, County of Navajo Superior Court Hand Delivered to Clerk of the Court
100 East Carter Drive S Hwy 77, (PO BOX 668) Holbrook, AZ 86025

COPIES:

Michael Carpenter, CEO, GMAC, LLC 5/09 to Current in his personal and professional capacity, jointly and severally, 200 Renaissance Center, Detroit, MI 48265-2000

**(And GMAC LLC in care of CEO Michael Carpenter above)**

**(And GMAC Financial Services in care of Michael Carpenter  above)**

David Applegate CEO GMAC Mortgage  ("GMACM"), in his personal and professional capacity, jointly and severally, 1100 Virgina Drive Fort Washington, PA  19034

**(And GMACM in care of David Applegate  above)**

Thomas Marano, CEO Residential Capital LLC ("RESCAP") in his personal and professional capacity, jointly and severally, One Meridian Crossings, Minneapolis, Minn 55423

**(And Residential Capital LLC in care of Thomas Marano above)**

Edward E. Whitacre, Jr., CEO, "New" GM in his personal and professional capacity, jointly and severally, 300 Renaissance Center, Detroit, MI 48265-3000   *Mail Drop 482-Z39-B10*

***(And New GM in care of above, and Old GM in care of CEO Edward Whitacre above,)***

Motors Liquidation Company  C/O Albert Koch
500 Renaissance Center,  Ste 1400. Detroit, Michigan 48265

Kris J Kordella  in his personal and professional capacity
1575 Honert Road Ortonville, Michigan 48462

US DEPARTMENT OF US TREASURY  C/O  OFFICE OF GENERAL COUNSEL
740 15th Street NW, Suite 510,  Washington, DC 20220

~~U.S. TREASURY IN CARE OF:~~
~~U.S. DEPARTMENT OF JUSTICE~~
~~Room No. B-103  950 Pennsylvania Avenue, NW   Washington, DC 20530-0001~~

US ATTORNEY, DISTRICT OF ARIZONA
Dennis K. Burke, Two Renaissance Square
40 North Central Ave., Suite 1200  Phoenix, AZ 85004-4408

ARIZONA ATTORNEY GENERAL
Honorable Terry Goddard   1275 West Washington Street   Phoenix, Arizona 85007

John Lewis Mealer, Pro Per  (Pro Se)
6333 Gardenia Lane
Show Low, Arizona 85901
jlmealer@mealercompanies.com
jlmealer@yahoo.com

## IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
## IN AND FOR THE COUNTY OF NAVAJO

| | |
|---|---|
| JOHN LEWIS MEALER | ) |
| | ) **CASE_NUMBER_CV201000316** |
| PLAINTIFF | ) |
| vs | ) |
| | ) **NOTICE OF PROOF OF SERVICE** |
| GMAC MORTGAGE LLC and **CEO DAVID** | ) |
| **APPLEGATE**, GMAC FINANCIAL | ) |
| SERVICES, **GMAC LLC** and **CEO** | ) |
| **MICHAEL CARPENTER,** GENERAL | ) |
| MOTORS CORPORATION., GENERAL | ) |
| MOTORS COMPANY and **CEO EDWARD** | ) |
| **WHITACRE JR**, MOTORS LIQUIDATION | ) |
| COMPANY, RESIDENTIAL CAPITAL LLC | ) |
| and **CEO THOMAS MARANO**, UNITED | ) |
| STATES TREASURY DEPARTMENT, GM | ) |
| ENGINEER KRIS J KORDELLA, JANE | ) |
| DOE, JOHN DOE,  et al. | ) |
| DEFENDANTS | |

### NOTICE OF PROOF OF SERVICE

I, _____ , declare that:

I am employed in the county of Navajo, Arizona. My business address is:

_____,

I am over the age of eighteen years and not a party to this cause.

On August _____, 2010, I served the  *(1)* CIVIL COMPLAINT FOR TORT CRIMES

JURY TRIAL DEMANDEDFIRST AMENDED COMPLAINT, *APPENDIX I, II, II (2)* AFFIDAVIT

OF PLAINTIFF JOHN LEWIS MEALER, *(3)* PROOF OF SERVICE RESPONSE BY MAIL in said

cause by placing a true and correct copy thereof enclosed in a sealed envelope with postage thereon fully

prepaid in the United States Mail in ShowLow, Arizona addressed as follows: SEE ATTACHED

SERVICE LIST.

       I declare under penalty of perjury that the foregoing is true and correct and that this declaration

on August _____, 2010 at Lakeside, Arizona.

_____

_____

..................................................................................................................................................

## SERVICE LIST

ORIGINAL:

State of Arizona, County of Navajo Superior Court Hand Delivered to Clerk of the Court
100 East Carter Drive S Hwy 77, (PO BOX 668) Holbrook, AZ 86025

COPIES:

Michael Carpenter, CEO, GMAC, LLC 5/09 to Current in his personal and professional capacity, jointly and severally, 200 Renaissance Center, Detroit, MI 48265-2000

**(And GMAC LLC in care of CEO Michael Carpenter above)**

**(And GMAC Financial Services in care of Michael Carpenter above)**

David Applegate CEO GMAC Mortgage ("GMACM") in his personal and professional capacity, jointly and severally, 1100 Virgina Drive Fort Washington, PA 19034

**(And GMACM in care of David Applegate above)**

Thomas Marano, CEO Residential Capital LLC ("RESCAP") in his personal and professional capacity, jointly and severally, One Meridian Crossings, Minneapolis, Minn 55423

**(And Residential Capital LLC in care of Thomas Marano above)**

Edward E. Whitacre, Jr., CEO, "New" GM in his personal and professional capacity, jointly and severally, 300 Renaissance Center, Detroit, MI 48265-3000    *Mail Drop 482-Z39-B10*

*(And New GM in care of above, and Old GM in care of CEO Edward Whitacre above,)*

Motors Liquidation Company  C/O Albert Koch
500 Renaissance Center,  Ste 1400. Detroit, Michigan 48265

Kris J Kordella  in his personal and professional capacity
1575 Honert Road Ortonville, Michigan 48462

US DEPARTMENT OF US TREASURY  C/O  OFFICE OF GENERAL COUNSEL
740 15th Street NW, Suite 510,  Washington, DC 20220

~~U.S. TREASURY IN CARE OF:~~
~~U.S. DEPARTMENT OF JUSTICE~~
~~Room No. B-103  950 Pennsylvania Avenue, NW   Washington, DC 20530-0001~~

US ATTORNEY, DISTRICT OF ARIZONA
Dennis K. Burke, Two Renaissance Square
40 North Central Ave., Suite 1200  Phoenix, AZ 85004-4408

ARIZONA ATTORNEY GENERAL
Honorable Terry Goddard   1275 West Washington Street   Phoenix, Arizona 85007

1  John Lewis Mealer, Pro Per  (Pro Se)
   6333 Gardenia Lane
2  Show Low, Arizona 85901
   jlmealer@mealercompanies.com
3  jlmealer@yahoo.com

4              IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

5                    IN AND FOR THE COUNTY OF NAVAJO

6  JOHN LEWIS MEALER                    )
                                        )        **CASE NUMBER CV201000316**
7                          PLAINTIFF    )
                                        )
8                       vs             )        **REQUEST FOR JURY TRIAL**
                                        )
9  GMAC MORTGAGE LLC and **CEO DAVID**  )
   **APPLEGATE,** GMAC FINANCIAL        )
10 SERVICES, **GMAC LLC** and **CEO**   )
   **MICHAEL CARPENTER,** GENERAL       )
11 MOTORS CORPORATION., GENERAL         )
   MOTORS COMPANY and **CEO EDWARD**    )
12 **WHITACRE JR**, MOTORS LIQUIDATION  )
   COMPANY, RESIDENTIAL CAPITAL LLC     )
13 and **CEO THOMAS MARANO**, UNITED    )
   STATES TREASURY DEPARTMENT, GM       )
14 ENGINEER KRIS J KORDELLA, JANE       )
   DOE, JOHN DOE,  et al.
15
                       DEFENDANTS
16

17                    **REQUEST FOR JURY TRIAL**

18 Plaintiff hereby demands a trial of this action by jury.

19

20 DATED: July _____, 2010

21 _____

22                                            John Lewis Mealer

23

24

25

-114-

1
2
3

John Lewis Mealer, Pro Per  (Pro Se)
6333 Gardenia Lane
Show Low, Arizona 85901
jlmealer@mealercompanies.com
jlmealer@yahoo.com

4

### IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

5

### IN AND FOR THE COUNTY OF NAVAJO

6

JOHN LEWIS MEALER                        )
                                                          )        **CASE NUMBER CV201000316**
7
                                 PLAINTIFF    )
8                                       vs                )
                                                          )        **CERTIFICATE OF**
9     GMAC MORTGAGE LLC and **CEO DAVID** )    **COMPULSORY ARBITRATION**
      **APPLEGATE,** GMAC FINANCIAL        )
10   SERVICES, **GMAC LLC and CEO**      )
      **MICHAEL CARPENTER,** GENERAL    )
11   MOTORS CORPORATION., GENERAL    )
      MOTORS COMPANY and **CEO EDWARD** )
12   **WHITACRE JR**, MOTORS LIQUIDATION )
      COMPANY, RESIDENTIAL CAPITAL LLC )
13   and **CEO THOMAS MARANO**, UNITED )
      STATES TREASURY DEPARTMENT, GM )
14   ENGINEER KRIS J KORDELLA, JANE    )
      DOE, JOHN DOE,  et al.                      )
15

16                        DEFENDANTS

17          Comes now plaintiff(s), pro per and pro se by this honorable court's description, and
hereby certifies that this case is not subject to the Uniform Rules of Procedure for Arbitration,
18   because equitable relief is sought.
      DATED THIS _____DAY OF _____, 2010
19

20   Submitted on _____          _____

21   Signature Witnessed this _____ day of _____, by

22

23                                              _____
                                                Notary Public/ Deputy Clerk

24

25

1

John Lewis Mealer, Pro Per  (Pro Se)
6333 Gardenia Lane

2

Show Low, Arizona 85901
jlmealer@mealercompanies.com

3

jlmealer@yahoo.com

4

### IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

5

### IN AND FOR THE COUNTY OF NAVAJO

6

JOHN LEWIS MEALER                    )
                                     )        **CASE NUMBER CV201000316**

7

                    PLAINTIFF        )
                                     )

8

                    vs               )
                                     )        **SUMMONS**

9

GMAC MORTGAGE LLC and **CEO DAVID** )
**APPLEGATE**, GMAC FINANCIAL        )

10

SERVICES, **GMAC LLC** and **CEO**  )
**MICHAEL CARPENTER**, GENERAL       )

11

MOTORS CORPORATION., GENERAL         )
MOTORS COMPANY and **CEO EDWARD**    )

12

**WHITACRE JR**, MOTORS LIQUIDATION )
COMPANY, RESIDENTIAL CAPITAL LLC    )

13

and **CEO THOMAS MARANO**, UNITED    )
STATES TREASURY DEPARTMENT, GM       )

14

ENGINEER KRIS J KORDELLA, JANE       )
DOE, JOHN DOE,  **et al.**

15

16

                    DEFENDANTS

17

The plaintiff John Lewis Mealer to defendant(s):

18

19

20

21

        YOU ARE HEREBY SUMMONED and required to serve upon this plaintiff, pro per, an

22

answer to the complaint which is herewith served upon you, within twenty (20) days, exclusive

23

of the day of service, after service of this summons upon you if served within the State of

24

Arizona. Direct service is complete when made. Arizona Rules of Civil Procedure. Rule 4.

25

YOU ARE HEREBY NOTIFIED that in case of your failure to appear and defend within the time applicable, judgment may be taken against you   for the relief demanded in the Complaint.

YOU ARE CAUTIONED that in order to appear to defend, you must file an Answer or other proper response in writing with the Clerk of this Court, accompanied by the necessary filing fee, within the time required, and you are required to serve a copy of any Answer or other response upon the Plaintiff, pro per. Arizona Rules of Civil Procedure, Rule 10.

The name and address of the Plaintiff

John Lewis Mealer
6333 Gardenia Lane
Show Low, Arizona (85901)
jlmealer@mealercompanies.com
jlmealer@yahoo.com

REQUESTS FOR REASONABLE ACCOMODATION FOR PERSONS WITH DISABILITIES MUST BE MADE TO THE DIVISION ASSIGNED TO THE CASE BY APRTIES AT LEAST THREE (3) DAYS IN ADVANCE OF A SCHEDULED COURT PROCEEDING.

SIGNED AND SEALED this _____ day of _____, 2010

_____
Deputy Clerk/ Clerk of the Court