**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------x
                                              :
In re                                         :          **Chapter 11 Case No.**
                                              :
**MOTORS LIQUIDATION COMPANY,** *et al.,*     :          **09-50026 (REG)**
        **f/k/a General Motors Corp.,** *et al.*   :
                                              :
                          **Debtors.**        :          **(Jointly Administered)**
                                              :
-----------------------------------------------------------------x


**DEBTORS' SECOND AMENDED JOINT CHAPTER 11 PLAN**


WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
(212) 310-8000

Attorneys for Debtors and
Debtors in Possession

# TABLE OF CONTENTS

**Page**

Article I.    Definitions and Interpretation ................................................................. 1

1.1    363 Transaction ................................................................................ 1

1.2    Administrative Expenses ................................................................. 1

1.3    ADR Procedures ............................................................................. 2

1.4    Allowed ........................................................................................... 2

1.5    Asbestos Claimants' Committee .................................................... 2

1.6    Asbestos Claims .............................................................................. 2

1.7    Asbestos Insurance Assets ............................................................. 2

1.8    Asbestos Insurance Assets Trust .................................................... 3

1.9    Asbestos Personal Injury Claim ..................................................... 3

1.10    Asbestos Property Damage Claim ................................................. 3

1.11    Asbestos Trust ................................................................................. 4

1.12    Asbestos Trust Administrator ......................................................... 4

1.13    Asbestos Trust Agreement .............................................................. 4

1.14    Asbestos Trust Assets ..................................................................... 4

1.15    Asbestos Trust Claim ...................................................................... 4

1.16    Asbestos Trust Distribution Procedures ......................................... 5

1.17    Asbestos Trust Transfer Date .......................................................... 5

1.18    Avoidance Action ............................................................................ 5

1.19    Avoidance Action Trust .................................................................. 5

1.20    Avoidance Action Trust Administrative Cash ................................ 5

1.21    Avoidance Action Trust Administrator ........................................... 5

1.22    Avoidance Action Trust Agreement ............................................... 6

1.23    Avoidance Action Trust Assets ...................................................... 6

1.24    Avoidance Action Trust Claims Reserve ........................................ 6

1.25    Avoidance Action Trust Monitor .................................................... 6

1.26    Avoidance Action Trust Transfer Date ........................................... 6

1.27    Ballot ............................................................................................... 6

1.28    Bankruptcy Code ............................................................................ 6

i

# TABLE OF CONTENTS
## (continued)

Page

| | | |
|---|---|---|
| 1.29 | Bankruptcy Court | 6 |
| 1.30 | Bankruptcy Rules | 7 |
| 1.31 | Budget | 7 |
| 1.32 | Business Day | 7 |
| 1.33 | Cash | 7 |
| 1.34 | Causes of Action | 7 |
| 1.35 | Chapter 11 Cases | 7 |
| 1.36 | Claim | 7 |
| 1.37 | Claim Settlement Procedures | 7 |
| 1.38 | Class | 8 |
| 1.39 | Collateral | 8 |
| 1.40 | Commencement Date | 8 |
| 1.41 | Confirmation Date | 8 |
| 1.42 | Confirmation Hearing | 8 |
| 1.43 | Confirmation Order | 8 |
| 1.44 | Creditors' Committee | 8 |
| 1.45 | Debtors | 8 |
| 1.46 | Demand | 8 |
| 1.47 | DIP Credit Agreement | 8 |
| 1.48 | DIP Credit Agreement Claims | 9 |
| 1.49 | DIP Lenders | 9 |
| 1.50 | DIP Lenders' Avoidance Actions | 9 |
| 1.51 | DIP Lenders' Avoidance Assets | 9 |
| 1.52 | DIP Lenders' Collateral | 9 |
| 1.53 | Disclosure Statement | 9 |
| 1.54 | Disputed | 9 |
| 1.55 | Distribution Record Date | 10 |
| 1.56 | District Court | 10 |
| 1.57 | EDC | 10 |

# TABLE OF CONTENTS
## (continued)

Page

| | | |
|---|---|---|
| 1.58 | Effective Date | 10 |
| 1.59 | ENCORE | 10 |
| 1.60 | Encumbrance | 10 |
| 1.61 | Entity | 10 |
| 1.62 | Environmental Action | 10 |
| 1.63 | Environmental Laws | 10 |
| 1.64 | Environmental Response Trust | 11 |
| 1.65 | Environmental Response Trust Administrative Funding Account | 11 |
| 1.66 | Environmental Response Trust Administrative Trustee | 11 |
| 1.67 | Environmental Response Trust Agreement | 11 |
| 1.68 | Environmental Response Trust Assets | 11 |
| 1.69 | Environmental Response Trust Consent Decree and Settlement Agreement | 12 |
| 1.70 | Environmental Response Trust Parties | 12 |
| 1.71 | Environmental Response Trust Properties | 12 |
| 1.72 | Environmental Response Trust Transfer Date | 12 |
| 1.73 | Equity Interest | 12 |
| 1.74 | Eurobond Claim | 12 |
| 1.75 | Final Order | 12 |
| 1.76 | Fiscal and Paying Agency Agreements | 13 |
| 1.77 | Fiscal and Paying Agents | 13 |
| 1.78 | Future Claimants' Representative | 13 |
| 1.79 | General Unsecured Claim | 13 |
| 1.80 | Governmental Authorities | 13 |
| 1.81 | GUC Trust | 13 |
| 1.82 | GUC Trust Administrative Fund | 13 |
| 1.83 | GUC Trust Administrator | 14 |
| 1.84 | GUC Trust Agreement | 14 |
| 1.85 | GUC Trust Assets | 14 |
| 1.86 | GUC Trust Monitor | 14 |

# TABLE OF CONTENTS
## (continued)

Page

1.87    GUC Trust Transfer Date ......................................................................... 14

1.88    GUC Trust Units ..................................................................................... 14

1.89    Indentures ............................................................................................... 14

1.90    Indenture Trustee/Fiscal and Paying Agent Reserve Cash ..................... 16

1.91    Indenture Trustees .................................................................................. 16

1.92    Indirect Asbestos Claim .......................................................................... 16

1.93    Initial Debtors ......................................................................................... 17

1.94    Medical Liens .......................................................................................... 17

1.95    MLC ........................................................................................................ 17

1.96    MSPA ...................................................................................................... 17

1.97    New GM ................................................................................................... 17

1.98    New GM Securities .................................................................................. 18

1.99    New GM Stock ......................................................................................... 18

1.100   New GM Warrants ................................................................................... 18

1.101   Note Claim .............................................................................................. 18

1.102   Nova Scotia Guarantee Claims ............................................................... 18

1.103   Nova Scotia Wind-Up Claim ................................................................... 19

1.104   Person ..................................................................................................... 19

1.105   Plan ......................................................................................................... 19

1.106   Plan Supplement ..................................................................................... 20

1.107   Post-Effective Date MLC ........................................................................ 20

1.108   Priority Non-Tax Claim ........................................................................... 20

1.109   Priority Order Sites ................................................................................. 20

1.110   Priority Order Sites Consent Decrees and Settlement Agreements ......... 20

1.111   Priority Tax Claim ................................................................................... 20

1.112   Pro Rata Share ......................................................................................... 20

1.113   Property or Properties ............................................................................. 21

1.114   Property Environmental Claim ............................................................... 21

1.115   Protected Party ....................................................................................... 21

iv

# TABLE OF CONTENTS
## (continued)

Page

| | | |
|---|---|---|
| 1.116 | REALM | 22 |
| 1.117 | Registered Holder | 22 |
| 1.118 | Residual Wind-Down Assets | 22 |
| 1.119 | Schedules | 22 |
| 1.120 | Secured Claim | 22 |
| 1.121 | Solicitation Procedures | 23 |
| 1.122 | Tax Code | 23 |
| 1.123 | Term Loan Avoidance Action | 23 |
| 1.124 | Term Loan Avoidance Action Beneficiaries | 23 |
| 1.125 | Trusts | 23 |
| 1.126 | Unliquidated Litigation Claim | 23 |
| 1.127 | U.S. Treasury | 23 |
| 1.128 | U.S. Trustee | 23 |
| 1.129 | Voting Deadline | 23 |
| Article II. | Administrative Expenses and Priority Tax Claims | 24 |
| 2.1 | Administrative Expenses | 24 |
| 2.2 | Compensation and Reimbursement Claims | 24 |
| 2.3 | Priority Tax Claims | 24 |
| 2.4 | DIP Credit Agreement Claims | 24 |
| 2.5 | Special Provisions Regarding Fees and Expenses of Indenture Trustees and Fiscal and Paying Agents | 26 |
| Article III. | Classification of Claims and Equity Interests | 26 |
| Article IV. | Treatment of Claims and Equity Interests | 27 |
| 4.1 | Class 1 – Secured Claims | 27 |
| 4.2 | Class 2 - Priority Non-Tax Claims | 27 |
| 4.3 | Class 3 - General Unsecured Claims | 27 |
| 4.4 | Class 4 – Property Environmental Claims | 30 |
| 4.5 | Class 5 – Asbestos Personal Injury Claims | 30 |
| 4.6 | Class 6 - Equity Interests in MLC | 31 |
| Article V. | Provisions Governing Distributions | 32 |

# TABLE OF CONTENTS
## (continued)

Page

| | | | |
|---|---|---|---|
| 5.1 | | Distribution Record Date | 32 |
| 5.2 | | Method of Distributions Under the Plan | 32 |
| | a. | Payments and Transfers on Effective Date | 32 |
| | b. | Repayment of Excess Cash to DIP Lenders | 33 |
| | c. | Payment of Cash or Certain Assets to Charitable Organizations | 34 |
| | d. | Distributions of Cash | 35 |
| | e. | Sale of New GM Warrants About to Expire | 35 |
| 5.3 | | Delivery of Distributions and Undeliverable Distributions | 35 |
| 5.4 | | Withholding and Reporting Requirements | 36 |
| 5.5 | | Time Bar to Cash Payments | 37 |
| 5.6 | | Minimum Distributions and Fractional Shares or Units | 37 |
| 5.7 | | Setoffs | 38 |
| 5.8 | | Transactions on Business Days | 38 |
| 5.9 | | Allocation of Plan Distribution Between Principal and Interest | 38 |
| 5.10 | | Surrender of Existing Publicly-Traded Securities | 39 |
| 5.11 | | Class Proofs of Claim | 39 |
| Article VI. | | Means for Implementation and Execution of the Plan | 40 |
| 6.1 | | Substantive Consolidation | 40 |
| 6.2 | | The GUC Trust | 40 |
| | a. | Execution of GUC Trust Agreement | 40 |
| | b. | Purpose of GUC Trust | 40 |
| | c. | GUC Trust Assets | 41 |
| | d. | Governance of GUC Trust | 41 |
| | e. | GUC Trust Administrator and GUC Trust Monitor | 41 |
| | f. | Role of GUC Trust Administrator | 42 |
| | g. | Role of GUC Trust Monitor | 41 |
| | h. | Transferability of GUC Trust Interests | 42 |
| | i. | Cash | 42 |
| | j. | Costs and Expenses of GUC Trust Administrator | 42 |

## TABLE OF CONTENTS
### (continued)

Page

| | | | |
|---|---|---|---|
| | k. | Compensation of GUC Trust Administrator | 42 |
| | l. | Distribution of GUC Trust Assets | 43 |
| | m. | Retention of Professionals by GUC Trust Administrator and GUC Trust Monitor | 43 |
| | n. | U.S. Federal Income Tax Treatment of GUC Trust | 43 |
| | o. | Dissolution | 44 |
| | p. | Indemnification of GUC Trust Administrator and GUC Trust Monitor | 44 |
| | q. | Closing of Chapter 11 Cases | 45 |
| 6.3 | | The Asbestos Trust | 45 |
| | a. | Execution of Asbestos Trust Agreement | 45 |
| | b. | Purpose of Asbestos Trust | 45 |
| | c. | Assumption of Certain Liabilities by Asbestos Trust | 45 |
| | d. | Asbestos Trust Assets | 45 |
| | e. | Governance of Asbestos Trust | 46 |
| | f. | The Asbestos Trust Administrator | 46 |
| | g. | Role of Asbestos Trust Administrator | 46 |
| | h. | Nontransferability of Asbestos Trust Interests | 46 |
| | i. | Cash | 46 |
| | j. | Costs and Expenses of Asbestos Trust | 46 |
| | k. | Resolution of Asbestos Personal Injury Claims | 46 |
| | l. | Distribution of Asbestos Trust Assets | 47 |
| | m. | Retention of Professionals by Asbestos Trust Administrator | 47 |
| | n. | U.S. Federal Income Tax Treatment of Asbestos Trust | 47 |
| | o. | Dissolution | 48 |
| | p. | Indemnification of Asbestos Trust Administrator | 48 |
| 6.4 | | The Environmental Response Trust | 48 |
| | a. | Environmental Response Trust Agreement and Environmental Response Trust Consent Decree and Settlement Agreement | 48 |

# TABLE OF CONTENTS
## (continued)

**Page**

| | | | |
|---|---|---|---|
| | b. | Purpose of Environmental Response Trust | 49 |
| | c. | Environmental Response Trust Assets | 49 |
| | d. | Governance of Environmental Response Trust | 50 |
| | e. | Role of Environmental Response Trust Administrative Trustee | 50 |
| | f. | Nontransferability of Environmental Response Trust Interests | 50 |
| | g. | Cash | 50 |
| | h. | Indemnification of Environmental Response Trust Administrative Trustee | 50 |
| | i. | U.S. Federal Income Tax Treatment of Environmental Response Trust | 51 |
| 6.5 | | The Avoidance Action Trust | 51 |
| | a. | Execution of Avoidance Action Trust Agreement | 51 |
| | b. | Purpose of Avoidance Action Trust | 52 |
| | c. | Avoidance Action Trust Assets | 52 |
| | d. | Governance of Avoidance Action Trust | 52 |
| | e. | Avoidance Action Trust Administrator and Avoidance Action Trust Monitor | 52 |
| | f. | Role of Avoidance Action Trust Administrator | 52 |
| | g. | Role of Avoidance Action Trust Monitor | 53 |
| | h. | Nontransferability of Avoidance Action Trust Interests | 53 |
| | i. | Cash | 53 |
| | j. | Distribution of Avoidance Action Trust Assets | 53 |
| | k. | Costs and Expenses of Avoidance Action Trust | 54 |
| | l. | Compensation of Avoidance Action Trust Administrator | 54 |
| | m. | Retention of Professionals by Avoidance Action Trust Administrator and Avoidance Action Trust Monitor | 54 |
| | n. | U.S. Federal Income Tax Treatment of Avoidance Action Trust | 54 |
| | o. | Dissolution | 58 |

# TABLE OF CONTENTS
## (continued)

**Page**

|  |  | p. | Indemnification of Avoidance Action Trust Administrator and Avoidance Action Trust Monitor | 59 |
|---|---|---|---|---|
|  | 6.6 |  | Securities Law Matters | 59 |
|  | 6.7 |  | Cancellation of Existing Securities and Agreements | 60 |
|  | 6.8 |  | Equity Interests in MLC Subsidiaries Held by the Debtors | 61 |
|  | 6.9 |  | Administration of Taxes | 61 |
|  | 6.10 |  | Dissolution of the Debtors | 61 |
|  | 6.11 |  | Determination of Tax Filings and Taxes | 62 |
|  | 6.12 |  | Books and Records | 63 |
|  | 6.13 |  | Corporate Action | 64 |
|  | 6.14 |  | Effectuating Documents and Further Transactions | 64 |
|  | 6.15 |  | Continued Applicability of Final Order Approving DIP Credit Agreement | 65 |
| Article VII. |  |  | Procedures for Disputed Claims | 65 |
|  | 7.1 |  | Objections to Claims and Resolution of Disputed Claims | 65 |
|  | 7.2 |  | No Distribution Pending Allowance | 66 |
|  | 7.3 |  | Estimation | 67 |
|  | 7.4 |  | Allowance of Disputed Claims | 67 |
|  | 7.5 |  | Dividends | 67 |
| Article VIII. |  |  | Executory Contracts and Unexpired Leases | 67 |
|  | 8.1 |  | Executory Contracts and Unexpired Leases | 67 |
|  | 8.2 |  | Approval of Rejection of Executory Contracts and Unexpired Leases | 68 |
|  | 8.3 |  | Rejection Claims | 68 |
| Article IX. |  |  | Effectiveness of the Plan | 68 |
|  | 9.1 |  | Condition Precedent to Confirmation of Plan | 68 |
|  | 9.2 |  | Conditions Precedent to Effective Date | 68 |
|  | 9.3 |  | Satisfaction and Waiver of Conditions | 69 |
|  | 9.4 |  | Effect of Nonoccurrence of Conditions to Consummation | 69 |
| Article X. |  |  | Effect of Confirmation | 70 |

ix

# TABLE OF CONTENTS
## (continued)

Page

| | | |
|---|---|---|
| 10.1 | Vesting of Assets | 70 |
| 10.2 | Release of Assets | 70 |
| 10.3 | Binding Effect | 70 |
| 10.4 | Term of Injunctions or Stays | 71 |
| 10.5 | Term Loan Avoidance Action; Setoffs | 71 |
| 10.6 | Injunction | 71 |
| 10.7 | Injunction Against Interference with Plan | 71 |
| 10.8 | Special Provisions for Governmental Units | 71 |
| Article XI. | Retention of Jurisdiction | 72 |
| 11.1 | Jurisdiction of Bankruptcy Court | 72 |
| Article XII. | Miscellaneous Provisions | 74 |
| 12.1 | Dissolution of Committees | 74 |
| 12.2 | Substantial Consummation | 75 |
| 12.3 | Effectuating Documents and Further Transactions | 75 |
| 12.4 | Exemption from Transfer Taxes | 75 |
| 12.5 | Release | 76 |
| 12.6 | Exculpation | 76 |
| 12.7 | Post-Confirmation Date Fees and Expenses | 77 |
| | a.   Fees and Expenses of Professionals | 77 |
| | b.   Fees and Expenses of GUC Trust Administrator, Asbestos Trust Administrator, Environmental Response Trust Administrative Trustee, and Avoidance Action Trust Administrator | 78 |
| 12.8 | Payment of Statutory Fees | 78 |
| 12.9 | Modification of Plan | 78 |
| 12.10 | Revocation or Withdrawal of Plan | 78 |
| 12.11 | Courts of Competent Jurisdiction | 79 |
| 12.12 | Severability | 79 |
| 12.13 | Governing Law | 79 |
| 12.14 | Exhibits | 79 |

## TABLE OF CONTENTS
### (continued)

Page

12.15   Successors and Assigns........................................................................... 79

12.16   Time ..................................................................................................... 79

12.17   Notices ................................................................................................. 80

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
---------------------------------------------------------------x
                                                          :
In re                                                     :          **Chapter 11 Case No.**
                                                          :
**MOTORS LIQUIDATION COMPANY,** *et al.,*                 :          **09-50026 (REG)**
    **f/k/a General Motors Corp.,** *et al.*     :
                                                          :
        **Debtors.**                :          **(Jointly Administered)**
                                                          :
---------------------------------------------------------------x

## DEBTORS' SECOND AMENDED JOINT CHAPTER 11 PLAN

        Motors Liquidation Company (f/k/a General Motors Corporation); MLC of Harlem, Inc. (f/k/a Chevrolet-Saturn of Harlem, Inc.); MLCS, LLC (f/k/a Saturn, LLC); MLCS Distribution Corporation (f/k/a Saturn Distribution Corporation); Remediation and Liability Management Company, Inc.; and Environmental Corporate Remediation Company, Inc., the above-captioned debtors, propose the following chapter 11 plan pursuant to section 1121(a) of title 11 of the United States Code:

### ARTICLE I.

### DEFINITIONS AND INTERPRETATION

**DEFINITIONS.**  The following terms used herein shall have the respective meanings defined below (such meanings to be equally applicable to both the singular and plural):

    **1.1**    **363 Transaction** means the sale of substantially all the assets of General Motors Corporation and certain of its Debtor subsidiaries, and the assumption of certain executory contracts and unexpired leases of personal property and nonresidential real property, to a U.S. Treasury-sponsored purchaser pursuant to section 363 of the Bankruptcy Code, as embodied in the MSPA.

    **1.2**    **Administrative Expenses** means costs or expenses of administration of any of the Chapter 11 Cases allowed under sections 503(b), 507(a)(1), and 1114(e) of the Bankruptcy Code that have not already been paid by the Debtors, including, without limitation, any actual and necessary costs and expenses of preserving the Debtors' estates, any actual and necessary costs and expenses of operating the Debtors' businesses, any indebtedness or obligations incurred or assumed by the Debtors, as debtors in possession, during the Chapter 11 Cases, including, without limitation, for the acquisition or lease of property or an interest in property or the rendition of services, any compensation and reimbursement of expenses to the extent allowed by Final Order under sections 330 or 503 of the Bankruptcy Code, and any fees or charges assessed against the

estates of the Debtors under section 1930 of chapter 123 of title 28 of the United States Code; *provided, however*, that Administrative Expenses does not mean the Debtors' obligations and liabilities that were assumed by New GM under the MSPA, as approved by the order of the Bankruptcy Court entered July 5, 2009.

**1.3      ADR Procedures** means the alternative dispute resolution procedures, including mandatory mediation, approved by orders of the Bankruptcy Court, pursuant to section 105(a) of the Bankruptcy Code and General Order M-390 authorizing implementation of alternative dispute procedures, including mandatory mediation, entered February 23, 2010 and April 29, 2010 (ECF Nos. 5037, 5673), with respect to the following types of unliquidated and/or litigation Claims:  (i) personal injury Claims, (ii) wrongful death Claims, (iii) tort Claims, (iv) products liability Claims, (v) Claims for damages arising from the rejection of executory contracts or unexpired leases of nonresidential real property (excluding Claims for damages arising from the rejection of executory contracts as they related primarily to environmental matters), (vi) indemnity Claims (excluding tax indemnity Claims relating to leveraged fixed equipment lease transactions and excluding indemnity Claims relating to asbestos liability), (vii) lemon law Claims, to the extent applicable under section 6.15 of the MSPA, (viii) warranty Claims, to the extent applicable under section 6.15 of the MSPA, and (ix) class action Claims.

**1.4      Allowed** means, with reference to any Claim (other than an Asbestos Personal Injury Claim), (a) any Claim against any Debtor that has been listed by such Debtor in the Schedules, as such Schedules may be amended by the Debtors from time to time in accordance with Bankruptcy Rule 1009, as liquidated in amount and not disputed or contingent and for which no contrary proof of Claim has been filed, (b) any (I) timely filed Claim that is no longer subject to the ADR Procedures in the case of Unliquidated Litigation Claims or (II) Claim listed on the Schedules or timely filed proof of Claim, as to which no objection to allowance has been interposed in accordance with Section 7.1 hereof or such other applicable period of limitation fixed by the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or as to which any objection has been determined by a Final Order to the extent such objection is determined in favor of the respective holder, or (c) any Claim expressly allowed by a Final Order, pursuant to the Claim Settlement Procedures, or under this Plan.  The Asbestos Trust Claim shall be deemed "Allowed" when fixed by Final Order or settlement.

**1.5      Asbestos Claimants' Committee** means the official committee of unsecured creditors holding Asbestos Personal Injury Claims appointed by the U.S. Trustee in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code.

**1.6      Asbestos Claims** means Asbestos Personal Injury Claims and Asbestos Property Damage Claims.

**1.7      Asbestos Insurance Assets** means all rights arising under liability insurance policies issued to the Debtors with inception dates prior to 1986 with respect to liability for Asbestos Claims, including, but not limited to (i) rights (a) under insurance

2

policies, (b) under settlement agreements made with respect to such insurance policies, (c) against the estates of insolvent insurers that issued such policies or entered into such settlements, and (d) against state insurance guaranty associations arising out of any such insurance policies issued by insolvent insurers, and (ii) the right, on behalf of MLC and its subsidiaries as of the Effective Date, to give a full release of the insurance rights of MLC and its subsidiaries as of the Effective Date under any such policy or settlement agreement with the exception of rights to coverage with respect to workers' compensation claims.  The Asbestos Insurance Assets that shall be transferred to the Asbestos Insurance Assets Trust shall not include the transfer of any insurance policies themselves nor any rights or claims that the Debtors have or may have against any insurers with respect to amounts the Debtors have already paid on account of Asbestos Claims.

**1.8** **Asbestos Insurance Assets Trust** means the trust to be established to hold and administer the Asbestos Insurance Assets and any proceeds thereof for the benefit of the DIP Lenders, the terms of which trust shall be agreed upon between the Debtors and the DIP Lenders.

**1.9** **Asbestos Personal Injury Claim** means any Claim, remedy, liability, or Demand against the Debtors, now existing or hereafter arising, whether or not such Claim, remedy, liability, or Demand is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, whether or not the facts of or legal bases therefor are known or unknown, under any theory of law, equity, admiralty, or otherwise, for death, bodily injury, sickness, disease, medical monitoring, or other personal injuries (whether physical, emotional, or otherwise) to the extent caused or allegedly caused, directly or indirectly, by the presence of or exposure (whether prior to or after the Commencement Date) to asbestos or asbestos-containing products or things that are or were installed, engineered, designed, manufactured, fabricated, constructed, sold, supplied, produced, specified, selected, distributed, released, marketed, serviced, maintained, repaired, purchased, owned, occupied, used, removed, replaced, or disposed by any of the Debtors or an Entity for whose products or operations the Debtors allegedly have liability or for which any of the Debtors are otherwise allegedly liable, including, without express or implied limitation, any Claim, remedy, liability, or Demand for compensatory damages (such as loss of consortium, wrongful death, medical monitoring, survivorship, proximate, consequential, general, and special damages) and punitive damages, and any Claim, remedy, liability, or Demand for reimbursement, indemnification, subrogation, and contribution (including, without limitation, any Indirect Asbestos Claim with respect to an Asbestos Personal Injury Claim), and any claim under any settlement entered into by or on behalf of the Debtors prior to the Commencement Date relating to an Asbestos Personal Injury Claim.

**1.10** **Asbestos Property Damage Claim** means any Claim, remedy, liability, or Demand against the Debtors, now existing or hereafter arising, whether or not such Claim, remedy, liability, or Demand is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or

unsecured, whether or not the facts of or legal bases therefor are known or unknown, under any theory of law, equity, admiralty, or otherwise, for property damage, including but not limited to, the cost of inspecting, maintaining, encapsulating, repairing, decontaminating, removing, or disposing of asbestos or asbestos-containing products in buildings, other structures, or other property to the extent caused or allegedly caused, directly or indirectly, by the presence of or exposure (whether prior to or after the Commencement Date) to asbestos or asbestos-containing products or things that are or were installed, engineered, designed, manufactured, fabricated, constructed, sold, supplied, produced, specified, selected, distributed, released, marketed, serviced, maintained, repaired, purchased, owned, occupied, used, removed, replaced, or disposed by any of the Debtors or an Entity for whose products or operations the Debtors allegedly have liability or for which any of the Debtors are otherwise allegedly liable, including, without express or implied limitation, any Claim, remedy, liability, or Demand for compensatory damages (such as loss of proximate, consequential, general, and special damages) and punitive damages, and any Claim, remedy, liability, or Demand for reimbursement, indemnification, subrogation, and contribution (including, without limitation, any Indirect Asbestos Claim with respect to an Asbestos Property Damage Claim), and any claim under any settlement entered into by or on behalf of the Debtors prior to the Commencement Date relating to an Asbestos Property Damage Claim. Asbestos Property Damage Claims do not include any Claims or Causes of Action of governmental units under Environmental Laws.

   **1.11    Asbestos Trust** means the trust established under the Plan in accordance with the Asbestos Trust Agreement.

   **1.12    Asbestos Trust Administrator** means the Person confirmed by the Bankruptcy Court to serve as the Asbestos PI Trustee(s) (as such term is defined in the Asbestos Trust Agreement) of the Asbestos Trust, pursuant to the terms of the Asbestos Trust Agreement, or as subsequently may be appointed pursuant to the terms of the Asbestos Trust Agreement.  The Asbestos Trust Administrator shall be Kirk P. Watson, Esq.

   **1.13    Asbestos Trust Agreement** means that certain Asbestos Trust Agreement executed by the Debtors and the Asbestos Trust Administrator, substantially in the form annexed hereto as Exhibit "A."

   **1.14    Asbestos Trust Assets** means the Debtors' assets transferred to the Asbestos Trust in accordance with the Plan and the Asbestos Trust Agreement.  The Asbestos Trust Assets shall be comprised of (i) Cash in the amount of $2 million and (ii) the Asbestos Trust Claim (or, if fixed by Final Order or settlement prior to the Effective Date, the distribution to which such Claim is entitled as an Allowed General Unsecured Claim).

   **1.15    Asbestos Trust Claim** means the Claim (which shall be held by the Asbestos Trust) in the amount of the Debtors' aggregate liability for Asbestos Personal Injury Claims that either will be in an amount (i) mutually agreed upon by the Debtors,

the Creditors' Committee, the Asbestos Claimants' Committee, and the Future Claimants' Representative or (ii) ordered by the Bankruptcy Court, which, when fixed by Final Order or settlement, shall be treated as an Allowed General Unsecured Claim in Class 3 for purposes of distribution from the GUC Trust and the Avoidance Action Trust, as applicable.  For the avoidance of doubt, prior to the determination of the Allowed amount of the Asbestos Trust Claim, the Asbestos Trust Claim is not and shall not be treated as a Disputed General Unsecured Claim, except with respect to determining the Pro Rata Share of New GM Securities to be distributed hereunder.

     **1.16**    **Asbestos Trust Distribution Procedures** means the distribution procedures to be implemented by the Asbestos Trust Administrator pursuant to the Plan and the Asbestos Trust Agreement to process, liquidate, and pay Asbestos Personal Injury Claims, substantially in the form annexed hereto as Exhibit "B."

     **1.17**    **Asbestos Trust Transfer Date** means the date on which the Asbestos Trust Assets are transferred to the Asbestos Trust, which transfer shall occur on the Effective Date, or as soon thereafter as is reasonably practicable, but shall be no later than December 15, 2011.

     **1.18**    **Avoidance Action** means any action commenced, or that may be commenced, before or after the Effective Date pursuant to section 544, 545, 547, 548, 549, 550, or 551 of the Bankruptcy Code, except to the extent purchased by New GM under the MSPA or prohibited under the DIP Credit Agreement.

     **1.19**    **Avoidance Action Trust** means the trust established under the Plan in accordance with the Avoidance Action Trust Agreement.

     **1.20**    **Avoidance Action Trust Administrative Cash** means the Cash held and maintained by the Avoidance Action Trust Administrator for the purpose of paying the expenses incurred by the Avoidance Action Trust Administrator (including fees and expenses for professionals retained by the Avoidance Action Trust) in connection with the Avoidance Action Trust and any obligations imposed on the Avoidance Action Trust Administrator or the Avoidance Action Trust, including expenses relating to the performance of the Avoidance Action Trust Administrator's obligations under the Avoidance Action Trust Agreement and Section 6.5 hereof.  The Debtors shall reserve $1.6 million for the Avoidance Action Trust Administrative Cash, which shall be transferred to the Avoidance Action Trust, less any amounts expended by Post-Effective Date MLC from and after the Effective Date in respect of the prosecution of the Term Loan Avoidance Action, on the Avoidance Action Trust Transfer Date.

     **1.21**    **Avoidance Action Trust Administrator** means the entity appointed by the Debtors, with the consent of the U.S. Treasury and the Creditors' Committee, to serve as administrator of the Avoidance Action Trust, pursuant to the terms of the Avoidance Action Trust Agreement, or as subsequently may be appointed pursuant to the terms of the Avoidance Action Trust Agreement.  The Avoidance Action Trust Administrator

shall be Wilmington Trust Company. The Avoidance Action Trust Administrator shall be the successor-plaintiff in the Term Loan Avoidance Action.

1.22    **Avoidance Action Trust Agreement** means that certain Avoidance Action Trust Agreement executed by the Debtors and the Avoidance Action Trust Administrator, substantially in the form annexed hereto as Exhibit "G."

1.23    **Avoidance Action Trust Assets** means the (i) Term Loan Avoidance Action transferred to the Avoidance Action Trust and any proceeds thereof (for the benefit of the Term Loan Avoidance Action Beneficiaries), (ii) the Avoidance Action Trust Administrative Cash, and (iii) the remaining assets of MLC transferred to the Avoidance Action Trust upon the dissolution of MLC as set forth in Section 6.10 hereof.

1.24    **Avoidance Action Trust Claims Reserve** means (i) if the Term Loan Avoidance Action Beneficiaries have not been identified on or prior to the Avoidance Action Trust Transfer Date, the Avoidance Action Trust Assets other than the remaining assets of MLC transferred to the Avoidance Action Trust upon the dissolution of MLC and (ii) any Avoidance Action Trust Assets (to the extent not covered by the preceding clause) allocable to, or retained on account of, Disputed General Unsecured Claims, the Asbestos Trust Claim (but only until the Asbestos Trust Claim is determined, as set forth in Section 1.15 hereof), and the potential General Unsecured Claims arising from any successful recovery of proceeds from the Term Loan Avoidance Action or other Avoidance Actions.

1.25    **Avoidance Action Trust Monitor** means the entity appointed by the Debtors, with the consent of the U.S. Treasury and the Creditors' Committee, to oversee the Avoidance Action Trust, pursuant to the terms of the Avoidance Action Trust Agreement, or as subsequently may be appointed pursuant to the terms of the Avoidance Action Trust Agreement. The Avoidance Action Trust Monitor shall be FTI Consulting, Inc.

1.26    **Avoidance Action Trust Transfer Date** means the date selected by the Debtors, with the consent of the U.S. Treasury and (a) the Creditors' Committee prior to the Effective Date or (b) the GUC Trust Administrator on or after the Effective Date, as applicable, on which the Avoidance Action Trust Assets are transferred to the Avoidance Action Trust, which transfer shall occur on or before December 15, 2011; *provided, however,* that the transfer of the remaining assets of MLC, if any, shall occur upon the dissolution of MLC as set forth in, and in accordance with, Section 6.10 hereof.

1.27    **Ballot** means the form(s) distributed to holders of impaired Claims on which is to be indicated the acceptance or rejection of the Plan.

1.28    **Bankruptcy Code** means title 11 of the United States Code, as amended from time to time, as applicable to the Chapter 11 Cases.

**1.29    Bankruptcy Court** means the United States District Court for the Southern District of New York, having jurisdiction over the Chapter 11 Cases and, to the extent of any reference made under section 157 of title 28 of the United States Code, the unit of such District Court having jurisdiction over the Chapter 11 Cases under section 151 of title 28 of the United States Code.

**1.30    Bankruptcy Rules** means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, as amended from time to time, applicable to the Chapter 11 Cases, and any Local Rules of the Bankruptcy Court.

**1.31    Budget** means that certain budget for the post-Effective Date period agreed to by the U.S. Treasury, as a DIP Lender, the Debtors, and the Creditors' Committee detailing the funding of, among other things, the GUC Trust, the Asbestos Trust, the Environmental Response Trust, the Avoidance Action Trust, the Indenture Trustee/Fiscal and Paying Agent Reserve Cash, and any other post-Effective Date obligations detailed in the Plan or in the GUC Trust Agreement, the Asbestos Trust Agreement, the Environmental Response Trust Agreement, or the Avoidance Action Trust Agreement.  The Budget is a supporting schedule to Exhibit "B" annexed to the Disclosure Statement.

**1.32    Business Day** means any day other than a Saturday, a Sunday, or any other day on which banking institutions in New York, New York are required or authorized to close by law or executive order.

**1.33    Cash** means legal tender of the United States of America.

**1.34    Causes of Action** means the Avoidance Actions and any and all actions, causes of action, liabilities, obligations, rights, suits, damages, judgments, claims, and demands whatsoever, whether known or unknown, existing or hereafter arising, in law, equity, or otherwise, based in whole or in part on any act or omission or other event occurring prior to the Commencement Date or during the course of the Chapter 11 Cases, including through the Effective Date, except to the extent the prosecution of any Causes of Action are prohibited by the DIP Credit Agreement.

**1.35    Chapter 11 Cases** means the jointly administered cases under chapter 11 of the Bankruptcy Code commenced by the Debtors on the Commencement Date in the Bankruptcy Court and currently styled *In re Motors Liquidation Company, et al. f/k/a General Motors Corp. et al*, Ch. 11 Case No. 09-50026 (REG) (Jointly Administered).

**1.36    Claim** has the meaning set forth in section 101 of the Bankruptcy Code.

**1.37    Claim Settlement Procedures** means the procedures for settling Claims approved by order of the Bankruptcy Court, pursuant to section 105(a) of the Bankruptcy Code and Bankruptcy Rules 3007 and 9019(b), authorizing the Debtors to (i) file

7

omnibus Claims objections and (ii) establish procedures for settling certain Claims, entered October 6, 2009 (ECF No. 4180).

**1.38    Class** means any group of Claims or Equity Interests classified by the Plan pursuant to section 1122(a)(1) of the Bankruptcy Code.

**1.39    Collateral** means any property or interest in property of the estate of any Debtor subject to a lien, charge, or other encumbrance to secure the payment or performance of a Claim, which lien, charge, or other encumbrance is not subject to avoidance under the Bankruptcy Code.

**1.40    Commencement Date** means (i) June 1, 2009 with respect to Motors Liquidation Company; MLC of Harlem, Inc.; MLCS, LLC; and MLCS Distribution Corporation and (ii) October 9, 2009 with respect to Remediation and Liability Management Company, Inc. and Environmental Corporate Remediation Company, Inc.

**1.41    Confirmation Date** means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order.

**1.42    Confirmation Hearing** means the hearing to be held by the Bankruptcy Court regarding confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

**1.43    Confirmation Order** means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

**1.44    Creditors' Committee** means the statutory committee of unsecured creditors appointed by the U.S. Trustee in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code.

**1.45    Debtors** means Motors Liquidation Company; MLC of Harlem, Inc.; MLCS, LLC; MLCS Distribution Corporation; Remediation and Liability Management Company, Inc.; and Environmental Corporate Remediation Company, Inc., whether prior to or on and after the Effective Date.

**1.46    Demand** means a demand for payment that (i) was not a Claim during the Chapter 11 Cases, (ii) arises out of the same or similar conduct or events that gave rise to Asbestos Personal Injury Claims addressed by the Asbestos Trust, and (iii) is to be paid or otherwise addressed by the Asbestos Trust pursuant to the Plan.

**1.47    DIP Credit Agreement** means that certain Amended and Restated Superpriority Debtor-in-Possession Credit Agreement, dated as of July 10, 2009, as amended, among Motors Liquidation Company (f/k/a General Motors Corporation), as borrower, the Guarantors (as defined therein), and the United States Department of the Treasury and Export Development Canada, as lenders, and any of the documents and instruments relating thereto or referred to therein.

8

**1.48**    **DIP Credit Agreement Claims** means all Claims arising under the DIP Credit Agreement.

**1.49**    **DIP Lenders** means the U.S. Treasury and EDC, as lenders under the DIP Credit Agreement.

**1.50**    **DIP Lenders' Avoidance Actions** means any actions commenced, or that may be commenced, before or after the Effective Date pursuant to sections 544, 545, 547, 548, 549, 550, or 551 of the Bankruptcy Code, except (i) to the extent purchased by New GM under the MSPA or prohibited under the DIP Credit Agreement and (ii) for the Term Loan Avoidance Action.

**1.51**    **DIP Lenders' Avoidance Assets** means the collections, if any, realized on the settlement or resolution of any Avoidance Actions other than the Term Loan Avoidance Action.

**1.52**    **DIP Lenders' Collateral** means all Collateral of the DIP Lenders under the DIP Credit Agreement.

**1.53**    **Disclosure Statement** means the disclosure statement relating to the Plan, including, without limitation, all exhibits thereto, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code.

**1.54**    **Disputed** means, with respect to any Claim (other than an Asbestos Personal Injury Claim) that has not been Allowed pursuant to the Plan or a Final Order,

(a) if no proof of Claim has been filed by the applicable deadline: a Claim (other than an Asbestos Personal Injury Claim) that has been or hereafter is listed on the Schedules as other than disputed, contingent, or unliquidated, but as to which the Debtors or any other party in interest has interposed an objection or request for estimation which has not been withdrawn or determined by a Final Order; or

(b) if a proof of Claim or request for payment of an Administrative Expense has been filed by the applicable deadline: (i) a Claim for which no corresponding Claim has been or hereafter is listed on the Schedules, (ii) a Claim for which a corresponding Claim has been or hereafter is listed on the Schedules as other than disputed, contingent, or unliquidated, but the nature or amount of the Claim as asserted in the proof of Claim varies from the nature and amount of such Claim as listed on the Schedules, (iii) a Claim for which a corresponding Claim has been or hereafter is listed on the Schedules as disputed, contingent, or unliquidated, or (iv) a Claim for which a timely objection or request for estimation is interposed by the Debtors or other authorized Entity which has not been withdrawn or determined by a Final Order. Any Claim expressly allowed by a Final Order, pursuant to the Claim Settlement Procedures, or under this Plan shall be an Allowed Claim, not a Disputed Claim.

For the avoidance of doubt, if no proof of Claim has been filed by the applicable deadline and the Claim (other than an Asbestos Personal Injury Claim) has been or hereafter is listed on the Schedules as disputed, contingent, or unliquidated, such Claim shall not be valid and shall be disregarded.

**1.55    Distribution Record Date** means the Confirmation Date.

**1.56    District Court** means the United States District Court for the Southern District of New York having jurisdiction over the Chapter 11 Cases.

**1.57    EDC** means the Government of Canada and the Government of Ontario, through Export Development Canada, Canada's export trading agency.

**1.58    Effective Date** means a Business Day on or after the Confirmation Date specified by the Debtors on which the conditions to the effectiveness of the Plan specified in Section 9.2 hereof have been satisfied or otherwise effectively waived.  The Debtors shall file a notice of the Effective Date with the Bankruptcy Court and with the Securities and Exchange Commission.  The Debtors and/or the Creditors' Committee shall issue a press release regarding the Effective Date.

**1.59    ENCORE** means Environmental Corporate Remediation Company, Inc., a Delaware corporation, as debtor or debtor in possession, as the context requires.

**1.60    Encumbrance** means, with respect to any asset, any mortgage, lien, pledge, charge, security interest, assignment, or encumbrance of any kind or nature in respect of such asset (including, without limitation, any conditional sale or other title retention agreement, any security agreement, and the filing of, or agreement to give, any financing statement under the Uniform Commercial Code or comparable law of any jurisdiction).

**1.61    Entity** means an individual, corporation, partnership, limited liability company, association, joint stock company, joint venture, estate, trust, unincorporated organization, or government or any political subdivision thereof, or other Person or entity.

**1.62    Environmental Action** means any response, removal, investigation, sampling, remediation, reclamation, closure, post-closure, corrective action, engineering controls, institutional controls, deed restrictions, oversight costs and operation, monitoring, and maintenance activities authorized or required under law with respect to a Property.

**1.63    Environmental Laws** means any federal, state, or local laws, including ordinances, statutes, common law, codes, rules, regulations, orders, or decrees, now or hereinafter in effect, relating to (i) pollution, (ii) the protection or regulation of human health, natural resources, or the environment, (iii) the management of hazardous materials, or (iv) the release of hazardous materials into the environment.

**1.64**    **Environmental Response Trust** means the Environmental Response Trust established under the Plan in accordance with the Environmental Response Trust Agreement and the Environmental Response Trust Consent Decree and Settlement Agreement.

**1.65**    **Environmental Response Trust Administrative Funding Account** means the funding held by the Environmental Response Trust for the administration of the Environmental Response Trust, including property taxes, liability insurance, security, demolition costs, other plant wind-down costs, and any obligations imposed on the Environmental Response Trust or the Environmental Response Trust Administrative Trustee pursuant to the Plan, including expenses relating to the performance of the Environmental Response Trust Administrative Trustee's obligations under the Environmental Response Trust Agreement and Section 6.4 hereof.  The funding of the Environmental Response Trust Administrative Funding Account and the management of such funding shall be as provided in the Environmental Response Trust Consent Decree and Settlement Agreement.

**1.66**    **Environmental Response Trust Administrative Trustee** means the trustee or trustees designated to serve in a fiduciary capacity consistent with, and in furtherance of, the Environmental Response Trust, pursuant to the terms of the Environmental Response Trust Agreement or as subsequently may be appointed pursuant to the terms of the Environmental Response Trust Agreement.  The Environmental Response Trust Administrative Trustee shall be EPLET, LLC.

**1.67**    **Environmental Response Trust Agreement** means that certain Environmental Response Trust Agreement executed by MLC, the Governmental Authorities, the United States, and the Environmental Response Trust Administrative Trustee, substantially in the form annexed to the Environmental Response Trust Consent Decree and Settlement Agreement.

**1.68**    **Environmental Response Trust Assets** means the Environmental Response Trust Administrative Funding Account and the assets transferred to the Environmental Response Trust in accordance with the Plan, the Environmental Response Trust Agreement, and the Environmental Response Trust Consent Decree and Settlement Agreement, but shall not include any New GM Securities.  The Environmental Response Trust Assets shall be comprised of (i) Cash in the amount of $641,434,945, less any deductions made pursuant to Paragraph 36 of the Environmental Response Trust Consent Decree and Settlement Agreement, (ii) the Environmental Response Trust Properties, (iii) personal property, including equipment, related to certain of the Environmental Response Trust Properties set forth on Attachment A to the Environmental Response Trust Consent Decree and Settlement Agreement, (iv) all leases of manufacturing facilities with New GM, and (v) all property management contracts and contracts related to the Environmental Actions relating to the Environmental Response Trust Properties that the Debtors and the Environmental Response Trust Administrative Trustee agree should be assumed by the Environmental Response Trust.

**1.69    Environmental Response Trust Consent Decree and Settlement Agreement** means that certain Consent Decree and Settlement Agreement among the Debtors, the Environmental Response Trust Administrative Trustee, the United States, certain States, and the St. Regis Mohawk Tribe establishing an Environmental Response Trust for certain Environmental Response Trust Properties in Delaware, Illinois, Indiana, Kansas, Louisiana, Massachusetts, Michigan, Missouri, New Jersey, New York, Ohio, Pennsylvania, Virginia, and Wisconsin, executed by MLC and the Governmental Authorities, in the form annexed hereto as Exhibit "C."

**1.70    Environmental Response Trust Parties** means the Environmental Response Trust, the Environmental Response Trust Administrative Trustee, and the Environmental Response Trust's officers, directors, employees, consultants, agents, or other professionals or representatives employed by the Environmental Response Trust or the Environmental Response Trust Administrative Trustee.

**1.71    Environmental Response Trust Properties** means the properties set forth on Attachment A to the Environmental Response Trust Consent Decree and Settlement Agreement.

**1.72    Environmental Response Trust Transfer Date** means the date on which the Environmental Response Trust Assets are transferred to the Environmental Response Trust, which transfer shall occur on the Effective Date.

**1.73    Equity Interest** means the interest of any holder of an equity security of any of the Debtors, or any direct or indirect subsidiaries of the Debtors, represented by any issued and outstanding shares of common or preferred stock or other instrument evidencing a present ownership interest in any of the Debtors, or any direct or indirect subsidiaries of the Debtors, whether or not transferable, or any option, warrant, or right, contractual or otherwise, to acquire any such interest.

**1.74    Eurobond Claim** means a Claim against any of the Debtors arising under or in connection with any of the respective notes, bonds, or debentures issued under (i) that certain Fiscal and Paying Agency Agreement, dated as of July 3, 2003, among General Motors Corporation, Deutsche Bank AG London, and Banque Générale du Luxembourg S.A. and (ii) that certain Bond Purchase and Paying Agency Agreement, dated May 28, 1986, between General Motors Corporation and Credit Suisse, excluding the fees and expenses of the Fiscal and Paying Agents thereunder, which reasonable fees and expenses shall be paid pursuant to Section 2.5 hereof.

**1.75    Final Order** means an order or judgment of the Bankruptcy Court entered by the Clerk of the Bankruptcy Court on the docket in the Chapter 11 Cases which has not been reversed, vacated, or stayed and as to which (i) the time to appeal, petition for *certiorari*, or move for a new trial, reargument, or rehearing has expired and as to which no appeal, petition for *certiorari*, or other proceeding for a new trial, reargument, or rehearing shall then be pending, or (ii) if an appeal, writ of *certiorari*, new trial, reargument, or rehearing thereof has been sought, such order or judgment of the

Bankruptcy Court shall have been affirmed by the highest court to which such order was appealed, or *certiorari* shall have been denied, or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for *certiorari*, or move for a new trial, reargument, or rehearing shall have expired.  The susceptibility of a Claim to a challenge under section 502(j) of the Bankruptcy Code shall not render a Final Order not a Final Order.

**1.76    Fiscal and Paying Agency Agreements** means (i) that certain Fiscal and Paying Agency Agreement, dated as of July 3, 2003, among General Motors Corporation, Deutsche Bank AG London, and Banque Générale du Luxembourg S.A, (ii) that certain Fiscal and Paying Agency Agreement, dated as of July 10, 2003, among General Motors Nova Scotia Finance Company, General Motors Corporation, Deutsche Bank Luxembourg S.A., and Banque Générale du Luxembourg S.A., and (iii) that certain Bond Purchase and Paying Agency Agreement, dated May 28, 1986, between General Motors Corporation and Credit Suisse.

**1.77    Fiscal and Paying Agents** means the fiscal and paying agents under each of the Fiscal and Paying Agency Agreements and any and all successors or predecessors thereto.

**1.78    Future Claimants' Representative** means Dean M. Trafalet, the Legal Representative for Future Claimants appointed pursuant to the order dated and entered by the Bankruptcy Court on April 8, 2010.

**1.79    General Unsecured Claim** means any Claim against any of the Debtors that is (i) not an Administrative Expense, Priority Tax Claim, Secured Claim, Priority Non-Tax Claim, Asbestos Personal Injury Claim, or Property Environmental Claim or (ii) otherwise determined by the Bankruptcy Court to be a General Unsecured Claim.  Upon settlement or determination by Final Order of the Asbestos Trust Claim, the Asbestos Trust Claim shall be treated as an Allowed General Unsecured Claim in Class 3 for purposes of distribution from the GUC Trust and the Avoidance Action Trust, as applicable; *provided, however*, that any General Unsecured Claims reserved in Paragraph 100 of the Environmental Response Trust Consent Decree and Settlement Agreement are General Unsecured Claims.

**1.80    Governmental Authorities** means the United States of America, on behalf of the Environmental Protection Agency; the States of Delaware, Illinois, Kansas, Louisiana, Massachusetts, Michigan, Missouri, New Jersey, New York, Ohio, Pennsylvania, Virginia, Wisconsin; and the Saint Regis Mohawk Tribe, each as parties to the Environmental Response Trust Consent Decree and Settlement Agreement.

**1.81    GUC Trust** means the trust established under the Plan in accordance with the GUC Trust Agreement.

**1.82    GUC Trust Administrative Fund** means the fund established, held, and maintained by the GUC Trust Administrator for the purpose of paying the expenses

incurred by the GUC Trust Administrator (including fees and expenses for professionals retained by the GUC Trust) in connection with the GUC Trust and any obligations imposed on the GUC Trust Administrator or the GUC Trust, including expenses relating to the performance of the GUC Trust Administrator's obligations under the GUC Trust Agreement and Section 6.2 hereof. The Debtors shall deposit $52.7 million into the GUC Trust Administrative Fund on the GUC Trust Transfer Date.

**1.83** **GUC Trust Administrator** means the entity appointed by the Creditors' Committee with the consent of the Debtors to serve as administrator of the GUC Trust, pursuant to the terms of the GUC Trust Agreement, or as subsequently may be appointed pursuant to the terms of the GUC Trust Agreement. The GUC Trust Administrator shall be Wilmington Trust Company.

**1.84** **GUC Trust Agreement** means that certain GUC Trust Agreement executed by the Debtors and the GUC Trust Administrator, substantially in the form annexed hereto as Exhibit "D."

**1.85** **GUC Trust Assets** means the (i) GUC Trust Administrative Fund (comprised of Cash in the amount of $52.7 million), (ii) the New GM Securities, and (iii) the Residual Wind-Down Assets transferred to the GUC Trust upon the dissolution of MLC as set forth in Section 6.10 hereof.

**1.86** **GUC Trust Monitor** means the entity appointed by the Creditors' Committee with the consent of the Debtors to oversee the GUC Trust, pursuant to the terms of the GUC Trust Agreement, or as subsequently may be appointed pursuant to the terms of the GUC Trust Agreement. The GUC Trust Monitor shall be FTI Consulting, Inc.

**1.87** **GUC Trust Transfer Date** means the date on which the GUC Trust Assets are transferred to the GUC Trust pursuant to Section 5.2(a) hereof, which transfer shall be no later than December 15, 2011, except as otherwise expressly provided therein.

**1.88** **GUC Trust Units** means the units of beneficial interests in the GUC Trust.

**1.89** **Indentures** means (i) the Indenture, dated as of November 15, 1990, between General Motors Corporation, as issuer, and Wilmington Trust Company, as successor-in-interest Indenture Trustee to Citibank, N.A., as such Indenture may have been amended, supplemented, or modified, pursuant to which (a) $299,795,000 of 9.40% Debentures due July 15, 2021 were issued on July 22, 1991, (b) $600,000,000 of 8.80% Notes due March 1, 2021 were issued on March 12, 1991, (c) $500,000,000 of 7.40% Debentures due September 1, 2025 were issued on September 11, 1995, (d) $15,000,000 of 9.40% Medium Term Notes due July 15, 2021 were issued on July 22, 1991, and (e) $48,175,000 of 9.45% Medium Term Notes due November 1, 2011 were issued on December 21, 1990, (ii) the Indenture, dated as of December 7, 1995, between General Motors Corporation, as issuer, and Wilmington Trust Company, as successor-in-interest

Indenture Trustee to Citibank, N.A., as such Indenture may have been amended, supplemented, or modified, pursuant to which (a) $377,377,000 of 7.75% Discount Debentures due March 15, 2036 were issued on March 20, 1996, (b) $500,000,000 of 7.70% Debentures due April 15, 2016 were issued on April 15, 1996, (c) $400,000,000 of 8.10% Debentures due June 15, 2024 were issued on June 10, 1996, (d) $600,000,000 of 6.75% Debentures due May 1, 2028 were issued on April 29, 1998, (e) $1,500,000,000 of 7.20% Notes due January 15, 2011 were issued on January 11, 2001, (f) $575,000,000 of 7.25% Quarterly Interest Bonds due April 15, 2041 were issued on April 30, 2001, (g) $718,750,000 of 7.25% Senior Notes due July 15, 2041 were issued on July 9, 2001, (h) $690,000,000 of 7.375% Senior Notes due October 1, 2051 were issued on October 3, 2001, (i) $875,000,000 of 7.25% Senior Notes due February 15, 2052 were issued on February 14, 2002, (j) $1,150,000,000 of 4.50% Series A Convertible Senior Debentures due March 6, 2032 were issued on March 6, 2002, (k) $2,600,000,000 of 5.25% Series B Convertible Senior Debentures due March 6, 2032 were issued on March 6, 2002, (l) $1,115,000,000 of 7.375% Senior Notes due May 15, 2048 were issued on May 19, 2003, (m) $425,000,000 of 7.375% Senior Notes due May 23, 2048 were issued on May 23, 2003, (n) $3,000,000,000 of 8.375% Senior Debentures due July 15, 2033 were issued on July 3, 2003, (o) $4,300,000,000 of 6.25% Series C Convertible Senior Debentures due July 15, 2033 were issued on July 2, 2003, (p) $1,250,000,000 of 8.250% Senior Debentures due July 15, 2023 were issued on July 3, 2003, (q) $1,000,000,000 of 7.125% Senior Notes due July 15, 2013 were issued on July 3, 2003, (r) $ 720,000,000 of 7.50% Senior Notes due July 1, 2044 were issued on June 30, 2004, and (s) $1,500,000,000 of 1.50% Series D Convertible Senior Debentures due June 1, 2009 were issued on May 31, 2007, (iii) the Trust Indenture, dated as of July 1, 1995, between Michigan Strategic Fund and Law Debenture, as successor-in-interest Trustee to Dai-Ichi Kangyo Trust Company of New York, as such Indenture may have been amended, supplemented, or modified, related to $58,800,000 Michigan Strategic Fund Multi-Modal Interchangeable Rate Pollution Control Refunding Revenue Bonds Series 1995, (iv) the Indenture of Trust, dated as of July 1, 1994, between City of Moraine, Ohio and Law Debenture, as successor-in-interest Trustee to Dai-Ichi Kangyo Trust Company of New York, as such Indenture may have been amended, supplemented, or modified, related to $12,500,000 Solid Waste Disposal Revenue Bonds (General Motors Corporation Project) Series 1994, (v) the Indenture, dated as of July 1, 1999, between City of Moraine, Ohio and Law Debenture, as successor-in-interest Trustee to Dai Ichi Kangyo Trust Company of New York, as such Indenture may have been amended, supplemented, or modified, related to $10,000,000 Solid Waste Disposal Revenue Bonds (General Motors Project), Series 1999, (vi) the Trust Indenture, dated as of December 1, 2002, between City of Fort Wayne, Indiana and Law Debenture, as successor-in-interest Trustee to JPMorgan Chase Bank, and Bank One Trust Company, N.A., as Co-Trustee, as such Indenture may have been amended, supplemented, or modified, related to $31,000,000 City of Fort Wayne, Indiana Pollution Control Revenue Bonds (General Motors Corporation Project), Series 2002, (vii) the Trust Indenture, dated as of March 1, 2002, between Ohio Water Development Authority and Law Debenture, as successor-in-interest Trustee to JPMorgan Chase Bank, as such Indenture may have been amended, supplemented, or modified, related to $20,040,000 State of Ohio Pollution Control Refunding Revenue

Bonds (General Motors Corporation Project), Series 2002, (viii) the Indenture of Trust, dated as of December 1, 2002, between Ohio Water Development Authority and Law Debenture, as successor-in-interest Trustee to JPMorgan Chase Bank, as such Indenture may have been amended, supplemented, or modified, related to $46,000,000 State of Ohio Solid Waste Revenue Bonds, Series 2002 (General Motors Corporation Project), and (ix) the Trust Indenture, dated as of April 1, 1984, among City of Indianapolis, Indiana and Law Debenture, as successor-in-interest Trustee to Bankers Trust Company, and the Indiana National Bank, as Co-Trustee, as such Indenture may have been amended, supplemented, or modified, relating to $1,400,000 City of Indianapolis, Indiana Pollution Control Revenue Bonds (General Motors Corporation Project), Series 1984.

**1.90    Indenture Trustee/Fiscal and Paying Agent Reserve Cash** means Cash in the aggregate amount of $1.4 million, which shall be used to pay or reimburse the Indenture Trustees and the Fiscal and Paying Agents for administering distributions to Registered Holders, or for their continuing roles as members of the Creditors' Committee, as contemplated by the Plan and in accordance with the Budget, including all reasonable fees and expenses related thereto (including the reasonable fees and expenses of the respective counsel, advisors, and/or agents of the Indenture Trustees and the Fiscal and Paying Agents), and for compensating for any loss, liability, or reasonable expenses incurred without negligence or bad faith on the part of the Indenture Trustees or the Fiscal and Paying Agents, as applicable, arising out of or in connection with the performance of their duties under the Indentures or the Fiscal and Paying Agency Agreements, as applicable, including the reasonable costs and expenses of defending themselves against any claim of liability, from beneficial holders of the securities issued pursuant to the Indentures and the Fiscal and Paying Agency Agreements, the Registered Holders, or otherwise, related thereto.

**1.91    Indenture Trustees** means the trustees, co-trustees, agents, paying agents, distribution agents, authenticating agents, registrars, and bond registrars under the respective Indentures, and any and all successors or predecessors thereto.

**1.92    Indirect Asbestos Claim** means any Claim, remedy, liability, or Demand against (i) the Debtors, (ii) present affiliates and divisions of the Debtors, or (iii) former affiliates and divisions of the Debtors who are Protected Parties to the extent the Claim, remedy, liability, or Demand relate to the period of time during which the Debtors operated the respective affiliates or divisions, now existing or hereafter arising, whether or not such Claim, remedy, liability, or Demand is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, whether or not the facts of or legal bases for such Claim, remedy, liability, or Demand are known or unknown, that is (i) (A) held by (I) any Entity (other than a director or officer entitled to indemnification pursuant to Section 12.5 hereof) who has been, is, or may be a defendant in an action seeking damages for (a) death, bodily injury, sickness, disease, or other personal injuries (whether physical, emotional, or otherwise) to the extent caused or allegedly caused, directly or indirectly, by exposure to asbestos or asbestos-containing products or (b) property damage, including but not limited to, the cost of inspecting, maintaining, encapsulating, repairing,

decontaminating, removing, or disposing of asbestos or asbestos-containing products in buildings, other structures, or other property, to the extent caused or allegedly caused, directly or indirectly, by the presence of or exposure (whether prior to or after the Commencement Date) to asbestos or asbestos-containing products or things that are or were installed, engineered, designed, manufactured, fabricated, constructed, sold, supplied, produced, specified, selected, distributed, released, marketed, serviced, maintained, repaired, purchased, owned, occupied, used, removed, replaced, or disposed by the Debtors or an Entity for whose products or operations the Debtors allegedly have liability or for which the Debtors are otherwise allegedly liable, or (II) any assignee or transferee of such Entity, and (B) on account of alleged liability of the Debtors for reimbursement, indemnification, subrogation, or contribution of any portion of any damages such Entity has paid or may pay to the plaintiff in such action, or (ii) held by any Entity that is seeking reimbursement indemnification, subrogation, or contribution from the Debtors with respect to any surety bond, letter of credit, or other financial assurance issued by any Entity on account of, or with respect to, Asbestos Claims.

    **1.93**   **Initial Debtors** means MLC; MLC of Harlem, Inc. (f/k/a Chevrolet-Saturn of Harlem, Inc.); MLCS, LLC (f/k/a Saturn, LLC); and MLCS Distribution Corporation (f/k/a Saturn Distribution Corporation).

    **1.94**   **Medical Lien** means any lien on, or right of payment from, any distributions made hereunder to a holder of a personal injury or products liability Claim that is held or can be asserted by any public or private entity or unit, including, without limitation, Medicare and Medicaid.

    **1.95**   **MLC** means Motors Liquidation Company (f/k/a General Motors Corporation), a Delaware corporation, the parent debtor or debtor in possession, as the context requires.

    **1.96**   **MSPA** means that certain Amended and Restated Master Sale and Purchase Agreement, by and among General Motors Corporation and its debtor subsidiaries, as Sellers, and NGMCO, Inc., as successor in interest to Vehicle Acquisition Holdings LLC, a purchaser sponsored by the U.S. Treasury, as Purchaser, dated as of June 26, 2009, together with all related documents and agreements as well as all exhibits, schedules, and addenda thereto, as amended, restated, modified, or supplemented from time to time.

    **1.97**   **New GM** means General Motors Company (formerly known as General Motors Holding Company), a Delaware corporation formed as part of that certain holding company reorganization that occurred on October 19, 2009, pursuant to which all of the outstanding shares of common stock and preferred stock of the prior General Motors Company (now known as "**General Motors LLC**") were exchanged on a one-for-one basis for shares of common stock and preferred stock of the newly organized holding company that now bears the name General Motors Company. General Motors Company has a 100% ownership interest in General Motors Holdings LLC, a Delaware limited

liability company, and General Motors LLC is a direct wholly-owned subsidiary of General Motors Holdings LLC.

**1.98** __New GM Securities__ means the New GM Stock and the New GM Warrants, each of which was received as consideration pursuant to the 363 Transaction as embodied in the MSPA.

**1.99** __New GM Stock__ means the stock of New GM, including any additional shares issued if the Bankruptcy Court determines (to the extent the MSPA requires such determination) that the estimated or actual amount (as provided in the MSPA) of (i) Allowed General Unsecured Claims against the Initial Debtors and (ii) the Allowed Asbestos Trust Claim against the Initial Debtors collectively exceeds $35 billion.

**1.100** __New GM Warrants__ means (i) the warrants to acquire 136,363,635 newly issued shares of New GM Stock, with an exercise price set at $10.00 per share, and (ii) the warrants to acquire 136,363,635 newly issued shares of New GM Stock, with an exercise price set at $18.33 per share.

**1.101** __Note Claim__ means a Claim against any of the Debtors arising under or in connection with any Indenture and the respective notes, bonds, or debentures issued thereunder, excluding the fees and expenses of the Indenture Trustees, which reasonable fees and expenses shall be paid pursuant to Section 2.5 hereof.

**1.102** __Nova Scotia Guarantee Claims__ means the Claims against any of the Debtors arising under or in connection with the guarantee of the notes, bonds, or debentures issued under that certain Fiscal and Paying Agency Agreement, dated as of July 10, 2003, among General Motors Nova Scotia Finance Company, General Motors Corporation, Deutsche Bank Luxembourg S.A., and Banque Générale du Luxembourg S.A. (the "**Nova Scotia Fiscal and Paying Agency Agreement**"), excluding any claims for the fees and expenses of the Fiscal and Paying Agent thereunder to the extent such fees and expenses are paid pursuant to Section 2.5 hereof.  The Nova Scotia Guarantee Claims include, without limitation, Claims evidenced by the following:  (a) Proof of Claim No. 69551 filed by Greenberg Traurig, LLP (the "**Protective Claim**"); (b) Proof of Claim No. 66216 filed by Thoroughbred Fund LP; Proof of Claim No. 66217 filed by Palomino Fund LTD; Proof of Claim No. 66218 filed by Perry Partners International Inc.; Proof of Claim No. 66265 filed by Aurelius Investment LLC; Proof of Claim No. 66266 filed by Elliot International LP; Proof of Claim No. 67429 filed by Onex Debt Opportunity Fund, LTD; Proof of Claim No. 67499 filed by FCOF UB Securities LLC; Proof of Claim No. 66267 filed by The Liverpool Limited Partnership; Proof of Claim No. 66312 filed by Perry Partners LP; Proof of Claim No. 67428 filed by Drawbridge DSO Securities LLC; Proof of Claim No. 67430 filed by Redwood Master Fund LTD; Proof of Claim No. 67498 filed by Appaloosa Investment Limited Partnership I; Proof of Claim No. 67500 filed by Drawbridge OSO Securities LLC; and Proof of Claim No. 67501 filed by Thoroughbred Master LTD (collectively, the "**Specified Nova Scotia Noteholder Claims**"); and (c) Proof of Claim No. 1558 filed by Collins Stewart (CI) Ltd.; Proof of Claim No. 12042 filed by Sylvia Auerbach; Proof of Claim No. 37319 filed

by Ing. Hugo Wagner; Proof of Claim No. 60567 filed by UBS AG, Zurich
(Switzerland); Proof of Claim No. 61481 filed by Mr. Aly Aziz; Proof of Claim No.
63955 filed by Sirdar Aly Aziz; Proof of Claim No. 64332 filed by Josef Schmidseder;
Proof of Claim No. 64340 filed by Hermann & Helene Dettmar; Proof of Claim No.
65554 filed by Claus Pedersen; Proof of Claim No. 70201 filed by Morgan Stanley & Co.
International plc; Proof of Claim No. 66206 (amended by Proof of Claim No. 70201)
filed by Morgan Stanley & Co., International plc; Proof of Claim No. 68705 filed by
Bhalodia RV/RM/Patel RG; Proof of Claim No. 68941 filed by Red River Business Inc.;
Proof of Claim No. 1556 filed by Collins Stewart (CI) Ltd.; Proof of Claim No. 23323
filed by Ulrich Seipp; Proof of Claim No. 29128 filed by Lixandroiu Anca Cristina; Proof
of Claim No. 29379 filed by SPH Invest S.A.; Proof of Claim No. 29647 filed by
Consilium Treuhand AG & Beata Domus Anstalt; Proof of Claim No. 29648 filed by
Maria-Dorothea Laminet; Proof of Claim No. 49548 filed by Brencourt Credit
Opportunities Master, Ltd; Proof of Claim No. 60234 filed by Allianz Bank Financial
Advisors SPA; Proof of Claim No. 60547 filed by Rui Manuel Antunes Goncalves Rosa;
Proof of Claim No. 60566 filed by UBS AG, Zurich (Switzerland); Proof of Claim No.
61915 filed by Johanna Schoeffel; Proof of Claim No. 64298 filed by CSS, LLC; Proof
of Claim No. 66769 filed by Banca delle Marche SPA; Proof of Claim No. 67345
(amended by Proof of Claim No. 70200) filed by Morgan Stanley & Co. International
plc; Proof of Claim No. 70200 filed by Morgan Stanley & Co. International plc; Proof of
Claim No. 69306 filed by Canyon Value Realization Fund LP; Proof of Claim No. 69307
filed by Lyxor/Canyon Value Realization Fund Limited; Proof of Claim No. 69308 filed
by Canyon-GRF Master Fund, LP; Proof of Claim No. 69309 filed by The Canyon Value
Realization Fund (Cayman), Ltd; Proof of Claim No. 69734 filed by Anchorage Capital
Master Offshore Ltd; Proof of Claim No. 31168 filed by Credit Suisse AG; Proof of
Claim No. 31868 filed by Cheviot Asset Management; Proof of Claim No. 31167 filed by
Credit Suisse AG; Proof of Claim No. 65765 filed by HFR RVA Advent Global
Opportunity Master Trust; Proof of Claim No. 65784 filed by The Advent Global
Opportunity Master Fund; Proof of Claim No. 69552 filed by CitiGroup Global Markets
Inc.; Proof of Claim No. 67244 filed by Prospect Mountain Fund Limited; and Proof of
Claim No. 67245 filed by Ore Hill Credit Hub Fund Ltd (collectively, the "**Nova Scotia
Individual Claims**").

    **1.103**   **Nova Scotia Wind-Up Claim** means the Claim filed or otherwise asserted
by Green Hunt Wedlake, Inc. (the "**Nova Scotia Trustee**") under Nova Scotia law,
including, without limitation, the Claim evidenced by Proof of Claim No. 66319 filed by
the Nova Scotia Trustee.

    **1.104**   **Person** has the meaning set forth in section 101(41) of the Bankruptcy
Code.

    **1.105**   **Plan** means this chapter 11 plan, as the same may be amended,
supplemented, or modified from time to time in accordance with the provisions of the
Bankruptcy Code and the terms hereof.

**1.106    Plan Supplement** means the forms of documents, in a form reasonably acceptable to the U.S .Treasury, the Creditors' Committee, the Asbestos Claimants' Committee, and the Future Claimants' Representative, to the extent such documents affect the respective party, effectuating the transactions contemplated by this Plan, which documents shall be filed with the Clerk of the Bankruptcy Court no later than ten (10) days prior to the Confirmation Hearing.  Upon its filing with the Bankruptcy Court, the Plan Supplement may be inspected at the Office of the Clerk of the Bankruptcy Court during normal court hours.  Holders of Claims and Equity Interests may obtain a copy of the Plan Supplement upon written request to the undersigned counsel.  Copies of the Plan Supplement also are available on the Voting Agent's website, www.motorsliquidationdocket.com.

**1.107    Post-Effective Date MLC** means MLC on and after the Effective Date.

**1.108    Priority Non-Tax Claim** means any Claim, other than an Administrative Expense or a Priority Tax Claim, entitled to priority in payment as specified in section 507(a)(3), (4), (5), (6), (7), or (9) of the Bankruptcy Code.

**1.109    Priority Order Sites** means the non-owned sites, as set forth on Exhibit "E" hereto, that are subject to an order requiring performance of an Environmental Action.

**1.110    Priority Order Sites Consent Decrees and Settlement Agreements** means the Consent Decrees and Settlement Agreements to be filed with the Bankruptcy Court in respect of the Priority Order Sites.

**1.111    Priority Tax Claim** means any Claim of a governmental unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code other than Priority Tax Claims that New GM is liable for under the MSPA.

**1.112    Pro Rata Share** means the ratio (expressed as a percentage) of (i) the amount of any Allowed Claim in a particular Class to (ii) the sum of (x) the aggregate amount of Allowed Claims in such Class and (y) the aggregate amount of Disputed Claims in such Class.  Solely for purposes of determining the Pro Rata Share with respect to any distribution from (a) the Debtors with respect to the Term Loan Avoidance Action, (b) the GUC Trust, or (c) the Avoidance Action Trust, the aggregate amount of Disputed Claims shall include (x) Disputed General Unsecured Claims, (y) the Asbestos Trust Claim in the amount set forth in the Confirmation Order until such time as the amount of the Asbestos Trust Claim is finally determined as set forth in Section 1.15 hereof, and (z) the "Maximum Amount" (as defined in the GUC Trust Agreement) of the potential General Unsecured Claims arising from any successful recovery of proceeds from the Term Loan Avoidance Action or other Avoidance Actions.  The Debtors may seek a determination by the Bankruptcy Court of the amount that should be reserved in determining the Pro Rata Share on account of Disputed Claims on an individual or aggregate basis.

**1.113   Property or Properties** means the Environmental Response Trust Properties and the Priority Order Sites.

**1.114   Property Environmental Claim** means any civil Claim or Cause of Action by the Governmental Authorities against the Debtors under Environmental Laws with respect to the Properties except for any General Unsecured Claim reserved in Paragraph 100 of the Environmental Response Trust Consent Decree and Settlement Agreement or the Priority Order Sites Consent Decrees and Settlement Agreements.

**1.115   Protected Party** means (i) the Debtors, (ii) any Entity that, pursuant to the Plan or after the Effective Date, becomes a direct or indirect transferee of, or successor to, any assets of the Debtors (including, without limitation, the GUC Trust, the Environmental Response Trust, the Avoidance Action Trust, the GUC Trust Administrator, the Environmental Response Trust Administrative Trustee, the Avoidance Action Trust Administrator, the GUC Trust Monitor, the Avoidance Action Trust Monitor, and their respective professionals) or the Asbestos Trust (but only to the extent that liability is asserted to exist by reason of its becoming such a transferee or successor), (iii) the holders of DIP Credit Agreement Claims, (iv) any Entity that, pursuant to the Plan or after the Effective Date, makes a loan to the Debtors, Post-Effective Date MLC, or the Asbestos Trust, or to a successor to, or transferee of, any assets of the Debtors or the Asbestos Trust (but only to the extent that liability is asserted to exist by reason of such Entity's becoming such a lender or to the extent any pledge of assets made in connection with such a loan is sought to be upset or impaired), (v) an officer, director, or employee of the Debtors, of any past or present affiliate of the Debtors, of any predecessor in interest of the Debtors, or of any Entity that owns or at any time has owned a financial interest in the Debtors, in any past or present affiliate of the Debtors, or in any predecessor in interest of the Debtors, but only to the extent that he or she is alleged to be directly or indirectly liable for the conduct of, Claims against, or Demands on the Debtors or the Asbestos Trust on account of Asbestos Personal Injury Claims, (vi) any Entity to the extent he, she, or it is alleged to be directly or indirectly liable for the conduct of, Claims against, or Demands on the Debtors or the Asbestos Trust on account of Asbestos Personal Injury Claims by reason of such Entity's provision of insurance to the Debtors, to any past or present affiliate of the Debtors, to any predecessor in interest of the Debtors, or to any Entity that owns or at any time has owned a financial interest in (I) the Debtors, (II) any past or present affiliate of the Debtors, or (III) any predecessor in interest of the Debtors, but only to the extent that the Debtors or the Asbestos Trust enters into a settlement with such Entity that is approved by the Bankruptcy Court and expressly provides that such Entity shall be a Protected Party under the Plan, or (vii) with the consent of the Asbestos Claimants' Committee and the Future Claimants' Representative, or the Asbestos Trust Administrator, as applicable, any other Entity that, pursuant to an agreement approved by Final Order, has been determined to be providing appropriate consideration to the Debtors' estates or the Trusts (including, by way of example, by waiving the Entity's claim(s) against the Debtors or any of the Trusts) in exchange for being included in the definition of a Protected Party herein (including, without limitation, Remy International, Inc. (f/k/a Delco Remy International, Inc. and DR International, Inc.

and its wholly-owned subsidiary Remy Inc. (f/k/a Delco Remy America, Inc. and DRA Inc.)) ("**Remy**"), for whom no further consent from the Asbestos Claimants' Committee and the Future Claimants' Representative, or the Asbestos Trust Administrator, as applicable, is required), to the extent he, she, or it is alleged to be directly or indirectly liable for the conduct of, Claims against, or Demands on the Debtors or the Asbestos Trust on account of Asbestos Personal Injury Claims by reason of one or more of the following: (a) without in any way limiting clause (v) above, such Entity's involvement in the management of the Debtors or of any predecessor in interest of the Debtors, (b) such Entity's ownership of a financial interest in the Debtors, in any past or present affiliate of the Debtors, or in any predecessor in interest of the Debtors, (c) such Entity's involvement in a transaction changing the corporate structure, or in a loan or other financial transaction affecting the financial condition, of the Debtors, of any past or present affiliate of the Debtors, of any predecessor in interest of the Debtors, or of any Entity that owns or at any time has owned a financial interest in the Debtors, in any past or present affiliate of the Debtors, or in any predecessor in interest of the Debtors, (d) such Entity's current ownership of the assets of a former division of the Debtors or of a former division of the Debtors, or (e) such Entity's lease of real property owned or formerly owned by the Debtors.  Notwithstanding the foregoing, New GM shall neither be included in the definition of Protected Party herein nor shall Section 4.5 hereof govern or enjoin claims against New GM; *provided, however*, that nothing contained in the Plan shall in any way modify or limit any protections or rights afforded to New GM under or in connection with the Bankruptcy Court order approving the 363 Transaction.

1.116   **REALM** means Remediation and Liability Management Company, Inc., a Michigan corporation, as debtor or debtor in possession, as the context requires.

1.117   **Registered Holder** means the registered holders (or bearers, if applicable) of the securities issued pursuant to the Indentures or the Fiscal and Paying Agency Agreements.

1.118   **Residual Wind-Down Assets** means the Cash necessary to fund the resolution of Administrative Expenses, Priority Tax Claims, Priority Non-Tax Claims, and Secured Claims, and the Cash reserved to pay such Administrative Expenses and Claims.  If the Debtors have not resolved and paid all of the foregoing Claims and Administrative Expenses by the date of MLC's dissolution, then the Residual Wind-Down Assets (including the power to object, settle, and or satisfy such Claims and Administrative Expenses) shall be transferred to the GUC Trust.

1.119   **Schedules** means the schedules of assets and liabilities and the statements of financial affairs filed by the Debtors under section 521 of the Bankruptcy Code, Bankruptcy Rule 1007, and the Official Bankruptcy Forms of the Bankruptcy Rules as such schedules and statements have been or may be supplemented or amended through the Confirmation Date.

1.120   **Secured Claim** means a Claim (i) secured by Collateral, to the extent of the value of such Collateral (A) as set forth in the Plan, (B) as agreed to by the holder of

such Claim and the Debtors, or (C) as determined by a Final Order in accordance with section 506(a) of the Bankruptcy Code, or (ii) secured by the amount of any valid rights of setoff of the holder thereof under section 553 of the Bankruptcy Code.

**1.121   Solicitation Procedures** means the procedures relating to the solicitation and tabulation of votes with respect to the Plan.

**1.122   Tax Code** means title 26 of the United States Code, as amended from time to time.

**1.123   Term Loan Avoidance Action** means the Avoidance Action commenced by the Creditors' Committee against JPMorgan Chase Bank, N.A., individually and as Administrative Agent, and various lenders party to a term loan agreement, dated as of November 29, 2006, between General Motors Corporation, as borrower, JPMorgan Chase Bank, N.A., as agent, and various institutions as lenders and agents, styled *Official Committee of Unsecured Creditors of Motors Liquidation Co. v. JPMorgan Chase Bank, N.A. et al.*, Adv. Pro. No. 09-00504 (Bankr. S.D.N.Y. July 31, 2009).

**1.124   Term Loan Avoidance Action Beneficiaries** means the holders of the DIP Credit Agreement Claims and/or the holders of Allowed General Unsecured Claims, as determined either by (i) mutual agreement between the U.S. Treasury and the Creditors' Committee or (ii) Final Order.

**1.125   Trusts** means the GUC Trust, the Asbestos Trust, the Environmental Response Trust, the Avoidance Action Trust, and any other trust created pursuant to the Plan or the Confirmation Order and funded by Cash from (i) the DIP Lenders on which the DIP Lenders' lien remains in force or (ii) another source.

**1.126   Unliquidated Litigation Claim** means a General Unsecured Claim that qualifies for reconciliation pursuant to the ADR Procedures, regardless of whether the Claim is filed in an unliquidated amount, until it becomes an Allowed Claim.

**1.127   U.S Treasury** means the United States Department of the Treasury.

**1.128   U.S. Trustee** means the United States Trustee for the Southern District of New York.

**1.129   Voting Deadline** means the date set by the Bankruptcy Court by which all completed Ballots must be received.

**INTERPRETATION; APPLICATION OF DEFINITIONS AND RULES OF CONSTRUCTION.**

The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Plan as a whole and not to any particular section, subsection, or clause contained therein. A term used herein that is not defined herein shall have the meaning assigned to that term in the Bankruptcy Code. The rules of construction contained in section 102 of the Bankruptcy Code shall apply to the Plan. The headings in

the Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof.

## ARTICLE II.

### ADMINISTRATIVE EXPENSES AND PRIORITY TAX CLAIMS

**2.1    Administrative Expenses.**  Except to the extent that a holder of an Allowed Administrative Expense agrees to a different treatment or as provided in the subsequent sentence of this Section, on the Effective Date, or as soon thereafter as is reasonably practicable, the Debtors shall pay to each holder of an Allowed Administrative Expense, in full satisfaction of such Allowed Administrative Expense, an amount in Cash equal to the Allowed amount of such Administrative Expense. Notwithstanding the foregoing, any and all liabilities of the Debtors to the Governmental Authorities under Environmental Laws associated with the Properties that otherwise would constitute Administrative Expenses shall be treated and satisfied by and in accordance with the terms of the Environmental Response Trust Consent Decree and Settlement Agreement and the Priority Order Sites Consent Decrees and Settlement Agreements.

**2.2    Compensation and Reimbursement Claims.**  All entities seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 327, 328, 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code (i) shall file their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred by the date that is thirty (30) days after the Confirmation Date, and (ii) shall be paid in full in such amounts as are allowed by the Bankruptcy Court (A) on the date on which the order relating to any such Administrative Expense is entered or (B) upon such other terms as may be mutually agreed upon between the holder of such an Administrative Expense and the Debtors.

**2.3    Priority Tax Claims.**  Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a different treatment, on the Effective Date, or as soon thereafter as is reasonably practicable, the Debtors shall pay to each holder of an Allowed Priority Tax Claim, in full satisfaction of such Claim, an amount in Cash equal to the Allowed amount of such Claim.  Priority Tax Claims that New GM is liable for under the MSPA shall be the responsibility of New GM and shall receive no distribution under the Plan.

**2.4    DIP Credit Agreement Claims.**  The DIP Lenders shall have an Allowed Administrative Expense for the total amount due under the DIP Credit Agreement as of the Effective Date, ratably in accordance with their respective interests in the DIP Credit Agreement Claims, subject to any applicable provisions of (A) paragraph 5 of the Final Order approving the DIP Credit Agreement (ECF No. 2529) and (B) the Final Order approving the amendment to the DIP Credit Agreement to provide for the Debtors' postpetition wind-down financing (ECF No. 2969).  The Debtors shall pay on account of

the amounts outstanding under the DIP Credit Agreement an amount equal to all Cash and Cash equivalents, if any, remaining after funding all obligations and amounts to be funded under the Plan (including the GUC Trust Administrative Fund, the Asbestos Trust, the Environmental Response Trust Administrative Account, the Avoidance Action Trust Administrative Cash, and the Indenture Trustee/Fiscal and Paying Agent Reserve Cash, and such amounts necessary to satisfy payment of and funding to reconcile Administrative Expenses, Priority Tax Claims, Priority Non-Tax Claims, and Secured Claims), subject to the terms of the Plan, the Budget, and the Confirmation Order, and shall distribute beneficial interests in the Environmental Response Trust to the DIP Lenders.  To the extent it is determined that the DIP Lenders are entitled to any proceeds of the Term Loan Avoidance Action either by (i) mutual agreement between the U.S. Treasury and the Creditors' Committee or (ii) Final Order, the DIP Lenders shall receive the proceeds of the Term Loan Avoidance Action in accordance with Sections 4.3 and 6.5 hereof and the Avoidance Action Trust Agreement.  Notwithstanding anything to the contrary in the Plan, (a) if any of the DIP Lenders' Collateral (including the DIP Lenders' Avoidance Assets) is not distributed pursuant to the Plan, such DIP Lenders' Collateral shall be distributed to the DIP Lenders ratably in accordance with their respective interests in the DIP Credit Agreement Claims, and (b) the DIP Lenders shall (x) have the sole right to collect on, prosecute, designate another party to prosecute, assign, or waive the DIP Lenders' Avoidance Actions and the sole right to recover from or assign the DIP Lenders' Avoidance Assets and (y) be entitled to any Cash, Cash equivalents, proceeds, or other DIP Lenders' Collateral as set forth in Section 5.2(b) hereof.  The Asbestos Insurance Assets shall be held in and administered by the Asbestos Insurance Assets Trust for the benefit of the DIP Lenders as the DIP Lenders' Collateral.  At such time as all payments in respect of the DIP Credit Agreement Claims have been made pursuant to the Plan, any outstanding balance of the DIP Credit Agreement Claims shall be cancelled.  Notwithstanding the foregoing, the DIP Credit Agreement Claims shall remain outstanding until such time as the Term Loan Avoidance Action Beneficiaries are determined either by (x) mutual agreement between the U.S. Treasury and the Creditors' Committee or (y) Final Order.

If any Asbestos Insurance Assets are transferred to the Asbestos Insurance Assets Trust, the Asbestos Insurance Assets Trust shall assume all liability for premiums, deductibles, retrospective premium adjustments, security or collateral arrangements, or any other charges, costs, fees, or expenses (if any) that become due to any insurer in connection with the Asbestos Insurance Assets with respect to Asbestos Personal Injury Claims, asbestos-related claims against Entities insured under policies included in the Asbestos Insurance Assets by reason of vendor's endorsements, or under the indemnity provisions of settlement agreements that the Debtors made with various insurers prior to the Commencement Date to the extent that those indemnity provisions relate to Asbestos Personal Injury Claims, and the Debtors shall have no further financial or other responsibility for any of the foregoing.  Upon delivery of the Asbestos Insurance Assets to the Asbestos Insurance Assets Trust, the Debtors and their successors and assigns shall be released from all liability with respect to the delivery of such assets.  The Debtors shall cooperate with the Asbestos Insurance Assets Trust and the entity appointed to

serve as administrator of the Asbestos Insurance Assets Trust and use commercially reasonable efforts to take or cause to be taken all appropriate actions and do or cause to be done all things necessary or appropriate to effectuate the transfer of the Asbestos Insurance Assets to the Asbestos Insurance Assets Trust.  By way of enumeration and not of limitation, the Debtors shall be obligated, to the extent practicable, to (i) provide the Asbestos Insurance Assets Trust with copies of insurance policies and settlement agreements included within or relating to the Asbestos Insurance Assets and (ii) execute further assignments or allow the Asbestos Insurance Assets Trust to pursue claims relating to the Asbestos Insurance Assets in its name (subject to appropriate disclosure of the fact that the Asbestos Insurance Assets Trust is doing so and the reasons why it is doing so), including by means of arbitration, alternative dispute resolution proceedings, or litigation, to the extent necessary or helpful to the efforts of the Asbestos Insurance Assets Trust to obtain insurance coverage under the Asbestos Insurance Assets.

**2.5    Special Provisions Regarding Fees and Expenses of Indenture Trustees and Fiscal and Paying Agents.**  The reasonable prepetition and postpetition fees and expenses of each of the Indenture Trustees and the Fiscal and Paying Agents solely in connection with their performance of their duties (which includes the reasonable fees and expenses of any counsel and/or other professionals retained by the Indenture Trustees and the Fiscal and Paying Agents in connection with such duties) shall be deemed Allowed Administrative Expenses and shall be paid in Cash on the Effective Date, or as soon thereafter as is reasonably practicable, upon submission of documented invoices (in customary form) to the Debtors, the DIP Lenders, and the Creditors' Committee, subject to a review for reasonableness by the Debtors, the DIP Lenders, and representatives of the members of the Creditors' Committee who are not Indenture Trustees or Fiscal and Paying Agents, without the necessity of making application to the Bankruptcy Court.  Notwithstanding the foregoing, under no circumstances shall any such fees and expenses (including counsel and/or other professionals) include fees and expenses associated with defending objections to Claims or associated with Avoidance Actions.  Subject to Section 6.7 hereof, each Indenture Trustee's or Fiscal and Paying Agent's charging lien, if any, shall be discharged solely upon payment in full of the respective fees and expenses of the Indenture Trustees or the Fiscal and Paying Agents, as applicable, and termination of the respective Indenture Trustee's or Fiscal and Paying Agent's duties.  Nothing herein shall be deemed to impair, waive, or discharge the Indenture Trustees' and the Fiscal and Paying Agents' respective charging liens, if any, for any fees and expenses not paid by the Debtors.

## ARTICLE III.

## CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS

The following table designates the Classes of Claims against and Equity Interests in the Debtors and specifies which of those Classes are (i) impaired or unimpaired by the Plan, (ii) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code, and (iii) deemed to reject the Plan:

| Class | Designation | Impairment | Entitled to Vote |
|---|---|---|---|
| Class 1 | Secured Claims | Unimpaired | No (deemed to accept) |
| Class 2 | Priority Non-Tax Claims | Unimpaired | No (deemed to accept) |
| Class 3 | General Unsecured Claims | Impaired | Yes |
| Class 4 | Property Environmental Claims | Unimpaired | No (deemed to accept) |
| Class 5 | Asbestos Personal Injury Claims | Impaired | Yes |
| Class 6 | Equity Interests in MLC | Impaired | No (deemed to reject) |

For convenience of identification, the Plan classifies the Allowed Claims in Class 1 as a single Class.  This Class is actually a group of subclasses, depending on the underlying property securing such Allowed Claims, and each subclass is treated hereunder as a distinct Class for voting and distribution purposes.

## ARTICLE IV.

## TREATMENT OF CLAIMS AND EQUITY INTERESTS

**4.1**    **Class 1 – Secured Claims.**  Except to the extent that a holder of an Allowed Secured Claim agrees to a different treatment of such Claim, on the Effective Date, or as soon thereafter as is reasonably practicable, each holder of an Allowed Secured Claim shall receive, at the option of the Debtors, and in full satisfaction of such Claim, either (i) Cash in an amount equal to one hundred percent (100%) of the unpaid amount of such Allowed Secured Claim, (ii) the proceeds of the sale or disposition of the Collateral securing such Allowed Secured Claim, net of the costs of disposition of such Collateral, (iii) the Collateral securing such Allowed Secured Claim, (iv) such treatment that leaves unaltered the legal, equitable, and contractual rights to which the holder of such Allowed Secured Claim is entitled, or (v) such other distribution as necessary to satisfy the requirements of section 1129 of the Bankruptcy Code.  In the event a Secured Claim is treated under clause (i) or (ii) of this Section, the liens securing such Secured Claim shall be deemed released.

**4.2**    **Class 2 - Priority Non-Tax Claims.**  Except to the extent that a holder of an Allowed Priority Non-Tax Claim agrees to a different treatment of such Claim, on the Effective Date, or as soon thereafter as is reasonably practicable, each such holder shall receive, in full satisfaction of such Claim, an amount in Cash equal to the Allowed amount of such Claim.

**4.3**    **Class 3 - General Unsecured Claims.**

(a)    As soon as is reasonably practicable after the Effective Date (but no earlier than the first Business Day following the Distribution Record Date), each holder of an Allowed General Unsecured Claim as of the Distribution Record Date shall receive from the GUC Trust its Pro Rata Share of (i) the New GM Securities or the proceeds thereof, if any, and (ii) the GUC Trust Units, in accordance with the terms of

27

the GUC Trust and the GUC Trust Agreement.  The GUC Trust shall make subsequent distributions of New GM Securities and GUC Trust Units to holders of Disputed General Unsecured Claims as of the Distribution Record Date whose Claims are subsequently Allowed.  The GUC Trust shall make additional distributions of New GM Securities to holders of GUC Trust Units in accordance with the terms of the GUC Trust and the GUC Trust Agreement.  Notwithstanding anything to the contrary in the Plan, the amount of New GM Securities to be distributed under the Plan shall be subject to the New GM Securities or proceeds thereof withheld or expended to meet the costs and expenses of administering the GUC Trust that are not otherwise funded from the Budget.

(b)       If any proceeds of the Term Loan Avoidance Action are received prior to the Avoidance Action Trust Transfer Date, then, to the extent it is determined that the holders of Allowed General Unsecured Claims are entitled to any proceeds of the Term Loan Avoidance Action, either by (i) mutual agreement between the U.S. Treasury and the Creditors' Committee or (ii) Final Order, (A) each holder of an Allowed General Unsecured Claim as of the Distribution Record Date shall receive from the Debtors its Pro Rata Share of such proceeds, net of any expenses incurred by the Debtors on or after the Effective Date, and (B) the Debtors shall make subsequent distributions of the net proceeds of the Term Loan Avoidance Action to (x) holders of Disputed General Unsecured Claims as of the Distribution Record Date whose Claims are subsequently Allowed and (y) the Asbestos Trust when the amount of the Asbestos Trust Claim has been determined, as set forth in Section 1.15 hereof.  Holders of Disputed General Unsecured Claims on the Distribution Record Date whose Claims are subsequently Allowed prior to the initial distribution of proceeds of the Term Loan Avoidance Action shall be deemed to be holders of Allowed General Unsecured Claims as of the Distribution Record Date for the purpose of this Section 4.3(b).  If the amount of the Asbestos Trust Claim is determined, as set forth in Section 1.15 hereof, prior to the initial distribution of proceeds of the Term Loan Avoidance Action, the holder of the Asbestos Trust Claim shall be deemed to be a holder of an Allowed General Unsecured Claim as of the Distribution Record Date for the purpose of this Section 4.3(b).

(c)       As soon as is reasonably practicable after the Avoidance Action Trust Transfer Date, and to the extent (i) proceeds of the Term Loan Avoidance Action are received by the Avoidance Action Trust and (ii) it is determined that the holders of Allowed General Unsecured Claims are entitled to any proceeds of the Term Loan Avoidance Action, either by (a) mutual agreement between the U.S. Treasury and the Creditors' Committee or (b) Final Order, (x) each holder of an Allowed General Unsecured Claim as of the Distribution Record Date shall receive from the Avoidance Action Trust, to the extent not already distributed, its Pro Rata Share of such proceeds in accordance with the terms of the Avoidance Action Trust and the Avoidance Action Trust Agreement and (y) the Avoidance Action Trust shall make subsequent distributions of any proceeds of the Term Loan Avoidance Action to (A) holders of Disputed General Unsecured Claims as of the Distribution Record Date whose Claims are subsequently Allowed and (B) the Asbestos Trust when the amount of the Asbestos Trust Claim has been determined as set forth in Section 1.15 hereof.  The Avoidance Action Trust shall

make additional distributions of any proceeds of the Term Loan Avoidance Action to the Term Loan Avoidance Action Beneficiaries in accordance with the terms of the Avoidance Action Trust and the Avoidance Action Trust Agreement.  Holders of Disputed General Unsecured Claims on the Distribution Record Date whose Claims are subsequently Allowed prior to the Avoidance Action Trust Transfer Date shall be deemed to be holders of Allowed General Unsecured Claims as of the Distribution Record Date for the purpose of this Section 4.3(c).  If the amount of the Asbestos Trust Claim is determined, as set forth in Section 1.15 hereof, prior to the Avoidance Action Trust Transfer Date, the holder of the Asbestos Trust Claim shall be deemed to be a holder of an Allowed General Unsecured Claim as of the Distribution Record Date for the purpose of this Section 4.3(c).

(d)      Holders of Unliquidated Litigation Claims, at the option of the Debtors or the GUC Trust Administrator, as applicable, shall be subject to the ADR Procedures in order to determine the Allowed amount of their respective General Unsecured Claims.

(e)      The Note Claims shall be Allowed in the respective amounts listed next to each Indenture set forth in Exhibit "F" annexed hereto (the "**Fixed Allowed Note Claims**").  The Fixed Allowed Note Claims shall override and supersede (i) any individual Claims filed by Registered Holders or beneficial owners of debt securities with respect to the Note Claims and (ii) solely with respect to the Allowed amount of the Note Claims, any stipulation or agreement between the Debtors and any Indenture Trustee, Registered Holder, or beneficial owner of the debt securities with respect to the Note Claims.  For the avoidance of doubt, the terms of any stipulation or agreement between the Debtors and any Indenture Trustee, Registered Holder, or beneficial owner of debt securities with respect to the Note Claims shall continue in full force and effect except with respect to the Allowed amount of the Note Claims contained therein.  Distributions to holders of Note Claims shall be made in accordance with Section 5.3(b) hereof.

(f)      The Eurobond Claims under (i) that certain Fiscal and Paying Agency Agreement, dated as of July 3, 2003, among General Motors Corporation, Deutsche Bank AG London, and Banque Générale du Luxembourg S.A. shall be Allowed in the amount of $3,770,634,476 and (ii) that certain Bond Purchase and Paying Agency Agreement, dated May 28, 1986, between General Motors Corporation and Credit Suisse shall be Allowed in the name of Deutsche Bank AG London, as paying agent for the benefit of the holders of the Eurobond Claims, in the amount of $15,745,690 (together, the "**Fixed Allowed Eurobond Claims**").  The Fixed Allowed Eurobond Claims shall override and supersede any individual Claims filed by Registered Holders or beneficial owners of debt securities with respect to the Eurobond Claims.  Distributions to holders of Eurobond Claims shall be made in accordance with Section 5.3(b) hereof.

(g)      Notwithstanding anything to the contrary in the Plan, the Nova Scotia Guarantee Claims and the Nova Scotia Wind-Up Claim shall be treated as Disputed General Unsecured Claims unless and until a Final Order is entered that fixes the Allowed amount, if any, of such Claims.  For the purpose of determining Pro Rata

Shares for distributions to Allowed General Unsecured Claims, the aggregate dollar amount of the Disputed Nova Scotia Guarantee Claims and the Disputed Nova Scotia Wind-Up Claim shall be the lesser of (i) $2.69 billion and (ii) such other amount as may be fixed by order of the Bankruptcy Court.  Distributions to holders of Nova Scotia Guarantee Claims, if Allowed, shall be made in accordance with Section 5.3(b) hereof.

      (h)    Remy shall have an Allowed General Unsecured Claim in the amount of $484,978.33 as a result of Remy's agreement pursuant to Bankruptcy Rule 9019 to reduce (i) its Claim against MLC in the amount of $16,354,200 (Proof of Claim No. 43411) and (ii) its contingent Claim against ENCORE in the amount of $2,110,570 relating to property leased to DRA, Inc. by the Debtors (Proof of Claim No. 69951) in exchange for (x) the Plan providing that Remy is a Protected Party with respect to that portion of Remy's Claim against MLC relating to asbestos liability arising on or prior to the closing of that certain Asset Purchase Agreement by and among DR International, Inc., DRA, Inc., and GM, dated July 13, 1994, (y) Remy withdrawing its application for an order pursuant to Bankruptcy Rule 2004 (ECF No. 3770) to the extent it is still pending, and (z) upon request, the Debtors providing Remy with certain documents relating to remediation by the Debtors or Post-Effective Date MLC, as applicable, at sites adjacent to those leased by the Debtors to Remy or leased by Remy.

      (i)    Notwithstanding anything to the contrary in this Section 4.3, all proceeds of the Term Loan Avoidance Action shall be applied first to pay the DIP Lenders (i) all amounts expended to fund the costs and expenses associated with realizing such proceeds, including, without limitation, any such amounts expended to fund the costs and expenses of professionals retained by the defendants in the Term Loan Avoidance Action and (ii) without duplication, the amount of the Avoidance Action Trust Administrative Cash.

    **4.4**    **Class 4 – Property Environmental Claims.**  On the Effective Date, all Property Environmental Claims shall be satisfied and treated in accordance with the terms of the Environmental Response Trust Agreement, the Environmental Response Trust Consent Decree and Settlement Agreement, and the Priority Order Sites Consent Decrees and Settlement Agreements.  All Property Environmental Claims are fully satisfied in accordance with the terms of the Environmental Response Trust Consent Decree and Settlement Agreement and the Priority Order Sites Consent Decrees and Settlement Agreements.

    **4.5**    **Class 5 – Asbestos Personal Injury Claims.**  On the Effective Date, or as soon thereafter as is reasonably practicable, all Asbestos Personal Injury Claims shall be channeled to the Asbestos Trust and all Asbestos Personal Injury Claims shall be satisfied in accordance with the terms of the Asbestos Trust, the Asbestos Trust Distribution Procedures, and the Asbestos Trust Agreement.  The sole recourse of the holders of Asbestos Personal Injury Claims in their capacities as such shall be from the Asbestos Trust, and such holders shall have no right whatsoever at any time to assert their respective Asbestos Personal Injury Claims against any Protected Party, provided that, once Allowed, the Asbestos Trust Claim shall be entitled to the same distributions from

the GUC Trust and the Avoidance Action Trust, as applicable, as an Allowed General Unsecured Claim in Class 3. Without limiting the foregoing, on the Effective Date, all Entities shall be permanently stayed, restrained, and enjoined from taking any of the following actions for the purpose of, directly or indirectly, collecting, recovering, or receiving payment of, on, or with respect to any Asbestos Personal Injury Claim (other than actions brought to enforce any right or obligation under the Plan, any Exhibits to the Plan, the Plan Supplement, or any other agreement or instrument between the Debtors and the Asbestos Trust, which actions shall be in conformity and compliance with the provisions hereof and other than the right of the Allowed Asbestos Trust Claim to receive distributions from the GUC Trust and the Avoidance Action Trust, as applicable): (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding (including, without limitation, a judicial, arbitral, administrative, or other proceeding) in any forum against any Protected Party or any property or interests in property of any Protected Party, (ii) enforcing, levying, attaching (including without limitation, any prejudgment attachment), collecting, or otherwise recovering by any means or in any manner, whether directly or indirectly, any judgment, award, decree, or other order against any Protected Party or any property or interests in property of any Protected Party, (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any Encumbrance against any Protected Party or any property or interests in property of any Protected Party, (iv) setting off, seeking reimbursement of, contribution from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability owed to any Protected Party or any property or interests in property of any Protected Party, and (v) proceeding in any manner in any place with regard to any matter that is subject to resolution pursuant to the Asbestos Trust Agreement, except in conformity and compliance therewith. Nothing in the Plan, including the fact that New GM is not included in the definition of Protected Party herein, shall in any way modify or limit any protections or rights afforded to New GM under or in connection with the Bankruptcy Court order approving the 363 Transaction.

    **4.6**    <u>**Class 6 - Equity Interests in MLC**</u>**.** On the Effective Date, all Equity Interests issued by MLC shall be cancelled and one new share of MLC's common stock shall be issued to a custodian to be designated by MLC, who will hold such share for the benefit of the holders of such former Equity Interests consistent with their former economic entitlements. All Equity Interests of the other Debtors shall be cancelled when such Debtors are dissolved or merged out of existence in accordance with Section 6.10 hereof. Each holder of an Equity Interest shall neither receive nor retain any property or interest in property on account of such Equity Interest; *provided, however*, that in the event all Allowed Claims have been satisfied in full, holders of Equity Interests may receive a pro rata distribution of any remaining assets of the Debtors. On or promptly after the Effective Date, but in no event later than December 15, 2011, MLC shall file with the Securities and Exchange Commission a Form 15 for the purpose of terminating the registration of any of its publicly-traded securities. All Equity Interests in MLC outstanding after the Effective Date shall be cancelled on the date MLC is dissolved in accordance with Section 6.10 hereof. The rights of a holder of an Equity Interest or

former Equity Interest issued by MLC pursuant to this Section 4.6 shall be nontransferable.

## ARTICLE V.

### PROVISIONS GOVERNING DISTRIBUTIONS

**5.1    Distribution Record Date.**  Except with respect to any publicly-traded securities as to which distributions shall be treated as set forth in Section 5.10 hereof, (i) as of the close of business on the Distribution Record Date, the various transfer registers for each of the Classes of Claims or Equity Interests as maintained by the Debtors, or their agents, shall be deemed closed, (ii) there shall be no further changes in the record holders of any of such Claims or Equity Interests, and the Debtors shall have no obligation to recognize any transfer of such Claims or Equity Interests occurring on or after the Distribution Record Date, and (iii) the Debtors shall be entitled to recognize and deal for all purposes hereunder only with those record holders stated on the transfer ledgers as of the close of business on the Distribution Record Date, to the extent applicable; *provided, however*, that if the GUC Trust Units are transferable as set forth in Section 6.2(h) hereof, then the GUC Trust Administrator may set additional record dates for subsequent distributions to holders of GUC Trust Units, in accordance with the GUC Trust Agreement.

**5.2    Method of Distributions Under the Plan.**

**(a)    Payments and Transfers on Effective Date.**  On the Effective Date, or as soon thereafter as is reasonably practicable, the Debtors shall (i) remit to holders of Allowed Administrative Expenses (except as otherwise provided herein), Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, and, if applicable, Allowed Secured Claims an amount in Cash equal to the Allowed amount of such Claims, (ii) transfer the GUC Trust Assets (other than the New GM Securities and the Residual Wind-Down Assets) to the GUC Trust free and clear of all liens, claims, and encumbrances, but subject to any obligations imposed by the Plan, on behalf of holders of General Unsecured Claims, (iii) transfer the Asbestos Trust Assets to the Asbestos Trust free and clear of all liens, claims, and encumbrances, but subject to any obligations imposed by the Plan, on behalf of holders of Asbestos Personal Injury Claims, (iv) transfer the Environmental Response Trust Assets to the Environmental Response Trust free and clear of all liens, claims, and encumbrances (except for any statutory liens for property and ad valorem taxes not yet due and payable and all liens, claims, or security interests of the DIP Lenders under the DIP Credit Agreement and any order of the Bankruptcy Court approving the DIP Credit Agreement), but subject to any obligations imposed by the Plan, on behalf of holders of Property Environmental Claims, and (v) reserve Cash for the Indenture Trustee/Fiscal and Paying Agent Reserve Cash, which Cash shall be distributed to the Indenture Trustees and Fiscal and Paying Agents, as applicable, upon submission of documented invoices (in customary form) to the Debtors prior to December 15, 2011, or, thereafter, to the GUC Trust Administrator in accordance with Section 6.2(f) hereof without the necessity of making application to the Bankruptcy

Court.  The Debtors shall remit and transfer to the holders of Allowed DIP Credit Agreement Claims the payments and distributions provided for in Section 2.4 hereof.

On the Avoidance Action Trust Transfer Date, the Debtors shall transfer the Avoidance Action Trust Assets to the Avoidance Action Trust (except with respect to the remaining assets of MLC upon its dissolution, which shall be transferred to the Avoidance Action Trust, if accepted by the Avoidance Action Trust in the sole discretion of the Avoidance Action Trust Administrator as set forth in, and in accordance with, Section 6.10 hereof).

After the Effective Date and from time to time thereafter through no later than December 15, 2011, and upon the written request of the GUC Trust Administrator specifying the number of New GM Securities to be transferred to the GUC Trust, Post-Effective Date MLC shall promptly transfer to the GUC Trust such New GM Securities free and clear of all liens, claims, and encumbrances, but subject to any obligations imposed by the Plan.  All such New GM Securities shall be distributed by the GUC Trust to holders of Allowed General Unsecured Claims in accordance with the provisions of the GUC Trust Agreement and the Plan within thirty (30) days of the receipt thereof by the GUC Trust.  On or after December 15, 2011 but by no later than December 29, 2011, all remaining New GM Securities and all Residual Wind-Down Assets held by Post-Effective Date MLC shall be transferred to the GUC Trust free and clear of all liens, claims, and encumbrances, but subject to any obligations imposed by the Plan.  To the extent that any such remaining New GM Securities so delivered would otherwise be distributed on the next Distribution Date (as defined in the GUC Trust Agreement) because of Claims resolved (whether Allowed or disallowed) on or prior to the date such New GM Securities are received by the GUC Trust, such distribution shall be made no later than thirty (30) days after the receipt of such remaining New GM Securities by the GUC Trust.  All New GM Securities held by Post-Effective Date MLC in accordance with this paragraph shall be segregated and shall not be used for any purpose whatsoever other than for transfer to the GUC Trust as provided herein; *provided, however*, that Post-Effective Date MLC may sell certain of the New GM Securities pursuant to Section 2.3 of the GUC Trust Agreement (with the Cash proceeds thereof being transferred to the GUC Trust in accordance with the provisions of the GUC Trust Agreement, but in any event no later than December 29, 2011).  In no event shall the New GM Securities held by Post-Effective Date MLC be subject to or available for the payment of any Claims, liabilities, or obligations of MLC, except as explicitly provided in the GUC Trust Agreement.

**(b)**     **Repayment of Excess Cash to DIP Lenders.**  If the Debtors have any Cash remaining after (i) transferring the GUC Trust Assets to the GUC Trust, including the funding of the GUC Trust Administrative Fund and the transfer of the Indenture Trustee/Fiscal and Paying Agent Reserve Cash in accordance with Section 6.2 hereof, (ii) transferring the Asbestos Trust Assets to the Asbestos Trust, (iii) transferring the Environmental Response Trust Assets to the Environmental Response Trust, including the funding of the Environmental Response Trust Administrative Funding Account, (iv) transferring the Avoidance Action Trust Assets to the Avoidance Action

Trust, (v) the resolution (and the payment, to the extent Allowed) of all Disputed Administrative Expenses (including compensation and reimbursement of expenses under sections 330 or 503 of the Bankruptcy Code), Disputed Priority Tax Claims, Disputed DIP Credit Agreement Claims, Disputed Priority Non-Tax Claims, and Disputed Secured Claims; *provided, however*, that at the time of the transfer of the Residual Wind-Down Assets to the GUC Trust, the Debtors shall only transfer Cash in an amount (based on the Debtors' reasonable estimate) necessary to satisfy the ultimate Allowed amount of all remaining unpaid Administrative Expenses (including any compensation and reimbursement of expenses to the extent allowed by Final Order under section 330 or 503 of the Bankruptcy Code), Priority Tax Claims, Priority Non-Tax Claims, and Secured Claims, (vi) the payment in full of all Allowed Administrative Expenses (including any compensation and reimbursement of expenses to the extent allowed by Final Order under section 330 or 503 of the Bankruptcy Code), Allowed Priority Tax Claims, Allowed DIP Credit Agreement Claims, Allowed Priority Non-Tax Claims, and Allowed Secured Claims, and (vii) completing the acts described in Section 6.10 hereof, the Debtors shall pay such Cash to the DIP Lenders by wire transfer of immediately available funds to an account designated by the U.S. Treasury and by EDC, respectively, ratably in accordance with their respective interests in the DIP Credit Agreement Claims.  In the event any Cash remains in the GUC Trust Administrative Fund, the Environmental Response Trust Administrative Funding Account, the Avoidance Action Trust Administrative Cash, or the Indenture Trustee/Fiscal and Paying Agent Reserve Cash after all the obligations imposed on the GUC Trust Administrator, the Environmental Response Trust Administrative Trustee, the Avoidance Action Trust Administrator, the Indenture Trustees, or the Fiscal and Paying Agents, respectively, and the GUC Trust, the Environmental Response Trust, and the Avoidance Action Trust, respectively, pursuant to the Plan, the GUC Trust Agreement, the Environmental Response Trust Agreement, the Environmental Response Trust Consent Decree and Settlement Agreement, and the Avoidance Action Trust Agreement, respectively, have been satisfied, the GUC Trust Administrator, the Environmental Response Trust Administrative Trustee, and the Avoidance Action Trust Administrator, respectively, shall pay such Cash to the DIP Lenders by wire transfer of immediately available funds to an account designated by the U.S Treasury and by EDC, respectively, ratably in accordance with their respective interests in the DIP Credit Agreement Claims.  If the GUC Trust Administrator determines to close the Chapter 11 Cases in accordance with Section 6.2(q) hereof, the GUC Trust Administrator shall repay the Cash from the balance of the GUC Trust Administrative Fund after reserving any amounts necessary to close the Chapter 11 Cases to the DIP Lenders by wire transfer of immediately available funds to an account designated by the U.S. Treasury and by EDC, respectively, ratably in accordance with their respective interests in the DIP Credit Agreement Claims.

(c)      **Payment of Cash or Certain Assets to Charitable Organizations.**  In the event any Cash or property remains in the Asbestos Trust after all the obligations imposed on the Asbestos Trust Administrator and the Asbestos Trust pursuant to the Plan and the Asbestos Trust Agreement have been satisfied, the Asbestos Trust Administrator shall pay such Cash amounts to a charitable organization exempt

34

from U.S. federal income tax under section 501(c)(3) of the Tax Code to be selected by, and unrelated to, the Asbestos Trust Administrator.  In the event any Asbestos Trust Assets remain in the Asbestos Trust after all Asbestos Personal Injury Claims have been satisfied pursuant to the Plan and the Asbestos Trust Agreement, the Asbestos Trust Administrator shall transfer such Asbestos Trust Assets to a charitable organization exempt from U.S. federal income tax under section 501(c)(3) of the Tax Code to be selected by, and unrelated to, the Asbestos Trust Administrator.

(d)    **Distributions of Cash.**  At the option of the Debtors or the GUC Trust Administrator, the Asbestos Trust Administrator, the Environmental Response Trust Administrative Trustee, or the Avoidance Action Trust Administrator, as applicable, any Cash payment to be made under the Plan, the GUC Trust, the Asbestos Trust, the Environmental Response Trust, or the Avoidance Action Trust, as applicable, may be made by check or wire transfer or as otherwise required or provided in applicable agreements.

(e)    **Sale of New GM Warrants About to Expire.**  During the one hundred twenty (120) days preceding the expiration of the New GM Warrants, the GUC Trust Administrator shall have the authority to sell any New GM Warrants remaining in the GUC Trust, whether held in a reserve for Disputed General Unsecured Claims or otherwise, and distribute the proceeds thereof to holders of Allowed General Unsecured Claims and/or GUC Trust Units, as applicable, consistent with, and as provided in, the Plan.  Any such sale shall be made in compliance with an applicable exemption from the registration requirements of the Securities Act of 1933, as amended (the "**Securities Act**") and any equivalent securities law provisions under state law, other than section 1145(a) of the Bankruptcy Code, which is not available for such sale.  For the avoidance of doubt, any holder of an Allowed General Unsecured Claim and/or GUC Trust Unit, as applicable, that is entitled to receive such New GM Warrants shall receive only the net cash proceeds, if any, of the sold New GM Warrants that the GUC Trust Administrator received upon such sale.  To the extent holders of Allowed Claims and/or GUC Trust Units, as applicable, have received a portion of the New GM Warrants to which they are entitled pursuant to the Plan, the GUC Trust Administrator shall have the authority to sell the remaining portion of New GM Warrants pursuant to this Section 5.2(e).

## 5.3    Delivery of Distributions and Undeliverable Distributions.

(a)    Subject to Bankruptcy Rule 9010 and except as otherwise provided in the GUC Trust Agreement, all distributions to any holder of an Allowed Claim shall be made at the address of such holder as set forth on the Schedules filed with the Bankruptcy Court or on the books and records of the Debtors or their agents or in a letter of transmittal unless the Debtors or the GUC Trust Administrator or the Avoidance Action Trust Administrator, as applicable, have been notified in writing of a change of address, including, without limitation, by the filing of a proof of Claim by such holder that contains an address for such holder different from the address reflected on such Schedules for such holder.  In the event that any distribution to any holder is returned as undeliverable, no further distributions to such holder shall be made unless and until the

Debtors or the GUC Trust Administrator or the Avoidance Action Trust Administrator, as applicable, are notified of such holder's then-current address, at which time all missed distributions shall be made to such holder, without interest.  All demands for undeliverable distributions shall be made on or before ninety (90) days after the date such undeliverable distribution was initially made.  Thereafter, the amount represented by such undeliverable distribution shall irrevocably revert to the Debtors or the GUC Trust or the Avoidance Action Trust, as applicable, and any Claim in respect of such undeliverable distribution shall be discharged and forever barred from assertion against the Debtors, the GUC Trust, the Avoidance Action Trust, and their respective property.

(b)    Any distribution from the Debtors, the GUC Trust, or the Avoidance Action Trust to any of the Indenture Trustees or Fiscal and Paying Agents in accordance with the Plan shall be (x) deemed a distribution to the respective Registered Holders thereunder, (y) subject to the applicable Indenture Trustee's or Fiscal and Paying Agent's right to assert its charging lien against such distributions, and (z) in accordance with Section 5.6 hereof.  Distributions shall be made to the Registered Holders as follows:

(i)    Each Indenture Trustee and Fiscal and Paying Agent shall distribute, as soon as is reasonably practicable after receipt thereof and pursuant to the terms of the applicable Indenture and Fiscal and Paying Agency Agreement, the New GM Securities and the GUC Trust Units it receives from the GUC Trust in accordance with Section 4.3(a) hereof to the Registered Holders as of the date of surrender of the debt securities pursuant to Section 5.10 hereof.  The GUC Trust shall make additional distributions of New GM Securities to holders of GUC Trust Units (and not the Indenture Trustees and the Fiscal and Paying Agents) in accordance with the GUC Trust Agreement and Section 4.3(a) hereof.

(ii)    To the extent that it is determined that the holders of Allowed General Unsecured Claims are entitled to any proceeds of the Term Loan Avoidance Action either by (i) mutual agreement between the U.S. Treasury and the Creditors' Committee or (ii) Final Order, then each Indenture Trustee and Fiscal and Paying Agent shall distribute, as soon as is reasonably practicable after receipt thereof and pursuant to the terms of the applicable Indenture and Fiscal and Paying Agency Agreement, the net proceeds of the Term Loan Avoidance Action it receives from either (i) the Debtors in accordance with Section 4.3(b) hereof or (ii) the Avoidance Action Trust in accordance with Section 4.3(c) hereof, to the Registered Holders as of the earlier of (A) the day prior to the Avoidance Action Trust Transfer Date and (B) the date of surrender of the debt securities pursuant to Section 5.10 hereof.

**5.4    Withholding and Reporting Requirements.**  In connection with the Plan and all instruments issued in connection therewith and distributed thereon, any party issuing any instrument or making any distribution under the Plan shall comply with all applicable withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all distributions under the Plan and all related agreements shall be

subject to any such withholding or reporting requirements.  In the case of a non-Cash distribution that is subject to withholding, the distributing party may withhold an appropriate portion of such distributed property and sell such withheld property to generate Cash necessary to pay over the withholding tax.  Notwithstanding the foregoing, each holder of an Allowed Claim or Equity Interest (other than the Indenture Trustees and the Fiscal and Paying Agents) that receives a distribution under the Plan shall have responsibility for any taxes imposed by any governmental unit, including income, withholding, and other taxes, on account of such distribution.

**5.5**    **Time Bar to Cash Payments.**  Checks issued by the Debtors, the GUC Trust Administrator, or the Avoidance Action Trust Administrator, as applicable, in respect of Allowed Claims shall be null and void if not negotiated within one hundred eighty (180) days after the date of issuance thereof.  Requests for re-issuance of any check shall be made to the Debtors, the GUC Trust Administrator, or the Avoidance Action Trust Administrator, as applicable, by the holder of the Allowed Claim to whom such check originally was issued.  Any Claim in respect of such a voided check shall be made on or before thirty (30) days after the expiration of the one hundred eighty (180) day period following the date of issuance of such check.  Thereafter, the amount represented by such voided check shall irrevocably revert to the Debtors, the GUC Trust, or the Avoidance Action Trust, as applicable, and any Claim in respect of such voided check shall be discharged and forever barred.

**5.6**    **Minimum Distributions and Fractional Shares or Units.**

(a) The provisions of this Section 5.6(a) shall apply with respect to distributions made in respect of Allowed General Unsecured Claims (but not to distributions made in respect of GUC Trust Units).  Subject to the following sentence, (i) no payment of Cash in an amount less than $25 shall be made by the Debtors, the GUC Trust Administrator, or the Avoidance Action Trust Administrator, as applicable, to any holder of an Allowed Claim and (ii) no fractional shares of New GM Stock or fractional New GM Warrants shall be distributed.  Any fractional shares of New GM Stock or fractional New GM Warrants shall be rounded up or down to the next whole number or zero, as applicable (with one-half being closer to the next higher whole number for this purpose); *provided, however*, that for the purpose of determining the number of shares of New GM Stock or the number of New GM Warrants that any holder of an Allowed General Unsecured Claim shall be entitled to receive on any Distribution Date (as defined in the GUC Trust Agreement), the GUC Trust Administrator shall aggregate the GUC Trust Distributable Assets (as defined in the GUC Trust Agreement) that such holder of an Allowed General Unsecured Claim is entitled to receive in respect of all Allowed General Unsecured Claims held by such holder as of the Initial Distribution Record Date (as defined in the GUC Trust Agreement), in the case of distributions pursuant to Section 5.2 of the GUC Trust Agreement, or as of the last day of the calendar quarter next preceding the relevant Distribution Date, in the case of distributions pursuant to Section 5.3 of the GUC Trust Agreement.

(b) The provisions of this Section 5.6(b) shall apply with respect to distributions made in respect of GUC Trust Units (but not to distributions in respect of Allowed General Unsecured Claims). Subject to the following sentence, no fractional shares of New GM Stock or fractional New GM Warrants shall be distributed by the GUC Trust to any holder of a GUC Trust Unit. All fractional shares of New GM Stock and all fractional New GM Warrants that otherwise would have been distributable on the relevant Distribution Date (as defined in the GUC Trust Agreement) but for the provisions of Section 5.6(b) of the GUC Trust Agreement shall be aggregated and sold for Cash; *provided, however*, that for the purpose of determining the number of shares of New GM Stock or the number of New GM Warrants that any holder of GUC Trust Units shall be entitled to receive on any Distribution Date, there shall be aggregated the GUC Trust Distributable Assets (as defined in the GUC Trust Agreement) that such holder of a GUC Trust Unit is entitled to receive in respect of all GUC Trust Units at the time held by such holder. The net Cash proceeds of the sale of such New GM Stock and New GM Warrants, after deduction of brokerage commissions and other expenses of sale, shall be distributed to holders of GUC Trust Units pro rata based on the fractional shares of New GM Stock or fractional New GM Warrants that they otherwise would have been entitled to receive. If there shall exist at the time a public market for the New GM Stock or the New GM Warrants, all sales of the New GM Stock or the New GM Warrants, as the case may be, shall be in the public market.

**5.7    Setoffs.** The Debtors and/or the GUC Trust Administrator, the Asbestos Trust Administrator, and the Avoidance Action Trust Administrator, as applicable, may, but shall not be required to, set off against any Claim (for purposes of determining the Allowed amount of such Claim on which distribution shall be made), any claims of any nature whatsoever that the Debtors may have against the holder of such Claim, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors and/or the GUC Trust Administrator, the Asbestos Trust Administrator, or the Avoidance Action Trust Administrator, as applicable, of any such claim the Debtors may have against the holder of such Claim. Nothing in the Plan shall limit or affect any right of the United States to offset (subject to obtaining Bankruptcy Court approval to the extent required) any obligation owed by the United States to the Debtors against any obligation owed by the Debtors to the United States.

**5.8    Transactions on Business Days.** If the Effective Date or any other date on which a transaction may occur under the Plan shall occur on a day that is not a Business Day, the transactions contemplated by the Plan to occur on such day shall instead occur on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

**5.9    Allocation of Plan Distribution Between Principal and Interest.** All distributions in respect of any Allowed Claim shall be allocated first to the principal amount of such Allowed Claim, as determined for U.S. federal income tax purposes, and thereafter, to the remaining portion of such Claim, if any.

**5.10**    **Surrender of Existing Publicly-Traded Securities**.  On the Effective Date, or as soon thereafter as is reasonably practicable, each Registered Holder of the debt securities with respect to the Note Claims, the Eurobond Claims, or the Nova Scotia Guarantee Claims shall surrender its debt securities to the applicable Indenture Trustee or Fiscal and Paying Agent or, in the event such debt securities are held in the name, or by a nominee, of The Depository Trust Company or other securities depository (each, a "**Depository**"), the Debtors shall seek the cooperation of the Depository to provide appropriate instructions to the applicable Indenture Trustee or Fiscal and Paying Agent. No distributions under the Plan shall be made for or on behalf of such Registered Holder unless and until (i) such debt securities are received by the applicable Indenture Trustee or Fiscal and Paying Agent or appropriate instructions from the Depository are received by the applicable Indenture Trustee or Fiscal and Paying Agent or (ii) the loss, theft, or destruction of such debt securities is established to the reasonable satisfaction of the applicable Indenture Trustee or Fiscal and Paying Agent, which satisfaction may require such Registered Holder to submit (a) a lost instrument affidavit and (b) an indemnity bond holding the Debtors, Post-Effective Date MLC, the GUC Trust Administrator, the Avoidance Action Trust Administrator, and the applicable Indenture Trustee or Fiscal and Paying Agent harmless in respect of such debt securities and distributions made with respect thereto.  Notwithstanding the foregoing, holders of Nova Scotia Guarantee Claims shall not be required to surrender their debt securities to the applicable Fiscal and Paying Agent or provide instructions to the Depository and shall be entitled to retain their debt securities solely for the purpose of asserting their direct claims, if any, against GM Nova Scotia under the applicable Fiscal and Paying Agency Agreement.  For the avoidance of doubt, distributions under the Plan shall not be delayed to the holders of the Nova Scotia Guarantee Claims solely as a result of their retention of their debt securities as provided in this Section 5.10.  Upon compliance with this Section 5.10 by a Registered Holder of the debt securities, for all purposes under the Plan, such Registered Holder shall be deemed to have surrendered such debt securities.  Any Registered Holder that fails to surrender such debt securities or satisfactorily explain the loss, theft, or destruction of such debt securities to the applicable Indenture Trustee or Fiscal and Paying Agent within one (1) year of the Effective Date shall be deemed to have no further Claim against the Debtors, Post-Effective Date MLC, the GUC Trust, the Avoidance Action Trust, the GUC Trust Administrator, the Avoidance Action Trust Administrator, or the applicable Indenture Trustee or Fiscal and Paying Agent in respect of such Claim and shall not participate in any distribution under the Plan.  All property in respect of such forfeited distributions, including interest thereon, shall be promptly returned to the GUC Trust by the applicable Indenture Trustee or Fiscal and Paying Agent, and any such debt securities shall be cancelled.

**5.11**    **Class Proofs of Claim**.  If a class proof of claim is Allowed, it shall be treated as a single Claim for purposes of Article V of this Plan.

## ARTICLE VI.

## MEANS FOR IMPLEMENTATION AND EXECUTION OF THE PLAN

### 6.1    Substantive Consolidation.

(a)    Entry of the Confirmation Order shall constitute the approval, pursuant to section 105(a) of the Bankruptcy Code, effective as of the Effective Date, of the substantive consolidation of MLC of Harlem, Inc.; MLCS, LLC; MLCS Distribution Corporation; Remediation and Liability Management Company, Inc.; and Environmental Corporate Remediation Company, Inc., and their respective estates, into MLC for voting, confirmation, and distribution purposes under the Plan.  Solely for such purposes, on and after the Effective Date, (i) all assets and all liabilities of the Debtors shall be deemed merged into MLC, (ii) all guaranties of any Debtor of the payment, performance, or collection of obligations of another Debtor shall be eliminated and cancelled, (iii) any obligation of any Debtor and all guaranties thereof executed by one or more of the other Debtors shall be treated as a single obligation, and such guaranties shall be deemed a single Claim against the consolidated Debtors, (iv) all joint obligations of two or more Debtors and all multiple Claims against such entities on account of such joint obligations shall be treated and allowed only as a single Claim against the consolidated Debtors, (v) all Claims between or among the Debtors shall be cancelled, and (vi) each Claim filed in the Chapter 11 Case of any Debtor shall be deemed filed against the consolidated Debtors and a single obligation of the consolidated Debtors on and after the Effective Date.

(b)    The substantive consolidation and deemed merger effected pursuant to Section 6.1(a) hereof shall not affect (other than for purposes related to funding distributions under the Plan and as set forth in Section 6.1(a) hereof) (i) the legal and organizational structure of the Debtors, (ii) defenses to any Causes of Action or requirements for any third party to establish mutuality to assert a right of setoff, and (iii) distributions out of any insurance policies or proceeds of such policies.

### 6.2    The GUC Trust.

(a)    **Execution of GUC Trust Agreement.**  On or before the Effective Date, the GUC Trust Agreement, in a form acceptable to the Debtors, the Creditors' Committee, the U.S. Treasury, as a DIP Lender, and the GUC Trust Administrator, shall be executed, and all other necessary steps shall be taken to establish the GUC Trust and the beneficial interests therein, which shall be for the benefit of the holders of Allowed General Unsecured Claims.  This Section 6.2 sets forth certain of the rights, duties, and obligations of the GUC Trust Administrator.  In the event of any conflict between the terms of this Section 6.2 and the terms of the GUC Trust Agreement, the terms of the GUC Trust Agreement shall govern.

(b)    **Purpose of GUC Trust.**  The GUC Trust shall be established to administer certain post-Effective Date responsibilities under the Plan, including, but not limited to, distributing New GM Securities and resolving outstanding Disputed General

40

Unsecured Claims to determine the amount of Allowed General Unsecured Claims that will be eligible for distribution of their Pro Rata Share of New GM Securities under the Plan. If the Residual Wind-Down Assets are transferred to the GUC Trust upon dissolution of MLC, then the GUC Trust shall administer the resolution of all Disputed Administrative Expenses, Disputed Priority Tax Claims, Disputed Priority Non-Tax Claims, and Disputed Secured Claims. The GUC Trust has no objective to continue or engage in the conduct of a trade or business.

(c)     **GUC Trust Assets.** The GUC Trust shall consist of the GUC Trust Assets. On the GUC Trust Transfer Date, the Debtors shall transfer all the GUC Trust Assets (other than (i) the New GM Securities, which shall be transferred to the GUC Trust pursuant to Section 5.2(a) hereof, and (ii) the Residual Wind-Down Assets, which shall be transferred to the GUC Trust in accordance with Section 6.10 hereof) to the GUC Trust free and clear of all liens, claims, and encumbrances, except to the extent otherwise provided herein.

(d)     **Governance of GUC Trust.** The GUC Trust shall be governed by the GUC Trust Administrator and the GUC Trust Monitor.

(e)     **GUC Trust Administrator and GUC Trust Monitor.** Wilmington Trust Company shall be the GUC Trust Administrator. The GUC Trust Administrator shall retain AP Services, LLC to manage the day-to-day operations of the GUC Trust. FTI Consulting, Inc. shall be the GUC Trust Monitor.

(f)     **Role of GUC Trust Administrator.** In furtherance of and consistent with the purposes of the GUC Trust and the Plan, the GUC Trust Administrator shall (i) have the power and authority to hold, manage, sell, invest, and distribute to the holders of Allowed General Unsecured Claims the GUC Trust Assets, (ii) hold the GUC Trust Assets for the benefit of the holders of Allowed General Unsecured Claims, (iii) have the power and authority to hold, manage, sell, invest, and distribute the GUC Trust Assets obtained through the exercise of its power and authority, (iv) have the power and authority to prosecute and resolve (x) objections to Disputed General Unsecured Claims and (y) subject to obtaining any applicable consent from MLC or Post-Effective Date MLC, as the case may be, and any necessary approval of the Bankruptcy Court, any claims for equitable subordination and recharacterization in connection with such objections, (v) have the power and authority to perform such other functions as are provided in the Plan and the GUC Trust Agreement, (vi) have the power and authority to administer the closure of the Chapter 11 Cases in accordance with the Bankruptcy Code and the Bankruptcy Rules, and (vii) if the Residual Wind-Down Assets are transferred to the GUC Trust upon the dissolution of MLC, then the GUC Trust Administrator shall have the authority to prosecute, resolve objections, and satisfy the Disputed Administrative Expenses, the Disputed Priority Tax Claims, the Disputed Priority Non-Tax Claims, and the Disputed Secured Claims. The GUC Trust Administrator shall be responsible for all decisions and duties with respect to the GUC Trust and the GUC Trust Assets and shall file periodic public reports on the status of claims reconciliation and distributions. In all circumstances, the GUC Trust

41

Administrator shall act in the best interests of all beneficiaries of the GUC Trust and in furtherance of the purpose of the GUC Trust, and in accordance with the GUC Trust Agreement and not in its own best interest as a creditor.  Upon the dissolution of MLC, (i) the Indenture Trustee/Fiscal and Paying Agent Reserve Cash shall be transferred to the GUC Trust and the GUC Trust Administrator shall distribute funds to the Indenture Trustees and the Fiscal and Paying Agents from the Indenture Trustee/Fiscal and Paying Agent Reserve Cash as required and (ii) the Residual Wind-Down Assets shall be transferred to the GUC Trust.

(g)    **Role of GUC Trust Monitor.**  In furtherance of and consistent with the purpose of the GUC Trust and the Plan, the GUC Trust Monitor shall oversee the activities of the GUC Trust Administrator as set forth in the GUC Trust Agreement. The GUC Trust Administrator shall report material matters to, and seek approval for material decisions from, the GUC Trust Monitor, as and to the extent set forth in the GUC Trust Agreement.  Without limiting the foregoing, the GUC Trust Administrator shall obtain the approval of the GUC Trust Monitor with respect to settlements of Disputed General Unsecured Claims above a certain threshold and present periodic reports to the GUC Trust Monitor on the GUC Trust distributions and budget.  In all circumstances, the GUC Trust Monitor shall act in the best interests of all beneficiaries of the GUC Trust, in furtherance of the purpose of the GUC Trust, and in accordance with the GUC Trust Agreement.

(h)    **Transferability of GUC Trust Interests.**  Beneficial interests in the GUC Trust shall be transferable to the extent that the transferability thereof would not require the GUC Trust to register the beneficial interests under Section 12(g) of the Securities Exchange Act of 1934, as amended, and otherwise shall not be transferable except as provided in the GUC Trust Agreement.

(i)    **Cash.**  The GUC Trust Administrator may invest Cash (including any earnings thereon or proceeds therefrom) as would be permitted by the GUC Trust Agreement or as otherwise permitted by an order of the Bankruptcy Court, which may include the Confirmation Order.

(j)    **Costs and Expenses of GUC Trust Administrator.**  The costs and expenses of the GUC Trust, including the fees and expenses of the GUC Trust Administrator and its retained professionals, shall be paid out of the GUC Trust Administrative Fund, subject to the provisions of the Budget and the terms of the GUC Trust Agreement.

(k)    **Compensation of GUC Trust Administrator.**  The GUC Trust Administrator shall be entitled to reasonable compensation, subject to the provisions of the Budget and the terms of the GUC Trust Agreement, in an amount consistent with that of similar functionaries in similar types of bankruptcy cases.  Such compensation shall be payable from the GUC Trust Administrative Fund, subject to the terms of the GUC Trust Agreement.

(l) **Distribution of GUC Trust Assets.** Subject to Section 5.2(a) hereof, the GUC Trust Administrator shall distribute quarterly (to the extent there are sufficient assets available for distribution in accordance with the GUC Trust Agreement), beginning on the first Business Day following the Effective Date, or as soon thereafter as is practicable, the appropriate amount of New GM Securities (and other distributions of Cash, if any) to holders of Allowed General Unsecured Claims and/or GUC Trust Units, as applicable. The GUC Trust Administrator shall utilize in accordance with the GUC Trust Agreement Cash from the GUC Trust Administrative Fund (i) in amounts as reasonably necessary to meet contingent liabilities and otherwise address the expenses of the GUC Trust, (ii) to pay reasonable expenses (including, but not limited to, any taxes imposed on the GUC Trust or in respect of the GUC Trust Assets), and (iii) to satisfy other liabilities incurred by the GUC Trust in accordance with the Plan or the GUC Trust Agreement.

(m) **Retention of Professionals by GUC Trust Administrator and GUC Trust Monitor.** The GUC Trust Administrator and the GUC Trust Monitor may retain and reasonably compensate counsel and other professionals to assist in their duties as GUC Trust Administrator and GUC Trust Monitor on such terms as the GUC Trust Administrator and the GUC Trust Monitor deem appropriate without Bankruptcy Court approval, subject to notice to the U.S. Treasury, as a DIP Lender, and to the provisions of the GUC Trust Agreement. The GUC Trust Administrator and the GUC Trust Monitor may retain any professional who represented parties in interest, including the Debtors or the Creditors' Committee, in the Chapter 11 Cases. All fees and expenses incurred in connection with the foregoing shall be payable from the GUC Trust Administrative Fund subject to the provisions of the Budget and the terms of the GUC Trust Agreement.

(n) **U.S. Federal Income Tax Treatment of GUC Trust.**

(i) **Tax Status of GUC Trust.** For all U.S. federal and applicable state and local income tax purposes, all parties (including, without limitation, the Debtors, the GUC Trust Administrator, and the holders of General Unsecured Claims) shall treat the GUC Trust as a "disputed ownership fund" within the meaning of Treasury Regulation section 1.468B-9.

(ii) **Delivery of Statement of Transfers.** Following the funding of the GUC Trust (and in no event later than February 15th of the calendar year following the funding of the GUC Trust), MLC shall provide a "§ 1.468B-9 Statement" to the GUC Trust Administrator in accordance with Treasury Regulation section 1.468B-9(g).

(iii) **Tax Reporting.**

(1) The GUC Trust shall file (or cause to be filed) any other statements, returns, or disclosures relating to the GUC Trust that are required by any governmental unit.

43

(2)    The GUC Trust Administrator shall be responsible for payment, out of the GUC Trust Assets, of any taxes imposed on the GUC Trust or the GUC Trust Assets.

(3) The GUC Trust Administrator may request an expedited determination of taxes of the GUC Trust under section 505(b) of the Bankruptcy Code for all returns filed for, or on behalf of, the GUC Trust for all taxable periods through the dissolution of the GUC Trust.

(o)    **Dissolution.**  The GUC Trust Administrator and the GUC Trust shall be discharged or dissolved, as applicable, upon completion of their duties as set forth in the GUC Trust Agreement, including when (i) all Disputed General Unsecured Claims have been resolved, (ii) all GUC Trust Assets have been liquidated, (iii) all distributions required to be made by the GUC Trust Administrator under the Plan and the GUC Trust Agreement have been made, and (iv) if the Residual Wind-Down Assets are transferred to the GUC Trust upon dissolution of MLC, all Disputed Administrative Expenses, Disputed Priority Tax Claims, Disputed Priority Non-Tax Claims, and Disputed Secured Claims have been resolved, but in no event shall the GUC Trust be dissolved later than three (3) years from the Effective Date or such shorter or longer period authorized by the Bankruptcy Court in order to resolve all Disputed General Unsecured Claims.

(p)    **Indemnification of GUC Trust Administrator and GUC Trust Monitor.**  The GUC Trust Administrator and the GUC Trust Monitor (and their agents and professionals) shall not be liable for actions taken or omitted in its or their capacity as, or on behalf of, the GUC Trust Administrator, the GUC Trust Monitor, or the GUC Trust, except those acts found by Final Order to be arising out of its or their willful misconduct (including, but not limited to, conduct that results in a personal profit at the expense of the GUC Trust), gross negligence, fraud, malpractice, criminal conduct, unauthorized use of confidential information that causes damages, breach of fiduciary duty (to the extent applicable), or *ultra vires* acts, and each shall be entitled to indemnification and reimbursement for fees and expenses in defending any and all of its or their actions or inactions in its or their capacity as, or on behalf of, the GUC Trust Administrator, the GUC Trust Monitor,  or the GUC Trust, except for any actions or inactions found by Final Order to be involving willful misconduct (including, but not limited to, conduct that results in a personal profit at the expense of the GUC Trust), gross negligence, fraud, malpractice, criminal conduct, unauthorized use of confidential information that causes damages, breach of fiduciary duty (to the extent applicable), or *ultra vires* acts.  Any indemnification claim of the GUC Trust Administrator, the GUC Trust Monitor, and the other parties entitled to indemnification under this subsection shall be satisfied (i) first from the GUC Trust Administrative Fund, (ii) second from the Other GUC Trust Administrative Cash (as defined in the GUC Trust Agreement), and (iii) third from the GUC Trust Distributable Assets (as defined in the GUC Trust Agreement), as provided in the GUC Trust Agreement.  The GUC Trust Administrator and the GUC Trust Monitor shall be entitled to rely, in good faith, on the advice of its retained professionals.

(q)    **Closing of Chapter 11 Cases.**  When all Disputed Claims (other than Asbestos Personal Injury Claims and Property Environmental Claims) filed against the Debtors have become Allowed Claims or have been disallowed by Final Order, all of the GUC Trust Assets and all Avoidance Action Trust Assets, if applicable, have been distributed in accordance with the Plan, and all Allowed Administrative Expenses (other than the DIP Credit Agreement Claims), Priority Tax Claims, Priority Non-Tax Claims, and Secured Claims have been satisfied in accordance with the Plan, the GUC Trust Administrator shall seek authority from the Bankruptcy Court to close the Chapter 11 Cases in accordance with the Bankruptcy Code and the Bankruptcy Rules.  If at any time the GUC Trust Administrator determines that the expense of administering the GUC Trust so as to make a final distribution to its beneficiaries is likely to exceed the value of the GUC Trust Assets remaining in the GUC Trust, the GUC Trust Administrator shall apply to the Bankruptcy Court for authority to (i) reserve any amounts necessary to close the Chapter 11 Cases, (ii) repay any Cash balance from the GUC Trust Administrative Fund to the DIP Lenders in accordance with Section 5.2(b) of the Plan, and (iii) unless the Chapter 11 Cases have been closed, close the Chapter 11 Cases in accordance with the Bankruptcy Code and Bankruptcy Rules.  Notice of such application shall be given electronically, to the extent practicable, to those parties who have filed requests for notices and whose electronic addresses remain current and operating.

6.3    **The Asbestos Trust.**

(a)    **Execution of Asbestos Trust Agreement.**  On or before the Effective Date, the Asbestos Trust Agreement, in a form reasonably acceptable to the Debtors, the Creditors' Committee, the Asbestos Claimants' Committee, and the Future Claimants' Representative, shall be executed, and all other necessary steps shall be taken to establish the Asbestos Trust and the beneficial interests therein, which shall be for the benefit of the holders of Allowed Asbestos Personal Injury Claims.  In the event of any conflict between the terms of this Section 6.3 and the terms of the Asbestos Trust Agreement, the terms of the Asbestos Trust Agreement shall govern.

(b)    **Purpose of Asbestos Trust.**  The Asbestos Trust shall be established to, among other things, (i) direct the processing, liquidation, and payment of all Asbestos Personal Injury Claims in accordance with the Plan, the Asbestos Trust Distribution Procedures, and the Confirmation Order and (ii) preserve, hold, manage, and maximize the assets of the Asbestos Trust for use in paying and satisfying Asbestos Personal Injury Claims.

(c)    **Assumption of Certain Liabilities by Asbestos Trust.**  In consideration of the Asbestos Trust Assets transferred to the Asbestos Trust under the Plan and in furtherance of the purposes of the Asbestos Trust and the Plan, the Asbestos Trust shall assume all liability and responsibility for all Asbestos Personal Injury Claims and the Debtors shall have no further financial or other responsibility or liability therefor.

(d)    **Asbestos Trust Assets.**  The Asbestos Trust shall consist of the Asbestos Trust Assets.  On the Asbestos Trust Transfer Date, the Debtors shall transfer

all the Asbestos Trust Assets to the Asbestos Trust free and clear of all liens, claims, and encumbrances, except to the extent otherwise provided herein.  Neither the Debtors nor the DIP Lenders shall have any obligation to provide any further funding to or on behalf of the Asbestos Trust.

(e)    **Governance of Asbestos Trust.**  The Asbestos Trust shall be governed by the Asbestos Trust Administrator.

(f)    **The Asbestos Trust Administrator.**  The Asbestos Trust Administrator shall be designated on or before the Effective Date by the Debtors, with the consent of the Asbestos Claimants' Committee and the Future Claimants' Representative, and such designation shall be confirmed by the Bankruptcy Court.

(g)    **Role of Asbestos Trust Administrator.**  In furtherance of and consistent with the purposes of the Asbestos Trust and the Plan, the Asbestos Trust Administrator shall (i) have the power and authority to hold, manage, sell, invest, and distribute the Asbestos Trust Assets to the holders of Asbestos Personal Injury Claims, (ii) hold the Asbestos Trust Assets for the benefit of the holders of Asbestos Personal Injury Claims, (iii) have the power and authority to hold, manage, sell, and distribute the Asbestos Trust Assets obtained through the exercise of its power and authority, (iv) have the power and authority to prosecute and resolve objections to Asbestos Personal Injury Claims, and (v) have the power and authority to perform such other functions as are provided in the Plan and the Asbestos Trust Agreement.  The Asbestos Trust Administrator shall be responsible for all decisions and duties with respect to the Asbestos Trust and the Asbestos Trust Assets.  In all circumstances, the Asbestos Trust Administrator shall act in the best interests of all beneficiaries of the Asbestos Trust and in furtherance of the purpose of the Asbestos Trust.

(h)    **Nontransferability of Asbestos Trust Interests.**  The beneficial interests in the Asbestos Trust shall not be certificated and are not transferable (except as otherwise provided in the Asbestos Trust Agreement).

(i)    **Cash.**  The Asbestos Trust Administrator may invest Cash (including any earnings thereon or proceeds therefrom).

(j)    **Costs and Expenses of Asbestos Trust.**  The costs and expenses of the Asbestos Trust, including the fees and expenses of the Asbestos Trust Administrator and its retained professionals, shall, subject to the terms of the Asbestos Trust Agreement, be paid first out of the $2 million in Cash in the Asbestos Trust Assets and then out of the other Asbestos Trust Assets.

(k)    **Resolution of Asbestos Personal Injury Claims.**  With respect to any Asbestos Personal Injury Claim that is resolved by the Asbestos Trust in accordance with the Asbestos Trust Agreement and the Asbestos Trust Distribution Procedures, such resolution shall establish the amount of legal liability against the Asbestos Trust in the

amount of the liquidated value of such Asbestos Personal Injury Claim, as determined in accordance with the Asbestos Trust Distribution Procedures.

(l)    **Distribution of Asbestos Trust Assets.**  In accordance with the Asbestos Trust Agreement and the Asbestos Trust Distribution Procedures, the Asbestos Trust shall operate through mechanisms such as structured, periodic, or supplemental payments, pro rata distributions, matrices, or periodic review of estimates of the numbers and values of Asbestos Personal Injury Claims and Demands, or other comparable mechanisms, that provide reasonable assurance that the Asbestos Trust shall value, and be in a financial position to pay, Asbestos Personal Injury Claims and Demands that involve similar Claims in substantially the same manner.

(m)    **Retention of Professionals by Asbestos Trust Administrator.** The Asbestos Trust Administrator may retain and reasonably compensate counsel and other professionals to assist in its or their duties as Asbestos Trust Administrator on such terms as the Asbestos Trust Administrator deem appropriate without Bankruptcy Court approval, but subject to the provisions of the Budget and the terms of the Asbestos Trust Agreement.  The Asbestos Trust Administrator may retain any professional who represented parties in interest in the Chapter 11 Cases.

(n)    **U.S. Federal Income Tax Treatment of Asbestos Trust.**

(i)    **Tax Status of Asbestos Trust.**  For all U.S. federal and applicable state and local income tax purposes, all parties (including, without limitation, the Debtors, the Asbestos Trust Administrator, and the holders of Asbestos Personal Injury Claims) shall treat the Asbestos Trust as a "qualified settlement fund" within the meaning of Treasury Regulation section 1.468B-1.

(ii)    **Delivery of Statement of Transfers.**  Following the funding of the Asbestos Trust (and in no event later than February 15th of the calendar year following the funding of the Asbestos Trust), MLC shall provide a "§ 1.468B-3 Statement" to the Asbestos Trust Administrator in accordance with Treasury Regulation section 1.468B-3(e)

(iii)    **Other Statements.**  The Asbestos Trust shall file (or cause to be filed) any other statements, returns, or disclosures relating to the Asbestos Trust that are required by any governmental unit.

(iv)    **Tax Payments.**  The Asbestos Trust Administrator shall be responsible for payment, out of the Asbestos Trust Assets, of any taxes imposed on the Asbestos Trust or the Asbestos Trust Assets.

(v)    **Expedited Determination.**  The Asbestos Trust Administrator may request an expedited determination of taxes of the Asbestos Trust under section 505(b) of the Bankruptcy Code for all returns filed for, or on behalf of, the Asbestos Trust for all taxable periods through the dissolution of the Asbestos Trust.

47

(o)    **Dissolution.**  The Asbestos Trust Administrator and the Asbestos Trust shall be discharged or dissolved, as applicable, at such time as (i) all Asbestos Personal Injury Claims have been resolved, (ii) all Asbestos Trust Assets have been liquidated, and (iii) all distributions required to be made by the Asbestos Trust Administrator under the Plan and the Asbestos Trust Agreement have been made.

(p)    **Indemnification of Asbestos Trust Administrator.**  The Asbestos Trust Administrator and its or their agents and professionals shall not be liable for actions taken or omitted in its or their capacity as, or on behalf of, the Asbestos Trust Administrator or the Asbestos Trust, except those acts arising out of its or their own willful misconduct, gross negligence, bad faith, self-dealing, breach of fiduciary duty, or *ultra vires* acts, and each shall be entitled to indemnification and reimbursement for fees and expenses in defending any and all of its actions or inactions in its or their capacity as, or on behalf of, the Asbestos Trust Administrator or the Asbestos Trust, except for any actions or inactions involving willful misconduct, gross negligence, bad faith, self-dealing, breach of fiduciary duty, or *ultra vires* acts.  Any indemnification claim of the Asbestos Trust Administrator (and the other parties entitled to indemnification under this subsection (p)) shall be satisfied first from the $2 million in Cash in the Asbestos Trust Assets and then from the Asbestos Trust Assets.  The Asbestos Trust Administrator shall be entitled to rely, in good faith, on the advice of its retained professionals.

**6.4    The Environmental Response Trust.**

(a)    **Environmental Response Trust Agreement and Environmental Response Trust Consent Decree and Settlement Agreement.**  On the Effective Date, the Environmental Response Trust Agreement and the Environmental Response Trust Consent Decree and Settlement Agreement shall become effective and the Environmental Response Trust shall be established and funded.  Entry of the Confirmation Order shall constitute approval of the Environmental Response Trust Consent Decree and Settlement Agreement pursuant to section 1123(b) of the Bankruptcy Code and Bankruptcy Rule 9019.  The establishment and funding of the Environmental Response Trust and the transfer of Environmental Response Trust Assets to the Environmental Response Trust shall be in full settlement and satisfaction of all present and future civil environmental liabilities or obligations of the Debtors to the Governmental Authorities, other than the claims and rights reserved in Paragraphs 100-104 of the Environmental Response Trust Consent Decree and Settlement Agreement (as to which the United States reserves any right of setoff that may exist or arise), with respect to any of the Environmental Response Trust Properties listed on Attachment A to the Environmental Response Trust Consent Decree and Settlement Agreement, whether prepetition or postpetition, in accordance with this Section 6.4 and the Environmental Response Trust Consent Decree and Settlement Agreement; *provided, however*, that nothing in this sentence shall preclude additional payments to the Environmental Response Trust in the event that any of the Priority Order Sites Consent Decrees and Settlement Agreements are not approved as provided in the Priority Order Sites Consent Decrees and Settlement Agreements.  In the event of any conflict between the terms of the Plan and the terms of the Environmental

Response Trust Consent Decree and Settlement Agreement, the terms of the Environmental Response Trust Consent Decree and Settlement Agreement shall govern.

(b) **Purpose of Environmental Response Trust.** The purpose of the Environmental Response Trust shall be to conduct, manage, and/or fund Environmental Actions with respect to certain of the Environmental Response Trust Properties, including the migration of hazardous substances emanating from certain of the Environmental Response Trust Properties, in accordance with the provisions of the Environmental Response Trust Agreement and the Environmental Response Trust Consent Decree and Settlement Agreement; to reimburse the lead agency for Environmental Actions it conducts or has agreed to pay for with respect to the Environmental Response Trust Properties; to own certain of the Environmental Response Trust Properties, carry out administrative and property management functions related to the Environmental Response Trust Properties, and pay associated administrative costs; and to try to sell or transfer the Environmental Response Trust Properties owned by the Environmental Response Trust with the objective that the Environmental Response Trust Properties be put to productive or beneficial use. After the establishment and funding of, and the conveyance of the Environmental Response Trust Properties owned by the Debtors to, the Environmental Response Trust as provided in the Environmental Response Trust Consent Decree and Settlement Agreement, the Debtors shall have no further liability, role, or residual interest with respect to the Environmental Response Trust or the Environmental Response Trust Properties.

(c) **Environmental Response Trust Assets.** The Environmental Response Trust shall consist of the Environmental Response Trust Assets, as described in the Environmental Response Trust Consent Decree and Settlement Agreement. On the Effective Date, the Debtors shall transfer all the Environmental Response Trust Assets to the Environmental Response Trust, as provided in and subject to the provisions of the Environmental Response Trust Consent Decree and Settlement Agreement. Such transfer shall include the transfer of Environmental Response Trust Cash in the amount of $641,434,945, less any deductions made pursuant to Paragraph 36 of the Environmental Response Trust Consent Decree and Settlement Agreement, which represents the aggregate amounts approved by the Bankruptcy Court to pay the costs that will be incurred by the Environmental Response Trust with respect to Environmental Actions and the costs of administering the Environmental Response Trust. In settlement and full satisfaction of the Property Environmental Claims relating to the Environmental Response Trust Properties, on or before the Effective Date, the Environmental Response Trust Administrative Trustee shall create, and the Debtors shall make payments to, accounts held by or within the Environmental Response Trust as specified and in the amounts provided in the Environmental Response Trust Consent Decree and Settlement Agreement, and the Debtors shall make the payments required under the Priority Order Sites Consent Decrees and Settlement Agreements. The Environmental Response Trust Administrative Trustee shall deposit, maintain, and use the funding in accordance with the terms of the Environmental Response Trust Agreement and the Environmental Response Trust Consent Decree and Settlement Agreement for the purposes described

49

therein.  Any Environmental Response Trust Property may be sold or transferred by the
Environmental Response Trust Administrative Trustee in the circumstances and in light
of the considerations described in the Environmental Response Trust Consent Decree and
Settlement Agreement.

(d)    **Governance of Environmental Response Trust.**  The
Environmental Response Trust shall be governed by the Environmental Response Trust
Administrative Trustee according to the terms set forth in the Environmental Response
Trust Agreement and the Environmental Response Trust Consent Decree and Settlement
Agreement.

(e)    **Role of Environmental Response Trust Administrative
Trustee.**  The Environmental Response Trust Administrative Trustee shall be responsible
for implementing the purpose of the Environmental Response Trust, including overseeing
the development of budgets, retaining and overseeing professionals to conduct
Environmental Actions, entering into and overseeing the implementation of all contracts
binding the Environmental Response Trust, executing agreements, preparing and filing
all required plans and reports with the applicable Governmental Authorities, handling
accounting and legal matters for the Environmental Response Trust, establishing funding
objectives, monitoring the performance of the staff, and other administrative tasks, and
shall carry out and implement the Environmental Response Trust Agreement and the
Environmental Response Trust Consent Decree and Settlement Agreement.  The
Environmental Response Trust Administrative Trustee shall not be authorized to engage
in any trade or business with respect to the Environmental Response Trust Assets.

(f)    **Nontransferability of Environmental Response Trust Interests.**
The beneficial interests in and powers under the Environmental Response Trust shall not
be certificated and are not transferable (except as otherwise provided in the
Environmental Response Trust Agreement or the Environmental Response Trust Consent
Decree and Settlement Agreement).

(g)    **Cash.**  The Environmental Response Trust Administrative Trustee
may invest Cash (including any earnings thereon or proceeds therefrom) as would be
permitted by (i) section 345 of the Bankruptcy Code were the Environmental Response
Trust a debtor under the Bankruptcy Code and (ii) the Environmental Response Trust
Agreement and the Environmental Response Trust Consent Decree and Settlement
Agreement.

(h)    **Indemnification of Environmental Response Trust
Administrative Trustee.**  The potential liability of each Environmental Response Trust
Party shall be limited as set forth in the Environmental Response Trust Agreement and
the Environmental Response Trust Consent Decree and Settlement Agreement.  Each
Environmental Response Trust Party shall be indemnified and protected from litigation-
related expenses as set forth in the Environmental Response Trust Agreement and the
Environmental Response Trust Consent Decree and Settlement Agreement.

(i)      **U.S. Federal Income Tax Treatment of Environmental Response Trust.**

(i)      **Tax Status of Environmental Response Trust.**  Except as provided in the following sentence, for all U.S. federal and applicable state and local income tax purposes, all parties (including, without limitation, the Debtors, the Environmental Response Trust Administrative Trustee, the DIP Lenders, and the holders of Property Environmental Claims relating to the Environmental Response Trust Properties) shall treat the Environmental Response Trust as a "qualified settlement fund" within the meaning of Treasury Regulation section 1.468B-1.  This provision shall not be binding on the Internal Revenue Service as to the application of Treasury Regulation section 1.468B-1 or any other tax issue with respect to the Environmental Response Trust.

(ii)      **Delivery of Statement of Transfers.**  Following the funding of the Environmental Response Trust (and in no event later than February 15th of the calendar year following the funding of the Environmental Response Trust), MLC shall provide a "§ 1.468B-3 Statement" to the Environmental Response Trust Administrative Trustee in accordance with Treasury Regulation section 1.468B-3(e).

(iii)      **Other Statements.**  The Environmental Response Trust shall file (or cause to be filed) any other statements, returns, or disclosures relating to the Environmental Response Trust that are required by any governmental unit.

(iv)      **Tax Payments**.  The Environmental Response Trust Administrative Trustee shall be responsible for payment, out of the Environmental Response Trust Assets, of any taxes imposed on the Environmental Response Trust or the Environmental Response Trust Assets.

(v)      **Expedited Determination.**  The Environmental Response Trust Administrative Trustee may request an expedited determination of taxes of the Environmental Response Trust under section 505(b) of the Bankruptcy Code for all returns filed for, or on behalf of, the Environmental Response Trust for all taxable periods through the dissolution of the Environmental Response Trust.

**6.5**      **The Avoidance Action Trust.**

(a)      **Execution of Avoidance Action Trust Agreement.**  On or before the Effective Date, the Avoidance Action Trust Agreement, in a form acceptable to the Debtors, the U.S. Treasury, the Creditors' Committee, and the Avoidance Action Trust Administrator, shall be executed, and all other necessary steps shall be taken to establish the Avoidance Action Trust and the beneficial interests therein, which shall be for the benefit of the beneficiaries of the Avoidance Action Trust; *provided, however*, that the Avoidance Action Trust Assets shall not be transferred to the Avoidance Action Trust until the Avoidance Action Trust Transfer Date.  In the event of any conflict between the terms of this Section 6.5 and the terms of the Avoidance Action Trust Agreement, the

terms of the Avoidance Action Trust Agreement shall govern.  The Avoidance Action Trust Agreement may provide powers, duties, and authorities in addition to those explicitly stated in the Plan, but only to the extent that such powers, duties, and authorities do not adversely affect the status of the Avoidance Action Trust (or any applicable portion thereof) as a liquidating trust for federal income tax purposes, subject only to the federal income tax treatment of the Avoidance Action Trust Claims Reserve.

(b)    **Purpose of Avoidance Action Trust.**  The Avoidance Action Trust shall be established for the sole purpose of liquidating and distributing its assets, in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business.

(c)    **Avoidance Action Trust Assets.**  The Avoidance Action Trust shall consist of the Avoidance Action Trust Assets.  On the Avoidance Action Trust Transfer Date (except with respect to the remaining assets of MLC upon its dissolution, which shall be transferred to the Avoidance Action Trust, if accepted by the Avoidance Action Trust in the sole discretion of the Avoidance Action Trust Administrator as set forth in, and in accordance with, Section 6.10 hereof), the Debtors shall transfer the Avoidance Action Trust Assets to the Avoidance Action Trust.  Upon delivery of the Avoidance Action Trust Assets to the Avoidance Action Trust, the Debtors and their successors and assigns shall be released from all liability with respect to the delivery of such assets.

(d)    **Governance of Avoidance Action Trust.**  The Avoidance Action Trust shall be governed by the Avoidance Action Trust Administrator and the Avoidance Action Trust Monitor.

(e)    **Avoidance Action Trust Administrator and Avoidance Action Trust Monitor.**  Wilmington Trust Company shall be the Avoidance Action Trust Administrator, and FTI Consulting, Inc. shall be the Avoidance Action Trust Monitor.

(f)    **Role of Avoidance Action Trust Administrator.**  In furtherance of and consistent with the purpose of the Avoidance Action Trust and the Plan, the Avoidance Action Trust Administrator shall (i) have the power and authority to hold and manage the Avoidance Action Trust Assets, (ii) hold the Avoidance Action Trust Assets for the benefit of the beneficiaries of the Avoidance Action Trust, (iii) have the power and authority to prosecute and resolve (in consultation with the U.S. Treasury so long as the holders of the DIP Credit Agreement Claims continue to be a Term Loan Avoidance Action Beneficiary), in the name of the Debtors and/or the names of the Avoidance Action Trust Administrator, the Term Loan Avoidance Action, (iv) have the power and authority to invest and distribute to the Term Loan Avoidance Action Beneficiaries any proceeds of the Term Loan Avoidance Action, (v) have the power to sell, transfer, prosecute, resolve, or otherwise realize upon all other Avoidance Action Trust Assets, (vi) have the power and authority to invest and distribute to the holders of the DIP Credit Agreement Claims any proceeds of any remaining assets of MLC that are transferred to the Avoidance Action Trust in accordance with Section 6.10 hereof, and (vii) have the

52

power and authority to perform such other functions as are provided in the Plan and the Avoidance Action Trust Agreement. The Avoidance Action Trust Administrator shall be responsible for all decisions and duties with respect to the Avoidance Action Trust and the Avoidance Action Trust Assets. In all circumstances, the Avoidance Action Trust Administrator shall act in the best interests of the beneficiaries of the Avoidance Action Trust and in furtherance of the purpose of the Avoidance Action Trust. Prior to the Avoidance Action Trust Transfer Date, the Term Loan Avoidance Action shall be prosecuted, resolved, and administered by the Creditors' Committee. All expenses incurred in connection with the prosecution of the Term Loan Avoidance Action (whether prior to or after the Avoidance Action Trust Transfer Date) shall be funded by the Avoidance Action Trust Administrative Cash, subject to the provisions of the Budget and the terms of the Avoidance Action Trust Agreement.

(g)     **Role of Avoidance Action Trust Monitor.** In furtherance of and consistent with the purpose of the Avoidance Action Trust and the Plan, the Avoidance Action Trust Monitor shall oversee the activities of the Avoidance Action Trust Administrator as set forth in the Avoidance Action Trust Agreement. The Avoidance Action Trust Administrator shall report material matters to, and seek approval for material decisions from, the Avoidance Action Trust Monitor, as and to the extent set forth in the Avoidance Action Trust Agreement. Without limiting the foregoing, the Avoidance Action Trust Administrator shall obtain the approval of the Avoidance Action Trust Monitor with respect to settlements of the Avoidance Action Trust Assets and present periodic reports to the Avoidance Action Trust Monitor on the Avoidance Action Trust distributions and budget. In all circumstances, the Avoidance Action Trust Monitor shall act in the best interests of the beneficiaries of the Avoidance Action Trust, in furtherance of the purpose of the Avoidance Action Trust, and in accordance with the Avoidance Action Trust Agreement.

(h)     **Nontransferability of Avoidance Action Trust Interests.** The beneficial interests in the Avoidance Action Trust shall not be certificated and shall not be transferable (except as otherwise provided in the Avoidance Action Trust Agreement).

(i)     **Cash.** The Avoidance Action Trust Administrator may invest Cash (including any earnings thereon or proceeds therefrom) as permitted by the Avoidance Action Trust Agreement or as otherwise permitted by an order of the Bankruptcy Court, which may include the Confirmation Order; *provided, however*, that such investments are investments permitted to be made by a liquidating trust within the meaning of Treasury Regulation section 301.7701-4(d), as reflected therein, or under applicable Internal Revenue Service guidelines, rulings, or other controlling authorities.

(j)     **Distribution of Avoidance Action Trust Assets.** The Avoidance Action Trust shall distribute at least annually and in accordance with the Avoidance Action Trust Agreement any amount of Cash proceeds from the Term Loan Avoidance Action to the Term Loan Avoidance Action Beneficiaries and any amount of Cash proceeds from the remaining assets of MLC transferred to the Avoidance Action Trust, in accordance with the terms of Section 6.10 hereof, to the holders of the DIP Credit

Agreement Claims (treating as Cash for purposes of this Section 6.5(j) any permitted investments under Section 6.5(i) hereof) except such amounts, if any, (i) as would be distributable to (x) a holder of a Disputed General Unsecured Claim if such Disputed General Unsecured Claim had been Allowed prior to the time of such distribution (but only until such Claim is resolved), (y) the Asbestos Trust Claim if such Claim had been Allowed in the amount set forth in the Confirmation Order prior to the time of such distribution (but only until the Asbestos Trust Claim is determined, as set forth in Section 1.15 hereof), and (z) the "Maximum Amount" (as defined in the GUC Trust Agreement) of the potential General Unsecured Claims arising from any successful recovery of proceeds from the Term Loan Avoidance Action or other Avoidance Actions, (ii) as are reasonably necessary to meet contingent liabilities and maintain the value of the Avoidance Action Trust Assets during liquidation, (iii) necessary to pay reasonable incurred and anticipated expenses (including, but not limited to, any taxes imposed on the Avoidance Action Trust or in respect of the Avoidance Action Trust Assets), and (iv) necessary to satisfy other liabilities incurred and anticipated by the Avoidance Action Trust in accordance with the Plan or the Avoidance Action Trust Agreement.

(k)    **Costs and Expenses of Avoidance Action Trust.**  The costs and expenses of the Avoidance Action Trust, including the fees and expenses of the Avoidance Action Trust Administrator and its retained professionals, shall be paid out of the Avoidance Action Trust Assets, subject to the provisions of the Budget and the terms of the Avoidance Action Trust Agreement.  Fees and expenses incurred in connection with the prosecution and settlement of the Term Loan Avoidance Action shall be considered costs and expenses of the Avoidance Action Trust, subject to the provisions of the Budget and the terms of the Avoidance Action Trust Agreement.

(l)    **Compensation of Avoidance Action Trust Administrator.**  The Entities serving as or comprising the Avoidance Action Trust Administrator shall be entitled to reasonable compensation in an amount consistent with that of similar functionaries in similar roles, subject to the provisions of the Budget and the terms of the Avoidance Action Trust Agreement.

(m)    **Retention of Professionals by Avoidance Action Trust Administrator and Avoidance Action Trust Monitor.**  The Avoidance Action Trust Administrator and the Avoidance Action Trust Monitor may retain and compensate attorneys and other professionals to assist in their duties as Avoidance Action Trust Administrator and Avoidance Action Trust Monitor on such terms as the Avoidance Action Trust Administrator and the Avoidance Action Trust Monitor deem appropriate without Bankruptcy Court approval, subject to the provisions of the Budget and the terms of the Avoidance Action Trust Agreement.  Without limiting the foregoing, the Avoidance Action Trust Administrator and the Avoidance Action Trust Monitor may retain any professional that represented parties in interest in the Chapter 11 Cases.

(n)    **U.S. Federal Income Tax Treatment of Avoidance Action Trust.**

(i)      **Treatment of Avoidance Action Trust Assets.**  For all U.S. federal and applicable state and local income tax purposes, all parties (including, without limitation, the Debtors, the Avoidance Action Trust Administrator, the holders of the DIP Credit Agreement Claims, and the holders of Allowed General Unsecured Claims) shall treat the transfer of the Avoidance Action Trust Assets to the Avoidance Action Trust in a manner consistent with the remainder of this Section 6.5(n)(i).

(1)      If no remaining assets of MLC are transferred to the Avoidance Action Trust upon the dissolution of MLC, and the Term Loan Avoidance Action Beneficiaries have not been identified on or prior to the Avoidance Action Trust Transfer Date either by (x) mutual agreement between the U.S. Treasury and the Creditors' Committee or (y) Final Order, then the Avoidance Action Trust Administrator shall treat the Avoidance Action Trust for U.S. federal income tax purposes as either (A) a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 (including, if required, timely so electing) or (B) if permitted under applicable law and at the option of the Avoidance Action Trust Administrator, a "complex trust."

(2)      If any remaining assets of MLC are transferred to the Avoidance Action Trust upon the dissolution of MLC or the Term Loan Avoidance Action Beneficiaries have been identified on or prior to the Avoidance Action Trust Transfer Date, or otherwise upon identification of the Term Loan Avoidance Action Beneficiaries after the Avoidance Action Trust Transfer Date, the Avoidance Action Trust Assets shall be treated as being transferred (A) directly to the beneficiaries of the Avoidance Action Trust (*provided, however*, that to the extent Avoidance Action Trust Assets are allocable to Disputed Claims or otherwise definitionally comprise part of the Avoidance Action Trust Claims Reserve, such Avoidance Action Trust Assets shall be treated as being transferred to the Avoidance Action Trust Claims Reserve), followed by (B) the transfer by such beneficiaries of the Avoidance Action Trust of the Avoidance Action Trust Assets (other than the Avoidance Action Trust Assets allocable to the Avoidance Action Trust Claims Reserve) in exchange for beneficial interests in the Avoidance Action Trust. Accordingly, beneficiaries of the Avoidance Action Trust receiving beneficial interests in the Avoidance Action Trust shall be treated for U.S. federal income tax purposes as the grantors and owners of their respective share of the Avoidance Action Trust Assets (other than any Avoidance Action Trust Assets allocable to the Avoidance Action Trust Claims Reserve).  Any determination made pursuant to this Section 6.5(n)(i) shall be conclusive and binding on all parties (including the Debtors, the Avoidance Action Trust Administrator, the holders of the DIP Credit Agreement Claims, and the holders of Allowed General Unsecured Claims) for U.S. federal, state, and local income tax purposes.

Accordingly, to the extent permitted by applicable law, all parties shall report consistently with the federal income tax treatment of the Avoidance Action Trust by the Avoidance Action Trust Administrator for state and local income tax purposes.  For the avoidance of doubt, the Avoidance Action Trust Administrator shall, to the fullest extent permitted by law, be indemnified from all liability for any and all consequences resulting from its determination under this Section 6.5(n)(i).

     **(ii)**    **Tax Reporting.**

     (1)    If the Avoidance Action Trust Administrator elects to treat the Avoidance Action Trust in its entirety or, if otherwise applicable, the Avoidance Action Trust Claims Reserve as a disputed ownership fund within the meaning of Treasury Regulation section 1.468B-9, then following the Avoidance Action Trust Transfer Date (but in no event later than February 15th of the calendar year following the funding of the Avoidance Action Trust), MLC shall provide a "§ 1.468B-9 Statement" to the Avoidance Action Trust Administrator in accordance with Treasury Regulation section 1.468B-9(g).

     (2)    From and after the date on which Section 6.5(n)(i)(2) hereof applies, the Avoidance Action Trust Administrator shall file returns for the Avoidance Action Trust treating the Avoidance Action Trust (except the Avoidance Action Trust Claims Reserve) as a grantor trust pursuant to Treasury Regulation section 1.671-4(a) and in accordance with the applicable provisions of this Section 6.5(n).  The Avoidance Action Trust Administrator also shall annually send to each beneficiary of the Avoidance Action Trust a separate statement setting forth such beneficiary's share of items of income, gain, loss, deduction, or credit of the Avoidance Action Trust and shall instruct all such beneficiaries to report such items on their respective U.S. federal income tax returns or to forward the appropriate information to their respective beneficial holders with instructions to report such items on their U.S. federal income tax returns.  The Avoidance Action Trust Administrator also shall file (or cause to be filed) any other statements, returns, or disclosures relating to the Avoidance Action Trust that are required by any governmental unit.

     (A)    Allocations of the Avoidance Action Trust's taxable income among the beneficiaries of the Avoidance Action Trust shall be determined by reference to the manner in which an amount of Cash equal to such taxable income would be distributed (without regard to any restrictions on distributions described herein) if, immediately prior to such deemed distribution, the Avoidance Action Trust had distributed all of its other assets (valued at their tax book value and other than assets attributable to

the Avoidance Action Trust Claims Reserve) to the beneficiaries of the Avoidance Action Trust, in each case up to the tax book value of the assets treated as contributed by such beneficiaries, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Avoidance Action Trust. Similarly, taxable loss of the Avoidance Action Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining Avoidance Action Trust Assets.  The tax book value of the Avoidance Action Trust Assets for this purpose shall equal their fair market value on the date on which Section 6.5(n)(i)(2) hereof applies, adjusted in accordance with tax accounting principles prescribed by the Tax Code, applicable Treasury regulations, and other applicable administrative and judicial authorities and pronouncements.

(B)      If the Avoidance Action Trust previously was treated for U.S. federal income tax purposes as a disputed ownership fund within the meaning of Treasury Regulation section 1.468B-9 or a complex trust pursuant to Section 6.5(n)(i) hereof, the Avoidance Action Trust Administrator shall continue to treat the Avoidance Action Trust Claims Reserve in the same manner. If Section 6.5(n)(i)(2) hereof is applicable as of the Avoidance Action Trust Transfer Date, the Avoidance Action Trust Administrator shall (x) treat the Avoidance Action Trust Claims Reserve for U.S. federal income tax purposes as either (i) a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 by timely so electing or (ii) a "complex trust" and (y) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes.  Any determination made pursuant to this Section 6.5(n)(ii)(2)(B) shall be conclusive and binding on all parties (including the Debtors, the Avoidance Action Trust Administrator, the holders of the DIP Credit Agreement Claims, and the holders of Allowed General Unsecured Claims) for U.S. federal, state, and local income tax purposes.  For the avoidance of doubt, the Avoidance Action Trust Administrator shall, to the fullest extent permitted by law, be indemnified from all liability for any and all consequences resulting from its determination under this Section 6.5(n)(ii)(2)(B).

(C)      As soon as practicable after the Avoidance Action Trust Transfer Date, and, if applicable, at any later date on which Section 6.5(n)(i)(2) hereof applies, the Avoidance Action Trust Administrator shall make a good-faith valuation of the Avoidance Action Trust Assets, and such valuation shall be made

57

available from time to time, to the extent relevant, and shall be used consistently by all parties (including, without limitation, the Debtors, the Avoidance Action Trust Administrator, the holders of the DIP Credit Agreement Claims, and the holders of Allowed General Unsecured Claims) for all U.S. federal and applicable state and local income tax purposes.

(3)    The Avoidance Action Trust Administrator shall be responsible for payment, out of the Avoidance Action Trust Assets, of any taxes imposed on the Avoidance Action Trust or the Avoidance Action Trust Assets, including the Avoidance Action Trust Claims Reserve.  In the event, and to the extent, any Cash retained on account of Disputed Claims in the Avoidance Action Trust Claims Reserve is insufficient to pay the portion of any such taxes attributable to the taxable income arising from the assets allocable to, or retained on account of, Disputed Claims, such taxes shall be (i) reimbursed from any subsequent Cash amounts retained on account of Disputed Claims or (ii) to the extent such Disputed Claims subsequently have been resolved, deducted from any amounts otherwise distributable by the Avoidance Action Trust Administrator as a result of the resolution of such Disputed Claims.

(4)    The Avoidance Action Trust Administrator may request an expedited determination of taxes of the Avoidance Action Trust, including the Avoidance Action Trust Claims Reserve, under section 505(b) of the Bankruptcy Code for all returns filed for, or on behalf of, the Avoidance Action Trust for all taxable periods through the dissolution of the Avoidance Action Trust.

(o)    **Dissolution.**  The Avoidance Action Trust Administrator and the Avoidance Action Trust shall be discharged or dissolved, as applicable, at such time as (i) all of the Avoidance Action Trust Assets have been distributed pursuant to the Plan and the Avoidance Action Trust Agreement, (ii) the Avoidance Action Trust Administrator determines, in its sole discretion, that the administration of the Avoidance Action Trust Assets is not likely to yield sufficient additional Avoidance Action Trust Assets to justify further pursuit, and (iii) all distributions required to be made by the Avoidance Action Trust Administrator under the Plan and the Avoidance Action Trust Agreement have been made, but in no event shall the Avoidance Action Trust be dissolved later than three (3) years from the Avoidance Action Trust Transfer Date (or such earlier date as provided in the Avoidance Action Trust Agreement) unless the Bankruptcy Court, upon motion within the six (6) month period prior to the third (3rd) anniversary (or at least six (6) months prior to the end of an extension period), determines that a fixed period extension (not to exceed three (3) years, together with any prior extensions, without a favorable private letter ruling from the Internal Revenue Service that any further extension would not adversely affect the status of the Avoidance Action Trust as a liquidating trust for U.S. federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the Avoidance Action Trust Assets.  If at any time the Avoidance Action

Trust Administrator determines, in reliance upon such professionals as the Avoidance Action Trust Administrator may retain, that the expense of administering the Avoidance Action Trust so as to make a final distribution to the beneficiaries of the Avoidance Action Trust is likely to exceed the value of the Avoidance Action Trust Assets remaining in the Avoidance Action Trust, the Avoidance Action Trust Administrator may apply to the Bankruptcy Court for authority to (i) reserve any amounts necessary to dissolve the Avoidance Action Trust, (ii) transfer the balance to the DIP Lenders and/or the GUC Trust as determined either by (A) mutual agreement between the U.S. Treasury and the Creditors' Committee or (B) Final Order, or donate any balance to a charitable organization described in section 501(c)(3) of the Tax Code and exempt from U.S. federal income tax under section 501(a) of the Tax Code that is unrelated to the Debtors, the Avoidance Action Trust, and any insider of the Avoidance Action Trust Administrator, and (iii) dissolve the Avoidance Action Trust.

(p)    **Indemnification of Avoidance Action Trust Administrator and Avoidance Action Trust Monitor.**    The Avoidance Action Trust Administrator and the Avoidance Action Trust Monitor (and their agents and professionals) shall not be liable for actions taken or omitted in its or their capacity as, or on behalf of, the Avoidance Action Trust Administrator, the Avoidance Action Trust Monitor, or the Avoidance Action Trust, except those acts found by Final Order to be arising out of its or their own willful misconduct (including, but not limited to, conduct that results in a personal profit at the expense of the GUC Trust), gross negligence, fraud, malpractice, criminal conduct, unauthorized use of confidential information that causes damages, breach of fiduciary duty (to the extent applicable), or *ultra vires* acts, and each shall be entitled to indemnification and reimbursement for reasonable fees and expenses in defending any and all of its or their actions or inactions in its or their capacity as, or on behalf of, the Avoidance Action Trust Administrator, the Avoidance Action Trust Monitor, or the Avoidance Action Trust, except for any actions or inactions found by Final Order to be involving willful misconduct (including, but not limited to, conduct that results in a personal profit at the expense of the GUC Trust), gross negligence, fraud, malpractice, criminal conduct, unauthorized use of confidential information that causes damages, breach of fiduciary duty (to the extent applicable), or *ultra vires* acts.  Any indemnification claim of the Avoidance Action Trust Administrator and the Avoidance Action Trust Monitor (and the other parties entitled to indemnification under this subsection) shall be satisfied (i) first from the Avoidance Action Trust Administrative Cash, (ii) second from the Trust Distributable Assets (as defined in the Avoidance Action Trust Agreement), (iii) third from the Other GUC Trust Administrative Cash (as defined in the GUC Trust Agreement), and (iv) fourth from the GUC Trust Distributable Assts (as defined in the GUC Trust Agreement), or as otherwise provided in the Avoidance Action Trust Agreement.  The Avoidance Action Trust Administrator and the Avoidance Action Trust Monitor shall be entitled to rely, in good faith, on the advice of their retained professionals.

**6.6**    **Securities Law Matters.**  In reliance upon section 1145(a) of the Bankruptcy Code, the offer, issuance, or distribution of the New GM Securities by MLC

to the GUC Trust and the Asbestos Trust in accordance with the Plan, is exempt from the provisions of Section 5 of the Securities Act and any state or local law requiring registration for the offer, issuance, or distribution of a security by reason of section 1145(a) of the Bankruptcy Code.  The offering, issuance, or distribution of the New GM Securities by the GUC Trust in accordance with the Plan and, if applicable, by the Asbestos Trust to the holders of beneficial interests in the Asbestos Trust, in each case as a successor to the Debtors under the Plan, is exempt from the provisions of Section 5 of the Securities Act and any state or local law requiring registration for the offer, issuance, or distribution of a security by reason of section 1145(a) of the Bankruptcy Code.  The offering, issuance, or distribution of units or other beneficial interests in the GUC Trust, the Asbestos Trust, the Environmental Response Trust, and the Avoidance Action Trust, each as a successor to the Debtors under the Plan, in accordance with the Plan is exempt from the provisions of Section 5 of the Securities Act and any state or local law requiring registration for the offer, issuance, or distribution of a security by reason of section 1145(a) of the Bankruptcy Code.  The units or other beneficial interests in the GUC Trust shall be transferable to the extent that the transferability thereof would not require the GUC Trust to register the beneficial interests under Section 12(g) of the Securities Exchange Act of 1934, as amended, and otherwise shall not be transferable except as provided in the GUC Trust Agreement.  Any sale of New GM Securities by the GUC Trust Administrator in accordance with the provisions of the GUC Trust Agreement shall be made in compliance with an applicable exemption from the registration requirements of the Securities Act and any equivalent securities law provisions under state law, other than section 1145(a) of the Bankruptcy Code, which is not available for such sale.  The sale of any New GM Securities by MLC pursuant to Section 2.3 of the GUC Trust Agreement shall be made in compliance with an applicable exemption from the registration requirements of the Securities Act and any equivalent securities law provisions under state law, other than section 1145(a) of the Bankruptcy Code, which is available for such sale.

      **6.7**    <u>**Cancellation of Existing Securities and Agreements.**</u>  Except for purposes of evidencing a right to distributions under the Plan or otherwise provided hereunder or as set forth in Sections 2.4 and 10.1 hereof, on the Effective Date all the agreements and other documents evidencing the Claims or rights of any holder of a Claim against the Debtors, including all Indentures and Fiscal and Paying Agency Agreements (but not the Nova Scotia Fiscal and Paying Agency Agreement except with respect to any claims or rights against the Debtors or their successors) and bonds, debentures, and notes issued thereunder evidencing such Claims, all Note Claims, all Eurobond Claims, all Nova Scotia Guarantee Claims, and any options or warrants to purchase Equity Interests, or obligating the Debtors to issue, transfer, or sell Equity Interests or any other capital stock of the Debtors, shall be cancelled and discharged; *provided, however,* that the Indentures and Fiscal and Paying Agency Agreements shall continue in effect solely for the purposes of (i) allowing the Indenture Trustees and the Fiscal and Paying Agents to make any distributions on account of Allowed General Unsecured Claims in Class 3 pursuant to the Plan and perform such other necessary administrative functions with respect thereto, (ii) allowing the Indenture Trustees who are members of the Creditors'

Committee to continue their role as members of the Creditors' Committee, as contemplated by Section 12.1 hereof, (iii) permitting the Indenture Trustees and the Fiscal and Paying Agents to receive payment from the Indenture Trustee/Fiscal and Paying Agent Reserve Cash, and (iv) permitting the Indenture Trustees and the Fiscal and Paying Agents to maintain any rights or liens they may have for fees, costs, expenses, and indemnities under the Indentures and the Fiscal and Paying Agency Agreements, against or recoverable from distributions made under the Plan to the Registered Holders and/or beneficial owners of debt securities with respect to the Note Claims and the Eurobond Claims.  Notwithstanding the foregoing or Section 5.10 hereof, nothing contained herein shall affect any rights that a holder of a Note Claim or an Indenture Trustee may have against Delphi Corporation and/or any of its affiliates or successors with respect to that certain Assumption and Assignment Agreement – Industrial Revenue Bonds, dated as of January 1, 1999, between Delphi Automotive Systems LLC and General Motors Corporation and/or any related agreements or documents.  For the avoidance of doubt, nothing contained herein shall affect the rights of the holders of the Nova Scotia Guarantee Claims to assert direct claims, if any, against General Motors Nova Scotia Finance Company.

      **6.8**    **Equity Interests in MLC Subsidiaries Held by the Debtors.**  On the Effective Date, at the option of the Debtors, each respective Equity Interest in a direct or indirect subsidiary of MLC shall be unaffected by the Plan, in which case the Debtor holding such Equity Interests shall continue to hold such Equity Interests and shall cause any such subsidiaries to be dissolved prior to December 15, 2011.  An amount equal to any net proceeds realized from such dissolutions shall be distributed to the DIP Lenders on account of amounts outstanding.

      **6.9**    **Administration of Taxes.**  Subject to the MSPA and the GUC Trust Agreement, MLC shall be responsible for all tax matters of the Debtors until a certificate of cancellation or dissolution for MLC shall have been filed in accordance with Section 6.10 hereof.

      **6.10**    **Dissolution of the Debtors.**  Within thirty (30) days after its completion of the acts required by the Plan, or as soon thereafter as is practicable, but no later than December 15, 2011, each Debtor shall be deemed dissolved for all purposes without the necessity for any other or further actions to be taken by or on behalf of each Debtor; *provided, however,* that each Debtor shall file with the office of the Secretary of State or other appropriate office for the state of its organization a certificate of cancellation or dissolution; and *provided, further,* that upon the filing of such certificate of cancellation or dissolution, each such Debtor immediately shall cease to be, and not continue as, a body corporate for any purpose whatsoever.  Upon the dissolution of MLC (and therefore no later than December 15, 2011), (i) the Residual Wind-Down Assets shall be transferred to the GUC Trust, (ii) the Indenture Trustee/Fiscal and Paying Agent Reserve Cash shall be transferred to the GUC Trust, and (iii) all remaining assets of MLC shall be transferred to the Avoidance Action Trust at the sole discretion of the Avoidance Action Trust Administrator and shall constitute Avoidance Action Trust Assets, and any remaining assets not transferred to the Avoidance Action Trust shall be deemed

abandoned by the Debtors for all purposes without the necessity for any other or further actions to be taken by or on behalf of the Debtors.

### 6.11    Determination of Tax Filings and Taxes.

(a)    Following the filing of a certificate of cancellation or dissolution for MLC, subject to Section 6.16(a) of the MSPA and the GUC Trust Agreement, the GUC Trust Administrator shall prepare and file (or cause to be prepared and filed) on behalf of the Debtors, all tax returns, reports, certificates, forms, or similar statements or documents (collectively, "**Tax Returns**") required to be filed or that the GUC Trust Administrator otherwise deems appropriate, including the filing of amended Tax Returns or requests for refunds, for all taxable periods ending on, prior to, or after the Effective Date.

(b)    Each of the Debtors and the GUC Trust Administrator shall cooperate fully with each other regarding the implementation of this Section 6.11 (including the execution of appropriate powers of attorney) and shall make available to the other as reasonably requested all information, records, and documents relating to taxes governed by this Section 6.11 until the expiration of the applicable statute of limitations or extension thereof or at the conclusion of all audits, appeals, or litigation with respect to such taxes.  Without limiting the generality of the foregoing, the Debtors shall execute on or prior to the filing of a certificate of cancellation or dissolution for MLC a power of attorney authorizing the GUC Trust Administrator to correspond, sign, collect, negotiate, settle, and administer tax payments and Tax Returns for the taxable periods described in Section 6.11(a) hereof.

(c)    The Debtors and the GUC Trust Administrator shall have the right to request an expedited determination of the tax liability of the Debtors, if any, under section 505(b) of the Bankruptcy Code with respect to any tax returns filed, or to be filed, for any and all taxable periods ending after the Commencement Date through the filing of a certificate of cancellation or dissolution for MLC.

(d)    Following the filing of a certificate of cancellation or dissolution for MLC, subject to Section 6.16(a) and (d) of the MSPA, the GUC Trust Administrator shall have the sole right, at its expense, to control, conduct, compromise, and settle any tax contest, audit, or administrative or court proceeding relating to any liability for taxes of the Debtors and shall be authorized to respond to any tax inquiries relating to the Debtors (except with respect to any property and ad valorem taxes relating to the Environmental Response Trust Assets).

(e)    Following the filing of a certificate of cancellation or dissolution for MLC, subject to the MSPA, the GUC Trust Administrative Fund shall be entitled to the entire amount of any refunds and credits (including interest thereon) with respect to or otherwise relating to any taxes of any Debtors, including for any taxable period ending on, prior to, or after the Effective Date (except with respect to any property and ad valorem tax refunds and credits relating to the Environmental Response Trust Assets).

(f)      The Environmental Response Trust shall be responsible for the payment of any property and ad valorem taxes relating to the Environmental Response Trust Assets that become due after the Environmental Response Trust Transfer Date.

(g)      Following the Environmental Response Trust Transfer Date, subject to Section 6.16(a) and (d) of the MSPA, the Environmental Response Trust Administrative Trustee shall have the sole right, at its expense, to control, conduct, compromise, and settle any tax contest, audit, or administrative or court proceeding relating to any liability for property and ad valorem taxes attributable to the Environmental Response Trust Assets and shall be authorized to respond to any such tax inquiries relating to the Environmental Response Trust Assets.

(h)      Following the Environmental Response Trust Transfer Date, subject to the MSPA, the Environmental Response Trust Administrative Trustee shall be entitled to the entire amount of any refunds and credits (including interest thereon) with respect to or otherwise relating to any property and ad valorem taxes attributable to the Environmental Response Trust Assets, including for any taxable period ending on, prior to, or after the Effective Date.

(i)      Each of the Debtors and the Environmental Response Trust Administrative Trustee shall cooperate fully with each other regarding the implementation of this Section 6.11 (including the execution of appropriate powers of attorney) and shall make available to the other as reasonably requested all information, records, and documents relating to property and ad valorem taxes governed by this Section 6.11 until the expiration of the applicable statute of limitations or extension thereof or at the conclusion of all audits, appeals, or litigation with respect to such taxes. Without limiting the generality of the foregoing, the Debtors shall execute on or prior to the Environmental Response Trust Transfer Date a power of attorney authorizing the Environmental Response Trust Administrative Trustee to correspond, sign, collect, negotiate, settle, and administer tax payments and Tax Returns for the taxes described in Section 6.11(f) hereof.

6.12    **Books and Records.**  MLC shall comply with its obligations under the Environmental Response Trust Consent Decree and Settlement Agreement to provide documents, other records, and/or information to the Environmental Response Trust Administrative Trustee.  Upon the Effective Date, MLC shall transfer and assign to the GUC Trust full title to, and the GUC Trust shall be authorized to take possession of, all of the books and records of the Debtors, with the exception of those books and records that are necessary for the implementation of the Asbestos Trust, the Environmental Response Trust, or the Avoidance Action Trust, as applicable, which books and records MLC shall transfer and assign to the Asbestos Trust, the Environmental Response Trust, or the Avoidance Action Trust, respectively.  Upon the Effective Date, the Creditors' Committee shall transfer and assign to the GUC Trust Monitor the books and records related to the administration of the GUC Trust and any relevant information prepared by the Creditors' Committee during the Chapter 11 Cases.  Upon the Avoidance Action Trust Transfer Date, (i) MLC shall transfer and assign to the Avoidance Action Trust full

63

title to, and the Avoidance Action Trust shall be authorized to take possession of, all of the books and records of the Debtors relating to the Avoidance Action Trust Assets and (ii) the Creditors' Committee shall transfer and assign to the Avoidance Action Trust Monitor the books and records related to the administration of the Avoidance Action Trust and any relevant information prepared by the Creditors' Committee during the Chapter 11 Cases.  Any such books and records transferred by either the Debtors or the Creditors' Committee shall be protected by the attorney-client privilege.  The GUC Trust, the Asbestos Trust, the Environmental Response Trust, or the Avoidance Action Trust, as applicable, shall have the responsibility of storing and maintaining the books and records transferred hereunder until one year after the date MLC is dissolved in accordance with Section 6.10 hereof, after which time such books and records may be abandoned or destroyed without further Bankruptcy Court order; *provided, however*, that any tax-related books and records transferred hereunder shall be stored and maintained until the expiration of the applicable statute of limitations.  The Debtors shall cooperate with the GUC Trust Administrator, the Asbestos Trust Administrator, the Environmental Response Trust Administrative Trustee, or the Avoidance Action Trust Administrator, as applicable, to facilitate the delivery and storage of their books and records in accordance herewith.  The Debtors (as well as their current and former officers and directors) shall be entitled to reasonable access to any books and records transferred in accordance with this Section 6.12 for all necessary corporate purposes, including, without limitation, defending or prosecuting litigation, determining insurance coverage, filing tax returns, and addressing personnel matters.  For purposes of this Section, books and records include computer-generated or computer-maintained books and records and computer data, as well as electronically-generated or maintained books and records or data, along with books and records of the Debtors maintained by or in possession of third parties and all the claims and rights of the Debtors in and to their books and records, wherever located.

**6.13    Corporate Action.**  Upon the Effective Date, the Debtors shall perform each of the actions and effect each of the transfers required by the terms of the Plan, in the time period allocated therefor, and all matters provided for under the Plan that would otherwise require approval of the stockholders, partners, members, directors, or comparable governing bodies of the Debtors shall be deemed to have occurred and shall be in effect from and after the Effective Date pursuant to the applicable general corporation law (or other applicable governing law) of the states in which the Debtors are incorporated or organized, without any requirement of further action by the stockholders, partners, members, directors, or comparable governing bodies of the Debtors.  Each of the Debtors shall be authorized and directed, following the completion of all disbursements, other transfers, and other actions required of the Debtors by the Plan, to file its certificate of cancellation or dissolution as contemplated by Section 6.10 hereof. The filing of such certificates of cancellation or dissolution shall be authorized and approved in all respects without further action under applicable law, regulation, order, or rule, including, without express or implied limitation, any action by the stockholders, partners, members, directors, or comparable governing bodies of the Debtors.

**6.14    Effectuating Documents and Further Transactions.**  Each of the officers of each of the Debtors is authorized and directed to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

**6.15    Continued Applicability of Final Order Approving DIP Credit Agreement.**  The restrictions set forth in paragraph 20 of the Final Order approving the DIP Credit Agreement (ECF No. 2529) shall continue to apply to the DIP Lenders' Collateral however treated under the Plan.

**ARTICLE VII.**

**PROCEDURES FOR DISPUTED CLAIMS**

**7.1    Objections to Claims and Resolution of Disputed Claims.**

(a)    Unless otherwise ordered by the Bankruptcy Court after notice and a hearing, on and after the Effective Date and through the dissolution of MLC, the Debtors shall have the right to the exclusion of all others (except as to applications for allowances of compensation and reimbursement of expenses under sections 330 and 503 of the Bankruptcy Code) to object to Administrative Expenses, Priority Tax Claims, DIP Credit Agreement Claims, Priority Non-Tax Claims, and Secured Claims.

(b)    On and after the Effective Date, the GUC Trust Administrator shall have the exclusive right to object, and/or continue prosecution of objections, to General Unsecured Claims (other than the Asbestos Trust Claim).  If the Residual Wind-Down Assets are transferred to the GUC Trust upon the dissolution of MLC, after such transfer, the GUC Trust Administrator shall have the exclusive right to object to any remaining Administrative Expenses, Priority Tax Claims, DIP Credit Agreement Claims, Priority Non-Tax Claims, and Secured Claims.

(c)    The Debtors or the GUC Trust Administrator, as applicable, shall serve a copy of each objection upon the holder of the Claim to which the objection is made as soon as practicable, but in no event later than one hundred eighty (180) days after (i) the Effective Date for all Claims (with the exception of Unliquidated Litigation Claims as set forth in this Section 7.1), and (ii) such date as may be fixed by the Bankruptcy Court, whether fixed before or after the dates specified in clause (i) above. The Bankruptcy Court shall have the authority on request of the Debtors or the GUC Trust Administrator, as applicable, to extend the foregoing dates ex parte.  On and after the Effective Date, the Debtors shall continue to have the power and authority to prosecute and resolve objections to Disputed Administrative Expenses, Disputed Priority Tax Claims, Disputed DIP Credit Agreement Claims, Disputed Priority Non-Tax Claims, and Disputed Secured Claims.  All objections shall be litigated to a Final Order except to the extent the Debtors or the GUC Trust Administrator, as applicable, elects to withdraw any such objection or the Debtors or the GUC Trust Administrator, as applicable, and the

holder of a Claim elect to compromise, settle, or otherwise resolve any such objection, in which event they may compromise, settle, or otherwise resolve any Disputed Claim without approval of the Bankruptcy Court.

(d)     Notwithstanding the foregoing, holders of Unliquidated Litigation Claims (other than (i) the United States, including its agencies and instrumentalities, and (ii) state, local, and tribal governments with respect to any Claims concerning alleged environmental liabilities) shall be subject to the ADR Procedures and Unliquidated Litigation Claims shall be channeled to the GUC Trust and resolved in accordance with the ADR Procedures. If the Debtors or the GUC Trust Administrator, as applicable, terminate the ADR Procedures with respect to an Unliquidated Litigation Claim, the Debtors or the GUC Trust Administrator, as applicable, shall have one hundred eighty (180) days from the date of termination of the ADR Procedures to file and serve an objection to such Unliquidated Litigation Claim. If the Debtors or the GUC Trust Administrator terminate the ADR Procedures with respect to an Unliquidated Litigation Claim and such Unliquidated Litigation Claim is litigated in a court other than the Bankruptcy Court, the Debtors or the GUC Trust Administrator, as applicable, shall have ninety (90) days from the date of entry of a Final Order adjudicating such Claim to file and serve an objection to such Claim for purposes of determining the treatment of such Claim under the Plan unless such time is extended by order of the Bankruptcy Court for cause.

(e)     The resolution of Asbestos Personal Injury Claims shall be dealt with by the Asbestos Trust in accordance with the Asbestos Trust Distribution Procedures.

7.2     **No Distribution Pending Allowance.**  Notwithstanding any other provision hereof, if any portion of a Claim is a Disputed Claim, no payment or distribution provided hereunder to the holder thereof shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim. Until such time, with respect to General Unsecured Claims, the GUC Trust Administrator or the Avoidance Action Trust Administrator, as applicable, shall withhold from the property to be distributed to holders of beneficial interests in the GUC Trust or the Avoidance Action Trust, as applicable, the portion of such property allocable to Disputed General Unsecured Claims, the Asbestos Trust Claim based on the amount set forth in the Confirmation Order until such time as the amount of the Asbestos Trust Claim is finally determined as set forth in Section 1.15 hereof, and the "Maximum Amount" (as defined in the GUC Trust Agreement) of the potential General Unsecured Claims arising from any successful recovery of proceeds from the Term Loan Avoidance Action or other Avoidance Actions, and shall hold such property in the GUC Trust or the Avoidance Action Trust Claims Reserve, as applicable. All Unliquidated Litigation Claims shall be deemed Disputed Claims unless and until they are Allowed after resolution by settlement or Final Order. This Section 7.2 shall not apply to Property Environmental Claims.

7.3     **Estimation.**  The Debtors or the GUC Trust Administrator, as applicable, may at any time request that the Bankruptcy Court estimate any contingent, unliquidated,

or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtors or the GUC Trust Administrator previously objected to such Claim, and the Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection.  In the event that the Bankruptcy Court estimates any contingent, unliquidated, or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Debtors or the GUC Trust Administrator, as applicable, may pursue supplementary proceedings to object to the allowance of such Claim.  All the aforementioned objection, estimation, and resolution procedures are intended to be cumulative and not exclusive of one another.  On and after the Confirmation Date, Claims that have been estimated may be compromised, settled, withdrawn, or otherwise resolved subsequently, without further order of the Bankruptcy Court.  This Section 7.3 shall not apply to Property Environmental Claims, the Nova Scotia Guarantee Claims, or the Nova Scotia Wind-Up Claim.

**7.4**    **Allowance of Disputed Claims.**  If, on or after the Effective Date, any Disputed Claim becomes, in whole or in part, an Allowed Claim, the Debtors, the GUC Trust Administrator, or the Avoidance Action Trust Administrator, as applicable, shall, on the next applicable distribution date following when the Disputed Claim becomes an Allowed Claim, if all other conditions to such distribution have been satisfied, distribute to the holder thereof the distributions, if any, that such holder would have received had its Claim been Allowed on the Effective Date, except as otherwise provided herein.

**7.5**    **Dividends.**  In the event that dividend distributions have been made with respect to the New GM Securities that are in the GUC Trust, such dividends shall be distributed to holders of Allowed Claims in the same manner and at the same time as the New GM Securities to which such dividends relate are distributed.

**ARTICLE VIII.**

**EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

**8.1**    **Executory Contracts and Unexpired Leases.**  All executory contracts and unexpired leases to which any of the Debtors are parties shall be deemed rejected as of the Effective Date, except for an executory contract or unexpired lease that (i) has been assumed or rejected pursuant to the order of the Bankruptcy Court approving the 363 Transaction, (ii) has been assumed or rejected pursuant to Final Order of the Bankruptcy Court entered prior to the Effective Date, (iii) is the subject of a separate motion to assume or reject filed under section 365 of the Bankruptcy Code by the Debtors no later than thirty (30) days after the Effective Date, or (iv) constitutes an Environmental Trust Asset.

**8.2**    **Approval of Rejection of Executory Contracts and Unexpired Leases.**  Entry of the Confirmation Order shall constitute the approval, pursuant to section 365(a)

of the Bankruptcy Code, of the rejection of the executory contracts and unexpired leases rejected as of the Effective Date pursuant to the Plan.

**8.3** **Rejection Claims.** In the event that the rejection of an executory contract or unexpired lease by any of the Debtors pursuant to the Plan results in damages to the other party or parties to such contract or lease, a Claim for such damages, if not heretofore evidenced by a filed proof of Claim, shall be forever barred and shall not be enforceable against the Debtors, the GUC Trust Administrator, the Asbestos Trust Administrator, the Environmental Response Trust Administrative Trustee, and the Avoidance Action Trust Administrator, or any property to be distributed under the Plan, the GUC Trust, the Asbestos Trust, the Environmental Response Trust, and the Avoidance Action Trust unless a proof of Claim is filed with the Bankruptcy Court and served upon the Debtors, the GUC Trust Administrator, the Asbestos Trust Administrator, the Environmental Response Trust Administrative Trustee, and the Avoidance Action Trust Administrator on or before the date that is sixty (60) days after the Effective Date.

**ARTICLE IX.**

**EFFECTIVENESS OF THE PLAN**

**9.1** **Condition Precedent to Confirmation of Plan.** The following is a condition precedent to the confirmation of the Plan:

    **(a)** The Bankruptcy Court shall have entered the Confirmation Order in form and substance satisfactory to the Debtors.

**9.2** **Conditions Precedent to Effective Date.** The following are conditions precedent to the Effective Date of the Plan:

    **(a)** The Confirmation Order shall be in full force and effect, and no stay thereof shall be in effect;

    **(b)** The GUC Trust Agreement, the Asbestos Trust Agreement, the Environmental Response Trust Agreement, and the Avoidance Action Trust Agreement shall have been executed;

    **(c)** The applicable GUC Trust Assets shall have been transferred to the GUC Trust;

    **(d)** The Asbestos Trust Assets shall have been transferred to the Asbestos Trust;

    **(e)** The Environmental Response Trust Consent Decree and Settlement Agreement shall have been approved by order of the Bankruptcy Court, such order shall be in full force and effect, and no stay thereof shall be in effect, and the

Environmental Response Trust Assets shall have been transferred to the Environmental Response Trust; and

**(f)** The Debtors shall have sufficient Cash to pay the sum of (i) Allowed Administrative Expenses, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, and, if applicable, Allowed Secured Claims, and the professional fees of the Debtors, the Creditors' Committee, the Asbestos Claimants' Committee, the Future Claimants' Representative, and the fee examiner appointed in these Chapter 11 Cases that have not been paid, (ii) an amount that would be required to distribute to the holders of Disputed Administrative Expenses, Disputed Priority Tax Claims, Disputed Priority Non-Tax Claims, and, if applicable, Disputed Secured Claims if all such Claims are subsequently Allowed, as set forth more fully in Article VII hereof, and (iii) the amounts required to fund the GUC Trust Administrative Fund, the Asbestos Trust, the Environmental Response Trust Administrative Funding Account, the Avoidance Action Trust, and the Indenture Trustee/Fiscal and Paying Agent Reserve Cash.

**9.3** **Satisfaction and Waiver of Conditions.** Any actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action. If the Debtors decide that any of the conditions precedent set forth in Section 9.2 hereof cannot be satisfied and the occurrence of such conditions is not waived or cannot be waived, then the Debtors shall file a notice of the failure of the Effective Date with the Bankruptcy Court. Notwithstanding the foregoing, the Debtors reserve, in their sole discretion, the right, with the written consent of the Creditors' Committee, the Asbestos Claimants' Committee, and the Future Claimants' Representative, to waive the occurrence of any of the conditions precedent set forth in Section 9.2(b) or (c) hereof or to modify any of such conditions precedent. Any such written waiver of such condition precedents may be effected at any time, without notice or leave or order of the Bankruptcy Court, and without any formal action other than proceeding to consummate the Plan.

**9.4** **Effect of Nonoccurrence of Conditions to Consummation.** If each of the conditions to the occurrence of the Effective Date has not been satisfied or duly waived on or before the first Business Day that is one hundred eighty (180) days after the Confirmation Date, or such later date as shall be agreed by the Debtors and the Creditors' Committee, the Asbestos Claimants' Committee, the Future Claimants' Representative, and the U.S. Treasury, the Confirmation Order may be vacated by the Bankruptcy Court. If the Confirmation Order is vacated pursuant to this Section, the Plan shall be null and void in all respects, and nothing contained in the Plan shall constitute a waiver or release of any Claims against any of the Debtors.

## ARTICLE X.

### EFFECT OF CONFIRMATION

**10.1    Vesting of Assets.**  As of the Effective Date, the property of the Debtors' estates shall vest in the Debtors and, in accordance with Article VI hereof and subject to the exceptions contained therein, (i) the GUC Trust Assets shall be transferred to the GUC Trust (except with respect to (x) the New GM Securities, which shall be transferred to the GUC Trust in accordance with Section 5.2(a) hereof, and (y) the Residual Wind-Down Assets, which shall be transferred to the GUC Trust in accordance with Section 6.10 hereof), (ii) the Asbestos Trust Assets shall be transferred to the Asbestos Trust, (iii) the Environmental Response Trust Assets shall be transferred to the Environmental Response Trust, and (iv) on the Avoidance Action Trust Transfer Date, the Avoidance Action Trust Assets shall be transferred to the Avoidance Action Trust (except with respect to any remaining assets of MLC upon its dissolution, which shall be transferred to the Avoidance Action Trust, if accepted by the Avoidance Action Trust in the sole discretion of the Avoidance Action Trust Administrator as set forth in, and in accordance with, Section 6.10 hereof).  From and after the Effective Date, (i) the GUC Trust Administrator may dispose of the GUC Trust Assts free of any restrictions of the Bankruptcy Code, but in accordance with the provisions of the Plan and the GUC Trust Agreement, (ii) the Asbestos Trust Administrator may dispose of the Asbestos Trust Assets free of any restrictions of the Bankruptcy Code, but in accordance with the provisions of the Plan and the Asbestos Trust Agreement, (iii) the Environmental Response Trust Administrative Trustee may dispose of the Environmental Response Trust Assets free of any restrictions of the Bankruptcy Code, but in accordance with the provisions of the Plan, the Environmental Response Trust Agreement, and the Environmental Response Trust Consent Decree and Settlement Agreement, and (iv) the Avoidance Action Trust Administrator may dispose of the Avoidance Action Trust Assets free of any restrictions of the Bankruptcy Code, but in accordance with the provisions of the Plan and the Avoidance Action Trust Agreement; *provided, however*, that the DIP Lenders' liens on the DIP Lenders' Collateral remain fully perfected, nonavoidable, and enforceable with respect to the Cash the DIP Lenders fund into the Trusts as of and following the Effective Date.  As of the Effective Date, all assets of the Debtors, the GUC Trust, the Asbestos Trust, the Environmental Response Trust, and the Avoidance Action Trust shall be free and clear of all Claims and Encumbrances, except as provided in the Plan or the Confirmation Order.

**10.2    Release of Assets.**  Until the Effective Date, the Bankruptcy Court shall retain jurisdiction of the Debtors and their assets and properties.  Thereafter, jurisdiction of the Bankruptcy Court shall be limited to the subject matters set forth in Article XI hereof.

**10.3    Binding Effect.**  Because the Plan is a liquidating chapter 11 plan, confirmation of the Plan does not provide the Debtors with a discharge under section 1141 of the Bankruptcy Code.  Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code, on and after the Confirmation Date, the provisions of the Plan shall

bind any holder of a Claim against, or Equity Interest in, the Debtors and their respective successors and assigns, whether or not the Claim or Equity Interest of such holder is impaired under the Plan and whether or not such holder has accepted the Plan.

**10.4    Term of Injunctions or Stays.**  Unless otherwise expressly provided herein or in a Final Order, all injunctions or stays arising under or entered during the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the closing of the Chapter 11 Cases.

**10.5    Term Loan Avoidance Action; Setoffs.**  If the Term Loan Avoidance Action is still pending on the Avoidance Action Trust Transfer Date, the Avoidance Action Trust Administrator may pursue, abandon, settle, or release the Term Loan Avoidance Action transferred to the Avoidance Action Trust as it deems appropriate, without the need to obtain approval or any other or further relief from the Bankruptcy Court.  The Debtors, the GUC Trust Administrator, or the Avoidance Action Trust Administrator, as applicable, may, in their sole discretion, set off any claim held against a person against any payment due such person under the Plan; *provided, however*, that any claims of the Debtors arising before the Commencement Date shall first be set off against Claims against the Debtors arising before the Commencement Date; and *further provided* that before any setoff is exercised with respect to any payment due on account of the Nova Scotia Wind-Up Claim and/or the Nova Scotia Guarantee Claims, at least ten (10) days prior notice thereof shall be given to the attorneys for the Nova Scotia Trustee and/or the attorneys for the holders of the Nova Scotia Guarantee Claims, as the case may be.

**10.6    Injunction.**  On and after the Confirmation Date, all persons are permanently enjoined from commencing or continuing in any manner any action or proceeding (whether directly, indirectly, derivatively, or otherwise) on account of or respecting any claim, debt, right, or cause of action of the Debtors for which the Debtors, the GUC Trust Administrator, or the Avoidance Action Trust Administrator retains sole and exclusive authority to pursue in accordance with the Plan.

**10.7    Injunction Against Interference with Plan.**  Upon the entry of the Confirmation Order, all holders of Claims and Equity Interests and other parties in interest, along with their respective present or former employees, agents, officers, directors, or principals, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan.

**10.8    Special Provisions for Governmental Units.**  Except as provided in the Environmental Response Trust Consent Decree and Settlement Agreement and the Priority Order Sites Consent Decrees and Settlement Agreements, as to "governmental units" (as defined in the Bankruptcy Code), nothing in the Plan, including Sections 12.5 and 12.6 hereof, shall discharge, release, enjoin, or otherwise bar (i) any liability of the Debtors, their Estates, any successors thereto, the GUC Trust, the Asbestos Trust, the Environmental Response Trust, or the Avoidance Action Trust, arising on or after the

Confirmation Date, (ii) any liability that is not a "claim" within the meaning of section 101(5) of the Bankruptcy Code, (iii) any valid right of setoff or recoupment, (iv) any police or regulatory action, (v) any environmental liability that the Debtors, their Estates, any successors thereto, the GUC Trust, the Asbestos Trust, the Environmental Response Trust, the Avoidance Action Trust, or any other Person or Entity may have as an owner or operator of real property after the Effective Date, and (vi) any liability to a "governmental unit" (as defined in the Bankruptcy Code), on the part of any Persons or Entities other than the Debtors, their Estates, the GUC Trust, the Asbestos Trust, the Environmental Response Trust, the Avoidance Action Trust, the GUC Trust Administrator, the Asbestos Trust Administrator, the Environmental Response Trust Administrative Trustee, or the Avoidance Action Trust Administrator, except with respect to the parties as specifically provided for in Sections 12.5 and 12.6 hereof.

**ARTICLE XI.**

**RETENTION OF JURISDICTION**

**11.1    Jurisdiction of Bankruptcy Court.**  The Bankruptcy Court shall retain exclusive jurisdiction of all matters arising under, arising out of, or related to the Chapter 11 Cases and the Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code and for, among other things, the following purposes:

(a)  To hear and determine motions for the assumption, assumption and assignment, or rejection of executory contracts or unexpired leases and the allowance of Claims resulting therefrom;

(b)  To determine any motion, adversary proceeding, application, contested matter, and other litigated matter pending on or commenced before or after the Confirmation Date, including, without limitation, any proceeding with respect to a Cause of Action or Avoidance Action (including the Term Loan Avoidance Action);

(c)  To ensure that distributions to holders of Allowed Claims are accomplished as provided herein;

(d)  To consider Claims or the allowance, classification, priority, compromise, estimation, or payment of any Claim;

(e)  To enter, implement, or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

(f)  To issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any person with the consummation, implementation, or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(g) To hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in the Plan, the Disclosure Statement, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(h) To hear and determine all applications under sections 330, 331, and 503(b) of the Bankruptcy Code for awards of compensation for services rendered and reimbursement of expenses incurred prior to the Confirmation Date;

(i) To hear and determine disputes arising in connection with or related to the interpretation, implementation, or enforcement of the Plan, the Confirmation Order, the GUC Trust, the Asbestos Trust, the Environmental Response Trust, the Avoidance Action Trust, the GUC Trust Agreement, the Asbestos Trust Agreement, the Environmental Response Trust Agreement, the Environmental Response Trust Consent Decree and Settlement Agreement, and the Avoidance Action Trust Agreement, any transactions or payments contemplated hereby, or any agreement, instrument, or other document governing or relating to any of the foregoing, including to formulate and enforce alternative dispute resolution procedures with respect to the Environmental Response Trust Agreement or the Environmental Response Trust Consent Decree and Settlement Agreement; *provided, however*, that the Bankruptcy Court's jurisdiction with respect to the Environmental Response Trust Agreement and the Environmental Response Trust Consent Decree and Settlement Agreement shall be concurrent with the jurisdiction of other courts of competent jurisdiction over such matters to the extent such agreements provide for concurrent jurisdiction;

(j) To take any action and issue such orders as may be necessary to construe, enforce, implement, execute, and consummate the Plan or to maintain the integrity of the Plan following consummation;

(k) To recover all assets of the Debtors, property of the Debtors' estates, the GUC Trust Assets, the Asbestos Trust Assets, and the Avoidance Action Trust Assets, wherever located;

(l) To hear and determine all objections to the termination of the Asbestos Trust;

(m) To determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(n) To hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including, without limitation, matters with respect to any taxes payable by a trust or reserve established in furtherance of the Plan);

(o) To resolve all matters related to the 363 Transaction;

(p) To enforce all orders previously entered by the Bankruptcy Court;

(q) To hear and determine any other matters related hereto and not inconsistent with the Bankruptcy Code and title 28 of the United States Code; and

(r) To enter a final decree closing the Chapter 11 Cases.

To the extent that the Bankruptcy Court is not permitted under applicable law to preside over any of the forgoing matters, the reference to the "Bankruptcy Court" in this Article XI shall be deemed to be replaced by the "District Court." Notwithstanding anything in this Article XI to the contrary, (i) the resolution of Asbestos Personal Injury Claims and the forum in which such resolution will be determined shall be governed by and in accordance with the Asbestos Trust Distribution Procedures and the Asbestos Trust Agreement and (ii) the Bankruptcy Court and/or the District Court shall have concurrent, rather than exclusive, jurisdiction with respect to disputes relating to (a) rights under insurance policies issued to the Debtors that are included in the Asbestos Insurance Assets, and (b) the Debtors' rights to insurance with respect to workers' compensation claims. Nothing contained in this Section 11.1 shall expand the exclusive jurisdiction of the Bankruptcy Court beyond that provided by applicable law.

## ARTICLE XII.

## MISCELLANEOUS PROVISIONS

**12.1    Dissolution of Committees.** On the Effective Date, the Creditors' Committee shall dissolve; *provided, however*, that, following the Effective Date, the Creditors' Committee shall continue to have standing and a right to be heard with respect to (i) Claims and/or applications for compensation by professionals and requests for allowance of Administrative Expenses for substantial contribution pursuant to section 503(b)(3)(D) of the Bankruptcy Code, (ii) any appeals of the Confirmation Order that remain pending as of the Effective Date to which the Creditors' Committee is a party, (iii) responding to creditor inquiries for one hundred twenty (120) days following the Effective Date, (iv) the settlement or determination by Final Order of the Asbestos Trust Claim (including through any appeals), and (v) its role as plaintiff in the Term Loan Avoidance Action, and the settlement or determination by Final Order of the proper Term Loan Avoidance Action Beneficiaries (including through any appeals). On the Effective Date, the Asbestos Claimants' Committee shall dissolve. Upon the dissolution of the Creditors' Committee and the Asbestos Claimants' Committee, the current and former members of the Creditors' Committee, the members of the Asbestos Claimants' Committee, and the Future Claimants' Representative, and their respective officers, employees, counsel, advisors, and agents, shall be released and discharged of and from all further authority, duties, responsibilities, and obligations related to and arising from and in connection with the Chapter 11 Cases, and the retention or employment of the Creditors' Committee's, the Asbestos Claimants' Committee's, and the Future

74

Claimant's Representative's respective attorneys, accountants, and other agents shall terminate, except that the Creditors' Committee, the Asbestos Claimants' Committee, the Future Claimants' Representative, and their respective professionals shall have the right to pursue, review, and object to any applications for compensation and reimbursement of expenses filed in accordance with Section 2.2 hereof.  The Creditors' Committee shall continue to serve through the Avoidance Action Trust Transfer Date to prosecute the Term Loan Avoidance Action.  The Future Claimants' Representative shall continue to serve through the termination of the Asbestos Trust in order to perform the functions required under the Asbestos Trust Agreement.  The fees and expenses of the Future Claimants' Representative from and after the Effective Date relating to the role of the Future Claimants' Representative in the Asbestos Trust, pursuant to the Asbestos Trust Agreement and the Asbestos Trust Distribution Procedures (including, without limitation, the fees and expenses of any professionals retained by the Future Claimants' Representative), shall be the sole responsibility of the Asbestos Trust.  Likewise, the Asbestos Claimants' Committee and the Future Claimants' Representative shall each continue to have standing and a right to be heard with respect to any appeal to which it is a party, and which remains pending as of the Effective Date, with respect to the Confirmation Order and with respect to any order issued in connection with the determination of the Asbestos Trust Claim.  In addition, the Creditors' Committee shall be authorized to request, on behalf of the holders of General Unsecured Claims, a private letter ruling from the Internal Revenue Service regarding the tax treatment of the GUC Trust and the holders of General Unsecured Claims of the distribution of New GM Securities by the GUC Trust (and the GUC Trust Administrator shall be authorized to participate in such ruling request) and), notwithstanding anything to the contrary in the Plan, the Creditors' Committee shall not be dissolved before the private letter ruling has been issued, or the request therefore has been withdrawn.

**12.2    Substantial Consummation.**  On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

**12.3    Effectuating Documents and Further Transactions.**  An officer of each of the Debtors is authorized and directed to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents and take such actions as may be reasonably necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan and any securities issued pursuant to the Plan.

**12.4    Exemption from Transfer Taxes.**  Pursuant to section 1146(a) of the Bankruptcy Code, the assignment or surrender of any lease or sublease, or the delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, including any deeds, bills of sale, or assignments executed in connection with any disposition of assets contemplated by the Plan (including transfers of assets to and by the GUC Trust, the Asbestos Trust, the Environmental Response Trust, and the Avoidance Action Trust) shall not be subject to any stamp, real estate transfer, mortgage recording, sales, use, or other similar tax.

**12.5**    **Release.**  As of the Effective Date, the Debtors release (i) all present and former directors and officers of the Debtors who were directors and/or officers, respectively, on or after the Commencement Date, and any other Persons who serve or served as members of management of the Debtors on or after the Commencement Date, (ii) all post-Commencement Date advisors, consultants, agents, counsel, or other professionals of or to the Debtors, the DIP Lenders, the Creditors' Committee, the Asbestos Claimants' Committee, the Future Claimants' Representative, the Indenture Trustees, and the Fiscal and Paying Agents, and (iii) all members (current and former) of the Creditors' Committee and of the Asbestos Claimants' Committee, in their capacity as members of such Committees, the Future Claimants' Representative, and the Indenture Trustees and the Fiscal and Paying Agents and their respective officers, directors, and employees from any and all Causes of Action held by, assertable on behalf of, or derivative from the Debtors, in any way relating to the Debtors, the Chapter 11 Cases, the Plan, negotiations regarding or concerning the Plan, and the ownership, management, and operation of the Debtors, except for actions found by Final Order to be willful misconduct (including, but not limited to, conduct that results in a personal profit at the expense of the Debtors' estates), gross negligence, fraud, malpractice, criminal conduct, unauthorized use of confidential information that causes damages, breach of fiduciary duty (to the extent applicable), and *ultra vires* acts; *provided, however,* that the foregoing (a) shall not operate as a waiver of or release from any Causes of Action arising out of any express contractual obligation owing by any former director, officer, or employee of the Debtors or any reimbursement obligation of any former director, officer, or employee with respect to a loan or advance made by the Debtors to such former director, officer, or employee, and (b) shall not limit the liability of any counsel to their respective clients contrary to Rule 1.8(h)(1) of the New York Rules of Professional Conduct.

**12.6**    **Exculpation.**  To the maximum extent permitted by applicable law, neither the Debtors, the GUC Trust Administrator, the GUC Trust Monitor, the Asbestos Trust Administrator, the Environmental Response Trust Administrative Trustee, the Avoidance Action Trust Administrator, the Avoidance Action Trust Monitor, the DIP Lenders, the Creditors' Committee, the Asbestos Claimants' Committee, the Future Claimants' Representative, the Indenture Trustees, and the Fiscal and Paying Agents, nor any of their respective members (current and former), officers, directors, employees, counsel, advisors, professionals, or agents, shall have or incur any liability to any holder of a Claim or Equity Interest for any act or omission in connection with, related to, or arising out of the Chapter 11 Cases; negotiations regarding or concerning the Plan, the GUC Trust Agreement, the Environmental Response Trust Agreement, the Asbestos Trust Agreement, the Avoidance Action Trust Agreement, the Environmental Response Trust Consent Decree and Settlement Agreement, and the Priority Order Sites Consent Decrees and Settlement Agreements; the pursuit of confirmation of the Plan; the consummation of the Plan; or the administration of the Plan or the property to be distributed under the Plan, except for actions found by Final Order to be willful misconduct, gross negligence, fraud, malpractice, criminal conduct, unauthorized use of confidential information that causes damages, breach of fiduciary duty (to the extent applicable), and *ultra vires* acts, and, in all respects, the Debtors, the GUC Trust

Administrator, the GUC Trust Monitor, the Asbestos Trust Administrator, the Environmental Response Trust Administrative Trustee, the Avoidance Action Trust Administrator, the Avoidance Action Trust Monitor, the Creditors' Committee, the Asbestos Claimants' Committee, the Future Claimants' Representative, the Indenture Trustees, the Fiscal and Paying Agents, and each of their respective members (current or former), officers, directors, employees, counsel, advisors, professionals, and agents shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan; *provided, however*, that the foregoing shall not limit the liability of any counsel to their respective clients contrary to Rule 1.8(h)(1) of the New York Rules of Professional Conduct. In the event a holder of a Claim fails to satisfy a Medical Lien, the holder of such Medical Lien shall be barred and prohibited from seeking recourse directly against the Debtors, the GUC Trust, the Avoidance Action Trust, and any of their respective officers, directors, representatives, employees, counsel, and advisors. Following entry of the Confirmation Order, the Bankruptcy Court shall retain exclusive jurisdiction to consider any and all claims against the Debtors, the GUC Trust Administrator, the GUC Trust Monitor, the Asbestos Trust Administrator, the Environmental Response Trust Administrative Trustee, the Avoidance Action Trust Administrator, the Avoidance Action Trust Monitor, the DIP Lenders, the Creditors' Committee, the Asbestos Claimants' Committee, the Future Claimants' Representative, the Indenture Trustees, and the Fiscal and Paying Agents, and any of their respective members (current and former), officers, directors, employees, counsel, advisors, professionals, or agents, involving or relating to the administration of the Chapter 11 Cases, any rulings, orders, or decisions in the Chapter 11 Cases or any aspects of the Debtors' Chapter 11 Cases, including the decision to commence the Chapter 11 Cases, the development and implementation of the Plan, the decisions and actions taken during the Chapter 11 Cases and any asserted claims based upon or related to prepetition obligations administered in the Chapter 11 Cases for the purpose of determining whether such claims belong to the Debtors' estates or third parties. In the event it is determined that any such claims belong to third parties, then, subject to any applicable subject matter jurisdiction limitations, the Bankruptcy Court shall have exclusive jurisdiction with respect to any such litigation, subject to any determination by the Bankruptcy Court to abstain and consider whether such litigation should more appropriately proceed in another forum.

### 12.7    **Post-Confirmation Date Fees and Expenses.**

(a)    **Fees and Expenses of Professionals.**  The Debtors shall, in the ordinary course of business and without the necessity for any approval by the Bankruptcy Court (but subject to the review by and approval of the DIP Lenders), pay the reasonable fees and expenses, incurred after the Confirmation Date, of the professional persons employed by the Debtors, the Creditors' Committee, the Asbestos Claimants' Committee, and the Future Claimants' Representative in connection with the implementation and consummation of the Plan, the claims reconciliation process, and any other matters as to which such professionals may be engaged.

**(b)    Fees and Expenses of GUC Trust Administrator, Asbestos Trust Administrator, Environmental Response Trust Administrative Trustee, and Avoidance Action Trust Administrator.**  The fees and expenses of the GUC Trust Administrator, the Asbestos Trust Administrator, the Environmental Response Trust Administrative Trustee, and the Avoidance Action Trust Administrator shall be paid in accordance with the terms of the GUC Trust Agreement, the Asbestos Trust Agreement, the Environmental Response Trust Agreement, and the Avoidance Action Trust Agreement, respectively, and shall be subject to the provisions of the Budget.

**12.8    Payment of Statutory Fees.**  On the Effective Date, and thereafter as may be required, each of the Debtors, and after the Effective Date, the GUC Trust Administrator, the Asbestos Trust Administrator, the Environmental Response Trust Administrative Trustee, and the Avoidance Action Trust Administrator, shall each (i) pay all the respective fees payable pursuant to section 1930 of chapter 123 of title 28 of the United States Code and (ii) be responsible for the filing of consolidated postconfirmation quarterly status reports with the Bankruptcy Court in accordance with Rule 3021-1 of the Southern District of New York Local Bankruptcy Rules, which status reports shall include reports on the disbursements made (i) on the Effective Date by each of the Debtors and (ii) after the Effective Date by the GUC Trust, the Asbestos Trust, the Environmental Response Trust, and the Avoidance Action Trust.

**12.9    Modification of Plan.**  Upon reasonable notice to the Creditors' Committee, the Asbestos Claimants' Committee, and the Future Claimants' Representative, the Plan may be amended, modified, or supplemented by the Debtors in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law without additional disclosure pursuant to section 1125 of the Bankruptcy Code, except as the Bankruptcy Court may otherwise direct.  In addition, after the Confirmation Date, so long as such action does not materially adversely affect the treatment of holders of Claims or Equity Interests under the Plan, the Debtors (and as of the Effective Date, the GUC Trust Administrator) may institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order with respect to such matters as may be necessary to carry out the purposes and effects of the Plan.  Prior to the Effective Date, the Debtors may make appropriate technical adjustments and modifications to the Plan without further order or approval of the Bankruptcy Court; *provided, however,* that such technical adjustments and modifications do not adversely affect in a material way the treatment of holders of Claims or Equity Interests.  Nothing contained in this Section 12.9 shall in any way override the provisions of paragraph 5 of the Stipulation and Order Fixing Asbestos Trust Claim and Resolving Debtors' Estimation Motion (ECF No. 9214).

**12.10    Revocation or Withdrawal of Plan.**  The Debtors reserve the right to revoke or withdraw the Plan at any time prior to the Confirmation Date.  If the Debtors take such action, the Plan shall be deemed null and void.  In such event, nothing contained herein shall be deemed to constitute a waiver or release of any Claim by or against the Debtors or any other person or to prejudice in any manner the rights of the Debtors or any other person in any further proceedings involving the Debtors.

**12.11    <u>Courts of Competent Jurisdiction</u>.**  If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising out of the Plan, such abstention, refusal, or failure of jurisdiction shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

**12.12    <u>Severability</u>.**  If, prior to the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

**12.13    <u>Governing Law</u>.**  Except to the extent the Bankruptcy Code or other U.S. federal law is applicable, or to the extent an Exhibit to the Plan or a schedule in the Plan Supplement provides otherwise, the rights, duties, and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflicts of law thereof.

**12.14    <u>Exhibits</u>.**  The Exhibits to the Plan and the Plan Supplement are incorporated into and as part of the Plan as if set forth herein.

**12.15    <u>Successors and Assigns</u>.**  All the rights, benefits, and obligations of any person named or referred to in the Plan shall be binding on, and shall inure to the benefit of, the heirs, executors, administrators, successors, and/or assigns of such person.

**12.16    <u>Time</u>.**  In computing any period of time prescribed or allowed by the Plan, unless otherwise set forth herein or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

    **12.17**  **Notices.**  To be effective, all notices, requests, and demands to or upon the Debtors, the Creditors' Committee, the Asbestos Claimants' Committee, the Future Claimants' Representative, the U.S. Treasury, the GUC Trust Administrator, the Asbestos Trust Administrator, the Environmental Response Trust Administrative Trustee, or the Avoidance Action Trust Administrator shall be in writing (including by facsimile or electronic transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

    If to the Debtors, to:

    Motors Liquidation Company
    401 South Old Woodward Avenue
    Suite 370
    Birmingham, Michigan 48009
    Attn:  Thomas Morrow
    Telephone:  (313) 486-4044
    Telecopier:  (313) 486-4259
    E-mail:  tmorrow@alixpartners.com

    - and -

    AlixPartners LLP
    40 West 57th Street
    New York, New York 10019
    Attn:  Ted Stenger
    Telephone:  (212) 490-2500
    Telecopier:  (212) 490-1344
    E-mail:  tstenger@alixpartners.com

    -and-

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York  10153
Attn:    Stephen Karotkin, Esq.
          Joseph H. Smolinsky, Esq.
Telephone:  (212) 310-8000
Telecopier:  (212) 310-8007
E-mail:  stephen.karotkin@weil.com
          joseph.smolinsky@weil.com

If to the Creditors' Committee, to:

Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, New York 10036
Attn:    Thomas Moers Mayer, Esq.
          Robert Schmidt, Esq.
Telephone:  (212) 715-9100
Telecopier:  (212) 715-8000
E-mail:  tmayer@kramerlevin.com
          rschmidt@kramerlevin.com

If to the Asbestos Claimants' Committee, to:

Caplin & Drysdale, Chartered
375 Park Avenue, 35th Floor
New York, New York 10152-3500
Attn:    Elihu Inselbuch, Esq.
          Rita C. Tobin, Esq.
Telephone:  (212) 319-7125
Telecopier:  (212) 644-6755
E-mail:  ei@capdale.com
          rct@capdale.com

-and-

Caplin & Drysdale, Chartered
One Thomas Circle, N.W., Suite 1100
Washington, DC 20005
Attn:    Trevor W. Swett III, Esq.
          Kevin C. Maclay, Esq.
Telephone:  (202) 862-5000
Telecopier:  (202) 429-3301
E-mail:  tws@capdale.com
          kcm@capdale.com

If to the Future Claimants' Representative, to:

Stutzman, Bromberg, Esserman & Plifka,
A Professional Corporation
2323 Bryan Street, Suite 2200
Dallas, Texas 75201
Attn:   Sander L. Esserman, Esq.
        Robert T. Brousseau, Esq.
Telephone:  (214) 969-4900
Telecopier:  (214) 969-4999
E-mail:  esserman@sbep-law.com
         brousseau@sbep-law.com

If to the U.S. Treasury, to:

United States Department of the Treasury
1500 Pennsylvania Avenue, NW
Washington, D.C. 20220
Attn:   Chief Counsel, Office of Financial Stability
Telecopier:  (202) 927-9225
E-mail:  OFSChiefCounselNotices@do.treas.gov

-and-

Cadwalader, Wickersham & Taft LLP
1 World Financial Center
New York, New York 10128
Attn:  John J. Rapisardi, Esq.
Telephone:  (212) 504-6000
Telecopier:  (212) 504-6666
E-mail:  john.rapisardi@cwt.com

-and-

Cadwalader, Wickersham & Taft LLP
700 Sixth St. NW
Washington, DC 20001
Attn:  Douglas S. Mintz, Esq.
Telephone:  (202) 862-2200
Telecopier:  (212) 504-6666
E-mail:  douglas.mintz@cwt.com

If to the GUC Trust Administrator,
the GUC Trust Monitor,
the Asbestos Trust Administrator,
the Environmental Response Trust Administrative Trustee,
the Avoidance Action Trust Administrator, or
the Avoidance Action Trust Monitor,
to the address(es)
designated in the Confirmation Order

Dated:     New York, New York
           March 18, 2011

                    Respectfully submitted,


                    MOTORS LIQUIDATION COMPANY

                    By:     /s/ Ted Stenger
                                 Name:  Ted Stenger
                                 Title:  Executive Vice President

MLC OF HARLEM, INC.
MLCS, LLC
MLCS DISTRIBUTION CORPORATION
REMEDIATION AND LIABILITY MANAGEMENT COMPANY,
INC.
ENVIRONMENTAL CORPORATE REMEDIATION COMPANY,
INC.

BY:  MOTORS LIQUIDATION COMPANY, as agent for each of
the foregoing entities

By:    /s/ Ted Stenger
        Name:  Ted Stenger
        Title:  Executive Vice President

**EXHIBIT A**

**ASBESTOS TRUST AGREEMENT**

**MLC ASBESTOS PI TRUST AGREEMENT**

# MLC ASBESTOS PI TRUST AGREEMENT

## TABLE OF CONTENTS

SECTION 1 — Agreement of Trust ........................................................3

    1.1    Creation and Name ................................................3
    1.2    Purpose ..................................................................3
    1.3    Transfer of Assets ...............................................3
    1.4    Acceptance of Assets and Assumption of Liabilities .........4
    1.5    Certain Tax Matters ............................................4


SECTION 2 — Powers and Trust Administration .....................................5

    2.1    Powers ..................................................................5
    2.2    General Administration .......................................8
    2.3    Claims Administration ........................................12


SECTION 3 — Accounts, Investments, and Payments .............................12

    3.1    Accounts ..............................................................12
    3.2    Investments .........................................................13
    3.3    Source of Payments ............................................15


SECTION 4 — Trustee; Delaware Trustee ..............................................15

    4.1    Number ................................................................15
    4.2    Term of Service ..................................................16
    4.3    Appointment of Successor Trustee ....................16
    4.4    Liability of Trustee, Members of the TAC and
           the Futures Representative ..................................17
    4.5    Compensation and Expenses of Trustee ...........17
    4.6    Indemnification ...................................................18
    4.7    Lien ......................................................................19
    4.8    Trustee's Employment of Experts; Delaware Trustee's
           Employment of Counsel ....................................19
    4.9    Trustee's Independence .....................................20
    4.10   Bond ....................................................................20
    4.11   Delaware Trustee ................................................20

SECTION 5 — Trust Advisory Committee ...........................................................22

    5.1       Members ..................................................................................22
    5.2       Duties .....................................................................................22
    5.3       Term of Office .......................................................................22
    5.4       Appointment of Successor ......................................................23
    5.5       TAC's Employment of Professionals ....................................24
    5.6       Compensation and Expenses of the TAC .............................25
    5.7       Procedures for Consultation With and Obtaining the
               Consent of the TAC ........................................................26
               (a)       Consultation Process ..............................................26
               (b)       Consent Process ......................................................27


SECTION 6 — The Futures Representative .........................................................28

    6.1       Duties .....................................................................................28
    6.2       Term of Office .......................................................................28
    6.3       Appointment of Successor ......................................................29
    6.4       Futures Representative's Employment of Professionals ......29
    6.5       Compensation and Expenses of the Futures Representative ..............30
    6.6       Procedures for Consultation with and Obtaining the
               Consent of the Futures Representative ...........................31
               (a)       Consultation Process ..............................................31
               (b)       Consent Process ......................................................32

SECTION 7 — General Provisions ....................................................................33

    7.1       Irrevocability .........................................................................33
    7.2       Term; Termination .................................................................33
    7.3       Amendments ..........................................................................35
    7.4       Meetings ................................................................................36
    7.5       Severability ...........................................................................36
    7.6       Notices ...................................................................................36
    7.7       Successors and Assigns .........................................................38
    7.8       Limitation on Claim Interests for Securities Laws Purposes ..............38
    7.9       Entire Agreement; No Waiver ...............................................39
    7.10      Headings ................................................................................39
    7.11      Governing Law ......................................................................39
    7.12      Settlors' Representative and Cooperation .............................39
    7.13      Dispute Resolution ................................................................39
    7.14      Enforcement and Administration ...........................................40
    7.15      Effectiveness .........................................................................40
    7.16      Counterpart Signatures ..........................................................40

- ii

## MLC ASBESTOS PI TRUST AGREEMENT

This MLC Asbestos PI Trust Agreement (this "**PI Trust Agreement**"), dated the date set forth on the signature page hereof and effective as of the Effective Date, is entered into, pursuant to the **Debtors' Second Amended Joint Chapter 11 Plan** dated as of **March 17, 2011** (as it may be amended or supplemented, the "**Plan**"),[1] by **Motors Liquidation Company (f/k/a General Motors Corporation) and its affiliated debtors** (collectively referred to as the "**Debtors**," "**MLC**," or the "**Settlors**"), the debtors and debtors-in-possession whose chapter 11 cases are jointly administered under Case No. 09-50026 (REG) in the United States Bankruptcy Court for the Southern District of New York; the Legal Representative for Future Claimants (the "**Futures Representative**"); the Official Committee of Unsecured Creditors Holding Asbestos-Related Claims (the "**ACC**"); the Asbestos PI Trustee (the "**Trustee**"); **[Wilmington Trust Company]** (the "**Delaware Trustee**") and the members of the Trust Advisory Committee (the "**TAC**") identified on the signature pages hereof; and

**WHEREAS**, the Debtors are liquidating under the provisions of chapter 11 of the Bankruptcy Code in cases filed in the United States Bankruptcy Court for the Southern District of New York, jointly administered and known as In re Motors Liquidation Company, et al. (f/k/a General Motors Corporation, et al.), Case No. 09-50026 (REG); and

**WHEREAS**, the Confirmation Order has been entered by the Bankruptcy Court; and

---

[1] All capitalized terms not otherwise defined herein shall have their respective meanings as set forth in the Plan, and such definitions are incorporated herein by reference; *provided, however*, that "Asbestos Personal Injury Claims" as defined in the Plan shall be referred to herein as "**PI Trust Claims**." All capitalized terms not defined herein or defined in the Plan, but defined in the Bankruptcy Code or Rules, shall have the meanings ascribed to them by the Bankruptcy Code and Rules, and such definitions are incorporated herein by reference.

**WHEREAS**, the Plan provides, *inter alia*, for the creation of the MLC Asbestos PI Trust (the "**PI Trust**"); and

**WHEREAS**, pursuant to the Plan, the PI Trust is to use its assets and income to satisfy all PI Trust Claims; and

**WHEREAS**, it is the intent of MLC, the Trustee, the ACC, the TAC, and the Futures Representative that the PI Trust be administered, maintained, and operated at all times through mechanisms that provide reasonable assurance that the PI Trust will satisfy all PI Trust Claims pursuant to the MLC Asbestos PI Trust Distribution Procedures (the "**TDP**") that are attached hereto as Exhibit 1 in substantially the same manner, and in strict compliance with the terms of this PI Trust Agreement; and

**WHEREAS**, all rights of the holders of PI Trust Claims arising under this PI Trust Agreement and the TDP shall vest upon the Effective Date; and

**WHEREAS**, pursuant to the Plan, the PI Trust is intended to qualify as a "qualified settlement fund" within the meaning of section 1.468B-1 *et seq.* of the Treasury Regulations promulgated under section 468B of the Internal Revenue Code (the "**QSF Regulations**"); and

**WHEREAS**, the PI Trust and the Plan do not satisfy all the prerequisites that would be applicable for an injunction pursuant to section 524(g) of the Bankruptcy Code with respect to any and all PI Trust Claims, and no such injunction has been entered in connection with the Confirmation Order;

**NOW, THEREFORE**, it is hereby agreed as follows:

# SECTION I

## AGREEMENT OF TRUST

**1.1**    **Creation and Name.**  The Debtors as Settlors hereby create a trust known as the "MLC Asbestos PI Trust," which is the Asbestos PI Trust provided for and referred to in the Plan.  The Trustee of the PI Trust may transact the business and affairs of the PI Trust in the name of the PI Trust, and references herein to the PI Trust shall include the Trustee acting on behalf of the Trust.  It is the intention of the parties hereto that the trust created hereby constitute a statutory trust under Chapter 38 of title 12 of the Delaware Code, 12 Del. C. § 3801 et seq. (the "**Act**") and that this document, together with the by-laws described herein, constitute the governing instruments of the PI Trust.  The Trustee and the Delaware Trustee are hereby authorized and directed to execute and file a Certificate of Trust with the Delaware Secretary of State in the form attached hereto.

**1.2**    **Purpose.**  The purpose of the PI Trust is to assume all liabilities and responsibility for all PI Trust Claims, and, among other things to:  (a) direct the processing, liquidation and payment of all PI Trust Claims in accordance with the Plan, the TDP, and the Confirmation Order; (b) preserve, hold, manage, and maximize the assets of the PI Trust for use in paying and satisfying PI Trust Claims; and (c) qualify at all times as a qualified settlement fund.  The PI Trust is to use the PI Trust's assets and income to pay the holders of all PI Trust Claims in accordance with this PI Trust Agreement and the TDP in such a way that such holders of PI Trust Claims are treated fairly, equitably, and reasonably in light of the finite assets available to satisfy such claims.

**1.3**    **Transfer of Assets.**  Pursuant to, and in accordance with, Sections 5.2(a) and 6.3(d) of the Plan, the PI Trust has received the Asbestos Trust Assets (collectively, the "**PI**

**Trust Assets**") to fund the PI Trust and settle, discharge or channel all PI Trust Claims. In all

events, the PI Trust Assets or any other assets to be transferred to the PI Trust under the Plan will

be transferred to the PI Trust free and clear of any liens or other claims by the Debtors, New

GM, any creditor, or other entity except as otherwise provided in the Plan. The Debtors shall

also execute and deliver such documents to the PI Trust as the Trustee reasonably requests to

transfer and assign any PI Trust Assets to the PI Trust.

### 1.4    Acceptance of Assets and Assumption of Liabilities.

(a)    In furtherance of the purposes of the PI Trust, the PI Trust hereby

expressly accepts the transfer to the PI Trust of the PI Trust Assets or any other transfers

contemplated by the Plan in the time and manner as, and subject to the terms, contemplated in

the Plan.

(b)    In furtherance of the purposes of the PI Trust, the PI Trust expressly

assumes all liabilities and responsibility for all PI Trust Claims. Except as otherwise provided in

this PI Trust Agreement and the TDP, the PI Trust shall have all defenses, cross-claims, offsets,

and recoupments, as well as rights of indemnification, contribution, subrogation, and similar

rights, regarding such claims that MLC has or would have had under applicable law.

(c)    No provision herein or in the TDP shall be construed or implemented in a

manner that would cause the PI Trust to fail to qualify as a "qualified settlement fund" under the

QSF Regulations.

### 1.5    Certain Tax Matters.

(a)    For all U.S. federal and applicable state and local income tax purposes, all

parties (including, without limitation, the Debtors, the Trustee, the Delaware Trustee, and the

holders of PI Trust Claims) shall treat the PI Trust as a "qualified settlement fund" within the meaning of the QSF Regulations.

(b)    Following the funding of the PI Trust (and in no event later than February 15th of the calendar year following the funding of the PI Trust), MLC shall provide a "§ 1.468B-3 Statement" to the Trustee in accordance with Treasury Regulation section 1.468B-3(e).

(c)    The Trustee may request an expedited determination of taxes of the PI Trust under section 505(b) of the Bankruptcy Code for all returns filed for, or on behalf of, the PI Trust for all taxable periods through the dissolution of the PI Trust.

## SECTION II

## POWERS AND TRUST ADMINISTRATION

**2.1    Powers.**

(a)    The Trustee is and shall act as the fiduciary to the PI Trust in accordance with the provisions of this PI Trust Agreement and the Plan.  The Trustee shall, at all times, administer the PI Trust and the PI Trust Assets in accordance with the purposes set forth in Section 1.2 above.  Subject to the limitations set forth in this PI Trust Agreement, the Trustee shall have the power to take any and all actions that, in the judgment of the Trustee, are necessary or proper to fulfill the purposes of the PI Trust, including, without limitation, each power expressly granted in this Section 2.1, any power reasonably incidental thereto, and any trust power now or hereafter permitted under the laws of the State of Delaware.

(b)    Except as required by applicable law or otherwise specified herein, the Trustee need not obtain the order or approval of any court in the exercise of any power or discretion conferred hereunder.

(c)      Without limiting the generality of Section 2.1(a) above, and except as limited below, the Trustee shall have the power to:

(i)      receive and hold the PI Trust Assets and exercise all rights with respect thereto, including the right to vote and sell any securities that are included in the PI Trust Assets;

(ii)      invest the monies held from time to time by the PI Trust;

(iii)      sell, transfer, or exchange any or all of the PI Trust Assets at such prices and upon such terms as the Trustee may consider proper, consistent with the other terms of this PI Trust Agreement;

(iv)      enter into leasing and financing agreements with third parties to the extent such agreements are reasonably necessary to permit the PI Trust to operate;

(v)      pay liabilities and expenses of the PI Trust;

(vi)      establish such funds, reserves, and accounts within the PI Trust estate, as deemed by the Trustee to be useful in carrying out the purposes of the PI Trust;

(vii)      sue and be sued and participate, as a party or otherwise, in any judicial, administrative, arbitrative, or other proceeding;

(viii)      establish, supervise, and administer the PI Trust in accordance with this PI Trust Agreement and the TDP and the terms thereof;

(ix)      appoint such officers and hire such employees and engage such legal, financial, accounting, investment, auditing, and forecasting, and other consultants and agents as the business of the PI Trust requires, and delegate to such persons such powers and authorities as the fiduciary duties of the Trustee permit and as the Trustee, in his or her discretion, deems advisable or necessary in order to carry out the terms of this PI Trust;

- 6 -

(x)      pay employees, legal, financial, accounting, investment, auditing**,** and forecasting, and other consultants, advisors, and agents, including those engaged by the PI Trust in connection with its alternative dispute resolution activities, reasonable compensation;

(xi)     compensate the Trustee, the Delaware Trustee, the TAC members, and the Futures Representative as provided below, and their employees, legal, financial, accounting, investment, and other advisors, consultants, independent contractors, and agents, and reimburse the Trustee, the Delaware Trustee, the TAC members, and the Futures Representatives all reasonable out-of-pocket costs and expenses incurred by such persons in connection with the performance of their duties hereunder;

(xii)    execute and deliver such instruments as the Trustee considers proper in administering the PI Trust;

(xiii)   enter into such other arrangements with third parties as are deemed by the Trustee to be useful in carrying out the purposes of the PI Trust, provided such arrangements do not conflict with any other provision of this PI Trust Agreement;

(xiv)    in accordance with Section 4.6 below, defend, indemnify, and hold harmless (and purchase insurance indemnifying) (A) the Trustee, the Delaware Trustee, the members of the TAC, and the Futures Representative, and (B) the officers and employees of the PI Trust, and any agents, advisors and consultants of the PI Trust, the TAC, or the Futures Representative (the "**Additional Indemnitees**"), to the fullest extent that a statutory trust organized under the laws of the State of Delaware is from time to time entitled to indemnify and/or insure its directors, trustees, officers, employees, agents, advisors, and representatives;

(xv)     delegate any or all of the authority herein conferred with respect to the investment of all or any portion of the PI Trust Assets to any one or more reputable

- 7 -

individuals or recognized institutional investment advisors or investment managers without

liability for any action taken or omission made because of any such delegation, except as

provided in Section 4.4 below;

> (xvi)    consult with the TAC and the Futures Representative at such times

and with respect to such issues relating to the conduct of the PI Trust as the Trustee considers

desirable; and

> (xvii)   make, pursue (by litigation or otherwise), collect, compromise or

settle, in the name of the PI Trust, any claim, right, action, or cause of action included in the PI

Trust Assets, including, but not limited to, insurance recoveries (if applicable), before any court

of competent jurisdiction.

> (d)    The Trustee shall not have the power to guarantee any debt of other

persons.

> (e)    The Trustee agrees to take the actions of the PI Trust required hereunder.

> (f)    The Trustee shall give the TAC and the Futures Representative prompt

notice of any act performed or taken pursuant to Sections 2.1(c)(i), (iii), (vii), or (xv) above, and

any act proposed to be performed or taken pursuant to Section 2.2(f) below.

> **2.2**    **General Administration.**

> (a)    The Trustee shall act in accordance with the PI Trust Agreement.

> (b)    The Trustee shall (i) timely file such income tax and other returns and

statements required to be filed and shall timely pay all taxes required to be paid by the PI Trust,

(ii) comply with all applicable reporting and withholding obligations, (iii) satisfy all

requirements necessary to qualify and maintain qualification of the PI Trust as a qualified

settlement fund within the meaning of the QSF Regulations, and (iv) take no action that could

cause the PI Trust to fail to qualify as a qualified settlement fund within the meaning of the QSF

Regulations.

       (c)      The Trustee shall timely account to the Bankruptcy Court as follows:

       (i)      The Trustee shall cause to be prepared and filed with the

Bankruptcy Court, as soon as available, and in any event within one hundred and twenty (120)

days following the end of each fiscal year, an annual report (the "**Annual Report**") containing

financial statements of the PI Trust (including, without limitation, a balance sheet of the PI Trust

as of the end of such fiscal year and a statement of operations for such fiscal year) audited by a

firm of independent certified public accountants selected by the Trustee and accompanied by an

opinion of such firm as to the fairness of the financial statements' presentation of the cash and

investments available for the payment of claims and as to the conformity of the financial

statements with generally accepted accounting principles.  The Trustee shall provide a copy of

such Annual Report to the TAC and the Futures Representative when such reports are filed with

the Bankruptcy Court.

       (ii)      Simultaneously with the filing of the Annual Report, the Trustee

shall cause to be prepared and filed with the Bankruptcy Court a report containing a summary

regarding the number and type of claims disposed of during the period covered by the financial

statements.  The Trustee shall provide a copy of such report to the TAC and the Futures

Representatives when such report is filed.

       (iii)      All materials required to be filed with the Bankruptcy Court by this

Section 2.2(c) shall be available for inspection by the public in accordance with procedures

established by the Bankruptcy Court and shall be filed with the Office of the United States

Trustee for the Southern District of New York (the "**U.S. Trustee**").

(d)     The Trustee shall cause to be prepared as soon as practicable prior to the commencement of each fiscal year a budget and cash flow projections covering such fiscal year and the succeeding four fiscal years.  The budget and cash flow projections shall include a determination of the Maximum Annual Payment pursuant to Section  2.4 of the TDP, and the Claims Payment Ratio pursuant to Section 2.5 of the TDP.  The Trustee shall provide a copy of the budget and cash flow projections to the TAC and the Futures Representative.

(e)     The Trustee shall consult with the TAC and the Futures Representative (i) on the general implementation and administration of the PI Trust; (ii) on the general implementation and administration of the TDP; and (iii) on such other matters as may be required under this PI Trust Agreement and the TDP.

(f)     The Trustee shall be required to obtain the consent of the TAC and the Futures Representative pursuant to the Consent Process set forth in Section 5.7(b) and 6.6(b) below, in addition to any other instances elsewhere enumerated, in order:

(i)     to redetermine the Payment Percentage described in Section 2.3 of the TDP as provided in Section 4.2 of the TDP;

(ii)     to change the Claims Payment Ratio described in Section 2.5 of the TDP in the event that the requirements for such a change as set forth in said provision have been met;

(iii)     to change the Disease Levels, Scheduled Values and/or Medical/Exposure Criteria set forth in Section 5.3(a)(3) of the TDP, and/or the Average Values and/or Maximum Values set forth in Section 5.3(b)(3) and Section 5.4(a) of the TDP;

(iv)     to establish and/or to change the Claims Materials to be provided by holders of PI Trust Claims under Section 6.1 of the TDP;

- 10 -

(v)      to require that claimants provide additional kinds of medical evidence pursuant to Section 7.1 of the TDP;

(vi)     to change the form of release to be provided pursuant to Section 7.8 of the TDP;

(vii)    to terminate the PI Trust pursuant to Section 7.2 below;

(viii)   to settle the liability of any insurer under any insurance policy or legal action related thereto;

(ix)     to change the compensation and/or per diem of the members of the TAC, the Futures Representative, the Delaware Trustee or the Trustee, other than to reflect cost-of-living increases or changes approved by the Bankruptcy Court as otherwise provided herein;

(x)      to take actions to minimize any tax on the PI Trust Assets; provided that no such action prevents the PI Trust from qualifying as a qualified settlement fund within the meaning of the QSF Regulations or requires an election for the PI Trust to be treated as a grantor trust for tax purposes;

(xi)     to amend any provision of this PI Trust Agreement or the TDP in accordance with the terms thereof;

(xii)    to acquire an interest in or to merge any claims resolution organization formed by the PI Trust with another claims resolution organization that is not specifically created by this PI Trust Agreement or the TDP, or to contract with another claims resolution organization or other entity that is not specifically created by this PI Trust Agreement or the TDP, or permit any other party to join in any claims resolution organization that is formed by the PI Trust pursuant to the PI Trust Agreement or the TDP; provided that such merger, acquisition, contract or joinder will require the surviving organization to make decisions about

the allowability and value of claims in accordance with Section 2.1 of the TDP which requires that such decisions be based on the provisions of the TDP; or

(xiii)    if and to the extent required by Section 6.5 of the TDP, to disclose any information, documents, or other materials to preserve, litigate, resolve, or settle coverage, or to comply with an applicable obligation under an insurance policy or settlement agreement pursuant to Section 6.5 of the TDP.

(g)    The Trustee shall meet with the TAC and the Futures Representative no less often than quarterly.  The Trustee shall meet in the interim with the TAC and the Futures Representative when so requested by either.

(h)    The Trustee, upon notice from either the TAC or the Futures Representative, if practicable in view of pending business, shall at his or her next meeting with the TAC or the Futures Representative consider issues submitted by the TAC or the Futures Representative.

2.3    **Claims Administration.**  The Trustee shall promptly proceed to implement the TDP.

**SECTION III**

**ACCOUNTS, INVESTMENTS, AND PAYMENTS**

3.1    **Accounts.**

(a)    The Trustee may, from time to time, create such accounts and reserves within the PI Trust estate as he or she may deem necessary, prudent, or useful in order to provide for the payment of expenses and payment of PI Trust Claims and may, with respect to any such account or reserve, restrict the use of monies therein.

(b)     The Trustee shall include a reasonably detailed description of the creation of any account or reserve in accordance with this Section 3.1 and, with respect to any such account, the transfers made to such account, the proceeds of or earnings on the assets held in each such account and the payments from each such account in the reports to be filed with the Bankruptcy Court and provided to the TAC and the Futures Representative pursuant to Section 2.2(c)(i) above.

3.2     **Investments.**  Investment of monies held in the PI Trust shall be administered in the manner consistent with the standards set forth in the Uniform Prudent Investor Act, subject to the following limitations and provisions:

(a)     The PI Trust may invest only in diversified equity portfolios whose benchmark is a broad equity market index such as, but not limited to, the S&P 500 Index, Russell 1000 Index, S&P ADR Index or MSCI EAFE Index.  The PI Trust shall not acquire, directly or indirectly, equity in any entity or business enterprise if, immediately following such acquisition, the PI Trust would hold more than 5% of the equity in such entity or business enterprise.  The PI Trust shall not hold, directly or indirectly, more than 5% of the equity in any entity or business enterprise.

(b)     The PI Trust shall not acquire or hold any long-term debt securities unless (i) such securities are PI Trust Assets under the Plan, (ii) such securities are rated "Baa" or higher by Moody's, "BBB" or higher by Standard & Poor's ("**S&P's**"), or have been given an equivalent investment grade rating by another nationally recognized statistical rating agency, or (iii) have been issued or fully guaranteed as to principal and interest by the United States of America or any agency or instrumentality thereof.  This restriction does not apply to any pooled

- 13 -

investment vehicles where pooled assets receive an investment grade rating (i.e., "BBB" rating or above) by a nationally recognized rating agency.

(c)     The PI Trust shall not acquire or hold for longer than ninety (90) days any commercial paper unless such commercial paper is rated "Prime-1" or higher by Moody's or "A-1" or higher by S&P's, or has been given an equivalent rating by another nationally recognized statistical rating agency.

(d)     The PI Trust shall not acquire any debt securities or other debt instruments issued by any entity if, following such acquisition, the aggregate market value of all such debt securities and/or other debt instruments issued by such entity held by the PI Trust would exceed 5% of the then current aggregate value of the PI Trust's assets.  There is no limitation on holding debt securities or other debt instruments issued or fully guaranteed as to principal and interest by the United States of America or any agency or instrumentality thereof.

(e)     The PI Trust shall not acquire or hold any certificates of deposit unless all publicly held, long-term debt securities, if any, of the financial institution issuing the certificate of deposit and the holding company, if any, of which such financial institution is a subsidiary, meet the standards set forth in Section 3.2(b) above.

(f)     The PI Trust shall not acquire or hold any repurchase obligations unless, in the opinion of the Trustee, they are adequately collateralized.

(g)     The PI Trust may allow its investment managers to acquire prudently or hold derivative instruments, including, without limitation, options, futures and swaps in the normal course of portfolio management.  Specifically, the PI Trust may acquire or hold derivatives to help manage or mitigate portfolio risk, including, without limitation, interest rate

- 14 -

risk and equity market risk.  Using derivative instruments to leverage a portfolio to enhance

returns (at a much greater risk to the portfolio) is prohibited.

        (h)     The PI Trust may lend securities on a short-term basis, subject to

adequate, normal and customary collateral arrangements.

        (i)     Notwithstanding (a) above, the PI Trust may acquire and hold an equity

interest in a claims resolution organization without limitation as to the size of the equity interest

acquired and held if prior to such acquisition, the PI Trust complies with the provisions of

Section 2.2(f)(xii) hereof with respect to the acquisition.

**3.3**     **Source of Payments.**

        (a)     All PI Trust expenses and payments and all liabilities with respect to

claims shall be payable solely by the Trustee out of the PI Trust Assets.  Neither the Debtors,

their subsidiaries, the present or former directors, officers, employees or agents of the Debtors,

nor the Trustee, the TAC or Futures Representative, or any of their officers, agents, advisors, or

employees shall be liable for the payment of any PI Trust expense or any other liability of the PI

Trust, except to the extent provided in the Plan or Plan Documents.

        (b)     The Trustee shall include a reasonably detailed description of any

payments made in accordance with this Section 3.3 in the Annual Report.

## SECTION IV

## TRUSTEE; DELAWARE TRUSTEE

**4.1**     **Number.**  In addition to the Delaware Trustee appointed pursuant to Section 4.11,

there shall be one Trustee who shall be that person named on the signature page hereof.

**4.2**     **Term of Service.**

(a)     The initial Trustee named pursuant to Article 4.1 above shall serve until

the earlier of (i) his or her death, (ii) his or her resignation pursuant to Section 4.2(b) below,

(iii) his or her removal pursuant to Section 4.2(c) below, or (iv) the termination of the PI Trust

pursuant to Section 7.2 below.

(b)     The Trustee may resign at any time by written notice to the TAC and the

Futures Representative.  Such notice shall specify a date when such resignation shall take effect,

which shall not be less than ninety (90) days after the date such notice is given, where

practicable.

(c)     The Trustee may be removed at the recommendation of the TAC and the

Futures Representative with the approval of the Bankruptcy Court, in the event that he or she

becomes unable to discharge his or her duties hereunder due to accident or physical or mental

deterioration, or for other good cause.  Good cause shall be deemed to include, without

limitation, any substantial failure to comply with the general administration provisions of Section

2.2 above, a consistent pattern of neglect and failure to perform or participate in performing the

duties of the Trustee hereunder, or repeated non-attendance at scheduled meetings.  Such

removal shall require the approval of the Bankruptcy Court and shall take effect at such time as

the Bankruptcy Court shall determine.

**4.3**     **Appointment of Successor Trustee.**

(a)     In the event of a vacancy in the Trustee position, the vacancy shall be

filled by the TAC and the Futures Representative.  In the event that the TAC and the Futures

Representative cannot agree on the successor Trustee, the Bankruptcy Court shall make the

appointment.

- 16 -

(b)    Immediately upon the appointment of any successor Trustee, all rights, titles, duties, powers and authority of the predecessor Trustee hereunder shall be vested in, and undertaken by, the successor Trustee without any further act.  No successor Trustee shall be liable personally for any act or omission of his or her predecessor Trustees.

(c)    Each successor Trustee shall serve until the earliest of (i) his or her death, (ii) his or her resignation pursuant to Section 4.2(b) above, (iii) his or her removal pursuant to Section 4.2(c) above, or (iv) the termination of the PI  Trust pursuant to Section 7.2 below.

**4.4    Liability of Trustee, Members of the TAC and the Futures Representative.**

The Trustee, the Members of the TAC and the Futures Representative shall not be liable to the PI Trust, to any individual holding an asbestos claim, or to any other person, except for such individual's own breach of trust committed in bad faith or willful misappropriation.

**4.5    Compensation and Expenses of Trustee.**

(a)    The Trustee shall receive a retainer from the PI Trust for his or her service as a Trustee in the amount of $75,000.00 per annum, which amount shall be payable in monthly installments.  In addition, for all time expended attending meetings, preparing for such meetings, and working on authorized special projects, the Trustee shall receive the sum of $600 per hour, and the sum of $300 per hour for non-working travel time, in both cases computed on a quarter-hour basis.  The Trustee shall record all hourly time to be charged to the Trust on a daily basis. The per annum retainer and hourly compensation payable to the Trustee hereunder may be reviewed every year by the Trustee and, after consultation with the members of the TAC and the Futures Representative, appropriately adjusted by the Trustee for changes in the cost of living. The Delaware Trustee shall be paid such compensation as agreed to pursuant to a separate fee agreement.

- 17 -

(b)     The PI Trust will promptly reimburse the Trustee and the Delaware

Trustee for all reasonable out-of-pocket costs and expenses incurred by the Trustee or the

Delaware Trustee in connection with the performance of their duties hereunder.

(c)     The PI Trust shall include a description of the amounts paid under this

Section 4.5 in the Annual Report.

**4.6     <u>Indemnification.</u>**

(a)     The PI Trust shall indemnify and defend the Trustee, the members of the

TAC and the Futures Representative in the performance of their duties hereunder to the fullest

extent that a statutory trust organized under the laws of the State of Delaware is from time to

time entitled to indemnify and defend such persons against any and all liabilities, expenses,

claims, damages, or losses incurred by them in the performance of their duties hereunder or in

connection with activities undertaken by them prior to the Effective Date in connection with the

formation, establishment, or funding of the PI Trust.  The PI Trust may indemnify any of the

Additional Indemnitees in the performance of their duties hereunder to the fullest extent that a

statutory trust organized under the laws of the State of Delaware is from time to time entitled to

indemnify and defend such persons against any and all liabilities, expenses, claims, damages, or

losses incurred by them in the performance of their duties hereunder or in connection with

activities undertaken by them prior to the Effective Date in connection with the formation,

establishment or funding of the PI Trust.  Notwithstanding the foregoing, no individual shall be

indemnified or defended in any way for any liability, expense, claim, damage, or loss for which

he or she is ultimately liable under Section 4.4 above.

(b)     Reasonable expenses, costs and fees (including attorneys' fees and costs)

incurred by or on behalf of the Trustee, a member of the TAC, the Futures Representative or

- 18 -

Additional Indemnitee in connection with any action, suit, or proceeding, whether civil,

administrative or arbitrative, from which they are indemnified by the PI Trust pursuant to

Section 4.6(a) above, shall be paid by the PI Trust in advance of the final disposition thereof

upon receipt of an undertaking, by or on behalf of the Trustee, the members of the TAC, the

Futures Representative or Additional Indemnitee, to repay such amount in the event that it shall

be determined ultimately by final order that such Trustee, member of the TAC, the Futures

Representative or Additional Indemnitee is not entitled to be indemnified by the PI Trust.

(c)     The Trustee may purchase and maintain reasonable amounts and types of

insurance on behalf of an individual who is or was a Trustee, member of the TAC, the Futures

Representative or Additional Indemnitee, including against liability asserted against or incurred

by such individual in that capacity or arising from his or her status as a Trustee, TAC member,

Futures Representative, an officer or an employee of the PI Trust, or an advisor, consultant or

agent of the PI Trust, the TAC or the Futures Representative.

**4.7**     **Lien.**  The Trustee, members of the TAC, the Futures Representative and the

Additional Indemnitees shall have a first priority lien upon the PI Trust Assets to secure the

payment of any amounts payable to them pursuant to Section 4.6 above.

**4.8**     **Trustee's Employment of Experts; Delaware Trustee's Employment of**

**Counsel.**

(a)     The Trustee may, but shall not be required to, retain and/or consult with

counsel, accountants, appraisers, auditors, forecasters, experts, financial and investment advisors

and such other parties deemed by the Trustee to be qualified as experts on the matters submitted

to them (the "**Trust Professionals**"), and in the absence of gross negligence, the written opinion

of or information provided by any such party deemed by the Trustee to be an expert on the

particular matter submitted to such party shall be full and complete authorization and protection

in respect of any action taken or not taken by the Trustee hereunder in good faith and in

accordance with the written opinion of or information provided by any such party.

(b)    The Delaware Trustee shall be permitted to retain counsel only in such

circumstances as required in the exercise of its obligations hereunder and compliance with the

advice of such counsel shall be full and complete authorization and protection for actions taken

or not taken by the Delaware Trustee in good faith in compliance with such advice.

**4.9**    **Trustee's Independence.**  The Trustee shall not, during the term of his or her

service, hold a financial interest in, act as attorney or agent for, or serve as any other professional

for New GM.  The Trustee shall not act as an attorney for any person who holds an asbestos

claim.  For the avoidance of doubt, this Section shall not be applicable to the Delaware Trustee.

**4.10**    **Bond.**  The Trustee and the Delaware Trustee shall not be required to post any

bond or other form of surety or security unless otherwise ordered by the Bankruptcy Court.

**4.11**    **Delaware Trustee.**

(a)    There shall at all times be a Delaware Trustee.  The Delaware Trustee

shall either be (i) a natural person who is at least 21 years of age and a resident of the State of

Delaware or (ii) a legal entity that has its principal place of business in the State of Delaware,

otherwise meets the requirements of applicable Delaware law and shall act through one or more

persons authorized to bind such entity.  If at any time the Delaware Trustee shall cease to be

eligible in accordance with the provisions of this Section 4.11, it shall resign immediately in the

manner and with the effect hereinafter specified in Section 4.11(c) below.  For the avoidance of

doubt, the Delaware Trustee will only have such rights and obligations as expressly provided by

reference to the Delaware Trustee hereunder.

- 20 -

(b)    The Delaware Trustee shall not be entitled to exercise any powers, nor shall the Delaware Trustee have any of the duties and responsibilities, of the Trustee set forth herein.  The Delaware Trustee shall be one of the trustees of the PI Trust for the sole and limited purpose of fulfilling the requirements of Section 3807 of the Act and for taking such actions as are required to be taken by a Delaware Trustee under the Act.  The duties (including fiduciary duties), liabilities and obligations of the Delaware Trustee shall be limited to (i) accepting legal process served on the PI Trust in the State of Delaware and (ii) the execution of any certificates required to be filed with the Secretary of State of the State of Delaware that the Delaware Trustee is required to execute under Section 3811 of the Act and there shall be no other duties (including fiduciary duties) or obligations, express or implied, at law or in equity, of the Delaware Trustee.

(c)    The Delaware Trustee shall serve until such time as the Trustee removes the Delaware Trustee or the Delaware Trustee resigns and a successor Delaware Trustee is appointed by the Trustee in accordance with the terms of Section 4.11(d) below.  The Delaware Trustee may resign at any time upon the giving of at least sixty (60) days' advance written notice to the Trustee; provided, that such resignation shall not become effective unless and until a successor Delaware Trustee shall have been appointed by the Trustee in accordance with Section 4.11(d) below. If the Trustee does not act within such 60-day period, the Delaware Trustee may apply to the Court of Chancery of the State of Delaware for the appointment of a successor Delaware Trustee.

(d)    Upon the resignation or removal of the Delaware Trustee, the Trustee shall appoint a successor Delaware Trustee by delivering a written instrument to the outgoing Delaware Trustee.  Any successor Delaware Trustee must satisfy the requirements of Section

- 21 -

3807 of the Act.  Any resignation or removal of the Delaware Trustee and appointment of a

successor Delaware Trustee shall not become effective until a written acceptance of appointment

is delivered by the successor Delaware Trustee to the outgoing Delaware Trustee and the Trustee

and any fees and expenses due to the outgoing Delaware Trustee are paid.  Following

compliance with the preceding sentence, the successor Delaware Trustee shall become fully

vested with all of the rights, powers, duties and obligations of the outgoing Delaware Trustee

under this PI Trust Agreement, with like effect as if originally named as Delaware Trustee, and

the outgoing Delaware Trustee shall be discharged of its duties and obligations under this PI

Trust Agreement.

## SECTION V

## TRUST ADVISORY COMMITTEE

**5.1**   **Members.**  The TAC shall consist of three (3) members, who shall initially be the

persons named on the signature page hereof.

**5.2**   **Duties.**  The members of the TAC shall serve in a fiduciary capacity representing

all holders of present PI Trust Claims.  The Trustee must consult with the TAC on matters

identified in Section 2.2(e) above and in other provisions herein, and must obtain the consent of

the TAC on matters identified in Section 2.2(f) above.  Where provided in the TDP, certain other

actions by the Trustee are also subject to the consent of the TAC.

**5.3**   **Term of Office.**

(a)   The initial members of the TAC appointed in accordance with Section 5.1

above shall serve the staggered three-, four-, or five-year terms shown on the signature pages

hereof.  Thereafter, each term of office shall be five (5) years.  Each member of the TAC shall

serve until the earlier of (i) his or her death, (ii) his or her resignation pursuant to Section 5.3(b)

- 22 -

below, (iii) his or her removal pursuant to Section 5.3(c) below, (iv) the end of his or her term as provided above, or (v) the termination of the PI Trust pursuant to Section 7.2 below.

(b)    A member of the TAC may resign at any time by written notice to the other members of the TAC, the Trustee and the Futures Representative.  Such notice shall specify a date when such resignation shall take effect, which shall not be less than ninety (90) days after the date such notice is given, where practicable.

(c)    A member of the TAC may be removed in the event that he or she becomes unable to discharge his or her duties hereunder due to accident, physical deterioration, mental incompetence, or a consistent pattern of neglect and failure to perform or to participate in performing the duties of such member hereunder, such as repeated non-attendance at scheduled meetings, or for other good cause.  Such removal shall be made at the recommendation of the remaining members of the TAC with the approval of the Bankruptcy Court.

### 5.4    Appointment of Successor.

(a)    If, prior to the termination of service of a member of the TAC other than as a result of removal, he or she has designated in writing an individual to succeed him or her as a member of the TAC, such individual shall be his or her successor.  If such member of the TAC did not designate an individual to succeed him or her prior to the termination of his or her service as contemplated above, such member's law firm may designate his or her successor.  If (i) a member of the TAC did not designate an individual to succeed him or her prior to the termination of his or her service and such member's law firm does not designate his or her successor as contemplated above or (ii) he or she is removed pursuant to Section 5.3(c) above, his or her successor shall be appointed by a majority of the remaining members of the TAC or, if

- 23 -

such members cannot agree on a successor, the Bankruptcy Court.  Nothing in this Agreement shall prevent the reappointment of an individual serving as a member of the TAC for an additional term or terms, and there shall be no limit on the number of terms that a TAC member may serve.

(b)    Each successor TAC member shall serve until the earlier of (i) the end of the full term of five (5) years for which he or she was appointed if his or her immediate predecessor member of the TAC completed his or her term, (ii) the end of the term of the member of the TAC whom he or she replaced if his or her predecessor member did not complete such term (iii) his or her death, (iv) his or her resignation pursuant to Section 5.3(b) above, (v) his or her removal pursuant to Section 5.3(c) above, or (vi) the termination of the PI Trust pursuant to Section 7.2 below.

**5.5**    **TAC's Employment of Professionals.**

(a)    The TAC may but is not required to retain and/or consult counsel, accountants, appraisers, auditors, forecasters, experts, and financial and investment advisors, and such other parties deemed by the TAC to be qualified as experts on matters submitted to the TAC (the "**TAC Professionals**").  The TAC and the TAC Professionals shall at all times have complete access to the PI Trust's officers, employees and agents, as well as to the Trust Professionals, and shall also have complete access to all information generated by them or otherwise available to the PI Trust or the Trustee provided that any information provided by the Trust Professionals shall not constitute a waiver of any applicable privilege.  In the absence of gross negligence, the written opinion of or information provided by any TAC Professional or Trust Professional deemed by the TAC to be qualified as an expert on the particular matter submitted to the TAC shall be full and complete authorization and protection in support of any

- 24 -

action taken or not taken by the TAC in good faith and in accordance with the written opinion of or information provided by the TAC Professional or Trust Professional.

(b)    The PI Trust shall promptly reimburse, or pay directly if so instructed, the TAC for all reasonable fees and costs associated with the TAC's employment of legal counsel pursuant to this provision in connection with the TAC's performance of its duties hereunder. The PI Trust shall also promptly reimburse, or pay directly if so instructed, the TAC for all reasonable fees and costs associated with the TAC's employment of any other TAC Professional pursuant to this provision in connection with the TAC's performance of its duties hereunder; *provided, however*, that (i) the TAC has first submitted to the PI Trust a written request for such reimbursement setting forth the reasons (A) why the TAC desires to employ such TAC Professional, and (B) why the TAC cannot rely on Trust Professionals to meet the need of the TAC for such expertise or advice, and (ii) the PI Trust has approved the TAC's request for reimbursement in writing. If the PI Trust agrees to pay for the TAC Professional, such reimbursement shall be treated as a PI Trust expense. If the PI Trust declines to pay for the TAC Professional, it must set forth its reasons in writing. If the TAC still desires to employ the TAC Professional at the PI Trust's expense, the TAC and/or the Trustee shall resolve their dispute pursuant to Section 7.13 below.

**5.6**    **Compensation and Expenses of the TAC.**

The members of the TAC shall receive compensation from the PI Trust for their services as TAC members in the form of a reasonable hourly rate set by the Trustee for attendance at meetings or other conduct of PI Trust business, computed on a quarter-hour basis. The members of the TAC shall also be reimbursed promptly for all reasonable out-of-pocket costs and expenses incurred in connection with the performance of their duties hereunder. Such

- 25 -

reimbursement or direct payment shall be deemed a PI Trust expense.  The PI Trust shall include

a description of the amounts paid under this Section 5.6 in the Annual Report to be filed with the

Bankruptcy Court and provided to the Futures Representative and the TAC pursuant to Section

2.2(c)(i).

     **5.7**     **Procedures for Consultation With and Obtaining the Consent of the TAC**.

     (a)     **Consultation Process**.

     (i)     In the event the Trustee is required to consult with the TAC

pursuant to Section 2.2(e) above or on other matters as provided herein, the Trustee shall

provide the TAC with written advance notice of the matter under consideration, and with all

relevant information concerning the matter as is reasonably practicable under the circumstances.

The Trustee shall also provide the TAC with such reasonable access to the Trust Professionals

and other experts retained by the PI Trust and its staff (if any) as the TAC may reasonably

request during the time that the Trustee is considering such matter, and shall also provide the

TAC the opportunity, at reasonable times and for reasonable periods of time, to discuss and

comment on such matter with the Trustee.

     (ii)     In determining when to take definitive action on any matter subject

to the consultation procedures set forth in this Section 5.7(a), the Trustee shall take into

consideration the time required for the TAC, if its members so wish, to engage and consult with

its own independent financial or investment advisors as to such matter.  In any event, the Trustee

shall not take definitive action on any such matter until at least thirty (30) days after providing

the TAC with the initial written notice that such matter is under consideration by the Trustee,

unless such time period is waived by the TAC.

- 26 -

(b)    **Consent Process.**

(i)    In the event the Trustee is required to obtain the consent of the TAC pursuant to Section 2.2(f) above, the Trustee shall provide the TAC with a written notice stating that its consent is being sought pursuant to that provision, describing in detail the nature and scope of the action the Trustee proposes to take, and explaining in detail the reasons why the Trustee desires to take such action.  The Trustee shall provide the TAC as much relevant additional information concerning the proposed action as is reasonably practicable under the circumstances.  The Trustee shall also provide the TAC with such reasonable access to the Trust Professionals and other experts retained by the PI Trust and its staff (if any) as the TAC may reasonably request during the time that the Trustee is considering such action, and shall also provide the TAC the opportunity, at reasonable times and for reasonable periods of time, to discuss and comment on such action with the Trustee.

(ii)    The TAC must consider in good faith and in a timely fashion any request for its consent by the Trustee, and must in any event advise the Trustee in writing of its consent or its objection to the proposed action within thirty (30) days of receiving the original request for consent from the Trustee.  The TAC may not withhold its consent unreasonably.  If the TAC decides to withhold its consent, it must explain in detail its objections to the proposed action.  If the TAC does not advise the Trustee in writing of its consent or its objections to the action within thirty (30) days of receiving notice regarding such request, the TAC's consent to the proposed actions shall be deemed to have been affirmatively granted.

(iii)    If, after following the procedures specified in this Section 5.7(b), the TAC continues to object to the proposed action and to withhold its consent to the proposed action, the Trustee and/or the TAC shall resolve their dispute pursuant to Section 7.13.

- 27 -

However, the burden of proof with respect to the validity of the TAC's objection and withholding of its consent shall be on the TAC.

## SECTION VI

## THE FUTURES REPRESENTATIVE

**6.1     Duties.**  The initial Futures Representative shall be the individual identified on the signature pages hereto.  He shall serve in a fiduciary capacity, representing the interests of the holders of future PI Trust Claims for the purpose of protecting the rights of such persons.  The Trustee must consult with the Futures Representative on matters identified in Section 2.2(e) above and on certain other matters provided herein, and must obtain the consent of the Futures Representative on matters identified in Section 2.2(f) above.  Where provided in the TDP, certain other actions by the Trustee are also subject to the consent of the Futures Representative.

**6.2     Term of Office.**

(a)     The Futures Representative shall serve until the earlier of (i) his or her death, (ii) his or her resignation pursuant to Section 6.2(b) below, (iii) his or her removal pursuant to Section 6.2(c) below, or (iv) the termination of the PI Trust pursuant to Section 7.2 below.

(b)     The Futures Representative may resign at any time by written notice to the Trustee.  Such notice shall specify a date when such resignation shall take effect, which shall not be less than ninety (90) days after the date such notice is given, where practicable.

(c)     The Futures Representative may be removed by the Bankruptcy Court in the event he or she becomes unable to discharge his or her duties hereunder due to accident, physical deterioration, mental incompetence, or a consistent pattern of neglect and failure to

perform or to participate in performing the duties hereunder, such as repeated non-attendance at scheduled meetings, or for other good cause.

       **6.3**    **Appointment of Successor.**  A vacancy caused by death or resignation shall be filled with an individual nominated prior to the effective date of the resignation or the death by the resigning or deceased Futures Representative, and a vacancy caused by removal of the Futures Representative shall be filled with an individual nominated by the Trustee in consultation with the TAC, subject, in each case, to the approval of the Bankruptcy Court.  In the event a nominee has not been pre-selected, the successor shall be chosen by the Bankruptcy Court.

       **6.4 Futures Representative's Employment of Professionals.**

          (a)     The Futures Representative may, but is not required to, retain and/or consult counsel, accountants, appraisers, auditors, forecasters, experts, and financial and investment advisors, and such other parties deemed by the Futures Representative to be qualified as experts on matters submitted to the Futures Representative (the "**Futures Representative Professionals**").  The Futures Representative and the Futures Representative Professionals shall at all times have complete access to the PI Trust's officers, employees and agents, as well as to the Trust Professionals, and shall also have complete access to all information generated by them or otherwise available to the PI Trust or the Trustee provided that any information provided by the Trust Professionals shall not constitute a waiver of any applicable privilege.  In the absence of gross negligence, the written opinion of or information provided by any Futures Representative Professional or Trust Professional deemed by the Futures Representative to be qualified as an expert on the particular matter submitted to the Futures Representative shall be full and complete authorization and protection in support of any action taken, or not taken, by the Futures

Representative in good faith and in accordance with the written opinion of or information provided by the Futures Representative Professional or Trust Professional.

(b)      The PI Trust shall promptly reimburse, or pay directly if so instructed, the Futures Representative for all reasonable fees and costs associated with the Futures Representative's employment of legal counsel pursuant to this provision in connection with the Futures Representative's performance of his or her duties hereunder.  The PI Trust shall also promptly reimburse, or pay directly if so instructed, the Futures Representative for all reasonable fees and costs associated with the Futures Representative's employment of any other Futures Representative Professionals pursuant to this provision in connection with the Futures Representative's performance of his or her duties hereunder; *provided, however*, that (i) the Futures Representative has first submitted to the PI Trust a written request for such reimbursement setting forth the reasons (A) why the Futures Representative desires to employ the Futures Representative Professional, and (B) why the Futures Representative cannot rely on Trust Professionals to meet the need of the Futures Representative for such expertise or advice, and (ii) the PI Trust has approved the Futures Representative's request for reimbursement in writing.  If the PI Trust agrees to pay for the Futures Representative Professional, such reimbursement shall be treated as a PI Trust expense.  If the PI Trust declines to pay for the Futures Representative Professional, it must set forth its reasons in writing.  If the Futures Representative still desires to employ the Futures Representative Professional at the PI Trust's expense, the Futures Representative and/or the Trustee shall resolve their dispute pursuant to Section 7.13 below.

**6.5**      **Compensation and Expenses of the Futures Representative.**  The Futures Representative shall receive compensation from the PI Trust in the form of payment at the

- 30 -

Futures Representative's normal hourly rate for services performed, computed on a quarter-hour

basis.  The PI Trust will promptly reimburse the Futures Representative for all reasonable out-of-

pocket costs and expenses incurred by the Futures Representative in connection with the

performance of his or her duties hereunder.  Such reimbursement or direct payment shall be

deemed a PI Trust expense.  The PI Trust shall include a description of the amounts paid under

this Section 6.5 in the Annual Report to be filed with the Bankruptcy Court and provided to the

Futures Representative and the TAC pursuant to Section 2.2(c)(i).

### 6.6 **Procedures for Consultation with and Obtaining the Consent of the Futures Representative.**

(a) **Consultation Process.**

(i)    In the event the Trustee is required to consult with the Futures

Representative pursuant to Section 2.2(e) above or on any other matters specified herein, the

Trustee shall provide the Futures Representative with written advance notice of the matter under

consideration, and with all relevant information concerning the matter as is reasonably

practicable under the circumstances.  The Trustee shall also provide the Futures Representative

with such reasonable access to the Trust Professionals and other experts retained by the PI Trust

and its staff (if any) as the Futures Representative may reasonably request during the time that

the Trustee is considering such matter, and shall also provide the Futures Representative the

opportunity, at reasonable times and for reasonable periods of time, to discuss and comment on

such matter with the Trustee.

(ii)    In determining when to take definitive action on any matter subject

to the consultation process set forth in this Section 6.6(a), the Trustee shall take into

consideration the time required for the Futures Representative, if he or she so wishes, to engage

and consult with his or her own independent financial or investment advisors as to such matter.

In any event, the Trustee shall not take definitive action on any such matter until at least thirty (30) days after providing the Futures Representative with the initial written notice that such matter is under consideration by the Trustee, unless such period is waived by the Futures Representative.

      (b) **Consent Process.**

      (i)     In the event the Trustee is required to obtain the consent of the Futures Representative pursuant to Section 2.2(f) above, the Trustee shall provide the Futures Representative with a written notice stating that his or her consent is being sought pursuant to that provision, describing in detail the nature and scope of the action the Trustee proposes to take, and explaining in detail the reasons why the Trustee desires to take such action.  The Trustee shall provide the Futures Representative as much relevant additional information concerning the proposed action as is reasonably practicable under the circumstances.  The Trustee shall also provide the Futures Representative with such reasonable access to the Trust Professionals and other experts retained by the PI Trust and its staff (if any) as the Futures Representative may reasonably request during the time that the Trustee is considering such action, and shall also provide the Futures Representative the opportunity, at reasonable times and for reasonable periods of time, to discuss and comment on such action with the Trustee.

      (ii)     The Futures Representative must consider in good faith and in a timely fashion any request for his or her consent by the Trustee, and must in any event advise the Trustee in writing of his or her consent or objection to the proposed action within thirty (30) days of receiving the original request for consent from the Trustee.  The Futures Representative may not withhold his or her consent unreasonably.  If the Futures Representative decides to withhold consent, he or she must explain in detail his or her objections to the proposed action.  If the

Futures Representative does not advise the Trustee in writing of his or her consent or objections to the proposed action within thirty (30) days of receiving the notice from the Trustee regarding such consent, the Futures Representative's consent shall be deemed to have been affirmatively granted.

(iii)    If, after following the procedures specified in this Section 6.6(b), the Futures Representative continues to object to the proposed action and to withhold its consent to the proposed action, the Trustee and/or the Futures Representative shall resolve their dispute pursuant to Section 7.13.  However, the burden of proof with respect to the validity of the Futures Representative's objection and withholding of his or her consent shall be on the Futures Representative.

## SECTION VII

## GENERAL PROVISIONS

7.1    **Irrevocability.**  To the fullest extent permitted by applicable law, the PI Trust is irrevocable.

7.2    **Term; Termination.**

(a)    The term for which the PI Trust is to exist shall commence on the date of the filing of the Certificate of Trust and shall terminate pursuant to the provisions of this Section 7.2.

(b)    The PI Trust shall automatically dissolve on the date (the "**Dissolution Date**") ninety (90) days after the first to occur of the following events:

- 33 -

(i)        the date on which the Trustee decides to dissolve the PI Trust because (A) he or she deems it unlikely that new asbestos claims will be filed against the PI Trust, (B) all PI Trust Claims duly filed with the PI Trust have been liquidated and paid to the extent provided in this PI Trust Agreement and the TDP or have been disallowed by a final non-appealable order, to the extent possible based upon the funds available through the Plan, and (C) twelve (12) consecutive months have elapsed during which no new asbestos claim has been filed with the PI Trust; or

(ii)        if the Trustee has procured and has in place irrevocable insurance policies and has established claims handling agreements and other necessary arrangements with suitable third parties adequate to discharge all expected remaining obligations and expenses of the PI Trust in a manner consistent with this PI Trust Agreement and the TDP, the date on which the Bankruptcy Court enters an order approving such insurance and other arrangements and such order becomes a final order; or

(iii)        to the extent that any rule against perpetuities shall be deemed applicable to the PI Trust, the date on which twenty-one (21) years less ninety-one (91) days pass after the death of the last survivor of all of the descendants of the late Joseph P. Kennedy, Sr., father of the late President John F. Kennedy, living on the date hereof.

(c)        On the Dissolution Date or as soon as reasonably practicable, after the wind-up of the PI Trust's affairs by the Trustee and payment of all the PI Trust's liabilities have been provided for as required by applicable law including Section 3808 of the Act, all monies remaining in the PI Trust estate shall be given to such organization(s) exempt from federal income tax under section 501(c)(3) of the Internal Revenue Code, which tax-exempt organization(s) shall be selected by the Trustee using his or her reasonable discretion; *provided,*

- 34 -

*however*, that (i) if practicable, the activities of the selected tax-exempt organization(s) shall be related to the treatment of, research on, or the relief of suffering of individuals suffering from asbestos-related lung disease or disorders, and (ii) the tax-exempt organization(s) shall not bear any relationship to any entity that is related to pre-petition General Motors, MLC, New GM or any of their successors, assigns, or affiliates within the meaning of section 468B(d)(3) of the Internal Revenue Code.  Notwithstanding any contrary provision of the Plan and related documents, this Section 7.2(c) cannot be modified or amended.

(d)    Following the dissolution and distribution of the assets of the PI Trust, the PI Trust shall terminate and the Trustee shall execute and cause a Certificate of Cancellation of the Certificate of Trust of the PI Trust to be filed in accordance with the Act.  Notwithstanding anything to the contrary contained in this PI Trust Agreement, the existence of the PI Trust as a separate legal entity shall continue until the filing of such Certificate of Cancellation.

**7.3**    **Amendments.**  The Trustee, after consultation with the TAC and the Futures Representative, and subject to the unanimous consent of the TAC and the Futures Representative, may modify or amend this PI Trust Agreement and the PI Trust By-laws.  The Trustee, after consultation with the TAC and the Futures Representative, and subject to the consent of the TAC and the Futures Representative, may modify or amend the TDP; *provided, however*, that no amendment to the TDP shall be inconsistent with the provisions limiting amendments to that document provided therein, and in particular the provisions limiting amendment of the Claims Payment Ratio set forth in Section 2.5 of the TDP and of the Payment Percentage set forth in Section 4.2 of the TDP.  Any modification or amendment made pursuant to this Article must be done in writing.  Notwithstanding anything contained in this PI Trust Agreement or the TDP to the contrary, neither this PI Trust Agreement, the PI Trust Bylaws, the

TDP, nor any document annexed to the foregoing shall be modified or amended in any way that could jeopardize, impair, or modify the PI Trust's qualified settlement fund status under the QSF Regulations.

      **7.4**    **Meetings.**  The Delaware Trustee shall not be required nor permitted to attend meetings relating to the PI Trust.

      **7.5**    **Severability.**  Should any provision in this PI Trust Agreement be determined to be unenforceable, such determination shall in no way limit or affect the enforceability and operative effect of any and all other provisions of this PI Trust Agreement.

      **7.6**    **Notices.**  Notices to persons asserting claims shall be given by first class mail, postage prepaid, at the address of such person, or, where applicable, such person's legal representative, in each case as provided on such person's claim form submitted to the PI Trust with respect to his or her PI Trust Claim.

      (a)    Any notices or other communications required or permitted hereunder to the following parties shall be in writing and delivered at the addresses designated below, or sent by e-mail or facsimile pursuant to the instructions listed below, or mailed by registered or certified mail, return receipt requested, postage prepaid, addressed as follows, or to such other address or addresses as may hereafter be furnished in writing to each of the other parties listed below in compliance with the terms hereof.

To the PI Trust through the Trustee:

    Kirk P. Watson, Esq.
    2301 Woodlawn Boulevard
    Austin, Texas 78703
    Fax: (512) 478-6697
    kirkpwatson@gmail.com

    With a copy to:

    Douglas A. Campbell, Esq.

Campbell & Levine, LLC
1700 Grant Building
Pittsburgh, PA  15219
Fax: (412) 261-5066
dac@camlev.com


To the Delaware Trustee:

Attn: _____

_____

_____

_____


To the TAC:

John D. Cooney, Esq.
Cooney and Conway
120 N. LaSalle Street, 30th Fl.
Chicago, IL  60602-6412
 Fax: (312) 551-6759
jcooney@cooneyconway.com

Steven Kazan, Esq.
Kazan, McClain, Lyons, Greenwood
& Harley, PLC
Jack London Market
55 Harrison Street, Suite 400
Oakland, CA  94607
 Fax: (510) 835-4913
skazan@kazanlaw.com

Perry Weitz, Esq.
Weitz & Luxenberg
700 Broadway
New York, NY 10003
Fax: (212) 344-5461
pweitz@weitzlux.com


To the Futures Representative:

Hon. Dean M. Trafelet (Ret.)
P.O. Box 518

9130 Wild Lane
Baileys Harbor, WI  54202
Fax:  (920) 839-9438
dtrafelet@dcwis.com


To the Debtors:

    Attn:   _____

    _____

    _____


(b)    All such notices and communications if mailed shall be effective when physically delivered at the designated addresses or, if electronically transmitted, when the communication is received at the designated addresses and confirmed by the recipient by return transmission.

**7.7**    **Successors and Assigns.**  The provisions of this PI Trust Agreement shall be binding upon and inure to the benefit of the Debtors, the PI Trust, the Trustee, and their respective successors and assigns, except that neither the Debtors, the PI Trust, the Trustee, nor may assign or otherwise transfer any of its, or their, rights or obligations, if any, under this PI Trust Agreement except, in the case of the PI Trust and the Trustee, as contemplated by Section 2.1 above.

**7.8**    **Limitation on Claim Interests for Securities Laws Purposes.**  PI Trust Claims, and any interests therein (a) shall not be assigned, conveyed, hypothecated, pledged, or otherwise transferred, voluntarily or involuntarily, directly or indirectly, except by will or under the laws of descent and distribution; (b) shall not be evidenced by a certificate or other instrument; (c) shall not possess any voting rights; and (d) shall not be entitled to receive any dividends or interest; provided, however, that clause (a) of this Section 7.8 shall not apply to the holder of a claim that is subrogated to a PI Trust Claim as a result of its satisfaction of such PI Trust Claim.

- 38 -

7.9   **Entire Agreement; No Waiver.**   The entire agreement of the parties relating to the subject matter of this PI Trust Agreement is contained herein and in the documents referred to herein, and this PI Trust Agreement and such documents supersede any prior oral or written agreements concerning the subject matter hereof.   No failure to exercise or delay in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege hereunder preclude any further exercise thereof or of any other right, power or privilege.   The rights and remedies herein provided are cumulative and are not exclusive of rights under law or in equity.

7.10   **Headings.**   The headings used in this PI Trust Agreement are inserted for convenience only and do not constitute a portion of this PI Trust Agreement, nor in any manner affect the construction of the provisions of this PI Trust Agreement.

7.11   **Governing Law.**   This PI Trust Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware, without regard to Delaware conflict of law principles.

7.12   **Settlors' Representative and Cooperation.**   The Debtors are hereby irrevocably designated as the Settlors, and they are hereby authorized to take any action required of the Settlors by the Trustee in connection with the PI Trust Agreement.

7.13   **Dispute Resolution.**   Any disputes that arise under this PI Trust Agreement or under the TDP among the parties hereto shall be resolved by submission of the matter to an alternative dispute resolution ("**ADR**") process mutually agreeable to the parties involved. Should any party to the ADR process be dissatisfied with the decision of the arbitrator(s), that party may apply to the Bankruptcy Court for a judicial determination of the matter.   Any review conducted by the Bankruptcy Court shall be *de novo*.   In any case, if the dispute arose pursuant

- 39 -

to the consent provision set forth in Section 5.7(b) (in the case of the TAC) or Section 6.6(b) (in the case of the Futures Representative), the burden of proof shall be on the party or parties who withheld consent to show that the objection was valid.  Should the dispute not be resolved by the ADR process within thirty (30) days after submission, the parties are relieved of the requirement to pursue ADR prior to application to the Bankruptcy Court.  If the Trustee determines that the matter in dispute is exigent and cannot await the completion of the ADR process, the Trustee shall have the discretion to elect out of the ADR process altogether or at any stage of the process and seek resolution of the dispute in the Bankruptcy Court.

      **7.14**    **Enforcement and Administration.**  The provisions of this PI Trust Agreement and the TDP attached hereto shall be enforced by the Bankruptcy Court pursuant to the Plan. The parties hereby further acknowledge and agree that the Bankruptcy Court shall have exclusive jurisdiction over the settlement of the accounts of the Trustee and over any disputes hereunder not resolved by alternative dispute resolution in accordance with Section 7.13 above.

      **7.15**    **Effectiveness.**  This PI Trust Agreement shall not become effective until it has been executed and delivered by all the parties hereto.

      **7.16**    **Counterpart Signatures.**  This PI Trust Agreement may be executed in any number of counterparts, each of which shall constitute an original, but such counterparts shall together constitute but one and the same instrument.

IN WITNESS WHEREOF, the parties have executed this PI Trust Agreement this

_____ day of _____, 2011.


**Motors Liquidation Company**


By:_____


Title:  _____


**[ADD NAMES OF OTHER DEBTORS]**

**TRUSTEE**                                          **ACC**


_____            By:_____
Name:  Kirk P. Watson, Esq.

                                                    **DELAWARE TRUSTEE**


                                                    By:_____

## TRUST ADVISORY COMMITTEE

_____
Name:  John D. Cooney, Esq.
Expiration Date of Initial Term:  _____ Anniversary of
the date of this PI Trust Agreement


_____
Name:  Steven Kazan, Esq.
Expiration Date of Initial Term:  _____ Anniversary of
the date of this PI Trust Agreement


_____
Name:  Perry Weitz, Esq.
Expiration Date of Initial Term:  _____ Anniversary of
the date of this PI Trust Agreement


## FUTURES REPRESENTATIVE

_____
Hon. Dean M. Trafelet (Ret.)


[Signature Pages to PI Trust Agreement]

**EXHIBIT B**

**ASBESTOS TRUST DISTRIBUTION PROCEDURES**

**MLC**

**ASBESTOS PI TRUST**
**DISTRIBUTION PROCEDURES**

**MLC**

**ASBESTOS PI TRUST DISTRIBUTION PROCEDURES**

**TABLE OF CONTENTS**

Page

SECTION I — Introduction ......................................................................... 1

    1.1    Purpose ........................................................................... 1
    1.2    Interpretation ........................................................................... 1


SECTION II — Overview ......................................................................... 2

    2.1    PI Trust Goals ................................................................... 2
    2.2    Claims Liquidation Procedures ................................................. 3
    2.3    Application of the Payment Percentage ................................... 5
    2.4    PI Trust's Determination of the Maximum Annual Payment
           and Maximum Available Payment ....................................... 7
    2.5    Claims Payment Ratio ......................................................... 9
    2.6    Indirect Asbestos Trust Claims ............................................. 12


SECTION III — TDP Administration ........................................................... 12

    3.1    Trust Advisory Committee and Futures Representative ......................... 12
    3.2    Consent and Consultation Procedures ................................... 12


SECTION IV — Payment Percentage; Periodic Estimates ........................................... 13

    4.1    Uncertainty of Debtors' Personal Injury Asbestos Liabilities ............... 13
    4.2    Computation of Payment Percentage ................................... 13
    4.3    Applicability of the Payment Percentage ............................... 15

SECTION V — Resolution of PI Trust Claims ................................................................ 18

5.1    Ordering, Processing and Payment of Claims  ......................................... 18
       (a)    Ordering of Claims  ....................................................................... 18
              (1)    Establishment of the FIFO Processing Queue  ................ 18
              (2)    Effect of Statutes of Limitations and Repose  ................. 19
       (b)    Processing of Claims ..................................................................... 19
       (c)    Payment of Claims ........................................................................ 19
       (d)    New GM     ...................................................................................... 20
5.2    Resolution of Pre-Petition Liquidated PI Trust Claims ......................... 21
       (a)    Processing and Payment ................................................................ 21
       (b)    Marshalling of Security.................................................................. 23
5.3    Resolution of Unliquidated PI Trust Claims ........................................... 23
       (a)    Expedited Review Process ............................................................ 25
              (1)    In General .......................................................................... 25
              (2)    Claims Processing Under Expedited Review  ................. 26
              (3)    Disease Levels, Scheduled Value
                     and Medical/Exposure Criteria ................................. 26
       (b)    Individual Review Process ............................................................ 30
              (1)    In General .......................................................................... 30
                     (A)    Review of Medical/Exposure Criteria  ............... 32
                     (B)    Review of Liquidated Value  .............................. 32
              (2)    Valuation Factors to Be Considered in
                     Individual Review ............................................... 33
              (3)    Scheduled, Average and Maximum Values ................... 34
5.4    Categorizing Claims as Extraordinary and/or Exigent Hardship............ 36
       (a)    Extraordinary Claims .................................................................... 36
       (b)    Exigent Hardship Claims ............................................................. 36
5.5    Secondary Exposure Claims .................................................................... 37
5.6    Indirect PI Trust Claims .......................................................................... 38
5.7    Evidentiary Requirements ....................................................................... 40
       (a)    Medical Evidence ......................................................................... 40
              (1)    In General .......................................................................... 40
                     (A)    Disease Levels I–IV ........................................... 40
                     (B)    Disease Levels V–VIII  ...................................... 41
                     (C)    Exception to the Exception for Certain
                            Pre-Petition Claims........................................ 42
              (2)    Credibility of Medical Evidence .................................... 42
       (b)    Exposure Evidence........................................................................ 43
              (1)    In General .......................................................................... 43
              (2)    Significant Occupational Exposure.................................. 44
              (3)    Debtor Exposure ............................................................... 44
5.8    Claims Audit Program .............................................................................. 45
5.9    Second Disease (Malignancy) Claims  .................................................... 46

5.10    Arbitration ............................................................................    46
          (a)      Establishment of ADR Procedures .............................    46
          (b)      Claims Eligible for Arbitration ...............................    47
          (c)      Limitations on and Payment of Arbitration Awards..................    48
5.11    Litigation ............................................................................    48


SECTION VI — Claims Materials .............................................    48

6.1    Claims Materials .............................................................    48
6.2    Content of Claims Materials ............................................    49
6.3    Withdrawal or Deferral of Claims .....................................    49
6.4    Filing Requirements and Fees .........................................    50
6.5    Confidentiality of Claimants' Submissions ...........................    50


SECTION VII — General Guidelines for Liquidating and Paying Claims ...................    52

7.1    Showing Required       .............................................................    52
7.2    Costs Considered ...........................................................    52
7.3    Discretion to Vary the Order and Amounts of Payments in
            Event of Limited Liquidity ........................................    52
7.4    Punitive Damages ..........................................................    53
7.5    Sequencing Adjustment .................................................    54
          (a)      In General.............................................................    54
          (b)      Unliquidated PI Trust Claims ..................................    54
          (c)      Liquidated Pre-Petition Claims ...............................    55
7.6    Suits in the Tort System.................................................    55
7.7    Payment of Judgments for Money Damages .......................    56
7.8    Releases ......................................................................    57
7.9    Third-Party Services ......................................................    57
7.10    PI Trust Disclosure of Information .....................................    57


SECTION VIII — Miscellaneous       .......................................    58

8.1    Amendments ...............................................................    58
8.2    Severability .................................................................    58
8.3    Governing Law ............................................................    59

9

# MLC

## ASBESTOS PI TRUST DISTRIBUTION PROCEDURES

The MLC Asbestos PI Trust Distribution Procedures (the "**TDP**") contained herein provide for resolving all "Asbestos Personal Injury Claims" as defined in the Second Amended Joint Chapter 11 Plan of Motors Liquidation Company, *et al.*, f/k/a General Motors Corp., *et al.*, dated as of March 17, 2011 (as it may be amended or modified, the "**Plan**"),[1] as provided in and required by the Plan and the MLC Asbestos PI Trust Agreement (the "**PI Trust Agreement**"). The Plan and PI Trust Agreement establish the MLC Asbestos PI Trust (the "**PI Trust**"). The Trustee of the PI Trust (the "**Trustee**") shall implement and administer this TDP in accordance with the PI Trust Agreement.

## SECTION I

### Introduction

**1.1** **Purpose.** This TDP has been adopted pursuant to the PI Trust Agreement. It is designed to provide fair, equitable and substantially similar treatment for all PI Trust Claims that may presently exist or may arise in the future.

**1.2** **Interpretation.** Except as may otherwise be provided below, nothing in this TDP shall be deemed to create a substantive right for any claimant. The rights and benefits provided herein to holders of PI Trust Claims shall vest in such holders as of the Effective Date.

---

[1] Capitalized terms used herein and not otherwise defined shall have the meanings assigned to them in the Plan and the PI Trust Agreement; provided, however, that "Asbestos Personal Injury Claims" as defined in the Plan shall be referred to herein as "**PI Trust Claims.**"

# SECTION II

## Overview

**2.1    PI Trust Goals.**  The goal of the PI Trust is to treat all claimants equitably.  This TDP furthers that goal by setting forth procedures for processing and paying the Debtors'[2] several share of the unpaid portion of the liquidated value of PI Trust Claims generally on an impartial, first-in-first-out ("**FIFO**") basis, with the intention of paying all claimants over time as equivalent a share as possible of the value of their claims based on historical values for substantially similar claims in the tort system.[3,4]  To this end, the TDP establishes a schedule of seven asbestos-related diseases ("**Disease Levels**"), six of which have presumptive medical and exposure requirements ("**Medical/Exposure Criteria**") and specific liquidated values ("**Scheduled Values**"), and five of which have both anticipated average values ("**Average Values**") and caps on their liquidated values ("**Maximum Values**").  The Disease Levels, Medical/Exposure Criteria, Scheduled Values, Average Values and Maximum Values, which are set forth in Sections 5.3 and 5.4 below, have all been selected and derived with the intention of achieving a fair allocation of the PI Trust funds as among claimants suffering from different disease processes in light of the best available information considering the settlement histories of

---

[2] "**Debtors**" means Motors Liquidation Company (f/k/a General Motors Corporation; MLC of Harlem, Inc. (f/k/a Chevrolet-Saturn of Harlem, Inc.); MLCS, LLC (f/k/a Saturn, LLC); MLCS Distribution Corporation (f/k/a Saturn Distribution Corporation); Remediation and Liability Management Company, Inc.; and Environmental Corporate Remediation Company, Inc.

[3] As used in this TDP, the phrase "in the tort system" shall not include claims asserted against a trust established for the benefit of asbestos personal injury claimants pursuant to section 524(g) and/or section 105 of the Bankruptcy Code or any other applicable law.

[4] PI Trust Claims have been classified, for purposes of this TDP, as either Auto Mechanic Claims or Other Claims (as such terms are defined in Section 5.3 below) because the liquidated value of such claims varies on such basis.

the Debtors and the rights claimants would have in the tort system absent the bankruptcy.  A

claimant may not assert more than one PI Trust Claim hereunder.

      **2.2**      **Claims Liquidation Procedures.**  PI Trust Claims shall be processed based on

their place in the FIFO Processing Queue to be established pursuant to Section 5.1(a) below.

The PI Trust shall take all reasonable steps to resolve PI Trust Claims as efficiently and

expeditiously as possible at each stage of claims processing and arbitration, which steps may

include, in the PI Trust's sole discretion, conducting settlement discussions with claimants'

representatives with respect to more than one claim at a time, provided that the claimants'

respective positions in the FIFO Processing Queue are maintained and each claim is individually

evaluated pursuant to the valuation factors set forth in Section 5.3(b)(2) below.  The PI Trust

shall also make every effort to resolve each year at least that number of PI Trust Claims required

to exhaust the Maximum Annual Payment and the Maximum Available Payment for Category A

and Category B claims, as those terms are defined below.

      The PI Trust shall liquidate all PI Trust Claims except Foreign Claims (as defined below)

that meet the presumptive Medical/Exposure Criteria of Disease Levels I–IV, VI and VII under

the Expedited Review Process described in Section 5.3(a) below.  Claims involving Disease

Levels I–IV, VI and VII that do not meet the presumptive Medical/Exposure Criteria for the

relevant Disease Level may undergo the PI Trust's Individual Review Process described in

Section 5.3(b) below.  In such a case, notwithstanding that the claim does not meet the

presumptive Medical/Exposure Criteria for the relevant Disease Level, the PI Trust can offer the

claimant an amount up to the Scheduled Value of that Disease Level if the PI Trust is satisfied

that the claimant has presented a claim that would be cognizable and valid in the tort system.

3

PI Trust Claims involving Disease Levels III, IV, VI and VII tend to raise more complex valuation issues than the PI Trust Claims in Disease Levels I and II. Accordingly, in lieu of liquidating such claimant's claim under the Expedited Review Process, claimants holding claims involving these Disease Levels may alternatively seek to establish a liquidated value for the claim that is greater than its Scheduled Value by electing the PI Trust's Individual Review Process. However, the liquidated value of a more serious Disease Level III, IV, VI or VII claim that undergoes the Individual Review Process for valuation purposes may be determined to be less than its Scheduled Value, and in any event shall not exceed the Maximum Value for the relevant Disease Level set forth in Section 5.3(b)(3) below, unless the claim qualifies as an Extraordinary Claim as defined in Section 5.4(a) below, in which case its liquidated value cannot exceed the maximum extraordinary value specified in that provision for such claims. Level V (Lung Cancer 2) claims and all Foreign Claims may be liquidated[5] only pursuant to the PI Trust's Individual Review Process.

Based upon the Debtors' claims settlement histories in light of applicable tort law, and current projections of present and future unliquidated claims, the Scheduled Values and Maximum Values set forth in Section 5.3(b)(3) have been established for each of the five (5) more serious Disease Levels that are eligible for Individual Review of their liquidated values, with the expectation that the combination of settlements at the Scheduled Values and those resulting from the Individual Review Process should over time generally result in the Average Values also set forth in that provision.

All unresolved disputes over a claimant's medical condition, exposure history and/or the liquidated value of the claim shall be subject to binding or non-binding arbitration as set forth in

---

[5] For purposes of this TDP, "liquidated" means approved and valued by the PI Trust.

4

Section 5.10 below, at the election of the claimant, under the ADR Procedures that are to be

established by the PI Trust.  PI Trust Claims that are the subject of a dispute with the PI Trust

that cannot be resolved by non-binding arbitration may enter the tort system as provided in

Sections 5.11 and 7.6 below.  However, if and when a claimant obtains a judgment in the tort

system, the judgment shall be payable (subject to the Payment Percentage, Maximum Available

Payment, and Claims Payment Ratio provisions set forth below) as provided in Section 7.7

below.

      **2.3**     **Application of the Payment Percentage.**  After the liquidated value of a PI Trust

Claim is determined pursuant to the procedures set forth herein for Expedited Review, Individual

Review, arbitration, or litigation in the tort system, the claimant shall ultimately receive a pro-

rata share of that value based on a Payment Percentage described in Section 4.2 below.  The

Payment Percentage shall also apply to all Pre-Petition Liquidated Claims as provided in Section

5.2 below and to all sequencing adjustments paid pursuant to Section 7.5 below.

      An Initial Payment Percentage shall be set pursuant to Section 4.2 below promptly after

the PI Trust is established by the Trustee with the consent of the PI Trust Advisory Committee

(the "**TAC**") and the Legal Representative for Future Claimants (the "**Futures Representative**")

(who are described in Section 3.1 below).  The Initial Payment Percentage shall apply to all PI

Trust Voting Claims accepted as valid by the PI Trust, unless adjusted by the PI Trust with the

consent of the TAC and the Futures Representative pursuant to Section 4.2 below, and except as

provided in Section 4.3 below with respect to supplemental payments in the event the Initial

Payment Percentage is changed.  The term "**PI Trust Voting Claims**" includes (i) Pre-Petition

Liquidated Claims as defined in Section 5.2(a) below; (ii) claims filed against the Debtors in the

tort system or actually submitted to the Debtors pursuant to an administrative settlement

5

agreement prior to the Commencement Date of June 1, 2009 (October 9, 2009 with respect to

Remediation and Liability Management Company, Inc. and Environmental Corporate

Remediation Company, Inc.) (the "**Commencement Date**"); and (iii) all asbestos claims filed

against another defendant in the tort system prior to August 31, 2010, the date the Plan was filed

with the Bankruptcy Court (the "**Plan Filing Date**"); provided, however, that (1) the holder of a

claim described in subsection (i), (ii) or (iii) above, or his or her authorized agent, actually voted

to accept or reject the Plan pursuant to the voting procedures established by the Bankruptcy

Court, unless such holder certifies to the satisfaction of the Trustee that he or she was prevented

from voting in this proceeding as a result of circumstances resulting in a state of emergency

affecting, as the case may be, the holder's residence, principal place of business or legal

representative's place of business at which the holder or his or her legal representative receives

notice and/or maintains material records relating to his or her PI Trust Voting Claim; and

provided further that (2) the claim was subsequently filed with the PI Trust pursuant to Section

6.1 below by the Initial Claims Filing Date defined in Section 5.1(a) below.  The Initial Payment

Percentage shall be calculated on the assumption that the Average Values set forth in Section

5.3(b)(3) below shall be achieved with respect to existing present claims and projected future

claims involving Disease Levels III–VII.

The Payment Percentage may thereafter be adjusted upwards or downwards from time to

time by the PI Trust with the consent of the TAC and the Futures Representative to reflect then-

current estimates of the PI Trust's assets and its liabilities, as well as then-estimated value of

then-pending and future claims.  Any adjustment to the Initial Payment Percentage shall be made

only pursuant to Section 4.2 below.  If the Payment Percentage is increased over time, claimants

whose claims were liquidated and paid in prior periods under the TDP shall receive additional

6

payments only as provided in Section 4.2 below.  Because there is uncertainty in the prediction

of both the number and severity of future PI Trust Claims, and the amount of the PI Trust's

assets, no guarantee can be made of any Payment Percentage of a PI Trust Claim's liquidated

value.

  **2.4**  **PI Trust's Determination of the Maximum Annual Payment and Maximum**

**Available Payment.** After calculating the Payment Percentage, the PI Trust shall model the

cash flow, principal and income year-by-year to be paid over its entire life to ensure that all

present and future holders of PI Trust Claims are compensated at the Payment Percentage.  In

each year, based upon the model of cash flow, the PI Trust shall be empowered to pay out the

portion of its funds payable for that year according to the model (the "**Maximum Annual**

**Payment**").  The PI Trust's distributions to all claimants for that year shall not exceed the

Maximum Annual Payment.  The Payment Percentage and the Maximum Annual Payment

figures are based on projections over the lifetime of the PI Trust.  As noted in Section 2.3 above,

if such long-term projections are revised, the Payment Percentage may be adjusted accordingly,

which would result in a new model of the PI Trust's anticipated cash flow and a new calculation

of the Maximum Annual Payment figures.

  However, year-to-year variations in the PI Trust's flow of claims or the value of its

assets, including earnings thereon, will not mean necessarily that the long-term projections are

inaccurate; they may simply reflect normal variations, both up and down, from the smooth curve

created by the PI Trust's long-term projections.  If, in a given year, however, asset values,

including earnings thereon, are below projections, the PI Trust may need to distribute less in that

year than would otherwise be permitted based on the original Maximum Annual Payment

derived from long-term projections.  Accordingly, the original Maximum Annual Payment for a

given year may be temporarily decreased if the present value of the assets of the PI Trust as

measured on a specified date during the year is less than the present value of the assets of the PI

Trust projected for that date by the cash flow model described in the foregoing paragraph.  The

PI Trust shall make such a comparison whenever the Trustee becomes aware of any information

that suggests that such a comparison should be made and, in any event, no less frequently than

once every six months.  If the PI Trust determines that as of the date in question, the present

value of the PI Trust's assets is less than the projected present value of its assets for such date,

then it will remodel the cash flow year-by-year to be paid over the life of the PI Trust based upon

the reduced value of the total assets as so calculated and identify the reduced portion of its funds

to be paid for that year, which will become the Temporary Maximum Annual Payment

(additional reductions in the Maximum Annual Payment can occur during the course of that year

based upon subsequent calculations).  If in any year the Maximum Annual Payment was

temporarily reduced as a result of an earlier calculation and, based upon a later calculation, the

difference between the projected present value of the PI Trust's assets and the actual present

value of its assets has decreased, the Temporary Maximum Annual Payment shall be increased to

reflect the decrease in the differential.  In no event, however, shall the Temporary Maximum

Annual Payment exceed the original Maximum Annual Payment.  As a further safeguard, the PI

Trust's distribution to all claimants for the first nine months of a year shall not exceed 85% of

the Maximum Annual Payment determined for that year.  If on December 31 of a given year, the

original Maximum Annual Payment for such year is not in effect, the original Maximum Annual

Payment for the following year shall be reduced proportionately.

In distributing the Maximum Annual Payment, the PI Trust shall first allocate the amount

in question to (a) outstanding Pre-Petition Liquidated Claim and (b) Exigent Hardship Claims (as

8

defined in Section 5.4(b) below).  Should the Maximum Annual Payment be insufficient to pay

all such claims in full, they shall be paid in proportion to the aggregate value of each group of

claims and the available funds allocated to each group of claims shall be paid to the maximum

extent to claimants in the particular group based on their place in their respective FIFO Payment

Queue.  Claims in any group for which there are insufficient funds shall be carried over to the

next year, and placed at the head of their FIFO Payment Queue.  If there is a decrease in the

Payment Percentage prior to the payment of such claims, any such claims shall nevertheless be

entitled to be paid at the Payment Percentage that they would have been entitled to receive but

for the application of the Maximum Annual Payment.  The remaining portion of the Maximum

Annual Payment (the "**Maximum Available Payment**"), if any, shall then be allocated and used

to satisfy all other liquidated PI Trust Claims, subject to the Claims Payment Ratio set forth in

Section 2.5 below; provided, however, that if the Maximum Annual Payment is reduced during a

year pursuant to the provisions above, the Maximum Available Payment shall be adjusted

accordingly.  Claims in the groups described in (a) and (b) above shall not be subject to the

Claims Payment Ratio.

     **2.5**    **Claims Payment Ratio.**  Based upon the Debtors' claims settlement histories and

analysis of present and future claims, a Claims Payment Ratio has been determined which, as of

the Effective Date, has been set at 80% for Category A claims, which consist of PI Trust Claims

involving severe asbestosis and malignancies (Disease Levels III–VII) and at 20% for Category

B claims, which are PI Trust Claims involving non-malignant Asbestosis or Pleural Disease

(Disease Levels I and II).

     In each year, after the determination of the Maximum Available Payment described in

Section 2.4 above, 80% of that amount shall be available to pay Category A claims and 20%

9

shall be available to pay Category B claims that have been liquidated since the Commencement Date except for claims liquidated which, pursuant to Section 2.4 above, are not subject to the Claims Payment Ratio; provided, however, that if the Maximum Annual Payment is reduced during the year pursuant to the provisions of Section 2.4 above, the amounts available to pay Category A and Category B claims shall be recalculated based on the adjusted Maximum Available Payment.  In the event there are insufficient funds in any year to pay the liquidated claims within either or both of the Categories, the available funds allocated to the particular Category shall be paid to the maximum extent to claimants in that Category based on their place in the FIFO Payment Queue described in Section 5.1(c) below, which shall be based upon the date of claim liquidation.  Claims for which there are insufficient funds allocated to the relevant Category shall be carried over to the next year where they shall be placed at the head of the FIFO Payment Queue.  If there is a decrease in the Payment Percentage prior to the payment of such claims, such claims shall nevertheless be entitled to be paid at the Payment Percentage that they would have been entitled to receive but for the application of the Claims Payment Ratio.

If, for any year, there are excess funds available to pay the Category B claims because there is an insufficient amount of liquidated claims to exhaust the Maximum Available Payment amount allocable for Category B in such year, then the excess funds for Category B shall be available for the payment of Category A claims liquidated in such year.  If, after the payment of any such Category A Claims, there are remaining excess funds for Category B, then such excess funds for Category B shall be rolled over and remain dedicated to Category B claims.  If, for any year, there are excess funds available to pay the Category A claims because there is an insufficient amount of liquidated claims to exhaust the Maximum Available Payment amount allocable for Category A in such year, then the excess funds for Category A shall be rolled over

10

and remain dedicated to Category A claims.  During the first nine months of a given year, the PI

Trust's payments to claimants in a Category shall not exceed (a) 85% of the amount that would

otherwise be available for payment to claimants in such Category plus (b) in the case of Category

A, the amount of any excess funds that were rolled over for Category A from the prior year.

The 80%/20% Claims Payment Ratio and its rollover provision shall be continued absent

circumstances necessitating amendment to avoid a manifest injustice.  In considering whether to

make any amendments to the Claims Payment Ratio and/or its rollover provisions, the Trustee

shall consider the reasons for which the Claims Payment Ratio and its rollover provisions were

adopted, the settlement histories that gave rise to its calculation, and the foreseeability or lack of

foreseeability of the reasons why there would be any need to make an amendment.  In that

regard, the Trustee should keep in mind the interplay between the Payment Percentage and the

Claims Payment Ratio as it affects the net cash actually paid to claimants.

The Claims Payment Ratio shall not be amended until the first anniversary of the date the

PI Trust first accepts for processing proof of claim forms and the other materials required to file

a claim with the PI Trust.  In any event, no amendment to the Claims Payment Ratio to reduce

the percentage allocated to Category A claims may be made without the unanimous consent of

the TAC members and the consent of the Futures Representative, and the percentage allocated to

Category A claims may not be increased without the consent of the TAC and the Futures

Representative.  The consent process set forth in Sections 5.7(b) and 6.6(b) of the PI Trust

Agreement shall apply in the event of any amendments to the Claims Payment Ratio.  The

Trustee, with the consent of the TAC and the Futures Representative, may offer the option of a

reduced Payment Percentage to holders of claims in either Category A or Category B in return

for prompter payment (the "**Reduced Payment Option**").

11

**2.6     Indirect Asbestos Claims.**  As set forth in Section 5.6 below, any Indirect Asbestos Claim with respect to a PI Trust Claim (an "**Indirect PI Trust Claim**") shall be subject to the same categorization, evaluation, and payment provisions of this TDP as all other PI Trust Claims.

## SECTION III

## TDP Administration

**3.1     Trust Advisory Committee and Futures Representative.**  Pursuant to the Plan and the PI Trust Agreement, the PI Trust and this TDP shall be administered by the Trustee in consultation with the TAC, which represents the interests of holders of present PI Trust Claims, and the Futures Representative, who represents the interests of holders of PI Trust Claims that shall be asserted in the future.  The Trustee shall obtain the consent of the TAC and the Futures Representative on any amendments to this TDP pursuant to Section 8.1 below, and on such other matters as are otherwise required below and in Section 2.2(f) of the PI Trust Agreement.  The Trustee shall also consult with the TAC and the Futures Representative on such matters as are provided below and in Section 2.2(e) of the PI Trust Agreement.  The initial Trustee, the initial members of the TAC and the initial Futures Representative are identified in the PI Trust Agreement.

**3.2     Consent and Consultation Procedures.**  In those circumstances in which consultation or consent is required, the Trustee shall provide written notice to the TAC and the Futures Representative of the specific amendment or other action that is proposed.  The Trustee shall not implement such amendment nor take such action unless and until the parties have engaged in the Consultation Process described in Sections 5.7(a) and 6.6(a), or the Consent Process described in Sections 5.7(b) and 6.6(b), of the PI Trust Agreement, respectively.

12

## SECTION IV

## Payment Percentage; Periodic Estimates

**4.1    Uncertainty of Debtors' Personal Injury Asbestos Liabilities.**  As discussed above, there is inherent uncertainty regarding Debtors' total asbestos-related tort liabilities, as well as the total value of the assets available to the PI Trust to pay PI Trust Claims. Consequently, there is inherent uncertainty regarding the amounts that holders of PI Trust Claims shall receive.  To seek to ensure substantially equivalent treatment of all present and future PI Trust Claims, the Trustee must determine from time to time the percentage of full liquidated value that holders of present and future PI Trust Claims shall be likely to receive, *i.e.*, the "**Payment Percentage**" described in Section 2.3 above and Section 4.2 below.

**4.2    Computation of Payment Percentage.**  As provided in Section 2.3 above, the Initial Payment Percentage shall be set by the Trustee with the consent of the TAC and the Futures Representative promptly after the date the PI Trust is established.  The Initial Payment Percentage shall apply to all PI Trust Voting Claims as defined in Section 2.3 above, unless the Trustee, with the consent of the TAC and the Futures Representative, determines that the Initial Payment Percentage should be changed to assure that the PI Trust shall be in a financial position to pay holders of unliquidated and/or unpaid PI Trust Voting Claims and present and future PI Trust Claims in substantially the same manner.

In making any such adjustment, the Trustee, the TAC and the Futures Representative shall take into account the fact that, based upon the analysis of experts, the Initial Payment Percentage represents a reasonably reliable estimate of the PI Trust's total assets and liabilities over its life based on the best information available at the time.

13

Except with respect to PI Trust Voting Claims to which the Initial Payment Percentage applies, the Payment Percentage shall be subject to change pursuant to the terms of this TDP and the PI Trust Agreement if the Trustee with the consent of the TAC and Futures Representative determines that an adjustment is required. No less frequently than once every three (3) years, commencing with the first day of January occurring after the Effective Date, the Trustee shall reconsider the then applicable Payment Percentage to assure that it is based on accurate, current information and may, after such reconsideration, change the Payment Percentage if necessary with the consent of the TAC and the Futures Representative. The Trustee shall also reconsider the then applicable Payment Percentage at shorter intervals if he or she deems such reconsideration to be appropriate or if requested to do so by the TAC or the Futures Representative. In any event, no less frequently than once every twelve (12) months, commencing on the Initial Claims Filing Date, the Trustee shall compare the liability forecast on which the then applicable Payment Percentage is based with the actual claims filing and payment experience of the PI Trust to date. If the results of the comparison call into question the ability of the PI Trust to continue to rely upon the current liability forecast, the Trustee shall undertake a reconsideration of the Payment Percentage.

The Trustee must base his or her determination of the Payment Percentage on current estimates of the number, types, and values of present and future PI Trust Claims, the value of the assets then available to the PI Trust for their payment, all anticipated administrative and legal expenses, and any other material matters that are reasonably likely to affect the sufficiency of funds to pay a comparable percentage of full value to all holders of PI Trust Claims. When making these determinations, the Trustee shall exercise common sense and flexibly evaluate all relevant factors. The Payment Percentage applicable to Category A or Category B claims may

14

not be reduced to alleviate delays in payments of claims in the other Category; both Categories

of claims shall receive the same Payment Percentage, but the payment may be deferred as

needed, and a Reduced Payment Option may be instituted as described in Section 2.5 above.

  **4.3**  **Applicability of the Payment Percentage.** Except as set forth below in this

Section 4.3 with respect to supplemental payments, no holder of a PI Trust Voting Claim shall

receive a payment that exceeds the Initial Payment Percentage times the liquidated value of the

claim.  Except as otherwise provided (a) in Section 5.1(c) below for PI Trust Claims involving

deceased or incompetent claimants for which approval of the PI Trust's offer by a court or

through a probate process is required and (b) in the paragraph below with respect to Released

Claims, no holder of any other PI Trust Claim shall receive a payment that exceeds the liquidated

value of the claim times the Payment Percentage in effect at the time of payment; provided,

however, that if there is a reduction in the Payment Percentage, the Trustee, in his or her sole

discretion, may cause the PI Trust to pay a PI Trust Claim based on the Payment Percentage that

was in effect prior to the reduction if such PI Trust Claim was filed and actionable with the PI

Trust ninety (90) days or more prior to the date the Trustee proposed the new Payment

Percentage in writing to the TAC and the Future Claimants' Representative (the "**Proposal**

**Date**") and the processing of such claim was unreasonably delayed due to circumstances beyond

the control of the claimant or the claimant's counsel, but only if such claim had no deficiencies

for the ninety (90) days prior to the Proposal Date.

  If a redetermination of the Payment Percentage has been proposed in writing by the

Trustee to the TAC and the Futures Representative but has not yet been adopted, the claimant

shall receive the lower of the current Payment Percentage or the proposed Payment Percentage.

However, if the proposed Payment Percentage was the lower amount but was not subsequently

15

adopted, the claimant shall thereafter receive the difference between the lower proposed amount and the higher current amount.  Conversely, if the proposed Payment Percentage was the higher amount and was subsequently adopted, the claimant shall thereafter receive the difference between the lower current amount and the higher adopted amount.

Notwithstanding anything contained herein, if the proposed Payment Percentage is lower than the current Payment Percentage, a claimant whose PI Trust Claim was liquidated prior to the Proposal Date and who either (a) transmitted[6] an executed release to the PI Trust prior to the Proposal Date or (b) with respect to those claimants who had received releases fewer than thirty (30) days prior to the Proposal Date, transmitted an executed release to the PI Trust within thirty (30) days of the claimant's receipt of the release (the claims described in (a) and (b) are collectively referred to here in as the "**Released Claims**") shall be paid based on the current Payment Percentage (the "**Released Claims Payment Percentage**").  For purposes hereof, (a) a claimant represented by counsel shall be deemed to have received a release on the date that the claimant's counsel receives the release, (b) if the PI Trust transmits a release electronically, the release shall be deemed to have been received on the date the PI Trust transmits the offer notification, and (c) if the PI Trust places the release in the U.S. mail, postage prepaid, the release shall be deemed to have been received three (3) business days after such mailing date.  A delay in the payment of the Released Claims for any reason, including delays resulting from limitations on payment amounts in a given year pursuant to Sections 2.4 and 2.5 hereof, shall not affect the rights of the holders of the Released Claims to be paid based on the Released Claims Payment Percentage.

---

[6] For purposes of this sentence, "transmitted" is defined as the date/time postmarked if submitted by mail or the date/time uploaded if submitted electronically.

16

At least thirty (30) days prior to proposing in writing to the TAC and the Future

Claimants' Representative a change in the Payment Percentage, the Trustee shall issue a written

notice to claimants or claimants' counsel indicating that the Trustee is reconsidering such

Payment Percentage.  During the period of time when the Trustee is contemplating a change in

the Payment Percentage, the PI Trust shall continuing processing claims and making offers in a

manner consistent with its normal course of business.

There is uncertainty surrounding the amount of the PI Trust's future assets.  There is also

uncertainty surrounding the totality of the PI Trust Claims to be paid over time, as well as the

extent to which changes in existing federal and state law could affect the PI Trust's liabilities

under this TDP.  If the value of the PI Trust's future assets increases significantly and/or if the

value or volume of PI Trust Claims actually filed with the PI Trust is significantly lower than

originally estimated, the PI Trust shall use those proceeds and/or claims savings, as the case may

be, first to maintain the Payment Percentage then in effect.

If the Trustee, with the consent of the TAC and the Futures Representative, makes a

determination to increase the Payment Percentage due to a material change in the estimates of

the PI Trust's future assets and/or liabilities, the Trustee shall also make supplemental payments

to all claimants who previously liquidated their claims against the PI Trust and received

payments based on a lower Payment Percentage.  The amount of any such supplemental payment

shall be the liquidated value of the claim in question times the newly adjusted Payment

Percentage, less all amounts previously paid to the claimant with respect to the claim (excluding

the portion of such previously paid amounts that was attributable to any sequencing adjustment

paid pursuant to Section 7.5 below).

17

The Trustee's obligation to make a supplemental payment to a claimant shall be suspended in the event the payment in question would be less than $100.00, and the amount of the suspended payment shall be added to the amount of any prior supplemental payment/payments that was/were also suspended because it/they would have been less than $100.00.  However, the Trustee's obligation shall resume and the Trustee shall pay any such aggregate supplemental payments due the claimant at such time that the total exceeds $100.00.

**SECTION V**

**Resolution of PI Trust Claims.**

**5.1**      **Ordering, Processing and Payment of Claims.**

     **5.1(a)**   **Ordering of Claims.**

        **5.1(a)(1)**   **Establishment of the FIFO Processing Queue.** The PI Trust shall order claims that are sufficiently complete to be reviewed for processing purposes on a FIFO basis except as otherwise provided herein (the "**FIFO Processing Queue**").  For all claims filed on or before the date six (6) months after the date that the PI Trust first makes available the proof of claim forms and other claims materials required to file a claim with the PI Trust (such six-month anniversary being referred to herein as the "**Initial Claims Filing Date**"), a claimant's position in the FIFO Processing Queue shall be determined as of the earliest of (i) the date prior to Commencement Date that the specific claim was either filed against a Debtor in the tort system or was actually submitted to a Debtor pursuant to an administrative settlement agreement; (ii) the date before the Commencement Date that the asbestos claim was filed against another defendant in the tort system if at the time the claim was subject to a tolling agreement with a Debtor; (iii) the date after the Commencement Date but before the date that the PI Trust first makes available the proof of claim forms and other claims materials required to file a claim with

18

the PI Trust that the asbestos claim was filed against another defendant in the tort system; (iv)

the date after the Commencement Date but before the Effective Date that a proof of claim was

filed by the claimant against a Debtor in the Chapter 11 proceeding; or (v) the date a ballot was

submitted on behalf of the claimant for purposes of voting to accept or reject the Plan pursuant to

the voting procedures approved by the Bankruptcy Court.

Following the Initial Claims Filing Date, the claimant's position in the FIFO Processing

Queue shall be determined by the date the claim is filed with the PI Trust.  If any claims are filed

on the same date, the claimant's position in the FIFO Processing Queue shall be determined by

the date of the diagnosis of the asbestos-related disease.  If any claims are filed and diagnosed on

the same date, the claimant's position in the FIFO Processing Queue shall be determined by the

claimant's date of birth, with older claimants given priority over younger claimants.

**5.1(a)(2)  Effect of Statutes of Limitation and Repose.**  PI Trust Claims

may be filed with the PI Trust at any time irrespective of the application of any relevant federal,

state or foreign statute of limitation or repose.

**5.1(b)  Processing of Claims.**  As a general practice, the PI Trust shall review its

claims files on a regular basis and notify all claimants whose claims are likely to come up in the

FIFO Processing Queue in the near future.

**5.1(c)  Payment of Claims.**  PI Trust Claims that have been liquidated by the

Expedited Review Process as provided in Section 5.3(a) below, by the Individual Review

Process as provided in Section 5.3(b) below, by arbitration as provided in Section 5.10 below, or

by litigation in the tort system provided in Section 5.11 below, shall be paid in FIFO order based

on the date their liquidation became final (the "**FIFO Payment Queue**"), all such payments

being subject to the applicable Payment Percentage, the Maximum Available Payment, the

19

Claims Payment Ratio, and the sequencing adjustment provided for in Section 7.5 below, except as otherwise provided herein.  Pre-Petition Liquidated Claims, as defined in Section 5.2 below, shall be subject to the Maximum Annual Payment and Payment Percentage limitations, but not to the Maximum Available Payment and Claims Payment Ratio provisions set forth above.

Where the claimant is deceased or incompetent, and the settlement and payment of his or her claim must be approved by a court of competent jurisdiction or through a probate process prior to acceptance of the claim by the claimant's representative, an offer made by the PI Trust on the claim shall remain open so long as proceedings before that court or in that probate process remain pending, provided that the PI Trust has been furnished with evidence that the settlement offer has been submitted to such court or in the probate process for approval.  If the offer is ultimately approved by the court or through the probate process and accepted by the claimant's representative, the PI Trust shall pay the claim in the amount so offered, multiplied by the Payment Percentage in effect at the time the offer was first made.

If any claims are liquidated on the same date, the claimant's position in the FIFO Payment Queue shall be determined by the date of the diagnosis of the claimant's asbestos-related disease.  If any claims are liquidated on the same date and the respective holders' asbestos-related diseases were diagnosed on the same date, the position of those claims in the FIFO Payment Queue shall be determined by the PI Trust based on the dates of the claimants' birth, with older claimants given priority over younger claimants.

    **5.1(d)  New GM.**  The claim values set forth herein are for liquidation and settlement purposes with respect to claims filed against the PI Trust.  No provision of this TDP shall preclude a claimant from pursuing his or her claim against New GM in the appropriate

20

jurisdiction of his or her choice and seeking full recovery of his or her damages as permitted by law and without regard to any criteria or values of this TDP.

If a claimant has received payment from New GM in satisfaction of a judgment entered in the tort system with respect to the claimant's PI Trust Claim, such claimant shall not be entitled to then file a claim with the PI Trust.  If a claimant has received payment from New GM as the result of a settlement in connection with the claimant's PI Trust Claim, the claimant subsequently may file a claim with the PI Trust, and the amount of the claimant's settlement with New GM shall be irrelevant with respect to the valuation of the PI Trust Claim by the PI Trust. If a claimant has received payment from the PI Trust with respect to his or her PI Trust Claim and the claimant then files a lawsuit against New GM with respect to such claim, the PI Trust shall waive its subrogation rights and, at the time of verdict molding, shall provide any information necessary to allow New GM to receive a credit on the verdict for the amount claimant received from the PI Trust.

### 5.2    Resolution of Pre-Petition Liquidated PI Trust Claims.

**5.2(a)  Processing and Payment.**  As soon as practicable after the Effective Date, the PI Trust shall pay, upon submission by the claimant of the appropriate documentation, all PI Trust Claims that were liquidated by (i) a binding settlement agreement for the particular claim entered into prior to the Commencement Date that is judicially enforceable by the claimant, (ii) a jury verdict or non-final judgment in the tort system obtained prior to the Commencement Date, or (iii) a judgment that became final and non-appealable prior to the Commencement Date (collectively "**Pre-Petition Liquidated Claims**").  In order to receive payment from the Trust, the holder of a Pre-Petition Liquidated Claim must submit all documentation necessary to demonstrate to the PI Trust that the claim was liquidated in the manner described in the

21

preceding sentence, which documentation shall include (A) a court authenticated copy of the jury

verdict (if applicable), a non-final judgment (if applicable) or a final judgment (if applicable) and

(B) the name, social security number and date of birth of the claimant and the name and address

of the claimant's lawyer.

The liquidated value of a Pre-Petition Liquidated Claim shall be the unpaid portion of the

amount agreed to in the binding settlement agreement, the unpaid portion of the amount awarded

by the jury verdict or non-final judgment or the unpaid portion of the amount of the final

judgment, as the case may be, plus interest, if any, that has accrued on that amount in accordance

with the terms of the agreement, if any, or under applicable state law for settlements or

judgments as of the Commencement Date; however, except as otherwise provided in Section 7.4

below, the liquidated value of a Pre-Petition Liquidated Claim shall not include any punitive or

exemplary damages.  In addition, the amounts payable with respect to such claims shall not be

subject to or taken into account in consideration of the Claims Payment Ratio and the Maximum

Available Payment limitations, but shall be subject to the Maximum Annual Payment and

Payment Percentage provisions.  In the absence of a Final Order of the Bankruptcy Court

determining whether a settlement agreement is binding and judicially enforceable, a dispute

between the claimant and the PI Trust over this issue shall be resolved pursuant to the same

procedures in this TDP that are provided for resolving the validity and/or liquidated value of a PI

Trust Claim (*i.e.*, arbitration and litigation in the tort system as set forth in Sections 5.10 and 5.11

below).

Pre-Petition Liquidated Claims shall be processed and paid in accordance with their order

in a separate FIFO queue to be established by the PI Trust based on the date the PI Trust received

all required documentation for the particular claim.  If any Pre-Petition Liquidated Claims were

22

filed on the same date, the claimants' position in the FIFO queue for such claims shall be

determined by the date on which the claim was liquidated.  If any Pre-Petition Liquidated Claims

were both filed and liquidated on the same dates, the position of the claimants in the FIFO queue

shall be determined by the dates of the claimants' birth, with older claimants given priority over

younger claimants.

        **5.2(b)  Marshalling of Security.**  Holders of Pre-Petition Liquidated Claims that

are secured by letters of credit, appeal bonds, or other security or sureties shall first exhaust their

rights against any applicable security or surety before making a claim against the PI Trust.  Only

in the event that such security or surety is insufficient to pay the Pre-Petition Liquidated Claim in

full shall the deficiency be processed and paid as a Pre-Petition Liquidated Claim.

        **5.3**     **Resolution of Unliquidated PI Trust Claims.**  Within six (6) months after the

establishment of the PI Trust, the Trustee, with the consent of the TAC and the Futures

Representative, shall adopt procedures for reviewing and liquidating all unliquidated PI Trust

Claims, which shall include deadlines for processing such claims.  Such procedures shall also

require that claimants seeking resolution of unliquidated PI Trust Claims must first file a proof of

claim form, together with the required supporting documentation, in accordance with the

provisions of Sections 6.1 and 6.2 below.  It is anticipated that the PI Trust shall provide an

initial response to the claimant within six (6) months of receiving the proof of claim form.

        The proof of claim form shall require the claimant to assert his or her claim for the

highest Disease Level for which the claim qualifies at the time of filing.  Irrespective of the

Disease Level alleged on the proof of claim form, all claims shall be deemed to be a claim for the

highest Disease Level for which the claim qualifies at the time of filing, and all lower Disease

Levels for which the claim may also qualify at the time of filing or in the future shall be treated as subsumed into the higher Disease Level for both processing and payment purposes.

A claimant shall specify on his or her proof of claim form (and the claim form shall require that a claimant so designate) whether the claim is asserted to be an "Auto Mechanic Claim" or an "Other Claim."  The Trustee shall have the right (in addition to all other rights) to challenge any such assertion or designation.  As used in this TDP, the following terms shall have the following meanings:

(i)    "**Auto Mechanic Claims**" are PI Trust Claims held by "auto mechanics."  In order for a claimant to qualify as an "auto mechanic" under this TDP, said claimant must have worked professionally as a mechanic in the automotive servicing and repair industry performing work on General Motors marine engines, brakes and/or clutches on cars, trucks, buses, or other vehicles.  This work typically would have involved changing brakes and brake pads as well as clutches and clutch facings or other similar General Motors friction products such as Electo-Motive railroad friction products.  Also included under this definition of "auto mechanic" are individuals who worked alongside such brake mechanics, but in another capacity, including but not limited to those individuals working in said industry as body repairmen, parts department employees, or persons who cleaned up the facilities where such brake and clutch work was done.

(ii)    "**Other Claims**" means PI Trust Claims held by persons other than auto mechanics, including but not limited to "shade tree" mechanics, automobile hobbyists, individuals who occasionally performed brake and/or clutch work on their own vehicles and/or the vehicles of friends and neighbors, or any other individuals who were not regularly employed as professional auto mechanics.

24

Upon filing of a valid proof of claim form with the required supporting documentation, the claimant shall be placed in the FIFO Processing Queue in accordance with the ordering criteria described in Section 5.1(a) above. When the claim reaches the top of the FIFO Processing Queue, the PI Trust shall process and liquidate the claim based upon the medical/exposure evidence submitted by the claimant and under the Process elected by the claimant. If the claimant failed to elect a Process, the PI Trust shall process and liquidate the claim under the Expedited Review Process although the claimant shall retain the right to request Individual Review as described in Section 5.3(b) below.

**5.3(a)  Expedited Review Process.**

**5.3(a)(1)  In General.**  The PI Trust's Expedited Review Process is designed primarily to provide an expeditious, efficient and inexpensive method for liquidating all PI Trust Claims (except those involving Lung Cancer 2 – Disease Level V and all Foreign Claims (as defined below), which shall only be liquidated pursuant to the PI Trust's Individual Review Process), where the claim can easily be verified by the PI Trust as meeting the presumptive Medical/Exposure Criteria for the relevant Disease Level. Expedited Review thus provides claimants with a substantially less burdensome process for pursuing PI Trust Claims than does the Individual Review Process described in Section 5.3(b) below. Expedited Review is also intended to provide qualifying claimants a fixed and certain claims payment.

Thus, claims that undergo Expedited Review and meet the presumptive Medical/Exposure Criteria for the relevant Disease Level shall be paid the Scheduled Value for such Disease Level set forth in Section 5.3(a)(3) below. However, all claims liquidated by Expedited Review shall be subject to the applicable Payment Percentage, the Maximum Available Payment and the Claims Payment Ratio limitations set forth above; provided,

25

however, that Exigent Hardship Claims shall not be subject to the Maximum Available Payment and the Claims Payment Ratio.  Claimants holding claims that cannot be liquidated by Expedited Review because they do not meet the presumptive Medical/Exposure Criteria for the relevant Disease Level may elect the PI Trust's Individual Review Process set forth in Section 5.3(b) below.

Subject to the provisions of Section 5.8, the claimant's eligibility to receive the Scheduled Value for his or her PI Trust Claim pursuant to the Expedited Review Process shall be determined solely by reference to the Medical/Exposure Criteria set forth below for each of the Disease Levels eligible for Expedited Review.

**5.3(a)(2)  Claims Processing Under Expedited Review.**  All claimants seeking liquidation of their claims pursuant to Expedited Review shall file the PI Trust's proof of claim form.  As a proof of claim form is reached in the FIFO Processing Queue, the PI Trust shall determine whether the claim described therein meets the Medical/Exposure Criteria for one of the seven Disease Levels eligible for Expedited Review, and shall advise the claimant of its determination.  If a Disease Level is determined, the PI Trust shall tender to the claimant an offer of payment of the Scheduled Value for the relevant Disease Level multiplied by the applicable Payment Percentage, together with a form of release approved by the PI Trust.  If the claimant accepts the Scheduled Value and returns the release properly executed, the claim shall be placed in the FIFO Payment Queue, following which the PI Trust shall disburse payment subject to the limitations of the Maximum Available Payment and Claims Payment Ratio, if any.

**5.3(a)(3)  Disease Levels, Scheduled Values and Medical/Exposure Criteria.**  The seven Disease Levels covered by this TDP, together with the Medical/Exposure Criteria for each and the Scheduled Values for the six Disease Levels eligible for Expedited

26

Review, are set forth below.  These Disease Levels, Scheduled Values, and Medical/Exposure

Criteria shall apply to all PI Trust Voting Claims filed with the PI Trust (except Pre-Petition

Liquidated Claims) on or before the Initial Claims Filing Date provided in Section 5.1 above for

which the claimant elects the Expedited Review Process.  Thereafter, for purposes of

administering the Expedited Review Process and with the consent of the TAC and the Futures

Representative, the Trustee may add to, change, or eliminate Disease Levels, Scheduled Values,

or Medical/Exposure Criteria; develop subcategories of Disease Levels, Scheduled Values or

Medical/Exposure Criteria; or determine that a novel or exceptional asbestos personal injury

claim is compensable even though it does not meet the Medical/Exposure Criteria for any of the

then current Disease Levels.

| **Disease Level** | **Scheduled Value** | | **Medical/Exposure Criteria** |
| | **Auto Mechanic** | **Other** | |
| --- | --- | --- | --- |
| Mesothelioma (Level VII) | $175,000 | $20,000 | (1) Diagnosis[7] of mesothelioma; and (2) Debtor Exposure as defined in Section 5.7(b)(3). |
| Lung Cancer 1 (Level VI) | $50,000 | $6,000 | (1) Diagnosis of a primary lung cancer plus evidence of an underlying Bilateral Asbestos-Related Nonmalignant Disease[8], (2) six months |

[7] The requirements for a diagnosis of an asbestos-related disease that may be compensated under the provisions of this TDP are set forth in Section 5.7 below.

[8] Evidence of "Bilateral Asbestos-Related Nonmalignant Disease," for purposes of meeting the criteria for establishing Disease Levels I, II, IV, and VI, means either (i) a chest X-ray read by a qualified B reader of 1/0 or higher on the ILO scale or (ii)(x) a chest X-ray read by a qualified B reader or other Qualified Physician, (y) a CT scan read by a Qualified Physician, or (z) pathology, in each case showing either bilateral interstitial fibrosis, bilateral pleural plaques, bilateral pleural thickening, or bilateral pleural calcification. Evidence submitted to demonstrate (i) or (ii) above must be in the form of a written report stating the results (*e.g.,* an ILO report, a written radiology report or a pathology report). Solely for asbestos claims filed against a Debtor or another defendant in the tort system prior to the Commencement Date, if an ILO reading is not available, either (i) a chest X-ray or a CT scan read by a Qualified Physician, or (ii) pathology, in each case showing bilateral interstitial fibrosis, bilateral pleural plaques, bilateral pleural thickening, or bilateral pleural calcification consistent with or compatible with a diagnosis of asbestos-related disease, shall be evidence of a Bilateral Asbestos-Related Nonmalignant Disease

27

| Disease Level | Scheduled Value | | Medical/Exposure Criteria |
|---|---|---|---|
| | **Auto Mechanic** | **Other** | |
| | | | Debtor Exposure prior to December 31, 1982, (3) Significant Occupational Exposure[9] to asbestos, and (4) supporting medical documentation establishing asbestos exposure as a contributing factor in causing the lung cancer in question. |
| Lung Cancer 2 (Level V) | None | None | (1) Diagnosis of a primary lung cancer; (2) Debtor Exposure prior to December 31, 1982, and (3) supporting medical documentation establishing asbestos exposure as a contributing factor in causing the lung cancer in question. |
| | | | Lung Cancer 2 (Level V) claims are claims that do not meet the more stringent medical and/or exposure requirements of Lung Cancer 1 (Level VI) claims.  All claims in this Disease Level shall be individually evaluated.  The estimated likely average of the individual evaluation awards for this category is $16,000 for Auto Mechanic Claims and $2,500 for Other Claims, with such awards capped at $40,000 for Auto Mechanic Claims and $15,000 for Other Claims unless the claim qualifies for Extraordinary Claim treatment. |
| | | | Level V claims that show no evidence of either an underlying Bilateral Asbestos-Related Nonmalignant Disease or Significant |

for purposes of meeting the presumptive medical requirements of Disease Levels I, II, IV and VI. Pathological proof of asbestosis may be based on the pathological grading system for asbestosis described in the Special Issue of the Archives of Pathology and Laboratory Medicine, "Asbestos-associated Diseases," Vol. 106, No. 11, App. 3 (October 8, 1982).  For all purposes of this TDP, a "Qualified Physician" is a physician who is board-certified (or in the case of Canadian Claims or Foreign Claims, a physician who is certified or qualified under comparable medical standards or criteria of the jurisdiction in question) in one or more relevant specialized fields of medicine such as pulmonology, radiology, internal medicine or occupational medicine; provided, however, subject to the provisions of Section 5.8, that the requirement for board certification in this provision shall not apply to otherwise qualified physicians whose X-ray and/or CT scan readings are submitted for deceased holders of PI Trust Claims.

[9] The term "Significant Occupational Exposure" is defined in Section 5.7(b)(2) below.

| Disease Level | Scheduled Value | | Medical/Exposure Criteria |
| --- | --- | --- | --- |
| | Auto Mechanic | Other | |
| | | | Occupational Exposure may be individually evaluated, although it is not expected that such claims shall be treated as having any significant value, especially if the claimant is also a Smoker.[10]  In any event, no presumption of validity shall be available for any claims in this category. |
| Other Cancer (Level IV) | $10,000 | $1,600 | (1) Diagnosis of a primary colo-rectal, laryngeal, esophageal, pharyngeal, or stomach cancer, plus evidence of an underlying Bilateral Asbestos-Related Nonmalignant Disease, (2) six months Debtor Exposure prior to December 31, 1982, (3) Significant Occupational Exposure to asbestos, and (4) supporting medical documentation establishing asbestos exposure as a contributing factor in causing the other cancer in question. |
| Severe Asbestosis (Level III) | $50,000 | $6,000 | (1) Diagnosis of asbestosis with ILO of 2/1 or greater, or asbestosis determined by pathological evidence of asbestos, plus (a) TLC less than 65%, or (b) FVC less than 65% and FEV1/FVC ratio greater than 65%, (2) six months Debtor Exposure prior to December 31, 1982, (3) Significant Occupational Exposure to asbestos, and (4) supporting medical documentation establishing asbestos exposure as a contributing factor in causing the pulmonary disease in question. |

---

[10] There is no distinction between Non-Smokers and Smokers for either Lung Cancer 1 (Level VI) or Lung Cancer 2 (Level V), although a claimant who meets the more stringent requirements of Lung Cancer 1 (Level VI) (evidence of an underlying Bilateral Asbestos-Related Nonmalignant Disease plus Significant Occupational Exposure), and who is also a Non-Smoker, may wish to have his or her claim individually evaluated by the PI Trust.  In such a case, absent circumstances that would otherwise reduce the value of the claim, it is anticipated that the liquidated value of the claim might well exceed the Scheduled Value for Lung Cancer 1 (Level VI) shown above.  "Non-Smoker" means a claimant who either (a) never smoked or (b) has not smoked during any portion of the twelve (12) years immediately prior to the diagnosis of the lung cancer.

| Disease Level | Scheduled Value | | Medical/Exposure Criteria |
| --- | --- | --- | --- |
| | Auto Mechanic | Other | |
| Asbestosis/Pleural Disease (Level II) | $4,000 | $1,100 | (1) Diagnosis of Bilateral Asbestos-Related Nonmalignant Disease, plus (a) TLC less than 80%, or (b) FVC less than 80% and FEV1/FVC ratio greater than or equal to 65%, and (2) six months Debtor Exposure prior to December 31, 1982, (3) Significant Occupational Exposure to asbestos, and (4) supporting medical documentation establishing asbestos exposure as a contributing factor in causing the pulmonary disease in question. |
| Asbestosis/Pleural Disease (Level I) | $1,600 | $350 | (1) Diagnosis of a Bilateral Asbestos-Related Nonmalignant Disease, and (2) six months Debtor Exposure prior to December 31, 1982, and (3) five years cumulative occupational exposure to asbestos. |

### 5.3(b)  Individual Review Process.

5.3(b)(1)  **In General.**  Subject to the provisions set forth below, a claimant may elect to have his or her PI Trust Claim reviewed for purposes of determining whether the claim would be compensable in the tort system even though it does not meet the presumptive Medical/Exposure Criteria for any of the Disease Levels set forth in Section 5.3(a)(3) above.  In addition or alternatively, a claimant may elect to have a claim undergo the Individual Review Process for purposes of determining whether the liquidated value of claim involving Disease Levels III, IV, VI or VII exceeds the Scheduled Value for the relevant Disease Level also set forth in said provision.  However, until such time as the PI Trust has made an offer on a claim pursuant to Individual Review, the claimant may change his or her Individual Review election and have the claim liquidated pursuant to the PI Trust's Expedited Review Process.  In the event of such a change in the processing election, the claimant shall nevertheless retain his or her place in the FIFO Processing Queue.

30

The liquidated value of all Foreign Claims payable under this TDP shall be established only under the PI Trust's Individual Review process. PI Trust Claims of individuals exposed in Canada who were resident in Canada when such claims were filed ("Canadian Claims") shall not be considered Foreign Claims hereunder and shall be eligible for liquidation under the Expedited Review Process. Accordingly, a "**Foreign Claim**" is a PI Trust Claim with respect to which the claimant's exposure to an asbestos-containing product or conduct for which a Debtor has legal responsibility occurred outside of the United States and its Territories and Possessions, and outside of the Provinces and Territories of Canada.

In reviewing Foreign Claims, the PI Trust shall take into account all relevant procedural and substantive legal rules to which the claims would be subject in the Claimant's Jurisdiction as defined in Section 5.3(b)(2) below. The PI Trust shall determine the liquidated value of Foreign Claims based on historical settlements and verdicts in the Claimant's Jurisdiction as well as the other valuation factors set forth in Section 5.3(b)(2) below.

For purposes of the Individual Review process for Foreign Claims, the Trustee, with the consent of the TAC and the Futures Representative, may develop separate Medical/Exposure Criteria and standards, as well as separate requirements for physician and other professional qualifications, which shall be applicable to all Foreign Claims channeled to the PI Trust; provided however, that such criteria, standards or requirements shall not effectuate substantive changes to the claims eligibility requirements under this TDP, but rather shall be made only for the purpose of adapting those requirements to the particular licensing provisions and/or medical customs or practices of the foreign country in question.

At such time as the PI Trust has sufficient historical settlement, verdict and other valuation data for claims from a particular foreign jurisdiction, the Trustee, with the consent of

31

the TAC and the Futures Representative, may also establish a separate valuation matrix for any

such Foreign Claims based on that data.

**5.3(b)(1)(A)  Review of Medical/Exposure Criteria.**  The PI

Trust's Individual Review Process provides a claimant with an opportunity for individual

consideration and evaluation of a PI Trust Claim that fails to meet the presumptive

Medical/Exposure Criteria for Disease Levels I–IV, VI or VII.  In such a case, the PI Trust shall

either deny the claim or, if the PI Trust is satisfied that the claimant has presented a claim that

would be cognizable and valid in the tort system, the PI Trust can offer the claimant a liquidated

value amount up to the Scheduled Value for that Disease Level.

**5.3(b)(1)(B)  Review of Liquidated Value.**  Claimants holding

claims in the five more serious Disease Levels III–VII shall also be eligible to seek Individual

Review of the liquidated value of their claims, as well as of their medical/exposure evidence.

The Individual Review Process is intended to result in payments equal to the full liquidated value

for each claim multiplied by the Payment Percentage; however, the liquidated value of any PI

Trust Claim that undergoes Individual Review may be determined to be less than the Scheduled

Value the claimant would have received under Expedited Review.  Moreover, the liquidated

value for a claim involving Disease Levels III–VII shall not exceed the Maximum Value for the

relevant Disease Level set forth in Section 5.3(b)(3) below, unless the claim meets the

requirements of an Extraordinary Claim described in Section 5.4(a) below, in which case its

liquidated value cannot exceed the maximum extraordinary value set forth in that provision for

such claims.  Because the detailed examination and valuation process pursuant to Individual

Review requires substantial time and effort, claimants electing to undergo the Individual Review

Process may be paid the liquidated value of their PI Trust Claims later than would have been the

case had the claimant elected the Expedited Review Process.  Subject to the provisions of

Section 5.8, the PI Trust shall devote reasonable resources to the review of all claims to ensure

that there is a reasonable balance maintained in reviewing all classes of claims.

### 5.3(b)(2)  Valuation Factors to Be Considered in Individual Review.

The PI Trust shall liquidate the value of each PI Trust Claim that undergoes Individual Review

based on the historic liquidated values of other similarly situated claims in the tort system for the

same Disease Level.  The PI Trust shall thus take into consideration all of the factors that affect

the severity of damages and values within the tort system including, but not limited to, credible

evidence of (i) the degree to which the characteristics of a claim differ from the presumptive

Medical/Exposure Criteria for the Disease Level in question; (ii) factors such as the claimant's

age, disability, employment status, disruption of household, family or recreational activities,

dependencies, special damages, and pain and suffering; (iii) whether the claimant's damages

were (or were not) caused by asbestos exposure, including exposure to an asbestos-containing

product or to conduct for which a Debtor has legal responsibility prior to December 31, 1982 (for

example, alternative causes, and the strength of documentation of injuries); (iv) the industry of

exposure; (v) settlement and verdict histories and other law firms' experience in the Claimant's

Jurisdiction for similarly situated claims; and (vi) settlement and verdict histories for the

claimant's law firm for similarly situated claims.

For these purposes, the "Claimant's Jurisdiction" is the jurisdiction in which the claim

was filed (if at all) against a Debtor in the tort system prior to the Commencement Date.  If the

claim was not filed against a Debtor in the tort system prior to the Commencement Date, the

claimant may elect as the Claimant's Jurisdiction either (i) the jurisdiction in which the claimant

resides at the time of diagnosis or when the claim is filed with the PI Trust; or (ii) a jurisdiction

in which the claimant experienced exposure to an asbestos-containing product or to conduct for which a Debtor has legal responsibility.

With respect to the "Claimant's Jurisdiction" in the event a personal representative or authorized agent makes a claim under this TDP for wrongful death with respect to which the governing law of the Claimant's Jurisdiction could only be the Alabama Wrongful Death Statute, the Claimant's Jurisdiction for such claim shall be the Commonwealth of Pennsylvania, and such claimant's damages shall be determined pursuant to the statutory and common laws of the Commonwealth of Pennsylvania without regard to its choice of law principles.  The choice of law provision in Section 7.4 below applicable to any claim with respect to which, but for this choice of law provision, the applicable law of the Claimant's Jurisdiction pursuant to Section 5.3(b)(2) is determined to be the Alabama Wrongful Death Statute, shall only govern the rights between the PI Trust and the claimant, and, to the extent the PI Trust seeks recovery from any entity that provided insurance coverage to a Debtor, the Alabama Wrongful Death Statute shall govern.

**5.3(b)(3)  Scheduled, Average and Maximum Values.**  The Scheduled, Average and Maximum Values for claims involving Disease Levels I–VII  are the following:

### AUTO MECHANIC CLAIMS:

| Scheduled Disease | Scheduled Value | Average Value | Maximum Value |
|---|---|---|---|
| Mesothelioma (Level VII) | $175,000 | $220,000 | $525,000 |
| Lung Cancer 1 (Level VI) | $50,000 | $80,000 | $140,000 |
| Lung Cancer 2 (Level V) | None | $16,000 | $40,000 |
| Other Cancer (Level IV) | $10,000 | $16,000 | $40,000 |

34

**AUTO MECHANIC CLAIMS:**

| Scheduled Disease | Scheduled Value | Average Value | Maximum Value |
|---|---|---|---|
| Severe Asbestosis (Level III) | $50,000 | $80,000 | $140,000 |
| Asbestosis/Pleural Disease (Level II) | $4,000 | None | None |
| Asbestosis/Pleural Disease (Level I) | $1,600 | None | None |

**OTHER CLAIMS:**

| Scheduled Disease | Scheduled Value | Average Value | Maximum Value |
|---|---|---|---|
| Mesothelioma (Level VII) | $20,000 | $35,000 | $200,000 |
| Lung Cancer 1 (Level VI) | $6,000 | $9,000 | $45,000 |
| Lung Cancer 2 (Level V) | None | $2,500 | $15,000 |
| Other Cancer (Level IV) | $1,600 | $2,500 | $15,000 |
| Severe Asbestosis (Level III) | $6,000 | $9,000 | $45,000 |
| Asbestosis/Pleural Disease (Level II) | $1,100 | None | None |
| Asbestosis/Pleural Disease (Level I) | $350 | None | None |

These Scheduled Values, Average Values and Maximum Values shall apply to all PI Trust Voting Claims other than Pre-Petition Liquidated Claims filed with the PI Trust on or before the Initial Claims Filing Date as provided in Section 5.1 above.  Thereafter, the PI Trust, with the consent of the TAC and the Futures Representative pursuant to Sections 5.7(b) and 6.6(b) of the PI Trust Agreement, may change these valuation amounts for good cause and consistent with other restrictions on the amendment power.

35

**5.4 Categorizing Claims as Extraordinary and/or Exigent Hardship.**

     **5.4(a)  Extraordinary Claims.**  "Extraordinary Claim" means a PI Trust Claim that otherwise satisfies the Medical Criteria for Disease Levels I–VII, and that is held by a claimant whose exposure to asbestos (i) occurred predominantly as a result of working in a manufacturing facility of a Debtor during a period in which such Debtor was manufacturing asbestos-containing products at that facility, or (ii) was at least 75% the result of exposure to an asbestos-containing product or to conduct for which a Debtor has legal responsibility, and in either case there is little likelihood of a substantial recovery elsewhere.  All such Extraordinary Claims shall be presented for Individual Review and, if valid, shall be entitled to an award of up to a maximum extraordinary value of five (5) times the Scheduled Value set forth in Section 5.3(b)(3) for claims qualifying for Disease Levels I–IV, VI and VII, and five (5) times the Average Value for claims in Disease Level V, multiplied by the applicable Payment Percentage.

     Any dispute as to Extraordinary Claim status shall be submitted to a special Extraordinary Claims Panel established by the PI Trust with the consent of the TAC and the Futures Representative.  All decisions of the Extraordinary Claims Panel shall be final and not subject to any further administrative or judicial review.  An Extraordinary Claim, following its liquidation, shall be placed in the FIFO Payment Queue ahead of all other PI Trust Claims, except Pre-Petition Liquidated Claims and Exigent Hardship Claims, based on its date of liquidation and shall be paid subject to the Maximum Available Payment and Claims Payment Ratio described above.

     **5.4(b)  Exigent Hardship Claims.**  At any time the PI Trust may liquidate and pay PI Trust Claims that qualify as Exigent Hardship Claims as defined below.  Such claims may be considered separately no matter what the order of processing otherwise would have been

36

under this TDP.  An Exigent Hardship Claim, following its liquidation, shall be placed first in

the FIFO Payment Queue ahead of all other liquidated PI Trust Claims except Pre-Petition

Liquidated Claims and Disease Level I Claims, which claims, together with the Exigent

Hardship Claims, shall be paid in accordance with the provisions of Section 2.4 hereof.  A PI

Trust Claim qualifies for payment as an Exigent Hardship Claim if the claim meets the

Medical/Exposure Criteria for Severe Asbestosis (Disease Level III) or an asbestos-related

malignancy (Disease Levels IV–VII), and the PI Trust, in its sole discretion, determines (i) that

the claimant needs financial assistance on an immediate basis based on the claimant's expenses

and all sources of available income, and (ii) that there is a causal connection between the

claimant's dire financial condition and the claimant's asbestos-related disease.

     5.5    **Secondary Exposure Claims.**  If a claimant alleges an asbestos-related disease

resulting solely from exposure to an occupationally exposed person, such as a family member,

the claimant must seek Individual Review of his or her claim pursuant to Section 5.3(b) above.

In such a case, the claimant must establish that the occupationally exposed person would have

met the exposure requirements under this TDP that would have been applicable had that person

filed a direct claim against the PI Trust.  In addition, the claimant with secondary exposure must

establish that he or she is suffering from one of the seven Disease Levels described in Section

5.3(a)(3) above or an asbestos-related disease otherwise compensable under this TDP, that his or

her own exposure to the occupationally exposed person occurred within the same time frame as

the occupationally exposed person was exposed to asbestos or asbestos-containing products

manufactured, produced or distributed by a Debtor or to conduct for which a Debtor has legal

responsibility, and that such secondary exposure was a cause of the claimed disease.  All other

liquidation and payment rights and limitations under this TDP shall be applicable to such claims.

37

**5.6      Indirect PI Trust Claims.**  Indirect PI Trust Claims asserted against the PI Trust shall be treated as presumptively valid and paid by the PI Trust subject to the applicable Payment Percentage if (a) such claim satisfied the requirements of the Bar Date for such claims established by the Bankruptcy Court, if applicable, and is not otherwise disallowed by Section 502(e) of the Code or subordinated under Section 509(c) of the Code, and, and (b) the holder of such claim (the "**Indirect Claimant**") establishes to the satisfaction of the Trustee that (i) the Indirect Claimant has paid in full the liability and obligation of the PI Trust to the individual claimant to whom the PI Trust would otherwise have had a liability or obligation under this TDP (the "**Direct Claimant**"), (ii) the Direct Claimant and the Indirect Claimant have forever and fully released the PI Trust from all liability to the Direct Claimant, and (iii) the claim is not otherwise barred by applicable law (excluding a statute of limitation or repose).  In no event shall any Indirect Claimant have any rights against the PI Trust superior to the rights of the related Direct Claimant against the PI Trust, including any rights with respect to the timing, amount or manner of payment.  In addition, no Indirect PI Trust Claim may be liquidated and paid in an amount that exceeds what the Indirect Claimant has actually paid the related Direct Claimant.

To establish a presumptively valid Indirect PI Trust Claim, the Indirect Claimant's aggregate liability for the Direct Claimant's claim must also have been fixed, liquidated and paid fully by the Indirect Claimant by settlement (with an appropriate full release in favor of the PI Trust) or a Final Order (as defined in the Plan) provided that such claim is valid under the applicable state law.  In any case where the Indirect Claimant has satisfied the claim of a Direct Claimant against the PI Trust under applicable law by way of a settlement, the Indirect Claimant shall obtain for the benefit of the PI Trust a release in form and substance satisfactory to the Trustee.

38

If an Indirect Claimant cannot meet the presumptive requirements set forth above, including the requirement that the Indirect Claimant provide the PI Trust with a full release of the Direct Claimant's claim, the Indirect Claimant may request that the PI Trust review the Indirect PI Trust Claim individually to determine whether the Indirect Claimant can establish under applicable state law that the Indirect Claimant has paid all or a portion of a liability or obligation that the PI Trust had to the Direct Claimant. If the Indirect Claimant can show that it has paid all or a portion of such a liability or obligation, the PI Trust shall reimburse the Indirect Claimant the amount of the liability or obligation so paid, times the then applicable Payment Percentage. However, in no event shall such reimbursement to the Indirect Claimant be greater than the amount to which the Direct Claimant would have otherwise been entitled. Further, the liquidated value of any Indirect PI Trust Claim paid by the PI Trust to an Indirect Claimant shall be treated as an offset to or reduction of the full liquidated value of any PI Trust Claim that might be subsequently asserted by the Direct Claimant against the PI Trust.

Any dispute between the PI Trust and an Indirect Claimant over whether the Indirect Claimant has a right to reimbursement for any amount paid to a Direct Claimant shall be subject to the ADR Procedures provided in Section 5.10 below. If such dispute is not resolved by said ADR Procedures, the Indirect Claimant may litigate the dispute in the tort system pursuant to Sections 5.11 and 7.6 below.

The Trustee may develop and approve a separate proof of claim form for Indirect PI Trust Claims. Indirect PI Trust Claims that have not been disallowed, discharged, or otherwise resolved by prior order of the Bankruptcy Court shall be processed in accordance with procedures to be developed and implemented by the Trustee consistent with the provisions of this Section 5.6, which procedures (a) shall determine the validity, acceptability and

39

enforceability of such claims; and (b) shall otherwise provide the same liquidation and payment procedures and rights to the holders of such claims as the PI Trust would have afforded the holders of the underlying valid PI Trust Claims.  Nothing in this TDP is intended to preclude a trust to which asbestos-related liabilities are channeled from asserting an Indirect PI Trust Claim against the PI Trust subject to the requirements set forth herein.

**5.7    Evidentiary Requirements.**

**5.7(a)  Medical Evidence.**

**5.7(a)(1)  In General.**  All diagnoses of a Disease Level shall be accompanied by either (i) a statement by the physician providing the diagnosis that at least ten (10) years have elapsed between the date of first exposure to asbestos or asbestos-containing products and the diagnosis, or (ii) a history of the claimant's exposure sufficient to establish a 10-year latency period.  A finding by a physician after the Effective Date that a claimant's disease is "consistent with" or "compatible with" asbestosis shall not alone be treated by the PI Trust as a diagnosis.

**5.7(a)(1)(A)  Disease Levels I–III.**  Except for asbestos claims filed against a Debtor or any other defendant in the tort system prior to the Commencement Date, all diagnoses of a non-malignant asbestos-related disease (Disease Levels I–III) shall be based in the case of a claimant who was living at the time the claim was filed, upon a physical examination of the claimant by the physician providing the diagnosis of the asbestos-related disease.  All living claimants must also provide (i) for Disease Levels I–II, evidence of Bilateral Asbestos-Related Nonmalignant Disease (as defined in Footnote 3 above); (ii) for Disease Level

40

III,[11] an ILO reading of 2/1 or greater or pathological evidence of asbestosis, and (iii) for Disease

Levels II and III, pulmonary function testing.[12]

In the case of a claimant who was deceased at the time the claim was filed, all diagnoses

of a non-malignant asbestos-related disease (Disease Levels I–III) shall be based upon either (i) a

physical examination of the claimant by the physician providing the diagnosis of the asbestos-

related disease; or (ii) pathological evidence of the non-malignant asbestos-related disease; or

(iii) in the case of Disease Levels I–II, evidence of Bilateral Asbestos-Related Nonmalignant

Disease (as defined in Footnote 3 above), and for Disease Level III, either an ILO reading of 2/1

or greater or pathological evidence of asbestosis; and (iv) for either Disease Level II or III,

pulmonary function testing.

**5.7(a)(1)(B)  Disease Levels IV–VII.**  All diagnoses of an

asbestos-related malignancy (Disease Levels IV–VII) shall be based upon either (i) a physical

examination of the claimant by the physician providing the diagnosis of the asbestos-related

disease, or (ii) a diagnosis of such a malignant Disease Level by a board-certified pathologist or

---

[11] All diagnoses of Asbestos/Pleural Disease (Disease Levels I and II) not based on pathology shall be presumed to be based on findings of bilateral asbestosis or pleural disease, and all diagnoses of Mesothelioma (Disease Level VII) shall be presumed to be based on findings that the disease involves a malignancy.  However, the PI Trust may rebut such presumptions.

[12] "Pulmonary function testing" or "PFT" shall mean testing that is in material compliance with the quality criteria established by the American Thoracic Society ("**ATS**") and is performed on equipment which is in material compliance with ATS standards for technical quality and calibration. PFT performed in a hospital accredited by the JCAHO, or performed, reviewed or supervised by a board certified pulmonologist or other Qualified Physician shall be presumed to comply with ATS standards, and the claimant may submit a summary report of the testing. If the PFT was not performed in an JCAHO-accredited hospital, or performed, reviewed or supervised by a board certified pulmonologist or other Qualified Physician, the claimant must submit the full report of the testing (as opposed to a summary report); provided, however, that if the PFT was conducted prior to the Effective Date of the Plan and the full PFT report is not available, the claimant must submit a declaration signed by a Qualified Physician or other qualified party, in the form provided by the PI Trust, certifying that the PFT was conducted in material compliance with ATS standards.

by a pathology report prepared at or on behalf of a hospital accredited by the Joint Commission

on Accreditation of Healthcare Organizations ("JCAHO").

**5.7(a)(1)(C)  Exception to the Exception for Certain Pre-**

**Petition Claims.**  If the holder of a PI Trust Claim that was filed against a Debtor or any other

defendant in the tort system prior to the Commencement Date has available a report of a

diagnosing physician engaged by the holder or his or her law firm who conducted a physical

examination of the holder as described in Sections 5.7(a)(1)(A), or if the holder has filed such

medical evidence and/or a diagnosis of the asbestos-related disease by a physician not engaged

by the holder or his or her law firm who conducted a physical examination of the holder with

another asbestos-related personal injury settlement trust that requires such evidence, without

regard to whether the claimant or the law firm engaged the diagnosing physician, the holder shall

provide such medical evidence to the PI Trust notwithstanding the exception in Section

5.7(a)(1)(A).

**5.7(a)(2)  Credibility of Medical Evidence.**  Before making any payment

to a claimant, the PI Trust must have reasonable confidence that the medical evidence provided

in support of the claim is credible and consistent with recognized medical standards.  The PI

Trust may require the submission of X-rays, CT scans, detailed results of pulmonary function

tests, laboratory tests, tissue samples, results of medical examination or reviews of other medical

evidence, and may require that medical evidence submitted comply with recognized medical

standards regarding equipment, testing methods and procedures to assure that such evidence is

reliable.  Medical evidence (i) that is of a kind shown to have been received in evidence by a

state or federal judge at trial, (ii) that is consistent with evidence submitted to the Debtors to

settle for payment similar disease cases prior to the Debtors' bankruptcy, or (iii) that is a

42

diagnosis by a physician shown to have previously qualified as a medical expert with respect to

the asbestos-related disease in question before a state or federal judge, is presumptively reliable,

although the PI Trust may seek to rebut the presumption.  In addition, claimants who otherwise

meet the requirements of this TDP for payment of a PI Trust Claim shall be paid irrespective of

the results in any litigation at any time between the claimant and any other defendant in the tort

system.  However, any relevant evidence submitted in a proceeding in the tort system, other than

any findings of fact, a verdict, or a judgment, involving another defendant may be introduced by

either the claimant or the PI Trust in any Individual Review proceeding conducted pursuant to

5.3(b) or any Extraordinary Claim proceeding conducted pursuant to 5.4(a).

     **5.7(b)  Exposure Evidence.**

       **5.7(b)(1)  In General.**  As set forth above in Section 5.3(a)(3), to qualify

for any Disease Level, the claimant must demonstrate a minimum exposure to an asbestos-

containing product manufactured, produced or distributed by a Debtor or to conduct for which a

Debtor has legal responsibility.  Claims based on conspiracy theories that involve no exposure to

an asbestos-containing product manufactured, produced or distributed by a Debtor are not

compensable under this TDP.  To meet the presumptive exposure requirements of Expedited

Review set forth in Section 5.3(a)(3) above, the claimant must show (i) for all Disease Levels,

Debtor Exposure as defined in Section 5.7(b)(3) below prior to December 31, 1982; (ii) for

Asbestos/Pleural Disease Level I, six (6) months Debtor Exposure prior to December 31, 1982,

plus five (5) years cumulative occupational asbestos exposure; and (iii) for Asbestosis/Pleural

Disease (Disease Level II), Severe Asbestosis (Disease Level III), Other Cancer (Disease Level

IV) or Lung Cancer 1 (Disease Level VI), the claimant must show six (6) months Debtor

Exposure prior to December 31, 1982, plus Significant Occupational Exposure to asbestos.  If

the claimant cannot meet the relevant presumptive exposure requirements for a Disease Level

eligible for Expedited Review, the claimant may seek Individual Review pursuant to Section

5.3(b) of his or her claim based on exposure to an asbestos-containing product or to conduct for

which a Debtor has legal responsibility.

**5.7(b)(2)  Significant Occupational Exposure.**  "**Significant**

**Occupational Exposure**" means employment for a cumulative period of at least five (5) years

with a minimum of two (2) years prior to December 31, 1982, in an industry and an occupation

in which the claimant (a) handled raw asbestos fibers on a regular basis; (b) fabricated asbestos-

containing products so that the claimant in the fabrication process was exposed on a regular basis

to raw asbestos fibers; (c) altered, repaired or otherwise worked with an asbestos-containing

product such that the claimant was exposed on a regular basis to asbestos fibers; or (d) was

employed in an industry and occupation such that the claimant worked on a regular basis in close

proximity to workers engaged in the activities described in (a), (b) and/or (c).

**5.7(b)(3)  Debtor Exposure.**  The claimant must demonstrate (i)

meaningful and credible exposure, which occurred prior to December 31, 1982, to asbestos or

asbestos-containing products supplied, specified, manufactured, installed, maintained, or

repaired by a Debtor and/or any entity, including a Debtor contracting unit, for which a Debtor

has legal responsibility ("**Debtor Exposure**").  That meaningful and credible exposure evidence

may be established by an affidavit or sworn statement of the claimant, by an affidavit or sworn

statement of a co-worker or the affidavit or sworn statement of a family member in the case of a

deceased claimant (providing the PI Trust finds such evidence reasonably reliable), by invoices,

employment, construction or similar records, or by other credible evidence.  The specific

exposure information required by the PI Trust to process a claim under either Expedited or

44

Individual Review shall be set forth on the proof of claim form to be used by the PI Trust.  The

PI Trust can also require submission of other or additional evidence of exposure when it deems

such to be necessary.

Evidence submitted to establish proof of Debtor Exposure is for the sole benefit of the PI

Trust, not third parties or defendants in the tort system.  The PI Trust has no need for, and

therefore claimants are not required to furnish the PI Trust with evidence of, exposure to specific

asbestos products other than those for which a Debtor has legal responsibility, except to the

extent such evidence is required elsewhere in this TDP.  Similarly, failure to identify Debtor

products in the claimant's underlying tort action, or to other bankruptcy trusts, does not preclude

the claimant from recovering from the PI Trust, provided the claimant otherwise satisfies the

medical and exposure requirements of this TDP.

**5.8     Claims Audit Program.**  The PI Trust, with the consent of the TAC and the

Futures Representative, may develop methods for auditing the reliability of medical evidence,

including additional reading of X-rays, CT scans and verification of pulmonary function tests, as

well as the reliability of evidence of exposure to asbestos, including exposure to asbestos-

containing products manufactured or distributed by a Debtor prior to December 31, 1982.  In the

event that the PI Trust reasonably determines that any individual or entity has engaged in a

pattern or practice of providing unreliable medical evidence to the PI Trust, it may decline to

accept additional evidence from such provider in the future.

Further, in the event that an audit reveals that fraudulent information has been provided

to the PI Trust, the PI Trust may penalize any claimant or claimant's attorney by rejecting the PI

Trust Claim or by other means including, but not limited to, requiring the source of the

fraudulent information to pay the costs associated with the audit and any future audit or audits,

reordering the priority of payment of all affected claimants' PI Trust Claims, raising the level of

scrutiny of additional information submitted from the same source or sources, refusing to accept

additional evidence from the same source or sources, seeking the prosecution of the claimant or

claimant's attorney for presenting a fraudulent claim in violation of 18 U.S.C. § 152, and seeking

sanctions from the Bankruptcy Court.

**5.9    Second Disease (Malignancy) Claims.**  Notwithstanding the provisions of

Section 2.1 that a claimant may not assert more than one (1) PI Trust Claim hereunder, the

holder of a PI Trust Claim involving a non-malignant asbestos-related disease (Disease Levels I–

III) may assert a new PI Trust Claim against the PI Trust for a malignant disease (Disease Levels

IV–VII) that is subsequently diagnosed.  Any additional payments to which such claimant may

be entitled with respect to such malignant asbestos-related disease shall not be reduced by the

amount paid for the non-malignant asbestos-related disease, provided that the malignant disease

had not been diagnosed by the time the claimant was paid with respect to the original claim

involving the non-malignant disease.

**5.10    Arbitration.**

**5.10(a)  Establishment of ADR Procedures.**  The PI Trust, with the consent of the

TAC and the Futures Representative, shall institute binding and non-binding arbitration

procedures in accordance with Alternative Dispute Resolution ("**ADR**") Procedures to be

established by the Trustee, with the consent of the TAC and the Futures Representative, for

resolving disputes concerning whether a pre-petition settlement agreement with a Debtor is

binding and judicially enforceable in the absence of a Final Order of the Bankruptcy Court

determining the issue, whether the PI Trust's outright rejection or denial of a claim was proper, or

whether the claimant's medical condition or exposure history meets the requirements of this TDP

46

for purposes of categorizing a claim involving Disease Levels I–VII.  Binding and non-binding

arbitration shall also be available for resolving disputes over the liquidated value of a claim

involving Disease Levels III–VII, as well as disputes over the Debtors' share of the unpaid portion

of a Pre-Petition Liquidated Claim described in Section 5.2 above and disputes over the validity of

an Indirect PI Trust Claim.

In all arbitrations, the arbitrator shall consider the same medical and exposure evidentiary

requirements that are set forth in Section 5.7 above.  In the case of an arbitration involving the

liquidated value of a claim involving Disease Levels III–VII, the arbitrator shall consider the same

valuation factors that are set forth in Section 5.3(b)(2) above.  In order to facilitate the Individual

Review Process with respect to such claims, the PI Trust may from time to time develop a

valuation model that enables the PI Trust to efficiently make initial liquidated value offers on

those claims in the Individual Review setting.  In an arbitration involving any such claim, the PI

Trust shall neither offer into evidence or describe any such model nor assert that any information

generated by the model has any evidentiary relevance or should be used by the arbitrator in

determining the presumed correct liquidated value in the arbitration.  The underlying data that was

used to create the model may be relevant and may be made available to the arbitrator but only if

provided to the claimant or his or her counsel ten (10) days prior to the arbitration proceeding.

With respect to all claims eligible for arbitration, the claimant, but not the PI Trust, may elect

either non-binding or binding arbitration.  The ADR Procedures may be modified by the PI Trust

with the consent of the TAC and the Futures Representative.

**5.10(b)  Claims Eligible for Arbitration.**  In order to be eligible for arbitration,

the claimant must first complete the Individual Review Process with respect to the disputed issue

as well as any processes required under the ADR Procedures.  Individual Review shall be treated

47

as completed for these purposes when the claim has been individually reviewed by the PI Trust, the PI Trust has made an offer on the claim, the claimant has rejected the liquidated value resulting from the Individual Review, and the claimant has notified the PI Trust of the rejection in writing. Individual Review shall also be treated as completed if the PI Trust has rejected the claim.

**5.10(c)  Limitations on and Payment of Arbitration Awards.**  In the case of a non-Extraordinary claim involving Disease Levels I–II, the arbitrator shall not return an award in excess of the Scheduled Value for such claim.  In the case of a non-Extraordinary Claim involving Disease Levels III–VII, the arbitrator shall not return an award in excess of the Maximum Value for the appropriate Disease Level as set forth in Section 5.3(a)(3) above, and for an Extraordinary Claim involving any Disease Level, the arbitrator shall not return an award greater than the maximum extraordinary value for such a claim as set forth in Section 5.4(a) above.  A claimant who submits to arbitration and who accepts the arbitral award shall receive payments in the same manner as one who accepts the PI Trust's original valuation of the claim.

**5.11    Litigation.**  Claimants who elect non-binding arbitration and then reject their arbitral awards retain the right to institute a lawsuit in the tort system against the PI Trust pursuant to Section 7.6 below.  However, a claimant shall be eligible for payment of a judgment for monetary damages obtained in the tort system from the PI Trust's available cash only as provided in Section 7.7 below.

## SECTION VI

## Claims Materials

**6.1    Claims Materials.**  The PI Trust shall prepare suitable and efficient claims materials ("**Claims Materials**") for all PI Trust Claims, and shall provide such Claims Materials upon a written request for such materials to the PI Trust.  The proof of claim form to be

48

submitted to the PI Trust shall require the claimant to assert the highest Disease Level for which

the claim qualifies at the time of filing.  The proof of claim form shall also include a certification

by the claimant or his or her attorney sufficient to meet the requirements of Rule 11(b) of the

Federal Rules of Civil Procedure.  In developing its claim filing procedures, the PI Trust shall

make every effort to provide claimants with the opportunity to utilize currently available

technology at their discretion, including filing claims and supporting documentation over the

internet and electronically by disk or CD-rom.  The proof of claim form to be used by the PI

Trust shall be developed by the PI Trust and submitted to the TAC and the Futures

Representatives for approval; it may be changed by the PI Trust with the consent of the TAC and

the Futures Representative.

     **6.2**    **Content of Claims Materials.**  The Claims Materials shall include a copy of this

TDP, such instructions as the Trustee shall approve, and a detailed proof of claim form.  If

feasible, the forms used by the PI Trust to obtain claims information shall be the same or

substantially similar to those used by other asbestos claims resolution organizations.  If requested

by the claimant, the PI Trust shall accept information provided electronically.  The claimant

may, but shall not be required to, provide the PI Trust with evidence of recovery from other

defendants and claims resolution organizations.

     **6.3**    **Withdrawal or Deferral of Claims.**  A claimant can withdraw a PI Trust Claim

at any time upon written notice to the PI Trust and file another claim subsequently, but any such

claim filed after withdrawal shall be given a place in the FIFO Processing Queue based on the

date of such subsequent filing.  A claimant can also request that the processing of his or her PI

Trust Claim by the PI Trust be deferred for a period not to exceed three (3) years, in which case

the claimant shall also retain his or her original place in the FIFO Processing Queue.  During the

period of such deferral, a sequencing adjustment on such claimant's PI Trust Claim as provided

in Section 7.5 hereunder shall not accrue and payment thereof shall be deemed waived by the

claimant.  Except for PI Trust Claims held by representatives of deceased or incompetent

claimants for which court or probate approval of the PI Trust's offer is required, or a PI Trust

Claim for which deferral status has been granted, a claim shall be deemed to have been

withdrawn if the claimant neither accepts, rejects, nor initiates arbitration within six (6) months

of the PI Trust's written offer of payment or rejection of the claim.  Upon written request and

good cause, the PI Trust may extend the withdrawal or deferral period for an additional six (6)

months.

  **6.4** **Filing Requirements and Fees.**  The Trustee shall have the discretion to

determine, with the consent of the TAC and the Futures Representative, whether a filing fee

should be required for any PI Trust Claims.

  **6.5** **Confidentiality of Claimants' Submissions.**  All submissions to the PI Trust by

a holder of a PI Trust Claim or a proof of claim form and materials related thereto shall be

treated as made in the course of settlement discussions between the holder and the PI Trust, and

intended by the parties to be confidential and to be protected by all applicable state and federal

privileges, including but not limited to those directly applicable to settlement discussions.  The

PI Trust will preserve the confidentiality of such claimant submissions, and shall disclose the

contents thereof only, with the permission of the holder, to another trust established for the

benefit of asbestos personal injury claimants pursuant to section 524(g) of the Bankruptcy Code

or other applicable law, to such other persons as authorized by the holder, or in response to a

valid subpoena of such materials issued by the Bankruptcy Court, a Delaware State Court or the

United States District Court for the District of Delaware.  Furthermore, the PI Trust shall provide

counsel for the holder a copy of any such subpoena immediately upon being served. The PI

Trust shall on its own initiative or upon request of the claimant in question take all necessary and

appropriate steps to preserve said privileges before the Bankruptcy Court, a Delaware State

Court or the United States District Court for the District of Delaware and before those courts

having appellate jurisdiction related thereto. Notwithstanding anything in the foregoing to the

contrary, with the consent of the TAC and the Futures Representative, the PI Trust may, in

specific limited circumstances, disclose information, documents or other materials reasonably

necessary in the PI Trust's judgment to preserve, litigate, resolve, or settle coverage, or to

comply with an applicable obligation under an insurance policy or settlement agreement within

the Asbestos Insurance Assets, if applicable; provided, however, that the PI Trust shall take any

and all steps reasonably feasible in its judgment to preserve the further confidentiality of such

information, documents and materials, and prior to the disclosure of such information,

documents or materials to a third party, the PI Trust shall receive from such third party a written

agreement of confidentiality that (a) ensures that the information, documents and materials

provided by the PI Trust shall be used solely by the receiving party for the purpose stated in the

agreement and (b) prohibits any other use or further dissemination of the information, documents

and materials by the third party except as set forth in the written agreement of confidentiality.

Nothing in this TDP, the Plan or the PI Trust Agreement expands, limits or impairs the

obligation under applicable law of a claimant to respond fully to lawful discovery in any

underlying civil action regarding his or her submission of factual information to the PI Trust for

the purpose of obtaining compensation for asbestos-related injuries from the PI Trust.

51

## SECTION VII

### General Guidelines for Liquidating and Paying Claims

**7.1**    **Showing Required.**  To establish a valid PI Trust Claim, a claimant must meet the requirements set forth in this TDP.  The PI Trust may require the submission of X-rays, CT scans, laboratory tests, medical examinations or reviews, other medical evidence, or any other evidence to support or verify the PI Trust Claim, and may further require that medical evidence submitted comply with recognized medical standards regarding equipment, testing methods, and procedures to assure that such evidence is reliable.

**7.2**    **Costs Considered.**  Notwithstanding any provisions of this TDP to the contrary, the Trustee shall always give appropriate consideration to the cost of investigating and uncovering invalid PI Trust Claims so that the payment of valid PI Trust Claims is not further impaired by such processes with respect to issues related to the validity of the medical evidence supporting a PI Trust Claim.  The Trustee shall also have the latitude to make judgments regarding the amount of transaction costs to be expended by the PI Trust so that valid PI Trust Claims are not unduly further impaired by the costs of additional investigation.  Nothing herein shall prevent the Trustee, in appropriate circumstances, from contesting the validity of any claim against the PI Trust whatever the costs, or declining to accept medical evidence from sources that the Trustee has determined to be unreliable pursuant to the Claims Audit Program described in Section 5.8 above.

**7.3**    **Discretion to Vary the Order and Amounts of Payments in Event of Limited Liquidity.**  Consistent with the provisions hereof and subject to the FIFO Processing and Payment Queues, the Maximum Annual Payment, the Maximum Available Payment and the Claims Payment Ratio requirements set forth above, the Trustee shall proceed as quickly as

52

possible to liquidate valid PI Trust Claims, and shall make payments to holders of such claims in

accordance with this TDP promptly as funds become available and as claims are liquidated,

while maintaining sufficient resources to pay future valid claims in substantially the same

manner.

Because the PI Trust's income over time remains uncertain, and decisions about

payments must be based on estimates that cannot be done precisely, they may have to be revised

in light of experiences over time, and there can be no guarantee of any specific level of payment

to claimants.  However, the Trustee shall use his or her best efforts to treat similar claims in

substantially the same manner, consistent with his or her duties as Trustee, the purposes of the PI

Trust, the established allocation of funds to claims in Categories A and B, and the practical

limitations imposed by the inability to predict the future with precision.

In the event that the PI Trust faces temporary periods of limited liquidity, the Trustee

may, with the consent of the TAC and the Futures Representative, (a) suspend the normal order

of payment, (b) temporarily limit or suspend payments altogether, (c) offer a Reduced Payment

Option as described in Section 2.5 above and/or (d) commence making payments on an

installment basis.

**7.4    Punitive Damages.**  Except as provided below for claims asserted under the

Alabama Wrongful Death Statute, in determining the value of any liquidated or unliquidated PI

Trust Claim, punitive or exemplary damages, *i.e.*, damages other than compensatory damages,

shall not be considered or paid, notwithstanding their availability in the tort system.

Similarly, no punitive or exemplary damages shall be payable with respect to any claim

litigated against the PI Trust in the tort system pursuant to Sections 5.11 above and 7.6 below.

The only damages that may be awarded pursuant to this TDP to Alabama Claimants who are

53

deceased and whose personal representatives pursue their claims only under the Alabama

Wrongful Death Statute shall be compensatory damages determined pursuant to the statutory and

common law of the Commonwealth of Pennsylvania, without regard to its choice of law

principles.  The choice of law provision in Section 7.4 herein applicable to any claim with

respect to which, but for this choice of law provision, the applicable law of the Claimant's

Jurisdiction pursuant to Section 5.3(b)(2) is determined to be the Alabama Wrongful Death

Statute, shall only govern the rights between the PI Trust and the claimant including, but not

limited to, suits in the tort system pursuant to Section 7.6, and to the extent the PI Trust seeks

recovery from any entity that provided insurance to a Debtor, the Alabama Wrongful Death

Statute shall govern.

>   **7.5    Sequencing Adjustment.**

>   **7.5(a)  In General.**  Subject to the limitations set forth below, a sequencing

adjustment shall be paid on all PI Trust Claims with respect to which the claimant has had to

wait a year or more for payment, provided, however, that no claimant shall receive a sequencing

adjustment for a period in excess of seven (7) years.  The sequencing adjustment factor for each

year shall be five percent (5%) per annum for each of the first five (5) years after the Effective

Date; thereafter, the PI Trust shall have the discretion to change the sequencing adjustment factor

with the consent of the TAC and the Futures Representative.

>   **7.5(b)  Unliquidated PI Trust Claims.**  A sequencing adjustment shall be

payable on the Scheduled Value of any unliquidated PI Trust Claim that meets the requirements

of Disease Levels I–IV, VI and VII, whether the claim is liquidated under Expedited Review,

Individual Review, or by arbitration.  No sequencing adjustment shall be paid on any claim

liquidated in the tort system pursuant to Section 5.11 above and Section 7.6 below.  The

sequencing adjustment on an unliquidated PI Trust Claim that meets the requirements of Disease

Level V shall be based on the Average Value of such a claim.  Sequencing adjustments on all

such unliquidated claims shall be measured from the date of payment back to the earliest of the

date that is one year after the date on which (a) the claim was filed against a Debtor prior to the

Commencement Date; (b) the claim was filed against another defendant in the tort system on or

after the Commencement Date but before the Effective Date; (c) the claim was filed with the

Bankruptcy Court during the pendency of the Chapter 11 proceeding; or (d) the claim was filed

with the PI Trust after the Effective Date.

      **7.5(c)  Liquidated Pre-Petition Claims.**  A sequencing adjustment shall also be

payable on the liquidated value of all Pre-Petition Liquidated Claims described in Section 5.2(a)

above.  In the case of Pre-Petition Liquidated Claims liquidated by verdict or judgment, the

sequencing adjustment shall be measured from the date of payment back to the date that is one

(1) year after the date that the verdict or judgment was entered; provided, however, that in no

event shall the sequencing adjustment be measured from a date prior to the Commencement Date

if the liquidated value of the Pre-Petition Liquidated Claim includes pre-petition interest.  In the

case of Pre-Petition Liquidated Claims liquidated by a binding, judicially enforceable settlement,

the sequencing adjustment shall be measured from the date of payment back to the date that is

one (1) year after the Commencement Date.

      **7.6     Suits in the Tort System.**  If the holder of a disputed claim disagrees with the PI

Trust's determination regarding the Disease Level of the claim, the claimant's exposure history

or the liquidated value of the claim, and if the holder has first submitted the claim to non-binding

arbitration as provided in Section 5.10 above, the holder may file a lawsuit against the Trust in

the Claimant's Jurisdiction as defined in Section 5.3(b)(2) above.  Any such lawsuit must be

filed by the claimant in his or her own right and name and not as a member or representative of a class, and no such lawsuit may be consolidated with any other lawsuit.  All defenses (including, with respect to the PI Trust, all defenses which could have been asserted by a Debtor) shall be available to both sides at trial; however, the PI Trust may waive any defense and/or concede any issue of fact or law.  If the claimant was alive at the time the initial pre-petition complaint was filed or on the date the proof of claim form was filed with the PI Trust, the case shall be treated as a personal injury case with all personal injury damages to be considered even if the claimant has died during the pendency of the claim.

       **7.7**    **Payment of Judgments for Money Damages.**  If and when a claimant obtains a judgment in the tort system, the claim shall be placed in the FIFO Payment Queue based on the date on which the judgment became final.  Thereafter, the claimant shall receive from the PI Trust an initial payment (subject to the applicable Payment Percentage, the Maximum Available Payment and the Claims Payment Ratio provisions set forth above) of an amount equal to the greater of (i) the PI Trust's last offer to the claimant or (ii) the award that the claimant declined in non-binding arbitration; provided, however, that in no event shall such payment amount exceed the amount of the judgment obtained in the tort system.  The claimant shall receive the balance of the judgment, if any, in five (5) equal installments in years six (6) through ten (10) following the year of the initial payment (also subject to the applicable Payment Percentage, the Maximum Available Payment and the Claims Payment Ratio provisions above in effect on the date of the payment of the subject installment).

       In the case of non-Extraordinary claims involving Disease Levels I and II, the total amounts paid with respect to such claims shall not exceed the relevant Scheduled Value for such Disease Levels as set forth in Section 5.3(b)(3) above.  In the case of claims involving a non-

malignant asbestos-related disease that does not attain classification under Disease Levels I or II,

the amount payable shall not exceed the Scheduled Value for the Disease Level most comparable

to the disease proven.  In the case of non-Extraordinary claims involving severe asbestosis and

malignancies (Disease Levels III–VII), the total amounts paid with respect to such claims shall not

exceed the Maximum Values for such Disease Levels set forth in Section 5.3(b)(3).  In the case of

Extraordinary Claims, the total amounts paid with respect to such claims shall not exceed the

maximum extraordinary values for such claims set forth in Section 5.4(a) above.  Under no

circumstances shall (a) a sequencing adjustment be paid pursuant to Section 7.5 or (b) interest be

paid under any statute on any judgments obtained in the tort system.

      **7.8**     **Releases.**  The Trustee shall have the discretion to determine the form and

substance of the releases to be provided to the PI Trust.  As a condition to making any payment to

a claimant, the PI Trust shall obtain a general, partial, or limited release as appropriate in

accordance with the applicable state or other law.  If allowed by state law, the endorsing of a

check or draft for payment by or on behalf of a claimant may, in the discretion of the PI Trust,

constitute such a release.

      **7.9**     **Third-Party Services.**  Nothing in this TDP shall preclude the PI Trust from

contracting with another asbestos claims resolution organization to provide services to the PI

Trust so long as decisions about the categorization and liquidated value of PI Trust Claims are

based on the relevant provisions of this TDP, including the Disease Levels, Scheduled Values,

Average Values, Maximum Values, and Medical/Exposure Criteria set forth above.

      **7.10**    **PI Trust Disclosure of Information.**  Periodically, but not less often than once a

year, the PI Trust shall make available to claimants and other interested parties, the number of

claims by Disease Levels that have been resolved both by the Individual Review Process and by

57

arbitration as well as by litigation in the tort system indicating the amounts of the awards and the averages of the awards by jurisdiction.

## SECTION VIII

## Miscellaneous

**8.1    Amendments.**  Except as otherwise provided herein, the Trustee may amend, modify, delete, or add to any provisions of this TDP (including, without limitation, amendments to conform this TDP to advances in scientific or medical knowledge or other changes in circumstances), provided the Trustee first obtains the consent of the TAC and the Futures Representative pursuant to the Consent Process set forth in Sections 5.7(b) and 6.6(b) of the PI Trust Agreement, except that the right to amend the Claims Payment Ratio is governed by the restrictions in Section 2.5 above, and the right to adjust the Payment Percentage is governed by Section 4.2 above.  Nothing herein is intended to preclude the TAC or the Futures Representatives from proposing to the Trustee, in writing, amendments to this TDP.  Any amendment proposed by the TAC or the Futures Representatives shall remain subject to Section 7.3 of the PI Trust Agreement.

**8.2    Severability.**  Should any provision contained in this TDP be determined to be unenforceable, such determination shall in no way limit or affect the enforceability and operative effect of any and all other provisions of this TDP.  Should any provision contained in this TDP be determined to be inconsistent with or contrary to the Debtors' obligations to any insurance company providing insurance coverage to the Debtors in respect of claims for personal injury based on exposure to an asbestos-containing product or to conduct for which a Debtor has legal responsibility, the PI Trust with the consent of the TAC and the Futures Representative may

amend this TDP and/or the PI Trust Agreement to make the provisions of either or both documents consistent with the duties and obligations of the Debtors to said insurance company.

**8.3** **Governing Law.** Except for purposes of determining the liquidated value of any PI Trust Claim, administration of this TDP shall be governed by, and construed in accordance with, the laws of the State of Delaware. The law governing the liquidation of PI Trust Claims in the case of Individual Review, arbitration or litigation in the tort system shall be the law of the Claimant's Jurisdiction as described in Section 5.3(b)(2) above.

**EXHIBIT C**

**ENVIRONMENTAL RESPONSE TRUST CONSENT DECREE
AND SETTLEMENT AGREEMENT**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 09-50026 (REG) |
| MOTORS LIQUIDATION COMPANY, *et al.*, | ) | Chapter 11 |
|    f/k/a General Motors Corp., *et al.,* | ) | (Jointly Administered) |
| | ) | |
|    Debtors. | ) | |

**ENVIRONMENTAL RESPONSE TRUST
CONSENT DECREE AND SETTLEMENT AGREEMENT
AMONG DEBTORS,
THE ENVIRONMENTAL RESPONSE TRUST ADMINISTRATIVE TRUSTEE,
THE UNITED STATES,
THE STATES OF DELAWARE, ILLINOIS, INDIANA, KANSAS, MICHIGAN,
MISSOURI, NEW JERSEY, NEW YORK, OHIO, WISCONSIN, COMMONWEALTH
OF VIRGINIA, THE LOUISIANA DEPARTMENT OF ENVIRONMENTAL
QUALITY, THE MASSACHUSETTS DEPARTMENT OF ENVIRONMENTAL
PROTECTION, THE DEPARTMENT OF ENVIRONMENTAL PROTECTION OF
THE COMMONWEALTH OF PENNSYLVANIA AND THE SAINT REGIS
MOHAWK TRIBE**

# TABLE OF CONTENTS

I.      DEFINITIONS..................................................................................................6

II.     JURISDICTION ............................................................................................11

III.    PARTIES BOUND; SUCCESSION AND ASSIGNMENT .....................................11

IV.     PURPOSES AND FORMATION OF THE ENVIRONMENTAL
        RESPONSE TRUST ......................................................................................11

            Funding Adjustments ....................................................................17
            Appointment and Duties of the Administrative Trustee ..................22
            Environmental Response Trust Administration and Accounts........24
            a.      Cleanup and Redevelopment Managers..............................24
            b.      Approval of Annual Cleanup Budgets and Emergency
                    Environmental Actions .......................................................26
            c.      Administrative Funding Account.........................................29
            d.      Cushion Funding Account ..................................................32
            e.      Minimum Estimated Property Funding Accounts and Reductions......35
            f.      Reserve Property Funding Accounts and Reductions..........36
            g.      Transfer of Excess Funds in Property Funding Accounts .................37
            .       GM-IFG Syracuse Site.......................................................37
            Sale or Transfer of Environmental Response Trust Property .........38
            Notice of the Sale..........................................................................38
            Criteria for the Sale.......................................................................38
            Proceeds from the Sale...................................................................39
            Cleanup as Part of the Sale ...........................................................39
            GMNA Car – Wilmington Site ........................................................40
            Protections from Future Environmental Liability...........................41
            Coordination of Redevelopment and the Environmental Action.....43
            Sales of Property After Execution of Settlement Agreement But Prior
            to the Effective Date ......................................................................44
            Audits of the Environmental Response Trust ..................................45
            Completion of Environmental Actions ...........................................45
            Access to Property .........................................................................46
            Existing Financial Assurance in Massachusetts ............................46
            Existing Financial Assurance in Illinois .......................................47
            Existing Financial Assurance in Michigan .....................................47
            Disposition of Estate Assets Upon Termination of Trust ................48
            Miscellaneous Provisions...............................................................49

V.      ALTERNATIVE DISPUTE RESOLUTION ...........................................................53

VI.     OUTSTANDING OBLIGATIONS .......................................................................53

VII.    COVENANTS NOT TO SUE ...................................................................55

           Financial Assurance .......................................................................56

VIII.   RESERVATION OF RIGHTS AND REGULATORY AUTHORITY .....................59

IX.     CONTRIBUTION PROTECTION................................................................63

X.      PUBLIC COMMENT................................................................................64

XI.     JUDICIAL APPROVAL ...........................................................................65

XII.    PLAN ..................................................................................................65

XIII.   RETENTION OF JURISDICTION ..............................................................65

XIV.    EFFECTIVENESS OF SETTLEMENT AGREEMENT ...........................................66

XV.     SIGNATORIES/SERVICES ......................................................................66

ATTACHMENT A – Environment Response Trust Property Funding for Environmental
                Actions

ATTACHMENT B – Properties with Existing and Prospective Contracts for Demolition
                Activities

ATTACHMENT C – Environmental Response Trust Agreement

ATTACHMENT D – Motors Liquidation Company Bonds and Insurance Instruments for
                Owned Properties

## ENVIRONMENTAL RESPONSE TRUST
## CONSENT DECREE AND SETTLEMENT AGREEMENT

**WHEREAS**, this Environmental Response Trust Consent Decree and Settlement Agreement (the "Settlement Agreement") is made and entered as of the ___ day of ____, 2010, by and among MOTORS LIQUIDATION COMPANY ("MLC"), formerly known as General Motors Corporation ("General Motors Corp."), Remediation and Liability Management Company, Inc. ("REALM") and Environmental Corporate Remediation Company, Inc. ("ENCORE") (collectively the "Debtors"); the UNITED STATES OF AMERICA (the "United States"); the States of DELAWARE, ILLINOIS, INDIANA, KANSAS, MICHIGAN, MISSOURI, NEW JERSEY, NEW YORK, OHIO, VIRGINIA and WISCONSIN and the LOUISIANA DEPARTMENT OF ENVIRONMENTAL QUALITY, the MASSACHUSETTS DEPARTMENT OF ENVIRONMENTAL PROTECTION and DEPARTMENT OF ENVIRONMENTAL PROTECTION OF THE COMMONWEALTH OF PENNSYLVANIA, (collectively the "States"); the SAINT REGIS MOHAWK TRIBE (the "Tribe"); and EPLET, LLC, not individually but solely in its representative capacity as Administrative Trustee of the Environmental Response Trust established hereby (the "Administrative Trustee").

**WHEREAS**, on June 1, 2009, General Motors Corp. and three wholly-owned direct or indirect subsidiaries filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in this Court (the "Bankruptcy Court"); then, on October 9, 2009, REALM and ENCORE each filed voluntary petitions for relief under chapter 11 in the Bankruptcy Court.  The Debtors' cases are being jointly administered in the Bankruptcy Court.  The Debtors' cases are collectively referred to as the "Bankruptcy Cases;"

**WHEREAS**, on June 1, 2009, General Motors Corp. also filed a motion to approve the sale of substantially all of its assets pursuant to 11 U.S.C. § 363;

**WHEREAS**, as part of the sale of assets, General Motors Corp. excluded from the sale certain real property and personalty it owned;

**WHEREAS**, on July 5, 2009, the Bankruptcy Court approved the sale of assets to NGMCO, Inc. (a/k/a Newco), now known as General Motors Company ("New GM");

**WHEREAS**, following the sale of assets, General Motors Corp. was renamed Motors Liquidation Company ("MLC"), and has continued to own and manage the real property assets excluded from the sale to Newco;

**WHEREAS,** the Debtors have environmental liabilities at certain of the properties set forth and defined in Attachment A (the "Properties") and many of those Properties have been and/or will be the subject of environmental response activities and other work;

**WHEREAS**, on June 25, 2009, the Bankruptcy Court, pursuant to Bankruptcy Code Section 363, entered a Final Order Pursuant to Bankruptcy Code Sections 105(a), 361, 362, 364 and 507 and Bankruptcy Rules 2002, 4001 and 6004 (a) Approving a DIP Credit Facility and Authorizing the Debtors to Obtain Post-Petition Financing Pursuant Thereto, (b) Granting related Liens and Super-Priority Status, (c) Authorizing the Use of Cash Collateral and (d) Granting Adequate Protection to Certain Pre-Petition Secured Parties (the "DIP Order"), pursuant to which the United States Department of the Treasury ("U.S. Treasury") and Export Development Canada ("EDC") lent MLC $950 million in funding under a debtor-in-possession credit agreement ("DIP Loan") for purposes of, among other things, the orderly winding down of MLC's affairs;

**WHEREAS**, on July 5, 2009, the Bankruptcy Court amended the DIP Order and entered an Order Pursuant to Bankruptcy Code Sections 105(a), 361, 362, 363, 364 and 507 and Bankruptcy Rules 2002, 4001 and 6004 (a) Approving Amendment to DIP Credit Facility to Provide for Debtors' Post-Petition Wind-Down Financing, pursuant to which the U.S. Treasury and EDC increased their loan to MLC from $950 million to $1.175 billion in DIP Loan funding for the orderly winding down of MLC's affairs;

**WHEREAS**, the United States on behalf of the Environmental Protection Agency ("U.S. EPA"), the States and the Tribe (U.S. EPA, the States and the Tribe are hereinafter referred to collectively as the "Governments") have alleged that MLC and/or affiliated Debtors are potentially responsible or liable parties with respect to the Properties and surrounding areas where Hazardous Substances have migrated, are continuing to migrate, or otherwise have or will come to be located, and are obliged as an owner of the Properties to comply with applicable law including state and federal environmental laws;

**WHEREAS**, the United States on behalf of U.S. EPA has alleged that it has incurred past response costs, and/or may incur future response costs, under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601-9675, in connection with certain Properties for which Debtors allegedly are liable and that Debtors are liable for all post-petition response costs and the performance of Environmental Actions under CERCLA relating to the Properties as an owner thereof;

**WHEREAS**, the States and the Tribe have alleged that they have incurred past response costs, and/or may incur future response costs, under CERCLA or state environmental laws and, in connection with certain Properties for which Debtors are liable, that Debtors are liable for all post-petition environmental response costs and the performance

3

of Environmental Actions under CERCLA or state law relating to the Properties as an owner

thereof;

**WHEREAS**, the Governments have alleged that the Debtors have liabilities in

connection with several of the Properties to implement closure and post-closure work and

corrective action work, and perform any necessary action with respect to any imminent and

substantial endangerment to health or the environment as required by the Resource

Conservation and Recovery Act ("RCRA"), 42 U.S.C. §§ 6901 *et seq.* and State

environmental statutes, including any permits or orders issued thereunder;

**WHEREAS**, on November 28, 2009, the United States timely filed duplicate copies of

a Proof of Claim against MLC both in the Bankruptcy Court and directly with Debtors' claims

agent, and the two copies of the identical Proof of Claim were assigned Nos. 67362 and 64064,

and on April 16, 2010, filed Proofs of Claim against REALM and ENCORE which were

assigned Nos. 70254 and 70255, respectively, (collectively, the "U.S. Environmental Proofs

of Claim").  The U.S. Environmental Proofs of Claim protectively set forth, <u>inter alia</u>, claims

or causes of action for future work with respect to the Properties, and set forth claims for past

costs for the Properties;

**WHEREAS**, various of the States timely filed Proofs of Claim in the Bankruptcy

Cases as follows:  Nos. 48416 (Delaware); 44875 (against MLC) and 70228 (against

REALM) (Illinois); 59181 (against MLC) (Indiana); 45638 (Kansas); 65349 (Massachusetts

Department of Environmental Protection); 60528 (against MLC) and 70233 (against REALM)

(Michigan Department of Natural Resources and Environment); 60897 (against MLC), 70235

(against REALM) (Missouri); 44869 and 48352 (New Jersey); 50587 (New York); 50676

(against MLC) and 70234 (against REALM) (Ohio); and 44759 (Wisconsin), which, <u>inter alia</u>,

4

set forth claims and causes of action under environmental laws in connection with the

Properties.  Such proofs of claim filed by the States are hereinafter referred to as the "State

Environmental Proofs of Claim".  Certain of the States' Environmental Proofs of Claim

protectively set forth, inter alia, claims or causes of action for future work with respect to the

Properties, and set forth claims for past costs for the Properties;

**WHEREAS**, the Tribe timely filed Proof of Claim No. 59086 (against MLC) in the

Bankruptcy Cases setting forth claims or causes of action under environmental laws with

respect to the Massena, New York Property.  The proof of claim filed by the Tribe is

hereinafter referred to as the "Tribe Proof of Claim";

**WHEREAS**, the Tribe Proof of Claim, State Environmental Proofs of Claim and the

U.S. Environmental Proofs of Claim are hereinafter referred to collectively as the

"Government Proofs of Claim";

**WHEREAS**, on August 31, 2010, the Debtors filed a chapter 11 Plan of Liquidation

("Plan"), which as amended will annex and incorporate the terms of this Settlement

Agreement;

**WHEREAS**, Debtors and the Governments have agreed to enter into this Settlement

Agreement in connection with the Properties as provided herein, which will place certain of

the Properties and certain other assets of Debtors into an environmental response trust, to

settle, compromise and resolve their disputes relating to the Properties, as provided herein;

**WHEREAS**, the Governments have agreed to the provisions and language of this

Settlement Agreement based on the unique facts and circumstances present in this case, and

nothing in this Settlement Agreement shall be treated as having any precedential value in any

other bankruptcy;

**WHEREAS**, in consideration of, and in exchange for, the promises and covenants herein, the parties hereby agree to the terms and provisions of this Settlement Agreement;

**WHEREAS**, the obligations undertaken by Debtors pursuant to this Settlement Agreement are in the nature of compromises and it is the position of the Governments that these obligations are less than the Governments would seek in the absence of this settlement; and

**WHEREAS**, this Settlement Agreement is fair, reasonable, and in the public interest, and is an appropriate means of resolving the matters addressed in this Settlement Agreement.

**NOW, THEREFORE**, without the admission of liability or any adjudication on any issue of fact or law, and upon the consent and agreement of the parties by their authorized attorneys and authorized officials, it is hereby agreed as follows:

## I.  DEFINITIONS

1.    Unless otherwise expressly provided herein, terms used in this Settlement Agreement that are defined in CERCLA, RCRA, state environmental law or their respective regulations, or in the Bankruptcy Code shall have the meaning assigned to them in CERCLA, RCRA, state environmental law or their respective regulations, or in the Bankruptcy Code, as applicable.  Whenever terms listed below are used in this Settlement Agreement, the following definitions shall apply:

2.    "Administrative Funding Account" shall mean the funding held by the Environmental Response Trust for the costs necessary for the administration of the Environmental Response Trust and the orderly wind-down of the Properties, including, but not limited to, administrative and personnel costs, including professional and legal fees, security, utilities, maintenance, property taxes, property marketing costs, and demolition costs unrelated to Environmental Actions.  Such funding shall be set aside in separate dedicated subaccounts.

Funds in the Administrative Funding Account shall not be used by the Administrative Trustee to fund any Environmental Action.

3.    "Administrative Funding Reserve Account" shall mean the funding held by the Environmental Response Trust in a separate dedicated account for the express purpose of being used by the Administrative Trustee to fund actual or projected shortfalls in the Administrative Funding Account identified by the Administrative Trustee prior to the third anniversary of the Effective Date.  Such shortfalls are strictly limited to unexpectedly high demolition costs and Property holding costs and unexpectedly low proceeds derived from rental of Properties or proceeds derived from the sale of Properties or personalty.  The Administrative Funding Reserve Account shall not be used under any circumstances to fund any Environmental Action or any administrative or personnel matters, including legal or professional matters.

4.    "Administrative Trustee" shall mean (i) EPLET, LLC, not individually but solely in its representative capacity as Administrative Trustee, by and through Elliott Laws, not individually but solely in his representative capacity as president, manager or managing member of the Administrative Trustee, of the Environmental Response Trust that is created pursuant to this Settlement Agreement, the accompanying Environmental Response Trust Agreement (the "Trust Agreement") and the Debtors' Plan, as detailed in, *inter alia*, Paragraphs 42-44 of this Settlement Agreement, and (ii) any successor thereto.

5.    "Annual Cleanup Budget" shall mean the annual budget for Environmental Actions for each Property including any amendments thereto, as described in, *inter alia*, Paragraphs 43, 44, and 49 through 51 of this Settlement Agreement.

7

6.    "Cleanup Manager" shall mean an employee of the Environmental Response Trust or the

Administrative Trustee with responsibilities for certain Environmental Actions and related

activities at Properties located in a specified geographic area, as described in, *inter alia*,

Paragraphs 45-47 of this Settlement Agreement.

7.    "Cushion Funding Account" shall mean the funding held by the Environmental Response

Trust that is available for Environmental Actions at any of the Properties under the

circumstances described in Paragraphs 57 and 58 of this Settlement Agreement.

8.    "Effective Date" shall mean the day on which the Plan becomes effective in accordance

with its terms and the Bankruptcy Court's order confirming the Plan.

9.    "Environmental Action" shall mean any response, removal, investigation, sampling,

remediation, reclamation, closure, post-closure, corrective action, engineering controls,

institutional controls, deed restrictions, oversight costs and OMM activities authorized or

required under law with respect to a Property.

10.    "Environmental Response Trust" shall mean the Environmental Response Trust created

pursuant to this Settlement Agreement, the Trust Agreement, and the Plan.

11.    "Environmental Response Trust Protected Parties" shall mean the Administrative

Trustee, individually and/or in its capacity as official representative of the Environmental

Response Trust, and the Environmental Response Trust's and the Administrative Trustee's

shareholders, members, officers, managers, directors, employees (including but not limited to

the Cleanup Managers and the Redevelopment Manager), attorneys, and agents, if any, solely

in their capacities as such.  For avoidance of doubt, the Environmental Response Trust is not

an Environmental Response Trust Protected Party.

12. "Final Order" shall mean a court order that has not been reversed, stayed, modified, or amended, and as to which (i) the time to appeal, seek review, rehearing or remand, or petition for certiorari has expired and no timely filed appeal or petition for review, rehearing, remand or certiorari is pending; or (ii) any appeal taken or petition for certiorari filed has been resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought.

13. "Governments" shall mean the United States, the States, and the Tribe.

14. "Hazardous Substances" shall mean all materials, substances, or wastes defined, designated, regulated or classified as hazardous, toxic or radioactive, under any federal or state environmental law, whether by type or by quantity, and shall include but not be limited to petroleum or any derivative or by-product thereof and asbestos-containing materials.

15. "Lead Agency" shall mean the agency designated as such for each Property, as reflected on Attachment A, Column 7 to this Settlement Agreement. For each Property, the Lead Agency shall either be the U.S. EPA, or an agency of the State in which the Property is located. The U.S. EPA and the State in which a Property is located may provide the Administrative Trustee with joint written notice that the Lead Agency for the Property has changed.

16. "Long Term OMM Property Funding Account" shall mean the funding (if any) to be held by the Environmental Response Trust and to be set aside in separate dedicated subaccounts for each Property and preserved for OMM with respect to each Property beginning ten years after the Effective Date.

17. "Minimum Estimated Property Funding Account" shall mean the funding to be held by the Environmental Response Trust, and to be set aside in separate dedicated subaccounts for

each Property, that has been estimated as the minimum amount of funding with respect to Environmental Actions with respect to each Property.

18. "OMM" shall mean operation, monitoring and maintenance activities required as Environmental Action.

19. "Plan" means the Chapter 11 Plan of Liquidation filed by Debtors on August 31, 2010, as amended, modified and supplemented from time to time and incorporating this Settlement Agreement.

20. "Properties" shall mean the 89 properties set forth on Attachment A.

21. "Redevelopment Manager" shall mean the employee of the Environmental Response Trust or the Administrative Trustee with responsibilities relating to the return of Properties to beneficial use, as described in, *inter alia*, Paragraph 48 of this Settlement Agreement.

22. "Reserve Property Funding Account" shall mean the funding to be held by the Environmental Response Trust, and to be set aside in separate dedicated subaccounts for each Property, that has been estimated as an appropriate amount of reserve funding with respect to Environmental Actions with respect to each Property for use in performing Environmental Actions with respect to each Property upon exhaustion of the Minimum Estimated Property Funding Account.

23. "States" shall mean the States (or Commonwealths) of Delaware, Illinois, Indiana, Kansas, Michigan, Missouri, New Jersey, New York, Ohio, Virginia, and Wisconsin, the Louisiana Department of Environmental Quality, the Massachusetts Department of Environmental Protection, and the Department of Environmental Protection of the Commonwealth of Pennsylvania.

10

24. "Support Agency" shall mean the agency listed as such for each Property on Attachment A Column 8 to this Settlement Agreement. Where a State agency is the Lead Agency, U.S. EPA will be the Support Agency; where U.S. EPA is the Lead Agency, a State Agency and/or St. Regis Mohawk Tribe will be the Support Agency or Agencies.

25. "Tribe" shall mean the Saint Regis Mohawk Tribe.

26. "United States" shall mean the United States of America, and all of its agencies, departments, and instrumentalities, including the U.S. EPA and the U.S. Treasury.

## II.      JURISDICTION

27. The Bankruptcy Court has jurisdiction over the subject matter hereof pursuant to 28 U.S.C. §§ 157, 1331, and 1334.

## III.      PARTIES BOUND; SUCCESSION AND ASSIGNMENT

28. This Settlement Agreement applies to, is binding upon, and shall inure to the benefit of the parties hereto, their legal successors and assigns, and any trustee, examiner or receiver appointed in the Bankruptcy Cases.

## IV.      PURPOSES AND FORMATION OF THE ENVIRONMENTAL RESPONSE TRUST

29. The purpose of the Environmental Response Trust shall be to conduct, manage and/or fund Environmental Actions with respect to certain of the Properties, including the migration of Hazardous Substances emanating from certain of the Properties, in accordance with the provisions of this Settlement Agreement and the Trust Agreement; to reimburse the Lead Agency for Environmental Actions it conducts or has agreed to pay for with respect to the Properties; to own certain of the Properties, carry out administrative and property management functions related to the Properties and pay associated administrative costs; and to try to sell or transfer the Properties owned by the Environmental Response Trust with the

11

objective they be put to productive or beneficial use.  The Environmental Response Trust is separate and distinct from the Debtors, and is formed for the purposes expressly set forth herein.

30.    On the Effective Date and simultaneously with the payments to the Environmental Response Trust under Paragraph 32 hereof and pursuant to the Plan, Debtors shall transfer, assign and deliver to the Environmental Response Trust all of their rights, title, and interest in and to each of the Properties, including, without limitation, all of their fee ownership in the Properties and other Environmental Response Trust Assets as defined in the Environmental Response Trust Agreement, including all appurtenances, rights, easements, rights-of-way, mining rights, mineral rights, mineral claims, appurtenant groundwater rights, associated surface water rights, claims, and filings, permits, or other interests, including all personalty, related to the Properties (including without limitation all fixtures, improvements, and equipment located thereon as of the Effective Date).  After the establishment and funding of, and the conveyance of the Properties owned by Debtors to, the Trust as provided in this Settlement Agreement, the Debtors and their successors, assigns, officers, directors and employees in their respective capacities as such shall have no further role or residual interest with respect to the Trust or the Properties other than as expressly provided in Paragraphs 41, 93, 100 through 104 of this Settlement Agreement, nor shall they have any further liability, duty or obligation in connection with the matters resolved in this Settlement Agreement, including all environmental claims and other environmental liabilities asserted in any proof of claim filed by the Governments with respect to the Properties, other than as expressly reserved in Paragraphs 41, 93, 100 through 104 of this Settlement Agreement.  Pursuant to section 1146 of the Bankruptcy Code, the following shall not be subject to any stamp tax, transfer tax,

12

intangible tax, recording fee, or similar tax, charge, or expense to the fullest extent provided

for under the Code: (i) the issuance, transfer, or exchange of any securities, instruments, or

documents; (ii) the creation of any lien, mortgage, deed of trust, or other security interest; or

(iii) the making or assignment of any lease or sublease or the making or delivery of any deed

or other instrument of transfer under, pursuant to, in furtherance of, or in connection with the

Plan or the sale or transfer of any assets of the Debtors into the Environmental Response

Trust; any deeds, bills of sale, or assignments executed in connection with and in furtherance

of the Plan; the Confirmation Order; this Settlement Agreement; the Trust Agreement; or the

Environmental Response Trust, which are being entered into and created in connection with

the Plan.

31.   The transfer of ownership of the Properties and personalty to the Environmental

Response Trust shall be a transfer pursuant to the Plan of all of the Debtors' rights, title and

interests therein, and such transfer of the Properties and personalty (i) shall be as is and where

is, with no warranties of any nature whatsoever; (ii) shall, except for any statutory liens for

property and ad valorem taxes not yet due and payable against the Properties, to the maximum

extent permitted by law, be made free and clear of all claims, liens and interests, including but

not limited to liens for the payment of monetary claims, such as property taxes, liens held for

costs related to Environmental Actions undertaken prior to the Effective Date, or other

monetary claims asserted or that could have been asserted in the Bankruptcy Cases, but shall

remain subject to any existing *in rem* claims that do not secure payment of monetary claims

(such as easements or deed restrictions), and all liens, claims or security interests of the

lenders under the DIP Loan pursuant to the DIP Credit Agreement (as defined in the Plan) and

any order of the Bankruptcy Court approving the DIP Credit Agreement, provided, however,

that the Required Lenders (as defined in the DIP Credit Agreement) hereby consent to the sale

of all Properties or personalty securing those liens, claims and interests if such sale is made in

accordance with the approved annual budget and the provisions of this Settlement Agreement,

the Trust Agreement and the Plan; (iii) shall be subject to any rights of the Governments

under this Settlement Agreement or the Trust Agreement; and (iv) shall be accomplished by

quitclaim deed, in a form substantially similar to the quitclaim deed attached as Exhibit B to

the Trust Agreement, and/or personal property bill of sale without warranty, all such

conveyance documents to be agreed to in form by the Debtors and the Environmental

Response Trust, provided that in no event shall the conveyance include any warranty

whatsoever by the grantor by virtue of the grant document or statutory or common law or

otherwise.  The Debtors, or the entity administering the Plan for the benefit of the creditors, as

applicable, shall cooperate with the Governments and the Administrative Trustee to record or

cause to be recorded in the appropriate real property records the transfer documents with

respect to the Properties within five business days of the Effective Date.  Debtors shall pay all

property and ad valorem taxes relating to the Properties and other assets owned by the

Environmental Response Trust that are due on or prior to the Effective Date (and the

Environmental Response Trust shall not be liable for such taxes), and the Environmental

Response Trust shall pay all property and ad valorem taxes relating to the Properties and other

assets owned by the Environmental Response Trust that are due after the Effective Date.  On

the Effective Date, the Debtors shall execute and record releases of any liens or security

interests held by any of the Debtors or any creditors against any Property, provided, however

that the liens or security interests against any Property or personalty held by the Required

Lenders under the DIP Loan shall not be released prior to, and shall be released upon, the

14

Environmental Response Trust's completion of a sale of such Property or personalty.  After

Debtors execute this Settlement Agreement, Debtors shall not further encumber the Properties

or Debtors' other interests therein and shall maintain the Properties, including the

improvements thereon and the fixtures thereto that are related to Environmental Actions in the

condition that they exist as of the date of such execution, except to the extent that ongoing

Environmental Actions require otherwise or, with respect to demolition activities at Properties

with existing and prospective contracts for demolition activities listed on Attachment B.

Notwithstanding anything to the contrary herein or in the Plan, the lenders under the DIP

Credit Agreement shall maintain any and all liens on any Collateral (as defined in the DIP

Credit Agreement) and any transfer of that Collateral to the Environmental Response Trust

shall not be made free and clear of the liens of the lenders under the DIP Credit Agreement,

provided however that the Required Lenders hereby consent to the expenditure or sale of all

Collateral securing those liens, claims and interests if such sale is made in accordance with the

approved annual budget and the provisions of this Settlement Agreement, the Trust

Agreement and the Plan.

32.   On the Effective Date, and subject to adjustments as provided in Paragraph 36 of this

Settlement Agreement as applicable, Debtors shall make a payment to fund the Environmental

Response Trust in the amount of no less than $641,434,945; and the Debtor shall pay or cause

to be paid to the Expendable Trust as defined in Paragraph 79 of this Agreement in the

amount of $786,944, and the 807 Trust Fund as defined in Paragraph 80 of this Agreement in

the amount of $102,390.  The Environmental Response Trust funding amount consists of (i) a

Minimum Estimated Property Funding Account containing funding with respect to each

Property as set forth on Attachment A Column 2 attached hereto and totaling $295,036,131,

(ii) a Reserve Property Funding Account containing funding with respect to each Property as set forth on Attachment A Column 3 attached hereto and totaling $52,065,197, (iii) a Long Term OMM Property Funding Account containing funding (if any) for each Property as set forth in Attachment A Column 4 attached hereto and totaling $84,099,794; (iv) the Cushion Funding Account totaling $68,233,823; (v) the Administrative Funding Account in an amount of no less than $102 million; and (vi) the Administrative Funding Reserve Account totaling $40 million.

33.  Environmental Response Trust funding of the Minimum Estimated Property Funding Accounts, Reserve Property Funding Accounts, and Long Term OMM Property Funding Accounts shall be held in trust in segregated trust subaccounts for each Property as provided in this Settlement Agreement and the Trust Agreement.  Environmental Response Trust funding with respect to the Administrative Funding Account and the Cushion Funding Account each shall be held in trust in a segregated trust subaccount as provided in this Settlement Agreement.  Funding from a subaccount for a Property may not be used for another Property except as otherwise expressly provided by and in accordance with this Settlement Agreement.

34.  All interest earned in a subaccount shall be retained in such subaccount and used only for the same purposes as the principal in that subaccount as provided in this Settlement Agreement, subject to any reallocation provided for in accordance with the terms of this Settlement Agreement.

35.  Notwithstanding any other provision of this Settlement Agreement or the Trust Agreement, "separately dedicated subaccounts" may be accomplished by accounting entries and nothing herein shall preclude the Administrative Trustee from commingling funds solely

16

for investment or administrative purposes, provided, however, that the Administrative

Funding Account and Administrative Reserve Funding Account shall not be commingled with

any other accounts under any circumstances.

Funding Adjustments.

36.  (a) The amount of funding provided with respect to any Property in the Minimum

Estimated Property Funding Account and Reserve Property Funding Account shall be reduced

on the Effective Date to reflect actual expenditures by the Debtors at the Property for third

party contractor costs for Environmental Actions at the Property (1) that were paid by Debtors

between July 1, 2010, and October 31, 2010, except to the extent already credited under

Attachment A, provided that the costs for which the Debtors are seeking reduction were

approved in writing by the Lead Agency (including approval of an estimate of such costs),

and (2) any actual expenditures by the Debtors at the Property for third party contractor costs

for Environmental Actions with respect to a Property between November 1, 2010 and the

Effective Date will be a reduction provided that such costs were pre-approved in writing by

the Lead Agency (including pre-approval of an estimate of such costs).  In no event shall any

reductions be made for Environmental Actions performed by Debtors between July 1, 2010,

and the Effective Date that exceed either the cost for them in the Property's Minimum

Estimated Property Funding Account or Reserve Property Funding Account or any approval

or pre-approval of such costs.  Following completion of any such Environmental Action and

payment thereof, Debtors shall provide documentation to the Lead Agency of the exact

amount of the expenditure.  In no event shall reductions be made for expenditures of Debtors

that are not reimbursements of expenditures for and payments to third party contractors.  In no

event shall reductions be made for expenditures of Debtors on any property that is not related

17

to a Property set forth on Attachment A hereto. Any reductions or payments under this Paragraph are subject to the approval in writing of the Lead Agency that the reductions or payments are consistent with this Paragraph. Any disputes under this Paragraph shall be resolved by the Bankruptcy Court.

(b) The amount of funding provided with respect to the Administrative Funding Account shall be adjusted on the Effective Date to reflect actual expenditures by the Debtors, as a result of any delay in the Effective Date beyond December 31, 2010, for administrative costs that were part of Debtors projected budget for the Administrative Funding Account. Such adjustment shall be subject to the approval of the U.S. Treasury.

37. Debtors shall, on or before the Effective Date, directly reimburse a Lead Agency for costs expended by the Lead Agency for Environmental Actions with respect to a Property between June 1, 2009 and December 31, 2010 for Properties transferred to the Environmental Response Trust by MLC, or October 9, 2009 and December 31, 2010 for Properties transferred to the Environmental Response Trust by REALM or ENCORE, provided that (i) the applicable Debtor, the Lead Agency, and U.S. Treasury agree that the costs for which the Lead Agency is seeking reimbursement were included in the Property's Minimum Estimated Property Funding Account or Reserve Property Funding Account or were for Emergency Environmental Actions within the meaning of Paragraph 49; and (ii) the amount of funding provided with respect to any Property in the Minimum Estimated Property Funding Account and Reserve Property Funding Account is reduced on the Effective Date to reflect actual payments made by the Debtors to the Lead Agency. In the event of a dispute between the relevant Debtor, the United States, and/or Lead Agency regarding the Debtor's reimbursement of costs incurred by the Lead Agency as provided for in this Paragraph, the Bankruptcy Court

18

shall resolve the dispute.  Any costs expended by the Lead Agency for Environmental Actions

with respect to a Property between January 1, 2011 and the Effective Date will be included in,

and reimbursed by the Trust after the Effective Date pursuant to the Property's first approved

Annual Cleanup Budget provided that those costs were included in the Property's Minimum

Estimated Property Funding Account or Reserve Property Funding Account or were for

Emergency Environmental Actions within the meaning of Paragraph 49.  Under no

circumstances will the Debtors or the Environmental Response Trust under this Paragraph pay

any costs expended by the Governments in connection with any work relating to Debtors'

bankruptcy proceedings.

38.   The United States shall be the sole beneficiary of the Environmental Response Trust.

39.   The United States, the States, and the Tribe shall have the rights and powers set forth in

this Settlement Agreement and the Trust Agreement, and nothing shall limit their ability to

enforce those rights and powers, including but not limited to (i) the right to file suit against

Debtors or the Administrative Trustee for failure to fund on the Effective Date the

Environmental Response Trust's Minimum Estimated Property Funding Accounts, Reserve

Property Funding Accounts, Long Term OMM Property Funding Accounts and Cushion

Funding Account as set forth in this Settlement Agreement; (ii) the right to file suit against the

Environmental Response Trust or the Environmental Response Trust Protected Parties at any

time for fraud or willful misconduct (with all funds recovered in any such action to be

restored to the Environmental Response Trust subaccount from which they were taken); or

(iii) the right to file suit against the Administrative Trustee as set forth in Paragraphs 50, 101,

102, and 103 of this Settlement Agreement, provided, however, that the Bankruptcy Court

shall have exclusive jurisdiction over any issues relating to (a) approval of budgets and

19

expenditures of budgeted funds (provided further however, that if the Administrative Trustee enters into a consent decree or administrative order on consent, then the Governments may enforce the expenditure of budgeted funds to comply with such consent decree or administrative order on consent in other courts having jurisdiction), (b) changes to a Property's Minimum Estimated Property Funding, Reserve Property Funding and Long Term OMM Property Funding, if any, (c) access to Cushion Funding Account funds, (d) disputes involving the Administrative Funding Account, or (e) the removal of the Administrative Trustee.  Notwithstanding the foregoing, in no event shall the Environmental Response Trust Protected Parties be personally liable for any monetary damages other than for a finding of fraud or willful misconduct by Final Order, except as otherwise agreed in writing by the relevant Environmental Response Trust Protected Parties.

40.   The Environmental Response Trust shall have no objective or authority to engage in any trade or business.  The sale, lease or other disposition of some or all of a Property by the Environmental Response Trust shall not be deemed an engagement in any trade or business. The Environmental Response Trust, by and through its Administrative Trustee, the Debtors, and the Lead Agency for each of the Properties shall exchange information and reasonably cooperate to determine the appropriate disposition of any executory contracts or unexpired leases that relate to the relevant Property.

41.   With the exception of documents and information relating to the Properties and other assets of the Environmental Response Trust, including but not limited to personalty, stored at the facilities of Iron Mountain Inc. (the "Iron Mountain Documents"), no later than January 1, 2011, and at such earlier time as may be practicable, Debtors shall provide to the Administrative Trustee copies of or access to all documents and other materials in the care,

20

custody or control of Debtors, their professionals, consultants and/or contractors that: (i) contain or relate to environmental information regarding the Properties and other assets of the Environmental Response Trust, including but not limited to personalty, (e.g., field notes, data packages, historical documentation, cost estimations, summaries, other information, and databases including but not limited to all data included in the IDEA database, models, cost estimates, reports, correspondence, etc.); (ii) contain or relate to non-environmental information concerning the management of the Properties and other assets of the Environmental Response Trust, including but not limited to personalty, or prospective sale or other disposition of the Properties and other assets of the Environmental Response Trust, including but not limited to personalty; and (iii) contain or relate to any information concerning the implementation of and the spending of money associated with MLC's 10-Year Plan of Liquidation Financial Forecast as it relates to the Properties.  Prior to 30 days after the Effective Date, Debtors shall transmit all such documents and materials not already in the possession of the Administrative Trustee to the Administrative Trustee, and upon the Effective Date the Environmental Response Trust shall become the owner of the information in the IDEA database related to the Properties.  With respect to the Iron Mountain Documents, (i) prior to January 1, 2011, Debtors will undertake reasonable efforts to reach agreement with New GM on a process to transfer any Iron Mountain Documents requested by the Administrative Trustee to the Environmental Response Trust no later than July 31, 2011; and (ii) on the Effective Date, Debtors shall transfer all their rights to the Iron Mountain Documents, including their rights to copies of and access to such documents to the Administrative Trustee.  The United States shall provide to the Administrative Trustee, the States and the Tribe: (a) The Brattle Group, Inc.'s ("Brattle's") tables showing the estimated

timing and amount of future costs for Environmental Actions by Property; (b) Brattle's

updated spreadsheet showing the estimated timing and amount of future costs for

Environmental Actions by Property as of August 13, 2010; (c) cost backup documents in

Brattle's possession not provided in the data included in the IDEA database; and (d) Brattle's

Environmental Action summaries for the Properties.

Appointment and Duties of the Administrative Trustee.

42.   EPLET, LLC, not individually but solely in its representative capacity as Administrative

Trustee, by and through Elliott Laws, not individually but solely in his representative capacity

as president, manager or managing member of the Administrative Trustee, is appointed as the

Administrative Trustee to administer the Environmental Response Trust in accordance with

this Settlement Agreement and the Trust Agreement substantially in the form attached hereto

as Attachment C.  The term of the Administrative Trustee shall be for five years at which time

the Administrative Trustee may be re-appointed or terminated by the Bankruptcy Court upon

recommendation by the United States after consultation with the States and the Tribe.  The

Bankruptcy Court may remove the Administrative Trustee prior to the end of its five-year

term for "good cause" shown by the United States or any of the States, and appoint a new

Administrative Trustee upon recommendation by the United States after consultation with the

States and the Tribe.  "Good cause" in this context shall mean a finding by the Bankruptcy

Court that the Environmental Response Trust Administrative Trustee (i) committed fraud or

willful misconduct after the Effective Date in relation to the Environmental Response Trust

Administrative Trustee's duties under the Environmental Response Trust; (ii) has in any

material respect, as a result of negligence, exacerbated conditions at any of the Properties;

(iii) has been seriously or repeatedly deficient or seriously or repeatedly negligent or late in

22

the performance of its duties, or (iv) has violated the provisions of this Settlement Agreement

or the Trust Agreement.

43.   The Administrative Trustee shall be responsible for implementing the purposes of the

Environmental Response Trust, including overseeing the development of budgets, retaining

and overseeing professionals to conduct Environmental Actions, entering into and overseeing

the implementation of all contracts binding the Environmental Response Trust, executing

agreements, preparing and filing all required plans and reports with the Lead Agencies,

handling accounting and legal matters for the Environmental Response Trust, establishing

funding objectives, monitoring the performance of the Cleanup and Redevelopment Managers

and other administrative tasks.   The Administrative Trustee shall, consistent with the terms of

this Settlement Agreement, the Trust Agreement and the approved cleanup budgets for

Properties, conduct, manage and/or fund Environmental Actions with respect to the

Properties; arrange for the implementation of certain Environmental Actions with respect to

Properties; reimburse the Lead Agency for Environmental Actions with respect to a Property

consistent with the approved Annual Cleanup Budget; manage the Properties and pay

associated administrative costs; manage and allocate funds in the Minimum Estimated

Property Funding Accounts, Reserve Property Funding Accounts, Long Term OMM Property

Funding Accounts, the Administrative Funding Account and the Cushion Funding Account;

and seek to sell or transfer the Properties so that they can be put to productive or beneficial

use.

44.   The Administrative Trustee is authorized to expend funds from the Minimum Estimated

Property Funding Account, the Reserve Property Funding Account, and the Long Term OMM

Property Funding Account so long as all such expenditures are consistent with the terms of

this Settlement Agreement, the Trust Agreement and the approved Annual Cleanup Budget

described in Paragraphs 49 and 50 of this Settlement Agreement and the Trust Agreement.

<u>Environmental Response Trust Administration and Accounts</u>

      a.  <u>Cleanup and Redevelopment Managers</u>

45.  The Environmental Response Trust or Administrative Trustee shall employ a Cleanup

Manager for (a) the Properties in the State of Michigan, (b) the Properties in the State of New

York, (c) the Properties in the States of Delaware, Louisiana and Ohio and the

Commonwealths of Massachusetts, Pennsylvania, and Virginia, collectively, and (d) the

Properties in the States of Illinois, Indiana, Kansas, Missouri, New Jersey and Wisconsin,

collectively.  The Cleanup Managers' compensation and expenses will be paid from the

Administrative Funding Account.  Each Cleanup Manager shall be subject to the disapproval

of the applicable Lead Agencies.  The Lead Agency may request that the Administrative

Trustee replace the Cleanup Manager whose responsibilities include the Properties within the

Lead Agency's jurisdiction.  Each Cleanup Manager will report to and be subject to the

supervision of the Administrative Trustee and will be responsible for working with the Lead

Agencies to arrange for the implementation of Environmental Actions at each Property

consistent with the approved Annual Cleanup Budget.  The Administrative Trustee may

replace the Cleanup Manager at any time, provided that the new Cleanup Manager is subject

to the disapproval of the applicable Lead Agencies.

46.  The Administrative Trustee may delegate to the Cleanup Managers the authority to enter

into contracts without the written authorization of the Administrative Trustee provided that (i)

the total amount of the contract does not exceed $100,000 or, in the case of the Massena

Property, $250,000; (ii) the terms of such contracts are consistent with approved Annual

Cleanup Budgets for the Properties ; (iii) the terms of such contracts are consistent with this

Settlement Agreement and the Trust Agreement; (iv) the Cleanup Manager provides a copy of

such contract to the Administrative Trustee upon execution of the contract; and (v) the

Cleanup Manager keeps the Administrative Trustee apprised of all matters relating to such

contracts.  Where the above requirements are met, each Cleanup Manager has the discretion to

enter into contracts for periods longer than one year where appropriate to maximize the

efficiency or effectiveness of remediation.  The Administrative Trustee and/or Cleanup

Manager shall require appropriate liability insurance from each contractor or consultant hired

to perform work.

47.  The Lead Agency may require the use of competitive bidding for the selection of

Environmental Action contractors and consultants.  The Lead Agency shall have the right to

disapprove the selection of an Environmental Action contractor or consultant for good cause.

To the extent a Lead Agency maintains an approved list of Environmental Action contractors

or consultants, it shall be good cause for a Lead Agency's disapproval of the selection of an

Environmental Action contractor or consultant if that contractor or consultant is not on the

Lead Agency's approved list.  The Lead Agency may require that an Environmental Action

contractor or consultant working at a Property on the Effective Date be utilized, provided that

the continued use of the contractor or consultant would be cost effective.  No earlier than four

(4) years from the Effective Date, and at any time thereafter in connection with the Annual

Cleanup Budget process, the Administrative Trustee may propose the reduction of the number

of Cleanup Managers and/or the reallocation of the Properties for which each Cleanup

Manager is responsible, if such reduction and/or reallocation would be cost effective.  Such

proposal shall be subject to the approval of the applicable Lead Agencies, which shall not be

unreasonably withheld.

48.   The Environmental Response Trust or Administrative Trustee shall employ a

Redevelopment Manager who will report to and be subject to the supervision of the

Administrative Trustee and will assist the Administrative Trustee in dealing with the sale,

lease or redevelopment of the Properties owned by the Environmental Response Trust.  The

Redevelopment Manager's duties will include consulting with applicable federal and state

officials working on redevelopment issues and affected communities where the Property is

located.  The Redevelopment Manager's compensation and expenses will be paid from the

Administrative Funding Account.

      b.   <u>Approval of Annual Cleanup Budgets and Emergency Environmental Action</u>.

49.   (i) Each Cleanup Manager shall, under the supervision of the Administrative Trustee,

develop a proposed Annual Cleanup Budget with respect to each Property under its control

detailing expenditures for Environmental Actions that are consistent with the funding

available for such Property and the terms of this Settlement Agreement and the Trust

Agreement.  The Annual Cleanup Budget for each Property shall include work to be

undertaken in the upcoming year and shall include projections of work to occur during the

following years to ensure continuity of work.  The work to be undertaken may be work to be

performed by the Environmental Response Trust or work to be performed by the Lead

Agency and reimbursed by the Environmental Response Trust provided that the work

performed by the Lead Agency is consistent with the approved cleanup budget.  The

Administrative Trustee shall review and, if necessary, revise the proposed Annual Cleanup

Budget to ensure sufficient funding with respect to the budgeted Environmental Action.  The

Administrative Trustee shall provide each proposed Annual Cleanup Budget to the

appropriate Lead Agency for approval which shall not be unreasonably withheld.  During the

26

course of a budgeted year, the Lead Agency may request, or the Administrative Trustee may propose for the Lead Agency's approval, which shall not be unreasonably withheld, the amendment of the approved Annual Cleanup Budget for a Property to provide additional funding consistent with applicable requirements under environmental law and taking into account the funding available for Environmental Actions with respect to the Property. The Administrative Trustee shall provide a copy of any proposed budget or amendment and any approved budget or amendment to the Support Agency, which may provide comments to the Administrative Trustee and the Lead Agency. The Support Agency shall not have standing to challenge the budget.

(ii) In the event of an emergency at a Property requiring the performance of an Environmental Action within hours or days of the Administrative Trustee first receiving notice of the emergency, if the emergency does not permit sufficient time to amend the Annual Budget for that Property, the Administrative Trustee may utilize funding from the Property's Minimum Estimated Property Funding Account and/or Reserve Property Funding Account to undertake the Environmental Actions necessary to respond to the emergency (the "Emergency Environmental Actions"). If the Administrative Trustee does not undertake an Emergency Environmental Action, the Administrative Trustee may reimburse the Lead Agency (or the Support Agency, if the Lead Agency and Administrative Trustee concur in writing and the concurrence of the Trustee shall not be unreasonably withheld) for such Emergency Environmental Action from the Property's Minimum Property Funding Account or Reserve Property Funding Account provided that the Administrative Trustee and the Lead Agency (or Support Agency) agree in advance to a cap in the total amount of the funding, which must be sufficient to maintain flexibility to address conditions in the field, for such

27

Emergency Environmental Action, and further provided that sufficient funds to cover the

Emergency Environmental Action remain in the Property's Minimum Property Funding

Account and/or Reserve Property Funding Account.  Nothing in this subparagraph shall

preclude the payment or reimbursement of the Emergency Environmental Action through the

annual budget or budget amendment process.

50.  If the Lead Agency and the Administrative Trustee are unable to resolve any dispute

relating to the approval of the Administrative Trustee's proposed Annual Cleanup Budget or

any proposed amendment thereto, then the Lead Agency or Administrative Trustee may

petition the Bankruptcy Court to resolve the dispute.  Where the potential impact of the

dispute is unlikely to cause the ultimate cost of the Environmental Action to exceed the funds

in the Minimum Estimated Property Funding Account and the Reserve Property Funding

Account, then the Bankruptcy Court shall decide the petition based on the totality of the

evidence and the Administrative Trustee will bear the burden of proving by a preponderance

of the evidence that (i) the Lead Agency's disapproval of the Annual Cleanup Budget, (ii) the

Lead Agency's disapproval of a request by the Administrative Trustee to amend the approved

Annual Cleanup Budget, or (iii) the Lead Agency's request for an amendment to the approved

Annual Cleanup Budget was unreasonable.  If the Lead Agency and the Administrative

Trustee are unable to resolve the dispute where the potential impact of the dispute could

reasonably be expected to cause the ultimate cost of the Environmental Action to exceed the

funds in the Minimum Estimated Property Funding Account and the Reserve Property

Funding Account, then the Bankruptcy Court shall decide the petition based on the totality of

the evidence and the Lead Agency shall bear the burden of proving by clear and convincing

evidence that (a) its disapproval of the proposed Annual Cleanup Budget, (b) its disapproval

28

of an amendment to the Annual Cleanup Budget, or (c) its request for an amendment to the

approved Annual Cleanup Budget is based on material information, a material event, or a

material condition at the Property that was not reasonably foreseeable at the time the Lead

Agency and/or Support Agency participated in the development of the funding with respect to

the Property.  If the Administrative Trustee fails to fund the work provided for in the approved

Annual Cleanup Budget or the approved amended Annual Cleanup Budget, or fails to

reimburse the Lead Agency for performing such work, then the Lead Agency has the right to

file suit against the Administrative Trustee in his official capacity in the Bankruptcy Court in

accordance with the terms of this Settlement Agreement and the Trust Agreement.  In no

event shall the Environmental Response Trust Protected Parties be personally liable for any

monetary damages other than for a finding of fraud or willful misconduct by Final Order.

51.   Upon agreement of the Lead Agency and the Administrative Trustee, the Lead Agency

and Administrative Trustee shall engage in non-binding informal dispute resolution prior to

petitioning the Bankruptcy Court to resolve any dispute over the proposed Annual Cleanup

Budget or a request that the approved Annual Cleanup Budget be amended.

      c.   Administrative Funding Account.

52.   The Administrative Trustee shall administer the Administrative Funding Account and the

Administrative Funding Reserve Account.  The purpose of the Administrative Funding

Account is to provide funding with respect to costs necessary for the administration of the

Environmental Response Trust and the orderly wind-down of the Properties, including, but

not limited to, administrative and personnel costs, including professional and legal fees, and

Property holding costs (security, utilities, maintenance, property taxes), Property marketing

costs, and demolition costs unrelated to Environmental Actions.  The Administrative Funding

29

Account shall be partially funded on the Effective Date in an amount no less than $102

million subject to adjustments as provided in Paragraph 36, and partially funded from income

derived from the sale and/or lease of the Properties and the sale and/or lease of other assets,

such as fixtures, improvements, and equipment located on the Properties as of the Effective

Date that are not necessary to conduct or complete Environmental Actions. The

Administrative Trustee shall develop an annual budget for all expenditures from the

Administrative Funding Account based on the most cost-effective use of the funds. The

Administrative Trustee shall provide a copy of the annual budget for the Administrative

Funding Account to the U.S. Treasury for approval. Each approved administrative budget

shall include line items for emergency and unanticipated expenditures. After approval, the

Administrative Trustee shall provide a copy of the approved annual budget for the

Administrative Funding Account to the United States, the States, and the Tribe. The

Administrative Trustee is authorized to expend Administrative Funding Account funds

consistent with the terms of this Settlement Agreement, the Trust Agreement, the Budget (as

defined in the Plan) and the approved annual budget described in this Paragraph.

53.  The purpose of the Administrative Funding Reserve Account is to fund actual or

projected shortfalls in the Administrative Funding Account identified by the Administrative

Trustee prior to the third anniversary of the Effective Date. Such shortfalls are strictly limited

to unexpectedly high demolition costs and Property holding costs and unexpectedly low

proceeds derived from rental of Properties or proceeds derived from the sale of Properties.

The Administrative Funding Reserve Account shall be funded on the Effective Date in an

amount totaling $40 million and shall not be used under any circumstances to fund any

Environmental Action or any administrative or personnel matters, including legal and

professional fees, other than as provided for under this Paragraph.  In no event shall any disbursements be made from the Administrative Funding Reserve Account without prior approval by the U.S. Treasury.  In the event that the Administrative Trustee's application for funding from the Administrative Funding Reserve Account is approved by the U.S. Treasury, the approved amount in Administrative Reserve Funding shall be transferred to the Administrative Funding Account and shall be subject to all provisions otherwise applicable to Administrative Funding.  Any funds remaining in the Administrative Funding Reserve Account after the third anniversary of the Effective Date shall be returned to the U.S. Treasury.

54.    On or before the third anniversary of the Effective Date and semi-annually thereafter, the Administrative Trustee shall, in consultation with the U.S. Treasury, determine whether the amounts in the Administrative Funding Account exceed the amount of funds necessary to complete the tasks enumerated in Paragraph 52 of this Settlement Agreement.  If the Administrative Trustee makes such a determination, it shall reduce the amounts in the Administrative Funding Account and transfer such funds to the U.S. Treasury and Canada. The amount and basis for any such reductions will be provided in writing to the U.S. Treasury and Canada with copies to U.S. EPA, the States, and the Tribe no fewer than ten days prior to the proposed reduction and transfer.  The U.S. Treasury and Canada may petition the Bankruptcy Court for relief relating to the failure by the Administrative Trustee to follow the budget for the Administrative Funding Account or to make reductions and transfers in accordance with this section.  The Bankruptcy Court shall decide the petition based on the totality of all of the evidence submitted.  Notwithstanding anything to the contrary herein, in the Plan or in the Bankruptcy Court's order confirming the Plan, in the event any cash funding

31

remains in the Administrative Funding Account and Administrative Funding Reserve Account after all obligations imposed on the Environmental Response Trust and the Administrative Trustee pursuant to this Settlement Agreement, the Trust Agreement, and the Plan have been satisfied, the Administrative Trustee shall pay the remaining cash funding to the U.S. Treasury and EDC by wire transfer or immediately available funds to an account designated by the U.S. Treasury and EDC respectively, ratably in accordance with their respective interests in the DIP Credit Agreement Claims (as defined in the Plan).

        d.  <u>Cushion Funding Account</u>.

55.  The Administrative Trustee shall administer the Cushion Funding Account.  The purpose of the Cushion Funding Account is to provide portfolio-wide backup funding with respect to any of the Properties where the Minimum Estimated Property Funding and Reserve Property Funding have been exhausted, or the Long Term OMM Property Funding has been exhausted, and additional funding is necessary to undertake or complete the Environmental Action.  An additional purpose of the Cushion Funding Account is to provide funding with respect to Properties where no funding is allocated and unforeseeable conditions are discovered or arise which require funding to undertake Environmental Action.  The Governments have entered into this Settlement Agreement and the Trust Agreement in significant reliance on the availability of the Cushion Funding Account for any of the Properties.  In order to preserve funding in the account, there shall be a presumption against using Cushion Funding absent the showing set forth below.  This standard shall not apply to a shortfall in the Long Term OMM Property Funding with respect to a Property.

56.  For purposes of this Paragraph as well as Paragraphs 50, 55, 57, 58 and 60, in deciding whether information, an event, or condition was reasonably foreseeable at the time the Lead

Agency and/or Support Agency participated in the development of the Minimum Estimated

Property Funding amounts and Reserve Property Funding amounts for a Property within the

meaning of Paragraphs 50, 57, 58, and 60, the following shall not be considered to have been

reasonably foreseeable: (i) remedy failure; or (ii) the discovery of significant unknown

contamination requiring a material change in the scope of an Environmental Action,

including, but not limited to, a material change in the amount or toxicity of known

contamination.  In deciding whether information, an event, or condition was reasonably

foreseeable at the time the Lead Agency and/or Support Agency participated in the

development of the Minimum Estimated Property Funding amounts and Reserve Property

Funding amounts for a Property, the Administrative Trustee shall consider the Lead Agency's

submissions to the Administrative Trustee, the data included in the IDEA database, all

documents or other materials provided to the Environmental Response Trust by the United

States as required by Paragraph 41 of this Settlement Agreement, and any information

provided to the Environmental Response Trust by the Debtors as required by Paragraph 41 of

this Settlement Agreement to the extent this information was provided to or exchanged with

the relevant Governments at the time they participated in connection with the development of

the Minimum Estimated Property Funding amounts and Reserve Property Funding amounts

for the Property.

57.    The Administrative Trustee shall determine if it is appropriate for funds from the Cushion

Funding Account to be included in the proposed Annual Cleanup Budget.  The Administrative

Trustee's decision shall be based on the following criteria:  (i) the Minimum Estimated

Property Funding and Reserve Property Funding has been exhausted or will be exhausted

during the year covered by the proposed Annual Cleanup Budget; (ii) the basis for additional

funds is directly related to material information, a material event or a material condition at the
Property that was not reasonably foreseeable at the time the Lead Agency and/or Support
Agency participated in the development of the Minimum Estimated Property Funding and
Reserve Property Funding with respect to the Property; and (iii) the funds in the Cushion
Funding Account are sufficient to address the Lead Agency's request and any other budget
requests for other Properties made for that calendar year.  It is acknowledged that
unforeseeable conditions may be discovered or arise at a Property resulting in increased costs
of Environmental Actions.  Remedy failure or the discovery of significant unknown
contamination requiring a material change in the scope of response action which did not form
the basis of the Minimum Estimated Property and Reserve Property Funding shall not be
considered reasonably foreseeable within the meaning of this Section.  In the event that,
within ten years after the Effective Date, the Minimum Estimated Funding and Reserve
Funding with respect to a Property have been exhausted and no Cushion Funding is available,
but Long Term OMM Property Funding with respect to the Property remains, the Long Term
OMM Property Funding shall become available to fund Environmental Actions with respect
to the Property.

58.   A Lead Agency may request in writing that the Administrative Trustee include funds
from the Cushion Funding Account in the Annual Cleanup Budget for a Property.  If the
Administrative Trustee denies such a request, it shall provide the requesting Lead Agency
with written notice of its decision for such denial.  If the Lead Agency and the Administrative
Trustee are unable to resolve the dispute within a reasonable time, either party may petition
the Bankruptcy Court to resolve the dispute.  The Bankruptcy Court shall decide the petition
on the totality of the evidence submitted and the Lead Agency bears the burden of proving by

34

clear and convincing evidence that the funding request is necessary because the basis for
additional funds is directly related to material information, a material event or a material
condition at the Property that was not reasonably foreseeable at the time Lead Agency and/or
Support Agency participated in the development of the Minimum Estimated Property Funding
and Reserve Property Funding with respect to the Property.  The sole exception to this
standard is if the Long Term OMM Property Funding has been exhausted.  If the Long Term
OMM Property Funding has been exhausted, then the Bankruptcy Court will decide the
petition based on the totality of all of the evidence submitted.

59.   Any decision by the Administrative Trustee to expend Cushion Funding Account funds
pursuant to an Annual Cleanup Budget shall be provided to all of the Lead and Support
Agencies thirty days in advance of the date on which the Administrative Trustee intends to
use such funds, unless such funds are intended to be used on an emergency basis to respond to
an imminent and substantial endangerment to human health or the environment, in which case
written notice shall be provided as soon as practical.  A Lead or Support Agency has standing
to challenge the Administrative Trustee's decision to use Cushion Funding Account funds and
may petition the Bankruptcy Court to resolve the dispute.  The Bankruptcy Court shall decide
the petition on the totality of the evidence submitted and the Lead or Support Agency
challenging the decision shall bear the burden of proving by clear and convincing evidence
that the Administrative Trustee's decision was arbitrary and capricious.

     e.   <u>Minimum Estimated Property Funding Accounts and Reductions</u>.

60.   The Governments have entered into this Settlement Agreement and the Trust Agreement
in significant reliance on the availability of the Minimum Estimated Property Funding
Account provided for each Property.  There shall be a presumption against any reductions in

amounts allocated for each Property absent the showing as set forth below.  Any time after

three years from the Effective Date, the Administrative Trustee may reduce the amount of the

Minimum Estimated Property Funding Account for a Property if it determines that the basis

for reducing the funds is directly related to material information, a material event or a material

condition at the Property that was not reasonably foreseeable at the time the Lead Agency

and/or Support Agency participated in the development of the Minimum Estimated Property

Funding with respect to the Property.  Prior to reducing the Minimum Estimated Property

Funding Account for a particular Property, the Trustee must provide thirty days advance

written notice to the Lead Agency and Support Agency for the Property, setting forth the basis

for reducing the funding.  If the Lead Agency or Support Agency disputes the Administrative

Trustee's proposed reduction, and the parties are unable to resolve the dispute, then the

Administrative Trustee may petition the Bankruptcy Court to allow the reduction.  The

Bankruptcy Court shall decide the petition based on the totality of the evidence submitted and

the Administrative Trustee shall bear the burden of proving by clear and convincing evidence

that the proposed reduction in the Minimum Estimated Property Funding Account for a

particular Property is directly related to material information, a material event or a material

condition at the Property that was not reasonably foreseeable at the time the Lead Agency

and/or Support Agency participated in the development of the Minimum Estimated Property

Funding with respect to the Property.

       f.   Reserve Property Funding Accounts and Reductions.

61.  The Governments have entered into this Settlement Agreement and the Trust Agreement

in significant reliance on the availability of the Reserve Property Funding Account provided

for each Property.  Any time after three years from the Effective Date, the Administrative

Trustee may reduce the Reserve Property Funding Account for a Property based upon circumstances that changed from the time the funding was established for the Property. Prior to reducing the Reserve Property Funding Account for a particular Property, the Trustee must provide thirty days' advance written notice to the Lead Agency and the Support Agency for the Property, setting forth the basis for reducing the funding. If the Lead Agency or the Support Agency disputes the Administrative Trustee's proposed reduction, and the parties are unable to resolve the dispute, then the Administrative Trustee may petition the Bankruptcy Court to allow the reduction. The Bankruptcy Court shall decide the petition based on the totality of the evidence that the proposed reduction leaves sufficient funding to complete the Environmental Action with respect to such Property.

g. <u>Transfer of Excess Funds in Property Funding Accounts</u>.

62. The Administrative Trustee shall transfer any agreed-to or Bankruptcy Court-approved reduction in the Minimum or Reserve Property Funding Account for any Property to the Minimum or Reserve Property Funding Account for one or more other Properties in the same State where Cushion Funding is being used or will be used in the foreseeable future to fund Environmental Actions (any dispute about the amount of transfer of funds under this Paragraph to multiple properties in the same state shall be subject to the provisions of Paragraph 91). If there are no Properties in the same State where Cushion Funding is being used or will be used in the foreseeable future, the excess funds shall be transferred to the Cushion Funding Account.

63. <u>GM-IFG Syracuse Site</u>. The funding with respect to the IFG Syracuse Site from the Minimum Estimated Property Funding Account and the Reserve Property Funding Account shall be allocated in the following manner: $22,573,341 for remediation within the IFG

Syracuse facility property boundaries and $8,548,471 for the property extending from the

facility property boundaries to the Route 11 Bridge.  In the event that the existing building

structure at the GM-IFG Syracuse Site in New York is demolished or partially demolished,

thereby (i) eliminating the need for Long Term OMM Property Funding budgeted for vapor

intrusion mitigation, soils management, and interim soils removals, and (ii) requiring

additional Environmental Actions not included in the Property's funding estimates, the

Administrative Trustee shall transfer the amount of any remaining Long Term OMM Property

Funding budgeted for vapor intrusion mitigation, soils management, and interim soils

removals no longer required due to the demolition or partial demolition from the Property's

Long Term OMM Property Funding Account to the Property's Minimum Estimated Property

Funding Account so that this funding becomes available to pay for the additional

Environmental Actions required by the demolition.  Upon transfer of the funding to the

Property's Minimum Estimated Property Funding Account, all other provisions applicable to

Minimum Estimated Property Funding, including the provisions set forth in Paragraph 61,

shall apply.

Sale or Transfer of Environmental Response Trust Property.

64.   Notice of the Sale.  Any Property owned by the Environmental Response Trust may be

sold or transferred by the Administrative Trustee after the Administrative Trustee provides

thirty days' advance written notice of an intent to sell such Property to, and consults with, the

United States, the relevant State, the Tribe, if applicable, and affected communities where the

Property is located.

65.   Criteria for the Sale.  In contemplating the sale of all or part of a Property owned by the

Environmental Response Trust, the Administrative Trustee shall consider (i) whether the

monetary value of the purchase price is sufficient in light of the projected budget for the sale

of that Property, taking into account any surplus from past Properties sold or projected

shortfall on the sale of the remaining Properties; (ii) the potential for the reuse to create jobs in

the State, and the affected community; (iii) other benefits to the State, the Tribe, if applicable,

and affected communities (such as increasing tax revenue, reducing blight, and providing a

sense of renewal); (iv) avoiding a material increase in the cost of or interference with the

Environmental Action; (v) the views of the State, the Tribe, if applicable, and affected

communities; and (vi) the reputation and credibility of the prospective purchaser.

66.  <u>Proceeds from the Sale</u>. The proceeds from the sale of any Property owned by the

Environmental Response Trust shall be transferred to the Administrative Funding Account.

At no time shall any portion of the funding in any part of the Environmental Response Trust

be transferred to any purchaser or transferee of a Property.  Upon the transfer or sale of any

Property, the funding with respect to Environmental Action as provided in this Settlement

Agreement and the Trust Agreement will continue to be available for the performance of

Environmental Actions except as provided in Paragraph 67.

67.  <u>Cleanup as Part of the Sale</u>. The Administrative Trustee cannot require, as a condition of

the sale or transfer of the Property, that a prospective purchaser perform all or some portion of

the Environmental Action if there are available funds in the Minimum Estimated Property

Funding Account, Reserve Property Funding Account or Cushion Funding Account to

perform the Environmental Action with respect to such Property.  If the purchaser agrees to

perform all or some portion of the Environmental Action, the funds representing the cost of

the Environmental Action being performed by the purchaser shall be transferred from the

applicable Minimum Estimated Property Funding Account, Reserve Property Funding

Account and/or Long Term OMM Property Funding Account by the Administrative Trustee to (i) the Administrative Funding Account to cover any shortfall in the projected budget for the sale of that Property, and then to (ii) the Cushion Funding Account.  The funds can be transferred immediately provided the purchaser posts financial assurance on terms that are satisfactory to the applicable Lead Agency, or transferred after the completion of the Environmental Action provided the Lead Agency, in consultation with the Support Agency, agrees that the purchaser satisfactorily completed its portion of the Environmental Action. The transfer of funds representing the cost of such Environmental Action shall be consistent with (1) the funds budgeted or contemplated for the Environmental Action; (2) acceptable to the Administrative Trustee after consultation with the Lead Agency; and (3) the requirements for transferring excess funds out of such accounts as set forth in Paragraphs 60 through 62 of this Settlement Agreement.  If the above criteria are met, the Lead Agency and the Support Agency shall not object to the Administrative Trustee transferring the funds associated with the purchaser's cleanup out of the Minimum Estimated Property Funding Account or Reserve Property Funding Account.

68.    <u>GMNA Car – Wilmington Site</u>.  Notwithstanding the provisions of Paragraph 67 regarding the transfer of funds from the Minimum Estimated Property Funding Account, Reserve Property Funding Account, and the Long Term OMM Property Funding Account, the amount of funding provided by the Delaware Department of Natural Resources and Environmental Control ("DNREC") to Fisker Automotive, Inc. ("Fisker") as a grant under the Delaware Brownfields Program to conduct sampling required under the Brownfield Development Agreement entered into between DNREC and Fisker, dated, May 28, 2010, to establish a baseline of pre-existing conditions ("Baseline Investigation") at the former GM

Assembly Plant in Wilmington, Delaware (the "GM Wilmington Plant"), up to the amount of $225,000, and expended by Fisker, to conduct the GM Wilmington Plant Baseline Investigation (i) shall be deemed to be part of the funding provided for a site-wide remedial investigation and feasibility study; and (ii) shall not be transferred out of the Minimum Estimated Property Funding Account pursuant to Paragraph 67.  Consistent with the settlement agreement between DNREC and MLC, dated June 8, 2010 and approved by the Bankruptcy Court on June 29, 2010, DNREC shall be reimbursed from the Minimum Estimated Property Funding Account as provided for in this Settlement Agreement, for the amount of funding provided by DNREC to Fisker, and expended by Fisker, to conduct the GM Wilmington Plant Baseline Investigation, up to $225,000.  Debtors have commenced some preliminary environmental investigation at the GMNA Car – Wilmington Site, which may, upon approval by DNREC, become part of a site-wide remedial investigation and feasibility study.

69.  Protections from Future Environmental Liability.  Given the unique circumstances of the Bankruptcy Cases, U.S. EPA, the States and, if applicable, the Tribe, shall work with the prospective purchaser(s) of the Properties with funding for Environmental Actions under the Environmental Response Trust to address the liability concerns for the Property.  If the prospective purchaser determines that the self-executing statutory protection provided for bona fide prospective purchasers of contaminated sites under CERCLA or other statutory protections provided to purchasers of contaminated sites under applicable state law (including but not limited to Michigan's Natural Resources and Environmental Protection Act, MCL 324.20101 *et seq.*), are not sufficient to address the prospective purchaser's liability concerns, the U.S. EPA, relevant State and, where applicable, the Tribe, shall upon request use one or

41

more of the following enforcement or liability clarification tools for a Property to address the

liability concerns of prospective purchasers for existing contamination (provided the

purchasers comply with the requirements set forth in Paragraph 73(1)-(5):

- Prospective Purchaser Agreements or equivalent agreements under applicable State law (PPAs);
- Bona Fide Prospective Purchaser Work Agreements or equivalent agreements under applicable State law (BFPP Work Agreements); or
- Comfort/Status Letters or equivalent letter under applicable State practice.

U.S. EPA, the States, and the Tribe retain their enforcement discretion to select the

appropriate enforcement or liability clarification tool from the options set forth in the three

preceding bullet points.

70.  U.S. EPA and the applicable State may enter into PPAs with the prospective purchaser

that will provide the prospective purchaser with a covenant not to sue for existing

contamination at the time of purchase.  The purchaser would be responsible for any new

contamination or the exacerbation of existing contamination.

71.  If the prospective purchaser is willing to conduct environmental work at the site, either

by undertaking the on-going or planned Environmental Actions or enhancing the on-going or

planned Environmental Actions, U.S. EPA and the State may enter into a BFPP Work

Agreement (or an Administrative Order on Consent) to address the scope of the work to be

performed and the obligations that the prospective purchaser has with regard to existing

contamination.  The BFPP Work Agreement will provide the prospective purchaser with a

covenant not to sue for existing contamination and for the work performed (subject to the

prospective purchaser's performance of the agreed upon work), or liability concerns will be

addressed by way of a PPA or Comfort/Status Letter.

42

72.  U.S. EPA and the State may issue Comfort/Status Letters to the prospective purchaser

regarding the on-going or planned Environmental Action at a Property.

73.  In order to receive an enforcement or liability clarification tool as provided by

Paragraph 69 of this Settlement Agreement, in all cases the prospective purchaser would be

required to:

1.  Undertake efforts to be informed about and knowledgeable of the environmental condition of the Property.

2.  Comply with or institute land use restrictions and not impede the effectiveness or integrity of the ongoing or completed cleanup and institutional controls;

3.  Take reasonable steps to stop any continuing release, prevent any threatened future release and prevent or limit any human, environmental, or natural exposure to any previously released Hazardous Substances.  This will be a site-specific, fact-based inquiry;

4.  Provide cooperation, assistance and access to governmental agencies and their representatives; and

5.  Comply with information requests and administrative subpoenas and provide legally required notices.

Nothing in this Paragraph 73 shall require a prospective purchaser to perform all or some

portion of the Environmental Action if there are sufficient funds in the Minimum Estimated

Property Funding Account, Reserve Property Funding Account or Cushion Funding Account

to perform the Environmental Action.

74.  <u>Coordination of Redevelopment and the Environmental Action</u>.  The Administrative

Trustee and the applicable Lead Agency shall work together to attempt to integrate the

redevelopment of the Property with the timing and the sequencing of the Environmental

Action.  The Lead Agency and the Administrative Trustee shall communicate with the

prospective purchaser and/or the affected communities, including local economic

43

development officials, so that the purchaser and/or affected communities can integrate

redevelopment with the timing and sequence of the Environmental Action. The

Administrative Trustee and the Redevelopment Manager shall make a good faith effort to

obtain input regarding the reuse and redevelopment of the Property from the affected

communities during the sale process, including and without limitation, the consideration of

community-preferred end uses when marketing any Property and prior to entering into a sales

agreement with a prospective purchaser for any Property. Consistent with the terms of this

Settlement Agreement and the Trust Agreement, the Administrative Trustee, the

Redevelopment Manager and the relevant Cleanup Manager shall cooperate with any Lead

Agency or Support Agency that has identified acceptable funding sources for any Property

other than the funding provided by the Environmental Response Trust to maximize the use of

such additional funds and coordinate the efficient implementation of Environmental Actions

and redevelopment activities at the Property, including, where feasible, through coordinated

contracting. Except as provided under Paragraph 68 hereof, the availability or use of any such

funding sources at an Property shall not result in or be the basis for a reduction of the

Property's Minimum Estimated Funding, Reserve Funding Account or Long Term OMM

Property Funding, and shall not result in or be the basis for the denial of access to any

Cushion Funding with respect to that Property.

75.  Sales of Property After Execution of Settlement Agreement But Prior to the Effective

Date.  With respect to any Property sold by the Debtors prior to the Effective Date, the United

States and the applicable State (and the Tribe in the case of the Massena, New York Property)

must approve the terms of the sale in writing, in which event the funding obligations and other

provisions of the Settlement Agreement and Trust Agreement shall continue to apply to that

44

property in the same manner as obligations at properties that continue to be owned by Debtors.

76.   Audits of the Environmental Response Trust.  An independent certified public accountant shall conduct a financial audit, an agreed upon procedures engagement, or similar engagement, of the assets and liabilities of the Environmental Response Trust once every year, the costs of which shall not exceed $250,000 per audit.  The accountant will be selected by the United States in consultation with the States and the Tribe, and the same accountant shall not conduct more than three consecutive audits.  Within fifteen days of completing the financial audit report, the accountant shall provide a copy of the financial audit report to the Governments.  The accountant's compensation and expenses will be paid from the Administrative Funding Account.  The accountant shall provide a written report of the financial audit to the United States, the States, the Tribe, and the Administrative Trustee.  No earlier than 10 years from the Effective Date, and at any time thereafter, the Administrative Trustee may propose the discontinuation or reduction of the frequency of the financial audits.  Such proposal shall be subject to the approval of the United States, the States, and the Tribe, which shall not be unreasonably withheld.

77.   Completion of Environmental Actions.  For each Property, subject to the provisions of Paragraphs 60 through 62, any funds remaining in the Minimum Estimated Property Funding Account and the Reserve Property Funding Account shall be used to fund any remaining long term OMM requirements and implement institutional controls or deed restrictions required by the Lead Agency for the protection of human health or welfare or the environment.  Upon completion of all required Environmental Actions for all Properties, including all long term OMM, any funds remaining in the Minimum Estimated Property Funding Accounts, Reserve

Property Funding Accounts ten years after the Effective Date, Long Term OMM Property

Funding Accounts, and Cushion Funding Account shall be transferred to the Hazardous

Substances Superfund upon completion of required Environmental Actions for all Properties.

78.  Access to Property.  The Administrative Trustee shall at all reasonable times provide

Lead Agencies and the Support Agencies, as designated representatives of the Lead Agencies,

as well as their contractors or consultants access to all relevant portions of the Properties that

the Environmental Response Trust owns for the purposes of conducting Environmental

Actions.

79.  Existing Financial Assurance in Massachusetts.  In the case of Massachusetts, no later

than December 15, 2010, MLC and Massachusetts shall undertake steps necessary to arrange

for transfer, on or before the Effective Date, of $786,944, the total current value of the

existing penal surety bond for the Framingham Landfill Site, bearing Surety's bond number

K07593867, and MLC shall cause to be transferred $786,944 into an expendable trust to be

established pursuant to Mass. Gen. Laws ch. 6A, § 6, and 801 C.M.R. §§ 50.00, *et seq* (the

"Expendable Trust").  The Expendable Trust will satisfy the Debtors' and the Environmental

Response Trust's financial assurance obligation for the Framingham Landfill Site and be

retained and used solely to conduct or finance long term OMM at or in connection with the

Framingham Landfill Property after the Long Term OMM Property Funding Account for that

Property has been exhausted.  Cushion Funding shall not be available to finance long term

OMM costs at or in connection with the Framingham Landfill Property unless and until the

Expendable Trust has been exhausted.  In all other respects the Framingham Landfill Property

shall have access to Cushion Funding funds provided that all applicable requirements for

access to Cushion Funding under this Settlement Agreement have been met.

80.    Existing Financial Assurance in Illinois.  In the case of Illinois, no later than

December 15, 2010, MLC and Illinois shall undertake steps necessary to arrange for release of

the existing surety bond for the Danville Site and transfer the collateral on that bond into a

trust fund on or before the Effective Date in accordance with 35 Ill. Adm. Code 807.661, in

the forms specified by Illustration A in 35 Ill. Adm. Code 807 Appendix A, as modified by

Illinois, (the "807 Trust Fund") on or before the Effective Date.  The 807 Trust Fund will

satisfy the Debtors' and the Environmental Response Trust's financial assurance obligations

for the Danville Site and be retained and used solely to conduct or finance closure and post-

closure Environmental Actions at or in connection with the Danville Site after the Long Term

OMM Property Funding Account for that Property has been exhausted.  The Danville Site

shall not have access to Cushion Funding fund to finance unforeseen closure and post-closure

costs at or in connection with the Property unless and until the 807 Trust Fund has been

exhausted, but shall in all other respects have access to Cushion Funding funds where (i) the

Property's Minimum Estimated Property Funding and Reserve Property Funding have been

exhausted, or the Long Term OMM Property Funding has been exhausted; and (ii) the

otherwise applicable requirements for access to Cushion Funding funds under this Settlement

Agreement have been met.

81.    Existing Financial Assurance in Michigan.  In the case of Michigan, on or before the

Effective Date, MLC and Michigan shall take all necessary steps to cancel the performance

bonds for closure and/or postclosure care for the Pontiac North Property (Bond

No.K0748916A), Chevrolet-Pontiac-Canadian Pontiac Fiero Assembly Plant Property (Bond

No. K07489158), GMNA Buick City Property (Bond No. K07489171), and Coldwater Road

Landfill Property (Bond No. K07489225) issued to the Michigan Department of Natural

Resources and Environment (the "MDNRE") under Part 111 of the Natural Resources and

Environmental Protection Act, MCL 324.11101 *et seq*., and its implementing rules, MAC R

299.9705 with such cancellation to be effective only upon the full funding of the

Environmental Response Trust as required under paragraph 32 of this Settlement Agreement.

The Director of MDNRE, as beneficiary of the bonds, or his or her designee, will cancel the

bonds subject to and in reliance upon (i) the entry of a Court order requiring that the financial

assurance in place be cancelled at the same time as, and no sooner than, the Environmental

Response Trust is funded in full as required under Paragraph 32 of this Settlement Agreement;

(ii) the funding being provided to the Environmental Response Trust to cover the

Environmental Actions for which the bonds were issued; and (iii) the Environmental

Response Trust's agreement to perform the Environmental Actions for which the bonds were

issued, in accordance with the provisions of this Settlement Agreement.  On or before the

Effective Date, Michigan will also take all necessary steps to cancel the Agreement and

Acceptance of Certificate of Deposit for the Linden Road Landfill Property (General Motors

Standby TR/EPA Account No. 131365 with the Bank of New York, CUS #S86677980) and

direct the issuing financial institution to transfer such funds to the designated recipient

with such cancellation and transfer of funds to be effective only upon the full funding of the

Environmental Response Trust as required under Paragraph 32 of this Settlement Agreement.

82.  <u>Disposition of Estate Assets Upon Termination of Trust</u>.  Upon any termination of the

Environmental Response Trust, the disposition of all Properties remaining in the

Environmental Response Trust shall be governed by applicable State, tribal and federal law,

or by future agreement of the Administrative Trustee, the United States and the applicable

State and Tribe, or by order of the Bankruptcy Court.  Neither the United States nor any State

or the Tribe shall be required to accept an ownership interest in any Properties remaining in the Environmental Response Trust upon its termination. In no event shall any of the Properties or other assets owned by the Environmental Response Trust be transferred to the Debtor.

83. <u>Miscellaneous Provisions</u>. The Administrative Trustee shall at all times seek to have the Environmental Response Trust treated as a "qualified settlement fund" as that term is defined in Treasury Regulation section 1.468B-1. Approval of the Bankruptcy Court shall be sought, and the Bankruptcy Court shall retain continuing jurisdiction over the Environmental Response Trust and each of that trust's accounts sufficient to satisfy the requirements of Treasury Regulation section 1.468B-1. The Administrative Trustee shall not elect to have the Environmental Response Trust treated as a grantor trust. The Environmental Response Trust shall be treated as a separate taxable entity. The Administrative Trustee shall cause any taxes imposed on the earnings, gains or other income of the Environmental Response Trust to be paid out of such earnings, gains or other income and shall comply with all tax reporting and withholding requirements imposed on the Environmental Response Trust under applicable tax laws. The Administrative Trustee shall be the "administrator" of the Environmental Response Trust pursuant to Treasury Regulation section 1.468B-2(k)(3).

84. a. In no event shall any of the Environmental Response Trust Protected Parties be held personally liable to any third parties for any liability, action, or inaction of any other party including Debtors or any other of the Environmental Response Trust Protected Parties.

b. The Administrative Trustee shall take such actions and execute such documents as are reasonably requested by Debtors with respect to effectuating the transactions contemplated

hereby.  To the extent that Debtors request the Administrative Trustee to take such an action, the Administrative Trustee shall do so at the sole expense of Debtors.

    c.  The Environmental Response Trust is intended to be governed by the terms of the Settlement Agreement and the Trust Agreement and shall not be subject to any provision of the Uniform Custodial Trust Act as adopted by any state, now or in the future.

85.  The Environmental Response Trust Protected Parties shall be exculpated and indemnified and held harmless by the Environmental Response Trust, consistent with the provisions of Paragraphs 86, 87 and 88, for any claims, causes of action, or other assertions of liability arising out of or in connection with: (i) the ownership of Environmental Response Trust Assets; (ii) the discharge of duties and powers conferred upon the Environmental Response Trust and/or the Administrative Trustee by this Settlement Agreement, the Trust Agreement and the Plan, any order of the Court, or applicable law or otherwise, including the performance of an Environmental Action on behalf of the Environmental Response Trust and the making of payments in accordance with this Settlement Agreement, the Trust Agreement and the Plan, or any order of court, and the implementing of the provisions of this Settlement Agreement, the Trust Agreement and the Plan or any order of court; or (iii) any claim by or against Debtors.

86.  Unless a determination is made by a Final Order of the Bankruptcy Court finding that an Environmental Response Trust Protected Party committed fraud or willful misconduct in relation to the Environmental Response Trust Protected Party's duties, any judgment against that Environmental Response Trust Protected Party shall be paid solely from the Minimum Estimated Property Funding Account or Reserve Property Funding Account for the relevant Property if the judgment relates to an Environmental Action at the Property, and otherwise

shall be paid from the Administrative Funding Account, and without the Environmental Response Trust Protected Party having to first pay from its own funds for any liability. Unless a determination is made by a Final Order of the Bankruptcy Court finding that an Environmental Response Trust Protected Party committed fraud or willful misconduct in relation to the Environmental Response Trust Protected Party's duties, any costs of defense of that Environmental Response Trust Protected Party shall be paid from the Administrative Funding Account, and without the Environmental Response Trust Protected Party having to first pay from its own funds for any liability. In the event that the judgment is paid from the Minimum Estimated Property Funding Account or Reserve Property Funding Account, any payment shall be limited to funds in the Minimum Estimated Property Funding Account or the Reserve Property Funding Account for the relevant Property or the Administrative Account, as applicable. No Environmental Response Trust Protected Party shall be personally liable unless the Bankruptcy Court, by a Final Order, finds that it committed fraud or willful misconduct after the Effective Date in relation to the Administrative Trustee's duties.

87. The Environmental Response Trust Protected Parties and the Environmental Response Trust are exculpated by all persons or entities, including without limitation, holders of claims and other parties in interest, of and from any and all claims, causes of action and other assertions of liability arising out of or in connection with the matters contained in Paragraph 85(i), (ii) and (iii) of this Agreement. No person or entity, including without limitation, holders of claims and other parties in interest, shall be allowed to pursue any claims or cause of action against any Environmental Response Trust Protected Party or the Environmental Response Trust for any claim against Debtors, for making payments in accordance with this Settlement Agreement or any order of court, or for implementing the provisions of this

Settlement Agreement, the Trust Agreement, the Plan or any order of a court with competent

jurisdiction.  However, nothing in this Settlement Agreement or the Trust Agreement shall

preclude the Governments from enforcing their rights under this Settlement Agreement or the

Trust Agreement against an Environmental Response Trust Protected Party or the

Environmental Response Trust, including but not limited to any rights relating to a finding by

Final Order of fraud or willful misconduct.  Notwithstanding the foregoing, in no event shall

the Environmental Response Trust Protected Parties be personally liable for any monetary

damages other than upon a finding of fraud or willful misconduct by Final Order, except as

otherwise agreed in writing by the relevant Environmental Response Trust Protected Parties.

88.  There shall be an irrebuttable presumption that any action taken, or not taken, with the

approval of the Bankruptcy Court or other court with jurisdiction does not constitute willful

misconduct.

89.  Except as may otherwise be provided herein: (i) the Environmental Response Trust

Protected Parties or the Environmental Response Trust may rely, and shall be protected in

acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request,

consent, order, or other paper or document believed by them to be genuine and to have been

signed or presented by the proper party or parties; (ii) the Environmental Response Trust

Protected Parties may consult with legal counsel, financial or accounting advisors and other

professionals and shall not personally be liable for any action taken or not taken in accordance

with the advice thereof; and (iii) persons or entities dealing with the Environmental Response

Trust and the Environmental Response Trust Protected Parties shall look only to the

Environmental Response Trust assets that may be available to them consistent with this

Settlement Agreement and the Trust Agreement to satisfy any liability incurred by the

Environmental Response Trust and the Environmental Response Trust Protected Parties to

such person or entity in carrying out the terms of this Settlement Agreement, the Trust

Agreement, the Plan or any order of the Bankruptcy Court, and the Environmental Response

Trust Protected Parties shall have no personal liability absent a finding by Final Order of fraud

or willful misconduct.

90.   Neither the United States, the States, the Tribe, nor any of the Debtors shall be deemed to

be an owner, operator, trustee, partner, agent, shareholder, officer, or director of the

Environmental Response Trust or the Environmental Response Trust Protected Parties, or to

be an owner or operator of any of the Properties on account of this Settlement Agreement, the

Trust Agreement, or actions contemplated by the Settlement Agreement and/or Trust

Agreement.

## V.    **ALTERNATIVE DISPUTE RESOLUTION**

91.   The Parties recognize that alternative dispute resolution may lead to the more efficient

resolution of disputes in many circumstances and where appropriate and upon agreement of

the relevant Parties, will engage in non-binding informal dispute resolution prior to petitioning

the Court to resolve any dispute under this Settlement Agreement.

## VI.    **OUTSTANDING OBLIGATIONS**

92.   Subject to the provisions of Paragraph 34 of this Settlement Agreement, Debtors shall

continue, at their own expense, the operations of any required Environmental Actions being

performed by any Debtor at a Property until the payments required by Paragraph 32 of this

Settlement Agreement are made, including, but not limited to, environmental monitoring

activities.

93.   Notwithstanding any other provisions in this Paragraph 93 to the contrary, upon Debtors'

completion of the payments and transfers to the Environmental Response Trust provided for

herein, Debtors and their successors shall have no further obligations to perform work

pursuant to any outstanding consent decree, agreed order, administrative order on consent, or

administrative order issued unilaterally by EPA or any of the Governments regarding any of

the Properties, provided, however, that Debtors shall produce, or make available for

production, to the United States or any State with respect to a Property as to which such State

is a party to any order or consent decree, any records relating to the Property, and such records

should be provided in the state and condition in which such records are found.  Upon the

Effective Date the Lead Agency may, as necessary, substitute the Environmental Response

Trust for the applicable Debtor in any outstanding consent decree, administrative order or

other settlement agreement with the relevant Lead Agency regarding any of the Properties so

long as the amended or substituted decrees or orders are not inconsistent with the terms of,

and funding provided under, this Settlement Agreement and the Trust Agreement.

Specifically with respect to Administrative Order, Index No. CERLCA-02-2010-2027

(August 18, 2010), Administrative Order, Index No. II CERCLA-20215 (August 18, 1992),

and Administrative Order, Index No. II-CERLCA-20207 (March 31, 1992) as modified by

Amendment to Administrative Order, Index No. II-CERLCA-20207 (August 30, 1999) ,

which relate to the Massena Property, and NYS Department of Environmental Conservation

Administrative Orders on Consent, Index Numbers D-7-001-97-06 (September 25,1997) and

D7-0008-97-06 (July 15,1999) which relate to the IFG Property (the "Orders") upon the

Effective Date, the Environmental Response Trust shall be substituted as respondent to such

Orders and the Environmental Response Trust shall comply with such Orders, so long as the

54

amended or substituted decrees or orders are not inconsistent with the terms of, and funding

provided under, this Settlement Agreement and the Trust Agreement, and Debtors shall be

removed as respondent from such Orders. Within six months of the Effective Date, the Lead

Agencies shall undertake reasonable efforts to either substitute the Environmental Response

Trust for the Debtors in all other outstanding consent decrees, administrative orders or other

settlement agreements with the relevant Lead Agency regarding any of the Properties that

have ongoing obligations, so long as the amended or substituted decrees or orders are not

inconsistent with the terms of, and funding provided under, this Settlement Agreement and the

Trust Agreement, or remove the Debtors from such decrees, orders, or agreements.

Specifically with respect to Consent Judgment 92-3740-CE for the General Motors Powertrain

Bay City Facility, within six months of the Effective Date, the Lead Agency shall undertake

reasonable efforts to modify the judgment to substitute the Environmental Response Trust for

the Debtors and limit its obligations to only the portion of the General Motors Powertrain Bay

City Facility currently owned by the Debtors and to be transferred to the Environmental

Response Trust, the General Motors Powertrain (GMPT) Bay City Property (MLC Site ID

1100), so long as the amended or substituted decrees or orders are not inconsistent with the

terms of, and funding provided under, this Settlement Agreement and the Trust Agreement

and to substitute New GM for the Debtors for the remainder of the facility.

## VII.    COVENANTS NOT TO SUE

94.  With respect to the Properties (including releases of Hazardous Substances from any

portion of the Properties and all areas affected by migration of such substances emanating

from the Properties), and except as specifically provided in Section VIII (Reservation of

Rights and Regulatory Authority), upon the Effective Date and Debtors' transfer of the

Properties and full funding of the Environmental Response Trust Accounts as set forth in

Paragraphs 30, 31 and 32 of this Settlement Agreement, the United States on behalf of U.S.

EPA and the States and Tribe covenant not to sue or assert any administrative or other civil

claims or causes of action against Debtors, any successor entity thereto, or the Environmental

Response Trust and the Environmental Response Trust Protected Parties under CERCLA,

RCRA, and State environmental statutes, as well as any other environmental liabilities

asserted in the Government Proofs of Claim.

95.   With respect to the Properties, except as specifically provided in Section VIII

(Reservation of Rights and Regulatory Authority), the Government Proofs of Claim shall be

deemed satisfied in full in accordance with the terms of this Settlement Agreement, the U.S.

EPA and the States and Tribe shall not be entitled to file any further claims under CERCLA,

RCRA, or State environmental statutes, as well as any other environmental liabilities asserted

in the Government Proofs of Claim, whether unsecured, secured, administrative priority or

otherwise, and the U.S. EPA and the States and Tribe shall not receive any other distributions

in the Bankruptcy Cases on account of such claims.

96.   <u>Financial Assurance</u>.  The relevant States and Debtors shall take all necessary steps to

cancel or release the financial assurance instruments listed in Attachment D to this Settlement

Agreement at the time the Environmental Response Trust is funded.  Upon the Effective Date

and Debtors' transfer of the Properties and full funding of the Environmental Response Trust

Accounts as set forth in Paragraphs 30 through 32 of this Settlement Agreement, and the

funding of the Expendable Trust for the Framingham Landfill Site in Massachusetts and the

807 Trust Fund for the Danville Landfill Property in Illinois as required by Paragraphs 79 and

80 of this Settlement Agreement, the Governments agree not to seek and covenant not to sue

56

or assert any administrative or other civil claims or causes of action against Debtors, the

Environmental Response Trust or the Administrative Trustee, solely in his official capacity,

with respect to any financial assurance required under environmental law relating to the

Properties.

97.   The covenants not to sue in paragraphs 94 through 99 (and the reservations thereto) shall

also apply to Debtors' successors, assigns, officers, directors, employees, and trustees, but

only to the extent that the alleged liability of the successor, assign, officer, director, employee,

or trustee of Debtors is based solely on its status as and in its capacity as a successor, assign,

officer, director, employee, or trustee of Debtors.  For purposes of this Paragraph New GM

shall not be considered a successor or assign of Debtors.

98.   The covenants not to sue contained in this Settlement Agreement extend only to Debtors,

the Environmental Response Trust, the Environmental Response Trust Protected Parties, and

the persons or entities described in Paragraph 97 above and do not extend to any other person

or entity.  Nothing in this Agreement is intended as a covenant not to sue any person or entity

other than Debtors, the Environmental Response Trust, the Environmental Response Trust

Protected Parties, the United States, the States, the Tribe, and the persons or entities described

in Paragraph 97.  Except as provided in Paragraph 97, the United States, the States, the Tribe,

Debtors, and the Environmental Response Trust and the Environmental Response Trust

Protected Parties expressly reserve all claims, demands, and causes of action either judicial or

administrative, past, present or future, in law or equity, which the United States, States, Tribe,

or Debtors or the Environmental Response Trust Protected Parties and the Environmental

Response Trust may have against all other persons or entities, firms, corporations, entities, or

predecessors of Debtors for any matter arising at or relating in any manner to the Properties and/or claims addressed herein.

99.   Debtors, the Environmental Response Trust and the Administrative Trustee covenant not to sue and agree not to assert claims or causes of action against the United States, the Tribe or the States with respect to the Properties, including but not limited to any direct or indirect claim for reimbursement from (i) the Superfund (established pursuant to the Internal Revenue Code, 26 U.S.C. § 9507) through CERCLA Sections 106(b)(2), 107, 111, 112, 113, 42 U.S.C. §§ 9606(b), 9607, 9611, 9612, 9613, or (ii) any other provision of federal or state law; any claims against the United States, the Tribe or the States, including any of their departments, agencies or instrumentalities pursuant to Section 107 or 113 of CERCLA, 42 U.S.C. §§ 9607, 9613, or State environmental statutes; and any claims arising out of the response activities at the Properties.  Nothing in this Settlement Agreement shall be construed to constitute preauthorization of a claim within the meaning of Section 111 of CERCLA, 42 U.S.C. § 9611 or 40 C.F.R. § 300.700(d), or State environmental statutes.  Nothing herein shall preclude the United States, the States, or the Tribe from consenting to the application or making of a claim. Debtors covenant not to sue and agree not to assert claims or causes of action against the Environmental Response Trust and the Environmental Response Trust Protected Parties with respect to the Properties.  The Environmental Response Trust and the Administrative Trustee covenant not to sue or assert any claims or causes of action against Debtors and their successors, assigns, officers, directors and employees in their respective capacities as such, with respect to the matters addressed in this Settlement Agreement or acts or omissions in connection with, related to, or arising out of the negotiations or consummation of this Settlement Agreement or the holding, administration, investigation or remediation of the

58

Properties except for instances of fraud or willful misconduct on behalf of the Debtors or their

successors, assigns, officers, directors or employees.  In the event that an Environmental

Response Trust Protected Party asserts a claim or cause of action against the United States,

the States, the Tribe or the Debtors with respect to the Properties, then the covenant not to sue

provided to that Environmental Response Trust Protected Party under Paragraphs 94 through

99 shall be null and void and have no effect.

### VIII.   RESERVATION OF RIGHTS AND REGULATORY AUTHORITY

100.    The covenants not to sue set forth in Section VII do not apply to any matters other than

those expressly specified therein.  The United States, the Tribe, and the States reserve, and

this Settlement Agreement is without prejudice to, all rights against Debtors and the

Environmental Response Trust and the Environmental Response Trust Protected Parties or

other persons or entities with respect to all matters other than those set forth in Paragraphs 30

and 94 through 98.  The United States, the States, and the Tribe also specifically reserve all

rights against Debtors with respect to:

(i)     any action to enforce their rights under this Settlement Agreement;

(ii)    any general unsecured claim with respect to the release of Hazardous
        Substances into Lower Ley Creek, the Lake Bottom Subsite, or the Salina
        Landfill Subsite, which are part of the Onondaga Lake Superfund Site in
        Onondaga County, New York or the Old Ley Creek Channel in Onondaga
        County, New York.  "Lower Ley Creek" for purposes of this Settlement
        Agreement shall mean the entire portion of Ley Creek which is downstream
        from the Route 11 Bridge;

(iii)   any general unsecured claim arising from costs incurred by a Lead Agency or
        Support Agency for Environmental Actions with respect to a Property prior to
        June 1, 2009, with respect to MLC and prior to October 9, 2009, with respect
        to REALM and ENCORE;

(iv)    any claim or cause of action for response costs and injunctive relief under
        CERCLA Sections 106 and 107, RCRA Sections 3008, 7002 and 7003 or State
        environmental statutes for future acts taken by the Debtors after the Effective

Date that create liability under CERCLA, RCRA, or state law;

(v)     criminal liability;

(vi)    any general unsecured claim arising from damages or injury to, destruction of, or loss of natural resources, and for the costs of any natural resource damage assessments;

(vii)   all rights with respect to any site that is not a Property, other than claims or causes of action for migration of Hazardous Substances emanating from a Property; and

(viii)  all rights with respect to enforcement of state laws related to removal, collection or recovery of mercury-containing switches from end-of-life vehicles.

Debtors' future acts creating liability under CERCLA, RCRA or state law do not include continuing releases related to Debtors' conduct prior to the Effective Date. The United States, the States and the Tribe also reserve, and this Settlement Agreement is without prejudice to any liability of Debtors' successors, assigns, officers, directors, employees, and trustees for response costs and injunctive relief under CERCLA Section 106 and 107, RCRA Sections 7002 and 7003, and state laws for any future acts taken by any such respective entity after the Effective Date that create liability under CERCLA, RCRA or state law. Future acts creating liability under CERCLA, RCRA, or state law do not include continuing releases related to such party's conduct prior to the Effective Date. The United States, the States and the Tribe also specifically reserve all rights against the Environmental Response Trust and the Environmental Response Trust Protected Parties with respect to any action to enforce their rights under this Settlement Agreement, including but not limited to the right to file suit against the Environmental Response Trust and the Environmental Response Trust Protected Parties at any time for (i) fraud or willful misconduct (with all funds recovered in any such action to be restored to the Environmental Response Trust account or subaccount from which they were taken); (ii) criminal liability; and (iii) any rights reserved under Paragraphs 101 and

60

102 of this Settlement Agreement.  In no event shall the Environmental Response Trust

Protected Parties be personally liable for any monetary damages other than for a finding of

fraud or willful misconduct by Final Order.

101.    The United States, the States and the Tribe shall retain the right to issue, obtain, or

enforce an order against the Environmental Response Trust to perform Environmental Action

under applicable law, including an administrative order, provided that any such order or

enforcement is not inconsistent with the provisions of the Settlement Agreement or the Trust

Agreement.  The Administrative Trustee may enter into a consent decree or consent order

with the United States, the States and the Tribe in which a Property is located, and may

perform work pursuant to administrative orders issued unilaterally by U.S. EPA, a State or the

Tribe under applicable law, to facilitate or conduct Environmental Actions at such Property,

provided that any such consent decree, consent order or administrative order issued

unilaterally by U.S. EPA, a State or the Tribe is not inconsistent with the provisions of the

Settlement Agreement.  Nothing in the Settlement Agreement shall be deemed to limit the

information-gathering authority of the United States or the States under Sections 104 and 122

of CERCLA, 42 U.S.C. §§ 9604 and 9622, or any other applicable federal or state law or

regulation, or to excuse Debtors or the Environmental Response Trust from any disclosure or

notification requirements imposed by CERCLA or any other applicable federal or state law or

regulation.

102.    Nothing in the Settlement Agreement or the Trust Agreement shall impair any

authority of the United States, the States or the Tribe to select or authorize Environmental

Action for any Property under applicable law.  Nothing in this Settlement Agreement shall be

deemed to (i) limit the authority of the United States or the States to take response action

under Section 104 of CERCLA, 42 U.S.C. § 9604, or any other applicable federal or state law

or regulation; (ii) alter the applicable legal principles governing judicial review of any action

taken by the United States or the States pursuant to that authority; or (iii) limit or alter any

right of access of the United States or the States pursuant to applicable law.  The Lead Agency

may bring enforcement actions against the Environmental Response Trust that are not

inconsistent with the provisions of the Settlement Agreement in other courts having

jurisdiction, provided, however, that the Bankruptcy Court shall have exclusive jurisdiction

over any issues relating to (a) approval of budgets and expenditures of budgeted funds

(provided, however, that if the Administrative Trustee enters into a consent decree or

administrative order on consent, then the Governments may enforce the expenditure of

budgeted funds to comply with such consent decree or administrative order on consent in

other courts having jurisdiction), (b) changes to a Property's Minimum Estimated Property

Funding, Reserve Property Funding and Long Term OMM Property Funding, if any, (c)

access to Cushion Funding Account funds, (d) disputes involving the Administrative Funding

Account, or (e) the removal of the Administrative Trustee.  In no event shall the

Environmental Response Trust Protected Parties be personally liable for any monetary

damages other than for a finding of fraud or willful misconduct by Final Order.

103.    Debtors and the Administrative Trustee reserve, and this Settlement Agreement is

without prejudice to, all rights, as applicable, against the United States, the States, the Tribe,

the Debtors, and the Administrative Trustee with respect to (a) all matters other than those set

forth in Paragraph 99, and (b) any action to enforce their rights under the terms of this

Settlement Agreement.  In addition, Debtors' covenant not to sue under Paragraph 99 shall not

apply in the event that the United States, the Tribe, or a State brings a cause of action or issues

an order pursuant to the reservations set forth in Paragraph 100, but only to the extent that

Debtors' claims arise from the same response action, response costs, damages, or other relief

that the United States, the Tribe, or the State is seeking pursuant to the applicable

reservations.

104.    Except as provided in Paragraph 100, nothing in this Settlement Agreement shall be

construed to create any rights in, or grant any cause of action to, any person or entity not a

party to this Settlement Agreement.  Except as provided in paragraph 100, nothing in this

Settlement Agreement diminishes the rights of the Governments, pursuant Section 113(f)(2)

and (3) of CERCLA, 42 U.S.C. § 9613(f)(2)-(3), or State environmental statutes, to pursue

any persons or entities not a party hereto to obtain additional response costs or response

actions and to enter into settlements that give rise to contribution protection pursuant to

Section 113(f)(2), or State environmental statutes.  Except as provided in Paragraph 97, the

Governments expressly reserve all existing rights against all persons or entities not a party to

this Settlement Agreement, including New GM.

## IX.    CONTRIBUTION PROTECTION

105.    The parties hereto agree, and by entering this Settlement Agreement the Bankruptcy

Court finds, that this Settlement Agreement constitutes a judicially-approved settlement for

purposes of Section 113(f)(2) of CERCLA, 42 U.S.C. § 9613(f)(2), and that the Debtors and

the Environmental Response Trust and the Environmental Response Trust Protected Parties,

as of the Effective Date, are entitled to protection from contribution actions or claims as

provided by Section 113(f)(2) of CERCLA, 42 U.S.C. § 9613(f)(2) or as may be otherwise

provided by law, for "matters addressed" in this Settlement Agreement.  The "matters

addressed" in this Settlement Agreement are all costs of Environmental Actions incurred or to

be incurred by the U.S. EPA, the States, or the Tribe or any other person or entity relating to

or in connection with the Properties, including releases of Hazardous Substances from any

portion of the Properties, and all areas affected by migration of such substances emanating

from the Properties; provided, however, that the "matters addressed" in this Settlement

Agreement do not include (i) any matters reserved in Paragraph 100 of this Settlement

Agreement; or (ii) any claims for past costs asserted by potentially responsible parties who are

not parties to this Settlement Agreement.

106.     Debtors have informed Massachusetts, and hereby state, that they are not seeking

contribution protection under Mass. Gen.Laws ch.21E, § 3A(j)(2), so that the comment period

referenced in Mass. Gen.Laws ch.21E, § 3A(j)(2) shall be deemed to be closed.

## X.    PUBLIC COMMENT

107.     This Settlement Agreement will be subject to a public comment period following

notice published in the Federal Register and notice under any applicable state law providing

for public comment, which may take place concurrent with the judicial approval process

under Paragraph 108 hereof.  The United States and any State or Tribe receiving public

comment reserve the right to withdraw or withhold their consent if the public comments

regarding the Settlement Agreement disclose facts or considerations that indicate that this

Settlement Agreement is inappropriate, improper, or inadequate.  The Governments will

promptly provide Debtors copies of any public comments received during the public comment

period.  At the conclusion of the public comment period, the United States and any State or

Tribe taking public comment will provide the Bankruptcy Court with copies of any public

comments and their response thereto.  If the United States or any State or Tribe taking public

comment withdraws or withholds its consent to the Settlement Agreement prior to the

Effective Date, this Settlement Agreement shall be void and have no further force and effect.

Any changes, revisions or amendments to the Settlement Agreement in response to public

comment are subject to the approval of all Parties.

## XI.   JUDICIAL APPROVAL

108.    The settlement reflected in this Settlement Agreement shall be subject to approval by

the Bankruptcy Court pursuant to Bankruptcy Rule 9019.  Debtors shall move promptly for

court approval of this Settlement Agreement and shall exercise commercially reasonable

efforts to obtain such approval.

## XII.   PLAN

109.    The Debtors shall incorporate this Settlement Agreement into the Plan by reference

and approval of this Settlement Agreement shall be a condition precedent to confirmation of

the Plan.  The Debtors shall not file a Plan or amend the Plan in a manner inconsistent with

the terms and provisions of this Settlement Agreement, take any other action in the

Bankruptcy Cases that is inconsistent with the terms and provisions of this Settlement

Agreement, or propose terms for any order confirming the Plan that are inconsistent with this

Settlement Agreement.  The Governments shall not oppose any term or provision of the Plan

or an order confirming the Plan that is addressed by and is consistent with this Settlement

Agreement.  The Parties reserve all other rights or defenses that they may have with respect to

the Plan.  In the event of any inconsistency between the Plan, any order confirming the Plan,

and this Settlement Agreement, the terms of this Settlement Agreement shall control.

## XIII.   RETENTION OF JURISDICTION

110.    The Bankruptcy Court shall retain jurisdiction over both the subject matter of this

Settlement Agreement and the parties hereto, for the duration of the performance of the terms

and provisions of this Settlement Agreement for the purpose of enabling any of the parties to apply to the Bankruptcy Court at any time for such further order, direction and relief as may be necessary or appropriate for the construction or interpretation of this Settlement Agreement, or to effectuate or enforce compliance with its terms.

## XIV.   <u>EFFECTIVENESS OF SETTLEMENT AGREEMENT</u>

111.    This Settlement Agreement shall be effective after the close of the public comment period in accordance with Paragraph 107, and upon approval by the Bankruptcy Court pursuant to Paragraphs 107 and 108 of this Settlement Agreement and upon the Effective Date of the Debtor's Plan incorporating this Settlement Agreement.

## XV.   <u>SIGNATORIES/SERVICES</u>

112.    The signatories for the parties each certify that he or she is authorized to enter into the terms and conditions of this Settlement Agreement and to execute and bind legally such party to this document.

113.    The Administrative Trustee shall provide all notices to the Governments required by this Settlement Agreement and send copies of all reports, budgets, annual balance statements, and other documents that the Administrative Trustee is required to submit or provide to the Governments under the terms this Settlement Agreement, to the persons identified in Section 5.3 of the Trust Agreement.

[Remainder of this page is intentionally blank]

THE UNDERSIGNED PARTIES ENTER INTO THIS SETTLEMENT AGREEMENT

## FOR THE UNITED STATES

_____

ROBERT G. DREHER
Acting Assistant Attorney General
Environment and Natural Resources
   Division
U.S. Department of Justice

Date: _____

PREET BHARARA
United States Attorney
Southern District of New York
By: David S. Jones
Natalie N. Kuehler
Assistant U.S. Attorneys

Date: October 19, 2010

_____

Alan S. Tenenbaum
National Bankruptcy Coordinator
Patrick Casey
Senior Counsel
Environment and Natural Resources Division
Environmental Enforcement Section
U.S. Department of Justice

Date: _____

_____

CYNTHIA GILES
Assistant Administrator
Office of Enforcement and Compliance
Assurance
U.S. Environmental Protection Agency

67

THE UNDERSIGNED PARTIES ENTER INTO THIS SETTLEMENT AGREEMENT

## FOR THE UNITED STATES

_____
ROBERT G. DREHER
Acting Assistant Attorney General
Environment and Natural Resources
    Division
U.S. Department of Justice


Date:  _10/15/10_

_____
Alan S. Tenenbaum
National Bankruptcy Coordinator
Patrick Casey
Senior Counsel
Environment and Natural Resources Division
Environmental Enforcement Section
U.S. Department of Justice

Date:  _10/15/10_



_____
CYNTHIA GILES
Assistant Administrator
Office of Enforcement and Compliance
Assurance
U.S. Environmental Protection Agency


_____
PREET BHARARA
United States Attorney
Southern District of New York
By:  David S. Jones
Natalie N. Kuehler
Assistant U.S. Attorneys


Date:  _____

67

THE UNDERSIGNED PARTIES ENTER INTO THIS SETTLEMENT AGREEMENT

## FOR THE UNITED STATES

_____

ROBERT G. DREHER
Acting Assistant Attorney General
Environment and Natural Resources
   Division
U.S. Department of Justice

Date: _____

_____

PREET BHARARA
United States Attorney
Southern District of New York
By: David S. Jones
Natalie N. Kuehler
Assistant U.S. Attorneys

Date: _____

_____

Alan S. Tenenbaum
National Bankruptcy Coordinator
Patrick Casey
Senior Counsel
Environment and Natural Resources Division
Environmental Enforcement Section
U.S. Department of Justice

Date: _____

_____ 10/9/10

CYNTHIA GILES
Assistant Administrator
Office of Enforcement and Compliance
Assurance
U.S. Environmental Protection Agency

**FOR MOTORS LIQUIDATION COMPANY, MLC OF HARLEM, INC., MLCS, LLC, MLCS DISTRIBUTION CORPORATION, REMEDIATION AND LIABILITY MANAGEMENT COMPANY, INC., AND ENVIRONMENTAL CORPORATE REMEDIATION COMPANY, INC.**

Date: _October 19, 2010_

Ted Stenger
Executive Vice President
Motors Liquidation Company, as agent for each
   of the foregoing entities
500 Renaissance Center, Suite 1400
Detroit, MI 48243
Tel.: (313) 486-4044
Fax: (313) 486-4259
Email: tstenger@alixpartners.com

Date: _October 19, 2010_

James M. Redwine
Vice President of Environmental Affairs
Motors Liquidation Company, as agent for each
   of the foregoing entities

Date: _____

David R. Berz
Weil, Gotshal & Manges LLP
Attorneys for Debtors and Debtors in Possession
1300 Eye Street, NW, Suite 900
Washington, D.C. 20005
Tel.: (202) 682-7000
Fax: (202) 857-0939
Email: david.berz@weil.coms

**FOR MOTORS LIQUIDATION COMPANY, MLC OF HARLEM, INC., MLCS, LLC, MLCS DISTRIBUTION CORPORATION, REMEDIATION AND LIABILITY MANAGEMENT COMPANY, INC., AND ENVIRONMENTAL CORPORATE REMEDIATION COMPANY, INC.**

Date: _____        _____
                                   Ted Stenger
                                   Executive Vice President
                                   Motors Liquidation Company, as agent for each
                                     of the foregoing entities
                                   500 Renaissance Center, Suite 1400
                                   Detroit, MI 48243
                                   Tel.: (313) 486-4044
                                   Fax: (313) 486-4259
                                   Email: tstenger@alixpartners.com

Date: _____        _____
                                   James M. Redwine
                                   Vice President of Environmental Affairs
                                   Motors Liquidation Company, as agent for each
                                     of the foregoing entities

Date: October 19, 2010             _____
                                   David R. Berz
                                   Weil, Gotshal & Manges LLP
                                   Attorneys for Debtors and Debtors in Possession
                                   1300 Eye Street, NW, Suite 900
                                   Washington, D.C. 20005
                                   Tel.: (202) 682-7000
                                   Fax: (202) 857-0939
                                   Email: david.berz@weil.coms

68

**FOR THE ENVIRONMENTAL RESPONSE TRUST ADMINISTRATIVE TRUSTEE**

EPLET, LLC in its Representative Capacity as the Proposed Environmental Response Administrative Trustee of The Environmental Response Trust

Date:    ___October 19, 2010_____

By: _____
    Elliott P. Laws
    Managing Member

Date:    _____

By: _____
    Michael O. Hill
    Proposed Chief Operating Officer and
    General Counsel of
    The Environmental Response Trust

## FOR THE ENVIRONMENTAL RESPONSE TRUST ADMINISTRATIVE TRUSTEE

EPLET, LLC in its Representative Capacity as the Proposed Environmental Response Administrative Trustee of The Environmental Response Trust

Date: _____      By: _____
                                               Elliott P. Laws
                                               Managing Member

Date: _10/12/10_      By: _____
                                               Michael O. Hill
                                               Proposed Chief Operating Officer and
                                               General Counsel of
                                               The Environmental Response Trust

## FOR THE STATE OF DELAWARE

Date: 12 October 2010

Collin P. O'Mara, Secretary
Delaware Department of Natural Resources
and Environmental Control

Date: 10/12/10

Robert S. Kuehl
Deputy Attorney General
Delaware Department of Justice

# FOR THE STATE OF ILLINOIS AND THE ILLINOIS ENVIRONMENTAL PROTECTION AGENCY

FOR THE STATE OF ILLINOIS
LISA MADIGAN, Attorney General of the State of Illinois

MATTHEW J. DUNN, Chief
Environmental Enforcement/Asbestos Litigation Division

Date: ___10-18-10___

THOMAS E. DAVIS, Chief
Environmental Bureau
Assistant Attorney General
500 South Second Street
Springfield, IL  62706

FOR THE ILLINOIS ENVIRONMENTAL PROTECTION AGENCY

Date: ___16|12|10___

JOHN J. KIM
Chief Legal Counsel

71

State of Indiana's Signature Page for
**"ENVIRONMENTAL RESPONSE TRUST CONSENT DECREE AND SETTLEMENT AGREEMENT" among DEBTOR MOTORS LIQUIDATION CORPORATION, THE UNITED STATES, and Several States, including INDIANA**

Indiana Department of
Environmental Management

By: _____
        Thomas W. Easterly
        Commissioner


By: _____
        Bruce H Palin,
        Assistant Commissioner
        Office of Land Quality


Ind. Dept. of Environmental Mgmt
100 North Senate Avenue
MC 50-01, ICGN 1301
Indianapolis, IN 46204


Date: _Oct 13, 2010_


Gregory F. Zoeller,
Attorney General of Indiana
Atty. No. 1958-98

By: _____
        Patricia Orloff Erdmann
        Chief Counsel for Litigation
        Atty. No. 17664-49A


By: _____
        Timothy J. Junk
        Deputy Attorney General
        Atty. No. 5587-02


Office of the Attorney General
Indiana Government Center South, Fifth Floor
302 West Washington Street
Indianapolis, IN 46204


Date: _Oct. 13, 2010_

# FOR THE STATE OF KANSAS

Date: 10/8/2010

Roderick Bremby

RODERICK L. BREMBY
Secretary
Kansas Department of
Health and Environment

In re:                                    )        Case No. 09-50026 (REG)
                                          )        Chapter 11
MOTORS LIQUIDATION COMPANY, *et al.*,     )        (Jointly Administered)
        f/k/a General Motors Corp., *et al.*,   )
                                          )
        Debtors.                          )

**ENVIRONMENTAL RESPONSE TRUST**
**CONSENT DECREE AND SETTLEMENT AGREEMENT**
**AMONG DEBTORS,**
**THE ENVIRONMENTAL RESPONSE TRUST ADMINISTRATIVE TRUSTEE,**
**THE UNITED STATES,** *et al.*

## FOR THE STATE OF MICHIGAN

Date: _Oct. 14, 2010_          _[signature]_

Michael A. Cox
Attorney General

Celeste R. Gill (P52484)
Assistant Attorney General
Environment, Natural Resources and
Agriculture Division
6th Floor, G. Mennen Williams Building
525 West Ottawa Street
P.O. Box 30755
Lansing, MI  48909
Tel.: (517) 373-7540
Fax: (517) 373-1610
gillc1@michigan.gov
Attorneys for the Michigan Department
of Natural Resources and Environment

74

## FOR THE STATE OF MISSOURI

Date: 10/2/10

CHRIS KOSTER
Attorney General for the State of Missouri

JOHN K. McMANUS
Chief Counsel
Agriculture and Environment Division
P.O. Box 899
Jefferson City, Missouri 65102
Tel.: (573) 751-8370
Fax: (573) 751-8796
Email: jack.mcmanus@ago.mo.gov

Date: 10/13/10

Leanne Tippett Mosby
 Director
Division of Environmental Quality
Missouri Department of Natural Resources
P.O. Box 176
Jefferson City, Missouri 65102

75

## FOR THE STATE OF NEW JERSEY

Date:  _October 13, 2010_

_____
PAULA T. DOW
Attorney General for the State of New Jersey

By:   Richard F. Engel
Deputy Attorney General
Richard J. Hughes Justice Complex
25 Market Street
P.O. Box 093
Trenton, New Jersey 08625-0093
Tel.: (609) 984-4863
Fax: (609) 341-5030

**FOR THE STATE OF NEW YORK**

ANDREW M. CUOMO
Attorney General

Date: *October 19, 2010*

By:    Maureen Leary
Assistant Attorney General
Chief, Toxics Section
NYS Department of Law
Environmental Protection Bureau
The Capitol
Albany, New York 12224-0341
Tel.:  (518) 474-7154
Fax:  (518) 473-2534
maureen.leary@ag.ny.gov

**FOR THE STATE OF OHIO**

Date: 10/12/10

RICHARD CORDRAY
Attorney General for the State of Ohio

By:    Michelle T. Sutter
Principal Assistant Attorney General
30 E. Broad Street, 26th Floor
Columbus, Ohio  43215
Tel.:  (614) 752-4316
Fax:  (866) 483-1104
Email:  michelle.sutter@ohioattorneygeneral.gov

## FOR THE COMMONWEALTH OF VIRGINIA

KENNETH T. CUCCINELLI, II
ATTORNEY GENERAL

Date: ___10|18|10___    By: _Kerri L. Nicholas_

Kerri L. Nicholas, VSB # 47230
Assistant Attorney General
Environmental Section
Virginia Office of the Attorney General
900 East Main Street
Richmond, Virginia 23219
(804) 371-8721
knicholas@oag.state.va.us

79

**FOR THE STATE OF WISCONSIN**

MATTHEW J. FRANK
Secretary

Date: _10/12/10_

ALLEN K. SHEA
Deputy Secretary
Wisconsin Department of Natural Resources

Approved as to form:

J.B. VAN HOLLEN
Attorney General

Date: _10/12/10_

ANNE C. MURPHY
Assistant Attorney General
State Bar # 1031600
Attorneys for the State of Wisconsin

**FOR THE LOUISIANA DEPARTMENT OF ENVIRONMENTAL QUALITY**

Date: _____10/12/10_____

_____
Beau James Brock
Assistant Secretary
Office of Environmental Compliance
Louisiana Department of Environmental Quality

## FOR THE MASSACHUSETTS DEPARTMENT OF ENVIRONMENTAL PROTECTION

MASSACHUSETTS DEPARTMENT OF
ENVIRONMENTAL PROTECTION
By its attorney,

MARTHA COAKLEY,
ATTORNEY GENERAL

Date: 10/14/10

By: _____
Carol Iancu, MA BBO # 635626
Assistant Attorney General
Environmental Protection Division
Massachusetts Office of the Attorney General
One Ashburton Place, 18th Floor
Boston, MA 02108
(617) 963-2428
carol.iancu@state.ma.us

**FOR THE DEPARTMENT OF ENVIRONMENTAL PROTECTION OF
THE COMMONWEALTH OF PENNSYLVANIA**

Date: _10/14/10_

Susan Shinkman
Chief Counsel
Office of Chief Counsel
Rachel Carson State Office Building
400 Market Street
Harrisburg, Pennsylvania  17101-2301

**FOR THE SAINT REGIS MOHAWK TRIBE**

Date: _____        _____
                                McNAMEE, LOCHNER, TITUS
                                    & WILLIAMS, P.C.
                                John J. Privitera, Esq.
                                Jacob F. Lamme, Esq.
                                677 Broadway
                                Albany, New York  12207
                                Tel.:  (518) 447-3200
                                Fax:  (518) 426-4260

**Environmental Response Trust Property Funding for Environmental Activities**

| MLC Site ID | Site | 1. Total Property Funding [a] | 2. Minimum Estimated Property Funding | 3. Reserve Property Funding | 4. OMM Property Funding [b] | 5. State | 6. Region | 7. Lead Agency | 8. Support Agency |
|---|---|---|---|---|---|---|---|---|---|
| | **Total** | **$431,201,122** | **$295,036,131** | **$52,065,197** | **$84,099,794** | | | | |
| 1190 | GMNA Car - Wilmington | $11,728,473 | $9,084,380 | $1,603,126 | $1,040,967 | DE | 3 | State | EPA | |
| 1233 | GMPT - Danville Landfill | $5,258,489 | $3,090,664 | $545,411 | $1,622,414 | IL | 5 | State | EPA | * |
| 1288 | Former GM Delco Plant 5 | $7,268,319 | $5,508,605 | $972,107 | $787,607 | IN | 5 | EPA | State |
| Various | Bedford Town Sites (60 Properties) | $4,017,597 | $3,352,197 | $591,564 | $73,835 | IN | 5 | EPA | State |
| 1316 | Manual Transmission of Muncie | $5,695,448 | $3,715,037 | $655,595 | $1,324,816 | IN | 5 | State | EPA |
| 1191 | Metal Fab - Indianapolis | $3,713,446 | $1,890,167 | $333,559 | $1,489,720 | IN | 5 | State | EPA |
| 1320 | Delphi I - Anderson/Monroe | $2,811,565 | $2,280,338 | $402,413 | $128,814 | IN | 5 | State | EPA |
| 1325 | Allison Gas Turbines | $1,668,107 | $416,235 | $73,453 | $1,178,419 | IN | 5 | State | EPA |
| 1234 | Venture 2000 Property | $0 | $0 | $0 | $0 | IN | 5 | EPA | State |
| 1329 | 1-Acre Fire Suppression Lot | $0 | $0 | $0 | $0 | IN | 5 | EPA | State |
| 1289-1 | Fairfax I Plant | $4,786,321 | $3,727,624 | $657,816 | $400,881 | KS | 7 | State | EPA |
| 1289-2 | Fairfax Parking Lot | $0 | $0 | $0 | $0 | KS | 7 | State | EPA |
| 1192 | GMVM - Shreveport Assembly (exclude Stamping) | $0 | $0 | $0 | $0 | LA | 6 | State | EPA |
| 1290 | MCD - Framingham Landfill | $2,325,836 | $623,123 | $109,963 | $1,592,750 | MA | 1 | State | EPA | ** |
| 1199-1 | GMPT - Willow Run | $35,779,454 | $22,761,031 | $4,016,652 | $9,001,771 | MI | 5 | State | EPA |
| 1295 | GMNA - Buick City | $32,959,117 | $21,258,669 | $3,751,530 | $7,948,918 | MI | 5 | State | EPA |
| 1197 | Pontiac North | $11,015,247 | $9,025,526 | $1,592,740 | $396,981 | MI | 5 | EPA | State |
| 1003 | GMPT Saginaw Malleable | $10,725,985 | $7,310,082 | $1,290,014 | $2,125,889 | MI | 5 | State | EPA |
| 1004 | Saginaw Nodular Iron (PIMS297) | $4,668,779 | $3,510,346 | $619,473 | $538,960 | MI | 5 | State | EPA |
| 1300-3 | GMNA Car (Fisher Body) - Lansing | $7,736,956 | $5,013,345 | $884,708 | $1,838,903 | MI | 5 | State | EPA |
| 3064 | Midsize & Luxury Car - Willow Run | $7,573,707 | $5,737,276 | $1,012,460 | $823,971 | MI | 5 | State | EPA |
| 1302 | Delphi C - Livonia Groundwater | $6,669,037 | $2,734,383 | $482,538 | $3,452,116 | MI | 5 | EPA | State |
| 1300-1 | GMNA Car - Lansing 2 | $5,509,240 | $3,800,527 | $670,681 | $1,038,032 | MI | 5 | State | EPA |
| 1300-2 | GMNA Car - Lansing 3 | $5,385,566 | $3,695,404 | $652,130 | $1,038,032 | MI | 5 | State | EPA |
| 1103 | Delphi I - Coldwater Rd. (Landfill) | $4,250,661 | $1,829,223 | $322,804 | $2,098,634 | MI | 5 | State | EPA |
| 1198 | Stamping - Grand Rapids | $3,785,208 | $2,212,186 | $390,386 | $1,182,636 | MI | 5 | State | EPA |
| 1100 | GMPT Bay City | $3,526,770 | $1,018,689 | $179,769 | $2,328,312 | MI | 5 | State | EPA |
| 1299 | Flint West - Flint River (Bluff Street) | $3,186,069 | $2,708,159 | $477,910 | $0 | MI | 5 | EPA | State |
| 1107 | Vacant Land South of Van Born (68 acres) | $3,210,644 | $2,609,105 | $460,430 | $141,109 | MI | 5 | State | EPA |
| 1195 | GMPT - Livonia | $1,861,394 | $1,582,185 | $279,209 | $0 | MI | 5 | EPA | State |
| 1106 | Greenpoint Landfill | $1,774,460 | $790,276 | $139,460 | $844,724 | MI | 5 | State | EPA |
| 1291 | Hemphill lot | $1,779,650 | $1,476,984 | $260,644 | $42,022 | MI | 5 | State | EPA |
| 1327 | Peregrine - Coldwater Rd. (plant) | $1,471,173 | $1,005,992 | $177,528 | $287,653 | MI | 5 | State | EPA |
| 1001 | Employee Development Center | $1,213,426 | $1,031,412 | $182,014 | $0 | MI | 5 | State | EPA |
| 1121 | Chevrolet-Pontiac-Canada Pontiac Fiero Assembly Plant | $839,741 | $713,780 | $125,961 | $0 | MI | 5 | EPA | State |
| 1292 | Davison Road Land | $612,280 | $460,386 | $81,245 | $70,649 | MI | 5 | State | EPA |
| 1296 | Dort Highway Land | $528,634 | $449,339 | $79,295 | $0 | MI | 5 | State | EPA |
| 1306-1 | PCC-Validation | $470,639 | $400,043 | $70,596 | $0 | MI | 5 | EPA | State |
| 1328 | Saginaw PLt 2 Landfill | $374,204 | $318,073 | $56,131 | $0 | MI | 5 | State | EPA |

| MLC Site ID | Site | 1. Total Property Funding [a] | 2. Minimum Estimated Property Funding | 3. Reserve Property Funding | 4. OMM Property Funding [b] | 5. State | 6. Region | 7. Lead Agency | 8. Support Agency |
|---|---|---|---|---|---|---|---|---|---|
| 1308 | Pontiac Centerpoint Campus - West | $215,981 | $183,584 | $32,397 | $0 | MI | 5 | EPA | State |
| 1002 | Powertrain - Romulus Engineering Center | $276,029 | $234,625 | $41,404 | $0 | MI | 5 | State | EPA |
| 1005 | Former Howard W/H - Vacant Land | $248,252 | $211,014 | $37,238 | $0 | MI | 5 | State | EPA |
| 1108 | Textile Road Land | $160,789 | $136,671 | $24,118 | $0 | MI | 5 | EPA | State |
| 1310 | ACC - Penske site | $150,495 | $127,921 | $22,574 | $0 | MI | 5 | State | EPA |
| 1102 | Linden Road Landfill | $167,523 | $72,626 | $12,816 | $82,081 | MI | 5 | State | EPA |
| 1297 | Windiate Park Lots | $143,971 | $80,673 | $14,236 | $49,062 | MI | 5 | EPA | State |
| 1294 | Lot 8 - 6241 Cass Avenue at Amsterdam Ave. | $124,382 | $105,725 | $18,657 | $0 | MI | 5 | State | EPA |
| 1101 | 6560 Cass Ave/GMNA New Center Complex | $59,107 | $50,241 | $8,866 | $0 | MI | 5 | State | EPA |
| 1298-1 | GLTC land (Atherton Landfill/Die Lot Parking) | $223,394 | $189,885 | $33,509 | $0 | MI | 5 | State | EPA |
| 1006 | Vacant Land (76 acres) | $20,924 | $17,785 | $3,139 | $0 | MI | 5 | EPA | State |
| 1104 | Delphia C Livonia Coil & Bumper | $0 | $0 | $0 | $0 | MI | 5 | EPA | State |
| 1105 | Land along Stanley Road | $0 | $0 | $0 | $0 | MI | 5 | State | EPA |
| 1116 | Fiero Site (Powerhouse) | $0 | $0 | $0 | $0 | MI | 5 | EPA | State |
| 1120 | Flint Flow-through Warehouse | $0 | $0 | $0 | $0 | MI | 5 | EPA | State |
| 1194 | GMPT - Flint North #5/#10/#81 | $0 | $0 | $0 | $0 | MI | 5 | State | EPA |
| 1196 | GMVM - Pontiac Assembly | $0 | $0 | $0 | $0 | MI | 5 | EPA | State |
| 1293 | Midsize & Luxury Car Clark Street | $0 | $0 | $0 | $0 | MI | 5 | EPA | State |
| 1301 | Delta Engine Plant | $0 | $0 | $0 | $0 | MI | 5 | State | EPA |
| 1303 | 1831 Grondinwood (residence) | $0 | $0 | $0 | $0 | MI | 5 | EPA | State |
| 1304 | 1394 Oak Hollow (residence) | $0 | $0 | $0 | $0 | MI | 5 | EPA | State |
| 1305 | Pontiac Centerpoint Campus - Central | $0 | $0 | $0 | $0 | MI | 5 | EPA | State |
| 1307 | Pontiac Centerpoint Campus - East | $0 | $0 | $0 | $0 | MI | 5 | EPA | State |
| 1309 | Centerpoint Land (no Etkin ground lease) | $0 | $0 | $0 | $0 | MI | 5 | EPA | State |
| 1311 | Centerpoint Land (Etkin ground lease) | $0 | $0 | $0 | $0 | MI | 5 | EPA | State |
| 1312 | 652 Meadow Drive | $0 | $0 | $0 | $0 | MI | 5 | EPA | State |
| 1313 | 642 Meadow Drive | $0 | $0 | $0 | $0 | MI | 5 | EPA | State |
| 1314 | 631 Meadow Drive | $0 | $0 | $0 | $0 | MI | 5 | EPA | State |
| 1315 | 607 Meadow Drive | $0 | $0 | $0 | $0 | MI | 5 | EPA | State |
| 1199-2 | Willow Run Engineering Center | $0 | $0 | $0 | $0 | MI | 5 | State | EPA |
| 1306-2 | PCC Validation Southern Parking Lot | $0 | $0 | $0 | $0 | MI | 5 | EPA | State |
| 1007 | Former Leed's Assembly Plant - Northern Parcel | $1,724,806 | $1,166,210 | $205,802 | $352,794 | MO | 7 | State | EPA |
| 1109 | Former Leed's Assembly Plant - Southern Parcel | $0 | $0 | $0 | $0 | MO | 7 | State | EPA |
| 1008 | Hyatt Clark Industries | $14,176,022 | $6,900,785 | $1,217,786 | $6,057,451 | NJ | 2 | EPA | State |
| 1009 | Delphi Interior & Lighting Systems - Trenton | $10,532,047 | $8,422,742 | $1,486,366 | $622,939 | NJ | 2 | EPA | State |
| 1200 | Massena | $120,860,604 | $92,352,887 | $16,297,568 | $12,210,150 | NY | 2 | EPA | State |
| 1010 | GM-IFG Syracuse | $31,121,812 | $17,720,946 | $3,127,226 | $10,273,640 | NY | 2 | EPA | State |
| 1110 | Ley Creek PCB Dredging Site | $1,882,342 | $415,634 | $73,347 | $1,393,361 | NY | 2 | EPA | State |
| 1098 | Tonawanda Engine Landfill | $0 | $0 | $0 | $0 | NY | 2 | EPA | State |
| 1317 | Delphi Harrison - Moraine | $25,759,964 | $19,306,452 | $3,407,021 | $3,046,491 | OH | 5 | EPA | State |
| 1111 | Delphi Interior - Elyria | $7,263,306 | $3,421,417 | $603,780 | $3,238,109 | OH | 5 | State | EPA |

| MLC Site ID | Site | 1. Total Property Funding [a] | 2. Minimum Estimated Property Funding | 3. Reserve Property Funding | 4. OMM Property Funding [b] | 5. State | 6. Region | 7. Lead Agency | 8. Support Agency |
|---|---|---|---|---|---|---|---|---|---|
| 1201 | Stamping - Mansfield | $2,990,952 | $2,110,204 | $372,389 | $508,359 | OH | 5 | State | EPA |
| 1099 | GMPT - Toledo 103C Landfill | $2,634,063 | $1,087,244 | $191,867 | $1,354,952 | OH | 5 | EPA | State |
| 1203 | GMPT - Parma Complex | $746,705 | $634,699 | $112,006 | $0 | OH | 5 | State | EPA |
| 1011 | Lordstown Excess Land | $0 | $0 | $0 | $0 | OH | 5 | State | EPA |
| 1012 | Moraine Lagoon | $0 | $0 | $0 | $0 | OH | 5 | EPA | State |
| 1202 | Moraine Assembly | $0 | $0 | $0 | $0 | OH | 5 | EPA | State |
| 1204 | Metal Fab - Pittsburgh | $3,299,231 | $2,757,748 | $486,661 | $54,822 | PA | 3 | State | EPA |
| 1205 | GMPT - Fredericksburg | $25,922 | $22,034 | $3,888 | $0 | VA | 3 | State | EPA |
| 1013 | Janesville Training Center | $210,857 | $165,588 | $29,221 | $16,048 | WI | 5 | State | EPA |

**Notes:**

[a] Funding as of August 13, 2010 and subject to the adjustments provided for under paragraph 36 and 37 of the Settlement Agreement.
  Present value calculated as of January 2011, using Laddered Treasuries for discount rate (2/10/10) and CBO CPI projection for inflation rate (1/28/10).

[b] Long-term OMM costs after 10 years of remediation.

* In addition, $102,390 in funding for closure and post-closure activities will be placed in an Illinois trust fund created pursuant to 35 Ill. Adm. Code 807.661.

** In addition, $786,944 in funding for long-term OMM will be placed in a Massachusetts expendable trust account.

Doc 9835-6 Filed 03/18/11 Entered 03/18/11 18:06:04 Main Docum
Pg 302 of 813

# ATTACHMENT B

## Properties with Existing and Prospective Contracts for Demolition Activities

| PO Number | Effective Date | Expiration Date | Vendor # | Vendor Name | Description |
|---|---|---|---|---|---|
| FLN0003 STD | 7/12/2010 | 12/31/2010 | 00-OBRIEN | O'Brien & Gere Engineers, Inc | FEA Flint North |
| FLN0005 STD | 7/1/2010 | 7/31/2010 | 00-OBRIEN | O'Brien & Gere Engineers, Inc | O&C Flint North |
| FLN0006 STD | 7/19/2010 | 1/15/2012 | 00-BIER | Bierlein | Demo Flint North |
| FLN00xx STD | 11/29/2010 | 11/29/2012 | TBD | TBD | Demo Flint North |
| LAN0005 STD | 4/5/2010 | 12/31/2010 | 00-HANDI | Handijon, Inc. | Service Lansing |
| LAN0006 STD | 4/5/2010 | 12131/2010 | 00-BESCO | Besco Water Treatment | Service Lansing |
| LAN0007 STD | 7/12/2010 | 12/31/2010 | 00-OBRIEN | O'Brien & Gere Engineers, Inc | O&C Lansing |
| LAN00xx STD | 9/21/2010 | 1/31/2011 | TBD | TBD | Demo Lansing |
| MAN0001 STD | 2/9/2010 | 2/9/2011 | 00-OBRIEN | O'Brien & Gere Engineers, Inc | FEA Mansfield |
| MAS00xx STD | 9/7/2010 | 12/31/2011 | 00-OBRIEN | O'Brien & Gere Engineers, Inc | OSR Massena |
| MAS00xy STD | 9/17/2010 | 12/31/2011 | 00-BRAND | Brandenburg | Demo Massena |
| PPM0004 STD | 6/22/2010 | 12/19/2010 | 00-OBRIEN | O'Brien & Gere Engineers, Inc | FEA Pontiac N |
| REC0001 STD | 8/9/2010 | 11/7/2010 | 00-OBRIEN | O'Brien & Gere Engineers, Inc | O&C Romulus |
| REC0002 STD | | | 00-ADAMO | Adamo Group Inc. | Demo Romulus |
| SMI0001 STD | 10/12/2009 | 12/12/2011 | 00-NOAMDIS | North American Dismantling | Demo SMI |
| SMI0002 STD | 2/1/2010 | 11/30/2010 | 00-OBRIEN | O'Brien & Gere Engineers, Inc | O&C SMI |
| WLR0002 STD | 6/22/2010 | 6/22/2011 | 00-OBRIEN | O'Brien & Gere Engineers, Inc | FEA |

# Attachment C

# ENVIRONMENTAL RESPONSE TRUST AGREEMENT

## BY AND AMONG

**MOTORS LIQUIDATION COMPANY f/k/a GENERAL MOTORS CORP.,
REMEDIATION AND LIABILITY MANAGEMENT COMPANY, INC.,**
and
**ENVIRONMENTAL CORPORATE REMEDIATION COMPANY, INC.**
as Settlors,

**EPLET, LLC,**
not individually but solely in its representative capacity
as Environmental Response Trust Administrative Trustee,

## AND

### THE UNITED STATES OF AMERICA,
as Environmental Response Trust Beneficiary and Powers and Rights Holder

## AND

### THE STATES OF DELAWARE, ILLINOIS, INDIANA, KANSAS, MICHIGAN, MISSOURI, NEW JERSEY, NEW YORK, OHIO, WISCONSIN, COMMONWEALTH OF VIRGINIA, THE LOUISIANA DEPARTMENT OF ENVIRONMENTAL QUALITY, THE MASSACHUSETTS DEPARTMENT OF ENVIRONMENTAL PROTECTION, THE DEPARTMENT OF ENVIRONMENTAL PROTECTION OF THE COMMONWEALTH OF PENNSYLVANIA AND THE SAINT REGIS MOHAWK TRIBE
as Environmental Response Trust Powers and Rights Holders

# TABLE OF CONTENTS

ARTICLE 1 DEFINITIONS AND PRINCIPLES OF CONSTRUCTION ...................................... 2
   1.1    Definitions .................................................................................................................. 2
   1.2    Principles of Construction ......................................................................................... 9

ARTICLE 2 ESTABLISHMENT OF THE ENVIRONMENTAL RESPONSE TRUST ............. 9
   2.1    Name ........................................................................................................................... 9
   2.2    Establishment of Environmental Response Trust ................................................... 9
   2.3    Purpose of the Environmental Response Trust ..................................................... 10
   2.4    Transfer of Ownership ............................................................................................ 10
   2.5    Transfer of Funds and Creation of Environmental Response Trust Accounts .............. 11
   2.6    Holder of Environmental Response Trust Assets ................................................. 12
   2.7    Management of Environmental Response Trust Assets ....................................... 12
   2.8    Investment and Safekeeping of Environmental Response Trust Assets .......................... 13
   2.9    Insurance Policy to Cover Cost Overruns with Respect to Future
           Response Actions ..................................................................................................... 14
  2.10   Access and Institutional Controls .......................................................................... 14
  2.11   Internal Accounting ................................................................................................. 15
  2.12   Inspection of Books ................................................................................................. 15
  2.13   Independent Audits .................................................................................................. 15
  2.14   Termination .............................................................................................................. 16
  2.15   Property Disposition ................................................................................................ 17

ARTICLE 3 WORK AND DISTRIBUTIONS ........................................................................... 17
   3.1    Budgets for and Payments by the Environmental Response Trust ..................... 17
   3.2    Manner of Payment ................................................................................................. 19
   3.3    Unclaimed Distributions ......................................................................................... 20

ARTICLE 4 THE ENVIRONMENTAL RESPONSE TRUST ADMINISTRATIVE
TRUSTEE        ........................................................................................................... 20
   4.1    Appointment ............................................................................................................ 20
   4.2    General Authority .................................................................................................... 21
   4.3    Powers ...................................................................................................................... 21
   4.4    Cleanup Managers ................................................................................................... 23
   4.5    Redevelopment Manager ........................................................................................ 24
   4.6    Retention of Professionals ...................................................................................... 24
   4.7    Executive Compensation ......................................................................................... 25
   4.8    Limitation of the Environmental Response Trust Administrative
           Trustee's Authority .................................................................................................. 25
   4.9    Reliance by the Environmental Response Trust Protected Parties ..................... 25
  4.10   Cost Reimbursement of the Environment Response Trust Administrative Trustee ....... 26
  4.11   Liability of Environmental Response Trust Protected Parties. ........................... 26
  4.12   Exculpation and Indemnification ........................................................................... 27
  4.13   Termination of the Environmental Response Trust, Replacement or Removal
           of the Environmental Response Trust Administrative Trustee ............................ 28
  4.14   Appointment of Successor Environmental Response Trust Administrative Trustee ...... 30
  4.15   No Bond .................................................................................................................... 30

i

ARTICLE 5 ENVIRONMENTAL RESPONSE TRUST BENEFICIARY AND POWERS
AND RIGHTS HOLDERS .................................................................................. 30
    5.1    Environmental Response Trust Beneficiary ................................................ 30
    5.2    Identification of Environmental Response Trust Beneficiary ...................... 30
    5.3    Settlors and Powers and Rights Holders .................................................... 32
    5.4    Transfer of Beneficial Interests, Rights and Powers .................................. 40

ARTICLE 6 REPORTING AND TAXES ............................................................. 40
    6.1    Reports ........................................................................................................ 40
    6.2    Other .......................................................................................................... 41
    6.3    Reports in Support of Insurance Claims .................................................... 41
    6.4    Tax Treatment of the Environmental Response Trust .................................. 41
    6.5    Taxable Entity ............................................................................................ 41
    6.6    Trustee as Administrator ............................................................................ 42
    6.7    Fiscal Year ................................................................................................. 42
    6.8    Property Taxes ............................................................................................ 42
    6.9    Expedited Determination ............................................................................ 43

ARTICLE 7 MISCELLANEOUS PROVISIONS ................................................. 43
    7.1    Amendments and Waivers .......................................................................... 43
    7.2    Cooperation ................................................................................................ 43
    7.3    Situs of the Environmental Response Trust ................................................ 44
    7.4    Headings ..................................................................................................... 44
    7.5    Severability ................................................................................................. 44
    7.6    Sufficient Notice ......................................................................................... 45
    7.7    Counterparts ............................................................................................... 45
    7.8    Actions Taken on Other Than Business Day ............................................... 45
    7.9    Compliance with Laws ............................................................................... 45
    7.10  Preservation of Privilege ............................................................................ 45
    7.11  No Partnership ............................................................................................ 46
    7.12  Uniform Trust Act ...................................................................................... 46
    7.13  Dispute Resolution ..................................................................................... 46

EXHIBIT "A" – Legal Description of Properties Transferred to the Environmental
               Response Trust

EXHIBIT "B" – Form of Quitclaim Deed

EXHIBIT "C" – List of Transferred Contracts

# ENVIRONMENTAL RESPONSE TRUST AGREEMENT

This Environmental Response Trust Agreement ("Agreement") is made and entered as of the 3rd day of March, 2011, by and among Motors Liquidation Company f/k/a General Motors Corp. ("MLC"), a Delaware corporation, Remediation and Liability Management Company ("REALM"), a Michigan corporation, and Environmental Corporate Remediation Company, Inc. ("ENCORE"), a Delaware corporation, as debtors and debtors in possession in the Bankruptcy Case (defined below) (collectively "Settlors" or "Debtors"); EPLET, LLC, not individually but solely in its representative capacity as Environmental Response Trust Administrative Trustee (defined herein) of the Environmental Response Trust established hereby (the "Environmental Response Trust"); the United States of America (the "Environmental Response Trust Beneficiary" or "United States"); the States of Delaware, Illinois, Indiana, Kansas, Michigan, Missouri, New Jersey, New York, Ohio, Virginia and Wisconsin and the Louisiana Department of Environmental Quality, the Massachusetts Department of Environmental Protection and the Department of Environmental Protection of the Commonwealth of Pennsylvania (collectively, the "States") and the St. Regis Mohawk Tribe (the "Tribe").

## R E C I T A L S:

WHEREAS, on June 1, 2009, MLC and certain of its affiliates and subsidiaries commenced liquidation cases by filing voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 *et seq.*, as amended ( "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York, ("Bankruptcy Court"), and on October 9, 2009, REALM and ENCORE commenced liquidation cases by filing voluntary petitions for relief under chapter 11 of title 11 of the Bankruptcy Code in the Bankruptcy Court, (collectively, "Chapter 11 Cases");

WHEREAS, on August 31, 2010, the Debtors filed a Chapter 11 Plan of Liquidation ("Plan of Liquidation") (as amended, modified and supplemented from time to time) with the Bankruptcy Court;

WHEREAS, Settlors are potentially responsible or liable parties with respect to the Properties (identified in Attachment A to the Environmental Response Trust Consent Decree and Settlement Agreement Among Debtors, the Administrative Trustee, the United States and certain States ("Settlement Agreement")) and surrounding areas where Hazardous Substances have migrated, are continuing to migrate, or otherwise have or will come to be located, and are obliged as owner of the Properties to comply with applicable law, including Environmental Law;

WHEREAS, the Settlors, the United States and the States have entered into the Settlement Agreement with respect to the Properties;

WHEREAS, the Plan of Liquidation provides for the creation of the Environmental Response Trust and transfer of certain of the Properties and Funding (defined below) to the Environmental Response Trust to be administered by the Environmental Response Trust Administrative Trustee pursuant to this Agreement and the Settlement Agreement;

1

WHEREAS, in accordance with the Plan, this Agreement and the Settlement Agreement, the Environmental Response Trust is established to resolve or satisfy one or more contested or uncontested claims that have resulted or may result from an event (or related series of events) that has occurred and that has given rise to at least one claim asserting liability under environmental laws; and, in connection therewith, to conduct, manage and/or fund Environmental Actions with respect to certain of the Properties, including the migration of Hazardous Substances emanating from certain of the Properties, in accordance with the provisions of this Settlement Agreement and the Trust Agreement; to reimburse the Lead Agency for Environmental Actions it conducts or has agreed to pay for with respect to the Properties; own certain of the Properties; carry out administrative and property management functions related to certain of the Properties and pay associated administrative costs; and try to sell or transfer the Properties owned by the Environmental Response Trust so that they can be put to productive or beneficial use;

WHEREAS, pursuant to the Plan of Liquidation and the Settlement Agreement, on the Effective Date (defined below), Debtors shall transfer certain of the Properties, along with the Funds (defined below), to the Environmental Response Trust;

WHEREAS, this Agreement and the Settlement Agreement govern the Environmental Response Trust, which is created pursuant to section 1.468B-1 of the Treasury Regulations promulgated under the Internal Revenue Code;

WHEREAS, the Environmental Response Trust shall be the exclusive holder of the assets described herein and in the Settlement Agreement for purposes of 31 U.S.C. § 3713(b); and

WHEREAS, the Environmental Response Trust is intended to qualify as a qualified settlement fund pursuant to section 468B of the Internal Revenue Code and the Treasury Regulations promulgated thereunder ("Treasury Regulations").

NOW, THEREFORE, in consideration of the foregoing premises and the mutual covenants and agreements contained herein and in the Settlement Agreement, the Parties hereby agree as follows:

## ARTICLE 1
## DEFINITIONS AND PRINCIPLES OF CONSTRUCTION

1.1    Definitions

The following terms as used in this Agreement shall have the definitions given below:

    1.1.1    "Administrative Expenses" means the expenses incurred in administering the Environmental Response Trust, including but not limited to property taxes, liability insurance, security, personnel costs, utilities, maintenance, professional fees, Property marketing costs, and demolition costs unrelated to Environmental Actions.

    1.1.2    "Administrative Funding Account" means the funding held by the Environmental Response Trust for the costs necessary for the

2

administration of the Environmental Response Trust and the orderly wind-down of the Properties, including, but not limited to, Administrative Expenses. Such funding shall be set aside in separate dedicated subaccounts. Funds in the Administrative Funding Account shall not be used by the Administrative Trustee to fund any Environmental Action.

1.1.3   "Administrative Funding Reserve Account" means the funding held by the Environmental Response Trust in a separate dedicated account for the express purpose of being used by the Administrative Trustee to fund actual or projected shortfalls in the Administrative Funding Account identified by the Administrative Trustee prior to the third anniversary of the Effective Date. Such shortfalls are strictly limited to unexpectedly high demolition costs and Property holding costs and unexpectedly low proceeds derived from rental of Properties or proceeds derived from the sale of Properties or personalty. The Administrative Funding Reserve Account shall not be used under any circumstances to fund any Environmental Action or any administrative or personnel matters, including legal or professional matters.

1.1.4   "Administrative Trustee" or "Environmental Response Trust Administrative Trustee" means (i) EPLET, LLC, not individually but solely in its representative capacity as Administrative Trustee, by and through Elliott Laws, not individually but solely in his representative capacity as president, manager or managing member of the Administrative Trustee, of the Environmental Response Trust that is created pursuant to this Environmental Response Trust Agreement, the Settlement Agreement, and the Debtors' Plan of Liquidation, as detailed in, *inter alia*, paragraphs 29 through 32 of the Settlement Agreement, and (ii) any successor thereto.

1.1.5   "Agreement" means this Environmental Response Trust Agreement.

1.1.6   "Bankruptcy Court" means the United States Bankruptcy Court for the Southern District of New York.

1.1.7   "Bankruptcy Code" means chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 *et seq.*, as amended.

1.1.8   "Beneficiary" or "Environmental Response Trust Beneficiary" means the United States.

1.1.9   "CERCLA" means the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601 *et seq.*, as amended.

1.1.10  "Chapter 11 Cases" means the voluntary petitions for relief under chapter 11 of title 11 of the Bankruptcy Code in the Bankruptcy Court filed by MLC and certain of its affiliates and subsidiaries on June 1, 2009, and by REALM and ENCORE on October 9, 2009.

3

1.1.11  "Cleanup Manager" or "Environmental Response Trust Cleanup Manager" means an employee of the Environmental Response Trust or the Environmental Response Trust Administrative Trustee with responsibilities for certain Environmental Actions and related activities at Properties located in a specified geographic area, as described and designated pursuant to, *inter alia*, Paragraphs 45-47 of the Settlement Agreement.

1.1.12  "Confirmation Order" means the order of the Bankruptcy Court confirming the Plan of Liquidation pursuant to section 1129 of the Bankruptcy Code.

1.1.13  "Court" means the Bankruptcy Court or, if the Bankruptcy Court abstains from exercising jurisdiction or is otherwise without jurisdiction over any matter arising out of this Agreement, a United States District Court having competent jurisdiction with respect to such matters.

1.1.14  "Cushion Funding Account" means the funding held by the Environmental Response Trust that is available for Environmental Actions at any of the Properties under the circumstances described in Paragraphs 57 and 58 of the Settlement Agreement.

1.1.15  "Debtors" means MLC, REALM and ENCORE.

1.1.16  "EDC" means the Government of Canada and the Government of Ontario, through the Export Development Canada, Canada's export trading agency.

1.1.17  "Effective Date" means the day on which the Plan of Liquidation becomes effective in accordance with its terms and the Confirmation Order.

1.1.18  "Environmental Action" means any response, removal, investigation, sampling, remediation, reclamation, closure, post-closure, corrective action, engineering controls, institutional controls, deed restrictions, oversight costs and OMM activities authorized or required under law with respect to a Property.

1.1.19  "Environmental Costs" means the costs and expenses of implementing Environmental Actions with respect to any Property that are part of an approved budget.

1.1.20  "Environmental Cost Account" shall mean each of the Minimum Estimated Property Funding Account, Reserve Property Funding Account and Long Term OMM Property Funding Account.

1.1.21  "Environmental Response Trust" means the Environmental Response Trust as such term is defined in the Plan of Liquidation and the Settlement Agreement.  Actions of the Environmental Response Trust shall be performed by or at the direction of the Administrative Trustee.

4

1.1.22  "Environmental Response Trust Account" shall have the meaning given in Section 2.5.2. hereof.

1.1.23  "Environmental Response Trust Assets" means the funding placed in the Environmental Response Trust Accounts and the assets transferred to the Environmental Response Trust in accordance with this Agreement, the Settlement Agreement and the Plan, but shall not include any General Motors, LLC ("New GM") securities. The Environmental Response Trust Assets are comprised of (i) Cash in the amount of no less than $641,414,653 million, as adjusted pursuant to Paragraphs 36 and 37 of the Settlement Agreement; (ii) the Properties listed in Exhibit "A" to this Trust Agreement; (iii) personal property, including equipment, related to certain of the Properties; (iv) all leases of Environmental Response Trust Assets with New GM; (v) all Transferred Contracts; and (vi) such other assets acquired or held by the Environmental Response Trust from time to time pursuant to this Agreement, the Settlement Agreement and the Plan of Liquidation, or an order of the Court.

1.1.24  "Environmental Response Trust Protected Parties" means the Administrative Trustee, individually and/or in its capacity as official representative of the Environmental Response Trust, and the Environmental Response Trust's and the Administrative Trustee's shareholders, members, officers, managers, directors, employees (including but not limited to the Cleanup Managers and the Redevelopment Manager), attorneys and agents, if any, solely in their capacities as such. Each of the Environmental Response Trust Protected Parties is, individually, an Environmental Response Trust Protected Party. For avoidance of doubt, the Environmental Response Trust is not an Environmental Response Trust Protected Party.

1.1.25  "Environmental Response Trust Proceeds" means income, interest earned and proceeds of any liquidation, sale, lease, recovery or other disposition of or other proceeds with respect to the Environmental Response Trust Assets.

1.1.26  "Environmental Response Trust Beneficiary" or "Beneficiary" means the United States of America ("United States").

1.1.27  "Environmental Law" means any applicable federal, tribal, state or local law, statute, ordinance, rule, regulation or code, any license, permit, authorization, administrative or court order, judgment, decree or injunction, including all common law, related to pollution, protection or restoration of health, safety or the environment, or the use, storage, recycling, treatment, generation, transportation, processing, handling, labeling, production, release or disposal of pollutants or Hazardous Substances, including, without limitation, CERCLA; RCRA; the Clean Air Act, 42 U.S.C. Section 7401, et seq.; the Federal Water Pollution

5

Control Act, 33 U.S.C. Section 1251, et seq.; the Toxic Substances Control Act, 15 U.S.C. Section 2601, et seq.; the Emergency Planning and Community Right to Know Act, 42 U.S.C. Section 11001, et seq.; the Safe Drinking Water Act, 42 U.S.C. Section 300f, et seq.; the Oil Pollution Act of 1990, 33 U.S.C. Section 2701 et seq.; and the Occupational Safety and Health Act, 29 U.S.C. 651, et seq. as it relates to the exposure of Hazardous Substances, and any applicable tribal, state, or local law counterparts, as the same may be reauthorized or amended from time to time.

1.1.28 "Final Order" means a court order that has not been reversed, stayed, modified, or amended, and as to which (i) the time to appeal, seek review, rehearing or remand, or petition for certiorari has expired and no timely filed appeal or petition for review, rehearing, remand or certiorari is pending; or (ii) any appeal taken or petition for certiorari filed has been resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought.

1.1.29 "Funds" or "Funding" means those funds contributed by the Debtors to the Environmental Response Trust in an amount no less than $641,414,653 in order to pay Environmental Costs and Administrative Expenses of the Properties and the Environmental Response Trust, and to fulfill the purposes of the Environmental Response Trust consistent with this Agreement and the Settlement Agreement.

1.1.30 "Governments" means the United States, the States, and the Tribe.

1.1.31 "Hazardous Substances" means all materials, substances, or wastes defined, designated, regulated or classified as hazardous, toxic or radioactive, under any Environmental Laws, whether by type or by quantity, and includes but is not limited to petroleum or any derivative or by-product thereof and asbestos containing materials.

1.1.32 "Indemnifiable Expenses" has the meaning set forth in Section 4.12.2.

1.1.33 "Internal Revenue Code" or "IRC" means title 26 of the Internal Revenue Code of 1986, as amended, 26 U.S.C. §§ 1 et seq.

1.1.34 "Lead Agency" means the agency designated as such for each Property, as reflected on Attachment A Column 7 to the Settlement Agreement. For each Property, the Lead Agency shall either be the U.S. EPA, or an agency of the State in which the Property is located. The U.S. EPA and the State in which a Property is located may provide the Administrative Trustee with joint written notice that the Lead Agency for the Property has changed.

1.1.35 "Long Term OMM Property Funding Account" means the funding (if any) to be held by the Environmental Response Trust and to be set aside in

6

separate dedicated subaccounts for each Property and preserved for OMM with respect to each Property beginning ten years after the Effective Date.

1.1.36 "Minimum Estimated Property Funding Account" means the funding to be held by the Environmental Response Trust and to be set aside in separate dedicated subaccounts for each Property that has been estimated as the minimum amount of funding with respect to Environmental Actions with respect to each Property.

1.1.37 "MSPA" means the Amended and Restated Master Sale and Purchase Agreement by and among General Motors Corporation and its debtor subsidiaries, as Sellers, and NGMCO, Inc., as successor in interest to Vehicle Acquisition Holdings LLC, a purchaser sponsored by the U.S. treasury, as purchaser, dated as of June 26, 2009, together with all related documents and agreements as well as all exhibits, schedules, and addenda thereto, as amended, restated, modified, or supplemented from time to time.

1.1.38 "OMM" means operation, monitoring and maintenance activities required as Environmental Actions.

1.1.39 "Parties" means the Settlors, the Environmental Response Trust Administrative Trustee and the Governments.

1.1.40 "Person" means any individual, corporation, limited liability company, partnership, joint venture, association, joint-stock company, trust, charitable foundation, unincorporated organization, government or any agency or political subdivision thereof or any other entity.

1.1.41 "Plan of Liquidation" means the Chapter 11 Plan of Liquidation filed by Debtors on August 31, 2010, as amended, modified and supplemented from time to time and incorporating the Settlement Agreement.

1.1.42 "Properties" means each of the 89 properties that are set forth and more particularly described in Attachment A to the Settlement Agreement including, without limitation, all Settlor-owned fixtures, improvements, and equipment located thereon as of the Effective Date and all appurtenances, rights, easements, rights-of-way, mining rights, mineral rights, mineral claims, appurtenant groundwater rights, associated surface water rights, claims and causes of actions, and filings or other interests relating to or benefitting such properties.

1.1.43 "RCRA" means the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., as amended.

1.1.44 "Redevelopment Manager" means the employee of the Environmental Response Trust Administrative Trustee with responsibilities relating to the

return of Properties to beneficial use, as described in and designated pursuant to, *inter alia*, Paragraph 48 of the Settlement Agreement.

1.1.45  "Reserve Property Funding Account" means the funding to be held by the Environmental Response Trust and to be set aside in separate dedicated subaccounts for each Property that has been estimated as an appropriate minimum amount of reserve funding with respect to Environmental Actions with respect to each Property for use in performing Environmental Actions upon exhaustion of the Minimum Estimated Property Funding Account.

1.1.46  "Settlement Agreement" means the Environmental Response Trust Consent Decree and Settlement Agreement Among Debtors, the Administrative Trustee, the United States and Certain States dated October 20, 2010.

1.1.47  "Settlors" means MLC, REALM and ENCORE.

1.1.48  "States" means the States (or Commonwealths) of Delaware, Illinois, Indiana, Kansas, Michigan, Missouri, New Jersey, New York, Ohio, Pennsylvania, Virginia, and Wisconsin, and the Louisiana Department of Environmental Quality, the Massachusetts Department of Environmental Protection, and the Department of Environmental Protection of the Commonwealth of Pennsylvania.

1.1.49  "Superfund" means the "Hazardous Substance Superfund" established by 26 U.S.C. § 9507 or, in the event such Hazardous Substance Superfund no longer exists, any successor fund or comparable account of the Treasury of the United States to be used for removal or remedial actions to address releases or threats of releases of Hazardous Substances.

1.1.50  "Support Agency" means the agency listed as such for each Property on Attachment A Column 8 to the Settlement Agreement. Where a State environmental agency is the Lead Agency, U.S. EPA will be the Support Agency; where U.S. EPA is the Lead Agency, the State and, where applicable, Tribal environmental agency will be the Support Agency.

1.1.51  "Transferred Contracts" means those contracts and agreements relating to the Properties listed in Exhibit "C" to this Agreement.

1.1.52  "Treasury Regulations" means the Treasury Regulations promulgated under the Internal Revenue Code.

1.1.53  "Tribe" means the Saint Regis Mohawk Tribe.

1.1.54  "United States" means the United States of America, and all of its agencies, departments, and instrumentalities, including the U.S. EPA and the United States Department of the Treasury.

8

1.1.55 "U.S. EPA" means the United States Environmental Protection Agency and any successor departments or agencies of the United States.

1.1.56 "U.S. Treasury" means the United States Department of the Treasury and any successor departments or agencies of the United States.

1.2    Principles of Construction

1.2.1    The meanings set forth for defined terms in Section 1.1 or elsewhere in this Agreement shall be equally applicable to both the singular and plural forms of the terms defined.

1.2.2    All references to "this Agreement" or "hereof" and other like terms mean, unless the context requires otherwise, this Agreement, including the Exhibits hereto, as it may be amended, modified or supplemented from time to time in accordance with the terms of this Agreement.

1.2.3    The section headings contained in this Agreement are solely for convenience of reference and shall not affect the meaning or interpretation of this Agreement or of any term or provision hereof.

1.2.4    References in this Agreement to Sections and Exhibits, unless otherwise specified, are to Sections of and Exhibits to this Agreement.

1.2.5    To the extent reasonably possible, the provisions of this Agreement shall be interpreted in a manner consistent with the Plan of Liquidation and the Settlement Agreement. Where the provisions of this Agreement are irreconcilable with the provisions of the Plan of Liquidation, the terms of this Agreement shall govern. Where the provisions of this Agreement are irreconcilable with the provisions of the Settlement Agreement, the terms of the Settlement Agreement shall govern.

ARTICLE 2
ESTABLISHMENT OF THE ENVIRONMENTAL RESPONSE TRUST

2.1    Name

The name of the Environmental Response Trust shall be the "Revitalizing Auto Communities Environmental Response Trust."

2.2    Establishment of Environmental Response Trust

The Parties establish the Environmental Response Trust pursuant to this Agreement and the Settlement Agreement and as approved by the Bankruptcy Court to be effective as of the Effective Date to accomplish the purposes of the Environmental Response Trust described in Section 2.3 below and to benefit the Environmental Response Trust Beneficiary. It is the intention of the Parties that this Agreement and the Settlement Agreement constitute the

9

governing instruments of the Environmental Response Trust. As of the Effective Date, the Environmental Response Trust Administrative Trustee shall have all the rights, powers and duties set forth herein and in the Settlement Agreement with respect to accomplishing the purpose of the Environmental Response Trust as set forth below, and the Governments shall have the rights and powers set forth in this Agreement and the Settlement Agreement. Except as set forth in this Agreement or the Settlement Agreement, the Court shall retain continuing jurisdiction over the Environmental Response Trust, the Environmental Response Trust Assets and the Parties.

2.3    Purpose of the Environmental Response Trust

The exclusive purposes and functions of the Environmental Response Trust are to conduct, manage and/or fund Environmental Actions with respect to the Properties or migration of Hazardous Substances emanating from certain of the Properties in accordance with the provisions of this Agreement; to reimburse the Lead Agency for Environmental Actions it conducts with respect to the Properties; to own certain of the Properties, carry out administrative and property management functions related to the Properties and pay associated administrative costs; and to try to sell or transfer certain of the Properties with the objective that they be put to productive or beneficial use. The Environmental Response Trust shall have no objective or authority to engage in any trade or business. The performance by the Environmental Response Trust Administrative Trustee of its duties under this Agreement and the Settlement Agreement shall not be considered to be the Environmental Response Trust Administrative Trustee's engaging in a trade or business. This Environmental Response Trust is intended to satisfy all of the requirements of, and is intended by the Parties to be properly classified as, a qualified settlement fund pursuant to section 468B of the IRC and related Treasury Regulations.

2.4    Transfer of Ownership

Pursuant to the Plan of Liquidation and Paragraph 30 of the Settlement Agreement, the Parties hereby establish, on behalf of the Environmental Response Trust Beneficiary, and Settlors hereby agree to transfer, assign, and deliver to the Environmental Response Trust, or to an entity formed by the Environmental Response Trust or the Environmental Response Trust Administrative Trustee and owned by the Environmental Response Trust, if the law of the state in which the property to be transferred is situated prohibits a trust entity from holding title, on behalf of the Environmental Response Trust Beneficiary, all of Settlors' rights, title and interests in and to the Environmental Response Trust Assets. Settlors shall retain no ownership or other interest whatsoever in the Properties, the Funds or the Transferred Contracts. The transfer of ownership shall be of all of the Settlors' rights, titles and interests, and the transfer of the Properties shall be consistent with Paragraphs 30 through 32, 36 and 37 of the Settlement Agreement. The Environmental Response Trust Administrative Trustee, on behalf of the Environmental Response Trust, hereby accepts and agrees to hold the Environmental Response Trust Assets in the Environmental Response Trust for the benefit of the Environmental Response Trust Beneficiary for the purposes described in Section 2.3, subject to the terms of the Plan of Liquidation, the Settlement Agreement, this Agreement, and any applicable orders of the Court.

2.5    Transfer of Funds and Creation of Environmental Response Trust Accounts

2.5.1    Funding. On the Effective Date, the Settlors shall (i) transfer or cause to be transferred to the Environmental Response Trust or at the direction of the Environmental Response Trust Administrative Trustee cash in the amount of no less than $641,414,653, which constitutes the Environmental Response Trust Funds; (ii) pay or cause to be paid to the Expendable Trust as defined in Paragraph 79 of the Settlement Agreement the amount of $786,944; and (iii) pay or cause to be paid to the 807 Trust Fund as defined in Paragraph 80 of the Settlement Agreement the amount of $102,390. Upon the Settlors' transfer of the Properties listed in Exhibit "A" and Funds pursuant to this Agreement and the Settlement Agreement, Debtors shall have no further obligation to transfer any additional properties or funds under this Agreement, the Settlement Agreement or otherwise for the purpose of paying Environmental Costs, the costs of administering the Environmental Response Trust or for any other purpose relating to the Properties.

2.5.2    Environmental Response Trust Accounts. Upon receipt of the Properties and the Funds, the Environmental Response Trust Administrative Trustee shall set aside in separate segregated trust subaccounts (each an "Environmental Cost Account"), the Funding for Environmental Costs with respect to each Property as follows: (i) minimum estimated property funding shall be placed in a Minimum Estimated Property Funding Account containing funding amounts for each Property as set forth on Table A Column 2 attached to the Settlement Agreement and totaling $294,977,592, (ii) reserve property funding shall be placed in a Reserve Property Funding Account containing funding amounts for each Property as set forth on Table A Column 3 attached to the Settlement Agreement and totaling $52,054,867, and (iii) a Long Term OMM Property Funding Account containing funding amounts (if any) for each Property as set forth in Table A Column 4 attached to the Settlement Agreement and totaling $84,099,794. The Environmental Response Trust Administrative Trustee shall also set aside into a separate segregated trust subaccount the Cushion Funding totaling $68,282,400 (the "Cushion Funding Account"). The Environmental Response Trust Administrative Trustee shall further set aside into a separate segregated trust subaccount the Administrative Funding in an amount no less than $102 million (the "Administrative Funding Account"), and into a further separate segregated trust subaccount the Administrative Reserve Funding totaling $40 million (the "Administrative Funding Reserve Account"). The separate subaccounts are referred to in this Agreement individually as an "Environmental Response Trust Account" and collectively as the "Environmental Response Trust Accounts." The initial Funds for each of the Environmental Response Trust Accounts shall be as set forth in Paragraph 32 of the Settlement Agreement, subject to adjustment as provided by Paragraphs 36 and 37 of the Settlement Agreement. Subject to Section 2.7

11

of this Agreement, the income and gains from any investment of the Environmental Response Trust Assets in an Environmental Response Trust Account shall be allocated, paid and credited to that same Environmental Response Trust Account and shall be used for the same purposes as the principal in that Environmental Response Trust Account as provided for in, and subject to the qualifications of, Paragraph 34 of the Settlement Agreement.

2.6    Holder of Environmental Response Trust Assets

Upon transfer of the Environmental Response Trust Assets to the Environmental Response Trust, the Environmental Response Trust shall be the exclusive holder of the Environmental Response Trust Assets described herein, including the Environmental Response Trust Accounts, for purposes of 31 U.S.C. § 3713(b).

2.7    Management of Environmental Response Trust Assets

2.7.1    Consistent with this Agreement and the Settlement Agreement, including but not limited to Paragraphs 60 through 62 of the Settlement Agreement, the Environmental Response Trust shall use (i) the Minimum Estimated Property Funding Account for each of the Properties to perform or fund Environmental Actions and to reimburse the Lead Agency for Environmental Actions it conducts with respect to that Property; (ii) the Reserve Property Funding Account to perform or fund Environmental Actions applicable to that Property, and to reimburse the Lead Agency for Environmental Actions it conducts with respect to that Property, after the Property's Minimum Estimated Property Funding Account has been exhausted; and (iii) the Long Term OMM Account to fund or perform OMM at the Property, if any, beginning ten years after the Effective Date and to reimburse the Lead Agency for OMM it conducts with respect to that Property. The Environmental Response Trust Administrative Trustee shall also use the Cushion Funding Account to fund Environmental Actions at Properties under certain circumstances as provided for under the terms of this Agreement and the Settlement Agreement, including but not limited to Paragraphs 55 through 59 of the Settlement Agreement. The Environmental Response Trust Administrative Trustee shall further fund administrative expenses from the Administrative Funding Account as provided for under the terms of this Agreement and the Settlement Agreement, including but not limited to Paragraphs 52 and 54 of the Settlement Agreement.

2.7.2    Consistent with Paragraph 101 of the Settlement Agreement, the Environmental Response Trust Administrative Trustee may enter into a consent decree or consent order or agreement with the United States and/or a State or Tribe with regulatory authority, and may perform or cause to be performed work pursuant to administrative orders issued unilaterally by U.S. EPA or a State or Tribe under applicable law to

12

facilitate implementation of Environmental Actions with respect to such Property.

2.7.3    The Environmental Response Trust Administrative Trustee shall transfer Funds from or among the Environmental Cost Accounts as provided for under the Settlement Agreement, including but not limited to Paragraphs 60 through 62 of the Settlement Agreement. The Environmental Response Trust Administrative Trustee shall also transfer Funding from the Administrative Funding Account and the Administrative Funding Reserve Account as provided for under the Settlement Agreement, including but not limited to Paragraphs 52 through 54 of the Settlement Agreement.

2.8    <u>Investment and Safekeeping of Environmental Response Trust Assets</u>

2.8.1    The Environmental Response Trust Assets, until sold or otherwise disposed of as provided under the terms of this Agreement, the Settlement Agreement and the Plan of Liquidation, shall be held in trust. The Environmental Response Trust Administrative Trustee shall be under no liability for interest or producing income on any moneys received by the Environmental Response Trust hereunder and held for distribution or payment as provided in this Agreement, except as such interest is actually received by the Environmental Response Trust. Investments of any moneys held by the Environmental Response Trust shall be administered in a manner consistent with the standards and requirements of Section 704(a)(1) and (a)(2) of the Bankruptcy Code; provided, however, that the right and power of the Environmental Response Trust to invest the Environmental Response Trust Assets, the Environmental Response Trust Proceeds, or any income earned by the Environmental Response Trust, shall be limited to the right and power to invest such assets (pending periodic distributions in accordance with Article 3 hereof) in demand and time deposits, such as certificates of deposit, in banks or other savings institutions whose deposits are federally insured, or other liquid investments, such as U.S. Treasury bills, or such other investment as approved by the Governments; and provided further, that the scope of any such permissible investments shall be limited to include only those investments, or shall be expanded to include any additional investments, as the case may be, that a liquidating trust, within the meaning of the Treasury Regulations section 301.7701-4(d), may be permitted to hold, pursuant to Treasury Regulations, or any modification in the IRS guidelines, whether set forth in IRS rulings, other IRS pronouncements or otherwise (although the Parties acknowledge and agree that the Environmental Response Trust is intended to be properly characterized for U.S. federal and applicable state and local tax purposes as a qualified settlement fund within the meaning of Section 1.468B-1 of the Treasury

13

Regulations, and not as a liquidating trust under Section 301.7701-4(d) of the Treasury Regulations).

2.8.2    Consistent with Paragraph 35 of the Settlement Agreement, "separately dedicated subaccounts" may be accomplished by accounting entries and nothing herein shall preclude the Administrative Trustee from commingling funds solely for investment or administrative purposes, provided, however, that the Administrative Funding Account and Administrative Funding Reserve Account shall not be commingled with any other accounts under any circumstances and that the Environmental Response Trust Administrative Trustee is expressly prohibited from holding any or all of the Funds in a common, commingled or collective trust fund with the assets of any other entity.

2.8.3    Nothing in this Section 2.8 shall be construed as authorizing the Environmental Response Trust Administrative Trustee to cause the Environmental Response Trust to carry on any business or to derive any gains therefrom, including without limitation, the business of an investment company, or a company "controlled" by an "investment company," required to register as such under the Investment Company Act of 1940, as amended. The sole purpose of this Section 2.8 is to authorize the investment of the funds in the Environmental Response Trust Accounts or any portions thereof as may be reasonably prudent pending use of the proceeds for the purposes of the Environmental Response Trust.

2.9    <u>Insurance Policy to Cover Cost Overruns with Respect to Future Response Actions</u>

Only with the written consent of the United States on behalf of U.S. Treasury and U.S. EPA, shall the Environmental Response Trust Administrative Trustee spend any resources investigating the purchase of an insurance policy to cover cost overrun risks or re-opener risk with respect to future Environmental Actions at one or more of the Properties, with all associated costs to be funded from the Administrative Funding Account. If, and only if, the United States and the State in which, or Tribe in whose territory, the Property is located unanimously consent in writing to the purchase of such insurance, shall the Environmental Response Trust Administrative Trustee purchase such insurance, with all associated costs and premiums to be funded exclusively from the relevant Properties' Minimum Estimated Funding Account.

2.10    <u>Access and Institutional Controls</u>

As set forth in Paragraph 78 of the Settlement Agreement, the Environmental Response Trust shall at all reasonable times provide Lead Agencies and Support Agencies, as designated representatives of the Lead Agencies, as well as their contractors and consultants access to all relevant portions of the Properties for purposes of conducting Environmental Actions. Nothing in the Plan of Liquidation, the Settlement Agreement or this Agreement is intended to or shall be construed to terminate or otherwise amend any easements or deed restrictions of record as to any Property existing prior to the Effective Date. The Environmental Response Trust

14

Administrative Trustee shall abide by the terms of any institutional controls or deed restrictions in place as of the Effective Date.

### 2.11    Internal Accounting

The Environmental Response Trust Administrative Trustee shall maintain proper books, records, and accounts relating to all transactions pertaining to the Environmental Response Trust, and the assets and liabilities of, and claims against or assumed by, the Environmental Response Trust in such detail and for such period of time as may be necessary to enable the Environmental Response Trust Administrative Trustee to make full and proper accounting in respect thereof in accordance with Article 6 below and to comply with applicable provisions of law and Generally Accepted Accounting Principles ("GAAP"). Except as otherwise provided herein or by the Plan of Liquidation or the Settlement Agreement, the Environmental Response Trust Administrative Trustee shall not be required to file any accounting or seek approval of the Court with respect to the administration of the Environmental Response Trust, or as a condition for making any payment or distribution out of the Environmental Response Trust Assets. The United States shall have the right upon fourteen (14) days' prior written notice delivered to the Environmental Response Trust Administrative Trustee to inspect such books and records during normal business hours.

### 2.12    Inspection of Books

Subject to the Wind-Down, the Orders, the Related Section 363 Transactions and the Cases, as defined in the DIP Credit Facility, as amended and entered by the Court on July 5, 2009, the Environmental Response Trust shall (a) keep proper books of records and account in which full, true and correct entries in conformity with Generally Accepted Accounting Principles ("GAAP") and all requirements of law shall be made of all dealings and transactions in relation to its business and activities, and (b) permit representatives of the U.S. Treasury, the EDC, the Special Inspector General of the Troubled Asset Relief Program or the Comptroller General of the United States to visit and inspect any of its properties and examine and make abstracts from any of its books and records and other data delivered to them pursuant to the Loan Documents, as defined in the DIP Credit Facility, at any reasonable time upon reasonable notice and as often as may reasonably be desired and to discuss the business, operations, properties and financial and other condition of the Environmental Response Trust with advisors and employees of the Environmental Response Trust and with its independent certified public accountants.

### 2.13    Independent Audits

Consistent with Paragraph 76 of the Settlement Agreement, once every year, or in such other intervals as determined in accordance with Paragraph 76 of the Settlement Agreement, an independent certified public accountant selected by the United States in consultation with the States and Tribe shall conduct a financial audit of the assets, liabilities and accounting procedures of the Environmental Response Trust. The accountant will provide a written report of the financial audit to the Governments and the Environmental Response Trust Administrative Trustee within fifteen days of completing the financial audit. The Administrative Trustee shall make all books and records available to the accountant for inspection and pay the accountant's fees and expenses for conducting such audit, which shall not exceed $250,000 per audit from the

15

Administrative Funding Account. The same accountant shall not conduct more than three consecutive audits.

2.14    Termination

2.14.1 Consistent with the terms of this Agreement, the Settlement Agreement and the Plan of Liquidation, the Environmental Response Trust Administrative Trustee shall not unduly prolong the duration of the Environmental Response Trust and shall at all times endeavor to resolve, settle or otherwise dispose of all claims against Environmental Response Trust Assets and to effect the distribution of Environmental Response Trust Assets and other receipts relating thereto in accordance with the terms of this Agreement and the Settlement Agreement, and to terminate the Environmental Response Trust as soon as practicable consistent with this Agreement, the Settlement Agreement and the Plan of Liquidation.

2.14.2 The Parties agree that the rule against perpetuities does not apply to the Environmental Response Trust, but to the extent that any rule against perpetuities or a rule governing or limiting vesting, accumulations, the suspension of alienation or the like shall be deemed applicable, the Environmental Response Trust shall automatically terminate on the date 90 days after the date on which 21 years less 91 days pass after the death of the last survivor of all of the descendants of the late Joseph P. Kennedy, Sr., father of the late President John F. Kennedy, living on the date hereof, and provided further that if the Environmental Response Trust owns real property located in any jurisdiction that sets a maximum duration for interests in real property located in such jurisdiction held in trust under a rule against perpetuities or a rule governing or limiting vesting, accumulations, the suspension of alienation, or the like, that for the Environmental Response Trust is shorter than the date 90 days after the date on which 21 years less 91 days pass after the death of the last survivor of all of the descendants of the late Joseph P. Kennedy, Sr., father of the late President John F. Kennedy, living on the date hereof, the Environmental Response Trust shall automatically terminate as to such Property upon the expiration of the maximum period authorized pursuant to the laws of such jurisdiction. If the Environmental Response Trust is terminated in whole or in part pursuant to this Section 2.14.2, title to the relevant Property or Properties as to which the Environmental Response Trust is terminated shall be transferred outright and free of trust to or at the direction of the United States in consultation with any of the States in which the relevant Property or Properties are located (or the Tribe in the case of the Massena Property), provided, however, in accordance with Paragraph 83 of the Settlement Agreement, that the disposition of all relevant Property or Properties shall be governed by applicable state and federal law, or by agreement of the Environmental Response Trust Administrative Trustee, the United States and the applicable State or Tribe, or by order of the Court, and further provided that neither the

16

United States nor any State or Tribe will be required to accept an ownership interest in the relevant Property or Properties as to which the Environmental Response Trust is terminated. Any Environmental Response Trust Assets remaining upon termination of the Environmental Response Trust shall be disposed of as provided for under Paragraph 82 of the Settlement Agreement.

2.15    Property Disposition

2.15.1    The United States, the State in which a Property is located (or the Tribe in the case of the Massena Property), or a governmental unit that is a designee thereof, may at any time propose in writing to take ownership of any of the Properties or any part thereof. Any such proposed transfer and the terms thereof are subject to the notice to and consultation with the United States, the State or Tribe in whose jurisdiction the Property is located, and the affected communities. Any Property owned by the Environmental Response Trust may be sold or transferred by the Administrative Trustee after the Administrative Trustee provides notice to and consults with the United States and the applicable State or Tribe, and affected communities where the Property is located. Any sale or other disposition of a Property owned by the Environmental Response Trust shall be consistent with the provisions of Paragraphs 64 through 67 and 69 through 75 of the Settlement Agreement.

ARTICLE 3
WORK AND DISTRIBUTIONS

3.1    Budgets for and Payments by the Environmental Response Trust

3.1.1    Administrative Expenses of the Environmental Response Trust. Within ninety (90) days after the Effective Date, and on or before January 1 of each year thereafter, the Environmental Response Trust Administrative Trustee shall provide the United States with a proposed annual budget for all expenditures from the Administrative Funding Account based on the most cost-effective use of the Funds. The Administrative Trustee shall provide a copy of the proposed annual budget for the Administrative Funding Account to the U.S. Treasury for approval. The Administrative Trustee shall provide a copy of the approved annual budget for the Administrative Funding Account to the Governments. Along with each annual budget, the Administrative Trustee shall provide a separate forecast of administrative expenditures with annual details for at least the next three years (or such longer period as the United States shall reasonably request). The Administrative Trustee is authorized to expend Administrative Funding Account funds consistent with the terms of this Agreement, the Settlement Agreement and the approved annual budget described in this paragraph. The Environmental Response Trust shall

17

regularly, but not less often than annually, and otherwise upon the reasonable request of the United States, provide documentation to the United States, the States and the Tribe to substantiate compliance with the approved administrative budget. Each approved administrative budget shall include line items for emergency and unanticipated expenditures.

3.1.2    Remuneration for Environmental Response Trust Administrative Trustee's Start-Up Fees and Expenses.    The Environmental Response Trust Administrative Trustee shall, in connection with the first annual budget, be entitled to remuneration from the Environmental Response Trust Administrative Funding Account of up to $165,000 per month for its fees and expenses, including attorneys' fees, incurred from August 22, 2010, through the Effective Date in connection with the formation of the Environmental Response Trust, up to a maximum amount of $950,000. The Environmental Response Trust Administrative Trustee shall submit documentation of its expenses as part of the approval process of the first annual budget.    The Environmental Response Trust Administrative Trustee shall coordinate with the Settlors to avoid duplication of efforts.

3.1.3    Environmental Expenses of the Environmental Response Trust. Consistent with Paragraph 49 of the Settlement Agreement, the Environmental Response Trust Administrative Trustee shall oversee the preparation of balance sheets, financial statements and proposed annual budgets of projected expenditures for Environmental Costs from each of the Environmental Cost Accounts and the Cushion Funding Account. The first proposed budgets for the remainder of the current calendar year and the next calendar year shall be prepared within ninety (90) days following the Effective Date and annual budgets shall be prepared thereafter on or before each January 1 during the term of the Environmental Response Trust. The applicable Lead Agencies shall have the authority to approve or disapprove the proposed budgets consistent with Paragraph 49 of the Settlement Agreement. If disapproved, a budget shall be revised and resubmitted as expeditiously as possible. No expenses to be paid from an Environmental Cost Account may be incurred or paid by the Environmental Response Trust Administrative Trustee that are inconsistent with an approved budget, unless the Lead Agency approves an amended budget consistent with Paragraph 49 of the Settlement Agreement or any dispute relating to the budget is resolved by the Court or informal dispute resolution as set forth in Paragraphs 50 and 51 of the Settlement Agreement; provided, however, that the Environmental Response Trust Administrative Trustee may incur or pay ongoing or recurring expenses approved in the prior year's budget that occur between the time a proposed annual budget or proposed amended annual budget is submitted and the time it is approved. The Environmental Response Trust Administrative Trustee shall pay expenses and fees due to contractors, professionals or consultants hired consistent with the applicable approved annual budget or approved amended annual budget from the relevant

18

Environmental Response Trust Account. In addition, the Environmental Response Trust Administrative Trustee shall pay Funds from the relevant Environmental Cost Account or, if applicable and previously approved, Cushion Funding Account, to the Lead Agency within 10 business days of a written request by the Lead Agency for such funds if the Environmental Actions completed by the Lead Agency are consistent with the approved or approved amended annual budget for a Property. Such written request shall specify what expenditures by the Lead Agency the funds would reimburse and shall certify that such expenditures by the Lead Agency were only for Environmental Actions and/or oversight costs included in the approved or approved amended annual budget with respect to the Property. Disputes between the Environmental Response Trust Administrative Trustee and Lead Agency will be resolved in accordance with Paragraphs 50 and 51 of the Settlement Agreement.

3.1.4    <u>Emergency Environmental Action.</u>  Consistent with the provisions of Paragraph 49(ii) of the Settlement Agreement, in the event of an emergency at a Property requiring performance of an Environmental Action within hours or days of the Environmental Response Trust Administrative Trustee first receiving notice of the emergency, the Environmental Response Trust Administrative Trustee shall be authorized to utilize funding from a Property's Minimum Estimated Property Funding Account and/or Reserve Property Funding Account to conduct the emergency Environmental Actions or reimburse the Lead Agency or Support Agency for conducting the emergency Environmental Actions.

3.1.5    <u>Annual Reports.</u>  By March 1 of each year during the term of the Environmental Response Trust and within nine (9) months after termination of the Environmental Response Trust, the Environmental Response Trust Administrative Trustee shall prepare and submit to the Governments an annual report with respect to each of the Environmental Response Trust Accounts. The annual report shall pertain to the prior calendar year, or if the report is a final report, such period from the most recent annual report to the termination of the Environmental Response Trust Accounts. After receipt of an annual report, the States and Tribe shall have the right upon fourteen (14) days written notice delivered to the Environmental Response Trust Administrative Trustee to inspect the Environmental Response Trust's books and records as related to the annual report.

3.2    <u>Manner of Payment</u>

Payments made by the Environmental Response Trust pursuant to this Agreement and the Settlement Agreement shall be in United States dollars by checks drawn on a domestic bank whose deposits are federally insured selected by the Environmental Response Trust Administrative Trustee, or where possible by wire transfer from such a domestic bank, at the option of the Environmental Response Trust Administrative Trustee.

3.3    Unclaimed Distributions

Upon the termination of the Environmental Response Trust, and after payment of all obligations of the Environmental Response Trust in accordance with applicable law, the Environmental Response Trust Administrative Trustee shall, as expeditiously as is consistent with the conservation and preservation of the Environmental Trust Assets, distribute any remaining assets in the Environmental Response Trust in accordance with this Agreement and the terms of Paragraphs 53, 54, 77, and 82 of the Settlement Agreement.

ARTICLE 4
THE ENVIRONMENTAL RESPONSE TRUST ADMINISTRATIVE TRUSTEE

4.1    Appointment

4.1.1    Debtors, after approval by the United States, hereby appoint, not individually but solely in its representative capacity as Environmental Response Trust Administrative Trustee, to serve as the Environmental Response Trust Administrative Trustee, and the Environmental Response Trust Administrative Trustee hereby accepts such appointment and agrees to serve in such representative capacity, beginning on the Effective Date of this Agreement. Subject to the provisions of Section 4.11 herein, the term of the Environmental Response Trust Administrative Trustee shall be for five years at which time the Environmental Response Trust Administrative Trustee may be re-appointed or terminated as provided for under Paragraph 42 of the Settlement Agreement. Any successor Environmental Response Trust Administrative Trustee shall be appointed in accordance with Paragraph 42 of the Settlement Agreement. If the Environmental Response Trust Administrative Trustee is not reappointed and no successor Environmental Response Trust Administrative Trustee is appointed by the expiration of the Environmental Response Trust Administrative Trustee's term, the Court may, on an interim basis, reappoint the Environmental Response Trust Administrative Trustee or appoint a successor Environmental Response Trust Administrative Trustee until a successor is appointed in accordance with Paragraph 42 of the Settlement Agreement.

4.1.2    The Environmental Response Trust Administrative Trustee is authorized, consistent with the requirements of Paragraphs 46, 47, 49 and 50 of the Settlement Agreement to obtain the services of outside environmental contractors ("Contractors") and consultants ("Consultants") to implement the Environmental Actions. The Contractors and Consultants shall obtain environmental, general and professional liability insurance in the sum of no less than $25,000,000 or such lesser amount as agreed to by the Environmental Response Trust Administrative Trustee after consultation with the Governments. Additional insureds or other beneficiaries of the insurance policies shall be the Environmental Response Trust and the insurance policies shall cover negligence committed by the Contractors

20

and Consultants in implementing the future Environmental Actions or any other negligence committed by the Contractors and Consultants. The legal relationship of Contractors and Consultants to the Environmental Response Trust and Environmental Response Trust Administrative Trustee is that of an independent contractor professional, not that of an employee of the Environmental Response Trust or the Environmental Response Trust Administrative Trustee. The Contractors and Consultants shall not be deemed an Environmental Response Trust Protected Party.

4.2    General Authority

The Environmental Response Trust Administrative Trustee's powers are exercisable solely consistent with and in furtherance of the purposes of the Environmental Response Trust, and in accordance with the terms of this Agreement and the Settlement Agreement and not otherwise. The Environmental Response Trust Administrative Trustee shall have the authority to bind the Environmental Response Trust, and any successor Environmental Response Trust Administrative Trustee, or successor or assign of the Environmental Response Trust, but shall for all purposes hereunder be acting in its representative capacity as Environmental Response Trust Administrative Trustee and not individually.

4.3    Powers

In connection with the administration of the Environmental Response Trust, except as otherwise set forth in this Agreement and the Settlement Agreement, the Environmental Response Trust Administrative Trustee is authorized to perform any and all acts necessary to accomplish the purposes of the Environmental Response Trust. However the Environmental Response Trust Administrative Trustee shall take all best efforts to take no action that causes the Environmental Response Trust to fail to qualify as a qualified settlement fund (for which no grantor trust election has been made) under section 468B of the Internal Revenue Code and the Treasury Regulations thereunder. Expenditure of funds by the Environmental Response Trust Administrative Trustee to conduct, manage and/or fund Environmental Actions with respect to the Properties or migration of Hazardous Substances emanating from certain of the Properties in accordance with the provisions of this Agreement; to reimburse the Lead Agency for Environmental Actions it conducts with respect to the Properties; to own certain of the Properties, carry out administrative and property management functions related to the Properties and pay associated administrative costs; and to try to sell or transfer certain of the Properties with the objective that they be put to productive or beneficial use shall not be deemed to result in a breach of the preceding sentence. The powers of the Environmental Response Trust Administrative Trustee shall, without any further Court approval or order, include, without limitation, each of the following:

4.3.1    to receive, manage, invest, supervise and protect the Environmental Response Trust Assets, withdraw, make distributions and pay taxes and other obligations owed by the Environmental Response Trust or the Environmental Response Trust Accounts from funds held by the Environmental Response Trust Administrative Trustee and/or the Environmental Response Trust (or the Environmental Response Trust

Accounts) in accordance with this Agreement and the Settlement Agreement, and withhold and pay to the appropriate taxing authority any withholding taxes on distributions from the Environmental Response Trust;

4.3.2 to invest in, and only in, demand and time deposits such as certificates of deposit, in banks or other savings institutions or other liquid investments, such as a U.S. Treasury bills as permitted by Section 345 of the Bankruptcy Code or as otherwise permitted by the Bankruptcy Court or agreed to by the Governments, but including only those investments, and expanded to include any additional investments, as the case may be, that a liquidating trust, within the meaning of Treasury Regulation Section 301.7701-4(d), may be permitted to hold, pursuant to Treasury Regulations, or any modification in the IRS guidelines, whether set forth in IRS rulings, other IRS pronouncements or otherwise;

4.3.3 to incur or assume liabilities in furtherance of or in connection with the Environmental Response Trust Administrative Trustee's or the Environmental Response Trust's duties, powers, authority, and obligations under this Agreement and the Settlement Agreement and determine and satisfy any and all liabilities created, incurred or assumed by the Environmental Response Trust;

4.3.4 to make distributions of the Environmental Response Trust Assets from the Environmental Response Trust Accounts for the purposes contemplated in this Agreement, the Settlement Agreement and the Plan of Liquidation;

4.3.5 to engage and retain employees, counsel and other professionals in a manner not inconsistent with the terms of this Agreement and the Settlement Agreement to assist the Environmental Response Trust Administrative Trustee with respect to the responsibilities described herein, on such terms as the Environmental Response Trust Administrative Trustee deems appropriate, without Bankruptcy Court approval;

4.3.6 to perform duties, exercise the powers, and assert the rights of a trustee under Sections 704(a)(1) and 704(a)(2) of the Bankruptcy Code;

4.3.7 to obtain general liability insurance, pollution legal liability insurance for third-party bodily injury and property damage risks and other reasonable insurance coverage, including errors and omissions and directors and officers liability insurance, with respect to the Environmental Response Trust Administrative Trustee's liabilities and obligations as Environmental Response Trust Administrative Trustee under this Agreement and the Settlement Agreement (in the form of an errors and omissions policy or otherwise) and indemnification for the Environmental Response Trust

22

Administrative Trustee and others to the extent provided for in the Plan of Liquidation, this Agreement, and the Settlement Agreement;

4.3.8    to request any appropriate tax determination with respect to the Environmental Response Trust, protest, contest or otherwise object to any such tax determination, and make any tax election, settle or compromise any tax liability, or consent to any claim or assessment relating to taxes;

4.3.9    to effect all actions and execute all agreements, instruments and other documents necessary to implement this Agreement and the Settlement Agreement, including to exercise such other powers as may be vested in or assumed by the Environmental Response Trust and/or the Environmental Response Trust Administrative Trustee pursuant to this Agreement and any order of the Court or as may be necessary and proper to carry out the provisions of this Agreement. No Person dealing with the Environmental Response Trust shall be obligated to inquire into the authority of the Environmental Response Trust Administrative Trustee in connection with the protection, conservation or disposition of Environmental Response Trust Assets. The Environmental Response Trust Administrative Trustee is authorized to execute and deliver all documents on behalf of the Environmental Response Trust to accomplish the purposes of this Agreement and the Settlement Agreement;

4.3.10    to prosecute and defend lawsuits or administrative actions or proceedings on behalf of the Environmental Response Trust;

4.3.11    to take all other appropriate action with respect to the Environmental Trust Assets to the extent consistent with the purpose of the Environmental Response Trust; and

4.3.12    to file, if necessary, any and all tax and information returns with respect to the Environmental Response Trust, and pay taxes, if any, payable by the Environmental Response Trust.

4.4    Cleanup Managers

4.4.1    In connection with the administration of the Environmental Response Trust, the Environmental Response Trust Administrative Trustee is authorized to, consistent with the requirements of Paragraph 45 of the Settlement Agreement, employ on behalf of the Environmental Response Trust Cleanup Managers who will report to, and be subject to the supervision of, the Environmental Response Trust Administrative Trustee.

4.4.2    As provided for by Paragraph 45 of the Settlement Agreement, the Cleanup Managers shall be acceptable to the Lead Agencies with jurisdiction over Properties within the respective Cleanup Manager's responsibilities, and each Cleanup Manager is subject to the disapproval of the applicable Lead Agencies. Any Lead Agency may request that the

Environmental Response Trust Administrative Trustee replace the Cleanup Manager whose responsibilities include the Properties within the Lead Agency's jurisdiction, and the Environmental Response Trust Administrative Trustee may replace a Cleanup Manager at any time, provided that the new Cleanup Manager is acceptable to the applicable Lead Agencies. Costs associated with the Cleanup Managers will be paid from the Administrative Funding Account.

### 4.5    Redevelopment Manager

4.5.1    In connection with the administration of the Environmental Response Trust, the Environmental Response Trust Administrative Trustee is authorized to, consistent with the requirements of Paragraph 48 of the Settlement Agreement, employ on behalf of the Environmental Response Trust a Redevelopment Manager who will report to, and be subject to the supervision of, the Environmental Response Trust Administrative Trustee, to assist the Environmental Response Trust Administrative Trustee in dealing with the sale, lease or redevelopment of Properties.

4.5.2    As provided for under Paragraph 48 of the Settlement Agreement, the Redevelopment Manager's duties will include consulting with applicable federal and state officials working on redevelopment issues and affected communities where the Property is located, and the Redevelopment Manager's expenses will be paid from the Administrative Funding Account.

### 4.6    Retention of Professionals

The Environmental Response Trust Administrative Trustee is authorized to retain on behalf of the Environmental Response Trust and pay such third parties as the Environmental Response Trust Administrative Trustee (in accordance with a budget approved pursuant to Section 3.1 above) may deem necessary or appropriate to assist the Environmental Response Trust Administrative Trustee in carrying out its powers and duties under this Agreement, the Settlement Agreement and the Plan of Liquidation, including, without limitation, (i) counsel to the Environmental Response Trust and/or Environmental Response Trust Administrative Trustee, (ii) a public accounting firm to perform such accounting functions as may be required to (a) maintain the books and records of the Environmental Response Trust as required by this Agreement or the Settlement Agreement; (b) review and/or audit the financial books and records of the Environmental Response Trust as may be appropriate in the Environmental Response Trust Administrative Trustee's reasonable discretion; and (c) prepare and file any tax returns or informational returns for the Environmental Response Trust or the Environmental Response Trust Accounts as may be required, and (iii) environmental consultants, custodians, appraisers, security personnel, engineers, surveyors, brokers, contractors, and clerks. The Environmental Response Trust Administrative Trustee may pay all such Persons compensation for services rendered and expenses incurred in accordance with a budget approved as provided in Section 3.1.

24

4.7    Executive Compensation

The Environmental Response Trust shall take all necessary action to ensure that it complies in all respects with, and shall take all other actions necessary to comply with, (i)) Section 111 of the Emergency Economic Stabilization Act of 2008 ("EESA"), as implemented by any guidance or regulation thereunder, including the rules set forth in 31 C.F.R. Part 30, or any other guidance or regulations under the EESA, as the same shall be in effect from time to time (collectively, the "Compensation Regulations"), and (ii) any rulings, limitations or restrictions implemented or issued by the Office of the Special Master for Troubled Asset Relief Program Executive Compensation with respect to the Environmental Response Trust.  The Environmental Response Trust shall also take all necessary action to ensure that it complies in all respects with, and shall take all other actions necessary to comply with, the Employ American Workers Act.

4.8    Limitation of the Environmental Response Trust Administrative Trustee's Authority

The Environmental Response Trust and the Environmental Response Trust Administrative Trustee shall have no authority to do any of the following:

4.8.1    engage in any trade or business with respect to the Environmental Response Trust Assets or collect any proceeds therefrom except as, and to the extent the same is deemed in good faith by the Environmental Response Trust Administrative Trustee, to be reasonably necessary or proper for the conservation or protection of the Environmental Response Trust Assets, or the fulfillment of the purposes of the Environmental Response Trust;

4.8.2    take any action in contravention of this Agreement, the Settlement Agreement, the Plan of Liquidation, the Confirmation Order or applicable law, or any action that would make it impossible to carry on the activities of the Environmental Response Trust; or

4.8.3    except as otherwise set forth in this Agreement or the Settlement Agreement, possess property of the Environmental Response Trust or assign the Environmental Response Trust's rights in specific property for other than purposes of the Environmental Response Trust.

4.9    Reliance by the Environmental Response Trust Protected Parties

Except as may otherwise be provided herein: (a) the Environmental Response Trust Protected Parties, the Environmental Response Trust and the Administrative Trustee may rely, and shall be protected in acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, or other paper or document believed by them to be genuine and to have been signed or presented by the proper party or parties; (b) the Environmental Response Trust Protected Parties may consult with legal counsel, financial or accounting advisors and other professionals and shall not be personally liable for any action taken or not taken in accordance with the advice thereof; and (c) persons or entities dealing with

the Environmental Response Trust Protected Parties, the Environmental Response Trust and the Administrative Trustee shall look only to the Environmental Response Trust assets that may be available to them consistent with this Agreement and the Settlement Agreement to satisfy any liability incurred by the Environmental Response Trust Protected Parties to such person or entity in carrying out the terms of this Agreement, the Settlement Agreement, the Plan or any order of the Bankruptcy Court, and the Environmental Response Trust Protected Parties shall have no liability absent a finding by Final Order of fraud or willful misconduct.

4.10    Cost Reimbursement of the Environmental Response Trust Administrative Trustee

The Environmental Response Trust shall pay its own reasonable and necessary costs and expenses, and shall reimburse the Environmental Response Trust Administrative Trustee for the actual reasonable out-of-pocket fees and expenses to the extent incurred by the Environmental Response Trust Administrative Trustee's duties hereunder, including, without limitation, necessary travel, lodging, office rent, postage, photocopying, telephone and facsimile charges upon receipt of periodic billings, all in accordance with the applicable approved annual budget or approved amended annual budget and in accordance with the U.S. Department of Justice Fee Guidelines for Reviewing Applications for Compensation & Reimbursement of Expenses filed under 11 U.S.C. § 330, reprinted at 28 C.F.R. Part 58, without the necessity of court approval. In no event shall any of the Environmental Response Trust Protected Parties be compensated (i) at a rate above $500 per hour for the first 1,500 hours billed by an individual in a calendar year; (ii) at a rate above $400 per hour for any hours billed in excess of 1,500 hours by any individual during a calendar year; (iii) on the basis of a fee structure that includes blended hourly rates; or (iv) on the basis of a fee structure that includes incentive compensation.

4.11    Liability of Environmental Response Trust Protected Parties

In no event shall the Environmental Response Trust Protected Parties be held liable to any third parties for any liability, action, or inaction of any other Party including each other and the Settlors. The Environmental Response Trust Protected Parties shall, further, be indemnified and exculpated in accordance with Section 4.12 of this Agreement.

To the extent provided in the Settlement Agreement, the Environmental Response Trust Protected Parties are deemed to have resolved their civil liability to the Governments arising from or relating to the Properties under CERCLA, RCRA, and State environmental statutes, as well as any other environmental liabilities asserted in the Governments' proofs of claim, and have protection from contribution actions or claims as provided by Sections 113(f)(2) of CERCLA, 42 U.S.C. § 9613(f)(2) or similar state law for matters addressed in the Settlement Agreement. The Environmental Response Trust Protected Parties shall have the benefits of the covenants not to sue, contribution protections, and the other protection provisions as set forth in the Settlement Agreement.

26

4.12    Exculpation and Indemnification

The Environmental Response Trust Protected Parties shall be exculpated and indemnified and held harmless, consistent with the provisions of this Section 4.12 for any claims, causes of action, or other assertions of liability arising out of or in connection with:

(a) the ownership of Environmental Response Trust Assets;

(b) the discharge of duties and powers conferred upon the Environmental Response Trust and/or Environmental Response Trust Administrative Trustee by this Agreement, the Settlement Agreement and the Plan of Liquidation, any order of the Court, or applicable law or otherwise, including the performance of an Environmental Action on behalf of the Environmental Response Trust and the making of payments in accordance with this Agreement, the Settlement Agreement and the Plan of Liquidation, or any order of court, and the implementing of the provisions of this Agreement, the Settlement Agreement and the Plan of Liquidation or any order of court; or

(c) any claim by or against Settlors.

4.12.1    Exculpation.  The Environmental Response Trust Protected Parties and the Environmental Response Trust are exculpated by all persons, including without limitation, holders of claims and other parties in interest, of and from any and all claims, causes of action and other assertions of liability arising out of or in connection with the matters contained in Section 4.12 (a), (b), and (c).  No person, including without limitation, holders of claims and other parties in interest, shall be allowed to pursue any claims or cause of action against any Environmental Response Trust Protected Party or the Environmental Response Trust for any claim against the Debtors, for making payments in accordance with the Settlement Agreement or any order of court, or for implementing the provisions of this Agreement, the Settlement Agreement, the Plan or any order of court.  However, nothing in this Section 4.12.1 or this Agreement or the Settlement Agreement shall preclude the Governments from enforcing their rights under this Agreement or the Settlement Agreement, including but not limited to any rights relating to a finding by Final Order of fraud or willful misconduct.

4.12.2    Indemnification.  The Environmental Response Trust shall indemnify, defend and hold harmless (without the Environmental Response Trust Protected Parties having to first pay from their personal funds) the Environmental Response Trust Protected Parties from and against any and all claims, causes of action, liabilities, obligations, losses, costs, taxes, judgments, damages or expenses (including attorneys' fees and expenses) and any other assertion of liability arising out of or in connection with the matters contained in the provisions of Section 4.12 (a), (b) and (c) (collectively, the "Indemnifiable Expenses"), to the fullest extent

27

permitted by applicable law. Unless a determination is made by a Final Order of the Bankruptcy Court finding that an Environmental Response Trust Protected Party committed fraud or willful misconduct in relation to the Environmental Response Trust Protected Party's duties (i) the Indemnifiable Expenses shall be paid from the Minimum Estimated Property Funding Account or Reserve Property Funding Account for the relevant Property if the Indemnifiable Expenses relate to an Environmental Action at the Property, and otherwise shall be paid from the Administrative Funding Account; and (ii) any judgment against Environmental Response Trust Parties shall be paid from the Minimum Estimated Property Funding Account or Reserve Property Funding Account for the relevant Property if the judgment relates to an Environmental Action at the Property, and otherwise shall be paid from the Administrative Funding Account. In the event that the Indemnifiable Expenses are paid from the Minimum Estimated Property Funding Account or Reserve Property Funding Account, any payment shall be limited to funds in the Minimum Estimated Property Funding Account or the Reserve Property Funding Account for the relevant Property, as applicable. Notwithstanding the foregoing, to the extent fraud or willful misconduct of any Environmental Response Trust Protected Party is alleged and the Court finds, by a Final Order, that such Environmental Response Trust Protected Party committed fraud or willful misconduct after the Effective Date in relation to the Environmental Response Trust Administrative Trustee's duties that are alleged to be the basis for liability, there shall be no indemnification and no reimbursement for costs of defense of that Environmental Response Trust Protected Party for any judgments arising from such allegations of fraud or willful misconduct (the "Carved Out Expenses"). The Environmental Response Trust shall advance to any Environmental Response Trust Protected Party incurring any Indemnifiable Expenses such amounts, on a monthly basis, if the Environmental Response Trust Protected Party provides the Environmental Response Trust with an undertaking reasonably satisfactory to the Environmental Response Trust Administrative Trustee that such Environmental Response Trust Protected Party will repay any amounts finally determined to be Carved Out Expenses.

4.12.3  It shall be an irrebuttable presumption that any action taken, or inaction, consistent with Court approval or approval of another court of competent jurisdiction shall not constitute willful misconduct or fraud.

4.13  <u>Termination of the Environmental Response Trust, Replacement or Removal of the Environmental Response Trust Administrative Trustee.</u>

4.13.1  <u>Termination.</u>    The duties, responsibilities and powers of the Environmental Response Trust Administrative Trustee will terminate on the date the Environmental Response Trust is terminated under applicable law in accordance with this Agreement and the Settlement Agreement, or

by an order of the Court; provided that this Section and Sections 4.9, 4.11 and 4.12 above shall survive such termination. The Environmental Response Trust's duties to conduct Environmental Actions at a Property shall terminate when (i) the Lead Agency and Support Agency for the Property agrees in writing; or (ii) the purchaser of the Property agrees to assume responsibility for all Environmental Actions with respect to the Property in conformity with all applicable provisions of this Agreement and the Settlement Agreement. Prior to such termination errors and omissions insurance shall be established.

4.13.2. Resignation. The Environmental Response Trust Administrative Trustee may resign by giving not less than ninety (90) days prior written notice thereof to the Court.

4.13.3 Replacement. Consistent with the provisions of the Settlement Agreement, the Environmental Response Trust Administrative Trustee may be replaced upon completion of any five (5) year term, however, this Section and Sections 4.9, 4.11 and 4.12 above shall survive such replacement.

4.13.4 Removal. The Environmental Response Trust Administrative Trustee may be removed, if such removal is consistent with the terms of the Settlement Agreement, by:

(1) The entry of a Final Order by the Court, finding that the Administrative Trustee: (i) committed fraud or willful misconduct after the Effective Date in relation to the Environmental Response Trust Administrative Trustee's duties under the Environmental Response Trust; (ii) has in any material respect, as a result of negligence, exacerbated conditions at any of the Properties; (iii) has been seriously or repeatedly deficient or seriously or repeatedly negligent or late in the performance of its duties, or (iv) has violated the provisions of the Settlement Agreement or this Agreement. In the event of a finding by the Bankruptcy Court of the occurrence of the events set forth in the foregoing clauses (i), (ii), (iii), or (iv), the United States and the State in which, or Tribe in whose territory, the relevant Property is located may jointly direct that the Environmental Response Trust Administrative Trustee be replaced in accordance with this Agreement. The removal of the Environmental Response Trust Administrative Trustee under this Section 4.13.4(1) and 4.13.4.(2) shall become effective immediately upon notice of appointment of a temporary or permanent successor. The provisions of this Section and Section 4.9, 4.11 and 4.12 above shall survive the removal of the Environmental Response Trust Administrative Trustee.

(2) Other than with respect to removal for fraud or willful misconduct, the Environmental Response Trust Administrative Trustee shall continue to be compensated and his expenses reimbursed until a successor Environmental Response Trust Administrative Trustee is in place.

4.14    Appointment of Successor Environmental Response Trust Administrative Trustees

Any successor Environmental Response Trust Administrative Trustee shall be selected in accordance with the provisions of Paragraph 42 of the Settlement Agreement and appointed by the Court. Any successor Environmental Response Trust Administrative Trustee appointed hereunder shall execute an instrument accepting such appointment hereunder and shall file such acceptance with the Environmental Response Trust records. Thereupon, such successor Environmental Response Trust Administrative Trustee shall, without any further act, become vested with all the estates, properties, rights, powers, trusts and duties of its predecessor in the Environmental Response Trust with like effect as if originally named herein; provided, however, that a removed, incapacitated or resigning Environmental Response Trust Administrative Trustee shall, nevertheless, when requested in writing by the successor Environmental Response Trust Administrative Trustee, execute and deliver an instrument or instruments conveying and transferring to such successor Environmental Response Trust Administrative Trustee under the Environmental Response Trust all the estates, properties, rights, powers, and trusts of such predecessor Environmental Response Trust Administrative Trustee.

4.15    No Bond

Notwithstanding any state law to the contrary, the Environmental Response Trust Administrative Trustee, including any successor Environmental Response Trust Administrative Trustee, shall be exempt from providing any bond or other security in any jurisdiction, except as specifically set forth in Settlement Agreement Paragraphs 79 through 81.


ARTICLE 5
ENVIRONMENTAL RESPONSE TRUST BENEFICIARY
AND POWERS AND RIGHTS HOLDERS

5.1    Environmental Response Trust Beneficiary

Beneficial interests in the Environmental Response Trust shall be held by the United States.

5.2    Identification of Environmental Response Trust Beneficiary

5.2.1    In order to determine the actual names and addresses of the authorized representatives of the United States, the Environmental Response Trust and the Environmental Response Trust Administrative Trustee shall be entitled to rely conclusively on the name and address of the authorized representative for the United States listed below in Section 5.2.3, who may

30

from time to time provide additional or replacement names and addresses of authorized representatives, or listed in any written notice provided to the Environmental Response Trust Administrative Trustee in the future by an authorized representative of the United States.

5.2.2   The Environmental Response Trust Administrative Trustee shall send copies of all reports, budgets, annual balance statements, and other documents that the Environmental Response Trust Administrative Trustee is required to submit to the United States under this Agreement and the Settlement Agreement, and related implementation documents including any unilateral administrative orders, consent decrees, or administrative orders on consent to the following person(s), as applicable:

Authorized representative and party to receive all notices under Section 5.2.2:

The United States:

Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Ben Franklin Station
Washington, DC 20044
Ref. DOJ File No. 90-11-3-1-09754

David S. Jones
Natalie N. Kuehler
Assistant United States Attorneys
Office of the United States Attorney
for the Southern District of New York
86 Chambers Street, Third Floor
New York, NY 10007
Tel.: (212) 637-2739/2741
Fax: (212) 637-2750
Email: David.Jones6@usdoj.gov
        Natalie.Kuehler@usdoj.gov

U.S. EPA:

Bob Roberts
Attorney-Advisor
U.S. Environmental Protection Agency
Ariel Rios Building
1200 Pennsylvania Avenue, NW
Washington, DC 20460
Mail Code: 2272A
Tel.: (202) 564-4267

31

Fax: (202) 501-0269
Email: roberts.robert@epa.gov

U.S. EPA Region 2:
Marla E. Wieder
Joel E. Singerman
U.S. EPA, Region 2
290 Broadway
New York, NY 10007-1866
Tel.: (212) 637-3184
Fax: (212) 678-2424
Email: Wieder.Marla@epa.gov
       Singerman.Joel@epa.gov

U.S. EPA Region 5:
Peter Felitti
Jose Cisneros
U.S. EPA, Region 5
77 West Jackson Boulevard
Chicago, IL 60604
Tel.: (312) 886-5114
Fax: (312) 692-2495
Email: Felitti.Peter@epamail.epa.gov
       Cisneros.Jose@epamail.epa.gov

U.S. Treasury:
United States Department of the Treasury
1500 Pennsylvania Avenue, NW
Washington, D.C. 20220
Attention: Chief Counsel, Office of Financial Stability
Fax: (202) 927-9225
Email: OFSChiefCounselNotices@do.treas.gov

5.3    Settlors and Powers and Rights Holders

Upon the Effective Date of this Agreement, the Settlors shall have no interests including, without limitation, any reversionary interest, in the Environmental Response Trust or any Environmental Response Trust Assets. Upon the Effective Date of this Agreement, the States and Tribe shall have the rights and powers provided to them under this Agreement and the Settlement Agreement, including the right to receive certain notices, reports and other materials.

5.3.1    In order to determine the actual names and addresses of the authorized representatives of a State or Tribe, the Environmental Response Trust and the Environmental Response Trust Administrative Trustee shall be entitled to rely conclusively on the name and address of the authorized

32

representative for such State or the Tribe listed below in Section 5.3.2, who may from time to time provide additional or replacement names and addresses of authorized representatives, or listed in any written notice provided to the Environmental Response Trust Administrative Trustee in the future by an authorized representative of such State or the Tribe.

5.3.2    The Environmental Response Trust Administrative Trustee shall send copies of all reports, budgets, annual balance statements, and other documents that the Environmental Response Trust Administrative Trustee is required to submit to a State or the Tribe under this Agreement and the Settlement Agreement, and related implementation documents including any unilateral administrative orders, consent decrees, or administrative orders on consent to the following person(s), as applicable:

The State of Delaware

Kathleen M. Stiller
Program Manager II
DNREC-SIRB
391 Lukens Drive
New Castle, DE 19720
Phone: 302-395-2600
Fax: 302-395-2601
Email: Kathleen.Stiller@state.de.us

and

Robert S. Kuehl
Deputy Attorney General
DNREC-SIRB
391 Lukens Drive
New Castle, DE 19720
Phone: 302-395-2600
Fax: 302-395-2601
Email: Robert.Kuehl@state.de.us

The State of Illinois

James Morgan, AAG
Environmental Bureau South
Office of the Attorney General
500 South Second Street
Springfield, IL 62706
Tel.: 217-524-7506
Email: jmorgan@atg.state.il.us

33

and

James Kropid
Illinois Environmental Protection Agency
Division of Legal Counsel
P.O. Box 19276
1021 North Grand Avenue East
Springfield, IL 62794-9276
Tel.: 217-782-5544
Email: james.kropid@illinois.gov


The State of Indiana

Timothy J. Junk, Dep. Atty. Gen.
Office of the Attorney General
Indiana Government Center South, Fifth Floor
302 West Washington Street
Indianapolis, IN 46204
Tel.: (317) 232-6247
Email: tim.junk@atg.in.gov

and

Michael E. Sickels, Sen. Tech. Adv.
Indiana Department of Environmental Management
Office of Land Quality
100 North Senate Avenue
MC 66-30 IGCN 1101
Indianapolis, IN 46204-2251
Tel.: (317) 232-3406
Email: msickels@idem.in.gov


The State of Kansas

Rick Bean
Section Chief,
Remediation Section
Bureau of Environmental Remediation
Division of the Environment
Kansas Department of Health and Environment
1000 SW Jackson
Topeka, KS 66612-1368

and

34

Paul Gerard Marx
Attorney
Kansas Department of Health and Environment
1000 SW Jackson, Suite 560
Tel.: (785) 296-6917
Fax: (785) 296-7119
Email: pmarx@kdheks.gov


The State of Michigan

Delores Montgomery, Chief
Hazardous Waste Section
Environmental Resource Management Division
Michigan Department of Natural Resources and Environment
Constitution Hall, Atrium North
525 West Allegan Street
Lansing, MI  48933
Tel.: (517) 373-7973
Fax: (517) 373-4797
Email: montgomeryd1@michigan.gov

and

Chief; Redevelopment and Enforcement Support Unit
Compliance and Enforcement Section, Remediation Division
Michigan Department of Natural Resources and Environment
Constitution Hall
525 West Allegan Street
Lansing, MI  48933
Tel.: (517) 373-7508
Fax: (517) 241-9581
Email: monroeb@michigan.gov

and

Celeste R. Gill (P52484)
Assistant Attorney General
Environment, Natural Resources and Agriculture Division
6th Floor, G. Mennen Williams Building
525 West Ottawa Street
P.O. Box 30755
Lansing, MI  48909
Tel.: (517) 373-7540
Fax: (517) 373-1610
Email: gillc1@michigan.gov

<u>The State of Missouri</u>

Harry D. Bozoian
Department General Counsel
Missouri Department of Natural Resources
P.O. Box 176
1101 Riverside Drive
Jefferson City, MO 65102
Tel: (573) 751-0323
Email: harry.bozoian@dnr.mo.gov

and

David J. Lamb
Director, Hazardous Waste Program
PO Box 176
Jefferson City, MO 65102
Tel: (573) 751-2747
Email: david.lamb@dnr.mo.gov

and

John K. McManus, or his successor
Chief Counsel
Agriculture and Environment Division
P.O. Box 899
Jefferson City, MO 65102
Tel: (573) 751-8370
Fax: (573) 751-8796
Email: jack.mcmanus@ago.mo.gov

<u>The State of New Jersey</u>

Section Chief,
Cost Recovery/Natural Resource Damages Section
Office of the Attorney General
Department of Law and Public Safety Division of Law
25 Market Street
P.O.Box 093
Trenton, New Jersey 08625-0093

<u>The State of New York</u>

Maureen Leary
Assistant Attorney General
Chief, Toxics Section
NYS Department of Law
Environmental Protection Bureau
The Capitol
Albany, New York 12224-0341
Tel.: (518) 474-7154
Fax: (518) 473-2534
maureen.leary@ag.ny.gov


<u>The State of Ohio</u>

Laurie Stevenson
Deputy Director, Business Relations
Ohio Environmental Protection Agency
50 W. Town Street
Columbus, Ohio 43215
Tel.: (614) 644-2782
Fax: (614) 614-3184
Email: laurie.stevenson@epa.state.oh.us

and

Dale T. Vitale
Assistant Attorney General
30 E. Broad Street, 25th Floor
Columbus, Ohio  43215
Tel.: (614) 466-2766
Fax: (614) 644-1926
Email:  dale.vitale@ohioattorneygeneral.gov


<u>The Commonwealth of Virginia</u>

Melanie D. Davenport, Director
Division of Enforcement
Virginia Department of Environmental Quality
629 East Main Street
Richmond, Virginia  23219
Tel.: (804) 698-4038

The State of Wisconsin

Darsi Foss, Chief, Brownfields and Outreach Section
Bureau of Remediation and Redevelopment
Wisconsin Department of Natural Resources
101 South Webster Street, PO Box 7921
Madison, WI 53707-7921
Tel: (608) 267-6713
Fax: (608) 267-7646
E-mail: Darsi.Foss@wisconsin.gov

and

Janet DiMaggio, Project Manager
Wisconsin Department of Natural Resources – South Central Region
3911 Fish Hatchery Road
Fitchburg WI 53711
Tel: 608-275-3295
Fax: 608-275-3338
Email: janet.dimaggio@wisconsin.gov

and

Kathleen Strasbaugh, Staff Attorney
Bureau of Legal Services
Wisconsin Department of Natural Resources
101 South Webster Street, PO Box 7921
Madison, WI 53707-7921
Tel: (608) 266-0911
Fax: (608) 266-6983
Email: Kathleen.Strasbaugh@wisconsin.gov

and

Anne C. Murphy, Assistant Attorney General
Wisconsin Department of Justice
P.O. Box 7857
Madison, WI 53707-7857
Tel: (608) 266-9224
Fax: 608-267-2779
Email: MurphyAC@doj.state.wi.us

<u>The Louisiana Department of Environmental Quality</u>

Christopher A. Ratcliff
Attorney Supervisor
Louisiana Department of Environmental Quality
P.O. Box 4302
Baton Rouge, Louisiana 70821-4302
Tel.: 225-219-3985
Email: chris.ratcliff@la.gov


<u>The Massachusetts Department of Environmental Protection</u>

Stephen Johnson
Deputy Regional Director, Bureau of Waste Site Cleanup
Northeast Regional Office
Massachusetts Department of Environmental Protection
205B Lowell Street
Wilmington, MA 01887.

and

Jennifer Davis
Senior Counsel
Office of General Counsel
Massachusetts Department of Environmental Protection
One Winter Street
Boston, MA 02108


<u>The Department of Environmental Protection of the Commonwealth of Pennsylvania</u>

David Eberle
Environmental Cleanup Program Manager
Department of Environmental Protection of the Commonwealth of PA
400 Waterfront Drive
Pittsburgh, PA 15222-4745
Tel.: (412) 442-4156
Fax: (412) 442-4194
Email: deberle@state.pa.us

<u>The Saint Regis Mohawk Tribe</u>

John J. Privitera, Esq.
McNamee, Lochner, Titus & Williams, P.C.
677 Broadway
Albany, NY  12207
Tel.: (518) 447-3200
Fax: (518) 426-4260
Email: privitera@mltw.com

and

St. Regis Mohawk Tribe
Director, Environment Division
Community Building
412 Route 37
Akwesasne, NY  13655
Tel.: (518) 358-5937
Fax: (518) 358-6252

ATTN:Kenneth Jock
Email: ken.jock@srmt-nsn.gov

5.4    <u>Transfer of Beneficial Interests, Rights and Powers</u>

The beneficial interest of the United States in the Environmental Response Trust, and the rights and powers provided to the Governments in this Agreement and the Settlement Agreement, are not negotiable and may not be transferred other than by order of the Court.

ARTICLE 6
REPORTING AND TAXES

6.1    <u>Reports</u>

As soon as practicable after the end of the second and fourth quarters of each calendar year, beginning with the first such quarter ended after assets are first received by the Environmental Response Trust and ending as soon as practicable upon termination of the Environmental Response Trust, the Environmental Response Trust shall submit to the Governments a written report, including: (a) financial statements of the Environmental Response Trust through the end of such calendar quarter; and (b) a description of any action taken by the Environmental Response Trust in the performance of its duties which, as determined by outside counsel, accountants or other professional advisors, materially and adversely affects the Environmental Response Trust and of which notice has not previously been given to the Governments. The Environmental Response Trust shall promptly submit additional reports to the Governments whenever, as determined by outside counsel, accountants or other professional

40

advisors, an adverse material event or change occurs which affects either the Environmental Response Trust or the rights of the Persons receiving distributions (including, without limitation, the Governments) hereunder. The Environmental Response Trust shall also provide the reports or information required by Section 3.1 of this Agreement.

6.2    Other

The Environmental Response Trust shall also file (or cause to be filed) any other statements, returns or disclosures relating to the Environmental Response Trust, that are required by any applicable governmental unit.

6.3    Reports in Support of Insurance Claims

The Environmental Response Trust shall also file (or cause to be filed) reports and cost analyses in support of claims against insurance carriers at the request of the Governments and shall provide the Governments a copy of any such reports and cost analyses.

6.4    Tax Treatment of the Environmental Response Trust

Except as provided in the following sentence, for U.S. federal and applicable state and local income tax purposes, all Parties shall treat the Environmental Response Trust as a qualified settlement fund within the meaning of Treasury Regulation section 468B-1 (for which no grantor trust election has been made) and, to the extent provided by law, this Agreement shall be governed and construed in all respects consistently with such treatment. The preceding sentence shall not be binding on the Internal Revenue Service as to the application of Treasury Regulation section 1.468B-1 or any other tax issue with respect to the Environmental Response Trust. Following the funding of the Environmental Response Trust (and in no event later than February 15th of the calendar year following the funding of the Environmental Response Trust), the Settlors shall provide a "§ 1.468B-3 Statement" to the Environmental Response Trust Administrative Trustee in accordance with Treasury regulation section 1.468B-3(e). Prior to the delivery of the § 1.468B-3 Statement, the Environmental Response Trust Administrative Trustee may reasonably consult with the Settlors,

6.5    Taxable Entity

In connection with the foregoing, the Environmental Response Trust will be treated as a separate taxable entity. The Environmental Response Trust Administrative Trustee shall cause any property taxes imposed on property owned by the Environmental Response Trust, and all other taxes imposed on the Environmental Response Trust or its earnings, to be timely paid out of the Administrative Funding Account, and shall timely comply with all tax reporting and withholding requirements imposed on the Environmental Response Trust under applicable law. Subject to definitive guidance from the Internal Revenue Service or a judicial decision to the contrary, the Environmental Response Trust Administrative Trustee shall file tax returns and pay applicable taxes with respect to the Environmental Response Trust in a manner consistent with the provisions of Treasury Regulation Section 1.468B-2. All such taxes shall be paid from the Administrative Funding Account.

41

6.6    Trustee as Administrator

The Environmental Response Trust Administrative Trustee shall be the "administrator," within the meaning of Treasury Regulation Section 1.468B-2(k)(3), of the Environmental Response Trust.

6.7    Fiscal Year

The Environmental Response Trust's fiscal year shall be the calendar year.

6.8    Property Taxes

6.8.1.    Settlors shall pay all property and ad valorem taxes relating to the Properties and other assets owned by the Environmental Response Trust that are due on or prior to the Effective Date (and the Environmental Response Trust shall not be liable for such taxes), and the Environmental Response Trust shall pay all property and ad valorem taxes relating to the Properties and other assets owned by the Environmental Response Trust that are due after the Effective Date.

6.8.2.    Following the Effective Date, subject to Sections 6.16(a) and (d) of the MSPA, the Environmental Response Trust Administrative Trustee shall have the sole right, at its expense, to control, conduct, compromise, and settle any tax contest, audit, or administrative or court proceeding relating to any liability for property and ad valorem taxes attributable to the Properties and shall be authorized to respond to any such tax inquiries relating to the Properties.

6.8.3.    Following the Effective Date, subject to the MSPA, the Environmental Response Trust shall be entitled to the entire amount of any refunds or credits (including interest thereon) with respect to or otherwise relating to any property and ad valorem taxes attributable to the Properties, including for any taxable period ending on, prior to, or after the Effective Date.

6.8.4.    Each of the Debtors and the Environmental Response Trust Administrative Trustee shall cooperate fully with each other regarding the implementation of this Section 6.8 (including the execution of appropriate powers of attorney) and shall make available to the other as reasonably requested all information, records, and documents relating to property and ad valorem taxes governed by this Section 6.8 until the expiration of the applicable statute of limitations or extension thereof or at the conclusion of all audits, appeals, or litigation with respect to such taxes. Without limiting the generality of the foregoing, the Debtors shall execute on or prior to the Effective Date a power of attorney authorizing the Environmental Response Trust Administrative Trustee to correspond, sign, collect, negotiate, settle, and administer tax payments and tax returns

for the taxes payable by the Environmental Response Trust and described in Section 6.8.1. hereof.

6.9    Expedited Determination

The Environmental Response Trust Administrative Trustee may request an expedited determination of taxes of the Environmental Response Trust under section 505(b) of the Bankruptcy Code for all returns filed for, or on behalf of, the Environmental Response Trust for all taxable periods through the termination of the Environmental Response Trust.

ARTICLE 7
MISCELLANEOUS PROVISIONS

7.1    Amendments and Waivers

Any provision of this Agreement may be amended or waived by mutual written consent of the Environmental Response Trust Administrative Trustee, the United States, the States and the Tribe; provided, however, that no change shall be made to this Agreement that would alter the provisions of Section 6.4 hereof or adversely affect the U.S. federal income tax status of the Environmental Response Trust as a "qualified settlement fund" (for which no grantor trust election has been made), in accordance with Section 6.4 hereof, or, unless agreed to in writing by the affected Environmental Response Trust Administrative Trustee, the rights of the Environmental Response Trust Administrative Trustee.    Technical amendments to this Agreement may be made as necessary, to clarify this Agreement or enable the Environmental Response Trust Administrative Trustee to effectuate the terms of this Agreement in a manner consistent with the Settlement Agreement with the mutual consent of the Environmental Response Trust, the United States, the States and the Tribe.

7.2    Cooperation

Debtors agree to cooperate with the Environmental Response Trust Administrative Trustee prior to the Effective Date by providing reasonable access to and/or copies of their non-privileged books and records relating to the Properties for the purpose of performing the Environmental Response Trust Administrative Trustee's duties and exercising its powers hereunder, including all environmental information and/or data in the state and condition in which such records are found regarding the Properties in possession of Debtors or any environmental consultants or contractors previously retained by Debtors. As provided for under Paragraph 41 of the Settlement Agreement, no later than January 1, 2011, Debtors shall provide to the Administrative Trustee copies of or access to all documents and other materials in the care, custody or control of Debtors, their professionals, consultants and/or contractors that: (i) contain or relate to environmental information regarding the Properties, (e.g., field notes, data packages, historical documentation, databases, models, cost estimates, reports, correspondence, etc.); (ii) contain or relate to non-environmental information concerning the management of the Properties; and (iii) contain or relate to any information concerning the implementation of and the spending of money associated with MLC's wind-down budget as it relates to the Properties. Prior to 30 days after the Effective Date, Debtors shall transmit all such documents and materials

43

not already in the possession of the Administrative trustee to the Administrative Trustee, and upon the Effective Date the Environmental response Trust shall become the owner of the information in the IDEA database related to the Properties. With respect to documents stored at the facilities of Iron Mountain Inc., (i) prior to January 1, 2011, Debtors will undertake reasonable efforts to reach agreement with New GM on a process to transfer any Iron Mountain Documents requested by the Administrative Trustee to the Environmental Response Trust no later than July 31, 2011; and (ii) on the Effective Date, Debtors shall transfer all their rights to the Iron Mountain Documents, including their rights to copies of and access to such documents, to the Administrative Trustee. Prior to the Effective Date and for a period of sixty (60) days after the Effective Date, Debtors and/or any successor entity shall provide reasonable access by the Environmental Response Trust Administrative Trustee to such employees of Debtors, their agents, advisors, attorneys, accountants or any other professionals hired by the Debtors with knowledge of matters relevant to the Environmental Trust Assets. The Environmental Response Trust and Environmental Response Trust Administrative Trustee shall take such actions and execute such documents as are reasonably requested by Debtors with respect to effectuating this Agreement, the Settlement Agreement and the transactions contemplated thereby, provided that such actions are not inconsistent with this Agreement, the Settlement Agreement or the Plan of Liquidation, and provided that such actions shall be at the sole expense of the Debtors. The Environmental Response Trust Administrative Trustee, Debtor, and the Lead Agency for each of the Properties will exchange information and reasonably cooperate to determine the appropriate disposition of executor contracts or unexpired leases, if any, that relate to the relevant Property.

7.3    Situs of the Environmental Response Trust

The situs of the Environmental Response Trust herein established is New York, and except to the extent the Bankruptcy Code or other U.S. federal law is applicable the rights, duties, and obligations arising under the Trust Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflict of law thereof.

7.4    Headings

The section headings contained in this Agreement are solely for convenience of reference and shall not affect the meaning or interpretation of this Agreement or any term or provision hereof.

7.5    Severability

If any provision of this Agreement or application thereof to any Person or circumstance shall be finally determined by the Court to be invalid or unenforceable to any extent, the remainder of this Agreement, or the application of such provision to Persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and such provision of this Agreement shall be valid and enforced to the fullest extent permitted by law.

7.6    Sufficient Notice

Any notice or other communication hereunder shall be in writing (including, but not limited to, facsimile transmission or by e-mail) and shall be deemed to have been sufficiently given, for all purposes, if deposited, postage prepaid, in a post office or letter box addressed to the Person for whom such notice is intended (or in the case of notice by facsimile or e-mail, when received and telephonically or electronically confirmed), to the name and address set forth in Sections 5.2 and 5.3 of this Agreement or such other address provided in writing to the Environmental Response Trust Administrative Trustee by an authorized representative of the United States or the respective State or Tribe.

Any notice to the Environmental Response Trust Administrative Trustee shall be provided to:

Elliott P. Laws
1001 Pennsylvania Avenue, N.W., 13th Floor
Washington, DC  20004
Tel: 202/624-2500
Fax: 202.628.5116

7.7    Counterparts

This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original instrument, but all together shall constitute one agreement.

7.8    Actions Taken on Other Than Business Day

If any payment or act under the Plan of Liquidation, this Agreement or the Settlement Agreement is required to be made or performed on a date that is not a business day, then the making of such payment or the performance of such act may be completed on the next succeeding business day, but shall be deemed to have been completed as of the required date. For the purposes of this Agreement, a business day shall be any of the days Monday through Friday, excluding federal holidays.

7.9    Compliance with Laws

Any and all transfers or sales of Environmental Response Trust Assets by the Environmental Response Trust shall be in compliance with applicable federal and state laws.

7.10    Preservation of Privilege

In connection with the rights, claims, and causes of action that constitute the Environmental Response Trust Assets, any attorney-client privilege, work-product privilege, or other privilege or immunity attaching to any documents or communications (whether written or oral) transferred to the Environmental Response Trust shall vest in the Environmental Response Trust and its representatives, and the Parties are authorized to take all necessary actions to effectuate the transfer of such privileges.

45

7.11    <u>No Partnership</u>

This Agreement is intended to create a trust and a trust relationship and to be governed and construed in all respects as a trust. The Environmental Response Trust is not intended to be, and shall not be deemed to be or treated as, a general partnership, limited partnership, joint venture, corporation, joint stock company or association, nor shall the Environmental Response Trust Administrative Trustee, the United States, or any of them, for any purpose be, or be deemed to be or be treated in any way whatsoever to be, liable or responsible hereunder as partners or joint venturers. The relationship of the United States to the Environmental Response Trust shall be solely that of beneficiary of a trust and shall not be deemed to be a principal or agency relationship, and the rights of the United States shall be limited to those conferred upon it by this Agreement and the Settlement Agreement.

7.12    <u>Uniform Trust Act</u>

The Environmental Response Trust Agreement shall not be subject to any provision of the Uniform Trust Act as adopted by any State, now or in the future.

7.13    <u>Dispute Resolution</u>

The Parties recognize that alternative dispute resolution may lead to the more efficient resolution of disputes in many circumstances and where appropriate and upon agreement of the relevant Parties, will engage in non-binding informal dispute resolution prior to petitioning the Court to resolve any dispute under this Agreement. Where disputes are not resolved consensually or by alternative dispute resolution, the provisions of the Settlement Agreement regarding the judicial resolution of disputes shall apply.

[Remainder of this page is intentionally blank]

IN WITNESS WHEREOF, THE UNDERSIGNED PARTIES ENTER INTO THIS
AGREEMENT

**FOR THE UNITED STATES**

_____
ROBERT G. DREHER
Acting Assistant Attorney General
Environment and Natural Resources
    Division
U.S. Department of Justice

Date: _____

PREET BHARARA
United States Attorney
Southern District of New York
By: David S. Jones
Natalie N. Kuehler
Assistant U.S. Attorneys

Date: _3/2/2011_

_____
Alan S. Tenenbaum
National Bankruptcy Coordinator
Patrick Casey
Senior Counsel
Environment and Natural Resources Division
Environmental Enforcement Section
U.S. Department of Justice

Date: _____

_____
CYNTHIA GILES
Assistant Administrator
Office of Enforcement and Compliance
Assurance
U.S. Environmental Protection Agency

IN WITNESS WHEREOF, THE UNDERSIGNED PARTIES ENTER INTO THIS
AGREEMENT

## FOR THE UNITED STATES

_____
ROBERT G. DREHER
Acting Assistant Attorney General
Environment and Natural Resources
    Division
U.S. Department of Justice

Date:  __2/28/11__

_Alan S. Tenenbaum_
_____
Alan S. Tenenbaum
National Bankruptcy Coordinator
Patrick Casey
Senior Counsel
Environment and Natural Resources Division
Environmental Enforcement Section
U.S. Department of Justice

Date:  __2/28/11__

_____
CYNTHIA GILES
Assistant Administrator
Office of Enforcement and Compliance
Assurance
U.S. Environmental Protection Agency

_____
PREET BHARARA
United States Attorney
Southern District of New York
By:  David S. Jones
Natalie N. Kuehler
Assistant U.S. Attorneys

Date:  _____

47

IN WITNESS WHEREOF, THE UNDERSIGNED PARTIES ENTER INTO THIS
AGREEMENT

**FOR THE UNITED STATES**

ROBERT G. DREHER
Acting Assistant Attorney General
Environment and Natural Resources
   Division
U.S. Department of Justice

Date: _____

PREET BHARARA
United States Attorney
Southern District of New York
By:  David S. Jones
Natalie N. Kuehler
Assistant U.S. Attorneys

Date: _____

Alan S. Tenenbaum
National Bankruptcy Coordinator
Patrick Casey
Senior Counsel
Environment and Natural Resources Division
Environmental Enforcement Section
U.S. Department of Justice

Date: _____

_____ 3/1/11

CYNTHIA GILES
Assistant Administrator
Office of Enforcement and Compliance
Assurance
U.S. Environmental Protection Agency

47

**FOR MOTORS LIQUIDATION COMPANY, MLC OF HARLEM, INC.,
MLCS, LLC, MLCS DISTRIBUTION CORPORATION, REMEDIATION
AND LIABILITY MANAGEMENT COMPANY, INC., AND
ENVIRONMENTAL CORPORATE REMEDIATION COMPANY, INC.**

Date: 3/4/11

Ted Stenger
Executive Vice President
Motors Liquidation Company, as agent for each
of the foregoing entities
401 S. Old Woodward Avenue
Suite 370
Birmingham, MI 48009
Tel.: (313) 486-4044
Fax: (313) 486-4259
Email: tstenger@alixpartners.com

Date: 3/3/11

James M. Redwine
Vice President of Environmental Affairs
Motors Liquidation Company, as agent for each
of the foregoing entities

Date: 3/8/11

David R. Berz
Weil, Gotshal & Manges LLP
Attorneys for Debtors and Debtors in Possession
1300 Eye Street, NW, Suite 900
Washington, D.C. 20005
Tel.: (202) 682-7000
Fax: (202) 857-0939
Email: david.berz@weil.com

## FOR THE ENVIRONMENTAL RESPONSE TRUST ADMINISTRATIVE TRUSTEE

EPLET, LLC in its Representative Capacity as the
Environmental Response Administrative Trustee of
The Environmental Response Trust

Date: 2-23-11

By: _____
Name: Elliott P. Laws
Title: Managing Member

Date: 2-23-11

By: _____
Michael O. Hill
Chief Operating Officer and General Counsel
The Environmental Response Trust

**FOR THE STATE OF DELAWARE**

Date: _2/23/11_

Collin P. O'Mara, Secretary
Delaware Department of Natural Resources
and Environmental Control

Date: _2/24/11_

Robert S. Kuehl
Deputy Attorney General
Delaware Department of Justice

50

## FOR THE STATE OF ILLINOIS AND THE ILLINOIS ENVIRONMENTAL PROTECTION AGENCY

FOR THE STATE OF ILLINOIS
LISA MADIGAN, Attorney General of the State of Illinois

MATTHEW J. DUNN, Chief
Environmental Enforcement/Asbestos Litigation Division

Date: 2/10/11

THOMAS E. DAVIS, Chief
Environmental Bureau
Assistant Attorney General
500 South Second Street
Springfield, IL   62706

FOR THE ILLINOIS ENVIRONMENTAL PROTECTION AGENCY

Date: 2/10/11

JOHN J. KIM
Chief Legal Counsel

51

State of Indiana's Signature Page for
"ENVIRONMENTAL RESPONSE TRUST AGREEMENT

By and Among

MOTORS LIQUIDATION COMPANY f/k/a GENERAL MOTORS CORP.,
REMEDIATION AND LIABILITY MANAGEMENT COMPANY, INC.,
ENVIRONMENTAL CORPORATE REMEDIATION COMPANY, INC.,
EPLET, LLC, THE UNITED STATES OF AMERICA,
and SEVERAL STATES, including INDIANA

Indiana Department of
Environmental Management

By: _____
Thomas W. Easterly
Commissioner


By: _____
Bruce H Palin,
Assistant Commissioner
Office of Land Quality


Ind. Dept. of Environmental Mgmt
100 North Senate Avenue
MC 50-01, ICGN 1301
Indianapolis, IN 46204


Date: _Oct. 13, 2010_


Gregory F. Zoeller,
Attorney General of Indiana
Atty. No. 1958-98

By: _____
Patricia Orloff Erdmann
Chief Counsel for Litigation
Atty. No. 17664-49A


By: _____
Timothy J. Junk,
Deputy Attorney General
Atty. No. 5587-02


Office of the Attorney General
Indiana Government Center South, Fifth Floor
302 West Washington Street
Indianapolis, IN 46204


Date: _Oct. 13, 2010_

**FOR THE STATE OF KANSAS**

Date: ___4/4/2011___

ROBERT MOSER, MD
Acting Secretary
Kansas Department of
Health and Environment

ENVIRONMENTAL RESPONSE TRUST AGREEMENT
BY AND AMONG
MOTORS LIQUIDATION COMPANY f/k/a GENERAL MOTORS CORP.,
REMEDIATION AND LIABILITY MANAGEMENT COMPANY, INC.,
and
ENVIRONMENTAL CORPORATE REMEDIATION COMPANY, INC.
as Settlors

**FOR THE STATE OF MICHIGAN**

Date: _2/11/11_      _____

Bill Schuette
Attorney General

Celeste R. Gill (P52484)
Assistant Attorney General
Environment, Natural Resources and
Agriculture Division
6th Floor, G. Mennen Williams Building
525 West Ottawa Street
P.O. Box 30755
Lansing, MI 48909
Tel.: (517) 373-7540
Fax: (517) 373-1610
gillc1@michigan.gov
Attorneys for the Michigan Department
of Natural Resources and Environment

**FOR THE STATE OF MISSOURI**

Date: _2/10/11_

CHRIS KOSTER
Attorney General for the State of Missouri

JOHN K. McMANUS
Chief Counsel
Agriculture and Environment Division
P.O. Box 899
Jefferson City, Missouri 65102
Tel.: (573) 751-8370
Fax: (573) 751-8796
Email: jack.mcmanus@ago.mo.gov

Date: _2/14/11_

Leanne Tippett Mosby
 Director
Division of Environmental Quality
Missouri Department of Natural Resources
P.O. Box 176
Jefferson City, Missouri 65102

CONFIDENTIAL
Draft of October 7, 2010

## FOR THE STATE OF NEW JERSEY

Date: _October 13, 2010_

PAULA T. DOW
Attorney General for the State of New Jersey

By:    Richard F. Engel
       Deputy Attorney General
       Richard J. Hughes Justice Complex
       25 Market Street
       P.O. Box 093
       Trenton, New Jersey  08625-0093
       Tel.:  (609) 984-4863
       Fax:  (609) 341-5030

**FOR THE STATE OF NEW YORK**

ERIC T. SCHNEIDERMAN
Attorney General

Date:    February 25, 2011

By:     Maureen Leary
        Assistant Attorney General
        Chief, Toxics Section
        NYS Department of Law
        Environmental Protection Bureau
        The Capitol
        Albany, New York 12224-0341
        Tel.:  (518) 474-7154
        Fax:  (518) 473-2534
        maureen.leary@ag.ny.gov

**FOR THE STATE OF OHIO**

Date: _23 Feb 11_

_Dale T. Vitale_

**MICHAEL DeWINE**
**Attorney General for the State of Ohio**

By:     Dale T. Vitale
        Assistant Attorney General
        30 E. Broad Street, 25th Floor
        Columbus, Ohio  43215
        Tel.: (614) 466-5249
        Fax:  (614) 644-1926
        Email:  dale.vitale@ohioattorneygeneral.gov

CONFIDENTIAL
Draft of October 7, 2010

## FOR THE COMMONWEALTH OF VIRGINIA

KENNETH T. CUCCINELLI, II
ATTORNEY GENERAL

Date: _10|19|10_          By: _Kerri L. Nicholas_
                              Kerri L. Nicholas, VSB # 47230
                              Assistant Attorney General
                              Environmental Section
                              Virginia Office of the Attorney General
                              900 East Main Street
                              Richmond, Virginia 23219
                              (804) 371-8721
                              knicholas@oag.state.va.us

**FOR THE STATE OF WISCONSIN**

CATHY STEPP
Secretary

Date: 2/28/11

MATT MORONEY
Deputy Secretary
Wisconsin Department of Natural Resources

Approved as to form:

J.B. VAN HOLLEN
Attorney General

Date: 2/27/11

ANNE C. MURPHY
Assistant Attorney General
State Bar # 1031600
Attorneys for the State of Wisconsin

CONFIDENTIAL
Draft of October 7, 2010

**FOR THE LOUISIANA DEPARTMENT OF ENVIRONMENTAL
QUALITY**

Date:    10/12/10

Beau James Brock
Assistant Secretary
Office of Environmental Compliance
Louisiana Department of Environmental Quality

**FOR THE MASSACHUSETTS DEPARTMENT OF ENVIRONMENTAL PROTECTION**

MASSACHUSETTS DEPARTMENT OF
ENVIRONMENTAL PROTECTION
By its attorney,

MARTHA COAKLEY,
ATTORNEY GENERAL

Date: _2|15|11_          By: _____
Carol Iancu, MA BBO # 635626
Assistant Attorney General
Environmental Protection Division
Massachusetts Office of the Attorney General
One Ashburton Place, 18th Floor
Boston, MA 02108
(617) 963-2428
carol.iancu@state.ma.us

**FOR THE DEPARTMENT OF ENVIRONMENTAL PROTECTION OF
THE COMMONWEALTH OF PENNSYLVANIA**

Date: _10/14/10_

Susan Shinkman
Chief Counsel
Office of Chief Counsel
Rachel Carson State Office Building
400 Market Street
Harrisburg, Pennsylvania  17101-2301

**FOR THE SAINT REGIS MOHAWK TRIBE**

Date:  02|11|11

McNAMEE, LOCHNER, TITUS
& WILLIAMS, P.C.
John J. Privitera, Esq.
Jacob F. Lamme, Esq.
677 Broadway
Albany, New York 12207
Tel.: (518) 447-3200
Fax: (518) 426-4260

## EXHIBIT "A"

**Legal Description of Properties Transferred to the Environmental Response Trust**

## EXHIBIT A

### Property Description

Tax ID Number: **47-06-12-403-027.000-010**

Land situated in the County of **Lawrence**, State of **Indiana** is described as follows:

Lots Numbered 133, 134, 135, 136, 137, 178, 179, 180, 181 and 182, in Bedford Heights Subdivision, Section "E", to the City of Bedford, Lawrence County, Indiana.

# EXHIBIT A

## Property Description

PARCEL A:

Part of the West 1/2 of Section 5, Town 3 South, Range 9 East, and Part of the Southeast 1/4 of Section 6, Town 3 South, Range 9 East, City of Romulus, Wayne County, Michigan, described as: Beginning at the intersection of the North line of Ecorse Road and the West line of the Chesapeake & Ohio Railroad right-of-way, said point being South 89 degrees 54 minutes 20 seconds West, 42.5 feet and North 00 degrees 01 minutes 30 seconds West, 60.00 feet from the South 1/4 corner of Section 5; thence South 89 degrees 54 minutes 20 seconds West, 2653.46 feet and South 88 degrees 13 minutes 20 seconds West, 91.38 feet, along said North line of Ecorse Road; thence North 00 degrees 04 minutes 57 seconds West, 815.57 feet; thence North 89 degrees 55 minutes 03 seconds East, 32.00 feet; thence North 00 degrees 04 minutes 57 seconds West, 1730.75 feet; thence North 88 degrees 10 minutes 00 seconds East, 77.47 feet; thence North 00 degrees 12 minutes 50 seconds East, 328.83 feet; thence South 88 degrees 47 minutes 10 seconds East, 626.51 feet; thence South 00 degrees 06 minutes 34 seconds East, 315.47 feet; thence North 89 degrees 59 minutes 00 seconds East, 957.35 feet; thence South 00 degrees 01 minutes 38 seconds East, 475.24 feet; thence South 66 degrees 54 minutes 53 seconds East, 611.46 feet; thence South 89 degrees 26 minutes 29 seconds East, 489.98 feet, to the West line of Chesapeake & Ohio Railroad right-of-way; thence South 00 degrees 01 minutes 30 seconds East, 1822.42 feet, along said line to the point of beginning.

Together with and subject to the easements as set forth in the Easement Agreement recorded July 22, 1993 in Liber 26680, Page 160, Wayne County Records.

PARCEL B:

Part of the Southeast 1/4 of Section 6, Town 3 South, Range 9 East, City of Romulus, Wayne County, Michigan, described as: Beginning at a point on the North line of Ecorse Road, said point being North 00 degrees 19 minutes 30 seconds East, 60.00 feet and South 88 degrees 13 minutes 20 seconds West, 91.38 feet from the Southeast corner of Section 6; thence along said North line of Ecorse Road, South 88 degrees 13 minutes 20 seconds West, 1221.70 feet; thence North 00 degrees 25 minutes 10 seconds East, 1258.54 feet; thence North 00 degrees 18 minutes 40 seconds East, 635.81 feet; thence North 00 degrees 23 minutes 00 seconds East, 650.53 feet; thence North 88 degrees 10 minutes 00 seconds East, 1233.06 feet; thence South 00 degrees 04 minutes 57 seconds East, 1730.75 feet; thence South 89 degrees 55 minutes 03 seconds West, 32.0 feet; thence South 00 degrees 04 minutes 57 seconds East, 815.57 feet to the point of beginning.

PARCEL C:

A parcel of land lying Southerly of Van Born Road between Cogswell Road and the Chesapeake & Ohio Railroad, City of Romulus, Wayne County, Michigan. Part of the Northwest 1/4 of Section 5, Town 3 South, Range 9 East, and part of the Northeast 1/4 of Section 6, Town 3 South, Range 9 East, City of Romulus, Wayne County, Michigan, being more particularly described as follows: Commencing at the Northerly section corner common to Sections 5 and 6, Town 3 South, Range 9 East, City of Romulus, Wayne County, Michigan; running thence South 00 degrees 10 minutes 37 seconds West along the section line common to said Sections 5 and 6, a distance of 60.00 feet to a point on the South line

of Van Born Road (120 feet wide); thence North 89 degrees 52 minutes 40 seconds East along the South line of said Van Born Road, a distance of 217.02 feet to a point; thence South 00 degrees 10 minutes 40 seconds West, a distance of 1495.23 feet to the point of beginning of the parcel of land being described herein; proceeding thence from said point of beginning, South 00 degrees 10 minutes 40 seconds West, a distance of 689.92 feet to a point; thence North 88 degrees 47 minutes 10 seconds West, a distance of 217.02 feet to a point on the line common to said Sections 5 and 6; thence South 00 degrees 12 minutes 50 seconds West along said line common to said Sections 5 and 6, a measured distance of 328.83 feet (radius 330.12 feet) to the 1/4 corner common to said Sections 5 and 6; thence South 88 degrees 10 minutes 00 seconds West, along the East-West 1/4 line of said Section 6, a distance of 329.79 feet to a point; thence North 00 degrees 10 minutes 16 seconds East along the West line of the East 1/4 of the East 1/2 of the Northeast 1/4 of said Section 6, a distance of 931.30 feet to a point; thence South 89 degrees 49 minutes 44 seconds East, a distance of 511.17 feet to a point; thence North 20 degrees 46 minutes 25 seconds East along a line, 12.00 feet more or less, Westerly of and parallel to the Westerly top of bank of the McClaughrey Drain, as now exists, a distance of 101.52 feet to the point of beginning.

PARCEL D:

Part of the Northwest 1/4 of Section 5, Town 3 South, Range 9 East, City of Romulus, County of Wayne, State of Michigan, described as: Beginning North 0 degrees 10 minutes 40 seconds East 328.83 feet and South 88 degrees 47 minutes 10 seconds East 217.02 feet from West 1/4 corner of said Section 5; thence North 0 degrees 10 minutes 40 seconds West 939.24 feet; thence North 89 degrees 52 minutes 40 seconds East 1086.48 feet; thence South 0 degrees 27 minutes 46 seconds West 811.37 feet; thence North 89 degrees 58 minutes 20 seconds East 290.49 feet; thence South 0 degrees 01 minutes 30 seconds East 454 feet; thence South 89 degrees 53 minutes West 963.53 feet; thence North 0 degrees 06 minutes 34 seconds West 315.27 feet; thence North 88 degrees 47 minutes 10 seconds West 409.49 feet to the point of beginning.

Together with and subject to the easements as set forth in the Easement Agreement recorded July 22, 1993 in Liber 26680, Page 160, Wayne County Records.

**36880 Ecorse Road, Romulus, MI**

## Exhibit A - LEGAL DESCRIPTION

Tax ID Number: **241 0401300114**

Lots Twenty-Six (26), Twenty-Seven (27), Twenty-Eight (28), Twenty-Nine (29) and Thirty (30), Second Motor Subdivision, an addition to the City of Janesville, according to the recorded plat thereof, in the City of Janesville, Rock County, Wisconsin.

And

A strip of land lying Easterly of Lots 26, 27, 28, 29 and 30 of the Second Motor Subdivision, being a part of the SE ¼ of Section 1, Township 2 North, Range 12 East of the 4th P.M., City of Janesville, Rock County, Wisconsin, described as follows:

Beginning at the Northeast corner of said Lot 26; thence South 88 degrees 06 feet 02 inches East, a distance of 41.20 feet; thence South 00 degrees 37 feet 50 inches West, a distance of 17.95 feet to a point of curve; thence Southwesterly along a curve convexed Southeasterly an arc distance of 482.83 feet, having a radius of 554.60 feet, the chord bearing South 25 degrees 25 feet 17 inches West, a distance of 467.73 feet to the Easterly right of way line of South Jackson Street; thence North 00 degrees 07 feet 00 inches East, along said Easterly line, a distance of 48.52 feet to a point of curve; thence Northeasterly along a curve convexed Southeasterly, an arc distance of 413.96 feet, having a radius of 513.70 feet, the chord bearing North 23 degrees 20 feet 22 inches East, a distance of 402.85 feet; thence North 00 degrees 14 feet 50 inches East, a distance of 23.34 feet to the point of beginning.

Commonly known as:  **1405 S. Jackson Street, Janesville, Wisconsin**

## EXHIBIT A

### Property Description

**Tax ID Number:** 23-18-100-005-0080; 23-18-200-014-0080; 23-18-200-013-0080; 23- 18-200-015-0080; 23-18-300-010-0080; 23-18-400-013-0080; 23-18-301-101-0080; 23- 18-301-092[1]0080; 23-18-401-084-0080; 23-18-401-086-0060, 23-18-200-010 (Lot 3 of Clerk's Sub.), 23-18-100-022 (Lot 2 of Clerk's Sub.)

Land situated in **Danville,** in the County of **Vermilion,** State of **Illinois** is described as follows:

Part of Lots 2, 3, 4, 10 and 11 in the County Clerk's Subdivision of Section 18 Township 19 North, Range 11 West of the 2nd P. M., Vermilion County, Illinois, being further described as follows: Commencing at a Concrete Monument situated at the Southwest Corner of the Northwest Quarter of said Section; thence East on a local azimuth of 88 degrees 33 minutes 22 seconds, along the South line of said Lot 2, being the South line of the Northwest Quarter of said Section, a distance of 965.05 feet to a Concrete Monument for a place of beginning; thence continuing East, along said line, 150.2 feet to an Iron Rod situated on the West line of the East Half of said Lot 2; thence North 358 degrees 45 minutes 19 seconds, along said line, 245.58 feet to an Iron Rod; thence East 089 degrees 03 minutes 31 seconds, a distance of 294.04 feet to a Steel Fence Post, situated at the Northeast Corner of an Illinois Power Sub-Station as described in Deed Record Volume 956 Page 183 Document 935644 in the Office of the County Recorder of said County; the following property line is monumented by an existing 8 foot Cyclone Fence primary centered over the following described line: thence North 359 degrees 22 minutes 4 seconds, along said fence line, 28.96 feet to a Steel Fence Post; thence East 088 degrees 14 minutes 59 seconds, a distance of 57.84 feet to a Steel Fence Post; thence Northerly 357 degrees 39 minutes 34 seconds, along said fence line 25.17 feet to a Steel Fence Post; thence Southeasterly 106 degrees 32 minutes 22 seconds, along said fence line feet to a Steel Fence Post; thence East 089 degrees 12 minutes 48 seconds along said fence line 442.12 feet to a point; thence South 179 degrees 12 minutes 48 seconds, a distance of 27.0 feet to an Iron Rod; thence East 089 degrees 12 minutes 48 seconds, a distance of 20.00 fret to an Iron Rod; thence North 359 degrees 12 minutes 48 seconds, a distance of 27.4 feet to a point on said fence line; thence Easterly 089 degrees 12 minutes 48 seconds, a distance of 158.14 feet to a Steel Fence Post; thence Northerly 005 degrees 31 minutes 00 seconds, along said fence line, 318.65 feet to a Steel Fence Post; thence Easterly 088 degrees 49 minutes 15 seconds, along said fence line, 51.38 feet to a Steel Fence Post; thence Northerly 007 degrees 18 minutes 37 seconds, along said fence line 68.58 feet to a Steel Fence Post; thence Northeasterly 024 degrees 50 minutes 32 seconds, along said fence line, 62.22 feet to a Steel Fence Post; thence Northwesterly 352 degrees 21 minutes 18 seconds, along said fence line, 72.36 fret to a Steel Fence Post; thence Northeasterly around a curve to the left, along said fence line, an arc distance of 58.95 feet to a Steel Fence Post, (said curve having a radius of 47.92 feet, a chord azimuth of 036 degrees 45 minutes 47 seconds, and a chord distance of 55.30 feet); thence Northeasterly 008 degrees 03 minutes 04 seconds, along said fence line, 153.33 feet to a Steel Fence Post with an Iron Rod set. on the East side of said post; thence Northeasterly around a curve to the right, along said fence line, an arc distance of 329.46 feet, (said curve having a radius of 1,411.67 feet, a chord azimuth of 022 degrees 36 minutes 44 seconds, a chord distance of 328.72 feet) to a Steel Fence Post with an Iron Rod set on the East side of said post; thence Northeasterly 030 degrees 12 minutes 37 seconds, along said fence line, 101.41 feet to a Steel Fence Post; thence Northeasterly 038 degrees 21 minutes 54 seconds, along said fence line, 49.31 feet to a Steel Fence Post; thence Southeasterly 128 degrees 07 minutes 20 seconds, along said fence line, 53.98 feet to a Steel Fence Post; thence Northeasterly 070 degrees 21 minutes 18 seconds, along said fence line, 13.91 feel to a Steel Fence Post; thence Northeasterly 014 degrees 24 minutes 38 seconds, along said fence line, 123.65 feet; thence around a curve to the right, along said fence line, an arc distance of 144.05 feet, (said curve having a radius of 1,059.74 feet, a chord azimuth of 022 degrees 19 minutes IS seconds, and a chord distance of 143.94 feet) to a Steel Fence Post with an Iron Rod set on the East side of

said post; thence Northeasterly 027 degrees 58 minutes 09 seconds, along said fence line, 259.85 fret to a Steel Fence Post; thence Northeasterly 046 degrees 01 minutes 25 seconds, along said fence line, 20.63 fee to a Steel Fence Post, said point being the termination of said fence serving as a boundary line; thence Northeasterly 039 degrees 24 minutes 46 seconds, a distance of 57.42 feet to an Iron Rod; thence Northeasterly 017 degrees 01 minutes 26 seconds, a distance of 207.74 feet to an lion Rod; thence Northeasterly 016 degrees 01 minutes 12 seconds, a distance of 191.81 feet to an Iron Rod; thence North 000 degrees 00 minutes 00 seconds, distance of 120 feet more or less, to the South Bank of the Vermilion River; thence Easterly, following the meandering of said river bank 230 feet, more or less, to the West right-of-way line of the Consolidated Rail Corporation (formerly the C.C.C. & St. L. Railroad) described in Deed Record Volume 201 Page 59 in the Office of said County Recorder; thence Southwesterly 185 degrees 56 minutes 01 seconds along said right-of-way line, 1010 feet, more or less, to a point of curve; thence Southwesterly along said right-of-way line around a curve to the left an arc distance of 68.41 feet, (said curve having a radius of 5816.67 feet, a chord azimuth of 185 degrees 34 minutes 34 seconds, and a chord distance of 68.41 feet); thence Easterly 95 degrees 14 minutes 21 seconds, along said right-of-way line, 10 feet; thence Southerly along said right-of-way line around a curve to the left, an arc distance of 1754.24 feet to a point of tangency, (said curve having a radius of 5806.67 feet, a chord azimuth of 176 degrees 35 minutes 04 seconds, and a chord distance of 1747.58 feet); thence Southeasterly 167 degrees 55 minutes 47 seconds, along said right-of-way line, 749.62 feet to an Iron Rod situated on the North line of North Tilton Subdivision, as shown in Plat Record Volume 3 Page 434; thence West 268 degrees 24 minutes 36 seconds, along said line, 321.3 feet to an Iron Rod situated on the West line of "F" Street; thence South 178 degrees 25 minutes 13 seconds, along the West line of "F" Street in said Subdivision, 115 feet to an Iron Rod situated on the North line of Federal Aid Interstate Route 74, described in Deed Record Volume 656 Page 561, Document 707351; thence West 268 degrees 24 minutes 6 seconds, along said line and described by Deed Record Volume 634 Page 161 Document Number 703836, Deed Record Volume 658 Page 415 Document 709894 and Dead Record Volume 654 Page 409, Document Number 704248, a distance of 350 feet to an Iron Rod situated on the East line of Lot 351 in said Subdivision; thence South 178 degrees 25 minutes 13 seconds, along said line, 50 feet to an Iron Rod situated on the North line of said Highway described in Deed Record Volume 656 Page 561, Document Number 707351; thence West 268 degrees 24 minutes 36 seconds, along said line 200 feet to an Iron Rod situated on the West line of "G" Street (vacated); thence South 178 degrees 23 minutes 13 seconds, along said line, 7.0 fret to an Iron Rod situated on the North line of said Highway, (described in Deed Record Volume 657 Pages 9 and 11 in Document Numbers 707445 and 707446); thence West 268 degrees 24 minutes 3 seconds, along said line 250 fret to an Iron Rod situated on the West line of Lot 44 in said Subdivision, (described by Deed Record Volume 654 Pages 412 and 414, Document Numbers 704249 and 704250, Deed Record Volume 657 Pages 68 and 70, Document Numbers 707624 and 707625, Deed Record Volume 657 Page 431, Document Number 708642, and Deed Record Volume 657 Page 434, Document Number 708643); thence South 178 degrees 23 minutes 13 seconds, along said line, 11.68 feet to the North line of said Highway described in Deed Record Volume 679 Page 32 Document Number 735927; thence West 268 degrees 28 minutes 24 seconds, along said line, 1181.74 feet to a Concrete Monument situated on the West line of a parcel of land described in Deed Record Volume 791 Page 565, Document Number 818640; thence North 358 degrees 04 minutes 40 seconds, along said line, 1251.95 feet to the place of beginning (See Document Number 96-0000451 dated January 16, 1996 for the vacation of that part of Lots 326 through 353 and "G", "H", "J" and "L" Street lying North of the North right-of-way line of F.A.I. Route 74 as it exists in January, 1996), situated in Vermilion County, Illinois.

EXCEPT THE FOLLOWING DESCRIBED TRACTS OF LAND:
EXCEPT: Part of Lots 10 and 11 in the County Clerk's Subdivision of Section 48 Township 19 North, Range 11 West of the 2nd P. M., Vermilion County, Illinois, being further described as follows: Commencing at a Concrete Monument situated at the Northwest Corner of the Southwest Quarter of said Section; thence East on a local azimuth of 88 degrees 33 minutes 22 seconds, along the North line of the Southwest Quarter of said Section, a distance of 1417.99 feet; thence South 178 degrees 21 minutes 00 seconds, a distance of 136.26 feet (along a line described as the East line of a 200.1 feet by 109.9 feet Industrial Building, extended North), to a Chiseled "X" in the pavement for a place of beginning; thence continuing South along said line,

488.27 feet to a P.K. Nail set in asphalt thence West 268 degrees 21 minutes 00 seconds, a distance of 278.00 feet to a P.K. Nail set in asphalt; thence North 358 degrees 21 minutes 00 seconds, a distance of 443.00 feet to an Iron Rod set, thence Northeasterly 72 degrees 38 minutes 40 seconds, a distance of 167.24 feet to a P.K Nail set in asphalt; thence East 88 degrees 21 minutes 00 seconds, a distance of 117.00 feet to the place of beginning, situated in Vermilion County, Illinois.

ALSO: A permanent non-exclusive easement for the purpose of ingress and egress to the above described real estate, over and across a strip of land being 25 feet of even width lying East of, adjacent and parallel with the East line of the above described real estate, said strip of land shall extend North from the South property line of the Danville Industrial, L.L.C. property (being the North right-of-way of F.A.I. Route 74) and extend North 1,013 feet, more or less, to the Northwest Corner of the building housing said receiving dock;

ALSO: A permanent non-exclusive easement to serve the aforesaid receiving dock (identified as Easement B on the accompanying Plat of Survey), said easement being further described as beginning at the aforesaid point of beginning, being a chiseled "X"' in the pavement; thence North 38 feet, more or less, to a point West of an existing concrete retaining wall (being the South wail of an existing depressed dock ramp); thence East 78 feet; thence South 139 feet to the face of the North wail of the aforesaid manufacturing facility; thence West 18 feet; thence North 100 fret to the place of beginning,

ALSO: A temporary non-exclusive easement for the purpose of ingress and egress (identified as Easement C on the accompanying Plat of Survey) being 25 feet of even width centered over an existing service drive shall begin at the main gate serving the front parking lot, said gate being situated on the South line of the Danville Industrial, LLC property: thence North 175 feet more or less; thence West 379 feet, more or less, to its point of intersection with Easement A, situated in Vermilion County, Illinois.

EXCEPT: Part of Lots 3 and 11 in the County Clerk's Subdivision of Section Township 19 North, Range 11 West of the 2nd P. M., Vermilion County, Illinois, being further described as follows: Commencing at a Concrete Monument situated at the Southeast Corner of the Northeast Quarter of said Section; thence West on a local azimuth of 268 degrees 34 minutes 31 seconds, along the South line of the Northeast Quarter of said Section, a distance of 1822.42 feet to the point of intersection with the West right-of-way line of the Consolidated Rail Corporation as described in Deed Record Volume 201 Page 59, in the Office of the County Recorder of said County; thence Southeasterly, along said Railroad right-of-way line, along a curve to the left along, an arc distance of 375.30 feet, said curve having a radius of 5806.67 feet, a chord azimuth of 169 degrees 46 minutes 53 seconds, and a chord distance of 375.24 feet to a point of tangency for a place of beginning; thence continuing Southeasterly 167 degrees 55 minutes 47 seconds, a distance of 681.62 feet to an Iron Rod set; thence Northwesterly 307 degrees 12 minutes 52 seconds a distance of 444.96 feet to an Iron Rod set; thence Southeasterly 217 degrees 12 minutes 52 seconds, a distance of 44.36 fret to an Iron Rod set thence Northwesterly 307 degrees 12 minutes 52 seconds, a distance of 194.93 fret to an Iron Rod set at a point of curve; thence Northwesterly around a curve to the right, an arc distance of 192.83 fret, said curve having a radius of 411.82 feet, a chord azimuth of 320 degrees 37 minutes 41 seconds, and a chord distance of 191.07 feet to an Iron Rod set; thence West 266 degrees 55 minutes 31 seconds, a distance of 19.52 feet to an Iron Rod set that is 15 feet Northeasterly of the centerline of a Railroad Siding; thence Northwesterly 314 degrees more or less along a line being 15 feet Northeasterly of and parallel with the centerline of said Railroad Siding a distance of 265 feet more or less to a Railroad Spike set at the East edge of a concrete Service Drive; thence North 357 degrees 42 minutes 41 seconds along the East edge of said Service Drive extended North a distance of 356.31 feet to a Railroad Spike set on the Easterly edge of a granular Service Drive; thence Northeasterly 26 degrees 51 minutes 43 seconds along said Service drive 352.93 feet; thence North 358 degrees 38 minutes 51 seconds along said Service Drive 304.18 feet to an Iron Rod set at the intersection of the North line of an East-West Granular Service Drive; thence East 87 degrees 10 minutes 38 seconds along the North edge of said Service Drive 250.09 feet to an Iron Rod set; thence South 179 degrees 16 minutes 15 seconds a distance of 136.03 feet to the Southeast Corner of a concrete block building; thence East 90 degrees 49 minutes 10 seconds a distance of 12.4 feet to the top of the high bank of a Waste Water Treatment Lagoon; thence South along said high bank 358 feet; thence Southerly along said high bath 422 feet more or less to an Iron Rod set; thence Southeasterly 106 degrees 02

minutes 47 seconds along said high bank 140.54 feet to an Iron Rod set on the Easterly edge of Granular Service Drive; thence Southeasterly 121 degrees 50 minutes 48 seconds a distance of 122.78 feet to the place of beginning.

TOGETHER with an easement for the purpose of ingress and egress to the above described real estate, which shall be over and across a strip of land being 50 feet of even width, width, said Easement shall originate on the North right-of-way of F.A.I.A. Route 74 as shown in Deed Record Volume 654 Page 161 in the Office of said County Recorder, and pass through Lot 356 in the North Tilton Subdivision as recorded in Plat Record 3 Page in the Office of said County Recorder, and extends Northerly approximately 420 feet to a point of intersection with the existing railroad sidings, being the SOUTHWESTERLY line of the above described real estate.

TOGETHER with an easement over and upon the existing sidetrack accessing the described real estate. Neither grantor nor grantee assumes any responsibility or liability for maintaining the sidetrack.

ALSO EXCEPT: Tract I: Part of the Southwest Fractional Quarter of Section 18 Township 19 North, Range 11 West of the 2nd P. M., Vermilion County, Illinois, being further described as follows Commencing at a concrete monument situated at the Northwest Corner of the Fractional Southwest Quarter of said Section; thence East on a local azimuth of 88 degrees 33 minutes 22 seconds, along the North line of said Quarter Section, a distance of 965.05 feet to a Survey Monument; thence South 178 degrees 04 minutes 40 seconds a distance of 183.99 feet to an Iron Rod set for a place of beginning, thence continuing South 178 degrees .04 minutes 40 seconds a distance of 1067.96 et to GMC Survey Monument situated on the North right-of-way line of F.A.I.A. Route 74 as shown in Deed Record Volume 679 Page 32, Document Number 735927, in the Office of the County Recorder of said County; thence East 88 degrees 28 minutes 24 seconds along said right-of-way line 451.61 feet to an Iron Rod set; thence North 357 degrees 5 minutes 37 seconds a distance of 626.76 feet to an Iron Rod set (said point being the Southeast Corner of a parcel of land conveyed to Troxel Industries); thence West 268 degrees 21 minutes 00 seconds along the South line of said parcel a distance of 28.00 feet to an Iron Rod set at the Southwest Corner of said parcel; thence North 358 degrees 21 minutes 00 seconds along the West line of said parcel, 443.00 feet to an Iron Rod set at the Northwest Corner of said parcel; thence West 268 degrees 04 minutes 40 seconds a distance of 174.06 feet to the place of beginning, situated in Vermilion County, Illinois.

Tract II: A non-exclusive easement for the purposes of ingress and egress to Tract I herein, said easement to begin at the Southeast Corner of Tract I herein thence North contiguous to the East line of Tract I a distance of 626.76 feet; thence Easterly 50 feet; thence South parallel to the East line of Tract Ito a point 50 feet East of the place of beginning; thence West 50 feet to the place of beginning, situated in Vermilion County, Illinois.

ALSO EXCEPT: Parcel 1: Part of Lot 2 in County Clerk's Subdivision of Section 18 Township 19 North, Range 11 West of the 2nd P. M., Vermilion County, Illinois, being further described as follows: Commencing at the Southwest corner of the Northeast Quarter of said Section; thence East 88 degrees 33 minutes 22 seconds along the South line of said Quarter Section a distance of 1188.27 feet; thence North 359 degrees 3 minutes 31 seconds a distance of 86.94 feet to a point being 20 feet South of the Southwest Corner of a chain link fence enclosure for a place of beginning; thence continuing North a distance of 158 feet to the Northwest corner of said fence enclosure thence East 89 degrees 03 minutes 31 seconds along the North line of said fence enclosure a distance of 220 feet to the Northeast Corner of said fence enclosure; thence North 359 degrees 03 minutes 31 seconds a distance of 22 feet; thence East 89 degrees 03 minutes 31 seconds a distance of 110 feet; thence South 179 degrees 03 minutes 31 seconds a distance of 78 feet to the Northerly edge of a Existing Service Drive; thence Southwesterly 205 feet around a curve to the left along the Northerly and Westerly edge of said Service Drive, said curve having a radius of 150 feet; thence West 268 degrees 37 minutes 02 seconds along a line being 21 feet South of and parallel with the South line of an existing building a distance of 96 feet; thence Northwesterly 311 degrees 23 minutes 09 seconds a distance of 89.63 fret; thence West 269 degrees 03 minutes

31 seconds distance of 70 feet to the place of beginning, situated in Vermilion County, Illinois.
Parcel 2: Part of Lot 2 in the County Clerk's Subdivision of Section 18 Township 19 North, Range 11 West of the 2nd P. M., Vermilion County, Illinois, being further described as follows; Beginning at the Northeast Corner of the above described parcel; thence East 89 degrees 03 minutes 31 seconds a distance of 165 feet; thence South 179 degrees 03 minutes 31 seconds a distance of 78 feet more or less to the Northerly edge of an Existing Service Drive; thence Westerly 185 feet more or less along the Northerly edge of said Service Drive to the East line of the above described parcel; thence North 359 degrees 03 minutes 31 seconds (azimuth) along said East line 78 feet to the place of beginning, situated Vermilion County, Illinois. Parcel 3: A non-exclusive, permanent easement for ingress, egress to and for the benefit of Parcels 1 and 2 described above, over and across a Non-Exclusive Easement centered over an existing Service Drive, beginning at the existing entrance situated at the intersection of "G" Street and F.A.I.A. 74 frontage road; thence North and West along said Service Drive to the East line of the above described real estate, situated in Vermilion County, Illinois.

The East 1/2 of Lot 2 and Lot 3 of CLERK'S SUBDIVISION of Section 18, Township 19 North, Range 11 West of the 2nd P.M., EXCEPT therefrom the Right of Way of the Cleveland, Chicago and St. Louis Railway Company, ALSO EXCEPT those parts of the described premises conveyed to the Village of Tilton by deeds dated July 25, 1961, June 6, 1977 and December 11, 1997 and recorded respectively in Deed Record 661, page 454, Book 923, page 22 and as Document No. 97-13608, AND ALSO EXCEPT that part deeded by Special Warranty Deed recorded August 30, 1996 as Document no. 96-8872, situated in Vermilion County, Illinois.


 Commonly known as: 1-74 @ G Street, Danville, IL 61832

## EXHIBIT A

### Property Description

PARCEL I

LOT NUMBERED ONE (1) IN VENTURE 2000 INDUSTRIAL PARK, A SUBDIVISION IN THE CITY OF ANDERSON, MADISON COUNTY, INDIANA, AS PER PLAT THEREOF RECORDED IN PLAT BOOK 23 PAGE 20 IN THE OFFICE OF THE RECORDER OF MADISON COUNTY, INDIANA. CONTAINING 14.59 ACRES, MORE OR LESS.
EXCEPT THAT PART OF LOT NUMBER ONE (1) DEEDED THE TO THE CITY OF ANDERSON, BY INSTRUMENT RECORDED FEBRUARY 9, 2008 AS INSTRUMENT #2005002794.


PARCEL II (DR 352, page 287)

PART OF THE SOUTHEAST QUARTER OF SECTION 14, TOWNSHIP 19 NORTH, RANGE 7 EAST WITHIN THE CITY OF ANDERSON, MORE PARTICULARLY DESCRIBED AS FOLLOWS: COMMENCING AT A POINT 214.7 FEET EAST AND 40 FEET NORTH OF THE INTERSECTION OF THE EAST LINE OF THE RIGHT-OF-WAY OF THE CLEVELAND, CINCINNATI, CHICAGO AND ST. LOUIS RAILWAY AND THE SOUTH LINE OF SECTION FOURTEEN, TOWNSHIP NINETEEN NORTH, RANGE SEVEN EAST, AND RUNNING THENCE NORTH 340.5 FEET TO THE EAST LINE OF THE RIGHT-OF-WAY OF SAID RAILROAD; THENCE IN A NORTHEASTERLY DIRECTION ALONG SAID EAST RIGHT-OF-WAY LINE 1039 FEET TO THE SOUTH LINE OF THE TRACT OF GROUND HERETOFORE OWNED BY THE HILL STANDARD MANUFACTURING COMPANY; THENCE SOUTH 46° EAST 140 FEET; THENCE NORTH 70° EAST 473 FEET TO GREEN'S BRANCH; THENCE IN A SOUTHEASTERLY DIRECTION ALONG GREEN'S BRANCH 1046.7 FEET TO THE NORTH LINE OF PENDLETON AVENUE IN THE CITY OF ANDERSON, THENCE SOUTHWEST ALONG THE NORTH LINE OF SAID AVENUE 380 FEET TO THE NORTH LINE OF THE RIGHT-OF-WAY OF THE ANDERSON BELT RAILWAY COMPANY; THENCE WEST ALONG THE NORTH LINE OF SAID RIGHT-OF-WAY 1096.5 FEET TO THE PLACE OF BEGINNING. EXCEPTING FROM THE ABOVE TRACT A STRIP OF GROUND FIFTEEN FEET WIDE, THE SAME BEING SEVEN AND ONE-HALF FEET ON EACH SIDE OF A LINE BEGINNING AT A POINT IN THE NORTHERLY RIGHT-OF-WAY LINE OF THE ANDERSON BELT RAILWAY COMPANY, SAID RIGHT OF WAY LINE BEING PARALLEL WITH AND 40 FEET NORTHWARDLY, MEASURED AT RIGHT ANGLES FROM THE SOUTH LINE OF SAID SECTION, AND BEING THE SOUTHERLY LINE OF THE WESTERLY AND OF SAID STRIP OF LAND, SAID POINT BEING 481 FEET EAST OF WEST LINE OF SOUTHEAST QUARTER OF SAID SECTION; THENCE NORTHEASTWARDLY FROM A LINE RUNNING NORTHEASTWARDLY AT AN ANGLE OF 25° AND 58', WITH SAID RIGHT OF WAY LINE AS TANGENT BY A CURVE TO THE LEFT HAVING A'RADIUS OF 319.6 FEET FOR A DISTANCE OF 373 FEET TO A POINT; THENCE NORTHEASTWARDLY TANGENTIAL TO THE LAST COURSE BY A CURVE TO THE RIGHT, HAVING A RADIUS OF 309.6 FEET FOR A DISTANCE OF 457 FEET TO A POINT, THENCE EASTWARDLY TANGENTIAL TO THE LAST COURSE FOR A DISTANCE OF 328 FEET TO A LINE AT RIGHT ANGLES TO SAID CENTER LINE, SAID, BUT NOT WARRANTED, TO CONTAIN AN AREA OF .399 OF AN ACRE, TOGETHER WITH THE RIGHT VESTED IN SAID ANDERSON BELT RAILWAY COMPANY IN CONNECTION WITH SAID RIGHT-OF-WAY SO EXCEPTED TO EXTEND THE NECESSARY SLOPES THEREOF FOR CUTS AND FILLS OVER AND BEYOND THE BOUNDARY LINES OF SAID STRIP OF LAND, TOGETHER WITH ALL LEGAL AND EQUITABLE RIGHT, CLAIM AND DEMANDS THEREIN. EXCEPTING FURTHER SUCH PORTIONS OF SAID TRACT AS WAS APPROPRIATED BY THE BOARD OF PUBLIC WORKS OF THE CITY OF ANDERSON, INDIANA, BY A RESOLUTION ADOPTED APRIL 22, 1913 FOR THE FOR THE OPENING OF 22ND STREET, WHICH SAID PORTIONS ARE DESCRIBED AS FOLLOWS, TO-WIT: PART OF THE WEST HALF OF THE SOUTHEAST QUARTER OF SECTION 14, TOWNSHIP 19 NORTH AND RANGE 7 EAST, COMMENCING ON THE WEST LINE OF HENRY STREET IN THE CITY OF ANDERSON, ON THE NORTH LINE OF 22ND STREET PRODUCED FROM EAST; THENCE SOUTH ABOUT 51 FEET TO THE SOUTH LINE OF 22ND STREET PRODUCED; THENCE SOUTH 77° AND 15' WEST 471.4 FEET TO A STONE BOUND; THENCE NORTH 55° AND 12' WEST 160.5 FEET TO THE RIGHT OF WAY LINE OF THE C.C.C. & ST. L. RAILWAY; THENCE NORTHEASTWARDLY ALONG SAID RIGHT OF WAY LINE ABOUT 47 FEET; THENCE SOUTH 40° WEST 140 FEET, THENCE NORTH 70° EAST 313 FEET, THENCE NORTHEASTWARDLY 168.8 FEET TO THE PLACE OF BEGINNING. EXCEPTING FURTHER SUCH RESERVATIONS IF ANY, CONTAINED IN DECLARATORY RESOLUTION NO. 1119, BOARD OF PUBLIC WORKS, CITY OF ANDERSON, INDIANA, DATED MARCH 10, 1952,

X:\DOCUMENTS AND SETTINGS\MERRILLSCAN\LOCAL SETTINGS\TEMP\WZ1342\US_ACTIVE_EXHIBIT A - MLC #1234 & 1320 - VENTURE 2000 AND DELPHI I ANDERSON_MONROE_43637455_1.DOC

MLC #1234 & 1320 – Venture 2000 Industrial Park and
Delphi I – Anderson/Monroe

VACATING SUCH PORTIONS OF SAID TRACT AS WAS APPROPRIATED BY THE BOARD OF PUBLIC WORKS OF THE CITY OF ANDERSON, INDIANA, BY RESOLUTION ADOPTED APRIL 22, 1913 FOR THE OPENING OF DUNLAP AVENUE AND DESCRIBED AS FOLLOWS, TO-WIT: COMMENCING AT A POINT ON THE NORTH RIGHT OF WAY LINE OF ANDERSON BELT RAILWAY, AT A POINT ABOUT 403.6 FEET EAST OF THE WEST LINE OF SAID SOUTHEAST QUARTER OF SECTION 14, TOWNSHIP 19 NORTH AND RANGE 7 EAST, AND RUNNING THENCE NORTH 28° AND 4' EAST 1064.3 FEET; THENCE 41° EAST 182.2 FEET TO THE SOUTH LINE OF 22ND STREET; THENCE NORTH 77° AND 15 MINUTES EAST ALONG THE SOUTH LINE OF SAID 22ND STREET 50 FEET; THENCE SOUTH NO DEGREES AND 41' WEST 205.8 FEET; THENCE SOUTH 28° AND 4' WEST 1025.5 FEET; THENCE WEST 56.7 FEET TO THE PLACE OF BEGINNING.

EXCEPT (DR 465, page 60):
A PART OF THE NORTH HALF OF SECTION 23, TOWNSHIP 19 NORTH, RANGE EAST, MORE PARTICULARLY DESCRIBED AS FOLLOWS: BEGINNING AT THE POINT OF INTERSECTION OF THE NORTH RIGHT-OF-WAY LINE OF C.C.C. AND ST L. RAILROAD AND THE WEST RIGHT OF WAY LINE OF STATE ROAD NO. 9 (PENDLETON AVE) , THENCE NORTH 90 DEGREES 00 MINUTES WEST, ALONG SAID NORTH RAILROAD RIGHT-OF-WAY, 26.05 FEET; THENCE NORTHEASTERLY, PARALLEL TO AND 17.5 FEET DISTANT FROM SAID WEST HIGHWAY RIGHT-OF-WAY LINE, ALONG A CURVE TO THE LEFT HAVING A RADIUS OF 1390.19 FEET THROUGH AN ANGLE OF 27 DEGREES 10 MINUTES 14 SECONDS A DISTANCE OF 659.25 FEET; THENCE NORTH 20 DEGREES 15 MINUTES EAST, PARALLEL TO SAID HIGHWAY RIGHT-OF-WAY, 1043.96 FEET, THENCE NORTH 19 DEGREES 20 MINUTES EAST, PARALLEL TO SAID HIGHWAY RIGHT-OF-WAY, 702.76 FEET, THENCE ALONG A CURVE TO THE RIGHT HAVING A RADIUS OF 616.19 FEET THROUGH AN ANGLE OF 24 DEGREES 19 MINUTES 52 SECONDS A DISTANCE OF 261.67 FEET, PARALLEL TO SAID HIGHWAY RIGHT-OF-WAY, TO THE WEST LINE OF THE PROPERTY CONVEYED BY GENERAL MOTORS CORPORATION TO THE CITY OF ANDERSON AS SHOWN IN DEED RECORD 458, PAGE 348 IN THE RECORDS OF MADISON COUNTY, INDIANA; THENCE SOUTH 19 DEGREES 20 MINUTES WEST, ALONG SAID WEST PROPERTY LINE, 44.44 FEET TO A POINT 25.00 FEET FROM THE CENTER LINE OF STATE ROAD NO. 9; THENCE ALONG A CURVE TO THE LEFT HAVING A RADIUS OF 598.69 FEET THROUGH AN ANGLE OF 20 DEGREES 28 MINUTES 36 SECONDS A DISTANCE OF 213.96 FEET PARALLEL TO SAID HIGH-WAY CENTER LINE; THENCE SOUTH 19 DEGREES 20 MINUTES WEST, ALONG SAID HIGHWAY RIGHT-OF-WAY LINE 702.90 FEET; THENCE SOUTH 20 DEGREES 15 MINUTES WEST ALONG SAID HIGHWAY RIGHT-OF-WAY LINE, 1044.10 FEET; THENCE ALONG SAID HIGHWAY RIGHT-OF-WAY WITH A CURVE TO THE RIGHT HAVING A RADIUS OF 1407.69 FEET, THROUGH AN ANGLE OF 26 DEGREES 23 MINUTES 32 SECONDS A DISTANCE OF 648.43 FEET TO THE PLACE OF BEGINNING.

AND

A PART OF THE SOUTHEAST QUARTER OF SECTION 14, TOWNSHIP 19 NORTH, RANGE 7 EAST IN THE CITY OF ANDERSON, INDIANA, MORE PARTICULARLY DESCRIBED AS FOLLOWS: BEGINNING AT THE POINT OF INTERSECTION OF THE NORTHWEST LINE OF STATE ROAD NO. 9 (PENDLETON AVENUE) WITH THE NORTH RIGHT-OF-WAY LINE OF THE ANDERSON BELT RAILWAY COMPANY; THENCE SOUTH 89 DEGREES 31 MINUTES WEST, ALONG SAID NORTH RAILROAD RIGHT-OF-WAY LINE, 16.42 FEET; THENCE NORTH 52 DEGREES 00 MINUTES EAST, PARALLEL TO AND 10.0 FEET DISTANCE FROM SAID HIGHWAY RIGHT-OF-WAY; 400.92 FEET; THENCE SOUTH 16 DEGREES 09 MINUTES EAST, 10.77 FEET TO SAID HIGHWAY RIGHT-OF-WAY LINE; THENCE SOUTH 52 DEGREES 00 MINUTES WEST, ALONG SAID HIGHWAY RIGHT-OF-WAY, 383.80 FEET TO THE POINT OF BEGINNING.

ALSO EXCEPT (DR 473, page 153):
ALL THAT PARCEL OF LAND SITUATE IN THE CITY OF ANDERSON, COUNTY OF MADISON AND STATE OF INDIANA, BEING PART OF THE SOUTHWEST QUARTER OF THE SOUTHEAST QUARTER OF SECTION 14, TOWNSHIP 19 NORTH, RANGE 7 EAST, AND BEING PART OF THE RIGHT OF WAY OF THE FORMER RAILROAD OF THE PHILADELPHIA, BALTIMORE AND WASHINGTON RAILROAD COMPANY KNOWN AS THE ANDERSON BELT TRACK, BOUNDED AND DESCRIBED AS FOLLOWS: VIZ:

BEGINNING AT A POINT MARKED BY A P.K. NAIL IN THE SOUTH LINE OF SAID SECTION 14 AT THE

MLC #1234 & 1320 – Venture 2000 Industrial Park and
Delphi I – Anderson/Monroe

X:\DOCUMENTS AND SETTINGS\MERRILLSCAN\LOCAL SETTINGS\TEMP\WZ1342\US_ACTIVE_EXHIBIT A - MLC #1234 & 1320 - VENTURE 2000
AND DELPHI I ANDERSON_MONROE_43637455_1.DOC          2

SOUTHEASTERLY CORNER OF THE PARCEL OF LAND CONTAINING 4777 SQUARE FEET, +, WHICH HAS BEEN CONVEYED BY SAID RAILROAD COMPANY TO CITY OF ANDERSON AS PARCEL 1 IN A DEED DATED NOVEMBER 22, 1963, SAID BEGINNING POINT BEING AT THE DISTANCE OF 181.5 FEET MEASURED DUE EAST, ALONG SAID SOUTH LINE OF SECTION 14, FROM AN IRON PIN AT THE SOUTHWEST CORNER OF SAID SOUTHWEST QUARTER OF THE SOUTHEAST QUARTER OF SECTION 14; BEGINNING FROM SAID BEGINNING POINT THE FOLLOWING FOUR COURSES AND DISTANCES; (1) N. 0° 00' 30" E., PASSING THROUGH AN IRON PIN AT THE NORTHEASTERLY CORNER OF THE PARCEL OF LAND CONVEYED AS AFORESAID TO CITY OF ANDERSON AT THE DISTANCE OF 34 FEET FROM THE BEGINNING OF THE COURSES BEING DESCRIBED, 40.00 FEET TO A P.K. NAIL IN THE NORTHERLY RIGHT OF WAY LINE OF SAID FORMER RAILROAD; (2) DUE EAST, ALONG SAID NORTHERLY RIGHT OF WAY LINE, 1157.89 FEET TO THE NORTHWESTERLY LINE OF PENDLETON AVENUE (56 FEET WIDE); (3) S. 52° 28' 30" W., ALONG THE SAME 65.67 FEET TO SAID SOUTH LINE OF SECTION 14; AND (4) DUE WEST, ALONG THE SAME, 1105.82 FEET TO THE PLACE OF BEGINNING.

ALSO EXCEPT (DR 485, page 344):
BEGINNING AT THE SOUTHWEST CORNER OF THE SOUTHEAST QUARTER OF SECTION 14, TOWNSHIP 19 NORTH, RANGE 7 EAST; THENCE NORTH 90 DEGREES 00 MINUTES EAST 245.8 FEET; THENCE NORTH 00 DEGREES 05 MINUTES EAST 383.00 FEET TO THE EASTERLY RIGHT-OF-WAY LINE OF THE CLEVELAND-CINCINNATI, CHICAGO AND ST. LOUIS RAILROAD; THENCE NORTH 29 DEGREES 15 MINUTES EAST 451.3 FEET ON AND ALONG THE EASTERLY RIGHT-OF-WAY LINE OF SAID RAILROAD TO THE POINT OF BEGINNING OF A 01 DEGREE 00 MINUTES CURVE TO THE RIGHT; THENCE NORTHEASTERLY A LONG CHORD DISTANCE OF 565.2 FEET ALONG A CHORD HAVING A BEARING OF NORTH 32 DEGREES 05 MINUTES EAST TO THE POINT OF INTERSECTION OF THE EASTERLY RIGHT-OF-WAY LINE OF SAID RAILROAD WITH THE SOUTH RIGHT-OF-WAY LINE OF TWENTY-SECOND STREET AS LOCATED APRIL 1, 1966, SAID POINT BEING THE POINT OF BEGINNING; THENCE SOUTH 54 DEGREES 47 MINUTES EAST 158.4 FEET ON AND ALONG SAID SOUTH RIGHT-OF-WAY LINE OF TWENTY-SECOND STREET; THENCE NORTH 56 DEGREES 55 MINUTES 06 SECOND WEST 158.21 FEET TO THE EASTERLY RIGHT-OF-WAY LINE OF THE ABOVE MENTIONED RAILROAD; THENCE NORTHEASTERLY 5.0 FEET ON AND ALONG THE EASTERLY RIGHT-OF-WAY LINE OF SAID RAILROAD TO THE PLACE OF BEGINNING, BEING A PART OF THE SOUTHEAST QUARTER OF SECTION 14, TOWNSHIP 19 NORTH, RANGE 7 EAST IN THE CITY OF ANDERSON, ANDERSON TOWNSHIP, MADISON COUNTY, INDIANA AND CONTAINING .0091 OF AN ACRE MORE OR LESS (395.45 SQUARE FEET).

AND

BEGINNING AT THE SOUTHWEST CORNER OF THE SOUTHEAST QUARTER OF SECTION 14, TOWNSHIP 19 NORTH, RANGE 7 EAST; THENCE NORTH 90 DEGREES 00 MINUTES EAST 245.8 FEET; THENCE NORTH 00 DEGREES 05 MINUTES EAST 383.00 FEET TO THE EASTERLY RIGHT-OF-WAY LINE OF THE CLEVELAND, CINCINNATI, CHICAGO AND ST. LOUIS RAILROAD; THENCE NORTH 29 DEGREES 15 MINUTES EAST 451.3 FEET ON AND ALONG THE EASTERLY RIGHT-OF-WAY LINE OF SAID RAILROAD TO THE POINT OF BEGINNING OF A 01 DEGREE 00 MINUTES CURVE TO THE RIGHT; THENCE NORTHEASTERLY A LONG CHORD DISTANCE OF 565.2 FEET ALONG A CHORD HAVING A BEARING OF NORTH 32 DEGREES 05 MINUTES EAST TO THE POINT OF INTERSECTION OF THE EASTERLY RIGHT-OF-WAY LINE OF SAID RAILROAD WITH THE SOUTH RIGHT-OF-WAY LINE OF TWENTY-SECOND STREET AS LOCATED APRIL 1, 1966; THENCE SOUTH 54 DEGREES 47 MINUTES EAST A DISTANCE OF 158.4 FEET ON AND ALONG THE SOUTH RIGHT-OF-WAY LINE OF TWENTY-SECOND STREET TO THE PLACE OF BEGINNING; THENCE NORTH 77 DEGREES 27 MINUTES EAST 293.28 FEET ON AND ALONG THE SOUTH RIGHT-OF-WAY LINE OF TWENTY-SECOND STREET; THENCE SOUTH 12 DEGREES 33 MINUTES EAST 10.0 FEET; THENCE SOUTH 72 DEGREES 53 MINUTES 49 SECONDS WEST 135.37 FEET; THENCE SOUTH 84 DEGREES 23 MINUTES 04 SECONDS WEST 159.55 FEET TO THE PLACE OF BEGINNING. BEING A PART OF THE SOUTHEAST QUARTER OF SECTION 14, TOWNSHIP 19 NORTH, RANGE 7 EAST IN THE CITY OF ANDERSON, ANDERSON TOWNSHIP, MADISON COUNTY, INDIANA AND CONTINUING .0828 OF AN ACRE MORE OR LESS (3,608 SQUARE FEET).

ALSO EXCEPT (Inst. 9812970):
A PART OF THE SOUTHEAST QUARTER OF SECTION 14, TOWNSHIP 19 NORTH, RANGE 7 EAST,

MLC #1234 & 1320 – Venture 2000 Industrial Park and
Delphi I – Anderson/Monroe

X:\DOCUMENTS AND SETTINGS\MERRILLSCAN\LOCAL SETTINGS\TEMP\WZ1342\US_ACTIVE_EXHIBIT A - MLC #1234 & 1320 - VENTURE 2000 AND DELPHI I ANDERSON_MONROE_43637455_1.DOC          3

MADISON COUNTY, INDIANA, AND BEING THAT PART OF THE OWNER'S LAND LYING WITHIN THE RIGHT OF WAY LINES DEPICTED ON THE RIGHT OF WAY PARCEL PLAT OF PARCEL 78 OF THE CITY OF ANDERSON, INDIANA PROJECT STP-A560( )CN ATTACHED HERETO AS EXHIBIT "A", AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS: BEGINNING AT THE INTERSECTION OF THE NORTHWESTERN BOUNDARY OF PENDLETON AVENUE WITH THE NORTH LINE OF THE RIGHT-OF-WAY OF THE ANDERSON BELT RAILWAY COMPANY (THE FOREGOING PORTION OF THIS DESCRIPTION BEGINNING WITH THE WORDS "NORTH LINE OF THE RIGHT-OF-WAY IS QUOTED FROM DEED RECORD 352, PAGE 287); THENCE SOUTH 86 DEGREES 26 MINUTES 57 SECONDS WEST (ASSUMED BEARING) 14.416 METERS (47.30 FEET) ALONG THE NORTH LINE OF THE RIGHT-OF-WAY OF SAID ANDERSON BELT RAILWAY COMPANY; THENCE NORTH 55 DEGREES 52 MINUTES 33 SECONDS EAST 96.128 METERS (315.38 FEET) TO THE WEST LINE OF LOT 478 IN HAZELWOOD ADDITION TO THE CITY OF ANDERSON, INDIANA, THE PLAT OF WHICH ADDITION IS RECORDED IN PLAT BOOK 2, PAGE 90, IN THE OFFICE OF THE RECORDER OF MADISON COUNTY, INDIANA; THENCE SOUTH 0 DEGREES 15 MINUTES 42 SECONDS WEST 2.533 METERS (8.31 FEET) ALONG SAID WEST LINE TO THE NORTHWESTERN BOUNDARY OF SAID PENDLETON AVENUE; THENCE SOUTH 51 DEGREES 56 MINUTES 45 SECONDS WEST 82.745 METERS (271.47 FEET) ALONG THE BOUNDARY OF SAID PENDLETON AVENUE TO THE POINT OF BEGINNING AND CONTAINING 0.046 HECTARES (0.112 ACRES), MORE OR LESS.

Parcel III (DR 259, page 76)
ALL THAT PORTION OF THE NORTHWEST QUARTER OF THE NORTHEAST QUARTER AND THAT PART OF THE NORTHEAST QUARTER OF THE NORTHWEST QUARTER, ALL IN SECTION 23, TOWNSHIP 19 NORTH, RANGE 7 EAST, BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS: BEGINNING AT THE INTERSECTION OF THE EAST LINE OF THE RIGHT-OF-WAY OF THE CLEVELAND, CINCINNATI, CHICAGO & ST. LOUIS RAILROAD COMPANY WITH NORTH LINE OF SAID SECTION 23; RUNNING THENCE EAST AND ALONG SAID SECTION LINE 402.5 FEET; THENCE IN A SOUTH WESTWARDLY DIRECTION ON A LINE PARALLEL TO THE CENTER OF PENDLETON AVENUE IN JENNY ADDITION TO THE CITY OF ANDERSON IN SAID COUNTY AND STATE 941.2 FEET; THENCE WEST 583.4 FEET TO THE EAST LINE OF SAID RIGHT-OF-WAY; THENCE IN A NORTHEASTWARDLY DIRECTION ALONG AND ON THE EAST LINE OF SAID RIGHT-OF-WAY 1018 FEET TO THE PLACE OF BEGINNING, THE SAME CONTAINING 10 ACRES, MORE OR LESS; ALSO INCLUDING ALL RIGHT-OF-WAY, SIDE-TRACK AGREEMENTS, EASEMENTS, PRIVILEGES AND APPURTENANCES BELONGING TO SAID REAL ESTATE ABOVE DESCRIBED OR ANY PART THEREOF; BEING THE SAME PREMISES CONVEYED BY DEED DATED DECEMBER 28, 1928 FROM DELCO-REMY CORPORATION TO GUIDE LAMP CORPORATION AND RECORDED IN DEED RECORD 243, PAGE 537, IN THE RECORDER'S OFFICE OF MADISON COUNTY, INDIANA, ON JANUARY 30, 1929.

ALSO LOT NUMBER ONE HUNDRED NINETY-TWO (192) IN JENNY ADDITION TO THE CITY OF ANDERSON, INDIANA, AS SHOWN IN PLAT THEREOF RECORDED IN PLAT BOOK 6, AT PAGE 111, IN THE RECORDER'S OFFICE OF MADISON COUNTY, INDIANA; BEING THE SAME PREMISES CONVEYED BY DEED DATED MAY 9, 1930 FROM BERNARD B. HORTON AND EMMA MAY HORTON, HUSBAND AND WIFE, TO GUIDE LAMP CORPORATION AND RECORDED IN DEED RECORD 247, PAGE 329, IN SAID RECORDER'S OFFICE ON MAY 10, 1930.

ALSO ALL OF LOTS NUMBER 174 AND 175 IN SAID JENNY ADDITION EXCEPT THE FOLLOWING PORTIONS THEREOF HERETOFORE CONVEYED TO THE CITY OF ANDERSON FOR HIGHWAY PURPOSES:

ALSO BEGINNING AT A POINT ON THE EAST LINE OF LOT NUMBER ONE HUNDRED SEVENTY-FOUR (174) IN JENNY ADDITION TO THE CITY OF ANDERSON, INDIANA WHICH SAID POINT IS TWENTY-ONE AND THREE-TENTHS (21.3) FEET NORTHEAST ALONG THE EAST LINE OF SAID LOT FROM THE SOUTHEAST CORNER OF SAID LOT NUMBER ONE HUNDRED SEVENTY-FOUR (174); EXTENDING THENCE WEST PARALLEL WITH THE SOUTH LINE OF SAID LOT NUMBER ONE HUNDRED SEVENTY-FOUR (174) TO THE WEST LINE OF SAID LOT, THENCE SOUTHWEST TWENTY-ONE AND THREE TENTHS (21.3) FEET TO THE SOUTHWEST CORNER OF SAID LOT, THENCE EAST ALONG THE SOUTH LINE OF SAID LOT TO THE EAST LINE THEREOF, THENCE NORTHEAST TWENTY-ONE AND THREE TENTH (21.3) FEET TO THE PLACE OF BEGINNING.

ALSO, BEGINNING AT A POINT ON THE EAST LINE OF LOT NUMBER ONE HUNDRED SEVENTY-FIVE (175) IN JENNY ADDITION TO THE CITY OF ANDERSON, INDIANA, WHICH SAID POINT IS TWENTY-ONE AND THREE TENTHS (21.3) FEET NORTHEAST ALONG THE EAST LINE OF SAID LOT FROM THE SOUTHEAST CORNER OF SAID LOT NUMBER ONE HUNDRED SEVENTY-FIVE (175); EXTENDING THENCE WEST PARALLEL WITH THE SOUTH LINE OF SAID LOT NUMBER ONE HUNDRED SEVENTY-FIVE (175) TO THE WEST LINE THEREOF, THENCE SOUTHWEST ALONG THE WEST LINE OF SAID LOT TO THE SOUTHWEST CORNER THEREOF, THENCE EAST ALONG THE SOUTH LINE OF SAID LOT NUMBER ONE HUNDRED SEVENTY-FIVE (175) TO THE SOUTHEAST CORNER THEREOF, THENCE NORTHEAST TWENTY-ONE AND THREE TENTHS (21.3) FEET TO THE PLACE OF BEGINNING; AND THAT CERTAIN VACATED ALLEY OR PART OF STREET BEING BOUNDED ON THE NORTH BY THE PREMISES DESCRIBED IN PARAGRAPH (1) ABOVE, AND MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT THE NORTH EAST CORNER OF SAID LOT NUMBER 174 AND EXTENDING THENCE NORTHEASTERLY WITH THE EXTENDED LINE OF THE EAST END OF SAID LOT NUMBER 174, A DISTANCE 213 FEET, THENCE WEST TO THE RIGHT-OF-WAY LINE OF THE 0. 0. 0. AND ST. L. R. R., THENCE SOUTHERLY WITH SAID RIGHT-OF-WAY LINE 25 FEET TO THE NORTH WEST CORNER OF SAID LOT NUMBER 192, THENCE EAST ALONG THE NORTH LINE OF LOTS NUMBERED 192, 175 AND 174 IN SAID JENNY ADDITION AND SAID NORTH LINE EXTENDED TO THE PLACE OF BEGINNING; TOGETHER WITH ALL THE RIGHT, TITLE AND INTEREST OF THE SAID GRANTOR IN AND TO THE STREETS, AVENUES, ROAD AND ALLEYS NOW OR FORMERLY KNOWN AS SUCH IN FRONT OF AND ADJOINING ALL OF THE PREMISES ABOVE DESCRIBED.

ALSO (DR 426, page 495):
COMMENCING AT A CROSS MARKING THE POINT OF INTERSECTION OF THE CENTERLINE OF MADISON AVENUE AND THE CENTERLINE OF 29TH STREET IN THE CITY OF ANDERSON, INDIANA, SAID POINT BEING ON THE SECTION LINE BETWEEN SECTION 23, TOWNSHIP 19 NORTH, RANGE 7 EAST, AND SECTION 24, TOWNSHIP 19 NORTH, RANGE 7 EAST, AND RUNNING THENCE EAST ON AND ALONG THE SAID CENTERLINE OF 29TH STREET, A DISTANCE OF 570.1 FEET TO THE NORTHWEST CORNER OF BYRUM'S 29TH STREET ADDITION, SAID CORNER
BEING 760 FEET WEST OF THE NORTHEAST CORNER OF THE SOUTHWEST QUARTER OF THE NORTHWEST QUARTER OF SAID SECTION 24; THENCE SOUTH ON AND ALONG THE WEST LINE OF SAID ADDITION A DISTANCE OF 1,301.5 FEET TO THE NORTH RIGHT-OF-WAY LINE OF THE CLEVELAND, CINCINNATI, CHICAGO AND ST. LOUIS RAILWAY COMPANY; THENCE WEST ON AND ALONG SAID RIGHT-OF-WAY LINE A DISTANCE OF 1,908.2 FEET TO THE CENTERLINE OF THE STANLEY DITCH; THENCE TURN AN ANGLE TO THE RIGHT, 150 DEGREES AND 56 MINUTES AND MEASURE NORTHEASTERLY ON AND ALONG SAID CENTERLINE A DISTANCE OF 83.7 FEET; THENCE TURN AN ANGLE, TO THE LEFT, 22 DEGREES AND 24 MINUTES AND MEASURE NORTHEASTERLY ON AND ALONG SAID CENTERLINE A DISTANCE OF 763.7 FEET; THENCE TURN AN ANGLE TO THE LEFT 30 DEGREES AND 37 MINUTES AND MEASURE NORTHEASTERLY ON AND ALONG SAID CENTERLINE A DISTANCE OF 709.7 FEET TO THE CENTERLINE OF 29TH STREET; THENCE TURN AN ANGLE TO THE RIGHT, 84 DEGREES 35 MINUTES AND MEASURE EASTERLY A DISTANCE OF 706.3 FEET TO THE PLACE OF BEGINNING. BEING A PART OF THE NORTHEAST QUARTER OF SECTION 23, TOWNSHIP 19 NORTH, RANGE 7 EAST, AND CONTAINING 27.2 ACRES LOCATED IN ANDERSON TOWNSHIP, AND A PART OF THE NORTHWEST QUARTER OF SECTION 24, TOWNSHIP 19 NORTH, RANGE 7 EAST AND CONTAINING 17.13 ACRES LOCATED IN THE CITY OF ANDERSON, CONTAINING, IN ALL, 44.33 ACRES, MORE OR LESS, SUBJECT TO LEGAL RIGHT-OF-WAYS.

ALSO, COMMENCING AT A POINT IN THE CENTERLINE OF 29TH STREET IN THE CITY OF ANDERSON, INDIANA, SAID POINT BEING 706.3 FEET WESTERLY MEASURED ON AND ALONG SAID CENTERLINE FROM THE EAST LINE OF SECTION 23, TOWNSHIP 19 NORTH, RANGE 7 EAST, AND RUNNING THENCE WESTERLY ON AND ALONG SAID CENTERLINE A DISTANCE OF 1,308.5 FEET TO THE CENTERLINE OF STATE ROAD NUMBER 9 (AS LOCATED JUNE 15, 1960); THENCE TURN AN ANGLE TO THE LEFT, 72 DEGREES AND 15 MINUTES, AND MEASURE SOUTHWESTERLY ON AND ALONG SAID CENTER LINE A DISTANCE OF 966 FEET TO A POINT OF CURVE; THENCE ON A CURVE TO THE RIGHT HAVING A RADIUS OF 1,432.69 FEET A DISTANCE OF 584.5 FEET TO THE NORTH RIGHT-OF-WAY LINE OF THE CLEVELAND, CINCINNATI, CHICAGO AND ST. LOUIS RAILWAY COMPANY; THENCE EAST ON AND ALONG SAID RIGHT-OF-WAY LINE A DISTANCE OF 1,302.5 FEET TO THE CENTERLINE OF THE STANLEY DITCH; THENCE TURN AN ANGLE TO THE LEFT, 29 DEGREES AND 04 MINUTES, AND MEASURE NORTHEASTERLY ON AND ALONG SAID CENTERLINE A DISTANCE

OF 83.7 FEET; THENCE TURN AN ANGLE TO THE LEFT, 22 DEGREES AND 24 MINUTES, AND MEASURE NORTHEASTERLY ON AND ALONG SAID CENTERLINE A DISTANCE OF 763.7 FEET; THENCE TURN AN ANGLE TO THE LEFT, 30 DEGREES AND 37 MINUTES AND MEASURE NORTHEASTERLY ON AND ALONG SAID CENTERLINE A DISTANCE OF 709.7 FEET TO THE PLACE OF BEGINNING.
BEING A PART OF THE NORTHEAST QUARTER OF SECTION 23, TOWNSHIP 19 NORTH, RANGE 7 EAST, AND CONTAINING 44.12 ACRES, MORE OR LESS.

ALSO (DR 429, page 336 & DR 428, page 316):
COMMENCING AT A POINT ON THE WEST LINE OF SECTION 23, TOWNSHIP 19 NORTH, RANGE 7 EAST, SAID POINT BEING 1,699.5 FEET SOUTH OF THE NORTHWEST CORNER OF SECTION 23, TOWNSHIP 19 NORTH, RANGE 7 EAST AND RUNNING THENCE EAST PARALLEL WITH THE NORTH LINE OF SAID SECTION 23, A DISTANCE OF 1,362.2 FEET TO THE WEST LINE OF DEWEY STREET; THENCE SOUTH PARALLEL WITH THE WEST LINE OF SECTION 23 ON AND ALONG THE SAID WEST LINE OF DEWEY STREET A DISTANCE OF 426 FEET TO THE NORTHERLY LINE OF ARROW AVENUE EXTENDED; THENCE TURN AN ANGLE TO THE RIGHT, 28 DEGREES AND 35 MINUTES AND MEASURE SOUTHWESTERLY ON AND ALONG SAID NORTHERLY LINE A DISTANCE OF 51 FEET TO THE WEST LINE OF THE SOUTHEAST QUARTER OF THE NORTHWEST QUARTER OF SAID SECTION 23; THENCE TURN AN ANGLE TO THE LEFT, 28 DEGREES 35 MINUTES AND MEASURE SOUTH ON AND ALONG SAID WEST LINE A DISTANCE OF 170.5 FEET TO THE EASTERLY RIGHT-OF-WAY LINE OF THE OLD UNION TRACTION COMPANY, ALSO BEING THE WESTERLY RIGHT-OF-WAY LINE OF THE CLEVELAND, CINCINNATI, CHICAGO & ST. LOUIS RAILWAY COMPANY; THENCE TURN AN ANGLE TO THE LEFT 28 DEGREES 35 MINUTES AND MEASURE SOUTHWESTERLY ON AND ALONG SAID RIGHT-OF-WAY LINE A DISTANCE OF 9.4 FEET TO A POINT OF CURVE; THENCE CONTINUING ON AND ALONG SAID RIGHT-OF-WAY LINE ON A CURVE TO THE LEFT HAVING A RADIUS OF 11,499.19 FEET, A DISTANCE OF 356.4 FEET TO THE SOUTH LINE OF THE NORTHWEST QUARTER OF SECTION 23, TOWNSHIP 19 NORTH, RANGE 7 EAST; THENCE WEST ON AND ALONG SAID SOUTH LINE A DISTANCE OF 1,168 FEET TO THE SOUTHWEST CORNER OF SAID NORTHWEST QUARTER; THENCE NORTH ON AND ALONG THE WEST LINE OF SECTION 23, A DISTANCE OF 975.5 FEET TO THE PLACE OF BEGINNING; BEING A PART OF THE NORTHWEST QUARTER OF SECTION 23, TOWNSHIP 19 NORTH, RANGE 7 EAST AND CONTAINING 29.364 ACRES MORE OR LESS; TOGETHER WITH ALL STRIPS AND ACRES OF LAND WITHIN AND ADJOINING PREMISES DESCRIBED, INCLUDING ALL RIGHT, TITLE AND INTEREST IN RAIBLE AVENUE, 30TH STREET, DEWEY STREET AND ARROW AVENUE TO THE CENTER LINE THEREOF; SUBJECT, HOWEVER, TO RIGHT OF PUBLIC USE IN SAID STREET AND AVENUES.

ALSO (DR 487, page 4):
BEGINNING AT A POINT ON THE SOUTH LINE OF THE NORTHWEST QUARTER OF SECTION 23, TOWNSHIP 19 NORTH, RANGE 7 EAST, SAID POINT BEING 48.8 FEET WEST OF THE SOUTHEAST CORNER OF THE NORTHWEST QUARTER OF SAID SECTION 23, SAID POINT ALSO BEING IN THE CENTER LINE OF STATE ROAD 9 AND 67; THENCE NORTH 90 DEGREES 00 MINUTES WEST 431.20 FEET ALONG SAID SOUTH LINE OF THE NORTHWEST QUARTER OF SECTION 23 TO THE MOST WESTERLY ANGLE POINT OF THE PROPERTY DESCRIBED IN DEED FROM OTIS P. CRIM AND MINNIE E. CRIM TO THE CLEVELAND, CINCINNATI, CHICAGO AND ST. LOUIS RAILWAY COMPANY DATED MARCH 9, 1923, RECORDED IN BOOK 227, PAGE 114 OF THE DEED RECORDS OF SAID COUNTY; THENCE NORTH 75 DEGREES 52 MINUTES EAST 185.70 FEET ALONG THE NORTHWESTERLY LINE OF THE PROPERTY DESCRIBED IN SAID DEED DATED MARCH 9, 1923, TO A POINT THAT IS 45.35 FEET MEASURED PERPENDICULARLY NORTH FROM SAID SOUTH LINE OF THE NORTHWEST QUARTER OF SECTION 23; THENCE NORTH 90 DEGREES 00 MINUTES EAST 296.95 FEET ALONG THE NORTHERLY LINE OF THE PROPERTY DESCRIBED IN SAID DEED DATED MARCH 9, 1923, TO SAID CENTER LINE OF STATE ROAD NO. 9 AND NO. 67; THENCE SOUTH 45 DEGREES 33 MINUTES WEST 64.40 FEET TO THE POINT OF BEGINNING, CONTAINING 0.379 ACRES, MORE OR LESS, BEING A PART OF THE NORTHWEST QUARTER OF SECTION 23, TOWNSHIP 19 NORTH, RANGE 7 EAST IN THE CITY OF ANDERSON, MADISON COUNTY, INDIANA.

ALSO, BEGINNING AT A POINT ON THE NORTH LINE OF THE SOUTHWEST QUARTER OF SECTION 23, TOWNSHIP 19 NORTH, RANGE 7 EAST, SAID POINT BEING 306.88 FEET WEST OF THE NORTHEAST CORNER OF THE SOUTHWEST QUARTER OF SAID SECTION 23, SAID POINT ALSO BEING 25 FEET

MLC #1234 & 1320 – Venture 2000 Industrial Park and
Delphi I – Anderson/Monroe

X:\DOCUMENTS AND SETTINGS\MERRILLSCAN\LOCAL SETTINGS\TEMP\WZ1342\US_ACTIVE_EXHIBIT A - MLC #1234 & 1320 - VENTURE 2000
AND DELPHI I ANDERSON_MONROE_43637455_1.DOC                    6

DISTANT MEASURED NORTHERLY AT RIGHT ANGLES FROM THE CENTER LINE OF THE CLEVELAND, CINCINNATI, CHICAGO AND ST. LOUIS RAILWAY COMPANY'S MAIN TRACK KNOWN AS THE SOUTH ANDERSON CUT-OFF; THENCE SOUTHWESTERLY ALONG A LINE THAT IS APPROXIMATELY PARALLEL WITH AND 25 FEET NORTHWESTERLY OF THE CENTER LINE OF SAID TRACK KNOWN AS THE SOUTH ANDERSON CUT-OFF, BEING ALONG A CURVE TO THE LEFT HAVING A RADIUS OF 1935.08 FEET A LONG CHORD BEARING SOUTH 62 DEGREES 25 MINUTES 57 SECONDS WEST AND A LONG CHORD DISTANCE OF 1592.28 FEET TO A POINT THAT IS 50 FEET DISTANT MEASURED EASTERLY AT RIGHT ANGLES FROM THE CENTER LINE OF THE MAIN TRACK OF THE CLEVELAND, CINCINNATI, CHICAGO AND ST. LOUIS RAILWAY COMPANY; THENCE NORTH 65 DEGREES 41 MINUTES 09 SECONDS WEST 20 FEET TO A POINT THAT IS 30 FEET DISTANT MEASURED EASTERLY AT RIGHT ANGLES FROM THE CENTER LINE OF SAID MAIN TRACK; THENCE NORTHEASTERLY ALONG A LINE THAT IS PARALLEL WITH AND 30 FEET EASTERLY OF THE CENTER LINE OF SAID MAIN TRACK, BEING ALONG A CURVE TO THE RIGHT HAVING A RADIUS OF 11,429.2 FEET, A LONG CHORD BEARING NORTH 24 DEGREES 18 MINUTES 51 SECONDS EAST, AND A LONG CHORD DISTANCE OF 799.59 FEET TO A POINT IN NORTH LINE OF THE SOUTHWEST QUARTER OF SECTION 23; THENCE NORTH 90 DEGREES 00 MINUTES EAST 1100.70 FEET ALONG SAID NORTH LINE OF THE SOUTHWEST QUARTER OF SECTION 23 TO THE POINT OF BEGINNING, CONTAINING 5.363 ACRES, MORE OR LESS, BEING A PART OF THE SOUTHWEST QUARTER OF SECTION 23, TOWNSHIP 19 NORTH, RANGE 7 EAST IN THE CITY OF ANDERSON, MADISON COUNTY, INDIANA.

ALSO (DR 521, page 356)
A PART OF THE NORTHWEST QUARTER OF SECTION 23, TOWNSHIP 19 NORTH, RANGE 7 EAST, SAID PARCEL ALSO BEING PART OF THE OLD UNION TRACTION COMPANY RIGHT OF WAY, MORE PARTICULARLY DESCRIBED AS FOLLOWS: BEGINNING AT A POINT IN THE SOUTH LINE OF THE NORTHWEST QUARTER OF SECTION 23, TOWNSHIP 19 NORTH, RANGE 7 EAST, SAID POINT BEING NORTH 89 DEGREES 12 MINUTES 22 SECONDS EAST 1145.72 FEET FROM THE SOUTHWEST CORNER OF SAID NORTHWEST QUARTER, SAID POINT ALSO BEING; IN THE WESTERLY RIGHT OF WAY LINE OF THE OLD UNION TRACTION COMPANY, SAID POINT ALSO BEING 73.00 FEET MEASURED RADIALLY FROM THE CENTERLINE OF THE CLEVELAND, CINCINNATI, CHICAGO AND ST. LOUIS RAILROAD; THENCE NORTHEASTERLY ALONG THE WESTERLY RIGHT OF WAY OF SAID OLD UNION TRACTION COMPANY ON A CURVE TO THE RIGHT 430.56 FEET PARALLEL WITH THE CENTER LINE OF THE CLEVELAND, CINCINNATI CHICAGO AND ST. LOUIS RAILROAD, SAID CURVE HAVING AN INTERSECTION ANGLE OF 02 DEGREES 07 MINUTES 56 SECONDS; A RADIUS OF 11,569.67 FEET AND SUBTENDED BY A LONG CHORD WHOSE LENGTH IS 430.53 FEET AND WHOSE BEARING IS NORTH 26 DEGREES 29 MINUTES 16 SECONDS EAST TO A POINT ON THE WEST LINE OF THE EAST HALF OF THE NORTHWEST QUARTER OF SAID SECTION 23, SAID POINT ALSO BEING ON THE EASTERLY LINE OF ARROW AVENUE AT ITS SOUTHERLY TERMINUS; THENCE CONTINUE NORTHEASTERLY ALONG THE WEST RIGHT OF WAY LINE OF SAID OLD UNION TRACTION COMPANY PARALLEL WITH THE CENTERLINE OF THE CLEVELAND, CINCINNATI, CHICAGO AND ST. LOUIS RAILROAD ALONG A CURVE TO THE RIGHT 226.67 FEET TO THE POINT OF TANGENCY OF SAID CURVE, SAID CURVE HAVING AN INTERSECTION ANGLE OF 00 DEGREES 51 MINUTES 39 SECONDS A RADIUS OF 11,569.67 FEET AND SUBTENDED BY A LONG CHORD WHOSE LENGTH IS 226.66 FEET AND WHOSE BEARING IS NORTH 28 DEGREES 06 MINUTES 47 SECONDS EAST, SAID LINE ALSO BEING THE EASTERLY RIGHT OF WAY LINE OF ARROW AVENUE; THENCE NORTH 28 DEGREES 40 MINUTES 28 SECONDS EAST 394. 68 FEET ON AND ALONG THE WEST RIGHT OF WAY LINE OF SAID UNION TRACTION COMPANY PARALLEL WITH THE CENTER LINE OF THE CLEVELAND, CINCINNATI, CHICAGO AND ST. LOUIS RAILROAD, SAID LINE ALSO BEING THE EASTERLY LINE OF ARROW AVENUE TO A POINT ON A PARALLEL WITH AND 60 FEET SOUTH OF THE NORTH LINE 30TH STREET EXTENDED EAST; THENCE NORTH 89 DEGREES 46 MINUTES 00 SECONDS EAST 11.42 FEET PARALLEL WITH THE NORTH LINE OF SAID 30TH STREET, SAID LINE ALSO BEING PARALLEL WITH THE NORTH LINE OF THE NORTHWEST QUARTER OF SECTION 23, TOWNSHIP 19 NORTH, RANGE 7 EAST TO A POINT 63.00 FEET AT RIGHT ANGLES FROM THE CENTER LINE OF CLEVELAND, CINCINNATI, CHICAGO AND ST. LOUIS RAILROAD; THENCE NORTH 28 DEGREES 40 MINUTES 28 SECONDS EAST 484.35 FEET PARALLEL WITH THE CENTERLINE OF THE CLEVELAND, CINCINNATI, CHICAGO AND ST. LOUIS RAILROAD TO A POINT ON THE NORTH LINE OF 29TH STREET EXTENDED EAST; THENCE NORTH 89 DEGREES 46 MINUTES 00 SECONDS EAST 26.27 FEET ALONG THE NORTH LINE OF 29TH STREET EXTENDED EAST, SAID LINE ALSO BEING PARALLEL WITH THE NORTH LINE OF THE NORTHWEST QUARTER OF SECTION 23, TOWNSHIP 19 NORTH, RANGE 7 EAST TO A POINT ON THE EASTERLY RIGHT OF WAY LINE OF THE OLD UNION TRACTION COMPANY, SAID POINT ALSO BEING ON THE WESTERLY RIGHT OF WAY LINE OF THE CLEVELAND,

CINCINNATI, CHICAGO AND ST. LOUIS RAILROAD; AND 40 FEET MEASURED AT RIGHT ANGLE FROM THE CENTERLINE OF SAID CLEVELAND, CINCINNATI, CHICAGO AND ST. LOUIS RAILROAD; THENCE SOUTH 28 DEGREES 40 MINUTES 28 SECONDS WEST 897.25 FEET ALONG THE EASTERLY RIGHT OF WAY LINE OF SAID OLD UNION TRACTION COMPANY, SAID LINE ALSO BEING THE WESTERLY RIGHT OF WAY LINE OF THE CLEVELAND, CINCINNATI, CHICAGO AND ST. LOUIS RAILROAD TO THE POINT OF BEGINNING OF A CURVE TO THE LEFT; THENCE SOUTHWESTERLY ALONG THE EASTERLY RIGHT OF WAY LINE OF SAID OLD UNION TRACTION COMPANY PARALLEL WITH THE CENTERLINE OF THE CLEVELAND, CINCINNATI, CHICAGO AND ST. LOUIS RAILROAD 639.15 FEET TO A POINT IN THE SOUTH LINE OF THE NORTHWEST QUARTER OF SECTION 23, TOWNSHIP 19 NORTH, RANGE 7 EAST, SAID CURVE HAVING AN INTERSECTION ANGLE OF 03 DEGREES 10 MINUTES 27 SECONDS; A RADIUS OF 11,536.67 FEET AND SUBTENDED BY A LONG CHORD WHOSE LENGTH IS 639.03 FEET AND WHOSE BEARING IS SOUTH 27 DEGREES 02 MINUTES 14 SECONDS WEST, SAID CURVE ALSO BEING ON THE WESTERLY RIGHT OF WAY LINE OF THE CLEVELAND, CINCINNATI, CHICAGO AND ST. LOUIS RAILROAD; THENCE SOUTH 89 DEGREES 12 MINUTES 22 SECONDS WEST 36.80 FEET ON AND ALONG THE SOUTH LINE OF THE NORTHWEST QUARTER OF SECTION 23, TOWNSHIP 19 NORTH, RANGE 7 EAST TO THE PLACE OF BEGINNING AND CONTAINING 1.053 ACRES, MORE OR LESS OR 45,855 SQUARE FEET.

ALSO, A PART OF THE NORTHWEST QUARTER OF SECTION 23, TOWNSHIP 19 NORTH, RANGE 7 EAST, SAID PARCEL ALSO BEING A PART OF ARROW AVENUE RIGHT OF WAY, MORE PARTICULARLY DESCRIBED AS FOLLOWS: COMMENCING AT THE SOUTHWEST CORNER OF THE NORTHWEST QUARTER OF SECTION 23, TOWNSHIP 19 NORTH, RANGE 7 EAST; THENCE NORTH 89 DEGREES 12 MINUTES 22 SECONDS EAST 1145.72 FEET ON AND ALONG THE SOUTH LINE OF SAID NORTHWEST QUARTER TO A POINT IN THE WESTERLY RIGHT OF WAY LINE OF THE OLD UNION TRACTION COMPANY, SAID POINT ALSO BEING 73.00 FEET MEASURED RADIALLY FROM THE CENTERLINE OF THE CLEVELAND, CINCINNATI, CHICAGO AND ST. LOUIS RAILROAD; THENCE NORTHEASTERLY ALONG A CURVE TO THE RIGHT 430.56 FEET ON AND ALONG THE WESTERLY RIGHT OF WAY LINE OF THE OLD UNION TRACTION COMPANY PARALLEL WITH THE CENTERLINE OF THE CLEVELAND, CINCINNATI, CHICAGO AND ST. LOUIS RAILROAD, SAID CURVE HAVING AN INTERSECTION ANGLE OF 02 DEGREES 07 MINUTES 56 SECONDS; A RADIUS OF 11,569.67 FEET AND SUBTENDED BY A LONG CHORD WHOSE LENGTH IS 430.53 FEET AND WHOSE BEARING IS NORTH 26 DEGREES 29 MINUTES 16 SECONDS EAST TO THE POINT OF BEGINNING, SAID POINT BEING ON THE WEST LINE OF THE EAST HALF OF THE NORTHWEST QUARTER OF SAID SECTION 23 AND ALSO BEING ON THE EASTERLY LINE OF ARROW AVENUE AT ITS SOUTHERN TERMINUS; THENCE NORTH 00 DEGREES 03 MINUTES 23 SECONDS EAST 107.45 FEET ON AND ALONG THE WEST LINE OF SAID EAST HALF OF THE NORTHWEST QUARTER TO ITS POINT OF INTERSECTION WITH THE WESTERLY RIGHT OF WAY LINE OF ARROW AVENUE, SAID POINT ALSO. BEING 123.00 FEET MEASURED RADIALLY FROM THE CENTERLINE OF THE CLEVELAND, CINCINNATI, CHICAGO AND ST. LOUIS RAILROAD; THENCE NORTHEASTERLY ALONG CURVE TO THE RIGHT ALONG THE WESTERLY RIGHT OF WAY LINE OF ARROW AVENUE PARALLEL WITH THE CENTERLINE OF THE CLEVELAND, CINCINNATI, CHICAGO AND ST. LOUIS RAILROAD 132.33 FEET TO THE POINT OF ENDING OF SAID CURVE, SAID CURVE HAVING AN INTERSECTION ANGLE OF 00 DEGREES 39 MINUTES 09 SECOND A RADIUS OF 11,619.67 FEET AND SUBTENDED BY A LONG CHORD WHOSE LENGTH IS 132. 33 FEET AND WHOSE BEARING IS NORTH 28 DEGREES 20 MINUTES 52 SECONDS EAST; THENCE NORTH 28 DEGREES 40 MINUTES 28 SECONDS EAST 367.07 FEET ALONG THE WESTERLY LINE OF SAID ARROW AVENUE PARALLEL WITH THE CENTERLINE OF THE CLEVELAND, CINCINNATI, CHICAGO AND ST. LOUIS RAILROAD TO A POINT 60.00 FEET SOUTH OF THE NORTH LINE OF 30TH STREET EXTENDED EAST; THENCE NORTH 89 DEGREES 46 MINUTES 00 SECONDS EAST 57.12 FEET PARALLEL WITH THE NORTH LINE OF 30TH STREET, SAID LINE ALSO BEING , PARALLEL WITH THE NORTH LINE OF THE NORTHWEST QUARTER OF SAID SECTION 23 TO A POINT ON THE EASTERLY RIGHT OF WAY LINE OF ARROW AVENUE, SAID POINT ALSO BEING ON THE WESTERLY RIGHT OF WAY LINE OF THE OLD UNION TRACTION COMPANY AND 73.00 FEET MEASURED AT RIGHT ANGLES FROM THE CENTERLINE OF THE CLEVELAND, CINCINNATI, CHICAGO AND ST. LOUIS RAILROAD; THENCE SOUTH 28 DEGREES 40 MINUTES 28 SECONDS WEST 394.68 FEET ON AND ALONG THE EASTERLY LINE OF SAID ARROW AVENUE PARALLEL WITH THE CENTERLINE OF THE CLEVELAND, CINCINNATI, CHICAGO AND ST. LOUIS RAILROAD, SAID LINE ALSO BEING THE WESTERLY RIGHT OF WAY LINE OF THE OLD UNION TRACTION COMPANY TO THE POINT OF BEGINNING OF A CURVE TO THE LEFT; THENCE SOUTHWESTERLY ALONG SAID EASTERLY LINE OF ARROW AVENUE PARALLEL WITH THE CENTERLINE OF THE CLEVELAND, CINCINNATI, CHICAGO AND ST. LOUIS RAILROAD 226.67 FEET TO THE PLACE OF BEGINNING SAID CURVE ALSO BEING THE WESTERLY RIGHT OF WAY LINE OF THE OLD UNION TRACTION COMPANY HAVING AN INTERSECTION ANGLE OF 01 DEGREE 07 MINUTES 21 SECONDS; A RADIUS OF 11,569.67 FEET AND SUBTENDED BY A LONG CHORD WHOSE LENGTH IS

MLC #1234 & 1320 – Venture 2000 Industrial Park and
Delphi I – Anderson/Monroe

X:\DOCUMENTS AND SETTINGS\MERRILLSCAN\LOCAL SETTINGS\TEMP\WZ1342\US_ACTIVE_EXHIBIT A - MLC #1234 & 1320 - VENTURE 2000
AND DELPHI I ANDERSON_MONROE_43637455_1.DOC                    8

226.66 FEET AND WHOSE BEARING IS SOUTH 28 DEGREES 06 MINUTES 47 SECONDS WEST AND CONTAINING 0.644 OF AN ACRE, MORE OR LESS, OR 28,045 SQUARE FEET.

EXCEPT (DR 465, page 57):
A PART OF THE NORTH HALF OF SECTION 23, TOWNSHIP 19 NORTH, RANGE 7 EAST, MORE PARTICULARLY DESCRIBED AS FOLLOWS: BEGINNING AT A POINT OF INTERSECTION OF THE NORTH RIGHT-OF-WAY LINE OF THE C.C.C. AND ST. L. RAILROAD AND THE WEST RIGHT-OF-WAY LINE OF STATE ROAD NO. 9 (PENDLETON AVE.); THENCE NORTH 90 DEGREES 00 MINUTES WEST, ALONG SAID NORTH RAILROAD RIGHT-OF-WAY, 26.05 FEET; THENCE NORTHEASTERLY, PARALLEL TO AND 17.5 FEET DISTANT FROM SAID WEST HIGHWAY RIGHT-OF-WAY LINE, ALONG A CURVE TO THE LEFT HAVING A RADIUS OF 1390.19 FEET THROUGH AN ANGLE OF 27 DEGREES 10 MINUTES 14 SECONDS A DISTANCE OF 659.25 FEET; THENCE NORTH 20 DEGREES 15 MINUTES EAST, PARALLEL TO SAID HIGHWAY RIGHT-OF-WAY, 1043.96 FEET; THENCE NORTH 19 DEGREES 20 MINUTES EAST, PARALLEL TO SAID HIGHWAY RIGHT-OF-WAY, 702.76 FEET; THENCE ALONG A CURVE TO THE RIGHT HAVING A RADIUS OF 616.19 FEET THROUGH AN ANGLE OF 24 DEGREES 19 MINUTES 52 SECONDS A DISTANCE OF 261.67 FEET, PARALLEL TO SAID HIGHWAY RIGHT-OF-WAY, TO THE WEST LINE OF THE PROPERTY CONVEYED BY GENERAL MOTORS CORPORATION TO THE CITY OF ANDERSON AS SHOWN IN DEED RECORD 458, PAGE 348 IN THE RECORDS OF MADISON COUNTY, INDIANA; THENCE SOUTH 19 DEGREES 20 MINUTES WEST, ALONG SAID WEST PROPERTY LINE, 44.44 FEET TO A POINT 25.00 FEET FROM THE CENTER LINE OF STATE ROAD NO. 9; THENCE ALONG A CURVE TO THE LEFT HAVING A RADIUS OF 598.69 FEET THROUGH AN ANGLE OF 20 DEGREES 28 MINUTES 36 SECONDS A DISTANCE OF 213.96 FEET PARALLEL TO SAID HIGHWAY CENTER LINE; THENCE SOUTH 19 DEGREES 20 MINUTES WEST, ALONG SAID HIGHWAY RIGHT-OF-WAY LINE, 702.90 FEET; THENCE SOUTH 20 DEGREES 20 MINUTES WEST, ALONG SAID RIGHT-OF-WAY LINE, 1044.10 FEET; THENCE ALONG SAID HIGHWAY RIGHT-OF-WAY WITH A CURVE TO THE RIGHT HAVING A RADIUS OF 1407.69 FEET THROUGH AN ANGLE OF 26 DEGREES 23 MINUTES 32 SECONDS A DISTANCE OF 648.43 FEET TO THE PLACE OF BEGINNING.

ALSO EXCEPT
A PART OF THE SOUTHEAST QUARTER OF SECTION 14, TOWNSHIP 19 NORTH, RANGE 7 EAST, IN THE CITY OF ANDERSON, INDIANA, MORE PARTICULARLY DESCRIBED AS FOLLOWS: BEGINNING AT A POINT OF INTERSECTION OF THE NORTHWEST LINE OF STATE ROAD NO. 9 (PENDLETON AVENUE) WITH THE NORTH RIGHT-OF-WAY LINE OF THE ANDERSON BELT RAILWAY COMPANY; THENCE SOUTH 89 DEGREES 31 MINUTES WEST, ALONG SAID NORTH RAILROAD RIGHT-OF-WAY LINE, 16.42 FEET; THENCE NORTH 52 DEGREES 00 MINUTES EAST, PARALLEL TO AND 10.0 FEET DISTANCE FROM SAID HIGHWAY RIGHT-OF-WAY; 400.92 FEET; THENCE SOUTH 16 DEGREES 09 MINUTES EAST 10.77 FEET TO SAID HIGHWAY RIGHT-OF-WAY LINE; THENCE SOUTH 52 DEGREES 00 MINUTES WEST, ALONG SAID HIGHWAY RIGHT-OF-WAY, 383.80 FEET TO THE PLACE OF BEGINNING.

ALSO EXCEPT (DR 504, page 556):
COMMENCING AT A POINT ON THE EAST LINE OF THE NORTHEAST QUARTER OF SECTION 23, TOWNSHIP 19 NORTH, RANGE 7 EAST, SAID POINT BEING SOUTH 00 DEGREES 45 MINUTES 09 SECONDS WEST 25.00 FEET FROM A CROSS IN THE CONCRETE PAVEMENT AT THE INTERSECTION OF THE CENTER LINE OF 29TH STREET AND THE EAST LINE OF THE SAID NORTHEAST QUARTER; THENCE SOUTH 89 DEGREES 05 MINUTES 36 SECONDS EAST 50.00 FEET PARALLEL WITH AND 25.00 FEET MEASURED AT RIGHT ANGLES FROM THE CENTERLINE OF 29TH STREET; THENCE SOUTH 00 DEGREES 45 MINUTES 09 SECONDS WEST 40.00 FEET; THENCE NORTH 89 DEGREES 05 MINUTES 36 SECONDS WEST 50.00 FEET PARALLEL WITH AND 65.00 FEET MEASURED AT RIGHT ANGLES FROM THE CENTERLINE OF 29TH STREET; THENCE NORTH 87 DEGREES 28 MINUTES 50 SECONDS WEST 2006.32 FEET PARALLEL WITH AND 65.00 FEET MEASURED AT RIGHT ANGLES FROM THE CENTERLINE OF 29TH STREET TO A POINT ON THE EASTERLY RIGHT-OF-WAY LINE OF PENDLETON AVENUE (STATE ROAD NO. 9); THENCE NORTH 20 DEGREES 11 MINUTES 23 SECONDS EAST 36.73 FEET ON AND ALONG THE EASTERLY RIGHT-OF-WAY LINE OF PENDLETON AVENUE TO A POINT 30.00 FEET MEASURED AT RIGHT ANGLES FROM THE CENTERLINE OF 29TH STREET; THENCE SOUTH 87 DEGREES 28 MINUTES 50 SECONDS EAST 155.09 FEET PARALLEL WITH AND 30.00 FEET MEASURED AT RIGHT ANGLES FROM THE CENTERLINE OF 29TH STREET; THENCE SOUTH 13 DEGREES 36 MINUTES 32 SECONDS WEST 10.19 FEET TO A POINT 40.00 FEET MEASURED

MLC #1234 & 1320 – Venture 2000 Industrial Park and
Delphi I – Anderson/Monroe

AT RIGHT ANGLES FROM THE CENTERLINE OF 29TH STREET; THENCE SOUTH 87 DEGREES 28 MINUTES 50 SECONDS EAST 508.63 FEET PARALLEL WITH AND 40.00 FEET MEASURED AT RIGHT ANGLES FROM THE CENTERLINE OF 29TH STREET; THENCE SOUTH 02 DEGREES 31 MINUTES 10 SECONDS WEST 20.00 FEET TO A POINT 60.00 FEET MEASURED AT RIGHT ANGLES FROM THE CENTERLINE OF 29TH STREET; THENCE SOUTH 87 DEGREES 28 MINUTES 50 SECONDS EAST 1017.36 FEET PARALLEL WITH AND 60.00 FEET MEASURED AT RIGHT ANGLES FROM THE CENTERLINE OF 29TH STREET; THENCE NORTH 85 DEGREES
51 MINUTES 58 SECONDS EAST 301.85 FEET TO A POINT 25.00 FEET MEASURED AT RIGHT ANGLES FROM THE CENTERLINE OF 29TH STREET; THENCE SOUTH 87 DEGREES 28 MINUTES 50 SECONDS EAST 15.00 FEET PARALLEL WITH AND 25.00 FEET MEASURED AT RIGHT ANGLES FROM THE CENTERLINE OF 29TH STREET TO THE PLACE OF BEGINNING, CONTAINING 0.752 OF AN ACRE MORE OR LESS, OR 32,744 SQUARE FEET.

ALSO EXCEPT (DR 523, page 173)
A PART OF THE NORTHWEST QUARTER OF SECTION 23, TOWNSHIP 19 NORTH, RANGE 7 EAST MORE PARTICULARLY DESCRIBED AS FOLLOWS: BEGINNING AT THE SOUTHWEST CORNER OF THE NORTHWEST QUARTER OF SECTION 23, TOWNSHIP 19 NORTH, RANGE 7 EAST; THENCE NORTH 00 DEGREES 00 MINUTES 00 SECONDS 975.78 FEET ON AND ALONG THE WEST LINE OF SAID NORTHWEST QUARTER TO A POINT 25.00 FEET SOUTH OF THE NORTH LINE OF 30TH STREET; THENCE NORTH 89 DEGREE 46 MINUTES 00 SECONDS EAST 1362.20 FEET PARALLEL WITH THE NORTH LINE OF 30TH STREET, SAID LINE ALSO BEING PARALLEL WITH THE NORTH LINE OF SAID NORTHWEST QUARTER TO A POINT ON THE WEST LINE OF DEWEY STREET; THENCE SOUTH 00 DEGREE 00 MINUTES 00 SECONDS 35.00 FEET ON AND ALONG THE WEST LINE OF DEWEY STREET PARALLEL WITH THE WEST LINE OF SAID NORTHWEST QUARTER; THENCE SOUTH 89 DEGREES 46 MINUTES 00 SECONDS WEST 1327.20 FEET PARALLEL...WITH THE NORTH LINE OF 30TH STREET, SAID LINE ALSO BEING PARALLEL WITH THE NORTH LINE OF SAID NORTHWEST QUARTER TO A POINT 35.00 FEET EAST OF THE WEST LINE OF SAID NORTHWEST QUARTER; THENCE SOUTH 00 DEGREES 00 MINUTES 00 SECONDS 940.44 FEET PARALLEL WITH THE WEST LINE OF SAID NORTHWEST QUARTER TO A POINT IN THE SOUTH LINE OF SAID NORTHWEST QUARTER; THENCE SOUTH 89 DEGREES 12 MINUTES 22 SECONDS WEST 35.00 FEET ON AND ALONG THE SOUTH LINE OF SAID NORTHWEST QUARTER TO THE PLACE OF BEGINNING, CONTAINING 1.850 ACRES MORE OR LESS OR 80,595 SQUARE FEET.

ALSO EXCEPT
A PART OF THE NORTHWEST QUARTER OF SECTION 23, TOWNSHIP 19 NORTH, RANGE 7 EAST, SAID PARCEL ALSO BEING PART OF LOTS 5, 6, 14, AND 15 AND A PART OF THE FIRST NORTH SOUTH ALLEY EAST OF DEWEY STREET SOUTH OF 29TH STREET AS RECORDED IN BELMONT ADDITION, PLAT BOOK 7, PAGE 32 MORE SPECIFICALLY DESCRIBED AS FOLLOWS: COMMENCING AT THE SOUTHWEST CORNER OF THE NORTHWEST QUARTER OF SECTION 23, TOWNSHIP 19 NORTH, RANGE 7 EAST; THENCE NORTH 89 DEGREES 12 MINUTES 22 SECONDS EAST 1145.72 FEET ON AND ALONG THE SOUTH LINE OF SAID NORTHWEST QUARTER TO A POINT IN THE WESTERLY RIGHT-OF-WAY LINE OF THE OLD UNION TRACTION COMPANY, SAID POINT ALSO BEING 73.00 FEET MEASURED RADIALLY FROM THE CENTERLINE OF THE CLEVELAND, CINCINNATI, CHICAGO AND ST. LOUIS RAILROAD; THENCE NORTHEASTERLY ALONG A CURVE TO THE RIGHT 483.44 EAST ON AND ALONG THE WESTERLY RIGHT-OF-WAY LINE OF THE OLD UNION TRACTION COMPANY PARALLEL WITH THE CENTERLINE OF THE CLEVELAND, CINCINNATI, CHICAGO AND ST. LOUIS RAILROAD, SAID CURVE HAVING AN INTERSECTION ANGLE OF 02 DEGREES 23 MINUTES 39 SECONDS; A RADIUS OF 11,569.67 FEET AND SUBTENDED BY A LONG CHORD WHOSE LENGTH IS 483.41 FEET AND WHOSE BEARING IS NORTH 26 DEGREES 37 MINUTES 00 SECONDS EAST TO A POINT ON THE WESTERLY LINE OF DEWEY STREET EXTENDED SOUTH, SAID POINT ALSO BEING ON THE EASTERLY LINE OF ARROW AVENUE AT ITS SOUTHERN TERMINUS; THENCE NORTH 00 DEGREES 00 MINUTES 00 SECONDS 106.34 FEET ON AND ALONG THE WEST LINE OF DEWEY STREET PARALLEL WITH THE WEST LINE OF THE NORTHWEST QUARTER OF SAID SECTION 23 TO ITS POINT OF INTERSECTION WITH THE WESTERLY RIGHT-OF-WAY LINE OF ARROW AVENUE, SAID POINT ALSO BEING 123.00 FEET MEASURED RADIALLY FROM THE CENTERLINE OF THE CLEVELAND, CINCINNATI, CHICAGO AND ST. LOUIS RAILROAD; THENCE NORTHEASTERLY ALONG A CURVE TO THE RIGHT ON THE WESTERLY LINE OF SAID ARROW AVENUE 80.49 FEET PARALLEL WITH THE CENTERLINE OF THE CLEVELAND, CINCINNATI, CHICAGO AND ST. LOUIS RAILROAD TO THE POINT

MLC #1234 & 1320 – Venture 2000 Industrial Park and
Delphi I – Anderson/Monroe

X:\DOCUMENTS AND SETTINGS\MERRILLSCAN\LOCAL SETTINGS\TEMP\WZ1342\US_ACTIVE_EXHIBIT A - MLC #1234 & 1320 - VENTURE 2000
AND DELPHI I ANDERSON_MONROE_43637455_1.DOC                10

OF BEGINNING OF SAID CURVE, SAID CURVE HAVING AN INTERSECTION ANGLE OF 00 DEGREES 23 MINUTES 49 SECONDS; A RADIUS OF 11,619.67 FEET AND SUBTENDED BY A LONG CHORD WHOSE LENGTH IS 80.49 FEET AND WHOSE BEARING IS NORTH 28 DEGREES 26 MINUTES 30 SECONDS EAST; THENCE NORTH 28 DEGREES 40 MINUTES 28 SECONDS EAST 367.07 FEET ALONG THE WESTERLY LINE OF ARROW AVENUE PARALLEL WITH THE CENTERLINE OF THE CLEVELAND, CINCINNATI, CHICAGO AND ST. LOUIS RAILROAD TO THE POINT OF INTERSECTION OF THE WESTERLY LINE OF ARROW AVENUE WITH A LINE 60 FEET SOUTH OF AND PARALLEL WITH THE NORTH LINE OF 30TH STREET EXTENDED EAST AS RECORDED IN OAKLAND ADDITION IN PLAT BOOK 8, PAGE 81 IN THE RECORDER'S OFFICE OF MADISON COUNTY, INDIANA, SAID POINT ALSO BEING ON THE EAST LINE OF LOT 14 IN BELMONT ADDITION AS RECORDED IN PLAT BOOK 7, PAGE 32 AND THE PLACE OF BEGINNING; THENCE SOUTH 89 DEGREES 46 MINUTES 00 SECONDS WEST 158.51 FEET PARALLEL WITH SAID NORTH LINE OF 30TH STREET TO A POINT ON THE EAST LINE OF DEWEY STREET, SAID POINT ALSO BEING ON THE WEST LINE OF LOT 5 IN SAID BELMONT ADDITION 6 FEET NORTH OF THE SOUTHWEST CORNER OF SAID LOT 5; THENCE NORTH 00 DEGREES 00 MINUTES 00 SECONDS 60.0 FEET ON AND ALONG THE EAST LINE OF DEWEY STREET AND THE WEST LINE OF LOTS 5 AND 6 IN BELMONT ADDITION TO A POINT 14.0 FEET SOUTH OF THE NORTHWEST CORNER OF LOT 6; THENCE NORTH 89 DEGREES 46 MINUTES 00 SECONDS EAST 127.00 FEET PARALLEL WITH THE SAID NORTH LINE OF 30TH STREET TO A POINT ON THE WEST RIGHT-OF-WAY LINE OF A NORTH-SOUTH ALLEY; THENCE NORTH 59 DEGREES 39 MINUTES 21 SECONDS EAST 109.51 FEET TO A POINT ON THE WESTERLY LINE OF ARROW AVENUE, SAID POINT ALSO BEING ON THE EASTERLY LINE OF LOT 15 IN SAID BELMONT ADDITION; THENCE SOUTH 28 DEGREES 40 MINUTES 28 SECONDS WEST 131.30 FEET TO THE PLACE OF BEGINNING, CONTAINING 0.282 OF AN ACRE, MORE OR LESS OR 12,266 SQUARE FEET.


ALSO EXCEPT (DR 539, page 696):
A PART OF THE NORTHEAST QUARTER OF SECTION 23, TOWNSHIP 19 NORTH, RANGE 7 EAST AND A PART OF THE NORTHWEST QUARTER OF SECTION 24, TOWNSHIP 19 NORTH, RANGE 7 EAST MORE SPECIFICALLY DESCRIBED AS FOLLOWS:
BEGINNING AT THE POINT OT INTERSECTION OF THE SOUTH RIGHT-OF-WAY LINE OF WEST 29TH STREET AND THE WEST LINE OF THE NORTHWEST QUARTER OF SECTION 24, TOWNSHIP 19 NORTH, RANGE 7 EAST, SAID POINT BEING SOUTH 00 DEGREES 46 MINUTES 56 SECONDS WEST 65.00 FEET FROM A CROSS IN THE CONCRETE PAVEMENT AT THE INTERSECTION OF THE CENTERLINE OF WEST 29TH STREET AND THE WEST LINE OF THE NORTHWEST QUARTER OF SECTION 24, TOWNSHIP 19 NORTH, RANGE 7 EAST; THENCE SOUTH 89 DEGREES 05 MINUTES 36 SECONDS EAST 50.00 FEET ON AND ALONG THE SOUTHERLY RIGHT-OF-WAY LINE OF WEST 29TH STREET; THENCE SOUTH 00 DEGREES 46 MINUTES 56 SECONDS WEST 1244.58 FEET PARALLEL WITH AND 50.00 FEET MEASURED AT RIGHT ANGLES EAST OF THE WEST LINE OF SAID NORTHWEST QUARTER TO A POINT ON THE NORTH RIGHT-OF-WAY LINE OF THE CLEVELAND, CINCINNATI, CHICAGO & ST. LOUIS RAILWAY; THENCE SOUTH 90 DEGREES 00 MINUTES 00 SECONDS WEST 100.01 FEET ON AND ALONG THE NORTH RIGHT-OF-WAY LINE 0 OF THE SAID CLEVELAND, CINCINNATI, CHICAGO & ST. LOUIS RAILWAY TO A POINT 50.00 FEET MEASURED AT RIGHT ANGLES WEST OF THE EAST LINE OF THE NORTHEAST QUARTER OF SECTION 23; TOWNSHIP 19 NORTH, RANGE 7 EAST; THENCE NORTH 00 DEGREES 46 MINUTES 56 SECONDS EAST 1247.57 FEET PARALLEL WITH AND 50.00 FEET MEASURED AT RIGHT ANGLES WEST OF THE EAST LINE OF SAID NORTHEAST QUARTER OF SECTION 23, TOWNSHIP 19 NORTH, RANGE 7 EAST TO A POINT ON THE SOUTH RIGHT-OF-WAY LINE OF WEST 29TH STREET; THENCE SOUTH 87 DEGREES 28 MINUTES 50 SECONDS EAST 50.02 FEET TO THE POINT OF BEGINNING, CONTAINING 2.859 ACRES, MORE OR LESS (124,566.717 SQUARE FEET).


ALSO EXCEPT (Inst. 9409613):
A TRACT OF LAND LOCATED IN THE SOUTHWEST QUARTER OF SECTION 23, TOWNSHIP 19 NORTH, RANGE 7 EAST, IN ANDERSON TOWNSHIP, MADISON COUNTY, INDIANA, BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:
COMMENCING AT THE SOUTHEAST CORNER OF THE SOUTHWEST QUARTER OF SECTION 23, TOWNSHIP 19 NORTH, RANGE 7 EAST, AND RUNNING THENCE NORTH 00 DEGREES 50 MINUETS 18 SECONDS EAST (ASSUMED BEARING) 1, 242.00 FEET ALONG THE EAST LINE OF SAID SOUTHWEST QUARTER TO THE PLACE OF BEGINNING OF THIS DESCRIPTION, THENCE CONTINUE NORTH 00

MLC #1234 & 1320 – Venture 2000 Industrial Park and
Delphi I – Anderson/Monroe

DEGREES 50 MINUTES 18 SECONDS EAST 344.50 FEET ALONG THE EAST LINE OF SAID SOUTHWEST QUARTER TO AN EAST-WEST FENCE LINE, THENCE NORTH 89 DEGREES 13 MINUTES 53 SECONDS WEST 1,072.33 FEET ALONG SAID FENCE LINE TO THE EASTERLY RIGHT OF WAY LINE OF OLD STATE ROAD 9 (PENDLETON AVENUE); THENCE SOUTH 35 DEGREES 36 MINUTES 57 SECONDS WEST 36.22 FEET ALONG SAID EASTERLY RIGHT OF WAY LINE; THENCE SOUTH 88 DEGREES 13 MINUTES 53 SECONDS EAST 485.05 FEET; THENCE SOUTH 00 DEGREES 50 MINUTES 18 SECONDS WEST 332.02 FEET TO A POINT ON THE CENTER LINE OF A DRAINAGE EASEMENT; THENCE SOUTH 89 DEGREES 53 MINUTES 27 SECONDS EAST 607.91 FEET ALONG THE CENTERLINE OF SAID DRAINAGE EASEMENT TO THE PLACE OF BEGINNING. SUBJECT TO A DRAINAGE EASEMENT TO THE CITY OF ANDERSON , INDIANA, 40 FEET
WIDE ACROSS THE ENTIRE SOUTH SIDE THEREOF.


ALSO EXCEPT (Inst. 9802976):
A PART OF THE SOUTH HALF OF THE NORTHEAST QUARTER OF SECTION 23, TOWNSHIP 19 NORTH RANGE 7 EAST, DESCRIBED AS FOLLOWS:
BEGINNING AT A 5/8 INCH REBAR WITH CAP (SET) AT THE INTERSECTION OF THE WEST RIGHT-OF-WAY LINE OF MADISON AVENUE. WITH THE NORTH RIGHT-OF WAY LINE OF CONRAIL (FORMERLY THE C.C.C. AND ST. LOUIS RAILROAD), SAID POINT BEING NORTH 00 DEGREES 00 MINUTES 00 SECONDS (ASSUMED BEARING) 57.04 FEET AND SOUTH 89 DEGREES 10 MINUTES 40 SECONDS WEST 50.01 FEET FROM AN EXISTING IRON ROD IN A CASTING MARKING THE SOUTHEAST CORNER OF THE NORTHEAST QUARTER OF SECTION 23, TOWNSHIP 19 NORTH, RANGE 7 EAST; THENCE SOUTH 89 DEGREES 10 MINUTES 40 SECONDS WEST ALONG THE NORTH RIGHT-OF-WAY LINE OF CONRAIL A DISTANCE OF 1,269.11 FEET TO A 5/8 INCH REBAR WITH R.E. WARD CAP (SET); THENCE NORTH 00 DEGREES 00 MINUTES 00 SECONDS ON A LINE PARALLEL WITH THE WEST RIGHT-OF-WAY LINE OF MADISON AVENUE A DISTANCE OF 243.12 FEET TO A 5/8 INCH REBAR WITH CAP (SET); THENCE NORTH 89 DEGREES 08 MINUTES 56 SECONDS EAST A DISTANCE OF 168.09 FEET TO A 5/8 INCH REBAR WITH CAP (SET); THENCE NORTH 61 DEGREES 00 MINUTES 58 SECONDS EAST A DISTANCE OF 317.75 FEET TO A 5/8 INCH REBAR WITH CAP (SET); THENCE 89 DEGREES 10 MINUTES 10 SECONDS EAST A DISTANCE OF 452.78 FEET TO A 5/8 INCH REBAR WITH CAP (SET); THENCE NORTH 57 DEGREES 03 MINUTES 00 SECONDS EAST A DISTANCE OF 245.22 FEET TO A 5/8 INCH REBAR WITH CAP (SET); THENCE NORTH 89 DEGREES 11 MINUTES 09 SECONDS EAST A DISTANCE OF 165.52 FEET TO A 5/8 INCH REBAR WITH CAP (SET) ON THE WEST RIGHT-OF-WAY LINE OF MADISON AVENUE; THENCE SOUTH 00 DEGREES 00 MINUTES 00 SECONDS ALONG THE WEST RIGHT-OF-WAY LINE OF MADISON AVENUE A DISTANCE OF 523.66 FEET TO THE POINT OF BEGINNING, CONTAINING 488,176.92 SQUARE FEET OR 11.207 ACRES, MORE OR LESS: EXCEPTING THEREFROM A 15 FOOT WIDE UTILITY EASEMENT EXTENDING ALONG THE ENTIRE SOUTHERN BOUNDARY OF SAID REAL ESTATE AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS: BEGINNING AT A POINT ON THE INTERSECTION OF THE NORTH RIGHT-OF-WAY LINE OF CONRAIL WITH THE WEST LINE OF MADISON AVENUE IN THE CITY OF ANDERSON, INDIANA, SAID POINT BEING NORTH 00 DEGREES 00 MINUTES 00 SECONDS (ASSUMED BEARING) 57.04 FEET AND SOUTH 89 DEGREES 10 MINUTES 40 SECONDS WEST 50.01 FEET FROM A POINT MARKING THE SOUTHEAST CORNER OF THE NORTHEAST QUARTER OF SECTION 23, TOWNSHIP 19 NORTH, RANGE 7 EAST; THENCE SOUTH 89 DEGREES 10 MINUTES 40 SECONDS WEST ALONG THE NORTH RIGHT-OF-WAY- LINE OF CONRAIL A DISTANCE OF 1,269.11 FEET TO A POINT; THENCE NORTH 00 DEGREES 00 MINUTES 00 SECONDS ON A LINE PARALLEL WITH THE WEST RIGHT-OF-WAY LINE OF MADISON AVENUE A DISTANCE OF 15.00 FEET; THENCE NORTH 89 DEGREES 10 MINUTES 40 SECONDS EAST ON A LINE PARALLEL WITH THE NORTH RIGHT-OF-WAY LINE OF CONRAIL A DISTANCE OF 1,269.11 FEET TO A POINT ON THE WEST RIGHT-OF-WAY LINE OF MADISON AVENUE; THENCE SOUTH 00 DEGREES 00 MINUTES 00 SECONDS ALONG THE WEST RIGHT-OF-WAY LINE OF MADISON AVENUE A DISTANCE OF 1500 FEET TO THE POINT OF BEGINNING.


ALSO EXCEPT (Inst. 2005002794):
A PART OF THE NORTHWEST QUARTER OF SECTION 23, TOWNSHIP 19 NORTH, RANGE 7 EAST MADISON COUNTY, INDIANA, AND BEING THAT PART OF THE GRANTOR'S LAND LYING WITHIN THE RIGHT-OF-WAY LINES DEPICTED ON THE ATTACHED RIGHT OF WAY PARCEL PLAT MARKED EXHIBIT "B", DESCRIBED AS FOLLOWS: COMMENCING AT THE NORTHEAST CORNER OF SAID QUARTER

MLC #1234 & 1320 – Venture 2000 Industrial Park and Delphi I – Anderson/Monroe

X:\DOCUMENTS AND SETTINGS\MERRILLSCAN\LOCAL SETTINGS\TEMP\WZ1342\US_ACTIVE_EXHIBIT A - MLC #1234 & 1320 - VENTURE 2000 AND DELPHI I ANDERSON_MONROE_43637455_1.DOC          12

SECTION, SAID NORTHEAST CORNER BEING DESIGNATED AS POINT "407" ON SAID PLAT; THENCE SOUTH 0 DEGREES 27 MINUTES 48 SECONDS WEST (ASSUMED BEARING) 777.116 METERS (2,549.59 FEET) ALONG THE EAST LINE OF SAID QUARTER SECTION TO THE NORTHWESTERN BOUNDARY OF PENDLETON AVENUE (STATE ROAD NO. 9); THENCE ALONG THE BOUNDARY OF SAID PENDLETON AVENUE SOUTHWESTERLY 21.905 METERS (71.87 FEET) ALONG AN ARC TO THE RIGHT AND HAVING A RADIUS OF 423.730 METERS (1,390.19 FEET) AND SUBTENDED BY A LONG CHORD HAVING A BEARING OF SOUTH 44 DEGREES 56 MINUTES 31 SECONDS WEST AND A LENGTH OF 21.903 METERS (71.86 FEET); THENCE NORTH 89 DEGREES 23 MINUTES 57 SECONDS EAST 1.511 METERS (4.96 FEET) ALONG SAID BOUNDARY TO POINT "14016" DESIGNATED ON SAID PLAT AND THE POINT OF BEGINNING OF THIS DESCRIPTION; THENCE NORTH 89 DEGREES 23 MINUTES 57 SECONDS EAST 6.258 METERS (20.53 FEET) ALONG SAID BOUNDARY; THENCE ALONG SAID BOUNDARY SOUTHWESTERLY 20.515 METERS (67.31 FEET) ALONG AN ARC TO THE RIGHT AND HAVING A RADIUS OF 429.064 METERS (1,407.69 FEET) AND SUBTENDED BY A LONG CHORD HAVING A BEARING OF SOUTH 47 DEGREES 02 MINUTES 01 SECOND WEST AND A LENGTH OF 20.513 METERS (67.30 FEET) TO THE SOUTH LINE OF SAID QUARTER SECTION; THENCE SOUTH 89 DEGREES 23 MINUTES 57 SECONDS WEST 5.545 METERS (18.19 FEET) ALONG SAID SOUTH LINE TO POINT "14015" DESIGNATED ON SAID PLAT; THENCE NORTH 45 DEGREES 39 MINUTES 22 SECONDS EAST 19.992 METERS (65.59 FEET) TO THE POINT OF BEGINNING AND CONTAINING 0.0083 HECTARES (0.021 ACRES), MORE OR LESS.

ALSO EXCEPT
A PART OF THE NORTHEAST QUARTER OF SECTION 23, TOWNSHIP 19 NORTH, RANGE 7 EAST, MADISON COUNTY, INDIANA, AND BEING THAT PART OF THE GRANTOR'S LAND LYING WITHIN THE RIGHT-OF-WAY LINES DEPICTED ON THE ATTACHED RIGHT OF WAY PARCEL PLAT MARKED EXHIBIT "B", DESCRIBED AS FOLLOWS: COMMENCING AT THE NORTHWEST CORNER OF SAID QUARTER SECTION, SAID NORTHWEST CORNER BEING DESIGNATED AS POINT "407" ON SAID PLAT; THENCE SOUTH 0 DEGREES 27 MINUTES 48 SECONDS WEST (ASSUMED BEARING) 777.116 METERS (2,549.59 FEET) ALONG THE WEST LINE OF SAID QUARTER SECTION TO THE NORTHWESTERN BOUNDARY OF PENDLETON AVENUE (STATE ROAD NO 9); THENCE ALONG THE BOUNDARY OF SAID PENDLETON AVENUE NORTHEASTERLY 0.110 METERS (0.36 FEET) ALONG AN ARC TO THE LEFT AND HAVING A RADIUS OF 423.730 METERS (1,390.19 FEET) AND SUBTENDED BY A LONG CHORD HAVING A BEARING OF NORTH 43 DEGREES 27 MINUTES 13 SECONDS EAST AND A LENGTH OF 0.110 METERS (0.36 FEET) TO POINT "14020" DESIGNATED ON SAID PLAT AND THE POINT OF BEGINNING OF THIS DESCRIPTION: THENCE NORTHEASTERLY 174.230 METERS (571.62 FEET) ALONG AN ARC TO THE LEFT AND HAVING A RADIUS OF 537.500 METERS (1,763.45 FEET) AND SUBTENDED BY A LONG CHORD HAVING A BEARING OF NORTH 31 DEGREES 38 MINUTES 13 SECONDS EAST AND A LENGTH OF 173.468 METERS (569.12 FEET) TO POINT "14021" DESIGNATED ON SAID PLAT, WHICH POINT IS ON THE WESTERN BOUNDARY OF SAID PENDLETON AVENUE; THENCE SOUTH 20 DEGREES 08 MINUTES 33 SECONDS WEST 2.360 METERS (7.74 FEET) ALONG THE BOUNDARY OF SAID PENDLETON AVENUE; THENCE ALONG SAID BOUNDARY SOUTHWESTERLY 172.341 METERS (565.42 FEED ALONG AN ARC TO THE RIGHT AND HAVING A RADIUS OF 423.730 METERS (1,390.19 FEED AND SUBTENDED BY A LONG CHORD HAVING A BEARING OF SOUTH 31 DEGREES 47 MINUTES 39 SECONDS WEST AND A LENGTH OF 171.156 METERS (561.54 FEET) TO THE POINT OF BEGINNING AND CONTAINING 0.0224 HECTARES (0.055 ACRES), MORE OR LESS.

ALSO EXCEPT
A PART OF THE NORTHEAST QUARTER OF SECTION 23, TOWNSHIP 19 NORTH, RANGE 7 EAST, MADISON COUNTY, INDIANA, AND BEING THAT PART OF THE GRANTOR'S LAND LYING WITHIN THE RIGHT-OF-WAY LINES DEPICTED ON THE ATTACHED RIGHT OF WAY PARCEL PLAT MARKED EXHIBIT "B", DESCRIBED AS FOLLOWS: COMMENCING AT THE NORTHWEST CORNER OF SAID QUARTER SECTION, SAID NORTHWEST CORNER BEING DESIGNATED AS POINT "407" ON SAID PLAT; THENCE SOUTH 0 DEGREES 27 MINUTES 48 SECONDS WEST (ASSUMED BEARING) 777.116 METERS (2,549.59 FEET) ALONG THE WEST LINE OF SAID QUARTER SECTION TO THE NORTHWESTERN BOUNDARY OF PENDLETON AVENUE (STATE ROAD NO. 9); THENCE ALONG THE BOUNDARY OF SAID PENDLETON AVENUE NORTHEASTERLY 172.452 METERS (565.79 FEET) ALONG AN ARC TO THE LEFT AND HAVING A RADIUS OF 423.730 METERS (1,39019 FEET) AND SUBTENDED BY A LONG CHORD HAVING A BEARING OF NORTH 31 DEGREES 48 MINUTES 06 SECONDS EAST AND A LENGTH OF

MLC #1234 & 1320 – Venture 2000 Industrial Park and
Delphi I – Anderson/Monroe

171.264 METERS (561.89 FEET); THENCE NORTH 20 DEGREES 08 MINUTES 33 SECONDS EAST 262.350 METERS (860.73 FEED ALONG SAID BOUNDARY TO POINT "14030" DESIGNATED ON SAID PLAT AND THE POINT OF BEGINNING OF THIS DESCRIPTION; THENCE NORTH 17 DEGREES 19 MINUTES 45 SECONDS EAST 64.747 METERS (212.42 FEET) TO POINT "14031" DESIGNATED ON SAID PLAT; THENCE NORTH 16 DEGREES 03 MINUTES 18 SECONDS EAST 43.841 METERS (143.84 FEET) TO POINT "14032" DESIGNATED ON SAID PLAT; THENCE NORTHEASTERLY 43.519 METERS (142.78 FEED ALONG AN ARC TO THE RIGHT AND HAVING A RADIUS OF 1,513.000 METERS (4,963.91 FEET) AND SUBTENDED BY A LONG CHORD HAVING A BEARING OF NORTH 19 DEGREES 00 MINUTES 58 SECONDS EAST AND A LENGTH OF 43.518 METERS (142.78 FEET) TO POINT "14033" DESIGNATED ON SAID PLAT; THENCE NORTH 19 DEGREES 50 MINUTES 24 SECONDS EAST 118.723 METERS (389.51 FEET) TO POINT "14034" DESIGNATED ON SAID PLAT; THENCE NORTHEASTERLY 88.891 METERS (291.64 FEET) ALONG AN ARC TO THE RIGHT AND HAVING A RADIUS OF 193.000 METERS (633.20 FEET) AND SUBTENDED BY A LONG CHORD HAVING A BEARING OF NORTH 33 DEGREES 02 MINUTES 04 SECONDS EAST AND A LENGTH OF 88.107 METERS (289.07 FEET) TO POINT "14035" DESIGNATED ON SAID PLAT, WHICH POINT IS ON THE WESTERN BOUNDARY OF THE INTERSECTION OF SAID PENDLETON AVENUE AND 25TH STREET; THENCE SOUTH 19 DEGREES 13 MINUTES 33 SECONDS WEST 8.855 METERS (29.05 FEET) ALONG THE BOUNDARY OF THE INTERSECTION OF SAID PENDLETON AVENUE AND SAID 25TH FEET TO THE NORTHWESTERN BOUNDARY OF SAID PENDLETON AVENUE; THENCE ALONG THE BOUNDARY OF SAID PENDLETON AVENUE SOUTHWESTERLY 79.757 METERS (261.67 FEET) ALONG AN ARC TO THE LEFT AND HAVING A RADIUS OF 187.815 METERS (616.19 FEET) AND SUBTENDED BY A LONG CHORD HAVING A BEARING OF SOUTH 31 DEGREES 23 MINUTES 29 SECONDS WEST AND A LENGTH OF 79.159 METERS (259.71 FEET); THENCE SOUTH 19 DEGREES 13 MINUTES 33 SECONDS WEST 214.201 METERS (702.76 FEET) ALONG SAID BOUNDARY; THENCE SOUTH 20 DEGREES 08 MINUTES 33 SECONDS WEST 55.849 METERS (183.23 FEED ALONG SAID BOUNDARY TO THE POINT OF BEGINNING AND CONTAINING 0.1468 HECTORS (0.363 ACRES) MORE OR LESS.

MLC #1234 & 1320 – Venture 2000 Industrial Park and
Delphi I – Anderson/Monroe

X:\DOCUMENTS AND SETTINGS\MERRILLSCAN\LOCAL SETTINGS\TEMP\WZ1342\US_ACTIVE_EXHIBIT A - MLC #1234 & 1320 - VENTURE 2000 AND DELPHI I ANDERSON_MONROE_43637455_1.DOC

14

## EXHIBIT A

### Property Description

Tax ID Number: 47-06-12-300-063.000-010

Land situated in the County of Lawrence, State of Indiana is described as follows:

A part of the Southwest quarter of Section 12, Township 5 North, Range 1 West, described as follows: Beginning at an iron pipe which is 200 feet West and 320 feet South of the Northwest corner of Lot No. 62, Section B, Bedford Heights Subdivision, an addition to the City of Bedford, Indiana; thence West 664.53 feet (passing an iron pipe at 647.64 feet) to the center of Bailey Branch; thence with said branch, North 09 degrees 42 minutes East 24.10 feet and North 16 degrees 46 minutes West 44.93 feet to the center of the Old Bodenschactz Switch (abandoned railroad bed); thence with said railroad bed, South 45 degrees 45 minutes West 235.84 feet (passing an iron pipe at 20 feet) to an iron pipe; thence North 02 degrees 55 minutes East 448.38 feet to an iron pipe; thence East 819.55 feet to an iron pipe; thence South 350.00 feet to the beginning. Containing 6.70 acres, more or less.

Commonly known as: 639 Riley Blvd., Bedford, IN 47421

## EXHIBIT A

### Property Description

Tax ID Number: 47-06-02-400-071.000-009

Land situated in the County of Lawrence, State of Indiana is described as follows:

Part of the Southeast Quarter of Section 2, Township 5 North, Range 1 West, Lawrence County, Indiana, and more particularly described as follows:

Beginning in a County Road 68.08 feet North and 121.21 feet West of the Southeast corner of said Section 2; thence along said road South Seventy-eight (78) degrees, Twenty-six (26) minutes, Thirty-six (36) seconds West 135.18 feet; thence leaving said road and along the centerline of a 30 foot wide roadway and utility easement North Twenty-three (23) degrees, Eighteen (18) minutes, Fifty-three (53) seconds West 75.00 feet to the true point of beginning; thence continuing on said easement centerline North Twenty-three (23) degrees, Eighteen (18) minutes, Fifty-three (53) seconds West 79.27 feet; thence North Twenty-two (22) degrees, Thirty (30) minutes, Forty (40) seconds West 105.69 feet; thence North Thirty-eight (38) degrees, Eight (08) minutes, Forty (40) seconds West 72.22 feet; thence leaving said centerline North Forty (40) degrees, Fifty-two (52) minutes, Thirty-five (35) seconds East 195.17 feet; thence South Forty-nine (49) degrees, zero minutes, Forty-three (43) seconds East 59.59 feet; thence South Twenty-seven (27) degrees, Thirty-eight (38) minutes, Thirty-seven (37) seconds East 131.39 feet; thence South Twenty-eight (28) degrees, Seven (07) minutes, Twenty-three (23) seconds West 248.69 feet to the true point of beginning.

Subject to and together with, an easement being 30 feet wide, 15 feet wide on both sides of the following described centerline; beginning in a County Road 41 feet North and 253.65 feet West of the Southeast corner of said Section 2; thence North Twenty-three (23) degrees, Eighteen (18) minutes, Fifty-three (53) seconds West 154.27 feet; thence North Twenty-two (22) degrees, Thirty (30) minutes, Forty (40) seconds West 105.69 feet; thence North Thirty-eight (38) degree, Eight (08) minutes, Forty (40) seconds West 131.91 feet.

Commonly known as: 145 Broomsage Road, Bedford, IN 47421

X:\DOCUMENTS AND SETTINGS\MERRILLSCAN\LOCAL SETTINGS\TEMP\WZ9733\US_ACTIVE_EXHIBIT A - MLC #1239 - 145
BROOMSAGE_43637463_1.DOC

MLC #1239 – 145 Broomsage

## EXHIBIT A

## Property Description

Tax ID Number: 47-06-12-300-041.000-010 and 47-06-12-300-043.000-010

Land situated in the County of Lawrence, State of Indiana is described as follows:

A part of the Southwest Quarter of Section 12, Township 5 North, Range 1 West, described as follows: Commencing at a point on the West line of said Quarter Section, North 00 degrees 10 minutes East 980.5 feet from a cast iron monument at the Southwest corner of said Quarter Section; thence North 89 degrees 31 minutes East 636.94 feet to a point in the center of Bailey Branch and the true point of beginning; thence with the center of Bailey Branch North 33 degrees 55 minutes East 92.45 feet, North 60 degrees 35 minutes East 30.62 feet, South 84 degrees 34 minutes East 48.54 feet, North 48 degrees 02 minutes East 90.59 feet and North 89 degrees 52 minutes East 94.51 feet to the center of the Bailey Branch; thence continuing with the said branch, North 77 degrees 05 minutes East 92.63 feet, North 33 degrees 57 minutes East 30.20 feet and North 55 degrees 43 minutes East 37.41 feet to the former Easterly line of the Indiana Limestone Company property; then along said line, South 03 degrees 03 minutes West 197.40 feet to an old stone and South 24 degrees 33 minutes West 132.00 feet to the center of the Bailey Scales Road; thence with said road, North 04 degrees 47 minutes West 118.65 feet; thence South 89 degrees 31 minutes West 292.98 feet to the beginning. Containing 1.080 acres, more or less.

Commonly known as: 112 And 115 Bailey Scales Road, Bedford, IN 47421

## EXHIBIT A

### Property Description

Tax ID Number: 47-06-12-300-070.000-010

Land situated in the County of Lawrence, State of Indiana is described as follows:

A part of the Southwest Quarter of Section 12, Township 5 North, Range 1 West, described as follows:

Beginning at a marked 1/2 inch steel pin which is 30 feet North and 232.90 feet West of the Northwest corner of Lot 62, Section 8, Bedford Heights Subdivision, an Addition to the City of Bedford, Indiana; thence West 786.65 feet to an iron pipe; thence North 02 degrees 53 minutes West 240.81 feet; thence East 774.40 feet to a marked 1/2 inch steel pin; thence South 240.5 feet to the beginning, containing 4.31 acres, more or less.

Commonly known as: 641 Riley Blvd., Bedford, IN 47421

## EXHIBIT A

### Property Description

Tax ID Number: 47-06-11-100-049.000-009; 47-06-11-100-060.000-009; 47-06-11-100-061.000-009 Land situated in the County of Lawrence, State of Indiana is described as follows:

Part of the Southwest Quarter of the Northeast Quarter of Section 11, Township 5 North, Range 1 West, Second Principal Meridian, Shawswick Civil Township Lawrence County, Indiana as found on a plat of survey completed by Bell Surveying & Mapping, Inc. (Job #02196) and more fully described as follows:

COMMENCING at the Monument marking the Center of Section, Thence, concurrent with the Latitudinal Half Section Line, North 89 degrees 43 minutes 17 seconds East, 802.95 feet to a Mag-nail marking the Southeast corner of the Terrell Property (Deed Book 182, page 890) and also being the POINT of BEGINNING for the Description.

Thence, concurrent with the East line of the Terrell property, North 25 degrees 15 minutes 00 seconds West, (passing over a railroad spike at a distance of 14.00 feet) a total distance of 217.80 feet to a 5/8-inch rebar with a yellow plastic cap engraved. "GW Bell 29400007" and hereafter referred to as a capped rebar marking the Northeast corner of the Terrell Property; thence concurrent with the North line of Terrell and parallel to the Half Section Line, South 89 degrees 43 minutes 15 seconds West, 200.00 feet to a capped rebar marking the Northwest corner of Terrell (Deed Book 149, page 61) said rebar being in the East Right of way of the old vacated railroad; thence concurrent with said old right-of-way, North 24 degrees 55 minutes 38 seconds West, 321.79 feet to a capped rebar at Southwest corner of the Martin property (Deed Book 51, page 4); thence concurrent with the South line of the Martin Property, North 68 degrees 00 minutes 00 seconds East, 343.04 feet to a capped rebar; thence, with the South line of Johnson (Deed Book 35, page 33), North 89 degrees 47 minutes 49 seconds East, (passing over a Bledsoe and Tapp rebar at a distance of 44.52 feet) for a total distance of 344.56 feet to a capped rebar at the Northwest corner of Riley (Deed Book 84, page 405); thence, concurrent with the West line of Biley, South 01 degrees 17 minutes 38 seconds East, 326.42 feet to a capped rebar in the North line of Turney (Deed Book 88, page 829); thence, concurrent with the North line of Turney, South 89 degrees 34 minutes 42 seconds West, 70.00 feet to a capped rebar at the Northwest corner of said tract; thence, concurrent with the West line of Turney, South 1 degrees 17 minutes 11 seconds East, 292.90 feet to a Mag-nail in the Latitudinal Half Section Line; thence, concurrent with said Half Section line, North 89 degrees 43 minutes 17 seconds West, 178.06 feet back to the POINT OF BEGINNING, Said described tract containing 6.37 acres, more or less.

Commonly known as: 1081 Breckenridge Road, Bedford, IN 47421

X:\DOCUMENTS AND SETTINGS\MERRILLSCAN\LOCAL SETTINGS\TEMP\WZDI2A\US_ACTIVE_EXHIBIT A - MLC #1242 - 1081 BRECKENRIDGE_43637489_1.DOC

MLC #1242 – 1081 Breckenridge

## EXHIBIT A

### Property Description

Tax ID Number: 47-06-11-100-064.000-009; 47-06-11-100-063.000-009

Land situated in the County of Lawrence, State of Indiana is described as follows:

A part of the Northeast Quarter of Section 11, Township 5 North, Range 1 West, described as follows, to-wit: Beginning at a point 601 feet East of the Southwest corner of the Northeast quarter of said Section 11 (said point being 65 feet East of the center line of the Chicago, Indianapolis and Louisville Railway); thence North 25 degrees 15 minutes West a distance of 217.8 feet; thence East parallel with the South line of said quarter section a distance of 84 feet, thence in a Southeasterly direction a distance of 217.8 feet, more or less, to the South line of said quarter section; thence West on said line 60 feet to the place of beginning, containing 36/100 of an acre, more or less.

ALSO, a part of the Northeast Quarter of Section 11, Township 5 North, Range 1 West, Shawswick Township, Lawrence County, Indiana, and described as follows, to-wit: Beginning at a point 661 feet East of the Southwest corner of the Northeast quarter of said Section 11 (said point being 125 feet East of the center line of the Chicago, Indianapolis and Louisville Railway) thence with half section line East 140 feet; thence North 25 degrees 15 minutes West 217.8 feet; thence West parallel with South line 114 feet; thence Southeasterly in a straight line to the place of beginning, containing 64/100 acres, more or less.

Commonly known as: 1119 Breckenridge Rd, Bedford, IN 47421

## EXHIBIT A

### Property Description

Tax ID Number: **47-06-11-500-068.000-009**

Land situated in the County of **Lawrence,** State of **Indiana** is described as follows:

A part of the North Half of Section 11, Township 3 North, Range 1 West, bounded and described as follows, to-wit: Beginning at a point 73 rods and 17 links north and 92 rods West of the southeast corner of said Half Section; Thence North 57 rods and 10 links; Thence West 12 rods and 7 links; Thence North 6 rods to the centerline of the Rawlins Mill Pike Road; Thence West with the center line of said road 50 feet; Thence South 160 feet; Thence West 181.13 feet; Thence South 260 feet; Thence West 570 feet to the east right of way line of the Chicago, Indianapolis, and Louisville Railway Company; Thence with the east line of said right of way in a Southerly direction to a point due west of the place of beginning; Thence East to the place of beginning.

**Commonly known** as: Vacant Breckenridge Road, Bedford, IN 47421

# EXHIBIT A

## Property Description

Tax ID Number: 47-06-12-300-010.000-010; 47-06-12-300-011.000-010; 47-06-12-300-009.000-010

Land situated in the County of Lawrence, State of Indiana is described as follows:

A part of the SW1/4 of Section 12, T5N, R1W, Lawrence County, Indiana, described as follows: Beginning at a mag nail on the north line of said quarter section and in the center of Bailey Scales Road, said beginning point being N 89 deg 41' 06" E 548.94 feet from the northwest corner of said quarter section;

Thence N 89 deg 41' 06" E 394.42 feet (passing a capped 1/2 inch rebar at 15.77 feet) to a capped 5/8 inch rebar which is S 89 deg 41' 06" W 132.00 feet from a stone at the northeast corner of a tract conveyed to Lucinda J. Russell in Deed Record 240 on page 540; Thence parallel with the east line of said Russell tract, S 03 deg 02' 06" W 330.00 feet (passing a capped 1/2 inch rebar at 305.00 feet) to a mag nail on the north line of a 15 feet alley platted in Mapleton Addition, Lawrence County, Indiana; Thence S 89 deg 41' 06" W 268.50 feet (passing a mag nail at 252.73 feet) to a mag nail in the center of Bailey Scales Road;

Thence N 18 deg 15' 06" W 346.27 feet to the beginning. Containing 2.507 acres, more or less, being subject to a right-of-way easement of 15 feet of even width off of the entire south side which is being used as April Lane and to the right-of-way of bailey Scales Road, and being subject to all easements and rights-of-ways of record

Commonly known as: 402 Bailey Scales Road, Bedford, IN 47421

X:\DOCUMENTS AND SETTINGS\MERRILLSCAN\LOCAL SETTINGS\TEMP\WZE886\US_ACTIVE_EXHIBIT A - MLC #1246 - 402 BAILEY SCALES_43637498_1.DOC

MLC #1246 - 402 Bailey Scales

## EXHIBIT A

## Property Description

Tax ID Number: 47-06-11-400-002.000-010; 47-06-11-400-003.000-010

Land situated in the County of Lawrence, State of Indiana is described as follows:

Tract I

Part of the Southwest Quarter of the Southeast Quarter of Section 11, Township 5 North, Range 1 West, more particularly described as follows: Commencing at an iron pin at the Southwest Corner of the Southeast Quarter of said Section 11; thence due North on the West line of said quarter section 714.5 feet to a drill hole; thence North 89 degrees 33 minutes East 41.3 feet to the true point of beginning; thence due North 119.5 feet; thence South 89 degrees 33 minutes West 41.3 feet; thence due North 462.0 feet to a drill hole; thence North 89 degrees 33 minutes East to the West right of way line of the Monon Railroad; thence along the West right of way line of said railroad in a Southerly direction to a point South 00 degrees 17 minutes East 462.0 feet on said right of way line; thence along said right of way line of said railroad in a Southerly direction to a point South 08 degrees 40 minutes East 111.8 on said right of way line; thence South 89 degrees 33 minutes West 399.4 feet to the true point of beginning containing 5.06 acres, more or less, being all of the Town of Hancock as recorded in Mortgage Record 16 on page 582, plus a 12 foot strip on the South side of the Town of Hancock and plus 0.99 acres, more or less on the South side of the Town of Hancock, plus a 33 foot strip on the West side of the Town of Hancock, being a part of the land conveyed to this grantor in Deed Record 143 page 176.

Tract II

Part of the Southwest Quarter of the Southeast Quarter of Section 11, Township 5 North, Range 1 West, more particularly described as follows; Commencing at an iron pin at the Southwest corner of the Southeast Quarter of said Section 11; thence due North on the West line of said quarter section 714.5 feet to a drill hole and the true point of beginning; thence North 89 degrees 33 minutes East 41.3 feet; thence due North 110.5 feet; thence South 89 degrees 33 minutes West 41.3 feet; thence due South on the West line of said quarter section 110.5 feet to the point of beginning.

Commonly known as: 132 And 134 M Street, Bedford, IN 47421

## EXHIBIT A

### Property Description

Tax ID Number: 47-06-11-100-076.000-009

Land situated in the County of Lawrence, State of Indiana is described as follows:

TRACT I:
A part of the Northwest quarter of Section 12, Township 5 North, Range 1 West, of the second principal meridian, Lawrence County, Indiana, more particularly described as: Beginning at a point in the Southwest corner of the Northwest quarter of Section 12, said point being located in an old quarry hold; thence North along the section line 978.78 feet to the place of beginning; thence from said place of beginning, South 86 degrees 30 minutes East in line with an existing fence 189 feet to the West side of the Bailey Scales Road; thence North 20 degrees 55 minutes West in the with an existing fence 243 feet; thence North 79 degrees 15 minutes West 104 feet to the West line of Section 12; thence South along the West line of Section 12, 235 feet to the place of beginning.

TRACT II:
A part of the Northeast Quarter of Section 11, Township 5 North, Range 1 West, bounded and described as follows, to-wit: Beginning at a point 978 feet 9-3/8 inches North of the Southeast corner of said Northeast Quarter of said Section 11; thence North 83 degrees and 16 minutes West 697 feet 4-7/16 inches; thence North 317 feet, more or less to an existing fence; thence East along said fence line a distance of 598 feet; thence South 215 feet and 7 inches; thence East 96 feet 7 inches to the line of dividing Sections 11 and 12; thence South along said dividing line a distance of 167 feet 8 inches to the place of beginning.

TRACT III:
A part of the Northeast quarter of Section 11 and a part of the Northwest quarter of Section 12, Township 5 North, Range 1 West, Shawswick Township, Lawrence County, Indiana, more specifically described as follows:

COMMENCING at a point that is 1211.21 feet (formerly a record distance of 1213.78 feet) North 00 degrees 20 minutes 59 seconds East of the Southeast corner of said Northeast quarter of Section 11, said point being an aluminum monument set in cut limestone on the line between said Section 11 and 12; Thence on said section line South 00 degrees 20 minutes 59 seconds West 67.33 feet to a PK, nail set in the West side of a 12 inch diameter wild cherry tree; thence leaving said section line on and along an existing fence line North 87 degrees 23 minutes 30 seconds West 96.58 feet to a 5/8 inch diameter rebar with a cap marked "Curry 890006" set at a fence corner; thence North 02 degrees 26 minutes 52 seconds West 215.58 feet to a fence corner post; Thence leaving said fence line and on the prolongation of an existing fence line from the West South 88 degrees 56 minutes 21 seconds East 160.80 feet to PK nail set on the centerline of Bailey Scales Road; thence on said centerline South 19 degrees 58 minutes 54 seconds East 177.00 feet to a PK nail set; Thence leaving said road centerline North 81 degrees 39 minutes 58 seconds West 116.39 feet to the Point of Beginning containing within said bounds 0.81 ACRES (0.51 acres in the Northeast quarter of Section 11 and 0.30 acres in the Northwest quarter of Section 12) be the same more or less but subject to all rights-of-

way and casements according to a survey by Douglas R. Curry, Registered Surveyor No. 890006 in September of 1998.

Excepting and Reserving therefrom the following real estate: (811 Bailey-Scales Road-North-Tract)

A part of the NE1/4 of Section 11, T5N, R1W and a part of the NW1/4 of Section 12, T5N, R1W, Lawrence County, Indiana, described as follows:

Beginning at a Mag nail set in the root of a Cherry Tree on the East line of said Section 11, N 00 degrees 27' 45" E 1144.14 feet from the Southeast corner of the NE1/4 of said Section 11; thence along a fence, N 87 degrees 42' 00" W 97.06 feet to a found capped 5/8 inch rebar; thence along a fence, N 02 degrees 29' 53" W 215.59 feet to a fence corner; thence along the remnants of a fence line, S 89 degrees 14' 51" E 160.80 feet to a found P.K. nail; thence along the center of Bailey-Scales Road, S 20 degrees 17' 24" E 177.00 feet to a Mag nail; thence N 81 degrees 58' 23" W 116.39 feet to an Indian Limestone Company monument set in 1928; thence S 00 degrees 27' 45" W 67.41 feet to the beginning.

Containing 0.809 acres, more or less.

Subject to all easements and rights-of-way of record. (809 Bailey-Scales Road-South Tract)

A part of the NE1/4 of Section 11, T5N, R1W and a part of the NW 1/4 of Section 12, T5N, R1W, Lawrence County, Indiana, described as follows:

Beginning at a Mag nail set in the root of a Cherry tree on the East line of said Section 11, N 00 degrees 27' 45" E 1144.14 feet from the Southeast corner of the NE1/4 of said Section 11; thence N 00 degrees 27' 45" E 67.41 feet to an Indiana Limestone Company monument set in 1928; thence S 81 degrees 58' 23" E 116.39 feet to a Mag nail; thence along the center of Bailey-Scales Road, S 19 degrees 50' 20" E 257.49 feet; thence N 83 degrees 27' 12" W 219.68 feet )passing a capped 5/8 inch rebar at 16.87 feet) to a capped 5/8 inch rebar; thence intersecting and along a fence line, N 00 degrees 37' 49" E 166.55 feet to a fence corner; thence S 87 degrees 42' 00" E 13.26 feet to the beginning.

**Commonly known as:** Vacant Lot Bailey Scales Road, Bedford, IN 47421

MLC #1249 – Five Acres (Danny Wall's)

X:\DOCUMENTS AND SETTINGS\MERRILLSCAN\LOCAL SETTINGS\TEMP\WZA2B9\US_ACTIVE_EXHIBIT A - MLC #1249 -VACANT LOT BAILEY SCALES ROAD_43637494_1.DOC            2

## EXHIBIT A

### Property Description

Tax ID Number: 47-06-11-400-062.000-010

Land situated in the County of Lawrence, State of Indiana is described as follows:

A part of the Southeast quarter of Section 11, Township 5 North, Range 1 West, bounded and described as follows, to wit: Beginning at a point in the East line of Breckenridge Road, 40 feet North of a point 14 1/2 rods South of the Northwest corner of heretofore owned by the Bedford Belt, now the Chicago Milwaukee & St. Paul Railroad, thence East 150 feet, thence North 40 feet more or less to a point one foot South of the foundation of a garage as now located, thence West 150 feet to the East line of said Breckenridge Road, thence South 40 feet more or less to the place of beginning.

Commonly known as: 224 Madison St, Bedford, IN 47421

## EXHIBIT A

### Property Description

Tax ID Number: 47-06-12-300-064.000-010

Land situated in the County of Lawrence, State of Indiana is described as follows:
A part of the Southwest quarter of Section 12, Township 5 North, Range 1 West, bounded and described as follows, to-wit: Beginning at a point found by the following courses and distance: Beginning 60 feet North of the Northwest corner of Lot No. 62, Section B, Bedford Heights Subdivision, an Addition to the City of Bedford, Indiana; thence North 97 feet; thence West 130.9 feet; thence North 113.5 feet to the true point of beginning of this description; thence from said true beginning point North 300 feet to the North line of said Southwest quarter; thence West along said North line of said Southwest quarter 868.16 feet; thence South 2 degrees 30 minutes West 300 feet, more or less to a point due West of the point of beginning, thence East to the point of beginning. Containing 6.00 acres, more or less.

Commonly known as: 330 Robins Way, Bedford, IN 47421

## EXHIBIT A

### Property Description

Tax ID Number: 47-06-12-300-002.000-010

Land situated in the County of Lawrence, State of Indiana is described as follows:

A part of the Southwest Quarter of Section 12, Township 5 North, Range 1 West, Lawrence County, Indiana described as follows: Commencing at a railroad spike at the Northeast corner of said quarter section; thence South 89 degrees 24 minutes West, 1557.2 feet to an "Indiana Limestone Company" stone monument; thence South 08 degrees 03 minutes West, 968.90 feet to an iron pipe in the center of the old Bodenshactz switch (abandoned railroad bed) and the true point of beginning for the property herein described (said beginning point is North 03 degrees 03 minutes East 673.6 feet from old property stone); thence continued South 03 degrees 03 minutes West 476.20 feet to the center of the Bailey Branch; thence with the said branch South 55 degrees 43 minutes West 37.41 feet, South 33 degrees 57 minutes West 30.20 feet and South 77 degrees 05 minutes West 32.83 feet to a P.K. nail in the center of the Bailey Scales Road; thence with said road, North 01 degrees 47 minutes West, 363.48 feet and North 17 degrees 29 minutes West, 25.86 feet to a nail and cap in the center of said railroad bed; thence North 45 degrees 53 minutes East, 173.85 feet (passing an iron pipe at 16.78 feet) to the true point of beginning.  Containing 1.01 acres, more or less.

A part of the Southwest Quarter of Section 12, Township 5 North, Range 1 West, Lawrence County, Indiana, described as follows: Commencing at a railroad spike at the Northeast corner of said quarter section; thence South 89 degrees 24 minutes West, 1557.2 feet to an "Indiana Limestone Company" stone monument; thence South 03 degrees 03 minutes West, 968.90 feet to an iron pipe in the center of the old Bodenshactz switch (abandoned railroad bed) and the true point of beginning for the property herein described (said beginning point is North 03 degrees 03 minutes East, 673.6 feet from an old property stone); thence with said railroad bed, North 45 degrees 53 minutes East, 235.84 feet (passing an iron pipe at 215.84 feet) to the center of the Bailey Branch; thence with said branch, South 16 degrees 38 minutes East, 44.93 feet, South 09 degrees 50 minutes West, 53.28 feet, South 36 degrees 27 minutes East, 69.98 feet, South 30 degrees 16 minutes West, 167.60 feet, South 00 degrees 51 minutes West 103.10 feet, South 16 degrees 28 minutes West 70.62 feet, South 44 degrees 52 minutes West 70.02 feet, South 34 degrees 35 minutes West, 148.98 feet; thence leaving said branch North 03 degrees 03 minutes East, 476.20 feet to the point of beginning.  Containing 1.66 acres, more or less.

Commonly known as: 126 Bailey Scales Road, Bedford, IN 47421

## EXHIBIT A

### Property Description

Tax ID Number: 47-06-02-200-001.000-009

Land situated in the County of Lawrence, State of Indiana is described as follows:

A part of the West Half of the Northwest Quarter of Section 2, Township 5 North, Range 1 West, bounded and described as follows, to-wit: Beginning at the Northwest corner of said half quarter section; thence South to the center line of the Chicago, Indianapolis and Louisville Railroad; thence Easterly with the center line of said Railroad to the East line of said half quarter section; thence North along said East line to the Northeast corner of said half quarter section; thence West along the North line of said half quarter section to the place of beginning. Containing 30.03 acres, more or less.

ALSO, a part of the East Half of the Northwest Quarter of Section 2, Township 5 North, Range 1 West, and described as follows: Beginning at the Northwest corner of said half quarter; thence South 76 rods to the Chicago, Indianapolis and Louisville Railroad; thence in a Southeasterly direction with the center of said Railroad, 70 rods; thence 25 rods East; thence North 40 rods; thence West 40 rods; thence North 60 rods; thence West 40 rods to the place of beginning, EXCEPTING THEREFROM, 1 % acres heretofore deeded to Daniel Pafford out of the North part hereof; ALSO EXCEPTING THEREFROM, all that part of the above described real estate that lies East of the road leading from Bedford to Peerless.

EXCEPTING THEREFROM, a part of the West Half of the Northwest Quarter of Section 2, Township 5 North, Range 1 West, in Shawswick Township, Lawrence County, State of Indiana, bounded and described as follows: Commencing at the Northeast corner of said West half; thence South to a point on the center line of the abandoned Chicago, Indianapolis and Louisville Railroad, said point being 135.00 feet Northwesterly along the center line of said railroad from the center line of the road leading from Bedford to Peerless; thence from said point on and along said railroad North 87 degrees 00 minutes 00 seconds West 63.86 feet to the point of beginning; thence continuing on and along said railroad North 89 degrees 17 minutes 22 seconds West 298.44 feet; thence leaving said railroad North 01 degrees 55 minutes 09 seconds West 296.89 feet; thence North 87 degrees 57 minutes 56 seconds East 169.51 feet to a fence corner; thence on and along said fence South 76 degrees 19 minutes 14 seconds East 133.55 feet; thence leaving said fence South 01 degrees 55 minutes 09 seconds East 74.82 feet to Point A, said point being marked with a 5/8 inch diameter rebar; thence continuing South 01 degrees 55 minutes 09 seconds East 197.23 feet to the point of beginning. Containing 2.01 acres, more or less

Commonly known as: 1589 Peerless Rd, Bedford, IN 47421

## EXHIBIT A

### Property Description

Tax ID Number: 08-002419-01

Land situated in the County of Lawrence, State of Indiana is described as follows:

A part of the West Half of the Northwest Quarter of Section 2, Township 5 North, Range 1 West, in Shawswick Township, Lawrence County, State of Indiana, bounded and described as follows: Commencing at the Northeast corner of said West half; thence South to a point on the center line of the abandoned Chicago, Indianapolis and Louisville Railroad, said, point being 135.00 feet Northwesterly along the center line of said railroad from the center line of the road leading from Bedford to Peerless; thence from said point on and along said railroad North 87 degrees 00 minutes 00 seconds West 63.86 feet to the point of beginning; thence containing on and along said railroad North 89 degrees 17 minutes 22 seconds West 298.44 feet; thence leaving said railroad North 01 degrees 55 minutes 09 seconds West 296.89 feet; thence North 87 degrees 57 minutes 56 seconds East 169.51 feet to a fence corner; thence on and along said fence South 76 degrees 19 minutes 14 seconds East 133.55 feet; thence leaving said fence South 01 degrees 55 minutes 09 seconds East 74 82 feet to Point A, Said point being marked with a 5/8 inch diameter rebar; thence continuing South 01 degrees 55 minutes 09 seconds East 197.23 feet to the point of beginning. Containing 2.01 acres, more or less.

TOGETHER WITH a 15 feet wide ingress/egress easement lying 7.5 feet on each side of the following described center line: Beginning at the herein above described Point A; thence South 70 degrees 32 minutes 26 seconds East 133.60 feet; thence South 55 degrees 32 minutes 55 seconds East 71.56 feet; thence South 40 degrees 12 minutes 15 seconds East 86.48 feet to the center line of the road from Bedford to Peerless and the terminus of said easement.

Commonly known as: 1585 Peerless Road, Bedford, IN 47421

## EXHIBIT A

### Property Description

Tax ID Number: 47-06-12-300-089.000-010

Land situated in the County of Lawrence, State of Indiana is described as follows:

A part of the Southwest Quarter of Section 12, Township 5 North, Range 1 West, described as follows: Beginning at an iron pipe at the Northwest corner of Lot 55 in the Replat of Bedford Heights Subdivision, Section B to the City of Bedford, Indiana; thence South 16 degrees 35 minutes West 74.12 feet to an iron pipe; thence along the West line of said Subdivision, South 13 degrees 19 minutes West 122.5 feet; thence due West 920.16 feet to the center of the Bailey Branch; thence with said branch, North 34 degrees, 27 minutes East 3.92 feet, North 44 degrees 44 minutes East 70.02 feet, North 16 degrees 20 minutes East 70.62 feet, North 00 degrees 43 minutes East 103.10 feet, North 30 degrees 08 minutes East 167.60 feet, North 36 degrees 35 minutes West 69.98 feet and North 09 degrees 42 minutes East 29.18 feet; thence due East 464.53 feet (passing an iron pipe at 16.89 feet) to a cross cut on an a rock; thence due South 100.0 feet to an iron pipe; thence due East 200.0 feet to an iron pin; thence South 18 degrees 30 minutes West 140.77 feet; thence due East 229.69 feet (passing an iron pin at 50.0 feet) to the West line of Lot 56 in said subdivision; thence due South 30.0 feet to the beginning. Containing 7.53 acres, more or less.

EXCEPTING THEREFROM, the following described real estate to-wit: A part of the Southwest of Section 12, Township 5 North, Range 1 West, described as follows: Beginning at an iron pipe at the Northwest corner of Lot 55 in the Replat of Bedford Heights Subdivision Section B to the City of Bedford, Indiana; thence along the West line of said addition, South 16 degrees 35 minutes West 74.12 feet and South 13 degrees 19 minutes West 122.5 feet; thence due West 165.95 feet to a marked 1/2 inch steel pin; thence due North 113.75 feet to a marked 1/2 inch steel pin; thence along the Easterly side of a 50 foot roadway easement, North 18 degrees 30 minutes East 112.30 feet to a marked 1/2 inch steel pin; thence due East 179.69 feet to the West line of Lot 56; thence due South 30.00 feet to the beginning. Containing 0.93 acres, more or less.

ALSO EXCEPTING THEREFROM, the following described real estate, to-wit: A part of the Southwest Quarter of Section 12, Township 5 North, Range 1 West described as follows: Beginning at an iron pin at the Southwest corner of Lot 7 in Speer Addition to the City of Bedford, Indiana; thence South 68 degrees 01.1 minutes East 64.71 feet; thence due North 24.22 feet to the South line of said Lot 7; thence along the South line of said Lot 7, due West 60 feet to the beginning.

ALSO EXCEPTING THEREFROM, the following described real estate, to-wit: A part of the Southwest Quarter of Section 12, Township 5 North, Range 1 West, described as follows: Beginning at an iron pin at the Southeast corner of Lot 7 in Speer Addition to the City of Bedford, Indiana; thence along the West side of a 50 foot street (Riley Blvd.), South 18 degrees 30 minutes West 75.00 feet (passing an iron pin at 50.00 feet); thence along the North side of a proposed 50 foot street, North 68 degrees 01.1 minutes West 125.31 feet; thence due North 24.22 feet to the South line of said Lot 7; thence due East 140.00 feet to the beginning. Containing 0.147 acres, more or less.

ALSO EXCEPTING THEREFROM, the following described real estate, to-wit: A part of the Southwest Quarter of Section 12, Township 5 North, Range 1 West, described as follows:

X:\DOCUMENTS AND SETTINGS\MERRILLSCAN\LOCAL SETTINGS\TEMP\WZ6EC9\US_ACTIVE_EXHIBIT A - MLC #1282 - 659 RILEY BLVD._43637497_1.DOC

MLC #1282 – 659 Riley Blvd.

Beginning at an iron pin at the Southwest corner of Lot 7 in Speer addition to the City of Bedford, Indiana; thence along the Southwest side of a proposed 50 foot street, North 50 degrees 10.4 minutes West 156.14 feet to an iron pin; thence due East 119.91 feet to an iron pin at the Northwest corner of said Lot 7; thence due South 100.00 feet to the beginning. Containing 0.14 acres, more or less.

Commonly known as: 659 Riley Blvd., Bedford, IN 47421

## EXHIBIT A

### Property Description

Tax ID Number: 47-06-12-200-006.000-009
Land situated in the County of Lawrence, State of Indiana is described as follows:

A part of the Northwest Quarter of Section 12, Township 5 North, Range 1 West, bounded and described as follows, to-wit: Beginning at a point in the north line of said quarter section, 1371 feet West from the Northeast corner of said quarter section, thence East 100 feet, thence South 2 degrees and 45 minutes West 435.6 feet, thence West 100 feet, thence North 2 degrees and 45 minutes East 435.6 feet to the place of beginning, containing one acre, more or less.

EXCEPTING THEREFROM, all that part of the above described real estate contained in Quiet Title Decree recorded on May 17, 2000 in Record Book 129, page 869.

Also, Eight (8) acres off the Northwest corner of the following described real estate, to-wit: North central part of the Northwest Quarter of Section 12, Township 5 North, Range 1 West, containing 29.35 acres, more or less, being more particularly described as being bound on the North by the Rawlins Mill Road, on the east by lands of Sam Smith, on the South by land of George McGinnis, and on the West by land of the Denniston Estate or Spring Branch, reserving the right in Spring Branch for slush of Stone Companies, EXCEPTING FROM said above eight (8) acres, approximately 1 1/2 acres heretofore sold by sellers to their son, Warren D. Chaney.

EXCEPTING THEREFROM, all that part of the above described real estate contained in Quiet Title Decree recorded on May 17, 2000 in Record Book 129, page 869.

Which such real estate is more properly described by a more accurate, complete and modernized legal description prepared by Bledsoe Rigged Guerrettaz, Land Surveyors, dated March 7, 2008, recorded on April 21, 2008 in Record Book 310, page 186 and set forth as follows:

A part of the Northwest Quarter of Section 12, Township 5 North, Range 1 West, described as follows: Beginning at a mag nail on the North line of said quarter section, South 89 degrees 02 minutes 01 second West 1257.80 feet from a mag nail over a county monument at the Northeast corner of said quarter section; thence South 01 degree 47 minutes 29 seconds West 435.60 feet to a capped 5/8 inch rebar; thence South 89 degrees 02 minutes 01 seconds West 100.00 feet to a capped 5/8 inch rebar; thence South 01 degree 47 minutes 29 seconds West 308.40 feet to a capped 5/8 inch rebar; thence South 39 degrees 57 minutes 31 seconds East 311.00 feet to a capped 5/8 inch rebar; thence South 73 degrees 57 minutes 31 seconds East 100.00 feet to a capped 5/8 inch rebar; thence South 80 degrees 32 minutes 29 seconds West 432.12 feet (passing a capped 5/8 inch rebar at 378.36 feet) to the center of a branch; thence with said branch, North 16 degrees 08 minutes 53 seconds East 44.69 feet, North 11 degrees 06 minutes 17 seconds West 43.12 feet, North 32 degrees 27 minutes 58 seconds West 280.88 feet, North 58 degrees 02 minutes 41 seconds West 160.77 feet, North 64 degrees 12 minutes 52 seconds West 175.13 feet, North 48 degrees 36 minutes 22 seconds West 61.46 feet, North 65 degrees 15 minutes 47 seconds West 81.45 feet, North 75 degrees 54 minutes 07 seconds West 25.51 feet,

North 61 degrees 36 minutes 05 seconds West 20.27 feet, North 53 degrees 12 minutes 18 seconds West 47.89 feet, North 40 degrees 59 minutes 49 seconds West 51.49 feet and North 48 degrees 37 minutes 10 seconds West 37.20 feet; thence leaving said branch, North 81 degrees 33 minutes 22 seconds East 119.18 feet to a capped 5/8 inch rebar; thence North 37 degrees 48 minutes 55 seconds East 216.54 feet to a mag nail in the center of Broomsage Road; thence with said road, North 54 degrees 31 minutes 06 seconds East 22.34 feet, North 51 degrees 33 minutes 52 seconds East 22.68 feet, North 48 degrees 16 minutes 33 seconds East 24.25 feet, North 46 degrees 22 minutes 02 seconds East 21.18 feet, North 48 degrees 52 minutes 36 seconds East 23.66 feet, North 52 degrees 31 minutes 36 seconds East 19.75 feet, North 51 degrees 50 minutes 29 seconds East 14.84 feet, North 59 degrees 20 minutes 05 seconds East 16.57 feet and North 68 degrees 03 minutes 08 seconds East 46.08 feet; thence leaving said road, South 54 degrees 02 minutes 21 seconds East 74.67 feet to a capped 5/8 inch rebar; thence South 61 degrees 39 minutes 15 seconds East 413.21 feet to a capped 5/8 inch rebar; thence North 01 degree 47 minutes 29 seconds East 345.86 feet to a mag nail on the North line of said quarter section; thence North 89 degrees 02 minutes 01 second East 100.00 feet to the beginning.

Containing 10.874 acres, more or less.


Commonly known as: 572 Broomsage, Bedford, IN 47421

## EXHIBIT A

### Property Description

Tax ID Number: 47-06-11-400-060.000-010

Land situated in the County of Lawrence, State of Indiana is described as follows:

Part of the Southeast Quarter of Section 11, Township 5 North, Range 1 West, bounded and described as follows, to-wit: Beginning at a point on the West line of said quarter section located 68 feet South of the Northwest corner thereof; thence South on said West line a distance of 91 feet, more or less, to the Northwest corner of a 40 foot strip of land heretofore conveyed to John Inman and Effie Inman, husband and wife; thence East along the North line of said 40 foot strip of ground a distance of 150 feet; thence North parallel with the West line of said quarter section a distance of 91 feet more or less, thence West 150 feet to the place of beginning, containing 31/100 of an acre, more or less.

Commonly known as: 222 Madison St, Bedford, IN 47421

X:\DOCUMENTS AND SETTINGS\MERRILLSCAN\LOCAL SETTINGS\TEMP\WZ64F1\US_ACTIVE_EXHIBIT A - MLC #1285 - 222 MADISON STREET_43637487_1.DOC

MLC #1285 – 222 Madison Street

## EXHIBIT A

### Property Description

Tax ID Number: 47-06-11-400-063.000-010

Land situated in the County of Lawrence, State of Indiana is described as follows:

Part of the Southeast Quarter of Section 11, Township 5 North, Range 1 West, bounded and described as follows, to-wit: Beginning at a point 14 1/2 rods South of the Northwest corner of said quarter section on the North line of the 3 acre tract of land heretofore owned by the Bedford belt, now the Chicago Milwaukee and St. Paul Railroad; thence East 150 feet; thence North 40 feet; thence West 150 feet to the West line of said quarter section; thence South 40 feet to the place of beginning.

Commonly known as: 228 Madison Street, Bedford, IN 47421

X:\DOCUMENTS AND SETTINGS\MERRILLSCAN\LOCAL SETTINGS\TEMP\WZD186\US_ACTIVE_EXHIBIIT A - MLC #1286 - 228 MADISON STREET_43637490_1.DOC

MLC #1286 – 228 Madison Street

# EXHIBIT A

## Property Description

Tax ID Number: 47-06-11-100-072.000-009

Land situated in the County of Lawrence, State of Indiana is described as follows:
A part of the Northeast 1/4 of Section 11, Township 5 North, Range 1 West, bounded and described as follows, to-wit: Beginning at a point 989 feet East and 1961.5 feet North of a point where the Chicago, Indianapolis and Louisville Railroad crosses the South line of said I/4 section, which said point of beginning is in the Wes Bilyeu Pike; thence East 162 feet; thence South 170 feet; thence West 162 feet to said Pike road, thence North on said Pike Road 170 feet to the place of beginning, containing 0.63 of an acres, more or less.

EXCEPTING THEREFROM, all that portion of the above described real estate conveyed in Quit-claim Deed recorded on December 30, 2003 in Record Book 228, page 754.

Commonly known as: 640 Jackson St, Bedford, IN 47421

X:\DOCUMENTS AND SETTINGS\MERRILLSCAN\LOCAL SETTINGS\TEMP\WZCE45\US_ACTIVE_EXHIBIT A - MLC #1287 - 640 NORTH JACKSON_43637505_1.DOC

MLC #1287 - North Jackson

# **EXHIBIT A**

# **Property Description**

Part of the Northeast Quarter and part of the Northwest Quarter of Section 21, Township 15 North, Range 3 East, of the Second Principal Meridian in Marion County, Indiana, more particularly described as follows:

Beginning at a point on the West line of said Northeast Quarter Section, which point bears South 02 degrees 31 minutes 26 seconds West (assumed bearing) 295.00 feet from the Northwest corner thereof, thence North 90 degrees 00 minutes 00 seconds East 83.25 feet; thence South 71 degrees 00 minutes 00 seconds East 110.00 feet; thence South 35 degrees 00 minutes 00 seconds East 130.00 feet thence South 04 degrees 00 minutes 00 seconds East 250.00 feet; thence South 04 degrees 00 minutes 00 seconds West 220.00 feet; thence South 38 degrees 00 minutes 00 seconds West 270.00 feet; thence South 73 degrees 00 minutes 00 seconds West 142.04 feet to the West line of said Northeast Quarter Section; thence North 65 degrees 00 minutes 00 seconds West 150.00 feet; thence North 50 degrees 00 minutes 00 seconds West 14632 feet; thence North 12 degrees 45 minutes 00 seconds West 257.65 feet; thence North 02 degrees 00 minutes 00 seconds West 150.00 feet; thence North 14 degrees 00 minutes 00 seconds East 170.00 feet; thence North 19 degrees 00 minutes 00 seconds East 105.00 feet; thence North 65 degrees 00 minutes 00 seconds East 100.73 feet; North 90 degrees 00 minutes 00 seconds East 181.68 feet to the point of beginning, containing 10.269 acres, more or less.

Together with the following Access Easement:

Part of the Northeast Quarter of Section 21, Township 15 North, Range 3 East, of the Second Principal Meridian, in Marion County, Indiana, more particularly described as follows:

Commencing at the Northwest (Northeast record deed) corner of said Northeast Quarter Section; thence along the West line thereof, South 02 degrees 31 minutes 26 seconds West (assumed bearing) 295.00 feet to the beginning point of the 10.269 acre tract described in Exhibit A above (the next two courses are along the Northerly boundary of said tract); (1) thence North 90 degrees 00 minutes 00 seconds East 83.25 feet; (2) thence South 71 degrees 00 minutes 00 seconds East 42.50 feet to the POINT OF BEGINNING of the herein described Access Easement; thence North 19 degrees 00 minutes 00 seconds East 130.59 feet; thence North 80 degrees 10 minutes 07 seconds East 68.79 feet to a point near the Westerly edge of an asphalt access road; thence North 09 degrees 49 minutes 53 seconds West, approximately along the Westerly edge of said access road, 57.87 feet to the South right of way line of Airport Expressway (Raymond Street) per Instrument 81-3341-8 recorded in the Marion County Recorder's Office; thence along said South right of way line, South 89 degrees 32 minutes 51 seconds East 52.00 feet; thence South 00 degrees 08 minutes 12 seconds East, approximately along the Easterly edge of said access road, 74.65 feet; thence South 80 degrees 10 minutes 07 seconds West 92.61 feet; thence South 19 degrees 00 minutes 00 seconds West 115.82 feet to the Northerly boundary of said 10.269 acre tract; thence along said Northerly boundary, North 71 degrees 00 minutes 00 seconds West 25.00 feet to the Point of Beginning, containing 0.187 acres (8155 square feet), more or less.

X:\DOCUMENTS AND SETTINGS\MERRILLSCAN\LOCAL SETTINGS\TEMP\WZ359A\US_ACTIVE_EXHIBIT A - MLC #1325 - ALLISON GAS TURBINES_43637457_1.DOC

MLC #1325 – Allison Gas Turbines

## EXHIBIT A

## Property Description

Tax ID Number: 9999-1B-01/63142228

Land situated in the City of Anderson, in the County of Madison, State of Indiana is described as follows:

A survey and certification of a part of Lot Number 1 in Scatterfield Industrial Commons, an Industrial Park to the City of Anderson, Indiana, described as follows:

Beginning at the Southwest corner of Lot Number 1 in Scatterfield Industrial Commons, an Industrial part to the City of Anderson, Indiana, the plat of which is recorded in Plat Book 23, Pages 105 and 106 in the Office of the Recorder of Madison County, Indiana; and running thence North 00 degrees 10 minutes 30 seconds East along the West line of said Lot, a distance of 344.42 feet to an existing iron rod; thence South 70 degrees 39 minutes 06 seconds West along the Southerly line of said Lot, a distance of 158.93 feet to an existing iron rod marking the Northwesterly corner of said Lot being on a curve having a radius point of North 32 degrees 13 minutes 47 seconds West, 2,914.93 feet; thence Northeasterly along the Northerly curved line of said Lot an arc distance of 284.33 feet to a 5/8 inch rebar in concrete (set), said point having a radius point of North 37 degrees 49 minutes 07 seconds West, 2,914.93 feet; thence South 00 degrees 31 minutes 42 seconds West along an existing fence and said fence line projected a distance of 454.94 feet to a point of the South line of said Lot; thence North 89 degrees 58 minutes 26 seconds West along the South line of said Lot, a distance of 79.65 feet to the point of beginning.

INGRESS AND EGRESS EASEMENT:

Beginning at a point on the South line of Lot Number One in Scatterfield Industrial Commons, an Industrial Park to the City of Anderson, Indiana, the plat of which is recorded in Plat Book 23, pages 105 and 106 in the Office of the Recorder of Madison County, Indiana; said point being South 89 degrees 58 minutes 26 seconds East (assumed bearing) 99.18 feet from a point marking the Southwest corner of said Lot; thence North 01 degree 41 minutes 42 seconds East along the edge of pavement, a distance of 105.12 feet; thence North 89 degrees 56 minutes 26 seconds West on a line parallel with the South line of said Lot, a distance of 21.67 feet to a point in an existing fence line; thence North 00 degrees 31 minutes 42 seconds East along said existing fence line, a distance of 20.67 feet; thence South 89 degrees 58 minutes 26 seconds East on a line parallel with the South line of said Lot a distance of 45.52 feet; thence South 00 degrees 47 minutes 44 seconds West along the edge of pavement, a distance of 125.75 feet to a point on the South line of said Lot 1; thence North 89 degrees 58 minutes 26 seconds West along the South line of said Lot, a distance of 22.40 feet to the point of beginning.

## EXHIBIT A

### Property Description

All that certain lot, tract or parcel of land situate lying and being in the Township of Ewing In the County of Mercer and State of New Jersey and being Lot 1.01, Block 343 lands remaining to GM Corporation, said lot being created pursuant to a minor subdivision of Lot 1, Block 343 by action taken by the Planning Board of the Township of Ewing granting minor subdivision approval on April 4, 2002 and by Resolution of Memorialization by the Planning Board of the Township of Ewing at its regular meeting held September 5, 2002 and being more particularly bounded and described as follows to wit:

BEGINNING at the point in the southerly line of Parkway Avenue (80' ROW) and being distant 40.00 feet measured southwestwardly from and at right angles from the centerline thereof, said point being marked by a concrete monument with disc set 4119102 (Maser consulting PA) and being the following bearing and distance N 45° 50'00"W, 426.00 feet measured along the said southerly line of Parkway Avenue from the point of Intersection of the same With the existing westerly line of Silvia Street (50' ROW) and being distant 25.00 feet measured northwestwardly from and at right angles to the centerline thereof, marked by an iron pin with cap (R.W.Ent), and running, thence

1. S44° 01'00"W, 302.62 feet along the newly established westerly line of new Lot 1.02, Block 343 as shown on the aforesaid minor subdivision plan to an angle point, said point being marked by an concrete, monument with disc set 4/19/02 (Maser Consulting P.A.), thence

2. S00° 59'00"E, 201.13 feet still along the same to a point in the southerly line of the aforesaid new Lot 1.02, Block 343, said point being marked by a concrete monument with disc set 4/19/02 (Maser Consulting P.A.), thence

3. S45° 59'00"E, 272.00 feet along the aforesaid southerly line of new Lot 1.02, Block 343 to a point in the aforesaid existing westerly line of Silvia Street passing over a concrete monument with disc set 4/19/02 (Maser Consulting P.A.), said monument marking the newly established westerly line of Silvia Street and being distant 5.00 feet from the terminus of the herein course, the said newly established westerly line of Silvia Street, being distant 30 feet measured northwestwardly from and at right angles to the centerline thereof, thence

4. S45' 32'00"W, 1,455.77 feet along the aforesaid existing westerly line of Silvia Street to an angle point, said point being marked by a capped iron pin found (R.W.Ent), thence

5, S09° 28'10"W, 18.96 feet still along the same to a point in the northerly line of Lot 1, Block 342.01 lands now or formerly of Consolidated Rail Corporation, said point being marked by a stone monument found, thence

6. N65° 17'00'W, 1,333.23 feet along the aforesaid northerly line of Lot 1, Block 342.01 to a point of curvature in the same, said point being marked by a concrete monument found, thence

7. NORTHWESTWARDLY on an arc having a radius of 529.00 feet and curving to the right an arc distance of 811.82 feet (central angle 87 0 55'40") said arc being connected by a chord bearing N21° 19'10'W and chord distance 734.47 feet still along the same and beyond along the easterly line of Lot 2, Block 342, other lands now or formerly of the aforesaid Consolidated Rail Corporation and beyond along the easterly line of Lot 1, Block 342, other lands now or formerly of Consolidated Rail Corporation to a point of tangent, said point marked by a P.K. nail set in wall 12/18/01 (Maser Consulting P.A.), thence

8. N22° 39'00"E, 524.24 feet still along the easterly line of Lot 1, Block 342 to an angle point, said point being marked by a P.K. nail set in wall 12/18/01 (Maser Consulting P.A.), thence

9. N29° 33'00"E, 901.87 feet still along the same to a point in the aforesaid existing southerly line of Parkway Avenue said point being marked by a concrete monument found, thence

10. S61° 05'30"E, 127.53 feet along the aforesaid existing southerly line of Parkway Avenue to a point of curvature, said point being marked by a brass plug found, thence

11. SOUTHEASTWARDLY on an arc having a radius of 1,470.52 feet and curving to the right an arc distance of 132.82 feet (central angle 50° 10'30") said arc having connected by a chord bearing S58° 30'15"E and chord distance of 132.77 feet still along the same to a point of tangency said point being marked by concrete monument found, thence

12. S55° 55'00"E, 955.36 feet still along the same to a point of curvature said point being marked by a concrete monument found, thence

13. SOUTHEASTWARDLY on an arc having a radius of 1,115,70 feet and curving to the right an arc distance of 193.43 feet (central angle 9°56'00") said arc being connected by a chord distance 55° 57'00"E, and a chord distance of 193.19 feet, still along the same to a point of tangency, thence

14. S45° 59'00"E, 557.61 feet still along the same to the Point marked by a concrete monument with disc set 4/19/02 (Maser Consulting P.A.) and Place of BEGINNING.

## EXHIBIT A

### Property Description

ALL THAT CERTAIN TRACT OR PARCEL OF LAND, situate in the Town of Salina, County of Onondaga, and State of New York, being part of Military Lot 19 and being more particularly bounded and described as follows:

Commencing at a point said point being on the division line between the lands now or formerly of Ryacuss, Inc. on the east as described in Book 2461 of Deeds at page 215, the lands now or formerly of Niagara Mohawk Power Corporation on the west as described in Book 557 of Deeds at page 79, and the lands now or formerly of the County of Onondaga on the south, thence North 88 deg. 41 min. 58 sec. West 1011.74 ft. to the Point of Beginning; thence South 88 deg. 41 min. 58 sec. East along said division line between the said lands of Niagara Mohawk Power Corporation of the north, and the said lands of Ryacuss, Inc., in part by each, on the north and said lands of the County of Onondaga on the south, 138.93 ft. to a point; thence through the said lands of Niagara Mohawk Power Corporation the following three (3) courses: 1) North 44 deg. 43 min. 32 sec. East 80.41 ft to a point; thence 2) North 67 deg. 41 min. 06 sec. East 53.22 ft. to a point; and 3) North 84 deg. 38 min. 21 sec. East 173.77 ft. to a point on the division line between the said lands of Niagara Mohawk Power Corporation on the south and the lands now or formerly of the People of the State of New York (Mohawk Thruway - Interstate 90) on the north; thence North 89 deg. 04 min. 25 sec. East along said division line, 552.77 ft. to a point; thence through the said lands of the People of the State of New York (Mohawk Thruway - Interstate 90) the following thirty six (36) courses and distances: 1) North 66 deg. 19 min. 01 sec. East 74.55 ft. to a point; thence 2) North 84 deg. 13 min. 59 sec. East 99.71 ft. to a point; thence 3) South 78 deg. 31 min. 42 sec. East 50.48 ft. to a point; thence 4) South 84 deg. 21 min. 17 sec. East 59.24 ft. to a point; thence 5) South 88 deg. 27 min. 04 sec. East 29.92 ft. to a point; thence 6) South 84 deg. 52 min. 13 sec. East 92.90 ft. to a point; thence 7) South 88 deg. 23 min. 10 sec. East 94.66 ft. to a point; thence 8) South 82 deg. 50 min. 08 sec. East 69.25 ft. to a point; thence 9) South 78 deg. 57 min. 30 sec. East 74.32 ft. to a point; thence 10) South 83 deg. 35 min. 07 sec. East 127.11 ft. to a point; thence 11) North 82 deg. 41 min. 20 sec. East 32.06 ft. to a point; thence 12) South 84 deg. 06 min. 07 sec. East 56.05 ft. to a point; thence 13) North 87 deg. 48 min. 02 sec. East 69.86 ft. to a point; thence 14) North 86 deg. 17 min. 34 sec. East 92.47 ft. to a point; thence 15) South 84 deg. 25 min. 32 sec. East 73.40 ft. to a point; thence 16) South 78 deg. 58 min. 54 sec. East 104.85 ft. to a point; thence 17) South 81 deg 27 min. 57 sec. East 95.96 ft. to a point; thence 18) South 84 deg. 06 min. 51 sec. East 82.69 ft. to a point; thence 19) South 68 deg. 05 min. 54 sec. East 147.10 ft. to a point; thence 20) South 84 deg. 50 min. 31 sec. East 97.81 ft. to a point; thence 21) South 74 deg. 24 min. 25 sec. East 72.58 ft to a point; thence 22) South 70 deg. 11 min. 19 sec. East 78.60 ft. to a point; thence 23) South 74 deg. 23 min. 40 sec. East 57.62 ft to a point; thence 24) South 71 deg. 58 min. 57 sec. East 72.71 ft. to a point; thence 25) South 71 deg. 47 min. 47 sec. East 68.66 ft to a point; thence 26) South 74 deg. 16 min. 31 sec. East 151.32 ft. to a point; thence 27) South 68 deg. 37 min. 25 sec. East 68.45 ft.

to a point; thence 28) South 60 deg. 33 min. 44 sec. East 53.98 ft. to a point; thence 29) South 74 deg. 34 min. 26 sec. East 71.99 ft to a point; thence 30) South 82 deg. 20 min. 49 sec. East 75.63 ft. to a point; thence 31) South 75 deg. 45 min. 39 sec. East 118.47 ft. to a point; thence 32) South 68 deg. 26 min. 57 sec. East 44.40 ft. to a point; thence 33) South 75 deg. 02 min. 22 sec. East 71.59 ft. to a point; thence 34) South 66 deg. 13 min. 05 sec. East 84.02 ft. to a point; thence 35) South 69 deg. 05 min. 51 sec. East 163.94 ft. to a point; and 36) South 53 deg. 19 min. 26 sec. East 41.63 ft. to a point on the division line between the lands now or formerly of the County of Onondaga on the south and the lands now or formerly of the People of the State of New York (Mohawk Thruway - Interstate 90) on the north; thence along the division line between the lands now or formerly of the County .. of Onondaga on the south and the lands now or formerly of the People of the State of New York (Mohawk Thruway - Interstate 90) on the north the following two courses: 1) along the arc of a non-tangent curve to the right having a radius of 3,368.16 ft., a length of 140.70 ft and a chord of South 68 deg. 00 min. 32 sec. East 140.69 ft to a point; and 2) South 66 deg. 45 min. 59 sec. East 16.75 ft.; thence through the said lands of the People of the State of New York (Mohawk Thruway - Interstate 90) the following five (5) courses: 1) South 81 deg. 01 min. 17 sec. East 35.07 ft. to a point; thence 2) South 79 deg. 02 min. 20 sec. East 63.22. ft. to a point; thence 3) South 87 deg. 59 min. 04 sec. East 49.76 ft. to a point; thence 4) South 84 deg. 45 min. 16 sec. East 82.73 ft. to a point; and 5) South 81 deg. 44 nun. 13 sec. East 43.03 ft. to a point on the westerly margin of Town Line Road~ thence South 03 deg. 07 min. 16 sec. East along said margin, 76.14 ft. to a point on the division line between the lands now or formerly of the County of Onondaga on the south and the lands now or formerly of the People of the State of New York (Mohawk Thruway - Interstate 90) on the north; thence through the said lands of the County of Onondaga the following twenty one (21) courses and distances: 1) along the arc of a non tangent curve to the right having a radius of 136.44 ft, an arc length of 58.74 ft., a chord bearing of South 47 deg. 04 min. 14 sec. West and a chord distance of 58.29 ft to a point of compound curvature; thence 2) along the arc of a non tangent curve to the right having a radius of 213.90 ft., an arc length of 107.20 ft, a chord bearing of South 88 deg. 50 min. 00 sec. West, and a chord distance of 106.08 ft. to a point; thence 3) North 80 deg. 33 min. 34 sec. West 53.35 ft. to a point; thence 4) North 76 deg. 21 min. 41 sec. West 103.74 ft. to a point; thence 5) Norm 71 deg. 09 min. 14 sec. West 110.20 ft. to a point; thence 6) North 70 deg. 44 min. 08 sec. West 144.67 ft. to a point; thence 7) North 71 deg. 16 min. 26 sec. West 89.71 ft. to a point; thence 8) North 72 deg. 47 min. 34 sec. West 90.15 ft. to a point; thence 9) North 74 deg. 01 min. 17 sec. West 90.85 ft. to a point; thence 10) North 75 deg. 58 min. 23 sec. West 93.53 ft. to a point; thence 11) North 77 deg. 23 min. 04 sec. West 188.00 ft. to a point; thence 12) North 78 deg. 19 min. 57 sec. West 239.33 ft. to a point; thence 13) North 78 deg. 47 min. 50 sec. West 334.16 ft. to a point; thence 14) North 78 deg. 53 min. 44 sec. West 342.52 ft. to a point of curvature; thence 15) along the arc of a non tangent curve to the left having a radius of 6042.48 ft., an arc length of 453.67 ft., a chord bearing of North 80 deg. 55 min. 53 sec. West and a chord distance of 453.57 ft. to a point of compound curvature; thence 16) along the arc of a non tangent curve to the left having a radius of 5062.11 ft., a arc length of 340.69 ft., a chord bearing of North 84 deg. 55 min. 49 sec. West 340.62 ft. to a point; thence 17) South 89 deg. 54 min. 50 sec. West 79.82 ft. to a

point; thence 18) North 85 deg. 51 min. 50 sec. West 110.37 ft. to a point of curvature; thence 19) along the arc of a non tangent curve to the left having a radius of 9081.78 ft., an arc distance of 558.32 ft., a chord bearing of North 89 deg. 11 min. 44 sec. West and a chord distance of 558.23 ft. to a point of compound curvature; thence 20) along the arc of a non tangent curve to the left having a radius of 3880.39 ft., an arc distance of 709.26 ft., a chord bearing of South 83 deg. 16 min. 27 sec. West and a chord distance of 708.27 ft. to a point; thence 21) North 00 deg. 00 min. 00 sec. East 176.25 ft. to the point or place of beginning.

**EXHIBIT A**

**Property Description**

PARCEL 1:

Situated in the Township of Lordstown, County of Trumbull and State of Ohio: And known as being parts of Lots No. 71 and 72 of the original survey of said Lordstown Township, and is further and more fully bounded and described as follows:

Beginning at a stone monument at the Northwesterly corner of said Lot No. 71, it being also the Southwesterly corner of lands now or formerly owned by Archie A. McCorkle;

Thence running North 89 deg. 16' East along said lot line and along the Southerly line of said McCorkle's lands 2,113.00 feet to an iron pin at the Northeasterly corner of said Lot No. 71, it being also the Northwesterly corner of lands now or formerly owned by Rachael Smith;

Thence South 0 deg. 44' West along said Smith's Westerly line 1,242.87 feet to an iron pin;

Thence South 0 deg. 41' East along said Smith's Westerly line and along the Westerly line of lands now or formerly owned by Birdena Slee 1,614.46 feet to an iron pin at the Northeasterly corner of lands now or formerly owned by Alfred H. Imhoff et al;

Thence South 88 deg. 34' West along said Imhoffs Northerly line, and being parallel with the center line of the said Hallock-Young Road, 200.00 feet to an Iron pin at the Northwesterly corner of said Imhoffs lands;

Thence South 0 deg. 41' East along the Westerly line of said Imhoffs lands, and being parallel with the lot line on the Easterly side of said Lot No. 71, 390.02 feet to a bolt in the center line of the said Hallock-Young Road, said bolt being South 0 deg. 41' East, 30.00 feet from an iron pin in the Northerly line of said road;

Thence South 88 deg. 34' West along the center line of said road 903.90 feet to a spike at the Southeasterly corner of lands now or formerly owned by Edison E. Griffith et ai, said spike being South 2 deg. 25' East, 30.00 feet from an iron pin in the Northerly line of said road;

Thence North 2 deg. 25' West along said Griffith's East line 655.20 feet to an iron pin at the Northeasterly corner thereof;

Thence South 88 deg. 31' West along said Griffith's Northerly line 903.98 feet to an iron pin in the Westerly line of said Lot No. 71 at the Northwesterly corner of said Griffith's lands;

Thence North 1 deg. 52' West along the West line of said Lot No. 71, it being also the Easterly line of lands now or formerly owned by Ewalt A. Radtka et ai, 625.19 feet to an iron pin;

Thence South 88 deg. 07' West along said Radtka's Northerly line 1,090.38 feet to an iron pin at an angle in said line;

Thence North 0 deg. 38' West along said Radtka's Easterly line 1,997.58 feet to an iron pin in the Northerly line of said Lot No. 72, and the Southerly line of lands now or formerly owned by Joseph Bender et al;

Thence North 88 deg. 20' East along the North line of said Lot No. 72, and along said Bender's Southerly line 1,047.72 feet to the stone at the place of beginning.

Containing within said bounds 187.239 acres of land as surveyed by F. L. Davison, Registered Surveyor, in January, 1956. Of said acreage 48.965 acres are in Lot No. 72, and the remaining 138.274 acres are in said Lot No. 71.

PARCEL 2:
Situated in the Township of Lordstown, County of Trumbull and State of Ohio:
And known as being a part of Lot No. 63 of the original survey of said Lordstown Township, and is further and more fully bounded and described as follows:

Beginning at a railroad spike in the center line of the Ellsworth-Bailey Road, so called, at the Southwesterly corner of said Lot No. 63, said point being also South 88 deg. 20' West, 30.00 feet from an iron pin in the Easterly line of said road, and being also the Northwesterly corner of lands now or formerly owned by Ewalt A. Radtka et al;

Thence running North 0 deg. 45' West along the center line of said road 735.60 feet to a railroad spike at an angle in said road;

Thence North 1 deg. 44' West along the center line of said Ellsworth-Bailey Road 225.80 feet to a bolt, said bolt being also South 88 deg. 06' West, 30.00 feet from an iron pin in the Easterly line of said road, and being at the Southwesterly corner of lands now or formerly owned by Albert J. Sechler et al;

Thence North 88 deg. 06' East along said Sechler's Southerly line 817.12 feet to an iron pin at an angle in said line; Thence South 4 deg. 22' East along said Sechler's Westerly line 227.70 feet to an iron pin;

Thence North 88 deg. 31' East along said Sechler's Southerly line 1,736.66 feet to an iron pin in the lot line on the Easterly side of said Lot No. 63, it being also the Westerly line of lands now or formerly owned by Archie A. McCorkle;

Thence South 1 deg. 37' East along said lot line on the East side of said Lot No. 63, and along the Westerly line of said McCorkle's lands 731.30 feet to a stone monument at the Southwesterly corner thereof and at the Northeasterly corner of Lot No. 72;

Thence South 88 deg. 20' West along the lot line on the South side of said Lot No. 63, and along the - Northerly line of lands now or formerly owned by Isaac N. Best and lands now or formerly owned by Ewalt A. Radtka 2,575.31 feet to the place of beginning.

Containing within said bounds 47.629 acres of land as surveyed by F. L Davison, Registered Surveyor, in January, 1956.

PARCEL 3:
Situated in the Township of Lordstown, County of Trumbull and State of Ohio:
And known as being a part of Lot No. 63 of the original survey of said Lordstown Township, and is further and more fully bounded and described as follows:

Beginning at a railroad spike in the center line of the Ellsworth-Bailey Road, so called, at the Southwesterly corner of said Lot No. 63, said point being also South 88 deg. 20' West, 30.00 feet from an iron pin in the Easterly line of said road, and being also the Northwesterly corner of lands now or formerly owned by Ewalt A. Radtka et al;

Thence running North 0 deg. 45' West, along the center line of said road 735.60 feet to a railroad spike at an angle in said road;

Thence North 1 deg. 44' West along the center line of said Ellsworth-Bailey Road 225.80 feet to a bolt, said boll being also South 88 deg. 06' West, 30.00 feet from an iron pin in the Easterly line of said road, and being at the Southwesterly corner of lands now or formerly owned by Albert J. Sechler et al;

Thence North 88 deg. 06' East along said Sechler's Southerly line 817.12 feet to an iron pin at an angle in said line;

Thence South 4 deg. 22' East, along said Sechler's Westerly line 227.70 feet to an iron pin;

Thence North 88 deg. 31' East along said Sechler's Southerly line 1,736.66 feet to an iron pin in the lot line on the Easterly side of said Lot No. 63, it being also the Westerly line of lands now or formerly owned by Archie A. McCorkle;

Thence South 1 deg. 37' East along said lot line on the East side of said Lot No. 63, and along the Westerly line of said McCorkle's lands 731.30 feet to a stone monument at the Southwesterly corner thereof, and at the Northeasterly corner of Lot No. 72;

Thence South 88 deg. 20' West along the lot line on the South side of said Lot No. 63, and along the Northerly line of lands now or formerly owned by Isaac N. Best and lands now or formerly owned by said Ewalt A. Radtka 2,575.31 feet to the place of beginning.

Containing within said bounds 47.629 acres of land as surveyed by F.L. Davison, Registered Surveyor, in January, 1956.

PARCEL 4:
Situated in the Township of Lordstown, County of Trumbull and State of Ohio: And known as being a part of Lot No. 71 of the original survey of said Lordstown Township, and known as being a parcel of land out of the Southeasterly corner of the Isaac N. Best farm, and is further and more fully bounded and described as follows:

Beginning at a railroad spike in the center line of the Hallock-Young Road, so called, at the Southeasterly corner of said Lot No. 71, it being also the Southwesterly corner of lands now or formerly owned by Birdena Slee, said railroad spike being also South 0 deg. 41' East, 30.02 feet from an iron pin in the Northerly line of said road;

Thence running South 88 deg. 34' West along the center line of said Hallock-Young Road 200.00 feet to a bolt in said center line, said bolt being also South 0 deg. 41' East, 30.02 feet from an iron pin the Northerly line of said road;

Thence North 0 deg. 41' West along a line parallel with the lot line on the Easterly line of said Lot No. 71, a distance of 390.02 feet to an iron pin;

Thence North 88 deg. 34' East along a line parallel with the center line of said road 200.00 feet to an iron pin in the Easterly line of said Lot No. 71 and the Westerly line of the lands now or formerly owned by said Birdena Slee;

Thence South 0 deg. 41' East along said lot line and along the Westerly line of said Slee's lands 390.02 feet to the railroad spike at the place of beginning.

Containing within said bounds 1.791 acres of land, as surveyed by F. L Davison, Registered Surveyor, in January, 1956.

PARCEL 5:
Situated in the Township of Lordstown, County of Trumbull and State of Ohio: And known as being a part of Section No. 72 of the original survey of said Lordstown Township, and is further and more fully bounded and described as follows:

Beginning at a railroad spike in the center line of the Hallock-Young Road, so called, at the Southeasterly corner of said Lot No. 72, and at the Southwesterly line of Lands now or formerly owned by Edison E. Griffith et al, said railroad spike being also South 1 deg. 52' East, 30.00 feet from an iron pin in the Northerly line of said road;

Thence running South 88 deg. 34' West along the center line of said Hallock-Young Road 966.84 feet to an iron pin in the Northeasterly line of the Ohio Turnpike right-of-way;

Thence North 52 deg. 38' West along the Northeasterly line of said Ohio Turnpike (it being also the Southwesterly line of the re-located portion of the said Hallock-Young Road) 2,124.92 feet to a spike at the point where Northerly line of said Ohio Turnpike right-of-way intersects the center line of the Ellsworth-Bailey Road, so called, on the Westerly line of said Lot No. 72, said spike being also North 52 deg. 38' West, 206.85 feet from an iron pin in the line of said Turnpike right-of-way;

Thence North 0 deg. 45' West along the center line of said Ellsworth-Bailey Road 1,930.11 feet to a railroad spike at the Northwesterly corner of said Lot No. 72, and at the Southwesterly corner of lands now or formerly owned by Joseph Bender et al, said railroad spike being also South 88 deg. 20' West, 30.00 feet from an iron pin in the Easterly line of said road;

Thence North 88 deg. 20' East along the Northerly line of said Lot No. 72 and along the Southerly line of said Bender's lands 1,527.59 feet to an iron pin at the Northwesterly corner of lands now or formerly owned by Isaac N. Best;

Thence South 0 deg. 38' East along said Best's Westerly line 1,997.58 feet to an iron pin;

Thence North 88 deg. 07' East along said Best's Southerly line 1,090.38 feet to an iron pin in the lot line on the Easterly side of said Lot No. 72;

Thence South 1 deg. 52' East along said Best's Westerly line and along the Westerly line of lands now or formerly owned by Edison E. Griffith et al, a distance of 1,279.74 feet to the place of beginning.

Containing within said bounds 120.997 acres of land, as surveyed by F. L. Davison, Registered Surveyor, in January, 1956.

PARCEL 6:
Situated in the Township of Lordstown, County of Trumbull and State of Ohio;

And known as being a part of Lot No. 77 in the original survey of said Lordstown Township, and is further and more fully bounded and described as follows:

Beginning at a railroad spike in the center line of the Hallock-Young Road, so called, at the Northeasterly corner of said Lot No. 77, said point being also the Northwesterly corner of lands formerly owned by Andey Zajic in said Lot No. 78, said railroad spike being also North 1 deg. 34' West, 30.00 feet from an iron pin in the Southerly line of said road;

Thence running South 1 deg. 34' East along said lot line on the Easterly side of said Lot No. 77, and along the Westerly line of said Zajic's lands 779.86 feet to an iron pin in the Northeasterly line of the right-of-way of the Ohio Turnpike;

Thence North 52 deg. 37' West along the Northeasterly line of said Turnpike right-of-way 648.03 feet to an Iron pin at the point where said Turnpike line is intersected by the Southerly line of lands now or formerly owned by James and Loretta Zajic in said Lot No. 77 (see Deed Volume 501, Page 170);

Thence North 88 deg. 34' East along the Southerly line of said lands of said James and Loretta Zajic, and lands now or formerly owned by Ralph B. Harshman's 285.74 feet to an iron pin at the Southeasterly corner of said Harshman's lands, said line being parallel with and 373.40 feet by rectangular measurement Southerly from the center line of said Hallock-Young Road;

Thence North 1 deg. 26' West along the Easterly line of said Harshman's lands 373.40 feet to an iron pin in the center line of said Hallock-Young Road, said point being also North 1 deg. 26' West, 30.00 feet from an iron pin in the Southerly line of said road;

Thence North 88 deg. 34' East along the center line of said road 217.29 feet to the place of beginning,

Containing within said bounds 4.229 acres of land, as surveyed by F. L. Davison, Registered Surveyor, in February, 1956.

PARCEL 7:
Situated in the Township of Lordstown, County of Trumbull and State of Ohio:
And known as being a part of Lot No. 77 in the original survey of said Lordstown Township, and is further and more fully bounded and described as follows:

Beginning at a railroad spike in the center line of the Hallock-Young Road, so called, at the Northwesterly corner of lands now or formerly owned by James and Loretta Zajic in said Lot No. 77, said railroad spike being also North 1 deg. 25' West, 30.00 feet from an iron pin in the Southerly line of said road, and also being South 88 deg. 34' West, 683.94 feet from the Northeasterly corner of said Lot No. 77;

Thence running South 1 deg. 25' East along the Westerly line of said Zajic's lands 202.14 feet to an iron pin at the point where the Northeasterly line of the right-of-way of the Ohio Turnpike intersects the West line of said Zajic's lands (See Deed Volume 577, Page 348, Parcel 2);

Thence North 52 deg. 37' West along the Northeasterly line of said Turnpike right-of-way, it being along a line parallel with and 130.00 feet by rectangular measurement Northeasterly from the center line of said Turnpike, a distance of 322.23 feet to an iron

pin at the point where said line intersects the former center line of said Hallock-Young Road;

Thence North 88 deg. 34' East along the said center line of said Hallock-Young Road 251.00 feet to the railroad spike at the place of beginning.

Containing within said bounds 0.582 acre of land as surveyed by F. L. Davison, Registered Surveyor, in February, 1956.

PARCEL 8:
Situated in the Township of Lordstown, County of Trumbull, and State of Ohio:
And known as being all of Lots Nos. 64 and 65 In the original survey of said Lordstown Township, and is further and more fully bounded and described as follows:

Beginning at a railroad spike In the center line of the Warren-Salem Road, so called, at the Southeasterly corner of said Lot No. 65, and at the Northeasterly corner of lands now or formerly owned by William A. Smith in Lot No. 1 of Tract 15;

Thence running South 88 deg. 27' West along the Northerly line of said William A. Smith lands, and along the Northerly line of lands now or formerly owned by Rachael Smith 3,344.85 feet to an iron pin at the Northeasterly corner of Lot No. 71, said point being the Northeasterly corner of lands now or formerly owned by Isaac N. Best;

Thence South 89 deg. 16' West along said Best's North line 2,113.00 teet to a stone monument at the Northwest corner of said Lot No. 71 and at the Southeasterly corner of lands now or formerly owned by Joseph Bender et al;

Thence North 1 deg. 37' West along said Bender's East line and along the East line of lands now or formerly owned by Albert J. Sechler et al, 1,994.84 feet to an iron pin at the Northwest corner of said Lot No. 64 and at the Southwesterly corner of lands now or formerly owned by John C. Fishel;

Thence North 88 deg. 20' East along the lot line on the Northerly side of said Lots No. 64 and 65, said line being the South line of lands of said Fishel, and of Frank Kiches and of Mabel W. Shively, 5,450.00 feet to a spike in the center line of the said Warren-Salem Road at the Northeast corner of said Lot No. 65, said spike being also North 88 deg. 20' East, 30.00 feet from an iron pin in the Westerly line of said road;

Thence South 1 deg. 51' East along said center line 13.65 feet to an iron pin at an angle in said road;

Thence South 2 deg. 15' East along said center line of said road 416.85 feet to an iron pin at an angle in said road;

Thence South 1 deg. 46' East, 518.63 feet to an iron pin at an angle in said road;

Thence South 2 deg. 04' East along said center line of said road 827.32 feet to an iron pin at an angle in said road;

Thence South 0 deg. 11' West along the center line of said road 258.82 feet to the railroad spike at the place of beginning.

Containing within said bounds 253.642 acres of land as surveyed by F. L. Davison, Registered Surveyor, in January, 1956. Of said acreage approximately 126.014 acres are in said Lot No. 65, and the remaining 127.628 acres are in said Lot No. 64.

PARCEL 9:
Situated in the Township of Lordstown, County of Trumbull and State of Ohio:
And known as being a part of Lot No. 71 in the original survey of said Lordstown Township, and being a parcel of land out of the Southwesterly corner of the said Lot No. 71, and is further and more fully bounded and described as follows:

Beginning at a railroad spike in the center line of the Hallock-Young Road, so called, at the Southwesterly corner of said Lot No. 71, said railroad spike being also South 1 deg. 52' East, 30.00 feet from an iron pin in the Northerly line of said road;

Thence running North 1 deg. 52' West along said lot line and along the Easterly line of lands now or formerly owned by Ewalt A. Radtka et al. 654.55 feet to an iron pin in the Southwesterly corner of lands owned by Isaac N. Best;

Thence North 88 deg. 31' East along said Best's Southerly line 903.98 feet to an iron pin;

Thence South 2 deg. 25' East along said Best's Westerly line, a distance of 655.20 feet to a spike in the center line of said Hallock-Young Road, said spike being also South 2 deg. 25' East, 30.00 feet from an iron pin in the Northerly line of said road;

Thence South 88 deg. 34' West along the center line of said Hallock-Young Road 910.68 feet to the railroad spike at the place of beginning.

Containing within said bounds 13.640 acres of land as surveyed by F. L. Davison, Registered Surveyor, in January, 1956.

PARCEL 10:
Situated in the Township of Lordstown, County of Trumbull and State of Ohio:
And known as being a part of Lot No. 1 in Tract 15 of the original survey of said Lordstown Township, and known as being a parcel of land out of the Northeasterly corner of the Rachael Smith farm, and is further and more fully bounded and described as follows:

Beginning at a railroad spike in the center line of the Warren-Salem Road, so called, at the Northeasterly corner of said Lot No. 1, said point being also the Southeasterly corner of lands now or formerly owned by Archie A. McCorkle in Lot No. 65, and being also North 88 deg. 27' East, 30.00 feet from an iron pin in the Westerly line of said road;

Thence running South 0 deg. 11' West along the center line of said Warren-Salem Road 132.00 feet to a spike at the Northeasterly corner of lands now or formerly owned by Rachael Smith, said spike being also North 88 deg. 27' East, 30.00 feet from an iron in the Westerly line of said road;

Thence South 88 deg. 27' West along said Rachael Smith's Northerly line, and being parallel with the Northerly line of said Lot No. 1, a distance of 495.00 feet to an iron pin;

Thence North 0 deg. 11' East along a line parallel with the center line of said Warren-Salem Road 132.00 feet to an iron pin in the Southerly line of said lands now or formerly owned by said McCorkle;

Thence North 88 deg. 27' East along the Southerly line of said McCorkle's lands, a distance of 495.00 feet to the place of beginning.

Containing within said bounds 1.500 acres of land as surveyed by F. L. Davison, Registered Surveyor, in January, 1956.

PARCEL 11:
Situated in the Township of Lordstown, County of Trumbull and State of Ohio:
And known as being a parcel of land out of the center portion of Lot No. 2 in Tract 15 of the original survey of said Lordstown Township, and is further and more fully bounded and described as follows:

Beginning at a bolt in the center line of the Hallock-Young Road, so called, at the Southeasterly corner of lands now or formerly owned by Birdena Slee in said Lot No. 2, said bolt being also South 0 deg. 13' West, 30.00 feet from an iron pin in the Northerly line of said road;

Thence running North 0 deg. 13' East along the Easterly line of said lands now or formerly owned by said Birdena Slee 1,652.68 feet to an iron pin in the lot line on the North side of said Lot No. 2, and in the Southerly line of lands now or formerly owned by Rachael Smith;

Thence North 88 deg. 25' East along said Smith's Southerly line 288.30 feet to an iron pin at the Northwesterly corner of lands now or formerly owned by Erma E. and Clarence S. Cole;

MLC #1011 - Lordstown Excess Land

X:\DOCUMENTS AND SETTINGS\MERRILLSCAN\LOCAL SETTINGS\TEMP\WZAC9A\US_ACTIVE_EXHIBIT A - 1011 LORDSTOWN
EXCESS LAND_43636990_2.DOC                    9

Thence South 1 deg. 33' East along said Coles' Westerly line 1,660.30 feet to a spike in the center line of said Hallock-Young Road, said spike being also South 1 deg. 33' East, 30.00 feet from an iron pin in the Northerly line of said road;

Thence South 89 deg. 43' West along the center line of said Hallock-Young Road 339.68 feet to the bolt at the place of beginning,

Containing within said bounds 11.911 acres of land as surveyed by F. L. Davison, Registered Surveyor, in January, 1956.

PARCEL 12:
Situated in the Township of Lordstown, County of Trumbull, State of Ohio:
And known as being a part of Lot No. 2 in Tract 15 of the original survey of said Lordstown Township, and is further and more fully bounded and described as follows:

Beginning at a railroad spike in the center line of the Hallock-Young Road, so called, at the Southwesterly corner of said Lot No. 2 and at the Southeasterly corner of lands now or formerly owned by Alfred H. Imhoff, said railroad spike being also South 0 deg. 41' East, 30.02 feet from an iron pin in the Northerly line of said road;

Thence running North 0 deg. 41' West along said lot line, and along the Easterly line of said Imhoffs lands and along the Easterly line of lands now or formerly owned by Isaac N. Best 1,586.70 feet to an iron pin at the Southwesterly corner of Lot No. 1 in said Tract 15, it being also the Southwesterly corner of lands now or formerly owned by Rachael Smith;

Thence North 88 deg. 25' East along said lot line and along the South line of said Smith's lands 1,356.67 feet to an iron pin at the Northwest corner of lands now or formerly owned by Orson L. Bailey, et al;

Thence South 0 deg. 13' West along the Westerly line of said Bailey's lands 1,652.68 feet to a bolt in the center line of said Hallock-Young Road, said bolt being also South 0 deg. 13' West, 30.00 feet from an iron pin in the North line of said road;

Thence South 89 deg. 43' West, along the center line of said road 174.70 feet to an iron pin at an angle in said road;

Thence North 88 deg. 33' West along the center line of said Hallock-Young Road 1,157.50 feet to the place of beginning;

Containing within said bounds 50.042 acres of land as surveyed by F. L. Davison, Registered Surveyor, in January 1956.

PARCEL 13:
Situated in the Township of Lordstown, County of Trumbull and State of Ohio:

And known as being the Easterly portion of Lot No. 2 in Tract 15 of the original survey of said Lordstown Township, and is further and more fully bounded and described as follows:

Beginning at an iron pin in the Southeasterly corner of said Lot No. 2, said point being the point where the center line of the Warren-Salem Road, so called, intersects the center line of the Hallock-Young Road, so called;

Thence running South 89 deg. 43' West along the center line of said Hallock-Young Road 230.40 feet to a spike at the Southeasterly corner of a parcel of land now or formerly owned by R. G. Hammond, said spike being also South 1 deg. 48' East, 30.61 feet from an iron pin near the Northerly line of said road;

Thence North 1 deg. 48' West along the East line of said Hammond's lands 200.41 feet to an iron pin;

Thence South 89 deg. 45' West along the Northerly line of said Hammond's lands 189.05 feet to an iron pin at the Northwesterly corner thereof;

Thence South 1 deg. 50' East along the Westerly line of said Hammond's lands 200.51 feet to a spike in the center line of said Hallock-Young Road, said spike being also South 1 deg. 50' East, 30.71 feet from an iron pin rear the North line of said road;

Thence South 89 deg. 43' West along the center line of said road 935.40 feet to a spike at the Southeasterly corner of lands now or formerly owned by Erma E. and Clarence S. Cole, said spike being also South 0 deg. 37' East, 30.01 feet from an iron pin in the Northerly line of said road;

Thence North 0 deg. 37' West along said Cole's Easterly line 1,668.15 feet to an iron pin at the Northeasterly corner thereof, and in the Southerly line of lands now or formerly owned by Rachael Smith;

Thence North 88 deg. 25' East along said Smith's Southerly line (it being also the lot line on the North side of said Lot No. 2), a distance of 1,353.14 feet to a spike in the centerline of said Warren-Salem Road, said spike being also North 88 deg. 25' East, 30.01 feet from an iron pin in the Westerly line of said road;

Thence South 0 deg. 42' East along the center line of said Warren-Salem Road 1,698.20 feet to the place of beginning.

Containing within said bounds 51.448 acres of land as surveyed by F. L. Davison, Registered Surveyor, in January, 1956.

PARCEL 14:
Situated in the Township of Lordstown, County Trumbull and State of Ohio:

And known as being a part of Lot No. 78 in the original survey of said Lordstown Township, and a part of Lot No. 3 in Tract 15 of said Lordstown Township, and is further and more fully bounded and described as follows:

Beginning at a railroad spike in the center line of the Hallock-Young Road, so called, at the Northeasterly corner of said Lot No. 78;

Thence running South 88 deg. 33' East along the center line of said road 329.30 feet to a spike at the Northwesterly corner of lands now or formerly owned by Erma E. and Clarence S. Cole, said spike being also North 1 deg. 26' West, 32.65 feet from an iron pin found near the South line of said road;

Thence South 1 deg. 26' East along said Coles' West line 663.05 feet to an iron pin at an angle therein;

Thence running North 88 deg. 54' West along a North line of said Coles' lands 330.16 feet to an iron pin in the lot line on the Easterly line of said Lot No. 78;

Thence South 1 deg. 26' East along said lot line and along said Coles' West line 1,075.65 feet to an iron pin at an angle in said line;

Thence South 2 deg. 29' East along said lot line and along the Westerly line of lands now or formerly owned by Ellen M. Greenwalt, a distance of 649.54 feet to an iron pin in the Northeasterly line of the right-of-way of the Ohio Turnpike (said point being 125 feet by rectangular measurement Northeasterly from the center line of said Turnpike (see plat Volume 11, Page 68);

Thence North 52 deg. 37' West along the Northeasterly line of said Turnpike right-of-way, and being parallel with and 125 feet by rectangular measurement Northeasterly from said center line as shown by said plat Volume 11, Page 68, a distance of 2,039.90 feet to an iron pin at the point where said line intersects the Easterly line of lands now or formerly owned by James Zajic and Bertha Z. Harner;

Thence North 1 deg. 18' West along said Zajic-Harner Easterly line 1,110.00 feet to a spike in the center line of said Hallock-Young Road, said spike being also North 1 deg. 18' West, 30.00 feet from an iron pin in the South line of said road;

Thence North 88 deg. 34' East along the center line of said Hallock-Young Road 1,575.98 feet to the place of beginning.

Containing within said bounds 68.250 acres of land as surveyed by F. L. Davison, Registered Surveyor, in February, 1956. Of said acreage 5.027 acres are located in said Lot No. 3 of Tract 15, and the remaining 63.223 acres are in said Lot No. 78.

PARCEL 15:

Situated in the Township of Lordstown, County of Trumbull and State of Ohio:
And known as being a part of Lot No. 77 in the original survey of said Lordstown
Township, and is further and more fully bounded and described as follows:

Beginning at a spike in the center line of the Hallock-Young Road, 50 called, at the
Northwesterly corner of lands now or formerly owned by Ralph B. Harshman, said spike
being North 1 deg. 26' West, 30.00 feet from an iron pin in the Southerly line of said
road, and being also South 88 deg. 34' West, 333.94 feet from a railroad spike at the
Northeasterly corner 01 said Lot No. 77;

Thence running South 1 deg. 26' East along the West line of said Harshman's lands
373.40 feet to an iron pin at the Southwesterly corner thereof, said iron pin being also in
the Northerly line of lands now or formerly owned by Ewalt A. Radtka et al;

Thence South 88 deg. 34' West along the Northerly line of said Radtka's lands 169.09 feet
to an iron pin in the Northeasterly line of the right-of-way of the Ohio Turnpike, said
point being 110.00 feet by rectangular measurement Northeasterly from the center line of
said Turnpike right-of-way;

Thence North 52 deg. 37' West along the Northeasterly line of said Turnpike right-of-
way, it being a line parallel with and 110 feet by rectangular measurement Northeasterly
from the center line of said Turnpike, 232.63 feet to an iron pin;

Thence North 1 deg. 25' West along the Easterly line of a part of said right-al-way, and
along the Easterly line of lands now or formerly owned by said Radtka, 227.80 feet to a
railroad spike in the center line of said Hallock-Young Road, said railroad spike being
also North 1 deg. 25' West, 30.00 feet from an iron pin in the South line of said road;

Thence North 88 deg. 34' East along the center line 01 said Hallock-Young Road 350.00
feet to the place of beginning,

Containing within said bounds 2.698 acres of land as surveyed by F.L. Davison,
Registered Surveyor, in February, 1956.

PARCEL 16:
Situated in the Township of Lordstown, County of Trumbull and State of Ohio:
And known as being a part of Lot No. 77 in the Original Survey of said Lordstown
Township, and is further and more fully bounded and described as follows:

Beginning at an iron pin in the center line of the Hallock-Young Road, 50 called, said
iron pin being South 88 deg. 34' West, 217.29 feet from the Northeasterly corner of said
Lot No. 77, and being also North 1 deg. 26' West, 30.00 feet from an iron pin in the
Southerly line of said road;

Thence running South 1 deg, 26' East, along the Westerly line of lands now or formerly owned by Ewalt A. Radtka et al, a distance of 373.40 feet to an iron pin;

Thence South 88 deg. 34' West along a line parallel with the center line of said road, and being the Northerly line of said Radtka's lands, 116.65 feet to an iron pin at the Southeasterly corner of lands now or formerly owned by James and Loretta M. Zajic;

Thence North 1 deg. 26' West along said Zajic's Easterly line 373.40 feet to a spike in the center line of said Hallock-Young Road, said spike being also North 1 deg. 26' West, 30.00 feet from an iron pin in the Southerly line of said road;

Thence North 88 deg. 34' East, along the center line of said Hallock-Young Road 116.65 feet to the place of beginning, containing within said bounds 1.000 acre of land as surveyed by F. L. Davison, Registered Surveyor, in February, 1956.

PARCEL 17:
Situated in the Township of Lordstown, County of Trumbull and State of Ohio:
And known as being a parcel of land out of the center portion of Lot No. 2 in Tract 15 of the original survey of said Lordstown Township, and is further and more fully bounded and described as follows:

Beginning at a spike in the center line of the Hallock-Young Road, so called, at the Southwesterly corner of lands in said Lot No. 2 now or formerly owned by Rudy K. Fenstermaker, said spike being also South 0 deg. 37' East, 30.00 feet from an iron pin in the Northerly line of said road;

Thence running South 89 deg. 43' West along the center line of said Hallock-Young Road 347.00 feet to a spike at the Southeasterly corner of a tract of land now or formerly owned by Orson L. Bailey et al, in said Lot No. 2, said spike being also South 1 deg. 33' East, 30.00 feet from an iron pin in the Northerly line of said road;

Thence North 1 deg. 33' West along said Bailey's Easterly line 1,660.30 feet to an iron pin in the South line of lands now or formerly owned by Rachael Smith;

Thence North 88 deg. 25' East along said Smith's Southerly line, it being also the North line of said Lot No. 2,' a distance of 374.29 feet to an iron pin at the Northwesterly corner of said lands now or formerly owned by said Rudy K. Fenstermaker;

Thence South 0 deg. 37' East along said Fenstermaker's Westerly line 1,668.15 feet to the spike at the place of beginning,

Containing within said bounds 13.778 acres of land as surveyed by F. L. Davison, Registered Surveyor, in January 1956.

PARCEL 18:

Situated in the Township of Lordstown, County of Trumbull, and State of Ohio:
And known as being a part of Lot No. 3 in Tract 15 of the Great Salt Springs Tract of the original survey of said Lordstown Township, and is further and more fully bounded and described as follows:

Beginning at a spike in the center line of the Hallock-Young Road, so called, at the Northeasterly corner of a 5.027 acre parcel of land in said Lot No. 3 now or formerly owned by Myron J. Kistler, said spike being South 88 deg. 33' East, 329.30 feet from the Northwesterly corner of said Lot No. 3, and being also North 1 deg. 26' West, 32.65 feet from an iron pin near the Southerly line of said road;

Thence running along the center line of said Hallock-Young Road South 88 deg. 33' East, 642.22 feet to a railroad spike at the Northwesterly corner of lands now or formerly owned by Orson L. and May Bailey, said railroad spike being also North 1 deg. 26' West, 30.00 feet from an iron pin in the South line of said road;

Thence South 1 deg. 26' East along the Westerly line of said lands now or formerly owned by said Bailey, and being parallel with the lot line on the West side of said Lot No. 3, a distance of 1,681.74 feet to an iron pin in the North line of lands now or formerly owned by Ward C. Kistler;

Thence South 87 deg. 57' West along the North line of said Kistler's lands and along the North line of lands now or formerly owned by Ellen M. Greenwalt, a distance of 971.90 feet to a stone In the lot line on the West side of said Lot No. 3, and in the Easterly line of lands now or formerly owned by said Myron J. Kistler;

Thence North 1 deg. 26' West along said lot line and along said Myron J. Kistler's East line 1,076.65 feet to an iron pin at the Southwesterly corner of said 5.027 acre parcel referred to above;

Thence South 88 deg. 54' East along the South line of said 5.027 acre parcel 330.16 feet to an iron pin at the Southeasterly corner thereof;

Thence North 1 deg. 26' West along the Easterly line of said 5.027 acre parcel 663.05 feet to the spike In the center line of said Hallock-Young Road at the place of beginning.

Containing within said bounds 33.149 acres of land as surveyed by F. L. Davison, Registered Surveyor, in February, 1956.

PARCEL 19:
Situated In the Township of Lordstown, County of Trumbull and State of Ohio:
And known as being a part of Lot No. 78 In the original survey of said Lordstown Township, and is a parcel of land out of the Northwesterly corner of said Lot No. 78, and is further and more fully bounded and described as follows:

Beginning at a railroad spike in the center line of the Hallock-Young Road, so called, at the Northwest corner of said Lot No. 78, said railroad spike being also North 1 deg. 34' West, 30.00 feet from an iron pin in the Southerly line of said road, and being also the Northeasterly corner of lands now or formerly owned by Ewalt A. Radtka et al;

Thence running North 88 deg. 34' East along the center line of said Hallock-Young Road, a distance of 438,60 feet to a spike at the Northwesterly corner of lands now or formerly owned by Myron J. Kistler said spike being also North 1 deg. 18' West, 30.00 feet from an iron pin in the South line of said road;

Thence South 1 deg. 18' East along the Westerly line of said Kistler's lands 1,110.00 feet to an iron pin in the Northeasterly line of the right-of-way of the Ohio Turnpike at a point 125.00 feet by rectangular measurement Northeasterly from the center line of said Turnpike;

Thence continuing South 1 deg. 18' East along said line 19.22 feet to an iron pin at a point 110.00 feet Northeasterly by rectangular measurement from the center line of said Turnpike;

Thence North 52 deg. 37' West along the Northeasterly line of said Turnpike right-of-way, and being parallel with and 110.00 feet by rectangular measurement Northeasterly from the center line of said Turnpike, a distance of 557.14 feet to an iron pin at the point where the said Turnpike line is intersected by the lot line on the West side of said Lot No. 78;

Thence North 1 deg. 34' West along the said lot line on the West side of said Lot No. 78, it being also the Easterly line of lands now or formerly owned by Ewalt A. Radtka et al, a distance of 779.86 feet to the place of beginning.

Containing within said bounds 9.572 acres of land as surveyed by F. L. Davison, Registered Surveyor, in February, 1956.

PARCEL 20:
Situated in the Township of Lordstown, County of Trumbull and State of Ohio:
And known as being a part of Lot No. 2 in Tract 15 of the original survey of said Lordstown Township, and is further and more fully bounded and described as follows:

Beginning at a spike in the center line of the Hallock-Young Road, so called, on the South line of said Lot No. 2, said spike being South 89 deg. 43' West, a distance of 230.40 feet from an iron pin at the point where the said center line of said road intersects the center line of the Warren-Salem Road, so called, at the Southeasterly corner of said Lot No. 2, and said spike being also South 1 deg. 48' East, 30.61 feet from an iron pin near the Northerly line of said Hallock-Young Road;

Thence running South 89 deg. 43' West along the center line of said Hallock-Young Road 189.00 feet to a spike in said center line, said spike being also South 1 deg. 50' East, 30.71 feet from an iron pin in the Northerly line of said road;

Thence North 1 deg. 50' West along the Easterly line of other lands now or formerly owned by said Rudy K. Fenstermaker 200.51 feet to an iron pin;

Thence North 89 deg. 45' East along a Southerly line of said Fenstermaker's lands 189.05 feet to an iron pin;

Thence South 1 deg. 48' East still along said Fenstermaker's lands 200.41 feet to the spike at the place of beginning.

Containing within said bounds 0.870 acres of land as surveyed by F. L. Davison, Registered Surveyor, in January, 1956.

PARCEL 21:
Situated in the Township of Lordstown, County of Trumbull and State of Ohio:
And known as being a part of Lot No.1 of Tract 15 of the original survey of said Lordstown Township; and is further and more fully bounded and described as follows:

Beginning at an iron pin in the South line of lands now or formerly owned by Archie A. McCorckle, said point being also the Northeasterly corner of Lot No. 71, now or formerly owned by Isaac H. Best;

Thence running North 88 deg. 27' East along said lot lines, and along the Southerly line of said McCorckles' lands, a distance of 2,849.85 feet to an iron pin at the Northwesterly corner of a parcel of land now or formerly owned by William A. Smith;

Thence South 0 deg. 11' West, along the Westerly line of said William A. Smith's lands, and being parallel with the center line of the Warren-Salem Road, 132.00 feet to an iron pin;

Thence North 88 deg, 27' East, along said Smith's Southerly line, and being parallel with the South line of said McCorckle's lands, a distance of 495.00 feet to a spike in the center line of said Warren-Salem Road, said spike being also West 88 deg. 27' East, 30.00 feet from an iron pin in the West line of said Road;

Thence South 0 deg. 11' West along the center line of said Road 145.13 feet to an iron pin at an angle in said road;

Thence South 0 deg. 42' East along the center line of said Warren-Salem Road 1,380.25 feet to a railroad spike at the Northeasterly corner of lands now or formerly owned by Rudy K. Fenstermaker, said railroad spike being also North 88 deg. 25' East, 30.00 feet from an iron pin in the West line of said road;

Thence South 88 deg. 25' West along the lot line on the South side of said Lot No. 1, it being also the Northerly line of said Fenstermaker's lands, and of lands now or formerly owned by Erma E. Cole, by Orson L. Bailey, and by Birdena Slee, a distance of 3,372.40 feet to an iron pin in the Easterly line of said Isaac W. Best's lands and at the Southwest corner of said Lot No. 1;

Thence North 0 deg. 41' West along said Best's Easterly line 417.78 feet to an iron pin at an angle in said line;

Thence North 0 deg. 44' East along said Best's Easterly line 1,242.87 feet to the Iron pin at the place of beginning.

Containing within said bounds 126.444 acres of land as surveyed by F. L. Davison, Registered Surveyor, in January 1956.

PARCEL 22:
Situated in the Township of Lordstown, County of Trumbull and State of Ohio:
And known as being a part of Lot 3 in Great Salt Springs Tract 15 in the original survey of said township and is more fully bounded and described as follows:

Beginning at a point in the original centerline of Hallock-Young Road at its intersection with the West line of lands now or formerly owned by Union Building Corporation and the East line of lands of Orson Bailey, et al, as recorded in Trumbull County Records of Deeds in Volume 640 at Page 520, said point being North 0 deg. 41' West, 30 feet from an iron pin in the South line of the road;

Thence South 0 deg. 41' East along the West line of Union Building Corporation and the East line of Bailey, 1,153.40 feet to an iron pin at the Northwest corner of lands now or formerly owned by H. G. Deutsch; .

Thence South 0 deg. 55' 15" East along the West line of Deutsch and the East line of Bailey, 496.95 feet to an iron pin in the North line of lands now or formerly owned by E. M. Greenwalt and at the Southeast corner of lands of Bailey;

Thence South 88 deg. 12' 30" West along Greenwalt's North line and the South line of Bailey, 1,025.21 feet to a concrete monument at the Southeast corner of lands of General Motors Corporation and the Southwest corner of lands of Bailey;

Thence North 1 deg. 31' 35" West along the East line of General Motors Corporation and the West line of Bailey, 934.23 feet to an iron pin;

Thence North 1 deg. 29' West along the East line of General Motors Corporation, the East line of lands of Trumbull County and the West line of Bailey, 747.56 feet to a point

in the original centerline of Hallock-Young Road, said point being North 1 deg. 29' West, 30.34 feet from a monument near the South line of the road;

Thence South 88 deg. 36' East along the original centerline of the road, 188.50 feet to a point, said point being North 0 deg. 31' East, 30 feet from an iron pin in the South line of the road;

Thence North 89 deg. 38' East continuing along the South line of the road, 859.04 feet to the point of beginning. Containing within said lands 39.654 acres.

EXCEPTING THEREFROM, THE FOLLOWING DESCRIBED PROPERTY:
EXCEPTION PARCEL 1:
Situated in the Township of Lordstown, County of Trumbull and State of Ohio:
And known as being parts of Sections 72, 77, 78 and Lots 2 and 3 in Tract 15 in the original survey of said Township, being more fully bounded and described as follows:

Beginning at a point in the Westerly right-of-way line of the Salem-Warren Road at its intersection with the center line of the existing Hallock-Young Road;

Thence South 0 deg. 45' East, along the Westerly line of the Salem-Warren Road, 60 feet to a point;

Thence South 89 deg. 38' West, 542.87 feet to a point in the Westerly line of a parcel of land owned by the General Motors Corporation;

Thence North 4 deg. 58' West, 60.19 feet to a point in the center line of the existing Hallock-Young Road at the Northeast corner of lands now or formerly owned by Orson L. and Mae Bailey;

Thence South 89 deg. 38' West, along the center line of the road, 1638.88 feet to an iron pin at an angle in the said center line;

Thence North 88 deg. 36' West, continuing along the center line of the road, 185.98 feet to an iron pin at the Northwest corner of lands of said Bailey;

Thence South 1 deg. 29' East, along the West line of said Bailey, 227.62 feet to a point;

Thence South 88 deg. 31' West, 368.06 feet to a point;

Thence South 37 deg. 22' West 2,018.23 feet to a point in the Northeasterly line of lands of the Ohio Turnpike Commission;

Thence along the Northeasterly line of said Turnpike the following courses and distances:
North 52 deg. 37' West, 1,177.19 feet to an iron pin; .
South 1 deg. 18' East, 19.22 feet to an iron pin;

North 52 deg. 37' West, 1437.80 feet to an iron pin;
North 1 deg. 25' West, 25.66 feet to an iron pin;
North 52 deg. 37' West, 322.23 feet to an iron pin;
South 88 deg. 34' West, 31.92 feet to an iron pin;
and North 52 deg. 38' West, 2,124.97 feet to a railroad spike in the center line of the
Ellsworth-Bailey Road;

Thence North 0 deg. 45' West, along the center line of the Ellsworth-Bailey Road,
1,930.11 feet to a railroad spike at the Northwest corner of Section 72;

Thence North 88 deg. 20' East, along the North line of Section 72, 60 feet to a point;
Thence South 0 deg. 45' East, 636.71 feet to a point;
Thence South 35 deg. 45' East, 488.16 feet to a point;
Thence South 0 deg. 45' East, 525.00 feet to a point;

Thence Southeasterly along a curve to the left having a radius of 889.93 feet (chord South
26 deg. 41' 30" East, 778.61 feet) an arc distance of 805.86 feet to a point;

Thence South 52 deg. 38' East, 3,693.04 feet to a point;

Thence Easterly along a curve to the left having a radius of 497.96 feet (chord North 82
deg. 22' East, 704.22 feet) an arc distance of 782.19 feet to a point;

Thence North 37 deg. 22' East, 1,374.63 feet to a point;

Thence Northeasterly on a curve to the right having a radius of 672.96 feet (chord North
63 deg. 30' East, 592.83 feet) an arc distance of 613.89 feet to a point;

Thence North 89 deg. 38' East, 2,329.04 feet to a point in the Westerly line of the Salem-
Warren Road;

Thence South 0 deg. 47' East, along the Westerly line of the road, 130 feet to the point of
beginning, containing within the said bounds 46.9873 acres of land of which 18.1600
acres are in Section 72, 3.8168 acres are in Section 77, 11.1170 acres are in Section 78,
7.6590 acres are in Lot 2, Tract 15 and 6.2345 acres are in Lot 3, Tract 15.

EXCEPTION PARCEL 2:
Situated in the Township of Lordstown, County of Trumbull and State of Ohio:
And known as beginning at a point in the Westerly right-of-way line of the Salem-
Warren Road at its intersection with the center line of the existing Hallock-Young Road;

Thence South 0 deg. 45' East, along the Westerly line of the Salem-Warren Road, 60 feet
to a point which is the true point of beginning of the parcel herein described;

Thence continuing South 0 deg. 45' East, along the Westerly line of the Salem-Warren Road, 200.00 feet to a point;

Thence South 89 deg. 15' West, 75.00 feet to a point;
Thence North 46 deg. 11' West, 287.74 feet to a point;

Thence North 89 deg. 38' East, 280.00 feet to the point of beginning of the parcel herein described and containing within said bounds 0.8165 acres of land.

EXCEPTION PARCEL 3:
Situated in the Township of Lordstown, County of Trumbull and State of Ohio:
And known as beginning at a point in the Westerly right-of-way line of the Salem-Warren Road at its intersection with the center line of the existing Hallock-Young Road;

Thence North 0 deg. 47' West, along the Westerly line of the Salem-Warren Road, 130.00 feet to a point which is the true point of beginning of the parcel herein described;

Thence South 89 deg. 38' West, 300.00 feet to a point;
Thence North 44 deg. 32' East, 316.53 feet to a point;

Thence North 89 deg. 13' East, 75.00 feet to a point in the Westerly line of the Salem-Warren Road;

Thence South 0 deg. 47' East, 225.00 feet along said line to the point of beginning.

And containing within said bounds 0.9655 acres of land.

EXCEPTION PARCEL 4:
Situated in the Township of Lordstown, County of Trumbull and State of Ohio:
And known as being a part of Section 65 in the original survey of said Township, being further bounded and described as follows:

Beginning at a point in the center line of the Warren-Salem Road at the Northeasterly corner of Section 65 in said Township;

Thence South 1 deg. 49' East along the center line of the Warren-Salem Road, 13.65 feet to an iron pin;

Thence South 2 deg. 12' 30" East, continuing along the center line of the Warren-Salem Road, 416.81 feet to an iron pin;

Thence South 1 deg. 43' 30" East, continuing along the center line of the Warren-Salem Road, 43.54 feet to the true point of beginning of the parcel herein described;

Thence South 1 deg. 43' 30" East continuing along the center line of the Warren-Salem Road, 100.00 feet to a point;

Thence South 88 deg. 16' 30" West, 185.00 feet to an iron pin;
Thence North 1 deg. 43' 30" West, 100.00 feet to an iron pin;

Thence North 88 deg. 16' 30" East, 185.00 feet to the true place of beginning, containing within said bounds 0.425 acre.

EXCEPTION PARCEL 5:
Situated in the Township of Lordstown, County of Trumbull and State of Ohio:
And known as being a part of Section 65 in the original survey of said Township, being further bounded and described as follows:

Beginning at a point at the Northeast corner of Section 65, said point being at the intersection of the Northerly line of the grantor with the existing center line of the Warren-Salem Road;

Thence Southerly, along the existing center line of said road the following courses and distances:

South 1 deg. 49' East, 13.65 feet to an iron pin;

South 2 deg. 12' 30" East, 416.81 feet to an iron pin;

South 1 deg. 43' 30" East, 43.54 feet to a point at the Northeasterly corner of a parcel deeded to the City of Warren, as recorded in Trumbull County, Ohio, Record of Deeds, Volume 847, Page 28;

Thence South 88 deg. 16' 30" West along the Northerly line of the City of Warren, 80 feet to an iron pin;

Thence Northerly, parallel to the existing center line of said road the following courses and distances:

North 1 deg. 43' 30" West, 43.20 feet to an iron pin;
North 2 deg. 12' 30" West, 416.75 feet to an iron pin;
North 1 deg. 49' West, 14.13 feet to an iron pin in the Northerly line of the grantor;

Thence North 88 deg. 20' East, 80 feet to the place of beginning, containing within said bounds 0.871 acres.

EXCEPTION PARCEL 6:
Situated in the Township of Lordstown, County of Trumbull and State of Ohio:

And known as being a part of Section 65 in the original survey of said Township and a part of Sections 1 and 2 in the Great Salt Springs Tract in said Township, being further bounded and described as follows:

Beginning at an iron pin at the Southeast corner of Section 2 in the Great Salt Springs Tract, said iron pin being at the intersection of the existing center line of the Warren Salem Road with the existing center line of the Hallock-Young Road;

Thence South 89 deg. 41' West, 30 feet to a point;
Thence North 0 deg. 44' West, 335 feet to a point;
Thence South 89 deg. 16' West, 75 feet to an iron pin;
Thence North 10 deg. 46' East, 125.35 feet to an iron pin;
Thence North 0 deg. 44' West, 3,367.48 feet to an iron pin;
Thence North 1 deg. 24' West, 264.99 feet to an iron pin;
Thence North 2 deg. 04' West, 328.14 feet to an iron pin;

Thence North 1 deg. 43' 30" West, 375.33 feet to an iron pin in the Southerly line of a parcel deeded to the City of Warren, as recorded in Trumbull County, Ohio, Record of Deeds, Volume 847, Page 28;

Thence North 88 deg. 16' 30" East, along the Southerly line of the City of Warren, 80 feet to a point in the original center line of the Warren-Salem Road;

Thence Southerly along the existing center line of the Warren-Salem Road the following courses and distances:
South 1 deg. 43' 30" East, 375.09 feet to an iron pin;
South 2 deg. 04' East, 827.00 feet to a cross on a bridge;

Thence South 0 deg. 11' West, 535.83 feet to an iron pin;

Thence South 0 deg. 44' East, 3,077.63 feet to the place of beginning, containing within said bounds 8.561 acres.

EXCEPTION PARCEL 7:
Situated in the Township of Lordstown, County of Trumbull and State of Ohio:

And known as being a part of Section 3 in the Great Salt Springs Tract in said Township, being further bounded and described as follows:

Beginning at an iron pin at the Northeast corner of Section 3 in the Great Salt Springs Tract, said iron pin being at the intersection of the existing center line of the Warren-Salem Road with the existing center line of the Hallock-Young Road;

Thence South 0 deg. 42' East, along the existing center line of the Warren-Salem Road, 409.54 feet to a point;

Thence South 89 deg. 33' West, 105 feet to an iron pin;
Thence North 0 deg. 42' West, 149.28 feet to an iron pin;
Thence North 89 deg. 18' East, 75 feet to an iron pin;

Thence North 0 deg. 42' West, 260 feet to a point in the existing center line of the Hallock-Young Road;

Thence North 89 deg. 41' East, along the existing center line of the Hallock-Young Road, 30 feet to the place of beginning, containing within said bounds 0.539 acres.

Said land being also more particularly described as:

Trumbull 45, Section 0.00.

Situated in the Township of Lordstown, County of Trumbull, State of Ohio, and in Lot 65 and bounded and described as follows:

PARCEL 67-BWD
Lying on the left side of the center line of a survey made by the Department of Highways, and recorded in Books 29 and 30, Pages 97 through 99 and 40 through 42 of the records of Trumbull County and being located within the following described points in the boundary thereof:

Beginning at the Northeast corner of Lot 65, same being the grantor's Northeast property corner and being in the existing center line of SR45, said point being the true place of beginning for the parcel herein conveyed and being further described as being at Station 87+13.20 in the center line of survey of SR45;

Thence South 01 deg. 54' 55" East along the existing center line of SR45, the grantor's Easterly property line and the Easterly line of Lot 65, a distance of 13.94 feet, to a point;

Thence South 02 deg. 14' 25" East, along the existing center line of SR45, the grantor's Easterly property line and the Easterly line of Lot 65, a distance of 417.1 0 feet, to a point;

Thence South 01 deg. 45' 25" East along the existing center line of SR 45, the grantor's Easterly property line and the Easterly line of Lot 65, a distance of 42.70 feet, to a point at a Southeasterly property corner of this grantor;

Thence South 88 deg. 14' 35" West along a Southerly property line of this grantor, a distance of 80.00 feet, to a point on the proposed right-of-way line of SR45;

Thence along the proposed right-of-way line of SR45 by the following courses:
North 01 deg. 45' 25" West, a distance of 42.70 feet, to a point;

North 02 deg. 14' 25" West, a distance of 417.10 feet, to a point;

North 01 deg. 54' 55" West, a distance of 13.94 feet, to a point on the grantor's Northerly property line, same being the Northerly line of Lot 65;

Thence North 88 deg. 16' 05" East along the grantor's Northerly property line, same being the Northerly line of Lot 65, a distance of 80.00 feet, to the true place of beginning, containing 0.87 acres of land of which 0.54 acres is to be acquired and 0.33 acres is within the existing highway right-of-way.

EXCEPTION PARCEL 8:
Trumbull 45, Section 0.00
Situated in the Township of Lordstown, County of Trumbull and State of Ohio:
And known as being in Lots 2 and 1 of Tract 15 and Lot 65 and bounded and described as follows:

Parcel 67-WD:

Lying on the left and right sides of the center line of a survey, made by the Department of Highways, and recorded in Books 29 and 30, Pages 97 through 99 and 40 through 42 of the records of Trumbull County and being located within the following described points in the boundary thereof:

Beginning at the Southeast corner of Lot 2, Tract 15, same being the intersection of the existing center line of Hallock-Young Road (CH. 86) with the existing center line of State Route 45, said point being the true place 01 beginning and being at Station 33+22.35 in the center line 01 survey of State Route 45 and being in the Easterly property line 01 this grantor;

Thence South 89 deg. 39' 05" West along the existing center line 01 Hallock-Young Road (CH. 86), same being the Southerly line 01 Lot 2, Tract 15, a distance 0130.00 feet, to a point on the existing right-of-way line 01 SR45;

Thence North 00 deg, 45' 55" West along the existing right-of-way line of SR45, a distance of 355,00 feet, to a point on the existing right-of-way 01 Hallock-Young Road (CH. 86);

Thence South 89 deg. 14' 05" West along the existing right-of-way line of Hallock-Young Road (CH. 86), a distance of 75.00 feet, to a point on the proposed right-of-way line of SR45;

Thence along the proposed right-of-way line of SR45 by the following courses:
North 10 deg. 44' 21" East, a distance of 125.35 feet, to a point;

North 00 deg. 45' 55" West, passing through the line common to Lot 2 and Lot 1 of Tract 15 and the line common to Lot 1, Tract 15 and Lot 65, a distance of 3,369.41 feet to a point;

North 01 deg. 25' 40" West, a distance of 264.99 feet, to a point

North 02 deg. 04' 00" West, a distance of 328.84 feet, to a point;

North 01 deg. 43' 30" West, a distance of 375.95 feet, to a point on a Northerly property line of this grantor;

Thence North 88 deg. 14' 35" East along a Northerly property line of this grantor, a distance of 80.00 feet, to a point at a Northeasterly property corner of this grantor, said point being in the existing center line of SR45 and the Easterly line of Lot 65;

Thence South 01 deg. 45' 25" East along the existing center line of SR45, the grantors Easterly property . line and the Easterly line of Lot 65, a distance of 375.95 feet to a point;

Thence South 02 deg. 05' 25" East along the existing center line of SR45, the grantor's Easterly property line' and the Easterly line of Lot 65, a distance of 827.00 feet, to a point;

Thence South 00 deg. 08' 05" West along the existing center line of SR45, the grantor's Easterly property line, a distance of 535.83 feet, passing over the Southeast corner of Lot 65, same being the Northeast corner of Lot 1, Tract 15, to a point;

Thence South 00 deg. 45' 55" East along the existing center line of SR45, the grantor's Easterly property line and the Easterly line of Lot 1, Tract 15, a distance of 1,379.44 feet, to a point at the. Southeast corner of Lot 1, Tract 15, same being the Northeast corner of Lot 2 of Tract 15;

Thence continuing South 00 deg. 45' 55" East along the existing center line of SR45, the grantor's Easterly property line and the Easterly line of Lot 2, Tract 15, a distance of 1,698.19 feet, to the true place of beginning, containing 8.57 acres of land of which 5.25 acres of land is to be acquired and 3.32 acres of land is within the existing highway right-of-way.

EXCEPTION PARCEL 9:
Trumbull 45, Section 0.00
Situated in the Township of Lordstown, County of Trumbull and State of Ohio:
And known as being in Lot 3, Tract 15 and bounded and described as follows:

Parcel 67-AWD
Lying on the left side of the center line of a survey, made by the department of Highways, and recorded in Books 29 and 30, Pages 97 through 99 and 40 through 42 of the records of Trumbull County, and being located within the following described points in the boundary thereof:

Beginning at the Northeast corner of Lot 3, Tract 15, same being the intersection of the existing center line of Hallock-Young Road (CH. 86) with the existing center line of State Route 45, said point being the true place of beginning and being at Station 33+22.35 in the center line of survey of State Route 45 and said point also being in the Easterly property line of this grantor;

Thence South 00 deg. 43' 55" East along the grantor's Easterly property line, the Easterly line of Lot 3, Tract 15 and the existing center line of State Route 45, a distance of 409.54 feet, to a point at the grantor's Southeast property corner;

Thence South 89 deg. 31' 05" West along the grantor's Southerly property line, a distance of 105.00 feet, to a point on the proposed right-of-way line of State Route 45;

Thence North 00 deg. 43' 55" West along the proposed right-of-way line of State Route 45, a distance of 149.28 feet, to a point on the existing right-of-way line of Hallock-Young Road (CH. 86);

Thence North 89 deg. 16' 05" East along the existing right-of-way line of Hallock-Young Road (CH. 86), a distance of 75.00 feet, to a point on the existing right-of-way line of State Route 45;

Thence North 00 deg. 43' 55" West along the existing right-of-way line of State Route 45, a distance of 260.00 feet, to a point on the existing center line of Hallock-Young Road (CH. 86), same being the Northerly line of Lot 3, Tract 15;

Thence North 89 deg. 39' 05" East along the existing center line of Hallock-Young Road (CH. 86), same being the Northerly line of Lot 3, Tract 15, a distance of 30.00 feet, to the true place of beginning, containing 0.54 acres of land of which 0.26 acres of land is to be acquired and 0.28 acres of land is within the existing highway right-of-way.

EXCEPTION PARCEL 10:
Situated in the Township of Lordstown, County of Trumbull and State of Ohio:
And known as being a part of Sections 63, 64 and 65 in the original survey of said township, being further bounded and described as follows:

Beginning at a railroad spike in the center line of Ellsworth-Bailey Road at the Northwesterly corner of Section 63 in said Township;

Thence North 88 deg. 18' East along the Northerly line of Section 63, the distance of 2,567.00 feet to an iron pin at the corner common to Sections 57, 58, 63 and 64 in said township;

Thence North 88 deg. 20' East along the Northerly line 01 Sections 64 and 65, the distance 015,369.93 feet to an iron pin in the new Westerly right-of-way line of the Warren-Salem Road (State Route 45), said pin being South

88 deg. 20' West, 80.00 feet from a point at the Northeasterly corner of Section 65 in said Township and in the original center line of the Warren-Salem Road;

Thence Southwardly along said new right-of-way line, parallel to the original center line of the Warren-Salem Road the following courses and distances:

South 1 deg. 49' East, 14.13 feet to an iron pin;
South 2 deg. 12' 30" East, 416.75 feet to an iron pin;

South 1 deg. 43' 30" East, 43.20 feet to an iron pin in the Northerly line of lands deeded to the City of Warren by deed recorded in Trumbull County, Ohio, Record of Deeds, Volume 847, Page 28;

Thence along the boundary of lands of the City of Warren the following courses and distances:

South 88 deg. 16' 30" West, 105.00 feet to an iron pin;
South 1 deg. 43' 30" East, 100.00 feet to an iron pin;

North 88 deg. 16' 30" East, 105.00 feet to an iron pin in said new right-of-way line 01 the Warren-Salem Road;

Thence Southwardly along said new right-of-way line the following courses and distances:

South 1 deg. 43' 30" East parallel to the original center line of the Warren-Salem Road, 375.33 feet to an iron pin;

South 2 deg. 04' East parallel to the original center line of the Warren-Salem Road 328.14 feet to an iron pin;

South 1 deg. 24' East, 264.99 feet to an iron pin;

South 0 deg. 44' East parallel to the new center line of the Warren-Salem Road, 297.39 feel 10 a point, said point being North 76 deg. 49' 30" West, 89.74 feet from a railroad spike in the original center line of the Warren-Salem Road;

Thence North 76 deg. 49' 30" West, 86.01 feet to an iron pin;

Thence on a curve to the right having a radius of 894.02 feet, an arc distance of 637.15 feet to an iron pin (chord bearing North 56 deg. 24' 30" West, 623.74 feet);

Thence North 35 deg. 59' 30" West, 935.68 feet to an iron pin;

Thence on a curve to the left having a radius of 744.0:2 feet, an arc distance of 722.97 feet to an iron pin (chord bearing North 63 deg. 49' 45" West, 694.87 feet);

Thence South 88 deg. 20' West, 245.07 feet to an iron pin;
Thence South 82 deg. 36' West, 265.00 feet to an iron pin;

Thence on a curve to the left having a radius of 746.27 feet, an arc distance of 488.00 feet to an iron pin (chord bearing South 63 deg. 52' West, 479.35 feet); .

Thence South 88 deg. 20' West, 230.00 feet to an iron pin;
Thence South 72 deg. 48' 40" West, 373.68 feet to an iron pin;
Thence South 88 deg. 20' West, 1,475.00 feet to an iron pin;
Thence North 70 deg. 14' 45" West, 358.21 feet to an iron pin;

Thence on a curve to the left having a radius of 1,797.61 feet, an arc distance of 672.06 feet to an iron pin (chord bearing North 80 deg. 57' 22-1/2" West, 668.15 feet);

Thence South 88 deg. 20' West, 2,202.55 feet to a point in the center line of the Ellsworth-Bailey Road, said point being South 88 deg. 20' West, 30.00 feet from an iron pin in the Easterly line of said road;

Thence North 1 deg. 44' West along the center line of the Ellsworth-Bailey Road, 428.94 feet to the place of beginning, containing within said bounds 116.504 acres, be the same more or less but subject to all legal highways.

EXCEPTION PARCEL 11:
Situated in the Township of Lordstown, County of Trumbull and State of Ohio:
And known as being a part of Section 63, in the original Survey of said Township, being more fully bounded and described as follows:

Commencing at a point at the intersection of the existing centerline of Ellsworth Bailey Road with the existing centerline of Wilson East Road, said point being 20.28 feet right of centerline Station 86+06.14;

Thence South 1 deg. 45' 45" West along the existing centerline of Ellsworth Bailey Road, 428.94 feet to a point, said point being at the Grantor's Northwest property corner, said point also being 27.83 feet right of centerline Station 81+77.26, said point also being the true point of beginning of the parcel described herein;

Thence North 88 deg. 18' 15" East along the Grantor's Northerly property line, 57.00 feet to a point on the proposed Easterly right-of-way line of Ellsworth Bailey Road;

Thence South 2 deg. 4' 45" West along said proposed Easterly right-of-way line 178.42 feet to an angle point in said proposed right-of-way line;

Thence South 1 deg. 25' 30" East along said proposed Easterly right-of-way line of the Ellsworth Bailey Road, 1,384.24 feet to a point said point being on the Easterly right-of-way line of Ellsworth Bailey Road;

Thence South 88 deg. 20' 15" West along said right-of-way line, 50.00 feet to a point on the existing centerline of Ellsworth Bailey Road;

Thence North 0 deg. 44' 15" West along said existing centerline of Ellsworth Bailey Road and the existing Westerly property line of the Grantor, 734.47 feet to a point;

Thence North 1 deg. 45' 45" West, continuing along the existing centerline of Ellsworth Bailey Road and the Grantor's Westerly property line, 827.86 feet to the place of beginning, and containing within said bounds 1.621 acres of land, more or less.

EXCEPTION PARCEL 12:
Situated in the Village of Lordstown, County of Trumbull and State of Ohio:
And known as being part of a 68.250 acre tract and a 33.149 acre tract as conveyed to General Motors Corporation by instruments of record in Deed Book 646,647 at Page 540,54 of the Deed Records of Trumbull County, and being more fully described as follows:-

Commencing at the intersection of the Trumbull/Mahoning County line with the centerline of the Ohio Turnpike;

Thence North 52 deg. 38' 15" West along the centerline of the Ohio Turnpike for a distance of 1,341.81 feet to a point on the line between Lot No. 78 and Lot No. 4;

Thence North 02 deg. 29' 00" West along the lot line for a distance of 162.81 feet to a point on the existing Northerly limited access right-of-way line, and the true place of beginning for the tract of land described herein;

Thence North 52 deg. 38' 15" West along the existing limited access right-of-way line for a distance of 691.98 feet to a point on the proposed limited access right-of-way line;

Thence North 46 deg. 50' 21" East along the proposed limited access right-of-way line for a distance of 130.92 feet to a point;

Thence North 65 deg. 03' 18" East and continuing along the proposed limited access right-of-way line for a distance of 511.09 feet to a point, and crossing the lot line at 468.61 feet;

Thence North 33 deg. 54' 49" East along the proposed lim ited access right-of-way line for a distance of 1,087.35 feet to a point;

Thence North 39 deg. 19' 31" West along the proposed limited access right-of-way line for a distance of 135.11 feet to a point;

Thence North 53 deg. 16' 34" West and continuing along the proposed limited access right-of-way line for a distance of 200.09 feet to a point;

Thence South 37 deg. 20' 45" West along said proposed limited access right-of-way line or a distance of 625.40 feet to a point;

Thence North 52 deg. 39' 15" West along the proposed limited access right-of-way line for a distance of 40.00 feet to a point on the existing right-of-way line of Hallock-Young Road;

Thence North 37 deg. 20' 45" East along the existing right-of-way line of Hallock-Young Road, and the
proposed limited access right-of-way line for a distance of 844.98 feet to a point;

Thence South 53 deg. 16' 34" East and continuing along the proposed limited access right-of-way line for a distance of 237.70 feet to a point;

Thence South 41 deg. 39' 19" East, along said proposed limited access right-of-way line for a distance of 202.74 feet to a point;

Thence South 19 deg. 06' 27" East, and continuing along said proposed limited access right-of-way line for a distance of 190.80 feet to a point;

Thence South 02 deg. 44' 49" West along the proposed limited access right-of-way line for a distance of 190.80 feet to a point;

Thence South 23 deg. 47' 38" West along said proposed limited access right-of-way line for a distance of 176.85 feet to a point;

Thence South 33 deg. 54' 49" West continuing along said proposed limited access right-of-way line for a distance of 674.77 feet to a point on the line between Lot No. 3 and Lot No. 4;

Thence South 87 deg. 58' 35" West along the lot line for a distance of 430.17 feet to a point on the line between Lot No, 4 and Lot No. 78;

Thence South 02 deg. 29' 00" East along line between Lot No. 4 and Lot No. 78 for a distance of 649.54 feet to the true place of beginning, and containing 16.473 acres of

land, more or less, and being 4.534 acres, more or less out of Lot No. 78, and 11.939 acres, more or less out of Lot NO. 3.

## EXHIBIT A

### Property Description

PARCEL 1

ALL THAT TRACT OR PARCEL OF LAND, being a part of Farm Lot 28, situate in the Town County of Onondaga, and State of New York, bounded and described as follows:

Beginning at a point on the Westerly line of lands conveyed by Earl Barton, et al, to General Motors Corporation and recorded in the Onondaga County Clerk's Office in Book of Deeds 1498 at Page 280; thence North 3 degrees 14 minutes 02 seconds West 447.S6 feet; thence North 86 degrees 45 minutes 28 seconds East 300.06 feet and North 3 degrees 13 minutes 45 seconds West 58.62 feet from the intersection of said Westerly line with the Northerly line of lands of the Syracuse Junction Branch of The New York Central Railroad; running thence North 65 degrees 24 minutes 5S seconds West 101.88 feet; thence North 29 degrees 59 minutes 05 seconds East 164.50 feet to the said Westerly line of General Motors Corporation; thence South 3 degrees 13 minutes 45 seconds East along the Westerly line of General Motors Corporation 185.17 feet to the place of beginning.

PARCEL 2

ALL THAT TRACT OR PARCEL OF LAND situate in the Town of Salina, County of Onondaga and State of New York, being part of Military Lots 19 and 28 in said Town and more particularly bounded and described as follows: Beginning at the intersection of the easterly line of lands conveyed by Christina B. Barton to the Syracuse Lighting Company, Inc. by warranty deed dated April 16,1930, and recorded in the Onondaga County Clerk's Office April 17, 1930, in Book 623 of Deeds at page 272 etc. with the southerly line of lands conveyed by said Christina B. Barton to the County of Onondaga by warranty deed dated June 10, 1936, and recorded July 9, 1936, in said Clerk's Office in Book 804 of Deeds at page 475 etc.; thence South 78· 30' 42" East along lastly described southerly line, 287.62 feet to a point of curve therein; thence on a curve, whose chord bears South 72' 19' 42" East with a radius 00168.16 feet to the east line of the premises described and conveyed by a deed from Sarah 1. Luther to Christina B. Galster dated February 17, 1882, and recorded in the Onondaga County Clerk's Office on the 8th day of May, 1882, in Book 238 of Deeds, page 193 etc. which is the west line of the premises described and conveyed by a deed from George W. Thayer, as Trustee of Elizabeth K. Sherwood, to Gilbert Mautz and Anna Mautz, his wife dated March 31, 1910, and recorded in the Onondaga County Clerk's Office on the 28th day of April, 1910, in Book 395 of Deeds, page 335 etc.; thence southerly along the east line of the premises of said Christina B. Galster, which is the West line of the premises of said Gilbert Mautz and Anna Mautz, his wife, to the northerly line of the premises of the New York Central Railroad Company described and conveyed by a deed from Henry Muller to it dated April 21, 1873, and recorded in the Onondaga County Clerk's Office on the 2nd day of June, 1873, in Book 193 of Deeds, page 247; thence North 60' 00' 24" West along

the northerly line of the premises of the New York Central Railroad Company to the east line of the premises of the said Syracuse Lighting Company, Inc.; thence North 3' 14' 2" West along the east line of the premises of said Syracuse Lighting Company, Inc, 447.56 feet to a Corner of said premises; thence North 86' 45' 28" East 300.06 feet to a corner of the premises of said Syracuse Lighting Company, Inc.; thence North 3' 13' 45" West along the east line of the premises of said Syracuse Lighting Company, Inc. 1163.07 feet to the place of beginning.

PARCEL 3

ALL THAT TRACT OR PARCEL OF LAND situate in the Town of aka, County of Onondaga and State of New York, being part of Military Lot 19 and 28 in said Town of Salina, bounded and described as follows: Beginning at the intersection of the westerly line of the United States Air Corps Base Access Road (New Town Line Road) as conveyed by Gilbert Mautz and others to the People of the State of New York by an instrument recorded in the Onondaga County Clerk's Office On April 26, 1944, in Book 1096 of Deeds, page 94 etc. with the southerly line of land conveyed to and owned by the County of Onondaga for sewer purposes; thence South 3' 02' 50" East along said westerly road line, 756.88 feet to an angle therein; thence South 12° 08' 08" East, along said westerly road line, 134.62 feet to the intersection thereof with the westerly line of the old Town Line Road; thence South 2' 54' 00" East, parallel 'with the line between the Towns of Salina and Dewitt, and 24.75 feet westerly, measured at right angles therefrom, 1261.49 feet to the northerly line of the New York Central Railroad Company as conveyed to it by Henry Muller April 21, 1873, and recorded in said Clerk's Office June 2, 1873, in Book 193 of Deeds at page 247; thence North 60° 00' 24" West, along said northerly line to the east line of the premises described and conveyed by a deed from Sarah J. Luther to Christina B. Galster dated February 17, 1882, and recorded in the Onondaga County Clerk's Office on the 8th day of May, 1882, in Book 238 of Deeds, page 193 etc. which is the west line of the premises described and conveyed by a deed from George W. Thayer. as Trustee of Elizabeth K. Sherwood, to Gilbert Mautz and Anna Mautz, his wife, dated March 31, 1910, and recorded in the Onondaga County Clerk's Office on the 28th day of April, 1910, in Book 395 of Deeds, page 335 etc.; thence northerly along the east line of the premises of said Christina G. Galster, which is the west line of the premises of said Gilbert Mautz and Anna Mautz, his wife, to the south line of said premises of the County of Onondaga; thence easterly along said premises of the County of Onondaga to the place of beginning, together with all right, title and interest of, in and to the west one-half of the highway adjacent to the premises herein described.

Parcel 2 above and the firstly described parcel within Parcel 3 last described, may also be described as follows:

ALL THAT TRACT OR PARCEL OF LAND situate in the Town of Salina, County of Onondaga and State of New York, being part of Military Lots 19 and 28 in said town and more particularly bounded and described as follows: Beginning at the intersection of the

easterly lines of lands conveyed by Christina B. Barton to the Syracuse Lighting Company, Inc. by warranty deed dated April 16, 1930, and recorded in the Onondaga County Clerk's Office April 17, 1930, in book 623 of Deeds at page 272 etc., with the southerly line of lands conveyed by said Christina B. Barton to the County of Onondaga by warranty deed dated June 10, 1936, and recorded July 9, 1936, in said Clerk's Office in Book 804 of Deeds at page 475 etc.; thence South 78° 30' 42" East, along lastly described southerly line, 287.62 feet to a point of curve therein thence on a Curve, whose chord bears South 72° 19' 42" East, with a radius of 3168.16 feet, through a central angle 12° 22' 00", a length of arc of 683.81 feet to a point of tangent in said southerly line; thence South 66° 08' 42" East, still along the southerly line of land owned by the County of Onondaga, 41,936 feet to the westerly line of the U.S. Air Corps Base Access Road (Town Line Road) as conveyed by Gilbert Mautz et al. to The People of the State of New York by instrument recorded in said Clerk's Office April 26, 1944, in Book 1096 of Deeds at page 94 etc., thence South 3° 02' 50" East, along said westerly road line, 756.88 feet to an angle therein; thence South 12' 08' 08" East, along said westerly road line, 134.62 feet to the intersection thereof with the westerly line of the old Town Line Road; thence South 2° 54' 00" East parallel with the line between the Towns of Salina and Dewitt and 24.75 feet westerly, measured at right angles therefrom, 1261.49 feet to the northerly line of the New York Central Railroad Company as conveyed to it by Henry Muller April 21, 1873, and recorded in said Clerk's Office June 2, 1873, in Book 192 of Deeds at page 247; thence North 60° 00' 24" West, along said northerly line and along the northerly line of land conveyed to said Railroad Company by William G. Hiller by deed dated April 21, 1873. and recorded in said Clerk's Office in Book 193 of Deeds at page 242, a distance of 1913.02 feet to the easterly line of the lands of said Syracuse Lighting Company, Inc.; thence North 3° 14' 02" West, along said last mentioned line, 447.56 feet to the intersection thereof with the southerly line of the land conveyed by Christina B. Barton to the Syracuse Lighting Company, Inc., as mentioned first above; thence North 86° 45' 28" East, along said southerly line, 300.06 feet to the southeasterly comer thereof; thence North 3° 13' 45" West along the easterly line of land of said Syracuse Lighting Company, Inc., 1163.07 feet to the point of beginning, containing 63.743 acres of land and being part of land conveyed by Sarah 1. Luther by Horace Alvord, her attorney, to Christina B. Galster by warranty deed dated February 17,1882, and recorded in said Clerk's Office in Book 2'38 of Deeds at page 193 etc., and also part of lands conveyed by George W. Thayer, as Trustee of Elizabeth K. Sherwood, to Gilbert Mautz and Anna Mautz, his wife, by warranty deed dated March 31,1910, and recorded in said Clerk's Office in Book 395 of Deeds at page 335 etc. All bearings herein referred to arc true north.

ALSO ALL THAT TRACT OR PARCEL OF LAND situate in the Town of Dewitt, County of Onondaga and State of New York, being part of !At 20 in said Town and particularly bounded and described as follows: Beginning at the intersection of the westerly line of lands acquired by the County of Onondaga (for the elimination of the grade crossing of the Town Line Road) from the Long Meadows Land Company by condemnation proceedings recorded in the Onondaga County Clerk's Office June 13, 1924, in Book of Lis Pendens Y at page 202, with the northerly line of the New York

Central Railroad Company; thence North 60° 00' 24" West, along said northerly line 158.8 feet to the easterly line of the Town Line Road; thence North 2° 54' 00" West, along said easterly line parallel to and 24.75 feet easterly, measured at right angles, from the line between the Towns of Salina and Dewitt, 480.1 feet to the southerly line of said lands as acquired by the County of Onondaga; thence South 50° 04' 00" East, along said southerly line, 226.6 feet to a point of curve in said southerly line; thence on a curve, whose chord bears South 16° 46' 20" East, with a radius of 275.0 feet, through a central angle of 66'35' 30", a distance of 319.6 feet to the said first above described westerly line; thence South 38° 30' 40" West, along said westerly line, 159.0 feet to the place of beginning, containing 2.244 acres of land, and being part of land conveyed by Mary Capak to Gilbert Mautz by deed dated April 4, 1944, and recorded in said Clerk's Office September 11, 1945, in Book 1166 of Deeds at page 551 etc. All bearings herein refereed to are true north. Together with all right, title and interest of, in and to one-half of the highway adjacent to the premises herein described.

ALSO ALL THAT TRACT OR PARCEL OF LAND situate in the Town of Dewitt, County of Onondaga and State of New York, being part of Lot 20 in said Town and more particularly bounded and described as follows: Beginning in the easterly line of the Town Line Road, which easterly line is parallel to and 24.75 feet easterly, measured at right angles, from the line between the Towns of Salina and Dewitt, at a point North 2° 54' 00" West, 1023.97 feet, as measured along said easterly road line, from the northerly line of the New York Central Railroad Company's land; said point of beginning also being at the intersection of said easterly line of the Town Line Road with the straight continuation northwesterly of the westerly line of Parcel No. I of a perpetual easement appropriated by the People of the State of New York from Mary Capak by instrument recorded in the Onondaga County Clerk's Office April 26, 1944, in Book 1096 of Deeds, at page 103 etc.; thence South 22° 45' 00" East, along said last mentioned westerly line, 760.1 feet to its intersection with the northerly line of lands acquired by the County of Onondaga (for the elimination of the grade crossing of the Town Line Road) from the Long Meadows Land Company by condemnation proceedings recorded in said Clerk's Office June 13, 1924, in Book of Lis Pendens Y at page 202; thence North 50° 04' 00" West, along last mentioned northerly line, 215.9 feet to a point of curve therein; thence on a curve whose chord bears North 26° 29' 00" West, with a radius of 275.0 feet and through a central angle of 47° 10' a distance of 226.4 feet; thence South 87° 06' 00" West, at right angles to the Town Line Road, 11.7 feet to the easterly line thereof; thence North 2° 54' 00" West, along the easterly line of the Town Line Road, 366.5 feet to the place of beginning, containing 1.277 acres of land and being part of land conveyed by Mary Capak to Gilbert Mautz by deed dated April 4, 1944, and recorded in said Clerk's Office September 11, 1945, in Book 1116 of Deeds at page 551 etc. All bearings herein referred to as true north. Together with all right, title and interest of, in and to one-half of the highway adjacent to the premises herein described.

PARCEL 4

All that piece or parcel of land situate in the Town of Dewitt, County of Onondaga. State of New York, as shown on the accompanying map and described as follows:

Parcel No. 53
Beginning at a point on the division line between the lands of N.Y.C.R.R. (reputed owners) on the southwest, and the lands of General Motors Corporation (reputed owner) on the northeast, said point being 4S± feet distant northwesterly, measured at right angles, from station 12+80 I)f the survey base line of the proposed Syracuse-Bridgeport, Part 1, State Highway 672A, Onondaga County; thence southeasterly along said division line 75.5;1: feet to a point 30 feet distant southeasterly, measured at right angles from station 12.;-89± of said base line, said point also being 130 feet distant northwesterly, measured at right angles from station 106+28:1: of the survey base line for the construction of the Syracuse-Bridgeport Part 3, FASH 56-3; thence northeasterly 17'2" feet to a point 18 feet distance northerly, measured on a :radial line from station 14+60 of said base line, said point also being 130 feet distant northwesterly, measured at right angles form station 108+00 of the survey base line for the said construction of the Syracuse-Bridgeport Part 3, FASH 56.3; thence northerly 231± feet to a point 25 feet distant northeasterly, measured at right angles, from station 'E' 4+22± of said base line; said point also being 81± feet distant westerly, measured at right angles from station 0+94 of the survey base line for the construction of the Untied States Air Corps Base Access Road (Town Line Road); thence northwesterly 326± feet to a point 25 feet distant northeasterly, measured at right angles, from station 'D' 19+35.6 of said base line; thence northwesterly 189± feet along the arc of 275 feet radius curve, to a point on the easterly boundary of the existing Town Line highway, the last mentioned point being 25 feet distant easterly, measured on a radial line from station 'D' 21+42± of said base line; thence southerly 156 feet along the last mentioned boundary of said existing Town Line highway to a point 35:1: feet distant southwesterly, measured on a radial line from station 'D' 20+00± of said base line; thence southeasterly 208± feet to a point 25 feet distant southwesterly, measured at right angles, from station 'D' 17+98.7 of said base line; thence southeasterly and southerly 320± feet along the arc of 275 feet radius curve to a point 25 feet distant northwesterly measured on a radial line, from station 'D' 14+50 of said base line; thence southwesterly 157± feet to the point of beginning, being 1.180 acres, more or less.

Also, all that tract or parcel of land situate in the Town of Dewitt, County of Onondaga, New York, as shown on the accompanying map and described as follows: Beginning on the east line of Town Line Road 480.1 feet northerly measured along said easterly line of Town Line Road from its intersection with the northerly line of the New York Central Railroad; thence southeasterly 18.6 feet more or less to the southwesterly corner of lands conveyed to General Motors by the County of Onondaga, as shown on Map No. l-c Parcel No. 53 of the Syracuse-Bridgeport Highway Pt.1 S.H. No. 672·A; said point being 35 feet more or less distant southwesterly measured on a radial line from station D 20-00+ of the base line of said highway; thence northerly 156 feet ± along the westerly line

of the parcel shown on Map No. I-C Parcel No. 53 of the Syracuse-Bridgeport Highway, to a point on a curve; thence northwesterly along a curve of 275 feet :radius 37.4 feet more or less to a point; thence westerly at right angles to the East Line of Town Line Road 11.7 feet to the said east line of Town Line Road; thence southerly along said easterly line of Town Line Road 177.37 feet to the place of beginning.

PARCEL 5

Permanent easements for the purpose of constructing, reconstructing and maintaining thereon a highway over and to ail those pieces or parcels of property hereinafter designated as parcel 5, 6 and 7 situate in the towns of Salina and Dewitt, County of Onondaga, State of New York, and being part of Map No. 1 Parcel No. 1 acquired by the People of the State of New York from Mary Capak and part of Map No. 2 Parcel No. 2 acquired by the People of the State of New York from Gilbert Mautz for the construction of the U.S. Air Corps Base Access Road (Town Line Road), described as follows:

PARCEL NO. 5

Beginning at a point on the northeasterly boundary of Syracuse-Bridgeport, Pan I, S. H. on-A, said point being 30± feet distant easterly, measured at right angels, from Station 1+80 of the hereinafter described survey base line for the proposed construction of the U. S. Air Corps Base Access Road; thence northerly six hundred fifty-four feet, more or less, to a point five feet distant westerly, measured at right angles, from Station 8+33 of said base line; thence easterly ninety-eight feet, more or less, to a monument ninety-three feet, more or less, distant easterly, measured at right angles, from Station 8+40± of said base line; thence southerly six hundred forty-two feet, more or less, to a point one hundred thirty feet distant easterly, measured at right angles, from Station 2+00 of said base line; thence southwesterly one hundred seventeen feet, more or less, to a point on the aforementioned northeasterly boundary of said Syracuse Bridgeport highway, the last mentioned point being eighty-one feet, more or less, distant easterly, measured at right angles, from Station 0+94 of said base line; thence northwesterly along the last mentioned boundary of said highway 100 feet, more or less, to the point of beginning, being one and five hundred eighty-seven one-thousandths acres, more or less.

PARCEL NO. 6

Beginning at a point on the easterly boundary of the existing Town Line Road, said point being thirty-three feet, more or less, distant easterly, measured at right angles, from Station 15+33: of the hereinafter described survey base line for the proposed construction of the U. S. Air Corps Base Access Road; thence southerly four hundred sixty feet, more or less, to a point eighty feet distant easterly, measured at right angles, form Station 10+50 of said base line; thence southerly thirty-one feet, more or less, to a point (monument) eighty-two feet, more or less, distant easterly, measured at right angles, from Station 10+20 of said base line; thence westerly seventy-one feet, more. or less, to a point on the easterly boundary of said existing Town Line Road, the last mentioned point being eighteen feet, more or less, distant easterly, measured at right angles, from Station 10+16 of said base line; thence northerly along the last mentioned boundary of said existing

Town Line Road five hundred ten feet, more or less, to the point of beginning, being three hundred twenty-four one·thousandths of an acre, more or less.

## PARCEL NO. 7

Beginning at a point on the westerly boundary of the existing Town Line Road, said point being thirteen feet, more or less, distant westerly, measured at right angles, from station 11+50 of the hereinafter described survey base line for the proposed construction of the U. S. Air Corps Base Access Road; thence northerly two hundred three feet, more or less, to a point forty-five feet distant westerly, measured at right angles, from Station 13+50 of said base line; thence northerly four hundred fifty-two feet to a point forty-five feet distant westerly, measured at right angles, from Station 18+02 of said base line; thence Southeasterly forty-four and two tenths feet to a point on the westerly boundary of said existing Town Line Road, the last mentioned point being thirteen feet, more or less, distant westerly, measured at right angles, from Station 17+71.55 of said base line; thence southerly along the last mentioned boundary of said existing Town Line Road six hundred twenty-one and fifty-five one-hundredths feet to the point of beginning, being three hundred ninety-four one-thousandths of an acres, more or less.

The above mentioned survey base line is a portion of the survey base line for the construction of the U. S. Air Corps Base Access Road, County of Onondaga, as shown on a map on file in the Office of the State Department of Public Works, and is described as follows: Beginning at Station 0·153.5; thence North twenty-eighty degrees, forty minutes, thirty seconds East, one hundred fifty-three and five tenths feet to Station 0+00; thence North two degrees, thirty-nine minutes, no seconds West, one thousand sixty-nine feet to Station 10+69; thence North fourteen degrees, no minutes, no seconds East, two thousand eighty-one feet to Station 31+50.

All bearings are referred to magnetic north as the needle pointed in 1943 A.D.

Excepting all that tract or parcel of land not above conveyed which was appropriated by the People of the State of New York for the Town Line Road, a notice of which Appropriation was filed on April 26, 1944 in Liber 1096 of deeds, at page 94.

PARCEL 6

FIRST PARCEL

ALL THAT TRACT OR PARCEL OF LAND situate in the Town of Dewitt, County of Onondaga and State of New Yolk, being part of Subdivision No. 1 of Farm Lot No. 20 in said Town of Dewitt, bounded and described as follows: Beginning in the south line of said Farm Lot No. 20 at the southeast corner of the west half of said Sub-division No. 1 (being the southeast corner of the premises described and conveyed by a deed from Mary E. Capak to Myron S. Melvin dated June 3, 1946); thence south eighty-six degrees (86°) fifty-six minutes (56;) twenty seconds (20") west along the south line of said Farm Lot No. 20 one hundred and thirty-four One hundredths (100.34) feet to the northerly line of the premises of the N,Y.C.R.R. Co., formerly the premises of the N.Y.C. & H.R.R.R.

Co.; thence north fifty-nine degrees (59°) fifty-four minutes (54 ') twenty seconds (20")
west along such northerly line three hundred forty-two and six tenths (342.6) feet to its
intersection with the southerly line of the highway extending from Syracuse to Collamer;
thence easterly along such southerly line ninety-eight (98) feet more or less to an angle;
thence easterly along such southerly line eighty-eight (88) feet more or less to an angle;
thence easterly along such southerly line ninety (90) feet more or less to an angle; ;thence
easterly along such southerly line eighty-eight (88) feet more or less to an angle; thence
easterly along such southerly line eighty-nine (89) feet more or less to the intersection of
such southerly line with the east line of the west half of said Sub-division No, 1(being the
east line of the premises described and conveyed by a deed from Mary E. Capak to
Myron S. Melvin dated June 3, 1946); thence south two degrees (2°) filly-four minutes
(54') east along the east line of the west half of said sub-division No. I two hundred thirty
and six-tenths (230.6) feet to the place of beginning, Excepting and reserving the parcel
of land containing sixteen one-hundredths (.16) of an acre of land more or less acquired
by the Syracuse Lighting company, Inc. under a notice of pendency in an action for
condemnation filed and recorded in the Onondaga County clerk's Office December 19,
1925, in Book Y of Lis Pendens, page 598 etc.

SECOND PARCEL

ALL THAT TRACT OR PARCEL OF LAND, situate in the Town of Dewitt County of
Onondaga and State of New York, being part of vision No. 1 of Farm Lot No. 20 in said
Town of Dewitt bounded and described as follows: Beginning in the northerly line of the
highway extending from the Air Base at Mattydale, along the Town Line road, to
Collamer, at its intersection with the east line of the west half of said Sub-division No. 1,
being the east line of the premises described and conveyed by a deed from Mary E.
Capak to Myron S. Melvin dated June 3, 1946; thence north fifty degrees (50°) four
minutes (4') west along the northerly line of such highway two hundred (200) feet more
or less to an angle; thence north twenty-six degrees (26°) forty-eight minutes (48') fifteen
seconds (15") west along the easterly line of such highway two hundred forty-five (245)
feet more or less to an angle; thence north twenty-two degrees (22°) forty-five minutes
(45') west along the easterly line of such highway eight hundred fifty-one and three-
tenths (851.3) feet more or less to an angle; thence north nine degrees (9°) four minutes
(4') west along the easterly line of such highway four hundred fifty-eight and six-tenths
(458.6) feet more or less to an angle; thence south eighty-seven degrees (87°) six minutes
(6') west six and sixty-two one-hundredths (6.62) feet to an angle; thence north two
degrees (2°) fifty-four minutes (54') west along the east line of such highway five
hundred forty-two and six-tenths (542.6) feet more or less to the southerly line of
premises acquired by the County of Onondaga; thence south sixty-six degrees (56°) eight
minutes (8') forty seconds (40") east along the southerly line of the premises acquired by
the County of Onondaga six hundred sixty-five and four one-hundredths (665.04) feet
more or less to the east line of the west half of said Subdivision No. I, being the east line
of the premises described and conveyed by a deed from Mary E. Capak to Myron S.
Melvin dated June 3, 1946; thence south two degrees (2°) fifty-four minutes (54') east
along such east line eighteen hundred fifty-nine and fifty-three one-hundredths

(1859.53) feet to the place of beginning.

THIRD PARCEL

ALL TEAT TRACT OR PARCEL OF LAND situate in the Town of Dewitt, County of Onondaga and State of New York, being part of subdivision No. 1 of Farm Lot No. 20 in said Town of Dewitt, bounded and described as follows: Beginning in the northerly line of the premises acquired by the County of Onondaga at its intersection with the easterly line of the highway called the Town Line Road; thence northerly along the easterly line of such highway eighty-seven (87) feet to the northerly line of the premises described and conveyed by a deed from Mary E. Capak to Myron S. Melvin dated June 3, 1946; thence north eighty-six degrees (86°) fifty-six minutes (56') twenty seconds (20") east along such northerly line five hundred eighty-eight and fifty-nine one-hundredths (588.59) feet to the northeast corner of the premises descried and conveyed by a deed from Mary E. Capak to Myron S. Melvin dated June 3, 1946, in the east line of the west half of said Sub-division No. 1; thence south two degrees (2°) fifty-four minutes (54') east along the east line of the west half of such Sub-division No. 1 which is along the east line of the premises described and conveyed by deed from Mary E. Capak to Myron S. Melvin dated June 3, 1946, three hundred eighty-five and thirty-eight one-hundredths (385.38) feet to the northerly line of the premises acquired by the County of Onondaga; thence north sixty-six degrees (66°) eight minutes (8') forty seconds (40") west along the northerly line of the premises acquired by the County of Onondaga six hundred fifty-nine and sixteen one-hundredths (659.16) feet to the place of beginning.

## EXHIBIT A

### Property Description

Tract I

A tract of land containing 172.84 acres, more or less, located in Sections 28 and 33, Township 17 North, Range 15 West, Caddo Parish, Louisiana, being more particularly described as follows:

Commence at the common corner of Sections 20, 21, 28 and 29, Township 17 North, Range 15 West, and proceed South 01°25'39" West along the section line common to Sections 28 and 29 a distance of 2,664.95 feet to the Point of Beginning of the tract herein described; from the Point of Beginning proceed South 56°25'23" East a distance of 2,130.81 feet to a point and corner; run thence South 01°24'37" West a distance of 3,605.00 feet to a point on the Northerly right-of-way of the proposed South Park Road and corner; run thence North 88°35'23" West along the Northerly boundary of the Proposed South Park Road a distance of 1,805.16 feet to a point on the section line common to Sections 32 and 33, Township 17 North, Range 15 West, and corner; run thence North 01°25'39" East along the section line common to Sections 32, 33, 28 and 29 a distance of 4,739.41 feet to the Point of Beginning.

AND

A tract of land containing 264.47 acres, more or less, located in Sections 28, 29, 32 and 33, Township 17 North, Range 15 West, Caddo Parish, Louisiana, being more particularly described as follows:

Commence at the corner of Sections 27, 28, 33, and 34, Township 17 North, Range 15 West, and proceed South 01°13'32" West along the section line common to Sections 33 and 34 a distance of 2,633.62 feet to a point; run thence North 88°50'05" West a distance of 106.75 feet to a point on the Westerly right-of-way of the Industrial Loop Expressway; proceed North 88°50'05" West along the Southerly boundary of the Southwestern Electric Power Company 170 foot easement a distance of 3,342.45 feet (2,267.50, 900.83, 174.12) to a point; run thence North 01°24'37" East a distance of 499.80 feet to a point on the Northerly right-of-way of the proposed South Park Road and the Point of Beginning of the tract herein described; from the Point of Beginning proceed North 88°35'23" West along the Northerly boundary of the Proposed South Park Road a distance of 4,000.00 feet (1,805.16', 2,194.84') to a point and corner; run thence North 01°24'37" East along the Easterly right-of-way of the proposed West Park Road a distance of 5,737.20 feet to a point and corner; run thence South 64°33'10" East a distance of 2,295.51 feet and corner; run thence South 56°25'23" East a distance of 2,248.72 feet to a point and corner; run thence South 01°24'37" West a distance of 3,605.00 feet to the Point of Beginning of the tract herein described, less and except the following described tract, to wit:

A tract of land located in Sections 28 and 33, Township 17 North, Range 15 West, Caddo Parish, Louisiana, being more particularly described as follows:

Commence at the common corner of Sections 20, 21, 28 and 29, Township 17 North, Range 15 West, and proceed South 01°25'39" West along the section line common to Sections 28 and 29 a distance of 2,664.95 feet to the Point of Beginning of the tract herein described; from the Point of Beginning proceed South 56°2523" East a distance of 2,130.81 feet to a point and corner; run thence South 01°24'37" West a distance of 3,605.00 feet to a point on the Northerly right-of-way of the proposed South Park Road and corner; run thence North 88°3523" West along the Northerly boundary of the Proposed South Park Road a distance of 1,805.16 feet to a point on the section line common to sections 32 and 33, Township 17 North, Range 15 west, and corner; run thence North 01°25'39" East along the section line common to Sections 32, 33, 28 and 29 a distance of 4,739.41 feet to the Point of Beginning.

LESS AND EXCEPT Shreveport Red River Utilities, LLC Leased Parcel

Being a tract of land containing 350,245.00 square feet, more or less, located in the Southwest Quarter, Section 28 and the Southeast Quarter, Section 29, Township 17 North, Range 15 West, Caddo Parish, Louisiana, being more particularly described as follows:

From GM-2, being an aluminum cap monument, having GM Plant Coordinates North 3574.1691 - East 2426.8687, run South 10°54'21.32" West a distance of 78.59 feet, to a set 1/2" pin, having GM Plant Coordinates North 3497.0000 - East 2412.0000, said point and corner also being the Point of Beginning of the tract herein described, run South, 475.00 feet, to a set 1/2" pin, having GM Plant Coordinates North 3022.0000 - East 2412.0000; run thence West a distance of 179.00 feet, to a set 1/2" pin, having GM Plant Coordinates North 3022.0000 - East 2233.0000; run thence South, a distance of 186.00 feet, to a set 1/2" pin, having GM Plant Coordinates North 2836.0000 - East 2233.0000; run thence South 71°33'54.18" West a distance of 18.97 feet, to a set 1/2" pin, having GM Plant Coordinates North 2830.0000 - East 2215.0000; run thence West a distance of 325.00 feet to a set 1/2" pin, having GM Plant Coordinates North 2830.0000 - East 1890.0000; run thence North 48°00'46.04" West, a distance of 53.81 feet, to a set 1/2" pin, having GM Plant Coordinates North 2866.0000 - East 1850.0000; run thence North 638.00 feet, to a set 1/2" pin, having GM Plant Coordinates North 3504.0000 - East 1850.0000; run thence North 47°04'12.11" East a distance of 58.73 feet, to a set 1/2" pin, having GM Plant Coordinates North 3544.0000 - East 1893.0000; run thence East a distance of 81.00 feet, to a set 1/2" pin, having GM Plant Coordinates North 3544.0000 - East 1974.0000; run thence South a distance of 85.00 feet, to a set 1/2" pin, having GM Plant Coordinates North 3459.0000 - East 1974.0000; run thence East a distance of 164.00 feet, to a set 1/2" pin, having GM Plant Coordinates North 3459.0000 - East 2138.0000; run thence North a distance of 85.00 feet, to a set 1/2" pin, having GM Plant Coordinates North 3544.0000 -East 2138.0000; run thence East a distance of 228.00 feet, to a set 1/2" pin, having GM Plant Coordinates North 3544.0000 - East 2366.0000; run thence South 44°23'02.18" East a distance of 65.76 feet, to the Point of Beginning.

Tract II

A tract of land containing 30.8648 acres, more or less, located in portions of Sections 28 and 33, Township 17 North, Range 15 West, Caddo Parish, being more fully described as follows:

From the common section corner of Section 27, 28, 33 and 34, run South 1, 0720.85 West, along the line common to said Section 33 and 34, a distance of 2,242.20 feet;

Run thence North 88 5239.15 West, a distance of 96.99 feet, to a set 1/2 Pin. to the point of intersection with the west right-of-way line of the Industrial Loop Expressway, as recorded in Book 1488, Page 441, and the north right-of-way line of General Motors Boulevard, as recorded in Book 1733, page 70, records of Caddo Parish, Louisiana;

Run thence South 65 5423.85 West, along said north right of way line of General Motors Boulevard, a distance of 94.77 feet, to set 1/2 Pin (South 65 5405 West, a distance of 94.84 feet recorded);

Run thence North 82 1624.85 West, along said right-of-way line, a distance of 1,119.69 feet, to a set 1/2 Pin (North 82 1643 West, a distance of 1,119.69 feet recorded);

Run thence North 88 2649.15 West, along said right-of-way line, to the southeast corner of a public right-of-way, as described in Book 3402, Page 558, records of Caddo Parish, Louisiana, a distance of 959.52 feet, to a set 1/2 Pin (North 88 2708 West recorded);

Run thence North 1 3310.85 East, along said right-of-way, a distance of 150.00 feet to a set 1/2 Pin (North 1 0955

East recorded);

Run thence North 88 2649.15 West, along said right-of-way, a_distance of 165.00 feet, to a set 1/2 Pin (north 88 5005 West recorded);

Run thence South 1 3310.85 West, along said right-of-way, to the point of intersection with the said north right-of-way line of General Motors Boulevard, a distance 140.00 feet to a set 1/2 Pin (South 1 0955 West recorded);

Run thence North 88 2649.15 West, along said right-of-way line, a distance of 648.00 feet, to a set 1/2 Pin (North 8 2708 West recorded), said point and corner being the point of beginning (POE) of the tract herein described;

Run North 88 2649.15 West, along said right-of-way line, a distance of 400.00 feet, to a set 1/2 Pin (North 88 2708 West recorded), said point and corner being the southeast corner of a 172.84 acre tract of land presently owned by General Motors Corporation, as recorded in Book 1644, Page 236, records of Caddo Parish, Louisiana;

Run thence North 1 1825.85 East, along the east property of said General Motors Corporation tract, a distance of 3.449,52 feet, to a set 1/2 Pin (North 1 2437 East recorded), said point and corner being the point of intersection with south right-of-line of the Union Pacific Railroad, as recorded in Book 1669, Page 421 records of Caddo Parish, Louisiana;

Run thence South 64 3921.15 east, along said right-of-way, a distance of 437.98 feet to a set 1/2 Pin (South 64 3321.15 East recorded);

Run thence South 1 1825.85 West, being 400.00 feet east of and parallel to the said east line of the said General Motors Corporation tract, a distance of 3,272.84 feet, to the point of beginning. Containing

30.8648 acres, more of less, as calculated by the above courses and distance which were made in accordance with the Minimum Angle. Distance and Closure Requirements for Survey Measurements Which Control Land Boundaries for ALTA/ACSM Land Title Surveys.

Tract III

Being Tract "B" and Tract "C" of that certain survey by Kenneth V. Hill dated February 18, 2002 and located in Sections 28 and 33, Township 17 North, Range 15 West, Caddo Parish, Louisiana, being more particularly described as follows:

From the common section corner of Section 27, 28, 33 and 34, run South 1°0720.85" West, along the line common to said Sections 33 and 34 a distance of 2,242.20 feet;

Run thence North 88°52'39.15" West, a distance of 96.99 feet, to a set 1/2" Pin, to the point of intersection with the west right-of-way line of the Industrial Loop Expressway, as recorded in Book 1488, Page 441, and the north right-of-way line of General Motors Boulevard, as recorded in Book 1733, Page 70, records of Caddo Parish, Louisiana;

Run thence South 65°5423.85" West, along said north right-of way line of General Motors Boulevard, a distance of 94.77 feet, to a set 1/2" Pin(South 65°54'05" West, a distance of 94.84 feet recorded);

Run thence North 82°16'24.15" West, along said right-of-way line, a distance of 1.119.69 feet, to a set 1/2" Pin (North 82°16'43" West a distance of 1,119.69 feet recorded);

Run thence North 88°26'49.15" West, along said right-of-way line, to the southeast corner of a public right-of-way, as dedicated in Book 3402, Page 558, records of Caddo Parish, Louisiana, a distance of 959.52 feet, to a set 1/2" Pin (North 88°27'08" West recorded);

Run thence North 1°33'10.85" East, along said right-of-way, a distance of 140.00 feet, to a set 1/2" Pin ( North 1°09'55" East recorded);

Run thence North 88°26'49.15" West, along said right-of-way, a distance of 116.35 feet, t a set 1/2" Pin (North 88°50'05" West recorded), said point and corner being the west line of a drainage easement as recorded in Book 1712, Page 70, records of Caddo Parish, Louisiana, and also being the point of beginning (POB) of the tract herein described;

Run thence North 88°26'49.15" West, along said right-of-way, a distance of 48.65 feet, to a set 1/2" Pin (North 88°50'05" West recorded);

Run thence South 1°33'10.85" West, along said right-of-way, to the point of intersection with the said north right-of-way line of General Motors Boulevard, a distance of 140.00 feet, to a set 1/1" Pin (South 1°09'55" West recorded);

Run North 88°26'49.15" West, along said right-of-way line of General Motors Boulevard, a distance of 648.00 feet, to a set 1/2" Pin (North 88°27'08" West recorded);

Run thence North 1°18'25.85" East, being 400.00 feet east of and parallel to the east line of General Motors Corporation tract, to the point of intersection with the south right-of-way line of Union Pacific Railroad, as recorded in Book 1669, Page 421, records of Caddo Parish, Louisiana, a distance of 3,272.84 feet, to a set 1/2" Pin;

Run thence South 64°39'21.15" East, along said right-of-way line, a distance of 240.00 feet, to a set 1/2" Pin (South 64°33'10" East recorded);

Run thence South 64°39'21.15" East, along said right-of-way line, a distance of 246.16 feet, to a set 1/2" Pin (South 64°33'10" East recorded);

Run thence North 25°26'50" East, along said right-of-way line, a distance of 70.00 feet, to a set 1/2" Pin (North 25°26'50" East recorded);

Run thence South 73°00'22.15" East, along said right-of-way line, to the point of intersection with the north easement line of said drainage easement, a distance of 1.508.68 feet to a set 1/2" Pin (South 72°54'11" East recorded);

Run thence South 69°04'13.85" West; to the point of intersection with the north line of said drainage easement, a distance of 1,336.05 feet, t a set 1/2" Pin (South 69°10'25" West, a distance of 1,336.04 recorded);

Run thence South 1°03'13.85" West, along said drainage easement line, a distance of 2, 088.23 feet (South 1°09'55" West recorded); to the point of beginning, containing 61.9995 acres, more or less.

## EXHIBIT A

### Property Description

Tax ID Number: **12·09·300·004 (as to Parcel A); 56·09·400·022 (as to Parcel B)**

Land situated in the Township of Grand Blanc, in the County of Genesee, State of Michigan is described as follows:

PARCEL A:
ALL THAT PART OF THE SOUTHWEST 1/4 OF SECTION 9, TOWN 6 NORTH, RANGE 7 EAST, GRAND BLANC TOWNSHIP, GENESEE COUNTY, MICHIGAN, LYING EASTERLY OF THE EAST RIGHT OF WAY LINE OF DORT HIGHWAY AND DORT HIGHWAY. EXCEPTING THERE FROM THE FOLLOWING PREMISES CONVEYED BY COVENANT DEED RECORDED IN INSTRUMENT NO. 20051260009155, DESCRIBED AS: PART OF SECTION 9, TOWN 6 NORTH, RANGE 7 EAST, TOWNSHIP OF GRAND BLANC, GENESEE COUNTY, MICHIGAN, DESCRIBED AS FOLLOWS: BEGINNING AT A POINT ON THE EAST AND WEST 1/4 LINE, WHICH IS NORTH 88 DEGREES 58 MINUTES 16 SECONDS EAST, 296.00 FEET FROM THE WEST 1/4 CORNER OF SAID SECTION 9; THENCE NORTH 00 DEGREES 59 MINUTES 34 SECONDS WEST ALONG THE EAST RIGHT-OF-WAY LINE OF DORT HIGHWAY EXTENSION, 627.13 FEET TO THE SOUTHEASTERLY LINE OF CONSUMERS ENERGY COMPANY PROPERTY; THENCE NORTHEASTERLY ALONG SAID SOUTHEASTERLY LINE, NORTH 24 DEGREES 45 MINUTES 07 SECONDS EAST, 243.89 FEET AND NORTH 49 DEGREES 11 MINUTES 44 SECONDS EAST, 1186.67 FEET TO THE SOUTHWESTERLY LINE OF SAGINAW ROAD; THENCE SOUTH 40 DEGREES 55 MINUTES 25 SECONDS EAST ALONG SAID SOUTHWESTERLY LINE, 2093.21 FEET; THENCE SOUTH 88 DEGREES 56 MINUTES 16 SECONDS WEST, 4.02 FEET; THENCE SOUTH 01 DEGREES 01 MINUTES 44 SECONDS WEST, 354.11; THENCE SOUTH 49 DEGREES 09 MINUTES 08 SECONDS WEST 409.24 FEET; THENCE SOUTH 38 DEGREES 08 MINUTES 45 SECONDS EAST, 20.25 FEET; THENCE SOUTH 49 DEGREES 26 MINUTES 33 SECONDS WEST, 105.46 FEET; THENCE ON A CURVE TO THE RIGHT, HAVING A RADIUS OF 200.00 FEET, WITH A CHORD BEARING AND DISTANCE OF SOUTH 71 DEGREES 51 MINUTES 13 SECONDS WEST, 152.50 FEET; THENCE ON A CURVE TO THE RIGHT, HAVING A RADIUS OF 300.00 FEET, WITH A CHORD BEARING AND DISTANCE OF NORTH 69 DEGREES 51 MINUTES 18 SECONDS WEST, 164.18 FEET; THENCE NORTH 53 DEGREES 58 MINUTES 29 SECONDS WEST 105.44 FEET THENCE NORTH 48 DEGREES 17 MINUTES 30 SECONDS EAST, 26.50 FEET; THENCE NORTH 42 DEGREES 40 MINUTES 11 SECONDS WEST, 20.97 FEET; THENCE SOUTH 48 DEGREES 37 MINUTES 35 SECONDS WEST, 26.06 FEET; THENCE NORTH 40 DEGREES 54 MINUTES 28 SECONDS WEST 501.10 FEET; THENCE SOUTH 49 DEGREES 07 MINUTES 41 SECONDS WEST, 999.97 FEET; THENCE NORTH 40 DEGREES 50 MINUTES 37 SECONDS WEST, 258.51 FEET; THENCE ON A CURVE TO THE LEFT, HAVING A RADIUS OF 503.00 FEET WITH A CHORD BEARING AND DISTANCE OF NORTH 76 DEGREES 53 MINUTES 29 SECONDS WEST, 245.10 FEET; THENCE ON A CURVE TO THE RIGHT, HAVING A RADIUS OF 85.00 FEET, WITH A CHORD BEARING AND DISTANCE OF NORTH 45 DEGREES 59 MINUTES 34 SECONDS WEST, 120.21 FEET TO

SAID EAST RIGHT OF WAY LINE OF DART HIGHWAY EXTENSION; THENCE NORTH 00 DEGREES 59 MINUTES 34 SECONDS WEST, ALONG SAID EAST LINE, 518.05 FEET TO THE PLACE OF BEGINNING.

TOGETHER WITH A NON-EXCLUSIVE TEMPORARY ACCESS ROADWAY EASEMENT FOR THE PURPOSE OF PERMITTING THE PASSAGE OF MOTOR VEHICLES AND PEDESTRIANS TO AND FROM DORT HIGHWAY, EVIDENCED OF RECORD BY ACCESS EASEMENT AGREEMENT (RACEWAY) RECORDED IN INSTRUMENT NO. 200407220078701, GENESEE COUNTY RECORDS.

ALL THAT PART OF THE NORTHEAST 1/4 OF THE NORTHWEST 1/4 OF SECTION 16 LYING NORTHERLY OF A LINE DESCRIBED AS: BEGINNING NORTH 89 DEGREES 41 MINUTES EAST, 100 FEET AND NORTH 00 DEGREES 05 MINUTES 20 SECONDS WEST 283.48 FEET FROM THE SOUTHWEST CORNER OF THE NORTHEAST 1/4 OF THE NORTHWEST 1/4; THENCE NORTH 70 DEGREES EAST TO THE NORTH-SOUTH 1/4 LINE OF SAID SECTION 16 AND THE POINT OF ENDING.

EXCEPTING THEREFROM THE FOLLOWING DESCRIBED PREMISES CONVEYED BY DEED RECORDED IN THE DEED LIBER 1331, PAGE 505 TO THE CHESAPEAKE AND OHIO RAILWAY COMPANY, DESCRIBED AS: PART OF SECTION 16, TOWN 6 NORTH, RANGE 7 EAST AND LOT 189 OF ASSESSOR'S PLAT NO. 3, CITY OF GRAND BLANC, TOWN 6 NORTH, RANGE 7 EAST, CITY OF GRAND BLANC AND TOWNSHIP OF GRAND BLANC, GENESEE COUNTY, MICHIGAN, DESCRIBED AS: BEGINNING AT A POINT ON THE EAST 1/8TH LINE OF SAID SECTION 16, WHICH IS NORTH 89 DEGREES 44 MINUTES EAST ALONG THE NORTH LINE OF SAID SECTION 16, 1331.59 FEET AND SOUTH 00 DEGREES 07 MINUTES 30 SECONDS WEST, 281.92 FEET FROM THE NORTH 1/4 POST OF SAID SECTION; THENCE SOUTH 77 DEGREES 33 MINUTES EAST, 216.76 FEET; THENCE 433.07 FEET ON A CURVE TO THE RIGHT, HAVING A RADIUS OF 683.87 FEET AND A CHORD BEARING AND DISTANCE OF SOUTH 59 DEGREES 24 MINUTES 30 SECONDS EAST, 425.87 FEET; THENCE NORTH 77 DEGREES 01 MINUTE EAST, 39.95 FEET, TO THE CHESAPEAKE AND OHIO RAILWAY COMPANY'S WESTERLY RIGHT-OF-WAY LINE; THENCE SOUTH 06 DEGREES 51 MINUTES EAST ALONG SAID WESTERLY RIGHT-OF-WAY LINE, 39675 FEET; THENCE SOUTH 78 DEGREES 04 MINUTES WEST, 147.27 FEET; THENCE NORTH 10 DEGREES 54 MINUTES WEST, 56.85 FEET; THENCE SOUTH 78 DEGREES 58 MINUTES WEST, 100.55 FEET; THENCE NORTH 12 DEGREES 59 MINUTES WEST, 54.00 FEET; THENCE SOUTH 77 DEGREES 01 MINUTE WEST 138.00 FEET, THENCE SOUTH 12 DEGREES 59 MINUTES EAST, 44.00 FEET: THENCE SOUTH 77 DEGREES 01 MINUTE WEST, 283.62 FEET; THENCE SOUTH 00 DEGREES 07 MINUTES 30 SECONDS WEST, 296.52 FEET TO THE CENTER LINE OF REID ROAD: THENCE SOUTH 89 DEGREES 11 MINUTES WEST ALONG THE CENTER LINE OF REID ROAD, 1332.60 FEET; THENCE SOUTH 89 DEGREES 41 MINUTES WEST A LONG SAID CENTER LINE OF REID ROAD, 1238.75 FEET; THENCE NORTH 00 DEGREES 12 MINUTES EAST 283.00 FEET; THENCE NORTH 71 DEGREES 00 MINUTES EAST, 1265.00 FEET; THENCE NORTH 78 DEGREES 43 MINUTES EAST, 1403.49 FEET; THENCE NORTH 00 DEGREES 07 MINUTES 30 SECONDS EAST, 79.88 FEET TO THE PLACE OF BEGINNING. ALSO EXCEPTING THERE FROM THE FOLLOWING

PREMISES CONVEYED BY SPECIAL WARRANTY DEED RECORDED IN MASTER LIBER 3402, PAGE 63, DESCRIBED AS: PART OF THE NORTHWEST 1/4 OF SECTION 16, TOWNSHIP 6 NORTH, RANGE 7
EAST, TOWNSHIP OF GRAND BLANC, GENESEE COUNTY, MICHIGAN, DESCRIBED AS: COMMENCING AT THE NORTHWEST CORNER OF SAID SECTION 16; THENCE SOUTH 89 DEGREES 57 MINUTES 10 SECONDS EAST ALONG THE NORTH LINE OF SAID SECTION 16, A DISTANCE OF 1334.40 FEET; THENCE SOUTH 00 DEGREES 05 MINUTES 20 SECONDS WEST 545.44 FEET TO THE POINT OF BEGINNING; THENCE SOUTH 48 DEGREES 47 MINUTES 10 SECONDS EAST 568.31 FEET; THENCE SOUTH 70 DEGREES 51 MINUTES 41 SECONDS WEST 347.48 FEET: THENCE SOUTH 00 DEGREES 05 MINUTES 20 SECONDS WEST 283.48 FEET TO THE CENTERLINE OF REID ROAD; THENCE SOUTH 89 DEGREES 41 MINUTES 00 SECONDS WEST ALONG SAID CENTERLINE 100.00 FEET; THENCE NORTH 00 DEGREES 05 MINUTES 20 SECONDS EAST 772.40 FEET TO THE POINT OF BEGINNING.

PARCEL B:
A PARCEL OF LAND LOCATED IN THE SOUTHEAST 1/4 OF SECTION 9, AND THE NORTHEAST 1/4 OF SECTION 16, TOWN 6 NORTH, RANGE 7 EAST, CITY OF GRAND BLANC, GENESEE COUNTY, MICHIGAN, DESCRIBED AS: BEGINNING AT THE SOUTH 1/4 OF SECTION 9; THENCE SOUTH 600 FEET; THENCE NORTH 78 DEGREES EAST TO THE EAST 118TH LINE OF SAID SECTION 16; THENCE NORTH 00 DEGREES 07 MINUTES 30 SECONDS EAST, 79.88 FEET; THENCE SOUTH 77 DEGREES 33 MINUTES EAST 216.76 FEET; THENCE SOUTH 59 DEGREES 24 MINUTES 30 SECONDS EAST, 425.87 FEET; THENCE NORTH 77 DEGREES 01 MINUTE EAST, 39.95 FEET; THENCE NORTH 11 DEGREES 09 MINUTES WEST, 550.13 FEET; THENCE NORTH 15 DEGREES 01
MINUTE WEST, 489.3 FEET; THENCE NORTH 39 DEGREES 06 MINUTES WEST TO THE EAST WEST 114 LINE; THENCE WESTERLY 4.13 FEET TO THE NORTHWEST CORNER OF THE SOUTHEAST 114 OF SECTION 9; THENCE SOUTH TO THE PLACE OF BEGINNING. EXCEPTING THERE FROM THE FOLLOWING DESCRIBED PREMISES CONVEYED BY DEED RECORDED IN
DEED LIBER 1331, PAGE 505 TO THE CHESAPEAKE AND OHIO RAILWAY COMPANY, DESCRIBED AS: PART OF SECTION 16, TOWN 6 NORTH, RANGE 7 EAST, AND LOT 189 OF ASSESSOR'S PLAT NO. 3, CITY OF GRAND BLANC, TOWN 6 NORTH, RANGE 7 EAST, CITY OF GRAND BLANC AND TOWNSHIP OF GRAND BLANC, GENESEE COUNTY, MICHIGAN, DESCRIBED AS: BEGINNING AT A POINT ON THE EAST 1/8TH LINE OF SAID SECTION 16, WHICH IS NORTH 89 DEGREES 44 MINUTES EAST ALONG THE NORTH LINE OF SAID SECTION 16, 1331.59 FEET AND SOUTH 00 DEGREES 07 MINUTES 30 SECONDS WEST, 281.92 FEET FROM THE NORTH 1/4 POST OF SAID SECTION; THENCE SOUTH 77 DEGREES 33 MINUTES EAST 216.76 FEET; THENCE 433.07 FEET ON A CURVE TO THE RIGHT, HAVING A RADIUS OF 683.87 FEET AND A CHORD BEARING AND DISTANCE OF SOUTH 59 DEGREES 24 MINUTES 30 SECONDS EAST, 425.87 FEET: THENCE NORTH 77 DEGREES 01 MINUTE EAST, 39.95 FEET, TO THE CHESAPEAKE AND OHIO RAILWAY COMPANY'S WESTERLY RIGHT-OF-WAY LINE; THENCE SOUTH 06 DEGREES 51 MINUTES EAST ALONG SAID WESTERLY RIGHT-OF-WAY LINE, 396.75 FEET; THENCE SOUTH 78 DEGREES 04 MINUTES WEST, 147.27 FEET; THENCE NORTH 10

DEGREES 54 MINUTES WEST, 56.85 FEET; THENCE SOUTH 78 DEGREES 58 MINUTES WEST, 100.55 FEET; THENCE NORTH 12 DEGREES 59 MINUTES WEST, 54.00 FEET: THENCE SOUTH 77 DEGREES 01 MINUTE WEST 138.00 FEET; THENCE SOUTH 12 DEGREES 59 MINUTES EAST, 44.00 FEET, THENCE SOUTH 77 DEGREES 01 MINUTE WEST, 283.62 FEET; THENCE SOUTH 00 DEGREES 07 MINUTES 30 SECONDS WES-296.52 FEET TO THE CENTER LINE OF REID ROAD: THENCE SOUTH 89 DEGREES 11 MINUTES WEST ALONG THE CENTER LINE OF REID ROAD, 1332.60 FEET; THENCE SOUTH 89 DEGREES 41 MINUTES WEST ALONG SAID CENTER LINE OF REID ROAD, 1238.75 FEET; THENCE NORTH 00 DEGREES 12 MINUTES EAST, 283.00 FEET; THENCE NORTH 71 DEGREES 00 MINUTES EAST 1265.00 FEET: THENCE NORTH 78 DEGREES 43 MINUTES EAST, 1403.49 FEET; THENCE NORTH 00 DEGREES 07 MINUTES 30 SECONDS EAST, 79.88 FEET TO THE PLACE OF BEGINNING. ALSO EXCEPTING THEREFROM THE FOLLOWING PREMISES CONVEYED BY DEED OF GIFT RECORDED IN THE DEED LIBER 1602, PAGE 149, BEING PART OF SECTION 9, TOWN 6 NORTH, RANGE 7 EAST, CITY OF GRAND BLANC, GENESEE COUNTY, MICHIGAN, DESCRIBED AS FOLLOWS: BEGINNING AT A POINT NORTH 00 DEGREES 07 MINUTES 30 SECONDS EAST ALONG THE EAST 1/8TH LINE OF SECTION 16, A DISTANCE OF 678.60 FEET TO THE SOUTH LINE OF SECTION 9 AND NORTH 89 DEGREES 44 MINUTES EAST ALONG SAID SOUTH LINE, 200 FEET, AND NORTH 00 DEGREES 21 MINUTES EAST, 143.21 FEET FROM THE NORTHWEST CORNER OF THE RECORDED PLAT OF ASSESSOR'S PLAT N03, CITY OF GRAND BLANC; THENCE NORTH 00 DEGREES 21 MINUTES EAST PARALLEL WITH THE EAST 1/8TH LINE OF SAID SECTION 9, A DISTANCE OF 330.0 FEET; THENCE NORTH 50 DEGREES 54 MINUTES EAST, 139.89 FEET TO THE SOUTHWESTERLY LINE OF SAGINAW ROAD FM-54) ROAD; THENCE SOUTH 39 DEGREES 06 MINUTES EAST ALONG SAID SOUTHWESTERLY LINE OF 112.61 FEET TO THE INTERSECTION OF THE WESTERLY RIGHT OF WAY LINE OF THE C & 0 RAILROAD; THENCE SOUTHERLY ALONG SAID WESTERLY RIGHT OF WAY LINE ON A CURVE TO THE RIGHT, CHORD BEARING AND DISTANCE SOUTH 15 DEGREES 33 MINUTES 20 SECONDS EAST, 342.10 FEET; THENCE SOUTH 89 DEGREES 44 MINUTES WEST PARALLEL WITH THE SOUTH LINE OF SAID SECTION 9, A DISTANCE OF 273.36 FEET TO THE PLACE OF BEGINNING; ALSO EXCEPTING THEREFROM THE FOLLOWING PREMISES CONVEYED BY COVENANT DEED RECORDED IN INSTRUMENT NO. 200603140027555, DESCRIBED AS: PART OF THE SOUTHEAST 1/4 OF SECTION 9, TOWN 6 NORTH, RANGE 7 EAST, CITY OF GRAND BLANC, GENESEE COUNTY, MICHIGAN, DESCRIBED AS FOLLOWS: BEGINNING AT THE INTERIOR 1/4 COMER OF SAID SECTION 9; THENCE NORTH 88 DEGREES 58 MINUTES 16 SECONDS EAST, 4.02 FEET TO THE SOUTHWESTERLY RIGHT-OF-WAY LINE OF SAGINAW ROAD, SO-CALLED; THENCE SOUTH 40 DEGREES 55 MINUTES 25 SECONDS EAST, ALONG SAID RIGHT-OF-WAY LINE 269.41 FEET; THENCE SOUTH 49 DEGREES 09 MINUTES 08 SECONDS WEST 230.19 FEET TO THE NORTH AND SOUTH 1/4 LINE OF SAID SECTION 9; THENCE NORTH 01 DEGREE 01 MINUTES 44 SECONDS WEST, 354.11 FEET TO THE PLACE OF BEGINNING.

EXCEPTING THE FOLLOWING:

PARCEL A: PART OF THE SOUTHWEST 1/4 OF SECTION 9, TOWN 6 NORTH, RANGE 7 EAST, GRAND BLANC TOWNSHIP, GENESEE COUNTY, MICHIGAN, BEING FURTHER DESCRIBED AS COMMENCING AT THE SOUTHWEST CORNER OF SAID SECTION 9: THENCE NORTH 87 DEGREES 58' 15" E, 310.99 FEET ALONG THE SOUTH LINE OF SAID SECTION 9 TO THE EAST RIGHT OF WAY LINE OF DORT HIGHWAY PER RECORDED DOCUMENT IN L.1980, P.44, GENESEE COUNTY RECORDS; THENCE NORTH 02 DEGREES 14' 45" W, 1023.00 FEET ALONG SAID EAST RIGHT OF WAY LINE: THENCE NORTH 87 DEGREES 58' 15" E, 63.63 FEET PARALLEL WITH AND 1023 FEET NORTH OF MEASURED AT RIGHT ANGLES, SAID SOUTH SECTION LINE: THENCE CONTINUING ALONG SAID EAST RIGHT OF WAY LINE OF DORT HIGHWAY, NORTH 01 DEGREES 42' 28" W, 398.59 FEET PARALLEL WITH AND 365 FEET EAST OF, MEASURED AT RIGHT ANGLES, THE WEST LINE OF SAID SECTION 9 TO THE POINT OF BEGINNING: THENCE CONTINUE NORTH 01 DEGREES 42' 28"W, 522.76 FEET PARALLEL WITH AND 365 FEET EAST OF, MEASURED AT RIGHT ANGLES, THE WEST LINE OF SAID SECTION 9: THENCE NORTH 89 DEGREES *01'* 15" E, 107.06 FEET: THENCE ALONG THE ARC OF A CURVE TO THE RIGHT AN ARC DISTANCE OF 168.34 FEET, SAID CURVE HAVING A RADIUS OF 200.00 FEET, DELTA ANGLE OF 48 DEGREES 13' 34" AND A CHORD BEARING AND DISTANCE OF SOUTH 66 DEGREES 45' 58" E, 163.42 FEET: THENCE SOUTH 42 DEGREES 39' 11" E, 175.06 FEET: THENCE SOUTH 47 DEGREES 25' 37" W, 489.19 FEET TO THE POINT OF BEGINNING, CONTAINING 2.64 ACRES, MORE OR LESS, AND IS SUBJECT TO ANY AND ALL EASEMENTS AND/OR RIGHTS OF WAY WHETHER USED, IMPLIED OR OF RECORD.

PARCEL B: PART OF THE SOUTHWEST 1/4 OF SECTION 9, TOWN 6 NORTH, RANGE 7 EAST, GRAND BLANC TOWNSHIP, GENESEE COUNTY, MICHIGAN, BEING FURTHER DESCRIBED AS COMMENCING AT THE SOUTHWEST CORNER OF SAID SECTION 9: THENCE NORTH 87 DEGREES 58' 15" E, 310.99 FEET ALONG THE SOUTH LINE OF SAID SECTION 9 TO THE EAST RIGHT OF WAY LINE OF DORT HIGHWAY PER RECORDED DOCUMENT IN L.1980, P.44, GENESEE COUNTY RECORDS; THENCE NORTH 02 DEGREES 14' 45" W, 473.42 FEET ALONG SAID EAST RIGHT OF WAY LINE TO THE POINT OF BEGINNING: THENCE CONTINUE NORTH 02 DEGREES 14' 45" W, 549.58 FEET; THENCE NORTH 87 DEGREES 58' 15" E, 63.63 FEET PARALLEL WITH AND 1023 FEET NORTH OF, MEASURED AT RIGHT ANGLES, SAID SOUTH SECTION LINE; THENCE CONTINUING ALONG SAID EAST RIGHT OF WAY LINE OF DORT HIGHWAY, NORTH 01 DEGREES 42' 28" W, 398.59 FEET PARALLEL WITH AND 365 FEET EAST OF, MEASURED AT RIGHT ANGLES, THE WEST LINE OF SAID SECTION 9: THENCE NORTH 47 DEGREES 25' 37" E, 489.19 FEET: THENCE SOUTH 42 DEGREES 39' 11" E, 925.47 FEET: THENCE SOUTH 22 DEGREES 17' 46" W, 610.50 FEET: THENCE SOUTH 87 DEGREES 25' 50" W, 786.65 FEET TO THE POINT OF BEGINNING, CONTAINING 21.22 ACRES, MORE OR LESS, AND IS SUBJECT TO ANY AND ALL EASEMENTS AND/OR RIGHTS OF WAY WHETHER USED, IMPLIED OR OF RECORD.

PROPOSED ACCESS EASEMENT: AN EASEMENT FOR ACCESS, INGRESS AND EGRESS BEING PART OF THE SOUTHWEST 1/4 OF SECTION 9, TOWN 6 NORTH, RANGE 7 EAST, GRAND BLANC TOWNSHIP, GENESEE COUNTY, MICHIGAN, BEING FURTHER DESCRIBED AS COMMENCING AT THE SOUTHWEST CORNER OF SAID

SECTION 9; THENCE NORTH 87 DEGREES 58' 15" E, 310.99 FEET ALONG THE SOUTH
LINE OF SAID SECTION 9 TO THE EAST RIGHT OF WAY LINE OF DORT HIGHWAY
PER RECORDED DOCUMENT IN L. 1980, P. 44, GENESEE COUNTY RECORDS;
THENCE NORTH 02 DEGREES 14' 45" W, 1023.00 FEET ALONG SAID EAST RIGHT OF
WAY LINE; THENCE N 87 DEGREES 58' 15" E, 63.63 FEET PARALLEL WITH AND 1023
FEET NORTH OF, MEASURED AT RIGHT ANGLES, SAID SOUTH SECTION LINE;
THENCE CONTINUING ALONG SAID EAST RIGHT OF WAY LINE OF DORT
HIGHWAY, NORTH 01 DEGREES 42' 28" W, 883.72 FEET PARALLEL WITH AND 365
FEET EAST, MEASURED AT RIGHT ANGLES, THE WEST LINE OF SAID SECTION 9
TO THE POINT OF BEGINNING; THENCE CONTINUE NORTH 01 DEGREES 42' 28" W,
150.46 FEET PARALLEL WITH AND 365 FEET EAST OF, MEASURED AT RIGHT
ANGLES, SAID WEST LINE OF SECTION 9; THENCE SOUTH 47 DEGREES 01' 58" EAST
27.30 FEET; THENCE ALONG THE ARC OF A CURVE TO THE RIGHT, AN ARC
DISTANCE OF 247.59 FEET, SAID CURVE HAVING A RADIUS OF 503.00 FEET, DELTA
ANGLE OF 28 DEGREES 12' 10" AND A CHORD BEARING AND DISTANCE OF SOUTH
77 DEGREES 55' 53" E, 245.10 FEET; THENCE SOUTH 41 DEGREES 53' 01" E, 258.51
FEET; THENCE SOUTH 41 DEGREES 32' 37" E, 277.46 FEET; THENCE SOUTH 48
DEGREES 21' 28" W, 73.84 FEET; THENCE NORTH 41 DEGREES 32' 37" W, 212.26 FEET;
THENCE N 42 DEGREES 10' 07" W, 64.85 FEET; THENCE N 41 DEGREES 53' 01" W,
70.56 FEET; THENCE ALONG THE ARC OF A CURVE TO THE LEFT, AN ARC
DISTANCE OF 343.11 FEET SAID CURVE HAVING A RADIUS OF 392.00 FEET, DELTA
ANGLE OF 50 DEGREES 08' 59" AND A CHORD BEARING AND DISTANCE OF N 66
DEGREES 57' 29" W, 332.26 FEET; THENCE S 42 DEGREES 58' 02" W, 28.50 FEET TO
THE POINT OF BEGINNING.

## EXHIBIT A

### Property Description

A part of the Northeast Quarter of Section 11, Township 5 North, Range 1 West,
Lawrence County, Indiana, more particularly described as follows: Commencing at
a P.K. Nail over 1/2 inch rod at the Southwest corner of the Southwest Quarter of
the Northeast Quarter· of said Section 11; thence North 90 degrees 00 minutes 00
seconds East along the South line of said quarter quarter, 979.00 feet to a P.K. Nail
and the point of beginning; thence leaving said South line North 01 degrees 30
minutes 00 seconds West, 293.10 feet to a 5/8 inch rebar; thence South 89 degrees 53
minutes 55 seconds East, 140.01 feet to a 1/2 inch iron pipe; thence South 01 degrees
30 minutes 00 seconds East, 292.85 feet to a P.K. Nail on the South line of said
quarter quarter; thence South 90 degrees 00 minutes 00 seconds West, 140.00 feet to
the point of beginning. Containing 0.94 acres, more or less.

**Commonly known as:**   1081 Breckenridge Road, Bedford, IN
                        APN#  47-06-11-100-048.000-009 and 47-06-11-100-074.000-009

## EXHIBIT A

### Property Description

A part of the Southeast Quarter of Section 2, Township 5 North, Range I West, Lawrence County, Indiana, and more particularly described as follows: Beginning at a rebar 299.49 feet North and 621.48 feet West of the Southeast corner of said Section 2, thence North 28 degrees 54 minutes 09 seconds West 198.82 feet to the rebar, thence North 68 degrees 22 minutes East 32.11 feet, thence North 68 degrees 21 minutes 21 seconds East 303.21 feet to a rebar, thence South 49 degrees 40 minutes 43 seconds East 116.10 feet to the rebar, thence South 40 degrees 52 minutes 35 seconds West 255.96 feet, thence South 77 degrees 59 minutes 24 seconds West 139.65 feet to the point of beginning. Containing 1.50 acres, more or less.

ALSO, a permanent and perpetual easement to a roadway, running with the land as a means of ingress and egress, which said roadway is more particularly described as follows: A 30 foot wide roadway and utility easement, being 15 feet on both sides of the following described centerline: Beginning at a spike in a country road 41.00 feet North and 253.65 feet West of the Southeast corner of said Section 2, thence North 23 degrees 18 minutes 53 seconds West 154.27 feet, thence, North 22 degrees 30 minutes 40 seconds West 105.69 feet, thence North 38 degrees 08 minutes 40 seconds West 150.72 feet.

X:\DOCUMENTS AND SETTINGS\MERRILLSCAN\LOCAL SETTINGS\TEMP\WZC8F8\US_ACTIVE_EXHIBIT A - 1321 - APN #47-06-02-400-069.000-009_43636473_2.DOC

MLC #1321 – APN #47-06-02-400-069.000-009

# EXHIBIT A

## Property Description

A part of the Northwest Quarter of Section 12, Township 5 North, Range 1 West, Lawrence County, Indiana, described as follows:

Commencing at a County Monument at the Northeast corner of said Northwest Quarter; thence following the North line of said Section 12, South 90 degrees 00 minutes 00 seconds West, a distance of 1357.73 feet 10 a MAG nail in a bituminous county road and the point of beginning of this description: thence following an existing fence line, South 2 degrees 46 minutes 06 seconds West, a distance of 345.89 feet to a marked 5/8 inch rebar; thence following an exiting fence line, North 60 degrees 40 minutes 39 seconds West, a distance of 413.34 feet to a marked 5/8 inch rebar; thence North 53 degrees 03 minutes 44 seconds West, a distance of 74.67 feel to a MAG nail to the center of said county road; thence following said center, North 74 degrees 29 minutes 36 seconds East, a distance of 70.98 feet; thence North 74 degrees 50 minutes 14 seconds East, a distance of 150.70 feet; thence North 74 degrees 17 minutes 55 seconds East, a distance of 80.89 feet; thence North 83 degrees 33 minutes 29 seconds East, a distance of 72.81 feet; thence North 82 degrees 22 minutes 20 seconds East, a distance 73.34 feet to the point of beginning and containing 1.832 acres, more or less.

## EXHIBIT A

### Property Description

A part of the Northwest Quarter of Section 12, Township 5 North, Range 1 West, described as follows: Beginning at a mag nail on the North line of said quarter section, South 89 degrees 02 minutes 01 second West 1257.80 feet from a mag nail over a county monument at the Northeast corner of said quarter section; thence South 01 degree 47 minutes 29 seconds West 435.60 feet to a capped 5/8 inch rebar; thence South 89 degrees 02 minutes 01 seconds West 100.00 feet to a capped 5/8 inch rebar; thence South 01 degree 47 minutes 29 seconds West 308.40 feet to a capped 5/8 inch rebar; thence South 39 degrees 57 minutes 31 seconds East 311.00 feet to a capped 5/8 inch rebar; thence South 73 degrees 57 minutes 31 seconds East 100.00 feet to a capped 5/8 inch rebar; thence South 80 degrees 32 minutes 29 seconds West 432.12 feet (passing a capped 5/8 inch rebar at 378.36 feet) to the center of a branch; thence with said branch, North 16 degrees 08 minutes 53 seconds East 44.69 feet, North 11 degrees 06 minutes 17 seconds West 43.12 feet, North 32 degrees 27 minutes 58 seconds West 280.88 feet, North 58 degrees 02 minutes 41 seconds West 160.77 feet, North 64 degrees 12 minutes 52 seconds West 175.13 feet, North 48 degrees 36 minutes 22 seconds West 61.46 feet, North 65 degrees 15 minutes 47 seconds West 81.45 feet, North 75 degrees 54 minutes 07 seconds West 25.51 feet, North 61 degrees 36 minutes 05 seconds West 20.27 feet, North 53 degrees 12 minutes 18 seconds West 47.89 feet, North 40 degrees 59 minutes 49 seconds West 51.49 feet and North 48 degrees 37 minutes 10 seconds West 37.20 feet; thence leaving said branch, North 81 degrees 33 minutes 22 seconds East 119.18 feet to a capped 5/8 inch rebar; thence North 37 degrees 48 minutes 55 seconds East 216.54 feet to a mag nail in the center of Broomsage Road; thence with said road, North 54 degrees 31 minutes 06 seconds East 22.34 feet, North 51 degrees 33 minutes 52 seconds East 22.68 feet, North 48 degrees 16 minutes 33 seconds East 24.25 feet, North 46 degrees 22 minutes 02 seconds East 21.18 feet, North 48 degrees 52 minutes 36 seconds East 23.66 feet, North 52 degrees 31 minutes 36 seconds East 19.75 feet, North 51 degrees 50 minutes 29 seconds East 14.84 feet, North 59 degrees 20 minutes 05 seconds East 16.57 feet and North 68 degrees 03 minutes 08 seconds East 46.08 feet; thence leaving said road, South 54 degrees 02 minutes 21 seconds East 74.67 feet to a capped 5/8 inch rebar; thence South 61 degrees 39 minutes 15 seconds East 413.21 feet to a capped 5/8 inch rebar; thence North 01 degree 47 minutes 29 seconds East 345.86 feet to a mag nail on the North line of said quarter section; thence North 89 degrees 02 minutes 01 second East 100.00 feet to the beginning.

Containing 10.874 acres, more or less. Subject to all easements and rights-of-way of record.

X:\DOCUMENTS AND SETTINGS\MERRILLSCAN\LOCAL SETTINGS\TEMP\WZC625\US_ACTIVE_EXHIBIT A - 1326 - APN #47-06-12-200-009.000-009_43636541_2.DOC

MLC #1326 – 47-06-12-200-009.000-009

## EXHIBIT A

### Property Description

A part of the Northeast Quarter of Section 11, Township 5 North, Range 1 West, Lawrence County, Indiana, described as follows: Commencing at the Southeast corner of said quarter section; thence along the South line of said quarter section, North 90 degrees 00 minutes 00 seconds West 682.64 feet; thence North 00 degrees 00 minutes 00 seconds West 1259.86 feet; thence North 83 degrees 24 minutes 58 West 5.90 feet to a found capped 5/8 inch rebar at the point of beginning for the property herein described; thence North 83 degrees 24 minutes 58 seconds West 371.55 feet to a found capped 5/8 inch rebar; thence North 01 degree 55 minutes 15 seconds East 70.23 feet to a found capped 5/8 inch rebar; thence South 83 degrees 24 minutes 58 seconds East 369.18 feet to a found capped 5/8 inch rebar; thence South 00 degrees 00 minutes 00 seconds West 70.47 feet to the beginning. Containing 0.60 acres, more or less.

X:\DOCUMENTS AND SETTINGS\MERRILLSCAN\LOCAL SETTINGS\TEMP\WZ76C7\US_ACTIVE_EXHIBIT A - 1330 - APN #47-06-11-100-027.000-009_43636495_2.DOC

MLC #1330 – APN #47-06-11-100-027.000-009

# EXHIBIT A

## Property Description

Tract # 4 - Large Tract Section 34

Part of Section 34, Township 6 North, Range 1 West, 2nd Principal Meridian, Marshall Civil Township, Lawrence County Indiana as shown on a plat of survey completed by Bell Surveying and Mapping (JOB # 02186) and being described as follows:

COMMENCING at a Stone marking the Northwest Corner of said Section 34. Thence, concurrent with north line of said section, North 89 degrees 59 minutes 05 seconds East, 1391.18 Feet to the intersection with the centerline of Salt Creek which is the POINT of BEGINNING. Thence, continuing with said North Section Line, NORTH 89 Degrees 59 Minutes 05 Seconds EAST, [passing over a 5/8 inch rebar with yellow cap engraved GW BELL 29400007 (hereafter referred to as a capped rebar) at a distance of 50 feet on the East Bank of the Creek] for a total distance of 2545.43 FEET to a railroad spike found; thence, SOUTH 00 Degrees 11 Minutes 26 Seconds WEST, 2022.64 FEET to a capped rebar set in the centerline of the old railroad bed; thence, concurrent with the centerline of said old railroad bed for the following eight (8) courses:

1) SOUTH 71 Degrees 22 Minutes 57 Seconds WEST, 2.78 FEET;
2) SOUTH 42 Degrees 56 Minutes 30 Seconds WEST, 118.62 FEET:
3) SOUTH 45 Degrees 29 Minutes 21 Seconds WEST, 99.45 FEET;
4) SOUTH 50 Degrees 02 Minutes 01 Seconds WEST, 56.78 FEET;
5) SOUTH 59 Degrees 44 Minutes 26 Seconds WEST, 690.72 FEET:
6) SOUTH 70 Degrees 52 Minutes 08 Seconds WEST, 92.50 FEET:
7) SOUTH 65 Degrees 52 Minutes 24 Seconds WEST, 206.93 FEET:
8) SOUTH 69 Degrees 52 Minutes 33 Seconds WEST, 264.20 FEET to a capped rebar set in the meridianal Half Section Line;

thence, concurrent with said Half Section Line, SOUTH 00 Degrees 12 Minutes 55 Seconds WEST, 2422.45 FEET to a capped rebar set in the South Section Line thence, concurrent with said South Section Line, NORTH 89 Degrees 40 Minutes 20 Seconds WEST, 1407.60 FEET to a capped rebar at the intersection of said South Section Line and the Centerline of the old railroad bed; thence, continuing with said South Section Line, NORTH 89 Degrees 40 Minutes 20 Seconds WEST, (passing over a capped rebar by Mike Arena at a distance of 630.60 Feet) a total distance of 694.63 FEET to the centerline of Salt Creek; thence concurrent with the center line of "Salt Creek" for the following three (3) courses:

1) NORTH 07 Degrees 43 Minutes 17 Seconds WEST, 153.81 FEET:
2) NORTH 13 Degrees 15 Minutes 30 Seconds WEST 479.14 FEET;
3) NORTH 19 Degrees 48 Minutes 59 Seconds WEST, 844.33 FEET:

thence, NORTH 19 Degrees 50 Minutes 27 Seconds WEST, 316.03 FEET to the southern most intersection of said section line with the centerline of salt creek: thence

concurrent with the west section line of said section passing over a 5/8-inch rebar with yellow plastic cap engraved, "GW Bell 29400007" [hereafter referred to as capped rebar] at distance of 888.23 Feet, to the northern most intersection of said Section line with centerline of Salt Creek; thence concurrent with the center line of "Salt Creek" for the following three (4) courses:

1) NORTH 54 Degrees 56 Minutes 45 Seconds EAST, 283.09 FEET:
2) NORTH 58 Degrees 07 Minutes 15 Seconds EAST, 1322.40 FEET:
3) NORTH 03 Degrees 20 Minutes 15 Seconds EAST, 705.16 FEET:
4) NORTH 01 Degrees 09 Minutes 17 Seconds EAST 492.86 FEET back to the POINT of BEGINNING.

Said tract containing 324.86 Acres, more or less.

EXCEPT Part of Section 34, Township 6 North, Range 1 West, 2nd Principal Meridian, Marshall Civil Township, Lawrence County Indiana, described as follows:

Commencing at the point where the main track of C.I. and L. Railway Company crosses the South line of Section 34, Township 6 North, Range 1 West in Lawrence County, Indiana and running thence North along said center line of the main track Nine Hundred and Ten (910) feet; thence Westwardly at right angles to said center line of the main track Thirty (30) feet to the West line of the right of way of said Railway Company which is the place of beginning: thence running Westwardly at right angles to said center line of the main track Fourteen (14) feet to a point; thence Northerly Five Hundred and Twenty (520) feet to a point Seventy (70) feet West of the center of the main track of said Railway Company; thence Northwestwardly on a curve to the left of Six Hundred and Six (606) feet radius for a distance of Nine Hundred and Six (906) feet more or less to the South line of the land deeded by Monon Realty Company to C.I. and L. Railway Company by deed dated January 21, 1911, and recorded in Lawrence County, Indiana in deed book No. 60, page 61; thence running Easterly along the South line of said land Eight Hundred and Thirty-five (835) feet more or less to the Westwardly right of way line of said Railway Company: thence Southerly along the Westwardly line of said right of way to the place of beginning, containing 3.65 acres, more or less.

## EXHIBIT A

### Property Description

Tract # 3 - Section 33

Part of the Northwest Quarter of Section 33, Township 6 North, Range 1 West, 2nd
Principal Meridian, Marshall Civil Township, Lawrence County Indiana as shown
on a plat of survey completed by Bell Surveying and Mapping (JOB # 02186) and
being described as follows:

BEGINNING at the point where the Centerline of Salt Creek intersects the East Line
of said Section. Which point is South 00 Degrees 24 Minutes 11 Seconds West,
2057.39 feet of the Northeast Corner of said Section. Thence, continuing with said
Section Line, SOUTH 00 Degrees 24 Minutes II Seconds WEST, (passing over
5/8-inch rebars with yellow plastic caps engraved, "GW Bell 29400007" [hereafter
referred to as capped rebar] at distances of 50.00,531.29 Feet (Quarter Corner) and
1369.51 Feet) for a total distance of 1419.51 FEET to the southern most intersection
of said Section Line with the Centerline of Salt Creek; thence, concurrent with said
centerline of Salt Creek for the following three (3) courses:

I) NORTH 19 Degrees 50 Minutes 27 Seconds WEST, 39.92 FEET,
2) NORTH 19 Degrees 35 Minutes 24 Seconds WEST, 1159.73 FEET,
3) NORTH 54 Degrees 56 Minutes 45 Seconds EAST, 503.75 FEET, back to the
POINT of BEGINNING.

Said described tract containing 6.69 Acres, more or less.

## EXHIBIT A

### Property Description

Tract #5 SE Corner Section 34

Part of the Southeast Quarter of the Southeast Quarter of Section 34, Township 6 North, Range 1 West, 2nd Principal Meridian, Marshall Civil Township, Lawrence County Indiana as shown on a plat of survey completed by Bell Surveying and Mapping (JOB # 02186) and being described as follows:

BEGINNING at a stone marking the Southeast Corner of Section 34. Thence, concurrent with the South section line, NORTH 89 Degrees 40 Minutes 20 Seconds WEST, 957.00 FEET to a 5/8 inch rebar with yellow cap engraved GW BELL 29400007 (hereafter referred to as a capped rebar.); thence, parallel to the East Line of said section, NORTH 00 Degrees 01 Minutes 54 Seconds EAST, 1633.50 FEET to a capped rebar; thence, SOUTH 89 Degrees 40 Minutes 20 Seconds EAST, 957.00 FEET to a capped rebar set in the East Section line: thence, concurrent with the said section line, SOUTH 00 Degrees 01 Minute 54 Seconds WEST, 1633.50 FEET back to the POINT OF BEGINNING.

Said Parcel Containing 35.89 Acres, more or less.

# EXHIBIT A

## Property Description

A part of the Southeast quarter of Section 2 and a part of the Northeast quarter of Section 11. all in Township 5 North, Range 1 West, Lawrence County, Indiana and more particularly described as follows: Beginning at a spike in a County Road 68.08 feet North and 121.21 feet West of the Southeast corner of said Section 2; thence along said Road the following courses and distances; South 78 degrees 26 minutes 36 Seconds West., 135.18 feet to a spike, thence South 78 degrees 58 minutes 00 seconds West., 265.11 feet to a point, thence South 62 degrees 38 minutes 00 seconds West 85.63 feet to a spike; thence South 62 degrees 48 minutes 00 seconds West 254.03 feet to a spike, thence leaving hid Road North 04 degrees 33 minutes 09 seconds West, 333.59 feet to a Pipe, thence North 60 degree 00 minutes 35 seconds East, 133.74 feet to a rebar, thence South 25 degrees 44 minutes 29 seconds East, 176.00 feet to a point, thence North 71 degrees 56 minutes 25 seconds East, 217.313 feet to a point, thence North 07 degrees 35 minutes 14 seconds West, 72.00 feet to a rebar, thence North 63 degree 13 minutes 06 seconds West 188.85 feet to a rebar, thence North 77 degrees 59 minutes 24 seconds East 139.65 feet to a rebar, thence North 40 degrees 52 minute 3 seconds East., 255.96 feet to rebar, thence South 49 degrees 00 minutes 43 seconds East, 118.19 feet to a rebar, thence South 27 degrees 38 minutes 37 seconds East, 131.39 feet to rebar, thence South 14 degrees 56 minutes 00 seconds. East, 198.97 feet to a rebar, thence South 05 degree. 07 minutes 19 seconds West 69.17 feet to the place of beginning, containing 4.36 acres, more or less, in Section 2 and .70 acre, more or less, in Section 11, containing 5.06 acres, more or less.

X:\DOCUMENTS AND SETTINGS\MERRILLSCAN\LOCAL SETTINGS\TEMP\WZ5357\US_ACTIVE_EXHIBIT A - 1337, 1343 - APN 47-06-02-400-012 AND 47-06-11-100-013_43636448_2.DOC

MLC #1337 and 1343
APN #47-06-02-400-012.000-009 and 47-06-11-100-013.000-009

## EXHIBIT A

### Property Description

<u>Tract # 2 - NW Portion Section 3</u>

Part of the Northwest Quarter of Section 3, Township 5 North, Range 1 West, 2nd Principal Meridian, Shawswick Civil Township, Lawrence County Indiana as shown on a plat of survey completed by Bell Surveying and Mapping (JOB # 02186) and being described as follows:

BEGINNING at a 518 inch rebar with yellow cap engraved GW BELL 29400007(hereafter referred to as a capped rebar) marking the North Quarter Corner of said Section. Thence, concurrent with the meridial Half Section Line, SOUTH 00 Degrees 13 Minutes 35 Seconds EAST, 1462.79 FEET to a capped rebar set in the centerline of the old railroad bed; thence, concurrent with the center line of said railroad bed for the following ten (10) courses:

1) SOUTH 86 Degrees 26 Minutes 17 Seconds WEST, 491.25 FEET,
2) NORTH 81 Degrees 28 Minutes 15 Seconds WEST, 158.72 FEET,
3) NORTH 69 Degrees 37 Minutes 39 Seconds WEST, 265.94 FEET,
4) NORTH 56 Degrees 20 Minutes 34 Seconds WEST, 252.87 FEET,
5) NORTH 42 Degrees 28 Minutes 37 Seconds WEST, 255.89 ,FEET,
6) NORTH 28 Degrees 34 Minutes 12 Seconds WEST, 223.57 FEET,
7) NORTH 12 Degrees 59 Minutes 31 Seconds WEST, 352.11 FEET,
8) NORTH 00 Degrees 06 Minutes 35 Seconds EAST, 176.39 FEET,
9) NORTH 05 Degrees 13 Minutes 31 Seconds EAST, 126.07 FEET,
10) NORTH 10 Degrees 44 Minutes 02 Seconds EAST, 218.80 FEET to a capped rebar at the intersection of said railroad bed and the north line of said section;

thence, concurrent with said section line, SOUTH 89 Degrees 40 Minutes 20 Seconds EAST, 1407.60 FEET back to the POINT of BEGINNING. Said tract containing 44.40 Acres, more or less.

X:\DOCUMENTS AND SETTINGS\MERRILLSCAN\LOCAL SETTINGS\TEMP\WZD672\US_ACTIVE_EXHIBIT A - 1338 - APN #47-06-03-200-004.000-009_43636400_2.DOC

<u>MLC #1338 – APN #47-06-03-200-004.000-009</u>

## EXHIBIT A

### Property Description

A part of the Southeast Quarter of Section 2, Township 5 North, Range 1 West,
Lawrence County, Indiana, Indiana, described as follows:

Beginning at a capped 5/8 inch rebar on the North line of said Quarter Section, South
89 degrees 15 minutes 52 seconds West 405,68 feet from a stone monument at the
Northeast corner of said Quarter Section, said point being on the North line of a 20
acres tract conveyed to John I. McBride and Joan McBride and recorded in Deed
Record 152 on page 64 of the Office of the Recorder of Lawrence County, Indiana;
thence along a fence South 19 degrees 20 minutes 36 seconds East 543,03 feet to a 4
inch steel fence post and South 10 degrees 38 minutes 11 seconds East 423,87 feet to
a capped 518 inch rebar on the South line of said 20 acres tract, which point is South
89 degrees 15 minutes 52 seconds West 150.61 feet from a 518 inch rebar at the
Southeast corner of said tract; thence along the South line of said 20 acres tract South
89 degrees 15 minutes 52 seconds West 509.39 feet to a corner of said tract; thence
parallel with the East line of said Quarter Section North 00 degrees 11 minutes 15
seconds West 202.62 feet to a corner of said tract; thence South 89 degrees 15
minutes 52 seconds West 350.62 feet to a corner of said tract; thence North 00
degrees 11 minutes 15 seconds West 729.63 feet to the Northwest corner of said tract;
thence North 89 degrees 15 minutes 52 seconds East 604.94 feet to the beginning.
Containing 14.445 acres, more or less.

## EXHIBIT A

### Property Description

A part of the Southeast Quarter of Section 2, Township 5 North, Range 1 West, Lawrence County, Indiana, described as follows: Commencing at an aluminum monument at the Southeast corner of said section; thence along the east line of said Southeast quarter, North 00 degrees 46 minutes 36 seconds East 93.29 feet to a Mag Nail in the center of Broomsage Road; thence along the center of said road, North 78 degrees 56 minutes 08 seconds West 4.27 feet to a Mag Nail at the point of beginning; thence continuing with said road, North 78 degrees 56 minutes 08 seconds West 13.16 feet, North 89 degrees 00 minutes 05 seconds West 60.51 feet and South 83 degrees 15 minutes 35 seconds West 37.63 feet to a Mag Nail; thence along the Westerly line of a tract conveyed to Leif Erik & Donna Sue Hansen in Deed Record 214 on page 595, North 05 degrees 42 minutes 44 seconds East 72.92 feet, North 14 degrees 20 minutes 35 seconds West 198.97 feet, North 27 degrees 03 minutes 12 seconds West 13 1.39 feet, North 49 degrees 05 minutes 18 seconds West 234.29 feet to a capped 5/8 inch rebar, North 68 degrees 57 minutes 25 seconds East 75.78 feet to a capped 5/8 inch rebar, North 39 degrees 36 minutes 35 seconds West 299.64 feet to a capped 5/8 inch rebar and North 74 degrees 24 minutes 35 seconds West 198.00 feet to a capped 5/8 inch rebar at the Northwest corner of said Hansen tract; thence along the North line of said Hansen tract, North 71 degrees 50 minutes 26 seconds East 757.26 feet to a capped 5/8 inch rebar on the East line of said Section 2; thence along the section line, South 00 degrees 46 minutes 36 seconds West 180.67 feet to a capped 5/8 inch rebar; thence North 89 degrees 28 minutes 31 seconds West 200.24 feet to a capped 5/8 inch rebar; thence South 40 degrees 46 minutes 35 seconds West 120.11 feet; thence South 16 degrees 32 minutes 43 seconds West 68.24 feet; thence South 00 degrees 58 minutes 42 seconds West 34.23 feet; thence South 25 degrees 33 minutes 42 seconds East 53. J7 feet; thence South 21 degrees 23 minutes 49 seconds East 61.52 feet; thence South 31 degrees 00 minutes 14 seconds East 67.45 feet; thence South 25 degrees 3 I minutes 13 seconds East 31.12 feet; thence South 40 degrees 11 minutes 54 seconds East 50. 19 feet; thence South 40 degrees 17 minutes 12 seconds East 42.34 feet; thence South 30 degrees 03 minutes 19 seconds East 33.60 feet; thence South 29 degrees 52 minutes 51 seconds East 35.12 feet; thence South 24 degrees 43 minutes 23 seconds East 53.53 feet; thence South 25 degrees 51 minutes 58 seconds East 43. 15 feet; thence South 07 degrees 53 minutes 17 seconds East 61.17 feet; thence South 22 degrees 34 minutes 34 seconds East 32.31 feet; thence South 03 degrees 56 minutes 36 seconds East 139.06 feet; thence South 17 degrees 07 minutes 14 seconds East 7837 feet to the point of beginning.

Containing 4.469 acres, more or less. Subject to all easements and rights-of-way of record.

## EXHIBIT A

### Property Description

A part of the Southwest Quarter of Section 12, Township 5 North, Range I West, described as follows: Beginning at an iron pin at the Southwest corner of Lot 7 in Speer Addition to the City of Bedford, Indiana; thence along the Southwest side of a proposed 50 foot street, North 50 degrees 10.4 minutes West 156.14 feet to an iron pin; thence due East 119.91 feet to an iron pin at the Northwest corner of said Lot 7; thence due South 100.00 feet to the beginning. Containing 0.14 acres, more or less.

MLC #1344 – 47-06-12-300-065.000-010

## EXHIBIT A

### Property Description

**TRACT I:**

A part of Lot Number 7 in Speer Addition to the City of Bedford, Indiana, and a part of the Southwest Quarter of Section 12, Township 5 North, Range 1 West, described as follows: Beginning at a cross cut on a rock outcrop at the Northwest corner of Lot 7 in Speer Addition to the City of Bedford, Indiana; thence along the North line of said Lot 7, due East 60.00 feet; thence due South 124.22 feet to the North line of a proposed 50 foot street; thence along said proposed street, North 68 degrees 01.1 minutes West 64.71 feet to an iron pipe at the Southwest corner of said Lot 7; thence due North 100.00 feet to the beginning. Containing 0.154 acres, more or less.

**TRACT II:**

A part of the Southwest Quarter of Section 12, Township 5 North, Range 1 West, described as follows: Beginning at an iron pin at the Southwest corner of said Lot 7 in Speer Addition to the City of Bedford, Indiana; thence along the Southwest side of a proposed 50 foot street, North 50 degrees 10.4 minutes West 156.14 feet to an iron pin; thence due East 119.91 feet to an iron pin at the Northwest corner of said Lot 7; thence due South 100.00 feet to the beginning, containing 0.14 acres, more or less.

**Commonly known as:** 641 Riley Blvd., Bedford, Indiana.  APN # 47-06-12-300-081.000-010.

X:\DOCUMENTS AND SETTINGS\MERRILLSCAN\LOCAL SETTINGS\TEMP\WZB321\US_ACTIVE_EXHIBIT A - 1345 APN #47-06-12-300-081.000-010_43636611_2.DOC

MLC # 1345 -- APN # 47-06-12-300-081.000-010

## EXHIBIT A

### Property Description

Lot Number 177 in Bedford Heights Subdivision, Section "E", to the City of Bedford, Lawrence County, Indiana.

**EXCEPTING THEREFROM,** the following described real estate, to-wit: A part of Lot 177 in Bedford Heights Subdivision, Section "E" to the City of Bedford, Indiana, described as follows: Beginning at an iron pipe at the Southwest corner of said Lot 177; thence along the Westerly line of said lot and the easterly line of Riley Boulevard, North 22 degrees 50 minutes 00 West 17.00 feet to a capped 5/8 inch rebar; thence North 68 degrees 18 minutes 57 seconds East 139.27 feet (passing a capped 5/8 inch rebar at 138.82 feet) to the easterly line of said lot; thence South 27 degrees 04 minutes 18 seconds East 9.00 feet the Southeast corner of said lot; thence along the line of Lots 176 and 177, South 65 degrees 01 minutes 30 seconds West 140.00 feet to the beginning. Containing an area of 0.04 acres of 1813 square feet.

**Commonly known as**: 645 Riley Blvd., Bedford, Indiana
APN # 47-06-12-403-042.000-010

## EXHIBIT A

### Property Description

<u>Tract # 1_NE/4 Section 3</u>

Part of the Northeast Quarter of Section 3, Township 5 North, Range 1 West, 2nd Principal Meridian, Shawswick Civil Township, Lawrence County, Indiana as shown on a plat of survey completed by Bell Surveying and Mapping (JOB # 02186) and being described as follows:

Beginning at a stone marking the Northeast Corner of Section 3. Thence, concurrent with east line of said section, SOUTH 00 degrees 14 Minutes 30 Seconds WEST, 1171.03 FEET to a inch iron pipe in the southern Right-of-Way of the old Monon Railroad: thence concurrent with said railroad Right-of-Way for the following eight (8) courses:

1) SOUTH 73 Degrees 02 Minutes 56 Seconds WEST, 1159.29 FEET,
2) SOUTH 83 Degrees 53 Minutes 25 Seconds WEST, 151.24 FEET,
3) SOUTH 88 Degrees 37 Minutes 48 Seconds WEST, 93.98 FEET,
4) NORTH 86 Degrees 56 Minutes 33 Seconds WEST, 132.47 FEET,
5) NORTH 84 Degrees 51 Minutes 20 Seconds WEST, 117,27 FEET,
6) NORTH 82 Degrees 21 Minutes 45 Seconds WEST, 123.42 FEET,
7) NORTH 83 Degrees 13 Minutes 19 Seconds WEST, 128.65 FEET,
8) NORTH 87 Degrees 22 Minutes 58 Seconds WEST, 125.89 FEET to a rebar with orange cap mark "PC GRAHAM":

thence, leaving said Right-of-way, NORTH 00 Degrees 11 Minutes 25 Seconds EAST, 1483.77 FEET to a 5/8 inch rebar with yellow cap engraved GW BELL 29400007 (hereafter referred to as a capped rebar) set in the North Line of said Section: thence, concurrent with said section line, SOUTH 89 Degrees 40 Minutes 20 Seconds EAST, (passing over a capped rebar at a distance of 1021.19 Feet) for a total distance of 1978.19 FEET back to the Point of Beginning. Said tract containing 64.41 Acres, more or less.

X:\DOCUMENTS AND SETTINGS\MERRILLSCAN\LOCAL SETTINGS\TEMP\WZC898\US_ACTIVE_EXHIBIT A - 1348 - APN #47-06-03-100-011.000-009_43636395_2.DOC

MLC #1348 – APN #47-06-03-100-011.000-009

# EXHIBIT A

## Property Description

**PARCEL 1**

Township of Buena Vista, Section 5, Township 12 North, Range 5 East, Part of Government Lot 4, commencing on South line of Crow Reserve at East line of Crow Island Road, thence North 79°35' East 120 feet, Southeasterly parallel with East line of highway 60 feet; thence South 79°35' West 120 feet; thence Northwesterly along Easterly line of Highway, 60 feet to beginning;

and,

A parcel of land in Government Lot 4, Fractional Section 5, Buena Vista Township, Saginaw County, Michigan, described as follows: Commencing on the centerline of Crow Island Road at a point 60.00 feet, South 12°53'10" East, from the point of intersection of said road centerline with the South line of the Crow Reservation; thence North 89°11'22" East, parallel with and 60.00 feet, measured parallel with the centerline of Crow Island Road, South of the South line of said Reservation, 153.75 feet; thence North 12°53'10" West, parallel with and 120.00 feet, measured parallel with the South line of said Reservation, East of the East right-of-way line of said Crow Island Road, 60.00 feet to the South line of said Reservation; thence North 89°11'22" East, on said South line, 246.25 feet; thence South 12°53'10" East, parallel with and 400.00 feet, measured parallel with said South line; East of the centerline of said Crow Island Road, 236.60 feet; thence South 89°11'22" West, on a line which is parallel with and 194.30 feet, measured at right angles, North of the North line of Calpine's Subdivision, according to the plat thereof recorded in Liber 1, Page 75 of Plats, Saginaw County Records, 400.00 feet to the centerline of Crow Island Road; thence North 12°53'10" West, on said centerline, 176.60 feet to the point of beginning;

and,

A parcel of land in Government Lot 4, Fractional Section 5, Buena Vista Township, Saginaw County, Michigan, described as follows: Commencing on the centerline of Crow Island Road at a point 236.60 feet, South 12°53'10" East, from the point of intersection of said road centerline with the South line of the Crow Reservation; thence North 89°11'22" East, on a line which is parallel with and 194.30 feet, measured at right angles, North of the North line of Calpine's Subdivision, according to the plat thereof recorded in Liber 1, Page 75 of Plats, Saginaw County Records, 400.00 feet; thence South 12°53'10" East, parallel with and 400.00 feet, measured parallel with said South line, East of the centerline of said Crow Island Road, 198.70 feet to the North line of said Calpine's Subdivision; thence South 89°11'22" West, on said North line, 400.00 feet to the centerline of Crow Island Road; thence North 12°53'10" West, on said centerline, 198.70 feet to the point of beginning;

and,

Township of Buena Vista, Section 5, Township 12 North, Range 5 East, Commencing at intersection of Crow Island Road and South line of Calpine Plat, thence East 258 feet; thence South 92 feet; thence West 239 feet; thence Northwesterly to point of beginning, in Southeast quarter;

and,

Township of Buena Vista, Saginaw County, Michigan, a parcel of land in the Southwest 1/4 of Section 5, Town 12 North, Range 5 East, described as commencing at the intersection of Crow Island Road and the South line of Calpine Subdivision; thence East on the South line of said

Subdivision to the West line of Lot 6, Calpine Subdivision; thence Southeasterly parallel with said Crow Island Road, 207.55 feet; thence West to the centerline of said road; thence Northwesterly along the centerline of said road to the place of beginning; excepting therefrom the North 92 feet of the West 239 feet thereof;

and,

Township of Buena Vista, Saginaw County, Michigan, a parcel of land in the Fractional Section 5, Town 12 North, Range 5 East, being a part of so-called brick yard lot lying South and adjacent to Calpine's Subdivision described as follows: To fix a point of beginning commence at the point of intersection of the centerline of Crow Island Road with the South line of the Crow Reservation; thence South 12°53'10" East, on said centerline, 928.54 feet; thence North 89°11'22: East, on the South line of Calpine's Subdivision, 333.51 feet to the Southwest corner of Lot 6, Block 1, of said Subdivision and the point of beginning of this description; thence North 89°11'22" East on the South line of said Subdivision, 66.49 feet; thence South 12°53'10" East, on a line which is 400 feet, measured parallel with the South line of the Crow Reservation, East of the centerline of Crow Island Road, 210.52 feet; thence South 89°11'22" West, parallel with the South line of Calpine's Subdivision which is parallel with the South line of said Reservation, 66.49 feet; thence North 12°53'10" West, parallel with the centerline of said Crow Island Road, 210.52 feet to the point of beginning;

and,

A parcel of land in Government Lots 4 and 5, Fractional Section 5, Town 12 North, Range 5 East, Buena Vista Township, Saginaw County, Michigan, described as: To fix a point of beginning commence at the point of intersection of the centerline of Crow Island Road with the South line of the Crow Reservation; thence South 12°53'10" East, on said centerline, 1139.06 feet to the point of beginning of this description; thence North 89°11'22" East, parallel with the South line of said Reservation, 1742.00 feet; thence South 00°27'21" West, 522.13 feet; thence South 89°52'49" West, 1580.32 feet to a point on the centerline of said Crow Island Road, said point being 1664.81 feet Southeasterly along said centerline from the South line of the Crow Reservation; thence North 19°44'30" West, along said centerline 122.81 feet; thence North 89°11'22" East, parallel with the South line of said Reservation, 153.00 feet; thence North 19°44'30" West, parallel with said centerline, 240.00 feet; thence South 89°11'22" West, parallel with said Reservation line 151.37 feet to a point on the centerline of said Crow Island Road, said point being 12.92 feet North 12°53'10" West, from a deflection point in said centerline; thence North 12°53'10" West, on said centerline, 163.38 feet to the point of beginning;

and,

A parcel of land in Government Lot 4, Fractional Section 5, Buena Vista Township, Saginaw County, Michigan, described as follows: To fix a point of beginning commence at the point of intersection of the centerline of Crow Island Road with the South line of the Crow Reservation; thence South 12°53'10" East, 1315.36 feet to a deflection point in said centerline; thence South 19°44'30" East, on said centerline, 66.64 feet to the point of beginning of this description, said point being 1382.00 feet Southeasterly along said centerline from the South line of the Crow Reservation; thence North 89°11'22" East, parallel with the South line of said Reservation, 153.00 feet; thence North 19°44'30" West, parallel with said centerline, 80.00 feet; thence South 89°11'22" West, parallel with the South line of said Reservation, 151.37 feet to the centerline of said Crow Island Road; thence South 12°53'10" East, on said centerline, 12.92 feet to a deflection point in said centerline; thence South 19°44'30" East, on said centerline, 66.64 feet to the point of beginning;

and,

A parcel of land in Government Lot 4, Fractional Section 5, Town 12 North, Range 5 East, Buena

Vista Township, Saginaw County, Michigan, described as follows: To fix a point of beginning commence at the point of intersection of the centerline of Crow Island Road with the South line of the Crow Reservation; thence South 12°53'10" East, on said centerline 1315.36 feet to a deflection point in said centerline; thence South 19°44'30" East, on said centerline, 66.64 feet to the point of beginning of this description, said point being 1382.00 feet Southeasterly along said centerline from the South line of the Crow Reservation; thence North 89°11'22" East, parallel with the South line of said Reservation, 153.00 feet; thence South 19°44'30" East, parallel with said centerline, 80.00 feet; thence South 89°11'22" West, parallel with the South line of said Reservation 153.00 feet to the centerline of said Crow Island Road; thence North 19°44'30" West, on the said centerline, 80.00 feet to the point of beginning;

and,

A parcel of land in the Government Lot 4, Fraction Section 5, Town 12 North, Range 5 East, Buena Vista Township, Saginaw County, Michigan, described as follows: To fix a point of beginning commence at the point of intersection of the centerline of Crow Island Road with the South line of the Crow Reservation; thence South 12°53'10" East, on said centerline, 1315.36 feet to a deflection point in said centerline; thence South 19°44'30" East, on said centerline, 146.64 feet to the point of beginning of this description, said point being 1462.00 feet Southeasterly along said centerline from the South line of the Crow Reservation; thence North 89°11'22" East, parallel with the South line of said Reservation, 153.00 feet; thence South 19°44'30" East, parallel with said centerline, 80.00 feet; thence South 89°11'22" West, parallel with the South line of said Reservation, 153.00 feet to the centerline of said Crow Island Road; thence North 19°44'30" West, on said centerline, 80.00 feet to the point of beginning;

and,

A parcel of land in Government Lots 4 and 5, Fractional Section 5, Town 12 North, Range 5 East, Buena Vista Township, Saginaw County, Michigan, described as follows: To fix a point of beginning commence at the Southeast corner of said Section; thence North 00°02'30" East, on the East line of said Section, 1344.73 feet; thence North 89°43'16" West, on the South line of Government Lot 5, 567.76 feet to the point of beginning of this description; thence continuing North 89°43'16" West on the South line of said Government Lots 4 and 5, 841.84 feet to a point which is 66.00 feet North 89°43'16" West from the Southeast corner of Government Lot 4; thence North 00°22'30" East, parallel with the East line of Government Lot 4, 37.68 feet; thence North 89°52'49" East, 841.93 feet; thence South 00°27'21" West, 43.54 feet to the point of beginning;

and,

A parcel of land in Government Lots 4 and 7, Fractional Section 5, Town 12 North, Range 5 East, Buena Vista Township, Saginaw County, Michigan, described as follows: Commencing on the South line of said Section 5 at a point 1417.64 feet North 88°37'30" West, along said South line from the Southeast corner of said Section, said point being 66.00 feet North 88°37'30" West, along said South line from the Southeast corner of said Lot 7; thence continuing North 88°37'30" West, along said South line, 245.90 feet; thence North 19°44'30" East, along the centerline of Crow Island Road, 1431.97 feet to a point which is 1664.81 feet Southeasterly along said centerline from the South line of the Crow Reservation; thence North 89°52'49" East, 738.39 feet; thence South 00°22'30" West, on a line which is parallel with and 66.00 feet, measured parallel with said South Section line, West of the East line of said Government Lots 4 and 7, 1355.28 feet to the point of beginning;

and,

A parcel of land in Government Lots 6 and 7, Fractional Section 5, Town 12 North, Range 5 East, Buena Vista Township, Saginaw County, Michigan, described as follows: Commencing on the South line of said Section 5 at a point 265.84 feet, North 88°37'30" West, along said South line

from the Southeast corner of said Section; thence continuing North 88°37'30" West, on said South line, 1151.80 feet; thence North 00°22'30" East, on a line which is parallel with and 66.00 feet, measured parallel with said South line, West of the East line of said Government Lot 7, 1317.60 feet; thence South 89°43'16" East, on the North line of said Lots 6 and 7, 1409.60 feet to the East line of Section 5; thence South 00°02'30" West, on said East line, 1031.28 feet; thence South 40°54'00" West, on a line which is parallel with and 93.00 feet, measured at right angles, Northwesterly on the centerline of Chesapeake and Ohio Railway Company right-of-way, 406.25 feet to the point of beginning; AND, a parcel of land in Government Lot 6, Fractional Section 5, Town 12 North, Range 5 East, Buena Vista Township, Saginaw County, Michigan, described as follows:  Commencing at the Southeast corner of said Section 5; thence North 88°37'30" West, on the South line of said Section, 102.49 feet; thence North 40°54'00" East, on the Southeasterly right-of-way line of the Chesapeake and Ohio Railway Company right-of-way being a line which is parallel with and 33.00 feet, measured at right angles, Southeasterly of the centerline of said railway, 156.62 feet to the East line of said Section; thence South 00°02'30" West, on said East line, 120.84 feet to the point of beginning;

and,

Lots 1, 2, 3 and 4, Block 1, Calpine's Subdivision, being a part of Fractional Section 5, Town 12 North, Range 5 East, Buena Vista Township, Saginaw County, Michigan, described as follows: To fix a point of beginning commence at the point of intersection of the centerline of Crow Island Road with the South line of the Crow Reservation; thence South 12°53'10" East, on said centerline, 805.83 feet; thence North 89°11'22" East, 33.75 feet to the Northwest corner of said Lot 1 and the point of beginning of this description; thence continuing North 89°11"22" East, on the North line of said Block 1 which is also the South line of French Street, 264.45 feet to the Northeast corner of said Lot 4; thence South 01°18'17" East, on the East line of Lot 4 of said Block, 120.00 feet; thence South 89°11'22" West, on the South line of said Lots 2, 3 and 4 which is also the South line of Calpine's Subdivision, 239.81 feet to the Southwest corner of said Lot 2; thence North 12°53'10" West, on the Westerly line of said Block 1 which is also the Easterly right-of-way line of Crow Island Road, 122.71 feet to the point of beginning;

and,

A parcel of land in the Fractional Section 5, Town 12 North, Range 5 East, being a part of Blocks 1 and 2 of Calpine's Subdivision and that part of French Street lying adjacent thereto, described as follows: To fix a point of beginning commence at the point of intersection of the centerline of Crow Island Road with the South line of the Crow Reservation; thence South 12°53'10" East, on said centerline, 928.54 feet; thence North 89°11'22" East, on the South line of said Subdivision, 333.51 feet to the Southwest corner of Lot 6, Block 1, of said Subdivision and the point of beginning of this description; thence North 01°18'14" West, on the West line of said Lot 6, Block 1, 120 feet to the Northwest corner of said Lot 6, Block 1; thence North 01°18'54" West, across said French Street, 30 feet to the Southwest corner of Lot 6, Block 2 of said Subdivision; thence North 01°18'27" West, on the West line of said Lot 6, Block 2, 120 feet to the Northwest corner of said Lot 6, Block 2; thence North 89°11'22" East, on the North line of said Block 2 which is also the South line of Calpine's Street, 1107 feet; thence South 12°53'10" East, on the line which is 400 feet, measured parallel with the South line of the Crow Reservation, East of the centerline of Crow Island Road, 276.11 feet; thence South 89°11'22" West, on the South line of said Subdivision, 66.49 feet to the point of beginning;

and,

Lot 5, Block 1, Calpine's Subdivision, being a part of Fractional Section 5, Town 12 North, Range 5 East, Buena Vista Township, Saginaw County, Michigan, described as follows: To fix a point of beginning commence at the point of intersection of the centerline of Crow Island Road with the South line of the Crow Reservation; thence South 12°53'10" East, on said centerline, 805.83 feet; thence North 89°11'22" East, on the Westerly extension of the South line of French Street, 33.75

feet to the Northwest corner of Lot 1, Block 1, Calpine's Subdivision; thence North 89°11'22" East, on said South line of French Street which is also the North line of said Block 1, of Calpine's Subdivision, 264.45 feet to the Northwest corner of said Lot 5 and the point of beginning of this description; thence North 89°11'22" East, on the North line of said Lot 5 which is also the South line of French Street, 59.95 feet to the Northeast corner of said Lot 5; thence South 01°18'14" East, on the East line of said Lot, 120 feet to the Southeast corner of said Lot; thence South 89°11'22" West, on the South line of said Lot, 59.95 feet to the Southwest corner of said Lot; thence North 01°18'17" West, on the West line of said Lot, 120.00 feet to the point of beginning;

and,

Entire Lots 1 and 2, Block 2, Calpine's Subdivision, being a part of Fractional Section 5, Town 12 North, Range 5 East, Buena Vista Township, Saginaw County, Michigan, described as follows: To fix the point of beginning, commence at the point of intersection of the centerline of Crow Island Road with the South line of the Crow Reservation; thence South 12°53'10" East, on said centerline, 652.43 feet; thence North 89°11'22" East, 33.75 feet to the Northwest corner of said Lot 1 and the point of beginning of this description; thence continuing North 89°11'22" East, on the North line of said Lot 1 which is also the South line of Calpine Street, 175.32 feet; thence South 01°18'36" East, on the East line of Lots 1 and 2 of said Block, 120.00 feet; thence South 89°11'22" West, on the South line of said Lot 2 which is also the North line of French Street, 150.69 feet; thence North 12°53'10" West, on the Westerly line of said Lots 1 and 2 which is also the Easterly right-of-way line of Crow Island Road, 122.72 feet to the point of beginning;

and,

Entire Lots 3, 4 and 5, Block 2, Calpine's Subdivision, being a part of Fractional Section 5, Town 12 North, Range 5 East, Buena Vista Township, Saginaw County, Michigan, described as follows: To fix the point of beginning commence at the point of intersection of the centerline of Crow Island Road with the South line of the Crow Reservation; thence South 12°53'10" East, on said centerline, 652.43 feet; thence North 89°11'22" East, on the North line of said Block 2 which is also the South line of Calpine Street, 209.07 feet to the Northwest corner of said Lot 3 and the point of beginning of this description; thence continuing North 89°11'22" East, on the North line of said Block, 179.87 feet to the Northeast corner of Lot 5; thence South 01°18'27" East, on the East line of Lot 5 of said Block, 120.00 feet; thence South 89°11'22" West, on the South line of said Lots 3, 4 and 5 which is also the North line of French street, 179.86 feet to the Southwest corner of said Lot 3; thence North 01°18'36" West, on the West line of Lot 3 of said Block, 120.00 feet to the point of beginning;

and,

A part of Lots 2, 4, 5, 6 and 9 and entire Lots 3, 7 and 8 in Block 3 of Calpine's Subdivision, being a part of Fractional Section 5, Town 12 North, Range 5 East, Buena Vista Township, Saginaw County, Michigan, described as follows: To fix the point of beginning commence at the point of intersection of the centerline of Crow Island Road with the South line of Crow Reservation; thence South 12°53'10" East, on said centerline, 435.30 feet to the North line of said Calpine's Subdivision; thence North 89°11'22" East, on said North line, 33.75 feet to the East right-of-way line of Crow Island Road and the point of beginning of this description; thence continuing North 89°11'22" East, on said North line, 466.25 feet to a point which is 500.00 feet North 89°11'22" East, along said North line from the centerline of said Crow Island Road; thence South 12°53'10" East, parallel with said centerline, 155.77 feet to the South line of said Block 3; thence South 89°11'22" West, on said South line of Block 3, 158.71 feet to the Southwest corner of Lot 7; thence North 01°14'44" West, on the West line of Lot 7, 61.55 feet; thence South 89°11'22" West, on a line which is parallel with and 40.00 feet, measured at right angles, South of the Easterly extension of the Northerly line of said Lot 2, 320.25 feet to the Easterly right-of-way line of Crow Island Road; thence North 12°53'10" West on said Easterly right-of-way line, 92.83 feet to the point of beginning;

and,

Entire Lot 1, and a part of Lots 2, 4, 5 and 6, in Block 3 of Calpine's Subdivision, being a part of Fractional Section 5, Town 12 North, Range 5 East, Buena Vista Township, Saginaw County, Michigan, described as follows:  To fix the point of beginning commence at the point of intersection of the center line of Crow Island Road with the South line of the Crow Reservation; thence South 12°53'10" East, on said center line, 528.13 feet; thence North 89°11'22" East, parallel with the North line of said Subdivision, 33.75 feet to the East right-of-way line of Crow Island Road and the point of beginning of this description; thence continuing North 89°11'22" East, on a line which is 40.00 feet, measured at right angles, South of the North line of said Lot 2, 320.25 feet to the East line of said Lot 6; thence South 01°14'44" East, on said East line, 61.55 feet to the South line of said Block 3; thence South 89°11'22" West, on said South line of Block 3, 307.54 feet to the Easterly right-of-way line of Crow Island Road; thence North 12°53'10" West, on said Easterly right-of-way line, 62.95 feet to the point of beginning.

**PARCEL 2**
A parcel of land in Government Lot 5, Fractional Section 5, Town 12 North, Range 5 East, Buena Vista Township, Saginaw County, Michigan, described as follows: To fix the point of beginning, commence at the point of intersection of the centerline of Crow Island Road with the South line of the Crow Reservation; thence South 12°53'10" East on said centerline, 1,315.36 feet to a deflection point in said centerline; thence South 19°44'30" East, 349.45 feet to a point on said centerline which is 1,664.81 feet, Southeasterly along said centerline from the South line of the Crow Reservation; thence North 89°52'49" East, 1,580.32 feet to the point of beginning of this description; thence North 00°27'21" East, 522.13 feet; thence North 89°11'22" East, parallel with the South line of said Reservation, 181.56 feet to the Southwesterly line of the I-75 right-of-way; thence South 44°04'33" East on said Southwesterly line, being a line which is parallel with and 150.00 feet, measured at right angles, Southwesterly from the centerline of the I-75 median, 548.94 feet to the East line of said Section; thence South 00°02'30" West on said East line, 176.61 feet to the Southeast corner of said Government Lot 5; thence North 89°43'16" West on the South line of said Lot, 567.76 feet; thence North 00°27'21" East, 43.54 feet to the point of beginning.

**PARCEL 3**
Northeast 1/4 of Section 8, T12N, R5E, Except C&O RR R/W, Also except commencing on center line of Crow Island Road, 644.77 feet North 32 1/4 Deg from North and South 1/4 line; thence North 32 1/4 Deg East 363.84 feet; thence South 57 3/4 Deg East to C&O RR R/W; thence Southwesterly along said RR R/W to a line which bears South 57 3/4 Deg East; thence North 57 3/4 Deg West to beginning, Also except North 800 feet of West 435.72 feet thereof.

**PARCEL 4**
A parcel of land in the Southwest 1/4 of the Northeast 1/4 of Section 8, Township 12 North, Range 5 East, Buena Vista Township, Saginaw County, Michigan, described as follows: To fix a point of beginning, commence at the Northeast corner of Section 8; thence North 88°37'30" West, on the North line of Section 8, 1,196.19 feet to the centerline of Crow Island Road; thence South 32°06'00" West, on said centerline, 1,825.38 feet to the point of beginning of this description; thence South 57°54'00" East, on the North line of the South 3 acres of so-called Lot 27 of Fuller's Unrecorded Map, as described by Deed Fuller to Horr and recorded in Liber 167, Page 360, 504.68 feet to the Northwesterly right-of-way line of C. & O. Railway; thence South 40°53'30" West, on said right-of-way line, 368.16 feet; thence North 57°54'00" West, on the Southerly line of the Northerly 1.42 chains of so-called Lot 26 of Fuller's Unrecorded Map, as described by deed Fuller to Miller and recorded in Liber 160, Page 501, 448.41 feet to the centerline of Crow Island Road; thence North 32°06'00" East, on said center-line, 363.84 feet to the point of beginning.

**PARCEL 5**
North 1/2 of North 1/2 of Southeast 1/4 of Section 8, T12N, R5E lying Easterly of C&O RR R/W,

Except Consumers Power R/W, Also Except commencing at a point on East & West 1/4 line 509.12 feet South 89°48'30" West from East 1/4 corner of Section 8 to Northwesterly R/W of Consumers Power Company; thence South 21°17'30" West on said R/W to South line of North 1/4 of North 1/2 of Southeast 1/4 of Section 8; thence South 89°44'52.5" West on said 1619.56 feet; thence North 40°53'30" East parallel to C&O R/W 66 feet; thence South 89°44'52.5" West 330 feet to Easterly R/W of C&O RR R/W; thence North 40°53'30" East on said R/W 190.17 feet; thence North 89°48'30" East 418.75 feet; thence North 00°11'30" West 141.25 feet to East & West 1/4 line; thence North 89°48'30" East on said 1/4 line 191.37 feet; thence South 00°11'30" West 209.10 feet; thence North 89°48'30" East 210 feet; thence North 00°11'30" West 209.10 feet to East & West 1/4 line; thence North 89°48'30" East to POB.

**PARCEL 6**
The South 1/2 of the North 1/2 of the South 1/2 of the Northwest 1/4 of the Southeast 1/4 of Section 8, Township 12 North, of Range 5 East.

**PARCEL 7**
The West 50 feet of the East 1651 feet of the South 120 feet of the North 329.1 feet of the Southeast 1/4 of Section 8, Township 12 North, Range 5 East.

**PARCEL 8**
The South 50 feet of that part of the North 1/2 of the North 1/2 of the Northwest 1/4 of the Northwest 1/4 of Section 9, Township 12 North, Range 5 East, lying Westerly from the right-of-way of the Michigan Railway Company, so-called, now Consumers Power Company; and the North 90 feet of the South 1/2 of the North 1/2 of the Northwest 1/4 of the Northwest 1/4 of Section 9, Township 12 North, Range 5 East, lying West of the Michigan Railway Company, so-called, now Consumers Power Company, all in Township of Buena Vista, County of Saginaw, State of Michigan.

**PARCEL 9**
The South 1/2 of the North 1/2 of the Northwest 1/4 of the Northwest 1/4 of Section 9, Town 12 North, Range 5 East, lying Northwesterly of the Consumers Power Company right-of-way formerly the Interurban Railroad right-of-way between Saginaw and Bay City, excepting therefrom the North 90 feet and also excepting therefrom the South 75 feet.

**PARCEL 10**
A parcel of land in the South 1/2 of the North 1/2 of the Northwest 1/4 of the Northwest 1/4 of Section 9, Town 12 North, Range 5 East, Buena Vista Township, Saginaw County, Michigan, lying Westerly of the Consumers Power Company right-of-way, formerly the Interurban Railroad right-of-way, described as follows: Commencing on the West line of said Section 9 at a point 557.31 feet, South 04°26'35" West of the Northwest corner of said Section 9; thence South 86°28'38" East, on a line which is parallel with and 75.00 feet, measured at right angles, North of the South line of the South 1/2 of the North 1/2 of the Northwest 1/4 of the Northwest 1/4, 258.88 feet; thence South 25°39'38" West, on the Westerly line of said right-of-way, 80.97 feet; thence North 86°28'38" West, on said South line of the South 1/2 of the North 1/2 of the Northwest 1/4 of the Northwest 1/4, 229.57 feet to the West line of said Section; thence North 04°26'35" East, on said West Section line, 75.01 feet to the point of beginning.

**PARCEL 11**
A parcel of land in the North 1/2 of the North 1/2 of the Northwest 1/4 of the Northwest 1/4 of Section 9, Town 12 North, Range 5 East, Buena Vista Township, Saginaw County, Michigan, lying Westerly of the Consumers Power Company right-of-way, formerly the Interurban Railroad right-of-way, described as follows: Commencing at the Northwest corner of said Section 9; thence South 86°43'52" East, on the North line of said Section, 477.49 feet; thence South 25°39'38" West, on the Westerly line of said right-of-way, 288.69 feet; thence North 86°36'15" West, on a line which is parallel with and 50.00 feet, measured at right angles, North of the South line of the North 1/2 of the North 1/2 of the Northwest 1/4 of the Northwest 1/4, 372.98 feet to the

West line of said Section; thence North 04°26'35" East, on said West line, 266.15 feet to the point of beginning.

## PARCEL 12
City of Saginaw, County of Saginaw, State of Michigan and described as follows:
A parcel of land in NW 1/4 of Section 8, T12N, R5E viz; Beginning at a point on N & S 1/4 line of said Section 800 feet S'ly of N Section line, thence W'ly parallel to N Section line 450 feet, thence NW'ly to a point on E'ly line of M-13 which is 705.75 feet from said N Section line, thence S'ly along E line of M-13 to a point that is 1718.07 feet S'ly of N Section line as measured at right angles more or less from N & S 1/4 line, thence S89°45'40"E 47.17 feet, to a point on a curve to the right having a radius of 2719.79 feet, thence NE'ly on the arc of said curve 507.93 feet, said arc being subtended by a chord bearing N 23°09'25"E 507.20 feet, thence N29°10'49"E 282.72 feet, thence N47°31'03" E 176.12 feet, thence N71°15'34"E 149.97 feet, thence N88°56'30"E 256.67 feet, thence S54°30'01"E 408.48 feet to N & S 1/4, thence N'ly along 1/4 line 265.23 feet to POB.

## PARCEL 13  (Assessed as follows)
City of Saginaw, County of Saginaw, State of Michigan and described as follows:
That part of the W. 1/2 of Sec. 8, T.12,N.R.5,E. lying N. of the P.M.R.R. Right of Way & S. of Saginaw River & W. of Saginaw Bay City Road being State Trunk Line Road M-13 & E. of the E. Shore Line of the Saginaw River, Exc. Nly. 800 ft.

## PARCEL 14  (Assessed as follows)
City of Saginaw, County of Saginaw, State of Michigan and described as follows:
All that part of W 1/2 of Sec 8, T12N R5E lying N of PMRR & E of State Hwy M-13, Exc that part viz; Beg at N 1/4 post of said Sec thence S'ly on N & S 1/4 line of said Sec to a point 800 feet S'ly of N Sec line, thence W'ly parallel with N'ly line of said Sec 450 feet, thence NW'ly to a point on E'ly line of State Hwy M-13, 705.75 feet S'ly of N'ly Sec line measured along E'ly line of said Hwy, thence N'ly along E'ly Hwy line to N'ly line of said Sec, thence E'ly along N'ly Sec line 544.56 feet to POB, Also Exc a parcel viz; Comg at N 1/4 corner of said Sec, thence S00°00'00"W on N & S 1/4 line of said Sec 800 feet, thence N88°37'30"W parallel with N line of NE 1/4 of said Sec 138.39 feet, thence S00°30'20"W 168.81 feet to POBM, thence cont S00°30'20"W 309.13 feet to a point on a curve to the right having a radius of 75 feet, thence point on a curve to the right having a radius of 75 feet, thence SW'ly on the arc of said curve 201.45 feet said arc being subtended by a chord bearing S77°11'13"W 146.13 feet, thence N89°45'40"W 354.61 feet, thence S12°41'02"W 419.73 feet, thence N89°45'40"W 466.58 feet to a point on a curve to the right having a radius of 2719.79 feet, thence NE'ly on the arc of said curve 507.93, said arc being subtended by a chord bearing N23°09'25"E 507.19 feet, thence N29°10'49"E 282.72 feet, thence N47°31'03"E 176.12 feet, thence N71°15'34"E 149.97 feet, thence N88°56'30"E 256.67 feet, thence S54°30'01"E 236.71 feet to POB.

## PARCEL 15  (Assessed as follows)
City of Saginaw, County of Saginaw, State of Michigan and described as follows:
Lots 11, 12, 13, 14, 15, Exc. S. 120 ft., E. 40 ft. of S. 120 ft. of said Lot 15, & Lot 19, EDDY URBAN RENEWAL REPLAT NO. 1. ALSO Lot 496, EDDY URBAN RENEWAL REPLAT NO. 3. ALSO that part of vacated Washington Ave. lying between Ely. line of 14th St. extended N.Ely. to Ely. line of Motor PL. & a line viz. comg. at int. of S. line of Washington Ave. & Wly line of Welch St., thence Nly. to a point on Nly. line of Washington Ave. that is 191 ft. W. of E. line of 18th St., thence W. along N. line of Washington Ave. to N.Wly. line of Veterans Memorial Parkway, thence N.Ely. along said line to a point that is 191 ft. W. of E. line of 18th St., to S.Ely line of Veterans Memorial Parkway & Point of Ending of line, ALSO vacated Motor Pla Parkway & Point of Ending of line, ALSO vacated Motor Place.

## EXHIBIT A

### Property Description

A parcel of land, being part of Block 6 and Block 7, all in Brewster Park Addition to the City of East Saginaw, now the City of Saginaw, Saginaw County, Michigan, according to the plat thereof recorded in Liber 38, Page 195, and that part of Owen Street vacated by Saginaw City Council December 23, 1919, and that part of Howard Street, vacated by Saginaw City Council June 8, 1915, and that part of Morse (now known as Garey) Street vacated by Saginaw City Council December 24, 1935, described as follows: Commencing at the point of intersection of the West line of the Brown Street right of way and the North line of the Grand Trunk Western Railroad Company right of way; thence South 88°21'28" West, on said North line of the Grand Truck Western Railroad Company right of way, 584.74 feet to the Easterly line of the existing Owen Street right of way, said Easterly line being the arc of a curve to the right having a radius of 488.67 feet; thence Northeasterly on said Easterly line of existing Owen Street and on the arc of said curve to the right; 60.26 feet to the point of tangency of said curve, said arc being subtended by a chord bearing North 11°47'04" East, 60.22 feet to said point of tangency; thence North 15°19'00" East, on said Easterly line of the existing Owen Street right of way, 326.17 feet  to the South line of existing Garey Street right of way; thence South 74°34'23" East, on said South line of Garey Street; 15.00 feet to the Northwest corner of said Block 6 of said Brewster Park Addition, according to the plat thereof recorded in Liber 38, Page 195 of Plats, Saginaw County Records; thence North 15°19'00" East, on the Northerly extension of the Westerly line of Block 6 of said Brewster Park Addition, 3.00 feet; thence South 74°34'23" East, on the North line of a 3.00 foot strip of said Morse (now Garey) Street vacated by Council December 24, 1935, and also on a line which is parallel to and 30.00 feet, measured at right angles, South of the centerline of said Garey Street right of way, 547.70 feet to said West line of Brown Street; thence South 15°13' 51" West, on said West line of Brown Street, 217.63 fee to the point of beginning.

MLC# 1005 – Former Howard W/H – Vacant Land

## EXHIBIT A

### Property Description

Lots 553 to 566, 567 to 581, 594 to 608, 609 to 623, 642 to 656, 657 to 671, 698 to 712, 713 to 726, 761 to 774, 775 to 787, 831 to 843, 844 to 855, 905 to 916, 917 to 927 and 985 to 995 of GENERAL MOTORS PARK NO. 1, as recorded in Liber 6, Page 16 of Plats, Genesee County Records, more particularly described as Part of Sections 31 and 32, Town 8 North, Range 7 East, and being part of the vacated plats of GENERAL MOTORS PARK AND GENERAL MOTORS PARK NO. 1, described as beginning at a point that is South 89 degrees 16 minutes 24 seconds West 576.29 feet along the North line of Section 31 and South 11 degrees 00 minutes 09 seconds West 2785.11 feet along the Easterly right of way line of the C & O Railroad, and North 88 degrees 52 minutes 33 seconds East along the Southerly line of Stewart Avenue 839.39 feet from the Northeast corner of said Section 31; thence South 01 degrees 39 minutes 54 seconds East 50.00 feet; thence South 88 degrees 52 minutes 33 seconds West 75.00 feet to the East line of James P. Cole Blvd.; thence South 01 degrees 39 minutes 54 seconds East along said East line 300.20 feet; thence North 88 degrees 20 minutes 06 seconds East 50.00 feet; thence South 01 degrees 39 minutes 54 seconds East 210.00 feet; thence South 88 degrees 20 minutes 06 seconds West 50.00 feet; thence South 01 degrees 39 minutes 54 seconds East 790.00 feet; thence North 88 degrees 20 minutes 06 seconds East 50.00 feet; thence South 01 degrees 39 minutes 54 seconds East 210.00 feet; thence South 88 degrees 20 minutes 06 seconds West 50.00 feet; thence South 01 degrees 39 minutes 54 seconds East 395.00 feet; thence North 88 degrees 20 minutes 06 seconds East 489.52 feet to the Westerly right of way line of Interstate 475; thence North 16 degrees 46 minutes 07 seconds East along said Right of Way line 31.65 feet; thence North 12 degrees 17 minutes 04 seconds East 194.95 feet; thence North 10 degrees 33 minutes 31 seconds East 61.39 feet; thence North 03 degrees 14 minutes 45 seconds East 191.48 feet; thence North 04 degrees 59 minutes 17 seconds East 60.41 feet; thence North 00 degrees 14 minutes 32 seconds West 189.77 feet; thence North 04 degrees 31 minutes 44 seconds West 60.08 feet; thence North 05 degrees 42 minutes 47 seconds West 190.76 feet; thence North 05 degrees 28 minutes 50 seconds West 60.13 feet; thence North 13 degrees 33 minutes 18 seconds West 194.16 feet; thence North 11 degrees 07 minutes 43 seconds West 60.83 feet; thence North 11 degrees 13 minutes 35 seconds West 192.68 feet; thence North 12 degrees 58 minutes 35 seconds West 61.19 feet; thence North 16 degrees 41 minutes 30 seconds West 196.73 feet; thence North 05 degrees 28 minutes 50 seconds West 60.13 feet; thence North 10 degrees 44 minutes 03 seconds East 102.39 feet; thence North 01 degrees 39 minutes 54 seconds West 56.60 feet; thence North 46 degrees 39 minutes 54 seconds West 20.63 feet to the Southerly line of Stewart Avenue; thence South 88 degrees 52 minutes 33 seconds West along said Southerly line 350.55 feet to the point of beginning.

4002 James Cole Blvd, Flint, MI  48503

## EXHIBIT A

## Property Description

PARCEL B:

Lots 1, 2, 3, 4, 7, 8 and that part of Lots 5, 6, 9 and 10 lying Southeasterly of the Southerly Right-of-Way line of Grand Trunk Western Railroad, including that portion of vacated Robinson Street adjacent to said Lots, PLAT OF ROBINSON PLACE, according to the recorded plat thereof, as recorded in Plat Liber 1, Page 28, Genesee County Records.

ALSO, a contiguous part of Block 3, PLAT OF MCFARLAN'S ADDITION TO WEST FLINT, according to the recorded plat thereof, as recorded in Deed Liber 82, Page 0, Genesee County Records, described as:  Lots 8, 9, 10, 11, and that part of Lots 6 and 7 lying Southeasterly of said Southerly Right-of-Way line of Grand Trunk Western Railroad, including the vacated East-West alleys lying adjacent to Lots 8, 9, 10 and 11.

ALSO, a contiguous part of Block 1, PLAT OF WEST FLINT, according to the recorded plat thereof, as recorded in Deed Liber 33, page 642, and transcribed in Plat Liber 6, page 6, Genesee County Records, described as:  The Westerly 20 feet of the Southerly 60 feet of Lot 6, as originally platted, and that part of Lot 7 lying Southeasterly of said Southerly Right-of-Way line of Grand Trunk Western Railroad, EXCEPT a triangular portion of said Lot 7 lying on the Westerly side conveyed in Master Liber 4095, Page 299, Genesee County Records.

ALSO, a contiguous part of Lots 2, 3, and 4, Block 4, including part of vacated Asylum Street and Kearsley Street, PLAT OF WEST FLINT, according to the recorded plat thereof, as recorded in Deed Liber 33, page 642, and transcribed in Plat Liber 6, page 6, Genesee County Records, described as: Beginning at the Southeasterly corner of Lot 10 of said Block 3; thence Southeasterly along the Easterly line of said lot extended Southeasterly 3.0 feet; thence Southwesterly parallel to the Southerly line of said lot and its Southwesterly extension, 90 feet; thence Southwesterly to a point on the Southerly line of Kearsley Street, 78 feet, Southwesterly from its intersection with the Westerly line of Chase Street; thence Southwesterly to a point on the Easterly line of Asylum Street, 84 feet, Southeasterly from the Northwesterly corner of said Lot 4, as originally platted; thence Southwesterly to a point on the Westerly line of Asylum Street, 15 feet Northwesterly from its intersection with the Northwesterly line of Glenwood Avenue; thence Northwesterly along said Westerly extended Northwesterly to the Northerly line of Kearsley Street, as originally platted; thence Northeasterly  along said Northerly line to the Place of Beginning.  EXCEPT That part of the Westerly 1/2 of Asylum Street lying Southeasterly of the following described line: Commencing at the intersection of the Westerly line of Asylum Street with the Northwesterly line of Glenwood Avenue; thence Northwesterly along said Westerly line of its Northwesterly extension, 80 feet for Place of Beginning; thence Easterly at right angles, a distance of 33 feet to the Place of Ending.

PARCEL L:

That part of Lots 16, 18, 20, 22, 24, 26, 28 and 30 of WILCOX PLAT, as recorded in Liber 54 of Deeds,  Page 0, Genesee County Records, that lie Northeasterly of the following described line: Commencing at a point on the Northwesterly line of said Lot 16, South 57 degrees 54 minutes 10 seconds West, 19 feet from the Northeast corner of said Lot; thence along the Southwesterly Right-of-way line of Chevrolet Avenue, relocated, on a curve to the right, having a radius of 605.98 feet, a central angle of 12 degrees 28 minutes 27 seconds

and long chord bearing and distance of South 26 degrees 15 minutes 47 seconds East, 131.67 feet; thence along said right-of-way line, on a curve to the left, having a radius of 681.98 feet, a central angle of 12 degrees 33 minutes 51 seconds and long chord bearing and distance of South 26 degrees 18 minutes 28 seconds East, 149.25 feet; thence South 32 degrees 35 minutes 23 seconds East, 194.03 feet; thence North 57 degrees 54 minutes 33 seconds East,  to a Place of Ending, on the Northeasterly line of Lots 30, EXCEPT the Easterly 56 feet of Lot 30.

PARCEL M:

Part of Lots 3, 4, 6 and 8, Block 3 of THE PLAT OF WEST FLINT, as recorded in Liber 6 of Plats, Page 6, Genesee County Records, Genesee County Records, described as: Beginning at the Northwesterly corner of said Lot 4; thence North 60 degrees 34 minutes 20 seconds East along the Northerly line of said Lots 4 and 3, 103.95 feet; thence Southerly along a curve to the right having a radius of 200.69  feet a chord bearing and distance of South 16 degrees 17 minutes 10 seconds East, 91.26 feet; thence South 03 degrees 08 minutes 40 seconds East, 171.47 feet to the Westerly line of said Lot 8; thence North 31 degrees 08 minutes 40 seconds West along the Westerly line of said Lots 8, 6, and 4 to the Place of Beginning. EXCEPT the following premises conveyed to City of Flint by Quit Claim Deed recorded in Deed Liber 1990, Page 597, and being described as: That part of Lots 4 and 3, Block 3 of WEST FLINT, according to the plat therefrom as recorded in Liber 6 of Plats, Page 6, Genesee County Records:  Beginning at the Northwesterly corner of said Lot 4; thence along the Northerly line of Block 3, North 60 degrees 34 minutes 20 seconds East, 103.95 feet; thence Southerly on a curve to the right, having a radius of 200.69 feet, a chord bearing and distance of South 27 degrees 17 minutes 23 seconds East, 15.01 feet; thence South 60 degrees 34 minutes 20 seconds West, 57.94 feet; thence South 36 degrees 19 minutes 59 seconds West, 48.69 feet to the Westerly line of said Lot 4; thence along said West line, North 31 degrees 08 minutes 40 seconds West, 35.0 feet to the Point of Beginning.

PARCEL N:

Part of Lots 12 and 13, Section 3, Plat of Sections 2, 3 4, 5 and 6 and 8, being part of the Reserve at near the Grand Traverse on Flint River, described as follows:  Beginning at the intersection of the Westerly line of Chevrolet Avenue, as widened, with the Northerly face of the retaining wall at the Flint River; thence the following courses and distances along the Northerly face of said retaining wall: North 71 degrees 59 minutes 29 seconds West, 26.20 feet (described as 25.85 feet); thence South 55 degrees 50 minutes 32 seconds West, 64.58 feet (described as 66.19 feet); thence South 59 degrees 25 minutes 05 seconds West, 279.97 feet; thence North 32 degrees 05 minutes 35 seconds West, 126.53 feet; thence North 59 degrees 16 minutes 55 seconds East, 348.23 feet (described 346.63 feet) to the Westerly line of Chevrolet Avenue, as widened; thence South 32 degrees 00 minutes 29 seconds East, along the Westerly line of said Chevrolet Avenue, as widened, 34.86 feet to an angle point in said street line; thence South 61 degrees 54 minutes 41 seconds East, continuing along said street line, 26.74 feet to an angle point in said street line; thence South 31 degrees 59 minutes 10 seconds East, continuing along said street line, 85.27 feet (described as 84.82 feet) to Place of Beginning.

## EXHIBIT A

### Property Description

Tax ID Number:  Error! Unknown document property name.

Land situated in the Error! Unknown document property name. of Error! Unknown document property name., in the County of Error! Unknown document property name., State of Error! Unknown document property name. is described as follows:

PARCEL A: A parcel of land located on the North side of South Boulevard between Franklin Road and Saginaw Street, City of Pontiac, Oakland County, Michigan, being Lots 1 through 32, inclusive, including vacated streets, of DONALDSON ADDITION to the City of Pontiac, Oakland County, Michigan, as recorded in Liber 8 of Plats, Page 5, Oakland County Records, Lots 33 through 42, inclusive, of DONALDSON ADDITION NO.1 to the City of Pontiac, Oakland County, Michigan, as recorded in Liber 18 of Plats, Page 39, Oakland County Records, Lots 1 through 8, inclusive, of SACHSE ADDITION to the City of Pontiac, Oakland County, Michigan, including that part of vacated Wilson Avenue lying adjacent thereto, as recorded in Liber 9 of Plats on Page 4, Oakland County Records, Lot 1, Lots 10 through 42, inclusive, and part of Lots 7, 8, and 9, including vacated streets and alleys of RAPID MOTOR ADDITION to the City of ·Pontiac, Michigan, as recorded in Liber 5 of Plats on Page 49, Oakland County Records, Lots 1 through 11, inclusive and part of Lot 12 of ASSESSOR'S PLAT NO. 90, including that part of vacated Wilson venue lying adjacent thereto, part of the Southwest 1/4 of Section 33, Town 3 North, Range 10 East, as recorded in Liber 18 of Plats on Page 90, Oakland County Records, and Lots 1, 2, 3, 8, 9, 10, and 15 and part of Lots 4, 5, 6, 7, 11, 12, 13, 14, and 16 of ASSESSOR'S PLAT NO. 91, including that part of vacated Wilson Avenue lying adjacent thereto, part of the Southwest 1/4 of Section 33, Town 3 North, Range 10 East, as recorded in Liber B-1 of Plats on Page 91, Oakland County Records, all being located in the City of Pontiac Oakland County, Michigan and being more particularly described as follows: Beginning at the Northeast corner of Franklin Road (width varies) and South Boulevard (width varies, said point being also the Southwest corner of Lot 42 of said DONALDSON ADDITION NO.1; proceeding thence from said point of beginning North 05 degrees 04 minutes 47 seconds East along the East line of said Franklin Road, said line being also the West line of Lots 42, 41 and 40 of said DONALDSON ADDITION NO.1, the West line of Lot 1 of said ASSESSOR'S PLAT NO. 91 and the West line of Lots 4 through 1, inclusive, of said SACHSE ADDITION, a distance of 1032.43 feet to the Northwest corner of Lot 1 of said SACHSE ADDITION; thence North 06 degrees 12 minutes 07 seconds East across the Westerly end of vacated Wilson Avenue (width varies), a distance 'of 59.61 feet to the Northeast corner of vacated Wilson Avenue and Franklin Road, said point being also the Southwest corner of Lot 3 of said ASSESSOR'S PLAT NO. 90; thence North 05 degrees 57 minutes 22 seconds East along the East line of said Franklin Road, said line being also the West line of Lots 3, 2, 1 and 4 of said ASSESSOR'S PLAT NO. 90, a distance of 332.15 feet to the Northwest corner of said Lot 4; thence continuing along the East line of said Franklin Road, North 05 degrees 52 minutes 14 seconds East, said line being also the West line of Lots 26 through 19, inclusive, the West end of vacated Josephine Street (40 feet wide), and the West line of Lots 18 through 10, inclusive, and part of Lot 9 of said RAPID MOTOR ADDITION, a distance of 930.25 feet to the Southeasterly corner of Franklin Road and Rapid Street as opened through said subdivision; thence North 60 degrees 29 minutes 25 seconds East along the Southerly line of Rapid Street (46 feet wide), said line runs through the interior of Lots 9, 8, and 7 of said RAPID MOTOR ADDITION and is the Northerly end of vacated Motor Street (50 feet wide) and the Northerly line of Lot 1 of said subdivision, a distance of 410.51 feet to the point of intersection of the Southerly line of said Rapid Street with the Westerly line of the Grand Trunk Western Railroad right-of-way (80 feet wide) said point being also the  northeasterly corner of said Lot 1; thence South 29 degrees 51 minutes 20 seconds East along the Westerly line of said railroad right-of-way, said line being also part of the Easterly line of said Lot 1, a distance of 753.26 feet to a point of curve in said right-of-way; thence continuing along said right-of-way line along the arc of a curve concave to the Northeast, radius 3090.45 feet, an arc distance of 725.29 feet (chord bears South 36 degrees 34 minutes 44 seconds East,

723.64 feet) to the Southeasterly corner of said Lot 1 and of said subdivision; thence Southeasterly along said right-of-way line on the arc of a curve which is concave to the Northeast and which forms the Northeasterly line of Lots 9 and 10 of said ASSESSOR'S PLAT NO. 90, an arc distance of 45.90 feet (chord bears South 43 degrees 29 minutes 04 seconds 45.90 feet) to the lot corner common to Lots 10 and 11 of said ASSESSOR'S PLAT; thence continuing Southeasterly along said right-of-way line along the arc of a curve concave to the Northeast, radius 3090.45 feet, an arc distance of 242.81 feet (chord bears South 46 degrees 16 minutes 05 seconds East 242.76 feet) to the point of intersection of said right-of-way with the Westerly line of Saginaw Street, as widened; thence South 26 degrees 44 minutes 58 seconds East, 146.57 feet along the Westerly line of said Saginaw Street through the interior of Lot 12 of said ASSESSOR'S PLAT NO. 90 and across the Easterly end of said vacated Wilson Avenue to a point on the Northerly line of Lot 4 of said ASSESSOR'S PLAT NO. 91; thence continuing along the Westerly line of said Saginaw Street South 26 degrees 15 minutes 20 seconds East through the interior of said Lot 4, a distance of 48.54 feet to a point on the Southerly line of said lot; thence continuing Southeasterly along the Westerly line of said street, through the interior of Lots 5, 6, 7, and 11 of said ASSESSOR'S PLAT NO. 91, to a point on the Southerly line of said Lot 11; thence continuing Southeasterly along the Westerly line of said street, through the interior of Lots 12, 13, 14, and part of Lot 16 of said ASSESSOR'S PLAT NO. 91, to an angle point in said street line; thence South 22 degrees 53 minutes 27 seconds East along the Westerly line of South Saginaw Street, as widened, a distance of 305.95 feet to the Northeasterly corner of a triangular parcel of land deeded to the Michigan State Highway Department for Highway purposes, as recorded in Liber 5802 of Deeds on Page 794, Oakland County Records; thence South 33 degrees 51 minutes 26 seconds West along the Northwesterly line of said triangular parcel, a distance of 19.97 feet to a point on the North line of South Boulevard (width varies); thence North 84 degrees 29 minutes 13 seconds West along the North line of said South Boulevard, said line being also the South line of part of Lot 16, the South line of Lots 10, 9, and 1 of said ASSESSOR'S PLAT NO. 91, the South line of Lots 32, 31, and 30, the South end of vacated York Street (40 feet wide), the South line of Lots 19 through 14, inclusive, the South end of vacated Duke Street (40 feet wide) and the South line of Lots 3, 2, and 1 of said DONALDSON ADDITION and the South line of Lots 33 through 39, inclusive, and Lot 42 of said DONALDSON ADDITION NO.1, a distance of 2235.07 feet to the point of beginning.

PARCEL B: A parcel of land located on the South side of South Boulevard West of Howland Avenue, City of Pontiac, Oakland County, Michigan, being Lots 52 through 59, inclusive, Lots 49 through 51, inclusive, except the North 10.00 feet, Lots 60 through 78, inclusive, except the North 10.00 feet thereof, and Lots 79 through 120, inclusive, of WOODWARD ESTATES SUBDIVISION of part of the East 1/2 of the Northwest 1/4 of Section 4, Town 2 North, Range 10 East, Township of Bloomfield, (now City of Pontiac), Oakland County, Michigan, as recorded in Liber 27 of Plats, on Page 2, Oakland County Records, including the vacated alley adjacent to said lots.

PARCEL C: A parcel of land located on the Westerly side of South Saginaw Street, South of Rapid Street, City of Pontiac, Oakland County, Michigan, being Lot 15 of the PLAT OF HAMMOND'S ADDITION, City of Pontiac, Oakland County, Michigan, as recorded in Liber 4 of Plats on Page 47, Oakland County Records.

**Commonly known as**:  200 South Boulevard West, **Error! Unknown document property name.**, **Error! Unknown document property name.  Error! Unknown document property name.**

## EXHIBIT A

### Property Description

Tax ID Number: **59-29-300-024**

Land situated in the **Township** of **Flint**, in the County of **Genesee**, State of **Michigan** is described as follows:

Part of the Southeast 1/4 of Section 30 and part of the Southwest 1/4 of Section 29, Town 7 North, Range 7 East, City of Burton, Genesee County, Michigan more particularly described as follows:

Commencing at the West 1/4 corner of Section 29; thence South 89 degrees 14 minutes 00 seconds West 299.08 feet to a point on the East-West 1/4 line of Section 30; thence South 09 degrees 03 minutes 00 seconds East 183.34 feet to a point on the East line of Saginaw Road and the point of beginning; thence continuing South 09 degrees 03 minutes 00 seconds East 200.00 feet; thence North 80 degrees 57 minutes 00 seconds East 125.00 feet; thence South 09 degrees 03 minutes 00 seconds East 175.00 feet; thence North 80 degrees 57 minutes 00 seconds East 125.00 feet; thence South 09 degrees 03 minutes 00 seconds East 420.00 feet; thence North 80 degrees 57 minutes 00 seconds East 300.00 feet; thence North 09 degrees 03 minutes 00 seconds West 845.42 feet; thence South 89 degrees 41 minutes 00 seconds West 264.54 feet thence South 89 degrees 14 minutes 00 seconds West 140.02 feet; thence South 09 degrees 03 minutes 00 seconds East 110.98 feet; thence South 80 degrees 57 minutes 00 seconds West 150.00 feet to the point of beginning.

**Commonly known as**:  S. Saginaw St., Flint, MI  48507

MLC# 1291 – Hemphill Lot (7+/- acres)

X:\DOCUMENTS AND SETTINGS\MERRILLSCAN\LOCAL SETTINGS\TEMP\WZ3890\US_ACTIVE_EXHIBIT A - # 1291 - HEMPHILL LOT- FLINT, MI_43637374_1 (4).DOC

## EXHIBIT A

### Property Description

Tax ID Numbers:  19-2231-000; 19-2232-000; 19-2249-000; 19-2258-000; 19-2231-001; 19-2258-001.

Land situated in the City of Saginaw, in the County of Saginaw, State of Michigan, is described as follows:

Parcel 1:

Part of Sections 34 and 35, Town 12 North, Range 4 East, viz: Beginning at a point on Southeasterly line of Salt Street which is 23.88 feet Northeasterly of Northeasterly line of vacated Sylvan Street; thence South 38°08'56" East 183.21 feet; thence South 28°26'22" East 207.15 feet; thence South 26°16'10" East 71.79 feet; thence South 43°59'51" East 226.76 feet; thence South 47°42'46" East 158.71 feet; thence South 00°40'40" West 159.80 feet; thence South 89°19'16" East 8.85 feet; thence South 00°09'51" West 80.9 feet; thence South 24°10'00" East 89.8 feet, thence South 24°46'47" East 365.55 feet; thence South 00°37'27" West 1023.19 feet; thence South 89°07'00" East parallel with South line of said Section 35, 1422.14 feet; thence South 01°30'00" East parallel with said Section line common to Sections 34 & 35 100 feet; thence South 89°07'00" East to West Harbor Line; thence Northerly along said Harbor Line 2238.33 feet more or less, to South line of West Center Street; thence Westerly along said street line to a point that is 769.15 feet Southeasterly of intersection of West line of vacated Queen Street and South line of West Center Street; thence South 1°7'05" West 454.47 feet; thence South 88°52'55" West 275.1 feet; thence South 1°7'55" West 468.89 feet; thence South 88°52'55" West 118.9 feet; thence North 0°14'46" East 91.14 feet; thence North 48°8'14" West 424.72 feet; thence North 0°14'46" East 338.85 feet; thence North 34°45'31" East 399.19 feet; thence North 0°14'46" East 449.9 feet to South line of Center Street; thence Westerly along said South line to Southeasterly line of Salt Street; thence Southwesterly along said Southeasterly line to middle of vacated rededicated Florence Street; thence Southeasterly along said centerline of Florence Street to a point which is perpendicular to a point on South line of Florence Street 185.48 feet from Southeasterly line of Salt Street; thence Southerly at right angles 193.55 feet; thence Westerly 163.1 feet to a point 100.97 feet Easterly of Salt Street & 106 feet Southerly at right angles to original Southerly line of said Florence Street; thence Westerly 100.97 feet to a point on Southeasterly line of Salt Street; thence Southwesterly along said street line to point of beginning.

Parcel 2:

A parcel of land in Section 35, Town 12 North, Range 4 East, viz: Beginning at intersection of West line of vacated Queen Street & South line of West Center Street; thence Southeasterly along said South line of West Center Street 769.15 feet; thence South 1°7'5" West 454.47 feet; thence South 88°52'55" West 275.1 feet; thence South 1°7'55" West 468.89 feet; thence North 88°52'55" West 118.9 feet; thence North 0°14'46" East 91.14 feet; thence North 48°8'14" West 424.72 feet; thence North 0°14'46" East 338.85 feet; thence North 34°45'31" East 399.19 feet; thence North 0°14'46" East 449.9 feet to point of beginning.

Parcel 3:

A parcel of land in fractional Sections 2 and 3, Town 11 North, Range 4 East and Sections 34 and 35, Town 12 North, Range 4 East, viz: Beginning at a point on line common to said Section 3 and 34 which is 799.72 feet North 89 degrees 11 minutes 15 seconds West from Section corner common to said Sections 2, 3, 34 and 35; thence ̇North 00 degrees 19 minutes 20 seconds East on line that is parallel with and 180 feet measured at right angles, East of Southerly extension of Salt Street, 811.47 feet; thence South 89 degrees 10 minutes 40 seconds East parallel with South 1/8 line of Section 34, 453.65 feet thence North 00 degrees 36 minutes 00 seconds East, parallel with Section line common to said Sections 34 and 35, 500 feet to said Section 1/8 line of Section 34; thence South 89 degrees 10 minutes 40 seconds East on said South 1/8 line, 350 feet to said Section line common to Sections 34

and 35; thence South 00 degrees 36 minutes 00 seconds West on said Section line 524.17 feet; thence South 89 degrees 07 minutes 00 seconds East on North line of South I/2 of South 90.77 acres of Southwest 1/4 of said Section 35, 300 feet; thence North 00 degrees 36 minutes 00 seconds East parallel with said Section line common to Sections 34 and 35, 100 feet; thence South 89 degrees 07 minutes 00 seconds East parallel with said North line 1422.14 feet; thence South 01 degrees 30 minutes 00 seconds East parallel with Section line common to said fractional Section 2 & 3, 2042.5 feet; thence North 89 degrees 26 minutes 00 seconds West on a line which is parallel with and 1163.55 feet measured at right angles , South of Section line common to said Sections 2 and 35, 2591.03 feet to said line being 180 feet measured at right angles, East of Southerly extension of Salt Street; thence North 00 degrees 19 minutes 20 seconds East on said line 1166.99 feet to point of beginning.

Parcel 4:

That part of Northwest 1/4 of Section 2, Town 11 North, Range 4 East, and Southwest 1/4 of Section 35, Town 12 North, Range 4 East, lying Easterly of a line described as follows: Commencing at the West 1/4 post of Section 2; thence North along West Section line 176.33 feet; thence North 80 degrees 14 minutes 30 seconds East 1844.27 feet to point of beginning of said line; thence North 1 degrees 30 minutes West 2731.03 feet to point of ending of said line, lying Northerly of a line described as follows: Commencing at West IA post of Section 2; thence North along West Section line 176.33 feet; thence North 80 degrees 14 minutes East 1844.27 feet to point of beginning of said line; thence continuing North 80 degrees 14 minutes East a distance of 419.88 feet; thence South 34 degrees 59 minutes 30 seconds East to center thread of Saginaw River, and lying Southerly on a line that is located 523.66 feet South of South 1/8 post of said Section 35, and running East parallel to South line of said Section 35.

Parcel 5:

A parcel of land in the Southwest 1/4 of Section 35, Town 12 North, Range 4 East described as: Beginning at a point on the West line of said Section 787.14 feet North 00 degrees 36 minutes 00 seconds East from the Southwest corner of said Section; thence continue on said West Section line 535.24 feet; thence South 89 degrees 24 minutes 46 seconds East 300 feet; thence South 00 degrees 36 minutes 00 seconds West parallel with said West Section line 536.79 feet to the North line of the South half of side of-called South 80.77 acres of said Southwest 1/4; thence North 89 degrees 07 minutes 00 seconds West on said North line 300 feet to the point of beginning.

Parcel 6:

A strip of land 72 feet wide in Section 2, Township 11 North, Range 4 East, and in Section 35, Township 12 North, Range 4 East described as follows: To find the place of beginning, commence at the West IA post of said Section 2; run thence North 01 degrees 30 minutes West along the West line of said Section 2, a distance of 176.33 feet to a point on the Northerly line of property conveyed to Consumers Power Company by a certain warranty deed dated January 14, 1964; thence North 80 degrees 14 minutes 30 seconds East along he Northerly line of said property, a distance of 1,771.53 feet to the point of beginning of this description; running thence North 01 degrees 30 minutes West parallel with the West line of said Section 2, a distance of 1,965.72 feet to a point on the North line of said Section 2, said point being 1,754.31 feet distant Easterly of and measured along the North line of said Section 2 from the Northwest corner thereof, thence continuing North 01 degrees 30 minutes West into said Section 35, a distance of 778.65 feet to a point on the Southerly line of land now or formerly owned by General Motors Corporation, said point being 1,725.3 feet distant from and measured at right angles to the West line of said Section 35, thence South 89 degrees 05 minutes East along the Southerly line of said land now or formerly owned by General Motors Corporation, a distance of 72.06 feet; thence South 01 degrees 30 minutes East, parallel with the first course of this description , a distance of 778.25 feet to the South line of said Section 35; thence continuing South 01 degrees 30 minutes East a distance of 1,952.78 feet to the aforesaid Northerly line of the above mentioned property conveyed to Consumers Power Company by a certain warranty deed dated January 14, 1964; thence South 80 degrees 14 minutes 30 seconds West along said Northerly line of said property, a distance of 72.74 feet to the place of beginning.

Commonly known as:  75, 77 and 79 West Center Street and 3305 and 3307 Gabriel, Saginaw, MI

## EXHIBIT A

### Property Description

Tax ID Number:  Error! Unknown document property name.

Land situated in the Error! Unknown document property name. of Error! Unknown document property name., in the County of Error! Unknown document property name., State of Error! Unknown document property name. is described as follows:

A part of the Southeast 1/4 of the Northeast 1/4 of Section 17, Town 7 North, Range 6 East, Flint Township, Genesee County, Michigan, described as:  Commencing at the East 1/4 corner of Section 17; thence North 89 degrees 48 minutes 15 seconds West 400.00 feet along the East West 1/4 line for a point of beginning; thence continuing North 89 degrees 48 minutes 15 seconds West 936.34 feet along the 1/4 line to the 1/8 line; thence North 00 degrees 17 minutes 45 seconds East 1329.80 feet along the 1/8 line; thence South 89 degrees 27 minutes 45 seconds East 929.50 feet; thence South 1324.26 feet to the East West 1/4 line and to the point of beginning.

Subject to and together with the following 108.00 foot wide easement for ingress-egress described as: Commencing at the East 1/4 corner of Section 17; thence North 676.83 feet along the East line of Section 17 and center line of Linden Road; thence West 50.00 feet to the West right of way of Linden Road and for a point of beginning; thence South 54.00 feet along the West right of way of Linden Road; thence West 350.00 feet; thence North 108.00 feet; thence East 350.00 feet to the West right of way of Linden Road; thence South 54.00 feet along the West right of way of Linden Road and to the point of beginning.

**Commonly known as**:  **Error! Unknown document property name., Error! Unknown document property name., Error! Unknown document property name.  Error! Unknown document property name.**

## EXHIBIT A

## Property Description

Tax ID Number:  Error! Unknown document property name.

Land situated in the Error! Unknown document property name. of Error! Unknown document property name., in the County of Error! Unknown document property name., State of Error! Unknown document property name. is described as follows:

Being all that real property situated in the East 1/2 of Section 18, Township 8 North, Range 7 East, Genesee Township, Genesee County, Michigan, described as follows: Commencing at the South 1/4 corner of said Section 18 and thence running South 88 degrees 30 minutes 19 seconds East, 50.20 feet along the South line of the Southeast 1/4 of said Section 18i thence North 00 degrees 29 minutes 38 seconds East, 29.29 feet to the point of beginning thence along the East line of Horton Street (formerly Alfred Street) North 00 degrees 29 minutes 38 seconds East, 2140.02 feet; thence South 82 degrees 29 minutes 52 seconds East, 170.82 feet; thence South 89 degrees 32 minutes 24 seconds East, 170.00 feet; thence North 00 degrees 27 minutes 36 seconds East, 129.91 feet; thence South 89 degrees 34 minutes 30 seconds East, 696.84 feet;  thence North 00 degrees 43 minutes 40 seconds East, 1175.70 feet; thence North 08 degrees 54 minutes 02 seconds West, 114.92 feet; thence North 20 degrees 25 minutes 09 seconds West, 190.42 feet; thence North 26 degrees 45 minutes 51 seconds West, 312.89 feet; thence North 16 degrees 56 minutes 25 seconds West, 224.25 feet; thence North 82 degrees 24 minutes 45 seconds West, 69.33 feet; thence North 10 degrees 07 minutes 00 seconds West, 292.15 feet;  thence North 13 degrees 18 minutes 36 seconds West, 234.78 feet to the Westerly right of way line of the CSX Railroad; thence South 28 degrees 04 minutes 14 seconds East along said Westerly right of way, 1379.69 feet; thence South 27 degrees 17 minutes 43 seconds East along said Right of Way, 1028.40 feet to the East-West 1/4 line of Section 18; thence North 88 degrees 56 minutes 57 seconds West, 3.93 feet along said East-West 1/4 line to a point on a curve; thence along said curve in a Southeasterly direction for 1398.24 feet (long chord bearing South 15 degrees 33 minutes 28 seconds East, 1395.73 feet, central angle of 11 degrees 53  minutes 46 seconds, radius 6734.41 feet)  thence South 07 degrees 09 minutes 39 seconds East, 763.83 feet to the North Right of Way line of re-located Coldwater Road; thence South 63 degrees 46 minutes 11 seconds West along said North Right of Way, 851.36 feet to a point on a curve to the right; thence along said curve in a Southwesterly direction for 466.82 feet (long chord bearing South 77 degrees 36 minutes 11 seconds West, 462.30 feet, central angle of 27 degrees 40 minutes 02 seconds, radius 966.74 feet)  thence South 01 degrees 26 minutes 11 seconds West, 43.26 feet; thence North 88 degrees 29 minutes 49 seconds West along the North Right of Way line of Coldwater Road, 537.62 feet to a point; thence continuing along said Right of Way line, North 88 degrees 36 minutes 49 seconds West, 438.90 feet to the point of beginning.

And

Being that real property situated in section 18, Town 8 North, Range 7 East, Genesee Township, Genesee County, State of Michigan, and described as follows:  Commencing at the South 1/4 corner o£ said Section 18 and thence running South 88 degrees 30 minutes 19 seconds East, 50.20 feet along the South line of the Southeast 1/4 of said Section 18; thence North 00 degrees 29 minutes 38 seconds East, 2,169.31 feet to the Point of Beginning; thence North 00 degrees 29 minutes 38 seconds East, 87.79 feet; thence North 89 degrees 36 minutes 47 seconds West, 30.00 feet; thence North 00 degrees 29 minutes 38 seconds, East along the vacated centerline of Horton Street (formerly Alfred Street) a distance of 409.70 feet; thence South 89 degrees 24 minutes 18 seconds West, 40.90 feet; thence North 01 degree 20 minutes 00 seconds West along the East line of BUICK SUBDIVISION, as recorded in Plat Book 10, Page 1, a distance of 1,329.31 feet; thence North 88 degrees 49 minutes 39 seconds West, 993.43 feet; thence North 00 degrees 30 minutes 24 seconds East, 29.75 feet; thence North 89 degrees 09 minutes 44 seconds West, 981.68 feet to the East right of way line of Saginaw Highway; thence North 01 degree

33 minutes 22 seconds East along the East right of way line of said Saginaw Highway, 376.81 feet; thence South 89 degrees 10 minutes 38 seconds East, 280.00 feet; thence North 01 degree 33 minutes 22 seconds East, 264.00 feet; thence North 89 degrees 10 minutes 38 seconds West, 280.00 feet; thence along said East right of way line of Saginaw Highway, North 01 degree 33 minutes 17 seconds East, 438.08 feet; thence North 35 degrees 20 minutes 14 seconds East, 210.22 feet; thence South 88 degrees 00 minutes 30 seconds East, along the South line of Stanley Road, 1,808.31 feet; thence continuing along the South line of said Stanley Road, South 89 degrees 48 minutes 49 seconds East, 468.72 feet to the West right of way line of the CSX Railroad; thence South 25 degrees 29 minutes 59 seconds East, along said West right of way line, 541.14 feet; thence South 13 degrees 18 minutes 36 seconds East, 234.78 feet; thence South 10 degrees 07 minutes 00 seconds East, 292.15 feet; thence South 82 degrees 24 minutes 45 seconds East, 69.33 feet; thence South 16 degrees 56 minutes 25 seconds East, 224.26 feet; thence South 26 degrees 45 minutes 51 seconds East, 312.89 feet; thence South 20 degrees 25 minutes 09 seconds East, 190.42 feet; thence South 08 degrees 54 minutes 02 seconds East, 114.92 feet; thence South 00 degrees 43 minutes 40 seconds West, 1,175.70 feet; thence North 89 degrees 34 minutes 30 seconds West, 696.84 feet; thence South 00 degrees 27 minutes 36 seconds West, 129.91 feet; thence North 89 degrees 32 minutes 24 seconds West, 170.00 feet; thence North 82 degrees 29 minutes 52 seconds West, 170.82 feet to the Point of Beginning.

**Commonly known as: Error! Unknown document property name., Error! Unknown document property name., Error! Unknown document property name.  Error! Unknown document property name.**

## EXHIBIT A

### Property Description

Tax ID Number:  Error! Unknown document property name._____

Land situated in the Error! Unknown document property name. of Error! Unknown document property name., in the County of Error! Unknown document property name., State of Error! Unknown document property name. is described as follows:

PARCEL A:

A parcel of land in the Southeast 1/4, in the Southwest fractional 1/4, in the Northwest fractional 1/4 (now City of Mount Morris) and in the Northeast 1/4 of Section 7, Town 8 North, Range 7 East, Genesee Township, Genesee County, State of Michigan, more particularly described by Darrell Hughes, Michigan Registered Land Surveyor No. 19834, as beginning at a point, said point being the intersection of the Easterly line of the CSX Railroad (100 feet wide) with the North and South Â¼ line of Section 7, said point being distant North 04 degrees 00 minutes 51 seconds East, 2056.87 feet, along the North and South 1/4 line, from the South 1/4 corner of Section 7; proceeding thence from said Point of Beginning, the following two courses, along the Easterly line of the CSX Railroad: North 13 degrees 06 minutes 05 seconds West, 782.49 feet, to a point of curve; thence 550.20 feet along the arc of a 2930.42 foot radius curve to the left, having a central angle of 10 degrees 45 minutes 27 seconds, whose chord measures 549.39 feet and bears North 10 degrees 45 minutes 27 seconds West; thence leaving said railroad South 86 degrees 44 minutes 35 seconds East (not tangent with previous course), 440.52 feet; thence North 04 degrees 00 minutes 51 seconds East, 30.39 feet, along the North and South 1/4 line of Section 7; thence South 86 degrees 06 minutes 40 seconds East, 1332.66 feet, along the North line of the South 18 acres (so-called) of the Southwest 1/4 of the Northeast Â¼ of Section 7 (as occupied and monumented); thence South 03 degrees 58 minutes 24 seconds West, 668.69 feet, along the East 1/8 line of Section 7 to the East and West 1/4 line of Section 7; thence South 04 degrees 05 minutes 52 seconds West, 1333.58 feet, along the East 1/8 line of Section 7 to the South 1/8 line of Section 7; thence North 86 degrees 42 minutes 01 seconds West, 1109.08 feet along the South 1/8 line of Section 7, to the Easterly line of the CSX Railroad; thence North 13 degrees 06 minutes 05 seconds West, 754.98 feet along said railroad line to the Point of Beginning.

PARCEL C:

A parcel of land in the Southeast 1/4 of Section 7, Town 8 North, Range 7 East, Genesee Township, Genesee County, State of Michigan, more particularly described by Darrell Hughes, Michigan Registered Land Surveyor No. 19834, as beginning at a point, said point being the intersection of the Easterly line of CSX Railroad (100 feet wide) with the South line of Section 7 and centerline of Stanley Road, said point being distant South 86 degrees 39 minutes 27 seconds East, 667.47 feet, along the South line of Section 7 and centerline of Stanley Road, from the South 1/4 corner of Section 7; proceeding thence from said Point of Beginning along the Easterly line of CSX Railroad, the following two courses:  629.90 feet along the arc of a 5690.41 foot radius curve to the right, having a central angle of 06 degrees 20 minutes 33 seconds, whose chord measures 629.58 feet and bears North 16 degrees 16 minutes 21 seconds West, to a point of tangency for said arc; thence North 13 degrees 06 minutes 05 seconds West, 633.53 feet; thence leaving said railroad, South 86 degrees 42 minutes 01 seconds East, 735.54 feet, parallel with the South 1/8 line of Section 7 and along the Southerly line of Consumers Energy's fee strip (132 feet wide); thence South 04 degrees 24 minutes 56 seconds West, 1201.43 feet, along the Easterly line of the West 30 acres of the Southwest 1/4 of the Southeast 1/4 of Section 7 (as monumented); thence North 86 degrees 39 minutes 27 seconds West, 322.36 feet, along the South line of Section 7 and centerline of Stanley Road to the Point of Beginning.

**Commonly known as:  Error! Unknown document property name., Error! Unknown document property name., Error! Unknown document property name.  Error! Unknown document property name.**

## EXHIBIT A

## Property Description

The West 15.44 chains in width of the Northwest 1/4 of Section 25, Town 3 South, Range 7 East, Ypsilanti Township, Washtenaw County, Michigan

Also Described As:    The West 1019.04 feet of the Northwest 1/4 of Section 25, Town 3 South, Range 7 East, Ypsilanti Township, Washtenaw County, Michigan

MLC# 1108 – Textile Road Land

X:\DOCUMENTS AND SETTINGS\MERRILLSCAN\LOCAL SETTINGS\TEMP\WZC4C4\US_ACTIVE_EXHIBIT A - #1108 - TEXTILE ROAD, YPSILANTI, MI_43637413_1.DOC

## EXHIBIT A

### Property Description

PARCEL A:    Lots 1 through 15, inclusive, and Lot 16, except that part described as beginning at the Northeast corner of said Lot 16; thence South 00 degrees 04 minutes East along the East line of Lot 16 a distance of 15.0 feet; thence North 44 degrees 25 minutes 30 seconds West 21.45 feet to the North line of Lot 16; thence South 88 degrees 47 minutes East along said North line 15.0 feet to the place of beginning, and Lots 17 through 32, inclusive, all in Block 20, and Lots 1 through 32, inclusive, Block 21, and, Lots 1 through 30, inclusive, and the North 42 feet of Lot 32, all in Block 22, OAK PARK SUBDIVISION, according to the recorded plat thereof, as recorded in Plat Liber 2, Pages 12 and 13, Genesee County Records.

PARCEL 11: All of Block 13, of PARKLAND, according to the recorded plat thereof, as recorded in Plat Liber 3, Page 18, also a contiguous part of DURANT-DORT CARRIAGE COMPANY'S REPLAT, of part of Block 12 and 27, and all of Blocks 13, 14, and 15 of Oak Park Subdivision, according to the plat thereof, as recorded in Plat Liber 4, Page 37, Genesee County Records, described as 58, 60, 62, 64, 66, 68, 70, 72, 74, 76, 78, 80, 84, 86, 88, 90, 92, 94 and 96; also the Northerly 100.00 feet of Lots 59, 61, 63, 65, 67, 69, 71, 73, 75, 77, 79, 81, 83, 85, 87, 89, 91, 93, 95, and 97, also that part of vacated Taylor Street described as: Beginning at the Northwest corner of said Lot 58; thence North 17 degrees 22 minutes 05 seconds East along the new East line of North Street, 31.42 feet to the centerline of vacated Taylor Street; thence South 89 degrees 56 minutes 28 seconds East along said centerline 802.12 feet to the West line of Industrial Avenue, as platted in said PARKLAND plat; thence South 01 degrees 40 minutes 57 seconds West along said West line to the Northeast corner of Lot 21, Block 13, PARKLAND; thence Westerly along the Southerly line of vacated Taylor Street to place of beginning.

PARCEL 12: A tract of land commencing at a point on the North side of Hamilton Avenue where the West side line of the Pere Marquette Railroad (now merged with CSX Transportation, Inc.) intersects same, running thence Westerly along the North side of Hamilton Avenue, 467.9 feet; thence Northerly at right angles along the Easterly line of the right of way owned by the Durant-Dort-Carriage Company, 334 feet; thence Easterly at right angles along the Southerly line of property owned by the Oak Park Power Company, 120 feet; thence Northerly at right angles along the Easterly line of said property owned by the Oak Park Power Company, 323 feet; thence Westerly along the Northerly line of said property of the Oak Park Power Company, 120 feet to the Easterly line of the said right of way; thence Northerly along the Easterly line of said right of way, 833 feet; thence Westerly at right angles along the Northerly line of property owned by the Michigan Motor Castings Company to the Easterly line of Industrial Avenue; thence Northerly along said Easterly line of Industrial Avenue to the Southerly line of a tract of land conveyed by the Buick Motor Company to John C. Zimmerman by deed recorded in Volume 202 of Deeds on Page 371, Genesee County Registry; thence Easterly along said line to the Southeast corner of said tract of land; thence Northerly along the Easterly line of said tract of land, 2278.7 feet to a point in the East and West 1/4 section line of Section 31, Town 8 North, Range 7 East, 1447 feet West of  the Westerly line of Pere Marquette Railroad (now merged with CSX Transportation, Inc.) Company's right of way; thence Southerly along said Westerly line of said right of way to the point of beginning. (Said description contains Block 27 of OAK PARK SUBDIVISION, as recorded in Plat Liber 2, Pages 12 and 13, Genesee County Records, Block 11 of PARKLAND SUBDIVISION, as recorded in Plat Liber 3, Page 18, Genesee County Records, Lot 98 of DURANT-DORT CARRIAGE CO.'S REPLAT OF PARTS OF BLOCKS 12 AND 27 AND ALL OF 13, 14, AND 15 OF OAK PARK SUBDIVISION, as recorded in Plat Liber 4,

MLC# 1194, 1295 – GMPT – Flint North #5/#10/#81
and GMNA – Buick City

Page 37, Genesee County Records, and part of G.M.DEWEY'S AND WM. HAMILTON'S SUBDIVISION, as recorded in Plat Liber 18, Page 9, Genesee County Records.) Also, that part of Hamilton Avenue which is adjacent to Block 27 of OAK PARK SUBDIVISION, described as follows: Beginning at the Southwest corner of said Block 27; thence South 88 degrees 47 minutes East along the South line of Block 27 a distance of 256.58 feet; thence South 01 degrees 13 minutes West 10.00 feet; thence South 50 degrees 20 minutes 41 seconds West 17.88 feet to a point that is 242.58 feet Easterly of the Southerly extension of the West line of said Block 27 and 21.70 feet Southerly of said South line of Block 27; thence North 88 degrees 34 minutes 31 seconds West 221.70 feet to a point that is 20.90 feet Southerly of said South line of Block 27 and 20.90 feet Easterly of said Southerly extension of the West line of Block 27; thence North 44 degrees 25 minutes West 29.88 feet to the place of beginning. Also, that part of Hamilton Avenue vacated in the instrument recorded in Deed Liber 1263, Page 259, described as follows: Commencing on the North line of Hamilton Avenue at a point 256.58 feet East of its intersection with the East line of Industrial Avenue; thence South 19 feet; thence East parallel with the North line of Hamilton Avenue, 302.21 feet; thence North 19 feet to the North line of Hamilton Avenue; thence West along the North line of Hamilton Avenue, 302.21 feet to the place of beginning. Also, that part of 1/2 of the vacated Industrial Avenue adjacent to the descriptions herein, as disclosed in the instrument recorded in Deed Liber 2212, Page 538, Genesee County Records.

PARCEL 12A: Commencing at a point on the North line of Hamilton Avenue in Block 27 of OAK PARK SUBDIVISION, as recorded in Plat Liber 2, Pages 12 and 13, Genesee County Records, 210 feet Easterly from the East line of Industrial Avenue; running thence Westerly along the North line of Hamilton Avenue, 26 feet; thence Northerly and parallel to the East line of Industrial Avenue, 885 feet to the South line of Dayton Street, if extended Easterly; thence East along the South line of Dayton Street, if extended Easterly, 26 feet; thence Southerly and parallel to the East line of Industrial Avenue, 885 feet to the place of beginning.

PARCEL 12B: Beginning at the Southwest corner of Block 27 of OAK PARK SUBDIVISION; thence Easterly along the Northerly line of Hamilton Avenue, 184 feet; thence Northerly parallel to Industrial Avenue to a point on the Southerly line of Dayton Street, if extended; thence Westerly along said Southerly line of Dayton Street, if extended, to the Easterly line of Industrial Avenue; thence Southerly along the Easterly line of Industrial Avenue to the place of beginning, being part of Block 27 of OAK PARK SUBDIVISION, as recorded in Plat Liber 2, Pages 12 and 13, Genesee County Records.

PARCEL 12C: That portion of Block 27 of OAK PARK SUBDIVISION, as recorded in Plat Liber 2, Pages 12 and 13, Genesee County Records, commencing at a point on the East side line of Industrial Avenue, 945 feet North of the North side line of Hamilton Avenue, running thence North on the East side line of Industrial Avenue, 545 feet; thence East at right angles with said East side line of Industrial Avenue, 184 feet; thence South 545 feet; thence West at right angles with the East side line of Industrial Avenue to the place of beginning.

PARCEL 12D: That portion of Block 27 of OAK PARK SUBDIVISION, as recorded in Plat Liber 2, Pages 12 and 13, Genesee County Records, commencing at a point on the East line of a right of way belonging to the Durant-Dort Carriage Company, 334 feet North of the Northerly line of Hamilton Avenue and 25 feet West of the West main wall of the Buick Motor Company; thence Easterly at right angles 120 feet; thence Northerly parallel with the said right of way 323 feet; thence Westerly at right angles 120 feet to the Easterly line of

said right of way; thence Southerly along said Easterly line, 323 feet to the place of beginning.

PARCEL 12E: That part of Block 27 of OAK PARK SUBDIVISION, as recorded in Plat Liber 2, Pages 12 and 13, Genesee County Records, being 26 feet in width, more or less, East of and adjacent to that parcel described in Deed Liber 187, Page 56, Genesee County Records, and also, that part of said Block 27 being 60 feet in width, more or less, lying South of and adjacent to said parcel described in Deed Liber 187, Page 56, and also that part of said 60 foot wide parcel lying South of and adjacent to the 26 foot parcel described above.

PARCEL 14: Lots 16 and 17, Block 16, Lots 10, 11, 12, and the West 40 feet of Lot 13, Lots 15 and 16, Block 17, Lots 5, 17, and 18, Block 18, Lot 16 and the Northerly 35 feet of Lot 17, Block 19, OAK PARK SUBDIVISION, according to the recorded plat thereof, as recorded in Plat Liber 2, Pages 12 and 13, Genesee County Records.

ALSO, Part of Blocks 16, 17, 18, and 19, of OAK PARK SUBDIVISION, according to the recorded plat thereof, as recorded in Plat Liber 2, Pages 12 and 13, Genesee County Records, and also all that part of vacated Dayton, Warren and Newall Streets adjacent to said Blocks, more particularly described as follows: Beginning at a point on the South line of Baker Street, said South line also being the North line of said Block 16 which is South 89 degrees 58 minutes 03 seconds East 60.00 feet from the Northwest corner of said Block 16; thence continuing along said line South 89 degrees 58 minutes 03 seconds East 690.20 feet to the Northwest corner of Lot 16 of said Block 16; thence South 01 degrees 11 minutes 20 seconds East along the West line of Lots 16 and 17 of Block 16 a distance of 289.97 feet to the center line of vacated Dayton Street; thence North 89 degrees 57 minutes 06 seconds West along the center line of said Dayton Street, 49.99 feet to Point "A", said Point "A" being the intersection of the West line of Lot 15 of said Block 17 extended Northerly to the center line of vacated Dayton Street; thence South 01 degrees 11 minutes 39 seconds East along said West line of Lot 15 of Block 17 and its extension Northerly 110.00 feet; thence South 89 degrees 57 minutes 06 seconds East 99.97 feet to the West line of Industrial Avenue, as platted in said plat; thence South 01 degrees 11 minutes 06 seconds East along said West line of Industrial Avenue, 355.69 feet to the Northeast corner of Lot 17 of said Block 16; thence North 89 degrees 54 minutes 13 seconds West along the North line of Lot 17 and Lot 18 of said Block 18 a distance of 99.93 feet to the Northwest corner of said Lot 18; thence South 01 degrees 11 minutes 11 seconds East along the West line of said Lot 18 a distance of 155.16 feet to the center line of said vacated Newall Street; thence South 89 degrees 53 minutes 42 seconds East along said center line 49.96 feet; thence South 10 degrees 10 minutes 54 seconds East along the West line of Lot 16 of said Block 19 extended Northerly 155.09 feet to the Southwest corner of said Lot 16 of Block 19; thence North 89 degrees 53 minutes 04 seconds West along the North line of Lots 18 through 23, inclusive, of said Block 19 a distance of 299.82 feet to the Northwest corner of said Lot 23; thence South 01 degrees 09 minutes 57 seconds East along the West line of said Lot 23 a distance of 140.03 feet to the North line of Hamilton Avenue; thence North 89 degrees 52 minutes 26 seconds West along said North line of Hamilton Avenue, 389.78 feet to a point on the new East right-of-way line of North Street, said point also being South 89 degrees 52 minutes 26 seconds East 60.00 feet from the Southwest corner of Block 19 of OAK PARK SUBDIVISION; thence North 01 degrees 12 minutes 51 seconds West along said new East line of North Street, 1204.88 feet to the point of beginning; EXCEPT Lots 10, 11, 12, and the West 40.00 feet of Lot 13 of Block 17 of said OAK PARK SUBDIVISION, more particularly described as commencing at the previously described Point "A"; thence North 89 degrees 57 minutes 06 seconds West along the centerline of vacated Dayton Street, 59.97 feet for the point of beginning; thence South 01 degrees 12 minutes 10 seconds East 155.21 feet to the

MLC# 1194, 1295 – GMPT – Flint North #5/#10/#81
and GMNA – Buick City

X:\DOCUMENTS AND SETTINGS\MERRILLSCAN\LOCAL SETTINGS\TEMP\WZ3570\US_ACTIVE_EXHIBIT A - #1194, 1295 - GMPT - FLINT
NORTH AND GMNA BUICK CITY_43637363_2.DOC       3

South line of said Lot 12 of Block 17; thence North 89 degrees 55 minutes 55 seconds West along the South line of Lots 10 through 13 of said Block, 189.94 feet to the Southwest corner of said Lot 10; thence North 01 degrees 13 minutes 08 seconds West along the West line of said Lot 10 and said West line extended Northerly, 155.15 feet to the center line of said vacated Dayton Street; thence South 89 degrees 57 minutes 06 seconds East along said center line, 189.97 feet to the point of beginning of said exception; ALSO EXCEPT Lot 5, Block 18, and Lot 14, Block 19, OAK PARK SUBDIVISION.

ALSO, that part of 1/2 of the vacated Industrial Avenue adjacent to said description, as disclosed in the instrument recorded in Deed Liber 2212, Page 538, Genesee County Records.

PARCEL 16: Lots 1 through 6, inclusive, Lots 8 through 14, inclusive, and the Southerly 40 feet of Lot 7 of MCLAUGHLIN'S ADDITION TO THE CITY OF FLINT, according to the recorded plat thereof, as recorded in Plat Liber 2, Page 16, Genesee County Records.

ALSO,

Lot 9, except the West 50 feet, Block 23 and the East 44 feet of Lot 24, Block 23 of OAK PARK SUBDIVISION, according to the recorded plat thereof, as recorded in Plat Liber 2, Page 12, Genesee County Records.

PARCEL 17: Entire Block 25, also Entire Block 26, Except the Easterly 30.00 feet, OAK PARK SUBDIVISION, of part of Sections 1 and 2 of Smith's Reservation, according to the recorded plat thereof, as recorded in Liber 2 of Plats, Pages 12 and 13, Genesee County Records; Including all of vacated Harriet Street lying adjacent thereto; also a contiguous part of MACLAUGHLIN'S ADDITION, according to the recorded plat thereof, as recorded in Liber 2 of Plats, Page 16, Genesee County Records, described as: Lots 29, 30, 31, 32, and 39, and the Northerly 28.75 feet of Lot 33 and Lot 38, Except the Westerly 49.00 feet of Southerly 172.75 feet; Also Except Beginning at Easterly most corner of said lot; thence Southwesterly along Southeasterly line of said lot, 450.00 feet to the Southerly line of said lot; thence Westerly along said Southerly line, 32.00 feet to Northwesterly line of said lot; thence Northeasterly along said Northwesterly line and its Northeasterly extension to a line 75.00 feet Easterly from and parallel with the Westerly line of said lot; thence Southerly parallel with said Westerly line to a line 0.50 feet Northwesterly from and parallel with the Southeasterly line of said lot; thence Northeasterly parallel with said Southeasterly line to a Northeasterly line of said lot; thence Southeasterly along said Northeasterly line to place of beginning.

PARCEL 19:  All of Block 12, and part of Blocks 1, 2, 3 and 11 of FAIRVIEW, according to the recorded plat thereof, as recorded in Liber 3 of Plats, Page 17; Also part of Blocks 20 and 21 of RIVER ADDITION TO FAIRVIEW PLAT, according to the recorded plat thereof, as recorded in Liber 3 of Plats, Page 20A; Also, Lots 1 through 7 of DURANT-DORT CARRIAGE COMPANY'S REPLAT of part of Block 28 of Oak Park Subdivision, according to the recorded plat thereof, as recorded in Liber 4 of Plats, Page 28, and part of Blocks 28 and 33 of OAK PARK SUBDIVISION, according to the recorded plat thereof, as recorded in Liber 2 of Plats, Pages 12 and 13, and part of following vacated Streets and Avenues: Campau Avenue, Garfield Avenue, Michigan Avenue and St. John Street, described as: Beginning at the Southeast corner of Lot 16, Block 1 of FAIRVIEW PLAT, said plat also being the Westerly Right of Way line of James P. Cole Boulevard, and the Northeast corner of Lot 6 of the DURANT-DORT CARRIAGE COMPANY'S RE-PLAT of part of Block 28 of Oak Park Subdivision; thence along the Westerly Right of Way line of the said James P. Cole Boulevard, the

following 8 courses being South 18 degrees 56 minutes 00 seconds West, 197.39 feet, and South 71 degrees 04 minutes 00 seconds East, 0.56 feet, and South 42 degrees 40 minutes 30 seconds West, 14.75 feet, and South 18 degrees 57 minutes 00 seconds West, 561.01 feet to a point of curvature and 334.58 feet along the arc of a curve concave to the Northwest having a radius of 360.00 feet and a chord bearing of South 45 degrees 34 minutes 30 seconds West, 322.67 feet and South 72 degrees 12 minutes 00 seconds West, 105.84 feet to the point of curvature and 180.01 feet along the arc of a curve concave to the Southeast having a radius of 440.00 feet and a chord bearing of South 60 degrees 28 minutes 46 seconds West, 178.76 feet, and continuing 99.01 feet along the arc of a curve concave to the Southeast having a radius of 440.00 feet and a chord bearing of South 42 degrees 18 minutes 45 seconds West, 98.90 feet to the Northerly Right of Way line of Hamilton Avenue; thence North 65 degrees 47 minutes 00 seconds West, 225.00 feet along the Northerly Right of Way line of Hamilton Avenue to the Easterly Right of Way line of the C & O Railroad Right of Way; thence North 10 degrees 56 minutes 51 seconds East, 1677.20 feet along the Easterly Right of Way line of the C & O Railroad Right of Way and the Westerly line of the OAK PARK SUBDIVISION and the DURANT-DORT CARRIAGE COMPANY'S RE-PLAT of part of Block 28 of Oak Park Subdivision and the Fairview Plat; thence South 87 degrees 32 minutes 57 seconds East, 1044.06 feet along an existing fence line to the Westerly Right of Way line of the James P. Cole Boulevard, the following 4 courses being South 38 degrees 20 minutes 00 seconds West, 60.74 feet to a point of curvature; thence 292.17 feet along the arc of a curve concave to the Southeast having a radius of 872.16 feet and chord bearing of South 28 degrees 44 minutes 10 seconds West, 290.81 feet, and South 19 degrees 08 minutes 21 seconds West, 254.18 feet, and South 67 degrees 17 minutes 29 seconds East, 15.54 feet to the place of beginning.

PARCEL 20:  Part of Block 33, OAK PARK SUBDIVISION, according to the recorded plat thereof, as recorded in Plat Liber 2, Pages 12 and 13, Genesee County Records, described as: Commencing at Northwesterly corner of said block; thence South 18 degrees 56 minutes West, 100.80 feet; thence South 71 degrees 04 minutes East, 24.65 feet; thence South 18 degrees 57 minutes West, 208.59 feet for a place of beginning; thence South 18 degrees 57 minutes West, 462.54 feet; thence along a tangential curve to the right radius of 440.00 feet, a long chord bearing and distance of South 45 degrees 34 minutes 30 seconds West, 394.31 feet; thence South 72 degrees 12 minutes West, 105.84 feet; thence along a tangential curve to the left having a radius of 360.00 feet, a long chord bearing and distance of South 64 degrees 50 minutes 06 seconds West, 92.30 feet; thence South 39 degrees 26 minutes 30 seconds West, 151.82 feet to the Northerly line of Hamilton Avenue, as occupied; thence South 50 degrees 33 minutes 30 seconds East, along said Northerly line to the Westerly bank of the Flint River; thence Northerly along said Westerly bank to a line bearing South 47 degrees 19 minutes 30 seconds East from Place of Beginning; thence North 47 degrees 19 minutes 30 seconds West to the place of beginning.

MLC# 1194, 1295 – GMPT – Flint North #5/#10/#81
and GMNA – Buick City

X:\DOCUMENTS AND SETTINGS\MERRILLSCAN\LOCAL SETTINGS\TEMP\WZ3570\US_ACTIVE_EXHIBIT A - #1194, 1295 - GMPT - FLINT NORTH AND GMNA BUICK CITY_43637363_2.DOC          5

## EXHIBIT A

### Property Description

Parcel 1

Property Retained by GM (Parcel "C")

Part of the North 1/2 of Section 10, Town 7 North, Range 7 East, City of Burton, Genesee County, Michigan, and "Emerald Estates Subdivision", as recorded in Liber 38, Page 18, of Plats, Genesee County Records, and also part of vacated Donegal Street and vacated Flanigan Street, described as: Commencing at the North quarter corner of Section 10, Town 7 North, Range 7 East, City of Burton, Genesee County, Michigan; thence North 88 degrees 02 minutes 45 seconds West, 1322.12 feet along the North line of said Section to the intersection of the West line of Donegal Street extended and the North line of Section 10, thence South 00 degrees 22 minutes 43 seconds East, 550.07 feet along the West line of Donegal Street extended to the Northwest corner of "Emerald Estates Subdivision"; thence continuing South 00 degrees 22 minutes 43 seconds East, 194.76 feet to the POINT OF BEGINNING; thence South 89 degrees 18 minutes 28 seconds East, 206.67 feet to a point on the Westerly line of Lot 1 of said subdivision; thence on a curve to the left, along the Westerly line of said Lot 1, having a radius of 153.80 feet, with a chord bearing and distance of North 39 degrees 38 minutes 31 seconds West, 141.98 feet; thence on a curve to the right, continuing along the Westerly line of Lot 1, having a radius of 93.80 feet, with a chord bearing and distance of North 33 degrees 44 minutes 17 seconds West, 103.25 feet; to the Northwest corner of said Lot 1; thence South 88 degrees 02 minutes 45 seconds East, 763.74 feet along the North line of said subdivision to the Northeast corner of Lot 7 of said subdivision; thence South 00 degrees 16 minutes 59 seconds East, 109.87 feet along the East line of said Lot 7 to the Northwest corner of Lot 8 of said subdivision; thence South 88 degrees 02 minutes 45 seconds East, 433.71 feet along the North line of said subdivision; thence North 00 degrees 28 minutes 55 seconds West, parallel to the North-South 1/4 line, 660.00 feet to the North line of Section 10; thence South 88 degrees 02 minutes 45 seconds East along the North line of Section 10, 66.00 feet to the North 1/4 Corner; thence South 00 degrees 28 minutes 55 seconds East along the North-South 1/4 line, 300.00 feet; thence South 88 degrees 05 minutes 10 seconds East, parallel to the North line of Section 10, 30.00 feet; thence South 00 degrees 28 minutes 55 seconds, parallel to the North-South 1/4 line, 556.34 feet; thence due East, 74.53 feet; thence due South, 240.00 feet; thence due West, 72.51 feet to the North-South 1/4 line; thence South 00 degrees 28 minutes 55 seconds East along the North-South 1/4 line, 907.74 feet; South 65 degrees 16 minutes 21 seconds East, 311.57 feet; thence South 00 degrees 50 minutes 34 seconds West, 360.47 feet to the North line of the Grand Trunk Western Railroad Right of Way; thence North 89 degrees 15 minutes 08 seconds West, along said North line, 906.17 feet to the East line of the Consumers Power Sub-Station property; thence North 00 degrees 22 minutes 32 seconds West, 464.18 feet to the Northeast corner of said Consumers Power property; thence South 89 degrees 37 minutes 28 seconds West, 723.12 feet to the East line of said Consumers Power property; thence North 00 degrees 22 minutes 43 seconds West, 1324.83 feet along said East line to the point of beginning.

Parcel 2

Part of the Emerald Estates Subdivision, as recorded in Liber 38 of Plats, page 18, Genesee County, Michigan Records AND ALSO part of vacated Donegal Street, described as follows: Commencing at the North 1/4 of Section 10, Town 7 North, Range 7 East, City of Burton, Genesee County, Michigan; thence North 88 degrees 02 minutes 45 seconds West, along

the North line of Section 10, a distance of 66.00 feet; thence South 00 degrees 28 minutes 55 seconds East, 660.00 feet to the North line of said EMERALD ESTATES SUBDIVISION; thence along said North line of EMERALD ESTATES SUBDIVISION, North 88 degrees 02 minutes 45 seconds West, 433.71 feet AND North 00 degrees 16 minutes 59 seconds West 109.87 feet (platted as 110.00 feet) and North 88 degrees 02 minutes 45 seconds West, 763.74 feet (platted as 763.82 feet) to the Northwest corner of Lot 1 of said plat, and the Place of Beginning of this description; thence along the Westerly line of said Lot 1, on a curve to the left, having a radius of 93.80 feet, with a chord bearing and distance of South 33 degrees 44 minutes 18 seconds East, 103.25 feet; thence on a curve to the right, having a radius of 153.80 feet, with a chord bearing and distance of South 39 degrees 38 minutes 29 seconds East, 141.98 feet; thence North 89 degrees 18 minutes 28 seconds West, 206.67 feet, to the West line of the East 1/2 of the Northwest 1/4 of said Section 10; thence North 00 degrees 22 minutes 43 seconds West, 194.75 feet to the North line extended West of said Lot 1 of EMERALD ESTATES SUBDIVISION; thence South 88 degrees 02 minutes 45 seconds East, 60.05 feet to the Place of Beginning.

## EXHIBIT A

### Property Description

PARCEL A:

Lot 43 through 82, inclusive, including the vacated alley adjacent to Lots 72 through 82, SCOTTEN AND LOVETT'S SUBDIVISION, as recorded in Liber 1 of Plats, Page 198, Wayne County Records,

EXCEPT part of Lots 43 and 44 of said Subdivision, described as follows: Beginning at the intersection of the Westerly line of Scotten Avenue and the Northerly right-of-way line of the Michigan Central Railroad Company; thence Westerly along said right-of-way line, 523 feet more or less, to the Easterly line of Clark Avenue; thence Northwesterly at an angle of 72 degrees 55 minutes 30 seconds along said Easterly line of Clark Avenue, 11.51 feet to a point 11 feet Northerly, measured at right angles from the Northerly right-of-way line of the Michigan Central Railroad; thence Easterly parallel to and 11 feet distant from said right-of-way, 523 feet more or less to the Westerly line of Scotten Avenue; thence Southerly at an angle of 72 degrees 55 minutes 30 seconds along said Westerly line of Scotten Avenue 11.51 feet to the Point of Beginning.

ALSO EXCEPT the West 1 foot of above Lots lying adjacent to Clark Avenue as conveyed to the City of Detroit.

ALSO EXCEPT that part taken for the widening of Michigan Avenue.

PARCEL B:

Part of Lots 44, 45 and 46 of THE PLAT OF PRIVATE CLAIM NO. 30 AND BACK CONCESSION THEREOF, as laid out by the Commissioners for Dividing the Estate of the Late Gen L. John R. Williams, Dec'd 1857, as recorded in Liber 1 of Plats, on Page 67, Wayne County Records; Also part of Lots 7 and 8 of BRUSH SUBDIVISION OF PRIVATE CLAIM 260, between the Chicago Road and The Michigan Central Railroad, as recorded in Liber 1 of Plats, Page 97, Wayne County Records, Also part of the former New York Central Railroad right-of-way, all being in the City of Detroit, Wayne County, Michigan, and being more particularly described as follows: Commencing at the intersection of the Southerly line of Michigan Avenue (120 feet wide, as widened) and the Westerly line of Clark Avenue (60 feet wide at this point) extended Northerly; running thence South 27 degrees 09 minutes 09 seconds West, along the extension Northerly of the Westerly line of Clark Avenue and along the Westerly line of said Clark Avenue, a distance of 344.24 feet to an angle point in said street line; thence South 28 degrees 00 minutes 49 seconds East along the Westerly line of Clark Avenue (width varies), a distance of 1581.96 feet to the point of intersection of said street line with the Northerly line of the Conrail (Penn Central) Railroad right-of-way (width varies, as widened); thence South 79 degrees 04 minutes 03 seconds West, along the Northerly line of said railroad right-of-way, a distance of 153.74 feet to an angle point in said right-of-way line; thence South 79 degrees 40 minutes 13 seconds West, along said right-of-way line, a distance of 200.00 feet to an angle point in said line; thence South 79 degrees 04 minutes 03 seconds West, along said railroad right-of-way line, a distance of 422.11 feet to the Point of Beginning of the parcel herein being described; proceeding thence from said Point of Beginning South 79 degrees 04 minutes 03 seconds West along the Northerly line of said railroad right-of-way, a distance of 872.24 feet to a jog in said right-of-way line; thence South 27 degrees 09 minutes West along said jog , a distance of

16.52 feet to a point; thence South 79 degrees 04 minutes 03 seconds West, along the Northerly line of said Conrail (Penn Central) Railroad right-of-way, a distance of 90.92 feet to the point of intersection of said railroad right-of-way line with the Easterly line of the New York Central Railroad property, (Formerly known as Detroit, Monroe, and Toledo Railroad); thence along the Easterly line of New York Central Railroad property the following courses and distances, along the arc of a curve concave to the Northwest, radius 1157.78 feet, an arc distance of 117.74 feet (chord bears North 23 degrees 21 minutes 19 seconds East, 117.69 feet) to a point of tangent; thence North 20 degrees 26 minutes 31 seconds East, along a line which is tangent to the foregoing curve, a distance of 43.03 feet to a point of curve; thence along the arc of a curve concave to the Southeast, radius 1134.78 feet, an arc distance of 91.14 feet (chord bears North 22 degrees 44 minutes 34 seconds East, 91.12 feet) to a point of tangent; thence North 25 degrees 02 minutes 37 seconds East, along a line which is tangent to the foregoing curve, a distance of 98.01 feet to a point; thence North 27 degrees 09 minutes 09 seconds East, a distance of 805.53 feet to a point; thence leaving the Easterly line of said New York Central Railroad property, South 28 degrees 00 minutes 49 seconds East, a distance of 952.15 feet to the Point of Beginning.

Together with a reservation of easement for right of access and entry over adjacent property, as disclosed in instrument recorded in Liber 30067, Page 1089.

PARCEL DD:

Part of Lots 2 through 17, inclusive, including the adjoining vacated alley, of BLACK'S SUBDIVISION of Out Lots 79, 80, & 81, Private Claim 563, known as J. B. Campau Farm, City of Detroit, Wayne County, Michigan, Feb. 18th, 1889, as recorded in Liber 12 of Plats, on Page 59, Wayne County Records, and being more particularly described as follows: Commencing at the Southwesterly corner of Lot 78, as platted in the PLAT OF THE SUBDIVISION OF PRIVATE CLAIM NO. 563 for the Heirs of J.B. Campau, Nov. 1852, as recorded in Liber 1 of Plats, on Pages 94 and 95, Wayne County Records; running thence North 62 degrees 00 minutes 10 seconds East, as measured along the Southerly line of said Lot 78, a distance of 25.00 feet to a point on the Easterly line of Scotten Avenue (recorded 66 feet wide); thence North 28 degrees 01 minute 51 seconds West, along the Easterly line of said Scotten Avenue, a distance of 26.00 feet to an angle point in said street line; thence North 27 degrees 59 minutes 51 seconds West along the Easterly line of said Scotten Avenue, a distance of 752.00 feet to the Point of Beginning of the parcel of land herein being described; proceeding thence from said Point of Beginning, North 27 degrees 59 minutes 51 seconds West, along the Easterly line of said Scotten Avenue, a distance of 160.74 feet to an angle point in said line; thence North 00 degrees 35 minutes 51 seconds West, along the Easterly line of said Scotten Avenue, a distance of 30.91 feet to the Southeasterly corner of Michigan Avenue (120 feet wide, as widened) and said Scotten Avenue; thence North 89 degrees 24 minutes 10 seconds East, along the Southerly line of said Michigan Avenue, as widened, a measured distance of 402.60 feet (described 403.21 feet) to the Point of Intersection of said Street line with the Westerly line of Conrail (Penn Central) Railroad Right-of-Way (width varies); thence South 28 degrees 01 minute 05 seconds East, along the Westerly line of said Railroad Right-of-Way, said line being also part of the Easterly line of Lot 17 of said BLACK'S SUBDIVISION (as recorded in Liber 12 of Plats, Page 59, Wayne County Records), a distance of 72.86 feet to a point; thence South 61 degrees 58 minutes 55 seconds West, a distance of 35.44 feet to a point; thence South 28 degrees 01 minute 05 seconds East, a distance of 19.45 feet to a point; thence South 62 degrees 03 minutes 36 seconds West, a distance of 63.84 feet to a point; thence South 81 degrees 29 minutes 24 seconds West, a distance of 131.62 feet to a point; thence North 27

degrees 59 minutes 50 seconds West, a distance of 45.44 feet to a point; thence South 62 degrees 00 minutes 10 seconds West, a distance of 148.33 feet to the Point of Beginning.

PARCEL FF:

Part of Lot 76 and 77, PLAT OF THE SUBDIVISION OF PRIVATE CLAIM. 563 for the Heirs of J.B. Campau, Nov. 1852, as recorded in Liber 1 of Plats, Pages 94 and 95, Wayne County Records, described as:  Beginning at a point on the East line of Scotten Avenue, 66 feet wide, distant South 28 degrees 01 minute 51 seconds East, 16.66 feet from the North line of said Lot 77; thence North 61 degrees 57 minutes 52 seconds East, 338.92 feet; thence South 28 degrees 01 minute 05 seconds East, 431.98 feet; thence on a curve to the right 545.81 feet, radius 362.80 feet, chord bearing South 15 degrees 04 minutes 52 seconds West, 495.78 feet to the East line of said Scotten Avenue; thence along said East line, North 28 degrees 01 minutes 51 seconds West, 793.30 feet to the Place of Beginning.  EXCEPT any part thereof of said property contained in conveyances to Consolidated Rail Corporation recorded in Liber 29627, Page 961, and Liber 29630, Page 1252.

PARCEL GG:

Part of Private Claims No. 583 and 47, also part of Lots 46 and 47, including a vacated private right-of-way lying adjacent to said Lot 47 of the "Plat of Private Claim No. 30 and Back Concession thereof as laid out by the Commissioners for dividing the Estate of the late General John R. Williams, Deceased 1857" as recorded in Liber 1 of Plats on Page 67, Wayne County Records, also part of the former New York Central Railroad Right-of-Way, all being in the City of Detroit, Wayne County, Michigan and being more particularly described as follows: commencing at the intersection of the Southerly line of Michigan Avenue (120 feet wide, as widened) and the Westerly line of Clark Avenue (60 feet wide at this point) extended Northerly; running thence South 27 degrees 09 minutes 09 seconds West, along the extension Northerly of the Westerly line of Clark Avenue, a distance of 69.56 feet to the point of beginning of the parcel of land herein being described; proceeding thence from said point of beginning South 27 degrees 09 minutes 09 seconds West, along the Westerly line of Clark Avenue, a distance of 274.68 feet to an angle point in said street line; thence South 28 degrees 00 minutes 49 seconds East along the Westerly line of Clark Avenue (width varies), a distance of 725.50 feet to a point; thence South 61 degrees 59 minutes 11 seconds West a distance of 741.00 feet to a point; thence North 28 degrees 00 minutes 49 seconds West a distance of 325.58 feet to a point on the Easterly line of the New York Central Railroad property (formerly known as Detroit, Monroe and Toledo Railroad); thence North 27 degrees 09 minutes 09 seconds East, along the Easterly line of the New York Central Railroad property, a distance of 1130.91 feet to the point of intersection of said Easterly line of the New York Central Railroad property with the Southerly line of said Michigan Avenue, as widened; thence North 89 degrees 24 minutes 10 seconds East, along the Southerly line of said Michigan Avenue, a distance of 37.79 feet to a point of curve; thence along the Arc of a curve which is tangent to the foregoing line, said curve being concave to the Southwest, radius 42.00 feet, an Arc distance of 86.31 feet (chord bears South 31 degrees 43 minutes 21 seconds East 71.91 feet) to the point of beginning.

## EXHIBIT A

### Property Description

Tax ID Number:  Error! Unknown document property name.

Land situated in the Error! Unknown document property name. of Error! Unknown document property name., in the County of Error! Unknown document property name., State of Error! Unknown document property name. is described as follows:

Part of Out Lot 116 of the Subdivision of part of the Cass Farm, City of Detroit, Wayne County, Michigan, as recorded in Liber 1 of Plats on Pages 175, 176, and 177, Wayne County Records, more particularly described as follows: Beginning at the Northwest corner of Cass Avenue (80 feet wide) and Amsterdam Avenue (50 feet wide): Running thence from said point of beginning South 67 degrees 01 minutes 35 seconds West along the North line of said Amsterdam Avenue, a distance of 165.00 feet to a point; thence North 22 degrees 43 minutes 25 seconds West along a line which is parallel to the West line of Cass Avenue, a distance of 375.17 feet to a point in the South line of the right of way of the Michigan Central Railroad (the total right of way width is 118.70 feet); thence North 63 degrees 29 minutes 26 seconds East along said right of way line, a distance of 161.35 feet to a point in the West line of Cass Avenue; thence South 31 degrees 09 minutes 47 seconds East along the West line of Cass Avenue, a distance of 27.18 feet to an angle in said Cass Avenue; thence South 22 degrees 43 minutes 25 seconds East along the West line of said Cass Avenue, a distance of 358.22 feet to the point of beginning.

**Commonly known as:  Error! Unknown document property name., Error! Unknown document property name., Error! Unknown document property name.  Error! Unknown document property name.**

MLC# 1294 – 6241 Cass Aveanue
(aka Lot 8 Cass and Amsterdam)

## EXHIBIT A

## Property Description

Tax ID Number:  Error! Unknown document property name.

Land situated in the Error! Unknown document property name. of Error! Unknown document property name., in the County of Error! Unknown document property name., State of Error! Unknown document property name. is described as follows:

The West 1/2 of Section 27, Town 4 North, Range 3 West, Delta Township, Eaton County, Michigan, except the Southwest 1/ 4 of the Southwest 1/4 thereof.

Also except:

Part of the Northwest 1/4 and the Southwest 1/4 of Section 27, Town 4 North, Range 3 West, Delta Township, Eaton County, Michigan described as: Commencing at the Northwest corner of said Section 27; thence South 00 degrees 19 minutes 48 seconds West, 1604.27 feet along the West line of said Section 27 to the extension of the South right of way line of Central Circle Drive; thence South 89 degrees 54 minutes 42 seconds East, 2643.40 feet along the extension of said South right of way line to the North-South 1/4 line of said Section 27; thence South 00 degrees 14 minutes 0 seconds West 3695.59 feet along said North-South 1/4 line to the south 1/4 corner of said Section 27; thence North 89 degrees 36 minutes 15 seconds 1316.41 feet along the South line of said Section 17; thence North 00 degrees 08 minutes 54 minutes West 1317.72 feet; thence North 89 degrees 29 minutes 59 seconds West 1320.76 feet to the West line of said Section 27; thence North 00 degrees 16 minutes 01 seconds East 1320.37 feet along said West line of the West 1/4 corner of said Section 27; thence North 00 degrees 19 minutes 48 seconds East 1040.96 feet continuing along said West line to the point of beginning.

EXCEPT:
Part of the Northwest 1/4 of Section 27, Town 4 North, Range 3 West, Delta Township, Eaton County, Michigan, described as: Beginning at the Northwest corner of said Section 27; thence South  89 degrees 2 minutes 9 seconds  East, 1400.00 feet along the North line of said Section 27; thence South 0 degrees 19 minutes 48 seconds West, 800.00 feet parallel with the West line of said Section 27; thence North  89 degrees 52 minutes 9 seconds  West, 1400.00 feet parallel with said North line to said West line thence N 00°19'48" E, 800.00 feet along said West line to the point of beginning.

EXCEPT:
Parcel B-1
Part of the Northwest 1/4 and the Southwest 1/4 of Section 27, Town 4 North, Range 3 Wes , Delta Township, Eaton County, Michigan, described as: Commencing at the Northwest corner of said Section 27; thence South 0 degrees 19  minutes 48 seconds West, 800.00 feet along the West line of said Section 27 to the point of beginning of this description; thence South 89 degrees 52 minutes 9 seconds East , 1000.00 feet parallel with the North line of said Section 27; thence South  0 degrees 19 minutes 48 seconds West, 803.53 feet to the extension of the South right of way line of Central Circle Drive; thence North  89 degrees 54 minutes 42 seconds  West, 1000.00 feet along the extension of said South right of way line to said West line; thence North 0 degrees 19 minutes 48 seconds  East, 804.27 feet along said West line to the point of beginning.

EXCEPT:
Legal Description of Parcel 2
Part of the Northwest 1/4 of Section 27, Town 4 North, Range 3 West, Delta Township, Eaton County, Michigan, described as: Beginning at the North 1/4 corner of said Section 27; thence 1602.30 feet along the said North-South 1/4 line of said Section 27; thence North  89 degrees 54 minutes 42 seconds West

270.00 feet; thence North  0 degrees 14 minutes 0 seconds East 773.30 feet; thence North  89 degrees 52 minutes 9 seconds  West 972.09 feet; thence North  0 degrees 19 minutes 48 seconds  East 829.21 feet to the North line of said Section 27; thence South  89 degrees 52 minutes 9 seconds  East 1240.69 feet along said line to the Place of Beginning.

ACCORDING TO COVENANT DEED RECORDED IN LIBER 1981, PAGE 1192, ALSO KNOWN AS:

EXHIBIT C:
Part of the Northwest 1/4 of Section 27, Town 4 North, Range 3 West, Delta Township, Eaton County, Michigan, described as: Commencing at the North 1/4 Corner of said Section 27; thence South 0 degrees, 14 minutes 0 seconds West 1602.30 feet along the North-South 1/4 Line of said Section 27; thence North 89 degrees 54 minutes 42 seconds West  270.00 feet for a PLACE OF BEGINNING; thence continuing  North 89 degrees 54 minutes 42 seconds West  1373.40 feet; thence North 0 degrees, 19 minutes 48 seconds East 803.53 feet; thence South 89 degrees 52 minutes 9 seconds East 400.00 feet; thence South 0 degrees 19 minutes 48 seconds West 29.21 feet; thence South 89 degrees 52 minutes 9 seconds East 972.09 feet; thence South 0 degrees, 14 minutes 0 seconds West  773.30 feet to the Place of Beginning.

**Commonly known as**:  **Error! Unknown document property name.** (aka 2901 S. Canal Rd.) **Error! Unknown document property name., Error! Unknown document property name.  Error! Unknown document property name.**

## EXHIBIT A

### Property Description

Tax ID Number: **19-03-126-008** Land situated in the **City** of **Pontiac**, in the County of **Oakland**, State of **Michigan** is described as follows:

That part of Lot 5, "ASSESSOR'S PLAT NO. 110", as recorded in Liber 52, Page 46 of Plats, Oakland County Records, described as follows: beginning at a point on the North line of said Section 3, which is North 87 degrees, 23 minutes, 0 seconds West, 49.70 feet from the North 1/4 corner of said Section 3; thence South 2 degrees, 36 minutes, 47 seconds West, 1125.94 feet; thence on a curve to the left, having a radius of 810.00 feet, with a chord bearing and distance of South 13 degrees, 41 minutes, 13 seconds East 454.68 feet; thence South 29 degrees, 59 minutes, 13 seconds East, 135.67 feet; thence South 60 degrees, 0 minutes, 47 seconds West, 498.29 feet; thence on a curve to the left, having a radius of 347.00 feet, with a chord bearing and distance of South 41 degrees, 9 minutes, 50 seconds West, 224.22 feet; thence South 18 degrees, 13 minutes, 45 seconds West, 175.45 feet; thence South 22 degrees, 18 minutes, 53 seconds West, 347.12 feet; thence on a curve to the right, having a radius of 269.50 feet, with a chord bearing and distance of South 30 degrees, 1 minute, 2 seconds West 455.61 feet; thence North 42 degrees, 16 minutes, 49 seconds West, 408.58 feet; thence on a curve to the right, having a radius of 269.50 feet, with a chord bearing and distance of North 19 degrees, 50 minutes, 14 seconds West 205.77 feet; thence North 2 degrees, 36 minutes, 20 seconds East 2236.04 feet to the North line of Section 3; thence South 87 degrees, 23 minutes, 0 seconds East along said North line, 1334.96 to the point of beginning.

**Commonly known as**: 2000 CENTERPOINT PKWY, Pontiac, MI 48340

## EXHIBIT A

### Property Description

Tax ID Number:  Error! Unknown document property name.

Land situated in the County of Error! Unknown document property name., State of Error! Unknown document property name. is described as follows:

That part of Lot 2 which lies West of Highway U.S. 10 (Wide Tract Drive East) as opened, also all of Lots 3 through 7 inclusive, all of Lots 16 and 17, also Lots 8 through 15 inclusive except the West 10 feet of said lots as taken for the widening of Mill Street, all being part of "Assessor's Plat No. 121, a replat of part of Chamberlin's Addition, City of Pontiac, Oakland County, Michigan," as recorded in Liber 53 of Plats on Page 41, Oakland County Records.  Being more particularly described as follows:  Beginning at the Northeasterly corner of Mill Street (50 feet more or less in width) as widened and University Drive (formerly Mt. Clemens Street), said point of beginning being distant 10.24 feet Easterly as measured along the Southerly line of Lot 8 of said "Assessor's Plat No. 121," (L. 53, P. 41 Plats) from the Southwesterly corner of said Lot 8; running thence from said point of beginning North 15 degrees 22 minutes 50 seconds West along the Easterly line of said Mill Street as widened, through the interior of Lots 8 through 15 inclusive of said subdivision, said line being 10.00 feet Easterly of, as measured at right angles to and parallel to the Westerly line of said lots as platted, a measured distance of 380.89 feet (recorded as 381.04 feet per street widening) to an angle point  on said Mill Street, said angle point being located in a North line of said Lot 15, and being distant 10.96 feet Easterly, as measured along the North line of said Lot 15, from the Northwesterly corner thereof; thence North 50 degrees 27 minutes 10 seconds East along the Southerly line of said Mill Street (40 feet more or less in width at this point), said line being also the Northerly line of part of said Lot 15 and all of Lots 16 and 17 of said subdivision, a measured distance of 170.42 feet (recorded as 170.59 feet) to the Northeasterly corner of said Lot 17; thence South 64 degrees 20 minutes 26 seconds East along the Northeasterly line of said Lot 17, a measured distance of 80.57 feet (recorded an 80.70 feet) to the Southeasterly corner thereof; thence North 30 degrees 53 minutes 44 seconds East along the rear of part of Lot 4, Lot 3 and part of Lot 2 of said subdivision, a distance of 160.00 feet to a point in the Westerly line of Highway U.S. 10 (Wide Tract Drive East) as opened through Lots 1 and 2 of said subdivision; thence along the Westerly right-of-way line of said U.S. 10, by the following courses and distances:  Southerly along the arc of a curve which is concave to the West, radius 553.11 feet, an arc distance of 162.95 feet to the end of said curve (chord bears South 36 degrees 17 minutes 12 seconds East 162.36 feet); thence South 26 degrees 51 minutes 04 seconds East a distance of 18.22 feet to a point; thence North 63 degrees 08 minutes 56 seconds East a distance of 5.00 feet to a point; thence South 26 degrees 51 minutes 04 seconds East a distance of 221.00 feet to a point; thence South 21 degrees 20 minutes 37 seconds West a distance of 39.75 feet to a point of intersection of said Westerly line of Highway U.S. 10 as opened, with the Northerly line of University  Drive, said point being distant 40 feet Westerly as measured along the Southerly line of said Lot 2 from the Southeasterly corner thereof; thence South 62 degrees 17 minutes 40 seconds West along the Northerly line of said University Drive, said line being also the Southerly line of part of Lot 2, Lots 3 through 7 inclusive and part of Lot 8, a measured distances of 426.34 feet (recorded as 426.39 feet) to the point of beginning.

**Commonly known as**:  **Error! Unknown document property name., Error! Unknown document property name., Error! Unknown document property name.  Error! Unknown document property name.**

## EXHIBIT A

### Property Description

Tax ID Number:  Error! Unknown document property name.

Land situated in the Error! Unknown document property name. of Error! Unknown document property name., in the County of Error! Unknown document property name., State of Error! Unknown document property name. is described as follows:

Parcel 1:
Part of Lot 2, Assessor's Plat No. 3, parts of Southwest and Southeast 1/4 of Section 19 and Northwest 1/4 of Section 30, Town 3 North, Range 10 East, City and Township of Pontiac, Oakland County, according to the plat thereof as recorded in Liber 1A of Assessor's Plat, Page 3, Oakland County, more particularly described as follows: Beginning at a point on the Northwesterly line of Oakland Avenue as widened bearing South 43 degrees 16 minutes West 27 feet and South 46 degrees 45 minutes East 180.8 feet from the Northeasterly corner of said Lot 2; thence South 43 degrees 16 minutes West, parallel to the Northwesterly line of said lot 495.24 feet to the Southwesterly line if said lot; thence South 38 degrees 24 minutes East along the Southwesterly line of said Lot 101.07 feet; thence North 46 degrees 16 minutes East 509.89 feet to the widened line of Oakland Avenue; thence North 46 degrees 45 minutes West along Oakland Avenue 100 feet to the point of beginning.

Parcel 2:
Part of Lot 2, Assessor's Plat No. 3, parts of Southwest and Southeast 1/4's of Section 29, and Northeast 1/4 of Section 30, Town 3 North, Range 10 East, City and Township of Pontiac, Oakland County, Michigan, according to the plat thereof as recorded in Liber 1A of Assessor's Plats, Page 3, Oakland County Records, described as beginning at South corner of Lot 2; thence North 43 degrees 00 minutes 30 seconds East 125.15 feet to point on curve; thence to right on said curve having radius of 543 feet a distance of 466.83 feet to point of tangency; thence North 43 degrees 00 minutes 20 seconds East 62.34 feet to point on Southwesterly line Oakland Avenue as widened; thence North 46 degrees 40 minutes 10 seconds West 405.78 feet along said Widening line to point on Northwesterly line of said Lot 2; thence South 43 degrees 27 minutes 50 seconds West 509.89 feet to West line Lot 2; thence South 38 degrees 22 minutes 00 seconds East 605.20 feet along South Westerly line said Lot 2 to point of beginning.

**Commonly known as**:  **Error! Unknown document property name., Error! Unknown document property name., Error! Unknown document property name.  Error! Unknown document property name.**

.

X:\DOCUMENTS AND SETTINGS\MERRILLSCAN\LOCAL SETTINGS\TEMP\WZ53F1\US_ACTIVE_EXHIBIT A - # 1310 - 675 CESAR CHAVEZ, PONTIAC, MI_43637355_1.DOC

# EXHIBIT A

## Property Description

Tax ID Number:  Error! Unknown document property name.

Land situated in the Error! Unknown document property name. of Error! Unknown document property name., in the County of Error! Unknown document property name., State of Error! Unknown document property name. is described as follows:

Being all that real property situated in the East 1/2 of Section 18, Township 8 North, Range 7 East, Genesee Township, Genesee County, Michigan, described as follows: Commencing at the South 1/4 corner of said Section 18 and thence running South 88 degrees 30 minutes 19 seconds East, 50.20 feet along the South line of the Southeast 1/4 of said Section 18i thence North 00 degrees 29 minutes 38 seconds East, 29.29 feet to the point of beginning thence along the East line of Horton Street (formerly Alfred Street) North 00 degrees 29 minutes 38 seconds East, 2140.02 feet; thence South 82 degrees 29 minutes 52 seconds East, 170.82 feet; thence South 89 degrees 32 minutes 24 seconds East, 170.00 feet; thence North 00 degrees 27 minutes 36 seconds East, 129.91 feet; thence South 89 degrees 34 minutes 30 seconds East, 696.84 feet;  thence North 00 degrees 43 minutes 40 seconds East, 1175.70 feet; thence North 08 degrees 54 minutes 02 seconds West, 114.92 feet; thence North 20 degrees 25 minutes 09 seconds West, 190.42 feet; thence North 26 degrees 45 minutes 51 seconds West, 312.89 feet; thence North 16 degrees 56 minutes 25 seconds West, 224.25 feet; thence North 82 degrees 24 minutes 45 seconds West, 69.33 feet; thence North 10 degrees 07 minutes 00 seconds West, 292.15 feet;  thence North 13 degrees 18 minutes 36 seconds West, 234.78 feet to the Westerly right of way line of the CSX Railroad; thence South 28 degrees 04 minutes 14 seconds East along said Westerly right of way, 1379.69 feet; thence South 27 degrees 17 minutes 43 seconds East along said Right of Way, 1028.40 feet to the East-West 1/4 line of Section 18; thence North 88 degrees 56 minutes 57 seconds West, 3.93 feet along said East-West 1/4 line to a point on a curve; thence along said curve in a Southeasterly direction for 1398.24 feet (long chord bearing South 15 degrees 33 minutes 28 seconds East, 1395.73 feet, central angle of 11 degrees 53  minutes 46 seconds, radius 6734.41 feet)  thence South 07 degrees 09 minutes 39 seconds East, 763.83 feet to the North Right of Way line of re-located Coldwater Road; thence South 63 degrees 46 minutes 11 seconds West along said North Right of Way, 851.36 feet to a point on a curve to the right; thence along said curve in a Southwesterly direction for 466.82 feet (long chord bearing South 77 degrees 36 minutes 11 seconds West, 462.30 feet, central angle of 27 degrees 40 minutes 02 seconds, radius 966.74 feet)  thence South 01 degrees 26 minutes 11 seconds West, 43.26 feet; thence North 88 degrees 29 minutes 49 seconds West along the North Right of Way line of Coldwater Road, 537.62 feet to a point; thence continuing along said Right of Way line, North 88 degrees 36 minutes 49 seconds West, 438.90 feet to the point of beginning.

And

Being that real property situated in section 18, Town 8 North, Range 7 East, Genesee Township, Genesee County, State of Michigan, and described as follows:

Commencing at the South 1/4 corner o£ said Section 18 and thence running South 88 degrees 30 minutes 19 seconds East, 50.20 feet along the South line of the Southeast 1/4 of said Section 18; thence North 00 degrees 29 minutes 38 seconds East, 2,169.31 feet to the Point of Beginning; thence North 00 degrees 29 minutes 38 seconds East, 87.79 feet; thence North 89 degrees 36 minutes 47 seconds West, 30.00 feet; thence North 00 degrees 29 minutes 38 seconds, East along the vacated centerline of Horton Street (formerly Alfred Street) a distance of 409.70 feet; thence South 89 degrees 24 minutes 18 seconds West, 40.90 feet; thence North 01 degree 20 minutes 00 seconds West along the East line of BUICK SUBDIVISION, as recorded in Plat Book 10, Page 1, a distance of 1,329.31 feet; thence North 88 degrees 49 minutes 39 seconds West, 993.43 feet; thence North 00 degrees 30 minutes 24 seconds

East, 29.75 feet; thence North 89 degrees 09 minutes 44 seconds West, 981.68 feet to the East right of way line of Saginaw Highway; thence North 01 degree 33 minutes 22 seconds East along the East right of way line of said Saginaw Highway, 376.81 feet; thence South 89 degrees 10 minutes 38 seconds East, 280.00 feet; thence North 01 degree 33 minutes 22 seconds East, 264.00 feet; thence North 89 degrees 10 minutes 38 seconds West, 280.00 feet; thence along said East right of way line of Saginaw Highway, North 01 degree 33 minutes 17 seconds East, 438.08 feet; thence North 35 degrees 20 minutes 14 seconds East, 210.22 feet; thence South 88 degrees 00 minutes 30 seconds East, along the South line of Stanley Road, 1,808.31 feet; thence continuing along the South line of said Stanley Road, South 89 degrees 48 minutes 49 seconds East, 468.72 feet to the West right of way line of the CSX Railroad; thence South 25 degrees 29 minutes 59 seconds East, along said West right of way line, 541.14 feet; thence South 13 degrees 18 minutes 36 seconds East, 234.78 feet; thence South 10 degrees 07 minutes 00 seconds East, 292.15 feet; thence South 82 degrees 24 minutes 45 seconds East, 69.33 feet; thence South 16 degrees 56 minutes 25 seconds East, 224.26 feet; thence South 26 degrees 45 minutes 51 seconds East, 312.89 feet; thence South 20 degrees 25 minutes 09 seconds East, 190.42 feet; thence South 08 degrees 54 minutes 02 seconds East, 114.92 feet; thence South 00 degrees 43 minutes 40 seconds West, 1,175.70 feet; thence North 89 degrees 34 minutes 30 seconds West, 696.84 feet; thence South 00 degrees 27 minutes 36 seconds West, 129.91 feet; thence 'North 89 degrees 32 minutes 24 seconds West, 170.00 feet; thence North 82 degrees 29 minutes 52 seconds West, 170.82 feet to the Point of Beginning.

**Commonly known as: Error! Unknown document property name., Error! Unknown document property name., Error! Unknown document property name.  Error! Unknown document property name.**

## EXHIBIT A

## Property Description

Tax ID Number: 46-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-002

Land situated in the City of Livonia, in the County of Wayne, State of Michigan

is described as follows: REALM PARCEL:

A part of the Northwest 1/4 of Section 30, Town 1 South, Range 9 East, City of Livonia, Wayne County, Michigan being described as commencing at the West 1/4 corner of said Section 30; thence North 00 degrees 26 minutes 07 seconds East, 43.00 feet along the West line of Section 30; thence South 89 degrees 32 minutes 30 seconds East, 60.00 feet to the point of beginning; thence North 00 degrees 26 minutes 07 seconds East, 199.00 feet along the East right-of-way line of Eckles Road (120 feet Right of Way); thence South 89 degrees 32 minutes 30 seconds East, 765.44 feet; thence South 00 degrees 26 minutes 07 seconds West, 199.00 feet to the North Right-of-Way line of Amrhein Road (86 feet Right of Way); thence North 89 degrees 32 minutes 30 seconds West, 765.44 feet along said Right-of-Way line to the point of beginning.

Commonly known as: 12950 Eckles Road, Livonia, MI 48150

X:\DOCUMENTS AND SETTINGS\MERRILLSCAN\LOCAL SETTINGS\TEMP\WZ6745\US_ACTIVE_EXHIBIT A - MLC 1104 - DELPHI C LIVONIA COIL & BUMPER_43637838_1.DOC

MLC #1104 – Delphi C Livonia Coil & Bumper

## EXHIBIT A

### Property Description

Tax ID Numbers: 46-099-99-000[1]-00 Parcel A); 46-09 9-0004-002 (Parcels B C); 46-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-000 (Parcel E)

Land situated in the City of Livonia, in the County of Wayne, State of Michigan described as follows:

PARCEL A:

That part of the Southwest 1/4 of Section 25, Township 1 South, Range 9 East City of Livonia, Wayne County, Michigan, described as Beginning due South 49.5 feet and South 89 degrees 27 minutes 40 seconds East 105 feet from the West 1/4 corner of said Section 25; thence South 89 degrees 27 minutes 40 seconds East, 1873/3 feet thence South 02 degrees 49 minutes 27 seconds West 237.36 feet thence North 87 degrees 13 minutes 27 seconds West 661.60 feet thence South 00 degrees 19 minutes 20 seconds West 1036,10 feet thence North 89 degrees 54 minutes 10 seconds West 126239 feet thence North 00 degrees 33 minutes 50 seconds East, 502.85 feet thence South 89 degrees 38 minutes 20 seconds East 300 feet thence North 00 degrees 33 minutes 50 seconds East 249.9 feet; thence South 89 degrees 38 minutes 20 seconds East 93.50 feet thence North 00 degreed 33 minutes 50 seconds East 249.95 feet; thence South 89 degrees 47 minutes West 368.55 feet thence North 04 degreed 35 minutes 45 seconds East, 285.13 feet to the point of beginning.

PARCEL B:

Part of the "Elm School Site," being part of the Southwest 1/4 of Section 25. Town 1 South, Range 9 East, City of Livonia, Wayne County, Michigan, being more particularly described as follows: Commencing at the West 1/4 corner of Section 25, Town 1 South, Range 9 East, City of Livonia, Wayne County, Michigan; and proceeding thence from said point South 00 degrees 33 minutes 50 seconds West along the West line of said Section 25, said line being also the center line of Middlebelt Road, a distance of 33428 feet to a point thence South 89 degrees 42 minutes 18 seconds East a distance of 84.95 feet to a point on the proposed Easterly line of Middlebelt Road and the point of beginning of the parcel of land herein being described; thence from said point of beginning South 89 degrees 42 minutes 1$ seconds East, a distance of 368.55 feet to a point; thence South 00 degrees 33 minutes 50 seconds West, a distance of 249.95 feet to a point; thence North 89 degrees 38 minutes 20 seconds West, a distance of 368.15 feet to a point on the Easterly line of proposed Middlebelt Road; thence North 04 degrees 35 minutes 45 seconds East along the Easterly line of proposed Middlebelt Road, a distance of 25028 feet to the point of beginning.

PARCEL C:

Part of the Southwest 114 of Section 25, Town 1 South, Range 9 East, City of Livonia, Wayne County, Michigan, described as Beginning at a point South 00 degrees 33 minutes 50 seconds West, along the West line of Section 25, a distance of 583.78 feet and South 89 degrees 38 minutes 20 seconds East a distance of 67.35 feet from the West 114 of corner of said Section 25; thence South 89 degrees 38 minutes 20 seconds East, 292,65 feet thence South 00 degrees 33 minutes 50 seconds West 260.00 feet thence North 89 degrees 38 minutes 20 seconds West, 7926 feet to -a point on the Easterly face of an existing 8 foot high masonry wall; thence North 00 degrees 25 minutes 53 seconds East along the Easterly face of said existing masonry wall, a distance of 160. 85 feet; thence North 89 degrees 37 minutes 35 seconds West, along the Northerly face of an existing S foot high masonry wall and its Westerly extension, a distance of 219,30 feet to a point on the East line of Middlebelt Road (width

varies); thence North 04 degrees 35 minutes 45 seconds East, along the East line of said Middlebelt Road, a distance of 89.35 feet to the point of beginning.

PARCEL D: INTENTIONALLY OMITTED

PARCEL E:

Part of the West 1/2 of the East 1/2 of the Southwest 1/4 of Section 25, Livonia Township, now City of Livonia, Wayne County, Michigan, and more particularly described as Beginning at a point, said point being South 87 degrees 13 minutes East, 1327.93
feet along the South line of Section 25, also being the center line of Plymouth Road, so called, and North 02 degrees 47 minutes East, 2282 feet from the Southwest corner of said Section 25 thence North 02 degrees 47 minutes East, 80 feet tea point; thence South 87 degrees 13 minutes East 200 feet along a fine parallel to the South line of said Section 25, to a point thence South 02 degrees 47 minutes West, 80 feet to a point thence North 87 degrees 13 minutes West, 220 feet along a line parallel to the South line of said Section 25 to a Point of Beginning.


Commonly known as: 12200 Middlebelt Rd., Livonia, MI 48150

## EXHIBIT A

### Property Description

*Tax ID Number* **46-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-001**

Land situated in the City of Livonia, in the County of Wayne, State of Michigan is described as follows:

PARCEL 1:

A part of the North 1/2 of Section 30, Town 1 South, Range 9 East, City of Livonia, Wayne County, Michigan, commencing at the West 1/4 corner of said Section 30; thence North 00 degrees 26 minutes 07 seconds East, 43.00 feet along the West line of Section 30; thence South 89 degrees 32 minutes 30 seconds East, 60.00 feet; thence North 00 degrees 26 minute 07 seconds East (M), 199.00 feet (M) to the Point of Beginning; thence North 00 degrees 26 minutes 07 seconds East (M&R), 1907.45 feet (M), 1907.80 feet (R) along Eckles Road right-of-way, (120 foot right-of-way) to a point on the Southerly line of the Chesapeake and Ohio Railroad Right-of-Way; thence South 75 degrees 30 minutes 44 seconds East (M), South 75 degrees 29 minutes 32 seconds East (R), 3119.90 feet (M), 3120.84 feet (R) along said Southerly Right-of-Way line; thence South 00 degrees 00 minutes 21 seconds West (M), South 00 degrees 02 minutes 00 seconds West (R), 1347.10 feet (M), 1347.19 feet (R) to a point on Amrhein Road Right-of-Way (86 foot right-of-way); thence along said right-of-way, the two (2) following courses, North 89 degrees 52 minutes 40 seconds West (M), North 89 degrees 45 minutes 37 seconds West (R), 521.65 feet (M), 521.47 feet (R) and North 89 degrees 32 minutes 30 seconds West (M), North 89 degrees 32 minutes 34 seconds West (R), 1749.55 feet (M); 1749.73 feet (R); thence North 00 degrees 26 minutes 07 seconds East (M), 199.00 feet (N1), thence North 89 degrees 32 minutes 30 seconds West (NI), 765.44 feet (M), to the Point of Beginning.

Commonly known as: 13000 Eckles Road, Livonia, MI 48150

## EXHIBIT A

### Property Description

**Beginning at a point in the Southeasterly right of way line of the Lehigh Valley Railroad at its intersection with the most Northwesterly corner of lands formerly of J. Ludlow Estate, formerly of Johnson & Johnson, now or formerly of J.B. Williams Co., and from said beginning point running thence**

1. **South 43 degrees 51 minutes 30 seconds East along the Southwesterly line of land now or formerly of J. B. Williams Co. as aforesaid a distance of 2004.636 feet to a point in the Westerly line of Walnut Avenue; thence**

2. **South 7 degrees 05 minutes 00 seconds East along the aforesaid Westerly line of Walnut Avenue a distance of 7.090 feet to a point of curve; thence**

3. **Southwesterly along a curve to the right connecting the aforesaid Westerly line of Walnut Avenue to the Northwesterly line of Raritan Road having a radius of 75.0 feet an arc distance of 96.342 feet to a point of tangent; thence**

4. **South 66 degrees 31 minutes 00 seconds West along the aforesaid Northwesterly line of Raritan Road a distance of 113.795 feet to a point of curve; thence**

5. **Southwesterly along a curve to the left as delineated on a plan entitled "Plan Showing Proposed Widening of Raritan Road from Central Avenue to Centenial Avenue Clark & Cranford Twps. & City of Linden, Union Co., N.J. Dated Jan. 1925" having a radius of 1176.280 feet an arc distance of 289.815 feet to a point of tangent; thence**

6. **South 52 degrees 24 minutes 00 seconds West still along the aforesaid Northwesterly side line of Raritan Road a distance of 1315.185 feet to a point being the intersection of the aforesaid Northwesterly line of Raritan Road and the Northeasterly line of the right of way of the Bloodgood Branch of the Lehigh Valley Railroad; thence**

7. **North 54 degrees 47 minutes 00 seconds West along the aforesaid Northeasterly line of the right of way of the Bloodgood Branch of the Lehigh Valley Railroad a distance of 881.330 feet to a point of curve; thence**

8. **Along a curve to the right being the Easterly line of the Bloodgood Branch of the Leigh Valley Railroad having a radius of 922.370 feet, an arc distance of 1641.768 feet to a point in the aforementioned Southeasterly right of way line of the Lehigh Valley Railroad; thence**

9. **North 55 degrees 51 minutes 00 seconds East along the aforesaid Southeasterly right of way line of Lehigh Valley Railroad a distance of**

**1045.073 feet to the point and place of Beginning.**


**FOR INFORMATIONAL PURPOSES ONLY:**

**Premises described herein is designated as Lot 1, Block 143 on the Tax Map of the Township of Clark, Lot 1 Block 541 on the Tax Map of the Township of Cranford, County of Union, State of New Jersey**

1300 Raritan Rd., Clark, NJ  07066

MLC #1008 – Hyatt Hills Golf Complex

X:\DOCUMENTS AND SETTINGS\MERRILLSCAN\LOCAL SETTINGS\TEMP\WZF3E1\US_ACTIVE_EXHIBIT A - MLC #1008 HYATT HILLS GOLF
COMPLEX, 1300 RARITAN RD, CLARK NJ.DOC_43637517_1.DOC          2

# EXHIBIT A

## Property Description

Tax ID Number:  Error! Unknown document property name.

Land situated in the Error! Unknown document property name. of Error! Unknown document property name., in the County of Error! Unknown document property name., State of Error! Unknown document property name. is described as follows:

**PARCEL 1:** Commencing at the South ¼ corner of Section 6, Town 3 South, Range 8 East Van Buren Township, Wayne County, Michigan: thence South 86 degrees 20 minutes 14 seconds West 257.60 feet along the South line of said Section 6 for a PLACE OF BEGINNING; thence continuing South 86 degrees 20 minutes 14 seconds West 27.26 feet along said South line; thence North 03 degrees 39 minutes 46 seconds West 33.00 feet to the Northerly Right-of-Way line of Ecorse Road (Variable Width); thence the following two (2) courses along the said Northerly Right-of-Way line of Ecorse Road  945.75 feet along the arc of a 2167.01 foot radius non-tangential circular curve to the right, having a chord which bears North 78 degrees 36 minutes 11 seconds West 938.26 feet, and North 66 degrees 06 minutes 01 seconds West 1506.64 feet; thence North 40 degrees 08 minutes 29 seconds East 1004.49 feet along the Easterly Right-of-Way line of Michigan Avenue (Variable Width); thence North 77 degrees 35 minutes 51 seconds East 1704.12 feet along the Southerly Right-of-Way line of the CSX Railroad (100.00 feet wide); thence South 00 degrees 25 minutes 37 seconds East 1960.94 feet to the Place of Beginning.

**Commonly known as**:  Vacant Land South of Van Born (Encore)

## EXHIBIT A

### Property Description

Tax Id Number(s): 14-20-130-018, 14-17-384-003, 14-17-453-034, 14-20-201-001, 14-20-201-002
Land Situated in the City of Pontiac in the County of Oakland in the State of MI

PARCEL 1:

Lots 81 to 93, inclusive, and the North 1/2 of Lot 99 and all of Lots 100 to 108, inclusive, BUENA VISTA HEIGHTS SUBDIVISION, EXCEPT the East 30 feet of the North 1/2 of Lot 99 and Lots 100 to 103, inclusive, taken for road, including all of vacated alley described as: Beginning at the Northwest corner of Lot 103; thence South 01 degrees 12 minutes 14 seconds East, 176.42 feet; thence North 59 degrees 52 minutes 59 seconds West 18 feet; thence South 30 degrees 07 minutes 01 seconds West 13.05 feet to the Northeasterly corner of Lot 93; thence Northwesterly along the North line of Lots 83 to 93, inclusive, to the South line of vacated Street, Louise Avenue; thence Easterly along said South line to the West corner of Lot 108; thence Southeasterly along South line of Lots 104 to 108 inclusive, to the Southeast corner of Lot 104; thence North along the. East line of Lot 104 to the Northeast corner of Lot 104; thence Easterly 18 feet along the North line of Lot 104, extended Easterly; thence Southerly 20 feet to beginning. ALSO including the South 1/2 of vacated Street Louise Avenue adjacent to the same. ALSO including the East 1/2 of vacated Hollywood Avenue adjacent to the same, as recorded in Liber 24,
Page 27 of Plats, Oakland County Records.

PARCEL 2:

Lots 109 to 141 inclusive, BUENA VISTA HEIGHTS SUBDIVISION, EXCEPT the East 30 feet of Lots 123 to 127 inclusive, taken for road. ALSO Lots 170 to 202 inclusive, EXCEPT the East 30 feet of Lots 184 to 188 inclusive, taken for road. Including 1/2 vacated street, Louis Avenue adjacent to Lots 109 to 123 inclusive.

ALSO including all of vacated Mansfield Avenue East of the East line of Hollywood Avenue, that part of vacated Tennyson Avenue adjacent to the West 77 feet of Lot 188, and 1/2 of vacated Hollywood Avenue adjacent to Lots 109 and 141. ALSO including all of vacated alley adjacent to Lots 122 to 128 inclusive, and Lots 183 to 189 inclusive, as recorded in Liber 24, Page 27 of Plats, Oakland County Records.

EXCEPTING therefrom the North 10 feet of Lots 109 to 122 inclusive, and the South 10 feet of Lots 128 to 141 inclusive, Lots 170 to 175 inclusive, and Lots 196 to 202 inclusive, BUENA VISTA HEIGHTS SUBDIVISION, as recorded in Liber 24, Page 27 of Plats, Oakland County Records.

PARCEL 8:

Part of the West 1/2 of Section 17, Town 3 North, Range 10 East, bounded on the East by the Grand Trunk Western Railroad, on the North Tennyson Avenue, on the West by Baldwin Avenue, also vacated part of Tennyson Avenue of Baldwin Park, adjacent thereto. All that part of the East 1/2 of the Northeast 1/4 of Section 20, Town 3 North, Range 10 East, described as: Beginning in the center line of the highway known as Kennett Road, now vacated, at its intersection with

the Westerly line of the Pontiac, Oxford and Northern branch of the Grand Trunk Railroad, running thence along the Westerly line of said Railroad right-of-way North 05 degrees 42 minutes 50.5 seconds West 1028.03 feet to a point in the West line of said right-of-way; thence South 84 degrees 10 minutes 43.8 seconds West 1319.43 feet to a point in the center of Baldwin Avenue; thence South 6 degrees 28 minutes 58 seconds East 646.74 feet along the center line of Baldwin Avenue to its intersection with the center line of Kennett Road; thence South 79 degrees 35 minutes 31 seconds East, 1364.71 feet along the center line of Kennett Road, now vacated, to the point of beginning.

Also, Part of the Southeast 1/4 of Section 17 and part of the Northeast 1/4 of Section 20, Town 3 North, Range 10 East, City of Pontiac, Oakland County, described as a 1 foot strip of land lying East of and parallel to the West line of Grand Trunk Western Railroad right-of-way extending North 05 degrees 54 minutes 00 seconds West 1457.23 feet from the Northerly line of Kennett Avenue to the Southerly line of vacated Tennyson Avenue.

Client Reference: 900 Baldwin Avenue (Parcels 1, 2 & 8), Pontiac, MI 48340-2602

## EXHIBIT A

## Property Description

PARCEL I:

Situated in the Northeast Quarter (NE 1/4) of Section Ten (10) Township Fifteen (15) North, Range Three (3) East more particularly described as follows:

From the intersection of the Southerly line of Washington Street with the Easterly line of Harding Street in said City, measure Southerly One Thousand Two Hundred and Thirty-two and two tenths (1232.2) feet along the Easterly line of Harding Street for the place of beginning; thence continue the last described course measure Three Hundred and Thirty-nine and nine tenths (339.9) feet; thence deflecting One Hundred Seven (107) degrees and Three (3) minutes to the left measure Northeasterly Fifty-six (56) feet along Grantor's Southerly property line; thence measure Northeasterly Six Hundred Seventy-one and four tenths (671.4) feet along said Southerly property line which is also the Northerly property line of Pennsylvania Railroad Company same being on a curve to the right having a radius of Six Thousand Five Hundred Nineteen and six tenths (6519.6) feet and being parallel with and Fifty (50) feet distant measured Northwesterly at right angles to the center line of said Pennsylvania Railroad Company's Eastward main tract; thence deflecting Seventy-eight (78) degrees and Fifty-one (51) minutes to the left measure Northerly One Hundred Thirty-five and seven tenths (135.7) feet; thence deflecting Eighty-four (84) degrees and Thirty (30) minutes to the left measure Northwesterly Two Hundred Fifty-four and five tenths (254.5) feet parallel with and Forty (40) feet distant measured Southwesterly at right angles to the center line of the Grantor's so called latter track; thence deflecting Five (5) degrees and Thirty (30) minutes to the left measure Westerly Four Hundred Fifty-one (451) feet to the place of beginning; containing Three and Eighty-five Hundredths (3.85) acres, more or less.

PARCEL II:

All-that certain piece or parcel of land, being a part of the Northeast Quarter of Section 10, Township 15 North, Range 3 East, situated in the City of Indianapolis, County of Marion and State of Indiana, being more particularly bounded and described in accordance with a Plat of Survey prepared by Sol C. Miller, Registered Land Surveyor No. 9788, of Mid-States Engineering Co., Inc., Job no. 380-276, dated October 22, 1981, as follows:

Commencing at the Northwest corner of said Northeast Quarter-Section; thence South 00° 59' 33" West along the West line thereof 690.42 feet to the point of beginning of the herein-described parcel; thence continuing South 00° 59' 33" West along said West line 72.27 feet; thence on the following three courses along the north and east lines of a certain 3.85 acre tract described in Quitclaim Deed recorded as Instrument No. 15439-61 in the Office of the Recorder of said County: (1) South 88° 40' 26" East 484.36 feet: (2) South 84° 12' 40" East 254.50 feet; (3) South 00° 14' 39" West 108.61 feet to a point on a curve concave southerly, having a central angle of 03° 58' 26" and a radius of 4633.72 feet; thence easterly along said curve an arc distance of 321.40 feet (said arc being subtended by a chord having a bearing of North 81° 15' 59" East and a length of 321.33 feet); thence North 83° 30' 40" East 62.34 feet; thence North 83° 38' 27" East 1205.53 feet; thence North 06° 21' 33" West 100.00 feet to a point on a curve concave southerly, having a central angle of 05° 42' 16" and a radius of 2583.19 feet; thence westerly along said curve, being 50 feet south of the centerline of the main track of railroad of Consolidated Rail Corporation (formerly Cleveland, Cincinnati, Chicago and St. Louis Railway Company) known as the main line Indianapolis to St. Louis and identified as Line Code 8305 in the records of the United States Railway Association, an arc distance of 257.19 feet (said arc being subtended by a chord having a bearing of North 86° 29' 54" West and a length of 257.08 feet); thence South 88° 48' 35" West 247.13 feet; thence South 87° 24' 14" West, parallel with and 50 feet south of said centerline 1800.47 feet to the point of beginning, containing 8.314 acres, more or less.

PARCEL III:(Easement rights)

An easement for sidetrack, driveway, fence, underground and overhead utilities, overhead conveyor and for fire water line and no other purposes in, on under over, through and across:

All that certain piece or parcel of land, being a part of the Northeast Quarter of Section 10, Township 15 North, Range 3 East, situated in the City of Indianapolis, County of Marion and State of Indiana, being more particularly bounded and described in accordance with a Plat of Survey prepared by Dewitt Clinton Keeler, Registered Land Surveyor No. S0263 of Keeler-Webb Associates, Suite 100, Park 11, 5850 West 85th Street, Indianapolis, Indiana, dated April 25, 1986, as follows: Commencing at the northwest corner of the Northeast Quarter Section; thence South 01° 07' 10" East along the west line thereof, 690.42 feet to a PK nail; thence North 85° 16' 54" East a distance of 35.07 feet to a concrete monument on the east right of way of Harding Street, the point of Beginning; thence North 01° 07' 10" West, a distance of 25.10 feet to a point; thence North 85° 18' 45" East, parallel to and 25 feet southerly from the centerline of the near track of railroad of Consolidated Rail Corporation, a distance of 1544.9636 feet to a point; thence South 04° 56' 41" East, 21.36 feet to a point; thence North 85° 54' 10" East, a distance of 18.0979 feet to a point; thence North 04° 56' 41" West, a distance of 21.36 feet to a point; thence North 85° 18' 45" East, parallel to and 25 feet from said centerline a distance of 215.3785 feet to a point; thence along a curve to the right concentric with and 25 feet from said centerline, having a radius of 2,608.19 feet, central angle of 16° 35' 55", a long chord of 752.96 feet and a long chord bearing of South 88° 08' 47" East, a distance of 755.5995 feet to a point; thence South 00° 00' 00" West, a distance of 89.4719 feet to a point; thence South 81° 45' 11" West parallel to and 20 feet northerly from the centerline of the near track of railroad of Consolidated Rail Corporation, a distance of 1140.5891 feet to a point; thence South 61° 13' 14" West, a distance of 28.52 feet to a point; thence South 81° 45' 11" West, parallel to and 10 feet from said centerline, a distance of 281.9251 feet to a point; thence along a curve to the left, concentric with and 10 feet from said centerline, having a radius of 4569.81 feet, a central angle of 9° 58' 32", a long chord 794.63 feet and a long chord bearing of South 76° 58' 01" West, a distance of 795.64 feet to a point; thence South 71° 58' 45" West, parallel to and 10 feet from said centerline, a distance of 323.81 feet to a point on the east line of Harding Street; thence North 01° 07' 10" West along said east line, a distance of 27.34 feet to a concentric monument; thence North 71° 44' 35" East, a distance of 56.02 feet to a concrete monument; thence northeasterly along a curve to the right, having a radius of 6519.60 feet, a central angle of 05° 54' 11", a long chord of 671.40 feet and a long chord bearing of North 74° 45' 18" East, a distance of 671.6970 feet to a concrete monument; thence North 01° 44' 04 East, a distance of 25.77 feet to a concrete monument; thence along a curve to the right, having a radius of 4633.72 feet, a central angle of 3° 58' 27", a long chord of 321.34 feet and a long chord bearing of North 78° 50' 47" East, a distance of 321.4 feet to a concrete monument; thence North 81° 24' 40" East, a distance of 62.34 feet to a concrete monument; thence North 81° 35' 13" East, a distance of 1206.10 feet to a concrete monument; thence North 08° 25' 09" West, a distance of 99.79 feet to a concrete monument; thence southwesterly along a curve to the left, having a radius of 2583.19 feet, a central angle of 05° 42' 22", a long chord of 257.16 feet and a long chord bearing of North 88° 32' 58" West, a distance of 257.26 feet to a concrete monument; thence South 86° 41' 15" West, a distance of 247.30 feet to a concrete monument; thence South 85° 17' 08" West, a distance of 1767.27 feet to a concrete monument, the point of beginning, containing 3.4374 acres, more or less.

PARCEL IV:

All that part of land situated in the City of Indianapolis, County of Marion and State of Indiana, being a part of the Northwest Quarter of Section 11, Township 15 North, Range 3 East, more particularly described as follows:

Commencing at the intersection of the West line of White River Parkway West Drive as conveyed to the City of Indianapolis by deed recorded August 26, 1915, in Land Record 61, page 274, in the Office of the Recorder of Marion County, Indiana, with the North line of Oliver Avenue, which is 40.00 feet North from the center line thereof (the next ten courses to the place of beginning are along the said West line of White River Parkway West Drive); thence North 00 degrees 25 minutes 42 seconds West 603.21 feet; thence South 89 degrees 34 minutes 18 seconds West 10.00 feet; thence North 00 degrees 25 minutes 42 seconds West 177.10 feet, to the beginning of a curve having a radius of 1707.28 feet, the radius point of which, bears North 89 degrees 34 minutes 18 seconds East; thence northerly, along the said curve, 282.08 feet to a point which bears North 80 degrees 57 minutes 42 seconds West from the said radius point; thence North 09 degrees 02 minutes 18 seconds East 272.50 feet; thence South 80 degrees 57 minutes 42 seconds East 15.00 feet; thence North 09 degrees 02 minutes 18 seconds East 136.10 feet to the beginning of a curve having a radius of 1139.01 feet, the radius point of which bears North 80 degrees 57 minutes 42 seconds East; thence Northerly along said curve 157.90 feet to a point in the South property line of the original 100 foot wide strip of land of The Philadelphia, Baltimore and Washington Railroad Company (formerly known as the Vandalia Railroad), said South property line bears North 87 degrees 58 minutes 48 seconds West, and said point bears South 88

degrees 54 minutes 17 seconds East from the said radius point; continue thence Northerly. along said curve, 32.61 feet to a point which bears North 89 degrees 27 minutes 18 seconds East from the said radius point; thence North 00 degrees 32 minutes 42 seconds West 32.51 feet to the Place of Beginning; thence North 88 degrees 02 minutes 51 seconds West 98.70 feet; thence North 84 degrees 29 minutes 55 seconds West 80.24 feet; thence North 82 degrees 30 minutes 41 seconds West 82.63 feet; thence North 87 degrees 57 minutes 13 seconds West 189.98 feet; thence North 00 degrees 32 minutes 42 seconds West 64.82 feet; thence North 84 degrees 44 minutes 11 seconds East 291.57 feet; thence North 84 degrees 33 minutes 19 seconds East 160.00 feet to the said West line of White River Parkway West Drive; thence South 00 degrees 32 minutes 42 seconds East along the said West line, 135.37 feet to the place of beginning, containing 1.022 acres, more or less.

PARCEL V:

That part of the east one-half of the northeast one-quarter of Section Ten (10), and part of the west one-half of the northwest one-quarter and part of the west one-half of the southwest one-quarter of Section Eleven (11), Township Fifteen (15) North, Range Three (3) East, in Marion County, State of Indiana, described as follows:

Beginning at the northeast corner of Drover Street and Oliver Avenue and extending east along the north line of Oliver Avenue 239.25 feet to the west line of the west drive of White River Parkway; thence in a northerly direction along said west line 603.21 feet and continuing on said right-of-way west 10 feet; north 177.10 feet, continuing in a northerly direction along the arc of a circle having for its radius 1707.28 feet for a distance of 282.10 feet; thence tangent to this curve 272.50 feet 272.50 feet; thence easterly in right angle to the last described line 15 feet; thence in a northerly direction at right angles to the last described line 136.10 feet; thence continuing along the west line of said west drive curving to the left along the arc of a circle having for its radius 1139.01 feet for a distance of 156.20 feet to the south right-of-way line of the Vandalia Railroad; thence in a westerly direction along said right-of-way line 1688.90 feet to a point 300 feet east of the east line of Division Street; thence south parallel to Division Street 324.95 feet; thence west 300 feet to the east line pf Division Street to a point 642 feet north of the north line of Henry Street; thence south along the east line of Division Street 642 feet to the north line of Henry Street; thence west along the north line of Henry Street 1663.25 feet to the east line of Drover Street; thence south on the east line of Drover Street to the place of beginning. Together with that portion of vacated Division Street adjoining said property as set forth in the Declaratory Resolution 98-VAC-21 recorded July 6, 1998 as Instrument No. 98-112821.

PARCEL VI:

Part of the West Half of the Northeast Quarter of Section 10, Township 15 North, Range 3 East in Marion County, Indiana, more particularly described as follows:

Beginning at a point on the South right of way line of the Terre Haute and Indianapolis Railroad Company which said point lies on the East line of said Half Quarter Section at a point North 00 degrees 16 minutes 52 seconds West 1673.22 feet (measured) 1673 feet (Deed) from the Southeast corner of said Half Quarter Section; thence along the East line of said Half Quarter Section South 00 degrees 16 minutes 52 seconds East 257.72 feet (measured) 257 feet (Deed) to the North line of Gillett Street; thence along the North line of Gillett Street South 89 degrees 40 minutes 15 seconds West 384.00 feet; thence parallel with the East line of said Half Quarter Section North 00 degrees 16 minutes 52 seconds West 179.30 feet; thence North 71 degrees 31 minutes 45 seconds East 200.00 feet to a point on said South railroad right of way line, said point lies on a curve having a radius of 5679.65 feet; the radius point of which bears South 06 degrees 04 minutes 07 seconds East; thence Easterly along said curve and right of way 194.69 feet (measured) 194.4 feet (Deed) to a point which bears North 04 degrees 06 minutes 17 seconds West from said radius point which is the Point of Beginning. Together with that portion of vacated Division Street adjoining said property as set forth in the Declaratory Resolution 98-VAC-21 recorded July 6, 1998 as Instrument No. 98-112821.

PARCEL VII:

A part of the West Half of the Northeast Quarter of Section 10, a part of Lot 150 in Clark and Osgoods First Addition to West Indianapolis and a part of Deputy's Westside Addition to West Indianapolis, all in Township 15 North,

Range 3 East in Marion County, Indiana, being more particularly described as follows:

Beginning at a point on the East line of Harding Street that is 508.0 feet North of the North line of Henry Street as platted by Clark and Osgoods First Addition to West Indianapolis as recorded in Plat Book 9, page 65 in the Office of the Recorder of said County (said point also being 24.00 feet North of the Southwest corner of Lot 150 in said Clark and Osgoods First Addition and 35.00 feet East of the West line of said Half Quarter Section; Thence North 00 degrees 14 minutes and 48 seconds West along said East right of way 159.27 feet to a point on the South property line of a Deed recorded in Land Record 33, page 79, in said Recorder's Office to the Indianapolis Union Railroad, dated January 7, 1878, said point being North 41 degrees 36 minutes 46 seconds West of the radius point of a 655.0 feet radius curve, said point also being 116.47 feet (113 feet by Deed) South of the center line of the Terre Haute and Indianapolis Railway measured along said East right of way; thence Northeasterly along said 655.0 foot radius curve 257.91 feet to a point that is on the South right of way line of the Terre Haute and Indianapolis Railway and said point being North 19 degrees 03 minutes 07 seconds West of the radius point, (said right of way described in Land Record 33, Page 79 by deflection angles from its point of beginning to points on the arc of the property line), said point in South right of way is on a curve having a radius of 5679.65 feet and is North 15 degrees 16 minutes 00 seconds West of ,radius point; Thence Easterly along said curve to the right 911.80 feet to a point that is 194.69 feet West of the East line of said Half Quarter Section as measured along said Railroad right of way; Thence South 71 degrees 31 minutes 45 seconds West 200.0 feet to a point that is 384 feet West of said East Half Quarter Line; Thence South 00 degrees 16 minutes 52 seconds East and parallel to said East Half Quarter Line 229.30 feet to a point on the South line of Gillett Street and North line of Lot 18 in Deputy's Westside Addition to West Indianapolis, as recorded in Plat Book 10, Page 184 in the said Recorder's Office (said point being the Southeast corner of Gillett Street Vacation by Resolution #12778, dated December 14, 1925); Thence North 89 degrees 40 minutes 15 seconds East along the South right of way of Gillett Street 41.59 feet to its intersection with the West right of way line of Arbor Street as platted in Clark and Osgoods Second Addition to West Indianapolis and recorded in Plat Book 9, page 107; Thence South 00 degrees 16 minutes 52 seconds East along the West line of Arbor Street and the East line of Lots 15 through 18 in said Deputy's Addition 137.4 feet to a point 11 feet North of the Southeast corner of Lot 15; Thence South 88 degrees 47 minutes 29 seconds West parallel to and 11 feet North of the South line of Lots 15 and 22 and parallel to the North line of Henry Street 340.0 feet to a point on the West line of Coffey Street (now vacated); Thence South 00 degrees 16 minutes 52 seconds East along said West line 22.0 feet to a point that is 493 feet North of the North line of Henry Street as platted in said Clark and Osgoods First Addition; Thence South 88 degrees 47 minutes 29 seconds West and parallel to the North line of Henry Street 438.51 feet to a point that is 191 feet East of the East line of Harding Street and 25 feet North of the North line of Lot 151 and on the East line of Lot 150 in said Clark and Osgoods First Addition; Thence North 00 degrees 14 minutes 48 seconds West and on the East line of said Lot 150, 15.00 feet to a point 24 feet North of the Southeast corner of said Lot 150 and on the North line of a 40 foot dedication of a public street; Thence South 88 degrees 47 minutes 29 seconds West and along said dedicated right of way 191.0 feet to the point of beginning, containing 7.286 acres, more or less. Together with that portion of vacated Gillette Street and Arbor Avenue adjoining said property as set forth in the Declaratory Resolution 98-VAC-21 recorded July 6, 1998 as Instrument No. 98-112821.

PARCEL VIII:

Situated in Marion County, State of Indiana, more particularly described as follows:

Part of the East Half (1/2) of the Northeast Quarter (1/4) of Section Ten (10), Township Fifteen (15) North Range Three (3) East, bounded as follows, to-wit:

Beginning on the east line of Osgood (now Division ) Street, at a point Thirteen Hundred Sixty (1360) feet north of the south line of said half quarter section; running thence east at right angles with the said East Line of Osgood Street three hundred (300) feet; thence North parallel with the said east line of Osgood Street 324 - 95/100 feet to the south line of the right-of-way of the Railroad of the Terre Haute and Indianapolis Railroad Company; thence westwardly with the South line of said right-of-way of the Railroad Three Hundred (300) feet to the east line of Osgood Street; thence south on the east line of Osgood Street 316 - 45/100 feet to the place of beginning, containing 2 -1/5 acres, more or less. Together with that portion of vacated Division Street adjoining said property as set forth in the Declaratory Resolution 98-VAC-21 recorded July 6, 1998 as Instrument No. 98-112821.

Except and with the exception and reservation of an Easement and right-of-way thirty (30) feet in width

through and upon said described real estate for the construction, use and maintenance of railroad switches, according to an agreement made by former owners with said Railroad Company, which said agreement is hereby referred to and made a part hereof the same as if copied herein.

and

All that certain piece or parcel of land situated in the City of Indianapolis, Center Township, in the County of Marion and State of Indiana, bounded and described as follows, viz:

Beginning at a point in a northerly line of land of Consolidated Process Company, Inc. at a distance of one hundred twenty-two feet and three tenths of a foot measured north eight-nine degrees forty-eight minutes East along the line dividing the strip of land thirty feet wide, in tenure of The Pittsburgh, Cincinnati, Chicago and St. Louis Railroad Company occupied by side track Number 110 of said Railroad Company on the North, from said land of the Consolidated Process Company, Inc. on the South, from a point in the easterly line of Division Street, sixty feet wide, said last mentioned point being the distance of one hundred ninety-one feet and ninety-five one-hundredths of a foot measured due North along the said easterly line of Division Street, from a steel pipe fence post, common to a corner of said land of Consolidated Process Company, Inc. and common to a corner of land now or formerly of the General Motors Corporation (Chevrolet Commercial Body Division), immediately Southward of a point where the prolongation eastwardly of the southerly line of Gillette Street meets said easterly line of Division Street; Extending from said beginning point the following four courses and distances; the first two thereof being by land in tenure of the said Railroad Company; (1) Due North six feet to a point; (2) North eighty-nine degrees forty-eight minutes East, on a line parallel with and distant eight feet measured southwardly and at right angles from a tangent portion of the center line of the said side track Number 110, one hundred thirty-two feet to a point in another northerly line of land of the Consolidated Process Company, Inc.; the following two courses and distances being along the said northerly line of last mentioned land; (3) South eighty-two degrees twenty-two minutes West forty-six feet and four tenths of a foot to a point; and thence (4) South eighty-nine degrees forty-eight minutes West eighty-six feet, more or less, to the place of beginning, containing six hundred fifty-four square feet, more or less. Together with that portion of vacated Division Street adjoining said property as set forth in the Declaratory Resolution 98-VAC-21 recorded July 6, 1998 as Instrument No. 98-112821.

PARCEL IX:

Lots 1 to 13 inclusive and Lots 22 to 47 inclusive in Clark and Osgood's First Addition to the Town of West Indianapolis, now in the City of Indianapolis, as per plat thereof, recorded in Plat Book 9, page 65, in the Office of the Recorder of Marion County, Indiana and the vacated alley adjacent to Lots 1-13 and 22-34 as vacated in Declaratory Resolution 81-VAC-11 recorded June 29, 1981 as Instrument No. 81-40502 and vacated Arbor Avenue adjacent to Lots 22-34 and 35-47 as vacated in Declaratory Resolution 97-VAC-3 recorded May 8, 1997 as Instrument No. 97-64560. Together with that portion of vacated Division Street adjoining said property as set forth in the Declaratory Resolution 98-VAC-21 recorded July 6, 1998 as Instrument No. 98-112821.

PARCEL X:

Lots 245, 246 and the South 11 feet of Lot 247, and Lots 248 through 255, inclusive and Lots 257 through 260 inclusive all in Clark and Osgood's Second Addition to West Indianapolis, now in the City of Indianapolis as per plat thereof recorded in Plat Book 9, page 107 in the Office of the Recorder of Marion County, Indiana and the vacated alley between Lots 245, 246, part 247, 248 through 255, 257 and part 258 as set forth in Declaratory Resolution 73-VAC-5 recorded August 2, 1974 as Instrument No. 97-48591. Together with that portion of vacated Division Street, Henry Street, Gillett Street and Arbor Street adjoining said property as set forth in the Declaratory Resolution 98-VAC-21 recorded July 6, 1998 as Instrument No. 98-112821.

PARCEL XI:

Lots 20 through 50 inclusive, 54 through 184 inclusive and 190 through 199 inclusive all in Clark's Third Addition to West Indianapolis, now in the City of Indianapolis, the plat of which is recorded in Plat Book 9, page 88, in the Office of the Recorder of Marion County, Indiana. Together with vacated Streets and alleys as set forth in

Declaratory Resolution 17998-Modified recorded in Deed Record 1982, as Instrument No. 17973, Declaratory Resolution D-65-27 recorded December 16, 1965 as Instrument No. 65-66907, Declaratory Resolution D-66-23 recorded November 13, 1967 as Instrument No. 6756338, Declaratory Resolution 74-VAC-14 recorded July 9, 1974 as Instrument No. 74-42040, Declaratory Resolution 78 VAC-39 recorded August 17, 1979 as Instrument No. 79-61563, and Declaratory Resolution 98-VAC-21 recorded July 6,1998 as Instrument No. 98-112821.

## EXHIBIT A

### Property Description

Land situated in **Kansas City**, in the County of **Wyandotte**, State of **Kansas** is described as follows:

Parcel 1:

Beginning at a point on the North line of Kindelberger Road, said point being 33 feet North and 1293.97 feet West of the center of Section 27, Township 10 South, Range 25 East, Wyandotte County, Kansas, thence North parallel to the North-South center line of said Section 27 a distance of 1899.76 feet to the South right of way line of the Union Pacific Railroad spur line to the North American Aviation Company Plant; thence North 77 degrees 14 minutes 15 seconds East along said right of way line a distance of 154.42 feet thence North parallel to the North-South center line of said Section 27 a distance of 21.38 feet; thence North 77 degrees 13 minutes East a distance of 195.59 feet; thence North 84 degrees 36 minutes East a distance of 959.73 feet, thence North 85 degrees 14 minutes East a distance of 478.39 feet to the West line of Old Fairfax Road (now vacated) extended; thence Southerly along said extended line a distance of 270.18 feet to the intersection with the Northeasterly boundary of a tract of land described in an indenture of easement from the Kansas City Industrial Land Company, a corporation, to the United States of America, dated March 5, 1941; thence South 35 degrees 27 minutes East along said boundary to a point 300 feet East of the center line of said Fairfax Road (now vacated) and 1496.18 feet North of the North boundary of said Kindelberger Road extended; thence South 89 degrees 01 minutes 04 seconds East a distance of 29.79 feet; thence Southerly parallel with the said Fairfax Road (now vacated) a distance of 1322.90 feet; thence North 89 degrees 01 minutes 04 seconds West a distance of 329.79 feet to the center line of said Fairfax Road (now vacated); thence Southerly along said center line a distance of 173.28 feet to the North line of said Kindelberger Road extended; thence Westerly along said North line extended and the North line of Kindelberger Road a distance of 1810.03 feet to the point of beginning.

Parcel 2:

A tract of land situated in the Northeast 1/4, Section 27, Township 10 South, Range 25 East, of the Sixth Principal Meridian, Wyandotte County, Kansas, described as follows:

Starting at the Southwest corner of said Northeast 1/4, thence East along the South line of said Northeast 1/4 a distance of 516.07 feet; thence North along a line parallel with and 516 feet distant East at right angles from the West line of said Northeast 1/4 a distance of 33 feet to the true point of beginning; thence East at right angles to the West line of said Northeast 1/4 a distance of 404.79 feet; thence North along a line parallel with the West line of said Northwest 1/4 a distance of 173.28 feet; thence West along a line at right angles to the West line of said Northeast 1/4 a distance of 404.79 feet; thence South along a line parallel with the West line of said Northeast 1/4 a distance of 173.28 feet to the true point of beginning, containing an area of 1.61 acres, more or less, subject only to the provisions of RESOLUTION NO. 17199 adopted by the Board of Commissioners of The City of Kansas City, Kansas, on June 8, 1961.

**Commonly known as**: Fairfax Assembly Plant, Kansas City, KS 66101

Parcel 3:

Tax Id Number(s): 298401/4B 76 4616-3-2 (Lot 2), 298402/46 7B 4616-3-3 (Lot 3), 298403/48 7B 4616-3-4 (Lot 4)

Land Situated in the City of Kansas City in the County of Wyandotte in the State of KS

Lots 2 and 3 and 4 Fairfax I, a Subdivision in Kansas City, Wyandotte County, Kansas according to the recorded plat thereof.

**Commonly known as**: 100, 120, 220 Kindelberger Rd., Kansas City, KS 66101

X:\DOCUMENTS AND SETTINGS\MERRILLSCAN\LOCAL SETTINGS\TEMP\WZE10C\US_ACTIVE_EXHIBIT A - MLC #1289-1,2 - FAIRFAX PLANT AND PARKING LOT.DOC_43637594_1.DOC

MLC #1289-1, 2 – Fairfax Plant and Parking Lot

## EXHIBIT A

### Property Description

Tax ID Number: **19-03-126-008** Land situated in the **City** of **Pontiac**, in the County of **Oakland**, State of **Michigan** is described as follows:

That part of Lot 5, "ASSESSOR'S PLAT NO. 110", as recorded in Liber 52, Page 46 of Plats, Oakland County Records, described as follows: beginning at a point on the North line of said Section 3, which is North 87 degrees, 23 minutes, 0 seconds West, 49.70 feet from the North 1/4 corner of said Section 3; thence South 2 degrees, 36 minutes, 47 seconds West, 1125.94 feet; thence on a curve to the left, having a radius of 810.00 feet, with a chord bearing and distance of South 13 degrees, 41 minutes, 13 seconds East 454.68 feet; thence South 29 degrees, 59 minutes, 13 seconds East, 135.67 feet; thence South 60 degrees, 0 minutes, 47 seconds West, 498.29 feet; thence on a curve to the left, having a radius of 347.00 feet, with a chord bearing and distance of South 41 degrees, 9 minutes, 50 seconds West, 224.22 feet; thence South 18 degrees, 13 minutes, 45 seconds West, 175.45 feet; thence South 22 degrees, 18 minutes, 53 seconds West, 347.12 feet; thence on a curve to the right, having a radius of 269.50 feet, with a chord bearing and distance of South 30 degrees, 1 minute, 2 seconds West 455.61 feet; thence North 42 degrees, 16 minutes, 49 seconds West, 408.58 feet; thence on a curve to the right, having a radius of 269.50 feet, with a chord bearing and distance of North 19 degrees, 50 minutes, 14 seconds West 205.77 feet; thence North 2 degrees, 36 minutes, 20 seconds East 2236.04 feet to the North line of Section 3; thence South 87 degrees, 23 minutes, 0 seconds East along said North line, 1334.96 to the point of beginning.

**Commonly known as**: 2000 CENTERPOINT PKWY, Pontiac, MI 48340

## EXHIBIT A

### Property Description

Tax ID Numbers. : Tax Id Nos. 19-03-101-003 (Parcels 25, 26 and 27); 19 04 226-020 (Parcels 29 and 30)

 Land situated in the City of Pontiac, in the County of Oakland, State of Michigan is described as follows:

PARCEL 25:

Lots 1, 2 and 4, and Part of Lots 5 and 11, ASSESSOR'S PLAT NO 110, as recorded in Liber 52, Page 26 of Plats, Oakland County Records, Also Part of Section 3, Town 2 North, Range 10 East, City of Pontiac, Oakland County, Michigan, described as Beginning at a point distant North 87 degrees 23 minutes 00 seconds West 1334.96 feet from the North 1/4 corner of said Section 3; thence South 02 degrees 36 minutes 20 seconds West, 2236.05 feet; thence along a curve to the left, radius 319.50 feet, chord bears South 19 degrees 50 minutes 14 seconds East, 243,95 feet, distance of 250.30 feet thence South 42 degrees 16 minutes 49 seconds East, 511.12 feet thence along a curve to the left, radius 358 feet, chord bears South 65 degrees 55 minutes 06 seconds East, 87.18 feet, distance of 87A0 feet; thence South 72 degrees 54 minutes 43 seconds East, 8210 feet; thence along a curve to the right radius 398 feet chord bears South 54 degrees 06 minutes 50 seconds East 25220 feet, distance of 256.77 feet; thence South 35 degrees 22 minutes 57 seconds East, 5.04 feet thence East 356.59 feet thence North 45 degrees 00 minutes 00 seconds East 5232 feet thence South 86 degrees 19 minutes 30 seconds East 130.98 feet; thence South 45 degrees 00 minutes 00 seconds East, 40.45 feet, thence East 413.69 feet thence South 04 degrees 42 minutes 41 seconds West, 141,05 feet thence along a curve to the right radius 700 feet, chord bears South 16 degrees 58 minutes 24 seconds West 297.34 feet, distance of 299.62 feet; thence South 29 degrees 14 minutes 08 seconds West 85.68 feet thence along a curve to the left, radius 520 feet, chord bears South 07 degrees 58 minutes 11 seconds East 628..86 feet, distance of 675.33 feet to the Northeasterly right of way line of  Grand Trunk Western Railroad; thence North 45 degrees 10 minutes 30 seconds West 993.14 feet, thence North 39 degrees 38 minutes 57 seconds West, 237.47 feet thence along a curve to the right, radius 564.59 feet, chord bears North 27 degrees 37 minutes 20 seconds West, 235.29 feet, distance of 237.03 feet to the Southerly line of Lot 5 of said Subdivision; thence South 69 degrees 19 minutes 44 seconds West, 211.25 feet thence North 45 degrees 17 minutes 26 seconds West 1000 feet, thence North 47 degrees 03 minutes 06 seconds West, 813.17 feet to the most Westerly corner of said Lot 5 thence Northeasterly 84,99 feet to the most Southerly, corner of Lot 1 of said Subdivision, thence Northwesterly 376.47 feet to the Southwest corner of said Lot 1; thence Northerly 1213.01 feet along the West line of Lots 1 and 2 to the Northwest corner of Lott; thence Easterly 392.45 feet to the Southwest corner of Lot 4; thence Northerly 431.26 feet to the North line of Section 3; thence South 87 degrees 23 minutes 00 seconds East to the Place of Beginning, EXCEPT that part in South Boulevard.

PARCEL 26:

Lot 3 of ASSESSOR'S PLAT NO. 10, recorded in Liber 52, Page 26 of Plats, Oakland County Records.

PARCEL 27:

Part of Lot 2 of ASSESSOR'S PLAT NO 98, as recorded in Liber 18 of Assessor's Plats, Page 98,

Oakland County Records described as: Beginning at a point distant South 01 degree 54 minutes 22 seconds West 50.08 feet and North 84 degrees 47 minutes 29 seconds West 49.75 feet from the Northeast corner of Section 4; thence North 84 degrees 47 minutes 29 seconds West 249,05 feet thence South 03 degrees 31 minutes 21 seconds West, 248.07 feet; thence South 14 degrees 35 minutes 31 seconds West 283.65 feet; thence South 87 degrees 51 minutes 14 seconds East, 300.03 feet; thence North 03 degrees 54 minutes 16 seconds East, 511.80 feet to the Place of Beginning.

AND, Part of Lot 2 of ASSESSOR'S PLAT NO 98, as recorded in Liber 1B of Assessor's Plats, Page 98, Oakland County Records, described as Beginning at a point distant North 89 degrees 08 minutes 11 seconds West, 37437 feet and South 01 degree 04 minutes 03 seconds East, 31 feet and South 89 degrees 08 minutes 11 seconds East 74 90 feet and South 00 degrees 49 minutes 20 seconds East, 263.76 feet and South 10 degrees 18 minutes 08 seconds West 284.53 feet from the Northeast corner of Section 4; thence North 87 degrees 51 minutes 17 seconds East 300.13 feet thence North 00 degrees 23 minutes 29 seconds West, 511.94 feet; thence South 89 degrees 05 minutes 58 seconds East, 49.75 feet; thence South 00 degrees 25 minutes 10 seconds East, 57622 feet; thence South 48 degrees 09 minutes 24 seconds West, 707.27 feet thence North 38 degrees 09 minutes 50 seconds East, 17930 feet; thence North 02 degrees 08 minutes 28 seconds West, 23.19 feet thence North 38 degrees 09 minutes 50 seconds East, 85.75 feet; thence along a curve to the left, radius 441 83 feet, chord bears North 24 degrees 13 minutes 59 seconds East 21234 feet distance of 214.85 feet to the Place of Beginning.


PARCEL 29:

Lot 3 of ASSESSOR'S PLAT NO 98, as recorded in Liber 1B of Assessor's Plats, Page 98, Oakland County Records, S o u t h w e s t e r l y  feet along the Northwesterly line and 102.11 feet along the Southeasterly line, ALSO EXCEPT that part in said parcel, described as:   Beginning at the intersection of the Northeasterly line of Grand Trunk Western 'Railroad and the Northwesterly lot line; thence South 51 degrees 42 minutes 20 seconds East, 48.79 feet; thence along a curve concave Northwesterly, radius 1136.74 feet, chord bears North 39 degrees 30 minutes 16 s e c o n d s East, 5118 feet, distance of 53.18 feet; thence North 38 degrees 09 minutes 50 seconds East, 83.64 feet to the Northwesterly lot line; thence South 5$ degrees 16 minutes 05 seconds West, 145.56 feet to the Place of Beginning

PARCEL 30:

Part of Lots 4, 5, and 6 of ASSESSOR S PLAT NO. 98, as recorded in Liber 1B of Assessor's Plats, Page 98, Oakland County Records, described as follows: Beginning at a point on the East line of Section 4, located South 00 degrees 25 minutes 10 seconds East, 1525.37 feet from the Northeast corner of said Section 4, said point being the Northeasterly corner of Lot 4; thence South 73 degrees 16 minutes 54 seconds West, 114.3 feet thence South 51 degrees 46 minutes 25 seconds East, 135 feet, more or less, to a point on the East tine of Lot 6; thence North 00 degrees 25 minutes 10 seconds West, 119.83 feet to the Place of Beginning.


**Commonly known as**: 520 S. Boulevard East, Pontiac, MI 48340

## EXHIBIT A

### Property Description

A part of the Northwest Quarter and a part of the Southwest Quarter of Section 16 Township 20 North Range 10 East, more particularly described as follows, to-wit:

Beginning at a point in the West line of Elliott Street, as said Elliott Street is laid out and platted in the T. F. Rose First Addition to the City of Muncie, Indiana at the point of intersection of the West line of said Elliott Street with the North line of the Southwest Quarter of Section 16 Township 20 North Range 10 East; thence South 00 -06'-45" West and on and along the West line of said Elliott Street 1,299.74 feet to its intersection with the North line of 8th Street, as said 8th Street is laid out and platted in the T. F. Rose First Addition to the City of Muncie, Indiana; thence North 90 00'-00" West and on and along the North line of said 8th Street and said line extended West 1,847.15 feet to a point 30.0 feet East of the East line of Perkins Avenue, as said Perkins Avenue is laid out and platted in J. J. Perkins Addition to the City of Muncie, Indiana; thence in a Northwesterly direction on a curve to the right, said curve having a radius of 30.0 feet and a long chord distance of 42.43 feet to its intersection with the East line of said Perkins Avenue at a point 40.0 feet North of the Southwest Corner of Lot 206 in said J. J. Perkins Addition; thence North 00 -00'-00" East and on and along the East line of said Perkins Avenue 1,102.80 feet to its intersection with the South Right-of-Way line of the Conrail Railroad (formerly the C. C. C. & St. L. R. R.); thence North 76 -50'-45" East and on and along the said South Right-of-Way line of said Conrail Railroad 1,930.93 feet to its intersection with the West line of Elliott Street in the T. F. Rose First Addition to the City of Muncie, Indiana; thence South 00 -06'-45" West and on and along the West line of said Elliott Street 271.34 feet to the point of beginning.

EXCEPTING THEREFROM Lots 292, 291 and the West (four) 4.0 feet of Lot 290 and the South Half of the vacated alley lying adjacent and North of the above described lots, all in J. J. Perkins Addition to the City of Muncie, Indiana. Containing after said Exception 58.012 acres, more or less. (The above description is intended to include all of T. F. Rose First Addition East of Elliott Street heretofore vacated and the following lots in J. J. Perkins Addition to the City of Muncie, Indiana: Lots 193 thru 206, except South ten (10.0) feet, Lots 217 thru 230, Lots 241 thru 254, Lots 265 thru 278, Lot 289, the East 46' of Lot 290, Lots 293 thru 302, Lots 317 thru 326;. ALSO including vacated 5th Street from the East line of Perkins Avenue to the West line of Sampson Avenue, vacated 6th Street, from the East line of Perkins Avenue to the East line of the J. J. Perkins Addition, vacated 7th Street from the East line of Perkins Avenue to the East line of the J. J. Perkins Addition, and vacated Sampson Avenue from the South line of 5th Street to a point 10.0' North of the North line of 8th Street. ALSO, all of the vacated alley between Lots 317 thru 326 and Lots 293 thru 302, all of the vacated alley between Lots 265 thru 268 and Lots 241 thru 244 all of the vacated alley between Lots 269 thru 278 and Lots 245 thru 254, all of the vacated alley between Lots 217 thru 220 and Lots 193 thru 196, all of the vacated alley between Lots 221 thru 230 and Lots 197 thru 206 and the South Half of the vacated alley adjacent to Lots 289 and the East 46' of Lot 290). Also the following described parcel of land, more particularly described as follows, to-wit: Beginning at the Southwest corner of Lot 148 in J. J. Perkins First Addition to the City of Muncie, Indiana (being the intersection of the East line of Sampson Avenue and the North line of 9th Street); thence North on the East line of said Sampson Avenue 301.7 feet to the South line of 8th Street; thence East on the South of said 8th Street and said South line extended East 858.8 feet to the West line of Birch Street, as said street is laid out and platted in Winton Place, an addition to the City of Muncie, Indiana; thence South on the West line of said Birch Street and said West line extended South 182.5 feet to a point 17.5 feet South of the North line of said 9th Street in said Winton Place; thence West and parallel with the North line of said 9th Street 350.0 feet; thence South 3.82 feet; thence in a Southerly and Westerly direction on a curve to the left, said curve having a radius of 137.5 feet and an arc distance of 153.74 feet to its intersection with the North line of 9th Street extended; thence West on the North line of said 9th Street and said line extended 210.0 feet to the East line Lot 145 in J. J. Perkins First Addition; thence South on the said East line 10.0 feet to the Southeast Corner of said Lot 145; thence West on the North line of said 9th Street 200.0 feet to the point of beginning. Estimated to contain 4.907 acres, more or less. (The above description is intended to include all of the following, Lots 70 thru 75 except North 10.0 feet. Lots 219 and 223 except North 10 feet, Lots 220, 221, 222,

224, 225, 226, 227 & 228, the vacated North 17.5 feet of 9th Street, vacated Pierce Street, the vacated alley lying adjacent to and West of Lots 223 thru 228, all in Winton Place, an addition to the City of Muncie, Indiana; also intended to include Lots 169 thru 172, and Lots 145 thru 148 and a vacated alley lying between Lots 169 thru 172 and Lots 145 thru 148 all in J. J. Perkins First Addition). Also the following described parcel of land, more particularly described as follows, to-wit: All of Lots 7, 8, 14, 15, 16, 23, 24, 25, 46, 47, 48, 69, 70, 71, 92, 93, 94 in T. F. Rose First Addition to the City of Muncie, Indiana and the following vacated alley and street; vacated 6th Street between Lots 46 thru 48 and Lots 69 thru 71, and vacated alley between Lots 69 thru 71 and Lots 92 thru 94 all in T. F. Rose First Addition to the City of Muncie, Indiana.

Also the following described parcel of land, more particularly described as follows, to-wit: Lots 63, 64, 65, 66, and 67, except the North ten (10.0) feet and also the vacated North 17.5 feet of 9th Street lying adjacent to Lots 63 thru 67 all in Winton Place, an addition to the City of Muncie, Indiana.

## EXHIBIT A

### Property Description

Tract # 6 - Large Tract Section 35

Part of the South Half of Section 35, Township 6 North, Range 1 West, 2nd Principal Meridian, Marshall Civil Township, Lawrence County Indiana as shown on a plat of survey completed by Bell Surveying and Mapping (JOB # 02186) and being described
as follows:

Beginning at a stone marking the southwest corner of Section 35. Thence, concurrent with the west section line NORTH 00 Degrees 01 Minutes 54 Seconds EAST 1845.65 FEET to a railroad spike; thence, SOUTH 88 Degrees 40 Minutes 23 Seconds EAST, 340.63 FEET to a 5/8 inch rebar with yellow cap engraved GW BELL 29400007 (hereafter referred to as a capped rebar); thence, parallel with the West Section Line, NORTH 00 Degrees 37 Minutes 30 Seconds EAST, 195.01 FEET to a capped rebar; thence, NORTH 88 Degrees 40 Minutes 05 Seconds WEST, 340.74 FEET to a railroad spike in said West Section Line and also being the centerline of PEERLESS ROAD a.k.a. OLD PIKE ROAD"; thence, concurrent with the West Section Line, NORTH 00 Degrees 16 Minutes 15 Seconds EAST, 563.21 FEET to a railroad spike marking the west quarter corner; thence, concurrent with the half section line, SOUTH 89 Degrees 59 Minutes 54 Seconds EAST, 5272.54 FEET to a yellow plastic capped rebar engraved "FARKAS LS0114" marked the East Quarter Corner of said section; thence, concurrent with the East Section Line of said section, SOUTH 00 Degrees 04 Minutes 30 Seconds WEST, 1915.52 FEET to a capped rebar marked "GRAHAM PC 9800014"; thence, NORTH 89 Degrees 26 Minutes 40 Seconds WEST, 241.310 FEET to an iron pin; thence, parallel to the East Section Line, NORTH 00 Degrees 04 Minutes 30 Seconds EAST, 209.10 FEET to a capped rebar; thence, NORTH 89 Degrees 37 Minutes 18 Seconds WEST, 380.73 FEET to a capped rebar; thence, SOUTH 00 Degrees 04 Minutes 30 Seconds WEST, 209.10 FEET to a mag nail in the centerline of "BUD IKERD ROAD"; thence, NORTH 89 Degrees 50 Minutes 08 Seconds WEST, 2013.41 FEET to a capped rebar; thence, SOUTH 00 Degrees 03 Minutes 02 Seconds WEST, 244.03 FEET to a mag nail set; thence concurrent with the center line of said "BUD IKERD ROAD" for the following fifteen (15) courses:

1) SOUTH 53 Degrees 16 Minutes 45 Seconds WEST, 116.77 FEET;
2) NORTH 35 Degrees 42 Minutes 24 Seconds WEST, 0.04 FEET;
3) SOUTH 49 Degrees 29 Minutes 44 Seconds WEST, 42.75 FEET;
4) SOUTH 47 Degrees 34 Minutes 02 Seconds WEST, 93.29 FEET;
5) SOUTH 37 Degrees 55 Minutes 09 Seconds WEST, 85.51 FEET;
6) SOUTH 31 Degrees 32 Minutes 29 Seconds WEST, 82.68 FEET;
7) SOUTH 40 Degrees 28 Minutes 20 Seconds WEST, 63.41 FEET,
8) SOUTH 56 Degrees 48 Minutes 38 Seconds WEST, 64.81 FEET;
9) SOUTH 66 Degrees 41 Minutes 10 Seconds WEST, 50.02 FEET;
10) SOUTH 74 Degrees 11 Minutes 51 Seconds WEST, 62.57 FEET;
11) SOUTH 88 Degrees 41 Minutes 45 Seconds WEST, 52.73 FEET;
12) NORTH 84 Degrees 27 Minutes 45 Seconds WEST, 109.46 FEET;
13) NORTH 89 Degrees 22 Minutes 58 Seconds WEST, 35.46 FEET;
14) SOUTH 86 Degrees 01 Minutes 58 Seconds WEST, 67.23 FEET,
15) SOUTH 56 Degrees 14 Minutes 48 Seconds WEST, 102.51 FEET to a mag nail set on the South Section Line; thence, concurrent said South Section Line of said section, NORTH 89 Degrees 46 Minutes 07 Seconds WEST, 1805.78 FEET back to the POINT OF BEGINNING.

Said tract containing 267.02 Acres, more or less.

X:\DOCUMENTS AND SETTINGS\MERRILLSCAN\LOCAL SETTINGS\TEMP\WZ7704\US_ACTIVE_EXHIBIT A - MLC #1340 & 1341 - APN #47-06-35-300-014 & 021_43636434_2.DOC

MLC #1340 & 1341
APN # 47-03-35-300-021,000-006 and APN #47-06-02-400-081,000-009

## EXHIBIT A

### Property Description

Tax ID Number:  Error! Unknown document property name.

Land situated in the Error! Unknown document property name. of Error! Unknown document property name., in the County of Error! Unknown document property name., State of Error! Unknown document property name. is described as follows:

**PARCEL 1:** Commencing at the South ¼ corner of Section 6, Town 3 South, Range 8 East Van Buren Township, Wayne County, Michigan: thence South 86 degrees 20 minutes 14 seconds West 257.60 feet along the South line of said Section 6 for a PLACE OF BEGINNING; thence continuing South 86 degrees 20 minutes 14 seconds West 27.26 feet along said South line; thence North 03 degrees 39 minutes 46 seconds West 33.00 feet to the Northerly Right-of-Way line of Ecorse Road (Variable Width); thence the following two (2) courses along the said Northerly Right-of-Way line of Ecorse Road  945.75 feet along the arc of a 2167.01 foot radius non-tangential circular curve to the right, having a chord which bears North 78 degrees 36 minutes 11 seconds West 938.26 feet, and North 66 degrees 06 minutes 01 seconds West 1506.64 feet; thence North 40 degrees 08 minutes 29 seconds East 1004.49 feet along the Easterly Right-of-Way line of Michigan Avenue (Variable Width); thence North 77 degrees 35 minutes 51 seconds East 1704.12 feet along the Southerly Right-of-Way line of the CSX Railroad (100.00 feet wide); thence South 00 degrees 25 minutes 37 seconds East 1960.94 feet to the Place of Beginning.

And

**PARCEL 2:** Part of the Southeast 1/4 of Section 6, Town 3 South Range 8 East described as beginning at the Southeast corner of Section 6, thence South 89 degrees 35 minutes 29 seconds West 1372.54 feet; thence North 00 degrees 23 minutes 51 seconds West 2279.57 feet; thence North 77 degrees 39 minutes 30 seconds East 20.47 feet; thence North 77 degrees 38 minutes 20 seconds East 1336.13 feet; thence South 00 degrees 40 minutes 30 seconds East 457.64 feet; thence North 89 degrees 29 minutes 35 seconds East 33 feet; thence South 00 degrees 40 minutes 30 seconds East 2102.96 feet to the point of beginning, including Lots 10, 11, 12, 13, and 14, Supervisor's Van Buren Plat No. 2 of part of the East ½ of Section 6, Town 3 South, Range 8 East, Van Buren Township, Wayne County, Michigan as recorded in Liber 67, page 51 of plats, Wayne County Michigan.

And

**PARCEL 3:** Part of the Southwest 1/4 and Southeast 1/4 Section 6, Town 3 South, Range 8 East, described as beginning South 89 degrees 35 minutes 29 seconds West 1372.54 feet from the Southeast corner of Section 6; thence South 89 degrees 35 minutes 29 seconds West 1317.35 feet; thence South 86 degrees 20 minutes 14 seconds West 257.6 feet; thence North 00 degrees 25 minutes 37 seconds West 1960.94 feet; thence North 77 degrees 35 minutes 51 seconds East 249.52 feet; thence North 77 degrees 39 minutes 30 seconds East 1360.94 feet thence South 00 degrees 23 minutes 51 seconds East 2279.57 feet to the point of beginning.

**Commonly known as:  Error! Unknown document property name., Error! Unknown document property name., Error! Unknown document property name.  Error! Unknown document property name.**

## EXHIBIT A

### Property Description

Tract 1:

A tract of land in Section 24, Township 49, Range 33, including part of Blocks 11, 12, 28, 29, 30 and 31, in Leeds, a subdivision of land and also part of the vacated streets and alleys therein, all in Kansas City, Jackson County, Missouri, being more particularly described as follows:

Commencing at the Northeast corner of the Southwest Quarter at the Northeast Quarter of said Section 24, Township 49, Range 33, Jackson County, Missouri; thence North 90 degrees 00 minutes 00 seconds East along the North line of the Southeast Quarter of the Northeast Quarter of said Section 24, a distance of 25.47 feet; thence South 0 degrees 00

minutes 00 seconds West at right angles to said North line, a distance of 30.50 feet to the intersection of the South right-of-way line of 37th Street, as now established, with the Westerly right-of-way line of the Kansas City Southern Railway Company, as now established; thence Southerly along said Westerly right-of-way line, the following courses: thence South 3 degrees 01 minute 33 seconds West, a distance of 340.13 feet; thence South 0 degrees 07 minutes 34 seconds East, a distance of 109.03 feet; thence South 89 degrees 52 minutes 52 seconds East, a distance of 2.00 feet; thence South 0 degrees 05 minutes 08 seconds West, a distance of 70.00 feet; thence North 89 degrees 52 minutes 52 seconds West, a distance of 11.08 feet; thence South 7 degrees 28 minutes 32 seconds West, a distance of 50.48 feet; thence South 2 degrees 44 minutes 21 seconds West, a distance at 200.25 feet; thence South 4 degrees 22 minutes 12 seconds West, a distance of 373.25 feet; thence South 90 degrees 00 minutes 00 seconds West, a distance of 4.24 feet; thence South 6 degrees II minutes 08 seconds West, a distance of 116.82 feet; thence North 89 degrees 59 minutes 35 seconds, West, a distance of 47.82 feet; thence South 6 degrees 11 minutes 08 seconds West, a distance at 60.35 feet; thence South 89 degrees 59 minutes 35 seconds East, a distance of 42.74 feet; thence South 6 degrees 01 minutes 44 seconds West, a distance of 819.34 feet to the TRUE POINT OF BEGINNING; thence continuing South 06 degrees 01 minutes 44 seconds West, a distance of 509.99 feet; thence North 89 degrees 59 minutes 35 seconds West, a distance at 1229.06 feet to a point on the Easterly High Bank of the Big Blue River; thence Northwesterly along said Easterly High Bank the following courses: thence North 38 degrees 21 minutes 23 seconds West, a distance of 32.39 feet; thence North 44˙degrees 40 minutes 12 seconds West, a distance of 185.19 feet; thence North 54 degrees 46 minutes 27 seconds West, a distance or 87.97 feet to a point an the Easterly right-of-way of the Missouri Pacific Railroad; thence departing aforesaid Easterly High Bank of the Big Blue River and Northerly along said Easterly right-of-way of the Missouri Pacific Railroad the following courses: North 37 degrees 27 minutes 48 seconds East, a distance of 193.48 feet; thence Northerly along a curve to the left, being tangent to the last described course and having a radius of 2526.35 feet, a central angle of 6 degrees 45 minutes 07 seconds an arc distance of 297.72 feet; thence South 60 degrees 01 minutes 53 seconds East, a distance of 118.08 feet; thence North 29 degrees 20 seconds 45 minutes East, a distance of 263.46 feet; thence South 60 degrees 57 minutes 51 seconds East, a distance of 559.21 feet; thence South 89 degrees 59 minutes 35 seconds East, a distance of 500.00 feet to the POINT OF BEGINNING.

Tract 2:

Easement granted to Environmental Corporate Remediation Company, Inc., for access, ingress and egress, as established in the instrument dated November 13, 2006, recorded November 29, 2006, as Document No. 2006E0128982, over the following described land:

Parcel 1:

All that part of the North Half of Section 24, Township 49, Range 33, in Kansas City, Jackson County, Missouri, described as follows:

Commencing at the Southwest corner of the Northeast Quarter of the Northeast Quarter of said Section 24; thence North 90 degrees 00 minutes 00 seconds East, along the South line of said Quarter Quarter Section, a distance of 26.83 feet to a point on the Westerly right-of-way line of the Kansas City Southern Railway, as now established; thence North 6 degrees 08 minutes 00 seconds East, along said Westerly right-of-way line,

a distance of 50.29 feet to the intersection of said Westerly right-of-way line with the North right-of-way line of 37th Street, as now established, said point being the true point of beginning of the tract of land to be herein described; thence South 90 degrees 00 minutes 00 seconds West, along, said North right-of-way line, a distance of 814.81 feet; thence North 11 degrees 13 minutes 45 seconds East, a distance of 157.00 feet; thence North 42 degrees 57 minutes 30 seconds East, a distance of 60.35 feet; thence North 52 degrees 41 minutes 20 seconds East, a distance of 41.24 feet; thence North 90 degrees 00 minutes 00 seconds East, a distance of 269.15 feet; thence North 11 degrees 13 minutes 45 seconds East, a distance of 636.11 feet, to a point on the Southwesterly right-of-way line of the Chicago Rock Island and Pacific Railroad; thence South 36 degrees 17 minutes 15 seconds East, along said Southwesterly right-of-way line, a distance of 601.82 feet, to the intersection of said Southwesterly right-of-way line with the aforesaid Westerly right-of-way line; thence South 6 degrees 08 minutes 00 seconds West, along said Westerly right-of-way line, a distance of 364.08 feet to the point of beginning.

Parcel 2:
A tract of land in Section 24, Township 49, Range 33, including part of Blocks 5, 6, 11, 12, 26, 27, 28, 29, 30 and 31, in Leeds, a subdivision of land and also part of the vacated streets and alleys therein, all in Kansas City, Jackson County, Missouri, being more particularly described as follows:

Commencing at the Northeast corner of the Southwest Quarter of the Northeast Quarter of said Section 24, Township 49, Range 33; thence North 90 degrees 00 minutes 00 seconds East along the North line of the Southeast Quarter of the Northeast Quarter of said Section 24, a distance of 25.47 feet; thence South 0 degrees 00 minutes 00 seconds West at right angles to said North line, a distance of 30.50 feet to the intersection of the South right-of-way line of 37th Street, as now established, with the Westerly right-of-way line of the Kansas City Southern Railway Company, as now established, said point also being the point of beginning of the tract of land herein described; thence Southerly along said Westerly right-of-way line, the following courses: thence South 3 degrees 01 minute 33 seconds West, a distance of 340.13 feet; thence South 0 degrees 07 minutes 34 seconds East, a distance of 109.03 feet; thence South 89 degrees 52 minutes 52 seconds East, a distance of 2.00 feet; thence south 0 degrees 05 minutes 08 seconds West, a distance of 70.00 feet; thence North 89 degrees 52 minutes 52 seconds West, a distance of 11.08 feet; thence South 7 degrees 28 minutes 32 seconds West, a distance of 50.48 feet; thence South 2 degrees 44 minutes 21 seconds West, a distance of 200.25 feet; thence South 4 degrees 22 minutes 12 seconds West, a distance of 373.25 feet; thence South 90 degrees 00 minutes 00 seconds West, a distance of 4.24 feet; thence South 6 degrees 11 minutes 08 seconds West, a distance of 116.82 feet; thence North 89 degrees 59 minutes 35 seconds West, a distance of 47.82 feet; thence South 6 degrees 11 minutes 08 seconds West, a distance of 60.35 feet; thence South 89 degrees 59 minutes 35 seconds East, a distance of 42.74 feet; thence South 6 degrees 01 minute 44 seconds West, a distance of 1329.34 feet; thence North 89 degrees 59 minutes 35 seconds West, a distance of 1229.06 feet to a point on the Easterly High Bank of the Big Blue River; thence Northwesterly along said Easterly High Bank, the following courses: thence North 38 degrees 21 minutes 23 seconds West, a distance of 32.39 feet; thence North 44 degrees 40 minutes 12 seconds West, a distance of 185.19 feet; thence North 54 degrees 46 minutes 27 seconds West, a distance of 88.53 feet to a point on the Easterly right-of-way line of line Missouri Pacific Railroad; thence departing aforesaid Easterly High Bank of the Big Blue River and Northerly along said Easterly right-of-way line of the Missouri Pacific Railroad, the following courses: North 37 degrees 29 minutes 16 seconds East, a distance of 193.53 feet; thence Northerly along a curve to the left, being tangent to the last described course and having a radius of 2526.35 feet, a central angle of 16 degrees 35 minutes 41 seconds an arc distance of 731.72 feet; thence North 11 degrees 12 minutes 38 seconds East along a line that is not tangent to the last described curve, a distance of 1672.49 feet to a point on the aforesaid South right-of-way line of 37th Street; thence departing the aforesaid Easterly right-of-way line of the Missouri Pacific Railroad; thence North 90 degrees 00 minutes 00 seconds East, along said South Right-of-way line, a distance of 892.61 feet to the point of beginning.

EXCEPT that part thereof described as follows:

A tract of land in Section 24, Township 49, Range 33, including part of Blocks 11, 12, 26, 28, 29, 30 and 31, in Leeds, a subdivision of land and also part of the vacated streets and alleys therein, all in Kansas City, Jackson County, Missouri, being more particularly described as follows:

Commencing at the Northeast corner of the Southwest Quarter at the Northeast Quarter of said Section 24, Township 49, Range 33, Jackson County, Missouri; thence North 90 degrees 00 minutes 00 seconds East along the North line of the Southeast Quarter of the Northeast Quarter of said Section 24, a distance of 25.47 feet; thence South 0 degrees 00

minutes 00 seconds West at right angles to said North line, a distance of 30.50 feet to the intersection of the South right-of-way line of 37th Street, as now established, with the Westerly right-of-way line of the Kansas City Southern Railway Company, as now established; thence Southerly along said Westerly right-of-way line, the following courses: thence South 3 degrees 01 minute 33 seconds West, a distance of 340.13 feet; thence South 0 degrees 07 minutes 34 seconds East, a distance of 109.03 feet; thence South 89 degrees 52 minutes 52 seconds East, a distance of 2.00 feet; thence South 0 degrees 05 minutes 08 seconds West, a distance of 70.00 feet; thence North 89 degrees 52 minutes 52 seconds West, a distance of 11.08 feet; thence South 7 degrees 28 minutes 32 seconds West, a distance of 50.48 feet; thence South 2 degrees 44 minutes 21 seconds West, a distance at 200.25 feet; thence South 4 degrees 22 minutes 12 seconds West, a distance of 373.25 feet; thence South 90 degrees 00 minutes 00 seconds West, a distance of 4.24 feet; thence South 6 degrees 11 minutes 08 seconds West, a distance of 116.82 feet; thence North 89 degrees 59 minutes 35

seconds, West, a distance of 47.82 feet; thence South 6 degrees 11 minutes 08 seconds West, a distance at 60.35 feet; thence South 89 degrees 59 minutes 35 seconds East, a distance of 42.74 feet; thence South 6 degrees 01 minutes 44 seconds West, a distance of 819.34 feet to the TRUE POINT OF BEGINNING; thence continuing South 06 degrees 01 minutes 44 seconds West, a distance of 509.99 feet; thence North 89 degrees 59 minutes 35 seconds West, a distance at 1229.06 feet to a point on the Easterly High Bank of the Big Blue River; thence Northwesterly along said Easterly High Bank the following courses: thence North 38 degrees 21 minutes 23 seconds West, a distance of 32.39 feet; thence North 44 degrees 40 minutes 12 seconds West, a distance of 185.19 feet; thence North 54 degrees 46 minutes 27 seconds West, a distance or 87.97 feet to a point an the Easterly right-of-way of the Missouri Pacific Railroad; thence departing aforesaid Easterly High Bank of the Big Blue River and Northerly along said Easterly right-of-way of the Missouri Pacific Railroad the following courses: North 37 degrees 27 minutes 48 seconds East, a distance of 193.48 feet; thence Northerly along a curve to the left, being tangent to the last described course and having a radius of 2526.35 feet, a central angle of 6 degrees 45 minutes 07 seconds an arc distance of 297.72 feet; thence South 60 degrees 01 minutes 53 seconds East, a distance of 118.08 feet; thence North 29 degrees 20 seconds 45 minutes East, a distance of 263.46 feet; thence South 60 degrees 57 minutes 51 seconds East, a distance of 559.21 feet; thence South 89 degrees 59 minutes 35 seconds East, a distance of 500.00 feet to the POINT OF BEGINNING.

(Commonly known as: 6817 Stadium Dr., Kansas City, Missouri)

## EXHIBIT A

## Property Description

PARCEL I

SITUATED, IN MONTGOMERY COUNTY, OHIO, MIAMI TOWNSHIP, SECTION 18, TOWN 2, RANGE 5, M.R.S. AND BOUNDED AND DESCRIBED AS FOLLOWS:

BEING A PARCEL OF LAND LYING ON THE LEFT SIDE OF THE CENTERLINE OF A SURVEY, MADE BY THE DEPARTMENT OF HIGHWAYS, AND RECORDED IN BOOK YY, PAGES 3 & 4, OF THE RECORDS OF MONTGOMERY COUNT( AND BEING LOCATED WITHIN THE FOLLOWING ,DESCRIBED POINTS IN THE BOUNDARY THEREOF:

BEGINNING IN THE GRANTOR'S SOUTH PROPERTY LINE AT A POINT 260 FEET LEFT OF AND RADIALLY FROM STATION 164 (+) 03.84 IN SAID CENTERLINE OF SURVEY, SAID POINT BEING AT STATION 14 (+) 13.43 IN THE CENTERLINE OF LYONS ROAD; THENCE NORTHWESTERLY ALONG SAID CENTERLINE OF LYONS ROAD TO STATION 6 (+) 00; THENCE NORTHWESTERLY TO A POINT 20 FEET LEFT OF STATION 6 (+) 00; THENCE EASTERLY TO A POINT 70 FEET LEFT OF STATION 9 (+) 00; THENCE EASTERLY TO A POINT 90 FEET LEFT OF STATION 13 (+) 57.74; THENCE SOUTHERLY TO THE PLACE OF BEGINNING, BEING A PART OF THE SAME PROPERTY DESCRIBED IN A DEED RECORDED IN VOLUME 1537, PAGE 100, OF THE RECORDS OF MONTGOMERY COUNTY, OHIO.

**PPN: K45 02607 0061**

PARCEL II

FROM THE NORTHEAST CORNER OF SECTION 18, T. 2, R. 5 M.R.S.; MEASURE S. 66 DEGREES, 15 MINUTES, 35 SECONDS W. ALONG THE NORTH LINE OF SAID SEC. 18, A DISTANCE OF , 1,385.07 FEET TO AN IRON PIPE FOR A PLACE OF BEGINNING, SAID PIPE BEING 240 FEET; RIGHT OF AND MEASURED AT RIGHT ANGLES TO CENTERLINE STATION 179/85.16; THENCE S. 11 DEGREES, 56 MINUTES, 50 SECONDS E MEASURE 37.89 FEET TO AN IRON PIPE IN THE EAST LINE OF LAND CONVEYED TO GENERAL MOTORS CORPORATION, AS DESCRIBED IN DEED BOOK NO. 1645, PAGE 401, OF MONTGOMERY COUNTY, OHIO RECORDS; SAID PIPE BEING 240 FEET RIGHT OF AND MEASURED AT RIGHT ANGLES TO CENTERLINE STATION 179/47.11; THENCE S. 5 DEGREES, 44 MINUTES W. ALONG THE SAID EAST LINE OF THE GENERAL MOTORS CORPORATION LAND, 852.69 FEET TO AN IRON PIPE 19.46 FEET LEFT OF AND MEASURED AT RIGHT ANGLES TO CENTERLINE STATION 171/37.13 FEET; SAID PIPE BEING ALSO THE SOUTHEAST CORNER OF SAID GENERAL MOTORS CORPORATION LAND; THENCE N. 83 DEGREES, 34 MINUTES W. ALONG THE SOUTH LINE OF SAID GENERAL MOTORS 'CORPORATION LAND 253.60 FEET TO AN IRON PIPE, SAID PIPE BEING 260 FEET LEFT OF AND MEASURED AT RIGHT ANGLES TO CENTER LINE STATION 172/17.83; THENCE N. 12 DEGREES, 20 MINUTES W. A DISTANCE OF 665.11 FEET TO AN IRON PIPE IN THE NORTH LINE OF SAID SEC. 18; AND COMMON WITH THE NORTH LINE OF THE SAID GENERAL MOTORS CORPORATION LAND, SAID PIPE BEING 265 FEET LEFT OF AND MEASURED AT RIGHT ANGLES TO CENTER LINE STATION 178/84.25; THENCE N. 66 DEGREES 15 MINUTES, 35 SECONDS E. ALONG THE COMMON NORTH LINE, 514.98 FEET TO THE PLACE OF BEGINNING, AND BEING PART OF THE SAME PREMISES CONVEYED BY DEED RECORDED IN VOLUME 1645, PAGE 401, OF THE RECORDS OF MONTGOMERY COUNTY, OHIO.

**PPN: K45 02607 0071**

PARCEL III.

LOCATED IN SECTION 4, TOWN 1, RANGE 7 M.R.S., CITY OF DAYTON, COUNTY OF MONTGOMERY, STATE OF OHIO, AND BEING A TRACT OF LAND DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT IN THE EAST LINE OF WEBSTER STREET, SAID POINT OF BEGINNING' BEING THE NORTHWEST CORNER OF LAND CONVEYED TO GENERAL MOTORS CORPORATION BY DEED RECORDED IN BOOK 2316, PAGE 273, IN THE DEED RECORDS OF MONTGOMERY COUNTY, OHIO:

THENCE WITH THE EAST LINE OF SAD WEBSTER STREET, NORTH TWELVE DEGREES FIFTY-

ONE MINUTES THIRTY SECONDS (12° 51' 30") WEST FOR TWENTY-NINE AND 36/100 (29.36); FEET

THENCE LEAVING SAID EAST LINE, NORTH SEVENTY-SEVEN DEGREES EIGHTEEN MINUTES NO SECONDS (77° 18' 00") EAST FOR NINE AND 00/100 (9.00) FEET;

THENCE SOUTH TWELVE DEGREES FIFTY-ONE MINUTES THIRTY SECONDS (12° 51' 30") EAST FOR TEN AND 00/100 (10.0) FEET;

THENCE NORTH SEVENTY-SEVEN DEGREES EIGHTEEN MINUTES NO SECONDS (77° 18' 00") EAST FOR EIGHTY-SEVEN AND 93/100 (87.93) FEET TO AN ANGLE POINT IN THE NORTH LINE OF

SAID GENERAL MOTORS CORPORATION LAND;

THENCE WITH THE NORTH LINE OF SAID LAND, SOUTH SIXTY-SIX DEGREES THIRTY-EIGHT MINUTES FIFTY SECONDS (66° 38' 50") WEST FOR FIFTY-NINE AND 23/100 (59.23) FEET:

THENCE STILL WITH SAID NORTH LINE, SOUTH TWELVE DEGREES FIFTY-ONE MINUTES THIRTY SECONDS (12° 51' 30") EAST FOR SEVEN AND 46/100 (7.46) FEET;

 THENCE STILL WITH SAID NORTH LINE, SOUTH SEVENTY-FIVE DEGREES FIFTY-ONE MINUTES . NO SECONDS (75° 51' 00") WEST FOR THIRTY-EIGHT AND 70/100 (38.70) FEET TO THE POINT OF BEGINNING.

CONTAINING NO AND 0262/10,000 (0.0262) ACRES, MORE OR LESS.

PPN: R72 00904 0033

Property Address: 3100 Dryden Road

MLC # 1012, 1202, 1317 – Moraine Lagoon,
GMVM - Moraine Assembly, Delphi Harrison - Moraine

## EXHIBIT A

Property Description

All that tract or parcel of land, situate in the Town of Tonawanda, County of Erie and State of New York, and more particularly described as follows:

Beginning at the northeasterly corner of lands N/F of GENERAL MOTORS CORPORATION as described in L.7346, P.446;

1. Thence, Westerly, a distance of 816.41 feet;
2. Thence, Southerly, turning an interior angle to the right of 89°57'00" with last said line, a distance of 644.66 feet;
3. Thence, Easterly, turning an interior angle to the right of 90°15'30" with last said line, a distance of 1051.02 feet to a point in the westerly line of Kenmore Avenue (49.5 ft. wide);
4. Thence, Northerly, in last said line, turning an interior angle to the right of 89°49'41" with last said line, a distance of 383.16 feet to a point of a non-tangent curve to the left;
5. Thence, Northwesterly, along a curve to the left having a radius of 600.26 feet, an arc distance of 360.08 feet, the same having a chord distance of 354.70 feet, and turning an interior angle to the right of 138°22'56" with last said line to the POINT OF BEGINNING.

Containing 654,983 square feet, (15.036+/- acres)

Intending to describe property conveyed by GENERAL MOTORS CORPORATION in L.7346, P. 446, and also depicted on a map prepared by Clough, Harbour and Associates, LLP entitled "Boundary Survey Map showing property N/F of GENERAL MOTORS CORPORATION, to be conveyed to Environmental Corporate Remediation Company, Inc. (ENCORE)" project # 12722-13527, last revised July 28, 2004.

## EXHIBIT A

### Property Description

Parcel 1:
The Northwest one-quarter (1/4) of the Northwest one-quarter (1/4) of Section number ten (10), Town nine (9) South, Range seven (7) East, in Washington Township, Lucas County, Ohio, excepting therefrom the West six hundred eighteen and twelve hundredths (818.12) feet of the North three hundred thirty (330) feet thereof, and also excepting therefrom the East six hundred eighteen (618) feet of the North three hundred thirty (330) feet thereof.

Excepting therefrom a parcel of land bounded and described as follows:

A certain parcel of land comprising part of the Northwest one-quarter (1/4) of the Northwest one-quarter (1/4) of Section ten (10), Town nine (9) South, Range seven (7) East, in the City of Toledo, Lucas County, Ohio, bounded and described as follows:

Commencing at the Northwest corner of the said Section ten (10); thence South one (1) degree, twenty-six (26) minutes, thirty (30) seconds West along the Westerly One of the said Section ten (10) (centerline of Jackman Road) a distance of three hundred thirty and ten hundredths (330.10) feet, more or less, to a point on the Southerly line of the Northerly three hundred thirty and zero hundredths (330.00) feet of the said Northwest one-quarter (114) of the Northwest one-quarter (114) of said Section ten (10); thence North ninety (90) degrees, zero (00) minutes, zero (00) seconds East along the Southerly line of the Northerly three hundred thirty and zero hundredths (330.00) feet of the Northwest one-quarter (1/4) of the Northwest one-quarter (114) of said Section ten (10) a distance of thirty and one hundredth (30.01) feet, more or less, to a point on a line drawn parallel to the said Westerly line of Section ten (10) and distant Easterly thirty and zero hundredths (30.00) feet from said Westerly measured normal to said Westerly line being the point of beginning; thence continuing North ninety (90) degrees, zero (00) minutes, zero (00) seconds East along the said Southerly line of the Northerly three hundred-thirty and zero hundredths (330.00) feet of the Northwest one-quarter (114) of the Northwest one-quarter (1/4) of said Section ten (10), a distance of twenty and one hundredth (20.01) feet, more or less, to a point on a line drawn parallel to the said Westerly line of Section ten (10) and distant Easterly fifty and zero hundredths (50.00) feet to said Westerly line measured normal to said Westerly line; thence South one (1) degree, twenty-six (26) minutes, thirty (30) seconds West along the said line drawn parallel to the Westerly line of Section ten (10) and distant easterly fifty and zero hundredths (60.00) feet to the said Westerly line measured normal to said Westerly line a distance Of nine hundred eighty-eight and eighty-eight hundredths (988.88) feet, more or less, to a point on the Southerly line of the said Northwest one-quarter (114) of the Northwest one-quarter (1/4) of said Section ten (10); thence North eighty-nine (89) degrees, fifty-five (55) minutes, fifty-eight (68) seconds West along the said Southerly line of the Northwest one-quarter (1/4) of the Northwest one-quarter (1/4) of said Section ten (10) a distance of twenty and zero hundredths (20.00) feet, more or less, to a point on the said line drawn parallel to the Westerly line of Section ten (10) and distant Easterly thirty and zero hundredths (30.00) feet from said Westerly line measured normal to said Westerly line; thence North one (1) degree, twenty-six (26) minutes, thirty (30) seconds East along a line drawn parallel to the Westerly line of said Section ten (10) and distant Easterly thirty and zero hundredths (30.00) feet from said Westerly Tine measured normal to said Westerly line a distance of nine hundred eighty-eight and eighty-five hundredths (988.86) feet, more or less, to the point of beginning.

AND ALSO EXCEPTING therefrom a parcel of land bounded and described as follows:

All that part of the Northwest one-quarter (114) of the Northwest one-quarter (1/4) of Section ten (10), Town nine (9) South, Range seven (7) East, In the City of Toledo, Lucas County, Ohio, bounded and described as follows:

Starting at the Southwest corner of the Northwest one-quarter (1/4) of the Northwest one-quarter (1/4) of said Section ten (10); thence Easterly, along the South line of the Northwest one-quarter (114) of the Northwest one-quarter (1/4) of said Section ten (10), a distance of three hundred seventy and one hundredth (307.01) feet to the point of beginning; thence Northerly, forming an angle of ninety (90) degrees, zero (00) minutes, zero (00) seconds with the last described line, a distance of one and zero hundredths (1.00) feet to a point; thence Easterly forming an angle of ninety (90) degrees, zero (00) minutes, zero (00) seconds with the last described line, a distance of twenty-seven and zero hundredths (27.00) feet to a point; thence Southerly, forming an angle of ninety (90) degrees, zero (00) minutes, zero (00) seconds with the last described line, a distance of one and zero hundredths (1.00) feet to the South line of the Northwest one-quarter (114) of the Northwest one-quarter (1/4) of said Section ten (10); thence Westerly, along the South line of the Northwest one-quarter (1/4) of the Northwest one-quarter (1/4) of said Section ten (10), a distance of twenty-seven and zero hundredths (27,00) feet to the point of beginning and also excepting that part conveyed in Deed 94-013-B02 bounded and described as follows:

All that part of the Northwest one-quarter (114) of Section ten (10), Town nine (9) South, Range seven (7) East, City of Toledo, Lucas County, Ohio, bounded and described as follows:

Commencing at a monument box found at the West one-quarter (1M) of said Section ten (10); thence Northerly along the West line of said Section and the centerline of Jackman Road on a bearing of North zero (00) degrees, twenty-nine (29) minutes, twenty-six (26) seconds East, a distance of thirteen hundred eighteen and ninety-five hundredths (1318.95) feet to a point; Thence Easterly along the North line of land recorded in MF-89.455-A01 Lucas County Deed Record on a bearing of North eighty-nine (89) degrees, six (6) minutes, fifty-eight (58) seconds East, a distance of fifty and one hundredth (50.01) feet to a P.K. nail set on the East line of existing right-of-way of Jackman Road, and the point of beginning; thence Northerly on a bearing of North zero (00) degrees, twenty-nine (29) minutes, twenty-six (26) seconds East, a distance of eight and zero hundredths (800) feet to a five-eighths (5/8) Inch rod set; thence Easterly on a bearing of North eighty-nine (89) degrees, six (6) minutes, fifty-eight (58) seconds East a distance of two hundred eighty-five and zero hundredths (285.00) feet to a five-eighths (5/8) inch rod set; thence Southerly on a bearing of South zero (00) degrees, twenty-nine (29) minutes, twenty-six (26) seconds West, a distance of eight and zero hundredths (8.00) feet to a five-eighths (5/8) inch iron rod set on the North line of land recorded in MF89-455-A01; thence Westerly along said line on a bearing of South eighty-nine (89) degrees, six (6) minutes, fifty-eight (58) seconds West, a distance of two hundred eighty-five and zero hundredths (285.00) feet to the point of beginning, containing 2,279 square feet and subject to all easements, highways, and restrictions of record.

Parcel 2:
That part of the Southwest one-quarter (1/4) of the Northwest one-quarter (1/4) of Section number ten (10), Town nine (9) South, Range seven (7') East, in Washington Township, Lucas County, Ohio, lying South of a line one hundred twelve (112) rods South of and parallel with the North line of the Northwest one-quarter (1/4) of said Section ten (10), containing twenty-four (24) acres, more or less.

EXCEPTING therefrom a parcel of land bounded and described as follows:

Being part of the Northwest one-quarter (1/4) of Section ten (10), Town nine (9) South, Range seven (7) East, in the City of Toledo, Lucas County, Ohio, being more particularly bounded and described as follows:

Commencing at the Northwest corner of said Section ten (10), Town nine (9) South, Range seven (7) East, thence South zero (00) degrees, zero (00) minutes, zero (00) seconds West, along the West line of said Section ten (10) and the centerline of Jackman Road, a distance of sixteen hundred eighty-two and fifteen hundredths (1682.15) feet, more or less, to the North line of the South five (5) acres of the North one hundred twelve (112) rods of the West one-half (1(2) of the Northwest one-quarter (1/4) of said Section ten (10); said point being the point of beginning; thence North eighty-eight (88) degrees, thirty-three (33) minutes, thirty (30) seconds East along the said North line of the South five (5) acres of the North one hundred twelve (112) rods of the West one-half (112) of the Northwest one-quarter (1/4) of Section ten (10), a distance of sixty and two hundredths (60.02) feet; thence continuing North eighty-eight (88) degrees, thirty-three (33) minutes, thirty (30) seconds East along the North line of the South five (6) acres of the North one hundred twelve (112) rods of the West one-half (1/2) of the Northwest one-quarter (1/4) of Section ten (10), a distance of five hundred seventy-five and sixteen hundredths (575.16) feet thence South one (1) degree, twenty-six (26) minutes, zero (00) seconds East, a distance of forty-six and zero hundredths (46.00) feet; thence South eighty-eight (88) degrees, thirty-three (33) minutes, thirty (30) seconds West along a line drawn parallel to the said North line of the South five (5) acres of the North one hundred twelve (112) rods of the West one-half (1/2) of the Northwest one-quarter (114) of Section ten (10), a distance of three hundred forty-four and fifty-five hundredths (344.55) feet; thence South eighty (80) degrees, fifteen (15) minutes, two (2) seconds West, a distance of one hundred eighty-six and sixty-four hundredths (186.64) feet; thence South twenty-seven (27) degrees, thirty-four (34) minutes, one (1) second West, a distance of one hundred twenty-four and seventy-eight hundredths (124.78) feet, more or less, to a point on a line drawn parallel to and fifty (50) feet Easterly of the West line of said Section ten (10); thence South zero (00) degrees, zero (00) minutes, zero (00) seconds West, parallel to the said West line of Section ten (10), a distance of seven hundred seventy-three and eighty-six hundredths (773.86) feet, more or less to the East-West centerline of said Section ten (10); thence South eighty-eight (88) degrees, forty-one (41) minutes, thirty (30) seconds West, along the said East-West centerline of Section ten (10), a distance of fifty and one hundredth (50.01) feet, more or less, to the West one-quarter (114) corner of said Section ten (10); thence North zero (00) degrees, zero (00) minutes, zero (00) seconds East, along the West line of said Section ten (10) and the centerline of Jackman Road, a distance of nine hundred fifty-five and eighty-nine hundredths (955.89) feet, more or less, to the point of beginning. Containing 81,932 square feet (1.881 acres) of land, more or less. Subject to legal highways.

Parcel 3:
The South five (5) acres of the North one hundred twelve (112) rods of the West one-half (112) of the Northwest one-quarter (1/4) of Section ten (10), Town nine (9) South, Range seven (7) East, in the City of Toledo, Lucas County, Ohio, excepting therefrom a parcel of land bounded and described as follows:

Being part of the Northwest one-quarter (1/4) of Section ten (10), Town nine (9) South, Range seven (7) East, in the City of Toledo, Lucas County, Ohio, being more particularly bounded and described as follows:

Commencing at the Northwest corner of said Section ten (10), Town nine (9) South, Range seven (7) East, thence South zero (00) degrees, zero (00) minutes, zero (00) seconds West,

along the West line of said Section ten (10) and the centerline of Jackman Road, a distance of sixteen hundred eighty-two and fifteen hundredths (1682.15) feet, more or less, to the North line of the South five (5) acres of the North one hundred twelve (112) rods of the West one-half (1/2) of the Northwest one-quarter (1/4) of said Section ten (10); said point being the point of beginning; thence North eighty-eight (88) degrees, thirty-three (33) minutes, thirty (30) seconds East along the said North line of the South five (5) acres of the North one hundred twelve (112) rods of the West one-half (112) of the Northwest one-quarter (1/4) of Section ten (10), a distance of sixty and two hundredths (60.02) feet; thence continuing North eighty-eight (88) degrees, thirty-three (33) minutes, thirty (30) seconds East along the North line of the South five (6) acres of the North one hundred twelve (112) rods of the West one-half (1/2) of the Northwest one-quarter (1/4) of Section ten (10), a distance of five hundred seventy-five and sixteen hundredths (575.16) feet; thence South one (1) degree, twenty-six (26) minutes, zero (00) seconds East, a distance of forty-six and zero hundredths (46.00) feet; thence South eighty-eight (88) degrees, thirty-three (33) minutes, thirty (30) seconds West along a line drawn parallel to the said North line of the South five (5) acres of the North one hundred twelve (112) rods of the West one-hail (1/2) of the Northwest one-quarter (1/4) of Section ten (10), a distance of three hundred forty-four and fifty-five hundredths (344.55) feet; thence South eighty (80) degrees, fifteen (15) minutes, two (2) seconds West, a distance of one hundred eighty-six and sixty-four hundredths (186.64) feet; thence South twenty-seven (27) degrees, thirty-four (34) minutes, one (1) second West, a distance of one hundred twenty-four and seventy-eight hundredths (124.78) feet, more or less, to a point on a line drawn parallel to and fifty (50) feet Easterly of the West line of said Section ten (10); thence South zero (00) degrees, zero (00) minutes, zero (00) seconds West, parallel to the said West line of Section ten (10), a distance of seven hundred seventy-three and eighty-six hundredths (773,86) feet, more or less to the East-West centerline of said Section ten (10); thence South eighty-eight (88) degrees, forty-one (41) minutes, thirty (30) seconds West, along the said East-West centerline of Section ten (10), a distance of fifty and one hundredth (50.01) feet, more or less, to the West one-quarter (1/4) corner of said Section ten (10); thence North zero (00) degrees, zero (00) minutes, zero (00) seconds East, along the West line of said Section ten (10) and the centerline of Jackman Road, a distance of nine hundred fifty-five and eighty-nine hundredths (955.89) feet, more or less, to the point of beginning. Containing 81,932 square feet (1.881 acres) of land, more or less. Subject to legal highways.

Parcel 4:
The East one-half (1/2) of the Northwest one-quarter (114) of Section number ten (10), Town nine (9) South, Range seven (7) East, In Washington Township, Lucas County, Ohio, excepting therefrom the North one thousand six hundred five (1,605) feet of the East sixty (60) feet thereof, and also excepting therefrom the South one hundred (100) feet thereof and excepting therefrom that part contained in Deed 00.0393-E07 bounded and described as follows:

Being part of the Northeast and Northwest one-quarter (114) of Section ten (10), Town nine (9) South, Range seven (7) East, City of Toledo, Lucas County, Ohio, bounded and described as follows:

Commencing at a three-quarters (3/4) inch iron bar monument In a box found at the North quarter post of Section ten (10), said point also being on the centerline of West Alexis Road, so-called; Thence North eighty-nine (89) degrees; thirty-seven (37) minutes, fifty-eight (58) seconds East along the centerline of West Alexis Road, also being the North line of Section ten (10), a distance of nine hundred ten and eighteen hundredths (910.18) feet to a point, said point being at the Northwest corner of land as conveyed to Temperance Yard Corporation by Lucas County Microfiche Number 88-98-D05, said point also being the true point of beginning; Thence

South zero (00) degrees, eighteen (18) minutes, two (2) seconds East along the Westerly line of land as conveyed to Temperance Yard Corporation, passing a one-half (1/2) inch galvanized steel pipe set at forty-five and zero hundredths (45.00) feet, said point also being on the Southerly right-of-way of West Alexis Road, a distance of nineteen hundred eighty-two and seven hundredths (1,982.07) feet to a point, from said point an iron pipe is found zero and thirty-three hundredths (0.33) feet West and zero and fifty-seven hundredths (0.57) North. Thence South eight (8) degrees, six (6) minutes, six (6) seconds West along the Westerly line of land as conveyed to Temperance Yard Corporation a distance of three hundred thirty-three and eighteen hundredths (333.18) feet to a point of curvature, from said point a concrete monument with an Iron bar is found zero and ninety hundredths (0.0) feet West and zero and thirty-three hundredths (0;33) feet North;

Thence traversing an arc to the right, said arc having a central angle of twenty-seven (27) degrees, forty-three (43) minutes, sixteen (16) seconds, a radius of four hundred fifty-six and fifty-eight hundredths (456.58) feet, a tangent of one hundred twelve and sixty-six hundredths (112.66) feet, an arc length of two hundred twenty and ninety hundredths (220.90) feet, a chord bearing of South twenty-one (21) degrees, fifty-seven (57) minutes, five (6) seconds West, and a chord length of two hundred eighteen and seventy-five hundredths (218.75) feet along the Westerly line of land as conveyed to Temperance Yard Corporation to a point, from said point a concrete monument with an Iron bar Is found zero and forty-one hundredths (0.41) feet North and zero and eighty-four hundredths (0.84) feet West;

Thence South eighty-nine (89) degrees, twenty-two (22) minutes, fifty-two (52) seconds West on a line parallel with and one hundred twenty-six and thirty hundredths (126.30) feet distant from the East-West centerline of Section ten (10), a distance of seven hundred eighty-four and eighty hundredths (784.80) feet to a point; Thence South zero (00) degrees, nine (9) minutes, thirty-nine (39) seconds East a distance of twenty-six and thirty-two hundredths (26.32) feet to a point one hundred (100) feet North of the East-West centerline of Section ten (10), from said point an iron pin monument Is found leaning zero and forty-seven hundredths (0.47) feet West; Thence South eighty-nine (89) degrees, twenty-four (24) minutes, fifty-nine (59) seconds West on a line parallel with and one hundred (100) feet distant from the East-West centerline of Section ten (10), a distance of thirteen hundred nineteen and ninety-one hundredths (1319.91) feet to a fence post on the West line of the East one-half (112) of the Northwest one-quarter (114);

Thence North zero (00) degrees, twenty-one (21) minutes, thirty (30) seconds East along the West line of the East one-half (1/2) of the Northwest one-quarter (1/4), a distance of two hundred twenty-seven and nine hundredths (227.09) feet to a one-half (1/2) inch galvanized steel pipe set; Thence North fifty-six (56) degrees, forty-three (43) minutes, fifty-three (53) seconds East, a distance of twenty-seven and fifty hundredths (27.50) feet to a fence post; Thence North eighty-five (85) degrees, forty-two (42) minutes, zero (00) seconds East a distance of one hundred thirty-seven and twenty-one hundredths {137.21) feet to a fence post; Thence North eighty-two (82) degrees, twenty-one (21) minutes, eight (8) seconds East a distance of one hundred thirty-five and sixty-five hundredths (135.65) feet to a fence post; Thence North nine (9) degrees, two (2) minutes, fifty (50) seconds West, a distance of two hundred forty-three and fifty-two hundredths (243.52) feet to a one-half (112) inch galvanized steel pipe set; Thence North eighty (80) degrees, fifty-five (55) minutes, fifty-five (55) seconds East, a distance of ninety and forty-eight hundredths (90.48) feet to a one-half (112) Inch galvanized steel pipe set; Thence North eight (8) degrees, twenty (20) minutes, thirty (30) seconds West, a distance of fifty-six and seventy-one hundredths (56.71) feet to a one-half (112) Inch galvanized steel pipe set; Thence North forty-three (43) degrees, twelve (12) minutes, forty (40) seconds East, a distance of one hundred seventy-nine and twenty-six hundredths (179.26) feet to a one-half (1/2) inch galvanized steel pipe set; Thence South eighty-nine (89) degrees, twenty-seven (27) minutes, forty (40) seconds East, a distance of seven hundred eighty-two and thirty-eight hundredths (782.38) feet to a drilled hole set; Thence South

zero (00) degrees, thirty-two (32) minutes, twenty (20) seconds West, a distance of one hundred eleven and ten hundredths (111.10) feet to a one-half (1/2) Inch galvanized steel pipe set; Thence North eighty-five (85) degrees, fifty (50) minutes, forty (40) seconds East, a distance of eighty-seven and forty-four hundredths (87.44)feet to a one-half (1/2) inch galvanized steel pipe set; Thence North four (4) degrees, eighteen (18) minutes, fifty (50) seconds West, a distance of ninety and one hundredth (90.01) feet to a one-half (1/2) Inch galvanized steel pipe set; Thence North eighty-nine (89) degrees, fifty-seven (57) minutes, twenty (20) seconds East, a distance of one hundred seventy-three and sixty-eight hundredths (173.68) feet to a one-half (112) inch galvanized steel pipe set; Thence North zero (00) degrees, eighteen (18) minutes, fifty-five (55) seconds West a distance of thirty and forty-six hundredths (30.46) feet to a one-half (1/2) Inch galvanized steel pipe set; Thence South eighty-nine (89) degrees, fifty-five (55) minutes, forty (40) seconds East, a distance of six hundred eighty-six and two hundredths (686.02) feet to a one-half (112) inch galvanized steel pipe set that is fifty (50) feet distant from the Westerly line of land as conveyed to Temperance Yard Corporation. Thence North zero (00) degrees, eighteen (18) minutes, two (2) seconds West on a line parallel with and fifty and zero hundredths (50.00) feet distant from the Westerly line of land as conveyed to Temperance Yard Corporation, passing a one-half (1/2) inch galvanized steel pipe set at seventeen hundred ninety-eight and thirty-three hundredths (1798.33) feet, a distance of eighteen hundred forty-three and thirty-three hundredths (1843.33) feet to a point on the North line of Section ten (10); Thence North eighty-nine (89) degrees, thirty-seven (37) minutes, fifty-eight (58) seconds East along the North line of Section ten (10), a distance of fifty and zero hundredths (50.00) feet to the true point of beginning;
Bearings used hereon are based upon an assumed meridian and are for the express purpose of showing angular measurement All one-half (1/2) inch galvanized steel pipe set are marked with a cap bearing company name and P.S. Number 7476.

Parcel 5:
The North sixteen hundred five (1,605) feet of the East sixty (60) test of the East one-half (1/2) of the Northwest one-quarter (1/4) of Section ten (10), Town nine (9) South, Range seven (7) East, In the City of Toledo, Lucas County, Ohio. Subject to legal highways.

Parcel 6:
Parcel A. Lands in the Northeast one-quarter (114) of Section ten (10), town nine (9) South, Range seven (7) East, in Washington Township, Lucas County, Ohio, more particularly described as follows:
Commencing at a point marked by an Iron pipe, said point being South eighty-eight (88) degrees, fifty-six (56) minutes, ten (10) seconds West, twenty-five hundred eighty-five and forty-nine hundredths (2,585.49) feet, and South zero (00) degrees, fifty-three (53) minutes, twenty (20) seconds East, thirty-seven and twenty hundredths (37.20) feet from the Northeast corner of said Section ten (10); running thence South forty-two (42) degrees, twenty-three (23) minutes, twenty (20) seconds East, parallel to and thirty (30) feet southwesterly of the centerline of the main track of the Detroit, Toledo and Ironton Railroad Company, as located on November 11,1948, ten hundred twenty-three and ninety hundredths (1,023.90) feet to a point of curve to the right, marked by an Iron pipe, said curve having a radius of four hundred seventy-eight and thirty-four hundredths (478.34) feet; thence Southeasterly along the arc of said curve three hundred forty-four and forty-four hundredths (344.44) feet to a point of tangent, marked by an iron pipe, said point bearing South twenty-one (21) degrees, forty-three (43) minutes, twenty (20) seconds East, three hundred thirty-seven and sixty-four hundredths (337.84) feet from the last mentioned point; thence South one (1) degree, three (3) minutes, twenty (20) seconds East, parallel to and one hundred forty-four (144) feet Westerly of the centerline of the Yard Track Number two (2) of the Detroit, Toledo and Ironton Railroad Company, as located on November

11,1948, four hundred sixty and forty-four hundredths (460.44) feet to a point marked by an iron pipe; thence South eighty-eight (88) degrees, thirty-four (34) minutes, forty (40) seconds West, seven hundred ninety-nine and thirty hundredths (799.30) feet to a point marked by an iron pipe; thence North zero (00) degrees, fifty-three (53) minutes, twenty (20) seconds West, fifteen hundred fifty-one and forty hundredths (1551.40) feet to the point of commencement; containing twenty (20) acres, more or less; and Parcel B. Lands in the North one-half (112) of Section ten (10), Town nine (9) South, Range seven (7) East, in Washington Township, Lucas County, Ohio, more particularly described as follows:

Commencing at a point marked by an iron pipe, said point being South eighty-eight (88) degrees, fifty-six (56) minutes, ten (10) seconds West, twenty-five hundred eighty-five and forty-nine hundredths (2,586.49) feet, and South zero (00) degrees, fifty-three (53) minutes, twenty (20) seconds East, thirty-seven and two tenths (37.2) feet from the Northeast corner of said Section ten (10), and running thence South zero (00) degrees, fifty-three (53) minutes, twenty (20) seconds East, fifteen hundred sixty-seven and eight tenths (1,5672) feet to an iron pipe; thence South eighty-eight (88) degrees, thirty-four (34) minutes, forty (40) seconds West, five and twenty-nine hundredths (5.29) feet to the East line of above described parcel, said line being the Northerly portion of a line extending from a concrete monument accepted as the center of said Section ten (10), Town nine (9) South, Range seven (7) East, North zero (00) degrees, forty-one (41) minutes, fifty (50) seconds East, twenty-six hundred forty-four and eighty-four hundredths (2,644.84) feet to a monument at the North one-quarter (1/4) corner of said
Section and located South eighty-eight (88) degrees, fifty-six (56) minutes, ten (10) seconds West, twenty-five hundred eighty-five and forty-nine hundredths (2,58549) feet from the Northeast corner of said Section ten (10), (said last mentioned line having a course of North one (1) degree, twelve (12) minutes, thirty-five and one tenth (35.1) seconds East in the deed of conveyance to American Propeller Corporation of the property adjoining on the West); thence North zero (00) degrees, forty-one (41) minutes, fifty (50) seconds East, along the said East line of above described parcel to a point located thirty (30) feet Southwesterly at right angles to the center line of main track of Detroit, Toledo and Ironton Railroad Company as located on November 11, 1948; thence South forty-two
(42) degrees, twenty-three (23) minutes, twenty (20) seconds East to the place of commencement; containing 0.777 acres, more or less.

Parcel C. That part of the Northwest one-quarter (1/4) of Section ten (10), Town nine (9) South, Range seven (7) East, City of Toledo, Lucas County, Ohio, bounded and described as follows: along said North line of Section ten (10), a distance of eight hundred thirty-six and fifty-two hundredths (836.52) feet; thence Southward, at an angle of eighty-nine (89) degrees, fifty-six (58) minutes, zero (00) seconds, measured from West to South off said North line of Section ten (10), a distance of eleven hundred forty-eight and eighty-three hundredths (1,148.83) feet to the point of beginning of the herein described parcel and also the point of beginning for land conveyed by the Detroit, Toledo and Ironton Railroad Company to General Motors Corporation and described therein as Parcel II as per Deed recorded In Volume 1669 of Deeds, age 375; thence Northward, along the last described IIE, a distance of one hundred ninety-seven and twenty hundredths (197.20) feet, more or less, to a concrete monument being the same concrete monument defining the Southerly corner of land conveyed by the Detroit, Toledo and Ironton Railroad Company to General Motors Corporation described therein as Parcel I as per Deed recorded in Volume 1669 of Deeds, page 375; thence Northwestward, deflecting left at an angle of forty-one (41) degrees, twenty (20) minutes, forty-five (45) seconds, more or less, off the last described line, and running along the Southwesterly line of said Parcel I set forth in said deed recorded in Volume 1669 of Deeds, page 375, a distance of twelve hundred sixty-six and

7

thirty hundredths (1,266.30) feet, more or less, to the point of commencing; thence Westward, along said North line of Section ten (10), to said North one-quarter (114) corner of Section ten (10); thence Southward, along the North and South centerline of said Section ten (10) at an angle of ninety (90) degrees, twenty (20) minutes, forty-seven (47) seconds, more or less, measured from East to South off said North line of Section ten (10), a distance of thirty-even and eight hundredths (37.08) feet, more or less, to intersect the common Northeasterly line of land conveyed by Brown Trailers, Inc. to General Motors Corporation described as Parcels A and B therein, as per deed recorded in Volume 1815 of Deeds, page 374; thence Southeastward, deflecting left at an angle of forty-one (41) degrees, thirty-seven (37) minutes, seventeen (17) seconds, more or less, off said North and South centerline of Section ten (10), running along said common Northeasterly line of lands conveyed by said Deed recorded In volume 1669 of Deeds, page 375, and described therein as Parcels "A" and "B", and continuing along the common Northeasterly line of said Parcel II as per deed recorded In Volume 1669 of Deeds, page 375, to the point of beginning; said common boundary between said Parcels "A" and "B" and is being measured as follows: running from said point of intersection along said common Northwesterly line a distance of twelve hundred seventy and seventy-six hundredths (1,270.76) feet, more or less, to a none-tangent point of curve described in said Parcel II, thence Southeastward, along a line curving to the right with a radius of five hundred sixty-three and sixty-nine hundredths (563.69) feet, a central angle of seventeen (17) degrees, thirty-two (32) minutes, fifty (50) seconds and a chord bearing of one hundred seventy-one and ninety-six hundredths (171.96) feet, an arc distance of one hundred seventy-two and sixty-three hundredths (172.63) feet to the point of beginning, said chord deflecting right at an angle of sixteen (16) degrees, fifty-eight (68) minutes, three (3) seconds, more or less, off the last described line. Subject to a perpetual easement and right-of-way for public highway and road purposes granted to the State of Ohio by instrument recorded in Volume 1807 of Deeds, page 93. Subject to legal highways.

Being the same property conveyed to General Motors Corporation by deed from Detroit, Toledo and Ironton Railroad Company dated July 14, 1972 and recorded September 29, 1972, In Volume 2166 of Deeds, page 141.

Parcel 7:
(Parcel I): All of that part of the Northeast one-quarter (1/4) of Section ten (10), Town nine (9) South, Range seven (7) East, in Washington Township, Lucas County, Ohio, bounded and described as follows:

Beginning at a point in the North line of the said Section ten (10) (centerline of Alexis Road), which is distant seventy-three and sixty-six hundredths (73.66) feet South eighty-nine (89) degrees, thirty-eight (38) minutes, forty-five (45) seconds East from a stone monument which defines the North one-quarter (1/4) corner of the said Section ten (10); thence South eighty-nine (89) degrees, thirty-eight (38) minutes, forty-five (45) seconds East, along the said North line of Section ten (10) (centerline of Alexis Road), a distance of eight hundred thirty-six and fifty-two hundredths (836.52) feet; thence South zero (00) degrees, twenty-five (25) minutes, fifteen (15) seconds West, a distance of thirty (30) feet to a point in the Southerly line of the said Alexis Road, the said point being defined by a brass plate monument set in concrete; thence continuing South zero (00) degrees, twenty-five (25) minutes, fifteen (15) seconds West, a distance of nine hundred twenty-one and forty-nine hundredths (921.49) feet to a point, the said point being defined by a brass plate monument set in concrete; thence North forty (40) degrees, fifty-five (55) minutes, forty-five (45) seconds West, a distance of twelve hundred twenty-six and twenty-seven hundredths (1226.27) feet to a point in the said Southerly line of Alexis Road, the said point being defined by a brass plate monument set in concrete; thence continuing North

MLC #1099 – GMPT Toledo 103C Landfill

forty (40) degrees, fifty  five (55) minutes, forty-five (45) seconds West, a distance of thirty-nine and ninety-two hundredths (39.92) feet, to the place of beginning, containing 9.136 acres of land, more or less, subject to legal highways.

(Parcel 11); All of that part of the Northeast one-quarter (1/4) of Section ten (10), Town nine (9) South, Range seven (7) East, in Washington Township, Lucas County, Ohio bounded and described as follows:

Commencing at a stone monument that defines the North one-quarter (114) corner of the said Section ten (10); thence South eighty-nine (89) degrees, thirty-eight (38) minutes, forty-five (45) seconds East, along the North line of the said Section ten (10) (centerline of Alexis Road), a distance of nine hundred ten and eighteen hundredths (910.18) feet; thence South zero (00) degrees, twenty-five (25) minutes, fifteen (15) seconds West, a distance of eleven hundred forty-eight and eighty-three hundredths (1148.83) feet to a point the said point being defined by an iron pipe, the said point also being the point of beginning; thence continuing South zero (00) degrees, twenty-five (25) minutes, fifteen (15) seconds West, a distance of eight hundred thirty-three and thirty-four hundredths (833.34) feet to a point, the said point being defined by an Iron pipe; thence South eight (8) degrees, forty-nine (49) minutes, twenty-three (23) seconds West, a distance of three hundred thirty-three and thirty-five hundredths (333.35) feet to a point, the said point being defined by an iron pipe; the said point also being a point of curve;

thence Southwesterly, along .a circular curve to the right, or West, having a radius of four hundred fifty-six and fifty-three hundredths (45643) feet, an arc distance of two hundred twenty and seventy-three hundredths (220.73) feet, the said arc subtending a central angle of twenty-seven (27) degrees, forty-two (42) minutes, ten (10) seconds, the chord of the said arc having a length of two hundred eighteen and fifty-nine hundredths (218.59) feet and bearing South twenty-two (22) degrees, forty-one (41) minutes, one (1) second West to a point, the said point being defined by an iron pipe; thence North eighty-nine (89) degrees, fifty-three (53) minutes, fifty-one (51) seconds West, a distance of seven hundred eighty-four and six hundredths (784.06) feet to a point, the said point being defined by an Iron pipe; thence North zero (00) degrees, thirty-two (32) minutes, thirty-nine (39) seconds East, a distance of nine hundred twenty-nine and fifty-two hundredths (929.52) feet to a point, the said point being defined by an Iron pipe; thence South eighty-nine (89) degrees, fifty-six (56) minutes, fifteen (15) seconds East, a distance of seven hundred ninety-nine and sixty hundredths (799.60) feet to a point, the said point being defined by an Iron pipe; thence North zero (00) degrees, twenty-five (25) minutes, fifteen (15) seconds East, a distance of four hundred sixty and forty-four hundredths (460.44) feet to a point, the said point being defined by an iron pipe, the said point also being a point of curve; thence Northwesterly, along a circular curve to the left, or West, having a radius of four hundred seventy-eight and fifty-six hundredths (478.56) feet, an arc distance of three hundred forty-five and thirty-seven hundredths (345.37) feet, the said arc subtending a central angle of forty-one (41) degrees, twenty-one (21) minutes, the chord of the said arc having .a length of three hundred thirty-seven and ninety-three hundredths (337.93) feet and bearing North twenty (20) degrees, fifteen (15) minutes, fifteen (16) seconds West to a point, the said point being defined by an Iron pipe; thence South forty (40) degrees, fifty-five (55) minutes, forty-five (45) seconds East, a distance of two hundred forty-five and ninety-seven hundredths (245.97) feet to a point, the said point being defined by an iron pipe, the said point also being a point of curve; thence Southeasterly, along a circular curve to the right, or Southwest, having a radius of five hundred sixty-three and sixty-nine hundredths (563.69) feet, an arc distance of one hundred seventy-two and sixty-three hundredths (172.63) feet, the said arc subtending a central angle of seventeen (17) degrees, thirty-two (32) minutes, fifty (50) seconds, the chord of said arc having a length of one hundred seventy-one and ninety-six hundredths (171.96) feet and bearing South twenty-three (23) degrees, fifty-three (53) minutes, forty-two (42) seconds East, to the place of beginning, containing 20.524 acres of land, more or less, subject to all legal highways.

MLC #1099 – GMPT Toledo 103C Landfill

(Parcel III): All of that part of the Northeast one-quarter (1/4) of Section ten (10), Town nine (9) South, Range seven (7) East, in Washington Township, Lucas County, Ohio, bounded and described as follows:

Beginning at the center of said Section ten (10), which point Is defined by a concrete monument; thence Easterly along the East and West centerline of the said Section ten (10), a distance of seven and forty-one hundredths (7.41) feet to an iron pipe; thence North zero (00) degrees, thirty-two (32) minutes, thirty-nine (39) seconds East along a line drawn from said iron pipe to the North one-quarter (114) corner of said Section ten (10), a distance of one hundred (100) feet to a point, which point is the point of beginning of parcel of land herein described, the said point being defined by an iron pipe; thence continuing North zero (00) degrees, thirty-two (32) minutes, thirty-nine (39) seconds East along the last described line, which line Is also the West boundary line of lands conveyed August 7,1957 to General Motors Corporation, a distance of nine hundred thirty-eight and nineteen hundredths (938.19) feet to the Southeasterly line of lands owned by General Motors Corporation, a distance of four and fifty hundredths (4.50) feet, to a point in the North and South centerline of said Section ten (10), the said point being defined by an iron pipe; thence South zero (00) degrees, forty-two (42) minutes, seventeen (17) seconds West, along the said North and South centerline of Section ten (10), which line is also the East boundary line of lands owned by General Motors Corporation, a distance of nine hundred thirty-eight and eighteen hundredths (938.18) feet to a point, the said point being defined by an iron pipe; thence South eighty-nine (89) degrees, fifty-two (62) minutes, zero (00) seconds East, a distance of seven and thirteen hundredths (7.13) feet to the place of beginning, containing 0.125 of an acre of land, more or less, subject to all legal highways.
Excepting from Parcels 2 and 3 that part conveyed in Deed 00.0393-E07 bounded and described as follows:

Being part of the Northeast and Northwest one-quarter (1/4) of Section ten (10), Town nine (9) South, Range seven (7) East, City of Toledo, Lucas County, Ohio, bounded and described as follows:

Commencing at a three-fourths (3/4) inch iron bar monument in a box found at the North quarter post of Section ten (10), said point also being on the centerline of West Alexis Road, so-called:

Thence North eighty-nine (89) degrees, thirty-seven (37) minutes, fifty-eight (58) seconds East along the centerline of West Alexis Road, also being the North line of Section ten (10), a distance of nine hundred ten and eighteen hundredths (910.18) feet to a point, said point being at the Northwest corner of land as conveyed to Temperance Yard Corporation by Lucas County microfiche number 88-95-DOS, said point also being the true point of beginning; Thence South zero (0D) degrees, eighteen (18) minutes, two (2) seconds East along the Westerly line of land as conveyed to Temperance Yard Corporation, passing a one-half (1/2) inch galvanized steel pipe set at forty-five and zero hundredths (45.00) feet, said point also being on the Southerly right-of-way of West Alexis Road, a distance of nineteen hundred eighty-two and seven hundredths (1982.07) feet to a point, from said point an Iron pipe is found zero and thirty-three hundredths (0.33) feet West and zero and fifty-seven hundredths (0.57) feet North; Thence South eight (8) degrees, six (6) minutes, six (6) seconds West along the Westerly line of land as conveyed to Temperance Yard Corporation, a distance of three hundred thirty-three and eighteen hundredths (333.18) feet to a point of curvature, from said point a concrete monument with an iron bar is found zero and ninety hundredths (0.90) feet West and zero and thirty-three hundredths (033) feet North; Thence traversing an arc to the right, said arc having a central angle of twenty-seven (27) degrees, forty-three (43) minutes, sixteen (16) seconds, a radius of

four hundred fifty-six and fifty-eight hundredths (456.58)feet, a tangent of one hundred twelve and sixty-six hundredths (112.66) feet, an arc length of two hundred twenty and ninety hundredths (220.90) feet, a chord bearing of South twenty-one (21) degrees, fifty-seven (57) minutes, five (5) seconds West, and a chord length of two hundred eighteen and seventy-five hundredths (218.75) feet along the Westerly line of land as conveyed to Temperance Yard Corporation to a point, from said point a concrete monument with an iron bar is found zero and forty-one hundredths (0.41) feet North and zero and eighty-four hundredths (0.84) feet West; Thence South eighty-nine (89) degrees, twenty-two (22) minutes, fifty-two (52) seconds West on a line parallel with and one hundred twenty-six and thirty hundredths (126.30) feet distant from the East-West centerline of Section ten (10), a distance of seven hundred eighty-four and eighty hundredths (784.80) feet to a point; Thence South zero (00) degrees, nine (9) minutes, thirty-nine (39) seconds East a distance of twenty-six and thirty-two hundredths (26.32) feet to a point one hundred (100) feet North of the East-West centerline of Section ten (10), from said point an iron pin monument is found leaning zero and forty-seven hundredths (0.47) feet West; Thence South eighty-nine (89) degrees, twenty-four (24) minutes, fifty-nine (59) seconds West on a line parallel with and one hundred (100) feet distant from the East-West centerline of Section ten (10), a distance of thirteen hundred nineteen and ninety-nine hundredths (1319.91) feet to a fence post on the West line of the East one-half (112) of the Northwest one-quarter (1/4); Thence North zero (00) degrees, twenty-one (21) minutes, thirty (30) seconds East along the West line of the East one-half (112) of the Northwest one-quarter (114), a distance of two hundred twenty-seven and nine hundredths (227.09) feet to a one-half (1/2) Inch galvanized steel pipe set; Thence North fifty-six (56) degrees, forty-three (43) minutes, fifty-three (53) seconds East, a distance of twenty-seven and fifty hundredths (27.50) feet to a fence post; Thence North eighty-five (85) degrees, forty-two (42) minutes, zero (00) seconds East, a distance of one hundred thirty-seven and twenty-one hundredths (137.21) feet to a fence post; Thence North eighty-two (82) degrees, twenty-one (21) minutes, eight (8) seconds East, a distance of one hundred thirty-five and sixty-five hundredths (135.65) feet to a fence post; Thence North nine (9) degrees, two (2) minutes, fifty (50) seconds West, a distance of two hundred forty-three and fifty-two hundredths (243.52) feet to a one-half (1/2) inch galvanized steel pipe set; Thence North eighty (80) degrees, fifty-five (55) minutes, fifty-five (55) seconds East, a distance of ninety and forty-eight hundredths (90.48) feet to a one-half (1/2) inch galvanized steel pipe set; Thence North eight (8) degrees, twenty (20) minutes, thirty (30) seconds West, a distance of fifty-six and seventy-one hundredths (56.71) feet to a one-half (1/2) inch galvanized steel pipe set; Thence North forty-three (43) degrees, twelve (12) minutes, forty (40) seconds East, a distance of one hundred seventy-nine and twenty-six hundredths (179.26) feet to a one-half (1/2) inch galvanized steel pipe set; Thence South eighty-nine (89) degrees, twenty-seven (27) minutes, forty (40) seconds East, a distance of seven hundred eighty-two and thirty-eight hundredths (782.38) feet to a drilled hole set; Thence South zero (00) degrees, thirty-two (32) minutes, twenty (20) seconds West, a distance of one hundred eleven and ten hundredths (111.10) feet to a one-half (1/2) inch galvanized steel pipe set; Thence North eighty-five (85) degrees, fifty (50) minutes, forty (40) seconds East, a distance of eighty-seven and forty-four hundredths (87.44) feet to a one-half (1/2) inch galvanized steel pipe set; Thence North four (4) degrees, eighteen (18) minutes, fifty (50) seconds West a distance of ninety and one hundredth (90.01) feet to a one-half (1/2) inch galvanized steel pipe set; Then North eighty-nine (89) degrees, fifty-seven (57) minutes, twenty (20) seconds East a distance of one hundred seventy-three and sixty-eight hundredths (173.68) feet to a one-half (1/2) inch galvanized steel pipe set; Thence North zero (00) degrees, eighteen (18) minutes, fifty-five (66) seconds West, a distance of thirty and forty-six hundredths (30.46) feet to a one-half (1/2) inch galvanized steel pipe set; Thence South eighty-nine (89) degrees, fifty-five (55) minutes, forty (40) seconds East, a distance of six hundred eighty-six and two hundredths (686.02) feet to a one-half (1/2) inch galvanized steel pipe set that is fifty (50) feet distant from the Westerly line of land as conveyed

to Temperance Yard Corporation; Thence North zero (00) degrees, eighteen (18) minutes, two (2) seconds West on a line parallel with and fifty and zero hundredths (50.00) feet distant from the Westerly line of land as conveyed to Temperance Yard Corporation, passing a one-half (1/2) inch galvanized steel pipe set at seventeen hundred ninety-eight and thirty-three hundredths (1798.33) feet, a distance of eighteen hundred forty-three and thirty-three hundredths (1843.33) feet to a point on the North line of Section ten (10);  Thence North eighty-nine (89) degrees, thirty-seven (37) minutes, fifty-eight (58) seconds East along the North line of Section ten (10), a distance of fifty and zero hundredths (50.00) feet to the true point of beginning; Bearings used hereon are based upon an assumed meridian and are for the express purpose of showing angular measurement; All one-half (1/2) inch galvanized steel pipe set are marked with a cap bearing company name and P.S. number 7476.

Parcel 8:
A parcel of land being part of the Northeast one-quarter (1/4) of Section ten (10), Town nine (9) South, Range seven (7) East, in the City of Toledo, Lucas County, Ohio, said parcel of land being bounded and described as follows:

Commencing at the intersection of the North line of said Northeast one-quarter (114) of Section ten (10), with the West line of said Northeast one-quarter (114) of Section ten (10), said point of intersection being marked with a found iron pin in a monument box, said North line of the Northeast one-quarter (114) of Section ten (10) also being the centerline of West Alexis Road, as it now exists; Thence In an Easterly direction along said North line of the Northeast one-quarter (1/4) of Section ten (10), having an assumed bearing of North eighty-eight (88) degrees, fifty-six 156) minutes, fifty-one (51) seconds East, a distance of eight hundred sixty and eighteen hundredths (860.18) feet to the intersection of the Westerly line of a parcel of land as described In Microfiche 00-0393-E07, Lucas County Deed Records; Thence continuing North eighty-eight (88) degrees, fifty-six (56) minutes, fifty-one (51) seconds East along said North line of the Northeast one-quarter (1/4) of Section ten (10), a distance of fifty and zero hundredths (50.00) feet to the intersection of the Easterly line of said parcel of land as described In Microfiche 004393-E07, Lucas County Deed Records; Thence South zero (00) degrees, fifty-nine (59) minutes, nine (9) seconds East along said Easterly lien of a parcel of land as described in Microfiche 00-0393-07, Lucas County Deed Records, passing through a set capped iron rebar at a distance of two hundred eighty-four and eighty-three hundredths (284.83) feet and passing through a set capped iron rebar at a distance of one thousand three hundred thirty-one and ninety-one hundredths (1331.91) feet to a total distance of one thousand eight hundred forty-three and seventy-three hundredths (184373) feet to the intersection of the Easterly extension of the Northerly line of said parcel of land as described in Microfiche 00-0393-E07, Lucas County Deed Records, said point of intersection being marked with a set capped iron rebar; Thence South eighty-nine (89) degrees, twenty-three (23) minutes, thirteen (13) seconds West along said Easterly extension of the Northerly line of a parcel of land as described in Microfiche 00-0393-E07, Lucas County Deed Records, a distance of fifty and zero hundredths (60.00) feet to the intersection of said Westerly line of a parcel of land as described in Microfiche 00-0393-507, Lucas County Deed Records, said point of Intersection being marked with a set capped Iron rebar; Thence North zero (00) degrees, fifty-nine (59) minutes, nine (9) seconds West along said Westerly line of a parcel of land as described In Microfiche 00-0393-E07, Lucas County Deed Records, passing through a set capped iron rebar at a distance f five hundred nine and seventy-seven hundredths (509.77) feet and passing through a set capped Iron rebar at a distance of one thousand two hundred five and ninety-three hundredths (1205.93) feet, a total distance of one thousand eight hundred forty-three and thirty-five hundredths (1843.35) feet to the True Point of Beginning. Said parcel of land containing an area of 92,177 square feet or 2.116 acres of land, more or less, all within Tax Parcel No. 22-

MLC #1099 – GMPT Toledo 103C Landfill

04018. Subject to legal highways.

The above described parcel of land is subject to any and all leases, easements and restrictions of record. The bearings used hereon are based on an assumed meridian and are for the express purpose of calculating angular measurement. Said set capped iron rebar being a one-half (1/2) inch diameter and thirty (30) inch long iron rebar with plastic cap stamped "Feller Finch".

The above description is based on a survey performed under my supervision during December, 2006. Prior Deed Reference is Microfiche 00-0393-E07, Lucas County Deed Record. Prepared by: Feller, finch & Associates, Inc. Duane E. Heck, P.S. Registered Surveyor No. 7432

Excepting from the aforesaid Parcels 4, 5, 8, 7, and 8 that part thereof conveyed to the Toledo-Lucas County Port Authority by Official Record No. 20070307-0013265 bounded and described as follows:

A parcel of land being part of the Northeast one-quarter (1/4) and also being part of the Northwest one-quarter (1/4) of Section ten (10), Town nine (9) South, Range seven (7) East, in the City of Toledo, Lucas County, Ohio, said parcel of land being bounded and described as follows:

Commencing at the Intersection of the North line of said Northeast one-quarter (1/4) of Section ten (10), with the West line of said Northeast one-quarter (1/4) Of Section ten (10), said point of intersection being marked with a found iron pin In a monument box, said North line of the Northeast one-quarter (1/4) of Section ten (10) also being the centerline of West Alexis Road, as it now exists; Thence in an easterly direction along said North line of the Northeast one-quarter (1/4) of Section ten (10), having an assumed bearing of North eighty-eight (88) degrees fifty-six (56) minutes fifty-one (51) seconds East, a distance of four hundred forty-one and twenty-six hundredths (441.26) feet to the True Point of Beginning;  Thence continuing North eighty-eight (88) degrees fifty-six (56) minutes fifty-one (51) seconds East along said North line of the Northeast one-quarter (114) of Section ten (10), a distance of four hundred sixty-eight and ninety-two hundredths (468.92) feet to the intersection of the easterly line of a parcel of land as described in Microfiche 00-0393-E07, Lucas County Deed Records; Thence South zero (00) degrees fifty-nine (59) minutes nine (09) seconds East along said easterly line of a parcel of land as described in Microfiche 00-0393-E07, Lucas County Deed Records, a distance of two hundred eighty-four and eighty-three hundredths (284.83) feet to a point, said point being marked with a set capped iron rebar;  Thence South eighty-nine (89) degrees fourteen (14) minutes twenty-nine (29) seconds West along a line, a distance of four hundred forty-eight and fourteen hundredths (448.14) feet to a point, said point being marked with a set mag nail; Thence South zero (00) degrees seven (07) minutes fifty-four (54) seconds East along a line, a distance of one hundred fifty-eight and forty-one hundredths (158.41) feet to a point, said point being marked with a set drill hole in concrete; Thence North eighty-nine (89) degrees eighteen (18) minutes sixteen (16) seconds East along a line, a distance of one hundred sixty-seven and thirty-nine hundredths (167.39) feet to a point, said point being marked with a set capped iron mbar;  Thence South twenty-three (23) degrees forty-two (42) minutes thirty-six (36) seconds East along a line, a distance of one hundred two and thirteen hundredths (102.13) feet to a point, said point being marked with a set capped iron rebar;  Thence South forty-one (41) degrees fifty-one (51) minutes twenty-five (26) seconds East along a line, a distance of fifty-three and thirteen hundredths (53.13) feet to a point; said point being marked with a set capped iron rebar; Thence South seventy (70) degrees two (02) minutes thirty-eight (38) seconds East along a line, a distance of one hundred seventy and twelve hundredths (170.12) feet to the

13                    <span>MLC #1099 – GMPT Toledo 103C Landfill</span>

intersection of the westerly line of said parcel of land as described in Microfiche 00-0393-E07, Lucas County Deed Records, said point of intersection being marked with a set capped Iron rebar; Thence South zero (00) degrees fifty-nine (59) minutes nine (09) seconds East along said westerly line of a parcel of land as described in Microfiche 00-0393-E07, Lucas County Deed Records, a distance of six hundred ninety-six and sixteen hundredths (696.16) feet to a point, said point being marked with a set capped iron rebar; Thence South eighty-nine (99) degrees nineteen (19) minutes nineteen (19) seconds West along a line, a distance of three hundred twenty and zero hundredths (320.00) feet to a point, said point being marked with a set capped iron rebar; Thence South sixty-one (61) degrees forty-one (41) minutes twenty-six (26) seconds West along a line, a distance of fifty-eight and eighty-four hundredths (58.84) feet to a point said point being marked with a set capped iron rebar; Thence South thirty-six (36) degrees twenty-two (22) minutes nine (09) seconds West along a line, a distance of one hundred fifty-five and twenty-six hundredths (155.26) feet to a point, said point being marked with a set capped iron rebar; Thence South sixty (60) degrees forty-nine (49) minutes zero (00) seconds West along a line, a distance of ninety-four and forty-two hundredths (94.42) feet to a point, said point being marked with a set capped Iron rebar; Thence South forty-four (44) degrees zero (00) minutes twenty-eight (28) seconds West along a line, a distance of one hundred twenty-one and ninety-one hundredths (121.91) feet to a point, said point being marked with a set capped iron rebar; Thence South fifty-four (54) degrees twenty (20) minutes eighteen (18) seconds West along a line, a distance of fifteen and seventy hundredths (15.70) feet to a point, said point being marked with a set capped iron rebar; Thence South seventy-nine (79) degrees thirteen (13) minutes thirty-eight (38) seconds West along a line, a distance of twenty and seventy hundredths (20.70) feet to a point, said point being marked with a set capped iron rebar; Thence North three (03) degrees twenty-six (26) minutes zero (00) seconds East along a line, a distance of thirty-three and eighty-seven hundredths (3327) feet to a point, said point being marked with a set capped iron rebar; Thence North fifty-four (54) degrees twenty (20) minutes eighteen (18) seconds East along a line, a distance of nine and ninety-five hundredths (9.95) feet to a point, said point being marked with a set capped iron rebar; Thence North forty-four (44) degrees zero (00) minutes twenty-eight (28) seconds East along a line, a distance of one hundred twenty-three and ninety-two hundredths (123.92) feet to a point, said point being marked with a set capped iron rebar; Thence North thirty-five (35) degrees six (06) minutes fifty-four (54) seconds East along a line, a distance of eighty-six and nine hundredths (86.09) feet to a point, said point being marked with a set capped iron rebar; Thence North six (06) degrees twenty-one (21) minutes forty-six (46) seconds West along a line, a distance of sixty-six and fifty-seven hundredths (66.57) feet to a point, said point being marked with a set capped Iron rebar; Thence North fifty-nine (59) degrees nineteen (19) minutes forty-three (43) seconds West along a line, a distance of one hundred fifty-five and sixty-nine hundredths (155.69) feet to a point, said point being marked with a set capped iron rebar; Thence South eighty-nine (89) degrees nineteen (19) minutes nineteen (19) seconds West along a line, a distance of two hundred nineteen and fifty-four hundredths (219.54) feet to a point, said point being marked with a set capped iron rebar; Thence South forty-five (45) degrees thirty-six (36) minutes fifty-three (53) seconds West along a line, a distance of forty-seven and seventy-six hundredths (47.76) feet to a point, said point being marked with a set capped iron rebar; Thence South zero (00) degrees forty (40) minutes forty-six (46) seconds East along a line, a distance of fifty-five and zero hundredths (55.00) feet to a point, said point being marked with a set capped iron rebar; Thence South eighty-nine (89) degrees nineteen (19) minutes nineteen (19) seconds West along a line, a distance of one hundred twenty-five and zero hundredths (125.00) feet to a point, said point being marked with a set drill hole In concrete; Thence North zero (00) degrees forty (40) minutes forty-six (46) seconds West along a line, a distance of thirty-five and zero hundredths (35.00) feet to a point, said point being marked with a set drill hole in concrete; Thence South eighty-nine (89) degrees nineteen (19) minutes nineteen (19) seconds West

14    <u>MLC #1099 – GMPT Toledo 103C Landfill</u>

along a line, passing through a set drill hole in concrete at a distance of fifty and zero hundredths (50.00) feet, a total distance of fifty-five and zero hundredths (55.00) feet, more or less, to the intersection of the easterly face of the existing General Motors Powertrain Manufacturing Building; The following three (3) courses follow on and along said easterly face of the existing General Motors Powertrain Manufacturing Building; Thence North zero (00) degrees forty (40) minutes forty-six (46) seconds West along a line, a distance of six hundred and thirty-four hundredths (600.34) feet, more or less; Thence North eighty-nine (89) degrees twenty-four (24) minutes fifty-three (53) seconds East, a distance of thirty-seven and ninety-two hundredths (37.92) feet, more or less; Thence North zero (00) degrees forty-five (45) minutes thirty-seven (37) seconds West, a distance of one hundred fifteen and fifty-eight hundredths (115.58) feet to the intersection of the northerly face of the new Manufacturing Building (under construction); Thence North eighty-nine (89) degrees eighteen (18) minutes sixteen (16) seconds East along said northerly face of the new Manufacturing Building (under construction), a .distance of four hundred sixty-eight and eighty-six hundredths (468.88) feet, more or less, to the easterly face of an existing building; Thence North eighty-nine (89) degrees eighteen (18) minutes sixteen (16) seconds East along a line, passing through a set drill hole in concrete at a distance of fourteen and forty hundredths (14.40)feet, a total distance of seventy-five and eighteen hundredths (75.18) feet to a point, said point being marked with a set capped Iron rebar; Thence North zero (00) degrees seven (07) minutes fifty-four (54) seconds West along a line, passing through a set mag nail at a distance of three hundred eighty-five and eighty-two hundredths (385.82) feet, a total distance of four hundred forty and eighty-two hundredths (440.82) feet to the True Point of Beginning; Said parcel of land containing an area of 915,662 square feet, or 21.020 acres of land, more or less. Subject to legal highways.

Said parcel of land having a present road occupied area of 24,415 square feet or 0.560 acres of land, more or less. The above described parcel of land is subject to any and all leases, easements and restrictions of record.

The bearings used hereon are based on an assumed meridian and are for the express purpose of calculating angular measurement.  Said set capped iron rebar being a one-half (1/2) inch diameter and thirty (30) inches long iron rebar with plastic cap stamped "Feller Finch".

The above description is based on a survey performed under my supervision during December, 2006.
Prepared by: Feller, Finch 8 Associates, Inc. Duane E. Heck, P.S.
Registered Surveyor No. 7432.


GM Powertrain Toledo - GMC 1445 West Alexis Rd., Toledo, OH

## EXHIBIT A

### Property Description

Tract 1:

A tract of land in Section 24, Township 49, Range 33, including part of Blocks 32, 33, 34, 35, 37 and 38 in Leeds, a subdivision of land in and also part of the vacated streets and alleys therein, all in Kansas City, Jackson County Missouri, being more particularly described as follows:

Commencing at the Northeast corner of the Southwest Quarter of the Northeast Quarter of said Section 24, Township 49 Range 33; thence North 90 degrees 00 minutes 00 seconds East along the North line of the Southeast Quarter of the Northeast Quarter of said Section 24, a distance of 25.47 feet; thence South 0 degrees 00 minutes 00 seconds West, at right angles to said North line, a distance of 30.50 feet to the intersection of the South right-of-way line of 37th Street, as now established, with the Westerly right-of-way line of the Kansas City Southern Railway Company, as now established; thence Southerly along said Westerly right-of-way line, the following courses: South 3 degrees 01 minutes 33 seconds West, a distance of 340.13 feet; thence South 0 degrees 07 minutes 34 seconds East, a distance of 109.03 feet; thence South 89 degrees 52 minutes 52 seconds East, a distance of 2.00 feet; thence South 0 degrees 05 minutes 08 seconds West, a distance of 70.00 feet; thence North 89 degrees 52 minutes 52 seconds West, a distance of 11.08 feet; thence South 7 degrees 28 minutes 32 seconds West, a distance of 50.48 feet; thence South 2 degrees 44 minutes 21 seconds West, a distance of 200.25 feet; thence South 4 degrees 22 minutes 12 seconds West, a distance of 373.25 feet; thence South 90 degrees 00 minutes 00 seconds West, a distance of 4.24 feet; thence South 06 degrees 11 minutes 08 seconds West, a distance of 116.82 feet; thence North 89 degrees 59 minutes 35 seconds West, a distance of 47.82 feet; thence South 06 degrees 11 minutes 08 seconds West, a distance of 60.35 feet; thence South 89 degrees 59 minutes 35 seconds East; a distance of 42.74 feet; thence South 6 degrees 01 minutes 44 seconds West, a distance of 1,329.34 feet to the point of beginning of the tract of land herein described; thence departing from said Westerly right-of-way line, North 89 degrees 59 minutes 35 seconds West, a distance of 1,229.06 feet to a point on the Easterly high bank of the Big Blue River; thence Southeasterly along said Easterly high bank, the following courses; South 38 degrees 21 minutes 23 seconds East, a distance of 278.71 feet; thence South 33 degrees 14 minutes 16 seconds East, a distance of 274.96 feet; thence South 22 degrees 41 'minutes 20 seconds East, a distance of 100.85 feet; thence South 27 degrees 45 minutes 39 seconds East, a distance of 251.14 feet; thence South 44 degrees 51 minutes 33 seconds East, a distance of 239.67 feet; thence South 29 degrees 49 minutes 05 seconds East, a distance of 15952 feet; thence South 13 degrees 08 minutes 53 seconds East, a distance of 225.17 feet, to a point on the South right-of-way line of vacated 43rd Street; thence departing said Easterly high bank and continuing along said South right-of-way line, South 89 degrees 54 minutes 28 seconds East, a distance of 116.64 feet to a point on the aforesaid West right-of-way line of the Kansas City Southern Railway Company; thence departing said South right-of-way line and continuing Northerly along said West right-of-way line the following courses: North 0 degrees 22 minutes 55 seconds West, a distance of 15.00 feet to a point on the centerline of vacated 43rd Street; thence South 89 degrees 54 minutes 16 seconds East and along said centerline, a distance of 30.00 feet; thence departing said centerline, North 0 degrees 22 minutes 55 seconds West, a distance of 15.00 feet to a point on the North right-of-way line of vacated 43rd Street; thence North 26 degrees 15 minutes 58 seconds East, a distance of 111.42 feet; thence North 5 degrees 08 minutes 50 seconds East, a distance of 165.64 feet; thence South 0 degrees 52 minutes 59 seconds East, a distance of 112.00 feet; thence Northerly along a curve to the left, having an initial tangent bearing of North 24 degrees 49 minutes 33 seconds East, with a radius of 1,432.79 feet, a central angle of 15 degrees 29 minutes 24 seconds and an arc distance of 387.33 feet; thence North 10 degrees 05 minutes 21 seconds East, a distance of 647.23 feet; thence North 6 degrees 01 minutes 44 seconds East, a distance of 102.77 feet to the point of beginning.

<u>Tract 2:</u>

The non-exclusive easement appurtenant to Tract 3 shown above as established in the Easement Agreement recorded November 29, 2006 as Document No. 2006E0128983.

<u>Tract 3:</u>

The non-exclusive easement appurtenant to Tract 3 shown above as established in the Easement Agreement recorded November 29, 2006 as Document No. 2006E0128984.

## EXHIBIT A

### Property Description

Situated in the City of Elyria, Lorain County, Ohio, and being that part of the Original Elyria Township Lot No. 12, West of Black River and being part of that land of General Motors Corporation, D.V. 360, Page 344, all references herein to the records of the Lorain County Recorder's Office, more particularly described as follows:

Beginning at a 1 inch iron pipe found at the southeast  corner of said Original Lot 12;

Thence upon the South line of said Lot and upon the north line of lands of Grubbe Fruit Farm, Ltd., Instrument No. 970479529, North 89°45'00" West, 805.09 feet to a 1 inch iron pipe found;

Thence upon the east line of said Grubbe Fruit Farm, North 1°30'27" East, 552.31 feet to a 1 inch iron pipe found at the northeast corner of said lands;

Thence upon the north line of said tract, North 89°51'37" West, passing through a 1 inch iron pipe found at 784.45 feet, 790.75 feet to a point in the east line of lands of Donald A. Schuster, Living Trust, O.R. 1434, Page 49;

Thence upon said line, North 1°49'12" East, 589.77 feet to a ¾ inch iron rod found at the northeast corner of said Schuster lands;

Thence upon the east line of lands of Northern Ohio Associates, D.V. 227, Page 465, North 1°49'12" East, 718.96 feet to a 5/8 inch iron rod found;

Thence continuing upon said line, North 89°22'18" East, 261.37 feet to a 5/8 inch iron rod found;

Thence continuing upon said east line of Northern Ohio Associates, North 0°15'30" West, 1417.42 feet to a 1 inch iron pipe found in the Southern right of way line of Conrail Railroad;

Thence upon said line, South 73°14' 30" East, 1406.96 feet to a ½ inch iron rod set at the northeast corner of lands of John J. Lakso, Jr., Trustee, D.V. 65, Page 226;

Thence upon said line and upon the east line of said Original Lot 12, South 1°14' 30" West, 2880.90 feet to the point of beginning, containing 95.2249 acres, more or less, but subject to all legal highways.

MLC # 1111 – Elyria Landfill (Delphi Interior)

## EXHIBIT A

### Property Description

Lots 553 to 566, 567 to 581, 594 to 608, 609 to 623, 642 to 656, 657 to 671, 698 to 712, 713 to 726, 761 to 774, 775 to 787, 831 to 843, 844 to 855, 905 to 916, 917 to 927 and 985 to 995 of GENERAL MOTORS PARK NO. 1, as recorded in Liber 6, Page 16 of Plats, Genesee County Records, more particularly described as Part of Sections 31 and 32, Town 8 North, Range 7 East, and being part of the vacated plats of GENERAL MOTORS PARK AND GENERAL MOTORS PARK NO. 1, described as beginning at a point that is South 89 degrees 16 minutes 24 seconds West 576.29 feet along the North line of Section 31 and South 11 degrees 00 minutes 09 seconds West 2785.11 feet along the Easterly right of way line of the C & O Railroad, and North 88 degrees 52 minutes 33 seconds East along the Southerly line of Stewart Avenue 839.39 feet from the Northeast corner of said Section 31; thence South 01 degrees 39 minutes 54 seconds East 50.00 feet; thence South 88 degrees 52 minutes 33 seconds West 75.00 feet to the East line of James P. Cole Blvd.; thence South 01 degrees 39 minutes 54 seconds East along said East line 300.20 feet; thence North 88 degrees 20 minutes 06 seconds East 50.00 feet; thence South 01 degrees 39 minutes 54 seconds East 210.00 feet; thence South 88 degrees 20 minutes 06 seconds West 50.00 feet; thence South 01 degrees 39 minutes 54 seconds East 790.00 feet; thence North 88 degrees 20 minutes 06 seconds East 50.00 feet; thence South 01 degrees 39 minutes 54 seconds East 210.00 feet; thence South 88 degrees 20 minutes 06 seconds West 50.00 feet; thence South 01 degrees 39 minutes 54 seconds East 395.00 feet; thence North 88 degrees 20 minutes 06 seconds East 489.52 feet to the Westerly right of way line of Interstate 475; thence North 16 degrees 46 minutes 07 seconds East along said Right of Way line 31.65 feet; thence North 12 degrees 17 minutes 04 seconds East 194.95 feet; thence North 10 degrees 33 minutes 31 seconds East 61.39 feet; thence North 03 degrees 14 minutes 45 seconds East 191.48 feet; thence North 04 degrees 59 minutes 17 seconds East 60.41 feet; thence North 00 degrees 14 minutes 32 seconds West 189.77 feet; thence North 04 degrees 31 minutes 44 seconds West 60.08 feet; thence North 05 degrees 42 minutes 47 seconds West 190.76 feet; thence North 05 degrees 28 minutes 50 seconds West 60.13 feet; thence North 13 degrees 33 minutes 18 seconds West 194.16 feet; thence North 11 degrees 07 minutes 43 seconds West 60.83 feet; thence North 11 degrees 13 minutes 35 seconds West 192.68 feet; thence North 12 degrees 58 minutes 35 seconds West 61.19 feet; thence North 16 degrees 41 minutes 30 seconds West 196.73 feet; thence North 05 degrees 28 minutes 50 seconds West 60.13 feet; thence North 10 degrees 44 minutes 03 seconds East 102.39 feet; thence North 01 degrees 39 minutes 54 seconds West 56.60 feet; thence North 46 degrees 39 minutes 54 seconds West 20.63 feet to the Southerly line of Stewart Avenue; thence South 88 degrees 52 minutes 33 seconds West along said Southerly line 350.55 feet to the point of beginning.

4002 James Cole Blvd
Flint, MI  48503

X:\DOCUMENTS AND SETTINGS\MERRILLSCAN\LOCAL SETTINGS\TEMP\WZ085F\US_ACTIVE_EXHIBIT A - MLC # 1120 - FLINT FLOW-
THROUGH WAREHOUSE_43637546_1.DOC

MLC # 1120 – Flint Flowthrough
Warehouse

## EXHIBIT A

### Property Description

Land situated in the City of Pontiac, in the County of Oakland, State of Michigan is described as follows:

Tax ID Numbers: (Parcel 1); 19-03-201-003 (Parcel 14);

Land situated in the City of Pontiac, in the County of Oakland, State of Michigan is described as follows: Part of Lots 5, 6, and 7, all of Lot 8, part of Lot 9, and all of Lot 10, of ASSESSORS PLAT NO. 110, as recorded in Liber 52, Page 26 of Plats, Oakland County Records, also part of the East 1/2 of Section 3, Town 2 North, Range 10 East, being more particularly described as: Beginning at a point distant South 00 degrees 36 minutes 21 seconds West, 1215.50 feet from the Northeast section corner thence South 00 degrees 36 minutes 21 seconds West, 2059,81 feet to the East 1/4 corner; thence South 00 degrees 24 minutes 47 seconds East, 880.96 feet; thence South 89 degrees 35 minutes 13 seconds West, 95 feet; thence along a curve to the left, radius 215 feet, chord bears South 61 degrees 29 minutes 01 seconds West, 202.56 feet, distance of 210.91 feet; thence along a curve to the right, radius 225 feet, chord bears South 62 degrees 11 minutes 13 seconds West, 216.83 feet, distance of 226.24 feet; thence North 89 degrees 00 minutes 24 seconds West, 1422.62 feet; thence North 45 degrees 10 minutes 30 seconds West, 432.91 feet; thence along a curve to the right, radius 400 feet, chord bears North 07 degrees 58 minutes 11 seconds West, 483.74 feet, distance of 519.48 feet thence North 29 degrees 14 minutes 08 seconds East, 299.59 feet thence along a curve to the left, radius 750 feet, chord bears North 15 degrees 19 minutes 08 seconds East, 360.76 feet, distance of 364.33 feet; thence North 01 degrees 24 minutes 09 seconds East, 632.31 feet; thence along a curve to the left, radius 750 feet, chord bears North 14 degrees 17 minutes 32 seconds West, 405.77 feet, distance of 410.89 feet; thence North 29 degrees 59 minutes 13 seconds West. 24;18 feet thence North 01 degrees 32 minutes 01 seconds East, 299.48 feet; thence North 87 degrees 51 minutes 44 seconds West, 61.57 feet; thence North 02 degrees 32 minutes 55 seconds East, 124.59 feet; thence South 87 degrees 25 minutes 69 seconds East, 287.26 feet; thence North 00 degrees 11 minutes 13 seconds East, 616.94 feet; thence along a curve to the left, radius 450 feet, chord bears North 47 degrees 58 minutes 00 seconds East, 65.95 feet, distance of 66 feet; thence North 44 degrees 34 minutes 41 seconds East, 56.60 feet; thence along a curve to the right, radius 357 feet, chord bears North 67 degrees 36 minutes 06 seconds East, 279.25 feet, distance of 286.91 feet; thence South 89 degrees 22 minutes 30 seconds East, 723.10 feet; thence South 85 degrees 22 minutes 15 seconds East, 200.49 feet; thence along a curve to the right, radius 190 feet, chord bears South 51 degrees 09 minutes 50 seconds East, 235.06 feet, distance of 253.43 feet; thence South 12 degrees 57 minutes 10 seconds East, 184.05 feet; thence along a curve to the left, radius 250 feet, chord bears South 51 degrees 10 minutes 24 seconds East, 309.35 feet, distance of 333.54 feet; thence South 89 degrees 23 minutes 39 seconds East, 15572 feet to the place of beginning. EXCEPT that part taken for Opdyke Road.

PARCEL 14:

Part of Section 3, Town 2 North, Range 10 East, City of Pontiac, Oakland County, Michigan, also being part of Lot 7, as platted, a part of Assessor's Plat No. 110, as recorded in Liber 52, Page 26 of Plats, Oakland County Records, being more particularly described as follows: Commencing at the North 1/4 corner of said Section 3, Township 2 North, Range 10 East; thence South 89 degrees 46 minutes 13 seconds East along the North line of Section 3, 71.08 feet; thence South 02 degrees 36 minutes 47 seconds West along the extension of the Easterly line of Centerpoint Parkway (120 feet wide), 67.78 feet to a point on the South line of South Boulevard (120 feet wide); thence due East along the South line of said South Boulevard, 1227.63 feet to the Point of Beginning; thence due East along the Southerly line of said South Boulevard, 483.00 feet to a point on the West line of North Connector Road (66 feet wide); thence due South along the West line of said North Connector Road, 195.69 feet; thence South 74 degrees 26 minutes 44 seconds West 16.09 feet; thence due West 453.06 feet; thence North 44 degrees 50 minutes 04 seconds West, 20.48 feet; thence due North, 185,48 feet to the Point of Beginning.

## EXHIBIT A

### Property Description

Tax Id Number(s): 14-17-276-002 (Part)

Land Situated in the City of Pontiac in the County of Oakland in the State of MI

Part of the Northwest 1/4 of Section 16 and the Northeast 1/4 of Section 17, Town 3 North, Range 10 East, City of Pontiac, Oakland County, Michigan: Commencing at the West 1/4 corner of said Section 16, also being the East 1/4 corner of said Section 17; thence along the West line of said Section 16, also being East line of said Section 17, North 02 degrees 17 minutes 33 seconds West, 116.50 feet to a point on the North right of way of Columbia Avenue (width varies), said point also being the point of beginning; thence along said North right-of-way the following three (3) courses: 1) South 87 degrees 48 minutes 42 seconds West, 613.50 feet, 2) South 84 degrees 15 minutes 09 seconds West, 266.67 feet, 3) North 87 degrees 33 minutes 37 seconds East, 1742.15 feet thence South 02 degrees 09 minutes 08 seconds East, 1241.83 feet to a point on the said North right-of-way of Columbia Avenue; thence along said North right-ofway the following two (2) courses: 1) North 85 degrees 57 minutes 36 seconds West 112.78 feet and 2) South 87 degrees 48 minutes 42 seconds West, 316.02 feet to the point of beginning.

Client Reference: 202 Columbia, Pontiac MI 48340

## EXHIBIT A

### Property Description

PARCEL 1:

ALL that parcel or tract of land situate in the Town of Massena, County of St. Lawrence and State of New York and known and distinguished as Lots 1 and 10 and part of Lot number 2 in the subdivision of the Outhout Patent and bounded and described as follows:

BEGINNING at a boundary monument set in the westerly line of the St. Regis-Mohawk Indian Reservation, said monument having New York State Grid Coordinates North 1,818,529.99, East 398,415.25; thence South 05 deg. 00' 02" East along said westerly line a distance of 4496.05 feet to a monument set on the top of the northerly bank of the Raquette River, so called, and having New York State Grid Coordinates North 1,814,051.05, East 398,807.15; thence continuing on the same bearing a distance of 250 feet more or less to a point in the centerline of said Raquette River; thence westerly along said centerline as it generally winds and turns, a distance of 1150 feet, more or less, to a point; thence North 05 deg. 14' 48" West along the east line of lands owned by Medrick and Mayfred Hamelin a distance of 2634 feet more or less to a fence corner having New York State Grid Coordinates North 1,815,925.30, East 397,555.97; thence South 82 deg. 41' 51" West along the Hamelin property a distance of 200.62 feet to a fence corner having New York State Grid Coordinates North 1,815,899.53, East 397,356,98; thence North 05 deg. 40' 53" West along the east line of the Hamelin Property a distance of 2206 feet more or less to a point in the southerly shore line of the St. Lawrence River; thence easterly along said shore line as it generally winds and turns, a distance of 1530 feet, more or less to a point; thence South 05 deg. 00' 02" East a distance of 116 feet, more or less, to a point of beginning.

ALSO that tract or parcel of land, situate in the Town of Massena, County of St. Lawrence and State of New York and bounded and described as follows:

BEGINNING at the intersection of the westerly line of the Diebow property with the southerly shore line of the St. Lawrence River, said corner also being the northwesterly corner of that part of Lot Number 2 of the Outhout Patent known as the Derosia lot; thence along the westerly line of said Diebow property South 05 deg. 40' 53" East a distance of 2206 feet, more or less, to a fence corner, having a New York State grid Coordinates North 1,815,899.53, East 397,356.98; thence North 82 degrees 41' 51" East along said Diebow property a distance of 200.62 feet to a fence corner having New York State Grid Coordinates North 1,815,925.30, East 397,555.97; thence South 05 deg. 14' 48" East along the westerly line of the Diebow lot a distance of 2634 feet, more or less, to a point in the centerline of the Raquette River, so called; thence northwesterly along said centerline as it generally winds and turns a distance of 2025 feet more or less, to a point in the easterly line of the New York Central Railroad R.O.W.; thence North 16 degrees 57' 59" West a distance of 898 feet to the point of curvature of a curve the radius of which is 5680 feet, said curve being the New York Central Railroad R.O.W.; thence continuing along the arc of said curve a distance of 218.10 feet to a point having New York State Grid Coordinates North 1,815,752.32, East 396,203.60; thence North 82 deg. 53' 37" East a distance of 286.47 feet to a fence corner having New York State Grid Coordinates North 1,815,787.76, East 396,487.87; thence North 05 deg. 08' 05" West a distance of 2164.00 feet to a point in the south shoreline of the St. Lawrence River; thence easterly along said shoreline as it generally winds and turns, a distance of 860 feet, more or less to the point of beginning.

ALSO ALL THAT PARCEL OR TRACT OF LAND, situate in the Town of Massena, County of St. Lawrence, State of New York, and more particularly known and distinguished as part of Lot No. 3 in the subdivision of the Outhout Patent and bounded and described as follows:

BEGINNING at the intersection of the south shoreline of the St. Lawrence River with the westerly line of the lands owned by Medrick and Mayfred Hamelin; thence South 05 deg, 08' 05" East along said west line a distance of 2164 feet, more or less, to a fence corner having New York State Grid Coordinates, North

1,815,787.76, East 396,487.87; thence South 82 deg. 53' 37" West along the Hamelin lot a distance of 286.47 feet to a point in the New York Central Railroad R.O.W.; having New York State Grid Coordinates North 1,815,752.32, East 396,203.60; thence northerly along a curve, said curve being the New York Central Railroad R.O.W.; and said curve having a radius of 5680 feet a distance of 1899.42 feet to the point of tangency with the next succeeding course; thence North 04 deg. 09' 16" East a distance of 484 feet to a point in the south shoreline of the St. Lawrence River; thence easterly along said shoreline as it generally winds and turns a distance of 290 feet more or less to the point of beginning.

PARCEL 1
BEING and intended to be the same premises described in deed from William S. Crapser and William C Ward to General Motors Corporation, dated 9/25/57 and recorded 9/25/57 in Liber 620 cp 296.

LESS and excepting that portion of the premises acquired by the People of the State of New York in Liber 663 cp 288, Liber 666 cp 52 and Liber 929 cp 580.

ALSO less and excepting that portion of the premises described in deed to the County of St. Lawrence in Liber 720 cp 18 and that portion described in deed to the Town of Massena in Liber 777 cp 305.

ALSO less and excepting that portion of the premises described in deed from General Motors Corporation to Minerals Processing Corporation of New York recorded in Liber 962 cp 14.

PARCEL 2:

Being part of Parcel No. eight (8) of Subdivision of the Outhout Patent and also being the parcel of land formerly conveyed by General Motors Corporation to Minerals Processing Corporation of New York by Deed dated June 25, 1981 and recorded in the Office of the St. Lawrence County Clerk in Liber 962 of deeds at page 14 and being more precisely described as follows:

BEGINNING at a point located in the Northerly right of way bounds of the Massena-Hogansburg Highway (known also as New York State Route 37) said point also being located in the Southwesterly corner of a 189.84 acre parcel of land now or formerly owned by General Motors Corporation, and also being located in the Easterly right of way bounds of the Penn Central Transportation Company Railroad, said point having New York State Easterly zone grid coordinates N-1, 815,232.84; E-396,360.68; thence

(1)    North 16 degrees 57 minutes 59 seconds West along the division line between said General Motors parcel on the East and Penn Central Transportation parcel on the West, a distance of 50.00 feet to a point having grid coordinates of N-1,815,280.66; E-396,346.09; thence

(2)    South 88 degrees 21 minutes 09 seconds East, a distance of 52.18 feet to a point on the circular curve having a radius of 5899.65 feet, said point also having grid coordinates N-1,815,279.16; E-396,298.25; thence

(3)    Curving to the right along said circular curve, a distance of 708.5 feet to a point having grid coordinates N-1, 815,343.37; E-397,103.27; thence

(4)    North 38 degrees 57 minutes 09 seconds East, a distance of 585.85 feet to a point having grid coordinates N-1, 815,798.97; E-397,471.59; thence

(5)    South 51 degrees 02 minutes 51 seconds East, a distance of 200.00 feet to a point having grid coordinates N-1, 815,673.24; E-397,627.13; thence

(6)      South 00 degrees 02 minutes 26 seconds East, a distance of 404.77 feet to a point on a circular curve having a radius of 5829.65 feet, said point also being located in the Northerly right of way bounds of said Route No. 37 and having a grid coordinates N-1, 815,268.47; E-397,627.41; thence

(7)      Curving to the left along said circular curve a distance of 740.7 feet, more or less, to a point having a grid coordinates N-1, 815,263.69; E-396,886.93; thence

(8)      Continuing along said New York State Route 37 bounds, North 04 degrees 01 minutes 27 seconds West a distance of 30.00 feet to a point on a circular curve having a radius of 5859.65 feet, said point also having grid coordinates N-1, 815,293.56; E-396,884.82; thence

(9)      Curving to the left along said circular curve, a distance of 527.2 feet, more or less, to the point and place of beginning.

PARCEL 2:
BEING and intended to be the same premises described in deed from Minerals Processing Corporation of New York to General Motors Corporation dated 5/1/95, recorded 5/15/95 in Liber 1088 cp 772.

PARCEL 3:

ALL that certain plot, piece or parcel of land, situate, lying and being in the Town of Massena, County of St. Lawrence and State of New York, being part of Parcels 3 and 8 of Subdivision of the Outhout Patent, bounded and described as follows:

Consisting of a strip of land one hundred (100) feet wide and two thousand two hundred and twenty-eight and thirty-nine hundredths (2228.39) feet in length being fifty (50) feet wide on each side of and parallel with the center line of the New York Central Railroad, said center line being more particularly described as follows:

BEGINNING at a low water mark in the southerly shore line of the St. Lawrence River and the center line of the old St. Lawrence Bridge, said point having New York State Grid
Coordinates North 1,818,109.17, East 396,017.62; Thence South 04 degrees 09' 16" West a distance of four hundred eighty-four (484) feet to the point of curvature of a curve, the radius of which is five thousand seven hundred thirty (5,730) feet, said point of curvature having New York State Grid Coordinates North 1,817,626.44, East 395,982.86; Thence deflecting to the left and continuing along the arc of said curve a distance of one thousand seven hundred forty-four and thirty-nine hundredths (1,744.39) feet to a point having New York State Grid Coordinates North 1,815,916.22, East 396,108.94.

PARCEL 3
Being and intended to be the same premises described in deed from William S. Crapser and William C. Ward to General Motors Corporation dated 6/13/61 and recorded 12/13/61 in Liber 697 cp 568.

## EXHIBIT A

### Property Description

**PARCEL I:**

Situated in the Township of Springfield, County of Richland and State of Ohio and being a part of the Northwest Quarter of Section 23, Township 21, Range 19, and more particularly described as follows:

Beginning at a point on the West line of said Quarter Section, said point being 1330.13 feet, South 1 degree, 50 minutes 06 seconds East of the Northwest corner of said Quarter Section; thence North 89 degrees 00 minutes 44 seconds East, 2501.68 feet to the North Right-of-Way line of the Mansfield by-pass, U.S. Route 30; thence South 62 degrees 37 minutes 24 seconds West and along said Right-of-way line, 2772.35 feet to the West line of Section 23; thence North 1 degree 50 minutes 06 seconds West along said West line of Section 23, 1232.33 feet to the place of beginning and containing 35.38 acres, more or less.

SAVE AND EXCEPT THE FOLLOWING:

Situated in the Township of Springfield, County of Richland, State of Ohio and being a part of the Northwest Quarter of Section 23, Township 21, Range 19, and more particularly described as follows:

Starting at the Northwest corner of the Northwest Quarter of Section 23; thence South 1 degree 50 minutes 06 seconds East 1572.00 feet to the true place of beginning; thence North 88 degrees 09 minutes 54 seconds East 4.69 feet to the centerline of relocated Beer Road (Township Highway No. 160); thence North 87 degrees 59 minutes 39 seconds East 30.00 feet; thence South 2 degrees 00 minutes 21 seconds East along a curve to the left having a radius of 559.18 feet, a distance of 365.98 feet, with a long chord bearing South 20 degrees 45 minutes 21 seconds East, having a distance of 359.48 feet; thence South 39 degrees 30 minutes 21 seconds East 308.20 feet to a point on the following described curve; thence along a curve to the left having a radius of 360.15 feet, a distance of 271.29 feet, with a long chord bearing South 61 degrees 05 minutes 08 seconds East, having a distance of 264.92 feet, to the North Right-of-way line of The Mansfield By-pass being U.S. Highway No. 30 South; Thence South 62 degrees 37 minutes 24 seconds West 628.72 feet along the North Right-of-way line of The Mansfield By-Pass, being U.S. Highway No. 30 South, to the West line of the Northwest Quarter of Section 23; thence North 1 degree 50 minutes 06 seconds West 990.46 feet along the West line of said Quarter Section to the true place of beginning and containing 5.011 acres, more or less. 0.456 of an acre being in the existing Township Highway No. 160 (Beer Road) and 4.555 acres being additional land.

This parcel is now located in the City of Ontario, Inc.

**PARCEL II:**

Situated in the Township of Springfield, County of Richland, and State of Ohio and known as being part of the southwest and the Southeast Quarters of Section 14 and part of the Northwest and Northeast Quarters of Section 23,

MLC# 1201 – Stamping Mansfield

X:\DOCUMENTS AND SETTINGS\MERRILLSCAN\LOCAL SETTINGS\TEMP\WZ4743\US_ACTIVE_EXHIBIT A - MLC # 1201 - STAMPING MANSFIELD_43637858_1.DOC

1

Township 21, Range 19, Springfield Township, Richland County, Ohio and more particularly described as follows:

Beginning at the southwest corner of the Southwest Quarter of Section 14, said point being on the centerline of Beer Road, T.H. 160; thence North 2 degrees 00 minutes 21 seconds West along the West line of said Quarter Section and the centerline of said road, 2513.64 feet to the centerline of Crestline-Mansfield Road, State Route US 30 North; thence South 77 degrees 25 minutes 06 seconds East along the centerline of said road, 3566.16 feet; thence South 78 degrees 00 minutes 42 seconds East and continuing along said centerline, 74.16 feet; thence South 0 degrees 07 minutes 54 seconds West, 1628.69 feet to the South line of Section 14, also being the north line of Section 23; thence South 1 degree 09 minutes 52 seconds West, 412.23 feet; thence South 88 degrees 54 minutes 10 seconds West, 770.00 feet; thence South 0 degrees 46 minutes 51 seconds East, 948.08 feet; thence South 89 degrees 00 minutes 44 seconds West, 2653.82 feet to the West line of Section 23 and the centerline of Beer Road, T.H. 160; thence North 1 degree 50 minutes 06 seconds West along said centerline and said West line of Section 23, 1330.13 feet to the place of beginning and containing 255.91 acres, more or less, but subject to all legal highways.

SAVE AND EXCEPT THE FOLLOWING:
Situated in the Township of Springfield, County of Richland and State of Ohio and being a part of the Southwest Quarter of Section 14, Township 21, Range 19, and more particularly described as follows:

Beginning at the Southwest corner of said Southwest Quarter of Section 14, said point being in the centerline of Beer Road, Township Highway 160; thence North 2 degrees 00 minutes 21 seconds West along the West line of said Quarter Section, 2265.65 feet, to the Right-of-way line of the Mansfield-Crestline Road, State Route U.S. 30 North; thence South 77 degrees 25 minutes 06 seconds East along the right-of-way line of said road, 48.20 feet to a point on the following described curve; thence along and with a curve to the left having a radius of 1392.39 feet, a distance of 135.75 feet, with a long chord bearing South 0 degrees 48 minutes 08 seconds West, having a distance of 135.69 feet; thence South 2 degrees 00 minutes 21 seconds East, along a line parallel to the West line of said Southwest Quarter of Section 14, 2118.05 feet; thence South 1 degree 50 minutes 06 seconds East, 0.22 feet to the South line of said Quarter Section; thence South 88 degrees 23 minutes 34 seconds West along the South line of said Quarter" Section, 40.00 feet to the place of beginning and containing 2.083 acres more or less, 1.039 acres being the existing Road, and 1.044 acres additional for widening thereof.

SAVE AND EXCEPT THE FOLLOWING:
Situated in the Township of Springfield, County of Richland and State of Ohio and being a part of the Northwest Quarter of Section 23, Township 21, Range 19, and more particularly described as follows:

Beginning at the Northwest corner of said Northwest Quarter of Section 23, said point being in the centerline of Beer Road, Township Highway 160; thence South 1 degree 50 minutes 06 seconds East along the West line of said

Quarter Section and the centerline of said Road, 1330.13 feet; thence North 89 degrees 00 minutes 44 seconds East, 40.0 feet; thence North 1 degree 50 minutes 06 seconds West, along a line parallel to the West line of said Northwest Quarter of Section 23, 1330.56 feet to the North line of said Quarter Section; thence South 88 degrees 23 minutes 34 seconds West, along the North line of said Quarter Section 40.0 feet to the place of beginning and containing 1.22 acres more or less, 0.61 acres being the existing Road, and 0.61 acres additional for widening thereof.

SAVE AND EXCEPT THE FOLLOWING:
Situated in the Township of Springfield, County of Richland and State of Ohio and more particularly described as: TRACT OF THE ROAD WIDENING OF THE MANSFIELD-CRESTLINE ROAD, MORE COMMONLY KNOWN AS U.S. HIGHWAY ROUTE 30 NORTH; Situated in the Township of Springfield, County of Richland and State of Ohio and being a part of the Southwest and Southeast Quarter of Section 14, Township 21, Range 19 and more particularly described as follows: Beginning at a point on the West line of said Southwest Quarter of Section 14, said point being 2265.65 feet North 2 degrees 00 minutes 21 seconds West from the Southwest corner of said Quarter Section, and being in the centerline of Beer Road, Township Highway 160; thence North 2 degrees 00 minutes 21 seconds West and continuing along the West line of said Quarter Section and the centerline of said Road, 196.33 feet to a point 50.00 feet Southwesterly and at right angles to the centerline of the Crestline-Mansfield Road, U.S. Route 30 North; thence South 77 degrees 25 minutes 06 seconds East, 251.79 feet; thence South 66 degrees 06 minutes 30 seconds East, 305.94 feet; thence South 81 degrees 30 minutes 10 seconds East, 701.68 feet; thence South 77 degrees 25 minutes 06 seconds East, 2048.29 feet to a point on a curve; thence along a curve to the left, having a radius of 57,355.78 feet, a long chord of 340.45 feet whose bearing is south 77 degrees 35 minutes 10 seconds East, an arc distance of 340.45 feet, to a point 60.00 feet Southwesterly and radially to the centerline of the Crestline-Mansfield Road, U.S. Route 30 North; thence south 0 degrees 07 minutes 54 seconds West, 20.45 feet to a point on a curve; thence Westerly a long a curve to the right having a radius of 57,375.78 feet, a long chord of 344.86 feet whose bearing is North 77 degrees 35 minutes 20 seconds West, an arc distance of 344.86 feet; thence North 77 degrees 25 minutes 06 seconds West, 1748.29 feet; thence North 79 degrees 08 minutes 08 seconds West, 1000.34 feet; thence North 77 degrees 25 minutes 06 seconds West, 400.00 feet; thence South 35 degrees 11 minutes 36 seconds West, 140.82 feet; thence North 77 degrees 25 minutes 06 seconds West, 48.20 feet to the place of beginning and containing 2.18 acres more or less.

TRACT FOR STORM DRAINAGE PURPOSES FROM THE MANSFIELD-CRESTLINE ROAD MORE COMMONLY KNOWN AS U.S. HIGHWAY ROUTE 30 NORTH;
Situated in the Township of Springfield, County of Richland and State of Ohio and being a part of the Southwest Quarter of Section 14, Township 21, Range 19 and more particularly described as follows:

Starting at the Southwest corner of said Southwest Quarter Section; thence North 2 degrees 00 minutes 21 seconds West, 2513.64 feet along the West line of said Quarter Section and the centerline of Beer Road, Township Highway 160, to the centerline of the Crestline-Mansfield Road, U.S. Route 30 North; thence South 77 degrees 25 minutes 06 seconds East along the centerline of the Crestline-Mansfield Road, 1052.49 feet;

MLC# 1201 – Stamping Mansfield

thence South 12 degrees 34 minutes 54 seconds West, 95.37 feet to the true place of beginning, being a point on the proposed Southerly Right-of-way line of the Crestline-Mansfield Road; thence South 25 degrees 00 minutes 00 seconds West, 67.48 feet; thence South 65 degrees 00 minutes 00 seconds East, 20.00 feet; thence North 25 degrees 00 minutes 00 seconds East, 72.52 feet; thence North 79 degrees 08 minutes 08 seconds West, 20.62 feet to the place of beginning and containing 0.03 acres, more or less.

SAVE AND EXCEPT THE FOLLOWING:
Situated in the City of Ontario, Township of Springfield, County of Richland and State of Ohio, more particularly described as follows:

Being part of the Southeast Quarter of Section Fourteen (14) and the Northeast Quarter of Section Twenty-three (23), Township Twenty-one (21), Range Nineteen (19), within the City of Ontario, Springfield Township, Richland County, Ohio and being more particularly described as follows:

Beginning for the same at the Southwest corner of the Southeast Quarter of Section Fourteen (14); thence North 88 degrees 49 minutes 32 seconds East along the South line of said Section a distance of 703.93 feet to the real point of beginning of the parcel herein described; thence North 1 degree 09 minutes 52 seconds East a distance of 2.51 feet to a point; thence North 0 degrees 07 minutes 54 seconds East a distance of 1,645.27 feet to a point on the he centerline of West Fourth Street (State Route US-30N); thence South 77 degrees 25 minutes 42 seconds East along the centerline of State Route US-30N, a distance of 46.09 feet to a point; thence South 78 degrees 00 minutes 42 seconds East a distance of 35.75 feet to a point which is the Northeast corner of the General Motors Corporation property; thence South 0 degrees 07 minutes 54 seconds West along the East line of the General Motors Corporation property a distance of 1,628.69 feet to a point on the South line of Section Fourteen (14); thence South 1 degree 09 minutes 52 seconds West and continuing along the East property line and into the Northeast Quarter of Section Twenty-three (23) a distance of 412.23 feet to a point on the South line of the General Motors property; thence South 88 degrees 54 minutes 10 seconds West along the south property line a distance of 80.06 feet to a point; thence North 1 degree 09 minutes 52 seconds East on a line parallel to the East line a distance of 412.13 feet to the point of beginning and containing 3.765 acres, more or less, of which 3.009 acres is in the Southeast Quarter of Section Fourteen (14) and 0.757 acres is in the Northeast Quarter of Section Twenty-three (23).

EXCEPTING THEREFROM:
That portion of the above described property heretofore conveyed to the State of Ohio by Deed dated August 27, 1957, and recorded in Deed Volume 443, Page 484. SUBJECT TO any and all easements, restrictions and covenants of record affecting said parcel of land, including but not limited to:
 1)   Easement to The Ohio Public Service Company dated August 5, 1936, recorded at Deed Volume 215, Page 306;
 2)   Easement to Sinclair Refining Company, assigned to Sinclair Pipe Line Company, dated September 19, 1945 and recorded in Deed Volume 266, Page 55;
 3)   Easements to Ohio Edison Company dated August 7, 1951, recorded at Deed Volume 344, Page 160 and dated February 21, 1952, recorded at Deed

Volume 352, Page 25;
 4)   Easement to Sinclair Pipe Line Company dated November 20, 1957,
recorded at Deed Volume 458, Page 457;
 5)   Any portion of said property within the bounds of any legal highways.

The above described premises were surveyed by Fred E. Krocka, Ohio
Registered Surveyor No. 3702, in Survey dated May 12, 1969, Revised May 28,
1969.

Property Address:  2525 West Fourth Street, Ontario, OH 44906

MLC# 1201 – Stamping Mansfield

## EXHIBIT A

## Property Description

TRACT 1:

Situated in the City of Parma, County of Cuyahoga and State of Ohio:

And known as being part of Original Lot No. 17 in the Tuckerman Tract in Parma Township, bounded and described as follows:

Beginning on the center line of Stumpf Road (60 feet wide) at the Northwesterly corner of said Original Lot No. 17;

Thence Southerly along the center line of Stumpf Road to the Northwesterly corner of land conveyed to John Hausserman by deed dated September 4, 1854 and recorded in Volume 102, Page 418 of Cuyahoga County Records;

Thence Easterly along the Northerly line of land so conveyed to John Hausserman to the Southwesterly corner of land conveyed to Board of Park Commissioners of The Cleveland Metropolitan Park District by deed dated March 8, 1927 and recorded in Volume 3568, Page 276 of Cuyahoga County Records;

Thence North 1 deg. 53' 57" East along a Westerly line of land so conveyed to Board of Park Commissioners of The Cleveland Metropolitan Park District, 248 feet;

Thence continuing North 23 deg. 31' 21" East along the Northwesterly line of land so conveyed, 295.58 feet;

Thence continuing North 2 deg. 38' 39" East along a westerly line of land so conveyed, 82 feet to the Northerly line of said Original Lot No. 17;

Thence Westerly along the Northerly line of said Original Lot No. 17 to the place of beginning, be the same more or less, but subject to all legal highways.

EXCEPTING THEREFROM THE FOLLOWING DESCRIBED PROPERTY: Situated in the City

of Parma, County of Cuyahoga and State of Ohio:

And known as being a part of Original Parma Township Lot No. 17, Tuckerman Tract, and bounded and described as follows:

Beginning on the center line of Stumpf Road, formerly known as Stumpf Road, 80 feet in width, as shown by the plat recorded in Volume 131, Page 470 of Cuyahoga, County Map Records, at the Northwesterly corner of original Parma Township Lot No. 17, Tuckerman Tract;

Thence North 89 deg. 49' 20", East along the North line of said Original Parma Township Lot No. 17, Tuckerman Tract, a distance of 826.33 feet to the Southeasterly corner of land conveyed by Robert Davis and wife to Frederick Finfil by deed dated May 30, 1844 and recorded in Volume 34, Page 722 of Cuyahoga County Deed Records, and the principal place of beginning of the premises herein intended to be described, and from which point a stone monument bears North 00 deg. 03' 55" West a distance of 0.22 feet;

Course No. 1:

Thence North 89 deg. 49' 20" East along the Northerly line of said Original Parma Township Lot No. 17, Tuckerman Tract, a distance of 2,503.70 feet to the center line of Hausserman Road, formerly Hoffman Road, 40 feet in width;

Course No. 2:

Thence South 2 deg. 01' 20" East, along the center line of said Hausserman Road, a distance of 610.00 feet to the Northerly line of land conveyed by Frederick Hausserman and wife to John Hausserman by deed dated September 4, 1854 and recorded in Volume 102, Page 418 of Cuyahoga County Deed Records;

Course No. 3:

Thence South 89 deg. 29' 07" West along the Northerly line of land so conveyed to John Hausserman, a distance of 2,524.61 feet to its intersection with the Southerly prolongation of the Easterly line of land conveyed to Frederick Finfil, as aforementioned, said point of intersection being distant North 89 deg. 29' 07" East, as measured along the Northerly line of land so conveyed to John Hausserman from its intersection with the center line of the aforementioned Stumpf Road, a distance of 827.07 feet;

Course No. 4:

Thence North 00 deg. 03' 55" West along the Southerly prolongation of the Easterly line of land so conveyed to Frederick Finfil, a distance of 624.535 feet to the place of beginning, and containing 35.338705 acres of land, exclusive of the Westerly one-half of Hausserman Road, according to the survey of George M. Garrett and Associates, Registered Professional Engineers and Surveyors.

ALSO EXCEPTING THEREFROM THE FOLLOWING DESCRIBED PROPERTY:
Situated in the City of Parma, County of Cuyahoga and State of Ohio:

And known as being a part of Original Parma Township Lot No. 17, Tuckerman Tract, and bounded and described as follows:

Beginning on the center line of Hausserman Road, formerly Hoffman Road, 40 feet in width at its point of intersection with the Northerly line of said Original Parma Township Lot No. 17, Tuckerman Tract;

Course No. 1:

Thence South 2 deg. 01' 20" East along the center line of said Hausserman Road, a distance of 610.00 feet to the Northerly line of land conveyed by Frederick Hausserman and wife to John Hausserman by deed dated September 4, 1854 and recorded in Volume 102, Page 418 of Cuyahoga County Deed Records.

Course No. 2:

Thence North 89 deg. 29' 07" East along the Northerly line of land so conveyed to John Hausserman, a distance of 284.97 feet to the Southwesterly corner of Parcel No. 1 of land conveyed to The Board of Park Commissioners of Cleveland.

EXCEPTING THEREFROM THAT PROPERTY CONVEYED TO THE CITY OF PARMA FOR WIDENING OF STUMPF ROAD, AS SHOWN IN DEDICATION PLAT FOR WIDENING OF STUMPF ROAD, filed for record April 28, 1948 in Plat Book 131, Page 448, of the Cuyahoga County Records.

TRACT 2:

Situated in the City of Parma County of Cuyahoga and State of Ohio:

And known as being part of Original Parma Township Lots No. 18 and 19, Tuckerman Tract, and together forming a parcel of land, bounded and described as follows:

Beginning on the Center line of Stumpf Road (60 feet wide) at the Southwesterly corner of said Original Lot No. 18;

Thence Northerly along said center line of Stumpf Road, 765.60 feet to the Southwesterly corner of an eight (8) acre parcel of land conveyed to Anna Elizabeth Bergsiaker and Caroline Sturnes by deed dated May 29, 1920, and recorded in Volume 2380, Page 353 of Cuyahoga County Records;

Thence Easterly along the Southerly line of said eight (8) acre parcel of land so conveyed, 825 feet to the Westerly line of land conveyed to Lucy Radway by deed dated July 1, 1884, and recorded in Volume 366, Page 565 of Cuyahoga County Records;

Thence Southerly along said Westerly line of land so conveyed to Lucy Radway, 765.60 feet to the Southerly line of said Original Lot No. 18;

Thence Westerly along said Southerly line of said Original Lot No. 18, 825 feet to the place of beginning, be the same more or less, but subject to all legal highways.

Above premises more accurately described as a result of a recent survey reading as follows:

Situated in the City of Parma, County of Cuyahoga, State of Ohio and known *as* parts of Lots No. 19 and 18, Tuckerman Tract and being bounded and described as follows:

The Beginning point is in the centerline of Stumpf Road (60 feet wide) distant South 1 deg. 13' 30" West along said center line 431.64 feet from its intersection with the center line of Brook Park Road said center line of Brook Park Road being the North line of said Lot No. 19,

Course No. 1:

Thence South 1 deg. 13' 30" West along said center line of Stumpf Road 761.08 feet to its intersection with the South line of said Lot No. 18.

Course No. 2:

Thence South 88 deg. 57' 50" East along the South line of said Lot No. 18, 845.03 feet to an iron monument at the Southeast corner of a 14.5 acre parcel of land conveyed by Robert Davis and wife to Frederick Finfil by deed recorded in Volume 34, Page 722 of Cuyahoga County Deed Records, witness an iron monument distant South 88 deg. 57' 50" East along the South line of said Lot No. 18, 30.00 feet from said center line.

Course No. 3:

Thence North 1 deg. 07' 30" East, along the East line of said 14.5 acre parcel of land it being the West line of a parcel of land conveyed by Bernhard Kroether and wife to Valentine Kraus by deed recorded in Volume 100, Page 693 Cuyahoga County Deed Records, 775.33 feet to an iron monument at the Northeast corner of said 14.5 acre parcel of land conveyed to Frederick Finfil as aforesaid.

MLC# 1203 – GMPT Parma Complex

Course No. 4:

Thence North 89 deg. 56' 00" West along the North line of said 14.5 acre parcel of land it being the South line of an 8 acre parcel of land conveyed by Jacob Kurfus to John C. Deubel by deed recorded in Volume 107, Page 404, Cuyahoga County Deed Records, 843.88 feet to the beginning, witness an iron monument distant South 89 deg. 56' 00" East 30.00 feet from said beginning point.

Containing 14.8909 acres of land according to survey, of Edward C. O'Rourke, May 1946.

Be the same more or less.

EXCEPTING THEREFROM THAT PROPERTY CONVEYED TO THE CITY OF PARMA FOR WIDENING OF STUMPF ROAD, AS SHOWN IN DEDICATION PLAT FOR WIDENING OF STUMPF ROAD, filed for record April 28, 1948 in Plat Book 131, Page 448, of the Cuyahoga County Records.

PPN: 442-33-002

PARCEL 2:

Situate in the City of Parma, County of Cuyahoga and State of Ohio, and known as being parts of Original Parma Township Lots 20, 21, 22, 23, 24 and 25 in the Tuckerman Tract, together bounded and described as follows:

Beginning at the point of intersection of the center line of Brookpark Road, 100 feet wide, and the center line of Stumpf Road, 60 feet wide, said point being marked by an iron pin;

Course 1 Thence due South along the center line of Stumpf Road, 3377.47 feet to a point at the southeasterly corner of said Lot 24, said point being distant North 89° 59' 26" West 2.84 feet from an iron pin;

Course 2 Thence North 89° 59' 26" West along the southerly line of Lot 24, a distance of 2353.09 feet to a stone monument at the northwesterly corner of the land conveyed to Mathias Kaurfess by Deed dated November 9, 1853, and recorded in Volume 70 of Deeds, Page 222, of the Cuyahoga County Records;

Course 3 Thence South 00° 29' 25" West along the westerly line of the land as conveyed to Mathias Kaurfess and being along the westerly line of lands now or formerly owned in part by Vera Lasko and in part by Mabel G. Huth (formerly Mabel G. Wetzel), a distance of 726.82 feet to a stone monument in the southerly line of said Lot 25;

Course 4 Thence South 89° 51' 25" West along the southerly line of said Lot 25, a distance of 1810.93 feet to a point at the southwesterly corner of said Lot 25, said point

being in the center line of West 130th Street, formerly known as Settlement Road, 60 feet wide;

Course 5 Thence North 00° 17' 55" East along the center line of West 130th Street and being along the westerly line of said Lots 25 and 24, a distance of 1280.28 feet to a point in the southeasterly line of the land of The Baltimore and Ohio Railroad Company;

Course 6 Thence North 32° 17' 20" East along the southeasterly line of the land of The Baltimore and Ohio

Railroad Company, a distance of 2626.075 feet to an angle marked by an iron pin;

Course 7 Thence North 89° 42' 22" East along the southerly line of the land of The Baltimore and Ohio Railroad Company, a distance of 142.74 feet to an angle marked by an iron pin;

Course 8 Thence North 00° 15' 25" East along the easterly line of the land of The Baltimore and Ohio Railroad Company, a distance of 151.34 feet to an angle marked by an iron pin;

 Course 9 Thence North 32° 17' 20" East along the southeasterly line of the land of The - Baltimore and Ohio Railroad Company, and along the prolongation of said line, a distance of 502.40 feet to a point in the center line of Brookpark Road;

Course 10 Thence North 89° 16' 35" East along the center line of Brookpark Road and being along the northerly line of said Lot 20, a distance of 2126.96 feet to an angle marked by an iron pin;

Course 11 Thence North 88° 50' 10" East continuing along the center line of Brookpark Road and along the northerly line of said Lot 20, a distance of 222.23 feet to the place of beginning, and containing, exclusive of the areas within Brookpark Road, Stumpf Road and West 130th Street, 287.524 acres, more or less, according to the survey made by George M. Garrett, Ohio Registered Surveyor No. 826, during August 1945.

Less and Except the Lands conveyed out via the following instruments as recorded  in the Cuyahoga County Records:

#1 Limited Warranty Deed recorded as 92-8881, Page 56;

#2 Deed recorded as Vol. 10989, Page 471;

#3 Warranty Deed recorded as Vol. 15091, Page 219;

#4 Limited Warranty Deed recorded as 19998091041;

#5 Limited Warranty Deed recorded as 200406281348 and re-recorded as 200504041021; and

## EXHIBIT A

## Property Description

TRACT I: That certain tract of land in Lee Hill District, Spotsylvania County, Virginia, bounded as follows:

BEGINNING at a point in the southwesterly right of way line of U.S. Route 17 and State Route 2, a corner to the land now or formerly owned by Pierson, thence with said Routes along a right hand curve having a radius of 2824.79 feet, an arc distance of 450.97 feet, a chord distance of 450.49 feet, and a chord bearing South 38° 52' 30" East to a point, thence continuing with said Routes South 34° 18' East 711.03 feet to a point, corner to Tract II; thence with Tract II, South 37° 10' 20" west 896.46 feet to a point; thence continuing with Tract II, North 34° 18' West 1185.52 feet to a point, corner to Tract II and Pierson; thence with Pierson North 38° 01' 25" East 854.42 feet to the point of beginning, containing 22.87 acres as shown on plat of Eugene W. Kniseley, C. L.S., dated January 1978, recorded in Deed Book 446, at page 503.

TRACT II: That certain tract of land in Lee Hill District, Spotsylvania County, Virginia, bounded as follows:

BEGINNING at a point in the line of Pierson, the westernmost corner of Tract I, thence with Tract I, South 34° 18' East 1185.52 feet to a point, thence continuing with Tract I North 37° 10' 20" East 896.46 feet to a point in the southwesterly side of U.S. Route 17 and State Route 2; thence with said Routes South 34°18' East 352.34 feet to a point, corner to Lot 19; thence with Lot 19, South 53° 25' West 264.81 feet to a point, corner to Lot 19 and Keenan; thence with Keenan and others, South 37° 10' 20" West 353.70 feet to a point, corner to Carr; thence with Carr South 44° 24' 16" East 223.14 feet to a point near the southwesterly terminus of State Route 737; thence with said route, South 44°24'02" East 30.00 feet to a point in said Route; thence with said Route and James, South 37°03'58" East 192.63 feet to a point, corner to James and Lee; thence with Lee, South 45° 26' 31" West 49.40 feet to a point; thence continuing with Lee, South 09° 28' 30" East 240.60 feet to a point; thence continuing with Lee, South 74° 26' 13" West 20.00 feet to a point; thence continuing with Lee, South 10° 15' 34" East 161.07 feet to a point, corner to Lee and the Fredericksburg-Spotsylvania National Military Park; thence with said Park, First, South 61° 24' 11" West 278.44 feet to a point; Second, South 56° 30' 56" West 199.02 feet to a point; Third, South 70° 29' 23" West 88.11 feet to a point; Fourth, South 89° 11' 14" West 77.56 feet to a point; Fifth, North 76° 49' 02" West 107.14 feet to a point; Sixth, North 60° 03' 25" West 328.36 feet to a point; Seventh, North 69° 00' 51" West 234.96 feet to a point; Eighth, North 63° 26' 49" West 334.23 feet to a point; Ninth, North 47° 00' 03" West 289.58 feet to a point; Tenth, North 35° 36' 28" West 581.46 feet to a point, corner to said park and Pierson; thence with Pierson, North 38° 01' 25" East 1200.47 feet to the point of beginning, containing 54.23 acres as shown on the aforementioned plat of Eugene W. Kniseley, dated January, 1978, recorded in Deed Book 446, at page 503.

Together with an easement 50 feet in width for the construction of a railroad spur track 25 feet on either side of the following described centerline.

Being the same property conveyed to General Motors Corporation, a Delaware corporation by Deed from American Poclain Corporation, a Delaware corporation dated March 23, 1978, recorded May 15, 1978 in Deed Book 446, Page 500 in the Clerk's Office of the Circuit Court of Spotsylvania, Virginia.

# EXHIBIT A

## Property Description

Tax ID Number: **41-19-454-014**

Land situated in the **City** of **Flint**, in the County of **Genesee**, State of **Michigan** is described as follows:

Part of the South 1/2 of Section 19, Township 7 North, Range 7 East: Beginning at a point on Westerly line of South Saginaw Street, 97 feet North 9 degrees 21 minutes 30 seconds West from its intersection with Northerly line of Atherton Road; thence South 39 degrees 14 minutes West, 40 feet; thence South 50 degrees 17 minutes 54 seconds West, 78.91 feet; thence South 88 degrees 56 minutes West, 823.44 feet; thence North 3 degrees 08 minutes East, 736.56 feet; thence North 50 degrees 36 minutes East, 198.85 feet to Southwesterly line of C & O Railroad Right of Way; thence Southeasterly along said Southwesterly line, 1007.45 feet to Westerly line of Saginaw Street; thence Southerly along said Westerly line, 63.18 feet to place of beginning.

**Commonly known as**: Atherton Rd., Flint, MI  48502

## EXHIBIT A

### Property Description

Tax ID Numbers: 33-21-01-07-426-001, 33-21-01-18-226-001, 33-21-01-18-276-001, 33-21-01-18-276-002, 33-21-01-18-276-003, 33-21-01-18-277-001, 33-21-01-18-277-002, 33-21-01-18-278-007, 33-21-01-18-278-010, 33-21-01-18-227-001, 33-01-01-17-101-023, 33-01-01-17-176-001

Land situated in the Township of Lansing, in the County of Eaton, State of Michigan is described as follows;

North 26 feet of Lot 31 and all of Lot 32, Capitol View Subdivision, Township of Lansing, Ingham County, Michigan, according to the recorded plat thereof, as recorded in Liber 7 of Plats, Page 5, Ingham County Records.
(33-21-01-18-276-002)

Lots 51 and 52, Capitol View Subdivision, Township of Lansing, Ingham County, Michigan, according to the recorded plat thereof, as recorded in Liber 7 of Plats, Page 5 Ingham County Records,
(33-21-02-18-277-001)

Lots 71 and 72, Capitol View Subdivision, Township of Lansing, Ingham County, Michigan, according to the recorded plat thereof, as recorded in Liber 7 of Plats, Page 5, Ingham County Records,
(33-21-01-18-277-002)

Lots 1 through 22, Michigan Heights, Township of Lansing, Ingham County, Michigan, according to the recorded plat thereof, as recorded in Liber 8 of Plats, Page 26, Ingham County Records; EXCEPT that part of Lot 3 described as beginning at the Southwest corner of said Lot 3 running thence along the Westerly lot line N 00° 00' 00" E 25.00 feet thence S 45° 08'00" E 35.27 feet to the South lot line, thence S 89° 44' 00" W 25.00 feet to the point of beginning. Also Lots 10 through 30 and South 16 feet of Lot 31; and North 6.8 feet of Lot 44; and Lots 45 through 50; and North 6.8 feet of Lot 64; and Lots 65 through 70; and North 6.8 feet of Lot 84; and Lots 85 through 92, Capitol View Subdivision, Township of Lansing Ingham County, Michigan, according to the recorded plat thereof, as recorded in Liber 7 of Plats, Page 5, Ingham County Records. Also a parcel described as commencing at the East 1/4 post of Section 18; thence West 660 feet; thence North 990 feet; thence East 660 feet, thence South 990 feet to the point of beginning; EXCEPT South 661.2 feet of the West 420 feet; ALSO EXCEPT commencing at the Southeast corner, thence West 240 feet; thence North 661.2 feet, Northeasterly to a point 990 feet North of point of beginning; thence South 990 feet to point of beginning, Township of Lansing, Ingham County, Michigan
(33-21-01-18-276-003)

Lots 4 through 9 and Lots 33 through 43; and South 33.2 feet of Lot 44; and Lots 53 through 63 and South 33.2 feet of Lot 64; and Lots 76 through 83 and South 33.2 feet of Lot 84, Capitol View Subdivision, Township of Lansing, Ingham County Michigan, according to the recorded plat thereof, as recorded in Liber 7 of Plats, Page 5, Ingham County Records.

Also a parcel described as commencing at the East 1/4 post of Section 18, T4N, R2W, thence West 660 feet; thence North 990 feet; thence East 660 feet; thence South 990 feet to point of beginning, EXCEPT the North 328.8 feet of the West 420 feet and EXCEPT beginning at the Northeast corner; thence West 240 feet; thence South 328.8 feet; thence Northeast to point of beginning, Township of Lansing, Ingham County, Michigan.
(33-21-01-18-278-007)

Lot 92, Capitol View Subdivision, Township of Lansing, Ingham County, Michigan, according to the recorded plat thereof, as recorded in Liber 7 of Plats, Page 5, Ingham County Records.
(33-21-01-18-278-010; NOTE above parcel also included in 33-21-01-18-276-003)

Beginning at the Northeast corner of Section 18, South 50 feet on the East section line, thence S 89° 39' W 812.37 feet, thence N 73°08' 23" W to a point S 89° 39' E 974.10 feet from the Northeast corner of Section 18, thence S 89° 39' E 974.10 feet to the Northeast corner of Section 18, T4N, R2W, Ingham County, Michigan; ALSO all that portion of land lying South of the above described parcel and North of relocated Saginaw Street.
(33-21-01-18-226-001)

North 50 acres of the East 1/2 of the Northeast 1/4 of Section 18, T4N, R2W; EXCEPT that portion North of and relocated Saginaw Street in the Northeast corner; Also Lots 24 through 62 inclusive, except the North 17 feet of Lots 60, 61 and 62 and the East 132 feet of vacated Elaine Street, Michigan Heights, Township of Lansing, Ingham County, Michigan, according to the recorded plat thereof, as recorded in Liber 8 of Plats, Page 26, Ingham County Records.
(33-21-01-18-227-001)

Commencing at the Southwest corner of Verlinden Avenue and Osborn Road, thence South 1737.57 feet to the North line of Michigan Avenue, thence West 1191.37 feet to the East line LM Railroad Right-of-Way; thence Northerly to a point on the South line of Saginaw Street relocated lying 72.1 feet East and 247.44 feet South of the Northwest corner of Section 17, thence Northeasterly along Right-of-Way to the West line of Stanley Street, thence South to the South line of Osborn Road, thence East to the point of beginning EXCEPT a parcel described as commencing at the Northwest corner of Section 17, thence S 89° 55' 20" E 218.6 feet on the North line of said Section 17, thence S 00° 26' 38" E l00.0 feet to point of beginning, running thence S 00° 26' 38" E 87.05 feet; thence N 67° 52' 03" E 106.37 feet to a point of curvature, thence Northeasterly 150.09 feet on the arc of a 1072.92 foot radius curve to the right whose chord bears N 71° 52' 30" E 149.93 feet to a point lying 100.0 feet South of North line of said Section 17, thence N 89° 55'20" W 241.69 feet to the point of beginning, T4N, R2W, City of Lansing, Ingham County, Michigan.
(33-01-01-17-101-023)

Lots 6 and 7, McPherson's Inverness Subdivision, City of Lansing, Ingham County, Michigan, according to the recorded plat thereof, as recorded in Liber 7 of Plats, Page 15, Ingham County Records.
(33-01-01-17-176-001)

The East 1/2 of the Southeast 1/4 of Section 7, EXCEPT the East 150 feet of the South 1847.6 feet on the Southeast 1/4, ALSO the Southwest 1/4 of the Southeast 1/4 EXCEPT the West 330 feet, Section 7, T4N, R2W, Township of Lansing, Ingham County, Michigan.
(33-21-01-07-426-001)

Lot 23, Michigan Heights, Township of Lansing, Ingham County, Michigan, according to the recorded plat thereof, as recorded in Liber 8 of Plats, Page 26, Ingham County Records.
(33-21-01-18-276-001)

Commonly known as: *2800*-2801 West, Saginaw, Lansing, MI 48917

## EXHIBIT A

### Property Description

**Tax ID Numbers**: 14-34-451-017 (as to part of Parcel 3); 14-34-451-016 (as to part of Parcel 3); 14-34-452-019 (as to Parcel 16); 14-34-454-003 (as to Parcel 17); 14-34-454-003 (as to Parcel 18); 14-34-452-020 (as to Parcel 19); 14-34-454-004 (as to Parcel 20); 14-34-452-021 (as to Parcel 21); 14-34-454-005 (as to Parcel 22); 19-04-226-014 (as to part of Parcel 28); 19-04-226-017 (as to part of Parcel 28); 19-03-176-003 (as to Parcel 34); 14-34-381-012 (as to Parcel 36); 14-34-380-041 (as to Parcel 37); 19-03-226-006 (as to Parcel 38); 19-03-226-007 (as to Parcel 39); 14-34-451-015 (as to Parcel 40).

Land situated in the **City of Pontiac**, in the County of **Oakland**, State of **Michigan** is described as follows:

PARCEL 3:

The South 50 feet of Lot 64, of OAK LAWN FARMS, as recorded in Liber 20, Page 23 of Plats, Oakland County Records, EXCEPT an Easterly triangular part of said property conveyed to City of Pontiac in Deed of Gift recorded in Liber 26914, Page 764.

ALSO, The North 25 feet of Lot 64, and the South 25 feet of Lot 65, of OAK LAWN FARMS, as recorded in Liber 20, Page 23 of Plats, Oakland County Records. EXCEPT an Easterly triangular part of said property conveyed to City of Pontiac in Deed of Gift recorded in Liber 26914, Page 764.

PARCEL 16:

Parts of Lot 85 and 87, and All of Lot 86, of OAK LAWN FARMS, as recorded in Liber 20, Page 23 of Plats, Oakland County Records, Also Part of Lot 10 of ASSESSOR'S PLAT NO. 141, as recorded in Liber 54, Page 99 of Plats, Oakland County Records, described as: Beginning at a point distant West  2301.80 feet and North 00 degrees 30 minutes 09 seconds East, 952.77 feet from the Southeast corner of Section 34; thence North 00 degrees-30 minutes 09 seconds East, 276 feet; thence East 299.03 feet; thence South 00 degrees 30 minutes 09 seconds West, 319.76 feet; thence West 21.92 feet; thence West 21.92 feet, thence along a curve to the left, radius 330 feet, chord bears South 68 degrees 55 minutes 11 seconds West, 237.39 feet, distance of 242.83 feet; thence North 46 degrees 30 minutes 20 seconds West, 0.95 feet; thence along a curve to right, radius 175 feet, chord bears North 23 degrees 00 minutes 05 seconds West, 139.59 feet, a distance of  143.58 feet to Place of Beginning.

PARCEL 17:

Part of Lot 10 of ASSESSOR'S PLAT NO. 141, as recorded in Liber 54, Page 99 of Plats, Oakland County Records, described as: Beginning at a point distant West 2301.80 feet and North 00 degrees 30 minutes 09 seconds East, 1228.77 feet and East 299.03 feet and South 00 degrees 30 minutes 09 seconds West, 64.76 feet from the Southeast corner of Section 34; thence East 102 feet; thence South 00 degrees 30 minutes 09 seconds West, 255 feet; thence West 102 feet; thence North 00 degrees 30 minutes 09 seconds East, 255 feet to the Place of Beginning.

PARCEL 18:

Part of Lots 9 and 10 of ASSESSOR'S PLAT NO. 141, as recorded in Liber 54, Page 99 of Plats, Oakland County Records, described as: Beginning at a point distant West 2301.80 feet and North00 degrees 30 minutes 09 seconds East, 1228.77 feet and East 299.03 feet and South 00 degrees 30 minutes 09 seconds West, 319.76 FT and East 102 feet from the Southeast corner of Section 34; thence North 00 degrees 30 minutes 09 seconds East, 342.52 feet; thence North 77 degrees 06 minutes 04 seconds East,

990.22 feet; thence South 00 degrees 26 minutes 10 seconds West, 563.57 feet; thence West 963.95 feet to the Place of Beginning.

PARCEL 19:

Part of Lots 87 and 88 of OAKLAWN FARMS, as recorded in Liber 20, Page 23 of Plats, Oakland County Records, described as:  Beginning at a point distant West 2301.80 feet and North 00 degrees 30 minutes 09 seconds East, 858.39 feet from the Southeast corner of Section 34; thence North 00 degrees 30 minutes 09 seconds East, 94.38 feet; thence along a curve to the left, radius 175 feet, chord bears South 23 degrees 00 minutes 05 seconds East, 139.59 feet, distance of 143.58 feet; thence South 46 degrees 30 minutes 20 seconds East 0.95 feet; thence along a curve to the left, radius 330 feet, chord bears South 44 degrees 39 minutes 09 seconds West, 36.69 feet, distance of  36.71 feet; thence along a curve to the right, radius 75 feet, chord bears North 26 degrees 26 minutes 44 seconds West, 67.98 feet, distance of 70.55 feet to the Place of Beginning.

PARCEL 20:

Part of Lots 87 to 90, inclusive, OAKLAWN FARMS, as recorded in Liber 20, Page 23 of Plats, and Part of Lots 9 and 10 of ASSESSOR'S PLAT NO. 141, as recorded in Liber 54, Page 99 of Plats, Oakland County Records, described as:  Beginning at a point distant West 2301.80 feet and North 00 degrees 30 minutes 09 seconds East, 369.31 feet from the Southeast corner of Section 34; thence North 00 degrees 30 minutes 09 seconds East, 489.08 feet; thence along a curve to the left, radius 75 feet, chord bears South 26 degrees 26 minutes 44 seconds East, 67.98 feet, distance of 70.55 feet; thence along a curve to the right, radius 330 feet, chord bears North 65 degrees 43 minutes 58 seconds East, 271.25 feet, distance of 279.54 feet; thence East 1147.55 feet; thence South 00 degrees 26 minutes 39 seconds West, 66 feet; thence West 1147.03 feet; thence along a curve to the left, radius 264 feet, chord bears South 45 degrees 15 minutes 05 seconds West, 371/71 feet, distance of 412.37 feet; thence South 00 degrees 30 minutes 09 seconds West, 212.74 feet; thence North 87 degrees 22 minutes 21 seconds West, 16.01 feet to the Place of Beginning.

PARCEL 21:

Part of Lots 87 through 90, inclusive, of OAKLAWN FARMS, as recorded in Liber 20, Page 23 of Plats, Oakland County Records, described as:  Beginning at a point distant West 2301.80 feet and North 00 degrees 30 minutes 09 seconds East, 369.31 feet and South 87 degrees 22 minutes 21 seconds East, 16.01 feet from the Southeast corner of Section 34; thence North 00 degrees 30 minutes 09 seconds East, 212.74 feet; thence along a curve to the right, radius 264 feet, chord bears North 45 degrees 15 minutes 05 seconds East, 371.17 feet, distance of 412.37 feet; thence East 13.63 feet; thence South 00 degrees 26 minutes 10 seconds West, 487.08 feet; thence North 87 degrees 22 minutes 21 seconds West, 276.07 feet to the Place of Beginning.

PARCEL 22:

Part of Lot 10, of ASSESSOR'S PLAT NO. 141, as recorded in Liber 54, Page 99 of Plats, Oakland County Records, described as: Beginning at a point distant West 1889.50 feet and North 00 degrees 26 minutes 10 seconds East, 60 feet from the Southeast corner of Section 34; thence West 120 feet; thence North 00 degrees 26 minutes 10 seconds East, 783 feet; thence East 120 feet; thence South 00 degrees 26 minutes 10 seconds West, 783 feet to the Place of Beginning.

PARCEL 28:

Part of Lot 2 of ASSESSOR'S PLAT NO 98, as recorded in Liber 1B of Assessor's Plats, Page 98, Oakland County Records, described as:  Beginning at a point distant South 01 degree 54 minutes 22 seconds West, 50.08 feet and North 84 degrees 47 minutes 29 seconds West, 373.42 feet and North 87 degrees 50 minutes 59 seconds West, 32.85 feet and South 02 degrees 09 minutes 01 seconds West,

310.14 feet and North 87 degrees 51 minutes 14 seconds West, 30 feet from the Northeast corner of Section 4; thence South 22 degrees 05 minutes 28 seconds West, 232.77 feet; thence South 58 degrees 11 minutes 13 seconds West, 34.68 feet; thence North 87 degrees 56 minutes 44 seconds West, 733.98 feet to the Northeasterly right of way line of Grand Trunk Western Railroad; thence Northwesterly 354.86 feet along said line; thence South 87 degrees 51 minutes 14 seconds East, 637.28 feet; thence North 02 degrees 08 minutes 46 seconds East, 15 feet; thence South 87 degrees 51 minutes 14 seconds East, 479.8 feet to the Place of Beginning.

AND, Part of Lot 2 of ASSESSOR'S PLAT NO 98, as recorded in Liber 1B of Assessor's Plats, Page 98, Oakland County Records, described as:  Beginning at a point distant South 00 degrees 25 minutes 10 seconds East, 593.11 feet and South 58 degrees 12 minutes 27 seconds West, 846.46 feet and North 48 degrees 50 minutes 41 seconds West, 141.23 feet from the Northeast Lot Corner; thence North 36 degrees 02 minutes 39 seconds East, 37.06 feet; thence North 38 degrees 09 minutes 50 seconds East, 445.72 feet; thence South 87 degrees 45 minutes 49 seconds West, 762.71 feet; thence along a curve concave Southwesterly, radius 14428.60 feet, chord bears South 52 degrees 58 minutes 31 seconds East, 582.32 feet, distance of 582.36 feet to the Place of Beginning.

Parcel 34:

Unit 7 of CENTERPOINT BUSINESS CAMPUS CONDOMINIUM, according to the Master Deed recorded in Liber 16667, Pages 11 to 47, inclusive, Oakland County Records, First Amendment to the Master Deed recorded in Liber 17018, Pages 808 to 818, inclusive, Second Amendment to the Master Deed recorded in Liber 17615, Pages 107 to 120, inclusive, Third Amendment to the Master Deed recorded in Liber 18244, Page 160 to 171, inclusive, Fourth Amendment to the Master Deed recorded in Liber 20069, Page 99 to 107, inclusive, Fifth Amendment to Master Deed recorded in Liber 21468, Page 838 to 854, inclusive, Sixth Amendment to Master Deed recorded in Liber 24909, Page 537 to 549, inclusive, Seventh Amendment to Master Deed recorded in Liber 28874, Page 149 to 157, inclusive, Eighth Amendment to Master Deed recorded in Liber 35596, Page 855 to 874, inclusive, and Ninth Amendment to Master Deed recorded in Liber 39555, Page 61 to 70, inclusive, Oakland County Records and designated as Oakland County Subdivision Plan No. 1004, together with rights in general common elements and limited common elements as set forth in the above Master Deed (and Amendments thereto) and as described in Act 59 of the Public Acts of 1978, as amended.

Parcel 36:

Unit 17 of CENTERPOINT BUSINESS CAMPUS CONDOMINIUM, according to the Master Deed recorded in Liber 16667, Pages 11 to 47, inclusive, Oakland County Records, First Amendment to the Master Deed recorded in Liber 17018, Pages 808 to 818, inclusive, Second Amendment to the Master Deed recorded in Liber 17615, Pages 107 to 120, inclusive, Third Amendment to the Master Deed recorded in Liber 18244, Page 160 to 171, inclusive, Fourth Amendment to the Master Deed recorded in Liber 20069, Page 99 to 107, inclusive, Fifth Amendment to Master Deed recorded in Liber 21468, Page 838 to 854, inclusive, Sixth Amendment to Master Deed recorded in Liber 24909, Page 537 to 549, inclusive, Seventh Amendment to Master Deed recorded in Liber 28874, Page 149 to 157, inclusive, Eighth Amendment to Master Deed recorded in Liber 35596, Page 855 to 874, inclusive, and Ninth Amendment to Master Deed recorded in Liber 39555, Page 61 to 70, inclusive, Oakland County Records and designated as Oakland County Subdivision Plan No. 1004, together with rights in general common elements and limited common elements as set forth in the above Master Deed (and Amendments thereto) and as described in Act 59 of the Public Acts of 1978, as amended.

Parcel 37:

Unit 18 of CENTERPOINT BUSINESS CAMPUS CONDOMINIUM, according to the Master Deed recorded in Liber 16667, Pages 11 to 47, inclusive, Oakland County Records, First Amendment to the Master Deed recorded in Liber 17018, Pages 808 to 818, inclusive, Second Amendment to the Master Deed recorded in Liber 17615, Pages 107 to 120, inclusive, Third Amendment to the Master Deed recorded in Liber 18244, Page 160 to 171, inclusive, Fourth Amendment to the Master Deed recorded in Liber 20069, Page 99 to 107, inclusive, Fifth Amendment to Master Deed recorded in Liber 21468, Page 838 to 854, inclusive, Sixth Amendment to Master Deed recorded in Liber 24909, Page 537 to 549, inclusive, Seventh Amendment to Master Deed recorded in Liber 28874, Page 149 to 157, inclusive, Eighth Amendment to Master Deed recorded in Liber 35596, Page 855 to 874, inclusive, and Ninth Amendment to Master Deed recorded in Liber 39555, Page 61 to 70, inclusive, Oakland County Records and designated as Oakland County Subdivision Plan No. 1004, together with rights in general common elements and limited common elements as set forth in the above Master Deed (and Amendments thereto) and as described in Act 59 of the Public Acts of 1978, as amended.

Parcel 38:

Unit 53 of CENTERPOINT BUSINESS CAMPUS CONDOMINIUM, according to the Master Deed recorded in Liber 16667, Pages 11 to 47, inclusive, Oakland County Records, First Amendment to the Master Deed recorded in Liber 17018, Pages 808 to 818, inclusive, Second Amendment to the Master Deed recorded in Liber 17615, Pages 107 to 120, inclusive, Third Amendment to the Master Deed recorded in Liber 18244, Page 160 to 171, inclusive, Fourth Amendment to the Master Deed recorded in Liber 20069, Page 99 to 107, inclusive, Fifth Amendment to Master Deed recorded in Liber 21468, Page 838 to 854, inclusive, Sixth Amendment to Master Deed recorded in Liber 24909, Page 537 to 549, inclusive, Seventh Amendment to Master Deed recorded in Liber 28874, Page 149 to 157, inclusive, Eighth Amendment to Master Deed recorded in Liber 35596, Page 855 to 874, inclusive, and Ninth Amendment to Master Deed recorded in Liber 39555, Page 61 to 70, inclusive, Oakland County Records and designated as Oakland County Subdivision Plan No. 1004, together with rights in general common elements and limited common elements as set forth in the above Master Deed (and Amendments thereto) and as described in Act 59 of the Public Acts of 1978, as amended.

Parcel 39:

Unit 54 of CENTERPOINT BUSINESS CAMPUS CONDOMINIUM, according to the Master Deed recorded in Liber 16667, Pages 11 to 47, inclusive, Oakland County Records, First Amendment to the Master Deed recorded in Liber 17018, Pages 808 to 818, inclusive, Second Amendment to the Master Deed recorded in Liber 17615, Pages 107 to 120, inclusive, Third Amendment to the Master Deed recorded in Liber 18244, Page 160 to 171, inclusive, Fourth Amendment to Master Deed recorded in Liber 20069, Page 99 to 107, inclusive, Fifth Amendment to Master Deed recorded in Liber 21468, Page 838 to 854, inclusive, Sixth Amendment to Master Deed recorded in Liber 24909, Page 537 to 549, inclusive, Seventh Amendment to Master Deed recorded in Liber 28874, Page 149 to 157, inclusive, Eighth Amendment to Master Deed recorded in Liber 35596, Page 855 to 874, inclusive, and Ninth Amendment to Master Deed recorded in Liber 39555, Page 61 to 70, inclusive, Oakland County Records and designated as Oakland County Subdivision Plan No. 1004, together with rights in general common elements and limited common elements as set forth in the above Master Deed (and Amendments thereto) and as described in Act 59 of the Public Acts of 1978, as amended.

PARCEL 40

The North 50 feet of Lot 65, of OAK LAWN FARMS, as recorded in Liber 20, Page 23 of Plats, Oakland County Records

**Commonly known as:**  MLC #1309, 1311, 1312, 1313, 1314 and 1315, Centerpoint Land (Etkin with and without ground lease), and 607, 631, 642 and 652 Meadow Drive.

## EXHIBIT A

### Property Description

PARCEL 1:
Lot Number 1 in K.H.D.C. North Minor Subdivision, an addition to the City of Kokomo, Center Township, Howard County, Indiana, as shown in Recorder's Instrument No. 9934016427.

PARCEL 2:
All that part of Lot 25 in Avery's Addition to the City of Kokomo, lying West of North Washington Street, Center Township, Howard County, Indiana, as shown in Recorder's Plat Book 1, page 9.

PARCEL 3:
Lot 28 in Avery's Addition to the City of Kokomo, Center Township, Howard County, Indiana, as shown in Recorder's Plat Book 1, page 9.
EXCEPTING THEREFROM:
That part thereof which has been appropriated for Washington Street.

PARCEL 4:
Lots 33, 35 and 36 in Avery's Addition City of Kokomo, Center Township, Howard County, Indiana, as shown in Recorder's Plat Book 1, page 9.

ALSO:
A strip of ground 18 feet wide adjacent to said Lot 35 in Avery's Addition to the City of Kokomo on the Southwest corner thereof and being the East Half of that part of Robinson Street heretofore vacated which lies at the Southwest corner of and adjacent to said Lot 35.

PARCEL 5:
All of Spraker Street vacated lying West of Washington Street and lying between all that part of Lot 25 and all that part of Lot 26 in Avery's Addition West of Washington Street and Lots 27, 28, 33, 34 and 35 in Avery's Addition to the City of Kokomo, Center Township, Howard County, Indiana, as shown in Recorder's Plat Book 1, page 9.

## EXHIBIT A

### Property Description

Tax ID Number:  Error! Unknown document property name.

Land situated in the Error! Unknown document property name. of Error! Unknown document property name., in the County of Error! Unknown document property name., State of Error! Unknown document property name. is described as follows:

PARCEL A:  Lots 143, 144, 145 and 146 of DIXIELAND, as recorded in Plat Liber 11, Pages 5 and 6, Genesee County Records.

PARCEL B:  Lot 150 of DIXIELAND, including part of vacated Shelley Lane lying adjacent thereto, as recorded in Plat Liber 11, Pages 5 and 6, Genesee County Records.  EXCEPT that portion of said Lot conveyed in Corporate Covenant Deed recorded in Master Liber 3925, page 561, Genesee County Records, described as:  Commencing at the Southwest corner of Lot 148 and the Easterly right of way for Milton Drive for a point of beginning; thence North 09 degrees 19 minutes 31 seconds West, 84.91 feet along said right of way; thence North 80 degrees 44 minutes 12 seconds East,99.62 feet; thence North 50 degrees 36 minutes 14 seconds East, 39.58 feet; thence South 15 degrees 53 minutes 27 seconds East, 105.20 feet; thence South 80 degrees 38 minutes 39 seconds West, 145.99 feet to the point of beginning. ALSO EXCEPT that portion of said Lot 150 conveyed in Corrective Corporate Covenant Deed recorded in Master Liber 4357, page 726, Genesee County Records, described as: Commencing at the Northwest corner of Lot 149 of said subdivision and the Easterly right of way line for Milton Drive for a point of beginning; thence North 80 degrees 38 minutes 39 seconds East, 145.99 feet; thence South 15 degrees 53 minutes 27 seconds East, 83.10 feet to the South right of way line of vacated Shelley Lane; thence South 69 degrees 54 minutes 00 seconds West, 143.42 feet along said line to a point on a tangent curve concave to the Southwest having a radius of 15.04 feet; thence 20.80 feet along the arc of said curve, said arc having a chord bearing and distance of South 30 degrees 15 minutes 40 seconds West to a point of the Easterly right of way line for Milton Street; thence North 09 degrees 19 minutes 31 seconds West, 104.20 feet along said line to the point of beginning.

PARCEL C:  Lot 151 of DIXIELAND, including that part of vacated Shelley Lane lying adjacent thereto, as recorded in Plat Liber 11, Pages 5 and 6, Genesee County Records.

PARCEL D:  Lot 152 of DIXIELAND, including that part of vacated Shelley Lane lying adjacent thereto, as recorded in Plat Liber 11, Pages 5 and 6, Genesee County Records.

PARCEL E:  Lot 153 of DIXIELAND, including that part of vacated Shelley Lane lying adjacent thereto, as recorded in Plat Liber 11, Pages 5 and 6, Genesee County Records.

PARCEL F:  Lot 154 of DIXIELAND, including that part of vacated Shelley Lane lying adjacent thereto, as recorded in Plat Liber 11, Pages 5 and 6, Genesee County Records.

PARCEL G: Lots 155, 156 and 157, including that part of vacated Shelley Lane lying adjacent thereto, as recorded in Plat Liber 11, Pages 5 and 6, Genesee County Records.  ALSO, That part of Lot 158 of DIXIELAND, and part of vacated Shelley Lane adjacent to Lot 158, as recorded in Plat Liber 11, Pages 5 and 6, Genesee County Records, lying Easterly of a line described as:  Beginning at the South corner of Lot 158, said corner being 54.13 feet from the Southwest corner of Lot 158, measured along the South line of said Lot; thence North 15 degrees 53 minutes 17 seconds West, 306.7 feet, more or less, to the

North corner of Lot 150, said corner being 39.53 feet from the Northwest corner of Lot 150, measured along the North line of said Lot for a Point of Ending.

PARCEL H:   Lot 164 of DIXIELAND, as recorded in Plat Liber 11, Pages 5 to 6, Genesee County Records.

PARCEL I:   Lot 165 of DIXIELAND, as recorded in Plat Liber 11, Pages 5 to 6, Genesee County Records.

PARCEL J:   Lot 182 of DIXIELAND, as recorded in Plat Liber 11, Pages 5 and 6, Genesee County Records, EXCEPT beginning at a point on the Southwesterly line of Pengelly Road at a corner common to Lots 182 and 183 of said plat; thence South 42 degrees 17 minutes West along Southeasterly line of said Lot 182, 130.5 feet; thence North 46 degrees 53 minutes West, 137.30 feet; thence North 42 degrees 17 minutes East, 128.50 feet to the Southwesterly line of Pengelly Road; thence South 47 degrees 43 minutes East, 137.30 feet to the point of beginning.

PARCEL M:   Lots 111 through 116, both inclusive, DIXIELAND, as recorded in Liber 11, Pages 5 and 6 of Plats, Genesee County Records.

PARCEL N:   Lot 162 of DIXIELAND, as recorded in Plat Liber 11, Pages 5 to 6, Genesee County Records.

PARCEL O:   Lot 460 of DIXIELAND, as recorded in Plat Liber 11, Pages 5 and 6, Genesee County Records.

PARCEL P:   Lot 461 of DIXIELAND, as recorded in Plat Liber 11, Pages 5 and 6, Genesee County Records.


**Commonly known as**:  **Error! Unknown document property name., Error! Unknown document property name., Error! Unknown document property name.  Error! Unknown document property name.**

## EXHIBIT A

### Property Description

Tax ID Numbers:  K-11-12-100-003 (Parcel 1); K-11-12-200-001 (Parcel 2); K-11-12- 200-002; K-11-12-300-006 (Parcel 3) 83-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-000 (as to Parcel 1, Wayne County); 83-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-000 (as to Parcel 2, Wayne County)

Land situated in the Township of Ypsilanti, in the County of Washtenaw, State of Michigan is described as follows:

Parcel 1, Washtenaw County:

Commencing at the Northeast corner of Section; thence South 1 degree 25 minutes 10 seconds West, 83.14 feet in East line of Section for the point of beginning; thence South 01 degree 25 minutes 10 seconds West, 749.02 feet: thence South 89 degrees 57 minutes 40 West 273.70 feet; thence South 00 degrees 02 minutes 20 seconds West, 581.42 feet; thence South 20 degrees 35 minutes 45 seconds East, 546.30 feet; thence South 847.82 feet; thence East 51.75 feet; thence South 26.97 feet; thence along a curve to the right, curve having a radius of 401.82 feet, a central angle of 1 degree 39 minutes 11 seconds, chord which bears South 23 degrees 32 minutes 07 seconds West, a distance of 11.59 feet; thence West, 47.12 feet; thence South 67.85 feet; thence West 324.92 feet; thence South 00 degrees 38 minutes 45 seconds West, 16.44 feet; thence West, 648.73 feet; thence South 00 degrees 08 minutes 45 seconds West, 127.05 feet: thence West, 1652.28 feet; thence South 73 degrees 53 minutes 36 seconds West, 239.20 feet, thence North 89 degrees 55 minutes 54 seconds West, 712.71 feet; thence North 29 degrees 31 minutes 47 seconds West, 93.50 feet; thence South 78 degrees 02 minutes 40 seconds West, 111.75 feet; thence South 00 degrees 18 minutes 58 seconds West, 29.55; thence South 89 degrees 59 minutes 40 seconds West, 115.00 feet; thence North 23 degrees 31 minutes 00 seconds East, 292.26 feet; thence North 00 degrees 20 minutes 50 seconds East, 38.57 feet; thence North 88 degrees 53 minutes 40 seconds East, 1241.41 feet; thence North 00 degrees 01 minutes 40 seconds East, 1311.38 feet; thence North 88 degrees 15 minutes 48 seconds east. 1275.36 feet; thence north 00 degrees 44 minutes 00 seconds East, 1191.22 feet; thence along a curve to the right, said curve having a radius of 1512.88 feet, a central angle of 14 degrees 37 minutes 30 seconds, a chord which bears North 80 degrees 08 minutes 00 seconds East, 386.17 feet; thence North 87 degrees 33 minutes 50 seconds East, 617.91 feet; thence North 87 degrees 44 minutes 52 seconds East, 294.77 feet to the point of beginning. Being a part of Section 12, Town 3 South, Range 7 East.

Parcel 2, Washtenaw County:

Beginning at center of Section; thence North 0 degrees 01 minutes 40 seconds East, 1311.28 feet; thence North 88 degrees 15 minutes 48 seconds East, 1275.36 feet; thence North 0 degrees 44 minutes East, 1191.22 feet; thence VVesterly in arc of curve left, radius 1512.88 feet to point of tangency; thence South 61 degrees 04 minutes 40 seconds West, 456.56 feet; thence North 184.59 feet; thence West, 181.00 feet; thence South 284.30 feet; thence South 61 degrees 04 minutes 40 seconds West, 1297.17 feet; thence 431.02 feet in arc of curve right, radius 2914.93 feet, chord South 65 degrees 18 minutes 50 seconds West, 430.63 feet; thence South 69 degrees 33 minutes 00 seconds West. 931.90 feet; thence 568.88 feet in arc of curve left, radius 5679.65 feet, chord South 66 degrees 40 minutes 40 seconds West, 568.65 feet; thence South 63 degrees 48 minutes 40 seconds West, 84.88 feet; thence Northwesterly to a

point South 00 degrees 27 minutes 23 seconds West, 1893.39 feet from the Northwest corner of Section; thence North 0 degrees 27 minutes 23 seconds East, 927.30 feet; thence 1235.0 feet in arc of a curve right, radius 3967.56 feet, chord North 58 degrees 39 minutes 51 East, 1230.02 feet; thence South 20 degrees 55 minutes 15 seconds East, 283.06 feet; thence 390.84 feet in arc of curve right, radius 1362.69 feet, chord South 12 degrees 49 minutes 50 East, 389.50 feet; thence South 4 degrees 36 minutes 50 seconds East, 408.92 feet; thence North 69 degrees 34 minutes 21 seconds East, 83.40 feet, thence North 69 degrees 33 minutes 20 seconds East, 20.54 feet; thence North 04 degrees 36 minutes 50 seconds West, 380.59 feet; thence 419.52 feet in arc of curve left, radius 1462.69 feet, chord North 12 degrees 49 minutes 50 seconds West, 418.09 feet; thence North 20 degrees 55 minutes 15 seconds West, 284.08 feet; thence 669.08 feet in arc of curve right, radius 3967.56 feet, chord North 73 degrees 52 minutes 13 seconds East, 668.29 feet; thence North 78 degrees 42 minutes 05 seconds East, 325.43 feet; thence 845.04 feet in arc of curve right, radius 618.70 feet, chord South 62 degrees 04 minutes East, 780.87 feet; thence South 22 degrees 10 minutes West, 280.52 feet; thence South 61 degrees 05 minutes 34 seconds West, 958.34 feet; thence 426.13 feet in arc of curve right, radius 2885.02 feet, chord South 65 degrees 19 minutes 27 seconds West, 425.74 feet; thence South 69 degrees 33 minutes 20 seconds West, 121.34 feet, thence South 69 degrees 34 minutes 21 seconds West, 805.88 feet; thence 583.35 feet in arc of curve left, radius 5827.39 feet, chord South 66 degrees 41 minutes 21 seconds West, 583.11 feet; thence South 63 degrees 55 minutes 11 seconds West, 73.56; thence Southeasterly to a point North 0 degrees 27 minutes 20 seconds East, 744.54 feet and North 69 degrees 33 minutes 30 seconds East, 18.58 feet from West 1/4 corner of Section; thence South 17 degrees 43 minutes 30 seconds East, 656.29 feet; thence South 34 degrees 16 minutes 41 seconds East, 264.00 feet; thence South 75 degrees 19 minutes 00 seconds East, 750.58 feet; thence North 89 degrees 59 minutes 40 seconds East, 143.62 feet; thence North 23 degrees 31 minutes 00 seconds East, 292.28 feet; thence 0 degrees 20 minutes 50 seconds East, 38.51 feet; thence North 88 degrees 53 minutes 40 seconds East, 1241.41 feet to point of beginning, ALSO, that part of Section 1 and 12 which lies Northerly of Old Ecorse Road (Abandoned), Easterly of GM Plant entrance, Southerly of Willow Run Expressway, Westerly of E/L of Sections 1 and 12, being part of Southeasterly 114, Section 1 and part of entire Section 12 Town, 3 South, Range 7 East.

EXCEPT that part deeded to Beyer Drain, Willow Run Drain and Ypsilanti Township Drain No. 7 as recorded in Liber 1781, Page 27, Washtenaw County Records.

Parcel 3, Washtenaw County:

Part of the Southeast 1/2, Section 12, Town 3 South, Range 7 East, Ypsilanti Township, Washtenaw County, Michigan, commencing at Southeast corner of Section 12; thence South 87 degrees 46 minutes 46 seconds West along South line of Section 935.33 feet to point of beginning; thence continuing South 87 degrees 46 minutes 46 seconds West, along South line of Section which is also the Center line of Tyler Road (Proposed 120 feet wide) 1397.50 feet; thence North 00 degrees 00 minutes 25 seconds West, 732.97 feet; thence North 89 degrees 53 minutes 01 seconds East, 192.96 feet; thence North 33 degrees 03 minutes 21 seconds East, 305.54 feet to point that approximately the center line of Willow Run Creek; thence along center line in a Southerly direction in the Willow Run Creek the following courses and distance: South 16 degrees 47 minutes 55 seconds East, 173.21 feet; thence South 42 degrees 09 minutes 05 seconds East, 284.61 feet; thence South 86 degrees 11 minutes 10 seconds East, 300.66 feet; thence South 74 degrees 06 minutes 15 seconds East, 157 feet; thence North 83 degrees 10 minutes 55 seconds East, 185.31 feet, thence South 82 degrees 54 minutes 10 seconds East, 250.92 feet thence South 45 degrees 40 minutes 10 seconds East, 181.74 feet; thence South 01 degrees 51 minutes 50 seconds West, 188.68 feet; thence leaving the

approximate centerline of the Willow Run Creek on course of South 61 degrees 16 minutes 45 seconds West, 232.01 feet to a point that is on the North line of Tyler Road; thence South 04 degrees 16 minutes 17 seconds East, 60.01 feet to point of beginning.

Land situated in the Township of Van Buren, County of Wayne in the State of Michigan is described as follows:

Parcel 1, Wayne County:

That part of the Northwest 1/4 of Section 7, Town 3 South, Range 8 East, Van Buren Township, Wayne County, Michigan, described as: Beginning at the Northwest corner of said Section 7 and proceeding thence South 01 degree 25 minutes 10 seconds West along the West Section line, 799.13 feet; thence North 89 degrees 57 minutes 40 seconds East, 193.19 feet; thence North 00 degrees 02 minutes 20 seconds West, 275.00 feet; thence South 89 degrees 57 minutes 40 seconds West, 153.16 feet; thence North 01 degree 25 minutes 10 seconds East, 525.40 feet; thence South 87 degrees 34 minutes 10 seconds West along the North Section line, 33.07 feet to the Point of Beginning.

Together with a 60 foot wide easement for roadway purposes over lands adjoining on the North side, as reserved in Deed recorded in Liber 18050, Page 673, Wayne County Records.

Parcel 2, Wayne County:

Part of the West 1/2 of Section 7, Town 3 South, Range 8 East, Van Buren Township, Wayne County, Michigan, described as: Beginning at the West 1/4 of Section 7; thence North 01 degree 27 minutes 26 seconds East, 855.18 feet; thence South 24 degrees 17 minutes 05 seconds East, 238.53 feet; thence due South 768.31 feet; thence South 41 degrees 23 minutes 40 seconds West, 181.57 feet; thence North 00 degrees 02 minutes 43 seconds East. 267.04 feet to the Place of Beginning.

Client Reference: 2930 Ecorse Road, Ypsilanti, MI 48197

## EXHIBIT A

### Property Description

Tax ID Number 09-160-021-201-003-00

Land situated in the City of Bay City, County of Bay in the State of Michigan is described as follows:

A parcel of land in Section 21, Town 14 North, Range 5 East, City of Bay City, Bay County, Michigan, described as follows: To fix the point of beginning, commence at the intersection of the North line of vacated Water Street with the Westerly line of Johnson Street; Thence South 86 degrees 15 minutes 15 seconds West, on said North line, 1885.76 feet; Thence North 14 degrees 21 minutes 15 seconds West, 54.19 feet; Thence North 73 degrees 24 minutes 54 seconds West, 39.05 feet; Thence South 78 degrees 00 minutes 06 seconds West, 93.00 feet; Thence South 11 degrees 59 minutes 54 seconds East, 20.00 feet; Thence South 78 degrees 00 minutes 06 seconds West, 17.80 feet; Thence South 77 degrees 15 minutes 06 seconds West, 199.00 feet to said North line of vacated Water Street; Thence South 86 degrees 15 minutes 15 seconds West, on said North line 14.23 feet to a deflection point; Thence South 77 degrees 36 minutes 15 seconds West, on said North line 70.12 feet to the point of beginning of this description; Thence continuing South 77 degrees 36 minutes 15 seconds West on said North line, 259.73 feet; Thence North 09 degrees 34 minutes 07 seconds East, on a line previously recorded in Liber 918, Page 305, Bay County Records, 950.00 feet; Thence North 14 degrees 24 minutes 53 seconds West, on a line previously recorded in said Liber 918, Page 305, 150.00 feet; Thence North 76 degrees 42 minutes 05 seconds East 304.01 feet to a point on the Southerly bank of the Saginaw River; Thence South 13 degrees 17 minutes 55 seconds East, 20.00 feet to a point on a reference line along the Southerly bank of the Saginaw bank of the Saginaw River, being approximately parallel with and 20 feet, more or less, Southerly of the water's edge of the Saginaw River, said reference line is for surveying purposes only and it is the intention of this description to included all lands to the water's edge of the Saginaw River; Thence South 53 degrees 03 minutes 41 seconds East, on said reference line, 37.99 feet; Thence South 17 degrees 45 minutes 05 seconds East, 89.31 feet; Thence South 12 degrees 51 minutes 59 seconds East, 256.40 feet; Thence South 76 degrees 03 minutes 04 seconds West, 41.65 feet; Thence South 13 degrees 56 minutes 55 seconds East, 61.91 feet; Thence South 75 degrees 45 minutes 43 seconds West, 5.75 feet; Thence South 14 degrees 15 minutes 52 seconds East, 75.75 feet; Thence South 76 degrees 06 minutes 07 seconds West, 25.70 feet; Thence South 14 degrees 19 minutes 43 seconds East, 126.69 feet; Thence South 74 degrees 41 minutes 20 seconds West, 191.16 feet; Thence South 43 degrees 19 minutes 19 seconds West 29.40 feet; Thence South 32 degrees 27 minutes 55 seconds West, 112.40 feet; Thence South 26 degrees 32 minutes 48 seconds West, 118.44 feet; Thence South 13 degrees 37 minutes 18 seconds East, 112.49 feet; Thence South 77 degrees 27 minutes 07 seconds West 24.62 feet; Thence South 13 degrees 37 minutes 37 seconds East, 18.63 feet; Thence North 77 degrees 27 minutes 07 seconds East, 24.62 feet; Thence South 13 degrees 37 minutes 37 seconds East, 46.22 feet to the point of beginning.

ALSO:

A parcel of land in Section 21, Town 14 North, Range 5 East, City of Bay City, Bay County, Michigan, described as follows: To fix the point of beginning, commence at the intersection point of the North line of Vacated Water Street with the Northerly extension of the West line of Block 2, FRASER'S ADDITION, thence North 77 degrees 36 minutes 15 seconds East, on said North line, 15.52 feet, thence North 09 degrees 34 minutes 07 seconds East, on a line previously recorded in Liber 918, Page 305, Bay County Records, 35.14 feet to the point of beginning of this description, thence South 75 degrees 10 minutes 45 seconds West, on a line previously surveyed and monumented, 75.00 feet; Thence North 09 degrees 34 minutes 07 seconds East, 153.30 feet, thence North 03 degrees 29 minutes 58 seconds West, 76.01 feet, thence North 16 degrees 03 minutes 22 seconds East, 112.74 feet, thence North 12 degrees 42 minutes 57 seconds East, 217.33 feet, thence North 10 degrees 20 minutes 07 seconds East, 349.28 feet, thence North 10 degrees 59 minutes 28 seconds West, 91.29 feet, thence North 26 degrees 05 minutes 48 seconds East, 95.75 feet, thence South 14 degrees 24 minutes 53 seconds East, on said line previously recorded in Liber 918, Page 305, 150.00 feet, thence South 09 degrees 34 minutes 07 seconds West, on said line previously recorded in Liber 918, Page 304, 914.86 feet to the point of beginning.

## EXHIBIT A

### Property Description

Tax Id Number(s): 41-17-24-201-007 (Parcel 3), 41-17-13-455-049 (as to Parcel 2), 41-17-13-455-051 (Lot 838 of Parcel 1) (Contains other land), 41-17-13-455-050 (Parcel 1 except Lot 838), 41-17-24-178-007 (Parcel 4)

Land Situated in the City of Wyoming in the County of Kent in the State of Michigan.

Parcel 1:

Lots 833, 844, 883 and 894 except the Northerly 9 feet thereof, also except the East 7 feet of Lot 833, Home Acres No. 2, City of Wyoming, Kent County, Michigan, as recorded in Liber 30 of Plats, Page 13;

Also, Lots 834 and 835 EXCEPT the East 7 feet thereof and all of Lots 842, 843, 884, 885, 892, 893 and 922, Home Acres No. 2, City of Wyoming, Kent County, Michigan, as recorded in Liber 30 of Plats, Page 13;

Also, Lot 838, Home Acres No. 2, EXCEPT that part lying South of a line described as: Commencing at the South 1/4 corner of Section 13, T6N, R12W, City of Wyoming, Kent County, Michigan; thence S 88 degrees 04 minutes 34 seconds East 1013.0 feet along the South line of said Section to a point of intersection with the West line of Lot 841 Home Acres No. 2, extended Southerly to said Section line; thence N 0 degrees 45 minutes 26 seconds West 50.05 feet to a point that is 50.00 feet North (perpendicular measurement) from the South line of said Section 13 and the True Place of Beginning of said line; thence S 88 degrees 04 minutes 34 seconds East 272.99 feet parallel with the South line of said Section 13 to the present West right of way line of Buchanan Avenue (being 40.00 feet West perpendicular measurement from the center line of said Avenue), and the place of ending of said line.

Also, Lots 886, 887, 888, 889, 890, 891 and 923 Home Acres No. 2, EXCEPT that part lying South of a line described as: Commencing at the South 1/4 corner of Section 13, T6N, R12W, City of Wyoming, Kent County, Michigan; thence S 88 degrees 04 minutes 34 seconds East 100.65 feet along the South line of said Section to a point of intersection with the West line of said Lot 923 extended Southerly to said Section line; thence N 0 degrees 38 minutes 26 seconds West 50.05 feet to a point 50.00 feet North perpendicular measurement) from the South line of said Section 13, and the True Place of Beginning of said line; thence S 88 degrees 04 minutes 34 seconds East 852.18 feet parallel with the South line of said Section to the East line of said Lot 886 and the place of ending of said Line.

Also, that part of Hillcroft Avenue in Home Acres No. 2, described as follows: Commencing at the Southeast corner of Lot 923 of said plat; thence East 60 feet to the Southwest corner of Lot 891 of said plat; thence North feet to a point on the East line of Lot 922 of said plat at a point 249 feet North of the place of beginning; thence South 249 feet to the place of beginning.

And Also, that part of Birchwood Avenue in Home Acres No. 2, described as follows: Commencing at the Southeast corner of Lot 885 of said plat; thence East 60 feet to the Southwest corner of Lot 842 of said plat; thence North feet to the East line of Lot 883 of said plat at a point

122 feet North of the place of beginning; thence South 122 feet to the place of beginning.

Parcel 2:

Lot 841, Home Acres No. 2, Section 13, City of Wyoming, Kent County, Michigan, as recorded in Liber 30 of Plats, Page 13 together with the East 1/2 of vacated Birchwood Avenue adjacent thereto on the West. EXCEPT therefrom that part lying South of a line described as: Commencing at the South 1/4 corner of Section 13, T6N, R12W, City of Wyoming, Kent County, Michigan; thence S 88 degrees 04 minutes 34 seconds East 983 feet along the South line of said Section 13; thence N 0 degrees 45 minutes 26 seconds West 50.05 feet to a point 50.00 feet North (perpendicular measurement) from the South line of said Section 13 and the True Place of Beginning of said Line; thence 5 88 degrees 04 minutes 34 seconds East 76.66 feet parallel with the South line of said Section 13 to the East line of said Lot 841 and the place of ending of said line.

Parcel 3:

That part of McQueen-Doyle Park No. 1, Wyoming Township, Kent County, Michigan, (now situated in the City of Wyoming), as recorded in Liber 30 of Plats, Page 10, described as: Commencing at a point on the North line of said plat 82.64 feet S 87 degrees 49 minutes 30 seconds East from the Northwest corner of said plant thence 5 87 degrees 49 minutes 30 seconds East 150.0 feet along the North line of said plat, to the East line of Lot 152 of said plat extended North; thence South 0 degrees 02 minutes 30 seconds East 165.15 feet along the East line of said Lot 152 to the Southeast corner of said Lot; thence N 87 degrees 49 minutes 30 seconds West 50 feet along the South line of Lot 152 to the Southwest corner of said Lot; thence S 0 degrees 02 minutes 30 seconds East 30.0 feet along the East line of Lot 146 of said plat; thence S 26 degrees 27 minutes 40 seconds West 111.96 feet to the Southwest corner of said Lot 146; thence S 0 degrees 02 minutes 30 seconds East 16.51 feet to the center line of Floyd Street (33 feet wide); thence N 87 degrees 49 minutes 30 seconds West 132.0 feet to the West line of McQueen-Doyle Park No. 1; thence N 0 degrees 09 minutes 30 seconds West 148.63 feet along the West line of said plat; thence 5 87 degrees 49 minutes 30 seconds East 82.29 feet along the North line of Lot 148 of said plat and its Westerly extension to the Northeast corner of said Lot 148; thence N 0 degrees 02 minutes 30 seconds West 165.15 feet along the West line of Lot 150 and its Northerly extension to the place of beginning.

Also, Lot 149 of McQueen-Doyle Park No. 1 and that part of Lots 145, 153, 154 and 155 of McQueen-Doyle Park No. 1 which lies Westerly of a line which is 33 feet West of the centerline of relocated Stafford Avenue as constructed and that part of Lot 146 McQueen-Doyle Park No. 1 lying Westerly of a line which is 33 feet West of the centerline of relocated Stafford Avenue as constructed and which lies Easterly of a line described as follows: Commencing at the Southwest corner of said Lot 146; thence Northeasterly to the East line of said Lot at a point 30 feet South of the Northeast corner of said Lot.

Also, that part of vacated 40th Street lying West of relocated 40th Street and Stafford Avenue.

Also, the West 1/2 of the Northeast 1/4 of Section 24, T6N, R12W, City of Wyoming, Kent County, Michigan, EXCEPT the Conrail Railroad right of way, also excepting a strip of land 40 feet in the width lying West of and adjoining to the centerline of Buchanan Avenue for highway purposes.

Also, Except that part of the West 1/2 of the Northeast 1/4 of Section 24, T6N, R12W, City of

Wyoming, Kent County, Michigan, described as: Commencing at the point of intersection of the South line of said West 1/2 of the Northeast 1/4 with the West line of Buchanan Avenue (being 40 feet distant Westerly from the centerline of Buchanan Avenue) said point being 75.28 feet N 87 degrees 49 minutes 30 seconds West from the Southeast corner of said West 1/2 of the Northeast 1/4; thence N 87 degrees 49 minutes 30 seconds West 828.27 feet along the South line of said West 1/2, of the Northeast 1/4; thence N 47 degrees 10 minutes 30 seconds E 46.67 feet to a point 33 feet distant North from the South line of the West 1/2 of the Northeast 1/4; thence S 87 degrees 49 minutes 30 seconds E 695.3 feet; thence Northeasterly 125.8 feet along a 101.8 foot radius curve to the left (the chord of which bears 117.95 feet N 56 degrees 46 minutes 24 seconds East) to said West line of Buchanan Avenue; thence South 101.4 feet along the West line of Buchanan Avenue to the place of beginning.

Also, Except that part of the West 1/2 Northeast 1/4 of Section 24, T6N, R12W, City of Wyoming, Kent County, Michigan, described as: Commencing at the Northeast corner of the West 1/2 Northeast 1/4 of said Section; thence South 33.03 feet along the East line of said West 1/2 Northeast 1/4; thence N 87 degrees 22 minutes West 40.04 feet parallel with the North line of said Section to the Place of Beginning of this description; thence N 87 degrees 22 minutes West 10.0 feet along the South line of 36th Street thence S 43 degrees 41 minutes East 14.46 feet to a point on the West line of Buchanan Avenue which is 10.0 feet South from the Place of Beginning; thence North 10.0 feet to the Place of Beginning.

And further Excepting, all that part of the West 1/2 of the Northeast 1/4 of Section 24, T6N, R12W, City of Wyoming, Kent County, Michigan, described as: Commencing at the North 1/4 corner of said Section 24; thence S 88 degrees 04 minutes 34 seconds East 36.85 feet along the North line of said Section to a point of intersection with the East line of the CONRAIL (formerly Pennsylvania R.R. and Penn Central R. R.) right-of-way extended Northerly to said Section line; thence S 0 degrees 32 minutes 11 seconds West 33.03 feet along said Northerly extended railroad right-of-way line to a point which is 33.00 feet South (perpendicular measurement) from the North line of said Section for The Place of Beginning of this description: Thence S 88 degrees 04 minutes 34 seconds East 1239.0 feet parallel with the North line of said Section to a point which is 50.04 feet N 88 degrees 04 minutes 34 seconds West (formerly described as N 87 degrees 22 minutes West) from the East line of the West 1/2 Northeast 1/4 of said Section 24; thence S 44 degrees 23 minutes 58 seconds East 14.47 feet (formerly described as S 43 degrees 41 minutes East 14.46 feet) to the Westerly right-of-way line of Buchanan Avenue (being 40.00 feet perpendicular measurement West from the center line of said Avenue) at a point which is 43.00 feet South perpendicular measurement from the North line of said Section 24; thence S 0 degrees 43 minutes 22 seconds East 37.02 feet along said Westerly right-of-way line of Buchanan Avenue, N 44 degrees 23 minutes 58 seconds West 43.39 feet to a point which is 50.00 feet South (perpendicular measurement) from the North line of said Section 24; thence N 88 degrees 04 minutes 34 seconds West 1219.05 feet parallel with the North line of said Section to the East line of CONRAIL railroad right-of-way; thence N 0 degrees 32 minutes 11 seconds East 17.02 feet along said railroad right-of-way line to the Place of Beginning.

Also together with that part of vacated Buchanan Avenue described as, that part of the West 1/2, Northeast 1/4, Section 24, T6N, R12W, City of Wyoming, Kent County, Michigan, described as: Commencing at the NE corner of said Section 24; thence N 88 degrees 04 minutes 34 seconds West 1323 feet along the North line of said Section 24 to the center line of Buchanan Avenue (South) and also being the so called Northeast corner of said West 1/2, Northeast 1/4; thence S 0 degrees 43 minutes 22 seconds East 512.88 feet along said

MLC # 1198 – Stamping – Grand Rapids

center line of Buchanan Avenue; thence Southerly 599.97 feet along said center line on a 22,727.58 foot radius curve to the left, the long chord of which bears S 0 degrees 02 minutes 00 seconds West 599.95 feet; thence S 0 degrees 47 minutes 23 seconds West 328.37 feet along said center line; thence N 89 degrees 12 minutes 37 seconds West 40 feet to the West right of way line of Buchanan Avenue to the Place of Beginning of this description; thence S 0 degrees 47 minutes 23 seconds West 272.03 feet along the West right of way line of said Avenue; thence Southerly 206.78 feet along said West right of way line on a 29,932.44 foot radius curve to the left, the long chord of which bears S 0 degrees 35 minutes 31 seconds West 206.78 feet; thence S 89 degrees 58 minutes 46 seconds East 5.71 feet; thence N 0 degrees 01 minutes 14 seconds East 478.78 feet to the Place of Beginning.

Parcel 4:

That part of the East 1/2 of the East 1/2 of the Northwest 1/4 of Section 24, T6N, R12W, City of Wyoming, Kent County, Michigan, described as: Commencing at the North 1/4 corner of said section; thence South 88° 04 West 163.4 feet along the North line of said section to the Westerly line of the Consumers Power Company right-of-way; thence South 4° 32' 40" East 990.0 feet along said Westerly right-of-way line to the Point of Beginning; thence South 4° 32' 40" East along said right-of-way line 1097.25 feet; thence South 88° 04' West 465.75 feet parallel with the North line of said section to the East line of Clay Avenue; thence North 4° 26' West 225.74 feet along the East line of Clay Avenue; thence Northeasterly 443.47 feet on a 533.66 foot radius curve to the right, the long chord of which bears North 19° 22' 23" East 430.82 feet; thence North 43° 10' 45" East 134.26 feet; thence Northeasterly 421.36 feet on a 595.22 foot radius curve to the left, the long chord of which bears North 22° 53' 58" East 412.62 feet to the intersection of the East line of Clay Avenue and a line which is 990.0 feet South of the North line of said section; thence East 0.66 feet parallel to the North line of said section to the Point of Beginning. Excepting therefrom 0.0832 acres conveyed by Deed recorded in Instrument No. 20100520-0045269.

Client Reference: 300 36th Street , Wyoming, MI 49501

## EXHIBIT "B"

### FORM OF QUITCLAIM DEED

### QUITCLAIM DEED

STATE OF _____        §
                          §    KNOW ALL BY THESE PRESENTS
COUNTY OF _____       §

       THAT _____, a _____
("Grantor"), for and in consideration of the sum of TEN DOLLARS and No/100 ($10.00) and
other good and valuable consideration paid by _____, a
_____ ("Grantee"), the receipt of which is hereby acknowledged, and pursuant
to the Order of the United States Bankruptcy Court for the Southern District of New York
entered on _____, 20__ in Case No. 09-50026 (REG) styled *In re: Motors Liquidation
Company, f/k/a General Motors Corporation, et al.*, has QUITCLAIMED and by these presents
does QUITCLAIM unto Grantee, all of Grantor's rights, title and interests in and to (a) those
certain tract(s) of land, as more particularly described in Exhibit B attached hereto and
incorporated herein by this reference for all purposes (b) strips and gores between such tract(s) of
land and any abutting properties whether owned or claimed by deed, limitations or otherwise,
and whether or not held under fence by Grantor, (c) any land lying in or under the bed of any
creek, stream or waterway or any highway, avenue, street, road, alley, easement or right-of-way,
open or proposed, in, on, across, abutting or adjacent to such tract(s) of land, (d) improvements,
buildings or fixtures located on such tract(s) of land, (e) mineral, water, oil, gas, solar and wind
rights relating to all or any part of such tract(s) of land, together with all of Grantor's rights,
claims, titles and interests in and to any and all appurtenances, rights, easements, ands rights-of-
way, filings or other interests, including without limitation rents and profits accruing after the
effective date hereof, related to or benefiting such tract(s) of land (collectively, the "Properties").

       TO HAVE AND TO HOLD all of Grantor's rights, titles and interests in and to
the Properties unto Grantee, its successors and assigns forever, so that neither Grantor nor its
successors and assigns shall have, claim or demand any right or title to the Properties or any part
thereof.

WHEN RECORDED RETURN TO:

_____
_____
_____
_____

[Signature on following page]

1

EXECUTED effective as of the _____ day of _____, 20___.

GRANTOR: _____

By:_____
    Name:
    Title:

By:_____
    Name:
    Title:

STATE OF _____ §
                §
COUNTY OF _____ §

    This instrument was acknowledged before me on ___, 20__, by _____, the _____ of _____, a _____, the _____ of _____, a _____, on behalf of said _____.


_____
NOTARY PUBLIC


STATE OF _____ §
                §
COUNTY OF _____ §

    This instrument was acknowledged before me on ___, 20__, by _____, the _____ of _____, a _____, the _____ of _____, a _____, on behalf of said _____.


_____
NOTARY PUBLIC


2

## Exhibit C
### Transferred Contracts

| | Counterparty Name | Contract Description | Contract Start Date | Counterparty Address |
|---|---|---|---|---|
| 1. | American Workplace Trucking Centers, Inc. | Easement/ Access/ License Agreement<br><br>Hamilton & Industrial SE Vacant<br>Flint, Michigan | 12/15/2006 | Attn: William Morrow, President<br>5910 Kings Pointe Dr.<br>Rochester, MI 48306-2246 |
| 2. | AYSO Region 766 | Easement/ Access/ License Agreement<br><br>28 Acres - Linden Road<br>Flint, Michigan | 1/1/2000 | Attn: Legal Officer/Bankruptcy Department<br>5270 Wyndemere Common Square<br>Swartz Creek, MI 48473 |
| 3. | Bitzer Scroll, Inc. | Landlord Lease<br><br>One General Motors Circle<br>Syracuse, New York | 2/1/2008 | Attn: Corporate Officer/ Authorized Agent<br>6731 Collamer Road<br>East Syracuse, NY 13057 |
| 4. | Bogus Swamp Drainage District | Easement/ Access/ License Agreement<br><br>2800 West Saginaw Street<br>Lansing, Michigan | 5/11/1979 | Attn: Legal Officer/Bankruptcy Department<br>407 North Cedar Street<br>Mason, MI 48854-1012 |
| 5. | Camp Dresser & McKee Inc. | Brokerage<br><br>Syracuse, New York | 3/5/2002 | Salina Industrial Power Park<br>Attn: Legal Officer/Bankruptcy Department<br>One General Motors Drive, Suite 2<br>Syracuse, NY 13206 |
| 6. | Capital Area Transportation Authority | Easement/ Access/ License Agreement<br><br>2800 West Saginaw Street<br>Lansing, Michigan | 7/25/2007 | St. Vincent Catholic Charities<br>Attn: Legal Officer/Bankruptcy Department<br>2800 W. Willow St.<br>Lansing, MI 48917-1833 |
| 7. | Carrier Creek Drain Drainage District #326 | Easement/ Access/ License Agreement<br><br>Central Circle Drive<br>(a/k/a 2901 S. Canal Rd.)<br>Eaton, Michigan | | Carrier Creek Drain Drainage District #326<br>1045 Independence Blvd.<br>Attn: Brady Harrington<br>Charlotte, MI 48813 |

| | Counterparty Name | Contract Description | Contract Start Date | Counterparty Address |
|---|---|---|---|---|
| 8. | Carrier Creek Drain Drainage District #326 | Easement/ Access/ License Agreement<br><br>Central Circle Drive<br>(a/k/a 2901 S. Canal Rd.)<br>Eaton, Michigan | : | Carrier Creek Drain Drainage District #326<br>1045 Independence Blvd.<br>Attn: Brady Harrington<br>Charlotte, MI 48813 |
| 9. | Centerpoint Associates Limited Partnership | Landlord Lease<br><br>Parts of Centerpoint Area<br>Pontiac, Michigan | 6/18/1996 | Attn: Corporate Officer/ Authorized Agent<br>29100 Northwestern Highway<br>Suite 200<br>Southfield, MI 48034 |
| 10. | Charter Township of Lansing, West Side Water Supply | Easement/ Access/ License and Amendment/ Continuation<br><br>2801 West Saginaw Street<br>Lansing, Michigan | 6/19/1986 | Charter Township Of Lansing West Side Water Supply<br>Attn: Legal Officer/Bankruptcy Department<br>3209 W Michigan Ave.<br>Lansing, MI 48917-2921 |
| 11. | City of Flint | Easement/ Access/ License and Amendment/ Continuation<br><br>902 East Hamilton Avenue<br>Flint, Michigan | 12/4/1967 | City Of Flint<br>Attn: Legal Officer/Bankruptcy Department<br>902 E. Hamilton Ave.<br>Flint, MI 48550-0001 |
| 12. | City of Flint | Easement/ Access/ License Agreement<br><br>902 East Hamilton Avenue<br>Flint, Michigan | 4/20/1960 | City Of Flint<br>Attn: Legal Officer/Bankruptcy Department<br>902 E. Hamilton Ave<br>Flint, MI 48550-0001 |

2

| | Counterparty Name | Contract Description | Contract Start Date | Counterparty Address |
|---|---|---|---|---|
| 13. | City of Pontiac | Easement/ Access/ License and Amendment/ Continuation<br><br>Parts of Centerpoint Area Pontiac, Michigan | 6/1/1995 | City Of Pontiac Department Of Public Services Attn: Roderyck B. Blake 47450 Woodward Ave. Pontiac, MI 48342-5009 |
| 14. | City of Pontiac | Easement/ Access/ License Agreement<br><br>Parts of Centerpoint Area Pontiac, Michigan | 6/1/1995 | City Of Pontiac Department Of Public Services Attn: Roderyck B. Blake 47450 Woodward Ave. Pontiac, MI 48342-5009 |
| 15. | City of Pontiac | Easement/ Access/ License and Amendment/ Continuation<br><br>Parts of Centerpoint Area Pontiac, Michigan | 6/1/1995 | City Of Pontiac Attn: Thomas E. Hunter, Deputy City Attorney 47450 Woodward Ave Pontiac, MI 48342-5009 |
| 16. | City of Pontiac | Easement/ Access/ License and Amendment/ Continuation<br><br>2100 South Opdyke Road Pontiac, Michigan | 9/14/1995 | City of Pontiac Attn: Legal Officer/Bankruptcy Department 450 Wide Track Drive, East Pontiac, MI 48058 |
| 17. | City of Pontiac | Easement/ Access/ License Agreement<br><br>Roadways@ Centerpoint Business Pontiac, Michigan | 1/19/1994 | City of Pontiac Attn: Legal Officer/Bankruptcy Department 55 Wessen Street Pontiac, MI 48341 |

3

| | Counterparty Name | Contract Description | Contract Start Date | Counterparty Address |
|---|---|---|---|---|
| 18. | Clark Street Redevelopment Five, LLC | Partnership Agreement<br><br>Former Cadillac Site<br>Detroit, Michigan | 6/1/1998 | Smith Group Development, Inc.<br>Attn: Corporate Officer/Authorized Agent<br>150 W Jefferson Ave., Ste. 100<br>Detroit, MI 48226-4452 |
| 19. | Clark Street Redevelopment Four, LLC | Partnership Agreement<br><br>Former Cadillac Site<br>Detroit, Michigan | 8/1/1998 | Smith Group Development, Inc.<br>Attn: Corporate Officer/Authorized Agent<br>150 W Jefferson Ave., Ste. 100<br>Detroit, MI 48226-4452 |
| 20. | Clark Street Redevelopment One, LLC | Partnership Agreement<br><br>Former Cadillac Site<br>Detroit, Michigan | 6/1/1998 | Smith Group Development, Inc.<br>Attn: Corporate Officer/Authorized Agent<br>150 W Jefferson Ave., Ste. 100<br>Detroit, MI 48226-4452 |
| 21. | Clark Street Redevelopment Three, LLC | Partnership Agreement<br><br>Former Cadillac Site<br>Detroit, Michigan | 10/1/1998 | Smith Group Development, Inc.<br>Attn: Corporate Officer/Authorized Agent<br>150 W Jefferson Ave., Ste. 100<br>Detroit, MI 48226-4452 |
| 22. | Clark Street Redevelopment, LLC | Partnership Agreement<br><br>Former Cadillac Site<br>Detroit, Michigan | 1/1/1998 | Smith Group Development, Inc.<br>Attn: Corporate Officer/Authorized Agent<br>150 W Jefferson Ave., Ste. 100<br>Detroit, MI 48226-4452 |
| 23. | Consolidated Rail Corporation | Easement/ Access/ License Agreement<br><br>2800 West Saginaw Street<br>Lansing, Michigan | 11/1/1951 | Consolidated Rail Corporation<br>Attn: Corporate Officer/Authorized Agent<br>2801 West Saginaw Street<br>Lansing, MI 48912 |

4

| | Counterparty Name | Contract Description | Contract Start Date | Counterparty Address |
|---|---|---|---|---|
| 24. | Consolidated Rail Corporation | Easement/ Access/ License Agreement<br><br>2801 West Saginaw Street<br>Lansing, Michigan | 8/1/1953 | Consolidated Rail Corporation<br>Attn: Corporate Officer/Authorized<br>Agent<br>2801 West Saginaw Street<br>Lansing, MI 48912 |
| 25. | Consumers Power Company | Easement/ Access/ License Agreement<br><br>902 East Hamilton Avenue<br>Flint, Michigan | 5/12/1952 | Consumers Power Company<br>Attn: Corporate Officer/Authorized<br>Agent<br>212 W Michigan Ave.<br>Jackson, MI 49201-2236 |
| 26. | Consumers Power Company | Easement/ Access/ License and Amendment/ Continuation<br><br>902 East Hamilton Avenue<br>Flint, Michigan | 5/9/1957 | Consumers Power Company<br>Attn: Corporate Officer/Authorized<br>Agent<br>212 W Michigan Ave.<br>Jackson, MI 49201-2236 |
| 27. | Consumers Power Company | Easement/ Access/ License Agreement<br><br>902 East Hamilton Avenue<br>Flint, Michigan | 5/9/1957 | Consumers Power Company<br>Attn: Corporate Officer/Authorized<br>Agent<br>212 W Michigan Ave.<br>Jackson, MI 49201-2236 |
| 28. | Consumers Power Company | Easement/ Access/ License and Amendment/ Continuation<br><br>902 East Hamilton Avenue<br>Flint, Michigan | 7/1/1966 | Consumers Power Company<br>Attn: Corporate Officer/Authorized<br>Agent<br>212 W Michigan Ave.<br>Jackson, MI 49201-2236 |

5

| | Counterparty Name | Contract Description | Contract Start Date | Counterparty Address |
|---|---|---|---|---|
| 29. | Consumers Power Company | Easement/ Access/ License Agreement<br><br>300 36th Street Southwest<br>Grand Rapids, Michigan | 11/20/1987 | Consumers Power Company<br>Attn: Corporate Officer/Authorized Agent<br>212 W Michigan Ave.<br>Jackson, MI 49201-2236 |
| 30. | Consumers Power Company | Easement/ Access/ License Agreement<br><br>200 South Boulevard West<br>Pontiac, Michigan. | 2/3/1977 | Consumers Power Company<br>Attn: Corporate Officer/Authorized Agent<br>212 W Michigan Ave.<br>Jackson, MI 49201-2236 |
| 31. | Consumers Power Company | Easement/ Access/ License Agreement<br><br>902 East Hamilton Avenue<br>Flint, Michigan | 8/8/1980 | General Motors Corporation<br>Attn: Director Of Retail Real Estate<br>3044 W Grand Blvd.<br>Detroit, MI 48202-3009 |
| 32. | Consumers Power Company | Easement/ Access/ License Agreement<br><br>300 36th Street Southwest<br>Grand Rapids, Michigan | 10/26/1970 | Consumers Power Company<br>Attn: Corporate Officer/Authorized Agent<br>212 W Michigan Ave.<br>Jackson, MI 49201-2236 |
| 33. | Consumers Power Company | Easement/ Access/ License Agreement<br><br>300 36th Street Southwest<br>Grand Rapids, Michigan | 9/22/1972 | Consumers Power Company<br>Attn: Corporate Officer/Authorized Agent<br>212 W Michigan Ave.<br>Jackson, MI 49201-2236 |
| 34. | Consumers Power Company | Easement/ Access/ License and Amendment/ Continuation<br><br>902 East Hamilton Avenue<br>Flint, Michigan | 11/1/1967 | Consumers Power Company<br>Attn: Corporate Officer/Authorized Agent<br>212 W Michigan Ave.<br>Jackson, MI 49201-2236 |

6

| | Counterparty Name | Contract Description | Contract Start Date | Counterparty Address |
|---|---|---|---|---|
| 35. | Consumers Power Company | Easement/ Access/ License Agreement<br><br>902 East Hamilton Avenue<br>Flint, Michigan | 11/1/1967 | Consumers Power Company<br>Attn: Corporate Officer/Authorized Agent<br>212 W Michigan Ave.<br>Jackson, MI 49201-2236 |
| 36. | Consumers Power Company | Maintenance Agreement<br><br>902 East Hamilton Avenue<br>Flint, Michigan | 11/1/1967 | Consumers Power Company<br>Attn: Corporate Officer/Authorized Agent<br>212 W Michigan Ave.<br>Jackson, MI 49201-2236 |
| 37. | Consumers Power Company | Easement/ Access/ License Agreement<br><br>200 South Boulevard West<br>Pontiac, Michigan | 2/3/1977 | General Motors Corporation<br>Attn: Corporate Officer/Authorized Agent<br>3044 W Grand Blvd.<br>Detroit, MI 48202-3009 |
| 38. | Consumers Power Company | Easement/ Access/ License Agreement<br><br>300 36th Street Southwest<br>Grand Rapids, Michigan | 8/31/1978 | General Motors Corporation<br>Attn: Corporate Officer/Authorized Agent<br>485 W. Milwaukee St.<br>9th Floor, Argonaut "A" Building<br>Detroit, MI 48202-3220 |
| 39. | Consumers Power Company | Easement/ Access/ License Agreement<br><br>300 36th Street Southwest<br>Grand Rapids, Michigan | 8/31/1987 | Harold W. Nestle<br>300 36th St. SW<br>MC 495-300-00<br>Grand Rapids, MI 49548-2107 |
| 40. | Consumers Power Company | Easement/ Access/ License Agreement<br><br>300 36th Street Southwest<br>Grand Rapids, Michigan | 10/1/1987 | Harold W. Nestle<br>300 36th St. SW<br>MC 495-300-00<br>Grand Rapids, MI 49548-2107 |

7

US_ACTIVE:\43640472\01\72240.0639

| | Counterparty Name | Contract Description | Contract Start Date | Counterparty Address |
|---|---|---|---|---|
| 41. | Consumers Power Company | Easement/ Access/ License Agreement<br><br>300 36th Street Southwest<br>Grand Rapids, Michigan | 9/1/1988 | Harold W. Nestle<br>300 36th St. SW<br>MC 495-300-00<br>Grand Rapids, MI 49548-2107 |
| 42. | County of Genesee, Michigan | Easement/ Access/ License Agreement<br><br>1245 Coldwater Road<br>Flint, Michigan | 10/3/2005 | County Of Genesee, Michigan<br>Attn: Legal Officer/Bankruptcy Department<br>G-4610 Beecher Road<br>Flint, MI 48532 |
| 43. | County of Genesee, Michigan | Easement/ Access/ License Agreement<br><br>1245 Coldwater Road<br>Flint, Michigan | 10/3/2005 | County Of Genesee, Michigan<br>Attn: Legal Officer/Bankruptcy Department<br>G-4610 Beecher Road<br>Flint, MI 48532 |
| 44. | CSX Transportation, Inc. | Easement/ Access/ License Agreement<br><br>Route 37 East<br>Massena, New York | 2/15/2002 | CSX Transportation, Inc.<br>Karen E. Mohler<br>500 Water Street<br>Jacksonville, FL 32202 |
| 45. | CSX Transportation, Inc. | Easement/ Access/ License Agreement<br><br>One General Motors Circle<br>Syracuse, New York | 1/21/2004 | CSX Transportation, Inc.<br>Attn: Karen E. Mohler<br>500 Water St<br>Jacksonville, FL 32202-4423 |
| 46. | CSX Transportation, Inc. | Easement/ Access/ License Agreement<br><br>One General Motors Circle<br>Syracuse, New York | 1/21/2004 | Roth Global Plastics, Inc.<br>John C. Pezzi<br>1 General Motors Drive<br>Syracuse, NY 13206 |
| 47. | Detroit Edison Company | Easement/ Access/ License Agreement<br><br>Former Cadillac Site<br>Detroit, Michigan | 11/18/2004 | Attn: Corporate Officer/Authorized Agent<br>2000 Second Avenue<br>Detroit, MI 48226 |

8

US_ACTIVE:\43640472\01\72240.0639

| | Counterparty Name | Contract Description | Contract Start Date | Counterparty Address |
|---|---|---|---|---|
| 48. | Detroit Edison Company | Easement/ Access/ License Agreement <br><br> Parts of Centerpoint Area <br> Pontiac, Michigan | 3/4/1986 | Michigan Bell Telephone Company <br> Attn: Corporate Officer/Authorized Agent <br> 1565 Cass Avenue <br> Detroit, MI 48226 |
| 49. | Erie-Lackawanna Railroad Company | Easement/ Access/ License and Amendment/ Continuation <br><br> 2525 W. Fourth Street <br> Mansfield, Ohio | 12/31/1956 | Erie-Lackawanna Railroad Company <br> Attn: Corporate Officer/Authorized Agent <br> 5088 Tallow Point Road <br> Tallahassee, FL 32309 |
| 50. | Erie-Lackawanna Railroad Company | Easement/ Access/ License Agreement <br><br> 2525 W. Fourth Street <br> Mansfield, Ohio | 12/31/1956 | Erie-Lackawanna Railroad Company <br> Attn: Corporate Officer/Authorized Agent <br> 5088 Tallow Point Road <br> Tallahassee, FL 32309 |
| 51. | Etkin Equities, Inc. | Easement/ Access/ License Agreement <br><br> Roadways@ Centerpoint Business <br> Pontiac, Michigan | 1/19/1994 | Attn: Corporate Officer/Authorized Agent <br> 450 Wide Track Drive, East <br> Pontiac, MI 48058 <br> -and- <br> Attn: Corporate Officer/Authorized Agent <br> 55 Wessen Street <br> Pontiac, MI 48341 |
| 52. | Fralo Plastech Manufacturing, LLC | Landlord Lease and Amendment/ Continuation <br><br> One General Motors Circle <br> Syracuse, New York | 12/9/2002 | Attn: Corporate Officer/Authorized Agent <br> One General Motors Drive, Syracuse, NY 13206 |

9

US_ACTIVE:\43640472\01\72240.0639

| | Counterparty Name | Contract Description | Contract Start Date | Counterparty Address |
|---|---|---|---|---|
| 53. | Grand Trunk Railroad | Easement/ Access/ License Agreement<br><br>200 South Boulevard West<br>Pontiac, Michigan | 7/20/1977 | General Motors Corporation<br>Attn: Corporate Officer/Authorized Agent<br>3044 W Grand Blvd.<br>Detroit, MI 48202-3009 |
| 54. | Grand Trunk Western Railway Company | Easement/ Access/ License Agreement<br><br>200 South Boulevard West<br>Pontiac, Michigan | 7/20/1977 | Grand Trunk Western Railway Company<br>Attn: Corporate Officer/Authorized Agent<br>131 W Lafayette Blvd.<br>Detroit, MI 48226-2600 |
| 55. | Grand Trunk Western Railroad Company | Landlord Lease<br><br>200 South Boulevard West<br>Pontiac, Michigan | 8/20/1970 | Grand Trunk Western Railroad Company<br>Attn: Corporate Officer/Authorized Agent<br>131 W Lafayette Blvd.<br>Detroit, MI 48226-2600 |
| 56. | Grand Trunk Western Railroad Company | Easement/ Access/ License and Amendment/Continuation<br><br>2100 South Opdyke Road<br>Pontiac, Michigan | 10/23/1972 | Grand Trunk Western Railroad Company<br>Attn: Corporate Officer/Authorized Agent<br>131 W Lafayette Blvd.<br>Detroit, MI 48226-2600 |
| 57. | Grand Trunk Western Railroad Company | Easement/ Access/ License and Amendment/Continuation<br><br>200 South Boulevard West<br>Pontiac, Michigan | 8/20/1970 | Grand Trunk Western Railroad Company<br>Attn: Corporate Officer/Authorized Agent<br>131 W Lafayette Blvd.<br>Detroit, MI 48226-2600 |

10

| | Counterparty Name | Contract Description | Contract Start Date | Counterparty Address |
|---|---|---|---|---|
| 58. | Hyatt Hills Golf Course Commission | Operating Agreement<br><br>1300 Raritan Road<br>Clark, New Jersey | 8/20/2002 | 1300 Raritan Road<br>Attn: Corporate Officer/Authorized Agent<br>P.O. Box 5663<br>Clark, NJ 07066<br>-and-<br>Rogut Mccarthy PC<br>Attn: Legal Officer/Bankruptcy Department<br>37 Alden Street<br>Cranford, NJ 07016 |
| 59. | Kansas City Power & light Company | Easement/ Access/ License and Amendment/Continuation<br><br>6817 Stadium Drive<br>Kansas City, Missouri | 6/7/1963 | Kansas City Power & Light Company<br>Attn: Corporate Officer/Authorized Agent<br>P.O. Box 418679<br>Kansas City, MO 64141 |
| 60. | Klein Steel Service Inc. | Landlord Lease<br><br>One General Motors Circle<br>Syracuse, New York | 1/2/2009 | Salina Industrial Powerpark<br>Attn: Corporate Officer/Authorized Agent<br>1 General Motors Drive<br>Syracuse, NY 13206 |
| 61. | Lansing Board of Water and Light | Easement/ Access/ License Agreement<br><br>2800 West Saginaw Street<br>Lansing, Michigan | 11/4/1996 | Lansing Board Of Water And Light<br>Attn: Legal Officer/Bankruptcy Department<br>123 West Ottawa Street<br>P.O. Box 13007<br>Lansing, MI 48901-3007 |
| 62. | Lear K. Simpson and Constance Eileen Simpson | Easement/ Access/ License Agreement<br><br>1451 Lebanon School Road<br>W. Mifflin, Pennsylvania | 7/5/1955 | Lear K. Simpson and Constance Eileen Simpson<br>578 Euclid Ave.<br>Dravosburg, PA 15034 |

11

US_ACTIVE\43640472\01\72240.0639

| | Counterparty Name | Contract Description | Contract Start Date | Counterparty Address |
|---|---|---|---|---|
| 63. | Leeds Industrial Park, Inc. | Landlord Lease<br><br>6817 Stadium Drive<br>Kansas City, Missouri | 11/13/2006 | Attn: Corporate Officer/Authorized Agent<br>6817 Stadium Drive, #2<br>Kansas City, MO 64129 |
| 64. | New Castle County, State of Delaware | Easement/ Access/ License Agreement<br><br>801 Boxwood Road<br>Wilmington, Delaware | 8/3/1970 | NCC Government Center<br>Attn: Corporate Officer/Authorized Agent<br>87 Read's Way<br>New Castle, DE 19720 |
| 65. | New Castle County, State of Delaware | Easement/ Access/ License Agreement<br><br>801 Boxwood Road<br>Wilmington, Delaware | 8/3/1970 | NCC Government Center<br>Attn: Corporate Officer/Authorized Agent<br>87 Read's Way<br>New Castle, DE 19720 |
| 66. | New Par d/b/a Verizon Wireless | Easement/ Access/ License Agreement<br><br>660 East South Boulevard<br>Pontiac, Michigan | 2/23/2005 | Attn: Corporate Officer/Authorized Agent<br>180 Washington Valley Road<br>Bedminster, NJ 07921 |
| 67. | New York Power Authority | Maintenance Agreement<br><br>Massena, New York | 11/30/1992 | New York Power Authority<br>Attn: Legal Officer/Bankruptcy Department<br>PO Box 2245<br>Syracuse, NY 13220-2245 |
| 68. | New York Power Authority | Operating Agreement<br><br>Massena, New York | 6/23/1992 | New York Power Authority<br>Attn: Legal Officer/Bankruptcy Department<br>PO Box 2245<br>Syracuse, NY 13220-2245 |

12

| | Counterparty Name | Contract Description | Contract Start Date | Counterparty Address |
|---|---|---|---|---|
| 69. | Niagara Mohawk Power Corporation | Easement/ Access/ License Agreement<br><br>Townline Road<br>Syracuse, New York | 1/7/1997 | Niagara Mohawk Power Corporation<br>300 Erie Blvd W.<br>Attn: Supervisor<br>Syracuse, NY 13202-4201 |
| 70. | Niagara Mohawk Power Corporation | Easement/ Access/ License Agreement<br><br>Route 37 East<br>Massena, New York | 8/27/2007 | Niagara Mohawk Power Corporation<br>300 Erie Blvd W.<br>Attn: Supervisor<br>Syracuse, NY 13202-4201 |
| 71. | Niagara Mohawk Power Corporation | Easement/ Access/ License Agreement<br><br>Route 37 East<br>Massena, New York | 1/8/2007 | Niagara Mohawk Power Corporation<br>300 Erie Blvd W.<br>Attn: Supervisor<br>Syracuse, NY 13202-4201 |
| 72. | Niagara Mohawk Power Corporation | Easement/ Access/ License Agreement<br><br>Townline Road<br>Syracuse, New York | 1/7/1997 | Niagara Mohawk Power Corporation<br>300 Erie Blvd W.<br>Attn: Ron Kuhn<br>Syracuse, NY 13202-4201 |
| 73. | Norfolk Southern Corporation c/o Met Fab Division | Easement/ Access/ License Agreement<br><br>300 36th Street Southwest<br>Grand Rapids, Michigan | 5/8/1973 | Norfolk Southern Corporation<br>c/o Met Fab Division<br>Attn: Corporate Officer/Authorized Agent<br>300 36th. St. SW<br>Grand Rapids, MI 49548-2107 |
| 74. | Ohio Edison Company | Easement/ Access/ License and Amendment/ Continuation<br><br>2525 W. Fourth Street<br>Mansfield, Ohio | 11/15/1956 | Ohio Edison Company<br>47 N Main St.<br>Attn: Corporate Officer/Authorized Agent<br>Akron, OH 44308-1925 |

13

| | Counterparty Name | Contract Description | Contract Start Date | Counterparty Address |
|---|---|---|---|---|
| 75. | Ohio Edison Company | Easement/ Access/ License and Amendment/ Continuation 2525 W. Fourth Street Mansfield, Ohio | 9/17/1957 | Ohio Edison Company 47 N Main St. Attn: Corporate Officer/Authorized Agent Akron, OH 44308-1925 |
| 76. | Onondaga County Water Authority | Easement/ Access/ License and Amendment /Continuation One General Motors Drive Syracuse, New York | 4/23/1958 | Onondaga County Water Authority 1240 Wolf Street Attn: Legal Officer/Bankruptcy Department Salina, NY 13208 |
| 77. | Pyramid Brokerage, Inc. | Operating Agreement One General Motors Drive Syracuse, New York | 1/1/2000 | Pyramid Brokerage, Inc. Attn: John Clark 5786 Widewaters Pkwy P.O. Box 3 Syracuse, NY 13214 |
| 78. | Red Oak Holdings, Inc. | Easement/ Access/ License Agreement a/k/a 199 NE 12th Street Miami, Florida | 3/27/1997 | Red Oak Holdings, Inc. President 6101 SW 76th St South Miami, FL 33143-5021 |
| 79. | Remediation and Liability Management Company, Inc. | Easement/ Access/ License Agreement 12950 Eckles Road Livonia, Michigan | 8/21/2002 | The Detroit Edison Company Director 2000 2nd Ave Detroit, MI 48226-1203 |
| 80. | Remediation and Liability Management Company, Inc. | Easement/ Access/ License Agreement 28 Acres - Linden Road Flint, Michigan | 12/8/2005 | Attn: Corporate Officer/Authorized Agent 6249 Covered Wagon Trail Flint, MI 48532 |

14

US_ACTIVE\43640472\01\72240.0639

| | Counterparty Name | Contract Description | Contract Start Date | Counterparty Address |
|---|---|---|---|---|
| 81. | Remediation and Liability Management Company, Inc. c/o Worldwide Real Estate | Easement/ Access/ License Agreement<br><br>12950 Eckles Road Livonia, Michigan | 8/21/2002 | The Detroit Edison Company<br>Attn: Director<br>2000 2nd Ave<br>Detroit, MI 48226-1203 |
| 82. | Sinclair Pipe Line Company | Easement/ Access/ License and Amendment/ Continuation<br><br>2525 W. Fourth Street Mansfield, Ohio | 11/20/1957 | Sinclair Pipe Line Company<br>Attn: Corporate Officer/Authorized Agent<br>P.O. Box 30825<br>Salt Lake City, UT 84130 |
| 83. | SRCTec, Inc. | Landlord Lease<br><br>One General Motors Circle Syracuse, New York | 11/15/2008 | Attn: Corporate Officer/Authorized Agent<br>5801 East Taft Road, North Syracuse, NY 13212 |
| 84. | St. Lawrence Gas Company, Inc. | Easement/ Access/ License and Amendment/ Continuation<br><br>Route 37 East Massena, New York | 3/13/1973 | St. Lawrence Gas Company, Inc.<br>Attn: Corporate Officer/Authorized Agent<br>42 Main St<br>Massena, NY 13662-1920 |

15

US_ACTIVE:\43640472\01\72240.0639

| | Counterparty Name | Contract Description | Contract Start Date | Counterparty Address |
|---|---|---|---|---|
| 85. | Syracuse Glass Company, Inc. | Landlord Lease and Amendment/ Continuation<br><br>One General Motors Circle Syracuse, New York | 5/1/2009 | One General Motors Drive Suite 617 Attn: Corporate Officer/Authorized Agent P.O. Box 381, Syracuse NY 13206 -and- Shulman Curtin Grunder & Regan P.C. Attn: Legal Officer/Bankruptcy Department 250 South Clinton Street Suite 502 Syracuse, NY 13202-1262 |
| 86. | The Chesapeake and Ohio Railway Company | Easement/ Access/ License and Amendment/ Continuation<br><br>902 East Hamilton Avenue Flint, Michigan | 2/27/1951 | The Chesapeake And Ohio Railway Company Attn: Corporate Officer/Authorized Agent 1 Lewis Street Whitesville, WV 25209 |
| 87. | The City of Anderson, Indiana | Easement/ Access/ License Agreement<br><br>2915 Pendleton Avenue Anderson, Indiana | | The City Of Anderson, Indiana Attn: Legal Officer/Bankruptcy Department 120 E 8th St Anderson, IN 46016-1505 |
| 88. | The City of Flint, Michigan | Easement/ Access/ License Agreement<br><br>902 East Hamilton Avenue Flint, Michigan | 1/25/2007 | The City Of Flint, Michigan Attn: Legal Officer/Bankruptcy Department 1101 S. Saginaw Street Flint, MI 48502 |

16

US_ACTIVE:\43640472\01\72240.0639

| | Counterparty Name | Contract Description | Contract Start Date | Counterparty Address |
|---|---|---|---|---|
| 89. | The City of Lansing | Easement/ Access/ License Agreement<br><br>2800 West Saginaw Street<br>Lansing, Michigan | 9/16/1968 | City of Lansing<br>Attn: Legal Officer/Bankruptcy<br>Department<br>123 W Ottawa Street<br>Lansing, MI 48933-1601 |
| 90. | The City of Pontiac | Easement/ Access/ License and Amendment/ Continuation<br><br>2100 South Opdyke Road<br>Pontiac, Michigan | 11/25/1969 | The City Of Pontiac<br>Attn: Legal Officer/Bankruptcy<br>Department<br>47450 Woodward Ave<br>Pontiac, MI 48342-5009 |
| 91. | The City of Pontiac | Easement/ Access/ License Agreement<br><br>2000 Centerpoint Parkway<br>Pontiac, Michigan | 8/22/1977 | The City Of Pontiac<br>Attn: Legal Officer/Bankruptcy<br>Department<br>450 Wide Track Drive, East<br>Pontiac, MI 48058 |
| 92. | The City of Pontiac | Easement/ Access/ License Agreement<br><br>200 South Boulevard West<br>Pontiac, Michigan | 2/3/1978 | The City Of Pontiac<br>Attn: Legal Officer/Bankruptcy<br>Department<br>450 Wide Track Drive, East<br>Pontiac, MI 48058 |
| 93. | The City of Syracuse, New York | Easement/ Access/ License Agreement<br><br>One General Motors Circle<br>Syracuse, New York | | The City Of Syracuse<br>Attn: Legal Officer/Bankruptcy<br>Department<br>233 East Washington Street<br>Syracuse, NY 13202 |

17

US_ACTIVE\43640472\01\72240.0639

| | Counterparty Name | Contract Description | Contract Start Date | Counterparty Address |
|---|---|---|---|---|
| 94. | The City of Syracuse, New York | Easement/ Access/ License and Amendment/ Continuation<br><br>One General Motors Circle Syracuse, New York | | The City Of Syracuse Attn: Legal Officer/Bankruptcy Department 233 East Washington Street Syracuse, NY 13202 |
| 95. | The Detroit Edison Company | Easement/ Access/ License Agreement<br><br>Clark Street & Michigan Avenue Detroit, Michigan | 4/27/1998 | The Detroit Edison Company Attn: Corporate Officer/Authorized Agent 2000 Second Avenue Room 2310 Wcb Detroit, MI 48226 |
| 96. | The Detroit Edison Company | Easement/ Access/ License Agreement<br><br>Clark Street & Michigan Avenue Detroit, Michigan | 4/27/1998 | The Detroit Edison Company Attn: Corporate Officer/Authorized Agent 2000 Second Avenue Room 2310 Wcb Detroit, MI 48226 |
| 97. | The Detroit Edison Company | Easement/ Access/ License Agreement<br><br>2100 South Opdyke Road Pontiac, Michiga | 5/10/1996 | The Detroit Edison Company Attn: Corporate Officer/Authorized Agent 2000 Second Avenue Room 2310 Wcb Detroit, MI 48226 |
| 98. | The Detroit Edison Company | Easement/ Access/ License Agreement<br><br>2000 Centerpoint Parkway Pontiac, Michigan | 9/13/1961 | The Detroit Edison Company Attn: Corporate Officer/Authorized Agent 2000 Second Avenue Room 2310 Wcb Detroit, MI 48226 |

18

| | Counterparty Name | Contract Description | Contract Start Date | Counterparty Address |
|---|---|---|---|---|
| 99. | The Detroit Edison Company | Landlord Lease<br><br>620 South East Boulevard<br>Pontiac, Michigan | 3/15/1955 | The Detroit Edison Company<br>Attn: Corporate Officer/Authorized Agent<br>2000 Second Avenue<br>Room 2310 Wcb<br>Detroit, MI 48226 |
| 100. | The Detroit Edison Company | Easement/ Access/ License and Amendment/ Continuation<br><br>2000 Centerpoint Parkway<br>Pontiac, Michigan | 7/1/1988 | The Detroit Edison Company<br>Attn: Corporate Officer/Authorized Agent<br>2000 Second Avenue<br>Room 2310 Wcb<br>Detroit, MI 48226 |
| 101. | The Detroit Edison Company | Easement/ Access/ License and Amendment/ Continuation<br><br>660 East South Boulevard<br>Pontiac, Michigan | 11/28/1950 | The Detroit Edison Company<br>Attn: Corporate Officer/Authorized Agent<br>2000 Second Avenue<br>Room 2310 Wcb<br>Detroit, MI 48226 |
| 102. | The Kansas City Southern Railway Company | Easement/ Access/ License Agreement<br><br>6817 Stadium Drive<br>Kansas City, Missouri | 6/1/1962 | The Kansas City Southern Railway Company<br>Attn: Corporate Officer/Authorized Agent<br>427 West 12th Street<br>Kansas City, MO 64105-1403 |
| 103. | The New York Central Railroad Company | Easement/ Access/ License Agreement<br><br>One General Motors Circle<br>Syracuse, New York | 3/18/1953 | The New York Central Railroad Company<br>Attn: Corporate Officer/Authorized Agent<br>230 Park Avenue<br>New York, NY 10169-0005 |

19

US_ACTIVE\43640472\01\72240.0639

| | Counterparty Name | Contract Description | Contract Start Date | Counterparty Address |
|---|---|---|---|---|
| 104. | The New York Central Railroad Company | Easement/ Access/ License Agreement<br><br>Route 37 East<br>Massena, New York | 1/19/1962 | The New York Central Railroad Company<br>Attn: Corporate Officer/Authorized Agent<br>230 Park Avenue<br>New York, NY 10169-0005 |
| 105. | The New York Railroad Company | Easement/ Access/ License Agreement<br><br>One General Motors Circle<br>Syracuse, New York | 1/21/2004 | The New York Central Railroad Company<br>Attn: Corporate Officer/Authorized Agent<br>230 Park Avenue<br>New York, NY 10169-0005 |
| 106. | The Village of Tilton, Illinois | Easement/ Access/ License Agreement<br><br>1-74 G Street<br>Daniville, Illinois | | The Village Of Tilton, Illinois<br>Attn: Legal Officer/Bankruptcy Department<br>201 W 5th St.<br>Tilton, IL 61833-7429 |
| 107. | The Village of Tilton, Illinois | Easement/ Access/ License Agreement<br><br>1-74 G Street<br>Daniville, Illinois | | The Village Of Tilton, Illinois<br>Attn: Legal Officer/Bankruptcy Department<br>201 W 5th St.<br>Tilton, IL 61833-7429 |
| 108. | The Village of Tilton, Illinois | Easement/ Access/ License Agreement<br><br>1-74 G Street<br>Daniville, Illinois | | The Village Of Tilton, Illinois<br>Attn: Legal Officer/Bankruptcy Department<br>201 W 5th St.<br>Tilton, IL 61833-7429 |

20

US_ACTIVE\43640472\01\72240.0639

| | Counterparty Name | Contract Description | Contract Start Date | Counterparty Address |
|---|---|---|---|---|
| 109. | Village of Tilton | Easement/ Access/ License Agreement<br><br>1-74 G Street<br>Daniville, Illinois | | T The Village Of Tilton, Illinois<br>Attn: Legal Officer/Bankruptcy Department<br>201 W 5th St.<br>Tilton, IL 61833-7429 |
| 110. | Village of Tilton | Easement/ Access/ License Agreement<br><br>1-74 G Street<br>Daniville, Illinois | | The Village Of Tilton, Illinois<br>Attn: Legal Officer/Bankruptcy Department<br>201 W 5th St.<br>Tilton, IL 61833-7429 |
| 111. | Xstraata Magnesium Corporation | Easement/ Access/ License Agreement<br><br>1820 East 32nd St<br>Anderson, Indiana | 1/16/2001 | Attn: Corporate Officer/Authorized Agent<br>1820 East 32nd Street<br>Anderson, IN 46013<br>-and-<br>Brunson & Kahn<br>300 West Washington, 14th Floor<br>Chicago, IL 60606 |
| 112. | Xstraata Magnesium Corporation | Easement/ Access/ License Agreement<br><br>1820 East 32nd St<br>Anderson, Indiana | 1/16/2001 | Attn: Corporate Officer/Authorized Agent<br>1820 East 32nd Street<br>Anderson, IN 46013<br>-and-<br>Brunson & Kahn<br>300 West Washington, 14th Floor<br>Chicago, IL 60606 |
| 113. | 4Site Environmental Resources LLC | Employee Leasing Agreement | 9/16/10; continued automaticall y on 8/10/10 | 4Site Environmental Resources LLC<br>216 East Water Street<br>Unit C<br>Sandusky, OH 44870 |

21

US_ACTIVE\43640472\01\72240,0639

| | Counterparty Name | Contract Description | Contract Start Date | Counterparty Address |
|---|---|---|---|---|
| 114. | Arcadis U.S., Inc. | Master Services Agreement | 5/1/10 | ARCADIS U.S., Inc.<br>Attn: General Counsel<br>630 Plaza Drive<br>Highlands Ranch, CO 80129<br><br>ARCADIS U.S., Inc.<br>Attn: Lowell McBurney<br>Box 66, 6723 Towpath Road<br>Syracuse, NY 13214 |
| 115. | Bierlein Companies, Inc. | Demolition of Flint North Plants 36 & 38 | 7/19/10 | Bierlein Companies, Inc.<br>Attn: Ron Bierlein<br>2000 Bay City Road<br>Midland, MI 48642 |
| 116. | BOW Environmental Solutions, Inc. | Employee Leasing Agreement | 5/1/10 | BOW Environmental Solutions, Inc.<br>3400 DeWeese Parkway<br>Dayton, OH 45414 |
| 117. | Brandenburg Industrial Service | Massena, New York Demolition Project Pull-a-head Work (Brandenburg Project No. MA0481, PO MAS0066) | 1/11/11 | Brandenburg Industrial Service<br>Attn: Eric Ahlgren, Project Manager<br>2625 South Loomis Street<br>Chicago, Illinois 60608-5414 |
| 118. | Brandenburg Industrial Service | Massena, New York Asbestos Abatement Work (Brandenburg Project No. MA0481, PO MAS0067) | 1/11/11 | Brandenburg Industrial Service<br>Attn: Eric Ahlgren, Project Manager<br>2625 South Loomis Street<br>Chicago, Illinois 60608-5414 |
| 119. | CBRE | Commission Agreement for property at 1451 Lebanon School Road, West Mifflin, PA | 2/12/11 | Mr. Robert Blackmore<br>CB Richard Ellis, Inc.<br>600 Grant Street<br>Suite 1400<br>Pittsburgh, PA 15219 |

22

| | Counterparty Name | Contract Description | Contract Start Date | Counterparty Address |
|---|---|---|---|---|
| 120. | Commercial Development Company, Inc. | Real Estate Purchase Contract (Pittsburgh Stamping Property) | 5/5/10 Amendments 1-7: 5/24/10; 6/23/10; 8/20/10; 9/30/10; 11/4/10; 12/15/10 2/__/11 | Commercial Development Company, Inc. Attn: Michael J. Roberts 1650 Des Peres Road Suite 303 St. Louis, MO 63131 Commercial Development Company, Inc. Attn: General Counsel 1650 Des Peres Road Suite 303 St. Louis, MO 63131 |
| 121. | Conestoga-Rovers & Associates, Inc. | Master Services Agreement | 5/1/10 | CRA, Inc. Attn: Ian K. Richardson, EVP 2055 Niagara Falls Blvd. Suite #3 Niagara falls, NY 14304 |
| 122. | Contractual Security Services and Investigations, LLC | Agreement for Security Service | 8/1/09 | Contractual Security Services and Investigations, LLC Suite 5D 8263 S. Saginaw Road Grand Blanc, MI 48439 |
| 123. | Favero Geosciences | Employee Leasing Agreement | 5/1/10 | Favero Geosciences 1210 South 5th Street Springfield, IL 62703 |

23

| | Counterparty Name | Contract Description | Contract Start Date | Counterparty Address |
|---|---|---|---|---|
| 124. | General Motors LLC | Master Lease Agreement (Excluded Manufacturing Assets) | 7/10/09 | General Motors LLC<br>Attn: Lawrence S. Buonomo, Esq.<br>400 Renaissance Center<br>Detroit, Michigan 48265<br><br>Cadwalader, Wickersham & Taft LLP, attorneys for the United States Department of the Treasury<br>Attn: John J. Rapisardi, Esq.<br>One World Financial Center<br>New York, New York 10281<br><br>United States Department of the Treasury<br>Attn: Joseph Samarias, Esq.<br>1500 Pennsylvania Avenue NW, Room 2312<br>Washington, D.C. 20220<br><br>Vedder Price, P.C., attorneys for Export Development Canada<br>Attn: Michael J. Edelman, Esq. and Michael L. Schein, Esq.<br>1633 Broadway, 47th Floor<br>New York, New York 10019 |

24

| | Counterparty Name | Contract Description | Contract Start Date | Counterparty Address |
|---|---|---|---|---|
| 125. | General Motors LLC | Master Lease Agreement (Subdivision Properties) | 7/10/09 | General Motors LLC<br>Attn: Lawrence S. Buonomo, Esq.<br>400 Renaissance Center<br>Detroit, Michigan 48265<br><br>Cadwalader, Wickersham & Taft L.L.P, attorneys for the United States Department of the Treasury<br>Attn: John J. Rapisardi, Esq.<br>One World Financial Center<br>New York, New York 10281<br><br>United States Department of the Treasury<br>Attn: Joseph Samarias, Esq.<br>1500 Pennsylvania Avenue NW, Room 2312<br>Washington, D.C. 20220<br><br>Vedder Price, P.C., attorneys for Export Development Canada<br>Attn: Michael J. Edelman, Esq. and Michael L. Schein, Esq.<br>1633 Broadway, 47th Floor<br>New York, New York 10019 |

25

US_ACTIVE\43640472\01\72240.0639

| | Counterparty Name | Contract Description | Contract Start Date | Counterparty Address |
|---|---|---|---|---|
| 126. | General Motors LLC | Letter Agreement Regarding Soil Removal at Bedford, Indiana Property | 6/23/10 | Director of GM WFG Remediation Attn: William J. McFarland 30200 Mount Road Mail Code 480-111-W60 Warren, Michigan 48090 (586) 986-2281 (facsimile)<br><br>General Motors Legal Staff Attn: Laura L. Fitzpatrick Mail Code 482-C24-D24 300 Renaissance Center PO Box 300 Detroit, Michigan 48265-3000 |
| 127. | General Motors LLC | Letter Agreement Regarding Retention Pond at Pontiac North Facility | 6/28/10 | General Motors Legal Staff Attn: Laura L. Fitzpatrick Mail Code 482-C24-D24 300 Renaissance Center PO Box 300 Detroit, Michigan 48265-3000<br><br>Jenner & Block Attn: Donald I. Resnick, Esq. 353 N. Clark Street Chicago, IL 60654-3456 (312) 222-9350 (telephone) (312) 527-0484 (facsimile) |
| 128. | Haley & Aldrich, Inc. | Master Services Agreement | 5/1/10 | David J. Hagen Haley & Aldrich, Inc. 5755 Granger Road Suite 320 Cleveland, OH 44131 |

26

| | Counterparty Name | Contract Description | Contract Start Date | Counterparty Address |
|---|---|---|---|---|
| 129. | Hilco Industrial, LLC and Maynards Industries (1991) Inc. | Asset Marketing Agreement | 11/12/09 (as amended on 2/24/11) | Hilco Industrial, LLC Attn: Joseph Malfitano, VP, Assistant General Counsel 5 Revere Drive Suite 206 Northbrook, IL 60062 <br><br> Hilco Industrial, LLC Attn: Robert Levy, President 31555 West 14 Mile Road Farmington Hills, MI 48334 <br><br> Maynards Industries (1991) Inc. Attn: Taso Sofikitis, President 21700 Northwestern Highway Southfield, MI 48075 |

27

US_ACTIVE\43640472\01\72240.0639

| | Counterparty Name | Contract Description | Contract Start Date | Counterparty Address |
|---|---|---|---|---|
| 130. | Illinois Union Insurance Company | (ACE Policy No. G24136796001) | 5/31/10 | Mercator Risk Services, Inc. 14 Wall Street, 18th Floor New York, New York 10005 |
| | | | | Illinois Union Insurance Company 525 Monroe Street, Ste. 400 Chicago, Illinois 60661 |
| | | | | Westchester Surplus Lines Insurance Company 500 Colonial Center Parkway, Ste. 200 Roswell, Georgia 30076 |
| | | | | ACE USA Companies Attn: Saverio Rocco, Assistant General Counsel PO Box 1000 436 Walnut Street – WA04K Philadelphia, Pennsylvania 19106 |

28

US_ACTIVE:\43640472\01\72240.0639

| | Counterparty Name | Contract Description | Contract Start Date | Counterparty Address |
|---|---|---|---|---|
| 131. | IRG Moraine LLC | Real Estate Purchase Contract (Moraine Assembly Property) | 12/6/10 Amended 2/3/11 | IRG Moraine LLC Attn: Christopher S. Semarjian 23240 Chagrin Blvd. Suite 250 Cleveland, OH 44122-5450<br><br>Hurtuk & Daroff Co., LLP Attn Edward A. Hurtuk, Esq. 6120 Parkland Blvd. Suite 100 Cleveland, OH 44124<br><br>McClellan Park Attn: Jay Heckenlively, Esq. 3140 Peacekeeper Way McClellan, CA 95652 |
| 132. | Jones Lang LaSalle Americas, Inc. | Commission Agreement for Sale of Property at 200 Centerpoint Parkway, Pontiac, Michigan | 2/12/11 | Jones Lang LaSalle Americas, Inc. Attn: Michael Stafford 600 Renaissance Drive, Ste. 1260 Detroit, Michigan  48243 |
| 133. | Lee Industrial Plaza | Real Estate Purchase Contract (ACG Penske Property) | 10/27/10 | Lee Industrial Plaza, LLC Attn: Edward Lee 631 Oakland Avenue Pontiac, MI 48342 |

29

| | Counterparty Name | Contract Description | Contract Start Date | Counterparty Address |
|---|---|---|---|---|
| 134. | Llyold's | MLC Insurance Policy related to Real Property, Personal Property, and Rental Income (Policy No. JA114102Z) | 3/1/10 | Newman Martin and Buchan LLP NMB House 17 Bevis Marks London EC3A 7LN United Kingdom<br><br>Mendes and Mount 750 Seventh Avenue New York, New York 10019-6829 |
| 135. | Marcus & Millichap | Broker Commission Agreement (Grand Rapids Stamping Property) | 11/4/10 | Marcus & Millichap Attn: Richard O'Connor Northwestern Highway Southfield, MI 48075 |
| 136. | Merit Laboratories, Inc. | Laboratory Services Agreement | 9/1/10 | Merit Laboratories, Inc. Attn: Maya Murshak, Director 2680 East Lansing Dr. East Lansing, MI 48823 |
| 137. | Michael Kadis, as Trustee of the Michael Kadis Trust | Real Estate Purchase Contract (Parma Powertrain Property) | 12/23/10 Amended 2/7/11 | Michael Kadis c/o Federal Equipment Company 8200 Bessemer Ave Cleveland, OH 44127<br><br>Federal Equipment Company Attn: Matt Hicks 8200 Bessemer Ave Cleveland, OH 44127 |

30

US_ACTIVE\43640472\01\72240.0639

|  | Counterparty Name | Contract Description | Contract Start Date | Counterparty Address |
|---|---|---|---|---|
| 138. | MMP Group | Real Estate Purchase Contract (PCC West Property) | 12/1/10 First Amendment 1/10/11 Second Amendment 1/24/11 | MMP Group- West, LLC Attn: Linden Nelson, Manager 2100 East Maple Road Suite 200 Birmingham, MI 48009<br><br>Jackier Gould, PC Attn: Eric A. Bean, Esq. 121 W. Long Lake Road Suite 200 Bloomfield Hills, MI 48304 |
| 139. | MMP Group – Central, LLC | Real Estate Purchase Contract (PCC Central Property) | 12/1/10 First Amendment 1/10/11 Second Amendment 1/24/11 | MMP Group- Central, LLC Attn: Linden Nelson, Manager 2100 East Maple Road Suite 200 Birmingham, MI 48009<br><br>Jackier Gould, PC Attn: Eric A. Bean, Esq. 121 W. Long Lake Road Suite 200 Bloomfield Hills, MI 48304 |

31

| | Counterparty Name | Contract Description | Contract Start Date | Counterparty Address |
|---|---|---|---|---|
| 140. | MMP Group-Assembly, LLC | Real Estate Purchase Contract (Pontiac Assembly Property) | 12/1/10<br>First Amendment 1/10/11<br>Second Amendment 1/24/11 | MMP Group- Assembly, LLC<br>Attn: Linden Nelson, Manager<br>2100 East Maple Road<br>Suite 200<br>Birmingham, MI 48009<br><br>Jackier Gould, PC<br>Attn: Eric A. Bean, Esq.<br>121 W. Long Lake Road<br>Suite 200<br>Bloomfield Hills, MI 48304 |
| 141. | Morrison Security Corporation, Inc. | Security Service Agreement | 12/10/09 | Morrison Security Corporation, Inc.<br>12334 South Keeler Ave.<br>Alsip, IL 60803 |
| 142. | National Union Fire Insurance Company of Pittsburg | Umbrella Liability with Crisis Response Binder (Chartis Policy No. 15972449) | 7/10/10 | Excess Casualty, A Division of Chartis<br>175 Water St., 20th Floor<br>New York, New York 10038<br><br>AON Risk Services Central Inc.<br>Attn: Lauren Cisco<br>3000 Town Center #3000<br>Southfield, Michigan 48075 |
| 143. | O'Brien & Gere Engineers, Inc. and O'Brien & Gere, Inc. of North America | Master Services Agreement | 5/1/10 | O'Brien & Gere Engineers, Inc. and O'Brien & Gere, Inc. of North America<br>Attn: Scott L. Cormier, P.E., V.P.<br>37000 Grand River Ave.<br>Suite 260<br>Farmington Hills, MI 48335 |

32

US_ACTIVE:\43640472\01\72240.0639

| | Counterparty Name | Contract Description | Contract Start Date | Counterparty Address |
|---|---|---|---|---|
| 144. | Plant 15, LLC | Real Estate Purchase Contract (Pontiac North Plant 15 Property) | 12/1/10 | c/o North American Dismantling Corp.<br>Attn: Rick Marcicki<br>380 Lake Nepessing Road<br>P.O. Box 307<br>Lapeer, MI 48446<br><br>Plunkett Cooney, P.C.<br>Attn: Scott K. Lites, Esq.<br>38505 Woodward<br>Suite 2000<br>Bloomfield Hills, MI 48304 |
| 145. | Plant 25, LLC | Real Estate Purchase Contract (Pontiac North Plant 25 Property) | 12/1/10 | c/o North American Dismantling Corp.<br>Attn: Rick Marcicki<br>380 Lake Nepessing Road<br>P.O. Box 307<br>Lapeer, MI 48446<br>Plunkett Cooney, P.C.<br>Attn: Scott K. Lites, Esq.<br>38505 Woodward<br>Suite 2000<br>Bloomfield Hills, MI 48304 |

33

US_ACTIVE:\43640472\01\72240.0639

| | Counterparty Name | Contract Description | Contract Start Date | Counterparty Address |
|---|---|---|---|---|
| 146. | Pyramid Brokerage Company, Inc. | Management Agreement, as amended (Syracuse Property) | 8/1/2002 | Pyramid Brokerage Company, Inc. PO Box 3, 5786 Widewaters Parkway DeWitt, New York 13214-003 Attn: John Clark (315) 445-2074 (facsimile)<br><br>Copy to:<br><br>The Widewaters Group 5786 Widewaters Parkway PO Box 3 DeWitt, New York 13214-0003 Attention: Patrick T. Lawless, Assistant General Counsel (315) 445-8570 (facsimile) |
| 147. | Securitas Security Services USA, Inc. | Security Services Agreement (Massena, Moraine, Pittsburgh) | 11/13/09 | Securitas Security Services USA, Inc. 25330 Telegraph Road Suite 350 Southfield, MI 48033<br><br>Securitas Security Services USA, Inc. Attn: Legal Department 4330 Park Terrace Drive Westlake Village, CA 91361 |
| 148. | Securitas Security Services USA, Inc. | Security Services Agreement (Saginaw Malleable Plant) | 8/30/09 | Securitas Security Services USA, Inc. 616 Creyts Road Suite A Lansing, MI 48917 |

34

| | Counterparty Name | Contract Description | Contract Start Date | Counterparty Address |
|---|---|---|---|---|
| 149. | Signature Associates | Commission Agreement for properties at: 900 East Baldwin, Pontiac MI; 875 Oakland Ave., Pontiac, MI; Former General Motors Pontiac Stamping Plant 15, Pontiac, MI; Former General Motors Pontiac Stamping Plant 25, Pontiac MI | 2/11/10 | Signature Associates Attn: Grant Bruce One Towne Square Suite 1200 Southfield, MI 48076 |
| 150. | TestAmerica Laboratories, Inc. | Laboratory Services Agreement | 9/1/10 | TestAmerica Laboratories, Inc. Attn: Sharon L. Gordon, Legal & Contracts Director 4101 Shuffel Street NW North Canton, OH 44720 |
| 151. | The City of Parma | Real Estate Purchase Contract (Parma Powertrain Land) | 11/17/10 Amended 2/7/11 | City of Parma Attn: Mayor and Service Director 6611 Ridge Road Parma, Ohio 44129 |
| 152. | Thunder Ventures, LLC | Real Estate Purchase Contract (Grand Rapids Stamping Property) | 12/ /10 | Thunder Ventures, LLC. Attn: Christopher G. Brochert 6755 Daly Road West Bloomfield, MI 48322 Thunder Ventures, LLC. Attn: Jason M. Horton, Esq. 6755 Daly Road West Bloomfield, MI 4322 |

35

| | Counterparty Name | Contract Description | Contract Start Date | Counterparty Address |
|---|---|---|---|---|
| 153. | Westchester Fire Insurance Company | Commercial General Liability Occurrence Insurance (ACE Policy No. G24146819001) | 7/10/10 | Westchester Specialty Attn: Eric Koppang 525 W. Monroe St., Ste 500 Chicago, Illinois 60661 Mercator Risk Services Attn: Samantha Gilman 14 Wall Street New York, New York 10005 |
| 154. | Williams Realtors (Carpenter Realtors) | Exclusive Listing Contract (Bedford Residential Properties) | 1/23/11 | Williams Realtors 3269 Williams Blvd. Bedford, Indiana 47421 |

36

US_ACTIVE:\43640472\01\72240.0639

# ATTACHMENT D

MOTORS LIQUIDATION COMPANY BONDS AND
INSURANCE INSTRUMENTS FOR OWNED PROPERTIES

| | BOND NO. | OBLIGEE | SITE DESCRIPTION | BOND AMOUNT | COLATTERAL AMOUNT |
|---|---|---|---|---|---|
| | K07489195 | ILLINOIS ENVIRONMENTAL PROTECTION AGENCY | GM Foundry Landfill - I-74 AT "G" STREET, Danville, IL | $ 102,390.00 | $ 102,390.00 |
| | K07593119 | UNITED STATES ENVIRONMENTAL PROTECTION AGENCY | General Motors - Central Foundry Division Superfund Site, Rooseveltown Hwy, St. Lawrence County, Massena, NY | $ 22,071,714.00 | $ 22,071,714.00 |
| | K07736757 | UNITED STATES ENVIRONMENTAL PROTECTION AGENCY | Pontiac Centerpoint Campus Site (sections 3 & 4 of Township T2N, Range R10E, Pontiac, Michigan) | $ 206,980.00 | $ 206,980.00 |
| | K08181974 | DEPARTMENT OF ENVIRONMENTAL MANAGEMENT OF THE STATE OF INDIANA | Former Allison Gas Turbine, 2701 West Raymond Street, Indianapolis, IN 46013 | $ 868,158.00 | $ 868,158.00 |
| | K0818205A | DEPARTMENT OF ENVIRONMENTAL MANAGEMENT OF THE STATE OF INDIANA | WFG Anderson, 2915 Dr. Martin Luther King Blvd., Anderson, IN 46016 | $ 377,752.00 | $ 377,752.00 |
| ENVIRONMENTAL BONDS | | | **ACE-USA/WESTCHESTER FIRE INSURANCE COMPANY** | $ 23,626,994.00 | $ 23,626,994.00 |
| | CORRECTIVE ACTION 0907329 | UNITED STATES ENVIRONMENTAL PROTECTION AGENCY | GM CORP. FORMER DELPHI CHASSIS DIVISION (RCRA), LIVONIA - 13000 Eckles Road, Livonia, MI 48150 | $ 3,839,721.29 | $ 3,794,191.00 |
| | CLOSURE 0907330 | NJ DEPT. OF ENVIRONMENTAL PROTECTION | WORLDWIDE FACILITIES GROUP - TRENTON (RCRA) CLOSURE - 1445 Parkway Avenue, Trenton, NJ 08628 | $ 297,022.00 | $ 293,500.00 |
| | CLOSURE/POST CLOSURE 0907327 | OHIO ENVIRONMENTAL PROTECTION AGENCY | WFG ELYRIA (RCRA) - POST CLOSURE - 1400 Lowell St., Elyria, OH 44035 | $ 3,079,006.96 | $ 3,042,497.00 |
| | CLOSURE/POST CLOSURE 0907327 | OHIO ENVIRONMENTAL PROTECTION AGENCY | WFG MORAINE FORMER HARRISON DAYTON (RCRA) - POST CLOSURE - 3600 Dryden Rd, Moraine, OH  45439 | $ 2,743,532.00 | $ 2,711,000.00 |
| ENVIRONMENTAL INSURANCE | | | **AIG - AISLIC INSURANCE COMPANY** | $ 9,959,282.25 | $ 9,841,188.00 |
| | CASH COLLATERAL FOR LETTER OF CREDIT FOR | NJ DEPT. OF ENVIRONMENTAL PROTECTION | Hyatt Clark - 1300 Raritan Road, Clark, NJ 07066 | $ 12,875,000.00 | $ 12,875,000.00 |
| ENVIRONMENTAL LOCs | | | **JPMORGAN CHASE BANK** | $ 12,875,000.00 | $ 12,875,000.00 |
| TOTAL | | | | $ 46,461,276.25 | $ 46,343,182.00 |

# EXHIBIT D

# GUC TRUST AGREEMENT

# MOTORS LIQUIDATION COMPANY
# GUC TRUST AGREEMENT

MOTORS LIQUIDATION COMPANY GUC TRUST AGREEMENT, dated as of [DATE] (as it may be amended from time to time, this "Trust Agreement"), by and among Motors Liquidation Company ("MLC"), MLC of Harlem, Inc., MLCS, LLC, MLCS Distribution Corporation, Remediation and Liability Management Company, Inc., and Environmental Corporate Remediation Company, Inc. (collectively, the "Debtors"), as debtors and debtors-in-possession, Wilmington Trust Company, as trust administrator and trustee (together with any successor appointed under the terms hereof, the "GUC Trust Administrator") of the Motors Liquidation Company GUC Trust (the "GUC Trust") for the benefit of the general unsecured creditors of the Debtors and FTI Consulting, Inc., as trust monitor (together with any successor appointed under the terms hereof, the "GUC Trust Monitor") of the GUC Trust. Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to such terms in the Debtors' Second Amended Joint Chapter 11 Plan of liquidation pursuant to chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq., as amended (the "Bankruptcy Code") dated [DATE], as confirmed (including all exhibits thereto, as the same may be further amended, modified, or supplemented from time to time, the "Plan").

## Background

A.      Beginning on June 1, 2009, the Debtors filed in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") voluntary petitions for relief under chapter 11 of Title 11 of the Bankruptcy Code (the "Chapter 11 Cases").

B.      On or about August 31, 2010, the Debtors filed their Plan and Disclosure Statement in the Bankruptcy Court.  The Debtors filed an amended Plan and Disclosure Statement on December 7, 2010. The Debtors filed a second amended Plan on [DATE].

C.      The Disclosure Statement was approved by the Bankruptcy Court on December 8, 2010.

D.      On or about [DATE], the Bankruptcy Court entered an order (the "Confirmation Order") confirming the Plan.

E.      The Plan provides for the creation of the GUC Trust as a post-confirmation successor to MLC within the meaning of Section 1145(a) of the Bankruptcy Code, to hold and administer:

(i)    the common stock of General Motors Company ("New GM Common Stock") to be contributed to the GUC Trust under the Plan, including (x) any dividends declared thereon in the form of New GM Common Stock, whether prior to or on or after the Effective Date, (y) any additional shares of New GM Common Stock (the "Additional Shares") to be issued in respect of General Unsecured Claims pursuant to the MSPA, together with any dividends declared thereon in the form of New GM Common Stock, whether prior to or on or after the Effective Date, and (z) any capital stock or other property or assets into which such New GM Common Stock may be converted or for

which it may be exchanged (including by way of recapitalization, merger, consolidation, reorganization or otherwise) (the "GUC Trust Common Stock Assets");

(ii)   the two series of warrants, each entitling the holder to acquire one share of New GM Common Stock, one series with an exercise price of $10.00 per share (subject to adjustment) and an expiration date of July 10, 2016 (the "New GM $10.00 Warrants") and the other with an exercise price of $18.33 per share (subject to adjustment) and an expiration date of July 10, 2019, (the "New GM $18.33 Warrants" and together with the New GM $10.00 Warrants, the "New GM Warrants" and, together with the New GM Common Stock, the "New GM Securities") to be contributed to the GUC Trust under the Plan, as such warrants may from time to time be modified or adjusted in accordance with their terms (the "GUC Trust Warrant Assets" and, together with the GUC Trust Common Stock Assets, the "GUC Trust Securities Assets");

(iii)  any dividends on the GUC Trust Common Stock Assets, whether in the form of Cash, securities or other property other than New GM Common Stock, declared prior to the Effective Date (the "Initial GUC Trust Dividend Assets") and any such dividends, including New GM Common Stock, declared on or after the Effective Date (the "Subsequent GUC Trust Dividend Assets," and, together with the Initial GUC Trust Dividend Assets, "GUC Trust Dividend Assets");

(iv) Cash proceeds from the sale of fractional New GM Securities sold pursuant to Section 5.6 (the "Fractional Share Proceeds");

(v)   any Cash proceeds from the sale of New GM Securities, from the sale of expiring New GM Warrants or otherwise, but excluding Fractional Share Proceeds and excluding Cash proceeds constituting Other GUC Trust Administrative Cash (the "GUC Trust Distributable Cash" and, collectively with the GUC Trust Dividend Assets and the GUC Trust Securities Assets, the "GUC Trust Distributable Assets");

(vi)  Cash for purposes of funding the administrative expenses of the GUC Trust, contributed to the GUC Trust from MLC on or about the Effective Date in accordance with the terms of the Plan (the "Wind-Down Budget Cash"); and

(vii) other sources of Cash (other than the Residual Wind-Down assets) for the purposes of funding the administrative expenses of the GUC Trust, including (i) Cash obtained upon the sale or pledge, in whole or in part, of GUC Trust Distributable Assets reserved in the Additional Holdback, Reporting and Transfer Holdback and Protective Holdback and Taxes on Distribution Holdback pursuant to Sections 6.1(b), (c), (d), and (e), (ii) Cash received from the Debtors pursuant to Section 2.3(e) or (f) hereof, or (iii) Cash (other than GUC Trust Distributable Cash) otherwise obtained by the GUC Trust on or following the Effective Date (the "Other GUC Trust Administrative Cash" and together with the Wind-Down Budget Cash, the "GUC Trust Administrative Cash"),

(collectively, the "GUC Trust Assets") and distribute the GUC Trust Distributable Assets to the GUC Trust Beneficiaries (as hereafter defined), in accordance with the terms of the Plan, the Confirmation Order and this Trust Agreement.

F.     The GUC Trust is being created on behalf of, and for the benefit of, (i) the holders of General Unsecured Claims against the Debtors that are allowed as of the Initial Distribution Record Date (the "Initial Allowed General Unsecured Claims") and (ii) (a) the holders of General Unsecured Claims against the Debtors that are Disputed ("Disputed General Unsecured Claims") as of the Initial Distribution Record Date and that are allowed after the Initial Distribution Record Date in accordance with the claims resolution procedures administered under the Plan (to the extent so resolved); (b) the holders of the Term Loan Avoidance Action Claims, to the extent and in the amount collected by the Debtors or the Avoidance Action Trust against the respective defendants (including by way of settlement) in the underlying litigation; and (c) the holders of the Other Avoidance Action Claims, to the extent and in the amount collected against the respective defendants (including by way of settlement) in the underlying litigations (collectively, the "Resolved Allowed General Unsecured Claims" and, together with the Initial Allowed General Unsecured Claims, the "Allowed General Unsecured Claims").  The holders of Allowed General Unsecured Claims, and any holders of Units acquired, directly or indirectly, by transfer from holders of Allowed General Unsecured Claims, in their capacities as beneficiaries of the GUC Trust, are sometimes referred to as the "GUC Trust Beneficiaries."

G.     The GUC Trust Administrator shall have all powers necessary to implement the provisions of this Trust Agreement and administer the GUC Trust, including the power to: (i) prosecute for the benefit of the GUC Trust Beneficiaries, through counsel and other professionals selected by the GUC Trust Administrator, any causes of action that may from time to time be held by the GUC Trust, (ii) resolve Disputed General Unsecured Claims against the Debtors; (iii) preserve and maintain the GUC Trust Assets; (iv) distribute the GUC Trust Distributable Assets to the GUC Trust Beneficiaries in accordance with the Plan, the Confirmation Order and this Trust Agreement; (v) expend the GUC Trust Administrative Cash to cover fees and expenses of the GUC Trust; (vi) reserve and/or sell New GM Securities and convert the proceeds to Other GUC Trust Administrative Cash; and (vii) otherwise perform the functions and take the actions provided for in this Trust Agreement or permitted in the Plan and/or the Confirmation Order, or in any other agreement executed pursuant to the Plan, in each case subject to the provisions of Articles VI, VIII and XI hereof regarding the rights and powers of the GUC Trust Monitor and, to the extent so provided, the approval of the Bankruptcy Court.

H.     The GUC Trust is subject to the continuing jurisdiction of the Bankruptcy Court, whose approval is required to pay or distribute money or property to, or on behalf of, a GUC Trust Beneficiary, except as expressly provided in this Trust Agreement.

I.     The GUC Trust is intended to qualify as a "disputed ownership fund" under Treasury Regulations section 1.468B-9.

J.     The GUC Trust shall be responsible for administering the wind-down of the affairs of the Debtors.

K.     If the Residual Wind-Down Assets are transferred to the GUC Trust, the GUC Trust Administrator shall be responsible for administering and distributing any Residual Wind-Down Assets transferred to the GUC Trust pursuant to the Plan, in each case subject to Section 6.13 and 8.1(c) of this Trust Agreement.

## Agreement

**NOW, THEREFORE**, in consideration of the promises and the mutual covenants contained herein, the Debtors, the GUC Trust Administrator and the GUC Trust Monitor agree as follows:

## ARTICLE I
## DEFINED TERMS

1.1.    <u>Definitions</u>.  Whenever used in this Trust Agreement, unless the context otherwise requires, the following words and phrases shall have the respective meanings ascribed to them as follows:

(a)    "<u>Additional Holdback</u>" has the meaning set forth in <u>Section 6.1(b)</u>.

(b)    "<u>Additional Shares</u>" has the meaning set forth in Background paragraph E(i).

(c)    "<u>Affiliates</u>" means, with respect to any Person, any other Person which directly or indirectly controls, is controlled by or is under common control with such Person.  For purposes of this definition "control" means, with respect to any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through ownership of voting securities, by contract or otherwise.

(d)    "<u>Aggregate Maximum Amount</u>" means the sum of the Maximum Amounts of all Disputed General Unsecured Claims, Unresolved Term Loan Avoidance Action Claims and Unresolved Other Avoidance Action Claims.

(e)    "<u>Allowed General Unsecured Claims</u>" has the meaning set forth in Background paragraph (F).

(f)    "<u>Bankruptcy Code</u>" has the meaning set forth in the preamble to this Trust Agreement.

(g)    "<u>Bankruptcy Court</u>" has the meaning set forth in Background paragraph A.

(h)    "<u>Budget</u>" shall have the meaning set forth in <u>Section 6.4</u> of this Trust Agreement.

(i)    "<u>calendar quarter</u>" means the relevant three-month period ending on the last day of March, June, September or December, as applicable, of each calendar year; <u>*provided, however*</u>, that if the Effective Date is not the first day of such a three-month period, the first calendar quarter, as used in this Trust Agreement, shall be deemed to include the relevant three-month period which includes the Effective Date (but only the portion of such period which begins on the Effective Date) as well as the next

succeeding three month period, and the second calendar quarter, as used in this Trust Agreement, shall be the calendar quarter following immediately thereafter.

(j)      "Certificate of Trust" means the certificate of trust of the GUC Trust as required by Section 3810 of the Delaware Act.

(k)      "Chapter 11 Cases" has the meaning set forth in Background paragraph A.

(l)      "Claim Conflict Resolution" has the meaning set forth in Section 3.7.

(m)      "Confidential Party" has the meaning set forth in Section 13.12.

(n)      "Confirmation Order" has the meaning set forth in Background paragraph D.

(o)      "Current Total Amount" means as of a given date, the sum of (A) the Total Allowed Amount as of such date and (B) the Aggregate Maximum Amount as of such date.

(p)      "Debtors" has the meaning set forth in the preamble to this Trust Agreement.

(q)      "Delaware Act" means the Delaware Statutory Trust Act, 12 Del. C. § 3801 et seq.

(r)      "DIP Lenders" means the U.S. Treasury and EDC, as lenders under the DIP Credit Agreement.

(s)      "Distribution Date" means the date of any distribution made by the GUC Trust Administrator to the GUC Trust Beneficiaries pursuant to this Trust Agreement, whether on account of either or both of Allowed General Unsecured Claims or Units.

(t)      "Distribution Record Date" means the Confirmation Date.

(u)      "Distribution Threshold" means an amount of Excess GUC Trust Distributable Assets equal to: (i) with respect to New GM Common Stock, 1 million shares of New GM Common Stock, (ii) with respect to the New GM $10.00 Warrants, warrants to acquire 909,091 shares of New GM Common Stock (subject to customary adjustment), (iii) with respect to the New GM $18.33 Warrants, warrants to acquire 909,091 shares of New GM Common Stock (subject to customary adjustment), (iv) with respect to Cash, $5 million, and (v) with respect to any other GUC Trust Distributable Assets, an amount determined by the GUC Trust Administrator and approved by the GUC Trust Monitor.

(v)      "DTC" means The Depository Trust Company.

(w)      "Excess Distribution Record Date" means, with respect to any given calendar quarter other than the first calendar quarter, the first date of such calendar quarter, which date shall constitute the record date for distributions pursuant to Section 5.4 hereof.

(x)      "Excess GUC Trust Distributable Assets" means (i) the amount of the GUC Trust Distributable Assets held by the GUC Trust, or the Debtors, as applicable (after providing for all distributions then required to be made in respect of Resolved Allowed General Unsecured Claims), minus (ii) the amount of the GUC Trust Distributable Assets (A) necessary for the satisfaction of Claims in the amount of the Aggregate Maximum Amount pursuant to Section 5.3(a)(i), (B) comprising the Additional Holdback, the Reporting and Transfer Holdback, the Protective Holdback and the Taxes on Distribution Holdback pursuant to Sections 6.1(b), (c), (d) and (e), and (C) remaining, if any, to be sold by the Debtors pursuant to Section 2.3(e) hereof.

(y)      "Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder, as in effect from time to time.

(z)      "External Distribution Account" has the meaning set forth in Section 3.3(c).

(aa)     "Fair Market Value" means, with respect to the New GM Securities on any given date, the closing price of the New GM Securities on the national securities exchange on which such New GM Securities trade on that date or, in the event that the New GM Securities are not traded on that date, the closing price on the immediately preceding trading date.  If any of the New GM Securities are not traded on a national securities exchange, then "Fair Market Value" means, with respect to the New GM Securities on any given date, the fair market value of the New GM Securities as determined by the GUC Trust Administrator in good faith, and with the approval of the GUC Trust Monitor.

(bb)     "Fractional Share Proceeds" has the meaning set forth in Background paragraph E(iv).

(cc)     "GUC Trust" has the meaning set forth in the preamble to this Trust Agreement.

(dd)     "GUC Trust Administrative Cash" has the meaning set forth in Background paragraph (E)(vii).

(ee)     "GUC Trust Administrator" has the meaning set forth in the preamble to this Trust Agreement.

(ff)     "GUC Trust Administrator Parties" means the GUC Trust Administrator and its principals, directors, officers, employees, agents, representatives, attorneys, accountants, advisors and other professionals (including the Trust Professionals).

(gg)    "GUC Trust Assets" has the meaning set forth in Background paragraph (E).

(hh)    "GUC Trust Beneficiaries" has the meaning set forth in Background paragraph (F).

(ii)    "GUC Trust Cash" means Cash or cash equivalents included in the GUC Trust Assets, including but not limited to any GUC Trust Administrative Cash, Fractional Share Proceeds, and GUC Trust Distributable Cash, plus any Cash or cash equivalents included in the Residual Wind-Down Assets.

(jj)    "GUC Trust Common Stock Assets" has the meaning set forth in Background paragraph (E)(i).

(kk)    "GUC Trust Distributable Assets" has the meaning set forth in Background paragraph (E)(v)

(ll)    "GUC Trust Distributable Cash" has the meaning set forth in Background paragraph (E)(v).

(mm)   "GUC Trust Dividend Assets" has the meaning set forth in Background paragraph (E)(iii).

(nn)    "GUC Trust Funding Date" has the meaning set forth in Section 2.3(a).

(oo)    "GUC Trust Monitor" has the meaning set forth in the preamble to this Trust Agreement.

(pp)    "GUC Trust Monitor Parties" means the GUC Trust Monitor and its principals, directors, officers, employees, agents, representatives, attorneys, accountants, advisors and other professionals.

(qq)    "GUC Trust Reports" means reports prepared by the GUC Trust Administrator each calendar quarter, as provided in Section 6.2.

(rr)    "GUC Trust Securities Assets" has the meaning set forth in Background paragraph (E)(ii).

(ss)    "GUC Trust Warrant Assets" has the meaning set forth in Background paragraph (E)(ii).

(tt)    "Holdback" has the meaning set forth in Section 2.6(d) of this Trust Agreement.

(uu)    "Incompetency" means, with respect to any Person, the incompetency of such Person if such Person is a natural person.

(vv)    "Initial Allowed General Unsecured Claims" has the meaning set forth in Background paragraph (F).

(ww)    "Initial Distribution Record Date" means the Effective Date.

(xx)    "Initial GUC Trust Dividend Assets" has the meaning set forth in Background paragraph (E)(iii).

(yy)    "IRS" means the Internal Revenue Service.

(zz)    "Maximum Amount" means,

(A)    with respect to any Disputed General Unsecured Claim, (x) the amount agreed to by the Debtors and/or the GUC Trust Administrator and the holder of such claim (which shall include any agreed capped amount pursuant to the ADR Procedures approved by the Bankruptcy Court); (y) the amount, if any, estimated or determined by the Bankruptcy Court in accordance with Bankruptcy Code Section 502(c); or (z) absent any such agreement, estimation or determination, the liquidated amount set forth in the proof of claim filed by the holder of such claim, or in the case of unliquidated claims, the amount estimated by the Debtors and/or the GUC Trust Administrator with the approval of the GUC Trust Monitor, and after final resolution of such Disputed General Unsecured Claim or dismissal of such Disputed General Unsecured Claim by Final Order, zero;

(B)    with respect to any Unresolved Term Loan Avoidance Action Claim, (i) an amount equal to the maximum amount that the plaintiff is seeking to recover with respect to such Unresolved Term Loan Avoidance Action Claim (which shall be initially equal to $1.5 billion for all Unresolved Term Loan Avoidance Action Claims in the aggregate) and (ii) upon dismissal of the Term Loan Avoidance Action by Final Order or if such claim ceases to be an Unresolved Term Loan Avoidance Action Claim, an amount equal to zero; and

(C)    with respect to any Unresolved Other Avoidance Action Claim, (x) if, on the date as of which the Maximum Amount is being measured, the respective Avoidance Action has not been commenced and/or identified in writing to the GUC Trust Administrator as potentially forthcoming by the proposed plaintiffs, an amount equal to zero, or (y) if, on the date as of which the Maximum Amount is being measured, such Avoidance Action has been commenced and/or identified in writing to the GUC Trust Administrator as potentially forthcoming by the proposed plaintiffs, (i) an amount estimated by the GUC Trust Administrator, with the approval of the GUC Trust Monitor, equal to the maximum amount reasonably recoverable by the plaintiffs with respect to such Unresolved Other Avoidance Action Claim and (ii) upon dismissal of such Avoidance Action by Final Order in its entirety against such defendant or if such claim ceases to be an Unresolved Other Avoidance Action Claim, an amount equal to zero.

(aaa)    "MLC" has the meaning set forth in the preamble to this Trust Agreement.

(bbb)    "New GM $10.00 Warrant" has the meaning set forth in Background paragraph E(ii).

(ccc)    "New GM $18.33 Warrant" has the meaning set forth in Background paragraph E(ii).

(ddd)    "New GM Common Stock" has the meaning set forth in Background paragraph (E)(i).

(eee)    "New GM Securities" has the meaning set forth in Background paragraph E(ii).

(fff)    "New GM Warrants" has the meaning set forth in Background paragraph (E)(ii).

(ggg)    "Other Avoidance Action Claims" means the additional General Unsecured Claims that have arisen as a result of recovery of proceeds of the Avoidance Actions other than the Term Loan Avoidance Action (and any related unsecured claims).

(hhh)    "Other GUC Trust Administrative Cash" has the meaning set forth in Background paragraph (E)(vii).

(iii)    "Permissible Investments" means investments in any of the following:

(i)    Marketable securities issued by the U.S. Government and supported by the full faith and credit of the U.S. Treasury, either by statute or an opinion of the Attorney General of the United States;

(ii)    Marketable debt securities, rated Aaa by Moody's and/or AAA by S&P, issued by U. S. Government-sponsored enterprises, U. S. Federal agencies, U. S. Federal financing banks, and international institutions whose capital stock has been subscribed for by the United States;

(iii)    Certificates of deposit, time deposits, and bankers acceptances of any bank or trust company incorporated under the laws of the United States or any state, *provided that*, at the date of acquisition, such investment, and/or the commercial paper or other short term debt obligation of such bank or trust company has a short-term credit rating or ratings from Moody's and/or S&P, each at least P-1 or A-1;

(iv)    Commercial paper of any corporation incorporated under the laws of the United States or any state thereof which on the date of acquisition is rated by Moody's and/or S&P, provided each such credit rating is least  P-1 and/or A-1;

(v)    Money market mutual funds that are registered with the Securities and Exchange Commission under the Investment Company Act of 1940, as amended, and operated in accordance with Rule 2a-7 and that at the time of such investment are rated Aaa by Moody's and/or AAAm by S&P, including such funds for which the GUC Trust Administrator or an Affiliate provides investment advice or other services;

(vi)     Tax-exempt variable rate commercial paper, tax-exempt adjustable rate option tender bonds, and other tax-exempt bonds or notes issued by municipalities in the United States, having a short-term rating of "MIG-1" or "VMIG-1" or a long term rating of "AA" (Moody's), or a short-term rating of "A-1" or a long term rating of "AA" (S&P);  and

(vii)     Repurchase obligations with a term of not more than thirty days, 102 percent collateralized, for underlying securities of the types described in clauses (i) and (ii) above, entered into with any bank or trust company or its respective affiliate meeting the requirements specified in clause (iii) above.

(jjj)     "Plan" has the meaning set forth in the preamble to this Trust Agreement.

(kkk)     "Protective Holdback" has the meaning set forth in Section 6.1(d).

(lll)     "Reporting and Transfer Costs" means any fees, costs or expenses incurred by

(i)     the GUC Trust that are directly or indirectly related to (x) reports required to be filed by the GUC Trust with the SEC pursuant to Section 6.3 of this Trust Agreement or otherwise pursuant to applicable rules, regulations and interpretations of the SEC (including, without limitation, any legal, accounting or registration fees, costs and expenses incurred by the GUC Trust with respect thereto), (y) the transfer, registration for transfer and certification of any Units (including, without limitation, the fees, costs and expenses of engaging a transfer agent) and (z) pursuant to Section 7.1 hereof, the application to the IRS for a private letter ruling regarding the tax treatment of the GUC Trust and the holders of General Unsecured Claims with respect to the distribution of New GM Securities; provided that, for the avoidance of doubt, notwithstanding any other provision of this Trust Agreement, the fees, costs and expenses that the GUC Trust would be required to incur even in the absence of the provisions of Sections 3.5(b) and 6.3 of this Trust Agreement (including, without limitation, any fees, costs or expenses incurred pursuant to Section 6.2 of this Trust Agreement) shall be included in the Budget and shall not be deemed Reporting and Transfer Costs; and

(ii)     the Creditors' Committee (x) as named plaintiff in the Term Loan Avoidance Action, to the extent not constituting actual litigation expenses or otherwise payable from the Avoidance Action Trust Administrative Cash, and (y) with respect to the settlement or determination by Final Order of the proper Term Loan Avoidance Action Beneficiaries (including through any appeals).

(mmm)     "Reporting and Transfer Holdback" has the meaning set forth in Section 6.1(c).

(nnn)     "Residual Wind-Down Claims" means the Administrative Expenses (but not including DIP Credit Agreement Claims and any claims related thereto), Priority Tax Claims, Priority Non-Tax Claims, and Secured Claims (in each case whether Allowed or Disputed) remaining at such time as the Residual Wind-Down Assets are transferred to the GUC Trust pursuant to Section 2.7 of this Trust Agreement.

(ooo)    "Residual Wind-Down Expenses" has the meaning set forth in Section 6.13.

(ppp)    "Resolved Allowed General Unsecured Claims" has the meaning set forth in Background paragraph (F).  For the avoidance of doubt, unless and until a Disputed General Unsecured Claim, Unresolved Term Loan Avoidance Action Claim or Unresolved Other Avoidance Action Claim becomes a Resolved Allowed General Unsecured Claim, there shall not be any distribution from the GUC Trust in respect of such claim.

(qqq)    "SEC" means the Securities and Exchange Commission.

(rrr)    "Secretary of State" means the Office of the Secretary of State of the State of Delaware.

(sss)    "Subsequent GUC Trust Dividend Assets" has the meaning set forth in Background paragraph (E)(iii).

(ttt)    "Tax Returns" means all tax returns, reports, certificates, forms or similar statements or documents.

(uuu)    "Taxes on Distribution" has the meaning set forth in Section 7.3.

(vvv)    "Taxes on Distribution Holdback" has the meaning set forth in Section 6.1(e)(i).

(www)    "Term Loan Avoidance Action Claims" means the additional General Unsecured Claims that have arisen as a result of recovery of proceeds of the Term Loan Avoidance Action (or any related unsecured claims).

(xxx)    "Total Allowed Amount" means the sum of the amount of all Initial Allowed General Unsecured Claims plus the amount of all Resolved Allowed General Unsecured Claims.

(yyy)    "Treasury Regulations" means the income tax regulations promulgated under the Tax Code, including any amended or successor income tax regulations thereto.

(zzz)    "Trust Agreement" has the meaning specified in the preamble to this Trust Agreement.

(aaaa)    "Trust Professionals" means, collectively, independent contractors, including attorneys, accountants, appraisers, disbursing agents or other parties deemed by the GUC Trust Administrator to have the qualifications necessary or desirable to assist in the proper administration of the GUC Trust and that are employed or retained by the GUC Trust in such capacities.

(bbbb)  "Trust Professional Maximum Amount" means the aggregate dollar amount allocated from the Wind-Down Budget Cash for each Indenture Trustee, Fiscal and Paying Agent and Trust Professional reflected on the Wind-Down Professional Fee Budget in the column labeled "Total."

(cccc)  "Unit Issuance Ratio" means the ratio of one Unit for each $1,000 in amount of Allowed General Unsecured Claims.

(dddd)  "Units" means the units of beneficial interest issued by the GUC Trust to holders of Allowed General Unsecured Claims.

(eeee)  "Unresolved Other Avoidance Action Claim" means an Other Avoidance Action Claim that has not yet arisen because no determination (including by way of settlement) has been made in the respective Avoidance Action against the respective defendant who would be entitled to such claim in the event of such determination (or if a determination has been made against the defendant, the proceeds related to such resolution have not been recovered in full).

(ffff)  "Unresolved Term Loan Avoidance Action Claim" means a Term Loan Avoidance Action Claim that has not yet arisen because no determination (including by way of settlement) has been made in the Term Loan Avoidance Action against the respective defendant who would be entitled to such claim in the event of such determination (or if a determination has been made against the defendant, the proceeds related to such resolution have not been recovered in full).

(gggg)  "Wind-Down Budget Cash" has the meaning set forth in Background paragraph (E)(vi).

(hhhh)  "Wind-Down Professional Fee Budget" means the supporting schedule to Exhibit B of the Disclosure Statement, which provides the anticipated fees and expenses of the Indenture Trustees, Fiscal and Paying Agents and certain Trust Professionals on a per entity basis.

1.2.    Meanings of Other Terms.  Except where the context otherwise requires, words importing the masculine gender include the feminine and the neuter, if appropriate, words importing the singular number shall include the plural number and vice versa and words importing persons shall include firms, associations, corporations and other entities. All references herein to Articles, Sections and other subdivisions, unless referring specifically to the Plan or provisions of the Bankruptcy Code, the Bankruptcy Rules, or other law, statute or regulation, refer to the corresponding Articles, Sections and other subdivisions of this Trust Agreement, and the words herein and words of similar import refer to this Trust Agreement as a whole and not to any particular Article, Section or subdivision of this Trust Agreement.  The term "including" shall mean "including, without limitation."

## ARTICLE II
## DECLARATION OF TRUST

2.1.    Creation of Trust.  The Debtors and the GUC Trust Administrator, pursuant to the Plan and the Confirmation Order and in accordance with the applicable provisions of chapter 11 of the Bankruptcy Code, hereby constitute and create the GUC Trust, in the form of a statutory trust under the Delaware Act, which shall bear the name "Motors Liquidation Company GUC Trust."  In connection with the exercise of the GUC Trust Administrator's power hereunder, the GUC Trust Administrator may use this name or such variation thereof as the GUC Trust Administrator sees fit.  The GUC Trust Administrator, as trustee of the GUC Trust, is hereby authorized and directed to execute and file a Certificate of Trust for the GUC Trust in the form attached hereto as Exhibit E.

2.2.    Purpose of GUC Trust.  The sole purpose of the GUC Trust is to implement the Plan on behalf, and for the benefit, of the GUC Trust Beneficiaries, to serve as a mechanism for distributing the GUC Trust Distributable Assets under the Plan and in accordance with Treasury Regulations section 1.468B-9, paying all expenses incident thereto (including with respect to the fees and expenses of the Trust Professionals and other professionals retained by the GUC Trust) and, following the dissolution of the Debtors, to wind-down the Debtors' affairs, with no objective to engage in the conduct of a trade or business.

2.3.    Transfer of GUC Trust Assets to the GUC Trust.

(a)    On the Effective Date, or as soon thereafter as is reasonably practicable, the Debtors shall transfer, pursuant to Bankruptcy Code Sections 1123(a)(5)(B) and 1123(b)(3)(B), and in accordance with the Plan and the Confirmation Order, the GUC Trust Assets (other than the New GM Securities and the Indenture Trustee/Fiscal and Paying Agent Reserve Cash) to the GUC Trust, free and clear of any and all liens, claims, encumbrances of all other entities to the maximum extent contemplated by and permissible under Bankruptcy Code Section 1141(c), on behalf of holders of General Unsecured Claims; provided, however that notwithstanding anything to the contrary in the Plan, Disclosure Statement, Confirmation Order, this Trust Agreement or any other agreement, the DIP Lenders shall maintain their liens on the Wind-Down Budget Cash, provided that for the avoidance of doubt, the DIP Lenders shall not demand acceleration of their liens on the Wind-Down Budget Cash except in accordance with the provisions of section 7.2 of the DIP Credit Agreement.  After the Effective Date and from time to time thereafter through no later than December 15, 2011, and upon the written request of the GUC Trust Administrator specifying the number of New GM Securities to be transferred to the GUC Trust, the Debtors shall promptly transfer to the GUC Trust such New GM Securities and the corresponding GUC Trust Dividend Assets free and clear of all liens, claims, and encumbrances for the purposes of distributions pursuant to Sections 5.2, 5.3 or 5.4 hereof. All such New GM Securities transferred for purposes of distributions pursuant to Sections 5.2, 5.3 or 5.4 hereof shall be distributed by the GUC Trust to holders of Allowed General Unsecured Claims in accordance Sections 5.2, 5.3 and 5.4 hereof within thirty (30) days of the receipt thereof by the GUC Trust. On or after December 15, 2011, but by no later than December 29, 2011 (such date, the "GUC Trust

Funding Date"), all remaining New GM Securities, Other GUC Trust Administrative Cash and other GUC Trust Assets held by the Debtors (including the Additional Shares) shall be transferred to the GUC Trust free and clear of all liens, claims, and encumbrances.  To the extent that any such remaining New GM Securities so delivered would otherwise be distributed on the next Distribution Date because of Claims resolved (whether Allowed or disallowed) on or prior to the date such New GM Securities are received by the GUC Trust, such distribution shall be made no later than thirty (30) days after the receipt of such remaining New GM Securities by the GUC Trust. For the avoidance of doubt, (x) all references in this Trust Agreement to GUC Trust Distributable Assets held by or administered by the GUC Trust shall include all GUC Trust Distributable Assets (or the relevant subcategory thereof), whether held by the Debtors or by the GUC Trust, and (y) the New GM Securities necessary to satisfy the initial distribution on account of the Asbestos Trust Claim shall be reserved and distributed directly by the Debtors in accordance with the Plan and the proviso in Section 5.2(a) of this Trust Agreement. Such transfers shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use or other similar tax.  The Debtors and their successors and assigns shall be released from any and all liability with respect to the transfer of the GUC Trust Assets to the GUC Trust as aforesaid.  Nothing in this Trust Agreement is intended to, or shall be construed to, effect a release, extinguishment or compromise of any claim or cause of action transferred to the GUC Trust pursuant to this Trust Agreement.  The GUC Trust Assets and all other property held from time to time by the GUC Trust under this Trust Agreement and any earnings (including interest) thereon are to be managed, applied and disposed of by the GUC Trust Administrator in accordance with the terms hereof, the Plan and the Confirmation Order for the benefit of the GUC Trust Beneficiaries, and for no other party, subject to the further covenants, conditions and terms hereinafter set forth, including the provisions of Sections 2.6 and 2.7 of this Trust Agreement.

(b)    To the extent any GUC Trust Assets held by the Debtors cannot be transferred to the GUC Trust, because of a restriction on transferability under applicable non-bankruptcy law that is not superseded by Bankruptcy Code Section 1123 or any other provision of the Bankruptcy Code, such assets shall be retained by the Debtors.  The proceeds of sale of any such assets retained by the Debtors shall be allocated to the GUC Trust pursuant to the Plan as if such transfer had not been restricted under applicable non-bankruptcy law.  The GUC Trust Administrator may commence an action in the Bankruptcy Court to resolve any dispute regarding the allocation of the proceeds of any assets retained by the Debtors pursuant to the Plan and Confirmation Order.

(c)    Within 3 Business Days of the entry of the Confirmation Order, the Debtors shall deliver to the GUC Trust (i) a complete list of all General Unsecured Claims, both Allowed and Disputed, reflected on the claims registry as of the Distribution Record Date, including the names and addresses of all holders of such General Unsecured Claims, whether such claims have been Allowed or are Disputed, and the details of all objections in respect of Disputed General Unsecured Claims, and (ii) a complete list of all known Avoidance Actions. Within 1 Business Day of the Effective Date, the Debtors shall deliver to the GUC Trust a list of any changes to the claims registry between the Distribution Record Date and the Effective Date.

(d)	The GUC Trust Administrator shall take such action, when and as appropriate and in consultation with the GUC Trust Monitor, to determine whether the GUC Trust or the Debtors may be entitled pursuant to the MSPA to receive a distribution of Additional Shares (or any additional distribution of Additional Shares) as a result of the aggregate amount of Allowed General Unsecured Claims exceeding $35 billion, and, if the GUC Trust or the Debtors is so entitled, the GUC Trust Administrator or the Debtors, as applicable, shall take such steps as described in the MSPA to request the issuance of such Additional Shares by General Motors Company to the Debtors, or the GUC Trust, as applicable.

(e)

(i)	On the Effective Date, or as soon thereafter as is reasonably practicable, the Debtors shall sell from the GUC Trust Distributable Assets, in one or more transactions, an amount of GUC Trust Distributable Assets the Cash proceeds of which, net of any applicable costs, fees, expenses and taxes payable in respect thereof, shall approximate $5.75 million. Such sale shall (in the aggregate) be made, to the extent practicable, from each asset type in a proportion to the total amount of such asset type comprising the GUC Trust Distributable Assets on the Effective Date that shall be the same as nearly as possible for each asset type.   Any Cash proceeds of such sale or sales shall be deemed Other GUC Trust Administrative Cash designated for the satisfaction of Reporting and Transfer Costs. From time to time after the Effective Date through December 15, 2011, upon the written request of the GUC Trust Administrator specifying the amount of Cash to be transferred to the GUC Trust from the proceeds of such sale or sales, the Debtors shall promptly transfer such Cash to the GUC Trust free and clear of all liens, claims, and encumbrances; provided that the GUC Trust Administrator shall only request the transfer of such proceeds for the purpose of satisfaction of Reporting and Transfer Costs reasonably expected by the GUC Trust Administrator to be incurred by the GUC Trust prior to December 15, 2011.  Any of such proceeds as shall remain with the Debtors on December 15, 2011 shall be transferred to the GUC Trust as provided in Section 2.3(a).

(ii)	Notwithstanding anything herein to the contrary, the Debtors shall transfer directly to the Avoidance Action Trust on the Avoidance Action Trust Transfer Date (but prior to any transfer of New GM Securities to the GUC Trust on such date) $500,000 in Cash, such amount reducing amounts otherwise designated as Other GUC Trust Administrative Cash for the satisfaction of Reporting and Transfer Costs, and not from the DIP Lenders' Collateral. Such funds shall be held by the Avoidance Action Trust in a segregated account and shall be used solely for the satisfaction of fees, costs or expenses that are directly or indirectly related to reports that may be required to be filed by the Avoidance Action Trust with the SEC pursuant to applicable rules, regulations and interpretations of the SEC (including, without limitation, any legal, accounting or registration fees, costs and expenses incurred by the Avoidance Action Trust with respect thereto).

(f)	From time to time after the Effective Date through December 15, 2011, upon the written request of the GUC Trust Administrator specifying the amount of Cash needed, the Debtors shall, in accordance with the provisions of Section 6.1 of this Trust Agreement, but only to the extent necessary to satisfy expenses reasonably expected by the GUC Trust Administrator to be incurred by the GUC Trust prior to December 15,

15

2011, sell New GM Securities (and transfer any corresponding GUC Trust Dividend Assets) pursuant to the liquidation of all or a portion of the Additional Holdback, the Reporting and Transfer Holdback, the Protective Holdback or the Taxes on Distribution Holdback. Any Cash proceeds of such a liquidation shall, in accordance with the provisions of Section 6.1 of this Trust Agreement, be deemed Other GUC Trust Administrative Cash designated for the satisfaction of the expenses for which the respective holdback was reserved and shall be promptly transferred by the Debtors to the GUC Trust free and clear of all liens, claims and encumbrances.

(g)      To the extent that any governmental unit can demonstrate, to the satisfaction of the GUC Trust Administrator in its sole discretion, that such governmental unit is precluded by applicable law from accepting and owning New GM Securities, the GUC Trust Administrator may, but shall not be required to, at any time following the GUC Trust Funding Date, sell the New GM Securities that would otherwise be distributable to such governmental unit pursuant to Sections 5.2, 5.3 or 5.4 hereof free and clear of all liens, claims and encumbrances and distribute the proceeds of such sale net of any applicable costs, fees, expenses and taxes payable in respect thereof, to such governmental unit in lieu of any distribution of New GM Securities.  Prior to December 15, 2011, any such sale shall be made by the Debtors at the request of the GUC Trust Administrator, and the Cash proceeds thereof (net of any applicable costs, fees, expenses and taxes payable in respect thereof) transferred to the GUC Trust free and clear of all liens, claims and encumbrances.

(h)      On the GUC Trust Funding Date, the Debtors shall transfer to the GUC Trust, free and clear of all liens, claims and encumbrances, the Indenture Trustee/Fiscal and Paying Agent Reserve Cash. Upon such transfer, the Indenture Trustee/Fiscal and Paying Agent Reserve Cash shall be deemed Wind-Down Budget Cash; *provided*, *however*, for the avoidance of doubt, that the Indenture Trustee/Fiscal and Paying Agent Reserve Cash shall be used solely for the satisfaction of the costs, fees and expenses of Indenture Trustees and Fiscal and Paying Agents.

(i)      Any sale of GUC Trust Securities Assets in accordance with this Section 2.3 shall be made in compliance with an applicable exemption from the registration requirements of the Securities Act of 1933, as amended, and any equivalent securities law provisions under state law (it being understood that Section 1145 of the Bankruptcy Code is not available for such purposes).

2.4.      Appointment and Acceptance of GUC Trust Administrator.  The GUC Trust Administrator shall be deemed to be appointed pursuant to Bankruptcy Code Section 1123(b)(3)(B) and is hereby appointed trustee of the GUC Trust under the Delaware Act. The GUC Trust Administrator hereby accepts such appointments, including the trusteeship of the GUC Trust created by this Trust Agreement and the grant, assignment, transfer, conveyance and delivery by the Debtors to the GUC Trust Administrator, on behalf of the GUC Trust, and for the benefit, of the GUC Trust Beneficiaries, of all of their respective right, title and interest in the GUC Trust Distributable Assets, upon and subject to the terms and conditions set forth in the Plan, the Confirmation Order and this Trust Agreement.  The GUC Trust Administrator's powers are exercisable solely in a fiduciary

capacity consistent with, and in furtherance of, the purpose of the GUC Trust and not otherwise, and in accordance with applicable law, including the Delaware Act. The GUC Trust Administrator shall have the authority to bind the GUC Trust within the limitations set forth herein, but shall for all purposes hereunder be acting in the capacity as GUC Trust Administrator, and not individually.

2.5.    Distribution of GUC Trust Distributable Assets. The GUC Trust Administrator shall, in an expeditious but orderly manner and subject to the provisions of the Plan, the Confirmation Order and this Trust Agreement, make timely distributions of the GUC Trust Distributable Assets in accordance with the terms hereof and not unduly prolong the existence of the GUC Trust. The GUC Trust Administrator may incur and pay any reasonable and necessary expenses in connection with the administration of the GUC Trust, including the fees and expenses of the Trust Professionals, *provided*, *however*, that all such expenditures, solely to the extent that they are paid from the Wind-Down Budget Cash, shall be made in accordance with the Budget.

2.6.    No Reversion to Debtors.

(a)    In no event shall any part of the GUC Trust Assets revert to or be distributed to or for the benefit of any Debtor. Except as otherwise provided in this Trust Agreement, all GUC Trust Distributable Assets shall be applied to the satisfaction of Allowed General Unsecured Claims, including through distributions made in respect of the Units.

(b)    To the extent that after satisfaction in full of all of the costs and expenses of the administration of the GUC Trust, after all Allowed General Unsecured Claims have been paid pursuant to the Plan, after satisfaction of all other obligations or liabilities of the GUC Trust (including without limitation distributing the Residual Wind-Down Assets to holders of Allowed Residual Wind-Down Claims, but not including the claims of the DIP Lenders) incurred or assumed in accordance with the Plan, Confirmation Order or this Trust Agreement, (or to which the GUC Trust Assets are otherwise subject), and after the affairs of the GUC Trust have been finally wound up and concluded in accordance with the provisions of Section 4.3 hereof and Section 3808 of the Delaware Act, there shall remain any Wind-Down Budget Cash or Residual Wind-Down Assets, the GUC Trust Administrator is authorized to and shall distribute any such remaining Wind-Down Budget Cash and Residual Wind-Down Assets to the DIP Lenders in accordance with the terms of the DIP Credit Agreement. To the extent any portion of such residue is not accepted by the respective DIP Lenders, the GUC Trust Administrator shall (i) be authorized to distribute up to $100,000 of such remaining Wind-Down Budget Cash or Residual Wind-Down Assets to an organization described in section 501(c)(3) of the Tax Code and exempt from U.S. federal income tax under section 501(a) of the Tax Code that is unrelated to the Debtors, the GUC Trust, the GUC Trust Administrator Parties or the GUC Trust Monitor Parties, or (ii) with respect to amounts in excess of $100,000, request an order of the Bankruptcy Court authorizing the GUC Trust Administrator to distribute any such remaining Wind-Down Budget Cash or Residual Wind-Down Assets to such an organization, or authorizing such other disposition as recommended by the GUC Trust Administrator and approved by the Bankruptcy Court.

(c)        The GUC Trust agrees that all payments of Wind-Down Budget Cash to Trust Professionals shall be subject to the annual Budget and are further subject to the Wind-Down Professional Fee Budget.  If the billings of a Trust Professional have exceeded the amount allocated to it in the Budget (measured on an annual basis) and such Trust Professional has not exceeded the Trust Professional Maximum Amount) of such Trust Professional (measured on a cumulative basis), such Trust Professional shall not be paid from the Wind-Down Budget Cash any amount greater than the amount allocated to it in the Budget for such period except with the written consent of the DIP Lenders, *provided that* if the DIP Lenders do not consent, the GUC Trust Administrator, in consultation with the GUC Trust Monitor may seek Bankruptcy Court approval to pay the Trust Professional from the Wind-Down Budget Cash an amount greater than the amount allocated in the Budget for such period.  The GUC Trust Administrator may only request such Bankruptcy Court approval on the grounds that the DIP Lenders acted in bad faith in not consenting to authorize payment to the Trust Professional in excess of the Budget.  "Bad faith" shall not include, *inter alia*, a failure to permit payments outside the Budget for any rational business purpose.  The GUC Trust Administrator agrees that under no circumstances will Wind-Down Budget Cash be used to pay a Trust Professional once such Trust Professional exceeds its Trust Professional Maximum Amount.

(d)        All payments of Wind-Down Budget Cash to Trust Professionals shall be subject to a holdback of 10 percent of the amount billed for each calendar year (the "Holdback").  If the billings of the Trust Professional do not exceed the amount allocated to such Trust Professional in the Budget for such calendar year, such Trust Professional shall receive any amounts actually owed but not yet paid for the calendar year from the Wind-Down Budget Cash in the amount of its Holdback, no less than 30 days after the end of the calendar year.  If the billings of the Trust Professional exceed the amount allocated to it in the Budget for any calendar year, such Trust Professional shall not receive the Holdback for such calendar year until 30 days after the earlier of (x) the termination of such Trust Professional's engagement by the GUC Trust or (y) the dissolution of the GUC Trust pursuant to Section 4.1 of this GUC Trust Agreement (which amount shall be payable from the Wind-Down Budget Cash to the extent such funds are available at that time, and otherwise from Other GUC Trust Administrative Cash).

(e)        Any Wind-Down Budget Cash remaining upon the dissolution of the GUC Trust, including the aggregate unspent Trust Professional Maximum Amount, but excluding the Holdback, shall be returned to the DIP Lenders in accordance with Section 2.4 of the Plan.  Notwithstanding the foregoing, a Trust Professional may receive payment for amounts in excess of the Budget from sources other than the Wind-Down Budget Cash in accordance with Section 6.1(d) of this Trust Agreement. For the avoidance of doubt, the Reporting and Transfer Costs shall not be set forth in the Budget and shall not be paid for with Wind-Down Budget Cash.

(f)        The GUC Trust Administrator shall provide reports regarding the Residual Wind-Down Assets to the DIP Lenders as described in Section 6.2(e) of this Trust Agreement.  The GUC Trust Administrator, the GUC Trust Monitor or the DIP Lenders may petition the Bankruptcy Court to resolve any disputes concerning the use of the Residual Wind-Down Assets, as contemplated herein.

(g)     Notwithstanding the foregoing, any remaining unspent Other GUC Trust Administrative Cash, other than Other GUC Trust Administrative Cash received by the GUC Trust pursuant to Section 7.7(d) hereof, shall not be distributed to the DIP Lenders, but rather shall be distributed to holders of Allowed General Unsecured Claims or holders of Units, as the case may be, pursuant to Article V.

2.7.    Dissolution of the Debtors.  If any Residual Wind-Down Claims shall remain upon dissolution of the Debtors, which according to the Plan shall occur no later than December 15, 2011, then, on the GUC Trust Funding Date, the Debtors shall transfer to the GUC Trust (i) all remaining Residual Wind-Down Assets, free and clear of any and all liens, claims, encumbrances of all other entities to the maximum extent contemplated by and permissible under Bankruptcy Code Section 1141(c), and (ii) a complete list of all Residual Wind-Down-Claims, both Allowed and Disputed, reflected on the claims registry as of the date of transfer, including the names and addresses of all holders of such Residual Wind-Down Claims, whether such claims have been Allowed or are Disputed, and the details of all objections in respect of Disputed Residual Wind-Down Claims.  In such case, after such transfer, the GUC Trust Administrator shall have the exclusive right to object to any remaining Residual Wind-Down Claims, and shall administer the resolution of all Residual Wind-Down Claims, all in accordance with the terms of the Plan, the Confirmation Order and Section 8.1(c) of this Trust Agreement; provided, however that notwithstanding anything to the contrary in the Plan, Disclosure Statement, Confirmation Order, this Trust Agreement or any other agreement, the DIP Lenders shall maintain their liens on the Residual Wind-Down Assets, provided that for the avoidance of doubt, the DIP Lenders shall not demand acceleration of their liens on the Residual Wind-Down Assets except in accordance with the provisions of section 7.2 of the DIP Credit Agreement.

## ARTICLE III
## GUC TRUST BENEFICIARIES; UNITS

3.1.    Rights of Beneficiaries.

(a)     Except as otherwise provided in this Trust Agreement, the GUC Trust Beneficiaries shall be the sole beneficiaries of the GUC Trust Distributable Assets and of the GUC Trust; the GUC Trust Administrator shall retain only such incidents of ownership as are necessary to undertake the actions and transactions authorized in the Plan, the Confirmation Order and this Trust Agreement, including those powers set forth in Articles VI and VIII hereof.

(b)     The beneficial interest of a GUC Trust Beneficiary in the GUC Trust is hereby declared and shall be in all respects and for all purposes intangible personal property.

(c)     Except as expressly provided herein, a GUC Trust Beneficiary shall have no title or right to, or possession, management or control of, the GUC Trust, or the GUC Trust Assets, or to any right to demand a partition or division of such assets or to require an accounting of the GUC Trust Administrator or the GUC Trust Monitor.  The

whole legal title to the GUC Trust Assets shall be vested in the GUC Trust as a separate legal entity under the Delaware Act or, if necessary, in the GUC Trust Administrator on behalf of the GUC Trust, and the sole beneficial interest of the GUC Trust Beneficiaries shall be as set forth in this Trust Agreement.

3.2.    Limited Liability.  No provision of the Plan, the Confirmation Order or this Trust Agreement, and no mere enumeration herein of the rights or privileges of any GUC Trust Beneficiary, shall give rise to any liability of such GUC Trust Beneficiary solely in its capacity as such, whether such liability is asserted by any Debtor, by creditors or employees of any Debtor, or by any other Person. GUC Trust Beneficiaries are deemed to receive the GUC Trust Distributable Assets in accordance with the provisions of the Plan, the Confirmation Order and this Trust Agreement in exchange for their Allowed General Unsecured Claims or on account of their Units, as applicable, without further obligation or liability of any kind, but subject to the provisions of this Trust Agreement.

3.3.    Manner of Receipt of Distributions

(a)    Except with respect to holders of Note Claims and Eurobond Claims, in order to receive a distribution from the GUC Trust of New GM Common Stock, New GM Warrants or Units, holders of Allowed General Unsecured Claims must designate a direct or indirect participant in DTC with whom such holder has an account and take such other ministerial actions (i) as specifically identified on Exhibit B hereto, and (ii) as the GUC Trust Administrator shall from time to time reasonably require by written communication to the holders of Allowed General Unsecured Claims.  With respect to holders of Note Claims and Eurobond Claims, the GUC Trust shall distribute New GM Securities and shall issue Units to such holders through the applicable Indenture Trustees and Fiscal and Paying Agents, who will in turn distribute the New GM Common Stock, New GM Warrants and Units to such holders in accordance with the procedures of DTC and its participants; _provided_, _however_, that a holder of Note Claims or Eurobond Claims who holds such Claims in certificated form shall not be treated as a holder of Note Claims or Eurobond Claims for purposes of this Section 3.3.

(b)    If and for so long as a holder of an Allowed General Unsecured Claim (other than the holders of Note Claims and Eurobond Claims) does not designate a direct or indirect participant in DTC and take such other actions required by Section 3.3(a), the GUC Trust Administrator, or the Debtors, as applicable, shall, except as otherwise provided by this Section 3.3, hold the New GM Common Stock, New GM Warrants and Units such holder is otherwise entitled to receive, together with any GUC Trust Distributable Assets distributed in respect of such New GM Common Stock, New GM Warrants and Units, until such time as such holder complies with the requirements of Section 3.3(a). At any time following the date on which a holder of an Allowed General Unsecured Claim complies in full with the requirements of Section 3.3(a), but in any event, as soon as practicable following the beginning of the calendar quarter next following such date, the GUC Trust Administrator shall distribute to such holder the New GM Common Stock, New GM Warrants and Units and any distributions thereon to which such holder is entitled; _provided_, _however_, that if a holder has not complied with the requirements of Section 3.3(a) prior to the final Distribution Date, then (i) the Units

otherwise distributable to such holder or holders shall be deemed cancelled and not outstanding, and (ii) the GUC Trust Distributable Assets otherwise distributable to such holders (other than assets which have been distributed to the External Distribution Account pursuant to Section 3.3(c) hereof), including in respect of Units otherwise distributable to such holder, shall be distributed pro rata to all holders of Units then outstanding on the final Distribution Date.

(c)    (i) The GUC Trust Administrator is authorized to, and shall open, maintain and close an account (the "External Distribution Account") in a name other than that of the GUC Trust, for the purposes set forth in this Section 3.3(c).

(ii)    If —

(A)    any GUC Trust Distributable Assets are received by the GUC Trust prior to the GUC Trust Funding Date and the holder of an Allowed General Unsecured Claim or of a Unit is entitled to a distribution of such GUC Trust Distributable Assets pursuant to Sections 5.2, 5.3 or 5.4 hereof, but for any reason whatsoever, the GUC Trust Administrator is unable to transfer the GUC Trust Distributable Assets to the account designated by such holder, or

(B)    any GUC Trust Distributable Assets are received by the GUC Trust on the GUC Trust Funding Date for distribution on the Distribution Date next following the GUC Trust Funding Date because of Claims resolved (whether Allowed or disallowed) on or prior to the GUC Trust Funding Date and the holder of an Allowed General Unsecured Claim or of a Unit is entitled to a distribution of such GUC Trust Distributable Assets pursuant to Sections 5.2, 5.3 or 5.4 hereof, but such holder has not complied in full with the requirements of Section 3.3(a) hereof, or has complied with such requirements but, for any reason whatsoever, the GUC Trust Administrator is unable to transfer the GUC Trust Distributable Assets to the account designated by such holder,

then, in any such case, the GUC Trust Administrator shall distribute such GUC Trust Distributable Assets to such holder by transferring such GUC Trust Distributable Assets to the External Distribution Account, where they will be held on behalf of such holder. Following such transfer, the GUC Trust Distributable Assets so transferred shall no longer be GUC Trust Assets, but shall be held in the External Distribution Account solely for the benefit of such holder, who shall be liable for all taxes in respect thereof as if distributed to an account designated by such holder.

(iii)    If any GUC Trust Distributable Assets are transferred to the External Distribution Account for the benefit of a holder as provided in this Section 3.3(c), the Units issuable to such holder in connection therewith, as provided in Section 3.4(a), shall be issued to the External Distribution Account for the benefit of such holder, and thereafter any distribution of GUC Trust Distributable Assets made in respect of such Units shall similarly be transferred to the External Distribution Account for the benefit of such holder.

(iv)    As soon as reasonably practicable after the holder has complied with the requirements of Section 3.3(a) hereof or the reason for the inability of the GUC Trust

Administrator to transfer the GUC Trust Distributable Assets and Units held in the External Distribution Account for the benefit of such holder to the account designated by the holder ceases to exist, the GUC Trust Administrator shall arrange for the transfer of such GUC Trust Distributable Assets and Units from the External Distribution Account to the account designated by such holder.

        (v)      If, at the time of the final Distribution Date, any GUC Trust Distributable Assets or Units remain in the External Distribution Account, then (x) any such Units shall be deemed cancelled and shall cease to be outstanding, and (y) to the extent permitted by law, any such GUC Trust Distributable Assets shall be distributed pro rata to all holders of Units then outstanding on the final Distribution Date, and, to the extent not so permitted, shall otherwise be disposed of in accordance with applicable law.

        3.4.     <u>Issuance of Units</u>.

        (a)      The GUC Trust shall issue Units to holders of Allowed General Unsecured Claims as provided in this Trust Agreement.  At such time as the holders of Initial Allowed General Unsecured Claims receive their initial distribution of New GM Securities pursuant to <u>Section 5.2</u> of this Trust Agreement, they shall also receive the number of Units equal to the amount of such Initial Allowed General Unsecured Claims multiplied by the Unit Issuance Ratio, rounded up or down to the nearest whole Unit (with one-half being closer to the next higher number for these purposes).  Following the Effective Date, holders of Resolved Allowed General Unsecured Claims shall receive, at the time such holders receive their initial distribution of New GM Securities pursuant to <u>Section 5.3</u>, a number of Units equal to the amount of such Resolved Allowed General Unsecured Claims multiplied by the Unit Issuance Ratio, rounded up or down to the nearest whole Unit (with one-half being closer to the next higher number for these purposes).  Units will represent the contingent right to receive, on a pro rata basis as provided in the Plan, the Confirmation Order and this Trust Agreement, GUC Trust Distributable Assets that are not required for satisfaction of Resolved Allowed General Unsecured Claims.   The Units shall be issued subject to all the terms and conditions of the Plan, the Confirmation Order and this Trust Agreement.  References in this Trust Agreement to holders of Units shall be to the record holders of such Units or to the beneficial holders of the Units, as the context requires.

        (b)      With respect to the claims of beneficial holders of debt securities arising out of or relating to the Note Claims and Eurobond Claims, the GUC Trust shall issue additional Units to the Indenture Trustees and Fiscal and Paying Agents, to the extent necessary to provide each such beneficial holder with a number of Units equal to the number of Units such holder would receive had its claim been treated as an Initial Allowed General Unsecured Claim hereunder.

        (c)      As provided in <u>Section 7.5</u> hereof, the GUC Trust Administrator may also hold back and retain Units otherwise issuable pursuant to this section with respect to Allowed General Unsecured Claims that are subject to tax withholding, and the GUC Trust Administrator shall apply amounts distributed in respect of such retained Units to satisfy such tax withholding obligations.

(d)    Following the final Distribution Date, all outstanding Units shall be deemed cancelled and shall cease to be outstanding.

3.5.    Evidence of Units.

(a)    Except as otherwise provided in this Trust Agreement, Units will be issued in book-entry form only, and held through participants (including securities brokers and dealers, banks, trust companies, clearing corporations and other financial organizations) of DTC, as depositary.  Unit holders will not receive physical certificates for their Units, and the Units will not be registered in a direct registration system on the books and records of the GUC Trust.  For so long as DTC serves as depositary for the Units, the GUC Trust Administrator may rely on the information and records of DTC to make distributions and send communications to the holders of Units and, in so doing, the GUC Trust Administrator shall be fully protected and incur no liability to any holder of Units, any transferee (or purported transferee) of Units, or any other person or entity.

(b)    If DTC is unwilling or unable to continue as a depositary for the Units, or if the GUC Trust Administrator with the approval of the GUC Trust Monitor otherwise determines to do so, the GUC Trust Administrator shall exchange the Units represented in book-entry form for physical certificates.

(c)    Notwithstanding anything to the contrary in the Plan, the Confirmation Order or this Trust Agreement, the GUC Trust shall not issue any Units unless and until (i) the GUC Trust receives a favorable ruling from the Division of Corporation Finance of the SEC, in a form acceptable to the GUC Trust Administrator in its sole discretion, which provides that, among other matters, the Division of Corporation Finance of the SEC would not recommend enforcement action if such Units are not registered under Section 12(g) of the Securities Exchange Act of 1934, and (ii) in addition to such favorable ruling from the Division of Corporation Finance of the SEC, the Divisions of Investment Management and Trading and Markets of the SEC formally or informally communicate that they have no objection to the issuance of the Units and the establishment of the GUC Trust; *provided, however,* that in the case of each of clauses (i) and (ii) above; if, and only if the Units are not transferable except by operation of law, the GUC Trust Administrator may waive the requirement of such a ruling or "no objection" communication, as applicable, in its sole discretion.

3.6.    Transfers of Units.  Units shall be freely negotiable and transferable to the extent that the transferability thereof would not require the GUC Trust to register the Units under Section 12(g) of the Securities Exchange Act of 1934, as amended, and otherwise shall not be transferable except as provided herein.  For so long as DTC continues to serve as depositary for the Units, the transferability of the Units shall also be subject to the requirements of DTC's electronic book-entry system.  In no event, however, shall the GUC Trust Administrator or anyone acting on its behalf, directly or indirectly, engage in any activity designed to facilitate or promote trading in the Units including by engaging in activities prohibited pursuant to Section 8.2; provided that no activity undertaken by the GUC Trust Administrator in compliance with the terms of the Plan, the Confirmation

Order or this Trust Agreement shall be deemed to facilitate or promote trading in the Units for these purposes.

  3.7. <u>Conflicting Claims to Units</u>.  If the GUC Trust Administrator has actual knowledge of any conflicting claims or demands that have been made or asserted with respect to a Unit, or a beneficial interest therein, the GUC Trust Administrator shall be entitled, at its sole election, to refuse to comply with any such conflicting claims or demands.  In so refusing, the GUC Trust Administrator may elect to make no payment or distribution with respect to the Unit subject to the claims or demands involved, or any part thereof, and the GUC Trust Administrator shall be entitled to refer such conflicting claims or demands to the Bankruptcy Court, which shall have exclusive and continuing jurisdiction over resolution of such conflicting claims or demands.  The GUC Trust Administrator shall not be or become liable to any party for either (i) its election to continue making distributions pursuant to its books and records and/or the books and records of DTC, as applicable, without regard to the conflicting claims or demands; or (ii) its election to cease payments or distributions with respect to the subject Unit or Units.  In the event that the GUC Trust Administrator elects to cease payments, it shall be entitled to refuse to act until either (x) the rights of the adverse claimants have been adjudicated by a Final Order of the Bankruptcy Court (or such other court of proper jurisdiction) or (y) all differences have been resolved by a written agreement among all of such parties and the GUC Trust Administrator, which agreement shall include a complete release of the GUC Trust, the GUC Trust Administrator Parties and the GUC Trust Monitor Parties in form and substance reasonably satisfactory to the GUC Trust Administrator and the GUC Trust Monitor (the occurrence of either (x) or (y), a "<u>Claim Conflict Resolution</u>").  Until a Claim Conflict Resolution is reached with respect to such conflicting claims or demands, the GUC Trust Administrator shall hold in a segregated account any payments or distributions from the GUC Trust to be made with respect to the Unit or Units at issue.  Promptly after a Claim Conflict Resolution is reached, the GUC Trust Administrator shall transfer the payments and distributions, if any, held in the segregated account, together with any interest and income earned thereon, if any, in accordance with the terms of such Claim Conflict Resolution.

**ARTICLE IV**
**<u>DURATION AND TERMINATION OF THE GUC TRUST</u>**

  4.1. <u>Duration</u>.  The GUC Trust shall become effective upon the Effective Date, the execution of this Trust Agreement and the filing of the Certificate of Trust with the Secretary of State, and shall remain and continue in full force and effect until (x) the earlier of (i) the date on which (A) all of the GUC Trust Distributable Assets have been distributed by the GUC Trust Administrator in accordance with this Trust Agreement, the Plan, and the Confirmation Order, and (B) if the Residual Wind-Down Assets are transferred to the GUC Trust upon the dissolution of the Debtors, the GUC Trust Administrator has completed the resolution of the Residual Wind-Down Claims and distribution of the Residual Wind-Down Assets, and (ii) the third anniversary of the Effective Date, or (y) such shorter or longer period authorized by the Bankruptcy Court upon application of the GUC Trust Administrator with the approval of the GUC Trust Monitor (I) in order to resolve all Disputed General Unsecured Claims, the Term Loan

Avoidance Action and other Avoidance Actions, and (II) to complete the resolution of the Residual Wind-Down Claims and distribution of the Residual Wind-Down Assets.

4.2.    Dissolution of the GUC Trust.  Notwithstanding anything to the contrary in this Trust Agreement, in no event shall the GUC Trust Administrator unduly prolong the duration of the GUC Trust, and the GUC Trust Administrator shall, in the exercise of its reasonable business judgment and in the interests of all GUC Trust Beneficiaries, at all times endeavor to terminate the GUC Trust as soon as practicable in accordance with the purposes and provisions of this Trust Agreement and the Plan.  Upon final dissolution and wind-up of the GUC Trust, the GUC Trust Administrator shall file a certificate of cancellation for the GUC Trust with the Secretary of State.

4.3.    Continuance of GUC Trust for Purposes of Winding Up.  After the dissolution of the GUC Trust and solely for the purpose of liquidating and winding up its affairs, the GUC Trust Administrator shall continue to act in such capacity until its duties hereunder have been fully performed.  The GUC Trust Administrator shall retain the books, records and files that shall have been delivered to or created by the GUC Trust Administrator until distribution of all the GUC Trust Assets and the resolution of the Residual Wind-Down Claims and distribution of the Residual Wind-Down Assets.  At the GUC Trust Administrator's discretion, all of such records and documents may be destroyed at any time following the later of (x) final distribution of the GUC Trust Assets and completion of the resolution of the Residual Wind-Down Claims and distribution of the Residual Wind-Down Assets, if applicable, unless such records and documents are necessary to fulfill the GUC Trust Administrator's obligations pursuant to Articles VI and VIII hereof and subject to any joint prosecution and common interests agreement(s) to which the GUC Trust Administrator may be party, and (y) the date until which the GUC Trust Administrator is required by applicable law to retain such records and documents.

## ARTICLE V
## CLAIMS RESOLUTION; DISTRIBUTIONS

5.1.    Resolution of Claims.

(a)    Except as otherwise provided in this Trust Agreement, as of the Effective Date, objections to, and requests for estimation of Disputed General Unsecured Claims against the Debtors may be interposed and prosecuted only by the GUC Trust Administrator.  Such objections and requests for estimation, to the extent not already pending, shall be served on the respective claimant and filed with the Bankruptcy Court on or before the 180th day following the Effective Date (with the exception of Unliquidated Litigation Claims); provided, that the GUC Trust Administrator may seek extension of such date by *ex parte* application to the Bankruptcy Court, *provided further* that the GUC Trust Administrator shall provide the U.S. Treasury with five business days notice prior to its application to the Bankruptcy Court.

(b)    Except as otherwise set forth herein, no distributions shall be made with respect to any portion of a Disputed General Unsecured Claim, Unresolved Term Loan Avoidance Action Claim or Unresolved Other Avoidance Action Claim unless and

until such Disputed General Unsecured Claim, Unresolved Term Loan Avoidance Action Claim or Unresolved Other Avoidance Action Claim has become an Allowed General Unsecured Claim.

(c)    To the extent that a Disputed General Unsecured Claim, Unresolved Term Loan Avoidance Action Claim or Unresolved Other Avoidance Action Claim has become an Allowed General Unsecured Claim, distributions (if any) shall be made to the holder of such Allowed General Unsecured Claim in accordance with the provisions of the Plan, the Confirmation Order and this Trust Agreement.

(d)    From and after the Effective Date, the GUC Trust Administrator shall have the authority to compromise, settle, otherwise resolve or withdraw any objections to Disputed General Unsecured Claims against the Debtors, subject to the consent of the GUC Trust Monitor, as may be required pursuant to the terms of Section 11.3 hereof.

(e)    The GUC Trust Administrator may at any time request that the Bankruptcy Court estimate any contingent claim, unliquidated claim or Disputed General Unsecured Claim pursuant to Section 502(c) of the Bankruptcy Code regardless of whether the Debtors or any other Person previously objected to such General Unsecured Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any General Unsecured Claim at any time during litigation concerning any objection to any General Unsecured Claim, including, without limitation, during the pendency of any appeal relating to any such objection, provided that the GUC Trust Administrator shall not object to, or seek estimation of, any General Unsecured Claim that would be allowed pursuant to a settlement signed by the Debtors prior to the Effective Date, unless such settlement requires approval by the Bankruptcy Court and that approval is denied.  In the event that the Bankruptcy Court estimates any contingent claim, unliquidated claim or Disputed General Unsecured Claim, the amount so estimated shall constitute either the Allowed amount of such General Unsecured Claim or a maximum limitation on such General Unsecured Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on the amount of such General Unsecured Claim, the GUC Trust Administrator may pursue supplementary proceedings to object to the allowance of such General Unsecured Claim. All of the aforementioned objection, estimation and resolution procedures are intended to be cumulative and not exclusive of one another.  General Unsecured Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court. This Section 5.1(e) shall not apply to Nova Scotia Guarantee Claims or the Nova Scotia Wind-Up Claim.

(f)    Notwithstanding anything to the contrary contained in this Section 5.1 or elsewhere in this Trust Agreement, holders of Unliquidated Litigation Claims (other than (i) the United States, including its agencies and instrumentalities, and (ii) state, local and tribal governments with respect to any Claims concerning alleged environmental liabilities) shall be subject to the ADR Procedures.  The GUC Trust Administrator shall, at all times and in all cases, comply with and implement the ADR Procedures with respect to holders of Unliquidated Litigation Claims.  As set forth in the Plan, if the GUC Trust

Administrator terminates the ADR Procedures with respect to an Unliquidated Litigation Claim, the GUC Trust Administrator shall have one hundred eighty (180) days from the date of termination of the ADR Procedures to file and serve an objection to such Unliquidated Litigation Claim.  If the GUC Trust Administrator terminates the ADR Procedures with respect to an Unliquidated Litigation Claim and such Unliquidated Litigation Claim is litigated in a court other than the Bankruptcy Court, the GUC Trust Administrator shall have ninety (90) days from the date of entry of a Final Order adjudicating such Claim to file and serve an objection to such Claim solely for purposes of determining the treatment of such Claim under the Plan unless such time is extended by order of the Bankruptcy Court for cause.

      5.2.    Distributions to Holders of Initial Allowed General Unsecured Claims.

      (a)    As promptly as practicable following the Effective Date (but no earlier than the first Business Day of the full calendar month next following the Effective Date), the GUC Trust Administrator shall deliver to each holder of an Initial Allowed General Unsecured Claim, subject to Section 3.3 hereof, a distribution consisting of:

      (i)    the amount of GUC Trust Distributable Assets then available for distribution pro rata in accordance with the following formula:

$$D_I = ( \frac{A_I}{C_I} ) \times (\Sigma \, G_I)$$

$$and$$

$$G_I = (G_O - H_O)$$

Where—

| | |
|---|---|
| $D_I$ | is the initial distribution that the holder of an Initial Allowed General Unsecured Claim will be entitled to receive (rounded in the case of New GM Common Stock and each series of New GM Warrants in accordance with Section 5.6(a) hereof); |
| $A_I$ | is the amount of the Initial Allowed General Unsecured Claim; |
| $C_I$ | is the Current Total Amount as of the Initial Distribution Record Date; and |
| $\Sigma \, G_I$ | is all amounts of all assets, by respective asset type, available for distribution as of the Effective Date, net of deductions |
| $G_I$ | is the amount of the respective asset type available for distribution as of the Effective Date, net of deductions; |
| $G_O$ | is all amounts of all assets, by respective asset type, available for distribution (whether by the GUC Trust Administrator or directly by the Debtors) as of the Effective Date (consisting of a total of 150 million shares of New GM Common Stock and 136,363,635 New GM Warrants in each of the two series); and |
| $H_O$ | is the sum of the Protective Holdback, the Additional Holdback, the Reporting Transfer Holdback and the Taxes on Distribution Holdback, each allocated to the respective asset type, and the amount of GUC Trust Distributable Assets of the respective asset type sold |

27

or to be sold by the Debtors pursuant to Section 2.3(e) hereof as of the Initial Distribution Record Date; [1]

   (ii) a number of Units as provided in Section 3.4;

*provided*, *however*, that the initial distribution of GUC Trust Distributable Assets on account of the Asbestos Trust Claim shall be made directly by the Debtors, in an amount determined in accordance with Section 5.2(a)(i), in consultation with the GUC Trust Administrator and GUC Trust Monitor as necessary to determine such amount.  For the avoidance of doubt, the distribution of Units distributable on account of the Asbestos Trust Claim shall be made by the GUC Trust Administrator in the manner prescribed in Section 3.5 at the direction of the Debtors.

   (b) With respect to the claims of beneficial holders of debt securities arising out of or relating to the Note Claims and the Eurobond Claims, the GUC Trust shall issue additional GUC Trust Distributable Assets to the Indenture Trustees and Fiscal and Paying Agents, to the extent necessary to provide each such beneficial holder with a number of GUC Trust Distributable Assets equal to the amount of GUC Trust Distributable Assets such holder would receive had its claim been treated as an Initial Allowed General Unsecured Claim hereunder.

   5.3. <u>Distributions to Holders of Resolved Allowed General Unsecured Claims</u>.

   (a) As promptly as practicable following the beginning of each calendar quarter, beginning with the second calendar quarter, the GUC Trust Administrator, with the approval of the GUC Trust Monitor, shall deliver to each holder, if any, of a Disputed General Unsecured Claim or other Claim that has become a Resolved Allowed General Unsecured Claim during the prior calendar quarter (or, in the case of the second calendar quarter, since the Initial Distribution Record Date) a distribution consisting of:

   (i) the pro rata amount of GUC Trust Distributable Assets that the holder of such Resolved Allowed General Unsecured Claim would have received had such Resolved Allowed General Unsecured Claim been an Initial Allowed General Unsecured Claim, including the aggregate amount of Excess GUC Trust Distributable Assets that the holder would have received had it been the holder of Units referred to in clause (ii) below on each Excess Distribution Record Date for any calendar quarter prior to the date of such distribution; provided that a holder of a Resolved Allowed General Unsecured Claim shall not receive pursuant to this clause (i) an amount of Excess GUC Trust Distributable Assets distributed in respect of any prior Excess Distribution Record Date to the extent that it will be receiving such Excess GUC Trust Distributable Assets as a distribution on the Units to be received by such holder pursuant to clause (ii) below; and

   (ii) a number of Units as provided in Section 3.4;

---

[1] See Exhibit A-1 for an illustrative calculation of the distribution to holders of Initial Allowed General Unsecured Claims. For the avoidance of doubt, Section 5.2 of this Trust Agreement shall govern in the event of any inconsistencies with Exhibit A-1.

(b)     For the avoidance of doubt, it is intended that the distributions to be made to holders of Resolved Allowed General Unsecured Claims in accordance with this Section 5.3 shall provide such holders, as nearly as possible, with the exact same amount of distributions of each asset type as if such holders had been holders of Initial Allowed General Unsecured Claims.

(c)     On any Distribution Date where the GUC Trust, or the Debtors, as applicable, does not hold sufficient GUC Trust Distributable Assets to satisfy all Disputed General Unsecured Claims or other Claims, in each case, that became Resolved Allowed General Unsecured Claims during the prior calendar quarter (or, in the case of a Distribution Date during the second calendar quarter, since the Initial Distribution Record Date), the GUC Trust Administrator shall (following the reservation of the Additional Holdback, the Reporting and Transfer Holdback, the Protective Holdback and the Taxes on Distribution Holdback in accordance with Sections 6.1(b), (c), (d) and (e) of this Trust Agreement, the sale by the Debtors of any GUC Trust Distributable Assets remaining to be sold pursuant to Section 2.3(e) hereof, and/or the sale or pledge of any GUC Trust Distributable Assets to the extent necessary and approved by the GUC Trust Monitor and/or the Bankruptcy Court, as applicable) distribute all GUC Trust Distributable Assets that remain in the GUC Trust, or with the Debtors, as applicable, to the holders of such Resolved Allowed General Unsecured Claims pro rata by Claim amount.  Following such distribution, any remaining unsatisfied portion of such Resolved Allowed General Unsecured Claims, together with all remaining Disputed General Unsecured Claims and other Claims (including, without limitation, the Term Loan Avoidance Action Claims and the Other Avoidance Action Claims) shall be discharged and forever barred from assertion against the GUC Trust.

5.4.     Distribution of Excess GUC Trust Distributable Assets.

(a)     Beginning with the first calendar quarter, the GUC Trust Administrator shall determine the Excess GUC Trust Distributable Assets, if any, as of the last date of such calendar quarter, taking account of the extent to which Disputed General Unsecured Claims are disallowed or the Term Loan Avoidance Action or other Avoidance Actions are resolved in favor of the defendants therein.

(b)     Beginning with the second calendar quarter, the GUC Trust Administrator shall, as promptly as practicable following the beginning of such calendar quarter, distribute, subject to Section 5.4(c), the Excess GUC Trust Distributable Assets, in each case determined as of the last date of the prior calendar quarter, to the holders of Units outstanding on the Excess Distribution Record Date for the current calendar quarter (including Units distributed or to be distributed to holders of Resolved Allowed General Unsecured Claims pursuant to Section 5.3(a)(ii) on such Distribution Date), pro rata according to the following formulas:

$$D_U = (\ \frac{U_H}{U_O}\ ) \times (\Sigma G_X)$$

and

$$G_X = (G_E - H) \times \left[ \frac{T}{C} - \frac{T}{(C+L)} \right] + \left( S \times \frac{T}{C} \right)$$

Where—

| | |
|---|---|
| $D_U$ | is the distribution of Excess GUC Trust Distributable Assets that a holder of Units will be entitled to receive (with Cash payable in lieu of fractional shares of New GM Common Stock and fractional New GM Warrants in accordance with Section 5.6(b) hereof); |
| $U_H$ | is the number of Units held by the holder; |
| $U_O$ | is the total number of Units outstanding (including Units distributed, or to be distributed to holders of Resolved Allowed General Unsecured Claims during the current calendar quarter; |
| $\Sigma\, G_X$ | is all amounts, by asset type, of the Excess GUC Trust Distributable Assets as of the last day of the prior calendar quarter; |
| $G_X$ | is the amount of the Excess GUC Trust Distributable Assets for each asset type, respectively, as of the last day of the prior calendar quarter; |
| $G_E$ | is the amount of the respective asset type available for distribution (whether by the GUC Trust Administrator or directly by the Debtors) as of the Effective Date (consisting of a total of 150 million shares of New GM Common Stock and 136,363,635 New GM Warrants in each of the two series) plus, in the case of New GM Common Stock, the amount of Additional Shares received by the Debtors or the GUC Trust, as applicable, as of the prior Excess Distribution Record Date; |
| $T$ | is the Total Allowed Amount as of the last day of the prior calendar quarter; |
| $C$ | is the Current Total Amount as of the last day of the prior calendar quarter; |
| $S$ | is the number of Additional Shares received by the Debtors or the GUC Trust, as applicable, since the prior Excess Distribution Record Date; |
| $L$ | is the aggregate amount of all (i) Disputed General Unsecured Claims disallowed during the preceding calendar quarter (or, in the case of a calculation taking place during the second calendar quarter, since the Initial Distribution Record Date), (ii) Unresolved Term Loan Avoidance Action Claims to the extent resolved (including by way of settlement) in favor of the respective defendants during the preceding calendar quarter (or, in the case of a calculation taking place during the second calendar quarter, since the Initial Distribution Record Date); and (iii) all Unresolved Other Avoidance Action Claims to the extent resolved (including by way of settlement) in favor of the respective defendants during the preceding calendar quarter (or, in the case of a calculation taking place during the second calendar quarter, since the Initial Distribution Record Date); and |
| $H$ | is the sum of the Protective Holdback, the Additional Holdback, the Reporting Transfer Holdback and the Taxes on Distribution Holdback, each allocated to the respective asset type, the amount of GUC Trust Distributable Assets of the respective asset type sold or to be sold by the Debtors pursuant to Section 2.3(e) hereof, and the amount of any GUC Trust Distributable Assets of the respective asset type sold or pledged pursuant to Section 6.1 as of the last day of the preceding calendar quarter.[2] |

---

[2]    See Exhibit A-3 for an illustrative calculation of a distribution to holders of Units.  For the avoidance of doubt, Section 5.4 of this Trust Agreement shall govern in the event of inconsistencies with Exhibit A-3.

(c)    Anything to the contrary herein notwithstanding, the GUC Trust Administrator shall not, during any calendar quarter, make a distribution of any Excess GUC Trust Distributable Assets of a particular asset type for which the amount of Excess GUC Trust Distributable Assets of such asset type, determined as of the last date of the prior calendar quarter, does not exceed the relevant Distribution Threshold.  In such case, any Excess GUC Trust Distributable Assets of such asset type then available for distribution shall be held by the GUC Trust, or the Debtors, as applicable, until the next calendar quarter for which the amount of Excess GUC Trust Distributable Assets of such asset type available for distribution exceeds the relevant Distribution Threshold.

(d)    Notwithstanding the foregoing, the GUC Trust Administrator, may, with the consent of the GUC Trust Monitor, withhold distribution of Excess GUC Trust Distributable Assets to the holders of Units if the GUC Trust Administrator becomes aware of previously unknown potential Allowed General Unsecured Claims, in an amount that the GUC Trust Administrator, with the approval of the GUC Trust Monitor, estimates to be the maximum amount reasonably distributable on account of such Claims.

(e)    For the avoidance of doubt, for purposes of any distribution pursuant to this Section 5.4, the total number of Units outstanding shall be deemed to include Units which would be issuable to holders of Allowed General Unsecured Claims as of the time of such distribution, but have not yet been distributed and will not be distributed to such holders prior to or on the current Distribution Date due to such holders' failure to comply with the requirements of Section 3.3(a).

5.5.    Retention of GUC Trust Assets.   Notwithstanding anything in this Trust Agreement to the contrary, the GUC Trust Administrator, or the Debtors (pursuant to Section 2.3(a) of this Trust Agreement), as applicable, shall at all times, subject to the provisions of Sections 5.3(c) and 6.1, retain:

(a)    sufficient GUC Trust Distributable Assets as the GUC Trust Administrator shall determine, with the approval of the GUC Trust Monitor, as would be distributable (I) to all holders of Disputed General Unsecured Claims at the time outstanding as if all Disputed General Unsecured Claims were allowed at the Maximum Amount, but only until such Disputed General Unsecured Claims are resolved,  (II) to the holders of all Resolved Allowed General Unsecured Claims at the time outstanding, to the extent not previously distributed, (III) in respect of the Unresolved Term Loan Avoidance Action Claims, at the Maximum Amount thereof but only until the Term Loan Avoidance Action is dismissed  by Final Order or the Unresolved Term Loan Avoidance Action Claims become Resolved Allowed General Unsecured Claims,  (IV) in respect of Unresolved Other Avoidance Action Claims at the Maximum Amount thereof but only until such claims become Resolved Allowed General Unsecured Claims or the related other Avoidance Actions are dismissed by Final Order, and (V) in respect of the Protective Holdback, the Additional Holdback, the Reporting and Transfer Holdback and the Taxes on Distribution Holdback;

(b)        sufficient GUC Trust Administrative Cash as the GUC Trust Administrator shall determine, with the approval of the GUC Trust Monitor, to be necessary (x) to pay reasonable incurred or anticipated fees and expenses (including any taxes imposed on the GUC Trust or in respect of the GUC Trust Assets) of the GUC Trust and (y) to satisfy other liabilities incurred by the GUC Trust or anticipated by the GUC Trust Administrator in accordance with the Plan, the Confirmation Order and this Trust Agreement; and

(c)        the amount, if any, of GUC Trust Distributable Assets as the GUC Trust Administrator shall determine, with the approval of the GUC Trust Monitor, remaining to be sold pursuant to Section 2.3(e) hereof.

    5.6.        Minimum Distributions and Fractional Shares.

(a)        The provisions of this Section 5.6(a) shall apply with respect to distributions made in respect of Allowed General Unsecured Claims (but not to distributions in respect of Units).  Subject to the following sentence, (i) no cash payment in an amount less than $25 shall be made by the GUC Trust Administrator to any holder of an Allowed General Unsecured Claim, and (ii) no fractional shares of New GM Common Stock or fractional New GM Warrants shall be distributed by the GUC Trust hereunder to any holder of an Allowed General Unsecured Claim.  Any fractional shares of New GM Common Stock or fractional New GM Warrants shall be rounded up or down to the next whole number or zero, as applicable (with one-half being closer to the next higher whole number for these purposes); *provided that* for the purposes of determining the number of shares of New GM Common Stock or the number of New GM Warrants that any holder of an Allowed General Unsecured Claim shall be entitled to receive on any Distribution Date, the GUC Trust Administrator shall aggregate the GUC Trust Distributable Assets that such holder of an Allowed General Unsecured Claim is entitled to receive in respect of all Allowed General Unsecured Claims held by such holder as of the Initial Distribution Record Date, in the case of distributions pursuant to Section 5.2 of this Trust Agreement, or as of the last day of the calendar quarter next preceding the relevant Distribution Date, in the case of distributions pursuant to Section 5.3 of this Trust Agreement.

(b)        The provisions of this Section 5.6(b) shall apply with respect to distributions made in respect of Units (but not to distributions in respect of Allowed General Unsecured Claims).  Subject to the following sentence, no fractional shares of New GM Common Stock or fractional New GM Warrants shall be distributed by the GUC Trust hereunder to any holder of a Unit.  All fractional shares of New GM Common Stock and all fractional New GM Warrants that would otherwise have been distributable on the relevant Distribution Date but for the provisions of this Section 5.6(b) shall be aggregated and sold for Cash in reliance on Section 1145(b)(2) of the Bankruptcy Code, *provided that* for the purposes of determining the number of shares of New GM Common Stock or the number of New GM Warrants that any holder of Units shall be entitled to receive on any Distribution Date, there shall be aggregated the GUC Trust Distributable Assets that such holder of a Unit is entitled to receive in respect of all Units at the time held by such holder. The net Cash proceeds of the sale of such New GM Common Stock and the New GM Warrants, after deduction of brokerage commissions and other expenses of sale, shall be

distributed to holders of Units pro rata based upon the fractional shares of New GM Common Stock or fractional New GM Warrants that they would have otherwise been entitled to receive.  If there shall exist at the time a public market for the New GM Common Stock or the New GM Warrants, all sales of the New GM Common Stock or the New GM Warrants, as the case may be, shall be in the public market.

      5.7.    <u>Sale of Expiring New GM Warrants</u>.

      (a)   If there shall remain as part of the GUC Trust Assets New GM Warrants of any series as of a date that is 120 days prior to the expiration date of the New GM Warrants of that series, the GUC Trust Administrator shall be authorized, but not required, at any time thereafter to sell for Cash all such remaining New GM Warrants.  Any such sale shall be made in compliance with an applicable exemption from the registration requirements of the Securities Act of 1933, as amended, and any equivalent securities law provisions under state law, other than section 1145(a) of the Bankruptcy Code, which is not available for such sale. Following such sale, the net proceeds received after deduction of brokerage commissions and other expenses shall constitute and be held by the GUC Trust Administrator as GUC Trust Distributable Cash. If there shall exist at the time a public market for the New GM Warrants and the GUC Trust Administrator elects to sell the expiring New GM Warrants, the GUC Trust Administrator shall sell the New GM Warrants in the public market, unless the GUC Trust Monitor approves of the sale in a privately-negotiated transaction or such sale would require registration under the Securities Act of 1933, as amended, or applicable state securities laws and the New GM Warrants could not be so registered timely or at all; provided that in all circumstances any such sale shall be made in compliance with applicable federal and state securities laws.

      (b)   If any New GM Warrants of a particular series shall be sold pursuant to <u>Section 5.7(a)</u>, such proceeds, after deduction of brokerage and commissions and other expenses of sale, plus any interest actually earned thereon by the GUC Trust, shall be distributed to the GUC Trust Beneficiaries who otherwise would have been entitled to receive such New GM Warrants, at such times as the GUC Trust Beneficiaries would have been entitled to receive the same.

      5.8.    <u>Distributions Not in Compliance with this Article</u>.  Subject to <u>Section 5.3(b)</u>, in the event that the GUC Trust Administrator determines in good faith that it is necessary or desirable in order to carry out the intent and purposes of the Plan, the Confirmation Order and this Trust Agreement to receive any assets or make any distribution in a manner that is not in technical compliance with this Trust Agreement, the GUC Trust Administrator shall be permitted to receive assets or make, or cause to be made, distributions in such manner, but only with the approval of the GUC Trust Monitor; <u>provided, however</u>, that no such distribution shall result in any holder of an Allowed General Unsecured Claim receiving a distribution in excess of the distribution that such holder would have received had such claim been an Initial Allowed General Unsecured Claim or shall unfairly discriminate among the holders of Units. Except as aforesaid or as otherwise provided in the Plan, the Confirmation Order or this Trust Agreement, no payment or distribution out of the GUC Trust Assets shall be made to, or on behalf of, a GUC Trust Beneficiary or any other person except in strict accordance with the terms of

this Trust Agreement, the Plan, and the Confirmation Order, unless such payment or distribution shall have been approved by the Bankruptcy Court.

5.9.    Approval.  Except as otherwise provided in the Plan, the Confirmation Order or this Trust Agreement, nothing shall require the GUC Trust Administrator to file any accounting or seek approval of any court with respect to the administration of the GUC Trust or as a condition for making any payment or distribution out of the GUC Trust Assets or as a condition to the sale of fractional New GM Securities pursuant to Section 5.6 or expiring New GM Warrants pursuant to Section 5.7.

## ARTICLE VI
## ADMINISTRATION OF THE GUC TRUST

6.1.    Payment of Costs, Expenses and Liabilities.

(a)    Use of Wind-Down Budget Cash. Subject to the Budget, the GUC Trust Administrator shall use the Wind-Down Budget Cash:

(i)    to pay reasonable costs and expenses of the GUC Trust that are incurred in connection with the administration thereof (including taxes imposed on the GUC Trust (other than Taxes on Distribution, which shall be paid from the proceeds of the liquidation of the Taxes on Distribution Holdback pursuant to Section 6.1(e)), and actual reasonable fees and out-of-pocket expenses incurred by the GUC Trust Administrator, GUC Trust Monitor and the Trust Professionals retained by the GUC Trust Administrator in connection with the administration of the GUC Trust Assets and preservation of books and records);

(ii)    to satisfy other obligations or other liabilities incurred or assumed by the GUC Trust (or to which the GUC Trust Assets are otherwise subject) in accordance with the Plan, the Confirmation Order, or this Trust Agreement, including fees and expenses incurred and in connection with the protection, preservation and distribution of the GUC Trust Assets and the costs of investigating, defending against and resolving any Disputed General Unsecured Claims and the costs and fees of the Indenture Trustees and Fiscal and Paying Agents out of the Indenture Trustee/Fiscal and Paying Agent Reserve Cash pursuant to the Plan; and

(iii)    to satisfy any other obligations of the GUC Trust expressly set forth in the Plan, the Confirmation Order or this Trust Agreement to be satisfied out of the Wind-Down Budget Cash.

*provided*, *however*, for the avoidance of doubt, any Residual Wind-Down Expenses and any other fees, costs and expenses of the GUC Trust incurred in connection with the wind-down of the Debtors' affairs shall be paid in accordance with Section 6.13.

(b)    Reservation and Sale of GUC Trust Distributable Assets.  (i) If, at any time, the GUC Trust Administrator determines that the Wind-Down Budget Cash is not reasonably likely to be adequate to satisfy the current and projected future fees, costs and expenses of the GUC Trust (including, without limitation, the fees, costs or expenses related to the wind-down of the Debtors' affairs and any indemnification expenses incurred or anticipated to be incurred pursuant to Section 6.11(b), 9.6 and 11.4 hereof)

other than (w) Residual Wind-Down Expenses, (x) Taxes on Distribution, which are addressed in subsection (e) below, (y) fees, costs and expenses relating to the Reporting and Transfer Costs, which are addressed in subsection (c) below, and (z) the Trust Professional fees and expenses, which are addressed in subsection (d) below, or, if, at any time, the GUC Trust Administrator determines that the Residual Wind-Down Assets are not reasonably likely to be adequate to satisfy current and projected Residual Wind-Down Expenses, then, the GUC Trust Administrator may, with the approval of the GUC Trust Monitor, reserve an amount, or increase the amount previously reserved, of GUC Trust Distributable Assets whose proceeds upon liquidation would be sufficient to satisfy such fees, costs and expenses (the "Additional Holdback").

(ii)    If at any time, the GUC Trust Administrator determines (which such determination shall be made no more frequently than once per calendar quarter) that the value of the expected proceeds, upon liquidation, of the assets which make up the Additional Holdback is materially greater than the amount of the current and projected future fees, costs and expenses on account of which the assets of the Additional Holdback have been reserved pursuant to Section 6.1(b)(i), the GUC Trust Administrator shall, with the approval of the GUC Trust Monitor, but without the need to seek or obtain approval of the Bankruptcy Court, release from the Additional Holdback an amount of GUC Trust Distributable Assets whose proceeds upon liquidation would be equal to the size of such excess.

(iii)    To the extent necessary to satisfy in full the fees, costs and expenses on account of which the Additional Holdback may be reserved pursuant to this Section 6.1(b), the GUC Trust Administrator may, in consultation with the GUC Trust Monitor, and upon approval by the Bankruptcy Court in accordance with the provisions of Section 6.1(b)(iv), liquidate (or request that the Debtors liquidate, in accordance with Section 2.3(f) hereof) all or a portion of the Additional Holdback and designate the Cash proceeds thereof to satisfy the applicable fees, costs and expenses for which the Additional Holdback may be reserved pursuant to this Section 6.1.

(iv)    The application of the GUC Trust Administrator seeking Bankruptcy Court approval to sell or borrow and pledge GUC Trust Distributable Assets shall include the position of the GUC Trust Monitor in respect thereof.  The GUC Trust Administrator shall provide at least twenty days notice to the GUC Trust Monitor, the holders of Units and the holders of Disputed General Unsecured Claims prior to a hearing on a motion to use, sell and/or borrow against the GUC Trust Distributable Assets.  An order of the Bankruptcy Court authorizing the GUC Trust Administrator to borrow against the GUC Trust Distributable Assets may also authorize the GUC Trust Administrator to sell GUC Trust Distributable Assets to repay the amount borrowed without further order of the Bankruptcy Court.

(c)    Reporting and Transfer Holdback.  (i) If at any time, the GUC Trust Administrator determines that the amount of unspent Other GUC Trust Administrative Cash designated for the satisfaction of Reporting and Transfer Costs is insufficient to satisfy current and projected future Reporting and Transfer Costs, the GUC Trust Administrator may, with the approval of the GUC Trust Monitor, reserve an amount, or increase the amount previously reserved, of GUC Trust Distributable Assets whose

proceeds upon liquidation would be sufficient to satisfy such Reporting and Transfer Costs (the "Reporting and Transfer Holdback").

(ii)       If at any time, the GUC Trust Administrator determines (which such determination shall be made no more frequently than once per calendar quarter) that the value of the expected proceeds, upon liquidation, of the assets which make up the Reporting and Transfer Holdback, together with the Other GUC Trust Administrative Cash designated for Reporting and Transfer Costs is materially greater than the amount which will be reasonably necessary to satisfy current and projected Reporting and Transfer Costs of the GUC Trust, the GUC Trust Administrator shall, with the approval of the GUC Trust Monitor, but without the need to seek or obtain approval of the Bankruptcy Court release from the Reporting and Transfer Holdback an amount of GUC Trust Distributable Assets whose proceeds upon liquidation would be equal to the size of such excess.

(iii)       To the extent necessary to satisfy in full the current and projected future Reporting and Transfer Costs, the GUC Trust Administrator may, in consultation with the GUC Trust Monitor and upon approval by the Bankruptcy Court in accordance with the provisions of Section 6.1(b)(iv), liquidate (or request that the Debtors liquidate, in accordance with Section 2.3(f) hereof) all or a portion of the Reporting and Transfer Holdback and designate the Cash proceeds thereof to the satisfaction of current or projected future Reporting and Transfer Costs.

(d)       Protective Holdback.  (i) If at any time one or more Trust Professional's fees and expenses (other than Residual Wind-Down Expenses) are in excess of its Budget and (except for the Holdback) such Trust Professional(s) are not paid such amounts pursuant to Section 2.6, then, with the approval of the GUC Trust Monitor, the GUC Trust Administrator may reserve an amount, or increase the amount previously reserved, of GUC Trust Distributable Assets whose proceeds upon liquidation would be sufficient to satisfy the aggregate reasonable fees and expenses of such Trust Professional(s) that have been approved by the GUC Trust Administrator and GUC Trust Monitor but have not been paid (the "Protective Holdback").

(ii)       If at any time, the GUC Trust Administrator determines (which such determination shall be made no more frequently than once per calendar quarter) that the value of the expected proceeds, upon liquidation, of the assets which make up the Protective Holdback is materially greater than the amount of the unpaid fees and expenses of the Trust Professionals on account of which the assets of the Protective Holdback have been reserved pursuant to Section 6.1(d)(i), the GUC Trust Administrator shall, with the approval of the GUC Trust Monitor, but without the need to seek or obtain approval of the Bankruptcy Court, release from the Protective Holdback an amount of GUC Trust Distributable Assets whose proceeds upon liquidation would be equal to the size of such excess.

(iii)       To the extent necessary to satisfy in full the fees and expenses of the Trust Professionals, the GUC Trust Administrator may, in consultation with the GUC Trust Monitor and upon approval by the Bankruptcy Court, liquidate (or request that the Debtors liquidate, in accordance with Section 2.3(f) hereof) all or a portion of the Protective Holdback and apply the proceeds thereof to satisfy the applicable unpaid fees and expenses of the GUC

Trust.  The GUC Trust Administrator shall not liquidate the Protective Holdback, in whole or in part, except in accordance with the provisions of Section 6.1(b)(iv); provided that the GUC Trust Administrator shall not seek Bankruptcy Court approval for such liquidation more frequently than on a semi-annual basis.

(e)    Taxes on Distribution Holdback. (i) At any time and from time to time, the GUC Trust Administrator may, with the approval of the GUC Trust Monitor, reserve an amount, or increase the amount previously reserved, of GUC Trust Distributable Assets whose proceeds upon liquidation would be sufficient to satisfy current and projected Taxes on Distribution (the "Taxes on Distribution Holdback").

(ii)    If at any time the GUC Trust Administrator determines (which such determination shall be made no more frequently than once per calendar quarter) that the value of the expected proceeds, upon liquidation, of the assets which make up the Taxes on Distribution Holdback is materially greater than the amount which will be reasonably necessary to satisfy current and projected Taxes on Distribution, the GUC Trust Administrator shall, with the approval of the GUC Trust Monitor, but without the need to seek or obtain approval of the Bankruptcy court, release from the Taxes on Distribution Holdback an amount of GUC Trust Distributable Assets whose proceeds upon liquidation would be equal to the size of such excess.

(iii)    To the extent necessary to satisfy in full current and projected Taxes on Distribution, the GUC Trust Administrator may, with the approval of the GUC Trust Monitor, but without the need to seek or obtain approval of the Bankruptcy court, liquidate (or request that the Debtors liquidate, in accordance with Section 2.3(f) hereof) all or a portion of the Taxes on Distribution Holdback and designate the proceeds thereof to satisfy current and future Taxes on Distribution.

(f)    General.  (i) If the GUC Trust Administrator shall sell or pledge any GUC Trust Distributable Assets pursuant to this Section 6.1 or shall reserve or release from a reserve any GUC Trust Distributable Assets in respect of the Additional Holdback, Reporting and Transfer Holdback, Protective Holdback or Taxes on Distribution Holdback, the sale, pledge, reservation or release shall be made, to the extent practicable, from the assets of each type then held by the GUC Trust in a proportion to the total amount of such asset type then held by the GUC Trust that shall be the same as nearly as possible for each asset type.

(ii)    For the purposes of this Section 6.1 and Sections 2.3(f), 5.2, 5.3 and 5.4, (x) Cash dividends received in respect of GUC Trust Common Stock Assets and Cash received upon the sale GUC Trust Warrant Assets pursuant to Section 5.7 of this Trust Agreement shall each be deemed a separate type of asset; (y) the allocation of such assets for the satisfaction of fees, costs and expenses shall be deemed to be a "sale" of such assets and (z) the liquidation of any of the Additional Holdback, Reporting and Transfer Holdback, Protective Holdback or Taxes on Distribution Holdback refers to the sale or pledge of the GUC Trust Distributable Assets contained therein, in whole or in part, as the case may be.

(iii)    Any Cash proceeds from the sale or pledge of GUC Trust Distributable Assets pursuant to this Section 6.1, shall be designated as Other GUC Trust

Administrative Cash, and shall be used to satisfy the fees, costs and expenses of the GUC Trust for which they were sold without any order or further order of the Bankruptcy Court.

(iv)    Any sale of GUC Trust Securities Assets in accordance with this Section 6.1 shall be made in compliance with an applicable exemption from the registration requirements of the Securities Act of 1933, as amended, and any equivalent securities law provisions under state law (it being understood that Section 1145 of the Bankruptcy Code is not available for such purposes).

(g)    Continuing Satisfaction of Claims.  Notwithstanding that as a result of the utilization, sale or pledge of GUC Trust Distributable Assets the amount of GUC Trust Distributable Assets shall or may be less than the assets required to satisfy, pursuant to Section 5.3(a)(i), Claims in the amount of the Current Total Amount, after taking into account the amount of GUC Trust Distributable Assets, if any, remaining to be sold pursuant to Section 2.3(e) hereof and the Additional Holdback the Reporting and Transfer Holdback, the Protective Holdback and the Taxes on Distribution Holdback and, if any then outstanding, the GUC Trust Administrator shall continue to satisfy Disputed General Unsecured Claims, the Unresolved Term Loan Avoidance Action Claims and the Unresolved Other Avoidance Action Claims that become Allowed General Unsecured Claims in the order they are resolved as otherwise provided in this Trust Agreement.

6.2.    GUC Trust Reports.

(a)    The GUC Trust Administrator shall prepare quarterly GUC Trust Reports as provided in this Section 6.2, beginning for the first calendar quarter.  The GUC Trust Reports shall be filed with the Bankruptcy Court and provided to the GUC Trust Monitor and DIP Lenders no later than thirty days following the end of each calendar quarter, except that the GUC Trust Report for the end of any calendar year may be filed, provided and posted no later than forty-five days following the end of the calendar year. The GUC Trust Administrator shall arrange to have each GUC Trust Report posted to a generally accessible website at the time it is filed with the Bankruptcy Court and shall take reasonable steps to inform the beneficial holders of Units of the existence of the website and the availability of the GUC Trust Reports thereon.

(b)    The GUC Trust Reports shall include financial statements consisting of:

(i)    a statement of net assets as of the end of the calendar quarter or calendar year for which the report is made and as of the end of the next preceding calendar year;

(ii)    a statement of changes in net assets for the calendar quarter or calendar year for which the report is made and for the comparable period of the next preceding calendar year; and

(iii)    a statement of cash flows for the calendar quarter or calendar year for which the report is made and for the comparable period of the next preceding calendar year.

The financial statements shall be prepared in accordance with generally accepted accounting principles except as may be indicated in the notes thereto, and need not be audited except for the calendar year financial statements.

(c)     (i)     The GUC Trust Reports shall also disclose each of the following amounts outstanding at the time or times, or for the period or periods, as applicable, and/or the changes thereto, as indicated below:

| | Amounts | Reporting Times or Periods |
|---|---|---|
| A. | Number of Units Outstanding | As of the end of (i) the relevant calendar quarter or calendar year; (ii) the next preceding calendar quarter (or, in the case of a report for the first calendar quarter, the Effective Date) and (iii) the next preceding calendar year. |
| B. | GUC Trust Common Stock Assets<br><br>GUC Trust Warrant Assets<br><br>GUC Trust Dividend Assets<br><br>other GUC Trust Distributable Cash<br><br>(whether held by MLC or the GUC Trust) | As of the end of (i) the relevant calendar quarter or calendar year; (ii) the next preceding calendar quarter (or, in the case of a report for the first calendar quarter, the Effective Date) and (iii) the next preceding calendar year. |
| C. | Total Allowed Amount<br><br>Maximum Amount of all Disputed General Unsecured Claims (in the aggregate)<br><br>Maximum Amount of all Unresolved Term Loan Avoidance Action Claims (in the aggregate)<br><br>Maximum Amount of all Unresolved Other Avoidance Action Claims (in the aggregate)<br><br>Aggregate Maximum Amount<br><br>Current Total  Amount | As of the end of (i) the relevant calendar quarter or calendar year; (ii) the next preceding calendar quarter (or, in the case of a report for the first calendar quarter, the Effective Date) and (iii) the next preceding calendar year. |
| D. | Protective Holdback<br><br>Additional Holdback<br><br>Reporting and Transfer Holdback<br><br>Taxes on Distribution Holdback | As of the end of (i) the relevant calendar quarter or calendar year; (ii) the next preceding calendar quarter (or, in the case of a report for the first calendar quarter, the Effective Date) and (iii) the next preceding calendar year. |
| E. | Resolved Allowed General Unsecured Claims allowed<br><br>Disputed General Unsecured Claims | During (i) the relevant calendar quarter or calendar year; and (ii) the period beginning on the Initial Distribution Record Date and ending on the last day of the relevant calendar quarter or calendar |

|   | disallowed | year. |
|---|---|---|
|   | Unresolved Term Loan Avoidance Action Claims resolved (including by way of settlement) in favor of the respective defendants |   |
|   | Other Avoidance Action Claims, resolved (including by way of settlement) in favor of the respective defendants |   |
| F. | Distributions of in respect of Resolved Allowed General Unsecured Claims of—<br><br>GUC Common Stock Assets<br><br>GUC Trust Warrant Assets<br><br>GUC Trust Dividend Assets<br><br>other GUC Trust Distributable Cash | During (i) the relevant calendar quarter or calendar year; and (ii) the period beginning on the Effective Date and ending on the last day of the relevant calendar quarter or calendar year. |
| G. | Distributions in respect of Units of—<br><br>GUC Common Stock Assets<br><br>GUC Trust Warrant Assets<br><br>GUC Trust Dividend Assets<br><br>other GUC Trust Distributable Cash | During (i) the relevant calendar quarter or calendar year; and (ii) the period beginning on the Effective Date and ending on the last day of the relevant calendar quarter or calendar year. |
| H. | Excess GUC Trust Distributable Assets reserved for distribution to holders of Units (but not yet distributed or withheld from distribution) of—<br><br>GUC Common Stock Assets<br><br>GUC Trust Warrant Assets<br><br>GUC Trust Dividend Assets<br><br>other GUC Trust Distributable Cash<br><br>(whether held by MLC or the GUC Trust) | As of the end the relevant calendar quarter or calendar year. |
| I. | Additional Shares received<br><br>(whether held by MLC or the GUC Trust) | During (i) the relevant calendar quarter or calendar year; and (ii) the period beginning on the Effective Date and ending on the last day of the relevant calendar quarter or calendar year. |

(ii)    The GUC Trust Reports shall also disclose such other information as the GUC Trust Administrator, in consultation with the Trust Professionals deems advisable or as the GUC Trust Monitor or DIP Lenders may reasonably request from time to time or as may be required by the Bankruptcy Court.

(d)    The GUC Trust Administrator shall also timely prepare and file and/or distribute such additional statements, reports and submissions as may be necessary to cause the GUC Trust and the GUC Trust Administrator to be in compliance with applicable law, and shall prepare and deliver to the GUC Trust Monitor such statements, reports and other information as may be otherwise reasonably requested from time to time by the GUC Trust Monitor.

(e)    The GUC Trust Administrator shall also provide quarterly reports to the DIP Lenders specifying the balance of the Residual Wind-Down Assets as of the last day of such quarter and as of the last day of the prior quarter.

6.3.    _SEC Reporting_. The GUC Trust will file such reports as shall be required by the rules and regulations of the SEC, including pursuant to any no-action guidance issued to the GUC Trust by the staff of the SEC.

6.4.    _Budget_. The GUC Trust Administrator shall prepare and submit to the GUC Trust Monitor and DIP Lenders for approval a reasonably detailed annual plan and budget (the "Budget") at least thirty (30) days prior to the commencement of each calendar year; _provided, however_, that the first such Budget shall be agreed to as of the Effective Date. Such annual plan and Budget shall set forth (on a quarterly basis) in reasonable detail: (A) the GUC Trust Administrator's anticipated actions to administer the GUC Trust Assets; and (B) the anticipated fees and expenses, including professional fees, associated with the administration of the GUC Trust, a separate amount representing the anticipated fees and expenses of the GUC Trust Monitor and detail as to how the GUC Trust will budget and spend the Wind-Down Budget Cash. Such Budget shall be updated and submitted to the GUC Trust Monitor and DIP Lenders for review on a quarterly basis, and each such quarterly update shall reflect the variances (with explanations) between (x) the Budget, (y) any updated Budget, and (z) the actual results for the same period. For the avoidance of doubt, the DIP Lenders may object in the Bankruptcy Court with respect to any quarterly update that materially changes the Budget and the Bankruptcy Court shall resolve such dispute. All actions by the GUC Trust Administrator shall be consistent with the Budget, (as updated). The GUC Trust Administrator may obtain any required approval of the Budget on reasonable negative notice (which shall be not less than 15 days after receipt of the Budget) and approval of the Budget shall not be unreasonably withheld. In the event of any dispute concerning the Budget (or the taking of actions consistent with the Budget), the GUC Trust Administrator, the GUC Trust Monitor or the DIP Lenders may petition the Bankruptcy Court to resolve such dispute. For the avoidance of doubt, the Reporting and Transfer Costs shall not be set forth in the Budget and shall not be paid for with the Wind-Down Budget Cash.

6.5.    <u>Setoff</u>.  The GUC Trust Administrator may, but shall not be required to, setoff against or recoup from any payments to be made pursuant to the Plan in respect of any Allowed General Unsecured Claim, including in respect of any Units, any claims of any nature whatsoever that the GUC Trust, as successor to the Debtors, may have against the claimant, but neither the failure to do so nor the allowance of any General Unsecured Claim hereunder shall constitute a waiver or release by the Debtors or the GUC Trust Administrator of any such claim they may have against such claimant.

6.6.    <u>Compliance with Laws</u>.  Any and all distributions of GUC Trust Assets shall be in compliance with applicable laws, including applicable federal and state tax and securities laws.

6.7.    <u>Fiscal Year</u>.  Except for the first and last years of the GUC Trust, the fiscal year of the GUC Trust shall be the calendar year.  For the first and last years of the GUC Trust, the fiscal year of the GUC Trust shall be such portion of the calendar year that the GUC Trust is in existence.

6.8.    <u>Books and Records</u>.

(a)    The GUC Trust Administrator shall maintain and preserve the Debtors' books, records and files that shall have been delivered to or created by the GUC Trust Administrator.

(b)    The GUC Trust Administrator shall maintain books and records relating to the assets, liabilities, income and expense of the GUC Trust, all distributions made by the GUC Trust and the payment of fees and expenses of, and satisfaction of claims against or assumed by, the GUC Trust and the GUC Trust Administrator, in such detail and for such period of time as may be necessary to enable it to make full and proper reports in respect thereof in accordance with the provisions of this Trust Agreement and otherwise to comply with applicable provisions of law, including tax law.

6.9.    <u>Cash Payments</u>.  All distributions of GUC Trust Cash required to be made by the GUC Trust Administrator may be made in Cash denominated in U.S. dollars by checks drawn on a United States domestic bank selected by the GUC Trust Administrator or, at the option of the GUC Trust Administrator, by wire transfer from a United States domestic bank selected by the GUC Trust Administrator or as otherwise required or provided in applicable agreements; <u>*provided*</u>, <u>*however*</u>, that cash payments to foreign persons may be made, at the option of the GUC Trust Administrator, in such funds as and by such means as are necessary or customary in a particular foreign jurisdiction.

6.10.    <u>Insurance</u>.  The GUC Trust shall maintain customary insurance coverage for the protection of the GUC Trust Administrator, the GUC Trust Monitor and any such other persons serving as administrators and overseers of the GUC Trust on and after the Effective Date, in all cases in accordance with the Budget.  The GUC Trust Administrator may also obtain such insurance coverage as it deems necessary and appropriate with respect to real and personal property which may become GUC Trust Assets, if any, in accordance with such Budget.

6.11.    Cooperation with and Indemnification of the Administrator of the Avoidance Action Trust.

(a)    The GUC Trust Administrator shall timely provide the Avoidance Action Trust Administrator with such information as the Avoidance Action Trust Administrator shall reasonably request.  Without limiting the foregoing, the GUC Trust Administrator shall provide to the Avoidance Action Trust Administrator copies of the GUC Trust Reports as soon as they become available, under appropriate arrangements of confidentiality to the extent the reports have at the time not yet been publicly disclosed. The GUC Trust Administrator will also from time  to time, upon reasonable request of the Avoidance Action Trust Administrator, provide the Avoidance Action Trust Administrator with the GUC Trust Administrator's most recent determination of all Resolved Allowed General Unsecured Claims, the Disputed General Unsecured Claims, the Maximum Amounts, the Aggregate Maximum Amount and the Current Total Amount, and any other information within the custody and control of the GUC Trust Administrator as the Avoidance Action Trust Administrator shall reasonably request to make any calculation or determination or otherwise to fulfill its responsibilities under the agreement governing the Avoidance Action Trust.  The provision of any such information shall be made under appropriate arrangements of confidentiality to the extent such information has at the time not been publicly disclosed.  In addition, neither the GUC Trust Administrator nor the GUC Trust Monitor shall be required to provide access to or disclose any information where such access or disclosure would give rise to a material risk of waiving any attorney-client privilege.  In the event that the GUC Trust Administrator or the GUC Trust Monitor does not provide access or information to the Avoidance Action Trust Administrator in reliance on the preceding sentence, the GUC Trust Administrator and/or the GUC Trust Monitor shall use its reasonable best efforts to communicate the applicable information to the Avoidance Action Trust Administrator in a way that would not violate such privilege.

(b)    The GUC Trust shall indemnify and provide advances to the Trust Administrator Parties (as defined in the Avoidance Action Trust Agreement) and the Trust Monitor Parties (as defined in the Avoidance Action Trust Agreement) as provided in Sections 9.6(b) and 11.4 of the Avoidance Action Trust Agreement and shall satisfy any such indemnification expenses from the GUC Trust Administrative Cash or the GUC Trust Distributable Assets as provided in 9.6(b) and 11.4 of the Avoidance Action Trust Agreement.

(c)    The GUC Trust Administrator shall cooperate with the Avoidance Action Trust Administrator regarding the transfer of funds pursuant to Section 2.3(e)(ii) hereof.

6.12.    Cooperation of the Debtors and the GUC Trust. In addition to taking any actions necessary to effect the transfer of GUC Trust Distributable Assets or Other GUC Trust Administrative Cash to the GUC Trust or the Avoidance Action Trust pursuant to the provisions Section 2.3 of this Trust Agreement, the Debtors shall (i) if the Debtors shall be entitled to the issuance of any Additional Shares, determined as provided in Section 2.3(d) of this Trust Agreement, request such Additional Shares from New GM in accordance with the MSPA and (ii) timely provide the GUC Trust Administrator with such information as

the GUC Trust Administrator shall reasonably request. The provision of any such information shall be made under appropriate arrangements of confidentiality to the extent such information has at the time not been publicly disclosed.  In addition, the Debtors shall not be required to provide access to or disclose any information where such access or disclosure would give rise to a material risk of waiving any attorney-client privilege.  In the event that the Debtors do not provide access or information to the GUC Trust Administrator in reliance on the preceding sentence, the Debtors shall use their reasonable best efforts to communicate the applicable information to the GUC Trust Administrator in a way that would not violate such privilege.

6.13.    Funding in Respect of the Wind-Down of the Debtors' Affairs. Notwithstanding anything to the contrary in this Trust Agreement, any expenses, costs, liabilities, obligations or fees, to the extent related to or incurred in connection with the resolution or satisfaction of the Residual Wind-Down Claims or the distribution of the Residual Wind-Down Assets, or to the extent otherwise related to the Residual Wind-Down Assets (the "Residual Wind-Down Expenses") shall, to the extent incurred by the GUC Trust pursuant to the terms of this Trust Agreement, the Plan or the Confirmation Order, be satisfied (i) first from the Residual Wind-Down Assets (ii) second from the applicable portion of the Other GUC Trust Administrative Cash, and (iii) third from the GUC Trust Distributable Assets as provided in Section 6.1(b). Any other expenses, costs, liabilities, obligations or fees incurred by the GUC Trust pursuant to the terms of this Trust Agreement, the Plan or the Confirmation Order and in connection with the wind-down of the Debtors' affairs (including without limitation the indemnification obligations of the GUC Trust under Sections 6.11(b) 9.6 and 11.4 hereof) shall be satisfied (i) first from the Wind-Down Budget Cash, to the extent provided for in the Budget, (ii) second from the applicable portion of the Other GUC Trust Administrative Cash, and (iii) third from the GUC Trust Distributable Assets as provided in Section 6.1(b).

6.14.    Excess Residual Wind-Down Assets. At least thirty (30) days prior to the commencement of each calendar year, the GUC Trust Administrator, in consultation with the GUC Trust Monitor, shall determine whether the Residual Wind-Down Assets exceed the amounts necessary to pay and to fund the resolution of the remaining Residual Wind-Down Claims (assuming all such Claims were Allowed and payable), and to the extent the Residual Wind-Down Assets exceed the amounts necessary to pay and to fund resolution of the foregoing Residual Wind-Down Claims, the GUC Trust Administrator is authorized to and shall distribute such excess Residual Wind-Down Assets to the DIP Lenders in accordance with the terms of the DIP Credit Agreement.

## ARTICLE VII
## TAX MATTERS

7.1.    Tax Treatment.  For all U.S. federal income tax purposes, all parties (including the GUC Trust Beneficiaries) will treat the GUC Trust on and after the GUC Trust Funding Date as a "disputed ownership fund" within the meaning of Treasury Regulations section 1.468B-9, which is taxable as a "qualified settlement fund," within the meaning of Treasury Regulations section 1.468B-2, except to the extent otherwise provided by Treasury Regulations section 1.468B-9 or in a private letter ruling issued by

the IRS, or as determined by a court of competent jurisdiction. The "administrator" of the GUC Trust, within the meaning of Treasury Regulations section 1.468B-9, shall be the GUC Trust Administrator. Upon the request of the Creditors' Committee on behalf of the GUC Trust Beneficiaries and the holders of General Unsecured Claims, the GUC Trust Administrator shall cooperate in seeking a private letter ruling from the IRS regarding the tax treatment of the GUC Trust and the GUC Trust Beneficiaries with respect to the distribution of New GM Securities by the GUC Trust (including by providing funding for the costs, fees and expenses of the Creditors' Committee and of tax professionals in respect of, and by participating in the request). For all U.S. federal income tax purposes, all parties (including the GUC Trust Beneficiaries) will treat the GUC Trust before the GUC Trust Funding Date as an agent of the Debtors. The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes.

7.2.   Valuation of Assets.   As soon as practicable after, and in no event later than 60 days following (i) each transfer of New GM Securities to the GUC Trust by the Debtors as a result of a request by the GUC Trust Administrator pursuant to Section 2.3(a) hereof, and (ii) the transfer of GUC Trust Assets to the GUC Trust on the GUC Trust Funding Date, the GUC Trust Administrator shall make a good-faith valuation of the GUC Trust Assets then transferred (using the Fair Market Value of any New GM Securities contained therein), and such valuation shall be made available from time to time to the extent relevant for tax reporting purposes, and shall be used consistently by all parties (including the Debtors, the GUC Trust Administrator and the GUC Trust Beneficiaries) for all U.S. federal and applicable state and local income tax purposes.

7.3.   Payment of Taxes.   The GUC Trust Administrator shall be responsible for payment, out of the GUC Trust Assets or the Residual Wind-Down Assets, as applicable, of any taxes imposed on the GUC Trust or the GUC Trust Assets, including without limitation, any U.S. federal, state, or local income tax liability incurred by the GUC Trust with respect to the distribution of GUC Trust Assets (the "Taxes on Distribution"). For the avoidance of doubt, no Taxes on Distribution incurred by the GUC Trust shall be paid from the Wind-Down Budget Cash, and the Taxes on Distribution shall instead be paid with the proceeds of liquidation of the Taxes on Distribution Holdback in accordance with Section 6.1(e).

7.4.   Tax Reporting.   The GUC Trust Administrator shall prepare and timely file (or cause to be prepared and timely filed) Tax Returns for the GUC Trust treating the GUC Trust as a qualified settlement fund pursuant to Treasury Regulations section 1.468B-9(c)(1)(ii), except to the extent provided otherwise in a private letter ruling issued by the IRS or as determined by a court of competent jurisdiction. The GUC Trust Administrator shall also prepare and timely file (or cause to be prepared and timely filed), and/or provide to GUC Trust Beneficiaries, any other statements, returns or disclosures relating to the GUC Trust that are required by any governmental unit.

7.5.   Tax Withholdings.   The GUC Trust Administrator shall withhold and pay to the appropriate taxing authority all amounts required to be withheld pursuant to the Tax Code, Treasury Regulations or other applicable requirements, including any provision of any foreign, state or local tax law, with respect to any payment or distribution to the

holders of Allowed General Unsecured Claims and/or Units.  All such amounts withheld, and paid to the appropriate taxing authority, shall be treated as amounts distributed to such holders of Allowed General Unsecured Claims and/or Units for all purposes of this Trust Agreement.  The GUC Trust Administrator shall be authorized to collect such tax information from the holders of Allowed General Unsecured Claims and/or Units (including social security numbers or other tax identification numbers) as it in its sole discretion deems necessary to effectuate the Plan, the Confirmation Order and this Trust Agreement, or to comply with any applicable withholding or reporting requirement.  The GUC Trust Administrator may refuse to make a distribution to any holder of an Allowed General Unsecured Claim and/or Units that fails to furnish such information in a timely fashion, until such information is furnished; *provided*, *however*, that upon the holder of an Allowed General Unsecured Claim and/or Units furnishing such information, the GUC Trust Administrator shall make such distribution to which such holder is entitled, without interest.  The GUC Trust Administrator may also hold back and retain Units otherwise issuable pursuant to Section 3.4 hereof with respect to Allowed General Unsecured Claims that are subject to withholding, and the GUC Trust Administrator shall apply amounts distributed in respect of such retained Units to satisfy such withholding obligations.

   7.6. Expedited Determination of Taxes.  The GUC Trust Administrator may request an expedited determination of taxes of the GUC Trust or the Debtors under Section 505(b) of the Bankruptcy Code for any or all returns filed for, or on behalf of, the GUC Trust or the Debtors for any or all taxable periods (or part thereof) through the dissolution of the GUC Trust.

   7.7. Debtor Tax Matters.

   (a) Following the filing of a certificate of cancellation or dissolution for MLC, subject to Section 6.16(a) of the MSPA, the GUC Trust Administrator shall prepare and timely file (or cause to be prepared and timely filed), on behalf of the Debtors, the Tax Returns required to be filed or that the GUC Trust Administrator otherwise deems appropriate, including the filing of amended Tax Returns or requests for refunds, for all taxable periods ending on, prior to, or after the Effective Date.

   (b) Each of the Debtors and the GUC Trust Administrator shall cooperate fully with each other regarding the implementation of this Section 7.7 (including the execution of appropriate powers of attorney) and shall make available to the other as reasonably requested all information, records, and documents relating to taxes governed by this Section 7.7 until the expiration of the applicable statute of limitations or extension thereof or the conclusion of all audits, appeals, or litigation with respect to such taxes.  Without limiting the generality of the foregoing, the Debtors shall execute on or prior to the filing of a certificate of cancellation or dissolution for MLC a power of attorney authorizing the GUC Trust Administrator to correspond, sign, collect, negotiate, settle, and administer tax payments and Tax Returns for the taxable periods described in Section 7.7(a) hereof.

   (c) Following the filing of a certificate of cancellation or dissolution for MLC, subject to Sections 6.16(a) and (d) of the MSPA, the GUC Trust Administrator

shall have the sole right, at the expense of the GUC Trust, to control, conduct, compromise and settle any tax contest, audit, or administrative or court proceeding relating to any liability for taxes of the Debtors and shall be authorized to respond to any tax inquiries relating to the Debtors (except with respect to any property and *ad valorem* taxes relating to the Environmental Response Trust Assets); *provided*, *however*, for the avoidance of doubt, such expenses shall be satisfied in accordance with Section 6.13.

(d)    Following the filing of a certificate of cancellation or dissolution for MLC, subject to the MSPA, the GUC Trust Administrator shall be entitled to the entire amount of any refunds and credits (including interest thereon) with respect to or otherwise relating to any taxes of any Debtors, including for any taxable period ending on, prior to, or after the Effective Date (except with respect to any property and *ad valorem* taxes relating to the Environmental Response Trust Assets), and such refunds and credits shall be deemed Other GUC Trust Administrative Cash.

(e)    In the event of any conflict between this Trust Agreement and the MSPA relating to the allocation of rights and responsibilities with respect to the Debtors' tax matters, or in the event the MSPA addresses any such matter that is not addressed in this Trust Agreement, the provisions of the MSPA shall control; *provided*, *however*, that the provisions of the MSPA applicable to the Debtors shall apply, *mutatis mutandis*, to the GUC Trust Administrator following the filing of a certificate of cancellation or dissolution for MLC.

7.8.    Delivery of Statement of Transfers.  Following the funding of the GUC Trust (and in no event later than February 15th of the calendar year following the funding of the GUC Trust), MLC shall provide a "§ 1.468B-9 Statement" to the GUC Trust Administrator in accordance with Treasury Regulations section 1.468B-9(g).

7.9.    Allocation of Distributions Between Principal and Interest.  All distributions in respect of any Allowed General Unsecured Claim shall be allocated first to the principal amount of such Allowed General Unsecured Claim, as determined for federal income tax purposes, and thereafter, to the remaining portion of such Allowed General Unsecured Claim, if any.

## ARTICLE VIII
## POWERS OF AND LIMITATIONS ON THE GUC TRUST ADMINISTRATOR

8.1.    Powers of the GUC Trust Administrator.

(a)    Pursuant to the terms of the Plan and the Confirmation Order, the GUC Trust Administrator shall have various powers, duties and responsibilities concerning the prosecution of claims, the disposition of assets, the resolution of claims, and other obligations relating to maximizing the property of the GUC Trust Assets and the administration of the GUC Trust.  In addition, the GUC Trust Administrator shall coordinate with the Avoidance Action Trust Administrator to maximize efficiency in distributions to general unsecured creditors in any situation where such coordination would be beneficial.

(b)      The GUC Trust Administrator shall have only such rights, powers and privileges expressly set forth in the Plan, the Confirmation Order or this Trust Agreement and as otherwise provided by applicable law.  Subject to the Plan, the Confirmation Order and other provisions herein, including the provisions relating to approvals of the GUC Trust Monitor and the DIP Lenders, the GUC Trust Administrator shall be expressly authorized to undertake the following actions, in the GUC Trust Administrator's good faith judgment, in the best interests of the GUC Trust Beneficiaries and in furtherance of the purpose of the GUC Trust:

(i)      hold legal title to any and all rights of the GUC Trust Beneficiaries in, to or arising from the GUC Trust Assets, for the benefit of the GUC Trust Beneficiaries that are entitled to distributions therefrom under the Plan, whether their General Unsecured Claims are Allowed on or after the Effective Date and whether they are the original holders of Units or the transferees of such holders;

(ii)      manage and supervise the GUC Trust Assets;

(iii)      execute all agreements, instruments and other documents, and effect all other actions necessary or appropriate to dispose of the GUC Trust Assets;

(iv)      in the GUC Trust Administrator's reasonable business judgment, object to and/or withdraw objections to Disputed General Unsecured Claims, and manage, control, prosecute and/or settle on behalf of the GUC Trust, (x) objections to Disputed General Unsecured Claims on account of which the GUC Trust Administrator (as a disbursing agent) will be responsible (if Allowed) for making distributions under the Plan and pursuant to this Trust Agreement, and (y) subject to obtaining any applicable consent from the Debtors and any necessary approval of the Bankruptcy Court, any claims for equitable subordination and recharacterization in connection with such objections subject to the consent of the GUC Trust Monitor, if applicable, in accordance with Section 11.3 hereof;

(v)      monitor and enforce the implementation of the Plan insofar as relating to this Trust Agreement, the GUC Trust Assets or the GUC Trust;

(vi)      calculate and implement distributions of the GUC Trust Distributable Assets obtained through the exercise of its power and authority as contemplated by the Plan, the Confirmation Order and this Trust Agreement and in accordance with the interests of the holders of Allowed General Unsecured Claims;

(vii)      retain, pay, oversee and direct the services of, and terminate Trust Professionals in accordance with Section 8.3 hereof to carry out its duties and obligations hereunder, *provided*, *however*, that all such expenditures, solely to the extent that they are paid from the Wind-Down Budget Cash, shall be made in accordance with the Budget;

(viii)      pay the reasonable fees and expenses of the GUC Trust Administrator and GUC Trust Monitor, *provided*, *however*, that all such expenditures, solely to the extent that they are paid from the Wind-Down Budget Cash, shall be made in accordance with the Budget;

(ix)    pay the reasonable fees and expenses of the Indenture Trustees and Fiscal and Paying Agents out of the Indenture Trustee/Fiscal and Paying Agent Reserve Cash;

(x)    incur and pay all reasonable expenses, satisfy ordinary course liabilities and make all other payments reasonable and necessary to administer and dispose of the GUC Trust Assets, *provided, however,* that all such expenditures, solely to the extent they are paid from the Wind-Down Budget Cash shall be made in accordance with the Budget;

(xi)    invest monies received by the GUC Trust, the GUC Trust Administrator or otherwise held by the GUC Trust or the GUC Trust Administrator in accordance with Section 8.4 hereof;

(xii)    protect and enforce the rights to the GUC Trust Assets vested in the GUC Trust Administrator by this Trust Agreement by any method deemed reasonably appropriate, including by judicial proceedings or pursuant to any applicable bankruptcy, insolvency, moratorium or similar law and general principles of equity;

(xiii)    vote any claim or interest held by the GUC Trust in a case under the Bankruptcy Code and receive any distribution therefrom for the benefit of the GUC Trust;

(xiv)    to the extent required, vote or make elections with respect to the GUC Trust Securities, *provided that*, in the event a vote or election is required, the GUC Trust Administrator, unless otherwise directed by the GUC Trust Monitor or the Bankruptcy Court, shall vote or make elections with respect to the GUC Trust Securities held in the GUC Trust on the record date for such vote or election in the same manner and proportion as all other relevant securities of the same class(es) are voted or with respect to which elections are made by holders other than the GUC Trust;

(xv)    make all necessary filings in accordance with any applicable law, statute or regulation;

(xvi)    purchase customary insurance coverage in accordance with Section 6.10 hereof;

(xvii)    pay out of the GUC Trust Administrative Cash any fees to the U.S. Trustee, to the extent required in respect of this Trust Agreement, the GUC Trust Assets or the GUC Trust;

(xviii)  assert and/or waive any applicable privileges (legal or otherwise) on behalf of the GUC Trust, or with respect to the GUC Trust Assets held by the Debtors at any time (prepetition or postpetition);

(xix)    maintain the books and records of the GUC Trust;

(xx)    furnish information to the Avoidance Action Trust Administrator, as provided in Section 6.11;

(xxi)   request that the Debtors provide New GM Securities to the GUC Trust, as and when needed, pursuant to Section 2.3(a) of this Trust Agreement;

(xxii)   sell GUC Trust Securities Assets in accordance with Section 6.1 of this Trust Agreement or request that the Debtors sell GUC Trust Securities Assets in accordance with Section 2.3 of this Trust Agreement;

(xxiii)   open, maintain and close any bank, securities or other accounts that are necessary and appropriate to manage the GUC Trust Assets, including but not limited to the accounts listed on Exhibit C hereto; and

(xxiv)   perform such functions and take such actions as are provided for or permitted in the Plan, the Confirmation Order, this Trust Agreement or any other agreement executed pursuant to the Plan and take any other actions as it may deem to be reasonably necessary or appropriate to dispose of the GUC Trust Assets.

(c)   Without limiting the powers and responsibilities set forth in Section 8.1(b), the GUC Trust Administrator shall also be expressly authorized to undertake the following actions, in the GUC Trust Administrator's good faith judgment, in furtherance of the wind-down of the Debtors' affairs:

(i)   If the Residual Wind-Down Assets are transferred to the GUC Trust upon the dissolution of the Debtors, the GUC Trust Administrator shall be responsible for the administration and distribution of the Residual Wind-Down Assets, in accordance with the Plan, the Confirmation Order and this Trust Agreement, and shall have the authority to object to and satisfy the Residual Wind-Down Claims in accordance with Section 6.13 of this Trust Agreement; provided, however, that in such event, and to the extent that the GUC Trust Administrator, in consultation with the GUC Trust Monitor, deems it necessary and advisable, the GUC Trust Administrator may petition the Bankruptcy Court for authorization to implement supplementary procedures (which shall not be contrary to the Plan, the Confirmation Order and this Trust Agreement) for the orderly resolution of Residual Wind-Down Claims and the administration and distribution of the Residual Wind-Down Assets.

(ii)   monitor and enforce the implementation of the Plan insofar as relating to the wind-down of the Debtors' affairs;

(iii)   subject to Section 7.7 and the MSPA, file, if necessary, any and all tax and regulatory forms, returns, reports and other documents with respect to the Debtors and pay taxes properly payable by the Debtors insofar as relating to the wind-down of the Debtors' affairs;

(iv)   take all actions, file any pleadings with the Bankruptcy Court, and create any documents necessary to wind up the affairs of the Debtors and their Affiliates, implement the Plan, and close the bankruptcy cases;

(v)   execute all agreements, instruments and other documents, and effect all other actions necessary or appropriate to dispose of the Residual Wind-Down Assets and to wind-down the Debtors' affairs;

(vi)    vote any claim or interest included in the Residual Wind-Down Assets;

(vii)    make all necessary filings in accordance with any applicable law, statute or regulation insofar as relating to the wind-down of the Debtors' affairs;

(viii)    purchase customary insurance coverage in accordance with Section 6.10 hereof insofar as relating to the wind-down of the Debtors' affairs;

(ix)    act as a signatory on behalf of the Debtors for all purposes, including those associated with the novation of contracts and the wind-down of the Debtors' affairs;

(x)    cause the reduction, reinstatement or discharge of any intercompany claim and any claim held against any non-Debtor subsidiary or Affiliate by any Debtor or by any other non-Debtor subsidiary or Affiliate;

(xi)    pay any fees to the U.S. Trustee, to the extent required in respect of the wind-down of the Debtors' affairs;

(xii)    pay the reasonable fees and expenses incurred in connection with the wind-down of the Debtors' affairs and the resolution of the Residual Wind-Down Claims and distribution of the Residual Wind-Down Assets;

(xiii)    open, maintain and close any bank, securities or other accounts that are necessary and appropriate to manage the Residual Wind-Down Assets, including but not limited to the accounts listed on Exhibit D hereto; and

(xiv)    perform such functions and take such actions as are provided for or permitted in the Plan, the Confirmation Order, this Trust Agreement or any other agreement executed pursuant to the Plan and take any other actions as it may deem to be reasonably necessary or appropriate to effectuate the wind-down of the Debtors' affairs, obtain an order closing the Chapter 11 Cases, and exercise the GUC Trust Administrator's powers granted herein in respect thereof.

(d)    In all circumstances other than with respect to the matters addressed in Section 8.1(c), the GUC Trust Administrator shall act in the best interests of all GUC Trust Beneficiaries and in furtherance of the purpose of the GUC Trust in a manner consistent with the Budget, and, with respect to the matters addressed in Section 8.1(c), in a manner not inconsistent with the best interests of the GUC Trust Beneficiaries. The GUC Trust Administrator shall not take any action inconsistent with the purpose of the GUC Trust, or take (or fail to take) any action that would cause the GUC Trust to fail to qualify as a "disputed ownership fund" within the meaning of Treasury Regulations section 1.468B-9.

(e)    Notwithstanding any provision herein to the contrary, the GUC Trust Administrator shall not serve on the board of directors, management committee or any similar governing body of any non-Debtor subsidiary of MLC, where the charter,

limited liability company agreement, partnership agreement or other similar constituent document of such subsidiary does not provide for a liquidating purpose for such subsidiary.  Except as otherwise provided in this Trust Agreement, the GUC Trust Administrator will not be required to obtain the order or approval of the Bankruptcy Court, or any other court of competent jurisdiction in, or account to the Bankruptcy Court or any other court of competent jurisdiction for, the exercise of any right, power or privilege conferred hereunder.  Notwithstanding the foregoing, where the GUC Trust Administrator determines, in its reasonable discretion, that it is necessary, appropriate or desirable, the GUC Trust Administrator will have the right to submit to the Bankruptcy Court or any other court of competent jurisdiction any question or questions regarding any specific action proposed to be taken by the GUC Trust Administrator with respect to this Trust Agreement, the GUC Trust, or the GUC Trust Assets, including the administration and distribution of the GUC Trust Assets and the termination of the GUC Trust.  Pursuant to the Plan, the Bankruptcy Court has retained jurisdiction for such purposes and may approve or disapprove any such proposed action upon motion by the GUC Trust Administrator.

     8.2.    <u>Limitations on the GUC Trust Administrator</u>.  The GUC Trust Administrator shall not be authorized to engage, in its capacity as GUC Trust Administrator, in any trade or business with respect to the GUC Trust Assets or any proceeds therefrom except to the extent reasonably necessary to, and consistent with, the purpose of the GUC Trust.  The GUC Trust Administrator shall take such actions consistent with the prompt orderly disposition of the GUC Trust Assets as required by applicable law and consistent with the treatment of the GUC Trust as a disputed ownership fund under Treasury Regulations section 1.468B-9, to the extent such actions are permitted by this Trust Agreement.  The GUC Trust Administrator shall, in its capacity as GUC Trust Administrator and on behalf of the GUC Trust, hold the GUC Trust out as a trust in the process of liquidation and not as an investment company.  The GUC Trust Administrator shall not, and shall not cause the GUC Trust to, become, engage or encourage the services of a market-maker for the Units, list the Units on a national securities exchange or a quotation service or system, place any advertisements in the media promoting investment into the Units, collect or publish information about prices at which Units have been or may be transferred or otherwise take actions intended to facilitate or encourage the development of an active trading market in the Units.  For the avoidance of doubt, any actions permitted, required or contemplated by the Plan, the Confirmation Order, this Trust Agreement (including the posting of information to a public website as contemplated by <u>Section 6.2</u> herein) or applicable law (including required reporting to the SEC) shall not be considered actions that facilitate or encourage the development of an active trading market.  The GUC Trust Administrator shall, in its capacity as GUC Trust Administrator, be restricted to the liquidation of the GUC Trust on behalf, and for the benefit, of the GUC Trust Beneficiaries and the distribution and application of GUC Trust Assets for the purposes set forth in, and the conservation and protection of the GUC Trust Assets and the administration thereof, and to the matters addressed in <u>Section 8.1(c)</u>, in each case in accordance with, the provisions of the Plan, the Confirmation Order and this Trust Agreement.

     8.3.    <u>Agents and Professionals</u>.

(a)    The GUC Trust Administrator on behalf of the GUC Trust may, but shall not be required to, from time to time enter into contracts with, consult with and retain Trust Professionals, on such terms as the GUC Trust Administrator deems appropriate in accordance with Section 8.1 hereof and in accordance with the Budget. None of the professionals that represented parties-in-interest in the Chapter 11 Cases shall be precluded from being engaged by the GUC Trust Administrator solely on account of their service as a professional for such parties-in-interest prior to the Effective Date. Notwithstanding anything herein to the contrary, if the Trust Professionals will be paid from the Wind-Down Budget Cash, prior to such retention, the GUC Trust Administrator shall identify the Trust Professionals to the DIP Lenders. The DIP Lenders shall not object to the retention of Trust Professionals so long as the payment structure for such Trust Professionals is consistent with the Budget, the provisions of the Plan including section 6.2(m) thereof, the Confirmation order and this Trust Agreement.

(b)    After the Effective Date, Trust Professionals and any other persons that may be entitled to receive payment from the GUC Trust other than the GUC Trust Administrator and GUC Trust Monitor shall be required to submit reasonably detailed invoices on a monthly basis to the GUC Trust Administrator, the GUC Trust Monitor and the DIP Lenders, including in such invoices a description of the work performed, the individuals who performed such work, and, if billing on an hourly basis, the hourly rate of such person, plus an itemized statement of expenses. Subject to withholding the applicable Holdback for each Trust Professional, the GUC Trust Administrator shall timely pay all such invoices that are not disputed by the GUC Trust Administrator and as to which the GUC Trust Monitor or the DIP Lenders do not object within fifteen days after their receipt thereof, and shall not require approval of the Bankruptcy Court in order to do so; *provided that* the GUC Trust Administrator shall not pay any amounts that are not in compliance with Section 2.6(c) of this Trust Agreement, unless such Trust Professionals shall be paid from amounts other than the Wind-Down Budget Cash. In the event of any dispute concerning the entitlement to, or the reasonableness of any compensation and/or expenses of any Trust Professionals or any other persons that may be entitled to receive payment from the GUC Trust as aforesaid, either the GUC Trust Administrator or the other party to the dispute may petition the Bankruptcy Court to resolve the dispute.

(c)    All payments to Trust Professionals shall be paid out of the GUC Trust Administrative Cash or the Residual Wind-Down Assets, as applicable.

(d)    The GUC Trust Administrator shall pay the respective Holdback amounts to the applicable Trust Professionals, in accordance with Section 2.6(d) of this Trust Agreement.

8.4.    Investment of GUC Trust Cash.

(a)    The GUC Trust Administrator shall set up segregated accounts for the GUC Trust Cash as follows: (i) GUC Trust Distributable Cash which shall be held in trust for the benefit of GUC Trust Beneficiaries; (ii) Other GUC Trust Administrative Cash which shall be used to first pay the administrative expenses of the GUC Trust as provided in Section 6.1, and to the extent not required for such payment, shall be held in

trust for the benefit of GUC Trust Beneficiaries; (iii) Wind-Down Budget Cash (other than the Indenture Trustee/Fiscal and Paying Agent Reserve Cash) which shall be used to pay the administrative expenses of the GUC Trust, and over which the DIP Lenders have a lien; (iv) Indenture Trustee/Fiscal and Paying Agent Reserve Cash, which shall be used to pay or reimburse the Indenture Trustees and the Fiscal and Paying Agents for administering distributions to holders of Note Claims and Eurobond Claims pursuant to the Plan; and (v) Residual Wind-Down Assets, which shall be used to satisfy the Residual Wind-Down Expenses, and over which the DIP Lenders have a lien.

(b)    The GUC Trust Administrator shall invest the GUC Trust Cash (including any earnings thereon or proceeds thereof) in the manner set forth in this Section 8.4, but shall otherwise be under no liability for interest or income on any monies received by the GUC Trust hereunder and held for distribution or payment to the GUC Trust Beneficiaries, except as such interest shall actually be received. Investment of any GUC Trust Cash shall be administered in accordance with the general duties and obligations hereunder. The right and power of the GUC Trust Administrator to invest the GUC Trust Cash and the proceeds thereof, or any income earned by the GUC Trust, shall be limited to investing such GUC Trust Cash (pending distribution or disbursement in accordance with the Plan or this Trust Agreement) in Permissible Investments; *provided*, *however*, that such Permissible Investments shall be limited to include only those investments that a disputed ownership fund, within the meaning of Treasury Regulations section 1.468B-9, may be permitted to hold, pursuant to the Treasury Regulations, or any modification in the IRS guidelines, whether set forth in IRS rulings, other IRS pronouncements or otherwise.

(c)    For the avoidance of doubt, the GUC Trust is not, and will not hold itself out as, an "investment company" as such term is understood under the Investment Company Act of 1940, and is prohibited from investing, reinvesting or trading in securities (other than making any Permissible Investments or holding and administering the GUC Trust Securities Assets as contemplated by the Plan, the Confirmation Order and this Trust Agreement) or conducting any trade or business other than implementing the Plan, distributing GUC Trust Distributable Assets under the Plan and this Trust Agreement and effectuating the wind-up of the affairs of MLC and the other Debtors.

8.5.    Termination. The duties, responsibilities and powers of the GUC Trust Administrator will terminate when the GUC Trust is dissolved and terminated pursuant to Article IV hereof and the GUC Trust Administrator has performed all of its obligations under Section 4.3, by an order of the Bankruptcy Court or by entry of a final decree closing the Debtors' cases before the Bankruptcy Court; *provided*, *however*, that Sections 9.4, 9.5 and 9.6 hereof shall survive such termination, dissolution and entry.

# ARTICLE IX
# ADDITIONAL MATTERS CONCERNING THE GUC TRUST ADMINISTRATOR

9.1.    Reliance by GUC Trust Administrator. Except as otherwise provided in the Plan, the Confirmation Order or this Trust Agreement, the GUC Trust Administrator may rely and shall be protected in acting upon any resolution, statement, instrument, opinion, report, notice, request, consent, order or other paper or document reasonably

believed by the GUC Trust Administrator to be genuine and to have been signed or
presented by the proper party or parties.

       9.2.    <u>Liability to Third Persons</u>.  To the fullest extent permitted by applicable
law, the GUC Trust Administrator Parties shall not be subject to any personal liability
whatsoever, in tort, contract or otherwise, to any person (including, in the case of the GUC
Trust Administrator, to any Trust Professionals retained by the GUC Trust Administrator
in accordance with this Trust Agreement) in connection with the GUC Trust Assets, the
Residual Wind-Down Assets or the affairs of the GUC Trust and shall not be liable with
respect to any action taken or omitted to be taken in good faith, except for actions and
omissions determined by a Final Order of the Bankruptcy Court to be due to their
respective willful misconduct (including, but not limited to, conduct that results in a
personal profit at the expense of the GUC Trust), gross negligence, fraud, malpractice,
criminal conduct, unauthorized use of confidential information that causes damages,
breach of fiduciary duty (to the extent applicable), or *ultra vires* acts, and all such persons
shall look solely to the GUC Trust Assets or Residual Wind-Down Assets, as applicable,
for satisfaction of claims of any nature arising in connection with affairs of the GUC Trust.

       9.3.    <u>Non-liability of GUC Trust Administrator for Acts of Others</u>.  Except as
provided herein, nothing contained in the Plan, the Confirmation Order or this Trust
Agreement shall be deemed to be an assumption by the GUC Trust Administrator of any
of the liabilities, obligations or duties of the Debtors or shall be deemed to be or contain a
covenant or agreement by the GUC Trust Administrator to assume or accept any such
liability, obligation or duty.  Any successor GUC Trust Administrator may accept and rely
upon any accounting made by or on behalf of any predecessor GUC Trust Administrator
hereunder, and any statement or representation made as to the assets comprising the GUC
Trust Assets or the Residual Wind-Down Assets, or as to any other fact bearing upon the
prior administration of the GUC Trust, so long as it has a good faith basis to do so.  The
GUC Trust Administrator shall not be liable for having accepted and relied in good faith
upon any such accounting, statement or representation if it is later proved to be
incomplete, inaccurate or untrue.  Neither the GUC Trust Administrator nor any successor
GUC Trust Administrator shall be liable for any act or omission of any predecessor GUC
Trust Administrator, nor have a duty to enforce any claims against any predecessor GUC
Trust Administrator on account of any such act or omission, unless directed in good faith
to do so by the GUC Trust Monitor.

       9.4.    <u>Exculpation</u>.  To the fullest extent permitted by applicable law, the GUC
Trust Administrator Parties shall be and hereby are exculpated by all Persons, including
holders of General Unsecured Claims, Units and Residual Wind-Down Claims and other
parties-in-interest, from any and all claims, causes of action and other assertions of
liability arising out of the discharge of their respective powers and duties conferred by the
Plan, the Confirmation Order, this Trust Agreement or any Order of the Bankruptcy Court
entered pursuant to or in furtherance of the Plan, or applicable law or otherwise (including,
without limitation, any claims, causes of action and other assertions of liabilities arising
out of or related to the Residual Wind-Down Expenses and the wind-down of the Debtors'
affairs), except for actions or omissions to act that are determined by Final Order of the
Bankruptcy Court to have arisen out of the willful misconduct (including, but not limited

to, conduct that results in a personal profit at the expense of the GUC Trust), gross negligence, fraud, malpractice, criminal conduct, unauthorized use of confidential information that causes damages, breach of fiduciary duty (to the extent applicable), or *ultra vires* acts of such GUC Trust Administrator Party. No holder of a General Unsecured Claim or other party-in-interest will have or be permitted to pursue any claim or cause of action against the GUC Trust Administrator Parties or the GUC Trust, for making payments and distributions in accordance with the Plan, the Confirmation Order or this Trust Agreement or for implementing the provisions thereof. Any action taken or omitted to be taken with the express approval of the Bankruptcy Court will conclusively be deemed not to constitute willful misconduct, gross negligence, fraud, malpractice, criminal conduct, unauthorized use of confidential information that causes damages, breach of fiduciary duty, or *ultra vires* acts; *provided*, *however*, that notwithstanding any provision herein to the contrary, the GUC Trust Administrator shall not be obligated to comply with a direction of the GUC Trust Monitor, whether or not express, which would result in a change to the distribution provisions of the Plan, the Confirmation Order or this Trust Agreement.

9.5.    Limitation of Liability.  In no event shall the GUC Trust Administrator Parties be liable for punitive, exemplary, consequential, special or other damages for a breach of, or otherwise in connection with, this Trust Agreement under any circumstances.

9.6.    Indemnity.  To the fullest extent permitted by applicable law, the GUC Trust Administrator Parties shall be indemnified by the GUC Trust solely from the GUC Trust Assets or the Residual Wind-Down Assets, as applicable, for any losses, claims, damages, liabilities and expenses, including reasonable attorneys' fees, disbursements and related expenses which the GUC Trust Administrator Parties may incur or to which the GUC Trust Administrator Parties may become subject in connection with any action, suit, proceeding or investigation brought by or threatened against one or more of the GUC Trust Administrator Parties on account of the acts or omissions in their capacity as, or on behalf of, the GUC Trust Administrator; *provided*, *however*, that the GUC Trust shall not be liable to indemnify any GUC Trust Administrator Party for any act or omission arising out of such GUC Trust Administrator Party's respective actions that are determined by a Final Order of the Bankruptcy Court to be willful misconduct (including, but not limited to, conduct that results in a personal profit at the expense of the GUC Trust), gross negligence, fraud, malpractice, criminal conduct, unauthorized use of confidential information that causes damages, breach of fiduciary duty (to the extent applicable), or *ultra vires* acts.  Notwithstanding any provision herein to the contrary, the GUC Trust Administrator Parties shall be entitled to obtain advances from the GUC Trust to cover their reasonable expenses of defending themselves in any action brought against them as a result of the acts or omissions, actual or alleged, of a GUC Trust Administrator Party in its capacity as such; *provided*, *however*, that the GUC Trust Administrator Parties receiving such advances shall repay the amounts so advanced to the GUC Trust immediately upon the entry of a final, non-appealable judgment or order finding that such GUC Trust Administrator Parties were not entitled to any indemnity under the provisions of this Section 9.6.  Any amounts payable to any GUC Trust Administrator Party pursuant to this Section 9.6 shall be satisfied as follows:  (i) first from the Wind-Down Budget Cash, (ii) second from the Other GUC Trust Administrative Cash, and (iii) third from the GUC Trust

Distributable Assets as provided in Section 6.1(b); *provided*, *however*, that the use of GUC Trust Distributable Cash or the sale and/or borrowing against GUC Trust Distributable Assets as contemplated in clause (iii) of the foregoing shall be subject to the prior approval by the Bankruptcy Court, as provided in Section 6.1(b)(iv).  The foregoing indemnity in respect of any GUC Trust Administrator Party shall survive the termination of such GUC Trust Administrator Party from the capacity for which they are indemnified.  For the avoidance of doubt, any claim, to the extent related to the wind-down of the Debtors' affairs or the resolution or satisfaction of the Residual Wind-Down Claims or distribution of the Residual Wind-Down Assets, or to the extent otherwise related to the Residual Wind-Down Assets, shall be satisfied in accordance with Section 6.13.

9.7.    Compensation and Expenses.  The GUC Trust Administrator shall receive fair and reasonable compensation for its services, to be paid out of the Wind-Down Budget Cash in accordance with the Budget prior to the final Distribution Date.  The GUC Trust Administrator shall be entitled, without the need for approval of the Bankruptcy Court, to reimburse itself from the Wind-Down Budget Cash on a monthly basis for such compensation and all reasonable out-of-pocket expenses actually incurred in the performance of duties in accordance with this Trust Agreement and the Budget.  In addition, to the extent the Wind-Down Budget Cash is not sufficient to provide the GUC Trust Administrator fair and reasonable compensation for its services or for reasonable out-of-pocket expenses, it shall be paid out of the Other GUC Trust Administrative Cash in accordance with Section 6.1.

9.8.    No Personal Financial Liability.  No provision of the Plan, Confirmation Order or this Trust Agreement shall be construed as requiring the GUC Trust Administrator to expend or risk its own funds or otherwise to incur any personal financial liability (x) in the performance of any of its duties thereunder or hereunder, including but not limited to the payment of fees and expenses of the Trust Professionals, and any situation where the GUC Trust Assets and/or the Residual Wind-Down Assets are insufficient to permit the administration of the GUC Trust or distributions as contemplated herein, or (y) in the exercise of any of its rights or powers afforded hereunder or thereunder.

## ARTICLE X
## SUCCESSOR GUC TRUST ADMINISTRATORS

10.1.    Resignation.  The GUC Trust Administrator may resign from the GUC Trust by giving at least sixty (60) days' prior written notice thereof to the GUC Trust Monitor.  Such resignation shall become effective on the later to occur of (x) the date specified in such written notice and (y) the effective date of the appointment of a successor GUC Trust Administrator in accordance with Section 10.4 hereof and such successor's acceptance of such appointment in accordance with Section 10.5 hereof.

10.2.    Removal.  The holders of a majority of the Units may at any time petition the Bankruptcy Court for the removal of the GUC Trust Administrator, but only for good cause shown. Such removal shall become effective on the date ordered by the Bankruptcy Court, provided that such removal shall not become effective until the appointment of a

successor GUC Trust Administrator in accordance with Section 10.4 hereof and such successor's acceptance of such appointment in accordance with Section 10.5 hereof.  The services of the GUC Trust Administrator shall also terminate upon its bankruptcy, provided that such termination shall not become effective until the appointment of a successor GUC Trust Administrator in accordance with Section 10.4 hereof and such successor's acceptance of such appointment in accordance with Section 10.5 hereof.

      10.3.    Effect of Resignation or Removal.  The resignation, removal or bankruptcy of the GUC Trust Administrator shall not operate to terminate the GUC Trust or to revoke any existing agency created pursuant to the terms of the Plan, the Confirmation Order or this Trust Agreement or invalidate any action theretofore taken by the GUC Trust Administrator.  The exculpation, indemnity and limitation of liability provisions of Article X of this Trust Agreement shall survive the resignation, removal or bankruptcy of the GUC Trust Administrator.  All fees and expenses properly incurred by the GUC Trust Administrator prior to the resignation, Incompetency, removal or bankruptcy of the GUC Trust Administrator shall be paid from the GUC Trust Administrative Cash, or Residual Wind-Down Assets, as applicable, unless such fees and expenses are disputed by (x) the GUC Trust Monitor or (y) the successor GUC Trust Administrator, in which case the Bankruptcy Court shall resolve the dispute and any disputed fees and expenses of the predecessor GUC Trust Administrator that are subsequently allowed by the Bankruptcy Court shall be paid from the GUC Trust Administrative Cash or Residual Wind-Down Assets, as applicable.  In the event of the resignation, removal or bankruptcy of the GUC Trust Administrator, such GUC Trust Administrator shall:

      (a)    promptly execute and deliver such documents, instruments and other writings as may be reasonably requested by the successor GUC Trust Administrator or directed by the Bankruptcy Court to effect the termination of such GUC Trust Administrator's capacity under this Trust Agreement;

      (b)    promptly deliver to the successor GUC Trust Administrator all documents, instruments, records and other writings related to the GUC Trust as may be in the possession of such GUC Trust Administrator; and

      (c)    otherwise assist and cooperate in effecting the assumption of its obligations and functions by such successor GUC Trust Administrator.

      10.4.    Appointment of Successor.  In the event of the resignation, removal, Incompetency or bankruptcy of the GUC Trust Administrator, the GUC Trust Monitor shall promptly appoint a successor GUC Trust Administrator, *provided that* such appointment shall not take effect unless approved by the Bankruptcy Court upon the petition of the GUC Trust Monitor and until the successor GUC Trust Administrator shall have delivered written acceptance of its appointment as described Section 10.5 below.   If a successor GUC Trust Administrator does not take office within thirty (30) days after the resignation, removal, Incompetency or bankruptcy of the retiring GUC Trust Administrator, the Bankruptcy Court, upon its own motion or the motion of the retiring

GUC Trust Administrator or any GUC Trust Beneficiary, shall appoint a successor GUC Trust Administrator.

10.5.    _Acceptance of Appointment by Successor GUC Trust Administrator_.  Any successor GUC Trust Administrator appointed hereunder shall execute an instrument accepting its appointment and shall deliver one counterpart thereof to the Bankruptcy Court for filing and to the GUC Trust Monitor and, in case of the GUC Trust Administrator's resignation, to the resigning GUC Trust Administrator.  Thereupon, such successor GUC Trust Administrator shall, without any further act, become vested with all the duties, powers, rights, obligations, title, discretion and privileges of its predecessor in the GUC Trust with like effect as if originally named GUC Trust Administrator and shall be deemed appointed pursuant to Bankruptcy Code Section 1123(b)(3)(B); _provided_, _however_, such successor GUC Trust Administrator shall file an amendment to the Certificate of Trust with the Secretary of State as required by the Delaware Act.  The predecessor GUC Trust Administrator shall duly assign, transfer and deliver to such successor GUC Trust Administrator all GUC Trust Assets held by such predecessor GUC Trust Administrator hereunder and shall, as directed by the Bankruptcy Court or reasonably requested by such successor GUC Trust Administrator, execute and deliver an instrument or instruments conveying and transferring to such successor GUC Trust Administrator upon the trusts herein expressed, all the duties, powers, rights, obligations, title, discretion and privileges of the predecessor GUC Trust Administrator.

10.6.    _Successor Entity to GUC Trust Administrator_. Any business entity into which the GUC Trust Administrator may be merged or converted or with which it may be consolidated, or any entity resulting from any merger, conversion or consolidation to which the GUC Trust Administrator shall be a party, or any entity succeeding to all or substantially all of the corporate trust business of the GUC Trust Administrator, shall be the successor of the GUC Trust Administrator hereunder, without the execution or filing of any paper or any further act on the part of any of the parties hereto; _provided_, _however_, such successor GUC Trust Administrator shall file an amendment to the Certificate of Trust with the Secretary of State as required by the Delaware Act.

**ARTICLE XI**
**GUC TRUST MONITOR**

11.1.    _General_.

(a)    The GUC Trust Monitor shall oversee the activities of the GUC Trust Administrator as set forth in this Trust Agreement.  In all circumstances, the GUC Trust Monitor shall act in the best interests of all GUC Trust Beneficiaries, in furtherance of the purpose of the GUC Trust, and in accordance with this Trust Agreement.

(b)    In furtherance of its rights and responsibilities under this Trust Agreement, the GUC Trust Monitor shall have access, on reasonable advance notice and during regular business hours, to all such books and records of the GUC Trust, and the GUC Trust Administrator shall have the right to consult with all such professionals engaged by the GUC Trust Administrator and shall participate in all such meetings of the

GUC Trust Administrator and the Trust Professionals as the GUC Trust Monitor deems reasonably necessary or appropriate.  Any documents shared between the GUC Trust Administrator and the GUC Trust Monitor shall be subject to joint privilege, and such sharing shall not be deemed to waive any attorney-client or work product privilege in respect of such documents.

(c)    Without limiting the access rights of the GUC Trust Monitor generally, for each of the first twelve calendar months following the Effective Date, the GUC Trust Administrator shall provide to the GUC Trust Monitor a monthly report containing the information set forth in Sections 6.2(b) and (c), mutatis mutandis, with respect to such month, to be delivered as follows:  (i) with respect to each month, other than the last month, of each calendar quarter, reports shall be delivered within 14 days after the end of the month; (ii) with respect to the last month of each calendar quarter, reports shall be delivered within 30 days following the end of the month; and (iii) with respect to the last month of the fiscal year of the GUC Trust, the report shall be delivered within 45 days following the end of the month.

(d)    Notwithstanding anything in this Section 11.1 or Section 11.2 hereof, the GUC Trust Monitor shall not take (or fail to take) any action which will cause the GUC Trust to fail to qualify as a "disputed ownership fund" within the meaning of Treasury Regulation section 1.468B-9 for U.S. federal or applicable state or local income tax purposes.

11.2.    Appointment and Removal of the GUC Trust Monitor.

(a)    Subject to Section 11.2(d), the GUC Trust Monitor shall serve until the earlier of (w) the final distribution of all GUC Trust Distributable Assets, (x) its resignation pursuant to subsection (b) of this Section 11.2, (y) its removal pursuant to subsection (c) of this Section 11.2 or (z) its bankruptcy.

(b)    The GUC Trust Monitor may resign at any time by written notice of resignation to the GUC Trust Administrator, a copy of which shall also be filed by the GUC Trust Monitor with the Bankruptcy Court.  Such resignation shall be effective no earlier than sixty (60) days from the date of such notice or such earlier time as a successor is appointed in accordance with the provisions of subsection (d) of this Section 11.2.

(c)    The holders of a majority of the Units may at any time petition the Bankruptcy Court for the removal of the GUC Trust Monitor, but only for good cause shown.  Such removal shall become effective on the date ordered by the Bankruptcy Court.

(d)    In the event of the resignation, removal or bankruptcy of the GUC Trust Monitor, the GUC Trust Administrator shall promptly appoint a successor GUC Trust Monitor, *provided that* such appointment shall not take effect unless approved by the Bankruptcy Court upon the petition of the GUC Trust Administrator and until the successor GUC Trust Monitor shall have delivered written acceptance of its appointment as described in clause (e) of this Section 11.2 below; and *provided further that* until a new GUC Trust Monitor's appointment is effective, the resigning GUC Trust Monitor's

appointment shall remain in effect, and the resigning GUC Trust Monitor shall fulfill all obligations and duties of the GUC Trust Monitor. If a successor GUC Trust Monitor does not take office within thirty (30) days after the resignation, removal, Incompetency or bankruptcy of the retiring GUC Trust Monitor, the Bankruptcy Court, upon its own motion or the motion of the retiring GUC Trust Monitor or any GUC Trust Beneficiary, shall appoint a successor GUC Trust Monitor.

(e)    Any successor GUC Trust Monitor appointed hereunder shall execute an instrument accepting its appointment and shall deliver one counterpart thereof to the Bankruptcy Court for filing and to the GUC Trust Administrator.

(f)    Immediately upon effectiveness of the appointment of a successor GUC Trust Monitor, all rights, powers, duties, authority, and privileges of the predecessor GUC Trust Monitor hereunder will be vested in and undertaken by the successor GUC Trust Monitor without any further act. The successor GUC Trust Monitor shall not be liable personally for any act or omission of the predecessor GUC Trust Monitor.

11.3.    Approval of and Consultation with the GUC Trust Monitor.

(a)    Notwithstanding anything in this Trust Agreement to the contrary, the GUC Trust Administrator shall submit to the GUC Trust Monitor for its review and prior approval the following matters, in addition to any other matters that expressly require the approval of the GUC Trust Monitor pursuant to the terms of the Plan, the Confirmation Order or this Trust Agreement:

(i)    Any decision to settle or otherwise resolve any objections to Disputed General Unsecured Claims against the Debtors where the amount sought to be Allowed equals or exceeds $10,000,000;

(ii)    Any decision to refrain from making any distributions to the holders of Allowed General Unsecured Claims or Units, as the case may be, in accordance with the Trust Agreement, except as expressly permitted herein;

(iii)    Any decision to retain and/or to terminate the retention of Trust Professionals (other than legal counsel retained to represent the GUC Trust Administrator in connection with its role as GUC Trust Administrator, which shall be in the GUC Trust Administrator's sole discretion);

(iv)    The incurrence of any cost or expense of the GUC Trust in excess of 10% of any individual line item therefor in the approved Budget, measured on a yearly basis; _provided_, _however_, that approval of the GUC Trust Monitor shall not be required in the case of any cost or expense authorized by further order of the Bankruptcy Court;

(v)    The reports and Budget described in Sections 6.2 and 6.4 hereof and any changes thereto;

(vi)    Any amendment of this Trust Agreement as provided in Section 13.13 hereof;

(vii)    Any privately-negotiated transaction to sell the New GM Securities for the sole purpose of liquidating fractional shares or expiring warrants pursuant to <u>Sections 5.6 and 5.7</u>, respectively; and

(viii)    Any distribution that is not made in accordance with the provisions of  <u>Article V</u> as contemplated by <u>Section 5.8</u>; *provided*, *however*, that any deviation from the provisions of <u>Article V</u> other than as contemplated by <u>Section 5.8</u> shall also require approval of the Bankruptcy Court.

Notwithstanding anything herein to the contrary, the provisions of this <u>Section 11.3</u> shall not supercede or modify the rights of the DIP Lenders to approve or review the expenditure of the Wind-Down Budget Cash or the Budget.

(b)    In addition to any other matters that expressly require consultation with the GUC Trust Monitor pursuant to the terms of the Plan, the Confirmation Order or this Trust Agreement, the GUC Trust Administrator shall consult with the GUC Trust Monitor in advance of an application to the Bankruptcy Court to sell or borrow against the GUC Trust Distributable Assets in order to satisfy the fees and expenses of the GUC Trust, as contemplated by <u>Section 6.1(b), (c) and (d)</u> hereof; *provided* <u>*that*</u>, the GUC Trust Administrator shall not be required to obtain the approval of the Bankruptcy Court or consult with or obtain the consent of the GUC Trust Monitor in connection with the sale of any New GM Securities in the public market for the sole purpose of liquidating fractional shares or expiring warrants pursuant to <u>Sections 5.6 and 5.7</u> respectively.

(c)    In the event of any disagreement between the GUC Trust Administrator and the GUC Trust Monitor regarding any matter requiring the approval or direction of the GUC Trust Monitor under this Trust Agreement, the GUC Trust Administrator and the GUC Trust Monitor shall consult and negotiate diligently and in good faith to resolve such disagreement.  If despite their good faith efforts, the GUC Trust Administrator and the GUC Trust Monitor are unable to resolve any disagreement, or the GUC Trust Administrator cannot otherwise obtain approval or direction from the GUC Trust Monitor as required by this Trust Agreement, the GUC Trust Administrator may petition the Bankruptcy Court, with a copy to the GUC Trust Monitor, requesting such approval or direction.

11.4.    <u>Exculpation and Indemnification; Limitation of Liability</u>.  To the fullest extent permitted by applicable law, the GUC Trust Monitor Parties shall not be subject to personal liability, and shall be exculpated and indemnified, and shall have the right to obtain advances to cover reasonable expenses of defense, to the same extent as the GUC Trust Administrator Parties pursuant to <u>Section 9.2</u>, <u>Section 9.4</u>, <u>Section 9.5</u>, <u>Section 9.6</u> and <u>Section 10.3</u>.  In no event will the GUC Trust Monitor Parties be liable for punitive, exemplary, consequential, special or other damages for a breach of, or otherwise in connection with, this Trust Agreement under any circumstances.

11.5.    <u>Compensation and Expenses</u>.  The GUC Trust Monitor shall receive fair and reasonable compensation for its services, to be paid out of the Wind-Down Budget Cash, in accordance with the Budget.  The GUC Trust Monitor shall be entitled, without

the need for approval of the Bankruptcy Court, to direct the GUC Trust Administrator to reimburse the GUC Trust Monitor from the Wind-Down Budget Cash on a monthly basis, for all reasonable out-of-pocket expenses actually incurred in the performance of duties in accordance with this Trust Agreement, consistent with the Budget prepared pursuant to Section 6.4 hereof.  In addition, to the extent the Wind-Down Budget Cash is not sufficient to provide the GUC Trust Monitor fair and reasonable compensation for its services or for reasonable out-of-pocket expenses, it shall be paid out of the Other GUC Trust Administrative Cash in accordance with Section 6.1.

## ARTICLE XII
## ACTION BY MAJORITY OF HOLDERS OF UNITS

Holders of a majority of the Units from time to time outstanding may petition the Bankruptcy Court to remove the GUC Trust Administrator in accordance with Section 10.2 or to remove the GUC Trust Monitor in accordance with Section 11.2, but in each case only for good cause shown.  In determining whether the holders of a majority of the Units have concurred in any such petition, Units held by the GUC Trust Administrator or the GUC Trust Monitor or any of their respective Affiliates shall be disregarded.

## ARTICLE XIII
## MISCELLANEOUS PROVISIONS

13.1.    Actions Taken on Other Than Business Day.  In the event that any payment or act under the Plan, the Confirmation Order or this Trust Agreement is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

13.2.    Governing Law.  This Trust Agreement shall be governed by and construed in accordance with the laws of the State of Delaware without giving effect to rules governing conflicts of law.

13.3.    Jurisdiction.  Subject to the proviso below, the parties agree that the Bankruptcy Court shall have exclusive and continuing jurisdiction over the GUC Trust and the GUC Trust Administrator, including the administration and activities of the GUC Trust and the GUC Trust Administrator; *provided*, *however*, that notwithstanding the foregoing, the GUC Trust Administrator shall have power and authority to bring any action in any court of competent jurisdiction to prosecute any claims or Causes of Action assigned to the GUC Trust, including the Delaware Chancery Court, the Delaware Superior Court and the Delaware Supreme Court.

13.4.    Third Party Beneficiary.  GUC Trust Beneficiaries are third party beneficiaries of this Trust Agreement.  The GUC Trust Administrator Parties (other than the GUC Trust Administrator) are third party beneficiaries of the provisions of Section 9.2, Section 9.4, Section 9.5 and Section 9.6 of this Trust Agreement. The GUC Trust Monitor Parties (other than the GUC Trust Monitor) are third party beneficiaries of the provisions of Section 11.4 of this Trust Agreement, and, to the extent incorporated therein, Section

9.2, Section 9.4, Section 9.5 and Section 9.6 of this Trust Agreement.  The Trust Administrator Parties (as defined in the Avoidance Action Trust Agreement) and the Trust Monitor Parties (as defined in the Avoidance Action Trust Agreement) are third party beneficiaries of the provisions of Section 6.11 of this Trust Agreement. The DIP Lenders are third party beneficiaries of this Trust Agreement to the extent of their rights of approval contained herein and their residual interests in the Wind-Down Budget Cash and the Residual Wind-Down Assets.  Except as aforesaid, there are no other third party beneficiaries of this Trust Agreement.

13.5.    Severability.  In the event any provision of this Trust Agreement or the application thereof to any person or circumstances shall be determined by a final, non-appealable judgment or order to be invalid or unenforceable to any extent, the remainder of this Trust Agreement or the application of such provision to persons or circumstances or in jurisdictions other than those as to or in which it is held invalid or unenforceable, shall not be affected thereby, and each provision of this Trust Agreement shall be valid and enforceable to the fullest extent permitted by law.

13.6.    Notices.  Any notice or other communication required or permitted to be made under this Trust Agreement shall be in writing and shall be deemed to have been sufficiently given, for all purposes, if delivered personally, by email, facsimile, sent by nationally recognized overnight delivery service or mailed by first-class mail:

(A)    if to the GUC Trust Administrator, to:

Wilmington Trust Company
Rodney Square North
1100 North Market Street
Wilmington, Delaware, 19890-1615
Phone: (302) 636-6000
Telecopier: (302) 636-4140
Attn: Corporate Trust Administration

With a copy to:

Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166-0193
Phone: (212) 351-4000
Telecopier (212) 351-4035
Attn: Matthew Williams and Keith Martorana

(B)    if to the GUC Trust Monitor, to:

FTI Consulting, Inc.
1201 W. Peachtree St., Suite 600
Atlanta, GA 30309

      (C)      if to any GUC Trust Beneficiary, in the case of a holder of an Allowed General Unsecured Claim, to the last known address of such GUC Trust Beneficiary according to the Debtors' Schedules or such GUC Trust Beneficiary's proof of claim, and, in the case of holder of Units (i) if and for so long as the Units are held in book-entry form through DTC, in accordance with the practices and procedures of DTC; and otherwise (ii) to such address as appears on the books and records of the GUC Trust Administrator, or such other address as may be designated from time to time by notice given in accordance with the provisions of this <u>Section 13.6</u>.

      (D)      if to the DIP Lenders, to:

          (1)      U.S. Treasury

United States Department of the Treasury
1500 Pennsylvania Avenue, NW
Washington, D.C. 20220
Attn: Chief Counsel, Office of Financial Stability
Telecopier: (202) 927-9225
E-mail: OFSChiefCounselNotices@do.treas.gov

with a copy to:

Cadwalader, Wickersham & Taft LLP
One World Financial Center
New York, NY 10281
Phone: (212) 504-6000
Attention: John Rapisardi and Doug Mintz
E-mail: john.rapisardi@cwt.com
E-mail: douglas.mintz@cwt.com

          (2)      EDC

Export Development Canada
151 O'Connor Street
Ottawa, Ontario
Canada K1A 1K3
Attention: Loans Services
Telecopy: 613-598-2514

with a copy to:

Export Development Canada
151 O'Connor Street
Ottawa, Ontario

Canada K1A 1K3
Attention: Asset Management/Covenants Officer
Telecopy: 613-598-3186

(E)      if to the U.S. Treasury, to:

United States Department of the Treasury
1500 Pennsylvania Avenue, NW
Washington, D.C. 20220
Attn: Chief Counsel, Office of Financial Stability
Telecopier: (202) 927-9225
E-mail: OFSChiefCounselNotices@do.treas.gov

with a copy to:

United States Department of Justice
86 Chambers Street, Third Floor
New York, NY  10007
Phone: (212) 637-2739
Telecopier: (212) 637-2730
Attn: David S. Jones

and

Cadwalader, Wickersham & Taft LLP
One World Financial Center
New York, NY 10281
Phone: (212) 504-6000
Attention: John Rapisardi and Doug Mintz
E-mail: john.rapisardi@cwt.com
E-mail: douglas.mintz@cwt.com

13.7.    <u>Headings</u>.  The headings contained in this Trust Agreement are solely for convenience of reference and shall not affect the meaning or interpretation of this Trust Agreement or of any term or provision hereof.

13.8.    <u>Plan</u>.  The terms of this Trust Agreement are intended to supplement the terms provided by the Plan and the Confirmation Order.  To the extent that the terms of Sections 5.6 and 6.2 of the Plan are inconsistent with the terms set forth in this Trust Agreement with respect to the GUC Trust, then the terms of the Trust Agreement shall govern.  All other provisions of the Plan shall supersede the provisions of this Trust Agreement, including Section 6.15 of the Plan, which provides that the restrictions set forth in paragraph 20 of the Final Order approving the DIP Credit Agreement (ECF No. 2529) shall continue to apply.

13.9.    <u>Ambiguities and Construction</u>.

(a)        This Trust Agreement is intended to create a "disputed ownership fund" within the meaning of Treasury Regulation section 1.468B-9 for U.S. federal and applicable state and local income tax purposes and, to the extent provided by law, shall be governed and construed in all respects as such a trust and any ambiguity herein shall be construed consistent herewith and, if necessary, this Trust Agreement may be amended to comply with such U.S. federal and applicable state and local income tax laws, which amendments may apply retroactively.

(b)        Unless the context otherwise requires:

(i)        a term has the meaning assigned to it;

(ii)        "or" is not exclusive;

(iii)        words in the singular include the plural, and in the plural include the singular;

(iv)        the words "hereof," "herein," "hereunder" and similar words refer to this Trust Agreement as a whole and not to any particular provisions of this Trust Agreement and any subsection, Section, and Article references are to this Trust Agreement unless otherwise specified;

(v)        any pronoun shall include the corresponding masculine, feminine and neuter forms; and

(vi)        "including" means including without limitation.

13.10.    Entire Trust Agreement.  This Trust Agreement contains the entire agreement between the parties and supersedes all prior and contemporaneous agreements or understandings between the parties with respect to the subject matter hereof.

13.11.    Cooperation.  The Debtors shall turn over or otherwise make available to the GUC Trust Administrator at no cost to the GUC Trust or the GUC Trust Administrator, all books and records reasonably required by the GUC Trust Administrator to carry out its duties hereunder, and agree to otherwise reasonably cooperate with the GUC Trust Administrator in carrying out its duties hereunder, subject to the obligation to preserve the confidential nature of the Debtors' books and records, as provided in Section 13.12.

13.12.    Confidentiality.  The GUC Trust Administrator and the GUC Trust Monitor, and their respective employees, members, agents, professionals and advisors, including the Trust Professionals (each a "Confidential Party" and collectively the "Confidential Parties") shall hold strictly confidential and not use for personal gain any material, non-public information of which they have become aware in their capacity as a Confidential Party, of or pertaining to any Debtor to which any of the GUC Trust Assets relates or which is otherwise received from the Debtors by the GUC Trust; *provided*, *however*, that such information may be disclosed if:

(i)      it is now or in the future becomes generally available to the public other than as a result of a disclosure by the Confidential Parties; or

(ii)      such disclosure is required of the Confidential Parties pursuant to legal process, including subpoena or other court order or other applicable laws or regulations.

In the event that any Confidential Party is requested to divulge confidential information pursuant to clause (ii), such Confidential Party shall promptly, in advance of making such disclosure, provide reasonable notice of such required disclosure to the GUC Trust Administrator (or the GUC Trust Monitor in case the GUC Trust Administrator is the disclosing party) to allow sufficient time to object to or prevent such disclosure through judicial or other means and shall cooperate reasonably with the GUC Trust Administrator (or the GUC Trust Monitor, as applicable) in making any such objection, including but not limited to appearing in any judicial or administrative proceeding in support of any objection to such disclosure.

13.13.    Amendment and Waiver.

(a)      The GUC Trust Administrator, with the approval of the GUC Trust Monitor, may amend or supplement this Trust Agreement without notice to or consent of the Bankruptcy Court or any GUC Trust Beneficiary for the purpose of (x) curing any ambiguity, omission, inconsistency or correcting or supplementing any defective provision; (y) evidencing and providing for the acceptance of the appointment of a successor GUC Trust Administrator or GUC Trust Monitor; or (z) making any other changes to this Trust Agreement that do not adversely affect the interests of the GUC Trust Beneficiaries or the DIP Lenders in any material respect.

(b)      The GUC Trust Administrator may amend or supplement this Trust Agreement for any other purpose, but only on petition to, and with the approval of, the Bankruptcy Court; *provided that* (x) no amendment or supplement to this Trust Agreement shall be inconsistent with the purpose and intent of the GUC Trust to dispose of in an expeditious but orderly manner the GUC Trust Assets in accordance with the terms of the Plan, the Confirmation Order and this Trust Agreement, and (y) this Trust Agreement shall not be amended in a manner that is inconsistent with the Plan in the form confirmed by the Bankruptcy Court, subject to any post-confirmation modifications to the Plan pursuant to Section 1127 of the Bankruptcy Code, or with the Confirmation Order.

(c)      Any amendment to this Trust Agreement shall be posted on the website contemplated by Section 6.2(a).

(d)      The GUC Trust Administrator may not amend Sections 2.6(a), (b), (c), (d), (e) & (f), 6.4, 8.3, or 13.8 without the written consent of the DIP Lenders.

(e)      The GUC Trust Administrator shall file any amendment to the Certificate of Trust with the Secretary of State as may be required or permitted by the Delaware Act.

13.14.    Counterparts.  This Trust Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all such counterparts shall

together constitute but one and the same instrument.  A facsimile or portable document file (PDF) signature of any party shall be considered to have the same binding legal effect as an original signature.

**[Remainder of Page Blank — Signature Pages Follows]**

<u>**Draft of February 26, 2010**</u>

**IN WITNESS WHEREOF**, the parties hereto have executed this Trust Agreement or caused this Trust Agreement to be duly executed by their respective officers, representatives or agents, effective as of the date first above written.

**MOTORS LIQUIDATION COMPANY**

By:_____
    Name:
    Title:

**MLC OF HARLEM, INC.**

By:_____
    Name:
    Title:

**MLCS, LLC**

By:_____
    Name:
    Title:

**MLCS DISTRIBUTION CORPORATION**

By:_____
    Name:
    Title:

**REMEDIATION AND LIABILITY MANAGEMENT COMPANY, INC.**

By:_____
    Name:
    Title:

**ENVIRONMENTAL CORPORATE REMEDIATION COMPANY, INC.**

By:_____
    Name:
    Title:

**WILMINGTON TRUST COMPANY, as GUC Trust Administrator and trustee**


By:_____
    Name:
    Title:


– and –

**FTI CONSULTING, INC., as GUC Trust Monitor**


By:_____
    Name:
    Title:

[Signature Page to Motors Liquidation Company GUC Trust Agreement]

<u>Exhibit A-1</u>

Motors Liquidation Company
GUC Trust Agreement

Hypothetical Distribution to a Holder of
<u>an Initial Allowed General Unsecured Claim</u>[1]

Assumptions:

| | |
|---|---|
| Number of shares of New GM Common Stock available for distribution on the Effective Date ($G_I$):[2] | 150,000,000 |
| Number of New GM $10.00 Warrants available for distribution on the Effective Date ($G_I$): | 136,363,636 |
| Number of New GM $18.33 Warrants available for distribution on the Effective Date ($G_I$): | 136,363,636 |
| Total Allowed Amount (sum of Initial Allowed General Unsecured Claims) as of the Initial Distribution Record Date: | $32,000,000,000 |
| Aggregate Maximum Amount on the Initial Distribution Record Date (sum of the Maximum Amounts of all Disputed General Unsecured Claims, Unresolved Term Loan Avoidance Action Claims and Unresolved Other Avoidance Action Claims): | $10,000,000,000 |
| Current Total Amount (sum of the Initial General Unsecured Claims and Aggregate Maximum Amount) as of the Initial Distribution Record Date ($C_I$): | $42,000,000,000 |
| Unit Issuance Ratio: | 1 Unit/$1,000 of Allowed Claim |

*Accordingly, a holder of an Initial Allowed General Unsecured Claim in the Amount of $1,000,000 (A) would receive:*

| | |
|---|---|
| Shares of New GM Common Stock | $1,000,000 ÷ $42,000,000,000 $x$ 150,000,000 = 3,571 shares |
| New GM $10.00 Warrants | $1,000,000 ÷ $42,000,000,000 $x$ 136,363,636 = warrants to acquire 3,247 shares |

---

[1] This illustration is purely hypothetical, uses hypothetical numbers for the amounts of allowed/disputed claims, and is not representative of the actual dollar amounts of claims in any respect.

[2] If the total claims pool exceeds $35 billion and the GUC Trust receives Additional Securities, such Additional Securities will be distributed as provided in <u>Sections 5.3 and 5.4</u> of the Agreement.

| New GM $18.33 Warrants | $1,000,000 ÷ $42,000,000,000 $x$ 136,363,636 = warrants to acquire 3,247 shares |
|---|---|
| Units | 1,000 Units |

A1-2

Exhibit A-2

Motors Liquidation Company
GUC Trust Agreement

Hypothetical Distribution to a Holder of
a Resolved Allowed General Unsecured Claim[1]

*As of the end of the first calendar quarter:*

Assumptions:

| | |
|---|---|
| Total Amount of Resolved Allowed General Unsecured Claims: | |
|     Amount of Resolved Allowed General Unsecured Claims as of the Initial Distribution Record Date: | $0 |
|     Amount of Resolved Allowed General Unsecured Claims which are Allowed since the Initial Distribution Record Date: | $2,000,000,000 |
|     Total: | **$2,000,000,000** |
| Amount of General Unsecured Claims disallowed since the Initial Distribution Record Date: | **$500,000,000** |
| Aggregate Maximum Amount (sum of the Maximum Amounts of all Disputed General Unsecured Claims, Unresolved Term Loan Avoidance Action Claims and Unresolved Other Avoidance Action Claims): | **$7,500,000,000** |
| Total Allowed Amount (sum of amounts all Initial Allowed General Unsecured Claims and all Resolved General Unsecured Claims): | **$34,000,000,000** |
| Current Total Amount (C) (Sum of the Total Allowed Amount and Aggregate Maximum Amount): | **$41,500,000,000** |

---

[1] This illustration is purely hypothetical, uses hypothetical numbers for the amounts of allowed/disputed claims, and is not representative of the actual dollar amounts of claims in any respect.

A2-1

*Accordingly, pursuant to Section 5.3 of the GUC Trust Agreement, a holder of a Disputed Claim in the Amount of $2,000,000 that was Allowed in the amount of $1,000,000 (A) as of the end of the first calendar quarter would receive:*

|  | Corresponding to the Distribution to the Holders of Initial Allowed Claims | Corresponding to the First Quarter Distribution to Holders of Units[*] | Total |
|---|---|---|---|
| Shares of New GM Common Stock | 3,571 shares | 43 shares | 3,614 shares |
| New GM $10.00 Warrants | warrants to acquire 3,247 shares | warrants to acquire 39 shares | warrants to acquire 3,286 shares |
| New GM $18.33 Warrants | warrants to acquire 3,247 shares | warrants to acquire 39 shares | warrants to acquire 3,286 shares |
| Units | 1,000 Units |  |  |

\* See Exhibit A-3 for a calculation of the first quarter distribution of Excess GUC Distributable Assets to holders of Units.

A2-2

*As of the end of the second calendar quarter:*

Assumptions:

| | |
|---|---|
| Total Amount of Resolved Allowed General Unsecured Claims: | |
| Amount of Resolved Allowed General Unsecured Claims as of the end of the prior calendar quarter: | $2,000,000,000 |
| Amount of Resolved Allowed General Unsecured Claims during the calendar quarter: | $1,000,000,000 |
| Total: | **$3,000,000,000** |
| Amount of General Unsecured Claims disallowed as of the end of the calendar quarter: | |
| Amount of Claims disallowed as of the end of the prior calendar quarter: | $500,000,000 |
| Amount of Claims disallowed during the calendar quarter (L): | $700,000,000 |
| Total | **$1,200,000,000** |
| Aggregate Maximum Amount at the time: | **$5,800,000,000** |
| Total Allowed Amount (sum of Initial Allowed General Unsecured Claims and Resolved Allowed General Unsecured Claims) (T) | **$35,000,000,000** |
| Current Total Amount (C): | **$40,800,000,000** |

A2-3

*Accordingly, pursuant to Section 5.3 of the GUC Trust Agreement, a holder of a Disputed Claim in the Amount of $2,000,000 that was Allowed in the amount of $1,000,000 (A) as of the end of the second calendar quarter would receive:*

|  | Corresponding to the Distribution to the Holders of Initial Allowed Claims | Corresponding to the First Quarter Distribution to Holders of Units[*] | Corresponding to the Second Quarter Distribution to Holders of Units[*] | Total |
|---|---|---|---|---|
| Shares of New GM Common Stock | 3,571 shares | 43 shares | 62 shares | 3,676 shares |
| New GM $10.00 Warrants | warrants to acquire 3,247 shares | warrants to acquire 39 shares | warrants to acquire 56 shares | warrants to acquire 3,342 shares |
| New GM $18.33 Warrants | warrants to acquire 3,247 shares | warrants to acquire 39 shares | warrants to acquire 56 shares | warrants to acquire 3,342 shares |
| Units | 1,000 Units |  |  |  |

\*  See Exhibit A-3 for a calculation of the first and second quarter distributions of Excess GUC Distributable Assets to holders of Units.

A2-4

**Draft of February 26, 2010**

<u>Exhibit A-3</u>

Motors Liquidation Company
GUC Trust Agreement

Hypothetical Distribution to a Holder of
<u>a Unit from Excess GUC Trust Distributable Assets[1]</u>

Assumptions:

*As of the Effective Date:*

| | |
|---|---:|
| Number of shares of New GM Common Stock available for distribution on the Effective Date ($G_I$):[2] | 150,000,000 |
| Number of New GM $10.00 Warrants available for distribution on the Effective Date ($G_I$): | 136,363,636 |
| Number of New GM $18.33 Warrants available for distribution on the Effective Date ($G_I$): | 136,363,636 |
| Total Allowed Amount as of the Initial Distribution Record Date(sum of Initial Allowed General Unsecured Claims): | $32,000,000,000 |
| Aggregate Maximum Amount (sum of Maximum amounts of Disputed General Unsecured Claims, Unresolved Term Loan Avoidance Action Claims, and Unresolved Other Avoidance Action Claims): | $10,000,000,000 |
| Current Total Amount (sum of Total Allowed Amount and Aggregate Maximum Amount): | $42,000,000,000 |
| Unit Issuance Ratio: | 1 Unit/$1,000 of Allowed Claim |
| Number of Units issuable: | 42,000,000 |

---

[1] This illustration is purely hypothetical, uses hypothetical numbers for the amounts of allowed/disputed claims, and is not representative of the actual dollar amounts of claims in any respect.

[2] If the total claims pool exceeds $35 billion and the GUC Trust receives Additional Securities, such Additional Securities will be distributed as provided in <u>Sections 5.3 and 5.4</u> of the Agreement.

## First Distribution Date

*As of the end of the first calendar quarter:*

| | |
|---|---:|
| Total Amount of Resolved Allowed General Unsecured Claims: | |
|     Amount of Resolved Allowed General Unsecured Claims as of the Initial Distribution Record Date: | $0 |
|     Amount of Resolved Allowed General Unsecured Claims since the Initial Distribution Record Date: | $2,000,000,000 |
|     Total | **$2,000,000,000** |
| Amount of General Unsecured Claims disallowed since the Initial Distribution Record Date (L): | **$500,000,000** |
| Aggregate Maximum Amount (sum of Maximum amounts of Disputed General Unsecured Claims, Unresolved Term Loan Avoidance Action Claims, and Unresolved Other Avoidance Action Claims): | **$7,500,000,000** |
| Total Allowed Amount (sum of Initial Allowed General Unsecured Claims and Resolved Allowed General Unsecured Claims) (T): | **$34,000,000,000** |
| Current Total Amount (C): | **$41,500,000,000** |
| Number of Units outstanding as of Effective Date | 32,000,000 |
| $U_O$ (total number of Units outstanding, including Units distributed, or to be distributed to holders of Resolved Allowed General Unsecured Claims during the calendar quarter) | 34,000,000 |
| H (Protective Holdback and other deductions)[3] | 0 |
| $G_{X \text{ shares}} = (G_I - H) * [T/C - T/(C + L)]$ | 1,462,995 |
| $G_{X \text{ warrants}} = (G_I - H) * [T/C - T/(C + L)]$ | 1,329,995 |

---

[3] Ignoring for these purposes the initial Taxes on Distribution Holdback and Reporting and Transfer Holdback.

KL2 2677419.29

Calculations:

*Distributions to Holders of Units*

| Shares of New GM Common Stock | *In respect of 34,000,000 Units:* |
| --- | --- |
| | 1,462,995 shares: |
| | *On a 1,000 Unit basis:* |
| | $1,000 \div 34,000,000 \ x \ 1,462,995 = 43$ shares |
| New GM $10.00 Warrants | *In respect of 34,000,000 Units:* |
| | warrants to acquire 1,329,995 shares |
| | *On a 1,000 Unit basis:* |
| | $1,000 \div 34,000,000 \ x \ 1,329,995 =$ warrants to acquire 39 shares |
| New GM $18.33 Warrants | *In respect of 34,000,000 Units:* |
| | warrants to acquire 1,329,995 shares |
| | *On a 1,000 Unit basis:* |
| | $1,000 \div 34,000,000 \ x \ 1,329,995 =$ warrants to acquire 39 shares |

A3-3

<u>Second Distribution Date</u>

*As of the End of the second calendar quarter*

| | |
|---|---|
| Total Amount of Resolved Allowed General Unsecured Claims as of the end of the calendar quarter: | |
| Amount of Resolved Allowed General Unsecured Claims as of the end of the prior calendar quarter: | $2,000,000,000 |
| Amount of Resolved Allowed General Unsecured Claims during the calendar quarter: | $1,000,000,000 |
| Total | **$3,000,000,000** |
| Amount of General Unsecured Claims disallowed as of the end of the calendar quarter: | |
| Amount of Claims disallowed as of the end of the prior calendar quarter: | $500,000,000 |
| Amount of Claims disallowed during the calendar quarter (L): | $700,000,000 |
| Total | **$1,200,000,000** |
| Aggregate Maximum Amount at the time: | **$5,800,000,000** |
| Total Allowed Amount (sum of Initial Allowed General Unsecured Claims and Resolved Allowed General Unsecured Claims) (T) | **$35,000,000,000** |
| Current Total Amount (C): | **$40,800,000,000** |
| Total number of Units outstanding at the end of the prior quarter | 34,000,000 |
| $U_O$ (total number of Units outstanding, including Units distributed, or to be distributed to holders of Resolved Allowed General Unsecured Claims during the calendar quarter) | 35,000,000 |
| H (Protective Holdback and other deductions)[4] | 0 |
| $G_{X \text{ shares}} = (G_I - H) * [T/C - T/(C + L)]$ | 2,170,446 |
| $G_{X \text{ warrants}} = (G_I - H) * [T/C - T/(C + L)]$ | 1,973,133 |

---

[4] Ignoring for these purposes the initial Taxes on Distribution Holdback and Reporting and Transfer Holdback.

KL2 2677419.29

*Distributions to Holders of Units*

| | |
|---|---|
| Shares of New GM Common Stock | *In respect of 35,000,000 Units:*<br>     2,170,446 shares<br>*On a 1,000 Unit basis:*<br>     1,000 ÷ 35,000,000 *x* 2,170,446 =  62 shares |
| New GM $10.00 Warrants | *In respect of 35,000,000 Units:*<br>     warrants to acquire 1,973,133 shares<br>*On a 1,000 Unit basis:*<br>     1,000 ÷ 35,000,000 *x* 1,973,133= warrants to acquire 56 shares |
| New GM $18.33 Warrants | *In respect of 35,000,000 Units:*<br>     warrants to acquire 1,973,133 shares<br>*On a 1,000 Unit basis:*<br>     1,000 ÷ 35,000,000 *x* 1,973,133= warrants to acquire 56 shares |

KL2 2677419.29

<u>**Draft of February 26, 2010**</u>

<u>Exhibit B</u>

WILMINGTON TRUST COMPANY
as Trust Administrator and Trustee for the
MOTORS LIQUIDATION COMPANY GUC TRUST

March __, 2011

To the Holders of Allowed Class 3 General Unsecured Claims of Motors Liquidation
Company (f/k/a General Motors Corporation):

Wilmington Trust Company has been selected as the Trust Administrator and Trustee for
the Motors Liquidation Company GUC Trust that will make distributions to holders of
Allowed Class 3 General Unsecured Claims under the Second Amended Joint Chapter 11
Plan of Motors Liquidation Company *et al.* (f/k/a General Motors Corporation).[1]  In that
capacity, Wilmington Trust Company will be making distributions to these holders
(subject to the following paragraph), which distributions will consist of common stock of
General Motors Company, warrants to purchase General Motors Company common
stock, and trust units representing the contingent right to receive additional General
Motors Company common stock and warrants.

**The Amended Joint Chapter 11 Plan of Motors Liquidation Company *et al*. (f/k/a
General Motors Corporation) has not yet become effective.  As a prerequisite to
your receipt of the stock, warrants and units described in this letter, the Plan must
become effective and other conditions described in the order confirming the Plan
must be fully satisfied.  If the Plan does not become effective and/or the other
conditions described in the order confirming the Plan are not satisfied, you may not
be entitled to receive all or a portion of the stock, warrants and units described in
this letter.**

Listed on the accompanying statement is your name as it appears on the records of the
Trust, the identification number that has been assigned to you and the amount of your
Allowed Class 3 General Unsecured Claim.  In order to receive the General Motors
Company common stock and warrants and the trust units attributable to your Allowed
Class 3 General Unsecured Claim, please review your statement and then continue with
the steps below.

---

[1]    On or about March __, 2011, the United States Bankruptcy Court for the Southern District of New
York entered an order confirming the Second Amended Joint Chapter 11 Plan of Liquidation dated
March __, 2011, of Motors Liquidation Company *et al* (f/k/a General Motors Corporation).

A2-1

If you are a U.S. person, you must provide the Trust Administrator with your social security number or other taxpayer identification number.  Accordingly, please fill out the attached Form W-9 Request for Taxpayer Identification Number and Certification.  If you are not a U.S. person, instead please fill out the attached Form W-8BEN Certificate of Foreign Status of Beneficial Owner for United States Tax Withholding (or other applicable Form W-8).  Send the applicable document via facsimile to the following number: (302) 636-4140.  The information you provide, including your social security or taxpayer identification number, will be held on a confidential basis.

**You must designate a broker, bank or other financial institution with whom you maintain a securities account to receive your General Motors Company common stock and warrants and your trust units on your behalf.  You will not receive _any_ distribution from the Motors Liquidation Company GUC Trust unless and until you designate a broker in accordance with the instructions below.**

**If you DO have a securities account with a broker, bank or other financial institution**. If you currently have a securities account with a broker, bank or other financial institution, you must provide the name and contact information of that broker, bank or other financial institution to the Trust Administrator via facsimile to the following number: (302) 636-4140.  Please include your name and identification number on any information or documents that you deliver to the Trust Administrator.  The Trust Administrator will then provide further instructions to you and/or your broker, bank or other financial institution.

**If you DO NOT have a securities account with a broker, bank or other financial institution**. If you do not currently have a securities account with a broker, bank or other financial institution, you **must** open such an account before you can receive your General Motors Company common stock and warrants and your trust units.  We have listed below certain brokerage firms that are prepared to assist you in opening a securities account.  You are not limited to these firms, and may select any broker, bank or other financial institution authorized to maintain a securities account on your behalf.  Once you have opened a securities account, you must provide the name and contact information of that broker, bank or other financial institution to the Trust Administrator via facsimile to the following number: (302) 636-4140.  Please include your name and identification number on any information or documents that you deliver to the Trust Administrator.  The Trust Administrator will then provide further instructions to you and/or your broker, bank or other financial institution.

If you are entitled to receive a distribution of stock, warrants and units but the Trust Administrator is unable to transfer such stock, warrants and units to a securities account of yours, the Trust Administrator will under certain circumstances distribute these assets to you by transferring them to an account where they will be held on your behalf.  Once

KL2 2677419.29

you have completed the actions described in this letter, and all other required conditions for transferring the stock, warrants and units to your securities account have been satisfied, the Trust Administrator will transfer the securities from that account to your securities account.

If you do not take the actions required by this letter and any further instructions provided by the Trust Administrator, you could forfeit your interests in the stock, warrants and units to which you would otherwise be entitled.

Receipt of the stock, warrants and units may have tax consequence for you, and you are encouraged to consult with your tax advisor.

If you have any questions about your distribution, or for more information, you may contact the Trust Administrator by calling the following number: (866) 521-0079.  You may also write to the Trust Administrator at:

> David A Vanaskey
> Vice President
> Wilmington Trust Company
> Rodney Square North
> 1110 North Market Street
> Wilmington, Delaware, 19890-1615

Sincerely,

WILMINGTON TRUST COMPANY, as Trust Administrator and Trustee of the Motors Liquidation Company GUC Trust

For your convenience, we provide below contact information for brokerage firms that have indicated their willingness to assist you in opening a securities account.  In addition, there may be numerous other brokers, banks and other financial institutions prepared to act in this capacity.  The fact that a brokerage firm is listed below is in no way an endorsement or recommendation of that firm by the Trust Administrator.  Before choosing a broker, bank or other financial institution to maintain a securities account on your behalf, you should consider, among other things, any fees that the institution may charge for its services.  You may also wish to consult with a financial advisor, attorney or other professional before opening a securities account.

| · **M&T Securities, Inc.**<br>**(877) 405-1791** | · **Morgan Stanley Smith Barney**<br>**(800) 780-0718** |
|---|---|

KL2 2677419.29

SCHEDULE OF ALLOWED CLAIM

| IDENTIFICATION NUMBER | NAME | ALLOWED CLASS 3 GENERAL UNSECURED CLAIM |
|---|---|---|
|  |  |  |

KL2 2677419.29

**<u>Draft of February 26, 2010</u>**

<u>Exhibit C</u>

<u>Accounts not in the name of the GUC Trust:</u>

External Distribution Account

<u>Securities Accounts in the name of the GUC Trust:</u>

GUC Trust Securities Assets Sub Account
Undistributable Claims Distribution Sub Account
Returned Distributions Claim Sub Account

<u>Cash Accounts in the name of the GUC Trust:</u>

GUC Trust Distributable Cash Sub Account
Wind-Down Budget Cash Sub Account
Trust Professional Holdback Sub Account
Indenture Trustee/Fiscal and Paying Agent Reserve Sub Account
Reporting and Transfer Holdback Sub Account
Additional Holdback Sub Account
Protective Holdback Sub Account
Taxes on Distribution Holdback Sub Account
Liquidation of Governmental Unit Claims Sub Account

**<u>Draft of February 26, 2010</u>**

<u>Exhibit D</u>

<u>Cash Accounts in the name of the GUC Trust</u>:

Residual Wind-Down Assets Sub Account

**Draft of February 26, 2010**

<u>Exhibit E</u>

**FORM OF
CERTIFICATE OF TRUST
<u>OF</u>
<u>MOTORS LIQUIDATION COMPANY GUC TRUST</u>**

THIS Certificate of Trust of Motors Liquidation Company GUC Trust (the "Trust") is being duly executed and filed on behalf of the Trust by the undersigned, as trustee, to form a statutory trust under the Delaware Statutory Trust Act (12 <u>Del. C.</u> § 3801 <u>et seq</u>.) (the "Act").

1. <u>Name</u>.  The name of the statutory trust formed by this Certificate of Trust is Motors Liquidation Company GUC Trust.

2. <u>Delaware Trustee</u>.  The name and business address of the trustee of the Trust with a principal place of business in the State of Delaware are Wilmington Trust Company, 1100 North Market Street, Wilmington, Delaware 19890, Attn: Corporate Trust Administration.

3. <u>Effective Date</u>.  This Certificate of Trust shall be effective upon filing.

IN WITNESS WHEREOF, the undersigned has duly executed this Certificate of Trust in accordance with Section 3811(a)(1) of the Act.

WILMINGTON TRUST COMPANY, not in its individual capacity but solely as Trust administrator and trustee

By:_____
Name:
Title:

A2-1

**EXHIBIT E**

**PRIORITY ORDER SITES**

**PRIORITY ORDER SITES**

Wheeler Pit, Intersection of County Highway O and County Highway J, LaPrairie Township, WI

Scatterfield Road/Columbus Avenue, 2900 South Scatterfield Road, 2401 Columbus Avenue, Anderson, IN

Harvey & Knott, Old County Road, Kirkwood, DE

Sioux City, 1805 Zenith Drive, Sioux City, IA

Delphi Dayton, 300 Taylor Street, Dayton, OH

Garland Road, Frederick Garland Road, West Milton, OH

**EXHIBIT F**

**FIXED ALLOWED NOTE CLAIMS**

# FIXED ALLOWED NOTE CLAIMS

| *Wilmington Trust 1990 Indenture* | *Fixed Allowed Amount* |
|---|---|
| 9.40% Debentures due July 15, 2021 | $309,680,298 |
| 8.80% Notes due March 1, 2021 | $536,202,711 |
| 7.40% Debentures due September 1, 2025 | $507,066,072 |
| 9.4% Medium-Term Notes due July 15, 2021 | $15,010,245 |
| 9.45% Medium-Term Notes due November 1, 2011 | $48,808,100 |

| *Wilmington Trust 1995 Indenture* | |
|---|---|
| 7.75% Discount Debentures due March 15, 2036 | $213,338,714 |
| 7.70% Debentures due April 15, 2016 | $504,711,704 |
| 8.10% Debentures due June 15, 2024 | $414,135,144 |
| 63/4% Debentures due May 1, 2028 | $599,250,820 |
| 7.20% Notes due January 15, 2011 | $1,540,836,389 |
| 7.25% Quarterly Interest Bonds due April 15, 2041 | $580,326,736 |
| 7.25% Senior Notes due July 15, 2041 | $725,408,420 |
| 7.375% Senior Notes due October 1, 2051 | $698,481,250 |
| 7.25% Senior Notes due February 15, 2052 | $877,819,444 |
| 4.50% Series A Convertible Senior Debentures due March 6, 2032 | $39,866,281 |
| 5.25% Series B Convertible Senior Debentures due March 6, 2032 | $2,634,125,000 |
| 7.375% Senior Notes due May 15, 2048 | $1,118,654,722 |
| 7.375% Senior Notes due May 23, 2048 | $425,696,528 |
| 8.375% Senior Debentures due July 15, 2033 | $3,061,758,700 |
| 6.25% Series C Convertible Senior Debentures due July 15, 2033 | $4,401,527,778 |
| 8.25% Senior Debentures due July 15, 2023 | $1,281,933,413 |
| 7.125% Senior Notes due July 15, 2013 | $1,024,152,876 |
| 7.5% Senior Notes due July 1, 2044 | $729,000,000 |
| 1.50% Series D Convertible Senior Debentures due June 1, 2009 | $1,009,112,882 |

| *Law Debenture Trust Company of New York Indentures* | |
|---|---|
| Industrial Revenue Bond-City Of Moraine, Ohio (616449AB0) | $10,282,500 |
| Industrial Revenue Bond-City Of Moraine, Ohio (616449AA2) | $12,851,563 |
| Industrial Revenue Bond-City of Indianapolis, Indiana (455329AB8) | $1,413,125 |
| Industrial Revenue Bond-Michigan Strategic Fund (594693AQ6) | $59,711,400 |
| Industrial Revenue Bond-Ohio Water Development Authority (67759ABC2) | $47,449,000 |
| Industrial Revenue Bond-State of Ohio (677596AU2) | $20,321,813 |
| Industrial Revenue Bond-City of Fort Wayne (349272AT1) | $31,961,000 |

**EXHIBIT G**

**AVOIDANCE ACTION TRUST AGREEMENT**

## MOTORS LIQUIDATION COMPANY
## AVOIDANCE ACTION TRUST AGREEMENT

MOTORS LIQUIDATION COMPANY AVOIDANCE ACTION TRUST AGREEMENT, dated as of [DATE] (as it may be amended from time to time, this "Trust Agreement"), by and among Motors Liquidation Company ("MLC"), MLC of Harlem, Inc., MLCS, LLC, MLCS Distribution Corporation, Remediation and Liability Management Company, Inc., and Environmental Corporate Remediation Company, Inc. (collectively, the "Debtors"), as debtors and debtors-in-possession, Wilmington Trust Company, as trust administrator and trustee (together with any successor appointed under the terms hereof, the "Trust Administrator") of the Motors Liquidation Company Avoidance Action Trust (the "Trust") for the benefit of the Trust Beneficiaries (as defined below), and FTI Consulting, Inc., as trust monitor (together with any successor appointed under the terms hereof, the "Trust Monitor") of the Trust.  Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to such terms in the Debtors' Second Amended Joint Chapter 11 Plan of liquidation pursuant to chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq., as amended (the "Bankruptcy Code"), dated [DATE], as confirmed (including all exhibits thereto, as the same may be further amended, modified, or supplemented from time to time, the "Plan").

## Background

A.    Beginning on June 1, 2009, the Debtors filed in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases").

B.    On or about August 31, 2010, the Debtors filed their Plan and Disclosure Statement in the Bankruptcy Court.  The Debtors filed an amended Plan and Disclosure Statement on December 7, 2010. The Debtors filed a second amended Plan on [DATE].

C.    The Disclosure Statement was approved by the Bankruptcy Court on December 8, 2010.

D.    On or about [DATE], the Bankruptcy Court entered an order (the "Confirmation Order") confirming the Plan.

E.    The Plan provides for the creation of the Trust as a post-confirmation successor to MLC within the meaning of Section 1145(a) of the Bankruptcy Code, to hold and administer the Avoidance Action Trust Assets for the benefit of the Trust Beneficiaries and, to the extent received by the Trust, to distribute the Distributable Trust Assets to the Trust Beneficiaries in accordance with the terms of the Plan, the Confirmation Order and this Trust Agreement.

F.    The Plan also provides that the Trust Administrator may determine to hold and administer Other Debtor Residual Trust Assets, if any, for the benefit of the DIP Lenders.

G.    The Trust is being created, with respect to the Avoidance Action Trust Assets, on behalf of, and for the benefit of, the Trust Beneficiaries, and, with respect to the Other Debtor Residual Trust Assets, if any, on behalf of, and for the benefit of, the DIP Lenders.

H.    The Trust Administrator shall have all powers necessary to implement the provisions of this Trust Agreement and administer the Trust in respect of the Avoidance Action Trust Assets, including the power to: (i) prosecute for the benefit of the Trust Beneficiaries, through counsel and other professionals selected by the Trust Administrator, the Term Loan Avoidance Action and any other causes of action that may from time to time be held by the Trust in respect thereof; (ii) preserve and maintain the Avoidance Action Trust Assets; (iii) distribute the Distributable Trust Assets, if any, to the Trust Beneficiaries in accordance with the Plan, the Confirmation Order and this Trust Agreement; and (iv) expend the Avoidance Action Trust Administrative Cash (and, if applicable, the Avoidance Action Trust SEC Reporting Cash) to cover fees and expenses of the Trust, including payment of the fees and expenses of the Trust Professionals (other than in respect thereof of the Other Debtor Residual Trust Assets).

I.    The Trust Administrator shall also have all powers necessary to implement the provisions of this Trust Agreement and administer the Trust in respect of the Other Debtor Residual Trust Assets, if any, including the power to: (i) prosecute for the benefit of the DIP Lenders, through counsel and other professionals selected by the Trust Administrator, any causes of action that may from time to time be held by the Trust in respect thereof; (ii) preserve and maintain the Other Debtor Residual Trust Assets; (iii) distribute the Distributable Other Debtor Residual Trust Assets, if any, to the DIP Lenders in accordance with the Plan, the Confirmation Order and this Trust Agreement; and (iv) expend the Other Debtor Residual Trust Administrative Cash to cover fees and expenses of the Trust, including payment of the fees and expenses of the Trust Professionals, in respect thereof.

J.    The Trust Administrator shall otherwise perform the functions and take the actions provided for in this Trust Agreement or permitted in the Plan and/or the Confirmation Order, or in any other agreement executed pursuant to the Plan, in each case subject to the provisions of Articles VI, VIII and XI hereof regarding the rights and powers of the Trust Monitor.

K.    The Trust is subject to the continuing jurisdiction of the Bankruptcy Court, whose approval is required to pay or distribute money or property to, or on behalf of, a Trust Beneficiary, except as expressly provided in this Trust Agreement.

L.    The Trust (other than the Avoidance Action Trust Claims Reserve) is intended to qualify as a liquidating trust under Treasury Regulation section 301.7701-4(d) that is treated as a "grantor trust" for federal and applicable state and local income tax purposes.

## Agreement

**NOW, THEREFORE**, in consideration of the promises and the mutual covenants contained herein, the Debtors, the Trust Administrator and the Trust Monitor agree as follows:

# ARTICLE I
# DEFINED TERMS

1.1.    <u>Definitions</u>.  Whenever used in this Trust Agreement, unless the context otherwise requires, the following words and phrases shall have the respective meanings ascribed to them as follows:

(a)    "<u>Affiliates</u>" means, with respect to any Person, any other Person which directly or indirectly controls, is controlled by or is under common control with such Person. For purposes of this definition "control" means, with respect to any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through ownership of voting securities, by contract or otherwise.

(b)    "<u>Aggregate Maximum Amount</u>" means the sum of the Maximum Amounts of all Disputed General Unsecured Claims, Unresolved Term Loan Avoidance Action Claims and Unresolved Other Avoidance Action Claims, as set forth in the applicable GUC Trust Report as the Aggregate Maximum Amount as of a given date.

(c)    "<u>Allowed General Unsecured Claims</u>" means, collectively, (i) the Initial Allowed General Unsecured Claims and (ii) the Resolved Allowed General Unsecured Claims.

(d)    "<u>Avoidance Action Proceeds</u>" means the proceeds of the Term Loan Avoidance Action.

(e)    "<u>Avoidance Action Trust Administrative Cash</u>" means the Cash held and maintained by the Trust Administrator for the purpose of paying the fees and expenses incurred by the Trust Administrator (including fees and expenses for Trust Professionals) in connection with the Trust and any obligations imposed on the Trust Administrator or the Trust, including fees and expenses relating to the performance of the Trust Administrator's obligations under this Trust Agreement and the Plan, other than in respect of the Other Debtor Residual Trust Assets.  The Debtors shall reserve $1.6 million for the Avoidance Action Trust Administrative Cash, which shall be transferred to the Trust, less any amounts expended by MLC from and after the Effective Date in respect of the prosecution of the Term Loan Avoidance Action, on the Avoidance Action Trust Transfer Date.

(f)    "<u>Avoidance Action Trust Assets</u>" means, collectively, (i) the Term Loan Avoidance Action transferred to the Trust, (ii) the Avoidance Action Proceeds, (iii) the Avoidance Action Trust Administrative Cash, and (iv) the Avoidance Action Trust SEC Reporting Cash.

(g)    "<u>Avoidance Action Trust SEC Reporting Costs</u>" means any costs, fees or expenses incurred by the Trust that are directly or indirectly related to reports that may be required to be filed by the Trust with the SEC pursuant to applicable rules, regulations and interpretations of the SEC (including, without limitation, any legal, accounting or registration fees, costs and expenses incurred by the Trust with respect thereto).

(h)    "<u>Avoidance Action Trust SEC Reporting Cash</u>" has the meaning set forth in <u>Section 2.3(e)</u> of this Trust Agreement.

(i)    "<u>Avoidance Action Trust Transfer Date</u>" means the date selected by the Debtors on which the Avoidance Action Trust Assets are transferred to the Trust, which transfer shall occur on or before December 15, 2011.

(j)    "<u>Bankruptcy Code</u>" has the meaning set forth in the preamble to this Trust Agreement.

(k)    "<u>Bankruptcy Court</u>" has the meaning set forth in Background paragraph A.

(l)    "<u>Budget</u>" has the meaning set forth in <u>Section 6.3</u>.

(m)    "<u>calendar quarter</u>" means the relevant three-month period ending on the last day of March, June, September or December, as applicable, of each calendar year; <u>*provided, however*</u>, that the calendar quarter that contains the Avoidance Action Trust Transfer Date shall be the period commencing on the Avoidance Action Trust Transfer Date and concluding on the date on which the relevant calendar quarter would naturally end in accordance with the foregoing.

(n)    "<u>Certificate of Trust</u>" means the certificate of trust of the Trust as required by Section 3810 of the Delaware Act.

(o)    "<u>Chapter 11 Cases</u>" has the meaning set forth in Background paragraph A.

(p)    "<u>Claim Conflict Resolution</u>" has the meaning set forth in <u>Section 3.6</u>.

(q)    "<u>Confidential Party</u>" has the meaning set forth in <u>Section 13.12</u>.

(r)    "<u>Confirmation Order</u>" has the meaning set forth in Background paragraph D.

(s)    "<u>Current Total Amount</u>" means as of a given date, the sum of (A) the Total Allowed Amount as of such date and (B) the Aggregate Maximum Amount as of such date, as set forth in the applicable GUC Trust Report as the Current Total Amount as of a given date.

(t)    "<u>Debtors</u>" has the meaning set forth in the preamble to this Trust Agreement.

(u)    "<u>Delaware Act</u>" means the Delaware Statutory Trust Act, 12 <u>Del</u>. <u>C</u>. § 3801 <u>et</u> <u>seq</u>.

(v)    "<u>DIP Credit Agreement Claims</u>" means all Claims arising under the DIP Credit Agreement and Orders approving the DIP Credit Agreement dated June 25, 2009 and July 5, 2009.

(w)    "<u>DIP Lender Distributable Trust Assets</u>" means the Distributable Trust Assets distributable to the DIP Lenders, (x) in an amount equal to (i) the amounts of Cash advanced directly or indirectly by MLC to fund the costs and expenses associated with realizing the proceeds of the Term Loan Avoidance Action, including, without limitation, any such amounts expended to fund the costs and expenses of professionals retained by the defendants in the Term Loan Avoidance Action and (ii) without duplication, the amount of the Avoidance Action Trust Administrative Cash, and otherwise (y) as determined either by (i) mutual agreement between the U.S. Treasury and the Creditor's Committee or (ii) Final Order.

(x)    "<u>DIP Lenders</u>" means the U.S. Treasury and EDC, as lenders under the DIP Credit Agreement.

(y)    "<u>Disputed General Unsecured Claims</u>" means the General Unsecured Claims against the Debtors that are Disputed (as defined in the Plan) as of the Initial GUC Record Date, until a time when such claims become Resolved General Unsecured Claims or are otherwise resolved pursuant to the claims resolution procedures contained in the Plan.

(z)    "<u>Distributable Other Debtor Residual Trust Assets</u>" means the Other Debtor Residual Assets Proceeds, if any, together with any earnings (including interest) thereon.

(aa)    "<u>Distributable Other Debtor Residual Trust Cash</u>" means any Cash or cash equivalents included in the Distributable Other Debtor Residual Trust Assets.

(bb)    "<u>Distributable Trust Assets</u>" means the Avoidance Action Proceeds together with any earnings (including interest) thereon.

(cc)    "<u>Distributable Trust Cash</u>" means any Cash or cash equivalents included in the Distributable Trust Assets.

(dd)    "<u>Distribution Date</u>" means the date of any distribution made by the Trust Administrator to the Trust Beneficiaries pursuant to this Trust Agreement, whether to the DIP Lenders pursuant to <u>Section 5.1(d)</u> or on account of Allowed General Unsecured Claims and/or Units.

(ee)    "<u>Distribution Threshold</u>" means $10,000,000.

(ff)    "<u>Excess GUC Distributable Trust Assets Determination Date</u>" has the meaning set forth in <u>Section 5.4(a)</u>.

(gg)    "<u>Excess GUC Distributable Trust Assets</u>" means (i) the amount of the GUC Distributable Trust Assets held by the Trust (after providing for all distributions then required to be made in respect of Resolved Allowed General Unsecured Claims), minus

5

(ii) the amount of the GUC Distributable Trust Assets necessary for the satisfaction of Claims in the amount of the Aggregate Maximum Amount pursuant to <u>Section 5.3</u>.

(hh)    "<u>Final Recovery Date</u>" has the meaning set forth in <u>Section 5.1(a)</u>.

(ii)    "<u>GUC Beneficiaries</u>" means the holders of Allowed General Unsecured Claims or Units received in respect of such claims.

(jj)    "<u>GUC Distributable Trust Assets</u>" has the meaning set forth in <u>Section 5.1(d)</u>.

(kk)    "<u>GUC Trust Reports</u>" means the reports prepared by the GUC Trust Administrator each quarter as provided in the GUC Trust Agreement, which shall be delivered to the Trust Administrator pursuant o the terms of the GUC Trust Agreement.

(ll)    "<u>Holdback</u>" has the meaning set forth in <u>Section 6.1(b)</u>.

(mm)  "<u>Incompetency</u>" means, with respect to any Person, the incompetency of such Person if such Person is a natural person.

(nn)    "<u>Initial Allowed General Unsecured Claims</u>" has the meaning set forth in <u>Section 5.2(b)</u>.

(oo)    "<u>Initial GUC Distribution Date</u>" has the meaning set forth in <u>Section 5.2(b)</u>.

(pp)    "<u>Initial GUC Record Date</u>" has the meaning set forth in <u>Section 5.2(b)</u>.

(qq)    "<u>IRS</u>" means the Internal Revenue Service.

(rr)    "<u>Maximum Amount</u>" means the maximum amount of any Disputed General Unsecured Claim, Unresolved Term Loan Avoidance Action Claim or Unresolved Other Avoidance Action Claim, calculated in accordance with the GUC Trust Agreement and as set forth in the applicable GUC Trust Report as the Maximum Amount of any Claim or group of Claims as of a given date.

(ss)    "<u>MLC</u>" has the meaning set forth in the preamble to this Trust Agreement.

(tt)    "<u>Other Avoidance Action Claims</u>" means the additional General Unsecured Claims that have arisen as a result of recovery of proceeds of the Avoidance Actions other than the Term Loan Avoidance Action (and any related unsecured claims).

(uu)    "<u>Other Debtor Residual Assets</u>" means any assets of MLC remaining at such time as the Debtors shall be liquidated, other than the Term Loan Avoidance Action and the Term Loan Avoidance Action Administrative Cash and any other assets of MLC whose disposition is specifically provided for under the Plan or the Confirmation Order.

(vv)   Other Debtor Residual Accepted Assets" means Other Debtor Residual Assets accepted by the Trust Administrator for transfer to the Trust pursuant to Section 2.3(b).

(ww)   "Other Debtor Residual Assets Proceeds" means any proceeds realized in respect of the Other Debtor Residual Accepted Assets.

(xx)   "Other Debtor Residual Trust Administrative Cash" means the Cash, if any, held and maintained by the Trust Administrator for the purpose of paying the fees and expenses incurred by the Trust Administrator (including fees and expenses for Trust Professionals) in connection with the Trust and any obligations imposed on the Trust Administrator or the Trust, including fees and expenses relating to the performance of the Trust Administrator's obligations under this Trust Agreement and the Plan, but only in respect of the Other Debtor Residual Trust Assets, which Cash may be obtained by transfer to the Trust by the Debtors, from the DIP Lenders (in their sole discretion) or from the proceeds of the Other Debtor Residual Accepted Assets.

(yy)   "Other Debtor Residual Trust Assets" means, if any, collectively, (i) the Other Debtor Residual Accepted Assets transferred to the Trust, (ii) the Other Debtor Residual Assets Proceeds and (iii) the Other Debtor Residual Trust Administrative Cash.

(zz)   "Other Debtor Residual Assets Transfer Date" means the date selected by the Debtors on which the Other Debtor Residual Assets Transfer, if any, are transferred to the Trust, which transfer shall occur on or before December 15, 2011.

(aaa)   "Permissible Investments" means investments in any of the following:

(i)   Marketable securities issued by the U.S. Government and supported by the full faith and credit of the U.S. Treasury, either by statute or an opinion of the Attorney General of the United States;

(ii)   Marketable debt securities, rated Aaa by Moody's and/ or AAA by S&P, issued by U. S. Government-sponsored enterprises, U. S. Federal agencies, U. S. Federal financing banks, and international institutions whose capital stock has been subscribed for by the United States;

(iii)   Certificates of deposit, time deposits, and bankers acceptances of any bank or trust company incorporated under the laws of the United States or any state, provided that, at the date of acquisition, such investment, and/or the commercial paper or other short term debt obligation of such bank or trust company has a short-term credit rating or ratings from Moody's and/or S&P, each at least P-1 or A-1;

(iv)   Commercial paper of any corporation incorporated under the laws of the United States or any state thereof which on the date of acquisition is rated by Moody's and/or S&P, provided each such credit rating is least  P-1 and/or A-1;

(v)   Money market mutual funds that are registered with the Securities and Exchange Commission under the Investment Company Act of 1940, as amended, and operated in accordance with Rule 2a-7 and that at the time of such investment are rated Aaa by

Moody's and/or AAAm by S&P, including such funds for which the Trust Administrator or an Affiliate provides investment advice or other services;

> (vi)    Tax-exempt variable rate commercial paper, tax-exempt adjustable rate option tender bonds, and other tax-exempt bonds or notes issued by municipalities in the United States, having a short-term rating of "MIG-1" or "VMIG-1" or a long term rating of "AA" (Moody's), or a short-term rating of "A-1" or a long term rating of "AA" (S&P);  and

> (vii)   Repurchase obligations with a term of not more than thirty days, 102 percent collateralized, for underlying securities of the types described in clauses (i) and (ii) above, entered into with any bank or trust company or its respective affiliate meeting the requirements specified in clause (iii) above.

> (bbb)   "Plan" has the meaning set forth in the preamble to this Trust Agreement.

> (ccc)   "Resolved Allowed General Unsecured Claims" means, collectively, (I) the Disputed General Unsecured Claims that are allowed after the Initial GUC Record Date in accordance with the claims resolution procedures administered under the Plan (to the extent so resolved); (II) the Term Loan Avoidance Action Claims, to the extent and in the amount collected by the Trust against the respective defendants in the underlying litigation (including by way of settlement); and (III) the Other Avoidance Action Claims, to the extent and in the amount collected against the respective defendants in the underlying litigations (including by way of settlement).  For the avoidance of doubt, unless and until a Disputed General Unsecured Claim, Unresolved Term Loan Avoidance Action Claim or Unresolved Other Avoidance Action Claim becomes a Resolved Allowed General Unsecured Claim, the holders of such claim shall not receive any distribution from the Trust.

> (ddd)   "Resolved Allowed General Unsecured Claims Determination Date" has the meaning set forth in Section 5.3(a).

> (eee)   "SEC" means the Securities and Exchange Commission.

> (fff)   "Secretary of State" means the Office of the Secretary of State of the State of Delaware.

> (ggg)   "Tax Returns" means all tax returns, reports, certificates, forms or similar statements or documents.

> (hhh)   "Term Loan Avoidance Action" means the Avoidance Action commenced by the Creditors' Committee against JPMorgan Chase Bank, N.A., individually and as Administrative Agent, and various lenders party to a term loan agreement, dated as of November 29, 2006, between General Motors Corporation, as borrower, JPMorgan Chase Bank, N.A., as agent, and various institutions as lenders and agents, styled *Official Committee of Unsecured Creditors of Motors Liquidation Co. v. JPMorgan Chase Bank, N.A. et al.*, Adv. Pro. No. 09-00504 (Bankr. S.D.N.Y. July 31, 2009).

(iii)    "Term Loan Avoidance Action Claims" means the additional General Unsecured Claims that have arisen as a result of recovery of proceeds of the Term Loan Avoidance Action (or any related unsecured claims).

(jjj)    "Total Allowed Amount" means the sum of the amount of all Initial Allowed General Unsecured Claims plus the amount of all Resolved Allowed General Unsecured Claims, as set forth in the applicable GUC Trust Report.

(kkk)    "Treasury Regulations" means the income tax regulations promulgated under the Tax Code, including any amended or successor income tax regulations thereto.

(lll)    "Trust" has the meaning set forth in the preamble to this Trust Agreement.

(mmm)    "Trust Administrator" has the meaning set forth in the preamble to this Trust Agreement.

(nnn)    "Trust Administrator Parties" means the Trust Administrator and its principals, directors, officers, employees, agents, representatives, attorneys, accountants, advisors and other professionals (including the Trust Professionals).

(ooo)    "Trust Agreement" has the meaning set forth in the preamble to this Trust Agreement.

(ppp)    "Trust Beneficiaries" means the holders of the DIP Credit Agreement Claims and the holders of Allowed General Unsecured Claims (or Units received in respect of such claims).

(qqq)    "Trust Cash" means the Cash or cash equivalents included in the Avoidance Action Trust Assets or the Other Debtor Residual Trust Assets, if any.

(rrr)    "Trust Monitor" has the meaning set forth in the preamble to this Trust Agreement.

(sss)    "Trust Monitor Parties" means the Trust Monitor and its principals, directors, officers, employees, agents, representatives, attorneys, accountants, advisors and other professionals.

(ttt)    "Trust Professionals" means, collectively, independent contractors, including attorneys, accountants, appraisers, disbursing agents or other parties deemed by the Trust Administrator to have the qualifications necessary or desirable to assist in the proper administration of the Trust and that are employed or retained by the Trust in such capacities.

(uuu)    "Unit Issuance Ratio" means the ratio of one Unit for each $1,000 in amount of Allowed General Unsecured Claims.

(vvv)    "Units" means the units of beneficial interest issued by the Trust to holders of Allowed General Unsecured Claims.

(www)    "Unresolved Other Avoidance Action Claim" means an Other Avoidance Action Claim that has not or has not yet arisen because no determination (including by way of settlement) has been made in the respective Avoidance Action against the respective defendant who would be entitled to such claim in the event of such determination (or if a determination has been made against the defendant, the proceeds related to such resolution have not been recovered in full).

(xxx)    "Unresolved Term Loan Avoidance Action Claim" means a Term Loan Avoidance Action Claim that has not or has not yet arisen because no determination (including by way of settlement) has been made in the Term Loan Avoidance Action against the respective defendant who would be entitled to such claim in the event of such determination (or if a determination has been made against the defendant, the proceeds related to such resolution have not been recovered in full).

(yyy)    "Wind-Down Facility" means the $1.175 billion wind-down facility provided to the Debtors pursuant to the DIP Credit Agreement.

## ARTICLE II
## DECLARATION OF TRUST

2.1.    Creation of Trust.  The Debtors and the Trust Administrator, pursuant to the Plan and the Confirmation Order and in accordance with the applicable provisions of chapter 11 of the Bankruptcy Code, hereby constitute and create the Trust, in the form of a statutory trust under the Delaware Act, which shall bear the name "Motors Liquidation Company Avoidance Action Trust."  In connection with the exercise of the Trust Administrator's power hereunder, the Trust Administrator may use this name or such variation thereof as the Trust Administrator sees fit.  The Trust Administrator, as trustee of the Trust, is hereby authorized and directed to execute and file a Certificate of Trust for the Trust in the form attached hereto as Exhibit B

2.2.    Purpose of Trust.  The sole purpose of the Trust is to liquidate and distribute its assets pursuant to the Plan in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business.

2.3.    Transfer of Avoidance Action Trust Assets to the Trust.

(a)    Effective upon the Avoidance Action Trust Transfer Date, the Debtors hereby transfer to the Trust, pursuant to Bankruptcy Code Sections 1123(a)(5)(B) and 1123(b)(3)(B), and in accordance with the Plan and the Confirmation Order, the Avoidance Action Trust Assets (other than the Avoidance Action Trust SEC Reporting Cash), as they exist on the Avoidance Action Trust Transfer Date, free and clear of any and all liens, claims, encumbrances and interests (legal, beneficial or otherwise) of all other persons to the maximum extent contemplated by and permissible under Bankruptcy Code Section 1141(c); provided, however that notwithstanding anything to the contrary in the Plan, Disclosure Statement, Confirmation Order, this Trust Agreement or any other agreement, the DIP Lenders shall maintain their liens on the Avoidance Action Trust Administrative Cash,

provided that for the avoidance of doubt, the DIP Lenders shall not demand acceleration of their liens on the Avoidance Action Trust Administrative Cash except in accordance with the provisions of section 7.2 of the DIP Credit Agreement.  Such transfers shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use or other similar tax pursuant to Bankruptcy Code Section 1146.  The Debtors and their successors and assigns shall be released from any and all liability with respect to the transfer of the Avoidance Action Trust Assets to the Trust as aforesaid.  Nothing in this Trust Agreement is intended to, or shall be construed to, effect a release, extinguishment or compromise of any claim or cause of action transferred to the Trust pursuant to this Trust Agreement.  The Avoidance Action Trust Assets and all other property held from time to time by the Trust under this Trust Agreement (other than the Other Debtor Residual Trust Assets) and any earnings (including interest) thereon are to be managed, applied and disposed of by the Trust Administrator in accordance with the terms hereof, the Plan and the Confirmation Order for the benefit of the Trust Beneficiaries, and for no other party, subject to the further covenants, conditions and terms hereinafter set forth, including the provisions of <u>Section 2.6</u>.

(b)  To the extent any Avoidance Action Trust Assets cannot be transferred to the Trust, because of a restriction on transferability under applicable non-bankruptcy law that is not superseded by Bankruptcy Code Section 1123 or any other provision of the Bankruptcy Code, such assets shall be retained by the Debtors or any successor thereto including, without limitation, the GUC Trust.  The proceeds of the sale of any such assets retained by the Debtors (or any successor thereto) shall be allocated to the Trust pursuant to the Plan as if such transfer had not been restricted under applicable non-bankruptcy law.  The Trust Administrator may commence an action in the Bankruptcy Court to resolve any dispute regarding the allocation of the proceeds of any assets retained by the Debtors (or any successor thereto) pursuant to the Plan and Confirmation Order.

(c)  On the Avoidance Action Transfer Date, the Debtors shall also deliver, or cause to be delivered, to the Trust a complete list of all General Unsecured Claims, both Allowed and Disputed, reflected on the claims registry as of the Avoidance Action Trust Transfer Date, including the names and addresses of all holders of such General Unsecured Claims, whether such claims have been Allowed or are Disputed, and the details of all objections in respect of Disputed General Unsecured Claims.

(d)  Effective upon the Other Debtor Residual Assets Transfer Date, the Debtors hereby transfer to the Trust, pursuant to Bankruptcy Code Sections 1123(a)(5)(B) and 1123(b)(3)(B), and in accordance with the Plan and the Confirmation Order, such of the Other Debtor Residual Assets, as they exist on the Other Debtor Residual Assets Transfer Date, as the Trust Administrator, in its sole discretion but with the approval of the Trust Monitor, shall determine to accept, free and clear of any and all liens, claims, encumbrances and interests of all other persons to the maximum extent contemplated by and permissible under Bankruptcy Code Section 1141(c); provided that, for the avoidance of doubt, the Trust Administrator may determine not to accept the transfer to the Trust of any or all of the Other Debtor Residual Assets for any reason or for no reason.   Any such transfer shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use or other similar tax pursuant to Bankruptcy Code Section 1146.  The Debtors and their successors and assigns shall be released from any and all liability with respect to the transfer of the Other Debtor Residual Accepted Assets to

the Trust as aforesaid.  Nothing in this Trust Agreement is intended to, or shall be construed to, effect a release, extinguishment or compromise of any claim or cause of action transferred to the Trust pursuant to this Trust Agreement, and notwithstanding anything to the contrary in the Plan, Disclosure Statement, Confirmation Order, this Trust Agreement or any other agreement, the DIP Lenders shall maintain their liens on the Other Debtor Residual Accepted Assets.  The Other Debtor Residual Trust Assets and all other property held from time to time by the Trust under this Trust Agreement in respect thereof, and any earnings (including interest) thereon, are to be managed, applied and disposed of by the Trust Administrator in accordance with the terms hereof, the Plan and the Confirmation Order for the benefit of the DIP Lenders, and for no other party, subject to the further covenants, conditions and terms hereinafter set forth, including the provisions of <u>Section 2.6</u>.

(e)    (i) On the Avoidance Action Trust Transfer Date, the Debtors shall, pursuant to <u>Section 2.3(e)</u> of the GUC Trust Agreement, transfer Cash to the Trust in an amount of $500,000 (the "<u>Avoidance Action Trust SEC Reporting Cash</u>").  The Avoidance Action Trust SEC Reporting Cash shall be held by the Trust in a segregated account and shall be used solely for the satisfaction of Avoidance Action Trust SEC Reporting Costs.  Any taxes imposed on the Trust in respect of the Avoidance Action Trust SEC Reporting Cash shall be satisfied from the income realized thereon.

(ii)    The Trust Administrator shall only use Avoidance Action Trust SEC Reporting Cash to satisfy Avoidance Action Trust SEC Reporting Costs to extent there is no other available source of funds to satisfy such expenses, including, without limitation, any funds obtained through the reservation and application of all or a portion of the Holdback pursuant to <u>Section 6.1(b)</u> hereof.

(iii)    If the Trust Administrator determines that (x) reports are not, and at no time will be,  required to be filed by the Trust with the SEC pursuant to applicable rules, regulations and interpretations of the SEC or (y) the Trust has other available funds which are sufficient to satisfy any current or future projected, fees, costs or expenses that are directly or indirectly related to reports that may be required to be filed by the Trust with the SEC pursuant to applicable rules, regulations and interpretations of the SEC (including, without limitation, any legal, accounting or registration fees, costs and expenses incurred by the Trust with respect thereto), then the Trust shall transfer to the GUC Trust any Avoidance Action Trust SEC Reporting Cash that has not been applied as provided in this <u>Section 2.3(e)</u>.

(iv)    Any income earned on the Avoidance Action Trust SEC Reporting Cash, net of taxes paid thereon, shall be Avoidance Action Trust Administrative Cash.

2.4.    <u>Appointment and Acceptance of Trust Administrator</u>.  The Trust Administrator shall be deemed to be appointed pursuant to Bankruptcy Code Section 1123(b)(3)(B) and is hereby appointed trustee of the Trust under the Delaware Act.  The Trust Administrator hereby accepts the such appointments, including trusteeship of the Trust created by this Trust Agreement and the grant, assignment, transfer, conveyance and delivery by the Debtors to the Trust Administrator, (i) on behalf of the Trust, and for the benefit, of the Trust Beneficiaries, of all of their respective right, title and interest in the Distributable Trust Assets, and (ii) on behalf of the Trust, and for the benefit, of the DIP

Lenders, of all of their respective right, title and interest in the Other Debtor Residual Trust Assets, upon and subject to the terms and conditions set forth in the Plan, the Confirmation Order and this Trust Agreement. The Trust Administrator's powers are exercisable solely in a fiduciary capacity consistent with, and in furtherance of, the purpose of the Trust and not otherwise, and in accordance with applicable law, including the Delaware Act. The Trust Administrator shall have the authority to bind the Trust within the limitations set forth herein, but shall for all purposes hereunder be acting in the capacity as Trust Administrator, and not individually.

2.5.     _Distribution of Distributable Trust Assets_. The Trust Administrator shall, in an expeditious but orderly manner and subject to the provisions of the Plan, the Confirmation Order and this Trust Agreement, make timely distributions of the Distributable Trust Assets and the Distributable Other Debtor Residual Assets in accordance with the terms hereof and not unduly prolong the existence of the Trust. The Trust Administrator may incur and pay any reasonable and necessary expenses in connection with the administration of the Trust, including the fees and expenses of the Trust Professionals _provided, however,_ that all such expenditures (other than in respect of the Other Debtor Residual Trust Assets) shall be made in accordance with the Budget.

2.6.     _No Reversion to Debtors_.

(a)   In no event shall any part of the Avoidance Action Trust Assets or the Other Debtor Residual Trust Assets revert to or be distributed to or for the benefit of any Debtor. All Distributable Trust Assets shall be applied as provided in Section 5.1(d), including to the satisfaction of Allowed General Unsecured Claims, including through distributions made in respect of the Units. All Distributable Other Debtor Residual Trust Assets shall be applied as provided in Article 5A.

(b)   To the extent that after satisfaction in full of all of the costs and expenses of the administration of the Trust, after all Allowed General Unsecured Claims have been paid pursuant to the Plan, after satisfaction of all other obligations or liabilities of the Trust incurred or assumed in accordance with the Plan, Confirmation Order or this Trust Agreement (or to which the Avoidance Action Trust Assets are otherwise subject), and after the affairs of the Trust have been finally wound up and concluded in accordance with the provisions of Section 4.3 hereof and Section 3808 of the Delaware Act, there shall remain any Avoidance Action Trust Administrative Cash, the Trust Administrator is authorized to and shall distribute any such remaining Avoidance Action Trust Administrative Cash to the DIP Lenders in accordance with the terms of the DIP Credit Agreement and the Plan. To the extent any portion of such residue is not accepted by the respective DIP Lenders, the Trust Administrator shall (i) be authorized to distribute up to $100,000 of such remaining Avoidance Action Trust Administrative Cash to an organization described in Section 501(c)(3) of the Tax Code and exempt from U.S. federal income tax under section 501(a) of the Tax Code that is unrelated to the Debtors, the Trust, any Trust Administrator Parties or any Trust Monitor Parties, or (ii) request an order from the Bankruptcy Court authorizing the Trust Administrator to distribute any such remaining Avoidance Action Trust Administrative Cash to such an organization, or authorizing such other disposition as recommended by the Trust Administrator and approved by the Bankruptcy Court.

## ARTICLE III
## TRUST BENEFICIARIES; UNITS

3.1.    Rights of Beneficiaries.

(a)    Except as provided in Section 2.6 hereof, the Trust Beneficiaries shall be the sole beneficiaries of the Trust (to the extent of the Avoidance Action Trust Assets) and the Distributable Trust Assets, and the Trust Administrator shall retain only such incidents of ownership as are necessary to undertake the actions and transactions authorized in the Plan, the Confirmation Order and this Trust Agreement, including those powers set forth in Articles VI and VIII hereof.

(b)    The beneficial interest of a Trust Beneficiary in the Trust is hereby declared and shall be in all respects and for all purposes intangible personal property.

(c)    Except as expressly provided herein, a Trust Beneficiary shall have no title or right to, or possession, management or control of, the Trust, or the Avoidance Action Trust Assets, or to any right to demand a partition or division of such assets or to require an accounting of the Trust Administrator or the Trust Monitor.  The whole legal title to the Avoidance Action Trust Assets shall be vested in the Trust as a separate legal entity under the Delaware Act or, if necessary, in the Trust Administrator on behalf of the Trust and the sole beneficial interest of the Trust Beneficiaries shall be as set forth in this Trust Agreement.

3.2.    Limited Liability.  No provision of the Plan, the Confirmation Order or this Trust Agreement, and no mere enumeration herein of the rights or privileges of any Trust Beneficiary, shall give rise to any liability of such Trust Beneficiary solely in its capacity as such, whether such liability is asserted by any Debtor, by creditors or employees of any Debtor, or by any other Person.  GUC Beneficiaries are deemed to receive the GUC Distributable Trust Assets in accordance with the provisions of the Plan, the Confirmation Order and this Trust Agreement in exchange for their Allowed General Unsecured Claims or on account of their Units, as applicable, without further obligation or liability of any kind, but subject to the provisions of this Trust Agreement.

3.3.    No Control by Trust Beneficiaries.  A Trust Beneficiary shall have no title to, or any right to possess, manage or control, the Avoidance Action Trust Assets, or any portion thereof or interest therein, except as expressly provided herein.  No surviving spouse, heir or devisee of any deceased Trust Beneficiary shall have any right of dower, homestead or inheritance, or of partition, or any other right, statutory or otherwise, in the Avoidance Action Trust Assets, but the whole title to all the Avoidance Action Trust Assets shall be vested in the Trust Administrator and the sole interest of the Trust Beneficiaries shall be the rights and benefits provided to such persons under this Trust Agreement.

3.4.    Issuance of Units.

(a)    The Trust shall issue Units to holders of Allowed General Unsecured Claims as provided in this Trust Agreement.  On the Initial GUC Distribution Date, holders of Initial Allowed General Unsecured Claims shall receive the number of Units equal to the

amount of such Initial Allowed General Unsecured Claims multiplied by the Unit Issuance Ratio, rounded up or down to the nearest whole Unit.  Following the Initial GUC Distribution Date, holders of Resolved Allowed General Unsecured Claims shall receive the number of Units equal to the amount of such Resolved Allowed General Unsecured Claims multiplied by the Unit Issuance Ratio, rounded up or down to the nearest whole Unit.  Units will represent the contingent right to receive, on a pro rata basis as provided in the Plan, the Confirmation Order and this Trust Agreement, Excess GUC Distributable Trust Assets.  The Units shall be issued subject to all the terms and conditions of the Plan, the Confirmation Order and this Trust Agreement.  References in this Trust Agreement to holders of Units shall be to the record holders of such Units.

(b)    As provided in Section 7.5 hereof, the Trust Administrator may retain Units otherwise issuable pursuant to this section with respect to Allowed General Unsecured Claims that are subject to withholding, and the Trust Administrator shall apply amounts distributed in respect of such retained Units to satisfy such withholding obligations.

(c)    Notwithstanding the foregoing, if as of the Initial GUC Distribution Date, the total amount of the Disputed General Unsecured Claims in the aggregate is less than 0.5% of the Current Total Amount, no Units shall be distributed and any GUC Distributable Trust Assets remaining after satisfaction of all Initial Allowed General Unsecured Claims and any other obligations of the Trust shall be disposed of as set forth in the last sentence of Section 2.6(b).

    3.5.    Ownership of Units; Transfers of Units.

(a)    The interest of a Trust Beneficiary is in all respects personal property, and upon the death, insolvency or incapacity of an individual GUC Beneficiary, such GUC Beneficiary's Units shall pass to the legal representative of such GUC Beneficiary.

(b)    The Units will be issued and evidenced by appropriate notation on the books and records of the Trust Administrator.  The Units shall not be certificated and shall not be transferable, assignable, pledged or hypothecated in whole or in part, except by applicable laws of descent and distribution (in the case of a deceased individual GUC Beneficiary); by operation of law; in accordance with applicable Bankruptcy law; or as otherwise approved by the Bankruptcy Court.  The Trust Administrator shall not be required to recognize any equitable or other claims to such interest by the transferee thereof, and the named GUC Beneficiary shall remain as such for all purposes hereunder.

    3.6.    Conflicting Claims to Units.  If the Trust Administrator has actual knowledge of any conflicting claims or demands that have been made or asserted with respect to a Unit, or a beneficial interest therein, the Trust Administrator shall be entitled, at its sole election, to refuse to comply with any such conflicting claims or demands.  In so refusing, the Trust Administrator may elect to make no payment or distribution with respect to the Unit subject to the claims or demands involved, or any part thereof, and the Trust Administrator shall be entitled to refer such conflicting claims or demands to the Bankruptcy Court, which shall have exclusive and continuing jurisdiction over resolution of such conflicting claims or demands.  The Trust Administrator shall not be or become

15

liable to any party for either (i) its election to continue making distributions pursuant to its books and records, without regard to the conflicting claims or demands; or (ii) its election to cease payments or distributions with respect to the subject Unit. In the event that the Trust Administrator elects to cease payments, it shall be entitled to refuse to act until either (x) the rights of the adverse claimants have been adjudicated by a Final Order of the Bankruptcy Court (or such other court of proper jurisdiction) or (y) all differences have been resolved by a written agreement among all of such parties and the Trust Administrator, which agreement shall include a complete release of the Trust, the Trust Administrator Parties and the Trust Monitor Parties in form and substance reasonably satisfactory to the Trust Administrator and Trust Monitor (the occurrence of either (x) or (y), a "Claim Conflict Resolution"). Until a Claim Conflict Resolution is reached with respect to such conflicting claims or demands, the Trust Administrator shall hold in a segregated account any payments or distributions from the Trust to be made with respect to the Unit(s) at issue. Promptly after a Claim Conflict Resolution is reached, the Trust Administrator shall transfer the payments and distributions, if any, held in the segregated account, together with interest and income earned thereon, if any, in accordance with the terms of such Claim Conflict Resolution.

3.7.    Distributions Relating to Note Claims and Eurobond Claims. The Trust shall distribute GUC Distributable Trust Assets and Units to the Indenture Trustees and Fiscal and Paying Agents, to the extent necessary to provide each beneficial holder of debt securities arising out of or relating to the Note Claims and Eurobond Claims with an amount of GUC Distributable Trust Assets and Units equal to the amount of GUC Distributable Trust Assets and Units such holder would receive had its claim been treated as an Initial Allowed General Unsecured Claim hereunder. For the avoidance of doubt, Units will be issued and evidenced by appropriate notation on the books and records of the Trust Administrator in the names of the Indenture Trustees and the Fiscal and Paying Agents, as applicable, and not in the individual names of the beneficial holders of debt securities arising out of or relating to the Note Claims and Eurobond Claims.

**ARTICLE IV**
**DURATION AND TERMINATION OF THE TRUST**

4.1.    Duration. The Trust shall become effective upon (x) the earlier to occur of (i) the Avoidance Action Trust Transfer Date and (ii) the Other Debtor Residual Assets Transfer Date, if any, and (y) the execution of this Trust Agreement and the filing of the Certificate of Trust with the Secretary of State and shall remain and continue in full force and effect until (a) all of the Distributable Trust Assets and all Distributable Other Debtor Residual Trust Assets, if any, have been distributed pursuant to the Plan and this Trust Agreement, (b) the Trust Administrator determines, in its discretion and with the approval of the Trust Monitor, that the administration of the Avoidance Action Trust Assets is not likely to yield sufficient additional Distributable Trust Assets or Distributable Other Debtor Residual Trust Assets to justify further pursuit, and (c) all other distributions required to be made by the Trust Administrator under the Plan and this Trust Agreement have been made, but in no event shall the Trust be dissolved later than three (3) years from the earlier of (i) the Avoidance Action Trust Transfer Date and (ii) the Other Debtor Residual Assets Transfer Date, unless the Bankruptcy Court, upon motion within the six

(6) month period prior to the third (3rd) anniversary of the earlier of (i) the Avoidance Action Trust Transfer Date and (ii) the Other Debtor Residual Assets Transfer Date (or at least six (6) months prior to the end of an extension period), determines that a fixed period extension (such that, together with any prior extensions, the dissolution of the Trust shall occur no later than five (5) years from the date on which the Trust became effective, without a favorable private letter ruling from the IRS that any further extension would not adversely affect the status of the Trust as a liquidating trust for U.S. federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the Avoidance Action Trust Assets or the Other Debtor Residual Trust Assets, as the case may be.  If at any time the Trust Administrator determines, in reliance upon such professionals as the Trust Administrator may retain and with the approval of the Trust Monitor, that (x) the expense of administering the Trust so as to make a final distribution to the Trust Beneficiaries is likely to exceed the value of the Avoidance Action Trust Assets remaining in the Trust and (y) the expense of administering the Trust so as to make a final distribution to the DIP Lenders is likely to exceed the value of the Other Debtor Residual Trust Assets, if any, remaining in the Trust, the Trust Administrator may apply to the Bankruptcy Court for authority to (i) reserve any amounts necessary to dissolve the Trust, (ii) transfer the balance to the DIP Lenders and/or the GUC Trust as determined either by (A) mutual agreement between the U.S. Treasury and the Creditors' Committee or, if the Creditors' Committee shall have been disbanded, the Trust Monitor or (B) Final Order, or donate any balance to a charitable organization described in section 501(c)(3) of the Tax Code and exempt from U.S. federal income tax under section 501(a) of the Tax Code that is unrelated to the Debtors, the Trust, any Trust Administrator Parties or any Trust Monitor Parties, and (iii) dissolve the Trust.

4.2.    Dissolution of the Trust.  Notwithstanding anything to the contrary in this Trust Agreement, in no event shall the Trust Administrator unduly prolong the duration of the Trust, and the Trust Administrator shall, in the exercise of its reasonable business judgment and in the interests of all Trust Beneficiaries, at all times endeavor to terminate the Trust as soon as practicable in accordance with the purposes and provisions of this Trust Agreement and the Plan.  Upon final dissolution and wind-up of the Trust, the Trust Administrator shall file a certificate of cancellation for the Trust with the Secretary of State.

4.3.    Continuance of Trust for Purposes of Winding Up.  After the dissolution of the Trust and solely for the purpose of liquidating and winding up its affairs, the Trust Administrator shall continue to act in such capacity until its duties hereunder have been fully performed.  The Trust Administrator shall retain the books, records and files that shall have been delivered to or created by the Trust Administrator until distribution or resolution of all the Avoidance Action Trust Assets and Other Debtor Residual Trust Assets, if any.  At the Trust Administrator's discretion, all of such books, records and files may be destroyed at any time following the later of (x) final distribution of the Avoidance Action Trust Assets and Other Debtor Residual Trust Assets, if any, unless such books, records and files are necessary to fulfill the Trust Administrator's obligations pursuant to Articles VI and VIII hereof and subject to any joint prosecution and common interests agreement(s) to which the Trust Administrator may be party, and (y) the date until which

17

the Trust Administrator is required by applicable law to retain such books, records and files.

## ARTICLE V
## DISTRIBUTIONS TO TRUST BENEFICIARIES

5.1.    General.

(a)    Until such date as the Term Loan Avoidance Action shall have been completely and finally resolved in full against all defendants (including by way of settlement) and the Trust Administrator determines that all Avoidance Action Proceeds have been collected in respect thereof (such date, the "Final Recovery Date"), the Trust Administrator shall establish Distribution Dates no less frequently than once each calendar year and no more frequently than once a calendar quarter for the distribution of Distributable Trust Assets as provided in this Article V; provided that distributions need not be made in any calendar year to the extent (A) there are no Distributable Trust Assets held by the Trust or (B) the Trust Administrator, with the approval of the Trust Monitor, determines (i) that it is reasonably necessary to retain the Distributable Trust Assets to meet contingent liabilities and maintain the value of the Avoidance Action Trust Assets (such as, for example, in the event that the Trust Administrator determines that the Distributable Trust Assets are so small in amount as not to justify making a distribution, taking into account the costs that would be incurred in making the distribution,  the anticipated total amount of Distributable Trust Assets expected to be available for distribution over time and the timing of the distribution or distributions thereof), or (ii) that it is necessary to retain the Distributable Trust Assets to pay reasonable incurred and anticipated expenses (including any taxes imposed on the Trust or in respect of the Avoidance Action Trust Assets) or to satisfy liabilities incurred and anticipated by the Trust in accordance with the Plan, the Confirmation Order and this Trust Agreement. Following the Final Recovery Date, distributions shall be made on a quarterly basis, as provided in this Article V.

(b)    Except as otherwise set forth herein, no distributions shall be made with respect to any portion of a Disputed General Unsecured Claim, Unresolved Term Loan Avoidance Action Claim or Unresolved Other Avoidance Action Claim unless and until such Disputed General Unsecured Claim, Unresolved Term Loan Avoidance Action Claim or Unresolved Other Avoidance Action Claim has become an Allowed General Unsecured Claim.

(c)    To the extent that a Disputed General Unsecured Claim, Unresolved Term Loan Avoidance Action Claim or Unresolved Other Avoidance Action Claim has become an Allowed General Unsecured Claim, distributions (if any) shall be made to the holder of such Allowed General Unsecured Claim in accordance with the provisions of the Plan, the Confirmation Order and this Trust Agreement.

(d)    The Distributable Trust Assets shall be distributed

18

(i)      first, to the DIP Lenders, each in their relative proportion pursuant to the terms of the DIP Credit Agreement, in the amount of the DIP Lender Distributable Trust Assets; and

(ii)      second, the remainder, if any, to the holders of Allowed General Unsecured Claims (the "GUC Distributable Trust Assets").

(e)    On any Distribution Date following the Final Recovery Date on which the Trust does not hold sufficient GUC Distributable Trust Assets, after taking into account any amounts necessary to satisfy the current and projected future fees and expenses of the Trust (including those of any Trust Professionals) pursuant to Section 6.1(b), to satisfy all Disputed General Unsecured Claims or other Claims that became Resolved Allowed General Unsecured Claims since the next preceding Resolved Allowed General Unsecured Claims Determination Date following which there was a distribution pursuant to Section 5.3(c), the Trust Administrator shall distribute all GUC Distributable Trust Assets that remain in the Trust to the holders of such Resolved Allowed General Unsecured Claims pro rata by Claim amount. Following such distribution, any remaining unsatisfied portion of such Resolved Allowed General Unsecured Claims, together with all remaining Disputed General Unsecured Claims and other Claims (including any Term Loan Avoidance Action Claims and any Other Avoidance Action Claims) shall be forever barred from assertion against the Trust.

(f)    Anything to the contrary herein notwithstanding but subject to Section 5.1(a), the Trust Administrator shall not make a distribution of GUC Distributable Trust Assets on any Distribution Date pursuant to Sections 5.2 or 5.4, if the amount to be distributed pursuant thereto does not exceed the Distribution Threshold.  In such case, any GUC Distributable Trust Assets then available for distribution shall be held by the Trust and distributed on a subsequent Distribution Date when the amount of the GUC Distributable Trust Assets to be distributed shall exceed the Distribution Threshold; _provided_ that if on the date determined by the Trust Administrator to be the final Distribution Date the GUC Distributable Trust Assets do not exceed the Distribution Threshold, then such GUC Distributable Trust Assets shall be disposed of as provided in the final sentence of Section 2.6(b).

(g)    For the avoidance of doubt, if the Trust fails to recover any Avoidance Action Proceeds or if the Avoidance Action Proceeds recovered by the Trust through the Final Recovery Date do not exceed the amount of DIP Lender Distributable Trust Assets, then no distributions shall be made hereunder in respect of any Allowed General Unsecured Claims.

5.2.    Distribution to the DIP Lenders and to Holders of Initial Allowed General Unsecured Claims.

(a)    The Trust Administrator shall make distributions to the DIP Lenders, from time to time in accordance with Section 5.1(a), of the DIP Lender Distributable Trust Assets until the DIP Lender Distributable Trust Assets shall have been distributed in full.

(b)    Once the DIP Lender Distributable Trust Assets have been distributed in full, the Trust Administrator shall make distributions of the GUC Distributable Trust Assets,

19

from time to time in accordance with Section 5.1(a).  The Trust Administrator shall establish a record date (the "Initial GUC Record Date") for the holders of the General Unsecured Claims that are allowed as of the Initial GUC Record Date (the "Initial Allowed General Unsecured Claims") who shall be entitled to participate in the first distribution of GUC Distributable Trust Assets, which date shall be the last day of the calendar quarter next preceding the date of such distribution (such Distribution Date, the "Initial GUC Distribution Date").  On the Initial GUC Distribution Date, the Trust Administrator shall distribute to each holder of an Initial Allowed General Unsecured Claim a distribution consisting of:

        (i)     an amount of GUC Distributable Trust Assets at the time available for distribution, in proportion to the amount of such Initial Allowed General Unsecured Claim as prescribed in subsection (d) below; and

        (ii)    a number of Units as provided in Section 3.4.

        (c)   During the period, if any, following the Initial GUC Distribution Date and prior to the Final Recovery Date, and as promptly as practicable following the Final Recovery Date, as and to the extent that additional GUC Distributable Trust Assets become available for distribution from time to time as a result of additional recoveries by the Trust in the Term Loan Avoidance Action, the Trust Administrator shall, from time to time in accordance with Section 5.1(a), make additional distributions to the holders of Initial Allowed General Unsecured Claims, on a Distribution Date or Dates designated by the Trust Administrator for such purpose, in the amount prescribed in subsection (d) below.  Subject to the proviso in Section 5.1(a), the Trust Administrator shall make such distributions no less frequently than once each calendar year and no more frequently than once each calendar quarter.

        (d)   The amount of GUC Distributable Trust Assets that the holder of an Initial Allowed General Unsecured Claim shall be entitled to receive pursuant to Section 5.2 (or, in the case of a holder of a Resolved Allowed General Unsecured Claim being treated as if it were a holder of an Initial Allowed General Unsecured Claim in the amount of its Resolved Allowed General Unsecured Claim pursuant to Section 5.3(c)) on any Distribution Date (including the Initial Distribution Date) shall be determined in accordance with the following formula:

$$D = ( \frac{A}{C} ) \times G$$

Where—

    D         is the distribution that the holder of an Initial Allowed General Unsecured Claim (or the holder of a Resolved Allowed General Unsecured Claim pursuant to Section 5.3(c)) will be entitled to receive;

    A         is the amount of the Initial Allowed General Unsecured Claim (or the holder of a Resolved Allowed General Unsecured Claim pursuant to Section 5.3(c));

    C         is the Current Total Amount as of the last day of the calendar quarter next preceding the respective Distribution Date; and

G          is the amount available for distribution determined as of the last day of the calendar quarter next preceding the respective Distribution Date, after taking account of any Holdback, or the application of such Holdback, pursuant to Section 6.1(b).

5.3.    Distributions to Holders of Resolved Allowed General Unsecured Claims.

(a)    Following the Initial GUC Distribution Date, the Trust Administrator, with the approval of the Trust Monitor, shall periodically make a determination (the date of any such determination, which shall in all cases be made as of the last day of a calendar quarter, being a "Resolved Allowed General Unsecured Claims Determination Date") whether any holders of Disputed General Unsecured Claims or other Claims have become holders of Resolved Allowed General Unsecured Claims since the next preceding Resolved Allowed General Unsecured Claims Determination Date or, in the case of the first such determination, since the Initial GUC Record Date.  During the period, if any, following the Initial GUC Distribution Date and prior to the Final Recovery Date, the Trust Administrator shall make such determination no less frequently than once each calendar year and no more frequently than once each calendar quarter, and following the Final Recovery Date such determination shall be made once each calendar quarter.

(b)    On a Distribution Date scheduled as soon as practicable following each Resolved Allowed General Unsecured Claims Determination Date, the Trust Administrator shall, subject to the proviso in Section 5.1(a), distribute to each holder of a Resolved Allowed General Unsecured Claim identified on such Resolved Allowed General Unsecured Claims Determination Date, if any:

(i)    the pro rata amount of GUC Trust Distributable Assets that the holder of such Resolved Allowed General Unsecured Claim would have received had such Resolved Allowed General Unsecured Claim been an Initial Allowed General Unsecured Claim, including the aggregate amount of Excess GUC Trust Distributable Trust Assets that the holder would have received had it been the holder of Units referred to in clause (ii) below on each Excess GUC Distributable Trust Assets Determination Date occurring on or prior to the date of such distribution; provided that a holder of a Resolved Allowed General Unsecured Claim shall not receive pursuant to this clause (i) an amount of Excess GUC Trust Distributable Assets distributed in respect of any prior Excess GUC Distributable Trust Assets Determination Date to the extent that it will be receiving such Excess GUC Trust Distributable Assets as a distribution on the Units to be received by such holder pursuant to clause (ii) below; and

(ii)    a number of Units as provided in Section 3.4.

(c)    Once a holder of a Resolved Allowed General Unsecured Claim has received the distribution prescribed in the preceding subsection (b), such holder shall be treated as if it were a holder of an Initial Allowed General Unsecured Claim in the amount of its Resolved Allowed General Unsecured Claim on all subsequent Distribution Dates established for purposes of Section 5.2(c).

(d)    For the avoidance of doubt, it is intended that the distributions to be made to holders of Resolved Allowed General Unsecured Claims in accordance with this Section 5.3

shall provide such holders, as nearly as possible, with the exact same amount of distributions as if such holders had been holders of Initial Allowed General Unsecured Claims.

5.4.    Distribution of Excess GUC Distributable Trust Assets.

(a)    Following the Initial GUC Distribution Date, the Trust Administrator, with the approval of the Trust Monitor, shall periodically make a determination (the date of any such determination, which shall in all cases be as of the last day of a calendar quarter, being an "Excess GUC Distributable Trust Assets Determination Date") of the Excess GUC Distributable Trust Assets as of such date, taking into account the extent to which Disputed General Unsecured Claims are disallowed or the Term Loan Avoidance Action or other Avoidance Actions are resolved in favor of the defendants therein.  During the period, if any, following the Initial GUC Distribution Date and prior to the Final Recovery Date, the Trust Administrator shall make such determination no less frequently than once each calendar year and no more frequently than once each calendar quarter, and following the Final Recovery Date such determination shall be made once each calendar quarter.

(b)    On a Distribution Date scheduled as soon as practicable following each Excess GUC Distributable Trust Assets Determination Date, the Trust Administrator shall, subject to the proviso of Section 5.1(a), distribute the Excess GUC Distributable Trust Assets, in each case determined as of the respective Excess GUC Distributable Trust Assets Determination Date, to the holders of Units outstanding on such Excess GUC Distributable Trust Assets Determination Date (including Units distributed or to be distributed to holders of Resolved Allowed General Unsecured Claims pursuant to Section 5.3(b)(ii) on such Distribution Date), pro rata according to the following formula:

$$D_U = \left(\frac{U_H}{U_O}\right) \quad x \ (\Sigma G - H) \ x \ \left[\ \frac{T_U}{C_U} \ - \ \frac{T_U}{(C_U + L)}\ \right]$$

Where—

$D_U$    is the distribution of Excess GUC Distributable Trust Assets that a holder of Units will be entitled to receive;

$U_H$    is the number of Units held by the holder;

$U_O$    is the total number of Units outstanding (including Units distributed to holders of Resolved Allowed General Unsecured Claims pursuant to Section 5.3(b)(ii) on such Distribution Date);

$\Sigma G$    is the sum of the amounts that are or were available for distribution to holders of Initial Allowed General Unsecured Claims (and holders of Resolved Allowed General Unsecured Claims pursuant to Section 5.3(c)) on the relevant Distribution Date and each prior Distribution Date;

$T_U$    is the Total Allowed Amount as of the Excess GUC Distributable Trust Assets Determination Date;

$C_U$    is the Current Total Amount as of the Excess GUC Distributable Trust Assets Determination Date;

L        is the aggregate amount of all (i) Disputed General Unsecured Claims disallowed since the next preceding Excess GUC Distributable Trust Assets Determination Date (or, in the case of the first Excess GUC Distributable Trust Assets Determination Date, since the Initial GUC Record Date), (ii) Unresolved Term Loan Avoidance Action Claims to the extent resolved (including by way of settlement) in favor of the respective defendants since the next preceding Excess GUC Distributable Trust Assets Determination Date (or, in the case of the first Excess GUC Distributable Trust Assets Determination Date, since the Initial GUC Record Date); and (iii) all Unresolved Other Avoidance Action Claims to the extent resolved (including by way of settlement) in favor of the respective defendants since the next preceding Excess GUC Distributable Trust Assets Determination Date (or, in the case of the first Excess GUC Distributable Trust Assets Determination Date, since the Initial GUC Record Date); and

H        is the amount, if any, of any holdback pursuant to Section 6.1 that was not otherwise deducted from the amounts available for distribution on a Distribution Date.

(c)   Notwithstanding the foregoing, if the Trust Administrator becomes aware of previously unknown potential Allowed General Unsecured Claims, the Trust Administrator may, with the approval of the Trust Monitor, withhold distribution of Excess GUC Distributable Trust Assets to the holders of Units in an amount that the Trust Administrator, with the approval of the Trust Monitor, estimates to be the maximum amount reasonably allowable in respect of such previously unknown claims.

5.5.    Retention of Avoidance Action Trust Assets.  Notwithstanding anything in this Trust Agreement to the contrary, the Trust Administrator shall at all times, to the extent practicable, retain

(a)   sufficient GUC Distributable Trust Assets as the Trust Administrator shall determine, with the approval of the Trust Monitor, as would be distributable (I) to all holders of Disputed General Unsecured Claims at the time outstanding as if all Disputed General Unsecured Claims were allowed at the Maximum Amount, but only until such Disputed General Unsecured Claims are resolved, (II) to the holders of all Resolved Allowed General Unsecured Claims at the time outstanding, to the extent not previously distributed, (III) in respect of any Unresolved Term Loan Avoidance Action Claims at the Maximum Amount thereof but only until the Term Loan Avoidance Action is dismissed by Final Order or such claims become Resolved Allowed General Unsecured Claims, and (IV) in respect of any Unresolved Other Avoidance Action Claims at the Maximum Amount thereof but only until such claims become Resolved Allowed General Unsecured Claims or the related other Avoidance Actions are dismissed by Final Order; and

(b)   sufficient Avoidance Action Trust Administrative Cash as the Trust Administrator shall determine, with the approval of the Trust Monitor and subject to the Budget, is necessary (x) to pay the reasonable incurred or anticipated fees and expenses of the Trust (including any taxes imposed on the Trust or in respect of the Avoidance Action Trust Assets) and (y) to satisfy other liabilities incurred or anticipated by the Trust in accordance with the Plan, the Confirmation Order and this Trust Agreement.

5.6.    <u>Minimum Distributions</u>.  Notwithstanding anything to the contrary contained herein, no Cash payment in an amount less than $25 shall be made by the Trust Administrator to any holder of an Allowed General Unsecured Claim or Unit under any circumstance; *provided* that the Trust Administrator shall carry the entitlement of such holder of an Allowed General Unsecured Claim or Unit to such amount on its books and records, shall aggregate such amount with any subsequent amount to which such holder shall become entitled and shall make payment of such amount to such holder at such time as the amounts due such holder in the aggregate shall equal $25 or more; *provided further* that if any such amount shall be owing to a holder of an Allowed General Unsecured Claim or Unit as of the date determined by the Trust Administrator to be the final Distribution Date, such amount shall be disposed of as provided in the final sentence of <u>Section 2.6(b)</u>.

5.7.    <u>Distributions Not in Compliance with this Article</u>.  Subject to <u>Section 5.3(d)</u>, in the event that the Trust Administrator determines in good faith that it is necessary or desirable in order to carry out the intent and purposes of the Plan, the Confirmation Order and this Trust Agreement to receive any assets or make any distribution in a manner that is not in technical compliance with this Trust Agreement, the Trust Administrator shall be permitted to receive assets or make, or cause to be made, distributions in such manner, but only with the approval of the Trust Monitor; *provided, however*, that no such distribution shall result in any holder of an Allowed General Unsecured Claim receiving a distribution in excess of the distribution that such holder would have received had such claim been an Initial Allowed General Unsecured Claim or shall discriminate among the holders of Units.  Except as aforesaid, no payment or distribution of Avoidance Action Trust Assets shall be made to, or on behalf of, a Trust Beneficiary or any other person except in strict accordance with the terms of this Trust Agreement, the Plan, and the Confirmation Order, unless such payment or distribution shall have been approved by the Bankruptcy Court.

5.8.    <u>No Accounting</u>.    Except as otherwise provided in the Plan, the Confirmation Order or this Trust Agreement, nothing shall require the Trust Administrator to file any accounting or seek approval of any court with respect to the administration of the Trust or as a condition for making any payment or distribution out of the Avoidance Action Trust Assets.

## ARTICLE VA
## DISTRIBUTIONS TO DIP LENDERS

If any Other Debtor Residual Accepted Assets shall be transferred to the Trust, the Trust Administrator shall make distributions to the DIP Lenders of Distributable Other Debtor Residual Assets, if any, from time to time (but no less frequently than once each calendar year), pro rata as their interests appear, as the Trust Administrator shall determine with the approval of the Trust Monitor or as the Trust Administrator shall be directed by a majority in interest of the DIP Lenders; provided that distributions need not be made in any calendar year to the extent (A) there are no Distributable Other Debtor Residual Assets held by the Trust or (B) the Trust Administrator, with the approval of the Trust Monitor, determines that it is necessary to retain the Distributable Other Debtor Residual Assets to (i) meet any contingent liabilities of the Trust

or maintain the value of the Other Debtor Residual Trust Assets (such as for example, in the event that the Trust Administrator determines that the Distributable Other Debtor Residual Assets are so small in amount as not to justify making a distribution, taking into account the costs that would be incurred in making the distribution, the anticipated total amount of Distributable Other Debtor Residual Assets expected to be available for distribution over time and the timing of the distribution or distributions thereof), or (ii) pay reasonable incurred and/or anticipated expenses of the Trust (including any taxes imposed on the Trust or in respect of the Other Debtor Residual Trust Assets) or to satisfy liabilities incurred and/or anticipated by the Trust in accordance with the Plan, the Confirmation Order and this Trust Agreement.

## ARTICLE VI
## ADMINISTRATION OF THE TRUST

6.1.    <u>Payment of Costs, Expenses and Liabilities (other than in respect of the Other Debtor Residual Accepted Assets)</u>.

(a)    Subject to the Budget, the Trust Administrator shall use the Avoidance Action Trust Administrative Cash:

(i)    to pay reasonable costs and expenses of the Trust that are incurred in connection with the administration thereof (including any taxes imposed on the Trust, actual reasonable fees and out-of-pocket expenses incurred by Trust Professionals retained by the Trust Administrator in connection with the administration of the Avoidance Action Trust Assets and preservation of books and records);

(ii)    to satisfy other obligations or other liabilities incurred or assumed by the Trust (or to which the Avoidance Action Trust Assets are otherwise subject) in accordance with the Plan, the Confirmation Order, or this Trust Agreement, including fees and expenses incurred and in connection with, the prosecution and resolution of the Term Loan Avoidance Action the protection, preservation and distribution of the Avoidance Action Trust Assets; and

(iii)    to satisfy any other obligations of the Trust expressly set forth in the Plan, the Confirmation Order or this Trust Agreement to be satisfied out of the Avoidance Action Trust Administrative Cash.

(b)    (i) If, at any time, the Trust Administrator determines that the Avoidance Action Trust Administrative Cash is not reasonably likely to be adequate to satisfy the current and projected future fees, costs and expenses (including, without limitation any Avoidance Action Trust SEC Reporting Costs) of the Trust (other then in respect of the Other Debtor Residual Trust Assets), the Trust Administrator may, with the approval of the Trust Monitor, reserve an amount, or increase the amount previously reserved, of Distributable Trust Assets to satisfy such fees, costs and expenses (the "<u>Holdback</u>").  If at any time, the GUC Trust Administrator determines that the Holdback is materially greater than the amount of the current and projected future fees, costs and expenses as aforesaid, the Trust Administrator shall, with the approval of the Trust Monitor, release from the Holdback the amount of such excess.

(ii)    To the extent necessary to satisfy the fees, costs and expenses on account of which the Holdback may be reserved, the GUC Trust Administrator may, in consultation with the Trust Monitor, and upon approval by the Bankruptcy Court in accordance with the provisions of Section 6.1(b)(iii), apply all or a portion of the Holdback to the satisfaction of such fees, costs and expenses.

(iii)    The application of the Trust Administrator seeking Bankruptcy Court approval to utilize Distributable Trust Assets shall include the position of the Trust Monitor in respect thereof.  The Trust Administrator shall provide at least twenty (20) days notice to the Trust Monitor, the holders of Units and the holders of Disputed General Unsecured Claims prior to a hearing on a motion to use any Distributable Trust Assets.

(c)    Notwithstanding that as a result of the utilization of Distributable Trust Assets pursuant to Section 6.1(b) the amount of GUC Distributable Trust Assets shall be less than the assets required to satisfy Claims in the amount of the Current Total Amount then outstanding, the Trust Administrator shall continue to satisfy Disputed General Unsecured Claims, any Unresolved Term Loan Avoidance Action Claims and any Unresolved Other Avoidance Action Claims that become Allowed General Unsecured Claims in the order they are resolved as otherwise provided in this Trust Agreement.

6.2.    Payment of Costs, Expenses and Liabilities in respect of the Other Debtor Residual Accepted Assets.

(a)    The Trust Administrator shall not be required to undertake any activity in respect of the Other Debtor Residual Accepted Assets, including for purposes of realizing upon such assets in order to make distributions of Distributable Other Debtor Residual Trust Assets to the DIP Lenders, unless there shall be available to the Trust Administrator Other Debtor Residual Trust Administrative Cash sufficient for such purposes.

(b)    If sufficient Other Debtor Residual Trust Administrative Cash shall be available to the Trust Administrator, then the Trust Administrator shall, as approved by the Trust Monitor or as directed by a majority in interest of the DIP Lenders:

(i)    pay reasonable costs and expenses of the Trust that are incurred in connection with the Other Debtor Residual Accepted Assets (including any taxes imposed on the Trust, actual reasonable fees and out-of-pocket expenses incurred by Trust Professionals retained by the Trust Administrator in connection with the administration of the Other Debtor Residual Accepted Assets and preservation of books and records);

(ii)    satisfy other obligations or other liabilities incurred or assumed by the Trust in respect of the Other Debtor Residual Accepted Assets (or to which the Other Debtor Residual Accepted Assets are otherwise subject) in accordance with the Plan, the Confirmation Order, or this Trust Agreement, including fees and expenses incurred and in connection with, the prosecution and resolution of any action to realize upon the Other Debtor Residual Accepted Assets and the protection, preservation and distribution of the Other Debtor Residual Accepted Assets; and

(iii)    satisfy any other obligations of the Trust expressly set forth in the Plan, the Confirmation Order or this Trust Agreement to be satisfied out of the Other Debtor Residual Trust Administrative Cash.

6.3.    <u>Budget</u>.

(a)    The Trust Administrator shall prepare and submit to the Trust Monitor and the DIP Lenders for approval a reasonably detailed annual plan and budget (the "<u>Budget</u>") at least thirty (30) days prior to the commencement of each calendar year; *provided, however,* that the first such Budget shall be agreed to as of the Avoidance Action Trust Transfer Date. Such annual plan and Budget shall set forth (on a quarterly basis) in reasonable detail: (A) the Trust Administrator's anticipated actions to administer the Avoidance Action Trust Assets; and (B) the anticipated fees and expenses, including professional fees, associated with the administration of the Trust, a separate amount representing the anticipated fees and expenses of the Trust Monitor and detail as to how the Trust will budget and spend the Avoidance Action Trust Administrative Cash. Such Budget shall be updated and submitted to the Trust Monitor and the DIP Lenders for review on a quarterly basis, and each such quarterly update shall reflect the variances (with explanations) between (x) the Budget, (y) any updated Budget, and (z) the actual results for the same period. For the avoidance of doubt, the DIP Lenders may object in the Bankruptcy Court with respect to any quarterly update that materially changes the Budget and the Bankruptcy Court shall resolve such dispute. All actions by the Trust Administrator shall be consistent with the Budget (as updated). The Trust Administrator may obtain any required approval of the Budget on reasonable negative notice (which shall be not less than 15 days after receipt of the Budget) and approval of the Budget shall not be unreasonably withheld. In the event of any dispute concerning the Budget (or the taking of actions consistent with the Budget), the Trust Administrator or the Trust Monitor may petition the Bankruptcy Court to resolve such dispute.

(b)    The Trust Administrator, with the approval of the Trust Monitor, and the DIP Lenders may agree on a budget for activities in respect of the Other Debtor Residual Accepted Assets.

(c)    Notwithstanding any other provision of this Trust Agreement, the approval of the DIP Lenders shall not be required for any use of the Avoidance Action Trust SEC Reporting Cash.

6.4.    [Intentionally omitted.]

6.5.    <u>Compliance with Laws</u>. Any and all distributions of Avoidance Action Trust Assets shall be in compliance with applicable laws, including applicable federal and state tax and securities laws.

6.6.    <u>Fiscal Year</u>. Except for the first and last years of the Trust, the fiscal year of the Trust shall be the calendar year. For the first and last years of the Trust, the fiscal year of the Trust shall be such portion of the calendar year that the Trust is in existence.

6.7.    <u>Books and Records</u>.

(a)    The Trust Administrator shall maintain and preserve the Debtors' books, records and files that shall have been delivered to or created by the Trust Administrator.

(b)    The Trust Administrator shall maintain books and records relating to the assets, liabilities, income and expense of the Trust, all distributions made by the Trust and the payment of fees and expenses of, and satisfaction of claims against or assumed by, the Trust and the Trust Administrator, in such detail and for such period of time as may be necessary to enable it to make full and proper reports in respect thereof in accordance with the provisions of this Trust Agreement and otherwise to comply with applicable provisions of law, including tax law.

(c)    The Trust Administrator shall maintain, or cause to be maintained, a register of holders of Units, from time to time outstanding, to the extent any Units are issued hereunder, in customary form.

6.8.    <u>Cash Payments</u>.  All distributions of Distributable Trust Cash required to be made by the Trust Administrator may be made in Cash denominated in U.S. dollars by checks drawn on a United States domestic bank selected by the Trust Administrator or, at the option of the Trust Administrator, by wire transfer from a United States domestic bank selected by the Trust Administrator or as otherwise required or provided in applicable agreements; <u>provided</u>, <u>however</u>, that cash payments to foreign persons may be made, at the option of the Trust Administrator, in such funds as and by such means as are necessary or customary in a particular foreign jurisdiction.

6.9.    <u>Insurance</u>.  The Trust shall maintain customary insurance coverage for the protection of the Trust Administrator Parties and the Trust Monitor Parties and any such other persons serving as administrators and overseers of the Trust, on and after the Avoidance Action Trust Transfer Date, in all cases in accordance with the Budget.  The Trust Administrator may also obtain such insurance coverage as it deems necessary and appropriate with respect to real and personal property which may become Avoidance Action Trust Assets, if any, in accordance with such Budget.  To the extent that there is any incremental cost for customary insurance coverage covering the activities of the Trust Administrator Parties and the Trust Monitor Parties in respect of the Other Debtor Residual Accepted Assets, the Trust Administrator and the Trust Monitor shall not be required to undertake any such activities unless there is available sufficient Other Debtor Residual Trust Administrative Cash to fund such incremental cost.

## ARTICLE VII
## TAX MATTERS

7.1.    <u>Tax Treatment</u>.

(a)    For all U.S. federal and applicable state and local income tax purposes, all parties (including the Debtors, the Trust Administrator, the holders of the DIP Credit Agreement Claims, and the holders of Allowed General Unsecured Claims) shall treat the

Trust and the transfer of the Avoidance Action Trust Assets and the Other Debtor Residual Assets to the Trust in a manner consistent with the remainder of this Section 7.1.

(b)   If no Other Debtor Residual Assets are transferred to the Trust upon the dissolution of MLC and the DIP Lender Distributable Trust Assets have not been determined (either as a percentage or as a fixed amount of Distributable Trust Assets or on some other basis) on or prior to the Avoidance Action Trust Transfer Date, then (subject to clause (c) below) the Trust Administrator shall treat the Trust as either (A) a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 (including, if required, timely so electing) or (B) if permitted under applicable law and at the election of the Trust Administrator, as a "complex trust."

(c)   If Other Debtor Residual Assets are transferred to the Trust upon the dissolution of MLC or the DIP Lender Distributable Trust Assets have been determined (either as a percentage or as a fixed amount of Distributable Trust Assets or on some other basis) on or prior to the Avoidance Action Trust Transfer Date, or otherwise upon determination of the DIP Lender Distributable Trust Assets (either as a percentage or as a fixed amount of Distributable Trust Assets or on some other basis) after the Avoidance Action Trust Transfer Date, the Trust (other than the Avoidance Action Trust Claims Reserve) shall be treated as a liquidating trust that is treated as a grantor trust and the Avoidance Action Trust Assets (upon the determination of the DIP Lender Distributable Trust Assets) and Other Debtor Residual Trust Assets (upon the transfer of Other Debtor Residual Assets to the Trust) shall be treated as (i) being transferred directly to the Trust Beneficiaries; provided, however, that to the extent Avoidance Action Trust Assets are allocable to Disputed General Unsecured Claims, Unresolved Term Loan Avoidance Action Claims or Unresolved Other Avoidance Action Claims, such Avoidance Action Trust Assets shall be treated as being transferred to the Avoidance Action Trust Claims Reserve, followed by (ii) the transfer by such Trust Beneficiaries of the Avoidance Action Trust Assets (other than the Avoidance Action Trust Assets allocable to the Avoidance Action Trust Claims Reserve) and the Other Debtor Residual Trust Assets, as applicable, to the Trust in exchange for beneficial interests in the Trust.  Accordingly, Trust Beneficiaries receiving beneficial interests in the Trust shall be treated as the grantors and owners of their respective share of the Avoidance Action Trust Assets (other than any Avoidance Action Trust Assets allocable to the Avoidance Action Trust Claims Reserve) and Other Debtor Residual Trust Assets, as applicable.

(d)   Any determination made pursuant to this Section 7.1 shall be conclusive and binding on all parties (including the Debtors, the Trust Administrator, the holders of the DIP Credit Agreement Claims, and the holders of Allowed General Unsecured Claims) for U.S. federal, and (to the extent permitted by applicable law) state and local, income tax purposes.  Accordingly, to the extent permitted by applicable law, all parties shall report consistently with the U.S. federal income tax treatment of the Trust by the Trust Administrator for state and local income tax purposes.

7.2.    Valuation of Assets.  As soon as practicable after the Avoidance Action Trust Transfer Date, the Trust Administrator shall make a good-faith valuation of the Avoidance Action Trust Assets and Other Debtor Residual Trust Assets, and such valuation shall be made available from time to time, to the extent relevant, and shall be

used consistently by all parties (including the Debtors, the Trust Administrator, the holders of the DIP Credit Agreement Claims, and the holders of Allowed General Unsecured Claims) for all U.S. federal and applicable state and local income tax purposes.

7.3.    Payment of Taxes.  The Trust Administrator shall be responsible for payment, out of the Avoidance Action Trust Assets, of any taxes imposed on the Trust (other than in respect of the Other Debtor Residual Assets) or the Avoidance Action Trust Assets, including the Avoidance Action Trust Claims Reserve. The Trust Administrator shall be responsible for payment, out of the Other Debtor Residual Assets of any taxes imposed on the Trust in respect of the Other Debtor Residual Assets or on the Other Debtor Residual Assets.  In the event, and to the extent, any Cash retained on account of Disputed General Unsecured Claims, Unresolved Term Loan Avoidance Action Claims or Unresolved Other Avoidance Action Claims in the Avoidance Action Trust Claims Reserve is insufficient to pay the portion of any such taxes attributable to the taxable income arising from the assets allocable to, or retained on account of, Disputed General Unsecured Claims, Unresolved Term Loan Avoidance Action Claims or Unresolved Other Avoidance Action Claims, such taxes shall be (i) reimbursed from any subsequent Cash amounts retained on account of Disputed General Unsecured Claims, Unresolved Term Loan Avoidance Action Claims or Unresolved Other Avoidance Action Claims, or (ii) to the extent such Disputed General Unsecured Claims, Unresolved Term Loan Avoidance Action Claims or Unresolved Other Avoidance Action Claims subsequently have been resolved, deducted from any amounts otherwise distributable by the Trust Administrator as a result of the resolution of such Disputed General Unsecured Claims, Unresolved Term Loan Avoidance Action Claims or Unresolved Other Avoidance Action Claims.

7.4.    Tax Reporting.

(a)    The Trust Administrator shall file (or cause to be filed) Tax Returns for the Trust treating the Trust (except the Avoidance Action Trust Claims Reserve or as otherwise provided in Section 7.1(b) above) as a grantor trust pursuant to Treasury Regulation section 1.671-4(a) and in accordance with the applicable provisions of this Section 7.4.  The Trust Administrator also shall annually send to each Trust Beneficiary a separate statement setting forth such Trust Beneficiary's share of items of income, gain, loss, deduction, or credit of the Trust (including, for the avoidance of doubt, earnings on the Avoidance Action Trust Administrative Cash and the Avoidance Action Trust SEC Reporting Cash) and shall instruct all Trust Beneficiaries to report such items on their respective U.S. federal income Tax Returns or to forward the appropriate information to their respective beneficial holders with instructions to report such items on their U.S. federal income Tax Returns.  The Trust Administrator also shall file (or cause to be filed) any other statements, returns, or disclosures relating to the Trust that are required by any governmental unit.

(b)    Allocations of the Trust's taxable income among the Trust Beneficiaries shall be determined by reference to the manner in which an amount of Cash equal to such taxable income would be distributed (without regard to any restrictions on distributions described herein) if, immediately prior to such deemed distribution, the Trust had distributed all of its other assets (valued at their tax book value and other than assets attributable to the Avoidance Action Trust Claims Reserve) to the Trust Beneficiaries, in each case up to the tax

book value of the assets treated as contributed by such Trust Beneficiaries, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Trust. Similarly, taxable loss of the Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining Avoidance Action Trust Assets and Other Debtor Residual Trust Assets. The tax book value of the Avoidance Action Trust Assets and Other Debtor Residual Trust Assets for this purpose shall equal their fair market value on the Avoidance Action Trust Transfer Date and Other Debtor Residual Trust Assets Transfer Date, as applicable, adjusted in accordance with tax accounting principles prescribed by the Tax Code, applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

(c)    The Trust Administrator shall (x) treat the Avoidance Action Trust Claims Reserve for U.S. federal income tax purposes as either (i) a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 by timely so electing or (ii) a "complex trust," provided, however, that if the Trust is treated as a "disputed ownership fund" or as a "complex trust" pursuant to Section 7.1(b) above, then the Avoidance Action Trust Claims Reserve shall be treated in the same manner, and (y) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes. Any determination made pursuant to this Section 7.4 shall be conclusive and binding on all parties (including the Debtors, the Trust Administrator, the holders of the DIP Credit Agreement Claims, and the holders of Allowed General Unsecured Claims) for U.S. federal, state, and local income tax purposes.

7.5.    Tax Withholdings.    The Trust Administrator shall withhold and pay to the appropriate taxing authority all amounts required to be withheld pursuant to the Tax Code, Treasury Regulations or other applicable requirements, including any provision of any foreign, state or local tax law, with respect to any payment or distribution to the Trust Beneficiaries. All such amounts withheld, and paid to the appropriate taxing authority, shall be treated as amounts distributed to such Trust Beneficiaries for all purposes of this Trust Agreement. The Trust Administrator shall be authorized to collect such tax information from the Trust Beneficiaries (including social security numbers or other tax identification numbers) as it in its sole discretion deems necessary to effectuate the Plan, the Confirmation Order and this Trust Agreement, or to comply with any applicable withholding or reporting requirement. The Trust Administrator may refuse to make a distribution to any Trust Beneficiary that fails to furnish such information in a timely fashion, until such information is furnished; *provided*, *however*, that upon a Trust Beneficiary furnishing such information, the Trust Administrator shall make such distribution to which such Trust Beneficiary is entitled, without interest.

7.6.    Expedited Determination of Taxes.    The Trust Administrator may request an expedited determination of taxes of the Trust, including the Avoidance Action Trust Claims Reserve, under Section 505(b) of the Bankruptcy Code for any or all Tax Returns filed for, or on behalf of, the Trust for any or all taxable periods (or part thereof) through the dissolution of the Trust.

7.7.    [Intentionally omitted.]

7.8.    <u>Delivery of Statement of Transfers</u>.  If the Trust Administrator elects to treat (i) the Trust, pursuant to and to the extent provided in <u>Section 7.1</u> above and/or (ii) the Avoidance Action Trust Claims Reserve as a disputed ownership fund within the meaning of Treasury Regulation section 1.468B-9, then following the Avoidance Action Trust Transfer Date (but in no event later than February 15th of the calendar year following the Avoidance Action Trust Transfer Date), MLC shall provide a "§ 1.468B-9 Statement" to the Trust Administrator in accordance with Treasury Regulation section 1.468B-9(g).

7.9.    <u>Allocation of Distributions Between Principal and Interest</u>.  All deemed distributions (including deemed transfers pursuant to <u>Section 7.1(b)(i)</u>) in connection with the allowance of any Allowed General Unsecured Claim shall be allocated first to the principal amount of such Allowed General Unsecured Claim, as determined for federal income tax purposes, and thereafter, to the remaining portion of such Allowed General Unsecured Claim, if any.

## ARTICLE VIII
## POWERS OF AND LIMITATIONS ON THE TRUST ADMINISTRATOR

8.1.    <u>Powers of the Trust Administrator</u>.

(I)    <u>Other Than in Respect of the Other Debtor Residual Accepted Assets</u>

(a)    Pursuant to the terms of the Plan and the Confirmation Order, the Trust Administrator shall have various powers, duties and responsibilities concerning the prosecution of and resolution of the Term Loan Avoidance Action, maximizing the property of the Trust, the disposition of the Avoidance Action Trust Assets and the administration of the Trust.  In addition, the Trust Administrator shall coordinate with the GUC Trust Administrator to maximize efficiency in distributions to general unsecured creditors in any situation where such coordination would be beneficial.

(b)    The Trust Administrator shall have only such rights, powers and privileges expressly set forth in the Plan, the Confirmation Order or this Trust Agreement and as otherwise provided by applicable law.  Subject to the Plan, the Confirmation Order and other provisions herein, including the provisions relating to approvals of the Trust Monitor, the Trust Administrator shall be expressly authorized to undertake the following actions, in the Trust Administrator's good faith judgment, in the best interests of the Trust Beneficiaries and in furtherance of the purpose of the Trust:

(i)    hold and manage the Avoidance Action Trust Assets;

(ii)    hold legal title to any and all rights of the Trust Beneficiaries in, to or arising from the Avoidance Action Trust Assets, for the benefit of the Trust Beneficiaries that are entitled to distributions therefrom under the Plan, whether, in the case of GUC Beneficiaries, their General Unsecured Claims are Allowed on or after the Avoidance Action Trust Transfer Date;

(iii)    prosecute and, if appropriate, sell, settle and resolve, abandon and/or dismiss the Term Loan Avoidance Action;

(iv)    execute all agreements, instruments and other documents, and effect all other actions necessary or appropriate to dispose of the Avoidance Action Trust Assets;

(v)    monitor and enforce the implementation of the Plan insofar as relating to this Trust Agreement, the Avoidance Action Trust Assets or the Trust;

(vi)    calculate and implement distributions of the GUC Distributable Trust Assets obtained through the exercise of its power and authority as contemplated by the Plan, the Confirmation Order and this Trust Agreement and in accordance with the interests of the holders of Allowed General Unsecured Claims;

(vii)    retain, pay, oversee and direct the services of, and terminate Trust Professionals in accordance with Section 8.3 hereof to carry out its duties and obligations hereunder, in all cases in accordance with the Budget;

(viii)    pay the reasonable fees and expenses of the Trust Administrator and Trust Monitor, in all cases in accordance with the Budget;

(ix)    incur and pay all reasonable expenses, satisfy ordinary course liabilities and make all other payments reasonable and necessary to administer and dispose of the Avoidance Action Trust Assets, in all cases in accordance with the Budget;

(x)    invest monies received by the Trust, the Trust Administrator or otherwise held by the Trust or the Trust Administrator in accordance with Section 8.4 hereof;

(xi)    protect and enforce the rights to the Avoidance Action Trust Assets vested in the Trust Administrator by this Trust Agreement by any method deemed reasonably appropriate, including by judicial proceedings or pursuant to any applicable bankruptcy, insolvency, moratorium or similar law and general principles of equity;

(xii)    vote any claim or interest held by the Trust in a case under the Bankruptcy Code and receive any distribution therefrom for the benefit of the Trust;

(xiii)    make all necessary filings in accordance with any applicable law, statute or regulation;

(xiv)    purchase customary insurance coverage in accordance with Section 6.9 hereof;

(xv)    assert and/or waive any applicable privileges (legal or otherwise) on behalf of the Trust, or with respect to the Avoidance Action Trust Assets held by the Debtors at any time (prepetition or postpetition);

(xvi)    maintain the books and records of the Trust;

33

(xvii)   open, maintain and close any bank, securities or other accounts that are necessary and appropriate to manage the Avoidance Action Trust Assets, including but not limited to the accounts listed on Exhibit A hereto;

(xviii)  receive from the Debtors and administer the Avoidance Action Trust SEC Reporting Cash in accordance with Section 2.3(e) hereof and file such reports as may be required pursuant to the applicable rules, regulations and interpretations of the SEC; and

(xix)   perform such functions and take such actions as are provided for or permitted in the Plan, the Confirmation Order, this Trust Agreement or any other agreement executed pursuant to the Plan and take any other actions as it may deem to be reasonably necessary or appropriate to realize, preserve and dispose of the Avoidance Action Trust Assets.

(c)   [Intentionally omitted.]

(d)   In all circumstances, the Trust Administrator shall act in the best interests of all Trust Beneficiaries and in furtherance of the purpose of the Trust, and in a manner not inconsistent with the best interests of the Trust Beneficiaries and consistent with the Budget. The Trust Administrator shall not take any action inconsistent with the purpose of the Trust, or take (or fail to take) any action that would cause the Trust (other than the Avoidance Action Trust Claims Reserve) to fail to qualify as a liquidating trust within the meaning of Treasury Regulation section 301.7701-4(d) that is treated as a grantor trust.

(e)   Notwithstanding any provision herein to the contrary, the Trust Administrator shall not serve on the board of directors, management committee or any similar governing body of any non-Debtor subsidiary of MLC, where the charter, limited liability company agreement, partnership agreement or other similar constituent document of such subsidiary does not provide for a liquidating purpose for such subsidiary.  Except as otherwise provided in this Trust Agreement, the Trust Administrator will not be required to obtain the order or approval of the Bankruptcy Court, or any other court of competent jurisdiction in, or account to the Bankruptcy Court or any other court of competent jurisdiction for, the exercise of any right, power or privilege conferred hereunder.  Notwithstanding the foregoing, where the Trust Administrator determines, in its reasonable discretion, that it is necessary, appropriate or desirable, the Trust Administrator will have the right to submit to the Bankruptcy Court or any other court of competent jurisdiction any question or questions regarding any specific action proposed to be taken by the Trust Administrator with respect to this Trust Agreement, the Trust, or the Avoidance Action Trust Assets, including the administration and distribution of the Avoidance Action Trust Assets and the termination of the Trust.  Pursuant to the Plan, the Bankruptcy Court has retained jurisdiction for such purposes and may approve or disapprove any such proposed action upon motion by the Trust Administrator.

(II)   In Respect of the Other Debtor Residual Accepted Assets

The Trust Administrator shall have the rights, powers and privileges to act in respect of the Other Debtor Residual Accepted Assets, if any, in the manner set forth in Section 8.1(I), *mutatis mutandis*.  In all such circumstances, the Trust Administrator shall act in the best

interests of DIP Lenders and in furtherance of the purpose of the Trust, and in a manner not inconsistent with the best interests of the DIP Lenders.  For the avoidance of doubt, the Trust Administrator shall not be obligated to undertake any activities in respect of the Other Debtor Residual Trust Assets unless there shall be available sufficient Other Debtor Residual Trust Administrative Cash to pay in full its fees, costs and expenses in respect thereof.

8.2.    Limitations on the Trust Administrator.  The Trust Administrator shall not be authorized to engage, in its capacity as Trust Administrator, in any trade or business with respect to the Avoidance Action Trust Assets or to take (or fail to take) any action that would cause the Trust (other than the Avoidance Action Trust Claims Reserve) to fail to qualify as a liquidating trust within the meaning of Treasury Regulation section 301.7701-4(d) that is treated as a grantor trust.  The Trust Administrator shall take such actions consistent with the prompt orderly disposition of the Avoidance Action Trust Assets and the Other Debtor Residual Accepted Assets, if any, as required by applicable law and consistent with the treatment of the Trust (other than the Avoidance Action Trust Claims Reserve) as a liquidating trust within the meaning of Treasury Regulation section 301.7701-4(d) that is treated as a grantor trust, to the extent such actions are permitted by this Trust Agreement.  The Trust Administrator shall, in its capacity as Trust Administrator, be restricted to (x) the liquidation of the Trust on behalf, and for the benefit, of the Trust Beneficiaries and the distribution and application of Avoidance Action Trust Assets for the purposes set forth in, and the conservation and protection of the Avoidance Action Trust Assets and the administration thereof, and (y) the liquidation of the Trust on behalf, and for the benefit, of the DIP Lenders and the distribution and application of Other Debtor Residual Trust Assets for the purposes set forth in, and the conservation and protection of the Other Debtor Residual Trust Assets and the administration thereof, in each case in accordance with, the provisions of the Plan, the Confirmation Order and this Trust Agreement.

8.3.    Agents and Professionals.

(a)    The Trust Administrator on behalf of the Trust may, but shall not be required to, from time to time enter into contracts with, consult with and retain Trust Professionals, on such terms as the Trust Administrator deems appropriate in accordance with the terms hereof and (other than in respect of the Other Debtor Residual Accepted Assets) in accordance with the Budget.  None of the professionals that represented parties-in-interest in the Chapter 11 Cases shall be precluded from being engaged by the Trust Administrator solely on account of their service as a professional for such parties-in-interest prior to the Avoidance Action Trust Transfer Date or the Other Debtor Residual Assets Transfer Date, as the case may be.

(b)    After the Avoidance Action Trust Transfer Date, Trust Professionals shall be required to submit reasonably detailed invoices on a monthly basis to the Trust Administrator and the Trust Monitor, including in such invoices a description of the work performed, the individuals who performed such work, and, if billing on an hourly basis, the hourly rate of such person, plus an itemized statement of expenses.  The Trust Administrator shall timely pay all such invoices that are not disputed by the Trust Administrator and as to which the Trust Monitor does not object within fifteen (15) days after their receipt thereof, and

shall not require approval of the Bankruptcy Court in order to do so.  In the event of any dispute concerning the entitlement to, or the reasonableness of any compensation and/or expenses of any Trust Professionals, either the Trust Administrator or the affected Trust Professional may petition the Bankruptcy Court to resolve the dispute.

(c)    Except as permitted by <u>Section 6.1(b)</u> and <u>Section 2.3(e) hereof</u>, all payments to Trust Professionals (other than in respect of Other Debtor Residual Trust Assets) shall be paid out of the Avoidance Action Trust Administrative Cash.  Payments to Trust Professionals for activities in respect of the Other Debtor Residual Trust Assets shall be paid out of the Other Debtor Residual Trust Administrative Cash.

8.4.    <u>Investment of Trust Cash</u>.

(a)    The Trust Administrator shall establish segregated accounts for the Trust Cash as follows: (i) Distributable Trust Cash which shall be held in trust for the benefit of the Trust Beneficiaries; (ii) Distributable Other Debtor Residual Cash, which shall be held in trust for the benefit of the DIP Lenders and on which the DIP Lenders shall have a lien; (iii) Avoidance Action Trust Administrative Cash and Other Debtor Residual Trust Administrative Cash which shall be used to pay the administrative expenses of the Trust, on which the DIP Lenders shall have a lien; and (iv) Avoidance Action Trust SEC Reporting Cash which shall be used to satisfy Avoidance Action Trust SEC Reporting Costs in accordance with <u>Section 2.3(e)</u> hereof.

(b)    The Trust Administrator shall invest the Trust Cash (including any earnings thereon or proceeds thereof) in the manner set forth in this <u>Section 8.4</u>, but shall otherwise be under no liability for interest or income on any monies received by the Trust hereunder and held for distribution or payment to the Trust Beneficiaries, except as such interest shall actually be received.  Investment of any Trust Cash shall be administered in accordance with the general duties and obligations hereunder.  The right and power of the Trust Administrator to invest the Trust Cash and the proceeds thereof, or any income earned by the Trust, shall be limited to investing such Trust Cash (pending distribution or disbursement in accordance with the Plan or this Trust Agreement) in Permissible Investments; <u>*provided*</u>, <u>*however*</u>, that such Permissible Investments shall be limited to include only those investments that a liquidating trust, within the meaning of Treasury Regulations section 301.7701-4(d), may be permitted to hold, pursuant to the Treasury Regulations, or any modification in the IRS guidelines, whether set forth in IRS rulings, other IRS pronouncements or otherwise.

(c)    For the avoidance of doubt, the Trust is not, and will not hold itself out as, an "investment company" as such term is understood under the Investment Company Act of 1940, and is prohibited from investing, reinvesting or trading in securities (other than making any Permissible Investments as contemplated by the Plan, the Confirmation Order and this Trust Agreement) or conducting any trade or business other than implementing the Plan and distributing Distributable Trust Assets under the Plan and this Trust Agreement.

8.5.    <u>Communication with the GUC Trust Administrator</u>.  The Trust Administrator shall communicate with the GUC Trust Administrator to obtain such

information regarding, as of a given date, (A) the holders and amounts of General Unsecured Claims, Disputed General Unsecured Claims, Unresolved Term Loan Avoidance Action Claims, Unresolved Other Avoidance Action Claims and Resolved Allowed General Unsecured Claims, (B) the respective Maximum Amounts of all Disputed General Unsecured Claims, Unresolved Term Loan Avoidance Action Claims and Unresolved Other Avoidance Action Claims, (C) the Current Total Amount, (D) the Aggregate Maximum Amount, (E) any components of the foregoing and (E) any other information within the custody or control of the GUC Trust Administrator which shall be necessary or desirable in order for the Trust Administrator to timely make any calculation or determination hereunder to identify and make distributions to the GUC Beneficiaries and to maintain any books and records required to be maintained, or necessary or desirable for the Trust Administrator or the Trust Monitor to fulfill their respective functions, hereunder; provided, however, that the provision of such information shall be under appropriate arrangements of confidentiality to the extent such information has at the time not been publicly disclosed.

8.6.    Termination.  The duties, responsibilities and powers of the Trust Administrator will terminate when the Trust is dissolved and terminated pursuant to Article IV hereof and the Trust Administrator has performed all of its obligations under Section 4.3, by an order of the Bankruptcy Court or by entry of a final decree closing the Debtors' cases before the Bankruptcy Court; *provided*, *however*, that Sections 9.4, 9.5 and 9.6 hereof shall survive such termination, dissolution and entry.

**ARTICLE IX**
**ADDITIONAL MATTERS CONCERNING THE TRUST ADMINISTRATOR**

9.1.    Reliance by Trust Administrator.  Except as otherwise provided in the Plan, the Confirmation Order or this Trust Agreement, the Trust Administrator may rely and shall be protected in acting upon any resolution, statement, instrument, opinion, report, notice, request, consent, order or other paper or document reasonably believed by the Trust Administrator to be genuine and to have been signed or presented by the proper party or parties.

9.2.    Liability to Third Persons.  To the fullest extent permitted by applicable law, the Trust Administrator Parties shall not be subject to any personal liability whatsoever, in tort, contract or otherwise, to any person (including, in the case of the Trust Administrator, to any Trust Professionals retained by the Trust Administrator in accordance with this Trust Agreement) in connection with the Avoidance Action Trust Assets, the Other Debtor Residual Trust Assets or the affairs of the Trust and shall not be liable with respect to any action taken or omitted to be taken in good faith, except for actions and omissions determined by a Final Order of the Bankruptcy Court to be due to their respective willful misconduct (including, but not limited to, conduct that results in a personal profit at the expense of the Trust), gross negligence, fraud, malpractice, criminal conduct, unauthorized use of confidential information that causes damages, breach of fiduciary duty (to the extent applicable), or *ultra vires* acts, and all such persons shall look solely to the Avoidance Action Trust Assets (other than in respect of the Other Debtor Residual Accepted Assets and activities related thereto) or the Other Debtor Residual Trust

Assets (in respect of the Other Debtor Residual Accepted Assets and activities related thereto) for satisfaction of claims of any nature arising in connection with affairs of the Trust.

9.3.    <u>Non-liability of Trust Administrator for Acts of Others</u>.  Except as provided herein, nothing contained in the Plan, the Confirmation Order or this Trust Agreement shall be deemed to be an assumption by the Trust Administrator of any of the liabilities, obligations or duties of the Debtors or shall be deemed to be or contain a covenant or agreement by the Trust Administrator to assume or accept any such liability, obligation or duty.  Any successor Trust Administrator may accept and rely upon any accounting made by or on behalf of any predecessor Trust Administrator hereunder, and any statement or representation made as to the assets comprising the Avoidance Action Trust Assets or the Other Debtor Residual Trust Assets, or as to any other fact bearing upon the prior administration of the Trust, so long as it has a good faith basis to do so.  The Trust Administrator shall not be liable for having accepted and relied in good faith upon any such accounting, statement or representation if it is later proved to be incomplete, inaccurate or untrue.  Neither the Trust Administrator nor any successor Trust Administrator shall be liable for any act or omission of any predecessor Trust Administrator, nor have a duty to enforce any claims against any predecessor Trust Administrator on account of any such act or omission, unless directed in good faith to do so by the Trust Monitor.

9.4.    <u>Exculpation</u>.  As of the earlier of the Avoidance Action Trust Transfer Date and the Other Debtor Residual Assets Transfer Date, to the fullest extent permitted by applicable law, the Trust Administrator Parties shall be and hereby are exculpated by all Persons, including holders of DIP Credit Agreement Claims, General Unsecured Claims and Units and other parties-in-interest, from any and all claims, causes of action and other assertions of liability arising out of the discharge of their respective powers and duties conferred by the Plan, the Confirmation Order, this Trust Agreement or any Order of the Bankruptcy Court entered pursuant to or in furtherance of the Plan, or applicable law or otherwise, except for actions or omissions to act that are determined by Final Order of the Bankruptcy Court to have arisen out of each such Trust Administrator Party's own respective willful misconduct (including, but not limited to, conduct that results in a personal profit at the expense of the Trust), gross negligence, fraud, malpractice, criminal conduct, unauthorized use of confidential information that causes damages, breach of fiduciary duty (to the extent applicable), or *ultra vires* acts.  No holder of a DIP Credit Agreement Claim, General Unsecured Claim or other party-in-interest will have or be permitted to pursue any claim or cause of action against the Trust Administrator Parties or the Trust, for making payments and distributions in accordance with the Plan, the Confirmation Order or the this Trust Agreement or for implementing the provisions thereof.  Any action taken or omitted to be taken with the express approval of the Bankruptcy Court and, in the case of action taken in respect of the Other Debtor Residual Accepted Assets, with the approval or at the direction of the DIP Lenders will conclusively be deemed not to constitute willful misconduct, gross negligence, fraud, malpractice, criminal conduct, unauthorized use of confidential information that causes damages, breach of fiduciary duty, or *ultra vires* acts; <u>*provided*</u>, <u>*however*</u>, that notwithstanding any provision herein to the contrary, the Trust Administrator shall not be obligated to comply

with a direction of the Trust Monitor, whether or not express, which would result in a change to the distribution provisions of the Plan, the Confirmation Order or this Trust Agreement.

       9.5.    <u>Limitation of Liability</u>.  In no event shall the Trust Administrator Parties be liable for punitive, exemplary, consequential, special or other damages for a breach of, or otherwise in connection with, this Trust Agreement under any circumstances.

       9.6.    <u>Indemnity</u>.

       (a)   To the fullest extent permitted by applicable law, the Trust Administrator Parties shall be indemnified by the Trust from the Avoidance Action Trust Assets (other than in respect of the Other Debtor Residual Accepted Assets and activities related thereto) or the Other Debtor Residual Trust Assets (in respect of the Other Debtor Residual Accepted Assets and activities related thereto) for any losses, claims, damages, liabilities and expenses occurring after the earlier of the Avoidance Action Trust Transfer Date and the Other Debtor Residual Assets Transfer Date, including reasonable attorneys' fees, disbursements and related expenses which the Trust Administrator Parties may incur or to which the Trust Administrator Parties may become subject in connection with any action, suit, proceeding or investigation brought by or threatened against one or more of the Trust Administrator Parties on account of the acts or omissions in their capacity as, or on behalf of, the Trust Administrator; *provided*, *however*, that the Trust shall not be liable to indemnify any Trust Administrator Party for any act or omission arising out of such Trust Administrator Party's respective actions that are determined by a Final Order of the Bankruptcy Court to be willful misconduct (including, but not limited to, conduct that results in a personal profit at the expense of the Trust), gross negligence, fraud, malpractice, criminal conduct, unauthorized use of confidential information that causes damages, breach of fiduciary duty (to the extent applicable), or *ultra vires* acts. Notwithstanding any provision herein to the contrary, the Trust Administrator Parties shall be entitled to obtain advances from the Trust to cover their reasonable expenses of defending themselves in any action brought against them as a result of the acts or omissions, actual or alleged, of an Trust Administrator Party in its capacity as such; *provided*, *however*, that the Trust Administrator Parties receiving such advances shall repay the amounts so advanced to the Trust immediately upon the entry of a final, non-appealable judgment or order finding that such Trust Administrator Parties were not entitled to any indemnity under the provisions of this <u>Section 9.6</u>.  Any amounts payable to any Trust Administrator Party pursuant to this <u>Section 9.6</u> (other than in respect of the Other Debtor Residual Accepted Assets and activities related thereto) shall be satisfied as follows: (i) first from the Avoidance Action Trust Administrative Cash, and (ii) second from the Distributable Trust Cash, if any; *provided*, *however*, that the use of Distributable Trust Cash as contemplated in clause (ii) of the foregoing shall be subject to the prior approval by the Bankruptcy Court, as provided in <u>Section 6.1(b)</u>.  Any amounts payable to any Trust Administrator Party pursuant to this <u>Section 9.6</u> in respect of the Other Debtor Residual Accepted Assets and activities related thereto shall be satisfied as follows: (i) first from the Other Debtor Residual Trust Administrative Cash, and (ii) second from the Distributable Other Debtor Residual Trust Cash, if any.

(b)   Anything to the contrary in this Trust Agreement or in any other agreement notwithstanding, to the extent that the Avoidance Action Trust Administrative Cash or Distributable Trust Cash, or the Other Debtor Residual Trust Administrative Cash or Distributable Other Debtor Residual Trust Cash, as the case may be, shall be insufficient to fully indemnify the Trust Administrator Parties or to provide advances to the Trust Administrator Parties in accordance with Section 9.6(a), the Trust Administrator Parties shall be indemnified and shall be entitled to obtain advances, first from the Other GUC Trust Administrative Cash (as defined in the GUC Trust Agreement), and second from the GUC Trust Distributable Assets (as defined in the GUC Trust Agreement), to the same extent as the GUC Trust Administrator Parties under Section 9.6 of the GUC Trust Agreement or any successor provision thereunder, as provided in Section 9.6 of the GUC Trust Agreement in effect on the date hereof.

(c)   The foregoing indemnities in respect of any Trust Administrator Party shall survive the termination of such Trust Administrator Party from the capacity for which they are indemnified.

9.7.   Compensation and Expenses.

(a)   The Trust Administrator shall receive fair and reasonable compensation for its services (other than in respect of the Other Debtor Residual Accepted Assets and activities related thereto), to be paid out of the Avoidance Action Trust Administrative Cash in accordance with the approved Budget (or from the Avoidance Action Trust SEC Reporting Cash in accordance with Section 2.3(e) hereof).  The Trust Administrator shall be entitled, without the need for approval of the Bankruptcy Court, to reimburse itself on a monthly basis (i) from the Avoidance Action Trust Administrative Cash for such compensation and all reasonable out-of-pocket expenses actually incurred in the performance of duties in accordance with this Trust Agreement and the Budget and (ii) from the Avoidance Action Trust SEC Reporting Cash for such compensation and all reasonable out-of-pocket expenses actually incurred in the performance of duties in accordance with this Trust Agreement and with the approval of the Trust Monitor.

(b)   The Trust Administrator shall receive compensation for its services in respect of the Other Debtor Residual Accepted Assets and activities related thereto, to be paid out of the Other Debtor Residual Trust Administrative Cash, as the Trust Administrator and a majority in interest of the DIP lenders shall agree; provided that the Trust Administrator shall not be obligated to undertake any activities in respect of the Other Debtor Residual Accepted Assets unless such compensation arrangements shall be acceptable to the Trust Administrator in its sole discretion.

9.8.   No Personal Financial Liability.  No provision of the Plan, Confirmation Order or this Trust Agreement shall be construed as requiring the Trust Administrator to expend or risk its own funds or otherwise to incur any personal financial liability (x) in the performance of any of its duties thereunder or hereunder, including any situation where the Avoidance Action Trust Assets are insufficient to permit the administration of the Trust or distributions as contemplated herein or the payment of fees and expenses of the Trust

Professionals, or (y) in the exercise of any of its rights or powers afforded hereunder or
thereunder.

## ARTICLE X
## SUCCESSOR TRUST ADMINISTRATORS

10.1.    Resignation.  The Trust Administrator may resign from the Trust by
giving at least sixty (60) days' prior written notice thereof to the Trust Monitor.  Such
resignation shall become effective on the later to occur of (x) the date specified in such
written notice and (y) the effective date of the appointment of a successor Trust
Administrator in accordance with Section 10.4 hereof and such successor's acceptance of
such appointment in accordance with Section 10.5 hereof.

10.2.    Removal.  The holders of a majority of the Units or the DIP Lenders may
at any time petition the Bankruptcy Court for the removal of the Trust Administrator, but
only for good cause shown. Such removal shall become effective on the date ordered by
the Bankruptcy Court, provided that such removal shall not become effective until the
appointment of a successor Trust Administrator in accordance with Section 10.4 hereof
and such successor's acceptance of such appointment in accordance with Section 10.5
hereof.  The services of the Trust Administrator shall also terminate upon its bankruptcy,
provided that such termination shall not become effective until the appointment of a
successor Trust Administrator in accordance with Section 10.4 hereof and such successor's
acceptance of such appointment in accordance with Section 10.5 hereof.

10.3.    Effect of Resignation or Removal.  The resignation, removal or
bankruptcy of the Trust Administrator shall not operate to terminate the Trust or to revoke
any existing agency created pursuant to the terms of the Plan, the Confirmation Order or
this Trust Agreement or invalidate any action theretofore taken by the Trust Administrator.
The exculpation, indemnity and limitation of liability provisions of Article X of this Trust
Agreement shall survive the resignation, removal or bankruptcy of the Trust
Administrator.  All fees and expenses properly incurred by the Trust Administrator prior to
the resignation, Incompetency, removal or bankruptcy of the Trust Administrator shall be
paid from the Avoidance Action Trust Administrative Cash (other than in respect of the
Other Debtor Residual Accepted Assets and activities related thereto), from the Other
Debtor Residual Trust Administrative Cash (in respect of the Other Debtor Residual
Accepted Assets and activities related thereto) or from Avoidance Action Trust SEC
Reporting Cash (in respect of Avoidance Action Trust SEC Reporting Costs in accordance
with Section 2.3(e) hereof), unless such fees and expenses are disputed by (x) the Trust
Monitor or (y) the successor Trust Administrator, in which case the Bankruptcy Court
shall resolve the dispute and any disputed fees and expenses of the predecessor Trust
Administrator that are subsequently allowed by the Bankruptcy Court shall be paid from
the Avoidance Action Trust Administrative Cash (other than in respect of the Other Debtor
Residual Accepted Assets and activities related thereto), from the Other Debtor Residual
Trust Administrative Cash (in respect of the Other Debtor Residual Accepted Assets and
activities related thereto) or from Avoidance Action Trust SEC Reporting Cash (in respect
of Avoidance Action Trust SEC Reporting Costs in accordance with Section 2.3(e)

hereof).  In the event of the resignation, removal or bankruptcy of the Trust Administrator, such Trust Administrator shall:

(a)    promptly execute and deliver such documents, instruments and other writings as may be reasonably requested by the successor Trust Administrator or directed by the Bankruptcy Court to effect the termination of such Trust Administrator's capacity under this Trust Agreement;

(b)    promptly deliver to the successor Trust Administrator all documents, instruments, records and other writings related to the Trust as may be in the possession of such Trust Administrator; and

(c)    otherwise assist and cooperate in effecting the assumption of its obligations and functions by such successor Trust Administrator.

10.4.    _Appointment of Successor_.  In the event of the resignation, removal, Incompetency or bankruptcy of the Trust Administrator, the Trust Monitor shall promptly appoint a successor Trust Administrator, _provided_ _that_ such appointment shall not take effect unless approved by the Bankruptcy Court upon the petition of the Trust Monitor and until the successor Trust Administrator shall have delivered written acceptance of its appointment as described Section 10.5 below.  If a successor Trust Administrator does not take office within thirty (30) days after the resignation, removal, Incompetency or bankruptcy of the retiring Trust Administrator, the Bankruptcy Court, upon its own motion or the motion of the retiring Trust Administrator or any Trust Beneficiary, shall appoint a successor Trust Administrator.

10.5.    _Acceptance of Appointment by Successor Trust Administrator_.  Any successor Trust Administrator appointed hereunder shall execute an instrument accepting its appointment and shall deliver one counterpart thereof to the Bankruptcy Court for filing and to the Trust Monitor and, in case of the Trust Administrator's resignation, to the resigning Trust Administrator.  Thereupon, such successor Trust Administrator shall, without any further act, become vested with all the duties, powers, rights, obligations, title, discretion and privileges of its predecessor in the Trust with like effect as if originally named Trust Administrator and shall be deemed appointed pursuant to Bankruptcy Code Section 1123(b)(3)(B) ; _provided_, _however_, such successor Trust Administrator shall file an amendment to the Certificate of Trust with the Secretary of State as required by the Delaware Act.  The predecessor Trust Administrator shall duly assign, transfer and deliver to such successor Trust Administrator all Avoidance Action Trust Assets held by such predecessor Trust Administrator hereunder and shall, as directed by the Bankruptcy Court or reasonably requested by such successor Trust Administrator, execute and deliver an instrument or instruments conveying and transferring to such successor Trust Administrator upon the trusts herein expressed, all the duties, powers, rights, obligations, title, discretion and privileges of the predecessor Trust Administrator.

10.6.    _Successor Entity to Trust Administrator_. Any business entity into which the Trust Administrator may be merged or converted or with which it may be consolidated, or any entity resulting from any merger, conversion or consolidation to which the Trust

Administrator shall be a party, or any entity succeeding to all or substantially all of the corporate trust business of the Trust Administrator, shall be the successor of the Trust Administrator hereunder, without the execution or filing of any paper or any further act on the part of any of the parties hereto; *provided*, *however*, such successor Trust Administrator shall file an amendment to the Certificate of Trust with the Secretary of State as required by the Delaware Act.

## ARTICLE XI
## TRUST MONITOR

11.1.    General.

(a)    The Trust Monitor shall oversee the activities of the Trust Administrator as set forth in this Trust Agreement.  In all circumstances, the Trust Monitor shall act in the best interests of all Trust Beneficiaries, in furtherance of the purpose of the Trust, and in accordance with this Trust Agreement.

(b)    In furtherance of its rights and responsibilities under this Trust Agreement, the Trust Monitor shall have access, on reasonable advance notice and during regular business hours, to all such books and records of the Trust and the Trust Administrator, shall have the right to consult with all such professionals engaged by the Trust Administrator and shall participate in all such meetings of the Trust Administrator and the Trust Professionals as the Trust Monitor deems reasonably necessary or appropriate.  Any documents shared between the Trust Administrator and the Trust Monitor shall be subject to joint privilege, and such sharing shall not be deemed to waive any attorney-client or work product privilege in respect of such documents.

(c)    [Intentionally omitted.]

(d)    Notwithstanding anything in this Section 11.1 or Section 11.2 hereof, the Trust Monitor shall not take (or fail to take) any action which will cause the Trust (other than the Avoidance Action Trust Claims Reserve) to fail to qualify as a liquidating trust within the meaning of Treasury Regulation section 301.7701-4(d) that is treated as a grantor trust.

11.2.    Appointment and Removal of the Trust Monitor.

(a)    Subject to Section 11.2(d), the Trust Monitor shall serve until the earlier of (w) the final distribution of all Distributable Trust Assets and the Distributable Other Debtor Residual Trust Assets, if any, (x) its resignation pursuant to subsection (b) of this Section 11.2, (y) its removal pursuant to subsection (c) of this Section 11.2 or (z) its bankruptcy or insolvency.

(b)    The Trust Monitor may resign at any time by written notice of resignation to the Trust Administrator, a copy of which shall also be filed by the Trust Monitor with the Bankruptcy Court.  Such resignation shall be effective no earlier than sixty (60) days from the date of such notice or such earlier time as a successor is appointed in accordance with the provisions of subsection (d) of this Section 11.2.

(c)    The holders of a majority of the Units or the DIP Lenders may at any time petition the Bankruptcy Court for the removal of the Trust Monitor, but only for good cause shown.  Such removal shall become effective on the date ordered by the Bankruptcy Court.

(d)    In the event of the resignation, removal, bankruptcy or insolvency of the Trust Monitor, the Trust Administrator shall promptly appoint a successor Trust Monitor, _provided_ _that_ such appointment shall not take effect unless approved by the Bankruptcy Court upon the petition of the Trust Administrator and until the successor Trust Monitor shall have delivered written acceptance of its appointment as described in clause (e) of this Section 11.2 below; and _provided_ _further_ _that_ until a new Trust Monitor's appointment is effective, the resigning Trust Monitor's appointment shall remain in effect, and the resigning Trust Monitor shall fulfill all obligations and duties of the Trust Monitor.  If a successor Trust Monitor does not take office within thirty (30) days after the resignation, removal, incompetency, bankruptcy or insolvency of the retiring Trust Monitor, the Bankruptcy Court, upon its own motion or the motion of the retiring Trust Monitor or any Trust Beneficiary, shall appoint a successor Trust Monitor.

(e)    All fees and expenses properly incurred by the Trust Monitor prior to the resignation, Incompetency, removal or bankruptcy of the Trust Monitor shall be paid from the Avoidance Action Trust Administrative Cash (other than in respect of the Other Debtor Residual Accepted Assets and activities related thereto), from the Other Debtor Residual Trust Administrative Cash (in respect of the Other Debtor Residual Accepted Assets and activities related thereto) or from Avoidance Action Trust SEC Reporting Cash (in respect of Avoidance Action Trust SEC Reporting Costs in accordance with Section 2.3(e) hereof), unless such fees and expenses are disputed by (x) the Trust Administrator or (y) the successor Trust Monitor, in which case the Bankruptcy Court shall resolve the dispute and any disputed fees and expenses of the predecessor Trust Monitor that are subsequently allowed by the Bankruptcy Court shall be paid from the Avoidance Action Trust Administrative Cash (other than in respect of the Other Debtor Residual Accepted Assets and activities related thereto) from the Other Debtor Residual Trust Administrative Cash (in respect of the Other Debtor Residual Accepted Assets and activities related thereto) or from Avoidance Action Trust SEC Reporting Cash (in respect of Avoidance Action Trust SEC Reporting Costs in accordance with Section 2.3(e) hereof).

(f)    Any successor Trust Monitor appointed hereunder shall execute an instrument accepting its appointment and shall deliver one counterpart thereof to the Bankruptcy Court for filing and to the Trust Administrator.

(g)    Immediately upon effectiveness of the appointment of a successor Trust Monitor, all rights, powers, duties, authority, and privileges of the predecessor Trust Monitor hereunder will be vested in and undertaken by the successor Trust Monitor without any further act.  The successor Trust Monitor shall not be liable personally for any act or omission of the predecessor Trust Monitor.

11.3.    Approval of and Consultation with the Trust Monitor.

(I)    Other Than in Respect of the Other Debtor Residual Accepted Assets

(a)    Notwithstanding anything in this Trust Agreement to the contrary, the Trust Administrator shall submit to the Trust Monitor for its review and prior approval the following matters, in addition to any other matters that expressly require the approval of the Trust Monitor pursuant to the terms of the Plan, the Confirmation Order or this Trust Agreement:

(i)    Any decision to settle or otherwise resolve the Term Loan Avoidance Action;

(ii)    Any decision to refrain from making any distributions to the holders of Allowed General Unsecured Claims or Units, as the case may be, in accordance with this Trust Agreement, except as expressly permitted herein;

(iii)    Any decision to retain and/or to terminate the retention of Trust Professionals (other than legal counsel retained to represent the Trust Administrator in connection with its role as Trust Administrator, which shall be in the Trust Administrator's sole discretion);

(iv)    The incurrence of any cost or expense of the Trust in excess of 10% of any individual line item therefor in the approved Budget, measured on a quarterly basis; *provided*, *however*, that approval of the Trust Monitor shall not be required in the case of any cost or expense authorized by further order of the Bankruptcy Court;

(v)    The Budget described in Section 6.3 hereof and any changes thereto;

(vi)    Any amendment of this Trust Agreement as provided in Section 13.13 hereof; and

(vii)    Any distribution that is not made in accordance with the provisions of  Article V as contemplated by Section 5.7; *provided*, *however*, that any deviation from the provisions of Article V other than as contemplated by Section 5.7 shall also require approval of the Bankruptcy Court.

(b)    In addition to any other matters that expressly require consultation with the Trust Monitor pursuant to the terms of the Plan, the Confirmation Order or this Trust Agreement, the Trust Administrator shall consult with the Trust Monitor in advance of an application to the Bankruptcy Court to use, or to sell or borrow against, the Distributable Trust Assets in order to satisfy expenses of the Trust, as contemplated by Section 6.1(b) hereof.

(c)    In the event of any disagreement between the Trust Administrator and the Trust Monitor regarding any matter requiring the approval or direction of the Trust Monitor under this Trust Agreement, the Trust Administrator and the Trust Monitor shall consult and negotiate diligently and in good faith to resolve such disagreement.  If despite their good faith efforts, the Trust Administrator and the Trust Monitor are unable to resolve any disagreement, or the Trust Administrator cannot otherwise obtain approval or direction from the Trust Monitor as required by this Trust Agreement, the Trust Administrator may petition the Bankruptcy Court, with a copy to the Trust Monitor, requesting such approval or direction.

(II)    In Respect of the Other Debtor Residual Accepted Assets

The Trust Monitor shall have the rights, powers and privileges to act in respect of the Other Debtor Residual Accepted Assets, if any, in the manner set forth in Section 11.3 (I), *mutatis mutandis* and to the extent applicable.  For the avoidance of doubt, the Trust Monitor shall no be obligated to undertake any activities in respect of the Other Debtor Residual Trust Assets unless there shall be available sufficient Other Debtor Residual Trust Administrative Cash to pay in full its fees, costs and expenses in respect thereof.

11.4.    Exculpation and Indemnification; Limitation of Liability.  To the fullest extent permitted by applicable law, the Trust Monitor Parties shall not be subject to personal liability, and shall be exculpated and indemnified, and shall have the right to obtain advances to cover reasonable expenses of defense, to the same extent as the Trust Administrator Parties pursuant to Section 9.2, Section 9.4, Section 9.5, Section 9.6 and Section 10.3.  In no event will the Trust Monitor Parties be liable for punitive, exemplary, consequential, special or other damages for a breach of, or otherwise in connection with, this Trust Agreement under any circumstances.

11.5.    Compensation and Expenses.

(a)    The Trust Monitor shall receive fair and reasonable compensation for its services (other than in respect of the Other Debtor Residual Accepted Assets and activities related thereto), to be paid out of the Avoidance Action Trust Administrative Cash, in accordance with the approved Budget (or from the Avoidance Action Trust SEC Reporting Cash in accordance with Section 2.3(e) hereof).  The Trust Monitor shall be entitled on a monthly basis, without the need for approval of the Bankruptcy Court, to direct the Trust Administrator to reimburse the Trust Monitor (i) from the Avoidance Action Trust Administrative Cash for all reasonable out-of-pocket expenses actually incurred in the performance of duties in accordance with this Trust Agreement, consistent with the Budget prepared pursuant to Section 6.3 hereof and (ii) from the Avoidance Action Trust SEC Reporting Cash for such compensation and all reasonable out-of-pocket expenses actually incurred in the performance of duties in accordance with this Trust Agreement.

(b)    The Trust Monitor shall receive compensation for its services than in respect of the Other Debtor Residual Accepted Assets and activities related thereto, to be paid out of the Other Debtor Residual Trust Administrative Cash, as the Trust Monitor and a majority in interest of the DIP lenders shall agree; provided that the Trust Monitor shall not be obligated to undertake any activities in respect of the Other Debtor Residual Accepted Assets unless such compensation arrangements shall be acceptable to the Trust Monitor in its sole discretion.

# ARTICLE XII
# ACTION BY MAJORITY OF HOLDERS OF UNITS

Holders of a majority of the Units or the DIP Lenders from time to time outstanding may petition the Bankruptcy Court to remove the Trust Administrator in accordance with Section 10.2 or to remove the Trust Monitor in accordance with Section 11.1, but in each case only for good

cause shown.  In determining whether the holders of a majority of the Units have concurred in any such petition, Units held by the Trust Administrator or the Trust Monitor or any of their respective Affiliates shall be disregarded.

## ARTICLE XIII
## MISCELLANEOUS PROVISIONS

13.1.    Actions Taken on Other Than Business Day.  In the event that any payment or act under the Plan, the Confirmation Order or this Trust Agreement is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

13.2.    Governing Law.  This Trust Agreement shall be governed by and construed in accordance with the laws of the State of Delaware without giving effect to rules governing conflicts of law.

13.3.    Jurisdiction.  Subject to the proviso below, the parties agree that the Bankruptcy Court shall have exclusive and continuing jurisdiction over the Trust and the Trust Administrator, including the administration and activities of the Trust and the Trust Administrator; _provided_, _however_, that notwithstanding the foregoing, the Trust Administrator shall have power and authority to bring any action in any court of competent jurisdiction to prosecute any claims or Causes of Action assigned to the Trust, including the Delaware Chancery Court, the Delaware Superior Court and the Delaware Supreme Court.

13.4.    Third Party Beneficiary.  Trust Beneficiaries (including the DIP Lenders in their capacities as such) are third party beneficiaries of this Trust Agreement.  The Trust Administrator Parties (other than the Trust Administrator) are third party beneficiaries of the provisions of Section 9.2, Section 9.4 and Section 9.6 of this Trust Agreement. The Trust Monitor Parties (other than the Trust Monitor) are third party beneficiaries of the provisions of Section 11.4 of this Trust Agreement, and, to the extent incorporated therein, Section 9.2, Section 9.4, Section 9.5 and Section 9.6 of this Trust Agreement.  Except as aforesaid, there are no other third party beneficiaries of this Trust Agreement.

13.5.    Severability.  In the event any provision of this Trust Agreement or the application thereof to any person or circumstances shall be determined by a final, non-appealable judgment or order to be invalid or unenforceable to any extent, the remainder of this Trust Agreement or the application of such provision to persons or circumstances or in jurisdictions other than those as to or in which it is held invalid or unenforceable, shall not be affected thereby, and each provision of this Trust Agreement shall be valid and enforceable to the fullest extent permitted by law.

13.6.    Notices.  Any notice or other communication required or permitted to be made under this Trust Agreement shall be in writing and shall be deemed to have been sufficiently given, for all purposes, if delivered personally, by email, facsimile, sent by nationally recognized overnight delivery service or mailed by first-class mail:

(A)    if to the Trust Administrator, to:

Wilmington Trust Company
Rodney Square North
1100 North Market Street
Wilmington, Delaware, 19890-1615
Phone: (302) 636-6000
Fax: (302) 636-4140
Attn: Corporate Trust Administration

With a copy to:

Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166-0193
Phone: (212) 351-3991
Fax: (212) 351-6391
Attn: Matthew Williams and Keith Martorana

(B)    if to the Trust Monitor, to:

FTI Consulting, Inc.
1201 W. Peachtree St., Suite 600
Atlanta, GA 30309

(C)    if to any Trust Beneficiary, to:

    (1)    in the case of a DIP Lender,

        a.    if to the U.S. Treasury, to:

           United States Department of the Treasury
           1500 Pennsylvania Avenue, NW
           Washington, D.C. 20220
           Attn: Chief Counsel, Office of Financial Stability
           Telecopier: (202) 927-9225

        b.    if to EDC, to:

           Export Development Canada
           151 O'Connor Street
           Ottawa, Ontario
           Canada K1A 1K3
           Attention: Loans Services
           Telecopy: 613-598-2514;

           with a copy to:

>Export Development Canada
>151 O'Connor Street
>Ottawa, Ontario
>Canada K1A 1K3
>Attention: Asset Management/Covenants Officer
>Telecopy: 613-598-3186

(2)    in the case of a holder of an Allowed General Unsecured Claim, to the last known address of such holder according to the Debtors' Schedules and/or such holder's proof of claim; and

(3)    in the case of holder of Units, to such address as appears on the books and records of the Trust Administrator, or such other address as may be designated from time to time by notice given in accordance with the provisions of this <u>Section 13.6</u>.

13.7.   <u>Headings</u>.  The headings contained in this Trust Agreement are solely for convenience of reference and shall not affect the meaning or interpretation of this Trust Agreement or of any term or provision hereof.

13.8.   <u>Plan</u>.  The terms of this Trust Agreement are intended to supplement the terms provided by the Plan and the Confirmation Order.  To the extent that the terms of sections 5.6 and 6.5 of the Plan are inconsistent with the terms set forth in this Trust Agreement with respect to the Trust, then the terms of the Trust Agreement shall govern. All other provisions of the Plan shall supersede the provisions of this Trust Agreement, including section 6.15 of the Plan, which provides that the restrictions set forth in paragraph 20 of the Final Order approving the DIP Credit Agreement (ECF No. 2529) shall continue to apply.

13.9.   <u>Ambiguities and Construction</u>.

(a)   The Trust created by this Trust Agreement (other than the Avoidance Action Trust Claims Reserve) is intended to qualify as a liquidating trust under Treasury Regulation section 301.7701-4(d) for U.S. federal and applicable state and local income tax purposes and, to the extent provided by law, shall be governed and construed in all respects as such a trust and any ambiguity herein shall be construed consistent herewith and, if necessary, this Trust Agreement may be amended to comply with such U.S. federal and applicable state and local income tax laws, which amendments may apply retroactively.

(b)   Unless the context otherwise requires:

(i)    a term has the meaning assigned to it;

(ii)    "or" is not exclusive;

(iii)    words in the singular include the plural, and in the plural include the singular;

(iv)    all references herein to Articles, Sections and other subsections, unless referring specifically to the Plan or provisions of the Bankruptcy Code, the Bankruptcy Rules, or other law, statute or regulation, refer to the corresponding Articles, Sections and other subsections of this Trust Agreement;

(v)    the words "hereof," "herein," "hereunder" and similar words refer to this Trust Agreement as a whole and not to any particular provision, Article, Section or subsection of this Trust Agreement unless otherwise specified;

(vi)    words importing persons shall include firms, associations, corporations and other entities;

(vii)    any pronoun shall include the corresponding masculine, feminine and neuter forms; and

(viii)    "including" means including without limitation.

13.10.    Entire Trust Agreement.  This Trust Agreement contains the entire agreement between the parties and supersedes all prior and contemporaneous agreements or understandings between the parties with respect to the subject matter hereof.

13.11.    Cooperation.  The Debtors shall turn over or otherwise make available to the Trust Administrator at no cost to the Trust or the Trust Administrator, all books and records reasonably required by the Trust Administrator to carry out its duties hereunder, and agree to otherwise reasonably cooperate with the Trust Administrator in carrying out its duties hereunder, subject to the obligation to preserve the confidential nature of the Debtors' books and records, as provided in Section 13.12.

13.12.    Confidentiality.  The Trust Administrator and the Trust Monitor, and their respective employees, members, agents, professionals and advisors, including the Trust Professionals (each a "Confidential Party" and collectively the "Confidential Parties") shall hold strictly confidential and not use for personal gain any material, non-public information of which they have become aware in their capacity as a Confidential Party, of or pertaining to any Debtor to which any of the Avoidance Action Trust Assets relates or which is otherwise received from the Debtors by the Trust; *provided*, *however*, that such information may be disclosed if

(i)    it is now or in the future becomes generally available to the public other than as a result of a disclosure by the Confidential Parties; or

(ii)    such disclosure is required of the Confidential Parties pursuant to legal process, including subpoena or other court order or other applicable laws or regulations.

In the event that any Confidential Party is requested to divulge confidential information pursuant to clause (ii), such Confidential Party shall promptly, in advance of making such disclosure,

provide reasonable notice of such required disclosure to the Trust Administrator (or the Trust Monitor in case the Trust Administrator is the disclosing party) to allow sufficient time to object to or prevent such disclosure through judicial or other means and shall cooperate reasonably with the Trust Administrator (or the Trust Monitor, as applicable) in making any such objection, including appearing in any judicial or administrative proceeding in support of any objection to such disclosure.

13.13.  <u>Amendment and Waiver</u>.

(a)   The Trust Administrator, with the approval of the Trust Monitor, may amend or supplement this Trust Agreement without notice to or consent of the Bankruptcy Court or any Trust Beneficiary for the purpose of (x) curing any ambiguity, omission, inconsistency or correcting or supplementing any defective provision; (y) evidencing and providing for the acceptance of the appointment of a successor Trust Administrator or Trust Monitor; or (z) making any other changes to this Trust Agreement that does not adversely affect the interests of the Trust Beneficiaries in any material respect.

(b)   The Trust Administrator may amend or supplement this Trust Agreement for any other purpose, but only on petition to, and with the approval of, the Bankruptcy Court; *provided* that (x) no amendment or supplement to this Trust Agreement shall be inconsistent with the purpose and intent of the Trust to dispose of in an expeditious but orderly manner the Avoidance Action Trust Assets in accordance with the terms of the Plan, the Confirmation Order and this Trust Agreement, and (y) this Trust Agreement shall not be amended in a manner that is inconsistent with the Plan in the form confirmed by the Bankruptcy Court, subject to any post-confirmation modifications to the Plan pursuant to Section 1127 of the Bankruptcy Code.

(c)   Any amendment to this Trust Agreement shall be filed with the Bankruptcy Court.

(d)   No amendment shall be made to any provision of this Trust Agreement that materially and adversely affects the rights of the DIP Lenders without the written consent of the DIP Lenders.

(e)   The Trust Administrator shall file any amendment to the Certificate of Trust with the Secretary of State as may be required or permitted by the Delaware Act.

13.14.  <u>Counterparts</u>.  This Trust Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all such counterparts shall together constitute but one and the same instrument.  A facsimile or portable document file (PDF) signature of any party shall be considered to have the same binding legal effect as an original signature.

**[Remainder of Page Blank — Signature Pages Follows]**

**IN WITNESS WHEREOF**, the parties hereto have executed this Trust Agreement or caused this Trust Agreement to be duly executed by their respective officers, representatives or agents, effective as of the date first above written.

MOTORS LIQUIDATION COMPANY

By:_____
    Name:
    Title:

MLC OF HARLEM, INC.

By:_____
    Name:
    Title:

MLCS, LLC

By:_____
    Name:
    Title:

MLCS DISTRIBUTION CORPORATION

By:_____
    Name:
    Title:

REMEDIATION AND LIABILITY MANAGEMENT COMPANY, INC.

By:_____
    Name:
    Title:

ENVIRONMENTAL CORPORATE REMEDIATION COMPANY, INC.

By:_____
    Name:
    Title:

**WILMINGTON TRUST COMPANY, as Trust Administrator and trustee**


By:_____
    Name:
    Title:


– and –

**FTI CONSULTING, INC., as Trust Monitor**


By:_____
    Name:
    Title:

[Signature Page to Motors Liquidation Company Avoidance Action Trust Agreement]

**Draft of February 26, 2010**

**Exhibit A**

<u>Cash Accounts</u>:

Avoidance Action Budget Sub Account
Avoidance Action Assets Sub Account
Avoidance Action Trust SEC Reporting Costs Account

**Exhibit B**

**FORM OF**
**CERTIFICATE OF TRUST**
**OF**
**MOTORS LIQUIDATION COMPANY AVOIDANCE ACTION TRUST**

THIS Certificate of Trust of Motors Liquidation Company Avoidance Action Trust (the "Trust") is being duly executed and filed on behalf of the Trust by the undersigned, as trustee, to form a statutory trust under the Delaware Statutory Trust Act (12 Del. C. § 3801 et seq.) (the "Act").

1.       Name.  The name of the statutory trust formed by this Certificate of Trust is Motors Liquidation Company Avoidance Action Trust.

2.       Delaware Trustee.  The name and business address of the trustee of the Trust with a principal place of business in the State of Delaware are Wilmington Trust Company, 1100 North Market Street, Wilmington, Delaware 19890, Attn: Corporate Trust Administration.

3.       Effective Date.  This Certificate of Trust shall be effective upon filing.

IN WITNESS WHEREOF, the undersigned has duly executed this Certificate of Trust in accordance with Section 3811(a)(1) of the Act.

WILMINGTON TRUST COMPANY, not in its individual capacity but solely as Trust administrator and trustee


By:_____
Name:
Title: